# IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA, Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al, Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place: San Diego, California

Date: May 27, 1960

Pages: 13,401 to 13,532

FILED
SEP 24 1963
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By [signature] DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

\- - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

\- - - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs FALLBROOK PUBLIC UTILITY DISTRICT, et al., Defendants. | No. 1247-SD-C |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

San Diego, California
Friday, May 27, 1960

APPEARANCES:

FOR THE PLAINTIFF: WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General, Department of Justice, Washington, D.C.

LCDR DONALD W. REDD

FOR THE DEFENDANTS:

For Defendant Fallbrook Public Utility District, et al.: FRANZ R. SACHSE, ESQ.,

APPEARANCES (continued)

FOR THE DEFENDANTS (continued):

| | |
|---|---|
| For Defendant Vail Company | GEORGE STAHLMAN, ESQ., |
| For Defendant State of California | STANLEY MOSK, ESQ., Attorney General, By FRED GIRARD, ESQ., Deputy Attorney General. ERNEST SANCHEZ, ESQ. |
| For Defendants Gibbon and Cottle | GEORGE GROVER, ESQ. |

INDEX TO WITNESSES



| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| L.J. Tripp | 13,436 | | | |
| Lee Illingworth | 13,509 | 13,515 (by Mr. Veeder)<br>13,525 (by Mr, Stahlman) | | |
| Mr. Wilkinson | 13,523 | | | |



INDEX TO EXHIBITS



| For the Defendants: | For Identification | In Evidence |
|---|---|---|
| California's AX | | 13,526 |



MISCELLANEOUS


1. Mr. Veeder and Mr. Stahlman to prepare summary of record as to Vail's case. 13,425
2. Discussion of Interlocutory Decree re Vali Stipulated Judgment. 13,426

SAN DIEGO, CALIFORNIA, FRIDAY, MAY 27, 1960, 10:00 A. M.

- - -

THE CLERK: 2 - 1247-SD-C United States of America v. Fallbrook etc., et al. Further court trial.

MR. GIRARD: Your Honor, I would like to request that Mr. Ernest Sanchez, of our Los Angeles office, be associated as Counsel of record in the case. He has been doing some work in the Los Angeles office and is here now primarily to see the proceedings that he has been reading about. He is admitted to the Federal District Court in this District.

THE COURT: I am glad to permit your association in this case, Mr. Sanchez.

Where is Mr. Grover?

MR. VEEDER: I haven't seen him, your Honor.

May we go on with something else until Mr. Grover shows up?

THE COURT: Yes. Hadn't we better put in a call to see if he is coming in?

MR. VEEDER: I have received a letter from him saying that he is going to be here. But I will be glad to have the girl call.

We had a discussion last evening, your Honor, in regard to the properties which are situated in the towns of Temecula, Murrieta and Wildomar. Mr. Sachse has clients in the area. The Vail Company owns some lots in Temecula, as I recall. It

was agreed among us that the letter which your Honor sent out for May 26th and 27th would be appropriate for use within those town areas. It is true that those people probably are largely domestic users. But the matter has been brought up and I have discussed it with Counsel. Whether they want to exercise their domestic preference is up to them. All of them are overlying owners and are they are entitled to a correlative share, and unless your Honor has some objection to using --

THE COURT: Lets see that letter.

(Mr. Veeder hands document to the Court.)

MR. VEEDER: It will be noted that in there reference is made to a determination as to whether the lands are overlying or not. That was your letter on the 26th. There is no question in regard to the land --

THE COURT: We had another letter, didn't we?

MR. VEEDER: The first letter. That would be the one to use, yes.

THE COURT: Where is it?

MR. VEEDER: I can get a copy of it, if you want it. It would be the one we have used between the defaults.

THE COURT: Have we any of those in the Exhibit?

MR. VEEDER: Yes, we have, your Honor.

May I have Exhibit 207E?

There are the ones that we used on the April 26th hearing (handing document to the Court)

THE COURT: This is the letter that should be used rather than the one you first handed me.

MR. VEEDER: That is right your Honor.

As I understand from Mr. Girard and Mr. Sachse they have no objection to using that.

MR. SACHSE: The letter that recites that they are overlying landowners?

MR. VEEDER: That is right.

MR. SACHSE: Yes.

THE COURT: All right.

MR. VEEDER: If it is agreeable, we will use that letter then.

THE COURT: What do you do about these people you write letters to and that we don't even hear from them?

MR. VEEDER: That was the point I raised yesterday.

THE COURT: Put the copies of the letters in evidence together with the affidavit of mailing?

MR. VEEDER: We are filing each time the affidavit of mailing covering all the parties.

THE COURT: With the affidavit of mailing are you attaching a form of the letter that you sent?

MR. VEEDER: That is correct, your Honor. But here is the thing that concerns me, and the matter I brought up to your Honor. The letters that are returned to us and the letters to which there is no response create a situation where

ultimately we are going to have to move for a default judgement as I see it, where they haven't filed answers.

THE COURT: It may be a default in the sense that they dont appear, but we will make findings as we outlined in the letter.

MR. VEEDER: That would be the default judgement in regard to the people who haven't even filed an answer. There are a lot of those, your Honor.

THE COURT: I don't like the use of the word "default". We are talking about the same thing.

MR. VEEDER: I will use whatever term your Honor desires. I think to clear the record on these things we are going to have to do that.

THE COURT: It would seem to me that what you would do -- you have so many of them in there -- you would probably take them by areas, throw as many in one judgement as are in some one area or in the whole valley, if you want to do it in one judgement, and you would recite that as to certain of them they had replied to the letter sent out, copy of which is attached to this judgement, and have agreed that the proposed findings as indicated in the letter are proper; that as to another group a letter had been sent out, a copy of which is attached to this judgement, affidavit of mailing is on file, and that no word was received from them, and that, as stated in the letter, if they were satisfied, we would enter the

judgement as indicated in the letter and that therefore accordingly we find that they have so many acres of ground and so much is irrigable and that it is overlying ground and that they have correlative rights.

It is not a default judgement, because in the letter itself we say, "if you are disatisfied, come in and be heard; but if you are satisfied, this is what we are going to do."

MR. VEEDER: I would be very pleased to handle it that way, your Honor. I used the term "default" simply by reason of the fact that they had not appeared.

THE COURT: Lets not use it. It doesn't sound good in this record. We are talking about the same thing.

MR. VEEDER: All right.

THE COURT: How many of these letters will go out?

MR. VEEDER: In the whole watershed?

THE COURT: No, you are estimating now on these three townsites.

MR. VEEDER: What we intend to do is to conclude by mailing to the last people whose lands are situated in 207-C-1, which is the map of the Pauba; Murrieta areas, which your Honor has seen. Those owners, together with the properties in the three towns, will run somewhat in excess of 300. I haven't made a calculation as to the number in the town, but there are 300 people who will be notified.

THE COURT: Are these descriptions in the townsite by

lot and tract?

MR. VEEDER: They are by lot?

THE COURT: What else -- block, tract?

MR. VEEDER: Yes, they are. They are referred to, for example, in the town of Temecula by block and lot.

THE COURT: We don't have any appreciable number of metes and bounds descriptions then?

MR. SACHSE: Not in the townsite, your Honor.

MR. VEEDER: No, there is not an appreciable number but there are some.

THE COURT: The only other suggestion that I have is that these hieroglyphics that you put on these letters, tucked them around on the corner somewhere, no layman would know what you are talking about. Let me see what we are talking about. They mean a lot to you, but they don't mean anything to the person who gets the letter. I am refering here to a letter that went out to the Withrow; up in the corner it says "19-47 217."

MR. VEEDER: It doesn't mean a thing to anybody but the Clerk, the Recorder, the Assessor and this Court; but I am sure that it doesn't mean anything to the man who receives it.

THE COURT: You have altered that a little on some of the later letters that went out.

MR. VEEDER: In some them we did refer to the Exhibit numbers, but I don't believe that that was very often.

THE COURT: Yes, the later letters had at the top Exhibit Number so-and-so, Parcel Number so-and-so. I think that is a better form. But I think in the case of these townsites where you don't have descriptions you might as well put their Lot and Block Number right in there.

MR. VEEDER: To the extent that we have the descriptions we will do that your Honor.

THE COURT: All right.

MR. VEEDER: As I understand it, Mr. Grover is on his way in, your Honor. His office said that he had left there.

Here he is now.

MR. GIRARD: While we are waiting for Mr. Grover to get settled, I wonder if we can discuss the future progress of this case.

THE COURT: All right.

MR. GIRARD: If we could move on these individual parcels just about as fast as Colonel Bowen can make his surveys, because I am sure that with limited facilities he can't make enough surveys to give us any more than two or three days a month of hearings on these individual parcels. We still have the evidence remaining from the United States on rebuttal and I presume some from Vail on the major aspects of the case. If at all possible I would suggest that maybe we could try to go ahead on some of that without waiting until we find when we wind up all of the individual total acres and irrigable acres

on these smaller parcels. As I look at the case, the only evidence that has to go in, as far as the major elements of the case are concerned, are whatever Vail wants to put in and the United States' rebuttal, and if they are ready to go ahead I would like to suggest that we do it in the near future.

THE COURT: When are you going to be ready, Mr. Veeder?

MR. VEEDER: As I understand it, Mr. Stahlman is going to amend his pleadings and put in evidence in support, I assume, of his amended pleadings and when that transpires then we can talk about rebuttal. But I am certainly not going to talk about rebuttal in the present posture of this litigation. I think I said long, long ago that until your Honor has ruled on this stipulated judgement, until we know what the Vail Company is going to do, I don't dare to rest.

THE COURT: Do you want me to rule on the stipulated judgement before you rest?

MR. VEEDER: Well, yes.

THE COURT: Why?

MR. VEEDER: For the very simple reason, your Honor, if your Honor does as he says he is most anxious to do, namely, rule against us, then my course of action will be a complete reappraisal of the litigation, and I don't look at it as a game where we can easily decide what to do. If your Honor rules against us we have the situation of a tremendous Camp largely built outside the watershed dependent upon that stip-

ulated judgement, and the responsibility is such that I certainly would want to be free, and without having to open my case again, to determine what we must do.

Secondly, Mr. Stahlman stated yesterday that he intends to put in evidence in regard to Santa Rosa and in regard to the irrigable acreage in Santa Rosa and in regard to I don't know what else. But he hasn't pleaded in regard to those lands, and again I certainly wouldn't state what my position would be until he has amended his pleadings and set forth the kind of claim that he is going to assert and the extent of the claim and the quantities of water. Everything turns on the present status of the pleadings and the present status of the course which the Vail Company is going to pursue. So to ask me about rebuttal is to anticipate a good long way, under the circumstances.

MR. SACHE: Your Honor, if Mr. Veeder is right, if the pleadings are not in order, I can agree with him. But if that isn't the fact, this is the first time that I have ever heard of a party in a quiet title action telling the Court, I want your Honor to rule on some of this quiet title and then I will decide what kind of case I am going to put on. I think the Plaintiff puts on a case -- good, bad or indifferent. When he puts it on, then the Defendants meet it --- good, bad or indifferent.

Speaking personally for a moment, I certainly/with Mr. agree

Girard. It seems to me that the whole theory under which we started to try this, from the mechanical standpoint, has kind of gone by the boards. And I am not critical of anybody. We originally, I think, all had the hope that this Court would concern itself principally with the large users and the direct riparian claimants and that the small users would be disposed of before the Master. For a great many reasons that has not worked out as expected, and I agree with Mr. Veeder that this current procedure followed before your Honor is probably more effective that before the Master.

(See next page.)

I am not quarreling about that.

But I don't see why the basic idea can't still be followed, namely, that we proceed with the principal case and set aside one day a week or one day every two weeks or whenever Colonel Bowen's facilities enable him to be ready for these little people, set aside one day for that matter, and at the same time continue with the case, which was our original idea. I don't think that anyone will deny that we contemplated your Honor trying the big case and that periodically the little ones would be disposed of at the same time.

I am not complaining, but I want to point out that it is kind of a hardship to some of us of necessity not only to sit through a great deal of this with which we are not concerned, but not to know when to be ready, how this thing is going to proceed, when we should be prepared to consider whether we have sur-rebuttal or what the problem is.

I think we are the stage in this case where 60 to 90 days of work, if we could do it, would close up the taking of evidence. I am sure that it would do it.

THE COURT: We could do it in less than that, if we could do that continuously.

MR. SACHSE: I say 60 to 90 days because I know that your Honor is interrupted a good deal.

THE COURT: But I doubt that Colonel Bowen could keep up that kind of schedule.

MR. SACHSE: I don't see why the large defendants we

can't dispose of, put the United States to rebuttal evidence then. I don't think that their evidence is going to change five cents' worth. Mr. Veeder is not creating the evidence. I don't care what your Honor's conclusion is going to be, the evidence is going to be the same. Mr. Kunkel is planning to leave for Europe. Mr. Kunkel has some new exhibits. I know that they have prepared their hydrographs on wells because we hav e been getting them. I don't see why we can't go ahead in June and July and get this material in and let Mr. Kunkel go to Europe. It is not as though Mr. Veeder would want to hire a new geologist. The facts are going to be the same. It is a question of what facts Mr. Veeder wants to put in evidence, that's all.

I would strongly request, as one of the attorneys for one of the major litigants, that we do try to arrange a schedule that would permit us to move on the part of the big litigants in this case.

MR. STAHLMAN: Your Honor, I don't know, when we get into these matters here Mr. Veeder comes up with something like the pleadings this morning. If he has something that he is going to attack in the pleadings, we ought to sit down and have it heard.

THE COURT: Are you talking about amending the Answer?

MR. STAHLMAN: No, I don't think it needs amending, your Honor, especially in view of the ruling that Judge Yankwich

made in regard to dispensing with cross-pleadings.

This matter that he talks about that we haven't pleaded Santa Rose, here is the situation on Santa Rosa. The day before yesterday I received from Colonel Bowen the report on the De Luz area, and yesterday on the Sandia area. We just want the usual time to look those over. I think we can dispense with that. Then we can have the evidence on the balance of the Santa Rosa Ranch.

THE COURT: Is there a survey going to be made on the balance of it?

MR. STAHLMAN: Yes, your Honor. And it won't take too long to do that. I think that within the reasonably near future we can set a date and the Vail Company will put on the balance of its testimony, that together with this other evidence that your Honor requested with relation to the matters pertaining to the dam and the Pauba well, and there are a couple of other loose ends, with some readjustments on so me other matters in connection with it.

However, I don't see why, whether Mr. Veeder calls it rebuttal or what, with these well tests going on for this length of time and tests on which we may wish to present certain testimony, we can't hear from Mr. Kunkel to say at least what has progressed up to this point. There is a map here. We think we know what certain things mean on there, but maybe they don't; and I think we ought to have the right to question Mr. Kunkel in connection with the work that he has

done and to have the exhibit that they have prepared marked and put in court here -- especially when last evening he said that he is going to Helsinki on August 4. He may never come back.

MR. VEEDER: Oh, yes.

MR. STAHLMAN: Well, it's kind of dangerous going over there now.

MR. VEEDER: Then I'll not let him go.

But as to Mr. Veeder holding back rebuttal, there is nothing mysterious or secretive about this evidence. We let them put these recorders on. We cooperated and went out with them and spent time with them. And I think that now we should begin to put some of these things together, so that we know what co nclusions they are making in relation to these tests. There shouldn't be any mystery about it or any holding back and waiting and not going into rebuttal.

As Mr. Sachse says, Mr. Veeder hasn't even rested yet in this case, and he is talking about other people putting on evidence. We have progressed as rapidly as we could. I think it will take about two more days for Vail within a reasonable time after we have had an opportunity to make comparison between the Sandia and the De Luz. We will probably be in the same position as other defendants in relation to Colonel Bowen's analysis. But the balance of the Ranch we have to do ourselves. We have to elininate these two.

I think the next date you set is the 23rd and 24th. Next month we will be ready to go ahead and finish our two days. But if Mr. Veeder is going to have some rebuttal, we will probably have sur-rebuttal, too. But I think we should know what these exhibits are tending toward, so that in the meantime we will not be kept in the dark.

THE COURT: Mr. Girard.

MR. GIRARD: Your Honor, I would like to make one very brief comment on this problem of amending the pleadings and all that type of thing.

I will probably get fired for this by the Los Angeles office. But I have Judge (Special Master) Rifkind's decision. Arizona attempted to amend their pleadings. He cites some cases here to the effect that in a lawsuit like this pleadings don't mean anything; it is the relevant legal principles governing the decision in the light of the facts, regardless of the pleadings.

If we can't move ahead without every time worrying about the pleadings, we are wasting our time.

THE COURT: That was my impression.

Let's talk about this Answer. What is wrong with it?

MR. VEEDER: May I respond, your Honor? These people who don't have responsibilities speak very freely.

Here is our situation. Your Honor says that he is going to rule against us, if you can, on the stipulated judgment.

THE COURT: I didn't say "if I can."

MR. VEEDER: That you desired to.

MR. GIRARD: If the facts support it.

MR. VEEDER: No, you said that your own inclination was that if you can rule against us you will. I accept that. I proceed on that basis. But I say this --

THE COURT: That is not exactly what I said, Mr. Veeder. I haven't announced a ruling. Probably from what I said I indicated that I was leaning toward that ruling. It is not a matter of a desire to do one thing or the other. It is a matter of what the law and the facts would indicate.

MR. VEEDER: In any event, it is one lawsuit where we can use water outside the watershed as against the Vail Company. It is entirely another lawsuit if your Honor rules against us. It is completely different.

THE COURT: What has that to do with the pleadings?

MR. VEEDER: I refer to the Second Affirmative Defense of the Vail Company:

> "The Vail Company holds title in fee to lands in excess of 40,575 acres riparian to the Santa Margarita River. Of this land in excess of 29,410 acres can be practicably and profitably irrigated."

Now if I understand that pleading, that relates to the Pauba Ranch. If I am wrong on this, George, correct me.

". . . If available, in excess of 79,510 acre feet of water from the Santa Margarita would be applied profitably to these lands. Presently, due to the shortage of water, only about 4500 acres of land of the Vail Company are being irrigated.

"In addition to the lands designated in the preceding paragraph, Vail Company holds title in fee simple to other large acreage riparian to many streams and tributaries of the Santa Margarita stream system and to which said Vail Company has a correlative right to the use of water together with other riparian owners . . ."

(see next page)

THE COURT: Isn't that broad enough to cover any other type of land that they have?

MR. VEEDER: No, not to me it isn't, your Honor. Because I am extremely anxious now to know the extent of the demands that they are making on Sandia and on De Luz. Because so far as I am concerned, this lawsuit is deadly earnest. If you rule against us, I truly don't know what the exact status of the Marine Corps is going to be. I went over this matter last night with Colonel Bowen and the others. I assume that we would be greatly prejudiced. When all is said and done, I have to assume the responsibility of these matters. We would be greatly prejudiced.

THE COURT: Let's talk about one thing at a time.

MR. VEEDER: All right.

THE COURT: I have as high a regard for the Marine Corps as you have probably. That is not the question here. It is a question of water law.

MR. VEEDER: The pleadings are deficient because they simply do not describe the extent and the nature of the rights that they are now asserting in regard to the De Luz and the Sandia areas, and they are not included in the pleadings --

MR. SACHSE: There is no law, to the best of my knowledge, that the extent of the riparian right as to be pleaded other than the simple statement that the riparian right exists.

THE COURT: The pleadings allege that the Vail Company

own the Santa Rose and the Pauba.

MR. STAHLMAN: Why is he so exercised about Sandia? There is water that flows down there. But that land will probably go in the category that your Honor indicated as being a nebulous right. How are we going to use the water down there? It accumulates in those areas and flows down precipitous canyons. Mr. Yackey has a dam. He will probably get the water out of Vail dam. Otherwise it goes down Sandia and De Luz . They will get the benefit of that water. If there were facilities in the Deluz and the Sandia area by which water could economically and feasibly be used, we would have filed on the water. It only comes down there in the rainy season.

THE COURT: Let's see the Vail answer. Is this the last answer?

MR. VEEDER: No, your Honor. I will tender to you what I have on it. Here it is -- Second Affirmative Defense.

THE COURT: There was an amendment.

MR. VEEDER: That related to George's attack on the stipulated judgment. He didn't plead any acreages there.

THE COURT: Did that supercede the prior answer?

MR. STAHLMAN: It incorporates the original answer insofar as it is inconsistent with the subsequent answer.

MR. VEEDER: That is my personal file. If you would like to take a look at the Court record, that would probably be the

better thing to do.

MR. STAHLMAN: I don't see where the Vail Company has to plead any different than anybody else.

MR. VEEDER: You have pleaded in regard to the Pauba, but you didn't plead in regard to the Sandia.

MR. STAHLMAN: I think that is a pleading there. You read it.

THE COURT: What is this 40,575 figure?

MR. STAHLMAN: That was the figure that at the time had been exportized.

MR. VEEDER: What is this "exportized"? What does that mean?

MR. STAHLMAN: You know what it means.

THE COURT: I don't understand. What is the 40,575 figure?

MR. STAHLMAN: The 40,500 figure was the amount of land that Coit had included within the survey, your Honor. It included part of the three ranches and part of the Santa Rosa, just a very small part of the Santa Rosa. So that much we felt was definite.

THE COURT: Then the paragraph goes on:

" . . . In addition to the lands designated in the preceding paragraph, Vail Company holds title in fee simple to other large acreage riparian to many streams and tributaries of the Santa Margarita stream system, and to which said Vail Company has a

correlative right to the use of water together with other riparian owners on said streams and tributaries."

As far as I am concerned, that is broad enough to indicate that the Vail Company has other lands besides the 40,000 acres referred to, which Mr. Stahlman says is the Coit survey. I don't think there is any magic in any pleadings that would be required to set up the particular lands. The evidence will show what the lands are. The Government by its Complaint has put in issue all of the lands within the watershed. They are all in issue in this case by the Complaint which you filed when you brought in all of the owners in the watershed. So there is in issue in this case all of the land in the watershed and what rights pertain to them.

As far as I am concerned, no additional pleadings are going to be necessary.

MR. VEEDER: I will interpose an objection to any evidence that will be introduced, your Honor.

THE COURT: It is overruled now, and will be in the future.

This still doesn't answer our problem. I am going to require that Mr. Stahlman submit to me promptly a summary of what other evidence he is going to put on. By a summary I mean the name of the witness and the subject-matter as to which you are going to put on evidence.

MR. STAHLMAN: Within what period of time?

THE COURT: Wind up the Vail case.

MR. STAHLMAN: About a week or so? Would that be proper?

THE COURT: Within a week.

2. I am going to require also that Mr. Stahlman and Mr. Veeder confer and submit to me what other loose ends there are in this Vail controversy. My memory should be better, but I don't know whether you ever solved -- I think you did solve the irrigable land in the Pauba Valley.

MR. VEEDER: The maximum ever irrigated.

THE COURT: The irrigated land, yes. I think you did solve that.

MR. VEEDER: I want to be sure about that.

MR. STAHLMAN: There is still a loose end on that.

THE COURT: All right.

MR. STAHLMAN: The other 300 acres that was cleared this Spring.

THE COURT: I want that worked out.

I am in doubt as to where we stand upon the irrigable land of the Vail Company outside the Santa Rosa. As I recall, there was a difference of about ten per cent in the proof of Vail and the contention by the Government. Was that solved between you?

MR. STAHLMAN: There never was a contention bythe Government on that. They just merely said that they did not

believe the report.

THE COURT: I said there was a dispute between the proof made by Vail and the contention of the Government. The Government, as I recall, has put on no proof.

MR. STAHLMAN: No proof.

THE COURT: I want you, gentlemen, to go over the record and summarize these things and bring them up to date. As I recall the state of the record, it was that when the Vail Company rested then the United States was going to have to determine whether they would stand upon their objections that they had made to the Vail proof as not being properly admitted, or if they weren't content to stand upon the legal position they had taken that the Vail proof was entirely inadequate then the Government would have to come forward with proof on their side as to the irrigable acreage in the Vail property other than Santa Rosa. We hadn't talked about Santa Rosa up to then.

Isn't that about the way the thing stood?

MR. GIRARD: Yes, that is my understanding, your Honor.

MR. STAHLMAN: That is my understanding.

THE COURT: I want you to summarize for me just where we stand on these matters.

There was also a contention by Vail that they wanted to await the completion of their case until the proof was completed on other upstream owners who were to be heard.

MR. STAHLMAN: That is right.

THE COURT: You should check that and see if all of the upstream owners and the proof about wells or diversions and matters upstream of Vail have been completed to your satisfaction so that you are in a position to stop there.

MR. STAHLMAN: We are pretty well along on that, I think, your Honor.

THE COURT: And finally, of course, there is the hotly contested issue on the stipulated judgment which has not been determined.

So the second thing I want done is Mr. Veeder and Mr. Stahlman to check over this record -- I am just relying on my memory as to the loose ends, pull these loose ends together and see just where we are on the matter.

As to the Vail stipulated judgment, we have adopted a policy of interlocutory judgments, and subject to such views as Counsel may have, once the Government says "We rest" and Vail says "We rest" on the question of the stipulated judgment, even though the case is not completed, I am willing to make a decision on that and enter an interlocutory judgment on that issue of the stipulated judgment.

MR. VEEDER: That was my understanding of the course that was going to be followed.

THE COURT: That would be in line with the practice that we have been following.

However, before I do that, the Government is going to have to tell me that they have presented everything that they want to present that bears upon the issue of the stipulated judgment. I am not going to be concerned about other matters in the case, if you tell me that you have presented all that you want to present. But I am not going to rule on the stipulated judgment and have the Government come back and say, "Now we have some other proof that we want to put on that would bear on the stipulated judgment."

MR. VEEDER: Bear in mind, your Honor, that we are in this situation -- and I make no apology for my status in this situation. California is going to put on a witness to support its position in regard to uses of water. We have a witness in the courtroom now. We have an exhibit that he is going to try to support by oral evidence. I am no soothsayer. I can't anticipate. I don't know. It is impossible for me to comprehend.

THE COURT: You mean that this will bear on the stipulated judgment problem?

MR. VEEDER: Yes, your Honor.

MR. GIRARD: That is that minor exhibit, that compilation of figures.

MR. VEEDER: Minor?

THE COURT: Look, gentlemen, isn't it just this simple? If you want me to rule on the stipulated judgment and do it by

interlocutory judgment, then I have to hear Counsel say, "We have all said all that we want to say. We have all produced all that we want to produce on that issue." Isn't it that simple?

MR. VEEDER: The onus is on the Vail Company, not on me, your Honor.

THE COURT: Isn't it that simple?

MR. VEEDER: It is that simple. George is attacking the stipulated judgment. California is attacking it. They have the burden of proof on it.

MR. GIRARD: Let's clear up one thing. Californis is not attacking it. That exhibit was requested by the Judge, and I can cite you the page if you want it.

THE COURT: Don't worry about that.

Isn't it that simple, Mr. Veeder?

MR. VEEDER: Sure.

THE COURT: So I don't propose to rule on the matter of the stipulated judgment until I have heard Counsel say that they have said all that they want to say, that they have put on all the proof that they want to put on.

But the case is of such magnitude that we could decide that --

MR. VEEDER: I think under Rule 54 (b) I could get an appealable order, and that would be it.

MR. GIRARD: I might add, your Honor, that as far as

California and that exhibit are concerned, we are ready to go and have our evidence on at any time, including today.

THE COURT: All right.

Next, once you have done the things that I have asked you to do and Vail has completed their case, then why shouldn't you start with your rebuttal?

MR. VEEDER: If your Honor orders me to, I will.

THE COURT: What reason would there be that you not do it?

MR. VEEDER: Frankly, your Honor -- I'll be perfectly candid with you -- my own view about the case is that when all the defendants have put on their case, which includes all these people, the normal course would be for me to go ahead with the rebuttal. I realize Mr. Sachse's difficulties. I realize the State's difficulties. If they don't like to sit here day in and day out, I don't like to either. But my point is this. The United States of America has adjusted all the way down the line as far as I think it should in regard to what has to be done. I realize that we are plaintiffs. But I am not going to give away the property of the Government either.

The point that I make, your Honor, is that the normal process would be that I shouldn't have to put in rebuttal until the last bit of evidence is introduced.

MR. SACHSE: May I inquire, Mr. Veeder -- I am really trying to understand you -- even the evidence that you, yourself,

are introducing in connection with these little people?

MR. VEEDER: In connection with these little people? Yes, I think that is true.

MR. STAHLMAN: Here is a map that he has here. Aren't these people, as well as those of us here, entitled to know what they have projected on this map? Are we to sit here and just guess and wait until some witness comes in at a later date? Are we to be placed in a position where evidence may have an effect on our situation and we are not able to go ahead and make our preparation and research all matters that have an effect on it?

MR. VEEDER: I don't comprehend. There are two things before your Honor at the moment. And there are people in the courtroom whom I would like very much to assist, if we can. Mr. Sachse has raised one point: Do I think it is important to have all the claims of the little people in before we go into rebuttal? My answer is "Yes." My answer is "Yes" based upon my conversations with Colonel Bowen and Mr. Kunkel. I think that is the case. As I said, if you order me, I will go out of order and put in rebuttal. But it will be only on order.

THE COURT: I am going to so order you to do it. So you can rest assured that we are going to hear about these well levels before we take all the final evidence about those people in the basement complex and the older weathered basement complex. We are not going to wait until all that is in

as to every claimant who has a little bit of ground before we hear evidence about the well levels. Put your mind to rest on that.

MR. VEEDER: Rebuttal is one thing. Putting in this evidence that we have here is an entirely different thing. 15-E is an excellent exhibit, and I would just as soon have it in, and I would just as soon have it in now.

THE COURT: Then, of course, if later when the case is all concluded as to every bit of ground you have some other rebuttal, we will hear it. But we have given you orders permitting you to take well levels, you have made maps, you have made measurements. We are going to hear that before long.

MR. VEEDER: That suits me. But I would like respectfully to recommend to your Honor that I don't intend to close my rebuttal until all the evidence is in by the defendants. I don't see how we can.

MR. SACHSE: I will not argue about that. I think that if I should get up, after rebuttal is over and everything else is over, and say, "Your Honor, I forgot something for Fallbrook," I think your Honor would give me permission to put it in out of order. I am sure that you would do the same thing with the United States.

I want to see that we keep the case rolling with the big people, instead of waiting one month at a time for two days of hearings on the little ones. It's that simple.

I'm very happy. If Mr. Veeder says that he can go ahead and put on Mr. Kunkel and put on the well logs that he has and we can set aside a week and get it done, that's wonderful.

MR. VEEDER: Just so you don't call it rebuttal. I would just as soon put it on.

MR. SACHSE: I don't care what you call it.

THE COURT: Mr. Veeder, you have another decision that you have to make, and that is when you want me to rule on the question of the stipulated judgment.

MR. VEEDER: I would just as soon have your Honor rule now, right this second.

THE COURT: I am not going to rule in a second. But the point is this. If somewhere along the line you want me to rule on it before the final conclusion of the case, you have to say, "I have presented all data that pertains on that subject matter," or obviously I can't decide it. You understand that. It's that simple.

MR. VEEDER: No, your Honor, I have put in a great deal of evidence to show that all the water during the short water period is on the Vail Company's land. That has been challenged repeatedly. So every single defendant in the Murrieta Valley, to some degree, is important in regard to the stipulated judgment. But I simply say, it is a matter of law. Wipe it out, if your Honor desires to.

THE COURT: Is it a matter of law? Or does it also

involve fact? It's just that simple. You don't decide an issue unless Counsel say, "Everything is in on that issue." When you tell me that, then I will decide the matter of the stipulated judgment. But you are not going to talk out of both sides of your mouth and say that it is only a matter of law, and in the next breath tell me that every bit of land in the watershed has some bearing on it.

MR. VEEDER: Every time I have tendered that thought, I have been knocked down on it. That is the point. So far as I am concerned, the stipulated judgment could be ruled on as of this moment. I can't do more, your Honor.

THE COURT: You had better put it in writing. I don't want double talk. You say as far as you are concerned. Of course, you are not a party to this case. You are an attorney.

MR. VEEDER: That is right.

THE COURT: When you submit to me something in writing that the Government is now content, on the state of the record, that I rule on the stipulated judgment, then, unless other Counsel have objection, I will rule on it. But not from double talk like you gave me this morning.

MR. VEEDER: Your Honor, if I were attacking the stipulated judgment, I would comprehend your Honor's position in this matter.

THE COURT: I thought there was some value, from the Government's standpoint, of an earlier interlocutory decree

in this and possibly a consideration whether you wanted to make the order appealable.

MR. VEEDER: I want to make it appealable, by all means.

THE COURT: Without passing on it, this is what I thought you had in mind. But if you want to wait until the final conclusion of the case, then it will have to wait. If you want me to decide it, I want a written statement from you, over your signature as attorney for the Government, saying that the Government is now satisfied with the state of the record and that the Court may rule and enter an interlocutory judgment one way or the other in connection with the stipulated Vail judgment.

This is not asking too much. That is just a very simple request. So it is up to you when you want me to rule on that.

MR. VEEDER: I have asked you to rule this morning. I will give it to you in writing. I would just as soon have you rule now, and that is in the record.

THE COURT: I am not going to rule upon a statement like that. You put it in writing and I will look it over, and when I am satisfied that you have submitted that issue to me I will decide it--you acting on behalf of the United States.

MR. VEEDER: Yes.

THE COURT: When I see that in writing, and without if's and and's and clearly saying, "We are content now. We have said all we want to say." If you want further argument,

I will be glad to arrange for that. I may want further argument on it anyhow. But if you are satisfied with the proof in the record that the matter is in a posture to be ruled on --

MR. VEEDER: As I understand it, Mr. Stahlman is going to put in more evidence, the State is going to put in more evidence.

THE COURT: I understand there are some loose ends there. Both of you agree on that. Mr. Stahlman should complete his case, and California should get this other exhibit identified and put in.

All right, Mr. Grover, are you ready to proceed?

MR. GROVER: Yes, your Honor. I wish to apologize for being late. I had a considerable distance to come this morning and I misjudged the time.

Your Honor, I have here Mr. L. J. Tripp, who is the son of the original claimant of the water rights on the Gibbon and Cottle property, who will be our only witness today.

THE COURT: Will this complete your case?

MR. GROVER: Your Honor, there is one other witness who was unable to be here today, who may be able to testify about a brief period in the early '30's. It wouldn't take any longer, I don't believe, than did Mr. Johansen's testimony last time.

THE COURT: You were also going to take the deposition of a witness, I understood.

MR. GROVER: Yes. That is Mr. Tripp's brother. I am hoping that it will not be necessary. He was an owner of the property at one time. But if Mr. L. J. Tripp here today can cover the ground, as I believe he can, the other witness would be merely cumulative.

THE COURT: It's time for a recess. Take a short recess and then put your witness on.

MR. GROVER: Thank you, your Honor.

THE COURT: Meanwhile Mr. Veeder and Mr. Stahlman, arrange between yourselves when you are going to sit down and work this out for me.

(RECESS)

THE COURT: Call your witness.

MR. GROVER: Mr. L. J. Tripp.

THE COURT: What exhibit do you have on the board, Mr. Grover?

MR. GROVER: Exhibit Gibbon and Cottle A.

L. J. TRIPP,

called as a witness on behalf of defendants Gibbon and Cottle, and being first duly sworn, on his oath was examined and testified as follows:

THE CLERK: State your name, please.

THE WITNESS: My full name, L. J. Tripp is my name -- L. J. are the initials.

DIRECT EXAMINATION

BY MR. GROVER:

Q Mr. Tripp, where do you live?

A I live near Dinuba at a little settlement. Munson is the name of the place that I live. Dinuba is the postoffice address.

Q Have you ever lived near Radec, California?

A I used to live there for a good part of my life.

Q When were you born, Mr. Tripp?

A In 1875.

Q When did you first come to Radec?

A In 1885 we moved there.

Q Are you related to the Samuel B. Tripp who owned land at Radec?

A He was my father..

Q Are you familiar with this exhibit here labled Gibbon & Cottle A?

A Is that the one we looked over, over there?

Q That was my copy that we looked at, at the ranch. Would you co me down and see it is the same?

THE COURT: We will assume that it is, if you showed him a copy.

MR. GROVER: Yes.

THE COURT: That is satisfactory. Go ahead.

BY MR. GROVER:

Q Would you tell us about the diversions of water from Temecula Creek at Radec which were made by your father?

A Well, when we started in there in '85 we commenced to take water out of that creek to irrigate, and we took it out -- when we first started we took it out in two places, what is known now as the "Middle Ditch" and the "Lower Ditch." Those two we took it out first. And later on we went further up the creek and took it out at another place and used it for -- I don't remember, it was several years, on som e ground that laid along the creek. We raised sweet potatoes there for a long time. And later on we run that Upper Ditch down higher than the others and eventually got it out on the flats there where it is now and irrigated there. My father died before we got that finished, and after he died I finished the ditch on down to where it is running out on those flats now on the ditch and I used it there for several years -- I raised alfalfa there, and used it to all three places for a good many years.

Q When did your father die?

A In 1895.

Q And when did you finish the Upper Ditch?

A It was probably along, if I remember right, maybe 1906 or --

Q Beg your pardon?

A About 1906 or '07. Or 1806 was it? No.

Q How long after your father died, Mr. Tripp?

A Well, he died in '95; and '96 or '97, it would be just a year or two later that I got the ditch finished.

THE COURT: You mean that you finished it in 1896 or '97?

THE WITNESS: 1896 or '97. I got it clear down to where it is running now.

THE COURT: A year or two after your father died?

THE WITNESS: That's right.

BY MR. GROVER:

Q When you looked at this map Exhibit A yesterday, the copy of it --

A Yes.

Q -- did the Upper Ditch follow the line shown for the Upper Ditch, did the Upper Ditch which you worked on go approximately the same course as the line marked "Upper Ditch" on the map?

A Yes, pretty close. I don't think there is very much difference.

Q Where did you take the water for the Upper Ditch?

A Well, when we first started the Upper Ditch we took it out, and it washed out later in '91, it washed everything out of there, it washed our land along the creek out and everything we had, and I had to go further up there to get the water out into the ditch. You remember, Smith-Long Creek we call it. We used to take it out below that, and afterward we went above where they come in to the main --

Q Temecula Creek.

A Temecula Creek, yes.

Q When did you begin work on the Upper Ditch, the first work that you did on what is now the Upper Ditch?

A Well, like I tell you, on the Upper Ditch we first took it out and irrigated there some ground along the river that we raised sweet potatoes there for two or three years, if I remember right. I know we had a house there and we made a cellar to put those sweet potatoes in to keep them through the winter.

Q About when was that, what year?

A It was away along in -- well, it was before '91 that we got that there. It must have been eighty- -- well, we might say '90 or '89.

Q And you had taken water out of the Lower Ditch, though, as early as '85; is that right?

A Yes, we started in '85. We moved out there. The first thing we did, we went there in April and we had to get the water out to raise something to eat, you know, like potatoes and corn and stuff like that.

Q How did you construct the lower ditch?

MR. VEEDER: Just a moment. He was ten years old. How did he construct it?

MR. GROVER: I meant he and his father. I meant you plural. I'll put it that way.

MR. VEEDER: You mean you-all.

THE WITNESS: Well, the way we did those, we had a team and plow and where we could we plowed the furrow each way and made a ditch and then we could clean it out with a shovel. It saved a lot of work that way. And we could fix a "V," you know, it was like that, it come out, and put the team on that, and then one man ride it to drive the team, and throwed the dirt out of the ditch to the sides. That is the way we did in those days making ditches.

MR. GROVER: This is on the Lower Ditch.

THE WITNESS: Well, any ditch we made that we could use a plow on; it saved a lot of hard work shoveling.

THE COURT: This Lower Ditch diversion you made on your own property?

THE WITNESS: Yes.

THE COURT: That was on your own property.

THE WITNESS: Y es. Well, the Lower and Middle Ditch was, too.

THE COURT: But the Upper Ditch?

THE WITNESS: The Upper Ditch, some of it was not on my father's. You see, he located a homestead on the south end of the old place we bought, and part of that ditch was on that homestead, and not all of it. I think his homestead didn't run as far up as where we took the ditch out quite.

THE COURT: But the diversion on the Upper Ditch was on

Government land.

THE WITNESS: It was, some of it, at that time, yes.

BY MR. GROVER:

Q To go back to the Lower Ditch for just a minute, Mr. Tripp, which you constructed in 1885, was it approximately the same location as the line shown on this Exhibit A and marked "Lower Ditch"?

A Yes, pretty close, because we was there yesterday and looked over the old sign of the old ditch, you see.

MR. VEEDER: Did you say "the sign of the old ditch," sir?

THE WITNESS: The sign where it had been. Part of the old ditch had been filled up, but you could still tell there had been a ditch there where we was yesterday, where the pear tree was.

BY MR. GROVER:

Q I am talking about the Lower Ditch.

A The Lower Ditch was further down. The Lower Ditch was taken out right close to where we stood, you know, there and looked at the well. That is where the Lower Ditch was taken out, right west of the house, pretty near straight west from the house, you remember.

Q Yes. But for the benefit of those who were not there, were we standing just west of that pump on Mrs. Gibbon's well?

MR. VEEDER: I object to this. I can't identify where.

THE COURT: Maybe Counsel can look it up and show us. Overruled.

BY MR. GROVER:

Q Do you recall the pump that was operating yesterday, Mr. Tripp?

A Yes. Was it pumping water out of the reservoir?

Q No, the pump on the well.

A Oh. Well, I remember the pump running, but I never paid much attention to where it came out of the ground. It was running there, I know, one pump was. I guess that was the one.

MR. VEEDER: Then I object to this line of questioning.

MR. GROVER: I could fill it in. But if Counsel objects, of course, I can't testify.

MR. VEEDER: I have no objection to helping the witness under the circumstances, but I do believe that he has said that he doesn't recall where it was.

THE WITNESS: I remember the pump running there, but I couldn't tell you now just where it was. It was after we co me in the gate there somewhere, wasn't it, I think?

BY MR. GROVER:

Q Well, let's get back to seeing if we can locate the Lower Ditch. You said that you saw signs of the Lower Ditch yesterday. Did you see signs of the Lower Ditch?

A Well, I could see down there where we took the water out. I think it was from the Middle Ditch maybe about where the pear tree was.

Q Yes.

A That is where it was.

Q Do you recall where the signs of the Middle Ditch were in relation to the large reservoir there?

A That was right west of it down the creek.

Q Would it be fair to say that it ran right along the western edge of that reservoir?

A No, it was further west than the reservoir.

Q About how many feet?

THE COURT: You are describing now about the Middle Ditch.

MR. GROVER: The Middle Ditch, yes, your Honor.

THE COURT: Then you are talking about the eastern side of the reservoir.

MR. GROVER: No, the western.

THE WITNESS: The Middle Ditch run on the west.

THE COURT: All right.

THE WITNESS: But I showed you where our old vineyard used to be. There is a raise along there for quite a ways where we stood. The sign of the Middle Ditch runs away down there.

BY MR. GROVER:

Q And about how many feet between that sign of the Middle Ditch and the edge of the reservoir?

A Oh, that reservoir comes out and the dirt was pretty tamped over where that ditch was.

Q Just a few feet apart?

A Yes. There was quite a raise all the way down from that oak tree to where we stood, and the reservoir is right up over there, and the dirt comes almost down to where that old ditch used to be.

MR. GROVER: I realize, your Honor, that we got off onto the Midlle Ditch, which is not shown on the Exhibit because Mr. Tripp is the first witness who has given testimony about it.

Q Now the Lower Ditch, did it run west of the Middle Ditch?

A Yes, it was quite a ways down there to it, where we stood in the field there, below the reservoir, you see, and then the Lower Ditch, I suppose it was a hundred feed or maybe more down to where that Lower Ditch was taken out of the creek.

Q Beyond the Middle Ditch?

A What?

Q West of the Middle Ditch?

A Yes.

MR. GROVER: I think, your Honor, with that assistance that we can compare the distances on Exhibit A and get the

approximate location of the Lower Ditch.

Q Now would you tell us where the Middle Ditch picked up the water from the creek?

A Well, where I showed you yesterday, where that old strawberry patch was. We had strawberries --

Q You see, Mr. Tripp, the other people here, the Court and the others here, were not at the ranch yesterday. So we have to --

A Well, I can tell you, and right where you saw where the old strawberry patch was, and we went over to the creek right there at the strawberries patch, right there is where we took out the Middle Ditch.

Q Do you recall the wooden flume that we saw yesterday?

A Well, we used a wooden flume. That was on the Upper Ditch.

Q Yes, but I mean you recall where it was.

A Yes.

Q And it was used, was it not, to cross this un-named tributary or wash that comes in from the northeast?

A That's right.

Q Where was the intake of the Middle Ditch compared to where that flume is now?

A It was probably -- oh, it would probably be three hundred feet down the creek, around that, something like that

as near as I could figure.

Q What was the course of the Middle Ditch from that point on?

A It run down -- you see, that along the creek there the canyon varied. It wouldn't run straight. From where we took that out there it would go down around the edge there and make a kind of circle and come down to the hill under the Upper Ditch.

THE COURT: Can you put the map in front of him and have him show it?

MR. GROVER: Yes. Maybe the next question will obviate that, your Honor.

Q Was it approximately the same course as the Upper Ditch but further down lower on the bank?

A Yes. Practically all the ditches were the same course, because the ground would come out and vary a little, not straight. It would be crooked, you see.

Q Would you come down to the mappthen?

THE COURT: Put it in front of him. I have a copy of it in front of me.

MR. VEEDER: Just take it off the board and put it in front of him.

THE COURT: That is what I am suggesting.

(Mr. Grover places map in front of witness.)

THE WITNESS: Where is the north end?

MR. GROVER: The north end is at the top, Mr. Tripp.

THE WITNESS: Turn it around that way. Have you got a pencil? I'll not mark it any. Now where were we yesterday?

MR. GROVER: Here is the wooden flume you just referred to.

THE WITNESS: Right there, yes. Well, when we was there yesterday we come to the flume and we went down that ditch from where we went over to the creek. That is where we took the Middle Ditch out.

MR. GROVER: Now you are going up the ditch there with your pencil, Mr. Tripp. This is downstream over here.

THE WITNESS: Yes, that's right. You see, here is that little patch of land that was there under the Upper Ditch, here.

MR. VEEDER: Just a moment.

THE WITNESS: The Middle Ditch is where we were where we took it out. That is the flume, isn't it? We went down the creek just a short distance like that. That is where the Middle Ditch was taken out, and it run around like that.

MR. GROVER: It ran downstream, didn't it?

THE WITNESS: It ran downstream.

MR. VEEDER: I don't mind Counsel prompting, but I think there has to be some limit to it. I understand the witness's difficulty.

THE COURT: Just a minute. Everybody stop.

Mr. Grover, point out on the map some landmark showing

where the town of Radec is, showing the place of the house.

THE WITNESS: I will watch after this where it goes downstream or upstream.

BY MR. GROVER:

Q This is the big reservoir here, Mr. Tripp.

A Yes.

Q Here is the intersection of the highway away up here.

A Yes.

Q And the house over there where Mrs. Miller lives.

A Yes, I recall that.

Q And then Mrs. Gibbon's present house is over here.

A Yes.

Q And then the little cabin, although it is not shown on the map, is down --

A Under the oak trees where we were.

Q It is down right at that patch you referred to a minute ago.

A Yes.

THE COURT: What is your question, Mr. Grover?

BY MR. GROVER:

Q Where did the Middle Ditch start, and then where did it go? You have marked there where it started. Where did it go from there?

A It come on down to this patch of land, it would

come around here, you see, and down where that reservoir is. It followed the hills, the canyons right close to the bank on the upper side. It goes under the hill there right close to the bottom. The Upper Ditch was graded up on the side of the hill along there probably twenty feet higher than the land there, wasn't it? I am not so positive. But anyway that Upper Ditch was quite so much higher than the other. That is why we took it out to get the water up on high ground to get more ground under irrigation. And this Middle Ditch come on down and irrigated, it was a vineyard in there. The vineyard would start about here.

MR. VEEDER: Your Honor, can you see where he is pointing there?

THE WITNESS: There was quite a little patch of land there. There was probably four acres we had into vineyard.

THE COURT: Is that where the reservoir is now?

THE WITNESS: The reservoir? No, the reservoir is further down than the vineyard was.

MR. GROVER: For the record, when he mentioned vineyard he was pointing approximately to the line between Sections 19 and 30.

THE WITNESS: And when in '91 high water come it washed all that -- well, I'll tell you now before we go any further. From the vineyard north we had an orchard right along the edge of the creek. There was quite a little land there. It was a

quarter-mile long where that orchard was.

THE COURT: He is indicating, apparently, both sides of the creek and between the 19 and the 30.

THE WITNESS: No, there was nothing under irrigation up above this high ditch line.

THE COURT: Point out to him the creek line.

MR. GROVER: This is the creek line, the long line with the three dots and long line with three dots.

THE COURT: Which side of the creek line was the orchard on?

THE WITNESS: It was on the easterly creek line, because that land was along the creek there between where the Upper Ditch was put later.

THE COURT: Make an A there where you say the old orchard was that washed out.

MR. GROVER: Could I --

MR. VEEDER: Counsel, I think the witness should be permitted to proceed with his testimony without your prompting him any more.

MR. GROVER: That is certainly true, and I am not prompting him, Counsel. It is that Mr. Tripp is not, as the story will evidence, a map expert at all, and I was with him on the land and I could save the Court time, and Counsel will have ample opportunity to confirm the facts.

THE WITNESS: Here is the intake of the Lower Ditch

right there, and we was standing there yesterday, right along there, and that Middle Ditch come -- the vineyard here was washed out, and so was all the orchard washed out away down the creek, down the stream instead of up. This would be upstream.

THE COURT: Just a minute. You are indicating with your pencil that the orchard was on the west side of that creek.

MR. GROVER: But he doesn't mean to indicate, your Honor.

THE COURT: The orchard is on the east side of that creek?

THE WITNESS: The orchard was all on the east side of the creek there. But after the Upper Ditch was made there was a -- well, after '91 it washed out, there was no land left there. It was all washed right up to the bank of the creek on the east side, on the west side of the place.

BY MR. GROVER:

Q Are there any trees of the orchard that still remain?

A There are three.

Q Where are they? Would you point them out on the map?

A Toward that reservoir.

Q That is the big reserve right there, the large one?

A Well, one of them is quite off by itself. It is just below the reservoir a little. There is another one in

there like that, and another one over here. There are three of the old pair trees living.

THE COURT: He has made three marks immediately to the west of the reservoir marked "1" and both north and south of the words on the map "Creek Well.

MR. GROVER: I don't believe it is marked. That is the large reservoir.

THE COURT: Large reservoir.

THE WITNESS: That is where the trees are. All three of them are west of the big reservoir there.

THE COURT: That is part of the old orchard.

THE WITNESS: Yes, that is all that is left of the old orchard. It come quite a ways down there. It washed away.

BY MR. GROVER:

Did the Middle Ditch continue beyond the orchard down-stream further, down ditch further?

Well, there was a patch of land there that we irrigated, an acre or so, along -- I don't know whether I could find it on this map or not, but where -- here is the reservoir, and down in there would be about where the end of the orchard, about the middle, about between here and there would be the middle, the lower end of the orchard.

THE COURT: He is indicating an area where the letters appear on the map "19Q2."

MR. GROVER: Perhaps if Counsel will permit I will ask

him:

Q Do you recall a gully going east and west in that area?

A Yes.

Q Do you recall where that gully is in relation to the smaller reservoir?

MR. VEEDER: I object. The gully has not moved.

MR. GROVER: No, the gully as we saw it yesterday.

THE WITNESS: This here reservoir, there was a little old gully, it's practically filled in now, right at this end of the reservoir.

MR. GROVER: Wasn't the gully north of that?

THE COURT: Indicating north end of the big reservoir.

THE WITNESS: It was a little low place. I know the ladies said they always had a hard time irrigating there, because it was so steep. And further north there was another' gully that runs into the creek down here somewhere. It comes from away up. It is right north of the house.

BY MR. GROVER:

Q Does that gully run through the small reservoir?

A Well, there is a little reservoir right down that gully where we saw it yesterday.

Q Yes. And is that little reservoir this small blue patch?

A I think so. I'm pretty sure it is.

Q And the end of the Upper Ditch, was it north of that gully?

A The end of the Upper Ditch?

Q Of the Middle Ditch I meant to say.

A It was right just below that little old reservoir, because we kept getting it higher all of the time, and finally I got it up on the flat there, which would be away down west of the flat now, and run it on further down and used the water down here.

THE COURT: Indicating Pasture #3.

MR. GROVER: Yes.

MR. VEEDER: He showed it further down than that, your Honor, to be honest. He was pointing to --

MR. GROVER: -- to #4. But he meant, I'm sure, the southern part of #3. That is to be honest to you, Mr. Veeder.

MR. VEEDER: Let's be honest.

MR. GROVER: As he pointed out to me on the ground yesterday.

MR. VEEDER: All right.

MR. GROVER: It really was not #4.

Q About how many acres out there at the end of the Middle Ditch did you irrigate?

A West of the orchard I think it was about -- I guess there was anyway an acre and a half of ground right along there, and then the ditch I took out and irrigated, kept raising,

kept getting higher, was still below the Upper Ditch where it is now.

Q But how many acres out there did you irrigate from the Middle Ditch, in addition to the orchard and the vineyard?

A I didn't irrigate so long there, because I got the Upper Ditch in there. I think I had about five acres that year that I run the ditch on down, and I had this flume in across a gulch that comes in from where the stores are.

Q Five acres in addition to the orchard?

A Yes, something like that.

THE COURT: How many acres in the orchard?

THE WITNESS: The old orchard was all washed away at that time. That is where I had the Middle Ditch there, wasn't it?

Q Did the Middle Ditch supply the orchard?

A No.

Q The Middle Ditch.

A Let's see, the Midile Ditch, yes, supplied water for the orchard. That was before the Upper Ditch was made. And I always did use that as long as I irrigated the orchard from that Middle Ditch. I used the other water of the Upper Ditch --

THE COURT: You used the Middle Ditch to irrigate the orchard.

THE WITNESS: Yes.

THE COURT: Then the orchard got washed away. Then you

used the Middle Ditch to irrigate another five acres.

THE WITNESS: Yes, farther down.

MR. VEEDER: A different five acres.

THE WITNESS: A different five acres from that.

THE COURT: How many acres in the orchard?

THE WITNESS: I suppose there was probably three or four acres altogether.

THE COURT: How many acres in the vineyard?

THE WITNESS: About the same number of acres.

BY MR. GROVER:

Q Then when the high water came in 1891 what happened to the Middle Ditch?

A It all washed out along there, practically all the land that I irrigated from that nearly washed out, except away down there where I told you this acre and a half of ground was.

Q Did you ever use the Midle Ditch after that flood of '91?

A No, never used that after that, I don't think. I used the -- well, the one further up on the Lower Ditch on the place and took the water out right west of where we were standing. I showed you there where the outlet was for the Lower Ditch.

Q Did you ever use the Middle Ditch after the flood of '91?

A No, I don't think so. There was no land to use it on. Because we got this Upper Ditch and we used all the water, all that land under water there like that. But the Lower Ditch, we always used that so long as I was there, and after my sister was there until she sold out.

Q To go back to the Upper Ditch, when you started the Upper Ditch where did you take the water out?

A Well, where this -- where does that creek co me in from the old schoolhouse? We took the water out up here, where I walked over to see that old hole that I blasted in the rock.

Q Where the wooden flume is?

A Yes. There is a hill comes out, and this ditch we took out up here, and it would not have to go so far back those days because the level of the creek had not washed down. We didn't have to go so far up. There was a patch of land along here like that -- well, it comes right down like this, and right there is where that hole goes in the rock, and we irrigated all that, probably I would say three or maybe three and a half acres that we used under that Upper Dithc before we got it. Well, used it there, and then on down here where I showed you, I had irrigated that old little patch, you know, there yesterday.

Q Y es. But about this land up above the wooden flume, when was the last that you irrigated that land up there?

A I didn't irrigate above the wooden flume.

Q When I say wooden flume I mean where this old gulch near the schoolhouse came in there where the little flume is now. The irrigation upstream from that, when did you last irrigate any land further upstream than that?

MR. VEEDER: May I have the last question? Ask it again.

MR. GROVER: I'll start over again.

THE WITNESS: I can tell you. We never irrigated any after '91. That all washed out, and we never used that Upper Ditch to irrigate. There was no land to irrigate. It was all gone. But here is where they tunnelled the hole in the rocks, and the flume is right there, and we kept on going down with it until we got it down to where it is now along the side of the hill there.

Q But before the flood of '91 there was land upstream from that little wooden flume that you irrigated?

A Yes, it was below the Upper Ditch along there. It was a long strip of land.

THE COURT: Indicating southerly from the old flume along the creek.

THE WITNESS: Yes.

THE COURT: To the line of the Natio nal Forest. And the witness has indicated even southerly of the National Forest line.

THE WITNESS: It was a quarter-mile, I think maybe,

along that little strip of land there from here where the flume is and that hole up to where we took it out of the creek.

MR. VEEDER: Just a moment. Are you asserting that you changed the point of diversion and place of use of some of the land?

MR. GROVER: Yes.

MR. VEEDER: I think that is important, because your pleadings do not reflect it. I am not trying to make it difficult for Mr. Tripp. I just want to know what your claim is in regard to that acreage.

What is your Section there?

THE COURT: The Southwest Quarter of the Northeast Quarter of Section 30.

THE WITNESS: This would be Section 30 clear up here, wouldn't it?

MR. VEEDER: I'm trying to orient myself now, Mr. Tripp.

THE COURT: Notice that under his hand 30 runs clear across.

MR. VEEDER: Yes.

MR. GROVER: This is 30.

THE WITNESS: Y es.

MR. VEEDER: This is the Section corner here.

MR. GROVER: Yes.

I believe that your Honor was right, the Southeast of

the Northeast Quarter of Section 30.

THE COURT: Southeast Quarter of the Northeast Quarter of Section 30.

MR. GROVER: Crossing into Section 29.

THE COURT: Section 29 at the southerly portion.

MR. GROVER: Yes.

THE COURT: And northward.

MR. GROVER: Or southward. Beg your pardon.

THE COURT: Also, it proceeds up to the old wooden flume, which was in the Northeast Quarter of the Northeast Quarter of Section 30.

THE WITNESS: Yes.

THE COURT: How many acres in there did you irrigate? Three and a half? Three?

THE WITNESS: Something like that, as near as I can remember. It was good rich ground. We raised sweet potatoes. There was nobody else raised them, and we just piled them up and would sell them in the winter to people that could use them. But that land in '91 practically all got cleaned up clear down to this place. And still there was enough. It was not washed back far enough there to hurt much, and we could make the ditch very easy down there again. But every year we used to have a good deal of high water, it would wash that channel a little deeper and we would have to go maybe a little farther up to get the water out.

BY MR. GROVER:

Q After '91 then you did not irrigate any land upstream from that little flume?

A After '91? Well, after '91 we didn't irrigate there from that because we didn't have the ditch finished. Well, the ditch was washed out along there at the end of '91, it washed it out, and we worked on it to get it on down higher up for a long time. That is a point of rocks that is run out there, and in '91 we drilled a hole in there so that we could get the flume around that, and before '91 we got that ditch built around there to where this man's house, this little oak grove is, you know.

Q The little cabin?

A The little cabin there. I showed you the end of the cut I made there. There's a cut that I made there. My father started it, and a fellow and I worked on it, and after he died we got the ditch done. I had that cut out. I guess it is about a hundred yards long where I showed you yesterday that I dug out.

Q Would it be near where the beginning of the steep bank of the mountain is over here?

A The end of that wouldn't be far down to where it was getting steep.

Q After '91 what did you do to complete the Upper Ditch?

A Well, we had to keep digging it on down the side of the hill there. We didn't do it so fast because with a pick and shovel, you know, when you don't have powder you don't go so fast in a place like that, kept going a little further each time and getting the ditch down, and after we got it through and coming out here on the valley, you might say, there was a place where I had the flume around that point of rocks. But later on I got some powder and blowed that off, so I got a ditch along that side hill all the way down. That would be down here, you see.

Q Was that place where you had the flume just south of where the big reservoir is now?

A No, there is that flume across the canyon up there.

Q No, I mean the little flume that you said you had around the bank.

A Well, it was about half-way down from where this hill starts. The ditch starts at the side of the hill. About half-way down that to where we would get it out on the valley there.

Q And where it comes out on the valley, is that near the big reservoir?

A This end of the reservoir is pretty close to where the ditch come out.

THE COURT: Indicating the southern end of the big reservoir.

THE WITNESS: The ditch is above the reservoir quite a w ways there.

BY MR. GROVER:

Q By above do you mean east of the reservoir?

A Yes.

Q Do you see this line on the map running east of the large reservoir, that blue line?

A Yes. Here?

Q Yes. Is that about where the Upper Ditch was when you built it?

A That is just about the same place now when I built it. They have never changed it. The only place it has been changed is right toward this end of the reservoir. There used to be a low place, and they irrigate that from this reservoir, you see. But that was not a real gulch; it is just a low place. I never irrigated it much because the water all run off and washed the ground off. This lady said they always had trouble irrigating that. But it's different now. They have that reservoir in there, and they have a sprinkling system and they can irrigate it all right.

Q When the ditch was completed how far did it go?

A It come clear around up here toward those houses there.

Q This is the house where Mrs. Miller lived here.

A Right there. This ditch come around and crossed

that gulch that co me in from where this store is in Lancaster, below that and across the sand wash, and then co me on down by her house.

Q Approximately where it is now?

A Yes. There has been very little change in it since then.

Q Did it go beyond, that is, north and west of the big rock here?

A Is that her house there?

Q Yes.

A If that's her house, it run down around like that, toward that big rock there it run.

Q Yes.

A It is'nt straight. It makes a bend there, you see, and over. That would be the west end -- no, that would be the south end of the rock.

THE COURT: That is the north end.

THE WITNESS: The north end. But it went from her house over the ridge there and come on down into that lower field with waste water. I never used it.

THE COURT: Indicating green field A.

MR. VEEDER: I don't believe he finished his statement. You said you didn't use it. The water ran on down?

THE WITNESS: It ran over there, over the hill. It was rough and covered with brush. I didn't try to irrigate much

there. But she had a little place there. She had an orchard. It is into permanent pasture now, right straight west of her house.

BY MR. GROVER:

Q That is this green field west of her house there. Is that what you mean?

A Yes.

THE COURT: Part of Field B shown on Exhibit A.

MR. GROVER: Yes.

Q And then did it go west of the rocks here? Did it go north of the rocks and west into this brown field?

A It ran north of the rocks. The ditch come on. But she could irrigate from here west of the rocks all that land.

Q Do you mean east or west?

A East of the rocks. The rocks come there, and right in here was four or five I would call it, seven acres, in there that they irrigate in one patch from that ditch.

Q That is this green part here?

A Yes.

THE COURT: He is pointing to areas west of the rock and he says it is east of the rock, the rock being an oblong white space between Field A and Field B shown on Exhibit A.

THE WITNESS: There was a high ridge there where the road goes today, where the water come where her ditch was, it run over there some. But back in here east there they used to --

that patch runs along there several acres they have permanent pasture.

MR. GROVER: There is the rock. Do you mean east of the rock?

THE WITNESS: Yes, it comes east, the irrigated part is east of th is rock.

THE COURT: Wait a minute. Let's get this straight. You are pointing west of the rock.

THE WITNESS: No, this is --

THE COURT: North of the rock. Your pencil is pointing north.

THE WITNESS: I'll get it now. That is north.

THE COURT: No, your pencil is pointing north.

THE WITNESS: That is what I say. That is north. This is east, isn't it?

THE COURT: Yes.

THE WITNESS: That is west.

THE COURT: Yes.

THE WITNESS: And this is south.

THE COURT: That's right.

THE WITNESS: So that water right in here and clear over to there, that was all irrigated, and there is a little patch in there that was irrigated.

THE COURT: He is indicating a portion immediately south of the so-called rockl and a portion west of the rock.

THE WITNESS: That there is not where I am pointing at, because you go over that ridge west of the rock, that was not irrigated that I know of. I know I didn't irrigate it. But all this in here, the house is up there, and that is all in permanent pasture, and it is four or five, they call it seven, acres.

BY MR. GROVER:

Q Let me ask you this. The part that you call permanent pasture seven acres, is that between the house and the rock?

A Well, it partly is.

MR. VEEDER: Let me get in on this. Are you talking present permanent pasture?

MR. GROVER: Yes, that is what he is talking about.

THE WITNESS: Yes.

MR. VEEDER: It was not that way when you were there; is that right?

THE WITNESS: No, I had alfalfa in what they call the seven acres now. At that time I put in alfalfa and made hay with it.

BY MR. GROVER:

Q Did you ever irrigate anything beyond the rock, west of the rock over here in this brown patch? Here's the rock.

A Well, now, wait a minute. Here is where that seven acres is, it comes around like that, and clear up into there

where they irrigated is in permanent pasture. And I ditched there, I irrigated it. I used to call it four acres. They call it seven acres, now, because they have more.

MR. VEEDER: That is inflation.

THE WITNESS: And clear down to where the creek bank is on the south, you see.

MR. GROVER: Your Honor, I think the map makes it difficult because --

THE COURT: Well, he pointed to the highway and calls it the creek bank. The creek is to the south, and the highway is to the north.

MR. GROVER: But his language is just as he described it to me yesterday on the ground.

MR. VEEDER: I think he confused you, Counsel.

MR. GROVER: I am sure that he didn't. But the map obviously makes it difficult for Mr. Tripp. He has said that he irrigated this so-called 7-acre piece east of the rock, and that would be Field B on the map or the one now in pasture.

Q You also said you did not take any water west of the rock.

A Not from the Upper Ditch.

Q That's right.

A But the Lower Ditch there comes in, you know, it hits that rock, on the south end there.

Q Yes. Well, just stick to the Upper Ditch now.

THE COURT: Let's take our noon recess.

MR. VEEDER: Mr. Reche, what were your plans for today? Were you going to go home at noon?

MR. RECHE: I almost have to get a bus at 12:35 to get back, or wait for five o'clock. If there is a session this afternoon, I could stay and take a five o'clock bus.

MR. GROVER: May I interrupt.

Mr. Reche, are you going back to the Radec area?

MR. RECHE: Yes.

MR. GROVER: I would be happy to take you with me.

MR. RECHE: I have a roundtrip ticket.

THE COURT: You can turn it in and cash it.

MR. GROVER: We will go by and take Mr. Tripp up to Hemet.

THE COURT: You can turn in the other end of the ticket and cash it and return with Mr. Grover. Is that all right?

MR. RECHE: It's all right with me.

THE COURT: Adjourn until 1:30.

(NOON RECESS)

SAN DIEGO, CALIFORNIA, FRIDAY, MAY 27, 1960, 1:30 P. M.

- - -

THE COURT: Proceed.

(L. J. TRIPP resumes the witness-stand.)

DIRECT EXAMINATION (resumed)

BY MR. GROVER:

Q Mr. Tripp, we were talking at one point this morning about the Middle Ditch. And after water traveled to the end of the Middle Ditch what happened to it?

A It run into the Lower Ditch there.

Q About how much of the Upper Ditch had you completed before the flood of 1891?

A Well, it would be down to where we was yesterday, you know, where I made that cut up there at the rocks. It was down to that.

Q Who started the Upper Ditch?

A Well, my father did.

Q Had any part of the ditches been begun before your father got the property?

A State that again. I didn't get it.

Q Let me ask this. Who owned the property before your father did?

A Well, on part of the place it belonged to a man name of Thane, and when he got killed my father got it from the estate.

Q And had he done any ditch work before Mr. Thane was killed?

A He had done a little. Where was we yesterday there? Let me look. Here is where that flume comes across, ain't it?

Q Yes.

A Well, right along here above that flume he had made a little ditch. I don't think it was over a hundred feet long. He had dug it out to get the water out of the creek above and run into that and bring it down lower.

THE COURT: You said above the flume. Do you mean upstream from the flume?

THE WITNESS: There is the flume there. This is down, now.

THE COURT: Downstream.

THE WITNESS: Down there from the flume. Here is the end of the hill there. Right in there, there was an old ditch when we went there. He had dug like he had intended to get the water out higher up and run it over the flat.

THE COURT: Pointing at the word "Ditch" downstream on the Ditch from the location of the old wooden flume.

MR. VEEDER: I move to strike the statement "as if he had intended to take water."

THE COURT: Overruled.

THE WITNESS: Well, he got killed, you see, before he could do much work on that, I guess. Anyway, that was it.

I'll never forget it because when we got the ditch we planted strawberries below where he had started the old ditch.

BY MR. GROVER:

Q From the time you came to the ranch in 1885 until the Upper Ditch was completed, as you said, about 1897, did you work continuously on the ditches, you and your father?

A Well, he died in '95, and after he died I stayed there and worked on that. I don't think I worked steady on it all of the time, but whenever I could I would get out and do some work on it.

Q You say whenever you could. What would prevent you from working?

A Well, I would have to do other work on the place, and maybe hire out. I used to work for wages sometimes, too.

Q Did you or your father or both of you farm the place continuously from 1885 until the ditch was completed in 1897?

A Well, there was one year, I think in 1891, after it washed everything away about, we only farmed that lower field down there below. We had grain in there, and irrigated some, too.

Q But how about at other times from 1885 to 1897, except for that one year? Did you farm the whole place there?

A Practically everything. There was some that we hadn't got cleared the brush off all. That was all covered

with brush when we went in there about, except in that lower patch below the rock and right west or south of where my sister's house is. They call it a 7-acre field now. That had been cleared of brush. We farmed that, raised hay on it, until we got the water in the Upper Ditch.

THE COURT: How many acres did you irrigate each of those years from the ditches?

THE WITNESS: I never could figure it. I suppose that we irrigated forty acres or more. I don't know. It was in different patches, fields. The gulches run across. We would have to irrigate where we could.

THE COURT: You mean that each year you would irrigate as much as forty acres?

THE WITNESS: Yes, we did, at least that much.

BY MR. GROVER:

Q Did you irrigate more after the ditches were completed?

A After I got that Upper Ditch there we irrigated a lot more, because it went up higher than those other ditches that we had out of the creek.

Q How did you and your father and the family make their living while you were building the ditches?

A Well, we had a station there. In those days nearly everybody that was on the road much, people would come along and stay overnight that stayed. If they wanted feed for their

horses, we sold them hay and things like that. And my father was a Justice of the Peace for years; he got a little money out of that. And we got the Postoffice there; there was a little bit in that. And at one time he run a stage from Temecula to Julian, the mining camp. For a year or two he run that. They would make a trip three times a week. They would start from Temecula early in the morning and make our house there. I don't know whether I showed you where our first old house was. There was quite a lot of passengers.

THE COURT: This is not material.

THE WITNESS: Well, whatever you want.

MR. GROVER: Your Honor, my idea was to point out that they worked continuously on the ditches during the 12-year period, except for what was necessary to live. The twelve years was the period where diligence would be in issue, and I wanted to bring it out.

THE COURT: He stated that he ran a stage. But the details of how the stage ran --

MR. GROVER: I grant that.

Q The food that you ate did you grow on the place?

A A good part of it. We grew corn. We would harvest the corn, and had a grinder to grind meal and make corn bread. Then we raised potatoes, had hogs on the ranch, some cattle. Everything that you do in ranching, you know. It was not on a big scale there.

Q And at this time did you work on the ditches in this 12-year period until the ditches were completed? Did you or your father, or both of you, work on them whenever you could?

A Yes.

Q Did you ever abandon the idea of completing the ditch?

A No, I never did. I never did. After he died, I always figured on finishing that ditch up and get it around on this ground here, for it would make the place worth more money. I used to raise hay to sell there, you see, and all such stuff as that.

Q When did you begin the Middle Ditch, about what year?

A The Middle Ditch we started in '85, as soon as we got there in April '85, we started to get water out of those to the Lower and Middle Ditch. And then the Upper Ditch is later a little.

Q Now I would like to go over the ranch parcel by parcel or field by field and ask you whether or not you irrigated a particular field and what ditch you used to irrigate it and at what times it was irrigated.

A I couldn't tell you exactly about the fields. But the way I irrigated there -- this is the Upper Ditch, ain't it, here -- after I got it out around the hole, come in right

around there, wasn't it?

Q Yes.

A Where the big reservoir -- is this the ditch?

Q That is the Lower Ditch.

A That is the Upper Ditch.

Q Yes.'

A Here I would get all the ground under irrigation so I could raise more stuff, pasture and hay.

Q Did you ever irrigate above the Lower Ditch before you finished the Upper Ditch?

A Irrigated --

Q Let me withdraw that. Did you ever irrigate above the Middle Ditch before you finished the Upper Ditch, between the Middle and the Upper Ditch?

A I couldn't very well, because between the Middle and the Upper Ditch would be uphill.

Q That's right. Did you ever pump --

A I never did pump any there.

Q And you never irrigated from the Middle Ditch after the flood of '91?

A No, I don't think so. Because the Middle Ditch irrigated the vineyard and the orchard. That is what I said, wasn't it? But after '91 the Middle Ditch come on down there and entered the Lower Ditch, you see.

Q After you completed the Upper Ditch about '97, what

did you irrigate from the Upper Ditch?

A All this land where they are irrigating now. Of course, they have some piped up there and a sprinkler system. But I never had that. I just irrigated what was under the Upper Ditch.

Q When you say under the Upper Ditch you mean --

A Below it.

Q Water would flow onto land under the ditch?

A Down toward the creek, you see, it's downhill.

Q The land between the Upper and the Lower Ditches, then, is what you irrigated from the Upper Ditch?

MR. VEEDER: This is getting to be very cumulative. We have been all over this about three or four times.

THE COURT: Overruled.

THE WITNESS: Say that again.

BY MR. GROVER:

Q The land between the Upper and the Lower Ditches, is that what you irrigated with the Upper Ditch?

A Yes.

Q And if there was any water left over in the Upper Ditch, what happened to it?

A I could run it do wn and over past that rock a little, but I never tried. I would always try to manage to use that water night and day. After the irrigating season started I tried to use all that water without wasting it any

more than I could help. Once in a while something would happen, I would have to turn the water in the ditch back into the creek a little until I got my ditch repaired.

Q Would the water from the Upper Ditch ever go into the Lower Ditch?

A Well, I don't think so. Sometimes it might run over from the alfalfa down into the Middle or Lower Ditch, but not very much.

Q Did you irrigate the land below the Upper Ditch, between the two ditches, the Upper and the Lower, did you irrigate that continuously after the Upper Ditch was completed every year?

A I think so. Let's see, after that Upper Ditch was built everything below that I would irrigate clear down to the Middle Ditch or -- I don't know just how to word it myself, but that water was all used. When I was there I never wasted any water for any ditches during the summer because I had to take care of it to get it over the ground. I tried not to let the ground get dry.

Q How about the land below the Lower Ditch?

A Well, that was most of that irrigated down there -- well, practically all. I took the water out of there where I showed you yesterday and run it on down -- where is that place where I took that Lower Ditch out? It should be -- there it says "Ditch," "Ditch."

MR. GROVER: I believe, your Honor, that this black pencil mark was the one he indicated this morning as one of his intakes.

THE COURT: All right.

THE WITNESS: That is the reservoir. Right west of that a little down the creek is where I took the water out to the Lower Ditch and it run on down there and there was some ground down there along that stream.

BY MR. GROVER:

Q Now Mr. Tripp, you mean to go downstream?

A Yes.

Q This is downstream this way.

A That is the way I went. There is a bank along there. It is there yet where the Lower Ditch irrigated it. It runs right down along like that. But I irrigated all that lower field there from that ditch. Where is that big rock?

Q The big rock is over here.

A From the lower ditch around onto that, come out under the ground there.

Q South of the big rock?

A South of the big rock.

Q That would be that way from the big rock?

A Yes. And I made a ditch right around that place and went clear around to the lower end of that field where the pond is now in the lower end of that field.

Q There is a pond shown next to the creek here. Would that be the end of the Lower Ditch? That blue spot is a pond.

A Yes. But this is -- what do you have figured there? Ground?

Q Yes, that is the area between the Lower Ditch and the creek there. Is that the area that you irrigated from the Lower Ditch?

A Well, anyway, here is where that water come out that run down around like that and co me in -- this would be the pond -- like that.

Q You took it in over here, you said, near the big reservoir. And then did the Lower Ditch run around where this blue line is here?

A I am pretty sure it must have, because --

Q And south of the big rock?

A And south of the big rock.

Q And over to the pond?

A Yes, because there was kind of a bluff there and bank, it is there yet, right along here. It is right west of the house where we was yesterday. That bank runs along like that, you see. This would be down. At one time the creek had made a bank there for ten or fifteen feet high, straight up and down, and around there like that.

THE COURT: Let me interrupt. Call the criminal case.

(Interruption.)

THE CLERK: 2 - 1247-SD-C United States of America v. Fallbrook Public Utility District, et al.

THE COURT: Proceed.

BY MR. GROVER:

Q Mr. Tripp, you see this line that I am marking along here that I am showing you.

A Yes.

THE COURT: Indicating the Lower Ditch.

MR. GROVER: Yes.

THE WITNESS: Here is where it starts at the intake.

MR. GROVER: Yes.

THE COURT: Indicating intake.

THE WITNESS: That would connect about like that.

BY MR. GROVER:

Q The land between that and the creek, that is, down below the Lower Ditch and onto the creek, when did you start irrigating that land?

A You take the land -- let's see, this is the Lower Ditch, it goes around, and that would be on the upper side of that land.

Q It would be below the Lower Ditch there.

A All this?

Q Yes.

A Yes, that would.

Q Did you irrigate that from the Lower Ditch?

A Everything down there was irrigated from the Lower Ditch. There is land out in the creek there that was never irrigated. It is grown up in wood, wood trees. But that land that we irrigated is practically all clear now. They have permanent pasture on some of the land down in there now.

Q When did you begin irrigating that land?

A We started on that Lower Ditch irrigating in '85 about, first, because that was one of the first -- the Lower Ditch and Middle Ditch was the first one we took out.

THE COURT: He has been putting his pencil around the area shown as I and J. Show him the area now marked Pasture H.

BY MR. GROVER:

Q Does that include this part marked "Pasture," the white outlined in red marked H?

A That is the south end of the big rock?

Q Right.

A That should run right back around -- the water would run right back around here, if I don't get mixed up.

Q That's right. Did you irrigate into this pasture marked H, this part in here, from the Lower Ditch?

THE COURT: That is the nearest piece to the house below the Lower Ditch.

THE WITNESS: Well, I irrigated in there. Of course, it is covered up; it has changed since I started in there first. But there was a little patch of land there, and the creek

bottom, there was probably an acre or two or three that I irrigated for pasture -- I didn't try to farm it. But from the Lower Ditch, you see --

Q Did you irrigate that continuously every year after '85?

A It was irrigated until I left there every year. I irrigated that because it made a little feed for my cattle, you see.

THE COURT: How many acres did you irrigate in I and J? Show him where I and J are.

MR. GROVER: These are Fields I and J over east of the pond there. You see, here is south of the big rock, and over beyond west of the rock, below the Lower Dith .

THE WITNESS: I can't figure that. Those pastures were not there when I was there. It was all one field. That is where I irrigated from the big rock, you know. It was all in one field.

THE COURT: It was all one field, and you irrigated an acre or two of it; is that it?

THE WITNESS: No, right there is where the water come into where that cut that I made, the water come out right to the south end of that big rock, and that water went away around like that.

MR. GROVER: Wait. This is west over here, this is downstream over here.

THE WITNESS: Yes. The ditch run on the upper side there, and the water run south from it to irrigate that ground there.

BY MR. GROVER:

Q Did the ditch go down to this pond here?

A Yes, it went away around.

Q How about this land west of the big rock and below the Lower Ditch there? Well, let's not look at the map for a minute, Mr. Tripp. Let's just talk about it. You mentioned a minute ago that you made a cut south of the big rock.

A That co me out of the Lower Ditch.

Q You made a cut for the Lower Ditch there.

A Well, it run back --

Q Not on the map, but just talk here for a minute. Then where did the water go after it went through that cut?

A It come out right there at the south end of that big rock and went away around the field and like --

Q Not on the map. Just tell us. Which direction did it go?

A It run west from that big rock where that cut come, right around the field and circled clear around and co me back down into where this reservoir is there.

Q To the pond you mean?

A To the pond, yes.

Q And did you irrigate the land below the ditch,

between the rock and the pond?

A On that field because there was land in the creek there that was covered with trees, that I didn't irrigate. All the rest of the land that was cleared under that Lower Ditch I irrigated.

THE COURT: How many acres was that?

THE WITNESS: There must have been 25 acres in that one field there where that big rock is. I think there was at least 25 acres there.

BY MR. GROVER:

Q And it was one field then and not two?

A Yes, it was one field there.

Q The land below the Upper Ditch, between the two ditches, you said you irrigated after the ditch was completed in '97. How long did you continue irrigating while you were at the ranch?

A Just as long as I was there I irrigated from that Upper Ditch down.

Q And the Lower Ditch, too, as long as you were there?

A And used the Lower Ditch, too.

Q And when did you leave the ranch?

A I left there first in 1899. I went away and came back. Then I rented the ranch there.

Q What year was that that you rented?

A Let's see, I left in 1899 and I come back in 1902,

I think, or 1903 is when I come to the estate and stayed there.

Q Then how long when you rented did you stay that time, after you started renting?

A I stayed right on the ranch there three or four years. Well, I think I stayed there until about 1907.

Q Did you ever live on the ranch after 1907?

A No.

Q Did you ever visit the ranch between '99 when you left and 1903 when you came back and rented it?

A Yes.

Q About how often did you visit the ranch?

A I left there in '99, and I came back that fall and I went to Randsburg and worked in a mine there, and I left there in 1901 and went to Tonopah. I came back there after that and rented the ranch.

Q In that period from 1899 when you first left and 1903 when you came back and rented it, did you see the ranch every year?

A Yes.

Q How many times a year?

A Oh, maybe it was o nce or twice, or three times. I don't remember just which.

Q Who had the ranch in that period from 1899 to 1903?

A I think that Clint and my brother Ed had it there.

Q It was in your family, though.

A Yes.

Q Did they continue to irrigate the fields that you were irrigating before 1899?

A Yes, they always kept the fields irrigated.

Q And then from 1903 during the period that you rented it did you continue to irrigate the fields?

A Yes, I irrigated everything I could get water on. I tried to raise feed. I ran all the ditches.

Q And then after 1903 you rented it until 1907, and then when you left in 1907 did you visit the ranch after that?

A Yes. I went to the Imperial Valley in 1907. I came back in 1908 to the place and I worked a year there.

Q Let me ask you this. How long did it stay in your family?

A Until my sister and Clint sold out. She sold out in 1934, and Clint sold out I forget what year it was. But it was always in the family until they sold out.

Q Did Clint sell out about the same time that your sister did?

A He sold out before.

Q About how many years before?

A I couldn't tell you exactly. It might have been two or three or four years.

Q After you left in 1907 until 1934 did you visit the ranch every year?

A Yes, maybe two or three times a year. I know I worked a year there, and I would go down to the place maybe

once a month.

Q And your family was living there?

A Yes.

Q And you actually went on the ranch?

A I was on the ranch. My sister lived there, and Clint had moved, I think -- I'm not sure. He hadn't sold out yet. My mother was still living there.

Q From 1907 up until 1934 were the field that you irrigated while you had the ranch still irrigated?

A Yes.

Q And every year?

A Ever year, I am sure.

Q Was there ever any irrigation, to your knowledge, above the Upper Ditch?

A There was. At one time McGaw, when he got the place from Johanson, right where the ditch comes down, right here is about where it comes onto the flat --

Q No, here is the big reservoir.

A I know, but the ditch come in above the reservoir up here somewhere.

Q That is right.

A Now what did you want?

Q You said something about McGaw.

A He rented and bought that place from Johanson where Mrs. Cottle is.

Q Mrs. Cottle or Mrs. Gibbon?

A Mrs. Gibbon, I guess. I don't know. And McGaw, when he come there -- I was there in 1934 -- right where this ditch come into the upper flat there, he put a centrifugal pump in there and pumped the water in a pipe up on the hill there, the slope, and irrigated around north in this direction. He had so me irrigation above the house around there and then over that gulch. It is marked "street" here on the -- that runs through the place. He piped it across that gulch, and he must have had ten or fifteen acres of corn on that flat from that pump. That was the summer of '34.

Q That was in land above the Upper Ditch.

A Yes.

Q Do you know any other years that that was done, that the land was irrigated from the Upper Ditch?

A I don't know when it could have been. He left there right shortly after that, McGaw did. Whether anybody else used that pump or not I don't know.

Q When you constructed the Upper Ditch was it about the same size as it is now, or larger or smaller?

A Well, it was not much different in size. When you cleaned the ditch out you had a pretty good sized ditch, and after it was filled up a little, I would say the ditch now is not as big as when I had it, because it kind of growed up with moss and stuff, and I would every spring clean it out

good shape and have it as big as I could to get all the water down that I could.

Q Did the ditch ever get flooded out or damaged or anything like that?

A Oh, at times there would be a gulch, you know, run in there. If we got a heavy rain it would wash the ditch out. But I would repair it, I would fix it.

Q Was there any time when you left it damaged, didn't repair it?

A You mean after I left the place?

Q No, while you were on the place.

A No, if the ditch was ever damaged or a gulch ran through and washed it out, I would fix it right away. I didn't wait. I would take a team and scraper and soon fill it up. I would have to, because I couldn't go without water.

Q Did you ever run out of water?

A I never did while I was there, no.

Q Did you ever let any water go to waste from the ditch?

A Very little that I ever wasted when it got down low in the summer. In the winter time there would be water run by, particularly when I didn't need to irrigate.

Q Did you take all the water that was in the creek in the summertime?

A I did at times. Like the Upper Ditch, I would take

all the water there was there in that. And the next ditch down, I would take all of that. It would keep raising, you see. That water would sink and raise. The Upper Ditch, I would use all the water out of that creek there, and then the Middle Ditch, and then the Lower Ditch. But when you got down to where this pond is here, where that canyon is, the water would raise again. A good stream to irrigate the place below where my brother used to be. Whoever has it now, I don't know the name.

Q What was your method of irrigation? Did you have sprinklers?

A No, no one ever had heard of a sprinkler in those days. We had the ground bordered up like where I come from, these are borders built up, and turn the water in and irrigate between those borders. That is the way I irrigated alfalfa. If we raised corn or anything, we run the water in the furrows between the rows of corn.

Q Is that what they call flood irrigation?

A Not for corn. Flood irrigation is where you flood your ground with water, like in alfalfa. You have to cover it good in borders, so that it doesn't spread all over the country.

Q But for corn you used furrows?

A Yes.

Q For alfalfa did you use flood irrigation?

A Well, you could call it flood irrigating. But I

turned it in the high end of this border and let it run through. When it got through I would change it into another one. That is the way they irrigated. You do it with alfalfa yet where you have plenty of water.

Q What crops did you grow on the fields?

A Well, I raised, in that lower field at one time I had that all into alfalfa, thick stand of alfalfa, raised hay there. Before that I had raised grain. And after I got the Upper Ditch there I raised alfalfa on that as long as I stayed there, got a good stand of alfalfa. Later on it had kind of gone to bermuda grass; the hay was not so good. But on dry ground that I had I couldn't irrigate, I would plant grain or hay.

Q Where would the dry ground be?

A Well, up above the ditch. Like they have ground above the ditch, but they use a sprinkler system. I didn't have that. I planted wheat there and made wheat hay.

Q What did you do with the hay?

A I used some of it and sold some of it where I could sell it. I used to haul it to Temecula with a team and sell it.

Q Did you run any cattle on the place?

A Yes, I always had some cattle there, about what I could keep and do well. I also raised hogs, too.

Q About how many head of cattle would you have on there?

A I don't know. I don't think I ever had less than 20 or 25. I couldn't say for sure.

Q What was the most you ever had on there?

A At one time when I had some ground rented I think I had 125 head. But there wasn't feed enough on the place. I got them ready to sell and got rid of them.

MR. GROVER: I believe that is all the questions I have.

MR. VEEDER: I have no questions.

MR. GIRARD: I have no questions.

THE COURT: Mr. Stahlman?

MR. STAHLMAN: No questions.

THE COURT: Step down. Thank you, Mr. Tripp.

MR. GROVER: Your Honor, the other witness I have is a son of the Mr. McGaw referred to by Mr. Tripp, and I believe he has been a witness before. He was unable to be here. I would like to have the opportunity to bring him at another time when the Court will be in session. Rather than fix a definite time, I am wondering if it might not be more convenient if at sometime Mr. Veeder and I could agree that when Mr. McGaw is available he can come when you are going to be here anyway.

THE COURT: What do you expect to prove by Mr. Mc. Gaw?

MR. GROVER: A little more detail about this pumping above the Upper Ditch.

THE COURT: That was done for one year, according to Mr. Tripp.

MR. GROVER: Nineteen thirty-four was the year he left there and that is the year he knows about, and then the pumping from the Upper Ditch above that he is not sure how long it went on.

THE COURT: Do you know how long Mr. McGaw will testify that it went on?

MR. GROVER: I believe that he will testify that up to 1936 there was irrigation above the Upper Ditch, and that is the year that Dr. Cottle bought the property, the father of the present owner.

THE COURT: I don't want to say that I will not hear other witnesses, if you want to bring them in. But we have to have an end to this sometime.

MR. GROVER: I understand that he had planned to be here today, but he was working on a project subject to deadline and he was subject to penalty if he left his work.

THE COURT: Do you have proof on the use of the Upper Ditch after '36?

MR. GROVER: I believe that the record already shows, from the witness Spaniol and also from Mrs. Gibbon, that there was use after that time.

THE COURT: For how long?

MR. GROVER: Well, of course, I have forgotten the exact details of it. But it is used today above the Upper Ditch. And Dr. Cottle came in '36, Spaniol first started working there

in '39, and that there has been some form of activity continuously since then.

THE COURT: What have you shown other than the ordinary use of a riparian owner of water on property?

MR. GROVER: Well, a diversion was made, your Honor, on Government land.

THE COURT: There is proof of a diversion made on Government land. But take the difersions you talk about down the Lower and Middle Ditch, they weren't made off the property -- they were made on the property.

MR. GROVER: That is right.

THE COURT: Wouldn't that be just a riparian use?

MR. GROVER: It might well be, your Honor, yes. But so far as this diversion on Government land is concerned, it would bind all subsequent patentees of the Government, which would be people at various places throughout the watershed and would be a right that would be superior to any right that they have as riparian owners.

MR. VEEDER: Your Honor, in that regard, I believe that a riparian owner can divert above his land. I don't think that adds a bit of significance to this claim. I have viewed this as strictly an expose of a riparian user; I don't believe I am wrong in saying this. I believe that the fact that the man conducts the water from another party's land or off the National Government's land, I don't believe that it makes a bit of

difference in regard to the riparian use.

Do you agree with that?

MR. SACHSE: I agree.

I am under the impression that if this were an action to quiet title to the use of the ditch, testing their right to use the ditch, that might be one kettle of fish. But I don't think the ditch adds anything to the water right, under the circumstances.

THE COURT: There would be the question, of course, of the right to use this ditch across this Government land. Is that still Government land?

MR. GROVER: No, it is not.

Now your Honor may recall -- and I might preface it by saying that I didn't come prepared for thorough argument -- I believe the case of Smith v. Gaylord, cited as the case relied on by the Government at the first trial to prove that a downstream owner could get a prescriptive right running against an upstream owner, and your Honor may recall the introduction of the material in that case -- the name of it slips me, but it is a California Supreme Court case -- showing that the original trespass there was on a larger piece of land, that there was a severance, and consequently after severance of the properties it looked as though the man downstream had gotten a right against a man upstream. But as a matter of fact, it was an actual trespass upon the land, and as I

understand it from that series of cases discussed in that controversy that we had before, a man going upon another man's land can gain not only the right to go upon but a water right to the extent that he violates rights.

THE COURT: What I am trying to suggest, without deciding anything, is that there is in this case also whether or not you have a right to operate a ditch across another person's property.

Do you know who owns this property presently?

MR. GROVER: I believe the name is Schroeder, I have been told.

THE COURT: Is there an agreement reached as to the use of the ditch? Because it would seem to me to be within the issues of this case to determine whether you had acquired a right to operate a ditch across that piece of ground, and that would be apart from whether or not you have other than a riparian right. In other words, you might have only a riparian right, but you might have acquired a right over someone else's property to take water from the stream and use it for riparian uses on your land.

MR. GROVER: I agree.

MR. VEEDER: If I understand correctly, that was built across Government property, wasn't it?

THE COURT: Originally.

MR. GROVER: Yes.

THE COURT: But subsequently it passed from the hands of the Government into the hands of some private owner.

MR. VEEDER: But after the Act of August 1890 the property, whoever acquired it, would take subject to the ditch.

THE COURT: Act of 1890. What was that?

MR. VEEDER: The Act of 1890 says that any patent subsequently issued -- wait a minute. It goes further back. It goes back to 1877 and 1870.

MR. GIRARD: Yes.

MR. VEEDER: If they went on the property and built a ditch across the property --

MR. GIRARD: 1866.

MR. VEEDER: No, the Act of 1866 related to water.

So the situation, as I see it, the talk about a trespass or an invasion has no validity because the National Government recognized those rights and subsequent patents that were issued simply --

THE COURT: -- took subject to existing ditches, regardless how long they had been in effect.

MR. VEEDER: That is right.

So I go back to the original premise to which I brought your Honor's attention. What is he claiming? He is claiming, as I see it, and I believe the proof relates only to, a riparian right, and the mere fact that he is diverting water upstream lends nothing whatever to the claimed right.

THE COURT: Well, let's not argue the case today. But you had better check on this statute, and you had better ascertain also if this man Schroeder, whoever owns this property, has made an appearance and you had better suggest that he be in here at the time the matter is argued. Because one thing to be determined here would be your right to continue to use this ditch, and since it involves another man's property that ought to be determined as it pertains to the use of water.

MR. SACHSE: As a matter of pure interest -- I don't know anything about Mr. Schroeder -- but I believe that you will find that every title policy issued in Riverside and that area has a specific exception as to all existing ditches, etc. It is practically standard.

THE COURT: That doesn't tell you too much. That is just an attempt of the title company to avoid liability.

MR. SACHSE: Mr. Schroeder may know all about this.

THE COURT: The title company will also say that they make no guarantee as to what might be seen by going upon the ground. This is standard practice.

Will you check on this matter?

MR. GROVER: Yes, I had intended to do it, your Honor. I had intended to give notification to Mr. Schroeder. I will do my best to ascertain the owner.

THE COURT: Wouldn't it be a healthier situation to have him in here when you argue the case?

MR. GROVER: I agree, except we are adverse to everybody on the water rights.

THE COURT: Well, we have tried when we can to have particular people here who have particular problems.

MR. GROVER: All right, your Honor.

THE COURT: It may be an open and shut situation, under the statutes that Mr. Veeder referred to, that you have a right to operate that ditch across that land.

MR. GROVER: I believe that that is the case, your Honor.

THE COURT: Can you have this man in here at our next session?

MR. GROVER: When will that be?

MR. VEEDER: June 23 and 24.

THE COURT: June 23 and 24.

MR. GROVER: He told me that he would finish this project next week and that after that, as far as he knew, he could be here at any time.

THE COURT: Let's have him in here on, say, June 24 or 23, whichever suits you best. Will you do that?

MR. GROVER: Yes, your Honor. Either day would be satisfactory.

THE COURT: I would think the morning of the 24th. Your notices are going out for that morning, aren't they, Mr. Veeder?

MR. VEEDER: That is correct.

THE COURT: We will probably have a lot of people in here in the morning. The afternoon of the 23rd might be a good time. On the 24th we will have our friends from the Schloss Estate back.

MR. SACHSE: I was going to suggest for the 24th, I told Mr. Veeder yesterday, Occidental College is ready to put on what little they have. We are in complete accord with Colonel Bowen's engineering report. But there is a very small dam involved, and we are going to present to your Honor what evidence we have as to its history. I don't think over a half hour.

MR. VEEDER: I would like, before we break up in regard to this particular claim, Mr. Grover, we desire a little more time to review the data that you have placed in our hands.

MR. GROVER: I was going to ask that. That can certainly go over until the 23rd.

MR. STAHLMAN: Are you sure that you have the right man on whose property that ditch is?

MR. GROVER: No, I am not. I have just heard that, and I may be mistaken. But I will endeavor to find out where the title is on that land.

MR. STAHLMAN: I might be able to help you.

THE COURT: We are interested in the record owner of that land where your point of diversion is.

And we are interested in this man McGaw, who is your last witness.

MR. GROVER: Yes.

THE COURT: I would like to have both of them in here on the 23rd.

MR. GROVER: Will it be the morning or the afternoon?

THE COURT: Let's say the afternoon. I think it would probably save some time.

MR. GROVER: I will put it down for 1:30 then.

THE COURT: Mr. Sachse, you will be ready on Occidental College?

MR. SACHSE: I think I will be ready. I want to be sure of the date. I am sure I can be ready.

THE COURT: Very short period of time?

MR. SACHSE: Very short, your Honor.

MR. VEEDER: A point has been raised in regard to the presence of Mr. Reche. I don't see him here.

THE COURT: He didn't come back.

MR. VEEDER: Apparently not. If amenable to your Honor, we will notify him in regard to the day and hour, because I think Mr. Grover should be here when Mr. Reche testifies. I will have somebody check in the hall.

THE COURT: Mr. Reche apparently wanted to be sure to use that return bus ticket. Let's try to have him here on the 23rd also.

MR. VEEDER: What was the hour?

MR. GROVER: One-thirty.

THE COURT: Mr. Stahlman, will you be ready on June 23 to finish up your end of it?

MR. STAHLMAN: Your Honor, I thought the first session after that. But maybe we can. We made some arrangements this noon to get this Santa Rosa finished up. Colonel Bowen and Mr. Wilkinson are getting together. We expect to have all that evidence in.

Do you think you can have it by the 23rd?

You have Mr. Tarwater on the 23rd also.

You also have Mr. Lincoln.

THE COURT: They are co ming in the morning of the 24th.

MR. STAHLMAN: If we could have a session shortly after that. I think we have about enough for two days here.

THE COURT: I don't think Mr. Tarwater is going to take very much time. But let's have him in here on that occasion.

Between now and the 23rd why can't you be ready to close up your end of this?

MR. STAHLMAN: I will put on everything, except that Colonel Bowen and Mr. Wilkinson told me that they didn't think they would be finished by that time.

THE COURT: If they are not through with the Santa Rosa -- which is going to be, I would think, pretty pro forma --

be ready on any other loose ends.

MR. STAHLMAN: Very well, your Honor. Will that be the 23rd or 24th?

THE COURT: Let's say the 23rd. Maybe it will be the 24th or the 23rd.

MR. STAHLMAN: Mr. Kunkel will be here then? We can follow that plan we suggested this noon, Mr. Veeder.

MR. VEEDER: I think it is going to take more time than the 23rd or 24th.

MR. STAHLMAN: I thought so, too.

We had discussion this noon, and I think Mr. Veeder and I reached a rather practical plan to dispose of considerable of this evidence with relation to the tests that have been made up to the present time, and also the Vail evidence.

THE COURT: Will you and Mr. Veeder prepare for me some little summary of these loose ends that I went over this morning?

MR. STAHLMAN: Yes.

THE COURT: Plus whatever other agreement you arrive at.

MR. VEEDER: We will give you the summarization.

I would like to state in the record while the gentlemen are here in the courtroom, if that will be the next order of business --

THE COURT: All right.

MR. VEEDER: From the standpoint of the United States,

we will be in a position to put into evidence Exhibit 15-E, which has been marked for identification, the supporting data in connection with that.

We have had prepared another exhibit, which will be designated 15-A as revised for 1958.

Then we will have Exhibit 15, which has been revised and refined for the year 1953. That data will be predicated upon the info rmation that has been obtained under Court order and under the auspices of the Court and under the procedure that we have been following.

We will also be in a position to put in hydrographs of the recorder charts and the hydrographs of selected wells.

In these discussions with Mr. Stahlman, he has indicated that he desires this data in regard to the stipulated judgment. He has agreed with me, however, that the exhibit and the supporting data will be general in character and will not be limited to rebuttal. Your Honor will remember that when we got these orders to go on and make this well canvass, I agreed that it would be used in regard to rebuttal. As I understand, the informatio n, the data and the supporting testimony in connection with it will be general in character and there will be no limitation as to its use. That at the close of the case, as I understand it, I can proceed with rebuttal in due form. That was the general discussion.

Is that correct?

MR. STAHLMAN: That is correct.

Evidently there has been a misconception. I had no idea that in order to get this evidence here that I think we should have at this time that we would limit Mr. Veeder from some further rebuttal in the case. I didn't intend that at all. As Mr. Sachse said this morning, your Honor is going to permit evidence that has a bearing on the case until the case is concluded. I didn't stress a great deal of importance on whether we call it rebuttal.

THE COURT: I don't either, Mr. Veeder. If you have been worried about that, quit worrying about it.

MR. VEEDER: The point that I make is that your orders were entered on the predicate that that is how I use the data.

THE COURT: Are you going to lodge the exhibit?

MR. VEEDER: They are going to be lodged, your Honor. I will try to get them lodged this afternoon, although the hydrographs, I believe, we haven't completed.

MR. GIRARD: We have been served with all those hydrographs.

MR. VEEDER: The only thing that will be entailed in regard to those hydrographs will be a compilation of the data. That has been already delivered to you. I would like until June 15th in regard to the hydrographs. In regard to the maps, I think that will be today or very shortly.

THE COURT: What about this supporting data?

MR. VEEDER: That is going to be the witness. I will have to call Mr. Kunkel for oral testimony. It will be the well canvass.

THE COURT: Any exhibits that he is going to use, or compilatio ns, will you file or lodge beforehand?

MR. VEEDER: That is correct, your Honor.

THE COURT: So that we will have all the documentary and written material lodged before the witness is called.

MR. VEEDER: Yes.

THE COURT: The hydrographs will be when, June 15th?

MR. VEEDER: I would like to have it. It is just a simple matter of compilation now.

You have no objection?

MR. SACHSE: No.

MR. GIRARD: No.

MR. VEEDER: It is a matter of convenience to us.

MR. SACHSE: What I am most interested in is how we would proceed after that date. I certainly agree that we are not, on the 23rd and 24th, going to get all this in, and my hope would be that during our July session, preferably immediately before the one when Mr. Veeder intends to call for more small landowners, we could set aside a week and knock some of this stuff off.

MR. STAHLMAN: I am for that. And we can get through with Vail then.

THE COURT: You just want to keep postponing, Mr. Stahlman.

MR. STAHLMAN: No, I don't, your Honor. I take issue with the Court on that. I want to get this thing over. If you want me to co me down here on Monday of next week and put Vail's evidence on, we will do it.

MR. VEEDER: Monday of next week?

MR. STAHLMAN: Yes.

MR. VEEDER: Decoration Day.

MR. STAHLMAN: I am not trying to stall this Court.

THE COURT: We have laid out a number of things for the 23rd and 24th. Let's see what we can do on those days.

MR. SACHSE: Let's keep on going.

THE COURT: We might even go into Monday the 27th and Tuesday, the 28th.

MR. STAHLMAN: Good.

THE COURT: And then we will fix some dates in July also to try to see what we can do to clean the things up.

MR. SACHSE: That is good.

MR. VEEDER: I have no objection to that.

THE COURT: Mr. Stahlman, will you try to be ready by the 23rd or 24th and finish up what you can, except for possibly a loose end on the Santa Rosa?

MR. STAHLMAN: Very well.

THE COURT: Will you have Mr. Kunkel here?

MR. VEEDER: Yes, your Honor.

THE COURT: Mr. Girard, when do you want to prove this exhibit?

MR. GIRARD: We can do it now or the first thing on the 23rd. I will leave it up to the Court and Counsel.

THE COURT: Let's do it now.

MR. VEEDER: Your Honor, there are some more letters that I would like to put in Exhibit 207-E, if I may.

THE COURT: They may be received in evidence as part of Exhibit 207-E.

Mr. Grover, by the 23rd you will have, of course, put on all of your case.

MR. GROVER: Yes, your Honor.

THE COURT: Will you be prepared to submit prior to the 23rd, a few days before, what you will propose to be the interlocutory findings and judgment in co nnection with your problem?

MR. GROVER: Your Honor, I could do it. Actually, there are some other matters in there that would make it harder to do then than at another time. But I can.

THE COURT: I was thinking that if we had before us what you were claiming and what findings you thought would be supported, it would be useful to have them as we hear the argument on it. But if you find that you can't, all right.

I think Mr. Veeder also ought to submit what he thinks.

MR. VEEDER: In regard to Gibbon and Cottle.

THE COURT: Yes.

Suppose I leave that to you and Mr. Veeder. If you decide that you can get something in before that time, all right. If not, I will put it over to the July date.

MR. GROVER: Yes, your Honor, I will endeavor to do it.

THE COURT: What exhibit number is this now that you are going to work on?

MR. GIRARD: California's AX, your Honor.

THE COURT: I find it.

LEE ILLINGWORTH,

having been previously duly sworn, on his oath was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GIRARD:

Q Mr. Illingworth, you have been sworn previously and you are the Lee Illingworth who has testified previously; is that correct?

A Yes.

Q This California's Exhibit AX, Mr. Illingworth, was prepared by you or under your supervision and control?

A Yes, it was.

Q Directing your attention to the upper graph or chart which is on California's Exhibit AX, could you explain what the solid heavy line not broken indicates?

A That represents --

MR. VEEDER: I am going to interpose an objection to any testimony along this line on the grounds that the Exhibit as identified purports to show uses under the stipulated judgment and in effect to show that there has not been compliance. The evidence and the Exhibit AX are incompetent, irrelevant and immaterial and do not tend to prove any issue in this case.

The facts show, in our view, that the Vail Company, through a course of conduct since the United States of America bought the properties, by what we purport to show by our evidence in the record, the agreement by the Vail Company to be bound by the stipulated judgment if we withdrew our protests to the building of the Vail dam, that we agree to put in the Pauba well, that there has been a continuous course of conduct since at least 1947 which is binding upon the Vail Company. They are estopped now to deny the validity of the stipulated judgment.

THE COURT: Overruled. First of all, the Exhibit has not been offered. It is merely an attempt to identify it. Secondly, you talk about the Vail Company being estopped. This is evidence from the State of California, which is here pro patriae.

Let's go ahead.

MR. VEEDER: Your Honor, I would like to have the objection that I made run to all this evidence and all further exhibits that are offered on any further grounds, so that I

don't have to repeat it.

THE COURT: Insofar as it pertains to this Exhibit AX?

MR. VEEDER: And so far as it pertains to this testimony.

THE COURT: To the testimony of the witness. All right.

BY MR. GIRARD:

Q This solid line on the upper chart is representative of what, Mr. Illingworth?

A It represents two-thirds of the larger streamflow at Station 3 or Station 6, Station 3 being the USGS Gauging Station at Temecula Gorge and Station 6 being the USGS Gauging Station at Ysidora.

Q In other words, whichever station had the most water in it at the particular time, you took two-thirds of the water flowing by that station?

A That is correct.

Q And the broken lines on the chart indicate what, Mr. Illingworth?

A That represents the total diversion by the United States; that is, it is the sum of the measured pumping of Camp Pendleton wells, plus the diversions from the Santa Margarita stream diversion point of the Naval Ammunition Depot, and plus the diversions made through O'Neill ditch. They are labelled hereon as O'Neill Lake diversions. Their measuring point was at O'Neill Ditch as reported by the Geological Survey.

Q In regard to these figures for the total diversions,

there are three sources of those, as I understand it.

A Yes.

Q Insofar as Camp Pendleton pumping is concerned, where did you obtain your figures to determine how much should be attributed to Camp Pendleton pumping?

A That data came from two sources. It came from Vail Exhibit AD for the period October 1955 through October 1958, or I should say to October 1958. And for the period October 1942 to October 1955 the data was obtained from page 114 of the Department of Water Resources Bulletin No. 57, which reproduced data submitted by the United States in the first trial of this case.

Q In other words, the figures in Bulletin No. 57 were taken from United States exhibits which were introduced at the first trial?

A Yes.

MR. VEEDER: Aren't those in this trial marked as California's Exhibit X? I'm sorry to interrupt. But I think all this is in the present record, is it not?

MR. GIRARD: Yes.

MR. VEEDER: Marked by California present exhibit numbers.

MR. GIRARD: No, all of these are not in California's exhibits, but all of the sources are basically in evidence in one place or another.

MR. VEEDER: Okay.

Q As to the Naval pumping, where did you compile your figures or get your figures as to the amount of water attributable or amount of diversions attributable to the Naval Ammunition Depot?

A That data was obtained from Plaintiff's Exhibit 150 in this case. Although, as you may recall, an inspection of the Exhibit did indicate that the values shown thereon are annual figures. So lakking monthly values, I simply took one-twelfth of the annual value and utilized that figure in determining the monthly value shown on this chart. That is an approximation. But that particular diversion is a relatively small part of the total. Hence, it appeared to be a reasonable procedure.

Q Where did you obtain your diversion figures for Lake O'Neill?

A That was taken from Vail Exhibit AD.

Q And you, personally, didn't make any investigation or examination as to whether the figures which are in these exhibits in evidence are correct or not?

A I did not make any detailed check of them. At the time they were offered or identified I did notice that they appeared to be substantially correct.

Q Now, directing your attention to the lower chart , the straight lines are indicative of what?

A The solid lines?

Q The solid lines.

A They represent one-third of the larger of the flows at Station 3 or Station 6.

Q And the broken lines are --

A The broken line represents the total diversion by the Vail Company, which total is made up of Vail pumping from wells, plus the gross catchment in Vail Lake and less the release to Pauba basin from Vail Lake.

Q Incidentally, these figures are in acre feet?

A Yes, they are in acre feet per month.

Q Where did you obtain your figures to compute the total pumping from Vail properties?

A Those values were obtained from Vail Exhibit AD.

Q Where did you obtain your figures for Vail Lake gross catchment less Vail Lake release to basin?

A The gross catchment in Vail Lake was obtained from Vail AD. The Vail Lake release to the basin was obtained from Vail Exhibit N.

Q Is it correct to say, Mr. Illingworth, that when in either one of these upper-lower charts it is colored, that to the extent of the coloring corresponding to acre feet represents excess over the two-thirds one-third amount?

A That is correct.

THE COURT: Mr. Illingworth, that one bit of supporting data that you said you took from Bulletin No. 57, did you or Mr.

Girard check to see whether that is in evidence here? The fact that it was in evidence at the first trial wouldn't make it in evidence here. If it is not in evidence, let's see that it gets into evidence before we are through here.

MR. GIRARD: All right, I will do that, your Honor.

That is all I have for the foundation for the exhibit, Mr. Veeder.

MR. VEEDER: Have you offered it?

MR. GIRARD: Do you want to offer it before you cross-examine?

I will offer it now, your Honor.

MR. VEEDER: I would like to ask a couple of questions.

CROSS EXAMINATION

BY MR. VEEDER:

Q In calculating the colored areas, the yellow and the red, as shown on Identification AX, you used the purely mechanical procedure of taking the arithmetic calculation of one-third two-thirds; you didn't attempt to interpret the stipulated judgment, did you?

A You asked me --

Q I will rephrase the question. You just took the simple method one-third two-thirds, did you not?

A In plotting those lines?

Q Yes.

A That is correct.

Q Who directed you to do that? Mr. Girard?

A Yes.

Q Now, in making your calculations you didn't attempt any further interpretation of the stipulated judgment, did you?

A No.

Q Did you take into consideration that a very substantial return of sewage effluent goes into the basins at Camp Pendleton?

A No.

Q In other words, this yellow that is shown on the AX could very well be in part, and undoubtedly is in part, sewage effluent that has been pumped out of that basin?

A I am not sure that that follows. You say part of the area shown in yellow.

Q I will simplify it. You simply took the pumping figures, did you not?

A That is correct.

Q So if there was sewage effluent included in the water that was pumped, your figures included the sewage, didn't it?

Well, to the extent that the sewage represents a portion of the water that was pumped from those wells, then that water is included in the values.

THE COURT: I have your point, and the record so shows. Let's go on to something else.

BY MR. VEEDER:

Q In regard to waters which are diverted into Lake O'Neill and which percolate into the ground waters, they likewise would be included in the figures that you utilized?

A That is correct, as stated on the chart.

Q And to the extent, then, that that phenomenon took place your figures would be demonstrative of utilizing the water twice, at least the measurements twice? Is that right?

A I believe that that is true. These values do not -- or I should say the calculations do not take into account the return flow any more than the stipulated judgment does.

Q Now, in regard to the Vail figures, did you use the gross impoundment or the net impoundment at Vail dam?

A I used the value of gross catchment as it is presented in Vail AD.

Q In other words, your figures are reflective of any evaporation or bank storage losses that might have transpired; is that right?

A Well, I would like to see Vail AD.

THE COURT: The bottom part of the chart as to Vail, you are charging Vail, under the head "All Diversions," actually the water that they got backed up at the dam?

THE WITNESS: Yes, sir.

THE COURT: On the grounds that they control it until they release it?

THE WITNESS: Yes, that is right, your Honor. Actually, it could be considered a diversion; it is diverted to storage. And we subtracted it out when it was released to the basin. But not when it was applied as irrigation water.

MR. VEEDER: You asked for AD, and here it is. Was it AD that you desired?

THE WITNESS: It is my recollection --

MR. VEEDER: If you don't know, Mr. Illingworth, simply say you used the figures and then you can clarify as to what those figures really mean.

THE WITNESS: I used these figures that are shown on AD. Do you want me to explain what they mean?

MR. VEEDER: No.

THE COURT: Tell me. I want to know. Do they show the loss from evaporation? I notice that your chart says "Gross Catchment," which I would assume would not take into account evaporation.

THE WITNESS: I believe that they do. I think that this represents the amount of water that was stopped by the dam. That is what it is intended to represent.

THE COURT: Then it would not take into account evaporation after the water got into the dam?

THE WITNESS: In order to calculate the gross catchment, you have to allow for the evaporation. You have to estimate it and add it back in to find out.

THE COURT: I see what you mean. If evaporation has lowered the water of the Lake and in the succeeding month there is so much catchment, the first thing that has happened is that the evaporation has been made up by the first water that came in, and if the level of the Lake rises then the additional amount beyond what was evaporated is new water.

THE WITNESS: That is right.

THE COURT: So actually this does take into account, month by month, the evaporation out of the Lake?

THE WITNESS: Yes.

BY MR. VEEDER:

Q Did you use an annual figure, or what did you use? Do these figures show, Mr. Illingworth, a month by month gross catchment?

A Yes, they do.

THE COURT: By that you mean that you took the levels of the Lake month by month, or that the figures that you took were worked out on the basis of the levels of the Lake month by month? That is the only way that you could measure catchment at the dam, isn't it?

THE WITNESS: Yes, sir. If you want details on actually how these calculations were made, I would suggest that we would have to get the data that this Vail AD was based on.

MR. VEEDER: That was why I said no when the question was asked.

THE COURT: Let's skip it.

BY MR. VEEDER:

Q In other words, these colored areas would include also releases out of the dam during the month that you have calculated your gross impoundment?

A If you will let me answer the question and explain it, I will try to do that. I am not sure --

Q Do you understand the question?

A I understand what you are driving at.

Q I want to phrase it so that there will be no doubt.

THE COURT: You may explain it, Mr. Illingworth.

THE WITNESS: This gross catchment is the amount of water that was stopped by the dam. If in a given month there was no inflow and there were some releases to this basin, we would co me out with a negative value. If, on the other hand, there were no releases to the basin and a thousand acre feet flowed into the reservoir, a thousand acres feet is what is shown as gross catchment. If a thousand came in and a hundred went out as released to the basin, then the gross catchment is nine hundred.

THE COURT: But you did not compute the water used by Vail in its irrigation system for irrigation?

THE WITNESS: No, sir, that is not deducted from these values. This is simply the amount of water that was stopped by the dam in a given month.

MR. GIRARD: Less the amount released.

THE COURT: But all water released from that dam goes down through that one channel. So what figures did you have of water released to the basin except water that went out through that ditch?

THE WITNESS: Well, I should have explained that a little bit more. This Vail Lake released to basin is the portion of the water that was released through the dam in the 30-inch pipeline which was not subsequently re-diverted into Vail irrigation pipes approximately a mile downstream from the dam. Some portion of the water released through the dam actually goes downstream down the Temecula and goes to the basin directly and is not used for irrigation.

THE COURT: Is it released down near the Narrows to keep the flow up; is that it?

THE WITNESS: I don't know what the purpose is, but it has the effect of recharging the groundwater.

THE COURT: Where is it actually released from the pipeline system? Down near the Narrows? Or is it spread?

THE WITNESS: As you may recall, the release from the reservoir goes through a meter and then out into the stream itself, and approximately a mile downstream from there there is a small secondary diversion structure and a pipeline. The portion of the water that was not diverted into this secondary pipeline or secondary diversion point went on downstream, and

that is what is represented by this Vail Lake release to basin.

THE COURT: You mean that there is water at that secondary catchment basin which when not diverted into the Vail pipeline goes down the bed of the Temecula?

THE WITNESS: At certain times, as they control it, it does do that.

BY MR. VEEDER:

Q Is there presently water being released directly into the basin?

A I don't know about today, but the records indicate that this is done on and off.

Q I am speaking now, for example, about '55-'56, '56 -'57, '57-'58. Are you saying that water has been released directly from Vail dam into the Temecula groundwater basin?

A Let me refer to the records.

MR. VEEDER: George, is it or is it not?

MR. STAHLMAN: Yes, there have been releases there.

MR. VEEDER: The point I make, is it being done now?

MR. STAHLMAN: At times it is, yes.

THE WITNESS: The record I have before me --

MR. STAHLMAN: What is done right at the present time, I would have to ask Mr. Wilkinson.

MR. VEEDER: I have no purpose in pursuing it. I thought that it went into a closed pipeline system at the present time and that there are no releases into the basin now.

Mr. Wilkinson, can you tell us? Is it not correct that you now have an enclosed pipeline system running from the reservoir down to your irrigation system?

MR. WILKINSON: It is not true. There is water in an open ditch down to the intake below the dam.

MR. VEEDER: And how far is that, Mr. Wilkinson?

MR. WILKINSON: I think that is about six thousand feet.

MR. VEEDER: But there is no water released in the so-called outwash area for the purpose of recharge; is that correct?

MR. WILKINSON: Not there. The release occurs upstream from that.

THE COURT: What you mean is that you think that water seeps out of this ditch into the --

MR. WILKINSON: We know it does.

THE COURT: -- basin in the area between where it is measured coming out of the dam and where it enters into your pipeline.

MR. WILKINSON: Yes.

THE COURT: In other words, your measurement going into the pipeline compared with the measurement on the release from the dam.

MR. WILKINSON: That is right.

THE COURT: But there is no water spilling over into the bed of the Temecula down where your pipeline starts.

MR. WILKINSON: No; only on rare occasions.

MR. VEEDER: And it does go into a closed pipeline system there.

MR. WILKINSON: It does.

THE COURT: We understand.

BY MR. VEEDER:

Q In regard to your red picture, is that gross pumpage from the J K Well, the Navy Well, the Pit Well?

A It is the total of all wells as shown on AD.

Q In other words, to the extent that it is return flow into the basin, the Temecula basin, it is water that might well be measured twice; is that not correct?

A It is simply what it says it is. It is the total of that water which was pumped from the wells.

Q In other words, if it was reused, it was included; is that right?

A Yes, if it was returned.

MR. VEEDER: I have no further questions.

What I would like to do, your Honor, is to reserve the right, if we think it is desirable, to put in some rebuttal on this.

THE COURT: You will have that righ t.

Any questions?

MR. STAHLMAN: I have one question, your Honor. I think Mr. Veeder just cleared it up for me.

CROSS EXAMINATION

BY MR. STAHLMAN:

Q The situation exists, so far as return flow is concerned, that that was not considered. In other words, you didn't figure any percentage of return flow but merely the pumping of the wells in the Pauba basin, just like you did in the basin at Camp Pendleton.

A That is correct.

Q By the way, Mr. Illingworth, assume a river system such as the Santa Margarita, with basins, do you have an opinion as to whether or not a measurement of surface flow either at Station 3 or at Station 6, that you could, when diversion from underground pumping occurs in basins such as those on Camp Pendleton and those on the Pauba, that you can determine an accurate apportionment of water by the measurement of surface flow?

MR. VEEDER: Let me have the question again. I fell off about Temecula Canyon.

(The Reporter read the pending questio n.)

MR. VEEDER: I have several objections, but first it goes beyond the scope of the direct examination and I don't think it is proper.

MR. STAHLMAN: I will call him as my witness.

MR. VEEDER: He is opening the whole vista on this matter.

THE COURT: If you want to go into that, do that as part of your case. It is not too pertinent to this problem here. I will sustain it without prejudice to going into this matter and calling this man as your witness, if you want.

MR. STAHLMAN: Very well.

THE COURT: Is it offered in evidence, Mr. Girard?

MR. GIRARD: Yes, your Honor.

THE COURT: The objections that Mr. Veeder had running to this whole matter are overruled, and the exhibit is received in evidence.

I take it, Mr. Girard, that the purpose of this exhibit is to show the unreality of the stipulated judgment.

MR. GIRARD: That is correct, your Honor.

(California's Exhibit AX was received in evidence.)

THE COURT: In other words, here was entitlement under the decree two-thirds to the United States and one-third to Vail, and yet -- subject, of course, to some adjustment that would only probably decrease the size of the colored area -- indicating that both the Government and Vail have taken more water than they should have taken under the stipulated decree.

MR. GIRARD: That is right. I made that statement at one time in the record and stated that I thought there was evidence in the record already to sustain it, and this ties it all up in one exhibit.

This is a little different exhibit. We are not intro-

ducing it, but I just point out --

MR. VEEDER: I object to this, if it is not in the evidence.

THE COURT: He could mark it for identification. He could explain the exhibit to me. He might never offer it. If you want it in evidence, you can put it in evidence.

MR. GIRARD: I am not going to offer it. I am just going to comment.

MR. VEEDER: I object to the comment.

MR. STAHLMAN: I ask that it be marked.

MR. GIRARD: It is not ready to be marked.

MR. VEEDER: If it is not ready to be marked, I object to it.

MR. GIRARD: All right.

THE WITNESS: The data is all there. It is just not colored.

MR. VEEDER: I have been very patient.

THE COURT: All right, I will sustain the objection, Mr. Veeder.

Wait until you get it ready. I think I have your point, Mr. Girard.

Anything further, gentlemen?

MR. VEEDER: June 23 and 24.

THE COURT: Are you working over any of the interlocutory judgments in this Murrieta area we have been covering?

MR. VEEDER: Am I working on any? You mean preparing the findings? I haven't started, your Honor. But I think we can, and I think we will.

THE COURT: What about findings on some of these larger ranches that we have tried?

MR. VEEDER: If I recall, Mr. O'Malley was going to tender those to us for revision. Do you want me to call him about it?

THE COURT: Yes.

Mr. Sachse had one here.

MR. SACHSE: Yes. I have rested. I am waiting for Mr. Veeder's rebuttal. I haven't brought that up because that is a side issue -- rebuttal on Searl Brothers. That will be true rebuttal on Searl Brothers, and Diamond and Domenigoni Valley also.

THE COURT: You said that you might have some rebuttal. I have asked if you are going to lay down and play dead after we heard about the water running out of the watershed over there, and you said no, that you would probably have some rebuttal on that. Have you changed your mind?

MR. VEEDER: No, not in the slightest. But does your Honor expect me to rebut each of these things as we go along?

THE COURT: No. On reflection you might assume that a pretty sound showing was made there and might not want to argue further about that.

MR. VEEDER: When he began to talk about a hundred acre feet squirting out the side of the valley, I had to laugh. I hope that he didn't spend much money for that. But my own view is that when we go into this matter of rebuttal valley-wide, we are certainly going to cover it and there is going to be data in regard to it.

THE COURT: Without being too formal about putting on rebuttal, couldn't we clean up some of these areas? Can't you put on what rebuttal you have on so me of these isolated areas and get Counsel working on some of the findings?

MR. SACHSE: I don't think I will disagree with Mr. Veeder's findings. I have no illusions about what I did or did not prove on Stardust Ranch. We might have an interlocutory judgment on that one.

THE COURT: Why don't you submit findings? Mr. Veeder might decide that he didn't want any rebuttal.

MR. VEEDER: I think that is entirely the case in a great many of these instances.

THE COURT: Why don't you prepare some on Domenigoni Valley? The case has been closed.

MR. SACHSE: That is right.

THE COURT: After Mr. Veeder sees what you propose, he might decide not to go into a lot of work on it.

MR. SACHSE: I will do that, your Honor.

THE COURT: Any objection to that?

MR. VEEDER: I feel fine about that, your Honor.

MR. STAHLMAN: In view of what we have stated in the record as to Vail Company proceeding on the 23rd or 24th or the following week, will it be necessary to submit the memorandum suggested this morning?

THE COURT: I want you gentlemen to sit down and tell me these loose ends. I can't remember all these details. And I tried to refresh your recollection and mine. For instance, where are we on irrigable acreage? I want it from the two of you. You will have to go over the record. I think we are at the place that I mentioned. I want you to sit down and between you go over these loose ends before we walk off and leave them hanging there.

MR. SACHSE: I have tendered to Mr. Veeder already a set of proposed findings, or actually a proposed interlocutory judgment, on Harry Bergman, Tule Valley Land & Cattle.

THE COURT: Will you look them over?

MR. VEEDER: We are moving.

THE COURT: Anything further, gentlemen?

MR. SACHSE: That is all from me, sir.

THE COURT: All right. And I would hope that we would enter also some interlocutory judgment shortly after the 23rd on this Treaty of Guadalupe Hidalgo.

MR. VEEDER: You are not expecting anything from me on that, are you, your Honor?

THE COURT: No. I thought Mr. Girard wrote a pretty fair memorandum on it. The only person who is pushing it is Mr. Tarwater and a few of his lay friends.

MR. VEEDER: They are co ming in all the time on these letters.

THE COURT: Who don't know anything about law. But they know that Mr. Tarwater is talking about Treaty of Guadalupe Hidalgo, and so they say "reserving any rights we have under the Treaty of Guadalupe Hidalgo."

MR. VEEDER: We will summarize what George and I talked about today in regard to our present status of the case, if that is what your Honor wants.

THE COURT: And the things that I mentioned. I am interested in where you stand on this irrigable acreage.

MR. VEEDER: Your Honor, in regard to that, the point that I brought up this morning, if I may interrupt one more time, in regard to the Pauba Ranch -- correct me if I am wrong, George -- that is one situation. In regard to the Santa Rosa, it is another situation.

THE COURT: I understand that. I am talking about the Pauba Ranch. I am talking about the Little Temecula and the Temcula.

MR. VEEDER: And the Government land.

THE COURT: And the Coit survey.

MR. STAHLMAN: We had Hall's testimony at the first

trial in evidence. We had Mr. Wilkinson testify. And we had Colonel Bowen.

THE COURT: Summarize it between the two of you, where we are on that.

MR. STAHLMAN: Very well.

(ADJOURNMENT TO JUNE 23, 1960, AT 10:00 A.M.)