# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Thursday, June 23, 1960

Pages:     13,533 through 13,698

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

13,533

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, June 23, 1960

APPEARANCES:

    FOR THE PLAINTIFF:           WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney General,
                                    Department of Justice,
                                    Washington, D.C.

                                    LCDR DONALD W. REDD

FOR THE DEFENDANTS:

    For Defendant Fallbrook        FRANZ R. SACHSE, ESQ.,
    Public Utility District, et al.

1   APPEARANCES (continued)

2       FOR THE DEFENDANTS (continued):

3       For Defendant Vail                GEORGE STAHLMAN, ESQ.,
        Company

4       For Defendant State of            STANLEY MOSK, ESQ.,
5       California                        Attorney General,
                                          By FRED GIRARD, ESQ.,
6                                            Deputy Attorney
                                             General.
7                                         ERNEST SANCHEZ, ESQ.

8       For Defendants Gibbon and         GEORGE GROVER, ESQ.
        Cottle

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        INDEX TO WITNESSES
```

| For the Defendant's | D | X | RD | RX |
|---|---|---|---|---|
| Julius Borenstein | 13,537 | | | |
| Warren S. Winters | 13,560 | | | |
| Nathan Bergman | 13,563 | | | |
| Gustav Patzner | 13,573 | | | |
| Louis M. Carter | 13,590 | | | |
| W. A. Schroeder, Jr | 13,603 | | | |

For the Plaintiff

| | | | | |
|---|---|---|---|---|
| Fred Kunkel | 13,575 | | | |
| Lee Illingsworth | 13,649 | | | |

```
                      E X H I B I T S
```

| Plaintiff's Exhibit | Iden. | In Evid. |
|---|---|---|
| 207-E (letters made a part of this exhibit) | | 13,552 |
| 207-E (letters made a part of this exhibit) | | 13,554 |
| 207-E (letters made a part of this exhibit) | | 13,574 |
| 15 E-1 | | 13,578 |

Defendant California

| | | |
|---|---|---|
| Exhibit AX-1 | | 13,557 |

1   SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 23, 1960, 9:30 A.M.

2                            - - -

3       (Other matters)

4       THE CLERK:  3 - 1247-SD-C United States of America vs

5   Fallbrook etc., et al.

6       MR. SACHSE:  Your Honor, before Mr. Veeder proceeds, I

7   want to state that I received a telephone call this morning

8   from Mr. Littleworth.  He requested me to advise the Court

9   and Counsel that neither he nor Mr. Krieger would be here

10  today or tomorrow; that they have no objection whatsoever to

11  proceding with any evidence that Mr. Veeder wished to put on

12  on new geology or new hydrographic findings, and that they had

13  an understanding with Mr. Veeder that they could recall Mr.

14  Kunkel for cross-examination at a later date; and further req-

15  uested me to advise the Court that they joined in the request

16  which I and the State of California made earlier that we

17  attempt to press the case, and that they would be available

18  at any time during July or August at the Court's convenience,

19  if they were required.

20      THE COURT:  All right.

21      MR. VEEDER:  Here is another letter that came today, two

22  letters, plus one where an attorney makes inquiry as to a

23  suggestion that there should be a finding as to the amount of

24  acre feet per year that could be used on 3.acres of ground.

25      THE COURT:  You may reply to the letter.

13,536

1    MR. VEEDER:  Yes your Honor.

2    THE COURT:  What parties are here in response to notices

3  sent out by the Court?/

4    MR. VEEDER:  Your Honor, Colonel Tarwater is here.  His

5  father is ill.

6    Will you stand up, Colonel Tarwater.

7    In regard to this Guadalupe Hidalgo Treaty matter, Colonel

8  Tarwater is here.

9    Mr. Borenstein is here and has asked to be heard by the

10  Court.

11    Mr. Sachse has a couple of stipulations.

12    MR. SACHSE:  Your Honor, I have several clients repres-

13  ented by me in small areas.

14    MR. VEEDER:  I don't know how your Honor desires to pre-

15  ceed on that.  Mr. Borenstein, however, has indicated that he

16  would like to state into the record his position in regard to

17  the matter.  I have his file and his pleading.

18    Would you stand up, Mr. Borenstein?

19    THE COURT:  Does Colonel Tarwater expect to testify also?

20    MR. VEEDER:  I don't believe he is going to testify, your

21  Honor.

22    Do you expect to testify?

23    COLONEL TARWATER:  No, I do not.  I believe my father

24  (sent )everything he has to say on the matter, and I came pri-

25  marily to find out if there was going to be a decision today

13,537

1   or whatever it might be, so I could inform him of the procedure.

2        THE COURT:   Thank you.   What is your father's condition?

3   A temporary illness?

4        COLONEL TARWATER:   Yes, I believe it is temporary.   He

5   is in a sort of nervous condition, I believe, coupled with

6   the fact that he is rather old.   But I think it is temporary.

7        THE COURT:   Fine.

8        Come forth Mr. Borenstein and be sworn.

9                         JULIUS BORENSTEIN,

10  one of the defendants, being first duly sworn, on his oath

11  was examined and testified as follows:

12       THE CLERK:   State your name, please.

13       THE WITNESS:   Julius Borenstein.

14       MR. VEEDER:   Your Honor, I have my file here with his

15  pleading if you desire to see it.

16       THE COURT:   The answer filed by the defendant shows that

17  you and your wife Bella together own 160 acres in Riverside

18  County within the watershed.

19       WITNESS BORENSTEIN:   Yes.   Beg your pardon sir.   I don't

20  think my land is in that watershed.

21       THE COURT:   But you say it is within the watershed.   You

22  say, "I own 160 acres of land in Riverside County and within

23  the watershed."

24       WITNESS BORENSTEIN:   I don't know what watershed, but it

25  is a watershed on my land possibly.

1      MR. VEEDER:   Your Honor, I would have to check it out.

2  I didn't know that he was going to say that he was not in the

3  watershed.

4      THE COURT:   The Murrieta Eucalyptus Company's Tract.

5      MR. VEEDER:   I think it is in the watershed.

6      THE COURT:   Lots 24 to 27.

7      "Watershed" means that area where, if a rain would fall,

8  it would eventually run down on the surface, if there was

9  enough of it.

10     WITNESS BORENSTEIN:   This is possible; yes sir.

11     THE COURT:   That is possible?

12     WITNESS BORENSTEIN:   Yes sir.

13     MR. VEEDER:   Then I think it is in the watershed.

14     THE COURT:   The answer also relies upon the Treaty of

15  Guadalupe Hidalgo.

16     What does your Exhibit show as to the number of irrigable

17  acres?

18     MR. VEEDER:   You have the letter, Mr. Borenstein, that

19  we sent to you.

20     (Witness Borenstein producing document and handing it to

21  Mr. Veeder.)

22     MR. VEEDER:   We show it all irrigable, your Honor.

23     THE COURT:   Let me see the letter.

24     This is one of the letters that doesn't indicate where

25  the land is situated with reference to the basin of the

1   Murrieta.

2       MR. VEEDER:   Your Honor, it is one of those situations

3   where the lands lie north and east of the Wildomar fault.

4       THE COURT:   Can somebody point the land out to me on a

5   map?

6       MR. VEEDER:   We can put up Exhibit 15A.

7       THE COURT:   Colonel Bowen, you have been sworn.   Can you

8   locate approximately where this land lies in the watershed?

9       COLONEL BOWEN:   Yes your Honor.   If I may have 207C-1.

10      Refering to 207C-1, Mr. Borenstein's land is in the

11  Murrieta Eucalyptus Company's Tract, Lots 24, 25, 26 and 27,

12  which lies northerly of the town of Murrieta; and on 15E it

13  would be located partly within Section 5 Township 7 South

14  Range 2 West overlying the older alluvian.   It is within the

15  exterior boundaries of the old Temecula Grant.

16      THE COURT:   Put your finger on it again.

17      MR. VEEDER:   You can find it on 15E.

18      THE COURT:   You are in 3 West, Colonel Bowen.

19      COLONEL BOWEN;   Yes sir; thats right.

20      THE COURT:   You said 2 West.   It should be 3 West.

21      COLONEL BOWEN:   It should be 3 West, your Honor.

22      THE COURT:   Have you checked this land in that area?

23      COLONEL BOWEN:   Yes sir.

24      THE COURT:   Do you have an opinion as to whether water

25  found under that ground is local, vagrant, percolating water,

1  or part of the stream system of the Santa Margarita?

2  COLONEL BOWEN:  Well, your Honor, I haven't really formed

3  an opinion about that area up in there.  That is pretty close

4  to the fringe area.

5  MR. VEEDER:  We are going to put in evidence today in

6  regard to that area at the time Mr. Kunkel is on the stand,

7  your Honor.

8  THE COURT:  From the map it is obviously a questionable

9  zone.  It could go either way.  Section 5 seems to lie close

10  to the basin complex immediately above.  The alluvian couldn't

11  be very deep.

12  MR. VEEDER:  He has two wells, 5 L one and 5 L two.

13  THE COURT:  You have two wells on your place?

14  WITNESS BORENSTEIN:  Yes sir.  In fact, I had three, but

15  two of them are dry.

16  THE COURT:  How deep is the one?

17  WITNESS BORENSTEIN:  The one that is operating now?

18  THE COURT:  Yes.

19  WITNESS BORENSTEIN:  It is 105 feet, and I pump water from

20  84 feet.

21  THE COURT:  How many inches of water can you pump?

22  WITNESS BORENSTEIN:  Not many.  I only use a one horse-

23  power electric motor.

24  THE COURT:  What is the other well?

25  WITNESS BORENSTEIN:  The other well is only about 48 feet

1   deep and it has a very low water table.

2       THE COURT:  What do you mean by low?

3       WITNESS BORENSTEIN:  The water is way down.

4       THE COURT:  Do you use it to pump at all?

5       WITNESS BORENSTEIN:  I don't use it right now, but I

6   intend to use it for a reserve, in case of emergency.

7       THE COURT:  Anything further.

8       MR. VEEDER:  I have nothing further, your Honor.

9       THE COURT:  I could decide everything about your property

10  except one thing.  The Court will find that you have 160 acres

11  of land and that it is all subject to irrigation if you have

12  water for it, and that you are in the watershed.

13      The thing that I can't decide is whether your land over-

14  lies water which is out of the stream system, in which event

15  you would have correlative rights with other people on the

16  stream system to pump water; or on the other hand I might find

17  the water under your land is local, vagrant, percolating water,

18  not part of the stream system, in which event you would have a

19  right to use all the water you could get out of your land

20  subject only to complaints that immediate neighbors might make.

21  That I can't decide presently because we haven't heard all of

22  the evidence, some of which we are going into today on this

23  particular area.

24      Thirdly, I am going to rule against your contention that

25  you have any special rights under the Treaty of Guadalupe

1  Hidalgo.  The State of California found an excellent brief in

2  the matter.  I read and studied Mr. Tarwater's reply that he

3  sent in, and I am in accord with the views as expressed by

4  Mr. Girard in the brief by the State of California, which

5  confirmed my earlier tentative views in the matter, and that

6  is simply this: that our California Water Law is based largely

7  on Mexican law, so that the rules of law that pertain to land

8  coming subject to the Treaty of Guadalupe Hidalgo are pract-

9  ically the same rules of law that we have in California, and

10  that is that if you own land where your water is part of the

11  stream system you have a right to the correlative use of that

12  water with other people who have similar rights.  You have no

13  special rights just because your land at one time was in

14  Mexican ownership and you trace your title to the Treaty of

15  Guadalupe Hidalgo.  The same situation would prevail under

16  Mexican law.  If you own a piece of ground and there were

17  other people on the stream that were interested in the water

18  and you took all the water or took more than your share of

19  the water, they would have a right to complain exactly as

20  people have a right to complain under California law.

21      I don't think you have any particular problem.  Your

22  land may turn out to be within an area where your water is

23  not part of the stream system.  That would be the most des-

24  irable thing that could happen to you.  If your land overlies

25  water which is part of the stream system, you have no large

1   supply of water anyhow and I can't anticipate that there would

2   be problems where there would be a request that you pump less

3   water.  You have a one horsepower motor on a well, and you

4   have 160 acres of land.

5      Do you contemplate, Mr. Veeder, that the Government would

6   insist that he cut down his pumping out of this well?

7      MR. VEEDER:  Well, your Honor, I'm always afraid of stare

8   decisis or precedents with your Honor.  No, I don't think so.

9      THE COURT:  I am being fictitious.  But the point is

10  this, that nobody is going to be particularly concerned about

11  the amount of water you get out of this well where you have

12  160 acres of irrigable ground.  So I think as far as your con-

13  cerned you can rest easy which ever way I decide with refer-

14  ence to your water.

15     WITNESS BORENSTEIN:  My objective of asking this is to

16  have my rights as it was previous to this suit.  This is my

17  main objective.

18     THE COURT:  Your rights that will be adjudicated here

19  are going to be the rights that you had before the suit.  In

20  other words, before the suit, they weren't adjudicated, but

21  whatever they were those rights existed one way or the other.

22  So the result of this suit will not affect your rights in

23  that sense.  Your rights are the same after the suit as they

24  were before, except that they have been adjudicated.  This

25  is not a suit to take away any right that you had.  Any right

1    that you have will be preserved.

2        WITNESS BORENSTEIN:  The chances are that the stipulations

3    and the decision may hurt me -- and maybe others too, but I am

4    just talking about myself now -- because if I have limitations,

5    then I am really hurt.  I have now a little poultry ranch and

6    I have to have water.  I pray everytime I see that well work-

7    ing, I pray for it not to fail on us.  The chances are that I

8    may have to drill another well deeper than this.  So if I have

9    stipulations against me not being able to drill or not being

10   able to use the water, I am done.

11       THE COURT:  I don't think you have too many problems.

12   As a matter of fact, if the Court finds that the water is local,

13   vagrant water not part of the stream system, you are better off

14   than before the suit started, because you will be free of this

15   litigation from here on out.  On the other hand, it it turns

16   out that this water is part of the stream system, then you have

17   correlative rights; but with the small amount of water that

18   you have and the area where you are located, I can't anticipate

19   that there would ever be a situation where you would be asked

20   to curtail your pumping.

21       WITNESS BORENSTEIN:  The thing is a fellow never knows

22   when they may expand activity.  It all depends on the demand.

23       THE COURT:  If you had a well and were pumping 300 or 400

24   inches of water, then you might have some concern.  With a

25   well where you have a one horsepower motor and 160 acres of

1    land, go home and forget about it.

2        WITNESS BORENSTEIN:  But it is, as I said before, my

3    main objective of interest is not to be impaired, my rights

4    should not be impaired that I had previous.

5        THE COURT:  What rights did you have before?

6        WITNESS BORENSTEIN:  As far as I know, I had unlimited

7    right to use the water I can find.

8        THE COURT:  No, you did not.  You had just whatever right

9    anyone else had in the State of California, and if your water

10   was part of the stream system you had rights which had to be

11   shared with everybody else on the stream system.  On the other

12   hand, if you were over an area where the water was not part of

13   the stream system, like particularly in that blue colored area

14   and some of that grey colored area, then you would have a right

15   to produce the water that you could off of that ground.  But

16   even then if the neighbor next door could show that you were

17   taking more than your share of water, where you and he had a

18   common source, he could complain even then.  That is the law.

19   It is my job to make a judgment here in accordance with it.

20       WITNESS BORENSTEIN:  I would like to know if the Govern-

21   ment engineers have decided yet under what circumstances I am

22   located, to give me at least an idea of whether I am safe or

23   not.

24       THE COURT:  What the Government engineers say doesn't

25   make any difference.  They put in some evidence.  I might

13.546

1   follow it or I might not follow it.  I am the one who says.

2   Don't worry about the Government engineers.  I have told you

3   already that since you have a one horsepower motor on a well

4   and since you have 160 acres of irrigable ground, I can't con-

5   cieve of a situation where there would be an attempt made to

6   cut down on the use of the small amount of water that you have

7   out of that well.

8       MR. VEEDER:  Certainly from the stand-point of the United

9   States of America I don't believe Mr. Borenstein has any con-

10  cern, certainly at this moment, and in what I can see as the

11  foreseeable future, if he wants an assurance from the United

12  States -- if that is of any help.  You have had all the

13  assurance in the world, I think, from this Court just a moment

14  ago.  But if what I have said helps any, you have it.

15      I understand his problem.

16      WITNESS BORENSTEIN:  The way I understand it, there is

17  no limitations, and there is no limitations of stipulations --

18  I am sorry to repeat all these things, but I am a little man

19  and I would like to know whether I can be safe to the rights

20  to water on my ground..That is the whole thing.

21      THE COURT:  I think you are in pretty good shape, except

22  I don't think you have very much water up there.  I don't

23  think you will ever get very much water in that area.  But I

24  don't think you have any problem.  If you were able to drill a

25  well and get 200, 400, 500 inches of water, you might have some

1   problems some day.  But you are never going to get that kind

2   of water in that area.  You don't think you are either, do you?

3   WITNESS BORENSTEIN:  I would have to spend very much

4   money to get it.

5   THE COURT:  You just can't get it up there.

6   WITNESS BORENSTEIN:  I don't know.

7   MR. VEEDER:  No one else does frankly.

8   THE COURT:  All we can do is give our best judgment on

9   the basis of the geology we have heard.

10   WITNESS BORENSTEIN:  Your Honor, I have an old man working

11   for me drilling my last well and we started drilling.  He said,

12   "I can't find any water."  I said, "Go down further."  He kept

13   on going and he found some water.

14   THE COURT:  I want to spend as much time with you as you

15   think I should, but lets not labor this thing.  Let me show

16   you here what the evidence shows.  You see this blue area.

17   WITNESS BORENSTEIN:  Yes.

18   THE COURT:  That is practically solid rock, with a little

19   dirt on top.

20   You see this area.

21   WITNESS BORENSTEIN:  Yes.

22   THE COURT:  That is also rock.  That is the Santa Rosa

23   Mountains.  The evidence shows that this rock slopes downward

24   from where it appears up here toward this area.  So that down

25   near the Santa Rosa Mountains in the Temecula Valley there is

1    an immense basin of water.  In fact, down here in the Pauba

2    Valley, which you can't see, further down at the Vail Ranch

3    the Government drilled a well and went 2600 feet and never hit

4    rock.  So this basin is sloping down.

5        But here is where you are located up here in Section 5.

6    Here is your basement sloping down, and there is no vast

7    amount of water bearing material under your ground because of

8    the area in which you are located.  The closer you get to the

9    blue the less soil there is.  You notice an area of blue here

10   south-west of you, where again there is rock cropping up. Over

11   on the other side, inbetween this area, there is a further

12   basin of water.  But the location of your property indicates

13   that you will never get a lot of water out of there, unless --

14       MR. VEEDER:  Here are his wells, your Honor, set out on

15   here.

16       THE COURT:  Which ones are they?

17       MR. VEEDER:  L 1 and L2 in Section 5.

18       THE COURT:  Do you know whetherthat well that is 100 feet

19   deep went down to solid rock?

20       WITNESS BORENSTEIN:  No, it did not.  It went through

21   hard-pan to begin with, hard-pan and clay.

22       THE COURT:  Did they hit solid rock?

23       WITNESS BORENSTEIN:  No sir.

24       THE COURT:  My advice to you is to go home and tend to

25   your chickens and don't worry about it.

1    WITNESS BORENSTEIN:  Is it all right?  Is that all there

2  is your Honor.

3    THE COURT:  That is all.

4    WITNESS BORENSTEIN:  Thank you very much your Honor.

5    THE COURT:  Now, in connection with this Treaty problem,

6  do you propose that we have an interlocutory judgment on that

7  and get that disposed of?

8    MR. VEEDER:  If your Honor would like to have me draw an

9  order to that effect I will based on your ruling to Mr.

10  Borenstein.

11    THE COURT:  Do we need any findings in connection with it?

12    MR. GIRARD:  It is purely a question of law, your Honor.

13    MR. VEEDER:  I think we could recite, though, and the

14  reason why it is important to us is that we have quite a large

15  number of letters in which they say that if we do not have thus

16  and so we are going to rely upon the Treaty of Guadalupe

17  Hidalgo, and if you did make some findings along that line it

18  might be helpful.

19    THE COURT:  What about letting Mr. Girard draw it?

20    MR. VEEDER:  Fine.

21    MR. GIRARD:  Did you want findings or just an order drawn

22  up.

23    THE COURT:  Probably some legal conclusions and an order.

24    MR. GIRARD:  Did you happen to read Time magazine a couple

25  months ago, your Honor?

13,550

1      THE COURT:  No.

2      MR. GIRARD:  They had a description of the history of the

3  Treaty of Guadalupe Hidalgo in it about three weeks ago.  And

4  they outlined Mr. Trist's functions in negotiating the Treaty.

5      MR. STAHLMAN:  Did it comport with your --

6      MR. GIRARD:  Yes.

7      THE COURT:  Colonel Tarwater, your father has diligently

8  pressed this point.  I find no merit in it.  I don't think

9  there is any difference between the rights he would have under

10  the Treaty and the rights he would have under California Water

11  Law.  The source of of California Water Law is Mexican Law.  I

12  am going to dispose of this issue and get it out of the way

13  once and for all.

14      COLONEL TARWATER:  I would appreciate it if, when you make

15  these findings and judgment, I could get an official copy of

16  your decision on this particular matter.

17      THE COURT:  Do you want it mailed to you or do you want

18  it mailed to your father or to both of you?

19      COLONEL TARWATER:  To either one is fine, your Honor.

20      THE COURT:  We will see that it is mailed to your father.

21      MR. VEEDER:  Would it be your father's address to which

22  we would direct it?

23      COLONEL TARWATER:  That would be fine.

24      MR. VEEDER:  We will get copies for both of you.

25      COLONEL TARWATER:  Fine.

1    THE COURT:  Any other land owners here?

2    MR. WINTERS:  I have a letter here.

3    THE COURT:  What is your name?

4    MR. WINTERS:  Winters.

5    THE COURT:  What about you?

6    A VOICE:  I have never received a letter.  I am right

7    across the street from this gentlemen.

8    MR. VEEDER:  I have not met either of these men, your

9    Honor.  They haven't come before Court.

10    THE COURT:  Are you ready to have someone talk to them

11    in the office?

12    MR. VEEDER:  Yes.

13    THE COURT:  What about the men in the front row?

14    MR. SACHSE:  For the record, I can clear three of your

15    letters, if you want, in just a moment.

16    THE COURT:  All right.

17    MR. PATZNER:  My name is Patzner.  I am here on behalf

18    of my mother.

19    THE COURT:  What is her name?

20    MR. PATZNER:  Cecilia Patzner.  I am Mr. Tarwater's son-

21    in-law.

22    THE COURT:  We haven't heard her parcel yet?

23    MR. PATZNER:  I think this is one of the letters that

24    you might have.

25    MR. VEEDER:  Could I ask you to check in my office on

1  that? We don't have your letter in Court.  Then we can take

2  care of it.

3  THE COURT:  Will you check it with Commander Redd who

4  has the files and come back?

5  MR. PATZNER:  All right.

6  THE COURT:  All right, Mr. Sachse.

7  MR. SACHSE:  Your Honor addressed a letter to my office

8  as Attorneys for Ranchers Tractor and Implement Company.  We

9  accept the proposed findings as stated in your Honor's letter.

10  Your Honor addressed a letter to my office as Attorneys

11  for Robert R. and Elaine Gagnon.  We accept the proposed find-

12  ings.

13  Your Honor addressed a letter to my office as Attorneys

14  for Louis and Catherine I. Gagnon, and again we accept the

15  findings.

16  Those are the three covered by letter.  There are some

17  others that I would discuss later.

18  MR. VEEDER:  Would it be all right if I file copies of

19  the letters in Exhibit 207E as we have in the others, and that

20  will take care of it.

21  THE COURT:  You mean the letters mailed?

22  MR. VEEDER:  Yes.

23  THE COURT:  Yes, you may do that.

24  (The letters above referred to were made a part of

25  Plaintiff's Exhibit 207E and received in evidence.)

13,553

1    MR. SACHSE:  These are the first ones I have had in the

2  Murrieta area.  We will ultimately handle it through a mass

3  interlocutory judgment with a great many names in it which

4  will embrace these.  Is that correct?

5    MR. VEEDER:  That is the proposal.

6    THE COURT:  You have changed it.  Mr. Veeder wants to

7  draw a separate judgment on each party.

8    MR. SACHSE:  Thats all right.

9    THE COURT:  That gives the stenographers some extra work.

10  It looks to me like it will have more problems.

11    MR. VEEDER:  I think you are speaking, though, of people

12  in the Fallbrook area rather than in the Murrieta area.

13    THE COURT:  You don't intend to do that in the Murrieta

14  area?

15    MR. VEEDER:  No, your Honor.

16    MR. SACHSE:  All I want to know is that I will ultimately

17  have more than the letter and statement; that there will be an

18  interlocutory judgment.

19    MR. VEEDER:  Yes.

20    THE COURT:  There will be an interlocutory judgment.

21    MR. VEEDER: Now that you have brought up the point, I

22  am submitting to your office today -- and I was going to con-

23  sult with Mr. Sachse and Mr. Girard on this proposition --

24  these people who have not appeared at all, filed no answer,

25  made no appearance, pursuant to your direction I am preparing

1    a proposed interlocutory judgment that we will send out and

2    say that we have located your property, you are the apparent

3    owner, and treat them as if they had appeared.  That is in

4    accord with what you said, and that will be upon your desk

5    today, your Honor.

6        THE COURT:  All right.

7        MR. VEEDER:  I have 67 responses accepting your Honor's

8    letter, and with your Honor's permission I will deliver them

9    to the Clerk and have them marked 207E, as we have with the

10   rest of them, for the purpose of showing that they have accepted

11   your Honor's letter.

12       THE COURT:  They will be made part of Exhibit 207E.

13       Do you mark each one of them?

14       THE CLERK:  No, your Honor, I am marking each group that

15   Mr. Veeder is presenting, showing the date they were presented

16   by way of an Exhibit Stamp which is put on the group and I

17   will clip all these together.

18       THE COURT:  All right, part of Exhibit 207E received in

19   evidence.

20       (The letters above referred to were received in evidence

21   and made part of Exhibit 207E.)

22       MR. VEEDER:  I have nothing more along that line at this

23   time, your Honor.

24       THE COURT:  Mr. Sachse, You haven't found out about

25   Occidental College?

1    MR. SACHSE:   No, your Honor.   I expect to have some kind

2    of word, but my hunch is that they may not even appear now.

3    So I am not concerning myself too much.

4        MR. VEEDER:   You are still of record, though.

5        MR. SACHSE:   I am still of record, and they have not

6    advised me definitely.   That is purely a hunch.   But I think

7    that they may simply accept the engineering report of Colonel

8    Bowen and offer no other evidence.

9        MR. VEEDER:   Has Mr. Grover appeared today?

10       THE COURT:   I haven't seen him.

11       MR. SACHSE:   I haven't heard from Mr. Grover either.

12       MR. STAHLMAN:   This was the day set.

13       MR. VEEDER:   Yes, I had a matter involving some of the

14   diversions.   Maybe it is set for 1:30 P.M.

15       MR. STAHLMAN:   Yes.

16       THE COURT:   He was in here the other day.   I understood

17   that he was going to be here for sure in the afternoon.

18       MR. GIRARD:   Your Honor, one brief clarification.   When

19   we put on California's Exhibit AX, which was that Chart dir-

20   ected to the extent of the pumping of the Vail and the United

21   States, Mr. Illingworth testified that some of his figures as

22   to diversions were taken from a California Exhibit in Bulletin

23   No. 57, which was in turn taken from former exhibits introduced

24   by the United States in the original suit and you asked us to

25   determine if that had been in evidence, and it is not.   It was

1  not admitted in evidence.   That is Table 23 in Bulletin No. 57.

2  It was not received in evidence in this case.

3      THE COURT:  Can Table 23 be put in as supporting data?

4      MR. GIRARD:  I have no objection to it.

5      THE COURT:  In what volume was it?

6      MR. GIRARD:  In Volume 1 at Page 113, your Honor.

7      THE COURT:  I have a copy here.  Can we receive it in

8  evidence as supporting data for that Exhibit?

9      MR. VEEDER:  I haven't looked at that your Honor.  At the

10  recess I will respond to that inquiry, if it is all right.

11      THE COURT:  I will pull it out here and we will mark it.

12  There are two parts: agricultural and military use.  Is that

13  right?  Table 23?

14      MR. GIRARD:  Yes.  That is correct, your Honor.

15      THE COURT:  It runs on both sides of the page.

16      MR. GIRARD:  Yes.

17      THE COURT:  Pages 113 and 114.  We will mark it an

18  Exhibit with a California Number next in order, which would be

19  --

20      MR. GIRARD:  Why not AX-1, so we can use it with AX.

21      THE COURT:  All right.

22      MR. VEEDER:  I would like the opportunity to check out

23  those figures, because I believe there has been some change

24  since those were entered, and if there has been we will just

25  make the revisions on it, if that is all right with your Honor.

1    THE COURT:  Well, make the revisions on it.

2    MR. VEEDER:  I would have Colonel Bowen explain why it

3  was done.

4    THE COURT:  Then you upset the results shown on the Chart.

5    MR. VEEDER:  That would be most satisfactory to me.

6    MR. GIRARD:  I don't think any revisions have been made

7  to upset it much one way or the other.  Wasn't there a problem

8  in this case, Colonel Bowen, that there was a distinction

9  between fiscal and calendar year on two United States Exhibits?

10    COLONEL BOWEN:  Yes sir, that is right.

11    THE COURT:  Mark it for identification as California's

12  AX-1 and then let us hear from you, Mr. Veeder.

13    (California's Exhibit AX-1 marked for identification.)

14    THE COURT:  These new Exhibits that have been tendered,

15  let me see which ones I have.

16    MR. VEEDER:  We delivered your Honor one and a copy to

17  the Clerk.  You are speaking now of the 15 Series, is that

18  right?

19    THE COURT:  Yes.

20    MR. VEEDER:  Did you have a copy of the list of Exhibits,

21  your Honor?

22    THE COURT:  Yes, I have that.  I don't seem to have 15E,

23  15G, 15F and 15H.

24    I find 15E.

25    MR. VEEDER:  Which is the one that you do not have, your

1 Honor?

2 THE COURT:  15F as in Frank, 15G and 15H.

3 MR. VEEDER:  Mr. Clerk, don't you have copies for the

4 Court?  If you don't have, I can send to my office and get

5 one.  There were two colored copies lodged on those, your

6 Honor.

7 THE COURT:  When were they lodged?

8 MR. VEEDER:  I think they were lodged, these original

9 Exhibits were lodged --

10 THE COURT:  15E I have a copy of.  That was some time ago.

11 MR. VEEDER:  15E was marked for identification long ago.

12 15F and G, if my records are right, were at the end of May.

13 MR. GIRARD:  I can give you the exact date, Mr. Veeder.

14 It is on the letter of transmittal.

15 MR. VEEDER:  I sent out a memorandum dated May 31st.  Did

16 your Honor get a copy of that?

17 THE CLERK:  15F, as in Frank, was marked on May 31st.

18 MR. GIRARD:  That is correct; his letter is dated May 31st.

19 THE CLERK:  15G was also May 31st.

20 15H was on May 31st.

21 MR. VEEDER:  I sent to my office for additional copies,

22 your Honor.

23 THE COURT:  All right.

24 MR. STAHLMAN:  I would like to make one statement, your

25 Honor.  Heretofore the Exhibits have been sent to the Vail

1    Ranch.  I would like to get these Exhibits first, and those

2    that are to be passed on I will pass them on.  But I would

3    like them to be sent to me.

4        MR. VEEDER:  I had colored copies made up for your Honor.

5    I thought they were lodged.  If they were not, here are 15F

6    and 15G.

7        THE COURT:  Are you ready to proceed with Mr. Kunkel?

8        MR. VEEDER:  I would like very much to proceed, if I

9    could, with Mr. Kunkel and go as long as we could.

10       If I understand the schedule as you outlined to me we

11   will go until tomorrow noon; is that right?

12       THE COURT:  Yes, and then again on Monday.

13       MR. VEEDER:  And then on Monday.

14       MR. SACHSE:  We are resuming on Monday.

15       MR. GIRARD:  Will we go that whole week?  I could be here

16   on Monday, but not on Wednesday.

17       MR. VEEDER:  I figured Monday, but not Tuesday.

18       MR. STAHLMAN:  How long do you anticipate you will be?

19   We are practically ready at any time, except I hadn't planned

20   on today.

21       MR. VEEDER:  I was going to put in these Exhibits that

22   have been marked, and I can't tell how long the cross-examina-

23   tion will be.

24       THE COURT:  I will have probably Monday and Tuesday

25   available.  There may be some interruptions on Monday.

1      MR. VEEDER:  That is the 27th and 28th, is it not?

2      THE COURT:  Yes.

3      Let's take a recess and then start in with Mr. Kunkel.

4      (Morning recess)

5      MR. VEEDER:  Your Honor, the two gentlemen who were in

6  the Courtroom, Mr. Winters and Mr. Bergman, have now reviewed

7  the matters in my office, and Mr. Winters would like to make

8  a statement into the record on the basis of the proposal that

9  was made to him.

10      THE COURT:  All right, swear both these gentlemen.

11                          WARREN S. WINTERS,

12  one of the defendants, herein, being first duly sworn, on his

13  oath, was examined and testified as follows:

14      THE CLERK:  State your name please.

15      THE WITNESS:  Warren S. Winters.

16      MR. VEEDER:  Mr. Winters, would you state into the record

17  what you said to me in regard to your claim so that it will be

18  clear, in regard to your position?

19      WITNESS WINTERS:  Well, I want to state that I own my

20  water rights with my title; that my title has come down through

21  time, clear through the history of Guadalupe, and that I have

22  my water rights, and that I want to say here now that I do

23  have and intend to keep them.

24      MR. VEEDER:  Well, sir, in regard to your land, I observed

25  --

13.561

1    WITNESS WINTERS:   That is 25 acres of Lot 123 in the

2 Murrieta portion of Temecula Rancho.

3    This pertains to two lots downtown which I traded off.

4    THE COURT:   You don't own these two lots?

5    THE WITNESS:   No.

6    MR. VEEDER:   You have 25 acres; is that right?

7    WITNESS WINTERS:   25 and ½ acres.

8    THE COURT:   Do you know who these lots went to?

9    WITNESS WINTERS:   To my dad.

10    THE COURT:   What is his name?

11    WITNESS WINTERS:   Harry C. Winters.

12    THE COURT:   When did you transfer them to Harry C.

13 Winters?

14    WITNESS WINTERS:   About 2 or 3 years ago.

15    THE COURT:   When was the lis pendens filed, Mr. Veeder?

16    MR. VEEDER:   The lis pendens was filed in April, 1957,

17 your Honor.

18    THE COURT:   What is your father's address?

19    WITNESS WINTERS:   Murrieta, Box 89.

20    MR. VEEDER:   We will direct a letter to him, your Honor.

21    THE COURT:   Do that.

22    As to the land you own, you own 25 acres?

23    WITNESS WINTERS:   Yes, about 25 and ½ acres.

24    THE COURT:   No letter sent to him?

25    MR. VEEDER:   No letter has been sent to him.

1    WITNESS WINTERS:  It was probably sent to him.  We traded.

2    MR. VEEDER:  You traded?

3    WITNESS WINTERS:  More or less.  I traded the Lots in

4  for the 25 acres.  The Lots have a house on them.

5    THE COURT:  The 25 acres was owned by your father, Harry

6  C. Winters?

7    WITNESS WINTERS:  Yes sir.

8    THE COURT:  And now you have title to them?

9    WITNESS WINTERS:  Yes.

10   THE COURT:  What is your first name?

11   WITNESS WINTERS:  Warren.

12   THE COURT:  Where is your 25 acres located?  Do you have

13  a description?

14   MR. VEEDER:  I have sent for it, your Honor.

15   WITNESS WINTERS:  Lot 123 in the Murrieta portion of the

16  Temecula Rancho.

17   THE COURT:  We will find out in just a minute.

18   On the matter of the Treaty of Guadalupe Hidalgo, you

19  were out at the time, but I ruled on that this morning.  It

20  has been briefed by the State of California.  Mr. Tarwater

21  submitted a series of documents and refers to the Treaties,

22  etc..  The Court has ruled that you have no special rights

23  that arise out of that Treaty.

24   WITNESS WINTERS:  Well, special rights, but I have my

25  water rights to my land that came down with my title.

1    THE COURT:  You have water rights the same as any other

2  person who owns land in the State of California.

3    WITNESS WINTERS:  That is right.

4    THE COURT:  That is going to depend on where your land

5  is located, whether you are over a stream or whether you are

6  over a basin, and all that.  We will find out in just a minute.

7    MR. VEEDER:  While Mr. Bergman is here, we could proceed

8  with him, if that is all right.

9    THE COURT:  All right, Mr. Bergman.  Have you been sworn?

10    MR. BERGMAN: Yes sir.

11    THE COURT:  What is your first name?

12    WITNESS BERGMAN:  Nathan Bergman.

13              NATHAN BERGMAN,

14  one of the defendants herein, being first duly sworn, on his

15  oath was examined and testified as follows:

16    MR. VEEDER:  May I state in regard to Mr. Bergman that

17  he was served by publication.  He has not answered, but he is

18  willing to accept your Honor's statement.

19    Isn't that correct, Mr. Bergman?

20    WITNESS BERGMAN:  You mean sign this?

21    MR. VEEDER:  Yes.

22    WITNESS BERGMAN:  Well, I am not willing to sign that.

23    MR. VEEDER:  I want you to state to the Court your pos-

24  ition on it.  That is the point.

25    WITNESS BERGMAN:  I am not fully acquainted with it, I

1  am not sure what it is all about, so I wouldn't be ready to

2  sign.

3      THE COURT:   Let me see the letter.

4      WITNESS BERGMAN:   These are the same letters that were

5  sent to the others, except they took out the portion where --

6      THE COURT:   There are 3 different kinds of letters.   One

7  is information about the suit.   That is this letter.   The

8  other letters go to different people.   One of them is a letter

9  which states that your land overlies a basin.   The other is a

10 letter which states that we don't know yet and that at some

11 later date the Court will decide.

12     You have 19.8 acres?

13     WITNESS BERGMAN:   Yes.

14     THE COURT:   The Government is prepared to find that they

15 are all irrigable.   Is there any objection to that?

16     WITNESS BERGMAN:   Is that the statement there?

17     THE COURT:   That is the statement up here.

18     WITNESS BERGMAN:   Well, they are all irrigable.

19     THE COURT:   Then you don't object to that?

20     WITNESS BERGMAN:   That is right.

21     THE COURT:   Do you have a well on the property?

22     WITNESS BERGMAN:   Yes.

23     THE COURT:   How deep is the well?

24     WITNESS BERGMAN:   90 feet.

25     THE COURT:   How much water do you pump out of it?

13,565

WITNESS BERGMAN:  I am not quite sure.

THE COURT:  How many inches of water?

WITNESS BERGMAN:  Well, we are not sure yet.  We haven't tested it.  We are just using it.  We haven't tested the amount of water that comes out of it.

THE COURT:  How big a pump do you have?

WITNESS BERGMAN:  Five horse.

THE COURT:  Are you presently irrigating all this land?

WITNESS BERGMAN:  Yes sir, we are starting to.

THE COURT:  What are you growing on it?

WITNESS BERGMAN:  Just permanent pasture.

THE COURT:  Did I understand you to say that you have 2 wells?

WITNESS BERGMAN:  Well, we were in the course of putting in the second well.  That is why we are not sure.

THE COURT:  You are drilling a second well?

WITNESS BERGMAN:  That is right.  That is the one that is 90.  We have one that is 75 feet.

THE COURT:  The 75 foot is the older well?

WITNESS BERGMAN:  That is right.  That has a one horse pump on it.

THE COURT:  How much water did you get out of it?

WITNESS BERGMAN:  Not very much.  We have never tested it. Just enough for domestic purposes.

THE COURT:  Has the well that is now 90 feet been completed,

13,566

1   or are you still drilling it?

2       WITNESS BERGMAN:  It is complete, but we haven't put a

3   pump on it yet.  We haven't completed the setting of the pipe

4   and whatever goes with it.

5       THE COURT:  Here are your letters.

6       Colonel Bowen, have you been able to locate the Bergman

7   property?  Or are you looking for the Winters property?

8       COLONEL BOWEN:  I am locating the Winters property, your

9   Honor.

10      WITNESS BERGMAN:  He is catty-corner from me.

11      WITNESS WINTERS:  I can show him on the map where it is.

12      THE COURT:  I am afraid you wouldn't be able to show on

13  our geologic map.

14      COLONEL BOWEN:  Yes, your Honor, I have them both located.

15      THE COURT:  Will you demonstrate to me/15G, Colonel Bowen.

16      COLONEL BOWEN:  Yes sir.  Mr. Winters property, your

17  Honor, is located in the south-east corner of Section 22

18  Township 7 South Range 3 West.  It is bounded on the south-

19  easterly side by Elm Street.

20      Mr. Bergmans property is across U.S. 395 and located in

21  the northeasterly portion of Section 27 Township 7 South 3

22  West.

23      THE COURT:  Both parcels appear to be in an area of older

24  alluvian and fairly close to the Murrieta Basin.  I haven't

25  yet made a finding on this, but the chances are that I am going

1  to find that you overlie a basin in the Murrieta Valley and

2  that you therefore have correlative rights with other persons

3  who have rights in the stream system.

4      I will show you what we are talking about.  On this map,

5  if you will look, this area in here is all clearly a basin.

6  There is no dispute about that.  This is a basin in here, a

7  basin in here.  The question is how far back from the edge of

8  this Murrieta Basin does this basin run?  The Government has

9  put lines on here -- I don't know whether these are the lines

10  or not, but roughly they will follow, for instance, a line

11  something like this.  It is the Government's contention that

12  the basin runs at least that far back.  There is no doubt here

13  in the Santa Gertrudes that this is all part of the basin, and

14  the probabilities are that this area where you are is over-

15  lying a basin of water, and that therefore you have correlative

16  rights with your neighbors and with other persons who have

17  rights in the stream system.

18      WITNESS WINTERS:  Who are the other persons?  Does that

19  include the Santa Margarita water stream?

20      THE COURT:  That means everybody who has rights on the

21  stream.

22      WITNESS WINTERS:  That is the stream that is in question.

23  That is the Santa Margarita watershed.

24      THE COURT:  Of course, your particular problems would

25  concern people downstream from you and you wouldn't be

1   particularly concerned, you wouldn't be too concerned with

2   persons on other tributaries up-stream from you.

3       Do you understand what we mean by the rule of correlative

4   rights?

5       WITNESS WINTERS:  Yes, somewhat.  I mean, if I pump water

6   that lowered my neighbors well.  Isn't that it?

7       THE COURT:  It amounts to about this.  Take a simple

8   situation.  Suppose there is a little stream that flows into

9   the ocean.  To make it simple, lets assume it flows on the

10  top of the ground.  Ten people have property along that stream.

11  The theory of correlative rights is that no one person can

12  take all of the water of that stream.  The ten people who have

13  a right on that stream share it equitably and fairly --

14  correlative rights.

15      WITNESS WINTERS:  I don't want to say that that is the

16  way it is.  I don't know that that is the way it is.  I own

17  a piece of land that has underground water and drill a hole

18  in the ground and take the water out.  That is what I am here

19  just to say that I want to keep these rights.

20      THE COURT:  You haven't got those rights to start with.

21  Look at this map again.  Do you see the area that is marked

22  in blue up at the top?

23      WITNESS WINTERS:  Yes.

24      THE COURT:  And then there is a lot more of it up there.

25  And the area that is marked grey.  Up in that area there is no

13 569

1    basin.  The blue means that it is practically what we call

2    basement, with a little dirt on top, and solid rock.  The

3    grey is an area of the same material, except that the top

4    is weathered a little more.  There is no basin in there.  Any

5    water flowing on the top of the ground would only flow in the

6    winter and is part of the stream system.  But any water under-

7    neath in that blue or grey part is ordinarily not part of the

8    stream system.  It occurs only in fissures or cracks.  So that

9    if you own land up in there the judgment of the Court would be

10   that if you got any water under your ground you would just be

11   lucky to have it.

12        WITNESS WINTERS:  The people that filed suit to quiet

13   title on their Santa Margarita Rancho made the statement that

14   this is a basin.  Is that right?  I don't know that this is a

15   basin.  I don't know that any water runs downsto the Santa

16   Margarita Rancho.

17        THE COURT:  We have heard expert witnesses on all sides

18   testify.  We are trying to get a picture what we call the

19   geology of this area and the evidence seems to indicate that

20   this is a basin.  Certainly as far back as you are.

21        You say that you want the right to pump all the water you

22   want out of your piece of ground.  Isn't that it?

23        WITNESS WINTERS:  That is right.

24        THE COURT:  Suppose that the man next door to you claims

25   the same right.  So he puts down a well and puts a big pump on

13,570

1   it and with his well and his pump he takes all the water and

2   you don't have any.  Do you think that would be fair?

3        WITNESS WINTERS:  That doesn't have anything to do with

4   whether I was part of the Santa Margarita water or not.

5        THE COURT:  Lets make it even more extreme.  Suppose that

6   you have 4 neighbors on all sides of you and 4 neighbors put

7   down wells and each of them puts down a deep well and a big

8   pump on it and as a result you did not get any water at all.

9   Do you think that would be fair?

10       WITNESS WINTERS:  That wouldn't make any difference what

11  I think about it.  That doesn't have anything to do with the

12  fact that whether I think I am in the Santa Margarita watershed

13  or not.  That would come under California State Law, which

14  this suit isn't filed under that California State Law.

15       THE COURT:  Yes, this is the California Law.  We are

16  applying California State Law to these water problems.

17       WITNESS WINTERS:  The way I understand it, the Santa

18  Margarita Rancho filed suit to quiet title to the effect that

19  they claim that they own all the water in the Santa Margarita

20  Basin.

21       THE COURT:  That is not true.  Did you get a letter where

22  I described what this suit is about?  How far did you go in

23  school?  Eighth grade?  High School?

24       WITNESS WINTERS:  Yes, about three or four years of

25  College and a few other things.  I don't see that that has

1   anything to do with the Santa Margarita water case either.

2       THE COURT:   This letter dated June 14th, if you read it

3   carefully, tells you the nature of this suit.   This is not a

4   suit where the Government or the Santa Margarita Rancho, as

5   you call it, seeks to take all the water in the watershed.

6   It is a quiet title action in which the Government wants the

7   Courtto declare what are the respective rights of the various

8   parties -- what your rights are.

9       WITNESS WINTERS:   The way I understand, if you file a

10   suit to quiet title and someone has made a claim to the water

11   right and no one has objected to that claim, he may wind up

12   with the water right.   Isn't that right?

13       THE COURT:   That is not true either.   Because in this

14   case whether defendants have appeared by answer or not, I am

15   seeing to it that the decree provides a statement of what

16   their rights are.   The mere fact that somebody brings a suit,

17   it doesn't follow that he gets all the water rights.   We are

18   trying to find out what the facts are and then apply

19   California Water Law to them.   So the Government's suit is a

20   suit to have declared what are the rights of the persons who

21   have rights on this stream system.

22       WITNESS WINTERS:   And the Santa Margarita Rancho hasn't

23   claimed a right to all the water in the Santa Margarita stream?

24       THE COURT:   They haven't claimed all the water, they can't

25   claim all the water; they are only one riparian owner.

1    WITNESS WINTERS:  They haven't claimed any specified

2    amount on any water rights in the land that/they have a claim

3    to the water rights under my land?

4       THE COURT:  It is true that they have made certain claims

5    as to how much water they would be entitled to.

6       WITNESS WINTERS:  All I want to say is that I feel like

7    they don't have any such claim.  That is why I came down here

8    today.  I feel like I have a claim to the water under my land

9    because my title gives me the water rights with the land.

10      THE COURT:  The decree will provide that you have a right

11   to water under your land, but you have to use that right

12   correlatively with all other persons that have a right on the

13   stream system.  The decree will provide that you have water

14   rights.

15      WITNESS WINTERS:  I have said what I have come to say.

16      THE COURT:  All right.

17      Anything further, Mr. Bergman?

18      WITNESS BERGMAN:  No.

19      THE COURT:  I wish you would look that letter over.  You

20   will see a little clearer, if you read it carefully, just

21   exactly what the suit is about.

22      WITNESS WINTERS:  Okay.

23      MR. VEEDER:  Mr. Patzner is here, your Honor.

24      May I ask, Mr. Patzner, will you take the stand please.

25                    GUSTAV PATZNER,

13,573

1   one of the defendants, being first duly sworn, on his oath was

2   examined and testified as follows:

3        THE CLERK:  State your name please.

4        WITNESS:  Gustav Patzner.

5        MR. VEEDER:  Mr. Patzner has a statement that he would

6   like to make in regard to the Treaty of Guadalupe Hidalgo,

7   your Honor.

8        I would like to hand to the Court, Mr. Patzner, your

9   statement that you made, to the end that he will see your

10  petition on this.

11       (Witness Patzner hands document to the Court.)

12       THE COURT:  Your mother has 6.9 acres?

13       WITNESS PATZNER:  Roughly, yes sir.

14       THE COURT:  All irrigable?

15       WITNESS PATZNER:  Yes sir.

16       THE COURT:  And apparently from this letter it lies over the

17  Santa Margarita Basin, is that right?

18       COLONEL BOWEN:  Yes sir.

19       THE COURT:  All right, the Court has decided that as a

20  legal proposition there are no special rights growing out of

21  the Treaty of Guadalupe Hidalgo.  So in your mother's case,

22  the judgment would be that she has 6.9 acres of irrigable land,

23  that she overlies a basin, that she has rights to the use of

24  water out of the stream system but that her rights are

25  correlative with those of all other persons who have rights

1    in the stream system.

2         WITNESS PATZNER:  I would like to state that we would

3    accept the correlative rights if we have no rights under the

4    Treaty of Guadalupe Hidalgo.

5         MR. VEEDER:  Also in regard to appeal.

6         WITNESS PATZNER:  And in regard to appeal, if it is

7    appealed at a later date, that we would like to retain the

8    rights of the Treaty.

9         THE COURT:  I have nothing to do about an appeal.  Some

10   Appellate Court will decide that.  You would have to participate

11   in an appeal and raise your point on appeal.

12        WITNESS PATZNER:  Yes, we would like to just hold on to

13   those rights and not give them away at this time.

14        THE COURT:  You are not giving anything away.  I am just

15   holding that you have no special rights under the Treaty.  If

16   I am wrong, the Appellate Court should tell me so.

17        MR. VEEDER:  I would like to make part of Exhibit 207E

18   a letter dated May 3, 1960 from Cecilia Patzner and our note

19   that she has 6.9 acres all irrigable, and also I would like

20   to make a part of Exhibit 207E a wire dated April 5, 1960 from

21   Cecilia Patzner.

22        THE COURT:  Yes, they may become part of Exhibit 207E.

23        (The documents above referred to were made part of

24   Exhibit 207E and received in evidence.)

25        THE COURT:  Thank you Mr. Patzner.

1    WITNESS PATZNER:   Thank you, your Honor and Mr. Veeder.

2    THE COURT:   Are you ready to go with Mr. Kunkel?

3    MR. VEEDER:   Yes, your Honor.

4    I will call Fred Kunkel please.   He has been sworn.

5    THE COURT:   All right.

6                        FRED KUNKEL,

7    called as a witness on behalf of the Plaintiff, having been

8    previously duly sworn, on his oath was examined and testified

9    further as follows:

10    FURTHER DIRECT EXAMINATION

11    BY MR. VEEDER:

12    Q    Mr. Kunkel, I refer to the Map which is on the easel

13    marked for identification 15G and ask you to state into the

14    record what is depict and set forth on that identification.

15    A    Exhibit identified 15G is a Map of the Murrieta

16    Batchelor Mountain and part of the Wildomar, Pachanga and

17    Temecula quadrangles of California, showing the geology,

18    locations of wells, and water level contours for 1953.

19    Q    Would you correlate that Map by oral statements with

20    the Exhibit United States Plaintiff's Exhibit 15?

21    A    For the quadrangles described in duplicates 15 at

22    a larger scale includes minor revisions of the water level

23    contours.

24    Q    Will you refer more specifically to the data and the

25    controls upon which you relied to modify the water level

1    contours and to distinguish those from United States Exhibit 15?

2    Your Honor, at this time, while we are putting up 15,

3    Mr. Sachse wrote a letter about the Master Exhibits and

4    attempting to obtain the Exhibits from the same scale of Map.

5    While I didn't know that he was going to write such a letter,

6    that is precisely what we have undertaken, because we find

7    that working on 15, which is 1 to 62 thousand --

8    THE WITNESS:   15 is in scale 1 to 62 thousand five-

9    hundred, whereas 15G is 1 to 24 thousand.

10    MR. VEEDER:   We are attempting, your Honor, to have a

11    consistency in the scale of Maps.  We are attempting to attain,

12    I think, precisely what Mr. Sachse has asked for by having

13    consistent scale maps, particularly in regard to our geology,

14    and that will carry on throughout the valley.

15    MR. SACHSE:   All on the same scale as 15G.

16    MR. VEEDER:   All on 1 to 24 thousand.

17    BY MR. VEEDER:

18    Q    Now would you proceed, Mr. Kunkel, and point out

19    what slight variations there are between 15G for identification

20    and 15?

21    A    May I refer to the supporting data for 15G.  The

22    supporting data for 15G, I believe, have been marked for

23    identification as Government's Exhibit 15E1.

24    Q    Here is 15E-1.  I haven't offered it yet.

25    A    The last three pages of that Exhibit.

1     Q    You are referring to 15E-1.

2     A    15E-1 are the water level measurements which have

3    been used in the construction of 15G.  These data are from

4    the files of the Department of Water Resources, and with the

5    exception of about 4 altitudes of measuring point they are

6    exactly the same data that were used in the construction of

7    15.  The changes in measuring points that were made are for

8    wells 7 S 2 W 16 J 4, which on the construction of 15 was

9    assumed to be 1380 feet.  A closer inspection and interpellation

10   of the altitude of the measuring point from the more up-to-date

11   topographic maps led me to change that figure to 1386.

12        The measuring point for well 73 6 D 1 likewise was

13   changed from 1340 to 1320 feet.

14        THE COURT:  What well?

15        THE WITNESS:  7 S 3 W 6 D 1.

16        Likewise 7 S 3 W 9 M-1 was changed from 1250 to 1264.

17        7 S 3 W 17 K 2 was changed from 1120 to 1112.

18        And while I am on the subject of measuring points, I

19   would like to refer ahead to the supporting data for 1958.

20   These same changes were made, plus an additional change, and

21   I would now refer to Page 1 of 2 pages for 1958, supporting

22   date for Exhibit 15F.  Well 7 S 3 W 15 Q 3 was changed from

23   1150 feet to 1170.35 feet. This is an actual surveyed altitude

24   to determine that measuring point.

25   BY MR VEEDER:

Q    Mr. Kunkel, I think what I had better do is get into the evidence 15E-1.

A    This covers all M.P. changes for all Exhibits.

Q    I will ask you to state into the record what is the data that is set forth on the identification Exhibit 15E-1?

A    15E-1 are the supporting data for Exhibits 15E, 15F and 15G.

Q    And what is the source of the data on which that compilation was made?

A    For 1953 the data were collected from the files of the Department of Water Resources and the Vail Company.

For 1958 and 1959 the measurements were made by the Geological Survey, by myself or persons under my direct supervision.

Q    Would you state into the record whether you have reviewed identification of 15E-1 for purposes of accuracy?

A    I have reviewed them for purposes of accuracy.

Q    And is it accurate to your personal knowledge?

A    To my personal knowledge the results are accurate.

MR. VEEDER:  We will offer in evidence Exhibit 15E-1, your Honor.

THE COURT:  Received in Evidence.

Mr. Clerk, while I am at it, what was the last Government Exhibit Number?

THE CLERK:  262 your Honor.

1    MR. GIRARD:   15E-1 was the one that was offered in

2  evidence?

3    MR. VEEDER:   That is right.

4    THE COURT:   That is the water levels.

5    MR. VEEDER:   It is a measurement of water levels by the

6  U.S. Geological Survey in the Santa Margarita area.

7    That was the result of your well canvas that you con-

8  ducted.

9    MR. GIRARD:   Didn't Mr. Kunkel testify that some of those

10  were from reports to the State?

11    THE WITNESS:   Yes.

12    MR. STAHLMAN:   1953 was.

13    THE WITNESS:   The results for 1959 were collected in

14  accordance with the recent Court Order.  For 1958 they were

15  done by the Geological Survey approximately a year ago.  And

16  for 1953 the records are from the files of the Department of

17  Water Resources.

18    MR. STAHLMAN:   May I ask a question, Mr. Veeder.

19    MR. VEEDER:   Certainly.  Examination on voirdire.

20  BY MR. STAHLMAN:

21    Q    When you say 1953 and 1958, are they both contained

22  in this document?

23    A    Yes, they are all three, 1953, 1958 and 1959 contain-

24  ed in 15E-1.

25    THE COURT:   And this Exhibit 15E-1 is supporting data

1    for 15E, 15F and 15G?

2         THE WITNESS:   That is correct.

3    BY MR. STAHLMAN:

4         Q    The 1953, which is marked with the number here on

5    the corner, that is the data that you obtained from the

6    Department of Water Resources?

7         A    Yes.

8         Q    And the 1958 and 1959 are measurements which your

9    studies actually made?

10        A    That is correct.

11        Q    Since the Court ordered it done?

12        A    For 1958 on the Court Order, and for 1958 prior to

13   the Court Order.

14        Q    They were measurements, however, made by the U.S.G.S.?

15        A    They were measurements made by the U.S.G.S.

16   BY MR. VEEDER:

17        Q    Are there any other changes that appear on 15G from

18   the Exhibit 15?

19        A    Yes.  As a result of the continuing study and the

20   analysis of those results, the water level contours have been

21   extended slightly in length on 15G from those shown on 15,

22   and in places, owing to the changes in M.P. there has been

23   slight modification of their position.

24        Q    What other changes, if any, are there from 15?

25        A    Only those changes of geology that were incorporated

in 15A.  So as regards the position of the geologic formations,

if there is a difference between 15 and 15G, 15G is in agree-

ment with 15A.

MR. VEEDER:  We offer in evidence 15G, your Honor.

MR. STAHLMAN:  May I ask some questions on this.

MR. VEEDER:  By all means.

BY MR. STAHLMAN:

Q      You have also prepared a map of 15E?

A      That is correct.

Q      What was the difference between 15E and 15G?

MR. VEEDER:  May I explain this?

MR. STAHLMAN:  Yes.

MR. VEEDER:  We are going to offer evidence just as

rapidly as we can and I can with-hold the offer until I have

completed the identification.

THE COURT:  15G is 1953, 15F is 1958, and 15E is 1959.

MR. VEEDER:  That is right.

MR. SACHSE:  Water level contours only.  The only

difference is in the water level.

MR. VEEDER:  He has made some other statement as to some

other difference.

MR. SACHSE:  That is what I want to ask him.

MR. VEEDER:  If you have some voirdire, go ahead.  I will

with-hold the offer.

MR. STAHLMAN:  I just wanted to get my self straightened

13,582

1    out on this.

2    BY MR. STAHLMAN:

3        Q    The question I have on 15E, what is this line that

4    goes through?

5        THE COURT:  Probably the aqueduct, Mr. Stahlman.

6        MR. STAHLMAN:  I know it is not that.

7        MR. VEEDER:  We are going to get there as fast as we

8    can.

9        MR. STAHLMAN:  All right.  You said that the only diff-

10   erence was this, and I saw that other thing on there.  All

11   right.

12       MR. SACHSE:  I have one or two quick questions to be

13   sure that I understand.

14       Q    Mr. Kunkel, the map 15G is the same scale as the

15   Exhibit 15A, is it not?

16       A    That is correct.

17       Q    There have been changes between your conclusion as

18   to geology between what is shown on 15G and what is shown on

19   15, have there not?

20       A    There has been some modification of geologic context

21   owing to the change in scales.

22       Q    You stated that the changes in geology incorporated

23   in 15A are included in 15G.

24       A    That is correct.

25       Q    Those changes in geology in 15A are changes from

1  what, from 15?

2      A    That is correct.

3      Q    So that the geology with which we are currently

4  working represents your best conclusions as to the geology

5  of this watershed and we could use alternatively 15G or 15A?

6      A    In regard to geology, 15A.  A, G, F and E are all

7  the same geologic base map.

8      Q    The water level contours, as I understand it, that

9  is shown on 15G, would be the same as shown on 15 except that

10  you have made allowance for the greater scale, you have con-

11  sidered one or two changes in elevation that you referred to,

12  and what was the other factor?

13      A    And the over-all knowledge of the watershed that I

14  have gained.

15      Q    I wonder if you could tell us very quickly -- maybe

16  this is cross-examination, and if so I will not object if you

17  want to do it differently -- can you tell us what the changes

18  were on the water level contours between the two?

19      A    They are not great and they do not alter any basic

20  conclusions.  For example, refer to the 1100 foot water level

21  contour crossing Pauba Valley on Exhibit 15.  It extends from

22  approximately on the south of the Rancho line of the Vail

23  Ranch up to and crosses Long Canyon, a distance of approximately

24  4 miles.  The same water level contour on Exhibit 15G starts

25  at approximately the same position, the Vail Rancho line, and

1   extends northward for a distance of approximately 6½ miles.

2   This is perhaps one of the major changes.  1150 has also been

3   extended.

4       Q    What additional material did you obtain that enabled

5   you to interpolate those lines 2 or 3 miles further north?

6       A    The results of the water level studies in 1958 and

7   1959 made it possible to project backwards and rely on meas-

8   urements for 1953 that I had not previously relied upon to

9   the same degree -- in other words, based on a longer record

10  of a well,  A well, having, say, only one measurement on it

11  there is always a greater chance for error in that measurement

12  than if you have a continual record of that well for several

13  more years.  You then become more certain of your earlier

14  measurements if they line up in a reasonable manner with pre-

15  vious measurements.  Therefore, in my construction 15G I

16  relied more heavily on water levels in Section 19 7 South

17  2 West.

18      MR. SACHSE:  I have one more question.  This is proper

19  voirdire.

20      Q    Isn't it a fact, Mr. Kunkel, that the reason that

21  you could extend these lines on 15E, F and G was that on

22  these lines you were willing to use the data found in

23  Bulletin No. 57, whereas on your first one you did not use

24  the data found in Bulletin No. 57?

25      MR. VEEDER:  I object to that.

13,585

1          MR. SACHSE:  I submit the question.

2          THE COURT:  Overruled.

3          THE WITNESS:  I used the same data in both cases.

4     BY MR. SACHSE:

5          Q    You used all 1953 measurements that you got from

6     Bulletin No. 57 in calculating the water level contours on

7     Exhibit 15?

8          A    The records and files of the Department of Water

9     Resources I examined and considered in plotting 15.

10         Q    But you gave them a little more weight when you

11    plotted 15E?

12         A    Oh, due to the fact that we had additional measure-

13    ments in 1958 and 1959, in my opinion I was able to give them

14    more weight than I had without those previous measurements.

15         MR. SACHSE:  That is all.

16         MR. VEEDER:  I offer 15G your Honor.

17         MR. GIRARD:  I have no objection to it's going in, unless

18    Mr. Kunkel --

19         MR. VEEDER:  Would your Honor rule on the offer?

20         THE COURT:  I have previously ruled on it.  You offered

21    it before and I received it in evidence.

22         15G received in evidence.

23    BY MR. VEEDER:

24         Q    The wells that you used to plot these ground water

25    contours, do they appear anywhere here?

1        A    Yes, the wells I used in plotting the water contours

2   which are shown in 15E-1, those wells are also shown on 15G.

3   For example, pointing to Section 7 South 3 West 19, there are

4   wells C-1, C-3, and P-1, all of which have a small number beside

5   them.   For example, C-1 has 1063, C-3 has 1069, and P-1 has the

6   number 1118.   Those same numbers appear on Exhibit 15E-1 and

7   are the altitudes of the water surface in those wells in the

8   autumn of 1953.

9        THE COURT:  Altitude of the water surface in the well?

10       THE WITNESS:  In the well.

11       MR. SACHSE:  Maybe I don't quite understand.

12       Q    For example, there appear to be no wells listed on

13   this area here on this particular Exhibit.

14       A    That is correct.

15       Q    In drawing this line, for example, where this one

16   is here, which apparently is up here, the next one on this

17   Exhibit is here.  Were there any intermediate wells between

18   these two spots that were used by you to draw the 1100 elevation?

19       A    For 1953, no.

20       Q    And the same would be true throughout the elevations?

21       A    Where similar circumstances exist, that would be true.

22       MR. VEEDER:  Are there any further questions?

23       THE COURT:  You built 15E the same way, except from 1958

24   water contours?

25       THE WITNESS:  That is correct.

1        MR. VEEDER:  I would like to examine him on that.  But

2    you go ahead and refer to 15F .

3        MR. STAHLMAN:  May I make a suggestion that you put the

4    year and number on each one of these.

5        MR. VEEDER:  Right here it is.

6        MR. STAHLMAN:  I see it.  All right.  They are all in the

7    same place.

8    BY MR. VEEDER:

9        Q    Would you refer to the identification marked 15F and

10   state into the record what is shown on that map?

11       A    15F is exactly the same geologic and topographic base

12   map as 15G.  It is also the same geologic and topographic base

13   map as 15A, except it has been extended westerly to include

14   part of the Batchelor Mountain quadrangle, which will then

15   extend the geology and hydrology to the watershed line.  It

16   makes 15F a little more complete.

17       THE COURT:  You are talking now about the difference

18   between 15F and 15G?

19       THE WITNESS:  No, 15F and 15A.  15A does not include the

20   Wildomar quadrangle.  Where I have previously said Batchelor

21   Mountain I was in error I should have said Wildomar.

22       THE COURT:  Mr. Stahlman, the one your comparing it with

23   is not 15A but 15.

24       MR. STAHLMAN:  Yes, I understand.

25       THE WITNESS:  So 15F and G are exactly the same base.

1    BY MR. VEEDER:

2         Q    Have you other changes that are involved ?

3         A    Yes.

4         Q    Please state them.

5         A    There are other changes that have been involved.

6    These same measuring point changes have been used in all three

7    maps -- E, F and G.  I failed to state one when I was first

8    giving them because it did not apply to 15G but it does apply

9    to 15F.  Referring to well 7 South 3 West 23 K 1 Roripaugh

10   well No. 8, in 15A I used an altitude of measuring point of

11   1111 feet.  I have subsequently gone out and examined this

12   well more carefully and have interpolated the altitude of that

13   well to be 1119 feet rather than 1111 feet.  The effect of

14   this will be actually to minimize as far as the land surface

15   topographic contours will allow the effect of any pumping

16   depression that may be in this area.

17        Q    When you refer to pumping depression would you point

18   to 15F and indicate where one is located based upon your inter-

19   pretation of the data.

20        A    I am referring to a pumping depression centered in

21   Section 26 Township 7 South range 3 West.  That change was

22   incorporated.  Owing to that change, plus the fact that when

23   15A was constructed we had only one measurement in 23-K and

24   as the Court questioned me at that time as to why I did not

25   rely heavily or use that water level measurement, I indicated

1    that I suspected the measurement as being inaccurate.  We have

2    since subsequent to that time measured that well regularly on

3    a periodic basis and now have a water level recorder establish-

4    ed on that well and the record on that well indicates that the

5    measurement in 1958 was correct and subsequent measurements

6    are correct.  Consequently, I have relied on well 7 South 23-K1

7    to a degree that I did not rely on it in constructing 15A.

8    Consequently, the shape of the pumping depression centered in

9    Section 26 is somewhat different than it is on 15A.

10        Q    The 23-K1 to which you have made reference is the

11   Roripaugh well upon which has been maintained the continuous

12   recorder; isn't that correct?

13        A    That is correct.

14        MR. VEEDER:  I observe that it is noon, your Honor.

15        THE COURT:  Do you want to come back at 1:30?

16        MR. VEEDER:  I would like to, your Honor.  I am going to

17   try to get through with Mr. Kunkel tomorrow if I can.

18        THE COURT:  All right, 1:30.

19        (Noon Recess)

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 23, 1960, 1:30 P. M.

2                          - - -

3         MR. VEEDER:  Your Honor, some of the pro per defendants

4    are in the courtroom.  Mr. Carter, to whom you have written a

5    letter, is here now.  Do you want me to interrupt Mr. Kunkel

6    and call them now?

7         THE COURT:  Yes.  Who is here presently?

8         MR. VEEDER:  Mr. Carter, will you stand?

9         THE COURT:  Come forward.

10                          LOUIS M. CARTER,

11   on the defendants herein, being first duly sworn, on his oath

12   was examined and testified as follows:

13        THE CLERK:  State your name, please.

14        THE WITNESS:  Louis M. Carter.

15        THE COURT:  Let me see the file.

16        You and your wife Nell F. Carter own 4½ acres of ground?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  Up near Elsinore?

19        THE WITNESS:  Yes, sir; Sedco Hills.  It is part of

20   Elsinore.

21        THE COURT:  The Government's evidence in this case shows

22   that the entire piece is irrigable; that is, if you had

23   sufficient water you could irrigate all of it.  Is that correct?

24        THE WITNESS: That is true; yes, sir.

25        THE COURT:  You wrote me a letter that you have a well

1   on the place.  How deep a well is it?

2          THE WITNESS:  101 feet.

3          THE COURT:  How big a pump on it?

4          THE WITNESS:  Half a horse -- small.

5          THE COURT:  Just a domestic well?

6          THE WITNESS:  That's all.

7          THE COURT:  Did you get a copy of a form letter which

8   told you what this case was about?

9          THE WITNESS:  Yes, sir, I did.

10         THE COURT:  That it is a quiet title suit to determine

11  the rights of the various people in the action.

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Colonel Bowen, you have been sworn.  Can you

14  point out on the map approximately where this property lies?

15         MR. VEEDER:  If we could use that memorandum, your

16  Honor, it would identify it for us.

17         COLONEL BOWEN:  This parcel (indicating), your Honor, is

18  located in Section 26 Township 6 South Range 4 West.

19         THE COURT:  Almost to the watershed line at the northwest

20  part of the watershed, map Exhibit 15A or 15F.

21         COLONEL BOWEN:  Yes, your Honor.

22         THE COURT:  Is the Government going to contend that

23  underground water in that area is part of the stream system?

24         MR. VEEDER:  I think that is an area of the older

25  alluvium, and our position is that the older alluvium does

13,592

1  contain water-bearing strata that are part of the Santa

2  Margarita River system.

3       THE COURT: Colonel Bowen, do you have an opinion?  Or is

4  this an --

5       COLONEL BOWEN:  This is an area about which I have not

6  formed an opinion in regard to the nature of the water, your

7  Honor.

8       THE COURT:  Mr. Carter, the Court would propose to find

9  that your land is in the watershed, and that your 4½ acres are

10  all irrigable.

11      We have not yet completed the evidence as to whether you

12  fall in one of the two categories.  One category would be a

13  finding that the water under your ground is local, vagrant,

14  percolating water and not part of the stream system.  In that

15  event, an interlocutory judgment would be entered and you would

16  be out of the case forever, and any water that you found you

17  would just be lucky to have.  The only problem you might have

18  would be your immediate neighbors.

19      The other alternative is that the Court might find that

20  the water under your ground is part of the stream system, that

21  it overlies a basin.  In that event, you would have correlative

22  rights with all other persons who have water rights in the

23  basin which is part of the stream system.  However, with the

24  small well that you have and the small amount of water that

25  you have used for domestic use, I don't think you have any

1  particular problem.  Under California water law, domestic use

2  comes first ahead of all other uses.  And in my opinion, you

3  will never get a good well in the area in which you are

4  located, and there will probably never be any problem of any

5  order that you cease any pumping.  You don't have enough water

6  materially to affect the situation.

7      That is my general view of it.

8      MR. VEEDER:  Your Honor, you are speaking in regard to

9  groundwater as distinguished from any surface runoff.

10      THE COURT:  I am talking about groundwater.

11      The law of California is that the surface water that falls

12  by rain should be allowed to run down the stream, fill up the

13  basins, etc.  The only legal way in which you can ever impound

14  any rainwater is through permits from the state water board.

15  If there are little gullies that carry water through your

16  ground, you would have a riparian right to use that water as it

17  went by.  But if it runs only in the winter, you don't need it

18  then.

19      I can't tell you presently how far this basin will

20  extend.  I am hearing evidence now as to the extent of this

21  basin.  You are up in an area that is a little hard to decide.

22  Some are very easy.  When you get down near the Murrieta Valley,

23  that is clearly a basin.  The blue area on the map is basement

24  complex, and any water in the ground there is local and not

25  part of the stream system.

1    You are just over toward the edge of the basement complex.

2    THE WITNESS:  Two of my neighbors were released.

3    THE COURT:  How close were they?

4    THE WITNESS:  Just close to the road; one on one side,

5    and one on the other.

6    THE COURT:  I do n't know whether they were released or

7    not.  They may have misunderstood.

8    THE WITNESS:  That is what I wondered.

9    THE COURT:  I don't think I have made any decisions in

10   that area.

11   I don't think you have anything to worry about.  If you

12   had a well pumping 500 inches of water, some day you might

13   have a question.  But your only purpose is to try to get some

14   domestic water out of your well.

15   Thank you for coming.

16   THE WITNESS:  Thank you, Judge.

17   MR. VEEDER:  Your Honor, there are a couple more farmers

18   who are in town.

19   Mr. Grover is here with his witness Mr. McGaugh, and it

20   is amenable to me if Mr. Grover wants to go ahead.

21   THE COURT:  Let's stick with these individuals.

22   MR. VEEDER:  They are working in the office.

23   THE COURT:  Let's take up the alien then.

24   (Another matter.)

25   THE CLERK:  3 - 1247-SD-C United States v. Fallbrook.

1    MR. VEEDER:  Your Honor, there is in the courtroom

2  Mr. Simonelli, who is a defendant.  We have checked his

3  acreage and there is a disparity of such magnitude that I am

4  going to ask Colonel Bowen to check it out for the purpose of

5  determining what is the irrigable acreage.

6    Mr. Simonelli, will you please stand up?

7    THE COURT:  Do you want to have him come back at some

8  other time, or can we go over any other matters?

9    MR. VEEDER:  I don't believe there are any other matters

10  except that.  If he has anything to say, I would like to have

11  him say it to you.

12    THE COURT:  Who owns the property?

13    A VOICE:  Paul K. Wolf at the present time.

14    THE COURT:  Is Paul K. Wolf here?

15    A VOICE: Yes.

16    THE COURT:  You are the owner of the property?

17    MR. WOLF:  Yes.

18    THE COURT:  What interest does Simonelli have in it?

19    MR. WOLF:  We are the parents, and it was all in our

20  name and we had it transferred over to our daughter.  But at

21  the time he was served it was all in our name.

22    MR. VEEDER:  It is next to and adjoining the Querry

23  property, which would be the area in Wolf Valley.

24    THE COURT:  What you pointed to is basement complex,

25  is it?

1    MR. VEEDER:   I think there is some basement complex

2    there, but I want to have it checked out, your Honor.   **That is**

3    **all I can do.**

4    THE COURT:   Have these people been sworn?

5    MR. VEEDER:   No.

6    THE COURT:   All three raise your hands.   All three of

7    you come forward.

8    (Whereupon, the Clerk swears three persons.)

9    THE COURT:   When the suit was brought, the property was

10   in your name, Mr. Simonelli?

11   MR. SIMONELLI:   Yes.

12   THE COURT:   Your first name is what?

13   MR. SIMONELLI:   Bartholomew.

14   THE COURT:   And your wife's maiden name?

15   MR. SIMONELLI:   Clara.

16   THE COURT:   And you and your wife have transferred the

17   property to your daughter Mrs. Wolf.

18   MR. SIMONELLI:   Yes, we did, about **four years ago.**

19   THE COURT:   Do you have her name?

20   MR. VEEDER:   No.   Paul K. Simonelli (Wolf).

21   MR. SIMONELLI:   Yes.

22   THE COURT:   Do you have a well on this property?

23   MR. SIMONELLI:   Yes, we had to put in a well, because

24   when we were up above the part Mr. Querry got we had three

25   springs up there in the mountains, and we had quite a few cows

13,597

1   and lots of hogs and chickens.  We had lots of water.  We didn't

2   use any well then.  But now that corner 31 acres we don't have

3   any water at all.  So we had to dig a well.

4        THE COURT:  Do you have a well now?

5        MR. SIMONELLI:  Yes, we had to, to build a house.

6        THE COURT:  How deep is the well?

7        MR. SIMONELLI:  260 feet or 257 feet.

8        THE COURT:  How big a pump do you have?

9        MR. SIMONELLI:  We don't have very much.  Well, we had to

10  put 7½ horsepower to boost it up to the house.  It is on the

11  flat, toward the river.

12       THE COURT:  Is this water just for domestic use?

13       MR. SIMONELLI:  Well, we put a few fruit trees there

14  around the house.

15       THE COURT:  Just around the house?

16       MR. SIMONELLI:  Yes, and the garden.

17       THE COURT:  You don't irrigate any farmland.

18       MR. SIMONELLI:  No.  I would like to put alfalfa, because

19  we have to buy the alfalfa, and it is pretty high.

20       THE COURT:  How much water does this well produce?

21       MR. SIMONELLI:  I don't remember now.  I think 2,000

22  gallons we got.  We got to boost is up to the hill by the

23  house, and he fill up in 18 minutes the well, 3½ inch.  We

24  have to cross the field with a pipe, boost her up.

25       THE COURT:  Are you going to have a survey made of this

property?

1    MR. VEEDER:  That is correct.

2    THE COURT:  Field survey?

3    MR. VEEDER:  I will have Colonel Bowen check the whole

4  thing out.  The disparity is so great.  We figure 8 acres, and

5  Mr. Simonelli says that there are 25 acres.  There is no basis

6  of adjusting that.  We just wanted to check on it.

7    THE COURT:  Will you have a report showing whether some

8  of this ground is in the basement complex?

9    MR. VEEDER:  Yes, I will have Colonel Bowen make a full

10 check on it.

11    MR. STAHLMAN:  May I ask a question?

12    THE COURT:  Yes.

13    MR. STAHLMAN:  Did you formerly raise some crops on this

14 land?

15    MR. SIMONELLI:  Oh, yes.  We keep three or four cow, and

16 then we raise quite a few calves.  I put oats.

17    MR. STAHLMAN:  Did you have some pasture?

18    MR. SIMONELLI:  No, I got to put some sprinkle to raise

19 some.  You mean permanent pasture.

20    MR. STAHLMAN:  Yes.

21    MR. SIMONELLI:  No, I don't have that.

22    MR. STAHLMAN:  Where did you get your water before, you

23 say?

24    MR. SIMONELLI:  Where Mr. Querry is.  It is three-quarter

25 mile up above.  So we keep the corner down below.

1    MR. STAHLMAN:  There has been no change in your water

2 conditions?

3    MR. SIMONELLI:  No, it was all on the same place, only

4 we sold 360-some and we keep them 31 acres on the corner.

5    THE COURT:  I don't think we can do anything further

6 today.  The Government will make a survey of this property

7 and will serve you with a copy of it, and then we will be better

8 able to determine just what the situation is.

9    You have certain rights in the stream system, there is

10 no doubt.  Your land overlies in part water-bearing land and

11 you have certain rights in the stream system which are

12 probably correlative rights which you have to share with other

13 people who have similar rights.  In other words, other people

14 who have property along there can pump water just like you can.

15 No one can take it all.

16    MR. SIMONELLI:  Querry he got pretty near 200 acre in

17 green feed.  He has water going day and night there.

18    MR. STAHLMAN:  Since he takes that water, does that

19 affect your water?

20    MR. SIMONELLI:  Well, I don't think so.  This big well

21 he got along the Pala road.  He gots lot from the river, you

22 know.

23    MR. VEEDER:  May I inquire whether anyone else came in?

24    THE COURT:  Thank you, Mr. Simonelli.

25    MR. SIMONELLI:  Thank you very much.

13,600

1      THE COURT:  Has anyone else come in who has an interest

2  in land in this watershed.

3      MR. GROVER:  He is the owner of the land on which the

4  diversion of my clients is made.

5      MR. VEEDER:  I don't believe he has anything to do with

6  us then.

7      THE COURT:  He has land in this watershed?

8      MR. VEEDER:  Yes, but not with these people to whom you

9  have written letters.

10      THE COURT:  Anyone else to whom the Court has written a

11  letter who owns land in this watershed, who has come in in

12  response to the letter?

13      Mr. Grover.

14      MR. GROVER:  Did you want to take up the matter of Mr.

15  Schroeder's interest first?

16      THE COURT:  Yes, I think we should.

17      Mr. Schroeder, come up and take a chair up here somewhere.

18      MR. GROVER:  Your Honor will recall that the last time

19  the Gibbon and Cottle interests came before the Court because

20  the diversion which they make for the Upper Ditch is not on

21  their own land that you instructed me to ascertain the owner

22  of the land where the diversion is made and to notify them

23  that they could appear today to protect their interests.

24      I ascertained by telephone from the Title Company that

25  the West Half of the Southwest Quarter of Section 29 Township 8

1  South Range 1 East is owned by Walter A. Schroeder, Jr. and

2  Janet H. Schroeder, husband and wife, as joint tenants; that

3  his address if First and Front Streets, Temecula; and I sent

4  both you and Mr. Veeder copies of the letter which one of the

5  other attorneys in our office mailed to Mr. Schroeder.

6       THE COURT:  Let's explain to Mr. Schroeder what the

7  problem is, if we can.

8     MR.GROVER: Do you want me to do that, your Honor?

9       THE COURT:  Well, you undertake it.

10      MR. GROVER:  All right.

11      Under the statutes which were discussed last time, the

12 citations of which I don't have but can get, when a diversion

13 is made upon certain public lands, the Government recognizes

14 the right to continue that diversion and recognizes an ease-

15 ment in the diverter to continue to make an appropriation and

16 go upon the lands for that purpose.

17      In 1885 Mr. Sam Tripp began a diversion on this particular

18 land down by Mr. Schroeder at a time when it was Government

19 land and subject to these statutes.  That diversion has con-

20 tinued.  It is now known as the Upper Ditch and has continued

21 to the present time.  Since then the land was patented to Mr.

22 Schroeder's predecessors in interest, is now owned by him,

23 but is subject, under the terms of these statutes and, I

24 believe, the terms of the patent in most cases, to the right

25 to go on the land and to continue the diversion that was thus

1  made; and in this suit, since it was an incident of our water

2  right, we will ask the Court to adjudicate our right to go upon

3  the land for that purpose.

4  THE COURT:  In more simple language, Mr. Grover is the

5  attorney for Gibbon and Cottle, who have the ditch that

6  originates on your property, runs across your property down

7  to theirs.  You are familiar with that?

8  MR. SCHROEDER:  Yes.

9  THE COURT:  Mr. Grover is their attorney, and he is stat-

10  ing his contentions as to what the law is in the matter.  I

11  asked that you come in because we have been hearing the

12  Gibbon and Cottle case and since this ditch originates on your

13  land I thought you should be here.

14  You didn't patent this land from the Government; you did-

15  n't get the homestead on it, somebody else did ahead of you?

16  MR. SCHROEDER:  Yes sir.

17  THE COURT:  I think Mr. Grover is correct in stating that

18  at the time this was Government land before it was homesteaded

19  the parties had a right to go on the land, make a ditch and

20  divert water, and then when the homestead patent issued, the

21  person who got that patent took it subject to that right, and

22  you in the chain of title on down the line owned the land

23  subject to that right to maintain that ditch.

24  Now we wanted particularly to know whether this is your

25  view of the matter or whether you have any objection to a

1  judgment that will say that.  Do you have any objection to

2  that?

3       MR. SCHROEDER:  Yes sir, very much so.

4       THE COURT:  What is your position.

5       MR. SCHROEDER:  I bought the property.

6       MR. STAHLMAN:  Your Honor, I happen to know the back-

7  ground of this.  I think possibly we had better take it in the

8  form of evidence.

9       THE COURT:  Have him sworn.

10                     W. A. SCHROEDER, Jr.,

11  one of the defendants herein, being first duly sworn, on his

12  oath was examined and testifed as follows:

13       THE CLERK:  State your name please.

14       THE WITNESS:  W. A. Schroeder, Jr.

15       MR. VEEDER:  May I inquire if Anna P. Schroeder is any

16  relation to you?

17       THE WITNESS:  I don't believe so.

18       MR. VEEDER:  We have that name in the file, your Honor.

19       Your Honor, here is our file, if you are interested in it

20  -- the answer, I am sure it is Mr. Schroeder's statement.

21       THE COURT:  Mr. Schroeder, do you own this land by your-

22  self or do you and your wife own it?

23       THE WITNESS:  My wife and I.

24       THE COURT:  What is her name?

25       THE WITNESS:  Janet Helen.

1          THE COURT:  The answer is filed only by Walter A.
2     Schroeder.  Let the record show that Janet Helen Schroeder and
3     Walter A. Schroeder own the property.
4          80 acres of ground?
5          THE WITNESS:  Yes sir.
6          THE COURT:  You say you also own a lot in Temecula?
7          THE WITNESS:  Yes.
8          THE COURT:  You still do?
9          THE WITNESS:  Yes sir.
10         THE COURT:  Have you checked that up yet?
11         MR. VEEDER:  I will have to check on that your Honor.
12         THE COURT:  We are not presently interested in that lot.
13    Right now we are interested in this 80 acres.
14         THE WITNESS:  You mean every piece of ground I own I am
15    going to have to come to San Diego on, Mr. Judge?
16         THE COURT:  No, not necessarily.  We are only talking
17    about land in the watershed of the Santa Margarita.  Do you
18    own other property in the watershed up there?
19         THE WITNESS:  Quite a bit, yes;  a little piece here and
20    there.
21         THE COURT:  Is there more than one answer filed here?
22         MR. VEEDER:  That is the only answer we have, your Honor.
23         THE COURT:  Could you supply a list of how many pieces of
24    property you have?
25         THE WITNESS:  I could if I had it today.

1    THE COURT:  Approximately how many do you have?

2    THE WITNESS:  I have 8 lots in town;  I have 2 little

3  houses, and a Bar and a licquor store, and a wrecking yard.

4    THE COURT:  Do you own the land?

5    THE WITNESS:. Yes sir.

6    MR. VEEDER:  In Temecula?

7    THE WITNESS:  Yes sir.  And I have 80 acres above this

8  property that looks right down on it.  That is the original

9  homestead of my grand-mother.

10    THE COURT:  You have another 80 acres that adjoins this?

11    THE WITNESS:  No, it is 640 acres above it.  It is only

12  80 acres though.  But there is a separation of 640 acres.

13    THE COURT:  Between the two.

14    THE WITNESS:  Between the two, that is correct.

15    THE COURT:  In other words, you have two 80 acre pieces?

16    THE WITNESS:  Very close together.

17    THE COURT:  Separated by --.

18    THE WITNESS:  By an estimated 6 quarters.

19    THE COURT:  A section?

20    THE WITNESS:  Yes, I assume so.

21    THE COURT:  The answer also talks about one lot in

22  Temecula.

23    MR. VEEDER:  I am having that checked now.

24    THE COURT:  You check this out.

25    When did you acquire all these lots?  Just recently.

1    THE WITNESS:  Some of them recently, and some of them

2  ten years ago.

3    THE COURT:Get a list of the legal descriptions of this

4  property.

5    THE WITNESS:  I will do that.

6    THE COURT:  And get them to Mr. Veeder for the Government.

7    THE WITNESS:  I already gave them to the Government

8  surveyor that was at Temecula.  I got acquainted with him

9  quite well.

10    MR. VEEDER:  I would suggest that you stop in my office,

11  Mr. Schroeder.

12    They tell me that you were on notice to appear today in

13  this matter for Temecula.  So he has been notified.

14    THE COURT:  Has there been a survey made of this property?

15    MR. VEEDER:  No, there has not.

16    THE COURT:  What is your position about this ditch across

17  your property?

18    THE WITNESS:  When I bought the property -- I have the

19  original map, and it showed that that ditch was not near that

20  far up where it is now.  And I also notice, I go down there

21  every six months with several people, and it is supposed to

22  have a four foot right of way on the ditch to maintain the

23  ditch, and with no permission whatsoever -- I stopped them a

24  dozen times -- they just built a road that you can drive a

25  regular truck or tractor on up through the middle of our pro-

1    perty.  We are going to build cabin sites but since this

2    happened I have subdivided, I have let six people buy into it,

3    and they are all going to build cabins over there.  We can't

4    do anything because every time we go down there they have

5    something torn upswhere we are going to do something and they

6    shut the water off.  All we have is mosquitoes and no water.

7    They take every drop of the water.  I know that can't possibly

8    be right.

9         THE COURT:  Do we have a description of your property?

10        I will ask you to look at a map which is in evidence, get

11   yourself oriented on it.  This is called Gibbon and Cottle's

12   Exhibit A.  Within the heavy black lines is shown the Gibbon

13   and Cottle property running up to the road at Rabec, pointing

14   to the north.  Here is a ditch shown down along the Temecula.

15   I take it that it is this property in here that you own?

16        THE WITNESS:  Yes, it sets right along here.

17        THE COURT:  That is in Section 29?

18        THE WITNESS:  Yes.

19        MR. VEEDER:  We have the aerial here.

20        THE COURT:  Which way do you run there?

21        THE WITNESS:  I believe it runs just like this.  I haven't

22   looked at the map for a long time.

23        THE COURT:  Section 29 runs up here.  Your 80 would be

24   approximately this?

25        THE WITNESS:  Yes.

1   THE COURT: Here is a creek.  Is that Smith Canyon?

2   THE WITNESS:  Yes.

3   THE COURT:  That runs through your property?

4   THE WITNESS:  Yes.

5   THE COURT:  And joins the Temecula in your property?

6   THE WITNESS:  Yes.

7   THE COURT:  When did you first acquire the property?

8   When did you first know anything about it?  When did you first

9   see it?

10   THE WITNESS:  Oh, gosh, about 1932.

11   THE COURT:  Was the ditch in the same place then?

12   THE WITNESS:  I can't recall.  But 5 years ago I believe

13   it just ran about where you see that little black line.

14   THE COURT:  You mean when you first bought the property

15   the ditch was just above where Smith Creek ran into it?

16   THE WITNESS:  It is so close to Smith Creek, that I can't

17   say for sure.

18   THE COURT:  How many feet?

19   THE WITNESS:  I couldn't say.  I know it was just a few

20   steps one way or the other.

21   THE COURT:  When was the ditch extended up to where it

22   is presently?

23   THE WITNESS:  A little at a time.  It just goes up there.

24   I go down there every six months.  There is a road they built

25   through here.  I went up every six months with 2 people, because

1   I was warned that after five years if people continue to use
2   something they acquire it permanently.  I put a pile of rocks
3   with a sign on it don't go through there.  But they tear the
4   pile of rocks down and take the sign away.
5       THE COURT:  When did you first build the pile of rock?
6       THE WITNESS:  The first 30 days I got out of escrow.
7       THE COURT:  What year was that?
8       THE WITNESS:  I would have to look it up.  I have had
9   many property changes since then.
10      THE COURT:  Where does this road go?  Just follow along
11  the side of the ditch?
12      THE WITNESS:  First they had a four foot right-of-way
13  and they went right on top of the ditch.  Then they started
14  the road.  We tried stopping it.  But I can't live there.  But
15  every six months I take some reliable people with me, whom I
16  contacted yesterday and they said if necessary they would make
17  a statement that they helped put the rocks and the sign there.
18  I asked Mr. Gibbon one day with a tractor and I said, "you
19  will have to stop doing that."  And Mr. Gibbon said, "no, I
20  have a right-of-way over here," and he threatened to drive
21  over me with the tractor.  They cut down the cottonwood trees.
22  He said he didn't do that.  Then, of course, he died very
23  shortly afterward.
24      THE COURT:  What cottonwood trees were those?
25      THE WITNESS:  They were scattered periodically around.

1   They cut them down to make a bridge so they could get over to

2   make their aqueduct.

3         THE COURT:  Do you have an aerial on this?

4         MR. VEEDER:  Yes;  78W-11.  We had better have Colonel

5   Bowen identify it.

6         What is the year of that flight, Colonel Bowen?

7         COLONEL BOWEN:  1955.

8         MR. VEEDER:  Can you locate the confluence of the streams?

9         THE COURT:  Which is north of that map.

10        COLONEL BOWEN:  Exhibits 78W-11 appears on the north edge

11   of the photograph, your Honor.  Temecula Creek enters the area

12   of this photograph in the lower right hand corner and flows

13   northwesterly across the left hand corner.  The confluence of

14   Smith Creek or Long Canyon Creek with Temecula Creek I will

15   encircle with a pencil, and encircle the confluence of Smith

16   Creek with Temecula Creek with an orange pencil on 78W-11.

17        THE COURT:  Where would be the Gibbon and Cottle property?

18   Up above here?

19        COLONEL BOWEN:  Yes, your Honor, the Gibbon and Cottle

20   prpperty is comprised in part of the cleared area to the left

21   of the word "Radec" which is written in red grease pencil on

22   78W-11.

23        MR. VEEDER:  You may be able to orient your 78W-11 with

24   the soil survey Colonel.

25        COLONEL BOWEN:  Referring to Plaintiff's Exhibit 230,

1  the Gibbon property appears on portions of two aerial photo-

2  graphs enlarged of the cleared area I mentioned as appearing

3  on 78W-11 and comprising part of the Gibbon and Cottle property

4  as shown in the upper portion of the first aerial photograph

5  in Plaintiff's Exhibit 230, aerial photograph 3-0186.  The

6  Gibbon property extends westerly from the clearing there and

7  southerly from State Highway 79, as shown in the aerial photo-

8  graph 5-0106, part of Plaintiff's Exhibit 230, on down into

9  Section 29.  The West half of the Northwest Quarter of Section

10  29 is shown in Plaintiff's Exhibit 230 outlined in red.

11      MR. VEEDER:  Our records show that your Honor sent a

12  letter to Mr. Schroeder dated June 7, 1960 referring to the

13  Temecula properties that he has.  He tells me that he didn't

14  receive it.

15      THE WITNESS:  I don't think I did.

16      MR. VEEDER:  May I ask you to check it?

17      THE WITNESS:  It is feasible that my father might have

18  got it.  He gets all my mail sometimes and for spells I'll

19  get all his mail.  We have the same initials.  I keep all

20  letters.

21      THE COURT:  Would you see him afterward.

22      MR. VEEDER:  I saw that he had a letter in his hand.

23      THE WITNESS:  No, this is the one from the Gibbon lawyer.

24      THE COURT:  What is the claim of Gibbon and Cottle?  A

25  four foot right-of-way?

13,612

1    MR. GROVER:  No it is a right under the statute to main-

2    tain a ditch, and four feet is not sufficient for that.

3    THE COURT:  Where do you get the idea four feet?

4    THE WITNESS:  I recall it is written right on the deed

5    I have if I am not mistaken.  I'll have to get it out.  This

6    caught me quite unaware.

7    THE COURT:  Mr. Stahlman, you say you know some facts

8    about this?

9    MR. STAHLMAN:  I don't know any facts, your Honor.  I

10   have heard of this situation.

11   MR. VEEDER:  Why don't you cross-examine the witness about

12   that.

13   MR. STAHLMAN:  I am perfectly willing.  I will cross-

14   examine him on the assumption that --

15   THE COURT:  If you can bring out some facts that will

16   assist.  We are shooting sort of blind here.

17   MR. STAHLMAN:  Yes, your Honor.

18   BY MR. STAHLMAN:

19   Q    From whom did you acquire this property?

20   A    Irene Barton.

21   Q    Does she live in the area?

22   A    Yes.  She is Mrs. Welch now.

23   Q    Have you talked to her about this diversion ditch?

24   A    Not yet.  I talked to her when I first bought the

25   property, and she also told me there was a four foot right-of-

1   way to maintain it.

2       Q   You say the diversion ditch is in a different place

3   now than it was?

4       A   I am almost positive.  I am going to see Irene after

5   this.

6       Q   Will you talk to her about it?

7       A   I would like to do that.

8       THE COURT:  How long did Mrs. Barton own this property?

9       THE WITNESS:  Before World War II I am almost positive

10  of that.

11      THE COURT:  That isn't very far back.  Before 1941 you

12  mean?

13      THE WITNESS:  Yes, I would assume that, but I could be

14  wrong.  I didn't ask her.  However, I recall that I used to

15  go swimming down there a lot.  She had it fenced.

16  BY MR. STAHLMAN:

17      Q   Was there any difference in the condition of the

18  stream flow at that place compared to when you first saw it?

19      A   They have taken every drop of water completely.

20      Q   Was there previously --

21      A   Yes, previously they probably had about a third of

22  it and they let two-thirds of it go through, I am estimating.

23      Q   Up to what year did you notice that change-over?

24      A   When they put a stone and steel inlet into their

25  tube.

1        Q        About what date was that?

2        A        The second aqueduct was going through.

3        Q        That would be just a year or two ago?

4        A        Yes, thereabouts.

5        THE COURT:  When they put this cement dyke or dam in

6    there, is this when they dug down through the gravel and put

7    the dam down?

8        THE WITNESS:  No, the dam is much further up than that.

9    It has an open ditch.  From this cement and steel opening the

10   aqueduct is an open ditch that goes up, I would say, a 100

11   yards.  That is a guess too.  They probably have the figures.

12   And then there is a small dam there, large enough that it takes

13   every single drop of the water 100 per cent.

14       THE COURT:  You are speaking of the up-stream dam?

15       THE WITNESS:  Yes sir; the only dam.

16       THE COURT:  Is that the one that was put in a few years

17   ago about the time of the second aqueduct?

18       THE WITNESS:  That has been in there for quite a few years.

19       THE COURT:  I am lost on this.

20       MR. STAHLMAN:  I am, too, your Honor.

21       THE COURT:  Let's start at the junction of Smith Creek

22   and Temecula.

23       THE WITNESS:  It has a steel pipe --

24       THE COURT:  From there downstream?

25       THE WITNESS:  -- from there downstream, and at the opening

1  of that is cement with steel bars on it.

2       MR. VEEDER:  Can't we put up Gibbon and Cottle's

3  Exhibit B?  I can't follow him.

4       THE COURT:  Maybe you can.

5       We start at the junction of Smith Creek and Temecula.

6  As I understand your testimony, from Smith Creek and its joinder

7  with the Temecula the water system of Gibbon and Cottle from

8  there downstream across your property is a steel pipe?

9       THE WITNESS:  For part of it.  Then it has an open ditch

10  to the end of it.

11      THE COURT:  Now start up at the end of the pipe where

12  water first enters this pipe-line.  Where is that?  Upstream

13  from Smith Creek?

14      THE WITNESS:  Yes.

15      THE COURT:  Upstream on the Temecula?

16      THE WITNESS:  Yes.

17      THE COURT:  About how far upstream?

18      THE WITNESS:  Twenty-five yards from Smith Creek is this

19  cement entrance to the steel pipe.

20      THE COURT:  What does it look like?

21      THE WITNESS:  Oh, it is a cement facing wall with a pipe

22  in the center of it with steel bars, and then there is an open

23  ditch that approaches it from the dam which is above.

24      THE COURT:  This cement facing and the pipe is on a ditch;

25  it is not on the stream?

THE WITNESS:  That is right, it is on their ditch above the stream.

THE COURT:  YOU mean laying on higher ground?

THE WITNESS:  Yes.

THE COURT:  Then the ditch runs up to this dam?

MR. VEEDER:  Here is the whole thing.

THE COURT:  He has seen that.

From these steel bars and the beginning of the pipeline, you say that the ditch runs upstream of the Temecula?

THE WITNESS:  Upstream open ditch.

THE COURT:  How far up?

THE WITNESS:  Oh, I would say 100 yards or 150 yards.  I would say 125 yards.

THE COURT:  To a dam?

THE WITNESS:  To a dam.

THE COURT:  You don't know when that dam was put in?

THE WITNESS:  No, I don't know when that dam was put in there.

THE COURT:  What was the thing you saw put in which you say kept any water from flowing down the stream?

THE WITNESS:  Well, the dam also has two outlets.  There is an outlet to go down the natural course of the stream. Then there is an outlet which is the same height which goes in their aqueduct, and they have a plug in the other pipe completely shutting it off and all of the water goes into

1   their aqueduct.

2       THE COURT:  This is what you mean then was the cause of

3   all the water going down the aqueduct; they plugged the out-

4   let that went downstream?

5       THE WITNESS:  Yes, a hundred per cent.

6       THE COURT:  When was that done?

7       THE WITNESS:  Years ago.  Keep checking it.  Keep taking

8   it out.

9       THE COURT:  What do you mean?

10      THE WITNESS:  It shouldn't be in there.  Every time I

11  go up I see that it is plugged, and I tell people.  And I go

12  back up and it is out again.  Of course, the Gibbon's could

13  be opening that plug themselves I don't know.  B$^U$t before when

                                                              water
14  I brought the property they only took about a third of the /and

15  about two-thirds of it went down the creek.

16      THE COURT:  From this dam?

17      THE WITNESS:  From that dam.

18      THE COURT:  When did you buy it?

19      THE WITNESS:  About 5 years ago.

20      MR. STAHLMAN:  May I ask a question, your Honor.  As I

21  say, I didn't get the information from this witness.

22      Q    Are you acquainted with the situation which exists

23  downstream to other property owners down there?

24      A    Yes.

25      Q    Who are some of the other people down there who

1  depend upon this stream for source of water?

2      A    There is Mr. Poor and Mr. Ritchie.

3      Q    Mr. Poor and Mr. Ritchie?

4      A    Yes.

5      Q    Neither of them has any water?

6      A    No.  Whenever you go up there and find that someone

7  has opened up that flow of water, they tell me right away and

8  I go right away because they tell me they have water in their

9  wells.  Its takes every drop of their drinking water away,

10  they tell me, and I don't think they would lie.

11      Q    Have you ever seen a pump working up in there?

12      A    Yes, the Gibbons had apump in Smith Canyon pumping

13  out of the little lake the two creeks form.  They pumped all

14  of the water out of there up into their aqueduct also and let

15  it run down on the Gibbon property.

16      THE COURT:  When did they start doing that?

17      THE WITNESS:  Two years ago, a year and a half ago.

18      THE COURT:  Was there a well dug there?

19      THE WITNESS:  No.  There is a little lake almost half as

20  large as this room.

21      THE COURT:  They fixed a pump to pump this out into the

22  ditch?

23      THE WITNESS:  They pumped it out of there and up into the

24  top of the ditch and then it goes dry.

25      MR. VEEDER:  The lake.

1          THE WITNESS: The lake.

2    BY MR. STAHLMAN:

3          Q     When does Mr. Ritchie and Mr. Poor get their water

4    now?

5          A     I believe they haul it.  I am not sure of that.  I

6    know they did for awhile.  I think they run their pumps in

7    the morning once in awhile for a hour or half an hour until

8    it dries up.

9          Mr. Judge, regardless of how this is, surely they don't

10   have the right to keep these roads through my property, do

11   they?

12         THE COURT:  That is a legal question I will have to decide.

13         THE WITNESS:  We are almost afraid to build a house down

14   there.  We don't know where they are going to go next.  We

15   stop them every time.

16         THE COURT:  If they have a right to the ditch, they pro-

17   bably have a right to tend the ditch.  But my first impression

18   would be thatthe right to an area to tend the ditch would be

19   immediately adjacent to it.  It wouldn't be wandering off in

20   all directions on your property.

21         THE WITNESS:  They cut down the two best cabin sites we

22   had and put in roads.

23         THE COURT:  What did they cut down?

24         THE WITNESS:  Trees.  And we have some high ground where

25   they went through when the floods came, on account of the flood

13 620

1    washed them out.

2        MR. VEEDER:  I wonder if you could locate on Gibbon and

3    Cottle's Exhibit A where these sites are on your property.

4        THE WITNESS:  You mean by this map?

5        MR. VEEDER:  Yes.

6        THE WITNESS:  Absolutely not.

7        MR. VEEDER:  You can't.

8        THE WITNESS:  No, impossible.

9        MR. VEEDER:  Here is Temecula Creek.  Do you own this

10   area right in here?  Is that right?

11       THE WITNESS:  Yes.

12       MR. VEEDER:  We have Numbers 250 and 300.

13       THE WITNESS:  What do these mean?

14       MR. VEEDER:  Those are distances as shown in the record,

15   the length of the pipe.

16       THE COURT:  Apparently he owns the West Half of the

17   Southwest Quarter of Section 29.

18       MR. VEEDER:  And your place is intersected by the stream,

19   as I see it, that is, the 80 acres which you pleaded in your

20   answer.

21       THE COURT:  His answer doesn't describe any property,

22   Mr. Veeder.

23       MR. VEEDER:  He has referred to 80 acres.

24       THE COURT:  This is the 80 acres you are talking about?

25       THE WITNESS:  Yes, this is the 80 acres I am talking about.

THE COURT:  I found what I was looking for in the test-
imony of Gustav A. Spaniol.  My notes showed -- we would have
to find the transcript on that -- that 5 years ago they dug
down six or seven feet and put in clay.  They found no old
clay.  Apparently they dug down, took out the gravel and put
in the clay.  They found no old clay.  But this was the first
time this was done, and this increased the amount of water
obtained.  They put in a 12" outlet at stream bed level, which
controls the stream.  My inquiry is, does that testimony refer
to this upper dam?  Is that the only place that there is a
12" outlet that goes out to the stream?

THE WITNESS:  There is 2 in that dam; one for the stream,
and one for their ditch.

THE COURT:  You don't know when that dam was put in there?

THE WITNESS:  No, I don't.  I probably could find within
a couple of months of when it was put in.

THE COURT:  Did you find the place?

MR. VEEDER:  I am checking Mr. Spaniol's testimony now.

MR. STAHLMAN:  I think the history of that probably lies
in the knowledge of the witness he mentioned -- what was her
name?

THE WITNESS:  Irene Barton.  The week I bought the pro-
perty we hiked in together and looked at it.

THE COURT:  Was that dam there then?

THE WITNESS:  I don't think that one was there then.  But

1  until I see Irene I would hate to have said it was.  I could

2  be wrong.  I recall when he made the road. When he made the

3  road, the dam showed up.  It is almost a natural dam but nature

4  anyway.  It is a unique spot to put a dam.  It is protected by

5  rock on both sides.

6       THE COURT:  Mr. Grover, do you have some questions?

7       MR. GROVER:  Yes, your Honor.  First of all, I would like

8  to move to strike all the testimony relating to Mr. Ritchie and

9  Mr. Poor.  Not only because it is heresay but also because it

10  was stated as "I am not sure" and "I think".

11       THE WITNESS:  That is right.

12       THE COURT:  The motion is denied.  I will ignore the

13  heresay.

14       MR. GROVER:  I would like to move to strike anything that

15  Mr. Gibbon may have said, your Honor.

16       THE WITNESS:  I had a witness to what Mr. Gibbon said.

17       MR. GROVER:  I move to strike it as being heresay.  Mr.

18  Gibbon is deceased.  There is no foundation for making it

19  binding on my client.

20       THE WITNESS:  Your foreman will back me up.  The foreman

21  of your ranch will back up what I said.  He was there.

22       MR. GROVER:  He is subject to subpoena.

23       THE COURT:  I didn't get it.

24       MR. GROVER:  Mr. Gibbon said that he would agree to a

25  four foot right of way?

13,623

1    THE WITNESS:  No, I don't believe he said he agreed to

2  four foot right-of-way.  He agreed that he shouldn't build a

3  road down there, and that he wouldn't do it any more, and that

4  he wouldn't drive over it with a tractor, that there was a

5  four foot right-of-way but that he couldn't drive a tractor

6  down a four foot right-of-way, that is word for word what Mr.

7  Gibbon said.

8    MR. GROVER:  I move to strike it as being heresay under

9  the dead man statute.  There is no proper foundation.

10    THE COURT:  The motion is granted.

11    Was there anyone else present at this conversation?

12    THE WITNESS:  The foreman of the Gibbon ranch and Frankie

13  Lee, a fireman of the Fire Department.

14    THE COURT:  What is the foreman's name?

15    THE WITNESS:  I would have to ask him what the foreman's

16  name is.  It has been 2 years now.

17    THE COURT:  What is the name of the foreman?

18    MR. GROVER:  I don't know who it was at that time, your

19  Honor.

20    THE COURT:  Can you find out from your clients?

21    MR. GROVER:  I can ascertain.

22    THE COURT:  Let's do it now.

23    MR. GROVER:  Was it Mr. Dixon?

24    THE WITNESS:  I would have no idea.  All I know is that

25  you fired him.  You have so much trouble keeping foremen. You

1  would have to ask the lady who is the owner now and she would

2  have to tell you.

3      MR. SACHSE:  Your Honor and Mr. Veeder, I don't know

4  whether this is in evidence, and I am only trying to be help-

5  ful to the Court.  It is exceedingly heresay, but it an

6  official publication.  The Report of Referee in Barbey vs

7  Oviatt has ahistory of this diversion as found by the Referee.

8      THE COURT:  How long ago?

9      THE SACHSE:  This reference is dated July 1956.

10      THE COURT:  How long in pages?

11      MR. SACHSE:  Less than a page and a half, a summarization

12  of this diversion and the changes in it, and so on.

13      THE COURT:  Let me see it.

14      MR. STAHLMAN:  It is on file in the Superior Court.

15      MR. VEEDER:  That is the Report of Referee in Barbey vs

16  Oviatt?

17      MR. SACHSE:  Yes.

18      THE COURT:  Any objection to having this in evidence for

19  what it is worth?

20      MR. GROVER:  I would like to offer it in evidence, your

21  Honor.

22      MR. VEEDER:  I would like to look at it.

23      MR. SACHSE:  It is only a page long.

24      MR. VEEDER:  I have a copy in my office.  I will look at

25  it.

1    THE COURT:  You should read this before you leave here.

2  You can read it now.  The last paragraph says:

3        "According to a 1926 survey of the system, known at

4        that time as the Clinton G. Tripp diversion, the

5        main ditch diverted from the creek immediately below

6  t     the confluence with Smith Creek, and the lower ditch

7        was approximately in it's present position."

8    However, the lower ditch, as I recall, looking at the map,

9  the lower ditch we are talking about is on the Gibbon property

10 where they divert, say below your place.  They are talking

11 about this other ditch that runs through part of your property

12 and on to your 80.

13   THE WITNESS:  I didn't know they had a lower ditch.

14   THE COURT:  Do you offer in evidence the portion beginning

15 on Page C-73 and running to the top of Page C-75?

16   MR. GIRARD:  May we have the Reporter transcribe that?

17 That is our only copy.

18   THE COURT:  Yes, that is what we will do.

19   Do you offer it in evidence?

20   MR. GROVER:  Yes, your Honor.

21   THE COURT:  All right.  The Reporter will transcribe into

22 the Record what I have marked in red pencil, starting at

23 Page C-73.

24   MR. VEEDER:  I will read that afternoon, and if I have

25 any objection I will let you know.

1      THE COURT:  It will be received as part of the record.

2    I would like to have Mr. Schroeder have an opportunity to read

3    it and then take such notes as he may want and make any further

4    investigation.

5      (The material directed by the Court to be copied into

6    the record is in words and figures as follows:)

7    "Diversion 8S/1E-29L.  Katharine C. Gibbon and William W.Cottle

8      Diversion is from Temecula Creek in the canyon between

9    Aguanga and Radec in the NE¼, SW¼, Section 29, T. 8 S., R. 1 E.,

10   S.B.B. & M.

11     The diversion system consists of an earth and rock dam

12   which diverts the entire stream flow, an open earth ditch

13   about 550 feet long, 500 feet of 12-inch steel pipe, and an

14   open earth ditch about 7,500 feet long terminating at the

15   Cottle Reservoir.  The steel pipe was installed in January,

16   1953.

17     Water from this diversion is used on the Gibbon and

18   Cottle ranches, being applied alternately for three and one-

19   half days on each ranch.  Use on the Gibbon ranch was for

20   irrigation of pasture, grain, and a small deciduous orchard

21   in the amounts of 58, 18, and 55 acres in 1951, 1952, and

22   1953, respectively.  Use by Cottle was for irrigation of

23   alfalfa, pasture, and a small amount of grain totaling 17,

24   17, and 31 acres in the years 1951, 1952, and 1953, respect-

25   ively.  Gibbon applies water by gravity and by pumping from

1    the diversion ditch through a sprinkler system.

2         Regular measurements have been made at weirs near the

3    intake and near the place of Gibbon's use, for the period

4    January 1951, through September 1954, and occasional meas-

5    urements of the diversion have been made since 1943.

6         A water claim for this diversion was filed February 11,

7    1885, by S. V. Tripp in the office of the San. Diego County

8    Recorder.  Claim was for the entire flow of the stream and

9    its tributaries for agricultural and milling purposes.  Use

10   of the diversion has been continuous since that date, but

11   the intake and upper end of the ditch have been variously

12   located above and below the confluence of Temecula Creek

13   with Smith Creek (also known as Smith Mountain Creek and

14   Long Canyon Creek).  Former owners of the property and water

15   right include S. V. Tripp, Lula Miller, Franklin G. and

16   Caroline R. Johannsen, and Dr. Cottle.  Katharine C. Gibbon

17   and William W. Cottle took title to the land and water right

18   on December 30, 1941, and it is claimed each is entitled to

19   one-half of the original claim.

20        A second ditch from Temecula Creek about one mile below

21   the main ditch has been used to serve pasture land below the

22   ditch.  Mr. Cottle states that "this ditch, which was opened

23   last year (1953), but was unusable for several years due to

24   lack of water, sometimes picks up water which is oveflow

25   water from the Gibbon property".

1       According to a 1926 survey of the system, known at that

2  time as the Clinton G. Tripp diversion, the main ditch div-

3  erted from the creek immediately below the confluence with

4  Smith Creek, and the lower ditch was approximately in its

5  present position."

6       THE COURT:  Let me look at this transcript a minute.

7       MR. VEEDER:  I am not quite sure what your reference was,

8  your Honor, but there is reference to the dam there.

9       THE COURT:  I want to make note of that portion of the

10  record and read it in my chanbers.

11      THE WITNESS:  I believe the water company man gave me

12  one of those books just a couple of days ago, but I haven't

13  had a chance to look at it.

14      THE COURT:  I am talking about the transcript of this

15  trial, about Pages 12,537 and running on to at least 12, 544.

16      I don't know what trial you are even talking about.

17      This trial.  You make a note of these, write it down,

18  and if you want to look at this record you can read it.  I

19  have the Volumes in my office.  There was some part of this

20  trial that concerned this dam.

21      THE WITNESS:  May I borrow a pencil?

22      THE COURT:  Yes.  Page 12,537 and running on to about

23  Page 12,544.  There is testimony about this dam that we are

24  talking about.  There is a lot more material in here, too.

25      Do you want to ask some questions, Mr. Grover?

1      MR. GROVER:  Yes sir, your Honor.

2      THE COURT:  Mr. Schroeder, if you are not sure just say

3  so and don't answer.  If the question is something you know

4  about and can answer it, answer it.

5      THE WITNESS:  Okay.

6      THE COURT:  Because Mr. Grover is ~~representing~~ these

7  people downstream from you.

8      Go ahead.

9      MR. GROVER:  I might say, your Honor, that I asked Mrs.

10  Gibbon, who is present in the Courtroom today, about the con-

11  versation which Mr. Schroeder referred to, and she is not

12  certain who the foreman was -- that it might have been Mr.

13  Dixon.  However, I might also say that our information about

14  that conversation is quite different, and we would like an

15  opportunity to attempt to find and bring in the witnesses who

16  were there.

17      THE COURT:  Since you objected and moved to strike this

18  out, this witness has stated that other people were present

19  at the conversation.

20      MR. GROVER:  Yes.

21      THE COURT:  Your objection is no longer good to it then,

22  is it?

23      MR. GROVER:  Well, under the dead man statute.

24      THE COURT:  How is your objection good if other people

25  were present?  You would strike this man's testimony and then

1  you would bring in these other people who were present and let

2  them testify.

3      MR. GROVER:  He can bring them in, too.

4      THE COURT:  He was present.  Why wouldn't he have the

5  same right to testify that these third persons would have?

6      MR. GROVER:  But we don't know who these other people

7  were in the first place.

8      THE COURT:  He has named --

9      THE WITNESS: Frankie Lee.

10     THE COURT:  A man doesn't have to know the pedigree of

11  the person present at a conversation to be able to testify to

12  it.

13     MR. GROVER:  Perhaps the objection is that it is irrel-

14  ivant.  What has Mr. Gibbons statement that he will or will

15  not do something to do with it when he was not even the owner

16  of the property?  The thing I want to get away from is any

17  suggestion of a contract or undertaking or representation

18  of future conduct.

19     THE COURT:  If your intention is to bring in some of these

20  people who were present at this conversation.

21     MR. GROVER:  If I can locate them.

22     THE COURT:  I will set aside my ruling and the witness'

23  testimony that I previously struck may stand.

24     CROSS EXAMINATION

25  BY MR. GROVER:

1      Q     What was the exact date of this conversation?

2      A     I have to ask Frankie.  He has certain days off at
the Fire Department.

4      Q     Do you know the exact date?

5      A     No.

6      Q     Do you have any idea approximately what date it
was?

8      A     No.

9      THE COURT:  Do you know what year it was?

10    THE WITNESS:  Last year.

11    THE COURT:  You mean in 1959?

12    THE WITNESS:  Frankie will tell him exactly.

13    MR. VEEDER:  You didn't answer the question.

14  BY MR. GROVER:

15      Q     We are trying to get what you know.

16      A     I don't know.  But it was in 1959.

17      Q     But it was in 1959?

18      A     Yes sir.

19      Q     There was not only the foreman of the Gibbon ranch,
but another person present?

21      A     Yes.

22      Q     Who was that other person?

23      A     Frank Lee of the Anaheim Fire Department, one of
the new owners.

25      Q     He is a co-owner with you of this 80 acres?

1    A    There are 5 others.

2    Q    Who are the other owners?

3    A    Bob Dawes of the Right-Spot Cafe, Larry of Larry's

4 Cafe in Fallbrook, Fallbrook Lumber Company, and other man I

5 don't recall -- I only met him once.

6    Q    Were any of these other persons present?

7    A    No, just Frankie.

8    Q    On this occasion did you have a gun which you

9 displayed to Mr. Gibbon?

10    A    No, I don't carry a gun when I go down there.

11    Q    Did you ever display a gun to Mr. Gibbon?

12    A    I never saw Mr. Gibbon only twice in my life and I

13 never had a gun when I saw him.

14    Q    Did you ever threaten him with physical violence?

15    A    No.

16    Q    At the time when he came on the property with the

17 tractor did he go ahead then with the tractor up to the dam?

18    A    Oh no.

19    Q    How far did he go?

20    A    He turned the tractor around and took it out. very

21    Q    Have you ever seen him take the tractor up to the

22 dam?

23    A    No I never have.

24    Q    How far up has the tractor ever gone to your knowledge?

25    A    I know the tractor has been up to the dam, because

13,633

1    I checked the tire marks and the tire marks were of this

2    tractor.  He built the road there.

3         THE COURT:  When did he build this road there?

4         THE WITNESS:  2½ YEARS AGO.

5         THE COURT:  You mean in 1957 sometime.

6         THE WITNESS:  Well, I would say some time in 1957, yes,

7    becuase I know we had a good rain right after that because

8    it flooded everything and washed everything out.

9    BY MR. GROVER:

10        Q    Was there a road before that time?

11        A    No, absolutely not.  Not even a trail.

12        Q    Will you describe the road?

13        A    The road leaves the Gibbon property, it goes straight

14   due East, I would say, it goes along the river, it crosses the

15   river, after about fifty yards, it goes up to where the cabin

16   sites were going to be, it goes clear up to Smith Creek,

17   crosses Smith Creek, cuts out the bank topside and keeps on

18   going along the aqueduct, turned and cut out our camps up

19   there above the dam.  And there was nothing there before.

20        THE COURT:  Trees were cut out to make the road?

21        THE WITNESS:  Yes, certainly.

22   BY MR. GROVER:

23        Q    Directing your attention to an Exhibit marked

24   Gibbon and Cottle A, would you with a pencil indicate where

25   that road is?

1     THE COURT:  Get yourself oriented.  You know where the

2 junction of Smith Creek and Temecula is?

3     THE WITNESS:  Yes.  I don't know what youcall that.  It

4 is called stile cross-over.  There is a stile there.

5 BY MR. GROVER:

6     Q    You are pointing to the place where the creek

7 crosses the boundary line between your property and Mr.

8 Gibbons property?

9     A    Yes.

10     THE COURT:  A stile over the fence?

11     THE WITNESS:  Yes, over the fence.  It goes right along.

12 This goes -- you are going to be cramped -- it goes right

13 along here, crosses over here, drops down here and crosses and

14 drops down here and crosses right here, there is a sand bar,

15 it goes right on around here.  This is the dam, is it?  Goes

16 right on here and goes across here and they cut all this camp

17 site here, took every bit of it out.

18     MR. STAHLMAN:  For the road?

19     THE WITNESS:  I don't know why he cut that out.

20 BY MR. GROVER:

21     Q    What did he do?  Cut out trees?

22     A    The trees that were there.

23     Q    Cut any land?

24     A    No, it is level ground there.  But he cut all the

25 ground along here.  There is a beautiful cabin site.

THE COURT:  Indicating on the west side of the ditch, apparently between the ditch and the stream.  Is that right?

THE WITNESS:  The ditch and the stream on the first very slight part of it, probably 75 yards.  Then it crosses over the ditch, and then it goes on the west side all the way down.

MR. VEEDER:  That is the road?

THE WITNESS:  That is the road that he made, yes.

BY MR. GROVER:

Q   Prior to this time was there any road there at all?

A   Not to my knowledge.

Q   Had they ever used that road to get to the dame?

A   Not that I know of.  How could they?

Q   Did they ever use it?

A   No, of course not.  They couldn't.  There was trees and stuff there then.

THE COURT:  You could walk, couldn't you?

THE WITNESS:  They did walk.  They carried that stuff on their back before.

I still say I don't intend to have anybody carry pipe on their back.  Some agreement certainly should be made so they can maintain their ditch, but I ought to have a little say-so where.

BY MR. GROVER:

Q   Prior to that time how would they get to the dam?

A   They asked permission of me one time, and we all gave permission to use the road I had built.

13,636

Q     Who asked permission?

A     I forget his name.  There was a man who worked for them up there off and on.  He came to me and asked permission and we said "certainly." and he used a road I had built from the main highway to maintain the ditch.

Q     Where is that road?

A     It is on that aerial map you had.  It was made in 1957.  I don't know the name of it.

THE COURT:  This is 78W-11.  Here is the junction of Smith Creek and Temecula with a circle around it.  Where is your road?

THE WITNESS:  Right here.  No, its right here.  This must be Half-Way House.

THE COURT:  When did you put your road in?

THE WITNESS:  I thought it was before 1957.

THE COURT:  This map was made in 1955.

THE WITNESS:  No, it will not show it.  It is a real good road.  It comes from below the Half-Way House and cuts this road and comes on down this creek here and then you can drive up.

THE COURT:  It hits Temecula Creek?

THE WITNESS:  Yes.

THE COURT:  And after your hit Temecula Creek you can drive down to the junction of Temecula and Smith?

THE WITNESS:  Yes.  It is hard to do, but then the road

1     is a bad road, too.

2     BY MR. GROVER:

3          Q     Is that road still there today?

4          A     Oh yes, I just went over it.

5          Q     Prior to the time that they built this road on the

6     west bank that goes partly on the west bank, how did they get

7     to the dam?

8          A     I understood they carried stuff on their back.

9          Q     Do you know how they got there?

10         A     I know they didn't go by car.

11         Q     Do you know how they did go?

12         A     They carried it on their back.

13         Q     Do you know what route they took?

14         A     There is a beautiful trail right on the dam.

15         Q     On the dam.

16         A     I beg your pardon.  On the aqueduct.  There is a

17    well worn beautiful trail.

18         Q     Along the ditch?

19         A     Along the ditch.

20         Q     Did you ever see them use that ditch?

21         A     Oh yes, I certainly have.

22         Q     When did you say you first became the owner of the

23    property?

24         A     I didn't say.  I would have to look it up.

25         Q     Was it within the last five years?

1    A    I believe it was right close to five years.

2    Q    You say you are not sure where the dam was at that

3    time?

4    A    No, I am not sure.

5    Q    Is there any water in the little lake which you

6    described as having been pumped from by Gibben and Cottel?

7    A    Yes, it is half full right now.

8    Q    Is it being pumped?

9    A    Oh, no, they took the pump away quite awhile ago.

10   Q    When was that?

11   A    When this water suit gottoo hot.

12   Q    Do you have a date on that?

13   A    I can ask Frankie.

14   Q    When did the water suit get hot?

15   A    When the Water District moved into Temecula, the

16   man that represents the Water District from Camp Pendleton.

17   Q    What Water District from Camp Pendleton?  Was this

18   five years ago, ten years ago?

19   A    Oh no.

20   Q    Do you know when the suit was filed?

21   A    This was about a year and a half ago when the water

22   man came into Temecula.

23   THE COURT:  Do you mean when the man from Camp Pendleton,

24   Office of Ground Water Resources, opened the office in

25   Temecula?

1        THE WITNESS:  Yes, that is right.

2   BY MR. GROVER:

3        Q    So that this was about a year and a half ago that

4   they stopped pumping from that lake?

5        A    No, I am wrong.  It was sometime this year, because

6   I remember it was after that last good small rain we had that

7   they had the pump in there.

8        THE COURT:  You say this year.  Are you talking about

9   1960?

10       THE WITNESS:  Yes, the pump was in the creek this year.

11  I can verify that by somebody else, because there is always

12  a month leeway there, I could be wrong, but it was in the last

13  eight months.

14  BY MR. GROVER:

15       Q    And when was it started?

16       A    The pump?

17       Q    Yes, when was it first there?

18       A    I don;t go down there only every 3 to 6 months.  I

19  don't know how long it had been there.

20       Q    Have you ever seen it there before?

21       A    No.

22       Q    So it would not have been there for the 3 to 6

23  months prior to that time?

24       A    That is what I would say.

25       MR. VEEDER:  Are you claiming some right under the pump-

1   ing right?

2       MR. GROVER:   I am trying to find out the facts about it

3   and then I will ascertain what the facts are.   I don't know

4   of any pump in that lake there personally.   But it may have

5   been done.

6       Q    From whom did you purchase the property?

7       A    Irene Barton.

8       Q    What familiarity did you have with the property

9   prior to the time you purchased it?

10      A    Summer vacations I came down.

11      Q    Every summer?

12      A    Just about, yes, I would say every summer for a

13   day or a week.   We have a ranch up above it.   We go to our

14   place and hike down and go for a swim.

15      Q    And when you did that what was the first time you

16   did that on summer vacation?

17      A    I would say 1947.

18      Q    And that is your earliest personal familiarity with

19   the property where the dam and the ditch are?

20      A    Even then I don't recall where they were at that

21   time either.   The creek washes out completely every year up

22   until the last few years -- completely, everything.

23      Q    By creek --

24      A    Both creeks.

25      THE COURT: But since they put this other dam that is up

1  there at the highest point on Temecula, that hasn't washed

2  out?

3      THE WITNESS:  No, because they put it in a very natural

4  rocky spot.  I don't think it will ever wash out.  I think it

5  will be there forever.

6  BY MR. GROVER:

7      Q    Did you ever personally remove the plug you des-

8  cribed in the dam?

9      A    I haven't got the guts to do it.

10     Q    Did you ever do it?

11     A    No, I would be afraid of getting sued.  I don't

12  know the laws on that stuff, you know.

13     Q    Did you ever have anyone do it at your direction?

14     A    No sir.

15     Q    It has been done though?

16     A    It certainly has.

17     Q    Do you know who did it?

18     A    No.

19     MR. GROVER:  Your Honor, I would like to inquire about

20  the proceeding here.  We do have three people in the Court-

21  room who are familiar with some of the facts.  Mr. Illingworth,

22  who assisted in the preparation of this Report of Referee and

23  who is familiar as far back as 1951 with the physical cir-

24  cumstances.  Another is Mr. Strange, who, although co-counsel

25  with me for Gibbon and Cottle, is also the son-in-law of Mrs.

1   Gibbon and is familiar with the property as far back as 1952.

2   And of course Mrs. Gibbon is here.  I feel, and I think perhaps

3   your Honor may feel, that this can't be resolved today,

4   because we certainly would want to check with this other

5   witness if we can locate him and it might be better to post-

6   pone the whole thing until another time.  But at the same time

7   if it would suit your Honor's pleasure we could put these

8   witnesses on to describe what they have to day.

9        THE COURT:  Yes, we can do that.

10       Let me ask this question before we finish up with you.

11       Where is Bergman Springs from the junction of Smith Creek

12   and Temecula?

13       THE WITNESS:  I never heard of Bergman Springs.  I am

14   sorry.

15       THE COURT:  Do you know where Bergman Spring are?

16       MR. VEDDER:  They have been referred to in the record.

17       THE WITNESS:  They must be on the Trunelle property some-

18   where, because he bought Bergman's, all the property along the

19   river.

20       MR. VEEDER:  Do you know?

21       MR. GROVER:  I don't know exactly.  I understand it is

22   outside the map shown on Exhibit A.

23       THE COURT:  Is it upstream or downstream from Smith Creek?

24       MR. GROVER:  It is upstream.

25       THE WITNESS:  It would have to be upstream.

1     MR. GROVER:  I understand on the Trunelle property.

2     MR. VEEDER:  I think Mr. Spaniol testified about it.

3     MR. GROVER:  Yes, I am not sure that he located it

4 exactly, but it is upstream from the dam.

5     THE COURT:  The witness says he want to ask a question.

6     THE WITNESS:  If this has to be prolonged -- I have 3

7 businesses, and none of them pay very much -- can I just

8 trust that you will handle this?  You certainly have handled

9 it in my behalf so far.  Can I trust you to take care of this.

10 I can go to work?

11     MR. VEEDER:  A motion of bias and prejudice.

12     THE COURT:  Well, you are down here now.  Can't you

13 stay a little longer?

14     THE WITNESS:  Surely.  But I understand the gentlemen

15 wants it to go some other time, too.

16     THE COURT:  I have to decide this matter and I want all

17 the help I can get.  But I can't be you lawyer.  I might

18 rule against you.

19     THE WITNESS:  That's all right.

20     THE COURT:  This is an important matter to you.  You own

21 that piece of property.  It is a rather important matter to

22 you to get this matter straightened out.

23     THE WITNESS:  Yes, but you brought out more than I knew

24 already.

25     THE COURT:  All right, step down.

P 1

1    Q  Is there any water in the little lake which you

2  described as having been pumped from by Gibbon and Cottle  ?

3    A Yes, it is half full right now.

4    Q  Is it being pumped?

5    A  Oh, no, they took the pump away quite a while ago.

6    Q  When was that?

7    A  When this water suit got too hot.

8    Q  Do you have a date on that?

9    A  I can ask Frankie.

10    Q  When did the water suit get hot?

11    A  When the Water District moved into Temecula, the man

12  that represents the Water District from Camp Pendleton.

13    Q  What water district from Camp Pendleton?  Was this 5

14  years ago, 10 years ago?

15    A  Oh no.

16    Q  Do you know when the suit was filed?

17    A  This was about a year and a half ago when the water

18  man came into Temecula.

19    THE COURT:  Do you mean when the man from Camp Pendleton,

20  Office of Ground Water Resources, opened the office in Temecula?

21    THE WITNESS:  Yes, that is right.

22  BY MR. GROVER:

23    Q  So that this was about a year and a half ago that they

24  stopped pumping from that lake?

25    A  No, I'm wrong.  It was some time this year, because I

P 2

1   remember it was after that last good small rain we had that they

2   had the pump in there.

3        THE COURT:   You say this year.  Are you talking about 1960?

4        THE WITNESS:   Yes, the pump was in the creek this year.  I

5   can verify that by somebody else, because there is always a

6   month leeway there I could be wrong.  But it was in the last

7   eight months.

8   BY MR. GROVER:

9        Q   And when was it started?

10       A   The pump?

11       Q   Yes, when was it first there?

12       A   I don't go down there only every three to six months.

13  I don't know how long it had been there.

14       Q   Had you ever seen it there before?

15       A   No.

16       Q   So it would not have been there more than three to six

17  months prior to that time?

18       A   That is what I would say.

19       MR. VEEDER:   Are you claiming some right under the pumping

20  right?

21       MR. GROVER:   I'm trying to find out the facts about it and

22  then I will ascertain what the facts are.  I don't know of any

23  pump in that lake there personally.  But it may have been done.

24       Q   From whom did you purchase the property?

25       A   Irene Barton.

P 3

1    Q  What familiarity did you have with the property prior

2    to the time you purchased it?

3    A  Summer vacations I came down.

4    Q  Every summer?

5    A  Just about, yes, I would say every summer for a day or

6    a week.  We have a ranch above it.  We go to our place and hike

7    down and go for a swim.

8    Q  And when you did that what was the firt time you did

9    that in the summer vacation?

10   A  I would say 1947.

11   Q  And that is your earliest personal familiarity with the

12   property where the dam and the ditch are?

13   A  Even then I don't recall where they were at that time

14   either.  The creek washes out completely every year up until

15   the last few years--completely, everything.

16   Q  By "creek"--

17   A  Both creeks.

18   THE COURT:  But since they put this other dam that is up

19   there at the highest point up on Temecula, that hasn't washed

20   out?

21   THE WITNESS:  No, because they put it in a very natural

22   rocky spot.  I don't think it will ever wash out.  I think it

23   will be there forever.

24   BY MR. GROVER:

25   Q  Did you ever personally remove the plug you described

P 4

1   in the dam?

2        A   I haven't got the guts to do it.

3        Q   Did you ever do it?

4        A   No, I would be afraid of getting sued.   I don't know the

5   laws on that stuff, you know.

6        Q   Did you ever have anyone do it at your direction?

7        A   No sir.

8        Q   It has been done though?

9        A   It certainly has.

10       Q   Do you know who did it?

11       A   No.

12       MR. GROVER:   Your Honor, I would like to inquire about

13   the proceeding here.   We do have three people here in the court

14   room who are familiar with some of the facts.   Mr. Illingworth,

15   who assisted in the preparation of this Report of Referee and

16   who is familiar as far back as 1951 with the physical circum-

17   stances.   Another is Mr. Strange, who, although co-counsel with

18   me for Gibbon and Cottle, is also the son-in-law of Mrs. Gibbon

19   and is familiar with the property as far back as 1952.   And of

20   course Mrs. Gibbon is here.   I feel, and I think perhaps your

21   Honor may feel, that this can't be resolved today, because we

22   certainly would want to check with this other witness if we

23   can locate him and it might be better to postpone the whole

24   thing until another time.   But at the same time if it would

25   suit Your Honor's pleasure we could put these witnesses on to

P 5   1    describe what they have to say.

2         THE COURT:  Yes, we can do that.

3         Let me ask this question before we finish up with you.

4    Where is Bergman Springs from the junction of Smith Creek and

5    Temecula?

6         THE WITNESS:  I never heard of Bergman Springs.  I'm sorry.

7         THE COURT:  Do you know where Bergman Springs are?

8         MR. VEEDER:  They have been referred to in the record.

9         THE WITNESS:  They must be on the Trunelle property some-

10   where, because he bought Bergman's, all of the property along

11   the river.

12        MR. VEEDER:  Do you know?

13        MR. GROVER:  I don't know exactly.  I understand it is

14   outside the map shown on Exhibit A.

15        THE COURT:  Is it upstream or downstream from Smith Creek?

16        MR. GROVER:  It is upstream.

17        THE WITNESS:  It would have to be upstream.

18        MR. GROVER:  I understand on the Trunelle property.

19        MR. VEEDER:  I think Mr. Spaniol testified about it.

20        MR. GROVER:  Yes.  I'm not sure that he located it exactly,

21   but it is upstream from the dam.

22        THE COURT:  The witness says he wants to ask a question.

23        THE WITNESS:  If this has to be prolonged--I have three

24   businesses--and none of them pay very much--can I just trust

25   that you will handle this?  You certainly have handled it in

1  my behalf so far.  Can I trust you to take care of this and I

2  can go to work?

3      THE COURT:  Well, you're down here now.  Can't you stay

4  a little longer?

5      THE WITNESS:  Surely.  But I understand the gentleman

6  wants to go to some other time, too.

7      THE COURT:  I have to decide this matter, and I want all

8  the help I can get.  But I can't be your lawyer.  I might rule

9  against you.

10      THE WITNESS:  That's all right.

11      THE COURT:  This is an important matter to you.  You own

12  that piece of property.  It is a rather important matter to you

13  to get this matter straightened out.

14      THE WITNESS:  Yes, but you brought out more than I knew

15  already.

16      THE COURT:  All right, step down.

17      Let's call the next witness.

18

19                    LEE ILLINGWORTH,

20  having been previously duly sworn, on his oath was examined and

21  testified further as follows:

22                    DIRECT EXAMINATION

23

24

25

BY MR. GROVER:

Q  Mr. Illingworth, are you familiar with the information stated in the Report of Referee admitted in evidence, pages C-73 to C-75?

A  Yes.

MR. VEEDER:  There is only one page admitted in evidence.

THE COURT:  No, it is part of three pages in fact.

MR. VEEDER:  Go ahead.

BY MR. GROVER:

Q  To your knowledge are the statements in there correct?

A  Yes.

Q  When did you first see the dam shown on Exhibit Gibbon and Cottle A down in the west half of the southwest quarter of Section 29 described there as "Intake Upper Ditch"?

A  It was approximately in 1951.  If I could refer to some other pages in here just moment.  Do you want it closer than that?

Q  The year is close enough.

A  All right, 1951.

Q  Was the dam located where it is today?

A  I don't know where it is today.  I can check to see if it is in the same location as on Gibbon & Cottle A.

Q  Yes.  Would tell us that?

A  I would like to compare it with the exhibit in this Report of Referee--correction--Plate 8-A, on which the location of the ditch is shown as it was at the time that I viewed it.

P 8

1  Comparing that with Gibbon and Cottle's Exhibit A, it shows it

2  to be very close to the same point.

3  Q  When you say "very close" could you give us an area of

4  closeness there in feet?  In about how many feet?

5  A  Yes.  This map is at 500 feet to the inch.  It is more

6  than about a tenth of an inch difference as I can tell it,

7  which would be about fifty feet.

8  Q  And would that be upstream or downstream from Smith

9  Mountain Creek?

10  A  That is upstream.  Did you say Smith Mountain Creek?

11  Q  Yes.

12  A  Yes, it is upstream.

13  THE COURT:  Show me, where is this bend in Temecula Creek

14  on your plat that you are looking at?

15  THE WITNESS:  The creek is shown through the middle.  It

16  is the same as this legend here on the photograph.  It is where

17  this line intersects the creek, and I have drawn a pencil mark

18  there.  It was just upstream from the vertical line shown on

19  the Plate 8-A as bounding the parcel number 106B.

20  THE COURT:  I don't understand your symbols.  What is this

21  broken line?

22  THE WITNESS:  That is the edge of the alluvium.  This is

23  Recent Alluvium.

24  Q  What is the creek bottom?

25  THE WITNESS:  The long dash and three dots.

P 9

1    THE COURT:   Is there a ditch shown in there?

2    THE WITNESS:   The ditch is the very fine line with the long

3    dash and the single dot.

4    THE COURT:   You have no mark meaning "diversion"?

5    THE WITNESS: No sir, it is not shown.  However, we did

6    assign a number 29L to that diversion.  The full number is

7    8S1E29L for the diversion number, and L, according to the Plate

8    8A, is that quarter quarter section to the right of the east

9    line of this Parcel 106B.  So it is just barely within that

10   property.

11   THE COURT:   We don't have that plate in evidence, but

12   the significant thing is that Gibbon and Cottle's Exhibit A

13   and the plate you referred to both show the point of diversion

14   at just about the most southerly part of the bend.

15   THE WITNESS:   That is correct.

16   THE COURT:   In the Temecula there.

17   THE WITNESS:   That is right.

18   THE COURT:   So in that sense in Gibbon and Cottle Exhibit

19   A it appears to be, as a matter of fact, a little bit downstream

20   of the most southerly point of the bend.

21   THE WITNESS:   That is true, and that made the slight

22   difference that I referred to in the location of our plate.  We

23   have it just above the southernmost point.  They are very close

24   to the same point.

25   BY MR. GROVER:

P 10

1    Q  The location you have testified to is the location in

2  1951 approximately when you first saw it?

3    A  Yes.  And we observed it through the period 1951-1954,

4  and I never observed it as being changed during that period.

5    Q  Are you familiar with the structure there described as

6  "pipeline" on exhibit Gibbon and Cottle A just downstream from

7  the dam?

8    A  Yes.

9    Q  Do you know when that was installed?

10    A  I believe there is a statement on the pages previously

11  referred to with respect to that pipeline.

12    Q  Is your knowledge of that pipeline the same as shown

13  on the Report of Referee?

14  MR. VEEDER:  You have two questions pending, counsel.

15  THE WITNESS:  Referring to the first question, the bottom

16  page C-73 is the statement, "the steel pipeline was installed

17  in January 1953," and that is correct.

18  THE COURT:  You saw it during the course of installation?

19  THE WITNESS:  I saw it before and after; yes sir.

20  THE COURT:  Where did you get the information shown, if

21  you know, where the information came in the Report at the very

22  end of the section we put into the record about 1926?

23    A  This came from some information that was obtained for

24  the Vail Company by Mr. H. M. Hall.  It was information obtained

25  in 1926 approximately the time of the first trial.  I presume

P 11

1    it had something to do with that trial, and it was a survey by

2    Mr. Hall.  This is a map location of that survey that I got this

3    information.

4          THE COURT:  Did Mr. Hall have a map as of 1926?

5          THE WITNESS:  Yes sir, there is a sketch map.

6          THE COURT:  Which you have seen?

7          THE WITNESS:  Yes.

8          THE COURT:  Do you know where that map is now?

9          THE WITNESS:  I have a photostatic copy of it.  Not with

10   me, however.

11         THE COURT:  Could you bring that in?

12         THE WITNESS:  Yes sir.

13         THE COURT:  All right.

14   BY MR. GROVER:

15       Q  Has there been a ditch from the dam as you have located

16   on down to the Gibbon and Cottle properties since 1951?

17       A  To the extent of my knowledge, which was through about

18   1954 was about the last time I was there, the ditch had been

19   there throughout that time.

20         MR. GROVER:  That is all I have.

21         THE COURT:  Any questions?

22         MR. SACHSE:  Yes.

23                        CROSS EXAMINATION

24   BY MR. SACHSE:

25       Q  Mr. Illingworth, you answered that the dam was there in

P 12

1    1951.   Is it the same dam?

2         A   The same dam as was previously described here this

3    after?

4         Q   Concrete structure?

5         A   No sir, it was not a concrete structure.

6         Q   In other words, the dam you viewed in 1951 and 1954 was

7    what?

8         A   Was an earth and rock structure.

9         MR. SACHSE:   That is all.

10        THE COURT:   Is the dam that is there now a concrete dam?

11        MR. SACHSE:   That is what the testimony has been.

12        MR. GROVER:   I believe it is a concrete mouth.   The dam

13   is still a rock dam.   The mouth of the pipeline was described

14   as being concrete.

15        MR. VEEDER:   They dug out the bed of the stream, as shown

16   in the record.

17        THE COURT:   When you saw this dam in 1951-1954, was there

18   concrete there in connection with it, or was it an earth fill

19   dam?

20        THE WITNESS:   It was definitely earth fill, earth and rock

21   fill, and to the best of my knowledge there was no concrete

22   poured at that point.   The ditch took off from the stream at

23   the location of a rather large rock on the north side of the

24   stream.

25        THE COURT:   It took off just as a ditch behind a diversion?

13,656

P 13

1      THE WITNESS:  As an earth ditch, yes.

2      THE COURT:  There was no pipeline the water ran through?

3      THE WITNESS:  Not at that point.  The pipeline was further

4  downstream.

5      THE COURT:  There was no pipe opening from the area behind

6  the diversion?

7      THE WITNESS:  I was trying to recall that particular detail,

8  and I don't recall that there was.  At any rate, if it were a

9  pipeline it would have been extremely short, two or three feet

10  long, something of that sort.  It wouldn't have, in my opinion,

11  no great significance.

12      MR. SACHSE:  That is all.

13      THE COURT:  Step down.

14      Take a short recess.

15      (Afternoon recess)

16      THE COURT:  Do you have another witness?

17      MR. GROVER:  Yes your Honor.

18      THE COURT:  I just had a telephone call from Mrs. Rosalind

19  Bates, who says that Mr. Lincoln has done nothing about perfecting

20  an appeal and the matter is in status quo, and that If I am

21  going to make the same ruling I made before she doesn't want

22  to come down.  I said I am going to make the same ruling.  So

23  I am going to continue her matter tomorrow morning.  I take it

24  that there will be no objection.

25      Call on the next witness.

P 14

1      MR. GROVER:  Mr. McGaugh, who was called in connection with

2  another matter, does have some knowledge of the ditch back in

3  the days when he was working the property.  I wonder if we can

4  put him on for both matters, even though the other part doesn't

5  affect Mr. Schroeder.

6      THE COURT:  All right.

7      MR. GROVER:  Mr. Mc Gaugh.

8      THE COURT:  Come forward.  I'll swear you.

9                      DEE MCGAUGH,

10  one of the defendents herein, having been first duly sworn, on

11  his oath, was examined and testified as follows:

12      THE CLERK:  What is your name please?

13      THE WITNESS:  Dee McGaugh.

14                  DIRECT EXAMINATION

15  BY MR. GROVER:

16      Q  Mr. McGaugh, are you familiar with the ranch owned by

17  Mrs. Gibbon and Mr. Cottle near Radec?

18      A  Yes.

19      Q  And are you familiar with Exhibit Gibbon and Cottle A

20  in this proceeding?

21      A  Yes.

22      Q  On Exhibit Gibbon and Cottle A could you point out to

23  us where the diversion in the property down here in the west

24  half of the southwest quarter of Section 29 that Mr. Schroeder

25  has stated that he owns, would you point there where the diversion

13,658

P 15

1    by Gibbon and Cottle was as far back as you can remember the

2    first time you can remember?

3         A  Well, this pipeline is in dispute, that was a redwood

4    flume when I was on there some twenty-odd years ago.

5         THE COURT:  Indicating southerly of the Gibbon and Cottle

6    line down toward the junction with Smith Creek.

7         THE WITNESS:  Yes, right where what is know as Smith Creek

8    comes in.  There is a rock bluff where it hits into this hillside,

9    and it was probably near the early thirties--I can't recall just

10   what year, but our intake was just above Smith Canyon there.

11        THE COURT:  By above, do you mean downstream or upstream?

12        THE WITNESS:  Upstream.

13        THE COURT:  Just above it.

14   BY MR. GROVER:

15        Q  And there was a redwood flume where the pipe is now;

16   is that true?

17        A  Yes.

18        THE COURT:  How far above Smith Creek would you say it was?

19   How many feet?

20        THE WITNESS:  Oh gosh, it has been so many years ago, your

21   Honor, I wouldn't know.  But probably two or three hundred feet,

22   something of that nature.

23        THE COURT:  You notice on the map you are looking at a

24   blue line drawn across the dots which indicate the creek?

25        THE WITNESS:  Yes.

P 16

1        THE COURT:  Would be about right? In this case it is a red

2   line--the blue line has been covered up by that red mark there.

3        THE WITNESS:  Well, I don't know the scale here.

4        MR. GROVER:  One inch is 500 feet.

5        THE WITNESS:  One inch.  I would say roughly in that area.

6   BY MR. GROVER:

7        Q  About what year was this?

8        A  Oh, it was probably 1933-1934.

9        Q  And how did you happen to be associated with the property?

10       A  Well, my father owned the property at that time on a

11   contract.  His name doesn't appear on the deed.

12       Q  A contract to purchase the property?

13       A  Yes.

14       Q  Did you have anything to do with the ditch in those days?

15       A  We used to clean it every spring.

16       Q  Did you move the intake or diversion from the point you

17   have indicated?

18       A  Yes, there was one year there we had a flash flood

19   and it washed the area out here that lowered the elevation of

20   the creek, which we had to move up a few feet to get back into

21   our ditch, and in those days we just employed sand bags and

22   threw in the creek to shoot the water into the open ditch.

23       Q  So as a result of the flood you put a diversion higher

24   up on the stream?

25       A  Yes.

P 17  1        Q  About where was the point of diversion?

       2        A  Just like I stated, somewhere about two or three hundred

       3   feet above Smith Canyon.

       4        Q  That is where it was first.  But then did you carry it

       5   further upstream?  Did you start a diversion further upstream

       6   after that?

       7        A  Just a few feet, just enough to get on the elevation

       8   to get it back into our ditch.  Assuming your ditch line is

       9   on this level and your creek is here, you are going to have to

      10   come up higher on the creek to get it back in on the same level

      11   again.

      12        Q  Is that where the point of diversion was as long as you

      13   were associated with the property?

      14        A  Yes.

      15        Q  And what period was that?

      16        A  That was during the early thirties.

      17   THE COURT:  How long?

      18   THE WITNESS:  Well, probably over a period between 1932

      19   to 1936, along in that period.

      20   BY MR. GROVER:

      21        Q  And in that period did you work on the ditch?  Did you

      22   and others connected with you and your father maintain the ditch?

      23        A  Yes.

      24        Q  Was there ever any dispute about your right to upon this

      25   property to maintain the ditch?

P 18

1 A  I can recall--I don't know all the particulars, but at

2 that time this property where the ditch comes off, the fellow

3 by the name of Davidson, I believe was his name, tried to stop

4 my father from going up there.  I don't know whether they came

5 around orally and settled it or whether it was settled through

6 the courts or not, but I do remember the incident.

Belt 8 7 BY MR. GROVER:

8 Q  And what was the outcome of that controversy?

9 A  Our ditch stayed where it was.  I don't know the talk

10 out of it, but I do know the ditch remained.

11 THE COURT:  When you went to work on the ditch how did you

12 go, by foot?

13 THE WITNESS:  In those days it was kind of not a bluff,

14 but a dirt bank right here where the Temecula is connected with

15 Smith and we drove to that point with a team and wagon.

16 THE COURT:  How did you drive?

17 THE WITNESS:  Right straight up the canyon.

18 BY MR. GROVER:

19 Q  On which side of the creek?

20 A  Both sides.  Mostly right in the bed of the creek just

21 winding up over all these cobble stones and everything else in

22 there, but you could get over it with a team and wagon.

23 Q  Did the natural condition of the ground remain the same

24 all of the time?

25 A  No.

P 19    1       Q  Did it change with rains?

2       A  With rains it would change.

3       Q  Did you changes you made in the road going on one side

4    depend on the condition of the river bottom at a particular time?

5       A  Yes, I would say from season to season you might travel

6    at this year at one spot and after the season rain you may have

7    to move over and travel some other spot.  But we were always

8    able to get in there.

9       THE COURT:  When you had this flash flood and washed out

10   that first diversion point and moved upstream a few feet, was

11   there any evidence on the ground of a ditch leading further up

12   at that time?

13      THE WITNESS:  I don't recall one.

14      THE COURT:  You don't recall seeing any old ditch that led

15   further up?

16      THE WITNESS:  No.

17   BY MR. GROVER:

18      Q  Was your use of the ditch and your maintenance of the

19   ditch ever interrupted?  Were you ever prevented from maintaining

20   the ditch, to your knowledge?

21      A  You mean cleaning the ditch?  No.

22      Q  You were never prevented then from doing what needed to

23   be done on the ditch?

24      A  Not while I was affiliated with it.

25      MR. GROVER:  I think that is all I have on this.

P 20

1    THE COURT:  When you had that diversion point in there

2    before this flash flood came, you made your sand bags to make a

3    little dam for that purpose?

4    THE WITNESS:  Yes, we would just throw our sand bags in

5    there to check the water to eliminate that dirt fill washing out.

6    THE COURT:  Then you put a dirt fill behind the sand bags?

7    THE WITNESS:  No, we just stand them on there.

8    THE COURT:  Did you cut off the entire flow of the stream

9    or just the major portion of it?

10   THE WITNESS:  No, in those days there was always enough

11   water went on down.  In fact, the ranch down below known as the

12   Dan Tripp place, now the Sunnybrook, they got water out of the

13   same creek and irrigated.  I understand their's is dried up now.

14   THE COURT:  And when you changed the diversion point up-

15   stream a few feet and put sand bags in, was the same situation

16   true that you didn't cut the entire flow of the stream?

17   THE WITNESS:  That is right.  We could have never used all

18   the water.  We would take the full capacity of our ditch and

19   that was it.  If you forced more in it you washed out your ditch

20   banks.

21   THE COURT:  But on each occasion you put enough bags in

22   to fill your ditch full; is that right?

23   THE WITNESS:  Yes.  That is more or less what we used to

24   do to gauge our capacity of our ditch.

25                          CROSS EXAMINATION

P 21

1   BY MR. SACHSE:

2      Q  When is the last time you saw this diversion on the most

3  recent occasion?

4      A  About 1936.

5      Q  You haven't seen it since?

6      A  No sir.

7      Q  So you don't know where the present diversion takes off?

8      A  No sir, I do not.  I haven't been up there. I don't know

9  what they have there.

10     THE COURT:  Do you want to come forward and have a chair

11  closer up, Mr. Schroeder?  If you want to ask some questions

12  you may later.

13     MR. SCHROEDER:  I would like to.

14     THE COURT:  Come up further where you can hear better.

15  BY MR. SACHSE:

16      Q  Who did you say was the owner of the property with whom

17  your father had a disagreement about a ditch?

18      A  Davidson I believe was his name.

19      Q  Do you know whether Mr. Davidson consented to your

20  father's use of this as a result of this conversation?

21      A  That I wouldn't know.  I was not that closely connected

22  with it.  My father handled all the business.  Whether he took

23  it to court or what.

24      Q  You just knew there was a--

25      A  I just knew that there was a dispute on it; yes sir.

P 22

1    MR. SACHSE:   That is all.

2                        CROSS EXAMINATION

3    BY MR. STAHLMAN:

4        Q   At the time you were connected with it the water which

5    was running down here on this property into ponds on the Gibbon

6    and Cottle property would flow back into the stream system,

7    wouldn't it?

8        A   This ditch here used to come on around, if you notice--

9    I don't think it is marked here.

10       MR. VEEDER:   Just a moment.   You said "this ditch here."

11   Will you identify that for us?

12       THE WITNESS:   The main upper ditch.

13       THE COURT:   You mean the lower ditch?

14       THE WITNESS:   The upper ditch.   This is the lower ditch

15   here.   It comes around and there is a reservoir here by the old

16   buildings, and there is a row of cottonwoods right along the

17   highway and the ditch.   You can still see part of the old flume

18   where we crossed over a swale here.

19       THE COURT:   Referring to an area marked "A" on Gibbon and

20   Cottle's Exhibit A.

21       THE WITNESS:   Yes.   And then in the wintertime when you

22   didn't need the water let it continue on and this was all bermuda

23   grass that wouldn't wash.

24       THE COURT:   Indicating an area south of the piece "A".

25       THE WITNESS:   Yes.

P 23  1   BY MR. STAHLMAN:

2      Q  And then it came back down into the creek?

3      A  Yes.

4      THE COURT:  Did it flow back into the creek during the

5   summertime?

6      THE WITNESS:  No, in the wintertime.

7      THE COURT:  Did it ever flow back into the creek in the

8   summertime?

9      THE WITNESS:  Not that I recall.  Pretty well used the

10  water during the summer.

11  BY MR. STAHLMAN:

12      Q  Do you know where water was diverted from prior to 1932?

13      A  No I don't.  But when I first saw the property was when

14  my father acquired it.

15      Q  Your recollection then is about 1932, along in there?

16      A  Yes, somewhere in there, 1932-1933.

17      THE COURT:  About the time when you are familiar with it,

18  1932 to 1936-37, was the lower ditch being used shown on the

19  map there, the lower intake?

20      THE WITNESS:  Yes, that flowed over to Mrs. Miller at that

21  time.

22      THE COURT:  Was that being used?

23      THE WITNESS:  Yes, she had this ditch here that she irri-

24  gated Bermuda and Burr clover pasture mostly.

25      THE COURT:  Indicating the areas apparently in I,J,J and H

P 24

1   on Gibbon and Cottle Exhibit A.

2   BY MR. STAHLMAN:

3      Q  Water which came into that lower ditch used to flow

4   back into the stream, didn't it?

5      A  I don't recall whether it did or not.  It may have, but

6   I don't recall.

7      THE COURT:  Mr. Schroeder, do you have any questions?

8      MR. SCHROEDER:  Yes.

9      THE COURT:  You may ask them.

10                   CROSS EXAMINATION

11   BY MR. SCHROEDER:

12      Q  Mr. Davidson definitely told me that he sold the property

13   that he was connected with, so he wouldn't have any dispute on

14   that.  But you say 1936 you were last down there to do any work?

15      A  Yes.

16      Q  And that you went up the creek bed to maintain it with

17   a team and wagon?

18      A  Yes.

19      Q  Just recently you went down the river at night time to

20   take care of a horse and ended up shooting the horse?

21      A  Yes.

22      Q  At that time did you notice the riverbed was full of

23   cottonwood trees and Oaks?

24      A  Yes.  Considerable new trees had grown.

25      Q  How long did it take to have those cottonwood and Oak

13,668

P 25   1   trees grown, as you know?

2        A   That probably might have been, say, twenty-five years

3   since I have seen it.

4        Q   And the riverbed is solid from one end to the other

5   with them, isn't it?

6        A   Yes.   In fact I noticed where this horse you speak of,

7   somebody had shot it, a night hunter or somebody.   I went up

8   there to doctor it and it was beyond doctoring, so I took a

9   pistol and shot it.

10       THE COURT:   This riverbed you say was full of cottonwoods?

11       THE WITNESS:   Cottonwoods.

12       THE COURT:   And Oaks too?

13       THE WITNESS:   There are Oaks in there.   I didn't particularly

14   notice.

15       THE COURT:   How tall are these Oaks?

16       THE WITNESS:   Gosh, I couldn't say, your Honor.

17       THE COURT:   How big around are the trunks of the oak trees?

18       THE WITNESS:   Well, possibly the most--

19       THE COURT:   A foot or two in diameter?

20       THE WITNESS:   I couldn't say, your Honor.   I didn't parti-

21   cularly pay any attention.   But there is one thing that impressed

22   me, that there was a lot of growth there that changed the general

23   appearance as I had last seen it twenty or so years before.

24       THE COURT:   Do you know anything about the size of these

25   Oaks?

P 26

1    THE WITNESS:  No, I don't, particularly.

2    THE COURT:  Were there Oak trees in there when you saw it

3 back in the thirties?

4    THE WITNESS:  Yes, there was quite a few Oaks scattered

5 up and down the creek there, cottonwoods and willows.

6 BY MR. SCHROEDER:

7    Q  It is so thick now you can hardly walk through it ex-

8 cept where they cut this road, and no doubt in order to get

9 to the horse you had to walk down the road.

10    A  In fact, we drove a jeep in.

11    Q  If that road was not there and the growth was natural

12 you couldn't even begin to go through with a horse; is that right?

13    A  I would say that.

14    MR. SCHROEDER:  That is what I am driving at.

15    THE COURT:  Any further questions?

16    Step down.

17    MR. GROVER:  Your Honor, I would like to have the location

18 of the cottonwoods placed a little more definitely.

19    Where was the dead horse, Mr. McGaugh?

20    THE WITNESS:  I can't--

21    MR. VEEDER:  Aren't we truly kicking a dead horse?

22    THE COURT:  We are not concerned with the dead horse except

23 as it will show where the growth was.

24    THE WITNESS:  I would say the horse was right in this area.

25    THE COURT:  Indicating just north of the Temecula junction

P 27

1 with the Smith.

2     THE WITNESS:  Yes.

3     THE COURT:  Just south of there.

4     THE WITNESS:  It was at night and we came in over a road

5 up through here somewhere and dropped off down there and as I

6 recall we opened a wire gate and drove in just a short ways and

7 crossed the creek and the horse lay there.

8     MR. GROVER:  I have these other questions about the use

9 on the ranch that I would like to ask Mr. McGaugh your Honor.

10     THE COURT:  All right.

11               DIRECT EXAMINATION

12 BY MR. GROVER:

13     Q  You were familiar with the operations of what are now

14 the Gibbon properties as you have described them in the period

15 1932-1936?

16     A  Yes.

17     Q  Was water ever pumped out of the upper ditch?

18     A  Yes, we used to pump water.  We had a sump right along

19 side the ditch.

20     THE COURT:  Indicating a place immediately below where

21 Reservoir No. 2 is.

22     MR. GROVER:  Could we say across from the mark "Engine

23 House Gibbon"?

24     THE COURT:  Yes.

25     THE WITNESS:  We had a sump here that we employed a pump

P 28

1   on, and these fields have changed considerably since I was there,

2   but we just followed the contour of the natural terrain there,

3   and our road was right along our ditch.  Now they have the road

4   moved up here somewhere.  But roughly this area in here was

5   irrigated from an old Fairbanks Morris pump that we had installed.

6   BY MR. GROVER:

7       Q   I understand then that from that sump you pumped into

8   a ditch which was uphill from the upper ditch shown on the map?

9       A   That is right.  We lifted the water approximately ten

10  feet and put it in an open ditch and then contoured the hill,

11  which gave us quite an area above what you referred to as the

12  upper ditch here.

13      Q   Would you draw on the exhibit as nearly as you can the

14  route of that ditch uphill from the upper ditch?

15      A   I think I can.  Assuming they lifted this about four

16  feet--there used to be a ridge there, but later they cut that

17  off.  This used to come around and along what is the main build-

18  ing now, it used to be our bunkhouse, and there is a wash here

19  somewhere in this area that we flumed across quite a gorge.  And

20  then if this is the old road, there is still remnants of that

21  old road and ditch there.  It just more or less contoured around

22  then came and hit the highway.  Let's see, something about like

23  that.  That would give you a rough idea about the way it went.

24      MR. GROVER:  Could I mark on the map an arrow to that line

25  and mark it "McGaugh"?

P 29

1       THE COURT:  Yes.

2       THE WITNESS:  You can see kind of an indentation.  They

3   have farmed over it.  I have noticed it from the highway.

4   BY MR. GROVER:

5       Q  In the period 1932 to 36 when you were there did you

6   irrigate the fields between that red ditch which you have marked

7   and the upper ditch?

8       THE WITNESS:  As well as we could.  This ground isn't

9   level and we used to terrace, like grain crops, and more or less

10  just open into your ditches which is made by just turning the

11  plow and let it flood over and make your grain crop.  And row

12  crops you would contour the rows as well as you could to elimi-

13  nate running off to waste.

14      Q  What particular crops did you put in there?

15      A  Mostly we would raise barley.  I recall one year we

16  raised pumpkins, and one year we raised corn.

17      Q  During all of that period was all of that area irrigated?

18      A  Yes, like I say, as good as I could.  You didn't have

19  the modern sprinkler like you have nowadays.  That is, you could

20  irrigate on level land that was irrigable.

21      MR. GROVER:  That is all I have.

22      MR. VEEDER:  I have no questions.

23      THE COURT:  Mr. Schroeder, do you have any questions?

24      MR. SCHROEDER:  No sir.

25      THE COURT:  Thank you Mr. McGaugh.  Step down.

P 30

1    Do you have another witness?

2    MR. GROVER:  Yes; Mr. Strange.

3    THE COURT:  All right.

4                    OWEN STRANGE,

5    being first duly sworn, on his oath was examined and testified

6    as follows:

7    THE CLERK:  State your name please.

8    THE WITNESS:  Owen Strange.

9                    DIRECT EXAMINATION

10   BY MR. GROVER:

11   Q  Mr. Strange, you are an attorney, are you not?

12   A  Yes, I am an attorney in Los Angeles in the Rowan Building,

13   associated with a tax firm.

14   Q  What firm is that?

15   A  Freed and Holley.

16   Q  You are co-counsel in this case, although not in my firm?

17   A  That is correct.  My name appears on the pleadings and

18   that is about the extent of it.

19   Q  Are you related to Mrs. Gibbon, one of the owners?

20   A  I am married to her daughter Elizabeth.

21   Q  Are you familiar with the upper ditch as it has been

22   discussed here?

23   A  I am familiar with it pretty thoroughly since 1952 when

24   I married Elizabeth.

25   Q  Where was the dam which makes possible the diversion in

P 31

1    the upper ditch in 1952?

2       A   It was in the same location that it is located at the

3    ppresent time.

4       Q   Is that the location shown as "Intake Upper Ditch" on

5    Exhibit Gibbon and Cottle A?

6       A   Yes.

7       Q   In 1952 was there a pipeline in the place shown on

8    Exhibit Gibbon and Cottle A?

9       A   Yes.

10       Q   Was that at the same location where it is now?

11       A   That is correct; it is.

12       THE COURT:   What pipeline are you talking about?   Pipeline

13    below the confluence, downstream from the confluence with Smith

14    Creek?

15       THE WITNESS:   It starts just above the confluence and con-

16    tinues through the area of the confluence and below the conflu-

17    ence.   It is a 12 inch pipeline.

18    BY MR. GROVER:

19       Q   Has the location of that dam at the upper intake changed

20    since 1952?

21       A   No, it has not.

22       THE COURT:   When you first saw it in 1952 was there any

23    concrete in connection with it?

24       THE WITNESS:   No, there was not.

25       THE COURT:   When was the concrete put in?

P 32

1    THE WITNESS:  There is no concrete there.

2    THE COURT:  Isn't there concrete around a pipe which diverts

3    water into a ditch?

4    THE WITNESS:  No, your Honor.  The concrete that you are

5    thinking in terms of previously alluded to is the concrete that

6    encases the opening at the beginning of this pipeline which is

7    several hundred feet below the diversion.  It is a little con-

8    crete box that has a grate on it that keeps the leaves and

9    brush from going into the pipeline.  It is nowhere near the

10   diversion.  The diversion is earth and rock.

11   THE COURT:  Is there any method presently at this upstream

12   diversion for water to go into the stream, or is all of the

13   water diverted into the ditch?

14   THE WITNESS:  The diversion since I have known it, since

15   1952, has had two pipes in it.  One pipe is underground.  The

16   dam goes over the top of it, with a cap allows the water to go

17   into the diversion ditch.  At a lower level in the dam there

18   is another pipeline.  I think it is 10 inch or 12 inch with a

19   cap.  That allows the water to go through the dam and down the

20   creek whenever we have a rain so as to keep the thing from

21   washing out too much, and also when the ditch is being cleaned

22   in the winter it is allowed to go down this other pipe.

23   THE COURT:  Was this diversion washed out at any time

24   between 1952 and present?

25   THE WITNESS:  It has never been washed out completely,

P 33

1 but I know on occasions it has been washed over, and we have

2 put rocks back on top of it.  It is in a little declivity with

3 a rock on either side of it, and the policy has been to close

4 it off from the ditch and let the water rush over it.  All it

5 does is erode the top for the most part.  That is maintained

6 every year.

7 BY MR. GROVER:

8     Q  In the period since 1952 have the Gibbons and Cottles

9 diverted at the upper intake all of the water in the stream up

10 to the maximum that could be carried in the ditch?

11     A  Yes, they have.  I think when I got married they started

12 to have dry years, because we have had nothing but diminishing

13 flow of water, I know that, and we have always tried to take

14 every bit of water through the diversion.

15     Q  And since 1952 have anyysteps been made to make sure

16 that the maximum amount up to the capacity of the ditch could

17 be taken from the diversion?

18     A  As long as I have been there myself or somebody checks

19 the diversion at least once a week to make sure it is holding

20 water.

21     THE COURT:  Do you know this man Spaniol?

22     THE WITNESS:  Yes, your Honor, I have known him since 1952.

23     THE COURT:  He testified that some work was done on one of

24 these places, I think it was the upper dam, where they took out

25 all the gravel and sand and put clay down to make a better dam.

P 34   1    Are you familiar with that?

2           THE WITNESS:  That is correct.

3           THE COURT:  When was that done?

4           THE WITNESS:  I am not sure.  I think it was done just

5    when I got back from Korea about 1955.  I am not sure of these

6    dates.  But I recall it.

7           THE COURT:  Did you see it being done?

8           THE WITNESS:  Yes.

9           THE COURT:  What did they do?

10          THE WITNESS:  I think the project took at least a week,

11   because they had other chores to do.  They removed the soil--

12   I didn't see any gravel, your Honor--and hauled in soil from--

13   gosh, it was some here and there--well, on the Gibbon property

14   as distinguished from the Schroeder property, hauled the earth

15   in and put it in the hole they dug out and piled flat shale

16   type rock on top of it.  The shale type rock has always been

17   there.  It was a question of replacing it.  And we put at that

18   time-- I don't know whether we replaced the existing steel pipe

19   or put in a new one.

20          THE COURT:  Did this result in more of a flow of water

21   into your ditch?

22          THE WITNESS:  I don't know.  I hope so.  I don't think

23   that it -- it didn't result in any change, at least that I

24   can recall, in the surface flow.  But some may have been flow-

25   underground.

BY MR. GROVER:

1   Q   What/the purpose of this change?
        is

2   A   The purpose was to try to pick up water that I

3   think was seeping under the existing dam, to tighten it up so

4   that we could try to fill our pipe.

5   Q   And was the capacity of the ditch increased at that

6   time?

7   A   No.

8   Q   And since that change was made has anything more

9   than the capacity of the ditch been diverted?

10  A   No.  I think we have about half a pipe now.

11  Q   Are you familiar with the road that leads up to the

12  dam?

13  A   Yes I am.

14  Q   Could you describe that road in the period from 1952

15  to the present?

16  A   Well, it is not a road in the normal sense.  It is

17  what I would call a tractor trail.  I don't think you could

18  drive a car on it.  It starts at the Gibbon house and winds

19  on up on the west of the creek.

20  THE COURT:  Let's not worry about it until where we get

21  to where it leaves the Gibbon property.  Is it down near the

22  stream at that time?

23  THE WITNESS:  Yes, your Honor.  The canyon there is quite

24  narrow.  It is within 10 feet of the stream.  It is between

the diversion ditch, the pipe-line, and creek itself.

THE COURT:  Then did it continue up between the ditch and the stream?

THE WITNESS:  That is correct.

THE COURT:  All the way up on that same side?

THE WITNESS:  It continues up there to shortly before the confluence of Smith Canyon.  Then it crosses the creek.  There is some rusty pipes that help make the crossing.  It crosses the creek at that point.  So then it is on the east side of the creek.

THE COURT:  Then it crosses over to the west side of the creek?

THE WITNESS:  Excuse me.  It was on the east and crossed to the west.  It proceeds on the west side, and at which time crosses Smith Creek on the west side of Temecula, continues on up to the diversion, except for one problem.  The big rain two years ago washed on over the diversion, dug a hole about six feet deep in this road next to a granite abutement so that it is impossible to drive a tractor through there at this time, or any other vehicle.  So what I do is stop the tractor at that point and walk the rest of the fifty feet.

BY MR. GROVER:

Q    Are you familiar with any changes that have been made in the exact route of the road since 1952?

A    Yes, a couple of years ago or maybe more, maybe

1   three years ago, we had I guess a heavier rain that washed out

2   our parapet that conducts this pipe-line, wooden framework at

3   the confluence of the Smith.  At the same time it washed out

4   the road and left a nice little pond there.  Always had been

5   a pond there.  But it left a nice big one now with a beach on

6   it.  At that point we diverted the road twenty-five or so up

7   to where it crosses Smith Canyon rather than up through the

8   creek and then it makes this elbow and is back on the old road

9   again.

10      Q    Was that change necessitated by the results of the

11  flood?

12      A    Yes.  We didn't go through the pond anymore.

13      Q    Except for changes that were necessitated by the

14  results of flow and flood, have there been any changes in the

15  road since 1952?

16      A    No.  We just maintained it.  Everytime I go up there,

17  and I try to go up every time I am out there, with a tractor

18  and trailer, I throw rocks out of the way or throw out -- I

19  think there is alders that keep falling down.  I push them out

20  of the way.  It is a pretty poor excuse for a road.

21      Q    Do you always go the same way?

22      A    There is only one way to go.

23      THE COURT:  Referring to this Gibbon and Cottle Exhibit A,

24  if you look over here, I have the same map in front of me, and

25  right to the northeast of the upper intake and northerly of the

1    Temecula, Mr. Schroeder says that a number of trees were cut

2    out in there on the north side of the Temecula.  Are you

3    familiar with that?

4         THE WITNESS:  Above the intake.

5         THE COURT:  Let me see your map.  This area right here.

6         THE WITNESS:  This area here, there is a little bluff and

7    a little meadow.  There are lots of big oak and cottonwood

8    trees about ten feet above the level of the creek.  To my

9    knowledge no trees have ever been cut there.  I have never

10   seen any evidence of any sawdust even.

11   BY MR. GROVER:

12        Q    Did Gibbon or Cottle or anyone acting under their

13   direction or authority ever pump water from the pond at the

14   confluence of Smith Creek and Temecula into their ditch?

15        A    No, not to my knowledge.  I have never seen a pump

16   in that location, and I think if anybody did I would know about

17   it.  It is a very poor place for a pump anyway.  The thing

18   dries up.  It's dry now I think.  At least Smith Creek is dried

19   up.

20        THE COURT:  How often are you up there?

21        THE WITNESS:  I am up there at least once a month.  I

22   will not say I am there every month.  Sometimes I go up two

23   or three times a month.

24        THE COURT:  You go up to the ranch?

25        THE WITNESS:  That is correct.  And everytime I go to the

1   ranch I go to that diversion.  Oftentimes I don't take the

2   tractor up.  I will ride up or walk up, get on a horse.

3       MR. GROVER:  That is all.

4       THE COURT:  Mr. Schroeder, do you have any questions.

5       MR. SCHROEDER:  Yes.

6       CROSS EXAMINATION

7   BY MR. SCHROEDER:

8       Q    You say you don't recall any trees being cut.  Mr.

9   Gibbon -- and I have a witness -- not only cut them down, but

10  chained them together to make a walk-way to take pipe over.

11  It is chained together now, unless in the last week somebody

12  unchained them.

13      A    No, I don't recall ever walking over that.

14      Q    Walkway?

15      A    No I don't.  Whereabouts is it?

16      Q    Just about 20 feet below the inter-section of the

17  two creeks.

18      A    I think I recall there are a couple of -- is this

19  where the two pipes are through the creek?

20      Q    I don't know about the two pipes.  You have pipe

21  laying all over the place now.

22      THE COURT:  You say this place is about 20 feet down-

23  stream?

24      MR. SCHROEDER:  About 20 feet from the inter-section of

25  the two creeks.

```
1        THE WITNESS:  I am not familiar with it, but I wouldn't
2   doubt that they made a walk-way to cross.
3        MR. SCHROEDER:  Mr. Gibbons said at the time that his
4   help did it.  But we told him he was responsible.  He said we
5   were right and he would see that it stopped, and it did stop.
6        THE COURT:  Do you have any other questions.
7        MR. SCHROEDER:  No sir.
8        THE COURT:  Mr. Veeder?
9        MR. VEEDER:  No, your Honor.
10       THE COURT:  Mr. Stahlman?
11       MR. STAHLMAN:  No.
12       THE COURT:  Mr. Sachse?
13       Mr. Girard?
14       MR. GROVER:  I believe that is all I have now on this,
15   except that I would like to locate the witness we have refer-
16   ed and have an opportunity to come back with him if I can loc-
17   ate him.
18       THE COURT:  Which witness?
19       MR. GROVER:  The witness who is supposed to have witnessed
20   the conversation between Mr. Gibbon and Mr. Schroeder.
21       MR. VEEDER:  What significance does this have?  I have
22   waited all day to find out why we are going about this.  From
23   my own view, and I have undertaken some thinking as to these
24   findings you have directed me to prepare, my own view is that
25   there has been a complete failure to prove anything but a
```

1    riparian right, if these lands are riparian.

2         THE COURT:  And the right to maintain a ditch.

3         MR. VEEDER:  Yes.  As I think I said originally, I think

4    that 43 USC 321 or 661, the old Acts of 1870 and 1877 probably

5    will take care of it.  I don't know.  I am not worried about

6    the ditch.  My own view is that we spend a lot of time in this

7    law suit, and I don't believe they proved a prescriptive right,

8    I don't believe they proved an appropriative right, and I move

9    to dismiss any claims of that character.  And I will agree that

10   if these lands are riparian they are entitled to participate

11   on a reasonable basis in the quantity of water available.

12        THE COURT:  What is your contention as to the ditch, Mr.

13   Grover?  The evidence seems to indicate that at least in the

14   late thirties the upper ditch took off near Smith Canyon.  In

15   fact, the Report of Referee that we looked at in the case of

16   Barbey vs Oviate indicated that up to 1926 it took off down-

17   stream from Smith Canyon.  Do you claim any kind of right

18   adverse to Mr. Schroeder to run that ditch upstream of that

19   place?

20        MR. GROVER:  That I would want to check the evidence on,

21   your Honor, because of course Mr. Judd Tripp and Mr. Spaniol

22   testified concerning the location of the diversion.  But

23   certainly we would claim one or both of two rights against

24   Mr. Schroeder.  First, a right under the statute because it

25   was public land when the appropriation was made, to the extent

1    that we had a right at the time the patent was issued, and I

2    would have to check to see when that was issued.  After that,

3    a prescriptive right if the necessary elements for prescription

4    were present.  While I would want to submit authorities on it,

5    I believe that one is not necessarily limited to the exact spot

6½   that he has used if he has, in response to changes of nature

7    always come back and done substantially the same thing, and

8    the thing that we have consistently done here/filled that

9    ditch when we could get water into it.

10       THE COURT:  How long do you think it takes you to acquire

11   a prescriptive right?

12       MR. GROVER:  I assume 5 years, if it is a change that we

13   are entitled to make within the original right.

14       MR. VEEDER:  Aren't we all adverse one to another?  I

15   have been attempting to follow this idea of a prescriptive

16   right.  I think in 1956 they changed their diversion.  They

17   increased their diversion.  I think the whole structure was

18   different in 1956 than it was prior to that time.  I don't

19   believe there is any concievable right now that could have

20   inured by reason of those acts at this late date.

21       MR. GROVER:  Under the statutes perhaps.  Although the

22   patents, I believe, in that area are about the 30's, that is

23   my recollection.  But in any event, the prescription against

24   Mr. Schroeder or his predessors, if the change was made as far

25   back as 1926 and 1932, as seems to be indicated here, pres-

1    cription five years after the change was made as far as the

2    right-of-way goes.

3    Now, as far as the water right goes, as I indicated last

4    time, it would be my position that this led to an appropriative

5    right. But frankly I want to submit a brief on that.

6    But the only purpose in bringing back the details of this

7    conversation would be to clear it up in connection with the

8    right-of-way as against Mr. Schroeder. It wouldn't have any-

9    thing to do with the other parties except as they might

10    of course indirectly benefit if we didn't have such right.

11    MR. VEEDER:  That is not true. We have 2 ditches. There

12    is no right in connection with the lower ditch, as near as I

13    can tell. I haven't heard a single word that they are going

14    to change the point of diversion or place of use of that right,

15    if a right indeed existed. I am trying to simplfy this. I

16    am under your Honor's direction to prepare findings, and as I

17    say we would all agree that if this land is riparian he has a

18    riparian right. But in regard to his other claims, I move to

19    dismiss them on the grounds that he hasn't produced evidence

20    to support them, particularly in regard to the storage right.

21    There is not a -- of evidence in regard to the storage right

22    in the reservoir. And in regard to these diversions that were

23    made, appropriative in character, to which he has made reference,

24    there is not a -- of evidence to show that he needed or that

25    he ever indeed used more than what was his riparian share.

property, and if there have been such things as cutting timber without permission I don't think that is proper.  I think it should be a right-of-way adjacent to the ditch and not one that roams at will over the landscape.

Also I have some doubt as to any rule of law that says that a man who locates a point of diversion pursuant to some claim may thereafter at his will locate it anywhere else. Probably a few feet won't make any difference.  But there is a question in my mind about moving upstream four or five hundred feet.

MR. GROVER:  There is some testimony by Judd Tripp, you recall, that he tried to get more head.  I don't have that in mind, frankly, because it was a month ago.  But if it is done while it is still public land, then it might have a bearing on it -- subject, however, to whatever was the status at the time that the patent was issued.  Of course, you don't have a right to locate it anywhere, but as long as you respond naturally to natural requirements where there are floods, washouts, etc., your right -- I would want to submit authorities on it -- is to maintain your ditch and fill your ditch as you have to do.

THE COURT:  If this is true and something happens here, you can move another mile upstream to protect your water right. I don't think that is right.

MR. GROVER:  Undoubtedly there are reasonable limits. But this is not limited to the exact square footage where you

1    were.

2          MR. VEEDER:  If it increases the burden on the stream,

3    that is the limitation.  As a matter of fact, if he has moved

4    the point of diversion upstream and has increased the burden

5    on the Schroeder plant, I think there is a very important

6    legal question as to his authority to do so.

7          MR. GROVER:  But to move upstream from the confluence

8    would decrease the burden on the stream.  Obviously an intelli-

9    gent man wouldn't do that unless it was necessary.

10         MR. VEEDER:  I am talking about the Schroeder property.

11         MR. GROVER:  But the burden on the stream there is not

12    affected by the --

13         THE COURT:  Well, we can't do anything about it.  We

14    can't decide it at this time.  However, you gentlemen who are

15    concerned with these ranchos -- Mr. Sachse, yourself, Mr.

16    Veeder, Mr. Stahlman, Mr. O'Malley, who is not here, -- I

17    wish you gentlemen would confer and see what you can come up

18    with as to when you can get findings and conclusions in and

19    could draw them and set those down for a later hearing.  I

20    think we ought to get that behind us.

21         MR. GROVER:  As I mentioned to your Honor on Tuesday with

22    Mr. Veeder, and I spoke about the findings that you requested

23    for today, I do feel however, there necessarily will have to

24    be reserved some of the more basic questions about the law suit

25    in which the Vail's and others are interested.  Specific find-

13.690

P 1

1    ings regarding our specific acreage, use, etc. we will be glad

2    to work on.  But the question of apportionment or the question

3    of the Vail judgement--

4        THE COURT:  Oh, certainly.  I am talking only about an

5    interlocutory judgement that concerns the particular problems

6    of these ranchos on the stream, it being understood that later

7    on they will become part of the final judgement.

8        MR. VEEDER:  Your Honor, I picked up a new word from Mr.

9    Grover; he says "apportionment.".  I said, "what do you mean?"

10   He said "regulation."  I think if ever there was an instance

11   where a stream is crying for regulation, it is Temecula Creek,

12   and I am hoping that by next year we will have some on it.

13       MR. GROVER:  Mr. Veeder said, "do you mean regulation?"

14   and I agreed.

15       MR. VEEDER:  I twisted his arm, if that is what you mean.

16       THE COURT:  Here is a file of yours, Mr. Veeder.

17       Here is an exhibit, Mr. Clerk.

18       Here is somebody's transcript.

19       MR. GROVER:  I have three exhibits that have not been

20   admitted in evidence, Gibbon and Cottle's exhibits C, D, and E.

21   Those are the ones concerning which we submitted to Mr. Veeder

22   some ranch records.  I understand that he has objections.

23       MR. VEEDER:  I am going to object to them primarily on the

24   grounds that I have gone through them and based on the review

25   of them they don't appear to be coherent.  I think it may go to

P 2

1   the weight, but I wish your Honor would before he rules on the

2   admissability of them take a look at them and see what signifi-

3   cance they have or how they could be significant.   One of the

4   reasons brought up this motion to which I think we are entitled,

5   namely, that the only possible right would be a riparian right.

6   If you examine those records, you will find that they simply

7   are not reflective of the definition and utilization of water.

8        THE COURT:  Mr. Veeder, Exhibit C purports to show the

9   surplus diversion in the years 1947 to 1958.   No record exist-

10  ing in 1947-48-49.   It purports to show the acre feet diverted.

11  Nothing proves everything.  But on Mr. Grover's theory that this

12  has probative value, unless you contend that these aren't

13  accurate, unless

14       MR. VEEDER:   I think they were maintained.   I am not

15  challenging that phase.

16       THE COURT:  All right, Exhibit C will be received in

17  evidence.   The objection is overruled.

18       Exhibit D purports to show the ground water extractions

19  by Gibbon in acre feet from the wells.   Again, you contend that

20  it is just not material?

21       MR. VEEDER:   Yes, your Honor, I think there should be an

22  explanation on that that you gave me.

23       MR. GROVER:  Yes.   On the one that has 23, I believe it

24  is Well 1, it has  .3 in the later years.   It should be .3 in

25  all of the years.   Mr. Gibbon an arithmetic mistake in his

P 3  1  calculation and reported it to the State Water Rights Board

2  with respect to Well 2, and that is corrected and I neglected

3  to make it in prior years for Well 1.

4      THE COURT:   It shown "47 Well 1 15 acre feet."

5      MR. VEEDER:   That is the point I am making, your Honor.

6      MR. GROVER:   I believe it applies only to the years where

7  it was shown.

8      MR. VEEDER:   I can't straighten them out.   I can't understand

9  them, frankly, your Honor.

10      THE COURT:   Looking at Exhibit D, it would be carried over

11  into where, just the summary of the two?   What should Exhibit

12  D show?

13      You can have my copy, if you want to look at it.

14      MR. GROVER:   Yes.

15      THE COURT:   Here is my copy of Exhibit D.   Here is your

16  .3 in 57-58, and 15 acre feet in '47.

17      MR. GROVER:   The correction would not apply to '47.   I

18  will double check that.   It was his method of estimating, which

19  was the same for each year that it came out 2 plus, and he

20  realized that it should have been .3.

21      THE COURT:   Instead of 2 plus it should have been .3 each

22  of those years?

23      MR. GROVER:   Instead of 2 plus it should have been .3 each

24  of those years.   But I will double check '47.   There couldn't

25  have been any significance, because the one year of 15 stands

P 4
Belt 10

1    by itself.

2        THE COURT:  Then we will postpone action on Exhibits D and

3    E until you have checked it out and have them at least accurate.

4        MR. GROVER:  I can do it right now, your Honor, if I can

5    have just a moment.

6        THE COURT:  Tomorrow morning we will proceed with Mr.

7    Kunkel?

8        MR. VEEDER:  Yes sir.

9        THE COURT:  And we are going to adjourn at noon.

10       MR. VEEDER:  Can we start at 9:30?

11       THE COURT:  Yes.  How long do you anticipate you will be

12   with Mr. Kunkel?

13       MR. VEEDER:  I shouldn't be long.  I understand some of

14   counsel are ready to cross examine for three days.

15       THE COURT:  How long do you think cross examination of

16   Mr. Kunkel will take on these exhibits?

17       MR. SACHSE:  I think quite a while, your Honor.  We will

18   not get finished tommorrow by noon, I'll guarantee.  I will

19   not along.

20       THE COURT:  Do you think you will finish Monday?

21       MR. SACHSE:  Frankly, I don't have so very much, but I

22   think there is a lot there and if nobody does it I am going

23   to do it for the sake of the record.

24       MR. VEEDER:  Why doesn't he just write you a letter?

25       THE COURT:  A noble attitude.

P 5

1      MR. SACHSE:  I want to get this in.

2      THE COURT:  Mr. Girard, do you have considerable cross

3  examination?

4      MR. GIRARD:  Not a great deal, but I would guess it might

5  run into an hour, depending on whether Mr. Sachse covers it.

6  I think ours will more or less correspond.

7      MR. VEEDER:  It does become important if we have to run

8  over until Monday.

9      THE COURT:  Mr. Grover, have you found that yet?

10      MR. GROVER:  No, your Honor, I haven't.

11      THE COURT:  We can't act on it until we make the correction.

12  Are you going to be here tomorrow?

13      MR. GROVER:  I hadn't planned to.

14      THE COURT:  What do you want me to do, fix a date and

15  bring in any other witness you have?  If you are not going to

16  be here, I will have to act in your absence.

17      MR. GROVER:  So far as picking a date is concerned, you

18  can pick a date tomorrow if it is not convenient.  I will abide

19  by your Honor's order.

20      MR. STAHLMAN:  It is not necessary to have Mr. Vail here

21  tomorrow then?

22      THE COURT:  No.

23      MR. STAHLMAN:  We will take it up the next day.

24      THE COURT:  Mr. Schroeder?

25      MR. SCHROEDER:  Can I ask you something?

13,695

P 6

1   THE COURT:  Yes.

2   MR. SCHROEDER:  We have a bunch of the Pala Indian Boy

3   Scouts at Rincon going down that creek and camping.  There is

4   no place else for them to go.  Can't I make some kind of deal

5   with these Gibbons to let them put in proper maintenance and

6   keep their old pipe and let a little water go through so every-

7   body down below has a little and we can get along?  I don't

8   mind them putting a road in, but I don't want them to take all

9   that water.  I don't see anything wrong with that.

10   MR. VEEDER:  He is willing to furnish them a right to

11   maintain it across his land, as I understand, so why are we

12   worrying anymore about that point?

13   MR. SCHROEDER:  I will even help them keep up the road.

14   THE COURT:  Mr. Grover, I think you ought to talk to Mr.

15   Schroeder on this matter right away.  The legal question where

16   the diversion point is and legal rights of that sort we will

17   have to take up later.

18   MR. STAHLMAN:  I understand, these people downstream are

19   completely without domestic water.  They are going to come, I

20   have heard.

21   MR. SCHROEDER:  They wanted to come in now, but they don't

22   feel good--they are older people.

23   THE COURT:  Who are they?

24   MR. SCHROEDER:  Mr. Ritchie and Mr. Poor.

25   They could let a little down once in a while just to keep

P 7

1   their wells full and keep the mosquitoes out of the creek, and

2   the Boy Scouts can splash around a little.  We will help them

3   keep the road up if they will put a decent road in a decent

4   spot.

5       THE COURT:  I can't just make an order like you suggest

6   now and say to Mr. Grover, "let water down the creek."  But I

7   suggest you talk to Mr. Grover while he is here and see if

8   something practical can be worked out without prejudice what-

9   ever to the rights the two of you have when this case is finally

10  decided.

11      The other thing I was going to suggest is that you ought

12  to contact Mr. Veeder or my office--I would prefer that you

13  bother him and not me--and read the testimony that has been

14  given by other witnesses who appeared before today about this

15  diversion, if you are interested in it.  It has a bearing on

16  your rights.  There is considerable evidence in the record

17  about this ditch and this diversion point.

18      MR. VEEDER:  The record is in my office, your Honor, if

19  he wants to see it.

20      THE COURT:  It is written up and it is there to be read.

21      Finally, I think when we get ready to draw findings on this,

22  Mr. Schroeder should be served with a copy of these findings

23  in connection with Gibbon and Cottle.

24      Mr. Grover, will you talk to Mr. Schroeder tonight before

25  you leave?

13,697

P 8

1      MR. GROVER:  Yes, I will, your Honor.

2      THE COURT:  And see what practical thing can be worked out

3  to at least temporarily solve some of his problems without

4  prejudice to the rights of either party.

5      MR. GROVER:  Yes I will.

6      THE COURT:  Nine-thirty tomorrow morning.

7      MR. GROVER:  Is there any reason why we couldn't set the

8  next date today just as well, so that if I have a conflict we

9  can work it out?

10     THE COURT:  I don't know whether we can or not.  What day

11  is suggested, Mr. Veeder?

12     MR. VEEDER:  I have talked to Col. Bowen about this and

13  the progress of the work.  But I am not in apposition today to

14  say when I think we should resume.  Monday, yes.  I am thinking

15  about the next setting.  I will call Mr. Grover and tell him.

16     THE COURT:  All right.

17     I still don't have a copy of Government's 15H.

18     MR. VEEDER:  I will give you a copy of 15H.

19     Didn't you find those two colored maps?

20     THE COURT:  No.

21     MR. VEEDER:  They are precious.

22     THE COURT:  You are going to get me a copy of Exhibit 15H.

23     MR. VEEDER:  Yes.

24     THE COURT:  Nine-thirty tomorrow morning.

25     MR. VEEDER:  Here is 15H.  That is mine.  I'll give it to

P 9   1   you.

2       MR. GROVER:   I have found the reason 1947 is different.

3   The pump was changed in 1947 on Well No. 1, so the correction

4   I made would not apply to 1947.  Every year marked 2 plus should

5   be .3.

6       THE COURT:  Will you make the correction?

7       MR. GROVER:   I will make the correction, and if your Honor

8   would prefer I will introduce substitute exhibits.

9       THE COURT:   This also changes your Exhibit E.

10      MR. GROVER:   That is right.

11      THE COURT:   Make your corrections and then offer it some

12   time.

13      MR. GROVER:   Yes your Honor.

14      (Adjournment until Friday, June 24, 1960 at 9:30 A.M.)

15

16

17

18

19

20

21

22

23

24

25