# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Friday, June 24, 1960

Pages:     13,699 through 13,768

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 10

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| | |
| Defendants. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, June 24, 1960

APPEARANCES:

FOR THE PLAINTIFF:

WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney General,
Department of Justice,
Washington, D.C.

LCDR DONALD W. REDD

FOR THE DEFENDANTS:

For Defendant Fallbrook
Public Utility District, et al.

FRANZ R. SACHSE, ESQ.,

13,700

APPEARANCES (continued)

    FOR THE DEFENDANTS (continued)

For Defendant Vail             GEORGE STAHLMAN, ESQ.,
Company

For Defendant State of          STANLEY MOSK, ESQ.,
California                         Attorney General,
                                 By Fred GIRARD, ESQ.,
                                  Deputy Attorney
                                  General.
                           ERNEST SANCHEZ, ESQ.

INDEX TO WITNESSES

Kunkel,
    W H V
    Stathman

Lincoln, Walter gould - p. 13,718 - continued to aug 11th

E X H I B I T S

| Plaintiff's Exhibit | Iden. | In Evid. |
|---|---|---|
| 15 J | | 13,704 |
| 15 F | | 13,706 |
| 15 E | | 13,718 |
| 160 A, 160 B, and 160 C | | 13,740 |
| 15 I | | 13,744 |
| 15 I-1 | | 13,748 |
| 15 I-2 | | 13,751 |
| 15 K-1 through K-7 | | 13,751 |

P 12 1    SAN DIEGO, CALIFORNIA Friday June 24, 1960, 9:30 A.M.

2         (Other matters)

3         THE CLERK: 2-1247-SD-C United States vs Fallbrook.

4         Hearing motion of Schloss Estate for substitution of

5    attorneys.

6         MR. VEEDER:  Mr. Kunkel please.

7                    FRED KUNKEL,

8    previously duly sworn, on his oath was examined and testified

9    further as follows;

10                   DIRECT EXAMINATION (resumed)

11   BY MR. VEEDER:

12        Q  Mr. Kunkel, I hand you the exhibit of the United States

13   marked for identification 15H and ask you to state into the

14   record the contents of that exhibit.

15        A  Government's Exhibit marked for identification 15H

16   entitled "Data on Water Wells in the Murietta and Temecula

17   Valley Area, California."

18        Q  State into the record the source of the data set forth

19   in that identification?

20        A  The source of the data tabulated in Exhibit 15H were

21   collected by personnel of the Geological Survey working under

22   my immediate supervision.

23        Q  Is that pursuant to the order of this Court that the

24   wells were to be canvassed?

25        A  It would be pursuant to the order of this Court.

1    Q   Are those figures as set forth and the data set forth

2    correct, to your personal knowledge?

3    A   To my personal knowledge, these figures are correct.

4    MR. VEEDER:   We offer in evidence the Exhibit marked 15H

5    for identification.

6    THE COURT:   Of course, you relied upon heresay and in-

7    quired around as best you could as to when wells were dug, etc.?

8    MR. VEEDER:   He might have to take the Fifth Amendment on

9    that.

10   THE WITNESS:   No, this is correct and information reported

11   by owners and others is differentiated from that actually

12   measured by the Geological Survey.   For example--

13   THE COURT:   I am being facetious.   I know you measured

14   where you could and calculated altitude and all that.   But

15   when you say a well was dug in 1910, this is just what you

16   were told.

17   THE WITNESS:   That is correct.

18   THE COURT:   And this was not told to you, but to some of

19   your employees, in many cases?

20   THE WITNESS:   That is correct.

21   THE COURT:   The only reason I ask this question is because

22   this is the way that the California's Bulletin No. 57 was pre-

23   pared.

24   MR. SACHSE:   This is the way that Searle Brothers Exhibit,

25   to which Mr. Veeder objected so vigorously, was prepared, except

P 14   1    that my man did it himself.

2       THE COURT:   If it is a Government's exhibit this sort of

3    thing is proper.   If it happens to be California's exhibit or

4    Searle Brothers' exhibit, we have a big rumpus about it.

5       But the exhibit will be received in evidence.

6       MR. VEEDER:   Your Honor, in regard to the Bulletin to which

7    you made reference, my objection has always been directed to

8    the editorial aspects of it.  California's Exhibit G, as I

9    recall.

10      MR. SACHSE:   L.

11      MR. VEEDER:   Is it L?

12         No, the statistical data that has been put

13    in we had to interpose an objection.

14      THE COURT:   I am being facetious.   Your objections were

15    pretty broad, but I know particularly your objection was to

16    the conclusions and the editorial comment.

17      MR. VEEDER:   Yes.

18      THE COURT:   Exhibit 15H received in evidence.

19      (Government's 15H was received in evidence.)

20   BY MR. VEEDER:

21      Q  I hand you the exhibit marked for identification Exhibit

22    15J and I ask you to state into the record the content of that

23    exhibit.

24      A  Government's exhibit marked for identification 15J,

25    entitled "Water Level Measurements in the Santa Margarita River

P 15

1   Area" are measurements by the Geological Survey collected in

2   accordance with the Court Order, measurements by the Geological

3   Survey collected prior to the Court Order, and in certain cases

4   water level measurements from the records of the Vail Company

5   or from California's Exhibit G.  The complete series of measure-

6   ments in certain cases has been tabulated in order to relate all

7   measurements to a common reference point and provide the conti-

8   nuity necessary for constructing hydorgraphs.

9        MR. VEEDER:  We offer in evidence the exhibit marked for

10   identification 15J.

11        THE COURT:  15J received in evidence.

12        (Government's Exhibit 15J was received in evidence.)

13   BY MR. VEEDER:

14        Q  Mr. Kunkel, would you approach the easel and resume your

15   comparison or contrast, as the case may be be, between 15A,

16   which is in evidence, and 15F, which has been marked for identi-

17   fication, concerning which you offered some testimony yesterday

18   before the interruption.

19        A  I don't recall exactly how many differences I had pointed

20   out.

21        MR. VEEDER:  Your Honor, I think I can help him some.  He

22   was talking about the well depressions, if you want to start

23   there.

24        THE WITNESS:  I had indicated that the map covered a larger

25   area.

P 16

1          MR. VEEDER:   That is right.

2          THE WITNESS:   And I was discussing the differences in

3    water level contours.

4          The principal differences are two, the first of which re-

5    lates to a water level depression or a pumping depression

6    shown in Section 16 or centered beneath the northeast quarter

7    Section 26, Township 7 south range 3 west.   The extent of the

8    depression and position and aerial extent of it is somewhat

9    different from that shown on 15A.

10   BY MR. VEEDER:

11         Q   What was the reason for that differentiation as shown?

12         A   The principal difference was the reliance that I placed

13   on water level measurements in well 7 south 3 west 23K1, which

14   is Roripaugh's Well No. 8.

15         Q   And that is the one upon on which a continous recorder

16   was maintained; is that right?

17         A   That is correct.   When 15A was constructed we only had

18   one measurement in Well 23K1 and I suspected the validity of

19   the measurement.   Subsequent to the construction of 15A we had

20   made many measurements of water levels and have maintained a

21   continous water level recorder in that well, and the subsequent

22   data indicate that the original data was reliable.   Consequently,

23   I have relied on Well 23K1 to a degree that I didn't rely on

24   it in the construction of 15A.

25         Q   Are there any other differences between 15A and identi-

P 17   1   fication 15F?

2      A   One other difference that south of the Vail Company

3   ranch and east of Wolf Valley, approximately along the rancho

4   line, water level contours have been changed.   The basis for

5   that change is based on additional data collected and testimony

6   of Erle Stanley Gardner's ranch foreman who testified in this

7   Court.

8      Q   Sam Hicks?

9      A   Sam Hicks.   Based on the testimony of Sam Hicks and

10  also some of the study of Col. Bowen in the area.

11     MR. VEEDER:   We offer in evidence 15F.

12     THE COURT:   15F received in evidence.

13     (Government's Exhibit 15F received in evidence.)

14     MR. VEEDER:   Are there going to be any questions?   We are

15  going to move to another.

16     MR. SACHSE:   There will be cross examination on all of them,

17  but no voir dire.

18  BY MR. VEEDER:

19     Q   Now I refer to the easel upon which is placed identifi-

20  cation 15E and ask you to state whether that exhibit was pre-

21  pared by you or under your direction?

22     A   Government's Exhibit 15E was prepared by me or by

23  personnel working under my direct supervision.

24     Q   Would you read the title block into the record?

25     A   The title of Exhibit 15E is "Map of the Murietta

P 18

1   Batchelor Mountain and parts of the Wildomar, Pachanga and

2   Temecula Quadrangles of California, Showing the Geology, Loca-

3   tions of Wells and Water Level Contours for Autumn 1959."

4   Q  Would you compare or contrast that with Exhibit 15A,

5   which is also on the easel and which is now part of the record

6   in the case?

7   A  15E and 15A, for the areas covered, are exactly the

8   same geologic base map.  15E, however, is for the larger area.

9   Q  When you say the larger area you mean--

10  A  It includes part of the Wildomar Quadrangle, which 15A

11  does not include, and 15E is for 1959 whereas 15A is for the

12  year 1958.

13  Q  Would you step to the easel and refer to your legend

14  or explanation and very briefly summarize the meaning of each

15  of those items as set forth, avoiding reference to those parts

16  of the legend which relate to interpretive matters?  Do you

17  understand what I've said?

18  A  I understand.  The explanation for the symbols used on

19  Exhibit 15E in part different from those used on 15A in that

20  15E describes in more detail certain of the features related

21  to the wells.

22  The first item shown is a single open circle with a letter

23  such as M1 after it, which indicates the location of the well

24  with regard to the numbering system that has been used in the

25  Court.  A single open circle indicates the position of a

13,708

P 19

1 domestic, stock or unused well.

2 The second symbol shown is a double circle having the same

3 number designation or using the same system of designation. This

4 double circle indicates a large supply or irrigation well having

5 a pump of 5 h.p. or more. The differentiation between large

6 supply or irrigation is made for the reason that wells such as

7 Wells 23A-1, 23A-2 and 23A-3 7 south 3 west, which belong to

8 the Murietta Hot Springs, are not used principally for irriga-

9 tion but are used principally for the water supply of the

10 Murietta Hot Springs.

11 The third symbol is an open circle with a vertical line

12 through it. This indicates a dry or destroyed well. A number

13 of dry or destroyed wells are shown because there data available

14 for those wells that have been used or considered in the analysis

15 of the geology and hydrology, such as well logs or older water

16 level measurements that were considered.

17 The fourth symbol is a solid red circle with a tail on it.

18 These indicate springs, seeps or points of risingground water

19 in the autumn of 1959. For the areas where the tail from the

20 well is of considerable extent, such as from the circle in

21 Murietta Creek north of the town of Temecula, the solid red

22 line from the spring to and through Temecula Narrows indicates

23 the extent of the actual flowing water from that spring.

24 Q Mr. Kunkel, did you observe these things yourself?

25 A These things have been observed by myself personally.

P. 20

1    Q   You may proceed.

2    A   The fifth symbol is a solid red circle, which indicates

3    a well that was flowing in the autumn of 1959.  For example,

4    Well 17M1, the Navy well, Well 8 south 2 west 16G1, 8 south 2

5    west 15C1 are all wells that were observed to be flowing in the

6    autumn of 1959.  Two wells, Well 16A1 and Well 17G1, on the

7    property of the Vail Company, known as the Dairy Well and the

8    Studley Well, were not observed to be flowing.  The Studley

9    well, Well 17G1, was capped and was inaccessible to us, and in

10   this particular instance we relied on the reports of the Vail

11   Company that this well had been flowing.  Well 16A1, which is

12   the Dairy well, flows or is pumped directly into a closed system

13   of the Vail Company and the casing is reportedly old and owing

14   to a very recent reluctance on the part of the Vail Company this

15   well was not shut off to actually observe.  However, these wells

16   are shown as flowing based on that reported data.

17        The sixth symbol is a circle that is colored half red.

18   These are wells that when drilled or sometime in their history

19   formerly flowed.

20        Q   What was the source of the data that you relied upon

21   for that purpose?

22   Belt 11    A   The source of the data relied upon are well logs in

23   Exhibit 16A, testimony of persons in the Court such as Mr.

24   Philo, Mr. Wilkes, Jack Roripaugh, and water level records in

25   California's Exhibit G.

13,710

P 21

1       One other thing that is not covered in the legend, but it

2   is not an interpretative nature, is this.  I direct your atten-

3   tion to the South half of Section 17 range 8 south 2 west.  Along

4   the stream line the stream flow is shown as three dots, a dash,

5   three dots, dash.  This is a standard symbol for an intermittently

6   flowing stream, and observed by myself and other persons under

7   my direction the Temecula stream was not flowing for the reach

8   indicated from the West half of Section 16 to the East half of

9   Section 19.  One year ago it was flowing for the full length

10  of this stream in the fall, and according to the testimony Mr.

11  Wilkinson the stream flow dried up as a result of pumping the

12  pit well.

13      MR. STAHLMAN:  You are going into testimony now.  If you

14  want to do it that way, it's all right.

15      MR. VEEDER:  All I'm trying to do is to show the sources

16  of this data, because I think it will be helpful to the Court.

17      THE WITNESS:  It was direct observation that the stream

18  was not flowing in the section indicated.

19  BY MR. VEEDER:

20      Q  What is the symbol for the springs there?

21      A  The spring has already been covered.  That is the fourth

22  symbol, a solid red circle with a tail on it.

23      Q  And those are your own personal observations?

24      A  Those are my personal observations, yes.

25      Q  I note that you have a line of geological section.

13,711

P22

1    Will you state what that means, Mr. Kunkel?

2        A  I am presently constructing a line of geologic section

3    from the points shown at the northwest end of the watershed

4    boundary G, the line runs in a generally southeasterly direction

5    to the point called H in Section 19 8 south 1 west.  There is

6    also another line of section.  Apparently the symbol hasn't

7    been put to this.  Yes, here it is.  It is right at the approx-

8    imate boundary in Section 24 8 south 3 west, and it is a line

9    that runs closely up the center of the Pauba Valley to a point

10   called F at the head of Temecula Creek on the east edge of the

11   map.

12

13       Q  Alluding to the wells with red tails on them, located

14   in the residuum, would you state the significance of those?

15       A  We have skipped one symbol, which is not necessarily

16   in the residuum.  There a number of springs that were observed

17   to be dry in the autumn of 1959.  Again, these are sites that

18   were visited by myself, and based upon evidence in the field,

19   it is my opinion that these were sites of former springs which

20   have dried up, and it is also based on testimony of persons in

21   this Court, again, such as Mr. Weeks and Mr. H. M. Hall, the

22   Vail Company, if I remember correctly, and other persons who

23   have testified.

24       Q  I have asked you a question in regard to the wells

25   which appear in the residuum and that have red tails on them?

     A  Those are springs that were flowing in the fall of 1959.

P 23

1   The one spring in particular is in the southwest part of Section

2   8 Township 7 south 2 west, and I observe  two springs which I

3   failed to show tails on in Section 25 6south 3 west, but those

4   were springs that were flowing.

5       Q  In regard to the wells through which the arrows are

6   drawn, would you state what that means?

7       A  Arrows are used on Exhibit 15E to show the direction of

8   groundwater movement at the sites of those wells.  All the wells

9   that we could find in the residuum were canvassed and water levels

10  were measured.  The altitude of the water surface in each well

11  for which a measurement was made is shown at the well.  I am

12  pointing to Well 7 south 3 west 12J2, which has a water level

13  altitude of 1280, J1 1283, H1 1278, and other wells throughout

14  the entire area both on the residuum and on the older and

15  younger alluvium bearing this designation.

16      Q  Can you locate the pumping well, Roripaugh B22, on the

17  creek property?

18      A  If I recall correctly, the creek property is in Section

19  28 and the wells belong to Frick.

20      Q  Would you give the township and range?

21      A  Township 6 south 2 west.  There are a number of wells

22  that belong to Frick.

23      Q  Pumping wells?

24      A  I will check.  Referring to Government's Exhibit 15H,

25  Carl Frick owns seven wells in Township 6 south 2 west Section

P 24

1    28:  Wells 28B1, 28C1, 28G1, 28G2, 28G3, 28J1 and 28J2.

2        Q  Have you observed the terrain and general area of the

3    Frick property?

4        A  Yes I have.

5        Q  Based upon your observation, do you think that the water

6    that is being pumped by Frick is part of the Santa Margarita

7    stream system?

8        A  It is my opinion that water pumped by Frick is part of

9    the Santa Margarita river system.

10       Q  Are there any other factual data concerning which you

11   haven't made any reference on this map, Mr. Kunkel?

12       A  I don't believe there are.

13       Q  Now, would you allude to that portion of the legend

14   which has to do with interpretative elements and point out

15   where those legends will be found?

16       A  The first item that involves interpretation is the water

17   level contours as indicated by the legend "Water Level Contour

18   1959-Where Control is Perfect."  A long dash will indicate

19   position is interpolated.  Short dash will indicate position

20   is inferred.  On Government's Exhibit 15E water levels contours

21   based on water levels in wells have been constructed for the

22   area underlain by younger and older alluvium deposits and the

23   method of construction is the same that I testified to in

24   earlier testimony.

25       Q  In regard to the arrows, is the same significance to

13,714

P 25

1    be ascribed to those that you ascribed on the other exhibits

2    15A, etc.?

3        A   Where they are associated with water level contours,

4    yes.   Where they are directly associated with water level con-

5    tours, I believe there is further explanation needed.

6        Q   Would you go ahead, if there is further explanation?

7        A   Where the water levels contours are shown, the evidence

8    indicates that there is an appreciable thickness of alluvium

9    and a water body of appreciable thickness, and therefore in my

10   opinion be sufficient control to construct or interpolate water

11   level contours.

12       In the ares of the residuum, the residuum compared to the

13   thickness of the younger and older alluvial deposits it is

14   relatively thin.   The residuum ranges from a feather edge to

15   perhaps a hundred or at the most a hundred and fifty feet in

16   thickness.   The topographic relief in the area of residuum re-

17   lating to its thickness, the thickness of the residuum is also

18   relatively greater that the topographic relief related to the

19   total thickness of the alluvial deposits.   For this reason, it

20   is my opinion that where there is an appreciable thickness of

21   residuum, sufficient thickness to drill a well and get a measured

22   water level, water in those deposits for the contact between the

23   residuum and the basement complex closely approximates land

24   surface, the slope of the contact closely approximates the land

25   surface, therefore any water that would be in the residuum would

P 26

1    be in large part resting on the basement complex at the lower

2    part of residuum and the movement of that water would be down

3    the slope of the contact, which in general will approximate the

4    slope of land surface.  Therefore, at every well where we had a

5    water level measurement determining the altitude of the water

6    surface, we constructed an arrow to the nearest drainage course

7    or down the slope of land surface at that point.

8         Q   When you say the drainage course, what do you mean by

9    that?

10        A   The nearest surface drainage.

11        Q   Those would be intermittent streams that are shown

12   across the residuum?

13        A   Those would be the intermittent streams that are shown

14   across residuum.

15        Q   I observe, Mr. Kunkel, that you have a line, the 1050

16   contour water level 1927.  Would you explain what you mean by

17   that?

18        A   There were a number of water level measurements in the

19   records of the Vail Company for 1927.  In the vicinity of

20   Santa Gertruiis Valley and Long Valley there were a number of

21   measurements in a realtively close area and the altitudes of

22   the water surface for 1927 are calculated from the records, and

23   on the basis of the 1927 records there were sufficient control

24   to indicate the position of the 1050 foot contour in 1927.  So

25   on Exhibit 15E that single contour for 1927 was shown as a

P 27

1     heavy dashed line and it is labeled "1050 Foot Water Level

2     Contour 1927."

3         MR. GIRARD:   That was taken from where?

4         THE WITNESS:   This was constructed form 1927 water level

5     measurements which are shown for--

6         MR. VEEDER:   The source.

7         THE WITNESS:   Vail Company's records, I believe they are,

8     and also California's G.

9         THE COURT:   Then the fact that you show the 1050 foot

10     contour line in 1959 further to the east means that the water

11     level has dropped?

12         THE WITNESS:   It would indicate a decline in water leve.

13         THE COURT:   What is this line I see running from up near

14     the lefthand corner of the map, a dotted line running through

15     the older alluvium?

16         A   It separates the material called Qtoal (older alluvium)

17     from the material I have indicated as Qtoal?, which is older

18     alluvum.   But as I had testived earlier, the contact in this

19     area--

20     BY MR. VEEDER:

21         Q   When you say "this area," would you refer to the section

22     and township?

23         A   In Sections 6, 5, 4, 10, 11, 14, Township 7 south range

24     3 west.   The differentiation is not made on the area east of

25     Murietta Hot Springs.   It is in Sections 16, 15, 14, 7 south

P 28

1   2 west.  But the same problem exists, I am going to discuss

2   and have previously testified to, that as one goes from to the

3   older alluvium northward to the residuum or to the basement

4   complex there is a point in there where one cannot differentiate

5   with certainty the older alluvium from the residuum and it is

6   entirely possible that a thin mantle of residuum exists in the

7   area or only a very thin veneer of older alluvium overlies

8   residual in the area indicated Qtoal? and there is no simple

9   solution to this problem.  It is one where a geologist has to

10  use his judgement and say at this point the contact exists,

11  realizing full well that it is a very difficult thing to deter-

12  mine and that some other person might place it at a slightly

13  different position.

14      Q  Now, referring to the line with the crosses on it, that

15  sort of descends the valley, what is the significance of that?

16  I think you had better read the legend.

17      A  A solid line with a series of x's along the line.  The

18  explanation reads "Approximate position of divide in autumn of

19  1959 between ground waters tributary to Temecula Canyon and

20  those no longer tributary to Temecula Canyon."

21      Q  What is the basis of your conclusion on that?

22      A  Under natural conditions and conditions of moderate

23  pumping and development, all the ground water upstream from

24  Temecula Canyon moved in an uninterrupted course from its

25  points of recharge to Temecula Canyon and then out Temecula

P 29

1    Canyon.  However, owing to pumping in Murietta Valley and in

2    Santa Gertrudis Valley and adjacent area, there has been a

3    reduction of water level as indicated by the water level con-

4    tours to the point that in the fall or in the autumn of 1959

5    water levels in wells indicated that the head relation was such

6    that the direction of ground water movement was toward the

7    pumping holes, one of which is centered in Section 34 Township

8    7 south 3 west, the other one centered in Section 26 7 south

9    3 west.  As a result of these two pumping deperssions, a ground

10   water divide has been created.

11       Q  State the time that that divide existed, Mr. Kunkel?

12       A  This was in the autumn of 1959.

13       Q  Is that a continous phenomenon?

14       MR. SACHSE:  I object to that as being to vague.  What

15   do you mean by "continous"?  For how long?  Are you asking him

16   how long this dotted line continues in this place?

17       MR. VEEDER:  I will simplify it very much.

18       Q  Did that phenomenon of the ground water flowing toward

19   the pumping depressions continue after the pumping season was

20   over, in your opinion?

21       A  In my opinion, it probably did not.

22       MR. VEEDER:  That is what I meant by "continous".

23   We offer in evidence 15E.

24       THE COURT:  15E received in evidence.

25       Mr. Lincoln, Mrs. Bates called on the telephone and said

P 30

1   that there had been no change in the status with reference to

2   the Schloss Estate; that you had secured an extension of time

3   on the appeal, the appeal was apparently not progressing and

4   had not been acted on; and she wanted to know whether she should

5   come down or not. And I said, "Well, if you think the situation

6   is the same as it was before, I will put the matter over again."

7   That explains why she is not here.

8        MR. LINCOLN:  Your Honor, in the first place, I have had no

9   word from Mrs. Bates that she would not be here, and of course

10   I am here in response to your Honor's original Order.

11       I might say, in answer to Mrs. Bates' suggestion to your

12   Honor, that everything has been done by myself in the appeal

13   insofar as it can be done.  All of the money required to be

14   paid for the transcript on appeal and for the reporter's

15   transcript on appeal has been paid by me.  The reporter's

16   transcript, however, has not yet been made, and that is no

17   fault of mine.

18       There is another circumstance which has woven itself into

19   this situation of the trustees of the Schloss Estate in that

20   at a hearing before the Superior Court in Riverside County,

21   at which Mrs. Bates were present, based upon her presentation

22   of an order asking the Court to appoint a further trustee

23   selected by herself, we discovered that the Attorney General

24   of the State of California has interjected himself into this

25   case, for what purpose did not appear at that time.  That

P 31

1   matter has been contined until the 5th of July.

2         There is one other thing, if your Honor will be patient

3   with me.  I was extremely anxious that Mrs. Bates appear today,

4   so I have served upon her and filed with this Court the necessary

5   copies showing the time of the actual service upon her of an

6   order requiring to produce before this Court and subject to my

7   inspection an actual or certified copy of the procedure at the

8   meetings in which I was presumably discharged by some persons

9   calling themselves trustees.  Of course, not being there, I

10  can't demand that at the present moment, and possibly wouldn't

11  see it.  That possibly might be a reason that she preferred

12  not to be here.

13        I thank you for your consideration.

14        May I suggest, has your Honor examined a future date for

15  an appearance of either one of us?

16        THE COURT:  I haven't, and counsel will discuss it and

17  we will talk about it this morning.

18        MR. VEEDER:  When do you want further hearings in this

19  matter?

20        Frankly, your Honor, the way things going in the prepara-

21  tion of the findings, I was wondering if some time in August

22  would be acceptable.

23        MR. STAHLMAN:  Are you going to finish this matter per-

24  taining to the stipulated judgement at this session?

25        MR. VEEDER:  I thought so.

P 32

1    MR. STAHLMAN:  You are going to stay here then until we
2    get it finished?

3    MR. VEEDER:  Monday and Tuesday.

4    MR. STAHLMAN:  I think probably we can.

5    MR. VEEDER:  I thought you and I agreed to that last night.

6    MR. STAHLMAN:  I never agree to something in the future
7    that I don't know what will happen.  I will continue with it.
8    I think we will finish it by Tuesday night, if we get to it
9    Monday morning.

10   MR. VEEDER:  I certainly figure we're going to be here
11   Monday and Tuesday.

12   MR. STAHLMAN:  I don't know when we are going to finish
13   with Mr. Kunkel.  How can I forecast time of finishing.

14   THE COURT:  Let's quit talking about that.  When do you
15   want to come back again?  In August?

16   MR. VEEDER:  I want to keep this thing going now that we
17   are moving on it.  I do have the problem, though--it is a
18   problem that I have talked to Col. Bowen about--the relatively
19   simple checking out that we could do in the Murietta Valley.
20   I want Col. Bowen to verify these things I am stating, if he
21   has any differences with me on them.  It is hard to locate a
22   great many of these things without on-the-ground inspection
23   in regard to monuments, etc., which takes more time than it
24   did in the Murietta Valley.

25   Isn't that correct?  The problem of locating irrigated

P 33   1   and irrigable acreages becomes extremely difficult in the base-

2   ment complex area?

3        COL. BOWEN:  That is correct.

4        MR. GIRARD:  May I get that again?

5        MR. VEEDER:  I said, there a great deal of basement

6   complex in this area, and in the valleys where the alluvium

7   is and where the irrigated and irrigable acreage is located.

8        MR. SACHSE:  I have a question on this.  Does this testi-

9   mony of Mr. Kunkel and these minor amendments to the geology

10   that are indicated on your new exhibits then conclude the

11   geologic testimony?  Or do we have still more to wait for?

12        MR. VEEDER:  Certainly in this area that concludes it.

13   I am going to say this, that in regard to the area above Vail

14   Dam there may be more geology.

15        MR. SACHSE:  Frankly, your Honor, I had hoped, and I was

16   going to make the request--obviously it can't be done now if

17   Mr. Veeder is going to have a longer time to wait for geology--

18   but I was thinking of asking your Honor to make this into an

19   interlocutory judgement on the extent of the stream system.

20   That ties in with this letter that I addressed to your Honor

21   and to the other members of counsel.  I think if we could have

22   done this at the very beginning, as we discussed, the idea of

23   doing all are geology and hydrology and deciding it by inter-

24   locutory rulings--for example, that all basement complex ground

25   waters should be regarded as being outside the stream system--

P 34

1   then we would not be troubling Col. Bowen with these extensive

2   surveys in that area, and I have had in mind--and I will tip

3   my hand--that the moment that Mr. Kunkel's geology is in I was

4   going to ask your Honor for an interlocutory finding.  The State

5   of California's is in, mine is in.  Such interlocutory finding

6   on the extent of the stream system would do more to shorten the

7   rest of the time we have to spend on this case than any other

8   single thing I can think of.  I think your Honor has all the

9   evidence on the point.

10   MR. VEEDER:  Your man put in a great deal of evidence.  I

11   am not going to be restricted on rebuttal, unless his Honor

12   orders it that way and says I am precluded from it.  I can't

13   agree to it.  This is a complex matter.  We are doing all we

14   can to press this thing as hard as we can.

15   THE COURT:  You are entitled to rebuttal.  But don't you

16   understand the practical value of Mr. Sachse's suggestion that

17   if we may an interlocutory judgement showing the extent of the

18   stream system: (1)  The surface streams etc. and the finding

19   that all this surface runoff is part of the stream system and

20   (2) That ground water in the basement complex is not part of

21   the stream system, with the possible exception of small areas

22   of the younger alluvium, we would then be in a position to

23   eliminate a lot of this basement complex material right out of

24   the case on the basis of those findings.

25   MR. VEEDER:  I have tried very hard to understand what is

1  meant by "eliminate out of the."  I would not be a party to

2  telling these people that they have no interest at all in the

3  Santa Margarita System simply because they are located in the

4  basement complex.  I say from the stand-point of ground water,

5  yes.

6      MR. SACHSE:  That is all I'm asking; an interloctury

7  judgment very similar to the one you have just tentatively

8  approved.

9      MR. VEEDER:  Has there ever been any doubt in regard to

10  the basement complex?  I have never had any doubt on it.

11      MR. SACHSE:  All right, let's say it.

12      THE COURT:  Let's do what Mr. Sachse has suggested.  You

13  don't have any rebuttal on the basement complex, have you?

14      MR. VEEDER:  No.  If that is all he is talking about.

15  I don't believe there has been disagreement in regard to the

16  basement complex.  I have never disagreed on it.  He has

17  tendered to me findings of fact and conclusions of law in

18  regard to the Tule Land Company, and I want to thank him for

19  it, and I said from our stand-point, subject to some possible

20  refinement, I am in agreement on that.  I believe that a great

21  part of the lands of the Tule Land & Cattle Company that he

22  represents is on basement complex, and I don't believe that

23  the ground water, if any, that would be found in it, would

24  be of such character that it would be influencial at all in

25  the yield of this stream.  That is all I have ever cared about,

1   and while I was never too happy about the terms of the

2   "vagrant, percolating" etc., I think it is reflective of a

3   situation where there is no water and where any ground water

4   is not part of the stream system.

5       Is that what your Honor want? I have agreed to that now.

6       MR. SACHSE:  Mr. Veeder, I think you are over-complicating

7   it.  I can readily appreciate your problem with Searl Brothers

8   in Diamond Valley and Domenigoni Valley.  So lets put that

9   aside.  I realize that you might want to offer extensive

10  evidence on it, and you have that privilege.  But I truly don't

11  believe that the United States is going to have any more

12  evidence to offer on the creeks, where they are, what their

13  names are, what time of year they run, whether they are truly

14  intermittent or not.  I made the suggestion --.

15      MR. VEEDER:  Save some gas.  I believe that entirely.

16  However, I think your Honor knows where the streams are, I

17  think, where they are located.  If it would make you happy,

18  I will agree that a finding could be entered now as to the

19  outer extremity of the Santa Margarita watershed, the trib-

20  itaries, the principal sources of water, the location of most

21  of the springs, the location of most of the important wells.

22      MR. SACHSE:  Now, lets go the next step.  I will not ask

23  the Judge as yet.  I don't think he is ready to take a pencil

24  and draw a line on this map and say that below this point, this

25  part is the stream.  But I think we can do it in DeLuz Creek,

13,726

1   I think we can do it in Sandea Creek, I think we can do it in

2   Fallbrook Creek, and I think we should do it -- delineate the

3   stream system.

4       MR. VEEDER:  Isn't it true that the Master has already

5   put findings in here concerning which, to a large entent, I

6   haven't objected?  I don't know what this is all about.  I am

7   willing to go all the way on these matters.  I would just like

8   to have somebody be a little definitive.  I see no problem

9   whatever in regard to situations such as the Tule Land & Cattle

10  Company.  Long experience in these matters has told me that

11  everytime that I have stipulated with a broad brush there was

12  trouble to the Court before we finished.  So I have tried to

13  avoid making a basin-wide stipulation.  But in regard to the

14  basement complex, except in the rare instances where there are

15  springs that run into the system, I say the ground water there,

16  on the basis of our own testimony, Mr. Sachse --

17      THE COURT:  Now we are just getting into some oratory.

18  Let me ask you specifically.  Generally speaking, as far as

19  the basement complex is concerned, you have no other evidence

20  to present?

21      MR. VEEDER:  No.

22      THE COURT:  Mr. Sachse, in these proposed findings and

23  conclusions and interlocutory judgment on the stream system,

24  how would you propose to describe the land?  By reference to

25  one of the maps?

1    MR. SACHSE:   I mentioned that casually to Mr. Veeder

2  yesterday in connection with my earlier letter to your Honor,

3  and he said that he has in mind the preparation of a set of

4  maps on the same scale as these 15E Series.  They wouldn't have

5  to show water level contours, but we can use the same master

6  map that the United States has, delineate on it the line your

7  Honor has drawn.  I think your Honor could, after considering

8  all the evidence, finally say, "very well, Mr. Veeder, and

9   gentlemen, my finding now is that everything below such

10  and such a point, I am treating as part of the stream system."

11  We would then give that map to perhaps the State of California

12  or to the United States -- it doesn't matter -- and simply say,

13  "use the same base map that the United States has and transpose

14  on to it this line," and from then on everyone of us in our

15  findings refer to that map and say that that shows the

16  boundary on each individual's property.

17    THE COURT:   I understand what you are talking about as

18  far as the Murrieta  - Pauba Valleys are concerned.  But if I

19  understand you, as far as the rest of the watershed is concern-

20  ed north and east of the Pauba and Murrieta Valleys, would

21  use a map rather than a description.

22    MR. SACHSE:  Yes your Honor.

23    THE COURT:  You would say that in the area shown as

24  basement complex on Map so-and-so, the ground water is not

25  part of the stream system.

1    MR. SACHSE:  Yes your Honor.  That the ground waters under-

2    lying the area of younger alluvium are part of the stream

3    system.

4    THE COURT:  Would you propose to wait to do this until I

5    have made my ruling on the basin in the Pauba-Murrieta area?

6    MR. SACHSE:  In all honesty, I certainly would not

7    attempt to delineate the stream system of the Pauba-Murrieta

8    until you had made that ruling.

9    But Mr. Veeder is talking about Colonel Bowen's burden of

10   work in the upper watershed, where his own maps show nothing

11   but basement complex and slivers of alluvium.  What does

12   Colonel Bowen have to do any work up there for, if we are all

13   going to agree that ground waters in the basement complex are

14   out and the surface waters are in?

15   THE COURT:  It's a good question.

16   MR. VEEDER:  It is an excellent question.  All you have

17   to do is take a look at land titles and our maps showing the

18   land titles and you will find the exterior boundaries of the

19   ownership's extend through a variety of geological formations,

20   and I simply say that the simple and the best way to do these

21   things is to take our 207 Series, take the maps, do a careful

22   workmanlike job and tie our titles to our geology, as we have

23   been doing with these people that come in here, and go on

24   through the whole valley that way.

25   Let me add one more thing.  We are in the process at the

1   present moment of preparing maps on the same scale as 15A for

2   Domenigoni Valley, we are going all the way through that way,

3   so your Honor will have before him on the same scale geologic

4   maps.

5       I see no problem whatever if Mr. Sachse wants to draw a

6   red line through here "no ground water" and a pink line drawn

7   through there, and something else.  Fine.  All I say is that

8   when we get through I want to be able to identify a piece of

9   property and say that this man owns it.  I want the title

10  insurance company to say, and your Honor, and I talk about this

11  "no ground water here".

12      THE COURT:  We are not in disagreement, except that it is

13  Mr. Sachse's suggestion that we have an interlocutory judgment

14  on the stream surface-wise and as to what part of the area of

15  the ground water lies as part of the stream system.  Then in

16  drawing these individual judgements you wouldn't need, in many

17  cases, additional findings.

18      MR. VEEDER:  I don't believe there is any disagreement

19  between Mr. Sachse and me.  There is only one thing.  It may be

20  that Mr. Sachse doesn't have the details that I have to be

21  concerned about in this law suit.  I think that may be one of

22  the disparities.  When all is said and done, I think we can

23  hurry through and have some interlocutory judgments that we

24  might have to change, if we are not careful in the way we do

25  them.

13,730

1    THE COURT:  Mr. Lincoln is waiting to see when we will be

2  back again.

3    MR. VEEDER:  The middle of August is suitable to the

4  Colonel.

5    MR. GIRARD:  I would like to go straight on through.  I

6  don't see any sense in going over to the next month.  Unless

7  his Honor's calendar dictates.

8    MR. SACHSE:  I agree, your Honor.  I would like to keep

9  the show moving.

10    MR. LINCOLN:  I suggest that the matter of Mrs. Bates

11  and myself be placed off calendar, because it is very probable

12  that many other matters in the Superior Courts in Los Angeles

13  County will perhaps prevent a decision upon the question for a

14  considerable time, during which period your Honor probably

15  would very wisely contend that he would not pass upon the

16  question but would leave it to be decided by the Superior Court

17  where it is.  And if the matter went off calendar it could be

18  placed back, of course, by Mrs. Bates or myself at any suitable

19  time, without the necessity for us to reappear when one of the

20  other of us didn't appear.

21    THE COURT:  I am not objecting to that.  It is a silly

22  proposition anyhow.  I could have you and Mrs. Bates both in

23  here and I could try this estate problem in about thirty

24  minutes, and I doubt that either of you would object to what

25  we did.  But if you want it to go off calendar to be re-set

1   on notice either by Counsel or the Court, it is all right with

2   me.

3       MR. LINCOLN:  Very well, your Honor.

4       While I am on my feet, I just heard some remarks about a

5   consideration of the stipulated judgment.  In that regard, as

6   your Honor knows, I have opposed it, and I presented a slight

7   brief, which is quite imperfect, I confess.  Recently I have

8   discovered a clue which I trust may lead me to something quite

9   definite, so that your Honor may be able by virtue of the

10  decisions which I hope to be able to find, make a determination

11  of this question one way or the other, and may I then have

12  your Honor's permission to file an amendment to my brief at

13  such time as your Honor thinks is proper and that to be con-

14  sidered at the time your Honor makes a final disposition of

15  the question.

16      MR. GIRARD:  Your Honor, I object unless Mr. Lincoln gets

17  on it right now and does it.  If he has the points and auth-

18  orities, get them in within two weeks.  I don't care whether

19  he or Mrs. Bates does it.  But if we are going to get this

20  stipulated judgment out of the way, lets not wait until they

21  get through with their little argument about who represents

22  whom.  If they have a brief he can do it in two weeks and for-

23  get about it.

24      MR. STAHLMAN:  Why not have them both down and try the

25  Schloss case?

1   MR. GIRARD:   Frankly, I think they are wasting the State's

2   money with all these appearances.   It is none of the State's

3   business, but that is my view.

4   THE COURT:   The only time I see that we can set it right

5   now would be the 11th or 12th of August.

6   The Clerk will make this Minute Order.   The Schloss

7   matter is continued to the 11th of August at 9:30 A.M.   Mr.

8   Lincoln and Mrs. Bates are instructed to file any briefs they

9   want to file on the question of the stipulated judgment on or

10  before July 15th, to be served upon all the Counsel on the list

11  who have been receiving copies of briefs, and probably dispose

12  of this matter of the stipulated judgments on those dates, the

13  11th and 12th.

14  MR. SACHSE:   Do I understand that the 11th and 12th would

15  also be set for argument on the stipulated judgment?

16  THE COURT:   Yes.

17  MR. LINCOLN:   Thank you your Honor.

18  THE COURT:   Mr. Clerk, see that a copy of this Minute

19  Order goes to Mrs. Bates and also Mr. Lincoln, and the Motion

20  that Mrs. Bates had on for this morning will be continued to

21  that date also.

22  I will probably proceed to try this Schloss matter, with

23  both of you here.   I don't see how any harm could come if both

24  conflicting sets of Trustees were represented and given a

25  chance to be heard.

1    MR. LINCOLN:  My respectfull contention is that the lady

2  is representing persons who are not Trustees at all your Honor.

3    THE COURT:  And that is her contention as to you.  And

4  as a practical matter, any rights that the Schloss Estate has

5  to be relieved of the stipulated judgment is going to ride

6  along on the decision made between Vail and the Government,

7  whether you came in with a brief or didn't come in with a

8  brief.  I'll be glad to see your brief, Mr. Lincoln.

9    MR. LINCOLN:  Thank you.

10    THE COURT:  Mr. Veeder, before we take a recess, when

11  will you be through with evidence on this basin problem east

12  of the Murrieta and north of the Pauba?

13    MR. VEEDER:  You are speaking of these Exhibits?

14    THE COURT:  I am talking about, when is the Government

15  going to be through on this?

16    MR. VEEDER:  You mean Domenigoni Valley and all of that?

17    THE COURT:  No, leave it out.  That is a separate problem.

18  I am talking about this "Kunkel line" that you want drawn.

19  When are you going to be through?  When is this going to be

20  ripe for decision so that I can figuratively, as Mr. Sachse

21  says, take a red pencil and say "here is where I think the

22  basin is,"?

23    MR. VEEDER:  I think when we put this material in that

24  is here, I know of nothing more.

25    THE COURT:  Will there be any rebuttal?

1    MR. GIRARD:   I doubt it very much.

2    MR. SACHSE:   I would like to rephrase the question,

3  because if Mr. Veeder means what I think he meant, I am the

4  happiest man in the world.

5    Do I understand that as to this particular Exhibit --

6  just the ground that is on it, this doesn't include Domenigoni

7  Valley or anything -- that when Mr. Kunkel is through with

8  this Exhibit you would be ready to rest the United States' case

9  on it and have Judge Carter delineate the basin?

10    MR. VEEDER:   I have no further geology.

11    MR. SACHSE:   Wonderfull.

12    THE COURT:   Then we are getting pretty well to the end

13  of this and we will get this out of the way in a big hurry.

14    MR. SACHSE:   Yes.

15    THE COURT:   Take a short recess.

16    (Recess)

17  BY MR. VEEDER:

18    Q    Mr. Kunkel, I hand to you Plaintiff United States'

19  Exhibits marked 160A, 160B and 160C for identification and I

20  ask you to state into the record what they disclose.

21    THE COURT:   What Exhibits?

22    MR. VEEDER:   They have been in the record for a long while.

23  They are data prepared by Mr. Green based upon well measurements.

24  I think they have been in the record for six or eight months,

25  your Honor.

1        THE COURT:   Are they in evidence?

2        MR. VEEDER:   No, just marked for identification.

3        THE COURT:   They are supposed to be hyetographs.

4        MR. VEEDER:   That is correct.

5   BY MR. VEEDER:

6        Q    Have you checked those hyetographs against records

7   maintained by the Vail Company and by the United States?

8        A    I have checked those hyetographs against records

9   maintained by the Vail Company.

10        Q    Are the hyetographs reflective of those records?

11        A    The hyetographs are reflective of those records.

12        Q    And they are accurate, to your own personal knowledge?

13        MR. STAHLMAN:   What is accurate?

14   BY MR. VEEDER:

15        Q    The hyetographs are accurate based upon the records,

16   are they?

17        A    To my knowledge, they are accurate with the possible

18   exception that if there are differences between 160A, B, and C

19   and Exhibit 15I, 15I is correct.   I am not certain that there

20   are any differences.

21        MR. STAHLMAN:   May I ask a question along this line?

22        MR. VEEDER:   Yes.

23        CROSS EXAMINATION

24   BY MR. STAHLMAN:

25        Q    The records you have talked about maintained by the

1   Vail Company, were those Mr. Green's records?

2       A       Those were Mr. Green's records.

3       Q       In other words, Mr. Green prepared the hyetographs

4   and you compared Mr. Green's records that were at Vail Company

5   with Mr. Green?

6       A       With the hyetographs.

7       Q       Did you compare them with the records which Mr. Green

8   used in constructing the hyetographs?

9       A       There may be a shade of difference in what Mr.

10  Stahlman is asking.  The exact records which Mr. Green per-

11  sonally used in constructing the hyetographs, I do not know

12  which records those are.

13      Q       It is true, is it not, that you determined the system

14  that Mr. Green used in his records when you checked these

15  various records?

16      A       That is correct.

17      Q       And you found out that the records that were fur-

18  nished to the Navy and Vail Company were taken from basic

19  records that he used and that he compiled records from that;

20  is that right?

21      A       I am not sure I am with you.

22      Q       You have been talking to Mr. Green about his system

23  of compiling his records; isn't that correct?

24      A       I do not know Mr. Green's system in the field for

25  compiling his records.

1 Q Or his field notes?

2 A No, these were not field notes.

3 Q These were not field notes that you saw at the Vail

4 Company?

5 A That is correct.

6 Q But the records that Mr. Green used in compiling

7 these documents here, the 160 Series, what record did he use

8 to compile that?

9 A I do not know.

10 MR. STAHLMAN:  It would seem to me that Mr. Green would

11 be the man here.

12 DIRECT EXAMINATION RESUMED

13 BY MR. VEEDER:

14 Q What records did you look at when you checked these

15 out, Mr. Kunkel?  That is what I want to get into the record.

16 A I compared them back against California's Exhibit G.

17 I compared them back against our tabulation.

18 MR. STAHLMAN:  There is no California's G.

19 MR. VEEDER:  It is LG.  If you will take a look at the

20 record, you will find that this compilation of water levels

21 maintained and compiled by California has been marked G.

22 THE COURT:  Is this the same as G?

23 THE WITNESS:  L Appendix G.

24 MR. VEEDER:  That is right.

25 MR. STAHLMAN:  There is no foundation laid for these, your

1   Honor.   In other words, if Mr. Green compiled some records and

2   they were then filed with the Vail Company and then he made a

3   map out of his original records, all this witness is doing is

4   saying that Mr. Green prepared some documents and I compared

5   these with the documents that he prepared and he prepared these

6   and therefore they are correct.

7        THE WITNESS:   That isn't what I said.

8        MR. STAHLMAN:   That is what it means, though.

9        MR. VEEDER:   Let him say what it means.

10        I had these marked for identification.   They are reflective

11   of the 151.   I thought they might be helpful to your Honor in

12   the record.

13        Q     Would you state the source of the data from which

14   those hyetographs were checked?

15        A     I had no idea which --

16        Q     What records did you use to check?

17        A     The ones I used?   I checked them back against

18   California's LC and against tabulations of Mr. Green which are

19   supplied to the Vail Company and to the Government both.

20        Q     Did you find that the hyetographs 160A, B and C were

21   accurate based upon the records that you reviewed?

22        A     Based on the records that I reviewed hyetographs160A,

23   B and C are accurate.

24        MR. STAHLMAN:   What is the purpose of this, Mr. Veeder?

25   If it is some simple purpose, its all right.

1    MR. VEEDER:  It is a very simple purpose.  It simply shows

2    a reflection of the changes in water levels based on Mr.

3    Green's measurements.

4    MR. STAHLMAN:  At Recess Time when you were showing these

5    to Mr. Kunkel you said you were going to put something on and

6    you were going to talk to him privately and didn't want me

7    there.  That may have been perfectly innocent.

8    THE COURT:  As I understand, the Government has prepared

9    some hyetographs that they are about ready to identify.

10    MR. VEEDER:  Yes your Honor.

11    THE COURT:  And it is Mr. Veeder's contention that these

12    hyetographs 160A, B and C are very similar to the ones that

13    Mr. Kunkel prepared.  As I understand, this man Green works

14    partly for the Government and partly for Vail.

15    MR. VEEDER:  That is correct.

16    THE COURT:  And the records that he compiles he makes

17    available to Vail and the Government.

18    MR. VEEDER:  Yes sir.

19    THE COURT:  What did you do, check the records he filed

20    with the Government or check only the set that he filed with

21    Vail?

22    THE WITNESS:  I checked the set that Colonel Bowen supplied

23    to me, which, to the best of my knowledge, are the same records

24    as supplied to the Vail's, I also checked them back against

25    California's LG, which also are the same records, and the record

P 1

1    all agree.

2        MR. STAHLMAN:  I don't think it is very important.  But

3    if this were something important, it would be appoor way to go

4    at it.

5        THE COURT:  Do you object if we let it in evidence now

6    and reserve your right to strike if you find something wrong?

7        MR. STAHLMAN:  No, your Honor, I want to get along with

8    the case.

9        THE COURT:  All right, Exhibits 160A, B and C are re-

10   ceived in evidence, reserving the right to move to strike if

11   somebody finds that they are not correct.

12        (Plaintiff's Exhibits 160A, 160B and 160C received in

13   evidence.)

14        MR. STAHLMAN:  Will you give us copies of these Mr. Veeder?

15        MR. VEEDER:  All right.

16        MR. SACHSE:  I don't want them.

17        MR. STAHLMAN:  My engineer said he would like to have them.

18        THE COURT:  Let me see them.

19        Go ahead, Mr. Veeder.

20   BY MR. VEEDER:

21        Q  Would you step to Exhibit marked for identification

22   15I and state into the record what is depicted on that identi-

23   fication?

24        A  Exhibit 15I is entitled "Hydrographs of Selected Wells

25   in Pauba Valley."

P 2

1      Q   Also read the title block at the bottom of the exhibit.

2      A   The title block at the bottom of the exhibit--there are

3  two of them--one is "Hydrographs of Monthly Runoff of Temecula

4  Creek at Vail Dam," and it is an exact copy of Government's

5  Exhibit 32.   Also, in an inset box entitled "Hydrographs of

6  Selected Wells and Runoff in Pauba Basin," this is an exact

7  reproduction of California's Exhibit AC.

8      Q   View the top hydrograph and state into the record what

9  is depicted there and the source of the data upon which you

10 relied in the preparation of it?

11     A   The top well indicated is 8 south 2 west 7A1, the

12 Schrode well.   The data are all in evidence in either California's

13 LG, the records of the Vail Company, and for 1958 to 1960 the

14 measurements are by the Geological Survey and have been entered

15 as Exhibits 15J.

16     Q   Proceed on down on each one of the wells and refer to

17 the hydrograph and comment on source.

18

19

20

21

22

23

24

25

1      A     The sources of data for all of the hydrographs are

2  the same as for the Scrode.

3      The wells in order of occurence on the hydrograph are:

4      8 South 2 West 16 G 1, the main Camp domestic well of

5  the Vail Company.

6      8 South 2 West 16 A 1, the dairy well of the Vail

7  Company.

8      8 South 2 West 15 C 1, the China Garden well of the

9  Vail Company.

10      8 South 2 West 17 M 1, the Navy well of the Vail Company.

11      8 South 2 West 17 G 1, the Studley well of the Vail

12  Company.

13      8 South 2 West 28 C 1, the Ludy well of the Vail Company.

14      8 South 2 West 29 G 1, the well on the Pachanga Indian

15  Reservation.

16      And the last well is 8 South 2 West 20 L 1, the Pit well

17  on the Vail Company.

18      THE COURT:  Are the figures on the left hand side the

19  depth that you water?

20      THE WITNESS:  The depth to water below or above reference

21  point for those wells that are flowing wells.

22      THE COURT:  I don't understand.  Take the Schrode well.

23  What are the figures here?

24      THE WITNESS:  Feet below reference point.

25      THE COURT:  What is the reference point?

1    THE WITNESS:  The reference point described in 15J in all

2  cases, and it is either the top of the casing or land surface

3  or some reference point that is very closely land surface.

4    MR. VEEDER:  It is shown in this Exhibit here 15J.

5    THE COURT:  So that the Schrode well between 1927 and

6  the present, the water level has dropped; is that the point?

7    THE WITNESS:  The overall trend has been down.  There

8  have been fluctuations.  The reason reference point is used

9  is that over the course of time from 1926 or 1923 when the

10  records start to the present time there have been in some

11  wells a number of measuring point changes, different people

12  have measured from different points, so we have related them

13  all together.

14    THE COURT:  What is the significance of the plus mark in

15  the China Garden well?

16    THE WITNESS:  Those are wells that stand above land

17  surface.  The casing is extended or a measurement is made

18  with a monimeter to measure the actual head of water above the

19  reference point.

20    THE COURT:  So that the China Garden well then, between

21  say 1926 and 1959, remained about the same?

22    THE WITNESS:  There has been a decline of five feet.

23    THE COURT:  The Navy well, again, is a plus figure.  It

24  shows between 1951 and 1954 that where it was 20 feet above

25  land surface it has gone down to about 8 feet above land

1    surface.

2         THE WITNESS:  That is correct.

3         THE COURT:  Is that the significance?

4         THE WITNESS:  That is the significance.

5         THE COURT:  Where is the Ludy well located?

6         THE WITNESS:  The Ludy well is in Wolf Valley, well 28C1.

7    I might state, these hydographs are up-to-date through May 25th.

8         MR. VEEDER:  I might also state that we are pulling the

9    Recorder's at the present time.  We are leaving on the 23K1

10   by agreement with Mr. Rorapaugh until he wants the well.

11        THE WITNESS:  This is 15 I-1, this is 15 I-2.

12        THE COURT:  What is this 15 I?  Do you offer it in

13   evidence?

14        MR. VEEDER:  I will offer 15 I in evidence, your Honor.

15        THE COURT:  Received in evidence.

16        (Plaintiff's Exhibit 15 I received in evidence)

17   BY MR. VEEDER:

18        Q     Alluding to the easel upon which is placed Exhibit

19   marked for identification 15 I-1, will you state what is

20   depict on that identification, Mr. Kunkel?

21        A     15 I-1 depicts the hydrographs for 7 wells for the

22   period 1958 through --

23        Q     Just a moment.  You said for 7 wells?  Are you

24   speaking of 15 I-1?

25        A     I am sorry.  15 I-1 depicts hydrographs for three

1    wells for the period October, 1958 through May 16, 1959, based

2    on spot measurements on hydrographic charts.  The hydrographic

3    charts have been marked for identification as Government's

4    Exhibits 15 K1 through 15 K-7, copies of which have been

5    supplied to all Counsel every month shortly after they were

6    removed from the Recorder's.

7         The spot measurements are shown as small circles.  The

8    hydrograph, for mechanical reasons which differ from well to

9    well, were at different scales.  Also, the hydrograph shows a

10   continuous record and it is very difficult to fit the hydro-

11   graph together and compare one to the other.  So where we have

12   hydrographic records for every day for which there was a

13   hydrographic record, we calculated the daily high and daily

14   low as indicated by the records and plotted that daily high

15   and daily low on Exhibit 15 I-1.

16        Q    Referring to the hydrograph for 23 K-1, will you

17   explain for the record the rather spectacular rise and fall --

18        THE COURT:  I still don't understand about this.  Lets

19   take 15 I-1.  This top part seems to be the hydrograph.

20        THE WITNESS:  That is correct.

21        THE COURT:  That is reproduced from the hydrograph from

22   this first well, is it?

23        THE WITNESS:  That is correct.

24        THE COURT:  The one below on a hydrograph on which you

25   put in dots where readings were taken and then you drew lines

1  in --

2      THE WITNESS:  That is correct.

3      THE COURT:  -- That would be two different wells?

4      THE WITNESS:  They are two different wells.

5      THE COURT:  Looking at the third well, it seems as if

6  you had a couple of spot checks here in the water year 1959,

7  and that continued over to about February, 1960 and then the

8  hydrograph was put on the well; is that right?

9      THE WITNESS: That is correct.

10     THE COURT:  What are these spots?

11     THE WITNESS:  For some mechanical reason the hydrograph

12 failed to operate and those are places where someone went out

13 and actually made tape measurements.

14     MR. VEEDER:  Who do you mean by"someone"?

15     THE WITNESS:  Someone working under my direct supervision

16 or myself.

17     THE COURT:  I think I understand.

18 BY MR. VEEDER:

19     Q    Would you explain, based upon your investigation,

20 the spectacular nature of the hydrograph shown for 23 K-1?

21     A    In both Exhibits 15 I-1 and 15 I-2 all of the

22 hydrographs are shown at the same scale, approximately 2 feet

23 per inch.  A measurement was first made in well 23 K-1 in

24 October, 1958 and the water level was slightly below 92 feet.

25 Subsequent measurement made in February, 1959 indicated a

1   water level of 71 feet.  A third measurement made in September,

2   1959 indicated a water level of 106 feet.  Subsequent to that

3   time there were measurements one or more per month and with

4   minor fluctuation, the over-all trend was one of recovery to

5   approximately the 18th or 19th of February, at which time the

6   well achieved its maximum recovery, which was about 72 feet.

7   Since the middle of February to about March 13th water levels

8   fluctuated within a relatively narrow range of less than two

9   feet, at which time water levels began a rather precipitious

10  drop.  However, there were periods of minor recovery during

11  this time, but the over-all trend since the 13th or 14th of

12  March has been one of decline to a maximum decline of about

13  103 feet, to a depth of 103 feet in the early part of June.

14  June 16th there was a slight recovery of one or two feet.

15  This is the end of the record.

16      THE COURT:  Which well was this?

17      THE WITNESS:  Rorapaugh No. 8, Well 7 South 3 West 23 A1.

18      THE COURT:  Where were the first two wells?

19      THE WITNESS:  The Hutch well is right next to the stream

20  channel, approximately to the Vail property line in Section 35.

21  The well is 7 South 3 West 35 P 1.

22      MR. VEEDER:  Related to the point or rising water on

23  15 E.

24      THE WITNESS:  It is very close to the point of rising

25  water.

13 748

1    THE COURT:   The Schrode well?

2    THE WITNESS:   The Schrode well is 8 South 2 West 7 A 1.

3    THE COURT:   A wind-mill well?

4    THE WITNESS:   There was a wind-mill on it.   The wind-

5    mill was pulled on 7 South 3 West 23 K 1 and there are no

6    other wells in the immediate vicinity.

7    MR. VEEDER:   I will offer 15 I-1.

8    THE COURT:   15 I-1 is received in evidence.

9    (Exhibit 15 I-1 was received in evidence.) (Plaintiff)

10   MR. SACHSE:   Just a moment.   For the record, I would like

11   to make an objection to the materiality of all this.   Your

12   Honor has just pointed out the facts on the location of these

13   wells.   Now, whether the water level on the Vail Ranch has

14   gone up or down 50 feet either way is, in my judgement,

15   entirely immaterial, unless some kind of damage results to

16   the United States, I would like to reserve a motion to strike

17   on the basis that there is not any proof that any of this

18   fluctuation is in any way affects the United States.

19   THE COURT:   That is not the purpose of this.

20   MR. SACHSE:   I think it is the purpose, your Honor.

21   THE COURT:   Let me point out.   Here is the Hutch well

22   and the Schrode well.   Here is the Hutch well down here, and

23   here is the Schrode well here, and if I am not mistaken the

24   witness is going to testify to a comparison in those two charts

25   of the well in the older alluvium and the well down in the

13 749

1  younger alluvium.

2  MR. SACHSE:  No, this is showing the extend of the stream

3  system andthe continuity between the waters.

4  THE COURT:  That is what I think.  Is that the purpose?

5  MR. VEEDER:  Certainly, your Honor, right on the nose.

6  Why should I say anything?

7  THE COURT:  The objection is overruled.

8  BY MR. VEEDER:

9  Q  Would you refer to 15 I-2 and state the source of

10  the data utilized in the preparation of that identification?

11  A  Government's Exhibit 15 I-2 are hydrographs for

12  5 wells for the same period of time, and the records were

13  collected in the same manner and were compiled on the same

14  scale as 15 I-1.

15  THE COURT:  When do the big fluctuations shown on the

16  Pitt well -- was this the pumping that went on?

17  THE WITNESS:  The Pitt well, upon which the hydrograph

18  was placed was about 65 feet away from a large production

19  supply well on the Vail Ranch, and some of the small fluct-

20  uations are during the period when the neighboring well, the

21  Pitt well, was pumping.  The higher fluctuations are during

22  the period when the adjacent well was not pumping.  Inbetween

23  are a full series of very large fluctuations, on the order of

24  10 feet.  Those occurred whenever the pumping well adjacent

25  to the Pitt well was turned off or on, and there were a large

1   number of power failures that resulted in the large number of

2   turning the pumps on and off.

3   BY MR. VEEDER:

4      Q      Refer to the hydrograph for the period of December

5   through March and explain to the Court what, in your opinion,

6   that reflects.

7      A      Starting about the middle of December through

8   approximately the early part of March there is a period of

9   continuous recovery and a relatively high water level in the

10  well 8 South 2 West 20 E-2.

11     THE COURT:  All wells would show that, wouldn't they?

12  That is the time of year when you have the rainy season when

13  all wells show recovery?

14     MR. SACHSE:  That is cross examination that I want to ask.

15     THE WITNESS:  If one will observe the bottom two wells,

16  the quarry well 8 South 2 West 29 C-1 and 8 South 2 West 29 G-1,

17  both of which have continuous recorders during the same period,

18  you will notice that they did not follow the similiar pattern.

19     THE COURT:  Why, in your opinion?

20     THE WITNESS:  In my opinion, apparently -- it is my

21  opinion that there is a fault or concealed barrier of some

22  type through the main part of the Wolf Valley and the two

23  wells 8 South 2 West 29 C-1 and 29 G-1, it would be comparable

24  to the effect of a baffle in a tank and was not the direct

25  effect owing to pumping and recharge, that there was in the

1    other wells.

2         MR. VEEDER:  We offer 15 I-2, your Honor.

3         THE COURT:   15 I-2 received in evidence.

4         (15 I-2 received in evidence for the Plaintiff)

5         MR. VEEDER:  Then we have the Exhibits marked 15 K-1

6    through 15 K-7.  They are the the hydrographs.  I would like

7    to offer tthem at this time.  Copies of them have been dis-

8    tributed to Counsel.

9         THE COURT:   15 K-1 through 15 K-7 received in evidence.

10         (Plaintiff's Exhibits 15 K-1 through 15 K-7 were rec-

11    eived in evidence.)

12         THE WITNESS:  Mr. Veeder, may I explain something on the

13    hydrographs?

14         MR. VEEDER:  Go ahead.

15         THE WITNESS:  The hydrographs are grouped by well number

16    and referencing to the first well 7 South 3 West 23 K 1, one

17    will observe in the upper right hand corner the 10 with a

18    small circle around it and the following hydrographs are 11,

19    12, 13.  These are all hydrographs for Well 7 South 23 K 1.

20    All of the hydrographs have similar number designations, some

21    of which start with number 1, and all except the Ludy extend

22    through number 13.  Hydrograph No. 11 for all wells are for

23    exactly the same period of time.  There is no hydrograph 1 to

24    9 for the Rorapaugh Well because there was no recorder set at

25    that time.  This was put on for easy reference if there is to

1   be any comparison of the recorder charts.

2       THE COURT:  Does 10 signify the month then?

3       THE WITNESS:  It is the tenth chart and it corresponds

4   approximately with the middle of one month to the middle of

5   the preceding month.

6   BY MR. VEEDER:

7       Q    Mr. Kunkle, referring to 15 E, which has been

8   admitted in evidence, what in your opinion, is the direction

9   of the ground water at the present time or at least at the

10   time when you drew the ground water divide line south of that

11   line?

12       MR. SACHSE:  South of the line where the X is?

13       MR. VEEDER:  That is right.

14       Q    What is the direction of the ground water, in your

15   opinion?

16       A    South and southeast of the divide zone by a solid

17   line and a line of X's the ground water in general is moving

18   from northeast to southwest of the continuous Hydraulic gradient

19   and ground water rises and discharges out of the lower or

20   at the lower end of Pauba Valley down Temecula Gorge.

21       Q    What in your opinion is causing the ground water

22   to take that course in its progress toward the Gorge?  What

23   has resulted in that direction?

24       MR. STAHLMAN:  I would rather have the witness answer the

25   first question.  There are two of them.

1     THE COURT:  You have asked two questions.  Ask one question.

2     MR. VEEDER:  I surely don't follow your Honor.

3     THE COURT:  You have asked two different questions, and

4 Mr. Stahlman has objected.  He wants to know which question you

5 want answered.  Ask one question.  If you ask two questions

6 and the witness gives an answer, you can't tell from the record

7 which one he was answering.

8 BY MR. VEEDER:

9     Q    What has caused the direction of the ground water

10 as shown on 15 E?

11     A    The direction of the ground water movement as

12 shown on 15 E is the sum total of the effects of the recharge

13 and discharge conditions as they existed at the particular time

14 the contour map was drawn.

15     Q    Have you considered the relative depth to water in

16 the Pauba Valley in the preparation -- I am speaking of the

17 area of the younger alluvium now in Pauba Valley -- have you

18 considered the question of the depth to ground water in 1959

19 as it relates to the course of ground water shown on 15 E?

20     A    Yes.

21     Q    What is the effect of the lowering of the ground

22 water table in the Pauba Valley upon the course of the ground

23 water south of the divide line as shown on 15 E?

24     MR. GIRARD:  The witness hasn't testified that the ground

25 water is lower.

1      MR. VEEDER:  The Exhibit has already gone into the record.

2  May I have 15 I?  It is a California Exhibit.

3      MR. GIRARD:  Ask him if he knows it?

4      THE COURT:  I didn't get the particular question or the

5  objection, so start all over again.

6      MR. VEEDER:  I will start all over again.

7      THE COURT:  What Exhibit is this?

8      MR. VEEDER:  15 I.

9      Q     Referring to Exhibit 15 I, Mr. Kunkel, and to the

10  hydrograph of selected wells and run-off in Pauba Basin, which

11  is California's AC, would you state into the record which is

12  disclosed by the hydrograph in regard to the levels of the

13  ground water table since the closure of Vail Dam?

14      A     The ground water level in the Windmill well,

15  8 South 2 West 12 H 1, has been one of overall decline through

16  the period of records shown on 15 I and California's Exhibit AC,

17  and subsequent measurements by the Geological Survey have

18  indicated an additional decline of about 2 feet.

19      Q     And would you state into the record the extend of

20  the decline since the closure of the Vail Dam as shown on that

21  hydrograph?

22      A     As shown by the hydrograph of Well 8 South 2 West

23  12 H 1, as depict on California's AC and Government's Exhibit

24  15 I, the decline since the closure of Vail Dam has been on

25  the order of 35 to 37 feet.

13,755

Q     What has been the effect, in your opinion, of the lowering of the ground water table as depict by the hydrograph to which you just made reference to the movement of ground water north of Pauba Valley in the older alluvium?

A     Owing to the decline of water level in the Windmill Well, 12 H 1, and other wells in Pauba Valley in the same general area, has been to increase or cause a greater increment of ground water to move from the older alluvium toward the younger alluvium.

Q     What in your opinion has resulted in the decline in the head in the Navy Well as shown on the hydrographs on 15 I-1?

A     The Navy Well is not shown on 15 I.

MR. STAHLMAN:  Here is all you have on the Navy Well, as I understand it, with the question mark?

MR. VEEDER:  15 I.

MR. STAHLMAN:  This is the one you are referring to.

MR. VEEDER:  That is right.

Q     What brought about the decline in the head of the Navy Well as shown on 15 I?

A     It would be the sum total of all the ground water discharges and the sum total effect of the recharge condition, the drought, pumping, a combination of both.

Q     Now, in regard to the a rea north of the ground water divide as shown on 15 E, would you state which wells

1  contributed to what you have described as a reverse gradient

2  in the ground water movement?  Do you understand what I said?

3      A     Yes.   This is any well from which water has been

4  withdrawn, has contributed.

5      Q     Would you refer to the large pumping well specifically

6  in the Santa Gratudus area --

7      A     They have contributed to the decline.

8      Q     -- which resulted in the decline of the ground water

9  table north of the divide?

10     MR. STAHLMAN:  He has already said all of them.

11     THE WITNESS:  The principal wells -- well, the effect

12 would be directly proportional to the amount that the well is

13 pumped and inversely proportional to the distance it is away

14 from the pumping depression.  Consequently, the pumping

15 depression centered beneath Section 26 7 South 3 West, was,

16 in large part, perhaps the greatest part caused by the pump-

17 ing of wells 7 South 3 West 26 J 1, 25 M 2,26 R 1, 35 B 1,

18 35 C 1, the effect being the greatest of the largest production

19 and the closest well.

20 BY MR. VEEDER:

21     Q     Have you knowledge as to the well which is utilized

22 to irrigate the properties referred to as the "Piece By Jack's"?

23     A     Yes I have.

24     Q     Would you state which well that is?

25

Belt 14

P 3

1    Q  Would you state which well that is?

2    A  To my knowledge the "Piece by Jack's" is irrigated by

3  Well 7 south 3 west 35B-1.

4    Q  Can you locate the August Cantirini Well?

5    A  The August Cantirini well is 8 south 3 west 1P2.

6    Q  Where is that located in regard to the groundwater

7  divide line that is shown there?

8    A  It is located south of the divide line.

9    Q  Would you state whether in your opinion that has had

10  any effect on the groundwater condition that you have depicted

11  on 15E?

12    MR. STAHLMAN:  Which condition?

13    MR. VEEDER:  The depressions and the groundwater divide

14  that has been set up there and shown on that map.

15    THE WITNESS:  It has been a contributing factor, if one

16  will consider or observe that the position of the 1050 foot

17  water level contour in 1927 as compared with the position of

18  the 1050 foot water level contour in 1950.  The movement or

19  migration of that contour for that period has been in part

20  caused by pumping Well 8 south 3 west 1P2.  There are addi-

21  tional wells that contribute to the whole overall  decline;

22  Wells 7 south 3 west 24A1, 24A2, 7 south 3 west 23A1 and 23A2

23  and 23A3 when it is pumped (that well is not generally pumped),

24  Well 7 south 3 west 15Q2, and in all probability Well 7 south

25  3 west 16K1.

P 4

1  Q  What wells, in your opinion, contributed to the sharp

2  variations in water levels as shown on Exhibit 15I-1, referring

3  to 15E for that purpose?  Do you understand the question?

4  A  Yes.  Under natural conditions, it is my opinion that

5  the fluctuation of wells such as 23K1 would be nowhere near as

6  great if it were not due to pumping.  If there were no pumping

7  in the area the well undoubtedly fluctuate on a seasonal basis

8  to a small degree and overall trends would reflect overall

9  periods of drouth or extra wetness and there would be overall

10  recovery and overall decline over a period of years.  But the

11  seasonal fluctuation, while there would be one, would be no-

12  where near as great.  That part of this fluctuation depicted

13  by Government's Exhibit 15I-1 for Well 23K1 in very large part,

14  in my opinion, is caused by the combined effect of the surround-

15  ing pumping wells, namely, 7 south 3 west--

16  Q  What is the distance of that well to which you have just

17  made reference, 23K1?

18  A  Seven south 3 west 23J1 is approximately 5,100 feet

19  from Well 23K1.  The nearest pumping well to 23K1 is 7 south

20  3 west 23A2, and that is approximately 3,000 feet.

21  Q  What is the distance of the other wells to which you

22  made reference that have effect upon this 23K1?

23  A. Disregarding the relatively minor effect of small

24  production domestic wells, which also do contribute their share

25  to the decline, the other large pumping wells are 24A1, which is

P 5

1    approximately 6500 feet away; 24A2, which is about 7100 feet

2    away; the well that previously had not been mentioned, but

3    which in all probability contributes to the decline is 7 south

4    2 west 19C1, which is approximately 9200 feet away; 7 south 3

5    west 15Q2, approximately 6300 or 6400 feet away; and 7 south 3

6    west 16K1, which is about 11,000 feet away.

7         THE COURT:  The are all distances from--

8         THE WITNESS:  --23K1.

9         THE COURT:  What is the name of that?

10        MR. VEEDER:  Roripaugh's recorder well.

11        THE WITNESS:  Roripaugh No. 8.

12   BY MR. VEEDER:

13        Q  Based upon your investigation, which of these wells

14   created the pumping depression which is shown in Section 15,

15   the 1050 foot contour elevation?  Can you locate it?

16        A  Yes.  The well that caused the principal part of the

17   decline or the major part of the decline is Well 15Q2.  Other

18   pumping wells have contributed an increment, but actually--

19        Q  Which would be some of those other wells that contri-

20   buted to that pumping depression, in your opinion?

21        A  Again, it gets to be a matter of degree.

22        Q  That is all we want, is degrees, Mr. Kunkel.

23        A  Every well that took any water out of the--

24        Q  Out of what, Mr. Kunkel?

25        A  Out of the water-bearing deposits in that area

13,760

P 6

1    contributed its share.

2        Q  What, Mr. Kunkel, in your opinion, has been the cause

3    of the springs which are shown on 15E to have dried up?

4        A  The cause of the springs, in the first place, is the

5    Wildomar fault that extends the full length along the east side

6    of Wolf Valley and Murietta Valley.  The effect of that fault

7    has been that of a barrier in that it retarded the movement of

8    groundwater through the deposits, however, as a result of this

9    retarding there has been a build-up of the water levels on the

10   upstream side of the fault and a leakage of ground water at

11   land surface caused by the barrier effect of the fault.  The

12   lowering of head reflected by the declining water levels in

13   wells, plus the drouth, both have contributed to the drying up

14   of the springs.

15       Q  Now Mr. Kunkel, in regard to the Frick property to

16   which we have made reference when we were identifying 15E and

17   laying a foundation for it, would you refer to the pumping well

18   and state into the record the number of the well on the Frick

19   property which is in Section 28--would you give me the township

20   and range?

21       A  Six South 2 West Section 28, Well 28G2.

22       I am referring to Government's Exhibit 15H, page 2.  The

23   data on that well are tabulated on the line indicated by 6

24   South 2 West 28G1.  On July 14, 1959 there was a 5 horsepower

25   pump on that well used for irrigation.

P 7

1      Q  Based upon your observations of that area and based

2  upon your knowledge of the kind and type of geographical forma-

3  tion there, what was the basis upon which you arrived at your

4  conclusion that the waters being pumped that well to which you

5  have just made reference as part of the Santa Margarita river

6  system?

7      A  In my opinion, there is a continous continuity of water

8  from--

9      Q  Are you speaking of water or ground water?

10     A  --continous continuity of ground water from the Santa

11  Margarita or Murietta river to Well 6 South 2 West 28G2.

12     MR. STAHLMAN:  Would you point out that well again please.

13     MR. GIRARD:  I don't think it is on the map.

14     MR. VEEDER:  Is there any doubt about it?

15     MR. STAHLMAN:  It almost didn't get on.

16  BY MR. VEEDER:

17     Q  Mr. Kunkel, in regard to the other wells which are

18  shown on the residuum, for example, the well in Section 4 which

19  has a double circle on it, have you located it now?

20     A  Seven South 2 West 5 H1?

21     Q  Would you state, whether in your opinion, that water

22  that is pumped from that well is part of the Santa Margarita

23  river water system.

24     MR. SACHSE:  I object to this handling of specific wells,

25  for lack of foundation.  I think Mr. Kunkel is fully qualified

P 8

1  to express an opinion as to water underlying the residuum as

2  a whole, if he wants to do so.  But there is no foundation for

3  this specific well, and if we are going to go into this thing

4  by indirection and backward we ought to get it.  If he wants

5  to state his basic geologic contention, I don't care if he puts

6  it in.

7      MR. VEEDER:  I don't follow that objection at all, your

8  Honor.

9      THE COURT:  Overruled, although there is merit to it, to

10  save a lot of time instead of taking these up well by well.

11      MR. VEEDER:  I am simply trying to point our examples.

12      THE COURT:  Answer the question.

13      MR. VEEDER:  Go ahead and answer the question.

14      THE WITNESS:  In my opinion, water pumped from that well

15  is part of the Santa Margarita river system.

16      THE COURT:  Is that true of all those wells, in your

17  opinion, in the weathered basement complex?

18      MR. VEEDER:  That is the residuum to which your Honor is

19  referring.

20      THE WITNESS:  Any ground water pumped from those deposits

21  has a head and it is moving down the hydraulic gradient toward

22  the river system, and as indicated by the arrow the problems

23  encountered in contouring this area are quite complex because

24  the deposits are very thin and in many places virtually lacking

25  and in places above the water table even.  Therefore, it doesn't

P 9

1 follow that every place where there is residuum there is water.

2 But where there is water it is in hydraulic continuity and part

3 of a gradient.   If one will observe the hydraulic gradient

4 indicated by the water level measurements starting with Well 7

5 South 3 West 12P1, the water surface altitude is 1258.   Moving

6 up gradient the water level in 12H and J are on the order of

7 1280.   Again I point out most of these altitudes there is a

8 degree of inexactitude of one or two feet because most of the

9 altitudes are interpolated.   However, where the altitudes are

10 carried to a tenth they are surveyed altitudes and those are

11 more accurate control points.   But as a result of this minor

12 inexactitude in altitude determination, it still does not re-

13 verse the hydraulic gradient.   It is moving up to 7 South 2 West

14 6A2 the water surface altitude is 1316, moving up to 6A1 it is

15 1329, moving to 6 South 2 West 31R-1 and 2 surfact altitudes

16 are 1319 and 1308, moving up to 32L-1 6 South 2 West it is

17 1342, and almost any line of drainage that one will follow this

18 same circumstance exists.   In my opinion, this indicates a

19 movement of water down the gradient.

20    MR. SACHSE:   May I ask Mr. Veeder a question?   It may lead

21 up to some objection.

22    Is this designed to impeach the previous exhibits that

23 United States has introduced prepared by this witness showing

24 the capacity of the ground water basins and the boundaries of

25 the ground water basins?

1   MR. VEEDER:   I think you are making a complete misstatement

2   of fact, Mr. Sachse.   There has never been a line drawn for the

3   purpose of establishing a ground water basin.

4   MR. SACHSE:   There have been calculations made by this

5   witness of the capacity in what he calls "Ground water storage

6   units."   If those capacities are being now rebutted, I think

7   we are entitled to know it.

8   MR. VEEDER:   As I said before, you haven't comprehended

9   the geology.

10   Q   Would you state into the record what was meant when

11   you drew the Kunkel line and made calculations as to storage

12   capacity?

13   A   The line referred to as the "Kunkel Line" outlined on

14   Exhibit 15, the area within which it was my opinion that at

15   least 100 feet of saturated deposits occurred.   Outside of

16   that line there are saturated deposits that are part of the

17   stream system, but those deposits in all places do not have

18   100 feet of saturated section beneath them.   I certainly would

19   not say that there was 100 feet of saturated section at any

20   particular point in the residuum, without test drilling to

21   prove it, because in many places there may be no saturated

22   section.

23   THE COURT:   It is time to go.   But tell me, if you can,

24   in a sentence or two what the Government's contention is going

25   to be, so that I can think about it as I ponder this afternoon.

P. 11

1   Are you going to contend that this narrow surface of residuum

2   holds a supply of ground water that is part of the stream system?

3       MR. VEEDER:   That is, in our view, correct.   The residuum

4   as shown on 15E, it is our position, contains part of a con-

5   tinous ground water body which extends from the Temecula gorge

6   to the top of Exhibit 15E at least.   Now I am speaking of the

7   residuum.   I am not speaking of the basement complex.

8       THE COURT:   When did you decide to take this position?

9       MR. SACHSE:   Your Honor, this isn't residuum; this is

10  "BC(W)."   That is Mr. Kunkel's own word.   Residuum is what is

11  down at Fallbrook.   Maybe they are very nearly the same.   But

12  let's not hash these two words back and forth.   This is Mr.

13  Kunkel's symbol "BC(W)."

14      THE COURT:   Weathered basement complex.

15      MR. SACHSE:   Weathered basement complex.

16      MR. VEEDER:   That is right.

17      THE COURT:   Are you going to contend that the area where

18  there is weathered basement complex is part of the stream system?

19      MR. VEEDER:   We put in evidence to that effect, as we have

20  put in evidence now.

21      THE COURT:   Are you going to contend that the decree will

22  subject all those persons in that area to possible regulation

23  where underground water is part of the stream system?

24      MR. VEEDER:   Your Honor has asked me quite a multiple

25  question.   Are we going to ask for regulation is one thing.

P 12

1    MR. SACHSE:  I am interested in his contention.  He has

2    two witnesses who have testified contradictory.

3    MR. VEEDER:  Before we go any further, Mr. Sachse, do you

4    comprehend the Kunkel Line and what was meant by that?

5    MR. SACHSE:  I comprehend his answer.

6    THE COURT:  Is the Kunkel Line going to be moved as a

7    result of the testimony?

8    MR. VEEDER:  No, your Honor, there would be no reason for

9    moving the Kunkel Line, as I tried to explain.  It was simply

10   a segment of the water-bearing areas that was delineated, per-

11   haps unfortunately.

12   In regard to your Honor's question, I believe that the

13   water, for example, on the Frick place here is just as much

14   part of the water system as the water of any other place in

15   the older continental.  I think he is using water which ul-

16   timately would have reached the Temecula gorge.

17   MR. STAHLMAN:  I would like to have him answer the other

18   question that your Honor asked.

19   THE COURT:  When did you decide this?

20   MR. VEEDER:  When did I decide what?

21   THE COURT:  That there was ground water that was part of

22   the stream system up in this weathered basement complex? Because

23   we had certain people in here owning land there and I made find-

24   ings that they were vagrant percolating waters not part of the

25   stream system up in that area.

P 13 1    MR. VEEDER:   I don't recall that you did.

2    MR. SACHSE:   Yes, in fact, Mr. Veeder, I will tell you

3 one of your interlocutory judgements has some of my people on

4 it in that area that you have agreed by interlocutory judgement.

5    MR. STAHLMAN:   When?

6    MR. VEEDER:   I am going to state into the record that this

7 question of when is a little absurd for Mr. Stahlman.   Never at

8 any time did I say, and you can check the record forward and

9 backward, you never have seen a statement from me since this

10 case started that there would not be instances that we were

11 saying that none of the weathered basement complex should be

12 part of this lawsuit.   Never.

13    THE COURT:   What time do you want to come in Monday.

14    MR. VEEDER:   Nine-thirty.   Is it 9:30 your Honor?

15    THE COURT:   Yes.

16    MR. GIRARD:   Your Honor, have you the criminal calendar

17 on Monday?   The reason I ask is that we can come in on a 10:30

18 plane on Monday morning from Sacramento.   If you are going to

19 hold it at 9:30, we have to come in on Sunday night.

20    THE COURT:   I don't have the criminal calendar.   I have

21 just the odds and ends.   Make it 10:30.   I'll get rid of what

22 I can on this other matter first.

23    MR. VEEDER:   It looks like we will run to Tuesday with

24 Mr. Stahlman's material.   Is that correct?

25    MR. STAHLMAN:   Yes, the way that this is going.   I doubt

P 14  1   that we will finish on Tuesday.

2         THE COURT:  Yes, I will have to see.  I have two bank robbers

3   that have to be tried next week.

4         MR. STAHLMAN:  We can go on, though.  We are perfectly

5   willing and ready.

6         THE COURT:  That is all I can tell you.  They are in jail.

7   Maybe I might leave them in jail for a while.

8         (Adjournment until Monday, June 27, 1960 at 10:30 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25