# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

– – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – –

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Monday, June 27, 1960

Pages:     13,769 to 13,842

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - - - - - -

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
     vs.                       )       No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
            Defendants.        )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Monday, June 27, 1960

APPEARANCES:

FOR THE PLAINTIFF:              WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney General,
                                Department of Justice,
                                Washington, D. C.

                                LCDR DONALD W. REDD

FOR THE DEFENDANTS:

     For Defendant Fallbrook    FRANZ R. SACHSE, ESQ.,
     Public Utility District,et al.

1    APPEARANCES (continued)

2        FOR THE DEFENDANTS (continued)

3        For Defendant Vail                  GEORGE STAHLMAN, ESQ.,
         Company

4        For Defendant State of              STANLEY MOSK, ESQ.,
5        California                          Attorney General
                                             By FRED GIRARD, ESQ.,
6                                               Deputy Attorney
                                                General.
7                                              ERNEST SANCHEZ, ESQ.,

8        For Defendants in                   ARTHUR L. LITTLEWORTH, ESQ.
         Roripaugh Area

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, Monday, June 27, 1960; 10:45 A.M.


THE CLERK:  No. 1247-SD-C United States vs. Fallbrook.

MR. VEEDER: May we proceed, your Honor?

THE COURT: Yes.

MR. VEEDER:  Here are copies of the exhibits 15F and G, your Honor.

THE COURT:  Will you take the stand, Mr. Kunkel?

MR. STAHLMAN:  Your Honor, at some time during the day I would like to put Mr. Vail on.  He is here in connection with that motion Mr. Veeder made, and it will be short.

THE COURT:  What motion?

MR. STAHLMAN:  Mr. Vail testified that the meeting with some representatives of the Navy prior to the time the revocable permit was signed they were at the ranch, there was a conversation there in which the statement was made by one of the officials that the Navy desired to drill a well to obtain an emergency supply of water.  And Mr. Veeder has made a motion to strike that on the ground the proper foundation has not been laid.  And I indicated to your Honor the following day when the motion was made, after Mr. Vail testified that he had refreshed his memory as to who was present at that time by a photograph which was taken of these persons.

THE COURT:  All right.

MR. STAHLMAN:  That would then complete the foundation, I think.

1    THE COURT:  All right.  When do you want to do that?

2    MR. STAHLMAN:  I can do it right now, if you wish.

3    THE COURT:  Step forward, Mr. Vail.

4                      MAHLON VAIL,

5    previously duly sworn, on his oath was examined and testified

6    further as follows:

7                      DIRECT EXAMINATION (resumed)

8    BY MR. STAHLMAN:

9        Q  Mr. Vail --

10       THE CLERK: Mr. Vail has been sworn, your Honor, on

11   February 10th.

12   BY MR. STAHLMAN:

13       Q  Mr. Vail, in connection with the testimony which you

14   gave in your last appearance upon the witness stand, after you

15   left the courtroom did you recall that you had taken a photo-

16   graph of the persons representing the Navy who were present

17   at your ranch when the discussion was had relative to drilling

18   the Navy well?

19       A  Yes, I do.

20       Q  Directing your attention to a photograph here, do you

21   recognize that as a photograph taken at your ranch?

22       A  That is right.

23       Q  And directing your attention to the back of the

24   photograph, the date September 30, 1950, and the names of the

25   persons who appear on the photograph, is that in your

1    handwriting?

2        A  It is.

3        Q  And did you take this photograph?

4        A  Yes, I did.

5        Q  The dog there, that is your dog?

6        A  That is correct.

7        Q  Do you recognize the background as the ranch?

8        A  Yes, I do.

9        Q  Now, in referring to the photograph and the -- By the

10   way, these people were not people that were intimately known

11   to you at this time?

12        MR. VEEDER:  What is the name of the dog?

13   BY MR. STAHLMAN:

14        Q  What is the name of the dog?  You didn't put his name

15   on the picture?

16        A  No, I didn't.

17        Q  In reference to the names which -- You did not know

18   these people intimately at the time?

19        A  That is correct.

20        Q  And you did write their names, however, on the back of

21   the photograph at the time it was taken?

22        A  Yes, or shortly after that.

23        Q  And this was taken with a Polaroid camera, that is a

24   camera that develops a picture?

25        A  Yes, my camera.

1    Q   Now then, in reference to the names, will you state who

2    the persons were that were present at that time?

3    A   Well, there was Hall, and Col. Henderson, and Col.

4    Anderson, and Col. Dubber, and Mr. Agnew.

5    Q   Now, having seen this photograph, you recall that these

6    persons were the persons who were present on that occasion?

7    A   Yes.

8    Q   And that was the occasion when there was discussion in

9    relation to the Navy well, and the testimony which you had

10   heretofore given about the reasons given to you for drilling

11   the well. Is that correct?

12   A   Yes.

13   MR. VEEDER:   May I see the photograph?

14   MR. STAHLMAN:   Yes.   We have some extra copies we have had

15   made, if you wish one, Mr. Veeder.

16   Does your Honor desire a copy of this photograph?   We have

17   extras.

18   THE COURT:   What is the issue here?

19   MR. STAHLMAN:   Merely the foundational matter.   He was

20   unable to say at that time who was present, Mr. Veeder objected

21   and made a motion to strike.

22   MR. VEEDER:   Well, I view this matter now, your Honor, that

23   apparently there is nothing ambiguous about the document, the

24   exhibit 159.

25   THE COURT:   What is the issue, if any, that arose out of

1   this conversation between Mr. Vail and the Navy officers?

2        MR. STAHLMAN:  At that time he was unable to say who was

3   present.

4        THE COURT:  What was the issue involved in his testimony?

5        MR. STAHLMAN:  That there was a statement made to Mr.

6   Vail prior to the drilling of the well that the reason for

7   wanting to drill the well was to obtain an emergency supply of

8   water for the Navy.

9        THE COURT:  Well, so what?  What does that do to us?  How

10  does that have any impact on this case?

11       MR. STAHLMAN:  Well, your Honor, I think when we argue the

12  question of the drilling of the Pauba well it will have some

13  impact on it.  In other words, we contend and will show by the

14  documents which we have lodged here that the well was drilled

15  first as an exploratory well and for the purpose of providing

16  evidence in connection with the lawsuit, and that there was no

17  such statement made to Mr. Vail, that this well was drilled in

18  contemplation of a lawsuit.  And I think it becomes important

19  in that respect, in view of the issues that Mr. Veeder has

20  created by his having contended that there was an unjust

21  enrichment of the Vail Company by a drilling of the well.

22       THE COURT:  The lawsuit was pending when the well was

23  drilled?

24       MR. VEEDER:  No.  The lawsuit wasn't started until January

25  25, 1951.

1      MR. STAHLMAN:  Yes.  And here is the sequence of events:

2   The lawsuit had been filed, however Vail Company had not been

3   served until after the signing of the revocable permit to drill

4   the well.

5      It is our contention that the Vail Company was unaware of

6   the fact that they were contemplating drilling this well for

7   the purpose of the lawsuit.

8      THE COURT:  All right.

9      MR. VEEDER:  But, your Honor, I want to straighten one

10   thing out.  This picture, September 30, 1950, I don't -- And

11   I think that is the only thing that is at issue here.

12      MR. STAHLMAN:  It refreshes his memory is all.

13      MR. VEEDER:  And I object on the grounds --

14      THE COURT: Object to what?

15      MR. VEEDER:  I would, if I had the opportunity to, object

16   on the grounds --

17      THE COURT:  Object to what?  The picture hasn't been

18   offered, and there is no question pending.

19      MR. VEEDER:  I thought George had offered it.

20      MR. STAHLMAN: I hadn't offered it. It refreshes his

21   memory. If you want to put it in, you can.

22      MR. VEEDER:  Then I object to this -- This is silly.  Here

23   is a document the four corners of which are clear.

24      MR. STAHLMAN:  Your Honor, it was silly to make the motion

25   to strike, I think, because of the technical ground that the

13,777

1    foundation had not been laid.  And he objected to it on the
2    specific ground that there was no identification of the
3    parties who were there.  Here is a picture.  We argued this
4    matter at the time we continued the motion which Mr. Veeder has
5    on the record. I want to clear up the record in connection with
6    that motion.

7        THE COURT:  What is pending before me?

8        MR. VEEDER:  Well, the thing that is amazing to me now
9    is that this picture is not being offered.  We have a man on
10   the stand --

11       THE COURT:  What is this, a lawsuit or just a forensic
12   debate?

13       MR. VEEDER:  I don't know.  I started out as a lawsuit.

14       THE COURT: Either you object, or we go ahead.

15       MR. VEEDER:  I objected to this whole line of testimony
16   on the ground we have a document in the record, it is a contract;
17   he is trying to vary the words of the contract by some of the
18   preliminary events.

19       THE COURT: Overruled.  You had a motion to strike Mahlon
20   Vail's testimony?

21       MR. VEEDER:  In regard to some conversation.

22       THE COURT:  Denied.

23       Now, do you want the exhibit marked?  Mark it Vail's
24   exhibit next in order, it will be 18.

25       THE CLERK:  A-W, your Honor.

1      MR. STAHLMAN:  A-W.

2      Q  Now, Mr. Vail, during this meeting when this statement

3  was made which -- You have already testified this was the

4  meeting at which the statement was made regarding the purpose

5  for drilling the well, who made the statement at that time?

6      MR. VEEDER:  Now, I am going to object to this again.

7  Again this is an effort to vary the express language of a

8  contract. It is incompetent, irrelevant and immaterial.

9      THE COURT:  No, it isn't. It is the testimony as to what

10  was the reason for the contract.  The contract speaks for

11  itself. Motion denied.

12  BY MR. STAHLMAN:

13      Q  Give us your best recollection who made that statement.

14      A  Well, my best recollection is that it was -- I guess

15  it was Dubber.

16      MR. VEEDER:  You guess it was Dubber. I move to strike the

17  answer.

18      THE WITNESS:  Well, it was discussed with all of us.  And

19  I don't know who was the --

20      THE COURT: Motion denied.

21      THE WITNESS:  -- who was the principal talker, but --

22  BY MR. STAHLMAN:

23      Q  Who did most of the talking?

24      A  Well, I had Dubber as making most of -- doing most of

25  the talking.

13,779

1    THE COURT:  Well, this is the same Col. Dubber who has

2  been out here a time or two in connection with this case?  He

3  is apparently the senior officer present at this time.

4    MR. VEEDER:  I doubt if he was, your Honor. I think Gen.

5  Anderson, or Col. Anderson.

6    MR. STAHLMAN:  But the statement that was made at the time

7  all persons were present is competent, your Honor.

8    MR. VEEDER:  Are you through, George?

9    MR. STAHLMAN:  Yes.

10    THE COURT:  This was talked about by all of them present?

11    THE WITNESS:  Yes, it was a meeting regarding the well.

12    THE COURT:  A-W received in evidence.

CROSS EXAMINATION

13

14  BY MR. VEEDER:

15    Q  And this irrevocable permit signed by Mahlon Vail, you

16  are the Mahlon Vail that signed the permit that permitted the

17  digging of the Navy well on the Vail Company property. Is that

18  correct?

19    A  I think I did.

20    Q  Well, take a look at it.

21    A  Well, I don't see any signature there.

22    Q  Well, this is a copy, that is probably the reason.

23    MR. STAHLMAN:  We will stipulate he signed it.  He testified

24  previously he had signed it.

25    THE COURT:  Yes, that is right.  Anything further?

1    BY MR. VEEDER:

2        Q  And you have been using the Naval well for irrigation

3    purposes ever since it was drilled. Isn't that right?

4        A   That is right.

5        MR. VEEDER:  I have no further questions.

6        MR. STAHLMAN:  That is all.

7        THE COURT:  Anybody else?

8        MR. VEEDER:  Thank you, George.

9        THE COURT:  Step down, Mr. Vail.

10       MR. VEEDER:  Mr. Kunkel, will you take the stand?

11       MR. STAHLMAN:  I think for the record your Honor should

12   rule on Mr. Veeder's motion which he spent a lot of time in

13   making.

14       MR. VEEDER:  He has already ruled on it.  What do you

15   want, blood?

16       MR. STAHLMAN: I am sorry.

17       THE COURT: I think I ruled on all of them.

18       MR. VEEDER:  Yes, we have that.

19                        FRED KUNKEL,

20   previously duly sworn, on his oath was examined and testified

21   further as follows:

22                    DIRECT EXAMINATION ( resumed)

23   BY MR. VEEDER:

24       Q  Mr. Kunkel, referring to Exhibit 15E, would you step

25   down to the exhibit again and locate on that exhibit the August

1    Cantarini well as it relates to the 1927 water level contour?

2        A   The August Cantarini well is well 8 South, 2 West, 1P-2.

3        Q   Where is the water level contour as of 1927 in relation

4    to that?

5        A   It is to the southwest or down gradient from the August

6    Cantarini well.

7        Q   And what is the water level at that point?   What is the

8    measurement, elevation?

9        A   At that point the water level was determined by well

10   8 South, 3 West, 1Q-1, water level altitude was approximately

11   1069 feet.   The August Cantarini well 1P-2 was not in existence

12   at that time.

13       Q   Now, where is the water level contour of 1927 as it

14   relates to the Piece By Jack?   Can you locate the Piece By

15   Jack?

16       A   The Piece By Jack --

17       Q   As that reference is used by Vail in their field

18   location.

19       A   The Piece By Jack in general is in the northeast quarter

20   of Section 35. It is not the entire northeast quarter, it is

21   part of the northeast quarter -- I don't know the exact

22   boundaries.   But it lies in the northeast quarter for the most

23   part of Section 35, Township 7 South, 3 West.

24       Q   It intersects the Piece By Jack, is that correct, the

25   water level contour from 1927?

1          A   The 1050 water level contour for 1927 extends through

2     the Piece By Jack.

3          Q   Now, what in your opinion has been the effect of the

4     pumping of the August Cantarini well and the pumping for the

5     water supply by the Piece By Jack upon the water level contours

6     as shown for 1959?

7          MR. SACHSE:   From when, Mr. Veeder?   I mean are you

8     comparing contours of '59 with any specific date, or not?

9          MR. VEEDER:   Well, in 1927 and 1959.

10         THE WITNESS:   The water level contours indicated by

11    Government Exhibit 15F, the 1050 water level contour is for the

12    year 1927.   The water level contour -- The other water level

13    contours are for the autumn of 1959.

14         THE COURT:   Now, I thought you were referring to 15E. Is

15    this 15F on the board?

16         THE WITNESS:   15E.

17         THE COURT:   You said F.

18         THE WITNESS:   I am sorry, I meant E.

19    BY MR. VEEDER:

20         Q   Will you answer the question?   What in your opinion has

21    been the effect of  the pumping on the August Cantarini well

22    and the well utilized to irrigate the Piece By Jack upon the

23    water level contours that are shown on Exhibit 15E?

24         A   The pumping of the two wells named have contributed to

25    the decline of water levels in the area, and as indicated by the

1  migration of the water level contour, the 1050 water level

2  contour specifically, from the position it was in 1927 to the

3  position it was in the fall of 1959.

4      Q  Now, Mr. Kunkel, I hand to you the exhibit marked 227A,

5  which is the engineering report of Thomas H. Wilks, prepared

6  by Colonel --

7          THE COURT:  Is it in evidence?

8          MR. VEEDER:  Yes, Exhibit 227A.

9          THE COURT:  It is in evidence?

10         MR. VEEDER:  Yes.

11     Q  -- and ask you -- this is Thomas H. Wilks -- and ask

12  you to locate on Roripaugh B the properties of Thomas H. Wilks.

13     A  I am trying to locate Thomas Wilks --

14     Q  16.

15     A  Thomas H. Wilks on Roripaugh Exhibit B are identified

16  by Parcel No. 16.

17     Q  Now, are you personally acquainted with that area in

18  which the properties are located?

19     A  I am personally acquainted in that area.

20     Q  Now, can you locate the Wildomar Fault as it relates to

21  the properties of Thomas H. Wilks?  That is the No. 16A and B,

22  as appearing on Roripaugh B.

23     A  There is on Roripaugh B in Section 2, 7 South --

24     Q  Speaking of A and B now.

25     A  Oh.  Parcels 16A and 16B are northeast of the

1    Wildomar Fault, as shown on Government Exhibit 15E.

2        Q   I want you to take another look at 16A for the purpose

3    of locating the Wildomar Fault.  Can you make --

4        A   Well, the Wildomar Fault lies right along the south

5    part -- or, southwest part of 16A, and the fault is south of

6    16B.

7        Q   It runs right through it.

8        THE COURT:   That is what I was going to say.  The copy I

9    have shows the Wildomar Fault running --

10       THE WITNESS:   Well, as shown by B it does.  As shown by

11   16F, it borders right along the property -- The line as Rori-

12   paugh B in my opinion is too far to the northeast.

13   BY MR. VEEDER:

14       Q   Now, based upon your investigations -- Strike that.

15       Would you state the general course of the ground waters

16   underlying exhibits -- I beg your pardon -- tracts 16A and

17   B of Thomas H. Wilks?

18       A   In general the ground water movement beneath the Parcel

19   16A and 16B, as shown on Roripaugh B, is from northeast to

20   southwest.

21       Q   Now, what is your opinion as to whether the waters

22   underlying tracts 16A and B are part of the waters of the

23   Santa Margarita River?

24       A   My opinion, the ground waters beneath tracts 16A and

25   16B, as shown on Roripaugh B, are part of the waters of the

1    Santa Margarita River.

2        Q   Now, I have handed you a grease pencil, red.  Would you

3    mark -- draw a line with an arrow through and across the Wildo-

4    mar Fault?

5        THE COURT:  Did I make a finding on Wilks when he was here,

6    or reserve it?

7        MR. VEEDER:  I think you made it, your Honor.  I checked

8    the record on that.

9        THE COURT:  What was it?

10       MR. VEEDER:  You made the finding that the water was part

11   of the Santa Margarita River.

12       THE COURT:  I am talking about a tentative --

13       MR. VEEDER:  That is right.

14       THE WITNESS:  By a red grease pencil I will make a mark,

15   an arrow --

16   BY MR. VEEDER:

17       Q   Starting at the basement complex, if that is your

18   opinion.

19       A   I will make several marks; it will show the general

20   direction and ground water movement in the area.  The first

21   mark -- or, all of them will be either in Section 35, 36, 6

22   South, 4 West.  In general the direction of ground water

23   movement will be perpendicular to the water level contours as

24   shown on 15E.  The arrows also are shown in Section 1, Township

25   7 South, 4 West, as well as the other two sections to which I

13,786

1    have made reference.  Altogether I have made six arrows.

2         Q  Now, would you state whether in your opinion your

3    testimony made in regard to Thomas H. Wilks would be equally

4    applicable to the other properties of the Wilks which appear

5    on Roripaugh B-50?  Can you locate these now?

6         MR. LITTLEWORTH:  You are referring to T. H. Wilks?  He

7    has several more, and there are others.

8         MR. VEEDER:  I am referring to T. H. Wilks, 50 on Roripaugh

9    B.

10        Q  Would your opinion be the same in that regard?

11        A  Let me inspect it just a little more closely.

12        THE COURT:  Where is 50?

13        THE WITNESS:  Center in Section 1.

14   BY MR. VEEDER:

15        Q  Well, would your opinion be the same in regard to 50

16   as --

17        A  The opinion would be virtually the same in regard to 50

18   as in regard to the others.

19        Q  Now, will you locate, using the red pencil, the

20   irrigation well of Rail, which is located in Section 16, 3, 7?

21        A  7 South, 3 West is well 16K-I.  Do you wish me to

22   circle the well?

23        Q  Yes, if you would, with your pencil.

24        Now, I hand to you Exhibit 200, the engineering report

25   for M. J. Yoder, and ask you to locate the properties of Yoder

1  as they appear on Roripaugh B, and correlate those locations to

2  15E, the Yoders and the --

3      A  M. J. Yoder on Roripaugh Exhibit B is Parcel No. 17.  On

4  Government Exhibit E --

5      Q  15.

6      A  -- 15E wells 7 South, 3 West, 15Q-1, Q-2 and Q-3 are

7  on the property of M. J. Yoder, and also well 7 South, 3 West,

8  15N-1.

9      Q  Now, can you locate properties of Yoder in Sections

10  3 and 4, 9, 10 and 16 on 15E?  Are you oriented on those?

11      A  Township and range?

12      Q  Well, it would be on 7, 3.

13      A  Yes.  Township 7 South, Range 3 West, Sections -- parts

14  of Sections 3, 4, 9, 10, 11, 14, 15 and 22.

15      Q  Now, referring to your Exhibit 15E again would you draw

16  arrows with your red pencil showing the course of the ground

17  waters in these Sections?

18      THE COURT:  We will take a short recess while he is doing

19  that.

20      (Recess.)

21  BY MR. VEEDER:

22      Q  Mr. Kunkel, using your blue pencil, would you indicate

23  the course of the ground waters underlying the Gunther properties

24  and the other properties -- Would you state what your opinion

25  is as to the course of the ground waters underlying the Gunther

13,788

1   properties and the Wilks properties in a state of nature?

2       A   May I refer to Exhibit 15G?

3       Q   I would like to have you use the pencil on 15E, however.

4   THE COURT:   What is 15E?

5   MR. VEEDER:   15E, your Honor, is the autumn 1959 contours.

6   THE COURT:   '59?

7   MR. VEEDER:   That is right, autumn of 1959.

8   THE COURT:   All right.

9   MR. SACHSE:   The question was a state of nature?

10  MR. VEEDER:   Yes, what his opinion was as to the course of

11  the water.

12  MR. SACHSE:   I am going to object, your Honor, that that is

13  too indefinite.   We have here exhibits from '53, '58, contours

14  from '27, and I would like to pin this state of nature

15  business down a little more definitely, if possible.

16  MR. VEEDER:   All right. I will change it to 1953.

17  MR. SACHSE:   1953, all right.

18  THE COURT:   What is he talking about 1959?  15E is 1959?

19  MR. VEEDER:   Right.   And 15G is 1953.

20  THE COURT:   What are you going to '53 for?

21  MR. VEEDER:   Because I want to show the change in the

22  direction of ground water.

23  MR. STAHLMAN:   What is the question now?

24  BY MR. VEEDER:

25      Q   What is your opinion as to the course of the ground

1   water underlying the Wilks and the Gunther properties as of

2   1953?  Referring to 15G, which is in evidence.

3        A  Referring to 15G, the ground water movement in 1953 in

4   the vicinity of the Wilks properties was in general northeast-

5   southwest. I will draw a blue arrow approximately in that

6   position.

7        The direction of ground water movement in the vicinity of

8   the Wilks properties since 1953 has not changed appreciably.

9   There has been slight curvature, slight change in the direction,

10  perhaps; but overall, the overall direction of movement is still

11  the same.  However, the gradient is somewhat reduced.

12       And the Yoder property, Section 15, in general in 1953

13  ground water movement was in a north-south direction. I will

14  show that direction on 15E.

15       Q  Using a blue pencil.

16       A  The direction is still fairly much the same.  However,

17  as one approaches the southeast quarter of Section 15, the

18  present ground water movement is towards a pumping depression

19  that did not exist -- or, did not exist anywhere near the same

20  degree in 1953.

21       THE COURT:  What well is located in that pumping

22  depression?

23       THE WITNESS:  7 South, 3 West, 15Q-1.

24  BY MR. VEEDER:

25       Q  Who is the owner of that well?

13,790

1    A   Yoder.   It is C. E. Yoder.   So -- I correct that, it is

2    M. J. Yoder.

3    Q   Now, locate, if you can, Mr. Kunkel -- Do you want us

4    to interrupt, your Honor?

5    THE COURT:   No.   Go ahead.

6    BY MR. VEEDER:

7    Q   Will you locate on 15E the Borenstein property, Mr.

8    Borenstein having testified?

9    A   The Borenstein property is 7 South, 3 West, Section 5.

10   The wells on Mr. Borenstein's property are 5L-1 and 2 shown on

11   Exhibit 15E.

12   Q   Now, using your red pencil would you show the direction

13   of the ground waters in Sections 5 and 6, Township 7, Range 3?

14   Now, Mr. Kunkel, based upon your observations, would you

15   state whether you have an opinion as to whether there is a

16   continuous ground water body extending from the Wilks properties

17   down to and through the ground waters underlying the Borenstein

18   land?

19   A   In my opinion there is a continuous water body underlying

20   the Borenstein-Wilks property, and the intermediate lands in

21   between.

22   Q   And would that be your opinion in regard to the

23   Borenstein-Wilks and Gunther properties -- the Yoder properties?

24   I beg your pardon?

25   A   In my opinion there is a continuous water body from the

1   one?

2         A   There is an arrow shown flowing out, with an arrow

3   after it, yes.

4         MR. VEEDER:   Wait a minute.   That answer is not responsive.

5   BY MR. SACHSE:

6         Q   Does that arrow indicate ground water movement?

7         A   That arrow indicates ground water movement.

8         Q   Out of the watershed?

9         A   Out of the watershed.

10        Q   Now, I observe a heavy line with the printing on it

11  "probable barrier" in that area.   Do you know the line to which

12  I refer?

13        A   I do.

14        Q   What is that "probable barrier"?

15        A   It may be a fault, it may be some other discontinuity

16  in the bedrock, extreme fault.   It probably is a fault.

17        Q   Have you found surface evidence of a fault there?

18        A   I have found no surface expression of the barrier.

19        Q   Then your conclusion that a barrier exists there is

20  based on the fact that the water movement switches to another

21  direction in that area. Is that right?

22        A   There is quite a discontinuity of water levels there in

23  several wells that indicate that the hydraulic gradient in that

24  direction probably is towards Elsinore Valley.

25        Q   Now, if you will step down and take your red pencil I

1    Wilks to the Borenstein to the Yoder properties.

2         MR. VEEDER:  I have no further questions.

3         THE COURT:  Let's take up these criminal cases.

4         (Other matters.)

5         THE CLERK:  No. 1247-SD-C, United States vs. Fallbrook.

6         THE COURT:  Mr. Veeder finished his direct examination.

7                        CROSS EXAMINATION

8    BY MR. SACHSE:

9         Q  Mr. Kunkel, these red arrows you have drawn on indicate

10   the direction of ground water movement, according to your best

11   judgment?

12        A  For the fall or the autumn of 1959, yes.

13        Q  And I don't observe any conflicts, but if there should

14   be any discrepancy between those arrows and the arrows that you

15   placed on the map do you want us to adhere to the more carefully

16   drawn ones on the map?  I don't know that there are any errors.

17        A  Well, the ones on the map were drawn more precisely.

18   However, the lengths and the other red arrows are equally

19   correct.

20        Q  Now, I observe at the northerly end of the Temecula

21   Valley that it is your opinion that the ground waters flow out

22   of the valley into the San Jacinto watershed.  Is that right?

23        A  There is a bit of a problem there.

24        Q  Well, first before you explain it, I asked you your

25   opinion as shown by this exhibit.  Am I correct that you show

1    am going to ask you to show me direction of ground water

2    movement in that area.

3         Now, will you locate well 34H-1?

4         A  34H-1, yes, sir.

5         Q  Now, show the direction of ground water movement between

6    34H-1 and 34B-1 and B-2 with a red arrow.

7         Am I correct -- Excuse me.  Are you ready to do it?

8         A  In all probability the ground water movement is from

9    north to south.

10        Q  Draw it then, if that is your opinion.

11        THE COURT:  North to south?

12        THE WITNESS:  From north to south.

13   BY MR. SACHSE:

14        Q  Now, this is between H-1 and B-1 and B-2 I asked.

15        A  I want to question mark this one.

16        Q  I think you misunderstood me. I didn't say D-1, I said

17   B-1 and B-2.

18        A  Oh, I don't have a water level measurement on B-2.

19        Q  But you have one on B-1?

20        A  I do have.

21        Q  What is the direction of ground water movement?  Draw

22   another arrow to show it.

23        A  I will draw a question mark and an arrow towards --

24        Q  Towards San Jacinto?

25        A  Towards the north, probably.

1    Q  Now, actually your tabulation -- Excuse me, I am going

2   to look at your exhibit.  I think this is the one I am

3   referring to, Mr. Kunkel.

4        A  Yes, it is 15H.

5        Q  Your tabulation shows many more well depths than

6   actually appear on the map, doesn't it?

7        A  Water level?

8        Q  Yes.  You didn't write the water level on every well

9   shown on the map?

10       A  For the autumn of '59 where we had a measurement we

11  wrote it down. In the tabulation you will observe that they

12  cover a period of a great many months.

13       Q  But then you didn't measure them all in '59?

14       A  We didn't measure them all in the fall of 1959, no.  In

15  further explanation of that last question, Mr. Sachse, the

16  control that was used in the construction of 15E is Government

17  Exhibit 15E-1, you will observe that all of the measurements in

18  this period are within a short period of each other.

19       Q  Are all of those measurements shown on the map?

20       A  To the best of my knowledge, all of those measurements

21  are shown on 15E.

22       Q  Now, do you have any measurements, depth measurements,

23  for the group of wells 34E-1, 2 and 3?  I think you do, unless

24  I am mistaken.

25       A  Yes, I probably do.  6, 3, 34J-1 is the only -- I don't

1    have anything --

2         Q   You have nothing for this plot?

3         A   Wait a minute.   This would be 33.   No, I don't. I am

4    sorry.   Wait a minute, I may have given you the wrong answer.

5    I was looking at the wrong page.

6         I do have water level measurements for 33A-2 --

7         Q   34 I wanted.

8         A   34B-1, 34B-2, 34B-3, 34 --

9         Q   How about 34E-1?

10        A   34E-1, 2, 3.

11        Q   Let's pick E-1 and E-2, and please figure out the depth

12   to ground water there.   And I am going to ask you to draw

13   another arrow.

14        A   An altitude of water surface at well 34E-1 on January

15   25, 1960, was 1215 above sea level.

16        Q   All right.   Then what in your opinion is the direction

17   of ground water movement between 34E-1 and 27N-1? Draw me an

18   arrow.

19        A   34E-1 and 27N-1.   On the basis of two wells only one

20   cannot draw an arrow directly towards it.   But it appears that

21   27N-1 has a lower altitude, and in general there would be a

22   ground water movement from 34B-1 -- I am sorry, 34E-1 to 27N-1.

23        Q   Will you draw the arrow, please?

24        A   Could I elect some symbol to differentiate this symbol

25   that is based on more precise control?   Could I use a different

color?

Q   Well, I think this control is about as precise as the one you have drawn in in red.

THE COURT: Make a dash arrow to show --

MR. SACHSE:  But lines across it.

THE WITNESS: I will make a dashed arrow from --

BY MR. SACHSE:

Q   Now, still on the blackboard, will you step down a little lower?  I want to direct your attention to the line you have indicated across the middle of 15E with a series of small X's in the center.  Do you see the one to which I refer?

A   Yes.

Q   The legend says, "The approximate position of divide in autumn 1959 between ground waters tributary to Temecula Canyon and those no longer tributary to Temecula Canyon."  Do I understand by that that it is the intent of this exhibit to show that ground waters in areas lying south of the line are tributary to Temecula Canyon?

MR. VEEDER: Would you say that again?

(Record read.)

MR. VEEDER:  I don't follow that question.

MR. SACHSE:  I think it is clear.  I want it to be clear.

Q   This says it is a divide between ground waters tributary to Temecula Canyon and not tributary to Temecula Canyon.

1     A   South of the line the ground waters are tributary to

2  Temecula Canyon.

3     Q   Now, is that true of the ground water, for example,

4  flowing in the younger alluvium in Long Valley?

5     MR. VEEDER:   In the autumn of 1959?

6     MR. SACHSE:   In the autumn of 1959.

7     THE WITNESS:   If the younger alluvium is saturated, the

8  answer would be yes.   In all probability, if I recall the water

9  levels correctly, the younger alluvium is not saturated.

10  BY MR. SACHSE:

11     Q   Then please draw me an arrow -- Let me ask him this one

12  question:

13     I am going to ask you next, Mr. Kunkel, to indicate the

14  direction of ground water movement in the younger alluvium of

15  Long Valley, that is the stream channel of Long Valley, ground

16  waters in it, by a series of arrows.

17     THE COURT:   This is direction to the younger alluvium,

18  and not the older?

19     MR. SACHSE:   The younger, yes.

20     THE COURT:   The gentlemen from the Fallbrook case are

21  excused from court.

22     (Other matters.)

23     (Noon recess.)

24

25

SAN DIEGO, CALIFORNIA, Monday, June 27, 1960; 1:45 P. M.

(Other matters.)

THE CLERK:  No. 1247-SD-C, United States vs. Fallbrook.

MR. STAHLMAN:  Your Honor, on June 21st I lodged an exhibit, and thereafter noted there was an error in the designation of one of the columns, it was just reversed.  And I would like to substitute at this time the copy that is the same in every respect except that the two columns are reversed, that is "irrigable acres" and "irrigated acres".

THE COURT:  What exhibit is it?

MR. STAHLMAN:  Exhibit A-B.

THE COURT:  It may be substituted.  Have you written "substituted" on so we won't get it mixed up?

MR. STAHLMAN:  I haven't done a thing, your Honor.

THE COURT:  Let the clerk do it then.  Do you have a copy for me?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  Is it in evidence?

MR. STAHLMAN:  No, it is something we have not reached yet until Mr. Wilkerson takes the stand.

MR. SACHSE:  Shall I proceed, your Honor?

THE COURT:  Yes.

BY MR. SACHSE:

Q   Mr. Kunkel, before the noon recess I was asking you

13,799

1    about the direction of ground water movement in the area

2    underlying areas delineated as younger alluvium in Long Canyon.

3    Would you take your red crayon and in --

4        THE COURT: Mr. Sachse --

5        MR. VEEDER: Is that a question, Mr. Sachse?

6        THE COURT: You said in the materials underlying the younger

7    alluvium.

8        MR. SACHSE: I said in the area underlying the younger

9    alluvium.

10       THE COURT: You mean the area in the younger alluvium?

11       MR. SACHSE: I supposed the witness would distinguish.

12       Q   Can you indicate the direction of ground water movement

13   in -- Withdraw that, please.

14       What month is autumn 1959?

15       A   Virtually all of the measurements on which the water

16   level contour map 15E was based upon were made upon October

17   28th, 29th and 30th; a few measurements were made on November

18   3rd and 4th.

19       Q   Well, let's just take November 1st as a date.  Tell me --

20   Indicate by a red arrow your opinion as to the direction of

21   ground water movement in the younger alluvium in Long Canyon

22   in Section 27.

23       A   In the autumn of -- Or, November 1st, my opinion there

24   was no ground water in the younger alluvium.

25       Q   Now, then, what would you say was the wettest date in

1959 when the younger alluvium would have been most saturated?

MR. VEEDER:  Now, let's start all over again.  What was the wettest date?

MR. SACHSE:  Yes.

Q  At what date in 1959 would you expect to find the younger alluvium in that area most saturated, March?

A  Immediately following precipitation I would expect the most water to be contained in the younger alluvium, but in the--

It is not ground water in the sense that it occurs beneath the water table. It would be water percolating downward, recharging thewater body beneath it, and this is not ground water.

Q  Then let me ask it this way:  Let us take a period in the spring of this year immediately following precipitation, would you find movement of water beneath the surface in younger alluvium to the northwest?

MR. VEEDER:  Now, I object to that, it goes beyond the scope of the direct examination.

THE COURT:  Overruled.

THE WITNESS:  If there was precipitation and subsequent runoff in Long Valley area in both the younger and the older alluvium, the water as it went beneath the surface of the ground would be what is known as vadose water, as opposed to ground water, and the motion of that water would be downward to the water body.

Q  It would be down the hydraulic gradient, would it not?

A  There would be no hydraulic gradient, the water would have no head.  The water would be moving under the influence of gravity down to the water table.

Q  Let's not make this difficult.  Let's take an exact spot under the letter L, in Long Valley in Section 27, that if the younger alluvium under that letter L is saturated following a period of rain that there is no movement down the stream, that all the movement is vertical into the ground waters below?

A  That is the principle.

Q  There is no movement then down this younger alluvium at all under those conditions?

A  There would be no water table, the water table is considerably below and the movement of water is down.

Q  And it doesn't run down the creek?  I want to be sure of this.  It wouldn't run through the sands down the creek, down the center to Truss Creek?

A  Only for short distances, where the ground water would encounter a relative impervious zone, and then it might move along that surface until it came to someplace where it could go down.  But the overall trend would be one of down.  And we are not talking about ground water.

Q  We are talking about water in the younger alluvium, and that is not ground water.  Then the same answer --

THE COURT:  You say it is not ground water?

1    MR. SACHSE:  That is what he says. I love it.

2    THE COURT:  You are not talking about surface water?

3    THE WITNESS:  Ground water by definition is the water

4 that occurs in the saturated deposits beneath the water table.

5    THE COURT:  Then you are talking about ground water, if

6 you are talking about water in the younger alluvium?

7    THE WITNESS:  The water table in the vicinity of wells

8 7 South, 1 West, 30N-1, I am referring to Government Exhibit

9 15J and 15E-1, 7 South, 3 West -- or, sorry, 7 South, 1 West,

10 well 30N-1.  The depth to water was 17 and one half feet.

11 This water at that particular well in my opinion is probably

12 right about at the contact between the younger and the older

13 alluvium.

14    Water in well 7 South, 26N-1 -- 7 South, 2 West, 26N-1,

15 was 156 feet.

16    Water in well 27R-1 was 128 feet.

17    Water in 33E-1 was 87.09 feet.

18    The depth to water in all of these cases is considerably

19 greater than the thickness of the younger alluvium.  The

20 younger alluvium is relatively thin veneer, probably 10, 15,

21 20, maximum 30 feet of thickness.  Therefore, the younger

22 alluvium is not saturated.

23    When precipitation falls on the area water infiltrates

24 into the younger alluvium, but that water is moving down to

25 the water table under the influence of gravity, and this is

1    not ground water; this is technically known as vadose water.

2         MR. VEEDER:  There is confusion of terms here, your Honor.

3    I don't believe there is any real conflict, is there?  All Mr.

4    Kunkel has said, as I understand it --

5         MR. SACHSE:  Just a minute, Mr. Veeder. I want his

6    testimony.  And, if you don't mind, you can argue later. I

7    would prefer, your Honor --

8         THE COURT:  Go ahead.

9    BY MR. SACHSE:

10        Q  Now, would your testimony be the same then as to Long

11   Canyon?

12        A  Yes, it would.

13        Q  And would it be the same as to this little stringer

14   of younger alluvium that I find in Section 32 that runs north-

15   west across here?

16        A  Yes, it would.

17        Q  So to make quite clear that I understand you now, in

18   each of those cases you feel that whatever water might be

19   found beneath the surface, but within the area of younger

20   alluvium, is moving only downward into older alluvium beneath,

21   and not moving down the channel of the younger alluvium?

22        A  The principal component of motion would be downward.

23        Q  Then you do not feel that in Long Canyon -- for example,

24   in Section 27 you have an underground body of water with bed

25   and banks in the younger alluvium, that is moving down Long

Canyon?

A  No, I do not.

Q  You do not feel that Long Canyon, running from Sections 34, 33, 32, 6, and so on, you do not feel that any ground water found-- Withdraw that.

You do not feel that any water found beneath the surface is confined between bed and banks in that canyon?

THE COURT:  Do you mean confined beneath the surface?

MR. SACHSE:  Yes.

THE COURT:  And found in the younger alluvium?

MR. SACHSE:  Yes.

Q  You do not believe that?

A  No, I do not.

Q  Would that be true of ground water that we would find -- Pardon me -- of water beneath the surface that we find in younger alluvium, for instance on Tucalota Creeck up in weathered B-C?

A  In large part it would also be true in that area. As a matter of fact, I know from personal observation that some of the areas where we have a stringer of younger alluvium flowing -- or, lying on top of residuum, I have actually dug down through the younger alluvium and I have observed that the water is in the residuum, and the water is being transmitted in the residuum.  In many places the younger alluvium itself is dry except for a capillary fringe of moisture.

Q   You do not believe that Long Valley, running through 25, 26 and 27, and so on, into Center Creek is an underground stream?

MR. VEEDER:  Don't answer that question for a moment.  Are you speaking only of the younger alluvium?

MR. SACHSE:  Yes.

MR. VEEDER:  And only to the depth of the younger alluvium?

MR. SACHSE:  Yes.

MR. VEEDER:  You are not talking about bed and banks?

MR. SACHSE:  Yes.

MR. VEEDER:  Just a minute.  You are not asking about bed and banks of the ground water aquifer, the water-bearing strata in the older alluvium?

MR. SACHSE:  Your Honor, I am going to ask leave to rephrase the question and ask Mr. --

THE COURT:  Permission granted. I think it is clear what Mr. Sachse asked.

BY MR. SACHSE:

Q   Would you describe, Mr. Kunkel, the water beneath the surface in the younger alluvium, if any, in Long Valley as an underground stream?

A   No, I would not describe the water, if any, that occurs in Long Valley as an underground stream.

Q   Suppose we go clear down below the younger alluvium, would you describe the water found in the older alluvium

1  beneath the area of Long Valley as an underground stream?

2      MR. VEEDER:  Before you answer that, have Mr. Sachse tell

3  you what he means by an underground stream.

4      MR. SACHSE:  If the Court please, if Mr. Veeder wants to

5  make an objection, address it to the Court. I don't want Mr.

6  Veeder telling the witness what to say.

7      THE COURT:  If it is an objection, it is overruled.

8  Proceed.

9      THE WITNESS:  Ground water contained beneath the younger

10  alluvium of Long Valley and Long Canyon, the water that occurs

11  beneath the water table is part of an overall body of ground

12  water which is generally moving from a northeast to a southwest

13  direction.

14  BY MR. SACHSE:

15      Q  Then it is not in a stream as such?

16      A  It is not in a stream as such.

17      Q  Now, Mr. Kunkel, I observe that this divide, if we can

18  call it a divide, the approximate position of divide in autumn

19  of '59 is not reproduced on 156. Do you think such a divide

20  existed in 1953?

21      A  To the best of my knowledge, I do not believe it

22  existed.

23      Q  There was no divide at all in '53. Where did the water

24  go in '53, then?

25      Let's take an exact spot. Let's say the Long Valley. In

1  which direction did the ground water move in 1953?

2  A  It moved generally parallel to the contours -- strike

3  that -- perpendicular to the contours toward Murietta Valley,

4  where the water either went through or over the fault, and

5  then under the influence of the hydraulic gradient in Murietta

6  Valley the water moved generally southeasterly toward the

7  Temecula Narrows, where it either rose and discharged as ground

8  water, evapile transportation or -- discharged as surface

9  water evapile transportation, or as a very small quantity of

10  underflow through whatever thin stringer of alluvium exists in

11  the valley.

12  THE COURT:  Let me ask a question.

13  Q  As I understood, this barrier line that appeared on

14  15E was a barrier, as I recall your testimony, indicating that

15  the water to the southeast thereof flowed into Temecula Canyon?

16  A  I am sorry, your Honor, I don't understand which

17  barrier you are alluding to.

18  MR. SACHSE:  Divide, your Honor.

19  THE COURT:  Well, take it back.

20  Q  The divide on 15E, that the ground water southeasterly

21  of it flowed toward the Temecula Canyon?

22  A  That is correct.

23  Q  And as I understood your testimony, the ground water

24  northwesterly of that divide did not flow into Temecula Canyon?

25  A  In the autumn of 1959, that is correct.  It flowed or

13,808

moved toward the pumping depression centered beneath Section 26, or toward the pumping depression in Section 34, 7 South, 3 West.

Q   Did I get the inference from your statement that having flowed northwesterly or having flowed westerly that it never reached Temecula Canyon, that it was used up in the pumping depressions?

A   If the pumping depressions would be continued indefinitely this is a circumstance that would occur.   Actually with the cessation of pumping both areas, and as indiacted by the hydrographs, there is a recovery in the spring when the pumping ceases, at which time the divides' position would either be moved, or perhaps disappear entirely.

Q   So that referring to the small divide, small part of the divide which crosses the Temecula Valley and is offset a little bit from the longer line of the divide, as shown on 15E, in the pumping season, according to the arrows there, the actual flow is to the northwest in the Murietta Valley?

A   That is correct.

MR. VEEDER:  Within the pumping depth?

THE WITNESS:  There is a movement of ground water toward the lower point.

MR. VEEDER:  Isn't this open for discussion?

MR. SACHSE:  This is questions. I would like to cross examine. I am very grateful for his Honor's --

1          THE COURT: It will save time.  Go ahead.

2    BY MR. SACHSE:

3          Q  Now, Mr. Kunkel, a general question -- don't resume

4    your seat, please -- am I correct in stating generally that

5    ground water contours would migrate season to season toward

6    the ocean or downstream as the water level rises?

7          A  That is true.

8          Q  And away from the ocean or upstream as the water level

9    declines?

10         A  In general that is correct, sir.

11         Q  Now, I wish you would come here where you can compare

12   15G and 15E, and start on your 1100 foot contour at the point

13   where it intersects the contact between younger and older

14   alluvium at Pauba Valley.  Compare the two, please, and then

15   make a little mark.  Maybe you would rather have a green pencil.

16   Have we got another color that we can use?  Make a little mark

17   to show the relative position of the contour in '53 to where it

18   was in '59.   No, I mean the other way.  I want to make the

19   mark on '59.

20         MR. VEEDER:  You want 15E.. Is that it?

21   BY MR. SACHSE:

22         Q  Now, at that particular point then your contour shows

23   a higher water table in '59 than in '53. Is that right?

24         A  At that particular point, that is correct.

25         Q  Now, just let's trace this out and show -- Make me the

1    same comparison at any points you find convenient.  For

2    instance, here it intersects a A-G, it should be easy to make

3    some comparisons along that line.

4         Now, again you have shown a higher water table in '59 than

5    you found in '53.  Correct?

6         A  Correct.

7         Q  All right, go ahead.   Now, again the point you have

8    indicated shows a higher water level in '59 than '53. Is

9    that correct?

10        A  Correct.

11        MR. VEEDER:  Could you give me the number of that?

12        MR. SACHSE:  I am going to identify them all for the

13   record.

14        THE COURT:  It is 1100 contour he is talking about.

15        MR. SACHSE:  That is enough.

16        Now, for the record may I state that the witness has

17   drawn green lines easterly of the 1100 foot contour at various

18   points on the map 15E, and each of those green lines indicates

19   the approximate location of that contour in 1953.

20        Q  Is that right?

21        A  That is right.

22        Q  So in each of these cases you have drawn you find a

23   higher water table in 1959 than you did in 1953.  Right?

24        A  Along the 1100 foot contour, that is perfectly correct.

25        Q  Do you think that water extractions -- ground water

extractions from the area that you have shown as a pumping

depression around the Roripaugh well -- Do you see the point to

which I refer?

A  Yes.

Q  Do you feel that ground water extractions from that

pumping depression affect the water table higher up in the

area of older alluvium?

A  Yes, I do.

Q  Then will you please tell me why we find a higher water

table in 1958 -- in '59, when we find a pumping depression

here, than we found in 1953 when there was no pumping

depression?

A  I am referring to Government Exhibit 15J, water level

for 7 South, 2 West, 27J-1, from October 28, 1958, to December

1, 1959, there is an indicated rise of 20 feet at well 27R-1.

At well 7 South, 2 West, 33E-1, from the period October 28,

1958, to November 4, 1959, there has been a rise of water level

of 6.59 feet.

Q  Just a minute, please.

MR. VEEDER:  Let him answer the question.

MR. SACHSE:  I don't hink the witness is answering the

question.  I asked him for the explanation why.

THE WITNESS:  I will give you the explanation.  For well

7 South, 2 West, 34N-1, for the period October 28, 1958, to

November 4, 1959, there has been a rise of 11.6 feet.  My

1   opinion this rise is reflective --

2      MR. VEEDER:  These rises, isn't that what you mean?

3      THE WITNESS:  These rises, or the overall rise of the

4   water table in this area, is reflective of a slug of recharge

5   that came down Long Canyon and caused infiltration downward

6   to ground water, causing a rise in the water table in that

7   area.  This has caused a movement of the ground water contours

8   beneath Long Canyon, in Long Valley, to move towards the ocean,

9   Mr. Sachse's terminology.  Continued pumping in the vicinity

10  of well -- the Windmill Well, 12H-1, has caused a two foot

11  decline in water level, 1150 contour has moved upgradient or

12  away from the ocean.    The effect of pumping in Section 26

13  and surrounding area by Roripaugh and others has in this case

14  with regard to the 1100 contour had less effect than the effect

15  of the 1958 recharge wave which was moving down the hydraulic

16  gradient.

17  BY MR. SACHSE:

18      Q  Now, you used just now for the first time the word

19  "1958 recharge wave".  Are you referring to the fact that you

20  feel that this recharge was caused by particularly heavy runoff

21  in 1958?

22      A  In 1958?

23      Q  How long would it take that recharge wave to move from

24  what you have shown as the 1100 foot contour to the pumping

25  depression?

A   Well, perhaps another three to six months.

Q   Do you feel that the permeability of the material east of your 1100 foot contour is generally speaking about the same as the permeability of the material west of the 1100 foot contour?

A   I really don't know. I don't believe that there would be appreciable differences.

Q   So you think that in this period of time between the end of the '58 rainy season, the water moved just far enough to reflect in the 1100 foot contour, but not the additional half that distance necessary to be reflected in the pumping depression?

A   Yes.  And I can give you the basis for my opinion. If one will refer to Government Exhibit 15I, which -- May I have it?

MR. VEEDER:  Isn't 15I on the easel?

MR. STAHLMAN: Not on the easel.

MR. VEEDER:  That is 15I-1.

THE WITNESS:  Referring to Government 15I, the lower part, which is a reproduction of Government Exhibit 2, Hydrograph of Monthly Runoff of Temecula Creek at Vail Dam, I refer to the year 1952 which is a relatively wet year, in which there was a peak flow of more than 5,000 acre feet.  Referring to the Schrode well, we only have two measurements, and they are in the year 1953, but they do indicate a considerable rise of

1   water level about one year after the recharge of 1952.

2   BY MR. SACHSE:

3        Q   Then, Mr. Kunkel, I realize --

4        A   A large part, it is my opinion that this rise is

5   caused or was caused by the slug of recharge from Long Canyon

6   in 1952.

7        Q   Now, then, could we state this in reverse, that in your

8   opinion then the pumping depressions that may exist are caused

9   perhaps not so much by the pumping as by the failure of a slug

10   of recharge?

11       A   The two go hand in hand.

12       Q   Now, let me direct your attention to the pumping hole

13   you show at the upper end of Tucalota Creek right at the edge

14   of the older alluvium.

15       A   Yes, for the pumping hole beneath the Seas property and

16   adjacent to the Shamel property.

17       Q   In your judgment why didn't that pumping hole in November

18   of '59 respond to a slug of recharge from Tucalota Creek, or

19   wasn't there any rain in Tucalota Creek?

20       A   I don't recall the exact conditions there. I don't have

21   any hydrographs or stream flow data.  However, assuming there

22   was a slug of recharge, the effect of pumping was more than

23   sufficient to offset it.  Assuming there was no recharge, it is

24   entirely due to the pumping.

25       Q   Have you made any calculations as to the speed with

1   which water moves through the material, older alluvium?

2       A   Not in this area.   The rate is very slow.

3       Q   When you say very slow what do you mean?

4       A   It is not rate of water movement that we are discussing,

5   but actually rate of head change; head is the important thing.

6   By saying that the water level contour, the 1100 foot contour,

7   has moved downstream, that does not mean that the actual water

8   that infiltrated to the water body has actually moved down that

9   far, but the effect of the head change has moved down that far.

10      Q   Well, would you say then that if a hundred acre feet

11  of water were withdrawn from the Seas well and let us say

12  completely exported from the watershed so we wouldn't worry

13  about return, how long would that take for that change in head

14  to be reflected at let's say the Wildomar Fault?

15      A   In my opinion, probably less than a year.

16      Q   All right.   How long would it take for that change in

17  head to be reflected at Camp Pendleton at the Ysidora Gauging

18  Station?

19      A   The change in head caused by that pumping -- I am talking

20  only of the head now in the water body, disregarding the effect

21  that this change in head will have on other elements of stream

22  flow, it might take a thousand years.

23      Q   How long would it take for Pendleton to realize a

24  decline in water levels as a result of such an extraction?

25      A   It may recognize a decline in the water levels in one

1   or two seasons, owing to the fact that the reduction of head

2   in this area or other areas will cause a diminution in stream

3   flow, resulting in an increased amount of recharge through the

4   ground water body when stream flow does occur in the stream.

5   In those years when stream flow is very low, if there had been

6   a considerable reduction in head all of the ground water

7   may well -- all of the surface water flow may well go to

8   ground water; where if there had been no reduction in head it

9   may have gone down Temecula Canyon to recharge the basins

10   downstream.

11       Q  You used the phrase "one or two seasons", in answering

12   the question.  So implicit in your answer is the idea that if

13   there should be a couple of wet seasons you might never notice

14   it. Is that right?

15       A  If there were a couple of wet seasons you might never

16   been able to measure it.

17       Q  If there were exceptionally dry seasons you might see

18   it earlier?

19       A  You might see it earlier, and rather -- Well, it might

20   consume all of what would be the low water flow, or the flow

21   in a relatively dry winter.

22       Q  So again, the quantity of water available to any

23   downstream user, downstream I will say below the narrows, is

24   affected not only by the pumping burden on the basins above,

25   but by the recharge. Is that correct?

1    A   That is right.

2    Q   Would you make any attempt to tell us in your opinion

3  the percentage figure how much is due to pumping and how much

4  is due to recharge?

5    MR. VEEDER:  I object.

6    MR. SACHSE: I am asking if he can.

7    THE COURT: If that is an objection, it is overruled.

8    THE WITNESS:  I have made no such studies, and I have no

9  opinion.

10  BY MR. SACHSE:

11    Q   Now, I want to change my subject just a little, Mr.

12  Kunkel. Let's go down here to the very southeasterly edge of

13  the map in the Pechanga Indian Reservation, the 1275 foot

14  contour.  Will you tell me what reference points you had in

15  locating that contour in the older alluvium?

16    A   There was none in the older alluvium.

17    Q   Now then, will you take a blue pencil and make a little

18  dotted -- put some dots along there, along the contour, so I

19  can distinguish this one where you had no reference points?

20    A   There is a reference point, 26K-1.

21    Q   But in the older alluvium there are no reference points.

22  Right?

23    A   No reference points based on wells starting in the

24  older alluvium. I would have to check the water level in this

25  well to make certain where the water is.

1      Referring to Government Exhibit 15E-1, well 8 South, 2 West,

2   26K-1, the water level in that well was 57 feet on November 5,

3   1959.  In my opinion it is very unlikely that the younger

4   alluvium is 57 feet thick.  Therefore, my opinion, that this

5   control point represents water level and the head of water in

6   the older alluvial deposits.

7      Q  I appreciate that is your opinion now. But I am trying

8   to find out your opinion which are tied to two reference points

9   and those that are not.

10      Am I correct in saying that this particular extension of

11   the 1275 foot contour is not tied to any reference point?

12      A  You are correct in that.

13      Q  Please mark it, because I am going to go through several

14   of them.

15      A  Is green pencil all right?

16      Q  Mark it right over the line, if you will.

17      A  What do you want me to do?

18      Q  Just draw some green lines along your contour.

19      A  Is that satisfactory?

20      Q  That is green.

21      A  Green dashes paralleling --

22      Q  Now, is the same thing true of the 1250 contour?

23      A  Yes, it is also true.

24      Q  Draw some green dashes along that, please.

25      Now, is the same thing true of the 1255?

1      A  1225.  Well, we do have this spring here that has an

2  altitude of discharge of about 1220 feet.

3      Q  Let's get that one then.

4      What reference points do you have on the westerly half

5  of the pumping depression under the Seas well?

6      A  There is no particular well which has an altitude of

7  more than 1050 between the Seas well and the Gunther wells.

8      Q  Well, then, would you draw some -- In this case please

9  take them around in a circle from Tucalota Creek.

10      A  The altitude of water surface in well 23A-3 was 1050;

11  and the altitude of water surface in 24A-1 was 1040.  So that

12  in itself is control to indicate that there is a pumping

13  depression at that point in the exact position of the 1050

14  foot contour is inferred.

15      Q  Well, put a -- All the way around that part, please, and

16  around the southwest, where you have no control.

17      THE COURT:  You have got down here 1056 feet.

18      MR. SACHSE:  That is the next question.

19      Q  Now, am I correct in saying that about a quarter of a

20  mile to the west you have a 1050 foot contour again?  Is that

21  right?

22      A  That is correct.

23      Q  So presumably somewhere between the 1050 foot contour

24  I have just referred to, and the 1050 foot contour on the Seas

25  pumping hole there ought to be a higher point, shouldn't there?

13,820

1        A   Or a point right at 1050.

2        Q   Well, in other words, the water runs both ways?

3        A   Yes. In one sense a divide separating water moving

4    toward the Shamel wells and the water moving toward --

5        Q   Now, take your red pencil with which you have drawn

6    directions of water movement, and draw for me a series of arrows

7    telling me which way you think the ground water in the younger

8    alluvium moves between let's say the well 24Q-1 and the Section

9    corner to the northwest.

10       MR. VEEDER:   At what time of the year?

11       MR. SACHSE:   At the time of the map.

12       MR. VEEDER:   I think you used the term "younger alluvium".

13       MR. SACHSE:   I am sorry.

14       Q   Will you please draw me a series of arrows showing the

15   direction of water movement in the area of older alluvium

16   between the 1050 contour west of the Shamel well and the next

17   1050 contour to the west?

18       MR. VEEDER:   Don't use that lovely red.

19       MR. SACHSE:   Yes, please use that lovely red.

20       MR. VEEDER:   All right.

21   BY MR. SACHSE:

22       Q   In other words, water runs in this half Section, the

23   north half of 24, you will find water running in almost

24   diametrically opposite directions at the same time of year.

25   Is that correct?

1      A   Not at the same place, but relatively close to each

2   other.

3      Q   Within that half Section, I said.

4      A   Within that half Section there is a divide.

5      Q   Would you call that vagrant water?

6      A   I certainly would not.  The water is definitely --

7   Define what vagrant water is.

8      Q   Mr. Kunkel, please follow me point by point here, if you

9   will.  And I will tell you what I am going to ask you first,

10  I am going to trace out for you a series of wells which,

11  according to your Exhibit 15E, all appear to have water levels

12  approximately 1050, as indicated by your exhibit, and then I

13  am going to ask you, Mr. Kunkel, why it is not equally logical

14  to trace this 1050 contour to include those wells.  Do you

15  understand what I am going to ask you?

16     A   I understand.

17     Q   Now, correct me if I am wrong on the well depths first.

18  30D-1 and 3 is at 1056.  Right?

19     A   Correct.

20     Q   I guess it is 30D-2 is at 1059. Is that correct?

21     A   Correct.

22     Q   24A-2 is 1060?

23     A   Correct.

24     Q   24A-1 is 1046?

25     A   Correct.

1    Q   23A-3 is 1050?

2    A   Correct.

3    Q   And 23A-1 and 2 are 1046?

4    A   Correct.

5    Q   Now, why is it not equally logical to go from point to

6    point and draw your 1050 contour in that way without a pumping

7    hole?

8    THE COURT:  Show me on the map where that contour would

9    run.

10   MR. SACHSE:  It would run something like that.

11   THE WITNESS:  Well, with the exception of the 1056 contour--

12   the 1056 control point at well 7 South, 3 West, 24Q-1, there

13   would not be much argument.  This gets down to the degree of

14   interpretation that enters in, and individual hydrologists

15   might interpret differently. However, the fact that this 1050

16   contour has been eliminated does not mean that the pumping

17   hole or pumping depression has ceased to exist, it merely

18   means that the two pumping depressions have enlarged to the

19   point that they have merged.  And your concept is perfectly

20   right, continued pumping in this area -- and in my opinion very

21   likely -- that this 1050 contour will ultimately swing back and

22   include the Yoder pumping depression, as well.

23   THE COURT:  Let me ask this::  Assuming you ran that

24   contour, what would you do with this well in 24A-1 where the

25   water level is 1040 feet? You have to ignore it, don't you, to

1    run that contour?

2        THE WITNESS: The contour would go between the 1040 and

3    the 1060, as it does.  The only well that Mr. Sachse would be

4    disregarding in the construction he proposes would be well

5    24Q-1.

6    BY MR. SACHSE:

7        Q  In other words, Mr. Kunkel, you don't draw a contour

8    from exact water level to exact water level, because you don't

9    find that condition?

10        A  That is right.  There are additional factors that --

11    We attempt to be as exact as the data will allow.  But certainly

12    many of the reference points from which we did our measuring

13    are interpreted from land surface contours, and there is an

14    exactitude of perhaps two, three or five feet, depending on

15    the quality of the topographic map from which you are working.

16    However, there are a large number of surveyed altitudes, and

17    where those are available those were indicated; and more

18    weight was given to those altitudes than to ones that were not

19    surveyed.  This again becomes a matter of degree and a matter of

20    judgment.

21        THE COURT: I think it is time for a recess.

22        (Recess.)

23    BY MR. SACHSE:

24        Q  Mr. Kunkel, I want to go just a step further with this

25    1050 contour, please.  I carried it over to about A-1, 2 and

1    3 of Section 23.  Now, as a matter of fact, I will invite your

2    attention to D-3 of 23, elevation 1052; N-2 of 14, elevation

3    1050; N-1 of 14, elevation 1049.  Now, would it perhaps not

4    be equally logical to carry that line over through those?

5         A  My opinion it wasn't, and I didn't construct it that

6    way.

7         Q  You curved it very markedly to the south, didn't you?

8         A  That is correct.

9         Q  But is it not a perfectly logical line to draw between

10   the two 1050's that are closer together than the curve you

11   drew?

12        A  I wouldn't say it was equally logical. If some other

13   hydrologist wishes to do this, I wouldn't differ with him. I

14   would say he was indicating the pumping hole was larger than I

15   thought it was.

16        Q  All we have here is my very hazy pencil scratch, and

17   while I am not asking you to accept what I drew I will ask you

18   to draw a line to make it look more proper.

19        A  I don't believe that is the way I would do it.

20        THE COURT:  What would you do with that well 15 there?  It

21   looks like it is 15Q-2, with 1033 feet.

22        THE WITNESS:  That is the lowest point in the pumping

23   depression, that is Yoder's principal irrigation well.  And as

24   long as the 1050 foot contour is to the north of it, or completely

25   surrounds the well, there is no problem with that depth,

1   because everything within the 1050 foot contour is less than

2   1050.

3   BY MR. SACHSE:

4       Q   Now, Mr. Kunkel, you don't give us a depth on your

5   exhibit, what is marked R-1.

6       A   R-1 is the well to the left.  The well to which you

7   are pointing is --

8       Q   You don't give us a depth for R-1 in 22.

9       A   I don't have an altitude of water surface there.

10   However, there is a rising ground water at the right of point

11   R-1. R-1 refers to the well to the left.  Well, there is no

12   number on the spring.  The circle to the right of R-1 is a

13   spring.

14       Q   And you don't have any elevation for that spring?

15       A   No, but it is land surface, approximately 1050 at that

16   point.

17       Q   Now, I asked you some general questions about the

18   movement of water in the fingers of younger alluvium southerly

19   of your divide line. I would like to ask you generally speaking

20   if your answers would be the same as to all of the fingers of

21   younger alluvium, or if there are any of them that are

22   different?

23       A   In my opinion there is probably some saturation in some

24   of the fingers of younger alluvium, but it would not alter my

25   conclusions.   Where the younger alluvium was truly saturated

1    this would be part of the overall ground water body.

2        Q   Can we go back for a moment to this probable barrier?

3    You testified that you thought it was a fault, but you saw no

4    surface evidence of it.   Right?

5        A   It is probably a fault, yes.

6        Q   Now, I observe, however, that you show no sign of that

7    probable barrier in 1953?

8        A   That is correct.

9        Q   You don't think the fault was there in 1953?

10       A   No, I don't have the water levels and control points

11   in that area; is not shown, actually.   It was probably there

12   in 1959, it was probably there in 1953.

13       Q   In other words, you don't think there have been any

14   faults created in this area since 1953, do you?

15       A   No.

16       Q   However, in 1953 would you have found the same direction

17   of ground water movements that you found in that area in 1959?

18       A   I don't know the pumping conditions well enough in

19   Elsinore Valley to answer that question.   It may have been, it

20   may not have been, I don't know.

21       Q   What you are saying is you have assumed the existence of

22   some sort of relative impermeable barrier to justify conclusions

23   as to directions of water movement.   Isn't that right?

24       A   I wouldn't put it quite that way, Mr. Sachse.   In my

25   opinion the water level in wells in that area indicate that

1    there is a barrier.

2         Q   Would you say that the waters lying northwest, ground

3    waters lying northwest of that probable barrier are part of

4    the Santa Margarita River system?

5         A   I would like a definition as to what constitutes the

6    river system. It lies within the surface watershed boundary.

7         Q   Well, Mr. Kunkel, I will give you -- I will simply

8    refer you to the same definition, whatever it may have been,

9    that you had in your mind when you testified that the Frick

10   wells, the water underlying them was a part of the Santa

11   Margarita River system.  Applying that yardstick, are those

12   waters part of the Santa Margarita River system?

13        A   If and where ground waters move from say the southeast

14   part of Section 27, 6 South, 4 West, where they move easterly,

15   I would say those ground waters are tributary to the San

16   Jacinto.

17        Q   And not a part of the Santa Margarita River system

18   then, or don't you know?  If you don't know, tell us.

19        A   I am cogitating with definitions, perhaps.  The ground

20   water in that area in my opinion is tributary to -- at the

21   time shown is tributary to the San Jacinto, and in that degree

22   they would not be part of the river system.  However, this does

23   not mean that pumping in the Santa Margarita River valley cannot

24   have an effect on those water levels, or vice versa.

25        Q   Now, applying that same definition that you had in your

1   mind, whatever it was -- I don't know -- tell us what you meant

2   by saying that the waters underlying the Frick wells were part

3   of the Santa Margarita River system.

4        A   My statement that the waters underlying the Frick wells

5   are part of the Santa Margarita River system --

6        MR. VEEDER:   Underlying the --

7        THE WITNESS:   Underlying the Frick properties, we know

8   water is there because we have observed it in Frick wells.   That

9   statement to me means that the ground water is moving down the

10  hydraulic gradient through the residuum toward the general area

11  of Murietta Hot Springs, and there is a considerable natural

12  discharge of ground water at the Hot Springs.   And in my

13  opinion a large part, or perhaps all, of this water is water

14  that had its source in the residuum north of Murietta Hot

15  Springs.

16  BY MR. SACHSE:

17       Q   Now, the spring wells are pretty close to basement

18  complex, aren't they?

19       A   They are relatively close.

20       Q   Is the water in the basement complex beyond the Frick

21  wells a part of the --

22       A   Ground water where it occurs -- I would like to expand

23  my answer after I have given it.   Ground water in the basement

24  complex where it occurs within the watershed is part of the

25  river system.

1      Q. All of it?

2      A. With the qualifications that I will give afterwards,

3 the answer is yes, all of the ground water.

4      Q. Go ahead.

5      A. But I wish to point out that in the area of younger

6 and older alluvium we are talking about, or discussing deposits

7 where the saturated thickness is on the order of many hundreds

8 of feet, perhaps as much as 2000 or more, as indicated by

9 wells that have been drilled and not reached basement complex.

10 In the residuum we are talking about a saturated thickness of

11 a few feet to perhaps a hundred or a hundred and fifty feet at

12 the very maximum; a vast difference in order of magnitude in

13 thickness. And in the basement complex we are talking about

14 ground water that occurs in cracks and fractures, and in terms

15 of well potential, well yields, the potential for water is far

16 less. And there are many spots in the basement complex where

17 one can drill and get a dry hole, ground water is not available

18 in many areas. There are many areas in the residuum where one

19 can get a dry hole. But there are also many areas which for

20 domestic purposes and limited irrigation sufficient water can

21 be obtained. And in the area of the younger and older alluvium

22 we are referring to an area where it is almost an impossibility

23 to get a truly dry hole, a hole in which there is no water.

24 Now, there are exceptions to this perhaps around the fringes

25 where the older alluvium laps upon residuum or basement complex.

1   But it is an extremely unlikely situation to get a truly dry

2   hole.  One may get low yields, but by and large one could almost

3   be assured of sufficient water for domestic purposes wherever

4   one drilled.

5   Q  Now, if I can paraphrase this briefly, you are saying

6   that in your judgment all of the ground waters within the

7   watershed are a part of the river system?

8   A  That is my opinion.

9   Q  However, the effect or the significance that ground

10  waters in various areas have on the quantity of water in the

11  river system varies greatly?

12  A  It does.

13  Q  Have you given any thought to the effect of extractions

14  by say Frick on the regimen of the stream in Murietta Valley,

15  timewise?

16  A  Frick and others in the residuum, where the situation

17  is similar, the effect of pumping will be one of lowering water

18  levels in the residuum and drying up of areas where there is

19  presently ground water discharge.  The effect on the stream

20  flow will be principally that of additional induced infiltration

21  to ground water of surface waters that would normally have gone

22  through the area and discharged out of the valley.  The actual

23  effect of the pumping in the cone of depression in the Frick

24  well expanding to a point that it has a significant effect on

25  say the Yoder well, or well 230-1, 7 South, 3 West, in my

1    opinion that type of effect would be minimal.

2         Q  I asked you earlier to assume the absolute withdrawal

3    of a hundred acre feet clear out of the watershed from the

4    area of older alluvium.  Assume the hundred acre feet were

5    extracted and withdrawn out of the Frick well, how long before

6    that would be noticeable at the foot of Santa Gertrudis Creek?

7         A  Where that withdrawal would lower the water table to

8    the point that it would induce additional recharge, that

9    effect would be felt in one season, one rainy season.

10        Q  Would a hundred acre feet be such a quantity?

11        A  It probably would not be a measurable amount.

12        Q  Now, are you familiar with the actual use of Seas and

13   the quantities of water taken out by Seas testified earlier

14   in this case?

15        A  I have heard the testimony of Mr. Seas. I am familiar

16   with the property, I have seen his operation.

17        Q  You are aware of the fact that the well A-2 was for the

18   first time drilled in 1959, are you not?

19        A  I knew it was a relatively new well.

20        Q  So it wasn't there except in the irrigating season of

21   1959?

22        A  This may have been, I didn't recall that.

23        Q  You testified in answer to my question that the slug

24   of recharge -- I am using your own word -- that came down

25   Tucalota Creek, the only reason it didn't show up here was it

1   was taken out faster by pumping than it had effect. Is that

2   correct?

3        A  I made two assumptions.  I do not know the exact

4   conditions of recharge in Tucalota Creek.  And I said it was

5   either -- assuming there was a slug, it was either taken out

6   faster than it was recharged, or perhaps there was not a large

7   quantity of water coming down Tucalota Creek.  I don't know

8   the conditions.

9        Q  Well, do you think that the -- I won't ask you to

10  think.  I will ask you don't you know that the drainage, the

11  surface drainage at Tucalota Creek is considerably greater

12  than the surface drainage feeding Long Canyon, the runoff area?

13       A  I hadn't measured them.

14       Q  Is that not your impression, Mr. Kunkel?  You have done

15  a lot of work in this watershed.  Are you not under the

16  impression that the drainage of the Tucalota Creek is one of the

17  largest drainages of the watershed?  Certainly larger than Long

18  Canyon?

19       A  I haven't measured them, Mr. Sachse, I couldn't give you

20  an answer on their relative sizes.

21       Q  Are you under the impression that there was no more or

22  less rainfall in 1958 in the Tucalota area than in the Long

23  Canyon?

24       A  They were probably in the same magnitude.  I suspect

25  there was a slug of recharge down Tucalota, also.

1    Q  Are you of the opinion that the irrigation of about

2  50 acres of alfalfa out of the Seas [Ceas] well during the irrigating

3  season in 1959 would use up the slug of recharge that came down

4  Tucalota Creek?

5    MR. VEEDER:  Let me have the question.

6    (Record read.)

7    THE WITNESS:  The slug of --

8    MR. VEEDER:  We are assuming there was a slug of recharge.

9    MR. SACHSE:  I am using the witness's exact words, Mr.

10  Veeder.

11    THE WITNESS:  Any slug of recharge that came down Tucalota

12  Creek contributed to the water body in the vicinity of the

13  Seas-Shamel well.  There probably was a rise of ground water

14  subsequent, and whatever excess -- or, depending on the rate

15  at which the water came, a certain amount of it went on through

16  to recharge areas downstream, also.  After the recharge was gone,

17  by the effect of pumping, the Seas well and the Shamel well --

18  because the Shamel well was pumped in 1959, and pumping well

19  19C-1, which is also used for irrigation, contributed to the

20  reduction of head in that area.  The head is reduced.

21  BY MR. SACHSE:

22    Q  A ground water depression or a pumping hole such as

23  you have indicated in several places on the map represents a

24  relative dewatering?  Isn't that a lay term for it?

25    A  It is a dewatering of water deposits, right.

1      Q  So you feel that the pumping --

2      A  This is a dewatering of deposits, yes, that is correct.

3   Let it stand that way.

4      Q  You feel that the pumping -- I am confining myself to

5   the Seas well; please you do it.  The Seas well is the only one

6   inside this pumping hole, the other one is outside it.  You

7   feel that the pumping of the Seas well and the acreage it

8   irrigated, whatever that may have been, created this pumping

9   hole, notwithstanding the recharge of 1958?

10     A  Well, No. 1, you can't limit it to the Seas well only,

11  for the simple reason that the 1050 contour is the contour that

12  is shown as enclosed, but the pumping hole or the effect of

13  that pumping extends back, and there is an overall depression

14  of water level from what it would have been if there had been

15  no pumping to what it was in 1959 owing to pumping.  And the

16  three wells principally -- Seas and Shamel 24A-1 and A-2, and

17  the pumping of well 19C-1 or C-2, I forget which well had the

18  irrigation pump on it --contributed to the formation of the

19  pumping hole which happens to be centered beneath the Seas well.

20  For example, if there had been a test well drilled right in

21  the northeast quarter of Section 26, 7 South, 3 West, and no

22  well had been placed on it, but it was right in the center of

23  what is shown as the pumping hole, that well wouldn't necessarily

24  have caused the pumping hole, even though it is centered in the

25  pumping hole.  One could have a pumping hole -- Well, the

1   pumping hole in large part is created by wells outside the

2   pumping depression.

3        Q   I will ask you a hypothetical question:  Assuming the

4   extraction of ground water in the neighborhood of the Seas well

5   sufficient to irrigate 15 -- not 50 -- acres of alfalfa, would

6   such extraction in your opinion be enough to create a pumping

7   hole, in the light of the 1958 slug of recharge?

8        A   Yes, it would.

9        Q   That pumping hole would continue how long if pumping

10  stops?

11       MR. VEEDER:  These are so far-fetched --

12       MR. SACHSE:  I don't think that is far-fetched at all.

13       MR. VEEDER:  How long would it continue --

14  BY MR. SACHSE:

15       Q   If pumping is stopped how long would the effect of

16  pumping stay there?

17       A   The effect would expand to the edges of the aquifer,

18  and there would be a slow recovery in the center part of the

19  pumping depression.  And in about one season, as indicated by

20  the hydrographs, water levels in all probability would recover

21  very close to their original static position, but not exactly

22  to the same altitude because there has been a quantity of water

23  removed.  And throughout the entire area there would be -- If

24  there were no other pumping in the area, and shut everything

25  down and allowed the recovery, there would be a recovery again

1    to something approximating the original static conditions, but

2    at a slightly lower altitude.

3         Q  You have answered me in your judgment it took about one

4    season for extractions to be felt between the 1050 contour and

5    the -- Withdraw that, that is wrong.

6         You told me that it took about a season for recharge to

7    be recovered to the Roripaugh area in general?

8         A  My statement in general was it took for recharge in

9    the Long Valley, it took about a year to move down to the

10   Schrode well, which is well 7 South -- no, 8 South, 2 West --

11   7 South, 2 West, 7A-1.  And the Schrode and the Roripaugh

12   wells being about the same distance, it would be my opinion

13   that the rate would be about the same for the two, although I

14   have no exact data to support this.

15        Q  When you say there would be a recovery not to the

16   exact same spot, a recovery during a season, you are referring

17   not to a year, you are referring to a wet season, are you not?

18        A  At the end of -- I was talking about a pumping season.

19   At the end of a pumping season it would recover --

20        Q  To the start of the next pumping season?

21        A  Yes. Which without additional recharge would be

22   somewhat less than the previous year.

23        Q  So when the pump is shut off -- Let's keep this

24   specific, let's say the Seas pump, if it is shut off at the end

25   of the pumping season and left off and its neighbors' pumps

1    also left off, without any slug of recharge you would expect

2    the depression you have indicated to largely disappear?

3         A  That is correct.

4         Q  So by March, we will say, or April of 1960 you would

5    have expected that this ground water depression would not show

6    on the map?

7         A  As a distinct depression.  But if we had exact

8    determinations of altitude of water surface throughout the area,

9    and assuming no recharge coming into the area -- this is before

10   the winter rains -- and no additional pumping of other wells,

11   there would be a measurable decline.

12        Q  But then if recharge comes in it could lift the table

13   up even to a higher level than it had the year before?

14        A  Depending upon the conditions of recharge and the

15   rainfall, there could be complete recovery.

16        Q  Well, your 1100 foot contour shows not only complete

17   recovery, but it shows that between '58 and '59 the water level

18   improved?

19        A  Yes.  But there is another point to be considered, Mr.

20   Sachse.  As indicated, the 1100 foot contour at the Windmill

21   Well 12H-1 declined two feet.  And actually if one will compare

22   the 1150 foot contours, that has moved upgrade considerably.

23   The result being that while under natural conditions water would

24   move directly through the older alluvium to perhaps the vicinity

25   of the Schrode well, through and over to the fault and out

1    Tucalota Canyon, ground water would now follow a course

2    starting somewhere below Buck Mesa and move in a general

3    perpendicular direction to the contours and actually be

4    moving toward and recharging the pumping depression created in

5    Pauba Valley owing to the pumping of wells in the vicinity of

6    Sections 11 and 12, 8 South, 2 West.  And actually this is as

7    much a pumping depression, even though the contours are not

8    closed circles.

9        MR. VEEDER:  When you say "this" would you state what you

10   are referring to?

11       THE WITNESS:  The reduction of head or water levels in

12   Section 12 and 11, 8 South, 2 West, that is as much a pumping

13   depression, even though the contours are not enclosed, as those

14   beneath 27.  And the ground water has been actually diverted

15   toward Pauba Valley itself, where under normal conditions it

16   would have moved in a more westerly direction. It is still

17   southwesterly, but more westerly than it does in 19 -- or, than

18   it did in the autumn of 1959.

19   BY MR. SACHSE:

20       Q  Now, on the Roripaugh well pumping depression what

21   reference points did you use in establishing the west -- well,

22   let's say what reference did you use in establishing those

23   parts of the depressions shown northerly of Santa Gertrudis

24   Creek younger alluvium?

25       A  Well 23K-1 was a key control point in that the water

1    level in that well was 1027 feet.  This is an interpolated

2    altitude, it could be off a few feet in either direction. I

3    actually made every effort to interpolate on the high altitude

4    side to keep the pumping depression from being greater.  I

5    mean when one interpolates, one has a leeway of a foot or two,

6    and I tried to be conservative.

7        Q  I don't think you understood my question.  I could see

8    how this line could readily be drawn near 25E-1, 1027; 23K-1,

9    1027.  In other words, I can see how a man could draw a 1025

10   contour up here.  How do you close it in to the west?

11       A  Well, we know the spring in the southeast quarter of

12   Section 22 has an altitude of approximately 1050 feet.  And

13   well 22K-1 had an altitude of 1054.  Well D-3 had an altitude

14   of 1052.  Well 27A-2 of 1042.  27H-2, 1039.  There happens

15   to be between those wells and the Roripaugh well 26J-1, which

16   is an altitude of 1019.  There has to be a 1025 contour.

17       Q  There has to be divides such as you showed between the

18   1050 Seas depression and the 1050 foot contour?

19       A  There has to be a comparable situation.

20       Q  Now, draw me some arrows as you did there to show me

21   the direction of ground water movement between the west line of

22   the Roripaugh depression and the fault.

23       MR. VEEDER:  You are speaking of the Wildomar?

24       MR. SACHSE:  Yes.

25       Q  Where do you think the ground water -- Suppose you start

13,540

1    a line right at well 27A-2.  Where would you draw your red

2    line or red arrow?

3        A   As one approaches the divide the decision becomes

4    harder and harder to make.  But 27A-2 I would -- it would be

5    just about on the divide.  One side of the water could be

6    moving in a general southwesterly direction, and the other side

7    of the water could be in a general easterly direction.  And

8    the exact point, one couldn't say this is the place.

9        THE COURT:  Are you talking about 27A-2?

10       THE WITNESS:  Yes, your Honor, 27A-2.

11       THE COURT:  You are not talking about the divide shown by

12   the X line?

13       MR. SACHSE:  No, I was referring to the divide that must

14   exist between the Roripaugh west line and the next one to the

15   south.  There must be another such as here if such a hole

16   exists.

17       THE WITNESS:  This is perfectly true.

18       MR. VEEDER:  You are meaning there is a difference in

19   gradient? Is that what you mean?

20       MR. SACHSE:  Difference in gradient.  At some point the

21   water must change the direction of its flow.

22       MR. VEEDER:  Right.  Just so we all understand it.

23   BY MR. SACHSE:

24       Q   Now, Mr. Kunkel, I want to make some comparisons

25   between the two exhibits 15G and 15E.  I observe -- please

1    1000.

2         THE COURT:  You are not talking about the 1000 that appears

3    up on the divide?

4         MR. SACHSE:  No.

5         Q  In other words, Mr. Kunkel, I am just asking if there

6    is any significance to the fact that you have extended the line

7    in 1959 beyond where it was in 1953?

8         A  No, none, except the fact that I had a little more

9    control in 1959 than I did in 1953.  And wells 8 South, 3 West,

10   12Q-2, with an altitude of 992 feet, influenced my thinking

11   that the 1100 foot contour probably extended up in that

12   direction.  I didn't have that control for the '53 contour.

13   There is no significance attached to it particularly, though.

14        Q  All right.  Now, take your 1000 foot contour, or your

15   two 1000 foot contours that you show at the base of Santa

16   Gertrudis Creek.  Do you see the two to which I refer?

17        A  I see them.

18        Q  Now, I can find what I might call reference points for

19   the more southerly of those.  I find a 998 on B-2, a 998 on B-1,

20   a 994 on K-1, but I can find no possible reference on the

21   exhibit for the more northerly of those two.

22        A  We do have the actual stream flow in Murietta Creek at

23   approximately the Vail property line, as indicated by the solid

24   red circle.  And that flow in that area would indicate, coupled

25   with the altitude of the water surface of 993.3 in the well

1    correct me if I am wrong -- that your 980 contour, the lowest

2    one in there, is very similar on the two of them?

3        A  Yes, very close to the same.

4        Q  Now, I observe that on the next contour upstream is a

5    thousand foot contour, on 15G.  And you have also a thousand

6    foot contour on 15E.

7        A  Correct.

8        Q  But you interpolated a 990 between the two.  In other

9    words, there is no 990 shown on 15G.  Right?

10       A  That is correct.  On 15E I had a few more control

11   points that I was able to put in a 990 on the basis of the

12   well in 8 South, 2 West, 24H-1, which indicated an altitude

13   of 995.  Now, whether that well was higher or lower in 1953,

14   I don't know; and this might have some bearing on the position.

15       Q  In other words, you don't know whether the 990 line that

16   you have interpolated for its entire length after H-1 existed

17   the same way in 1953 or not, do you?

18       A  Not exactly, but it is my opinion that it was very

19   close to the same position.

20       Q  All right.  Now, is there any reason why on 15E you

21   have extended the 1000 foot contour about a half mile farther

22   north than you did on 15G?

23       THE COURT:  You are talking about the line right below

24   the so-called divide in the Murietta Valley, aren't you?

25       MR. SACHSE:  Yes, your Honor.  There is a 980, 990, and

1  35P-1, would indicate that the head of water at that point was

2  very close to or approximately 1000 feet.

3      Q  Now, how about the northerly of those two 1000 foot

4  contours?  How do you establish that?

5      A  The control points are the same, and again this is a

6  matter of judgment or opinion.  One could leave that 1000 foot

7  out, and with the one 1000 that is to the south it would still

8  have to be a divide, for one could not take water levels from

9  989 feet, or lower, as indicated by wells in Section 27, and

10  have a hydraulic gradient up to 1000 feet. It is my opinion

11  that a 1000 foot contour probably exists in that area.

12      THE COURT:  Well, weren't you influenced by the well 34G-1,

13  962?

14      THE WITNESS:  That is quite low, and that is a pumping

15  measurement.  I so indicated.  That influenced me to know that

16  the water levels in this area, coupled with the water levels

17  in Section 27, were below 1000 feet.  We know right at the Vail

18  property line where there is rising ground water, plus Barnett

19  Springs, water is above 1000 feet.  And those, coupled with

20  interpretation of the geology and hydrology, would in my opinion

21  warrant the appraisement of a 1000 foot water contour.

22  BY MR. SACHSE:

23      Q  Why would it not be an equally intelligent picture

24  simply to eliminate the westerly half of the upper of the two

25  1000 foot contours and run your 1000 foot contour around like

1   this, and assuming a lower contour at the westerly end of

2   Temecula Valley?

3       MR. VEEDER:  The record is not going to show a thing --

4   BY MR. SACHSE:

5       Q  Is it possible that the ground water contours don't

6   run concave across Temecula Valley as you have drawn the one at

7   the foot of Santa Gertrudis Creek --

8       MR. VEEDER:  That is Murietta Valley.

9   BY MR. SACHSE:

10      Q  -- but instead run convex?

11      A  In that event water levels in my opinion would have to

12  drop considerably below the 999.3, and stream flow in Murietta

13  Creek would probably decline, or the position of the rising

14  water would move downstream.  And in the event that one could

15  draw a 1000 foot contour from say well 8 South, 2 West -- 8

16  South, 3 West, 35P-3, to up in a general direction paralleling

17  the Wildomar Fault to join the upper end of the upper 1000

18  foot water level contour, there would then be a 998 or a 999

19  or a 995 contour in there with a ground water divide.  And in

20  all probability this is what would occur.  It is virtually

21  impossible to draw water levels down in the area of Section 27

22  and 34, and if there is a continuing stream flow or water

23  available at about 1000 feet in the central part of Murietta

24  Valley in the approximate position of the rising ground water,

25  without some kind of a divide, ground water divide, to exist

1    in that area --

2         Q   I am almost through with this exhibit, and I want to

3    ask a couple of general questions to be sure I have this right,

4    Mr. Kunkel. It is your opinion that all of the ground waters

5    shown on -- or, underlying any part of the area shown on

6    Exhibit 15E are a part of the Santa Margarita River system,

7    except a very small area where you have shown it flowing into

8    the San Jacinto. Isn't that right?

9         A   This is my opinion.

10        Q   When you say they are a part of the Santa Margarita

11   River system, what you mean is that there is what we have

12   called, I think, hydrologic continuity between them.  Is that

13   about the size of it?

14        MR. VEEDER:   Hydrologic continuity throughout?

15        MR. SACHSE:   Throughout the watershed.

16        THE WITNESS:   That is correct. It doesn't mean that there

17   aren't barriers, that there are not barriers of very steep

18   gradient --

19   BY MR. SACHSE:

20        Q   Areas of low permeability?

21        A   That is correct.

22        Q   But throughout the hydrologic continuity, therefore,

23   it is a part of the stream system?

24        A   That is right.  In one manner or another removing water

25   from the system ultimately has an effect on the stream flow.

Q  And you have not considered in expressing that opinion the time factors that are involved?

A  This statement does not consider the time factor.

Q  You have not considered time factor?

A  No.

Q  In other words, even if the time factor should be several thousand years before a change in head would show up at Pendleton, you still regard that as a part of the stream system?

MR. VEEDER:  He didn't say several thousand years.

BY MR. SACHSE:

Q  What did you say?

A  I said under certain circumstances it is conceivable pumping in certain areas of residuum -- I didn't say all -- would affect the actual head reduction due to that pumping as a cone of depression going out; when it would affect Pendleton might be on the order of a thousand years.

Q  Not several.

A  This was not referring to the effect that it would have on the stream flow, which in turn would affect Pendleton, which might occur in a season.

Q  Now, finally, then your conclusion as to what waters are part of the stream system in no way relates to the legal question of what extractions should be controlled in the event of deficiencies in the stream system?

1      MR. VEEDER: I am going to object to that.

2      MR. SACHSE: I asked him if he had considered it.

3      THE COURT: I have several questions I want to ask him.

4   Overruled.

5   BY MR. SACHSE:

6      Q  Did you consider the legal question in your opinion as

7   to what extractions should be controlled in the event of a

8   deficiency anywhere in the watershed?

9      MR. VEEDER:  In the preparation of 15E?

10      MR. SACHSE:  Yes, in making this study did he consider

11   that aspect.

12      THE WITNESS:  I prepared 15E with the intent that it

13   should stand technically on its own two feet, so to speak.

14   However, I do have opinions.

15      THE COURT:  Let me ask a question right here that fits in,

16   and then maybe this will solve the problem.

17      Q  You testified before that you drew the Kunkel Line

18   on the map, which you included what you considered was an

19   underground basin--

20      MR. VEEDER:  Your Honor, may I object to that, because

21   I don't believe that that is a correct statement. I have no

22   alternative but to object.

23      THE COURT:  What do you think he testified to?

24      MR. LITTLEWORTH:  Storage unit was the term he used.

25      THE WITNESS:  I have made a specific point of this, your

1    Honor, to differentiate a storage unit.

2    BY THE COURT:

3        Q  Well, I got from your testimony that at that time before

4    you had made this later study the area that lay outside of that

5    storage unit you didn't consider materially affecting the

6    stream system, waters of the area that lay outside the storage

7    unit?  Do I get the right impression?

8        A  This in part is true.

9        Q  Well, I remember our discussion about this type of

10   material and its thickness, and as you got up near the basement

11   complex there was less and less of it, but you drew a line

12   which you called the Kunkel Line, do you remember?

13       A  Yes.

14       Q  And this storage unit you felt ran up to that line.

15   Now, I got the impression that you didn't consider there was

16   very much significance to waters that lay under the ground

17   outside, west -- or rather, east and northerly of that Kunkel

18   Line.

19       A  Well, the waters outside of that line in my opinion

20   did not have the same degree of significance.

21       Q  Well, am I in error when I felt that you attached sort

22   of the document diminimus to these waters that lay outside that

23   line?

24       A  I believe you were, your Honor.  This concept of diminimus,

25   as far as I am concerned, I believe is something that the

1   attorneys have attached to this line.

2          MR. VEEDER:  Not me.

3          THE WITNESS: I did not present it with that intention in

4   mind.

5   BY THE COURT:

6          Q  Tell me what you meant by drawing the line.  What was

7   the difference between the waters underlying the older alluvial

8   on one side and on the other side, realizing you could not make

9   an exact demarcation?

10         A  Well, the significance in my opinion is that outside

11  of that line -- and now on the basis of later work we have

12  modified the position of that line slightly -- in my opinion

13  the thickness of the saturated section outside of that area is

14  not great, therefore it would be extremely unlikely in my

15  opinion for a person to drill outside say in the area the

16  south half of Section 15, 7 South, 2 West, to drill a well that

17  would be of comparable quality to the Roripaugh well or even

18  say the Gunther wells in Section 23, 7 South, 3 West.

19         Q  Well, wasn't it your further opinion that wells so

20  drilled and pumped would have some appreciable effect upon the

21  stream system?

22         A  In my opinion those wells so pumped would have no

23  appreciable effect on the stream system, except insofar as they

24  would dewater areas that are now moist lands.  And by so doing

25  they would then clip the peaks off the winter stream flow; or

1    if the winter stream flow was very low it might induce an

2    appreciable part of that water to go underground. In that sense

3    pumping in that area would be significant.  In terms of dewater-

4    ing in that area, affecting water levels a mile or two away

5    within a pumping season or so would be small.

6        Q  I suppose you discussed with Mr. Veeder where you are

7    going to redraw the Kunkel Line?

8        A  No.

9        MR. VEEDER:  As a matter of fact, he hasn't, your Honor;

10   nor did I ever talk the Kunkel Line one way or the other.

11       THE WITNESS:  I am perfectly willing to stand on where it

12   stands, as long as it remains on 15. If it were put on 15E I

13   would want to reappraise the well logs and draw it according

14   to the larger scale, which would give us a little more exact --

15   BY MR. SACHSE:

16       Q  Would it include a smaller or larger area?

17       A  In part it would include a larger area, and in part it

18   might include a smaller area.

19   BY THE COURT:

20       Q  Well, have you changed your mind about the weathered

21   basement complex area shown in gray on 15E?

22       A  No, I haven't changed my mind about that. In my opinion

23   they are never going to drill wells up here and get wells of a

24   comparable yield as in the main valley.

25       Q  How many wells did you find in that area?

1    A   Compared to Murietta Valley they are relatively few,

2  but they are five in number that I spot right there, plus the

3  fact that there is a fairly high water table through much of

4  this whole area.

5    MR. VEEDER:   Would you state the area to which you are

6  pointing?

7    THE WITNESS:   To the area of weathered basement complex

8  tributary to Warm Springs Creek and Tucalota Creek.

9  BY THE COURT:

10    Q   How many miners inches or gallons per minute were

11  pumped from the smallest of these wells that you say you found?

12    A   I would have to check, but they are relatively small.

13  I don't recall. I would like to have the opportunity to correct

14  this if I am in error, but I don't think any of them pumped

15  more than 10, if they pumped 10 miners inches at all.  This is

16  my best recollection, and subject to correction.

17    MR. SACHSE:   Your Honor, you asked the witness one question

18  that interests me.

19    Q   Mr. Kunkel, if I understood your answer to his Honor's

20  question, you said that you felt the principal effect of

21  pumping in the area of weathered basement complex was not --

22  Withdraw that.

23    The principal effect of pumping in the area of weathered

24  basement complex on water supplied downstream was not the

25  reduction of water within the material, but rather the dewatering

1   of damp areas over which water runoff would naturally flow,

2   dewatering so water would go in the ground. Is that correct?

3        A  This is correct.

4        Q  In other words --

5        MR. VEEDER:  When you say "this" you mean that is correct?

6        THE WITNESS:  The statement Mr. Sachse made is correct.

7   BY MR. SACHSE:

8        Q  In other words, to get the maximum benefit downstream

9   from winter precipitation, you would have to keep every low

10  spot upstream saturated full?

11       A  This is correct -- or, that is correct.

12  BY THE COURT:

13       Q  Well, if I understand what you are talking about is

14  that ultimately downstream from the Temecula Gorge there would

15  be more runoff if those wells, for instance in the weathered

16  complex, were not pumped?

17       A  That is correct.

18       Q  Well, then if the runoff that goes to the ocean, assuming

19  for argument the runoff went to the ocean every year, it

20  wouldn't be very significant, this problem of replacing waters

21  pulled out of the weathered basement complex?

22       A  If water actually flowed to the ocean every year it

23  would be desirable to dewater those deposits in order to

24  capture that water. It is the long period of years that there

25  is no water to the ocean that moist areas in the basement

13,853

1  complex and throughout the watershed become of significance,

2  because when one has a stream flow it may discharge a thousand

3  acre feet to the ocean, if one were to dewater all of the

4  moist areas, it is entirely probably that -- it is extremely

5  likely that the amount that would go to the ocean would be

6  reduced to virtually nothing.

7  Q  Well, put it in laymen's language.  Let's take this

8  last year, we had a series of rains -- I am speaking now of

9  the area I am more familiar with, Escondido and Valley Center --

10  which were spaced, and in discussing with the farmers around

11  there they were of the opinion that the situation was just

12  about where if you had a real good rain you would begin to

13  get a lot of runoff.  In other words, the ground had absorbed

14  a lot of these early rains, and rains being spaced as they

15  were there had been very little runoff.  That sort of thing

16  goes on whether you pump wells or not?

17  A  Yes, sir.

18  Q  Now, if you pump wells in various areas and dewater

19  those areas then more of this precipitation runoff is held

20  there without going down by flood?

21  A  That is correct.

22  Q  Have you made any calculation as to how many acre feet

23  of water might be absorbed in the weathered basement complex

24  by reason of the pumping that goes on up there?  How significant

25  a thing is this?

1       A   I haven't made a calculation, although I have looked

2  at this area and considerable other areas where the water table

3  is high in both the younger alluvium, the older alluvium, the

4  weathered basement complex; and for any one of them it could

5  be said that the effect would not be appreciable or significant.

6  But if one were to take and add up this total acreage -- and it

7  is a rather significant number of acres when one considers

8  all the points of rising water that would fall in this same

9  category -- it is my opinion that the sum total very well might

10  be appreciable.

11      Q   Well, now, you say the water table is rather high in

12  that area of basement complex in 1959 when you studied it?

13      A   That is correct, because actually it is relatively

14  undeveloped up there.

15      Q   If the water table is high that means there is relatively

16  less water that could be taken in and collected in the under-

17  ground area than if the water table was low?

18      A   That is correct.  Now, I have interviewed a number of

19  residents in this area, I have been in the field and looked at

20  the evidence on the ground.  And compared to natural conditions

21  of say 1919 through 1925, or so, there is considerably less

22  water in the stream channels in the low summer months than there

23  was under natural conditions.  There is a well on the Fred

24  Perry property which is in the same area, but just slightly

25  off the map, where under natural conditions in something

1    closely approximating natural conditions, in the 20's and 30's

2    there was a considerable amount of water in these streams,

3    puddles and pools all summer long.  The early ranchers there

4    subirrigated alfalfa and actually put in ditches to drain the

5    high water.  And the water table now has declined, oh, nine,

6    ten, eleven feet.  There is still discharge, evidence of salt

7    grass over large areas here.  Now, undoubtedly a major part of

8    this decline in water levels and drying up is the long dry

9    spell we had.  But all of the pumping upstream from these areas

10   also has been a considerable contributing factor.

11       Q  Let me ask you the $64 question here:  You are familiar

12   with what we mean by a reasonable riparian use and a reasonable

13   use by an overlying owner?

14       A  Yes.

15       Q  Did you find any evidence up in that area of weathered

16   basement complex that any of those people could conceivably be

17   using more water than they could conceivably be entitled to

18   as riparian or overlying owners?

19       MR. VEEDER:  I have to object to that, your Honor, it is

20   a legal question. I don't believe this witness is qualified.

21   What would be the gauge?

22       THE COURT:  Well, if it was an exact thing, yes.  But in

23   my opinion I think it answers some obvious questions. I think

24   the Government ought to say right now, once and for all be rid

25   of this part of it.  How possibly could you -- Let's just look

1  at it this way, supposing the situation arose where you would

2  have to control some of the pumping in this area to protect

3  the rights of the Government downstream.  Would you have the

4  guts to go into the area of the weathered basement complex,

5  with the limited amounts of water they have, and contend that

6  those people were using more than their fair share as overlying

7  owners?

8      MR. VEEDER:  Let me just explain --

9      THE COURT:  Just answer my question.

10     MR. VEEDER:  Just let me explain a little to your Honor

11 on this.  You say, well, wash them out of the lawsuit.  I don't

12 want them washed out of the lawsuit.  I don't believe that there

13 is time now where I would have the guts, as your Honor uses

14 the term, to go in and regulate some fellow.  But I would have

15 the guts under a little bit different circumstances of asking

16 your Honor for some regulation.  Now, my --

17     THE COURT:  In the weathered basement complex area?

18     MR. VEEDER:  Are you talking about the basement complex

19 area?

20     THE COURT:  I am.

21     MR. VEEDER:  You and I are both speaking of the residuum

22 or the weathered basement complex?

23     THE COURT:  Right, the gray area on 15E.

24     MR. VEEDER:  As of now?  Should we ask for regulation, is

25 that your question?

13,857

THE COURT:  From what you know of this watershed can you conceive even a time in the future when you could go in -- I take it these men that are pumping ten inches of water probably have a hundred and sixty acres, which is a big ranch up there. Could you conceive that you could cut them down to less than ten inches of water as their proper correlative use as an overlying owner of a water basin?

MR. VEEDER:  Life is too short to answer that question yes or no.

MR. STAHLMAN:  We will never get an answer.

MR. VEEDER:  I have been up there, I have seen the Frick property, I have seen the operation. I have seen the area of runoff in there, and I believe it is quite possible that Frick and the people in the area along that area -- along that line are using quantities of water that could have an impact on the overall yield of the Santa Margarita River.

THE COURT:  Sure, any drop of water you take out would have an impact.

MR. VEEDER:  No, I said appreciable.

THE COURT:  Let's say also a riparian or overlying owner has a right to use water and it may have an impact on the downstream users.  How many acres does Frick have?

MR. VEEDER:  I think Frick --

MR. LITTLEWORTH:  Frick is one of our clients, your Honor, but I haven't got his file here.

13,858

THE COURT:  Appreciable acreage?

MR. LITTLEWORTH: I think he has got at least 40, and probably more.

MR. VEEDER:  I think he has got probably 200 acres up there.

THE COURT: If his well pumped no more than 10 inches would you think that that would be an excessive use?

MR. VEEDER:  I don't know. I will be candid.  I don't want you to take a big broad brush and start knocking people out of here, because at this juncture in the lawsuit I couldn't agree to it.

MR. LITTLEWORTH:   Your Honor, Frick is our No. 22, it looks like he has a little less than a half a Section.  Don't I recall correctly that he is the man that hauls water for a few turkeys?

MR. VEEDER:  No, you have got a character up there that has got some olive trees. I think you are mixed up on it.

THE COURT:  This lawsuit is a fine academic pursuit, it has been great for some lawyers who have probably made some pretty good fees out of it. It has created a hardship for others.  When we get all through, I understand there is going to be no request for a regulation or allotment?

MR. VEEDER:  Yes, there is going to be a request for regulation, I said that the other day.

MR. GIRARD:  We sat here about three times and you said

1    you didn't want an allocation.

2         THE COURT:  This is the first time this has been stated,

3    to my knowledge.

4         MR. GIRARD:  There are ten times in the record you have

5    said that.

6         MR. VEEDER:  All I say now to your Honor, that you will

7    find no statement from me that I didn't expect regulation. I

8    said the other day I expect regulation in regard to Gibbon

9    and Cottle and Oviatt and Stardust, and those people;  It is

10   unavoidable.

11        MR. GIRARD:  Your Honor, I think he is estopped to ask

12   for it.  We let his evidence come in here on irrigable acreage

13   on his statement he wasn't seeking allocation.  If he is going

14   to change his mind, mislead us and the Court with these phony

15   type of statements, he is estopped now on the assumption that

16   all he was using it for was to build the record so the Navy

17   could plan.  And now he comes in and says he has a plan. I

18   think it is just plain unethical.

19        MR. VEEDER:  Your Honor, I don't believe Mr. Girard is

20   very up on his water law.

21        MR. GIRARD:  I am interested in honesty.

22        MR. VEEDER:  I am going to say that I have never at any

23   time said that there would not be regulation in this valley.

24        THE COURT:  Now, wait.  Wait a minute.  You probably have

25   intimated that the day might come when there would have to be,

1   but my memory of this record is that counsel have been assured

2   that there would not be asked in this proceeding, leading up

3   to the final judgment, any allocation.

4   MR. VEEDER:  Your Honor, as recently as last week when the

5   Gibbon and Cottle matter was going in, I said that there is

6   going to be a question of regulation, I think that your Honor

7   should regulate the Temecula right now.  The fact is I have

8   begun working on the proposition of regulation, and if anybody --

9   Here is a really difficult thing, you see.  Somebody gets up

10  and says, oh, we don't want an allocation, all we care about

11  is irrigable acreage, all we care about is this.  Maybe I should

12  have immediately jumped up and said we are going to demand

13  regulation.

14  THE COURT:  You were the one who has been interested in

15  irrigable acres.  And you were interested, as I understood,

16  because you wanted the records to show Washington and the Navy

17  just how many acres might be irrigated.  And Mr. Sachse has

18  mentioned several times he didn't intend to put in irrigable

19  acres because of the position you had taken.

20  MR. SACHSE:  That is absolutely correct, your Honor.  Mr.

21  Veeder has stated repeatedly -- and in connection with my clients

22  you are very correct -- that there would be no request for an

23  apportionment of water in this proceeding. I used the word

24  apportionment, you used the word regulation.  But I have

25  specifically used that word at least a dozen times.

1     Mr. Veeder has at least a dozen times on this record, and

2  I will dig them up, has said that there would be no request

3  for apportionment in this proceeding among riparians.

4     THE COURT:  Or overlying owners.

5     MR. VEEDER:  No, let's go back and take a look at the

6  record.  Let's go back and take a look particularly in regard

7  to the record that I insisted to be put in in connection with

8  the Roripaugh property.  We will also check back on the evidence

9  that I insisted be put in above Vail Dam.

10     THE COURT: I am not going to say that there isn't evidence

11  here, in isolated cases, that might point to that sort of

12  thing.  But I am talking about your statement as counsel to

13  your co-counsel and to this Court as to just exactly what would

14  come from this final decree.

15     MR. SACHSE:  Your Honor, may I say something, because

16  this I think is very important.  And I am going to make a motion

17  if there is any further misunderstanding about this.  To

18  refresh your Honor's recollection about how this all developed,

19  I objected to the introduction of any evidence as to irrigable

20  acreage at all, and I carried this on consistently for a while

21  and then I just dropped it.  And my objection was that irrigable

22  acreage was completely immaterial unless there was going to be

23  an apportionment, and there couldn't be an apportionment until

24  an injured claimant on the river came in and showed injury to

25  himself, before we could start to talk apportionment.  And I

1    said there is no foundation of injury, there is no nothing.

2    The United States' evidence has shown that salt water

3    intrusion had stopped, and the water levels were rising.  That

4    is the broad history of it.  Mr. Veeder's reply to that was,

5    your Honor, the Marines have to plan, we have to know what

6    the ultimate burden on the stream can be.  He said this many

7    times, and your Honor on that basis permitted in, brushed

8    aside, overruled my objection on the basis that this evidence

9    of irrigable acreage was going in not for purposes of an

10   apportionment but to give the necessary factual and historical

11   data to the United States.

12   And, believe me, I will make a motion to strike en toto

13   any evidence of irrigable acreage on the ground that there is

14   no evidence whatsoever of any need for apportionment.

15   THE COURT:  Not only that, but I repeatedly insisted if

16   this was the purpose of irrigable acres there be some indication

17   in the compilation between those acres which were technically

18   irrigable over a dry winter, and there was some likelihood that

19   ground might be irrigated from a stream or basin.  If you wanted

20   a Congressman to know, they would be intelligently advised.

21   Actually on these dry gulches up in the basement complex it

22   could be riparian, but the chances of ever irrigating it out of

23   those dry gulches that run in the winter is infinitesimal.

24   MR. VEEDER:  I was checking your Honor's statements on this

25   yesterday.  And you said to me that you desired, based upon an

13,863

objection that I made -- I think it was on April 5th or 6th,

somewheres along in there -- that if I was going to take that

position you were going to insist upon a division of the kind

and type of irrigable acreages to which I was referring. In

other words, you said you were going to insist that I give you

a list of the irrigable acreage in which the rights would be

purely illusory. Then you said you would want another

classification, the nature of which I didn't quite grasp. But

then you got down to the point, as I understood what your Honor

was saying, was that there would be an area in which it was

manifest that that land was irrigable in character and that

water could be used upon it. Isn't that about what your Honor

said?

THE COURT: Right. This is all part of your talk of why

you wanted irrigable acres at all, because we all agreed that

the question of -- Go ahead.

MR. VEEDER: I have heard Mr. Girard, I never understood

what he meant. Every once in a while he would bounce up and

say "This isn't going to be an allocation." I never knew what

he meant, I am sure he didn't. Your Honor, if there is ever

an instance of a crying need for regulation, and I think the

Vail Company will join me in this request, there is a crying

need for regulation in the Temecula right at this moment, in

the Gibbon-Cottle-Poore-Schroeder-Rinhie-Oviatt-Stardust

area. And I believe this, that if there is not regulation the

1   Vail Company and the United States of America will experience

2   irreparable damage.

3        Now, I believe it will be borne out by the record, I don't

4   know whether Mr. Stahlman has analyzed the record or not, but

5   I believe he will agree that there are exorbitant uses above

6   Vail which exceed the reasonable riparian use.

7        Now, under those circumstances, a regulation by your Honor,

8   an order to that effect I believe is essential.

9        I will show another area where I think as the evidence

10  has progressed that regulation would be certainly desirable,

11  and that would be in the area in which the Roripaughs, the

12  others, have in my view pumped far beyond their share.  Now,

13  that is my view, your Honor.

14       MR. LITTLEWORTH:  Let me interject at this point, since

15  you are back in our area.  I remember the record exactly as

16  Mr. Sachse and Mr. Girard that there have been many representations

17  that there would be no quantitative apportionment sought on

18  riparian or overlying users.  When we put on our cases we made

19  no effort to prove great quantities of water.  I don't think

20  there is any evidence in this record on which the Government

21  could establish, certainly in the Murietta area -- I don't know

22  about the Temecula area -- but you can't have regulation unless

23  you talk first quantities of water, which requires amounts of

24  recharge drawn out, consumptive use; you have to be talking

25  quantities, and Mr. Kunkel said many times -- his testimony

1  came down to source, occurrence and movement of ground waters.

2  He has never given us anything on quantities.

3       Now, I don't think there can be any apportionment of a

4  single individual like Mr. Roripaugh, who happens to irrigate

5  200 acres out of about two or three thousand that he owns, I

6  believe. I don't think because one happens to irrigate one

7  tenth of his acres you can single him out and say we will cut

8  him in half, unless you are going to regulate everybody. If

9  you are going to regulate everybody there has to be a lot

10  more evidence than has come in so far.

11       I think if Mr. Veeder is going to try to regulate Mr.

12  Roripaugh he has to have more evidence, and we have to have a

13  chance to reopen ours.

14       MR. SACHSE:  I don't know how you are going to regulate

15  anything if you don't know what the quantities you are

16  regulating are. And the United States own exhibits are such

17  that on this very creek they are doing the talking about the

18  only surface gauge they have got is down at the very bottom of

19  it. They don't know how much water comes down Tucalota, Warm

20  Springs, Santa Gertrudis, or anything. If this stream is to

21  be regulated, I am jumping ahead of myself now, there is only

22  one conceivable way it could be done, that would be by a

23  Water Master, who would be directed to put in water systems,

24  directed to take comprehensive water levels in the Vail-Pauba

25  Basin, Camp Pendleton, who would try to work out a safe yield

1    arrangement where he might very well direct the Navy to pump

2    very hard and deplete a basin.  I am not going to argue this

3    any further.

4        In the first place it is obvious your Honor recollects the

5    facts correctly.  And I can find them in the record to prove

6    it.  But in the second place, Mr. Veeder can ask for a quanti-

7    tative apportionment as far as I am concerned until he is blue

8    in the face, and if there is not sufficient evidence in this

9    record before your Honor to give him one, I don't think your

10   Honor is going to do it.

11       Now, Mr. Veeder told us he was ready to have an inter-

12   locutory finding as to the extent of the stream system in this

13   area two days ago.  I expect to get this finished, and then I

14   am going to ask his Honor for an interlocutory finding on the

15   extent of the stream system. I trust that someday after that

16   we will do the same thing on the rest of this case, and that

17   then his Honor is going to make his findings as to who are

18   overlying, who are riparians, and then go ahead and ask him to

19   make an apportionment.  On your half-baked record you have got

20   today you couldn't uphold it for two minutes, and you know it.

21       MR. VEEDER:  I think the matter -- the burden of proof is

22   going to be extremely important.  But, your Honor, in regard

23   to this matter of regulation and how it can be carried out and

24   how it can be conducted, I have talked to members of the United

25   States Geological Survey during the last year, because of the

13,867

1    vagueness of the data in many instances I have pointed out that

2    if and when regulation is imposed it would be essential that

3    some criteria be adopted which would have significance from

4    the standpoint of recharge as related to water use, as related

5    to ground water level.  And I think probably that the time will

6    come, and I am not just sure when -- certainly if the drought

7    continues as it did during 1959 it will be precipitated very

8    greatly -- there will be selected key wells, the level of which

9    would be indicative of the point where limiting the use of

10   water would become essential, not only for the benefit of the

11   United States but for the benefit of everyone in the area.

12   And this 15E is an extremely important exhibit in that

13   connection.  As these pumping holes increase and are enlarged,

14   the damage at Temecula Gorge becomes greater by reason of the

15   reduction of the water reaching there. It is essential, in my

16   view, that in some manner and in some way we work out a

17   solution as to regulation.

18        Now, the idea of the appointment of a Water Master is not

19   new.  We have had a Water Master functioning, in effect, Mr.

20   Green. He hasn't regulated, but he has gone through and he has

21   checked these areas out.

22        Now, your Honor can, in my view, enter a decree that would

23   be effective in connection with the runoff at Temecula Creek

24   and the runoff in Santa Gertrudis and Murietta.  Whether there

25   would be need for regulation elsewhere I don't know, but I

1    assure you in my view the evidence that has gone on immediately

2    above Vail Dam indicates a present need for regulation.

3         THE COURT:  Well, let's --

4         MR. SACHSE:  Your Honor, I want to make a motion for the

5    record, and I am going to ask your Honor -- I am not an expert

6    on Federal Procedure, but I believe that it is proper to ask

7    the Court to make a ruling as to issues and what are or are not

8    involved.  And I am going to ask your Honor for a ruling on

9    whether or not the question of quantitative apportionment is

10   involved.  I have a specific reason.  I tried one of the largest

11   landowners in this valley, Stardust, in about two hours, on

12   the expressed statement of Mr. Veeder that there was going to

13   be no request for an apportionment. I am not going to be placed

14   in the position of telling Stardust of placing them in that

15   position on the basis of a half-baked case I put on.

16        THE COURT:  You will be protected, so don't make your

17   motion now.

18        MR. VEEDER:  I think this, I think in regard to the evidence

19   that Mr. Sachse put in, I will be perfectly candid, I couldn't

20   follow what he was doing on Stardust.  Stardust struck me as

21   a case where the matter of regulation is patent on its face.

22        THE COURT:  What work have you got cut out for you between

23   now and the time you come back August 12th?  What other

24   appearances do you have to make?  Are you writing any briefs,

25   are you appearing in the Indian case in Seattle?

13,869

1    MR. VEEDER:  Yes, I have got a case in San Francisco.

2    THE COURT:  You had better get yourself some boys, because

3    I am going to require you to go through this record and

4    submit me a list of those landowners who on the basis of the

5    present record you think are using an unreasonable amount of

6    water to the extent that you would ask apportionment as to

7    them, and submit to me their names, the acreage that they have,

8    how many inches they are pumping, all of the pertinent data

9    as to each one of them.

10    MR. VEEDER: Your Honor, in that regard may I ask Mr.

11    Kunkel do you have a copy of the map for the area above Vail

12    Dam, geological map?

13    THE WITNESS: Yes, incomplete work copy.

14    MR. VEEDER: If he doesn't have it, the area --

15    THE COURT:  Don't tell me now. I want the thing in writing.

16    I want the names of the owners, who their attorney is, how

17    many acres of ground they own.  It can be described on

18    Roripaugh B by parcel numbers.  Now, I don't remember the

19    amount of acres Roripaugh had.  But it would be one thing for

20    Roripaugh to be pumping 200 inches if he had 20 or 30 acres.

21    It would be another thing if he had two or three hundred acres

22    and was irrigating a small portion of it.

23    MR. VEEDER:  I agree, your Honor. I think this --

24    THE COURT:  You have got the burden. I am not going to

25    pass on this, but I think you are inaccurate in your statements.

1   You have assured this Court you were not going to seek

2   apportionment, and now you say you are going to.

3       MR. VEEDER:  Your Honor, now I stood by and let Mr.

4   Girard --

5       THE COURT:  This is my view. You check the record and

6   prove to me if I am wrong.  I have a vivid recollection of this,

7   as we planned the case.  As I have sat here listening and trying

8   to figure out what we were going to do, with never any thought

9   up to now that you were going to seek any apportionment of

10  water in this stage of the case.  You indicated there might

11  be some time in the future an application made, but that none

12  was intended as part of the case which I am trying.

13      MR. VEEDER:  I think that that was interpolated maybe by

14  others, but I want it known right now that in regard to the

15  area, as I said --

16      THE COURT:  You are going to seek apportionment right now

17  of certain areas?

18      MR. VEEDER:  I think we have gotten into a lot of trouble

19  in regard to --

20      THE COURT:  Or regulation. You get me the list of names,

21  areas, size of wells.  Let's get the whole dope together and

22  have it before August -- what day is it we are going to be

23  back?

24      MR. VEEDER:  11th and 12th.

25      THE COURT:  Serve copies on counsel.

1    MR. SACHSE: Every one of these people who went through

2    here last month from Murietta they had better get back.   They

3    sat here and said how much water are you going to give me.   And

4    I heard your Honor tell them there is not going to be any

5    apportionment of water in this case, we are determining your

6    class of water ownership.

7        THE COURT:  We are not going to write them a letter now.

8    Time to back up and retry the case if we decide what we are

9    going to do.   The immediate question is this, Mr. Sachse, have

10   you about finished your cross examination of Mr. Kunkel?

11       MR. SACHSE:  Yes, your Honor.

12       THE COURT: I am willing to hold a night sesssion.  Mr.

13   Swader says he will report it, go out and get something to eat

14   and come back.  Who would be the next man in order to cross

15   examine, Mr. Girard?

16       MR. GIRARD:  Maybe an hour, your Honor, at the longest.

17       THE COURT: Mr. Littleworth?

18       MR. LITTLEWORTH:  Since I didn't sit in on all of it, I

19   will wrap up the end, probably less than a half an hour.

20       THE COURT: Mr. Stahlman?

21       MR. STAHLMAN: I have at least a half an hour.

22       THE COURT: It would depend upon what other counsel have

23   brought out. I take it none of you are going to run too long

24   in the same place.

25       MR. VEEDER: Couldn't we run until 6 o'clock?

THE COURT:  Couldn't do it. I am tired. I would rather adjourn now and be back here at 6:30.

MR. VEEDER:  Suits me.

MR. SACHSE:  You can assume then that I am through my cross, your Honor. These gentlemen can take over.

THE COURT:  Let's adjourn until 6:30 then.