# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

———

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

———

UNITED STATES OF AMERICA,

　　　　　　　　　　　　Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

　　　　　　　　　　　　Defendants.

No. 1247-SD-C

———

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:　　　San Diego, California

Date:　　　Monday, July 18, 1960

Pages:　　13,975 to 14,158

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By　　　　　　　　　　　
　　　　　　　　　　　Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

F 1

Belt 1

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - - - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - - - - -

UNITED STATES OF AMERICA,)
                 )
        Plaintiff, )
                 )
   vs          )      No. 1247-SD-C
                 )
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al.,     )
                 )
        Defendants.)

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Monday, July 18, 1960

APPEARANCES:

    FOR THE PLAINTIFF:            WILLIAM H. VEEDER, ESQ.,
                            Special Assistant to
                            the Attorney General,
                            Department of Justice,
                            Washington, D.C.

                            LCDR DONALD W. REDD

FOR THE DEFENDANTS:

    For Defendant Fallbrook      FRANZ R. SACHSE, ESQ.,
    Public Utility District, et al.

    For Defendant Vail          GEORGE STAHLMAN, ESQ.
    Company

P 2

1   APPEARANCES (continued)

2        FOR THE DEFENDANTS (continued)

3        For Defendant State of            STANLEY MOSK, ESQ.,
         California                        Attorney General,
4                                          By FRED GIRARD, ESQ.,
                                           Deputy Attorney
5                                          General.

6        For Defendants in                ARTHUR L. LITTLEWORTH,
         Roripaugh Area                    ESQ.,
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 1

## INDEX TO WITNESSES

**For the Plaintiff:**      D      X      RD      RX      RE-RX

Fred Kunkel      13,981 (Veeder)

                     13,990 (Stahlman)

                                   14,004 (Stahlman

                     14,019 (Sachse)
                     14,032 (Girard)
                     14,039 (Littleworth)

                                   14,045 (Stahlman)

**For the Defendants:**

Orie A. Ussery      13,997

## INDEX TO EXHIBITS

| Plaintiff's Exhibits | Iden. | In Evidence |
|---|---|---|
| 207-E letters-mun | | 13,978 |
| 16-F - Profile EF- Tem Gauge - Below Paula Valley | | 13,985 |
| 16-G - Profile GH- Thru mun + Paula Valley | 13,987 | 13,988 |
| 207-E | 14,003 | 14,004 |

| Defendant's Exhibits | | |
|---|---|---|
| Vail's F | 13,983 | 13,985 |

SAN DIEGO, CALIFORNIA, Monday July 18, 1960, 10:00 A.M.

(Other matters)

(Morning recess)

THE CLERK:   16-1247-SD-C United States versus Fallbrook Public Utility District et al.  Further court trial.

THE COURT:   There has been handed to me Vail's Exhibit AR14 for identification to be substituted for Vail's Exhibit AR14 which is now in possession of the clerk.  This new exhibit will be substituted.

MR. STAHLMAN:   There is just one figure there different, your Honor.

THE COURT:   All right, gentlemen.

MR. VEEDER:   Your Honor, we have letters to the defendants who were called in for hearing on July 18th.  I would like to offer in evidence the ones that have been received by your Honor which show acceptance of the proposals and have them marked part of Exhibit 207E.

THE COURT:   They will be received in evidence as part of Government's Exhibit 207E.

MR. VEEDER:   Replies continue to come in for dates long past, and I would like to have those letters which have come in marked as part of Exhibit 207E, if that is agreeable to your Honor.

THE COURT:   Make them also part of 207E.

MR. VEEDER:   Your Honor, there is one query I would like

P 4

1    to make in regard to some of these claims which have come in by

2    letter in regard to the assertion of the rights under the Treaty

3    of Guadalupe Adalgo.  Your Honor has ruled on that contrary to

4    the position taken by Mr. Tarwater.  Would your Honor desire me

5    to write letters to those people and quote your statements from

6    the record to them?  Or how do you wish me to proceed?

7        THE COURT:  Well, I have ordered some findings drawn and an

8    interlocutory judgement.

9        MR. GIRARD:  Your Honor, it is in the process of being typed

10   in Sacramento.  It should be here next week.

11       THE COURT:  I would suggest that as soon as that interlocutory

12   judgement and findings are signed up, you send out to all these

13   people who made this Guadalupe Adalgo claim a copy of this inter-

14   locutory judgement and findings.

15       MR. VEEDER:  I will just retain these letters.

16       THE COURT:  In fact, you had better go through your file--

17   there is only a limited number of them and they are mostly

18   neighbors of Mr. Tarwater--and send them all a copy of this.

19       MR. VEEDER:  I will go through their answers, and wherever

20   that is asserted I will send them a copy of the findins and

21   interlocutory judgement.

22       THE COURT:  Make an affidavit of mailing and a list of the

23   people to whom you mailed them.

24       MR. VEEDER:  Yes your Honor.

25       I am not sure just how your Honor desires to proceed.

P 5  1    We have lodged with the court two cross sections of the Temecula

2    and Murrieta Valleys.  They have been designated for identifica-

3    tion as Exhibits 16F and 16G.  Talking with Mr. Stahlman, he has

4    indicated a desire to have those exhibits made part of the record

5    prior to concluding the cross-examination, and that is satisfac-

6    tory to me.

7         MR. STAHLMAN:  That isn't exactly it.  I asked you whether

8    you were going to put them in.  I just received them this morning.

9    I think we would like to look them over before we preclude our-

10   selves from cross-examining on the exhibits.

11        MR. VEEDER:  You have no objection to my proceeding in the

12   manner I suggested?

13        MR. STAHLMAN:  No.

14        MR. VEEDER:  I would think you would want them in the

15   record now.

16        MR. STAHLMAN:  I have no objection to them going in.  Just

17   so we are not precluded from cross-examining after we have had

18   an opportunity to check them.

19        MR. VEEDER:  I certainly have no objection to that.

20        If that is agreeable, may I call Mr. Kunkel for the purpose

21   of identifying these exhibits and offering them into the record.

22        THE COURT:  Yes.

23        MR. VEEDER:  Mr. Clerk, may I have on the easel Exhibits

24   16-F and 16G.

25        MR. STAHLMAN:  It might be well if they were explained,

P 6   1   so that we can determine whether or not there will be cross-

2   examination.

3   FRED KUNKEL,

4   having been previously duly sworn, on his oath was examined and

5   testified further as follows.

6   DIRECT EXAMINATION RESUMED

7   THE COURT:   That is what he proposes to do.

8   Briefly, what is Exhibit 16F, a profile of what?

9   MR. VEEDER:   Will you state into the record, Mr. Kunkel?

10   THE WITNESS:   Exhibit 16F is the profile EF starting from

11   the point shown as E on Government's Exhibit 15E in the Temecula

12   Gorge below Pauba Valley, extending in a general northeasterly

13   direction to the point F at the east edge of Goverment's Exhibit

14   15E.   Exhibit 16F is a profile up the center of Pauba Valley,

15   along that line.

16   THE COURT:   While you are at it, for my index here, what

17   is Exhibit 16G?

18   THE WITNESS:   Exhibit 16G is a profile starting at the

19   northwest edge of Murrieta Valley northeast of the Wildomar

20   Fault at the point G along the line through Well 6K1, through

21   the Navy Well 17M1, through the well labeled Erle Stanley Gardner

22   in Section 8 South 2 West 22L1, to the point labeled H in Section

23   19 8 South 1 West.

24   BY MR. VEEDER:

25   Q  Alluding first, Mr. Kunkel, to the identification marked

P. 7

1 16F, would you state the sources of information that you utilized

2 in preparing that exhibit?

3     A  Well logs in evidence identified above every well.  Every

4 well we used in the preparation of the exhibit is shown by a

5 well number above the line indicating the well.  For example,

6 Well 8 South 3 West 13R1 is Government's Exhibit 16A64, 8 South

7 2 West 18R1 is Government's Exhibit 16A58.

8     Q  Which is the Naval well?

9     A  The Navy well is 8 South 2 West 17M1, Government's

10 Exhibit 16A53.

11     Q  Would you locate the Windmill Well on the exhibit?

12     A  The Windmill Well is 8 South 2 West 12H1 Government's

13 Exhibit 16A49.

14     Q  On what scale have those been prepared?

15     A  The horizontal scale has been one to 24,000, the same

16 scale as Government's Exhibit 15E.  The vertical scale is one

17 inch equals 100 feet.  There is a considerable vertical exagger-

18 ation.  To give one an idea what the cross section would look

19 like without vertical exaggeration, there is a small section at

20 the top of Government's Exhibit 16F labeled "Geologic Section

21 EF Along the Temecula River Without Vertical Exaggeration."  It

22 is exactly the same line of section.  However, the scale in the

23 horizontal and vertical direction are the same.

24     Q  Now, observe on the Naval Well the cross section and the

25 apparent log that was utilized.  Would you tell us the source

P 8   1   of the data upon which you relied in preparing that phase of

2   Exhibit 16F?

3    A   The source of the data upon which I relied are the log,

4   Government's Exhibit 16A53, and also the electric log, which is

5   part of Fallbrook's Exhibit AB.

6    Q   Would you state into the record and read into the record

7   the title block on Fallbrook's AB?

8    A   The title block on Fallbrook's AB is "Report On the

9   Pauba Branch Exploratory Well In Riverside County," and the

10   author is George F. Worts, Jr., and others.

11    Q   Would you state whether or not the electric log to which

12   you made reference is part of Fallbrook's AB?

13    A   The electric log to which I have made reference is part

14   of Fallbrook's AB.  It is identified as Plate 7.

15    Q   Would you also state whether the log which was filed

16   with the State of California is part of Fallbrook's AB?

17    A   The log which is Government's Exhibit 16A53 is also

18   contained in the Fallbrook's AB.  There are actually two logs

19   shown; one log by the driller, which is the first of the two

20   logs shown in appendix 1; the log by the Geological Survey is

21   the second log of seven pages, and this log states "Source of

22   Data; Field Sampling During Drilling by R.B., L.D. and R.W."

23   R.B. is Ralph Brown, L. D. is Lee Dutcher and R. W. is Robert

24   Waite, all employees of the Geological Survey at that time.

25    Q   I hand to you an exhibit marked Vail's F for identifi-

P 9

1    cation, which has not been received into the record, and I ask

2    you to state into the record what is shown on that identification.

3        A   Vail's F, which has just been handed to me, is on a

4    County of Riverside official well record form and it is by the

5    Van Noy Drilling Company Incorporated, and it is an abbreviated

6    log of the Pauba or the Navy Well.

7        Q   Would you read what the abbreviated log states?

8        A   The abbreviated log states that the well was drilled

9    to a depth of 2480 feet, and the formations are identified as

10   "alternate stratas of sand, gravel and clay."

11       Q   Will you compare that with the log that is depicted on

12   16F?

13       A   The log on 16F indicates a total depth of 2478 feet,

14   indicating alternate stratas of sand, gravel and clay.

15       Q   Who prepared 16F?

16       A   Government's Exhibit 16F was prepared by myself.

17       Q   Is it correct, to your personal knowledge, based upon

18   the scale you used?

19       A   Based upon the scale I used, it is correct to my know-

20   ledge.

21       THE COURT:   What are you going to do with Vail's F?

22       MR. VEEDER:   I will withdraw my objection that was origin-

23   ally made to it, your Honor.

24       THE COURT:   Offer Vail's F in evidence?

25       MR. VEEDER:   Yes.

P 10   1      THE COURT:  Mr. Stahlman?

2      MR. STAHLMAN:  Yes your Honor.

3      THE COURT:  Vail's F received in evidence.

4      MR. VEEDER:  And I offer 16F.

5      THE COURT:  Government's Exhibit 16F received in evidence.

6  BY MR. VEEDER:

7      Q  Now Mr. Kunkel, I ask you to approach the exhibit marked

8  16G for identification and I ask you--

9      THE COURT:  Before you go into that, I want to ask a question

10  about this.

11      MR. VEEDER:  All right your Honor.

12      THE COURT:  You show various symbols under "Explanation."

13  You have one for clay, one for adobe, one for sand, one for

14  gravel, one for boulder, one for conglomerate, and one for rock.

15  But there is no symbol shown for these little straight lines

16  that you show horizontally across.

17      THE WITNESS:  The little straight lines are actually the

18  symbols for clay and adobe.  Actually, what happened was that

19  they didn't print well and the draftsmen heavied them up with

20  ink.

21      THE COURT:  Is there any significance where the straight

22  lines are darker?

23      THE WITNESS:  No Sir, there is not.  It is because the

24  draftsmen heavied them up.  They showed through better.

25      THE COURT:  So the numerous little straight lines shown

P 11  1   on the exhibit in faint print are no more significant than the

2   straight lines shown in the heavier print?

3       MR. VEEDER:   I would like to have that cleared up on the

4   exhibit.

5       THE WITNESS:   That is correct.

6       MR. VEEDER:   We can write that on, if you want us to, your

7   Honor.

8       THE WITNESS:   The same well shown on 16G, the lines are

9   not heavy.

10      MR. VEEDER:   Would your Honor like to have us do that.  We

11  can put it on 16F.

12      THE COURT:   Just add a note, Mr. Kunkel, on 16F, pointing

13  out that there is no significance to those straight horizontal

14  lines which are darker.  Do that at the recess.

15      Now you are going to 16G?

16      MR. VEEDER:   That is correct.

17      Q  Read the title block into the record, Mr. Kunkel.

18      A  The title block of Government's Exhibit 16G is "Geologic

19  Section GH Through the Murrieta and Pauba Valley Areas."

20      Q  You have already related that to Exhibit 15E, have you

21  not?

22      A  I have done that.

23      Q  Would you discuss generally what is depict   on Government's

24  Exhibit marked for identification 16G?

25      A  Government's Exhibit 16G as identified by the line of

P 12

1  section shown on 15E in general parallels the Murrieta Valley

2  northeast of the Murrieta fault zone to the point where it

3  intersects the Navy Well 8 South 2 West 17M-1, identified as

4  the Pauba Well on Government's Exhibit 16G, and from there it

5  moves in a line of section generally southeasterly to the out-

6  crop of the basement complex.

7  Q  What were the sources of data upon which you relied in

8  the preparation of the exhibit marked for identification 16G?

9  A  The same sources of data were relied upon for 16G as

10  for 16F and are indicated above every well.  For example, Well

11  7 South 3 West 6K1 is Government's Exhibit 16A13, Well 7 South

12  3 West 7A1 is Roripaugh's Exhibit D, 7 South 3 West 21H1 is

13  Government's Exhibit 16A23, and so on for the other wells on

14  the cross section.

15  Q  Have you an opinion as to whether all the wells depict

16  on 16F and 16G tap the same water bearing strata?

17  A  In my opinion, all of the wells shown on 16F and 16G

18  tap the same water bearing strata.

19  MR. VEEDER:  I offer in evidence the exhibit marked for

20  identification 16G, your Honor.

21  THE COURT:  Exhibit 16G received in evidence.

22  MR. SACHSE:  Would your Honor reserve ruling on that for

23  just a moment until I see whether I have any questions voir dire.

24  Would you read the last question and answer, Mr. Reporter.

25  (Whereupon the reporter read the last question and answer.)

P 13

1    MR. SACHSE:  I have no objection.

2    THE COURT:  Plaintiff's Exhibit 16G received in evidence.

3    THE WITNESS:  I noticed a slight omission on the part of

4    the draftsman who colored this section.  The lower part of Well

5    7 South 3 West 6H1 below the dashed line should have been colored

6    blue, and 17A1 below the dashed line should have been colored

7    orange.  May I add that at the recess?

8    THE COURT:  Yes, you may add that at the recess.

9    Tell me in about three sentences, what is the purpose of

10   these two exhibits?  What do these add to what we already know

11   about this matter?

12   MR. VEEDER:  I think they depict more clearly than we de-

13   picted prior to this time the continuous water bearing strata

14   that extends the full length of the Murrieta Valley on across

15   Pauba Valley and on down to the outer extremities of the Pauba

16   Valley.  I think it shows very clearly that anyone who is using

17   water in that Murrieta Valley and Temecula Valley are using

18   water upon the source of which the United States is relying in

19   this lawsuit.

20   THE COURT:  You arbitrarily put in there a hundred feet

21   of ground water storage unit in Exhibit 16G.

22   THE WITNESS:  That is arbitrary.

23   THE COURT:  Why do you cut it off on the righthand side

24   of 16G?

25   THE WITNESS:  A lack of data was the only reason that I

P 14
1   cut it off.  In my opinion, actually, the water does continue

2   towards the right or towards the east in that area.  However, I

3   didn't have sufficient control to extend it with certainty.

4       THE COURT:  Show me on the map below 15E where you cut it

5   off.  You cut it off just south of Well 8 South 2 West 22L-1.

6       THE WITNESS:  Measuring from the center line of 8 South 2

7   West 22L1, it is a distance of approximately 1850 feet.  The

8   same distance scaled off occurs in the southeast quarter of

9   Section 22.

10      THE COURT:  Go ahead.

11      MR. VEEDER:  I have nothing more on that, your Honor.

12      Cross-examination was in process when we recessed last

13  time.  However, before we resume on the cross-examination I

14  would like the record to show that Captain Libby of the Judge

15  Advocate General's office is present in the courtroom and that

16  he is going to take the place of Captain Powers, who formerly

17  oversaw this lawsuit from the standpoint of the Judge Advocate

18  General's office.

19      THE COURT:  What has happened to Captain Powers?

20      MR. VEEDER:  He has gone up to Deputy Judge Advocate

21  General.  He is in Washington D.C.

22      THE COURT:  I know Captain Libby .  I am glad to have him

23  here.

24      Come in at anytime Captain Libby .

25      MR. VEEDER:  The record should also show that Colonel

P 15

1    Frank Shine is in the courtroom.

2         THE COURT:  I am glad to have the Colonel here.

3         You are through, then?

4         MR. VEEDER:  I have the redirect examination, your Honor.

5         THE COURT:  All right, you may continue the cross-examina-

6    tion.

7                    CROSS-EXAMINATION RESUMED

8    BY MR. STAHLMAN:

9         Q  Mr. Kunkel, the area in which you have made your study

10   comprising Murrieta and Pauba Valleys, in relation to the various

11   faults that you were able to observe or to consider their ex-

12   istence by reason of your studies, do you consider this area to

13   be quite heavily faulted?

14        A  Compared to other areas where I have worked with faulted

15   alluvial deposits, I would not be of the opinion that this is,

16   using quite a qualitative term, a heavily faulted area.

17        Q  There is, however, considerable faulting in the area,

18   is there not?

19        A  There are a number of faults in the area, yes.

20        Q  And the faults which you have utilized in relation to

21   your studies and which you have considered are those all the

22   faults in the area?

23        A  In all probability, they are not all of the faults in

24   the area.

25        Q  Isn't it true that in an area such as this where you

P. 16

1   are able to observe and to discern and determine faults, that

2   there are a greater number of faults that you are unable to see?

3      A   There undoubtedly are a number of faults that I have been

4   unable to see.

5      Q   And there is no particular pattern as to the direction

6   of the faults in this area, is there?

7      A   There probably would be a pattern to the direction of

8   the faults.

9      Q   Have you been able to determine it?

10      A   I have done any detailed study with that specifically

11   in mind.

12      Q   But you know that within the area there are faults that

13   take various directions, some even at right angles to the others;

14   that is true, is it not?

15      A   They may occur at considerable angles to each other.

16      Q   As to the area of the Murrieta Valley, such as you have

17   attempted to depict using this chart here as an illustration,

18   down the entire valley there and east of the Murrieta fault,

19   do you know whether there is faulting in the area there that

20   is encompassed within the older alluvium?

21      A   There may well be, although I have observed no direct

22   field evidence that there is faulting in that area.

23      Q   And would, in your opinion, the faulting in that area,

24   if there is faulting in that area, have an effect on the flow

25   of water in that area?

MR. VEEDER:  Surface water or ground water?

MR. STAHLMAN:  Ground water.

THE WITNESS:  In all probability the faulting would have an effect on the movement of ground water.

BY MR. STAHLMAN:

Q  When you drew your water contours such as you depicted on the 15 series, did you in any way consider the water head of any of the artesian wells?

A  I was aware of the water head and I considered it in that sense.  I didn't base the contours exclusively on the artesian wells.

Q  Did you utilize the artesian wells in any way to determine the contours?  Are they part of the contours, in other words?

A  They were considered in that they were evidence as to approximate positions where water level contours would occur. They, coupled with other data of the non-flowing artesian wells, were all of the data I used.

Q  The water level in any particular artesian well would be of no import to determining the general water contour of the underground waters in the area, would it?

A  There would be a relationship.

Q  What would that relationship be?

A  If I may refer to 16F, the water level profile in the autumn of 1927, based on Wells 8 South 2 West 15C1 and 8 South

P 18

1    2 West 16G1, are shown as a dotted line above land surface.  Be-

2    low that there is another dotted line indicating the water level

3    profile in the autumn of 1959.  There has been a drop of--I

4    don't have the scale with me, but on the order of ten feet or

5    more in that area.  If one would then consider the water level

6    profile shown on shallow wells for the autumn of 1927, the

7    autumn of 1953 and the autumn of 1959, one would observe that

8    there has been a decline of water level in the profile based on

9    the shallow wells.  The two declines are related in that in all

10   probability the decline of water level in the deep wells is

11   directly related to the decline of water level in the shallower

12   wells.

13        Q  Could you, by measuring an artesian well, determine the

14   ground water levels in the shallower wells?

15        A  By direct measurement of the artesian wells only one

16   could not determine that.

17        Q  You are familiar with this well that has been referred

18   to as the Windmill Well, from which measurements were made under

19   the stipulated judgement?

20        A  I am acquainted with that well.

21        Q  Directing your attention to that well, your studies

22   indicate to you that that has been an artesian well?

23        A  That well has been a flowing well in the past, yes.

24        Q  Then your answer is yes?

25        A  My answer is a qualified yes, because, in my opinion

P-19

1   the water level in that well indicates the shallow water body

2   rather than the deep water body.

3       Q   Could you from that well determine your water level in

4   that area for all wells in the Pauba Valley?

5       A   It would be a good well to indicate what is happening

6   to the overall hydraulic gradient in that valley.

7       Q   Where is that well shown on this profile?

8       A   The Windmill Well is not shown profile GH, Government's

9   Exhibit 16G.   However, it is shown on Government's Exhibit 16F.

10      Q   That is this well here?

11      A   Well 8 South 2 West 12H1, Government's Exhibit 16A49.

12      Q   Drilled to a depth of 515 feet; is that right?

13      A   That is correct.

14      Q   And into the older alluvium?

15      A   Into the older alluvium.

16      Q   I would like to ask you a hypothetical question. Let

17  us assume a situation such as we have with the basin at Camp

18  Pendleton and a basin upstream such as we have at Pauba, with

19  a surface flow of water only such as we have at the gorge or

20  Station No. 3 and a measuring station such as at Ysidora where

21  there is surface flow and subsurface flow, and assume that you

22  were going to determine a division in any quanity between ex-

23  tractions of water from both these basins, in your opinion would

24  you be able to determine the equality of those measurements by

25  the flow of the surface water either at Station 3 or Station 6?

P 20

1    MR. VEEDER:  I object to that.  It doesn't make sense,

2    your Honor.  There are a vast number of facets that are involved

3    in that question which have not been stated necessarily.  For

4    example, counsel refers to the basin at Pauba.  The evidence

5    is that there is no Pauba Basin, but that the entire ground water

6    area extending northward up to the watershed line in Murrieta

7    Valley is a single ground water unit, and that there are innum-

8    erable factors that are involved in such matter--the effect of

9    faults, the effect of pumping, the effect of Vail--

10    MR. STAHLMAN:  I would like to have this answer before Mr.

11    Veeder's speech.  He can ask all the hypothetical questions he

12    wants to afterward.

13    THE COURT:  The objection is overruled.

14    MR. VEEDER:  I also add to this that the matter is incom-

15    petent, irrelevant and immaterial, not tending to prove any

16    issue in this case.

17    THE COURT:  Overruled.  I don't know what it tends to prove,

18    but let's hear the answer.

19    MR. VEEDER:  I think you ought to have it read back.  I

20    don't see how he could possibly--

21    THE WITNESS:  I would like to have it read back.

22    (The reporter read the pending question.)

23    THE WITNESS:  On the basis of the data which you have given

24    me in the hypothetical question, I would be/able to arrive at
     un

25    a division of water.

P 21

1    BY MR. STAHLMAN:

2         Q    You mean that in your opinion you could not make

3    such a measurement?

4         A    Not with only those facts before me.

5         MR. STAHLMAN:  I notice it is lunchtime, your Honor. I

6    still have a few questions.

7         THE COURT:  Do you want to go on for a few minutes?

8         MR. STAHLMAN:  I will get through with him more quickly

9    when we come back.  I am almost finished.

10        THE COURT:  Do you want to adjourn until 1:30 or until

11   2:00.

12        MR. STAHLMAN:  Either one.

13        THE COURT:  One-thirty.

14        (NOON RECESS)

                           - - -

15

16

17

18

19

20

21

22

23

24

25

P22

1    SAN DIEGO, CALIFORNIA, Monday, July 18, 1960, 1:30 P.M.

2    MR. VEEDER:  Your Honor, there is one gentleman in the

3    courtroom who came in by reason of letters that were sent out

4    for this date.  His name is Mr. Ussery.  He made some statements

5    to me.  I thought he should make them to your Honor.

6    THE COURT:  Come forward and be sworn Mr. Ussery.

7    ORIE A. USSERY,

8    one of the defendants herein, being first duly sworn, on his

9    oath was examined and testified as follows:

10   THE COURT:  You filed an answer in this case?

11   THE WITNESS:  Yes I did Sir.

12   THE COURT:  How much land do you own?

13   THE WITNESS:  Nineteen acres.

14   THE COURT:  Where is it located, Mr. Veeder?

15   MR. VEEDER:  It is located right at the confluence of

16   Warm Springs Creek with Murrieta in Section 27 Township 7 South

17   Range 3 West.  His two wells, your Honor, are 27L1 and 27L2.

18   I can point them out to you.

19   THE COURT:  Both in the younger alluvium in the Murrieta

20   Valley?

21   MR. VEEDER:  They are, your Honor, and between the faults.

22   THE COURT:  Is this an irrigation well and a domestic well?

23   THE WITNESS:  Yes sir.

24   THE COURT:  How deep is your irrigation well?

25   THE WITNESS:  Seventy-two feet, I believe.

THE COURT:  How much water do you pump?

THE WITNESS:  About 80 gallons a minute.

THE COURT:  How much of this 19 acres do you irrigate?

THE WITNESS:  Most of it.

THE COURT:  It is all irrigable?

THE WITNESS:  Practically all irrigable.  I notice here they gave me 18.8 or something like that.

THE COURT:  What does your record show, 18.8?

THE WITNESS:  Yes.

MR. VEEDER:  He has signed it.

THE COURT:  Is that satisfactory?

THE WITNESS:  Yes sir.

THE COURT:  What matter did you want to present to the court?

THE WITNESS:  Well, I would like for the court to consider dismissing this suit against me and this tract of land referred as Parcel 228 for lack of sufficient evidence as to what part of the underground water might belong to the stream system.  I have some small argument to offer in favor of it.

THE COURT:  What is your point?

THE WITNESS:  I offered to the Marine Corps Engineers the right to make any surveys necessary to establish the water conditions beneath this parcel of land.  I know of nothing being done about it that could be classified as definite evidence as to said conditions of the water stratas, where they came from

P 241   or where they might finally go.

2       Physically and financially, I have not been able to attend

3   this trial, but I believe it has been assumed that there is a

4   ground basin of water underneath this parcel fed by the Murrieta

5   Creek.

6       I can agree in part to this idea.  But underneath this

7   parcel there is not just one underground basin, but several

8   containing water of a different mineral test and having different

9   static level.  I have found that water can be pumped from one

10  for days without effecting the water level of any of the others,

11  leaving me to believe that beyond a reasonable doubt that the

12  different water stratas were being fed from a different source

13  and not part of the Santa Margarita watershed, and it is not

14  reasonable to believe that they will ever fill with water to

15  a sufficient level to flow or to get to Camp Pendleton, at least

16  not all of them will fill to such a level, and there is no

17  evidence that they are in any way connected together but on the

18  contrary there is circumstantial evidence that they are not so

19  connected.

20      I believe in justice to this parcel of land it should be

21  determined what stratas are being fed by Murrieta Creek and

22  the possibility of some being fed by other sources.

23      THE COURT:  I have your point in mind.

24      Let me give you an example.  We have been taking evidence

25  off and on on the geology under the ground.  No one can give

P 25

1   an exact picture of what underlay any piece of property, but we

2   have in this case the United States and the State of California

3   represented by Mr. Girard, who is here, as we say, propatirae

4   representing all the people, we have the attorney from the

5   Fallbrook Public Utility District, we have the attorney for the

6   Vail Ranch, we have had various counsel who have participated

7   throughout this trial, and we have the best evidence we can get

8   as to what lies beneath this property.  It is the agreement, I

9   think, of all counsel who have been in this case that certainly

10  between the fault lines of the Murrieta Valley--there is a fault

11  line on either side of that valley--that there is a basin of

12  water hydrologically connected, so that pumping anywhere within

13  that basin, at least legally, has an effect upon the rights of

14  other people.

15      So I would be prepared to hold that you would have correla-

16  tive rights with other persons who pump out of that same basin.

17      Let me give you an example of what might happen if this

18  were not the law.  This is the California law of water rights.

19  Suppose that the determination should be made that you owned

20  all the water beneath your ground--you could pump all you wanted.

21  And suppose the Vail Ranch decided they are going to acquire

22  a lot of this ground, so they bought all the ground for half

23  a mile all around you and put down a well on the four corners

24  of your 19-acre piece and decide they are going to pump water.

25  You have the right to all your water.  By the same token, they

P 26 1    have a right to all they could pump.  So they put wells down

2    all around your 19 acres and they irrigate a thousand acres that

3    they have up there.  What would happen to the water under your

4    19 acres?  You could just as well be without water.

5        THE WITNESS:  I don't think they should be allowed to pump

6    water off of the basin.

7        THE COURT:  This is all in the same watershed.  They would

8    not be violating California law if they pumped anywhere within

9    the Santa Margarita basin.

10        I am trying to give you a simple example.  I use the Vail

11    Company.  We could call it the X Company.

12        That is why the law grew up where people share a common

13    stream or common basin.  You have to have correlative rights.

14    Otherwise, you, holding a 19-acre piece, could well lose all

15    the water you might get under that ground.

16        THE WITNESS:  Unless it was just a basin that fills there

17    and stays there without flowing from one place to the other,

18    which kind of look reasonable to me.  I don't know.  The only

19    thing I find that I go down to one basin and that the water

20    level rises higher.  When I go down to the next one I have a

21    different water level altogether, a different test.  It leaves

22    me to believe that there is a basin under there as though there

23    was a dam there.

24        THE COURT:  As these basins were formed in the Pauba Valley

25    and the Murrieta Valley, and apparently the geology is very

P 27

1    similar, there is probably what we call lenticular layers--not

2    solid, continuous layers, but here is a layer of rather impervious

3    material, here is a layer that overlays, and you have a situation

4    where the material is not uniform--so it is entirely possible

5    that the well pumping from one level may seem to be taking water

6    from a different area than a well pumping at another level.  But

7    actually all of this water is interconnected.

8        THE WITNESS:  I would understand in that case why it would

9    happen.  It seems that water would seek its own level.  That is

10   all I know about it.

11       THE COURT:  It does, if you give it time.  But you notice

12   after you pump a well and let it be for a while the water level

13   rises, does it not?

14       THE WITNESS:  Yes, it comes back the same as it was when

15   I started out.

16       THE COURT:  Water comes in from other areas underneath the

17   ground.

18       THE WITNESS:  But here is a well just a few feet--I put

19   down testing holes a few feet--and the water will stand 28 feet

20   in it, where the first level it would stand at probably 12 to

21   18 feet.  And I can pump from your top level--of course, that

22   goes down while I am pumping, but when I quit pumping it rises

23   back to 12 to 16 feet, where your second level stays at the

24   same 24 to 28 foot level.

25       THE COURT:  Are you pumping the same amount of water out

P 28   1   of each of these holes?

2        THE WITNESS:  No, just from one at a time.

3        THE COURT:  The one that you say drops, you are pumping

4   much more water from it?

5        THE WITNESS:  I am pumping none from the other, just from

6   the one, and the level stayed the same.  This level would go

7   down while I am pumping, but as quick as I quit pumping the

8   level comes back to where it was.

9        THE COURT:  We have had well measurements made all through

10   that valley, and it is interesting to notice the correlation

11   of the water levels of all the wells through that valley, star-

12   ting at the north end of the Murrieta on down.  There is a

13   relationship between them showing that there is a water basin

14   underneath.  If there is anything I am certain about in this

15   lawsuit--there are some things I am in doubt about--it is that

16   you have a basin in the Murrieta.

17        THE WITNESS:  The question in my mind is whether we have

18   more than one basin.

19        THE COURT:  Anything further?

20        THE WITNESS:  No, I will not take anymore time.

21        THE COURT:  I propose to find that you have correlative

22   rights with other persons to the water from the Santa Margarita

23   stream system because of the overlying character of your land.

24        MR. VEEDER:  May Mr. Ussery's letter be made a part of

25   Exhibit 207E?

P 29   1   THE COURT:   It will be part of Exhibit 207E.

2   Come back, Mr. Kunkel.

3       FRED KUNKEL,

4 having been previously duly sworn, on his oath was examined and

5 testified as follows:

6      CROSS-EXAMINATION RESUMED

7 BY MR. STAHLMAN:

8   Q   Mr. Kunkel, in connection with these two wells in Sections

9 26 and 27, Well 1171-R1 and Well N-1, you have noted at different

10 times in taking measurements that the two wells had a considerable

11 difference in their static levels; is that correct?

12   A   That is correct.

13   Q   To what do you attribute the difference?

14   A   The easterly well 26N-1, in my opinion, is a sluggish

15 well and at all times did not represent the true conditions in

16 that area.

17   Q   Do you assume that the water in those two wells are of

18 the same chemical character?

19   A   I have made no qualitative or inspected no records or

20 analyses from the wells, but I would assume that they would be

21 in general of similar quality.

22   Q   For the purpose of this question, assume that there is

23 considerable difference in the chemical content of those two

24 wells.   What would be your explanation as to the source of water?

25   A   Depending on the nature of the difference.   The well

P 30

1   with the highest sodium percentage probably would be withdrawing

2   water from the deeper zones.

3       MR. VEEDER:  Did you say would be "withdrawing" water?

4       THE WITNESS:  Would be taking water from deeper zones.

5   BY MR. STAHLMAN:

6       Q  You assume that the well to the east, Well N-1, is the

7   sluggish well; is that right?

8       A  Mr. Vail has reported to me that when the well would

9   be pumped down it would be very slow to recover.

10      Q  How long have you let the wells remain without pumping

11  when you made your measurements?

12      A  I would have to check the record of the measurements,

13  but it would vary from, oh, perhaps ten, fifteen minutes to

14  several days, depending on the conditions at the time of the

15  measurements.  I know on some occasions the pumps were pulled

16  and they had not been pumped for several days.

17      Q  How many days would you assume the well would have to

18  remain a sluggish well such as this well would have to remain?

19  In other words, you assume that it is not its true static level

20  because of the sluggishness; is that correct?

21      A  Yes.

22      Q  How many days do you assume the well would have to

23  remain before it would reach that true static level?  It would

24  at some time, wouldn't it?

25      A  In all probability, it would at some time.

P 31   1      Q  Well, how long?

2      A  Well, that specific well I wouldn't be able to give you

3  an estimate.

4      Q  It wouldn't be a matter of weeks, would it?

5      A  I have observed wells where it has taken that long.  I

6  don't know.  Probably not in this case.

7      Q  Your water contours, what is the importance to you for

8  demonstrating the water contour?

9      A  The principal purpose of the contour is to show the

10  source and direction of movement of ground water in the area

11  over which the contours are shown.

12      Q  Source and movement, is that right?

13      A  Source and direction of movement.

14      Q  And the movement depends on what?

15      A  The hydraulic gradient, the head of water, the points

16  of recharge.

17      Q  How about the permeability of the substance through

18  which it travels?

19      A  Permeability would be a factor of the hydraulic gradient.

20  Assuming equal thicknesses in comparable areas of deposits, the

21  area of higher permeability would generally have the lower

22  hydraulic gradient.

23      Q  Permeability is the principal factor in its movement,

24  is it not?

25      A  Transmissibility is the principal factor, the sum of

P 32  1  the permeabilities.

2    Q   And permeability would determine whether or not it had

3  a chance to move or not?

4    A   Permeability would be a factor in the direction of

5  movement.

6    Q   By the way, these two wells that you have designated

7  in Sections 27 and 26, what is the distance between those two

8  wells?

9    A   As shown on Government's Exhibit 15E, the distance

10  between the two wells is approximately 2700 feet plus or minus.

11    Q   I want you to assume two wells in this area of that

12  approximate distance, both of them having a different water

13  level and neither well being sluggish, and they are two different

14  elevations, at some considerable distance, say 15 to 20 feet.

15  What, in your opinion, would be the cause of that.

16    A   They are not sluggish wells?

17    Q   Yes.

18    A   And they have a differenct in altitude of the water

19  surface of 15 to 20 feet?

20    Q   Yes.

21    A   And what are the other conditions?

22    Q   The distance.

23    THE COURT:  You mean they are 2700 feet apart, a half

24  mile apart?

25    MR. STAHLMAN:  Yes your Honor.

P 33

1    THE COURT:  Less than half a mile.

2    MR. STAHLMAN:  Approximate distance.

3    THE WITNESS:  What are the respective depths of the wells?

4    MR. STAHLMAN:  Would that make a difference?

5    THE WITNESS:  It might.

BY MR. STALHMAN:

Q  Assume they are both deep wells, both the same depth approximately.

A  We assume them both to be the same depth?

Q  Yes.

A  Similar construction, perforated in the same zones?

Q  Would that--

A  One possibility might be a fault barrier between the the wells.  The well having the higher head would be up the hydraulic gradient from the well having the lower head.

Q  Did you give any consideration to whether or not there may be any compartmentations in the area of Murrieta and Pauba valleys?

A  Yes, I have considered that as a possibility.

Q  And?

A  In my opinion--and what?

Q  Well, you considered it.  Did you reach any conclusion as to whether or not there existed any compartmentation?

A  Where I have been able to determine a compartmentation I have so indicated by faulting.

Q  You indicate one place up here.  Is this one of them you have indicated up here in the northeastern part of the valley?

A  Pointing to the southeast corner of Section 27 Range 4 West Township 6 South, I have indicated a probable barrier

P 2

1    which I have also testified is probably a fault.

2         THE COURT:  Far northwest corner of Exhibit 15E.

3         MR. STAHLMAN:  Yes.

4         Q  Any other areas within the--

5         A  I have indicated a probable barrier effect in Wolf

6    Valley in the Northeast quarter of Section 29 Township 8 South

7    Range 2 West.

8         Q  Is that the one that is also shown upon this?

9         A  No, that is not.

10        Q  That is not the one?  For the record, 16G.

11        A  No, that is not along the line of section.

12        Q  What were the factors upon which you determined the

13   probability of a barrier at those two places?  Some evidence of

14   the faulting?

15        A  The direction of the offset with relation to the overall

16   hydraulic gradient, in my opinion, would not be reason to show

17   a fault between Well 27R1 and 26N1 in Long Valley, because if

18   there were a barrier effect or a fault between Wells 27R1 and

19   26N1 one would expect--strike that.

20        Q  That is not the question I asked you.

21        A  I am sorry.

22        MR. STAHLMAN:  Read the question please.

23        (The Reporter read the pending question.)

24        MR. STAHLMAN:  Speaking now of the two last ones you have

25   just enumerated in the Northwest quarter of Murrieta and one in

1    Section 28-27.

2         THE COURT:   In the southeast corner of the map 15E.

3         MR. STAHLMAN:   Yes.

4         THE WITNESS:   The two barriers to which you have just

5    alluded were shown on the basis of different evidence.   The one

6    in the Southeast corner of the Government's Exhibit 15E in Wolf

7    Valley was based on the reaction of the water levels as shown

8    by the continous water level recorders in Wells 29C1 and 29G1.

9    In the northwest part of the area near the watershed boundary

10   between Murrieta and Elsinore, the probable barrier was shown

11   on the basis of several anomalous water levels in Wells 27J1

12   and 27M-3.

13   BY MR. STAHLMAN:

14        Q  Were there any physical characteristics of the land

15   there, topography or faulting, that would indicate that?

16        A  In the northwest in Section 27, the Elsinore and Murrieta

17   boundary, there was no surface evidence.   In Wolf Valley the

18   elongate outcrop of older alluvium in the southeast part of

19   Section 19, southwest part of Section 20 and the northeast part

20   of Section 29 indicates that the fault is a reasonable probability,

21   the surface expression of the outcrop.

22        Q  Did you find any of those characteristics in any other

23   area of the Murrieta or Pauba Valley?

24        A  One can observe the east west fault that goes south

25   through Murrieta Hot Springs.   If one were to project that fault

14,012

it would extend in a general westerly direction through parts

of Sections 15, 16 and 17, and if one would examine Government's

Exhibit 16G there is an offset shown in the cross section be-

tween the line separating basement complex or the projection

of the line separating basement complex as shown Well 7 South

3 West 6K-1 and 7 South 3 West 21H-1 and also the projection

of the line dividing parts of the older alluvium above which

they are identified as mostly semi-consolidated clay, silt,

sand and gravel as opposed to mostly consolidated sandstone

and shale.  Beneath the projected line there is an offset which

may well reflect the effect of faulting.  However, the exact

position and attitude of the fault, if a fault exists in that

place, has not been determined.

Q   This dashed line you have shown with the question mark

on it in Exhibit 16G, what do you propose to illustrate by that?

A   The term "rock" has occurred in a number of drillers

logs.  Specifically, I referred to Well Log 7 South 3 West 17A-1,

Roripaugh's Exhibit D, and Well 7 South 3 West 21H-1, Government's

Exhibit 16A23, and on Well 17A1 Roripaugh's D, the term "sand

and rocks" between the depths of 275 feet and 298 feet is used.

However, beneath that there is an entry called "sandy clay" from

298 to 320 feet.  Beneath that there is "brown sand and rocks"

from 320 to 360 feet.  Below that "clay and rocks." And there

are similar entries in Well 7 South 3 West 20H1, Government's

Exhibit 16A23, indicating that the driller encountered something

P 5

1   that was hard which he called "rocks." But this is not the

2   basement complex as defined and as used in this courtroom and

3   as I have used and as generally defined by the Geological

4   Survey, and the material within the zone where the driller

5   sometimes uses the term "rock," it is my opinion that the

6   deposits are relatively hard and contain relatively less water-

7   bearing materials than the materials above this line. Mr. Lynch,

8   the well driller, in his testimony describes similar circumstances

9   with relation to Well 7 South 3 West 6K1, and the Geological

10  Survey in the drilling of Well 8 South 2 West 17M1 encountered

11  very hard material at depths below 2150 feet.

12      Q  Then the question that I asked, can you answer that?

13  What does the line indicate here with the question mark on 16G?

14      A  It is the depth beneath which most of the alluvial

15  deposits are relatively hard and consolidated and the amount of

16  water-bearing material in that area is considerably less than

17  above the line.

18      Q  In connection with the drilling or the well log of 8

19  South 2 West 17M1, was that the depth as indicated here that

20  you say there was rock formation of some character found?

21      A  The Geological Survey did not define those materials

22  as "rock." I would like to refer to--

23      Q  Let me ask you this question.

24  MR. VEEDER:  Let him finish his answer.

25  THE WITNESS:  I would like to refer to Fallbrook's Exhibit

P.6

1  AB, page 23, which is in evidence.

2      MR. STAHLMAN: May I have the question reread?  I would

3  like to see whether he is answering it.

4      Would you read the question please?

5      (The Reporter read the pending.)

6  BY MR. STAHLMAN:

7      Q  Answer that yes or no, and then explain it.  All I am

8  interested in is whether it is or is not.

9      A  It is not basement complex.

10      Q  Is that the depth that you referred to when you said

11  they had reached rock in one of the drillings?

12      A  I didn't say they reached rock in the drilling of the

13  Pauba well or the Navy well.

14      Q  Do you consider the character of the material below the

15  dotted line with the question mark or dashed line with the question

16  mark or both these wells as the same substance?

17      A  They are probably very similar materials.  May I explain?

18      Q  That is all I want to know.

19      THE COURT:  Make your explanation.

20      MR. STAHLMAN:  Go ahead.

21      THE WITNESS:  Mr. Worts in the preparation of Fallbrook's

22  AB states on page 23:  "The terms used to classify materials

23  vary among drillers and differ from those used by the Geological

24  Survey.  Two sets of terms were used loosely, sand versus sandstone,

25  and clay versus shale.  Because no sandstone pieces or bits of

P 7

1  shale as such were seen to pass over the shaker table the mater-

2  ials were classified as sand or clay by the Survey, although it

3  was suspected or known that in the deeper part of the holes the

4  materials penetrated were fairly well consolidated."

5  BY MR. STAHLMAN:

6      Q  By "deeper part," do you have an opinion as to what the

7  deeper part is?

8      A  Below 2150, as supported by the electric log.

9      Q  This is the conclusion that you reached, and you give

10  consideration to the fact that Mr. Worts had reported that below

11  a thousand feet was bedrock?

12      A  I am aware of the report by Mr. Worts which was made

13  prior to the running of the electric log, and on the basis of

14  the electric log the final report and final conclusion was reached.

15  The reference you are making is pretty well left to the Navy,

16  not the final conclusion.

17      Q  The type and character of examination that was made

18  during the drilling of the test hole was a visual examination

19  by a geologist, to wit, Mr. Worts, was it not?

20      A  It was a geologist; as stated earlier, three men by

21  name of Ralph Brown, Lee Dutcher and Robert Waite.

22      Q  The electric log doesn't indicate the type of material,

23  does it?

24      A  The electric log indicates very well the type of material

25  with reference to its water yielding character.

1   THE COURT:  Let's interrupt now to take up the criminal

2   calendar.

3       (Other matters.)

4   THE CLERK:  Number 16-1247-SD-C United States versus Fallbrook.

5       THE COURT:  Mr. Stahlman, you were carrying on a scintil-

6   lating cross examination before the recess.

7       MR. VEEDER:  Your Honor, before he scintillates any more,

8   may I make an inquiry as to actually the objective of the cross

9   examination and where we are going.  From my standpoint, I have

10  gone back through the Vail Exhibits and I am convinced that the

11  Vail Company agrees that this Navy Well went into a water bearing

12  strata the full distance; and that, moreover, the Vail Company

13  spent a great deal of money in connection with its belief that

14  this was a water bearing strata from start to finish.  So what

15  is the objective?  I can't see the purpose.

16      THE COURT:  Proceed.

17      MR. STAHLMAN:  May I ask the next question your Honor?

18      THE COURT:  Yes, proceed.

19  BY MR. STAHLMAN:

20      Q  Mr. Kunkel, I will ask you will assume that you had two

21  wells of the same depth a thousand feet apart that constantly

22  had different water levels.  Wouldn't that indicate compartment-

23  ation or low permeability?

24      A  It very well might represent compartmentation.

25      Q  Well, it would, wouldn't it, one or the other?

P 9

1    THE COURT:  Your question ignores the fact that two wells

2    a thousand feet apart, one might be up gradient from the other.

3    If that were true, you would obviously have a different water

4    level than in the other.  Are you supposing, by your question,

5    that the two wells are on the same water contour line?

6    MR. STAHLMAN:  Yes, on the same water contour line, your

7    Honor.

8    THE COURT:  You didn't say that.

9    MR. STAHLMAN:  I will add that to it.

10   Q  Would that indicate low permeability or compartmentation?

11   A  It is possible that it might represent compartmentation.

12   Q  If the two wells were on the same ground level, would

13   it indicate the same thing?

14   A  It might.  However, if one well were up gradient, it

15   wouldn't necessarily imply that.

16   Q  If one well were what?

17   A  If one well were up the hydraulic gradient but on the

18   same ground level, it wouldn't necessarily imply compartmentation.

19   Q  One other question.  You have been up on the Warm Springs

20   Creek on occasions?

21   A  Yes.

22   Q  Did you ever see surface water there in the summertime?

23   A  I have observed water in Warm Springs Creek below

24   Murrieta Hot Springs.  Up further north I have not actually

25   observed surface water flowing in Warm Springs Creek.  However,

I have observed considerable evidence of a very shallow water table.

Q   You have indicated that this is surface flow here, as you have indicated on Exhibit 15E, is that right, the red line in Sections 23 and 14?

A   That is correct; 7 South 3 West Sections 14 and 23.

Q   How about below that point, between there and its confluence with Murrieta, have you ever seen flowing water there in the summertime?

A   To the best of my recollection I do not recall having seen flowing surface water there in the summertime.

Q   Have any of your studies or information that you used in any particular in compiling your maps indicate that there had been water at any time in the summertime in the area you have indicated?

A   Only insofar as there was a number of the wells in the area which had a considerable head above land surface.   In my opinion, under natural conditions there undoubtedly was ground water discharge in that vicinity.

Q   With that exception you would say no; is that right?

A   Other than that, I personally have not observed flowing water.

MR. STAHLMAN:   That is all I have your Honor.

THE COURT:   Mr. Sachse.

P 11

CROSS EXAMINATION

BY MR. SACHSE:

Q  Mr. Kunkel, inviting your attention to your Exhibit 16G, am I correct that the broken line immediately below the surface contour line shows the water level profile in the autumn of 1953?

A  That is correct.

Q  Am I correct, or do my eyes deceive me, that your water level profile shows a slope to the northwest from the Well 7 South 3 West 16K1?

A  Along the line of section there is an increment of slope toward the northwest.

Q  Toward the San Jacinto watershed.

A  Toward the San Jacinto watershed.  However, this is only one increment of the true slope.

Q  So that we clearly understand each other, this contour line that you have indicated on 16G1 shows that the hydraulic gradient in the fall of 1953 ran from the Well 6K1 to the San Jacinto watershed; is that right?

A  One can't refer only to section.

Q  I will limit it to that section.

A  Because actually the direction of movement is southeast toward Murrieta Valley, and as one goes from Well 26K1 toward the San Jacinto or Elsinore drainage there is decrease in hydraulic gradient or lowering of hydraulic gradient.  But the actual increment of the movement is not along that line of section.

P 12

1    Q   Then you don't want us to accept as an absolute fact

2   that the ground water gradient slopes between 35D1 and 6K1, left

3   to right--or right to left?

4    A   This is what one would call an apparent dip along the

5   line of section or apparent gradient along the line of section.

6    Q   But it is not true?

7    A   It is accurate along the line of section as indicated.

8   However, you have to think of it in three dimensions.  This is

9   only a two dimensional picture.

10   THE COURT:  Before you pass that--

11   MR. SACHSE:  I haven't passed it by a longshot, your Honor.

12   Q   Mr. Stahlman asked you some questions, repeating my

13   cross examination of you, concerning this probable barrier which

14   you have delineated up here.

15   A   That is correct.

16   Q   You said you thought it was a fault?

17   A   Probably.

18   Q   If I am quoting you correctly, I believe under my cross

19   examination several days ago you stated that you meant that it

20   was a barrier to the movement of water to the southwest; is that

21   correct?

22   A   Yes.

23   Q   In fact, you drew me one or two arrows showing movement

24   generally into the San Jacinto; isn't that correct?

25   A   That is correct.

P 13

1    Q   Where is that barrier with relation to this contour?

2    A   The barrier would be immediately toward the east of

3   Well 6 South 4 West 35D1.

4    Q   Then your hydraulic gradient is wrong, isn't it?

5    A   No, the hydraulic gradient is correct as shown.

6    Q   I asked you very carefully to show me with red arrows

7  where the water ran into the San Jacinto and where it ran

8  somewhere else.  On this line of section you show a continuous

9  line right through the barrier into the San Jacinto watershed;

10  is that correct?

11    A   That is correct.

12    Q   Now I want to refer to 15E-1.  Taking first the year

13  1959 as shown on Exhibit 15E-1--let's start with K-1, here it

14  is I believe--in the fall of 1959 you showed a 1282 foot contour;

15  is that right?

16    A   That is correct.

17    Q   The Well 1A1 you showed 1204 foot contour; that is on

18  the same line of section, isn't it?

19    A   For the year 1959.

20    Q   For the year 1959, but it is on the same line of section,

21  is it not?

22    A   It is on the same line of section.

23    Q   So you would have found a very marked hydraulic gradient

24  in 1959 from K1 to A1, would you not?

25    A   That is correct.

P 14

1    Q  I am going to ask you to make some comparisons between

2    water level measurements on the three years as shown on your

3    three exhibits El, F-1 and G-1.  Do I make myself clear?  These

4    are my copies.  If you want to use your originals you may, or

5    you may use mine.

6    A  Will the clerk let me have 15F and G.

7    Q  Let's start with K1.  I am going to stay in this general

8    area here.

9    A  Possibly we can put them up.

10   Q  I want 1958, 1953 and 1959 altogether.  Better put the

11   1959 right under it.

12   Let's start with 1959.

13   THE COURT:  Which is 1959?

14   MR. SACHSE:  1959, 1958, 1953, your Honor.

15   Am I correct?

16   THE WITNESS:  Yes.

17   MR. VEEDER:  15E is 1959.  That is the top map.

18   THE COURT:  What is the second map?

19   MR. SACHSE:  1958, 15F; and 1953 is 15G.

20   Q  Now, let us look first at the Well 6K1.  You had depth

21   to water in 1959 1282 feet; is that right?

22   A  That is correct.

23   Q  What was the depth to water in 1958 in the same well?

24   A  1286.

25   Q  So between 1958 and 1959 it went down four feet?

P 15

1    A  Yes.

2    Q  What was the depth in 1953?

3    A  1277.

4    Q  So between 1953 and 1959 this well went up five feet;

5 is that right?

6    A  On the basis of the records available, that appears to

7 be true.

8    Q  Let's jump over to Well 1A1 1959 1204 feet; is that right?

9    A  That is correct.

10    Q  What was it in 1958?

11    A  1164.

12    Q  In other words, it was up 40 feet in one winter; is that

13 right?

14    A  Apparently so.

15    Q  And incidentally, very interestingly, in 1958 this was

16 a--what is your code mark?  It is just a well.  But in 1959 after

17 we put an irrigation pump on it the water level rose 40 feet;

18 is that right?

19    A  Not necessarily.  For the years 1953, 1958 I do not have

20 sufficient data to differentiate which wells were irrigation

21 wells and which wells were not.  To the best of my recollection,

Belt 4  22 it was an irrigation well in 1958.

23    Q  Then in spite of the fact that they pumped it as an

24 irrigation well between the winter of 1958 and fall of 1958 and

25 the fall of 1959 it rose 40 feet?

P 16   1 A On the basis of the water levels available.

2 Q That is the fact, is it?

3 A Yes.

4 Q Let's jump over to Well 32N-1 and 2.  You have the two

5 marked together.  Have you located it? 1349 in 1959.

6 A N-1 and N-2.  Yes.

7 Q What was it in 1958?

8 A 1349 in 1959, 1334 in 1958.

9 Q It went up 15 feet during that winter again, did it?

10 A Between the periods recorded covering that well, that

11 is the amount.

12 Q Let's try 5L-1 and -2.  Tell me what change there was

13 in 1958 and 1959?

14 A In 1959, as shown by 15E, the water levels in 5L-1 and

15 5L-2 were about 1255 or 1256 apiece.

16 Q What were they in 1958?

17 A I didn't have a record in 1958.  However, in 1953 it

18 apparently was 1246.

19 Q What is the difference?

20 A A rise of water level between the period 1953 to 1959.

21 Q Of how much?

22 A Forty-six to fifty-six, about 10 feet.

23 Q Will you agree that this is rather a marked fluctuation

24 in elevation of the ground waters?

25 A Yes, also with the proviso that there is a relatively

P 17

1   limited number of records available on any one well to accurately

2   determine the overall seasonal pattern.

3       Q  Do you consider it to be the normal pattern as indicated

4   by the changes you have drawn in ground water contours that

5   water levels go up 25 feet or go up 40 feet in individual wells

6   during the period of time when you show the water level contour

7   going down?  Is that normal?

8       A  One cannot rely on any one well in a circumstance such

9   as this, because with a limited number of records there are apt

10  to be residual pumping effects in any one well, and this has

11  to be evaluated and a certain amount of judgement has to be

12  exercised by the person drawing the countours.

13      Q  And in drawing your water level contour changes that

14  took place between 1953 and 1958 and 1958-1959 you chose to

15  evaluate the changes that showed a decline in water levels,

16  but you didn't choose to evaluate the changes such as I have

17  pointed out that showed forty foot increase; is that right?

18      A  I used the well to show forty foot increases for the

19  same reason that I used--or at least they were evaluated.  I

20  didn't selectively take only wells and show a decline and those

21  that showed a rise.  I attempted in all cases to base the con-

22  tours of water levels that reflected the conditions as they

23  existed.

24      Q  Mr. Kunkel, I have pointed out to you in an area of

25  less than three sections half a dozen wells with very marked

14,026

P. 18

1   rises, just in that one little area of three sections.  Are you

2   telling me that you did in those three sections show an improve-

3   ment in the water level contours?

4       A  In Section 6 the 1250 foot contour for 1953, 1958 and

5   1959 is virtually the same.  The 1250 foot contour in 1958 in-

6   dicates perhaps a little higher water level than in 1959, but

7   it is not greatly significant, in my opinion--the difference.

8       Q  Do you consider it at all significant that the well

9   6 South 4 West 1A1, which showed a forty foot increase in one

10  year, is the one you picked to show a pumping hole?

11      A  Yes, that is a relatively good well for that immediate

12  area.  It was pumped relatively a large amount for that area,

13  and in my opinion there is a small pumping depression in the

14  vicinity of that well, which one would expect because water has

15  been withdrawn from the well.  The water level of necessity had

16  gone down and there must be a flow of water to replenish the

17  water which had been withdrawn, and this would be reflected by

18  a pumping depression.

19      Q  If after a rise in ground water level of 40 feet you

20  still show a pumping hole, you must have had a pretty good sized

21  pumping hole before you had the rise, must you not?

22      A  In all probability there was a--

23      Q  Show me the pumping hole that you had in 1958 in that

24  area.

25      MR. VEEDER:  Do you want him to draw one on there?

P 19

1    THE WITNESS:   The 1250 foot contour in 1958 and in '59 are

2  very close to the same.   There would be at all points between

3  the 1250 foot contour--there is no place, in my opinion, at that

4  time where there was a closed contour around that well.   It does

5  not imply that there was not a lowering of water levels in that

6  area.   As a matter of fact, the lack of the 1250 foot contour

7  would indicate that there was a pumping hole.

8    Q   Now Mr. Kunkel, just tell me this.

9    MR. VEEDER:   May I have the number of the well?

10    MR. SACHSE:   6 South 4 West 1A1.

11    Q   Mr. Kunkel, just explain to me, if you will, what fact--

12  any fact at all--you have that enabled you to draw a circular

13  1250 foot contour around that well immediately following its

14  40 foot rise when you had no contour around it before?   Tell

15  me what fact enabled you to do that.

16    A   I had less data in 1958 than I had available to me in

17  1959.

18    Q   That is what I am asking you.   What is the additional

19  data that you had in 1959?

20    A   I had water level measurement in Well 1H1 and 1C2.

21    Q   But you didn't know whether those went up or not, did you?

22    A   No I don't.

23    Q   But you knew that A1 went up 40 feet?

24    A   It is an attempt, Mr. Sachse, you might say, to be con-

25  servative against showing an extreme decline in the area, because

P 20   1   if one were to give full weight to the water level 1164--I would

2   like permission to check that to see if perhaps that might not

3   be a pumping level.  I don't recall right off.

4       Q  Do you want to check it now or later?

5       A  Let me check it later.  But if it is not a pumping level,

6   then one could draw a 1200 foot contour around that well, be-

7   cause the surface of the well, the water level, was below 1200

8   feet, which would indicate a much greater pumping hole.

9       Q  Maybe a pumping hole running clear up to the northwest;

10   is that right?

11       MR. VEEDER:  You mean up to Seattle?

12       MR. SACHSE:  Up to the northwest of the watershed.

13       THE WITNESS:  On the basis of the data you couldn't demon-

14   strate it one way or the other, but in my opinion it probably

15   didn't extend that distance.

16       Q  If it did extend at all, it would be in that direction.

17   That would necessarily alter the statement you earlier told us

18   that this hydraulic gradient is a three dimensional line, would

19   it not, because this flow would be to the northwest then and not

20   to the west?

21       A  However, the cross section on Government's Exhibit G,

22   cross section GH, is for the year 1953 and it was based on the

23   water level measurements in 1953, not in 1958 or 1959--the water

24   level profile autumn 1953.

25       Q  In other words, your 1953 gradient would be even sharper

P 21  1   in 1958 and 1959 to the northwest, would it not?

2         A   The water level as indicated in 1953 was the highest of

3   the period and therefore the gradient, the increment of the

4   gradient toward the west would be greater.

5         Q   Let us go to this one for a minute.   We have a new

6   definition, Mr. Kunkel--I wish you would explain it:   "Rock,"

7   undifferentiated sedimentary rock containing some water yielding

8   zones.   Do you see the code to which I refer?

9         A   Yes.

10        Q   If I recall your earlier testimony, you said that "rock"

11  was a geologic term for anything; that "dirt," as ordinary people

12  would call it, is geologic rock; isn't that correct?

13        MR. VEEDER:   Isn't this cumulative?

14        MR. SACHSE:   I haven't asked a word about this.

15        THE COURT:   Overruled.

16        THE WITNESS:   Earlier in my testimony I did use the term

17  "rock" for alluvium, and I indicated that this was not an un-

18  common way in which geologists refer to all the sedimentary or

19  igneous or metaphoric material.   However, the term "rock," as

20  shown on Exhibit 16G and Exhibit 16F, is the term from the

21  driller's log where the driller has used the term "rock," and

22  is an attempt to be helpful to the court and to eliminate as

23  much interpretation involved as possible over the confusion that

24  has come to exist between the terms "rock," "bedrock," and

25  "basement complex."   I recognize a confusion of terms in our

P. 22

1 discussion.

2 BY MR. SACHSE:

3     Q You read the driller's log, and when you found the word

4 "rock" in the driller's log you believe it means undifferentiated

5 sedimentary rock, do you?

6     A That is my interpretation.

7     Q In every case?  Or does it sometimes mean basement complex?

8     A In some places it probably means basement complex, and

9 this is where I have had to use interpretation.

10     Q Did you consult a driller on every one of the places

11 where you may have shown rock in your profile to find out what

12 the material looked like?

13     A No, I certainly did not have the opportunity; but in

14 so far as possible I did discuss the problem with Mr. Lynch.

15     Q So this decision as to when the driller's term "rock"

16 means basement complex and when the driller's term "rock" means

17 water bearing material is made solely by you after reading the

18 log; is that right?

19     A It is made by me on the basis of the data available in

20 the log and interpretation of what his terms must mean.  May I

21 offer an example, Mr. Sachse?

22     Q Yes, go ahead.

23     A For example, in referring to the log of Well 7 South 3

24 West 21H1, Government's Exhibit 16A23, the driller refers to

25 "decomposed granite" between the interval of 436 and 461.

P 23

1    Beneath that he has "hard sticky clay, hard sandy clay, cemented

2    sand and gravel."  Obviously, if he had clay and gravel beneath

3    his decomposed granite, then his decomposed granite, of necessity,

4    could not have been decomposed granite.

5       Q   He didn't call it "rock;" he called it--

6       A   Then he had "loose sand" beneath that, "some water,"

7    then he runs into "very hard conglomerate," then he has "more

8    water."  Beneath that, of necessity, in my opinion, he was in

9    some sedimentary sequence that he called "conglomerate."  Of

10   course, he did not again use "rock".  But at depth 1394 to 1465

11   he has "hard rock."  But below that, at a depth of 1531 to 1550,

12   he says "broken rock with shale, very sticky."  In my opinion,

13   having observed a considerable amount of drilling and having

14   talked with drillers, he was in a sedimentary sequence.  It is

15   not until he gets to the lower part of his log, 2000 feet or

16   more, that he begins to refer to "broken rock" and "very hard

17   rock."  And this is true in many logs.  Of necessity, a geologist

18   has to use his experience as a guide and try to interpret what

19   the driller meant.

20      Q   Do you think Mr. Worts is qualified to interpret the

21   driller's term "rock" as well as you are?

22      MR. VEEDER:  I object to this, your Honor.  How could he

23   be qualified?

24      MR. SACHSE:  He knows Mr. Worts.  He worked for him.

25      THE COURT:  The objection is sustained.

P. 24

1    MR. SACHSE: What is the basis, your Honor?  I didn't

2    hear any statement of objection by Mr. Veeder.

3    MR. VEEDER:  I said, how could he be qualified?

4    THE COURT:  I am not going to have one expert pass on another.

5    MR. VEEDER:  Particularly when he is his boss.

6    BY MR. SACHSE:

7    Q  Can you tell us--perhaps not now, I appreciate--could

8    you make a little search, when you are off the stand, and locate

9    for us the cases from driller's logs where you took the term

10   "rock" as meaning the basement complex, and cases where you

11   took the term "rock" to mean water bearing material?

12   A  I'll do my best.

13   Q  Not necessarily all of them, but a representative

14   sample of both.

15   That is all, your Honor.

16   THE COURT:  What are you trying to prove, Mr. Sachse?  That

17   the chart is wrong?

18   MR. SACHSE:  Yes, that the witness doesn't know what he

19   is doing, and that he draws the chart the way the United States

20   of America wants it.  That's what I am trying to prove.

21   THE COURT:  Any further cross examination?

22   MR. GIRARD:  I have just a few questions, Mr. Kunkel.

23                     RECROSS EXAMINATION

24   BY MR. GIRARD:

25   Q  You recall, Mr. Kunkel, in these two wells that you used

P 25

1  in all three years, they are in Sections 26 and 27 in Long Valley

2  which have been discussed today, where one went up 20 feet and

3  the other did not; are you familiar with the two wells?

4     A  I am acquainted with the wells to which you are referring.

5     Q  As I understand it, your explanation of that was that

6  the one well in 26N-1 was at all times the sluggish well; is

7  that correct?  I have a quote here.

8     A  That is correct.  Based on information given me by Mr.

9  Wilkinson, I came to the conclusion that the easterly well is

10  the sluggish well--26N-1.

11     Q  Just comparing the well measurements between 1953 and

12  1958, Mr. Kunkel, that is, from 16F and 16G, in 1953 one of the

13  wells was 1152 and the other was 1153; is that correct?

14     A  That is correct.

15     Q  If this were not a sluggish well, if the one in Section

16  26 was not a sluggish well, this would be a type of relationship

17  you would expect, would you not?

18     A  That is correct; that is what I would expect.

19     Q  And then in 1958, some five years later, 1151 and 1153?

20     A  That is correct.

21     Q  Again, we find what you would expect if the wells were

22  operating correctly.  And then you find a drastic change in

23  1959, a year later, from 1152 in one and 1171 in another?

24     A  That is correct.

25     Q  Could you conclude from that that this one well became

P. 26

1   sluggish in this one year, or has it been sluggish all the time?

2      A  This is like the stopped clock; its right twice a day.

3      Q  At least, in 1953, and from 1953 to 1958 you found the

4   correlation you would expect to find if the wells were not slug-

5   gish and they were both correct?

6      A  That is correct.

7      Q  And in 1958 you find a marked distinction?

8      A  That is correct.

9      Q  And you conclude that the answer to that must be that

10   one of the wells is sluggish?

11      A  That has been my opinion, because all other wells in

12   the same general area that also indicated a rise--I don't have

13   my notes with me, but we did discuss this in earlier testimony--

14   if I recall correctly, Well 35E-1 and 34N-1 also exhibited

15   rather marked rise in water level.

16      Q  Nothing approaching 20 feet, did they?

17      A  I believe one was 11 and one was on the order of 6, if

18   I remember correctly.

19      Q  And those are the only two wells, aren't they, incidentally,

20   other than these two in Sections 26 and 27, that you have records

21   on in 1953 in this general area right below these two wells in

22   Long Valley?

23      A  As I recall, there may have been one other one that

24   exhibited a smaller rise.  I don't believe I referred to that

25   in earlier testimony.  I would have to search my notes to say

P 27   1   which one it was.

2   Q   In drawing your contour lines, say, for example 15E,

3   Mr. Kunkel, as I understand, in so far as the deep artesian

4   wells are concerned, you took into consideration those?

5   A   I did evaluate what there period of record meant.   I

6   did not base the water level contours on the head in those wells.

7   Q   In other words, you didn't draw your water contour lines

8   to correspond to the head or the top of the artesian wells?

9   A   No.   As a matter of fact, if one would do that, one would

10   have a series of contour lines that would be above land surface,

11   and actually, where the 1050 and 1100 foot contours cross the

12   stream channel I very definitely made it a point that it was

13   somewhere in or slightly above the 1100 and the 1050 foot contour.

14   Q   One other question, not on this, Mr. Kunkel.   Mr. Veeder

15   asked you a question, I believe originally on direct examination,

16   in so far as these two exhibits, Exhibits 16G and 16F are con-

17   cerned, were these waters from the same water bearing strata?

18   And you answered it to the effect that they are from the same

19   ground water body; is that correct?

20   A   That is correct.

21   Q   Am I correct now that you would assume that the same

22   ground water body includes the same meaning you gave us, in so

23   far as hydraulic continuity is concerned, as the water up in the

24   areas of the Frick Well, etc.?

25   A   In general--

P 28

1    Q  In other words, that is what you believe?

2    A  That is right.  And if you remember, in reply to the

3    earlier question, I did point out that there was a considerable

4    difference in the thickness of the water body in the area under-

5    lain by older alluvium as compared with the area underlain by

6    residuum.

7    Q  But when Mr. Veeder used the term "ground water strata"

8    and you answered it "ground water body," you intended to make

9    clear, I believe, your same general movement of the ground water

10   or hydraulic continuity that you have made all the way through;

11   is that correct?

12   A  That is correct.  I think in terms of a body of ground

13   water.

14   MR. GIRARD:  I wanted to have this marked, your Honor.  I

15   think I can put it on the board, to make my point.

16   THE COURT:  A new California exhibit?

17   MR. GIRARD:  Yes, your Honor.  I don't think it will be

18   introduced in evidence.

19   MR. STAHLMAN:  It is only for illustration anyway, isn't it?

20   MR. GIRARD:  It is just for illustrative purposes only.

21   In fact, maybe we can do it without marking it.

22   THE COURT:  What is the number, Mr. Clerk.

23   THE CLERK:  California's Exhibit AY, your Honor.

24   MR. GIRARD:  I don't have a copy of it.

25   I will show it to you, and explain what it is, Mr. Kunkel.

14 037

P 29   1     This is an elevation of water surface in a well which is

2  in, I believe, another watershed.  Is that correct, Mr. Illingworth?

3     MR. ILLINGWORTH:  Yes.

Belt 5   4     MR. VEEDER:  I object to this as being incompetent and

5  immaterial and not tending to prove a single issue in the case,

6  your Honor.  It goes beyond the scope of the direct examination.

7     MR. GIRARD:  It will be connected up with the hydrographs,

8  your Honor.

9     THE COURT:  Overruled.

10  BY MR. GIRARD:

11     Q  This dotted line is indicative of the average monthly

12  temperature at Elsinore.  It is correct to say that it shows

13  an up and down rise from the ground water which corresponds up

14  and down with the temperature; would you say that is correct?

15     A  In general, there is a similarity of pattern.

16     Q  Incidentally, these lines which are here in pencil are

17  taken from your Exhibit I-1, which are the hydrographs which

18  we have discussed previously, and although they are not daily

19  the up and down corresponds to the way you have had them drawn;

20  would you say that is generally correct?

21     A  In all probability.

22     MR. VEEDER:  Just a moment.

23     MR. GIRARD:  He can give an estimate.

24     MR. VEEDER:  I think this witness should be given a chance

25  to examine and check the data.  This is a complex picture.  We

1  were not served with any of it.  We have no way of knowing what

2  is involved.

3      THE COURT:  Go ahead with it.  He says they are generally

4  similar.  If he wants to study them later, he may do it.

5  BY MR. GIRARD:

6      Q  In other words, the elevations and changes in the ground

7  water which you have shown on Exhibit I-1, assuming that this is

8  a correct interpretation of those, would go up and down generally

9  with the same movement of the wells in the other watershed?

10     A  Assuming the plotting is correct as the illustration

11 indicates.

12     Q  Assuming the plotting is correct.

13     THE COURT:  What are you trying to prove?

14     MR. GIRARD:  Maybe I am making my point too strong, your

15 Honor, but as I recall when we were examining as to the hydro-

16 graphs someone commented that the rise in the water and the

17 lowering of the water was nothing phenomenal to this watershed;

18 it is apparent in any watershed during seasons dry and rainy

19 and when the water is being used and when it is not.  This

20 illustrates that you can take a hydrograph from another watershed

21 and get the same picture they did on their Exhibit I-1.

22     MR. VEEDER: Is he trying to prove that when you pump the

23 water level goes down and when you quit pumping it rises?

24     MR. GIRARD:  That is right.

25     MR. VEEDER:  I stipulate to that.

P 31

1   MR. GIRARD:  And that is what this exhibit showed.

2   MR. VEEDER:  So what, from this standpoint?

3   MR. GIRARD:  I think that is all I have, your Honor.

4   THE WITNESS:  Do I have a question before me or not?

5   MR. VEEDER:  You don't.

6   MR. GIRARD:  No.

7   MR. LITTLEWORTH:  May I ask a couple then?

8   THE COURT:  Yes.

9                    RECROSS EXAMINATION

10  BY MR. LITTLEWORTH:

11      Q  Mr. Kunkel, how far northeast of the Wildomar fault

12  line is this profile on Exhibit 16G located, in general?

13      A  At its maxium it is about 3000 feet.  At its minimum

14  it is about 1500, maybe a thousand feet at the Navy Well.

15      Q  Varying roughly from a thousand to 3000 feet.

16      A  Yes.  And as one approaches to the southeast it gets

17  progressively farther away, 5000, and at its maximum it is about

18  9000.

19      Q  Does Exhibit 16F or Exhibit 16G in any way change any

20  of the opinions or testimony which you have previously given

21  in this case?

22      A  16F-G and coupled with 16E, changes some of my opinions

23  to the degree that I am now more of the opinion than I had been

24  in the past that there is considerable leakage through or across

25  the Wildomar fault.

P 32

1    Q  How does the geological cross section tell how much

2 water is moving across the fault?

3    A  The cross section, in itself, doesn't.  The entire study

4 and collection of additional data that went into the preparation

5 of E, F and G--15E, 16F and 16G.

6    Q  Maybe you misunderstood my question.  My question was

7 related to 16F and G, which are the two exhibits you put in to-

8 day.  I asked you whether those two exhibits in any way changed

9 your previous testimony.

10    A  Previous from what?

11    Q  Any time previous to today.

12    A  I am not aware of any major changes.

13    Q  Those are cumulative, then?

14    A  Well, without reviewing the record, to say that every-

15 thing I said--

16    MR. VEEDER:  That is a legal question, the meaning of

17 "cumulative."

18    THE COURT:  Sustained.

19 BY MR. LITTLEWORTH:

20    Q  Look on 16G, Mr. Kunkel, and tell me generally, how deep

21 is the alluvium shown on Well 7 South 3 West 6K1?

22    A  As reported by Mr. Lynch, who drilled the well, he

23 encountered bedrock--and in this particular case, Mr. Sachse,

24 in reply to one of your earlier questions, I am of the opinion

25 that the driller in this particular case meant basement complex,

14,041

P 33

1   He more or less reemphasizes himself by saying, "when you hit

2   it, you don't go."  This is a rather good way to state it.

3       Q  So you have some 1300 feet of younger alluvium, then,

4   on that well?

5       A  No, this older alluvium.

6       Q  Older alluvium.  Excuse me.

7       A  Yes.

8       Q  Do you agree with the previous testimony that the water

9   production from that well is very poor?

10      A  I have checked this well out, and it is poor.

11      Q  Can you tell me the reason for the poor production from

12  that well, in view of the depth of the older alluvium?

13      A  As indicated in earlier testimony, the upper part, in

14  general, of the older alluvium is more permeable or contains

15  more permeable zones than the lower part, and apparently the

16  upper part of the older alluvium in the vicinity of Wells 7

17  South 3 West 6K1 are less than 300 feet, or 280.  Mr. Lynch in

18  his testimony indicated that there was a zone there below which,

19  by two different periods of testing where he tested the entire

20  length of the well and sealed it off and tested the upper length,

21  indicated that the lower part of the well did not contribute a

22  large amount of water.  On this basis, I am of the opinion that

23  the section of older and tighter material indicated on 7 South

24  3 West 21H1, referred to in Goverment's Exhibit 16G, the inter-

25  val within which there is the symbol for rock, and the lowest

P 34

1   part of the Pauba Well below 2150 and the material in 6K1 below

2   several hundred feet--the exact depth I am not certain now--are

3   comparable in water yielding character.

4        Q  Let's see if I can take this in smaller pieces, then.

5   Is it your opinion that approximately the lower thousand feet

6   of the older alluvium in Well 6K1 is of poor water bearing

7   capability?

8        A  It is of relatively poorer water bearing capability than

9   the material above.

10        Q  And that is because it is compressed, it is tight?

11        A  Apparently so.  Geologically, it lies in a little area

12   that would be known perhaps as a graben or a down-dropped area

13   behind an outcrop of basement complex, and conditions in that

14   immediate area apparently are such that the older tighter phases

15   of the older alluvium are closer to the surface than they are

16   in other parts of Murrieta and Pauba Valleys.

17        Q  Do you have an opinion as to the effect of pumping from

18   this older, tighter material in the area of the well known as

19   6K1 on the surface flow of the water of the Santa Margarita

20   River?

21        A  In so far as water is withdrawn from the older materials,

22   it ultimately will cause a decline in surface flow from the

23   Santa Margarita River.

24        Q  When you say "ultimately" you mean it is going to take

25   much longer, then, than in certain other areas?

P 33a

1   A  This in all probability true.

2   Q  Would you say that in this area 6K1 it would take more

3  than a hundred years to show an effect?

4   A  Not necessarily.

5   Q  Do you mean that it would take less, or that you don't

6  know?

7   A  In my opinion, it very well might take less.

8   Q  More than fifty years?

9   A  I wouldn't be prepared to put a figure on it.  However,

10  as water is withdrawn from the area in the vicinity of 6K1 the

11  head is lowered.  That lowering of head, of necessity, must

12  ultimately show up as reduced discharge in the springs along

13  the Murrieta fault zone in Sections 35 6 South 4 West and Sections

14  1 and 2 7 South 4 West.  By the reduction of ground water dis-

15  charge in that area, any surface water flow over that area will

16  go underground to the water body, whereas under natural condi-

17  tions, had pumping not been done, the water would have moved

18  ultimately into the Santa Margarita River.

19   Q  You are assuming that the water could be gotten out of

20  the ground?

21   A  I am assuming that the water could be gotten out of

22  the ground.

23   Q  In this particular area the water could not be gotten

24  out of the ground; is that right?

25   A  In my opinion, water can be gotten out of the ground.

P 34 1   Water was pumped from the well.

2       Q  Not in sufficient quantity to be commercially usuable,

3   and perhaps not even for domestic purposes?

4       A  It apparently was not commercially feasible, although

5   I would not necessarily agree with you for domestic purposes,

6   because there are a large number of domestic wells in the area

7   that are actually yielding satisfactory quantities of water for

8   domestic purposes.  They are not what we call good wells,

9   necessarily.

10      Q  The thousand feet or so of older alluvium, in your

11  opinion, in that area of 6K1, is not good enough to yield

12  water in commercial quantities?

13      A  In all probability, this appears to be the case.

14      Q  Where did you tell me there was older alluvium of

15  similar character as to the thousand feet of older alluvium

16  in 6K1 that you have been testifying too?

17      A  The lower hundred feet or more of Well 17A1 7 South 3

18  West, the lower part of the older alluvium in 7 South 3 West

19  21H1, and the very lowest materials in the Navy Well or Pauba

20  Well, 8 South 2 West 17N-1.

21      Q  Does this Exhibit 16G show any effects of faulting in

22  the area?

23      A  Only insofar as the offset of the contact between the

24  upper and lower parts of the younger alluvium might imply a

25  projection of a fault into that area.

P 35

1    Q  Does 16G show that a fault is bisecting your profile

2  between this Well 17A1 and 21H1?

3    A  No, 16G does not show that, because on the basis of the

4  data available it very well might be a rather steep hole.  This

5  is not uncommon for a monoclinal or anticlinal hole in one area

6  as it moves on to actually become a fault in another area.  As

7  I pointed out in earlier testimony, the fault south of Murrieta

8  Hot Springs is projected to fall into part of the section where

9  the offset on 16G is shown.

10    Q  This might be explained, then, by the extension of the

11  faulting to the Murrieta Hot Springs area?

12    A  It might be an extension of the fault.  It might be

13  folded in that particular area.  On the basis of the data, I

14  am not prepared to say which.

15    MR. LITTLEWORTH:  That is all your Honor.

16    MR. STAHLMAN:  I have one more, if I may.

17             FURTHER RE-CROSS EXAMINATION

18  BY MR. STAHLMAN:

19    Q  Mr. Kunkel, do you attach any significance to the fact

20  that your Exhibit 16G, that the bedrock in connection with Well

21  7 South 3 West 6K1 is on about the same horizontal plane as 7

22  South 3 West 21H1 and would be somewhat relative to the position

23  of the place where Mr. Worts said he struck bedrock, being about

24  a thousand feet lower depth?

25    A  In my opinion, that would be a totally unwarranted

P 36   1   geologic conclusion.

2       Q   Why?

3       A   The logs don't indicate--I shouldn't say "the logs"--

4   the logs and all of the data don't indicate this.

5       Q   You don't attach any significance to the fact that Mr.

6   Worts said that the last thousand feet, and you show rock here

7   and you show bedrock here, you say the well driller gets confused

8   between rock and bedrock.  Do you think the geologist might some

9   time, too?

10      A   It sometimes happens.

11      THE COURT:  You don't make any contention that the last

12   thousand feet of the Pauba Well is bedrock, do you?

13      MR. STAHLMAN:  No your Honor.  I just make this contention

14   in connection with the Pauba Well, that the last thousand feet

15   is not much good.  It is not water bearing.

16      THE COURT:  He just testified that the--

17      MR. STAHLMAN:  He has marked 350 feet.  Mr. Worts' testimony

18   is a thousand feet.

19      THE WITNESS:  I shouldn't argue--

20      THE COURT:  You may speak up.

21      THE WITNESS:  This is not Mr. Worts' testimony that the

22   bottom thousand feet is bedrock.

23      MR. STAHLMAN:  Now we are going to have an argument.  It

24   is in the record.  Mr. Worts' letter is right in evidence.  He

25   said it is non-water bearing.

P. 37 1    THE COURT:  That doesn't mean that it is bedrock.

2    THE WITNESS:  May I refer to the letter, please?

3    MR. SACHSE:  It says "non-water bearing."

4    MR. STAHLMAN:  Let me refer to the letter that is in evidence.

5    THE COURT:  What does this have to do with this matter?

6    MR. STAHLMAN:  It has this to do, your Honor.  We have a

7    fight on here with Mr. Veeder in connection with the Navy Well.

8    THE COURT:  What do we care whether it is the bottom 300

9    feet or the bottom 1000 feet, whether it carries a little bit

10    of water or a lot of water?

11    MR. STAHLMAN:  I am glad you don't.

12    THE COURT:  It is obvious that the deeper you go down into

13    the older alluvium the less permeable and the less water bearing.

14    MR. STAHLMAN:  On the question of unjust enrichment they

15    are asking us to pay for a well down there.

16    THE COURT:  If you have to pay for the well, you want to

17    pay for the first 1500 feet and not the rest.

18    MR. STAHLMAN:  We don't want to pay for any of it.

19    MR. VEEDER:  I think the Vail Company's exhibits prove--

20    I'll not be unkind about it--how asinine has been the approach

21    taken here.  Here we have Vail's Exhibit AR8.  I will read it

22    to you.  This is where Old Man Vail buys himself a part of the

23    well.

24    MR. STAHLMAN:  Show a little more respect for your elders,

25    Mr. Veeder.

P 38

THE COURT:   I take it that you mean Mr. Mahlon Vail.

MR. VEEDER:   Yes, your Honor.

THE COURT:   Strike "Old Man Vail."

MR. VEEDER:   Here is a letter that was put in evidence by the Vail Company.   This is the last paragraph -- well, I'll read the whole thing:

"This office has been informed by Mr. Vail of the Vail Company Ranch that perforations are desired the entire length of the casing and that he will agree to pay the cost of additional per-forations.

"The Government will interpose no objection to additional perforations as directed by Vail Company, provided the additional perforation is done at the Vail Company's own expense.  By copy of this letter Vail Company is so informed."

MR. STAHLMAN:   This is typically getting us off the track.

THE COURT:   What is your point?

MR. VEEDER:   The point I am trying to make is that at the behest of Mahlon Vail -- I'll strike the "Old Man," figuratively -- the well was drilled deeper. If you will take a look at Vail's Exhibit AR9, there was a change order in the contract.  The well was reamed out, as I understand it, at 1278.85 feet deeper, there were 950 feet additional length of casing and gravel pack-ing, and then the 1240 lineal feet of additional performation at

P 39

1   the request of the Vail Company.

2        I submit, your Honor, that the Vail Company was the one

3   that decided they wanted to use the full depth of the Navy Well

4   for the purpose of going ahead and making themselves a very

5   excellent source of water.

6        In addition, your Honor, another Vail exhibit which I think

7   is extremely important is where the Vail Company buys in.  I

8   think it is Vail Company's AS.

9        THE COURT:  We are not arguing the case yet, Mr. Veeder.

10       MR. VEEDER:  I know we are not arguing the case.  The point

11   I am trying to make to your Honor is that all of a sudden we

12   have 180 degrees.  I thought this baby was laid to rest.

13       But the Vail Company's Exhibit As, if I may take a moment

14   more -- I am not trying to argue the case, but what I am trying

15   to show you is the importance of this thing-- here is Vail

16   Company's AS:

17            "Mr. Vail, through the Public Works Office,

18        with the technical okay of Mr. Worts, is buying

19        in on the well to get complete perforation of the

20        casing for the entire depth."

21       I don't want anybody to think that George can change

22   positions--

23       THE COURT:  Mr. Stahlman.

24       MR. STAHLMAN:  Your Honor, this typical Mr. Veeder's getting

25   us off the track.  Your Honor asked me a question.  Mr. Veeder

P 40

1  has made a declaration which I propose to meet, that the Navy

2  Well was a source of great enrichment to the Vail Company.  We

3  propose to show that it was not, and these are some of the fac-

4  tors that enter in to it.

5      Now the perforations were, as Mr. Veeder said, for further

6  exploration of the well, which was never done by the Navy.  That

7  is not important.  The important thing is that there is an issue

8  here that I feel I have to meet in this case, and that is their

9  claim of unjust enrichment.  We propose to show the location of

10  the well, the quality of its water, and many other things which

11  do not make it this "great source."  In his memorandum Mr.

12  Veeder says that it is the finest well the Vail Company has on

13  its ranch.  We propose to show that it is not.  To the contrary,

14  that we have a lot wells of shallower depth that cost less money

15  and produce more water and better water and in a position where

16  we can use it.

17      I say these factors have a bearing on this issue of unjust

18  enrichment.

19      THE COURT:  Are you through cross-examining Mr. Kunkel?

20      MR. STAHLMAN:  I am through your Honor.

21      MR. SACHSE:  Yes.

22      THE WITNESS:  Could I make a statement regarding Mr. Worts'

23  testimony?

24      MR. VEEDER:  I don't think we need anything more, Mr. Kunkel.

25      THE COURT:  I want to hear it.  What is it?

14,051

Belt 6

P 1

1      THE WITNESS:   If we will refer to Mr. Worts' letter of

2  the 19th--

3      THE COURT:   Is it an exhibit in this case?

4      THE WITNESS:   It is the letter to which Mr. Stahlman has

5  been referring in which Mr. Worts used the word "bedrock."  May

6  I refer to the last paragraph?

7      THE COURT:   What exhibit number is it?

8      MR. STAHLMAN:   AR9.

9      THE WITNESS:   May I refer to the last paragraph, please?

10  The last statement says:

11            "..data obtained from the electrolog will show the

12       more detailed character of the materials penetrated

13       and will indicate more definitely the advisability

14       of either stopping at the depth recommended or pro-

15       ceeding to a greater depth."

16      This has, as far as I am concerned, a direct bearing on

17  the case.  Mr. Worts made a statement prior to the term "the

18  electrolog."  Now we will refer to the Pauba report, Fallbrook's

19  Exhibit AB.  Mr. Worts describes the running of the electric

20  log.  On the bottom of page 24 he states:

21            "The electric log was of great value in

22       analyzing the general character and thickness

23       of the materials penetrated, the locations for

24       setting perforated pipe, determination of the

25       depth to ream the well, and general quality of

the water.  Very briefly, the log consists  of two

types of curves:  Resistivity and spontaneous-potential

curves."

Then he describes the logs, and his final conclusion is:

"The only major change in character of the

electrolog occurs at a depth of about 2,150 feet.

Above this depth the resistivity curves express a

lateral zigzag pattern of considerable activity and

amplitude; and below they express a pattern of less

lateral activity and amplitude.  In general, the

upper segment contains alternating beds of fine

and coarse materials in almost equal amounts and

in beds ranging in thickness from several feet to

as much as 60 feet, but averaging about 10 to 15

feet; whereas the lower segment contains more

fine than coarse materials, and further, the

lower coarse materials show less resistivity than

those above.  The lower segment indicates individ-

ual beds range in thickness from several feet to as

much as 20 feet, but average between 5 and 10 feet.

"The principal zones of predominately close

material that are probably the main yielding deposits

are indicated at depths of about 205-280, 345-400,

490-710, 880-910, 1035-1325, 1600-1665, 1875-1905, and

2055-2150 feet below Kelly bushing.."

P 3

1    THE COURT:  What are you reading from?

2    THE WITNESS:  The Pauba Report, Fallbrook's Exhibit AB.

3    THE COURT:  All this leaves me cold.

4    What have you got now, Mr. Stahlman?

5    MR. STAHLMAN:  He read only part of the exhibit.  We are

6    entitled to all of it.

7    THE COURT:  It is all in evidence.

8    MR. VEEDER:  It in there twice now.

9    MR. STAHLMAN:  Vail's AR-2.

10   MR. VEEDER:  We have it in there.

11   THE COURT:  That is three times it has been read into the

12   record.

13   MR. VEEDER:  And I don't know what it proves.

14   THE COURT:  Are you through with Mr. Kunkel for a while?

15   MR. VEEDER:  I have a lot of questions on redirect, your

16   Honor.

17   THE COURT:  Do you want to start tomorrow morning with him?

18   MR. VEEDER:  Yes, tomorrow will be fine, your Honor.

19   THE COURT:  How long will you be?

20   MR. VEEDER:  I'll be one hour, your Honor.

21   THE COURT:  Then, Mr. Stahlman, are you ready to go ahead

22   with the Vail matter?

23   MR. STAHLMAN:  Yes your Honor.

24   MR. SACHSE:  Mr. Veeder, if your Honor will recall, stated

25   that when he got through with Mr. Kunkel he would rest on

P 4

1    geology and hydrology on the general area shown on 15E.

2        Is that still a fact?
                              something
3    MR. VEEDER:  Unless/causes me to change my mind.

4        MR. SACHSE:  I would like to know by the time you are

5    through with Mr. Kunkel.  I think we are entitled to the word

6    "rest" on at least some part of this watershed.

7        MR. VEEDER:  I have absolutely no reason to assume, with

8    the devastating testimony I will introduce in the morning, that

9    there will be any further questions in regard to the geology

10   in this area.

11       MR.  GIRARD:  You will admit that there has not been any-

12   thing devastating yet.

13       THE COURT:  I have to pick a Grand Jury tomorrow morning.

14   I will excuse you until 10:30.

15   (ADJOURNMENT TO TUESDAY, JULY 19, 1960 at 10:30 A. M.)

16

17

18

19

20

21

22

23

24

25