# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

#### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:** San Diego, California

**Date:** Tuesday, July 19, 1960

**Pages:** 14,055 to 14,158

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 123                                                    14,035

P 5.
Belt 7

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3                   SOUTHERN DIVISION

4               - - - - - - - - -

5       HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6               - - - - - - - - -

7    UNITED STATES OF AMERICA,)
                              )
8                 Plaintiff,  )
                              )
9            vs               )        No. 1247-SD-C
                              )
10   FALLBROOK PUBLIC UTILITY )
     DISTRICT, et al.,        )
11                            )
                  Defendants. )
12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  San Diego, California
                    Tuesday, July 19, 1960
16

17   APPEARANCES:

18       FOR THE PLAINTIFF:        WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to
19                                 the Attorney General,
                                   Department of Justice,
20                                 Washington, D.C.

21                                 LCDR DONALD W. REDD

22       FOR THE DEFENDANTS:

23         For Defendant Fallbrook Public    FRANZ R. SACHSE, ESQ.,
           Utility District, et al.
24         For Defendant Vail Company        GEORGE STAHLMAN, ESQ.

25

P 6

1   APPEARANCES (continued)

2        FOR THE DEFENDANTS (continued)

3        For Defendant State of                    STANLEY MOSK, ESQ.,
         California                                Attorney General,
4                                                  By FRED GIRARD, ESQ.,
                                                   Deputy Attorney
5                                                  General.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14,057

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX | RRD |
|---|---|---|---|---|---|
| Fred Kunkel | 14,058 (Veeder) | | | | |
| | | 14,077 (Sachse) | | | |
| | | 14,113 (Girard) | | | |
| | | 14,118 (Stahlman) | | | |
| | | | 14,126 (Veeder) | | |
| | | | | 14,127 (Stahlman) | |
| | | | | | 14,130 (Veeder) |
| | | | | 14,130 (Sachse) | |
| | | | | | 14,131 (Stahlman) |
| | | | | 14,131 (Girard) | |

For the Defendants:

| | D | |
|---|---|---|
| Colonel Bowen | 14,136 (Stahlman) | |
| James V. Wilkinson | 14,140 (Stahlman) | |

## INDEX TO EXHIBITS

| Defendant's Exhibits | Iden. | In Evidence |
|---|---|---|
| Vail's AT | | 14,150 |

Belt 7

P 8

1   SAN DIEGO, CALIFORNIA, Tuesday, July 19, 1960, 10:30 A. M.

2      (Other matters)

3      THE CLERK:  7-1247-SD-C United States versus Fallbrook.

4                FRED KUNKEL,

5 having been previously duly sworn, on his oath was examined

6 and testified further as follows:

7              REDIRECT EXAMINATION

8 BY MR. VEEDER:

9    Q. Mr. Kunkel, will you approach Exhibit 15E and view

10 Sections 1, 36, 35 and state whether, in your opinion, the

11 drilling of domestic wells and the other wells that are in that

12 area have any effect on the quantities of water reaching Temecula

13 Gorge?

14      THE COURT:  What sections are these now?

15      MR. VEEDER:  They are Sections  6 and 1 in 7 South 3 West

16 and Sections 35 and 36 in 7 South 4 West.

17      THE COURT:  Point them out to me.

18      THE WITNESS:  The sections to which Mr. Veeder has referred

19 are Sections 6 7 South 3 West, Section 1 7 South 4 West, Section

20 35 and Section 36 of 6 South 4 West.

21      MR. SACHSE:  The question was limited to domestic wells?

22      MR. VEEDER:  I said the domestic wells and the other irri-

23 gation wells that are located there.

24      Q  Would they have any effect on the quantity of water

25 reaching Temecula Gorge?

P.9   1      A  Drilling and pumping water from domestic and irrigation

2    wells in the sections being described have reduced the head and

3    the pressure along and above the Wildomar fault zone, resulting

4    in a decline of water levels.  Certain wells that had formerly

5    flowed have ceased to flow and springs have dried up, the result

6    being that surface water that normally would have moved across

7    the surface of the ground into the Murrieta River and ultimately

8    down the Murrieta to Temecula, that water or part of that water

9    has gone underground to the water body and the full quantity of

10   surface water has not reached the narrows.

11      Q  You have mentioned pressure.  You mean hydrostatic

12   pressure in that area.  Is that reduced by reason of the drilling

13   and pumping of wells?

14      A  The term "head" and "pressure," as I have used them,

15   are interchangeble.

16      Q  Now, referring to the well situated in Section 1 7 South

17   4 West, Well 1A1, have you checked out the figures on that for

18   the purpose of determing the depth to water based upon the 1953,

19   1958 and 1959 canvasses?

20      A  Yes.  Referring to Government's Exhibit 15E-1 -- first,

21   I would like to describe the physical situation at the wells.

22   There are two wells within about 20 feet of each other, one of

23   which has an irrigation pump on it of 5 or 7 horsepower -- I'll

24   have to check.  Well 7-41A2 has a 10 horsepower turbine pump

25   on it.  Well 7 South 4 West 1A1 is an unused well within about

P 10

1  20 feet of the irrigation well.

2      Q   State into the record the circumstances that prevailed

3  during the time the measurements in 1953, 1958 and 1959 were

4  taken.

5      A   The measurement in 1959 was taken at a time when the

6  nearby irrigation well was not pumping.

7      Q   What was the depth to water at that time at that well?

8      A   At the time the water level shown on Government's Exhibit

9  15E was prepared, the depth to water was 94.04 feet.  That was

10  on October 30, 1959.  A previous measurement on August 11, 1959

11  was 122.5 feet.  However, at that time the nearby well was

12  pumping, Well A2 was pumping.  Therefore, I used the October

13  measurement, which reflected a static water level at that time

14  unaffected by the pumping at the nearby well.  The measurement

15  in 1958 for the same well, 7 South 4 West 1A1, on October 30,

16  1958 was 133.6 feet, and the nearby 1A2 was pumping.  For that

17  reason, in the construction of the water level contours on

18  Government's Exhibit 15F that water level was not used because,

19  in my opinion, it did not reflect the static condition at that

20  well.  And if one will refer to Government's Exhibit 15E-1 for

21  the year 1958 that water level is shown, and I would--

22      Q   Will you state the page at which it is shown?

23      A   It is page 2 of two pages, it is for the period 1958,

24  and I have checked the original record, and on the copy sub-

25  mitted to the Court I failed to indicate that the nearby well

P. 11

1  was pumping.  However, when I did analyze the data and con-

2  structed the water level for 1958, shown on Government's Exhibit

3  15F, I did consider the fact that the water level was affected

4  by a nearby well pumping.

5      Q  Do you have the official exhibit in your hand?

6      A  I do have the official exhibit in my hand.

7  MR. VEEDER:  Would you get us 15E-1, Mr. Luddy, please.

8  THE WITNESS:  Referring to 15E-1 for the year 1953 --

9  BY MR. VEEDER:

10     Q  Before you go on, with the Court's permission I would

11  like to have you make a correction on page 2 or make an addition

12  on page 2 of two of the official exhibit, showing the fact that

13  there was pumping in the nearby well, which resulted in the

14  elevation being 1164 at the time the measurement was taken.

15     If that is permissable, your Honor.

16  THE COURT:  That is satisfactory.

17  MR. VEEDER:  You may do that right now, if you will.

18  THE WITNESS:  I am writing the words "nearby well pumping"

19  in the "remarks" column behind the entry for Well 7 South 4 West

20  1A1.  I have also signed my initials by the entry.

21     On the same exhibit for the year 1953, if one will refer

22  to page 3 of three pages 1953 for the same well 7 -41A1, November

23  17, 1953, the water level was 78.6 feet below the measuring

24  point or at an altitude of 1219 feet above sea level.  This is

25  a non-pumping measurement and was used in the construction of

P 12

1  the water level contours on Government's Exhibit 15G, and in

2  my opinion the water levels for 1953 and 1959 are comparable

3  because they reflect static conditions at the time.  For  1958

4  the measurements are not comparable because they reflect the

5  effect of nearby pumping.

6  BY MR. VEEDER:

7      Q  Based upon the facts which you have just reviewed, have

8  you an opinion as to whether 15E, showing a pumping depression

9  at the well to which we have just been referring, correctly

10  depicts the ground water situation as it exists at the time of

11  the making of the exhibit?

12      A  In my opinion, 15E in the vicinity of Well 7 South 4

13  West 1A-1A2 correctly depicts the static conditions.

14      Q  Have you an opinion as to the drilling wells upon the

15  hydrostatic pressure throughout the area depict on 15E as the

16  older alluvium?

17      MR. SACHSE:  Wait a minute.  Has he an opinion?

18      MR. VEEDER:  Yes.

19      MR. SACHSE:  May I have the question read, please.

20      (The Reporter read the pending question.)

21      MR. SACHSE:  I think it is too vague, your Honor.

22      THE COURT:  Your predicate and subject are hard to determine.

23  Rephrase it.  Where are the wells being drilled, in the older

24  alluvium?  Or is it the effect on the older alluvium?

25      MR. VEEDER:  I will rephrase it, if you desire me to do so.

P 13 1   Q  Would you state, Mr. Kunkel, whether you have an opinion

2 as to the effect of the drilling and of pumping of wells through-

3 out the area of older alluvium on the hydrostatic pressure of

4 the ground water in the area of the older alluvium?

5    MR. SACHSE:  If the Court please, I still think it is too

6 vague.  It is A, B, C, and Mr. Kunkel many times/that this area
                  said

7 is departmentalized, it is lozeng-like, and to say, does drilling,

8 not pumping --

9    MR. VEEDER:  I said drilling and pumping.

10    MR. SACHSE:  Pardon me than.  Does the drilling and pumping

11 of one well affect the hydrostatic pressure in the older alluvium?

12 That is a piece of ground fifty miles long.  I would him to

13 pin this down a little more before he asks the question.

14    MR. VEEDER:  Your Honor, I have asked this question in

15 regard to the area of these sections.

16    THE COURT:  Your are limiting it those sections now?

17    MR. VEEDER:  No, I have already asked that question in

18 regard to Sections 1 and 6 of 7-4, and I have asked the question

19 in regard to Sections 35 and 36.  Now I am asking him, does he

20 have an opinion throughout the area depict on Exhibit 15 as

21 being in the older alluvium and whether as expressed in regard

22 to those questions is applicable throughout the entire area of

23 older alluvium?

24    THE COURT:  Would you include within your question the

25 existing wells as shown on Exhibit 15E there?

P 14

1    MR. VEEDER:  Yes, including those wells, your Honor.

2    THE COURT:  Then the objection is overruled.  If it means

3    the existing wells and doesn't just mean one well, certainly.

4    MR. VEEDER:  I certainly didn't intend one well.  I intended

5    all of the wells on 15E.  Do you want me to rephrase the question,

6    or is it clear?

7    THE COURT:  I understand it now.

8    MR. VEEDER:  Would you answer the question please?

9    THE WITNESS:  All the wells in 15E that penetrate both the

10   younger and older alluvial deposits, pumping water from those

11   wells decreases the head or the hydrostatic pressure in the

12   alluvial.

13   Q  And does that have an effect, in your opinion, upon the

14   quantity of water reaching Temecula Gorge?

15   A  By reducing or drying up spring flow, by causing wells

16   that formerly flowed to cease flowing, by drying grounds that

17   were formerly moist, the cumulative effect has been to induce

18   surface flow that would normally flow through the area to

19   Temecula Gorge, to induce a part of that water to infiltrate

20   to the ground waterwbody and not flow through as surface flow.

21   Q  Would you/step to 15E again and locate by section, township

22   and range the points of rising water as shown on that exhibit

23   in Warm Springs Creek?

24   A  The points of rising water indicated in Warm Springs

25   Creek are in the Southeast quarter of Section 14 7 South 3

P 15

1  West in the immediate vicinity of Murrieta Hot Springs.

2      Q  I hand you a green pencil, Mr. Kunkel, and I ask you

3  to state into the record the source of ground water which supports

4  that rising water in the Warm Springs Creek, referring specifi-

5  cally to Sections 13 and 14 in Township 7 South 3 West.  Would

6  you take your green pencil and mark the direction of that ground

7  water?

8      A  The source and direction of ground water movement in

9  the Sections 13 and 14 just alluded to are in general from the

10  north to the south, as indicated by green arrows on the Exhibit

11  15E.

12      Q  Would answer the phase of the question as to the source

13  of the ground water which supports that rising water in Warm

14  Springs Creek?

15      A  The source of the ground water is from residuum and

16  from cracks and fractures in the basement complex.

17      Q  Now, proceeding on up the valley, would you use your

18  green pencil and mark the course of the ground water which,

19  in your opinion, exists in the residuum, referring now speci-

20  fically to Section 7 of Township 7 South Range 3 West, and just

21  proceed on up the water courses as shown on 15E.

22      A  I draw a series of green arrows that depict the direction

23  of ground water movement in the area north of Murrieta Hot

24  Springs, largely in the area of the residuum or weathered

25  basement complex.

P 16

Q  Now, referring to the tributary streams of Tucalota Creek, would use your green pencil and indicate the course of the ground water and streams which support the flow in Tucalota Creek?

A  The source of the ground water will also be shown by a series of green arrows -- the source and direction of movement.

Q  Mr. Kunkel, referring to Exhibit 15, would point out the source of the recharge for the ground water into which the wells on the Frick properties have been drilled?  Can you locate yourself?

A  I can.  The Frick properties are in Section 28 in French Valley, in general the area --

Q  Give the township and range, please.

A  Six South 2 West Section 28, and the sources of recharge in that area are precipitation and infiltration.  The infiltration of precipitation on the residuum or weathered basement complex and runoff from the surrounding highland areas on to the weathered basement complex and infiltration of that runoff.

Q  Infiltration where?

A  Into the residuum in Section 28.

Q  Now, in your opinion, does the pumping of water up on the Frick premises and other properties similarly situated have an effect upon the quantity of water reaching Temecula Gorge and then proceeding on down to Camp Pendleton?

A  In so far as pumping on the Frick property and similarly situated properties is concerned, the areas that are now moist

P 17

1   and areas that now reject recharge or surface water flow, in so

2   far as those areas are dried up by the pumping of water, an

3   increment of the surface flow goes underground to recharge

4   ground water in that area and that water does not proceed as

5   surface water flow down the tributaries of the Santa Margarita

6   River.

7   Q   Would you state whether it would be physically possible

8   for a cone of depression created on the Frick properties to

9   extend down to and effect a well on Camp Pendleton?

10   A   Not by the expansion of a cone of depression.

11   Q   Why is that true?

12   A   There is virtually no field of alluvium or permeable

13   deposits through the narrows of Temecula canyon.  A cone of

14   depression could not migrate down that canyon to actually

15   intersect and influence a well on Camp Pendleton.

16   THE COURT:  May I ask some questions?

17   MR. VEEDER:  I would be honored, your Honor.

18   THE COURT:  You have made quite a study of this weathered

19   basement complex up here, haven't you?

20   THE WITNESS:   I have gone over it quite a bit, your Honor.

21   THE COURT:  And you have examined the depth of this weathered

22   material?

23   THE WITNESS:  I have.

24   THE COURT:  And on the whole it is rather shallow?

25   THE WITNESS:  It is rather shallow, yes sir.

P 18

1    THE COURT:  It would be rather difficult in shallow material

2    to get much of a cone of depression, wouldn't it?

3    THE WITNESS:  That is correct.

4    THE COURT:  Have you examined these various wells, studied

5    these wells throughout this area of weathered basement complex?

6    THE WITNESS:  Yes sir, I have.

7    THE COURT:  Have you studied how much they pump?

8    THE WITNESS:  The yields on most of them are relatively

9    small.

10   THE COURT:  Have you studied how much they are being used

11   presently or when you made your study up there in 1959?

12   THE WITNESS:  I have not detailed the acreage irrigated,

13   but I have observed the lands that are being irrigated.

14   THE COURT:  With that background and that study, you can

15   give me then, can you not, a figure of how many acre feet a

16   year is being used in this weathered basement complex from the

17   wells?

18   THE WITNESS:  It would take a little further analysis.  I

19   have not done that.  However, relatively speaking, the value is

20   not high.

21   THE COURT:  Not very much?

22   THE WITNESS:  Not very much.

23   THE COURT:  And the main effect, as I understand your

24   testimony, that the use of water up there would have would be

25   that water is pumped out of this area and then when the return

R 19 1  and the replacement occurs there are more places for that water

2  to go and the water would not flow down through the gorge?

3      THE WITNESS:  That is correct.

4      THE COURT:  Considering the big storms that come every

5  year -- there are one or two good sized storms -- and the amount

6  of water that then goes down the gorge and gets down to Camp

7  Pendleton, isn't the amount of water that would be absorbed by

8  replacement of water pumped almost infinitesimal in considering

9  our problem?

10     A  For the occasional year when there are storms and large

11  quantities of runoff, this would be a true statement.  For the

12  years where the runoff is low, I am not certain that this would

13  be a true statement.

14     THE COURT:  Even in years where the runoff is low and in

15  years when water does not flow out to the ocean, there are still

16  flood waters that run down the Temecula Gorge?

17     MR. VEEDER:  May I ask your Honor to define what would be

18  "flood waters"?

19     THE COURT:  I mean waters that have not been absorbed

20  upstream of the gorge, water that runs off.

21     MR. VEEDER:  Could I make a further inquiry?  Would it be

22  flood water, your Honor, in your opinion?  Because this is

23  important to me when your Honor decides what is going to be

24  what.

25     MR. STAHLMAN:  I object to the question; the witness hasn't

P 20

1   been sworn.

2       MR. VEEDER:  I am interested when you use the word "flood,"

3   your Honor, because I believe that "flood" is a term of art in

4   water law, and I believe, for example, in the year 1959 there

5   was no such thing as a flood flow.  I believe that in most of the

6   years since the Navy acquired Camp Pendleton there has not been

7   what you call a flood flow.  But most of these have been ordinary

8   years, isn't that correct, in which there has not been a deluge,

9   so to speak, a large flood.  We live off of the usual year, not

10   the high flood years, your Honor.

11       THE COURT:  I'll overrule the objection, whatever it was.

12       Answer the question.

13       THE WITNESS:  I am not certain just what it was, but I

14   will --

15       MR. VEEDER:  If you don't know what the question was, don't

16   answer it.

17       THE COURT:  I'll ask another question.

18       I drew a line here the other day when you were testifying,

19   this red line drawn very roughly in this area, indicating the

20   southeasterly section of this weathered complex on Exhibit 15E.

21   I understood you to tell me that in that particular area people

22   would just be lucky to get a domestic well and that the amount

23   of water taken from that was not worth considering.

24       THE WITNESS:  The statement that I believe I made was that,

25   in my opinion, about all that anyone could get in that area

P. 21

1   would probably be a domestic well.  I would be very surprised

2   if they got more than that.

3        THE COURT:  So now we limit consideration to the northerly

4   part and the southwesterly part of this weathered basement

5   complex.  Can you calculate how many acre feet a year come out

6   of those wells, or out of those irrigation wells?

7        MR. VEEDER:  Could we undertake the study for you on that?

8        THE COURT:  Do you want to ignore the domestic wells?  If

9   these people have domestic wells, they are going to come ahead

10  of any irrigation use anyway.  Could you tell me how many acre

11  feet come out of the irrigation wells or how many feet come out

12  of the irrigation wells and how many acre feet come out of the

13  domestic wells?

14        THE WITNESS:  It would take a brief study to do that.  It

15  could be done.

16        MR. VEEDER:  We will undertake, your Honor.

17        MR. SACHSE:  After lunch?

18        MR. VEEDER:  We will try as fast as we can.

19        MR. SACHSE:  Mr. Kunkel said it would be brief.

20        MR. VEEDER:  I think he could probably do it while he's in

21  Copenhagen.

22        THE COURT:  There are only a few irrigation wells up there,

23  are there not?

24        THE WITNESS:  That is correct.

25        THE COURT:  How many?

P 22

1    THE WITNESS:  Only a half a dozen or so.  I would have to

2    count them.

3    THE COURT:  You wouldn't have these people close up their

4    domestic wells, would you, Mr. Veeder, in order that water might

5    flow down to the Base?

Belt 8

6    MR. VEEDER:  I am concerned primarily with your Honor's

7    repeated statement that he was going to dismiss out a large

8    number of people.

9    THE COURT:  You read my mind properly, Mr. Veeder.

10    MR. VEEDER:  Well, I should by now, your Honor.  But the

11    point that I am trying to make is that when your Honor takes a

12    broad brush and goes like that in regard to a vast area which

13    does contribute to the Marine Corps supply of water, I am con-

14    cerned for one reason.  I am not going to say that I am going

15    to ask you to make a regulation in regard to any of these areas

16    right now, but I am greatly worried that if your Honor would say,

17    "Well, I am going to dismiss all these people out," that we

18    would have a situation where some years from now we could be

19    confronted with a problem of jurisdiction if control were required.

20    THE COURT:  You wouldn't be confronted; you would be pre-

21    cluded.

22    MR. VEEDER:  That is right.  So when we would bring another

23    lawsuit I would say, "proceeding on the basis of what has trans-

24    pired --

25    THE COURT:  I have enough consideration for the men who

14,073

P 23.

1   will follow me on this Bench in the next fifty years or hundred

2   years to see that there is never going to be another lawsuit

3   where there are 6000 or 7000 people brought into the lawsuit.

4   MR. VEEDER:  I think your Honor has taken care of many of

5   them.  But the point that I make --

6   THE COURT:  I have your point Mr. Veeder.

7   MR. VEEDER:  All right.

8   THE COURT:  Mr. Kunkel, you have told me that that weathered

9   basement complex is shallow almost all over the area.  What do

10  you mean by "shallow"?  What would be the range in feet?

11  THE WITNESS:  I think, as I have testified, almost no place

12  over a hundred feet, and in most places less than a hundred feet

13  in thickness.

14  THE COURT:  In many places it is a lot less than that?

15  THE WITNESS:  It would range from 0 to 100 feet.

16  THE COURT:  Where did you find the 100 feet?  Where some of

17  the big wells are located?

18  THE WITNESS:  I am not certain in this immediate area that

19  I have any exact figures as to the maximum depth.  I am relying

20  largely on my experience in the overall area and the depth to

21  which wells were drilled.  Usually these wells in the residuum

22  do not carry an accurate driller's log.

23  THE COURT:  By no stretch of the imagination would you call

24  that a water basin or a water unit, would you?

25  THE WITNESS:  I would think of the water in that area as

P 24

1   a water body.  To define it as a basin and put definite limits

2   and show the contour of the basin would be an exceedingly --

3        THE COURT:  Isn't this a more accurate description of it:

4   Throughout that area basement complex rears out of the ground.

5        THE WITNESS:  That is correct.

6        THE COURT:  And so you have an irregular basin underneath

7   this weathered complex.  And you have areas where there is no

8   weathered complex because the basement complex shows up.  And

9   then you have pockets or places where there is some depth, not

10  over a 100 feet, say, of weathered complex.  Is that right?

11       THE WITNESS:  That is correct.

12       THE COURT:  Therefore, what you have is a series of irre-

13  gular small pockets, valleys filled with residuum which might

14  contain some water?

15       THE WITNESS:  We know, on the basis of these wells, that

16  these pockets do contain water, and on the basis of the surface

17  geology it is my opinion that in the area north of Tucalota

18  Creek up toward the Diamond and the Domeni-goni valleys  that a

19  large number drain directly one into the other.  The exact

20  configuration of each pocket or basin I certainly do not pretend

21  to know what it is.

22       THE COURT:  I take it that it would be an impossibility to

23  make any calculation as to how much water might be retained in

24  that residuum.

25       THE WITNESS:  It would be a very crude approximation at best.

P 25

1        THE COURT:  If you had, for example, six wells that were

2   used for irrigation and the rest of them were domestic wells,

3   and having in mind that the domestic use has a priority over

4   irrigation use and, I would take it, military use, wouldn't

5   you say, therefore, that the only impact on the stream system

6   would be a few irrigation wells that existed, the only impact

7   in the sense that --this is more of a legal conclusion than a

8   factual question.

9        MR. VEEDER:  I was going to suggest that.

10       THE COURT:  So I will withdraw the question.

11       MR. STAHLMAN:  He will answer the question, though.

12       MR. VEEDER:  I move to strike Mr. Stahlman's unkind

13  statement.

14       I see that it is noon, your Honor.

15       THE COURT:  Yes, it is noon.  Come back at 1:30.

16       (Noon recess)

17

18

19

20

21

22

23

24

25

P 26

SAN DIEGO, CALIFORNIA, Tuesday, July 19, 1960, 1:30 P. M.

1

2     THE COURT:  Sorry to have been delayed.

3     MR. VEEDER:  Has your Honor finished his examination?

4     THE COURT:  Yes, I am completed with mine.

5     MR. SACHSE:  Have you finished yours of his Honor, Mr.

6 Veeder?

7     THE COURT:  I am finished with my examination on that

8 particular phase.

9     MR. VEEDER:  What's this?  You didn't dig this out did you

10 (Referring to rock samples)?

11     MR. KUNKEL:  No.

12 BY MR. VEEDER:

13     Q  Mr. Kunkel, would state the depth to ground water on

14 the basis of your data at the Windmill Well in Pauba Valley?

15     A  In the fall of 1959 the depth to water at the Windmill

16 Well in Pauba Valley was about 65 feet below land surface.

17     Q  In regard to the lands of the Vail Company which are

18 irrigated in that area, have you an opinion as to what occurrs

19 to the water applied to those lands for purposes of irrigation,

20 which water has penetrated to the root zone of the crops being

21 irrigated?

22     A  The pumped waters that are applied to the land surface,

23 the part of those waters that is not consumptively used by

24 vegetation or evaporation returns to the ground water body be-

25 neath the land surface in that area.

P 27

1    Q  Would you say they would proceed to a depth of 60 feet?

2    A  The water that is not consumptively used goes down to

3  the water body, which is at 65 feet in the area of the Windmill

4  Well.

5    MR. VEEDER:  I have no further questions.

6    THE COURT:  Were you able to make a computation as to the

7  acre feet from these irrigation wells in the area of the decom-

8  posed basement complex?

9    THE WITNESS:  No, I was not, your Honor.

10               RECROSS EXAMINATION

11  BY MR. SACHSE:

12    Q  First, on this last question asked by Mr. Veeder, Mr.

13  Kunkel, is the percolation, so to speak, at right angles down-

14  wards, or is it at an angle down the hydraulic gradient --

15  vertically downward, I should say, or at an angle down the

16  hydraulic gradient?

17    A  Until the water has a head, the hydraulic gradient is

18  not significant.  Therefore, the water tends to move straight

19  down under the influences of gravity.  However, if relatively

20  impermeable lenses are encountered, the water may move other

21  than straight down, dependent upon the dip of the relatively

22  impermeable bed that is encountered.  However, as soon as the

23  edge of that bed is encountered, or as soon as it penetrates

24  into the bed, the ground water tends to go stratight down under-

25  neath under the influence of gravity.

P 28

1    Q  Is it possible that ground water extractions and re-
2    application to beneficial use in Pauba Valley or in Lower Murrieta
3    Valley might actually increase the surface flow of water at
4    Temecula Narrows?

5    A  Under what circumstances?

6    Q  Under any circumstances? I am going to give you an
7    example in which I think that happened, but I want to know first
8    if you think I am completely wrong.  Is it possible that under
9    some circumstances the extraction of ground water and its appli-
10   cation to crops in Pauba Valley might not actually increase the
11   surface flow in the Temecula Gorge?

12   A  Under certain circumstances this is possible.

13   Q  In other words, the mere fact that ground water is being
14   extracted and applied to the surface on crops doesn't mean that
15   that extraction will necessarily decrease the flow at the gorge,
16   does it?

17   A  Where the water is applied to lands, where the depth to
18   water is 10 feet or more, the water will be turned downward to
19   ground water and not necessarily increase the stream flow.

20   Q  I am going to phrase this as something I think I have
21   observed.  I am not sure I have.  So please treat it as a
22   hypothetical question.  In the course of our many years opera-
23   tion of the Fallbrook Diversion and following the stream, we
24   think we have observed that when the Vails had large potato
25   plantings at the extreme lower end of the Pauba Valley which

14,079

P 29

1   they were irrigating by surface furrows and flooding an increased

2   flow in the river at the gorge.  In your opinion, is it possible --

3       MR. VEEDER:  I object to that; there is nothing in the record

4   to support the hypothesis.

5       MR. SACHSE:  This is purely hypothetical.

6       MR. VEEDER:  You have to have something in the record to

7   support the hypothetical question.

8       MR. SACHSE:  I beg your pardon.

9       THE COURT:  In substance, he is saying, assuming --

10      MR. SACHSE:  Assuming these conditions to exist.

11      THE COURT:  Overruled.

12  BY MR. SACHSE:

13      Q  In your opinion, would that be possible, assuming these

14  conditions existed?

15      A  If the ground water were pumped from, say, the upper

16  end of Pauba Valley and transported down to the lower end of

17  the Pauba Valley where the water table is high and applied to

18  the land surface, the circumstance that you have described might

19  be possible.

20      Q  Now Mr. Kunkel, I want to go for a moment to Exhibit

21  15.  Maybe you had better help me, to be sure I get my range

22  and section numbers right.  I am first directing your attention

23  to Chihuahua Valley as shown on Exhibit 15.  I observe that

24  In Township 9 South Range 2 East Section 8 the younger alluvium

25  in Chihuahua Valley appears to be rimmed or surrounded by

P 30

1  basement complex; is that correct?

2      MR. VEEDER:  I object on the ground that it goes beyond

3  the direct examination, your Honor.

4      THE COURT:  Overruled.

5      THE WITNESS:  You are referring to 9 South 3 East Section

6  8, the southeast corner of the section.  There is a contact

7  between basement complex and younger alluvium.

8  BY MR. SACHSE:

9      Q  I understood your earlier testimony, in response to Mr.

10  Veeder's redirect examination, to be that the extraction of

11  ground water in any amount and any place within the watershed

12  had an effect on the surface flow at the narrows in that they

13  at least de-watered dams, spots on the surface etc., and thereby

14  left more room for runoff to penetrate than reaching the narrows;

15  is that correct?

16      A  That is correct.

17      Q  Then do I understand your testimony to be that the

18  maximum increment of surface runoff at the narrows could only

19  exist if Chihuahua Valley were brimful?1?

20      MR. VEEDER:  Could I have the question again?

21      MR. SACHSE:  I am confining myself to Chihuahua Valley

22  alone for a moment.

23      Q  The maximum increment from Chihuahua Valley could only

24  exist if Chihuahua Valley were brimful?

25      A  Rather than use the term "brimful", I would prefer to

P 31

1  say there was a maximum amount of natural ground water discharge

2  from the valley.

3      Q  To get ground water discharge in an area where there is

4  younger alluvium contact with basement complex, you are going

5  to have to have the younger alluvium full, are you not?

6      A  That is correct.

7      Q  Can you tell us, based on your study, of a time when

8  Chihuahua Valley has ever been brimful 12 months of the year?

9      A  I would have to check my records, but I have observed

10  ground water discharge out of Chihuahua Valley, to the best of

11  my recollection, in the month of October or November.

12      Q  When the ground water basin of Chihuahua Valley is

13  brimful in that manner, that constitutes the greatest possible

14  encouragement to the growth of phreatophytes and water loving

15  vegetation, does it not?

16      A  That is correct.

17      Q  And such vegetation naturally uses considerable water

18  itself, does it not?

19      A  The water loving vegetation consumes ground water under

20  natural conditions.

21      Q  Without going through each one of these valleys shown

22  on Exhibit 15 in order, I observe that similar conditions appear

23  to exist in many places on the exhibit.  For example, in Township

24  8 South Range 1 East, at the extreme southerly line of that

25  section in Section 35, appears to be a point of contact again

P-32  1   between younger alluvium and basement complex; am I right?

2        A  You are correct.

3        Q  Is that the same situation existing that you have just

4   described in Chihuahua Valley?

5        A  In general the same circumstance exists.

6        Q  So for that portion of Temecula Creek to contribute

7   surface runoff to the narrows it would be necessary for the

8   alluvial areas upstream to be saturated?

                                              are
9        MR. VEEDER:  Just a moment.  If you/applying that same

10   statement to Chihuahua Valley, you didn't make the same state-

11   ment.

12       MR. SACHSE:  I intended to.  I used the phrase "brimful"

13   in Chihuahua Valley.

14       MR. VEEDER:  And you also said the greatest increment at

15   the gorge.

16       MR. SACHSE:  Yes.

17       MR. VEEDER:  But you didn't use it in this last question.

18   BY MR. SACHSE:

19       Q  In order for the section of Temecula Creek upstream

20   from the contact with basement complex I have          just

21   indicated to make the greatest contribution to surface flow

22   at the gorge it would be necessary for the younger alluvium

23   upstream to be brimful; is that right?

24       A  In order for the surface flow to make the maximum con-

25   tribution to Temebula Gorge, ground water basins such as

P. 33

1   such as Damron and Dolley would have of necessity have to be full.

2   Q  If that is true of every area of younger alluvium shown

3   on Exhibit 15 which has a downstream contact with basement com-

4   plex -- or do you observe any of which it is not true?

5   A  That is a true statement.

6   Q  In other words, every area of alluvium shown on Exhibit

7   15 which has a downstream contact with basement complex must be

8   brimful if it is to make the greatest possible contribution of

9   surface runoff at the narrows?

10   A  Until we define the word "brimful," I would prefer not

11   to use that word.

12   Q  Well, use your own word.

13   A  The alluvial deposits would have to be at their maximum

14   capacity of saturation as is physically possible under natural

15   circumstances.  Under those circumstances, one would have the

16   maximum discharge at the narrows when there was runoff in the

17   system.

18   THE COURT:  This is like  proving that two and two is

19   four.  I am nervously awaiting the next question.

20   BY MR. SACHSE:

21   Q  Is that also true of the contact between the alluvium

22   and the basement complex at the narrows, where, I believe you

23   testified to me that for all practical purposes there is no

24   younger alluvium?

25   A  That is correct.

P 34

1      Q  In other words, for the Government at Camp Pendleton

2  to get the greatest possible increment of surface runoff, every-

3  thing upstream from the narrows would have to be at the maximum

4  saturation; is that right?

5      MR. VEEDER:  That is objected to as being incompetent,

6  irrelevant and immaterial, not tending to prove a single issue

7  in this case.  We are not claiming against anybody upstream

8  that we are entitled to maximum runoff.  We are seeking to

9  share and enjoy our rights correlatively with these people and

10  necessarily the basins will be pulled down to some degree when

11  they are exercising their correlative shares.

12      THE COURT:  Overruled.  I understand your position.  But

13  he is entitled to show this.

14      But don't keep showing it over and over again.  I have

15  already got that point.  I am nervously awaiting the "now

16  therefore."

17  BY MR. SACHSE:

18      Q  Now, you don't concede, Mr. Kunkel--Mr. Veeder just

19  answered the question, but you don't concede that there is a

20  right on the part of anybody downstream to insist that any

21  one of these basins remain saturated to the greatest possible

22  extent, do you?

23      MR. VEEDER:  That is objected to as being a legal question.

24      MR. SACHSE:  This is still preliminary, your Honor.

25      THE COURT:  Overruled.

P 35.

BY MR. SACHSE:

    Q  Do you?

    A  Will you read the question?  I think you stated it in a manner you didn't intend to.

    Q  Let me rephrase it.  Do you concede that any person downstream from the narrows would have the right to insist that every basin upstream from the narrows remain saturated to its greatest possibility? Do you?

    A  This would not be my opinion.

    Q  Do you have any opinion as to how much any basin from the narrows can be reduced without unreasonably interfering with the rights of riparians below the narrows?  Do you have an opinion?  Just yes or no?

    MR. VEEDER:  I object to it, your Honor.  I don't think it is a proper question.  I don't think he has an opinion.  This is too vague and uncertain and unrealistic, your Honor.  I object to it.

    THE COURT:  Overruled.

    Answer yes or no.

    THE WITNESS:  I have an opinion, yes.

BY MR. SACHSE:

    Q  You have an opinion.  Is that opinion for the area as a whole or for a single basin?  Limit your location, first, as to what area your opinion applies.

    A  The reason I hesitated, it seems to me that I would have

14,086

P 36    1   to make some assumptions of a legal nature.

2        MR. SACHSE:  That is exactly what I want him to do.

3        MR. VEEDER:  I object to it, your Honor.  He shouldn't

4    make any legal assumptions.  That is for your Honor.

5        THE COURT:  We don't know whether these assumptions are of

6    a legal nature or not.  Find out what assumptions you have to

7    make.  We will decide that.

8        MR. VEEDER:  I would like to have the question read then.

9        MR. SACHSE:  The pending/was if this is limited to the

                        question

10   entire basin or just part, and please indicate to what parts he

11   was willing express his opinion.  That is the only pending

12   question.

13        THE WITNESS:  May I make a general reply rather than a

14   specific reply?

15        THE COURT:  Well, speak up.  We will see.

16        THE WITNESS:  If two basins would exist one above the

17   other, with a very thin stringer of alluvium between them or

18   no alluvium at all, to me it would not seem reasonable that

19   the upstream user could pump to the point that the entire dis-

20   charge was depleted to the point that a downstream riparian

21   couldn't get water.

22   BY MR. SACHSE:

23        Q  Have you found that condition to exist on your studies?

24   Have you found the condition you have just described in your own

25   words to exist in any basin to which you have testified?

P 37

1

2      MR. SACHSE:  Please read back his answer.

3      (The Reporter read the last answer of the Witness.)

4  BY MR. SACHSE:

5      Q  Tell me where you found that to exist.

6      Q  In Radeck Valley upstream uses have depleted the stream

7  flow to the point that Mr. Poor and Mr. Ritchie are required

8  to haul their domestic supply of water.

9      Q  At what season of the year?

10     A  I, personally, have observed this in October, and I

11  would have to check my notes,but I believe in the Spring of

12  this year.

13     Q  And that is on Temecula Creek; is that right?

14     A  That is on Temecula Creek.

15     Q  Have you observed that condition anywhere else to exist?

16     A  This is not a condition that I have made it a specific

17  point to check on, so I wish it understood that the fact that

18  I don't know of others doesn't mean that they may not exist.

19     Q  But you don't know of others.

20     A  I don't know of others.

21     Q  Have you made study, Mr. Kunkel, of any basin -- and

22  I'll use the word "basin" but I am referring to any area of

23  younger alluvium that you show anywhere on this map -- which is

24  surrounded by basement complex or which has a basement complex

25  lip downstream?  Have you made any study of any such area to

P38   1   enable you to testify what the safe yield of one of those con-

2   fined areas of younger alluvium would be?

3        A   I have made no safe yield studies.

4        Q   And would you agree that the determination of what is

5   or is not a reasonable extraction from such a basin depends upon

6   the safe yield of that basin?

7        MR. VEEDER:   He said he didn't make any studies.

8        MR. SACHSE:   I am asking him if he would agree that the

9   determination depends upon such a study.

10        THE WITNESS:   In a system such as the Santa Margarita it

11   is not possible to make a meaningful determination of safe yield

12   for any one increment.   Any determination of safe yield would

13   have to be for the entire system.

14        Q   Have you made any study to enable you to tell the Court

15   how much water can safely be extracted from the basin of Coahuila

16   Valley without unreasonably interfering with the flow downstream?

17   Have you made such a study?

18        A   I have some tentative studies underway in this regard.

19        Q   Are you ready now to tell the Court how much water you

20   think can be taken out of Coahuila Valley without unreasonably

21   interfering with the flow downstream?

22        A   Not at this time.

23        Q   Are you ready to tell the Court as to any -- as to

24   Terwilliger Valley?

25        A   As of today I am not ready.

P 2
Belt 9 .

1    Q  As to Chihuahua Valley?

2    A  No sir.

3    Q  As to Oak Grove Valley?

4    A  No.

5    THE COURT:  No valley?

6    MR. SACHSE:  No valley in the watershed?

7    THE COURT:  Is that right?

8    MR. VEEDER:  Speaking of net safe yield?

9  BY MR. SACHSE:

10    Q  Let's say Pauba Valley.  Are you ready to tell us how

11  much water can be safely extracted from Pauba Valley without

12  unreasonably interfering with flow downstream?

13    MR. VEEDER:  I believe that is invading the province of

14  the Court.  I object to it.

15    THE COURT:  Overruled.

16    THE WITNESS:  It will have to be an evaluation based on

17  water levels, and any system would have to be one that would be

18  modified as time progressed.

19  BY MR. SACHSE:

20    Q  But you haven't made it as of now?

21    A  As I said, studies are underway at the present time in

22  this particular regard.

23    THE COURT:  Is it your plan, in consultation with Counsel

24  for the Government, to present any such study at this trial?

25  Have you been instructed to make any such study, or is this

P 3  1  something you are doing on your own?

2  MR. VEEDER:  I can answer that, your Honor.  I have asked

3  him to proceed on the basis of making an analysis with members

4  of the U. S. Geological Survey to ascertain, if possible, if

5  there is a means of regulating the ground water depletions, for

6  example, in Murrieta Valley.

7  THE COURT:  Gentlemen, these questions by Mr. Sachse to

8  me are most pertinent.  I am sitting here looking at Exhibit

9  15 and 15A, on which I demarked certain ownerships.  Let's take

10  the Coahuila Valley.  We don't have yet prepared, I don't know

11  whether anybody contemplates preparing a map showing land

12  ownership that would be overlying entitled to use water out of

13  that basin.

14  What I have in mind is that some of the parcels of land

15  that overlie Coahuila Valley may also extend over the bordering

16  ground, not over the basin but where part of the land is over-

17  lying I would contemplate it would be the same as a riparian

18  owner and that the person who had a portion of land overlying

19  the Coahuila Valley could use his water on areas other than

20  over the basin.  And I would assume, for example, that if the

21  area of the Coahuila Valley, which from the map here looks to

22  be about a little over three square miles, I would assume that

23  there, again, there might be seven square miles of land that

24  would be entitled to use water out of that basin.

25  Having in mind the small depth to the younger alluvium

1   and the maximum amount of water that could ever be collected in

2   that basin, how can you say that it would be unreasonable for

3   the people who own land in Coahuila Valley to pump that basin

4   completely dry?

5        MR. VEEDER:  Are you speaking to me, your Honor?

6        THE COURT:  Yes.

7        MR. VEEDER:  I certainly think that precisely in point

8   with what we have been going into today.  I think that we have

9   to view the entire valley as the sole and only source of water

10  supply for us, and I believe that when Coahuila Valley would

11  be pumped dry, as I have just stated, that it would be completely

12  unreasonably to do so because that is the only source of water

13  we have.

14       THE COURT:  You don't understand my observation.  I say,

15  suppose we had a chart prepared for us that would show us how

16  many acres of ground were entitled to use water out of the

17  Coahuila Valley basin.  Do you follow me?

18       MR. VEEDER:  Yes.

19       THE COURT:  That land that is overlying and stretches

20  elsewhere.

21       MR. VEEDER:  Yes.

22       THE COURT:  We have had calculations of what that basin

23  would hold, and I would be willing to wager right now that

24  when you compute the amount of water available in Coahuila Basin

25  and the area in which that water would be entitled to be used,

P 5    1   that the maximum use out of Coahuila Valley would be a reason-

2   able use as compared with use by Vail or by the Government.  I

3   just guess that that basin has to be that small and there has

4   to be that kind of area that is entitled to use out of it.

5     MR. VEEDER:  I would say, in that regard, your Honor, that

6   the question of what is reasonable is a factual question that

7   your Honor must decide.

8     THE COURT:  But that is how I would decide it.  I think

9   there should be submitted to me some evidence as to how many

10   acres of ground would be using water out of the Coahuila Valley.

11     MR. VEEDER:  You will get that.  Colonel Bowen is now

12   working in the Warm Springs area.  We are going right around

13   clockwise the whole area.

14     THE COURT:  I still don't know whether you understand what

15   I mean.  I think I should be entitled to have some kind of

16   exhibit that would show me the land ownerships that have some

17   portion of the overlying land in Coahuila Valley.

18     MR. VEEDER:  You will get it, your Honor.

19     THE COURT:  To make some kind of estimate as to how many

20   acres of ground would be entitled to use.

21     MR. VEEDER:  On that precise point, your Honor, view this

22   Radec area that we have been talking about, where I said I

23   thought there was going to have to be regulation next year.

24     THE COURT:  That makes it more difficult.  Let's stay

25   away from it.  Take another example.  Look upstream on Warm

P 6

1   Springs Creek, and according to my ownership map I see Dixon,

2   Ceas and --

3       MR. VEEDER:  You have quite a number there.  You have

4   Shamel.

5       THE COURT:  I see three in a row here, Dixon, Ceas and

6   Hendricks, I guess, that own land that crosses that narrow stip

7   of younger alluvium.  Now considering the amount of land that

8   they have that is not riparian -- well, it is riparian to that

9   springs, and if there is underground there it is overlying.

10  Considering the amount of ground they have, and looking at the

11  rest of Warm Springs, all the way up, which is owned by other

12  persons, I can't conceive that there would ever be an unreason-

13  able use of water out of that stringer of younger alluvium at

14  Warm Springs.

15      MR. VEEDER:  As related to the United States?

16      THE COURT:  Yes.

17      MR. VEEDER:  Your Honor, there is only one thing we have

18  to view in this litigation; that a tiny quantity of water is

19  of immense importance here, and the use must be correlated to

20  the demands.

21      THE COURT:  What I am trying to say is that if you had

22  figures and if you could submit how much water was available

23  there, and considering the amount of land that would be entitled

24  to use it, that in comparison the amount of water they would

25  have available would be so small -- I am prognosticating what

P 7-   1   the facts would be -- that you would have to say it was a

2   reasonable use.

3       MR. VEEDER:  I would disagree on that, your Honor, and I

4   believe the Vail Company has an exhibit that they have prepared

5   right now that points up precisely what your Honor has alluded

6   to.

7       MR. STAHLMAN:  We prepared it for an entirely different

8   purpose, Your Honor.  It has no connection with this matter.

9       MR. VEEDER:  George, let me go ahead.

10      It is important, though, to look at that exhibit and see

11  precisely the problem that is there presented.

12      MR. STAHLMAN:  I don't think it answers the question the

13  Court is asking, though, Mr. Veeder.

14      MR. VEEDER:  We think that it demonstrates, though, the

15  problem in this litigation precisely.  For here is Jack Roripaugh

16  irrigating a 100 per cent of his land.

17      MR. SACHSE:  If your Honor please --

18      MR. STAHLMAN:  He missed the point.

19      THE COURT:  Wait a minute, please.  Let me talk.

20      Let's leave out the area of the Murrieta, the Pauba and

21  even the suggested basin by the Government, which is an entirely

22  different problem.

23      I am talking about (1)  these stringers of younger alluvium,

24  and (2) some of the very shallow basins of younger alluvium that

25  lie upstream.

P 8

1    MR. SACHSE:  That is what I am talking about.

2    THE COURT:  That is what Mr. Sachse' questions were directed

3  to.

4    MR. SACHSE:  Absolutely.

5    THE COURT:  That is all I am talking about.  I don't know

6  what you can show, but I would guess that ultimately -- let's

7  take this stringer in Lewis Valley.  It stretches through four

8  different square miles.  I don't know what the ownerships will

9  around that, but let's assume that there is 4 or 5 square miles

10  of area that would be entitled to take water out of that stringer

11  of younger alluvium.  Can anybody argue that when you figured

12  it out mathematically as to that amount of water, their maximum

13  use would be so small that all you could do would be to say

14  that it is certainly a reasonable use, because in comparison

15  with the amount of water per acre that Vail or the Government

16  could take they are getting just an infinitesimal amount of

17  what you would be getting for the other downstream owners.

18  That is my point.

19    MR. SACHSE:  Your Honor, you have half of my point.  What

20  you say is true.  But what this cross-examination is directed

21  to fundamentally is the request that I am going to make of

22  your Honor when this thing ends that you determine by an inter-

23  locutory decree the extent of this stream system, and it is my

24  contention that if, on the testimony of the Government's witnesses,

25  Reed Valley has to be fully saturated to give a contribution

1   down here, then Reed Valley ought to go out, because this Court

2   has absolutely no jurisdiction to order any land owner to leave

3   his land saturated and overgrown with phreatophytes.   The

4   California Constitution prohibits unreasonable uses.

5       THE COURT:  I get your point, but I don't know whether we

6   even have to go that far.

7       MR. SACHSE:  I have two points, your Honor:  (1)  On your

8   Honor's reasonable use, and (2)  that this relates absolutely

9   and directly, and that is why I confine myself to this fringe

10  area, to the question we are going to put to your other extent

11  of the stream system as shown on Exhibit 15E.

12      THE COURT:  Take Terwilliger Valley.  You have parts of

13  fifteen sections or square miles.  Undoubtedly there are people

14  in Terwilliger Valley who have a portion of their ground over-

15  lying the basin, and extending into the basement complex where

16  they might conceivably use some irrigation.  I will wager that

17  if computations were made of the maximum amount of water that

18  that basin would hold if full, divided up among the acres that

19  would be entitled to use it, nobody could argue but that what

20  they used was a reasonable use.

21      MR. GIRARD:  I think you are right.

22      THE COURT:  It wouldn't compare with what the United States

23  uses or with what Vail uses.

24      MR. STAHLMAN:  May I make an observation, your Honor.  Let's

25  take this particular basin here in the basement complex.  Assume

P 10 1    that if you would aggregate the land which is riparian there

2    too and entitled to water, that even though you were on a

3    correlative basis of fifty per cent of the water they still

4    wouldn't get enough water.

5         THE COURT:  That is what I am talking about.  This is

6    prognostication.  Because outside of some figures that we had

7    from the State of California as to the extent, some of the

8    larger figures, and some of the figures from the United States,

9    we have no factual basis as yet, except as to the area actually

10    overlying the basin.  But that is not the area of the land that

11    would be entitled to use.  And it would seem to me that if we

12    are going to approach these areas of younger alluvium -- let's

13    leave out Radec Valley and let's leave out the older alluvium,

14    which is a different problem -- but it would seem to me that

15    in these smaller areas, for instance, Reed Valley, to make any

16    determination as to Reed Valley we would have to have the owner-

17    ship of land that was entitled to use that water, which would

18    far exceed the area of the younger alluvium in Reed Valley.

19         MR. VEEDER:  Is this in evidence now, your Honor?

20         THE COURT:  This was the ground water data.

21         MR. STAHLMAN:  We have these basins put in by the State

22    and by you -- estimated storage capacity in acre feet 190.

23         THE COURT:  Upper Coahuila.  I don't know which is upper

24    and which is lower.  This must be the upper one in here.

25         MR. STAHLMAN:  That must be.  And this is the lower one.

P 11   1

MR. GIRARD:   That assumes that you can get it out, too.

2     THE COURT:   Does the Government propose to put on evidence

3  of riparian acres -- riparian in the sense of either overlying

4  or riparian to those basins, and the extent of water in them,

5  and the safe yield that could come out of them?

6     MR. VEEDER:   Your Honor, I tell you, I quit trying to play

7  the game of safe yield about twenty years ago, because I don't

8  know that anybody knows in the West what is the safe yield of

9  any area.   But your coming pretty close to home when you begin

10  to talk about Terwilliger Valley and the Coahuila Indian

11  Reservation, because in the Coahuila Indian Reservation some

12  of the lands overlie the Terwilliger basin.   So we know there

13  is competition there.   We know there has been a draft on that

14  basin.   It is entirely possible that there should be restricted

15  some pumping, if the rights of the United States are to be

16  protected.   But I say that in this litigation it is essential

17  that we fix the rights of the individual as we go along, and

18  that is my concern.

19     THE COURT:   But suppose that when you had the figures all

20  in, the ratio that the land owner got in Terwilliger was 1 to

21  10 as compared  with the United States' 1 to 5.   Do you say this

22  would be an unreasonable use then of the land owner in Terwilliger

23  Valley?

24     MR. VEEDER:   It would depend a great deal on what his crops

25  are.   There are a great many ways of administering a stream.

P-12   1   You can restrict pumping, you can do a lot of things.  And I

2   think you are going to have to use every device in the West to

3   regulate this stream to the end that the Marine Corps is pro-

4   tected in their claims.  And I think one of the real tragdies

5   is what happened on the Colorado River perhaps.  But it has

6   occurred.  And if there is anybody who thinks he is going to

7   get me to give up an acre foot of water he is in error.  I am

8   not going to do it.  I may get beaten down on it.

9       THE COURT:  I have not seen the figures.  I am not a wagering

10  man, but I would wager you right now that in these smaller

11  stringers of alluvium dotted around this valley there would not

12  be any problem.  I don't care what your figures would be.  I

13  am just guessing at what that would show.

14      MR. VEEDER:  I will not engage in the guessing game, your

15  Honor.  I would be reluctant to do so.  All I am saying is that

16  we will present before your Honor what I think is evidence

17  requisite to make a sound and honest adjudication in this matter,

18  and that is all we can do.

19      THE COURT:  When is that evidence coming in?

20      MR. VEEDER:  We are putting it in right along.  We just

21  finished up on the 18th on the Murrieta.  We are going into

22  Warm Springs, we are going all the way around, as your Honor

23  directed, the best we know how.

24      MR. SACHSE:  I am almost through, your Honor.

25      Q  Mr. Kunkel, you know the Vail dam is in existence and

14,100

P 13

1   you know where it is, don't you?

2       A   I do.

3       MR. VEEDER:   We will stipulate to that.

4   BY MR. SACHSE:

5       Q   Am I not correct in stating that any drying up of wet

6   spots upstream from the Vail dam, to the extent that such drying

7   up intercepts surface runoff it simply reduces the amount of

8   runoff impounded behind Vail dam?

9       A   I am not fully acquainted with the operation of Vail dam

10   and its releases in relation to the runoff.

11      Q   I am going to ask you to assume under the State Permit

12   the Vail dam has only the right to impound runoff between

13   November 1 and April 1, and I want you to assume that they obey

14   that permit.   Then would my previous statement be correct?

15      A   From November --

16      Q   November 1 through April 30th.

17      MR. VEEDER:   Restate the question, Franz.

18   BY MR. SACHSE:

19      Q   I am going to ask you to assume that the Vail permit

20   allows them to impound the entire runoff of the watershed of

21   Vail dam that occurs during the months of November 1 to April

22   30th annually.

23      MR. VEEDER:   I am going to object to that, your Honor.

24      MR. SACHSE:   I am asking him to assume it, your Honor.

25      MR. VEEDER:   Why would you assume something that is

P 14 1    manifestly incorrect?  Do you think the United States of America

2    isn't entitled to have that water run down to recharge its basin?

3    And certainly part of the Temecula Creek is going to constitute

4    a source of that water.

5         THE COURT:  Overruled, Mr. Veeder.  This is a hypothetical

6    question.  He is asking him to assume that in the wet months

7    the Vail dam is entitled to impound water.  This is without

8    prejudice to the rights of the Government on the stream.  He

9    is directing his attention to something entirely different.

10   BY MR. SACHSE:

11        Q  I am asking you to assume that they have the right to

12   take the entire surface runoff occurring above Vail dam.

13        THE COURT:  By "take" you mean --

14        MR. SACHSE:  Impound.

15        THE COURT:  You are not implying what they can do with it?

16        MR. SACHSE:  I am not discussing what they can do with it.

17        MR. VEEDER:  I renew my objection because it is contrary

18   to fact.

19        MR. SACHSE:  It is a hypothetical question, Mr. Veeder.

20        THE COURT:  Overruled.

21   BY MR. SACHSE:

22        Q  I am asking you to assume that they have a right to

23   stop the entire surface runoff upstream from the dam for the

24   period November 1 through April 30th.  Do you have the facts?

25        A  I have.

P 15   1    Q   You agree that is the wet season of the year, don't you,

2   November 1 through April 30th?

3    A   It includes most of the heavy storm period.

4    Q   Would you say it includes 90 to 95% of the runoff?

5    A   I haven't examined the records.  It is probably so.

6    Q   So am I not correct in stating that any drying up of

7   wet spots upstream from the Vail dam -- which drying up you

8   earlier testified has the effect of capturing more winter run-

9   offs; is that right?

10    A   That is right.

11    Q   Is it not true that any drying up of wet spots upstream

12   from Vail dam simply decreases the amount of water that Vail

13   could capture behind its dam?

14    A   That would be correct.

15    MR. SACHSE:  I have just about two or three more questions

16   your Honor.

17    THE COURT:  What is your point there?

18    MR. SACHSE:  So what?  I am assuming that your Honor is

19   going to find that the Vail permit is perfectly valid.  I

20   disagree with Mr. Veeder, but that is something we are going

21   to argue at a later.  So my point is, again, that all of this

22   stuff should be disregarded in considering the rights of the

23   United States to surface flow at the narrows downstream.  There

24   is enough water to take care of the needs of the United States

25   from the increments below here.

P 16

1       I make the point, first, that a lot of this is outside the

2  stream system anyway.  Second, the point your Honor pointed up,

3  a lot of these uses up here are perfectly usable.  And third,

4  it can't conceivably injure the United States because somebody

5  else uses it before it gets there under a proper use.

6      Q  In this general area of some six sections, you recall,

7  Mr. Veeder questioned you about this morning?

8      A  I am acquainted with the sections.

9      Q  You answered him that ground water extractions by

10  domestic and irrigation wells in that area, in your judgement,

11  did affect the head at the narrows; isn't that right?

12      A  That is correct.

13      Q  When you say "did" didn't you really mean "may" affect?

14      A  No, there actually has been a drying up of the springs

15  and a lowering of wells that formerly flowed no longer flow.

16      Q  What you meant was the cumulative effect of all of

17  them; you didn't mean any single one of them had that effect?

18      MR. VEEDER:  Are you speaking of wells?

19      MR. SACHSE:  Yes, wells.

20      THE WITNESS:  Individually and collectively --

21  BY MR. SACHSE:

22      Q  Is it not true --

23      MR. VEEDER:  Let him finish his answer.

24      THE WITNESS:  Individually and collectively, they have

25  affected the stream flow.

P 17  1    BY MR. SACHSE:

2          Q  Isn't it true that there are many other factors you are

3    just overlooking, such as ground water extractions that may

4    destroy consumptive use by vegetation, may they not, and they

5    simply replace consumptive use?  Is that right?

6          A  This factor must also be included.

Belt 10  7    Q  And if ground water extractions simply replaced con-

8    sumptive use, then it would have no affect at the narrows, would

9    it?

10         MR. VEEDER:  Again, on these hypothetical questions that

11   are being presented, your Honor, someplace in the record we

12   must find them or he can't have these hypotheses.

13         MR. SACHSE:  I beg your pardon.

14         THE COURT:  He is merely presenting the theory, as I

15   understand the question, that if it were found that the con-

16   sumptive use of phreatophytes was three acre feet in a certain

17   area, and if, on the hand, by extracting 3 acre feet the

18   phreatophytes died and weren't using water, then the thing would

19   be in balance and there would be no effect.

20         MR. VEEDER:  They build Glen Canyon on that theory, and

21   California is suffering from it.  But I simply take the position

22   that unless there is some evidence on the general proposition

23   that there has been a depleted use of water by water loving

24   plants -- they should have put that in evidence.  They haven't.

25   We have offered our evidence on the point.  We think there has

1   been a depletion of water at the gorge by reason of these uses.

2   MR. STAHLMAN:  There is a lot of evidence in.  There are

3   aerial photographs.

4   THE COURT:  You are both talking in generalities.  It

5   stands to reason that with the development of this valley there

6   be entailed a depletion of water at the gorge.

7   MR. VEEDER:  That is right.

8   THE COURT:  The Government has no right to say that the

9   valley shall be a desert.  The Government is entitled to a

10   reasonable use of the water.

11   MR. VEEDER:  There is not even an implication of that on

12   our part, your Honor.  But we do say that we have a right to

13   share correlatively in the water harvest.

14   THE COURT:  That is what we are talking about.

15   BY MR. SACHSE:

16   Q   Then you agree, Mr. Kunkel, that it is possible that a

17   ground water extraction might just equal the consumptive use

18   of phreatophytes?

19   A   It is possible.

20   Q   Is not another factor which you have to consider when

21   you weigh the effect on head at the narrows of any single ex-

22   traction anywhere in the watershed, is not another factor that

23   must be considered that of increment downstream from the ex-

24   traction?

25   THE COURT:  You mean from the use of the extraction?

P 19   1    MR. SACHSE:  That would be better, your Honor.

2          Q  Downstream from where the extracted water is used.  Any
3    increment to the stream system downstream from the point of use,
4    isn't that a factor you have to consider?

5          A  This was not in the question as I understood.

6          Q  I am asking you, if you are going to make a statement
7    that extractions of ground water by any well do have an effect,
8    no matter how small, on the head of the narrows, must you also
9    consider increments to the watershed below the point of use of
10   those extractions?

11         THE COURT:  That is two and two, isn't it?

12         MR. SACHSE:  I think it is, but Mr. Kunkel doesn't.

13         MR. VEEDER:  Did you withdraw it?

14         MR. SACHSE:  I am waiting.

15         THE WITNESS:  I am trying to understand the meaning of his
16   question.

17         THE COURT:  Take the use of water on the Vail property,
18   and if you want to take an extreme case take the use of it on
19   that area of land up nearest the dam where they grew the potatoes
20   at one time.  Is there any doubt but that the use of a good bit
21   of that water was again returned to the stream system?

22         THE WITNESS:  It was returned to the ground water body;
23   not necessarily the surface stream system.

24         THE COURT:  If it is returned to the ground water body,
25   the ground water feeds the irrigation wells.

P 20   1   MR. VEEDER:  What period is your Honor speaking of?

2   MR. STAHLMAN:  It is merely illustrative.

3   THE COURT:  Let's go ahead.

4   BY MR. SACHSE:

5   Q  Mr. Kunkel, you have told us that every extraction has

6   the effect on the flow at the narrows by drying up wet spots,

7   doesn't it?

8   A  That is correct.

9   Q  So that what you extract you put on the surface and

10   create new wet spots.  Doesn't that have any effect on the head?

11   A  In the area where it is applied, yes.

12   Q  That's all I want to know.  One other thing.  Is it

13   not equally true, then, that you must also consider entirely

14   new increments, not returned flow but new increments, rainfall

15   and surface flow from other tributaries below the point of the

16   extractions?  Don't they have an effect?

17   A  They would have an effect.

18   Q  If you have in a watershed, for example -- this is

19   hypothetical again -- an area at the extreme upper end of the

20   watershed with a rainfall of unit one, and an area halfway

21   down the water shed where the rainfall becomes unit five, five

22   times what it is at the upper, isn't that a factor you have to

23   consider when you say that the ground water extractions way

24   up where it was 1 can be felt down at the narrows?

25   A  It is a factor that enters into the equation, but it

P 21

1   doesn't alter the circumstances of the effect of withdrawing

2   ground water further up.

3       Q  It doesn't affect the circumstances, but it does affect

4   the impact of the withdrawal doesn't it? It affects how serious

5   the withdrawal is?

6       MR. VEEDER:  Have you two questions before him?

7       MR. SACHSE:  That is just a rephrasing.

8       Q  It affects whether or not it is de minimus, doesn't it?

9       A  For any one circumstance it would have an effect.

10  However, add ones de minimuses together and they are no longer

11  de minumus.

12      Q  Each one does, then, have an effect?

13      A  Each one does have an effect.

14      Q  So then you will back off your flat statement of this

15  morning that any ground water extraction necessarily -- the

16  fact of that extraction alone has an impact at the narrows?

17      A  I don't believe you are quoting me exactly right, Mr.

18  Sachse.  I will not back off from the statement that the pumping

19  at the northeast end of Wildomar Valley above the Murrieta

20  fault, in my opinion, has had an effect on the downstream flow.

21  That pumping in the area above Murrieta and Wildomar has reduced,

22  in my opinion, the amount of water that has gone over Temecula

23  gorge over what would have gone over if that area had not been

24  pumped.

25      Q  Have you any calculations how that effect at the narrows

P 22

1   has fluctuated, say, in the last ten years by reason of the

2   increased or decreased pumping?

3       A  As it relates to the area we have discussed?

4       Q  Yes.

5       A  Would you repeat your question?

6       Q  Have you any figures as to how the effect at the narrows

7   of pumping upstream has varied during the past eight to ten years?

8       A  No, I do not have any figures whatsoever.

9       MR. SACHSE:  I have no further questions, your Honor.

10      THE COURT:  I have a couple of questions along the same

11  line.

12          In the extreme easterly corner above Terwilliger Valley

13  there is a little area of alluvium called Burnt Valley.

14      THE WITNESS:  I know which you are referring to.

15      THE COURT:  The far most easterly one, see it up there in

16  the corner?

17      THE WITNESS:  Yes.

18      THE COURT:  Let us assume for argument that the rainfall

19  is so small in that area that never in recorded history that

20  we know about has that alluvial basin ever been full and running

21  over.

22      THE WITNESS:  Surface water?  I will assume, for argument,

23  but it is virtually an impossible circumstance, your Honor.

24      THE COURT:  I'm not so sure but that there are places in

25  that area, maybe not there because that is pretty close to the

P. 23

1    mountains, but elsewhere where the rainfall is very small.  But

2    assume for argument that the basin never got full.  If that were

3    true, then the pumping from that basin could have no effect

4    downstream, could it?

5         THE WITNESS:  If the basin had never gotten full, then

6    there would be no effect.  However, I repeat, this is virtually

7    an impossible circumstance.

8         THE COURT:  Look at the back country behind Burnt Valley.

9    There is not much watershed to feed it.

10        THE WITNESS:  Exhibit 15 doesn't show it, but subsequent

11   to the preparation of the exhibit I have double checked that

12   valley and there is ground water discharge out of Burnt Valley

13   that I failed to show on Exhibit 15.

14        THE COURT:  The second question is this:  In French Valley

15   in the decomposed basement complex isn't it entirely possible

16   that the pumping of the Frick wells -- I think the Frick wells

17   are the big wells you mentioned at the top of Exhibit 15E.

18        MR. VEEDER:  That is in French Valley, though.  You re-

19   ferred to French Valley.

20        THE COURT:  Yes, I think it is French Valley.

21        MR. VEEDER:  Yes, as shown on Exhibit 15.

22        THE COURT:  And shown particularly on Exhibit 15E, the

23   irrigation wells up there.

24        THE WITNESS:  Frick is 6 South 2 West 28G2.  That is one

25   of the irrigation wells with a 5 horsepower pump on it, 127

1   feet deep.

2       THE COURT:  Isn't it entirely possible that the pumping of

3   that water in that area and the use of it for irrigation helps

4   supply the smaller domestic wells downstream by return flow?

5       THE WITNESS:  That is not my opinion, your Honor.

6       THE COURT:  No return flow from the use of that water for

7   irrigation?

8       THE WITNESS:  There undoubtedly would be an increment --

9   I will not say "undoubtedly" --depending on the method of

10  irrigation, there very likely be an increment of return to

11  ground water.

12      THE COURT:  That would add to the water available for the

13  domestic wells below, would it not?

14      MR. VEEDER:  Is your Honor speaking of the long-term or

15  the short-term?

16      THE COURT:  Just speaking as I asked the question.

17      THE WITNESS:  It would depend somewhat on where he applied

18  the water.  If he applied it upstream from his point of pumping,

19  it would definitely have an impact on the amount of water avail-

20  able downstream.  If he applied it lower, there might be a

21  temporary benefit, but in the long run it would ultimately

22  deplete the water available to those downstream.

23      THE COURT:  That is all.

24      MR. SACHSE:  May I ask one more question I overlooked,

25  your Honor?

P 25

1        THE COURT:  Yes.

2    BY MR. SACHSE:

3        Q  Mr. Kunkel, I am going to call to your mind the broad

4    general question that I had when I was talking about Diamond

5    and Domenigoni Valleys.  I direct your attention to Dodge Valley,

6    Chihuahua Valley and Terwilliger Valley and ask you if it is

7    not true that each of those valleys also slops over into an

8    adjoining watershed under circumstances that make it very

9    difficult to see a contour on the surface?

10       A  The younger alluvial plane in the valleys that you have

11   mentioned do go over the surface divide into another watershed

12   and the surface gradient is very flat and without precise leveling

13   it is very difficult to determine the watershed divide.

14       Q  Would you further agree, then, that ground water

15   extractions in the San Luis Rey side of Dodge Valley might

16   conceivably change the direction of movement of ground water

17   in Dodge Valley to the San Luis Rey?

18       A  If the wells were properly placed they could have an

19   effect.

20       Q  The same in Chihuahua Valley?

21       A  I haven't examined the divide area that carefully in

22   Chihuahua Valley to answer the question.

23       Q  How about Terwilliger?

24       A  Likewise in Terwilliger.  I would have to field check

25   it carefully.

P-26

MR. SACHSE:  That is all your Honor.

THE COURT:  Mr. Girard.

MR. GIRARD:  I have just a few questions.  Mr. Sachse has covered most of them.

CROSS EXAMINATION

BY MR. GIRARD:

Q  I believe, Mr. Kunkel, when you were testifying to the few sections, 1, 36, etc., that you referred to as having the effect on the pumping and your opinion was that the result of that was to deplete springs which provide surface flow, with a consequent effect on the amount of water  in the Murrieta at the narrows; is that correct?

A  That is correct.

Q  Have you actually in reaching that determination examined the measurements of Murrieta Creek at or near the confluence with Temecula Creek?

A  I have examined the records.

Q  Going how far back?

A  To the best of my recollection, I have examined all of the records.

Q  There are records going back to 1920 on that, aren't there?

A  That is correct.

Q  And isn't there a substantial difference between what is flowing now in Murrieta Creek and what has been flowing

P 27

1   there for twenty years at the narrows or just above the narrows?

2   A  I do recall at the moment that there was an appreciable

3   difference.

4   Q  In reaching your conclusion that there has been an effect,

5   wouldn't the end result of whether you noticed it or not be

6   something that would be most pertinent in reaching your conclusion?

7   A  There are other factors entering into the runoff and

8   stream flow at the point that you describe that the measure of

9   the runoff is not the determining criterion with respect to the

10   several sections that you have spoken of northeast of Wildomar.

11   Q  But at least the surface flow at Murrieta just above the

12   joinder with Temecula has not changed appreciably, say, from

13   1920?

14   A  To the best of my recollection.

15   Q  To the best of your recollection.

16   A  I would like the opportunity to correct myself if I

17   am incorrect.

18   Q  Mr. Kunkel, this area and this color delineates what?

19   A  The weathered basement complex or the residuum.  The

20   terms are used interchangeably.

21   Q  And you state that you are quite familiar with this

22   area and the ranching etc. that is going on there?

23   A  I am familiar with it.

24   Q  And that has been for some period of time?

25   A  For several years, yes.

P. 28

Q  Has there been a great deal of change in the type of farming or amount of farming, say, from 1953?

A  I do not recall that there has been a large increase. However, I have not specifically made a study of this point.

Q  You are generally familiar with the irrigation and the farming that is going on in that area; is that correct?

A  In general, yes.

Q  Have you read Bulletin No. 57, incidentally, Mr. Kunkel?

MR. VEEDER:  There is no heresy in our crowd.

THE WITNESS:  I am acquainted with the Bulletin.

BY MR. GIRARD:

Q  Are you familiar with the Plate in that Bulletin, Plate 21B, that sets forth the amount of acres that are irrigated?

A  No I am not.  At least, I do not recall it.

Q  Assuming that that Plate for that area, in this entire area, shows 200 acres that has been irrigated in 1953.

THE COURT:  Which area are you talking about?

MR. GIRARD:  The area in this older alluvium, your Honor.

MR. SACHSE:  Residuum.

MR. GIRARD:  Residuum.

THE WITNESS:  Yes.

BY MR. GIRARD:

Q  Would you say that would be substantially correct, from your own personal knowledge?

A  Well, I was not there in 1953 to check it.

P 29

1    Q  How about now?  I mean, you have testified that you are
2    fairly familiar with this area.  I am not pinning you down to
3    an exact figure, but would 200 acres of land being irrigated
4    now sound to you reasonably accurate give or take say a hundred?
5        MR. VEEDER:  At the Court's direction we are going to check
6    that matter out.
7        MR. GIRARD:  You can check it out.  I have no objection.
8    I am just asking this witness if that sounds reasonable.
9        THE WITNESS:  It sounds reasonable.
10   BY MR. GIRARD:
11       Q  Again refering to the same area, you have indicated the
12   movement of water generally this way.
13       THE COURT:  Indicating to the southwest.
14       MR. GIRARD:  Southwest.
15       Q  How does that movement occur, Mr. Kunkel?  Is that
16   generally through cracks and fissures, etc.?
17       A  I have had an opportunity to inspect several deep cuts
18   etc.  The movement has been through the residuum which, in many
19   respects, resembles sand, and the ground water moves down the
20   hydraulic gradient in a continuous body of water from the upper
21   part of the area underlain by residuum in a generally south-
22   westerly direction, as indicated by the green and red arrows
23   shown on Government's Exhibit 15E.
24       Q  In other words, it would move down this way here, down
25   this way here --

P 30

1      MR. VEEDER:  Would you state which way you are pointing,

2  Counsel, please.

3  BY MR. GIRARD:

4      Q  Southwest, is that correct, Mr. Kunkel?

5      A  Generally in a southwesterly area.

6      Q  You have testified, I believe, that you would refer to

7  this as a basin; is that correct?

8      A  I said that I would hesitate to refer to it as a basin.

9      Q  You don't know its exact configurations or area or

10  scope; is that correct?

11      A  I would find it difficult to draw any boundary.

12      Q  Would you expect to find the same amount of water in

13  the ground under, say, Section 31 as you would find in Sections

14  5 or 4?

15      A  I would expect to find comparable occurrences of water.

16      Q  Is there, to your knowledge, any known and defined

17  ground water channel in this area, or is it more or less a

18  gradual movement through the underground?

19      A  The body of water is moving generally southwesterly

20  through the interstices and the weathered basement complex from

21  points of high head generally in a southwesterly direction

22  toward the Murrieta Hot Springs area, a continous migration of

23  ground water.

24      Q  In other words, through the entire area?

25      A  Except in the places where the basement complex sticks

P. 31

1   up above the water table, and in those places, it is my opinion

2   that some ground water moves from cracks and fractures in the

3   basement complex in that area.

4       Q  But to your own knowledge do you know of any definite

5   certain stream or channel in that area of ground water?

6       A  You mean with bed and banks?

7       Q  Yes, a limited defined underground stream?  And if you

8   don't know --

9       A  I would not call it an underground stream.

10      Q  It doesn't have defined banks and limits underground

11   to compare with a surface stream?

12      A  Compared to a surface stream, no.

13      MR. GIRARD:  That is all.

14                      CROSS EXAMINATION

15   BY MR. STAHLMAN:

16      Q  In relation to the Windmill Well in Pauba Valley that

17   you testified to on direct examination, I believe the present

18   water level is 65 feet; is that correct?

19      A  In October or November 1959 when I measured it the last

20   time, it was about 65 feet.

21      Q  One of the factors, naturally, contributing to the

22   receding of the water in that well is the drought?

23      A  It has been a contributing factor.

24      Q  Since the Vail dam has been built have there been any

25   conditions that existed there that caused the lowering of that

P 32

1  water table?

2      A  In so far as Vail dam has held back water that would

3  normally have gone to the outwash area in the vicinity of the

4  Windmill Well and above, that withholding of water has con-

5  tributed to the decline of water levels in that area.

6      Q  The Windmill Well is the easterly-most well on the

7  ranch, isn't it?

8      A It is very close to the easterly-most.  It may be.  I

9  don't recall right off.

10      Q  There is no well that utilizes -- there are no extractions

11  from the underground to the east of that well for irrigation,

12  are there?

13      A  I believe you are correct.  That is correct with the

14  possible exception of JK1, 12H1, H2.  They may be slightly

15  east, but very close to the same position.

16      Q  Did you take into consideration the fact that the

17  releases from Vail dam are conveyed to a point downstream from

18  that well for their major uses?

19      A  I am aware of the fact that a part of the water impounded

20  behind Vail dam is carried by open ditch pipeline and pumped

21  southeast into Wolf Valley and used in the vicinity of the

22  Ludy Well.

23      Q  That is not the point I am getting at all.  Let's put

24  it this way.  Prior to the building of Vail dam the outfall area

25  in the easterly portion of Pauba Valley would capture the water

P. 33

1    and that would go underground at that point?

2        A   That is correct.

3        Q   Since the building of Vail dam the waters that have been

4    utilized, mostly the major portions of this water, were conveyed

5    over that outfall area but were deposited on Vail property for

6    irrigation purposes downstream; is that correct?

7        A   Downstream in Pauba and Lewis valleys.

Belt 11  8    Q   Downstream from the well?

9        A   That is correct, in Pauba and Lewis valleys.

10       Q   So such wells as were utilized and the return flow from

11   those waters would be in an area to the west of this Windmill

12   Well; is that right?

13       A   By return flow do you mean return flow to the stream

14   or return flow to the ground water body?

15       Q   Return flow to the ground water body such as would show

16   up in well measurements?

17       A   The return to the ground water body of water pumped in

18   the vicinity of the Windmill Well are waters from Vail dam which

19   have returned to ground water in the area west of the Windmill

20   Well.

21       Q   In other words, all of the water which was released

22   from the Vail dam into their irrigation system would be utilized

23   or returned to the Pauba basin or the Wolf basin, if you want

24   to include; is that correct?

25       A   The part that returns to ground water could go to those.

P. 34

1   Whether it would be all of it, I don't know, because I am not

2   that well acquainted with your irrigation system.

3      Q   The major portion of it?

4      A   Only.

5      Q   Wouldn't one of the factors contributing to the lowering

6   of the well be, since the building of the Vail dam, bypassing

7   the water through a conduit system and into the basin below

8   rather than through the outfall area that it passed prior to

9   the building of the Vail dam?  Wouldn't that have a tendency to

10  lower that well?

11     A   That would also be a contributing factor.

12     Q   You have no idea to what extent, have you?

13     A   One place where I think it shows up on, I believe it

14  shows up, is shown on Government's Exhibit 1512 in the hydrograph

15  of the Ludy Well where the Ludy Well during the irrigation season

16  of 1959 actually recovered when most other wells were declining,

17  and in my opinion this indicates a return to ground water of

18  waters some of which are from Vail dam.

19     Q   It is true, is it not, that assuming that prior to the

20  building of Vail dam when storm water caused a surface flow

21  through the Pauba Valley down through the gorge that there was

22  a certain amount of those waters that flowed through and to the

23  gorge in seasons where there was sufficient precipitation that

24  some of those waters from this area were lost into the ocean?

25     A   Yes, historically this has occurred.

P 35

1    Q  And of course then two and two is four; since the build-

2    ing of Vail dam none of (the) storm waters were lost into the ocean,

3    is that correct?

4    A  That is correct.  Waters impounded behind Vail dam were

5    lost into the ocean.

6    MR. STAHLMAN:  That is all I have your Honor.

7    THE COURT:  Mr. Kunkel, when we had Exhibit 15A you drew

8    on that exhibit, I think -- at least, I have it on my copy --

9    the "Kunkel Line."  And on 15E the other day you put a dotted

10   line in red which, as I recall your testimony, indicated that

11   north of that line in the older alluvium you would only get

12   domestic wells.

13   THE WITNESS:  The line on 15A was not drawn by myself.

14   THE COURT:  15E.

15   THE WITNESS:  All right, the line on 15E northeast of

16   Murrieta Hot Springs, I referred to the lines separating the

17   Qtoal? from the Qtoal and indicated that in my opinion northeast

18   of that line it is extremely likely that one would only be able

19   to drill domestic wells.

20   THE COURT:  You are correct, and I ran a red line along it.

21   But on the easterly side of the map you drew the dotted line,

22   did you?

23   THE WITNESS:  The dashed red line is mine east of Murrieta.

24   THE COURT:  Do I understand that this is now the new

25   Kunkel Line or basin?

JOHN SWADER, OFFICIAL REPORTER

P 36

1    THE WITNESS:  Well, I am not quite sure what you mean by

2    what significance the Kunkel Line has.

3    THE COURT:  The Kunkel Line which you gave us before and

4    about which Mr. Veeder talked was the limits of the ground water

5    basin in this older alluvium?

6    MR. VEEDER:  The Kunkel Line was simply 100 feet of strata.

7    The point being that the Kunkel Line was not the outer extremity

8    of the basin.  The Kunkel Line was an area where we said that

9    there was 100 feet of wetted alluvium.  So it is quite a different

10   thing.

11   THE COURT:  You may be correct.

12   MR. VEEDER:  And we said that was an area in which there

13   was no doubt that that would be found.  That is an entirely

14   different matter, your Honor.

15   THE COURT:  What I am interested in is, what about the

16   eastern side here?  Where would you demark an area between

17   where irrigation wells and only domestic wells could be obtained?

18   THE WITNESS:  Without additional data, I would have to say

19   that the line corresponded to the contact between the basement

20   complex and the older and younger alluvium, or the volcanic

21   rocks and the older and younger alluvium.

22   THE COURT:  In that fashion?

23   THE WITNESS:  In that fashion.

24   THE COURT:  Take a short recess.

25   (Recess)

P 37

1    THE COURT:  I have another question of Mr. Kunkel.

2    Mr. Kunkel, assuming for argument that I should adopt the

3    line that you have indicated, or something like that, as the

4    extent of the ground water basin, would it do violence to your

5    opinion if, for ease in describing property, I would say,

6    excluding entirely Section 4, for example -- what is the township

7    and range?

8    THE WITNESS:  7 South 3 West.

9    THE COURT:  In other words, run the line across here. And

10    for instance, down in this next area possibly exclude the North-

11    east quarter of Section 10, and dropping down here exclude the

12    Southwest quarter of Section 11.  Instead of trying to fix a

13    line that would run by reference to a map, which would mean the

14    title company would always to find the map, use a legal descrip-

15    tion, zigzag the line along legal descriptions.  There is no

16    legal description --

17    MR. WILKINSON:  Not in sections.  You are on the Grant

18    when you start getting across this line.  It runs from Section

19    30 all the way up into Section 32.  That is part of the Grant.

20    So these section lines in here legally mean nothing.

21    THE COURT:  Could we make allowance for that and say

22    reconstruct the section lines?

23    MR. WILKINSON:  Fred knows more about that than I do,

24    your Honor.

25    COLONEL BOWEN:  Your Honor, there are blocks and lots

P 38  1  within the Grant which are legal descriptions, and those could

2  be followed in this case, and those lines, incidentally, are

3  either parallel or normal to the Grant line by and large, so

4  they would more nearly approximate the position of your line.

5  THE COURT:  Going over to the east side of the map, suppose,

6  for instance in Section 21 -- this is outside the Grant line

7  now?

8  THE WITNESS:  Yes.

9  THE COURT:  What is the township and range?

10  THE WITNESS:  7 South 2 West, your Honor.

11  THE COURT:  In this area exclude, say, the Northeast

12  quarter.  And going to Section 22, say, the North half of the

13  North half -- in other words, follow the legal description.

14  THE WITNESS:  Assuming that one tends to draw a line

15  approximating the red line or dashed line to which you have

16  alluded, it would be possible, in my opinion, to use legal

17  subdivisions, not necessarily the subdivisions shown on 15E

18  but other exhibits.

19  THE COURT:  Use section lines where they were available,

20  and use the lots and blocks within the Grant?

21  THE WITNESS:  That is correct.

22  THE COURT:  Anybody have any objection to that kind of

23  procedure?  Mr. Veeder?

24  MR. VEEDER:  Not at the moment, your Honor.  Whenever I

25  get a scar it is because I said "yes."

P 39

RE-DIRECT EXAMINATION

1

BY MR. VEEDER:

2

3    Q  Mr. Kunkel, would you state your opinion as to whether

4  -- I think you may be interested in this, Mr. Sachse --would

5  you state, Mr. Kunkel, whether you have an opinion as to whether

6  all of the ground waters from the point of the Temecula gorge

7  across the older alluvium and on up to the contact of the residuum

8  with the basement complex, for example, at the Fricke property

9  in the French Valley, would you state whether all the ground

10  water in that area described is hydrologically interconnected,

11  a continuous ground water body?

12    A  In my opinion, ground water from the Temecula gorge to

13  the Fricke property in 6 South 2 West Section 28 is a continuous

14  ground water body.

15    Q  State whether, in your opinion, all the molecules of

16  water are interrelated and interconnected throughout that whole

17  area?

18    A  In my opinion, the molecules of ground water are inter-

19  related and interconnected.

20    Q  Would you state what, in your opinion, would be the

21  confines of that ground water body to which you have just made

22  reference?

23    A  In the absence of additional data which, in my opinion,

24  is not readily available, I would say that one would have to

25  accept the contact between the weathered basement complex and

P. 40

1    the basement rocks and the younger and older alluvial deposits.

2    Q  And being the outer confines of this ground water body?

3    A  Being the outer confines of the ground water body.

4    MR. VEEDER:  I have no further questions.

5    MR. SACHSE:  I have none.

6    MR. STAHLMAN:  I have just one question.

7                    RE-CROSS EXAMINATION

8    BY MR. STAHLMAN:

9    Q  What do you understand by water being mined?

10   A  As I have used the term on other occasions, mining in

11   ground water is the withdrawal of ground water from storage

12   under a circumstance where the probability of its being re-

13   plenished within any meaningful period of time is virtually

14   impossible.

15   Q  By meaningful period of time you mean a matter of a

16   thousand years?

17   A  Within the time as man would use it in his own life

18   span.

19   Q  Do you have any opinion as to whether any waters within

20   the watershed of the Santa Margarita are being mined?

21   MR. VEEDER:  Outside of Pauba.

22   THE WITNESS:  Assuming that the area will continue in its

23   present state of development or the development be increased

24   and the area not revert to a natural state, in my opinion, there

25   are areas where ground water is being mined.

P 41

BY MR. STAHLMAN:

1

2      Q  At this time?

3      A  At this time.

4      Q  Which are those areas?

5      A  Terwilliger Valley would be an example.  This is based

6  on the assumption that the state of ground water development

7  will continue to be what it is or greater.

8      Q  Talking about at this time your belief that it is being

9  mined in Terwilliger Valley?

10     A  As I have defined it, I believe it is being mined.

11     Q  Any other areas?

12     A  Probably Diamond and Domenigoni Valleys.  This does not

13  mean that all of the water pumped is mined.

14     THE COURT:  You say that your opinion is that if it is

15  mined it will not be replenished within the lifetime of a man?

16     THE WITNESS:  Yes that is right, within the lifetime of

17  a man or several generations.  It is rather an indefinite thing.

18  It is a term that I must prefer to use in the truly closed

19  desert ground water basins where recharge is very low and dis-

20  charge is --

21     THE COURT:  I just wanted to get whether it will or will

22  not be replaced.  It will not be replaced within the period you

23  speak of, is that true?

24     THE WITNESS:  Within this period, yes.

25     THE COURT:  Have you made studies as to how much water is

14,129

P 42

1   being used in Terwilliger Valley, how many acres are being

2   irrigated?

3       THE WITNESS:  It is not necessary to do that.  All one

4   needs to know is that under natural conditions inflow to the

5   valley and discharge out of the valley are, over the long period,

6   in balance, and that there is no change in storage which is the

7   natural occurrence in virtually every ground water basin.  When

8   water is pumped from the basin, unless that pumping or until

9   that pumping reduces the natural discharge by the amount of

10  water pumped, that increment is mined, and until the mined water

11  is great enough to reduce the discharge of ground water levels

12  will fall and discharge will slowly dry  up until there is no

13  discharge out of the valley and if pumping continues at a more

14  or less continuous rate or stabilized  rate, which ultimately

15  will have to be equal to the perennial yield of the valley,

16  whatever it may be, at that time water levels will have stabl-

17  ized to a lower level, natural ground water discharge will have

18  ceased, and a stable condition will have been reached.

19      THE COURT:  You do not infer by your answer, however, that

20  such mining of water in Terwilliger Valley would be an unreason-

21  able riparian use as contrasted with other uses in the valley?

22      MR. VEEDER:  That implies a legal question, and I object

23  to it on that ground, your Honor.  I think to ask this witness

24  whether it is reasonable or unreasonable has to take into con-

25  sideration legal rights to use that water.  So I renew my

P 43   1  objection.

2  MR. STAHLMAN:  What are the legal rights in California?

3  THE COURT:  I will withdraw it.  There is no law against

4  my thinking when I want to think.  I will withdraw the question.

5  MR. VEEDER:  May I ask one more question.

6  THE COURT:  Yes.

7  RE-REDIRECT EXAMINATION

8  BY MR. VEEDER:

9  Q  Mr. Kunkel, assuming that the Vail Company is pumping

10  and using more water than there is yield of Temecula Creek, is

11  it your opinion that ultimately they will be mining water, based

12  upon the definition that you have given us?

13  A  If the circumstances continued and pumping was continued

14  over an indefinite period, there would be an increment of ground

15  water that would be mined and it would have a result of reducing

16  discharge from the valley.

17  MR. VEEDER:  I have no further questions.

18  RE-CROSS EXAMINATION

19  BY MR. SACHSE:

20  Q  Do you mean that the only factor that affects the ground

21  water in Pauba Valley is Temecula Creek?

22  MR. VEEDER:  That was not the question.

23  MR. SACHSE:  The answer was that if the water extracted is

24  more than the inflow from Temecula Creek --

25  Read to Mr. Veeder the original question.

P 44

1    THE COURT:  Yes, I think that is what he said.

2    ( The last question and answer were read. )

3    MR. SACHSE:  He said they would.

4    Q  Now you are saying that they get no water from the older

5    alluvium on either side?

6    A  I do not wish to imply that.

7    MR. SACHSE:  I have no further questions.

8                    RE-RECROSS EXAMINATION

9    BY MR. STAHLMAN:

10    Q  As long as we are talking about Vail, what would you

11    call the kind and type of water or the process of extraction

12    where they use the basin by pumping to the point where salt

13    water intruded into the basin?  Would that be mining water?

14    A  Generally, mining water is generally not --

15    Q  Would that be?

16    A  In my opinion, no.

17    MR. STAHLMAN:  That's all I have.

18                    RE-CROSS EXAMINATION

19    BY MR. GIRARD:

20    Q  Just so the record is clear, Mr. Kunkel --

21    MR. VEEDER:  If this record is clear, I'll throw in with

22    you.

23    BY MR. GIRARD:

24    Q  In answer to Mr. Veeder's last question, as I understand

25    your answer is that everything except basement complex is in

P 45   1   continuous hydraulic continuity, molecule by molecule of water

2   in the whole watershed?

3        MR. VEEDER:  I think we had better have that read.

4        THE COURT:  There is no use asking that.  It is obvious

5   that it is not where from areas of younger alluvium overflow

6   flows over basement complex.  It is obvious that that is not

7   true, and I don't think that is what he meant.

8        THE WITNESS:  The Judge has answered your question.

9        THE COURT:  That doesn't mean that the younger alluvium

10   might not be part of the stream system.

11        MR. GIRARD:  No.

12        Q  This ground water body that you referred to, that is

13   not the same type of body of water as, say, the Santa Margarita

14   basin or Camp Pendleton, is it?

15        A  No, I wouldn't it compare it as the same.  I would not

16   say it is the same kind of water body.

17        Q  It is not that type of basin?

18        A  It is not that type of basin.

19        MR. GIRARD:  That is all.

20        THE COURT:  Maybe you can step down, Mr. Kunkel.

21        THE WITNESS:  Thank you.

22        THE COURT:  I understand you are not going to get me those

23   figures about French Valley until you get back from Copenhagen?

24        THE WITNESS:  I will do my best to get them as soon as

25   possible, your Honor.

14,193

P 46

1    THE COURT:  Can you get them by tomorrow?

2    THE WITNESS:  I don't believe I can get them tomorrow.  I

3 will see what I can do on it.

4    MR. GIRARD:  Your Honor, I just want to point out for the

5 record that I referred to Plate 21B of Bulletin No. 57 insofar

6 as irrigation acreage in that area of basement complex is con-

7 cerned, and Plate 21B is in evidence.

8    MR. VEEDER:  But isn't that the one where they stored the

9 water above ground?

10    MR. GIRARD:  It is the California Exhibit which shows the

11 acres irrigated in that area in 1953.

12    THE COURT:  Two-hundred acres.

13    MR. GIRARD:  Yes, as computed.

14    THE COURT:  Have a nice trip, Mr. Kunkel.

15    THE WITNESS:  Thank you your Honor.

16    THE COURT:  What is next?  Mr. Stahlman?

17    MR. SACHSE:  Have we reached the end of the hydrology and

18 geology on Exhibit 15E?

19    THE COURT:  I take it that we have, except for the matters

20 I asked for from Mr. Kunkel.

21    MR. VEEDER:  Also in regard to the matters that Mr. Wilkinson

22 is going to put in.  Isn't that correct?

23    MR. SACHSE:  I don't think Mr. Wilkinson and Mr. Stahlman

24 have on the basic extent of the stream system.

25    MR. VEEDER:  I would like to make book on that.

P 47

1    THE COURT:  As far as the Government is concerned?

2    MR. VEEDER:  As far as we are concerned, yes.

3    MR. STAHLMAN:  Do you rest now?

4    MR. VEEDER:  No.

5    MR. SACHSE:  That is what I am trying to find out.

6    MR. VEEDER:  As far as we are concerned, we have put in

7 all of the geology we are going to in regard to 15E, unless you

8 people find something more.

9    THE COURT:  Do you have some further case you are going to

10 put on, on direct?

11    MR. VEEDER:  On this area here, no, your Honor.

12    THE COURT:  By this area --

13    MR. VEEDER:  I am pointing to 15E.

14    THE COURT:  But for all intents and purposes the Government

15 is through with the area shown on 15E?

16    MR. VEEDER:  Yes, your Honor, unless there is some rebuttal.

17    MR. SACHSE:  What I am getting at is that Mr. Littleworth

18 requested me to advise your Honor that they were through as far

19 as ground water hydrology and geology on all the areas shown on

20 15E is concerned, and that he would concur in my request, and

21 I can so advise your Honor, that at the earliest possible time

22 we can ask your Honor for an interlocutory judgement defining

23 the extent of the ground waters that are to be included in the

24 stream system in that area.  I am making such request now and

25 telling your Honor that Mr. Littleworth authorized me to speak

P. 48   1  for him and to say that he joins in the request.

2      THE COURT:  Aren't most of the counsel at the place where

3  we can do that?

4      MR. GIRARD:  Yes, I would join in the motion of Mr. Sachse,

5  your Honor.

6      THE COURT:  Mr. Stahlman?

7      MR. STAHLMAN:  Yes your Honor.

8      THE COURT:  Mr. Veeder?

9      MR. VEEDER:  I think in regard to 15E that is correct, your

10  Honor.

11      THE COURT:  By 15E you mean the extent of the basin of

12  ground water as shown there?

13      MR. VEEDER:  Yes your Honor.

14      THE COURT:  This matter that I have asked Mr. Kunkel to

15  look in to, wouldn't it be a very simple matter before you leave

16  tonight to compute the number of those irrigation wells and the

17  gallonage of them and submit it by letter to Mr. Veeder to show

18  to us tomorrow?

19      MR. VEEDER:  I think I will ask him to stay over until

20  tomorrow and see if we can get it done, your Honor.

21      THE WITNESS:  I will stay over and do whatever has to be

22  done, your Honor.

23      THE COURT:  When do you leave?

24      THE WITNESS:  I am not leaving until August 4th for

25  Copenhagen, your Honor.

P 49

1    THE COURT:  Then you will be here tomorrow?

2    THE WITNESS:  Yes sir.

3    THE COURT:  Take that up for us, will you please?

4    THE WITNESS:  Yes.

5    THE COURT:  All right, Mr. Stahlman.

6    MR. STAHLMAN:  I would like to call Colonel Bowen for a

7    few questions, your Honor.

8    THE COURT:  Colonel Bowen has been sworn?

9    COLONEL BOWEN:  Yes your Honor.

10   MR. STAHLMAN:  I would like to indicate to the Court that

11   the object of this testimony is merely to show certain generalized

12   accepted conditions that exist in relation to evapo transpira-

13   tion salvage of water in connection with the basin of dams and

14   the condition that exists in the basin of the Vail dam.

15                    DIRECT EXAMINATION   (RESUMED)

16   BY MR. STAHLMAN:

17     Q  Col. Bowen, are you familiar with the fact that studies

18   were made in relation to the storage areas of the evapo tran-

19   spiration salvage?

20     A  Yes sir.

21     Q  And will you explain to the Court what that is?  Not

22   what the studies are, but first just what the salvage of evapo

23   transpiration means?

24     A  Evapo transpiration is the sum of water transpired

25   through the plant system and the evaporation loss from free

P 50 1  water body surfaces or capillary water that may be exposed to

2  the air in the soil, and in a given valley the sum of these

3  losses per unit area times the area would be the evapo transpira-

4  tion losses for the particular valley.  This loss can be reduced

5  by one of several means, one of which we are doing at Camp

6  Pendleton in some areas, namely, the removal of the plants

7  which are using the water, and another in connection with the

8  studies and planning for dam construction and reservoir develop-

9  ment losses can be salvaged by flooding the area with surface

10  runoff.  And in connection with the dam study salvage of evapo

11  transpiration water is brought about in part by clearing the

12  reservoir site of plants so that the trash racks and outlets

13  of the dam are not fouled up, and partly by killing the plants

14  by flooding.

15     Q  Then it is true, is it not, that the loss through

16  evaporation alone is not the real loss occasioned by the flooding

17  of the dam storage area?

18

19

20

21

22

23

24

25

Belt 12

1     A    You mean the gross evaporation, Mr. Stahlman?

2     Q    Yes.

3     A    No, that has to be adjusted.

4     Q    And it is adjusted by the deduction of the evapo-

5 transpiration loss; is that right?

6     A    Yes sir.

7     Q    And that is a customary procedure in connection with

8 the construction of dams in such areas as the Vail Dam is

9 constructed, is it not?

10     A    Yes.

11     Q    To compute figures and made studies as to what the

12 relative difference will be?

13     A    Yes sir.

14     Q    To your knowledge, has that been done on the Vail

15 Dam and its construction?  Some studies have been made?

16     A    Yes sir, to my knowledge a study was made.

17     Q    And you, yourself, understand the method and the

18 principle of making these studies of evapo transpiration loss?

19     A    Yes sir.

20     Q    Have you ever checked the figures that were made by

21 the Sonderegger Report that preceeded the construction of the

22 Vail Dam?

23     A    No sir, I haven't had the Sonderegger Report long

24 enough to make a study and evaluation.

25     Q    Assuming for a moment that there was not such report

1    as the Sonderegger Report and no Report had been made, are

2    there any means or methods by which you can make a computation

3    of the evapo transpiration losses?

4        A    Of the Vail Dam?

5        Q    Yes.

6        A    Yes sir.

7        Q    Just briefly, what would that entail?

8        A    That would entail evaluation of Reports of the

9    surface flow and condition of the floral of the valley prior

10   to the construction of the Dam and creation of the reservoir.

11   An examination of aerial photographs taken prior to the constr-

12   uction of the Dam and impoundment of water behind it would be

13   very helpful in determining the area and density of cover

14   within the reservoir site.  And, of course, evaluation of

15   temperature, precipitation, hours of sunlight in the year, etc.,

16   are all variables which would be used in evaluating or deter-

17   mining this loss.

18       Q    And there are such records of those different factors

19   that you have mentioned, including the aerial photographs, that

20   existed prior to the building of the Dam, are there not?

21       A    Yes sir.

22       Q    Do you believe that you could check the Sonderegger

23   Report for its accuracy?

24       A    Yes sir.

25       MR. STAHLMAN:  That is all I have of Colonel Bowen, your

1   Honor.

2        MR. VEEDER:  I have no questions, your Honor.

3        THE COURT:  Generally, Colonel Bowen, does the loss by

4   evaporation of a Dam surface exceed that that was previously

5   lost by the floral in the area covered by the Dam?

6        THE WITNESS:  Yes sir, it would generally exceed the

7   gross loss by evapo transpiration.   However, it is possible

8   with some types of plants where transpiration might actually

9   exceed the loss by evaporation from accomparable free water

10  area.

11       THE COURT:  Any further questions of the Colonel?

12  Colonel, you may step down.

13       MR. STAHLMAN:  I will call Mr. Wilkinson

14                  JAMES V. WILKINSON,

15  called as a witness on behalf of defendant Vail, having been

16  previously duly sworn, on his oath was examined and testified

17  further as follows:

18       THE COURT:  Mr. Wilkinson has been sworn.

19  Have you not?

20       THE WITNESS:  I have, your Honor.

21       DIRECT EXAMINATION

22  BY MR. STAHLMAN:

23       Q    Mr. Wilkinson, are you familiar with this Sonderegger

24  Report?

25       A    It is a part of our records, Mr. Stahlman.

14,141

1       Q       It is part of the records that you keep and maintain

2   at the ranch?

3       A       That is right.

4       Q       The Sonderegger Report, do you have it with you?

5       A       I have a copy of the Sonderegger Report with me.

6   THE COURT:   It may be marked for identification.

7   Will you lend it to Colonel Bowen?

8   MR. STAHLMAN:   I think this is the only one.   There is

9   only a portion of this that goes to the particular --

10      Q       Of course, this is a Report on the evapo transpiration

11  loss, is it?

12      A       That is the document.

13  MR. STAHLMAN:   That is the only Report that we have, your

14  Honor.   I thought this could be available.   We can put it in

15  if your Honor desires, but it is the only one we have.

16  THE COURT:   Lend it to Colonel Bowen?

17  MR. STAHLMAN:   Yes.

18  THE COURT:   If there is no objection, when he comes back

19  in he can summarize his findings on the Report.

20  MR. STAHLMAN:   Could we have it available?   If anyone

21  wants it in evidence, we will put it in evidence.   But I think

22  we can bring out the factors without going into the entire

23  length of the Report that enters into the conclusions, which

24  are all that is important here.

25  MR. VEEDER:   You have no objection if I read it?

1          MR. STAHLMAN:  No.

2          THE COURT:  Lets go ahead.

3    BY MR. STAHLMAN:

4          Q     Have you made some computations after a study of the

5    Sonderegger Report in relation to what the evapo transpiration

6    salvage is?

7          A     Generally, yes.  It is mentioned on Vail's Exhibit

8    AU.

9          Q     Will you explain to the Court just what you did in

10   compiling Vail's Exhibit AU with reference to the Sonderegger

11   Report?

12         A     Table 12 of the Sonderegger Report, headed by the

13   title "Vail Reservoir - Net Consumptive Use by Evaporation and

14   Transpiration" is copied on page 2 of Vail's Exhibit AU.

15         THE COURT:  Did I ever get a copy of Vail's AU?

16         MR. STAHLMAN:  I think you did, your Honor.

17         THE COURT:  I don't think I did.

18         MR. STAHLMAN:  I brought them down here one day when I

19   lodged them quite some time ago.

20         THE COURT:  May I look at a copy?

21         MR. STAHLMAN:  Do you have some extra ones there?

22         THE WITNESS:  I have a copy that I was using.

23         As will be noted on Vail's AU, the first column shows the

24   contour intervals of the reservoir, the second column is the

25   area in acres, the third column is the consumptive use in the

period 1947-48, the fourth column is the gross mean consumptive
use under average conditions, and the fifth column is the net
mean consumptive use under average conditions.

This fifth column is the column of interest, and it shows
the actual use.  You will note that the column five is a
figure produced by deducting an annual rainfall of 12" from
the figures in column four.

Your column five, in turn, is used on page 1 of Vail's AU
to be applied at the various contour levels, and on the fifth
column of page 1 is the actual increase of losses due to the
Lake at the various contour intervals.

THE COURT:  This column says, "Actual increase." You mean
increase of losses?

THE WITNESS:  Increase of losses.

MR. VEEDER:  Actual increase of evaporation over and above
the evapo transpiration figure.  That is your calculation.

THE WITNESS:  Yes, it is a figure that represents evapora-
tion less the salvage.

MR. STAHLMAN:  We will offer Vail's Exhibit AU in evidence,
your Honor.

MR. VEEDER:  May I ask some questions?

MR. STAHLMAN:  Surely.  Examination on voirdire.

BY MR. VEEDER:

Q    Has the Lake ever attained the 1360 foot contour
level which is set forth in the first column?

1    A    Yes.

2    Q    At what level is it now, do you know?

3    A    I believe it would be about 1370 -- it would probably

4    be 1380.

5    Q    You use the word "average". Did you say average year?

6    A    I don't know just which you refer to, Mr. Veeder.

7    Q    Didn't you use the term "average year"?

8    A    I used the term "net mean consumptive use" and

9    "average conditions".

10    Q    What do you mean by "average conditions"?

11    A    That is a term that Mr. Sonderegger used in his

12    Report.

13    MR. VEEDER:  Your Honor, under the circumstances, I

14    think the offer has to be withheld until Colonel Bowen has

15    made this check-out and we have an agreement that there is a

16    proper foundation here.  I think the offer is premature.

17    THE COURT:  It is based upon the Sonderegger Report.

18    MR. STAHLMAN:  I have no objection to doing it that way,

19    your Honor.  I thought the simple way would be that the

20    Sonderegger Report could be checked by Colonel Bowen.

21    THE COURT:  All right, let him check the Report and Vail's

22    Exhibit AU, which is a sort of summary of it.

23    MR. STAHLMAN:  May it then be marked for identification?

24    It is merely at this time lodged.

25    THE COURT:  The Sonderegger Report?

1  MR. STAHLMAN:  No; Vail's AU.

2  THE COURT:  Vail's AU is already marked.

3  Whose copy do I have here?

4  MR. STAHLMAN:  You may have that copy, your Honor.

5  DIRECT EXAMINATION (Resumed)

6 BY MR. STAHLMAN:

7  Q Have you recently put some new land under irrigation

8 on the Vail properties?

9  A We have.

10  MR. VEEDER:  Did you say "irrigation" or "cultivation"?

11  MR. STAHLMAN:  I said "irrigation," but cultivation and

12 irrigation.

13  THE WITNESS:  It has been cultivated before.

14 BY MR. STAHLMAN:

15  Q It has been cultivated, but not irrigated before; is

16 that correct?

17  A That is correct.

18  Q Would you indicate on Vail's Exhibit J where that

19 land is located?

20  A The land that I make reference to is located toward

21 the eastern end of Pauba Valley in the area as noted on the

22 Map "Pear Tree Camp."  It consists of some 229 acres planted

23 this year and now being harvested in a crop of potatoes.

24  Q This land has been cultivated before, but this is

25 the first year it has been irrigated?

A     This is the first year it has ever been irrigated. This land has been farmed to grain prior to this season's irrigation.

Q     By the way, the land as referred to No. 19 on Vail's J, which was the land that came into existence last year, I believe, as you testified, was that under irrigation this year?

A     No, it was not.  The only irrigation in this general area is on the new land.  There is no irrigation being conducted on No. 19, and only on a small portion of Parcel 18.

THE COURT:  Which is the new Parcel?  Show me on the Map.

THE WITNESS:  The new Parcel I can draw in with a pencil, if you wish, your Honor.

THE COURT:  If you would.

THE WITNESS:  With an orange pencil I will generally mark out the new land that is being irrigated.

MR. VEEDER:  Do you have a name for that field yet?

THE WITNESS:  Pear Tree Field.

BY MR. STAHLMAN:

Q     You stated that is 200 --

A     229 acres.

THE COURT:  Does it include both these?

THE WITNESS:  Just within the area in orange, your Honor; not this area to the east.

THE COURT:  Write, "Pear Tree" across it.

MR. STAHLMAN:  May he designate it Parcel 20, your Honor.

1    THE COURT:  All right.

2    Parcel 20 includes across here?  What is this red line up

3  here?

4    THE WITNESS:  That is an area we were talking about using

5  for future irrigation at a previous time, your Honor.

6    THE COURT:  And the area between Parcels 19 and 20 --

7    THE WITNESS:  Has not been irrigated.

8  BY MR. STAHLMAN:

9    Q    How did you determine the extent of the area that

10  has been determined at 229 acres?

11    A    By actual physical examination of the area, looking

12  at the Maps, looking at the various aerial photographs, and

13  plenimetering the area on existing aerials that we have in our

14  records.

15    THE COURT:  What is the Exhibit on the Board there?

16    THE WITNESS:  Vail's J.

17    Mr. Stahlman, I think possibly we had an error.  You said

18  229.  It is 329 acres.

19  BY MR. STAHLMAN:

20    Q    Now then, I'll ask you some questions regarding the

21  Pauba Well.  Have you made specific capacity comparison between

22  the Pauba Well and other Wells?

23    A    I have in our local area.

24    MR. STAHLMAN:  There is Exhibit AT that has been lodged.

25  Does your Honor have a copy of it?

1        THE COURT: No.

2        MR. STAHLMAN:   I will have a couple here.

3        THE COURT:   If you will put my name on them and put them

4    on my bench or send them to my office, I'll get them.   I make

5    files up here as I get them.   I take it back.   I apologize.

6    Here it is.

7    BY MR. STAHLMAN:

8        Q    With reference to the document referred to as Exhibit

9    Vail AT, did you compile this document?

10       A    Yes I did.

11       Q    And where did you get the information from which the

12   figures and information on this document were obtained?

13       A    From the Vail Company's records.

14       Q    Will you explain to the Court what the various Wells

15   indicate, where they are, and for what purpose they are being

16   used?

17       A    The Wells are illustrative Wells in the Pauba Valley.

18   The first Well noted is the JK Well.   It is in the upper

19   reaches of the Valley close to the area I just talked about

20   where the new potatoes were planted.

21       As we do down the Valley there is another Well -- these

22   all appear on our other Exhibit, they are Wells in existance

23   now -- No. 40 Well.

24       Let me go back to the JK Well.   That Well was drilled to

25   a depth of 150 feet, with a 20" casing, a gravel packed Well.

1    The specific capacities are noted on the last column,

2  ranging all over 100 and as high as 159.

3    The No. 40 Well is further down the Valley.  It is 252'

4  deep, with both 16" and 20" casing.  It's specific capacity

5  has the range of 72 to 101.

6    The New 28 Well (8 South 2 West 20 B-4) is 289 feet deep.

7  It has a 16" casing, and is gravel packed.  It's specific

8  capacity is 70.

9    And at the bottom of Vail's AT we see the Navy or the

10 Pauba Well; 2150 feet deep, with various size casing running

11 30, 16 and 12.  It is also a gravel packed Well and has a

12 specific capacity at testing ranging from 16.8 to as high as

13 20.2.  The specific capacity of this Well does not compare

14 with the shallow Wells in the Pauba Valley.

15    Q    For the record will you state the significance of

16 the specific capacity and it's comparison?

17    A'    It is gallons per minute per foot of draw down.  It

18 exemplifies the cost of pumping water.  The higher the specific

19 capacity the cheaper it is to pump your water.

20    Q    Any water that is obtained from the Pauba or Navy

21 Well, what use do you put that water to -- what use have you

22 put it to?

23    A    We have used that water on lands only down gradient

24 from the Well itself.  The water is used at the bottom end of

25 the Pauba Valley.  It has been necessary to combine that water

14,150

1   with other water as best we could.

2        MR. STAHLMAN:  I would like to offer Vail's AT in evidence

3   at this time, your Honor.  It is merely for the purpose of

4   illustration.

5        MR. VEEDER:  No objection.

6        THE COURT:  Vail's AT received in evidence.

7   BY MR. STAHLMAN:

8        Q     What is the necessity for combining it with other

9   waters?

10       A     The quality of the water from the Navy or Pauba Well

11  is quite poor for irrigation purposes.

12       Q     I will direct your attention to a document here

13  referred to as Vail's Exhibit AR-14 heretofore lodged.  Did

14  you compile that document?

15       A     I did.

16       Q     Where did you obtain the information which you placed

17  on this Exhibit AR-14?

18       A     File of water analysis of various Wells on the ranch,

19  as well as stream water analysis.

20       Q     Were these made by licensed recognised chemists?

21       A     That is right.

22       MR. STAHLMAN:  Does your Honor have a copy?

23       THE COURT:  Yes, I have it.

24       MR. STAHLMAN:  Your Honor, there was a correction made on

25  Vail's Exhibit AR-14.

1   THE COURT:  I have the substituted copy that you gave me.

2   MR. STAHLMAN:  That is the correct one.

3   BY MR. STAHLMAN:

4   Q    Will you explain the document for the record, as to

5   what it shows and the significance of it?

6   A    The main feature or the main bad feature of the

7   irrigation water is its sodium content.  It will be noted that

8   the highest sodium content, other than the Navy Well, is only

9   50%.  They range for 8 South 2 West 12 J-1 47%, 8 South 2 West

10  11 J-1 47%, 8 South 2 West 15 D-1 43%, 8 South 2 West 20 B-4

11  50%, the stream at Nigger Canyon 37%, the stream in Pauba Valley

12  47%, the Navy Well has a sodium content of 96%.

13  THE COURT:  This is 96% of what?  Not the total quantity

14  of water?

15  THE WITNESS:  N$^O$, your Honor, it is a developed figure

16  that would be better explained by --

17  THE COURT:  Are you sure it is per-cent or is it 96 parts?

18  THE WITNESS:  No, it is not parts.  It is a percentage.

19  It is a pure figure.

20  THE COURT:  Colonel Bowen, can you tell us?

21  COLONEL BOWEN:  It is a percentage of the total dissolved

22  salts .  It is a percentage of the cations that are in solution

23  in the water.

24  BY MR. STAHLMAN:

25  Q    The explanation at the bottom of this Exhibit 14

1  indicating the percentages and their relationship to soil,

2  where did you obtain that information?

3      A   United States Department of Agriculture Bulletin,

4  and also Tables found in other documents.

5      Reference was made by the State of California as to

6  qualities.  These are accepted amounts that sodium percentages

7  below 60 are good, injurious ranges from 60% to 75%, and un-

8  satisfactory is above 75%.  The high sodium content waters

9  tend to create a hard unworkable soil that will not take water.

10     Q   Have you noticed the condition of this soil where

11  this water has been applied?

12     A   It's effect is already showing up.

13     THE COURT:  My index shows Exhibit AR-10 as the last

14  Exhibit.  You also have apparently lodged Exhibits 11, 12, and

15  13.

16     MR. STAHLMAN:  Yes, they are lodged also, your Honor.

17  And if I may at this time, I would like to indicate to your

18  Honor that Exhibit AR-11 is a copy of a document which I

19  obtained with Mr. Veeder's permission.

20     THE COURT:  I don't have any copies of these.  Do you

21  have an extra copy?

22     MR. STAHLMAN:  We will get them for your.

23     THE COURT:  Just let me look at it.  Maybe I don't want

24  them.

25     (Mr. Stahlman hands documents to the Court)

1        THE COURT:  Are these the originals?

2        MR. STAHLMAN:  These are copies, your Honor.

3        We had an arrangement with Mr. Veeder that I would go to

4    Camp Pendleton, look at the records, and then they sent copies

5    to me, and these are the copies of the copies which were sent

6    from the Government's file and they have a bearing and pertain

7    to the question of the Navy Well and the issues which have

8    been created by Mr. Veeder in relation to the question of

9    unjust enrichment of the Vail's by reason of the drilling of

10   the Well.

11       THE COURT:  Go ahead and I will look at them while you

12   are proceeding.

13   BY MR. STAHLMAN:

14       Q    Now then, Mr. Wilkinson, have you irrigated any lands

15   since the Navy Well was placed in operation where the water of

16   the Navy Well can be utilized in addition to the lands that

17   were under irrigation prior to the drilling of the Navy Well?

18       A    The lands irrigated from the Navy Well had previously

19   been irrigated from other sources.

20       Q    There are no Wells downstream from the Navy Well that

21   receive irrigation from that system in addition to those which

22   were under irrigation at the time the Navy Well was drilled;

23   is that correct?

24       A    I don't think you have the question right, Mr.

25   Stahlman.  I think you refer to "wells" when you meant "lands."

1    Q    Yes, I meant lands.  Any lands downstream from the

2    Navy Well that are under irrigation at the present time in

3    addition to those which were being irrigated prior to the

4    drilling of the Navy Well?

5    A    No, there are no additional lands irrigated now or

6    since the drilling of the Navy Well that were not irrigated

7    prior to the drilling of the Navy Well.

8    Q    And the Navy Well is in the position where it can

9    only irrigate, that is, the water from the Navy Well can only

10    irrigate lands which are to the west of the Navy Well; is that

11    correct?

12    A    It is down gradient.

13    Q    Then, compared to your entire irrigation system, has

14    the Navy Well added anything to benefit the operation of the

15    Vail Ranch?

16    A    As far as the distribution system is concerned, no.

17    As far as the irrigation system is concerned, it is of question-

18    able value due to its quality, although we do utilize the

19    water to the best of our ability.

20    Q    Are some cattle watered from the Lake that has been

21    created there by the Navy Well?

22    A    Customarily all of our reservoirs are used for cattle

23    watering at one time or another.

24    Q    By the way, when was this reservoir adjacent to the

25    Navy Well constructed?

1        A      Just after the completion of the Well.

2        Q      Prior to that time did you have cattle in that area?

3        A      We have had cattle in that area.

4        Q      Where did the cattle water prior to the construction

5   of the Dam at the Navy Well?

6        A      At a reservoir immediately west of it within 150

7   to 200 yards, or to the east of it, at what we refer to as the

8   Studley reservoir.

9        Q      How far away is that?

10       A      That is a matter of about 2-3000 feet.

11       Q      Is that a long  distance for cattle to go to get a

12   drink?

13       A      No, it is not a great distance.

14       MR. STAHLMAN:  Has your Honor looked at those Exhibits?

15       THE COURT:  I looked at 11 and 12.  But, of course, I

16   would need a translator to interpret them.  I can't make any

17   sense out of them.  Maybe the Colonel  can interpret them.

18   Maybe he can tell me what they mean.

19       MR. STAHLMAN:  I can tell you the substance of them.  One

20   of them makes reference to the fact --

21       MR. VEEDER:  Which one is that?

22       MR. STAHLMAN:  I don't have them in front of me.

23       THE COURT:  Here they are.  AR-11 is a teletype or wire

24   of June 23, 19551.

25       MR. STAHLMAN:  I might explain to your Honor that I think

Belt 13

1  all of the AR Series Exhibits, to some extent or in some respects

2  at least should be read in connection one with the other. Some

3  of them standing alone do not make a great deal of sense.

4      Our contention is that this series of Exhibits shown that

5  the Navy Well was drilled under the complete control and dom-

6  ination of the Navy; that it was not drilled for the purpose of

7  exploring the area there; that between the different departments

8  of the Navy there were communications that the purpose of it

9  also was in relation to the pending litigation -- in other words,

10  they had anticipated the litigation, and one of these documents,

11  this Exhibit AR-11, for instance, this communication from

12  Boondocks --

13      THE COURT:  What is that?

14      MR. STAHLMAN:  Bureau of Docks and Yards, I think it is.

15      MR. VEEDER:  Did you say, "Boondocks"?

16      MR. STAHLMAN:  Budocks.

17      MR. VEEDER:  That's where I came from.

18      MR. STAHLMAN:  We know that.  You show it.

19      This communication states "approval to expend not exceed-

20  ing (it is scratched out) dollars total            --

21      THE COURT:  Colonel Bowen, would you interpret this for

22  us?

23      MR. VEEDER:  Why can't we have Colonel Bowen type it up

24  and put it in as an Exhibit?  I have no objection.  I tried to

25  read it.  I don't know what it says.

1  THE COURT:  I can't make any sense out of it.

2  MR. VEEDER:  I have no objection.  It is from our file.

3  THE COURT:  Can you do it right now into the record?

4  MR. STAHLMAN:  Why not have him read it as he would read

5 it in English?

6  THE COURT:  What do you want?

7  MR. VEEDER:  I don't care.  I thought you wanted an Exhibit

8 out of it.  He can use my secretary to type it up as it would

9 be in English.

10  THE COURT:  Do that and we will have it tomorrow.  We will

11 have a translation of it.

12  MR. STAHLMAN:  Have a translation and put them both in

13 together.

14  THE COURT:  Yes.

15  MR. VEEDER:  You have another one that, I believe, needs

16 interpreting.

17  THE COURT:  Interpret AR-12.

18  MR. VEEDER:  We will do that for him.

19  MR. STAHLMAN:  Thank you, William.

20  MR. VEEDER:  Nothing too good for the taxpayers.

21  MR. STAHLMAN:  I was about to get my punch line in here

22 when we got bogged down.

23  MR. VEEDER:  You need to agrue your case now.

24  THE COURT:  Get the translation for tomorrow.

25  MR. STAHLMAN:  You argued your case all along yesterday.

1    MR. VEEDER:   Thats an entirely different matter.

2    MR. STAHLMAN:   Your Honor, its 4:30.   I am going to go

3    into another matter.

4    THE COURT:   All right, 10:00 o'clock tomorrow.

5    MR. SACHSE:   Your Honor, tomorrow I have a brief matter

6    in the Superior Court which is to be submitted simply on doc-

7    umentary evidence.   I may be delayed,   please proceed in my

8    absence.

9    THE COURT:   All right.

10   Court is in recess and I am going to finish reading this

11   letter of Hall to Pemberton and then I will adjourn.   I can

12   understand this.

13   (Adjournment until Wednesday, July 20, 1960 at 10:00 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25