# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Wednesday, July 20, 1960

Pages:     14,159 to 14,269

FILED

SEP 24 1973
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIF.
By

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

4

5

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                     - - - - - -

7
UNITED STATES OF AMERICA,   )
8            Plaintiff,     )
                            )
9        vs                 )        No. 1247-SD-C
                            )
10  FALLBROOK PUBLIC UTILITY )
    DISTRICT, et al.,        )
11                          )
            Defendants.     )

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              San Diego, California
              Wednesday, July 20, 1960

15  APPEARANCES:

16     FOR THE PLAINTIFF:              WILLIAM H. VEEDER, ESQ.,
                                       Special Assistant to
17                                     the Sttorney General,
                                       Department of Justice,
18                                     Washington, D.C.

19                                     LCDR DONALD W. REDD

20     FOR THE DEFENDANTS:

21        For Defendant Fallbrook Public
          Utility District, et al.    FRANZ R. SACHSE, ESQ.,
22
          For Defendant Vail Company  GEORGE STAHLMAN, ESQ.
23

24

25

1  APPEARANCES (continued)

2      FOR THE DEFENDANTS (continued)

3          For Defendant State of          STANLEY MOSK, ESQ.,
             California                      Attorney General,
4                                            By FRED GIRARD, ESQ.,
                                             Deputy Attorney
5                                            General.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### INDEX TO WITNESSES

| For the Defendant | D | X | RD | RX |
|---|---|---|---|---|
| James V. Wilkinson | 14,162 (Stahlman) | | | |
| | 14,175 (on Voir Dire by Sachse) | | | |
| | | | 14,204 (Veeder) | |
| | | | 14,258 (Girard) | |

### INDEX TO EXHIBITS

| Defendant's Exhibits | Iden. | In Evidence |
|---|---|---|
| Vail Company AR-11 and AR-12 | | 14,163 |
| Vail Company AR-13 | | 14,163 |
| Vail Company AV | | 14,167 |
| Vail Company AX | 14,168 | |
| Vail Company AY-1, AY-2 and AY-3 | 14,174 | |
| Vail Company AY-1, AY-2 and AY-3 | | 14,183 |
| Vail Company AZ | 14,185 | |
| Vail Company AZ | | 14,185 |
| Vail Company BA | 14,186 | 14,188 |
| Vail Company BB | 14,189 | 14,194 |
| Vail Company BC | 14,199 | 14,199 |
| Vail Company BD | 14,201 | 14,202 |
| Vail Company AK-11 | 14,202 | 14,204 |
| Vail Company AD | | 14,267 |
| Vail Company Ramsey Well Log added to 16-A | | 14,268 |

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, JULY 20, 1960, 10:00 A.M.

2         (Other matters)

3         THE CLERK:  No. 5-1247-SD-C, United States vs Fallbrook.

4    Further Court Trial.

5         THE COURT:  Proceed.

6         MR. STAHLMAN:  Last evening I understood there was going

7    to be an interpretation of these telegrams.  I understand they

8    are being written up and will be here shortly.

9         MR. VEEDER:  They are right here.

10                   JAMES V. WILKINSON,

11   a witness for defendant Vail, having been previously duly sworn,

12   on his oath was examined and testified afurther as follows:

13        MR. STAHLMAN: Mr. Veeder has handed me Exhibits AR-11 and

14   AR-12 as translated, your Honor.

15        THE COURT:  Let me have a copy.

16        Is there any objection to these translations?

17        MR. STAHLMAN:  No objection on my part.

18        THE COURT:  Give the Clerk the 2 originals and give me

19   a copy of them.

20        MR. STAHLMAN:  May they be marked with the same numbers?

21        THE COURT:  They are marked at the top, and they will be

22   included as part of Exhibit AR-11 and Exhibit AR-12.

23        MR. STAHLMAN:  Yes.

24        THE COURT:  Any objection to Exhibit AR-11 and Exhibit

25   AR-12 being received in evidence?

1    Vail's Exhibits AR-11 and AR-12 received in evidence.

2    MR. STAHLMAN:  Also AR-13, your Honor.

3    THE COURT:  Vail's Exhibit AR-13 received in evidence.

4    You haven't offered AR-14, I don't believe.  We held that

5    up, I remember.

6    MR. STAHLMAN:  No, AR-14, I think, is the Water Quality.

7    That was held up.

8    THE COURT:  Is AR-14 received, Mr. Clerk?

9    THE CLERK:  No, your Honor.

10   THE COURT:  If not, Vail's Exhibit AR will be received.

11   MR. VEEDER:  No objection.

12   MR. STAHLMAN:  Did your Honor receive a copy of Vail's

13   Exhibit AV?

14   THE COURT:  Yes, I have Vail's AV.  I have a substituted

15   copy.

16   MR. VEEDER:  Before we go too far and get away from Vail's

17   AR, I just want to inquire of counsel if the Pemberton Report

18   which the United States of America has offered in evidence is

19   the Pemberton Report referred to in Mr. Hall's letter to

20   Colonel

21   MR. STAHLMAN:  I assume so.

22   MR. VEEDER:  When you alluded to it in your Exhibit, I

23   am assuming that it is correct.

24   MR. STAHLMAN:  No evidence to the contrary.

25   BY MR. STAHLMAN:

1     Q    Directing your attention to Exhibit AV, you have a

2 corrected copy in front of your, Mr. Wilkinson.

3     A    Yes, I do.

4     Q    Did you prepare this Exhibit?

5     A    Yes, I did.

6     Q    What was the source of the information you obtained

7 in order to prepare the Exhibit?

8     A    As noted in columns 2 and 3, this information was

9 taken from Roripaugh Exhibit B and also from such ground water

10 reports as stated in both columns, with the exception of the

11 property of Mr. J. E. Roripaugh and also the Vail Company.

12     I  might state now that the acreage that is considered

13 for Vail Company does not include any acreage on the Santa Rosa

14 Grant.

15     Q    In other words, you considered only the acreage on

16 what you refer to as the Pauba portion of the Ranch connected

17 with the Little Temecula.  Does this consider the Government

18 Land also?

19     A    This considers the Government Land  also.

20     Q    And the Canterini?

21     A    This considers the Canterini.

22 MR. VEEDER:  Let me understand this.

23 MR. STAHLMAN:  August Canterini.

24 MR. VEEDER:  Is that part of the Temecula Grant?

25 MR. STAHLMAN:  Wait a minute, Mr. Veeder.  Go ahead.

1     MR. VEEDER:  I am just trying to expedite it.

2     THE COURT:  You say this considers Canterini.  Where is

3  Canterini on Vail's AB?

4     THE WITNESS:  It is not on there.  This includes all the

5  areas Vail Company owns, with the exception of the Santa Rosa

6  Grant, your Honor.

7     MR. STAHLMAN:  Your Honor will recall that August

8  Canterini was a piece of property acquired at the northern end

9  of the Vail boundary line, which is within the Temecula Grant.

10     THE WITNESS:  It is within the Temecula Grant.

11     MR. STAHLMAN:  And borders on the original Vail property

12  line.

13     THE COURT:  You were referring, then, to the bottom column

14  of the Vail Company and your statement is, then, that 30,000

15  irrigable acres includes all the irrigable acres of the Vail

16  property, including the Canterini property?

17     THE WITNESS:  With the exception of the Santa Rosa Grant,

18  your Honor.

19     THE COURT:  I understand.

20  BY MR. STAHLMAN:

21     Q    You have, by your calculations, determined the

22  percentage of lands of the particular persons who are designated

23  in the Exhibit  that are being   irrigated?

24     A    To the best of my ability, from the records, these

25  are the acres irrigated and irrigable acres.

1  Q  And when you say, records, what records do you refer

2 to?

3  A  Of this case.

4  Q  And you have taken these figures from Exhibits in

5 the case?

6  A  That is right, and also testimony in the record.

7  Q  That is, the testimony of the persons who testified

8 as to what amount of acreage was being irrigated on their pro-

9 perty?

10  A  That is right.

11  Q  Verbal testimony?

12  THE COURT:  You have used the Office of Ground Water

13 Resources Report NO.  Those aren't Exhibit numbers, are they?

14  THE WITNESS:  I do not believe so, your Honor.  They would

15 have to tie back into the series of Reports by the Office of

16 Ground Water Resources.

17  MR. STAHLMAN:  We will offer in evidence Exhibit AV.

18  MR. SACHSE:  I have no objection to the foundation, your

19 Honor.  And I have no objection to the Exhibit for the purpose

20 of the issues with which Mr. Stahlman  is concerned, I believe,

21 the stipulated judgment.

22  I will repeat the objection I have heretofore made as to

23 competency and materiality on the grounds that this evidence

24 is material only in the event     there shall be apportion-

25 ment or  regulation at this time, and therefore it has no

1    probative value.

2        MR. STAHLMAN:  We are not offering it for that purpose

3    at all.

4        MR. SACHSE:  I appreciate that, Mr. Stahlman, but I want

5    to make the objection for the record.

6        MR. VEEDER:  If it goes in, it goes in for all purposes.

7        MR. SACHSE:  I realize that.  That is why I make objection

8    as to it's materiality.

9        MR. VEEDER:  I am not making any objection, because I

10   expect it to go in for all purposes.

11       THE COURT:  The mere fact that it goes in for all purposes

12   doesn't mean that your suggestion that you, as counsel for the

13   Government, contrary to many expressions, have recently told

14   us that you are going to ask for apportionment.

15       MR. VEEDER:  Of course, I object to your Honor's state-

16   ment that I have made those statements. All I want is to be

17   free to cross examine.

18       THE COURT:  Vail's Exhibit AV received in evidence.

19   BY MR. STAHLMAN:

20       Q    Have you made a study of such stream flows as have

21   been presented in documents in this case, making a comparison

22   between the proportion of water that Vail would have received

23   under the original judgment -- that is, one-quarter to Vail

24   and three-quarters to Pendleton -- and assuming that the flow

25   of Murrietta Creek was to go to Vail with the stream flow

1 figures or with the figures that would on the apportionment from

2 the stream flow under the two-thirds - one-third of the stip-

3 ulated judgment?

4      A    I have.

5      Q    Did you tabulate those figures?

6      A    I tabulated those figures.

7      THE COURT:  Is this a new Exhibit?

8      MR. STAHLMAN:  Yes, your Honor.  It is merely a tabulation

9 from Exhibits that are in evidence.  May we mark it an Exhibit?

10     You are not objecting to the ten day rule, are you , Mr.

11 Veeder?

12     MR. VEEDER:  I didn't know this was coming in, George, let

13 me take a look at it.

14     MR. STAHLMAN:  It is merely for illustration.

15     THE COURT:  Mr. Clerk, AX?

16     THE CLERK:  AX, your Honor.

17     MR. STAHLMAN:  May it be so marked, your Honor.

18     THE COURT:  It may be so marked.

19     MR. VEEDER:  I insist that I have a little time to look

20 at it before you go any further.

21     MR. STAHLMAN:  Surely.  You don't mind looking at a copy

22 rather than the original, do you?  The Clerk is asking for the

23 original.

24 BY MR. STAHLMAN:

25     Q    Now then, in reference to the document marked Vail's

1  AX, will you indicate the sources from which you obtained the

2  information in the various columns?

3      A    This information was all obtained from Vail's

4  Exhibit AC.

5      Q    Now, will you explain this Exhibit to the Court and

6  indicate what you did and what the Exhibit indicates?

7      A    It is a simple matter of taking one-quarter of the

8  average Temecula flows and deducting the Murrietta flow to

9  arrive at the Temecula and Murrietta flows only.

10      Q    Pardon me for interrupting.  But over what period of

11  time did you use to determine this average?

12      A    Over the period covered by Vail's AC, the season

13  1922 - 1923 through 1957 - 1958.

14      Q    Very well.  Continue, if you will.

15      A    The average flow through Temecula Station 3 being

16  16,662 acre feet per year, the average flow in Murrietta being

17  only 7199 acre feet per year, shows the average flow at

18  Temecula to be only 9463 acre feet per year.  One-quarter of

19  this 9463 acre feet per year is 2365 acre feet per year.

20  MR. VEEDER:  I interpose an objection to this whole line

21  of testimony, your Honor.

22  THE COURT:  Let him finish.  Overruled.

23  THE WITNESS:  Plus average flow from Murrietta of 1999

24  acre feet totals an amount of 9564 acre feet per year. One-

25  third of the flow of the Temecula at Station 3, which is the

1   combination of both the Murrietta and the Temecula, is 5554

2   acre feet per year.   The difference of the two figures, 9564

3   acre feet less 5554 acre feet, is 4010 acre feet per year. This

4   is the quantity that appears if the allegation is one-quarter

5   of the Temecula only plus the Murrietta in comparison with

6   one-third of the total flow of the Temecula.

7        MR. VEEDER:   If it is all going in verbally, why put in

8   the Exhibit?   This is one of the most complex Exhibits.   Basic-

9   ly, he goes all the way back to the old judgment in the

10  Superior Court.   I had no idea this was coming in.   The 10

11  day rule is a very sensible rule, because experts have to check

12  these things.

13       THE COURT:   If it doesn't go into evidence, his testimony

14  will be stitken so lets not get excited about it.

15       MR. VEEDER:   I am excited about it.   I think the 10 day

16  rule is important.

17       THE COURT:   If you want time, you may have the 10 day

18  rule.   It will be up to you if the Exhibit is not received in

19  evidence to move to strike the testimony without it.

20       MR. VEEDER:   I will, your Honor.

21       THE COURT:   What is the purpose of the Exhibit?   What

22  conclusions do you draw?   That you got less from the stipulated

23  judgment?

24       MR. STAHLMAN:   That we got less from the stipulated

25  judgment than the Vail Company would have received under the

1    25%.

2         THE COURT:  So what?  What is your next step in your

3    reasoning?  You stipulated to the judgment.  What is the next

4    step in your logic?

5         MR. STAHLMAN:  The next step in the logic is that the

6    Vail Company had anticipated, under the stipulated judgment,

7    receiving the flow of the Murrietta Creek.  The definitions

8    in both judgments are the same as to what the stream system is.

9    Vail Company had anticipated that the implication would be that

10   the Vail Company certainly wouldn't enter into a stipulated

11   judgment after an appeal to receive less water than they would

12   have had before.

13        MR. VEEDER:  So they made a bad bargain.  I don't think

14   they did, but that is what he is saying.  He is saying that

15   O'Melveny and Myers --

16        MR. STAHLMAN:  It goes to the point that --

17        THE COURT:  Wait.  What dates does Vail's AC consider?

18   What period of time is considered in Vail's AC?

19        MR. STAHLMAN:  The witness has testified, I think, from

20   1922 to the present time.

21        MR. GIRARD:  Vail's AC or Vail's AX we are talking about?

22        MR. STAHLMAN:  Vail's AC.

23        THE COURT:  Vail's AC was the Exhibit that he said he

24   took this material from.

25        Here are the bar graphs for 1923 through 1958.

THE WITNESS:  Your Honor, the right hand top corner.

THE COURT:  On the right hand corner of the Exhibit AC is a summary "average flow for 35 year period at Nigger Canyon or Vail Dam, Murrietta Creek, Temecula Creek, Lake O'Neal, Ysidora," with various figures.

MR. GIRARD:  May I ask a question, your Honor?

MR. STAHLMAN:  Surely.

MR. GIRARD:  Mr. Stahlman, as I understood your position on this evidence, it is that the stipulated judgment itself, as you interpreted it and as they interpreted it, then, gives you the Murrietta?

MR. STAHLMAN:  Yes.

MR. GIRARD:  All of the Murrietta?

MR. STAHLMAN:  Yes.

MR. VEEDER:  Of course, that is exactly why I am objecting to this right now and why it is so absurd to spring this thing without one moment of notice.

THE COURT:  We have to take care of that.  It has not been offered.  I said the 10 day rule would apply.  It will not be offered.  I have reserved to you a motion to strike the testimony of this witness.  If the document doesn't go into evidence, how are you hurt?

MR. STAHLMAN:  Further to answer Mr. Girard's question, your Honor, the findings of fact in the original case, and as the judgment indicates, the stipulated judgment after findings

1    of fact gave the Murrietta to the Vail Company, and there was

2    no different description in the stipulated judgment as to what

3    the stream system is than it was in the original judgment.

4         MR. VEEDER:  This arguing the law suit is objectionable

5    to me, your Honor.

6         MR. STAHLMAN:  My position is that we either get the

7    Murrietta, if the judgment remains in effect, or there was a

8    mistake by the parties as to what the situation was and the

9    judgment should be thrown out by the Court.

10        THE COURT:  I understand your position.

11        MR. STAHLMAN:  Very well.

12        I am sure that Mr. Veeder is not going to object to this

13   one.

14        MR. VEEDER:  If it is from you, George, I had better.

15   BY MR. STAHLMAN:

16        Q    Have you prepared some graphs depicting the conditions

17   that exist as to flow at Station No. 3 in certain specified

18   recent years in comparison with the average flow over a period

19   of time?

20        A    Yes, I have.

21        Q    Do you have them here?

22        A    I do.

23        THE COURT:  Why haven't these been served before?  Let

24   counsel all have a chance to look at them.

25        MR. STAHLMAN:  Your Honor, they were prepared after I

P 1

1   lodged my last Exhibits.  They are merely taken from the evid-

2   ence in the case.

3       THE COURT:  Lets have them.  We will mark them for ident-

4   ification.  How many of them are there?

5       MR. STAHLMAN:  Just one, your Honor.

6       THE WITNESS:  There are three, a series.

7       THE COURT:  Three different documents?

8       MR. STAHLMAN:  They are attached together.

9       THE COURT:  We will call them Vail's AY-1, AY-2 and AY-3.

10   Do you have copies for me?

11   Counsel, I will look at them before you start in.

12       MR. STAHLMAN:  Yes, your Honor.

13       (Another matter).

Belt 14  14       THE COURT:  For the record, the chart on the Murrieta is

15   Vail's AY-1, on the Temecula gauge it is Vail's AY-2, and on

16   the Fallbrook gauge it is AY-3.  That is the order you have

17   them in, I think, Mr. Wilkinson.

18       THE WITNESS:  That is right your Honor.

19   BY MR. STAHLMAN:

20       Q  Directing your attention to Vail's AY-1, first, Mr.

21   Wilkinson --

22       THE COURT:  Wait just a minute.  Let's see if we are going

23   to have an uproar about this or not.  You haven't complied with

24   the ten-day rule.

25       MR. VEEDER:  I look at it this way, your Honor, that that

P.2

1   ten-day rule is very sensible.  I think there should be com-

2   pliance with it.  You may go ahead.  I would like to use up all

3   the day that I can.  I will let him go ahead and if I see some-

4   thing wrong with it I will move to strike.

5        THE COURT:  Both of you have violated the rule on occasion.

6   Let's go ahead.

7        MR. VEEDER:  Your Honor, I don't believe I have ever violated

8   the ten-day rule.

9        THE COURT:  Let's go ahead.

10  BY MR. STAHLMAN:

11       Q  Referring now to Vail's AY-1, where did you obtain the

12  information from which you plotted this graph?

13       A  U. S. G.S. runoff records, exhibits in this case.

14       Q  Did you use those U.S.G.S. runoff records in this case

15  to construct each of the three AY-1, AY-2 and AY-3?

16       A  I did.

17       THE COURT:  Is this the exhibit you referred to, United

18  States Exhibit 22?

19       THE WITNESS:  I believe, your Honor, 21, 22, 23 etc.,

20  records of the flows at the various gauges.  I guess overall

21  it is United States Exhibit 22.

22       THE COURT:  AY-1 refers to Exhibit 22, AY-2 refers to

23  Exhibit 21 and AY-3 refers to Exhibit 23.

24       THE WITNESS:  That is right.

25  BY MR. STAHLMAN:

P 3.

1    Q  So what you have done is merely take the runoff records

2    and plotted the graphs in connection with the records in rela-

3    tion to these three stations?

4    A  That is right.

5    Q  Starting in with this first graph, AY-1, will you explain

6    it and what it indicates?

7    A  It is indicative of the flows at the Murrieta gauge as

8    represented as a departure from the average flow for the period

9    of record.

10   Q  What period did you use in connection with AY-1?

11   A  The period covered by United States Exhibit 22.

12   Q  Do you recall what years those were?

13   A  I would not say definitely.  I believe 1927 or 1928.

14   Q  To the present time?

15   A  To the present time.

16   Q  In obtaining the average which is shown by the line

17   indicated by the 100, how did you arrive at that average?

18   A  That is a monthly average for each individual month.

19   In other words, the 100% line, or as noted on the righthand

20   side, average flow is the average flow for that particular

21   month throughout the period considered.

22   Q  In other words, you have taken as a start a point on

23   this graph the average flow for each month as indicated in the

24   monthly columns across the top?

25   A  That is right.  The average flow for any individual

P 4

1    month would be represented by the 100% line.

2         Q  And the various graphs which you placed on there repre-

3    sent the departure for those particular months from that average;

4    is that correct?

5         A  That is correct.

6         Q  What particular years did you utilize in determining

7    the departure from the average?

8         A  Used the years 1952, 1958 and 1959.  If you will note

9    at the righthand side of the graph, the total flow for the year

10   as considered for the average flows is mentioned.  In other

11   words, the year 1952 had a total flow past  the gauge of 330%

12   of average.

13        Q  In other words, that was a high year?

14        A  That is right.  In 1958 it was 190% of average.  While

15   for the year 1959 it was 9% of average.

16        Q  And those were the three years that also correspond to

17   the three years in which the water level measurements were

18   made by Mr. Kunkel on the 15 Series; is that right?

19        A  Mr. Kunkel didn't make any measurements in 1952, I

20   believe.

21        Q  I mean they correspond to the same years in which water

22   measurements were made according to Exhibits 15E, 15F and 15G?

23        A  Not exactly.  The period covers the -- 1952 starts in

24   1951; it is 1951-1952, 1957-1958, 1958 --

25        Q  This is then plotted according to the water years?

A   As depicted on United States' exhibits.

Q   What does it show after you have plotted it, with particular reference to the summer flows at this particular gauging station?

A   Well, it shows that there is a departure from the average.

Q   In other words, it has gone down from the average over that period of time for these years?

A   Yes.

Q   1951-1952 was a year of rather high precipitation, as indicated by your yearly average, being over 300?

A   That is right, and also from the ranch records.

Q   Let's go to Vail's Exhibit AY-2.  What does AY-2 indicate?

A   AY-2 represents the same situation.

Q   The same period of time?

A   The same period of time, but at a different gauge; this is at the Temecula gauge.  Temecula gauge, of course, includes the flow from the Murrieta.  The years are the same, the months are the same, the same procedures used throughout to develop the lines on the graph.

Q   And those are also for the years 1952, 1958 and 1959. Directing your attention to the year 1958, as shown by the yellow line, the month of July where it rises above the average, have you any explanation for that?

A   I believe that was when the aqueduct crossing went through the river and they dewatered the area by a series of

P 6

1  well points and increased the flow at the gauge by dewatering

2  the area so they could lay the pipeline.

3      Q  That was water taken out of the basin in order to lay

4  the pipeline which increased the flow at that particular gauging

5  station?

6      A  That is right.

7      THE COURT:  That is in July --

8      THE WITNESS:  July of 1958, your Honor.

9      MR. SACHSE:  Before we go further, may I ask one question --

10  it is sort of voir dire -- of Mr. Wilkinson?

11     MR. STAHLMAN:  Yes.

12                    EXAMINATION ON VOIR DIRE

13  BY MR. SACHSE:

14     Q  In doing these figures, Sandy, did you use the acre

15  foot figure that appears on United States Exhibit or the second

16  foot figure?  Your exhibits don't indicate whether your percent-

17  ages are calculated on acre foot.

18     A  Acre foot.

19     Q  The acre foot figure is the one you used?

20     A  That is right.

21     THE COURT:  Then you used the same method for AY-1, AY-2

22  and AY-3?

23     THE WITNESS:  That is correct.

24     THE COURT:  And the purpose, as I understand, is to show

25  that even in the wet years such as 1952 -- well, 1958 could

P. 7

1   hardly be called a wet year.

2   MR. STAHLMAN:  1957-1958 was rather heavy.

3   THE COURT:  Even the 1952 and 1958, when you got to the

4   summer flow, we will say, beginning in May or June, the summer

5   flow at these gauging stations was, with minor exceptions, below

6   the average for the long term period; is that right?

7   THE WITNESS:  That is right your Honor.

8   THE COURT:  And then I take it that you deduced from that

9   that therefore there has been more use of water upstream as

10   time went on?

11   MR. STAHLMAN:  And that as time goes on it is going to be

12   more difficult to supply the three cubics second feet.

13   THE COURT:  Is that your conclusion?

14   THE WITNESS:  It points to that, your Honor.  Time-wise

15   I am not qualified to say when this would occur.

16   BY MR. STAHLMAN:

17   Q  Directing your attention to the year 1959, AY-3, have

18   you any explanation as to what occurred in connection with that?

19   THE COURT:  What month?

20   THE WITNESS:  The months of June, July, August, September

21   show a marked decrease in flow at the Fallbrook gauge, taking

22   especially the year 1959, when the flow at the Fallbrook gauge

23   was zero.  This is unquestionably due to diversions upstream

24   from the gauge by the Fallbrook Public Utility District.

25   THE COURT:  This part of the evidence you don't object to,

1    Mr. Veeder, I take it.

2         MR. VEEDER:  No.

3         MR. SACHSE:  I move to strike the "unquestionably," but

4    beyond that I have no objection.

5         THE COURT:  Motion denied.

6         Subject to correction, is there any objection to receiving

7    the exhibit?

8         MR. SACHSE:  I would like to ask a couple of questions for

9    information, if I may, your Honor.

10        Q  Mr. Wilkinson, on all three exhibits there are certain

11   open graph lines where you haven't closed them.

12        A  That is right, Mr. Sachse.

13        Q  Is that because you couldn't close them?  Your graph

14   is too small?

15        A  The graph is too small.  Merely convenience.  I would

16   have to have a piece of paper that would be unwieldy.

17        Q  Let's look at AY-1.  The flow at the Murrieta gauge in

18   1958 for the month of April would have run clear on up off this

19   board; isn't that right?

20        A  That is right Mr. Sachse.

21        Q  And the same for January?

22        A  Not for that year.  That is the year 1952 that you

23   mentioned.

24        MR. SACHSE:  Yes.

25        I wonder -- I have done this myself quickly -- I wonder if

P 9   1    it would be helpful.  I am not making this request.  I am

2    suggesting to the Court that the Court might be interested.  To

3    insert the acre foot figure or something to show us that this

4    is a closed graph line -- where the top would be, in other words,

5    on each of these points.

6        MR. STAHLMAN:  By putting in the figure.

7        MR. SACHSE:  By putting in just a numerical figure.  Ob-

8    viously he can't run a stack of paper five feet high above.

9        MR. STAHLMAN:  You can do that, can you?

10       THE WITNESS:  Yes.  I would have to refer to some records

11   to put them in accurately.

12       MR. STAHLMAN:  Can you do it at recess time?

13       THE WITNESS:  I doubt if I have the records here.

14       THE COURT:  It is a percentage figure?

15       THE WITNESS:  That is right your Honor.

16       MR. SACHSE:  It is not an acre foot figure.  I have done

17   it hastily with acre foot.  In other words, to put a percentage

18   figure -- looking specifically on Exhibit AY-1, the 1952 flow

19   for January doesn't end at 353% is what I am trying to say.  It

20   ends at about 800%.

21       THE COURT:  I understand.

22       MR. SACHSE:  I would like that percentage put in, if I

23   can have it.

24       THE COURT:  You calculate it and bring it in.

25       THE WITNESS:  I will your Honor.

MR. SACHSE:  Is this on the water year basis?

THE WITNESS:  Just as used in the United States' exhibits.

MR. SACHSE:  That is all.

MR. VEEDER:  And when you say United States' exhibits --

THE WITNESS:  Exhibits 22, 21 and 23.

MR. VEEDER:  Those, of course, show the calendar year and the water year both.

MR. SACHSE:  No, they are water year.  They show by months, but it runs on the calendar year.

MR. VEEDER:  The summation of Vail dam, I know, is on the calendar year basis and also by water year.  If it is on a water year basis, that is all I care about.  I am speaking of that particular exhibit.

THE COURT:  Any objection to the introduction of AY-1, AY-2 and AY-3?

MR. SACHSE:  No objection.

THE COURT:  Received in evidence.

MR. STAHLMAN:  Is your Honor going to take a recess now?

THE COURT:  Yes.

(Recess)

BY MR. STAHLMAN:

Q  Mr. Wilkinson, did you by the use of the exhibits in this case figure the percentages of water used by Camp Pendleton inside and outside the watershed?

A  I did, Mr. Stahlman; United States' Exhibits 80 and 82.

P 11-

1    Q  Now in these exhibits you merely give the figures as

2  to the quantity of water used outside the watershed, you merely
                those to

3  reduce/  percentages; is that correct?

4    A  Yes.

5    Q  And for what years?

6    A  For the years 1944 through 1957.

7    MR. STAHLMAN:  We have a tabulation, your Honor, if you

8  wish it.  However, I think he is competent to testify on what

9  each year is.  I would just as soon mark it as an exhibit.

10    THE COURT:  Do you have copies of it?

11    MR. STAHLMAN:  Yes your Honor.

12    THE COURT:  Mark it an exhibit.  Give Counsel a copy of

13  it.  Mark it Vail's AZ.

14  BY MR. STAHLMAN:

15    Q  State for the record what percentages were used outside

16  the watershed for each of those years.

17    A  1944 fifty-eight per cent outside, 1945 --

18    MR. VEEDER:  The exhibit speaks for itself.

19    MR. STAHLMAN:  All right, it speaks for itself.  We will

20  offer it in evidence, your Honor.

21    MR. SACHSE:  Fallbrook has no objection, your Honor.

22    THE COURT:  Vail's AZ received in evidence.

23    MR. VEEDER:  Subject to being checked out.

24    THE COURT:  Yes, subject to checking.

25  BY MR. STAHLMAN:

P. 12

1      Q   Now, did you make a study, Mr. Wilkinson, by exhibits

2   in this case to make a determination of the relationship of the

3   quantity of water pumped by Vail Company as compared to some

4   of the other users in the area?

5      A   I made a comparison by examining Roripaugh's Exhibit A

6   as to the quantity of water pumpable from the wells mentioned

7   on that exhibit.

8      Q   In other words, see if I get this right, you have taken

9   just those wells which are designated on Roripaugh's Exhibit A

10  and determined their pumping capacity; is that correct?

11     A   That is right.

12     Q   And of course there are many other wells in the area

13  besides those on Roripaugh's A?

14     A   Numerous other wells.

15     Q   Now then also did you determine the amount of water

16  pumpable by the Vail Company's wells?

17     A   Yes, from Vail's Exhibit O.

18     MR. VEEDER:   What is the word you are using?

19     MR. STAHLMAN:   We are calling it "pumpable." It is the

20  amount of water you can pump from the wells by reason of the

21  tests.

22     MR. VEEDER:   As long as you are using the word "pumpable"

23  and you mean water that is subject to being pumped.

24     MR. STAHLMAN:   Subject to being pumped, yes.

25     MR. VEEDER:   That is a new word.

THE COURT:  He is talking about the pumping capacity of the well.

MR. STAHLMAN:  Yes.

THE COURT:  What exhibit did you use?

THE WITNESS:  Vail's Exhibit O, your Honor.

MR. STAHLMAN:  I might say this, I think, has a bearing upon Mr. Veeder's claim that the Vails control all the stream system.

THE COURT:  Do you have this written out also?

THE WITNESS:  Yes your Honor.

THE COURT:  Do you have copies of it?

THE WITNESS:  Yes your Honor.

THE COURT:  Let's have a look at it.

MR. VEEDER:  Total gallons pumpable.

THE COURT:  Marked Vail's Exhibit BA.

BY MR. STAHLMAN:

Q  Will you please explain again what you mean by pumpable?

A  It is the capacity of the various wells.

Q  Now, the figure that you obtained 13,422 gallons per minute or 30 second feet, that is from the Roripaugh's Exhibit A?

A  That is right.

Q  And what did you do, just take the accumulative capacity of each of the wells as designated on the exhibit?

A  That is right.

Q  And then what wells did you take of the Vail Company?

P. 14

1      A   Those listed on Vail's Exhibit O.

2      Q   And those are all the wells you are using on Vail for

3   irrigation purposes?

4      A   That is right.

5      THE COURT:  What do you mean?  Up above you show 13,422

6   gallons per minute or 30 second feet.  Down below you show 879MI.

7      THE WITNESS:  Miner's inches, your Honor.

8      MR. STAHLMAN:  But that has been reduced to second feet

9      THE COURT:  I see.

10   BY MR. STAHLMAN:

11     Q   Then the result is that 17.5 second feet is the capacity

12   of the Vail wells as against 30 second feet of only those wells

13   shown on Roripaugh's A?

14     A   That is right.

15     MR. VEEDER:  I am going to interpose an objection to this

16   on the grounds that it is incompetent, irrelevant and immaterial

17   and not tending to prove an issue in this case whatever.  Primarily

18   it is irrelevant because here we have added up the capacity of a

19   group of pumps.  We don't know how long they were used, when

20   they were used, the rate they were used -- a thousand other

21   things.  "Pumpable" may warrant some reference because I think

22   it is a fine word, but from my standpoint I don't believe that

23   this could be considered evidentiary in character, your Honor.

24     MR. STAHLMAN:  May I answer that, your Honor?

25     THE COURT:  It shows the capacity of wells based upon this

14,188

Roripaugh's Exhibit.  Probably there never was a time when every one of the wells was operating at the same time, and you might have problems.  I don't think it is completely devoid of evidentiary value.  It illustrates generally what I have suspected, that there is a terrific amount of pumping in the Murrieta area.

MR. STAHLMAN:  Also, your Honor, Mr. Veeder has repeatedly made declarations of the Vail Company controlling this whole river.  It shows that other --

THE COURT:  It shows a terrific amount of pumping capacity in the area.

MR. VEEDER:  That is correct your Honor.

THE COURT:  And it shows the Vail Company capacity --

MR. VEEDER:  -- is terrific.

THE COURT:  Probably Vail could not pump more than this amount.  There would be a question whether it even pumped this amount.  It couldn't pump more than this amount.

MR. VEEDER:  I simply don't think it lends anything to the case.  I don't think it is evidentiary.

THE COURT:  Any objection to Vail's BA other than you have stated?

MR. STAHLMAN:  I offer it in evidence your Honor.

THE COURT:  Vail's BA received in evidence.

MR. STAHLMAN:  Here is another thing on the ten-day rule. I would like to explain, first, what I am holding here that I will ask to be marked.  It is merely and solely the corner

P 16

1   taken out of the 15 type series of maps.  It has nothing on it

2   in addition, except that the Vail property line is indiscernible.

3   THE COURT:  Let me see it.  It is a blowup?

4   MR. VEEDER:  Yes, we have just accentuated the Vail property

5   line.

6   THE COURT:  Mark it BB.

7   MR. VEEDER:  May I have just a moment before do anything,

8   your Honor.

9   THE COURT:  Yes.

10  This is going to purport to show that the Vail Company

11  Santa Rosa Grant is riparian?

12  MR. STAHLMAN:  Yes your Honor.

13  Q  I will ask you the question, Mr. Wilkinson.  Is the

14  Santa Rosa Grant of the Vail property riparian to the Murrieta

15  Creek?

16  MR. VEEDER:  I am going to object to this on the grounds,

17  first, that it asks a legal question.

18  But more important, I interpose this objection, that the

19  stipulated judgement and the decree that was entered in the

20  case, going back to Rancho Santa Margarita versus Vail, is

21  res adjudicata.  I haven't had a chance to check this matter

22  out -- I will check it out, but I believe it was adjudged and

23  determined by the State Court of the State of California --

24  and I know that your Honor respects those courts -- the matter

25  was determined that this Santa Rosa was not riparian to Murrieta

P 17 1    Creek, but it was riparian, as I recall -- I want to check this

2    out -- it was riparian to Cottonwood Creek and one of the other

3    smaller affluents of Murrieta.  I believe the matter has been

4    determined and adjudged, and I believe it is a collateral attack

5    upon that determination.

Belt 15 6    MR. STAHLMAN:  Your Honor, Mr. Veeder in the first instance

7    is off base.  I expect to follow this up by pointing out certain

8    aerial photographs to show that the main stream of the Murrieta

9    is in fact Slaughter House Creek.  It think it will be quite

10   evident when we get to that.  And that is not inconsistent with

11   the findings in the previous case.

12        MR. SACHSE:  May I be heard, your Honor?

13        THE COURT:  Mr. Sachse.

14        MR. SACHSE:  I am so pleased with Mr. Veeder's objection

15   and I am going to strongly concur in it, because if your Honor

16   grants Mr. Veeder's objection I am going to ask that every word

17   of evidence on the extent of the Santa Margarita River system

18   beyond that as defined in the original judgement in Santa Margarita

19   versus Vail be stricken.  If it is res adjudicata in Mr. Stahlman's

20   case, it is res adjudicata in the United States' case, and we

21   can't slice this cake differently for two people.

22        MR. VEEDER:  The man who is not a party to the litigation

23   is speaking very fluently.

24        THE COURT:  What is the significance of that?  In the

25   stipulated judgement is the stream system inadequately described?

P. 18

1  MR. GIRARD:  No your Honor.  In the judgement which was

2 entered by the Court, not the stipulated judgement, the stream

3 system is defined and limited to certain areas.  That particular

4 judgement was appealed, but not on the issue of the extent of

5 the stream system.  In other words, this judgement defined by

6 a judgement and a finding the extent of the stream system, which

7 is a determination as to the status of a person's land to the

8 stream.  If that objection of Mr. Veeder's concerning the ident-

9 ical finding on the same type of thing, a status of land, is

10 valid as to Mr. Stahlman's position, I think it should be equally

11 valid as to Mr. Veeder's.

12  THE COURT:  Refresh my recollection.  It is the position

13 of California that a portion of the water by the stipulated

14 judgement or by the original judgement was subject to modifica-

15 tion?

16  MR. GIRARD:  Yes your Honor.

17  THE COURT:  But that, as I read in the brief and some of

18 the cases, a finding that land was or was not riparian might

19 come in a different category.

20  MR. GIRARD:  It might tend to be.  But I want to point

21 out that we certainly could never contend, if you were to

22 decide to set aside the stipulated judgement, that any party

23 should be bound by the old findings as to who is riparian, even

24 though they are considered in a different light.

25  MR. STAHLMAN:  I think it merely points out the great

P 19　1　mistake that was made in the original trial.

2　　　MR. GIRARD:   But I think your Honor is correct.   A finding

3　as to whether land is riparian is an entirely different status

4　as to res adjudicata when you are considering apportionment

5　of water.

6　　　MR. VEEDER:   Your Honor, these people who are not parties

7　to the stipulated judgement in <u>Rancho Santa Margarita versus</u>

8　<u>Vail</u> certainly can claim no benefits from that, and we certainly

9　are not bound by it.   Nor could they undertake to enforce it

10　against us.

11　　　MR. SACHSE:   That is not sound law and your Honor knows

12　it.   We are not bound by it.   It is absolutely contrary to that.

13　This has been briefed.   This is my file of Mr. Veeder's briefs,

14　my briefs, everybody else's briefs.   Your Honor has read them

15　all on this stipulated judgement.   We have been all over this

16　whole thing.

17　　　Your Honor will recall that I presented this very argument,

18　that your Honor was forced to write some sort of trick judgement

19　which would uphold the extent of the stream system as found in

20　the original judgement and throw it out in your judgement, and

21　I tried to write it.   I spent the whole Christmastime trying

22　to write and I told your Honor that it was utterly a hopeless --

23　it couldn't be done.

24　　　But the fact remains that Mr. Veeder can't pull a single

25　phrase out of this.   If this old judgement is in effect, it

P 20

1  determines his rights.

2      THE COURT:  Mr. Veeder, isn't it true that if I find that

3  the allocation of water is not binding and open that up, you

4  are not going to try and hang on to the remnants of the old

5  Santa Margarita judgement, are you?

6      MR. VEEDER:  You say if you throw out the stipulated judge-

7  ment.

8      THE COURT:  As to allocation of water between Vail and the

9  Santa Margarita.  You are not going to try to hang on to the

10  remnants of the old judgement?

11     MR. VEEDER:  I can't believe that you would do anything

12  so erroneous, in the first instance, your Honor.  But I want

13  to say this, that from my standpoint if I find that there is

14  a legal right attached to the United States, that it acquired

15  some right, I am not going to give it up, and until I come to

16  that point I am not going to respond one way or the other to

17  the question.

18     (An interruption.)

19     THE COURT:  I am going to take the evidence anyhow.  I

20  haven't ruled on this question.  I am going to take this evidence

21  and hear what this situation is, as to whether the Santa Rosa

22  Grant is riparian to the Temecula.

23     MR. VEEDER:  I fully expected that you would.  But I want

24  the objection interposed and made a matter of record.

25     MR. GIRARD:  It is still admissable as to other parties

P-21

1 who were not even connected with the stipulated judgement.

2     MR. VEEDER:  That is A, B, C.

3     THE COURT:  We marked the map as Vail's BB.

4     MR. STAHLMAN:  We will offer it in evidence your Honor.

5     THE COURT:  This a blowup from the 15 series.

6     MR. STAHLMAN:  Yes.  It is not a blowup.  It is a copy.

7 It is the same size.  It is a corner of it.

8     THE COURT:  Vail's Exhibit BB received in evidence.

9     MR. STAHLMAN:  We have a question before the witness, if

10 we may have that answered.

11     THE COURT:  Reframe your question.  Instead of using the

12 legal question whether it is "riparian," let's find out where

13 the stream runs.

14 BY MR. STAHLMAN:

15     Q  Do the lands of the Santa Rosa Grant abut on the stream

16 of the Murrieta Creek?

17     A  Abut and cover a portion of the stream of Murrieta

18 Creek.

19     THE COURT:  You mean part of Murrieta Creek runs over the

20 lands of the Santa Rose Grant?

21     THE WITNESS:  That is right your Honor.

22     THE COURT:  At this angle near the well?

23     THE WITNESS:  In the Section 12 shown on BB, to the right

24 of the word "Grant Line," you will see in fine print "Windmill"

25 and a circle there.

P 22

1    THE COURT:  Yes.

2    THE WITNESS:  That is the area that the creek crosses the

3    Grant.

4    THE COURT:  Does the creek run westerly of that Windmill

5    Well?

6    THE WITNESS:  The creek runs westerly of that Windmill Well,

7    your Honor, in the area of the light-yellow color, younger

8    alluvium Qoal   , as depicted on BB.

9    THE COURT:  Is that the only place that the creek runs

10   across the lands of the Santa Rose Grant?

11   THE WITNESS:  That is right, your Honor, except at flood

12   times.

13   THE COURT:  In flood times where does it run across the

14   lands of the Santa Rosa?

15   THE WITNESS:  It would approach it in Section 18.

16   THE COURT:  Where is Section 18?

17   THE WITNESS:  Section 18 is in the lower portion.

18   THE COURT:  I see.

19   MR. STAHLMAN:  Your Honor will recall that the evidence

20   shows the fault line is to the west of the property line also.

21   THE COURT:  Before you pass that point, you continued the

22   fault line there west of that Grant line and therefore the

23   Santa Rosa would overlie a basin?

24   MR. STAHLMAN:  Yes your Honor.

25   THE COURT:  What map shows that?

P 23

1    THE WITNESS:  Your Honor, it is on the 15 maps.  On

2    Goverment's Exhibit 15 the fault is depicted at the upper left-

3    hand corner right close to the word "Murrieta."  You will note

4    that there in that corner that there is a water contour line

5    marked 1150.  This water contour line is very close to the fault

6    that is depicted on 15.  Government's Exhibit 15 also has a

7    dash dot dot line depicting the Santa Rosa Grant line and you

8    will notice that the Grant line is to the east of the fault

9    line as depicted on 15.

10    THE COURT:  I see.  Is that place there the same place as

11    shown in this small exhibit?

12    THE WITNESS:  Yes it is your Honor.

13    THE COURT:  So that it is Vail's contention, there is a

14    creek runs west of that Windmill Well shown in the angle, but

15    that the basin extends westerly of that Grant line.

16    THE WITNESS:  That is true your Honor.  The creek does not

17    at the present time run westerly of that Windmill Well.

18  BY MR. STAHLMAN:

19    Q  You mean the surface flow?

20    A  I mean the surface flow.  But the Windmill Well is

21    within the Grant.

22    MR. VEEDER:  Is that the Vail Company's well?

23    THE WITNESS:  That is a Vail Company well.

24  BY MR. STAHLMAN:

25    Q  By the way, is that well utilized at the present time?

14,197

P 74

1    A  Just for stock purposes.

2    Q  Do you have an opinion as to the character of the well?

3    A  They couldn't bail it dry when they drilled it, but as

4  far as potential is concerned there I have no idea.

5    (Another matter)

6    THE COURT:  As a practical matter, are you prepared to

7  present any evidence as to how much irrigable land is involved

8  in this Santa Rosa Grant that could be irrigated?

9    MR. STAHLMAN:  We have made arrangements with Colonel

10  Bowen and Mr. Wilkinson to make a study of that to be presented

11  here at a later time your Honor.

12    THE COURT:  I take it that this is only going to concern

13  land on the easterly side of the Santa Rosa Mountains.

14    MR. STAHLMAN:  Yes, your Honor, and I don't think this is

15  of too great importance as far as Vail is concerned, because I

16  doubt whether they would get much water up in that area if they

17  attempted to.

18    MR. VEEDER:  Your Honor asks precisely the question I want

19  to know.  From the standpoint of our position in this matter,

20  we are not talking about transporting across the divide.

21    MR. STAHLMAN:  No.

22    MR. VEEDER:  Or up on the mesa.

23    THE COURT:  I take it that the irrigable land will lie

24  in some area --

25    MR. STAHLMAN:  Your Honor, this is also one of those

P 25

1    situations where there is an illusory right.  I think they

2    probably can irrigate some small quantity of land down there.

3        THE COURT:  Are you prepared later, after Colonel Bowen

4    and Mr. Wilkinson examine it, to make a report on that?

5        MR. STAHLMAN:  Yes your Honor.

6        THE COURT:  Fine.

7        MR. STAHLMAN:  There is another matter I have that we can

8    leave until Colonel Bowen and Mr. Wilkinson make the study.

9    However, we have some aerial photographs here that I think

10   clearly indicate that really the head waters of Murrieta Creek

11   are Slaughter House Canyon.  In other words, that the quantity

12   of flow in this area here starting in at the watershed line of

13   the Murrieta Creek, that the first large flow of water is from

14   Slaughter House Canyon.  In other words, it is really the main

15   stream.  There is just a little sliver that goes up there to

16   the watershed line.

17       We have here an aerial photograph which was taken --

18       THE COURT:  Do you have an extra copy of it?

19       MR. STAHLMAN:  Yes your Honor.

20       MR. VEEDER:  May I inquire, without creating a furor about

21   it, what difference does it make?  Is there any doubt that

22   that is a tributary?

23       MR. STAHLMAN:  I think it is part of the main stream.  It

24   is Murrieta Creek is what it is.

25       MR. VEEDER:  What is the issue, if I may inquire?  Actually,

P 26

1   what does this purport to do?

2        THE COURT:  Here is his contention:  That this stream with

3   a different name, this creek, is actually the head waters of

4   the Murrieta; that the Vail Company owns land on either side

5   of it and is riparian to it.

6        MR. STAHLMAN:  That is right your Honor.

7        THE COURT:  And therefore that they have a right to take

8   water out of the Murrieta Creek to irrigate the land.

9        MR. STAHLMAN:  Precisely.

10       THE CLERK:  Your Honor, Vail's Exhibit BC has been marked.

11       THE COURT:  Is that your position?

12       MR. STAHLMAN:  Yes your Honor.

13       THE COURT:  What is the matter, Mr. Veeder?

14       MR. VEEDER:  Well, George and I had a little exchange of

15   humor.

16       I have no objection to it.  I think it is already in evidence.

17       THE COURT:  Vail's BC received in evidence.

18       What is the name of this creek?

19       THE WITNESS:  Slaughter House Canyon your Honor.

20   BY MR. STAHLMAN:

21       Q  I will ask you if you will point out to the Court on

22   the aerial photograph and explain the characteristics that show

23   to you the character of the stream system in that area.  First,

24   when was this photograph taken?

25       A  This photograph was taken May 6, 1949.

14,200

P. 27

1    Q  Will you then answer the other question:  Explain the

2    characteristics in connection with the flows or the result of

3    flows on this photograph?

4    A  As best shown on this aerial are the washed areas of

5    the creek.  The washed area of Slaughter House Canyon beginning

6    at the upper lefthand portion of the aerial photograph and making

7    a bend around and joining into what is termed as Murrieta Creek.

8    The main drainage of Murrieta Creek as depicted on other maps

9    shows the two originate at approximately the center of the aerial,

10   going to the righthand bottom corner of it.  Looking at that

11   area you find no washed stream; you find cultivated lands and

12   very little evidence of any water having flooded in that direc-

13   tion.  The main flow is coming from the Slaughter House Canyon

14   area.

15   THE COURT:  Does this show the Windmill Well?

16   THE WITNESS:  It shows better on another aerial, your Honor.

17   The Windmill Well is located in the righthand portion of the map.

18   BY MR. STAHLMAN:

19   Q  Could you during the noon hour put on the location of

20   this Windmill Well, and also could you make plain the boundary

21   lines of the Vail Ranch?

22   A  I think, Mr. Stahlman, the 1939 aerial would show that

23   better.  It is more centrally located in the aerial.

24   THE COURT:  I take it this is the Vail line here?

25   THE WITNESS:  Yes, that is right.

R 28    1    THE COURT:  Cutting across.

2    THE WITNESS:  That is the Windmill, supposed to be, that

3    portion on the upper lefthand corner.

4    MR. STAHLMAN:  We have an aerial of the same general area

5    taken at a different time which, I think, would show its boundary

6    as the witness indicated.

7    THE COURT:  Mark it Vail's BD.

8    BY MR. STAHLMAN:

9    Q  Will you then by reference to Exhibit BD --

10    A  Vail's BD is actually not taken in 1939, but in 1938 --

11    June 21, 1938.

12    Q  Will you indicate on there where the line is?

13    A  The Santa Rose Grant line shows up quite clearly in the

14    portion of the aerial just to the left of the center.  It can

15    be seen.  The Murrieta Creek is overlain by an intersection of

16    two extensions of the Grant line.

17    THE COURT:  That point in the angle of the Grant is the

18    same point shown here, is it not?

19    THE WITNESS:  Shown on Vail's BC as well as a portion of

20    BB.

21    MR. VEEDER:  Is any of that area cultivated?  Are you

22    cultivating any of that area?

23    THE WITNESS:  We do.  That is in dry land grain on a three

24    year rotation.

25    MR. VEEDER:  But you are not irrigating it?

P 29

1    THE WITNESS:  We are not.

2    MR. STAHLMAN:  I will offer in evidence these photographs,

3    your Honor.

4    MR. VEEDER:  No objection.

5    THE COURT:  Vail's BD received in evidence.

6    MR. STAHLMAN:  May the Court please, I have lodged Exhibit

7    Vail AK-11.  There is an AK series, and this is an exhibit that

8    relates to the question Mr. Veeder raised about laches by reason

9    of withdrawal of the permit from the State for the building of

10   Vail dam.  This was a letter that I overlooked among some of

11   the letters that were sent to me from Camp Pendleton on the

12   arrangement I had with Mr. Veeder.  I offer in evidence this

13   letter.

14   MR. VEEDER:  No objection.

15   THE COURT:  Do you have a copy of it?

16   MR. STAHLMAN:  I think we supplied copies, your Honor.

17   THE COURT:  Let me look.  No, I have AK-1 to 10.  Let me

18   see it.

19   MR. STAHLMAN:  I will have copies made and will present a

20   copy to your Honor.

21   THE COURT:  Well, it's twelve o'clock.  I will read it

22   during the noon hour.  Recess until 1:30.

23   MR. SACHSE:  I am again tied up your Honor.  I have no

24   request for a delay, but I want to apologize if I am delayed

25   getting back from the Superior Court.

14,203

P 30    1     THE COURT:  That is all right.

2     MR. STAHLMAN:  I am almost through, your Honor.

3     THE COURT:  All right.

4     (Noon Recess)

14,204

1    SAN DIEGO, CALIFORNIA, Wednesday, July 20, 1960 1:30 P. M.

2         MR. STAHLMAN:  Your Honor, AK-11 was offered in evidence.

3         MR. VEEDER:  No objection.

4         THE COURT:  Vail's AK-11 received in evidence.  I think

5    it was already received in evidence.

6         MR. STAHLMAN:  That is all the questions I have, Mr.

7    Wilkinson.

8         THE COURT:  You may cross-examine.

9                        CROSS-EXAMINATION

10   BY MR. VEEDER:

11        Q  Mr. Wilkinson, I hand you Vail's Exhibit marked N  and

12   ask you to state what is meant by the number in the first column

13   on page 3 of the exhibit.  You will notice "Totals 820."  What

14   does that mean?

15        A  Totals --that is acreage.

16        Q  That is the acreage irrigated by the Vail Company in

17   1949?

18        MR. STAHLMAN:  You said page 3, for the record.  Why not

19   just mark these pages?  I see they are not numbered.

20        MR. VEEDER:  All right.

21   Does your Honor have a copy of Vail's N?

22        THE COURT:  Yes.

23   What page are you referring to?

24        MR. VEEDER:  It would be the third page down.  They are

25   not numbered pages.

P 33

1    A   Right around that.

2    Q   And similarly it is true, then, that in 1950 you were

3  irrigating 770 acres of land and using at that time 2317 acre

4  feet?

5    A   That is correct.  You must also note the asterisk on

6  page 3 of N.

7    Q   But those are the figures that you are representing to

8  this Court as the figures that you were utilizing?

Belt 16   9    A   That is correct.

10   Q   I am going to ask you to view the United States

11  Exhibit No. 20 and find for me in that Exhibit the runn off at

12  Vail Dam for the calendar year 1953.

13   A   Run off in  acre feet, is that is?

14   Q   No.  You have 1953 there.  If you want to, you can

15  write on your Exhibit N for the year 1952 the run off for the

16  calendar year.  These are calendar year figures.

17   A   There is no calendar year figure that I can find.

18  Maybe there is.  I haven't found it yet.  Calendar year 1953.

19   Q   What does that show?

20   A   Run off in acre feet.

21   Q   1908 does it not?

22   A   1908 acre feet.

23  THE COURT:  What year was this?

24  MR. VEEDER:  1953, your Honor.

25   Q   Would you just mark next to the 8939 the 1908 acre

P 32

1    THE COURT:  This is a substitute copy for an original of

2    the exhibit of the same number.

3    MR. STAHLMAN:  I think we made some corrections on the

4    original, your Honor.

5    BY MR. VEEDER:

6    Q  In other words, in 1949, Mr. Wilkinson, the Vail Company

7    reports that they were irrigating only 820 acres; is that right?

8    A  That is right.

9    THE COURT:  What page are you looking at?

10   MR. VEEDER:  The third page.

11   Q  And at that time you were utilizing an estimated 1694

12   acre feet a year; isn't that right?

13   A  That is right.

14   Q  And that is to be compared with the irrigated acreage

15   of 2492 acres in 1958 and a total water use of 9247 acre feet

16   in 1958; isn't that right?

17   A  That is right.

18   THE COURT:  Where do you get those figures for 1958?

19   THE WITNESS:  On the first page, your Honor.

20   MR. VEEDER:  On the first page.

21   Q  In other words, you have increased your water use since

22   1949 to 1958 by approximately six times, five and a half or

23   six times; isn't that right?

24   A  I assume you may be right.  I haven't --

25   Q  Well, 1694 and 9247 runs right around five or six times.

1    feet which is the total run off at Vail Dam?

2    A    (Marking Exhibit)

3    Q    Now, viewing the calendar year 1954, will you tell

4    me from Exhibit No. 20 the number of acre feet for the year

5    1954?

6    A    5712.

7    Q    And would you mark that right next to your 7957 for

8    the water use of Vail Company for that year.

9    MR. STAHLMAN:  May I ask the purpose of this, Mr. Veeder?

10   MR. VEEDER:  The purpose of it is, this, Mr. Stahlman.

11   It is manifest that the Vail Company has been using far more

12   than the yield of Temecula Creek for the years from 1953 to

13   date.

14   MR. STAHLMAN:  What is wrong with that?

15   MR. VEEDER:  If you are going into the argument on these,

16   it suits me.  But I would like to have the witness proceed.

17   THE COURT:  Proceed.

18   BY MR. VEEDER:

19   Q    For 1955 would you tell me the number of acre feet

20   at Vail Dam for the calendar year, and write it down next to

21   the 9607 acre feet you used that year?

22   MR. STAHLMAN:  If   Mr. Veeder considers that important,

23   I think the converse is true, too.  There are many years that

24   we used much less.

25   MR. VEEDER:  If he want to put in rebuttal, its all right

1    with me, your Honor.

2         MR. STAHLMAN:  Just a moment.  I am addressing the Court,

3    Mr. Veeder.  You know, Mr. Veeder, you have to let a fighter

4    punch himself out before you can slug him.

5         THE COURT:  Go ahead, Mr. Stahlman.

6         MR. STAHLMAN:  I think if this is important just to read

7    some particular years there when it shows more, how about the

8    many years when it shows that a lot less was used?  If that

9    is his purpose.

10        THE COURT:  Go ahead.  Did you get the figure for 1955?

11        THE WITNESS:  Yes.

12        MR. VEEDER:  1955 was 1638.

13        Q    For 1956 would you give me the run off at Vail Dam

14   for that year as compared with the 8249 acre feet which was

15   pumped?

16        THE COURT:  That is not pumped.  That is the gross

17   irrigation.

18        THE WITNESS:  That is the gross irrigation; that is right.

19        MR. VEEDER:  The gross water that he says was applied in

20   acre feet to his land.

21        THE COURT:  That is not what you asked.  You said 8249

22   acre feet was pumped.

23        MR. VEEDER:  Maybe I can ask the witness a question in

24   that regard, your Honor.

25        Q    Your releases into the basin that year were 575; is

     that not right?

1      A     The releases directly to the basin were 575, not

2  counting return water.

3      Q     Yes.  Now, go to your year 1957, if you will.

4  THE COURT:  You didn't give the figure yet for 1956.

5  MR. VEEDER:  He wrote it down.  It is 1259.

6  THE COURT:  What was the figure for 1957?

7  THE WITNESS:  909 acre feet, your Honor.

8  MR. VEEDER:  We don't have the calendar year for 1958.

9  That was a large year.  It was a water year.  If you want to

10  put that figure down, we can get the calendar year later on.

11  That was 11,057, if you want to write that in.

12  THE COURT:  That is not the accurate figure?

13  MR. VEEDER:  I am going to have to get it, your Honor.

14  We don't have a calendar year for that period.

15  THE WITNESS:  Shall I put "through September"?

16  MR. VEEDER:  Yes, if you will.

17      Q     Now, Mr. Wilkinson, is it not true, then, since 1953

18  you have been using several thousand more acre feet a year than

19  you did in the years previous to that time?

20  MR. STAHLMAN:  I object to that question as being

21  immaterial, your Honor.  The records speaks for itself.

22  THE COURT:  Overruled.

23  THE WITNESS:  Yes, there is evidence on that Exhibit.

24  That explains the situation.

25  BY MR. VEEDER:

1    Q    Now, in preparing your Exhibit of comparison of

2    irrigable vs irrigated acres, did you take into the considera-

3    tion the relationship between the quantity of water that you

4    were utilizing on the Vail Company's land with the quantity of

5    water that was actually being utilized by any other user?

6    A    The records, as you know, for the other users are

7    imcomplete.  They have no metering system.  They have not

8    testified to any exact quantity of water that they have used.

9    Q    In other words, you have not compared the quantities

10   of water that were utilized by other users in the Valley?

11   A    I have not compared the quantities, because they were

12   not available.  Only the acres that they irrigated.

13   Q    Now, in your Exhibit AY-1, Exhibit AY-2 and Exhibit

14   AY-3, you disclose a marked decline in the quantity of water

15   running through the Temecula Gorge; isn't that correct?

16   A    As a percentage of normal for the months considered,

17   the summer months, there is a decline from the average.

18   Q    How long, Mr. Wilkinson, have you had a determinative

19   voice, so to speak, in the operation of the Vail Company or

20   Vail Estate?

21   MR. STAHLMAN:  That is objected to as being indefinite

22   and uncertain, your Honor.

23   BY MR. VEEDER:

24   Q    When did you become --

25   MR. STAHLMAN:  Just a moment.

1      THE COURT:  He is modifying the question.

2      MR. VEEDER:  I will modify it, yes.

3      Q    How old are you Mr. Wilkinson?

4      A    37 years old.

5      Q    And how old were you in 1940?

6      A    In 1940 I was 17 years old.

7      Q    And did you participate in the negotiations for the

8   stipulated judgment which is now being attacted?

9      A    I did not.

10      Q    And you have no personal knowledge at all, do you?

11   Did you attend any of the negotiations in any way?

12      A    No, I did not.

13      Q    Where were you at the time?

14      A    In 1940 I was still in High School.

15      Q    So as a matter of fact when you state that there was

16   a mistake made by the Vail Company, you are not speaking  from

17   personal knowledge?

18      MR. STAHLMAN:  Just a moment.  I object to the question

19   as assuming facts not in evidence, and incompetent, irrelevant

20   and immaterial, your Honor.

21      THE COURT:  Overruled.

22   BY MR. VEEDER:

23      Q    When you state that there was a mistake made by the

24   Vail Company in entering into the stipulated judgment, you are

25   not speaking from personal knowledge, are you?

14,212

1    MR. STAHLMAN:  Just a moment.  That is objected to as

2  being incompetent, irrelevant and immaterial, assuming facts

3  not in evidence, your Honor.

4    THE COURT:  Overruled.

5    THE WITNESS:  Mr. Veeder, I don't believe I have made any

6  reference to mistake in entering the judgment.

7  BY MR. VEEDER:

8    Q    You don't believe you did?

9    MR. GIRARD:  That was Mr. Stahlman who made that statement,

10  I believe, Mr. Veeder.

11    MR. VEEDER:  Mr. Girard, you just be parens patre for a

12  mement, will you?

13    Q    Did the Vail Company, or did it not, file a pleading

14  in which it charged that there was a mistake in regard to the

15  geology --

16    MR. STAHLMAN:  That is objected to as being incompetent,

17  irrelevant and immaterial, your Honor.

18    MR. VEEDER:  Let me finish the question.

19    Q    Are you aware that the Vail Company filed a pleading

20  charging a mistake when it entered into the stipulated judg-

21  ment?

22    A    You are referring to a brief signed by Mr. Stahlman?

23    Q    No.

24    MR. STAHLMAN:  You have a brief signed by Stahlman in

25  front of him.  What is the reason for that then?

1    MR. VEEDER:  If Mr. Stahlman is not working for the Vail

2    Company -- I am not sure that he is,  but I am assuming that

3    when he files --

4        MR. STAHLMAN:  I am not sure that your not working for

5    the Russian Government.

6        THE COURT:  All right gentlemen.

7        MR. STAHLMAN:  Well, he starts these things, your Honor.

8        THE COURT:  Cut out the side remarks and proceed with the

9    case.  The only person you are helping is the reporter.  He

10   writes it down and you have to pay for it.

11       MR. VEEDER:  And we like John.

12       MR. GIRARD:  I object because I have to buy a copy.

13       MR. VEEDER:  I would like to straighten this out for this

14   young man.  Here is the second amended and second supplemental

15   answer     of the Vail Company.

16       THE COURT:  Is this signed by Mr. Wilkinson?

17       MR. VEEDER:  It is signed by Mr. George Stahlman, attorney

18   for the Vail Company.

19       THE COURT:  And is it verified by Mr. Wilkinson?

20       MR. STAHLMAN:  No sir, your Honor.

21       THE COURT:  You are wasting time, aren't you?

22       MR. VEEDER:  No sir.

23       THE COURT:  Go ahead then.

24       MR. VEEDER:  Any time that the Vail Company files an

25   answer that charges a mistake was made, I am assuming that the

1    Vail Company is saying that a mistake was made or that George

2    (Mr. Stahlman) is acting without authority. I don't know.

3        MR. GIRARD:   It is fundamental that you can only impeach

4    a witness if he signs it and also verifys it.

5        THE COURT:   That is right.

6        MR. VEEDER:   Parens patre, I am trying to impeach anyone.

7        THE COURT:   What do you want to find out?

8        MR. VEEDER: I want to find out what the mistake is that

9    is pled.   They plead here -- and I think it is worth reading --

10   they plead here very carefully that there was a mistake made

11   in regard to the geology, and the mistake was made by the Vail

12   Company.

13       MR. STAHLMAN:   Your Honor, this is the most ridiculous

14   thing to interpret the allegation of mistake as --

15       THE COURT:   You may take as much time as you want on this,

16   Mr. Veeder, but I'll tell you right now as far as I'm concerned

17   where a technical pleading is filed by counsel I don't expect

18   the lay client to know as much about it as the attorney does.

19   I'll sit back here and rest.   As Learned Hand said.   I will

20   listen with biased attention.

21       MR. VEEDER:   I am sure that is the case, your Honor.

22       The point I desire to make, and before you go into your

23   biased relaxation, I would like to tender this thought.   I

24   have been waiting here for a long while to find what the mis-

25   take is that the Vail Company charges was made when they entered

P 1-

1   into the stipulated judgement.  I don't know what it is, and

2   it is a matter that has to be proved.  He says there was a

3   mistake in geology.  Now what is that mistake?  This is not

4   impeachment of the witness, and I have never heard that you

5   couldn't ask the client what he meant by a pleading that was

6   filed by counsel, and I insist that I am entitled to know.  If

7   he doesn't know what the mistake was, fine; he can just say "I

8   don't know."

9       Q  What was the mistake, Mr. Wilkinson, that the Vail

10   Company says was made when it entered into the stipulated

11   judgement?

12      A  Mr. Veeder, I think there were many mistakes in the

13   stipulated judgement.  I don't know just definitely what you

14   are referring to there.

15      Q  You say there was a mistake in geology.  What was that

16   mistake?

17      THE COURT:  You say that he said there was a mistake in

18   geology.  He hasn't said anything.  The Vail Company's pleadings

19   state something.

20      MR. VEEDER:  That is right your Honor.

21      THE COURT:  Then ask the question properly, if you are

22   going to continue this cross-examination.

23   BY MR. VEEDER:

24      Q  The Vail Company avers that mistakes were made in regard

25   to the geology of the Santa Margarita River system at the time

P 2

1   that it entered into the stipulated judgement.  You were not in

2   attendance at the negotiations.  Nor were you aware, apparently,

3   of what went on.

4        THE COURT:  Is that a question?

5   BY MR. VEEDER:

6        Q  But would you state, if you know, the mistake that was

7   made in regard to the geology?

8        A  I would say that the exhibits in the case exemplify any

9   mistakes that were made.

10        Q  But you don't know the mistakes yourself?

11        A  There are probably a myriad of mistakes.  It would be

12   a job to check up the old geologic map that was utilized as

13   compared to the present geologic maps, which would evidence the

14   mistakes.

15        Q  But you don't know whether the Vail Company relied on

16   that particular exhibit when it entered into the stipulated

17   judgement, do you?

18        MR. STAHLMAN:  I object to that your Honor.

19   BY MR. VEEDER:

20        Q  You don't know?

21        MR. STAHLMAN:  Mistakes sometimes are never discovered

22   until after they are made.  They are usually not mistakes unless

23   they are discovered afterward.

24        THE COURT:  It's an utter waste of time.  He is a successor

25   in interests of other persons who were the legal representatives

14,217

1    of the Vail Estate at that time.  What difference does it make

2    what he said?  If he says he knows of his own knowledge, it only

3    means that he thinks he knows from what somebody told him.

4         MR. VEEDER:  That is precisely the point I am making, your

5    Honor.  We have a situation here where a judgement was entered

6    into twenty years ago.  The United States of America bought

7    land relying upon that judgement.  Now we have a pleading in

8    here that says there was a mistake made, and it would be very

9    odd if I couldn't ask the man for whom that allegation and

10   pleading was made if he knew the mistake.

11        THE COURT:  I am not keeping you from asking the question.

12   I am giving you all the rope you want.

13        As far as presenting any evidentiary matter to the Court,

14   I don't think it is adding a thing.

15        Go ahead.  What was the question?

16   BY MR. VEEDER:

17        Q  Do you know of your own knowledge whether the question

18   of geology entered into or did not enter into the negotiations

19   which gave rise to the stipulated judgement?

20        A  My only --

21        Q  Answer the question yes or no.

22        MR. STAHLMAN:  Let him answer the question then.  Don't

23   stop him before he starts.

24        THE COURT:  Go ahead.

25        THE WITNESS:  I can only make an assumption on that.  I

P 4

1   was not present.

2   BY MR. VEEDER:

3       Q   You don't know?

4       MR. GIRARD:  Of course he doesn't know.  He was 17 and in

5   high school.  He was not there.

6       (Another matter)

7       THE COURT:  Proceed Mr. Veeder.

8       MR. VEEDER:  Thank you your Honor.

9       Q   Now Mr. Wilkinson, how long have you personally been

10  acquainted with the fact that there were other water users beside

11  the Vail Company in the Santa Margarita River Valley?  After

12  you were seventeen years old -- you can start there.

13      A   I visited the ranch many times in my school days and

14  such as that, and I was always aware of irrigation going on at

15  various parts of Murrieta and the old Santa Margarita Ranch.

16      Q   Even as a youngster then?

17      A   That is right.

18      Q   Ten or twelve years old?

19      A   I wouldn't say ten or twelve years old, because I don't

20  think I visited Santa Margarita at that time.  I spent most of

21  my time at the Santa Rosa Ranch.

22      Q   But you will say you have been acquainted for an extended

23  period of time with the fact that there are other water users

24  participating in the use of water in that area?

25      A   That is right.

14,215

Q   Now I hand you Vail   Company's Exhibit AN which is the answer of the defendants named to amended complaint of plaintiffs filed herein in the Superior Court of the State of California. Did you ever look at this exhibit?

MR. STAHLMAN:   This is not cross-examination, but if it will serve any purpose I am not going to be technical about it.

THE WITNESS:   I have seen the exhibit.

BY MR. VEEDER:

Q   Did you ever go through it?

A   Not carefully.

Q   You did, yourself, as I recall, prepare Vail's AN?

A   Yes I did.

Q   And you prepared that on the basis of your own personal knowledge; is that correct?

A   On the basis of what records I had available and knowledge of the area.

Q   And it is a list of people using water in the Santa Margarita River Valley; is that not correct?

A   It is a list of people above the gorge.  As you say Santa Margarita River Valley, that could imply --

MR. VEEDER:   All right.

THE COURT:   Are you talking about Exhibit AM or Exhibit AN?

MR. VEEDER:   AN, your Honor.

Q   And you prepared it on the basis of your personal knowledge of these people above the gorge utilizing water?

P. 6

1    A   I set up records that we have to show that.

2    Q   I show you here the name J. E. Roripaugh.  Is that Jack

3    Roripaugh, a defendant here?

4    A   That is right.

5    Q   Do you know whether that is the same Jack Roripaugh who
                                      to
6    is referred/in Vail's Exhibit AN page 19?

7    A   It must be the same man.

8    Q   In other words, back in 1926, based upon Vail's own

9    evidence J. E. Roripaugh was a water user or a claimant to rights

10   to the use of water from the Santa Margarita River system?

11   A   I don't know whether he was using water at that time or

12   not.

13   Q   You would say, though, based upon this exhibit that

14   you have entered that he was a claimant to water; isn't that

15   right?

16   MR. STAHLMAN:  Just a moment.  I object to cross-examination

17   of this man of that nature.  That has nothing to do.  We are

18   getting no place with this.

19   MR. VEEDER:  May I respond to that without being castigated

20   too sharply?

21   THE COURT:  Certainly it is not cross-examination.

22   MR. VEEDER:  Why not?

23   THE COURT:  This witness has not testified to any of these

24   matters.

25   MR. VEEDER:  Do you mean, your Honor -- and I am asking

P 7

1   for a ruling -- that I am not permitted to cross-examine the

2   only Vail representative here and the man who has been here day

3   in and day out in this trial and ask him whether the J. E.

4   Roripaugh in the Exhibit AN that the Vail Company offered is or

5   is not the same J. E. Roripaugh that he has --

6        THE COURT:  He has already answered the question.

7        MR. STAHLMAN:  You asked him whether Roripaugh had a claim

8   to water at that time.  I submit that it is not cross-examination.

9        MR. VEEDER:  I certainly can ask him if he knows whether

10  he was claiming water at that time.

11       Let me explain what this is, your Honor.  When the Vail

12  Company was sued by Rancho Santa Margarita --

13       MR. STAHLMAN:  Are we going to have a speech?  I want a

14  response some time.  This man is going to continue making these

15  speeches and using questions of a witness as a vehicle or means

16  of making an argument.

17       MR. VEEDER:  The speech is very clear, your Honor.  This is

18  the point.  There are pleadings here, there are pleadings that

19  are before your Honor which say that there were other parties

20  in the valley.  They admit that.  But then they plead that they,

21  the Vail Company and Santa Margarita, made the mistake that they

22  had/ the legal right to divide the water arbitrarily between them-

23  selves without regard for the rights of other water users and

24  did so divide the water.  Now that is an issue before your

25  Honor.  And I am simply using the Vail Company's own evidence

P 8   1    to show that there was no mistake.

2    MR. STAHLMAN:  Your Honor, he started to explain what this

3    is, now he is making his argument on it.

4    THE COURT:  This (referring to Exhibit AN) was the answer

5    of the defendants Vail Company, and I take it this was the answer

6    in which they asserted that other defendants should be brought

7    in.

8    MR. STAHLMAN:  That is right.

9    MR. VEEDER:  That is right.

10   THE COURT:  This was done in 1926.

11   MR. VEEDER:  All right.

12   THE COURT:  This young man was born --

13   THE WITNESS:  I was born in 1923 your Honor.

14   THE COURT:  He was three years old.

15   MR. STAHLMAN:  That wouldn't make any difference to Mr.

16   Veeder.

17   THE COURT:  I am going to let you cross-examine, but let's

18   be reasonable about it.  Obviously he didn't know anything about

19   what went on at the time the document AN was prepared, unless

20   you have some very startling evidence.

21   MR. VEEDER:  I don't have any startling evidence, your

22   Honor.  All I have is the Vail Company's evidence.  And your

23   Honor, this gentleman did --

24   THE COURT:  Ask your questions.  We are just wasting time.

25   MR. VEEDER:  I am being interrupted all the time.

P 9

1      THE COURT:  Sit down, Mr. Stahlman.  Let Mr. Veeder have

2   his head a little while and see what comes.

3      MR. STAHLMAN:  Let him slug himself out.

4      THE COURT:  Go ahead, Mr. Veeder.

5      MR. VEEDER:  You know if I had said that, your Honor would

6   have sued me.

7      THE COURT:  Ask your question.

8   BY MR. VEEDER:

9      Q  During the period that you have had acquaintance with

10  the Vail Ranch, did the Vail Company ever at any time, to your

11  knowledge, undertake to prevent or to sue or to restrain in

12  any way the water users of the Roripaughs or any other user

13  near your property?

14     A  As far as the area below the dam and areas above the

15  gorge, I don't know of any actions.

16     Q  And you know of no time -- in fact, it is the truth, is

17  it not, that the Vail Company purchased water from J. E. Roripaugh

18  for some time?  Isn't that correct?

19     A  We have made arrangements to use water from his well on

20  our land.

Belt 17  21     Q  It is also true, is it not, that Leo Roripaugh, to your

22  full knowledge, has made very extensive developments on his

23  property, Cass and Roripaugh; isn't that right?

24     MR. STAHLMAN:  That is objected to as being incompetent,

25  irrelevant and immaterial, your Honor.

14,224

P 10     1          THE COURT:  Overruled.

2          THE WITNESS:  They are gradually developing their lands.

3    BY MR. VEEDER:

4          Q  And you are perfectly aware of that?

5          A  I am aware of that.  I have seen the land leveling

6    operations and the wells being drilled.

7          Q  You recognize, do you not, that they have some right to

8    participate in the waters of the Santa Margarita River?

9          A  Of course.

10          Q  Now, in regard to the water uses that you have made,

11    has there ever been a time, to your personal knowledge, that the

12    United States of America has said to you to refrain from using

13    the quantity of water that you were pumping at the time?

14          MR. STAHLMAN:  That is objected to as being incompetent,

15    irrelevant and immaterial.

16          If your question means what they said to him personally,

17    that is one thing.

18          THE COURT:  Read the question.

19          (The Reporter read the pending question.)

20          THE COURT:  Overruled.

21          THE WITNESS:  Said to me personally?  No.

22    BY MR. VEEDER:

23          Q  And you have been managing the ranch for how long?

24          A  I have not been the manager, Mr. Veeder.  I am one of

25    the foremen.

P-11

1    Q  Who is managing the ranch?

2    A  That is in the hands of Mahlon Vail and Louie Roripaugh.

3  I am subordinate to them.

4    Q  You are an owner of a part interest in the ranch; is

5  that right?

6    A  That is right.

7    Q  So you would say at least from your own personal exper-

8  ience the United States has never asked you to cease and desist

9  using the quantity of water that you had been using?

10    A  They have never asked me personally, no.

11    Q  Was there a time since 1953, to your personal knowledge,

12  that the United States has ever asked you to reduce your use

13  of water?

14    A  They have never personally asked me to.

15    Q  Do the records of your company show that the United

16  States has ever asked you to reduce the use of the waters at

17  your ranch?

18    MR. STAHLMAN:  Just a moment.  I object to the question in

19  its form -- if he knows whether they do.  But whether the records

20  show it or not, there are a lot of records up there.

21    THE COURT:  Overruled.

22    THE WITNESS:  As far as I know, the records don't show any

23  demands to decrease the usage.  I believe there have been requests

24  to increase the flow.

25  BY MR. VEEDER:

P 12

1   Q You have stated that the waters from the Navy Well are
2   such that you do not think that it is suitable for purposes of
3   irrigation; is that your testimony?

4   A According to standards for irrigation water quality,
5   it is not suitable.

6   Q When did the Vail Company first have knowledge of that,
7   do you know?

8   A To my own knowledge, I do not know exactly when they had
9   it.

10   Q Were you aware, Mr. Wilkinson, that there were tests
11   made prior to the time that the well was reamed out and casings
12   put in?

13   A I know there were tests made at the time of the drilling.
14   Whether it occurred before or after the reaming I really don't
15   know. But I know there were chemical tests made at the time
16   the well was drilled.

17   Q You say that after 1950 you lived on the ranch and
18   participated in the ranch operations; isn't that right?

19   A That is right.

20   Q And you were there at the time that the Navy Well was
21   drilled?

22   A I was on the ranch.

23   Q Did you at that time have any personal knowledge in
24   regard to the quality of the water?

25   A I did not.

P 13

1    Q  Do your records show, to your personal knowledge, the quality of the water?

3    A  Our records show the water quality.

4    Q  When do your records show that you had that knowledge?

5    A  That knowledge must have been obtained when we got the report of the water quality tests.  When we received that report I do not know.

8    Q  Could it have been in 1951, do you know?

9    A  No I don't know.

10    Q  Would you mind looking that up and telling us when you first found out the quality of the water, when your records show it?

13    A  I will endeavor to do that.

14    Q  You were aware, were you not, that at the behest and at the request of the Vail Company the casing in the Pauba Well was perforated the full depth of the well?

17    A  I am aware of the fact that the casing was perforated the full depth.

19    Q  Were you aware of that fact that the Vail Company asked that that be done?

21    A  At the time of the drilling of the well, no.

22    Q  You didn't know?

23    A  No I did not know.

24    Q  Your records show that that is the case, do they not?

25    A  That is true.

P 14
1      Q  And your records show, moreover, do they not, that the

2 Vail Company spent a very sizable sum of money to have that well

3 perforated the full depth; isn't that right?

4      MR. STAHLMAN: Tell him how much it cost.

5      THE WITNESS:  I don't remember the cost figures, Mr. Veeder.

6 BY MR. VEEDER:

7      Q  But you do know that the Vail Company spent the money

8 to have that well perforated the full length of the casing?

9      A  As I remember, they didn't have to pay for the full

10 perforations.  They wanted additional perforations.

11      Q  And what was the objective, in your view, of the Vail

12 Company in requesting to have this Navy Well perforated to the

13 full length?

14      A  I can only make suppositions on that.

15      Q  And what would be your supposition on that?

16      A  That they wished to have a well so that they could test

17 all the depths of it.

18      Q  And since that time have you not used the Navy Well to

19 supply water for irrigation at the Pauba Ranch since 1953?

20      A  We have used the well as a partial source of irrigation

21 water at the ranch.

22      Q  Are you using the well during the 1960 irrigation season?

23      A  We are.

24      Q  And did you use the well in 1959?

25      A  We did.

P 15

1     Q  And as a matter of fact you have used that well every

2  irrigation season, have you not, since 1953?

3     A  Without looking at my records, I wouldn't be exact on

4  the year.  It might be one year one way or the other.  But we

5  have used the well certainly since 1954.  Maybe it's 1953.  I

6  would have to look at the records to be sure.

7     Q  As a matter of fact, is it not true, as evidenced by

8  your Exhibit N, that since the Navy Well you have greatly in-

9  creased your irrigated acreage?

10     A  The completion of the Navy Well --

11     Q  Would you just answer the question.

12    MR. STAHLMAN:  Just let him answer the question before you

13  stop him.

14    THE COURT:  Proceed with your answer.

15    THE WITNESS:  The completion of the Navy Well practically

16  corresponds with the completion of the dam distribution system

17  period.  The dam distribution system has been the main source

18  of increased water on the ranch.  Certainly not the Navy Well.

19  BY MR. VEEDER:

20     Q  Have you compared the quantities of water pumped from

21  the Pauba basin since 1953 with the quantities of water pumped

22  from the Pauba basin prior to that time?

23     A  I am aware of the quantities, yes.

24     Q  So it is true, is it not, that you have actually greatly

25  increased your operations since the date of bringing in to

P 16

1   production the Navy Well?

2        A  The increased production is not due only to the Navy

3   Well.  We drilled other irrigation wells during that same period

4   of time.

5        Q  Is it not true that very frequently in the West -- maybe

6   you are not acquainted with the fact -- that the quality of water

7   is such that it is necessary to mix water from different sources

8   to make the water usable?  If you are not aware of it, just say

9   so.

10        A  I assume that that is the situation.

11        MR. VEEDER:  Mr. Clerk, will you get me Vail Company's

12   Exhibits D and C.

13        Q  Now, I observe that in the comparison of irrigable

14   versus irrigated acreage, which you have prepared as an exhibit,

15   you are stating that there are approximately 30,000 acres of

16   land of the Vail Company which are irrigable in nature, but

17   that there are only 2500 acres of land presently being irrigated?

18        A  I took the maximum figure we have ever irrigated in any

19   one season to come up with the 2500 acres.

20        Q  In other words, that is the ceiling to which you have

21   ever irrigated; is that right?

22        A  As evidenced in our exhibit.

23        Q  Wouldn't that be your Exhibit M or --

24        A  M or N.  I don't remember exactly.

25        Q  I guess it is N.  And you just rounded off the 2492,

P.17

1  as shown on Exhibit N?

2      A  That is right.

3      Q  As a matter of fact, in regard to the 2500 acres, there

4  is a very small acreage in comparison, is there not, of lands

5  which were irrigated throughout the entire irrigation season?

6      MR. STAHLMAN:  Read the question please.

7      (The Reporter read the pending question.)

8      MR. STAHLMAN:  I object to the question as being indefinite

9  and uncertain and unintelligible, your Honor.

10      MR. VEEDER:  It is not my fault that George is not trained,

11  your Honor.

12      THE COURT:  Sustained.  Reframe it.

13  BY MR. VEEDER:

14      Q  Would you state whether you irrigated the oats shown

15  on Exhibit N for the year 1958 throughout the entire irrigation

16  season?

17      A  No, we did not.

18      Q  And would you state whether you irrigated the barley

19  throughout the entire irrigation season?

20      A  Just a moment.  What do you mean by "irrigation season"?

21      Q  Let's turn it around.  What do you mean by the "irrigation

22  season"?

23      A  If it is the season you irrigate barley, we probably

24  irrigated during the season that it needed to be irrigated.

25  Some places it can be double cropped.  Some times it is a single

P 18

1    crop.  Sometimes there are two irrigations.  Maybe it is up to

2    six or seven.

3        Q  That's a good speech.  Would you tell me how many days

4    there are in the irrigation season in this area in which your

5    lands are located?  One hundred and eight? Two hundred? Two

6    hundred twenty-five days?

7        THE COURT:  What kind of crops?  Are you speaking generally?

8        MR. VEEDER:  Yes your Honor.  Normally in this kind of

9    lawsuit the question of the irrigation season is very important,

10   and the irrigation season, for example, alfalfa will be irri-

11   gated through the whole irrigation season.

12       THE COURT: For your information, there are places in

13   Southern California where they irrigate practically the year

14   around, in case you are not familiar with that.

15       MR. VEEDER:  I am familiar with that.  But the Vail Company

16   is not one of them.

17       THE COURT:  Are you referring to all crops?

18       MR. VEEDER:  I am referring to the irrigation season.

19       Well, I will turn that around.

20       Q  Would you say that your irrigation season in which you

21   actually are pumping water and applying it to crops normally

22   runs from about the first of March to the first of November?

23       A  If there is such a thing as a normal year, that might

24   be true.

25       Q  I thought this was one thing upon which you could agree.

JOHN SWADER. Official Reporter

P 19

1   How many irrigations do you usually apply to barley?

2      A   One or two.

3      Q   And when would you apply those?

4      A   In the Spring of the year.

5      Q   And based upon on your experience, what would you say

6   would be the gross quantity of water required to make a barley

7   crop?

8      A   A barley crop can be made with the rainfall itself.   If

9   we have a normal rainfall, we have a barley crop.

10      Q   How many irrigations were required this year to make

11   the barley crop for you?

12      A   We didn't irrigate any barley this year.

13      Q   Did you irrigate any oats?

14      A   Yes.

15      Q   How much water do you figure you had to apply to oats?

16      A   We only irrigated part of the oats we planted, and those

17   oats we irrigated only once.

18      Q   Have you any idea how much water you utilized at that

19   time?

20      A   I doubt if we used over four inches of water.   We were

21   late and tardy in our irrigation, tried to get it over as quick

22   as we could.

23      Q   Could you state, in any event, on the crops that you

24   have listed in 1958, that for the small grains you would only

25   irrigate during the calendar year once or twice?

P 20

1     A   Small grains, generally once or twice.

2     Q   It wouldn't be out of the way to say that your gross

3 water use per acre for oats, barley, milo --

4     A   Milo is a different subject entirely.

5     Q   How many irrigations on that?

6     A   We have run up as high as seven.

7     Q   And Sudan grass?

8     A   Depending on the number of cuttings you get; you can

9 run as high as four.

10     Q   How many irrigations do you require in regard to corn?

11     A   From four to seven.

12     Q   So you would say, then, Mr. Wilkinson, that the maximum

13 acreage outside of the grains which may or may not have been

14 made by natural precipitation, would be around 2000 acres; isn't

15 that right?

16     A   For the year 1958, you wish the figure less the barley

17 and less the oats?

18     Q   That is about right.

19     A   It would be around 2000 acres.

20     Q   Why is it, then, Mr. Wilkinson, that with 30,000 acres

21 of land you have only irrigated 2000, 2400 acres?

22     A   We were restricted as to the amount of land we had under

23 pipeline and the water available.

24     Q   Wouldn't you say that probably the most limiting factor

25 in regard to your operation is the shortage of water?

P 21

1    A   I would say the most limiting factor is rainfall.

2    Q   That is water, isn't it?

3    A   That's water.  Our operation is not directed to irrigation,

4    Mr. Veeder.

5    Q   Now Mr. Wilkinson, have you ever given thought to what

6    it would cost to irrigate the lands up here in Block 2 on the

7    Coit Survey, Exhibit C, from the Pauba Valley?

8    A   From the Pauba Valley, no.

9    Q   Would you not say that the costs of irrigating that land

10   in Block 2, in the light of the shortage of water, would be

11   prohibitive for the irrigation of the lands in Block No. 2 from

12   the Pauba Valley?

13   A   That would be a matter of cost study.  You must remember

14   that some of those lands are relatively frost free.

15   Q   Would it not be true, though, Mr. Wilkinson, that for

16   each irrigated acre that you brought in your Block No. 2 you

17   would reduce one of the 2500 acres that you are presently irri-

18   gating on the Pauba Valley?

19   A   I would like to have the question again.

20   MR. VEEDER:  All right, go ahead and listen to it.

21   (The Reporter read the pending question.)

22   THE WITNESS:  That all depends on what source of water you

23   would utilize, Mr. Veeder.

24   BY MR. VEEDER:

25   Q   Is there a source of Santa Margarita River water

P 22

1 available in Block No. 2 for the purpose of raising, for example,

2 the crops that you raise down in the Pauba Valley?

3     A  Apparently from what some of our neighbors do up there,

4 there is enough to play around with some water.  There is a

5 stream up there that has water in it now.

6     Q  And there is some ground water up there?

7     A  There is definite ground water.

8     Q  You have never given consideration, then, to taking

9 water up there from the Pauba Valley?

10     MR. STAHLMAN:  Objected to as being immaterial your Honor.

11     THE COURT:  Overruled.

12     Answer the question.

13     THE WITNESS:  No, Mr. Veeder.

14 BY MR. VEEDER:

15     Q  Did you ever make plans for taking water up there?

16     A  I myself never made any plans.

17     Q  Would you say, based upon your knowledge of the terrain

18 up there, that it would be a costly enterprise to build an

19 irrigation system for that land?

20     MR. STAHLMAN:  Objected to as being immaterial your Honor.

21     THE COURT:  Overruled.

22     THE WITNESS:  It would probably be a costly operation.  I

23 don't know whether it would be any more costly than some of

24 the operations going on in the Fallbrook area.

25     THE COURT:  If Mr. Veeder's and Mr. Kunkel's contentions

P 23

1 are correct, of course, that land up there sets right over a

2 basin of water in hydraulic continuity clear down to the narrows,

3 and therefore the possibility is, of course, that you might get

4 a good well up there.

5 BY MR. VEEDER:

6     Q  Do you agree with that geology, Mr. Wilkinson?

7     A  I am not a geologist.  I know there is water available

8 up there right now with the shallow well that we have.

9     Q  Do you think there is water there in quantities sufficient

10 for the purpose of irrigation?

11     A  Without test pumping the well, I couldn't say as to how

12 much land you could cover.

13     Q  Do you know what the elevation is of that land now?

14     A  Not without checking the map.

15     Q  In regard to the lands in Block 5, would your responses

16 be the same as you have made in regard to Block 2?

17 MR. STAHLMAN:  Which responses?

18 THE WITNESS:  Block 5 is closer to the Pauba Valley.  It

19 does also have some small wells and springs on it.  It is higher

20 land.

21 BY MR. VEEDER:

22     Q  Is it higher land in elevation?

23     A  Not in comparison to Block 2, but it is higher land of

24 the ranch land.

25     Q  But your company has made no study as to whether it

P 24

1   would be economically feasible to bring Temecula Creek water up

2   there; isn't that right?

3       A  No, we have made no study.

4       Q  Would you say that a riparian right in Temecula Creek,

5   in regard to the lands in Block 2, would be in connection with

6   the Temecula Creek an illusory right?

7       MR. STAHLMAN:  Objected to as calling for a legal conclusion,

8   your Honor.

9       THE COURT:  Sustained.

10      Looking at Exhibit 15, I am not sure that Block 2 isn't

11  a different watershed.  I think it drains into the Santa

12  Gertrudis.

13      MR. VEEDER:  I think it does, your Honor.  There is no

14  doubt about it.

15      MR. STAHLMAN:  So what?

16      MR. VEEDER:  Well, haven't you read the decision in <u>11</u>

17  <u>California Second?</u>

18      MR. STAHLMAN:  Yes, I have read it.

19      MR. GIRARD:  I haven't.

20      THE COURT:  That is the Vail case.

21      MR. STAHLMAN:  Yes.

22      THE COURT:  It is your contention, Mr. Veeder, that if the

23  lands in Block 2 on the Coit Map, Vail's Exhibit C, drained

24  into the Santa Gertrudis, that the water from the Temecula

25  could be used up in Block 2?

P 25

1    MR. VEEDER:  No, that was one of the issues that was sent

2    back for trial.  They said that under the circumstances legally

3    those lands might be considered were riparian.  But the question

4    of reasonableness was a matter that had to be tried, and that

5    was an issue that was not tried; it was settled by the stipu-

6    lated judgement.

7    MR. STAHLMAN:  If we are going to start on that situation,

8    we ought to go down to Camp Pendleton and take a little testimony

9    on some of that land down there that they put in.

10   THE COURT:  I sustain the objection on the grounds that

11   it asks for a legal conclusion.  Ask the next question.

12   MR. VEEDER:  May I inquire, your Honor? You have stated

13   to me, one of the things that brought out this course of cross-

14   examination, that the matter becomes important to you as to

15   whether a riparian right is an illusory right, and you told me

16   this.  You said that before I finished this case I would have

17   to tell you the character of lands in three categories, namely:

18   That there be the number three, I assume grade, that you

19   would say, "Well, sure, it is riparian; but doesn't have a

20   right to participate in the stream by reason of the fact that

21   there is insufficient water?"

22   Then there is another grade of land, as I understood your

23   Honor -- and I hope that I am paraphrasing correctly -- that

24   might have a little better right because it was better situated.

25   And then there would be, I assume, this 2000 acres of land

P'26    1    that might be in a better position.

2    THE COURT:   I haven't objected to your asking the altitude

3    or asking him whether or not he has made studies as to whether

4    it would be irrigable.   You have done all these things.   That

5    is the sort of thing, together with the geology here, that would

6    lead to a legal conclusion as to whether it is clearly irrigable

7    land or clear off on the other side, land that is technically

8    riparian but should never be irrigated.

9    Do you want the witness' opinion on this legal conclusion?

10    MR. VEEDER:   I believe your Honor made the very statement

11    today in regard to Santa Rosa, and I am not sure that Mr.

12    Wilkinson didn't respond when the question was, isn't this just

13    an illusory riparian right?

Belt 18    14    THE COURT:   I asked Mr. Stahlman whether he figured there

15    was only a small amount of land on the east side of the Santa

16    Rosa Mountains that could be irrigated.

17    MR. VEEDER:   Didn't you say it was illusory?

18    MR. STAHLMAN:   The same thing applies to Camp Pendleton.

19    MR. VEEDER:   Why don't you try your lawsuit when you get

20    to it?   I am cross-examining the witness and I don't think you

21    should interrupt.

22    THE COURT:   You can't both talk at one time.   Do you have

23    any other questions you want to ask Mr. Wilkinson?

24    MR. VEEDER:   Yes your Honor.

25    THE COURT:   The objection is sustained on the ground that

P 27

1  you were asking for practically the ultimate question to be

2  decided rather than obtaining facts from him.

3  BY MR. VEEDER:

4      Q  Mr. Wilkinson, I am referring to Vail's AV and I observe

5  that you put down there that 8.3% of your land riparian in

6  character is irrigated.  Isn't that what you calculate?

7      A  I made no reference to riparian character there.

8      Q  Well, irrigable then?

9      A  Irrigable.

10      Q  Of your total irrigable acreage you say that 8.3% is

11  irrigated?

12      A  Yes.

13      Q  And in regard to the irrigable lands, did you take into

14  consideration source of water at all in that calculation?

15      A  Only in the sense that the irrigated acres must have

16  a source of water.

17      Q  What about the irrigable in arriving at your 8.3?  Did

18  you take into consideration source of water in that?

19      A  In the sense that it is represented by the combination

20  of the two figures, irrigable and irrigated.

21      Q  And when you took your term "irrigable" you were viewing

22  that land as being irrigable within the Santa Margarita River

23  watershed, were you not?

24      A  That is right.

25      Q  Did you take into consideration the economic feasibility

P 28

1   of irrigating that land?

2   A  I didn't do it any more than would be done with any of

3   these Office of Ground Resources reports.

4   Q  In other words, you did not?

5   A  Economic feasibility?

6   Q  That is right.

7   A  I did not.

8   Q  So when you say that 8.3% of your lands are irrigated,

9   you didn't take into consideration possible sources of water

10   at all, did you, for the irrigable lands?  Did you answer?

11   A  I heard the question.

12   MR. VEEDER:  He is thinking.

13   THE WITNESS:  Not other than the fact that I am familiar

14   with the ranch and there are sources of water on the ranch.

15   BY MR. VEEDER:

16   Q  And you believe there is water available to irrigate

17   all this land up in Block No. 2 on Exhibit C?  Are you saying

18   there is adequate water to irrigate that land?

19   A  Probably by taking water from the Pauba Valley and

20   putting it on 2 you would have plenty of water for 2, if that

21   is what you mean.

22   Q  In other words, though, you would dry up some acreage

23   to irrigate the land in Block No. 2; isn't that right?

24   MR. STAHLMAN:  I object to the question as being argument-

25   ative your Honor.

P 29

1    THE COURT:  It is argumentative.  Sustained.  That was

2    the import of the witness' answer.  Let's go ahead.  We are

3    not making much progress.

4    BY MR. VEEDER:

5        Q  Would that also be true, your response to my last

6    question, that you would have to take the water away from the

7    Pauba land to irrigate lands in Block No. 2?

8        MR. STAHLMAN:  Just a moment.  I object to the question

9    as assuming facts not in evidence.  That is not what he said.

10       MR. VEEDER:  Your Honor, that is what I thought you said

11   he said.

12       THE COURT:  He didn't say you would have to do it, but you

13   could do it.  The objection is sustained.

14   BY MR. VEEDER:

15       Q  Do you have enough water to irrigate more than 2500

16   acres at the present time, Mr. Wilkinson?

17       MR. STAHLMAN:  I don't know whether he can answer that

18   question or not.  We haven't decided yet whether there is

19   280,000 acre feet of water under this land.  If there is, it

20   is obvious that whether he says he can or can't, if that finding

21   is made -- it calls for a legal conclusion and can't be made

22   until all the evidence is in.  Mr. Veeder is contending, on the

23   other hand, that there is 280,000 acre feet of water under that

24   land.  If that quantity of water is in that area, I assure you

25   that there is sufficient water to irrigate all of the land.

P 30

1        THE COURT:  Overruled.

2        The question is, do you have?  I take it you mean the

3   present water that is developed.

4        THE WITNESS:  Our present developed water resources are

5   not adequate to irrigate all of the land that we have under pipe-

6   line at the present.

7   BY MR. VEEDER:

8        Q  And your presently developed water resources are not

9   adequate to irrigate the lands in Block No. 2; isn't that correct?

10       A  I wouldn't say that, Mr. Veeder.  We could take the

11  water to Block No. 2, if we wish to.

12       Q  Do you have a system to take it there?

13       A  No.  You could take it there.

14       Q  So your answer to my question is no, that your present

15  developed system is not adequate to irrigate the lands in Block

16  No. 2; isn't that right?

17       MR. STAHLMAN:  I object to that.  It is not even an question.

18  The answer speaks for itself.

19       THE COURT:  Sustained; argumentative and repetitious.

20  BY MR. VEEDER:

21       Q  It is true, is it not, that your present system for

22  the irrigation of lands on the Vail Ranch is not such that you

23  can irrigate the lands in Block No. 2 of Vail's Exhibit C?

24       A  If you mean the physical pipeline or wells developed

25  in that area, we do not have the capabilities of irrigating

'P 31

that Block No. 2.

Q   And that is true in No. 5; is it not, in Block No. 5 of Exhibit C?

A   That is true.

Q   And that is true in 7, is it not?

A   That is true.

Q   And that is true in 10, is it not?

A   That is true.

Q   It is true in 14, is it not?

A   No, it is not true in 14.

Q   Is there some in 14 that is presently irrigated in the Pauba?

A   There is.

Q   Would you come here for a moment.  I can't tell from your exhibit the upper extremity of the lands that are irrigated in 14.

A   Generally, in Lots and surrounding Lots 47, 35, 16,5, 4, 3.

Q   But you would say that the Lots 15, 34; is that right?

A   That is right.

Q   Along that line?

A   They have not been irrigated.

Q   In 14 they are not?

A   They have not been.

Q   In regard to 13, the only lands that are irrigated in

P 32

1   13, it is correct, is it not, is the August Canterini property?

2       A   That is right.

3       Q   And that is owned by the Vail Company?

4       A   There/other portions of 13 that have been irrigated.
            *are*

5       Q   What is the acreage in there that have been irrigated?

6       A   I have to refer to another map, but it is designated

7   in the pink area 1 and in the area adjoining that and the area

8   by J. E. Roripaugh's property.

9       Q   Now, in regard to the J. E. Roripaugh property, just

10  from your personal observation and as an engineer would you

11  not say that those lands are in a better position to be irrigated

12  than any of the lands in 2, 5, 7 and 10, just from the physical

13  location?

14      A   They have a developed water supply on them, if that is

15  what you mean.

16      Q   And do they not lie better?

17      A   For what crop?

18      MR. STAHLMAN:  What does this prove?  Some land is better

19  than the other.  Go to any piece of property and this is the case.

20      THE COURT:  Overruled.

21      The witness has inquired, lie better for what crop?  Make

22  the question more certain.

23  BY MR. VEEDER:

24      Q   For the irrigated pasture?  Isn't it irrigated pasture

25  you have down there?

1    A    Adjoining the J.E. Roripaugh, the Shamel Ranch

2  irrigate the side hills that are a lot steeper than the area

3  into, 5, 7, 10.

4    Q    But they have developed water supply up at Shamel?

5    A    They have a developed water supply at Shamel.

6    Q    Have you investigated what you have an available

7  water supply in 2 for the purposes of irrigating that land?

8    MR. STAHLMAN:  That is objected to having been asked and

9  answered, your Honor.

10    THE COURT:  Overruled.

11  BY MR. VEEDER:

12    Q    You have not?

13    A    We have a Well up there.  As to it's potentiality,

14  I do not know.

15    Q    Have you run a test on it to see whether you can use

16  it for irrigation?

17    A    Not other than to test it by the driller when he
                                with
18  drilled the well/cable tools and bail.

19    Q    What did that show, do you recall?

20    A    He couldn't bail it out.

21    Q    In other words, in your view, there is a supply of

22  water up there; is that right?

23    A    I do not know of what size the supply is.

24    Q    Have you made any investigations in regard to 5 from

25  the stand-point of the sources of water?

14,248

1    A    I have made no investigations other than the fact

2  that we do have wells and springs in the area.

3    Q    Reviewing your Exhibit No. C, could you locate on C

4  where those Wells are?  Where Mr. Kunkel says they have a

5  sluggish response?

6    A    Perhaps.  I will see.  The Wells are generally at

7  the intersection of Blocks 5, 6, 7, 8 and 10.

8    THE COURT:  In Long Valley?

9    THE WITNESS:  In Long Valley, your Honor.

10  BY MR. VEEDER:

11    Q    What is the Section, Township and range of those?

12    A    That is part of the Grant.  There is one section -

13    Q    Could we have the State Numbers on those?  It is

14  27 R 1 and 26 N 1; is that nor correct?

15    A    I believe so.

16    Q    Township 7 South Range 2 West?

17    A    I believe you are right.

18    Q    And based upon your experience in operating this

19  ranch,    you believe there is a ground water supply available

20  for the lands in that area?

21    A    Ground water supply is adequate for our needs.

22    Q    For the purpose of irrigating those lands?

23    A    I have made no investigation.

24    Q    You don't know?  Are there any of the lands, for

25  example, in 2 which overly resídium?

1      MR. STAHLMAN:  He is not a geologist.  I don't know if

2  you want to qualify him.

3      MR. VEEDER:  Lets take a look at Exhibit 15-E.

4      MR. STAHLMAN:  Can't that be done by comparing the Tables,

5  your Honor.  Why would he have to ask this witness that?

6      THE COURT:  Most of 2 is in the residium, according to

7  the Exhibit.

8  BY MR. VEEDER:

9      Q    Would you take a look?  Can you generally locate 2

10  on 15-E?

11      THE COURT:  Exhbiit 15 has the Vail Grant on it.  Your

12  15, from which your 15 Series was made, should have the Grant

13  Lines right on it.

14      MR. VEEDER:  Can you find that now?

15      MR. STAHLMAN:  Why not use 15 where you have it?  I think

16  it shows.

17      MR. VEEDER:  This is my cross examination.

18      MR. STAHLMAN:  I don't think it is cross examination.

19      MR. VEEDER:  Will you locate that?

20      THE COURT:  Let's use 15, Mr. Veeder.  It has the Vail

21  Grant Line on it.

22      MR. VEEDER:  Your Honor, you have drawn a line around here

23  -- a nice big red line.  This witness says there is ground

24  water up in there.  You say there is not, I would like to have

25  this witness, who has been testifying in regard to No. 2,

draw a line

14,250

1   in the area in which your Honor also drew a line, and I want to

2   have --

3        THE COURT:  We will take a recess.  Here is my copy of 15.

4   You can use this or the Clerk's copy, which shows the Vail

5   Grant line, and figure out where it is.  If you want to take

6   that kind of time, I am not going to sit around waiting for it.

7        (Recess)

8   BY MR. VEEDER:

9        Q    Mr. Wilkinson, will you join me here at 15-E.  Using

10  a brown pencil, and to the extent that Block 2 appears on 15-E,

11  would you draw a line along the Grant Line of the Vail Company?

12       MR. STAHLMAN:  Can you do it, Mr. Wilkinson?

13       MR. VEEDER:  Draw it heavy so it will show up.

14       THE COURT:  You can use this.  Exhibit 15 has the Grant

15  Line on it.

16       MR. VEEDER:  He can find the Grant Line here, your Honor.

17       THE WITNESS:  Do you wish me to put it on 15-E or on 15?

18       MR. VEEDER:  I want it on 15-E.

19       As you proceed along the North line, you have gone along

20  the corner of 2, have you not, and proceed southward to the

21  northern line.

22       THE COURT:  Here is the Grant Boundary shown here.

23       MR. VEEDER:  Just follow right along there.

24       Q    Now again, on 15-E, this is 27 R 7-4.  That is the

25  Well which    you stated was sluggish.  How did you describe

1    the Well?

2        A   I didn't describe the Well.

3        Q   How do you describe it?  Is it a good Well?

4        A   It has discrepancies in the level in comparison with

5    the levels in Well 26 N-1.

6        Q   Have you any opinion as to whether there is compart-

7    mentation there or not?

8        A   I am not a geologist.

9        Q   So you wouldn't know whether there was a mistake made

10   in regard to the stipulated judgment or not, would you, in

11   regard to the geology?

12       MR. STAHLMAN:  Let me have the question please?

13       (The Reporter read the pending question)

14       MR. STAHLMAN:  That is objected to as being immaterial

15   your Honor.

16       THE COURT:  Let him answer it, to save time.  Overruled.

17       THE WITNESS:  I am not a geologist, Mr. Veeder.

18   BY MR. VEEDER:

19       Q   Can you answer the question?

20       A   I can't answer the question.

21       Q   So you don't know whether there was a mistake or not?

22       THE COURT:  That is what he said.  Let's go ahead.

23   BY MR. VEEDER:

24       Q   Now, would you take your pencil and locate on Exhibit

25   15, using the Grant Line showing the areas of No. 2 of Vail C,

1   which does not appear on 15-E?

2      A   (Drawing) Generally, I have marked the corner of the

3   Pauba Grant Line overlying Glen Oak Valley and Tucalota, the

4   younger alluvium shown in yellow and the basement complex in

5   blue.

6      Q   Now, would you state whether any of the 30,000

7   irrigable acres which you set forth on Vail's AV overly base-

8   ment complex?

9      A   Probably as you go deep enough they all overly base-

10  ment complex, Mr. Veeder.

11     Q   Basement complex, then, as shown on 15?

12     A   Unquestionably some --

13  MR. STAHLMAN: I object to the question.  The Map speaks

14  for itself.  It is their own testimony as to what basement

15  complex.

16  THE COURT:  Overruled.  The 30,000 acres shown on Exhibit

17  AV doesn't show where --

18  MR. STAHLMAN: Very well.

19  MR. VEEDER: Do you want me to rephrase the question?

20  THE COURT:  No.  Overruled.

21  THE WITNESS:  I am sorry.  The question got past me.

22  THE COURT:  In the 30,000 acres have you included areas

23  which on Exhibit 15 are shown as blue basement complex?

24  THE WITNESS:  Unquestionably there are some areas in there

25  that are one and the same basement complex.

BY MR. VEEDER:

Q     As shown on 15?

A     As shown on 15.

Q     Now, would you state whether in the Block No. 2,
of Vail's C, whether it overlys residium as shown on 15-E?

A     Residium designated in the light grey color?

Q     That is correct.

A     Part of the residium or weathered basement complex
shows in Block 2 of the Vail C.

THE COURT:  The most southwesterly portion?

THE WITNESS:  That is right, your Honor.

BY MR. VEEDER:

Q     Based upon your investigation, do you believe there
is or is not ground water in the residium in Block No. 2?

MR. STAHLMAN:  What is this?

THE WITNESS:  As far as the geological end of it, I don't
know; but as far as the area generally, there is some water
there because we have cattle waters and windmills.

Q     Now, in regard to water development in the Long
Valley areas, has your company made any investigations as th
the availability of water for purposes of irrigation?  To
assist you, I am referring to Sections 25 and 26 and 27 in
7 South Range 2 West.

A     The Long Valley area has windmill Wells located in
the bottom of the canyon generally, what is referred to on 15-E

1    as younger alluvium.

2        Q    You didn't answer the question.  The question was

3    whether your company has made any investigation, to your know-

4    ledge, to develop irrigation water?

5        A    That is the only extent of development there is, for

6    cattle water.  They are quite suitable for that.  But their

7    potential for irrigation, we have made no investigation.

8        Q    What is the reason that you no longer irrigate the

9    Brown-Hutch field?  Do you know where that it?  Is that not in

10   Block 17?

11       A    That is right.  We have no pumps in the area.

12       Q    Was it not from the Hutch Well that you took the motor

13   that you are presently using on the Navy Well?

14       A    Yes.  That pipe line went to pieces over in the

15   Hutch, and rather than buying a new pump we moved the pump over.

16       Q    When you took that land out of retirement, did you

17   bring in other land?

18       A    Took which land out?

19       Q    The Hutch?

20       A    We retired it or took it out of retirement?

21       Q    You retired it; it is no longer irrigated?

22       A    That is right.

23       Q    Did you include that land in the 2500 acres which,

24   you say, is the maximum that you have ever irrigated?

25       A    No, I took land that was actually irrigated in that

1    one year, and we didn't irrigate any area in the Hutch in 1958.

2        MR. VEEDER:  Your Honor, in regard to Vail's AX I am going

3    to have to take some time on that.  It has not been admitted

4    as yet.  It is a tabulation showing comparisons in regard to --

5    I don't know actually where it came from.  It says "one-fourth

6    of the Temecula only plus all of the Murietta is 4010 acre

7    feet greater than one-third of the Temecula including the

8    Murietta."  Do you have that?

9        THE COURT:  Yes.  It is not in evidence yet.

10       MR. VEEDER:  I would like to reserve the right to cross

11   examine on that later.

12       THE COURT:  You may.

13   BY MR. VEEDER:

14       Q    Mr. Wilkingon, in observing the run-off of Temecula

15   Creek and Murietta Creek, do you have an opinion as to whether

16   there is such a thing as an actual average run-off upon which

17   you can rely?

18       A    Average run-offs are no more reliable than average

19   rain-falls.

20       Q    Would you answer the question?

21       MR. STAHLMAN:  I think he has answered it.

22       THE COURT:  Yes, he has answered the question.

23       MR. STAHLMAN:  I think it is obvious.

24       THE COURT:  He says they are no more reliable.  Therefore

25   he has no average.

1    MR. VEEDER:   If that is the answer, I will buy it, but

2  I want to be sure that that is the witnesses answer.

3    Q    Did his Honor correctly interpret your answer that

4  there is no such thing as an average?

5    A    There certainly is.  It is a pure figure.  It is an

6  average.  Average run-offs are no more reliable than average

7  rain-fall.  We don't know from one year to the next what we

8  are going to get in rain-fall.

9    Q    You say that you believe that you can rely upon just

10  a rough average to determine the quantity of water that is go-

11  ing to be available to you?

12    A    If the averages are over a long term and you are

13  considering a long term period, it probably would be quite

14  reliable.

15    Q    Based upon the figures you have used in computing

16  your averages, are you of the opinion that they reflect the

17  quantity of water you can rely upon year in and year out?

18    A    That would be a statistician's and hydrologist's

19  opinion.  I don't have that.  I just took the figures that are

20  available.

21    Q    So, when you talk about an average flow you don't

22  want the Court to believe then that it is anything more than

23  an arithmetic gyration; isn't that correct?

24    A    It is an arithmetic procedure.  I don't know whether

25  it is a gyration or not.

Q     But it has nothing to do in regard to the quantity of water that you can normally expect from the Santa Margarita River; isn't that true?

A     Average figures are only valuable in the sense that they are a guide to what has happened in the past, and there are variations from past performance, as we know.

Belt 19

Q     In other words, it is true, is it not, that we have a history going back to 1923, actually, of run-off measurements? Isn't that true?

A     That is true.

Q     Do you think that taking that average you could calculate on the quantity of water that would be available in 1960?

A     Not, in one particular year.

Q     Do you think you do it for a calculation for a period of 5 years?

A     It would approach it.

Q     How close?

A     I do not know.   That is a statistician's problem.

Q     So, as a matter of fact, you truely don't know what you could expect from one year to the next in the Santa Margarita from the stand-point of the yields of water; is that right?

A     I answered that, I thought, Mr. Veeder, when I said it was no more reliable than the rain-falls.

1    MR. VEEDER:  I have no further questions, reserving the

2 right to go into this other matter on Exhibit AX.

3    MR. GIRARD:  I have just one or two questions, if I may?

4    CROSS EXAMINATION

5 BY MR. GIRARD:

6    Q    Mr. Wilkinson, the Vail Company was served with the

7 complaints of the United States, the original complaint and

8 the amended complaint; is that right?

9    A    We have copies of the complaints on file.

10    Q    And you were also served the protest of the United

11 States to the State Water Rights Board when you made your

12 application for Vail Dam; is that right?

13    A    That is right.

14    MR. GIRARD:  That is all.

15    MR. STAHLMAN:  That is all.

16    THE COURT:  Step down, Mr. Wilkinson.

17    Mr. Kunkel, did you make the computations?

18    MR. VEEDER:  In that regard, your Honor, I have asked

19 Colonel Bowen and Mr. Kunkel to get together on the basis of

20 Colonel Bowen's investigation and to write me a letter and I

21 will hand that letter to you as soon as it is received. It will

22 be received very shortly, I believe.

23    THE COURT:  All right.

24    Anything further?

25    MR. STAHLMAN:  Nothing at this time.  I believe that con-

1    cludes the evidence of the Vail Estate, except as I say, those

2    matters which we know are hanging in the air.

3        THE COURT:  You have the loose end of the Report by the

4    Colonel and Mr. Wilkinson on the irrigable acreage in the

5    Santa Rosa.

6        MR. STAHLMAN:  Yes.  Also on the evapo transpiration.

7        THE COURT:  You should check your Exhibits.  You can check

8    with the Clerk at any time when he is free.  But I show the

9    following Exhibits not in evidence.  Some you may have abandoned.

10       MR. STAHLMAN:  We have abandoned some.

11       THE COURT:  Do you want the list?

12       MR. STAHLMAN:  Yes, I would to have your Honor's list.

13       MR. GIRARD:  As I understand it, as soon as Mr. Kunkel

14   and Colonel Bowen submit the information regarding the weathered

15   basement complex, all parties agree, and I am sure that Mr.

16   Sachse does, that the geology, the extent of the stream system

17   on the area shown on Exhibit 15-E is ready for submission.

18       THE COURT:  That is my understanding -- including, however,

19   the cross examination, if any, on Exhibit AX.

20       MR. GIRARD:  Yes, your Honor.  That would be primarily on

21   the stipulated judgment.

22       MR. VEEDER:  It deals almost entirely with the run-off of

23   the Temecula and the Murietta and how they are calculated.

24       MR. GIRARD:  I am not interested in run-off on this, that

25   is, surface run-off.

1      THE COURT: Mr. Girard's statement is correct.  Except

2  for these loose ends, we are through with the evidence on the

3  basin shown on Exhibit 15-E.

4      MR. VEEDER:  That is correct.

5      THE COURT:  We will argue it when you get here on August

6  11th.

7      MR. VEEDER:  Argue what, your Honor?

8      THE COURT:  You have all been wanting to argue all day

9  long.  Do you want to argue about it or not?

10      MR. VEEDER:  Argue about the geology?

11      THE COURT:  Argue about the extent of the basin, what kind

12  of findings the Court should make.

13      MR. VEEDER:  Yes, if your Honor desires that, of course.

14      MR. GIRARD:  For the purpose of clarification, I will

15  point out that the State is agreeable to the line drawn by

16  Mr. Kunkel.

17      THE COURT:  And what about the Vail judgment situation?

18  Aren't we about ready to dispose of it one way or the other?

19      MR. STAHLMAN:  I think so, your Honor.

20      THE COURT:  By interlocutory judgment.

21      Do you have any further evidence you want to present that

22  bears on the question of the Vail judgment?

23      MR. STAHLMAN:  I think it is all in, your Honor.  I think

24  really inasfar as Exhibit AX is concerned that is in the record

25  as to the stream flow figures.

1    THE COURT:  You are through, in other words, are you?

2    MR. STAHLMAN:  Yes, your Honor.

3    THE COURT:  Mr. Veeder.

4    MR. VEEDER:  I would like to make a run through what I

5    have, but I see no evidence that I will put in.  There is one

6    point that I think I touched on that I think is important, and

7    I necessarily keep my foot in the door in that regard.  If the

8    stipulated judgment is wiped out, and your Honor has indicated

9    a desire to wipe it out if he can find a way --

10    THE COURT:  Not in so many words, unless you have been

11    reading my mind, and even then I might not be sure that you

12    might have read my mind at only one particular moment and not

13    at the right moment.

14    MR. VEEDER:  I shift in and out of there more often than

15    you think, your Honor.

16    The matter of whether these lands can be economically

17    irrigated is a point, on the 30,000 acres of land.  That is a

18    tremendous slug of land, if I may be so bold, and it may be

19    that there will be other evidence having nothing to do with

20    the stipulated judgment but nevertheless evidence upon which I

21    would choose to rely in seeking to have the Vail Company reg-

22    ulated in their use of water if the stipulated judgment is

23    washed out.  That is a point that is important, and we necessar-

24    ily have to reserve the right to proceed along that line.

25    THE COURT:  Did Colonel Bowen give testimony as to the

1   number of irrigable acres?

2      MR. STAHLMAN:  Yes, your Honor.

3      THE COURT:  He spot-checked the Coit survey as to the

4   acreage.  Did he spot-check it as to irrigable acreage?

5      MR. GIRARD:  I think he said it was accurate to within

6   10%.

7      MR. STAHLMAN:  No, he said he spot-checked and that it

8   was reasonably accurate.  I have prepared a memorandum on that

9   some time ago.  That is in the file.  Not this last one, but

10  one previous, analyzing all of the testimony of Mr. Coit,

11  Colonel Bowen, Mr. Hall and Mr. Wilkinson, who gave evidence.

12     THE COURT:  Mr. Veeder was to prepare one.  Did you also?

13     MR. VEEDER:  We sent you the memorandum on that, your

14  Honor.

15     THE COURT:  I haven't had time to look at either one of

16  them.

17     MR. VEEDER:  May I just touch on one thing, George?

18     MR. STAHLMAN:  You are always first.

19     MR. VEEDER:  I thought I was, but you were talking at the

20  moment.

21     MR. STAHLMAN:  Well, any moment you'll be the one who is

22  talking.  Go ahead.

23     MR. VEEDER:  The point of it is, your Honor, that we desire,

24  with the cooperation of the Vail Company, and they have agreed

25  to it, to place a recorder on the Pen Well where it was before.

1   It is in connection with the Querry operation, which is a

2   matter that I think is immediately related not only to the

3   stipulated judgment question but the question to which I made

4   reference in regard to Regulation in the event the stipulated

5   judgment goes out.

6   THE COURT:  I think there should be a conference between

7   Colonel Bowen, Mr. Wilkinson, Mr. Stahlman and you, Mr. Veeder,

8   if you want to sit in, or one of your Engineers, on this

9   matter of the 30,000 acres of the Vail property which is con-

10  tended to be irrigable, having in mind still some sort of

11  cataloging of a group of these problems.  It is pretty obvious

12  the ground in the Valley is in Class I.  It is irrigable land

13  and has been irrigable.  There may be another portion of that

14  ground that would be reasonably susceptible under irrigation

15  with some slight extension of the system, etc.  There are other

16  portions of it that I have no doubt appear in such small pieces

17  and are so remote that from a practical stand-point it is

18  probably illusory.

19  MR. STAHLMAN:  Shouldn't the same thing be done to

20  Pendleton then?

21  THE COURT:  Yes, I think it should be done on both sides.

22  I think it would be worth while to set down and talk about it.

23  You may come up with some reasonable understanding on it.

24  MR. VEEDER:  I think that, your Honor, is one of the points

25  I tried to touch on with Mr. Wilkinson on Cross Examination.

1    I think it is something that must be done.  You directed me to

2    do that with regard to other lands.  I think it is applicable

3    throughout the Valley, and we will have such a conference.

4         THE COURT:  Now here are the Exhibits that I show not in

5    evidence.

6         MR. VEEDER:  You have no objection to the Pen Well matter?

7         THE COURT:  No.

8         Mr. Clerk, will you follow the list of Exhibits?

9         MR. STAHLMAN:  He has B not marked in, but we checked the

10   record and it shows it to be admitted.

11        THE COURT:  I show B not in evidence.  I will just run

12   through them.  The Clerk check me and you find out later where

13   you are.

14        E not in evidence.

15        G.

16        H.

17        I-1 is for identification only.

18        MR. WILKINGON:  6-2-59 it was received in evidence, your

19   Honor.

20        THE COURT:  I is in evidence.

21        Is I-1 in evidence, Mr. Clerk?

22        THE CLERK:  I is in evidence.

23        THE COURT:  What about I-A?

24        THE CLERK:  I-A is not in evidence, your Honor.

25        THE COURT:  For identification only?

1      THE CLERK:   Yes, Your Honor.

2      THE COURT:   You can find out later what they are.   I just

3  want to run through them.

4      I show AA not in evidence.

5      AF apparently I directed might be withdrawn on May 29,

6  1959.

7      THE CLERK:   AF was withdrawn, your Honor.

8      MR. STAHLMAN:   That was the Taylor Map you recall.

9      THE COURT:   I show AJ, Mr. Hall's testimony, was copies

10  into the record, so it didn't go in as an Exhibit.

11     MR. STAHLMAN:   It was admitted, and it was copied both.

12     THE COURT:   It didn't go in evidence as an Exhibit, but

13  it was copied.

14     MR. STAHLMAN:   It doesn't make any difference.   It is in

15  the record.

16     THE COURT:   I show AL not in evidence.

17     MR. STAHLMAN:   That Map, I think, should be in evidence,

18  the old Map that was in the first case.   I thought we put that

19  in evidence, if that is the Map.

20     MR. GIRARD:   There was some question whether you wanted

21  to put in evidence.

22     MR. STAHLMAN:   The old Map we brought over from the State

23  Court that showed the geology, if that is the Map.

24     That is merely the same thing.   That is a copy of the Map

25  AQ, your Honor.

1    THE COURT:  You are not going to offer it then?

2    MR. STAHLMAN:  It doesn't add anything to the case.

3    THE COURT:  All right, not to be offered.

4    Then I show next, not in evidence AU, which we discussed

5    today or yesterday.  That was these evaporation studies.

6    Then AX not in evidence.

7    I show the rest of them in evidence.

8    MR. STAHLMAN:  Very well, your Honor.

9    THE COURT:  Is that what your record shows, Mr. Clerk?

10    THE CLERK:  Yes, your Honor.

11    MR. STAHLMAN:  Your Honor, there are 3 Exhibits we would

12    like to withdraw for the purpose of making copies; 160-A,

13    160-B and 160-C.

14    THE COURT:  Any objection?

15    THE CLERK:  I have one other Exhibit that I show marked

16    for identification only, AD Monthly Acre Feet Temecula-Santa

17    Margarita River.

18    THE COURT:  Yes.

19    Is there any objection to these being withdrawn for the

20    purpose of making copies?

21    MR. VEEDER:  Not at all, your Honor.

22    THE COURT:  All right, make a note, Mr. Clerk, and see

23    they get back.

24    THE CLERK:   Yes, your Honor.

25    THE COURT:  AD also shows as being marked for identification

1    only.

2         MR. WILKINSON:  It went in evidence 5-28-59, your Honor.

3         THE CLERK:  I have a stamp showing that it was admitted.

4    However, I have marked that out.

5         MR. STAHLMAN:  We found in the transcript that it was in.

6    We offer it at this time.

7         MR. GIRARD:  Maybe it was withdrawn to be corrected, if

8    he had it marked in and then marked it out.

9         MR. STAHLMAN:  It was corrected and then brought back in.

10   I recall that.

11        MR. WILKINSON:  I don't believe that was corrected.

12        MR. STAHLMAN:  No, I am thinking of something different.

13   I don't know of any reason why this should not be in.

14        THE COURT:  Any objection to AD?

15        MR. GIRARD:  None, your Honor.

16        THE COURT:  AD received in evidence.

17        MR. VEEDER, have you checked your Exhibits?

18        MR. VEEDER:  I have checked my Exhibits and I have asked

19   the Clerk and the Reporter to prepare for us an official set

20   of index of all Exhibits and of all Witnesses, with the request

21   that the Volume and Page Number where they are referred to be

22   prepared.  I think that will be helpful to everyone.

23        MR. GIRARD:  It certainly would.

24        MR. VEEDER:  And they will do it.

25        THE COURT:  Here is a loose end on my desk.  The Ramsey

1     Well Log should go into the Exhibit on Well Logs.

2          MR. STAHLMAN:  Yes.

3          THE COURT:  It was 16-A.  Do you give those a number, Mr.

4     Clerk?

5          THE CLERK:  No, your Honor.  They have just been adding

6     on to 16-A.

7          THE COURT:  The Ramsey Well Log will be received in

8     evidence.

9          THE CLERK:  Your Honor, I was missing an Exhibit, and Mr.

10    Veeder and the attorneys have been checking on it.  I think I

11    have located it.

12         THE COURT:  What is it?

13         THE CLERK:  Government's Exhibit 29-R, Topographic Map

14    of Vail Lake.  Just called Mr. Grover and he thinks he has it.

15         THE COURT:  All right, gentlemen, you are coming back,

16    are you, on August 11th and 12th?

17         MR. GIRARD: Yes, your Honor.  As I understand, those 2

18    days will be devoted to arguement primarily, is that correct?

19         MR. VEEDER:  Also for the water users in Upper Murietta

20    and Warm Springs Creek to the extent that we have Engineering

21    Reports and data.

22         MR. STAHLMAN:  Then, the Schloss Estate is set.

23         THE COURT:  Yes.

24         MR. STAHLMAN:  In connection with the Schloss Estate, I

25    understand that the Attorney General has filed an action to

1    take over the Estate.

2         MR. GIRARD:  We are not appearing in this, your Honor.

3         THE COURT:  Also, I received a brief from Mr. Lincoln, in

4    which he objects to any tampering with the original judgment

5    or the stipulated judgment.  It is a little hard for me to

6    follow.  He has joined your side of the case, Mr. Veeder.

7         MR. VEEDER:  I am glad I am not alone.

8         MR. STAHLMAN:  Mr. Veeder is in good company, or Mr.

9    Lincoln is.

10         (Adjournment until August 10, 1960 at 10:00 AM)