# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

—  —

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:       San Diego, California

Date:        August 30, 1960

Pages:  14,270 to 14,309

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1
Belt 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - - -

UNITED STATES OF AMERICA,)
           Plaintiff, )
                )
   vs            )      No. 1247-SD-C
                )
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al.,     )
                )
         Defendants.)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, August 30, 1960

APPEARANCES:

FOR THE PLAINTIFF:          WILLIAM H. VEEDER, ESQ.,
                            Special Assistant to
                            the Attorney General,
                            Department of Justice,
                            Washington, D.C.
                            LCDR. DONALD W. REDD

FOR THE DEFENDANTS:

   For Defendant Fallbrook Public    FRANZ R. SACHSE, ESQ.,
   Utility District, et al.

   For Defendant Vail Company       GEORGE STAHLMAN, ESQ.
                                EARL K. STANTON, ESQ.

   For Defendant State of         STANELY MOSK, ESQ.,
   California                    Attorney General,
                            By FRED GIRARD, ESQ.,
                            Deputy Attorney General.

1    APPEARANCES (continued)

2        FOR THE DEFENDANTS (continued)

3        For Defendants in                    ARTHUR L. LITTLEWORTH,
         Roripaugh Area                       ESQ.,

4

5                                             JOHN CRANSTON, SPECIAL
                                              MASTER.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 39

# INDEX TO WITNESSES

| For the Plaintiff | D | Voir Dire |
|---|---|---|
| Colonel A. C. Bowen | 14,288 (Veeder) | |
| | | 14,294 (Sachse |
| | | 14,295 (Girard) |

# INDEX TO EXHIBITS

| Plaintiff's Exhibits | Iden. | In Evidence |
|---|---|---|
| 263 Smith Engineering Report | 14,288 | 14,289 |
| 265 A thru G, Incl. Quadrangles - | 14,292 | 14,297 |
| portion of Wildomar | | |
| 264 - Curtis, Engineering Report | 14,297 | 14,298 |
| 266 - Cummins, | 14,300 | 14,301 |

14.273

P 2

1   SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 30, 1960, 10:00 A. M.

2        (Other matters)

3        THE CLERK:  12-1247-SD-C United States vs. Fallbrook, et al.

4   Hearing motion of Schloss for substitution of attorney on further

5   court trial.

6        THE COURT:  The Schloss motion has to go over because Mrs.

7   Bates has gone to Europe or Asia or somewhere and her associate

8   asked that it be continued.  I see Mr. Lincoln here.  I thought

9   you knew about this.  You got a copy of the letter?

10       MR. LINCOLN:  Yes, your Honor.  We have no objection.

11       May I respectfully suggest that I had a letter from an

12   associate of Mrs. Bates in which he stated that she probably

13   would not return until sometime in the middle of September.

14   We could carry this over until October.  It might meet the

15   calendar better.

16       THE COURT:  What is the next date we have set?

17       MR. VEEDER:  We haven't a date set, your Honor.  If you

18   would entertain a proposal, I would like to make one in regard

19   to the next date.

20       THE COURT:  Would you get my calendar, Mr. Swader.

21       (John Swader, the Court Reporter, leaves the courtroom to

22   get the Judge's calendar and returns.)

23       THE COURT:  Do you suggest the week of October 25th?

24       MR. VEEDER:  Well, yes.  Is that a Monday?

25       THE COURT:  Monday is the 24th.  Tuesday is the 25th.

P 3

1     MR. VEEDER:  That would be the week of the 25th.

2     THE COURT:  Is the 25th of October agreeable?

3     MR. SACHSE:  For how many days is your suggestion?

4     MR. VEEDER:  I would suggest two days, as we have this

5 time.  We find that in two days we can run through as many as

6 Colonel Bowen can get prepared.

7     MR. SACHSE:  I have no objection to the date.  The date is

8 eminently satisfactory.  But I am hopeful that your Honor will

9 shortly make some sort of order for the future conduct of the

10 trial as to the people I represent.  This situation, as I

11 understand it, is that the State of California has rested,

12 Fallbrook has rested, I have rested as to every single individual

13 client I had, I believe Vail has for all intents and purposes

14 rested except for one matter that Mr. Wilkinson and Colonel

15 Bowen are ironing out.  And I think we ought to know where we

16 are on the aspects of this possible rebuttal to our own cases,

17 and I think it would be appropriate to make some sort of direct-

18 ion as to what the future conduct of the trial on that score

19 is going to be, whether we are confronted with rebuttal and not

20 have to await indefinitely the pleasure of the United States

21 while it monkeys around with a couple of watershed holdings.

22 I am hopeful that some of them may be utterly unnecessary when

23 your Honor today or tomorrow rules on the extent of the stream

24 system.  I, personally, would feel that your Honor's ruling as

25 to ground waters in residuum or basement complex, if made on

P 4

1   the Murrieta according to a certain pattern, I would assume this

2   pattern would be more or less the same on the Temecula, and it

3   may well be that a great deal of this consideration of these

4   individual areas will be absolutely unnecessary.  I would hope

5   so.  I would like to see this taking of evidence over by the

6   end of the year.

7        MR. VEEDER:  If I may respond to Mr. Sachse on that prop-

8   osition.  Certainly we are pressing as hard as we can.  Colonel

9   Bowen and his staff are to be complimented on the work they

10  have been doing.  The idea offered by Mr. Sachse that your

11  Honor's ruling in regard to the residuum and in regard to the

12  basement complex would eliminate the necessary progression the

13  way we are progressing is fantastic.

14       THE COURT:  You misunderstand his point entirely.  I don't

15  think you really misunderstand it.  You don't want to understand

16  it.  The point is this.  If the Court rules that any water found

17  in the residual and the basement complex is not part of the

18  stream system, he doesn't have to be here.  You can go on for

19  the next year if you want to put on proof on some of these

20  small pieces of ground etc.  It wouldn't affect the other de-

21  fendants.

22       MR. VEEDER:  I truly am desirous of understanding what he

23  says, your Honor.

24       THE COURT:  Isn't that it?

25       MR. SACHSE:  That is exactly it, your Honor.

P 5   1        MR. VEEDER:  Say it that way then.

2          The reason I am bringing this point up is that a man came

3    to my office yesterday and said, "I understand you are dismissing

4    a lot of people out of the lawsuit."  I said, "I don't believe

5    anybody is being dismissed out."  He said, "What about this

6    ground water?"  The fact remains that under the mandate of the

7    Court of Appeals of the Ninth Circuit I have the responsibility

8    of presenting to your Honor, I believe, --

9          THE COURT:  We are going to have to find on all of the

10   ground in the watershed.  But can't we wipe a lot of it out

11   with a broad stroke?

12         MR. VEEDER:  I don't believe we can wipe a lot of it out

13   with a broad stroke.  I think you can say in regard to the

14   residuum in particular areas and in regard to the basement com-

15   plex generally that there is no ground water.  The thing I

16   except to is the Fallbrook publication to the effect that these

17   people are all out, and then they come in and say to me, "We

18   are through, aren't we?"

19         THE COURT:  Let's get off the subject of how Fallbrook

20   handles its press relations.  The point is what are we going to

21   do about this back part of the watershed where obviously there

22   is not any water in there that is part of the stream system?

23         MR. VEEDER:  Any ground water, your Honor.

24         THE COURT:  Yes, any ground water.

25         MR. VEEDER:  Thank you.

P 6

1      THE COURT:  Nobody talks about the surface water.  We know

2  the Government's position on that.  Nobody disputes it.

3      MR. VEEDER:  Fine.

4      I would like to call Colonel Bowen to the stand today and

5  show the procedures we are following in regard to the Warm

6  Springs Creek and Upper Murrieta.  I think your Honor should

7  see what we are doing and the procedures we have had to adopt.

8  I think that would be important.

9      THE COURT:  Specifically, let's respond to Mr. Sachse's

10  suggestion.  He is going to argue, I understand, that the Court

11  make some finding on the extent of the stream system.

12      MR. VEEDER:  I understand he is going to argue in regard

13  to the extent of the ground water within the stream system.

14      THE COURT:  Maybe a little of both.

15      MR. VEEDER:  He will argue both sides.  But the point I

16  am trying to make is that as long as he sticks to the ground

17  water I have very little disagreement with him.  I may regret

18  that statement.

19      THE COURT:  Do we have to fix this date now?  Can we fix

20  it today or tomorrow, Mr. Lincoln?  Are you going to attend

21  these hearings anyhow, or are you going to leave?

22      MR. LINCOLN:  Some of them I may attend.  Some of them I

23  may not.

24      MR. SACHSE:  I have no objection, to make it easy for Mr.

25  Lincoln.

P 7

1    THE COURT:  Thursday, the 27th of October.

2    MR. VEEDER:  27th and 28th is that right?

3    MR. SACHSE:  That, as I understand it, your Honor, then

4 still leaves open for consideration today and tomorrow whether

5 we go on more than two days?

6    THE COURT:  Yes, whether we go on this week more than two

7 days.  Let's see how far we get along.

8    So the Schloss matter is continued to the 27th and the case

9 will be continued to that date also.

10    Is there any change in the status of the matter in the

11 State Court?  Is there a row between yourself and Mrs. Bates?

12    MR. LINCOLN:  The only change, your Honor, is that two days

13 ago for the first time I received the reporter's transcript

14 which had been ordered.  Consequently, we are working on that

15 in an effort to complete the appeal.

16    MR. GIRARD:  I might add, your Honor, that the State of

17 California has filed a petition to have the land revert to them

18 under the trust originally.  But as far as this suit is concerned,

19 we are very happy to have you try it.

20    THE COURT:  This reversion is in the State Court, I take

21 it?

22    MR. GIRARD:  Yes, I think under the original trust if there

23 weren't some conditions it reverted to the State.  I don't know

24 the status of that case at all.

25    THE COURT:  What is your schedule for subject matters to

P 8

1   be discussed this morning?

2       MR. STAHLMAN:  Your Honor, may I make a correction of the

3   transcript at the last hearing before we go into that?

4       THE COURT:  Yes.

5       MR. STAHLMAN:  In Volume 123, page 14,122, lines starting

6   at 1, there is a question and answer there that is completely

7   out of context, and the question reads -- this was my examina-

8   tion of Mr. Kunkel:

9       "Q  And of course then two and two is four; since the

10  building of Vail Dam none of the   storm waters were lost into

11  the ocean, is that correct?"

12  It should read "none of those storm waters," because we are

13  referring to the previous questions in which we were talking

14  about the storm waters behind Vail Dam.

15      THE COURT:   You want to change "these" to "those"?

16      MR. STAHLMAN:  Yes your Honor.  And the answer is:

17      "A  That is correct.  Waters impounded behind Vail Dam

18  were lost into the ocean."

19  It should be "were not lost into the ocean."

20      THE COURT:  Insert the word "not," and change "these" to

21  "those."

22      What is the schedule now?

23      MR. VEEDER:  I intend to call Colonel Bowen in regard to

24  the people who have been notified that their engineering reports

25  have been completed, and we would offer those in evidence and

P 9   1     then offer the irrigable and irrigated acreages for the Rawson

2     Estate.

3     THE COURT:   Then where do we go?

4     MR. VEEDER:   Then we have some of these housekeeping matters

5     in regard to the people who have been notified as to the inter-

6     ogatories of Fallbrook.

7     Then I would assume that we would argue on the stipulated

8     judgement.  Isn't that right? Are you ready on that, George?

9     MR. STAHLMAN:  Yes, we are ready.

10     MR. VEEDER:  Then I think we would devote ourselves to that.

11     THE COURT:  Are you prepared to argue some of the problems

12     involved in some of these areas up on the Temecula after we

13     argue the stipulated judgement?

14     MR. VEEDER:  What does your Honor mean?

15     THE COURT:  Well, we have taken the evidence on Gibbon

16     and Cottle and Stardust.  I understood that some of them were

17     prepared to argue those problems to see where we stood.

18     MR. VEEDER:  Frankly, I didn't expect to argue Gibbon and

19     Cottle.  But I am ready to.

20     MR. LITTLEWORTH:  Mr. Grover, who represents them, isn't

21     here, your Honor.

22     MR. VEEDER:  Mr. Grover called me last night and asked me

23     what I thought was going to be up today, and I didn't think

24     there would be argument on that.  I asked him for data in re-

25     gard to preparation of the findings on his case.  I talked to

P 10   1   Mr. Sachse yesterday.  Didn't you talk to Mr. Grover, Mr. Sachse?

2   MR. SACHSE:  I talked to Mr. Grover last night.

3   MR. VEEDER:  I didn't realize that Mr. Grover was --

4   THE COURT:  I don't remember how far we expected to go.

5   Maybe we have enough to do here.

6   MR. VEEDER:  I had thought that today and tomorrow would

7   be the extent of the hearings for this time.

8   THE COURT:  I maybe be able to give you more time this

9   week.

10   MR. VEEDER:  I have a hearing in Seattle before Judge

11   Lindberg on Friday.

12   THE COURT:  You could be here Thursday?

13   MR. VEEDER:  I will be here as long as I can.

14   THE COURT:  Let's take up the first thing you have listed.

15   MR. SACHSE:  As I understand it -- I have the transcript

16   before me -- your Honor's direction to Mr. Veeder prior to the

17   11th and 12th of this month, which was the original date for

18   the hearing:

19   "THE COURT:  You get me the list of names, areas, size of

20   wells.  Let's get the whole dope together and have it before

21   August -- what day is it we are going to be back?

22   "MR. VEEDER:  11th and 12th.

23   "THE COURT:  Serve copies on counsel."

24   This was the conclusion of the lengthy discussion between your

25   Honor, Mr. Veeder and others of us on this question, where was

P 11    1    Mr. Veeder going to seek apportionment, and your Honor stated:

2    "..I am going to require you to go through this record and

3    submit me a list of those land owners who on the basis of the

4    present record you think are using/unreasonable amount of water
                                                   an

5    to the extent that you would ask apportionment as to them, and

6    submit to me their names, the acreage that they have, how many

7    inches that they are pumping, all of the pertinent data as to

8    each one of them."

9    That was very specifically by the transcript set for this hearing

10    of the 11th and 12th, this being that continued hearing.

11    Furthermore, it was my understanding that the second major

12    issue on today's hearings was the argument, if your Honor desired

13    argument, on the most recent United States large scale exhibit

14    of the Murrieta watershed.

15    MR. VEEDER:  15E, Franz.

16    MR. SACHSE:  Exhibit 15E.  Your Honor at the close of our

17    last hearing, perhaps off the record, approached the exhibit

18    and discussed informally with counsel how you contemplated de-

19    lineating the areas within which you would hold the ground water

20    to be part of the stream system.  I understood that was one of

21    the principle subjects for these two days hearings.  And I

22    hope it is.  I came here very much interested in that subject,

23    and I strongly urged Mr. Krieger to be here for that reason and

24    I see that Mr. Littleworth is here.

25    MR. VEEDER:  In regard to the matter of where, in my view,

P 12

1  there is an overdraft by the water users, I have prepared a

2  list in the Wilson Creek area and in the Temecula Creek area

3  of all the land owners, and I have had prepared maps with over-

4  lays showing the exterior boundaries of those properties.  The

5  data that I have prepared I would tender your Honor, I had hoped,

6  and to counsel more or less informally, because as I understood

7  your direction there was no requirement other than to tender to

8  you the area in which I was interested, and secondly to show

9  to your Honor where those properties are situated.  I discussed

10  this with Mr. Sachse yesterday, showed him the overlays and the

11  maps, brought to his attention that large area of this Aguanga

12  and Lancaster valleys, particularly where his Stardust properties

13  are situated, his older alluvium, and frankly I would rather

14  have it more or less an informal discussion with your Honor of

15  a pre-trial character in regard to this area than to go ahead

16  on the basis of an over-all argument.

17     I hadn't anticipated -- I am perfectly willing to go any

18  way your Honor directs on these matters.

19     THE COURT:  The point involved is that you a month or so

20  ago for the first time in the record indicated you were going

21  to ask some apportionment of some sort.

22     MR. VEEDER:  I think the word is "regulation," your Honor.

23     THE COURT:  All right, regulation.  This was what started

24  all this.  So I had asked you to prepare some material so we

25  could see whether I was even going to let you go into it or not.

P 13  1       MR. VEEDER:   Here is the material.

2       MR. SACHSE:   This is a list of all the land owners and all

3  the lands in the Temecula watershed.   That is not the material

4  your Honor asked for.   Your transcript states specifically --

5       MR. VEEDER:   Mr. Sachse, that is a misstatement.

6       MR. SACHSE:   Do you mind if I read this to the Court?

7     "THE COURT:   You had better/yourself some boys, because I

8  am going to require you to go through this record and submit me

9  a list of those land owners who on the basis of the present

10  record you think are using an unreasonable amount of water to

11  the extent that you would ask apportionment/to them, and submit

12  to me their names, the acreage that they have, how many inches

13  they are pumping, all of the pertinent data as to each one of

14  them."

15  Then there is more colloquy.

16     "THE COURT:   Don't tell me now.   I want the thing in

17  writing.   I want the names of the owners, who their attorney

18  is, how many acres of ground they own.   It can be described on

19  Roripaugh's B by parcel numbers..."

20  More colloquy.

21     "THE COURT:   You have got the burden.   I am not going to

22  pass on this, but I think you are inaccurate in your statements.

23  You have assured this Court you were not going to seek apportion-

24  ment, and now you say you are going to."

25  And so on, and what I read at the end.

P 14   1        He has not submitted to me --

2          THE COURT:  The purpose of this was to see exactly what

3     your suggestion amounted to.

4          MR. VEEDER:  That is right.

5          THE COURT:  You haven't done it.

6          MR. VEEDER:  But your Honor, from my standpoint, I have

7     followed the directions as sensibly as they can be made.  The

8     point of it is that in regard to Stardust, for example, which

9     is Mr. Sachse's client, you can locate the exterior boundaries.

10         THE COURT:  We are specifically interested in who are these

11    people as to whom you are going to seek regulation.  You know

12    what we talked about.

13         MR. VEEDER:  I do.

14         THE COURT:  Who are they?  They are not all of the people.

15    You are not intimating that all of the users in the watershed --

16         MR. VEEDER:  No sir.

17         THE COURT:  Who are they?

18         MR. VEEDER:  Mr. Sachse just made a complete misstatement

19    to your Honor when he said that this list that I have is all

20    of the land owners.  This doesn't relate to all of them.  I

21    have very definitely and very specifically defined the areas

22    where I believe -- the Gibbon and Cottle areas.  Would your

23    Honor care to look at these maps and the overlays?

24         MR. SACHSE:  You haven't done it on the Murrieta, which

25    is the case before us now and which is the case the argument

P 15   1   was over.

2   THE COURT:   I understand the material you have supplied

3   applies only to the Temecula.

4   MR. VEEDER:   It applies to the area -- of course, I shouldn't

5   get angry -- the area immediately above Vail Dam is the area

6   concerning which I was making the statement and concerning which

7   I said I thought there is evidence immediately in the record

8   showing that there is more --

9   THE COURT:   The material you have prepared then refers to

10   Temecula?

11   MR. VEEDER:   That is correct.

12   THE COURT:   Have you prepared anything similar on the

13   Murrieta?  Or aren't you going to make that contention on the

14   Murrieta?

15   MR. VEEDER:   From my standpoint, I have been looking at

16   the Roripaugh uses in there.  As I said into the record to your

17   Honor at the time this matter came up, I have asked the United

18   States Geological Survey to investigate and report to me as to

19   whether in their opinion there are wells that can be used as

20   key wells for purposes of regulation.  Now I believe that there

21   is an overdraft occurring presently in the Murrieta.

22   THE COURT:   Specifically, you have not yet made up your

23   mind or prepared anything on the Murrieta?

24   MR. VEEDER:   That is correct.  But I have gone through

25   on the area where Mr. Sachse's clients are located, where Mr.

P 16   1  O'Malley's clients are located, where Mr. Grover's clients are

2  located.  I have been working with Mr. Sachse on the findings

3  of fact and conclusions of law, and I have been working with Mr.

4  Grover on those.  I think when we get through with this we can

5  tender to your Honor a full statement as to where I think the

6  overdrafts are.  If your Honor sets aside the stipulated judge-

7  ment, I think there will be an area of regulation in the Pauba

8  Valley.  I think the facts will support that.  But at the moment

9  the only material in the record which I believe squarely pre-

10  sents an overdraft and an over-use is the area to which I re-

11  ferred, and I want it very clear that this is not the whole area.

12      THE COURT:  All right, we will take up what you have later.

13      MR. VEEDER:  All right.

14      THE COURT:  Let's go ahead with the other matters we have

15  listed.

16      MR. VEEDER:  May I call Colonel Bowen?

17      THE COURT:  Yes.

18      MR. SACHSE:  May I make one point?  Am I mistaken or am

19  I correct in the assumption that we will dispose of the extent

20  of the ground waters in the Upper Murrieta at these hearings?

21      THE COURT:  I thought we were going into a number of things

22  as you have suggested.  How far we can go in two or three days

23  I don't know.  But let's get started.

24      MR. SACHSE:  But that item was on the agenda, was it not,

25  your Honor?

P 17

1      THE COURT:  I thought it was.  Whether we can get into it

2  or not I don't know.

3      MR. VEEDER:  May I call Colonel Bowen your Honor?

4      THE COURT:  Yes.

5                        A. C. BOWEN,

6  called as a witness for the plaintiff, having been previously

7  duly sworn, on his oath was examined and testified as follows:

8      THE COURT:  262 is the last exhibit.

9      THE CLERK:  263 is the next one.

10      MR. VEEDER:  This will be the Smohl Engineering Report,

11  and would you mark that for identification 263?

12                    DIRECT EXAMINATION

Belt 2

13  BY MR. VEEDER:

14      Q  Colonel Bowen, I hand to you the engineering report

15  marked for identification 263 and ask you to state into the

16  record the content of that engineering report.

17      And I will hand to the Court a copy of that.

18      A  Plaintiff's Exhibit 263 for identification is comprised

19  of an engineering report No. 202 and a geologic overlay and a

20  portion of an aerial photograph showing the land classification

21  on the Leonard O. Smohl property.

22      THE COURT:  Is Mr. Smohl here?

23      MR. VEEDER:  He has been notified.  A letter went out to

24  him.  Mr. Smohl did not come to my office.

25      THE COURT:  He is not represented by counsel.

P 18   1     MR. VEEDER:  That is correct.

2     THE COURT:  Go ahead.

3  BY MR. VEEDER:

4     Q  Colonel Bowen, did you prepare that engineering report

5  or was it prepared under your direction?

6     A  It was prepared under my direction and supervision.

7     Q  Is it correct to your personal knowledge, Colonel Bowen?

8     A  Yes sir.

9     Q  Would you state into the record the irrigable and non-

10  irrigable acreage as you have determined it based on that in-

11  vestigation?

12     A  The total area of the property is 302 acres.  Of that

13  amount 277.9 acres are irrigable.

14     Q  Is the report correct to your personal knowledge,

15  Colonel Bowen?

16     A  Yes sir.

17     MR. VEEDER:  We offer it in evidence your Honor.

18     THE COURT:  Received in evidence.

19     (Plaintiff's Exhibit 263 received in evidence.)

20  BY MR. VEEDER:

21     Q  Colonel Bowen, would you identify that by parcel number

22  on Exhibit 208C, a copy of which is on the wall?

23     A  It is located in Township 7 South Range 2 West Section

24  6, and is shown on Plaintiff's Exhibit 208C with the number

25  395 encircled in two pieces, one of which lies in the Northwest

14 290

P 19

1  quarter of Section 6 and the other of which lies in the Southeast

2  quarter of Section 6 and a portion also is in Section 31 Township

3  6 South Range 2 West with the number 159 encircled outside that

4  parcel and indicated by a line extending from the encircled

5  number to the inner limits of the parcel.

6     THE COURT:  What does this overlay?  Older alluvium?

7     THE WITNESS:  No, your Honor, as shown by the geologic

8  overlay, it is underlain primarily by crystalline rock, Whitson

9  Mountain granodiorite, Bonsall tonalite, San Marcos gabbro, with

10  a small area of Recent alluvium.

11     THE COURT:  Do you have an opinion as to whether any ground

12  water under the property is part of the stream system?

13     THE WITNESS:  Yes sir I do.

14     THE COURT:  What is your opinion?

15     THE WITNESS:  My opinion is that the ground water, if any,

16  underlaying this parcel is very limited in quantity, uncertain

17  in location and hence is local, vagrant, percolating water and

18  not part of the stream system.

19     THE COURT:  What about the younger alluvium?  Isn't there

20  a small area shown down in the Southeast portion of the property

21  of younger alluvium?

22     THE WITNESS:  Yes sir.  Water in that younger alluvium

23  supports the surface stream system and in my opinion it would

24  be a part of the stream system.

25     THE COURT:  That would be the only part of it?

P 20

1       THE WITNESS:  Yes sir.

2       MR. VEEDER:  The offer has been made, your Honor.

3       THE COURT:  I received it in evidence.

4       I take it the land is all riparian to some gully or
5  tributary of the Santa Margarita?

6       THE WITNESS:  Yes your Honor.

7       THE COURT:  I would propose to find, with the exception
8  of the younger alluvium, which would be depicted on the 15
9  Series, that the ground water was not a part of the stream
10  system.  I don't know how we could do that.  By just describing
11  it by reference to these exhibits?

12      MR. VEEDER:  Your Honor, in that connection, maybe if I
13  could interrupt the course of this investigation, I could offer
14  in evidence, at least for your Honor's examination, some of
15  these maps that Colonel Bowen has prepared in connection with
16  this present investigation, in which the exterior boundaries
17  of individual parcels are set forth.

18      For example, Colonel Bowen, could you locate that tract
19  of land on this quadrangle?

20      Would you like to have this identified before we go further,
21  your Honor?

22      THE COURT:  I suppose we had better.

23      MR. VEEDER:  I think it would be helpful to your Honor to
24  make the findings on these.

25      THE COURT:  Will this be all the series like your 208 Series?

P 21    1      MR. VEEDER:  We have the 29 Series for the regular U.S.G.S.,

2  but I would prefer to have this in order.  This would be 265.

3  We already have for identification 264.

4      THE CLERK:  You didn't put 264 in yet.

5      MR. VEEDER:  I would like to have this in that sequence of

6  exhibits, if I may.

7      THE COURT:  Exhibit 265 then?  What would you mark these?

8      MR. VEEDER:  A, B, C, right on through.

9      THE COURT:  Any particular order?

10      MR. VEEDER:  I would like to have Colonel Bowen put them

11  in the order that would be most helpful to your Honor.

12      THE COURT:  I will temporarily mark them here A, B, C, D,

13  E, F, G.  Plaintiff's Exhibit 265 A to G, inclusive.

14  BY MR. VEEDER:

15      Q  I hand you the series of exhibits marked for identifi-

16  cation 265 A through G and ask you to state first what they are

17  and then describe the dark line that appears on 265A and then

18  in the upper righthand corner what is depicted in that corner.

19      A  Plaintiff's Exhibit 265A is a print of the Wildomar

20  Quadrangle U.S.G.S. 7½ minute series.  The heavy black irregular

21  line which traverses this quadrangle is, in part, the watershed

22  boundary of the Santa Margarita River and in part the sub-water-

23  shed of Murrieta Creek.  Then in the upper righthand corner in

24  Sections 25 and 26 6 South 4 West appears some straight black

25  lines with numbers encircled within those lines also in black.

P 22

1   The black lines define parcels.   The numbers are the number of

2   the parcels.   The irregular black line which is smaller than

3   the watershed line as found in Sections 25 and 26 6 South 4 West

4   delineates the irrigable and non-irrigable land.   The letters

5   "NI" indicate non-irrigable, and not shown on this map but on

6   others as we go through the letter "I" would designate "irrigable

7   land."

8        Q  How did you arrive at the determination as to the irri-

9   gable and non-irrigable character of the properties?

10       A  This survey is a detailed reconnaisance type survey.

11  The rougher areas, the mountainous, irregular, highly dissected

12  lands are platted with the use of vertical aerial photographs

13  and in combination with the topographic map.   The irrigable

14  portions have had a more intensive type or detailed type of

15  survey.   In many instances complete detailed surveys have been

16  made and the findings of those surveys are entered on these

17  maps.

18       Q  And is that the process that was followed throughout

19  the Series 265 A through G, Colonel?

20       A  Yes sir.

21       Q  And is that a standard practice in determining irrigated

22  and irrigable acreages?

23       A  Yes sir.  I might go on to add that these areas of

24  irrigable and non-irrigable lands, section by section, were

25  measured and the tabulation showing those acreages is currently

P 23 1   being prepared.

2       MR. VEEDER:  We will offer those exhibits marked for identi-

3   fication 265 A through G in evidence, your Honor.

4       MR. SACHSE:  May I inquire on voir dire just a minute,

5   your Honor.

6       THE COURT:  Yes.

7                   VOIR DIRE EXAMINATION

8   BY MR. SACHSE:

9       Q  Colonel Bowen, I understood Mr. Veeder to indicate that

10   these exhibits could be used to answer the question expressed

11   by the Court as to why you would determine what part of any

12   given ownership might be younger alluvium, for instance.  How

13   would you use this exhibit in that connection?  Take for example

14   the last parcel you testified to.

15       MR. VEEDER:  I said I thought it might be helpful to his

16   Honor.

17       MR. SACHSE:  That is what I want to know.  How would we

18   do it?  How could you use this exhibit in clarifying which areas

19   were younger alluvium on the Smohl parcel?

20       THE WITNESS:  This exhibit, Mr. Sachse, only shows irriga-

21   ble and non-irrigable lands.

22   BY MR. SACHSE:

23       Q  In other words, you can't use this exhibit to delineate

24   the areas in which you testified the ground waters are part of

25   the stream system?

P 24

1    A  No, this exhibit has no geologic information on it other

2    than what appears on the printed map.

3    MR. SACHSE:  I have no further questions your Honor.

4    I haven't any objection to its introduction.

5    MR. GIRARD:  I have a couple of questions.

6                    VOIR DIRE EXAMINATION

7    BY MR. GIRARD:

8    Q  Was there a survey made in this entire area or just in

9    this area?

10   THE COURT:  You are referring to Exhibit 265A.

11   MR. GIRARD:  Yes.

12   THE WITNESS:  Exhibit 265A, the bulk of the area included

13   Easterly of the watershed line is included within the Santa

14   Rosa Grant, a part of the Vail Ranch.  A detailed survey has

15   been made on that, and using aerial photographs for a base we

16   are about completed with our office work on that and about

17   ready to turn that over to the Vail Company.  As far as the old

18   La Laguna Ranch -- that was included in the Murrieta Valley --

19   previous testimony has been given regarding the irrigable acre-

20   age of that portion, the La Laguna portion shown on Exhibit 265A.

21   BY MR. GIRARD:

22   Q  In making your determination whether it was irrigable

23   or non-irrigable, Colonel, was there any segregation made in

24   your conclusion on marginal lands or sources of water or any-

25   thing like that, or just land characteristics without going

P 25

1   into economics?

2       A   This just takes soil depth, slope, texture, sub-drainage.

3       Q   Aside from these series of soil classifications, that

4   is true throughout the watershed on your soil examination reports?

5       A   Yes sir.

6       THE COURT:   What is the purpose of these?  What are they

7   to be used for -- 265A and B?

8       MR. VEEDER:   As far as I have used them myself and for the

9   purpose of determining exterior boundaries on lands where they

10  are intersected by tributaries or streams, and for the purpose

11  generally of identifying them within the area concerning which

12  there has been evidence.

13      THE COURT:   What are the parcels keyed into?

14      MR. VEEDER:   The parcels are keyed into the 208 Series.

15  Exhibits 208 A, B, C and D are the land descriptions of the

16  properties, the names, the locations generally.  Exhibit 208C,

17  which is hanging up, will have the same locations as these.

18  These, however, do locate the properties from the standpoint of

19  where they are situated and whether Colonel Bowen has determined

20  the irrigable or non-irrigable portions.  In other words, these

21  are all keyed to the title, your Honor, and from the standpoint

22  of being helpful to you, as I suggested they might be, I think

23  you can locate the properties from the standpoint of tributary

24  streams.

25      THE COURT:   Exhibits 265 A through G are received in evidence,

14,297

P 26

1  if there is no objection.

2      (Plaintiff's Exhibit 265 A through G inclusive, received

3  in evidence.)

4      THE COURT:  Did we finish up on this Smohl property?  Is

5  there any objection to the proposed finding that I would make

6  in connection with Smohl's property?  This all started out when

7  I said, how will we describe the younger alluvium?  And I said

8  by the 15 Series?  Then you started with these maps.  These

9  aren't going to help us with the younger alluvium at all.

10      MR. VEEDER:  I think they will show you where there are

11  tributary streams and they will assist you in locating them.

12  My point is that if you take a look at the geologic maps and

13  run these back against them, at least you can find the exterior

14  boundaries of the properties.  That is how I have used them myself.

15      THE COURT:  Any objection to the finding I would make in

16  connection with Smohl?

17      MR. VEEDER:  No your Honor.

18      THE COURT:  You started out with 264.

19      MR. VEEDER:  I have 264 marked for identification.

20      Q  I hand Colonel Bowen identification 264 and ask him

21  to state the name of the defendant who owns the property con-

22  cerning which that engineering report was prepared.

23      A  Plaintiff's Exhibit 264 for identification is an engineer-

24  ing report of the Val Curtis and Phyllis Curtis property.

25      Q  And under whose direction was that engineering report

P 27

1    prepared?

2        A  Prepared under my direction.

3        Q  Would you state the number of the parcel of that for us?

4    Do you have the number on that?

5        A  The property is located in Section 35 6 South 3 West,

6    with the parcel number 229 encircled and a line leading from

7    the circle to the inner portion of the parcel.

8        MR. SACHSE:  May I interrupt for a moment?  Is Exhibit

9    15E handy?  I would like to look at it at the same time.

10       THE CLERK:  I will go get it.

11       MR. SACHSE:  Thank you.

12       THE COURT:  How many irrigable acres?

13   BY MR. VEEDER:

14       Q  Would you state into the record the total acreage of

15   irrigable and non-irrigable land as you found them to be, Colonel?

16       A  The area of this property is about ten acres, and it is

17   all suited to irrigation and it is all irrigable land.

18       MR. VEEDER:  We offer in evidence the engineering report

19   your Honor.

20       THE COURT:  Exhibit 264 received in evidence.

21       (Plaintiff's Exhibit 264 received in evidence.)

22       THE COURT:  What is the character of the soil?

23       THE WITNESS:  On page 2 of the report, your Honor, on

24   page 2 of Exhibit 264 for identification is a description of

25   the geology.  It indicates that it overlies decomposed basement

14,299

P 28

1   complex.  The well on the property at the time of the survey

2   went 34 feet through a decomposed rock to hard rock.

3       THE COURT:  Do you have any opinion as to the character

4   of the ground water, if any?

5       THE WITNESS:  Yes sir I do.

6       THE COURT:  What is that opinion?

7       THE WITNESS:  It is my opinion that the water underlying

8   this property is negligible in quantity, uncertain in location,

9   hence is local, percolating water and not part of the stream

10  system.

11      THE COURT:  I propose to so find.

12      MR. VEEDER:  Did I make the offer on that your Honor?

13      THE COURT:  Yes you did.  It is in evidence.

14      MR. SACHSE:  Before you go to the next parcel, may I ask

15  the Colonel to help me locate this on Exhibit 15E.

16      If you can, approximately locate it.

17      THE WITNESS:  Parcel 229 is located in the Northerly part

18  of the Southwest Quarter of Section 35 6 South 3 West.  Referring

19  to Plaintiff's Exhibit 15E, that is shown to be an area of

20  basement complex.

21      MR. SACHSE:  Is there any stream running through that

22  parcel, Colonel?

23      THE WITNESS:  There is no named stream running through the

24  property.

25      THE COURT:  Let me ask you this.  Outside of ascertaining

P. 29

1   ownership, why do we have to spend any time in this area?

2        MR. GIRARD:  Exactly.

3        THE COURT:  Haven't we enough in the record to find now --

4   let's take Sections 33, 34 and 35 and the West half of 36, for

5   example, Range 3 West Township 6.  Can't we just make a finding

6   that the water therein is local, vagrant, percolating water and

7   not part of the stream system -- the water underneath?  That

8   the surface waters when there is rain and when they run, are

9   part of the stream system?  Then all we need, if you need it,

10  the reputed owner of this property.

11       MR. VEEDER:  And that evidence is already in, your Honor.

12       MR. SACHSE:  Then what are we doing this for?

13       THE COURT:  I suppose they requested an engineering report

14  and the Government made it.

15       MR. VEEDER:  That is right.

16       THE COURT:  I suppose that is how this came about.

17       MR. VEEDER:  That is right.

18       THE COURT:  When was this made?

19       THE WITNESS:  This was made in 1952, your Honor.

20       THE COURT:  Exhibit 264 is in evidence.

21  BY MR. VEEDER:

22       Q  Colonel Bowen, I hand to you the engineering report for

23  Robert Cummins and ask you to state into the record --

24       THE COURT:  What exhibit number?

25       MR. VEEDER:  That will be 266, your Honor.

p 30

1        THE WITNESS:  Plaintiff's Exhibit 266 for identification

2   is the engineering report prepared in December 1952 on the

3   property owned by Robert M. Cummins and Pearl Dickinson Cummins.

4   Exhibit 266 for identification is comprised of four reports

5   labeled "Parcel A," "Parcel B," "Parcel C," and "Parcel D."

6   The parcels as indicated on 208C, 388 and 393 as shown on 208C

7   are Parcel A of Plaintiff's Exhibit 266.

8        Parcel 157 as delineated on 208C is Parcel B on 266.

9        Parcel 108 on 208C is Parcel C on 266.

10       Parcel 121 and Parcel 149 as shown on 208C is Parcel D on

11  266.

12       MR. VEEDER:  Are those reports accurate to your personal

13  knowledge, Colonel Bowen?

14       THE WITNESS:  Yes sir.

15       MR. VEEDER:  We offer in evidence identification marked

16  266 your Honor.

17       THE COURT:  266 received in evidence.

18       (Plaintiff's Exhibit 266 received in evidence.)

19       THE COURT:  Do you have the total acreage or do you have

20  it by parcels here, the total irrigable acreage?

21       THE WITNESS:  I have it by parcels, your Honor.

22       THE COURT:  State it for the record.

23       MR. VEEDER:  If your Honor would want to mark those as we

24  go along.

25       THE WITNESS:  Parcels 388 and 393 as shown on 208C comprise

P 31

1   320 acres of land.  Of that amount 320 acres is irrigable.

2        THE COURT:  All irrigable?

3        THE WITNESS:  Yes sir.

4        THE COURT:  That is your Parcel A of 266.

5        THE WITNESS:  Yes sir.

6        THE COURT:  What are the parcels on 208C again?

7        THE WITNESS:  388 and 393, your Honor.

8        Parcel B, which is shown as Parcel 157 on 208C, has 480

9   acres, of which 429.8 acres are suitable for irrigation and the

10   remainder of 50.2 are non-irrigable.

11        MR. SACHSE:  What was the number of the last parcel, Colonel?

12        THE WITNESS:  157.

13        Parcel 108 as shown on Plaintiff's Exhibit 208C, Parcel

14   C of 266, has 80 acres of land, of which 79 acres are irrigable

15   and 1 acre is non-irrigable.

16        Parcel D of Plaintiff's Exhibit 266 is shown as 121 and

17   149 on 208C.  It has 240 acres, and of that amount 142 acres

18   are irrigable and 98 acres are non-irrigable.

19        THE COURT:  Do you have an opinion as to the character

20   of the ground water underlaying this ground?

21        THE WITNESS:  If I may, I would like to check 15E.

22        MR. VEEDER:  I don't believe it is on 15E, Colonel.  I

23   think it is above.

24        MR. SACHSE:  It is on it.

25        MR. VEEDER:  Is it?

P 32   1        MR. SACHSE:  All except one.

2        THE WITNESS:  Referring, your Honor, to Parcels 388 and

3    393, as shown on 208C, that is shown as overlying basement

4    complex weathered and basement complex on 15E.  In my opinion,

5    the water, if any, underlying these two parcels are small in

6    quantity, uncertain in location, characterized as local, vagrant,

7    percolating water and not part of the stream system.

8        THE COURT:  I propose to so find; to find that the land

9    is riparian, unless it is proved to the contrary.  However, the

10   riparian character of the right is an illusory one.  There is

11   no water that runs at any time except in rainy weather.

12       THE WITNESS:  Parcel 157, as shown on 208C, occupies the

13   Northwest Quarter and the East half of Section 31 6 South 2 West.

14   It is shown on Plaintiff's Exhibit 15E as overlying primarily

15   weathered basement complex, with a few small outcroppings of

16   basement complex.  My opinion of the ground waters on Parcel

17   157, your Honor, is that, if any, it is small in quantity,

18   local, vagrant, percolating and not part of the stream system.

19       THE COURT:  I propose to so find.

Belt 3  20       THE WITNESS:  Parcel 108, as shown on 208C, lies in Section

21   18 6 South 2 West, which is not shown on 15E.  However, your

22   Honor, page 3 of the Parcel C portion of 266 describes the

23   geology, and in reading this geology description it is my

24   opinion that ground water, if any, underlying Parcel 108 is

25   local, vagrant, percolating, and not a part of the stream system.

P 33

1    THE COURT:  I propose to so find.

2    THE WITNESS:  Parcels 121 and 149, as shown on 208C, occupy

3  the East half of the Southeast Quarter of Section 20 6 South 2

4  West, and that section is not shown on 15E.  However, the North-

5  east Quarter of Section 29 6 South 2 West is shown, at least

6  in part, on 15E as overlying weathered basement complex and a

7  small portion of the basement complex.  Page 3 of the Parcel

8  D portion of 266 describes the geology underlying this property,

9  and based on that description, your Honor, it is my opinion

10  that ground water, if any, underlying Parcels 121 and 149 are

11  local, vagrant, percolating and not part of the stream system.

12    THE COURT:  I propose to so find.

13    You heard the testimony of Mr. Kunkel, didn't you?

14    THE WITNESS:  Yes sir.

15    THE COURT:  And he testified at some length concerning

16  the weathered basement complex lying East of Warm Springs and

17  Northerly of Tucalota.  Did you hear his testimony about that?

18    THE WITNESS:  Yes your Honor.

19    THE COURT:  What is your opinion as to the ground water

20  in that area clear down to the fault line at Murrieta Hot Springs?

21    THE WITNESS:  I share Mr. Kunkel's opinion, your Honor,

22  that ground water, if any, will move in the direction of the

23  green arrows placed on 15E.  It is my opinion that the ground

24  water in that formation is extremely limited and moves at a

25  very slow rate of speed and is very limited in the amount of

P 34   1    recharge.

2    MR. STAHLMAN:  The last time we were in Court the question

3    came up in connection with that area as to what the irrigated

4    acreage was up there.  We guessed at it, and your Honor indicated

5    a survey should be made.  I wonder if that has been done.

6    MR. VEEDER:  Yes, your Honor, I have that report for your

7    Honor.  I will bring it in after lunch.

8    MR. GIRARD:  How many acres was there, Colonel?

9    THE WITNESS:  Much smaller than the Court had used as an

10   illustration.

11   MR. GIRARD:  How much?

12   THE COURT:  I forget the amount of my illustration.

13   MR. GIRARD:  A couple hundred?

14   THE COURT:  Well, could you say that there is any appre-

15   ciable amount of ground water that is part of the stream system?

16   THE WITNESS:  It is negligible.  I think the quantity of

17   water, your Honor, is negligible, and owing to the fact that

18   the recharge in that area is extremely limited it would have a

19   negligible effect on the stream flow.

20   THE COURT:  By that you mean that there is so little

21   material that could be filled up by rain or water running over

22   the surface that what recharge ground water did occur would

23   have a very small impact upon the runoff?  Is that what you

24   mean?

25   THE WITNESS:  That is partly what I mean, your Honor, and

P 35

1   also that the area of the highly absorptive materials in that

2   area is extremely limited.  The drainage above it, the watershed

3   above it is small.  Most of the recharge would be from water

4   gathering in the little channels and arroyos traversing that

5   area, percolating into the weathered basement complex, which is

6   not highly permeable at best.  The area that falls on the hills

7   themselves, in my opinion, would be largely consumed by vegeta-

8   tion and wouldn't be available to add appreciable quantities to

9   the amount of ground water in that material.

10      THE COURT:  Is the Government going to contend that the

11   ground water in that weathered basement complex is part of the

12   stream system?

13      MR. VEEDER:  All I am going to contend is what the evidence

14   shows, your Honor.

15      THE COURT:  You haven't answered my question.  What are

16   you going to contend?  You have heard the testimony and so have

17   I.

18      MR. VEEDER:  So far as the evidence that has gone in, your

19   Honor, I think there is evidence in areas that the progression

20   of the water is toward the Temecula Gorge, that whatever water

21   is there is part of the stream system for purposes of recharge.

22   How much there is I haven't any idea.  I do believe that it

23   becomes important.  If your Honor desires to hear my views on

24   it -- I have my hand right now by this Murrieta Creek -- I

25   think the recharge for this older alluvium does come in part at

P 36

1   least from the residuum.  I don't know how much it is.  I simply

2   say that these facts have been brought to your Honor's attention.

3   THE COURT:  How many acres did you find up there as being

4   irrigated?

5   MR. VEEDER:  I have that report and I will bring it in.

6   MR. SACHSE:  Maybe Colonel Bowen recalls.

7   MR. VEEDER:  All right, if he recalls it will save me

8   getting the report.

9   Have you got the report there, Colonel?

10  THE WITNESS:  Yes sir, I have the report.  Mr. Kunkel

11  supplied me this tabulation on wells which, in his opinion,

12  were irrigation wells and the total area that I have here is --

13  THE COURT:  Less than fifty acres?

14  THE WITNESS:  Yes sir.  I hesitated because I haven't added

15  them up.  4414 acres, your Honor.

16  THE COURT:  In the weathered basement complex as shown by

17  the grey colored material on 15E.

18  MR. VEEDER:  That is the lands that were actually irrigated

19  in 1959?

20  THE WITNESS:  Yes sir.

21  THE COURT:  But I mean in the entire area shown by the

22  weathered basement complex.

23  MR. VEEDER:  No, on the area of the six.  I am not arguing,

24  your Honor.

25  THE COURT:  I want to know where.

P. 37

1  THE WITNESS:  It extends, your Honor, from the Carl Frick

2  property down to the Guenther property.  The wells specifically

3  are those on Carl Frick, Pierre Pourroy 2, on the M. A. Nicolas

4  property, 1 on the R. M. Cummins property, and one on the A. F.

5  Borel property.

6  THE COURT:  You are going to bring in that report this

7  afternoon?

8  MR. VEEDER:  Yes your Honor.  Do you want it in evidence?

9  THE COURT:  Yes.

10  MR. SACHSE:  I want it if you don't.

11  THE COURT:  Mr. Kunkel has already testified that in his

12  opinion the area South and Easterly of Tucalota down to the

13  older alluvium, there is no water in there that is part of the

14  stream system.  He has eliminated this area.  So this tabula-

15  tion that you have must be in the area between Tucalota and

16  Warm Springs down to the Murrieta Hot Springs.

17  MR. VEEDER:  Your Honor will find those wells are located

18  in that area you made reference to.

19  THE COURT:  We will adjourn, gentlemen, until 2:30.  I

20  have some sentences of people for this afternoon.  I hope to be

21  here by that time.

22  (Noon recess)

23

24

25

P 38

1    <u>SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 30th, 1960 2:00 P.M.</u>

2         (Other matters)

3         THE COURT:  Do you gentlemen in the Fallbrook case want

4    to take a chance on half an hour this afternoon, or would you

5    rather come back in tomorrow morning?

6         MR. GIRARD:  I would rather take a chance on half an hour.

7    I am sure the other counsel don't agree with me.

8         THE COURT:  I am going to excuse you until tomorrow

9    morning until 9:30 in the Fallbrook case.  What complicated

10   our situation was that the judges meeting was called yesterday,

11   requiring this sentence calendar to be put over to today.  I

12   can only do so much.  By the time I get through with this

13   Wherry Housing case -- we have had a couple of pre-trials, and

14   I want to try to wind this up -- it will be four o'clock or

15   better, and Mr. Stahlman doesn't like to work after 4:30 and

16   neither do I.

17        MR. GIRARD:  No strenous objection on my part, your Honor.

18        MR. SACHSE:  No.

19        THE COURT:  Nine-thirty tomorrow morning for Fallbrook.

20        (Adjournment until Wednesday, August 31st, 1960 at 9:30

21   A. M.)

22        (Other matters)

23

24

25