# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, August 31, 1960

**Pages:**   14,310 to 14,433

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211   Ext. 370

Belt 1 1

## IN THE UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

#### SOUTHERN DIVISION

- - - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA,)<br>Plaintiff,)<br>)<br>vs        )<br>)<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, et al.,   )<br>Defendants.) | No. 1247-SD-C |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, August 31, 1960

APPEARANCES:

FOR THE PLAINTIFF:                    WILLIAM H. VEEDER, ESQ.,
                                      Special Assistant to
                                      the Attorney General,
                                      Department of Justice,
                                      Washington, D.C.

                                      LCDR DONALD W. REDD

FOR THE DEFENDANTS:

    For Defendant Vail Company        GEORGE STAHLMAN, ESQ.
                                      EARL K. STANTON, ESQ.

    For Defendant Fallbrook Public    FRANZ R. SACHSE, ESQ.
    Utility District, et al.

    For Defendant State of            STANLEY MOSK, ESQ.,
    California                        Attorney General,
                                      By FRED GIRARD, ESQ.,
                                      Deputy Attorney General.

1

## INDEX TO WITNESSES

2  __For the Plaintiff__                          D

3  Allen C. Bowen                       14,312 (Veeder)

4

5

6

7

## INDEX TO EXHIBITS

8  __Plaintiff's Exhibits__          __Iden.__          __In Evidence__

9  266-A - letter - Cummins          14,312               14,312

10  267- Eng. Report- Ellithorpe (Rheingans)                14,314

11  268 - Eng Report - Margenis                            14,316

12  269 - Tabulation - Lewis Rawson -    14,317            14,318
            Shipman + Shipley

13  270 - Data on selected wells -                         14,321

14

15

16

17

18

19

20

21

22

23

24

25

P 2   1   <u>SAN DIEGO, CALIFORNIA, WEDNESDAY, AUGUST 31, 1960, 9:30 A.M.</u>

2        (Other matters)

3        THE CLERK:   2-1247-SD-C United States of America vs. Fallbrook

4   et al.   Further court trial.

5        THE COURT:   A letter from Robert and Pearl D. Cummins

6   came in the mail yesterday.   It was one of the matters in which

7   you presented an exhibit, an engineering report.   It indicates

8   that they are content with the engineering report and desire

9   to present no other evidence.

10        MR. VEEDER:   May I file that your Honor?

11        THE COURT:   Yes.   What is that exhibit number?

12        THE CLERK:   The Cummins exhibit is Number 266 your Honor.

13        MR. VEEDER:   May I have that as 266A?

14        THE COURT:   All right, Plaintiff's Exhibit 266A received

15   in evidence.

16        (Plaintiff's Exhibit 266A received in evidence.)

17        THE COURT:   What are you proposing to put on this morning?

18        MR. VEEDER:   I would like, your Honor, to finish up with

19   the engineering reports which we have.

20        THE COURT:   How many do you have?

21        MR. VEEDER:   There are only three.

22        We had already marked exhibit for identification 267 at

23   the time we went into recess, your Honor.   Here is a copy of

24   267 for the Court.

25                    ALLEN C. BOWEN,

P 3   1   a witness for the plaintiff, having been previously duly sworn,

2   on his oath was examined and testified further as follows:

3   <u>DIRECT EXAMINATION RESUMED</u>

4   BY MR. VEEDER:

5   Q  Colonel Bowen, I hand to you the exhibit marked for

6   identification 267 and ask you to state into the record the

7   content of the report and the defendants to whose property it

8   has application.

9   A  This is an engineering report made of the property owned

10   at the time of the survey by Joe E. Rheingans.  The present

11   apparent owners are Philip L. and Esther M. Ellithorpe, which

12   is written in ink.  The survey was made by the Office of Ground

13   Water Resources at Camp Pendleton in 1952.

14   Q  Was that prepared under your direction Colonel Bowen?

15   A  Yes sir.

16   Q  Would you state the total acreage and the irrigable

17   acreage as reflected by identification 267?

18   A  The total acreage is about 1520 acres.  Of that amount

19   316.7 acres are irrigable and the balance is non-irrigable.

20   Q  Is the report correct to your personal knowledge,

21   Colonel Bowen?

22   A  Yes sir.

23   THE COURT:  The report shows that of that 1520 acres only

24   1094.1 acres are within the watershed.

25   THE WITNESS:  Yes sir.

14 314

P 4

1    THE COURT:  So that the 300 figure you gave would be

2    substracted from the 1094?

3    THE WITNESS:  Yes sir.  That is the area of the irrigable land

4    within the watershed.

5    MR. VEEDER:  We offer 267 in evidence, your Honor.

6    THE COURT:  Received in evidence.

7    (Plaintiff's Exhibit 267 received in evidence.)

8    THE COURT:  It is up in the Northeast corner?

9    MR. VEEDER:  Referring to Exhibit 208C.

10    THE WITNESS:  It is described, your Honor, as the Northeast

11    Quarter and the East half of the Northwest Quarter of Section

12    30 Township 6 South Range 3 West.

13    That 240 acres is delineated on Plaintiff's Exhibit 208C

14    with the number 200 encircled contained within the outer peri-

15    meter.  The property also comprises all of Section 19 and all

16    of Section 29 6 South 3 West.  Section 19 on 208C has the

17    parcel number 173 encircled within the outer limits of that

18    section and the watershed line of the Santa Margarita River

19    traverses Section 19 diagonally from the Northwest toward the

20    Southeast.  Section 29 6 South 3 West on 208C has the parcel

21    number 197 encircled within that section.  The watershed line

22    of the Santa Margarita River cuts across the Northerly portion

23    of that section.

24    THE COURT:  It is up in the basement complex area, I take

25

THE WITNESS:  Yes sir.

THE COURT:  And the ground water, if any, is minute, hard to find and local, percolating and not part of the stream system?

THE WITNESS:  Yes your Honor.

THE COURT:  I propose to so find.

THE CLERK:  Plaintiff's Exhibit 268 has been marked for identification your Honor.

BY MR. VEEDER:

Q    Colonel Bowen, I hand to you United States' exhibit marked 268 for identification and ask you to state into the record what it is and name the defendants for whom it was prepared.

A    Plaintiff's Exhibit 268 for identification is a copy of an engineering report prepared by the Office of Ground Water Resources in 1952 for Ernest Aubert.  That is now scratched out and the name Raoul and Minerva Marquis is written in ink.

Q    And under whose direction was it prepared Colonel?

A    It was prepared under my direction.

Q    Will you state into the record the total acreage to which the engineering report pertains and the irrigable acreage as found by you?

A    The total area of the property is 152 acres, and of that amount 152 acres are irrigable.

Q    Is the report as prepared correct to your personal knowledge, Colonel Bowen?

14,316

P 7

1    A    Yes sir.

2    MR. VEEDER:  We offer 268 in evidence your Honor.

3    THE COURT:  Received in evidence.

4    (Plaintiff's Exhibit 268 received in evidence.)

5    THE COURT:  Where is the property located, Colonel?

6    MR. VEEDER:  Parcel 396.

7    THE COURT:  Winchester Road apparently cuts it from the

8    Southeast to the Northwest.

9    THE WITNESS:  It is contained in Section 6 Township 7

10   South Range 2 West and is the Northeast Quarter of that section

11   and, as your Honor observed, it is bisected diagonally by

12   Winchester Road.  Parcel No. 396 encircled is contained within

13   the quarter section as shown on 208C.  As shown on Exhibit 15E,

14   it is underlain by weathered basement complex, with some small

15   outcroppings of basement complex approximately in the center

16   of the property.

17   THE COURT:  What is the character of the ground water, if

18   any, underneath the ground?

19   THE WITNESS:  Ground water underneath this property, in

20   my opinion, is extremely limited in quantity, uncertain in

21   location and would be classified as local, vagrant, percolating

22   and not part of the stream system.

23   THE COURT:  I propose to so find.

24   MR. VEEDER:  Your Honor, the next property to which we

25   are referring is the Rawson property.  It has been divided now

and is held in different ownerships since the original pleadings were filed. I checked the matter out with Mr. Swing, who originally appeared in the matter. He said he had no further interest, since new counsel had been appointed, and I think Mr. Sachse --

MR. SACHSE: I represented Rawson, your Honor. I have substituted out. Mr. Littleworth is in. He knows this is coming up. He authorized me to state that he had no objection to the introduction of the exhibit and alerted me to the item of cross-examination regarding ground water if your Honor didn't bring it up. He said that was his only concern.

THE COURT: Plaintiff's Exhibit 269 marked for identification, a tabulation.

MR. VEEDER: That is correct your Honor.

THE COURT: What do the numbers refer to? Originally it shows Louis Rawson and under that 529.

MR. VEEDER: I was going to have Colonel Bowen explain that, because there has been a breakdown apparently of an estate and it is not entirely clear to me.

THE WITNESS: Those numbers, your Honor, that appear beneath the names in the upper portion of the tabulation, namely 529 under Louis Rawson, 600 under Louis Rawson and John L. Roberts and R. E. Shipley and William H. and V. G. Shipman number 601, those numbers are our engineering numbers used in the Office of Ground Water Resources to identify the investigation

P 8

1    THE COURT:  So originally he had 12,899 acres as shown on

2    the exhibit, broken up into the irrigable and non-irrigable

3    as shown?

4    THE WITNESS:  That is right your Honor.

5    THE COURT:  308.80 irrigable, and 11.60 non-irrigable.

6    That is still broken down further, isn't it?

7    MR. VEEDER:  Would you proceed and explain anything that

8    has not been covered on that Colonel Bowen?

9    THE WITNESS:  Plaintiff's Exhibit 269 for identification

10   shows the section in the lefthand corner by township, range

11   and section in which each of the various parcels appear.  The

12   total number of acres within that section reported on herein

13   is shown in the second column, and the next six columns show

14   the irrigable and non-irrigable areas of each of the investi-

15   gations 529, 600 and 601.  The last two columns show the total

16   irrigable and non-irrigable for the entire property.

17   MR. VEEDER:  Are those figures correct to your personal

18   knowledge, Colonel Bowen?

19   THE WITNESS:  Yes sir.

20   MR. VEEDER:  We offer 269 in evidence your Honor.

21   THE COURT:  Received in evidence.

22   (Plaintiff's Exhibit 269 received in evidence.)

23   THE COURT:  And this property is up in the basement com-

24   plex, is it not?

25   THE WITNESS:  Primarily, your Honor, it is in basement

P 9  1  complex, with a few little areas of alluvial fill, shallow

2  largely narrow such as Crown Valley, very thin narrow stringers

3  of alluvium in part along Rawson Creek and a small amount of

4  alluvium along Tucalota Creek.

5  THE COURT:  Aside from the small stringers of alluvium,

6  what is the nature of the ground water, if any, underlying the

7  ground?

8  THE WITNESS:  It is uncertain in quantity and location,

9  your Honor, and would be characterized as local, vagrant,

10  percolating, and not part of the stream system.

11  THE COURT:  I propose to find that the land is riparian,

12  in the absence of a showing by the Government; that the riparian

13  character of the ground is an illusory right -- it has no value

14  except in times of rain and runoff when the water couldn't be

15  used for irrigation; that the water underlying the ground is

16  minute, local, vagrant, percolating and not part of the stream

17  system; that the areas of younger alluvium shown on the exhibit

18  in the 15 Series might or might not contain some water which

19  contributes to the stream system.

20  I don't know what we are going to do about those situations.

21  Have you worked out any arrangement as to how to word the

22  decree in connection with those stringers of younger alluvium?

23  MR. VEEDER:  We are working on that in that very area

24  right now your Honor.

25  THE COURT:  Who is working on it?

P. 10

1    MR. VEEDER:  The United States Geological Survey.

2    THE COURT:  Have you worked out the mechanics or the word-

3    ing, what you would say about these little fingers of alluvium

4    up in the basement complex?

5    MR. VEEDER:  We have that problem throughout.  I don't have

6    the language precisely, because as we go along the language has

7    to be developed, your Honor.

8    THE COURT:  All right, we will pass it then.

9    MR. VEEDER:  That is all of those named defendants, your

10   Honor, concerning which we have reports.

11   Your Honor had asked me to prepare data on selected wells

12   in the area of the residuum as shown on 15E.  Mr. Kunkel sub-

13   mitted the irrigable wells and Colonel Bowen prepared a report

14   on the irrigated acreage.  If you want that tabulation in the

15   evidence, I will have it marked as 270, and here is a copy for

16   your Honor.

17   THE COURT:  Where are these wells?

18   MR. VEEDER:  Those are the wells, if you recall, Mr.

19   Kunkel drew a line showing where, in his view, there was no

20   appreciable ground water.  Then you asked to have irrigation

21   wells tabulated as shown on the area between Warm Springs Creek,

22   and it would be the line that Mr. Kunkel drew, and that is the

23   tabulation and the irrigated acreage as prepared by Colonel

24   Bowen.

25   THE COURT:  What conclusions can you draw, Colonel, from

P 1   a tabulation of this sort that shows only the type of pump and

2   horsepower?  For instance, Turbine 12, how much water could that

3   throw -- 127 foot well?

4      THE WITNESS:  There is insufficient information there to

5   draw any conclusions on the amount of water it would produce,

6   your Honor.

7      THE COURT:  You could know a maximum, couldn't you, as to

8   what a turbine 12 would throw?

9      THE WITNESS:  You could have that in a dry hole, your Honor,

10   if I may respectfully observe.  The specific capacity of the

11   well would be the limiting factor, and that isn't indicated

12   on that tabulation.

13      MR. VEEDER:  If your Honor desires further information on

14   that, I will obtain it.

15      MR. SACHSE:  I would like to observe, if I am not out of

16   order, your Honor, that some hasty arithmetic discloses that

17   the irrigated acres represent 1½% of the irrigable acres on

18   this exhibit, which may be illuminating on the question your

19   Honor so often has raised as to some of this land that is

20   classified as irrigable being actually nebulous, marginal,

21   unrealistic --

22      MR. VEEDER:  Illusory.

23      MR. SACHSE:  Illusory.  Thank you Mr. Veeder.

24      THE COURT:  270 received in evidence.

25      (Plaintiff's Exhibit 270 received in evidence.)

P 12   1        THE COURT:  Actually, it is the type of thing we shouldn't

2    waste our time on.

3        MR. SACHSE:  I agree your Honor.

4        THE COURT:  Even if this area should be found to be part

5    of the stream system, the amount of water they get for the

6    irrigable acres they have is so inadequate that they would be

7    entitled to every drop they could take.  You would have to

8    concede that, wouldn't you?  Here is a man, one Pierre Pourroy,

9    has 1181 acres, and the rest of them are sizable pieces --

10   there is 13, 14, 19, 22, 23, 27 -- probably over 2800 acres

11   there.  Is there any possibility in the realm of even specula-

12   tion where you could ever say that you would want to regulate

13   the amount of water these people could take from this area?

14       MR. VEEDER:  All I am doing is offering evidence, your

15   Honor.  You haven't heard me argue for or against, backward or

16   forward, on matters.  I am just trying to do my job.

17       THE COURT:  All right, 270 has been received in evidence.

18       MR. VEEDER:  In regard to the Occidental properties, con-

19   cerning which Mr. Sachse has previously made reference, that

20   would be heard, if agreeable to your Honor, on October 27th and

21   28th.  As I understand it, however, Mr. Sachse is no longer

22   representing these people.

23       Isn't that correct?

24       MR. SACHSE:  Occidental has sold the property.  I don't

25   know the name of the new buyer.  The new buyer has received

P 13

1   copies of my correspondence with Occidental, at which time we

2   had agreed that I was going to stipulate to the admission of

3   Colonel Bowen's reports and that we had no evidence of our own

4   to offer.  Since I am not employed by the new buyer, I cannot

5   so stipulate.  But they have been advised that I am doing nothing.

6   I am just going to permit it to go in.

7        MR. VEEDER:  Your Honor, there were sent out for this

8   hearing 116 interlocutory judgements to the land owners in the

9   Fallbrook area that we believe overlie local, vagrant, perco-

10  lating water, if any, and there has been no objection by any

11  one.  There was no one in the courtroom yesterday or today in

12  regard to these interlocutory orders.  If amenable to your

13  Honor, I will present these to you for signature in the form

14  of interlocutory judgements, there being no objection to them.

15       THE COURT:  All right.

16       MR. VEEDER:  That is the process we have followed in the

17  past.

18       I have here, Mr. Girard, a copy of your letter of July

19  28, 1960 in regard to the Mexican Treaty, your proposed findings

20  of fact and conclusions of law, and as far as the United States

21  of America is concerned they are acceptable to us.  As I under-

22  stand the process, you are going to sign it and these will be

23  reproduced.

24       MR. GIRARD:  Mr. Sachse had a couple of corrections which

25  are purely perfunctory than anything else.  I am certainly

P. 14

1    agreeable to that.  I haven't been advised whether it is accept-

2    able to the Court and counsel.  As soon as I am, I will stencil

3    them and send you about a hundred or how many copies you want.

4        MR. VEEDER:  All right.  In the process, if this is signed

5    by your Honor, you send us the copies.

6        MR. GIRARD:  All right.

7        MR. VEEDER:  We will check through, as I understand your

8    direction, we will check through the answers where this matter

9    has been raised and we will send them copies of these findings

10   of fact and conclusions of law.

11       THE COURT:  If I recall, Mr. Sachse had a few minor

12   corrections.

13       MR. SACHSE:  Very minor.

14       THE COURT:  Are they acceptable?

15       MR. GIRARD:  They are.

16       MR. VEEDER:  They are your Honor.

17       THE COURT:  Will you correct it?

18       MR. GIRARD:  I will prepare the corrected one, if Mr.

19   Veeder wants me to, and send it to you for your signature.

20       THE COURT:  All right.

21       MR. GIRARD:  And have copies prepared and send them to

22   Mr. Veeder for forwarding.

23       THE COURT:  Do that.

24       MR. VEEDER:  That is everything we have, your Honor.

25       Mr. Girard, I will not be here, but if you submit it to

P 15  1    the office I will arrange to have it forwarded.

2        MR. GIRARD:  Have you any idea how many you will need,

3  Bill?

4        MR. VEEDER:  I am sure we will need a hundred, Fred.

5        MR. GIRARD:  I will keep the stencil, if you need it.

6        MR. VEEDER:  I have, as I said, nothing more, your Honor.

7        THE COURT:  Mr. Sachse, we had discussed before and you

8  had wanted to present something on the extent of the stream

9  system and some general finding or interlocutory judgement on

10  that.  How long will it take you to present that?

11        MR. SACHSE:  My presentation wouldn't take five minutes.

12  It is in the nature of a request, your Honor.

13        THE COURT:  Let's hear you on that now.

14

15

16

17

18

19

20

21

22

23

24

25

Belt 2    1        MR. SACHSE:   I would like to take just a second and back

2    up and say why, before I make the exact request.

3        We have now in evidence Exhibits similar to 208-C, either

4    before your Honor or before the Master, to the best of my

5    knowledge, covering the entire watershed.  It is possible from

6    those Exhibits and other Exhibits in evidence to determine

7    very readily whether a parcel of land is or is not physically

8    riparian to either a named or/unamed stream.  We have a stip-

9    ulation that if land      appears to be physically riparian it

10    will be deemed riparian in the absence of a showing by the

11    United States that some severance or other loss of riparian

12    right has occurred.   We have completed the taking of testi-

13    mony from the holders of all of the substantial appropriative

14    claims -- Fallbrook, Vail, Oviatt, Gibbon and Cottle, Stardust,

15    and there may be a few very small ones I don't know about.

16        If the purpose and intent and scope of this judgment is

17    to be an adjudication of the nature and character of the rights

18    in the stream, together with a regulatory or definitive judg-

19    ment covering appropriative and prescriptive rights, and that

20    is all -- in other words, if there is to be no regulatory or

21    quantitative provision contained in the judgment, I believe

22    the taking of evidence, insofar as my clients are concerned,

23    is for all purposes finished.   There is no earthly reason why

24    we today could not say draw a line somewhere and say I am

25    regarding the older alluvium and all the ground water in it

2

1    as a part of the stream system;   I am not regarding basement

2    complex and weathered basement complex and the water in it as

3    a part of the stream system.   If that is done, however, the

4    ruling may be, if your Honor should rule that the whole system,

5    that all the ground waters are part of the stream system, we

6    are still through, except for this one question that was raised

7    by Mr. Veeder a month and a half ago that now perhaps in some

8    cases we are going to ask for some sort of regulatory or

9    quantitative control over water use.

10        Now I believe that the defendants are entitled to ask

11   your Honor for a ruling, interlocutory in nature, as to where

12   on the Murrieta Creek, specifically, on 15-E, where the United

13   States has stated that is has no further geological testimony,

14   I believe we are entitled to ask your Honor for a ruling limit-

15   ing the ground waters that you will hold to be apart of the

16   stream system.   If you do that for us, we then are in a pos-

17   ition to sit down with our clients and say, "This is the

18   situation.   I see no earthly reason to spend any more of your

19   money, Mr. Jones." or "I think we have to go ahead, Mr. Jones."

20        That was the nature of my request.

21        In so far as the stream system is concerned, I have never

22   had the slightest desire to quarrel with the stream as delin-

23   eated on the U.S.G.S. Maps.   My reference is not to streams as

24   such.   My reference is to the surface areas beneath which

25   ground waters are to be hold to be part of the stream system,

1  and that is my only interest, and I believe we are ready in

2  the area delineated on 15-E to ask your Honor for that kind

3  of ruling.  It is my understanding that Mr. Veeder said that

4  we are ready for that kind of ruling.

5      THE COURT:  Let me interject. If the Court did make such

6  a finding for the purpose of an interloctory decree, even if

7  Mr. Veeder persisted in his contention that he might now take

8  up matters of regulation, and if the Court did go into that,

9  it would not concern these people --

10     MR. SACHSE:  -- who were eliminated.  That is correct.

11  Those who were held to be not part of the stream system.  To

12  be very specific, we have this very identical situation at

13  Fallbrook and we have written I don't know how many hundred --

14  Mr. Veeder has another bundle here -- of stipulated inter-

15  loctory judgments, where the surface flow of the stream is

16  conceededly within your Honor's jurisdiction, where there are

17  disclaimers or other factors eliminating the individuals

18  asserted right to it, and where we have said the ground waters

19  are vagrant, local and percolating your title is quieted to

20  those ground waters against the United States -- the United

21  States has no right, title or interest in them.  I believe we

22  are in shape to make that same kind of determination regardless

23  where your Honor might draw the actual line on the Map, for all

24  practical purposes, for everyone in the watershed.

25      But at the moment I am directing my attention to 15-E and

1 relying on Mr. Veeder's earlier statement that the geology

2 and hydrology for that Map is finished.

3     MR. VEEDER:  There is no question on that, Mr. Sachse.

4     MR. SACHSE:  That it is finished.

5     MR. VEEDER:  Yes.  Exhibit 15-E is reflective.  I think

6 I said that last June.

7     MR. SACHSE:  Yes.

8     MR. VEEDER:  Or July sometime.

9     MR. SACHSE:  Certainly June, I am sure.

10     THE COURT:  Is there any objection if I make such a find-

11 ing and we get an interloctory decree up involving the Murrieta

12 and the Pauba Valleys?

13     MR. VEEDER:  I look at it this way, your Honor, and I

14 believe that we have innumerable precedents.  Wherever the

15 lands, residuum or basement complex, are located, I see no

16 reason why we shouldn't have, in regard to those areas, the

17 same kind of decrees that we prepared for your Honor in the

18 Fallbrook area where the lands and the geology and requirements

19 are similar.

20     MR. SACHSE:  Yes, that is what I said.

Belt 3

21     THE COURT:  Mr. Sachse said that there might be an over

22 all finding in a general interloctory decree that a certain

23 area, the surface, overlies water, which water is a part of

24 the stream system, and then if you want to go ahead and work

25 out your/judgments from time to time, after you determine
                 little

1  apparently your irrigable areas, and all of that, fine and

2  dandy.  But your general finding would clear the air, and we

3  would know what people are in the area where we have to give

4  one type of attention, in other areas where we have to dispose

5  of them otherwise.  I think if that is the suggestion, for a

6  general interloctory finding outlining the area where the

7  underground water is a part of the stream system --

8      MR. VEEDER:  Then there is another reservation that I

9  would make if we proceed that way, that if we find an area

10  where we think there is some question, that we bring the

11  point up.

12      MR. SACHSE:  Your Honor, I can be quite specific, and

13  apparently I picked up the wrong file, and I don't have it

14  here, but this is the Master's finding, and the issues were

15  never objected to, and it is exactly what Judge Cranston did.

16  He made a blanket finding on Fallbrook Creek that the stream

17  was there, that the surface waters were there, and it was sub-

18  ject to the future jurisdiction of the Court, and subject to

19  the claims of the riparians but that all the underground water,

20  or if you want it the way it was written, it was the under-

21  ground percolating water, and I think we can do it the same

22  in the basement complex and in the weathered basement complex,

23  and possibly also in the alluvium.

24      I don't know where you will draw the line, but I think we

25  can draw that kind of a judgment and put the minds of several

   thousands of people at rest, and save us a lot of money and a

   lot of

6

1    time.

2        MR. VEEDER:  I don't recall what Judge Cranston did in all

3    of those areas, but I think the individual interloctory

4    judgments which your Honor has been signing, to my own recoll-

5    ection, in the Fallbrook area would be applicable to a great

6    number of the areas which are entirely/the basement complex.
                                        in

7    I don't know what the --

8        MR. SACHSE:  You talk about individual judgments, and I

9    would like to have an order, if his Honor so chooses, where

10   his Honor would say, for instance: reference is made to

11   Exhibit 15-E in evidence in this case, and then proceed by

12   saying, the Court finds that all underground waters lying

13   southwester/and westerly of the dark green line which the
              ly

14   Court has drawn on such Exhibit are all to be a part of the

15   stream system.  There is no such line here, of course, and I

16   don't imag ine the Court will draw it, but the Court can do

17   that, or, if the Court so determines, the Court can find that

18   all underground waters underlying the younger alluvium, or all

19   under basement complex, are such and such, and so forth.

20       MR. VEEDER:  I think I understand.

21       THE COURT:  That would take care of the younger and older

22   alluvium area, and in the basement complex.  Then the only

23   problem is the stringers of the under-alluvium area, and, as

24   a practical matter, why don't we have a few exceptions?   You

25   have the information where it proceeds, and let's leave out

1  those few areas.

2      Can't we word some particular general judgment that would

3  take care of the property, say, north and east of such-and-

4  such a line, namely, the basement complex, the older alluvium,

5  and so forth, and at the same time make some provisions for

6  the stringers of the younger alluvium?

7      MR. SACHSE:   I have asked that very question of the

8  engineer I used, Mr. Rowe: theoretically, how could we do it?

9  And this is the answer, as he gave it to me, and I would like

10  to pass it on to Colonel Bowen.  He said that those stringers

11  of the younger alluvium are so shallow that the water, if

12  there is a well drained layer in the stringer -- here is one

13  apparently right in there (indicating) -- actually the water

14  they are getting isn't what is going along through this

15  shallow layer of the younger alluvium except in the wet season

16  when it is saturated, but at that time it is intercepting water

17  from cracks, fissures, and so on in the surrounding area.

18      I tried to bring this out in some cross examination of

19  Mr. Kunkel as to the area over here in Long Valley, as I

20  think you will recall I asked how he could draw the areas for

21  his water contours going away from the stream?  I said, "Doesn't

22  the water run into the stream and the water go down the stream?"

23      He said, "There isn't any water in the younger alluvium

24  as such, except when it is full and running."  Now, the same

25  principle canbe applied here.  A judgment can be drawn taking

1    all of Tucalota Creek area, for example, as to all of the

2    underground waters, all of the vagrant local percolating

3    waters, and all of the surface waters of the riparians.   That

4    would, in my judgment, be a practical solution of that problem.

5         MR. VEEDER:   Why don't we settle one matter at a time

6    rather than bring in the stringers on the alluvium?   I would

7    rather settle one first.

8         I do believe with regard to the question of your Honor

9    with respect to 15-E, to the sections and townships and ranges

10   in the basement complex there is no question that you could

11   as of the mement enter a finding that water in those areas, by

12   reason of the scarcity of it, the location and all the other

13   factors you have alluded to is not a part of the Santa

14   Margarita system.   I believe that can be done.

15        Do you agree on that, Mr. Sachse?

16        MR. SACHSE:   Yes.

17        MR. VEEDER:   And California?

18        MR. GIRARD:   Yes, I agree on that, except I would like to

19   go further.

20        MR. VEEDER:   I have found that that is the only way you

21   can accomplish anything in a finding.   If there is agreement

22   on that, all right.

23        MR. GIRARD:   We will buy it.

24        MR. VEEDER:   I think you can get the descriptions of those

25   areas.   I believe that by looking at that line across there,

1   which has been drawn there -- well, I think from a practical

2   standpoint you would probably find it better to use the

3   section, township and range, the legal description because

4   certainly no ever surveyed --

THE COURT:  That is what I have in mind.  I talked to

6   you about that once before.  We are talking about something

7   that apparently you all agree to there.  What will we do on

8   that?

MR. SACHSE:  I would offer a practical solution.  For

10   example, you asked us at Christmas time to submit proposals,

11   and I drew a little sketch, and I still stick to it.  Thus,

12   for example, if a man owns land through which Tucalota Creek

13   runs, your Honor will have to retain jurisdiction over that,

14   and I don't care if your Honor finds that all of the under-

15   ground water is vagrant percolating water or not, but because

16   of its possible interference with surface water running

17   through there.  So it seems clear to me it makes very little

18   difference if you say all the water is vagrant local percolat-

19   ing water or not, but where the surface stream runs through

20   there, you can say, "I retain jurisdiction over the surface

21   stream," and then I think you have full control of it in the

22   future.

MR. VEEDER:  I would like to hear from Mr. Stahlman on

24   that.

THE COURT:  Just one thing first.  What do you say to

that suggestion?

1    MR. VEEDER:  Well in regard to my conversation with Mr.

2    Stahlman as to -- was it on Tucalota Creek, Mr. Wilkinson?

3    In other words, there is an area in there where the question

4    has already come up.  It is one of these stringer areas in

5    which the Vail Company says there is water there, and, as I

6    recall, you said that it was valuable water that could be

7    used for purposes of irrigation.  I don't know exactly where

8    that was.  This was where we were putting in evidence in

9    regard to basement complex, as it related to your land within

10   the Vail property grant.

11        Now, I am afraid of a general statement in regard to

12   those stringers of the alluvium for those reasons, because in

13   that the Vail Company and others are going to present problems

14   where I do think your general language will create a necessity

15   at a later date for us to come in and ask your Honor to change

16   it as to a particular parcel.

17        Now, I agree to a large extent with/Mr. Sachse has said
                                              what

18   in regard to basement complex, and certainly in regard to

19   residium in the Fallbrook area and the DeLuz Creek area, but

20   I cannot go along with him on the stringers of the alluvium,

21   because we have to take the responsibility to take into con-

22   sideration the individual situations.

23        MR. STAHLMAN:  May I make an observation on this matter,

24   your Honor?  The object is, first:  disassociating what may

25   be riparian land that might be benefited by some surface

1   water, could be or might be, and differentiating that from

2   our underground waters, we have agreed on the basement complex.

3        Now, in connection with what underground waters may be

4   available other than that, that is, outside of the area which

5   we have somewhat agreed upon here, your Honor may recall that

6   the Vail Company prepared an Exhibit as part of an outline

7   of proof which we submitted to the Court, I believe it was

8   last June sometime, and in there we made a calculation and a

9   comparison from State Exhibit F, and using both of the

10  Government basins and the State basins, we have made a compila-

11  tion of that, so that there has been an estimate as to the

12  ground water in storage in some of those basins.  So definitely

13  in the evidence there must be some of these areas on streams,

14  particularly --

15       THE COURT:  We are not talking about that, what is in

16  the ground water basins.  We are talking about the stringers,

17  as contrasted to the stringers that go through there.

18       MR. STAHLMAN:  As to whether they would be considered?

19       THE COURT:  We are not talking now about the basins.

20  This is a little different problem.

21       MR. ILLINGSWORTH:  Here is Tucalota Creek, your Honor,

22  with a small one here (indicating).  In other words, the

23  stringers do belly out into the underground.

24       THE COURT:  There has been no proof, has there, by

25  either the Government or the State of California that there

A12

is any basin on Tucalota Creek?

MR. ILLINGSWORTH:  Yes sir.  On Bulletin 57 there is a 585 acre feet capacity on Tucalota.

THE COURT:  On Tucalota?

MR. ILLINGSWORTH:  Yes.

MR. VEEDER:  Is that the area, Mr. Wilkinson, to which you were refering, -- Tucalota?

MR. WILKINSON:  I don't know what the State was refering to, Mr. Veeder.

THE COURT:  Where is that, do you know?

MR. ILLINGSWORTH:  Yes.  It is very close to where Highway 79 crosses, in the vicinity of Sage.

THE COURT:  In the vicinity of Sage?

MR. VEEDER:  It shows here on 15.  It is right through Sage Ranch.

It shows here on 15.  It is right through Sage Ranch.

MR. WILKINSON:  And it comes through Vail right there (indicating) right to the Vail boundaries.

MR. ILLINGSWORTH:  It is not on 15, is it?

MR. SACHSE:  It is not on 15, it is on 15-E.

MR. ILLINGSWORTH:  You meant 15-E, didn't you?

MR. VEEDER:  That is correct.

MR. SACHSE:  But it does    appear on 15.

THE COURT:  Here is Sage (indicating)?

MR. ILLINGSWORTH:  Yes.  It would be the larger segment

14,338

1   of this area, mapped as QYAL, which is to the north and east

2   of Sage.

3       MR. VEEDER:  Now, referring to the younger alluvium in

4   the Vail property, he would be downstream from that, and that

5   is where the Vail Company is interested in some ground water.

6       MR. WILKINSON:  That is where we have the well.

7       MR. VEEDER:  We were cross examining one day on that

8   point.  That is the property we were talking about on cross

9   examination when you started talking about the stringers.

10      MR. WILKINSON:  Yes.

11      MR. ILLINGSWORTH:  Perhaps it would be well if I clarified

12  how we determined an area was a ground water basin or not. One

13  of our criteria was that there had been some development there;

14  an area of alluvium of a given size may have been eliminated

15  because there had been no wells drilled there, and we had no

16  data on it, and, therefore, we felt that we would be conject-

17  uring too much to call it a basin.  But another area that we

18  called a basin perhaps was not a bit larger than that.

19      THE COURT:  I think where I got off the track is this:

20  my map indicates that Tucalota Creek proper runs up

21  northeasterly, and then strikes off to the north, and this

22  other Creek that comes down by Sage, I think it is called

23  Willow Creek, and it   joins Tucalota.  I think that Tucalota

24  runs in that direction (indicating) and then I think that

25  Willow Creek comes down here and runs into Tucalota, and I

1   was speaking of Tucalota proper when I was talking about the

2   stringers on Tucalota, and not up in here.

3      MR. ILLINGSWORTH:  Your Honor, up in here it is definitely

4   --

5      COLONEL BOWEN:  Your Honor, that intermittent stream

6   that you have indicated as Tucalota on your copy of Exhibit

7   15 --

8      THE COURT:  Exhibit 15, yes.

9      COLONEL BOWEN:  -- is Rawson Creek.  It rises in Crown

10  Valley and flows through the Rawson property to its confluence

11  with Tucalota Creek.  Tucalota Creek drains down through Sage,

12  and it is still called Tucalota Creek, and Willow Canyon is

13  a small tributary on the upper head waters of Tucalota Creek.

14     MR. VEEDER:  Isn't there an agreement on that?  I was

15  going to ask that we be governed by the 29-series.

16     THE COURT:  That straightens it out.

17     MR. GIRARD:  I would like to comment briefly on that,

18  your Honor.  I don't agree, your Honor, with some of these

19  statements that were made on these stringers.  Not so much on

20  the theoretical basis, but on a practical basis.  When you

21  get a stringer of younger alluvium which is underlying a dry

22  stream bed, that is, it only flows during the rainy season,

23  theoretically I suppose it does support the surface stream to

24  the extent that a surface run-off would go down if the basin

25  were full.  But practically you are not talking about any

1    water to speak of, and, practically, in the event there were

2    any future dispute on the stream, certainly whoever was pump-

3    ing water out of that basin would be entitled and would not

4    be required to keep the basin full in that little area just

5    so that the downstream could receive the maximum surface run-

6    off in the few days of the wet seasonal rain.

7         I think that as a practical matter as to some of the

8    stringers up in that area it would not hurt anyone and would

9    do everybody a lot of good to just drop them right out.

10        THE COURT:  That is what had been going on through my

11   mind.

12        MR. GIRARD:  We are not talking about any water, I don't

13   think, to speak of.

14        THE COURT:  If a man has just one acre over a stringer,

15   and has a little water, and someone around him has 500 or 600

16   acres, and you drop him out of the case , the amount of water

17   he might use could not do much damage, but he might get more

18   than his proportionate share as compared to the man who was

19   entitled to get some water from the little stringer.  But the

20   amount of water available, and I am not talking now about the

21   basin, but I am talking now about water in the stringers, has

22   to be of such small amount that there never could be any

23   attempt made to limit his use on the basis that downstream

24   owners were entitled to more water.  Isn't that true as a

25   practical matter?

1    MR. GIRARD:  The only way that can possibly hurt the

2    downstream user is to pump and lower the surface to the extent

3    that the surface water would be such that you would have to

4    recharge that basin, and the water would not get downstream.

5    The amount is negligible.

6        THE COURT:  The amount is negligible.

7        MR. STAHLMAN:  Could it be done on this basis:  could it

8    be done on the basis that when you get up in that area that a

9    finding could be made that any water that exists there would

10   not exceed the amount that would be necessary for domestic

11   use, and, therefore, domestic use having a prior use, might

12   be eliminated in the upper reaches of those streams?

13       MR. GIRARD:  You get the same thing from minor irrigation,

14   too.  I agree with the Judge that if you get basins or any

15   stringers where there is surface run-off year around or more

16   than just occasionally, they should be legally in.

17       THE COURT:  Could you  try this out: could you make a

18   finding that the amount of irrigable acres riparian to these

19   stringers was of such an extent that no use of water made out

20   of these stringers for riparian uses could ever be unreasonable

21   in comparison with downstream use?

22       MR. SACHSE:  Your Honor, may I just state this:  we all

23   like our own ideas, but I would like to take another approach

24   to my suggestion.  If any of these stringers, say on Temecula

25   Creek, are kept in this case, and if your Honor makes a find-

1 ing that all ground water is vagrant locally, even the ground

2 water of the stringers, you still have retained jurisdiction

3 over surface water.

4     THE COURT:  We agree on that.

5     MR. SACHSE:  Now, may I continue a moment?

6     THE COURT:  Yes.

7     MR. SACHSE:  Here is where I think Mr. Veeder would be

8 protected:  interference with surface flow, unreasonable

9 interference with surface flow could be accomplished -- it

10 could be -- by doing something to the stream.

12         (See next page)

P. 16
Belt 4

1    It could be done, for instance, by somebody moving in a bull-
2    dozer and creating a lake by scooping out all of the alluvium
3    and making a big sump.  In that case Mr. Veeder could come right
4    straight in here and ask for an order to show cause, and say,
5    "Mr. Jones is interfering with the surface flow of the stream,
6    and I want your Honor to enjoin him."  And you probably would.
7         What I am trying to say is that I think we are making this
8    too difficult.  We can make it a complete protection as to any
9    riparian user downstream by your Honor retaining jurisdiction
10   over this  man   and your right to stop him if he makes any
11   unreasonable interference with the surface flow of that stream,
12   and possibly Mr. Veeder might even argue that they pumped out all
13   of the alluvium.
14        MR. VEEDER:  Isn't that the practical way to approach it
15   rather than using a broad brush; simply retaining jurisdiction,
16   and if there is interference, why, I think we have talked about
17   that before --
18        THE COURT:  Yes.
19        MR. VEEDER:  I am afraid of your broad brush, your Honor.
20   That is my point.
21        THE COURT:  But here is one thing I want to keep in mind
22   in this decree, which is these people who have a piece of
23   property up here (indicating), and their right to go ahead with
24   developing this property without interference.
25        Now, possibly the suggestion you made, with one other,

P 17

1    might do it.  Supposing a man has a piece of property in the

2    basement complex, and it lays across a stringer, say it is

3    across a stringer of alluvium.  We could provide if he drilled

4    a well -- well, we could provide that the water underlying the

5    weathered complex out of the area of the alluvium was percolating

6    water, but if he tried to drill a well in this area (indicating),

7    he would not be subject to later litigation in this case.

8         If he wants to drill his well in the stringer of the

9    alluvium --

10        MR. VEEDER:  He may be --

11        THE COURT:  -- then he may be, so that is the fellow who

12   doesn't want to take a chance, and if he wants to be sure about

13   it and moves up on the bank and he tries to find some water that

14   is not connected with it --

15        MR. GIRARD:  That is my feeling about it, your Honor, that

16   you are going to find this as a part of the stream, the part

17   in his accounting of his riparian acres, and if he did drill

18   his well right there, all of his riparian land would be appli-

19   cable.

20        MR. SACHSE:  But my answer to that would be, and I think

21   that is the solution, if this man came to me and said, "Mr.

22   Sachse, you are an attorney, what do you think I ought to do?"

23        My answer to him would be if he had riparian land right

24   smack in the middle of the stream, if you think that is where

25   it was, my reasoning would be just exactly the same as Mr.

P 18

1  Girard has given, and I would say, "I don't think that Mr. Veeder

2  or anybody can come in and tell you that you have got to keep

3  this thing saturated, and I will defend you on it."  That would

4  be my answer, so I think your solution is eminently practical.

5      You have to keep jurisdiction because of the surface flow

6  on the main streams.  Not on every little barranca, but on the

7  main streams, yes, there must be jurisdiction, and having kept

8  it, simply find that the surface flow is a part of the stream

9  system, and the rest of it is not.  Then the job is done.

10     MR. VEEDER:   May I show, your Honor, in regard to 208C

11 the kind of a mechanical job that we have, as we have at Fallbrook,

12 and when we are moving out of that area (indicating).  Here are

13 the streams involved, which you are talking about.

14     Now, I think this, and that it would have to be included

15 in the finding, that we would locate the property, the evidence

16 of the property, where it is traversed by such-and-such a

17 stream, and you could make a finding based upon what your facts

18 are.

19     Wouldn't that be the way to do it?

20     THE COURT:  For the particular judgements involving the

21 particular owners.  But we are talking now about a general

22 statement which would let a lot of these people relax, and get

23 us out of their hair, which general judgement could be incorp-

24 orated by reference, particularizing that it would be such-and-

25 such, so there wouldn't be any conflict.  Or maybe you don't

P 19   1   need a general judgement.

2   MR. VEEDER:  My own view is that we have handled/with our

3   interlocutory judgements.  Now, I don't know how many we have.

It seems to be that is a simple way to do it.

4

5   THE COURT:  That will take forever.  That is the point.

6   MR. VEEDER:  Your Honor, it may take forever, but I am

7   afraid of the Ninth Circuit if I don't have a finding on each

8   one of these parcels of land and if I don't have a conclusion

9   of law regarding some of these parcels of land.  You can make

10   your general conclusion, as you desire, but I believe that I

11   have to bring to you an interlocutory decree for the land with-

12   in the exterior boundaries of each one of those parcels.

13   THE COURT:  Do you propose to have a separate judgement

14   on each one of those parcels?

15   MR. VEEDER:  To a large extent.  Where the land is ripar-

16   ian, I think we are going to have to.  I don't know of any other

17   way of handling it.  Sure, it is tedious, but we are set up to

18   do it.

19   MR. GIRARD:  You can do it that way, but if you are, you

20   are going to have judgements that are going to be the equivalent

21   of Cal. Juris. 2d.

22   MR. VEEDER:  Well, I can tell you that I have seen those

23   judgements, and I am not nearly as worried about the amount of

24   work that I have as I am worried about what the Ninth Circuit

25   told us to do.

MR. GIRARD:  We are not going to appeal, Mr. Veeder.

MR. VEEDER:  Pardon me?

MR. GIRARD:  We are not going to appeal.

THE COURT:  Mr. Veeder, let me point out this --

MR. VEEDER:  I think that somebody might come along and say this, that we didn't bring everybody in, and if that occurred, I would be worried.

THE COURT:  It seems to be that you ought to be able to eliminate a lot of these separate judgements.  That if you take one on Springer Creek, and you would not have to have all, but you could start at this Road here (indicating) and you could start on Springer Creek, and say that it flows in such-and-such a direction, and flows across property as hereinafter described, and has streams, shown on the map, and so forth; that the stream is a part of the stream system, and that the jurisdiction is retained over the surface flow of the stream, and that as to properties hereafter described it flows over them, and so forth. Then you could start in and take the parcels and say as to owner so-and-so, the land is riparian, so many acres are riparian and irrigable, and so many non-irrigable acres, and so forth, and say that the stream flows across there.  Say as to Parcel 100.  Then this could all be done in one judgement.

Then you could take and make the same finding at the same time, and take an area -- you could take an area such as west of Winchester Road, and you could pick up 102, and this 122, 124,

P. 21

1  and 117, which is not riparian.  Then you would have one judge-

2  ment.  I don't see why you would have to have a separate judge-

3  ment for each parcel.

4      MR. VEEDER:  Let me show your Honor on this as to what

5  you are doing now.

6      THE COURT:  I know that you say this is on Fallbrook --

7      MR. VEEDER:  I will show you again from the standpoint of

8  the simplicity of the descriptions, I think that we have gone

9  through this matter with the greatest care, and we are now in

10  a position to refer to exhibits, and to parcel numbers.

11      We have already said that we are delivering certified

12  copies of these to the Title Company, and I think the matter is

13  taken care of from the standpoint of descriptions.  I have no

14  worry on that point.  We are handling it every day now, and

15  certainly the mechanics of this thing is already accomplished

16  and in the record.

17      MR. GIRARD:  There may be a lot of merit to this insofar

18  as riparian land is concerned and surface flow, but when you

19  get over into the ground water basin, where, say, you have got

20  hundreds and hundreds of people, are you going to describe the

21  ownerships of each one?

22      MR. VEEDER:  I don't think we have to.  I think the Title

23  Insurance Company has already gone along with us, Mr. Girard,

24  on the proposition that if we file these certified copies with

25  them, that is sufficient.

P 22

1      THE COURT:  Exhibit 208?

2      MR. VEEDER:  208-B.

3      THE COURT:  And the series?

4      MR. VEEDER:  And the 208-Series.  Then from the standpoint

5  of reflection of the judgement and jurisdiction, we are over the

6  fence on it, and the decree is made a part of your title by

7  reference in that manner.  I think you are creating a lot of

8  difficulties that are not there.

9      THE COURT:  What would you do?  Refer to properties by

10  reference to 208-B?

11      MR. VEEDER:  Yes.

12      THE COURT:  And not repeat the description?

13      MR. VEEDER:  Why, no.  I think it is perfectly legal, and

14  certainly the Title Companies have bought it.

15      MR. SACHSE:  My only thought was it might be even simpler,

16  in other words, if Judge Carter could draw -- and I am making

17  this very simple now -- draw a line simply on the section lines,

18  on both sides of this, and I don't know why you would even have

19  to have an exhibit with you on this, but you could give your

20  title company a sheet of paper that said, "All the land within

21  the following boundaries is a part of the stream system, " and

22  that is all they would need.

23      MR. VEEDER:  Well, if I am going to give the whole matter

24  to the Title Company then it is reflected in the whole chain

25  of title, and then the problem of an extensive decree is very,

P 23

1  very simple.

2      MR. SACHSE:  That is a minor thing.

3      THE COURT:  Yes.  Let's take a short recess now.

4      (A short recess.)

5      THE COURT:  Before you leave today or tomorrow, I will

6  try probably off the record, while we are standing around the

7  map, to draw a line on that paper, and I don't think we will

8  have too much of a problem there, -- there may be a little

9  problem up there in the corner, with some of the water running

10  the other way, up in the Northwest corner of Murrieta, which

11  Mr. Kunkel was testifying about when he was talking about the

12  other watershed, a very small area, but we could work that out.

13      MR. VEEDER:  I don't think there is anything else.

14      THE COURT:  Are We prepared now to hear some argument on the

15  Vail judgement?

16      MR. STAHLMAN: Yes, your Honor.  I just have a few things

17  on which I would like to call Colonel Bowen.  The one is the

18  evapo transpiration loss on the storage area behind the dam,

19  and the other was the checking of the irrigated acreage on the

20  new potato land that was put in.

21      THE COURT:  Come forward, Colonel Bowen.

22          ALLEN C. BOWEN,

23  called as a witness on behalf of the Vail interests, and having

24  been previously duly sworn, testified further as follows:

25

## DIRECT EXAMINATION

BY MR. STAHLMAN:

Q  Colonel Bowen, since your last appearance in court, did you meet with Mr. Wilkinson and check the Sanderegger report in relation to the evapo transpiration losses in the area of the Vail reservoir site?

A  Yes sir.

Q  Did you make some calculations in connection with those matters?

A  Yes sir.

Q  Do have the result of them at this time?

MR. STAHLMAN:  May we have Exhibit AU, please?

THE COURT:  AU?  What exhibit?

MR. STAHLMAN:  AU.  I can get it here, your Honor.

THE COURT:  You may have my copy.

(The document referred to was handed to counsel.)

BY MR. STAHLMAN:

Q  You observed the figures that Mr. Wilkinson has worked up in Exhibit AU?

A  May I see the exhibit, Mr. Stahlman?

(The exhibit was handed to the witness.)

A  Yes sir, I have observed the tabulation as shown on Vail AU.

Q  Did you make independent calculations of your own in connection with this matter?

P 25

1        A   I made independent calculations of my own from the

2   basic data made available to me by Mr. James Vail Wilkinson.

3   Those data were plane table sheets, showing areas of type and

4   density of vegetation in the Vail dam reservoir site.   They were

5   made in January and February of 1948, as I recall.   And I also

6   had made available to me an enlarged or two enlarged vertical

7   aerial photographs, which were made in 1939.

8        MR. VEEDER:   Are those matters in the record? Are those

9   in evidence?

10        MR. STAHLMAN:   Is this a question now?

11        MR. VEEDER:   Yes; yes sir.   I am caught completely flat

12   footed, and I didn't know about           this approach.

13        MR. STAHLMAN:   The last time we were here, as you recall,

14   Mr. Veeder, it was agreed that Colonel Bowen would go up with

15   Mr. Wilkinson and check the data on the Vail Ranch, and such

16   other information as he desired.   He stated   at that time he

17   was able to make a calculation, and this is the result of it.

18        MR. VEEDER:   Yes, and all I asked was whether the data

19   that the Colonel used are in the record, and I think it is

20   important.

21        THE COURT:   Are they in the record, Mr. Stahlman?

22        MR. STAHLMAN:   I don't think so, your Honor.

23        THE COURT:   Can you put them in the record?

24        MR. STAHLMAN:   Surely.   They are basic data, as I explained

25   to your Honor the last time.   However, we will make them

P 26   1   available and put them in evidence, if the Court so desires.

2      THE COURT:  You saw aerial maps.  You say two aerial maps?

3      THE WITNESS:  Yes, your Honor.

4      THE COURT:  Of 1939?

5      THE WITNESS:  Yes sir.

6      THE COURT:  What other data did you work on to make your

7   calculations?

8      THE WITNESS:  Plane table sheets, I believe six in number,

9   which were made by Mr. Sanderegger in 1948.

10      THE COURT:  Go ahead.  We understand that you will produce

11   these documents later.

12      MR. STAHLMAN:  Yes.

13      Q  This series of aerials, are the series of aerials that

14   are in evidence in this case, do any of these cover these

15   particular aerial photographs?

16      A  Yes sir.

17      Q  In other words, so far as the aerial photographs, they

18   are in evidence and in this case?

19      A  They are for a different time, though, Mr. Stahlman.

20      Q  Very well.  What conclusion did you come to as a result

21   of your investigation as to the salvage and the evaporation

22   transpiration loss.

23      A  My conclusions, based on the calculations I made, are

24   that the consumptive use and the qquantitative values of salvage

25   water,  as determined by Mr. Sanderegger were valid.  They are

P 27

1   prepared in the usual accepted technical manner for the prepara-

2   tion of this type of data, and are probably on the conservative

3   side.

4       Q By that what do you mean, Colonel Bowen, that the --

5       A  By that I mean that if any errors are made in Mr.

6   Sanderegger's calculations, they undoubtedly are conservative,

7   in that they might not reflect as high a consumptive use as

8   actually occurrs.

9       Q  Then will you state that the figures as shown on Exhibit

10  AU, as presented by Mr. Wilkinson, your opinion

11  of those figures is that, although they may be on the conserva-

12  tive side, they are figures which reflect the salvage and the

13  evapo transpiration loss?

14      A  Yes sir.  In as much as this tabulation is extracted

15  from the A. L. Sanderegger report in 1948, I would say that

16  they are valid and conservative.

17      THE COURT:  Let me interrupt you.  Is this a good stopping

18  point?

19      MR. STAHLMAN:  Yes, your Honor.  I am going to another

20  subject.

21      THE COURT:  All right.

22      (Another matter is called.)

23      THE COURT:  Now, Colonel, you said the figures are conser-

24  vative.  There are two sets of figures.  One is the amount of

25  the evaporation from the lake, and the other is the consumptive

P 28 1    loss in the natural state.  Now, the one you said was conservative

2    is what, -- the consumptive loss in the natural state?

3         THE WITNESS:  Yes sir, those were the figures to which I

4    referred.

5         THE COURT:  And you were not refering to the evaporation

6    from the lake?

7         THE WITNESS:  No, your Honor.

8         THE COURT:  All right.

9    BY MR. STAHLMAN:

10        Q  Now, also, I think you indicated the last time that you

11   were to check up with Mr. Wilkinson on the area that was since

12   the last report brought under cultivation, on this exhibit J,

13   Vail J.  Did you make a calculation of the area?

14        THE COURT:  Is it designated in some way on the map?

15        MR. STAHLMAN:  Yes, designated as 20, Area 20 on the Vail

16   Exhibit J.

17        THE WITNESS:  Yes, I made a determination of the area of

18   that field.

19   BY MR. STAHLMAN:

20        Q  How did you make that determination?

21        A  I took a vertical aerial photograph and traversed the

22   perimeter of the field in company with Mr. Wilkinson, and

23   delineated the outer perimeter of that field on the photograph,

24   and made the determination of the area by measuring the area

25   delineated on the photograph.

14,356

1   Q   And what figure -- how many acres did you find to be

2   in that area which has now been brought under cultivation?

3   A   I determined the area of Field 20, as shown on Vail J,

4   to be 234 acres.

5   Q   And do you recall what Mr. Wilkinson's figures were?

6   A   Yes sir.

7   Q   And what were those?

8   A   329 acres.

9   MR. STAHLMAN:   Any questions?

10   MR. VEEDER:   I want to look at the exhibits when they are

11   produced.  Aren't you going to get the aerials which were used?

12   MR. STAHLMAN:   We have the aerials, and we will have to get

13   aerials made.  We desire to keep these.  They are a part of

14   other aerials.  And the plane table sheets we can have repro-

15   duced from the originals.  Wouldn't the observation be sufficient,

16   if we brought them in here?  It is the only set we have, and it

17   would cost about $75.00 to have it done.

18

19

20

21

22

23

24

25

1    MR. VEEDER:  I can't cross examine without seeing what

2  was used.

3    THE COURT:  Is there anything of anymoment here, Mr.

4  Veeder?

5    MR. VEEDER:  Yes, your Honor, there is a great deal. We

6  are in this position, of a downstream riparian with an

7  appropriater upstream.

8    THE COURT:  You can just answer that yes or now. I take

9  it that your answer is that there is?

10    MR. VEEDER:  Yes there is, your Honor,

11    THE COURT:  All right.  You have that right.

12    MR. STAHLMAN:  We will bring them in the next time.

13    That is all I have at the present time with Colonel Bowen.

14    THE COURT:  You may step down, Colonel.

15                           (Witness excused)

16    MR. STAHLMAN:  There was an Exhibit on the last occasion

17  that Mr. Veeder objected to, and he wanted to study it over.

18    MR. VEEDER:  I think that is Exhibit AX?

19    MR. STAHLMAN:  Yes, AX.

20    MR. VEEDER:  I have it here.  I have the Court copy here.

21    MR. STAHLMAN:  Your Honor will recall this was a cal-

22  culation that Mr. Wilkinson testified he made by using the

23  stream flow records that are in evidence in the case, and he

24  made a comparison between what would have been the average

25  of the quantity of water that Vail would be entitled to under

1    the 25% of the original judgment, and the average of the

2    amount of water he would be entitled to under the stipulated

3    judgments.

4         THE COURT:  Do you enter it now?

5         MR. STAHLMAN:  I offer it in evidence now.

6         MR. VEEDER:  Your Honor, in that regard the reason why

7    I asked to have the opportunity to examine it, I think it is

8    going to be a part of my argument, and I think if you would

9    with hold ruling on the offer, if you overrule my argument on

10   the point, then the matter can be tendered in evidence during

11   the course of the argument.

12        MR. STAHLMAN:  This would be best:  these are figures

13   that are just listed out, and this is merely for the purpose

14   of illustration relating to those figures.

15        MR. VEEDER:  Well, your Honor, may I show you the point

16   that I have in mind, and you can rule on it as you desire.

17        I have no particular view on the matter other than this:

18   it is his interpretation -- Mr. Wilkinson's interpretation

19   of the stipulated judgment.  It is my view that the interpre-

20   tation/    Mr. Wilkinson has adopted and that the State of

21   California has adopted is incorrect .  It is a matter con-

22   cerning which your Honor will have to rule.  As I say, I

23   would prefer that it would not be --

24        THE COURT:  I will hold it up, then, until you are ready.

25   How do you want to proceed now?

1    MR. STAHLMAN:  Your Honor will recall on the last

2    occasion when we made some attempt to argue the matter of the

3    stipulated judgment, that your Honor had expressed a desire

4    to hear us on several subjects, and two of them that we did

5    not reach were the matter relative to the Vail Dam, and the

6    other one was the Pauba Well, and Mr. Veeder then took the

7    floor, and I suppose took out from under me, and went ahead

8    with the argument which he made with relation to the features

9    involving the injunctive process.

10        So if your Honor would follow that procedure, I had

11   thought I would first make reference to the Vail Dam, the

12   features that surround that, as the Government have it in

13   their brief which they submitted, the memorandum that attacked

14   the Dam by reason of the fact that the Government had at one

15   time filed a protest to the application of the Dam; and in

16   connection with the matter of the Pauba Well, it attacked

17   that on the ground of unjust enrichment, and I thought if

18   your Honor so desired to have the argument on the Dam first,

19   and then go to the Pauba Well.

20        THE COURT:  I will hear from Mr. Veeder.

21        MR. STAHLMAN:  Very well.

22        MR. VEEDER:  You mean my argument in regard to this

23   matter?

24        THE COURT:  Yes.

25        MR. STAHLMAN:  You made the attack.

A 4

1    MR. VEEDER:  Very well.

2    THE COURT:  The argument on the Vail judgment, anything

3    that you want to present, the Dam and the Well.

4    MR. VEEDER:  I will be glad to go ahead, your Honor.

5    From the standpoint of the United Stated, your Honor,

6    we take the position that the evidence introduced by the

7    Vail Company themselves belies any basis for your Honor taking

8    the most drastic action which one Court can take against

9    another, that is, to set aside a judgment of a Court which

10   clearly had jurisdiction which tried the case for 444 days

11   and which concluded the ligitation by agreement among the

12   parties in the stipulated judgment.

13   We believe that there must be the most compelling reasons

14   for your Honor to take such harsh and drastic action.

15   We believe, moreover, that the United States of America,

16   having constructed a $200,000,000 project at Camp Pendleton and

17   the Navy Ammunition Depot and the Hospital, reliant upon it's

18   right to use water acquired from the Santa Margarita Rancho

19   is entitled to protection from this Court, and by this Court,

20   in regard to these invaluable rights covered by the stipulated

21   judgment.

22   THE COURT:  Of course, you would have to segregate the

23   part of the investment that was built up outside of the

24   watershed.

25   MR. VEEDER: The stipulated judgment very carefully

14,361

P 30

1   expresses this all important factor, that we can use the water

2   outside of the water shed as against the Vail Company, and is

3   one of the prime reasons why this stipulated judgement is of

4   tremendous importance.  As against the Vails, we can take the

5   riparian water outside of the watershed and may use it.

6       THE COURT:  But even so, if that is true, you can take it

7   out of the watershed as against others.

8       MR. VEEDER:  That is true, your Honor.

9       THE COURT:  And your argument is that there is a shortage

10  of water, and it is very obvious that other people could keep

11  you from using it there.

12      MR. VEEDER:  Your Honor, until someone comes along and

13  shows that we are in some way making demands upon them for the

14  delivery of water, the matter is moot.  Up to this time no

15  riparian has said that we have invaded their rights by the

16  diversion of this water out of the stream system.  We built

17  our area, we built the vast majority of the area, this great

18  project, outside of the watershed, and it was specifically

19  provided in the stipulated judgement that we could use the water

20  out of that.

21      Now, there is no question in my mind that riparians can

22  so contract and so stipulate, and that the California law is

23  very clear in that regard.  I have submitted to your Honor

24  briefs, extensive briefs, on the proposition that as between

25  two riparians they can make such an agreement, and that is all

P 31   1      that we have stated there.

2            Your Honor will recall that I filed with you a map showing

3      that Vail Company controlled during the low water period all of

4      the water in the Temecula and Murrieta creeks.  Your Honor has

5      that map, and it has never been contested, and no evidence has

6      been offered contrary to that proposition.

7            THE COURT:  That map, I take it, is just argument and it

8      is not an exhibit in the case?

9            MR. VEEDER:  Well, it is certainly a map that is drawn

10     from exhibits, yes.

11           I turn first, your Honor, to what I believe is a primary

12     ground upon which an attack has been made by the State of

13     California and to a decree by Mr. Stahlman.  It is urged that

14     there is difficulty in apportioning the water between the Vail

15     Company and the United States of America.

16           At great length it has been urged that you can't arrive

17     at the 33 1/3% and the 66 2/3% with any degree of certainty,

18     and the State of California introduced, I think, their Exhibit

19     AX to show that the measurements at Ysidora are no longer

20     pertinent by reason of pumping in the area.

21           But I call to your Honor's attention the most important

22     single proviso in the stipulated judgement.  If your Honor has

23     the judgement there, I would like to have him follow me, if he

24     would.

25           It is Section 12 of the Stipulated Judgement, and it would

P 32

1    be page 51 of the Amended Complaint.  Does your Honor have that?

2        THE COURT:  No, I don't know that I do.  Do we have an

3    exhibit number for the Stipulated Judgement?

4        MR. VEEDER:  It is known as Exhibit A of the complaint,

5    your Honor.

6        In any event, the provision to which I refer is paragraph

7    12, and if you desire for me to wait until you get it, your

8    Honor --

9        THE COURT:  I don't know that I have it.  Go ahead and

10   read it.  Is it long?

11       MR. VEEDER:  No.  It provides:

12       "The defendant at all times" -- that is the Vail Company --

13   "shall be entitled to divert from the Temecula Santa Margarita

14   River and its tributaries, and to apply to a beneficial use

15   upon their said lands, an amount of water equal to one half of

16   the amount which plaintiff is entitled to divert from said

17   river and its tributaries and apply to beneficial use upon

18   their land."

19       In other words, if the United States of America is using

20   100 acre feet under the stipulated judgement, then the Vail

21   Company is entitled to use one half of that, and that is 33 1/3%,

22   as provided by the stipulated judgement.  It is simplicity

23   itself.  There is no problem.

24       True, provision is made for measurement at Ysidora and at

25   Temecula Gorge, but in contemplation of the very thing that

P 33

1  transpires now, or certainly occurred at the time that this

2  judgement was entered, water did not go past Ysidora for a

3  great many years.  So the guiding criteria and the basic precept

4  that was written in this judgement to make it workable under

5  those circumstances was paragraph 12, which I just read.  That

6  is in no way related to the measurements at Temecula, and it

7  is not related to Ysidora.

8     So you have the modus operandi, as the Harvard boys would

9  say, on determining the quantity of water under this stipulated

10  judgement.

11     I call to your Honor's attention the fact that the inter-

12  pretation that was placed upon the judgement by Vail AX, and

13  by the exhibit prepared by Mr. Illingworth and offered in

14  evidence, did not take into consideration the basic principle

15  here, namely, that there are two ways of arriving at the

16  apportionment provided for under the Stipulated Judgement.

17     So there is no problem -- there is no problem whatever

18  in apportioning, pursuant to the will of the parties who entered

19  into this Stipulated Judgement to conclude costly litigation,

20  and it was costly litigation that brought the settlement, and

21  nothing else.

22     I turn, however, your Honor, at this point to Vail's AR,

23  and you will note that I think I can make my entire argument

24  on the basis of the Vail Company's exhibits which are offered

25  in evidence, Vail Company's AR-13 and in conformity with my

14,365

P 34 1    suggested interpretation, which I asked your Honor to adopt in

2    regard to paragraph 12, I refer to the letter of November 9, 1950.

3        Does your Honor have AR-13?

4        THE COURT:  Yes.  Which sub number did you say?

5        MR. VEEDER:  It is 13.  You will observe that there is

6    transmitted by that letter of November 9, 1950 to Colonel DuBBer

7    the J. R. Pemberton report, which is also an exhibit in this case.

8        There is reviewed there in that letter from H. M. Hall,

9    who was then representing the Vail Company in this matter, and

10    who had been their engineer for years, and who was the engineer

11    at the time the Stipulated Judgement was prepared, that he says

12    this, or he says, among other things, in the second paragraph:

13        "Therefore, water pumped under the Pemberton plan will

14    increase this total water crop and in reality is to the advan-

15    tage of Camp Pendleton.  However, under the terms of the

16    judgement we are entitled to use an amount of water equal to

17    one half of the total use of the Camp, plus all the flood water

18    we have captured at a Vail Dam."

19        THE COURT: "Plus all the flood water"?

20        MR. VEEDER:  Yes.  I am not buying that part, but I am

21    saying this, that in 1950, prior to the time that this litiga-

22    tion was initiated, there was an interpretation placed upon the

23    Stipulated Judgement exactly as I have interpreted it here,

24    your Honor.

25        THE COURT:  It could not be.  If the interpretation placed

14,366

P 35 1    upon it by Vail was that they had half of the water that the

2    Government used, plus all that they could catch in Vail Dam,

3    that isn't the interpretation that you have ever relied upon,

4    or that the Government placed any reliance upon.

5        MR. VEEDER:  Oh, yes, your Honor.

6        THE COURT:  That they could use all the water they caught

7    in Vail Dam in addition to their one half?

8        MR. VEEDER:  No.  I am talking about the 12th Proviso now,

9    that he interpreted, that is, I mean Mr. Hall interpreted to

10    a representative of the United States, and that is the way it

11    has always been dealt with so far as I have been concerned,

12    that for every 2 acre feet of water that was used, Vail was

13    entitled to 1.

14        Now, in regard to this matter of flood water, there may

15    be a question of further review, but as to whether this docu-

16    ment is subject to an intelligent interpretation, I submit

17    your Honor has before him the controlling provision or proviso,

18    so that the attack upon it, as not being subject presently to

19    interpretation, is not valid by the plain statement in the

20    Stipulated Judgement itself.

21        The next proposition that I would like to allude to, your

22    Honor, and I don't know whether your Honor has the pleadings

23    before him, but I refer to the second amended supplemental

24    answer of the Vails.  That is the document that they have

25    undertaken to prove -- I mean the allegations -- they have

P 36

1  undertaken to prove, but which I respectfully submit they have

2  totally failed.

3       They had the burden of proving all these elements and

4  aspects of their amendatory answer, and chief among those

5  allegations are allegations of mistake.  At this point I want

6  to urge to your Honor consideration of a repeated statement by

7  counsel in this courtroom, that the basic reason for concluding

8  this litigation, the litigation from which stemmed the Stipulated

9  Judgement, rather, was the fact that both parties were spending

10 themselves broke, and that they wanted to terminate the liti-

11 gation for that reason.  I can't imagine a better reason for

12 terminating litigation by a stipulated judgement.

13      I have submitted already to your Honor authorities showing

14 that the conclusion of the litigation -- that a stipulation or

15 agreement for the purpose of concluding litigation is a valid

16 consideration and an enforceable consideration, and creates a

17 contract that can be enforced.  I don't believe/there is any
                                                   that

18 doubt, and I don't believe that your Honor would doubt, that

19 the parties who, having litigated for 444 days could not thus

20 conclude their litigation.  So basically and fundamentally we

21 are back to Paragraph 12 again, saying that there is/language
                                                    a

22 that makes this operative, and the sole question is whether

23 this matter was properly concluded.

24      But as to mistake, I submit that is irrelevant, because

25 the Vail Company called not one single witness to testify, and

P 37

1   it behooved them to do so, that they would not have concluded

2   the litigation solely by reason of the desire to terminate the

3   costly processes in which they had been engaged, and I think

4   that one of the basic and fundamental issues here is why didn't

                                              who
5   they undertake to prove by the man/signed the Stipulated

6   Judgement that they would not have thus stipulated except for

7   a mistaken understanding of the geology of the area.

8        But assuming -- assuming that they did carry their burden --

9   Mr. Stahlman, in regard to signing the Stipulated Judgement,

10   you will find in the record that Mr. Mahlon Vail, as a trustee,

11   signed --

12        MR. STAHLMAN:  I wasn't talking to you , Mr. Veeder.

13        MR. VEEDER:  Then please don't talk when I am arguing.

14        MR. STAHLMAN:  I am sorry.

15        MR. VEEDER:  You raised a good point.  There is in the

16   record certified copies of the resolution approving the stipu-

17   lation, and Mahlon Vail signed it as trustee, as Mahlon Vail

18   individually, and as Mahlon Vail something else.

19        At any rate, the people who have the responsibility for

20   the administration of the Vail Company property entered into

21   the stipulation, and they approved it, and they said it was

22   for the best interests of the Vail Company.  So unless there

23   are extremely compelling reasons, your Honor should not, in

24   my view, overrule the Superior Court, as you are asked to do.

25        But, what, then, are the mistakes that they are now

P 38

1   pleading, but have not been proved?   They say that they didn't

2   know what the hydrology and the geology of the situation was,

3   or they wouldn't have entered into this agreement.   I submit

4   that they should have put a man on the stand, who would have

5   said, "Well if I had known all about this geology, I wouldn't

6   have signed it."   But they didn't, and it breaks down on that,

7   and the burden of proof is on them.

8        But let's take a look at this.   Let's take a look at the

9   record that was transmitted by the letter to which I just made

10   reference, from Mr. Hall, the Pemberton report.

11        The Pemberton report is Exhibit 205 in the record, and it

12   is extremely interesting, and I recommend to your Honor a

13   consideration of this approach:

14        That you take the Pemberton report, read it back against

15   15E, and you will find that the Vail Company in the summer of

16   1950 had to a very large extent full and complete knowledge of

17   the geology which we are now offering here for your Honor to

18   consider.

19        THE COURT:   Of course, that is ten years after the Stipulated

20   Judgement was signed.

21        MR. VEEDER:   Well, your Honor, if you let them sit around,

22   I am going to get to the question of laches.   But they are here

23   in 1960 saying that they didn't know what the geology was at

24   the time of the Stipulated Judgment, but they did know fully

25   and completely and in detail in the year 1950.

P 39

1        THE COURT:   Which was just a year before you filed this

2    suit.

3        MR. STAHLMAN:   Less than a year.

4        MR. VEEDER:   Well, all I can say to that is: so what?   The

5    fact remains that the Vail Company had full and complete know-

6    ledge of the geologic structure, they had full and complete

7    knowledge of our assertion, as shown on 15E, of a large water

8    bearing strata, which was considered to be a part by the Vail

9    Company of the Santa Margarita River.   They, moreover, as

10   pointed in the letter from which I just read -- they pointed

11   out in transmitting the Pemberton report that by incorporating

12   this deep well, as proposed by Mr. Pemberton, and by utilizing

13   this deep water there would be a benefit to Camp Pendleton and

14   to the Vail Company, both.

1      Your Honor will note, and I hope your Honor will follow

2   through on my request, paragraph by paragraph, the data set

3   forth in the Vail Company's Pemberton Report bears out the

4   geology on 15E.

5      I observe that it is twelve o'clock, your Honor.

6      THE COURT:  I don't want to interrupt the line of your

7   argument, and when you come back pick up where you are.  But

8   somewhere along the line tell me your views on this.  There

9   is an old adage that you can't have your cake and eat it, too.

10      As I understand the judgment that was entered, there

11   were findings that this area of older alluvium formed part of

12   the stream system -- the substance of it.  Now you, of course,

13   don't want me to be bound by that finding.  Now if the old

14   judgment sticks, I would apprehend that then I would be bound

15   by the entirety.  I would have to, therefore, say all this

16   talk about the geology here, as far as the United States and

17   Vail are concerned, is academic.  Vail Company can go outside

18   the banks of the Pauba Valley and stick down some wells in

19   there and any water they get is not counted in the proportion

20   between the United States and the Vail Company.

21      MR. VEEDER:  Sufficient to the day is the evil thereof.

22   Up to this point that has not transpired, and I submit, your

23   Honor, we have to live with the record as it stands today.

24      THE COURT:  I want you to discuss that.

25      MR. VEEDER:  I'll be glad to discuss it.

2

14. 372

1    THE COURT:  Because you want to sustain part of the old

2    proceedings and you want to throw out part.

3    MR. VEEDER:  Not at all, your Honor, not at all.

4    THE COURT:  I want your views on that.

5    MR. VEEDER:  I'll be glad to give your Honor my views on

6    that.

7    THE COURT:  We have evidence here which shows that at the

8    time of this decree they contemplated that the stream system

9    comprised the Pauba Valley and Murrietta Valley and did not

10   include this area of older alluvium.  If it is not part of the

11   stream system under the old decree, I suppose Vail could stick

12   wells down on either side of the Pauba Valley and any water

13   they got out of those wells wouldn't count on the one-third

14   two-thirds as between the United States and Vail.  Of course,

15   other people in the area might feel that this was taking more

16   than Vail's share of the water.  We would have to make a

17   finding as to other people that would be comparable to the

18   provisions of the old judgment between the United States and

19   Vail.

20   MR. VEEDER:  I accept your Honor's invitation to argue

21   a hypothesis that doesn't exist.  I'll be glad to do it.  I

22   don't see the relevancy of it at this juncture.  But I'll be

23   glad to argue the hypothesis based on the equities of this

24   case.  And here is the most important factor I know, that to

25   invoke the equity of this Court there have to be stronger

reasons than have been demonstrated here.  But I'll argue that after lunch.

THE COURT:  Well, let's get ourselves in position.  The plaintiff has invoked the equity jurisdiction of this Court.

MR. VEEDER:  Not attacking the stipulated judgment.

THE COURT:  The defendants have come in, in the equity proceeding.  They want equitable treatment, too.  But the plaintiff has instituted this suit and invoked the equity jurisdiction of the Court.

MR. STAHLMAN:  He who seeks equity must do equity.

MR. VEEDER:  Do you want me to respond now?

THE COURT:  Not now.

When do you want to be back?  How about a quarter of two?

MR. GIRARD:  Fine.

THE COURT:  All right.

(NOON RECESS)

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, AUGUST 31, 1960, 1:45 P.M.

2         (Other matters)

3         MR. VEEDER:  I had alluded to the chain of circumstances

4    which followed the preparation by Vail Company of the

5    Pemberton Report and the transmittal to the United States of

6    America of that document, with the interpretation placed upon

     the stipulated judgment by the Vail Company's representative.

8    But it warrants further reference because the Pemberton Report

9    is reflective of a plan of operation between the two parties

10   to the stipulated judgment which was actually completed and

11   in which the parties reliant upon the stipulated judgment

12   carried out a course of action.

13        It will be noted, under the heading of "geological

14   structure" that there was traced the Elsinore and Wildomar

15   faults, the review of the water bearing strata, the statement

16   that the sedimentary materials amounting to many cubic miles

17   in volume filled in the valley as we now know it, and that

18   Mr. Pemberton, who apparently, and I know, is a geologist

19   with a fine reputation, pointed out the value to the Vail

20   Company and to the United States of tapping the ground waters,

21   the "deep ground waters," as he alluded to them.  He had

22   recommendations there about drilling wells.  He even went

23   further, however -- and it was a point which strikes me as

24   being quite significant -- he wrote in the Pemberton Report

25   in regard to the differences in the chemical content of the

1    shallower and the deeper waters.  And each one of these

2    factors is an element concerning which we have knowledge now

3    and concerning which they had knowledge then.  He pointed out

4    the value of the deeper waters for domestic purposes, the

5    shallower waters for agricultural purposes, a thing we know.

     The Navy Well proved that.

        So we have the initial step of a course of conduct under

8    the stipulated judgment which appears to have been, if not

9    initiated by the Vail Company, certainly it was a cooperative

10   effort.  We know that.  And we know that every step that was

11   taken, based upon the Pemberton Report, came to completion

12   by the will of the Vail Company.  Else none of these things

13   could have transpired.  And more important, though, every

14   step that was taken was in contemplation of the apportionment

15   of 66 and 2/3 and 33 and 1/3 between the United States and

16   Vail Company.  Never a word about abrogation.

17      But again -- and I realy enjoy that I can rely upon the

18   Vail Company's Exhibits for virtually every argument that I

19   am presenting to your Honor -- I refer to Vail Company's

20   Exhibit AF.  It is a Report written by William R. Muehlberger,

21   First Lieut. United States Marine Corps.  But it is a Vail

22   Company Exhibit and it shows an additional step taken by Vail

23   Company and the National Government acting in unison and based

24   upon the desire of both parties under the stipulated judgment

25   to act for the benefit of both.

14,376

1    MR. STAHLMAN:  May I ask if your Honor is familiar with

2    this Vail Exhibit AF.  Do you know what he is talking about?

3        THE COURT:  I will become familiar with it as he talks,

4    I suppose.  Go ahead.

5        MR. VEEDER:  It is headed "Summary of the Conference

     Held in San Diego, Eleventh Naval District Public Works

     Offices" etc.

8        MR. STAHLMAN:  No one from the Vail Company was there.

9    I am sorry if I interrupted you.

10       THE COURT:  He is relying on the fact that it is your

11   Exhibit.  That is all he talked about.

12       Go ahead.  I have it before me.

13       MR. VEEDER:  In any event, the statements are made that

14   the tests which would be undertaken for the Naval Well would

15   be of assistance to all parties, and he adds in the second

16   paragraph:

17        "Who wants the tests and why. . . Vail, being apparently

18   interested in drilling more wells, would therefore like to

19   know the optimum depth at which to drill any further wells."

20   And then he goes on showing the course of action again:

21        "...Since the casing and graveling is now completed, as

22   per Mr. Vail's desires, the three following types of testing

23   were discussed:  packing, sanding, and the use of flow meters.

24   Mr. Vail worked through the Public Works Officer with the

25   technical O.K. from Mr. Worts for buying in on the well to get

1   complete perforation of the casing for the entire depth."

2      So the course of conduct, predicated, your Honor, upon

3   the geology as now known, was pursued at that time and cert-

4   ainly with the cooperation of the Vail Company.

5      There was a culmination, however, of this transaction

where Vail Company signed the revocable permit agreement, a

direct and immediate outgrowth of the Pemberton Report and

8   the action in unison of the United States and the Vail Company

9   and paragraph 4 as to the utilization of the Naval Well which

10  had been constructed at that time.  The representative of the

11  Vail Company declared: "It is understood and agreed that the

12  exploratory water well when completed shall belong to and be

13  wholy under the control of the permitor (it should be "permitee")

14  and shall be considered a water well under the certain stip-

15  ulated judgment in an adjudication suit entitled Rancho Santa

16  Margarita vs Vail, No.  42850 in the Superior Court of the

17  State of California."  Thus we have the culmination of a

18  series of acts stemming entirely from the geology, concerning

19  which the Vail Company in their pleadings dated November, 1959,

20  if you please, state that there was a mistake.

21     So we have before your Honor an attack upon a stipulated

22  judgment, an attack filed in November, 1959, virtually ten

23  full years after the Vail Company themselves brought to the

24  attention of the National Government the geology that appears

25  in this lawsuit.

1    I respectfully submit, your Honor, that equity cannot be

2    invoked under the circumstances of any alleged mistake ten

3    years after the mistake has been found, if indeed there was

4    a mistake, by reason of the fact that the United States of

5    America changed its position and changed its position radically

6    based upon the geology which the Vail VCompany is now saying

7    is so radically different from that which existed when the

8    parties had the meeting of their minds and terminated the

9    costly ligitation with this stipulated judgment.

10    We have brought to your Honor's attention, the cost .

11    We said $51,000.00, a minimum.  That was actually expended

12    by the United States of America.  And the Vail Company is

13    presently using the Naval Well as part of its irrigation

14    system, and the attacks that are made upon the quality of the

15    water by the Vail Company to show that the value of the well

16    is less than one would expect loses all significance when

17    consideration is given to the fact that the Vail Company,

18    when they cooperated under the stipulated judgment in drilling

19    the well, knew the quality of the water would be as it proved

20    out to be.

21    THE COURT:  How has the Government been hurt?  You still

22    have by contract the rights to the well that you had when it

23    was drilled.

24    MR. VEEDER:  The only rights we have is under the

25    stipulated judgment.  Wipe out the stipulated judgment and

1    you have the unjust enrichment of the Vail Company.

2        THE COURT:  You have rights to the well apart from the

3    stipulated judgment.  Your agreement as to the well came after

4    the stipulated judgment.

5        MR. VEEDER:  It is all predicated upon the stipulated

6    judgment, as I read to your Honor.

7        THE COURT:  How do you wipe out the Government's rights

8    to use the water from the well if you eliminate the stipulated

9    judgment?

10       MR. VEEDER:  I would like your Honor to take a look at

11   that agreement.

12       Paragraph 4, which is written in there specifically, is

13   initialed by Mahlon Vail, in addition to the agreement being

14   signed, and I dare say that the arrangement could not conciev-

15   ably have come into existance had it not been for the stip-

16   ulated judgment.  And your Honor says, how can we be hurt?

17   Well, we are using water outside the  watershed of the Santa

18   Margarita River as against the Vail Company and we are using

19   large quantities of it under that stipulated judgment, and

20   wipe out that stipulated judgment and the question will arise

21   then as to whether we can use that water as we are now using

22   it.  That is the crux of this litigation.  It is the most

23   positive question with which we are confronted.

24       THE COURT:  You have no right to require water to come

25   down to the enclave to be used outside the watershed as against

1    all the other riparians upstream, in any event.

2        MR. VEEDER:  Right.

3        THE COURT:  So whether Vail could complain or not, they

4    could keep you from doing that, unless you have sufficient

5    prescriptive rights in Lake O'Neil.

6        MR. VEEDER:  Your Honor, let somebody come along and ask

7    that we be restrained and prove that we are using water that

8    they themselves could have used, then you will have a cause of

9    action against us by some of these defendants.  But they have

10   not complained, and not a single one has cross complained, and

11   we have had a hundred days of trial and there has not been a

12   scintilla of evidence offered to support your Honor's position.

13   And again, it is a hypothesis that could destroy this military

14   establishment if you remove the binding effect upon the Vail

15   Company of the stipulated judgment.  Every attack brought

16   against us under the stipulated judgment is a hypothesis --

17   every one.  They are hypotheses concerning which there is not

18   a scintilla of evidence in the record.  As I stated this morn-

19   ing, it is not even doubtful that riparians can contract in

20   the manner set forth in the stipulated judgment as between

21   themselves.

22       THE COURT:  Well, sometime I want discussed by all of

23   you -- I don't know that it has been briefed: can this be

24   construed as contract?  Or was it impliedly understood that

25   this was a judgment that was submitted to the Court?

1      MR. VEEDER:   I briefed that for your Honor.   You have

2  briefs before you on that point.

3      THE COURT:   I am not so sure.   I don't think the other

4  parties have.

5      MR. SACHSE:   I didn't brief it, your Honor.   I suggested

6  that the only way it could be made workable was to consider

7  it a contract.   There is no brief.

8      MR. STAHLMAN:   It is a covenant not to sue, I believe.

9      MR. SACHSE:   That is right.   That is the only way it

10  could be enforced.

11      MR. VEEDER:   Is this my argument or someone elses?

12      THE COURT:   I raised the point.   Relax, Mr. Veeder.   I

13  suggested that I wanted this discussed sometime today or

14  tomorrow.   You may go ahead with your argument.   Complete the

15  phase you are on.   You don't have to go into it now.   Counsel

16  are responding to my inquiry whether it has been briefed.   You

17  say you have briefed it.   Maybe you have.   I have a lot of

18  briefs here.

19      MR. STAHLMAN:   Didn't you make some reference to it?

20      MR. GIRARD:   No.   Mr. Sashse touched on it, although he

21  didn't cite points and authorities one way or the other.

22      THE COURT:   You didn't?

23      MR. GIRARD:   No, your Honor.   There are a couple of

24  California cases that are indirectly concerned with it that

25  are not in our brief at all or discussed.

MR. STAHLMAN:  I would like to point out that it is a covenant not to sue.

THE COURT:  Let's move on and wind up this point, because you are directing all your fire to Vail's position. Sometime I want to hear you also in rebuttal to Mr. Girard's brief, which doesn't rest on the same basis at all as the Vail position.

MR. VEEDER:  I will do that, your Honor.

Of course, I don't know how important an argument is in the record, but I do desire to bring to your Honor's attention the basic and the fundamental fact that here is a course of conduct and a large expenditure of money in good faith in the belief that the Vail Company would remain bound by the stipulated judgment.

THE COURT:  I don't want to keep interrupting you, but I don't know whether I yet see the sequitur between the stipulated judgment and the drilling of the Pauba Well.

MR. VEEDER:  Because it was carried out as specifically provided in the agreement between the United States and the Vail Company that the Pauba Well was to be a "Water Well," to use the term of Mahlon Vail, a Water Well under the stipulated judgment.  It is spelled out in Exhibit 159 of the United States.

There is certainly, though, your Honor, more important -- I say more important, and I will say it again -- to the

1   letter transmitting the Pemberton Report, in which there was

2   devoted extended comment about the stipulated judgment and how

3   important the Pemberton Report was in regard to it and how

4   there would be a unity of action and a unity of use under the

5   stipulated judgment.   Every contemporary writing at that time

6   turned upon the stipulated judgment, and that is Vail's AR-13.

7           THE COURT:   In simple language, what did the United States

8   expect to get by drilling the Pauba Well?

9           MR. VEEDER:   It expected to get very clearly an analysis

10   of the waters that it could anticipate and receive from the

11   Pauba Well.

12           THE COURT:   It got that, didn't it?

13           MR. VEEDER:   Well, yes.

14           THE COURT:   And it would still have certain rights to

15   water from the Pauba Well whether the stipulated judgment is

16   here or not?

17           MR. VEEDER:   By what means?

18           THE COURT:   Doesn't the agreement provide --

19           MR. VEEDER:   No your Honor.   You can't divorce Exhibit

20   159 from the stipulated judgment.

21           But again I refer to one more letter from the then

22   Counsel for the Vail Company, which is part of Exhibit 159,

23   and the statement is made in that letter as follows --

24   In response to an objection to the then Commanding Officer

25   at Camp Pendleton: "We hope that the above information is

1  sufficient to satisfy your formal demand." That is, the

2  formal demand that they live by the stipulated judgment. "If

3  anything further is required, the Vail Company stands ready

4  to do everything humanly possible to comply with the provisions

5  of the stipulated judgment." Now that letter was written

6  several months after this ligitation was commenced and it was

7  written two months antecedent to the stipulation between the

8  Vail Company and the United States filed in this Court, the

9  stipulation declaring that in this ligitation the stipulated

10  judgment would be binding upon both parties.

11     Now those agreements between the parties were extant

12  throughout the whole course of conduct. And the second course

13  of conduct/which I make reference is the course of conduct
       ^to

14  in regard to the Vail Dam and Resevoir which was constructed

15  pursuant to the agreement among the  parties under the stip-

16  ulated judgment that both could build dams to impound their

17  share of the water, and in Exhibit 162 of the United States

18  Mahlon Vail wrote to the United States following a conference

19  at the office of the Public Works Officer of the Eleventh

20  Naval District: "We wish to state that in the Superior Court

21  judgment now in effect apportioning the waters of the Santa

22  Margarita River between us, it is our understanding at least

23  that the one-third - two-thirds division is of the total water

24  crop of the stream system, including the flood waters." Here

25  he is writing a letter in 1947 requesting that the United

1    States withdraw any objection to the construction of Vail Dam

2    and he said, "It is our understanding that this statement,"

3    the statement that he made, "Will enable you to withdraw your

4    protest of August 14th to Application 11518," which was the

5    application for the permit to construct the Vail Dam.

6         THE COURT:  How is the Government hurt?  If the stipulated

7    judgment is not effective, you have no doubt but that this

8    Court can apportion or control the use of the waters in the

9    stream regardless of Vail Dam.

10        MR. VEEDER:  Will your Honor permit us to divert water

11   outside the watershed?  That is how we would be hurt.  Set

12   this aside and that is how we are damaged.  You don't comply

13   with part of the judgment and not with another.  We don't go

14   along with, "Well, you're not hurt on this particular thing."

15   There has been a course of conduct in good conscience and

16   undoubtedly the most important single element to the United

17   States of America, and by that I mean the Marine Corps in

18   particular, it went ahead believing that it could apply water

19   outside the watershed, and that is the crux of this law suit.

20        THE COURT:  I am prepared to make a finding that the

21   officials of the Marine Corps knew nothing about California

22   Water Law -- of course, they were not a party at the time of

23   the stipulated judgment, but at the time they built the

24   installations outside the Marine Corps Base, outside the

25   watershed, they knew nothing about California Water Law.

1        MR. VEEDER:  How would you do that?

2        THE COURT:  Well, obviously they didn't.

3        MR. VEEDER:  I dare say Mr. Cannon testified here in

4    regard to the construction of this Camp and he knew that the

5    stipulated judgment was in existance and he knew that the

6    water could be used outside  the watershed, and that is not

7    even doubtful.

8        THE COURT:  Do you think that the Congress would have

9    given him  money to build the installations outside the

10   watershed if they had been shown a stipulated judgment  bind-

11   ing one upstream land owner and not affecting the other users

12   in the watershed upstream?

13       MR. VEEDER:  I wouldn't try to read the mind of Congress.

14       THE COURT:  It is.pretty obvious that they wouldn't have.

15       MR. VEEDER:  I see no reason for such conjecture.

16       But the point that I make is this, that here is a legal,

17   valid, binding agreement between two riparians, and to the

18   extent that the Vail Company and the Rancho Santa Margarita

19   are concerned during the greater share of the year all of the

20   water is upon their properties , and it is beyond me why,

21   under the California Law that existed then and exists now,

22   anyone would say you can't use water outside the watershed

23   because I have filed briefs with your Honor showing that as

24   between riparians they can agree to use water on  non-riparian

25   lands, they can't hurt anyone in so doing, and there is not a

1      scintilla of evidence showing a claim or proof that anyone

2      would be hurt by our using water outside the watershed.

3          THE COURT:   You have stated that two or three times.

4      Your action here was commenced, apparently, to determine what

5      were the rights in the stream, and apparently based upon the

6      ground that there was too much upstream use of water, and

7      you just recently said you were going to ask that some of

8      these uses be restrained.   What is this but an attempt to say

9      that more water should come downstream so that it reaches the

10     enclave and can be used outside the watershed?

11         MR. VEEDER:   The only thing that is being said here, and

12     we are not saying it against Gibbon and Cottle or Stardust in

13     regard to using water outside the watershed, we are saying

14     that as against the Vail Company it would be unconscionable

15     now to declare as against the Vail Company we can't use water

16     outside the watershed.

17         THE COURT:   Of course, after water gets there you can

18     do anything you want to with it. The question is whether you

19     can compel water to come down.

20         MR. VEEDER:   The only party we would ever ask to

21     compel to let water down to us to use outside the watershed

22     is the Vail Company.   I have repeatedly said that.   There

23     would be no legal basis for our claiming otherwise.   I have

24     never desired to do it otherwise.   The only point I would

25     make to your Honor now is that there has been a continuous

1   course of conduct between these two parties, and the attacks

2   upon the stipulated judgment were not made until most recently.

3       THE COURT:  Then you don't want any regulation as to

4   anybody else because you are not concerned with other peoples'

5   use?

6       MR.VEEDER: I don't know why your Honor says that.

7       THE COURT:  You just got through telling me that the

8   only person you seek to require to let water come down the

9   stream would be the Vail Company.

10      MR. VEEDER:  I said for use outside the watershed, your

11  Honor.

12      THE COURT:  Your theory then would be that you could

13  require the Vail Company, under the stipulated judgment, to

14  let water come down and this water you could use outside the

15  watershed.

16      MR. VEEDER:  That is right.

17      THE COURT:  And then you could compel other upstream

18  riparians to let water come down so that you could use it in

19  the watershed.

20      MR. VEEDER:  Certainly as against other riparians we

21  have never claimed a right to divert or use water outside

22  the watershed.

23      THE COURT:  I am just wondering    whether it is your

24  theory that you would then use the water which you required

25  Vail Company to release outside the watershed and then would

1    require other riparians to let water come down, or which water

2    you would then make riparian use within the enclave.

3        MR. VEEDER:  I don't believe there is any such difficulty

4    by reason of the nature of the stream, your Honor.  The

5    recharge into our basin, to a large degree, comes in the

6    wintertime and with few exceptions, your Honor, there is no

7    running water after about the first of June across the land.

8    Certainly that is true in the Murrieta area, certainly that

9    is true in the Santa Gertrudis area.

10        But in any event I would petition your Honor to consider

11    this matter as between the Vail Company and the United States

12    of America from the standpoint of not your desire that you

13    have expressed frequently to knock it out, but from the

14    standpoint --

                    (See next page)

1    THE COURT:  I have not expressed any desire.

2    MR. VEEDER:  Your Honor said, "If I can knock it out,

3    I will."  I would like to have a little equilibrium on this

4    thing, because there is so much involved.

5        But to get back to the proposition of the Vail Company

6    Dam, again you say, "Well, how can the United States be hurt?"

7    and I submit, with all respect to your Honor, that the basic

8    and fundamental approach to these matters is that we were

9    acting for the purpose of sustaining the stipulated judgment

10   for all purposes but primarily the right to use the water

11   outside the watershed.  On October 29, 1947 Captain Fogg,

12   based upon the activities of the Vail Company and the state-

13   ment that they would be bound by the stipulated judgment and

14   the basis upon which they would proceed if we would withdraw

15   our protest, wrote a letter to Mr. Hyatt, who was a State

16   Engineer, which letter is also part of Exhibit 162.

17        Government's Exhibit 161 is extremely interesting.  It

18   is a transcript of the hearing before the State Water Rights

19   Board in which repeated references are made to the stipulated

20   judgment and its importance between the United States and the

21   Vail Company, again evincing an intention by both parties to

22   sustain the stipulated judgment and to live by it.

23        So we go on through the pleadings as tendered, the

24   assertions in the pleadings of November, 1959 of a mistake.

25   I say if there was a mistake it should have been proved by

1    calling a witness and asking, "Would you have entered into

2    this agreement had you known the geology as it exists today?"

3    That is how you prove such a thing. You don't prove it by

4    saying here is some geology here, here is some geology here;

5    they wouldn't have entered into this agreement had they known

6    the difference. And that is the difference. And when I

7    attempted to interrogate Mr. Wilkinson on the subject I was

8    advised by Your Honor that I shouldn't ask a client the tech-

9    nicalities of a pleading.

10    THE COURT: Mr. Wilkinson, as I recall, was a school boy

11    about that time.

12    MR. VEEDER: I think he was 17.

13    THE COURT: Yes. He had nothing to do with it    at that

14    time. How could you get any intent from any testimony from

15    him?

16    MR. VEEDER: I was dredging, your Honor. I couldn't find

17    the man who said there was a mistake. He was not arround

18    because there was not a mistake. They settled this thing

19    for financial reasons and for no other.

20    Now we get to the question of the unconscionable judgment

21    as pleaded. We will omit the part of fraud because your Honor

22    struck that himself.

23    MR. STAHLMAN: He didn't strike it. We conceeded there

24    was none.

25    MR. VEEDER: It was stricken, George.

1       In any event, we get down to the question of the

2   unconscionable nature of the judgment, and again I petition

3   your Honor to consider only the facts that are in the record

4   and not to consider what might be a hypothisis at some future

5   date.

6       Your Honor will observe that based upon the records in

7   this case, Vail Company have increased the water uses by

8   perhaps seven times since 1949 and have increased their acreages

9   by a minimum of three times.  I am referring to defendants

10  Exhibit N.  In 1958 they diverted 9247 acre feet, and in 1949

11  they diverted 1694 acre feet.  So one has some difficulty in

12  comprehending the allegations which are contained in this

13  alleged grossly unfair, inquitable and unconscionable approach

14  and the charges against the National Government which are

15  found in these pleadings but for which there has been no

16  corroborative evidence offered at all.  Not one word will be

17  found in support of the contentions that the United States of

18  America is making unjust or unfair demands under the stipulated

19  judgment.  Not one word.  To the contrary, we have undertaken

20  in every possible/way to conduct ourselves equitably, and we

21  have done so.

22      It is asserted that there has been a great and a tremend-

23  ous change by reason of the purchase by the National Government

24  of Camp Pendleton.  And again I say, so what?  Eight years,

25  Nine years after the Government bought Camp Pendleton and had

1   changed it into the great Military Establishment that it is

2   today, the Pemberton Report was sent to the United States and

3   the United States and Vail Company acted under the stipulated

4   judgment.  Again, after the Military Establishment had been

5   built, Vail Company built their Dam.  So I believe that before

6   they could invoke the equities that they attempt to invoke

7   they would have to put in some evidence that this changed

8   use had hurt them and then they would have to overcome their

9   course of conduct.

10      What they have done to your Honor is this.  They have

11  handed your Honor some pleadings in which  vague charges have

12  been made about courses of conduct and about irreparable

13  damage.  But in each instance you can look to the record and

14  to the Exhibits introduced by the Vail Company and you find

15  their contentions refuted.  They plead irreparable damage by

16  reason of the entry of and existance of the said stipulated

17  judgment and the demands thereunder in excess thereof by the

18  United States of America.  And I submit, your Honor, that you

19  will search this record in vain and you will not find a single

20  word to prove that contention.  You will not find one scintilla

21  of evidence of irreparable damage.  And if your Honor will

22  review the briefs I have filed with  your Honor you will find

23  that irreparable damage is an essential element of proof before

24  you can invoke the conscience and equity to override the State

25  Court as you are asked to do.

1    THE COURT:  Possibly on the theory set forth by Vail. Not

2    on the theory set forth by Mr. Girard.  He was giving his

3    position wide clearance.  I suppose you are going to come to

4    it at some time or other.

5        MR. VEEDER:  I don't recall that Mr. Girard said anything

6    other than what I have already touched upon.

7        THE COURT:  Mr. Girard cited authorities to the effect

8    that an apportionment of riparian water is subject to change

9    under changed conditions.

10       MR. VEEDER:  Your Honor, I had covered that in a previous

11   argument, but I am glad to/go/back to it.  I pointed out that

12   Mr. Girard cited use and authorities which were not in point

13   in any way.  He cited authorities in regard A a riparian, B

14   a riparian, C a riparian, and said that the land had been

15   water logged or for some reason or other there had been a

16   change so that a particular area was no longer  irrigated and

17   therefore it wouldn't be permitted to proceed correlatively

18   on the same basis it would on the day the decree was entered.

19       But this is a horse from a different merry-go-round

20   entirely.  Here we have a situation which involves a wholly

21   different type of question.  Here two riparians agreed and

22   both acted on the agreement that they could use water outside

23   the watershed, and you will read Mr. Girard's brief in vain,

24   as I did, and you will not find a single authority that meets

25   the prime element here presented, namely, can you change a

1   stipulated judgment permitting the use of water outside the

2   watershed after the course of conduct that has existed here?

3   Anyone with fifteen minutes' experience in water law knows that

4   a decree is out-of-date the moment it is entered, and it does

5   not involve riparian rights alone.  We all know that when lands

6   irrigated by appropriative rights become sour or you can't use

7   water on them beneficially you change your decree.  But you

8   don't find, your Honor, a single authority -- indeed, the

9   authorities are to the contrary that where people have acted

10  as we have acted here to use water outside the watershed it is

11  a consummated agreement.  This is consummated.  We acted on it,

12  and they did, too; they used water outside the watershed, as

13  did we.  So your Honor, with all respect to Mr. Girard, his

14  brief is a very good one but it is not applicable.

15      THE COURT:  It goes into the question I want to talk to

16  you about as to whether this is a contract or a judgment.

17      The reason I am trying to answer you is that you jump

18  around so much.  You said that Mr. Girard submitted a series

19  of authorities, etc.,etc.,etc.  Actually, his brief was filed

20  five days before yours.  And he cited the case of Los Angeles

21  v. Baldwin.  You cited it in your brief.

22      MR. VEEDER:  Yes, sir.

23      THE COURT:  And it does not appear that you find any

24  authorities that decide it as not stating the law.  And then

25                      (next page)

1   you go into the question to get arround that principle by

2   talking about contract and reliance, etc.  That is a different

3   subject.

4        MR. VEEDER:  But your Honor, I will stipulate and agree

5   right now that as between two riparians a decree can be

6   modified by a change in circumstances.  But there is no

7   authority that will permit you to change this one, because it

8   is a consumated arrangement where we have acted in reliance

9   upon the Vail Company's conduct.  I searched this thing.  I

10  researched it very carefully, and the principles relied upon

11  by Mr. Girard simply do not relate to the facts before your

12  Honor.

13       THE COURT:  Now, will you tell me very simply again --

14  I asked this once before and I was not satisfied with the

15  answer, so see if you can tell me very simply because I am

16  not too smart, so I can understand -- what was it the Govern-

17  ment wanted out of the drilling of the Pauba Well?

18       MR. VEEDER:  It wanted an exploratory well, your Honor.

19       THE COURT:  They got it, didn't they?  What else did

20  they want?

21       MR. VEEDER:  What else did they want?

22       THE COURT:  Yes.  What else did the Government want by

23  the drilling of the Pauba Well?  First, they wanted an

24  exploratory well to see how deep this alluvium was, whether

25  there was a water basin there that went way down, etc. What

1  else did they want?

2     MR. VEEDER:  They wanted to be assured that under the

3  stipulated judgment and arrangement they would have an

4  adequate supply of water.  All we have to do is --

5     THE COURT:  Wait just a minute.  Do you mean that they

6  arranged for the drilling of the Pauba Well to in some way

7  heal up this stipulated judgment so that it could never be

8  set aside or changed?  Is that what you mean?

9     MR. VEEDER:  No.

10     THE COURT:  Then what do you mean?

11     MR. VEEDER:  The question was presented by Mr. Pemberton's

12  Report --

13     THE COURT:  Just tell me, what was it the Government

14  wanted when they agreed to take the Pauba Well?

15     MR. VEEDER:  They wanted to know how much water would

16  be available to them under the stipulated judgment.

17     THE COURT:  Under the stipulated judgment?

18     MR. VEEDER:  Why, of course.  All you have to do is to

19  read these -- Your Honor, you see, in your desire to overrule

20  us in this matter, you are making it extremely difficult, and

21  I really don't mind.  The point that I am making, and with

22  all respect to your Honor, is that if you were to read the

23  Exhibits --

24     THE COURT:  I have read them three or four times.

25     MR. VEEDER:  -- in the order in which they are presented.

1    THE COURT:  I will go back and read them.

2    MR. VEEDER:  You will find that the whole objective and

3  the basic and fundamental objective for the drilling of the

4  Pauba Well is contained in Vail's Exhibit AR-13.  Do you have

5  that Exhibit?

6    THE COURT:  That one I don't seem to have.

7    MR. VEEDER:  Be my guest, your Honor.  I would like to

8  have you read it (handing document to the Court), because

9  there it is set out.

10    THE COURT:  How about getting me a copy of it?

11    MR. VEEDER:  It is George's.

12    MR. STAHLMAN:  I supplied your Honor with a copy.

13    THE COURT:  I don't know.

14    MR. STAHLMAN:  I think I may have one right here.  I

15  have an extra copy here, your Honor (handing document to the

16  Court).

17    (A pause)

18    THE COURT:  Go ahead.

19    MR. VEEDER:  That concludes my statement, your Honor.

20    MR. STAHLMAN:  May I proceed, or will your Honor have

21  a recess.

22    THE COURT:  All right, go on for awhile.

23    MR. VEEDER:  Do I have a closing, your Honor?

24    THE COURT:  Yes.  That is why I let you open.

25    MR. STAHLMAN:  Your Honor, it makes it a little difficult

1    to know where to start, considering the skipping arround in

2    which Mr. Veeder indulged here.  However, I will take last

3    things first.

4        With reference to the building of the Vail Dam, the

5    significance it has in relation to the stipulated judgment

6    and the lawsuit, we want first to be mindful of the fact that

7    the lawsuit was brought by the Government and the timing of

8    the lawsuit has, I think, some rather important implications

9    in this case.

10       Going to this Pauba Well, which was the last thing Mr.

11   Veeder discussed with your Honor, he made great reference on

12   several occasions to the letter of H. M. Hall, Exhibit AR-13,

13   dated November 9, 1950.  We put the letter in.  It has some

14   significant purpose from our point of view.  Mr. Veeder has

15   made something else out of it.  Of course, it is an Exhibit

16   in the case and it is here for all purposes for which it may

17   have any evidenciary value.

18       For the events that led up to the drilling of the Pauba

19   Well we will have to go back to the testimony of Mr. Vail

20   wherein he testified that prior to the drilling of the well

21   and prior to the signing of the revocable permit there were

22   discussions with the Navy in connection with the well.  In

23   considering the Exhibits which we have introduced in relation

24   to the well, which was the AR Series and those which Mr. Veeder

25   introduced, the chronology becomes somewhat important.

1    Your Honor asked the very significant question of Mr.

2 Veeder, why did you want the well drilled?  And Mr. Veeder

3 went half-way with your Honor and he stated that we wanted

4 it drilled in order to explore the geology of the area.  Now

5 when we take into consideration that there was a lawsuit in

6 contemplation I think it becomes quite evident that the object

7 in drilling the well was not for the purpose of the great

8 consideration that he gives to it under the stipulated judg-

9 ment.  They took advantage of the fact that there was a

10 stipulated judgment at that time to obtain the permission to

11 go upon the Vail property and drill the well.  And they had

12 another object in mind.  In the perusal of the AR Series I

13 think you will find the other object, and that is that they

14 were in contemplation of a lawsuit, that there were legal

15 implications that they were concerned with and that they were

16 looking forward to the fact that they were going to be in

17 conflict with a great many people and that the ideal place in

18 order to obtain their geologic information was in the Navy Well.

19    Mr. Veeder objected strenously during the course of the

20 trial and attempted to have the testimony of Mr. Vail expunged

21 wherein he testified that prior to the drilling of the Navy

22 Well when they were having their discussions during the months

23 of September and October when this official group of Naval

24 Officers came to the Vail Ranch, that they there stated that

25 the reason they wanted to drill the well was to get an emergency

1  supply of water or to determine whether or not there was an

2  available supply of water in case of emergency.  Now Mr. Hall's

3  letter, Exhibit AR-13, corroborates that situation.  This was

4  written to Colonel Duffer, who was one of the parties present

5  there.  In the first paragraph enclosing the Pemberton Report

6  he said, "This is said to you in accordance with our conversa-

7  tion regarding the source of water for use at Camp Pendleton

8  for the critical years pending the completion of the DeLuz

9  Dam."

10      THE COURT:  I just got through reading the letter.

11      Let me ask you this.  Let's assume that the Navy wanted

12  to drill the Pauba Well to get a supply of water for emergencies.

13  This is a tenable conclusion from the letter.  Apparently,

14  after the well had been completed the Navy had no rights to

15  the use of the well.

16      MR. STAHLMAN:  No.

17      THE COURT:  How could the Navy in an emergency get any

18  supply of water out of the well if the stipulated judgment --

19      MR. STAHLMAN:  As I understand it, they were attempting

20  to find out if there was an available supply of water. There

21  were various ways they could receive that supply of water.

22  In the first place, I think anyone knowing that there was a

23  military operation downstream, when we had just concluded the

24  second World War and were in the Korean conflict, that the

25  military situation was such at the time that anybody would

1      let them find out if there was an emergency supply of water.

2      Then they could come up and condemn it.

3          THE COURT:  A second purpose might be that the Navy wanted

4      to find out what the extent of this basin was; that possibly

5      through condemnation, in the event of emergency, or the pur-

6      chase of a supply of water, and various things.

7          MR. STAHLMAN:  That is right.

8          THE COURT:  But on the first question I asked you,

9      assume that the purpose was that the well would be drilled so

10     that it would supply an emergency at Pendleton.  This is a

11     more limited assumption.

12         MR. STAHLMAN:  Yes.

13         THE COURT:  How could the Navy get any value out of the

14     well after the stipulated judgment is set aside?

15         MR. STAHLMAN:  I don't think that was the purpose for

16     which they drilled it.  You have asked how.  I presume if

17     your Honor made some sort of order that they had an interest

18     in this well and we were required to/lease water down there.

19     I don't know.  I haven't explored that possibility.  But I

20     think as we proceed further we will see that is not it.  You

21     have to consider the drilling of the Navy Well in relation

22     to the objectives they had.

23         THE COURT:  That is what I am trying to explore.  Why

24     was the Navy drilled?  The possible alternatives are (1) that

25     the well itself would be a source of supply in the sense of

1  pumping and dumping into the stream or possibly in hooking it

2  up with a pipe-line, (2) it was to check generally upon the

3  depth of this basin, the amount of water there, knowing the

4  United States was a downstream owner, etc. (3) it might have

5  been for general information in connection with what the

6  Government might have to do to get an adequate supply of water,

7  such as condemnation.  That is why I asked Mr. Veeder what his

8  theory was why they dug the well.  I had some trouble pinning

9  him down.

10  MR. STAHLMAN:  There is one other very significant

11  situation, and it appears in several places in these Exhbits.

12  Take Exhibit AS, to which Mr. Veeder made reference, which was,

13  your Honor, a report of a meeting which was held at the

14  Eleventh Naval District Offices during the period of the drill-

15  ing of the Pauba Well.  No one from Vail Company attended.

16  The parties present were Mr. Forman, Administrator, Eleventh

17  Naval District, DPWO; Commander Mahan; Commander Enger; all

18  representing the Officer in Charge of Construction; Mr. Conway

19  and Cox, of the Drilling Firm performing the contract; Mr.

20  Worts of U.S.G.S.; Mr. Turnbull, and Lieuts. Muehlberger and

21  Gierlich, of this office.  Who wants the tests and why?  Mr.

22  Veeder read part of it to you.  After the part that he read,

23  from which he conveniently left out these words: "OGWR would

24  like it for the same reasons, as well as for any legal

25  implications this well may have pertaining to ligitation in

   **hand."**

Belt B3
1

1     We know, your Honor please, that the testimony before this

2     Court is that Vail was not even served with the Complaint in

3     this case until after the signing of the revocable permit.  It

4     is quite evident -- and there is no evidence upon the subject,

5     so we must assume there is none; there is evidence to the

6     contrary that they were discussing the drilling of the well

7     for the emergency supply of water -- undoubtedly, the Govern-

8     ment having filed their Complaint in December 1952 or 1951,

9     they were in the stages of preparation of that Complaint some-

10    time prior thereto.

11        THE COURT:  What date was the Complaint filed?

12        MR. VEEDER:  January 1951, your Honor.

13        MR. STAHLMAN:  January 1951.

14        MR. VEEDER:  The Vail Company stipulated with us in

15    October 1951.

16        MR. STAHLMAN:  It was not served, however, your Honor

17    please, there was no summons issued until sometime after that

18    date.  The date of the summons was sometime after the filing

19    of the Complaint.

20        Now we have this language which I read to your Honor,

21    which Mr. Veeder conveniently left out, that they would like

22    to have it "pertaining to the litigation in hand."

23        We also have in Exhibit AR-12, which are the documents

24    that your Honor asked Colonel Bowen to have translated because

25    they were in the vernacular of Naval jargon, and referring to

2

1    AR-12 we find this language:   "Preliminary analysis of the

2    electric log on the Pauba exploratory well (Navy Contract

3    . . .) indicates agreement this office with reference to

4    . . . reaming and casing subject well to full depth of 2150

5    feet for optimum exploratory value and rebuttal of possible

6    future unfavorable legal implications."

7        So we find that this well was drilled for the dual

8    purpose of exploring the geology of the area, with the object

9    in mind of its being a benefit to their lawsuit.

10        THE COURT:  Let me ask this.  This is only incidental.

11    Vail was not served until after the permit was signed.

12        MR. STAHLMAN:  That is true, your Honor.  I have checked

13    the records on it.

14        THE COURT:  Is there any evidence in this record that

15    Vail did not know of the filing of the lawsuit?

16        MR. STAHLMAN:  Yes, your Honor.  He was asked the question.

17    He said, "I don't believe I knew."

18        MR. VEEDER:  I can make a statement here on that.  I want

19    to check the date when they were served.  And I also put into

20    the record the dates when counsel O'Melveny & Myers came to my

21    office in Washington, D. C. -- if this is going to be in it.

22        MR. STAHLMAN:  May I proceed, Mr. Veeder?

23        MR. VEEDER:  Go ahead.

24        MR. STAHLMAN:  I had to use great restraint and control --

25        THE COURT:  Go ahead.

1    MR. STAHLMAN:  -- to hold back when you were arguing.

2    THE COURT:  Use some more of it.  Keep on using it.

3    MR. STAHLMAN:  I'm going to have to.

4    Then a reading of the entire series of AK exhibits, your

5    Honor please, shows that the Naval well was completely under

6    the control and domination of the Navy.  There was not any

7    function performed by Vail whatsoever except the permission to

8    go upon the land, until he had to go to them and ask them and

9    get their permission to have the well casing perforated to a

10   greater depth.

11   There was considerable controversy even between the

12   people who were drilling the well, that is, the U.S.G.S. and

13   the Navy.  There were divergences of opinion in relation to

14   it.  For instance, we find in this note on this same meeting

15   which they had at the Eleventh Naval District Office -- I ask

16   your Honor to have in mind the situation that we had here

17   before in which there was some discussion and argument and

18   conflict about the geology of this area when Mr. Worts in his

19   report had stated that the last thousand feet of the well was

20   essentially basement complex, and then Mr. Kunkel in testify-

21   ing relied upon the electric log in order to support his

22   contention -- this report states:  "It is also the opinion of

23   Mr. Worts that the contractor and the driller's logs and the

24   electric logs gave conflicting information.  The drilling was

25   harder than the electric log would indicate.  The driller also

4

1    complained that he used seven bits when he estimated that two

2    would do the job."

3        So here is the overall situation.  Here is the Navy

4    coming to Mr. Vail, getting permission to drill the Naval well,

5    with the object in mind that it would assist them in their

6    legal matters, which Mr. Vail certainly didn't awaken to until

7    sometime after he was served in the case.

8        Not only that.  Let's assume for the sake of argument

9    that Mr. Vail had some idea that there was some kind of law-

10    suit in the air.  He certainly didn't know it was going to hit

11    him as it did.  He certainly didn't know that their successor

12    in interest, with whose predecessor in interest they had had

13    previous litigation, would then slap him with the kind and

14    character of lawsuit that he has, that would require him to be

15    placed in conflict with all the other people on the stream

16    system.

17        I submit that when Mr. Veeder or the Government filed

18    this Complaint making Vail a defendant to the action, under

19    the very basic, simple principle of equity that he who seeks

20    equity must do equity, and that he who comes into a court of

21    equity must come with clean hands, when he seeks equity he

22    must do equity.

23        That leads me to the next question.

24        THE COURT:  That could well be the recess.  Take a short

25    recess and you can start on the next question.

         (RECESS)

1       THE COURT:  Proceed.

2       MR. STAHLMAN:  Your Honor, one other exhibit in connect-

3 ion with the Naval well I would like to call your Honor's

4 attention to, and that is Vail's AR-11, which was another one

5 of these communicatio ns between the Navy which was interpret-

6 ed.  We find in AR-11 the following language:  "However,

7 recommendations are requested from the District Public Works

8 Office, 11th Naval District . . . as to casing depth based on

9 best interests of government considering resources and legal

10 data as well as most economical capacity."

11       So we find that there were two paramount purposes, I

12 think the evidence indicates, for which this well was drilled

13 from which the Navy has received the full benefit.

14       In addition to that, as far as Vail's point of view is

15 concerned -- I'm not going into the evidence, which your Honor

16 undoubtedly recalls -- the low specific capacity of the well,

17 the quality of the water, and its location does not make it a

18 valuable well for the amount of mo ney they spent in drilling

19 that well.  For half that amount Vail could drill half a dozen

20 much better wells in locations they could utilize to a much

21 better extent.

22       Vail's Exhibit AR-7, which was a letter from W. M. Enger

23 to the Resident Officer in charge of construction, Mr.

24 Wilkinson calls my attention, again makes reference to the

25 well in relation to the litigation.

1   Paragraph 3 of that letter reads:   "Resident officer in charge

2   of construction has been advised that the officer in charge

3   of Ground Water Resources, Camp Pendleton, is greatly interested

4   in obtaining such information for possible use in conjunction

5   with the current litigation."

6   Now, then, I will pass to the question of the building of

7   the Vail Dam.   The series AK exhibits, which are in evidence

8   in this case, your Honor, shows the progression of the building

9   of the Vail Dam in relation to the so-called protest to the

10   building of the Vail Dam.

11   THE COURT:   I am not too concerned about the Vail Dam.   It

12   is subject to the order of this Court, in any event.   I don't

13   see how the Vail Dam enters into it.   Certainly if the Court

14   is going to have any authority in this watershed, Vail can't

15   sit up there and impound water and use what it pleases without

16   regard to the other persons who are entitled to water.

17   MR. STAHLMAN:   There is no question about that.   I think

18   the Vail Dam will have to be operated in accordance with law.

19   The permit that is granted on the Dam, your Honor, will have

20   control in the determination of what is surplus water, what

21   water may be captured.   However, Mr. Veeder, in talking of the

22   Dam, weaved in a lot of situations that affected other phases.

23   THE COURT:   The best I could get from his argument was

24   that in some way or other by building Vail Dam you both

25   relied upon the stipulated judgment.   But I can't see how there

1  was any reliance to the hurt of the Government.  If anyone is

2  hurt, you could argue that it was the Vail's.  They spend a

3  lot of money on it, and when they get through they have water

4  rights on the stream and they have a dam they paid for, and

5  how the dam is used is subject to the order of the Court

6  pursuant to the law of California.

7        MR. STAHLMAN:  No question about it.  However, there has

8  been so much made of this protest that I would like to state

9  that notwithstanding that there was a letter written with-

10  drawing the protest there were other protests in considering

11  the same matter, they were all considered, and notwithstanding

12  the fact that the protest was withdrawn the Navy nevertheless

13  did send further communications in relation to their water

14  rights in connection with the permit and that it was consider-

15  ed by the State Water Rights Board.

16        THE COURT:  Any dam, properly controlled, is an asset to

17  a watershed.  If there has been water running out the mouth of

18  the Santa Margarita, even with Vail Dam there, there probably

19  would have been more run out if Vail Dam hadn't been built.

20  So any dam on the watershed is of value to everyone downstream

21  of the dam.

22        MR. STAHLMAN:  Then, your Honor, I will pass to this

23  other question that Mr. Veeder argued so vehemently, and that

24  is in relation to the allegations of mistake and the uncon-

25  scionable nature of the judgment.

1  In the first place, in relation to mistake, I don't think

2 you can, as Mr. Veeder has purported to do here, pick out

3 some one particular thing and say that proves the fact that

4 there was no mistake made in the case.  I think the overall

5 picture has to be considered in relation to the particular and

6 peculiar mistakes that were made in relation to the stipulated

7 judgment.

8  THE COURT:  What is the law?  What is the law as to

9 mistake of fact and mistake of law?  One has to be operative

10 on both sides, and one is unilateral?

11  MR. VEEDER:  Intrinsic and extrinsic.

12  THE COURT:  You are talking about fraud.  I am talking

13 about mistake.

14  MR. VEEDER:  Your Honor will find, in the briefs I filed,

15 that the same principles, intrinsic and extrinsic mistake and

16 intrinsic and extrinsic fraud, the same criteria are applicable.

17  MR. SACHSE:  If it is my mistake and Mr. Veeder is the

18 co-party to the contract, no mistake of his but he knows I

19 made the mistake, that is what you have to have on a mistake

20 of fact.  There has to be either a mistake on the part of both

21 of us as to the fact, or a unilateral mistake which the other

22 party realized was a mistake.

23  THE COURT:  And a mistake of law comes under the same

24 rule?

25  MR. SACHSE:  That is my understanding.  You have the

1    same rule whether it is mistake of fact or of law.

2        THE COURT:   I thought there was a distinction between

3    mistake of fact and mistake of law.

4        MR. STAHLMAN:   I think we start with the proposition and

5    the very first consideration given to the stipulated judgment,

6    and this of course is alleged in the Complaint and in the

7    Amended and Supplemental Complaint, that the Government relied

8    upon this situation.  So they allege.

9        Now, on the very first page of the stipulated judgment,

10    after the appearances of the attorneys, it states:

11            " . . . The introduction of evidence, oral and

12        documentary, being completed, arguments, oral and in

13        writing, having been submitted, and the court having

14        considered the same and being fully advised in the

15        premises, findings of fact and conclusions of law

16        having been signed by the court and filed with the

17        clerk thereof, and judgment on said findings and

18        conclusions having been signed and entered; defendants

19        and each of them thereon appealed from said judgment

20        and from each part thereof, but said intervenors did

21        not appeal from said judgment; the Supreme Court of

22        said State of California upon said appeal having

23        reversed said judgment and directed a new trial upon

24        certain issues designated in the opinion of said

25        court reported Rancho Santa Margarita . . ."

giving the citation.

1      Now, I submit that the stipulated judgment certainly was

2  based upon the situation and condition that existed at that

3  time, and the evidence here clearly indicates what it was.

4  At that time it was a cattle ranch or farm.  Now we have a

5  great Military Installation down there.  The findings, that

6  were undisturbed by the opinion of the Supreme Court,

7  unquestionably were the basis upon which a stipulated judgment

8  would be entered.  I think that is axiomatic.  And the reason

9  for mentioning it in the stipulated judgment must serve some

10  purpose, and that is that these findings of fact having been

11  made and the further fact that as you peruse the stipulated

12  judgment reference is made to the fact that the stream system

13  is the stream system as was defined in the findings of fact.

14      I think then that the findings of fact in relation to

15  the geology which has been developed in this case and the

16  Exhibits where reference is made to the stream system and

17  the geology in the other case which we introduced in the case

18  here as Exhibit No. AQ, in view of the evidence and in view

19  of the contentions made by the Government in this case as to

20  the geology becomes very significant.

21      Now I have excerpted here a few of these findings in

22  relation to the geology.  If your Honor is familiar with that

23  I will not burden you by reading them.  However, I didn't

24  realize how far the Court went in its findings in relation

25  to the areas which the Government now contends are part of

the stream system.

THE COURT:  Go ahead and read it into the record.

MR. STAHLMAN:  Finding 11 P. 22 L 17 to 26 of Exhibit AB, the Court states:

".... Said basin or valley was eroded by stream action out of or into a very much larger area and into an ancient plain composed of a closely compacted, indurated, unassorted and impervious formation of silts, sand, clays and disintegrated and decomposed rocks of the basement complex, which ancient formation is hereafter in these findings designated and termed 'Mesa Silt.'

"Intersperced throughout said Mesa Silt formation, remote one from another and entirely disconnected, of varying but comparitively small volume, of varying but lesser density than the general Mesa Silt formation, and located at various depths below the surface of said Mesa Silt, are lozenges or lenses of less compacted, indurated and impervious materials, in which small amounts of the water so collecting may be withdrawn, naturally and artifically, by erosions or wells cut or driven into said lenses or lozenges.  That the waters contained in said lenses and lozenges do not constitute an underground water plane, and in these

findings are not embraced in the term 'underground

water plane' but in these findings such waters con-

tained in such lenses or lozenges are designated as

'Suspended water planes.' "

Then in Finding 11 on page 24 - lines 13 to 18:

" ...and thus saturate the strata of such Outwash

Area of said Temecula Alluvial basin to ancient,

impervious material below, and to the confining

mesas of ancient impervious material on either

side thereof, but not beyond nor into such con-

fining meassas:....."

I would take that finding to mean that from the Outwash

Area the Court had indicated that there was no hydrologic

contact between the stream system and the Mesa Silts.

THE COURT:   Which is what we refer to as the older

alluvium.

MR. STAHLMAN:  Older alluvium.

Reading further now from Finding 23 on page 54 - starting

at line 23:

"It is not true that there is a common underground

water plane underlying the whole, or any portion,

of said ancient Mesa Silt formation; but it is true

that in lozenges or lenses within said ancient Mesa

Silt formation occur suspended water p,anes as

herein found; but there is no common water plane

substantially or at all continuous throughout said

Mesa Silt formation.

"The only underground water planes existing in said

area occupied by said ancient Mesa Silt formation

lie within the porous modern fills constituting the

alluvial basins of the Temecula creek or river and

the Murrieta creek or river, and are bounded by and

are co-terminous with the fills of said modern

valleys which have been cut into said ancient

formation of said Mesa Silt.  The limits of these

two underground water planes are co-terminous with

the edges or confines of said eroded valleys of the

Temecula and Murrieta creeks, and in no instance

extend into the ancient Mesa Silt formation beyond

or on either side thereof, and the limits of said

underground water planes found within said valleys

are co-extensive and in conformity with the boundaries

of the eroded modern valleys, and are confined, as

herein found, to the Temecula Alluvial basin and

the Murrieta eroded valley.

"There is no underground water plane underlying the

Temecula creek, the Murrieta Creek, the Santa

Gertrudis Creek, and the intervening areas between,

and there is no underground water plane underlying

the lands, or any of the lands, or the streams or

**14,416**

1   any of the streams upon the lands, of the defendants

2   other than the underground water plane of the

3   Temecula Alluvial basin and the underground water

4   plane of the Murrieta eroded valley, as herein

5   elsewhere as more specifically determined and defined.

6   "That the only underground water plane lying beneath

7   any portion of the lands of the defendants, which

8   underground water plane is in contact with, or

9   which is a part of, or which contributes to or

10   supports, or to which there are contributions from

11   the surface flow of said Temecula river or creek,

12   is the underground water plane of the Temecula

13   Alluvial basin, as herein found and described.

14   "....That in addition thereto, and wholly separate

15   and apart therefrom, and in no manner communicating

16   therewith, is another and very much smaller water

17   plane, lying beneath portions of the lands of the

18   defendants and parcels of land belonging to other

19   persons not parties of record herein, which lands

20   are within and constitute the fill of the eroded

21   valley of the Murrieta Creek.

22   "It is not true that the waters coming into the

23   area of said ancient Mesa Silt formation, or

24   particularly through Nigger Canyon are spread out

25   or absorbed by the sols and saturate a wide mass

1     of subteranian material.

2     " .... To bedrock below, of an unknown extent, or

3     to any great extent, or of any greater extent than

4     the eroded channels and the modern fills of the

5     valleys of the Temecula, the Murrieta, the Penjango,

6     the Santa Gertrudis, and other lesser streams occupy-

7     ing valleys eroded by water-action inso said ancient

8     Mesa Silt formation, as herein found."

9     Now here we have a finding which is made in relation to

10    the ligitation and upon which the stipulated judgment was

11    based, on which the Court had completely defined a stream

12    system that is contrary to the contention of the party in

13    this case who brought the ligitation, and I submit, your Honor

14    please, that you cannot have a lawsuit that is to be under

15    the control of this Court in which the Court can take future

16    action in relation to control or limitation or correlative

17    basis and have this stipulated judgment with one stream

18    system defined one way and the Court in it's findings finding

19    a stream system of an entirely different    character.  I

20    think that both parties, when the stipulated judgment was

21    entered into, were laboring under the misapprehension that

22    the conditions that existed at that time were contrary to

23    what the evidence has demonstrated in this case, or else Mr.

24    Veeder's geology in this case is completely contrary to what

25    the factual situation is.

1          Now I am going to answer some of Mr. Veeder's contentions

2     that he made in his remarks to your Honor.  He talked about

3     the simplicity of the division of this two-thirds -- one-third.

4          First, I would like to draw your Honor's attention to

5     the fact that we have, I believe, as we proceeded through

6     this case, all realized not only myself but the Court and

7     other attorneys, what a monstrosity this stipulated judgment

8     is -- the manner in which the judgment is drawn.  I expect

9     to spend some time to point out to your Honor the different

10    inconsistencies.  We did file a memorandum in which we analyzed

11    I think, a good many of these features.

12          THE COURT:  I have memoranda of May 29, 1959, August 28,

13    1959 from you .

14          MR. STAHLMAN:  If I May look at them I can tell by look-

15    ing at the first page, your Honor, please.  It is a memorandum

16    in which your Honor had requested that we point out the

17    evidence that was in the record.

18          THE COURT:  7-11-59.

19

20                    (see next page)

21

22

23

24

25

1    MR. STAHLMAN:   Then there is a supplement to that which

2   was filed shortly thereafter.   In that memorandum, if your

3   Honor please, we pointed out -- and I don't see any purpose

4   in reiterating it, I think your Honor may read the memorandum

5   again if you so desire -- but we have pointed out many of

6   these inconsistencies.

7      Now one matter that Mr. Veeder attempted to make so very

8   simple, and the great argument that he makes about the stip-

9   ulated judgment, that they were lured into a position of

10   putting water outside the watershed and that they were entitled

11   that the stipulated judgment should remain in force and effect

12   so that Pendleton may be able to utilize this water outside

13   the watershed.   I would like to make some comments on that.

14      In the first place, at the time of the previous trial,

15   as the evidence in this case shows, there was Stuart Mesa and

16   South Mesa where a relatively small area of farm land which

17   was outside the watershed was receiving water.   However,

18   compared with what is done today since there has been a change

19   and there is a great Military Installation there, wherein the

20   evidence here shows that more than 50% of the water is utilized

21   outside the watershed, I don't think it was in the minds or

22   contemplation of the parties that any provisions of this

23   stipulated judgment should be of such nature that Vail would

24   be in a position of knowing that they would at some future

25   time by reason of a change of this property have to supply a

1    tremendous amount of water that is put outside the **watershed**.

2        However, let us analyze the situation in relation to

3    assuming that that was in contemplation of the stipulated

4    judgment and let us see one of the unconscionable features

5    that exists in connection with that.  In the first place, as
                                                    in
6    Colonal Bowen has testified,/the application of water in **the**

7    Pauba Valley there is between 35% and 40% return in **flow to**

8    the Valley.  Now we know that in irrigation in the **Valley**

9    upon the part of Vail return flow, whatever is returned **and**

10   goes downstream, is again recorded at the measuring **station**

11   Number 6 and is water upon which an apportionment may be **made**.

12       Now, when we go down to Camp Pendleton and we are **going**

13   to measure at Station Number 6 and determine the division of

14   one-third  - two-thirds, and more than 50% of the water **is**

15   put outside the watershed, it does not come back and it **does**

16   not show in the measurement as it would if it were    applied

17   within the watershed, and therefore when the measurement **is**

18   made there must be a deduction of this 50%, which again **shows**

19   another inequitable situation insofar as Vail is **concerned**.

20   They do not get the measurement of that portion of **the water**

21   that is utilized outside the watershed because there is **no**

22   return flow.  They are pumping, it is true, and what **they pump**

23   is extracted, and Vail being limited to one-third of **what they**

24   use -- if that is what the stipulated judgment means, **and I**

25   am going to make some comment upon that later.  However, **that**

1   situation within itself, together with many other factors that

2   have heretofore been pointed out to your Honor, and the State

3   gave evidence upon this by Mr. Illingsworth, show why you

4   cannot measure the division by measuring surface flow when

5   the use and utilization of the water is extracted from basins

6   of which we do not even know the capacity.  So the very

7   premises, the very basis of the division, the system that was

8   utilized in the judgment does not do what the people even

9   intended or felt that it could do at the time.  We have had

10  various evidence about the mistakes that can be made in sur-

11  face diversion as testfied to by Mr. Hoffman.  We then have

12  the testimony of Mr. Kunkel that there is underground flow

13  at Station Number 6, water then goes into the ocean which is

14  not measured.  We have testimony that the capacity of the

15  basin is unknown.  The Vail Pauba Basin is unknown.  So we

16  are attempting to measure and utilize and make the most

17  efficient use of the stream system by a system of measurement

18  which is completely erroneous in making a determination as to

19  what that division is.  That point in and of itself should be

20  sufficient to abrogate the judgment which is a judgment which

21  cannot be performed in the manner in which it was intended

22  that it should be pefformed.

23      I will come back again to some of these matters.

24      However, Mr. Veeder said nothing about the three cubic

25  second feet.  We have kicked that three cubic second feet

around here at some length previously and your Honor has made some comments in relation to it.

First, I would like to call your Honor's attention to one thing that relates to this stipulated judgment before I go into the three cubic second feet.  I thought your observation that you made on one occasion when you stated, when we were going into the stipulated judgment, that any lawyer reading it would probably say, what animal in the legal menagerie does this fit into?  What class does it fit into?  And I think that very well characterizes this stipulated judgment.  The more you read it, the more confused it becomes, the more uncertainties exist in it.  For instance, just one situation in relation to what these parties may do on the one-third  - two-thirds basis, in Section Third of the stipulated judgment it says that the defendants are entitled -- and these are the words I want to emphasize -- "Take and use" on the whole or any part of their lands etc.  In talking about division of water in Section 9, it uses the term "Pumped and or diverted."  On Page 7 in talking about the allotment it says "Diverted or Abstracted." and on Page 30 it used the term "Diverted and Applied to Beneficial Use."

Now I submit that there are differences in what can be done with the water that is extracted, and upon which are we going to rely?  I think there are five different dilenations of the division of the water.  "Take and Use" is one thing.

1    "Divert and Abstract." is another.

2    Now let's get to the three second cubic feet.  As I say,

3    we have kicked this around before.  We have talked about this

4    three cubic second feet.  We have gone into the situation

5    where and how the three cubic second feet certainly affects

6    other people in the watershed or can affect other people in

7    the watershed.  I raised the question previously -- I don't

8    think we exhausted it -- that it can be claimed, I think by

9    anyone in the watershed, that the utilization of pumping of

10   water in order to fulfill the obligation of the three second

11   feet can be attacked upon the ground that it is not a reason-

12   able beneficial use.  In other  words, water that is abstracted

13   and applied to riparian land and used reasonably and bene-

14   ficially, but to take it away from others to send downstream,

15   particularly when we know that the downstream user is utiliz-

16   ing water outside the watershed, I think they have a stake in

17   that water that must be taken out and pumped and sent down-

18   stream to bleach their basin, and I don't think it can be

19   under the basis or a reasonable and beneficial use.  Because

20   it will go down into the underground water basin of Pendleton

21   and may stay there for years and years.  Who knows?  That

22   water is not water that is applied to any particular use, and

23   I don't think you could transport the water past other

24   riparians downstream for the purpose of applying it to Camp

25   Pendleton.  And notwithstanding the fact that the three cubic

1    second feet has been maintained at great disadvantage to Vail,

2    we know that the water never got down to Pendleton anyway.

3    And they certainly could not compel the water to come down

4    to be used outside the watershed.

5         And we have the situation where, as I pointed out to

6    your Honor before, that there is no reason at all why we

7    cannot go up here into the Hutch and preserve our basins so

8    that we can make economic utilization of water from the Pauba

9    basin in order to sustain crops to be planted there when

10   water is getting low and pump it out up here where it would

11   have, as Mr. Veeder's evidence shows and the testimony of Mr.

12   Kunkel on Exhibit 15-E, an  immediate effect upon the other

13   water users in the Murrieta Valley.

                    **(See next page)**

14,425

1          There is something else we have to consider in this case,
2     too, your Honor.  It has some bearing on this situation and it
3     would have some bearing upon the requirement of the Court that
4     the stipulated judgment remain in force and effect to operate
5     in relation to the old judgment -- that is, the findings of
6     fact with which I think the Government would be bound and
7     stuck.  And that is we have properties such as the August
8     Canterini property, which is up on the Santa Gertrudis in this
9     area, which was not part of the case -- Vail didn't own it at
10    that time.  So Vail then becomes in the same position as every-
11    one else up there in relation to the Murrieta Valley, and I
12    think insofar as that piece of property is concerned they would
13    be in a position with everybody else and be able to say that
14    the three cubic second feet should not be sent down.  This
15    would lead into endless litigation over the various phases
16    and character of this judgment.

17         Now we do know that the stream system has on occasions
18    gone below the three cubic second feet, and then Vail has to
19    do one of two things.  Either he has to terminate irrigation
20    in the lower part of the Valley, or he has to pump water.  As
21    I said before, it would be more reasonable and more logical,
22    because the stipulated judgment doesn't say anything about
23    that, that he would have a right to take it out of Murrieta
24    Valley or any place.

25         Then we have this broad question about Murrieta having

1    to be given to the Vail's in the first instance.  So there was

2    no consideration, when this stipulated judgment was entered

3    into, in relation to other parties on the stream.  That, of

4    course, didn't become obvious until the Government brought

5    their lawsuit and brought in all these people.  I think now

6    all of them have a stake in it, with all the defendants in

7    this case, and I think as time goes on and as this river

8    becomes more highly developed, as it is bound to with the

9    growth of Southern California, that you are going to run into

10    other complications in relation to this same feature and this

11    same situation.

12         THE COURT:  Can you argue and can you support any con-

13    tention that there was a mistake of fact in that the stipu-

14    lated judgment assumed that Vail had the full use of the

15    Murrieta/

16         MR. STAHLMAN:  Yes, your Honor, I think I can.  I think

17    there was a mistake in there for this obvious reason, that the

18    stream system as defined in the original judgment upon which

19    the findings of fact in relation to what the extent of the

20    stream system    that is used in the stipulated judgment, and

21    I think it then becomes obvious that when the stipulated judg-

22    ment was entered into, the findings of fact having theretofore

23    been made, that the mistake was made in believing, first,

24    that the stream system was such as it was, and second in

25    believing that the area up in here would not produce the

3

1   water that subsequent wells have demonstrated it would produce,

2   or I don't think in that original judgment that the O'Neill's

3   would have ever said to Vail, neither would the Court, if

4   they didn't treat that as being insignificant, say, "You can

5   have all of the Murrieta and the Santa Gertrudis."

6       THE COURT:  Can you argue, can you support it, from the

7   stipulated judgment or the judgment, that the Court in the

8   prior case contemplated that Vail's have all the flow of the

9   Murrieta?

10      MR. STAHLMAN:  I think by going to the findings of fact

11  and the original judgment that you can, your Honor.  I don't

12  have that material immediately available.  If we are going

13  over to tomorrow I would like to have an opportunity to check

14  tonight.

15      THE COURT:  You may check it tonight.

16      MR. STAHLMAN:  Furthermore, this three cubic second feet

17  not being in the contemplation of the parties, that these

18  extractions up here would have this tremendous effect that the

19  Government now contends is being felt in the Murrieta Valley.

20      Mr. Veeder argues on the one hand one thing to support

21  one contention and on the other hand another.  He argues that

22  the stream flow here is a reverse gradient and that it

23  created these great depressions here that altered the

24  character of the water body. If the Court and the parties had

25  any idea that any such thing as that could happen up there,

    they certainly would have thrown up their hands.  I think it

4

1   is obvious that someone is not going to contend they will do

2   something that they didn't think they could do at the time.

3   We know as the years have gone on there are times they can't

4   do that, and if the water table continues as the evidence here

5   shows and we have a few more dry years and Vail is put in a

6   position where they have to maintain the three cubic second

7   foot flow I think it would completely dry up the Vail Ranch

8   and we would have to put it into dry farming.  Because the

9   only time when you want to extract water from there is during

10  the summertime, the time when it is required, that the three

11  cubic second foot flow would have to be augmented.

12      Now we have this situation of this increased pumping on

13  the part of Vail.  Mr. Veeder, in his previous arguments and

14  in his statement here today, stated that Vail's control the

15  entire stream system, that they have complete control over

16  Pendleton.  That, your Honor, is just not true, according to

17  the evidence in this case.  We introduced the exhibit which

18  was referred to as "pumpable," where we made a comparison.  If

19  your Honor doesn't recall the exhibit, I will dig it out.

20      THE COURT:  Find it later.

21      MR. STAHLMAN:  Anyway, I recall what the exhibit shows.

22      This exhibit shows, your Honor please, that taking only

23  the wells and their capacity that is shown on Roripaugh's

24  Exhibit B-1 where we had, your Honor will recall, the

25  compilation of the various wells and their capacity, and then

5

1   taking the full capacity of the Vail wells at the present

2   time, we find that the full capacity of the Vail wells, if

3   they were all in operation, would be capable of pumping 17.5

4   cubic second feet; whereas the wells that are shown on

5   Roripaugh's B, which is only the clients that were represented

6   by Mr. Krieger and discounting every other well in that

7   Valley, of which there are many, probably the combined

8   capacity would be several times more than that thirty second

9   feet.   And then with the co nditions that exist upstream and

10   the diversion of waters up there, I don't think the Vail

11   Company measures up to this charge that Mr. Veeder has levelled

        ly

12   upon them that they entire/control the water supply at Camp

13   Pendleton.

14       If the Court obviates the stipulated judgment, we would

15   still have control over the water situation, and if the

16   division of water is such that correlative division must go

17   into effect your Honor can always put it in.   That is the

18   point we make.   We don't feel we are entitled to any more

19   than anyone else, but we do think we should, in all equity

    and good conscience, be considered on the same basis.   We have

21   been subjected first to this tremendous lawsuit initiated by

22   the predecessors in interest of Camp Pendleton, now projected

23   into this lawsuit by Pendleton, and I say it would be

24   unconscionable in and of itself if we were to come out of this

25   litigation, after having two lawsuits forced upon us, to be in

1   a position that would be worse than anyone else on the stream

2   system or to have a standard that is different than anyone

3   else.   It is certainly not reasonable, and it is certainly not

4   fair.

5   I think I have gone into the matter of the geology

6   sufficiently to point out the mistake that was made there in

7   relation to the concept that the court and the parties had.

8   I'm just going over these notes.

9   Now we come to another matter here.   You know, Mr. Veeder

10  has directed and we have all sort of pushed our minds upstream

11  on this case and sort of/looked what is happening down in the
                          over

12  lower part of the Valley that affects the stream system, and

13  that I think the Court would be interested in.

14  Mr. Veeder comes in and makes this charge of the great

15  depletion of the lower basin and the salt water intrusion.

16  Well, that is regrettable and it is unfortunate that the basin

17  has gotten into that condition.   But that is a result of what

18  has gone on heretofore and the predecessors of Pendleton and

19  then Pendleton following up in that until they corrected the

20  condition and created the condition of the salt water

21  intrusion below.

22  Mr. Veeder, if your Honor will recall, stated that the

23  three second feet was of no consequence to them, that they

24  didn't rely upon it; that they relied upon the water, the

25  floodwater, that came down in the wintertime.   Mr. Wilkinson

1   calls my attention to the fact that it is on page 11,550 at

2   line 9 to 14 in the transcript.

3       THE COURT:  Mr. Veeder's statement you mean?

4       MR. STAHLMAN:  Yes, Mr. Veeder's statement that they didn't

5   rely upon this.

6       MR. GIRARD:  May I have the citation?

7       MR. STAHLMAN:  It is Volume 103, page 11,550, lines 9 to

8   14.

9       Then we have this other situation, your Honor, this

10  exhibit that we offered in evidence and Mr. Veeder objected to

11  it and wanted to study it, and that was where we pointed up

12  the unreasonableness of the stipulated judgment in relation to

13  the original judgment, that the original judgment provided

14  25 per cent of the water for Vail's, and then -- and this is

15  something that your Honor mentioned at one time -- that after

16  the stipulated judgment and after the appeal where Vail had

17  all this large area of land to be included within its riparian

18  acreage, that has a bearing upon this question your Honor

19  asked in regard to Murrieta Creek, if there were any factual

20  situation that would indicate that there was a mistake made there,

21  and that exhibit which we put in points up the fact that the

22  Vail Company would have less water, unless they had Murrieta

23  Creek under the stipulated judgment, than they would have

24  under the original judgment.  And I think that pure common

25  sense would indicate that no one would go into a stipulated

1  judgment of the character we have here with the division that

2  was made if they were going to fare less well after the appeal

3  than they did before.

4  THE COURT:  Let's talk a minute about tomorrow.

5  MR. STAHLMAN:  Very well.

6  THE COURT:  How long can you stay tomorrow, Mr. Veeder?

7  MR. VEEDER:  I have a reservation out of here at eleven-

8  thirty tomorrow morning.  But I realize that we are here and I

9  will try to change my flight time, if necessary.  I would

10  rather not, of course.

11  I don't know how much longer George wants.

12  MR. STAHLMAN:  I am almost through, your Honor.  I would

13  welcome it if I could resume in the morning and kind of go

14  over things tonight and make it short and sweet.

15  THE COURT:  Make it short in the morning, because I want

16  to hear from Mr. Sachse and Mr. Girard.

17  Better change your flight.  We will go on tomorrow.  We

18  may have to go on until twelve-thirty or one, and then try to

19  wind up and let you get away.

20  MR. VEEDER:  I don't want to inconvenience the Court.

21  THE COURT:  I can't start until ten-thirty in the

22  morning.

23  MR. SACHSE:  That makes me very happy.  I was about to

24  apologize.  I have a nine-thirty law and motion matter in the

25  Superior Court.

9

1    THE COURT:  You can change your reservation.  You are just

2 flying up to Seattle, I take it.

3    MR. VEEDER:  I am making a connection out of there.  I

4 have to go into Seattle and then on to Yakima.

5    But I truly thought this was set up for only two days.  I

6 apologize for having brought the matter up.  I thought it was

7 for the 30th and 31st.

8    THE COURT:  Give some attention tonight to this question

9 whether this stipulated judgment can be considered a contract

10 or whether it was a stipulation looking toward a judgment, and

11 what bearing that has on the matter as set forth in Mr.

12 Girard's memorandum.

13    Ten-thirty tomorrow morning.

14    (ADJOURNMENT TO THURSDAY, SEPTEMBER 1, 1960, 10:30 A.M.)

15

16

17

18

19

20

21

22

23

24

25