# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                Defendants.

No.  1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Thursday, October 27, 1960

          Pages:  14,865 to 14,967

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1

1        IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3              SOUTHERN DIVISION

4                  - - -

5    HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                  - - -

7    UNITED STATES OF AMERICA,          )
                                        )
8                         Plaintiff,)
                                        )
9    vs.                                )        No. 1247-SD-C
                                        )
10   FALLBROOK PUBLIC UTILITY           )
     DISTRICT, et al,                   )
11                                      )
                                        )
12                         Defendants,)
     _____)

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS
14                 San Diego, California
                Thursday, October 27, 1960.

15   APPEARANCES:

16        For the Plaintiff:          WILLIAM H. VEEDER, ESQ.
17                                    Special Assistant to the
                                      Attorney General

18                                    LCDR. DONALD W. REDD
19        For the Defendants:

20           Vail Company            GEORGE STAHLMAN, ESQ.
21                                   EARL K. STANTON, ESQ.

             Fallbrook PUD, et al    FRANZ R. SACHSE, ESQ.
22
             State of California     FRED GIRARD, ESQ.
23                                   Deputy Attorney General

24           Barnett, et al          BEST, BEST & KRIEGER, by
25                                   ARTHUR E. LITTLEWORTH, ESQ.
             Murray Schloss Foundation  WALTER GOULD LINCOLN, ESQ.

P 20

## INDEX TO WITNESSES

| For the Plaintiff | Page |
|---|---|
| Colonel Bowen | 14,491, 14,493, 14,502 14,508, 14,540 |

| For the Defendant | |
|---|---|
| George Yackey | 14,496, 14,503 |
| Edward W. Wright | 14,507, 14,508 |
| Victor C. Hill | 14,514 |
| Clyde Christiansen | 14,521 |

## INDEX TO EXHIBITS

| Plaintiff's Exhibits | Iden. | In Evidence |
|---|---|---|
| 208D (letter) | 14,487 | 14,487 |
| 271 Yackey Eng. Report | | 14,494 |
| 272 Taylor | 14,494 | 14,494 |
| 273 Seissner | 14,495 | 14,496 |

P 2

1   SAN DIEGO CALIFORNIA, Thursday, October 27, 1960, 10:00 A.M.

2        (Other matters)

3        THE CLERK:   4-1247-SD-C United States versus Fallbrook

4   Public Utility District, et al.

5        MR. VEEDER:   Your Honor, the area with which we are

6   primarily concerned is the Upper Murrieta and Warm Springs

7   Creek, two sub-watersheds of the Santa Margarita River watershed.

8        There are some people who have come to Court today and

9   they are in my office working with Colonel Bowen straightening

10  out any differences they may have.  I would like to put off

11  calling any of those people until I get a report as to what those

12  developments are, if that is agreeable to your Honor.

13       THE COURT:   Are some of them already in the courtroom?

14  Have some come here who have not gone to your office?

15       MR. VEEDER:   You may have them stand up, your Honor.

16  They can give you their names, if you want to do that.

17       THE COURT:   Who is present here in response to the letter

18  sent out by the Court?

19       MR. WRIGHT:   Edward W. Wright.

20       THE COURT:   Have you been to the Government's office yet

21  to check on this?

22       MR. WRIGHT:   Just in the office on this floor.

23       THE COURT:   Yes.

24       MR. WRIGHT:   Yes, I did.

25       THE COURT:   What is your name?

P 3  1        MR. MC ELWEE:  My name is McElwee.  I am representing the

2  estate of Martha E. Bissett and Ernest R. Bissett.

3        THE COURT:  Mc Elwee?

4        MR. MC ELWEE:  Yes, Theo K. McElwee.

5        THE COURT:  What is the name of the estate?

6        MR. MC ELWEE:  Martha E. Bissett, deceased.

7        THE COURT:  What is your name?

8        MR. HILL:  Victor C. Hill.

9        THE COURT:  What is your name?

10       MR. NELSON:  William B. Nelson.

11       THE COURT:  Have you, Mr. Nelson and Mr. Hill, been down

12  to the Government's office on this floor yet to check this out?

13       MR. NELSON:  No sir, I haven't.

14       THE COURT:  What is the number of the room?

15       MR. VEEDER:  Room 302.  It is right around the corner.

16  My secretary is there and Colonel Bowen is there and they can

17  talk to you about it.

18       THE COURT:  Mr. McElwee, have you been down there?

19       MR. MC ELWEE:  No your Honor.

20       THE COURT:  Will you do that please.

21       MR. MC ELWEE:  Thank you.

22       THE COURT:  Anyone else here in response to these letters?

23       MR. WRIGHT:  Another piece of property of my son, Paul

24  C. Wright; I checked with them on that.

25       THE COURT:  You checked with them?

P 4

1    MR. WRIGHT:  Yes sir.

2    THE COURT:  You are ready to talk about it, too?

3    MR. WRIGHT:  Yes.

4    THE COURT:  I see Mr. Yackey is here.

5    MR. YACKEY:  Yes.

6    THE COURT:  We have you listed.  Anyone else?

7    Let's go ahead, then, until we find out about the rest of

8    them.

9    MR. VEEDER:  I would like to file with the Court the

10   letters that have been received.

11   THE COURT:  All right.  These are all up in the northwestern

12   part of Murrieta?

13   MR. VEEDER:  In the Upper Murrieta and Warm Springs Creek

14   areas, your Honor.  Ninety-six of them have been approved.

15   THE COURT:  These will be made part Exhibit 207E.

16   MR. VEEDER:  I would like to make that the 208 series,

17   your Honor.  We are out of the 207 series now.  This is a

18   different area, you see.

19   THE COURT:  What is the next exhibit?

20   THE CLERK:  The next Government's exhibit number would

21   be 271, your Honor.

22   MR. VEEDER:  But what we have been attempting to do is

23   to keep these responses correlated with the area in question

24   and the maps in question, your Honor.

25   THE COURT:  All right.

P 5

1      MR. VEEDER:  I would make it Exhibit 208E, if it would

2  be all right.

3      THE COURT:  Is this number available, Mr. Clerk?

4      THE CLERK:  208D, your Honor.

5      MR. VEEDER:  All right, 208D.

6      THE COURT:  They will be marked Exhibit 208D and received

7  in evidence.

8      MR. VEEDER:  I have three protests where they said they

9  didn't agree to the areas, your Honor.  If it is agreeable to

10  your Honor I will correspond with those people further and it

11  may be that we can straighten it out.

12      THE COURT:  All right.  Are these the other two laying on

13  the Clerk's desk?

14      MR. VEEDER:  No, your Honor, those are two more to be put

15  with 208D.  They just came in this morning.

16      In regard to the Fallbrook Interlocutory Judgment, we

17  notified 263 defendants this time, and you might inquire, if

18  you would, your Honor please, whether there is anybody in here

19  protesting those proposed Interlocutory Orders in the Fallbrook

20  area.

21      THE COURT:  Is this the area that was heard by the Master?

22      MR. VEEDER:  No your Honor.

23      THE COURT:  What part of the Fallbrook area is it, then?

24      MR. VEEDER:  Yes, the Master had some hearings on this.

25  But these are other individuals who answered but who did not

14,488

P 6

1   appear, your Honor.  This is the same practice and procedure

2   we have followed in the past.

3        THE COURT:  And this proposed Interlocutory Judgment is

4   one providing that the surface flow is part of the river system,

5   but that any water under the ground is vagrant, local, percola-

6   ting water and not part of the stream system.

7        MR. VEEDER:  That is correct.

8        THE COURT:  How has this been identified?  Have they been

9   sent a letter or a copy?

10       MR. VEEDER:  They were sent a copy of your Honor's letter

11   and a copy of the proposed Interlocutory Judgment that would be

12   entered if they didn't appear and object.

13       THE COURT:  Is anyone here from the Fallbrook area in

14   response to these letters on the proposed Interlocutory Judgment?

15       MR. MC ELWEE:  Your Honor, I was told to go to room 302

16   on this floor, and room 302 is locked.

17       THE COURT:  Either you got the wrong room number or there

18   is some mistake here.

19       Commander Redd or somebody, would you show him where the

20   room is.

21       Is anybody here from the Fallbrook area in response to

22   these letters and proposed Interlocutory Judgments?

23       I am prepared to sign it.  It will be in one Interlocutory

24   Judgment, I take it?

25       MR. VEEDER:  That is right.  I will bring it over to your

14,489

P 7

1  Honor.

2  THE COURT:  All right.  Does that clean up that Fallbrook

3  area?

4  MR. VEEDER:  That particular area is now cleaned up, your

5  Honor.

6  MR. SACHSE:  Not quite, your Honor.  There are a few still,

7  Mr. Veeder, that are floating around that involve soil conserva-

8  tion dams and things of that kind.  Basically, Mr. Veeder is

9  right that it is disposed of, except for a few very minor things.

10  MR. VEEDER:  There are, of course, some areas that I am

11  going to have to work on.  But this takes up the vast majority

12  of those defendants.

13  THE COURT:  What have you ever done about this offer to

14  settle and compromise that involved the half-acre etc.?  We

15  had lots of those sent in.  We haven't acted on those.

16  MR. VEEDER:  We just have them in our file, that's all,

17  your Honor.  When you say we haven't acted on them, what do you

18  mean?

19  MR. SACHSE:  In some of those cases -- I think I can

20  answer for Mr. Veeder -- a great many of those cases are in-

21  cluded within the Interlocutory Judgment on Fallbrook.

22  MR. VEEDER:  That is true.  But his Honor asked me what

23  we had done about them.  We have received them and we are hold-

24  ing them.

25  THE COURT:  What I was thinking about is whether or not

14,490

P 8  1    we should someday notify these people that you are not going to

2    do anything about it or just let the matter die a natural death.

3        MR. VEEDER:  I would want to check out each individual

4    one, because it can be important.  I don't want to do a blanket

5    job on that, your Honor.  We have them scattered throughout the

6    whole watershed, not only the Fallbrook area.

7        THE COURT:  You don't understand my inquiry.  We will pass

8    it up and talk about it later.

9        What is the next matter?

10        MR. VEEDER:  We have the Yackey, the Taylor and the Leissner

11   engineering reports, your Honor.

12        THE COURT:  Let's take those up.  Where is our map?  Can

13   you get a map up here?

14        MR. VEEDER:  I would like to get Colonel Bowen in here,

15   if I could.  Would you get Colonel Bowen, Commander Redd?

16        COMMANDER REDD:  Yes sir.

17        MR. VEEDER:  Which map does your Honor desire?  We have

18   a thousand of them.

19        THE COURT:  We are going to consider next, I understood,

20   some property of Yackey, Taylor and Leissner.  I want a map that

21   shows where that property is, that's all.  What area is this in?

22        MR. SACHSE:  In Sandia Creek.

23        MR. VEEDER:  Will you get me a map of Sandia Creek geology.

24        I have a map, your Honor, a geological map that we entered

25   into evidence.  I don't recall the exhibit number.

14,491

P 9

1      THE COURT:  Mr. Bailiff, do you want to get me my notebook

2  on the Fallbrook case.

3      MR. VEEDER:  I am sorry about the delay your Honor.  I

4  didn't know you were going to call for that map.

5      I will put up the general map of the watershed, your Honor,

6  and we can get the geologic map later.

7      THE COURT:  Yes.

8      THE CLERK:  It is Number 69, Mr. Veeder.

9      MR. VEEDER:  Will you get it.

10     Colonel Bowen, I would appreciate it if you would step

11  to the easel and designate the areas on Exhibit 69 and also on

12  the exhibit which is marked M-14 as to the location generally

13  of the George Yackey property, the Millicent Taylor property

14  and the Leissner property.

15     THE COURT:  What exhibit number are you looking at, Colonel

16  Bowen?

17     COLONEL BOWEN:  I am looking at Plaintiff's Exhibit 69,

18  your Honor, which is entitled "Geology of Sandia Creek Watershed."

19  On that exhibit of the area mentioned by Mr. Veeder it occupies

20  Section 36 and the fractional Section 25, both in Township 8

21  South Range 4 West, San Bernardino base line and Meridian, and

22  also fractional Section 30 and a portion of Section 31 located

23  in Township 8 South Range 3 West.

24     THE COURT:  I understand you to say he owned all of

25  Section 36 8 South 4 West?

14,492

P 10

1        COLONEL BOWEN:  Almost all, your Honor.  There is a portion

2 along Sandia Creek that is owned by the Fallbrook Public Utility

3 District, in the southerly portion of Section 36.  It was ac-

4 quired at the time they purchased and condemned land for a

5 reservoir site.  At the moment I don't recall how much, but it

6 is a fairly small acreage.

14,493

Belt 2

1       MR. VEEDER:  Would you resume the stand, Colonel Bowen?

2       Q     I hand to you the Engineering Report for the

3    property of George F. Yackey, which has been marked for

4    identification, plaintiff United States Exhibit 271 and ask

5    you to state into the record the content of that report and

6    under whose direction it was prepared.

7       A     Plaintiff's Exhibit 271 for identification is an

8    Engineering Report of property of Joseph F. Yackey prepared

9    by the office of Ground Water Resources under my direction

10   and supervision.  This report pertains to fractional section

11   25 8 South 4 West.

12      Q     Colonel Bowen, would you state into the record the

13   irrigated and irrigable acreage as you found it to be and

14   as reported in that Engineering Report?

15      A     The table in plaintiff's Exhibit 271 indicates

16   61.1 acres of land are irrigable and the remainder of the

17   area is non-irrigable.  The total area of this property is

18   206.6 acres.

19      Q     Have you delivered a copy of this report to Mr.

20   Yackey?

21      A     A copy of this report was delivered to Mr. Yackey;

22   yes sir.

23      Q     And is he in agreement with it, do you know, Colonel

24   Bowen?

25      A     I have not discussed the matter with Mr. Yackey.

1    MR. VEEDER:  We offer in evidence the Exhibit marked

2  for identification 271, your Honor.

3    THE COURT:  It is received in evidence.

4        (Government's Exhibit 271 received in evidence.)

5  BY MR. VEEDER:

6    Q    Colonel Bowen, I hand to you the Engineering

7  Report for the property of Millicent Y. Taylor and ask you

8  to state into the record the content of that report and under

9  whose direction the report was prepared.

10    THE COURT:  It will be marked 272 for identification.

11        (Government's Exhibit 272 marked for identification.)

12    THE WITNESS:  Plaintiff's Exhibit 272 for identification

13  is a copy of the Engineering Report prepared for the property

14  of Millicent Y. Taylor by the office of Ground Water

15  Resources.  This report was prepared under my direction and

16  supervision.

17  BY MR. VEEDER:

18    Q    State into the record the irrigated and irrigable

19  acreage as found by your investigation, Colonel Bowen.

20    A    The report shows that of the total area 28.7 acres

21  are suited to irrigation and the remainder is non-irrigable.

22  The total area of this property is 616 acres.

23    Q    Is the report accurate to your personal knowledge,

24  Colonel Bowen.

25    A    Yes sir.

1    MR. VEEDER:  We offer in evidence Exhibit marked for

2    identification 272, your Honor.

3    THE COURT:  It is received in evidence.

4 BY MR. VEEDER:

5    Q    Colonel Bowen, I hand to you the Exhibit marked

6 273 for identification, the Engineering Report on the property

7 of Richard Leissner.

8    A    Yes sir.

9    THE COURT:  This may be marked 273 for identification.

10       (Plaintiff's Exhibit 272 marked for identification.)

11 BY MR. VEEDER:

12    Q    Will you state the contents of that report and

13 under whose direction the report was prepared?

14    A    Plaintiff's Exhibit 273 for identification is a

15 copy of the Engineering Report prepared on the property of

16 Richard Leissner by the office of Ground Water Resources

17 under my direction and supervision.  It is a report of the

18 fractional section 30 and the East half of the Northwest

19 Quarter of section 31, both sections in Township 8 South

20 3 West.

21    Q    Will you state into the record the irrigable and

22 irrigated acres that you found it to be and as reported in

23 the report?

24    A    The report shows 25.4 acres of land to be irrigable

25 and the remainder to be non-irrigable.  The total area is

14,496

1   95 acres.

2       Q    Is the content of the report accurate to your

3   personal knowledge, Colonel Bowen?

4       A    Yes sir.

5       MR. VEEDER:  We offer in evidence the Exhibit marked for

6   identification 273.

7       THE COURT:  It is received in evidence.

8           (Plaintiff's Exhibit 273 received in evidence.)

9       MR. VEEDER:  I observe that Mr. Yackey is in the Court

10  room, your Honor.  He might express his acceptance or rejection

11  of the Engineering Reports that are involved here.

12      THE COURT:  Have you been previously sworn as a witness

13  in this case, Mr. Yackey?

14      MR. YACKEY:  I have.

15      THE COURT:  You needn't be sworn again.  What about your

16  view as to this report?

17      MR. YACKEY:  If I may take them just briefly in the

18  reverse order, using the Leissner report first, I don't know

19  how important it is to decide these matters, but the first

20  95 acres is listed as total and the surveyed acreage is 98.4

21  acres.

22      On the Yackey property the acreage is shown as 207 acres

23  in the report, and the actual survey acreage is 224.33 acres.

24      THE COURT:  What do you mean by "actual survey"?

25      THE WITNESS:  Certified surveyors report and drawings of

14,497

1   it.

2         THE COURT:  Did you have it surveyed?

3         THE WITNESS:  I had it surveyed.

4         Likewise on the ground storage reservoir, Reservoir

5   No. 1 is shown as 3 acres.  Actually the acre foot content

6   is 5.

7         And on Reservoir No. 2 it is shown as 5 acre feet

8   content, and the actual content of that is 7 acre feet.

9         To substantiate that I have the firgures of the Soil

10  Conservation who planned and put those in, and I have a

11  notation from them regarding those two acreages.

12        The only general comments that I would like to cite

13  about these reports are that the land use figures that

14  Colonel Bowen refers to do not jibe with my figures or with

15  many other previous figures of these properties.

16        THE COURT:  Land use?  Are you talking about irrigable

17  acres?

18        MR. YACKEY:  Yes sir.  And if his report is going to

19  be accepted the same as our reports would be for whatever

20  value it is, that is all right.  But if it is going to

21  carry more weight, then I would like to cite the fact that,

22  for instance, on the Taylor property, Section 36, he shows

23  an irrigable acreage of 28.7 and yet our  figure on that

24  was 492 acres.

25        THE COURT:   492 acres irrigable?

1    THE WITNESS:  Yes sir.  And in 1932 an engineer-

2  surveyor from Santa Ana made a report on that property which

3  led to the State Division of Water Resources granting a

4  permit for two and a half second feet of diversion from

5  that stream.

6    MR. VEEDER:  Your Honor, if he wants to testify I

7  would suggest that he proceed in an orderly manner.

8    THE COURT:  Yes.

9    What is your disagreement as to the so-called Yackey

10  property?  Where they say 61.1 acres is irrigable?

11    MR. YACKEY:  I showed 193 acres on that property.  The

12  reason I include that is that any lands that can be used

13  for avocados or lemons or for any agricultural project that

14  you would irrigate, even row crops or a home or recreational

15  area, I believe should be given water for that purpose.

16    THE COURT:  We will find out later.  We are going to

17  go into your reports.

18    On the Leissner property how many acres do you claim

19  are irrigable?

20    MR. YACKEY:  I showed 80 acres.

21    THE COURT:  Out of the 95?

22    MR. YACKEY:  Out of 99.48, and that is based on

23  avocado plantings that I have put in on orchards that would

24  be in that proportion.

25    THE COURT:  If we have a dispute on this we will have

1    to hear some testimony.  When do you want to do that?  You

2    say you have some report from the Soil Conservation.

3         THE WITNESS:  No, I referred merely to Section 36 about

4    the previous reports I had, because in Section 36 the M. Y.

5    Taylor property, the surveyor-engineer in 1932 in making his

6    reports to the State of California --

7         MR. VEEDER:  Your Honor, again, I am perfectly willing

8    to have him get on the witness stand and show these things,

9    but I don't believe he should be able to testify from

10   hearsay.

11        THE COURT:  Yes, you can't just get up and tell us

12   about a report in 1932.  We are going to have to see the

13   report.  Where is it?

14        MR. YACKEY:  It is a matter of  public record and I

15   thought it wouldn't be necessary to bring it in.

16        THE COURT:  It would be necessary to get a copy of it

17   at least.  Where is it of record?

18        MR. YACKEY:  The State of California gave two and a

19   half second foot permit and these figures were all compiled

20   and used in that and I am sure Mr. Veeder's office has

21   copies of that.

22        MR. GIRARD:  A permit to whom?

23        MR. SACHSE:  I object to that.  The Yackey water rights

24   permit is presently pending before the State Water Rights

25   Board.  There is no decision of the State Water Rights Board.

14,500

1    MR. YACKEY:  I beg your pardon Mr. Sachse.  There was

2    a two and a helf second foot permit issued to Hanson.

3    MR. VEEDER:  Which was thereafter revoked by the State

4    Water Rights Board, and the present water rights are pending

5    before the Water Rights Board.

6    MR. YACKEY:  I am merely citing the acreages that

7    were used in those reports to substantiate a point.

8    MR. VEEDER:  It has nothing to do with irrigated and

9    irrigable acreage.

10   THE COURT:  I don't think you are prepared to go ahead.

11   You haven't got your material this morning.  We will do it

12   on some other occasion.

13   MR. YACKEY:  I was going to cite one other thing,

14   because the man involved in that happens to be present.  In

15   the first reply to the Government suit, Mr. Swing, attorney

16   for the Hanson estate at that time, showed and cited that

17   there were 200 acres of irrigable land, of which 100 acres

18   have been cleared for -- 280 acres, and 180 acres had been

19   cleared for general crops.

20   THE COURT:  That is not evidence.  An answer made by

21   a defendant asserting rights is not evidence in the case.

22   MR. YACKEY:  I just want to cite that.

23   THE COURT:  If you want to present some matters, get

24   your material organized and we will fix some date and hear

25   you.

14,501

MR. YACKEY:  All right sir.

THE COURT:  Don't tell us about reports.  Bring in the reports or certified copies of them and we will see if they are admissible.  You have referred to a surveyors report on acreage, you have referred to Soil Conservation reports on the areas of the dams, you have referred to petitions in connection with these claimed water rights.  Let's get copies of all these things, if you are going to offer them.

MR. VEEDER:  As a means of saving your Honor's time and the rest of our time, he could deliver this material to the office of Ground Water Resources for review by Colonel Bowen, if he desires to do that, particularly this new survey he makes reference to.  It would save a great deal of time.  If those acreages are right, there is no reason for quarreling as far as I see.  In regard to the soil surveys and this other material, I think there is going to be a dispute about it because of the precedent that is here.

THE COURT:  In addition, unless we get some agreement, you may have to lay foundation to get some of these surveys in.  Acting as your own attorney is not an easy thing.  Do you know what I mean by "Foundation"?

MR. YACKEY:  Yes.

THE COURT:  You have to call somebody in who made the report and who will testify that it is accurate and put on the preliminary evidence which might make the document later

14,502

1    admissible.

2        I suggest that you get your material together.  That

3    you first talk to Colonel Bowen and see what areas aren't

4    really in dispute.  The total acreage you claimed doesn't

5    concern us nearly as much as your claim for irrigable acreage.

6    In other words, one of these parcels, the Government says,

7    is 95 acres and you say it is 99.  I am not particularly

8    concerned about that.  That is the total area.  We would be

9    more concerned with how many acres were irrigable.  But if

10   you will see Colonel Bowen and see whether there is any way

11   of reconciling some of these differences, we will narrow the

12   area that is in dispute.  We will fix some time and hear you

13   on it.  Get your material together.

14        Are we ready to hear these people now in the Courtroom?

15        MR. VEEDER:  I think we are, and if anyone has objection

16   I would suggest that they bring it to our attention, because

17   I think most of these things, if there are disagreements, we

18   can work them out through the office of Ground Water

19   Resources.

20        THE COURT:  Colonel Bowen, I understand some of this

21   land shown in Exhibit 271 is owned by Mr. Yackey, some in

22   Exhibit 272 by Taylor, and in Exhibit 273 by Leissner.

23        COLONEL BOWEN:  That is right.

24        THE COURT:  Is all of this land riparian to Sandia

25   Creek?

14,503

1      COLONEL BOWEN:  No, your Honor.

2      THE COURT:  What is riparian and what is not?

3      Do your studies, these Exhibits, show that?

4      COLONEL BOWEN:  Yes sir.  Sandia Creek flows through

5  the Yackey and Taylor property, but the Leissner property

6  is not contiguous to Sandia Creek.  The Leissner property,

7  as shown on plaintiff's Exhibit 69, is completely underlaid

8  by basement complex.

9      THE COURT:  Most of this area is underlain by basement

10  complex.  How much of this property has any younger alluvium

11  in it?

12      COLONEL BOWEN:  Again, your Honor, as shown on plaintiff's

13  Exhibit 69, just a narrow stringer of alluvium which runs

14  from the Santa Rosa grant line southerly to a point about

15  a quarter mile or a little more into section 36.

16      THE COURT:  Do you have a dispute with the geology as

17  shown on Exhibit 69?

18      MR. YACKEY:  I am not enough  of a geologist to take

19  objection to it, your Honor.

20      THE COURT:  We will put that over.  Unless you are

21  prepared to offer something in opposition, I am prepared

22  to make findings that the geology is as shown on Exhibit 69.

23      I will try to explain to you  what it means.  It would

24  be that as far as any of this land overlies basement complex

25  the Court would make a finding that any water found in it

1   was local, vagrant, percolating water and not part of the

2   stream system.  If you got any water it would be yours and

3   you would be lucky to have it.  That as far as the stream

4   bed or this younger alluvium is concerned, you would have

5   riparian rights, you and the Taylor property, would have

6   riparian rights subject to the rights of other people on

7   the stream system.  The big difference being what you can

8   do on a stream bed and what you can do elsewhere, if you

9   follow me.

10      MR. YACKEY:  Yes sir.  In other words, our land and

11   the Taylor land that are crossed by the Sandia Creek, we

12   would have a riparian use of the creek and whatever water

13   was flowing in that creek a correlative right.

14      THE COURT:  That is right.  Or if you put down a well

15   in the creek bed in the younger alluvium, you would have

16   again correlative rights.  But if you moved up into the

17   basement complex where you probably can't get water and

18   were lucky and got a well, then you would have no problem

19   as far as the stream system is concerned.  You might have

20   a problem with a neighbor who had hit the same fissure.

21   You and the neighbor might have to share your water.  But

22   any water you found under that basement complex would not

23   be part of the stream system.

24      Do you follow me?

25      MR. YACKEY:  Yes.

1      THE COURT:  That is the substance of what this geology

2   shows.

3      You study this map and be prepared when you come in

4   again to let us know how you stand on the geology problem.

5      As far as any rights you get from the State Water

6   Rights Board are concerned, the Court has ruled that I have

7   no right to decide what they are going to do.  If they give

8   you any appropriative rights, those rights are subject and

9   inferior to all other vested rights, which would mean

10  riparian rights on the stream system.  But I understand that

11  that matter is still pending.  Is that right?

12     MR. SACHSE:  Yes, your Honor.

13     THE COURT:  Let's not forget to set a date for Mr.

14  Yackey later.

15     MR. VEEDER:  Yes.

16     THE COURT:  Let's go on.

17     MR. VEEDER:  I would suggest the next hearing, whenever

18  we set that down.

19     THE COURT:  All right.

20     MR. VEEDER:  I would like, if he would, that he

21  correspond with my office as to what he has agreed to with

22  Colonel Bowen, so that then we will all understand exactly

23  the status at the next hearing.

24     THE COURT:  All right, remember that, Mr. Yackey.

25     MR. YACKEY:  I received copies of the three reports of

1  Colonel Bowen, but I just got the originals, and I didn't get
   carbon
2  a/copy  of the Leissner and the Taylor reports which the

3  Colonel promised to send me.  Therefore, I was not able to

4  forward those.  I would appreciate it very much if I could

5  get those, too.

6      THE COURT:  What is your relationship to Taylor and

7  Leissner?

8      MR. YACKEY:  I have a half interest in Taylor, and I

9  act a power of attorney in water maters for Leissner and

10 Taylor -- in fact, I operate the Taylor properties completely.

11 Taylor is in the East.

12     THE COURT:  Shall we take up these people who are in

13 the Court room now?

14     MR. VEEDER:  Yes, your Honor.

15     I have a note from Mr. Bissett, who appeared here a

16 moment ago, requesting that there be a soil survey and

17 engineering report made on the property of George McElwee.

18     THE COURT:  You mean it the other way around.  You

19 have a request from Mr. McElwee that a soil survey be made

20 on the Bissett estate.

21     MR. VEEDER:  That is right, your Honor.  I will give

22 that to the Colonel.

23     THE COURT:  We can put over any matter concerning the

24 Bissett estate until after the survey is made.  Is that *right?*

25 Is that your desire, Mr. Veeder?

1    MR. VEEDER:  Yes sir.

2    THE COURT:  Where is Mr. McElwee?  It looks like he has

3    already gone.

4    MR. VEEDER:  Yes sir.  There is no one in my office

5    now.  Everyone who has reported is in the Court room, I

6    understand.

7    THE COURT:  Anyone else who has come in in response to

8    these letters, whose names I have not listed?  I took some

9    names a moment ago.  Who else is here?  Anyone else?

10    Can we start down the list?

11    MR. VEEDER:  I would like to have each one stand up and

12    state that he is here and state whether he has any objection.

13    I think that would be the better way of handling it.

14    THE COURT:  Edward W. Wright.  You have checked this

15    out at the office?

16    MR. WRIGHT:  Yes sir.

17    THE COURT:  Do you have any objection  to the proposed

18    findings?

19    MR. WRIGHT:  Yes, to all of them.  The only reason I

20    say that any of it can be irrigated is that --

21    MR. VEEDER:  I would suggest that he take the stand,

22    your Honor.

23    THE COURT:  Step down, Colonel Bowen.

24    Where is this, in the upper Murrieta, Mr. Veeder?

25    MR. VEEDER:  That is correct.

1    THE COURT:  Let's get that map we were using.

2    Let me see your letter.

3    (Mr. Wright hands document to the Court.)

4        EDWARD W. WRIGHT,

5    being first duly sworn, on his oath testfied as follows:

6    DIRECT EXAMINATION

7    BY MR. VEEDER:

8        Q    Mr. Wright, did you receive a copy of a letter

9    signed by Judge Carter in regard to your property?

10       A    Yes.

11       Q    Did it set out acreage total and irrigable?

12   THE COURT:  There is a tabulation here.

13   Do you have the parcel numbers there on the map?

14   MR. VEEDER:  I have a map here with the parcel numbers,

15   your Honor.  They are up there (indicating).

16   THE COURT:  Colonel Bowen, can you tell where Section 20

17   and Section 28, 6 South 3 West, are on this map?

18   COLONEL BOWEN:  Section 28, your Honor, 6 South 3 West

19   --

20   THE COURT:  And the other is Section 20.

21   COLONEL BOWEN:  That is off the Exhibit, your Honor.

22   THE COURT:  It is in the basement complex?

23   COLONEL BOWEN:  Yes sir.  We were referring to

24   plaintiff's Exhibit 15-E.

25   THE COURT:  It would be cater-corner from Section 28.

14,509

1    It is all in the basement complex, is it not?

2        COLONEL BOWEN:  Yes, your Honor.

3        THE COURT:  Well, is there any problem here?  All of

4    this land lies in the basement complex.  Who cares whether

5    it is irrigable or not?  There is no right to water out of

6    the stream system.

7        MR. VEEDER:  Out of deference to Mr. Wright -- he says

8    that the land is irrigable.  He has told me that he has seen

9    land comparable to it that has been irrigated, and I think

10   he is simply expressing his view on it.

11       THE COURT:  What does this mean in 28 where there is

12   property in 28 and you say the portion outside the watershed

13   not included?

14       MR. VEEDER:  That is correct.

15       THE COURT:  28 is all within the watershed.

16       MR. WRIGHT:  Part of that is draining toward the east.

17       MR. VEEDER:  That is the basis of the information that

18   I received from the office of Ground Water Resources, your

19   Honor.

20       THE COURT:  Let's get out map 15, Mr. Clerk.

21       MR. VEEDER:  Did you locate that, Colonel?

22       MR. GIRARD:  About half of it is outside.

23       MR. VEEDER:  Will you show the Court?

24       THE COURT:  We just don't have the watershed line in

25   here.  That is the trouble with this, isn't it?

1    MR. VEEDER:  There is dip down.

2    MR. GIRARD:  It is all in the basement complex; none

3 riparian.

4    THE COURT:  Mr. Wright, the geology that we have in

5 evidence shows that all of your land, both in and outside

6 the watershed -- and we are concerned only about the part

7 in our watershed -- is all basement complex.  It is not

8 riparian to the stream.  I would be prepared to find that

9 any water you find from that land is yours and you are just

10 lucky to have it.  You have no correlative rights with any

11 body else, except as to rain water.

12    MR. WRIGHT:  Yes.

13    THE COURT:  Rain water is part of the stream system.

14    MR. WRIGHT:  One thing I would like to mention, too,

15 in regard to that.  Where that ridge comes along there is

16 a steep fault through the earth on both sides.  One side

17 that is in 28, that is, on the Santa Margarita side, we have

18 the water.  ON the opposite side there is a bunch of willows,

19 seepage, which is actually in the Santa Ana watershed.  The

20 same fault just cuts through.

21    THE COURT:  That won't effect the situation here.

22    MR. WRIGHT:  $N_o$.

23    THE COURT:  Do you understand what I am prepared to

24 find?

25    MR. WRIGHT:  Yes.

1    THE COURT:  The letter proposes to find that in Section

2  20 you have about 12.9 acres which are in the watershed and

3  none of them are irrigable.  How many acres out of that 12.9

4  do you say are irrigable?

5    MR. WRIGHT:  I doubt if there is any of that that I

6  would want to try to irrigate.

7    THE COURT:  In Section 28 the Government shows 134.4

8  and 80.8, about 215 acres, and it says that none of that is

9  irrigable.  Do you think any of that is irrigable?

10    MR. WRIGHT:  If there was water.  I don't believe there

11  would be over 20 acres left out of it.

12    THE COURT:  That could be irrigated?

13    THE WITNESS:  That wouldn't be irrigated.

14    THE COURT:  That wouldn't be?

15    THE WITNESS:  That couldn't be.

16    THE COURT:  I don't understand.  20 acres that could

17  or could not be irrigated?

18    MR. WRIGHT:  That could not be.

19    THE COURT:  I don't know what difference it makes.

20    MR. GIRARD:  I would think the Government wouldn't even

21  want a finding of irrigable acreage on land which is not

22  riparian and which is in basement complex.  There is no

23  reason for it.

24    THE COURT:  Do you understand what I propose to find?

25    MR. WRIGHT:  Yes.

1       THE COURT:  That any water you find up there is yours

2   and you are just lucky to find it.

3       MR. WRIGHT:  Absolutely.

4       THE COURT:  And that any water in the ground is not

5   part of the stream system.  HOwever, surface water has to

6   be allowed to flow down.

7       MR. WRIGHT:  Yes.

8       THE COURT:  Are you content with that?

9       MR. WRIGHT:  Yes.

10      Also is that on my son's?

11      THE COURT:  Which is your son's piece?  What is your

12  son's name?

13      MR. WRIGHT:  Paul G. Wright and Betty Joe Wright.

14      THE COURT:  How many acres does he have in Section 28

15  6 South 3 West?

16      MR. WRIGHT:  There are 300 acres, but I believe it

17  shows about 130 or 135 acres non-irrigable.

18      THE COURT:  We are not concerned about the irrigable

19  in this situation.  It is not riparian.  Let's forget about

20  the irrigable acreage.  It is one thing if you owned wells

21  on some irrigable acres that might be charges on the stream

22  system.  It is another thing to worry about irrigable acres

23  where the land is not riparian and the water is not part of

24  the stream system.

25      MR. VEEDER:  Let me say this, your Honor, that we  are

1     required by the mandate of the Court of Appeals to take each

2     parcel of land, and that is all we have done.  In regard to

3     situations like this, where he is not riparian to the stream,

4     where he is not overlying any ground water body, I think he

5     has no concern at all.

6         THE COURT:  Right.

7         Tell you son that as far as his property in Section 28

8     -- the   same Township and Range?

9         MR. WRIGHT:  Yes.

10        THE COURT:  I propose to make the same findings as on

11     yours.

12        MR. WRIGHT:  Yes.

13        THE COURT:  All right.  His name is Paul Wright?

14        MR. WRIGHT:  Paul G. Wright.

15        THE COURT:  You have a note on that, do you?

16        MR. VEEDER:  Yes, we do, your Honor.

17        THE COURT:  Thank you, Mr. Wright.

18        Mr. Victor C. Hill.

19

20

21

22

23

24

25

14,514

Belt 4    P 11

1                    VICTOR C. HILL,

2    one of the defendants herein, being first duly sworn, on his

3    oath was examinied and testified as follows:

4         THE CLERK:  State your name please.

5         THE WITNESS:  Victor C. Hill.

6         THE COURT:  May I see the letter that was sent to you?

7         The letter says that you have a total of 90.9 acres, none

8    of which are irrigable.

9         MR. HILL:  I don't agree with the non-irrigable.

10        THE COURT:  Let's find out where your property is, first.

11   You are in 6 South 1 West Section 23.  Maybe we are not even

12   concerned with your land.

13        MR. VEEDER:  Here it is, your Honor.

14        COLONEL BOWEN:  Referring to Exhibit 265G, your Honor,
         208-C

15   Parcel No. 58 and Parcel No. 53.

16        THE COURT:  Yes.  And is this land riparian to any tribu-

17   tary of the Santa Margarita?

18        COLONEL BOWEN:  One corner of Parcel 58 is crossed by a

19   stream running down Pixley Canyon, as shown on Exhibit 65G, but

20   it is at the upper end of that canyon.  Both these parcels are

21   very near the divide between Murrieta Hot Springs watershed and

22   the Tucalota watershed.

23        THE COURT:  In other words, it is this little piece of

24   Parcel 53 here and Parcel 58 here.  Is that it?

25        COLONEL BOWEN:  Yes sir.

14,515

P 12

1    THE COURT:  I don't see why we should waste any time on

2  this, Mr. Veeder.

3    MR. VEEDER:  All right.

4    THE COURT:  Mr. Hill, I propose to find that your land

5  overlies the basement complex; that if you find any water in it

6  you are just lucky to have it and it belongs to you.  And I am

7  not even going to worry about the riparian character of your

8  land.  You are away up at the head of the stream and there is

9  nothing you could do, in my opinion, that would have any effect

10  upon the river.  The surface runoff in any creek or tributary

11  that runs through there can't be stopped.  That is part of the

12  stream system.  Rain water is part of the stream system.

13    MR. HILL:  No check dams?

14    THE COURT:  No check dams, unless some arrangements are

15  made through State authorities or some arrangements might be

16  later made in the Court.  These check dams interfere with the

17  flow of the stream.  We haven't decided yet.  We have problems

18  we are going to take up later on the matter of check dams.  But

19  technically there is an interference with the surface flow,

20  which belongs to the stream.

21    But as far as wells are concerned, if you find a well up

22  there, have at it.  We are going to find that you don't affect

23  the stream system.

24    MR. HILL:  Very good sir.  Thank you.

25    THE COURT:  William B. Nelson.

14,516

P 13

1    You have no objection to that finding, do you, Mr. Veeder?

2    MR. VEEDER:  No your Honor.

3    THE COURT:  Mr. William B. Nelson.

4    MR. VEEDER:  He is probably gone, your Honor.

5    THE COURT:  What evidence do we have on this?  What is the

6    parcel number?  Let's get rid of it.

7    MR. VEEDER:  I think there was agreement with him in my

8    office, your Honor.  They were talking to him about it.

9    THE COURT:  Do you have a legal on it?

10   MR. VEEDER:  I am getting it, your Honor.

11   Your Honor, Mr. Nelson has, apparently, left.  I don't have

12   his parcel number in the courtroom.  He was in.  He talked to

13   the people in there and apparently straightened out the matter.

14   THE COURT:  You can't tell from your files here what his

15   parcel number is?

16   It's time for a recess anyway.  Take a short recess.

17   (Recess)

18   (Another matter)

19   THE CLERK:  1247-SD-C United States versus Fallbrook.

20   THE COURT:  What did we find out about Mr. Nelson's

21   report?

22   MR. VEEDER:  We ran down Mr. Nelson and find that his

23   name is A. J. and Wilma Nelson, and his parcel number is 237,

24   and it is in Section 36 Township 6 South Range 3 West.  The

25   property is crossed by Warm Springs Creek right here.

14,517

P 14

1    THE COURT:  Let's see where it is.

2    MR. VEEDER:  Would you like to look at the ownership map?

3    THE COURT:  What section?

4    MR. VEEDER:  Section 36, your Honor.  It is right there

5    (indicating map).

6    COLONEL BOWEN:  Your Honor, that appears on Plaintiff's

7    Exhibit 15F.

8    THE COURT:  What parcel number on Exhibit 265C?

9    COLONEL BOWEN:  Parcel 237, your Honor.

10   THE COURT:  Does it lie right over the younger alluvium?

11   MR. VEEDER:  That is right.

12   COLONEL BOWEN:  Yes sir, the younger alluvium runs through

13   it from north to south.

14   THE COURT:  Did he leave?

15   MR. VEEDER:  He is gone, your Honor.

16   THE COURT:  I would propose to find that the portion of

17   the property outside the area of younger alluvium, as shown on

18   Exhibit 265C, is over basement complex, and that any water under-

19   neath is vagrant, local, percolating water and not part of the

20   stream system; that as to the portion overlying Warm Springs

21   Creek and the younger alluvium therein, that as to water out

22   of that younger alluvium on the creek he has correlative rights

23   as part of the stream system.  Also, I propose to find that his

24   land is riparian, since it is cut by the creek.

25   MR. VEEDER:  That is correct.

14,518

1    THE COURT:  What did your finding show as to how much was

2  irrigable?  Was he finally satisfied with your finding on irri-

3  gable acreage?

4    MR. VEEDER:  14.5 acres irrigable out of 40 acres, and as

5  I understand it was worked out.

6    THE COURT:  That will be the finding of the Court.

7    This is the type of situation that could be taken care of

8  in the form of Interlocutory Judgment proposed by Mr. Sachse.

9    MR. SACHSE:  If your Honor adopts such judgment, it was

10  my hope and Mr. Littleworth's, when we worked on it, that it

11  would apply to people on Warm Springs, Tucalota or any other

12  stream.

13    THE COURT:  When I looked that over I had one or two

14  suggestions.

15    Have you looked it over?

16    MR. VEEDER:  Yes your Honor.

17    THE COURT:  Did it generally look all right to you?

18    MR. VEEDER:  I think generally, yes.

19    THE COURT:  My only suggestion, in thinking about it, is

20  that we should tie in some map for areas of younger alluvium.

21    MR. SACHSE:  Yes, your Honor.  I assume that this line

22  will be drawn sooner or later, and as your Honor once suggested --

23  I believe you did -- that you were probably going to try to

24  follow section lines simply, and that would make it simple to

25  insert another paragraph saying upstream from line so and so.

JOHN SWADER, OFFICIAL REPORTER

14,319

P 16

1   THE COURT:  Certainly going to do that on a big basin like

2   Temecula.

3   MR. LITTLEWORTH:  Are you thinking of the extent of the

4   younger alluvium?

5   THE COURT:  Yes.

6   MR. LITTLEWORTH:  At one time we did talk about putting

7   such reference to a map in and thought perhaps there was not a

8   map at the present time which was on large enough a scale to be

9   meaningful.  Maybe some of these other maps could be blown up

10  a little.

11  MR. SACHSE:  Mr. Veeder expressed his own desire on De

12  Luz Creek to get a larger scale delineation.

13  MR. VEEDER:  I think that is the only way you can proceed.

14  THE COURT:  That is what is being done on these section

15  maps such as 265C.  That is why in the case of Nelson here I

16  tied it in with that particular map.  It is very detailed.

17  MR. SACHSE:  We would/anxious to have such exhibits avail-

18  able.

19  THE COURT:  All right, who else is here in this area who

20  has received a letter and is not satisfied with it?

21  MR. VEEDER:  Colonel Bowen has been in discussion with

22  some of these land owners and I think we can work most of these

23  things out, unless there is someone here with a complaint.

24  THE COURT:  Anyone else who wants to be heard?

25  MR. VEEDER:  I think it can be said in general that these

14,520

P 17   1   lands which are overlying the basement complex would probably

2   be subject to the same kind of interlocutory finding.

3   THE COURT:  What area, generally, did you send letters out

4   on?  Can you show me on that map?

5   MR. VEEDER:  The Warm Springs Creek area and the Upper

6   Murrieta.  It takes in this whole area.

7   THE COURT:  You just take a brush of your hand.

8   MR. VEEDER:  Yes.

9   THE COURT:  What area?

10   MR. VEEDER:  Warm Springs Creek, and these are people who

11   haven't appeared by counsel, and then the balance of what we

12   call the Upper Murrieta Creek.  I have a map in my office, if

13   you'd like to have me bring it in so that you can get it pre-

14   cisely.

15   THE COURT:  Did you send letters to those people in the

16   basement complex lying north and east of the Murrieta Valley?

17   MR. VEEDER:  That is correct.  Every parcel of land has

18   now been covered.

19   THE COURT:  Let's think a long time before we spend a lot

20   of time on the rest of that basement complex.

21   MR. VEEDER:  My own view is that they are down now to the

22   last two areas.

23   THE COURT:  What are the last two areas?

24   MR. VEEDER:  There will be the Wilson Creek and the

25   Terwilliger areas, some of this Santa Gertrudis area, which I

14,521

_P 18  1    propose to put in together, to put the whole thing in, and then

2    there is the Upper Temecula, and that will take care of all the

3    parcels of land.  I have no more desire than your Honor has to

4    get involved on basement complex where there isn't any water.

5    At the same time, I feel, from the standpoint of due process,

6    that your letters have been effective and I think they would

7    cover us in the event of some objection later on.

8        THE COURT:  Do you have detailed maps of these other areas?

9        MR. VEEDER:  We do your Honor.

10       THE COURT:  Then it would seem to me that it would just

11   take a little more time to send the letters out.  If Smith, for

12   example, has a piece of ground that is in the basement complex

13   and there is no younger alluvium on it, I think we should tell

14   him in the letter what we propose to find.  Prepare a form letter

15   with six or seven different paragraphs, with the various altern-

16   atives in it, and cross off everything except what pertains to

17   him.  Let him know exactly what we think about the geology in

18   that area.

19       MR. VEEDER:  That is an excellent idea.  We will follow

20   through on it, your Honor.

Belt 5  21   MR. CHRISTIANSEN:  Your Honor, I was a little confused --

22       MR. VEEDER:  State your name for the record please.

23       MR. CHRISTIANSEN:  Clyde Christiansen.

24       I was a little confused as to whether I should testify

25   or not.  I arrived late.

14,522

P 19   1        I have no dispute with the irrigable acres as indicated

2   in this, really.  However, there is considerable acreage of land

3   that is on the very crest of the watershed and the line separates

4   the land outside the watershed and the land inside the watershed.

5   There are several parcels.  As to one parcel there is no question

6   that Warm Springs bisects it.  The second parcel is separated

7   some distance.  It is mainly details as to whether it is in

8   the basement complex or whether in a general way some of this

9   yellow area of alluvium is included in it or not.  I don't know

10   whether this is something you should decide.

11        THE COURT:  How many acres do you have up there?

12        MR. CHRISTIANSEN:  Some 700 acres are involved.

13        MR. VEEDER:  We have his data, your Honor, and, as I talked

14   to Mr. Christiansen just a moment ago, we have investigations

15   in that geology up there.  It is important, I am sure, to Mr.

16   Sachse to call Dr. Mann in regard to this precise area.  Mr.

17   Kunkel is investigating.

18        I suggest to Mr. Christiansen that the best way to do is

19   for us to sit down and talk with him about it, because there is

20   a great deal of detail involved.

21        THE COURT:  Here is one of the problems which has not yet

22   been resolved.  This is in Domenigoni Valley isn't it?

23        MR. VEEDER:  Yes.

24        THE COURT:  Testimony has been put on that underground

25   water runs not into this watershed but into another watershed,

14,523

P 20

1   and the Government has reserved the right to combat that testi-

2   mony.  They may decide that that testimony is correct.  They may

3   decide that it is not correct.

4          Let's see what could happen.  If the Court decides that

5   that underground water runs into the other watershed, then of

6   course that water underground is not a part of the stream system.

7   Surface water, however, as shown by our maps, runs into the stream

8   system.  So your case would be a little complicated, depending

9   on how that turns out.

10         MR. CHRISTIANSEN:  That land that I mentioned is right

11   in that area.  There are certain contentions --

12         THE COURT:  I would hazard a guess -- this gets to be a

13   complicated problem -- if the underground water runs out of the

14   basement complex, the surface water that comes down there is

15   used to fill those basins.  If you are allowed to pump indis-

16   criminately, then more surface water that would otherwise come

17   into our stream system is used to fill the basins, and of course

18   the rest of it runs underground.  On the other hand, there is

19   no doubt that the surface water that runs across is part of the

20   stream system.  There is no problem about basement complex areas.

21   If you get a well in basement complex where you get water, you

22   are just lucky.

23         MR. CHRISTIANSEN:  I would agree generally with what you

24   say.  In some of those areas there may be water in the stream

25   bed, but I contend it is a very insignificant amount.

14,524

P 21   1        THE COURT:  Where do you live?

2        MR. CHRISTIANSEN:  I live in Hemet.  Although we own and

3    farm this property that is inside the watershed in what is part

4    of Menifee Valley and South Domenigoni Valley.

5        THE COURT:  Do you want to be present when further testi-

6    mony is put on, if any, whether the water runs into that water-

7    shed or not?

8        MR. CHRISTIANSEN:  I would like to be.

9        MR. VEEDER:  I will assume the responsibility of notifying

10   him when that matter comes up.

11       THE COURT:  How soon will you be ready to put on the re-

12   buttal on that issue?

13       MR. VEEDER:  I couldn't say right now, your Honor.

14       THE COURT:  Mr. Veeder will notify you.  We will hold your

15   matter up and we will find out more about that underground sit-

16   uation.

17       MR. CHRISTIANSEN:  Thank you.

18       THE COURT:  Anything further?

19       MR. VEEDER:  I don't believe there is in these areas,

20   your Honor.

21       THE COURT:  The next item.  Let's go to Number 6.

22       MR. VEEDER:  Exhibit 15E is on the easel, your Honor.

23       THE COURT:  In laying out that by section lines, it seems

24   to me that we could do it informally without the reporter, with

25   most of us standing around the map and just put the lines in.

JOHN SWADER, OFFICIAL REPORTER

14,525

P 22

1    Don't you think it would be better to do it that way, when all

2    of us are talking at once, laying out our lines?

3        MR. SACHSE:  I concur, your Honor.  This finding is your

4    sole responsibility.  You have heard all the evidence.  You may

5    want some of our comments.

6        THE COURT:  This is the point.  I might say, "Wait.  What

7    about here?  When we get up to the north end we have even a

8    reverse flow."

9        MR. SACHSE:  I would like to see it attempted informally.

10       THE COURT:  Any objection to doing it that way?  We could

11   make our record subsequently.

12       MR. VEEDER:  I would concur on that.  I am thinking about

13   the individual parcels that would be involved in it and whether

14   we should follow the section lines or whether we should follow

15   the property line.  I think it would be up to you.

16       THE COURT:  Do we have detailed maps of that?

17       MR. VEEDER:  Do you have those U.S.G.S. Maps, Colonel

18   Bowen?

19       COLONEL BOWEN:  Which area?

20       MR. VEEDER:  Speaking now of the area on 15E extending

21   from the very northern end of the Murrieta Valley on down to,

22   I would assume, probably the Vail Company line.

23       That is what you are interested in, isn't it?

24       THE COURT:  Somewhere down there.

25       COLONEL BOWEN:  We have the 7½ minute series of U.S.G.S.

14,526

P 23

1    topographic maps of that area.

2         THE COURT:  Do you have the parcels that we are trying to

3    get placed on a blown up map?

4         COLONEL BOWEN:  Yes sir, there is a map in evidence.  It

5    doesn't have the topography on it, but it shows the parcels for

6    that area.

7         MR. LITTLEWORTH:  Some of our people are involved in this

8    area, and I think some of the parcels are so large that it is

9    going to be very difficult to take it on a proper line.  The

10   Yoder property, for example, has rather substantial acreage on

11   either side of storage unit No. 4 line.  I think it is going to

12   be rather difficult to make a line on the basis of property

13   ownership.

14        MR. GIRARD:  Section lines will always remain constant,

15   whereas property ownership lines will not.

16        MR. VEEDER:  May we go off the record until we decide

17   the maps best used?

18        THE COURT:  Yes.

19        (Discussion off the record.)

20        (Noon recess)

21   SAN DIEGO, CALIFORNIA, Thursday, October 27, 1960, 2:00 P.M.

22        (Another matter.)

23        THE CLERK:  4-1247-SD-C United States versus Fallbrook.

24        THE COURT:  We will be in recess as far as the reporter

25   is concerned, unless we need him from time to time.

14,527

P 24

1    MR. VEEDER:  Would it be possible for me to go back on

2    the record for a moment your Honor?

3       THE COURT:  Yes sir.

4       MR. VEEDER:  I would like to make one more suggestion.

5    What would your Honor?  I am proceeding strictly on the basis

6    of problems that I think are inherent in an arbitrary line.

7    Based upon the evidence of Mr. Kunkel and Colonel Bowen, this

8    would be, as I comprehend it, a zone in which the only waters

9    that would be found in the water-bearing strata would be suffi-

10   cient for the domestic purposes.  Now it occurs to me that if

11   you drew the lines here and said that, for all practical purposes,

12   these farmers up here -- I am thinking of Mr. Borenstein in

13   particular, who runs a chicken farm up there and his wells go

14   to bedrock; he is, nevertheless, within the older continental

15   alluvium -- I think if you drew the arbitrary line and said that

16   he has no interest in the ground water strata, that he would be

17   precluded, for example, from bringing an action for damages

18   against someone who had pumped more than his share and deprived

19   him of his water.  In other words, I believe the suggestion of

20   an arbitrary line is tantamount to depriving a man of his cause

21   of action against a heavy pumper who might withdraw all the

22   water under his land and thereby cause him irreparable damage.

23       THE COURT:  Is he located in the blue?

24       MR. VEEDER:  No, he is here.

25       THE COURT:  Which side of that temporary red line?

14,528

P 25

MR. VEEDER:  The temporary red line runs right through his property.

My thought is this.  Draw your line and call this the zone of domestic water, if you choose, but treat it on the basis that it is still part of the water-bearing strata.

THE COURT:  If you do that, then we get two lines.  We get a no-man's land in there of domestic water.  I would prefer, if this temporary red line ran through his property, to run the line on one side or the other of his property.  If he would prefer to be within what was called the basin, that is all right. If he would prefer to be on the other side, leave it up to him. We know we can't draw this line exactly.  We all know it is an approximation, and jogging around below or above a man's property in that area up there isn't going to make a bit of difference to anybody else in the watershed.

MR. VEEDER:  And he is the man for whom I am speaking at the moment, and I am speaking of his successor in interest.  I am speaking in perpetuity once this thing is established, because, as a matter of fact, your Honor is as interested as I am in seeing that the decree that is entered is sensible.  And my view is -- and I am perfectly willing to be overruled on it, but I want to be heard on it -- my own view is that this area where the delineation of the older continental alluvium is, is all part of the Santa Margarita River stream system; but our own evidence has proved just what I said, that those people

14,529

P 26

1   there have a minimum quantity of water and they are the least

2   able to take care of themselves in the event of a litigation

3   and they are the ones against whom the impact of the lowering

4   of the ground water table is first felt.  I have disagreed with

5   your Honor on the proposition that it is a benefit to let a man

6   out of the litigation.  I have never felt that.  But I do feel

7   that you can make such a line of demarkation and delineation

8   which would protect those people, but it would be an area con-

9   cerning which your Honor would say, "I see no reason for ever

10  regulating their uses, but I will not deprive them of the right

11  to protect themselves against encroachment."

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14,530

B1 6

1    THE COURT:  Of course, Mr. Veeder, it is refreshing

2  and proper to find you in here championing the right of some

3  small person.

4    MR. VEEDER:  I always have.

5    MR. STAHLMAN:  It is a little unusual, too.

6    THE COURT:  But this works both ways.  Take Mr.

7  Borenstein, if we put him inside the basin, then he is

8  subject to litigation forever, because any time something

9  comes up on the regulation of the water in this stream and

10  the basin, he is in the basin and he has to hire a lawyer

11  or he has to rock along without one.  If we put him out of

12  the basin he is rid of this litigation from here on out.

13  And the very area where he is indicates that he is probably

14  not really getting basin water down there.

15    MR. VEEDER:  Call it, then, the zone of non-regulation

16  by this Court.  But I wouldn't deprive him of what I think

17  is an extremely valuable right, that of protecting himself.

18    THE COURT:  Is he here today?

19    MR. VEEDER:  No.

20    THE COURT:  Has he expressed an opinion to you whether

21  he wanted to be inside or outside the line?

22    MR. VEEDER:  He hasn't expressed an opinion to me.  But

23  he did tell me that his problems were very great, namely,

24  that he had drilled to bedrock in an area of older continental

25  alluvium in which he was getting a small quantity of water.

14,531

THE COURT: How much water was he getting?

MR. VEEDER: I think it was 20 inches.

MR. SACHSE: How deep is his well?

MR. VEEDER: I wouldn't want to say on that.

But I do have that thought in mind. I think your line could be the older continental alluvium as depict there.

THE COURT: Let's analyze this.

MR. SACHSE: May I remind you of something, your Honor.

THE COURT: Yes.

MR. SACHSE: When we recessed in December 1958 you asked all counsel to give you their thoughts on how this matter of older alluvium, younger alluvium, etc., could be handled

14,531

1      THE COURT:  How much water was he getting?

2      MR. VEEDER:  I think it was 20 inches.

3      MR. SACHSE:  How deep is his well?

4      MR. VEEDER:  I wouldn't want to say on that.

5      But I do have that thought in mind.  I think your **line**

6  could be the older continental alluvium as depict there.

7      THE COURT:  Let's analyze this.

8      MR. SACHSE:  May I remind you of something, your Honor.

9      THE COURT:  Yes.

10     MR. SACHSE:  When we recessed in December 1958 you

11  asked all counsel to give you their thoughts on how this

12  matter of older alluvium, younger alluvium, etc., could be

13  handled, and if your Honor will recall I submitted even a

14  sketch diagram, and what Mr. Veeder is saying is exactly

15  my proposal then and he didn't like it.

16     It was my proposal, with this modification.  I said

17  that your Honor should hold that clearly all younger

18  alluvium was in forever and that everything other than

19  younger alluvium was out forever, and that the older alluvium

20  your Honor could treat as, so to speak, a non-suit and could

21  simply say, "There is no evidence before this Court at this

22  time sufficient to make a determination.  These people

23  are staying in the lawsuit but there is no possibility of

24  any restriction unless somebody opens it up later."  That

25  was the original proposal I made.  And I suggested that we

14,532

1    adopt -- we didn't have 15-E then, we had 15 -- that we adopt

2    the line of delineation between the younger alluvium that is

3    clearly the stream system, the basement complex and the

4    weathered clearly out, and that the rest of it hung in limbo,

5    in no-mans-land.  And I heard nothing but vigorous objection

6    from the United States at that time.

7        MR. VEEDER:  The only similarity between what Mr. Sachse

8    has said and what I said is that we both used the English

9    language.

10       THE COURT:  To a certain extent, yes, because Mr.

11   Veeder is proposing a new kind of zone in there that is

12   neither basin or older basement complex.

13       MR. VEEDER:  It is still basin.

14       THE COURT:  Let us analyze this.  Here is a fellow who

15   has a chicken ranch.  How many acres has he up there?

16       MR. VEEDER:  I think he probably has 60 acres.

17       THE COURT:  So he is getting some water, enough for

18   some chickens, out of this well.  Let us suppose that by

19   drawdown on this basin he is affected and he no longer gets

20   his 20 inches and is down to three or four inches or not

21   enough to take care of his operation.  Has he money enough

22   to open up this matter and bring in all parties on the

23   stream system to have an adjudication as to who is inter-

24   ferring with his right to water?  He couldn't possibly do

25   it.

A 25

14,533

1    MR. GIRARD:  He couldn't buy the stamps it would take

2   to notify all the parties.

3    MR. VEEDER:  I could give you the answer to that.  But

4   I am going to object to depriving him of that right.

5    THE COURT:  It is a dubious right.  It is a right to

6   be in a law suit the rest of his natural life and the lives

7   of his children and grand-children.  That is the kind of

8   right it is.

9    MR. VEEDER:  I truly believe, though , your Honor, that

10  the effort to draw the line would be made very much simpler

11  if you adopted the concept that I have just suggested rather

12  than --

13   THE COURT:  You mean draw two lines, then?

14   MR. VEEDER:  No, no.

15   THE COURT:  Then try again.

16   MR. VEEDER:  I simply say that north of the older

17  continental alluvium, north of this line, you would say

18  that there is an area of non-regulation.

19   MR. SACHSE:  Where does the complete throw-out start,

20  then?  Where are they completely out?

21   MR. VEEDER:  My whole view is that there is no ground

22  water in quantities certainly for regulation in the basement

23  complex, and that is where your line is.

24   MR. LITTLEWORTH:  But you are keeping him in the law suit

25  by saying we will not regulate.  It seems to me that if you

got regulation, then they shouldn't be in the law suit.

A-26

14,534

1    MR. VEEDER:  I didn't say that.  I said that as far

2  as the United States is concerned I see no reason for ever

3  having regulation in regard to them.

4    But I doubt your Honor's power to say to a man, "The

5  evidence shows that your land overlies a ground water body,

6  but I am going to make a finding and determination that your

7  neighbor across the line can pump water out from under you

8  and that you have no remedy against him."  That is what it

9  amounts to.

10    THE COURT:  You are really talking about the remedy

11  of somebody in the basin against this little chicken farm.

12    MR. VEEDER:  No, I am not.  I am talking about the

13  situation -- we might as well look at it -- I am talking

14  about the situation where, right here, you have a pumping

15  hole and it is in the process of dewatering all around it,

16  and I am saying that the man who is living here, if this

17  concept is carried to its ultimate as you are now outlining

18  it, this man in section 11 would not have a remedy against

19  the man in section 15 who dewatered the water bearing strata

20  under his property.  You can reject all that I am saying.

21  I just wanted to bring it to your attention, because what

22  you are doing is saying, "No, you can't in my Court have a

23  remedy against a man who damages you.'

24    THE COURT:  Of course, I would find -- to answer your

25  first suggestion -- that these areas outside this line are

1   not within the basin.  That would be the finding.  The

2   evidence from your own witness is going to be enough to

3   support it.

4       MR. VEEDER:  I think what you would find, with all

5   respect to your Honor, is that the water in that area is

6   part of the water bearing strata, but the water bearing

7   strata is so shallow and the quantity of water there is

8   such that only waters for domestic purposes are available.

9   I believe it would be contrary to the fact that the area

10  north of the line to the basement complex has no water

11  bearing strata which is part of the overall water body.

12      THE COURT:  It would be refreshing someday to have you

13  go along and agree on something when we are trying to work

14  out some practical suggestion.

15      MR. VEEDER:  I am just tendering a thought.

16      THE COURT:  The Government has changed the view of

17  the extent of this basin.  The court is about prepared to

18  accept your view that the big basin lies here.  There has

19  to be a line somewhere.  Nobody can draw it with exactitude

20  and we all agree that it is only an approximation.  I have

21  trouble following you.

22      MR. VEEDER:  I don't think I am recommending anything,

23  your Honor, that is  diametrically opposed to your position

24  at all.  I am simply recommending a thought to your Honor.

25      THE COURT:  Mr. Girard.

1    MR. GIRARD:  You are going to find that the water here

2    is part of the basin, and that this is vagrant, percolating

3    water not part of the basin.  So as a matter of law, if

4    this man does pump and that level goes down, he is pumping

5    some water which is not connected with this man up here, or

6    sufficiently connected to make any material difference.  Mr.

7    Veeder has referred to the fact that this is all one ground

8    water area in the whole area.

9    MR. VEEDER:  I am talking about the older continental

10   alluvium, the orange in front of you.

11   MR. GIRARD:  Yes, and Mr. Kunkel went even further.

12   He went all the way up to the top.  But there is certainly

13   evidence contrary to that.  Certainly Mr. Krieger's evidence

14   was to the effect that all of this is vagrant, local,

15   percolating water.

16   MR. VEEDER:  Not with a broad brush, not on the orange.

17   I am limiting my language strictly a red line on the orange.

18   THE COURT:  Isn't this a simple answer to this?  Where

19   we run on to an individual -- some of the people are here

20   represented by counsel -- where we run into a man like Mr.

21   Borenstein, say, "Take your choice.  What do you want?  The

22   tentative line runs through your 40 acres.  Do you want to

23   be on one side or the other?"  If he wants to be in the

24   litigation from here on, I will move the line up there.  If

25   he wants to be out of it, I will move the line below him.

1  It is that important.  Isn't that the answer -- where the

2  rough line runs right through his property?

3      MR. VEEDER:  I am tendering your Honor a thought which,

4  from the standpoint of simplicity, is much easier, because

5  you have your line here.

6      THE COURT:  Let me try once again.  You put a line in

7  there, and we are going to do it, if we can, by section lines

8  maybe later on by tract lines in the old grant.  I know what

9  I am going to make below the line; that is overlying the

10  basin and is part of the stream system.  What kind of finding

11  are we going to make above the line?

12      MR. VEEDER:  In the older continental alluvium.

13      THE COURT:  You mean, then, we make such finding in the

14  area above the line and up to the edge of the basement

15  complex.

16      MR. VEEDER:  Yes, that this area is an area where it

17  is part of the ground water body, but the water is limited

18  to domestic purposes, and based on the evidence in the record

19  as of today I simply declared that that area would be out of

20  regulation by this Court.

21      MR. GIRARD:  What term did you use, Bill -- it is part

22  of what area?

23      MR. VEEDER:  Water body.

24      MR. GIRARD:  Water body.  Would you also agree to a

25  finding that it is part of the water body, but is not part

1  of the stream?

2      MR. VEEDER:  I don't think that is necessary.

3      MR. GIRARD:  Would you object to that?

4      MR. VEEDER:  I don't know what the legal implications

5  of it would be.

6      THE COURT:  You have an inconsistency there.  But I see

7  his point.  In other words, we would do that by section lines,

8  and then we would merely refer to a map like 15-E and refer

9  to the boundary between the older continental    and base-

10  ment complex and say, "In the area north and east of the

11  line as drawn there is evidence that this older continental

12  is part of the edge of the basin and part of the stream

13  system, but that the present evidence in the record shows

14  that the amount of water available is only sufficient for

15  domestic use -- chickens or stock -- and that on the present

16  record, unless changed circumstances were shown, no regulation

17  would occur in that area."

18      MR. VEEDER:  You said it better than I.  But that would

19  be it.  Then we wouldn't have the problem that I have already

20  discussed with the personnel of the United States    with whom

21  I am working on this.  I said, "How do you arrive at it?

22  What do you mean?"  I talked to Mr. Littleworth on the same

23  thing.  I said, "How do you arrive at the line that would be

24  drawn?"  I think you would avoid that situation now by the

25  simple reference to, and you could take your section lines

1   and go right along as you said.  Then we wouldn't have the

2   physical problem.  Mr. Kunkel tells me we should do it by

3   natural monuments.  My own view, from the legal standpoint

4   and from the standpoint of the title companies, is that it

5   would be easier to draw lines on the legal sub-divisions

6   and say, "North of that area, while it is part of the water

7   bearing body, it would not be subject to regulation."

8       MR. GIRARD:  It has got to be either vagrant, local,

9   percolating water or part of the stream.

10      THE COURT:  That is true.  But he adds to the finding

11  that it is part of the basin and therefore part of the

12  stream system.  That on the evidence in the record now the

13  water there is now so insufficient in that area that it is

14  only useful for a limited domestic use and limited irrigation

15  around the home or for stock or something, and that on the

16  present record, unless substantial changes in condition

17  were shown, no regulation would hereafter be ever made in

18  that area.

19      MR. GIRARD:  Are you talking about the younger alluvium

20  or the basement complex?

21      THE COURT:  I am talking about this right here.

22      MR. VEEDER:  The orange.  Call it orange.

23      THE COURT:  Older alluvium.

24      MR. LITTLEWORTH:  Is Mr. Veeder trying a sort of back-

25  handed way to indicate that maybe we are going to have

1  regulation in other parts?  I don't believe there can be

2  regulation, in the present state of the record, anywhere.

3      MR. VEEDER:  Why not cross one bridge at a time?

4      THE COURT:  This will not be a precedent.  I see that

5  point.  Don't worry about that.

6      Actually, what he is saying is that I actually conform

7  my finding exactly to the testimony/Mr.  Kunkel.

8      MR. VEEDER:  And Colonel Bowen.

9      THE COURT:  Who testified that in the area above the

10  temporary red line there was water, that it was part of the

11  basin but that it was only good for domestic use.

12      MR. GIRARD:  But there is other testimony by other

13  people who call that vagrant, local, percolating water.

14      MR. VEEDER:  I don't recall that in the area north

15  of the red line.

16      MR. LITTLEWORTH:  Our evidence by our engineer was that

17  in this area the fault line marked the basin.  True, in the

18  Santa Gertrudis basin the basin bulges --

19      THE COURT:  This is a conflict in the evidence.  I

20  wouldn't worry about that.  I think Colonel Bowen had some

21  opinion on that.

22      Did you, Colonel Bowen?  Weren't you examined on that

23  fringe area bordering the basement complex?

24      COLONEL BOWEN:  Yes sir.  I recall that I was examined

25  briefly on it.

       THE COURT:  Do you remember what you said?

14,541

P 27
Belt 7

1    COLONEL BOWEN:  I believe I testified that the older

2    alluvium in the fringe area was feathered out all over the

3    basement complex.  Those alluvial deposits were quite shallow,

4    and that the water contained in them would be, therefore, very

5    limited in quantity.

6        THE COURT:  I don't actually see any harm in doing either

7    the way Mr. Veeder suggests or in the way we started to ori-

8    ginally, except that I think it still leaves open the question

9    of where we run the line around Mr. Borenstein's property.  Now

10   we still have to run a line one way or the other.

11       MR. VEEDER:  I am fully in accord.

12       MR. GIRARD:  Let Mr. Borenstein decide it.

13       MR. VEEDER:  I am thinking of the number of people he would

14   have to contact under the circumstances.

15       MR. LITTLEWORTH:  What Mr. Veeder is talking about is a

16   recital of those lands which are going to stay in.  We are try-

17   ing first to find those lands which are going out.

18       MR. VEEDER:  Mr. Littleworth, I worry about the statement --

19   you have made it several times -- that a man is going in or out

20   of the lawsuit, because if he has an arroyo across his property

21   he is not going out of the lawsuit.

22       MR. LITTLEWORTH:  Granted.  I am talking about the form
                                    the
23   of/proposed Interlocutory Judgment which has already been sub-

24   mitted, and granted as to surface waters or ground waters with-

25   in the younger alluvium of the stream bed he is in.  We under-

14,542

P 28

1  stand that.

2  MR. VEEDER:  Just so the record understands it.

3  THE COURT:  Mr. Kunkel, when you prepared this map you

4  actually put in a dotted line, which is what we were tracing

5  with a red pencil.  What was that dotted line, in your opinion?

6  MR. KUNKEL:  In this particular area?

7  THE COURT:  In 15E.

8  THE WITNESS:  In 15E northeast of Murrieta Hot Springs

9  the dotted line between Qtoal and Qtoal(?) is an area where

10  the older alluvium thins out and in part may even overly resi-

11  duum as well as basement complex and the quantity of water con-

12  tained in that area is -- the saturated deposits do not have a

13  great thickness and the wells that would be obtained in that

14  area would be domestic in nature rather than suitable for large

15  scale irrigation.

16  MR. VEEDER:  Mr. Sachse says that he agrees with the

17  provision I have recommended.

18  MR. SACHSE:  I say I have no objection.  If I understand

19  it correctly, Mr. Veeder's proposal is that there would be a

20  line drawn at the line of demarkation between older alluvium and

21  basement complex and your Honor would find all the basement

22  complex is vagrant, local, percolating and not part of the stream

23  system.

24  MR. VEEDER:  That is right.

25  MR. SACHSE:  Then the second line would be drawn on Mr.

14,543

P 29

1   Kunkel's dotted line where he showed the area as older alluvium

2   (?).  As to that area the finding would be that the water was

3   limited in quantity, difficult to locate and extract, etc., and

4   under present conditions not subject to regulation.

5       THE COURT:  It would be two lines.  Actually, the only

6   line I would propose to mark out with the legal descriptions

7   would be the line showing the northern limit where that dotted

8   line is now, and I would merely refer to the other line by the

9   map as the edge between the basement complex and the older

10   alluvium, and maybe provide that in case of dispute there the

11   actual conditions on the ground, in the event of dispute, would

12   be that line.

13       MR. SACHSE:  But you would still say that the ground waters

14   underlying the basement complex were vagrant,

15       THE COURT:  Right.

16       MR. SACHSE:  I don't care how you describe it.

17       MR. VEEDER:  I think there is agreement on that, Mr.

18   Sachse.  I think there has been agreement on it from the incept-

19   ion.

20       MR. GIRARD:  Then to get my thinking straight, you would

21   hold all of the area up in the basement complex as being vagrant,

22   local, percolating water.

23       THE COURT:  In the basement complex.

24       MR. GIRARD:  Yes.

25       THE COURT:  Between the line drawn and the basement

P 30  1  complex in that area follow Mr. Kunkel's testimony, and then on

2  the present record there should or could be no regulation until

3  after these substantially changed conditions before any regula-

4  tion would be contemplated.

5     MR. GIRARD:  Let me ask one question on that.  Under this

6  general idea, if this were to stay in, that under present condi-

7  tions there is no evidence of any possibility of excessive use,

8  wouldn't you concede, with that type of thing, the line should

9  be dropped considerably from where you have drawn it here?

10     MR. KUNKEL:  Without being specific, I would concede that

11  the position of the line could be changed.  I would want to

12  inspect the records more carefully.

13     MR. GIRARD:  I thought when you were considering this

14  line you were considering it in the light of the Judge's question

15  which indicated that everything would go out.  But if you were

16  going to have a doubtful area, which I think has been suggested,

17  I would think you would want to drop this line quite a bit down.

18     MR. VEEDER:  I would recommend that a committee of Mr.

19  Illingworth, Mr. Kunkel and Colonel Bowen sit down and work out

20  a line for your Honor to draw.  You draw it yourself as you see

21  it this afternoon.

22     MR. STAHLMAN:  Didn't he already draw a line when he set

23  out storage unit No. 4, really?

24     MR. VEEDER:  No.

25     MR. SACHSE:  I'm sorry, I may disagree with my co-defendants

P 31

1  here, if they think it would be wise for your Honor to let

2  people in or out as they choose.  I think it would be a very

3  serious mistake.  I think we should draw a line without regard

4  to what this individual may or may not think or if he has a

5  chance to be here.  Many people won't be here and will never

6  have an opportunity to be asked.  Your Honor should make a

7  determination and draw the line, and if he is half in and half

8  out that is tough.

9      MR. LITTLEWORTH:  I agree with you, Mr. Sachse, although

10  there may be some areas where you might vary it a little bit.

11      THE COURT:  Of course, if you are going to drop the line

12  down further, then I am not prepared now to mark out a line

13  until maybe you get together with a map and see what you can

14  figure out.

15      MR. GIRARD:  I was under the impression that if the line

16  was drawn here, one would be within the stream and one would be

17  out.

18      THE COURT:  That was my impression.

19      MR. GIRARD:  Frankly, I feel that is the better way.

20      MR. LITTLEWORTH:  Mr. Veeder's proposal is a refinement

21  of the area which is going to stay in.  Why can't you draw the

22  upper line now?

23      MR. VEEDER:  I said it was basement complex.

24      MR. LITTLEWORTH:  That is what you say.  That is not

25  necessarily what the Court says.  Even Mr. Kunkel indicated that

14,546

P 32

1    the basement line would be somewhere in there.

2         MR. VEEDER:  I am thinking of the work I have to do,

3    frankly.  I know how many people are there.  I know how many

4    exterior boundaries are there.

5         MR. GIRARD:  Whether you draw the line up here or down

6    here, you are going to run into the same trouble describing it.

7         MR. VEEDER:  No, you will find that the ownerships are

8    materially different in the basement complex.

9         As I say, I am not arbitrary on this matter.  I will

10   follow what your Honor says.  But I do believe, from my stand-

11   point, if you do it as we suggest -- follow the legal sub-

12   divisions -- that the work we will have to do will be so much

13   simpler.

14        THE COURT:  We are all over that hump.

15        MR. GIRARD:  Yes.

16        THE COURT:  The question is, what or where is the line

17   of that subdivision?

18        MR. GIRARD:  I would suggest that Mr. Kunkel draw a line

19   which, based on the record evidence, is within the stream and

20   which is out of the stream and vagrant, local and percolating;

21   and I recognize that any line your Honor draws will certainly

22   be an arbitrary one, but I am willing to rest on whatever it is.

23   Certainly, wherever you draw it, it will be supported by evi-

24   dence.

25        MR. SACHSE:  Your Honor, there is one other thing.  In

14,547

P 33   1   drawing a line -- we perhaps put the cart before horse -- I,

2   at least in behalf of my clients, and I think Mr. Littleworth

3   in behalf of his, are still contending that if the Santa

4   Margarita versus Vail Judgment remains in effect, that your

5   Honor can't draw a line.  Maybe we ought to have a clear under-

6   standing.

7        THE COURT:  I understand that.

8        MR. LITTLEWORTH:  It would be in the nature of an

9   Interlocutory Judgment.

10        THE COURT:  The Colonel is seeking out something.

11        COLONEL BOWEN:  Your Honor asked me about the testimony

12   that I had given in regard to this matter, and in Plaintiff's

13   Exhibit 200 we have drawn in a fault line shown on an overlay

14   contained within the exhibit which shows the geology rather

15   clearly in that one area, and the report itself in describing

16   the M. J. Yoder property on page 3 of Plaintiff's Exhibit 200

17   "Northeast of this structure crystalline intrusive rocks out-

18   crop at the surface with but negligible alluvium deposited along

19   major drainage lines.  Southwest of this structure older alluv-

20   ial sediments predominate except in one area.  The one exception

21   is the prescence of scattered outcrops of intrusive rocks

22   immediately adjacent to the west of Warm Springs Creek in

23   Section 14 (Projected) of Township 7 South Range 3 West and

24   southwest of the fault mentioned."  That would be the place to

25   start, your Honor, to draw the line.

P 1

1     MR. LITTLEWORTH:  Here is the M. J. Yoder property here.

2     COLONEL BOWEN:  The fault strikes about north 60 degrees

3  west from the southwest quarter of the southwest quarter of

4  Section 11 (Projected).

5     The fault isn't shown on 15E.

6     MR. VEEDER:  That is about where the line was drawn.

7     MR. GIRARD:  About where Mr. Kunkel has drawn his line.

8     COLONEL BOWEN:  It is approximately where Mr. Kunkel has

9  drawn his line of demarkation between the questionable older

10  alluvium and that material that he definitely identified as

11  older alluvium.

12     MR. GIRARD:  Would you interpret the language used in that

13  report, Colonel, to indicate that this would be vagrant, local?

14     THE COURT:  North and east.

15     MR. GIRARD:  Yes, north and east of that line.

16     THE COURT:  Of the dotted line.

17     COLONEL BOWEN:  Yes sir, that would be my opinion.

18     THE COURT:  Do you have the property map up in this area,

19  Colonel?

20     MR. LITTLEWORTH:  We have a few of them, your Honor, but

21  they are, by and large --

22     MR. STAHLMAN:  The quad sheets would show it.

23     COLONEL BOWEN:  Here is a print, your Honor, of 265C.  On

24  these U.S.G.S. topographic quadrangles we did not show the

25  parcels either in the old grant line or in those sections that

14,549

P 2

1    are shown on 207-C-1, which shows the land ownership within the

2    area that was described as Riverside Subdivision.

3        MR. GIRARD:   I would be very happy, Colonel Bowen, if you

4    drew just an approximate line and let him get aerials and make

5    whatever adjustments up or down to get a good description.

6        THE COURT:   That is what we talked about before lunch.

7    Down to here we can do it with section lines.   From the grant

8    line on you would work at it with your subdivision maps and

9    tie it in with property lines, roads, etc.

10       MR. GIRARD:   I wouldn't have any objection at all to that.

11       THE COURT:   Well, let's do something about it.

12       MR. GIRARD:   I move that your Honor pick up the crayon

13   and draw his line.

14       MR. LITTLEWORTH:   Here is the map here.

15       THE COURT:   What was the testimony up in this very far

16   corner here?

17       MR. SACHSE:   My recollection is that it was almost im-

18   possible to define the exact direction of water flow in that

19   area.   You had better ask Mr. Kunkel.

20       THE COURT:   Do you recall, Mr. Kunkel, what your situation

21   is up at this end?

22       MR. KUNKEL:   Water levels in Well 6 South 4 West 27J1 and

23   26N3 were considerably lower than wells to the east, and there

24   was evidence that there probably was a ground water barrier

25   which may be a fault and that water movement east of that barrier

14,550

P 3

1  may be westward toward the Elsinore Valley.  It is indicated on

2  15E as the probable barrier.  That is based on traction entirely.

3      MR. STAHLMAN:  That is your best opinion from measuring

4  those wells?

5      MR. KUNKEL:  On the basis of the hydrologic evidence,

6  that is my opinion where the barrier would be.

7      THE COURT:  Down here you have an arrow in the far north-

8  west corner.  These wells I now have my hand on in the bottom

9  part of Section 34 within the overlying land, where does this

10  line run -- in a westerly direction?

11      MR. KUNKEL:  In my opinion, the line would parallel the

12  Wildomar fault zone in a general northwest-southeast direction.

13      THE COURT:  What about this arrow down here?  You have

14  that running the other way.

15      MR. KUNKEL:  That particular arrow was drawn, I believe,

16  in response to Mr. Sachse's question as to the relative alti-

17  tude in two wells.

18      THE COURT:  In your opinion, then, this is all overlying

19  land?

20      MR. KUNKEL:  It is overlying land, and in the absence of

21  different data, in my opinion it is part of the main water body

22  of the Santa Margarita.

23      THE COURT:  Up here it would look as if you would take

24  Palomar Road.  Of course, it would leave a little area there,

25  but there certainly isn't any problem up that close to the

14,551

P 4   1  boundary line.  It would seem to me it would be logical to take

2  Palomar Road as a marking line here.

3       MR. VEEDER:  How far?

4       THE COURT:  Down to where this barrier comes in.  And then

5  possibly up on Orange.  What we would be excluding would be this

6  little piece, like that.

7       Well, let's try something for size here and see where we

8  come out.  I take it I'm on Palomar Road now.  And this is

9  Orange Avenue here.  This may be subject to a lot of variation,

10  gentlemen, but it gives us something to work on and see if we

11  can get a line through here.  That is supposed to be a quarter

12  section there.  Am I on the right line? Yes, I am.  Here we have

13  a couple of wells here in Section 6.  Do you know where that is?

14       MR. KUNKEL:  Yes.

15       MR. VEEDER:  Is that the Borenstein property?

16       MR. GIRARD:  What is the number of those wells?

17       COLONEL BOWEN:  6B-1 and 6A1.

18       THE COURT:  I will go ahead here.  We have a little piece

19  of alluvium there.  What is that?

20       MR. SACHSE:  It is an un-named tributary.

21       THE COURT:  Let the Colonel figure this out some way.  It

22  is on a quarter line anyway.

23       (The Court and counsel gathered around the maps and pro-

24  ceeded to draw a line on the map.)

25       THE COURT:  I am also prepared to hold that this entire

14,552

P 5   1   area of weathered basement complex is not part of the stream

2   system.  Can that be supported by the record?

3       MR. GIRARD:  Yes your Honor.

4       THE COURT:  Do we need to bother about that island of

5   basement complex in the Murrieta Valley?

6       MR. LITTLEWORTH:  I don't think so.

7       MR. SACHSE:  I don't think you need pay any attention.

8   Leave them in the basin.

9       THE COURT:  It would seem to me that with the findings

10   that Mr. Sachse has proposed on these streams such as the

11   Tucalota, the same thing with Warm Springs, that we could take

12   this whole area out of this case.

13       MR. SACHSE:  Subject to the alluvium remaining in as out-

14   lined.

15       MR. VEEDER:  Subject to any surface runoff.

16       THE COURT:  Surface runoff is part of the stream system.

17       MR. SACHSE:  And ground water within the alluvium would

18   be riparian.

19       THE COURT:  You read the findings, didn't you?

20       MR. VEEDER:  Yes.

21       MR. SACHSE:  I expressly found that it was part of the

22   stream.

23       MR. VEEDER:  However, I don't agree with everything he

24   said.  I want that understood.

25       THE COURT:  Take a short recess and then go back to work.

14,553

P 6 1  (Recess)

2  THE COURT: What is next on the list, gentlemen? I take

3 it a discussion of the proposed findings prepared by Mr. Sachse

4 on the handling of the alluvial strips would be in order. Is

5 that agreeable?

6  MR. SACHSE: If it is, your Honor, I would like to suggest

7 that counsel get their copies ready. As Mr. Littleworth pointed

8 out, he had inserted originally a clause referring to an exhibit

9 along the lines your Honor suggested, and I could very quickly

10 dictate it off into three spaces where there was the exact

11 language you are referring to in exhibit.

12  THE COURT: Have you all seen these findings?

13  MR. GIRARD: I have, your Honor, and I concur generally

14 in that.

15  THE COURT: I read them over fairly carefully. I didn't

16 check the section numbers.

17  MR. GIRARD: I didn't either.

18  MR. SACHSE: I would hope they will be checked by Colonel

19 Bowen.

20  THE COURT: That is a mechanical thing.

21  I had only two notes I made on the top of it:

22  (1) Should there be a reference to a map which we would

23 adopt as showing the younger alluvium? And should we say that

24 any situation that might come on for litigation or dispute, that

25 the actual condition of the ground would show the boundary

P 7

1   between the younger alluvium and the older alluvium and would

2   control if there was dispute about the map? Isn't it true that

3   on the ground this line of delineation is fairly evident?

4        MR. ILLINGWORTH:  Not in all cases, your Honor.

5        THE COURT:  It is evident in some cases?

6        MR. ILLINGWORTH:  Yes, I think I can see it in some cases.

7   Otherwise it takes a geologist, and they have to compromise.

8        THE COURT:  I don't think you could have much of a dispute

9   come up. Now let's see what could happen. A fellow could put

10  a well down in some of this younger alluvium and go on into the

11  basement complex, have the well perforated where he would pick

12  up water out of the younger alluvium and then claim that his

13  well went into the basement complex and that he was not taking

14  the water that was part of the stream system. I don't think

15  there would be any question that the well perforated to pick up

16  water out of the younger alluvium would do that. On the other

17  hand, he moves his well over into the basement complex someplace

18  and hits a fissure or crack and gets some water. There couldn't

19  be much dispute there. Or if he sticks a well that is just a

20  catch basin in the younger alluvium and picks up water. Don't

21  you think in the ordinary case it would be fairly easy to ascer-

22  tain factually whether he is getting his water out of the younger

23  alluvium or out of the basement complex?

24       MR. SACHSE:  Yes, your Honor, and that was the purpose and

25  intent of the fourth paragraph of the conclusions where

14,555

P 8  1   jurisdiction is reserved.  It was my understanding of this thing

2   that if anybody has a well in the younger alluvium there would

3   be a prima facie case, let's say, for someone who is downstream

4   to object on the basis of these findings.  Or if he went through

5   the younger alluvium and had perforations only down to the base-

6   ment complex, then the owner could insist, "Well, I am taking

7   water which is local, vagrant, percolating."  The Court could

8   look at any structure of any kind in the younger alluvium at

9   any time.  That is what we tried to do -- to preserve the down-

10  stream riparian the right to question any extractions that would

11  appear to be from the younger alluvium.

Belt 9  12       MR. VEEDER:  My inquiry in that connection is this. Assume

13  that a man put down a well in what appears to be at the present

14  time the weathered basement complex and as an actual matter of

15  fact when you pumped it would deplete the surface or the ground

16  water flow of what is designated as the younger alluvium.  Would

17  your Honor have jurisdiction in that circumstance or would he

18  not?

19       MR. SACHSE:  Not under my finding, Mr. Veeder.

20       MR. GIRARD:  No.

21       THE COURT:  Mr. Veeder, your own testimony from Mr. Kunkel

22  showed that in the weathered basement complex south of the

23  Tucalota there was no water there that was part of the stream

24  system.  You had testimony that in the basement complex north

25  of the Tucalota there was some contribution to the stream system.

14,556

P 9

1    On the other hand, Colonel Bowen's opinion, which i respect,

2    was that this was very minor in character.  I think he even went

3    so far as to characterize it as vagrant, local, percolating water.

4    In addition, we know what pumping is going on up there -- people

5    have tried to get wells, and we know it is a drop in the bucket

6    that they have been able to develop in that area.

7         MR. VEEDER:  The only point I made and the only inquiry

8    I presented was -- and it is from a mechanical standpoint as

9    much as anything, from the standpoint of writing the findings

10   in regard to these properties -- assuming that based upon the

11   line you have drawn here a man goes 15, 20 yards, a hundred

12   yards in and he puts in a pump, as an actual matter of fact

13   there is an impact on the stream.  Do you or do you not have

14   jurisdiction?

15        MR. GIRARD:  No.

16        MR. SACHSE:  Not under my findings he doesn't have.

17        THE COURT:  I would like to put it in, Mr. Veeder, once

18   and for all, that people harassed by litigation where they are

19   not appreciably a part of the stream system.  Let's take the

20   place where you put your hand up there.  We know that the slant

21   of the underlying basement complex is in a southwesterly direc-

22   tion.  We know that assuming there is a large basin in the older

23   alluvium, the yellow, we know that at the upper end it is at

24   the very fringe of it.  It is pretty hard for me to see, with

25   the slant of that basement complex underneath, how any well in

P 10

1   that older alluvium can draw any appreciable amount of water out

2   of this basin.  Here is the slant of that basin.  So a well is

3   put down here.  At the very best, under the most favorable

4   conditions, it could only draw something subject to the situa-

5   tion if you had a full basin and then only of the upper lip of

6   it.  It is not going to get any water out of the basin which is

7   deeper and deeper as you get down toward the fault lines to the

8   west and south.

9        Any other suggestions on it?

10       The second item I had listed is this.  There is a finding

11   that some of this land is riparian and that it is riparian on

12   these tributaries, and the findings show that generally water

13   in the tributaries is only after or during heavy rains.  If your

14   going to catalogue riparian land, this certainly should be put

15   in the illusory character, because there is no farmer going to

16   pump water out of that stream while the rains are going on.  He

17   may have a flow of water down the gulley while it is raining

18   and maybe for 24 hours afterward, but that is not the time of

19   year that you want to pump water.  I think the findings are

20   proper as drawn.  But if you are going eventually to catalogue

21   the area of this watershed, then this is the type of ground that

22   would go into the category that although there is riparian right

23   it is an illusory one, one that has no substantial value to the

24   owner, and there is no practical possibility of appreciable

25   increase of burden on the stream system by that use.  The amount

14,558

P 11 1   of water they get out of this younger alluvium could certainly

2   not be an unreasonble amount to be used on land that is riparian,

3   and the amount of water that might flow in larger quantities

4   in the wintertime is of no use to them.  So I can't see where

5   there could be any unreasonble riparian use on those upstream

6   tributaries -- considering the amount of acreage involved and

7   the relatively small amount of water in the tributary.

8        Are you in agreement?

9        MR. VEEDER:  I wouldn't want to make a general statement

10   on it, your Honor.  My only personal viewpoint about it is that

11   it is better to let things develop as we go along.  I think we

12   have made some headway today.  I wouldn't to say categorically

13   that I agree with your Honor in all of that.

14        THE COURT:  If you want me to do any cataloging about

15   land that is riparian, I want some classification.

16        MR. VEEDER:  I think I have agreed with your Honor on that.

17   I have said, in regard to these areas where it is obvious that

18   they are riparian but it is an illusory right, that we are going

19   to try to work out some kind of criterion that will guide us in

20   these matters.

21        MR. SACHSE:  I had felt we had covered it in Finding 7.

22        THE COURT:  I think you have.  And if we ever get down to

23   cataloging the number of riparian acres, we will have to have

24   findings such as this to tell us where this riparian land belongs,

25   in what category.

14,559

1    MR. SACHSE:  Would your Honor note on page 3, for instance,

2  at the top, I found specifically "The amount of water which can

3  be withdrawn from Tucalota Creek and put to beneficial use dur-

4  ing and immediately after such periods of heavy precipitation

5  and runoff is negligible, and such withdrawals will have no

6  material effect upon the flow of Tucalota Creek or of the Santa

7  Margarita River system."

8    THE COURT:  Good.  This set of proposed findings covers,

9  I take it, merely the sections through which this stream runs.

10    MR. SACHSE:  The sections I have described -- if I did

11  it correctly -- and again I would request Colonel Bowen or some-

12  one to please check me out -- bring Tucalota Creek down to the

13  junction of Santa Gertrudis Creek and Warm Springs Creek.  That

14  is all.

15    THE COURT:  Did you bring it clear into the yellow area?

16    MR. SACHSE:  Yes, with this modification, those findings

17  do not indicate anywhere this line of delineation.

18    MR. LITTLEWORTH:  You bring it to the basin limit.

19    MR. SACHSE:  We did bring it to the basin limit.  That

20  was our idea.  Since we didn't know where your line was, we

21  didn't draw it.  But we referrred to the following parcels

22  described on Exhibit 7, and the idea would be that the parcels

23  described on Exhibit 7 would end with whatever parcel --

24    THE COURT:  You are talking about Finding 7?

25    MR. SACHSE:  Find 7, Exhibit A, yes:  "The following

14,560

P 13

1   parcels of land, each of which is described in Exhibit _____,

2   attached hereto" would be parcels lying upstream from your break-

3   ing point.

4        THE COURT:  All right.

5        MR. SACHSE:  Downstream from your breaking point wouldn't

6   be on the exhibit.

7        THE COURT:  All right.  Will you work with Colonel Bowen

8   on this, Mr. Sachse, and submit a revised set of findings?

9        MR. SACHSE:  Yes.  Actually, we had it in.  Mr. Littleworth

10  suggested that I put it in, and I took it out.  If your Honor

11  wants it I will put it in.  I shouldn't have taken it out.  Mr.

12  Veeder has his copy there and I can tell him what language we

13  had and your Honor can tell us if it is satisfactory.

14       THE COURT:  What language?

15       MR. SACHSE:  On the first page, for example, at the end

16  of Finding 2:  "The surface extent of such deposits of younger

17  alluvium are shown on United States' Exhibit No. _____ "

18       And then similar language appears in two or three other

19  places, which I can also give you, Bill.  On page 2, Finding

20  4, add to the end of it:  "As shown on United States Exhibit

21  No. _____ ."

22       THE COURT:  Do Willow Creek and Rainbow Canyon run into

23  Tucalota?

24       MR. SACHSE:  No.

25       THE COURT:  We would have to use Exhibit 15 then.

14,561

P 14   1        MR. SACHSE:  No.  Didn't Mr. Veeder and your Honor agree

2        this morning that you were going to transpose these ownerships

3        to the U.S. quads and we would have better exhibits?

4        THE COURT:  Oh, you are going to transpose on the U.S.

5        quads this area of younger alluvium.

6        MR. VEEDER:  I think that is the only way we can do it.

7        THE COURT:  All right, then we will use the quad sheets

8        that you prepared for the exhibit number.  That is satisfactory.

9        MR. VEEDER:  If anyone has any better suggestion than

10       that.  I don't know how to identify it otherwise.

11       THE COURT:  That is satisfactory.

12       Am I in error that Willow Canyon is not a tributary of

13       Tucalota?

14       COLONEL BOWEN:  Willow Creek is a tributary to Tucalota;

15       yes sir.

16       THE COURT:  You would have to run clear upstream then.

17       MR. SACHSE:  My theory is that you would run to the end

18       of the watershed.

19       THE COURT:  You didn't do that.  You just took a sample

20       of some sections.

21       MR. SACHSE:  The sections that are exactly delineated are

22       only the ones that show on 15E, your Honor.

23       THE COURT:  But the findings you would draw --

24       MR. SACHSE:  I would run all the way to the top, yes.

25       THE COURT:  All right.

P 15

1    MR. LITTLEWORTH:  And you would use the same thing on

2  Warm Springs.

3       MR. SACHSE:  The same thing.

4       THE COURT:  Use the same thing on Lewis Valley?

5       MR. SACHSE:  My idea now, your Honor, would be that we

6  could take, as soon as Colonel Bowen has accurately delineated

7  on new 15E this property line, any stream as having younger

8  alluvium and that extends north of your boundary line you would

9  draw a similar set of findings, all the way to the end of the

10  watershed as far as younger alluvium is concerned.

11       THE COURT:  But that we could take into account Lewis

12  Valley, we could take into account Reed Valley and Wilson Creek.

13  What about Teriwilliger and Coahuila?

14       MR. SACHSE:  Your Honor, I would hope that ultimately we

15  will do that, too.  But in fairness to Mr. Veeder -- we were

16  just talking during the recess -- I presume that fairly soon

17  your Honor will draw a similar line to what you have on 15E on

18  the Temecula watershed.

19       MR. VEEDER:  We are going to propose, your Honor, in that

20  regard, this zone theory or whatever you want to call it that I

21  was talking about where we have a line, I am going to propose

22  to your Honor the areas in which we believe that there is a

23  ground water situation which warrants consideration, and outside

24  of that area we would say the ground water is so negligible *that*

25  we would not recommend consideration of it.  It is something

14,563

P 16    1   that we have to do in connection with sending out these letters

2   as you said.

3           THE COURT:  All right.

4           MR. VEEDER:  But I can't draw the line myself.  And we

5   are going to draw it throughout the remainder of the area.

6           THE COURT:  All right.

7           MR. VEEDER:  And I think that would correlate and dovetail

8   in with this younger alluvial matter that we were directed to.

9           MR. SACHSE:  With modification, your Honor.  I want to

10   point out that those findings would not apply, in my judgment,

11   to Teriwilliger or Coahuila.  Those are basins.  And I think

12   you are going to have to draw a different kind of finding that

13   may be much the same.

14           THE COURT:  Let's start with Tucalota as a pilot set of

15   findings and then we will have something to go on to the other

16   tributaries.  Any objection to that?

17           MR. SACHSE:  Do I understand that I am to then check with

18   Colonel Bowen on such technical items as sections etc. and

19   bearings and then redraft this and submit it to your Honor for

20   an interlocutory decree after he has drawn and definitively

21   fixed the line on 15E?

22           THE COURT:  You have laid out a big job for the Colonel.

23           MR. SACHSE:  We can't do it until the line is drawn for

24   15E.

25           THE COURT:  Yes.  In addition to that, the Colonel has been

14,564

P 17

1  given the job of taking these geologic sections, as I understand

2  it, and marking out on them the areas of the younger alluvium

3  on the limits of Tucalota Creek.

4      MR. VEEDER:  In addition, let us remember that the first

5  thing he has to worry about is getting through and finishing

6  up all the names so I can get these consents and everything else

7  out of the way.  I want to get the mechanical thing done.  I

8  don't think we should overload the Office of Ground Water

9  Resources too much.  I will work with you on that and attempt

10  to delineate the areas I was talking about awhile ago.  But I

11  think it is foolish to try to put too much on Colonel Bowen's

12  staff at this time because he does have a lot of work to do in

13  this irrigable and irrigated area.

14      THE COURT:  Let us not send out letters to people in the

15  basement complex.

16      MR. VEEDER:  I am going to come in with a delineation of

17  the areas.  But we still have to ask Colonel Bowen's assistance

18  in getting the names in these areas.

19      MR. SACHSE:  I don't think I am going to ask Colonel Bowen

20  for very much.  When this job is done and the line is drawn,

21  it seems to me that if Mr. Veeder will give me the ownership

22  map that shows the Tucalota Creek drainage I can draw the find-

23  ings.  It will say the extent of the alluvium as delineated on

24  Unites States Exhibit _____, but we don't have to have those

25  exhibits done at that particular minute.  We are going to accept

14,565

P 18

1    Colonel Bowen's delineation, and these are interlocutory find-

2    ings anyway.

3         MR. VEEDER:  Just a warning.  I would like to keep the

4    lawsuit moving along the channel it is, and if we bog down in

5    the office we will not get it down.

6         THE COURT:  All right, we will keep moving along.

7         Does this take care of Number 7 on our agenda?

8         MR. SACHSE:  That takes care of 7A, your Honor.

9         THE COURT:  It doesn't take care of 7B because 7B is

10   tied in with this other situation.

11        And it takes care of Number 6.

12        Now, we have left on the agenda 4, 5 and half of 7.  Is

13   that right?

14        MR. VEEDER:  That is correct.

15        THE COURT:  Who wants to be heard on this stipulated

16   judgement business again?  Mr. Girard has prepared a set of

17   proposed findings to give us something to talk about.

18        MR. VEEDER:  Your Honor, may I start, then, on the argu-

19   ment which will take in 4 and 5 of the agenda and to a degree

20   overlap the two separate items, as I see it.  And if I pursue

21   a course that doesn't meet with your approval, I am sure you

22   will let me know.

23        THE COURT:  I generally do.

24        MR. VEEDER:  I was going to say why should we break pre-

25   cedent this afternoon.

14,566

P 19

1       THE COURT:  Being shy is not one of my good attributes.

2       MR. VEEDER:  I believe one of the most important things

3   that has come out of the Court that has been adopted by the

4   tendering by Mr. Girard of proposed findings of fact and con-

5   clusions of law and the most recent brief filed by Mr. Stahlman

6   is that there has, for the first time I believe, been what I

7   can call a joinder of issues which may result in a resolution

8   of the key problem on this matter of the stipulated judgment.

9       It is stated in proposed finding Number 1 by Mr. Girard

10   and in proposed finding Number 4, in substance, that the subject

11   matter or the res in the case of Rancho Santa Margarita versus

12   Vail and in this case are the same.

13       THE COURT:  Where does that appear?

14       MR. VEEDER:  If you will turn to page 2.  Let me read

15   this as I have it set up.

16       MR. GIRARD:  Let's read it as it is written.

17       MR. VEEDER:  That is exactly what I intend to do.

18       It says:

19       "That on or about May 5, 1930 the Superior Court of the

20   State of California in and for the County of San Diego entered

21   findings of fact, conclusions of law and judgment in Case Number

22   42850 in the records of said court which, in essence, defined

23   the extent of the surface and ground waters of the Santa

24   Margarita River and its tributaries, determined the extent of

25   the parties' land riparian thereto ..."

14,567

P 20

1  And this is the point to which I am specifically directing your

2  attention:

3     "...apportioned the entire watershed of the river and its

4  tributaries to the riparian parties in that action..."

5  I am stopping there.

6     Now, turn over to page 3, Finding 4:

7     "That the waters subject to the litigation set forth in

8  the above findings are the same waters which are in litigation

9  before this Court."

10    Now that concept, which I believe is in error, is carried

11  throughout the proposed findings of fact and conclusions of law,

12  is carried throughout the briefs of California, and is carried,

13  I believe, throughout Mr. Stahlman's briefs.  I think it is

14  necessary -- and this is not an academic statement -- I think

15  it is necessary that we at this juncture define and determine

16  language which is most important.

17    There is not involved in this litigation, nor was there

18  involved in Rancho Santa Margarita versus Vail, nor is there

19  involved in the stipulated judgment, a question of water.  It

20  was a question of rights to the use of water.  And there is a

21  very important distinction, because in Rancho Santa Margarita

22  versus Vail the only thing that was in litigation were the

23  respective rights to the use of water of two ranches.  The waters

24  were not, and could not of course, be involved.  The corpus of

25  the water never is involved.  So by using the language "waters"

14,568

P 21

1    ---

2          THE COURT:  We can save a lot of time on that.  I think

3    there might be some merit to that.  You don't adjudicate the

4    corpus of the water.  But the whole intent and purpose of these

5    two paragraphs concerns the rights to water.  Finding Number 1

6    says:   Defined the surface and ground waters of the river,

7    determined the land riparian, apportioned the entire waters.

8          MR. VEEDER:  It didn't.

9          THE COURT:  Apportion the rights to the water.

10         MR. VEEDER:  And it didn't apportion all the rights.  That

11   is the point I am making.  Nor could it.  And the matter of

12   jurisdiction is immediately involved.

13         THE COURT:  Let's get from one thing to the other.  You

14   are objecting to the use of the term "water" instead of "rights

15   to water."

16         MR. VEEDER:  That is right.  And the reason why that is

17   so extremely important is this.  You can't say "apportioned the

18   entire rights to the use of water" because it was not before the

19   Court.  What we should say, and why it is extremely important

20   in this approach, is that when you delineate, as I request, a

21   determination of the rights to the use of water, you can see

22   how extremely important the element is in considering the

23   question of res adjudicata or estoppel by judgment, which is

24   the only correct term that can be used.  Because when we view

25   the limited issues of Rancho Santa Margarita versus Vail we

P 22

1   immediately see that what was adjudicated there, and all that

2   could be adjudicated there, would be those limited rights and

3   the exclusion of all other rights.

4       THE COURT:  What does that mean?

5       MR. GIRARD:  Let me point out one thing that Mr. Veeder

6   is completely confusing.  The question of res adjudicata is not

7   connected with whether these findings are correct or not.  In

8   other words, if this Court decides that it is going to set aside

9   the judgment and the stipulated judgment, then we don't get into

10   the problem of res adjudicata.  Then we just have to say, is

11   there evidence to support these findings.  The only time you

12   have to face up to the res adjudicata argument is if this Court

13   does not set aside that stipulated judgment and Mr. Sachse

14   raises it.  Let's look at the findings and see whether they are

15   supported by the evidence.  They are two separate problems.

16       MR. VEEDER:  If we are going to have this turn into a

17   high school debate, it is all right with me.

18       THE COURT:  But the distinction pointed out is a valid

19   one.  If the judgment and the stipulated judgment is to be set

20   aside, nobody is going to raise the issue of res adjudicata or

21   estoppel by judgment, whatever you want to call it.

22       MR. VEEDER:  That is the exact point I was trying to make

23   to you when I said I think you have to consider 4 and 5 together,

24   because the very important element and the very important factor

25   is that if you determine that what was involved in Rancho Santa

14,570

P 23

Belt 10

1    Margarita versus Vail was only the rights of the two parties

2    that were before the Court you immediately limit the impact of

3    the original judgment, then you further limit the impact of the

4    stipulated judgment.  And when that situation is presented then

5    you come to this question whether the alleged error in geology

6    is pertinent to anyone but Vail Company and the United States.

7    We come to that immediately.  Then if you say there is a differ-

8    ence between the geology in the old case and in the stipulated

9    judgement, then the question is, is it relevant at all in view

10   of the terms of the stipulated judgment?  So you can't separate

11   and segregate a consideration of whether the stipulated judgment

12   should or should not be separated and the effect of res adjudica-

13   ta or estoppel by judgment, you can't separate the two of them,

14   because the sole and only basis for setting aside a stipulated

15   judgment, as I see it now, is the question whether the mistake

16   in geology, if there was a mistake, is sufficiently important

17   to set aside the stipulated judgment.

18        THE COURT:  Mr. Veeder, I have tried several times, and

19   I want to hear you and I want to give you some time, but let

20   me start out and give you an outline of what I would like to

21   hear about.

22        MR. VEEDER:  All right.

23        THE COURT:  Sit down and rest yourself.  This will take

24   a little time.

25        If I were arguing this case, I would start out with the

14,571

P 24

1  judgment entered in 1930, a judgment which involved the Vail

2  Company and the Santa Margarita Rancho, the predecessor of the

3  United States, and in which the Schloss Estate or the predecess-

4  ors of Schloss, two other intervenors were involved.

5      MR. VEEDER:  That is right.

6      THE COURT:  Judgment was entered and there was an appeal

7  taken, not from the entire judgment but from a part of the

8  judgment.  And then went to the Supreme Court of California,

9  and the Supreme Court of California reversed parts of the

10  judgment from which an appeal was taken.  The intervenors did

11  not appeal.

12      Now, the judgment that was appealed from distributed the

13  rights to the water in certain ways, and the first judgment in

14  1930 defined the stream system of the Temecula and Murrieta and

15  defined the ground water basin as being only under the younger

16  alluvium.  No appeal was taken from the definition of the stream

17  system.  No appeal was taken from the definition of the basins,

18  as it were -- little basins lying under the Murrieta and under

19  the Pauba Valleys.

20      So it went up on appeal and it was reversed in various

21  respects, particularly as to the division of water and as to

22  riparian ground etc.  But the rest of the judgment was not

23  appealed from, was not reversed, and became a final judgment,

24  it is true, among only Vail, Santa Margarita and the two inter-

25  venors.  In fact, the two intervenors didn't even appeal from

14,572

P 25   1   any of the judgment.

2          Now, the Supreme Court ordered a retrial.  The parties

3   didn't retry it.  There were two things that they might have

4   done:   (1) If they wanted to sit down and say, "Look, let's be

5   through with this lawsuit.  Let's, Vail and Santa Margarita,

6   enter into a contract, and we will take our bundle of rights,

7   whatever we have, and we will just agree between ourselves by

8   a written contract that hereafter of our bundle rights on this

9   river Vail will get one-third and the United States will get

10  two-thirds."  They didn't do this, I don't think.  If they had

11  done this, that might have been one thing, because the parties

12  probably could contract to effect their rights in any way they

13  wanted to without it prejudicing anybody's interest.  But they

14  didn't do that.  They went into the Superior Court, where the

15  retrial had been ordered, and said to the Judge, "Here is a

16  stipulated judgment whereby we are now dividing the rights to

17  the water, or dividing the water, one-third to Vail and two-

18  thirds to the United States."  And the Judge put his signature

19  on there, his stamp of approval, and it was then entered up and

20  became the judgment.

21         So immediately several questions arise.  Was the agreement

22  that preceded the submission of the stipulated judgment a con-

23  tract?  Or by the very fact that they took it in and had the

24  Judge sign it as part of the judicial proceedings in that case,

25  is it, therefore, like any other judgment, and since it appor-

14,573

P 26

1    tioned water may it not be modified because of changed condi-

2    tions?   That is one point.

3           Secondly, don't we have to read the stipulated judgment

4    as being grafted upon the original judgment as being a final

5    completion of the proceedings in that case?  Because otherwise

6    we don't have anything.  The stipulated judgment itself does

7    not define the stream system, it does not define the basins.

8    If you try to look at it as a document in itself, it is abortive

9    -- it goes nowhere, it starts nowhere.  All it does is that it

10   is going to divide certain waters.  If you look upon it as hav-

11   ing been grafted on the original judgment and having, as it

12   were, healed up the judicial proceeding in that case, then some

13   sense is made, because in the original part of the judgment

14   not appealed from is a definition and a description of the

15   stream system and of the basins.

16          Now, we come to another very important point.  If the

17   stipulated judgment should be set aside, what do we do with

18   the old judgment?  Because the old judgment made findings that

19   this yellow area which you have contended from the very beginn-

20   ing of this case was part of a basin and on which you have now

21   convinced the Court and which you have generally succeeded in

22   convincing other counsel so that there is no substantial disa-

23   greement any of the counsel who participated here that this

24   basin is bigger than the basin the parties thought existed

25   when the old case was tried in 1930, what are you going to do

P 27

1    with that old judgment standing there and staring you in the

2    face, saying that the waters under the older alluvium are not

3    part of the stream system,      that the basins are only the

4    narrow strip of the Murrieta and the narrow strip of the Pauba?

5         Then of course, finally, somewhere along the line, you

6    get down to the question of estoppel by judgment or res adjudi-

7    cata and the fact that some third party might raise some points

8    on one or the other of these judgments, if they stand.  If they

9    are set aside, I don't think you ever reach that problem.

10        Now that is kind of what I want to hear about.  That is

11   what the case is about.

12        Before I finish, Mr. Girard and Mr. Sachse, have I omitted

13   some other major point that is involved in this discussion?

14        MR. GIRARD:  I don't think so, your Honor.  I think that

15   is exactly the issue and the factual background.

16        THE COURT:  You have the contentions of mistake made by

17   Vail.  You have the question whether there is inequity in this

18   matter to such an extent that something should be done about it.

19   But this is the thing we are talking about.

20        MR. VEEDER:  Precisely.

21        THE COURT:  There is the old story about the lawyer who

22   was in Athens trying a case -- he was from a famous Greek of

23   the day and his name was Posthumus -- so he proceeded to argue

24   about the glories of Greece, and the wars, and the sins of the

25   insensate Canai , and a lot of other fancy things.  Finally,

14,575

P 28

1   the client, who was sitting beside him, pulled his coattail and

2   said, "Posthumus, this case doesn't concern the Greek Wars, or

3   the Canai, or the Carthagenians.  This case concerns three goats

4   that I claim my neighbor stole from me.  It is time, Posthumus,

5   that you said something about my three goats."

6        This is what we're going to talk about.

7        MR. VEEDER:  Your Honor, I appreciate your caustic remark.

8        THE COURT:  I didn't mean to be caustic.

9        MR. VEEDER:  Well, I accept it as being caustic.

10        I had spent only two minutes -- I was careful about this

11   -- as introduction, because I think the important element that

12   I was trying to lead up to was this precise point, that assum-

13   ing, and I deny it, assuming that the old findings remain intact

14   under the stipulated judgment, the matter is totally unimpor-

15   tant to anyone but to the Vails and to the United States of

16   America, and under the provisions of the stipulated judgment

17   it is unimportant to us because all of the water that is pumped

18   or utilized or diverted under the stipulated judgment, whether

19   it is percolating or whether it is actually part of the stream

20   system, is governed by the apportionment under the stipulated

21   judgment.  So what difference does it make to anyone but to

22   the Vail Company and to the United States of America?

23        Now the second point that I attempted to reach bu never

24   got to, was this, that the question of what was the subject

25   matter or the res in the case is of most importance because

14,576

P 29

1   the Vail Company and the Rancho Santa Margarita could not have

2   adjudicated the extent of the basin.  The most that it could

3   have adjudicated, assuming that that finding stands, is the

4   area within the Vail Company's property.

5       So when you analyze this matter as I have attempted to

6   analyze it, you are down to the question and it comes right

7   back to res adjudicata, whether those findings of fact and

8   conclusions of law, which you say you think may have survived

9   the stipulated judgment, are they binding on anyone else or

10  can anyone else invoke them?  And my answer is no.  My answer

11  to it is that your Honor could leave the findings of fact and

12  conclusions of law stand if you choose, but I would ask you not

13  to, and they would still be irrevelant to anybody but to the

14  Vail Company and to the United States, because there was no

15  determination and there could be no determination outside of

16  the extremities of the Vail Company's boundary lines.

17      THE COURT:  You interest me.  Enlarge upon this.  I don't

18  know that I follow you, but I would like to hear about this.

19      MR. VEEDER:  Well, thank you.  Because I think it is the

20  crux of the thing, and that is what I started for before my

21  Greek friend interrupted.  I was attempting to say that if we

22  viewed the actual subject matter of the case --

23      THE COURT:  The first case.

24      MR. VEEDER:  Yes.  If you viewed the subject matter of

25  the first case, you are strictly and entirely limited to the

P 30

1    Temecula-Pauba Valley, as they call it, and to the older conti-

2    nental alluvium to the northern boundary of the Vail Company.

3        THE COURT:  Why?

4        MR. VEEDER:  Because there was nothing else before the

5    court that could be adjudicated.

6        THE COURT:  Why?

7        MR. VEEDER:  Because the only rights that were involved

8    were Vail's and Rancho Santa Margarita's.

9        THE COURT:  Didn't water come down the Temecula from

10   ground far upstream?

11       MR. VEEDER:  Precisely.

12       THE COURT:  Weren't they fighting about their rights to

13   the stream?

14       MR. VEEDER:  There is the very thing that I raised.  I

15   said that Mr. Girard has referred to "waters," and waters were

16   not involved.  What were involved were rights to the use of

17   water, and what was adjudicated were those rights and to the

18   extent that water was available it determined how the rights

19   would be apportioned.  But there was not and could not be any

20   determination of any right or any basin or any other element

21   involved other than those of the parties before the Court.

22       THE COURT:  Mr. Veeder, here were two land owners on a

23   stream with a large watershed and they went into court on a

24   water rights suit to determine what their rights were to the

25   use of water.

P 31

1    MR. VEEDER:  That is right.

2    THE COURT:  And the Court went to the trouble to take

3    three years to try the case.  The Court took evidence as to the

4    extent of the watershed, and as to the existence of the stream

5    system, even determined what basin existed, and then came up

6    with a decision that the rights to the water between them ex-

7    isted in a certain proportion.

8    MR. VEEDER:  That is precisely the point.

9    THE COURT:  Do you mean that a Court without jurisdiction

10   could enter that judgment at all?

11   MR. VEEDER:  Of course not.  It had the full and entire

12   right to adjudicate only the issues which were before it, and

13   the issues which it had determined before it were the area of

14   the basin within the Vail Company and that was all that was

15   determined.

16   THE COURT:  That was all that was determined?

17   MR. VEEDER:  That is correct.

18   THE COURT:  Didn't the judgment apportion rights to water

19   between the two ranchos?

20   MR. VEEDER:  Strictly on the basis, though, of their

21   respective rights.  It did nothing more.  It did not one more

22   thing than determine those rights.

23   THE COURT:  What rights?

24   MR. VEEDER:  The Vail Company's rights.

25   THE COURT:  To use water?

14,579

P 32

1    MR. VEEDER:    And the Rancho Santa Margarita -- that is

2  right.

3    THE COURT:  To use water that came out of the stream system.

4    MR. VEEDER:  Yes.  And that is where you have to distin-

5  guish between the corpus of the water and the usufructory in-

6  terests, and the only thing that could not be determined was

7  the usufructory interest, and if water showed up in the stream

8  they apportioned it on the basis of that determination.  They

9  could not and did not adjudicate or determine Mr. Roripaugh's

10  rights, Mr. Shamil's rights or any of the numerous rights in

11  the Murrieta, and any findings that were made could not and

12  would not be res adjudicata in regard to the balance of the

13  basin.  And if Mr. Girard had not used the word "water," I never

14  would have followed what he had been talking about.  What he

15  has been attempting to say and the reason why there has been

16  this confusion is that he has been looking to the entire yield

17  of the stream as having been the subject matter of the case.

18  It was not.  It was not and it couldn't be.  There is the prime

19  difference that I am leading up to.

20    If you take the approach of these limited rights and say,

21  "All right, the findings declare that the waters in the older

22  continental alluvium," as we referred to it, "are percolating,"

23  then we have to look and see, what did the stipulated judgment

24  do in regard to them -- assuming that the findings are there?

25  What the stipulated judgment declares is that the use of any of

14,580

P 33

1   the water percolating in the area is to be included in the

2   calculation of the 33 1/3 per cent.

3        Now on that basis my thought that I wish to advance to

4   you is that the matter is entirely academic.

5        THE COURT:  What is academic?

6        MR. VEEDER:  The matter of the findings.

7        THE COURT:  Of the old case?

8        MR. VEEDER:  Of the old case, except as to Vail Company

9   and the United States.  It makes no difference whatever to any

10  of the other defendants.  And your Bernhard Case becomes impor-

11  tant there.

12       THE COURT:  May I interrupt you a minute, because we will

13  have to adjourn in just a minute or two.  I am not going to

14  go past 4:30.

15       MR. VEEDER:  Surely.

16       THE COURT:  You have stated your general position?

17       MR. VEEDER:  One phase of the general position.

18       THE COURT:  I don't understand it.  Now I need a trans-

19  lator.  I don't understand what you are talking about.  I may

20  be dumb.  Maybe somebody can help me out.

21       Have you followed, Mr. Girard?  Do you know what he is

22  talking about?

23       MR. GIRARD:  What he is talking about reminds me of that

24  passage from the Caine Mutiny:

25       "When in danger, when doubt, run in circles, scream and

14,581

P 34

1   shout."

2        THE COURT:  If I get him right, he disclaims that the

3   original suit in 1930 involved a suit for water rights on the

4   Murrieta-Temecula or on the Santa Margarita, and that because

5   there was only certain land that belonged to each of the parties

6   to that suit some way or other this was not an adjudication

7   made of water rights on the stream but was some other kind of

8   legal animal.

9        MR. VEEDER:  No.

10       THE COURT:  And, that therefore, it can be ignored.  And

11  that therefore we will go to the stipulated judgment on that,

12  and that the stipulated judgment is binding and divided the

13  rights to water.

14       When you get to the stipulated judgment, are you talking

15  about "water" or "rights to water"?

16       MR. VEEDER:  I am always talking about rights to the use

17  of water.

18       THE COURT:  And divided the rights to the use of water

19  one-third and two-thirds.  And is it your position now that the

20  first judgment couldn't have done anything like that because

21  it was only certain land?  Is it your contention now that the

22  stipulated judgment, however, was a valid decree of the water

23  rights of the stream one-third to Vail and two-thirds to the

24  United States?

25       MR. VEEDER:  What I am saying to you -- and I don't be-

P 35

1    lieve it is extremely difficult -- I am simply saying to you

2    that the only rights that were involved in the original case

3    were the Vail Company's rights and the Rancho Santa Margarita's

4    rights, and those were all that could be adjudged, and any

5    adjudication in regard to the ground waters as attempted in

6    the original case could only be applicable to the Vail Company

7    and to the Rancho Santa Margarita and certainly would not be

8    in any sense binding or available to be relied upon by anybody

9    but the parties to the case.  The thing that they did, they

10   simply adjudicated their respective riparian rights.

11        THE COURT:  In which case?

12        MR. VEEDER:  In the first case.  And anything that was

13   found in that case which went beyond the exterior boundaries

14   of Vail Company would be a nullity and would have no effect

15   whatever.  There was an adjudication of the usufructuary rights

16   of the two parties in the first instance.  There was a deter-

17   mination and a finding between the two parties.  But those

18   findings would not be relevant, nor would they be binding, nor

19   would they be in any degree pertinent except as to Vail Company

20   and the United States in this litigation.  And certainly Mr.

21   Sachse's Searle brothers here in Domenigoni Valley would have

22   no interest whatever in that adjudication.  They could neither

23   be bound by it, nor could they invoke any of the provisions

24   of the judgment or the findings of fact.

25        MR. SACHSE:  Your Honor, may I throw in a nickel's worth

P 36

1    here?

2        THE COURT:  I am getting a little light.  In other words,

3    you are directing all your attention to this doctrine of res

4    adjudicata or estoppel by judgment.  That is what you are talk-

5    ing about then.

6        MR. VEEDER:  Of course, because it is the only conceivable

7    basis.

8        THE COURT:  Of course, that comes at the very end of this

9    analysis.

10        MR. SACHSE:  Mr. Veeder is talking about something that,

11    to the best of my knowledge, is not before this Court on any

12    formal motion, on any objection to evidence, on any ruling of

13    any kind.  I am the man who brought it up, and I have repeatedly

14    brought it up in only one way.  I invited Mr. Veeder's, Mr.

15    Girard's and Mr. Stahlman's attention to the fact that if the

16    judgments remain in effect I will expect to raise this question

17    that Mr. Veeder is talking about.  I simply brought that out

18    as something I am going to do if they remain in effect.  If

19    all he wants to do is shut me up, the easy thing to do is to

20    say that the judgments no longer remain in effect.  If the

21    judgments don't remain in effect, we are wasting our breath

22    to talk about res adjudicata, estoppel by judgment or anything,

23    because it has no bearing whatsoever.

24        I think he ought to argue, is your Honor going to set

25    aside the stipulated judgment and the judgment, or is your Honor

p 37

1   not going to set it aside?  And when your Honor rules on that,

2   then let's come to this other thing, which is entirely off the

3   point at present.

4       THE COURT:  Your point will be that if the judgment stays

5   in effect, then relying on the Bernhard Case you are going to

6   claim what?

7       MR. SACHSE:  In the case of some of my clients, I am

8   possibly going to seek to invoke the doctrine of estoppel by

9   judgment specifically on the basis that your Honor's attempted

10  inclusion of them within a stream system can't be done because

11  there is already a judgment that says they are in a stream system.

12      I concede that we are discussing rights to the use of

13  water.  Mr. Veeder very blithely ignores the question that water

14  is involved.  It is what water are we considering rights to the

15  use of?

16      THE COURT:  Your contention, if you made it, would arise

17  from people who would presently by this Court be found to be

18  within a basin which in the first case would be found to be

19  outside the basin.

20      MR. SACHSE:  Exactly.  And I will face right straight to

21  the Diamond Valley and Domenigoni Valley, because I think they

22  are out of this one also on the basis of the present record,

23  which Mr. Veeder hasn't rebutted.  That would be the first

24  client in whose behalf I would raise this issue, because they

25  are not within the stream system the water of which rights to

P 38

1    use of were adjudicated.

2         THE COURT:  Was the Domenigoni Valley excluded in that

3    first judgment?

4         MR. SACHSE:  It is not mentioned.

5         MR. VEEDER:  Yes.

6         MR. SACHSE:  Yes, it says that the extent of the stream

7    system is so and so, and no Diamond Valley or Domenigoni Valley

8    is in it.

Belt 11

9         MR. VEEDER:  That is precisely the point I attempted to

10   bring to your Honor's attention, that that adjudication could

11   not in any way extend to anything beyond the Vail Company's

12   interests and the rights of the Rancho Santa Margarita.

13        And I want to add the other point that if you turn to

14   Mr. Girard's most recent brief, to which you called my attention,

15   he says this -- and this is the thing to which I was directing

16   my attention:  "moreover, a person need not have been a party

17   in the prior adjudication where the findings and conclusions

18   of law resulted in an order to assert a plea of res adjudicata

19   in a subsequent action," and he sites the Bernhard Case.  And

20   I wish to bring to your Honor's attention -- and I can't give

21   it to you all in one mouthful -- that if you are going to con-

22   sider the stipulated judgment and the old judgment and the find-

23   ings you are bound to limit those strictly to the Vail Company

24   and to the United States of America, and they couldn't conceiva-

25   bly be in any way pertinent to anyone outside the confines of

14,586

P 39    1    that case.

2         THE COURT:  Tomorrow morning will you do me a favor,

3    please?  Will you separate your argument into to two parts and

4    first argue for me, if you want to give me any help, whether I

5    should set aside the stipulated judgment or the original judg-

6    ment of 1930 or both.

7         MR. VEEDER:  I will be glad to.

8         THE COURT:  And then after you have completed that argu-

9    ment, will you then address yourself to this question of estoppel

10   by judgment or res adjudicata?  Will you?

11        MR. VEEDER:  Yes.  You are the one to be convinced.

12        THE COURT:  It will make me feel much happier, because

13   I am beginning to get a little light.  I told you what I wanted

14   to hear.  So you start at the very end of it on a proposition

15   that hasn't yet come before the Court.  It is here only on the

16   suggestion of Mr. Sachse that he might raise this point if

17   certain things happen.  Please start at the beginning as I

18   outlined here and then after we have heard your views on that

19   as to whether the judgment should go out and be set aside.

20        Incidentally, Mr. Girard proposes to find that they are

21   void;  not that they be set aside on the grounds that they are

22   inequitable, but on the ground that they are void.  That is a

23   nice question.  Give me your views on that.

24        Then let's get down finally to this matter of estoppel

25   and see what your views are on that.

P 40

1      MR. VEEDER:  Yes, I can go either way.  I was just taking

2  what appeared to me to be the statement your Honor had made.

3      THE COURT:  All we have to do tomorrow is to hear some

4  more argument.  Can we finish this up in the morning?

5      MR. GIRARD:  I had one matter I wanted to discuss with

6  you maybe later in the morning and offer some evidence possibly.

7  But it will not take five minutes to offer the evidence.

8      THE COURT:  Would you like to come down early in the

9  morning and wind up early tomorrow?

10      MR. GIRARD:  As far as I am concerned.

11      MR. STAHLMAN:  I would like to if we can get through

12  early.

13      THE COURT:  Let's be down at 9 o'clock then.  Is that

14  agreeable?

15      MR. VEEDER:  Yes, I am always here.

16      THE COURT:  If we meet at nine we will take a recess in

17  the morning and might even run on to 12:30 or 1:00 and finish

18  up.  I have briefs here.  I want to get some arguments to help

19  me out on this.

20      Nine o'clock tomorrow.

21      (Adjournment until Friday, October 28th , 1960 at nine

22  o'clock A.M.)

23          - - -

24

25