# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       December 8, 1960

Pages:      14,685 to 14,802.

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIF.

By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211    Ext. 370

1                    IN THE UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF CALIFORNIA

3                         SOUTHERN DIVISION

4                            - - -

5           HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

7

8   UNITED STATES OF AMERICA,          )
                                       )
9                Plaintiff,            )
                                       )
10         vs.                         )        No. 1247-SD-C.
                                       )
11   FALLBROOK PUBLIC UTILITY          )
     DISTRICT, et al.,                 )
12                                     )
                 Defendants.           )
13                                     )

14

15

              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17                    San Diego, California
                   Thursday, December 8, 1960

18

19   APPEARANCES:

20         For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                      Special Assistant to the
21                                    Attorney General

22                                    LCDR. DONALD W. REDD.

23         For the Defendants:

24         Vail Company               GEORGE STAHLMAN, ESQ.

25

1    APPEARANCES (Continued):

2        For the Defendants:

3            Fallbrook Public
             Utility District,        FRANZ R. SACHSE, ESQ.
4            et al.,

5            State of California    FRED GIRARD, ESQ.

6                                    - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 99

## INDEX

### PLAINTIFF'S REBUTTAL

| WITNESS | D | C | RD | RC | RRD |
|---|---|---|---|---|---|
| Fred Kunkel | | 14,754(Stahlman) | | | |
| Fred Kunkel | | | 14,756(Veeder) | | |
| Fred Kunkel | | | | 14,758(Sachse) | |
| Fred Kunkel | | | | | 14,759(Veeder) |
| Fred Kunkel | | | | 14,761(Girard) | |
| Clyde C. Christensen | | 14,769(Sachse) | | | |
| Clyde C. Christensen | 14,775(Veeder) | | | | |

### INDEX TO EXHIBITS

| Plaintiff's Exhibits | Marked for Identification |
|---|---|
| 275 | 14,799 |
| 275A | 14,800 |
| 275B | 14,800 |
| 274 — Evidence - 14,690 | |
| 274A | |
| 274 B | |

1    SAN DIEGO, CALIFORNIA, THURSDAY, DECEMBER 8, 1960.   10 A. M.

2

3        THE CLERK:  One, 1247-SD-C, United States vs. Fallbrook.

4        MR. SACHSE:  Your Honor, may I apologize and express my

5    appreciation for holding things up.

6        THE COURT:  That's all right.

7        MR. VEEDER:  Shall we proceed, your Honor?

8        THE COURT:  Yes.

9        MR. VEEDER:  Mr. Kunkel, will you take the stand.

10

11                    FRED KUNKEL,

12   a witness for the plaintiff, having been previously duly sworn,

13   was oath was examined and testified as follows:

14

15                 DIRECT EXAMINATION

16   BY MR. VEEDER:

17       Q  Mr. Kunkel, I refer to the exhibit marked 274 for

18   Identification and ask you to state into the record what is

19   depict on that identification and state who prepared it.

20       MR. GIRARD:  Is that this one, Bill?

21       MR. VEEDER:  274, yes.

22       THE WITNESS:  Exhibit 274 is a map of Domenigoni and

23   Diamond Valley showing the locations of wells and geology,  The

24   exhibit was prepared by myself or by persons working under my

25   direct supervision.

1    Q   I hand to you Identification marked 274-A and ask you

2   to state into the record--

3        MR. STAHLMAN:   May we have a copy?

4        MR. VEEDER:   Yes (handing document to counsel).

5        Q   State into the record what is set forth in 274-A.

6        A   Exhibit 274-A is a tabulation of data or is entitled

7   "Data on Water Wells in Diamond and Domenigoni Valleys."   The

8   tabulation on six pages plus a stapled-in-seventh page is water

9   level measurements and other data on water wells shown on

10  Exhibit 274.

11       Q   And would you relate it to 274 by stating what is

12  shown on that map-- your designations and your legend?

13       A   On Exhibit 274 the younger alluvium or the areas

14  underlain by younger alluvial deposits are shown in yellow,

15  the areas underlain by older continental deposits are shown in

16  orange, the areas underlain by basement complex are shown in

17  blue, the areas underlain by weathered basement complex are

18  shown in gray.

19       The water wells are distinguished by three types of

20  circles.   A small single circle is a domestic, stock or unused

21  well.   A double circle well is an irrigation well.   And a

22  small circle with a vertical line through it is the site of a

23  dry or destroyed well.

24       Q   What scale is the map on as compared to United States

25  of America Plaintiff's Exhibit 15-E?

1      A   It is at the same scale as 15-E, one to 24,000.   It is

2   at the same scale, and the two maps abut each other and 274 in

3   one sense is a continuation of 15-E.

4      Q   I hand to you exhibit marked 274-B for Identification

5   and ask you to state --

6      THE COURT:   What number?

7      MR. VEEDER:   It is 274-B, your Honor, but may I explain.

8   I have now had the clerk hand to you 78Q5, which is the same

9   areal as 274-B, with the exception that we have now placed

10  an overlay on it.

11     Q   I will ask the witness to explain the overlay, please.

12     A   Exhibit 274-B is a transparent overlay for Exhibit 78Q5.

13  It is entitled "Lower Part of Domenigoni Valley, Township 6

14  South, Range 2 West."   The overlay shows parts or shows sec-

15  tions 3, 4, 5, 8, 9, 10, 15, 16 and 17.   It shows the locations

16  of wells.   It shows the course of Warm Springs Creek.   It

17  shows the course of an unnamed tributary a short distance

18  north of Warm Springs Creek.   And it shows the extent of salt

19  grass growth along Warm Springs Creek or the area covered by

20  the overlay.

21     Q   Are these exhibits which have been marked for iden-

22  tification in the series 274, 274-A and 274-B accurate to your

23  own personal knowledge?

24     A   To my own personal knowledge these exhibits are

25  accurate.

14,690

1    MR. VEEDER:   We offer in evidence the series of Exhibits

2    274, 274-A and 274-B, your Honor.

3        MR. SACHSE:   I have considerable informational questions.

4    I have no objection to putting them in.   I can ask them later on.

5        THE COURT:   Exhibits 274, 274-A and 274-B received in

6    evidence.

7        (Plaintiff's Exhibits 274, 274-A and 274-B received in

8    evidence.)

9        MR. VEEDER:   I hand to you, Mr. Kunkel, the exhibits

10   marked for identification, they are the 58 series, and in a

11   moment I will ask you to explain them.

12       We have a situation, your Honor, that I would like to

13   bring to your Honor's attention.   When we put in the original

14   geology we had slides, if you will recall, concerning which

15   Mr. Kunkel testified.   You asked that they be reproduced in

16   photograph form.   That has been done.   They have been lodged

17   with the Court for quite some time now.   They are identical

18   with the slides that you observed in regard to the geology.

19   And I would like now at this time to offer in evidence the

20   identification marked 58-A, of which these new photographs

21   would be made a part.

22       THE COURT:   This exhibit in your hands involves the

23   slides we saw generally of the watershed early in the case?

24       MR. VEEDER:   That is correct, your Honor.

25       THE COURT:   And what is the number of it?

1    MR. VEEDER:  It is 58A-2 to 58A-33.

2    THE CLERK:  The number of the color slides was 58.

3    However, this volume of prints was marked 58A, your Honor.

4    MR. STAHLMAN: Are these additional ones?

5    MR. VEEDER: These are the Domenigoni pictures which will

6    be added to this general geology-- photographic exhibits.

7    MR. STAHLMAN:  Does this exhibit contain both?

8    MR. VEEDER:  It will, if it is admitted.

9    THE COURT:  Let's mark your new pictures as 58B.

10    I will receive in evidence Exhibit 58A, the compilation

11    of the pictures.  Exhibit 58A received in evidence.

XX

12    (Exhibit 58A for Identification was received in evidence.)

13    MR. VEEDER:  Mr. Kunkel, would you rapidly run down the

14    photographs which I have handed to you, which have been marked

15    58B, and explain to the Court--

16    THE COURT:  Now, to identify the particular pictures,

17    your series stops at 58A-33.  How many pictures do you have

18    here?

19    THE WITNESS:  The new series will run from 58B-34 through

20    58B-63.

21    THE COURT:  You don't need the B in there.  How did we

22    do that before?  Do you have the slides in evidence?

23    THE CLERK:  Yes, your Honor, there are the 58A-1 through

24    58A-33.  The ones that have been lodged, the new ones, are--

25    THE COURT:  58-34 on?

1        THE CLERK:  58-34 through -55 are the only ones I have

2   received, your Honor.

3        THE COURT:  58-34 through 58-55.  Then when you compile

4   your booklet the booklet itself will be 58B and will have the

5   pictures 58-34 through -55.

6        MR. VEEDER:  Is that correct?

7        THE WITNESS:  Yes. But then there are some additional

8   ones we have not had time to have copies made and it will run

9   the number up to 63.  We will show some slides today.

10        THE COURT:  All right, it will go from 34 to 63, then.

11   Later you will put the pictures together and we will call that

12   new one 58B.

13        MR. VEEDER: We will do that, your Honor.  May we with-

14   draw them for the purpose of putting them together?

15        THE COURT:  Yes.

16        MR. VEEDER:  Your Honor has admitted the 274 series;

17   isn't that correct?

18        THE COURT:  That is right.

19   BY MR. VEEDER:

20        Q  Mr. Kunkel, would you state into the record just

21   briefly what these 58B series of pictures are, referring to the

22   individual photographs and to the panorama and hand them to

23   the Court as you make your statement.

24        A  I am handling the prints of the colored transparencies

25   which have been spliced together in a panorama view showing the

1   lower end of Domenigoni Valley.

2        The first series would be 58B-34-35-36-and-37, the prints

3   of those slides spliced together.  These four pictures were

4   taken with a wide-angle lens and show the lower end of

5   Domenigoni Valley through the outlet.

6        THE COURT:  In what direction are you looking?

7        THE WITNESS:  In answer to that question, may I show

8   the same series taken with a telephhoto lens which shows the

9   directions on them.  However, they run from 58-38 through 58-46.

10       On slide 58-39 there is a fence running through the

11  center of thepicture.  That fence is an east-west fence, the

12  westerly direction being to the top of the picture or in the

13  distance.  On slide 58-45 there is a road shown.  It is also

14  shown on 58-46 in part.  That is a north-south road, the dis-

15  tance being to the north.  Properly to look at the group of

16  slides they should actually be in a curved plane to give a

17  more accurate depiction of the conditions as seen from the site

18  where the photographs were taken.  The photographs were ac-

19  tually taken from a hilltop.

20       MR. VEEDER:  You are now pointing to 274 and would you

21  state the legal subdivision?

22       THE WITNESS:  The photographs were actually taken from

23  a hilltop in the Southeast Quarter of the Southwest Quarter of

24  Section 9, Township 6 South, Range 2 West.

25       MR. VEEDER:  We might save a little time if we were to

1    run the slides which we have, your Honor, and then ask to

2    identify these pictures from those slides, if that is suitable.

3        THE WITNESS:  Each picture bears a number that will

4    correspond to the exhibit number of the colored slide.

5        MR. VEEDER:  I would like to put up the screen, if we

6    could, your Honor.

7        THE COURT:  All right.

8        THE WITNESS:  If we could set it up on the Clerk's desk

9    on a slight angle so that the Court will be able to see it.

10       THE COURT:  I can get down.  If you want to put it up

11   somewhere so that everybody can have a look at it, I can step

12   down.

13       THE WITNESS:  This is about as good a spot, because we

14   have to keep the projector near an outlet.

15       THE COURT:  Counsel can get into the jury box.

16       MR. VEEDER:  Or at least over here.

17       THE COURT:  The reporter can't write in the dark,

18   gentlemen.

19       THE WITNESS: We can leave sufficient light on, I believe.

20   There is a fairly powerful bulb in the projector.

21       THE COURT:  Counsel, will you be able to see that?

22       Let's turn it around sideways, let them get into the

23   jury box, and I will sit down over here.

24       THE WITNESS:  Is there a pointer handy?

25       (The witness procures a pointer.)

1    MR. VEEDER:  Mr. Kunkel, as you proceed with your

2  references to the slides would you kindly allude to Exhibit

3  274 and also to the areal with the overlay 274-B.  You may

4  just refer to the overlay.  You don't necessarily have to have

5  it before you.

6    THE WITNESS: We will key to the overlay.

7    MR. VEEDER:  Do you want to see it as we go along?  I

8  don't know where it is.

9    THE COURT: Here is the overlay, and here is the panorama.

10  All right.

11    (At this point the first slide is shown on the screen.)

12    MR. VEEDER: State generally where that is located,

13  Mr. Kunkel.

14    THE WITNESS: For the record, this will be entered as

15  actually slide 46C.

16    THE COURT:  46?

17    THE WITNESS:  58-46C.

18    THE COURT: All right.

19    THE WITNESS:  The picture was taken in the latter part

20  of November, actually the day after Thanksgiving, which would

21  be November 25, 1960.

22    MR. SACHSE:  The section numbers?

23    THE WITNESS:  I will give you the section numbers.

24    A homestead is shown in the right-hand side of the

25  picture.  That cluster of houses and the hill is in the

1   Northeast quarter of a Section 10. It is one of three Domenigoni

2   residences in the immediate area.  Immediately north of the

3   homeastead in an east-west line is Section 3.  To the south

4   of an east-west line is Section 10.  There is a road visible

5   in the lower central part of the picture.  That is a north-

6   south road.  It is Winchester Road.  A well or a tank is shown

7   in the lower left-hand part of the photograph.  That is a

8   tank at the site of Well 9K1.  Well 9J1 is in the corner of

9   the green field adjacent to Winchester Road.

10       MR. VEEDER:  What is the section?

11       THE WITNESS:  In Section 9.  There is another well 10E1

12   not distinctly visible but it lies east of Winchester Road in

13   Section 10E1.  Another Domenigoni residence along Holland Road

14   is just off the center part of the picture to the left.  On the

15   alluvial plain along Warm Springs Creek--

16       MR. VEEDER:  Where are you pointing now?

17       THE WITNESS:  I am now pointing to the unirrigated

18   alluvium south of the contact with the alluvial plain and the

19   basement complex which is composed of the mountains in the

20   distance and the green irrigated fields in the foreground.

21   There is a plowed area of younger alluvium that is unirrigated

22   and the channel of Warm Springs Creek runs through that plowed

23   area of younger alluvium in Section 3.  This can be seen on the

24   overlay 274B. The channel of Warm Springs Creek in this area

25   'is underlain by a continuous growth of salt grass for a distance

1  of more than a mile.

2  Next slide, please.  This picture will be 46B.  It joins

3  46C.  Winchester Road is shown between two residences now

4  shown on the photograph.

5  THE COURT:  In which direction are you looking?  Tell us

6  each time which direction you are looking.

7  THE WITNESS:  We are looking in a general northeasterly

8  direction.  The road that appears to run in a general horizontal

9  direction to the picture is a north-south road-- north being to

10  the left, east being to the right of the road.  The residence

11  shown to the right of the road on the right side of the picture

12  is the Domenigoni residence in the northwest quarter of Section

13  10.  The cluster of trees, barns and houses shown on the left-

14  hand side of the picture is the Domenigoni, known as the

15  Domenigoni home place in the Northeast Quarter of Section 9.

16  The channel of Warm Springs Creek starting from the right-hand

17  side of the picture lies on the plowed alluvial plain that is

18  unirrigated north of the irrigated fields and south of the

19  mountains and runs in a general westerly direction and slightly

20  to the southeast to approximately the road intersection of

21  Holland Road and Winchester Road, at which point the stream

22  channel has been diverted by the activities of man along the

23  Winchester Road to approximately Well 9J1, at which the

24  channel traverses across the plowed fields.  The original

25  channel cuts across the field rather than following the road.

1      Next slide, please.  This will be photograph 46A and it

2   will abut right onto 46B.  Again the Domenigoni home place is

3   shown.  The course of Warm Springs Creek can be observed

4   across the plowed field to a point where a road on the left-

5   hand side of the picture in the central part of the picture

6   makes a turn.  We are looking at the younger alluvial plain

7   of Domenigoni Valley in the Northeast Quarter of Section 9.

8      Next slide, please.  This will be No. 46.

9      MR. VEEDER:  That is always prefaced by 58?

10      THE WITNESS:  58-46.  This picture was taken several

11   weeks earlier on either November 1st or 2nd-- I will have to

12   check my notes for the exact date-- 25 days before the earlier

13   pictures that were shown.

14      MR. VEEDER:  That is 1960?

15      THE WITNESS:  1960.  And this is the extreme right pic-

16   ture of the panorama that is spliced together.  And the road

17   shown in the left side of the picture is a north-south road.

18   The area to the right are irrigated fields.  The house to the

19   right central foreground is again the Domenigoni home place.

20   We are looking across up into a little re-entrant valley of

21   Section 4.

22      Next slide, please.  This is slide 58-45.  Again our

23   north-south road is shown.  The channel of Warm Springs Creek

24   is about in the center of the three power poles shown and it

25   traverses a line along the south end of brown grass which, at

14,699

1  the time of the picture, was a field of dead annuals.  However,

2  along the course of the channel of Warm Springs Creek at this

3  point there is a growth of salt grass.

4       MR. SACHSE:  In which direction does Warm Springs Creek

5  flow?

6       THE WITNESS:  Warm Springs Creek is flowing from the

7  notheast on the right-hand side of the photograph to the

8  southwest on the left-hand side of the photograph.

9       Next slide, please.  This is slide 58-44 and abuts right

10  onto 58-45.  The channel of Warm Springs Creek is in the lower

11  central part of the picture along the south line of a field of

12  annuals, and what we are actually looking at is the flood

13  plain of Warm Springs Creek.

14       THE COURT:  You were facing at that time northwest?

15       THE COURT:  We are now facing generally from the point

16  where we are standing to a nose of land on the right-hand

17  side of the picture where the basement complex comes down into

18  the foreground of the picture.  It is just a little bit west

19  of north.

20       MR. SACHSE:  What is the number of this one again, please?

21       THE WITNESS:  58-44.

22       THE COURT:  And this is Section 9, and I take it that

23  that hill and that nose we see butting out is the basement

24  complex shown in the northwest corner of Section 9?

25       THE WITNESS:  That is correct.  That is the basement

1    complex shown in the northwest corner of Section 9.

2        This is slide No. 58-43.  Again, a continuation of the

3    panorama.  The channel of Warm Springs Creek again is at the

4    south side of thefield of brown grass along an area of salt

5    grass, and the flow of the stream in general is from the north-

6    east to the southwest across the lower central partof the pic-

7    ture.  A group of trees are seen in the central distance.

8    Those trees are at the site of Well 8A1, which is a destroyed

9    well.  It is actually a windmill a little bit to the left

10   of the trees.

11       THE COURT:  What is that well number again?

12       THE WITNESS:  8A1.

13       THE COURT:  Which is outside the watershed?

14       THE WITNESS:  It is outside the watershed.  That is in

15   Menifee Valley, the watershed boundary.  There is also an

16   irrigated field in the distance of the extreme left-hand side

17   of the picture in the background.  That is a field in Menifee

18   Valley irrigated by wells 5N1 and 5N2.

19       MR. VEEDER:  What is the elevatio of the crest of the

20   watershed as depict on 43?

21       THE WITNESS:  Slide 43, the crest of the watershed, at

22   least on the extreme left-hand side of the picture, is about

23   1,450 feet.

24       MR. VEEDER: And what is the floor of the valley?

25       THE WITNESS:  The floor of the valley is about 1430 feet,

1440 feet.

MR. VEEDER:   You may continue, Mr. Kunkel.

THE WITNESS:   Next slide, please.   Again we have moved downstream.   The channel of Warm Springs Creek is depict by the growth of salt grass in the foreground just north of the boulders or basement complex which is actually a hill slope in the foreground of the picture.   Moving from northeast to southwest there are a group of trees shown in the left-hand side of the picture.   Those trees are on a hilltop, a rise of land that is actually the watershed divide between Menifee Valley in the background to Domenigoni Valley in the fore-ground.   There is also a fence line shown which, starting on the upper right-hand side of the picture, corresponds with the north-south fence between Section 8 and Section 9 to about the middle of the picture, at which time the fence line makes a right-angle turn on the half section and continues back into the picture into Menifee Valley.   There is another well ap-proximately at the bend in the fence line or at the turn in the fence line, and that is Well 6J2, which on either the first or second-- I will give you the exact date-- which on November 1, 1960, was dry at a depth of 54 feet.   The watershed divide on the right-hand side of the picture is in front of or toward the viewer with relation to the fence line shown.   The entire field in the upper right-hand side of the picture behind the fence line is in Menifee Valley.

1       THE COURT:  You said Well 6J2.  You meant 8J2?

2       THE WITNESS:  That is correct.  It is 8J2.

3       THE COURT:  8J2 is just outside the watershed line?

4       THE WITNESS:  It is just outside the watershed line.

5       THE COURT:  Show me where the well is again.

6       THE WITNESS:  Approximately there (indicating).

7       THE COURT:  So you are looking almost due west now?

8       THE WITNESS:  You are looking almost due west.  Actually,

9   it is a northwesterly direction.  Due west will show up-- the

10  fence line on the panorama to the left of these pictures is an

11  east-west fence, and again the green irrigated fields in the

12  distance at the base of the hills are in Menifee Valley and

13  are irrigated by Wells 5N1 and N2.  It is proper to point out

14  that this sequence of pictures in the panorama have been taken

15  with a telephoto lens and it appears to bring the objects in

16  the distance much closer then the viewer.  The other sequence

17  pictures, which will be 34, 35 and 36, are taken with a wide-

18  angle lens and show the relative distances in perhaps truer

19  perspective.  These show the details rather.

20      The next slide is 58-41.  Again we are looking in the

21  same general northwesterly direction, a little more westerly

22  than previously.  Each slide will be more westerly.  The

23  channel of Warm Springs Creek is in the foreground below the

24  outcrop of the basement complex, following more or less the

25  edge of the dead annual grasses to an area-- and incidentally,

1    as this picture and the previous pictures show, the area of

2    the dead annuals is a field that has been plowed and the

3    natural vegetation has been in large part obliterated.  However,

4    where the channel of the stream actually has not completely

5    destroyed the salt grass and there has been a growth of salt

6    grass along the channel, from the left central part of the

7    picture where there is a distinct break in the natural vegeta-

8    tion that is caused by the lack of plowing to the left and the

9    plowed to the right, and on the left side of the photograph

10   between the hills, are basement complex, the flood plain of

11   Warm Springs Creek actually very closely approximates is

12   native state, and the channel of Warm Springs Creek follows the

13   dead annual grasses on through about the center part of the

14   flood plain and on the extreme left of this photograph there

15   is a rather dense growth of salt grass.  The trees in the

16   distance again are Well 8J1 and the irrigated fields in the

17   distance are Menifee Valley.

18        THE COURT:  Where is Well 8J1?

19        THE WITNESS:  8J1 is actually a windmill right in the

20   center of those trees.  8J2 is over to the right where the

21   fence makes a turn at the half section.

22        Next slide, please.  This should be 58-40.  The channel

23   of Warm Springs Creek approximately down the center of the

24   flood plain.  In the very center of the picture there is a

25   green area which is rather dense growth of salt grass.  The

channel continues right on down through an area of large
boulders out the left-hand side of the picture.  Again we are
looking in a westerly direction, more west than north, on this
particular slide.

MR. SACHSE: You are standing in Section 16 or in Section
9?

THE WITNESS:  In Section 9, in the Southeast Quarter of
the Southwest Quarter on a hill.

MR. SACHSE:  With particular reference to the large
outcrop of basement complex, it is almost at the intersection
of 8, 9, 16 and 17.  Is that in the picture?

THE WITNESS:  Yes.

MR. SACHSE:  Will you locate it?

THE WITNESS:  Will you back up two notches.  That is it.
That is the outcrop shown.

THE COURT:  Which picture have you shown now?

THE WITNESS:  This is No. 40.  We backed up.

MR. SACHSE:  Am I correct, then, Mr. Kunkel, that the
outcrop in the middle slide 40 is the largest outcrop of
basement complex shown in the Southeast Quarter of Section 9
and overlapping into Section 16, et cetera?

THE WITNESS:  Yes.

MR. VEEDER:  You are referring to 274?

MR. SACHSE:  274, yes.

THE WITNESS:  The next slide will be an overlap.  This

1   is the same hill to which Mr. Sachse has referred.  There is

2   a distinct straight line fence going approximately through the

3   middle of the picture.  This is a fence along the section line

4   between Section 8 to the right and Section 17 to the left and

5   also Section 16 to the left.  The windmill shown in the lower

6   left-hand side of the photograph is actually in section 16.

7   The well number is 16C1  There is a second casing with no

8   windmill on it about a hundred feet to the south of Well C-1

9   and that is Well C-2.  That is not observable in the photo-

10  graphs.

11      MR. SACHSE:  Did you check the water depth as you went

12  along?

13      THE WITNESS:  Yes, I did, and they are in Exhibit 274A.

14      MR. VEEDER:  Describe Well 16C-1, its location, how it

15  is constructed and any other data that will reveal the kind and

16  type of well it is.

17      THE WITNESS:  May we describe that in relation to the

18  next photograph in which the picture actually shows it better.

19      (Next slide.)  This is the same photograph.  This is

20  58-38.  The windmill in the central part of the picture of the

21  right of the water tank and a tree is constructed in a pit

22  about 10 feet deep.  The channel of Warm Springs Creek is to

23  the west-- Yes, to the west-- of the photograph in an area

24  north of some boulders.  There is a large boulder sticking

25  up behind the windmill which will show up in a subsequent

1   picture for orientation.

2      MR. VEEDER:  Describe the pit, please, and how it appears

3   to have been constructed and how it was used and has been used.

4      THE WITNESS:  Well, the pit was originally bulldozed

5   out as a waterhole for cattle.  Since water levels have

6   declined in the area a well has been dug in the bottom of the

7   pit.  It was 3.43 feet to water below the measuring point at

8   the bottom of that pit on June 9, 1960.  However, there is

9   evidence that water has stood in that pit at a very recent

10   date, and the testimony of Dr. Mann indicated that water was

11   in that pit on the specific day that he visited.

12      MR. VEEDER:  Would you state whether the well was pumping

13   at the time you were there?

14      THE WITNESS:  The well was not pumping at that particular

15   time, although it had been pumping intermittently and water is

16   in the tank.

17      THE COURT:  Does this well pump out of a pit or does the

18   well go into the ground below the bottom of the pit?

19      THE WITNESS:  The windmill pumps out of a well drilled

20   in the bottom of the pit at the present time.  However, there

21   are cows do go down in to the pit during periods when there

22   is water in the pit.  Cows actually walk down into the pit and

23   drink water from the pit.

24      THE COURT:  How deep is the well below the surface or

25   below the bottom of the pit?

1    THE WITNESS: We were unable to plumb the depth of the

2  well.  There was a tight cover over it.  However, the depth

3  to water below the bottom of the pit was about two feet be-

4  cause actually the measuring point stood up a foot or more

5  above the bottom of the pit.  The actual measurement of water

6  below our measuring point was 3.43 feet.  In other words, at

7  the present time the actual depth to water on June 9th was

8  about 13 feet below land surface at that point.

9    The next picture, please.  This is 58-54.  This is a

10  growth of salt grass in the channel of Warm Springs Creek.

11  As was pointed out on a previous photograph-- I forget the

12  exact number-- we are now in the area where the flood plain of

13  Warm Springs Creek has not been plowed and this is a growth

14  of salt grass.  And downstream or to the southwest is to the

15  left of the viewer, and upstream is to the right of the viewer,

16  and the fence in the distant part of the picture is the section

17  fence again between Section 8 and Section 17 or 8 and 16.

18    MR. VEEDER:  Would you relate that picture of the salt

19  grass to the outcrop of basement complex as shown on Exhibit

20  274 and to which Mr. Sachse made reference?

21    THE WITNESS:  The growth of salt grass is right near

22  the section line of Section 9 due east of the outcrop as

23  pointed out by Mr. Sachse and discussed previously.

24    Next slide, please.

25    THE COURT:  What direction are you looking in, on that

1   slide?

2       THE WITNESS:  We were looking almost in a westerly direc-

3   tion.

4       We have now gone downstream.  The person who took the

5   picture was standing right on the section line approximately

6   between Section 16 and Section 9 looking upstream at the

7   channel of Warm Springs Creek.

8       MR. SACHSE:  What is the number of this?

9       THE WITNESS:  It should be 58-47.  It is 58-47.  The

10  channel of Warm Springs Creek is to the right of the individual

11  in the picture and the dense growth of salt grass in the

12  previous slide, No. 58-54, is just behind or in the center

13  of the picture and behind and upstream from the outcrop of

14  rocks shown.

15      Next slide, please.  This is 58-48.  It is generally

16  the same view.  However, the camera has been shifted slightly

17  to the right and we are looking in a northeasterly direction

18  up into Domenigoni Valley.  The trees to the right of the

19  outcrop in the foreground are the trees in the old Domenigoni

20  home place in the Northeast Quarter of Section 9, and the

21  channel of Warm Springs Creek is immediately in front of the

22  person standing in the picture.

23      Next slide, please.  This is 58-55.  These are the

24  boulders pointed out in the slide No. 58-38 as a reference

25  point.  The channel of Warm Springs Creek is to the right

1  of the boulder and we are looking there downstream in a

2  southwesterly direction down toward Murrieta Valley, if one

3  follows the stream channel, and there is a continuous growth

4  of salt grass across the entire flood plain.

5  MR. VEEDER:  Is there a well situated in the background

6  on that?

7  THE WITNESS:  The well in the pit 16C-1 is immediately

8  to the left of the truck and the truck is parked right on the

9  section line.

10  MR. VEEDER:  Do you mean to the left of the truck?

11  THE WITNESS:  It would be to the left of the viewer;

12  to the right of the truck.  The truck is facing the viewer.

13  MR. VEEDER:  16C-1?

14  THE WITNESS:  16C-1, that is correct.

15  Next slide, please.  This is 58-56.  This is now taken

16  from the half section in Section 17 at the site of Well 17J2.

17  Well 17J2 is to the back of the viewer.  The viewer is looking

18  upstream.  The tree in the center part of the picture is at

19  Well 16C-1.  The car is parked on the half section line.  The

20  flood plain of Warm Springs Creek is between the outcropping

21  of rock on each side.  The area is covered where unplowed

22  by a growth of salt grass.  In the foreground there is alkali

23  ground.  The ground is moist right at the surface and the

24  area has been plowed and the natural vegetation has been

25  destroyed.  However, there is evapo-transpiration taking place

1   from the soil and there is a pit right next to Well 17J2.   The

2   pit is approximately 10 feet or more deep and it is alluvium

3   for the full depth, and I have gone out with a shovel and

4   dug for an additional two feet or more and encountered ground

5   water in the hole that I dug and I have taken waterworn material

6   out of the very bottom of the pit, which is approximately 13

7   feet below land surface, and the pit has evidence that stand-

8   ing water has stood in the pit and was originally dug as a

9   waterhole-- scooped out with a bulldozer.

10          MR. SACHSE:   Before you go to the next slide, Mr. Kunkel,

11   may I inquire for a minute.   Are you continuing now steadily

12   downstream, or have I missed something, or did you not have

13   slides that show the location in the area around 16D1 and 16D2?

14   You gave us 16C.   Now you are down to 16J1.

15          THE WITNESS:   16D1 and 16D2 actually are on this photo-

16   graph.   However, they are not easily visible.   But they are

17   around between the parked automobile and the tree in the

18   distance on the flood plain of Warm Springs Creek.

19          MR. SACHSE:   Are there any other wells to which you

20   haven't made reference as you went along?

21          THE WITNESS:   Let's see, there are wells 16C1, 16C2, 16D1.

22          MR. VEEDER:   16C2 is right at C1?

23          THE WITNESS:   Within a hundred feet of C1.

24          MR. VEEDER:   Locate each one of those wells as you go

25   along, please, Mr. Kunkel.

14,711

1    THE WITNESS:  We have gone also past Wells 16D1 and

2    16D2 and we are at the site, on this photograph, right at the

3    site of 17J2.  I will check the number on that.  17J2 is

4    correct.

5        Next slide, please.

6        MR. SACHSE:  Just a minute, please.

7        (Mr. Sachse and Mr. Veeder confer off the record.)

8        MR. SACHSE:  With Mr. Veeder's consent, I would like to

9    remind you-- I have the transcript in front of me-- that the

10   well to which I referred, 16D1, is the well to which Dr. Mann

11   referred when he made his calculation of capacity and how much

12   water could flow out of Domenigoni Valley.  It was at that

13   point.  Do you recall when he said so many acre-feet?

14       THE COURT:  My recollection is, the real issue is, what

15   is the situation just north of the section between 8 and 17,

16   and 16 and 9?

17       MR. SACHSE:  That is right, your Honor.  That is where

18   he drew the barrier.

19       THE COURT: That is where the barrier is, if it exists.

20       MR. SACHSE:  And the well he used in calculating the

21   amount of outflow, depth of alluvium, et cetera, was 16D1.

22       THE COURT: Yes.

23       MR. VEEDER:  May I proceed, your Honor?

24       THE COURT:  Yes.

25       THE WITNESS:  Next slide, please.

1    According to my calculation, this should be 58-57.  That

2  is right.  This is the same picture again with a telephoto

3  lens.

4    THE COURT:  You are looking upstream toward the north-

5  east?

6    THE WITNESS:  And we are right at the site of Well 17C1.

7  Actually, the channel has split at this point and there is a

8  stream channel coming toward the right of the viewer and a

9  part of the channel coming toward the left of the viewer and

10  the viewer is standing on a little rise of ground looking

11  upstream.

12    THE COURT:  You said 17C1.

13    THE WITNESS:  17J2 is where the viewer is standing and

14  we are looking upstream.

15    Next slide, please.  This is 58-58.  We have again moved

16  upstream.

17    MR. VEEDER:  You say upstream.

18    THE WITNESS:  Downstream.  We are looking upstream to

19  the site of the previous photograph in the salt rising ground.

20  Well 17J2 is in the center of the photograph at the north end

21  of the white alkali.

22    MR. VEEDER:  Will you identify 16C1 on that photograph?

23    THE WITNESS:  16C1 is in the distance by the tree about

24  the center of the photograph.

25    Next slide, please.  This is 58-59.  This is approximately

1    the same view again taken a little later in the day with a

2    wide-angle lens.

3    　　　MR. VEEDER:   The same view as the previous photograph?

4    　　　THE WITNESS:   The same view as the previous photograph.

5    That is 58-59.

6    　　　Next slide, please.   This 58-60.   We are now standing

7    in the Northeast Quarter of the Northeast Quarter of Section

8    19, 6 South, 2 West looking upstream.   The windmill on the

9    extreme right of the picture is at Well 17N2.   The stream

10   channel actually passes a little bit to the right of the

11   windmill.   The windmill is actually on the flood plain and

12   continues north of an east-west road which is just north of

13   the power pole in the picture to a culvert and then the stream

14   makes a sharp turn to the left and comes down in a southerly

15   direction toward the viewer.

16   　　　Next picture, please.   This is 58-61.   This is the same

17   general area.   The well with the windmill 17N2 is immediately

18   to the right of the picture.   The east-west road is visible

19   in this picture.   The fence in the immediate foreground is a

20   north-south fence.   And this picture was taken on November

21   1st or 2nd-- I don't recall the exact date-- and it was a

22   period of several weeks after any rain had fallen in the area

23   and there is water standing in the channel of Warm Springs

24   Creek and there has been a continuous growth of salt grass

25   from-- well, actually the boundary between Sections 2 and 3,

6 South, 2 West, all the way down to this point except where actually plowed out by the activities of man.

Next slide, please.  This is 58-62.  This next slide actually now has moved us downstream a mile or more to 15E, and this is a ranch in the northeast quarter of Section 25, 6 South, 3 west.  This is an area that is shown on Exhibit 15E as residuum.  There is a gradual slope from the mountains in the distance to actually an area behind the viewer where there is just a smooth slope with the banks of the stream having been plowed out.  However, the stream channel runs approximately through the center of the photograph and can be seen by the differences in color and the banks have been plowed.  The irrigation in the distance is water that is brought in by a pipe line from some springs to the west of the property.

MR. SACHSE:  What is the name of that person?

THE WITNESS:  I don't recall the name of the person. It is immediately below McElhaney.  It is the Northeast Quarter of Section 25.

Next slide, please.  The next slide is a telephoto shot of the same area and the stream channel is in the fore-ground of the picture.  However, it has been completely plowed over by the activities of man.  Immediately below these pictures, I don't have any photographs but again the alluvial channel takes up. There is a continuous growth of salt grass and dense growth of willows locally, there are

1   tules, and there is a continuous area of evapo-transpiration

2   all the way down into Murrieta Valley or into the area by

3   Murrieta Hot Springs.

4        MR. VEEDER:  That concludes the photographs, your

5   Honor.
         THE WITNESS:  No.

6        MR. VEEDER:  Are there some more?

7        THE WITNESS:  There are a few others.

8        This is 58-37. I will run through these.  These are the

9   wide-angle shots of the same area.  The Domenigoni homeplace

10  is by the trees, the north-south road to the left of the

11  irrigated fields.

12       Next slide.  This is 58-36.  The trees on the hilltop

13  in the left of the photograph are Menifee Valley, the irrigated

14  fields in the extreme distance.

15       Next slide.  This is 58-35.  The trees in the central

16  part of the picture on the crest of the watershed divide

17  between Menifee Valley, and in the distance Domenigoni Valley

18  on the left, and the flood plain in Warm Springs Creek between

19  the outcrops of basement complex on the left of the picture.

20       The next slide is 58-34, the same picture.  The windmill

21  is Well 16Cl.  The fence line is east and west betwen Sections

22  9 and 16.

23       Next slide, please.  This is 58-49.  We are now

24  standing approximately on the flood plain of the stream look-

25  ing at the outcrop of basement complex in or very close to the

14,716

1   corner between Sections 9, 8, 17 and 16.

2        THE COURT:  Which way are you facing?

3        THE WITNESS: We are facing in a westerly direction on

4   this slide, and the next sequence we will move from a westerly

5   direction to a northwesterly direction.  The watershed divide

6   is the top of the low hill covered by vegetation on the right

7   and the hill in the foreground-- I am sorry-- not the hill in

8   the foreground, but the top of the vegetated are on the right

9   of the picture.

10       MR. SACHSE:  It runs behind the hill in the foreground.

11       THE WITNESS: Strike that about the watershed.  In the

12  foreground we are in the watershed of Domenigoni Valley.  The

13  mountains in the distance are in Menifee Valley.

14       This is 58-50.  It shows the Well 8J1 and the trees

15  which are on the watershed, and the watershed goes--

16       MR. VEEDER:  When you say on the watershed you mean the

17  watershed line; is that right?

18       THE WITNESS:  On the watershed line between Diamond

19  Valley and Menifee Valley.  And the watershed line strikes

20  back behind the vegetated field that is shown.

21       This is 58-51. The same group of trees.  However, we

22  are looking in a more northwesterly direction, and the crest

23  in this particular case is the watershed divide between

24  Diamond and Menifee Valleys.

25       This next slide is 58-52.  We have now shifted the

1  site of our photographs and we are standing on the nose land

2  in the Northeast Quarter of Section 9 looking in a southwesterly

3  direction across or along the watershed divide.  We are

4  actually standing in Diamond Valley and looking at the trees

5  at the site of Well 8J1.

6      MR. VEEDER:  You say Diamond Valley of Domenigoni Valley?

7      THE WITNESS: We are standing in Domenigoni Valley looking

8  over the watershed into Menifee Valley.

9      The next slide is 58-53.  The same photograph with a

10  telephoto lens.  Again the fence line in this photograph shows

11  up and the Well 8J2 is right approximately at the corner of the

12  fence where it makes a turn, and that well is in Menifee

13  Valley-- it is over the watershed divide.  The area between

14  the outcrops of the rocks right in the foreground and the fence

15  line where it has been plowed, if one will refer to the areal

16  photograph with the overlay 274B, one will see that this area

17  drains, when there is surface runoff, into a reservoir shown

18  in the south half of Section 17.  I am not sure who owns that,

19  but it drains into that reservoir, and it is part of the Warm

20  Springs Creek drainage.

21      That is all of the photographs.

22      MR. VEEDER:  May we have a recess for a moment, your

23  Honor?

24      THE COURT:  Yes.

25      (Recess.)

1          MR. VEEDER:  Your Honor, I think the record should show

2    that Clyde Christensen is in the courtroom.  He is one of the

3    ranchers in the Diamond-Domenigoni Valley.  I thought your

4    Honor might be interested in knowing it.

5          THE COURT:  Yes, sir.

6    BY MR. VEEDER:

7          Q  Mr. Kunkel, what have been your observations in

8    regard to the phreatophytic and water-loving plant growths

9    in the Diamond-Domenigonia Valley and the course of Warm

10   Springs Creek on down to the Murrieta?

11         MR. SACHSE:  When, please, Mr. Veeder?  Do you want to

12   fix a time?

13         MR. VEEDER: At any time you have been acquainted with

14   this valley.

15         MR. SACHSE:  I would like to know when he did it-- when

16   he saw the phreatophytic growth.

17   BY MR. VEEDER:

18         Q  When did you see the phreatophytic growth?

19         A I first observed phreatophytic growth in the area in

20   October, 1958, and the most recent examination of it has been

21   December 3rd of this year, and during that interval I have

22   traversed on foot the entire course of Warm Springs Creek in

23   one manner or another.

24         Q  Would you locate the salt grass area that you have

25   observed in Domenigoni Valley and relate it to the farming

1  operations of the Domenigonis in Section 3?

2      A   There is a continuous growth of salt grass across the

3  entire length of Section 3 along the course and on both sides

4  of Warm Springs Creek, and that is a condition that exists as

5  of today and has existed during my period of acquaintance with

6  the valley.

7      Q   What does that salt grass evince to you from the

8  standpoint of the groundwater table?

9      A   It evinces ground water occurrence at a depth of 8

10 feet or less under natural conditions.

11     Q   Would you relate the salt grass growth to which you

12 have testified as it relates to the alleged perched water

13 table as depict on Searle Brothers Exhibit C-1 (handing

14 document to the witness)?

15     THE COURT:   Who represented Searle?   You did, Mr.

16 Sachse?

17     MR. SACHSE:   I did, your Honor.

18     THE WITNESS:   The salt grass in Section 3 is above any

19 reference to salt grass made in relation to testimony of

20 Searle's C.   The irrigation is all below the area of salt

21 grass in Section 3.

22 BY MR. VEEDER:

23     Q   And what significance does that have to you from the

24 standpoint of the possibility that that salt grass stems from

25 the irrigation practices in the valley?

1      A   This salt grass is a natural condition that existed

2  before there was irrigation in the valley in 1915.   At Well

3  6 South, 2 West, 10D1 the depth to water was six feet, as shown

4  by Exhibit 274A, page 7.

5      THE COURT:   What section is this?

6      THE WITNESS:   Section 10, Northwest Quarter of Section

7  10, 6 South, 2 West, also in the Northwest Quarter of Section

8  11.

9      THE COURT:   There is no dispute that there is water in

10  the valley at that point.  The dispute hinges as to what happens

11  when we get down to the boundary line between Sections 8 and

12  17 and 9 and 16.

13      THE WITNESS:   This is a condition that existed under

14  natural conditions right on down through Warm Springs Creek,

15  because the fields of irrigated alfalfa at the present time

16  were originally subirrigated and present irrigation has lowered

17  water levels in the area 30 feet or more, and in the immediate

18  vicinity of the irrigated fields there may be a temporary

19  perching of water as indicated by the record of water levels

20  in Well 6 South, 2 West 10E1, shown on page 7, in which water

21  levels have fluctuated from 8 to more than 21 feet during the

22  period 1957 through 1960--

23      THE COURT:   What well is that again?

24      THE WITNESS:   6 South, 2 West, 10E1.

25      --indicating that this perching is a temporary condition

14 721

1    that exists during and immediately following irrigation, but

2    after irrigation ceases the water levels, the perched water

3    or semi-perched water as of the moment drains down toward the

4    main water body.

5        MR. VEEDER:  Your Honor asked the question.  Did you

6    direct the question to me as to what significance this has,

7    or were you addressing the witness?

8        THE COURT:  Just generally directing it.

9        MR. VEEDER:  It has been our position in this matter--

10   and perhaps I should have made an opening reference before we

11   started in-- what this evidence has disclosed, from our stand-

12   point, is that there is a continuous ground water body all the

13   way through extending on down the valley and that the salt

14   grass delineates and depicts the area through which this

15   subterranean stream is presently pumped.

16       THE COURT:  As I understood the proof put on by Mr.

17   Sachse, there is no dispute that some water continues on down

18   underground.  There have been no estimates given as to how

19   much.  But that other water went off where you have those

20   orange-colored older continental deposits, off in that area

21   underground.  I didn't understand it was an absolute barrier

22   there, that no water went through.

23       MR. VEEDER:  In the process of this course of evidence,

24   your Honor, we of course think that far more than -- I truly

25   don't understand how Dr. Mann could possibly have said 2.2

1    annually.   There is nothing in the record to support such

2    conclusion.

3         THE COURT:   Did he say there were 2.2 acre-feet annually?

4         MR. VEEDER:   That is right, your Honor.

5         THE COURT:   Underground?

6         MR. VEEDER:   That is right.

7         THE COURT:   Not counting surface?

8         MR. VEEDER:   Not counting surface, there is 2.2 annually;

9    and we, of course, take violent exception to that.

10        I didn't intend to be arguing the case.   I was simply

11   responding to questions your Honor had asked me.

12        THE COURT:   All right.

13   BY MR. VEEDER:

14        Q   Mr. Kunkel, have you made observations as to the

15   growth throughout the entire length of Warm Springs Creek?

16        A   I have.

17        Q   Would you estimate the number of acres which would

18   extend-- which would be in the course of Warm Springs Creek

19   from the point roughly where Well 16Cl is located on down to

20   where Warm Springs Creek enters Murrieta Valley?

21        MR. SACHSE:   I don't understand the question.

22        THE COURT:   The number of acres?

23        MR. VEEDER:   Of alluvial bed in the stream for its entire

24   length.

25        MR. SACHSE:   I don't quite understand that, either.

1        THE COURT:   The younger alluvium as shown on Exhibit

2    274?

3        MR. VEEDER:   That is right, yourHonor.

4        MR. SACHSE:   Below what point?

5        MR. VEEDER:   I will point right on down to Murrieta

6    Hot Springs.

7        THE COURT:   From where?

8        MR. VEEDER:   From 16C1, your Honor, the well just right

9    at the juncture.  Do you have Exhibit 274 before you?

10       THE COURT:   16C1, yes.

11       MR. VEEDER:   Have you located that, your Honor?  I am

12   asking the question as to the areal extent of the stream bed

13   of Warm Springs Creek from that point down to where it enters

14   the Murrieta Valley.

15       MR. SACHSE:   I have an objection, your Honor.  In the

16   first place, the areal extent of the stream bed is utter

17   meaningless since a part of this stream flows through residuum.

18   That is the first objection.  I don't know what the stream bed

19   is in the residuum, and there isno foundation for that.

20       THE COURT:   This you can bring out on cross-examination.

21   I want to understand what he is answering.  So your objection

22   is overruled on that ground.  Is there any other ground?

23       MR. SACHSE:   On the ground that it is absolutely

24   immaterial as to the surface area of the stream bed.

25       THE COURT:   What do you mean by areal part of the stream?

1   You are not talking about all the younger alluvium shown on

2   274 or on 15E?

3       MR. VEEDER:  I am talking about the areal extent, your

4   Honor, of the stream.  I am now pointing at 274.  Your Honor

5   will find down the full length of Warm Springs Creek as

6   depict on 274 and on 15E there is an area shown as younger

7   alluvium and some residuum.  I am asking the witness to state

8   the number of acres of land constituting the bed of Warm

9   Springs Creek through the course to which I just made refer-

10  ence.

11      THE COURT:  I take it that the bed of the stream might

12  be in the case of small rains one thing, in the case of very

13  heavy rainfall that lasted two or three days I would take it

14  the bed of the stream might meander much more broadly.  What

15  do you mean by the question?

16      MR. VEEDER:  The reason I continue to refer to the

17  exhibits is that I am bringing it to the witness's attention

18  as the width of the bed of the stream as depict on those

19  two exhibits.  He drew the exhibits on the basis of his

20  observation of the alluvial deposits throughout the course of

21  the stream.

22      THE COURT:  Which two exhibits are you talking about?

23      MR. VEEDER:  274 and 15E, your Honor.  They are put here

24  together, your Honor.

25      THE COURT:  If you mean by that just a little broken

1  line which shows where the stream runs, that is one thing.

2  If you mean all the  yellow area and the younger alluvium, that

3  is another.

4      MR. VEEDER:   I will ask the witness a question, your

5  Honor.

6      Q  Mr. Kunkel, would you state whether you have depict

7  what you consider to be the flood plain on area 274?

8      MR. SACHSE:   I object to that as being immaterial.   It

9  is not a question of the flood plain.   There isno question of

10  flood plain.   The question is the bed of the stream.   Now, he

11  is asking him if he has depicted something entirely different.

12     THE COURT:   If you want to try to find out what he is .

13  talking about-- it is true that he is talking about something

14  else entirely.

15     MR. VEEDER:   No, your Honor is seeking to be informed,

16  as I comprehend, of the areal extent.

17     THE COURT:   Yes.

18     MR. VEEDER:   I am trying to elicit by inquiry as to

19  whether Mr. Kunkel has observed the areal extent of the stream

20  bed of Warm Springs Creek up to 16C1.   I don't find the

21  difficulty myself.

22     THE COURT:   May I ask the witness?

23     MR. VEEDER:   Yes, your Honor.

24     THE COURT:   To get myself straightened out.

25     On Exhibit 274, Mr. Kunkel, starting in with Well C-1

1  in Section 16, you have drawn some solid lines and then some

2  dots and then some solid lines and again dots.  I take it that

3  those lines indicate the course of the stream?

4      THE WITNESS:  That is correct.

5      THE COURT:  Now, did you try to depict upon here a

6  flood plain of the stream?

7      THE WITNESS:  In general this on 274 below Well 16C1,

8  the rather restricted area delimited along the thread of the

9  bed of the stream, corresponds closely to the flood plain.

10      MR. VEEDER:  Would those be the bed and bank of the

11  stream?

12      THE WITNESS:  In general they would be the bed and bank

13  of the stream.

14      THE COURT:  What are the bed and bank?  The dotted lines

15  or the solid?  I have the map right here.

16      THE WITNESS:  The dashed line--

17      THE COURT:  Starting here with C-1?

18      THE WITNESS:  Starting with C-1, the dashed lines

19  through the area indicated as younger alluvium, there is

20  differentiation that would indicate the flood plain of the

21  stream as opposed to the tributary alluvial fan area, both of

22  which are younger alluvium.  The solid line plus three dots

23  is the actual course of the stream, the actual thread of the

24  stream along which water would flow when it would be very low

25  rates of flow.

1      THE COURT:   Then this area which shows on 274 up in

2  Section 16 in the northwest corner, about a half inch between

3  the dashed lines, is what you call the flood plain?

4      THE WITNESS:   This would correspond with the flood

5  plain in general.

6      THE COURT:   And down here in the bottom of Section 17

7  it would be almost three-quarters of an inch wide there?

8      THE WITNESS:   That is correct.

9      THE COURT:   That is your flood plain?

10     THE WITNESS:   That is your flood plain.

11     THE COURT:   Where do you stop showing flood plain?

12     THE WITNESS:   After the channel gets more restricted the

13  flood plain is the full width of the alluvial area.

14     THE COURT:   And from the intersection of Sections 17,

15  18, 19, and 20, from that time on you would call all the

16  younger alluvium the flood plain?

17     THE WITNESS:   All the younger alluvium would be the

18  flood plain.

19     THE COURT:   And above Wells N-1 and N-2 in Section 17

20  there would be this area between the dashed lines?

21     THE WITNESS:   That is correct.   And this area or that

22  area for the entire length is underlain by water at shallower

23  depth and there is a growth of salt grass, willows, tules,

24  various types of water-loving vegetation for the entire

25  length of the stream, except for the very limited area in

1   Section 25, 6 South, 3 West.

2       THE COURT:   Now I know what you mean.

3   BY MR. VEEDER:

4       Q   Based upon your observation and experience in these

5   matters, would you state that it would require more or less

6   than 2.2 acre-feet annually to support the growth that you have

7   observed in this area you have now described to the Court?

8       A   To support the growth I have observed it would

9   require many times more than 2.2 acre-feet annually.

10      THE COURT:   How much?

11      THE WITNESS:   I haven't made any estimate of the amount,

12  but there are several hundred acres of water-loving plants.

13  BY MR. VEEDER:

14      Q   Mr. Kunkel, what is the formula --

15      THE COURT:   Mr. Kunkel-- Let's stop right there.   I take

16  it that in rainy weather there is water that flows down the

17  surface of this stream?

18      THE WITNESS:  There is some.

19      THE COURT:   And it would fill up the younger alluvium,

20  would it not?

21      THE WITNESS:   Yes, it would.

22      THE COURT:   And that water which flowed down the surface

23  and went into the younger alluvium until it was gone would

24  support the growth that you observed, would it not?

25      THE WITNESS:   That is correct.

1    THE COURT:  Then how do you differentiate between how

2    much water to support this growth comes from the flood waters

3    that fill the younger alluvial deposits and how much comes

4    from an underground flow?

5    MR. VEEDER:  May I ask some questions along that line,

6    your Honor?

7    THE COURT:  I have just asked the question.

8    MR. VEEDER:  All right.

9    THE COURT:  How do you differentiate it?

10   THE WITNESS:  By the data presently available I would

11   be unable to differentiate.

12   BY MR. VEEDER:

13   Q  Mr. Kunkel, to your personal knowledge and based

14   upon any statistics and other reports you have observed, has

15   there been any surface stream flow down Warm Springs Creek

16   past Well 16C1 in the last two years?

17   A  In the last several years, in so far as I can observe

18   or have been able to determine, there has been no stream flow

19   down Warm Springs Creek.

20   THE COURT:  Some of your pictures showed water in the

21   ditch that came after a rain.  Was that further up?

22   MR. VEEDER:  That was away down, your Honor.

23   THE COURT:  It was upstream.

24   THE WITNESS:  The photographs showing water were in

25   Section 19, the Northeast Quarter, along the stream channel.

1    That was some standing water.  Whether it was ground water--

2        MR. VEEDER:  How many miles is that from 16C1?

3        THE WITNESS:  A mile and a half, approximately.

4        MR. VEEDER:  That was the point that I was making when I

5    said it was far down, your Honor.

6        Q  Mr. Kunkel, what are the calculations that are

7    required to make an estimation of an annual progression of

8    ground water down Warm Springs Creek?  What are the factors you

9    must consider?

10       A  On an annual basis one would need to know the

11   permeability of the water-bearing deposits through which the

12   underflow occurred, the hydraulic gradient, which would vary

13   from time to time as water levels in wells varied, and the

14   cross-sectional area of the water-yielding deposits through

15   which the ground water  moves.

16       Q  And what would precipitation and evapo-transpiration

17   have to do with the situation on an annual basis?

18       A  In so far as it would affect the water levels in

19   wells, there would be a different figure for different years,

20   because water levels in cross-sectional areas should immediately

21   change with the change of water levels.

22       Q Based upon your observation, Mr. Kunkel, do you have

23   an opinion as to whether there is a continuous, unbroken

24   ground water body extending up Warm Springs Creek and on

25   through Diamond Valley?

1     A  So far as I can determine from my own observations

2 there is a continuous progression of ground water unbroken from

3 the area in the vicinity of Murrieta Hot Springs along Warm

4 Springs Creek up to the watershed divide between San Jacinto

5 and Diamond Valley on the Searl property.

6     Q  What is the course of that progression of that ground

7 water from Diamond and Domenigoni Valley down Warm Springs

8 Creek?

9     A  The progression of ground water is from Diamond

10 Valley to Domenigoni Valley down eventually to Murrieta

11 Valley and ultimately to the ocean, as described in previous

12 testimony.

13     Q  Mr. Kunkel, would you state whether you have an

14 opinion as to the effect upon surface runoff of the reduction

15 of the ground water table in Diamond and Domenigoni Valleys?

16 Do you have an opinion?

17     A  Yes.

18     Q  Would you state whether the reduction of the ground

19 water table in those Diamond and Domenigoni Valleys would

20 reduce the quantity of surface runoff reaching the Murrieta

21 Valley?

22     A  The reduction of water level in Diamond and Domenigoni

23 Valley will reduce the amount of runoff reaching Murrieta

24 Valley along Warm Springs Creek.

25     Q  And what causes that situation to prevail?

1    A   The reduction of water level in Diamond and Domenigoni

2   Valley will reduce the area of evapo-transpiration which

3   occurred under natural conditions, thereby allowing surface

4   water which would normally flow down Warm Springs Creek to

5   go underground in Domenigoni Valley and thereby not proceed

6   downstream as surface flow.

7        THE COURT:   The more water you pumped out of the

8   Domenigoni and Diamond Valley in the areas of the younger

9   alluvium, the more space there would be for rainfall and flood

10  waters to enter the ground and make up for what had been

11  pumped out.

12       THE WITNESS:   That is correct.   And this is well demon-

13  strated in the water level of Well 6 South, 2 West, 10D1,

14  which has declined from 6 feet in 1915--

15       THE COURT:   Don't go so fast.   What section is it in?

16       THE WITNESS:   6 South, 2 West, 10D1.

17       THE COURT:   The section then is 10?

18       THE WITNESS:   The section is 10.

19       THE COURT:   Has declined from where?

20       THE WITNESS:   From 6 feet in November, 1915, to 28 feet

21  in April, 1959, to 35.4 feet in January 9, 1960, to 36.48 feet

22  on November 2nd, 1960.   The fields that were originally

23  irrigated in this vicinity were subirrigated and are now

24  irrigated by irrigation well 10D2, which has evidenced a

25  similar rate of decline for the period of record which is only

1    for two years.

2    BY MR. VEEDER:

3        Q   Would you state whether you have observed a continuous

4    ground water body gradient throughout the area of Warm Springs

5    Creek commencing at Well 16C1, based upon your well measure-

6    ments and your observation?

7        A   Based on my well measurements and observation, there

8    is a continuous progression of ground water downstream into

9    Murrieta Valley.

10       MR. VEEDER:  I have no further questions.

11       THE COURT:  Mr. Kunkel, let me ask a couple of questions

12   before the recess.  Look at 274 which I have before me.  Did

13   you make an investigation as to the depth of this younger

14   alluvium between Sections 8 and 9?

15       THE WITNESS:  I observed the cuttings that came out of

16   Well 8J2.

17       THE COURT:  How deep is that well?

18       THE WITNESS:  That well was 53 feet deep when I observed

19   it on November 1, 1960-- I am sorry-- 54 feet deep, and it

20   was a dry hole.

21       THE COURT:  Is it shown in this Exhibit 274-A?

22       THE WITNESS:  The data are shown on page 7 of 274-A,

23   Well 6 South, 2 West, 8J2.

24       THE COURT:  Where?

25       THE WITNESS:  (indicating).

1      THE COURT:  Dry at 54 feet in 1960.  It was a dry hole,

2  was it?

3      THE WITNESS:  It was a dry hole when I observed it.

4      THE COURT:  What about these cuttings that you saw?

5      THE WITNESS:  The cuttings beside the hole were water-

6  worn materials.

7      THE COURT:  Did the well go down to bedrock?

8      THE WITNESS:  I do not know the depth to which the well

9  went or what it encountered, except in so far as Mr. Christensen,

10  who is here now, has told me that the well did not encounter

11  bedrock.

12      THE COURT: What do you mean by water-worn materials?

13      THE WITNESS:  There are boulders, some of them the size

14  of your fist and on down smaller, with the edges rounded off,

15  which indicated they had been transported by the activities

16  of water.

17      THE COURT:  Indicated it was the bottom of an old stream

18  bed then of some kind?

19      THE WITNESS:  It would be part of an old stream bed.

20      THE COURT:  And this J-1 is actually in this older

21  continental deposit area?

22      THE WITNESS:  In my opinion it is, yes, sir.

23      THE COURT:  Were there any test holes made in the

24  younger alluvium shown on either side of the older continental

25  deposits, borings or anything, to show what kind of material

1  that was?

2      THE WITNESS:  I have done no testing.  I have been

3  unable to locate any logs except those supplied by the testi-

4  mony in this court as part of the Searl C exhibits.

5      THE COURT:  I have to go to a Rotary meeting today.

6  We will have to adjourn until 1:45.  Take an adjournment at

7  this time until 1:45.

8      (Noon recess.)

9

10  SAN DIEGO, CALIFORNIA, THURSDAY, DECEMBER 8, 1960. 1:45 P.M.

11      THE COURT:  Proceed.

12      (The witness Fred Kunkel resumes the witness stand.)

13      THE COURT:  Before you cross-examine, Mr. Sachse, in

14  the flurry of the objections and the Court's difficulty in

15  finding out what area you were talking about, I don't think

16  you ever did answer the question as to how many acres you

17  calculated were in the so-called stream bed.

18      MR. VEEDER:  He said several hundred, your Honor.

19      THE COURT:  Did he say several hundred?

20      MR. VEEDER:  Yes, your Honor.

21      THE COURT:  What is several hundred?  200?  1500?

22      THE WITNESS:  I would estimate between two and three

23  hundred acres of ground.

24      THE COURT:  You never made a real calculation?

25      THE WITNESS:  No, sir.

1        THE COURT:  It is a guess?

2        THE WITNESS:  It is an estimate, having observed the

3    area.

4        THE COURT:  All right.

5        MR. VEEDER:  I would like at this time, your Honor,

6    before Franz proceeds, to offer in evidence the slides and the

7    pictures and all that we have observed, that is, the 58 series.

8        THE COURT:  The pictures, which run from 34 to 63, with

9    the subdivisions of 46-- you did not have pictures of those,

10   did you?  You just had slides on 46-A, B and C?

11       MR. VEEDER:  Is that correct?

12       THE WITNESS:  That is correct, on 46-A, B and C, and

13   several of them for the end.  I will have pictures made of

14   those.  They were just taken recently and I didn't have time

15   to have prints made of all of them.

16       THE COURT:  Check with the clerk.

17       All the pictures will go into evidence.  You have the

18   slides here?

19       THE WITNESS:  I have the slides here.

20       THE COURT:  They will go into evidence with the 58

21   series 34 to 63.  And then you make pictures of those you

22   haven't got and they will go into evidence in a booklet 58-B.

23       THE CLERK:  Your Honor, I have received only the slides

24   from 34 up through 55.

25       THE WITNESS:  I will need to retain from 55 on in order

14,737

1   to make prints, and I will give you the slides and the prints

2   both.

3         THE COURT:   You may cross-examine.

4

5                    CROSS-EXAMINATION

6   BY MR. SACHSE:

7         Q   Mr. Kunkel, I believe the last question by Mr. Veeder

8   of you was an inquiry as to whether you found a continuous

9   hydraulic gradient extending from Well 16C1 to on down

10  Tucalota Creek; is that right?  And you said you did?

11        A   I said I did.

12        Q   Pardon me.  On down Warm Springs Creek?  Is that

13  right?

14        A   That is correct.

15        Q   Do you find any hydraulic gradient extending from

16  9J1 and 9K1 downstream to 16C2?

17        A   At the present time the hydraulic gradient is reversed

18  owing to pumping of Wells 9J1, 9K1 and, in part, 10D2.

19        Q   In other words, if my subtraction is correct, the

20  water level in 9K1 is at 1396 feet; is that correct-- 1496

21  minus 50?

22        THE COURT:   What figure did you come up with?

23        MR. SACHSE:   1396, your Honor.  I am looking at page 4

24  of Exhibit 274-A.

25        THE WITNESS:   You are referring now to 9K1?

1          MR. SACHSE:   Yes.

2          THE WITNESS:   1396.2, which is the altitude of the

3     water surface on June 8, 1960.

4     BY MR. SACHSE:

5          Q   And 16C1, what is the altitude of the water surface

6     on the same date?

7          A   C2 or C1?

8          Q   C1.

9          A   About 1422 feet.

10         Q   About 1428, as I read it.   Isn't the water depth

11    1431 feet?   I have a pencil correction in here.

12         A   That is correct; 1431, subtract 3.43 from it.

13         Q   It would be 1427.6.   In other words, the water level

14    in 16C1 is about 32 feet higher than it is in 9K1; is that

15    right?

16         A   At the present time, as of the dates of the measure-

17    ment, that was the circumstance that existed.

18         MR. VEEDER:   Are you saying 9K1 or J1?

19         MR. SACHSE:   9K1.

20         Q   So you do not then find a hydraulic gradient extending

21    from 9K1 or 9J1, was that, down Warm Springs Creek?

22         A   At the present time there is a reverse gradient

23    owing to the pumping by those wells.

24         Q   Do you have any water measurements which you can

25    depict or have depicted on a profile that show in recent times

1    a hydraulic gradient extending from J-1 and K-1 down to 16C1?

2        MR. VEEDER:   What do you mean by recent time?

3    BY MR. SACHSE:

4        Q   Do you have any?

5        A   The data on which one would have to rely would be a

6    water level measurement in Well 10D1 in November, 1915, of

7    6 feet below land surface in Well S South, 2 West, 10D1 and

8    reported distance to water by the owner, which are published

9    in the basic data of the California Bulletin No. 57, are

10   reported at 22 feet depth to water.   In Well K1 and one other

11   well which to the best of my recollection was J1--

12       Q   9K1, you mean?

13       A   9K1 and to my recollection it was also 22 foot depth

14   to water reported in 9J1.   I would want to verify that to be

15   certain.   But on the basis of those measurements, there would

16   be a continuous gradient from well 10D1 through 10K1 through

17   16C1.

18       Q   There would have been such a gradient in 1915?

19       THE COURT:   Wait a minute.   10K1.   You mean 9K1?

20       THE WITNESS:   9K1.   10D1, 9K1 and 16C1.   Under natural

21   conditions as existed or very closely existed in 1915 a

22   continuous gradient, in my opinion, existed.

23   BY MR. SACHSE:

24       Q   And you have no more recent data than 1915?

25       A   Well, the subsequent measurements have indicated a

1  continuing decline as indicated in earlier testimony of

2  approximately 30 feet in the vicinity of Well 10D1.

3      Q  In other words, as far as you are aware, since 1915

4  there has been a reverse gradient you have referred to earlier?

5      MR. VEEDER:  He didn't say that.

6      THE WITNESS:  Not since 1915.  Since pumping began,

7  whenever the wells were installed and pumped.  I do not know

8  the exact dates.

9  BY MR. SACHSE:

10      Q  Now, Mr. Kunkel, I am going to invite your attention

11  to the wells immediately downstream from 16C1 and 2 and

12  particularly to your data concerning those wells contained

13  in Exhibit 274-A.  Preliminarily, have you made any determina-

14  tion of the depth of the alluvium in that area, the northwest

15  corner of 16?

16      A  In the immediate vicinity of wells D1 and D2 I have

17  not made a determination of the thickness of the alluvium.

18      MR. VEEDER:  Didn't you say C1 and C2?

19      MR. SACHSE:  I say C1, C2, D1, D2, the whole series.

20      THE WITNESS:  The four wells?

21      MR. SACHSE:  Yes.

22      THE WITNESS:  I have observed the pit at the Well 16C1

23  and I have also observed the pit at Well 17J2.  At 17J2 the

24  alluvium is at least 13 feet in thickness, because I dug it

25  out with a shovel and encountered definite water-worn

1    materials.

2    BY MR. SACHSE:

3        Q   That is 17J2?

4        A   17J2.

5        Q   Let's back up for a minute to Cl.

6        A   And in Cl the materials are sandy, clayey soil that

7    in part is alluvium.   I am unable to determine the exact

8    thickness of it.

9        Q   Dr. Mann testified that the basement complex at Well

10   16D1 was, in his opinion, approximately the elevation 1400 or

11   28 feet below ground surface.

12       MR. VEEDER:   May I have the citation?

13       MR. SACHSE:   Pages 12,845 and 6.   It starts at the

14   bottom of 45 and goes over to 46.

15       Q   Would you agree or disagree with that opinion?

16       A   On the basis of the data that I have, I would have no

17   basis for disagreeing with the statement.

18       THE COURT:   You said basement complex at 1400 feet?

19       MR. SACHSE:   At elevation 1400, which would be 28 feet

20   below ground surface.

21       Q   Referring to Exhibit 274-A, the fifth column is

22   depth in feet.   I presume that is the depth of the well from

23   the best information you were able to obtain?

24       A   That is the reported depth of the well, yes.

25       Q   Nothing in this exhibit indicates whether this well

1   bottomed down at rock or not, does it?

2       A   Which well?

3       Q   Any of them.   Nothing in this exhibit would indicate--

4       A   No, nothing in this exhibit would indicate material

5   encountered in the depth of the well.

6       Q   But may you have that information in your files from

7   some other source?

8       A   I do not have it.

9       Q   Let me invite your attention to 16C2.   The bottom

10  of the well is 23.2 feet below ground surface; is that

11  correct?

12      A   That is the depth at which we pump the well.

13      Q   You don't know whether that is rock or not?

14      A   No.

15      Q   16D1 is 13.1 feet; is that correct?

16      A   That is correct.

17      Q   16D2, 15.7 feet; is that right?

18      A   17G1?

19      Q   17G1.

20      A   15.7 feet.

21      Q   17K1, 16 feet; is that right?

22      A   Yes.

23      Q   17J2, 16 feet?

24      A   That is correct.

25      Q   17N1, 13.3 feet?

1        A  That is correct.

2        Q  17N2, 17 feet?

3        A  Reported depth is correct.

4        Q  I observe that every one of those wells is drilled

5  in what you have indicated as a surface area of younger

6  alluvium; is that correct?

7        A  The well starts on the younger alluvial plain.

8        Q  From those well depths what would you conclude

9  as to the depth of the younger alluvium in that area?

10        MR. VEEDER:  I object, your Honor.  How could he

11  possibly speculate on such a thing?  It is the purest conjec-

12  ture-- why a man dug a well so deep.

13        THE COURT:  I will sustain the objection.

14        Do you have an opinion as to the depth to basement

15  complex or the depth to the younger alluvium in the area of

16  those wells?

17        THE WITNESS:  I have an opinion.

18  BY MR. SACHSE:

19        Q  What is your opinion as to the depth of the younger

20  alluvium?

21        A  It is relatively thin.

22        Q  By relatively, with relation to well depths, how

23  thin?

24        A  It would be on the order of 20, 25 feet.

25        Q  Then on the order of the well depth generally; is

1    that right?

2        A   In general.

3        Q   Now, Mr. Kunkel, I want to invite your attention

4    particularly to the area right at the break between Exhibit

5    274 and Exhibit 15E in the Northwest Corner of Section 30, 6

6    South, 2 West, where you indicate the younger alluvium pinch-

7    ing out and downstream from which point you indicate Warm

8    Springs Creek is flowing in residuum.  Do you see the area

9    to which I refer?

10       A   I see the area to which you refer.

11       Q   Did you have occasion to examine that area with

12    relation to surface water or salt grass or evapo-transpiration?

13       A   I have examined the area.

14       Q   And what did you find?  The area where the stream

15    is in the residuum.  That is what I am referring to.

16       MR. VEEDER:  Call the sections as you do it, please.

17       THE WITNESS:  The Southeast Quarter of Section 26, 6

18    South, Range 3 West in the area where the younger alluvium

19    pinches out from the extension of Warm Springs Creek from the

20    south to the contact with the weathered basement complex, as

21    shown on 15E, from there south there is a growth of salt grass

22    and willows.  From there north all evidence of vegetation has

23    been obliterated by plowing or discing.

24       Q So do you find then-- let me phrase it differently to

25    be sure I understand you.  Do you find anywhere below,

1    downstream from the point at which the younger alluvium

2    pinches out in the Northwest Quarter of Section 30, do you

3    find anywhere downstream from that point surface evidence of

4    water such as salt grass, evapo-transpiration, et cetera,

5    until you hit the next area of younger alluvium?

6         MR. VEEDER:  He just testified to that.

7         MR. SACHSE:  I want to be sure.  I didn't quite under-

8    stand him.  He went backward.  I want to go down from above.

9         THE WITNESS:  Between the two points of younger alluvium

10   where the stream channel crosses residuum in Section 25, 6

11   South, 3 West all evidence of vegatation has been destroyed by

12   discing or plowing.

13        THE COURT:  Didyou ever see any water flowing there?

14        THE WITNESS:  I have not observed a flow across that

15   point.  However, the course of the stream is visible and

16   determinable.  I have observed that.

17        THE COURT:  But you never saw any water flowing?

18        THE WITNESS:  I have never seen any water flowing.

19        THE COURT:  You have never been there in the wintertime

20   in time of rain?

21        THE WITNESS:  I have never been there in storm.

22        THE COURT:  But at other times you have been there you

23   have never seen any water flowing?

24        THE WITNESS:  No, sir.

25

BY MR. SACHSE:

Q   In that same area there is obviously no younger alluvium at all; it is just residuum; is that right?

A   If you are going to make it no younger alluvium at all, the answer would be, in my opinion, there is probably a thin veneer of younger alluvium along the stream channel. However, that has been plowed over so that it is very difficult at the moment to distinguish with a high degree of certainty the exact contact between the younger and older alluvium and for all practical purposes what younger alluvium does exist is relatively insignificant.

THE COURT:   You say between the older and younger.   You mean between the younger alluvium and the residuum?

THE WITNESS:   Yes, sir.

BY MR. SACHSE:

Q   Would I be correct in saying that all of the ground water to which you testified a moment ago you believe does go down gradient from 16Cl clear down Warm Springs Creek to its junction with Santa Gertrudis?   You did say that you believed there was ground water movement, did you not?

A   In my opinion, there is ground water movement.

Q   Would I be correct in saying, then, that all that ground water moves through an area which you classify as residuum, rather than an area you classify as younger alluvium in the area from the northwest corner of Section 30 to the

1  southeast corner of Section 25?

2  A   In Section 25 any ground water moving as underflow

3  beneath the course of the stream would be moving through

4  residuum.

5  Q   Which you have previously testified on many occasions

6  is a far tighter material than younger alluvium, far less

7  permeable?

8  A   In general it is less permeable, but under certain

9  circumstances it is of equal permeability with the younger

10  alluvium.

11  Q   In general it is less permeable?

12  A   In general it is less permeable.

13  Q   I think I have about only one more question.  You

14  expressed the opinion that ground water extractions from

15  Diamond and Domenigoni Valleys had an adverse effect on the

16  water moving downstream in that they left more room for

17  surface water and rainfall to percolate into; is that correct?

18  A   That is correct.

19  Q   Is it not a fact that the only condition under which

20  ground water extractions would not affect any downstream would

21  be to have the basins full?

22  MR. VEEDER:  I object to that, your Honor.  There are a

23  thousand different elements that could enter into that.  You

24  have a lot of other things.

25  MR. SACHSE:  I don't think it does.

14.748

1          THE COURT:   Read the question.

2          (The reporter read the pending question.)

3          THE COURT:   The objection is overruled.

4          THE WITNESS:   The maximum flow of Warm Springs Creek

5     would be with a full basin.

6     BY MR. SACHSE:

7          Q   And any extraction that takes any water away more than

8     a full basin interferes with some flow downstream, doesn't it?

9          A   That is correct.

10         MR. SACHSE:   I have nothing further.

11         THE COURT:   Who is next?   Mr. Girard?

12         MR. GIRARD:   I have just one question that probably

13    hasn't been asked and it is obvious.

14

15

16

17

18

19

20

21

22

23

24

25

Belt 5
Pl

1    Q   These measurements were made on June 9th of this year;

2    is that correct?

3    A   There were a number of measurements made on or about

4    that date.

5    Q   Referring to Exhibit 274 and the conditions that you

6    found on that day, so far as your well measurements set forth

7    in 274A, I take it then that the reverse gradient is now to the

8    East of the ground water movement; is that correct?

9    A   As of June and November when the wells were measured

10   in that area there is that reverse hydraulic gradient from

11   17C-1 toward 9K-1.

12   Q   And the ground water is approximately somewhere in the

13   neighborhood of 30 feet at 9K-1 from the surface; is that correct?

14   A   At 9K-1 on November 2, 1960 it was 52.64 feet to water,

15   on June 8, 1960 it was 50.08.

16   Q   On J2, is that right, on Section 8?  That is the well

17   that was drilled down below fifty feet and still dry; is that

18   correct?

19   A   On that particular well 6 South 8 West 8J-2 on November

20   1, 1960 I measured it to a depth of 54 feet and encountered no

21   water.

22   Q   So would you conclude that quite possibly the ground

23   water movement is out in a direction West through that outlet

24   under present conditions?

25   MR. VEEDER:   I object, your Honor; that goes beyond the

P 2

1   scope of the direct examination.  There is not a word in the

2   interrogation.

3       THE COURT:  We are trying to find out.  If his testimony

4   hasn't been of some assistance to us on that problem, then what

5   good is it?  He tested a well over there.

6       You may ask first if he has an opinion on this matter.  If

7   he says he hasn't, that is the end of it.

8       MR. VEEDER:  If I may be heard for just a moment on it,

9   your Honor.  The point I would like to make is that we have

10  proved that there is movement of ground water down Warm Springs

11  Creek.  The litigation involves the question of the water re-

12  sources of this valley.  I can't help, nor am I particularly

13  interested, if some water goes out into Menifee Valley.  But I

14  don't believe it is an issue in this case.

15      THE COURT:  Your objection is overruled.

16      MR. GIRARD:  I don't have any ulterior motive.

17      Q  It just seems to me, Mr. Kunkel, that this is not

18  correct; that your ground water depth is lower in Section 8 at

19  J2 than it is in Section 9 at K1.  You have already testified

20  that the movement is not westerly down Santa Gertrudis Creek

21  because of the reverse gradient.  Now it must go out the other

22  way westerly; is that correct?

23      MR. VEEDER:  I object to that.  It is entirely possible

24  that there is a pumping hole and that is all there is there,

25  more than likely.

P 3

1    THE COURT:  Are you assisting your witness or are you object-

2    ing?  Overruled.

3    BY MR. GIRARD:

4        Q  This is under the present conditions, Mr. Kunkel.

5    THE COURT:  Who is the expert here, Veeder or Kunkel.

6    THE WITNESS:  On Well 9K1 on November 2, 1960 I measured

7    the water level at 52.6 feet below the measuring point, the

8    measuring point 1446.3 feet, which would indicate an altitude

9    of water surface of 1395 feet at Well 9K1.  The hilltop for

10   Well 8J2 occurs approximately on the 1450 foot contour.  The

11   casing sticks up about a foot above land surface.  In other

12   words, the altitude of the measuring point from interpolated

13   data is about 1451 feet.  I measured it dry at 54 feet.  I do

14   not know what the depth to water is.  It may be 54, it may be

15   55 feet.  I don't know.  Subtracting 55 feet from 1451 gives us

16   a water level of 1396, a possible water level of 1396 feet.  It

17   is possible there is a reverse hydraulic gradient.  I don't know.

18       Q  You didn't find water at 54 feet, did you, in 8J2?

19       A  That is correct.

20       Q  And if you assumed, instead of finding water at 55 feet,

21   that you might have to go to 60 feet --

22       A  It might be dry at 60 feet.  I don't know.

23       Q  It might be dry at 60 feet.  It might be dry at 70 feet?

24       A  I don't know.  I have no way of determining the depth

25   to water at that point.

P 4

1   THE COURT:  Did you investigate Well J1, any data on it?

2   THE WITNESS:  J1, yes.

3   THE COURT:  What is the ground surface there?

4   THE WITNESS:  About 1450 feet, and the well was 22.2 feet

5   deep and dry.

6   THE COURT:  Did you investigate wells N1 and N2?

7   THE WITNESS:  No I didn't.

8   THE COURT:  Those are pumping wells, aren't they?

9   THE WITNESS:  They are pumping wells in Menifee Valley.

10   THE COURT:  Wouldn't water levels there be of some interest

11   to us?

12   THE WITNESS:  The testimony given on Searl's C indicates

13   a water level considerably below that of Domenigoni Valley.

14   I have no reason to doubt their accuracy, the accuracy of the

15   measurements in wells N1 and N2.

16   THE COURT:  Does anybody recall what the water levels were

17   in those?

18   THE WITNESS:  I would have to refer to Searl's C.

19   (Mr. Veeder hands the witness a document.)

20   THE WITNESS:  Water levels in April 1959, as depict on

21   Searl's C, are about 1325 -- sorry.  There are no measurements

22   given in Searl's C on 15N-1.  There is a measurement for 1953

23   which would place the water level at approximately 1360 feet

24   plus or minus a few feet.  I am estimating.

25   THE COURT:  When?

P 5   1          THE WITNESS:  January 23, 1953.

2   BY MR. GIRARD:

3          Q  Which would place it roughly about, assuming that that

4   is correct, 25 feet lower than the water level in 9K1?

5          A  That is correct.

6          Q  And you have no measurements as far as 8J1 or 8J2 as

7   far as where the water level is?

8          A  No.

9          Q  They are both dry?

10          A  8J1, 8J2 and          I visited and inspected all three

11   wells and all three of them are dry.

12          Q  Now we come to the crucial question.  Based on what

13   you know now and taking into account the evidence as evidenced

14   by N-1 and N-2, would you feel, it would be fair to say that

15   as of now the water moves westerly across Section 9 into the

16   upper portion of Section 8?

17          A  I don't know if water moves to 9 to 8 through the

18   slot.

19          Q  You do know, though, that it does not move now at least

20   down Santa Gertrudis into Section 17, down that way?

21          MR. VEEDER:  Warm Springs Creek.

22   BY MR. GIRARD:

23          Q  Or Warm Springs Creek, because of the reverse gradient?

24          A  The point of inflection between Well 16C1 and C2 and

25   9K1, the exact position of that inflection I do not know where

14,754

P 6   1    the break and slope takes place, but wherever it does occur

2    between the two wells from that point on the hydraulic gradient

3    is no longer down Warm Springs Creek.  However, this is a trans-

4    ient condition caused, in my opinion, by pumping of wells 9K1,

5    9J1 and 10D2.

6        Q  The only way to correct would be for the wells to stop

7    pumping?

8        MR. VEEDER:  Might have a rainstorm.

9        THE WITNESS:  I hesitated at the word "correct."  The

10   cessation of pumping in those wells would allow a recovery of

11   water levels.  Additional heavy precipitation would recharge

12   the ground water body.

13       MR. GIRARD:  I think that is all I have.

14       MR. STAHLMAN:  I have just one situation here, your Honor.

15                   CROSS EXAMINATION

16   BY MR. STAHLMAN:

17       Q  You classify salt grass as a phreatophyte?

18       A  That is correct.

19       Q  What is the limit of depth zone of root system of salt

20   grass?

21       A  Under natural conditions salt grass indicates of depth

22   to water of about 8 feet or shallower.

23       Q  Eight feet or less?

24       A  However, if there is pumping in the area and decline

25   of water levels after the salt grass has been once established

P 7

1  under natural conditions, the root system will follow down for

2  a depth greater than eight or ten feet and the salt grass will

3  begin to die.  So it will be maintained even though water levels

4  have declined below eight feet, but it will not necessarily start

5  its original growth unless the water levels are shallow.

6      Q  And then there is a type of phreatophyte that is hardy

7  and will exist over a period of drouth and revive itself again

8  when there is water?

9      A  No.  As a matter of fact, it must maintain its root

10  system in water at all times to live.  If it is shallow water

11  it will go down to the shallow water and there is a continous

12  supply of water and it will go through dry periods because there

13  is ground water available to supply it, not because it is

14  necessarily a hardy plant.

15      Q  As to the extent to depth of water that the salt grass

16  will extend?

17      A  Under natural conditions eight to ten feet.

18      Q  Isn't it true that where you have water level at greater

19  depth than eight to ten feet you find other types of phreatophytes

20  that have a deeper range of root system?

21      A  That is true.

22      Q  You have never found any in this area?

23      A  Not in the immediate vicinity of Domenigoni Valley.

24  Down Warm Springs Creek there is considerable growth of willows

25  in places.  I have also observed some tamarisk.

P 8

1  Q  Water "mottie" -- do you know what that is?

2  A  No.

3  Q  It is a poor grade of willow that grows.

4  A  I don't know it by that name.  I have observed tulles

5  in the channel of Warm Springs Creek.  But the principal vege-

6  tation at the lower end of Domenigoni Valley down to Section

7  25 6 South 3 West has been salt grass.

8  MR. STAHLMAN:  That is all I have.

9  MR. VEEDER:  Is everyone through with cross-examination?

10  <u>REDIRECT EXAMINATION</u>

11  BY MR. VEEDER:

12  Q  Mr. Kunkel, what is the source of water in Well 16C1?

13  Is that Domenigoni Valley water?

14  A  In my opinion, the source of water for 16C1 is Domenigoni

15  Valley water.

16  Q  In regard to the other wells that you have observed

17  down in the area, would you say that that water is derived from

18  the Domenigoni Valley?

19  A  Part of the supply of water down Warm Springs Creek

20  that is evidenced by the water levels in wells and vegetative

21  cover is derived from Domenigoni Valley.

22  MR. SACHSE:  Was it "part of the supply"?  I didn't hear

23  that.

24  THE WITNESS:  That is part of the supply.

25  BY MR. VEEDER:

P 9

1    Q   In your opinion, is the water that is moving down the

2    residuum in Warm Springs Creek concerning which you have testi-

3    fied and which is situated in Section 25, is that part of a

4    continuous ground water body moving down Warm Springs Creek?

5    A   That is part of a continuous ground water body moving

6    down Warm Springs Creek.

7    Q   In your opinion, does it make any difference that the

8    bed of the stream might or might not be alluvium or residuum,

9    from the standpoint of your opinion?

10    A   It makes no difference.

11    Q   Did you observe any salt grass or any willows growing

12    in the residuum in the bed of Warm Springs Creek?

13    A   I have observed salt grass growing on residuum in Warm

14    Springs Creek and, for that matter, in its tributaries as well.

15    Q   Would you describe the phenomenon that you think exists

16    in the pumping wells on the Domenigoni properties -- I believe

17    it is K1 in Section 9 -- the well that is used for irrigation

18    purposes?   Would you give me the citation on that?

19    A   Six South 2 West 9K1.

20    Q   Yes.   Is that the irrigation well?

21    A   That is an irrigation well.

22    Q   What is the effect of that pumping so far as you have

23    observed upon the ground water table in Domenigoni Valley?

24    A   The pumping of that well and other wells will lower

25    the water table in Domenigoni Valley.

P 10

1   Q  Has it created a pumping hole, so far as you are con-

2   cerned?

3   A  So far as I can determine, this pumping has created a

4   pumping hole.

5   MR. VEEDER:  I have no further questions.

6   ## RECROSS EXAMINATION

7   BY MR. SACHSE:

8   Q  Mr. Kunkel, did you say that you think a pumping hole

9   has been formed at 9K1?

10   A  In the vicinity of 9K1, J1 and 10D1.

11   Q  Have you prepared any ground water contours in that area?

12   A  No.  I have examined the recorded water levels in those

13   wells.

14   Q  But you have not bothered to prepare contours which

15   would delineate such a hole or its extent, have you?

16   A  I have not been able to get a sufficient number of

17   control points to contour this particular area.

18   Q  I have one other question.  You testified that a part

19   of the water in Warm Springs Creek, as it entered the area of

20   residuum, came from Diamond and Domenigoni Valley.  How much

21   of a part?  Can you state it as a percentage?

22   A  I have made no determinations.

23   Q  So it might be 1% or it might be 99%; you don't know?

24   A  I have made no determination.  I don't know.

25   Q  Then would you be prepared to agree or disagree with

P 11

1  Dr. Mann's conclusion as to the amount of water moving out of

2  Diamond and Domenigoni Valley and on down Warm Springs Creek

3  below surface?

4      A  On the basis of a single determination of hydraulic

5  gradient, determined for a very short period of time, as a matter

6  of fact just one day and the water levels as reflected in those

7  wells, I would not be prepared to come up with a similar con-

8  clusion for underflow on an annual basis.

9      Q  But you are not able to say whether he is right or

10  wrong; you just won't conclude?

11      A  There is insufficient data for a conclusion.

12      MR. SACHSE:  That is all.

13                RE-REDIRECT EXAMINATION

14  BY MR. VEEDER:

15      Q  The query that was presented to you in regard to Dr.

16  Mann's testimony was derived from this statement in the trans-

17  cript at page 12,845, lines 6, 7 and 8:  My calculations con-

18  verted to an annual basis show an underflow of 2.2 acre feet

19  per year through this residuum.  Will you state whether you

20  have an opinion as to whether that conclusion by Dr. Mann is

21  right or wrong?

22      THE COURT:  He just answered that.

23      MR. SACHSE:  He just answered the question.

24      THE COURT:  Go ahead.

25      MR. VEEDER:  I want him to answer.  I have a right to ask

THE COURT: Yes. But I wouldn't anticipate that he would

3  give any different answer than he gave.  The answer shouldn't

4  vary when you ask the question.

5        Answer the question Mr. Kunkel.

6        THE WITNESS:  It is not a yes or no question is it?

7        THE COURT:  Yes, the question is, do you have or don't you

8  have an opinion as to whether he is right or wrong? That's the

9  question.

10        THE WITNESS:  Converting --

11        MR. VEEDER:  I'll let you read it, Mr. Kunkel.

12        MR. SACHSE:  Just a moment.

13        THE WITNESS:  I don't need it.  Converting the data --

14        (Mr. Veeder hands document to the witness.)

15        MR. SACHSE:  If Mr. Kunkel is going to read it, I want the

16  whole formula read.

17        THE COURT:  Go ahead and answer the question Mr. Kunkel.

18        MR. VEEDER:  I would just as soon have the whole formula

19  read.

20        THE WITNESS:  The basic error in Dr. Mann's estimate is

21  that he has taken a transient condition and applied it, came up

22  with a steady state conclusion.  The conditions that he observed

23  are conditions/fluctuate.

24        THE COURT:  You say "steady state"?

25        THE WITNESS:  Steady state as opposed to transient state.

1    The conditions that he observed are transient state and he has

2    given an estimate of underflow in terms of an annual figure

3    which has the appearance of a steady state condition.

4    BY MR. VEEDER:

5        Q   Would an increase in precipitation and an increase in

6    the ground water table through recharge make that 2.2 change,

7    Mr. Kunkel?

8        A   Change of hydraulic gradient, rising of water levels

9    would change the hydraulic gradient.  His answer would be

10   different for different periods of time.

11       MR. VEEDER:  I have no further questions.

12       MR. SACHSE:  No questions.

13       MR. GIRARD:  I have just a couple.

14                     RE-CROSS EXAMINATION

15   BY MR. GIRARD:

16       Q   I believe in answer to a question by Mr. Veeder you

17   indicated, Mr. Kunkel, that the source of ground water found

18   in Well 16C1 was from Domenigoni Valley?

19       A   That is correct.

20       Q   Also the source of some of that would be from the areas

21   in Section 16 and others which might slope down aside from

22   Domenigoni Valley?

23       MR. VEEDER:  Where are you speaking about?  Do you see

24   where 16C1 is?

25       MR. GIRARD:  Yes.

P 14

1    Q  Certainly some of the runoff from the hills along the

2    sides which was not in the valley would contribute to the source

3    of that well, wouldn't it?

4    A  Any area above that well that is hydraulically above

5    the well would contribute some of the water.

6    Q  As I understood your testimony, Mr. Kunkel, you found

7    ground water movement down Warm Springs Creek based on the well

8    measurements of what particular wells primarily?

9    A  It would be all of the wells which are circles without

10   the vertical line through them.  To the best of my recollection

11   we have water level measurements on all of those wells.

Belt 6

12   Q  This gives you a sufficient number of control points

13   to determine from these water levels that under conditions at

14   least in 1915 the ground water moved down Warm Springs Creek?

15   A  The water levels plus the observed vegetative cover

16   are sufficient data.

17   Q  But as of June 1960 at least the control points that

18   you have and that you have observed would indicate the ground

19   water has not moved down Warm Springs Creek?

20   MR. VEEDER:  This is repetitious, your Honor.

21   MR. GIRARD:  I realize that.

22   THE COURT:  Overruled.

23   THE WITNESS:  Between Wells 16Cl and 9Kl there is an in-

24   flection point or a ground water divide which would separate

25   the point above which water no longer flows down Warm Springs

P 15

1    Creek.  That divide of necessity will move downstream if this

2    condition of pumping is maintained.

3        Q  And you feel that you do not have sufficient control

4    points, in your opinion, for you to draw a conclusion one way

5    or the other as to whether the water moves into Menifee Valley

6    now?

7        A  On the basis of the available data, I have no conclusion.

8        MR. GIRARD:  Thank you.

9        THE COURT:  Mr. Kunkel, looking at your strip pictures

10   58-38 and 58-46, which show in the very center thereof -- 58-41,

11   58-42 and 58-43 -- the surface into Menifee Valley, and show

12   in -39 and -40 the narrow strip between the rocky hill and the

13   rocks in the foreground, a much narrower strip, leading to

14   Murrieta Valley and Warm Springs.  You have that in mind?

15       THE WITNESS:  I have that in mind.

16       THE COURT:  You have in mind also that this well is drilled

17   out here near the trees in the center on a sort of knoll, went

18   down 54 feet at least and found there rocks and boulders in-

19   dicating washing action?

20       THE WITNESS:  Yes.

21       THE COURT:  Looking generally at the terrain, the slips

22   of basement complex shown on the right, wouldn't it be a fair

23   conclusion to say that at one time there must have been a fairly

24   deep channel toward the Menifee Valley, which was demonstrated

25   by the rock and gravel shown in the well, among other things,

P 16   1   and that subsequently there was a fill of younger alluvium in

2   this area?

3         THE WITNESS:   That is a reasonable conclusion; yes sir.

4         THE COURT:   And isn't it also a reasonable conclusion that

5   in the very narrow section, which I would estimate as more than

6   a mile wide --

7         THE WITNESS:   It is less than that.

8         THE COURT:   On the map it would probably be not more than

9   between a quarter and an eighth of a mile wide.

10        THE WITNESS:   On that order.

11        THE COURT:   And secondly, wouldn't it appear to you, from

12   the outcroppings of the rock and the basement complex in the

13   center of the picture 58-39, plus the basement complex in the

14   foreground, that this of necessity is a very thin layer of

15   alluvium?

16        THE WITNESS:   It is of necessity a thin layer.

17        THE COURT:   Also, with the lay of this valley as it is --

18   and on this you may have formed an opinion and you may not have --

19   let's assume a very heavy flooding, a cloudburst, in the

20   Domenigoni Valley.   The elevations are such that you could have

21   even surface flow into Menifee Valley, could you not?

22        THE WITNESS:   I doubt that.   I have seen no evidence that

23   such a thing has ever occurred in recent times.

24        THE COURT:   Except that it is apparent that this alluvial

25   plane was laid down by water?

P 17

1    THE WITNESS:  The area of the alluvial plane probably

2  within the memory of people in this courtroom has been flooded.

3  I have not observed it.

4    THE COURT:  Then isn't there a likelihood that there is

5  water that runs out of the Domenigoni Valley through this rocky

6  strata under the alluvial plane into Menifee Valley?

7    THE WITNESS:  It is possible that conditions could exist

8  that the circumstances could occur at times.  Whether it is a

9  circumstance that is presently occurring or the direction of

10  the gradients, I do not know.

11    THE COURT:  Do you know whether those nearest wells, 5N-1

12  and -2, in Menifee Valley have some of the similar phenomena

13  as the pumping wells in Domenigoni Valley, namely, that in the

14  last fifteen or twenty years the water level has been lowered?

15    THE WITNESS:  Based on information that has been given to

16  me by Mr. Christiansen, who is sitting in the courtroom, Well

17  8J2 had a water level of 28 feet when it was drilled, and I

18  believe the drilling was some time in the year 1951 to '53 --

19  I am not sure of the exact date -- and if one will take the

20  28 feet from approximately 1450 feet that is an altitude of

21  about 1422 feet.  Comparing that against Searl's C for the

22  same period of time, to the best of my recollection -- I would

23  want to check that to be certain, but I believe this would show

24  a reverse gradient into Domenigoni Valley at that time.  The

25  dates are not exactly comparable, but for 1953 the water level

P 18 1   as shown on Searl's C at Well 6 South 2 West 9K2 is on the order

2   of 1410 feet plus or minus a foot or two, and if the reported

3   depth to water as indicated by Mr. Christiansen was 28 feet at

4   that time, if the data can be compared -- I am not absolutely

5   certain of the year in which the well was drilled, but they

6   were very close, the same period -- it would indicate a strong

7   possibility or probability of a reverse gradient from Menifee

8   Valley into Domenigoni Valley.  I don't know.

9       THE COURT:  If water could run that way in an easterly

10   direction, depending on the water levels in the Menifee and

11   Domenigoni Valley, if you reversed the water level in the two

12   valleys, water could run just as easily the other way, could

13   it not?

14       THE WITNESS:  Under conditions of a full basin this would

15   be a probability.  I would again have to check the highest water

16   table in Diamond Valley in the vicinity of wells 9K1 and  K2

17   against the high water table on the divide, and it is a possi-

18   bility or perhaps even a probability that there was sufficient

19   evapo-transpiration from the lower end of Domenigoni Valley,

20   not knowing all of the geology in Menifee Valley.  It is possible

21   that a reverse hydraulic gradient -- I don't know.  Strike that.

22   I just don't know what the geologic conditions are on the basis

23   of the available data.

24       THE COURT:  Do we have any map or exhibit that shows where

25   this basement complex runs past the divide into sections 7 and

P 19   1   8 and 5 and 6?

2   MR. SACHSE:  Yes, your Honor.  I can't think of the exhibit

3   offhand, but I introduced it as part of Searl's, a geologic map

4   from both the old ones that we used and geologic map from the

5   Santa Ana River investigation.

6   THE COURT:  Do you have the Searl exhibits?

7   THE CLERK:  Yes your Honor.

8   MR. SACHSE:  One of them is Searl's K and another is Searl's

9   S.  Searl K, your Honor, is the old one which, you will remember,

10   we discussed at some great length, which shows Lake Elsinore

11   and all the rest on it.  And Searl's S is a recent one from the

12   State of California.

13   THE COURT:  We are going to have to locate ourselves here.

14   MR. SACHSE:  Searl's S is easier to work from.

15   Will you indicate to his Honor Menifee Valley?

16   THE WITNESS:  You just about have your finger on it.

17   THE COURT:  On Searl's K these dark lines are depth to

18   water, are they?

19   This is a map of San Jacinto-Temecula basins.

20   MR. SACHSE:  Yes.

21   THE COURT:  These are depth to water?

22   MR. SACHSE:  Yes your Honor.

23   THE COURT:  The part we are interested in is right in here.

24   This is Township 16, this 7, here is 8, here is 9 -- I have it

25   marked -- 10, 11, 12, 13, 14, 15, 16, 17, 18.  This is 17 here,

P 20

1   and 18 here.

2   THE WITNESS:  May I point out to the Court, in comparing

3   these two maps, that they are different projections than plane-

4   metric surveys.  It may be a little difficult in comparing

5   quarter sections or something that close.

6   THE COURT:  They show an open-ended water level on the

7   very mouth of the southwesterly portion at Warm Springs, don't

8   they?

9   MR. SACHSE:  Yes your Honor.

10   THE COURT:  Here is Warm Springs here.

11   MR. SACHSE:  Here is Domenigoni Valley, here is Menifee

12   Valley.

13   THE COURT:  But here is Warm Springs coming up, and this

14   is the outlet we  are talking about.  It runs from 17, right

15   at the corner of 18.  This is actually 17 here, and this is

16   18.  It is right in this corner.

17   MR. SACHSE:  That is the head waters.

18   MR. VEEDER:  May I go up beside your Honor?  I am too

19   short.

20   THE COURT:  This is 8, and this is 9.  We are talking about

21   this area right here.

22   Come around, Mr. Veeder.  It is hard to see anyway you

23   look at it.  We are talking about this area here.

24   MR. VEEDER:  If your Honor will recall my cross-examination

25   of Mr. Kunkel on this exhibit.

P 21

1      (Whereupon the Court descends from the bench and Court

2  and counsel gather around the map.)

3      MR. SACHSE:  Is this on the record your Honor?

4      THE COURT:  Let's be off the record.

5      (Discussion off the record.)

6      (Recess.)

7      MR. SACHSE:  I have no further questions of Mr. Kunkel

8  your Honor.

9      MR. GIRARD:  I have none.

10     THE COURT:  Thank you, Mr. Kunkel.

11     MR. SACHSE:  Does that conclude your rebuttal, Mr. Veeder?

12     MR. VEEDER:  Yes.

13     MR. SACHSE:  You didn't make it clear for the record.

14     MR. VEEDER:  If it is not clear for the record it should

15  have been from the last continuance that this was rebuttal

16  testimony in regard to Domenigoni Valley.

17     THE COURT:  On the Domenigoni Valley?

18     MR. SACHSE:  On this issue, your Honor.

19     MR. VEEDER:  This is sur-rebuttal?

20     MR. SACHSE:  Sur-rebuttal.

21     Mr. Christensen.

22           CLYDE C. CHRISTENSEN,

23  one of the defendants herein, being first duly sworn, on his

24  oath was examined and testified as follows:

25           DIRECTION EXAMINATION

P 22   1   BY MR. SACHSE:

2        Q   State your name please and address.

3        A   Clyde C. Christensen.

4        Q   Where do you live?

5        A   804 East Central, Hemet.

6        Q   How long have you been familiar with Diamond and Domenigoni

7   Valley personally?

8        A   All my life.

9        Q   You are farming there at present in that general area?

10       A   That is correct.

11       Q   Just as a matter of information, could you take this

12   part of 58B, being 58-38 through 58-45, and indicate to the

13   Court, if you will, the general area in which your farming oper-

14   ations have been conducted.

15       I think your Honor will find this interesting.

16       A   In the past we have farmed this entire area from the

17   Domenigoni farmstead, this entire area to the trees, a distance

18   of some two miles.

19       Q   And that area extends over into Menifee Valley; is that

20   correct?

21       A   Yes.

22   MR. VEEDER:   Is that the area where you and I were the

23   other day?

24   THE WITNESS:   That is correct.  We were here, and here.

25   BY MR. SACHSE:

P 23

1    Q   Specifically, do you have any familiarity or acquaintance

2    with the Well 8J2 6 South 2 West?

3    A   Yes.

4    Q   What is this acquaintance and familiarity with it? How

5    did it happen that you know about it?

6    A   A well driller and I drilled the well.

7    Q   How deep is it?

8    A   We drilled to a depth of 53 feet.

9    Q   Why did you stop?

10   A   He ran out of stem.

11   Q   Were you bottomed in hard material of any kind?

12   A   No.

13   Q   What was the material where you ended the well?

14   A   At a distance of about from to 28 to 30 feet the material

15   was the same until we quit digging, and it was a very loose,

16   sandy, what the natives would refer to as an old stream bed.

17   Q   You described to me how easy it was to drill this well

18   by telling me how fast the job was done.  Tell the Court how

19   long it took to drill it.

20   A   This well driller's implement was similar to a cesspool

21   digger and it was a rotary bucket, and he moved it out from

22   Perris and set the rig up one morning, and we intended of course

23   that it would probably take two or three days to drill it.  It

24   was necessary for livestock water because our other water supply

25   on the property had gone dry.  And we drilled through fairly

P 24

1   hard material, not rocks or anything, but hard material until

2   we hit moisture and water 28 to 30 feet and then it proceeded

3   rapidly as compared to this type of well drilling until he had

4   run out of he called/his stem.  That is all he brought because

5   we never thought we would get that deep or any need to go any

6   deeper.  We had all the water we needed.  So he pulled up and

7   removed his rig the same evening of this day that he had set

8   it up.

9      Q  And he drilled 58 feet in a day?

10      A  Fifty-three feet.

11      Q  Fifty-three feet.

12      A  Then the next day we put the casing in.

13      Q  Do you have any familiarity with the wells 16C1, 16C2,

14   D-1 and D-2?

15      A  You are going too fast.

16   THE COURT:  You are talking about J-2 now, or J-1?

17   THE WITNESS:  J-2.  The only thing I know about J-1 --

18   that is what I call a hand dug well where somebody did it back

19   in the 1800's -- and it has been dry all of the time, to my

20   knowledge.  It was within a few feet where we drilled it.

21   BY MR. SACHSE:

22      Q  Do you know anything about 16C-1 and -2?

23      A  16C-1 and -2, I have no personal knowledge outside of

24   knowing what it is.

25      Q  Do you have any personal knowledge of 16D-1 or D-2?

P 25

1 A No.

2 Q 17J-2?

3 A 17J-2, yes. I helped the well driller dig that.

4 Q Do you know how deep it is? To refresh your recollection,

5 Mr. Kunkel's exhibit indicates that it is 16 feet.

6 A I was going to say it is 15 or 16 feet, and we hit rock

7 and had to stop. We worked for a while on it and the bucket

8 kept jumping and finally had to give it up. That is as deep

9 as we could go.

10 Q Is there any other well in that same general area with

11 which you are familiar?

12 A There is apparently a well here. It would be 17K-1.

13 Q Can you tell about that well?

14 A There has been a little discussion of that. Again,

15 it is a well approximately the same depth, and it is drilled

16 within ten or fifteen feet of the line, indicating the midline

17 of the creekbed here, and that well is in decomposed granite,

18 outside of the upper topsoil which might be, I don't know, a

19 foot or a foot and a half in depth, and the rest is D.G. It

20 is a well that only seeps in as compared with this well back

21 in 8J-1. The water was free and was not bailed out as the well

22 was drilled. This well is the type you drill down and then

23 wait for water to collect.

24 Q Is that well also about 16 feet deep?

25 A Approximately.

P 26

1    Q  Why did you stop at 16 feet on that one?

2    A  It got harder and harder and we quit digging.  We got

3  four or five feet of water in it.

4    Q  Any other wells?

5    A  They were windmill wells for stock watering purposes.

6  There is no other well in that area, I believe.

7  It is listed as 17R-1.

8    Q  Yes.

9    A  And that, again, is several hundred feet from the

10  median line of Warm Springs Creek, and it again is drilled in

11  D.G.

12    THE COURT:  17R-1 or 18R-1?

13    THE WITNESS:  17R-1, within about an inch of the other

14  well on the map.

15  Adjacent to that is also -- occasionally we don't drill

16  a formal well for a windmill.  We scoop out a hole with a

17  bulldozer.  And adjacent to that is one of these scooped out

18  seeps, and that again I have helped push the dirt out of it

19  and occasionally cleaned it out for the stock.  And that again

20  is in decomposed granite.

21    Q  Do you know how deep 17R-1 is?

22    A  These are all in the neighborhood of 16.  Maybe that

23  one would be as deep as 18 feet, something like that.

24    Q  Why did you stop drilling that one?

25    A  Again, it got hard and it was too hard to drill, too

P 27

1    costly for the time it takes to drill it.

2         MR. SACHSE:  That's all your Honor.

Belt 7   3                    CROSS EXAMINATION

4    BY MR. VEEDER:

5         Q  What was the quality of the water that you found of

6    that 8J-1?

7         A  J-2?

8         Q  J-2?

9         A  It is a good quality of water.

10        Q  Good drinking water?

11        A  Yes.

12        Q  How does that compare with the quality of water in

13   Domenigoni Valley?

14        A  It didn't have as high a mineral content as water I

15   have tasted in wells directly in the bottom of Domenigoni Valley.

16        Q  In other words, it is quite possible that water in

17   8J-2 -- no way of knowing that that is from the same source

18   as Domenigoni Valley; is that right?

19        A  It is hard to look down there and see what it is.

20        Q  And you don't know whether the water is running into

21   the valley or out of the valley; isn't that right.

22        A  I couldn't say.

23        MR. VEEDER:  That is right.  I have no further questions.

24        MR. SACHSE:  That is all your Honor.  May Mr. Christensen

25   be excused?

P 28

1    MR. VEEDER:  I am always glad to have him here.

2    MR. SACHSE:  I just want him to know that he doesn't have

3  to come back here.  That's all.  Will you excuse him?

4    MR. VEEDER:  Yes.

5    THE COURT:  You may be excused.

6    THE WITNESS:  Your Honor, if you would be interested, there

7  are a couple of facts I would be familiar with in this area.

8    THE COURT:  All right.

9    THE WITNESS:  It may be technical but this point between

10  Domenigoni Valley and Menifee Valley is relatively hard to

11  distinguish in farming it.  It has similar topsoil all through

12  the area.  This may be, for instance, right now by a matter of

13  a few feet, this watershed boundary line is improperly placed.

14  It is too far over at this point.

15    THE COURT:  Too far which way?

16    THE WITNESS:  It is too far into Menifee Valley.  This

17  well is properly located in connection with the boundary line

18  but actually this runs over into this field.  The point I am

19  getting at is that it is hard to distinguish this.  This is

20  the second time apparently that this has been drawn.  When this

21  case was first started and this boundary was drawn through here

22  it went so far as to include this residence and the residence

23  up in here, all three people that were sued in the San Jacinto

24  watershed.

25    THE COURT:  They were sued in this?

P 29

1    THE WITNESS:  In this watershed.  And due to my action they

2    were released from the case.  A copy of the letter from Mr.

3    Veeder with me releasing them from the case.  And the survey

4    crew from Camp Pendleton Ground Water Resources came out and

5    re-surveyed this particular area.  I am only bringing it up

6    that in the beginning it was hard to distinguish the line of

7    demarkation here, and at the present time I feel this even too

8    far over by a matter of a few feet.  It is a technicality.  But

9    it is hard to distinguish.

10    THE COURT:  Indicating the line northerly of Well 8J-2.

11    THE WITNESS:  It should be further east.  This does say

12    approximate line.

13    THE COURT:  Yes.

14    THE WITNESS:  I am only bringing the point out that it is

15    very hard to distinguish it even to surveyors and engineers.

16    Twice there might have been a mistake there.

17    One other point.  Where Warm Springs runs down through --

18    I am particularly interested in the South half of Sections 16

19    and 17 since we farm that area and it is owned by the family --

20    Warm Springs is a very narrow profile down through there, and

21    at this location of Well 17J-2, I should have stepped it off,

22    but it is only a few hundred feet wide and in several locations

23    in wells that are not even shown on this map which we covered

24    up because we couldn't get deep enough to get enough water we

25    hit rocks and referred to it as basement complex, solid earth,

P 30

1   at around fifteen to eighteen feet.  Therefore, conceivably not

2   very much water can come down through there, and I feel some

3   opinion based on technical knowledge -- I am a director of the

4   San Jacinto basin soil and water conservation district -- that

5   conceivably a large portion of this water comes in from seepage

6   and drainage from the surrounding areas and hills.  The fact

7   exists right now that the depth to water in these wells referred

8   to as 16C-1 and 17J-2 is higher than it is back up and down

9   Domenigoni Valley.

10   Now the reason that we drilled Well 8J-2 in 1952 before

11   we were ever aware of the Santa Margarita case is because a

12   well not shown on this map but near 9K-2 did not have a sufficient

13   supply and later went dry.  That was the reason for drilling

14   J-2, to supply water to the cattle in this area we farmed.  That

15   was done prior to the time that any irrigation wells were ever

16   drilled in the valley.

17   MR. VEEDER:  What were the years when the irrigation wells

18   were drilled in the valley?

19   A   I would have to make an estimate of that.  I would say

20   it was probably six, conceivably six or seven years ago.

21   THE COURT:  You are talking about Domenigoni Valley?

22   THE WITNESS:  I am talking about these irrigation wells

23   9K-1 and J-1.  Those are, in our way of thinking, only recent

24   irrigation wells.  They have not had a long pumping history

25   and it has only been intermittent since the properties changed

P 31

1    hands a couple of times and each one took a whirl at it and sold

2    it to somebody else.

3         MR. VEEDER:  Prior to that time did they raise alfalfa or

4    anything like that in that area?

5         THE WITNESS:  We were operating it, in 1952, it was all

6    dry farmed and in that particular area there was no irrigation.

7    It was strictly a dry farm two-year rotation.

8         THE COURT:  What do you mean by two-year rotation?   A

9    crop every two years?

10        THE WITNESS:  In dry farming operation it requires two

11   years moisture to grow one year's crop.  You will leave the

12   ground fallow one year, which means that this land would lie

13   completely fallow and clear of any growth until it was planted.

14        To finish answering the question, the acreage I have men-

15   tioned where these wells were referred to, that was dry farm

16   land.  I do recall that across the road, which would be in

17   Section9, there was a very limited acreage of what you would

18   refer to as subirrigated alfalfa that was there for pasture.

19        MR. VEEDER:  Where was that located, in what section?

20        THE WITNESS:  That was farmed and raised by a man by name

21   of Blackmore in Section 9 north and east of the well location

22   -- pardon me, it is Section 10 -- and south of this well 10D-2.

23        MR. VEEDER:  Where would that be in connection with the

24   place where we saw the man seeding there that day?

25        THE WITNESS:  Just a few feet.  He was here in this location,

P 32

1  and in this location was this dry farming.  The sub-irrigated

2  alfalfa would be in this location, a very small acreage.

3      MR. VEEDER:  He didn't seed particular areas by reason of

4  the long time seep there; isn't that right?  You would seed part

5  of the field and then where the streambed and the salt grass

6  is situated he would not seed and he would go on across?

7      THE WITNESS:  That is correct.  In Section 3 there is an

8  area where they leave the salt grass in there for pasture and

9  do not till it up.

10     MR. VEEDER:  And that is along the high water table; isn't

11  that right?

12     THE WITNESS:  Well, usually you find salt grass where there

13  is some available moisture.

14     MR. VEEDER:  I think I had better quit.

15     THE COURT:  Anything further?

16  Thank you, Mr. Christensen.

17  Do you have property in this watershed, your family?

18     THE WITNESS:  I have approximately 700 acres, your Honor.

19     THE COURT:  Are represented by an attorney?

20     THE WITNESS:  No.  I have answered it myself so far.

21     THE COURT:  Do you have a soil survey on it?

22     THE WITNESS:  Yes I have.

23     THE COURT:  From Pendleton?

24     THE WITNESS:  No.  I used the Soil Conservation survey.

25     THE COURT:  Have we taken any tests about your property?

P 33

1    THE WITNESS:  No.  My answer is in the file and I have a

2  copy.

3    THE COURT:  Do you have a sketch showing where your land is?

4    THE WITNESS:  I have aerial photographs, soil maps and the

5  Conservation survey.

6    THE COURT:  Do you have it with you?

7    THE WITNESS:  Yes.  Produce it and let's look at it.

8    MR. VEEDER:  He is also an inventor and making money at it.

9    THE COURT:  If he can invent some water up in there.

10    Do you have something that shows first where your land is?

11    THE WITNESS:  I didn't realize that I would have to do this

12  right now or I would have had it all ready.

13    THE COURT:  In what section is it?

14    THE WITNESS:  The first land that is involved, the most

15  is in Sections 16 and 17.  It is in this area where we have

16  been locating these wells J-2 and --

17    THE COURT:  Do you have a sketch of it there and described

18  by quarter sections?

19    THE WITNESS:  Yes, I have it.  This property is actually

20  owned by my father and I have a power of attorney to speak for

21  him.  The Southeast one fourth of Section 17 Township 6 South

22  Range 3 West.

23    THE COURT:  That is 160 acres?

24    THE WITNESS:  One hundred and sixty acres.

25    The Southwest one fourth of Section 16.

P e 34

1    THE COURT:  That is 160 acres?

2    THE WITNESS:  A hundred and sixty acres.

3    Parcel 2 is the North one half of Section 18.  That would

4    be slightly to your left there of 17.

5    THE COURT:  Three hundred and twenty acres?

6    THE WITNESS:  It is more than that, your Honor.  It consists

7    of 360 acres.

8    THE COURT:  Is this called Parcel 2?

9    THE WITNESS:  That is Parcel 2.  It includes the Northwest

10   one fourth of the Southwest one fourth of Section 18.  In other

11   words, it is the North half plus the Northwest one fourth of

12   the Southwest one fourth.

13   THE COURT:  So it would be this little piece right here?

14   THE WITNESS:  Another forty.  That is correct.

15   Then Parcel 3 is the East one half of the Southeast one

16   fourth of Section 13, going further to your left.  It is that

17   triangular section in 13.  The East one half of the Northeast

18   one fourth of Section 13.  It consists of 80 acres more or less.

19   THE COURT:  That would be this piece right here?

20   THE WITNESS:  Yes sir.  Actually, we own practically all

21   of Section 13, but that is the only area within the watershed.

22   THE COURT:  This piece right here I have sketched out.

23   THE WITNESS:  Yes, that is all that is involved in it.

24   THE COURT:  What do you call that?

25   THE WITNESS:  That is Parcel 3.

P. 35

1    I would like to make one remark.

2    THE COURT:  Is that all?

3    THE WITNESS:  That is all.  You see, that gets involved.

4    THE COURT:  That is 640, 680, about 760 acres.

5    THE WITNESS:  Yes.  The total property measured by metes

6    and bounds discription.  However, the watershed boundary line

7    crosses across this property and eliminates some of the acreage

8    to give you in the Santa Margarita watershed somewhere around

9    538 acres net.

10   THE COURT:  How much of that do you say is irrigable, if

11   there were water?

12   THE WITNESS:  Utilizing only Class II, III and IV land

13   that could be irrigated in a practical and profitable manner

14   with modern methods, a total of 538 acres is available within

15   the watershed for this purpose.

16   THE COURT:  In other words, all of it?  Because you said

17   there was 538 acres in the watershed.

18   THE WITNESS:  I think this will clarify the figures.  The

19   legally described property where the watershed boundary crosses

20   totals 760 acres.  Of that 691 acres is in the Santa Margarita

21   watershed.  Of the 691 acres I feel that a total of 599 acres

22   could be irrigated, of which 538 acres is in the Santa Margarita

23   watershed.

24   THE COURT:  All right.

25   What I would propose to find as to your property -- if you

P 36

1   will just look at this map -- starting with your Parcel 2, that

2   any water under that Parcel 2 is vagrant, local, percolating

3   water, and you are just lucky to have it.

4   THE WITNESS:  That is just what is there.

5   THE COURT:  The only problem would be would be with your

6   immediate neighbors, which doesn't concern me.

7   The same would be true as to Parcel 3 in the basement com-

8   plex.

9   Can you see this, Mr. Veeder?

10   MR. VEEDER:  No, I haven't, your Honor.

11   THE COURT:  This is Parcel 2 lying in the North half of

12   Section 18.  That any water there is local, vagrant, percolating

13   water.

14   This is Parcel 3, the East half of the Northeast quarter

15   of Section 13.  That any water under that parcel is local, vagrant,

16   percolating water, not part of the stream system.

17   Parcel 2 includes this forty down here?

18   THE WITNESS:  Yes.

19   THE COURT:  The Northwest quarter of the Southwest quarter

20   of Section 18 is in that same category.

21   Now his Parcel 1 is the Southeast quarter of Section 17

22   and the Southwest quarter of Section 16.  As to that property

23   in Section 16 in the blue, the basement complex, any water you

24   find there is out of this lawsuit -- it is vagrant, local,

25   percolating water.

P 37

1   So the only part of your property with which we will be

2   particularly concerned is the Southeast quarter of Section 17,

3   which lies astride Warm Springs Creek.

4   THE WITNESS:  Warm Springs Creek actually enters right

5   at the section line.  There is an infinitesimal --

6   MR. VEEDER:  Which section your Honor?

7   THE COURT:  Between 16 and 17.

8   THE WITNESS:  Between 16 and 17.  It actually enters right

9   at the corner and there is a very, very small amount of any

10  recent alluvium connected with 16, and this showing on the map

11  I question in that the topsoil may be a foot or something is

12  soil and under that is D.G.  There is no depth to this area

13  here showing a recent alluvium that might be water bearing to

14  any extent.  You could almost cut out all of 16.

15  THE COURT:  Let me see this.

16  The Court, subject to the Government checking up on your

17  title, if your portion in Section 16 and 17 was acquired at

18  the same time, then all of your 16 is riparian.

19  THE WITNESS:  That is correct.

20  THE COURT:  But it is an illusory right because there will

21  never be enough water in that stream to increase the basement

22  complex area in 16.  So it is an illusory thing.

23  So actually we are concerned in this lawsuit with only

24  the younger alluvial area, part of which is in Section 16, which

25  you say is very thin.  But the stream does cut across the corner

38

1    of your parcel in 16.

2    THE WITNESS:  It touches it, just enough to tie it in.

3    THE COURT:  What we are definitely going to do with this

4    I am not prepared to say.  Of course, the younger alluvium in

5    the stream bed, being south of the contested area that we were

6    talking about today, is part of the stream system.  It shouldn't

7    concern you too much.  I doubt if you would ever get more water

8    out of that younger alluvium than you would be entitled to use,

9    considering the 320 acres you have that is riparian.

10   THE WITNESS:  It equals about a thousand, fifteen hundred

11   gallons a day for stock water purposes.

12   THE COURT:  On an equitable basis it would seem to me, no

13   matter what would happen, you would be entitled to use about

14   all the water you could get, considering the fact that you have

15   320 acres that are riparian.

16   Wouldn't you agree, Mr. Veeder?

17   MR. VEEDER:  I would have to think about it, your Honor.

18   THE COURT:  You wouldn't have to think very hard.  If the

19   man had 320 acres that was riparian and he got one thousand

20   gallons a day, wouldn't you think that would be a reasonable

21   use?

22   MR. VEEDER:  Let the record show no response.

23   THE WITNESS:  At least my claims in my answer claimed a

24   riparian right to the use of water.

25   THE COURT:  We can certainly find that.  The only thought

P 39

1  I have is this -- and you might later talk to the Office Ground

2  Water Resources about it, Mr. Veeder -- it might be that in

3  view of the, as you say, very shallow amount of topsoil at the

4  bottom of your piece in Section 16 and up in 17, except the

5  area which is actually the stream bed, you might prefer, from

6  the standpoint of your own convenience in passing title, to

7  arrange for a finding that all of that was out of the case, so

8  that as to this land in Section 16 you or your successors would-

9  n't be harassed by any later proceedings in the case.  In the

10  absence of some agreement, we might have to find this younger

11  alluvium in Section 16 --

12  THE WITNESS:  From my own experience, in clearing up these

13  various holes we might have water.  This is decomposed granite

14  and it is percolating and seeping water through the D.G.  It is

15  in evidence right now.  It can be observed and it all comes in

16  from the east side of the cut, running from east to west.  Actually,

17  it comes in that side of the excavation only it comes out of

18  this basement complex barrier here.  I feel definitely there

19  is a barrier area across here and a very limited amount of sur-

Belt 8   20  face water.  It is close to the surface.

21  MR. VEEDER:  Did you say surface water or ground water?

22  THE WITNESS:  I am referring to surface water, meaning

23  high ground water not running on the surface but being a short

24  distance to water, because it can't get any deeper; it has to

25  run on the surface, as evidenced by many banks of alkali where

P 40

1  they have been deposited from evaporation of that high water

2  table at that point.   There is a very small amount of percolating

3  water in that low area.

4  THE COURT:   You understand what we are thinking about?

5  THE WITNESS:   Yes.

6  THE COURT:   I think your Southwest quarter of Section 17 --

7  THE WITNESS:   It/traversed almost from one side to the

   *is*

8  other by Warm Springs Creek.

9  THE COURT:   That whole piece, with the exception of a

10  little bit of basement complex, probably should be included in

11  the litigation, with your riparian rights involved.

12  On Section 16, with the exception of this very top corner

13  at the north corner of 16, you might want to make some arrange-

14  ments to get that out of the litigation.

15  THE WITNESS:   If you have two or three minutes, on more or

16  less an official basis as a director of the Soil Conservation

17  District, what is your opinion toward the Government's sponsor-

18  ing work of soil and water conservation that involves building

19  broad basin terraces and contours, including dirt filled dams,

20  to retain water where it falls, in an attempt to get it to

21  penetrate into the soil?   I am speaking from the standpoint of

22  what you might call the surface water.

23  THE COURT:   You want to know my feeling, or what the law

24  is?

25  THE WITNESS:   I would like to know your feelings, from the

P 41

1   standpoint of the number of cooperators we have, as to how this

2   case might affect those operations where we are attempting to

3   retain the soil in good condition to hand on; whether there is

4   going to be any objection to this dirt filled dam retaining a

5   few gallons of water.  It has a spillway.

6   THE COURT:  We haven't crossed that bridge.  Here is what

7   happens.  Of course, all the surface water, water that falls by

8   rain in this watershed, is part of the stream system, and if

9   every person who had a piece of ground, everytime he had a little

10  ditch where you could put a dam, could put in a little dam to

11  retain that surface water and let it seep down into the ground,

12  conceivably could make a very impressionable dent in the surface

13  runoff of the stream.

14  Now we have, however, other problems that are even more

15  pressing than that.  Take a man who has a cattle ranch up there.

16  He has an immense dry area.  He wants to put a few little dams

17  in to collect water in winter and try to water his cattle during

18  the year.  There is even a better argument that he should be

19  permitted to do that, even though in an infinitesimal way he

20  is impeding the surface runoff.

21  We haven't crossed the bridge yet, Mr. Christensen, as to

22  what we are going to do about these check dams that are put in

23  by the Soil Conservation Service or with their approval.  But

24  under California Water Law, as I understand it, any time you

25  build a dam to collect water, other than a mere holding operation

P 42 1    for 24 or 48 hours to water a field, that is a matter which

2    interferes with the surface flow and technically, I suppose,

3    you could be required to get a permit from the State Department

4    of Water Resources before you could build a dam.

5         THE WITNESS:  Not that small.  I think there is a certain

6    height or water holding capacity.

7         MR. GIRARD:  That relates to the building of the dam.  You

8    would have to technically get a permit.

9         THE COURT:  For any dam?

10        MR. GIRARD:  Well, not for the dam; to store the water.

11   You would not have to get a permit to build the dam, if it is

12   a small dam.

13        THE COURT:  But you would have to get a permit to store

14   the water?

15        MR. GIRARD:  You would have to get a permit to have a valid

16   appropriative right.

17        THE COURT:  Which is the same thing.

18        MR. GIRARD:  Yes.

19        THE COURT:  We haven't crossed this bridge.  There is a

20   difference between my feelings in the matter and the law.  I

21   would like to permit as many as I could to have their check

22   dams to store water, because I think it would be good for the

23   soil and I think in certain instances some of this land is worth-

24   less unless you can store a little water for stock.

25        THE WITNESS:  Primarily I didn't have in mind the long time

P 43

1   storage of water.  These are more or less regulatory structures,

2   not with the intention of retaining water over a period of

3   months.  They have spillways and many of them have, by require-

4   ment of the Soil Conservation Service, at least a six inch pipe

5   imbedded at the base to regulate the water out slowly.  Now

6   there can conceivably be some cattle watering ponds that might

7   be deemed field structures that would hold a few thousand gallons

8   of water.  But of course the Soil Conservation people and I

9   feel strongly against practices of certain organizations that

10   place concrete lined structures in flood control projects and

11   rush the water into the sea.  Any natural resource should be

12   conserved, especially water, and I think it is much to our ad-

13   vantage to keep as much of this fresh water on the land and use

14   it for beneficial purposes as we can.  At present a lot of water

15   runs into the ocean and the Government subsidizes groups to

16   build paraphernalia for de-salting water and bringing it back

17   to fresh water.  It is sort of a round about process.  So I

18   speak strongly for soil and water conservation measures and

19   just want to bring it to the attention of the Court.

Belt 9

20   THE COURT:  What the law will be I don't know.  You see,

21   Mr. Veeder is sitting down at the end of the stream with a

22   bucket and he is anxious to have as much of this water flow

23   down there to fill up the basins in Camp Pendleton as he can.

24   On the other hand, he doesn't want water to run into the sea.

25   But this is the problem.

P 44

1    THE WITNESS:  I can see his point.  But I don't think he

2    would want to devastate the land behind here without allowing

3    any water to penetrate, which is a natural process, to hurry it

4    toward the ocean.

5    THE COURT:  There is a distinction, of course.  For instance,

6    I don't think Mr. Veeder could complain if you took a piece of

7    ground and plowed it before a rain.  Nor could he complain if

8    you took one of these devices that tear up the ground two or

9    three feet down.  I don't think that would be an unlawful acti-

10   vity.  And then if the water got into the ground and much of

11   it didn't run off it would be a misfortune for the people who

12   are further downstream.

13   But when you get to the check dams you have another problem.

14   If we knew beforehand that in a certain rain the water is going

15   to run into the ocean, we would all be content to say, "Close

16   the gaps in your check dams.  Hold as much as you can because

17   it is going to run into the ocean."  But this we never know.

18   THE WITNESS:  I feel personally that on these longer

19   slopes probably more water penetrates with proper farming

20   practices, with your mulch or your chiseling action that you

21   referred to, that there is more water penetration there than

22   would be received from any check dams that would be around

23   there.  Besides, if it gets into the ground and flows through

24   this channel Mr. Veeder will have it anyway.

25   THE COURT:  I just say, bear in mind this matter of

P 45   1   cultivation and tearing up the ground and all that.  I don't

2   know of any law that can keep you from doing that to retain

3   rain water on your property.  Other than that I can't tell you.

4   We haven't really argued this out.  We have talked informally

5   about what we could do for some of these people with stock water-

6   ing holes and small check dams.  We certainly can't put our-

7   selves on record as a matter of law that anybody can build a

8   check dam and not get a permit, or you could dry up the water

9   in the stream before it ever got down to Pendleton.

10   Thank you very much for coming in, Mr. Christensen.

11   THE WITNESS:  I appreciate your giving me the time to bring

12   this up.  I didn't expect an answer now.

13   THE COURT:  We are happy to have your suggestions where

14   they have merit.

15   MR. VEEDER:  We appreciate Mr. Christensen's coming down.

16   We talked to him and we are glad to have him in.

17   Your Honor, may we use this copy of your map 274 to put

18   on to the official exhibit 274 to get the delineations that

19   you drew on to your map?

20   THE COURT:  Yes.

21   MR. VEEDER:  If we may borrow it.

22   THE COURT:  Yes.

23   MR. SACHSE:  I rest in behalf of the Searl Brothers, then,

24   your Honor.

25   THE COURT:  Are we through with the issue on Domenigoni

P 46

1  Valley?

2      MR. VEEDER:  As far as I am concerned, Your Honor.

3      MR. SACHSE:  As far as I am concerned.  And I have been

4  advised by Mr. Krieger that he did not intend to present any

5  evidence in behalf of his clients, who are concerned in this

6  same issue.

7      THE COURT:  What is your program now for tomorrow?

8      MR. VEEDER:  Your Honor, the next thing that your Honor

9  has on the agenda is the statement in regard to the claimed

10  rights to appropriative rights to the use of water by Fallbrook

11  with a permit and by Mr. Yackey, who has now received a permit.

12  The objective of that particular phase of the agenda was to

13  have a ruling by your Honor, if we could obtain it, as to the

14  position or the law as you would apply it to determine whether

15  there was a surplus of water available for appropriation.

16      THE COURT:  Wasn't this ruled on at pre-trial, in my pre-

17  trial opinion?

18      MR. VEEDER:  My own reading of your Honor's pre-trial

19  rulings was such that it was not clear to me; that you would not

20  pass upon the question of whether the record supported a finding

21  for a surplus of water available for appropriation.

22      THE COURT:  We will take that up tomorrow.  I don't think

23  that will take very long.

24      What else do you have?

25      MR. VEEDER:  The next item that is there relates to the

P 47

1  matter of the stipulated judgment.  Now I have filed a brief

2  on that, your Honor and counsel have been served with copies

3  of it.  That was in keeping with your Honor's last ruling, as

4  I recall.

5      MR. STAHLMAN: I thought our evidence had been concluded

6  on that, but I was handed since noon a new brief on the subject.

                          had permission
7      THE COURT:  Mr. Veeder/last time to file a brief.

8      MR. STAHLMAN:  I received it this noon, your Honor.

9      MR. VEEDER:  I mailed it to you Tuesday, George.  If you

10  didn't get I am sorry.

11      MR. SACHSE:  May I back up for just a moment with a suggest-

12  ion?  On this question of whether your Honor will act or has

13  already ruled on the question whether you will act on the avail-

14  ability of appropriative water, I think your Honor will find

15  that your decision is not so much contained in your pre-trial

16  order as it is in the companion opinion that you wrote at the

17  same time on the remand.

18      THE COURT:  I didn't mean in my pre-trial order.  I meant

19  in the opinion I wrote.

20      MR. SACHSE:  It is in the remand opinion.  You will find

21  it covered in the remand opinion rather than in the specific

22  pre-trial order, Mr. Veeder.

23      MR. VEEDER:  I would like to have an opportunity to have

24  your Honor clarify that for us tomorrow, so that we can ascer-

25  tain exactly what the burdens are -- the burden of proof, that

P 48

1    is, of these parties.  Mr. Yackey has now received a permit.

2    He may start to build a dam.  I think it is extremely important

3    to know what disposition can be made of that.

4         The next point that we have is Number 4.  I have in the

5    courtroom here maps showing the exterior boundaries of the

6    Murrieta-Temecula ground water basin that you had the Office

7    of Ground Water Resources delineate.  I have also prepared a

8    tabulation of the names of the parties whose lands are traversed

9    by that line.  If your Honor would care to have that put on the

10   easel I will have it done.  If you would like to have me do it

11   now, we can see it.  I think it is important that we have your

12   Honor's ruling as soon as we can on that point -- that is,

13   what the exterior boundaries will be.

14        THE COURT:  Of course, I have tentatively made those find-

15   ings, but if you force me to find that this stipulated judgment

16   is in existence I am convinced I have to find that it has to

17   be read with the old judgement, and then if that is true then

18   as far as you and the Vail people are concerned the ground water

19   basin was found by the old judgment.  So I am on the horns of

20   a dilemma on that.

21        MR. VEEDER:  I would like to take you off that horn, if

22   I could, your Honor.  If you would simply sustain the stipulated

23   judgment, then the matter of interpretation would be immediately

24   presented, because I think there are provisos in that stipulated

25   judgment concerning which we would want to be heard if your

P 49

1   ruling were that the stipulated judgment is sustained and as

2   to Vail Company and small basins involved.

3       THE COURT:  I have already made tentative rulings.  If you

4   tip me over on it I am convinced I have to say that the stipu-

5   lated judgment is grafted on and is part of the old judgment.

6   When I do that then the old judgment has fixed the basins and

7   has, in substance, taken into account only the Pauba and Murrieta

8   Valley and this large area of younger and older alluvium, as

9   between you and Vail, has been settled by that judgment.  Then

10  we go to Mr. Sachse's contention that if that is true then you

11  are bound as to other parties.

12      MR. VEEDER:  Your Honor, in that regard, I would say that

13  the matter, until Mr. Sachse has pleaded it, is only a tentative

14  position on his part.  I don't know whether he is going to plead

15  it or not.  If he does plead it, then the question comes up as

16  to the issues under the Bernhard rule on estoppel against the

17  United States would be applicable.  I would like to be heard

18  on that, too, because I don't believe that the Bernhard case

19  would be applicable under the circumstances.  But again those

20  are matters concerning which we would like to have rulings from

21  your Honor so that we would know the course to take.

22      Do you want me to proceed with these, your Honor.

23      THE COURT:  I am just trying to figure out what you are

24  going to do tomorrow on these things.

25      MR. VEEDER:  There is a lot to be done, your Honor.

P 50

1   In view of the proposed findings which I have tendered to

2 your Honor and which Mr. Sachse gave his Honor the original

3 copy of those findings, we would like to have you consider the

4 question also if your Honor would make a ruling as to what his

5 views would be on the basin boundaries of the Aguanga ground

6 water basin, which I think would be a matter of great, of a

7 great deal of importance to the Stardust ranch, Mr. Sachse's

8 client, and to Mr. Oviatt.  I talked to Mr. O'Malley about

9 findings and I am working with him on those.  I have also talked

10 to Mr. Grover and findings will be distributed to those people

11 after I have talked to Mr. Sachse.

12   MR. SACHSE:  Does that mean that you are ready now, that

13 you have no more geologic evidence on the Upper Temecula?  You

14 are ready to have his Honor proceed to draw a line?

15   MR. VEEDER:  Not as to Anza.

16   MR. SACHSE:  No, but on the Upper Temecula?

17   MR. VEEDER:  Looking at Exhibit 15 on this, what I would

18 ask to be done would be a ruling on the Aguanga area here.

19   MR. SACHSE:  You haven't any more geology in here, either,

20 do you?

21   MR. VEEDER:  No I don't.  What I would do, Franz, I have

22 started to do the same thing as I did on Wilson Creek.  I am

23 going to start on Temecula Creek and come down with the land

24 ownerships and all diversions and all areas and tender to the

25 Court those findings.  I think the delineation of this area is

P 51

1   extremely important from that standpoint.

2        MR. SACHSE:  I am delighted.  Mr. Veeder apparently is

3   going faster than I had hoped for.  If I understand him correct-

4   ly, he is ready on the basis of this one additional map, as I

5   understand it, and this is a new one --

6        MR. VEEDER:  It has not been on.

7        MR. SACHSE:  On the basis of this one additional map, to

8   ask your Honor to draw a similar line to that which you drew

9   on Exhibit 15E covering the Temecula up past Aguanga; isn't

10  that right?

11       MR. VEEDER:  Up to Aguanga.

12       MR. SACHSE:  Which would leave us in Temecula only this

13  very limited Oak Grove and Dodge Valley and those big basins

14  upstream and a few little slips.  I think that is great, if

15  we can do that tomorrow.

16       Is that all you have to put in, the one map?

17       I certainly have no evidence on that watershed.

18       MR. VEEDER:  What is the next exhibit?

19       THE CLERK:  Exhibit 275.

20       MR. VEEDER:  At this time I would like to have marked for

21  identification a map of the Aguanga ground water basin, and I

22  will also place with Exhibit 275 an overlay showing the exterior

23  boundaries of the Aguanga ground water basin and a list of what

24  I believe are all of the owners.

25       THE COURT:  Do you have a copy for me?

P 52

1    MR. VEEDER:  Yes sir.  This will be your copy.  And the

2    copy that is up on the -- would you bring that here and I will

3    have that marked, too.

4    MR. SACHSE:  Did you have it reproduced?

5    MR. VEEDER:  I have only one copy.  I'll get it for you.

6    The overlay is just part of 275.  Can you keep them to-

7    gether?  I don't know whether you can mark them.

8    THE CLERK:  I can mark them.

9    MR. VEEDER:  Why don't you make the overlay 275A, then?

10    Is that all right?

11    THE COURT:  Yes.  This is to show the ownerships?

12    MR. VEEDER:  That is right.

13    THE COURT:  The list of owners will be 275B.

14    MR. VEEDER:  May I have that reproduced and give it to

15    counsel?

16    THE COURT:  Can you have that done by tomorrow?

17    MR. VEEDER:  I'll see.

18    THE COURT:  What is 23?

19    MR. VEEDER:  Knox.

20    THE COURT:  Have you heard from them?

21    MR. VEEDER:  I will have to check, your Honor.

22    THE COURT:  Did they appear?

23    MR. VEEDER:  Yes.

24    Sunnybrook has not appeared.

25    THE COURT:  Who represents them?

P 53

1    MR. STAHLMAN:  They have never answered in the case.  They

2  have just put down some new wells and are pumping a lot of water.

3    THE COURT:  Who is 69 in that list?

4    MR. VEEDER:  Trinell.

5    THE COURT:  He has never appeared, has he?

6    MR. VEEDER:  Not to my knowledge, your Honor.  I will have

7  to check those out.

8    MR. WILKINSON:  He sold out about a year ago.

9    MR. VEEDER:  I would like to bring up some of the problems

10  we have encountered in writing these findings on Wilson Creek,

11  your Honor.  For example, we find that Roy E. Shipley makes

12  diversion up there.  He is represented by Mr. Krieger.  But as

13  to the particular piece of land no answer has been filed and

14  no appearance has been made.

15    MR. GIRARD:  Before we adjourn, may I take a couple of

16  minutes to lodge with you a decision of a three judge court in

17  San Francisco which, in effect, I think knocks out our brief

18  which we filed on exclusive jurisdiction.  I think they have

19  rejected every argument we made.  I don't know that Mr. Veeder

20  would want to file a brief.  I think that pretty well takes

21  care of it.

22    THE COURT:  So this becomes only a matter of academic

23  interest?

24    MR. GIRARD:  We are appealing that, but that will never be

25  decided until this suit is ended.  So I would suggest that you

P 54

1    rule with that decision.

2        MR. VEEDER:  On that point, I am not going to answer the

3    brief, because I see, as far as I am concerned, that the Ninth

4    Circuit has ruled.

5        MR. GIRARD:  A three judge court had ruled.  I think it

6    wipes out, in all sincerity, every point in our brief, and I

7    think it is truly a point.  We can't distinguish it.

8        THE COURT:  All right, nine-thirty tomorrow morning.

9        (Adjournment until Friday, December 9, 1960 at 9:30 A.M.)

10            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25