# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      December 9, 1960

Pages:     14,803 to 14,919

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

14,803A

P 137

## INDEX TO WITNESSES

| For the Plaintiff | D | C |
|---|---|---|
| Fred Kunkel | 14,905 (Veeder) | |
| Fred Kunkel | | 14,908 (Sachse) |

## INDEX TO EXHIBITS

| Plaintiff's Exhibits | Iden. | In Evidence |
|---|---|---|
| 276 Exterior boundary lines of Temecula-Murrieta area | 14,904 | 14,904 |
| 276A Photostat of Ex. 276 | 14,904 | 14,904 |
| 276B Narrative statement of Exhibit 276 | 14,905 | 14,905 |
| 275 Map of Lancaster, Nigger, Radec, Aguanga and Wilson Valleys | | 14,908 |
| 275A Overlay for Exhibit 275 (transparent) | | 14,908 |

## MISCELLANEOUS

| | |
|---|---|
| Requests for admissions by Luce, Forward. | 14,804 |
| Mr. Krieger's letter of December 6, 1960 | 14,805 |
| Mr. Sachse's motion for summary judgment (Reservation of riparian rights) | 14,806 |
| Mr. Sachse's letter of November 17, 1960 listing the things to be decided | 14,808 |
| Findings on Domenigoni Valley (proposed) | 14,822 |
| Item No. 2 on the Agenda (permits, etc.) | 14,832 |
| Agenda for January 31, 1961 | 14,861 |

Exterior boundary lines of
Temecula-Murrieta area

F 55
Belt 10

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | No. 1247-SD-C. |
| FALLBROOK PUBLIC UTILITY ) DISTRICT, et al., ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, December 9, 1960

APPEARANCES:

For the Plaintiff

WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney General

LCDR. DONALD W. REDD.

For the Defendants:

Vail Company

GEORGE STAHLMAN, ESQ.

Fallbrook Public Utility
District, et al.,

FRANZ R. SACHSE, ESQ.

State of California

FRED GIRARD, ESQ.

- - -

P 56

SAN DIEGO, CALIFORNIA, FRIDAY DECEMBER 9, 1960, 9:30 A.M.

THE CLERK:  1-1247-SD-C United States versus Fallbrook.

THE COURT:  I think we ought to clean up a few loose ends around here.

I noticed that the firm of Luce, Forward, Hamilton and Scripps made requests for admissions.  And this procedure has been used also by Mr. Sachse.  It seems to me that any answers to these requests for admissions which were served on the Government would bind only the Government and would not affect the co-defendants -- all parties are adverse, and unless there is other proof in the record the requests for admissions served only on the United States don't get the party anywhere.  In the case of Mr. Sachse's matters where we ruled on them there was evidence in the record because of the geology we had and whatnot. I don't think there was any problem.  But it would seem to me that you might well call the attention of Luce, Forward, Hamilton and Scripps to this matter.  Now I think that most of the matters that are contained herein are matters in which we already have ample proof in the record -- the question whether land is ri-parian, the legal descriptions and the chain of title and all that.

MR. VEEDER:  I have talked to Mr. McGinnis, who sent those to me, and he understands the situation.  He said there was no need for response to them at this time.  I told him that as a matter of checking out the whole question, and that he would

P 57

1   be advised as to our position in regard to it.  I agree with

2   what your Honor says.  The need for responses to them is not

3   pressing at the time.

4       MR. STAHLMAN:  Would your Honor indicate the client in

5   that case?

6       THE COURT:  Sawday, Elser, that group.

7       If he would come into court someday when all counsel are

8   here at continued hearings and if various of these questions

9   were raised and it was our view that there was evidence in the

10  record to support all these things, then that is the end of it.

11      MR. VEEDER:  May I advise him to that effect, then, your

12  Honor?

13      THE COURT:  Yes, if you will.

14      MR. VEEDER:  I will call him today.

15      THE COURT:  You received copies of Best Best & Krieger's

16  letter, I take it?

17      MR. VEEDER:  Yes I did.

18      THE COURT:  It is in the nature of a brief.  I filed it.

19      MR. SACHSE:  I haven't seen it yet.

20      MR. STAHLMAN:  We have not received it.

21      THE COURT:  I will give you my copies.

22      MR. SACHSE:  Are we going to come in to it today?  I will

23  undoubtedly have one at the office.

24      THE COURT:  Yes, Mr. Sachse, you were sent a copy.  But

25  apparently the State of California was not.  Mr. Girard got a

P 58   1    copy.  Mr. Stahlman got a copy.

2    MR. STAHLMAN:  What is the date of the letter your Honor?

3    THE COURT:  December 6th.

4    MR. VEEDER:  The background of that letter may be desired

5    by the others.  I talked to Mr. Krieger's firm and explained to

6    them that this matter was coming up.  It certainly was most in-

7    formal.  I had no thought that he would write a letter back.

8    But I just wanted him to know you were going to consider the

9    exterior boundaries of this Temecula-Murrieta basin.  And he

10    has asked that he be given full opportunity to review everything

11    that is done in regard to that.

12    THE COURT:  Now Mr. Sachse made a motion for summary

13    judgment on the Fallbrook problem.

14    MR. SACHSE:  That is on the reservations of riparian rights

15    only, your Honor.

16    THE COURT:  Yes.  But this was served on the Government.

17    Any other counsel?

18    MR. SACHSE:  No other counsel.

19    MR. GIRARD:  I got a copy.

20    MR. SACHSE:  A courtesy copy.  But the motion was directed

21    only to the United States.

22    I am aware of the point your Honor makes of everyone being

23    adverse, but since this is a pure question of law I didn't

24    notice the motion, as you observe.  In fact, Mr. Veeder -- I

25    hope I am not misstating it -- my understanding from my last

P 59

1  conversation with him was that he would concede the possibility,

2  given the proper language of a reservation of riparian rights.

3  He did not want to be bound without an opportunity of reviewing

4  each of the deeds in question and further reviewing whether or

5  not some part of this line may not have been prior severed and

6  therefore no riparian right to reserve, which is of course quite

7  all right with me, and if the legal principle is agreed on I

8  think we can just let the thing set off calendar.

9     MR. VEEDER:  In my consultation with Mr. Sachse I said

10  this.  I was of the opinion that a riparian owner could reserve

11  riparian rights to the use of water for a severed tract of land.

12  But I think those are factual questions.  My own view is that

13  we could have objected to the summary judgment on the ground

14  that those are factual situations which your Honor would have

15  to consider.

16     MR. SACHSE:  That is very true.

17     THE COURT:  Let's dispose of that.  It can't turn off

18  really on a summary judgment.  This merely brings it to the

19  Court's attention.  Then it can be considered as part of the

20  trial, if there are other facts that can be produced.  If not,

21  rule on this question of law.  What do you want to do?  Postpone

22  this until you have checked?

23     MR. VEEDER:  I have already started checking the deeds,

24  and the course that was followed in regard to each parcel of

25  land.  As I understand it, that is agreeable.

P 60

1    MR. SACHSE: That is perfectly satisfactory, because I did

2    not get a complete chain of title report and it may well be that

3    some one of these pieces was originally severed and had nothing

4    to reserve.

5    MR. VEEDER: On Curt Peters, for example, if this is the

6    same parcel of land with which I am acquainted, I think they

7    have already subordinated their riparian rights to the Fallbrook

8    Irrigation District. Those are problems that are factual in

9    nature to a degree.

10    MR. SACHSE: I'll guarantee you that this minor question

11    is not going to delay the case very much. I don't care enough

12    about it.

13    THE COURT: We are not ready to do that today. So this

14    would go over on some further agenda. Is that right?

15    MR. VEEDER: That is correct, your Honor.

16    THE COURT: And if there is additional evidence that has

17    to be brought in, it will be brought in at that time.

18    MR. VEEDER: That is the way Mr. Sachse and I have agreed.

19    THE COURT: It is not an issue as part of this trial.

20    MR. VEEDER: That is correct. But yet it is an issue that

21    will ultimately have to be resolved.

22    THE COURT: Another thing I want to call your attention

23    to is Mr. Sachse's letter of November 27, 1960, of which I

24    think you all have copies, listing the things to be decided

25    in the case. I am in accord with his view that we generally

P 61   1    catalogue some of these matters and start in some orderly manner

2    to dispose of them.  There are probably other issues besides

3    the ones listed.  When I read it over I had several in mind.

4    I don't know whether I can think of them now or not.  Of course,

5    this is a very broad outline.

6        MR. STAHLMAN:  You are referring to Mr. Sachse's letter?

7        THE COURT:  I am referring to Mr. Sachse's letter of

8    November 27th, 1960.

9        MR. SACHSE:  The first item in my letter is now finished,

10   as I understand.  That is the rebuttal on Domenigoni Valley

11   and Diamond Valley.

12       THE COURT:  Yes.

13       The item 14 calls attention to the fact that on June of

14   this year the Court directed the United States to prepare a

15   list of the landowners and the areas in which regulation or

16   apportionment would be requested and asking that it be submitted

17   before August 11th.  The letter states that this instruction

18   has not been complied with.

19       MR. VEEDER:  Your Honor, I handed you not later than four

20   o'clock yesterday Exhibit 275, a map and an overlay and a list

21   of parties where I think regulation might well take place.

22       THE COURT:  I saw it here at the close of the day, but

23   nothing was said at that time about regulation.  This doesn't

24   comply with my instructions to you six months ago.

25       MR. VEEDER:  I had previously talked to your Honor about

P 62

1    that.  I have proceeded along the line of having this work done,

2    your Honor.  If the delay has upset anyone I am sorry about it.

3    It is a difficult matter.

4         THE COURT:  The point is this.  I think the record is going

5    to show that it was not until the middle of this year some time

6    that you injected this issue into the case, and I think counsel

7    are entitled to know as to what particular parcels, as to what

8    particular owners you are going to contend there should be some

9    regulation.

10        MR. VEEDER:  I think this, your Honor.

11        THE COURT:  This could upset the whole plan of the trial.

12   The case has been tried up to now on the theory that no appor-

13   tionment in terms of acre feet or amounts of water is to be

14   asked for, and then in the middle of this year you raised that

15   issue and counsel probably jumped you about it.  Now six months

16   has gone by and you have not yet told us who these people are

17   that you are going to claim are taking more than their fair

18   use of water.

19        MR. VEEDER:  Your Honor, in this six months that has gone

20   by I have worked on the matter, I have talked with your Honor,

21   and as each case came up --

22        THE COURT:  You haven't talked to me about apportionment.

23        MR. VEEDER:  No, about the problems.

24        THE COURT:  You have talked to me about problems in the

25   case, what to do next and all that.

P 63

1    MR. VEEDER:  About the ultimate relief that will come down.

2    I can't say to your Honor now that these particular parties

3    should be regulated.  But I believe if your Honor will review

4    the findings that I handed to you, the maps that I have put

5    into the record, it will be apparent that if this drought season

6    continues as it is that there is going to have to be some kind

7    of regulation on the river.

8    May I put in one more thing before anything else occurs.

9    I believe that the outburst of six months ago stems from a

10   matter of semantics.  I believe that on this river regulation

11   is an entirely different aspect than an attempted apportionment.

12   I believe that where we are as we are today, where the water

13   is so extremely short that we have a reverse gradient in Domenigoni

14   Valley where we are virtually out of water from the standpoint

15   of anything coming in from Wilson Creek or from Temecula, there

16   will be a demand someday.  I would assume that Vail itself will

17   ask for that to insure that water will come to them down the

18   river, the Temecula in particular, to the end that they will

19   get their fair share.

20   Now I believe that there is a misconception in regard to

21   what is meant by apportionment.  I believe that when you deter-

22   mine the irrigated and irrigable acres you set the basis upon

23   which an apportionment will be accomplished.  But you surely

24   cannot apportion a stream where riparian rights predominate

25   other than on almost a day to day or week to week basis.  Now

P 64

1    when you move into that area you begin to regulate to the end

2    that the downstream riparian will get his fair share of water.

3        Now that is my view about the difference between regulation

4    and apportionment.  I believe that this map that I put up here,

5    marked for identification 275, is a prime example of where

6    regulation may very well be called for.  Stardust diverts all

7    the water, every drop of water that comes down out of Wilson

8    Valley.  Gibbon and Cottle diverts every drop of water that

9    comes down the Temecula.  I don't know the significance, really,

10   of those acts.  But I do know, your Honor, that in regard to

11   Mr. Poor, I believe his name is, that the acts of Gibbon and

12   Cottle deprive him of even domestic water.  I know, moreover,

13   that the acts of Stardust have cut down and invaded Oviatt's

14   rights, in my view.  And I believe that it is an aggregate

15   matter.  I believe that there is a culmination of a vast number

16   of diversions and uses which ultimately invade Vail Lake and,

17   in turn, invade the rights of the United States of America.

18       Now, would regulation accomplish anything?  That is a very

19   important question.  But I do believe it is a question that is

20   going to be before your Honor.

21       And may I have one more minute.  We have put in evidence

22   yesterday in regard to Domenigoni Valley and we have a situation

23   where the water, though small in quantity, is no longer coming

24   down by reason of pumping.  There is a reverse gradient.  You

25   say, "Well, there is not much water involved."  Well, in this

P 65

1   lawsuit a second foot of water is extremely important.  I will

2   paraphrase your Honor one time when he said this, "You have

3   forty inches of water, that is a goldmine."  I agree with you.

4   And that is why we are willing to fight so hard in regard to

5   Domenigoni and all these other small places, because in the

6   aggregate, I would like to emphasize, that three second feet

7   in the gorge is of immense importance to us, and I think that

8   we are very soon going to be confronted with the same problem

9   at the granitic lip of Temecula gorge that we are confronted

10  with today at Well 16C at the outlet of Domenigoni Valley.

11       Now if anybody feels that I have misled them in regard to

12  regulation, maybe mother nature had something to do with it.

13       This is the point that I wanted to bring up in regard to

14  regulation and the possible need for it.

15       MR. SACHSE:  It seems to me, your Honor, that Mr. Veeder

16  misunderstands what my interest is in this.  I think your Honor

17  understands it from the way you have interpreted my letter.

18  What I am interested in is what we are going to do now to get

19  the case finished.  Now there is not the slightest doubt in
                        at
20  my mind that/a future time, maybe the day after tomorrow, if

21  there were a proper showing, your Honor might regulate Stardust

22  if Oviatt came in and complained.  But the question is, what

23  is this lawsuit that we are asking your Honor for a set of

24  findings on going to encompass?  And I don't believe your Honor

25  can, I don't believe Mr. Veeder would suggest that your Honor

P 66

1   can, on the present state of the record, make any regulation.

2   Now furthermore, I don't care if Mr. Oviatt is being injured.

3   That is Mr. Oviatt's right to assert, not Mr. Veeder's.  If

4   there is to be regulation of Stardust, Mr. Vail might come in

5   through his counsel and try to regulate, Mr. Oviatt might try

6   to regulate, they might try to show that Stardust diversions

7   are causing an injury, and at that time, yes, there will be

8   regulation.

9   But it has always been my understanding, until this event

10  of six months ago, that what we were doing now was cataloguing

11  the rights on this river.  We were going a step further than

12  I thought necessary in that we were also, at Mr. Veeder's in-

13  sistence, taking the irrigable acreage.  I didn't think that

14  was required.  But I thought that, then, would be the judgment.

15  I don't have the marked transcripts here that I used some

16  time ago, but at one point in them I made this very clear and

17  Mr. Veeder concurred, that having catalogued them, then the

18  individual aggrieved or the user comes in here with an OSC, if

19  he wants to, against Fallbrook, Vail, Stardust or anybody else,

20  and that is the way it is done and not in this case.  And that

21  was my thought.  That is what I thought your Honor had in mind

22  when you directed Mr. Veeder to tell us who, at this time in

23  this proceeding right now, he was going to attempt to ask

24  regulation of.

25  THE COURT:  May I add to what you have said also that Mr.

P 67

1  Sachse, in presenting his case on certain of his clients, pro-

2  ceeded, and told you so, on the basis that there was to be no

3  regulation, and he therefore did not put on any proof as to

4  irrigable acres, etc.  Now if his client, we will say, is up

5  in an area where he is not concerned with what happened down

6  around Stardust, this would make a big difference.  He might

7  well be content, if you were asking regulation, to rest on the

8  record that he made.  However, if he had a client adjacent to

9  Stardust, then he would be very much concerned about the type

10  of case that he made in connection with regulation.

11      That points up why the request was made that you tell us

12  who the people were, where the areas were that you were going

13  to talk about regulation on.

14      Is that a correct statement of your position?

15      MR. SACHSE:  That is absolutely correct, your Honor.

16      MR. VEEDER:  Your Honor, when I suggested that there is

17  a need, in my view, for regulation, there was no change whatever

18  in the nature of the lawsuit.  I said at that time, and I repeat

19  now, there is evidence in this area here that would indicate a

20  need for regulation.  And I believe that it is true.  I believe

21  that there is a need for regulation.

22      But let me point out one factor that I think is extremely

23  important in regard to the nature of this litigation.  That

24  when we get through with the litigation, as I comprehend it,

25  there must be in this record evidence of sufficient probative

14,816

P 68  1    nature so that at a request to your Honor for an order to show

2    cause your Honor can then on the basis of this record regulate

3    the individual or the group.

4        THE COURT: Mr. Veeder, that might be true and it might

5    not. If, for instance, a request came in on a certain area

6    and as a preliminary there was proof that conditions had not

7    changed since the time that I made the findings, then what you

8    say might be true. But that is a big question. Maybe at the

9    time the matter comes up things have occurred, different uses

10   are being made of the water; any regulation or apportionment

11   would have to take into account the uses as of the time it

12   was decided.

13       Now certain findings would be res adjudicata. I would

14   think that the finding that land was riparian could not be --

15   well, this would be changed, of course, if it were shown that

16   it had become non-riparian by conveyance. A finding that land

17   was non-riparian could never thereafter be changed to a finding

18   that it was riparian.

19       But the uses made of the water -- who is using water --

20   would have a great bearing on what was done. If, for instance,

21   a person with a ranch upstream would be entitled to extensive

22   use of riparian water but was not using it, and downstream two

23   other persons were using and one was taking all and the other

24   fellow  was getting none, the Court might require some present

25   use of that available water between the two who were using it.

P 69

1   But again the man upstream might begin to assert his rights

2   and you would have to make a different arrangement.

3        So any regulation would have to depend upon the situation

4   as of that date and not upon a record made today which could

5   conceivably bind somebody twenty years from now.

6        MR. VEEDER:  I am almost afraid to say this, but I will

7   say it.  I don't believe that there is any disagreement in

8   your Honor's statment and mine.  I don't believe there is.  I

9   think there is a difference semantics, and it is very important.

10  I believe that when you get through here and you enter your

11  decree that you will have catalogued every right and the regu-

12  lation concerning which I make reference will stem from an

13  invasion of the catalogued rights.

14       MR. GIRARD:  I would agree with that.

15       MR. SACHSE:  I think that's wonderful.

16       MR. VEEDER:  Then there is no real difference.

17       MR. GIRARD:  Cataloguing of rights.

18       MR. VEEDER:  And the point that I was making to you gentle-

19  men and that I made to your Honor, what I said six months ago

20  is not one bit different than what I said right now.  I said

21  based upon the facts as they appeared here it would seem that

22  regulation would be required.  You certainly have regulation

23  antecedent to the cataloguing of the rights, and as I said I

24  think that the difficulty that we have encountered here is a

25  matter of semantics in which I use the term "regulation."  Many

P 70

1   people went into orbit.  What happened was that there was a

2   failure to comprehend.

3        THE COURT:  All right。

4        MR. SACHSE:  I don't think this is quite enough, your

5   Honor.  The language of the transcript was -- and if Mr. Veeder

6   didn't mean this, or if we have it wrong, all right -- to set

7   forth the areas in which he would request regulation.  That is

8   what I want to know.  If in this case Mr. Veeder is going to

9   say to your Honor, in behalf of the United States, "I request

10   regulation of Stardust in the judgment to be entered by you in

11   the decree," that I have a right to know。  Because that imposes

12   upon him, in requesting such regulation, certain burdens that

13   have to be met, and it imposes on me the responsibility of

14   preparing for certain burdens.  Now if he is not in behalf of

15   the United States going to ask your Honor for any specific

16   regulation, I am satisfied.  I think we are in accord。  But if

17   he is going to ask you now in the drafting of your decree for

18   a regulatory order on anybody, that is what I think I am entitled

19   to know.

20        THE COURT:  It is just as simple as Mr. Sachse has stated,

21   Mr。 Veeder。

22        MR. VEEDER:  All right, and I believe it is just that simple.

23        THE COURT:  All right, I'll tell you what we are going to

24   do。  You made your statement.  They said, "We think we can go

25   along with that statement。"  You say it is a matter of semantics。

P 71    1    They say, "If we understand, yes." Now you write out for them

2    in detail, let me have a copy of it and let other counsel have

3    a copy, exactly in black and white what you mean by this.

Belt 11   4        MR. VEEDER:  I will be very happy to.

5        THE COURT:  Maybe we can stand still for it.

6        MR. VEEDER:  I will be very happy to.

7        THE COURT:  So then you are going to have to designate

8    these areas that you are going to ask regulation on.  You told

9    us that one of them is down around Stardust.

10        MR. VEEDER:  Your Honor, before we go any further, because

11    it has been most pleasant yesterday and today in the courtroom

12    -- there hasn't been a single hat busting, and I want to say

13    it's fine -- I would like to point out right here, though,

14    pointing to Vail Lake, here are two drainage areas.  I put

15    them up here so that your Honor can see our problem.  These

16    are the sources of our water -- Warm Springs Creek, Temecula,

17    and I believe that what is transpiring above us is going to

18    cause us irreparable damage.

19        THE COURT:  Mr. Veeder, now you are back in to generalities.

20    Let's just be specific about it.  It may well be that when we

21    decide the issues on the rights that it exists with Stardust

22    and Gibbon and Cottle the problem may be solved.  Without

23    intimating what my decision may be, we may find that they don't

24    have these appropriative rights that they claim to have, and

25    if the finding is that they are riparian and have a reasonable

P 72

1    right to use the water along with everybody else this isn't

2    regulation.  This is an adjudication of what rights they have.

3    This may solve the problem.  But if you want to go further and

4    say (a) here are their rights and (b) here is to be regulation

5    as to how much water they can use, etc., then that is what Mr.

6    Sachse and Mr. Girard --

7        MR. VEEDER:  And I think it is right there that semantics

8    has caused all the blood pressure.  If your Honor should deter-

9    mine that Cottle did not have his appropriative right, I think

10   the result would be that if he continued to exercise that right

11   he would be enjoined, and that would be regulation.

12       THE COURT:  No, that is not regulation.

13       MR. VEEDER:  Fred agreed with me.

14       MR. GIRARD:  No.

15       MR. SACHSE:  That is not regulation.

16       MR. VEEDER:  Then I wish they would tell me what regulation

17   means.

18       MR. GIRARD:  As I understand, Gibbon and Cottle are claim-

19   ing a prescriptive right to all of the water, and if this Court

20   would say they do not have a prescriptive right but only a

21   riparian right, then subsequently if they were to continue to

22   use all of the water this Court could by an order to show cause

23   restrict them to their reasonable riparian right to use.

24       MR. VEEDER:  And that is regulation.

25       THE COURT:  All right, let's go back to what I said.  We

P 73

1    can't spend all day on this.  I direct you to write out in

2    black and white what you are talking about and to submit it to

3    counsel and to me so that we will know what this matter of

4    semantics is.

5        MR. VEEDER:  Yes, your Honor, I think it has been most

6    productive, and I will write it up.

7        THE COURT:  Call the criminal matters.

8        (Other matters)

9        THE CLERK:  1-1247-SD-C United States versus Fallbrook.

10       THE COURT:  Now you understand the Court's directions on

11   that?

12       MR. VEEDER:  Yes sir.

13       THE COURT:  Now we started on this list of issues and got

14   off on Item 14.  I would like to delegate to Mr. Sachse the

15   task of taking his letter of November 27th and enlarging in

16   more detail upon the issues to be determined and to give some

17   consideration to the chronological order in which we should take

18   these up, the idea in mind being to establish some sort of

19   agenda where we would take up these undecided issues in a certain

20   order so that counsel could know when they are coming up.

21       MR. SACHSE:  I would be very happy to try, your Honor.

22       THE COURT:  I think you could render us a real service by

23   conferring with Mr. Veeder, Mr. Stahlman, Mr. Girard and working

24   out something that would be in the nature of an agenda.

25       MR. SACHSE:  I'll do that, your Honor.

P 74

1    THE COURT:  Now, on Domenigoni Valley I think I am prepared

2    to decide the facts in the matter.  I have serious doubt as to

3    what flows from those facts.  Do you want to be heard in the

4    matter?

5    MR. SACHSE:  I don't care to argue any further.

6    THE COURT:  Or do you want me to make tentative findings

7    and hear you where you think you are hurt?

8    MR. VEEDER:  Let's have the tentative findings, your Honor.

9    THE COURT:  I can illustrate it probably best by this map.

10   (The Court steps off the bench to the map.)

11   THE COURT:  First of all, I credit Dr. Mann's testimony

12   that originally the stream from Diamond and Domenigoni Valley

13   flowed from east to west through the area shown as the boundary

14   line between Sections 8 and 9 into Menifee Valley and that there

15   was a deep or fairly deep canyon there which later on was filled

16   up with the alluvial fill that now appears over it.  The evidence

17   is not conflicting that both Dr. Mann, Mr. Kunkel and everybody

18   who has made any investigation, even Mr. Christensen, have

19   found the water-worn rocks etc. in that area.  By the same token

20   the small gap between the basement complex in the Southwest

21   quarter of Section 9 was a higher altitude to the basement com-

22   plex at the time the stream originally ran the other way.  And

23   so I am convinced that there is an area of good permeability

24   along the watershed line between Sections 8 and 9, which would

25   permit water to flow from Section 9 into Section 8.

P 75 1   I also credit Dr. Mann's testimony, as also is confirmed

2 by the pictures and by the other investigations, that on the

3 southerly line of Section 9 between the two areas of basement

4 complex there is a basement complex lip or an area of hard

5 earth at about 1400 feet.  This checks with the other testimony,

6 including that of Mr. Christensen yesterday, who drilled wells

7 in there, and that on top of that 1400 foot lip there is an

8 alluvial fill also.

9   We then have a situation where we know that the pumping

10 levels in the Domenigoni Valley are down below 1400 feet, the

11 elevation of the water, and Mr. Kunkel himself concedes that

12 there is a reverse flow in a northeasterly direction in Section

13 9 toward what might be a pumping hole.

14   Let me make some further proposed findings.  That below

15 the boundary between Sections 9 and 16 in the area where we

16 have under consideration on the boundary line between 9 and 16

17 where the question is whether water underground flows from 9

18 into 16, below there there is seepage from the granite which

19 feeds the salt grass and supplies some water to the younger

20 alluvium in the Warm Springs streambed running southwesterly

21 from that area.  I have seen this seepage out of granite, I

22 am very familiar with it, because it happens to be the kind of

23 water we get where I have my property, where they get wells on

24 hilltops and they get it from seepage out of granite.  You can

25 hardly see the water flow, but overnight in the granite hole

P 76    1   you have water.  It is not an appreciable amount, hardly more

2   than enough for domestic use.

3      We then have a situation where for the underground flow

4   from Domenigoni Valley to flow through the younger alluvium and

5   down Warm Springs Creek the water elevations in Domenigoni

6   Valley would have to be in excess of 1400 feet, and I would be

7   prepared to find that if the water levels were that high there

8   would be some underground flow down Warm Springs Creek but there

9   would be a far greater flow into Menifee Valley.  I don't think

10   that you could say that the water wouldn't flow both ways there

11   in the younger alluvium.  Now in order, therefore, to require

12   water to come down Warm Springs Creek you would have to say that

13   the Domenigoni Valley basin should be full to 1400 feet and

14   overflowing, and I don't think you can say to overlying owners

15   and riparian owners that they must keep a basin full.  They

16   have a reasonable right to make use out of a basin, even if it

17   draws the basin down.

18      So we have, therefore, finally, the situation where to get

19   water to flow down Warm Springs Creek we would have to so re-

20   strict the owners of the Diamond and Domenigoni Valley that they

21   kept the basin full to 1400 feet or more as the water level, in

22   which event I have no doubt there would be an immense amount of

23   water running into Menifee Valley and leaving the watershed,

24   and the only time a situation like that could occur would be

25   at times when there were an exceedingly large amount of rainfall

P 77

1    and water filling up the basin to overflowing in order to get

2    something to cross the 1400 foot lip into Warm Springs, in

3    which event water would be moving in a far greater amount out of

4    the Domenigoni Valley and this is not to the interests of the

5    people in the watershed.  These people in Diamond and Domenigoni

6    Valley have a right to use water as riparian and overlying owners

7    and there would be no requirement, it would be unreasonable to

8    say that they must keep a basin full and limit their uses so

9    that at all times that basin was up to 1400 feet.  That would

10    be almost an impossibility.  Because in trying to get the basin

11    to 1400 feet, meanwhile you are letting water flow through the

12    old canyon covered now by silt that runs into Menifee Valley.

13    I think it comes to about this, that you just about have to

14    close off Domenigoni and Diamond Valley as being any particular

15    value to the stream system except as to surface flow.  I think

16    it is pretty clear.

17    And I'll be glad to hear suggestions as to either side or

18    any of you as to what should be added to or taken out of those

19    proposed findings.

20    MR. VEEDER:  I would like to look at the record, your

21    Honor, from what you have said, whether I make objection to it.

22    Our concern is that the reduction is a factor in the surface

23    runoff.  Also, we believe there is some underflow there.  We

24    will have an opportunity to review this.

25    THE COURT:  There is no doubt that the surface flow is

P 78

1   part of the stream system, and it would be only in times of

2   tremendous flood that surface flow would go through that gap.

3   I think the surface is sufficient to take the surface flow.

4   It is rather interesting that this channel as such in Warm

5   Springs apparently doesn't even contain a lot of water in times

6   of runoff.  It is not a big channel.  You have seen where it is

7   almost a ditch along a fence in a place or two.  What has happ-

8   ened is that the basin gets pulled down, surface flow in Diamond

9   and Domenigoni Valley feeds those basins and probably runs off

10  into Menifee Valley.

11      MR. SACHSE:  I will draft in very rough form, not even

12  submit it to your Honor till I have submitted to Mr. Veeder,

13  some proposed findings that I feel would embrace what you have

14  just stated.

15      THE COURT:  Are you content with those findings?

16      MR. SACHSE:  Yes your Honor.

17      Perhaps I can get his comments on it.

18      I am not trying to foreclose you from arguing on it.

19      It might even facilitate your Honor.  Would that be satis-

20  factory?  I will draft them and submit them to Mr. Veeder.

21      MR. VEEDER:  He is going to submit some findings to me

22  for review, is that right, for the next hearing?

23      THE COURT:  Yes.

24      Now I am not happy about this.  I am not happy about this

25  because the net result of it is that you are practically closing

P 70

1  off Diamond and Domenigoni Valley as being any assistance to

2  us in this job.  But it is not my job to be happy or unhappy

3  about the facts as they are, and I think that we are just stuck

4  with those physical facts and that we have got into a situation

5  where there is very little we can do about the uses made in

6  that valley.  It would probably have to be treated as a separate

7  unit.  The users in the valley might have rights inter se to

8  restrict each other.  But I doubt if we could do very much with

9  them.

10  MR. VEEDER:  I am not going to argue the point, your Honor,

11  because I would rather have an opportunity to check the findings

12  before I say anything more.

13  MR. SACHSE:  I would like to suggest one further thing.

14  I am more than happy with these findings, but I do want to

15  suggest now, because I think it is of importance to Mr. Veeder

16  and to your Honor, I can't see, frankly, that the single fact

17  that your Honor finds that the larger part of the ground water

18  moves westerly in the Menifee Valley is so terribly controlling.

19  I don't even know what the evidence is going to be yet, but I

20  am quite sure that we will find a somewhat similar situation

21  on Coahuila, because the map shows that there is a clear B.C.

22  lip.  We are going to find a somewhat similar situation where

23  your Honor will unquestionably find that when the water level

24  in Coahuila Valley is drawn below X number of feet then down-

25  stream runoff stops.  You will find that as a physical fact,

P 80

1   even though there is not any diversion out of the watershed.

2   It seems to me that the most critical part of your Honor's

3   findings here or the conclusions that will follow on them is

4   what do we do in that kind of case?  In other words, if there

5   is no unreasonable use in Coahuila or in those places.  I know

6   that I am anticipating problems.  But I think the identical

7   situation, except for the running out of the watershed, is going

8   to exist in every basin.

9   THE COURT:  The only difference I could see would be this,

10  and I don't know whether it makes any difference.  In a basin

11  where there is no other way out, such as may be the case up in

12  Coahuila, then conceivably -- and I don't know whether it is

13  impossible -- you might say that the use was unreasonable and

14  should be curtailed in order that there be some water come out

15  of the basin.  You can't do it in this basin for the reason

16  that there is an escape, and by trying to get your water high

17  enough to run over the lip and feed the stream you are losing

18  the water through a sieve into the valley.  Whether this will

19  control or not I don't know.  I certainly don't think there is

20  any requirement that people in a basin keep the basin full so

21  that the water can go out.  If the amount of water in the basin

22  taken in connection with their riparian overlying needs is only

23  sufficient to give them a reasonable use, and if this reasonable

24  use brought the basin down below the edge of the lip, it is

25  just too bad.

P 81

1     **other**
   If, on the/hand, you could imagine a situation where a

2 man had 160 acres overlying a basin and by using and wasting

3 water, using it far beyond what would be the reasonable needs

4 in this basin, he was able to keep the basin from overflowing

5 the lip, you might well say, "You are making an unreasonable

6 use of the water and in comparison with your neighbors down-

7 stream you are using far too much.  You therefore have only

8 a right to a reasonable use."  And when he cut himself down to

9 a reasonable use, then the basin might overflow and run into

10 the stream down below.

11   MR. SACHSE:  That is the point I was trying to make, your

12 Honor.  I think the same factual problem is going to exist

13 elsewhere.

14   THE COURT:  I have serious doubts, considering the overlying

15 land in Coahuila and the amount of water available, that you

16 can say there is unreasonable use in Coahuila.  We haven't got

17 there yet.  We will see what the facts will show.

18   MR. VEEDER:  My observations, your Honor, in regard to

19 what you have said on your proposed findings are these -- and

20 it is just that I would like to have you have it in mind at the

21 time these findings are filed by Mr. Sachse.  We believe that

22 the evidence that went in under the peculiar circumstances that

23 exist today during a period of protracted drought, and we don't

24 -- at least I don't find in the record anything to support that

25 a large quantity of water would go into Menifee Valley.  I would

P 82

1  hope that your Honor's findings would be directed to the fact

2  that as of this period the wetted area, the ground water area

3  in the outlet from the Domenigoni Valley into Murrieta Valley

4  is affected by the drought condition, coupled with the present

5  pumping, because I think that is what the record shows.  And I

6  believe that on that basis, and I think that is exactly what

7  Dr. Mann's evidence showed, that with the ground water pulled

8  far down he made a calculation which I think was in error.  But

9  nevertheless I think the findings should be directed to the

10  conditions as they prevail, not/the whole basin out of any
                                        knock

11  future regulation by this Court.

12     MR. SACHSE:  I did not interpret his Honor as meaning that,

13  and the findings I had in mind, Mr. Veeder, would leave the basin

14  in the continuing jurisdiction of the Court.

15     MR. VEEDER:  If that is the case --

16     MR. SACHSE:  But would proably say something to the effect

17  that under present conditions and on the present state of the

18  record there is no evidence that any ground water extractions

19  have an adverse effect downstream.  That would be the substance

20  of it.

21     THE COURT:  If you want to leave it in, I will be glad to

22  hear what you have to say about it.  But it is pretty hard for

23  me to visualize a situation where you could have that basin

24  filled up to where you would have an appreciable amount of water

25  coming down Warm Springs Creek without there being many times

P 83  1   that amount of water running out through this gap into Menifee

2   Valley.

3       MR. VEEDER:  That is the point.  I don't believe the record

4   would support that there would be many times that much water

5   flowing out.

6       THE COURT: Statistically, I suppose you could make the

7   same calculation over in that other gap.

8       MR. SACHSE:  Let's see what the findings are.

9       MR. VEEDER:  Let's see what Mr. Sachse comes up with.

10      THE COURT:  I think there should also be a finding, and

11  I don't know of any evidence I heard to indicate any unreasona-

12  ble uses up in that valley.

13      MR. SACHSE:  I would contemplate a finding that there is

14  no evidence that any use of water is unreasonable.  On the con-

15  trary, I would probably make an affirmative finding that the

16  evidence, as far as my clients are concerned, is that use is

17  entirely reasonable.  I would propose such a finding.

18      They are importing water, also, don't forget, your Honor.

19      THE COURT:  They haven't enough water to really take care

20  of what they have up there.

21      Now what is next?  I have finished these so-called house-

22  keeping items here.

23      MR. VEEDER:  Your Honor, if I comprehend what you have

24  stated, we are to prepare a long term agenda.

25      The matter of the Fallbrook ultra vires.

P 84  1      The matter of findings as to runoff and things like that.

2      THE COURT:  All items that we have to pass on.

3      MR. SACHSE:  I will try to put everything in, your Honor.

4      MR. VEEDER:  In other words, what is on the agenda for

5  today is yet to be on another agenda for another date; is that

6  correct?

7      MR. SACHSE:  If we don't dispose of it, it will be included

8  in the new one.

9      MR. VEEDER:  In other words, this Item No. 2?

10      MR. SACHSE:  Item No. 1 is done now.

11      MR. VEEDER:  Number 2 is to be on the next agenda at some

12  time to be heard; is that correct?

13      MR. SACHSE:  I guess we are going to work the rest of the

14  day, I hope, and maybe we can finish some of these.

15      I don't know what you want to do next, but I am ready to

16  talk about Number 2.

17      MR. VEEDER:  I am for that.  I didn't know whether it was

18  contemplated that Item No. 2 would be heard now or not.  It

19   suits me.

Belt 12  20      MR. SACHSE:  I am ready.  I have reviewed the pre-trial

21  opinions and have arrived at my own conclusion of what they

22  mean, your Honor.

23      THE COURT:  That is Item 2 on the agenda about the check

24  of permits and things of that sort.

25      MR. SACHSE:  Yes.

P 85

1      As I read it, your Honor ruled in two places, both in the

2  remand and in the hearing on the pre-trial opinion, that the

3  decision as to whether there is water in the river available

4  for appropriation is for the State agencies to determine.   To

5  quote it literally, page 14 of the Remand Opinion has this

6  language: --

7      THE COURT:  You don't have the page reference?

8      MR. SACHSE:  Fourteen your Honor.

9      THE COURT:  I have the text.

10     MR. SACHSE:  No your Honor.

11     THE COURT:  I see it.  I think it is 165 Fed Sup 878.

12     MR. SACHSE:  Your Honor states:

13  "The State agencies will determine (1) whether there is

14  any water in the river available for appropriation.  This will

15  not be a conclusive determination, but will be subject to vested

16  rights, and accordingly the United States District Court will

17  eventually make a determination, after determining and listing

18  the vested rights, if there is any water available for appropri-

19  ation."

20     Taking that, which is the closest single statement on the

21  subject, with the language in your basic pre-trial opinion, I

22  have interpreted it to mean that, speaking now specifically to

23  Fallbrook, the State has made a determination, a permit is in

24  evidence.  That permit sticks.  At such time as injury or ad-

25  verse effect upon any downstream user arises the same protective

14,834

P 86

1    measures would be available to the United States that we just

2    discussed a moment ago in connection with Stardust.

3        But even assuming that that meant that any further evidence

4    was required that sufficient water was available to permit the

5    construction of the project --

6        MR. VEEDER:  Did your Honor refer to a page citation in

7    165 Federal Supplement?

8        THE COURT:  I was looking at pages 878 and 879 in the

9    Remand Opinion.

10       MR. SACHSE:  Again, I don't have the Federal decision,

11   and I don't want to mislead you on it.  I want to call your

12   attention to everything, even if it may be language that is

13   injurious to me.

14       In the basic pre-trial opinion it is rather more difficult

15   to find specific quotations, but under that section of the opin-

16   ion in which you discussed the United States' motion for summary

17   judgment, in which you go at some length into an application of

18   State water laws, you have this language:

19       "True, this court has jurisdiction over the rights upon

20   the River.  But that does not require that it undertake a

21   quasi-legislative function and create, as it were, or allot

22   new rights.  Until permit issues no such right exists. (This

23   is the language to which I particularly refer.) When permits

24   issue this court will then determine whether there was surplus

25   water over and above the vested rights upon the River, against

P 87   1   which the permit might be operative and meaningful as consti-

2   tuting a 'right.' "

3   That is the only language I find anywhere in which --

4   THE COURT:  That is in substance what I said in the Remand

5   Opinion, isn't it?

6   MR. SACHSE:  The same thing, except --

7   THE COURT:  It has been a long time since I have worked

8   on this.

9   Do you agree with that?

10   MR. SACHSE:  I agree with that, your Honor.

11   THE COURT:  Do you agree, Mr. Girard?

12   MR. GIRARD:  Yes, I do.  I don't think you can possibly

13   determine whether there is any appropriative water available

14   for storage to the extent that it affected downstream rights

15   until Fallbrook built its dam and see what happened.  The

16   Circuit Court in reversing Judge Yankwich's decision clearly

17   stated in there that the finding that there was no unappropri-

18   ated water was wrong.  They said that obviously there is un-

19   appropriated water because water flows to the ocean.  To the

20   extent that water flows to the ocean now or ten years from now

21   when Fallbrook builds it dam, I don't see how you can anticipate

22   that now.

23   I think Mr. Sachse will concede that his dam is subject

24   to any vested rights of Mr. Veeder downstream, and to the extent

25   that storage would adversely affect those rights as of that time

P 88

1   it is subject to this court's orders for modification in the

2   operation of that dam.   I don't see how you can determine that

3   until he builds his dam.

4   MR. SACHSE:   To go back to our earliest arguments on this,

5   your Honor will recall that I made the argument to your Honor

6   that no power, no district court could prevent a land owner

7   from building a dam on his private property; that this court

8   could force us to knock a hole in it and let all the water out

9   -- that is clearly within your Honor's power.   But presuming

10   that we comply with the State's requirements as to obtaining

11   a permit and construction, it has always been my position that

12   we could construct and impound and the moment that our activity

13   of the impounding caused any injury whatsoever to the United

14   States or to anyone else downstream they would then, under your

15   continuing jurisdiction ruling, on which we have all agreed,

16   have a right to step into this court before your Honor and say,

17   "Let so much water out."

18   Now your Honor, away back again -- perhaps I will refresh

19   your recollection -- said something about you certainly would

20   want control with adequate outlet works and that the dam be

21   constructed in such fashion that any order could be readily

22   complied with without knocking a hole in it.   I would certainly

23   agree.   I would say only that that is a question with which I

24   don't think your Honor would have to concern yourself.   That

25   is something that the State Water Rights Board itself will insist

p 89

1   upon, because their own order requires that we provide works

2   sufficient to supply water downstream.

3        THE COURT:  What did I mean when I said this?  It has been

4   a long time ago.  I am in agreement with much of what has been

5   said.  In other words, these permits operate only on unappro-

6   priated water and they have no effect whatsoever on vested

7   rights -- riparian rights, prescriptive rights.

8        Now in the Remand Opinion, on page 878, I talked about the

9   State procedure:

10       "However these matters turn out, the following, we believe,

11  is correct.  The State agencies will determine:

12       "(1) whether there is any water in the River available

13  for appropriation.  This will not be a conclusive determination,

14  but will be subject to vested rights, and accordingly the United

15  States District Court will eventually make the determination

16  after determining and listing the vested rights, if there is any

17  water available for appropriation.  The action of the State

18  agencies will only operate on such water, if any, as is found

19  available for appropriation."

20       Now I think what that means is this.  That this court

21  determines the vested rights -- riparian rights, prescriptive

22  rights -- and later on, if there is a question as to whether

23  there was surplus waters subject to appropriation, this court

24  could say the vested rights have used it all up -- there is

25  none.  If there is water that would otherwise flow to the ocean,

P 90

1   then obviously it is available for appropriation.

2       The only thing I am wondering about is whether, in this

3   proceeding, I am required to make a determination, after I

4   consider all of the vested rights, whether there is surplus

5   unappropriated water on which the permit could operate, and I

6   don't see how you can make that at this time in a decree because

7   it would speak only of the moment.  It can't speak of the future.

8   How do I know whether next year much water might run into the

9   ocean?

10       MR. SACHSE:  I think there has been one slight mistake

11   made in your language, your Honor.  You said that if you find

12   that the vested rights are so great that there could be no

13   water for appropriation, something of that kind.  I don't think

14   that is literally what you do.  The vested rights may exist,

15   particularly riparian rights, and not be used, and as long as

16   they are not being used and as long as there is no adverse

17   effect on the vested rights the appropriation can continue.

18   The mere fact that vested prior riparian rights might eliminate

19   the water in the future does not make the water not available

20   for appropriation.

21       THE COURT:  What happens when the permit ripens into a

22   license?

23       MR. SACHSE:  It never affects the vested riparian rights.

24   They are always prior.  The license does only one thing; it

25   finally jells the maximum amount.  It has nothing to do with the

P 91

1    status of the water.

2        THE COURT:  The claim under the license is still subject

3    to the vested riparian rights.

4        MR. SACHSE:  Mr. Stahlman just pointed out that Fallbrook

5    had permits on the San Luis Rey.  I got them years ago when I

6    was practising law in Los Angeles, I can't remember how long

7    ago.  But they pumped water out of the San Luis Rey for years.

8    Riparian owners in the San Luis Rey, some of them represented

9    by Mr. Stahlman, brought an injunctive proceeding in 1951 or

10   1952 on the grounds that the basin had been so far depleted

11   that there is no longer any water on which our appropriative

12   rights could operate.  The Superior Court found in accordance

13   with their claim but did not enter a permanent injunction.

14       MR. STAHLMAN:  At that time they established a level by

15   a series of wells and took an average from that.  Judge Turrentine,

16   who had a great deal of experience in water law, made a very

17   practical observation, I think.  He said that with the present

18   use as it was proved at that time there should be some curtail-

19   ment because the users who had prior rights had now started to

20   use those rights and therefore there was not sufficient water

21   available for Fallbrook, unless the basin reached 18 feet from

22   the top.  It has not done that since that time and they haven't

23   pumped since then.

24       That is a practical example of how you regulate under a

25   State permit.

P 92

1    THE COURT:  Mr. Veeder.

2    MR. VEEDER:  I think the crux of this matter has not been

3    touched upon yet, your Honor.  I believe that your Honor has

4    an obligation in this litigation, I believe it is part of the

5    function, to see whether Fallbrook has sustained a burden of

6    proof in that there is a surplus of water and surplus of water

7    based upon a finding by you.

8    As I see this, it is a quiet title suit.  There are two

9    kinds of rights that are involved.  There are the vested rights

10   which would be all-inclusive.  Then there would be these inchoate

11   rights for which claims are now being made by the Fallbrook

12   Public Utility District.

13   Now, a permit is not a right.

14   MR. GIRARD:  Yes it is.

15   MR. VEEDER:  A permit is not a right.  It couldn't con-

16   ceivably be anything but an inchoate right, because until water

17   is diverted and applied to a beneficial use there can't be a

18   completed appropriation.  I believe that is the law and I don't

19   believe it can be contested.

20   MR. GIRARD:  It is a right.

21   MR. VEEDER:  It is an inchoate right for which claims are

22   being made which someday may ripen into a usufructary interest.

23   That is the law.

24   MR. SACHSE:  Mr. Veeder is asking your Honor to reverse

25   the language "the State agencies will determine whether there

P 93

1   is any water in the river available for appropriation." You

2   have perfect power to do so.  That is what you said, and I think

3   that is what you meant, and I think we ought to get a clear

4   understanding of that now.  I do not acknowledge any burden of

5   having to prove anything before your Honor on this permit.

6       MR. VEEDER:  Your Honor, may I tender a thought right here.

7   We had a very serious two days the last two days we met by reason

8   of the fact that every time I said something with which Mr.

9   Girard or Mr. Sachse disagreed they immediately interrupted,

10  with the result that that record is something to behold.   I

11  petition your Honor that while I am speaking I should be per-

12  mitted to finish.  I have tried this last two days to conduct

13  myself in regard to them.  I truly think that for whatever it

14  is worth we can get along faster.

15      THE COURT:  Yes, you should be permitted.  Go ahead.

16      MR. VEEDER:  The point that I make to your Honor is that

17  we have no obligation to do anything more than prove our rights

18  in this case and prove the utilization of our rights and the

19  extent of our rights.

20      The Fallbrook Public Utility District, as I comprehend the

21  law in this proceeding, is required to appear and prove its

22  inchoate right, which is based upon its application to appro-

23  priate water, and then prove to your Honor, on the basis of

24  available data, and put it in the record and show that it would

25  have a firm supply that could be exercised without invading our

P 94

1   rights.  I believe that what it has to do is to prove to your

2   Honor perhaps the same things that it had to prove in the State,

3   although I wouldn't want to go that far.  But in any event I

4   think that any appropriator who is claiming a right to use

5   water comes in here and proves that water is available or he

6   fails in his case.

7       Now what they had to do before the State Water Rights

8   Board to get a permit was to go through a complicated procedure

9   which, prior to 1914, simply entailed the posting of a notice

10  on a tree, the point of diversion and the filing of the case,

11  and that is all that was involved.

12      I think, with all respect to your Honor, that your Honor

13  didn't distinguish, in his opinion, between the act of initiating

14  a right and the act of adjudicating a right.  I think they are

15  entirely different.  I have always agreed that the only way an

16  individual can get a right to the use of water in the State of

17  California is to comply with the State law.  I have gone the

18  additional step here and said that I think that if Fallbrook

19  or anyone else had diverted water to beneficial use he should

20  be protected in that, because that to me is the acquisition of

21  a right.

22      But in any event I believe there have to be offered in

23  evidence, both by Mr. Sachse and by Mr. Yackey and the others

24  who are claiming appropriative rights, I think they have to

25  appear and prove that there is a firm supply of water available

P 95

1    to them.  Because without that I don't believe that a proper

2    decree could be entered.

3        Now Mr. Sachse said some time ago, and he said now, that

4    in his view he could go up there and build a dam above us,

5    impound water, without proof that there is water available.

6    I don't believe that that can be done in this day and age, and

7    I believe that the law of California would indicate that we

8    would have a right to enjoin the construction of that dam absent

9    proof that there is water available.

10       THE COURT:  You talk about the burden to make a showing

11   that there is a firm supply available.  As I have understood,

12   Fallbrook proposed to build this dam in the hope of catching the

13   flood waters which might otherwise go into the ocean and that

14   they anticipate that in some years they might get a lot of

15   water and in other years they might get very little, and that

16   this would be a matter of trying to save that water.  There is

17   proof in this record that while this case is being tried water

18   ran into the ocean.  There can't be any doubt but that in that

19   sense there was surplus water, unappropriated water, water that

20   was not used.  It passed over your basins in the Camp.  The

21   basins were clear full or it wouldn't have passed over them and

22   ran into the ocean.

23       I don't think Mr. Sachse, on behalf of Fallbrook, is re-

24   quired to show anything but that he got the permit.  They build

25   the dam at their peril.  I can conceive of a situation where they

P 96

1    might, and properly so, impound the flow of water to come down

2    that stream and if it turned out that there had been a terrific

3    flood there would be arrangements made to release, probably

4    in some orderly manner, water into the basins below, which would

5    be a real advantage to the United States because the water has

6    been contained and it is released to come down into the basin

7    in some orderly manner and would not be lost.  On the other hand,

8    they might close the doors and think a storm is coming along

9    and it turns out that what they got was very little.  It might

10   well be that they would have to release it all and let it go

11   on downstream.

12        But I can't see how the Government is hurt by that dam

13   up there.  If anything, the Government is better off, because

14   there is assurance that water will not pass into the ocean,

15   and since the dam can't affect the vested or riparian rights

16   of the United States and operates only on surplus unappropriated

17   water, then that is a subject that this court may determine.

18   They are just hoping that there will be some good rains and

19   that they can catch some extra water.  They don't expect to

20   fill that dam out of the three cubic feet that are going across

21   the lip at Temecula.

22        MR. VEEDER:  I hope not.

23        THE COURT:  I would assume that the only prospect they have

24   of filling that dam is flood water.

25        How many different years since this case has been tried

P 97

1   has flood water gone into the ocean?

2        MR. VEEDER:  Two.

3        MR. SACHSE:  Twice your Honor.

4        MR. VEEDER:  Nineteen fifty-two and 1958 your Honor.

5        THE COURT:  One of them a very appreciable amount of water.

6        MR. VEEDER:  Your Honor, may I proceed along the line I

7   started out and what I think Fallbrook's burden of proof is?

8   Did you want to interrupt now?

9        THE COURT:  Unless you are going to say something different

10  than you said, I don't think they have the burden of proving

11  anything except that they got the permit, and this court then

12  must say that this was done by a State agency and it has such

13  validity as the law provides and gives them a right to proceed

14  under the permit subject at all times to this court's determina-

15  tion as to whether or not the water on which they would operate

16  is actually surplus water.

17       MR. VEEDER:  Then the next point that I think your Honor

18  is called upon in this proceeding to determine --

19       THE COURT:  Shall we take a recess before we have the next

20  point?

21       MR. VEEDER:  All right.

22       THE COURT:  All right.

23       (Recess)

24       MR. VEEDER:  The additional factors that I believe are

25  required to prove the right before your Honor which Fallbrook

P 98

1  is claiming are (1) that Fallbrook has the financial ability

2  to construct an economically feasible project and (2) that it

3  has irrigable acreages upon which the water could be beneficially

4  used.

5      From my view of the record, those elements have not been

6  proved.  But they are just one phase.  Each of these is an

7  individual phase, I had better state, of the factors that will

8  constitute an inchoate right in Fallbrook to be adjudicated.

9  I think that your Honor is called upon to adjudicate that

10  inchoate right.  I think, moreover, that he has to find, in

11  regard to these incipient rights, that there is water in the

12  stream available for them.  I believe the course that your

13  Honor proposes to take is one which deprives the United States

14  of America of the right of cross-examination, because when the

15  State of California declares that there is a surplus of water

16  available it has to do so, in my view, based upon the known

17  rights in existence which are exercised.

18

19

20

21

22

23

24

25

In attempting to do so, in regard to the permits that were issued, it alluded to Bulletin 57, which was not admitted in evidence here, and in Bulletin 57 there was an analysis of surplus water in the stream available for appropriation. The State took into consideration the demands at Camp Pendleton and purported to relate it to an average runoff of 30,000 acre-feet a year.

Now, I believe that that is the task that your Honor must undertake here in adjudicating these rights. I believe that it would behoove Fallbrook to prove that there was water available for appropriation here. If they had to go into the State court, that is simply the initial act of acquiring a right. You are to adjudge it, and I think that those matters must be passed upon here.

In regard to economic feasibility, I think that there has to be proof that Fallbrook could levy assessments for the purposes of irrigation. I think your Honor is called upon to pass upon that. That is the ultra vires question.

But at the same time that they are claiming rights to the use of water for purposes of irrigation, I think they had to come in and show that there was irrigable land upon which this water could be economically used.

I think economic feasibility is extremely important here, and I believe there is a dearth in the record on that point.

THE COURT:   How can the Government be prejudiced if they

14,848

·13

Z2

1   build a dam at their peril, literally?

2        MR. VEEDER:   I am talking about legal rights, your Honor.

3   I can't go off on the idea, "Well, so they build a dam up

4   there."   I have been in the business a long while.   So they

5   build a dam up there.   I know what that means.   It means that

6   they can take from us water.   It is not even doubtful.   And I

7   believe your Honor might demand that they build a dam with a

8   big arch in it.   If you did that, or if you would enter a

9   decree that would say that they can pour a lot of dirt but

10  they have to leave a hole in it, that would be all right.

11       THE COURT:   There will be provision that there be a hole

12  to let the water out.   But that doesn't mean that the hole

13  has to be open all of the time.   You have brought a quiet

14  title suit and you are entitled to have adjudicated what

15  rights you have.

16       MR. VEEDER:   Yes.   I also have a right to have adjudicated

17  the rights of those people who are claiming adversely to us.

18       THE COURT:   That is easy enough.   If you want a finding

19  that any rights that Fallbrook has on their dam aren't adverse

20  to your best riparian, prescriptive, appropriative rights--

21       MR. VEEDER:   How about the rights in the stipulated

22  judgment?

23       THE COURT:   --that certainly is the law.

24       The dam has nothing to do with the stipulated judgment.

25  It is downstream from the stipulated judgment.

13
Z3

1    MR. VEEDER: But I believe your Honor will find, if he

2  reviews the permits, and certainly the basis upon which those

3  permits were issued, those permits were issued in contemplation

4  of an effective existing stipulated judgment awarding to the

5  United States rights by the Superior Court.

6    The point that I am trying to make to your Honor is that

7  I don't believe you can divorce the legal rights of the National

8  Government from the supply of water in the stream, and I think

9  Fallbrook had to shown in this court that it could build a dam

10  without invading our rights.

11    THE COURT:  Mr. Veeder, the answer to that would seem

12  to me to be very simple.  If their dam can in no way impinge

13  upon the vested rights of the United States-- riparian,

14  prescriptive, appropriative-- if any, then the dam can have no

15  effect on your legal rights.  And the permit issued makes a

16  claim, that is true.  A license that issues thereafter is

17  subject to the same limitations.

18    Now a question to be decided later is whether they were

19  taking water that interfered with your vested rights.  But that

20  is a question of fact to be determined.

21    The point is that the record shows that water ran into

22  the ocean.  How you could make any other finding but that there

23  was occasionally surplus water on this stream I don't know.

24  It would be contrary to the facts.

25    MR. VEEDER:  I don't believe it is per se waste into the

ocean, the fact that some water goes down there, and I believe the law of California is to that effect. I believe that there has to be a showing that there was some beneficial use to the United States when it went down there, and certainly the water has to reach us to recharge the basin.

But the fact remains, and the point I have apparently a hard time reaching here, that the permits which were issued by the State involved rights, and adjudication of effective rights, a determination of quantities of water we are using, a determination that there is 30,000 acre-feet of runoff in the system and that Fallbrook could use, I think it was, 5,000 acre feet of that without infringing any rights.

THE COURT: I am not bound by what the Board determined to be the surplus water.

MR. VEEDER: You are not?

THE COURT: No. I am going to say that they have a right to issue a permit. The permit is subject to all your vested rights.

MR. VEEDER: As you adjudicate those rights.

THE COURT: As I adjudicate your vested rights, that is right.

MR. VEEDER: In other words, so far as you would decide them you would chronicle our rights-- the rights which I believe we have under the stipulated judgment, the rights which I believe we have as overlying owners, the rights that we have

13
Z5

1  both in and outside the watershed, the rights that we have to

2  keep our basins at a level to maintain the converage that is

3  there.  All those rights your Honor will chronicle.

4  THE COURT:  I am not saying that you have all those

5  rights.

6  MR. VEEDER:  No, I am not saying that you would say that.

7  But if I comprehend what you have just said now, we will have

8  a tabulation of the acre-feet a year to which we are entitled.

9  MR. GIRARD:  No, you will not.

10  MR. SACHSE:  No.

11

12  THE COURT:  That is apportionment and regulation, et

13  cetera.  I don't know about that.

14  MR. VEEDER:  Certainly in regard to our appropriative

15  right you will specify the quantity of water to which we are

16  entitled.

17  MR. GIRARD:  That is right.

18  MR. VEEDER:  You will specify the quantity of water to

19  which we are entitled and which we have used in the past at

20  least both inside and outside the watershed; that we will

21  chronicle the quantity of water to which we are entitled by

22  reason of an overlying owner to have the water maintained at a

23  level for vegetative cover.  All these things, your Honor, as

24  I comprehend them, have to be adjudicated by you, and if I

25  comprehend the law correctly there must be a relationship

13
Z6

1   between those demands, the available supply of water and these

2   insipient, these inchoate rights of the Fallbrook Public

3   Utility District, and I think that in your decree you must

4   reflect that.

5       Now absent that I don't see how we could conceivably

6   know where we stand in regard to future development what our

7   rights are.

8       THE COURT:  I don't know how you will know.  This

9   valley is going to develop.  I certainly can't say that you

10  have a certain X quantity of water.  There may be development

11  upstream by other riparians.

12      MR. VEEDER:  I am talking only of Fallbrook, your Honor,

13  and I think a finding on that proposition is most important.

14      THE COURT:  You have talked about two or three issues.

15      Before we get too far away, let's hear the other side

16  of it.

17      MR. VEEDER:  All right.

18      I was going to touch on the matter of ultra vires and

19  then I would be through with No. 2 and then ask for a ruling

20  on it.

21      THE COURT:  All right.

22      MR. VEEDER:  Our view in regard to this matter of ultra

23  vires has been extensively briefed and handed to your Honor

24  and your Honor has the briefs on it.

25      Our position in regard to the Fallbrook Public Utility

13
Z7

1   District is this, that it is powerless to appropriate water,

2   it has no power or authority to appropriate water for purposes

3   of irrigation.   The reason we take that position is the law

4   under which the Fallbrook Public Utility District was organ-

5   ized was passed in the year 1921 with the objective of

6   establishing a quasi-municipal corporation with the powers

7   which could supply to suburban people fire protection,

8   schools, sewage, streets.

9        MR. SACHSE:   Water.

10       MR. VEEDER:   I am being very strong about this.   But I

11   am sincere, I think the heckling has caused a great deal of

12   trouble down through the years.

13       THE COURT:   Let's go ahead.   And water.   You mentioned

14   everything but water.

15       MR. VEEDER:   Mr. Sachse supplied it.

16       THE COURT:   I know.   But you mentioned everything but

17   water.

18       MR. VEEDER:   In regard to water for municipal purposes

19   and for no other purpose.   Certainly a water supply for

20   domestic needs and uses-- for fighting fires, for providing

21   water for schools-- that is what is meant by the word "water"

22   in the Enabling Act of the Fallbrook Public Utility District.

23       The best analysis and the best reasoning that you could

24   apply to this thing, your Honor, in our judgment, that Fall-

25   brook doesn't have a right to appropriate water for purposes

1  of irrigation is the very fact that the Fallbrook Irrigation

2  District was formed under the so-called Wright Act.  Now, the

3  irrigation district is one type of a state entity.  The

4  municipal district, which Fallbrook is, is another type of

5  municipal district.

6       THE COURT:  Let me ask you.  I didn't pass on this in

7  my pretrial statement?

8       MR. VEEDER:  You did not.

9       MR. SACHSE:  Your statement in the pretrial says that

10  this may or may not be appropriate for consideration.

11       THE COURT:  Then I will want this argued at greater

12  length than we have time for today.

13       MR. VEEDER: Do you want me to stop, your Honor?

14       THE COURT:  I will want to review the briefs on it.

15       MR. SACHSE:  It has never been briefed by me, your

16  Honor.  Mr. Veeder filed a brief.  I would like to brief it

17  and I would like to argue it at some length.

18       THE COURT:  I would want, therefore, Mr. Girard also to

19  file a brief.

20       MR. VEEDER:  May I have one more point on that No. 2,

21  your Honor.

22       THE COURT:  Yes.

23       MR. VEEDER:  The capacity of the Fallbrook Public Utility

24  District to appropriate rights to the use of water for purposes

25  of irrigation is a matter squarely presented to your Honor and

1  it is the other side of the coin that I have been arguing here,

2  namely, that your Honor in your capacity as the one to adjudge

3  the rights must not only determine whether there is water

4  available for appropriation, in my view, but you also must

5  determine whether the Fallbrook Public Utility District has

6  the corporate power to appropriate rights to the use of water.

7  THE COURT: Very offhand and just as a matter of logic--

8  although I don't agree with your other thing-- it may very

9  well be that when I was cataloging claims and came to a permit

10  issued by the State to Fallbrook I found that Fallbrook did

11  not have power or capacity to use the permit.  I might have

12  jurisdiction to find that just like I would have jurisdiction

13  to find that someone had a riparian status or didn't have a

14  riparian status.  This might be.  But let's wait until this is

15  briefed.

16  MR. VEEDER:  All right.

17  THE COURT:  This may cut through.  Although I don't

18  think I should go any further than to say merely that a

19  permit was issued on such and such a date and recite the

20  permit and what the status of it is, whether it has matured

21  into a license, et cetera.  It may be that I would have to

22  inquire into the capacity of the person to obtain the permit,

23  particularly if that had not been ruled on by the State

24  agencies.  I don't know.  Let's wait.

25  MR. VEEDER:  All right.  I will cease and desist on the

13
Z10

1   point. But I think it is very important.

2       THE COURT: In summary, as I understand, you claim--

3   these may not be in the right order-- (1) That Fallbrook has

4   the burden of showing economic ability to build a dam; (2) That

5   it must show that it has irrigable acreage, what the irrigable

6   acreage needed is, (3) That it has the burden to show that

7   there is unappropriated water to which its permit would apply

8   and that I must find that there is unappropriated water, and

9   (4) That Fallbrook, because of the doctrine of ultra vires,

10  has no authority to do anything but deal in domestic water and

11  not irrigation water.

12      MR. VEEDER: I think that looking solely to its corporate

13  capacity--

14      THE COURT: Those are your four points?

15      MR. VEEDER: In briefing I wouldn't want to be limited.

16      THE COURT: No. But so I understand your argument.

17      MR. VEEDER: All right.

18      THE COURT: Mr. Girard.

19      MR. GIRARD: I will be very brief, your Honor.

20      What Mr. Veeder has done in those four things, I think,

21  is to ask you to retry the State Water Rights Board's determin-

22  ation that Fallbrook be entitled to a permit which was awarded

23  to Fallbrook.

24      Mr. Veeder made a contention and statement to the effect

25  that applications and permits are gotten without opportunity

14,857

13
Zll

1   for cross-examination, without evidence-- that all the

2   evidence required was the posting of a notice on a tree, the

3   point of diversion, et cetera.   That was the law, of course,

4   prior to 1914.   But when Fallbrook got its application it

5   produced evidence before the State Water Rights Board on each

6   one of these things.   If the United States wanted to cross-

7   examine any of those people they were privileged to do so.

8   They had notice of the hearing.   Mr. Veeder showed up and said

9   that the State Water Rights Board did not have jurisdiction,

10   or something like that, and walked out without cross-examina-

11   tion.   If they didn't cross-examine the witnesses it was solely,

12   only and exclusively because they didn't want to.

13       Fallbrook produced evidence, there was a full hearing

14   before the State Water Rights Board, and all this is, is an

15   effort to have this court determine the issues that were

16   already decided by the State Water Rights Board, and I don't

17   think it is proper to do so.

18       I will save the merits of the ultra vires point for the

19   brief.

20       MR. SACHSE:   That is my story, except for the ultra

21   vires, on which there is argument.

22       THE COURT:   What is your view of what I should find?

23   Am I required to find that there is or is not unappropriated

24   water, in this decree?

25       MR. SACHSE:   No, your Honor.   I think you are required to

14,850

13
Z12

1    find that there is a permit for the Vail Dam as well as the

2    Fallbrook.  They are both permits.  If this river ever

3    completely dries up there may not be unappropriated waters

4    for Vail, just as there may not be for Fallbrook or anybody

5    else.  But you make that determination at the time somebody

6    comes in and says, "Your Honor, I am a riparian or prior

7    vested appropriator.  I am suffering injury by reason of this

8    appropriation."

9         THE COURT:  All right.  I think the only way to handle

10   this is to have it briefed.

11        MR. SACHSE:  You mean the ultra vires?

12        THE COURT:  This whole business of permits and these

13   four points.

14        MR. SACHSE:  Your Honor, are we going to re-brief this?

15        THE COURT:  You said that you didn't brief the ultra

16   vires.

17        MR. SACHSE:  Ultra vires is the only point that hasn't

18   been briefed.

19        THE COURT:  I made some rulings at pretrial and to the

20   extent that I decided some of these matters I would like to

21   have you pull this together.  You don't have to go into all

22   of it.  Certainly I have settled some of it in here, maybe

23   most of it.

24        MR. SACHSE:  The point is I would like to have this much

25   guidance from your Honor.  You repeated twice or three times

13
Z13

14,899

1  in your pretrial opinion the language, in slightly different

2  words, "In the absence of convincing authority to the contrary,

3  the Court intends to rule as herein stated."  Your Honor has

4  so stated on at least three or four occasions in your pretrial

5  order.

6       THE COURT:  There is the pretrial order and there are the

7  two opinions.

8       MR. SACHSE:  In the two opinions you stated, in so many

9  words, that in the absence or convincing evidence to the

10  contrary or overriding authority to the contrary you were

11  satisfied that the law was that the State had the right to

12  grant permits.  You appeared satisfied that the law was to that

13  effect.

14       THE COURT:  I am not going to back up on that.  I

15  reviewed that and to the extent that I decided that, that is

16  done.

17       I don't think there was considered in the opinion this

18  question of economic ability to build a dam.  I don't think

19  there was considered this argument about irrigable acreage.

20  And I don't think that I decided anything on ultra vires.

21       MR. SACHSE:  No, not on ultra vires.

22       THE COURT:  I decided that the State has authority to

23  issue permits.

24       I don't ask you to do a lot, but you could pull some of

25  this together.  You haven't briefed ultra vires.

13
Z14

14,860

1       MR. SACHSE:  No, your Honor.

2       THE COURT:  The State hasn't briefed it.

3       MR. GIRARD: No, your Honor.  I don't have a copy of the

4   brief Mr. Veeder wrote and I would like to have a copy of it.

5       Certainly these things like economic feasibility of

6   Fallbrook to build the project, et cetera, if your Honor wants

7   a brief on them, fine.  But I think they are rather novel

8   arguments and I have some difficulty visualizing any merit to

9   them.  Before I brief them I would like to see the brief

10  of the United States in writing as to why they think that could

11  be raised.  I would like to suggest that the United States

12  file their brief first and let us answer that.

13      THE COURT:  I think they should, because I think the

14  United States has the laboring oar on this proposition.  I

15  haven't been particularly impressed by these arguments, in

16  view of what I have already decided, and you would have the

17  job of filing the opening brief, Mr. Veeder.

18      MR. VEEDER:  If you please.

19      THE COURT:  When will you file it?  You may refer to

20  your earlier brief and give me a reference to it so that I cann

21  find it, and then in the light of what I have decided and these

22  cases, follow on and submit anything else you want to submit.

23  I don't think you have briefed this question of economic

24  feasibility or irrigable acreage.

25      MR. VEEDER:  I believe your Honor will find that I did,

1   but I will check it out.  I thought that Fallbrook had.  I

2   thought Mr. Swing and Mr. Sachse had filed a brief in response

3   to my brief on ultra vires.

4        MR. SACHSE:  No.  To refresh your recollection, your

5   ultra vires brief was included as one of the issues in this

6   motion for summary judgment, and our sole argument on your

7   motion for summary judgment was that the Court couldn't grant

8   it because it involved  questions of fact and the Court so

9   ruled.

10       MR. VEEDER:  When will be the next time that we convene?

11  The matter of time is somewhat important to me because I have

12  quite a few things going, your Honor.

13       THE COURT:  I would like to convene as early as we could

14  in January.  What views do you have on it?

15       MR. VEEDER:  The Master's hearing, I believe, has been

16  scheduled over to the 16th of January, your Honor.  I have a

17  trial that week.

18       THE COURT:  The 16th you have a trial?

19       MR. VEEDER:  During the period of that week.  I think

20  the 16th is a Monday.

21       THE COURT:  That is right.

22       MR. VEEDER:  I would prefer to have the hearing-- I am

23  worried about time on this thing-- I would prefer to have the

24  hearing toward the end of January to the end that we would

25  have a little more time to do this briefing, whatever is going

13
Z16

1   to be required of us.  I think the holidays may affect some

2   of these people.  I don't know.

3        MR. SACHSE:  How many days does your Honor have in mind

4   you might be able to give us?

5        THE COURT:  I will give you a whole week, if you can

6   use it.

7        How about the week of January 24th, starting Tuesday

8   the 24th?

9        MR. SACHSE:  Let's do it and let's take it all.  I will

10  get my briefs in.  I am sure Mr. Veeder can prior to then.

11  I am sure we can be ready.

12       I will be ready to present-- this is just a recital of a

13  few of the things we can do-- a judgment in Domenigoni Valley.

14       I will be ready to have a final judgment, which we

15  discussed at our last yearing, for Tucalota Creek and for these

16  so-called stringers of alluvium.

17       I will be read with proposed comments on Mr. Veeder's

18  submission for Wilson Creek.

19       Mr. Veeder is ready right now to go ahead up to Aguanga

20  Valley.  If we don't get to do that today maybe we can do that.

21       I am sure we will have plenty to do.

22       THE COURT:  The 31st would suit me better.

23       MR. SACHSE:  May we go a step further, then, if it is

24  going to be that far ahead, your Honor, and actually perhaps

25  plan one other thing.  There is no question but that certain

1  evidence, I don't think controversial, is going to have to

2  come in to bring up to date the hydrology of Camp Pendleton.

3      MR. VEEDER:  Those are already done and ready to be

4  filed.

5      MR. SACHSE: Can we plan on that for that week and get that

6  knocked off, too?

7      MR. VEEDER:  They are already prepared.

8      THE COURT:  The question is, can we put those on for

9  the week of the 31st?

10      MR. VEEDER:  Yes, your Honor.

11      MR. SACHSE: Good.

Belt 14

P 100

1   THE COURT:  Tuesday, January 31st, will be the continued

2   date  then.  The reason I put it that far ahead is the fact

3   that I have agreed to try a patent case for Judge Kunzel, and

4   I think I will try it.  And I have to try some short criminal

5   cases.  And they talk about two to four weeks.  It is set for

6   the tenth of January.  I can get through with it by the 31st.

7       All right, on the 31st we would have the briefs in on

8   this permit problem and also --

9       MR. VEEDER:  When you say the permit problem, that is the

10  ultra vires question?

11      MR. GIRARD:  I would like to have Mr. Veeder's at least

12  a week before I write it.

13      THE COURT:  We will get to that.  We are going to bring

14  up to date the data downstream on the onclave.  Is that right?

15      MR. VEEDER:  That is right.

16      THE COURT:  We will have presented the findings on Domenigoni

17  Valley.

18      MR. SACHSE:  Yes your Honor.  Mr. Veeder already has.  And

19  we will have ready to present the findings for Wilson Creek

20  and for Tucalota Creek also.

21      MR. VEEDER:  In regard to these Wilson Creek findings,

22  let us clear this thing up.  I have made a tentative draft.

23      MR. SACHSE:  And I expect to get something back to you.

24  I think we will have something ready by then.

25      MR. VEEDER:  How much of a distribution do you want me to

14,864

P 1011   give on that, your Honor?  I have only given to the State and

2   to Mr. Sachse.  Do you want everyone to review it?  If you do,

3   I will make another run of it.

4       THE COURT:  I think all the attorneys in the case ought

5   to have it.

6       MR. VEEDER:  All right.

7       THE COURT:  Why don't you also plan for this next hearing

8   to have prepared an interlocutory judgment on these permits?

9   I am fairly sure of what I am going to do.

10       MR. SACHSE:  You mean the language of it?

11       THE COURT:  Yes, and we might as well have the interlocutory

12   judgment prepared, unless Mr. Veeder can convince /me that this

13   problem is right I will sign that and get it out of the way.

14       MR. SACHSE:  I think we can certainly have the interlocutory

15   findings prepared, because there is not any argument on what

16   the findings are.  Mr. Veeder may argue on some of the conclusions.

17   But the fact of the permit is not controverted.

18       MR. GIRARD:  Yes, we can do that in the brief, just attach

19   the order and findings.

20       THE COURT:  Make a separate document and have it in shape

21   that if I am satisfied I can sign it.

22       MR. GIRARD:  Yes.

23       MR. VEEDER:  What about the stipulated judgment, your Honor?

24   Will you be ready to rule on that?

25       THE COURT:  I expect to be.  In fact, I expect to have some

·P 102

1   time to work the week after Christmas, maybe next week, on it.

2       MR. VEEDER:  You are not going to rule today on it?

3       THE COURT:  I made a tentative ruling.  The only thing is

4   whether you want to file another brief.  You filed it.  I have

5   read it over once.  Now you are talking about some issues I

6   asked you to talk about a long time ago.  But I am still going

7   to consider it.

8       MR. VEEDER:  But you will rule at the same time?

9       MR. STAHLMAN:  Does your Honor desire a reply brief to

10  this last brief of Mr. Veeder's?  I just read it over last

11  evening.  It is almost a rehash cooked over a hotter fire.

12      MR. GIRARD:  I can't say that.  I think it is one of the

13  better ones.

14      MR. VEEDER:  I think it is conclusive.

15      THE COURT:  I think you might as well file some replies

16  to it.  I think it is one of the better briefs, too.

17      MR. VEEDER:  Thank you, your Honor.  I enjoyed writing it.

18      THE COURT:  It took me a lot of swinging with a club to

19  get you to talk about some issues I wanted to hear about.  But

20  you got your pen ready and really went to work on it.

21      MR. VEEDER:  I was hoping your Honor would simply rule

22  that George hadn't proved his case.  Actually, I wrote you a

23  beautiful appellate brief there.

24      MR. STAHLMAN:  We know the object of it.

25      MR. SACHSE:  I have another suggestion for time, if Mr.

· P 103

1  Veeder could let it fit.  Mr. Veeder, could you possibly plan

2  on being here a part of the week prior?  I am confident that

3  we could hammer some of these orders out, just as we did when

4  your Honor was doing pre-trial.  We had a number of sessions

5  in your Honor's absence and then met later.  I think we can

6  probably get some of these interlocutory orders really in shape

7  to give your Honor something.

8     MR. VEEDER:  Mr. Sachse, I'll come from my trial down here.

9  I can't tell you when I will be here.

10     MR. SACHSE:  I will save the whole prior week, if you will

11  let me know.

12     THE COURT:  I think it would be a good idea for you to be

13  down here on the 23rd.

14     MR. VEEDER:  I will do my best, your Honor.

15     MR. SACHSE:  Let me know immediately you are done, because

16  I am going to save the time.

17     THE COURT:  Let's see if we can decide on time for these

18  briefs.  Mr. Veeder, the permit problem -- this is the 9th of

19  December -- when would you like to file that brief?

20     MR. VEEDER:  I will try very hard, your Honor, to get it

21  in by Christmas or that week.

22     MR. GIRARD:  Can you get it in by January 5th?  That would

23  be fine.

24     MR. VEEDER:  If I could have it in the first week of

25  January.

P 104

1    THE COURT:  Say January 5th, which is a Wednesday.

2    MR. VEEDER:  I will try.

3    THE COURT:  All right, 1-5.  That is a Thursday.

4    And then by the 16th can the defendants file?

5    MR. SACHSE:  I will have mine in.

6    MR. GIRARD:  Yes your Honor.

7    MR. VEEDER:  Could I touch on a point?

8    MR. STAHLMAN:  On the replies to this brief of Mr. Veeder's,

9    your Honor, is there any certain time?

10   THE COURT:  I will take that up next.  How much time do

11   you want to file a reply to the brief on the Vail judgment?

12   MR. STAHLMAN:  I will not come in on the last day like

13   Mr. Veeder did here.

14   THE COURT:  Do you want, say, to January 5th?

15   MR. STAHLMAN:  The 5th will be fine, your Honor.

16   THE COURT:  What about the State?

17   MR. GIRARD:  Yes, we can file one by then, if we file it.

18   I think we will file it.

19   THE COURT:  And Fallbrook will file?

20   MR. SACHSE:  Not on the Vail judgment, no, your Honor.

21   THE COURT:  We have arranged for briefs on the permits.

22   We have arranged for reply briefs on the Vail judgment.

23   There are going to be findings prepared for Domenigoni

24   Valley.

25   There are going to be findings prepared on the permits by

P 105   1   Mr. Girard -- he will have that responsibility -- or Mr. Sachse.

2   Who wants it?

3        MR. SACHSE:   Findings on Tucalota and Wilson Creek?

4        THE COURT:   First on the interlocutory findings on the

5   permits.   That is your job, Mr. Sachse.

6        MR. SACHSE:   Yes.   We were going to do this independently,

7   as I understood.

8        MR. GIRARD:   We will both submit them.   I am sure we will

9   pretty well parallel each other.

10        THE COURT:   Are you going to come back this afternoon?

11        MR. GIRARD:   Yes your Honor.

12        MR. SACHSE:   I hope so.

13        THE COURT:   What are we going to take up this afternoon?

14        MR. VEEDER:   Can't we take up the Murrieta-Temecula basin?

15        MR. STAHLMAN:   Is that related to the stipulated judgment?

16        MR. VEEDER:   Your Honor, on that point, time is of extreme

17   importance to us in moving along on this thing.

18        THE COURT:   I am going to do it.   Maybe we can do it this

19   afternoon -- give you an idea about the Murrieta-Temecula basin.

20        MR. GIRARD:   I think we can dispose of that subject of

21   the stipulated judgment as far as the facts go.

22        THE COURT:   But Mr. Veeder, these findings of the Murrieta

23   and the Temecula are subject entirely to what I eventually do

24   on the Vail judgment.   If you force me into a position that the

25   stipulated judgment stands, I have made up my mind that it stands

P 106

1   along with the old judgment, and then you are faced with the

2   finding that your basins are set forth in that old judgment.

3   There is no escape from that.

4       MR. VEEDER:  Then may I tender you a thought.  In addition

5   to our work on the last week of January, let us also write --

6   I don't know why I am doing this -- let's also write a brief

7   as to the applicability of the principles of the Bernhard case.

8   Do I understand that Mr. Sachse is going to amend his pleadings

9   to claim --

10      MR. GIRARD:  Let's wait until Judge Carter decides that

11  and then brief it.

12      MR. SACHSE:  When Judge Carter makes his ruling I may not

13  have to amend.  But if Judge Carter's rulings are that the

14  stipulated judgment remains in effect, then I would immediately

15  make a motion in behalf of certain clients for leave to amend

16  to raise the plea of estoppel by judgment against the United

17  States.

18      MR. VEEDER:  Why don't we put it in a bundle then?

19      MR. SACHSE:  Why do it?

20      THE COURT:  Have you written a brief on the Bernhard case

21  yet?

22      MR. VEEDER:  I have researched it.  I am ready.  I would

23  want to argue the point.  Maybe I am anticipating too much,

24  but I think your Honor should sustain the stipulated judgment,

25  and I think when you have done that the question of the Bernhard

P. 107

1  case is immediately appropriate to be heard.

2  THE COURT:  If I ever wanted to do anything that would

3  confuse this case for years to come and probably eventually

4  hurt the United States as much as anything I might find, it

5  would be to sustain the stipulated judgment.  This would be

6  nothing but a fertile cause of confusion from here on out.  How

7  anybody could draw a decree --

8  MR. VEEDER:  I will draw a decree for you.

9  THE COURT:  -- providing one basin and rights as to Vail

10  and the Government, and other basins and other rights as to

11  everybody else, this is unthinkable.

12  MR. GIRARD:  I think for this afternoon we can iron out

13  this area 4.

14  THE COURT:  Will you also get back early from lunch and

15  look over the proposed judgments on some of these creeks and

16  see how close together you are on some of that?

17  MR. GIRARD:  Yes your Honor.

18  THE COURT:  Take a recess until 1:30.

19  (Noon recess)

20  SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 9, 1960, 1:30 P. M.

21  MR. VEEDER:  Your Honor, there was a point that was not

22  alluded to.  We would like to set for the next hearing the

23  matter of objections in the lower Murrieta and Santa Gertrudis

24  Creek area where we sent out your letters for approval or dis-

25  approval of the proposed findings on your irrigable land.  If

P 108

1  that would be agreeable, we will mail those letters out, with

2  the same practice that we have used in the past.

3      THE COURT:  Set that for the 31st of January?

4      MR. VEEDER:  Yes your Honor.

5      THE COURT:  All right.

6      MR. STAHLMAN:  There are two other matters, your Honor.

7  One of them is the study of the Vail lands made by Colonel

8  Bowen, which I understand will be ready by that time.  And also

9  the conclusion of the matters of agreement on the evapo-trans-

10 piration losses.  We want Colonel Bowen to study those before

11 we put our exhibits in on that.

12     MR. VEEDER:  That is all right with us.

13     MR. SACHSE:  May I mention this prescriptive thing now?

14 Is that appropriate?

15     MR. VEEDER:  I was going to.

16     MR. SACHSE:  Go ahead.

17     MR. VEEDER:  Has your Honor had opportunity to look at

18 the proposed findings I gave you on Wilson Creek?

19     THE COURT:  I have just hurriedly looked them over.

20     MR. VEEDER:  You will find in there a matter that, in

21 writing them, concerned me, and Mr. Sachse has made reference

22 to the problem that is obvious from there.  In regard to certain

23 uses in Wilson Creek, it is apparent that they have had diversion

24 works in for a good many years, and it is apparent also from

25 looking at the record that these diversion works could not be

P 109

1 for riparian land.  When we go through the answers that have

2 been filed in this and elsewhere in the watershed we find claims

3 for prescriptive rights and for appropriative rights.  Now some

4 of them have not even answered -- some of these people have not

5 even answered in the findings I have offered.  There are others

6 who are claiming prescriptive and appropriative rights.  The

7 question has come up whether we should notify those people,

8 particularly the people claiming prescriptive rights, that you

9 are going to have a cutoff date in this proceeding some time

10 where they will either have to come in and prove their rights

11 or lose their claimed prescriptive rights.

12 MR. SACHSE:  I think you should, your Honor.  I have

13 suggested to Mr. Veeder that on appropriation you could, if

14 necessary, wait until the last minute and expect to bring your

15 appropriative findings up to date by simply having California

16 give you a certified copy of the record showing the status in

17 the Water Rights Board.  That would take care of everybody ex-

18 cept some old claim non-statutory.

19

20

21

22

23

24

25

1    On prescription I would have to agree with Mr. Veeder

2  that the burden is 100% on a prescriptive claimant to prove

3  his prescriptive claim.  And if Mr. Veeder or Commander Redd

4  could run the answers and advise you which prescriptive

5  claimants have not yet offered any proof of any kind I think

6  we ought to give them a cutoff date and tell them to come in

7  and do it.

8    THE COURT:  This fits in with what I was thinking about

9  last night with reference to Exhibit 275 and the overlay.  It

10  is apparent from just the little checking we did before we

11  adjourned that some of these people have never appeared nor

12  taken any part and they have good-sized holdings.

13    MR. VEEDER:  That is correct, your Honor.

14    THE COURT:  For instance-- we could spend some time on

15  it here to check out some of them-- Trenel, Parcel 69, over-

16  lies a good portion.

17    MR. VEEDER:  I would want to run down those names, your

18  Honor.

19    THE COURT:  This is very rough.

20    Then the property immediately east of the Vail property.

21  Is that Knox?

22    MR. STAHLMAN:  That is the Sunnybrook.

23    THE COURT:  They have not been in.

24    MR. VEEDER:  That is right, they have not pled.

25    THE COURT:  Here is a large parcel of land immediately

1   adjacent to Vail overlying the younger alluvium right in

2   Nigger Valley there.

3        MR. STAHLMAN:   That's right.

4        THE COURT:   And it seems to me that we should go through

5   and pick out some of these people that really have a stake

6   and probably issue an order to show cause that they file

7   something sometime in January and that they appear at the

8   hearing on January 31st to make proof of what rights they

9   have.

10       MR. SACHSE:   That was my thought, your Honor.   I didn't

11   limit my thinking only to prescription.   But I agree.

12       THE COURT:   I am not so concerned with people who

13   overlie the basement complex or some of these people where we

14   don't have that kind of problem.   We have enough in the record

15   to take care of their rights.

16       But here are, for instance, two big-sized parcels, and

17   I don't want them to feel that they have been lulled into some

18   sense of security by this statement that I was not going to

19   default anybody.   If they have rights, they ought to be in

20   here if they come in only as pro per.

21       MR. SACHSE:   There is only one thought.   I am not

22   disagreeing.   I don't know anything about Trenel.   But there

23   may be a riparian who has had legal advice or not or who says

24   to himself, "I am not going to waste five minutes in here.

25   I am a riparian and the record shows I am a riparian, and

15
Z21

1  that's enough for my case."  If so, I think we have a right

2  to forget him, because he doesn't have any real burden.  The

3  United States did agree to be bound by the ownership maps as

4  they are shown.  But the people who have the burden I think

5  we ought to give specific notice to, the prescriptors in

6  particular.

7       THE COURT:  I agree.

8       Do you think you could submit to me an order to show

9  cause directed to these persons who claim prescriptive rights?

10 And why shouldn't we include the appropriative?

11      MR. SACHSE:  I think you should include the appropriative.

12 Although we can get evidence on them from another source.

13      MR. VEEDER:  Yes, your Honor, we can.

14      THE COURT:  When would you have the names of these

15 people?  You have Wilson Creek lined up, and it wouldn't be

16 a big job to run that creek down.

17      MR. VEEDER:  Would it be preferable to do it subwatershed

18 by subwatershed?

19      THE COURT:  Yes.  In other words, start with these

20 findings we have.

21      MR. VEEDER:  All right.

22      THE COURT:  Do we have another set now besides Wilson

23 Creek?

24      MR. SACHSE:  I don't know how many prescriptors may or

25 may not be involved.  Mr. Veeder would have to guess.  But

15
Z22

1    don't forget, your Honor, we have findings of a sort by the

2    Special Master or yourself for everything now from the Narrows

3    down and Pechanga.

4        Bill, are there a lot of prescriptors in those areas?

5        MR. VEEDER:   There are a lot of people who claim

6    riparian, appropriative and prescriptive rights.

7        MR. SACHSE:   Riparian doesn't upset me too much, but the

8    other two do.

9        MR. VEEDER:   I think when a man files pro per a state-

10   ment that he has appropriative or prescriptive rights he is

11   entitled to be notified that there is a cutoff date.

12       THE COURT:   It doesn't do any harm to notify him of the

13   cutoff date.

14       MR. GIRARD:   Give everybody in the watershed notice.

15       THE COURT:   We don't have to do it all by January 31st,

16   but we could certainly take certain areas of the watershed.

17       MR. VEEDER:   Where we have completed our work, such as

18   in Murrieta Valley, I think it would be better to start in,

19   because that is the way we have been coming, if it is agreeable

20   with your Honor, to make that check.

21       THE COURT:   I wouldn't expect that you would find much

22   in Murrieta Valley, but make your check.

23       Did the Master make findings on Pechanga?

24       MR. SACHSE:   Yes, but they are most incomplete.

25       MR. VEEDER:   I was hopeful that we would go ahead the

1   way we are, frankly, write our findings, and if there is a

2   conflict and there is any need for further argument about

3   the Master's finding.

4        THE COURT:  Can you check Pechanga and Wilson Creek

5   from the answers?

6        MR. VEEDER:  Yes, your Honor.

7        THE COURT:  What about those three?

8        MR. SACHSE:  May I suggest, I don't think he is going

9   to find quite as many prescriptors and appropriators as he

10   think.  And if you want, why don't you give us a number?  Do

11   you want to set 50 or 75?  And just let Mr. Veeder go ahead

12   in whichever area he wants.

13        MR. VEEDER:  Let me come the way we have been coming.

14        THE COURT:  You can set as many as you want.  If we

15   find we have too many we will say, "Come back on another day

16   and we will hear you."  That is why I suggest that you make

17   it into an order to show cause that he be here personally and

18   show up.  I don't know how you would word it.

19        MR. VEEDER:  I will get some kind of order.

20        THE COURT:  To show what rights he has.

21        And this overlay on 275, you could certainly include

22   also Trenel and Knox in there as big parcels who haven't

23   appeared here.

24        MR. VEEDER:  I think when your Honor studies over the

25   proposed findings in regard to the individuals the need for

1    more than just notice in regard to prescription, I think, is
2    going to become quite apparent.  For instance, a man named
3    Roy E. Shipley has appeared in regard to certain property,
4    represented by Mr. Krieger.  I find that he has an old-time
5    appropriative right.  Where he uses the water I can't possibly
6    find from the record.  His lands are not pleaded and yet I
7    think it would be too bad for that man to be cut off on what-
8    ever right he has.  I think we have to get into contact with
9    Mr. Krieger or somebody and take care of it.  It is quite a
10   task, though.

11        In regard to irrigable and irrigated lands, we do have
12   some data in regard to that area but in regard to many of the
13   areas we don't, and yet we know that those rights, for example,
14   in Reed Valley and elsewhere, are overlying rights and might
15   have some interest in the stream, even though the water up
16   there is very meagre.

17        I want to do what your Honor wants me to do, but I would
18   like to avoid piecemealing this thing, if we can, and if you
19   are going to try that matter say, "What kind of rights are you
20   claiming?  You have a cutoff date on your prescriptive rights."
21   I think that would be better.  But I will do what you want me
22   to do.

23        THE COURT:  Do you suggest that you write them a letter
24   or that I write them a letter?

25        MR. VEEDER:  I will have you write them a letter, but I

15
Z25

1  think there are a lot of these people we are going to have to

2  hear on more than just one point.

3       MR. SACHSE:  Don't you think it would be better on a

4  shotgun OSC?

5       MR. VEEDER:  It would be much simpler for us.

6       THE COURT:  You could draw an order to show cause where

7  you would list the various varieties of rights here and you

8  can adapt this form to any situation by merely crossing off

9  as to certain people the things that weren't pertinent.  You

10  could have one form drawn, leave a blank date, mimeograph it

11  so we could use a later date on another hearing.  Then you

12  could list the whole bundle of possible claimed rights, knock

13  out 4, 5 and 6 if he hasn't raised those rights.  You could

14  have it apply to everything and cross out what is not pertin-

15  ent to the one particular man.

16       MR. VEEDER:  I will do that.

17       If they are asserting anything-- that is my view,-- I

18  think we should have the cutoff date, which is essential, and

19  there should be a time when we wind up on a particular tract

20  of land and we wouldn't have to worry about it any more.

21       THE COURT:  See what you can get out in the way of a form

22  for my approval and direct, first, that he file something in

23  the nature of a letter or answer telling us what his rights are

24  prior to the hearing on the 31st, and secondly that he be

25  present at that hearing with his data and documents and

1    witnesses to support his claim.

2         MR. VEEDER:   Your Honor will find a high proportion of

3    these people whose lands are actually riparian and overlying

4    haven't even answered or made an appearance.

5         THE COURT:   You will take care of that?

6         MR. VEEDER:   I will take care of it.

7         THE COURT:   Do you have mimeographed that list of owners

8    that goes with Exhibit 275?

9         MR. VEEDER:   I haven't had it mimeographed.   I will have

10   that prepared and distribute it to counsel.

11        THE COURT:   Then you are not prepared to do anything on

12   that?

13        MR. VEEDER:   At this time.   We will get the whole thing

14   in on the 31st of January.

15        MR. SACHSE:   Speaking only for myself, I have no objec-

16   tion to it if there is anything you want to put in now before

17   you give me a copy.   It is all right with me.   I am not con-

18   cerned.

19        THE COURT:   On this proposal as to Stardust, you sub-

20   mitted to me a copy of proposed findings.   Who is appearing

21   for Stardust?

22        MR. SACHSE:   I am, and I am going to work on them, and

23   that was part of my suggestion that Mr. Veeder could get in a

24   week early.   That ties into Wilson Creek.   I will try to have

25   something that we can at least tell you where we disagree by

1   the 31st.

2       MR. VEEDER:  May I suggest that you view that Stardust

3   offering that I made as part of the Wilson Creek proposed

4   findings.

5       THE COURT:  Yes.

6       MR. SACHSE:  I like Mr. Veeder's format in particular.

7   I think they are better than my own the way it is set up.  I

8   am going to re-do mine in his style.

9       THE COURT: That's the second compliment you have had

10  today, Mr. Veeder, one on your brief, and now one on your

11  findings.  This is a big day for you.

12      MR. GIRARD:  He'll be smiling on his way home tonight.

13      MR. VEEDER:  I will remember Domenigoni as of today.

14      THE COURT:  What do you want to work on now?

15      MR. VEEDER:  This is what I would like to work on now,

16  the Temecula-Murrieta Basin, and whether you want us to

17  propose findings in regard to those.

18      THE COURT:  You mean the proposed boundaries?

19      MR. VEEDER:  That is right.  And further, if I compre-

20  hend what next follows, it is findings in regard to the exterior

21  boundaries of the areas within that basin.  It is a big job and

22  I would like to get started on it as soon as I can.

23      THE COURT:  I didn't get the second part of it.  The

24  exterior boundaries is one thing.

25      MR. VEEDER: The exterior boundaries.  Then the interior

14,882

1  ownerships, the people who are actually overlying, who own

2  land, whose lands are riparian and are irrigated and irrigable

3  acreages.

4      THE COURT:  That is pulling together a lot of people we

5  have heard here?

6      MR. VEEDER:  That is right.

7      MR. SACHSE:  And some who haven't shown up.

8      MR. VEEDER: But I can't divorce the individual owners

9  from the exterior boundaries of the basin.  I would like to

10  proceed at once to start writing those findings, because I

11  think that is the biggest single job we have.

12      MR. GIRARD:  I think as far as exterior boundaries are

13  concerned, Col. Bowen could just show us where the line goes.

14  I think most of us could agree to it.

15      MR. SACHSE:  I have already checked it out.  It is all

16  right with me.  I have no objection to it.

17      MR. VEEDER:  I have supplied everyone a list of the

18  parcels.

19      MR. GIRARD:  I can't get too worked up as to the people

20  within the boundaries because you will have the boundaries

21  described and I presume that you will make a finding that

22  everything in there is part of the river.  What difference does

23  it make whether you describe them individually?

24      MR. VEEDER: There is a point I would like to make.

25  Would it be possible for you to express something along this

1    line, that the exterior boundary of this basin would not

2    preclude a man who lies outside the boundary or whose lands

3    are partially outside the boundary from taking action to

4    protect his interests if his rights are invaded by pumping

5    within the basin area?  I think that would save future diffi-

6    culty.

7        THE COURT:  Read that, Mr. Reporter.

8        (The reporter read Mr. Veeder's last statement.)

9        MR. VEEDER:  Is there any difficulty on it?  Do you

10   want me to clarify the point?

11       THE COURT:  I think I know what you mean.  Here is a

12   man who has a well and he is right outside the boundary of

13   this basin and it is found that his water is local, vagrant,

14   percolating, or of such small supply as to be no more than

15   domestic and therefore not of import in the stream system, and

16   somebody puts a well within the basin and takes all his water

17   away.  He should have some right against his neighbor or

18   against an adjacent owner or an adjacent owner one removed,

19   whatever it might be, to get some relief.  Is that what you

20   are talking about?

21       MR. VEEDER:  That is right, your Honor.

22       MR. SACHSE:  Your Honor, Mr. Veeder uses the word

23   "basin," and you just did, and I don't like it.  I don't think

24   you have found that this is a basin.  I think you found that

25   all the ground water in it is part of the stream.  There are

15
Z30

1  two very different things.  If it is treated as part of the

2  stream and a man owns land that overlaps your line, he is

3  reiparian and he is O.K.-- he can bring his action.  If

4  he owns land that is wholly outside your line, though, he

5  can't.  I think it is that simple.  There is no problem.

6      THE COURT:  I see that.  But now I am confused about

7  this talk about being part of the stream or a basin.  It has

8  to be the basin, doesn't it?

9      MR. SACHSE:  I don't think so.

10      MR. GIRARD:  It is probably a basin which is part of the

11  stream.

12      MR. VEEDER:  Yes.

13      MR. GIRARD:  If you want to approach it that way.  But

14  I personally would feel that regardless if you use that term

15  "part of the stream" that everyone within these lines and

16  everyone outside these lines, in so far as their use of ground

17  within the area which is delineated the basin or the stream

18  is concerned, would have what are essentially riparian rights,

19  not overlying rights.

20      MR. SACHSE:  That is my point.

21      MR. STAHLMAN:  They would be correlative one with the

22  other whether they abutted on the channel or the overlying

23  land.

24      THE COURT:  Why would you say "riparian" instead of

25  "overlying lands"?

1    MR. GIRARD:   I am not sure I am actually correct in this.

2    But as I understand overlying land over a basin, you could

3    only use water on land which actually overlies a basin; whereas

4    if you claim as a riparian as to ground water which is part

5    of the stream you can use water on lands which do not overlie

6    the stream but which have a riparian status to it.

7    MR. VEEDER:   I don't believe that you can have, Mr.

8    Girard, a riparian right without abutting upon the surface

9    stream.

10   MR. GIRARD:   No.  If you consider the ground water as a

11   stream, you would have a riparian right to it.

12   MR. VEEDER:   If I recall the law on this correctly-- I

13   think I had better brief it.  But the point of it is that these

14   people who do not abut upon the stream are owners of overlying

15   rights correlative one to the other.  Their rights are in the

16   nature of riparian rights, but they are not of the character

17   where you could take it off away from the basin surface area.

18   That is my understanding of the law.

19   They use the term in Peabody vs. Vallejo that an over-

20   lying owner has rights comparable in nature to a riparian right.

21   But they are not identical in nature because the only riparian

22   right I am acquainted with is the surface right abutting upon

23   a surface stream.  And I believe your Honor's use of the term

24   "basin" here is correct and I believe that the point that we

25   raise is valid, because I don't believe they can export water

1  away from the surface of the basin of the kind and type of

2  rights involved here, except surface rights.

3      MR. GIRARD:  I would throw out the idea to the Court

4  that if that is considered as a basin instead of a stream I

5  doubt very much if any person downstream of Camp Pendleton

6  would have any rights to that water under California law.

7      MR. STAHLMAN:  That is the point I raised at one time.

8      MR. SACHSE:  I think Mr. Veeder is right, and I also

9  don't like the use of the word "Basin."

10      THE COURT:  Enlarge upon that.

11      MR. GIRARD:  As I understand the law of California as to

12  ground water, the only rights the United States would have, or

13  any downstream user would have to ground water, if he is not

14  an overlying owner, would be if it is in a known defined channel

15  part of a stream system.

16      MR. SACHSE:  That is right.

17      MR. GIRARD:  Under a statute.  And unless you can say,

18  which I think you should say, that the ground waters within

19  this are in a known defined channel part of a stream system,

20  I don't think the Navy can claim a bit of right to the ground

21  water under California law.

22      MR. VEEDER:  I think, in that regard, the last phase

23  you touched on is the important phase.  Is this surface stream

24  fed and sustained by this body of water?  And that is the crux

25  whether we have a right to claim upstream.

15
Z33

14,887

1    I desire now to start writing findings on the Murrieta

2    for the purpose of outlining and delineating the area which

3    you have called a basin, which I think is a basin, and have

4    the finding also that the stream flow of the Santa Margarita

5    is supported by that source of supply.

6        THE COURT:  I take it that Mr. Sachse and Mr. Girard

7    both concede that the evidence would be sufficient to find

8    that the waters in this area that we are demarking, the out-

9    side perimeter, are part of the stream system.

10       MR. SACHSE:  Yes, your Honor.

11       MR. GIRARD:  Yes.

12       THE COURT:  Although it may also be in the nature of a

13   basin.

14       MR. SACHSE:  It may also be in the nature of a basin.

15       THE COURT:  And that unless defined as part of the

16   stream system, in their view of California law, your rights

17   would end.

18       You don't object to it, do you?  We are in agreement?

19       MR. VEEDER:  Yes.

20       THE COURT:  Let's do it the simple way.

21       MR. VEEDER:  All right.  I think we are in agreement.

22       MR. SACHSE:  The only thing that concerns me is the

23   very point that Mr. Veeder raised.  In the use of the word

24   "Basin" as such, there is law both ways.

25       THE COURT:  We don't have to use the word "Basin."  We

15
Z34

1    can say "a ground water body."

2         MR. SACHSE:   Part of the stream.

3         THE COURT:   Part of the stream.

4         MR. SACHSE:   That would solve your problem completely,

5    because the law would be automatic as night follows day that

6    if part of his land is within Unit 4 he can take the water out

7    of Unit 4 on the remainder of his land outside.   If none of

8    it is within Unit 4, he has no rights.

9         MR. STAHLMAN:   Your Honor, in Hutchins' California Law--

10   I think this is quite carefully put together-- under the

11   subject "Water Courses," and then further on it makes a

12   determination of waters which are part of an underground basin.

13   But there must be a definition first of the water course, and

14   the cases have given those, and that is a question of fact,

15   of course, and the cases have spelled out what determination a

16   court should make, what factors would constitute a watercourse

17   a part of a stream system.

18        THE COURT:   Are you in accord with Mr. Sachse and Mr.

19   Girard's suggestion?

20        MR. STAHLMAN:   I was reading this when they gave it,

21   your Honor.

22        MR. GIRARD:   Our position is, essentially, that the

23   ground water is treated exactly like surface water; the ground

24   water shall be defined as part of a stream system.

25        MR. VEEDER:   I think that is something that had better

15
Z35

1  be briefed, because I think you are going to find the language

2  this way-- I may be in error-- that if this man is pumping here,

3  he wants to take the water across this line here, he is going

4  to be in trouble.

5      MR. GIRARD:  He could not do it unless this land here was

6  riparian.

7      MR. VEEDER:  That is right.

8      MR. GIRARD:  Let's take Guenther here.

9      MR. VEEDER:  Guenther's Hot Springs is here, and he has

10  the very problem presented.

11      MR. GIRARD:  Unless he is riparian he can't use this

12  water within the river system on his adjoining land. But you

13  have to draw a line somewhere.

14

15

16

17

18

19

20

21

22

23

24

25

P 110
Belt 16

1   MR. VEEDER:  I was going to suggest in regard to Guenther

2   that you draw a straight line instead of a curved line.  Here

3   is the property.  If you straighten that line out rather than

4   have it come down like this.  By straightening that line out,

5   then there would be no question about Guenther's rights.

6   MR. GIRARD:  But suppose his well is here and he wants

7   to use it.

8   MR. VEEDER:  But actually he has his wells here and he

9   brings the water across there to supply his establishment.

10  MR. GIRARD:  He is riparian.  There is presumably a single

11  ownership of land which crosses the boundary drawn by Colonel

12  Bowen.  I think he would be privileged to do so.

13  THE COURT:  Does anybody have an objection to the finding

14  and conclusion that Guenther's land is riparian to the stream

15  system?

16  MR. GIRARD:  Not in the slightest, your Honor.

17  MR. SACHSE:  Not I.

18  MR. VEEDER:  I think we should.

19  THE COURT:  If we do that, then he can use water out of

20  the stream system.

21  MR. VEEDER:  I thought you would straighten out the line,

22  though.  Why don't you straighten out the line?  It will be

23  simpler.

24  THE COURT:  Let's find out.  But is this way acceptable

25  to say that he is riparian to the stream system?

P 111

1    MR. GIRARD:  I understand from the facts that he is ri-

2    parian.  Here are his wells.  They are right within the line,

3    I think, right here.  And he owns the land from the wells over

4    your line, doesn't he?  So he would be riparian anyway.

5    But I have no objection to finding it.

6    MR. STAHLMAN:  I want to read this.  I think it is a

7    question of fact.

8    THE COURT:  What is the page on it?

9    MR. STAHLMAN:  It is page 21, particularly the second

10   paragraph.  It refers to a finding by the District Court of

11   Appeal in 1947.  And then on page 25, under "Underflow of

12   Streams:"

13   "The underflow is a subsurface portion of a water course

14   comprising water flowing beneath the surface in close associa-

15   tion with the surface flow."

16   Then later on it ties in with the matter of overlying

17   lands.

18   In other words, it is conceivable that it could be a

19   water basin not part of the stream system, and this can be

20   water not part of the stream system.

21   MR. VEEDER:  Katz vs. Walkinshaw is a typical case where

22   you have a situation of a basin where the question of exporta-

23   tion arises.

24   This is a situation where you have a basin and a known

25   stream coming in and a known stream going out, and there is no

P 112

1   question but that we all agree that this water in this basin

2   is part of the Santa Margarita system.

3       MR. SACHSE:  That settles the argument.  I think we should

4   avoid calling it a  basin as such, just because of cases like

5   Katz vs. Walkinshaw.

6       MR. VEEDER:  This certainly isn't Katz vs. Walkinshaw.

7       MR. SACHSE:  Exactly, and the work "basin" is dangerous

8   for that reason.

9       MR. VEEDER:  Let's work it out.  Time is running by.

10      My own thought is that if your Honor wants to make a

11  finding that the line is to be drawn on there and then change

12  it later if the law should show it that way.

13      MR. GIRARD:  I have no objection to the Colonel's line.

14      MR. SACHSE:  I am satisfied with the Colonel's line.

15      MR. VEEDER:  I think we ought to mark that as an exhibit

16  now, though, so that when we are talking about it it will be

17  an official court document.

18      THE COURT:  Where is the line?

19      MR. STAHLMAN:  Here (indicating).

20      MR. GIRARD:  He can explain certainly why he followed

21  certain things.  He did to me and it was very helpful.

22      MR. VEEDER:  Let's put up the other map and your Honor will

23  be able to see it more easily.

24      THE COURT:  Do you want some of this on the record or not?

25      MR. SACHSE:  I would suggest that we stay off the record.

P 113

1    THE COURT:  Stay off the record.

2    (Discussion around the maps off the record.)

3    THE COURT:  Before we pass this, do you think we should

4    have in the record something by the Colonel as to what he has

5    told us here?

6    MR. VEEDER:  I think it would be the way to delineate

7    the area that is being encompassed and then identify the exhibit

8    as plaintiff United States of America's Exhibit 276.

9    THE COURT:  Do you think we should have in the record the

10   things he told us orally about following a road?

11   MR. VEEDER:  That is what I said.  I think there should

12   be testimony as to the exterior boundaries in a general way

13   as shown on Exhibit 276.

14   THE COURT:  Wouldn't it be better to have him write that

15   out at his leisure?

16   MR. VEEDER:  All right.

17   THE COURT: And at our subsequent hearing file it.

18   MR. VEEDER:  Very good.

19   THE COURT:  Swear him and accept it as his testimony.

20   Then he can do it with some finesse and be satisfied with it.

21   Is that agreeable to you to do it that way?

22   COLONEL BOWEN:  Yes your Honor.

23   THE COURT:  Let's get that on the record.

24   MR. VEEDER:  What is next on the agenda, your Honor.

25   THE COURT:  Do you want to talk about Pachanga?

P 114

1      MR. GIRARD:  There is something I would like to express an
2  opinion on, the establishment of procedures for the entering
3  of interlocutory judgments respecting lands situated wholly
4  within basement complex or weathered basement complex throughout
5  the entire watershed.

6      MR. VEEDER:  I have already given you a letter in that
7  regard that I thought we would use as we proceed on through
8  the valley.

9      THE COURT:  Tell counsel about it so he will know what you
10  are talking about.

11      MR. VEEDER:  We have done this.  We have prepared a letter
12  similar in character to the kind we have been sending out to
13  all parties.  We have selected the areas which appear to be
14  strictly in basement complex.  We are sending letters to those
15  people and saying that the ground waters, if any, under their
16  property are either vagrant, local, percolating ground waters
17  or are of such short supply that they could only be important
18  for domestic purposes.  Those people will be notified.  If they
19  don't object we would render them the same kind of stipulated
20  interlocutory judgment that we have been using in the Fallbrook
21  area.

22      That would be my recommendation as to how to handle that.
23  They wouldn't have to appear.  Is there some objection?

24      MR. GIRARD:  No.  The only thing is, of course, it is
25  either vagrant, local, percolating, or it is not.

P. 115

1    MR. VEEDER:  The point I was trying to make to you is that

2    there are areas where there may be some slight doubt as to

3    whether it is part of the Santa Margarita River system.  Even

4    if it is part of the Santa Margarita, if it is of such short

5    supply that it could only be used for domestic purposes we would

6    do the same.

7    THE COURT:  No, but answering Mr. Girard's point, when you

8    made your findings it would be one or the other.

9    MR. VEEDER:  That is right.

10    THE COURT:  But this letter you are sending them tells

11    them, in substance, that the surface water is going to be found

12    to be part of the stream system.

13    MR. VEEDER:  That is right.

14    THE COURT:  But that the ground water is one or the other.

15    MR. VEEDER:  I see.

16    THE COURT:  What it is going to be we don't know until

17    we receive the particular material on the particular area.

18    Does that satisfy your objection?

19    MR. GIRARD:  Yes your Honor.

20    THE COURT:  But as far as they are concerned, we are doing

21    it that way.

22    I don't see any harm in sending this letter out, and I

23    tentatively approved it to sort of let these people know what

24    is going on.  But wouldn't it be better to enter these inter-

25    locutory judgments by areas rather than to hit and miss a group

. P 116

1  of people that show up at one time and a group at another?  Do

2  you propose to do this by areas?

3      MR. VEEDER:  For example, when we move through an area

4  what I would like to do the hearing after the next one when we

5  go through the whole Wilson Creek area there will be probably

6  be twenty, or maybe fifty, parcels of land that will be in dis-

7  pute that I mentioned, and we would simply give them that kind

8  of letter and that would be the end of it.  The people who

9  happen to have overlying rights or substantial riparian rights,

10  I think we should give them the letter we have given them in

11  the past.

12      Does that clarify it?

13      MR. GIRARD:  Yes.  I don't object to it.  But it seems to

14  me we are drawing fairly close to the end of the factual trial

15  in this case where we can maybe within two or three months

16  settle down and start writing what will be the final judgment.

17  I have talked to Mr. Sachse about this and I don't know if he

18  agrees.  But I wonder sometimes if we are not running in circles

19  in everytime we get any of these things making a separate in-

20  terlocutory decree.  Could we make just one interlocutory decree

21  that would cover all lands within any area of the watershed

22  which is in basement complex and just say that a decree similar

23  to this will be entered pertaining to the particular area in

24  which you are located.  I notice in listening that Mr. Sachse

Belt 17  25  drafts something concerning one particular area and it is

14 897

P 117

1 submitted and negotiated back and forth.  Why couldn't we get

2 one to cover everything within a certain class of geologic

3 condition and not go through these interlocutory decrees separ-

4 ately for each little area throughout the watershed?  It seems

5 to me that if you have basement complex here you can treat it

6 just the same as here, here, or over there.

7 　　MR. VEEDER:  You could do that if you didn't have indivi-

8 dual parcels and ownerships.

9 　　MR. GIRARD:  We are going to have to consider individual

10 parcels and ownerhsips when we finally get around to drafting

11 a final decree.

12 　　MR. VEEDER:  Right.

13 　　MR. GIRARD:  Why do it twice?  Let's get the factual

14 evidence in.

15 　　MR. VEEDER:  Have you looked at the findings I have prepared

16 for Wilson Creek?

17 　　MR. GIRARD:  Yes.

18 　　MR. VEEDER:  It is so much simpler to go along the way we

19 have been doing it.

20 　　MR. GIRARD:  I don't agree.

21 　　MR. VEEDER:  I have to do the work.

22 　　MR. SACHSE:  My answer, Fred, in part would be this.

23 Granted that we are writing more pieces of paper.  But the real

24 places where we have written excess paper has been with the

25 Master and some of the early letters letting people out.  His

P 118

1   Honor said that the findings on Tucalota Creek and the slivers

2   of alluvium were tied up with the same type of findings as on

3   other slivers.  The rest will be almost as automatic as inter-

4   locutory judgments 2, 3, 4, 5, 6 and 7.  Once we worked out the

5   first one, the next six went like that.  Maybe we have been

6   a little cumbersome up to now, but I do think it would be a

7   mistake to try to change.

8        Your Honor, I want to put this on the record.  I just

9   called Mr. Littleworth and he confirmed again the statement I

10  made off the record that they are not concerned with the exact

11  location of that line between your water storage Unit 4 and the

12  area which is excluded from the stream system, because they

13  realize that it is going to cross land parcels in any event

14  sooner or later.  His only concern is in the conclusions of

15  law that may be drawn as to the rights of such land owners.  I

16  told him the opinion that we had all expressed here to the

17  effect that the rights would be analogous to riparian rights

18  rather than to strict basin rights.  He said that that is all

19  he was interested in and the line as presently drawn is satis-

20  factory.  He would like an exact map as soon as possible, but

21  he has checked it from the descriptions.

22       MR. GIRARD:  That is the only concern I have.  I don't

23  object if they do this.  But the only concern I have, the main

24  thing -- I think we all want to get through on the drawing of

25  temporary findings -- the main thing is to get all this testimony

P 119

1    heard that is going to be given.

2        THE COURT:  This could be called testimony, the matter of

3    identifying various ownership parcels, and that can only go so

4    fast, and eventually that has to be done either in an interlocu-

5    tory decree which is incorporated by reference or it has to be

6    done in your final decree.  So that if I should enter an

7    interlocutory decree that all land shown on this map has vagrant,

8    local, percolating water, it still won't take us closer to our

9    final decree because we are still going to have to identify it

10   by name and by parcel, and at the rate the Government has been

11   moving on these parcel maps, such as the one they have submitted

12   now with the overlay for above Vail dam, it looks like we could

13   move pretty rapidly on that.

14       MR. GIRARD:  I think we could move pretty rapidly on that.

15       What is the Government's present position on making land

16   classification uses on basement complex?  Are they still doing

17   that or has that been stopped?

18       MR. VEEDER:  What do you mean?

19       MR. GIRARD:  Engineering reports.

20       MR. VEEDER:  I don't think the Colonel is making any

21   engineering reports on the basement complex.

22       MR. GIRARD:  I think that would speed it up a great deal

23   if we did not have those.

24       COLONEL BOWEN:  I think that is correct.

25       THE COURT:  Mr. Veeder, you are still talking about having

P 120

1    classified lands as riparian or non-riparian, and I understood

2    you to tell me when I was inquiring about this hearing that the

3    Colonel would be prepared to give at least some cursory testi-

4    mony as to how many acres were irrigable in some of these parcels.

5    I think it is an illusory proposition pure and simple.  How

6    about that?  Can't we cut that out?

7    MR. VEEDER:  I will do whatever your Honor directs.  I

8    think the mandate of the Court of Appeals -- I don't want to

9    drag anything out.  I want to go as fast as I can.

10    THE COURT:  Particularly if we are going to hold that it

11    is not part of the water system.  Why are we concerned with

12    how many irrigable acres there are?

13    MR. GIRARD:  Certainly the surface use would be nil.

14    THE COURT:  In other words, here is a man, we will say,

15    has land that is riparian to this little tributary.  He has a

16    riparian right, but it is not worth a red cent.

17    MR. VEEDER:  It might be to him, that's all.

18    MR. GIRARD:  If he wants to submit land classifications,

19    fine.

20    THE COURT:  But we would find that his land is riparian

21    to this tributary.

22    MR. VEEDER:  Mr. Girard is talking about one thing and

23    your Honor is talking about another.

24    THE COURT:  We will talk what I want to talk about.

Belt
18

25    We find that he is riparian.  But why should we then go

P 121

1  ahead and say how many of his acres are irrigable and how many

2  are non-irrigable?  He couldn't irrigate one of them.  Why

3  would we even talk about it?  Because if you eventually class-

4  ify it you would have to put his irrigable acres in this illusory

5  category.  There is no water.  So why should we have to worry

6  about how much of this land is riparian and how much isn't?

7       MR. VEEDER:  I thought we had taken care of that by the

8  simple proposition that any piece of land that was intersected

9  by a stream would be treated as being riparian, and that is all.

10       THE COURT:  I am not making myself clear.

11       MR. VEEDER:  And you are asking me about irrigable acreage

12  now.

13       THE COURT:  Yes.

14       MR. GIRARD:  What difference does it make how much irrigable

15  acreage is on that land?

16       MR. VEEDER:  The Colonel has run it through on this area

17  now and on Lower Murrieta.

18       THE COURT:  Why not take him off of this work and let him

19  work on something constructive?  What difference does it make

20  how much of this land in this area is riparian to some part of

21  the water system?

22       MR. VEEDER:  Whatever right he has is purely illusory.

23       THE COURT:  Then why should the Colonel even worry about

24  whether all of that land is irrigable or non-irrigable?

25       MR. VEEDER:  If your Honor says it is unimportant and so

P 122

1  orders, it is unimportant.  There has never been a quarrel on

2  that proposition.  Certainly when we drew --

3  THE COURT:  I am not talking about the finding that it is

4  riparian.  We can find that from the evidence that we have.

5  But let us not spend any time going out and finding how much

6  of this land could be irrigated and how much couldn't be irri-

7  gated, because there is no possibility that he could ever

8  irrigate it.

9  MR. VEEDER:  It suits me fine.

10  THE COURT:  That ought to save a lot of time.

11  You don't object, do you?

12  COLONEL BOWEN:  No sir.  The only objection is, we have

13  already done it.

14  THE COURT:  All of it?

15  COLONEL BOWEN:  Not all of it.  Quite a bit of it.  We

16  have done up in this area here.  A lot of this is that public

17  domain we had worked on.  There are some big ownerships up in

18  here that we have worked on.  But as of now we will not work

19  on it anymore.

20  THE COURT:  If there is any question about it on a piece,

21  it is all right to do it.

22  MR. VEEDER:  We are going to have/an order from your Honor

to have

23  on that, because I can't assume the responsibility, surely.

24  THE COURT:  For what?

25  MR. VEEDER:  For determining whether we should make an

P 123

1  investigation or not.

2      MR. SACHSE:  If it will help you, Mr. Veeder, if you offer

3  some evidence on irrigable acreage and basement complex, I will

4  be happy to make an objection for the record and let his Honor

5  rule on it, if you want me to.

6      MR. VEEDER:  We will go ahead on that basis then, your

7  Honor.

8      THE COURT:  I will make a ruling now, if you feel better

9  about it, that in this area in basement complex we will propose

10  to find what land is riparian, which we can determine from the

11  physical evidence we have in the file, and it will be assumed

12  that it is all riparian unless the Government finds some break

13  in the title.  But we are not going to waste any more time

14  deciding how much of it is irrigable and how much of it is not

15  irrigable.

16      MR. VEEDER:  Suits me very well.

17      THE COURT:  This doesn't apply, of course, to small parcels

18  of land which abut on a stringer of younger alluvium.

19      MR. VEEDER:  Very good, your Honor.

20      THE COURT:  All right.

21      MR. VEEDER:  We will go ahead and we will treat that as

22  an order and that will be it.

23      THE COURT:  What do you want to talk about?  The outlines

24  of the basin above Vail Lake?

25      MR. VEEDER:  I think I would like very much to do that,

·P 124

1   and we can put Mr. Kunkel on the stand and have it identified

2   now and get it into the evidence while he is here, if it is all

3   the same with you.

4       THE COURT:  Was there an exhibit that you identified,

5   namely, the Bowen exterior limits?

6       MR. VEEDER:  Mr. Kunkel, will you take the stand, please.

7       THE COURT:  Did you have another one numbered here?  Did

8   you assign any number to Colonel Bowen's map?

9       MR. VEEDER:  No, I suggested Number 276 for it and you

10  said to wait until it has been further defined.

11      THE COURT:  Let us give it a number.

12      MR. VEEDER:  Give 276 to the exterior boundary lines of

13  the Temecula-Murrieta area that you have delineated.  That is

14  276 and we offer it in evidence.

15      THE COURT:  All right, Plaintiff's 276 received in evidence.

16      Do I understand that 276 is this colored map and not this

17  black and white?

18      MR. VEEDER:  May I inquire from the Colonel?

19      Do you need that to work with?

20      COLONEL BOWEN:  I do.

21      MR. VEEDER:  May we put this in and then substitute later

22  on?

23      THE COURT:  All right, the photostat we will call 276A

24  and receive it in evidence also, and the Colonel may withdraw

25  276 and return it.

P 125

1    MR. VEEDER:  We will assign also his narrative statement

2    as to exterior boundaries as 276B.

3        THE COURT:  276B.

4        MR. VEEDER:  May we proceed in regard to 275 and 275A?

5        THE COURT:  Yes.

6                    FRED KUNKEL,

7    having been previously duly sworn, on his oath was examined

8    and testified further as follows:

9                    DIRECT EXAMINATION

10   BY MR. VEEDER:

11       Q  Mr. Kunkel, alluding to the exhibit marked for identi-

12   fication 275 and to the overlay marked for identification 275A,

13   would you state who prepared the map and read into the record

14   the title block of that map?

15       A  Exhibit 275 entitled "Map of Lancaster, Nigger, Radec,

16   Aguanga and Wilson Valleys" was prepared by myself or persons

17   working under my direct supervision.  It is a geologic map or

18   it is a map that shows geology and location of water wells in

19   Lancaster, Nigger, Radec, Aguanga and Wilson Valleys.  The

20   geologic deposits are differentiated by three colors.  Materials

21   identified as younger alluvium are colored yellow, older conti-

22   nental deposits are colored orange, and basement complex is

23   colored blue.

24       Water wells, domestic, stock or unused, are shown by single

25   circles.  Irrigation wells having pumps of five horsepower or

P 126

1   more are shown by double circles.  Wells that were formerly

2   flowing are shown by a circle either single or double with a

3   half colored red -- half of the circle is red, half of it is

4   uncolored.  Dry or destroyed wells are shown by circles with

5   a vertical line through them.

6       Springs that were flowing in 1960 are shown by solid red

7   circles with a red tail on them, indicating the extent of the

8   flow or of flowing water in a channel below the spring.  Springs

9   that were formerly flowing are circles half colored red with

10  a red tail followed by three dots and then a solid red line and

11  three dots, which is actually the intermittment flow symbol.

12      Geologic contacts are shown by short dashed lines.  Faults

13  are shown by heavily dashed lines or dotted lines where concealed.

14      Q  State whether the ground waters in the older continental

15  and younger alluvium constitute a single continuous ground water

16  unit in the area shown on Identification 275.

17      A  The ground water in the areas underlain by younger

18  alluvium and older continental deposits within the areas of

19  Aguanga Valley, Lancaster Valley, Nigger Valley and intervening

20  area are a single ground water body.  However, there is some

21  compartmentation owing to two faults that have in general a

22  northwest-southeast trend.  Wilson Valley in Section 8 South

23  1 East contains a body of ground water with a natural discharge

24  at the lower end that flows as a continuous stream of surface

25  water into Lancaster Valley except where it is diverted by man.

P 127

1    Q   Would you state whether you have an opinion as to whether

2    the water which emerges at the level of Vail Lake as depict on

3    the map on up to and through Wilson Valley, would you say that

4    is a continuous surface or subsurface stream extending that

5    distance to which I just alluded except where artificially

6    diverted?

7    A   Referring to Exhibit 15, which is the smaller scale

8    but shows a little larger area, there is a spring shown in the

9    southwest quarter of Section 2 Range 1 East Township 8 South.

10   From that point downstream to the impoundment behind Vail dam

11   that stream course is either a continuous ground water body or

12   a surface stream except for artificial diversions.

13   Q   Is the map accurate, to your personal knowledge?

14   A   The map is accurate to my personal knowledge.

15   Q   Would you step over and look at 275A, the overlay, and

16   state into the record what is depict on 275A.

17   A   The map scale of 275 is the same as 15E and 274 -- one

18   to twenty-four thousand.

19   Exhibit 275A is a transparent overlay of 275 at the same

20   scale, showing land ownerships for the area of Exhibit 275.

21   Land ownerships are shown in three general categories:  National

22   forests, public domain and individual private ownerships.  The

23   private ownerships, natural forest and public domain are shown

24   by areas the boundaries of which are hatchered and the indivi-

25   dual ownerships are identified by a parcel number.  The parcel

P 128

1 number corresponds to the parcel numbers used in Government's

2 Exhibit -- it is prepared from ownership maps that are in

3 evidence, and the parcel numbers that appear on 275A correspond

4 to the parcel numbers used in other exhibits.

5     MR. VEEDER:  We offer in evidence 275 and 275A your Honor.

6     THE COURT:  Exhibit 275 is received in evidence.

7     And is the overlay 275A?

8     MR. VEEDER:  That is correct.

9     THE COURT:  Exhibit 275A is received in evidence also.

10     MR. VEEDER:  You may cross-examine.

11             CROSS-EXAMINATION

12 BY MR. SACHSE:

13     Q  Mr. Kunkel, the compartmentation you referred to is

14 indicated, in part, by the fault lines on 275 to which I am

15 referring now?

16     A  You are pointing to faults that in part traverse Section

17 16 8 South 1 East, and there is another fault that traverses

18 Sections 27 and 28 8 South 1 East.  Those are two faults that

19 cause a degree of compartmentation.

20     Q  To clarify your testimony about the ground water body,

21 is it your opinion that the ground water, for example, found

22 in Section 22 Township 8 South Range 1 East, that section line

23 between the two faults, that that ground water is also a part

24 of the ground water body in continuity with Nigger Valley and

25 Vail Lake?

P.129

1    A   Ground water in Section 22 8 South 1 East, in my opinion,

2    is in direct hydraulic continuity with the ground waters in

3    Nigger Valley and Vail Lake.

4    Q   With particular reference to your testimony concerning

5    the continuity between Wilson Valley and Lancaster Valley, am

6    I not correct in saying there is no actual ground water movement

7    between the two valleys, but that the ground waters of Wilson

8    Valley rise to the surface, then flow on the surface and again

9    disappear into the ground waters of Lancaster Valley in a state

10   of nature?

11   A   Without a more exact definition of what constitutes

12   Wilson Valley I would hesitate to give a categorical   answer,

13   because Wilson Valley is connected by a stringer or tongue of

14   older alluvium through Sections 9, 4, 5 and 8 into the ground

15   waters of Lancaster Valley, and just where a ground water divide

16   may occur and the exact conditions of ground water movement in

17   that area have not been accurately determined owing to a lack

18   of wells in the area.  However, we do know that Well 8 South

19   1 East 8K2 drilled in the older alluvial deposits is a flowing

20   well and --

21   MR. VEEDER:  That is on Stardust, isn't that correct?

22   THE WITNESS:  That is on the Stardust Ranch, to the best

23   of my knowledge, indicating a head of ground at an altitude

24   above land surface at that point.  And what the relationship

25   is between that head and the ground waters of Wilson Valley

P 130

1   there is insufficient data at this time to make a categorical

2   statement that it is or is not in direct continuity.

3   BY MR. SACHSE:

4       Q   I used the wrong word then.   I don't mean Wilson Valley.

5   The flow of Wilson Creek disappears into the alluvium of Wilson

6   Valley, does it not, and then rises to the surface near the

7   downstream end of Wilson Valley and thereafter flows for a

8   considerable distance over basement complex and then again

9   disappears into alluvium of Lancaster Valley?

10      A   Under natural conditions, that is the circumstance that

11  exists.

12      MR. SACHSE:   Here is the area to which I refer, here you

13  can see it, and here it is on a larger scale.

14      THE COURT:   Yes.

15  BY MR. SACHSE:

16      Q   So that insofar as Wilson Creek itself is concerned

17  there is no ground water continuity through the area of basement

18  complex indicated?

19      A   Except for very minor amounts in cracks and fractures,

20  there is no movement of ground water along Wilson Creek.   The

Belt 19  21  water is flowing over solid rock.

22      Q   One more question about the extent of the surface area

23  within which you feel the ground waters are part of the stream

24  system.   You stated, I believe, that all the areas of older

25  and younger alluvium you felt the ground waters were in

P 131

1   continuity with Nigger Valley and Vail Lake and part of the

2   stream system.  Do you mean even the isolated areas of older

3   alluvium such as found in Sections 30 and 31 which shows as an

4   island in basement complex?

5       A  Any ground water movement from islands of older alluvium

6   in Sections 29 and 30, any ground water discharge from an area

7   like that toward Vail Lake would of necessity have to go through

8   cracks and fractures in basement complex or a thin veneer of

9   residual material or soil.

10      Q  Then would it be fair to say if you were asked to de-

11  lineate on this map the area within which you felt ground waters

12  were a part of the stream system you would follow the outline

13  of older and younger alluvium, deleting therefrom the areas of

14  basement complex or any islands of older alluvium within base-

15  ment complex?

16      Let me withdraw that.  I think I can ask the question more

17  clearly.

18      Are there any areas of older alluvium other than islands

19  surrounded by basement complex within which you feel ground

20  waters are not part of the stream system?

21      A  The main body of ground water, if I may take a little

22  liberty with your question, is contained within the older and

23  younger alluvium bounded by the basement complex.  Islands of

24  older alluvium on top of the basement complex or detached are

25  a part of the stream system.  I don't mean to argue the point

P 132 1   with you, Mr. Sachse.  I believe you understand what I mean.

2        Q  What I am trying to get at is for the record and to

3   help his Honor when/draws the line.  You show a dotted line as
                         he

4   a point of contact starting immediately above the explanation

5   section and running through Sections 22, 23, 24, etc. between

6   the basement complex and the older alluvium.  With that dotted

7   line in mind, would you indicate, in your judgment, the boundary

8   between areas in which ground waters are and are not a part of

9   the stream system?

10       A  I don't mean to be difficult, but ground waters that

11   occur within the watershed are a part of the stream system,

12   Mr. Sachse.  It is a fundamental point of hydrology.

13       Q  Do you disagree with the conclusions that the court

14   heretofore made?

15       A  You are asking me a technical question.

16      MR. SACHSE:  That is a very unfair question.

17      MR. VEEDER:  He can get into enough trouble with me with-

18   out getting into it with the court.

19      MR. SACHSE:  May I go off the record for a minute.  I am

20   trying to make a record of some kind.

21      THE COURT:  This has all been covered in the past.

22      THE WITNESS:  This is a review.  I am not trying to be

23   difficult, Mr. Sachse.

24      MR. SACHSE:  I have nothing further.

25      THE COURT:  I see, Mr. Kunkel, that in your Exhibit 275

P 133

1  with your explanation you blocked out that part of Sections 28

2  and 29  -- this is 25, 26, 27, 28, 29 -- and on the bigger map,

3  which is Exhibit 15, I notice that this area of older alluvium,

4  younger alluvium, is connected by some water course into the

5  area you have shown on your map.  Do you have any view as to

6  whether this area of older alluvium in Sections 30 and --

7       THE WITNESS:  That is part of the area that drains into

8  Dripping Springs.  Actually I walked that canyon just last

9  Saturday and there is an alluvial tongue extending up to a

10  point where it becomes very narrow and very rocky and there is

11  actually a flow of surface water in the channel as of last

12  Saturday.  The alluvium as indicated on Exhibit 275 would pinch

13  out within a relatively short distance, a half mile or so, south

14  of the area where the explanation is now shown.

15       MR. VEEDER:  It is not depict as part of the Aguanga basin,

16  is it?

17       A  Actually when this map was prepared I did not have this

18  particular use in mind.  We should refer to Exhibit 15 for the

19  purposes of the boundary of that particular area.

20       THE COURT:  This line that you have already drawn, Colonel,

21  where does it come together?  Up here in Nigger Canyon somewhere?

22       COLONEL BOWEN:  It doesn't come together.  It runs off the

23  map at about this bend in the stream.  It follows this contour

24  approximately on the contact down to this little valley here

25  in Warner Springs.  The old Warner Springs road runs down the

P 134

1   valley, follows the valley down the road to 71 up 71 to another

2   road, down the road to the grant line, up the grant line, and

3   cuts right through here, your Honor.

4        THE COURT:  What suggestions do you have?  What is the

5   Government's position?  That this is all one ground water basin?

6        MR. VEEDER:  I believe it is all one ground water basin,

7   your Honor.

8        THE COURT:  What is California's position?

9        MR. GIRARD:  I haven't checked with my engineer, your

10  Honor.

11       Do you feel this is all one ground water basin, or is this

12  just continuity, Mr. Kunkel?

13       THE WITNESS:  In my opinion, it is one basin.

14       MR. GIRARD:  Is that opinion the same, that you said this

15  is all one basin, too?

16       THE WITNESS:  It would be comparable to the opinion saying

17  that all of the older and younger alluvial deposits in the

18  Murrieta and Pauba area constitute a large ground water basin.

19       MR. GIRARD:  Is there any difference in tightness between

20  the older alluvial deposits set forth in 275 as distinguished

21  from the ones set forth in 15F?

22       MR. VEEDER:  If you know.

23       THE WITNESS:  In general they are of the same nature.

24  However, the deposits in the Aguanga area may be slightly less

25  permeable -- it is not of great degree, and there are zones in

P. 135

1   the older alluvium that are very permeable.

2         THE COURT:  Does Fallbrook have any position?

3         MR. SACHSE:  I have no position because no matter where

4   you draw the line the only man I have in Lancaster is in it.

5   He has the whole thing.

6         THE COURT:  Mr. Stahlman?

7         MR. STAHLMAN:  I don't see any immediate objection to it.

8   The only question that arises in my mind is as to whether or

9   not we are going to include some people as riparians who may

10  not actually be riparians.  In other words, there is some early

11  testimony, as I recall -- I would like to refresh my memory --

12  by Mr. Kunkel in some of these areas where there is a tight

13  older alluvium.

14        Isn't this the area you testified to, Mr. Kunkel, as to

15  the older alluvium being rather tight?

16        THE WITNESS:  Not to my recollection.

17        MR. VEEDER:  I think, George, you may be recalling Dr.

18  Mann's testimony.

19        And in regard to 275 I want the record to show that I

20  talked to Mr. Grover on the phone about this matter and assured

21  him that he would have a full opportunity to be heard in regard

22  to it, and I am sure your Honor wants to do that, because he

23  has Gibbon and Cottle in there.

24        MR. STAHLMAN:  We may want to cross-examine someone else,

25  too, Bill.  We just saw this.

1       THE COURT:  I would want to review the testimony we heard.

2  And Mr. Girard says he wanted to.  He was not in the case when

3  some of this was heard.

4       I notice on the overlay 275A, Mr. Kunkel, a surface water

5  divide is shown on the overlay which separates the Lancaster

6  and the Aguanga Valleys.  Is there any significance to that

7  surface divide, in your opinion, below the surface?

8       THE WITNESS:  No, with regard to ground water, the surface

9  divide is of no significance.

10      THE COURT:  The only thing I would suggest is that you

11  dig out the references to the testimony in this area and give

12  me some suggestions on it and let me have a chance to read some

13  of the testimony and review it.  I am not prepared now to make

14  a finding on that.  I remember hearing some originally and then

15  we had testimony later when we  were trying some of the ranches.

16  I remember especially the testimony concerning Well 8K2.

17      And this is an interesting phenomenon -- you have to look

18  at 15 to see -- that well where I have my finger.

19      MR. VEEDER:  Is that the Southeast Quarter of Section 8?

20      THE COURT:  You have a large body of older continental

21  adjacent to the younger alluvium in Wilson Valley.  You have a

22  spring right at the surface where some of that water, instead

23  of flowing down through the younger alluvium, flows through the

24  older alluvium and makes its appearance in the form of this

25  artesian well 8K2.  This plat doesn't go so far as to cover

that.

1          All I can suggest is that you give me some references to

2     the transcript and make me some suggestions as to what I should

3     find in that area.

4          MR. VEEDER:  We will do that.

5          THE COURT: Can you do that before the 31st?

6          MR. VEEDER:  I will try very hard.

7          MR. GIRARD:  You will get a copy of the exhibit to us.

8          MR. VEEDER:  Yes.

9          MR. GIRARD:  Send it up.

10         MR. VEEDER:  Do you have the agenda before you, your

11    Honor?

12         THE COURT:  Yes.

13         MR. VEEDER:  We have covered 8, as I recall, on the

14    summary judgment matter.

15         We covered 5, talking about where we began skipping

16    around.

17         THE COURT:  We covered 4.

18         MR. VEEDER:  We covered 4.

19         We covered 3.

20         THE COURT:  6 -- we established procedures for the

21    hearings.

22         MR. VEEDER:  We have done that.

23         Consideration of proposed findings concerning which

24    evidence has already been introduced.  We have done that in

25    regard to Wilson.  We have been moving on that.

          I think that is the agenda, your Honor.

14,918

1    THE COURT:  If you could supply me by at least January 15

2    the references to the geology and the testimony of various

3    witnesses as to this area upstream from Vail Dam plus, in

4    shorthand form -- not by any metes and bounds description, but

5    generally, in shorthand form -- what you think the findings

6    should be, I will be glad to look them over and be ready to

7    talk about it further on the 31st.

8    MR. VEEDER:  I will undertake to do that by the 15th of

9    January.

10   THE COURT:  Yes, I want it sometime before the hearing.

11   MR. VEEDER:  Yes.

12   MR. SACHSE:  It seems to me that it should be very simple.

13   Upstream from there, looking at the map, except for perhaps

14   convenience in making the overlays of ownerships, it seems to

15   me that your ground water situation is exactly the same; and if

16   you can do the whole thing it is all right with me.

17   THE COURT:  I will tell you what my inclination is; to

18   find that it is one ground water body in continuity with the

19   stream.  I think that is the simple thing to do.  I don't think

20   anybody in particular gets hurt.

21   MR. SACHSE:  No.  That will be all right with me.

22   THE COURT:  There is a little loose end about that neck

23   where that well is.

24   MR. VEEDER:  In Section 3.

25   THE COURT:  And there is a little ground off your map

14,919

1   Exhibit 275 underneath your descriptive material.

2        But see what you can do on it.

3        MR. VEEDER:  All right, your Honor.

4        THE COURT:  Do you have enough to do before the next

5   hearing?

6        MR. SACHSE:  I should say.

7        MR. VEEDER:  Did you want a response, your Honor?  I'll

8   be glad to give it from my heart.

9        THE COURT:  We will take an adjournment.

10  (ADJOURNMENT TO JANUARY 31, 1961, 10:00 A.M.)

11                          - - -