# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:     January 31, 1961

Pages:  14,920 to 15,054

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

VOLUME I

14,920

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,        )
                               )
vs.                            )        No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
              Defendants.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, January 31, 1961

APPEARANCES:

    For the Plaintiff:               WILLIAM H. VEEDER, ESQ.,
                                               Special Assistant to the
                                               Attorney General

                                               LCDR. DONALD W. REDD.

    For the Defendants:

      Vail Company                 GEORGE STAHLMAN, ESQ.

      Fallbrook Public Utility     FRANZ R. SACHSE, ESQ.
      District, et al.,

      State of California          FRED GIRARD, ESQ., Deputy
                                               Attorney General and
                                             WILLIAM BUCKNER, ESQ.,
                                             Deputy Attorney General.

14,920a

APPEARANCES:   (Continued)

    For the Defendants:

       Vallecitos School District            JOSEPH KASE, JR., ESQ.,
                                                        Deputy County Counsel,
                                                        County of San Diego,
                                                        302 Civic Center,
                                                        San Diego, California.

       James Oviatt                           MUSICK, PEELER & GARRETT
                                                        By JESSE O'MALLEY, ESQ.

Vol 132   1/31/61

14,921

P 2

1

## INDEX TO WITNESSES

| For the Plaintiff | D | C | RD | RC |
|---|---|---|---|---|
| | 14,980 | | | |
| Col. Allen C. Bowen | 14,927 | 14,989 (Girard) | | |
| | 14,944 | | | |

For the Defendants

Willard F. Clark        14,948

## INDEX TO EXHIBITS

| Plaintiff's Exhibits | Ident. | In Evidence |
|---|---|---|
| 206D-1, 206D-2, 206D-3, 206D-4, 206D-5, 206D-6 | 14,944 | |
| Addition to 207E | | 14,948 |
| 206D-1 through 206D-6 | | 14,980 |
| 206E | | 14,981 |
| 46A & 47A | | 14,985 |
| 48A & 49A | | 14,986 |
| 50A | | 14,987 |
| 150A & 151A | | 14,988 |
| 119A | | 14,989 |

Defendants' Exhibits

| Yackey's E & F | | 14,941 |
|---|---|---|
| Vail's BH | | 15,053 |

P 3

SAN DIEGO, CALIFORNIA, MONDAY, JANUARY 16, 1961, 10:00 A.M.

1

2    THE CLERK:  Number 1247-SD-C United States vs Fallbrook.

3  Set for Master's hearing.

4    THE MASTER:  This is the time and place set for hearing

5  on objections to the proposed findings in regard to the Rainbow

6  Creek watershed.  Mr. Veeder is unable to be here.  The hearing

7  is hereby continued until Tuesday, January 31, 1961, at 10:00

8  A.M. in this court room.

P 4

Belt A1

1    SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 31, 1961, 10:00 A.M.

2        (Other matters.)

3        THE CLERK:  4-1247-SD-C United States vs Fallbrook.

4        THE COURT:  The Fallbrook matter will be held on the

5    calendar pending conclusion of the Master's hearing.

6        Mr. Clerk, here are a couple of orders.

7        THE MASTER:  This is the time to which the hearings on

8    objections to proposed findings as to Rainbow Creek was con-

9    tinued.

10        I have received written objections from G. Norman Kennedy,

11    the attorney for the defendants Ed M. Suderman and Doris

12    Lucille Suderman and from the County Counsel of San Diego by

13    Mr. Joseph Kase on behalf of the Vallecitos School District.

14        I have also received a letter from Mr. Franz Sachse

15    calling my attention to an apparent inconsistency between my

16    findings as to three parcels and Interlocutory Judgment No. 2

17    which was previously entered by Judge Carter.

18        I have received no further objections of any kind.  Is

19    there anyone in the court room at the present time that has

20    any additional objections to file to the proposed findings?

21    Apparently there are no further objections.

22        With reference to the objections filed by the County of

23    San Diego, or the County Counsel on behalf of the School District,

24    the objection is based upon the supposed fact that Parcel 166

25    in the Rainbow Creek, which is referred to in the proposed

P 5

1   findings on page 16, is, according to Counsel not entirely

2   within the Rainbow Creek watershed.

3          The maps which were introduced in evidence at the hearing

4   at Fallbrook show that the major portion of the parcel is with-

5   in the watershed.  It is apparent from one of the maps that

6   the southeastern corner of this parcel may not be within the

7   watershed.

8          Mr. Veeder, do you have any additional evidence which you

9   wish to present at this time in connection with the location

10  of this parcel?

11         MR. VEEDER:  Your Honor, we talked to Mr. Kase representing

12  the County in regard to the matter.  We did not have more

13  exact data than was suggested to you.  I have advised Mr. Kase

14  that we will request Colonel Bowen or a member of his staff to

15  check this matter out further and to report to us on it.  If

16  we find that it is outside the watershed, or if there is any

17  way we can eliminate this parcel from the litigation by stipu-

18  lation, we shall do that after the investigation is made, if

19  that is agreeable to your Honor.

20         THE COURT:  That would appear to be satisfactory.  My

21  present thought would be that unless the future investigation

22  reveals that the parcel is entirely outside the watershed,

23  which, from the evidence introduced at Fallbrook, would appear

24  unlikely, the matter might be solved by adding, on page 16 of

25  the proposed findings, at line 19 following the reference to

P 6

1  this parcel, language substantially as follows, continuing the

2  sentence which refers to this parcel:  "As to all of said parcel

3  lying within the Santa Margarita watershed," which would provide

4  that the finding referred only to that portion of the parcel

5  within the watershed; then continuing as follows, "This finding

6  shall not be construed as a determination that the southeasterly

7  portion of said parcel lies within said watershed, nor as a

8  determination that the waters, if any, underlying any portion

9  of said land which is not physically within the Santa Margarita

10  watershed constitute a portion of the underground flow of

11  Rainbow Creek."

12      Mr. Kase, would that be acceptable to you, assuming that

13  the further investigation indicates that at least a portion of

14  the parcel is within the watershed?

15      MR. KASE:  Your Honor, I understand the determination of

16  the line would be the problem, and this would leave out this

17  portion undescribed dividing the line which is the southeasterly

18  portion we are speaking of.  How far it goes will not be deter-

19  mined by the finding.

20      THE COURT:  That would not be determined by the findings

21  as proposed, because under the evidence as introduced there is

22  no way to make such a determination.

23      MR. KASE:  The problem further is complicated by the fact

24  that one map, I believe, shows it as entirely out of the water-

25  shed.  The determination first will be that if it is at all

P 7

1   within the watershed that portion, that southeasterly portion

2   will then be omitted by this addition to your finding.

3        THE COURT:  That was the thought of the addition to the

4   finding.  That is correct.

5        MR. KASE:  We will be agreeable to that, your Honor.

6        THE COURT:  Mr. Veeder, do you have any other suggestion?

7        MR. VEEDER:  It is acceptable, your Honor.  We have none

8   other under the circumstances.  We will check it out.

9        THE COURT:  Very well.

10       Now, with reference to the objections proposed by Mr.

11  Kennedy, Mr. Kennedy was present in this court room at the

12  date previously noticed for the hearing on objections and he

13  was advised then that in view of the fact that it was necessary

14  to continue the hearing he need not be present today.

15       I understand that Colonel Bowen has made some further

16  investigation of the property.  Is there any evidence you wish

17  to introduce or any stipulation you wish to make at this time,

18  Mr. Veeder?

19       MR. VEEDER:  Your Honor, I would like to state into the

20  record that I talked with Mr. Kennedy on the telephone, as a

21  matter of fact with your Honor, in regard to the objections

22  that he had filed.  He advised me he was going to be in trial

23  today and could not be here.  He advised me that your direction

24  to me was to have Colonel Bowen check out the objections for

25  the purpose of ascertaining the correctness of them; that if on

14,927

P 8

1  investigation that we could agree with Mr. Kennedy on the matter

2  that we would meet his objection and that you would, according-

3  ly, reflect it in your findings.  He said that was agreeable

4  with him.  I understand that Colonel Bowen went on the Suderman

5  property and I would like to call Colonel Bowen to the stand

6  for the purpose of meeting the objection Mr. Kennedy has inter-

7  posed.

8      THE COURT:  Very well.

9      Colonel Bowen.

Belt B1

10              COLONEL ALLEN C. BOWEN,

11  recalled as a witness on behalf of the United States, having

12  been previously duly sworn, testified further as follows:

13      MR. VEEDER:  I would like the record to show that the

14  engineering report to which Mr. Kennedy's objections were

15  directed is MR-32, Ed and Doris Suderman, referred to in the

16  Special Master's transcript, Volume 27, at page 2912.

17              DIRECT EXAMINATION

18  BY MR. VEEDER:

19      Q  Colonel Bowen, I hand to you the objections filed by

20  Mr. Kennedy on behalf of the Sudermans, and ask you to state

21  into the record whether you made an investigation recently in

22  regard to the objection as to the size of the swimming pool

23  as set forth in those findings?

24      A  I did.

25      Q  And would you state into the record the results of

P 9

1  your investigations, and any other information which would shed

2  light on this matter as it is now presented.

3  A   Yes sir.  On Thursday of last week, the 26th of January,

4  I believe, the day it rained, I went out to the Suderman proper-

5  ty, and Mr. and Mrs. Suderman were both there, and with Mr.

6  Suderman I went out and taped the dimensions of the swimming

7  pool.

8  It was full of water, and I made no soundings of it, but

9  I took Mr. Suderman's estimates of the depths, and then made a

10  rough calculation on the site, which indicated that the figure

11  contained in the objection, approximating 77,800 gallons as

12  the capacity of the pool is closer to the true capacity than

13  the 45,000 gallon approximation that was contained in our

14  engineering report.

15  So I told Mr. Suderman that I would affirm the approxima-

16  tion contained in this objection, namely, that the capacity of

17  the pool is nearer 77,800 gallons.

18  MR. VEEDER:  Accordingly, the exhibit for the Suderman

19  property, MR-32, should be revised to reflect Colonel Bowen's

20  testimony, if that is agreeable, your Honor.

21  THE MASTER:  Yes, that will be permitted.

22  Do you wish to remove that exhibit physically, or file an

23  additional supplement to it?

24  THE WITNESS:  What I would like to do, your Honor, is just

25  make a pen and ink change on the exhibit, and initial it, if

P 10

1  that meets with your approval.  It is only a change in the

2  volume of the pool.

3      THE MASTER:  That will be acceptable.

4      THE WITNESS:  In regard to the other objections, your

5  Honor, I really can't see that there are any other objections

6  in here, and no other matters were discussed with Mr. Suderman.

7      MR. VEEDER:  As a matter of fact, your Honor, when I talked

8  to Mr. Kennedy, that is the only objection he referred to.

9      I see that he has some comment in regard to the flow of

10  Rainbow Creek.

11      THE MASTER:  Mr. Kennedy, when he was here, indicated

12  that he was fearful that the language used in the findings,

13  which stated that the property was riparian to Rainbow Creek

14  would not reflect the fact that Rainbow Creek actually crossed

15  it.

16      It has been the practice in the findings, particularly

17  with reference to Rainbow Creek, simply to recite that the

18  property is riparian, even though the Creek flows across it.

19      There is no question, and the evidence is clear, that the

20  Creek does cross the property, and I believe that I should re-

21  vise the finding, Number 27, to indicate that the property is

22  traversed by the Creek, and I will attempt to do this in such

23  a fashion as not to do it by implication, and to indicate that

24  other property referred in other findings is not physically

25  traversed by the Creek in the evidence that has been taken.

P 11

1      The objection with regard to the fact that there is no

2  finding made with respect to a reasonable water duty is, in

3  my opinion, not pertinent, because there is no finding as to

4  reasonable water duty as to any parcel in any of my findings.

5  There is an express     statement that if any such finding is

6  to be made, it is to made only by Judge Carter at the conclusion

7  of the case, and that the findings are in no way a limitation

8  on such power.

9      Is that all that you have?

10      MR. VEEDER:   That is all we have, your Honor, unless there

11  is something more that you have.

12      THE MASTER:   I will then advise Mr. Kennedy of the proposed

13  change in the findings in the light of Colonel Bowen's testi-

14  mony, and in the event he still wishes to be heard, any further

15  hearing on his objections will be had on Monday, April 3, to

16  which time this hearing will be continued at the conclusion of

17  the hearing this morning, pursuant to my understanding with

18  Judge Carter.

19      You may step down, Colonel Bowen.

20                              (Witness excused.)

21      MR. VEEDER:   There is nothing further for the United States

22  then to do with respect to Mr. Kennedy?

23      THE MASTER:   There is nothing further for you to do with

24  regard to Mr. Suderman's property.

25      MR. VEEDER:   Thank you.

P 12

1    THE MASTER:  The other questions with respect to the

2  proposed findings were not contained in any formal objections,

3  but were contained in a letter to me from Mr. Sachse, copies

4  of course being sent to Mr. Veeder and Judge Carter, in which

5  he pointed out that as to the Costello property, which is

6  Parcel No. 126, referred to at page 18 of the proposed findings,

7  as to the Chapman property, which is Parcel No. 157 referred

8  to at page 41, and as to the Riggle property, Parcel 154 re-

9  ferred at page 39, I had made findings that each of these

10  parcels was riparian to Rainbow Creek and that the ground waters

11  were a part of the stream, whereas in Interlocutory Judgment

12  No. 2 Judge Carter had found that the ground waters were vagrant

13  and local, and that the parcels in effect were not riparian.

Belt B2

14    I have re-examined the evidence which was introduced be-

15  fore me, and I have also checked the answers and stipulations

16  and the Request for Admissions, and it appears that the conflict

17  arises not because of any apparent dispute as to the physical

18  fact but because of the stipulations which have been made by

19  the parties, and I would to prefer to remedy this difficulty

20  by certain amendments.  I have copies typed here.

21    Mr. Veeder, do you wish to examine them, and also I have

22  a copy for Mr. Sachse and any other counsel who may be inter-

23  ested, and after we have gone over this proposed amendment,

24  I would appreciate any comments from counsel as to whether they

25  believe that the proposed solution is satisfactory.

14,932

P 13

1      With reference to the Costello property on page 13, that

2  parcel is included with various other parcels in a general

3  finding, and I would propose to eliminate Parcel 126 from its

4  present position in Finding VII, so that instead of being the

5  first parcel referred to, it is the last parcel referred to in

6  that finding, and after stating that all of these parcels are

7  riparian to Rainbow Creek, the waters underlying any of them

8  constitute a part of Rainbow Creek, and then describing the

9  parcels, I would add this language following the statement that

10  the defendants Costello and Lincoln have filed answers, --

11  this is the addition:

12       ". . . affirmatively alleging that said property

13       is not riparian to any stream, and the plaintiff in

14       answer to Requests for Admissions filed herein has

15       admitted that the waters underlying said land are

16       vagrant, local and percolating waters, and therefore

17       for the purposes of this action said parcel shall be

18       treated as non-riparian, and the waters underlying

19       said parcel shall be treated as vagrant, percolating

20       waters."

Belt B3

21      I would make similar changes or additions in the other

22  findings.

23      As to Finding XXXVI, at page 39, as to the Riggle property,

24  after the statement at line 30 that the property is riparian

25  and that the waters do constitute a part of the flow of

P 14    1    Rainbow Creek, I would add the following language:

2    ". . .however, in the Answer filed by said

3    defendants said defendants affirmatively allege that

4    said property is not riparian to any stream, and the

5    plaintiff in answer to Requests for Admission filed

6    herein has admitted that the waters underlying said

7    land are vagrant, local and percolating waters, and

8    therefore for the purposes of this action said parcel

9    shall be treated as non-riparian, and the waters under-

10    lying said parcel shall be treated as vagrant, perco-

11    lating waters; it is therefore unnecessary to make

12    further findings as to said parcel."

13    I would then strike the balance of Finding XXXVI with

14    reference to the irrigable character of the property, the

15    crops that are grown, the reservoir, and so forth.

16    As to Parcel 157, Finding XXXIX on page 41, a similar

17    change would be made, striking out lines 17 to 25, following

18    the words "Said defendants Chapman have filed an Answer," and

19    inserting similar language.

20    It appears to me impossible for me in good conscience to

21    state that this land is not actually riparian in view of the

22    fact that the evidence introduced before me shows that it is,

23    and I would be faced with the conflict, if I say that this is

24    not riparian, that the evidence is incorrect, and then in a

25    dilemma as to adjacent parcels where there is no such admission.

P 15

1          Now, does this proposed amendment meet with the approval

2     of counsel, or are there objections to it?  I am certainly

3     open to any change or modification that may be suggested.

4          MR. VEEDER:  Reserving the right to review the record,

5     and the statements that have been made, and this is the whole

6     thing in relation to the other findings that have been made,

7     the United States takes a position that if someone wants to

8     get a claimed interest in the Santa Margarita River, and dis-

9     claim any interest in the Santa Margarita River, we are always

10    amenable to it, and Mr. Sachse and I have an agreement if they

11    have no rights in the Santa Margarita River, we claim no rights

12    against them in regard to any pumping on their land so long as

13    it does not interfere with the Santa Margarita River, and I

14    certainly will stipulate with anybody that wants to relinquish

15    any claim that they have.

16         THE MASTER:  Mr. Sachse, do you have any comments?

17         MR. SACHSE:  I am satisfied with your Honor's proposal.

18         THE MASTER:  Is there any other counsel here or any other

19    party present who would object to an amendment of the findings

20    along the lines suggested?

21         (No response.)

Belt B4    22         THE MASTER:  Then I will propose to amend the findings in

23    the manner in which I have indicated.

24         The final statement in Mr. Sachse's letter referred not

25    to a conflict but to a matter of clarification.  He called my

P 16

1    attention to the fact that two parcels overlapped into the

2    Rainbow Creek watershed -- and this is in connection with the

3    findings -- and that the two parcels in the area north of

4    Fallbrook Creek, west of Rainbow Creek, and south of the Santa

5    Margarita overlapped into the Rainbow Creek watershed, and that

6    in the previous findings I had pointed out that as to those

7    parcels conveyances had been made resulting in a physical

8    severance of the property from the Santa Margarita River or

9    its tributaries, and that the conveyance to the Fallbrook Public

10   Utility District in each case attempted to reserve to the

11   parcels their riparian rights, and that the legal effect of the

12   conveyance in the attempted reservation had not been considered

13   by me and had been left open for future determination.

14       I do not know that it is essential to make such a cross

15   reference in the findings.  However, I certainly see no objection

16   to it, and unless some counsel or some other party has any

17   objection, I would propose to amend Finding V of the proposed

18   findings as to Rainbow Creek on page 15, line 6 -- this is/the at

19   conclusion of Finding V, and is two and a half pages beyond

20   the reference to Parcels 58 and 68 -- with the following

21   language:

22       "Parcel 58, above mentioned, is a portion of the

23       same parcel as Parcel 93W-1773, referred to in paragraph

24       5 of the findings of fact and conclusions of law with

25       reference to the property north of Fallbrook Creek

P 17  1     watershed, west of Rainbow Creek watershed, and south

2     of the Santa Margarita River (including certain parcels

3     in Fallbrook Creek watershed), dated February 17, 1960.

4     And Parcel 68, above mentioned, is a portion of the

5     same parcel as Parcel 93W-8-11X1, referred to in said

6     paragraph 5 of said findings, dated February 17, 1960.

7         "Nothing herein contained shall constitute a

8     determination of the legal effect of the attempted

9     reservation of rights referred to in said Finding V

10    in said findings, dated February 17, 1960."

11    Is there any comment that any person present or counsel

12  present wishes to make to this proposed finding?

13    MR. VEEDER: It is acceptable to the United States, your

14  Honor.

15    MR. SACHSE:  Perfectly acceptable to me, your Honor.

16    THE MASTER:  Very well.  I propose then to make changes

17  in the findings as set forth.

18    In view of the fact that Mr. Kennedy may possibly wish to

19  argue further on the objections which he has raised, and in

20  view of the possible introduction of additional testimony with

21  reference to the Vallecitos School District property, I will

22  not actually sign the findings at the present time, even with

23  these modifications.

24    Is there any additional testimony or argument to be

25  presented at this time?

P 18

1    MR. VEEDER:  We have nothing further.

2    Has Mr. Kase gone?

3    (No response.)

4    MR. VEEDER:  Apparently so.  We may be able to handle

5    their matter by stipulation.  If we do, we will submit to you

6    a proposed stipulation for consideration before it is executed,

7    if that is acceptable to your Honor.

8    THE MASTER:  Very well.  Then the hearing as to any matters

9    before the Special Master will be continued until Monday,

10   April 3, at ten o'clock in this court room.

11   In the event it is necessary to present any additional

12   evidence other than by stipulation, it may be presented at that

13   time, and all matters before the Special Master are continued

14   now until April 3rd at ten o'clock in this court room.

15   (Thereupon the hearing before the Special Master was

16   adjourned until Monday, April 3, 1961, at 10 o'clock A.M.)

Tape C   17   (Recess.)

18   THE CLERK:  4-1247-SD-C United States vs Fallbrook.

19   THE COURT:  Do you want to spend a minute or two on this

20   agenda?

21   MR. SACHSE:  Yes, your Honor.

22   May I first simply advise your Honor that I have lodged

23   the proposed findings for Tucalota Creek, which findings have

24   been approved by Mr. Krieger and approved by Mr. Veeder as to

25   the generalities, that is, the general findings on the stream.

P 19

1    He reserves the right to make more specific findings on indi-

2    vidual parcels.

3        This was the finding, to refresh your recollection, you

4    instructed me to prepare a finding which could be used on what

5    you classed as stringers of alluvium -- that is the findings

6    to which I refer, and in its broad approach, as I understand

7    it, Mr. Veeder is satisfied, but as to specific parcels he will

8    want to elaborate.

9        Then I have also lodged proposed findings on Diamond and

10   Domenigoni Valley.  Now those findings attempt to cover only

11   your Honor's rulings as laid down in our last hearing, that is,

12   they do not include any specific findings on specific parcels

13   as to irrigable acreage, extent of diversions or extractions,

14   because I obviously don't have that data.  I have submitted

15   them to Mr. Veeder and he, I understand, is preparing some

16   proposed modifications.

17       THE COURT:  Well, on your findings on the stringers of

18   alluvium, is it your contemplation that the general findings

19   would be entered on some of these small creek beds?

20       MR. SACHSE:  That was the purpose --

21       THE COURT:  Allowing separate findings to be made later

22   on particular parcels of ground which lay within the younger

23   alluvium?

24       MR. SACHSE:  Yes, your Honor.

25       THE COURT:  Do you say so in them?

14 939

P 20

1   MR. SACHSE: Yes, your Honor. That is the way that Mr.

2   Veeder and I have worked on it together, and the general pur-

3   pose is to describe the basic rights of a person whose land

4   overlies this basement complex, except for this stringer of

5   alluvium through the middle.

6   THE COURT: Is/on Tucalota?
                          this

7   MR. SACHSE: It is drawn on Tucalota, your Honor -- we

8   worked on it together -- but our hope, I believe, is that once

9   approved and the last i dotted and the t crossed it would be

10  suitable for all these small stringers.

11  THE COURT: Who has any objection to these findings on

12  Tucalota Creek?

13  MR. STAHLMAN: I have no objection to them, your Honor.

14  There is a situation that has come up here. There is a

15  piece of property, Mr. Menzies from Los Angeles called me and

16  asked me if I would represent him in connection with the parcel

17  of property which, from a cursory examination this morning,

18  appears to be in Tucalota Creek, and I would like to have a

19  copy of these findings so that I may pass this information on

20  to him. Later on in the recess time I will attempt to locate

21  where this property is actually situated.

22  THE COURT: Mr. Menzies called me yesterday in Los Angeles.

23  I didn't know the property was on Tucalota Creek.

24  MR. STAHLMAN: I am not sure that it is, your Honor, but

25  I had some indication this morning from Colonel Bowen that he

P 21

1   thought it was, and I would like to check it out.

2       THE COURT:  We will wait until Mr. Menzies has a chance

3   to see it.

4       Mr. Veeder, you are satisfied then?

5       MR. VEEDER:  I am satisfied with the general propositions

6   set out, your Honor.  I think I have to prepare individual

7   references on a parcel-by-parcel basis throughout the length

8   of Tucalota Creek.

9       THE COURT: For this younger alluvium?

10      MR. VEEDER:  Yes, where they are riparian, yes.

11      Aren't you in agreement with that?

12      MR. SACHSE:  That is right.

13      MR. VEEDER:  Just like we did on Wilson Creek.

14      THE COURT:  Then Mr. Stahlman, other than the suggestion

15  you made, you are satisfied?

16      MR. STAHLMAN:  Yes your Honor.

17      THE COURT:  Mr. Girard?

18      MR. GIRARD:  Yes, your Honor.

19      THE COURT:  What about Domenigoni Valley?

20      MR. SACHSE:  Your Honor, I don't think you can yet ask

21  Mr. Veeder, in fairness, if he is satisfied.  I know he has

22  some other things he is working on as counter proposals.  I

23  have checked them out with Mr. Krieger and Mr. Girard, but I

24  anticipate that we will have some argument for your Honor on

25  specific findings before we are through.

P 22

1    MR. VEEDER:  I think you are right.

2    MR. SACHSE:  If I may have one more minute on another

3    housekeeping matter, your Honor.  Mr. Yackey asked me to bring

4    down, simply to save him the trouble, and offer in evidence

5    for him as Yackey's E and Yackey's F his permit as it now exists,

6    Yackey's E being the permit and Yackey's F being the decision

7    of the Water Rights Board denying Fallbrook's application for

8    reconsideration but further clarifying the language of the per-

9    mit.  The two are necessary to an understanding of his rights.

10   I will offer them for Mr. Yackey.

11   MR. VEEDER:  There is no objection, your Honor.

12   THE COURT:  They will be received in evidence as Yackey's

13   E and Yackey's F.

14                    (The documents above referred to were)
                     (marked and received in evidence as  )
15                    (Yackey's Exhibits E and F.          )

16   THE COURT:  Mr. O'Malley would like to start this morning.

17   We have the land owners we have asked to come in.  Mr. O'Malley's

18   matter is Number 3.

19   How long do you think you will take?

20   MR. O'MALLEY:  A very few minutes, say ten or fifteen

21   minutes.

22   MR. STAHLMAN:  Your Honor, there are going to be some

23   other matters presented to the Court in connection with this.

24   We want to present the situation as we view it.

25   MR. O'MALLEY:  Your Honor, I will be governed by the

P 23

1  convenience of everybody concerned.  I would like to get out of
    by noon,
2  here, if I could,/but I recognize that this is an important

3  matter.  So I will be governed by the convenience of everybody

4  concerned.

5       THE COURT:  You will be fortunate to get out by noon.

6       MR. STAHLMAN:  He has just handed us   proposed findings

7  which I think is going to provoke some discussion.

8       THE COURT:  Counsel have been around here for years and

9  you come running in here and want to run out by noon.  I don't

10 think you are going to be that lucky.

11      MR. GIRARD:  Your Honor, I would like to advise the Court

12 -- and I have to apologize for it -- that any matters in which

13 the State of California is particularly interested in, I cannot

14 be here tomorrow.  I have to attend the Aeronautics Board

15 hearing in regard to that Cal Poly plane crash, in San Francisco

16 tomorrow.  I will be here today, but I cannot be here tomorrow.

17 If there is anything in which we are not interested --

18      MR. VEEDER:  Is there anything in which you are not inter-

19 ested?

20      MR. GIRARD:  I think there are quite a few things on this

21 agenda that would go tomorrow with which I am not particularly

22 concerned.

23      THE COURT:  What area is covered by these letters we sent

24 out, Mr. Veeder?

25      MR. VEEDER:  Item No. 2 on the agenda, your Honor.

P 24

1    THE COURT:  What area is that?

2    MR. VEEDER:  Lower Murrieta and Santa Gertrudis Creek.

3    THE COURT:  I have some additional letters here I will

4  hand to you.

5    Point out on the map the area.  You refer to Exhibit 206B

6  and various parcels therein.

7    MR. VEEDER:  What I would like to do in that connection,

8  your Honor, would be to call Colonel Bowen, as we did the last

9  time, and introduce maps prepared by the Colonel showing the

10  exterior boundaries of the land and specifically designating

11  the areas which constitute the Lower Murrieta and the Santa

12  Gertrudis.

13    THE COURT:  All right.

14    MR. VEEDER:  Colonel Bowen, would you take the stand,

15  please, sir.

16    And this would be in the 206 series, your Honor.  I don't

17  know what would be your next number on that, Mr. Clerk.

18    THE CLERK:  206-D.

19            COL.ALLEN C. BOWEN,

20  previously duly sworn, on his oath was examined and testified

21  further as follows:

22    MR. VEEDER:  Would you please mark it, Mr. Clerk.  There

23  are six parts to it.

24    THE COURT:  You say there are six parts to this exhibit?

25    MR. VEEDER:  206-D, yes, your Honor.

P 25

1                       (The documents above referred to were)
                       (marked Plaintiff's Exhibits 206-D-1,)

2                       (206D-2, 206D-3, 206D-4, 206D-5 and  )
                       (206D-6 for identification.         )

3

4                      FURTHER DIRECT EXAMINATION

5 BY MR. VEEDER:

6     Q  Colonel Bowen, I hand you the identification marked

7 206D and ask you to state under whose direction these maps

8 were prepared, and then correlate, if you will, onto USA

9 Plaintiff's Exhibit 15-E to the end that the Court can identify

10 the Lower Murrieta, the Santa Gertrudis area, to which the

11 letters refer.

12     A  Exhibit 206D for identification is a photographic copy

13 of the U.S.G. Murrieta quadrangle, scale one to 24,000, and on

14 the lithograph print of that quadrangle are inscribed symbols

15 indicating the watershed boundary by long dashed line, which

16 is noticed in the southerly portion of the map traversing a

17 portion of the Santa Rosa Grant, crossing or reaching Murrieta

18 Creek just below Cherry Street and then following the divide

19 between Santa Gertrudis and Warm Springs Creek off to the

20 easterly portion of the map.  In the easterly portion of the

21 map and lying outside the exterior boundaries of the Temecula

22 Grant are inscribed parcel boundaries with the parcel number

23 encircled within the exterior perimeter of each parcel.  There

24 are also irregular lines with the symbols "NI, " meaning  "Not

25 Irrigable" and "I" meaning "Irrigable."

     MR. VEEDER:  I have just handed the Court 206C, which is

P 26

1  the map showing the area in question, but I want these also in

2  the record.

3  THE COURT:  Well, Colonel, you started talking about this

4  exhibit as 206D and there are six parts.  The one you are talk-

5  ing about would have to be 206D-1; is that right?

6  THE WITNESS:  Yes sir, that is right.

7  THE COURT:  The Clerk will number them accordingly.

8  THE WITNESS:  The Murrieta quadrangle, which is the base

9  for 206D-1, is used also as a part of Plaintiff's Exhibit 15E.

10  That part which comprises the westerly portion of 15E --

11  THE COURT:  I think that is sufficient.  It is to the

12  same scale, is it not?

13  THE WITNESS:  It is to the same scale, yes sir.

14  Exhibit 206D-1 shows the confluence of Santa Gertrudis

15  Creek and Murrieta Creek, which appears on Plaintiff's Exhibit

16  15E near the intersection of Winchester Road and Garfield

17  Avenue.

18  THE COURT:  What generally are the other five?  Are they

19  parts of 15E?

20  THE WITNESS:  They extend beyond 15E.  The other five

21  portions of 206D are photostatic copies of other U.S.G.S

22  quadrangles running upstream in this order:  Bachelor Mountain,

23  which is 206D-2; the Sage quadrangle, which is 206D-3; the

24  Winchester quadrangle, which is 206D-4; the Hemet quadrangle,

25  which is 206D-5; and a portion of an advance sheet prepared by

P 27

1   the U.S. Geological Survey which shows the upper portion of the

2   watershed which drains into the Santa Gertrudis Creek, lying

3   westerly of Little Coahuila Mountain.

4        MR. VEEDER:  May I interrupt for a moment, Colonel.

5        Q   This last one, 206-D-6, is that correct?

6        A   That is correct.

7        Q   And that would not be included in the 29 series, which

8   series constituted all of the U.S.G.S. maps and quadrangles

9   in this area?

10        A   It is not included because the advance sheet was not

11   available at that time.

12        Q   I just wanted to clarify that.

13        A   Yes sir.

14        THE COURT:  What are these extra copies?

15        MR. VEEDER:  These are just copies your Honor.  These are

16   copies for you.

17        THE COURT:  Have the Clerk get the right numbers on them,

18   on the originals and the copies.

19        MR. VEEDER:  These are the Court's copies, Mr. Clerk.

20        I would like to have marked at this time, your Honor --

21        THE COURT:  These new exhibits don't concern these people

22   who have been asked in here today, do they?

23        MR. VEEDER:  These?  They are the exterior boundaries of

24   their parcels, your Honor.

25        THE COURT:  I thought the references on their letters were

P 28

1    206B.

2        MR. VEEDER:  That is correct, your Honor.  But you see,

3    the 206B is the title data-land descriptions.  There is another

4    exhibit.

5        THE COURT:  Without the material from the U.S. Geologic

6    maps?

7        MR. VEEDER:  That is correct.  You have 206C, which is the

8    map.

9        THE COURT:  I see, all right.

10       MR. VEEDER:  About 25 letters have been received acknowledg-

11   ing your Honor's communications and accepting the total and

12   irrigable acreages set forth in those letters.  In the past we

13   have had those marked, as I remember, in the E series.

14       This would be 206E, these letters, Mr. Clerk.

15       THE COURT:  They will be received in evidence as part of

16   206E.

17       Here are additional ones you will have to look over.

18   Some do not agree and can't be included now.

19       MR. VEEDER:  This would be the new exhibit.  This would

20   be a new marking.

21       THE COURT:  206E will be a new series?

22       THE CLERK:  Yes your Honor.

23       MR. VEEDER:  We haven't been doing it that way in the

24   past, have we, Mr. Clerk?  I thought you were stapling those

25   together.

P 29

1    THE CLERK:  Adding them to 207.

2    MR. VEEDER:  Have you been including those all in 207E?

3    THE CLERK:  We have a series of letters.

4    MR. VEEDER:  If that is the practice, then you can add to

5  207E, if you want to.  I have no objection to it.

6    THE COURT:  Make them part of 207E.

7                      (The documents above referred to were )
                       (marked as part of Plaintiff's Exhibit)
8                      (207E and received in evidence.        )

9    MR. VEEDER:  Your Honor, I have no information of any

10  objections.  If there are objections, I am unaware of them.

11    THE COURT:  Let's find out who are here and who want to

12  be heard this morning.  I see some faces here that are obviously

13  just spectators since they have been here before.

14    Any land owners here who want to be heard?  Your name?

15    MR. CLARK:  Willard Clark.

16    THE COURT:  Come forward, Mr. Clark.  You may step down,

17  Colonel.

18    Mr. Clark, did you send in a letter?

19    MR. CLARK:  No, I brought the letter down with me.

20    THE COURT:  Swear Mr. Clark, Mr. Clerk?

21                    WILLARD F. CLARK,

22  one of the defendants herein, being first duly sworn, on his

23  oath was examined and testified as follows:

24                    DIRECTION EXAMINATION

25    THE COURT:  How many acres do you own, sir?

P 30

1    THE WITNESS:  One hundred and sixty.

2    THE COURT:  What did the letter say as to their being

3    irrigable?

4    THE WITNESS:  4.6.

5    THE COURT:  Do you agree with that?

6    THE WITNESS:  No sir.

7    THE COURT:  How many do you think are irrigable?

8    THE WITNESS:  If I could get the water, there would be

9    maybe forty to fifty acres, actually.

10   MR. VEEDER:  I was unaware that Mr. Clark was here.  Colonel

11   said that it appears to him that there is a discrepancy here

12   between what we said and what is actuality.  However, if this

13   land overlies basement complex, it is conceivable that it would

14   come within the area where we would have a finding.

15   THE COURT:  Can we identify where it lies?

16   MR. VEEDER:  Colonel, please.

17   THE COURT:  Point it out on 15E or on one of the others?

18   COLONEL BOWEN:  206D, your Honor.  It does not show on

19   15E.  It is a quarter section of land, Parcel 116, that is the

20   southwest border section 22 Township 7 South Range 1 East.  It

21   lies just easterly of the Pauba Grant.  The area is not shown

22   on 15E.

23   THE COURT:  It would be shown on 15?

24   COLONEL BOWEN:  Yes sir.

25   (A map is placed on the board.)

P 31

1      COLONEL BOWEN:  It is shown on Plaintiff's 15, your Honor.

2  The area is underlain by basement complex.

3      THE COURT:  With no areas of younger alluvium on it?

4      COLONEL BOWEN:  That is correct, your Honor, no alluvium

5  shown on 15.

6      THE COURT:  Your case is a small horse soon curried, and

7  the Court will find that your land overlies basement complex;

8  that any water that you can find on that property is local,

9  vagrant, percolating water and not part of the stream system

10  and you are just lucky to have it if you find it.  Therefore,

11  we are not concerned about how many irrigable acres you have.

12  As far as I am concerned, I am not.

13      Anybody concerned?  Any discrepancy between his claim of

14  forty and the finding of 4.6?

15      MR. VEEDER:  Certainly if his claim of forty --

16      THE COURT:  What difference does it make, if the land is

17  going to go out of the lawsuit on the ground that it is not

18  part of the stream system?

19      MR. VEEDER:  Certainly there is no ground water as con-

20  templated by the Court, I will agree to that, on the basis of

21  the testimony.

22      THE COURT:  No ground water that is part of the stream

23  system.

24      MR. VEEDER:  That is right.

25      THE COURT:  Do you understand what this means?

P 32

1    THE WITNESS MR. CLARK:  Yes.

2    THE COURT:  Certain areas of this land have water under-

3   neath it, generally speaking, which I have found as part of the

4   stream system; but not in that blue area, the basement complex.

5   Our purpose will be to finally get a decree that will sever you

6   from this lawsuit eventually, so you will never be brought in

7   again.

Belt D1   8    THE WITNESS:  Well, the thing is that if I could find

9   water, I would like to plant more acres, put more than four

10  acres into cultivation.

11    THE COURT:  If you find enough water up there, you plant

12  all you can.

13    THE WITNESS:  All right.  Thank you.

14                    (Witness excused.)

15    THE COURT:  Is there anybody else that has come in, who

16  wants to state his position?

17   (No response.)

18    THE COURT:  All right, Mr. O'Malley.  I see you are

19  watching the clock.

20    MR. O'MALLEY:  It isn't so much the particular time, your

21  Honor, but I know that this case has gone on for quite a while.

22    Now, if the Court please, I have served counsel and filed

23  with the Court the request for the following finding, and I

24  will read it:

25       "Water diversions and extractions of defendant,

P 33

1   James Oviatt, and the other owners of land riparian

2   to Lancaster Creek, which are above the impervious

3   barrier or dyke at the head of Nigger Canyon on the

4   Vail property, consisting of a concrete dam tied into

5   the foundation to bedrock, do not now and since the

6   erection thereof have not had more than an infinitesimal

7   effect on the amount of water available to owners of

8   riparian land below said dyke, and do not cause any

9   injury to said lower riparian owners."

10   Our position with respect to this finding is very simple,

11   and I can state it very briefly:

12   We believe that the evidence has established that the

13   water diversions of Mr. Oviatt and other comparable upper

14   riparian owners do not have any material effect on the Santa

15   Margarita River stream system insofar as the amount of water

16   available to the other riparian owners.

17   We submit that the evidence in support of this is quite

18   conclusive.  Colonel Bowen, who is plaintiff's own witness,

19   testified at transcript page 11,665-666:

20   "It consists of a concrete dam tied into the

21   foundation, to bedrock at foundation, and at the

22   abutment.  It cuts off any underground flow that might

23   have existed in the past there and limits the flow,

24   since it was constructed to releases by the Vail Company."

25   And now, in addition to the artificial dykes, with which

P 34

1   your Honor is fully familiar, I believe the record is fairly

2   clear, and I believe other counsel are more familiar with this

3   than I am, but I think it is that the basement complex forms

4   a narrow constriction at the location of the dam, which is

5   relatively impervious to underground water movement.

6       Because of this fact we submit, if your Honor please, in

7   view of the existing situation, that this proposed finding is

8   in order and should be made in this cause.

9       We will request other findings on behalf of Mr. Oviatt,

10  which we can submit at a later time, but I think at this time

11  this is fairly final.  I would like to say one word with respect

12  to our claim.

13      THE COURT:  Have you proposed a set of findings for Mr.

14  Oviatt?

15      MR. O'MALLEY:  I have a set of findings, frankly, in

16  addition to these, if your Honor please, which I just concluded

17  last night.  I would like an opportunity to review them.  I

18  might file them at this time, however, subject to any possible

19  correction that I might wish to make, say, in a stipulated

20  period of a week or so.

21      THE COURT:  Do you propose to argue this piecemeal today,

22  and then argue it again at some other time?  Is that it?

23      MR. O'MALLEY:  I propose merely to submit other findings.

24  I can   submit them at this time, your Honor, and I will make

25  such comments as I desire.

P 35

1    I only wish to make one comment, and that is with respect

2    to our claim of a prescriptive right.  Of course, I am sure

3    that counsel for the lower riparian owners, including of course

4    the Government, will take the position that we are attempting

5    to assert a prescriptive right in the face of this type of

6    evidence, and that with these findings which I have just alluded

7    to we are trying to carry water on both shoulders.

8         But we submit, if your Honor please, that our evidence in

9    support of the prescriptive right, which is fully covered in

10   our points and authorities which are on file with your Honor,

11   indicates that that right accrued prior to the erection of the

12   Vail Dam, and I am referring, of course, to the diversions from

13   the surface flow of Temecula Creek, so that we submit that any

14   action on the part of lower riparian owners cannot take from us

15   this right which accrued prior to the erection of the Vail Dam.

16   So because of our use of that water, the diversion of all of

17   the surface waters of Temecula Creek on the part of Mr. Oviatt,

18   which has continued from the prescriptive period, prior to the

19   erection of Vail Dam, we submit not only is this finding in

20   order, but your Honor should also find that we have a prescrip-

21   tive right to continue the takings which I have just alluded to.

22        We won't argue this in detail, because we have already

23   filed points and authorities which support our position.  I

24   think possibly the best procedure would be for me to file these

25   additional findings at this time.  I had hoped -- I can do so,

P 36

1   and if there is any modification that I wish to make of them,

2   I certainly can indicate that to your Honor, but I think they

3   are probably satisfactory, and with that I will serve counsel

4   with copies.

5       I should say that the proposed finding that I have just

6   now argued in favor of is Finding No. II in this set of findings,

7   which I will now serve. With that, I will now serve this other

8   set of findings, and file them with your Honor's clerk.

9       THE COURT:  They will be lodged with the clerk.  They will

10  not be filed.

11      MR. O'MALLEY:  Very well.

12      MR. VEEDER:  You say that is Finding No. II, Mr. O'Malley?

13      MR. O'MALLEY:  Yes, that is the finding I have just now

14  argued on behalf of.

15      The remainder of our argument with respect to the pre-

16  scriptive right I believe has already been fully covered in

17  our memoranda, and I don't feel it is necessary to enlarge upon

18  it at this time.

19      THE COURT:  Have you referred to the transcript references

20  and the factual situation?

21      MR. O'MALLEY:  In such memoranda, yes, your Honor.  Your

22  Honor will remember I filed it approximately a year ago, and

23  it was incorporated by reference in a memorandum which I filed --

24      THE COURT:  I don't remember, because there are 14,000 or

25  15,000 pages of testimony here, and piles and piles of documents.

P 37

1    MR. O'MALLEY:  I understand.

2    THE COURT:  If you are prepared, I would like to hear

3    briefly what you have proved in this case.

4    MR. O'MALLEY:  Very well.

5    THE COURT:  Do you have a copy of these findings for me?

6    THE CLERK:  Yes, your Honor.

7    THE COURT:  Thank you.  You say this memorandum was filed

8    a year ago?

9    MR. O'MALLEY:  Well, approximately.  It was shortly after

10   the hearing here, and it was filed March 1, 1960.  I also filed,

11   approximately on January 10th, a memorandum which incorporated

12   by reference.

13   THE COURT:  January 10th of this year?

14   MR. O'MALLEY:  That is right.  Now, in the first place,

15   with the respect to the riparian character of the lands of Mr.

16   Oviatt, we believe the evidence, as adduced, shows that all of

17   the real property of Mr. Oviatt lies within the Santa Margarita

18   River stream system, the Temecula Creek, and the Lancaster Creek,

19   respectively.  That was the testimony of our principal witness,

20   Mr. Max Bookman, and I believe there is no dispute in the record

21   with respect to that.

22   Secondly, we believe the evidence has indicated, as I have

23   stated, that there is no material effect because of Vail Dam

24   of any diversions on the part of Mr. Oviatt on the water avail-

25   able to the lower riparian owners.

P 38

1    Now, on the testimony with respect to the prescriptive

2    right, which we have urged, we believe that the case is within

3    the rule, after showing the continuous occupancy and the use of

4    the water, as though he were the owner more than five years,

5    that then an owner establishes a primafacie case of a prescrip-

6    tive right.  It then devolves upon the other parties to the

7    lawsuit to show that the use was permissive or without the

8    knowledge of such lower riparian owners.

9        That was the doctrine stated in <u>Silva v. Hawn</u>, cited at

10   page 4 of our memorandum, 10. Cal. App. 542, at page 552.   That

11   has special applicability on behalf of Mr. Oviatt, because the

12   evidence indicates that the irrigation system of Mr. Oviatt,

13   which diverts all of the waters of the Lancaster Creek, goes

14   right up to the Vail line, and each of the witnesses I called

15   in this lawsuit testified, beginning with some period back

16   prior to 1919, which, of course, was well prior to the purchase

17   by the Government of the properties which formed the Naval

18   Enclave, that total diversion of all the waters of the Creek,

19   except of course during flood season, and of course, we will

20   also refer to surface waters, was carried on continuously.

21       We had a series of witnesses, beginning with Mr. Amos

22   Welch, Mr. Harold Brinkerhoff, and, of course, Mr. Oviatt him-

23   self, and then there was Mr. -- this elderly gentleman whose

24   deposition we took.  Well, I believe that was Mr. Amos Welch.

25   We have traced the water back from some period back in 1919

P 39

1   right up to the present date, so that we believe we have esta-

2   blished within the meaning of the case I have just alluded to

3   the taking by Mr. Oviatt of all of the waters in that time.

4       The same thing is true with respect to the Oak Grove

5   property of Mr. Oviatt.

6       We have established from the period of time going back to

7   approximately the early 1900's a total diversion of all of the

8   waters of Temecula Creek onto the Oak Grove property of Mr.

9   Oviatt's predecessor for beneficial purposes and for purposes

10   of irrigation.

11       That, briefly, is our story with respect to a prescriptive

12   right.

13       There is this memoranda on file which summarizes our

14   position, and this now very briefly summarizes our position now.

15   This memoranda attempts in somewhat more comprehensive fashion

16   to deal with this problem.

17       I should say this, if your Honor please, this claim of a

18   prescriptive right is not inconsistent with the finding that

19   I have just proposed with respect to the effect of our taking

20   on the lower riparian owners, for this reason:  This right to

21   a prescriptive right to all of the surface waters of the stream

22   accrued prior to the acquisition by the Government of the

23   properties, including the Naval Enclave, so when the Government

24   took those properties, it took such property subject to whatever

25   claims were against that property.  That, very briefly, is our

16 959

P 40   1   position.

2        THE COURT:  Now, a prescriptive right has to be open,

3   notorious and constant; is that not right?

4        MR. O'MALLEY:  That is right.

5        THE COURT:  What about these downstream riparians that

6   live all over the world, that never heard about your ditch

7   there?  How could your taking be hostile to these people, who

8   have riparian land downstream, and who didn't even know that

9   you had a claim?  How can it be hostile to them?

10       MR. O'MALLEY:  Reference to that very fact is made in the

11   decision that I referred to, <u>Silva v. Hawn, 10 Cal.App. 542,</u>

12   at page 552, which holds as follows:

13            ". . . After showing the continuous occupancy

14        and use of the water as though he were the owner," --

15   I am quoting from that case, your Honor -- "for more than

16        five years, he establishes a primafacie case.  It then

17        devolves" -- and I am quoting verbatum -- "upon the

18        defendant to show that the use was permissive or with-

19        out the knowledge of the defendant."

20       In other words, we have made out a primafacie case, if

21   your Honor please, and we have shown our use of the water, and

22   under such circumstances, then it must necessarily be assumed

23   to have come to the attention of the lower riparian owners.

24       THE COURT:  Why wasn't your use merely a riparian use?

25   You, as a riparian owner, had a right to use water in that

P 41

1    stream, and if the water was not needed downstream, you had a

2    right to use all of it, if you had grounds to irrigate it on.

3    Why is your use any different than a reasonable riparian use?

4    MR. O'MALLEY:  Well, I would say this:  The total taking

5    of all of the surface waters of the stream places us in a

6    little different category than if we were merely taking for a

7    proper riparian use, and that is our position.

8    THE COURT:  Your claim is that this water had been used

9    on riparian ground?

10   MR. O'MALLEY:  That is correct.

11   THE COURT:  To irrigate crops?

12   MR. O'MALLEY:  That is correct, and for beneficial use.

13   THE COURT:  And for beneficial use?

14   MR. O'MALLEY:  Which would be within the scope of riparian

15   use.

16   THE COURT:  Let us take a simple case.  I am downstream

17   from you, along with three or four neighbors, and you are up-

18   stream, and I am not farming my property.  I am living in the

19   city somewhere, and I have some wild land up there, and I never

20   farm it.  So you take all the water, and you use it for a

21   beneficial use on your property.  How have you done anything

22   to make a reasonable riparian use of the water?

23   MR. O'MALLEY:  I think if you assume thatthedefendants,

24   or that the lower riparian owners in court have presented their

25   evidence of the facts in the hypothetical situation which your

P 42

1  Honor has just referred to, that would be one thing, but I

2  believe this case is now in this posture, if the Court please,

3  that we have made a showing of our usage continuously from the

4  prescriptive period.

5      We have shown that we took all of the water during that

6  prescriptive period, and we are then in this situation, if your

7  Honor please that it devolves upon anybody who would challenge

8  that claim to a prescriptive right to make a contrary showing,

9  and I don't believe that that is the state of the record here

10 in this case.  That, briefly, is our position.

11     I think your Honor is quite right, and the cases, of course,

12 so hold, that when you take water for use upon your riparian

13 land, it is presumed, as a matter of law, that it is for a

14 riparian use, but the Silva v. Hawn case holds that after a

15 showing has been made, such as we have made in this case, it

16 devolves upon the lower riparian owners to rebut that inference,

17 and we are now in that situation.

18     THE COURT:  I will hear from the other water experts here.

Belt   19 Who wants to be heard first on this?

D 2    20    MR. VEEDER:  Your Honor, I am not a water expert, but did

21 you hear from Mr. Starke or Mr. Grover today?  They were going

22 to call.

23     THE COURT:  Yes, they were jointly on the phone, and Mr.

24 Grover has accepted a position and has taken office as a member

25 of the Public Utilities Commission, and Starke will have to

P 43

1    take over from him,  They will, however, not be able to argue

2    their matter presently, and probably not until some hearing in

3    the early part of March.

4         MR. VEEDER:  The reason why I inquired is that I had sub-

5    mitted to them tentative findings that I thought covered the

6    situation.  They said they could not make any recommendations

7    at this time.  However, the point that was argued by Mr. O'Malley

8    is squarely presented by Mr. Starke, I think, in this same

9    problem.

10        THE COURT:  It is probably the same problem, but I think

11   Mr. O'Malley would be entitled to hear the views of you gentle-

12   men, if you want to state them briefly, and you will have to

13   state them over again for Mr. Starke.

14        MR. VEEDER:  The views of the United States are this, your

15   Honor, and this is something that we have adhered to in regard

16   to this particular area where the Oviatt lands are situated:

17   There is not a scintilla of evidence that I have been able to

18   find in the record as to the quantity of water that has been

19   diverted and applied to beneficial use.  I have not been able

20   to tell what water was diverted that would have flowed on down

21   the stream.  I am unable to tell what water was actually used.

22   I don't know what the rate of flow was.

23        It seems to me that the very essence of an appropriative

24   right and a prescriptive right is the establishment someplace

25   of a factual situation which would support a finding as to the

P 44

1  quantities of water.  Absent of that finding, I don't see how

2  you could say that it is a prescriptive right.  A prescriptive

3  right for what?  For the whole stream?  It does not flow day

4  in and day out, month in and month out, year in and year out

5  with the same quantity of water.

6       I think there is evidence that at sometimes water did pass

7  on by the diversion points, and certainly there is subsurface

8  flow.  We know that.  The evidence that is in the record

9  demonstrates clearly that below the Oviatt property on the Vail

10 land there is a surface flow.  So without limiting myself to

11 further argument, and without limiting myself, if it is all the

12 same with your Honor, to filing a brief on what has been said,

13 I would conclude my remarks with respect to what Mr. O'Malley

14 has said by saying that there has been a failure of evidence

15 as to a prescriptive right with respect to quantity.

16       THE COURT:  Mr. Girard.

17       MR. GIRARD:  I will just comment briefly, your Honor, as

18 I see the problem.  In the first place, it must be remembered

19 that Mr. O'Malley has said that this was riparian, and how can

20 the water, the use of water for any beneficial use be determined

21 to be riparian?

22       But diverting my attention for the moment to this statement

23 in the case, it indicates that if you use all of the water, a

24 riparian can be in a position where he can assert a prescriptive

25 right.  But I think the facts of that case will show that that

P 45

1  was a surface stream, which was continuing in surface all the

2  way down, and the reasoning of the opinion is that some other

3  riparian could see and notice it, and that if the fellow took

4  it all, he wasn't getting any more than he was entitled to.

5      I don't know the actual situation, but, as I recall, the

6  surface stream, even on Mr. Oviatt's property itself, disappears

7  into the ground, and there are many cases where a downstream

8  owner would never even know, even long before Vail Dam, whether

9  there was any use of the stream, because the water flowed under-

10  neath his property in the stream.

11      The whole idea of knowledge of taking all of the stream

12  is that the other person will obviously see it, and when you

13  have a stream which flows underground I think the reasoning

14  of that case disappears, and you couldn't hold a downstream

15  riparian to that knowledge factor.

16      In addition I think, and I may be wrong on this, that

17  there are records available as to stream measurements long be-

18  fore Vail Dam, which show that during many periods of time there

19  were or were not certain amounts of water in that stream.  Isn't

20  that right, Franz?

21      MR. SACHSE:  Yes sir.  We have all the U.S.G.S. flow

22  records on it.

23      MR. GIRARD:  I think these records would establish that,

24  and despite the use of all of the water on Mr. Oviatt's property,

25  downstream there would still be water flowing.

14,905

P 46

1    MR. VEEDER:  And there is affirmative testimony to that

2    effect.

3        THE COURT:  Your point, therefore, is that he did not take

4    all of the water of the stream?

5        MR. GIRARD:  He may have taken all of the water from the

6    surface stream, but you can't isolate the stream, and isolate

7    it from the part of the stream that is underground.  I am sure

8    under the law of California this is not a ground water basin,

9    this is percolating water, the stream flows underground and on

10   the surface, and you can't say that you take all of the water

11   in the stream just because you happen to drive your pipe into

12   a place where it is flowing on the surface.  Probably under-

13   neath that place there could be water flowing underground.

14       THE COURT:  Do you think that a riparian, where he has

15   made the use as contended for by Mr. O'Malley on behalf of Mr.

16   Oviatt, has a prescriptive right?

17       MR. GIRARD:  I certainly think that there is enough

18   evidence in the record to establish that he has not.

19       THE COURT:  Can a riparian obtain prescriptive rights if

20   he used the whole surface flow of the stream and used the water

21   beneficially?  When he has made a riparian use, how can he

22   therefore get a prescriptive right?

23       MR. GIRARD:  I think Mr. O'Malley has already cited that

24   case,  and I would not argue the case.  There are some later

25   cases on this question that say that where a riparian is using

P 47

1   all of the water under a claim of use, that the other riparians,

2   even though they are not using it, can bring an action for

3   declaratory relief to have their rights adjudicated within the

4   prescriptive period, to prevent the running of the prescription.

5       I don't have any citation of those cases, but I am sure

6   there are some along that line.  But I would think on the

7   factual basis of this showing, the downstream owners would not

8   know Mr. Oviatt was using all of this water because of the

9   nature of the stream itself.

10      THE COURT:  Mr. Stahlman.

11      MR. STAHLMAN:  This is a situation, your Honor please, in

12   the first place, where you have a matter of assuming that the

13   case which Mr. O'Malley cites is applicable to the situation

14   here.  It is still a matter of circumstantial evidence, in

15   which the Court can take notice of these other factors, as to

16   whether or not it was an open and notorious use, so that it

17   invaded the rights of downstream owners, and I think your Honor

18   hit the matter right on the head when you cited the case of an

19   owner downstream who had not been put upon notice, nor would

20   he be put on alertness to make inquiry, even if that were his

21   obligation.  I think all he demonstrated here was that a

22   riparian used a method of diversion of the water for riparian

23   use by taking it from the surface of the stream.  That certain-

24   ly does not give anyone a right, an upper stream riparian owner

25   simply because he uses the water, and uses some method of

P 48

1    diversion, when we have a stream system here and where we have

2    underground flow.  As the witness, Mr. Bookman  testified, it

3    was demonstrated that downstream water was still flowing, and

4    there were phreatophytes, and other indications of subsurface

5    flow, and Bulletin 57 that is in this case, I think it is Plate

6    16, shows that this is downstream from Oviatt, and through  to

7    Vail at that point, and intermittent, and down further it rises

8    to the surface again at several places, and rises again after

9    it gets past Temecula Gorge.

10    So the factual situation, as I recall the leading case, is,

11    in the first place, a surface stream, where the downstream

12    owner was completely run out of water.  The upstream owner had

13    blocked the stream by placing a dam there, and the downstream

14    owner then went up and complained to him about it, but did

15    nothing about it; in fact, thereafter took his wagon up there

16    and obtained water from the upstream owner.  In other words,

17    he had been put upon notice, and the factual situation showed

18    that the stream had been stopped, and under those circumstances

19    the riparian owner upstream on this small stream, which was

20    litigated, did obtain a right as against the downstream owner,

21    but he slept on his rights, and that was because of the factual

22    situation there.  But under the circumstances of this case,

23    with many people downstream, with many different types of

24    operations, with some in use, some not in use, some in weekend

25    use, it certainly presents circumstances from which the Court

P 49

1   can readily conclude that there was not that type of possession,

2   that there was not that notorious, adverse possession, and

3   certainly not invading the rights of the people downstream so

4   as to obtain a prescriptive right upstream.

Tape
D-3

5      In relation to the other finding in regard to the Vail

6   Dam, that does not make sense to me at all.  In the first

7   place, he overlooks the fact that in obtaining the permit from

8   the State of California that Vail is obligated to make certain

9   releases each year we file with the State the amount of water

10   that was put underground into the stream system.  That has been

11   testified to here, and counsel was in Court, and it is in the

12   record in this case as to our obligation each year to submit

13   to the State the quantity of water that has been placed down-

14   stream.  And I submit to your Honor that future regulations,

15   if it ever comes, and it is certainly here, give the Court

16   the power to determine what shall be released downstream in

17   order to satisfy the rights of the downstream owners as they

18   may be determined by this litigation.

19      So under that situation, the ridiculousness of that situ-

20   ation, we can go a step further, and let's assume that Fallbrook

21   builds a dam downstream, and they blocked off the river down

22   there.  Then we, as an upstream owner, can make the same claims

23   as the people downstream.

24      THE COURT:  I have trouble in following this proposed

25   finding on the Vail Dam.

P 50

1      MR. VEEDER:  I do, too.

2      THE COURT:  Maybe I don't know what you are getting at,

3  Mr. O'Malley.  Maybe you will want to take another try at it.

4  What is your contention?  Because Vail Dam was built down to

5  bedrock clear down to Temecula, -- what is your contention?

6      MR. O'MALLEY:  That because of that, it is a barrier,

7  your Honor.

8      THE COURT:  But it has a means to let water out of it.

9      MR. O'MALLEY:  There is that factor, if your Honor please,

10  but there is testimony with regard to the natural barrier which

11  is present.  I believe it is set forth in Exhibits 15, 15-A

12  and 15-I, and I believe I understand the record and I believe

13  Mr. Sachse will support me in this, that there is testimony

14  that that basement complex forms a natural barrier to the

15  movement of this underground water.

16      MR. VEEDER:  Where?  Down in Nigger Canyon?

17      THE COURT:  You mean on either side of the dam?

18      MR. O'MALLEY:  I beg your pardon?

19      THE COURT:  You mean on either side of the dam?

20      MR. O'MALLEY:  That is correct, your Honor, so that we

21  have both the artificial barrier that was erected with the

22  acquiescence of plaintiff in this  case, which is a complete

23  barrier to any movement downstream of the waters of Temecula

24  Creek, together with this natural barrier, so that we are in

25  this situation where any taking we have under the existing

P 51

1   situation could not possibly affect the downstream owners.

2       MR. VEEDER:  I can't buy that.

3       THE COURT:  I get everything but the "therefore".   Here

4   is water coming down the stream, --

5       MR. O'MALLEY:  Yes.

6       THE COURT:  -- and here a dam has been built, and now we

7   will assume that the dam has been built into the basement com-

8   plex on either side?

9       MR. O'MALLEY:  So it is completely impervious.

10      THE COURT:  So the dam and the basement complex are im-

11  pervious.  Now, you say, therefore, because the dam has cut

12  all the water off, therefore you can use all the water, because

13  it does not affect downstream owners.  But the dam was built,

14  number one, subject to all the vested rights downstream.

15      MR. O'MALLEY:  That is right.

16      THE COURT:  Now, the riparian rights are to the reasonable

17  use of water downstream.

18      MR. O'MALLEY:  That is right.

19      THE COURT:  Then, secondly, the dam has a hole in it, and

20  you can drain that water out of it and down into the stream

21  below.  If you had a case where you had a solid dam and a

22  basement complex, and with no outlet to it, and all the water

23  was being used upstream of the dam, the people downstream

24  could still complain, but I believe I could have a little more

25  understanding of what you are trying to get at.

P 52

1    MR. O'MALLEY:  Your Honor will recall the testimony of

2    Mr. Bookman, after laying down both the geological factors

3    that were involved, in addition to the natural geological factors,

4    the presence of Vail Dam, and then he testified after all of

5    that, because of all of those factors, that no taking by Mr.

6    Oviatt could have more than -- I believe the term was used by

7    your Honor -- a de minimus effect upon the lower riparian owners.

8        Now, of course, as you know, as any dam that is built for

9    such purpose, it can have water let out, but we submit that

10   that would be clearly an unconstitutional requirement to

11   compell water to be let downstream, to have it stored, when

12   there is not any present use for that water contemplated.

13       We submit that the use of the waters of Temecula Creek

14   would be pretty well in that situation.

15       MR. GIRARD:  Vail only stores flood waters.

16       MR. VEEDER:  We hope.

17       MR. STAHLMAN:  Your Honor, to analyze some of the testi-

18   mony, to show how unsatisfactory the record is as to what they

19   diverted, as Mr. Veeder mentioned to the Court, it is rather

20   interesting that Mr. Bookman testified in Volume 105, and made

21   reference to Exhibit AH, and I think it is page 11,874, -- he

22   testified that the study that the State had made -- and I be-

23   lieve Mr. Sachse was cross examining at the time -- showed that

24   in 1951 that the study of the Oviatt Ranch showed that they

25   had used 148 acre feet, 115 acre feet for 1952, and 235 acre

P 53

1  feet for 1953, which is an average of 155 acre feet, or a flow

2  of 8.6 miner's inches.  That would irrigate approximately fifty

3  to sixty acres of land.

4      Now, then Mr. Oviatt got on the stand and testified that

5  in 1951 they irrigated 154 acres, in 1952 95 acres -- and this

6  is also taken from their Exhibit AE -- and in 1953 97 acres,

7  so in those three years they irrigated 180 acres.

8      Now, the ridiculous part of it is to figure how much they

9  are using, and this year they are using about 28 acre feet of

10  water.

11     It does not lace together, and does not make sense, and

12  then the study that Mr. Bookman made before Mr. O'Malley became

13  their lawyer, to which he has testified here, is here, and so

14  I submit that when you get into it you will find they haven't

15  established that they have a prescriptive right.

16     THE COURT:  I have your point.  Now, what about the water

17  from Rattlesnake Canyon and from Kohler Canyon?

18     MR. O'MALLEY:  Well, I would submit that one is pursuant

19  to a permit, which, as your Honor points out --

20     THE COURT:  Which is the permit?

21     MR. O'MALLEY:  That is Rattlesnake.

22     THE COURT:  Has this gone into a license, or is it still

23  a permit?

24     MR. O'MALLEY:  Pursuant to a permit, which, as your Honor

25  pointed out, would be in the nature of a permissive use.

P 54

1    MR. SACHSE:  It is not a State permit, your Honor.

2    MR. O'MALLEY:  We are talking about two different things,

3    your Honor.  First, with respect to Rattlesnake, the usage there

4    was pursuant to a permit obtained from the U.S. Forestry Service.

5    Then we have the second situation for Kohler Canyon, where

6    there was a filing prior to 1913 on Kohler Canyon, and there

7    has been a continuous diversion, as the record shows, of $3\frac{1}{2}$ ·

8    miner's inches into Kohler Canyon since that time, so with

9    respect to that we submit a right by appropriation, because,

10   as your Honor knows, the law in California is that with respect

11   to filings and usage beginning in the year 1913, that satisfies

12   the statutory requirement.

13   MR. STAHLMAN:  Pardon me.  Does the exhibit come/in Volume 113?

14   THE COURT:  As to Rattlesnake Canyon, of course, that is

15   a permit from the United States Forestry Service, and that is

16   a permissive use that can be revoked at any time.

17   MR. O'MALLEY:  Yes.

18   THE COURT:  What is the situation as to Kohler?  What do

19   the other counsel have to say?

20   Mr. Girard; do you have anything on the Kohler Canyon

21   situation?

22   MR. GIRARD:  As to that $3\frac{1}{2}$ miner's inches?

23   THE COURT:  Yes.

24   MR. GIRARD:  I am not sure what the evidence shows in

25   regard to the fact that it was appropriated prior to 1913.

P 55

1    MR. STAHLMAN:  What is the exhibit number?

2    MR. O' MALLEY:  That was the testimony of Mr. Bailey.

3    MR. STAHLMAN:  I just don't remember.

4    MR. O'MALLEY:  I can dig it out.

5    THE COURT:  Mr. Stahlman, do you have anything further on

6    Kohler Canyon?

7    MR. STAHLMAN:  I want to check that, your Honor.

8    THE COURT:  Mr. Veeder, have you looked into Kohler Canyon?

9    MR. VEEDER:  I can recall the testimony in regard to it,

10    and at the time I noted in my mind from such exhibits that

11    there was no proof of the quantity they applied beneficially

12    to the land.

13    Assuming they did take $3\frac{1}{2}$ miner's inches down there, how

14    could you adjudicate and adjudge an appropriative right without

15    some showing actually of the period of use, the crops grown,

16    the acreage upon which the water was used?  I think your Honor

17    could not make a finding without that.

18    THE COURT:  Have you briefed the Kohler evidence in your

19    memoranda?

20    MR. O'MALLEY:  That is in this memoranda, your Honor.

21    MR. GIRARD:  Mr. O'Malley limits it purely to domestic use.

22    MR. O'MALLEY:  Domestic use and irrigation.  The testimony

23    shows that.  That was by the prior owner, this elderly Mr.

24    Bailey, if your Honor will recall, and, of course, by Mr.

25    Oviatt as the successor owner.

P 56

1      THE COURT:  You briefed it in the memoranda that you filed

2  last March, did you?

3      MR. O'MALLEY:  Yes, your Honor.

4      THE COURT:  You briefed it in that memorandum that you

5  filed last March, did you?

6      MR. O'MALLEY:  Yes, your Honor.

7      THE COURT:  Then I will ask counsel to look that memoran-

8  dum over, and I will, and if they would like to submit something

9  on it, I will ask you to submit separately a memorandum on this

10  problem raised by Mr. O'Malley.

11      MR. O'MALLEY:  This was only filed March 1, if the Court

12  please, but I incorporated it by reference in my memorandum

13  that was filed on January 10th.

Tape El 14      THE COURT:  Anything further?

15      MR. VEEDER:  Of this year?

16      MR. O'MALLEY:  Of this year.

17      THE COURT:  Anything further on the Oviatt matter?

18      MR. SACHSE:  I will be very very brief, your Honor.  I

19  agree with what Mr. Stahlman, Mr. Girard and Mr. Veeder have

20  said on the question of prescription.  I don't think there is

21  any proof of an adverse taking, and on the contrary I think

22  the record would affirmatively disclose that the use could not

23  possibly have been adverse because all the testimony in this

24  case discloses that this stream is intermittent both as to

25  time and as to place and it is utterly impossible for any

P 57

1    person down the stream to conclude, by the naked fact of the

2    presence of water or non-presence of water, that Oviatt was in

3    any way adversely affecting the rights of the downstream claim-

4    ants.  It is impossible to create a set of facts where your

5    Honor can find a prescriptive taking.

6        MR. VEEDER:  On that proposition we are asking for a

7    finding that there is a continuous and underground water stream

8    from Vail Dam on up through what is know as Wilson Valley.

9        MR. SACHSE:  Not surface?

10        MR. VEEDER:  I said surface and subsurface both.

11        MR. SACHSE:  That is the point.

12        MR. VEEDER:  I said that there is a continuous surface

13    and subsurface flow, and I think the record supports it.

14        THE COURT:  Mr. O'Malley.

15        MR. O'MALLEY:  One further remark I wish to make with

16    respect to the open and notorious diversion.  Mr. Oviatt

17    testified, at transcript 12,022, that in 1945 Mr. Mahlon Vail

18    -- who, of course, is the owner of the Vail properties --

19    protested that Oviatt was taking all of the water.

20        THE COURT:  I will dispose of part of this right now, and

21    we will hear and see what counsel develop on the other.  I am

22    going to reject your Finding No. II about the dam.  I can't see

23    any merit to that, that the effect of this dam gives you any

24    kind of rights at all.

25        And I am going to take under submission until I can read

P 58

1   your memorandum and anything that counsel want to submit as to

2   whether you have any prescriptive rights from the use of water

3   as a riparian.  I will tell you very frankly I don't believe

4   you have, but I will go over your memorandum and go over the

5   evidence and see.

6       Now on the Rattlesnake Canyon, that is a simple matter.

7   The finding that you have prepared is all right as far as facts

8   are concerned.  There would have to be a conclusion of law that

9   this was a permissive use and could be revoked at any time.

10  You acquired no rights to Rattlesnake.

11      MR. SACHSE:  I think you must go further, your Honor, on

12  Rattlesnake.  I have the exhibits here now and my memory is

13  refreshed.  Mr. Vail made the original finding.  He has a

14  permit from the Forest Service only, a permissive permit, but

15  the earliest one is December 1, 1914, which is after the law

16  of California would have required a filing with the State, and

17  there is no filing with the State on Rattlesnake.

18      THE COURT:  I understand that.  I say he has made the

19  finding here that this is a permit from the Forest Service.  He

20  doesn't claim any permit from the Water Rights Board.

21      MR. O'MALLEY:  Now you are talking about Rattlesnake.

22      THE COURT:  Rattlesnake.  And being a permit from the

23  Forest Service and having  been used pursuant to the permit,

24  it is a revocable permit -- it is not a water right.

25      MR. SACHSE:  I didn't read it carefully.

P 59

1    THE COURT:  I will also take under submission your Kohler

2    Canyon situation, and I have asked counsel to look into that

3    and advise me by a short memorandum on it.

4        MR. VEEDER:  Are you specifying any times on these, your

5    Honor?

6        THE COURT:  I think you ought to be able to do that in

7    about ten days.

8        MR. SACHSE:  As far as Kohler Canyon is concerned, I can

9    advise you at the moment, your Honor.  I think it is good.  He

10   has in evidence that prior to 1913 finding, and he did offer

11   testimony, which no one rebutted, of the use of 3½ miner's

12   inches.

13       MR. VEEDER:  That is right.

14       MR. SACHSE:  I think he did prove --

15       THE COURT:  I want Mr. Veeder and Mr. Girard then to

16   look into it and each submit a memorandum on Kohler Canyon.

17       MR. GIRARD:  Do you want me to submit a memorandum on the

18   other points involved here, your Honor?

19       THE COURT:  I have thrown the dam point out.

20       MR. GIRARD:  You may have thrown out the dam point -- I

21   agree with you that it should be thrown out, but I think Mr.

22   O'Malley is right on the crucial finding that there is no

23   evidence that any adverse use up there has been harmful to him.

24       THE COURT:  You submit a memorandum on the matter that is

25   left in there.  How long do you want, Mr. Veeder?  Is ten days

16979

P 60

1   sufficient for you?

2       MR. VEEDER:  Ten days, your Honor.

3       THE COURT:  All right.

4   Two o'clock.

5   You'll be excused, Mr. O'Malley.

6       MR. O'MALLEY:  Thank you.  I appreciate it.

7       (NOON RECESS.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14,980

52
21

1    San Diego, California, Monday, January 31, 1961.  2 P.M.

2

3        MR. VEEDER:  Are you ready to have us proceed,

4    your Honor?

5        THE COURT:  Yes, sir.

6        MR. VEEDER:  I would like to have Col. Bowen take

7    the stand, if he would, please.

8

9                    A. C. BOWEN,

10   previously duly sworn, on his oath was examined and

11   testified further as follows:

12       THE COURT:  What matter are you going into now?

13       MR. VEEDER:  I have just one exhibit that would

14   wind up this Lower--  Exhibit 206E.

15       THE COURT:  I don't know whether Exhibits 206-D-1

16   through 206D-6 were received in evidence.

17       MR. VEEDER:  I am going to offer those now, your

18   Honor.

19       THE COURT:  They will now be received in evidence,

20   Exhibits 206D-1 through 206D-6.

21                   (The documents above referred to
                     were received in evidence as
22                   Plaintiff's Exhibits 206D-1 through
                     206D-6.)

23

24

25

# FURTHER DIRECT EXAMINATION

BY MR. VEEDER:

Q   Col. Bowen, I hand you the tabulation marked 206E and ask you to state into the record what is set forth in that tabulation.

A   It sets forth by parcel numbers, legal description, name of apparent owner, the parcels which lie within the Santa Gertrudis Creek watershed.  This watershed, incidentally, includes Tucalota Creek.  Tucalota is tributary to the Santa Gertrudis, which itself is tributary to the Murrieta and the Santa Margarita River. Also in the tabulation are columns showing the irrigable, the non-irrigable acreage, and total acreage for each parcel, and the column headed "Remarks" is used primarily to note whether any portion of the land is outside the watershed or not.

Q   Is the tabulation correct, to your personal knowledge, Col. Bowen?

A   Yes, sir.

MR. VEEDER:  I offer in evidence Plaintiff's Exhibit 206E, your Honor.

THE COURT:  Plaintiff's Exhibit 206E received in evidence.

(The document above referred to was received in evidence as Plaintiff's Exhibit 206E.)

1    MR. VEEDER: Now, your Honor, if we would turn to

2    the agenda on the third page, No. 11.  That relates to

3    continuation of exhibits presently in the record to

4    bring them down to date.

5        THE COURT:  Let's talk a minute about the agenda.

6    Mr. Girard can't be here tomorrow.  He can be here

7    Thursday.

8        MR. GIRARD:  Yes, your Honor.

9        THE COURT:  And I am hopeful by Thursday morning

10   to have a rough draft of an opinion in this matter of

11   the stipulated judgment.  I don't propose to file it.

12   I propose to hand it to counsel and have some discussion

13   and let you shoot at it, and probably you will want to

14   read it beforehand.  Maybe we could do that on Friday,

15   if I got it to you on Thursday.  Does that sound all right?

16       MR. VEEDER: Very good.

17       MR. SACHSE:  That is agreeable, your Honor.

18       THE COURT:  What parts of the agenda did you plan

19   to cover today?  Do you propose to go to No. 11?

20       MR. GIRARD:  I would suggest No. 11 and possibly

21   at least 7, if we could.

22       THE COURT:  Today?

23       MR. GIRARD:  That would be my suggestion, and any

24   more that we can.  But I would think those two.  I don't

25   think No. 11 will have any problem with it at all.  I

E2
Z4

1    think that will go relatively quickly.  As to No. 7, I think

2    all of the parties have filed their briefs as requested by

3    the Court.  I don't know about the rest of it.

4        THE COURT:  Let's proceed with No. 11.

5        MR. VEEDER: There are copies, by the way, for counsel,

6    if you want copies of the exhibits.

7        MR. GIRARD:  You have already sent them up to us.

8        MR. VEEDER:  You got those?

9        MR. GIRARD:  Yes.

10       MR. VEEDER:  There are some more there.

11       Here is a copy for the Court.

12       Q Col. Bowen, I hand to you a tabulation of charts and

13   related data which are for the purpose of bringing to date or

14   as nearly to date as you have material, in regard to exhibits

15   already in the record.  I would ask that you refer to the

16   exhibit number and read the title block into the record and

17   then state what is depict on it in regard to the data which

18   it contains, starting with Exhibit No. 46, if that is con-

19   venient.

20       A  Plaintiff's Exhibit No. 46 is unchanged.  That is

21   entitled "Hydrographs of Paired Shallow and Deep Wells in

22   Ysidora Subbasin Camp Pendleton."  That was not brought up to

23   date.  It is in the same condition as when it was introduced

24   in evidence.

25       MR. GIRARD:  It might be premature, Col. Bowen, but I

E2

Z5

1    think the one that went into evidence before only went through

2    1957.  Now it is through 1958-- unless our copy is wrong.  Is

3    that right?

4          MR. VEEDER:  What copy do you have, Col. Bowen?

5          THE WITNESS:  I have "Revised 1960."

6          MR. GIRARD:  Here is our copy of the old one, which went

7    through 1957.

8          THE WITNESS:  Plaintiff's 46 then-- I was in error--

9    is brought down through 1958 for the Ysidora Subbasin.

10          THE COURT:  What do you propose to do?  Substitute this

11    one for the old one, mark this 46A, then, or what?

12          MR. VEEDER:  I had hoped to mark them as supplementary

13    exhibits now, 46A, 47A, showing continuation.

14          THE COURT:  Give them the letter A?  If we have 46, call

15    this 46A?

16          MR. VEEDER:  I think that would be proper.  I think we

17    should mark on these "Continuation January, 1961," so that we

18    will know what we are looking at.

19          THE COURT:  Will you write that on?

20          MR. VEEDER:  We will have that done, yes.

21          THE WITNESS:  It is on here, "Revised 1960" and I

22    will mark "Continued 1960."

23          MR. VEEDER:  Mark it on there.

24          THE COURT:  All right, we will call it 46A, and it is

25    received in evidence.

E2

Z6

1          (The document above referred to was marked
            as Plaintiff's Exhibit 46A and received
2           in Evidence.)

3          THE COURT:  Do you have an extra copy?  Copies are here.

4   BY MR. VEEDER:

5          Q  Col. Bowen, referring now to Exhibits 47, 48, et

6   cetera, that you have before you.

7          A  Plaintiff's Exhibit No. 47 is continued through

8   1959, showing graphically the pumpage by subbasins at Camp

9   Pendleton, the distribution of the pumpage.  It is marked

10  "Revised 1960" at the bottom, and in ink at the upper right-

11  hand corner "Continued 1960."

12         Q  Is that correct, to your personal knowledge, Colonel?

13         A  Yes, sir.

14         MR. VEEDER: We offer that as 47A in Evidence, your

15  Honor.

16         THE COURT:  47A received in evidence.

17               (The document above referred to was marked
                 and received in evidence as Plaintiff's
18               Exhibit 47A.)

19  BY MR. VEEDER:

20         Q  Exhibit 48.

21         A  Plaintiff's Exhibit No. 48 has been continued to

22  1959.

23         THE COURT:  To or through?

24         THE WITNESS:  Through, your Honor.  The copy I have has

25  printed at the bottom "Revised 1960," and under the Exhibit

# E2
Z7

1    No. 48 in the upper right-hand corner is "Continued 1960"

2    written in blue ink.   This shows the Camp Pendleton pumpage

3    and sewage affluent returned to the basin.

4        Q   Is the exhibit correct?

5        THE COURT:   Is that correct, to your knowledge?

6        THE WITNESS:   Yes, sir.

7        MR. VEEDER:   It is offered in evidence, your Honor.

8        THE COURT:   48A received in evidence.

9                    (The document above referred to was marked
                      Plaintiff's Exhibit No. 48A and received
10                    in evidence.)

11   BY MR. VEEDER:

12       Q   49:

13       A   Graph marked Exhibit No. 49, "Revised 1960" to show

14   the ground water recharge and discharge in the lower Santa

15   Margarita River Basin through 1959.   It has "Revised 1960"

16   printed at the bottom, and under the Exhibit No. 49, the

17   upper right-hand corner, in blue ink is "Continued 1960."

18       Q   Is that correct, to your personal knowledge, Colonel?

19       A   Yes, sir.

20       MR. VEEDER:   We offer in evidence 49A, your Honor.

21       THE COURT:   49A received in evidence.

22                    (The document above referred to was marked
                      Plaintiff's Exhibit 49A and received in
23                    evidence.)

24       MR. VEEDER:   No. 50 would be the next.

25       THE WITNESS:   Exhibit No. 50 is a tabulation brought

14,987

down to date showing the ground water storage changes at
Camp Pendleton.  It has "Revised 1960" printed at the bottom,
and in the upper right-hand corner under the Exhibit No. 50
is, in blue ink, "Continued 1960."

Q  Is that correct, to your personal knowledge Colonel?

A  Yes, sir.

MR. VEEDER:  We offer in evidence 50A, your Honor.

THE COURT:  50A received in evidence.

                (The document above referred to was
                marked Plaintiff's Exhibit 50A and
                received in evidence.)

MR. STAHLMAN:  May I see that?

(Mr. Stahlman steps forward to the witness stand.)

MR. VEEDER:  What is your problem, George?

MR. STAHLMAN:  I see.

THE WITNESS:  I would like to point out, your Honor,
that there were some corrections made in the graph and it
will not conform in every respect to the original exhibit
placed into evidence.  Those corrections appear in the years
1955 and '56.

MR. VEEDER:  Are those corrections correct, to your
personal knowledge, now that you have made the revision?

THE WITNESS:  Yes, sir.

MR. VEEDER:  I have made the offer, I believe, on 50A.

THE COURT:  50A received in evidence.

14,988

E2
29

BY MR. VEEDER:

Q   The next reference, Col. Bowen, is Exhibit 150.

A   Exhibit 150 is a typed tabulation continued through water year 1960, showing the water use for military purposes from the Santa Margarita River.

Q   And is that correct, to your personal knowledge, Col. Bowen?

A   Yes, sir.

MR. VEEDER:   I offer 150A, your Honor.

THE COURT:   150A received in evidence.

(The document above referred to was
marked Plaintiff's Exhibit 150A and
received in evidence.)

BY MR. VEEDER:

Q   Will you please refer to Exhibit 151A, Col. Bowen?

A   Exhibit No. 151A is a continuation of Exhibit 151, bringing the tabulation of water used for irrigation from the Santa Margarita River down through water year 1960.

Q   Is that correct, to your personal knowledge, Col. Bowen?

A   Yes, sir.

MR. VEEDER:   We offer in evidence United States Plaintiff's Exhibit 151A, your Honor.

THE COURT:   151A received in evidence.

(The document above referred to was
marked Plaintiff's Exhibit 151A and
received in evidence.)

14,989

E2

Z10

BY MR. VEEDER:

Q Will you please refer to United States Plaintiff's Exhibit 119A.   That is the sewage.

A Plaintiff's Exhibit No. 119A is a series of sheets showing the sewage affluent discharge from various disposal plants at Camp Pendleton.   This tabulation brings down through water year 1960 the records of affluent discharge plant by plant.

Q Are those records as shown on Exhibit 119A correct, to your personal knowledge, Col. Bowen?

A They are.

MR. VEEDER:   We offer it in evidence, your Honor.

THE COURT:   Received in evidence.

(The document above referred to was marked Plaintiff's Exhibit 119A and received in evidence.)

MR. VEEDER:   That concludes that phase of the agenda, your Honor.   They may cross-examine.


CROSS-EXAMINATION

BY MR. GIRARD:

Q Col. Bowen, referring to Exhibit 50A, which is in evidence, it is true, isn't it, that during many of these years, especially the peak years, say, 1958 for example, the basins would have filled even if no sewage had been placed into the basin in previous years?

1    MR. VEEDER:  I object to that.  That goes beyond the

2  scope of the direct examination, and there is no basis for the

3  question.

4    MR. GIRARD:  I think one of the purposes of the exhibit

5  is to indicate at least the possibility that if sewage had

6  not been placed into the basin in return, the available water

7  would have been less.  I realize that the exhibit says that

8  it postulates no change in other forms of recharge and dis-

9  charge; but I think we are entitled to know, if the Colonel

10  can answer it-- I don't know whether he can-- even if sewage

11  had not been returned to the basin during the previous years,

12  whether during the peak flood year the basin would have been

13  full.

14    THE COURT:  The objection is overruled.

15  BY MR. GIRARD:

16    Q  Do you have an opinion on that, Col. Bowen?

17    A  Yes, sir.

18    Q  And what is it?

19    A  It is my opinion that taking water year 1957-58,

20  for example, that even if the ground water body had not

21  received the sewage affluent that the runoff from that rain

22  in March and April of 1958 would have recharged the basin.

23    MR. GIRARD:  That is all the questions I have, sir.

24    MR. SACHSE:  No questions.

25    MR. VEEDER:  I have no further questions.

14,991

1        THE COURT:  All right, Colonel.  Thank you.

2        MR. SACHSE:  Does this complete Item No. 11, then, Mr.

3   Veeder?

4        MR. VEEDER:  That is right.

5        There is nothing more on Item 11, your Honor.

6        There is one matter that I would like to refer to now.

7   It is in Item 2, your Honor.  We have sent out interlocutory

8   judgments to the Fallbrook vicinity, the interlocutory judg-

9   ments being numbered 20 and 21.

10        THE COURT:  Is this in the vicinity of Fallbrook?

11        MR. VEEDER:  That is correct, your Honor.  As I under-

12   stand it, there has been no objection made, and no one is

13   here to object, if your Honor would like to inquire about it.

14        THE COURT:  Submit the judgments to me.

15        MR. VEEDER:  We will do that.

16        That concludes, as far as I am concerned, No. 2, No. 3

17   and No. 11 of the agenda.

18        I would like to refer to paragraph 5 of the agenda.

19   There I think the Gibbon and Cottle matter is directly involved.

20        In regard to the Knox ownership, I talked to Mr. Anderson,

21   a Los Angeles attorney who represents Knox.  And that, by the

22   way, I believe is the Sunnybrook Ranch, is it not?  They have

23   pleaded, you know.  I didn't realize that.  Referring to

24   Sunnybrook, that is Knox, as I understand it now.  They do

25   have an answer in.  I talked to Mr. Anderson.  He said he

E2
Z13

1   would be here if possible.  And I explained to  him that we

2   have now progressed to the point where it seems to me that

3   that rather large operation with the seemingly increasing

4   water use is something that should be taken into considera-

5   tion, particularly in view of the Vail Company downstream

6   and the Oviatt users upstream.

7           MR. WILKINSON:  They are in Wilson.

8           MR. VEEDER:  But Oviatt is also on Temecula.

9           MR. WILKINSON:  Yes.

10          MR. STAHLMAN:  Is that your copy of the answer?

11          MR. VEEDER:  Yes.  There is a copy  in my office if you

12   want to see it.

13          MR. STAHLMAN:  May I make a copy for myself?

14          MR. VEEDER:  Yes.

15          MR. GIRARD:  Do they allege anything prescriptive or

16   anything along that line?

17          MR. VEEDER:  I would want to take another look at it,

18   but they do make claim to surface and ground water right,

19   and I think they are immediately in conflict-- I will not say

20   in conflict-- at least they are making claims that would be

21   in conflict with that that has already gone on in this court.

22   And I think your Honor perhaps would want to make some kind

23   of order in regard to bringing those people in, because the

24   problem of our geology is becoming increasingly--

25          THE COURT:  We couldn't bring them in this week.

14,993

E2
Z14

1      MR. VEEDER:  No, I am thinking about the next hearing.

2      MR. GIRARD:  Do they have notice of this order, Mr.

3  Veeder?

4      MR. VEEDER:  Yes, I called and I mailed them a copy of

5  this agenda, and I also called counsel on the telephone and

6  advised him that this matter would come up today.

7      MR. GIRARD:  Is there any reason why Thursday this

8  couldn't be handled?

9      MR. VEEDER:  Mr. Girard, I don't know.

10      THE COURT:  Will you call Mr. Anderson again?

11      MR. VEEDER:  I will call him again, if you want me to,

12  your Honor.

13      THE COURT:  Yes.

14      MR. STAHLMAN:  May I ask a question of Mr. Veeder or

15  Col. Bowen, if they know, whether they are familiar with what

16  property this golf course is being built upstream.

17      MR. VEEDER:  I have no personal knowledge.  If Col.

18  Bowen has.

19      MR. STAHLMAN:  Do you have any, Col, Bowen?

20      COL. BOWEN:  Just rumor.

21      MR. STAHLMAN:  I have heard they are up there with bull-

22  dozers building a golf course.  I wonder where it is.  I

23  think we should know where it is.  It is upstream.

24      MR. VEEDER:  I will call Mr. Anderson this evening or

25  in the morning, your Honor.

14,994

E2
Z15

1          THE COURT:  Here is another letter from one of these

2   206B exhibits.  The letter has been signed by the owner of the

3   property and says, "Sometimes I wonder if society doesn't

4   suffer a loss when a bright young man takes up law.  To a

5   layman they sure do silly things." I will give you the consent

6   and the letter, Mr. Veeder.  I think it is directed to the Court

7   as much as to counsel, but I think you should share the burden

8   on this.

9          MR. STAHLMAN:  I would like to call the Court's atten-

10   tion to the fact that there are a number of people who are

11   interested in these findings.  I understand they don't know

12   what they mean.  It might be well if they be informed.

13          THE COURT:  What findings in what areas?

14          MR. STAHLMAN:  Santa Gertrudis and Tucalota.

15          THE COURT:  Let's let the record show who is present

16   here and what areas they are in.  Start at the other end.

17   Your name?

18          MRS. STREETER:  Mrs. E. W. Streeter.

19          THE COURT:  Where is your property?

20          MRS. STREETER:  Section 33.

21          THE COURT:  On Santa Gertrudis?

22          MRS. STREETER:  Yes.  Well, I don't know.  North of

23   Santa Gertrudis.

24          THE COURT:  The lady at the end?

25          A VOICE:  I am a spectator only.

14,995

E2
Z16

1     THE COURT:   The next one?

2     A VOICE:   My husband will speak for me.

3     THE COURT:   All right.

4     ANOTHER VOICE:   The same here.

5     THE COURT:   All right.

6     Your name and where your property is generally?

7     MR. POURROY:   Pierre Pourroy; Winchester.

8     THE COURT:   Are you interested in these findings?

9     MR. POURROY:   I think it is in Warm Springs.

10    THE COURT:   The next gentleman?

11    MR. NICHOLAS:   M. A. Nicholas.

12    THE COURT:   Where is your property?

13    MR. NICHOLAS:   Well, I am on the Tucalota and Margarita

14    both.   We are on Quarter Section 3, Half Section of 3, Quarter

15    Section of 4, 9, 10, 15, 16, and North Half of 22.

16    THE COURT:   This gentleman in the front row?

17    Admiral, you have no interest in this matter?

18    CAPTAIN LIBBY:   I have no ownership.

19    THE COURT:   But you have an interest, I take it?

20    CAPTAIN LIBBY:   An interest I have.

21    THE COURT:   You landowners are interested in what these

22    findings mean on these creeks?

23    LAND OWNERS PRESENT:   Yes.

24    THE COURT:   Mr. Sachse, do you want to start out,

25    subject to the Court's approval, and express in layman's

14,996

※ E2
Z17

1    language what these findings mean?

2         MR. SACHSE:  Since your Honor hasn't even looked at

3    them, I am taking a pretty big shot on Tucalota.

4         THE COURT:  I have looked them over, but I haven't

5    studied them.

6         MR. SACHSE:  The substance of the findings I have

7    drafted on Tucalota Creek is that upstream from the Murrieta

8    Hot Springs, roughly, the only waters that were a part of

9    the Santa Margarita River system were either surface waters

10   or ground waters contained in the saturated alluvium in the

11   bed of the stream, and that such alluvium was only saturated

12   during and immediately after heavy rains and runoff; that

13   all land owners in that area were the owners of all ground

14   waters and could use ground waters free of restraint in this

15   action, excepting such ground waters as they might extract

16   from the saturated alluvium and stream immediately after

17   runoff.  As to those ground waters, those were a part of the

18   stream system and their rights were correlative.

19        That is what I found.  I don't know whether that means

20   anything to you.

21        THE COURT:  Mr. Sachse has done a fine job of this in

22   lawyers language.  Would you like to have me tell you in

23   layman's language what it means?

24        LAND OWNERS PRESENT:  We would appreciate it.

25        THE COURT:  First, let me point out to you that this

E2
218

1    lawsuit concerns the efforts of the United States to quiet

2    title or have a court decide what its rights are in the waters

3    of the Santa Margarita River.

4         Now if waters are not part of that stream system, they

5    are not going to be subject to this claim by the United

6    States.  And so we are very much interested in whether water

7    found underground is part of the stream system or is not

8    part of the stream system.  If that water is part of the

9    stream system, then you people will be parties to a judgment

10   which, in days to come, may be opened up again for further

11   hearings and you will have correlative rights-- in other words,

12   rights that you must share with all other persons who have

13   rights to the stream system.  That includes the Government

14   at the mouth of the stream on up to all other persons who

15   have a right to the stream system.

E3   16        On the other hand, if there are waters which are not

17   part of the stream system, then you may use these waters as

18   you please, subject only to some claim that a neighbor might

19   make next door to you.  But you wouldn't be concerned with

20   the stream system.

21        Now, in studying the geology of this area-- by geology

22   I mean the rocks and various formations and all-- we have

23   shown on these maps an area that is called basement complex,

24   and that is pretty much solid rock.  It may have overlying it

25   a foot or two of loose dirt, but essentially it is very solid

material, and the evidence is practically without dispute
that any water found in that area is water that would occur
in a crack, in a fissure, something that may have been created
by an earthquake or a fault, or, as we speak of it here, it
is water that is not part of the stream system.  We call it
local, vagrant, percolating water, water that is not part of
the stream system.

Accordingly, we have proposed to find in all of those
areas that the people who own ground in those areas overlying
the basement complex, and even the gray-colored area, which
is basement complex which is weathered a little bit more
than the blue basement complex, that as to those waters if
you drill a well or have a spring that is your water-- this
lawsuit will not concern you.  You will have to have a decree
that says that.  But it is our hope that by properly drawing
this decree, when you go to sell the property and pass title
it will be clear that you and the people you sell to will be
through with this lawsuit in the future.

However, there are those areas of basement complex there
around these gullies and streams-- Tucalota Creek, Warm
Springs Creek, et cetera-- and if you have ever looked very
carefully at those areas you will notice that in the creek bed,
which may be ten, twenty, fifty, a hundred feet wide, there
is a loose material-- sand, gravel, loose material.  That is
the type of thing we speak of as the younger alluvium.  That

E3
Z20

1   is the type of material that does hold water, and if there is

2   water in those areas of younger alluvium along the streams

3   of the creek, that water would be part of the stream system.

4   Because it would eventually feed down and would eventually

5   feed the basins below and the Santa Margarita River.

6        And so we are proposing to draw findings pointing out

7   that as to these creeks-- we are talking particularly about

8   Warm Springs, Tucalota, Wilson, ones of that sort-- that

9   this area of younger alluvium will be kept in the case, while

10  the surrounding sides in the basement complex will be out of

11  the case.

12       That is the best we can do on it.

13       One other matter I should call your attention to, and

14  that is so far I have been talking about ground water, water

15  beneath the ground.  As to the surface flow, that flow when

16  there are rains and in flood time, that of course is all part

17  of the stream system.  But that doesn't particularly concern

18  you, because, although you might have 160 acres up in the

19  basement complex and you might have one of these streams

20  running through it that carried water only in the rainy season,

21  all your land would be riparian.  That is, you would have a

22  right to use that water on your land.  But unfortunately that

23  water comes down in the winter in flood time, at a time when

24  you have no need for it.  And so actually, although you

25  would technically have a right to make a reasonable use of

15,000

E3
Z21

1    that floodwater as it comes by, as a practical matter it is

2    not going to do you any good, because it comes at a time when

3    you don't need water.

4         All the surface water will be part of the stream system.

5    What I have been talking about in these decrees will refer to

6    that, but will particularly pertain to your water underground.

7         Have I done any better job on it than Mr. Sachse did?

8         LAND OWNERS PRESENT:  You have covered it all right.

9         THE COURT:  Do you have any questions that I could

10   answer?

11        MR. POURROY:  We could put a dam across those?

12        THE COURT:  The Court has ruled that any storage dam

13   that is to hold water for any period of time--

14        MR. PURROY:  For stock.

15        THE COURT:  I am not talking about stock dams now.  We

16   haven't yet faced that issue as to what we are going to do

17   about stock dams.

18        Let's take a dam that you would build to catch water

19   in the wintertime and try to use it for irrigation later.

20   That can only be done by permit from the Water Rights Board.

21   And technically the right to build that kind of dam, even a

22   small one, is on no different basis than the right of Vail

23   to build a dam.  You have to get a permit to do it, and when

24   you get the permit any rights you get are subject to all the

25   vested rights downstream.

15001

1    We haven't crossed the bridge finally as to stock dams

2  or ponds that have been created for the purpose of watering

3  stock.  Technically, they come within the rule on any other

4  kind of dam, I would suppose.  As a practical matter, we have

5  been hoping to find some way that we could say that the stock

6  dams would not be interfered with.

F-1
Z-23

15,002

1    Any other questions?

2         These interlocutory judgments on these creeks will first

3    outline these general principles we have been talking about

4    in the difference between the basement complex and the younger

5    alluvial which can be saturated with water, but later on there

6    will be judgments which will pick up particular parcels of

7    ground, and will name the person who is the owner, and describe

8    his ground, and by reference to a map show what part of that

9    ground overlies this younger alluvial, which does or could

10   contain water which is a part of the stream system, and those

11   will have to be set out later.  The interlocutory judgments

12   we are talking about now are generally in sort of general

13   terms, to show what part of the ground is in the stream

14   system, and what part is not, so far as underground water is

15   concerned.

16        MR. NICHOLAS:  A part of that water is in what is the

17   younger alluvial, will the land owners that are on that stream

18   get a portion of that water?

19        THE COURT:  Certainly, as to that part of your ground,

20   that water is a part of the stream system, and you have

21   rights to it the same as everybody else.  Ordinarily it would

22   be difficult to see-- if there were ten or twelve people who

23   had holdings along one of these creeks, with some sizable

24   amount of acreage, it would be hard to see how the amount of

25   water they used would not be a fair share.

F-1
Z-24

1        In other words, supposing you had 640 acres riparian

2   to Tucalota, and there was water in the younger alluvial of

3   Tucalota, you would have a right to use water out of Tucalota,

4   but that right is a correlative right, and that would have to

5   be shared with your neighbors, and you can't take it all,

6   any more than the Government could take it all.  You all

7   have correlative rights to that water.

8        MR. STAHLMAN:  May I make a statement relative to this?

9   Some of the exhibits show that some of these properties use

10  water for domestic use and irrigation use.  Some is only

11  used for domestic use.

12       THE COURT:  If you are only using domestic water, you

13  have no problem anyhow, because domestic use comes ahead of

14  irrigation use, and there would always be an allowance for

15  domestic use ahead of irrigation use.  All right.

16       MR. VEEDER:  To a degree, your Honor, but I can envision

17  a situation where municipalities claiming water for domestic

18  purposes in such quantities--

19       MR. SACHSE:  Municipalities in California do not have

20  domestic rights.

21       MR. VEEDER:  No, I am talking about where you have a

22  concentration of population, where the domestic use is

23  actually interfering with water coming down the stream, I

24  think there is a possibility that there would be a conflict

25  there.  I think that is the case.

F-1
Z-25

1    I think you have got the situation where your population

2    is moving into these areas at present, and taking substantial

3    quanties of water.  I am simply making that point, that I

4    don't believe we can have a blanket determination on that.

5    THE COURT:  Well, we can certainly say at the present

6    time--

7    MR. VEEDER:  Yes, I think you are right on that.

8    THE COURT:  --under the present development of the area,

9    the domestic uses have a priority.  You don't quarrel with

10    that statement, do you?  You are speaking ahead, I take it,

11    Mr. Veeder, when there is a population of 100,000 people up

12    in the Temecula area?

13    MR. VEEDER:  I don't know how many there are, and I

14    don't know how many there are going to be, your Honor, but

15    I just want these people to be put upon notice that the Marines

16    are going to need water for some period of time.

17    THE COURT:  Any other questions?

18    MRS. STREETER:  How does that apply to existing dams,

19    your Honor, dams for water to water the stock?

20    THE COURT:  For stock?

21    MRS. STREETER:  Yes, sir.

22    THE COURT:  That is the point that I say we haven't

23    determined.

24    MRS. STREETER:  You haven't determined that.

25    THE COURT:  We know there are a large number of stock

1   dams and reservoirs, created to water stock, and we haven't

2   made a decision on that.  Technically, there is a problem

3   there, but I have been hoping that the Government will not

4   raise it.

5        MR. STAHLMAN:  There are a lot of cows there that need

6   a drink.

7        THE COURT:  Are  you ready to proceed, then, with

8   Fallbrook Issue No. 7?

9        MR. SACHSE:  I am ready, your Honor.

10       THE COURT:  All right.

11       MR. VEEDER:  Do you want me to start the argument, your

12   Honor?

13       THE COURT:  Oh, you probably have the laboring oar, Mr.

14   Veeder.  At least, you have it as the plaintiff.

15       MR. VEEDER:  Your Honor, the proposition which I think

16   must be determined by you directly involves the kind and type

17   of decree which can be entered reflecting the rights of the

18   Fallbrook Public Utility District.

19       It will be remembered that the Utility District Act was

20   passed with the objective of supplying municipal services to

21   unincorporated areas, and that the sole and only purpose of

22   that Act, pursuant to which Fallbrook was established, was to

23   provide those municipal services.  It turns on a matter of

24   basic constitutional law.

25       The question is whether the Fallbrook Public Utility

F-1
Z-27

1     District, which is empowered to levy assessments for municipal

2     needs, could finance a dam of several million dollars in

3     cost, the prime objective of the dam being purposes of irriga-

4     tion.

5          I believe that your Honor has the responsibility to

6     take into consideration  the question of whether a man who

7     owns a filling station in Fallbrook should bear a tax for the

8     purpose of irrigating Mr. Sachse's land.  It is that simple.

9     That is the basic matter of justice.

10         THE COURT:  I should decide that?  If a dam was to be

11     built, it would be decided by the taxpayers and property

12     owners in the area, wouldn't it?  Why should I inject myself

13     into issues of that sort?

14         MR. VEEDER:  I said injustice, your Honor.  The point

15     that I make to you is very simple.  Can the Fallbrook Public

16     Utility District tax its citizens under a general tax law--

17     and that is the only law it can levy under the circumstances--

18     can it tax them to pay for an irrigation system?  And I say

19     it cannot.

20         I say that in simple justice a man who owns a filling

21     station or a man who owns a department store should not be

22     required to pay such taxes, and that stems from the basic

23     California law which says that a municipality can provide

24     certain services in contravention of the old common law, so

25     to speak,  In the progress our nation it became essential in

F-1
Z-28

1   the minds of those who made the laws to afford a municipality

2   the power of taxing to build schools, to build roads, to build

3   trolley lines, and, in general, to provide those services.

4        And in connection with those services they could provide

5   fire-fighting equipment, which would include the power to

6   acquire rights to the use of water for fire-fighting purposes.

7   Parks became essential in the minds of law makers, and they

8   could acquire water for purposes of fire. Because why?  Be-

9   cause that is a part of the general service of a municipality

10  to the inhabitants of the municipality.  Water for purposes of

11  sewage could be acquired.

12       But when a municipality desires to go beyond the specific

13  purposes to which I alluded, you enter into a different field

14  of law, you enter into a completely different idea of taxa-

15  tion.  Indeed, the cases are inclined to say it is not a tax,

16  that which you levy for the purpose of irrigating a piece of

17  land, that that is a special benefit assessment.  Why?  Be-

18  cause the man who is irrigating thirty, forty or fifty acres

19  of land is gaining a personal benefit over and above the rest

20  of the community.  Therefore, you have that kind of special

21  assessment.

22       California laws are very clear on that.  The Irrigation

23  District, the Reclamation District, and similarly created

24  what they call Improvement Districts have the power to levy

25  assessments only, when I believe it is two-thirds of the land

F-1
2-29

1   owners have agreed to the formation of the Improvement

2   District.

3        A bit of history on the point now:  In 1951, after this

4   lawsuit was initiated, the California Legislature passed a

5   law which declared-- there are three sections of it, as I

6   remember it-- passed a law which declared that a Utility District,

7   such as the Fallbrook Public Utility District, would have the

8   power similar to an Irrigation District to create Improvement

9   Districts.  And what could those Improvement Districts do?

10  They could provide a system for the purposes of irrigation.

11       In other words, the only way that there can be accomp-

12  lished what Fallbrook says it desires to do, and for which

13  it filed its application, is to establish Improvement Districts,

14  and as against the lands to be benefited for purposes of

15  irrigation to have them pay a special assessment.

16       And there is sound reason for it.  A man with a filling

17  station has no reason that I know of for paying an assessment

18  levied upon him for the purpose of irrigating someone else's

19  land.

20       THE COURT:  I can give you one that I think of.  If the

21  lands in the area around the filling station were not irrigated,

22  and the crops all dried up, the service station man would

23  probably go out of business.

24       MR. VEEDER:  He was there before the land was irrigated,

25  your Honor.  He has been there, and he is not sweating about

15,009

F-1
Z-30

1   it at all, and I think that he would object very strenuously,

2   I know I would if I were he, and I have seen it happen in the

3   past, where a man simply said, "Oh, I am not going to pay

4   any special assessment.  If you want to irrigate the land,

5   by all means go ahead and do it, but don't tax me for it."

6       And that is precisely the point that I am directing my

7   attention to now, for this reason, your Honor:  I am not

8   asking you to adjudge anything in regard to this poor filling

9   station man.  I am asking you to look at it from the stand-

10   point of California constitutional law, and it is an extremely

11   important point, because you get down to the question right

12   here, the prime question for bringing this lawsuit, if we

13   will hearken back just about ten years ago that Fallbrook came

14   along and said she wanted to get some water.  And we said,

15   "How much do you want?"  They said, "We want only about 7800

16   acre feet per year." And we went to court.

17       Now, the point is, if the Fallbrook Public Utility

18   District can build a dam only for municipal purposes at the

19   present time, and contrary to what Mr. Sachse interposed just

20   not too long ago about the power of a municipality to provide

21   domestic water, and I disagree with him anyway-- a dam that

22   could be financed for the purpose of providing only domestic

23   uses, about that high (indicating), but the dam that they are

24   planning for irrigation uses is a mighty big structure, so

25   if your Honor decides, as I think he must, whether the

F-1
Z-31

15,010

1    Fallbrook Public Utility District under the circumstances

2    which prevail has the power to put a burden on the stream of

3    maybe 300 acre feet a year, as distinguished from 30,000 acre

4    feet a year, the burden on the stream will be vastly different.

5    And we, the United States of America, are entitled to know

6    why.

7         Do you want to interrupt.

8

15,011

Tape F2
P 61

1    MR. VEEDER:  I just wondered if you wanted something.

2    THE COURT:  No.  I saw one Reporter here, and then I

3    wondered what he wanted.

4    MR. VEEDER:  You mean these pearls might be lost?

5    THE COURT:  No.  Go ahead.

6    MR. VEEDER:  The point that I was making, your Honor, is

7    that the inchoate right of the Fallbrook Public Utility

8    District, the incipient, the incomplete right is the thing

9    concerning which we are entitled to know whether it is a

10   municipal right, which would be very limited under the cir-

11   cumstances, or whether it is an irrigation right, or both.

12   THE COURT:  Now, Mr. Veeder, here is the way this looks to

13   me, and if you will address yourself to what I have in mind.

14   This application by Fallbrook to build a dam is essentially an

15   application to pick up unappropriated and excess waters over

16   and above the riparian rights of people on the stream, or, to

17   put it more simply, to pick up flood waters, and I think in two

18   years, at least since this case started, the waters ran into

19   the ocean, that is, they ran in in 1952 and in 1958, did they

20   not?

21   MR. VEEDER:  That is correct.

22   THE COURT:  Large amounts of water.  I apprehend that that

23   is what Fallbrook wants to do, and when you make it that simple

24   how can anybody complain?  How could anybody complain if

25   Fallbrook had had a  dam, and had picked up in that dam those

P 62

15,012

1   waters that ran into the ocean in 1952 and in 1958?  I don't

2   think that there is a lot of water year in and year out on

3   this stream that is subject to appropriation by Fallbrook, and

4   that is up to them to decide, how much flood waters there are

5   going to be that would otherwise be lost if they didn't pick

6   it up in a dam.  But let's just assume that that is what they

7   are building a dam for, and Mr. Sachse has stated in this

8   court that they do not expect the dry years to continue for-

9   ever, and they want to pick up the flood waters, then how could

10  the Government be hurt if they picked up the flood waters which

11  otherwise have already passed over the Government lands, and

12  then ran into the ocean?

13      MR. VEEDER:  Your Honor, so far as we are concerned,

14  Fallbrook at this moment is invading the rights of the United

15  States, and it has been in diverting water out of the channel

16  above the Enclave.  It is using water that would come to the

17  Enclave, water that we could very well use, and water for which

18  we have a prior right.

19      THE COURT:  That is something else again.  We are not

20  talking about that.  Now we are talking about the dam, and we

21  are talking about whether they can build a dam, and then you

22  raise the questions about the charter here, and whether they

23  can serve irrigation purposes as well as domestic.

24      The second point is this:  Let's assume that there might

25  be some debatable question on these problems that you raise

P 63  1  about this matter of taxation, and so forth.  Is this the

2  proper forum for that?

3  MR. VEEDER:  Yes.

4  THE COURT:  This is not a tax payer's suit --

5  MR. VEEDER:  Oh, no.

6  THE COURT: -- where a taxpayer comes in and opposes a

7  public improvement on the ground that he is a taxpayer.

8  This is not a quo warranto proceeding before the Attorney

9  General or in a court to determine the capacity of a corpora-

10  tion to carry on.  How am I concerned with that?

11  The Water Rights Board of the State of California has the

12  right to issue permits, and it is their function to decide

13  whether permits should be issued or not.  It is not my function

14  to decide that.

15  MR. VEEDER:  May I take up your points, your Honor, as you

16  have raised them?

17  One, when we brought this lawsuit, we brought it for the

18  purpose of having determined the respective rights to the use

19  of water of all parties upon the stream, and that included the

20  inchoate and incipient rights of all parties, and one of those

21  incipient rights, the measure of which we are interested in,

22  is the claim of Fallbrook Public Utility District.

23  Your Honor, it is a legal question, before your Honor

24  squarely presented, how much water can Fallbrook legitimately

25  appropriate under the Act pursuant to which it was created?

P 64  1    I am not talking quo warranto at all.  I want to say that

2    I want to know the measure of the claims upon this stream, and

3    I respectfully submit that we are entitled to know.  We are

4    entitled to know in regard to the Vail Company's inchoate right.

5    They have a right, they have diverted and applied water to

6    beneficial use.  They have a completed appropriation there.

7    But we are also entitled to know the extent of the incipient

8    right, and I dare say you will chronicle that right, owned by

9    the Vail Company.  Now, it is no different --

10    THE COURT:  Mr. Veeder, I have no crystal ball.  If we

11    had no more rain in the next five years than we had this year,

12    I would say that Fallbrook would not get any water.  But, on

13    the other hand, if we had rains like we had in 1952, Fallbrook

14    might very well fill a good sized dam.

15    MR. VEEDER:  But, your Honor, the point and the thing that

16    I consider and think is very crucial here is how much can

17    Fallbrook actually appropriate under the powers that are in-

18    vested in it, and I think we are entitled to have that matter

19    resolved, and your Honor can rule against us, but I submit

20    that in a quiet title suit, where adverse claims of the magni-

21    tude of the Fallbrook Public Utility District are asserted, we

22    are entitled to request this court, and we respectfully peti-

23    tion it to tell us what is going to be the extent of Fallbrook's

24    claims?

25    THE COURT:  I am prepared to find, as you well know, that

P 65

1   any rights that Fallbrook gets or may get for a permit for a

2   dam are all subject to all the rights of the United States, all

3   the vested rights of the United States.   They come along behind.

4   I think Fallbrook concedes it.

5       MR. VEEDER:  Even with that, your Honor, we are entitled

6   to know, as owners on the stream and with rights to the use of

7   water, we are entitled to know whether Fallbrook has a valid

8   and enforceable inchoate right to 300 acre feet of water, or to

9   500, based upon the proof that has been entered.

10      THE COURT:  How could any judge do that?  How could any

11  Water Rights Board do that?  All they could say would be, "We

12  will give you a permit to build a dam, and your rights to im-

13  pound water in the dam are subject to all the vested rights

14  in the river."  And you at your peril decide whether or not

15  there is going to be water enough for your dam, for you to use

16  it.  How can I say how much rain there will be?

17      MR. VEEDER:  I don't know what you are talking about,

18  frankly, your Honor.  I haven't mentioned it.

19      THE COURT:  You asked me to say --

20      MR. VEEDER:  No, your Honor, no.

21      THE COURT:   -- that there would be so many acre feet

22  available?

23      MR. VEEDER:  No, I didn't.  I said this:  We are entitled

24  to know the maximum claim that they can assert.

25      MR. SACHSE:  I think --

P 66

1    MR. VEEDER:  I wish they would be quiet, your Honor.

2    THE COURT:  The Water Rights Board did that.

3    MR. VEEDER:  No, they didn't.  Have you read my brief,

4  your Honor, with all respect to your Honor?  It is a question

5  of law whether there is a surplus of water in the stream or

6  not.  It is a question of adjudication of rights to the use of

7  water, and the cases in California which I cite to your Honor

8  are clear beyond question -- they are clear beyond question,

9  and while the State Water Rights Board in issuing that to

10  which I refer as a hunting license here, that is all Fallbrook

11  has got, -- it has got a gun and it has got a hunting license,

12  and if it can find some water, well, they would probably shoot

13  us, for that matter.  But the fact remains that the <u>Temescual</u>

14  case uses the phrase, and I love the language, that it is a

15  hunting license.  They say they have a hunting license, but

16  there is no ajudication, and there could be no ajudication,

17  and that case points out that there is no ajudication of the

18  actuality of surplus water.

19    Much less could that Board under any circumstance rule

20  upon the question of law that I am petitioning your Honor to

21  consider, because the cases in California are extremely clear

22  that the Board could not be invested with other than legisla-

23  tive power.  It could not make a determination of the character

24  that your Honor, with all respect to your Honor, is suggesting

25  that it might make.  It could not consider whether Fallbrook

P 67

1    Public Utility District has the power.  It does not have the

2    power to acquire rights for other than municipal purposes.  It

3    couldn't.  The California law is beautiful from my standpoint.

4    The California law is beautiful from my standpoint.

5        It says in explicit terms that the State Water Rights

6    Board could not make a determination on any of these points to

7    which your Honor just made reference, and I say to your Honor

8    on that point, and I am going to be back again and ask your

9    Honor to restore some of the counts you knocked out of my

10   complaint on this point, for this reason:

11       I don't want to go to the Ninth Circuit, with all respect

12   to your Honor, and go up there on the basis that we were en-

13   titled to be heard on some of these counts, because I think

14   we were, and the more I have studied California law, the more

15   convinced I am of that point, that here we have a situation

16   where a corporation -- are you going to limit me on time, your

17   Honor?  I didn't look at the clock when I started.

18       THE COURT:  What I was looking at the clock it was to

19   decide when I would take a recess.

20       MR. VEEDER:  If you want to take a recess now, it is all

21   right with me, your Honor.

22       THE COURT:  How much time do you want?

23       MR. VEEDER:  I hadn't thought about it.  I can get wound

24   up and talk a long while on this, your Honor.

25       MR. SACHSE:  I will make a very brief reply on this, your

P 68   1   Honor.  I will submit it on the briefs.  It is that clear.

2        MR. VEEDER:  I am not going to submit it on the briefs.

3        MR. SACHSE:  I don't blame you.  Mr. Veeder has written

4   32 pages on what he calls California law, and the only author-

5   ity for it --

6        MR. VEEDER:  Am I arguing now, or are you?

7        MR. SACHSE:  It is Veeder on municipal law.  He hasn't

8   read the statute.  When Mr. Veeder --

9        MR. VEEDER:  I am coming to the statute.

10       MR. SACHSE:  When Mr. Veeder says that irrigation is not

11  a municipal purpose, that is a bald-faced misstatement of the

12  law of California that has existed since 1909, and in 32 pages

13  of briefing he has not found the statute.

14       MR. VEEDER:  I am going to cover it all for you, your

15  Honor, -- all the points I haven't yet so far.

16       THE COURT:  We will take a short recess and let you get

17  your breath, and then go ahead, Mr. Veeder.

18       MR. VEEDER:  Very well.

19       (A short recess.)

Take G   20
follows.
        21

22

23

24

25

G-1
Z-32

1    MR. VEEDER:  I had emphasized to your Honor that

2 Fallbrook's claims have clouded every right that the United

3 States of America exercises.  Its claims are of great

4 magnitude.  That we as plaintiffs are entitled to have

5 chronicled in the decree which we will ask you to enter a

6 statement as to actually the extent of Fallbrook's inchoate

7 rights.  I am not asking you to use a crystal ball to say

8 how much water might come to them.  We are saying that there

9 are two aspects concerning which we are entitled to have

10 findings of fact, conclusions of law and judgment.

11    In other cases in which I have participated involving

12 municipalities the course of the events went this way.  We are

13 presently supplying water to a half million people.  Our

14 inchoate rights which we claim must be adequate to provide

15 for 1,500,000 people in the year 2025.

16    We are entitled to know in this litigation that informa-

17 tion based upon the claims Fallbrook is asserting.  They are

18 required, in our view, and they have failed to prove, present

19 municipal uses.  We are entitled to know that.  But you will

20 not find a word in the record on the subject.

21    We are, moreover, entitled to know the prospective

22 municipal demands of the Fallbrook Public Utility District.

23 You will not find a word in the record on that.

24    So it becomes extremely important, so far as we are

25 concerned, that findings along that line be prepared, and

G-1
2-33

1    if there are no findings we petition you now to enter findings

2    there is no basis for ascertaining the municipal present

3    demands and uses of the Fallbrook Public Utility District

4    from the Santa Margarita River.   And moreover, there is no

5    evidence in the record today to support a finding as to the

6    magnitude of Fallbrook's ultimate municipal demand.

7            THE COURT:   How would that be material?

8            MR. VEEDER:   By reason of the fact that—

9            THE COURT:   If they were sharing as a riparian and had

10   correlative rights to the use of the water in the stream, you

11   might be concerned about how extensive their demands might

12   be.   But they have only a right to water after the vested

13   rights of all riparians have been taken care of.

14           MR. VEEDER:   Fallbrook has extensive riparian rights.

15   It has purchased them, your Honor, and it is asserting them

16   here.

17           MR. SACHSE:   Now just a minute.

18           MR. VEEDER:   Why don't you let him rebut this, then?

19           MR. SACHSE:   Mr. Veeder, why don't you stay to the facts?

20   Fallbrook has never asserted a riparian right in this case,

21   and it is not asserting one now.

22           THE COURT:   That disposes of that, you see, right there.

23           MR. VEEDER:   Just let me get this into the record.

24   I don't mind this interruption at all. Fallbrook has purchased

25   land.   It is asserting riparian rights to a great number of

G-1
2-34

15,021

1    parcels of land.   Mr. Sachse has asked me to argue the

2    proposition whether you could have a severed riparian right.

3    Now, I respectfully submit that the Fallbrook Public Utility

4    District is claiming riparian rights, and any effort to deny

5    it is simply in error.

6         But that is beside the point. Fallbrook is, however--

7    I want the record clear-- claiming riparian rights here.

8         THE COURT:   That has nothing to do with their dam.

9         MR. SACHSE:   Nothing whatsoever.

10        THE COURT:   Nothing to do with their dam at all. If

11   they got riparian rights, that is another thing.   We are

12   talking now about a dam to store flood water, and this has

13   nothing to do with their riparian rights.

14        MR. VEEDER:   But I am referring to the fact, and I have

15   already mentioned it-- and I shouldn't digress, but I will

16   refer to it again-- that your Honor has dismissed certain

17   counts of the complaint that we are going to ask to be re-

18   stored.

19        But the fact remains that in this lawsuit in regard to

20   the dam we are going to ask for a finding as to the present

21   uses of stored and impounded water for present municipal needs,

22   and I respectfully submit that it would be a mighty odd quiet-

23   title decree which does not say that the Fallbrook Public

24   Utility District, by reason of the powers vested in it, will

25   make and can now make a beneficial use of X acre feet of water

15,022

1    impounded in that dam, and I submit that they have failed

2    right there.

3         But that is just part of the decree.  Then we will re-

4    quest this finding, conclusion and decree that in addition to

5    the X acre feet that they can now apply beneficially of that

6    stored water, there can in addition to that be 30,000 acre

7    feet of water for municipal purposes; and I submit that any

8    decree that doesn't have that in it is an erroneous decree,

9    because we, as people against whom claims have been asserted,

10   are entitled to have our rights cleared.  And your Honor has

11   already given us a ruling on that basic proposition.

12        THE COURT:  I am prepared to hold that your rights are

13   all superior to the rights of Fallbrook under its permit.

14   That would be a pretty good decree, wouldn't it?

15        MR. VEEDER:  As far as it goes, yes.  I am all for that.

16   And also I would think that you should say this, too, your

17   Honor, that Fallbrook cannot impound a drop of water until

18   water begins to flow into the ocean.  I want that.

19        But let's get back.

20        THE COURT:  That is going to be kind of hard to do.

21        MR. VEEDER:  I want Fallbrook to sit right down-- have

22   Mr. Sachse sitting right down by the Ysidora gauging station

23   and he will holler, "Hey, Ma, it's going into the ocean."

24   And she will close the dam.

25        THE COURT: Wouldn't you rather have all the water

G-1
Z-36

1    impounded and some of it released from time to time?

2        MR. VEEDER:  Not by them I wouldn't.  With all respect

3    to your Honor, I have scars from those people.  I don't want

4    them doing anything for me.  Nor do I want them doing anything

5    for the Navy.  Because I want to have those boats around

6    when we need them.

7        The fact is, your Honor, that the kind and type of

8    findings that we are going to request will be right along the

9    line I am pointing to, that from the standpoint of future

10   needs of the Fallbrook Public Utility District, for which

11   these inchoate rights can be asserted, we want to know how

12   big a town is going to be there, how many people are going to

13   be served.  We are entitled to know.  Not any of this hocus-

14   pocus, "Well, you have everything except what little bit

15   they are going to steal from you." We don't want that.  We

16   are entitled to have a decree.  They didn't prove it and Mr.

17   Sachse is a little worried about it.  They didn't prove how

18   much water they will ultimately require.  So basically and

19   fundamentally, both as to their direct flow rights and as to

20   their storage rights, their claims break down.

21       But California law is also very clear, your Honor, in

22   regard to another question, totally ignored by my friends over

23   here, that it is the responsibility of this Court to adjudicate

24   and to determine the extent of the unappropriated water that

25   is available for appropriation when all the claims have been

G
B-1
Z 37

1    met.

2         You say, "Well, that is a fluctuating thing.   We can't

3    be sure day in and day out."

4         But there did reside with the Fallbrook Public Utility

5    District the obligation not only to prove what they need

6    today, but what th ey are going to need tomorrow.   They were

7    required to assume the burden of proving a firm supply of

8    water for that dam, and we were very careful very early in

9    this lawsuit, we put on repeated witnesses on the stand, and

10   what did we prove?   That there was no repetitious pattern and

11   nobody could tell what a firm supply was.

12        So we are down to this position now.   They are taking

13   great delight that in 1952 and 1958 some water went into the

14   ocean.   But that is not per se waste.   That is not per se water

15   available for appropriation.   For we don't know, and neither

16   does your Honor, nor does anyone know precisely when water

17   is no longer needed to recharge our basins.

18        So we have the prime and the basic factor that the

19   question of Fallbrook's power to appropriate water for

20   municipal purposes is a prime matter for your Honor to de-

21   termine, and it is a prime matter under California law and it

22   is a matter that the State Water Rights Board could not

23   adjudicate, it could not determine, it was powerless to

24   consider it.   And while I joked about this hunting license

25   thing, I want to repeat it.   It is precisely all that Fallbrook

G-1
Z-38

15,025

1    obtained, and that hunting license is only good if they could

2    show that there was unappropriated water.

3         I will turn, your Honor, if I may, to some statutes

4    which I cited, relied upon very heavily, but to which no

5    reference is made by either California or by Fallbrook.  It

6    provided in Water Code Section 1461, under the heading "Limited

7    use"-- I like that:

8         "The application is, or the granting of a permit to

9    any municipality to appropriate water does not authorize the

10   appropriation of any water for other than municipal purposes."

11        It is inconceivable to me to have anything more explicit

12   than the statute which I just read.  They can make an appropria-

13   tion, but any decree that your Honor enters, with all respect

14   to your Honor, must be made in contemplation of the statute

15   which I just read.  And I submit that you cannot, on the

16   basis of the record, find out that which is a municipal use

17   and that which is for the purpose of irrigation.  So there is

18   where the Fallbrook case breaks down.

19        So you say: "Well, what is a municipal use?"  Well,

20   certainly irrigation is not a municipal use in the contempla-

21   tion of the law pursuant to which the Fallbrook Public Utility

22   District was established.

23        My friends across the way were critical of my citing of

24   the Orosi case, but I think it is a case squarely in point

25   and one to which your Honor must direct his consideration.

G-1
Z-39

1    There the matter arose as to the power of the district to
2    issue bonds-- the Orosi District.  The citation is 196 Cal. 43.
3         THE COURT:  A suit by a taxpayer?
4         MR. VEEDER:  Yes.  But the crux of the issue is the
5    precise issue that is here.  What is the measure of Fallbrook's
6    incipient and inchoate claim?  How far can they claim, and
7    what are their rights to make these claims? And those rights
8    are measured by the powers of the Fallbrook Public Utility
9    District under prevailing circumstances.  The court reviewed
10   the language of these constitutional provisions to which I
11   have made reference, and interestingly enough they pointed
12   out that the law pursuant to which the Fallbrook Public
13   Utility District was organized came into being in contemplation
14   of the services that a municipality must supply its inhabitants,
15   and that the idea was to give to people in an unincorporated
16   area and to supply them with the same services as are supplied
17   to people in the City of San Diego and identically the same
18   services.  Water, yes; but water for municipal and domestic
19   needs.  Surely not for irrigation.
20        And in the cited case, in this Orosi case, the question
21   came up as to the power of the reclamation district and the
22   power of the irrigation districts to levy assessments, and a
23   good many cases are there cited.  But the important thing is
24   what the court said, and I will read it to your Honor-- it
25   says:

G-1
Z-40

15,027

1    "The purposes for which the Orosi District

2    was formed, the appellant contends, are not

3    municipal, and a district formed for such

4    purposes does not possess the essential

5    characteristics of a municipal corporation.

6    If the authorities cited by him were strictly

7    in point, there would be an end to the con-

8    troversy; but they are not.  They deal with questions

9    arising in connection with districts formed for

10   the purpose of draining, irrigating, reclaim-

11   ing, or otherwise directly benefiting the

12   lands affected thereby.  (Citing cases.)  When

13   related to that class of districts, the cases

14   cited are clearly in point.  The improvements

15   contemplated by the acts under which they were

16   formed cannot be considered 'municipal

17   purposes.'"

18       In other words, the cases which I cited to your Honor,

19   the principal case upon which I relied, says in so many

20   words that the applying of irrigation water for purposes of

21   irrigation is not a municipal purpose.  And that is why this

22   section is so important, this Section 1461 of the Water Code,

23   because it prohibits the issuance of permits for purposes

24   other than municipal needs.

25       California and Fallbrook have both cited Section 10153

15,028

G-1
Z-Six 41

1   of the California Code, Public Utility Districts.  Does your

2   Honor have that citation?

3        THE COURT:   What is it again?

4        MR. VEEDER: Section 10153.

5        MR. SACHSE:   Of the Public Utilities Code.

6        MR. VEEDER:   Of the Public Utilities Code.  It provides

7   in the statute that a municipal corporation of the State-- I

8   am not going to quote it-- may acquire rights to water so far

9   as necessary, that is, an acquisition by municipalities, to

10   supply the inhabitants with an ample supply of water for

11   municipal, domestic, irrigation and manufacturing purposes.

12   That statute, in the first place, must be read in contempla-

13   tion of Section 1461, specifically limiting a permit to

14   a municipality for municipal purposes.

15        THE COURT:   Section 1461 is in what code?

16        MR. VEEDER:   That is the the Water Code.

17        So when you read those two statutes together you have

18   a broad general proviso in regard to municipalities.  Then

19   you find the strict limitation upon the power to issue permits.

20   There is where your Honor comes in.  That is a question of

21   law.  It couldn't be decided, in my view, by the State Water

22   Rights Board, because it is a legislative entity-- it has

23   nothing to do with juridical process.  So it is for your

24   Honor, with all respect to your Honor, to decide that point

25   and the applicability of California law under the circumstances.

G-1
2-42

1    But further que question arises as to whether a

2    municipality can provide water for purposes of irrigation

3    under the statute 10153, and I submit that that is not a

4    general authorization for the purposes of supplying water for

5    irrigation.  Repeatedly in the history of California we find

6    cases which use language about a municipality delivering water

7    into a pipe line for the purpose of a    supplying irrigation.

8    But those cases, when you follow them through, you will find

9    that the municipality had acquired an irrigation system as part

10   of its water supply.  That is always the case.  They have

11   gone out to buy water, and there may be a man with an irriga-

12   tion ditch who is entitled to some water; but that is a

13   wholly different factor than that which is here involved.

14   The question here involved, has Fallbrook got the power today

15   to claim public water from the State of California in excess

16   of municipal needs?  And I respectfully submit that the

17   answer is no.  For Fallbrook to acquire water for purposes

18   of irrigation, it would be essential for them to comply with

19   the California law, which I cited to your Honor in my brief,

20   and it says that if they are going to get water for purposes

21   of irrigation the Fallbrook Public Utility District would

22   have to go into an area where land owners who are going to

23   pay the assessments for that irrigation had consented to the

24   levy of the assessment. And that has not been done.  And

25   until it is done, it is impossible for the Fallbrook Public

15,030

1   Utility District validly to make a claim for purposes of

2   irrigation.  And there again your Honor has the obligation,

3   this Court has the obligation to determine the measure of

4   the rights.

5        Those are the basic and fundamental thoughts that I

6   have to advance to your Honor.  I would like to reserve a few

7   minutes to reply to Mr. Sachse and to Mr. Girard and their

8   response to me.  May I do that?

9        THE COURT:  Yes, sir.

10        MR. SACHSE: First of all, I am going to try to keep

11   this a little .1. more orderly, and I am going to discuss

12   primarily this ultra vires power issue, and I am going, first

13   of all, to read to the Court, and not read hastily as Mr.

14   Veeder did, but I would respectfully request your Honor to

15   listen to every word of this statute, which is a 1909

16   statute rewritten, verbatim, and codified-- it is Section

17   10153 of the Public Utility Code:

18            "There is granted to every municipal

19            corporation of the State the right to take--

20            not just to continue to serve, as Mr. Veeder

21            suggests, but the right to take-- in the

22            manner provided by law, any waters belonging to

23            the State not otherwise disposed of, flowing

24            or existing in any stream or lake intersected,

25            crossed, or tapped by its waterworks so far

15,031

G-1
Z-44

1   as is necessary to give such municipality and

2   its inhabitants an ample supply of water for

3   all municipal, domestic, irrigation and manu-

4   facturing purposes."

5   Now I was not being facetious when I stated that Mr.

6   Veeder has relied upon Veeder on Municipal Law as the

7   authority, and I quote from his brief:  "Irrigation is not a

8   municipal purpose."  And I quote again, "Irrigation is not a

9   municipal use under California law."  To put that kind of

10  statement in a brief that is presumably intended to be of

11  some assistance to the Court, when the law since 1909 has

12  granted to every municipal corporation a right to take water

13  for irrigation purposes, is, I think, a little silly.

14  Now, Mr. Veeder makes much of the Orosi case.  The

15  strange thing about this is that I have to agree with almost

16  everything he says, except his conclusion.  Mr. Veeder per-

17  sists in setting up a whole series of straw men and then

18  demolishing them.

19  Now Orosi was perhaps the first, if not the first one

20  of the first, public utility districts in California, and the

21  litigation was, as your Honor developed by your question, a

22  taxpayer's suit testing the validity of its first bond issue,

23  which was a waterworks system.  Mr. Veeder's quote is quite

24  correct.  The attack that the taxpayer made on the bond issue

25  was that this is a special assessment on which the land owners

1    benefited were required to have notice under the California

2    Constitution.  This was not a subject of general municipal

3    taxation.  That this was one of those type of levies that

4    to be constitutional required notice of the impending assess-

5    ment, rather than general taxation.  The court discussed the

6    two types of districts and concluded:  "We are convinced that

7    it was the intention of the Legislature to provide for the

8    creation of public corporations of a quasi-municipal character

9    with the power to carry on the particular functions limited

10   to them."  The court carefully discussed this question of

11   assessment districts and said that a public utility district

12   is not an assessment district.  And I so concur.  There is no

13   argument with Mr. Veeder.  I agree that we are a quasi-

14   municipal corporation.  I agree that we are a district whose

15   powers are strictly limited by statute.

16        But Mr. Veeder has not cited-- and I say this very

17   carefully-- any authority, case or statute, to the effect that

18   service of irrigation water is not a perfectly proper muni-

19   cipal use.

20        Now, Mr. Veeder had cited the Water Code section.  That

21   doesn't say that irrigation water is not a proper municipal

22   use.  The Water Code section simply says that a municipal

23   corporation can only appropriate water for municipal purposes.

24   That is all it says.  And I submit that the law since 1909

25   has specifically granted to every municipal corporation the

G-1
Z-46

1    right to take water for irrigation purposes, which is exactly

2    what we have done in this case.

3        Now we can go a step further. Our own statute gives us

4    the power to provide water; not water for sewage, not water

5    for fire, just water.  I will invite your Honor's attention to

6    the fact that that is the exact language that is used in the

7    California constitutional provision which gives to municipal-

8    ities the right to serve their people with water.  Under the

9    authority of that constitutional provision we have the specific

10   grant, then, in the code section I have just cited to your

11   Honor of the power to serve water for irrigation purposes and

12   to take water for irrigation purposes.

13       Mr. Veeder's statement a moment ago to the Court that

14   the cases where this has been justified are cases where a

15   municipality has acquired an irrigation system is not true.

16   There are such cases, yes.  But the grant is a grant to

17   municipalities to take water, not just to continue to serve

18   it if you acquire a system.

19       Now there is case law on this subject.  I have cited

20   all these in my brief. There are two companion cases involving

21   the City of Pasadena:  City of South Pasadena against Pasadena

22   Land & Water Company, and Orcutt vs. Pasadena Land & Water

23   Company, both of which involve irrigation water, and in one

24   of them, in the Orcutt case, the Court went so far as to say

25   that you could actually mandamus the city to serve irrigation

15,034

G-1
Z-47

1    water to this irrigation user.   In the City of Los Angeles

2    vs. City of Glendale the court expressly recognized the fact

3    that Los Angeles was recapturing water which had been permitted

4    to percolate underground after its sale by Los Angeles for

5    irrigation purposes.

6         THE COURT:   Is there any distinction between the right

7    of a municipality to appropriate water and the right of a

8    municipality to serve irrigation water where it has acquired

9    it otherwise?   I am familiar with the Los Angeles situation.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tape H1

P 69

1    MR. SACHSE:  Well, the right to appropriate, I submit,

2    can't be more clearly stated than in the language of 10153:

3         "There is granted to every municipal corporation

4    the right to take in the manner provided by law any

5    water for irrigation purposes."

6    THE COURT:  That is directed to the power.

7    MR. SACHSE:  That gives us the power to take in the manner

8    provided by law, which we did.  We complied with the manner

9    provided by law.  And I should interject here one thing that

10   perhaps isn't quite clear.  Our permits in their language refer

11   to municipal, domestic and irrigation purposes.  All three are

12   involved in the exact express language of the permit.  They are

13   not limited only to irrigation.  They are also for domestic

14   and municipal purposes.

15   But I can see no possible way to read 10153, your Honor,

16   than to say that when a municipal corporation is granted the

17   right to take in the manner provided by law, then how else can

18   we take it in the manner provided by law other than to file an

19   appropriation and then proceed to a permit.  How else can you

20   take water in a manner provided by law?  If we do it in any

21   other way, we are not doing it in the manner provided by law.

22   I might throw in in passing that when Mr. Veeder makes

23   much of the fact that the statute was amended in 1951, he says

24   that our statute was amended in 1951 to give us assessment

25   powers.  That is quite correct, and I think if there is any one

P 70

1   fundamental thing about the law of municipal corporations, and

2   you have to know so you can argue it, it is that they are

3   creatures of statute, and their powers can be expanded or

4   contracted at will, and that is done all the time.

5        So if -- and I don't concede it for one minute -- if there

6   was any deficiency in our power, it was certainly cured by the

7   1951 Act.  But I will not concede that there was any deficiency.

8   I will agree that we are quasi-municipal.  I will agree that

9   we are limited by statute, and I will agree that we are not an

10  irrigation district.  But I will not agree that there is any

11  place anywhere in any case or in any statute in California,

12  anything, that says that Fallbrook cannot appropriate and

13  serve water for irrigation purposes.  There is no such provision

14  anywhere.

15       Now, so much for the powers.  I am going to be brief on

16  this, your Honor, and I am going to respectfully request your

17  Honor to look at my brief again.  I think that the thing is so

18  clearly disposed of by statute and case law.

19       Mr. Veeder says he would insist that your Honor's decree

20  spell out our maximum use.  Well, in the first place, Mr. Veeder

21  has used this word so often, and I don't think he is changing

22  his mind now, and he says that your Honor is going to catalogue

23  rights, catalogue them all, inchoate or vested, as they exist.

24  Well, I don't think you are going to catalogue a right that we

25  don't have.  I think you are going to catalogue a right as it

P 71

1 exists, and the right as it exists today, for whatever it is

2 worth, is the right to impound water not to exceed 30,000 acre

3 feet of water per annum.  Now, that is what the right is, and

4 that is what you are going to catalogue, and you are not/going to

5 catalogue that maybe we will need more water in the future.

6     Furthermore, if he wants to know how big a town Fallbrook

7 is going to be, I am curious as to one thing:  Does he expect

8 that your Honor is going to use a crystal ball to figure out

9 how many babies are going to be born, or if perhaps he is going

10 to seek some sort of court order to restrict it.

11     I realize that mere custom or mere practice does not of

12 itself make an act legal.  That would be clearly ultra vires.

13     However, I checked into the question with the Water Rights

14 Board if we were the only poor chaps that thought that a

15 municipal corporation could appropriate water rights for

16 irrigation purposes, and I have attached, or I have listed six

17 samples, only samples, of appropriations by municipal corpora-

18 tions for irrigation purposes.

19     There are literally hundreds of them filed with the Water

20 Rights Board, and that has been going on since -- well, here

21 is one in 1917, where the City of Los Angeles appropriated

22 water for agricultural purposes.

23     In 1926 the City of San Jose appropriated 500 hundred acre

24 feet from Penitentia Creek for irrigation purposes.

25     THE COURT:  Where was the appropriation water for the City

P 72

1    of Los Angeles?

2         MR. SACHSE:   Walker Lake in Mono County.   It is a little

3    lake upstream from Bridgeport, your Honor.

4         Georgetown Divide Public Utility District -- your Honor,

5    a public utility district -- in 1948 appropriated 50 cubic feet

6    per second or 25,000 acre feet per annum from Pilot Creek for

7    irrigation and domestic and stock water.

8         Georgetown Divide again, in 1955 appropriated another

9    50 cubic feet per second and 4000 acre feet per annum from Onion

10   Creek for irrigation, domestic and stock water.

11        The Ventura River Municipal Water District in 1954

12   appropriated 120 cubic feet per second and 250,000 acre feet

13   for irrigation purposes.

14        Now, I am not urging on your Honor the fact that because

15   Ventura did it, that it is legal, and that we can do it.   I am

16   simply urging upon your Honor these obvious provisions of

17   statute law which Mr. Veeder seemed to think unnecessary to

18   mention in his discussion.   These obvious provisions of statute

19   law mean exactly what they say, that a public municipal corpora-

20   tion can take water and use water for irrigation purposes.

21        If we want an example, with which I am sure your Honor is

22   perfectly familiar, and the law of evidence in this state is

23   that the Courts can take judicial notice of matters of common

24   knowledge, the Metropolitan Water District is a quasi-municipal

25   corporation.   It so expressly held in a Supreme Court's decision

P 73

1    which carefully defined it, and even cites the Orosi case,

2    and says that is the kind of a case it is.  I don't think your

3    Honor has to be told that the Metropolitan Water District sells

4    a little water for irrigation purposes.  It keeps the whole

5    county of San Diego irrigated.  That is what it is doing, and

6    it has two special ordinances, copies of which I have attached,

7    because the Court is not supposed to take judicial of ordinances

8    unless you see them, -- two special ordinances providing even

9    different rates for irrigation water.

10   Here again because Metropolitan does it, I guess they have

11   been wrong all these years, and I guess they can't do it either,

12   and I guess the water supply from the Colorado River has to be

13   shut off, because of Veeder on Municipal Law -- that is the

14   only citation, and he says that irrigation use is not a muni-

15   cipal use under California law, without any authority whatso-

16   ever for it.

17   THE COURT:  Is that his statement?

18   MR. SACHSE:  That is in quotes, and I will give you the

19   page reference to it, your Honor.

20   On page 21, line 19, "Irrigation is not a municipal use

21   under California law."

22   Again, on page 24, line 11, "Irrigation is not a municipal

23   purpose."

24   Those are Mr. Veeder's statements in quotes.

25   I want to say just a fast word on these riparian rights,

15,040

P 74

1   because this is a typical example of refusing to recognize

2   what has been said countless times in this court room, which

3   I am ready to repeat any number of times, and put in black and

4   white if the United States wants it:

5   Fallbrook owns land on the river, which it bought some by

6   negotiation and some by condemnation.  That is riparian land.

7   We have, of course, a perfect right as a riparian to the water

8   flowing past our door, and we can lease that land if we so

9   choose, although we are not doing it, or if we sold it, the

10   riparian rights would go with it and somebody else would have

11   it.

12   But I have stated since the first day I got in this case

13   that we do not assert any rights or exercise any riparian rights

14   for purposes of resale to our consumers.  We do not.  There

15   isn't the slightest suggestion between Fallbrook's limited

16   riparian rights because of the land it happens to own on the

17   stream, all of which will be flooded if this dam is ever built,

18   so our riparian rights will accede to it, and it will throw

19   1300 acres of riparian land out of the watershed that is a

20   burden on the stream, and 1300 acres of land will cease to be

21   a theoretical burden.

22   THE COURT:  What about the severance of riparian rights?

23   MR. SACHSE:  Well, there are a few land owners -- I have

24   six, I believe, or seven, who in their deeds to us executed

25   purported reservations of riparian rights.  That is a matter

P 75

1   with which Fallbrook is not directly concerned, but I am

2   committed to present their case to this court.

3       THE COURT:  This does not concern Fallbrook?

4       MR. SACHSE:  No.

5       THE COURT:  This concerns these individuals?

6       MR. SACHSE:  Except that I, as Fallbrook's counsel, have

7   been instructed to present their case to the court.

8       THE COURT:  They sold their land to Fallbrook and reserved

9   the right?

10      MR. SACHSE:  Yes, reserved it to the remainder.

11      THE COURT:  The remainder of their land?

12      MR. SACHSE:  Yes, and they had a large block, and we took

13  the land subject to that.

14      THE COURT:  You took their other land?

15      MR. SACHSE:  Yes.

16      THE COURT:  None of them attempted to reserve a riparian

17  right in vacuum, as it were?

18      MR. SACHSE:  No.  In each case we purchased the land, we

19  purchased that part of the land in contact with the stream, and

20  they attempted to reserve the riparian right to the remainder.

21  We were not going to argue that question, but I think Mr. Veeder

22  will agree that it is proper, although I don't want to inject

23  that here because it has nothing to do with Fallbrook's rights,

24  although I will be speaking for them.

25      Now, Mr. Veeder states that the only way that Fallbrook

P 76

1   can do this job is to exercise the powers of a special assess-

2   ment district.  Well, again, this is untrue on its face.

3       When the City of San Diego bills San Vicente River, it

4   does not create a special assessment district.

5       When the City of Los Angeles went up in the Owens Valley,

6   it did not create a special assessment district.  It could,

7   but it followed its powers of general taxation, just exactly

8   as Fallbrook is doing.  We have never created a special assess-

9   ment district, and we don't contemplate it.  Yes, we have the

10  power granted us by statute to do it.  If we deem necessary,

11  I guess we can create a little district to lay pipelines out

12  to serve some area, but we don't have to.

13      THE COURT:  As to Los Angeles, some of the pipelines were

14  built by revenue bonds, so it wasn't all by taxes.

15      MR. SACHSE:  There were no special assessments, I am sure

16  of that.  But we have the power, similar to the Mattoon Act,

17  with which your Honor is familiar, that we could, if we chose,

18  if some area had to annexed, we could say, "We could give you

19  facilities," and we could create a special assessment district,

20  assessing the land for the purpose of putting a pipeline out

21  there.  That we could do, but we have never done it.  But Mr.

22  Veeder's assumption that that is the only way that we can build

23  a water project is ridiculous.  It is not the only way.  We

24  can build it with our general powers of taxation, or our powers

25  to issue revenue bonds, which we also have.

15,043

P 77

1    I want to mention only one thing more, and then I will

2    stop.  I think it is very important, because I am quite sure

3    it is going to come up again, and I know the troubles we have

4    had in attempting to draft judgments, so I would like to express-

5    ly impress this on your Honor, and ask you to direct us in

6    connection with it when it comes time to write the judgments,

7    so that we won't have to come back.  Mr. Veeder both in his

8    brief and in his argument told you that the United States would

9    expressly request that you define Fallbrook's appropriated

10   rights as limited to municipal and domestic uses.

11       In the first place, on the authority of the law I cited

12   to your Honor, I think such a limitation would be utterly

13   meaningless, because I will contend and have contended that

14   irrigation use is a proper municipal use.  But more important

15   than that, I do not think it is your Honor's responsibility in

16   this case to do more than to catalogue these rights that exist,

17   and I think that you should catalogue them as they exist, not

18   as Mr. Veeder feels they exist.  You should catalogue Vail's

19   right as exactly what it is, so many acre feet that Vail has,

20   and that it is in such-and-such a status, and that it is for

21   such-and-such a purpose, and you should catalogue Fallbrook's

22   right in exactly the same way.

23       We had a little discussion this morning over Mr. O'Malley.

24   He has 3½ miner's inches of rights for domestic purposes.  I

25   think you should so catalogue it, and state that he has a right

P 78

1    to 3½ miner's inches for domestic uses.

2         And when you come to Fallbrook, you should catalogue each

3    Fallbrook permit and say, for example, that Permit 8511 is to

4    impound for storage not to exceed 10,000 acre feet between

5    such-and-such a date for irrigation and municipal purposes.

6    That is the right you will be cataloguing, and I think you

7    should catalogue it in the language of the right.

8         I am not going to play Mr. Veeder's game and request more

9    time to reply.  I will respectfully request your Honor to take

10   another look at our briefs in this case.  I think the statute

11   and the case law is beyond any contradiction, beyond any possi-

12   bility of contradiction, and I assure your Honor it has not

13   been contradicted by anything cited in Mr. Veeder's brief, and

14   I would like you to so view the briefs, and to satisfy yourself

15   on that score.

16        I would be hopeful that we can get a ruling on this before

17   the week is out, and in accordance with your Honor's suggestion

18   I did draft what I felt would be an appropriate order, with

19   limitations that I think are so sweeping that I think it is

20   going to hard for Mr. Veeder to find any more adjectives to

21   assert against them.  We haven't served it on him yet, and I

22   haven't lodged it with the clerk, but I wanted your Honor to

23   know that I have prepared what I think would be an appropriate

24   order.

25        THE COURT:  Mr. Girard.

15,045

P 79

1    MR. GIRARD:  I am not going to comment at length at all,

2    your Honor.  I think Mr. Sachse has said everything, and I

3    concur in what he has said.  I only suggest that your Honor

4    read the briefs on this point.  If you haven't looked at them

5    recently, I think you will find the fact of whether a municipal-

6    ity can serve irrigation water is so crystal clear it can't be

7    doubted, that the statute so states, unless Mr. Veeder can come

8    up with a different statute, or case, or something, so it seems

9    to me that I don't know of any principle that is more clearly

10   established.

11       That is all I have, unless your Honor has some specific

12   questions.

Tape H 2

13       THE COURT:  I will hear Mr. Veeder again.  It is hard

14   for me to follow this talk about a municipality not being able

15   to use irrigation water.

16       MR. GIRARD:  Every municipality in the state does it.

17       THE COURT:  I grew up in the San Fernando Valley, and when

18   irrigation water was brought to the San Fernando Valley, it was

19   brought essentially for irrigation purposes.  Later it became

20   a great metropolitan area, but originally it was for irrigation

21   purposes, and there was an irrigation rate, and there was a

22   domestic rate and there was a combination rate.

23       I see the case is cited in Mr. Sachse's brief, on that

24   litigation of the City of Los Angeles, the various litigation

25   which they had, and they had a tunnel in the narrows there at

P 80

1    Elysian Park that would pick up water which had previously been

2    sold to the farmers for irrigation purposes, and they would just

3    pick it up again and put it into the tunnel and run it into

4    domestic uses.

5            MR. VEEDER:  May I proceed now; your Honor?

6            THE COURT:  Yes.

7            MR. VEEDER:  I am extremely interested in the history of

8    these matters, and I think it is entertaining, but I am here

9    to argue the proposition of the extent of the rights that

10   Fallbrook Public Utility District can acquire under the statutes.

11           They haven't, either of them, in briefs or in their argu-

12   ment referred to Section 1461 of the Water Code.

13           THE COURT:  Well, read it to me.

14           MR. VEEDER:  I thought I did.

15           THE COURT:  Read it to me now.

16           MR. VEEDER:  "1461.  Limited Use Water Code.  The

17   application for, or the granting of a permit to any municipality

18   to appropriate water does not authorize the appropriation of

19   water for other than municipal purposes" -- period.

20           THE COURT:  That begs the question.  What are municipal

21   purposes?

22           MR. VEEDER:  Let me go on.  I am pleased always to go

23   back and to repeat these things.  The _Orosi_ case says in so

24   many words that the draining, irrigating and reclaiming of

25   land cannot be considered municipal purposes, and it appears

P 81

1   on pages 52 and 53.

2        Now, it is extremely important that we take into consider-

3   ation the factors that are involved, because we are looking to

4   the measure of rights.  That is all we are looking to, and if

5   your Honor can find anyplace in the record or in the law which

6   says that a municipality can go into the business of supplying

7   water for purposes of irrigation, it can  probably rent some

8   water that is surplus, and, indeed, there may be a situation

9   where that is possible, but the permit that is issued to them

10  by the State of California must specifically limit the right

11  to the use of water to municipal needs, and the municipal needs

12  as referred to in the Orosi case.

13       It is true that Los Angeles has a specific statute which

14  permits them to go into the business of delivering water for

15  irrigation, but that was long ago.  But if your Honor will

16  consider Section 10153 as a general Act passed in 1909, and

17  then consider Section 1461, which limits the right to a permit

18  strictly to municipal uses, you will see the point that I am

19  making.  The point that I am making is that you can have a

20  right to the use of water for the municipal services, but that

21  irrigation has not and has never been included.

22       THE COURT:  Maybe municipal services back where you come

23  from in Washington D.C. are different from municipal services

24  out here.

25       MR. VEEDER:  Not a bit different than in Denver, where I

P 82

1   was.

2       THE COURT:   Because in many of our cities there were large

3   agricultural areas, farming areas, right within the city limits.

4       MR. VEEDER:   That is right.

5       THE COURT:   Then do you say that the city would have the

6   right to use household water, or municipal water, but where

7   there was a big farm within the city, you would have no right

8   to serve the farm?

9       MR. VEEDER:   It would have no right to have a permit issued

10   to it as of today for that purpose, and that is exactly what

11   the law says, because if you will review the Orosi case, to

12   which I made reference, and if you will review the statutes,

13   you will find that the word "irrigation" is separate and distinct

14   and apart from municipal uses.   The cases that I cited to your

15   Honor are squarely in point.

16       What would be the objective, your Honor, of Section 1461,

17   which says that a municipality can get no water except for

18   municipal purposes, if it intended that it would go into the

19   business of supplying water for purposes of irrigation?   I

20   respectfully submit that when the amended the Public Utility

21   District laws, as I stated that it did, they did so for one

22   reason.   They considered it unconstitutional, in my view, to

23   permit a municipality to levy assessment against this man who

24   runs the filling station for purposes of supplying a 50-acre

25   tract with water for irrigation.   That is the fundamental and

P 83

1   basic difference.  There is a difference between a municipal

2   need and irrigation, as such, and I repeat what I said before,

3   that we are going to ask your Honor to find upon the question

4   of what is domestic use.

5       Mr. Sachse states that you will find in their application

6   this statement, "We claim water for municipal, irrigation and

7   domestic."  Why in the world was it necessary to put in the

8   word "irrigation"?  It is of interest to note that in the

9   original applications which were filed by the Fallbrook Public

10  Utility District, they made their filing solely for municipal

11  and domestic needs.  Later they added irrigation.

12      Now, when someone tells me that there is no difference

13  between a municipal use and irrigation use, I say he is not

14  facing the facts, and he is not facing the law, and he is not

15  facing the practice that is actually followed.

16      Where are we?  We are back to the cases that I cited.  We

17  are back to the fact that neither one, neither the State nor

18  Fallbrook, refer to the statute upon which I most heavily rely.

19      It is true, your Honor, and I agree with you, that muni-

20  cipalities in the West under special statutes very frequently

21  acquire water for purposes of irrigation for a short period of

22  time, but those are under special Acts, and there is no special

23  Act that is permitting this municipality to do this specific

24  thing.

25      Your Honor is going to be called upon, in my view, to

P 84

1   review the extent of the permit that could be issued, and I

2   think that your Honor will have to distinguish, with all respect

3   to your Honor, what was meant by -- I beg your pardon, Mr.

4   Girard?

5   MR. GIRARD:  I have got to catch a plane.  I hate to leave

6   in the middle of your speech, but I am sorry.

7   THE COURT:  All right, Mr. Girard.

8   (Mr. Girard leaves the court room.)

9   MR. VEEDER:  Then to pick up again, the point I would like

10   to make, your Honor, is that I would like to have you rule on

11   the issue and make the determination as to how much domestic

12   water, how much municipal water, and how much irrigation water

13   Fallbrook is going to be entitled to, and it would make the

14   matter a great deal more clear to us, and I think it is essen-

15   tial before the entry of the decree for us to know.

16   I am greatly concerned with the fact that we are in the

17   position of having/say, "Well, if there is any surplus,
                  your Honor

18   Fallbrook can take it all, because I don't believe that is an

19   adjudication."

20   I think we are entitled to know, and if you came down

21   with the statement that their inchoate rights, their maximum

22   inchoate rights would be 3000 acre feet, that is the kind of

23   a decree that I think is required.  But once again I repeat

24   it is a question of law for you to decide, and it could not be

25   decided by the State Water Rights Board, and I respectfully

P 85

1   submit that in any findings, in any conclusions of law, or in

2   any decree those elements be covered.

3       THE COURT:   Anything further, Mr. Sachse?

4       MR. SACHSE:   I would only say this in this connection,

5   your Honor, as to why the permit mentions irrigation, that I

6   want to point out in the application form devised by the State

7   of California, you are required to spell out how many acres

8   are to be irrigated, how much water you want, and you have to

9   break this down even if you are a city.

10      The second thing I would like to mention to Mr. Veeder is

11   that I would appreciate him teaching me a little law, and I

12   would like to have him give me the citation to the special

13   statute which gives the City of Los Angeles the right to sell

14   irrigation water, because there is no such enactment, and also

15   the special statute which gives that right to the City of San

16   Jose, the City of Carlsbad in San Diego County, the City of

17   Stockton, and the City of Oceanside.   Mr. Veeder is blithely

18   assuming that there is a special statute when there is not,

19   and as your Honor knows, we have only one and not six classes

20   of cities, so when Stockton sells it, or when Carlsbad sells

21   it, or when Oceanside sells it, they are not selling it under

22   a special statute.

23      THE COURT:   Which is the class that Fallbrook is in?

24      MR. SACHSE:   I say we have abolished classes, and we have

25   only one class city.   We don't have six, or twelve, or sixteen,

P 86

1    or whatever it was we used to have.

2        MR. VEEDER:  I thought I would be entitled to close, your

3    Honor, but I want to ask further --

4        THE COURT:  You can talk tomorrow.

5        MR. VEEDER:  Did you get the call from Bill Ward?

6        THE COURT:  Yes.  Mr. Anderson's client advised me not

7    to do anything about the case, and Mr. Anderson so advised the

8    Court by letter, Mr. Anderson will file a substitution, and will

9    do everything that the Court directs.

10       MR. VEEDER:  That is all.

11       THE COURT:  We will have to get the letter, and you can

12   see what it says.

13       MR. VEEDER:  Isn't that important to you, Mr. Stahlman?

14       MR. STAHLMAN:  Yes, it is.

15       THE COURT:  We can issue an order to show cause and have

16   him in, whatever you say.

17       One other thing:  Vail has tendered Exhibit BH, and I

18   take it that this deals on the stipulated judgment?

19       MR. STAHLMAN:  Yes, your Honor.

20       THE COURT:  You wish to reopen your case to put that in?

21       MR. STAHLMAN:  Yes, I would like to, your Honor.

22       MR. VEEDER:  What is it?

23       MR. STAHLMAN:  It is a notice we sent to the Commandant

24   of the Eleventh Naval District in the form of a contract, if a

25   stipulated could be construed as a contract.

15,053

P 87

1    MR. VEEDER:  It is an exhibit now?

2    MR. STAHLMAN:  I will offer it.

3    THE COURT:  It has been marked.  Haven't you seen it?

4    MR. STAHLMAN:  He has seen it.

5    (Exhibiting the exhibit to counsel.)

6    MR. VEEDER:  I have no objection to that.

7    MR. STAHLMAN:  I offer it in evidence.

8    THE COURT:  Is it stipulated that it was sent to the

9  Commandant of the Eleventh Naval District?

10    MR. STAHLMAN:  It was sent.

11    MR. VEEDER:  It was sent there, was it, Captain Libby?

12    CAPTAIN LIBBY:  Yes, I happened to be in the office, where

13  I saw the original at headquarters.

14    THE COURT:  All right.  Vail Exhibit BH is received in

15  evidence, and the case will be reopened for that purpose on

16  the stipulated judgment.

17                          (The document heretofore marked)
                                      (Defendant Vail Exhibit BH was )

18                          (received in evidence.        )

19    THE COURT:  Ten o'clock tomorrow morning.

20    (Whereupon, at 4:30 o'clock P.M., Tuesday, January 31,  )
           (                                          )

21    (1961, an adjournment was taken until 10:00 o'clock A.M.)
           (                                          )

22    (Wednesday, February 1, 1961.                  )

23

24

25

15,054

P 88

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the Unites States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California this 31st day of January, A.D., 1961.

_____
Official Reporter

_____
Official Reporter