# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:  San Diego, California

Date:  February 1, 1961

Pages:  15,055 to 15,136

FILED

SEP 24 1943

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street,
San Diego 1, California
BElmont 4-6211 - Ext. 370

1    IN THE UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3    SOUTHERN DIVISION

      - - -

4    HONORABLE JAMES M. CARTER, JUDGE PRESIDING

      - - -

6    UNITED STATES OF AMERICA,          )
                                        )
7                      Plaintiff,       )
                                        )
8    vs.                                )        No. 1247-SD-C
                                        )
9                                       )
                                        )
10   FALLBROOK PUBLIC UTILITY           )
     DISTRICT, et al,                   )
11                                      )
                       Defendants.      )
12   ───────────────────────────────────)

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                   San Diego, California

15              Wednesday, February 1st, 1961

16   APPEARANCES:

17        For the Plaintiff:          WILLIAM H. VEEDER, ESQ.
                                      Special Assistant to the
18                                    Attorney General

19                                    LCDR. DONALD W. REDD

20        For the Defendants:

21        Vail Company:              GEORGE STAHLMAN, ESQ.

22        Fallbrook PUD, et al:      FRANZ R. SACHSE, ESQ.

23        STATE OF CALIFORNIA:
                                     WILLIAM BUCKNER, ESQ.
24                                   Deputy Attorney General

25

P 90

## INDEX TO WITNESSES

| For the Plaintiff | D | C | RD | RC |
|---|---|---|---|---|
| Fred Kunkel | 15,095 | | | |
| Col. Allen C. Bowen | 15,104 | | | |
| Fred Kunkel | 15,112 | | | |
| Fred Kunkel | 15,121 | | | |

## INDEX TO EXHIBITS

| Plaintiff's Exhibits | Identified | In Evidence |
|---|---|---|
| 275-Revised substituted for original Exhibit 275 | | 15,097 |
| 275-C, 275-D | 15,098 | |
| 275-C | | 15,098 |
| 275-D | | 15,099 |
| 275-B | | 15,102 |
| 277 | 15,103 | 15,107 |
| 278 | 15,122 | |
| 278-A | 15,122 | |
| 278, 278-A | | 15,123 |
| 58-64 through 58-83 | 15,126 | 15,126 |

15,057

Tape A1
P 91

1   SAN DIEGO, CALIFORNIA, Wednesday, February 1, 1961, 10:00 A.M.

2        THE CLERK:  Number 1, 1247-SD, United States v. Fallbrook.

3        THE COURT:  I am prepared to rule on what you argued

4   yesterday.

5        MR. VEEDER:  Without further argument from me, your Honor?

6        THE COURT:  Oh, do you have some further argument this

7   morning?

8        MR. VEEDER:  Yes, and I would like to make a motion on

9   it as I go along, if I may.

10       THE COURT:  All right.

11       MR. VEEDER:  The distillate -- if that is the correct

12   term -- the distillate of what we came down to yesterday was

13   the question of whether a municipal use encompasses the

14   irrigation use.

15       I submit, your Honor, that the statutes of California

16   that I have alluded to, and two others to which I will now

17   make reference, prove beyond a doubt, at least to me, that in

18   the amendment of 1943, and perhaps prior to that time, speci-

19   fic legislation was adopted directed to municipalities.

20       Antecedent to referring to those specific statutes, I

21   will say that we all know that municipalities, in the West

22   generally, frequently incorporate within their boundaries

23   lands which are irrigated, and that these cities frequently

24   supply water for purposes of irrigation under those circumstances.

25       But I believe that the real issue here is this:  What was

P 92.

1 the effect of Sections 1460, 1461 and 1462 upon the general

2 enactment?

3     MR. SACHSE:   Of the Water Code, Mr. Veeder?

4     MR. VEEDER:   The Water Code.

5     THE COURT:   Get me the Water Code.

6     MR. VEEDER:   I have your Water Code, your Honor.

7     THE COURT:   Oh, you have.   Then go ahead.

8     MR. VEEDER:   I say that those enactments must be read in

9 the light of the over-all law of California.   The general

10 statute relied upon almost entirely by Mr. Sachse and by Mr.

11 Girard is 10153, and it says that municipalities can take and

12 use the water for certain purposes, among them being irriga-

13 tion, but irrigation is separate and distinct from the muni-

14 cipal use, and that is why these Acts become so important.

15     The first statute, Section 1460 -- I will hand the book

16 to your Honor.   I remember what is involved.

17     (The book referred to was handed to the Court.)

18     MR. VEEDER:   The first enactment provides for the issuance

19 of a permit.   That is Section 1460, and that is the source of

20 the authority pursuant to which California could issue a

21 permit for the inceptive act of acquiring a right.

22     Section 1461 provides that the permit will be limited to

23 municipal uses.   Therefore, your Honor is called upon to rule

24 upon the proposition of whether an irrigation use is a munici-

25 pal use in the contemplation of California law, but if you read

P 93

1    this -- excuse me, if you want to interrupt, why, all right.

2         THE COURT:  No, go ahead, and then I will ask a question.

3         MR. VEEDER:  In your next section, 1462, it provides that

4    if the municipality is claiming inchoate rights for which it

5    is not making use at the time, someone else can use that water

6    until the municipality needs it.

7         Now, what other use could there be?  What is contemplated

8    there?  Well, it is obvious it must be irrigation or some simi-

9    lar use, and I believe that the question is a limitation upon

10   the power to issue the permit, as I said yesterday.

11        THE COURT:  Let me read 1462.

12        (The Court examined the section referred to.)

Tape B  13   THE COURT:  You notice a rather interesting thing about

14   these statutes.  They appear in the article "Preferred

15   Priorities of Municipalities," and the first one doesn't talk

16   about "municipal use" -- the first one talks about "domestic

17   use."  So there must be a difference between domestic use and

18   municipal use.  Section 1460 provides that the application for

19   a permit by a municipality for the use of water for the muni-

20   cipality or the inhabitants thereof for domestic purposes shall

21   be considered first in right.  If you are right that the words

22   "municipal use" and "domestic use" are identical, they wouldn't

23   use "municipal" in this section as they did in Section 1461.

24   So they talk about domestic being first in right.  Then you

25   come to 1461 -- the application for a right and the granting to

P 94   1   a municipality to appropriate water does not authorize the

        2   appropriation/any water other than for municipal purposes.
                   of

        3      MR. VEEDER:  That is right.

        4      THE COURT:  They don't say domestic purposes; they say

        5   municipal purposes.  What do they mean other than municipal

        6   purposes?  You argue that it means domestic purposes.

        7      MR. VEEDER:  No.

        8      THE COURT:  Well, you argue that it does not include

        9   irrigation.

      10      MR. VEEDER:  I say it does not include irrigation, and I

      11   say that the true criterion here is, what is meant by munici-

      12   pal purposes, and I say those are the services that can be

      13   provided for by a general assessment.

      14      THE COURT:  It might mean that it did not include appro-

      15   priation of water for the purpose of making water power.  It

      16   might mean that it did not include the appropriation of rights

      17   to water for resale, other than municipalities.  It might mean

      18   many things.  But you are arguing that municipal purposes ex-

      19   cludes irrigation.

      20      MR. VEEDER:  I think it does, your Honor.

      21      THE COURT:  And the only thing I get out of Section 1462

      22   is that where a municipality makes an appropriation which is

      23   in excess of existing municipal needs, the department may issue

      24   a permit pending the application for beneficial use, against the

      25   entire appropriation for the part then being applied.  I take

P 95

1   it this would be a situation where a city is growing and it has

2   to appropriate water to take care of its future uses, but it

3   can't put it to beneficial use; this is to protect the city in

4   that situation.  But I don't think it adds anything to the other

5   purpose.

6   MR. VEEDER:  I read those statutes, your Honor, on the

7   background of the sentence in the Orosi case, 196 Cal. 53,

8   that says "the improvements contemplated" -- that is, the

9   irrigation, reclamation of land.

10  THE COURT:  Mr. Veeder, I took that case home and read it

11  again, and you have pulled that right out of thin air.  I will

12  talk about that later.  In fact, the Orosi case was a situation

13  where a group of people who lived in the county, not in the

14  city, formed a public utility district and wanted water for

15  irrigation purposes -- that is what they wanted, and they

16  wanted to float an $18,000 bond issue to pump, distribute and

17  use this water.  It doesn't talk much about domestic, but for

18  domestic and irrigation uses.  And so the suit was a taxpayers

19  suit, and the lower court held the bonds were good and the

20  Supreme Court affirmed.

21  MR. VEEDER:  That is right.

22  THE COURT:  That is what the case holds.  That the bonds

23  were properly issued by a public utility district for the

24  construction of a plant to pump and supply, among other things,

25  irrigation water.  That is the holding of the case.

P 96

1       MR. VEEDER:  The holding of the case, and the point I

2   have been directing your attention to, the whole proceeding

3   here, your Honor, -- and apparently I have failed completely

4   to bring to your attention what I am saying -- is that if you

5   want to build an irrigation system, such as Fallbrook desires

6   to do, you must levy a special assessment.

7       THE COURT:  That isn't what the Orosi case says.

8       MR. VEEDER:  That is my reading of it, your Honor.

9       Finally, in conclusion on this proposition we have brought

10  up here, what I want to allude to is this, and it is the limit-

11  ing element of being able to levy taxes for the purposes to

12  which I refer.  But in this quiet title suit, among the issues

13  that we have agreed upon and certainly the issues that had to

14  be taken care of in this suit to get the kind and type of

15  decree that we desire, the question arises as to the extent

16  and nature of Fallbrook's rights, and I submit, your Honor,

17  that your decree that is entered must of necessity reflect the

18  amount of water that Fallbrook can apply to beneficial use for

19  municipal, domestic, and, if you construe it as I assume you

20  will, irrigation.  But there must be proof to show the number

21  of irrigable acres that will be irrigated, the number of

22  people who will receive water, the number of people anticipated

23  to receive water before, before you can adjudicate to Fallbrook

24  any rights at all.

25      And I call your Honor's attention to your rulings in the

P 97

1   transcript at page 8486, where you prohibited me from interr-

2   ogating the Fallbrook witnesses in regard to the extent of

3   irrigable acreage in the Fallbrook Public Utility District.

4       THE COURT:  I think I was right.  Since this water that

5   Fallbrook is talking about is only  that water over and above

6   all the vested rights of the United States, what interest

7   whatever can you have in the matter?  How can you be concerned?

8   No right they have can impinge upon any vested rights of the

9   United States.  If they want to build a dam, that is their

10  business.  Maybe the dam will never have water in it.  Maybe

11  they will get use out of the dam one year out of five years.

12  But it doesn't concern the United States.  Any rights they

13  have are entirely subject and junior to the rights of the

14  United States.

15      MR. VEEDER:  All I am doing is making a record, your Honor.

16      THE COURT:  All right.

17      MR. VEEDER:  It is my view of this matter that the obliga-

18  tions and responsibilities of this Court in regard to inchoate

19  rights is identical to its responsibility as to completed and

20  exercised rights; that the decree must reflect the vested

21  rights of Fallbrook, that is, the diversions and application

22  of water, the completed appropriations; and then it must re-

23  flect the inchoate or incipient right.

24      And in that regard I refer to page 29 of my brief, and

25  the case of Merritt vs. Los Angeles, 162 Cal. 47 (120 Pacific

P 98

Belt B2

1064).  It states what should be determined in this kind of
case where there are incipient inchoate rights.  It says:

". . . Such judgment . .

That is the decree, of course.

". . . should not declare the plaintiff absolutely
entitled to the water . .

Because he didn't have a vested right; he hadn't completed his
appropriation.

". . . it should only declare and describe the
plaintiff's contingent rights to use the water and
enjoin adverse claims or uses injurious thereto . .
If the defendant's right is paramount, but does not
include all the waters of the stream, the judgment
may so declare and fix the plaintiff's contingent
right in the surplus at such time as there is an
excess over defendant's use. . "

THE COURT:  I have written okay beside that in your brief.
I propose to do that.  I don't find any fault with that.

MR. VEEDER:  The point that I make, your Honor, and the
reason why at this time the United States of America moves for
judgment against Fallbrook Public Utility District, on the
grounds that they failed completely and entirely to prove the
facts requisite for an inchoate or incipient right because they
didn't prove the extent of the water   which they could ul-
timately apply to a beneficial use.  There is not a word in

P 99

1    the case.  So we move for judgment on that basis.

2        I also move to have your Honor restore --

3        THE COURT:  First, your motion for any judgment is denied

4    on the grounds that it is premature.  If you are talking about

5    any final judgment as to Fallbrook, it is premature.  If you

6    are talking about an interlocutory decree, I will take it under

7    advisement along with what I propose to do in this matter.

8        MR. VEEDER:  I am extremely anxious personally, your

9    Honor, for your Honor, if he would, because Fallbrook is

10   attempting to get some money to build a dam -- trying to get

11   it from the United States, and if not from the United States

12   I assume they will try to get it from California -- I would

13   like to get this on appeal under Rule 54B.  I think this is

14   a proper case where your Honor could enter an order to the

15   effect overruling our motion, and let's segregate this matter

16   and get it on appeal.  Because, your Honor, I am sufficiently

17   realistic to know that Fallbrook is coming in and saying, "All

18   we want is just a little bit of flood water every ten years."

19   That's hogwash.  Once they build that dam they will inflict

20   irreparable damage upon the United States of America, and I

21   know it.  So I am asking your Honor to enter a judgment -- I

22   would like in favor of us, but if it needs to be against us

23   in any event make it an appealable order.

24       I also move your Honor to restore into the complaint the

25   counts which your Honor struck in his pre-trial opinion.  The

13,060

P 100

1   counts that were struck appear in 165 Federal Supplement 858,

2   et seq.  I will not take the time to refer to each one of the

3   elements --

4           THE COURT:  Well, do you want to restore all of them?  Is

5   this a blanket motion for reconsideration of all of those?

6           MR. VEEDER:  I would like to have you reconsider them on

7   the basis of the brief that is before you in regard to Fallbrook's

8   claims.  The reason I am doing this, your Honor, is the ruling

9   to which I just referred where you restricted the cross exam-

10  ination, not permitting me to elicit evidence in regard to the

11  maximum ultimate beneficial use that Fallbrook could conceivably

12  have.  We are in this situation.  When this goes to the Ninth

13  Circuit it will be, in effect, the oldtime demurrer up there

14  on whether we stated sufficiently a claim to warrant testimony.

15          THE COURT:  Let's see the transcript to which you refer

16  where I made that ruling.

17          MR. VEEDER:  It is rather an extended reference, your

18  Honor, starting early in the volume.

19          THE COURT:  You mean it runs quite a ways?

20          MR. VEEDER:  Yes, it does.  You have made observations

21  throughout, but I think your statement of the page you are now

22  looking at is probably the final ruling where the examination

23  was limited.  It is very extensive, your Honor.  I spent a

24  good share of the weekend trying to analyze exactly where the

25  ruling was.

P 101

1    THE COURT:  You never did make the offer of proof, did you?

2    MR. VEEDER:  Yes.

3    MR. SACHSE:  I think not.

4    MR. VEEDER:  I will formalize the request for the rein-

5    statement of the counts and also the references there, your

6    Honor, if it would be better.  We were coming to the end of

7    this argument and I thought it desirable to bring the matter

8    up at this juncture for the purposes of the record.

9    THE COURT:  Well, Mr. Veeder, all I can say is that if

10   you want to make some motions to reconsider some rulings you

11   will have to do it in writing.  This happened two years ago

12   and in fairness to me and to other counsel if you want to make

13   some motions dig out the record and make it in writing.

14   MR. VEEDER:  I'll do that your Honor.

15   THE COURT:  I can't immediately find what you are talking

16   about.  I don't recall now the exact status of this.  You talk

17   in one place about I prevented you your cross examination of

18   witnesses.  You talk at another time about that Fallbrook did

19   not put on proof that you think they should have put on.  I

20   don't know what Fallbrook proved or didn't prove about it.

21   MR. VEEDER:  Your Honor, the reason why I thought it was

22   desirable now, somewhat in anticipation of your ruling you

23   were going to make this morning, is that I wanted it clear

24   that the matter is conceivably moot in any event in the present

25   state of the record because Fallbrook hadn't proved its claim.

Tape C1

15,068

P 102

1    I think that that is an element to be taken into considera-

2    tion, and I will, antecedent to the next hearing, move and be

3    specific in regard to each of the counts to which you referred,

4    and also in regard to a complete analysis of the evidence

5    Fallbrook offered to my cross examination -- to the limit upon

6    my cross examination, and in that manner the issues will be

7    formed, and I hope that you can then rule on it.

8    THE COURT:  Do you have any recollection of the state of

9    the record, Mr. Sachse?

10   MR. SACHSE:  Yes, I do, your Honor, and I am going to

11   vigorously object to this procedure.  Mr. Veeder yesterday

12   stated for the record of this court, and last week during our

13   conferences, and stated again that he was willing and anxious

14   to have your Honor rule on the fundamental question of the

15   validity or non-validity of our claims.  I think your Honor

16   should do so.

17   Now, the substance of what Mr. Veeder is talking about is

18   nothing more nor less than this:  He asserted at the time our

19   case was put on that Fallbrook had to prove how many irrigable

20   acres of land it had, how many acres it cropped, what the crop

21   was, and the use for all of it, and we objected to this on the

22   ground that your Honor in your decision on the pre-trial ruling,

23   and the decision on our motions to strike had already ruled

24   as a matter of law in striking these counts that they were no

25   concern of yours, but they were matters for the Water Rights

P 103

1 Board.

2        Now, without attempting to re-argue something that was

3 spread over months in the preliminary arguments at the pre-trial

4 hearings, I want to remind your Honor of one simple thing, and

5 I think Mr. Veeder is overlooking it, or not calling your

6 attention to it.  Everything he said about a permit is true.

7 It is an inchoate right, and for that very reason, your Honor,

8 it is impossible, it can't be done practically, and there is

9 no provision for proving all your uses until your application

10 is granted and you get a permit.  When you get a license, when

11 the State Water Rights Board finally grants a license, the

12 license then depends on having established your use.  When you

13 get a permit you simply go ahead to the State and say, "We

14 desire to build a dam, and we want the right to impound not

15 to exceed 30,000 acre feet."

16        The State gives us the right to do so, but the State does

17 not require, nor can your Honor require that we demonstrate

18 where every drop of that water is to go every year.  We objected

19 at the time to any question of irrigable rights, and so on,

20 beyond the basic fact that they were there.  We think they were

21 disposed of by your Honor's ruling.

22        I want to remind your Honor, and you will recall that in

23 your opinion you used the phrase, "In the absence of controlling

24 authority to the contrary, I will rule."

25        We reminded you of that at the time we objected, that there

15,070

P 104

1    was no controlling authority to the contrary, and your Honor

2    so ruled.  You told Mr. Veeder in substance that this was none

3    of the Court's business, and I don't care, that the evidence is

4    immaterial.

5    Now, that is the status of Mr. Veeder's motion, and if

6    Mr. Veeder by this device seeks to delay a ruling on the very

7    simple issue which your Honor stated, and which he stated a

8    month ago, on our power to do these things, I think it is a

9    completely unwarranted delaying tactic, which is absolutely

10   uncalled for.  I have patiently waited on this ultra vires

11   question.

12   I have worked on other aspects of this case, but from the

13   standpoint of my client, this is the heart and soul of our case.

14   I think we are entitled to a ruling from your Honor on the

15   ultra vires question, and I am going to press for it as strongly

16   as I know how.

17   If Mr. Veeder wants to make a motion thereafter to attempt

18   to reverse your ruling, all right, but let's do it that way,

19   and let's not drag this thing out indefinitely for more and

20   more arguments, for surely there have been enough pearls poured

21   on your Honor's lap.

22   THE COURT:  Let me read these pages in the pre-trial

23   opinion.

24   (The Court referred to the document stated.)

25   THE COURT:  Anything further?

P 105   1    MR. VEEDER:  No, your Honor.

2    THE COURT:  I propose to adopt Mr. Sachse's recommendation

3    and rule on this matter, and if you are dissatisfied and un-

4    happy about it, and you are so advised, you may make your

5    written motion for reconsideration, and you may call my attention

6    to the portions of the transcript and the authorities and so

7    on that you rely on, and the parts that you object to.

8         There is much in your 32-page brief that I find proper.

9    It is going to be necessary to rule on the nature and character

10   of Fallbrook's incipient claim, and the Court proposes to do

11   that.  What Fallbrook now has is a permit, and no right has

12   been exercised under it as yet.  It may grow later into a

13   license.  The extent of use that Fallbrook may make of her

14   appropriated water is limited by the  terms of the permit.

15   They mean to build a dam to hold -- what is it -- 32,000 or

16   38,000?

17        MR. SACHSE:  A proposed capacity of 35,000 annual impound-

18   ment under the permit.

Tape C2  19   THE COURT:  And I further find that any rights that

20   Fallbrook has in acting under the permit or any license/might
                                                         that

21   thereafter be issued are at all times junior and subordinate

22   and inferior to the vested rights of the United States, to

23   the riparian rights of the United States, and any other vested

24   rights that it may have; and to provide that if the dam is

25   built, it will be subject to the regulations of this Court, so

P 106

1   that a method will have to be worked out to provide that water

2   that would ordinarily flow over the lands of the United States

3   can mechanically accomplish the same purpose by release from

4   the dam.   The dam will be allowed to impound the waters that

5   ordinarily would be flood waters; not necessarily now, but

6   there will be provisions about the dam.   The dam will have to

7   go down to bedrock, and it will, of course, naturally impede

8   the underground flow of the Santa Margarita River, and allowance

9   will have to be made for that, but any rights that now exist

10   or that may develop are all junior to the vested rights of the

11   United States.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 110

D 1

1    It is true, as you say at page 18, this

2    permit refers to unappropriated water subject to all existing

3    rights.  It is not true that this sort of claim, this permit,

4    clouds the rights of the United States.  It can't cloud the

5    rights if it is subject to and inferior to your vested rights.

6        So I don't think I have any duty to read a crystal ball

7    and determine how much surplus water is available.  The fact

8    remains that during the course of this litigation in at least

9    two years, 1952 and 1958, there have been large amounts of

10   surplus water, and I would assume that in the future years

11   there will be more or less surplus water.  If we get into a

12   wet spell there may be a lot of surplus water.  If we get

13   into a dry spell there may not be any surplus water.  But

14   other than going that far, I don't expect to make some

15   estimate as to how much surplus water there will be.  I am no

16   better able than you are to predict what will happen in the

17   future.  We do know that in the past there has been surplus

18   water.

19       In my opinion, you misread entirely the Orosi case.  Do

20   you have it there?  You borrowed it off my desk.

21       MR. VEEDER:  It is 196 California, your Honor (handing

22   volume to the Court).

23       THE COURT:  You misread entirely the Orosi case, and you

24   take out of context the sentence "The improvements contem-

25   plated by the Acts under which they were formed cannot be

D 2   P111

1    considered municipal purposes." That statement refers back

2    to a series of cases, and each of the cases involved a dif-

3    ferent type of district.

4        The facts of the Orosi case are that this Orosi Public

5    Utility District was organized to provide for the incorpora-

6    tion of a public utility district in unincorporated territory.

7    We have here a district outside the city limits.  The action

8    was brought to determine the validity of an $18,000.00 bond

9    issue voted by the people of the district for the purpose of

10   raising money for developing, pumping, storing and distribut-

11   ing water.  I think it appears later that this was irrigation

12   water, but obviously an unincorporated district is not a

13   city.

14       The trial court found that the bond issue of the

15   district was according to law, and the case went up on the

16   judgment roll.  Then the court in the decision detailed at

17   length what this district could do, its powers under the Act

18   -- to acquire, construct, own, operate, control, or use works

19   for supplying the inhabitants of the district with light,

20   water, power, heat, transportation, phone service, etc.

21   Whenever there is a surplus of water, light, heat, above that

22   required by the inhabitants, it might sell or dispose of the

23   surplus out of the district.  It has the right of eminent

24   domain.  It may also borrow money, issue bonds, cause taxes

25   to be lievied and collected, for the purpose of carrying out

D 3 P 112

1   its operations and paying its obligations.  The Act further

2   provided that if, for any cause, the revenue shall be

3   inadequate to pay the principal or interest on any bonds,

4   debt or funds needed to carry out the objects and purposes of

5   the district they may levy a tax.

6       This was the type of district which the court held might

7   legally issue these bonds, and that is the holding of the

8   case.

9       They get down to the discussion then of a comparison of

10  this setup with other types, and the court says at page 52:

11      "The purposes for which the Orosi District was

12      formed, the appellant contends, are not municipal,

13      and a district formed for such purposes does not

14      possess the essential characteristics of a municipal

15      corporation."

16  That is what the appellant contended.  That was found not to

17  be true.  The appellant lost out on that.

18      " . . . If the authorities cited by him were strictly

19      in point, there would be an end to the controversy;

20      but they are not.  They deal --

21  Here the court is talking about the points raised by the

22  appellant.

23      "They deal with questions arising in connection with

24      districts formed for the purpose of draining,

25      irrigating, reclaiming, or otherwise directly

D 4
P 113

1   benefiting the lands affected thereby. . . "

2   And then there are cited a series of these cases which were

3   not cases involving public utility districts, such as

4   Fallbrook, but were cases involving particular limited activi-

5   ties that were to be carried on -- activities such as irriga-

6   tion by itself, reclamation, levees, etc.  And then this type

7   of cases that the court refers to when it says:

8       "When related to that class of districts, the cases

9       cited are clearly in point.  The improvements contem-

10      plated by the acts under which they were formed

11      cannot be considered municipal purposes."

12      So you have taken out of context one statement -- a

13  dictum, if you want to call it that.  They talk about other

14  types of districts, when actually in the case itself the

15  holding was that a public utility district, with powers

16  similar to that of Fallbrook, had the right to issue bonds

17  for the purpose of developing, pumping, storing and distribu-

18  ting water.

19      I can't go with you on the holding under the Orosi case.

20      From this you then arrive, by some process of legal

21  analysis, at the statement that "Irrigation is not a municipal

22  purpose."

23      MR. VEEDER:  Yes, sir.

24      THE COURT:  I still don't know where that comes from.

25

P 114

D 5

1   You haven't shown me where it comes from.

2          Then of course we have the section in the Public Utilities

3   Code on which Fallbrook relies, which makes it very clear.

4          Then you rely on section 1461, I take it, of the Water

5   Code. You just cited the California codes, but I guess it is

6   the Water Code.

7          "The application for, or the granting of, a

8          permit to any municipality to appropriate water

9          does not authorize the appropriation of any water

10         for other than municipal purposes."

11  That we looked at earlier.

12         The preceding section, of course, Section 1460, I think

13  throws further light on it:

14         "An application for a permit by a municipality

15         for the use of water for the municipality or the

16         inhabitants thereof for domestic purposes shall be

17         considered first in right . . ."

18         So the y use the words "domestic purposes" in one section,

19  and in the next section they use the words "municipal purposes."

20  They can't mean the same thing, or they would have used the

21  same words.

22         You call attention to the fact that in 1951 and 1953,

23  subsequent to the initiation of this cause, California

24  amended its laws, conferring upon public utility districts

25  "the same powers" with reference to improvement districts as

P 115

D 6

1   it conferred upon irrigation districts.

2       MR. VEEDER:  Fallbrook hasn't complied with those

3   statutes.  That is why I brought that in.  I think I mentioned

4   that in the brief, your Honor.

5       THE COURT:  You quoted from the Merritt case, and in my

6   notes here I propose to do just about what the Merritt case

7   says -- "It shall declare and describe plaintiff's contingent

8   rights."  It says"

9       " . . . If the defendant's right is paramount but

10          does not include all the water in the stream, . . .

11  I take it that your riparian rights are paramount rights in

12  the sense that that word is used.

13      " . . . the judgment may so declare and fix

14          plaintiff's contingent right in the surplus at

15          such time as there is an excess over the defendant's

16          use."

17  That is all that Fallbrook asks.

18      But I do not propose to find that Fallbrook's incipient

19  right is limited to municipal and domestic uses, if by those

20  terms you mean excluding irrigation uses.

21      I am in agreement with the memoranda filed by Mr. Girard

22  and Mr. Sachse.  I don't think there is any problem here.  In

23  fact, I don't propose to make this interlocutory finding

24  appealable.  I don't think you have a leg to stand on in this

25  one.  I am being very frank with you.

P 116

1        Are there any issues here that I haven't ruled on?

2        MR. SACHSE:  No, your Honor.  I would like to state that

3  I am in absolute accord with everything you have said and

4  everything Mr. Veeder has asked as to restrictions.  I have

5  here, which I will give to Mr. Veeder and lodge with the

6  Court, proposed findings and interlocutory judgment wherein,

7  I assure your Honor, I have tried, as desperately as I am

8  capable of wearing the judicial hat and not the advocate's --

9  and if Mr. Veeder can think of stronger language, in the

10  light of the ruling you have just made, I would be very happy

11  to hear it -- I literally don't know how to draw tighter

12  restrictions embracing the judgment or opinion you have just

13  given us.  And I would respectfully ask that Mr. Veeder,

14  the Captain, Mr. Stahlman and others check these over.  I

15  assure you there is no attempt to have a boobytrap in there.

16  If it doesn't say it strongly enough as I have said  it, I

17  would like to know more about it.

18      THE COURT:  Anything I have said should not be consider-

19  ed as a direct recommendation to the inhabitants of the

20  Fallbrook Public Utility District that they should build this

21  dam.

22      MR. SACHSE:  I am well aware of that.

23      THE COURT:  I don't pass on whether they are going to

24  get quid pro quo for their investment.  That is their problem.

25  And I don't want anything I have said or my ruling to be

D 8 P 117

1  used for any publicity purposes in the event that there is

2  some election on a bond issue.

3      MR. SACHSE:  There will be no election on a bond issue

4  for some little time.  I am sure of that.

5      MR. VEEDER:  Did I understand your Honor to say that

6  you would not make an appealable order?

7      THE COURT:  No, I don't think it should be appealable.

8  First of all, there is the prohibition in the Circuit Court

9  case which says enter no judgment until I finally dispose of

10  the case.  We interpret that to mean no appealable judgment.

11  And you are asking me to make a judgment appealable that

12  would fly right in the face of that language by the Circuit

13  Court.

14      MR. VEEDER:  With all respect, and without prolonging

15  the matter any further, there are two elements that are

16  extremely important to us, your Honor, and I think we are

17  entitled to some protection in this lawsuit.  I think the

18  United States of America should be heard on the failure of

19  Fallbrook to prove its claims, and should be heard on this

20  matter of legal power and authority.

21      THE COURT:  I have just been hearing you on power and

22  authority.  And if you want to make a written motion concern-

23  ing Fallbrook's failure of proof, as you call it, you can

24  submit that later.

25      MR. VEEDER:  I would like to have those both included,

P 118

D 9

1  because -- I am sincere when I say it -- I think there should

2  be an appeal on this.  I don't know what your Honor has done

3  on the stipulated judgment, but there are two elements

4  concerning which I think we should be permitted, if you rule

5  against us, to be heard.  It wouldn't stop the rest of the

6  case at all.  The very simple matter, your Honor, from our

7  standpoint,is that if the mandate to your Honor from the

8  Circuit Court of Appeals prohibits the operation of Rule 54(b)

9  the process is simply to file a motion to dismiss the appeal.

10  Let's see whether it is good or not.  I will get this pulled

11  together, and I don't want it separated, though -- I want

12  Fallbrook's proof and Fallbrook's powers to be one issue for

13  appeal.

14      THE COURT:  I haven't commented on it, but nothing I

15  have said here concerns the other problems that involve

16  Fallbrook.  We are talking entirely about its application for

17  a permit, etc. -- its alleged incipient right to appropriate

18  water.

19      MR. SACHSE:  Alleged what, your Honor?

20      THE COURT:  Its alleged right to appropriate water.

21      We are not talking about any riparian rights you may

22  have.  We are not talking about the revocable permit.  We

23  are not talking about adverse use.

24      MR. SACHSE:  I want to clarify.  Your Honor used the

25  word "prescription."  We have pleaded prescription.  I have

15,082

P 119

D 10

1   said it several times in this record and in our memorandum.

2   We have abandoned -- I will say it again -- our asserted

3   prescriptive right.  We are not attempting to press it.

4   THE COURT:  What I am trying to point out is that none of

5   these matters I have enumerated are involved in this decision.

6   MR. SACHSE:  That is right.

7   THE COURT:  One final thing, and that is this.  Notwith-

8   standing the fear of the United States that this proposed

9   dam might be harmful, it is very difficult for me to see how

10   an upstream dam could be harmful to a lower riparian where

11   the rights in connection with that dam are made subject to

12   vested rights.  For one thing, you are going to be sure that

13   no water gets away.  And certainly arrangements can be made

14   to see that the downstream basins of the United States of

15   America receive the flow of this water in an intelligent

16   manner, which otherwise would be entirely different -- either

17   a fast flood over it or a lot of it going into the sea.  I

18   don't see how the United States could be hurt.

19   MR. VEEDER:  I didn't intend to reargue the matter, your

20   Honor.  I simply want to make the record from the standpoint

21   that I requested.

22   THE COURT:  What do you have next on the agenda?  We will

23   take a short recess.

24   MR. VEEDER:  I would like after the recess to ask for

25   some instructions in regard to your direction that I write a

D 11

P 120

1  brief in regard to Mr. Oviatt's claim in Kohler Valley.

2  Incidentally, I think it is quite related to the problem I

3  have been arguing here about Fallbrook's failure of proof.

4  That would be the next brief thing I would like to take up.

5  We do have evidence to put on in regard to Aguange.  And I

6  would like to have some direction in regard to Anza Valley

7  sometime today.

8      THE COURT:  All right, take a short recess.

9      (RECESS)

P 107

Tape
El

1    MR. STAHLMAN:  Your Honor, before we proceed, may I have

2  permission of the Court to withdraw certain exhibits lodged,

3  the F series, from -1 to -6.  They are all positives, and we

4  desire to have negatives made in order to present them to the

5  Court.

6    THE COURT:  You may withdraw them and return them.

7    MR. VEEDER:  Your Honor had directed that I write a brief

8  in opposition to Finding No. V of Mr. Oviatt's proposed finding,

9  and submit it to the record.

10    My conclusions bear out what I orginally said to your

11  Honor, that I wasn't attacking the fact that he had diverted

12  some water, but there was not proof of beneficial use, and in

13  going through the record again, I cannot find a real basis

14  for what he is claiming.  I will be glad to write a brief for

15  you, but my ultimate conclusion would be that it would be

16  impossible from the state of the record for you to make the

17  kind of an opinion that will be essential.

18    THE COURT:  You don't have to write a long brief.  You

19  don't have to write 32 pages, but if you would give me the

20  references to the transcript.  You say there is no evidence,

21  but if you will give me the pages where the witnesses started

22  and ended, and say that you have looked the record over and

23  find no evidence, or something to that effect, and then I could

24  pull out my copies of the transcript and find it.

25    MR. VEEDER:  My thought was that this is a matter where

P 108

1   rebuttal evidence might come in.  I have been talking to Mr.

2   Illingsworth, and he tells me that the project now is of far

3   greater dimensions than it was originally.

4   THE COURT:  What project?

5   MR. VEEDER:  The Kohler Canyon.

6   MR. STAHLMAN:  Are you talking about Kohler Canyon?

7   MR. VEEDER:  Yes.

8   MR. STAHLMAN:  That shows that there was a 2-inch pipe,

9   and now there is a larger pipe, but I don't think there is any

10   proof that there was larger than a 2-inch pipe within the

11   statutory period.

12   THE COURT:  That is what I wanted you to pull out from

13   the transcript.

14   MR. SACHSE:  I think from the state of the record, your

15   Honor, if your Honor would write a finding approving the present

16   diversion works, that would be serious and wrong, because the

17   present diversion works, -- according to the calculations you

18   made, Mr. Illingsworth, you get about how much?

19   MR. ILLINGSWORTH:  About sixteen inches.

20   MR. SACHSE:  About sixteen inches, whereas the appropria-

21   tion was for only 3½ inches, and the original works would only

22   feed that in.  I think that is what Mr. Veeder is getting at.

23   MR. VEEDER:  The reason that I say this is that I am

24   trying to write findings up and down these creeks, and so far

25   as I am concerned, where the evidence is of this character, I

P 109

1   don't see how the record can support it, and I wanted to discuss

2   it, as to what I should do.  Shall I take each one of these

3   and submit to you what appears to be the record, or what the

4   record will support, or should I put in evidence in rebuttal,

5   or how shall I go ahead with it?

6       MR. STAHLMAN:  I am concerned about that, too.

7       MR. VEEDER:  I am anxious for a direction, and that is

8   why I brought this particular thing up.

9       THE COURT:  Some of the findings you submitted, such as

10  on the stringers in the younger alluvial, there is not much

11  dispute between anybody.  You have a problem there, and you have

12  worked it out between yourselves, and I am satisfied.  But

13  when we get into these ranches, where there are these claims

14  of appropriations and rights, there is a contest, and somebody

15  is going to have to do the job of pulling the material out of

16  the transcript, and telling me what is there, and summarizing

17  it, plus proposing what kind of a finding should be made.  I

18  have all I can do to read these things.

19      MR. SACHSE:  Your Honor, I think Mr. Veeder is apprehensive.

20  This is almost the stipulation.  All he says is that he wants

21  a permit for $3\frac{1}{2}$ miner's inches, and if your Honor would give

22  him exactly what he wants, I would have no objection, that is,

23  if you said that his present works are inadequate, and that

24  all he has is a right to $3\frac{1}{2}$ miner's inches.

25      MR. STAHLMAN:  Will a 2-inch pipe carry $3\frac{1}{2}$ inches?

P 122

1   MR. SACHSE:  I don't know.

2   MR. STAHLMAN:  Then he would be limited by the 2-inch pipe.

3   MR. VEEDER:  That is the question I am asking about.

4   THE COURT:  I don't care who does the job.  If you don't want

5 to do it, somebody else will have to.

6   MR. VEEDER:  I will be glad to write it up for you, but

7 what I am trying to do is to chronicle these things, as I

8 understand the Court wants, as to each and every diversion,

9 and, as I understand, you want each and every single right

10 chronicled and you will enter findings to that effect.

11   THE COURT:  Where there isn't any dispute, and we have a

12 number of these diversions which are shown by the evidence --

13 we have the California Report, and on many of them there is

14 no dispute as to what they are, and there is no problem there.

15 I am talking about these areas where there are waters in issue,

16 such as the Witness Cottle set up, and Oviatt set up, and

17 several others of them.

18   MR. VEEDER:  I will undertake to write this up on the

19 basis on which it appears.  I can't agree that the record will

20 support the 3½ miner's inches.

21   THE COURT:  Mr. Stahlman had a suggestion, to limit it by --

22   MR. STAHLMAN:  The 2-inch diameter.

23   THE COURT:  -- whatever this pipe was that had been used

24 for years.

25   MR. STAHLMAN:  Take the 6-inch, and close it down to

15,088

P 123

1    2-inch.

2         MR. VEEDER:  I will go along on that basis.

3         THE COURT:  Have you a suggestion, Colonel?

4         COLONEL BOWEN:  You will to specify the head, your Honor.

5         THE COURT:  Yes.  If you have a 2-inch, and you had a

6    50-foot head, you could put a lot of water through it.

7         COLONEL BOWEN:  Yes sir.

8         MR. VEEDER:  That is the precise point.

9         THE COURT:  If you had a 2-inch pipe and a 1-inch head,

10   why, you would have something else again.

11        MR. SACHSE:  That is why I think the 3½ miner's inches is

12   so simple.  Mr. Bailey's testimony as Mr. Veeder showed it to

13   me this morning, isn't very satisfactory.  He said he measured

14   it, but he didn't say he measured it with a bucket or some

15   kind of weir, but he said he measured it, and so there is

16   something in the record for the 3½ inches, and so long as it

17   sticks to that, I don't care.  But I would like to have it

18   clearly specified as not more than 3½ inches.

19        MR. VEEDER:  It is strictly the precedent that comes out

20   of that that I am concerned about.

21        MR. STAHLMAN:  The other thing I would like to inquire

22   with respect to is the claim of the prescriptive right of

23   Oviatt.  Your Honor has indicated you did not think --

24        THE COURT:  What is that?

25        MR. STAHLMAN:  The prescriptive right of Oviatt.  Your

P 124

1    Honor indicated you did not think it would apply because it

2    was applied to riparian land, but I wondered if you wanted us

3    to do any work on that.  That was sort of left up in the air.

4        THE COURT:  I asked Mr. Girard to file a memorandum on

5    that, as well as the Kohler Canyon matter, and I asked Mr.

6    Veeder to do it, too.  If anybody else wants to do it, they

7    may.

8        MR. STAHLMAN:  I will work with them and help them.  I

9    have drawn some of the factual matters out of the record and

10   have the pages on it.

11       The other thing is this Knox land, the answer filed in

12   the Knox case last night, and there again there is a claim for

13   an appropriated right, and from what inquiry I can make, it

14   all appears to be on riparian land.

15       THE COURT:  We discussed some time ago about an order to

16   show cause to various of these people who had claimed appropri-

17   ations and prescriptive rights.  Now, what is the status of

18   that, Mr. Veeder?

19       MR. VEEDER:  An order to show cause has been prepared in

20   accordance with your direction, and you approved the form.

21       Now, as I mentioned, and Mr. Sachse did, I brought to your

22   attention the fact that I believe the State has put in an

23   exhibit showing the status of all filed appropriations, all

24   applications and all permits.

25       Now, if you want me to follow through and send those

P 125

1    people who are thus situated this order to show cause, I will.

2    If it is appropriate now, I will say that I think a procedure

3    that would contemplate sending to them suggested findings of

4    fact and conclusions of law might be more helpful, and I would

5    be willing --

6        THE COURT:  Could they be run together into one set of

7    findings?

8        MR. VEEDER:  I think they could be.  Is that what you

9    mean, and attach your order to show cause to the proposed

10   findings, and say if they disagree with them, they should come

11   in?

12       THE COURT:  Then let them show cause on a certain date.

13       MR. VEEDER:  Yes.

14       THE COURT:  How many different items would there be in

15   this one interlocutory finding?

16       MR. SACHSE:  Do I understand that -- I am not sure whether

17   I understand.  Are you suggesting, your Honor, that all of

18   these appropriated rights be lumped into a single finding?

19       THE COURT:  That is what he is talking about now.

20       MR. SACHSE:  Oh, I thought we were going about it by having

21   each one on each creek.

Tape .E2   22       MR. VEEDER:  That is what I thought we would do on those,

23   take those on Wilson Creek, and on Temecula Creek, on each

24   separate stream.

25       THE COURT:  On the stream system?

P 126

1     MR. VEEDER:  Yes.

2     THE COURT:  And then we are down to these particular

3 persons with the proposed findings, and an order to show cause

4 stating that if/is unhappy with the findings that he is to

5 appear.  Is that what you propose to do?

6     MR. VEEDER:  Yes.  Now, I will tell you further, your

7 Honor, what I would like to have directions on.  I have put

8 on the board, on the easel here, the geology in regard to the

9 Anza area, the Coahuila area, and the Aguanga area.

10    I thought you might designate the area which you think

11 is the ground water body in the Aguanga, in the Aguanga basin,

12 and we would notify those people that you have determined the

13 overlying line, and as to what their irrigable acreage is.

14 Then we could proceed that way, and then we would begin con-

15 centrating on these various areas outside the basement complex

16 and get something comparable to your proposals which you sent

17 out to other areas.

18    I think that is the best way to do it myself, that if you

19 would define what you think is the ground water body in Aguanga,

20 then we could eliminate -- we could contact those people that

21 had no objection to the irrigable acreage that we found, and

22 that would be done.  And if there was a contest, such as Gibbon

23 and Cottle and Oviatt and Stardust, and others, we would have

24 to handle those separately.

25    I would like to do the same thing with Anza, if that is

P 127

1     agreeable with your Honor, that is, if you designate the area

2     of their overlying rights, and then on the basis of our typed

3     information, we would know they would have to be contacted, and

4     we would send them a letter over your signature, telling them

5     what you considered their irrigable acreage to be, and they had

6     overlying rights to a part of the Santa Margarita River, if

7     that is your finding.  In other words, I would like to start

8     moving on these alluvial areas where you have indicated that

9     you consider them to be a part of the Santa Margarita River

10     system.

11         MR. SACHSE:  May I inquire?  I thought your Honor already

12     indicated on the Aguanga area that you were accepting what I

13     believe Mr. Kunkel's testimony was, and it included all of the

14     older alluvial, with the possible exception of this little

15     isolated island (indicating).

16         THE COURT:  We talked about it, but we didn't draw any

17     line or instruct the Colonel on it.

18         MR. SACHSE:  If that is the next order of business, I

19     am authorized by Mr. Krieger to state that he has no objection

20     to that delineation, and I have no opposition, and I have al-

21     ready said so for myself.

22         THE COURT:  Is that agreeable to you?

23         MR. VEEDER:  Yes, your Honor.  I would like to put on

24     some more evidence in regard to the Aguanga area.

25         THE COURT:  How much would there be?  Can you put it on

P 128  1   this afternoon?

2       MR. VEEDER:  Oh, yes.

3       MR. SACHSE:  There will be no cross examination.

4       MR. VEEDER:  I have some exhibits, and some clarification,

5   your Honor.  We have ground water contours on this right now

6   on Exhibit 275, as revised, with the ancillary exhibits that

7   will go with it.

8       I would also, although this is anticipating somewhat, I

9   would also put into evidence during this session, today or

10   tomorrow, in regard to the Anza, Terwilliger, and Coahuila

11   Valleys, which would wind up everything above.

Tape F
follows   12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 121

F 1

1  I will state it the other way.  There would then be left the

2  upper reaches of Temecula for geology.  Then we would be

3  through with the whole valley.  But those two maps that are

4  there we could put in evidence this afternoon.

5      MR. STAHLMAN:  Does that indicate that we are getting

6  pretty near the end of this case?

7      MR. VEEDER:  That indicates that we are just about at

8  the end of the evidence.

9      MR. SACHSE:  I am strongly in favor of Mr. Veeder's

10  suggestion.  I think it will go fast.

11      THE COURT:  Why not do that this afternoon?  Let's

12  adjourn now and take a look at this map over here.  We will

13  adjourn until two o'clock.

14      (NOON RECESS)

Tape G
follows

15

16

17

18

19

20

21

22

23

24

25

Tape G1

P 129

1  SAN DIEGO, CALIFORNIA, Wednesday, February 1, 1961, 2:00 P.M.

2     MR. VEEDER:  Your Honor, I was called by Robert E.

3  Atkinson in regard to the properties formerly owned by Anthony

4  Eberle, and now owned by Wtzke -- I guess that is the pronoun-

5  ciation, and he told me that he could not get to the hearing,

6  that the matter had just been brought to his attention by reason

7  of your letter, and I told him I sent him a copy of the complaint

8  and answer, and I told him to locate his property, and apparent-

9  ly some of the property is riparian.

10     I will notify him, if it is agreeable to your Honor, that

11  he will be notified by the next hearing whether his property

12  overlies the ground water, and we can have him at the next

13  hearing.

14     THE COURT:  All right.

15     MR. VEEDER:  May I call Mr. Kunkel, please?

16     THE COURT:  Yes.

17               FRED KUNKEL,

18  recalled as a witness on behalf of the United States, having

19  been previously duly sworn, testified further as follows:

20               DIRECT EXAMINATION

21  BY MR. VEEDER:

22     Q  Mr. Kunkel, I refer you to the exhibit marked 275,

23  which is on the easel, and which also has after the identifica-

24  tion 275 the word "Revised."  Would/state under whose direction
                                          you

25  that map was prepared?

P 130

1   A   Prepared by me or persons working under my direct
2   supervision.

3   Q   Would you step down to the exhibit and read into the
4   record the title block?

5   A   The title on Exhibit 275 is "Map of Lancaster, Nigger,
6   ~~Radec;~~   Aguanga and Wilson Valleys, Showing Geology, Location
7   of Wells and Springs, and Water Level Contours for Spring ,
8   1960."

9   Q   Would you state into the record how that differs from
10  the original Exhibit 275, concerning which you testified on
11  December 8th, as I recall.

12  A   275 and 275-Revised are identical, except 275-Revised
13  has been extended for two miles to the north or two townships
14  north of north latitude 3-30, and the block has been lowered
15  about one mile or one tier of sections.  This was done in
16  order to incorporate the entire areas of alluvium and older
17  alluvium shown on 275.  In addition --

18  Q   What do you mean:  Two sections have been lowered?
19  You used the term "townships."  Isn't it sections?

20  A   I am sorry, lowered a section.  We lowered the title
21  block, and extended the two sections to the north of the map.
22  In addition, water level contours have been added to the map,
23  and the central points have been indicated by a small number
24  next to the well, indicating the altitude of the water surface.

25  Q   Based upon your investigations, Mr. Kunkel, have you

P 131

1  an opinion as to whether there is a continuous ground water

2  body extending through the older and younger alluvium as depicted

3  on Exhibit 275?

4      A  In my opinion, there is a continuous ground water body

5  beneath the older and younger alluvium on Exhibit 275.

6      Q  As Revised?

7      A  As Revised.

8      MR. VEEDER:  We offer in evidence the exhibit marked for

9  identification 275, as revised.

10      THE COURT:  Do you have an exhibit 275-A?

11      THE WITNESS:  We do.

12      MR. VEEDER:  We do have 275-A and -B already.  The "A"

13  is a letter and the "B" is a tabulation of the names of the

14  owners on Wilson and on Temecula Creeks within the area de-

15  picted on the exhibit.

16      THE COURT:  Shall we substitute this for the old Exhibit

17  275?

18      MR. VEEDER:  If that is agreeable, I would do that.  I

19  withdraw the old Exhibit 275, and then substitute this.

20      THE COURT:  All right.  That will be the order.

21      MR. VEEDER:  I make the offer.

Take·H
follows.

22      THE COURT:  That will be the order.  It will be received

23  in evidence in lieu of old 275, and old 275 will be withdrawn.

24                          (Plaintiff's Exhibit 275 was received)
                            ( in evidence in lieu of Plaintiff's )
25                          (old Exhibit 275.                     )

P 132

1    MR. VEEDER:  Would you mark this for identification, Mr.

2  Clerk.

3    THE CLERK:  Plaintiff's Exhibit 275-C for identification

4  and 275-D for identification.

5  BY MR. VEEDER:

6    Q  I hand you, Mr. Kunkel, the tabulation marked 275-C

7  for identification and ask you to state into the record what

8  is contained in that tabulation.

9    A  Exhibit 275-C marked for identification is entitled

10  "Data on Water Wells in Lancaster, Nigger, Radec, Aguanga and

11  Wilson Valleys, California."  Exhibit 275-C is a tabulation

12  of well data for the wells shown on Exhibit 275.

13    Q  Was that data used in the preparation of 275?

14    A  Those are the data used in the preparation of Exhibit

15  275.

16    Q  Is that tabulation correct, to your personal knowledge?

17    A  To my personal knowledge, the tabulation is correct.

18    MR. VEEDER:  We offer in evidence Exhibit marked for

19  identification 275-C, your Honor.

20    THE COURT:  It is received.

21                    (Plaintiff's Exhibit 275-C was)
                      (received in evidence.        )
22

23    THE COURT:  Have you identified and offered 275-B?

24    MR. VEEDER:  I think it is in the record, your Honor.  I

25  am quite sure it is, both A and B.

      THE CLERK:  275-A was admitted on December 9th.  275-B,

15,099

P 133

1  however, is not in evidence.

2          MR. VEEDER:  I will make an offer of that in a moment.

3      Q  I have handed to you tabulation marked 275-D for

4  identification and ask you to state into the record what is

5  set forth on that tabulation.

6      A  275-D is entitled "Measurements of Water Level in

7  Lancaster, Nigger, Radec and Aguanga Valleys."  Exhibit 275-D

8  is a tabulation of wells, the measurements of water level, and

9  altitude of the measuring point above sea level and the calcu-

10 lated altitude of the water surface above sea level.  These

11 are the data that were used in the construction of the water

12 level contour maps on Exhibit 275.

13         MR. VEEDER:  We offer in evidence identification 275-D.

14         THE COURT:  275-D received.

15                            (Plaintiff's Exhibit 275-D was)
16                            (received in evidence.          )

17         THE COURT:  Did you offer 275-C?

18         MR. VEEDER:  Yes I did.  I thought I did.  275-C is offered,

19 your Honor.

20         THE COURT:  It is received.

21                            (Plaintiff's Exhibit 275-C was)
                              (received in evidence.          )

22         MR. VEEDER:  I have copies for counsel of these exhibits.

23     Q  Mr. Kunkel, alluding to the Exhibit 275-D, it is noted

24 that there are some areas, for example, in Section 9 Township

25 8 South Range 1 East, where there is an area of basement complex

P 133

1   protruding through the alluvium as shown on 275.  Would you

2   state whether you consider that to be part of the ground water

3   body?  I'll show you right here.

4       THE COURT:  Island of basement complex.

5       MR. VEEDER:  Basement complex.

6       THE COURT:  Surrounded by older and younger alluvium.

7       THE WITNESS:  The island of basement complex to which you

8   have alluded contains ground water in very minor quantities

9   and in cracks and fractures.  Except for that, it is not part

10  of any water body.

11      MR. VEEDER:  That will conclude our offer in regard to

12  the geology of Aguanga.

13      MR. SACHSE:  Just to clarify the record, what about the

14  island of older alluvium south that is surrounded by b.c.?

15      THE WITNESS:  Water contained in that is separated from

16  the main water body, except for very minor amounts in cracks

17  and fractures.

18      THE COURT:  Do you consider the water underground as part

19  of the stream system or not?

20      THE WITNESS:  It is always an embarrassing question for

21  me, your Honor.  I speak in terms of the hydrologist.  I don't

22  pretend to give a legal opinion.  As a hydrologist, the ground

23  water is part of the stream system.  I don't pose that as a

24  legal opinion.

25      THE COURT:  It is not in hydrologic contact with the water

P 134   1    shown in the younger and older alluvium to the north, is it?

2         THE WITNESS:  Except for the minor continuity between

3    cracks and fractures through the basement complex.

4         THE COURT:  And you are just guessing as to whether there

5    are cracks and fractures, too, are you not?

6         THE WITNESS:  On the basis of my experience, the cracks

7    and fractures are quite ubiquitous.

8         MR. VEEDER:  What does that mean?

9         THE COURT:  Everywhere.

10        MR. VEEDER:  Thank you.

11        THE COURT:  Then you haven't located any, but you would

12   think there were some there?

13        THE WITNESS:  In my opinion, there are some there.

14        MR. VEEDER:  You may cross examine.

15        MR. SACHSE:  I have no questions.

16        THE COURT:  You may step down.

17                                    (Witness excused.)

18        MR. VEEDER:  If we may go ahead, your Honor, I would like

19   to --

20        THE COURT:  Let's wind up 275-B while you are at it.

21        MR. VEEDER:  I will offer 275-B, which is the list of

22   parcels, your Honor.

23        THE COURT:  What is that tied into?  Where do these parcels

24   appear on the map?

25        MR. VEEDER:  They will appear on Exhibit 211-C, which is

15,102

P 135

1  the ownership map setting out the exterior boundaries of each

2  tract of land, and they will also appear on 211-B, as I recall,

3  which is the tabulation of legal descriptions.  So the overlay

4  is nothing more or less than the composite of that data.

5      THE COURT:  Tied in with 211-C and 211-B then?

6      MR. VEEDER:  That is correct.

7      THE COURT:  275-B received in evidence.

8                          (Plaintiff's Exhibit 275-B was)
                           (received in evidence.        )

9

10     MR. VEEDER:  Now your Honor, in regard to Anza and

11 Terwilliger Valleys we have gone ahead and prepared a map of

12 that area.

13     THE COURT:  Before you go into that, let me ask you this,

14 while we are on this Aguanga area.  Are you prepared to offer

15 the map and the tentative line that the Colonel has drawn, or

16 how do you want to handle that?

17     MR. VEEDER:  I didn't know how your Honor would desire to

18 proceed on that.  As far as I am concerned, I would like to do

19 it that way, and then we would terminate the whole thing in

20 regard to Aguanga.

21     THE COURT:  Let's do that.  Let's have the Colonel tell

22 us what he did and make some comparison of that and 275.  The

23 Colonel has it.

24     MR. VEEDER:  Which one do you want, your Honor?  I have

25 had them photographed and it was a little better copy.

   Would you step down for a moment.

15,103

P 136

1    THE COURT:  Let's see the two maps, which is the easiest

2    one to work from.

3    MR. VEEDER:  May we go off the record for a moment.

4    THE COURT:  Yes.

5    (The Court and counsel gather around two maps and discussion

6    is had off the record.)

7    THE COURT:  I think we would get more use of the colored

8    one.

9    THE CLERK:  277 for identification.

10    MR. VEEDER:  Would you mark it for identification?

11                              (The map referred to was marked)
                              (Plaintiff's Exhibit 277 for    )
12                              (identification.               )

13    MR. VEEDER:  I think we had better put it up.  May we go

14    back on the record now your Honor.

15    THE COURT:  Yes.

16    MR. VEEDER:  If you recall, the exhibit marked 276 was

17    your original line where you outlined the Murrieta end of this

18    area.

19    THE COURT:  As worked out by property lines and sections

20    by Colonel Bowen and generally approved by all of us.

21    MR. VEEDER:  That is correct.  This is a composite of it.

22    THE COURT:  You have used that map, plus carried the same

23    type of lining onto the exhibit.

24    MR. VEEDER:  With minor variations.  I think the Colonel

25    should testify in regard to them, so that there will be a

P 137  1  correlation between the original Exhibit 276 and this which we

2  are offering.  I would ask Colonel if he would step to the

3  easel, view 277 and state into the record the differences that

4  exist between that map 277 and 276 as originally offered in this

5  court.

6  COLONEL ALLEN C. BOWEN,

7  previously duly sworn, on his oath was examined and testified

8  further as follows:

9  DIRECT EXAMINATION

10  THE WITNESS:  Exhibit 277 for identification as presented

11  at the last hearing in this court comprised the quadrangles

12  westerly of Vail Lake and Sage quadrangle.  So that that

13  exhibit for identification has had added three published

14  quadrangles, namely, Sage quadrangle, Vail Lake quadrangle,

15  and Aguanga quadrangle, and an enlargement of a portion of an

16  advanced sheet put out by the U.S.G.S. on an enlarged scale

17  one to 24,000 to conform with the rest of the map, the whole

18  map being a compilation of quadrangles of the 7½ minute series

19  U.S. Geologic Survey.

20  MR. VEEDER:  Colonel, you used the term 277.  You meant

21  276, as we originally used; isn't that correct?

22  THE WITNESS:  Yes sir, if that was the number put on it.

23  MR. VEEDER:  That is correct.

24  THE WITNESS:  276.

25  MR. VEEDER:  We are talking about the previous hearing.

P. 138

1    Before we get too far away from the 276 in the record I wanted

2    to straighten that out.

3         THE WITNESS:   That is correct.

4         Then on 276 as presented at the last hearing some changes

5    have been made in the perimeter of the ground water basin.

6    The major change appears within the Pauba Grant, a portion of

7    the Vail Ranch.   The line follows an unimproved road out past

8    Adobe Springs and on to this intersection with the Pauba Grant

9    line.  We have a written description of this entire line tied

10   into legal subdivisions.

11        THE COURT:   You mean the entire line as shown on 277?

12        THE WITNESS:   Yes sir.  Formerly or on 276 that line, that

13   is, the perimeter of the ground water basin line, followed the

14   unimproved road down to the Temecula Valley and then followed

15   generally the contact between the basement complex and the

16   younger alluvium up to Nigger Canyon.   In     view of the

17   geology as shown on Plaintiff's Exhibit 275, with the older

18   and younger alluvium extending easterly of that shown on 276

19   and being continuous on up to Aguanga Valley and the Wilson

20   Valley or Lancaster Valley, the line was revised to follow the

21   Pauba Grant line out to the extreme northeasterly corner and

22   then follow a described legal subdivision including the major-

23   ity of the area depicted as younger and older alluvium on 275.

24   Similarly, where the ground water basin line appeared on 276

25   as coming down to the old Warner Springs Road to State Highway

P 139

1   171, following State Highway 171 to an unimproved road, then

2   dropping southwesterly to the Pauba Grant line, that has now

3   been delineated from 277 and comes along the Pauba Grant line

4   to a point within the Vail Lake California quadrangle, and then

5   follows a described legal boundary again to encompass a major-

6   ity of the area depicted as older and younger alluvium on 275.

7   Then one other minor change of 276 shows some offset from

8   the Santa Rosa Grant line up in the vicinity of Lots 48 and 49

9   as shown lying southwesterly of the town of Murrieta.   That

10  perimeter of the ground water basin has now been brought along

11  the Santa Rosa Grant line as it borders those two lines.

12  Those changes from 276 and the addition of this material

13  on up to Aguanga Valley combined make 277, your Honor.

14  THE COURT:  And pursuant to the same instructions I gave

15  to you with reference to 276, in trying to mark out this area

16  now included on 277 of a ground water plane or basin, you have

17  attempted to follow roads and property lines and legal descrip-

18  tions in order to give some sort of line that could be described?

19  THE WITNESS:  Yes, your Honor.

20  THE COURT:  And as a result there are areas where there

21  are actually included small amounts of basement complex, and

22  there are other areas, I take it, where, as for instance on

23  the Vail line, a small area of older alluvium has been put on

24  the other side of the line.

25  THE WITNESS:  That is correct, your Honor.

P 140

1    MR. VEEDER:  I would like to reserve Exhibit 277-A for

2  the typewritten tabulation of the exterior boundaries of this

3  entire area, your Honor.

4    THE COURT:  That will take the place of what we talked

5  about as the tabulation on the earlier map?

6    MR. VEEDER:  Yes sir.

7    THE COURT:  Just have one?

8    MR. VEEDER:  Yes.

9    THE COURT:  277-A will be reserved as the legal descrip-

10  tion of this line surrounding the ground water bodies.

11    MR. VEEDER:  I offer in evidence 277 your Honor.

12    THE COURT:  277 received in evidence.

13                        (Plaintiff's Exhibit 277 was)
                          (received in evidence.        )
14

15    THE COURT: Any counsel have any real objection to the

16  fact that we have played a little fast and loose with actual

17  demarkation between basement complex and older alluvium?

18    MR. SACHSE:  No, your Honor, and Mr. Krieger authorized

19  me to advise your Honor that the line which he assumed would

20  be drawn, based on comments at the last session in December,

21  will be entirely satisfactory.

22    MR. VEEDER:  The United States has no objection.

23    THE COURT:  And you are content with this?  This is what

24  you would like to have me do.

25    MR. VEEDER:  I spent two years to get it, your Honor.

P 141

Tape I-L1

1     If I may have Colonel Bowen read into the record the

2     title block up there and the legend.

3         We didn't do that, Colonel.  Will you do that now.

4         THE WITNESS:  We have a title block out here on this map.

5     The legend, however, as it appears on Plaintiff's Exhibit 277,

6     describes the character of the line views and the various

7     delineations.  It shows the perimeter of the Pauba, Murrieta

8     and the Aguanga Basin, being a dashed line with three slanted

9     dots which is in black.

10        The Santa Margarita watershed line is shown as a black

11    line with a long and short dash alternating.  That appears

12    in the upper lefthand corner of Exhibit 277, where the Santa

13    Margarita watershed line traverses the land between the

14    Murrieta and the Elsinore Valleys.

15        The legend also shows a solid heavy black line, which is

16    the delineation between the upper and lower Temecula Creek.

17    That is based on the drainage into Temecula Creek above and

18    below Vail Dam, and it shows on 277.  That black line con-

19    verges on Vail Dam.  To the right or easterly of the black

20    line surface waters drain into Vail Lake, and to the left or

21    westerly of the black line drain into below Vail Lake.

22        Referring again to the legend on Exhibit 277, a dashed

23    red line is shown, and that is the watershed boundary between

24    Wilson and Temecula Creek.  Looking at 277, easterly of Vail

25    Lake you see the dashed red line traversing the ridge, and

P 142

1   indicating the divide of the watershed between Wilson Creek

2   to the north and Temecula Creek to the south.

3       Below that red line on the legend of Exhibit 277 appears

4   a diamond cross hatched symbol, which indicates the public

5   domain.   This is the same symbol that has been used throughout

6   all Plaintiff's exhibits depicting land owners.   The largest

7   area of public domain on 277 lies easterly of Vail Lake, and

8   between Lancaster Valley and Aguanga Valley.

9       The legend shows a wavy slanted line, which depicts the

10  National Forest, and the largest area of National Forest is a

11  part of the Cleveland National Forest, Palomar Division, which

12  appears in the lower portion of 277.   That symbol is also the

13  same as used on all ownership maps put in by the plaintiff.

14      The final symbol in the legend is a horizontal hatching

15  which indicates the indian reservation, and the largest appear-

16  ing on 277 is the Pechanga Indian Reservation, which lies

17  south of Vail Ranch, the bulk of it in one portion, with a

18  smaller portion westerly of the large one, and adjoining the

19  Earl Stanley Gardner property, which lies to the northwest.

20      THE COURT:  Parcel 11 is the Gardner property?

21      THE WITNESS:  Yes sir.

22      THE COURT:  And he owns property outside of the line or

23  inside of the line?

24      THE WITNESS:  No, your Honor, I am in error.  Parcel 11

25  is the Querry property.

P 143

1      The Gardner property lies southeast of the smaller part

2   of Pechanga Indian Reservation, and Plaintiff's Exhibit 277

3   has the parcel number 31 encircled.

4      MR. STAHLMAN:  Isn't Gardner's place back in here somewhere

5   (indicating)?

6      THE WITNESS:  His home place is shown by a cluster indica-

7   ting "buildings."

8      THE COURT:  In Parcel 31?

9      THE WITNESS:  In Parcel 31.

10      MR. VEEDER:  You mean the ground water body?

11      MR. STAHLMAN:  The body, yes.  In other words, all of this

12   is out.

13      THE COURT:  Has Mr. Stahlman or anyone else talked to Mr.

14   Gardner about this trial?  Does he know anything about it?

15      MR. STAHLMAN:  No, I haven't.

16      THE COURT:  Because he is probably in an area there which

17   is adverse, back of the house there.  I wondered how he would

18   feel about it.

19      Of course, you can't keep drawing these maps to suit

20   everybody.

21      MR. STAHLMAN:  When do you intend to get around to the

22   findings on this?

23      THE COURT:  Well, tentatively I am going to approve the

24   job that the Colonel has done.  I think he has done a very

25   good job.

P 144

1      MR. STAHLMAN:  I think so, too.

2      THE COURT:  We can't take into account everybody's

3  particular place, but the lines are shown, and we have done

4  it as well as we can.

5      MR. SACHSE:  Your Honor, I have one question.  I don't

6  know what the Colonel says on this, but now that we have put

7  both Murrieta and the Upper Temecula on the same exhibits, is

8  there any danger that we aren't making it sufficiently clear

9  as to who is correlative with whom?

10      In other words, I see this black line in the middle and

11  the legend says that is the delineation between Upper and Lower

12  Temecula Creek.  Does that have significance as to the ground

13  water body, and as to who would be correlative to whom?

14      THE COURT:  The line is revised, isn't it?

15      THE WITNESS:  That is correct, your Honor.

16      THE COURT:  Let's so mark it.  Could we get some testi-

17  mony in the record that we had off the record that the movement

18  of the water underground is apparently the same as on the

19  surface?

20      MR. VEEDER:  I was going to ask Mr. Kunkel that when he

21  got on the stand, after this has been introduced, to complete

22  the testimony as to the continuity of the body throughout the

23  whole valley.

24      THE COURT:  Does that solve your problem?

25      MR. SACHSE:  Yes.  It is not so much a problem, but we

P 145

ought to be clear if a land owner -- if Pauba Ranch would
exercise its correlative right over this ground water body
against something in Radec, or if it would exercise it only
on areas westerly of the surface divide.

THE COURT:  Let's take some testimony on that.

Any questions of Colonel Bowen on what he has done on
Exhibit 277?

(No response.)

THE COURT:  While you are here, Colonel, do you have
an opinion as to the movement of underground water in connection
with that surface divide between the eastern water body and
the western water body?

COLONEL BOWEN:  No sir, I have not formed an opinion on
that phenomena.

MR. VEEDER:  I have no further questions on the point.

(Witness excused.)

MR. VEEDER:  Should we call Mr. Kunkel now on this?

THE COURT:  You may call him, yes.

MR. VEEDER:  Would you take the stand, Mr. Kunkel?

FRED KUNKEL,

resumed the stand, and having been previously duly sworn,
testified further as follows:

DIRECT EXAMINATION (continued)

BY MR. VEEDER:

Q  Have you an opinion, Mr. Kunkel, as to whether there is

Tape I-2

P 146

1   a continuous ground water body extending from the most easterly

2   point in the Aguanga Valley, which is within the line drawn

3   by Colonel Bowen, and the farthestmost point in the north and

4   western part of Murrieta Valley, all of which are encompassed

5   within the single line?

6       A   Within the alluvium deposits encompassed within the

7   single line, which were referred to on Exhibit 277, there is

8   a continuous body from ground water in the alluvial deposits.

9       Q   Would you state whether you have an opinion whether all of

10  that body, that ground water body, is a part of the Santa

11  Margarita River system?

12      A   In my opinion, all of that ground water is a part of

13  the Santa Margarita River system.

14      Q   Would you state whether you have an opinion as to the

15  progression of ground water?  Would you step down to  Exhibit

16  277, please?

17      (Witness complies.)

18      Q   May I start again on that question.  Referring to the

19  red designation of the surface divide placed on Exhibit 277

20  by the Court, would you state whether you have an opinion as

21  to the course taken by the ground waters within the over-all

22  ground water body depicted on Exhibit 277?

23      A   The data are very limited.  However, on the basis of

24  the Federal data that are available, it is my opinion that

25  there is also a ground water divide that very closely

P 147

1  approximates the surface divide in the area of Oak Mountain

2  south through the alluvial deposits.

3    Q   To be more specific, will you locate Dripping Springs,

4  and state what is your opinion of the course of ground waters

5  underlying the general vicinity of those Springs?

6    A   In the area where Dripping Springs is located --

7    Q   First you had better identify where Dripping Springs

8  is, just for the record.

9    A   Dripping Springs is located on the Vail Lake quadrangle

10  south of Vail Lake, and, in my opinion, the movement of water

11  is from Dripping Springs northeast toward Vail Lake.

12    THE COURT:  So that on this underground divide, which

13  you say would appear to closely approximate the surface divide,

14  the movement of ground water as related to that is to the east

15  and to the north towards Vail Lake?

16    THE WITNESS:  That is correct.

17    THE COURT:  While on the west side of the underground

18  divide the water movement would be to the north and to the

19  west, in the direction, say, of Pauba Valley and Temecula?

20    THE WITNESS:  That is correct.

21    MR. VEEDER:  Is that satisfactory, your Honor?

22    THE COURT:  Yes.  Any questions on that?

23    MR. SACHSE:  I have no questions of the witness.  I would

24  appreciate it, and I don't know, but is it Mr. Veeder's idea

25  -- well, what I want to know is, what is the conclusion of

P 148

1    law?

2        THE COURT:   I am prepared to find in accordance with Mr.

3    Kunkel's testimony, and to conclude that there would be no

4    correlative rights --

5        MR. SACHSE:   Across the divide?

6        THE COURT:   Across the underground divide, that those

7    persons lying east of that underground divide would have

8    correlative rights, but that those persons lying west and

9    northerly would have correlative rights among themselves, but

10   that there was no interplay between them.

11       MR. SACHSE:   That was my question, if we had to take

12   Temecula and Murrieta correlatively, and whether we would have

13   to go up to Aguanga at the same time.

14       THE COURT:   Of course, the statement is really too broad

15   that I made, because you could have a situation where the

16   entrance between the two water bodies in the area where Vail

17   Dam is -- well, you could conceivably have a situation where

18   the excessive use made in the Aguanga area to the east would

19   be such that it would have an effect on ground stream riparians.

20   It isn't likely but --

21       MR. SACHSE:   Of course, the whole question is going to be

22   solved by your deciding whether we are going to treat these

23   areas as a part of the stream or as a ground water basin.   It

24   is around that that the legal significance is going to become

25   significant.   If it is a part of the stream, I don't see that

P 149

1  there is any problem, but if we treat them as basins, I think

2  there is a serious problem, because if it is all one basin,

3  theoretically a Murrieta extractor would argue on extractions

4  over here (Indicating), and would say it would affect him if

5  it is all one basin.  If it is all a part of the stream, that

6  isn't going to arise.

7      MR. VEEDER:  May I express this thought, that I think

8  that the proposed findings of fact and conclusions of law

9  would point up the real issues that your Honor has been cover-

10  ing, and that Mr. Sachse has been raising.

11      THE COURT:  Well, isn't the concensus that we are going

12  to treat the underground water bodies as parts of the stream,

13  and not necessarily as basins?  Isn't that the thinking of

14  most of us?

15      MR. SACHSE:  That is mine.

16      MR. VEEDER:  I have been looking at the law, and I think

17  we had better brief it.

18      THE COURT:  I don't know what the real difference would

19  be.  If you are part of the stream system, then there are

20  correlative rights on the stream which would include all of

21  the water rights on the stream.  What distinction do you make,

22  if you call them basins?  You have said it before, I know, but

23  I have forgotten.

24      MR. SACHSE:  It is a distinction without a difference,

25  probably, but if the land owners are over the one basin body,

P 150

1   then the mental picture you create is a uniform body, and where

2   you take it out here (indicating), it has an effect over here

3   (indicating).  It is like a bathtub or a tank, and their rights

4   within that basin are correlative one to the other, and no

5   matter how far away you are one side or the other, your rights

6   are correlative, and your extractions may be regulated to

7   control one or theoother side of the basin.  That is your basic

8   problem.

9       If you treat it as a stream, you don't have to do that,

10  because we have two different streams.  We have one running

11  over here (indicating) and one over here, and the man on

12  Murrieta isn't going to complain and can't complain on a stream

13  theory on an extraction from the Temecula.

14      THE COURT:  As a matter of fact, and what we have seen

15  of these lines showing water levels, instead of having actually

16  a bathtub situation, where you would ordinarily have one water

17  level, don't we come closer to having a part of a stream system?

18      MR. SACHSE:  I believe so.

19      THE COURT:  With varying water levels.

20      MR. VEEDER:  I have been reading the cases since I have

21  heard the comments by Mr. Girard and Mr. Sachse about this

22  being an underground stream, and I have difficulty in compre-

23  hending what they recommend.

24      The reason I have tendered the thought that we treat it

25  as a basin is that it involves extractions from lands which are

P 151

1 not underlying. As I understand the California law, you can't

2 export water over non-overlying land, and that is why I

3 tendered the thought that we had better organize our findings

4 and conclusions of law, and tender it to you, and argue the

5 matter out, because I think it is important, and I think the

6 matters that Mr. O'Malley brought to our attention pretty

7 forcefully directs our attention to the fact that if we don't

8 get our law and facts straight --

9       THE COURT: We have problems enough in this watershed

10 without throwing together as having correlative rights people

11 on the upper reaches of the Temecula with people on the Murrieta.

12 If they are two streams, those people north of Vail Dam are

13 not going to be concerned with what happens up in the northwest

14 corner of the Murrieta, nor are the people in the northwest

15 corner of the Murrieta going to be concerned with what people

16 are doing upstream of Vail Dam on the Temecula. It is true

17 when you get down --

18       MR. VEEDER: Where we are.

19       THE COURT: -- down to Pauba Valley, you do have a little

20 different situation, but you at least automatically terminate

21 a lot of uses, because certain of these people should not be

22 considered to have correlative rights on two different streams.

23       MR. VEEDER: I would think the physical situation would

24 probably eliminate that, your Honor, as a matter of natural

25 physical facts, because I don't think you can put them together

P 152

Tape J

1    with people up here (indicating). I don't think that is

2    conceivable. But the Unites States is sitting down at the

3    end of the line --

4        THE COURT: There is no doubt about that. You, being a

5    downstream riparian, are concerned with what all upstream

6    riparians do.

7        MR. VEEDER: That is correct. I had thought of the

8    possibility --

9        THE COURT: Maybe we had better look into it further

10   before we jump into something.

11       MR. STAHLMAN: I think we had better, because we are

12   oversimplifying the situation here, the distinction between

13   basins which are part of the stream system and those which

14   are not, and the fact that we have two different types of

15   material which we are combining into one basin -- it is going

16   to present problems. I think we should go into it before we

17   leave and set another date.

18       THE COURT: Let's decide what we are going to do about

19   this, that is, decide who is going to do the work on it and

20   what kind of work they are going to do, and let's try to make

21   the decision that would be one that would lead to as little

22   conflict as possible and not one that would lead to as much

23   conflict as possible between the various owners.

24       MR. STAHLMAN: I was just wondering, as a suggestion, if

25   it wouldn't be well, if we are interested in it, couldn't Mr.

P 153

1   Veeder, Mr. Sachse, Mr. Girard, myself and Mr. Krieger, if

2   you desire, to sit down and all hash this out a little and

3   give our views each to the other.

4       THE COURT:  You are not prepared to do that this afternoon

5   after we adjourn?

6       MR. STAHLMAN:  I have a party meeting me here at 4:30,

7   your Honor, on a very important matter I have in a Superior

8   Court, some affidavits in connection with a motion.  I think

9   Mr. Girard should be here when we do that, as well as maybe

10  notifying Mr. Krieger.

11      THE COURT:  If you have any extra time -- I am not going

12  that late this afternoon -- if you have any extra time this

13  evening or tomorrow morning, do a little looking into it and

14  maybe when Mr. Girard is here tomorrow you can confer on it

15  and make some decision before we leave here when we will bring

16  it up again and what to do about it.  Is that agreeable?

17      MR. VEEDER:  I think it is desirable, your Honor.  I

18  think we should get as much understanding and agreement on

19  findings in this area and as to what your legal conclusions

20  are going to be as we can.

21      I would like to go ahead with Anza , as far as we can.

22      THE COURT:  All right.

23      MR. VEEDER:  The ten day requirement has not been met,

24  but if anyone has any objections let him speak now.

25      THE COURT:  I hear none.  Go ahead.  What is the number

P 154

1   of your map up there, Mr. Kunkel?

2       MR. VEEDER:  It has not been marked yet.

3       MR. KUNKEL:  I presume it will be 278.

4       MR. VEEDER:  Would you mark this for identification as

5   278.  I think that would be the next number.

6       THE COURT:  Colonel, if you want to withdraw 277 for the

7   purpose of your description, you may do so.

8       COLONEL BOWEN:  Thank you sir.

9       MR. VEEDER:  Mr. Clerk, would you put 278 on the easel.

10  And this is for the Court.

11                       (Plaintiff's Exhibit 278 was marked)

12                       (for identification.       )

13                   FRED KUNKEL,

14  recalled as a witness for the plaintiff, having previously

15  been duly sworn, on his oath was examined and testified further

16  as follows:

17             DIRECT EXAMINATION (resumed)

18  BY MR. VEEDER:

19       Q  Mr. Kunkel, I refer to the map on the easel which has

20  been marked for identification Plaintiff's Exhibit 278 and

21  ask you to state into the record who prepared that exhibit or

22  under whose direction it was prepared.

23       A  Exhibit 278 was prepared by myself or persons working

24  under my direct supervision.

25       Q  Would you step down to the easel and read into the

    record the title block, or if you have a copy of it read it

P 155

1   into the record from there.

2        A   Exhibit 278 has no title block.   Exhibit 278 is the

3   actual office sheet prepared on an advance blue line print of

4   a topographic map that is not yet published.   The quadrangles

5   will be the Hemet and Idylwild quadrangles when published.   The

6   quadrangles will ultimately be published at a one to 62,500

7   scale.   Exhibit 278 is at a scale of one to 48,000.   However,

8   in order that Exhibit 278 may ultimately be compared directly

9   scale-wise with 15, 275 and other geologic maps submitted, we

10  will prepare 278 at the enlarged scale.

11       MR. VEEDER:   Will you mark this as 278-A.

12                              (The document referred to was marked)
                                (Plaintiff's Exhibit 278-A for           )
13                              (identification.                         )

14       THE WITNESS:   There is also no legend on the map at the

15  present time.   However, the colors and symbology are the same

16  as those used in the 15 series:   Blue being basement complex,

17  yellow being younger alluvium, and orange being older conti-

18  nental deposits.

19       MR. VEEDER:   I hand you identification 278-A.   Do you have

20  additional copies of that?

21       THE WITNESS:   Exhibit 278-A is a mimeographed tabulation

22  entitled "Data on Water Wells in Coahuila, Anza and Terwilliger

23  Valleys, California."

24  BY MR. VEEDER:

25       Q   Were those used in conjunction with the preparation

P 156

1  of 278?

2       A  The wells for which the data are tabulated on 278-A

3  are the wells shown on Exhibit 278.

4       Q  Now, would you state into the record whether the areas

5  of younger and older alluvium as depicted on 278 are accurate,

6  to your personal knowledge?

7       A  To my personal knowledge, the extent of the alluvial

8  deposits, basement complex and residuum as shown on 278 are

9  accurate.

10      Q  Have you an opinion as to the continuity of the ground

11  water body extending from the northeasterly portion of the

12  older alluvium on down to the Coahuila Valley area?

13      A  There is a continuous progression of ground water in

14  the alluvial deposits from the Ramona Indian Reservation on

15  the northern edge of the map to the lowest part of the Coahuila

16  Valley on the southwest edge of the map.

17      Q  Is the data set forth on 278-A accurate, to your

18  personal knowledge?

19      A  To my personal knowledge, 278-A is accurate.

20      MR. VEEDER:  We offer in evidence the exhibits marked

21  for identification United States Plaintiff's Exhibits 278 and

22  278-A.

23      THE COURT:  278 and 278-A received in evidence.

24                      (The maps above referred to were      )
                        (received in evidence as Plaintiff's )
25                      (Exhibits 278 and 278-A.              )

P 157

BY MR. VEEDER:

Q  Would you step down to the exhibit and point out the fault areas and any other physical phenomena that are shown up on 278?

A  The principal fault shown on Exhibit 278 is the San Jacinto fault running in a northwesterly direction approximately from the word "Trail" in Section 28 Township 7 South Range 4 East, northwesterly toward the Ramona Indian Reservation. It is a solid black line.

There is a small sliver or fault or splinter north of Burnt Valley.

There are also several general east west faults south of the Coahuila Valley at Range 2 East.

And there is also a fault in the basement complex north of Coahuila Valley.

MR. VEEDER:  Your Honor, you have indicated that you might not run to 4:30.  We have some slides in regard to this Coahuila area that I would like to introduce at this time, but I will conform, of course, to your Honor's desires about time. We have the slide machine and the screen, which I don't think would take more than half an hour, and that would conclude this phase of the evidence in regard to Anza and Terwilliger.

THE COURT:  I will be glad to see them, but is there any dispute about these fault lines and what effect they have on this matter?

P 158

1    MR. VEEDER:  George asked me about the fault lines.

2    MR. STAHLMAN:  You mean you are showing the pictures

3    because I asked you about it?

4    MR. VEEDER:  No, you were talking about the fault lines.

5    This is something entirely different.

6    THE COURT:  What are the pictures about?

7    MR. VEEDER:  Let me straighten this out.  George asked me

8    about the faults.  That is why I called the witness down.

9    No conflict -- none.

10    THE COURT:  What are the pictures about?

11    MR. VEEDER:  The pictures show the valley up through the

12    indian reservation and the area which is the actual source of

13    water coming down Coahuila Creek.  If you are not interested

14    in them, your Honor, we will not offer them.  But they may be

15    of importance in the record.

16    THE COURT:  If they are important, we can see them.  How

17    long will it take to show them?

18    MR. VEEDER:  How long Mr. Kunkel?

19    MR. KUNKEL:  Fifteen or twenty minutes.  I can run through

20    them very rapidly.

21    THE COURT:  Let's see them now.

22    (The projection machine was set up.)

23    THE COURT:  Do you want to mark the slides as exhibits?

24    MR. VEEDER:  I would like to have them marked Exhibit

25    279.

P 159

1    How many are there?

2    THE WITNESS:  We have identified them as part of the 58

3    series.  They are a continuous series.

4    THE COURT:  What series?

5    THE WITNESS:  58-74.

6    THE CLERK:  Start at 64.

7    THE WITNESS:  58-64 through 58-83.

8    THE COURT:  You have them already marked?

9    THE WITNESS:  They are all marked.

10   THE COURT:  They are marked already?

11   THE WITNESS:  Yes.

12   THE COURT:  All right, they will be part of Exhibit 58,

13   being 58-64 through 58-83.  Is that right?

14   THE WITNESS:  That is correct.

15   THE COURT:  They are received in evidence.

16                       (The slides above referred to were marked)
                         (and received in evidence as Plaintiff's )
17                       (Exhibits 58-64 through 58-83.           )

18   THE COURT:  Can everybody see?  How about the lights?

19   Shall we have them turned down?  Maybe we can see them without

20   that.

21   (At this point the slides were shown.)
                           is
22   THE WITNESS:  This a shot looking northwesterly up the

23   lower end of Anza Valley looking up the slot toward the main

24   part of the valley.  On both sides of the green area are the

25   outcrops of basement complex and the thin stringer of alluvium

P 160

1   and the pasture lands supported by shallow water table.  That

2   is 58-64.

3   The next slide is 58-65.  This is the same picture with

4   a close-up lens .

5   MR. VEEDER:  Is this on the indian reservation now?

6   THE WITNESS:  This is now on the indian reservation.

7   MR. VEEDER:  That is the Coahuila Indian Reservation?

8   THE WITNESS:  That is the Coahuila Indian Reservation.

9   The next slide is number 66.  We have moved further up

10   the valley.  We are still looking in a general northwesterly

11   direction.  We are actually standing on the indian reservation,

12   but we are looking northeasterly to lands that are not on the

13   indian reservation.  The outcrops of basement complex on both

14   sides, the outlet can be seen, and the green growth of grass,

15   in large part salt grass, supported by shallow water table.

16   MR. VEEDER:  Where is the outlet you mentioned?

17   THE WITNESS:  The outlet is between the outcrop of base-

18   ment complex, which are the brown slopes, and the flat norther-

19   ly slope of the alluvium through which the ground water moves

20   downstream, and it is also the area over which the surface

21   stream flows.

22   The next slide is 67.  In general, it is the same picture,

23   just slightly to the north.  The actual main thread of the

24   stream can be seen flowing across the alluvial plane.  The

25   south side of the valley, the outcrops of basement complex can

P 161

1    be observed.

2         MR. STAHLMAN:  Where does this stream flow?

3         THE WITNESS:  The stream at the present time is dry.

4         MR. STAHLMAN:  That's all right.

5         THE WITNESS:  However, the portion of the stream down

6    through the center of the alluvial plane is indicated by a

7    shallow trench.

8         The next slide is 68.  The same general area, just slight-

9    ly more to the north.  Irrigated fields can be seen to the

10   left edge of the picture.

11        The next slide is number 69.  These are slightly darker.

12   I had changed to a different roll of film with a different

13   light speed and they are slightly underexposed.  This is

14   looking almost due -- well, it is a little bit north of east

15   looking across the valley toward the east, toward the San

16   Jacinto fault in the San Jacinto Mountains, toward the irri-

17   gated fields in Coahuila Valley or in Anza Valley, which can

18   be observed.

19        The next slide is number 70.  We have now changed our

20   position to Section 28 Township 7 South due south of Anza

21   about a mile and a quarter.  We are on a hilltop looking in a

22   westerly direction now across the outlet of Anza Valley.  The

23   restrictive outlet can be observed in the left side of the

24   picture.

25        Number 71, please.  The following sequence of pictures

P 162

1   now is a panorama facing in a westerly direction, moving clear

2   across the horizon toward the east.  We are looking due north

3   now, very close to due north, across the main part of the

4   valley, and the irrigated fields can be observed.

5       The next slide is 72.  The town of Anza can be observed

6   in about the central part of the picture.  The main alluvial

7   plane is the flat brown area, except where the green irrigated

8   fields can be observed.  The road running through the picture

9   is running due north and south and it is the main road into

10  Anza from the south.

11      The next slide is 73.  We are now looking a little bit

12  to the east of Anza.  The same road can be observed.  The rocks

13  in the foreground are part of the area, mapped as basement

14  complex.  The mountains in the distance are basement complex.

15  The flat area inbetween is the alluvial plane on which the

16  agriculture takes place and virtually all the wells have been

17  drilled.  Irrigated fields again can be observed.

18      Number 74, please.  We are now looking in a northeasterly

19  direction across the main part of Anza Valley.  The basement

20  complex again in the foreground, the flat area is the alluvium,

21  and the mountains in the distance again are basement complex.

22      MR. STAHLMAN:  Are those all rocks in front there?

23      THE WITNESS:  Those are all rocks in front there, and on

24  Exhibit 278 that area is mapped as basement complex.

25      Next slide, please.  Slide 75 is actually looking up

P 163

1    Coahuila.  The road in the distance is not too clear, but the

2    road goes out and over the mountains to the east.  We are

3    looking across the flat alluvial plane of Anza Valley and the

4    outline of the fields can be seen.  Incidentally, these pictures

5    were taken a few days after Thanksgiving in 1960 and the fields

6    were brown, had either been cut or frosted and there was no

7    irrigation at that time, although the fields themselves are,

8    in large part, irrigated during the summer.

9          Next slide, please.  Slide 76 is almost looking due east

10   across the alluvium going south into Terwilliger Valley as

11   shown on Exhibit 278.  The alluvium is quite narrow.  Much of

12   the area that is actually cleared in the picture, the central

13   part of the picture to the right, is an area underlain by

14   residuum.  On first inspection it appears to be very similar

15   to an older alluvium, as it is in the areas shown on Exhibit

16   15E.  However, detailed mapping indicates that it is a weathered

17   residuum and the actual alluvium in this area is very restricted

18   in width and extends to the right or to the south out of the

19   picture.

20         Next slide, please.  This is slide 77.  This is looking

21   slightly south and east up the extension of Terwilliger Valley

22   toward the crest of the watershed.  The low rise in the right

23   central part of the picture is actually the watershed divide.

24   The ground water moves from the crest of the watershed in a

25   left or northwesterly direction into the main part of Anza

P 164

1  Valley.  The fields are all barren.  They are grazed.  There

2  is no intensive cultivation of the fields.  It is part of the

3  indian reservation and it is largely residuum on the low slopes

4  rather than alluvium.  The alluvium is restricted to the central

5  part of the cleared area.

6  Slide 78 please.  Slide 78 and the following slides will

7  be the same series of pictures again with a telephoto lens

8  that will bring things up a little closer but not quite as

9  wide a field.  The very central part of that picture there is

10  a little ditch can be seen with a little spot of reflected

11  light.  That is standing water.  It may be either irrigation

12  return or it may be natural ground water.  However, this area,

13  under natural conditions, was one of rising ground water.  Salt

14  grass is still very common from the point where the water can

15  be seen on downstream the full length of Coahuila Creek all

16  the way down to the bedrock in Section 31 Township 7 South

17  Range 2 East.

18  Next slide please.  Slide 79.  Again, the irrigated fields.

19  The shot is generally northwesterly across the main part of

20  the valley.

21  Number 80.  Slide 80 is looking about northwest across

22  the main part of the valley up across Section 8 Township 7

23  South Range 3 East.  The brown fields in the distance are not

24  cultivated.  The greener fields in the foreground are cultiva-

25  ted and irrigated.

P 165

1   Next slide please.  Slide 81.  Again, the shot is approxi-

2   mately due north across Anza Valley.  The basement complex in

3   the background, and the mountains.  There is also some of the

4   gentler slopes in the foreground or the area mapped as older

5   alluvium.  The flat area is the younger alluvial plane.  The

6   foreground is the area mapped as basement complex.  The pattern

7   of the fields is distinctly visible in the rectangular shapes

8   and are irrigated.

9   Eighty-two please.  Slide 82 is looking northeast of

10  Anza across the irrigated fields.

11  Slide 83, again, across the irrigated fields.  The verti-

12  cal silvery structure in the central part of the picture is

13  a well drilling rig.  A well is being drilled.  The foreground

14  of the picture is again basement complex.  The mountains in

15  the background are also basement complex.

16  That is the last slide.  Those are all of the slides.

17  MR. VEEDER:  I would like to withdraw those slides and

18  have pictures substituted, if that is agreeable to the court.

19  THE COURT:  You may do so.

20  What do you have on the agenda for tomorrow?  What is

21  next?

22  MR. VEEDER:  Well, if we are ready to talk, I would like

23  to proceed to do a little planning for the next hearing in

24  regard to this Anza and Aguanga area, if it is appropriate at

25  this point.  I would like to say, if agreeable, these areas

15 133

P 166

1  which have been depicted and shown as older alluvium and younger

2  alluvium in the Aguanga ground water basin and the Anza area,

3  we would notify those people of the irrigable acreage and their

4  total acreages and suggest to them or recommend to your Honor

5  that you find their ground waters under their property are

6  part of the Santa Margarita River and that you are going to

7  make on a date certain a tentative finding to that effect.

Tape K 1
8      THE COURT:  That would be people who owned land in the

9  younger alluvial?

10     MR. VEEDER:  And the older alluvial.

11     THE COURT:  And the older alluvial?

12     MR. VEEDER:  That is right.

13     THE COURT:  What about the weathered basement complex?

14     MR. VEEDER:  I thought you told me to leave that out.

15     THE COURT:  That is what I propose to have you do.  I

16  take it that your evidence as to it would be much the same as

17  to the other areas of the basement complex?

18     MR. VEEDER:  That is correct.  We are also going ahead

19  and getting the total irrigable acreage throughout the Wilson

20  Creek area for the riparian owners, and we would notify those

21  that they are riparian, and where they are riparian and over-

22  lying, we would advise them to that effect, and they would

23  have their opportunity to be heard.

24     Now, we have no way of notifying them other than by a

25  letter from you, and along the line that we have been following,

P 168   1   and I think that proved to be an expeditious way of getting

2   the case to move along.

3       THE COURT:  The people in the basement complex, what are

4   you going to do about them?  Just prepare some judgment as

5   to them?

6       MR. VEEDER:  Simply say -- if their lands are not traversed

7   by any surface water stream, and if their lands do not overlie

8   a ground water body, we would simply say, and I would recommend

9   to your Honor that you make the tentative finding that the

10   waters underlying their lands are not a part of the stream

11   system, and treat them as we have been treating the people in

12   the vicinity of Fallbrook.  In other words, quiet their titles

13   against claims by the United States, and, in turn, have them

14   relinquish any claim to waters in the Santa Margarita River.

15   That process has been used on a great many others now.  But

16   that is no reason why I am anxious to get through with this.

17       THE COURT:  Do you have any more geology to put on?

18       MR. VEEDER:  We are going to put on geology as to Temecula

19   Creek the next time we meet, and that is the geology so far as

20   the watershed is concerned.

21       THE COURT:  No other geology now?

22       MR. VEEDER:  Not at this time.

23       THE COURT:  Then is this a good stopping place?

24       MR. SACHSE:  What is our next schedule?

25       MR. VEEDER:  I certainly want to put this in.

P 169

1    THE COURT:  We want to go over this summary of issues to

2  be decided that I have worked on.

3    MR. SACHSE:  And we have quite a bundle of findings on

4  Wilson Creek and other valleys, your Honor, to work on.

5    THE COURT:  Maybe you can spend some time in getting some

6  of these findings out.

7    MR. SACHSE:  We have pretty well associated our points

8  of agreement, and have gotten them to the language we want

9  them in.

10    THE COURT:  Can you point those things out tomorrow?

11    MR. SACHSE:  Can we, Mr. Veeder?

12    MR. VEEDER:  Now?

13    THE COURT:  Not now, but tomorrow, to try to dispose of

14  some of these findings?

15    MR. VEEDER:  Yes, I think so.  What I am doing is that I

16  am preparing a tentative set of findings which I would recommend

17  in regard to Diamond and Domenigoni Valleys, which seems to

18  go along with the ones that Mr. Sachse has referred to, and

19  then we have disagreed on some of them.

20    THE COURT:  Then we will adjourn until ten o'clock

21  tomorrow morning.

22    (Adjournment at 3:45 o'clock P.M., Wednesday, February)
    (1, 1961 until 10:00 A.M., Thursday, February 2, 1961.)

23

24

25

P 170

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California this 1st day of February A.D. 1961.

_John Swader_
Official Reporter

_____
Official Reporter