# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Thursday, February 2, 1961

Pages:    15,137 to 15,249

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 171

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - - - -

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - -

UNITED STATES OF AMERICA, )
                     )
             Plaintiff, )
                     )
vs.                    )       No. 1247-SD-C.
                     )
FALLBROOK PUBLIC UTILITY  )
DISTRICT, et al,         )
                     )
            Defendants.)
_____

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, February 2, 1961

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | LCDR. DONALD W. REDD. |
| For the Defendants: | |
|   Vail Company | GEORGE STAHLMAN, ESQ. |
|   Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |
|   State of California | FRED GIRARD, ESQ., Deputy Attorney General. |

Vol 134   3/2/61

P 172

INDEX TO WITNESSES

| For the Plaintiff | D | C | RD | RC |
|---|---|---|---|---|
| Col. Allen C. Bowen | 15,197 | | | |
| | 15,198 | | | |

INDEX TO EXHIBITS

| Defendants's Exhibits | Identified | In Evidence |
|---|---|---|
| Vail's AX | | 15,200 |
| Vail's BF 1 through 6 (positives substituted for negatives) | 15,202 | |

Belt 1

P 173

1   SAN DIEGO, CALIFORNIA, Thursday, February 2, 1961, 10:00 A.M.

2   (Another matter.)

3   THE CLERK:  2-1247-SD-C United States vs Fallbrook.

4   THE COURT:  In the transcript yesterday there is one

5   correction I would like to make.  On page 15,074, at lines

6   11 and 12, the statement appears, "I think it appears later

7   that this was irrigation water, but obviously an unincorpor-

8   ated district is not a city."  Strike out the word "an" and

9   insert "territory" for "district"-- "obviously unincorporated

10  territory is not a city."

11  That is the only change I want to make.  Did you find the

12  place?

13  MR. SACHSE:  Yes your Honor.

14  THE COURT:  Now, you have the second series of the mystery

15  drama, and that is all I have.  It's too long and has to be

16  worked over -- a lot of corrections to be made.  Some time

17  today or tomorrow I want to hear from you on it.

18  What is the first order of business today?

19  MR. VEEDER:  Your Honor, I believe that anything we had

20  to offer has been entered into the record as of yesterday.

21  The matter of findings of fact and conclusions of law Mr. Sachse

22  and I have talked over.

23  May I inquire, Mr. Sachse, have you lodged your Diamond-

24  Domenigoni Valley?

25  MR. SACHSE:  Yes, it has been lodged.  I have lodged

P 174

1    Tucalota Creek, Diamond-Domenigoni and Fallbrook appropriative

2    rights.

3        MR. VEEDER:  Then I don't see anything further in regard

4    to those.  I look at it this way.  Mr. Sachse and I probably

5    -- I will say we cannot come to agreement with regard to his

6    findings on Diamond and Domenigoni.  I propose to file objections

7    to them.  Similarly in regard to the Fallbrook findings, there

8    would be no purpose, I believe, in arguing those.  I will

9    simply file objections to them.

10       THE COURT:  Now the procedure in the Federal Court, of

11   course, is to file objections, whereas in the State Court it

12   is to file alternate findings.  But I would like to have you

13   do it in such way that -- taking the general format of the

14   instructions -- that you would suggest, in place of Finding No.

15   II, or a certain part of it, so that we have something to work

16   from.  Not just objections in the strict sense.

17       You don't think that we could go over the Fallbrook findings

18   today?

19       MR. VEEDER:  Well, your Honor, from my standpoint, on the

20   Fallbrook findings I can't afford, from the standpoint of appeal,

21   to do other than simply say that I can't agree with them.

22       THE COURT:  Preserving to you your objection to findings,

23   if you need them, my only inquiry to you would be, are these

24   in accord with what the Court has decided, and are they in the

25   proper form?  Do they cover the issues that are to be covered?

P 175

1   You don't prejudice yourself by participating in discussion
                                                  will show,
2   about the findings.  The record / I take it, that it is your

3   desire to object to them all the way down the line from the

4   beginning to the end.

5       MR. VEEDER:  As I say, what Mr. Sachse has done, just let

6   them stand, that's all.

7       MR. SACHSE:  If Mr. Veeder feels that way about it, your

8   Honor, I would specifically request that we try to get them

9   signed this week.  As I said before, I have tried very honestly

10  to put reasonably properly phrased restrictions in.  If I

11  haven't done it, I would appreciate his comment.  But he doesn't

12  seem to think he can elaborate on my restrictions in any way.

13      MR. VEEDER:  I want it clear in particular, your Honor,

14  nor am I being adamant or not desirous of being completely of

15  assistance to you.  Your opinion, which I have read over, in

16  regard to the stipulated judgment, is tremendously involved

17  and shows a great deal of work by your Honor.  I would like to

18  consider the findings that Mr. Sachse has prepared.  I will be

19  candid with you.  I have to read his findings in the light of

20  this opinion.

21      THE COURT:  What does the opinion have to do with these

22  findings?

23      MR. VEEDER:  Your Honor, if the opinion rules that we

24  can't use -- may I inquire just what does the opinion do?  Does

25  it set aside the stipulated judgment?

P 1761    THE COURT:  It will provide that you may not enforce it.

2   Whether you call it "set aside" or what, it may not be enforced

3   in this proceeding.

4       MR. VEEDER:  I want to know exactly what it means, because

5   from the standpoint of my objections to Mr. Sachse's findings

6   I can't very well -- I am hesitant about doing anything on it

7   until I comprehend fully what effect your opinion has upon our

8   right to use water outside the watershed and to have water

9   come down from the Vail Company for use outside the watershed.

10  Are you ruling that we do not have that right?

11      THE COURT:  I tried to say it in as simple language as I

12  could.  That after the water gets there you can use it outside

13  the watershed, and apart also from any other rights that you

14  might have, which I have expressly excepted from this -- I am

15  talking only about the riparian right -- that you may not

16  compell water to come down --

17      MR. VEEDER:  From Vail Company?

18      THE COURT:  Where it comes from.

19      -- to come down the stream in order to take it outside

20  the water shed.

21      MR. VEEDER:  And that can't be claimed against Vail?

22      THE COURT:  No, I expressly mentioned that toward the end

23  of the opinion.  That if your contentions were right, as to

24  everybody but Vail they all could complain.  And as to any

25  theory you have of pooling your interests with Vail and saying,

P 177   1   therefore, that Vail's water could come down, any riparian

2   upstream could object to that on the grounds that it was an

3   unreasonable non-riparian use.

4       I think I have made it pretty clear.

5       MR. VEEDER:   In other words, you are setting aside the

6   judgment; is that right?

7       THE COURT:   I don't know what terms the judgment will take.

8   It will either provide that its operation and effect is re-

9   strained, or that it is not to be enforced in this proceeding.

10  The Government is the only one relying on it.   The legal

11  language doesn't make too much difference.

12      MR. VEEDER:   It makes a great deal of difference to me

13  when I consider Fallbrook's findings, your Honor.

14      THE COURT:   How does that involve these findings?

15      MR. VEEDER:   If Fallbrook can appropriate the rights to

16  the use of water that we have been in the past using outside

17  the watershed I have to know that.

18      MR. SACHSE:   I tried to take care of it in this way, Mr. Veeder.

19  His Honor hasn't told us what rights you have yet to water out-

20  side the watershed.   That is an issue that remains to be deter-

21  mined -- although I believe the evidence is in.   You have

22  asserted appropriative rights and many rights outside the

23  watershed.   I have found as a conclusion of law -- I am reading

24  this because it is the shortest:

Belt 2   25      "Each of the foregoing rights is subject to and junior

P 178

1      to all prior vested rights in or to the waters of the

2      Santa Margarita River, as such prior vested rights

3      have in these proceedings been determined to exist."

4  If the judgment on the Vail's stipulated judgment confirms a

5  right in you, that right is protected by my prior findings.

6  If it doesn't confirm a right in you, that right is not pro-

7  tected by my prior findings.  I don't think you can ask any-

8  thing more than that.  We have made ourselves subject to all

9  your rights as his Honor will determine them.  I don't see why

10  we should wait until his Honor finally determines all your

11  rights when we are perfectly willing to say we are subject to

12  them in whatever way they may be determined by his Honor.

13      MR. VEEDER:  I have expressed myself.  I have before me

14  a document here that I want to analyze.  I truly think it is

15  unjust that we are not permitted to appeal it, but your Honor

16  has ruled and there is little I can do except preserve the

17  right to appeal from everything that you do and if your findings

18  are contrary to us I can't stop that.  I have undertaken to

19  write the kind of findings I would like down the Valley.

20      MR. GIRARD:  I think, as far as Fallbrook's findings are

21  concerned, there would be no difference in considering their

22  propriety regardless whether the stipulated judgment was changed

23  or not.  In other words, if you would rule with Mr. Veeder on

24  the stipulated judgment point, on his contentions, I don't

25  think the law would have changed one iota insofar as Fallbrook's

P 179

1   findings are concerned.  I think the stipulated judgment

2   probably is entirely separate and distinct from the appropria-

3   tive rights claimed by Fallbrook.  I don't think that issue has

4   any relation at all to this.  And I might add the State does

5   not object to Fallbrook's findings.  We concur with them.

6       THE COURT:  I might have a suggestion or two on these

7   findings by Fallbrook, but they look about right to me, and I

8   don't see that the decision on the Vail judgment has anything

9   to do with these.  We will pass it up.  If I get a chance at

10  the noon hour to look them over further I may sign them up

11  this week.

12      MR. SACHSE:  Thank you your Honor.

13      THE COURT:  If you have any concrete suggestions, any

14  additions that should go in, anything that would make them

15  clearer to point up contentions you want to make, I will hear

16  you on it.

17      MR. VEEDER:  No, I have nothing.

18      THE COURT:  All right then.

19      What about Domenigoni Valley?  Are you in position to do

20  any work on those?

21      MR. VEEDER:  I can tell you the basic premise that I would

22  like to present to you.

23      MR. SACHSE:  Could we put the exhibit up, Mr. Veeder?  I

24  think it would help us both.

25      MR. VEEDER:  Yes.  That would be 274, I believe.

P 180

1    (The exhibit is placed on the board.)

2    MR. VEEDER:  Do you have your Domenigoni Valley findings

3    there, Franz?

4    MR. SACHSE:  Yes.  Do you want a copy?

5    MR. VEEDER:  Yes, if I may.

6    The objection that I have talked to Mr. Sachse about,

7    your Honor, --

8    MR. SACHSE:  You have marked here the ones you talked

9    about.  I can show you where they are.

10   MR. VEEDER:  I think the principal one is on page 3, No.

11   III.  It says:

12       "At such times as the ground water level in Diamond

13       and Domenigoni Valleys north of the south line of

14       Section 9 . . ., the greatest proportion of such

15       ground waters move westerly out of the Santa Margarita

16       River watershed and into Menifee Valley of the San

17       Jacinto River watershed, and only a very small pro-

18       portion of such ground waters move over the lip of

19       basement complex referred to herein and on down

20       Warm Springs Creek."

21   I had tendered to Mr. Sachse the thought, and I haven't had an

22   expression from him on it although we haven't talked about it

23   since, that the term "greatest proportion" could be made more

24   exact by saying "based upon Dr. Mann's testimony that 100 acre

25   feet of water would be the maximum that would move out of the

P 181

1   valley on that basis."

2       Isn't that correct, Mr. Sachse?

3       MR. SACHSE:  That is the point you urged.

4       Addressing myself to that for a moment, I don't believe

5   that was Dr. Mann's testimony.

6       MR. VEEDER:  What?

7       MR. SACHSE:  That only a hundred acre feet moved into

8   Menifee Valley.  He testified an amount that moved down Warm

9   Springs Creek, but not an amount that moved into Menifee Valley.

10      MR. VEEDER:  On cross examination I said, what quantity

11  of water do you believe would move out of Diamond-Domenigoni

12  Valley?  And he said, on the order of a hundred acre feet.  He

13  said the maximum would be a hundred acre feet.

14      THE COURT:  It is a very small figure for Warm Springs.

15      MR. SACHSE:  I took the language from your Honor's own

16  statement.  Your language is this:

17      "So we have, therefore, the situation where to get

18      water to flow down Warm Springs we would have to

19      so restrict the owners in Diamond and Domenigoni

20      Valley that they kept the basin full to 1400 feet

21      or more as to water level, in which event I have no

22      doubt there would be an immense amount of water

23      running into Menifee Valley and leaving the watershed."

24  That was your Honor's language.

25      I don't think at any time did Dr. Mann purport to state

P 182

1    an exact amount, because obviously, again as Colonel Bowen

2    pointed out yesterday in connection with the 2-inch pipe in

3    the Kohler Canyon, how much is the head?  How hard is it being

4    pushed?  How high above 1400 feet is the movement going to vary?

5    And you can't state it in a fixed amount.  It is impossible so

6    to state it.

7    THE COURT:  Plus the fact that it is like trying to fill

8    a bucket with a hole in it.  You are trying to get water high

9    enough, to the 1400 foot level.  Meanwhile water obviously is

10    going into Menifee Valley.

11    MR. VEEDER:  I don't believe the record would support that,

12    your Honor.  I think what he said -- and he said it on cross

13    examination, and I checked it -- I said, well, how much water

14    would be going down Menifee Valley?  He said, "Oh, around a

15    hundred acre feet."

16    THE COURT:  How many acre feet did he say would/go down Warm

17    Springs?

18    MR. VEEDER:  I think he said 2.2, something like that.

19    The point I am trying to make to your Honor, and the reason

20    why I am bringing this matter up in this order, is that the

21    storage capacity of Diamond and Domenigoni Valley, as found by

22    Mr. Illingsworth, is quite sizeable.

23    THE COURT:  What is it?

24    MR. VEEDER:  I think it is in the neighborhood of 40,000

25    acre feet.

P 183

1    MR. SACHSE:  That is Bulletin No. 57 you are referring

2    to -- that calculation.  Mr. Illingsworth didn't testify on

3    Diamond and Domenigoni Valley.  Bulletin 57 has a calculation.

4    MR. VEEDER:  I think that is correct.

5    THE COURT:  And the calculation was undoubtedly made with-

6    out having in mind the evidence we heard as to water flowing

7    out of the valley.

8    MR. VEEDER:  May I go on with what I was going to say.

9    THE COURT:  Yes.

10    MR. VEEDER:  The proposition being also that the surface

11    flow and the ground water are inextricably interelated, and

12    that the reduction of the elevation of the ground water table

13    would immediately have the effect of reducing the quantity of

14    surface runoff in the stream, which would go down Warm Springs

15    Creek.

16    Now, if I comprehend what Mr. Sachse's findings of fact

17    and conclusions of law propose to do, it would be for you

18    forever to relinquish over pumping in the Diamond and Domenigoni

19    Valley.  My view is that while certainly at the present time

20    regulation of pumping under the circumstances which exist would

21    not have the effect of delivering surface water to us, should

22    it start to rain, and most certainly it will start to rain

23    again, it is quite conceivable that those basins would fill up

24    and that the ground water would support the surface water under

25    a different factual situation than prevails now.

P 184 1      MR. SACHSE:  There is only one thing I would ask you to

2   do.

3      THE COURT:  Let's follow that a minute.  Then what?  I

4   could imagine that sort of situation.

5      MR. VEEDER:  Then I would say that rather than abandoning

6   for all time any control of ground water in the Diamond-

7   Domenigoni Valley, for you to retain jurisdiction of that ground

8   water in the event that circumstances should change which would

9   give us some surface water support from the ground water.  That

10  is the request that I am making, and that is the primary --

11     THE COURT:  I see your point.  It is pretty difficult to

12  see how we would get much water out of the valley.  If there

13  were such heavy rains that the basin filled up and the ground

14  water levels raised, and even though water was going out of

15  the valley into San Jacinto, still there was enough supporting

16  water to raise the water level toward the 1400 foot level or

17  to support a surface flow.

18     MR. SACHSE:  May I interject something, your Honor.  Mr.

19  Veeder has raised another straw man here.  My findings don't

20  say that.  My proposed conclusions of law again, No. II says:

21          "At the present time, and so long as the ground waters

22      of Diamond and Domenigoni Valleys immediately north of

23      the south line of Section 9 . . remain below elevation

24      1400 feet, the said ground waters are not a part of

25      the waters of the Santa Margarita River system."

P 185

1    Then follows the next conclusion:

2         "It would be wasteful and unreasonable, and contrary

3          to the provisions of Article XIV . . to require the

4          maintenance of a water level in Diamond and Domenigoni

5          Valleys at elevation 1400 feet or above for the purpose

6          of supporting a ground water movement southwesterly

7          past the south line of Section 9 . . "

8    But I don't say that you don't have that jurisdiction when they

9    are 1400 feet.  Nowhere do they say that.

10        MR. VEEDER:  That is precisely the point I am making.

11   How can we get regulation, assuming the basin is full, if you

12   say the ground waters are not part of the Santa Margarita

13   River below that?

14        MR. SACHSE:  I say, Mr. Veeder, that at the present time,

15   and so long as the ground waters are below 1400, they are not

16   part of the river system.  I don't know of any other way to

17   say what his Honor has found.

18        To try to give you a homely example, it seems to me, would

19   be a bathtub which has a typical drain in it, a kind of emer-

20   gency drain.  That is the outlet into Menifee.  Then we saw

21   a little tiny nick in the top of the bathtub rib much higher

22   than the drain.  If you pour enormous quantities of water into

23   that bathtub some will run over this little nick, but a much

24   larger amount will run out through the drain.  When it falls

25   down below the area of the nick, which is Warm Springs Creek,

P 186

1    it is out of your system.   It is no longer contributing anything

2    to the supply downstream.

3         I would make only the other comment, your Honor, that the

4    factual situation Mr. Veeder visualizes means a saturated

5    Diamond-Domenigoni Valley, and so help me if Diamond-Domenigoni

6    are saturated, under the evidence you have from Mr. Kunkel and

7    under the rainfall chart, believe me everything else in the

8    watershed is going to be saturated.   That is away up in the

9    interior, which gets much less water than does De Luz Creek

10   and Fallbrook area and the Naval Reservation.   If Warm Springs

11   Creek is running full, believe me water is spilling at Ysidora

12   -- if the valley is saturated.

13        MR. VEEDER:   Maybe I didn't make myself clear.   I don't

14   believe we can say that the ground waters at any level in

15   Diamond and Domenigoni Valley are not important in regard to

16   the Santa Margarita runoff, and I am not asking that regulation

17   be undertaken now.   I am saying that you should retain juris-

18   diction if at some later date there is recovery in the valley

19   where it can be shown that the surface runoff is affected by

20   pumping in that valley.   If that is accomplished --

21        MR. SACHSE:   I would like to see your suggestion, Mr.

22   Veeder.   Maybe we can get together on it.   I don't think I'm

23   quarreling with you.   I think I am trying to say what you are

24   asking for.   But you have not proposed a specific change.

25        THE COURT:   I think we could make a provision for changed

P 187

1  conditions or more information.  It is just supposition.  Al-

2  though there is evidence of this basement lip, suppose that

3  further evidence revealed that, for some strange reason, this

4  basement lip didn't cut clear across and later on you discovered

5  there was an underground fill of some sort at a lower elevation

6  that let water through, you might change your position.

7  MR. SACHSE:  I would have no objection to that type of

8  finding of jurisdiction.

9  MR. VEEDER:  I do think, in regard to a finding somewhat

10  along that line where you didn't -- as I construe this, for

11  all time there would be no control of pumping.

12  THE COURT:  I would want to leave the door open on

13  additional evidence which would give us more knowledge than we

14  have now.  But as a practical matter I think we have to pretty

15  near write it off.

16  MR. VEEDER:  I truly believe that there can be recovery

17  in there and we can support the surface stream by it, and that

18  some regulation of pumping might be helpful to us, and that is

19  all I am saying about it now.

20  THE COURT:  I can't see how you could regulate pumping.

21  Mr. Sachse's example is an excellent one.  You pour sufficient

22  water into the valley.  There is water running out    all the

23  time.  You might eventually get your water levels up so that

24  some amount would cut across this lip and be available.  But

25  by doing that you would be pouring a lot of water into the

P 188

1  San Jacinto Valley, to get your water levels that high, and

2  you therefore would be restraining the use of people who have

3  a right to use water out of that basin in order to get this

4  small amount of water to come downstream.

5  MR. VEEDER:  Your Honor, I have never bought the idea

6  that there is a tremendous quantity of water flowing into

7  Menifee Valley, and I don't believe the record supports it.

8  THE COURT:  You have a further practical matter.  Consider-

9  ing the area and the amount of rainfall you have up there, it

10  is doubtful in my mind whether you could ever show any large

11  amount of riparian acreage; that the uses made of water up

12  there were ever unreasonable compared with the rest of the

13  watershed.  A man who had 640 acres up there would be just

14  as much entitled to use water as Vail or the Government would

15  be, and when you consider the amount of riparian land on the

16  stream and the relatively small amount of water for that whole

17  area, no matter how you cut it you are going to find that it

18  is very difficult ever to have an unreasonable use up in that

19  area.

20  MR. VEEDER:  You have heard my views.

21  THE COURT:  Maybe you and Mr. Sachse could work it out.

22  Mr. Girard.

23  MR. GIRARD:  I might add, your Honor, as far as Finding

24  No. II is concerned, I probably concur with Mr. Veeder on it.

25  THE COURT:  Finding No. II?

P 189

1   MR. GIRARD:  Conclusion of law No. II.  The conclusion

2   that when the water drops below 1400 feet it is no longer a

3   part of the water of the Santa Margarita River stream system.

4   In my opinion, probably it would be, when you consider whether

5   it could ever be regulated or whether that use of that water

6   that drops is unreasonable.  But I think that is a little

7   different question from whether or not it is part of the stream.

8   I think it is still a part of the stream.  Theoretically you

9   could drop Pauba Valley below the lip so that no water could

10  go down into the gorge and you would have exactly the same

11  situation, except that here some of it goes into Domenigoni

12  Valley.

13      MR. SACHSE:  I would buy that.

14      THE COURT:  To follow your suggestion, let's make another

15  supposition.  There may be, and probably is, a lip in the

16  younger alluvium where the water goes into San Jacinto.  We

17  don't know what that elevation is.  Suppose that water in

18  Menifee dropped to where it was below the lip or the elevation

19  that  would preclude water from going into San Jacinto.  Then

20  of course the remaining water --

21      MR. GIRARD:  Then it would be a basin and it would be up

22  to this court and maybe the other court which handled the

23  jurisdiction there to tell whether the pumping was unreasonable.

24  I don't think any court in the world would ever hold that the

25  pumping in this valley which decreased water levels to such an

P 190

1   extent that it didn't go over the lip was unreasonable.  But

2   I don't believe you can draw the conclusion from that that the

3   water is no longer part of the stream system.  I think it is.

4        MR. SACHSE:  I see what Mr. Girard is saying, and I would

5   buy it.  I think conclusion No. II is probably unnecessary in

6   the light of what Fred says, if we left in III.  Conclusion No.

7   III simply says:

8        "It would be wasteful and unreasonable, . . to

9        require the maintenance of a water level in Diamond

10       and Domenigoni Valleys at elevation 1400 feet or

11       above for the purpose of supporting a ground water

12       movement southwesterly past the south line of

13       Section 9 . . and down Warm Springs Creek, and for

14       that reason the extractions of ground water from

15       within Diamond and Domenigoni basins will not be

16       regulated or restricted in these proceedings for

17       the purpose of maintaining such a flow."

18  We don't have to say anything about it being a part of the

19  stream system.  No. III would take care of my problem.  And I

20  again reiterate, I have no objection to continuing jurisdiction

21  -- absolutely none.  These people are in it for surface water

22  anyway.  You will make an order that they are staying in this

23  case because they are part of the stream.  None of them thinks

24  they are out of the case.

25       THE COURT:  On paragraph VII of your findings, where you

P 191

1   leave blank LAND OWNERSHIP AND WATER USE, I suppose you would

2   state that by separate interlocutory judgments --

3       MR. SACHSE:  Yes, my view of this was that we would follow

4   the format that Mr. Veeder worked up for Wilson Creek, which

5   is very good, I think.  This is the system that he used.  He

6   went through a series of basic findings and then he would come

7   to this land ownership and water use.  And in that lengthy

8   paragraph we would just start one at a time, and put them right

9   in there -- Searle Brothers have so many acres, so many irriga-

10  ble acres, their land is located so-and-so -- right down the

11  line with each one.  I did not insert it for the obvious reason

12  that I don't know anything about three-quarters of the land

13  owners.  I only attempted to write the general finding appli-

14  cable to all.

15      MR. VEEDER:  I have started that general description of

16  it.

17      MR. SACHSE:  I think it is a good system.

18      MR. VEEDER:  But the magnitude of the task will take ten

19  days to get it done to cover the whole matter, and from my

20  standpoint if we retain jurisdiction of the ground waters in

21  the valley and you retain jurisdiction of the surface waters

22  in the valley I am not requesting, and I have never even

23  tendered the thought, that as of the moment you should restrain

24  anybody up there from using his water.

25      MR. SACHSE:  I think we can tell his Honor, then, that we

P 192

1  are in agreement.

2      You had one other word you wanted to change, Mr. Veeder.

3  It is "divert" --

4      MR. VEEDER:  I didn't want the word.

5      THE COURT:  It is on page 3, paragraph III.

6      MR. VEEDER:  If you will go to line 7 on page 3 it says:

7      "The presence of the basement complex lip described

8      in Finding II, above, diverts all ground waters moving

9      beneath the surface of Diamond and Domenigoni Valleys

10     below elevation 1400 feet in a westerly direction, and

11     causes such ground waters to move out of the Santa

12     Margarita River watershed and into Menifee Valley of

13     the San Jacinto River watershed . . "

14 Of course, I don't believe the record shows that it diverts,

15 nor do I think all of the ground waters move out.  I think it

16 is a barrier the same as a barrier is a lip down here in

17 Temecula gorge.  I don't believe it diverts anything.

18     You are not in disagreement with me?

19     MR. SACHSE:  I think it is a matter of semantics.  I took

20 the language from his Honor's opinion, again, where you adopted

21 Dr. Mann's findings and you referred to the fact that the

22 stream had probably originally moved out in that direction.

23 But I think it is a matter of semantics.  If we can get a

24 better word, I don't care.

25     THE COURT:  Well, let's do a little more work on these in

P 193

1   view of the discussion and see if we can, before we are through

2   here this week, get these ready.

3      MR. SACHSE:  I don't see why we can't get the general part

4   ready, Bill.  And take as long as you need on paragraph VII.

5      MR. VEEDER:  I have told you in the past, and I have told

6   the Court now what my general objections were.

7      Now, in regard to this matter of Dr. Mann and his testi-

8   mony, on page 12,859 you will find the references to a hundred

9   acre feet.  I said:

10      "Q  When you say one hundred acre feet or more, you

11      might have gone to a million.  Would you be friendly

12      about this thing and --

13      "A  I think if we started getting up around 200 we

14      would be parting company. . . "

15  In other words, as I see it, he is saying that not more than

16  200 acre feet leaves the valley and goes into Menifee Valley.

17      MR. SACHSE:  Yes, but under the present conditions.

Belt 5   18      THE COURT:  It is a very indefinite statement.

19      Mr. Veeder, you would agree, would you not, that if water

20   levels, which were, as I recall, about 1346-1350 feet in

21   Domenigoni Valley -- isn't that about what they were?

22      MR. VEEDER:  Water levels now?

23      THE COURT:  In the wells.  Fifty feet below the basement

24   lip.

25      MR. SACHSE:  In Diamond and Domenigoni Valley, yes, your

P 194

1   Honor.

2       THE COURT:  Let's assume for argument that water levels

3   got up to 1380 feet.  Wouldn't you guess that probably there

4   may be a larger amount of water being lost from the valley than

5   at the present levels of the wells?

6       MR. VEEDER:  There is nothing in the record that would

7   support that.

8       THE COURT:  There is the geologic evidence as to this

9   whole stream bed and the fill of younger alluvium and the water

10  washed rocks that have been found down in there, which indicates

11  that at one time water went through there.  It has now been

12  filled up with a loose material.  It is certainly an easy in-

13  ference.

14      MR. VEEDER:  But can a finding be predicated on it?  You

15  can have an inference, but can you find a fact on it?  That

16  is the whole point I am saying now.

17      THE COURT:  You certainly have more evidence for a finding

18  to that effect than you do for this finding of 200 acre feet.

19  When it is not clear.  Probably he is talking about the present

20  situation of the water levels in wells, but it is not clear

21  what his view would be if the water levels were lower or higher.

22      MR. VEEDER:  I didn't get from what he said that he was

23  talking about the moment.  I said each year -- in fact, Mr.

24  Sachse said each year, and I assumed to be a year-in and year-

25  out proposition.

P 195

1   MR. SACHSE:  Mr. Veeder, Mr. Kunkel has testified, we have

2   had all kinds of evidence on how you measure ground water move-

3   ment rapidity, and one of the factors is the head.  It is so

4   simple there can be no contradiction.  I don't know how we can

5   more accurately state the testimony than I have done.  I didn't

6   take his Honor's word "immense."  I said "the greatest propor-

7   tion of such ground waters move westerly out of the Santa

8   Margarita River watershed and into Menifee Valley of the San

9   Jacinto watershed, and only a very small proportion of such

10  ground waters move over the lip of basement complex referred

11  to herein and on down Warm Springs Creek."

12      MR. VEEDER:  We can probably work out some language, Mr.

13  Sachse.

14      THE COURT:  Work on it further.

15      MR. VEEDER:  What else do we have in regard to other

16  findings?

17      MR. SACHSE:  I have told you I am satisfied with Wilson

18  Creek, with those minor changes.  I sent those in a letter and

19  I haven't heard from you whether you have redrafted them.

20      MR. VEEDER:  I have taken the view and I would like to

21  reserve the ultimate determination on the question whether

22  Stardust has or has not any appropriative rights based upon

23  conversations with Mr. Grover.  If you want to have the findings

24  as you have tendered to me on Wilson Creek go in as they are,

25  subject to the ultimate disposition of this matter with Mr.

P 196

1  Starke, I think the Wilson Creek findings can go in.

2      MR. SACHSE:  Perhaps Mr. Veeder has a point, your Honor.

3  Mr. Grover and I don't see our own appropriative rights eye to

4  eye.  I think Mr. Grover is going to ask for a stronger finding

5  on the subject of appropriative rights than I have.

6      Isn't that right?

7      MR. VEEDER:  That is right.  And they spent part of the

8  afternoon arguing with me about it.

9      MR. SACHSE:  If Mr. Grover gets them, I presume my client

10  is also entitled to them.  They are in the same situation.

11      MR. VEEDER:  Oviatt's Kohler Canyon is in the same situa-

12  tion.

13      MR. SACHSE:  I think Oviatt's Kohler Canyon is simple.

14      MR. VEEDER:  All I say is, if these are entered I reserve

15  the right, depending upon what comes out of the Starke conver-

16  sations -- he is going to send us in thirty days some findings.

17  I have tendered him a set of findings.  He is going to send me

18  back some findings.

19      THE COURT:  That is the general findings?

20      MR. VEEDER:  No, this is specific as to Stardust.

21      THE COURT:  I can't find a copy of the Wilson Creek findings.

22      MR. SACHSE:  Maybe they aren't before your Honor yet.

23      MR. VEEDER:  Yes, I gave you a copy of them.

24      MR. SACHSE:  The question is a simple one, your Honor.

25  It deals with whether or not Stardust has an appropriative

P 197

1    right.

2        THE COURT:  Is this what you are talking about (referring

3    to a document)?

4        MR. VEEDER:  That is the Grover findings.  I have submitted

5    to you mimeographed findings.

6        Would you get a copy of the mimeographed findings for

7    Wilson Creek, Mr. Bada.

8        MR. SACHSE:  The question is whether or not Mr. Sievers,

9    Mr. Allen, Stardust Ranch, has an appropriative right, just as

10   it is a question whether Cottles have an appropriative right.

11   And I tendered to Mr. Veeder --

12       MR. VEEDER:  Why don't you read into the record the last

13   paragraph.  I object to your language on appropriative.

14       THE COURT:  I would like to see what you are talking about

15   before you spend anymore time on it.  While you are looking up

16   that copy --

17       MR. VEEDER:  I have it here (handing document to the

18   Court).

19       On page 20, line 13, I say there is no evidence to support

20   the claim of either an appropriative right or a prescriptive

21   right to Wilson Creek water.  Mr. Sachse has tendered the

22   thought that he wants to set out references to the copy of the

23   notice and a statement.

24       THE COURT:  Wait a minute.  Catch me up on this.  I don't

25   know whether I have seen these.  This is Wilson Creek.

P 198

1    MR. SACHSE:  This page 20, line 14, is the specific one,

2  your Honor.

3    THE COURT:  Let's see what you have.  Have you checked all

4  these legal descriptions and references in the first part of it?

5    MR. SACHSE:  To the routing of Wilson Creek, yes, your

6  Honor.  We worked on that many times.

7    THE COURT:  Then you start on page 9 with land ownerships.

8    MR. VEEDER:  On those land ownerships, your Honor, we are

9  going to have to check each one of those out.  That is all I

10  c an do.

11    THE COURT:  When you get down to page 13 you have Shipley

12  here.

13    MR. VEEDER:  What page is that?

14    THE COURT:  Page 13.  There is a claimed appropriative

15  right.

16    MR. SACHSE:  No, your Honor.  The last sentence on page

17  14 -- this isn't my client, but I don't believe Mr. Veeder

18  specifically finds he has no evidence of an appropriative right.

19  He is riparian.  This is just a surface diversion.  This is

20  not an appropriative claim.

21    THE COURT:  Yes.

22    MR. VEEDER:  This is where I think you would have your

23  order to show cause.  I don't know how else to handle it.  If

24  he proves an appropriative right, I think he is entitled to it,

25  and there is evidence that he has actually used water.

P 199

1        MR. SACHSE:   Linke is that case.

2        MR. VEEDER:   Linke is another instance.

3        MR. SACHSE:   Linke is not riparian.

4        THE COURT:   If he is not riparian, how does he have fish-

5    ing ponds in the channel of Wilson Creek?

6        MR. SACHSE:   I will have to ask Mr. Veeder.

7        MR. VEEDER:   All I can say is that I ran out his land

8    description and as nearly as I can tell he is not on the stream.

9    However, apparently he has gone on the creek and put those dams

10   in.  All I can do is say what the record shows on that, your

11   Honor.

12       THE COURT:   Then these fishing ponds are on somebody else's

13   property?

14       MR. VEEDER:   I guess so.  I have to run it out.  That is

15   all I can do -- what the record shows.

16       MR. SACHSE:   I have not concerned myself with any of these

17   parties, your Honor, except Stardust.

18       MR. VEEDER:   It is almost impossible, your Honor, to do

19   otherwise than to notify these people of what appears to be

20   their rights and let them come in and complain about it.

21       THE COURT:   Yes, I think so.

22       MR. SACHSE:   When you get there, your Honor, I would like

23   to point out the one minor objection or two that I have on

24   Stardust and maybe we can settle that.

25       THE COURT:   What page on Stardust?

P 200

1    MR. SACHSE:  It starts on page 16.  But I have no objection

2    until we get down to page 18.

3    MR. VEEDER:  Where is your first objection?

4    MR. SACHSE:  I think you have agreed to this.

5    THE COURT:  Let me read it first.

6    MR. SACHSE:  It is line 30 on page 18.

7    THE COURT:  On line 26 the word "from" should be "for,"

8    shouldn't it?

9    MR. SACHSE:  I have "for" in my copy.

10   THE COURT:  It would be approximately four acre feet an

11   acre year.  It should be "four" instead of "from." Is that

12   right?

13   MR. SACHSE:  Yes.

14   MR. VEEDER:  That is right.

15   THE COURT:  What is your objection on page 18?

16   MR. SACHSE:  I think Mr. Veeder agreed to take out the

17   first five words on line 30 "Due to the severe water shortage".

18   That is not the fact.  The evidence was that this ranch changed

19   ownership during the process of this litigation, and your Honor

20   will recall that Mr. Allen sat up there and said he is a --

21   what did he call it -- an organic farmer, and you asked him

22   what that was.  All his land is fallow because all of these

23   vile fertilizers and sprays that we poison our system with

24   have to be eliminated before he can start growing anything.

25   It is not the fact that he has only 14 acres because there is

P 201   1    a severe water shortage.

2      MR. VEEDER:  I think it is a combination.  However, I

3    agreed to knock the first six words -- "Due to the severe water

4    shortage".

5      THE COURT:  All right.

6      MR. VEEDER:  There are approximately 14 acres.

7      MR. SACHSE:  That is right.

8      The next objection gets down to this broad problem, on

9    page 20, how to handle the appropriative claims.

10      THE COURT:  Let me read this.

11      All right.

12      MR. SACHSE:  On page 20, your Honor, it is the whole

13    section from line 13 on down, but particularly lines 15 through

14    17.  I don't believe that this is the proper way to handle the

15    appropriative claim.  My suggestion to Mr. Veeder was that

16    starting at line 15 you would insert this language instead.

17      THE COURT:  Line 15 or 13?

18      MR. SACHSE:  I would take line 13 and retitle it to say

19    "Appropriative Claims."

20      Then on line 15 --

21      MR. VEEDER:  What copy are you looking at?

22      THE COURT:  You have a different lined copy.

23      MR. VEEDER:  I think you had better use this, because this

24    is the copy the Court is using.

25      MR. SACHSE:  Yes, it would be line 12.  I would take the

P 202

Belt 6

1    title out and call it simply "Appropriative Claims," and then

2    instead of Mr. Veeder's brief sentence that "evidence will not

3    support a claim" I would feel that the Court should specify

4    in this finding what the claim was, what was established, and

5    in this case, to refresh your recollection, I will read you

6    the language I propose:

7        "Predecessors in interest  of the defendants filed

8        appropriative claims to the use of the waters of

9        Wilson Creek as hereinafter set forth:  (a)  Water

10       Claim 1 recorded July 20, 1885, in book so and so;

11       (b)  Water Claim 2 recorded January 28, 1891 in book

12       so and so.  The Court finds that the actual benefi-

13       cial use of water by defendants has never exceed 25

14       miner's inches diverted from surface flow during the

15       months of May through October annually."

16       I will state quite frankly I don't think that finding will

17   support a conclusion of law on your Honor's part that Stardust

18   has an appropriative right.  I don't think it will.  Mr. Grover

19   thinks it will.  Mr. Grover, on a more or less identical set

20   of facts, is going to argue that this exact sort of thing will

21   justify a conclusion of law and a judgment that he has an

22   appropriative right.  I want this in so that when you finally

23   hammer this out with Mr. Veeder, I am not going to argue it

24   but I want the finding of what we have so that if your Honor

25   should agree with Mr. Grover I would get the benefit of it.

P 203

1  Because my claim is older, my proof is exactly as clear or

2  perhaps clearer.  But speaking honestly, I don't think there

3  is any proof that he has done anymore at any time than use the

4  water for proper riparian purposes on riparian land without

5  injury to anybody below and that he can't get a prescriptive

6  right and hasn't got an appropriative right.  That is my inter-

7  pretation.  Mr. Grover disagrees.

8      THE COURT:  I see your point.  Certainly the matter can

9  either be held up or it should be worded in such a way, but the

10  treatment would be the same as to your clients and Mr. Grover's

11  clients.

12      To refresh my recollection, where is Mr. Grover's client

13  located?

14      MR. SACHSE:  He is on Temecula Creek.

15      THE COURT:  And this is Wilson Creek?

16      MR. SACHSE:  Mine is on Wilson Creek.

17      THE COURT:  You don't happen to include the conclusions

18  of law in here.

19      MR. SACHSE:  No your Honor.

20      MR. VEEDER:  I think you are going to have to have a

21  separate conclusion of law with each one of these individual

22  claims.  But it will be no problem writing those.

23      MR. SACHSE:  We had one or two more words on your Honor's

24  last page I wanted changed, and I think Mr. Veeder has agreed

25  to it.  On lines 17 and 18, "During the irrigation season,

P 204

1   this defendant diverts all . . " This is not true. "Substan-

2   tially all" is true. And Mr. Veeder agreed to that. Of the

3   surface flow; not of the water. Mr. Veeder has it that the

4   defendant diverts "all of the waters." And the fact is, as

5   Mr. Veeder's own witness has testified, that most of the water

6   on Wilson Creek is underground. So I can't stand still for a

7   finding that my man takes all of the water. He may take

8   substantially all the surface flow, but not all the water.

9       MR. VEEDER: On that point I would want to check it out

10  again, because in going back over the evidence, if I remember

11  correctly -- and you gentlemen could correct me if I am in

12  error -- the diversion is on bedrock, isn't it?

13      MR. SACHSE:  The diversion is in an area of basement

14  complex.  It is a loose rock dam, and the visible fact, as I

15  know Mr. Kunkel will confirm, is that there is some flow in

16  the stream below the dam.  Substantially all of the surface

17  flow is what it is.

18      THE COURT: ". . .the waters of Wilson Creek in" -- "in"

19  should be "by," shouldn't it?

20      MR. SACHSE: I think it is better grammar -- "by the above

21  described concrete dam".

22      THE COURT: What about the last three lines?

23      MR. SACHSE: The last three, I think, should go out in

24  their entirety. I see no justification for that finding.

25      MR. VEEDER: We are back again to being wed somewhat to

P 205

1  this argument of Mr. Starke.

2  MR. SACHSE: No, these last three sentences refer only to

3  riparian use. It has nothing to do with appropriation. You

4  see, in those last three lines, "Diversion and use of all of

5  the surface water of Wilson Creek during the irrigation season

6  is an unreasonable riparian use as against all downstream ri-

7  parian users." I think that is absolutely incorrect. I don't

8  think that is true.

9  MR. VEEDER: Let me point out that in my discussions with

10  Mr. Starke and Mr. Grover they say that when the water gets to

11  a particular level in Temecula Creek they divert all of the

12  water out of the stream. There is an issue as to whether that

13  is reasonable or unreasonable under the circumstances. Again,

14  I think we have to, to a degree, melt these findings of fact

15  and conclusions of law with others similarly situated. I am

16  not trying to hold things up. It can go this way, if you want

17  it. But I do say in regard to other claimants we have to take

18  cognizance that there may be changes made.

19  MR. SACHSE: On this specific point, your Honor, this

20  exact language might be appropriate in the case of Gibbon and

21  Cottle, because there was evidence before your Honor that a

22  downstream riparian has to carry water in a bucket, in the case

23  of Gibbon and Cottle. There is absolutely no evidence in the

24  case of Stardust. On the contrary, the testimony is that the

25  stream goes underground -- that there are extensive alluvial

P 206

1   basins; that it rises again at the edge of the Oviatt property.

2   So there is absolutely no basis for saying that the taking of

3   substantially all the surface flow hurts Oviatt.  Oviatt hasn't

4   asked for it.  Vail hasn't asked for it yet.  They may some day.

5   But there has been no request.

6      THE COURT:  I suppose that to resolve this I would have to

7   have reference to the transcript sections of the case on

8   Stardust and have to read it.

9      MR. SACHSE:  I don't think Mr. Veeder will disagree with

10   the fact I have stated, that the record is very clear that

11   there is surface flow on Stardust, that it disappears under-

12   ground on Stardust, that it rises again at about the point

13   where the stream enters the Oviatt property because of the

14   lateral constriction, that then there is surface flow on Oviatt,

15   that then it sinks again.  So to say diversion of substantially

16   all of the surface flow by Stardust is not a proper riparian

17   use by Stardust when there is surface flow at Oviatt, I think,

18   is wrong.

19      THE COURT:  Why you prepare and submit findings along the

20   line you have just mentioned?

21      MR. SACHSE:  I think it should go out.  I think it is

22   utterly unnecessary to say that diversion and use of all the

23   surface water is an unreasonable use as against anybody.  That

24   is not a good finding.

25      THE COURT:  I am talking about considering the possibility

P 207

1    of taking those three lines out, but in lieu of that find

2    somewhere in here what you have just stated to me -- that water

3    rises, how far down it rises, etc.  At a later date, if there

4    were a drier year and if these people downstream were having

5    to carry water in tanks or buckets, it then might be an un-

6    reasonable use.  Why don't you submit the findings, so that

7    later on we can see what the conditions were when we made this

8    finding and what they were when the matter would come up later.

9        MR. SACHSE:  Because there is a finding already at the

10   very beginning on the stream.

11       THE COURT:  Where?

12       MR. SACHSE:  Turn to page 3, paragraphs VI and VII, which

13   tells about the first point of rising water.  He spells this

14   stream out in detail -- that it rises and sinks, rises and

15   sinks.

16       MR. VEEDER:  Turn to page 8, line 28.

17       MR. SACHSE:  Then you go to line 4 in paragraph XI -- it

18   rises again.

19       THE COURT:  Does it tell exactly where it rises?

20       MR. SACHSE:  Pretty close -- as close as I think you can,

21   without a survey, and knowing that it changes constantly by

22   weather conditions.  Paragraph XI says:

23            "Water rises in the alluvial bed of Wilson Creek

24            during the low water season in Section 10. . . a short

25            distance from the point at which it enters Section 9 . ."

P 208

1    It is very clear.

2         Then he gets into Lancaster Valley.  It does the same

3    thing.

4         Turn to page 6, your Honor, Paragraph XVIII:

5         "Rising water during the dry season occurs in Wilson

6         Creek at or near the point where the stream leaves

7         Section 17 . . "

8    That is where you are going into Oviatt now right there.  That

9    is the point I am talking about.

10        MR. GIRARD:  I think if you are going to conclude that

11   the diversion of this substantially all the surface flow at

12   this one isolated point is not an unreasonable riparian use,

13   I don't know why you would even want to describe the diversion.

14   Are you going to describe in this judgment every riparian water

15   works and how he uses it?

16        MR. SACHSE:  I don't follow your question, if you are

17   asking me.

18        MR. GIRARD:  Under the heading on reasonable riparian

19   use there is a description of the fact that your client diverts

20   substantially all the surface water; is that correct?

21        MR. SACHSE:  Yes.

22        MR. GIRARD:  From that Mr. Veeder concludes that this

23   particular diversion is unreasonable.

24        MR. SACHSE:  Yes.

25        MR. GIRARD:  You conclude that it is not.

P 209

1    MR. SACHSE:  I want to delete it.  I don't want to conclude

2    anything.

3    MR. GIRARD:  Wouldn't you also delete the other paragraph

4    too?

5    MR. SACHSE:  You mean about the diversion works?

6    MR. GIRARD:  Yes.

7    MR. SACHSE:  No, I think that can stay in.

8    MR. VEEDER:  You have to show each diversion.

9    THE COURT:  Eliminate the suggestion.  I think your

10   description of the diversion should be in on the ground that

11   at some later date if there is a contention of a changed condi-

12   tion we should know what these conditions were at this time,

13   what type of diversion existed in 1961 when this was considered.

14   And also, Mr. Sachse, even though these other findings

15   that you mentioned probably cover it, that you might submit

16   some short summarization while we are right on the Stardust

17   picture, in a few sentences, about the creek and language

18   indicating findings as to why, under present conditions, it is

19   not an unreasonable use, and let me look at it.  I am not going

20   to pass on it now.

21   MR. SACHSE:  I will do that.

22   THE COURT:  Are you going to insist that that is an un-

23   reasonable use of water, Mr. Veeder?

24   MR. VEEDER:  As far as the United States is concerned,

25   your Honor, at that particular point I am not insisting that

P 210

1   it is.

2   THE COURT:   How many irrigable acres are involved there?

3   MR. SACHSE:   It is a big ranch -- lots of them.

4   THE COURT:   All riparian?

5   MR. SACHSE:   Yes.  Well, no.  There is one section that is

6   severed.  But there is a lot riparian.

7   MR. VEEDER:   1216 acres irrigable.

8   I'll say this -- I submitted this to Mr. O'Malley and I

9   have submitted it to everybody else -- that if Oviatt, sitting

10  immediately downstream, doesn't say it is unreasonable to take

11  all the surface runoff, I am not going to take any of your time

12  right now to argue about the point.

13  MR. SACHSE:   That is my point, that nobody is complaining

14  here.

15  THE COURT:   It seems to me that we ought to have Oviatt

16  and Stardust heard at the same time.

17  MR. SACHSE:   This has been checked out with Oviatt.  Oviatt

18  is fully aware of this thing.

19  THE COURT:   Oviatt probably has a copy of these tentative

20  findings?

21  MR. SACHSE:   Yes.

22  THE COURT:   Oviatt thinks maybe the Court is going to find

23  that your use is unreasonable.

24  MR. SACHSE:   I will send him whatever language I proposed,

25  or else we can get him down here.  I am sure he won't --

P 211

1    THE COURT:  I don't think we can do much more on it today.

2    MR. VEEDER:  I don't think we can do much more this week

3  on it, your Honor.  That is my view.

4    If you don't intend to have court tomorrow, I would like

5  to know now, if I may.

6    THE COURT:  I may have court.  I don't know.  We have some

7  other things to do.  I want to hear you on this rough draft of

8  this opinion.

9    MR. SACHSE:  We still also want to discuss the agenda and

10  analysis.

11    MR. VEEDER:  I am thinking about this afternoon.  I think

12  we can clean up everything this afternoon.  That is the point

13  I am leading to.

14    THE COURT:  We'll see.

15    MR. VEEDER:  I might as well say now that in regard to

16  the opinion I certainly would not be in a position to make any

17  comments on it.  I think it should be the first thing at the

18  next hearing, if we may do that.  Let me file specific objections,

19  or any way you want to.  But I certainly am not going to, and

20  I wouldn't be prepared, to do it today or tomorrow.

21    THE COURT:  Well, if you can't be of help to me, that is

22  just one thing.

23    MR. VEEDER:  I want to be of help to you.

24    THE COURT:  Have you read it, Mr. Girard?

25    MR. GIRARD:  Yes your Honor.

P 212

1   THE COURT:  Have you read it, Mr. Sachse?

2   MR. SACHSE:  Yes your Honor I have read the first half

3   very carefully.  The second half I have read only briefly.

4   THE COURT:  Have you read it?

5   MR. STAHLMAN:  Yes your Honor.

6   THE COURT:  We will take a short recess.

7   (Recess.)

8   MR. VEEDER:  I want it clear, your Honor, that my comments

9   are not in any sense desirous of being uncooperative.  I am

10  perfectly willing to cooperate.  But I truly believe that the

11  most effective way I could do it would be to sit down, analyze

12  it and submit a complete statement to you on it.

13  THE COURT:  Where are we on Tucalota?

14  MR. VEEDER:  They are lodged and they are subject to

15  review.  I have agreed to the general form.

16  MR. SACHSE:  Mr. Krieger and Mr. Veeder both asked that

17  when the detailed exposition of the rights of a given parcel

18  of land was involved that should be left open.  And I concur.

19  I submitted Tucalota with the idea of again making the general

20  findings that could be applicable to any of these small streams,

21  and they have both, as I understand it, approved the form.

22  THE COURT:  Can't we say so in so many words in this and

23  get rid of Tucalota?

24  MR. SACHSE:  I think so, except that was drafted with the

25  specific parcels.  I obtained from Colonel Bowen a list of the

P 213

1   people, and I believe Mr. Veeder wants further opportunity to

2   check the exact rights of those people who are attached.  Mr.

3   Krieger is satisfied.

4        MR. VEEDER:  They run along generally as we have prepared

5   Wilson Creek.  We are in the same situation on those as we are

6   on Wilson Creek.  It is just a matter of each one of those

7   individuals being reviewed, and we are in the process of re-

8   viewing them now.  The actual work has started up and down

9   Wilson Creek, Tucalota Creek, and all the other streams, for the

10   purpose of getting the specific findings for each specific

11   parcel of land.

12        MR. SACHSE:  I haven't pressed Tucalota because I have

13   no direct interest.  I did this at your Honor's direction, if

14   you recall, to prepare findings.

15        THE COURT:  Are you satisfied with the general findings

16   that were prepared, Mr. Veeder?

17        MR. VEEDER:  Yes.

18        THE COURT:  And you are in the process of checking out

19   the parcels?

20        MR. VEEDER:  Exactly just like we are on Wilson Creek,

21   your Honor.

22        THE COURT:  What do you propose will be added to this?

23        MR. VEEDER:  Well, there are situations that we are going

24   to encounter.  The Occidental College, I think, is an example

25   where they have structures across the stream that I think should

P 214

1   be described.  I don't have those descriptions.  I think there

2   are other diversions off Tucalota Creek that I think should be

3   described and I don't have all of those descriptions.  It is

4   simply a matter of investigation and writing them down.

5       THE COURT:  Who is working with you on this now?

6       MR. VEEDER:  Colonel Bowen's office.

7       THE COURT:  And Colonel Bowen's office is taking the

8   responsibility of checking out these things?

9       MR. VEEDER:  Yes.  And find the exterior boundaries on

10   each parcel of land and find the total and irrigable acreage

11   on these riparian lands, and that work is going ahead now.

12       MR. SACHSE:  Mr. Veeder, again, I think you are not going

13   to have to worry about irrigable acreage, because those general

14   findings, if you remember, it is all basement complex and

15   residuum, except for the thread of the stream.

16       MR. VEEDER:  I am simply giving you an idea that if there

17   was any riparian land with irrigable acreage I think that has

18   to be described.

19       THE COURT:  How long before you will be through with

20   Tucalota, Colonel Bowen?

21       COLONEL BOWEN:  We are essentially through with Tucalota

22   now, your Honor.  We may on some of these parcels have to go

23   in and make more detailed surveys, if it is desired that we

24   have irrigable and irrigated acreage on riparian land.  Basic-

25   ally we are completed.

P 215

1    THE COURT:  Have you checked out the diversions and matters

2  of that sort?

3    COLONEL BOWEN:  We are checking them out now, your Honor.

4    MR. GIRARD:  I think your Honor had already instructed

5  Colonel Bowen that it was not necessary to make irrigable acre-

6  age figures on basement complex.  Isn't that correct?

7    COLONEL BOWEN:  The instruction I received is the pro-

8  cedure I am now following.

9    THE COURT:  You are not checking irrigable acreage on

10  basement complex?

11    COLONEL BOWEN:  No sir.  But we had already done that

12  work in the Tucalota that was put in evidence this week, so

13  we went ahead and put it in.  The work we are now doing in

14  Wilson Creek and Upper Temecula Creek we will not present any.

15    THE COURT:  Are you checking irrigable acres in these

16  stringers of younger alluvium?

17    COLONEL BOWEN:  Yes sir.

18    THE COURT:  That is proper, I think.

19    MR. VEEDER:  I think you have to, your Honor.

20    THE COURT:  Yes, I think that is proper.  But you don't

21  need irrigable acres in the basement complex.

22    MR. VEEDER:  No, and we are not, definitely.  And the

23  instructions have been that way for two months, $2\frac{1}{2}$ months.

24    THE COURT:  Let me look this over.

25    Well then, advise me as soon as you have something ready

P 216

1    on Tucalota Creek.

2        MR. VEEDER:  Yes your Honor.

3        THE COURT:  And submit it.

4        MR. VEEDER:  I am hopeful that we will have it ready at

5    the next hearing, whenever that will be.

6        THE COURT:  All right.

7        What do you want to take up next.

8        MR. VEEDER:  The agenda refers to Mr. Sachse's suggestions

9    respecting issues, and I assume that that would be the next

10    matter, unless someone else knows of something else to be

11    discussed.

12        Do you know of anything more, George?

13        MR. STAHLMAN:  At this time?

14        MR. VEEDER:  Yes.

15        MR. STAHLMAN:  There is a little more evidence that has

16    to go in, but I don't think it has to go in right now.

17        MR. VEEDER:  I am talking about what is on the agenda.

18        MR. STAHLMAN:  There is one situation -- if we may check

19    it here.

20        (A pause.)

21        THE COURT:  What matter is that, Mr. Sachse?

22        MR. SACHSE:  Pardon me?

23        THE COURT:  You say there is one further matter.

24        MR. SACHSE:  That is this whole question -- I titled it

25    "Analysis of Issues and Proposed Order of Proof," to which Mr.

P 217

1    Veeder replied, and as a part of his reply, in connection with

2    his reply, it is necessary also to read his memorandum on

3    regulation.  I guess your Honor has seen it.

4         THE COURT:  I haven't read it.  It just came in.

5         MR. SACHSE:  I can say at the outset I don't quarrel with

6    anything he says in it except one word at the very end.

7         MR. VEEDER:  What is that, Franz?

8         MR. SACHSE:  Well, at the very end, the last sentence

9    reads:

10             "However, on the basis of the record, it is

11        obvious that this Court in the ultimate disposition

12        of the case must enjoin uses which interfere with the

13        vested rights of others."

14   I am not sure that I even disagree with that.  But I don't know

15   of any "on the basis of the record."  I don't think, on the

16   basis of the record, you can enjoin anybody, with the possible

17   exception of poor Mr. Poor, whatever his name was.

18        THE COURT:  You wouldn't enjoin him.

19        MR. SACHSE:  I mean, to protect him.  With that possible

20   exception, I don't think there is any record.

21        THE COURT:  Do you have specific instances in mind, Mr.

22   Veeder?

23        MR. VEEDER:  Yes sir.

24        THE COURT:  Have you listed them in your memorandum?

25        MR. SACHSE:  Your Honor instructed him to, but he didn't.

P 218

1     MR. VEEDER:  I refer specifically to the Poor situation,

2  I refer specifically to the United States of America situation,

3  where particularly --

4     It is in there, Mr. Sachse, I think you will find.

5     MR. SACHSE:  I don't find where you tell the Court whom

6  you want regulated, and that is what I thought you were being

7  asked to do.

8     MR. VEEDER:  No, I don't believe that I was asked to do

9  it.  But I certainly think this -- I will be now very specific

10  about regulation -- I think the Fallbrook Public Utility District,

11  when it is taking water that should go into Lake O'Neill, should

12  be regulated and should be prohibited from taking that water.

13  I think any interference upstream above it in the canyon should

14  be regulated.

15     THE COURT:  Now, specifically, whom are you going to seek

16  to have regulation applied to?  Fallbrook is just one you have

17  listed.

18     MR. VEEDER:  Certainly Fallbrook.  And I also reserved,

19  your Honor, in the analysis that I submitted to you of Mr.

20  Sachse's proposals on issues, I specifically stated that your

21  ruling on the stipulated judgment would be the key to the issues

22  in the future.  Your Honor has now set aside the stipulated

23  judgment.  I have asked for the right to reappraise.  It is

24  absolutely essential that I reappraise the areas of Vail

Belt 7  25  Company that it is now irrigating.  If we are on a basis of

P 219

1   correlative rights with Vail Company, I think it is necessary

2   that we decide now whether Vail is using more than its reasonable

3   share of water.

4       Now those are things that have to be considered, and I am

5   certainly not in the position this morning --

6       THE COURT:  I understand that.  All right, Vail Company,

7   Gibbon and Cottle, Fallbrook.  Who else?

8       MR. VEEDER:  I thought surely Mr. Oviatt would ask for

9   some regulation.  He hasn't.  So we will eliminate him.

10      THE COURT:  Regulation as to whom?

11      MR. VEEDER:  Between Stardust and Oviatt.  But he hasn't

12  asked for it.  So far as I am concerned, I am not going to

13  bring it up.

14      But those are the ones that I think there is an immediate

15  demand and a need for.  We haven't gotten the evidence in, in

16  regard to the Coahuila area, and I am not sure what the situa-

17  tion is in regard to the Indian rights up there.  I am responsi-

18  ble for those.  I would want to take another look at it.

19      THE COURT:  Let me take another look at your memorandum

20  on the offer of proof here.  Going to your statement, Mr. Veeder,

21  of the analysis, your first point concerns what ruling the

22  Court will make on the Vail judgment.  Then specifically,

23  paragraph A2 at the bottom of page 2:  "Issue is taken with

24  the statement that there has been a determination of areas

25  whose ground waters are not part of the river . . "  Now we

P 220

1    took care of part of that, and actually, isn't all that is

2    involved now Coahuila, Anza, and the upper part of Temecula?

3        MR. VEEDER:  Yesterday you determined the areas.  Is that

4    correct?

5        THE COURT:  Yes.  Doesn't that leave the three places that

6    you have specified?

7        MR. VEEDER:  I think that is right.  Also based upon a

8    discussion this morning on Diamond and Domenigoni Valley.  I

9    think that is correct.

10       THE COURT:  What is your next point here?  "Reference

11   in that regard is made to large areas in the Coahuila and

12   Temecula Creek subwatersheds concerning which the evidence

13   of individual irrigable acreage has not been offered."  You

14   are going to procure the evidence as to irrigable acres over

15   the younger alluvium, are you not?

16       MR. VEEDER:  That is right.

17       THE COURT:  That is what you have in mind there?

18       MR. VEEDER:  That is right, and that work is being done

19   now.

20       THE COURT:  What does the second part mean?

21       MR. VEEDER:  "Issue is also taken with the statement,

22   'It has been stipulated that no evidence need be offered as

23   to areas of basement complex or residuum.' . . "

24       THE COURT:  No additional evidence, I take it, because of

25   the evidence we already have on the map.

P 221

1    MR. VEEDER:  Then I say, "The subject is particularly

2    pertinent in regard to the claims of the Fallbrook Public

3    Utility District." As I understand it, you want me to send

4    you an analysis of the question of Fallbrook's responsibility

5    to prove irrigable acreage within the boundaries of it.

6    THE COURT:  That is what you are talking about there.

7    MR. VEEDER:  Yes sir.  That is residuum.

8    THE COURT:  And the next one?

9    MR. SACHSE:  The next one refers to the orders to show

10   cause, your Honor.  I think there is no misunderstanding on

11   that one.

12   THE COURT:  Order to show cause in connection with the

13   claimed appropriative and prescriptive rights?

14   MR. SACHSE:  Yes sir.

15   MR. VEEDER:  That is right.

16   THE COURT:  You are going to do that for the next hearing?

17   MR. VEEDER:  Yes, throughout the whole area.  I think

18   ultimately we are going to have to do that, but I am hopeful

19   we can submit proposed findings of fact and conclusions of law

20   to those people.  I don't know when the next hearing is going

21   to be, but we will move as rapidly as we can on the matter.

22   THE COURT:  Now your suggestion yesterday or the day before

23   was that we prepare findings and send to them, together with

24   an order to show cause.

25   MR. VEEDER:  If they disagree.

P 222

THE COURT: Now that postpones the matter for a long time because of the fact that you would have to draw these complete findings, doesn't it?

MR. VEEDER: I think that it does. Or if you would want to write --

THE COURT: Why wouldn't you be able to take the list that the State has prepared of the various permits, diversions, appropriative rights, and prepare a letter to them, with an enclosure showing what the State compilation shows, or an photostatic copy of it, except in those cases where there was some particular problem, and point out to them that this material is in the record and that this is the finding the court proposes to make with reference to the particular rights?

MR. VEEDER: I think that is correct.

THE COURT: It could be done a lot faster than waiting for findings to be prepared and sent out to all of them.

MR. VEEDER: All right.

THE COURT: What do other counsel think about this?

MR. VEEDER: May I tender a thought right here, though. Now on the Wilson Creek findings, on pages 13 and 14, there is evidence of people using water without compliance with the State law for appropriation. I think those people should be treated in the same category as those who have filed -- at least they should be given an opportunity to be heard on it. That is my view.

P 223

1  MR. SACHSE:  My original thought, which I thought was a

2  good one -- and Mr. Veeder talked me out of it -- my original

3  thinking was that he, through his answers, knew who had asserted

4  an appropriative right, and that he perhaps could send these

5  orders to show cause to those people who had asserted them in

6  an answer but not offered proof.  That one I was worrying about

7  on the question of due process.  If they haven't pleaded an

8  answer, I think we can forget about them.

9      But Mr. Veeder pointed out to me, and I thought with merit,

10  that the ones who had pleaded them, as far as he was concerned,

11  are pretty well going to be taken care of by the proposed

12  findings he was drafting and there was no reason to stir them

13  up with and OSC when a finding was going to be sent them listing

14  their appropriative right.  And on that basis I concurred.

15      I still think there may not be a need for an OSC in many

16  of these cases.  As to these two here, I don't know whether

17  they filed an answer or how we got this evidence.  I guess Mr.

18  Veeder got it from an answer.  That is all I can assume.

19      MR. VEEDER:  Yes, there are answers and we do have some

20  information.

21      MR. SACHSE:  And you do know they aren't on the State's

22  list?

23      MR. VEEDER:  Yes.

24      MR. SACHSE:  There is evidence in now, and if Mr. Wenke

25  or whatever his name is doesn't choose to come in to this court

P 224

1   to prove his case I don't think we have to wait forever for

2   him, because the evidence is in, in the data that the State

3   supplied you, and we know from that that he didn't file.

4       MR.GIRARD:  I don't think we can conclude absolutely that

5   because he didn't file with the State that he doesn't have an

6   appropriative right.  It may be a pre-1914 filing.  I think

7   those who are claiming appropriative rights or prescriptive

8   rights, and particularly appropriative rights, those whose

9   rights are not set up in the evidence already introduced from

10   the State, should just get a letter that says that you have

11   claimed an appropriative right in your answer and that a certain

12   date is the day set forth for you to show up in court and offer

13   proof establishing them, and if you don't there will be a

14   finding that you don't have them.

15       MR. STAHLMAN:  Do you think there is any necessity of

16   making a distinction between permits and licenses?

17       MR. GIRARD:  It doesn't matter.

18       MR. SACHSE:  It doesn't matter.

19       MR. GIRARD:  Those people who have a license or a permit,

20   there is already evidence in the record to sustain that.  I

21   think if we introduce evidence for them it is just as good as

22   if they had introduced it.

23       MR. STAHLMAN:  Does it show that they made a reasonable

24   beneficial use of water?

25       MR. GIRARD:  Whether they did or did not would be up to

P 225

1 the State Water Rights Board to revoke the license or the

2 permit, I think.

3     MR. STAHLMAN:  The point I had in mind, a person who has

4 a permit and the permit gives them a right to appropriate a

5 certain amount of water, they have only acquired a right of

6 appropriation for the quantity of water they have actually

7 devoted to beneficial use.  There is nothing in the record on

8 that.

9     MR. GIRARD:  Of course, there would not be anything done

10 from the State until they had gotten a license.

11     MR. STAHLMAN:  In other words, what you may be doing,

12 assuming a person has a permit and has only actually appropria-

13 ted to beneficial use a small amount of water and has been

14 doing it for a good many years, the State Permit would indicate

15 a much larger amount of water.  There wouldn't be actual proof

16 that they had been appropriating that quantity of water.

17     THE COURT:  Why should we take proof on that?

18     MR. GIRARD:  I don't think this court would have juris-

19 diction to do anything about it.

20     THE COURT:  If we had proof on it and made findings, we

21 would gum up the situation when the State Water Rights Board

22 came along to decide what the man had done and how much water

23 he had acquired.  That is their function.

24     Do you agree, Mr. Veeder?

25     MR. VEEDER:  Do I agree?

P 226

1    THE COURT:  No.

2    MR. GIRARD:  I think the simplest thing would be to send

3    out letters to people who have claimed these rights notifying

4    them to show up in court or there will be a finding that they

5    don't have them.

6    THE COURT:  Have you made a list from the Answers of

7    persons who claimed these rights and presented no proof and

8    who don't appear on the State's list, Mr. Veeder?

9    MR. VEEDER:  Of parties who claim appropriative rights?

10   THE COURT:  Some kind of right, particularly appropriative.

11   MR. VEEDER:  Your Honor, some kind of right -- there is

12   a riparian right.

13   THE COURT:  Appropriative rights.

14   MR. VEEDER:  I haven't made that list, your Honor, no.

15   But what we are doing is going through each tributary and each

16   stream just like I did on Wilson Creek.  If I find a filing

17   for an appropriation, fine.  That is one thing.  But as I have

18   done on a great many of these, I have found/there is some
                                          that

19   evidence that they have made some uses, and I think we have

20   to send them findings of fact and conclusions of law or else

21   write the letter your Honor has written to other people and

22   say we find that you have some claim.

23   THE COURT:  We are talking about two different things.

24   One situation is where a person has filed an Answer pro per

25   or by attorney and he has asserted something that looks like an

P 227

1     appropriative right.

2        MR. VEEDER:  Yes.

3        THE COURT:  The other situation is where by surveys on

4     the ground made by Colonel Bowen or some other source there

5     has come information that someone has a dam or a diversion or

6     is doing something with water where he may not have filed an

7     answer and where he doesn't appear on the State's list.  I

8     take it that you are trying to cover both those categories.

9        MR. VEEDER:  That is right.

10       THE COURT:  I asked you if you have made a list.

11       MR. VEEDER:  And I haven't made a list throughout the

12    whole watershed yet.

13       THE COURT:  Can we get that right away?

14       MR. VEEDER:  Yes, we will, your Honor.

15       THE COURT:  Then let's adjourn until two o'clock.  Will

16    you be prepared, with the exception of Mr. Veeder, to give me

17    some suggestions on this opinion?

18       MR. SACHSE:  Yes your Honor.

19       (Noon recess.)

20

21

22

23

24

25

P 228

<u>SAN DIEGO, CALIFORNIA, Thursday, February 2, 1961, 2:00 P.M.</u>

1

2          THE COURT:  I understand that you want to get away and

3    not be here tomorrow?

4          MR. VEEDER:  It is entirely up to you, your Honor.  I want

5    to do what you want me to do.

6          THE COURT:  It depends on how far along we get.  If we

7    can wind up what we have to do, there is no reason why you

8    should have to be back.

9          MR. VEEDER:  It will not mean anything from the standpoint

10   of doing the work I have outlined.  That I know I have to do.

11         There is one thing I would like to bring up right now,

12   though, your Honor.  It was not clear to me from our discussion

13   this morning.  I will outline what we are doing in regard to

14   Wilson Creek, and if this is not in accordance with your

15   directions I would like to have it specific.

16         Colonel Bowen's office is checking out all the legal

17   descriptions of all lands overlying the younger and older

18   alluvium, and we intend to contact those people and tell them

19   what their total and irrigable acres are in connection with

20   that older and younger alluvium.

21         THE COURT:  Contact them by letter?

22         MR. VEEDER:  By letter from you, as we have in the past.

23         THE COURT:  I would like to see the form of the letter.

24         MR. VEEDER:  Oh yes.  I will write the letter for your

25   signature and, as I have in the past, tender it to you for your

P 229

1  signature and improvement.

2  We are checking out on Wilson Creek all of the riparian

3  land, and on the lands which are riparian we are also checking

4  out the total and irrigable acreage.

5  Mr. Girard raised the point today, and you commented on

6  it, but I wanted to be sure that it is understood what we are

7  doing, so that next time there will be no question.

8  It has been my understanding that wherever you have a

9  situation where a stream comes down like this, the land being

10  riparian, we were to check out the total and irrigable acreage

11  of that land which is abutted or traversed by a stream.  We

12  would notify those people, as we have notified all overlying

13  rights.

14  THE COURT:  It is an idle gesture in a way, because if

15  you are cataloguing riparian land and you don't make categories

16  it is obvious that these peoples's rights to that little stringer

17  of younger alluvium is an illusory one.

18  MR. VEEDER:  All I am asking for is direction, your Honor.

19  THE COURT:  How big a job is it to do that?

20  MR. VEEDER:  We can have the work done in a period of about

21  three weeks.  In the process we check, too, all diversions and

22  everything else on those streams.  It would be most helpful to

23  me.

24  THE COURT:  What good would it do you to have listed a

25  bunch of this riparian land which, if we ever catalogue it, we

P 230

1  would have to put in an illusory category having no practical

2  chance of ever irrigating that land.

3      MR. VEEDER:  I think that is a problem with which we are

4  going to be confronted, for example, on the Vail lands now.

5  While we admit that this is illusory, while we do concede that

6  some of these acreages are illusory, my own personal feeling

7  about it is that while I can very well argue to a man in the

8  basement complex that his chances of getting water are nil,

9  nevertheless these people who are riparian will say, "Well,

10  I want what ever water I can get, and this would be the measure

11  of my rights."  Again, it is not for me to make the determina-

12  tion.  It is for the court to make the determination as to

13  whether we pursue it to the end or not.  I feel better myself,

14  from the standpoint of due process, writing such a letter to

15  these people, and I am willing to take the time to do it.  It

16  will not slow down the process at all.

17      THE COURT:  The Colonel's office would have to check any-

18  how on the ground to ascertain if there were impediments, dams,

19  diversions.

20      MR. VEEDER:  Yes.

21      THE COURT:  So this can be done at the same time.

22      MR. VEEDER:  I expect that can be done.  I see no other

23  way of doing it.

24      THE COURT:  All right, we will go on that basis.

25      MR. VEEDER:  Is there going to be any further question in

P 231

1  regard to the exterior boundaries of the ground water areas that

2  were marked yesterday?  If not, I will release the U.S.G.S.

3  people.

4  THE COURT:  The only inquiry was where we had shown some

5  of Gardner's mountain in the basement complex, and if he wanted

6  to complain about it, of course, that part upon the mountain

7  is not part of any ground water body.  That's sure.

8  Has anybody talked to him about it?  Mr. Stahlman, have

9  you?

10  MR. STAHLMAN:  No your Honor.  I called him last evening.

11  He is down at Palm Springs.  He is coming back today.

12  THE COURT:  There is no other reason.  This is a minor

13  matter that we could later on adjust.  It looks from the map,

14  and I think the Colonel would confirm, that we have thrown

15  that mountain behind him, for ease of description, into the

16  basement complex.

17  Have we not?

18  COLONEL BOWEN:  That is correct, your Honor.

19  THE COURT:  We have played fast and loose with fact, if

20  he doesn't care.  The other part of his land is obviously over-

21  lying the valley there.

22  MR. VEEDER:  Can't we take the position, if Colonel Bowen

23  notifies him and he objects, we will change the boundary.

24  THE COURT:  We could figure some line across the toe of

25  that mountain, couldn't we?

P 232

1      COLONEL BOWEN:  Yes sir, we could.

2      THE COURT:  Let's find out about it.

3      That is the only loose end I see.

4      MR. VEEDER:  Colonel Bowen should contact him; is that

5 right?

6      THE COURT:  I will let the Colonel contact him, if necessary.

7      MR. VEEDER:  Then if we revise 277A, a tabulation, to

8 reflect Mr. Gardner's feelings on the matter --

9      THE COURT:  277A has not been completed yet.

10      MR. VEEDER:  That is right.  It will be reflective of Mr.

11 Gardner's whim in the matter.

12      THE COURT:  If you want to put it that way.

13      MR. SACHSE:  Reflective of the facts.

14      THE COURT:  I am not particularly concerned with Gardner

15 any more than I am with anybody else.  But we have, without

16 dispute, thrown the mountain into the basement complex and he

17 would have a right to complain if he wanted to.  He has taken

18 more interest in this lawsuit than a lot of other land owners.

19 He has written a brief in behalf of Vail Company.

20      MR. VEEDER:  I had forgotten about that.

21      THE COURT:  He has shown an interest in the litigation.

22 I would just like to know what he thinks about the boundary.

23      MR. VEEDER:  We will take care of it that way then.

24      THE COURT:  All right.

25      MR. GIRARD:  I was not here yesterday, your Honor.  Does

P 233

1   this 277A problem concern treating this whole area as one basin?

2   THE COURT: No, 277A is reserved for a document which will

3   contain a description by section, property line, etc., of the

4   outside limits of the two ground water bodies. It does not

5   impinge upon a decision we will have to make later where there

6   is some separation between them.

7   MR. GIRARD: That is fine.

8   THE COURT: We took some evidence yesterday that there is

9   a surface divide, and probably an underground divide, and how

10  to treat the two.

11  MR. GIRARD: That question is open.

12  THE COURT: It is still open. I am listing some of the

13  things for the next meeting, and that should be listed.

14  MR. VEEDER: That is correct,

15  Do you want to talk about time for the next one?

16  MR. STAHLMAN: We have a couple of other things first,

17  Bill, we might go in to.

18  MR. VEEDER: All right.

19  MR. STAHLMAN: Your Honor will recall that at one of our

20  previous hearings we offered in evidence Exhibit Vail AX,

21  which was a comparison between the quantity of water that Vail

22  would obtain under the stipulated judgment as contrasted with

23  the quantity of water under the decision in the first Vail

24  case. There was testimony in the first Vail case in relation

25  to it. We offered this in evidence. Mr. Veeder asked that it

P 234

1  be not admitted until he had a chance to look at it.  I called

2  it to his attention today.  And we again offer Vail's AX.

3      MR. VEEDER:  He is going to put on some more evidence

4  later on.

5      MR. STAHLMAN:  It is based upon evidence already in the

6  record.  It is merely for the purpose of illustration.

7      THE COURT:  Vail AX received in evidence.

8                              (The document above referred to was)
                               (received in evidence as Vail's    )
9                              (Exhibit AX.                        )

10     MR. VEEDER:  That is over my objection.  I object to it.

11     THE COURT:  On what ground?

12     MR. VEEDER:  On the grounds that it purports to reflect

13  the fact that it is interpretative of the effect of the stipu-

14  lated judgment and the fact that Vails actually didn't acquire

15  as much water by the exchange of 66 2/3% to 33 1/3% as they

16  thought they should.  Now my view on the matter is that this

17  tabulation should show that under the stipulated judgment they

18  participate in the Rainbow, Sandia, De Luz area of water, and

19  they did not under the old judgment.  That is why I don't be-

20  lieve that it is reflective of the facts.  It goes to the

21  weight, of course.

Belt 8

22     THE COURT:  It is a tabulation based on other evidence

23  in the case, and for what it is worth it would be admissable.

24     MR. VEEDER:  I have my objection in there.

25     THE COURT:  Overruled, and received in evidence.

P 235

1    MR. STAHLMAN:  There is another matter.  This does not

2    pertain to matters that in any way reflect on the judgment.

3    This pertains to a matter we have reserved and will put in

4    evidence later on.  However, there was lodged the series B

5    exhibits we withdrew yesterday.  We had the negative.  We

6    withdrew it, and we now have a positive made.  If we could

7    substitute the positives for the negatives and lodge them with

8    the same exhibit numbers.  The matter will come up later on.

9    This is a matter that Colonel Bowen and Mr. Wilkinson had

10   some discussion on.  There has been some testimony and it has

11   been held up.  It is not finally completed.

12       THE COURT:  All you are doing is asking permission to

13   substitute positives for negatives?

14       MR. STAHLMAN:  That is right.

15       THE COURT:  For what exhibit number?

16       MR. STAHLMAN:  The BF series 1 through 6.

17       THE COURT:  BF 1 through 6?

18       MR. STAHLMAN:  Yes.

19       THE COURT:  You may withdraw the negatives and substitute

20   the positives.  They will have the same number.

21       Now, let me ask, is this that question that has never

22   finally been decided as to the total irrigable acreage?

23       MR. STAHLMAN:  No, this is the question in regard to the

24   evapo-transpiration loss of the area within the reservoir area

25   of the Vail Dam.  I think there was to be some discussion

P 236

1    between Colonel Bowen. He was to look over these exhibits and

2    the data, and I believe he has done so, and it is going to

3    resolve itself when we come to the question of merely whether

4    there is agreement and whether the exhibits then are admitted

5    in evidence.  It refers to the Sonderegger Report of the evapo-

6    transpiration loss of that area.

7         THE COURT:  Can that be got into position to dispose of

8    it at the next meeting?

9         MR. STAHLMAN:  Yes, I think so.

10        Colonel Bowen?  The Colonel nodded.

11        (As to Vail's Exhibits BF 1 through 6 positives were

12   substituted for the negatives.)

13        MR. STAHLMAN:  Then the other situation, which is almost

14   completed except for some tabulations, is the study made by

15   Colonel Bowen of the conditions of irrigable acreage on the

16   Santa Rosa Ranch.  We have already in the Sandia watershed and

17   the De Luz watershed, and the balance of the ranch he has made

18   a study on and has made the report, but wants to make a com-

19   pilation in relation to what the total figures are.

20        THE COURT:  And that can be ready, you think, by the next

21   meeting?

22        MR. STAHLMAN:  Ready the next time, yes.

23        THE COURT:  Where do we stand on the old problem of the

24   total irrigable acreage?

25        MR. STAHLMAN:  Your Honor will recall we submitted a

P 237

1    memorandum in which we analyzed all the evidence in the record

2    in relation to that and made a tabulation.  That was submitted

3    as a document.

4        THE COURT:  Yes, I remember.

5        MR. STAHLMAN:  I think after Colonel Bowen testifies as

6    to these other matters which are not in, then we can review

7    the whole picture of the Vail Ranch in regard to irrigable

8    acreage.  That could be done at the next session.

9        THE COURT:  Irrigable and irrigated acres of the Vail Ranch.

10       MR. STAHLMAN:  Right.

11       THE COURT:  As I remember, the matter was left something

12   like this.  I told Mr. Veeder that I thought you had made a

13   prima facie showing.

14       MR. STAHLMAN:  That is right.

15       THE COURT:  And the burden was on him then to make up

16   his mind either to let his record stand as it was or to put on

17   proof on the part of the Government as to irrigable acreage.

18   I think you got together finally on irrigated acres.

19       MR. STAHLMAN:  Yes, I think we are in agreement on that.

20       THE COURT:  Isn't that the situation, Mr. Veeder?

21       MR. VEEDER:  That is right.

22       THE COURT:  I think that matter should be reviewed.

23       MR. VEEDER:  I am reviewing the whole thing, your Honor.

24       THE COURT:  I will list that also.

25       MR. STAHLMAN:  Very well.

P 238

THE COURT:  What else?  Do you want to talk about the date?

MR. VEEDER:  Yes, I would.

There was a matter came up about the Knox claim.  Is that Sunnybrook Ranch?

MR. STAHLMAN:  Yes.

THE COURT:  There should be an order to show cause on Knox for next time.  What do you call it?

MR. VEEDER:  Sunnybrook.

THE COURT:  Sunnybrook Ranch.

I have a copy of a letter from Mr. Anderson.  I suppose you got one, too?

MR. VEEDER:  Yes.

THE COURT:  He wrote Mr. Knox and told him he was not going to represent him.  He wanted him to sign a substitution of attorneys for the reason that, as a lawyer, he was subject to the orders of this court and he has been called twice to come down here.  In fact, you might as well take the copy of the letter and put it with the file.

What do you suggest?  Say the last week in February -- February 28th is a Tuesday, and March 1st, 2nd, and 3rd?

MR. VEEDER:  Your Honor, from the standpoint of finishing up all of the work we have, and I have talked to Colonel Bowen's office about it and I have also talked to Mr. Grover about it, they indicate March 14th, which is a Tuesday.  I don't want to

P 239

1  delay these things, but it would be foolish to come here with-

2  out the data prepared.

3      THE COURT:  Is March 14th agreeable?

4      MR. GIRARD:  It is agreeable with me.  Any date is agree-

5  able.

6      MR. SACHSE:  I don't like it.  It is too late, but I can

7  make it.

8      THE COURT:  I am assuming that the work will go forward.

9  The fact that I give additional time doesn't mean there will

10  be less done but more done.

11      MR. VEEDER:  Your Honor, that is how I practice.

12      MR. SACHSE:  What day is March 14th?

13      THE COURT:  A Tuesday.  I will set aside the whole week

14  and expect to go ahead on the matter.  I may assign some other

15  tasks here so that you don't have to do all of the work -- get

16  some other things started here by some other counsel in the

17  case.

18      MR. VEEDER:  I am delighted.

19      THE COURT:  On that date, then, we should also have on

20  the agenda Mr. Grover -- what is his colleague's name?

21      MR. VEEDER:  Mr. Starke.

22      THE COURT:  Mr. Starke for Gibbon and Cottle.  And Mr.

23  Sachse for Oviatt?

24      MR. SACHSE:  Stardust.  I don't think you had better

25  assume there will be any evidence, your Honor.  I am just

P 240

1  sitting by to see what the ruling is going to be on the Gibbon

2  and Cottle appropriation.

3      THE COURT:  Who is representing Oviatt?

4      MR. SACHSE:  Mr. O'Malley.

5      MR. VEEDER:  And he has tendered his findings.

6      MR. GIRARD:  I think Mr. Veeder and I were under a duty

7  to file a brief on the prescriptive claims.

8      MR. VEEDER:  I was on appropriative, and you on the pre-

9  scriptive, as I remember.

10      MR. GIRARD:  I know I was requested to file a brief, which

11  will be in within time.

12      THE COURT:  These are all inter-related in that they have

13  common problems.

14      MR. GIRARD:  I think the Gibbon and Cottle problem is

15  about the same as Mr. O'Malley's on prescription.

16      THE COURT:  I think Mr. O'Malley should be told that that

17  matter is coming up on that date and that he should be here.

18      MR. GIRARD:  We will also offer an exhibit at that time

19  bringing California's Exhibit AS up to date, which is the State

20  Water Rights records as far as appropriations are concerned.

21  This one was prepared in February 1959.  We will bring it up

22  to date now.

23      THE COURT:  California's AS?

24      MR. GIRARD:  Yes your Honor.

25      MR. SACHSE:  May I suggest that you get that as quickly

P 241

1   as you can -- there may be some of those on Wilson Creek, and

2   send it to Mr. Veeder before you even file it, so that we can

3   have it on Wilson Creek.

4       MR. GIRARD:  All right.  That shouldn't take two minutes

5   of the court's time.

6       THE COURT:  Mr. Veeder, this has been an unpleasnt couple

7   of days for you -- two major rulings.  Of course, I had already

8   ruled on the stipulated judgment, subject only to writing it

9   up.  I am wondering whether or not we couldn't consider at the

10  next hearing some proposed findings on the appropriative rights

11  of the United States downstream.  I have ruled as to prescrip-

12  tive rights that persons downstream can't get a prescriptive

13  right against upstream users.  But there is open, and we haven't

14  approached it, the appropriative rights claimed in connection

15  with Lake O'Neill.

16      MR. VEEDER:  The evidence is in.

17      THE COURT:  The evidence is in.  I would be willing to

18  assign to one or two counsels sitting over here the job of

19  working on that --

20      MR. VEEDER:  Writing my findings?

21      THE COURT:  Wait a minute. -- with the idea of helping

22  you, and I have enough confidence in them that I think they

23  would do a lawyer-like job, at least they would get most of

24  the preliminary matters out of the way, and they could in their

25  rough drafts give you page references to transcript and it

P 242

1   would make your task a lot easier in deciding how fairly they

2   had drawn them.

3       MR. VEEDER:  Your Honor, I can't --

4       THE COURT:  I will say right now that I am going to listen

5   with a sympathetic ear to what kind of showing you can make on

6   appropriative rights.  As I recall the record, this goes back

7   a long way.  What the law is going to be may present some

8   problem.  But I am not trying to follow the practice of Judge

9   Bridlegoose in Rabellais -- you know, you may not have had

10  enough interest in Rabellais to have ever read this chapter;

11  I don't intend to make one ruling on one side and another ruling

12  on the other.

13      MR. VEEDER:  I don't expect that.

14      THE COURT:  I think this is a pretty important part of

15  your case and I think we are getting to the place where we

16  could well have some findings submitted on that issue as an

17  interlocutory decree.

18      MR. VEEDER:  As a matter of fact, your Honor -- of course,

19  you can direct anyone to do anything you want to, I couldn't

20  stop you -- but I had fully intended to write findings for the

21  entire enclave, including the Ammunition Depot and everything

22  else.

23      THE COURT:  Well, are there any real problems in dispute

24  except on Lake O'Neill?

25      MR. VEEDER:  That I wouldn't know.  I don't see how there

P 243

1  could be.

2  THE COURT:  I don't recall that there was.

3  MR. STAHLMAN:  The only one, your Honor, I think there

4  should be an analysis of the evidence as to whether or not the

5  quantity of water that has been testified to as to the operation

6  -- whether that is a reasonable beneficial use.

7  MR. VEEDER:  Quantity?

8  MR. STAHLMAN:  Yes.  There has been a tremendous quantity

9  of water in Lake O'Neill, and I would like to review the

10  evidence in relation to the quantity of water.

11  THE COURT:  Certainly all of you may review the evidence.

12  I am talking about getting something on the road here that we

13  can get our teeth into.

14  MR. GIRARD:  I don't think there is any major dispute at

15  all, as far as the State is concerned, with the United States'

16  claim, subject to the prior rulings of the court, except on

17  minor problems on Lake O'Neill.  We recognize that the United

18  States is riparian, that their uses are reasonable and bene-

19  ficial, etc. I believe Mr. Sachse originally had raised the

20  question, though, on their use.

21  THE COURT:  You concede that the United States has

22  appropriative rights?

23  MR. GIRARD:  Oh yes, I concede that they have an appropri-

24  ative right.  The only problem I have -- I was not in the

25  case at the time this evidence came in -- I would want to check

P 245

1    a little bit to see what amount the appropriative right is or

2    what use is actually made of Lake O'Neill.

3        MR. STAHLMAN:  Then the other question is whether or not

4    we don't have the same thing we have on some of these other

5    questions like Gibbon and Cottle, appropriation for riparian

6    purposes.  I think it may resolve itself in the fact that they

7    are storing riparian water down there.

8        THE COURT:  These all have to be ironed out.  But let's

9    get something started.

10        I have assigned Mr. Girard the task of preparing findings

11   in connection with this Vail prior judgment matter, and I

12   would be prepared to assign to Mr. Sachse -- and I think he

13   probably is not too burdened now with other duties -- to see

14   what he could pull together on it.  As a matter of fact, since

15   he was one of the parties that seemed to be in opposition, if

16   findings should turn out to be rather favorable as he drew

17   them up a lot of problems might be solved.

18        MR. SACHSE:  As I understand it, your Honor, this would be

19   on what I described in stating the issues of law in my memoran-

20   dum, "What appropriative rights does the United States have by

21   virtue of succession from its predecessor owner of the enclave?"

22   That is the idea.

23        THE COURT:  Yes.

24        MR. STAHLMAN:  It runs into a lot of very interesting

25   questions.

P 246

1     MR. VEEDER:  I will say it does.

2     THE COURT:  I am not trying to say that it is simple.  We

3 have to face these problems somewhere along the line, and one

4 good way to point up these problems is to get a proposed set

5 of findings and find out just where the areas of disagreement

6 are.  Much of the factual background can't be in disagreement.

7 We have a historical background which can't be denied.

8     MR. SACHSE:  I will be very happy to try my hand at it,

9 your Honor.  I am sure Mr. Veeder won't like either my draft

10 or my result, but I will try.

11     THE COURT:  I will give you that task, Mr. Sachse, and

12 without prejudice, letting Mr. Veeder do the same, or prefera-

13 bly to save him time wait to see what you come up with.

14     MR. SACHSE:  On this question, I would like to inquire

15 whether your Honor's ruling on the stipulated judgment disposes

16 of the issue that I have listed in my memorandum as Issue of

17 Law Number 10 -- and I took this right out of the pre-trial

18 order:

19     "Has the United States acquired any prescriptive

20     rights to use water in the enclave by virture of

21     activities in connection with the Stipulated

22     Judgment?"

23 I said that this issue remains to be determined, in my analysis

24 of issues.  But very frankly I have never quite understood

25 what type of prescriptive rights they were.  This is an issue

P 247

1  which you, yourself, set forth in your pre-trial order.  We

2  have to know whether we have still to face it or whether the

3  stipulated judgment ruling disposes of it.

4      MR. VEEDER:  I would like to assume the responsibility on

5  that myself, your Honor.

6      THE COURT:  It was picked up out of some of your conten-

7  tions.  That is how it got into the pre-trial order.

8      MR. VEEDER:  We have always taken the position that we

9  were delivered water by Vail Company at the head of Temecula

10  gorge, and we brought it down the gorge, as we could in this

11  state, and that it was actually delivered to us at that point,

12  and that was above Fallbrook and all these others and was open,

13  notorious, hostile and all the other elements, bringing water

14  on down through the area.

15      MR. SACHSE:  If that is the issue, I want to be heard on

16  it.

17      MR. STAHLMAN:  Are you going to assert that right?

18      MR. VEEDER:  I am not abandoning it.

19      THE COURT:  Whom could it concern except the few people

20  who had riparian ground between the Narrows and the enclave?

21      MR. SACHSE:  It can concern Fallbrook very seriously, your

22  Honor.

23      MR. GIRARD:  This is completely inconsistent with Mr.

24  Veeder's long contention in court to the effect that the stip-

25  ulated judgment right never affected anyone but the parties to

P 248

1  it.  If I have heard him once I have heard him 15 times say,

2  in arguing to oppose the stipulated judgment, that he stipulated

3  that it didn't apply to anyone other than the parties.  If that

4  is correct, it certainly couldn't have been adverse to him.

5  THE COURT:  I have heard him say the same thing many times.

6  MR. SACHSE:  I might also remind your Honor that it would

7  pay us to take a good look again at the Circuit decision where

8  there is a phrase by Judge Fee in it -- I can almost quote it

9  -- he said something to this effect:  Presumably whatever

10  deliveries were made by Vail were made for the benefit of

11  everybody downstream from the Narrows.  Not just the United

12  States.  It is something to that effect.

13  THE COURT:  Let's put this on the list for the next

14  meeting.  How will you term this?  Alleged -- you don't claim

15  this as an appropriative right -- prescriptive right?

16  MR. SACHSE:  Prescriptive right is the way it is phrased

17  in the pre-trial order.

18  THE COURT:  You don't claim it is an appropriative right.

19  MR. VEEDER:  No sir.

20  THE COURT:  Alleged prescriptive rights of the United States.

21  MR. SACHSE:  Arising out of the operation of the Vail

22  stipulated judgment.

23  THE COURT:  All right.

24  What else?  I don't have your list of issues before me,

25  Mr. Sachse.  What other matters?

P 249

1    MR. SACHSE:  According to my analysis, there were only

2    three issues of law remaining undetermined:  The appropriative

3    rights you asked me to take care of; the prescriptive rights

4    you have mentioned; and the 19th one:

5        "What is the extent of the water rights of the United

6        States in connection with Indian reservations, National

7        forests and other public lands outside the military

8        enclave?"

9    My comment on that is that to the extent that such rights may

10   be other than riparian, appropriative or prescriptive, the

11   issue hasn't jelled yet.  I think as to riparian, appropriative

12   and prescriptive rights probably it is all in the record, or

13   probably will be when you finish Coahuila.  But if there is

14   some other kind of right that we are not aware of --

15       MR. VEEDER:  It was recognized in your pre-trial ruling.

16       THE COURT:  As I remember the law, there is no doubt but

17   that the Indian in these adjudicated cases is given about as

18   good a right as there is.  In fact -- I am trying to remember

19   it -- it seems to me that the Indian can just use all the water

20   he may possibly need and it doesn't even concern anybody else.

21       MR. SACHSE:  I am of that opinion.  But what I mean is, on

22   this particular issue spelling out exactly what the claimed

23   rights are other than appropriative and prescriptive rights

24   has never been discussed.

25       MR. VEEDER:  It is simply the implied right.

P 250

1    MR. SACHSE:  I think that is for Mr. Veeder to draw a

2    finding on, because I don't think he is going to find very much

3    quarrel from any of us.

4    MR. STAHLMAN:  Is there any proof that these are Indian

5    reservations?

6    MR. VEEDER:  Yes.

7    MR. SACHSE:  Yes, that is in the record.

8    I don't see any reason, on a thing like Coahuila Valley --

9    I know from conversation with other counsel that none of us

10   is going to have any rebuttal or cross examination -- I don't

11   see any reason why Mr. Veeder shouldn't go ahead and have his

12   Coahuila findings ready to put in your lap right after the

13   evidence is in the record, if he can do it, because I don't

14   think there is going to be any fight over it.

15   MR. STAHLMAN:  Are the rights acquired by some Act?

16   MR. VEEDER:  They are acquired by a matter of establish-

17   ment of the public lands as a reserve with the implied reser-

18   vation of water for the purpose of development the land.  That

19   is the doctrine of implied reservation under the case of <u>United</u>

20   <u>States vs. Winters</u> (or Winters vs. United States) in 207 US.

21   THE COURT:  Do you want that on the agenda next time?  Or

22   have we got enough already?

23   MR. VEEDER:  I think you have a great deal on the record

24   already, your Honor, but I am perfectly willing to put it on.

25   THE COURT:  Let's postpone the entire thing.  I don't

Belt 9

P 251

1  think it will be too difficult.  We can take care of it later.

2    MR. GIRARD:  Maybe we can be thinking what we are going

3  to do about these stock watering ponds and flood control con-

4  servation things.

5    MR. VEEDER:  I think those are going to come up on these

6  individual findings on Wilson Creek to begin with, because I

7  think there are some of them up there.  I guess there are.

8    THE COURT:  The question is what position we are going to

9  take on them.

10   MR. GIRARD:  I think we ought to take a position that

11 will be pretty consistent throughout the watershed on them.

12 Whether they are on one particular stream is a novel situation.

13 I would hope we could reach some agreement.

14   MR. STAHLMAN:  Don't overlook the fact that there are

15 these stock watering ponds that are used as part of the irri-

16 gation system, too.

17   MR. GIRARD:  Assuming that the stock watering pond is

18 used as part of the irrigation system, it would come under a

19 riparian right.

20   MR. VEEDER:  Haven't you always told these people that

21 you have retained  jurisdiction to control any building on

22 the streams of these stock watering dams?  And wouldn't that

23 be the position to take, that if they put one in now that

24 interfered with any rights, they could be restrained or regu-

25 lated, whatever the circumstance is? -- I would just as soon

P 252

1   have it put on the 14th of March.

2       MR. SACHSE:   I think Mr. Veeder has stated it, and it

3   seems to me it is going to be the last paragraph of his find-

4   ings, that this court retains continuing jurisdiction to abro-

5   gate, restrict, control -- put in all the language we can think

6   of -- any diversion of any water found to be part of the stream

7   system.   That will take care of it.   You can do it all in one

8   package.

9       THE COURT:   Maybe so.   But I would like to have each of

10  you -- it doesn't have to be long -- give me your ideas on

11  how to handle the stock water ponds.   Mr. Girard mentioned the

12  other day some code section he found that looked interesting.

13  I had never seen it before.   As I recall, he said he is going

14  to look up the legislative history of it.

15      MR. GIRARD:   Yes.   I will try to look up the legislative

16  history on it.   As far as the State of California is concerned,

17  if it is of any benefit, we are not going to take a strong

18  position to oppose these things.

19      THE COURT:   Each of you give me your idea as to the law

20  and what, as a practical matter, we ought to do about it.

21      All right, are you prepared to give me some assistance

22  in connection with this draft of an opinion handed to you?

23  There are probably errors and omissions and ambiguities.   Who

24  wants to be heard first?

25      MR. GIRARD:   I will comment just briefly, your Honor.

P 253

1    There are certain things in this that I think, with a little

2    work, we can probably cut down a little, however, I think I

3    can better offer a suggestion if I have a little time to work

4    on it.   I think Wiel's quote, for example, and maybe some of

5    the discussion on the individual cases can be shortened slight-

6    ly.

7        I think the first part of this tentative opinion is a

8    very important part of it.   I, personally, have always been,

9    and still am, a hundred per cent in agreement that these have

10   to be treated as one unified integral judgment.

11       There was one thing in there that I, personally, was not

12   aware of before, where you referred to the quote in the stipu-

13   lated judgment which referred back to the findings and pointed

14   out that there were no findings.   I have wanted to check that

15   out a little bit and unfortunately I did not have the stipula-

16   ted judgment and haven't done it yet.

17       There are several minor additions or corrections that I

18   would suggest and will do so in writing.   One of them on page

19   19, where it is stated, about the middle of the page, that the

20   use of ground water is the only method whereby the United States

21   could acquire water from the river to meet its water require-

22   ments.   I would probably add that it is the only "economic"

23   method or something along that line.   Because I think physically

24   it is possible to build a dam, assuming that they comply with

25   State law and can get water rights.

P 254

1    I would like to have the opportunity when I return to

2 Sacramento to look at this carefully and maybe throw out some

3 suggestions a little bit as to possible change in order of

4 some of these head notes.

5    THE COURT:  I sweat a long time over that and I had them

6 in various orders.

7    MR. GIRARD:  I am not saying you are wrong.  I just read

8 it twice.

9    THE COURT:  I decided this was the logical way to do it.

10 Maybe I'm wrong.  I started out with the head note that the

11 judgments must be construed together; that they were, therefore,

12 a judgment of apportionment subject to modification under

13 changed conditions.  Then I took up the question of contract

14 and that if construed as a contract it has been breached.  And

15 then finally, it is in inequitable for the Government to claim

16 that ground water under thirty five sections of Vail land

17 which was not provided for in the earlier judgment and at the

18 same time tried to hold Vail's nose to the stipulated judgment.

19 That in simple language is what that whole section means.

20    But maybe your suggestions on the order --

21    MR. GIRARD:  As I say, I may not have any suggestions.

22 But the other comments I have would be just spelling changes

23 -- I think in one phrase in there you used the term "alluvial."

24 They are very minor changes.  But I would prefer to have three

25 days in Sacramento to go through in detail.

P 255

1    THE COURT:  You will submit those in writing.

2    MR. GIRARD:  As you know, and as has been clear, I think,

3    I agree with everything in it on principle.

4    THE COURT:  Will you give Mr. Sachse and Mr. Veeder and

5    the others a copy?

6    MR. GIRARD:  I will give everyone a copy.

7    THE COURT:  Do you think it is a correct determination?

8    MR. GIRARD:  I think it is the only equitable determina-

9    tion that could be made.

10   THE COURT:  Do you think it can be sustaine on appeal?

11   MR. GIRARD:  Of course, I have been reversed when I have

12   said I could have been sustained, but I would not have any

13   lack of confidence in advocating that this be sustained, and

14   in the event the United States is inclined to pursue that

15   avenue on appeal the State of California will certainly devote

16   its legal efforts, minor though they may be, to sustain it.

17   THE COURT:  List one other matter to check into while you

18   are working on it.  Vail, of course, came in with a series of

19   contentions on mistake and whatnot.  I haven't based anything

20   on mistake.  It might be desirable to put in a paragraph or

21   two about some of the mistakes that have been made.

22   My particular question, has Vail, by its pleadings,

23   asserted a defense of inequity on the part of the United States?

24   If not, I would be inclined to let Vail amend to present the

25   issue.

P 256

1    MR. GIRARD:  I am not certain as to the state of Vail's

2    pleadings.  In making these comments, I assumed that if their

3    pleadings did not conform to the evidence that has been intro-

4    duced in this case that they would be given an opportunity to

5    amend their pleadings.  I don't think there is any question at

6    all but that this court would be privileged, in the exercise

7    of its discretion, to grant Vail the opportunity to amend, if

8    necessary.

9    THE COURT:  I think, further, whether Vail had pled or

10    not, as a court of equity this court, of its own volition, in

11    trying to solve this problem, could fashion what would be an

12    equitable decree and wouldn't be compelled to fashion an in-

13    equitable one.

14    MR. GIRARD:  There is also substantial law on litigation

15    of this extensive type where the Supreme Court in several cases

16    have said, in effect, that pleadings don't mean anything; the

17    judgment conforms to the way the case is tried despite the

18    pleadings.  I think in Judge Rifkind's decision in United States

19    vs. Arizona California was raising that point, that his decision

20    didn't conform exactly to the pleadings, and that was rejected

21    by a paragraph, that in a long litigation no one is held

22    strictly to his pleadings.  If Vail has to amend, I think they

23    can do so with little difficulty.

24    THE COURT:  I will look forward to receiving them.

25    Mr. Sachse.

P 257

1   MR. SACHSE:   I would concur in what Mr. Girard has said.

2   I think it is going to be difficult to shorten this, except

3   perhaps by shrinking the quotations.

4      I would like to invite your Honor's attention to two

5   specific places where there are obviously typographical errors.

6   They have changed a negative to a positive, and they are rather

7   serious.  On page 13, lines 10 and 11, that paragraph is sort

8   of loused up anyway.

9      MR. STAHLMAN:   I have it marked also.

10     MR. SACHSE:   Between lines 10 and 11, the sentence reads

11  ". . it is reasonable there would be reason or need . . "

12     THE COURT:   There is something omitted.

13     MR. SACHSE:   The word "no" is omitted.  In the first place,

14  the language "it is reasonable," I think, is error.  That

15  shouldn't be in at all.  The significance of what you are

16  saying in here is that if such judgment allocation was res

17  adjudicata there would be no reason that the court maintain

18  jurisdiction.  But your language says "there would be reason."

19  They switched the negative to a positive.

20     THE COURT:   Or something has been omitted.

21     MR. SACHSE:   And the other one, the same kind, is on

22  page 31, lines 13 and 14.  The language reads " (subject not

23  to correlative rights of adjoining owners)."  I think it is

24  subject only to correlative rights of adjoining owners.

25     THE COURT:   Yes, that was some copying of my handwriting

P 258

1    that my secretary copied and she can't even read my writing.

2    MR. SACHSE:  Those are the only two of that kind that I

3    observed.

4    I am not going to take it upon myself to try to suggest

5    syntax or grammatical or organizational changes, but I am going

6    to read this again and if I find anything of that kind I will

7    write your Honor.  Otherwise, I am just going to let the thing

8    go.

9    I am very well satisfied with it, and I believe it is

10   sound and can be upheld, and I don't think too many cooks are

11   going to do you any good in the draftsmanship.

12   THE COURT:  On page 43, line 27, I say, "every upstream

13   riparian, except Vail and the intervenors, could successfully

14   resist . . ".  Possibly the word "riparian" is too limited.

15   MR. GIRARD:  I think that is correct.  I think it should

16   be "every upstream user" or something along that line.

17   THE COURT:  And probably in the next paragraph, the very

18   last line on page 44, line 4, again should be "users."

19   MR. SACHSE:  I believe that is right, your Honor.

20   THE COURT:  Mr. Sachse, do you agree that the matter is

21   correct in principle?

22   MR. SACHSE:  Yes your Honor.  As I said, I don't think it

23   would be giving you any service.  I think it is the hardest

24   thing in the world to have a committee write a letter or some-

25   thing like that.  I am not going to try to suggest changes in

P 259

1 text or format.  But if I find anything that I think is not

2 clear I will put it in writing.  Otherwise, I will offer

3 nothing further, unless your Honor directs me.

4     THE COURT:  I have had to do this in a hurry, and it is

5 the type of thing where you can get off base very easily, and

6 I welcome suggestions.  Also, although it is almost as long as

7 one of Mr. Veeder's briefs, I beat him this time.  His last

8 brief was 32 pages.  This is 45.

9     MR. VEEDER:  I'll top you.

10     THE COURT:  My point is that there may be other things

11 that I should talk about -- at least a footnote or make some

12 reference to.  There has been a lot of evidence on mistake,

13 and I said nothing about it.  But I concluded I don't have

14 any authority to do anything on the ground of mistake.

15     MR. SACHSE:  On that score, the first time I read it, the

16 first mental note I made to myself was that your Honor doesn't

17 explain sufficiently the impossibility of separating the trial

18 judgment and the stipulated judgment -- I mean, the physical

19 problems that would arise.  But I remember the booby trap I

20 got myself in to when I tried to write it out, and I am inclined

21 to think if you try to spell it out you will end up with 134

22 pages.

23     THE COURT:  I have a page and a half that I took out

24 trying to point that up.  I was wondering whether there should

25 be some footnote or insertion on that.

P 260

1    MR. SACHSE:  I imagine Mr. Stahlman has many objections.

2    MR. STAHLMAN:  With my low level of eloquence, I am going

3    to have difficulty in expressing my opinion of the court's

4    opinion.  I understand there are going to be two or three days

5    in which to do it, your Honor.  Needless to say, I agree with

6    the court's opinion.  I think it is very nicely done.

7    THE COURT:  You are in accord, then, are you?

8    MR. STAHLMAN:  I am strictly in accord, your Honor.  And

9    I might say this -- probably it seems a bit presumptious or

10   fallacious -- but in all seriousness I have pondered over

11   these many problems a good many times before they came to the

12   surface in this case, and I am quite convinced that your Honor's

13   opinion is sound, and I have no hesitation whatsoever in --

14   THE COURT:  Spending Vail's money in support?

15   MR. STAHLMAN:  If Mr. Veeder does as well on appeal as he

16   has done on the rest of the matters, and I might exclude

17   matters pertaining to the Vail judgment, I am going to be very

18   happy about it.

19   There are a few little things where your Honor has desig-

20   nated the first trial as starting in 1926.  I think it was

21   1923.  I will check the dates and give them to you accurately.

22   There are some small matters, such as the language you

23   use in referring to the Temecula basin.  I think we have

24   almost always in this case referred to the Pauba.  We might

25   bracket Pauba basin behind it.

P 261

1    A few things like that merely to editorialize.

2    THE COURT:  Will you set them down in a letter and give

3  copies?

4    MR. STAHLMAN:  Yes your Honor.

5    THE COURT:  Mr. Veeder, do you have any comments you want

6  to make?

7    MR. VEEDER:  No sir.

8    MR. STAHLMAN:  Shortest speech Mr. Veeder has ever made.

9    THE COURT:  Will you later have any comments?

10    MR. VEEDER:  Yes sir, I will.

11    THE COURT:  In a petition for reconsideration, or in a

12  letter setting forth the errors you think I have committed, or

13  in what form?

14    MR. VEEDER:  I have stated into the record our position

15  on this matter and there will be no need of my repeating it

16  now.  As far as I am concerned, you can go ahead with whatever

17  you want to do on it.  You will, however, hear from us on it.

18    MR. GIRARD:  I take it that all of the grounds by all

19  counsel -- Mr. Sachse, Mr. Stahlman, Mr. Veeder and myself --

20  will be in by the next meeting date?  Mine will be in within

21  a week, but I am concerned with the Unites States's primarily.

22    THE COURT:  That is why I inquired if Mr. Veeder wanted,

23  without prejudice to his legal position, to assist the court

24  with calling its attention to errors in dates or other matters,

25  or grievous omissions or whatnot, which would put this in form

P 262

1   to start re-doing it, I would be glad to have them -- without

2   prejudice to his right to urge later on a reconsideration of

3   my ruling.  If, on the other hand, he doesn't want to do that

4   and merely wants to urge a reconsideration of my ruling, then

5   I wouldn't wait for any comments from you.

6       MR. VEEDER:  I have to sit down and analyze the over-all

7   effect of this matter on the United States.  I certainly am

8   not asking you to refrain from putting it in the final. I want

9   to assist you as much as I can.  But I see no way of my doing

10  it in two or three days.  I really can't.

11      THE COURT:  May I request that as you study it, if you

12  find any errors in fact or date that are wrong and things of

13  that sort, that you call my attention to them.

14      MR. VEEDER:  Of course, there are errors in it that I

15  truly believe exist, but I have argued them to you.  But I will,

16  as rapidly as I can, put together my comments and I will get

17  them to you.  But I ask you not to wait for them.

18      THE COURT:  In your comments or in your motion to recon-

19  sider, I want you to tell me how you can justify a claim to

20  have correlative rights to use waters in 35 sections that we

21  now, at your urging, have prepared to find are older alluvium

22  and part of the stream system.

23      MR. VEEDER:  I have argued in the past on the proposition,

24  your Honor.  I have never urged correlative sharing in this

25  matter at all.

P 263

1    THE COURT:  You what?

2    MR. VEEDER:  I have never urged a correlative sharing

3    with Vail Company on any of these matters.  I never have urged

4    it.

5    THE COURT:  You may have never said it in those words,

6    but you have urged that this ground water body was part of the

7    stream system and that the United States has correlative rights

8    in the stream.

9    MR. VEEDER:  But I have never said a word about correla-

10   tive rights as to Vail.  I said that under a stipulated judgment

11   that was entered into prior to the time we bought the property

12   there was a right to take water outside the watershed.  There

13   was a right to impound water.  I think your Honor in his opinion

14   ignored that fact completely and entirely.  I think you applied

15   the rule on riparian correlative rights, which has no applica-

16   tion whatever in this litigation with the Vail Company, because

17   riparian rights were not involved.  What was involved was an

18   apportionment between two parties, permitting each to use his

19   water outside the watershed and to impound that water.

20   As I say, I have no desire further to argue the matter.

21   I have no purpose in doing it.  We are going to seek ways, if

22   we can, to appeal it as rapidly as possible, because we think

23   you have done us irreparable damage.

24   MR. SACHSE:  As far as comments from me are concerned,

25   your Honor, I am quite sure I can have them ready by the early

P 264

1   part of next week.

2       MR. STAHLMAN:  We will also.

3       THE COURT:  Then let's take a recess and come back and see

4   what we can do on Domenigoni Valley and the Fallbrook findings.

5       (Recess.)

6       THE COURT:  I have been looking over these Domenigoni

7   findings.  This may sound like a silly observation, but I don't

8   know what to do with this matter.

9       You have a situation where you have water running in the

10   stream -- and this doesn't happen too often.  You would have

11   water then in the area near the basement lip percolating down

12   into the ground beneath the surface, and undoubtedly some of

13   this water in times when there is water in the stream would

14   cross the basement lip -- this part of the underground flow of

15   the stream, if you follow me.

16       MR. SACHSE:  Yes sir.

17       THE COURT:  So when you get down to the bottom of page 2

18   you say "a lip of basement complex material rising to elevation

19   1400 feet, which lip prevents the movement of ground water .. "

20   It might be necessary to limit that by saying "the movement of

21   most of the ground water " -- in other words, not make it all-

22   inclusive.  What do you think of that suggestion?  Or is there

23   anything to worry about?

24       MR. SACHSE:  I see nothing wrong with it, and I wouldn't

25   object, your Honor.  The heart and soul of these findings in

P 265

1   the one part, so I can again repeat to your Honor and Mr. Veeder,

2   the one thing that I feel is pertinent to our case and which

3   I think your Honor flatly ruled on, is that any attempt to

4   regulate extractions to require above 1400 feet is unreasonable

5   and unconstitutional.  Words such as "divert" or "all of the

6   water" or "part of the water," those things are of relatively

7   minor importance to me.

Belt 10

8       THE COURT:  You could say "prevents movement of ground

9   water at elevation below 1400 feet."

10      MR. SACHSE:  I tried to say that on the next page in the

11  rest of the sentence, "prevents the movement of ground water

12  . . ., excepting at such times as the ground water level . . is

13  above".

14      THE COURT:  Well, you say "the ground water level" and

15  "this ground water level".

16      MR. SACHSE:  I follow you.  You mean there is moving

17  ground water above the level.

18      THE COURT:  Yes.

19      MR. SACHSE:  Yes.  I never thought of that.

20      THE COURT:  On the same page, "excepting such ground

21  water," strike out "level," "north of said lip which may exist

22  at or above elevation 1400 feet".  Does that do it?

23      MR. SACHSE:  ". . excepting such ground water north of

24  said lip which may exist at or above elevation 1400 feet" --

25  do I have it correct?

P 266

1    THE COURT:  Yes.  Will that do it?

2        MR. SACHSE:  I don't see anything wrong with it.  It may

3    leave open a question of fact as to when this happens, but it

4    doesn't worry me much.

5        THE COURT:  Or you could leave what you have, "excepting

6    at such times as the ground water level is at or above," or

7    "excepting such small amounts of ground water as may, from

8    time to time, exist above the 1400 foot level."

9        MR. SACHSE:  The first one is clearer.

10       THE COURT:  Try something out for size on that.

11           Now the next matter was on page 3, the word "diverts".

12       MR. SACHSE: ". . is a barrier to. ." Is that all right?

13       THE COURT: ". . is a barrier to," and instead of "all" - -

14       MR. SACHSE:  ". . is a barrier to the movement. . "

15       THE COURT:  Yes.  And "all" is not wrong there, in view

16   of your statement "below elevation 1400 feet."

17       MR. SACHSE:  No, I think "all" is correct.

18       THE COURT:  Do you object to "barrier," too, Mr. Veeder?

19       MR. VEEDER:  I suggested "barrier." I don't believe it

20   "diverts."  But I believe it is a barrier.  I think it is the

21   same kind of barrier you have at Temecula gorge.

22       THE COURT:  Then your conclusions over on the unnumbered

23   page -- I guess it would be page 5 -- on that second paragraph

24   I was going to suggest this language for lines 10 and 11,

25   picking up at 9 where it says "remain below elevation 1400

P 267

1   feet, the said ground waters," instead of saying "are not part

2   of the waters," say "do not contribute to the Santa Margarita

3   River system" and then add "downstream from the basement lip".

4   MR. SACHSE:  I think that is very accurate.

5   THE COURT:  That leaves them in as part of the stream

6   system above.  But they do contribute to the stream system be-

7   low the lip.

8   MR. VEEDER:  At that level.

9   THE COURT:  We already have that in.

10   MR. SACHSE:  Yes.

11   MR. VEEDER:  As long as that is in.

12   THE COURT:  ". . and so long as the ground waters

13   immediately north remain below 1400 feet, the said ground

14   waters do not contribute to the Santa Margarita River stream

15   system, downstream from the basement lip."

16   MR. VEEDER:  That is right, because they would tend to

17   support water coming in that should come in.

18   THE COURT:  Then down at paragraph 3, line 19, I would

19   insert the word "presently" in front of "regulated".

20   And down in paragraph 4 at line 24 you say that "said

21   basins extend out of the Santa Margarita River watershed and

22   into the San Jacinto River watershed. . " I don't know that the

23   evidence shows that that basin extends across there.  What

24   extends across the watershed is an old water course filled

25   with younger alluvium, and I would have serious doubts -- I

P 268

1  was inquiring about other water elevations on the other side

2  when we tried this -- I have serious doubt if there is what

3  can be called a basin that extends across that watershed line.

4      MR. SACHSE:  Why can't we just delete the whole conclusion?

5      MR. VEEDER:  Where are you?

6      MR. SACHSE:  Conclusion 4 on the next to the last page.

7  It is an unnumbered page.

8      I really think it is, in a sense, surplusage.  If you

9  don't to bring San Jacinto into this, there is no real reason

10  for bringing it in.

11      THE COURT:  You could say "for the reason of the movement

12  of ground water out of . . "

13      MR. SACHSE:  Or you could follow the pattern, if I may

14  offer still another suggestion, that we used somewhere else.

15  You could say "the quantity of the proportion of the ground

16  waters to which any land owner now can, or ever will be,

17  entitled to in these proceedings on the state of the record".

18  That is the plain truth.

19      THE COURT:  Personally, I would be satisfied by saying

20  that it can't be presently determined in these proceedings

21  because of the movement of ground waters out of the Santa

22  Margarita watershed and into the San Jacinto watershed, and

23  persons not parties to this proceeding may have -- we don't

24  have to say that they do.  What does that do to it?

25      MR. VEEDER:  Cannot be presently determined in these

P 269

1   proceedings because movement of ground water out of the Santa

2   Margarita watershed and into the San Jacinto watershed --

3   THE COURT:  -- and persons not parties to these proceedings

4   may have correlative rights there.

5   MR. VEEDER:  On that I have suggested language to Mr.

6   Sachse that no records have been maintained in record to the

7   quantities of surface runoff or ground waters, that there is

8   no repetitious pattern in the record in regard to the runoff,

9   and therefore no findings could be made in regard to them.

10   That has been my recommendation to Mr. Sachse.

11   THE COURT:  I am not talking about runoff now.

12   MR. VEEDER:  I am talking about any water.  There is no

13   evidence upon which you could make a finding as to quantities

14   of water whatsoever.  That is what I would like to see in there.

15   MR. SACHSE:  The only objection I had to Mr. Veeder's

16   suggestion was that it does not recognize the fact that your

17   Honor has found that there is some possibility of movement out

18   of the watershed and of other people being involved.

19   THE COURT:  All we are saying here is that we conclude

20   that the quantity or proportion can't be presently determined

21   because of this fact here.

22   MR. VEEDER:  The thing that I was pointing out is that

23   there are additional facts, there are facts in addition which

24   preclude a finding.

25   THE COURT:  If you want to work in "and in the absence of

P 270

1  records presented," I don't mind adding to this.

2  MR. SACHSE:  Because of the absence of adequate records

3  of precipitation, runoff, recharge, etc., and because of the

4  movement of ground waters.

5  MR. VEEDER:  I think that is more reflective of the situa-

6  tion.

7  MR. SACHSE:  All right.

8  THE COURT:  All right.

9  MR. SACHSE:  I will do that.

10  THE COURT:  Finally, it would seem to me that there should

11  be a final paragraph worked into the one on change, that if

12  additional evidence is obtained from the drilling wells or

13  from other geologic evidence which would vary the picture as

14  we see it today, that this matter is subject to change.

15  MR. VEEDER:  And you are retaining jurisdiction of both

16  surface and ground waters.  Is that right?

17  MR. SACHSE:  Yes.

18  THE COURT:  There is a finding in here about continuing

19  jurisdiction, isn't there?

20  MR. VEEDER:  Well, there was an implication on it -- at

21  least I read an implication into it.

22  MR. SACHSE:  The last one.

23  THE COURT:  That refers to surface water.  And I would

24  think that you could put another one in as to the ground waters.

25  In other words, I don't want to shut the door on what conditions

P 271

1   might be determined.

2      MR. SACHSE:  Your Honor, I will put that in on ground

3   water.  But you suggested something there that I feel rather

4   strongly about.  I have thought many times of placing in these

5   individual orders I have drawn when I have reserved jurisdiction

6   a specific statement that future studies or well records might

7   justify a change, and I discussed it -- and I have even drafted

8   one -- and Mr. Krieger and I decided that we felt that a

9   paragraph of that kind should be absolutely general for this

10   entire case, not for just Diamond and Domenigoni, and that we

11   should be very careful that whatever order your Honor makes

12   for continuing measurements should apply to everybody.

13      THE COURT:  That is all right as long as you keep it in

14   mind to get it into the final decree.

15      MR. SACHSE:  I would certainly expect that the final

16   decree would call attention to that.  But I don't think we

17   ought to try to write it into every single one of these, be-

18   cause there may be different little situations.

19      THE COURT:  All right.  Does that satisfy you, Mr. Veeder?

20      MR. VEEDER:  Yes sir.

21      THE COURT:  Try to get this done.

22      MR. SACHSE:  I will.  I think I can re-do it along these

23   lines and get it in his hands.  He assures me that he will

24   work on it quickly and we will try to get it back to you well

25   in advance of the next hearing for your signature.

P 272 | THE COURT:  All right.

2 | MR. VEEDER:  I have also told him, in regard to his

3 | Fallbrook findings, I have no objection to them as to form,

4 | reserving the right later on to make the objections, if the

5 | question arises.

6 | Is that all right, Mr. Sachse?

7 | MR. SACHSE:  That is most appreciated, Mr. Veeder.

8 | THE COURT:  I have a couple of questions.  Maybe Mr. Veeder

9 | doesn't, but I do have.  On page 5, lines 14, 15 and 16, is

10 | there evidence that the acquisition of land for the dam and

11 | reservoir is complete?

12 | MR. SACHSE:  Yes your Honor.  Every deed is in.

13 | MR. VEEDER:  Every deed is in on that.

14 | THE COURT:  And preliminary construction work has commenced?

15 | MR. SACHSE:  Yes your Honor.

16 | MR. VEEDER:  On that preliminary construction work, I was

17 | interested in that.  But I understand that you have built some

18 | roads.  Isn't that what you are talking about?

19 | MR. SACHSE:  Have cleared and built roads.

20 | MR. VEEDER:  That is in the record, if that is part of

21 | the building of a dam.

22 | THE COURT:  On line 22 it would sound to me a little

23 | better to say that there has been in the past, from time to

24 | time, surplus water, and then you say "sufficient to satisfy

25 | each of the appropriative rights. . "  I would feel a little

P 273   1   better about it if you said "to satisfy at least a large part

2   of the appropriative rights".  I don't know whether we have

3   evidence to show that all your appropriative rights could have

4   been, in the past.

5       MR. SACHSE:   There is no question that such evidence is

6   there.  But if your Honor feels better with that type of

7   language, I don't object.  I don't think it hurts us.

8       MR. VEEDER:  Before we go further, you will recall I

9   have requested the opportunity, and my agreement with Mr.

10   Sachse ties to that, to file with your Honor a request to

11   reopen some of these questions that you ruled on the prelimi-

12   nary hearing.

13       MR. SACHSE:  This is interlocutory.

14       MR. VEEDER:  This whole thing I am talking about is

15   contingent upon the right to review all these matters.

16       THE COURT:  Any litigant has a right to move for a new

17   trial.

18       MR. VEEDER:  I don't mean a new trial.  As I understand

19   it, these are interlocutory in character.  Mr. Sachse is

20   saying there are occasions when enough water goes through to

21   fill 30,000 acre feet.  I think there may be something to that

22   effect.

23       THE COURT:  Try my language out for size, Mr. Sachse.

24       MR. SACHSE:  Yes.

25       THE COURT:  On page 6, paragraph 2 of the conclusions,

P 274

1   you group the court and the Water Board together, and it would

2   seem to me that it might be better to say something like this,

3   "subject, however, to continuing jurisdiction of the California

4   State Water Rights Board" to do whatever they can do "and to

5   the jurisdiction of this court" -- something referring to the

6   vested rights.  Because the two jurisdictions are not the same,

7   and you make it look as if the Water Board and this court have

8   the same jurisdiction.

9       MR. GIRARD:  I think the court would only have jurisdiction

10  to tell Fallbrook what to do to the extent that their activi-

11  ties affected vested rights.  I don't think the court would

12  have any jurisdiction to control extractions unless they im-

13  paired        vested rights.

14      THE COURT:  You have us grouped together as if we are

15  doing the same thing.

16      MR. GIRARD:  They are different functions.

17      THE COURT:  It is an easy matter to say "jurisdiction of

18  the California State Water Rights Board within its sphere of

19  control" or list what they might do "and the jurisdiction of

20  this court insofar as the actions by Fallbrook would impair

21  vested rights."

22      MR. SACHSE:  I'll do that.

23      THE COURT:  That is a suggestion.

24      MR. SACHSE:  That same criticism, then, would be made

25  somewhere else in here, because I have the same thing.

P 275

1      THE COURT:  Well, no.

2      MR. SACHSE:  No, I have it in paragraph 4 on the next

3  page.

4      THE COURT:  You broke it up over there.

5      MR. SACHSE:  Did I?

6      THE COURT:  No, you threw in this court and the board,

7  and then you have this court reserving jurisdiction.

8      MR. SACHSE:  I see what you are getting at.

9      THE COURT:  Now the only other thing, and I think it is

10  probably clear enough, on page 7, II and III, you say "Each

11  of the foregoing rights. . "  I suppose that would refer to --

12      MR. SACHSE:  Licenses and permits.

13      THE COURT:  Yes.  I suppose we wouldn't have to specify

14  whether they were in the findings or in the conclusions.

15      MR. SACHSE:  I will list them by number.

16      THE COURT:  Or, if you want to be specific, since this

17  is a judgment, you could say, "Each of the foregoing rights

18  enumerated in paragraph I of this judgment" and do the same

19  thing in III, etc.

20      Do you raise any question about whether the findings

21  adequately dispose of the issues raised between you and Fallbrook,

22  Mr. Veeder?  For instance, there is no finding here on ultra

23  vires, finding that it is a public utility district and has

24  been granted certain rights.  Do you raise any question about

25  the adequacy of the findings to cover the issues that have been

P 276

1   litigated between you and Fallbrook on this phase of the case?

2      MR. VEEDER:   I want to reserve some comment on that

3   possibly.  I have said that as to form generally I don't see

4   anything wrong with them.

5      THE COURT:  Whenever you say "as to form," that is the

6   type of thing you are approving.  In other words, if I have

7   omitted a finding that you think is a material finding and

8   you approve it as to form, you can't be heard about it.  But

9   if you don't like a finding I have made that you approve as

10   to form, you can certainly be heard.

11      MR. VEEDER:  I assume that is what I did when I said that

12   to your Honor.  I have gone through them.

13      There is, for example, the word "threaten" and the word

14   "threat." I don't know what that means.  It may have implica-

15   tions.  It may be that later on we want to take a look at it.

16   Mr. Sachse has set up a series of statements wherein he has

17   said that all the rights they claim are subject to and sub-

18   ordinate to ours.  If that is the case, the form is only re-

19   flective.

20      THE COURT:  If you want a finding -- you want to have

21   something to shoot at -- if you want a finding that Fallbrook

22   as a public utility district has sufficient capacity to peti-

23   tion for these permits and to act under them and is not actually

24   ultra vires, I would be glad to make a finding and conclusion

25   to that effect.

P 277

1    MR. SACHSE:  I didn't fee it was necessary, and I further

2    felt that if it was imperative that such finding be included

3    -- that is why I carefully headed this "Findings of Fact,

4    Conclusions of Law and Interlocutory Judgment - Appropriative

5    Rights Fallbrook Public Utility District."  This was intended

6    to present to Mr. Veeder just what he has now stated, our

7    statement of the rights we claim and the restrictions on them.

8    That is all.  Not our very minor riparian rights, for example;

9    not our -- well, I don't know what else we have.

10    THE COURT:  I understand that.  But the only issue I can

11    think of that we really argued, discussed and briefed and there

12    is no finding on is this ultra vires issue.

13    MR. SACHSE:  I think a separate set could be drawn, if

14    you feel it is necessary.  But I think it is implicit.  But if

15    you want one we will draw one on that.  I didn't attempt to

16    draw one.  I didn't consider it in this.  That has to be a

17    separate instrument, as far as I am concerned.

18    MR. VEEDER:  My view is this, your Honor, and I thought

19    I covered it in my motion for reinstatement of the counts that

20    were stricken in the original ruling of your Honor, that I

21    would bring up what I think are important factors which cloud

22    our title based upon those allegations in the complaint, and

23    I think what I intend to write and what I intend to review will

24    have to be on the background of this form.

25    THE COURT:  Do you prefer or not prefer that there be a

P 278

1    finding in here as to this ultra vires question?

2         MR. VEEDER:  I think you have made a ruling on it.  I

3    think it is a matter of law.  I think it is a conclusion of

4    law, and if it were in there I would naturally object on the

5    grounds that, in my view -- I repeat that view -- that the

6    extent of Fallbrook's right to divert and apply water -- I

7    will start again.  I don't believe that Fallbrook has proved

8    what it has to prove to obtain an inchoate right to be adjudged

9    by this court.  That is what I am saying.

10         MR. SACHSE:  That is what I understood his Honor has ruled

11   upon.

12         MR. VEEDER:  No, he hasn't ruled on that.

13         THE COURT:  What?

14         MR. VEEDER:  On the matter of the extent of Fallbrook's

15   proof.  Did you rule on that yesterday?

16         THE COURT:  I intended to.

17         MR. SACHSE:  If he is signing a judgment that we are the

18   owners as of certain rights, I presume that means we have

19   proved the rights to them.

20         THE COURT:  My finding in that respect and my conclusion

21   would be that since Fallbrook has rights only to surplus

22   unappropriated water, that we are therefore looking at all the

23   other people with vested rights in the river.  We are not

24   concerned whether they are taking this out of a watershed or

25   whether they are taking it for mining or whether they are taking

P 279

1  it for irrigation.  Their rights only act upon surplus un-

2  appropriated water.  So why should we then be concerned with

3  what the extent of their use might be?

Bel 11

4      For instance, suppose we have a series of wet years, as

5  occurred before the turn of the century.  You might have enough

6  surplus water on the stream that Fallbrook could serve not

7  only its own area but take water that it appropriates under a

8  permit from the Water Board and do many other things with it.

9  It is not beyond the realm of possibility.  Why are we con-

10  cerned with it?  We tabulated riparian acres, we tabulated

11  irrigable and irrigated acres, because we are trying to divide

12  up the pie that consists of the water on the river that is

13  subject to riparian rights.  But assuming that there is enough

14  water for those rights, we are not concerned then with the

15  surplus.  Let's just forget that this surplus is a seasonal

16  thing here.

17      Let us assume that year after year millions of gallons

18  flowed into the ocean and we were working on the riparian

19  rights of the parties here.  Would we be concerned with how

20  many acres or where an appropriator was going to use that

21  water?  It wouldn't affect the other riparians, the people

22  with vested rights, one whit.

23      MR. VEEDER:  Your Honor, what I did yesterday, and what

24  I am doing now, is reserving the right to present that matter

25  to you further.  You have said that you agreed with my

P 280

1    citations of, I think it was, <u>Merritt vs Los Angeles</u>, in which

2    we urged that you would have to make a finding in this case,

3    or we were requesting you to make a finding of the extent of

4    Fallbrook's inchoate rights based upon the record.

5        THE COURT:  That isn't what <u>Merritt</u> said.  <u>Merritt</u> didn't

6    say you had to enumerate the acreage.

7        MR. VEEDER:  I reserve the right to present that to your

8    Honor.

9        THE COURT:  It is all right with me.  If you want that

10   sort of findings or conclusions in here, I'll put them in.  Or

11   if you want to wait and put them in some other part of the

12   final decree and findings, that is all right.

13       You approve it as to form?

14       MR. VEEDER:  When I say as to form, always reserving the

15   right to interpose objections to them.

16       THE COURT:  When you say approved as to form, I understand

17   you mean you are satisfied with these findings as far as they

18   go, reserving the right to request other findings and conclu-

19   sions on such matters as ultra vires and the matter you want

20   to raise as to whether they are able to show acreage; but that

21   you have approved them as to form in that they accurately state

22   the dates and describe what happened and what they got from

23   the Water Board, but that you are not waiving any of the

24   objections you have heretofore made when we have heard this

25   matter.  Do we understand each other?

D P281

1      MR. VEEDER:  I had better restate my position.  I want

2  to state my position on this because I am going to ask for

3  findings of my own in regard to the Rancho Santa Margarita.

4  I am going to request a finding from your Honor, for example,

5  that there is no repetitious pattern of runoff pursuant to

6  which you could make a determination as to a firm supply of

7  water for Fallbrook.  I am going to say there is nothing in

8  the record to show that merely because water goes into the

9  ocean that that water is surplus and available for appropria-

10  tion.

11      THE COURT:  That one I would have trouble with.  If you

12  want me to find that I can't tell you what is going to run

13  into the ocean next year, I'll be glad to find that.

14      MR. VEEDER:  I am simply saying, and I want it understood,

15  one of the real difficulties in piecemeal findings is this

16  very proposition.  I don't want to be precluded if Mr. Sachse

17  has an interpretation in regard to the word "surplus" as he

18  uses it in here to preclude me from bringing up the proposition

19  that I just advanced.

20      THE COURT:  You can bring it up, Mr. Veeder.  These are

21  interlocutory -- only a portion of the case.  I have only made

22  a simple inquiry to you and I haven't got an answer to it yet,

23  and that is, would you prefer that I include in this set of

24  findings a finding on the ultra vires matter and the capacity

25  of Fallbrook, and a conclusion of law, or do you want to let

P 282

1   that be handled, if you want to handle it, in some other part

2   of the final findings in this case or some other interlocutory?

3       MR. VEEDER:  Frankly, I would prefer to handle it in a

4   subsequent interlocutory order.

5       THE COURT:  That is the way it will be done then.

6       MR. VEEDER:  I hope that Mr. Sachse --

7       MR. SACHSE:  That is what I prefer also.

8       MR. VEEDER:  I hope that Mr. Sachse and your Honor under-

9   stands what I just said.  From the standpoint of surplus water,

10   I am going to tender findings myself.

11       MR. SACHSE:  I am sure you are.  I am sure that before

12   this case is over you are going to tender findings which will

13   in substance attempt to contradict every interlocutory order

14   that has been entered so far and attempt to contradict the

15   court's pre-trial opinion and the decision on Vail and every-

16   thing else.

17       MR. VEEDER:  As long as this is understood.

18       THE COURT:  It is understood.  When I say it is understood

19   you are going to tender it, that doesn't mean that I am going

20   to find it as you tender it, or it doesn't mean that I am

21   going to make a finding one way or the other on the issue you

22   tender.  I may decide that it is not an issue on which a finding

23   has to be made.  But you certainly have a right to tender it

24   and not to be precluded because of any interlocutory order

25   that has been entered.

P 283

1    MR. VEEDER:  That is all I want your Honor.

2    MR. SACHSE:  If I re-do this, may I then bring it down

3    and present it as early as possible, your Honor.

4    MR. VEEDER:  Will you send me a copy.

5    MR. SACHSE:  I will send you a copy.  But I don't want to

6    hold my breath while you go other places, waiting for your

7    approval.

8    THE COURT:  If the matter is revised along the line we

9    have talked about, you will not want to see it again, will you?

10   MR. VEEDER:  Are you talking to me, sir?

11   THE COURT:  Well, yes, but you were not listening to me.

12   Why don't you lodge it and serve it and give Mr. Veeder

13   five days to raise any other question about it.

14   MR. SACHSE:  Very well, your Honor.

15   THE COURT:  Anything further?

16   MR. VEEDER:  Nothing from me.

17   March 14th, is it?

18   THE COURT:  March 14th.

19   Well, we are making a little progress, don't you think?

20   MR. GIRARD:  I think so.

21   MR. STAHLMAN:  The end is almost in sight.

22   MR. SACHSE:  Are we off the record your Honor?

23   THE COURT:  Yes.

24   (Adjournment until Tuesday, March 14th, 1961 at 10:00 A.M.)

25                          - - - -

P 284

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California, this 2nd day of February A.D. 1961.

*John Swader*
Official Reporter