VOLUME NO. 60

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

—

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

—

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Tuesday, March 14, 1961

Pages:  15,250 to 15,387

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
Deputy

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211   Ext. 370

P 1
A1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - -

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
vs.                            )      No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.)
_____

- - - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, March 14, 1961

- - - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | LCDR. DONALD W. REDD. |
| For the Defendants: | |
| Vail Company | GEORGE STAHLMAN, ESQ. |
| Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |
| State of California | FRED GIRARD, ESQ. |

P 2

APPEARANCES (continued)

| | |
|---|---|
| Defendant Oviatt | JESSE R. O'MALLEY, ESQ. |
| Defendants Gibbon & Cottle | CLAYSON, STARK & ROTHROCK by DONALD D. STARK, ESQ. |
| Defendant Knox | TRENT ANDERSON, JR., ESQ. |

P 65

## INDEX TO WITNESSES

| For the Plaintiff | D | X | RD | RX |
|---|---|---|---|---|
| Col. Allen C. Bowen | 15,309 (The Court) | | | |
| | 15,345 (Veeder) | | | |
| | | 15,364 (Sachse) | | |

| For the Defendants' | D | X | RD | RX |
|---|---|---|---|---|
| Garner L. Knox | 15,281 (Anderson) | | | Mr. Hamilton, Mr. Hepburn 15,254 |
| | 15,313 (resumed) | | | Mr. Kennedy 15,270 |
| | | 15,331 (Stahlman) | | |
| | | 15,332 (Girard) | | |
| Roland E. Snow | 15,309 (The Court) | | | |

## INDEX TO EXHIBITS

| For the Plaintiff | Identified | Received |
|---|---|---|
| 207E (addition of letters) | 15,254 | 15,254 |
| 278B (study of Anza property by Dr. Mann) | 15,256 | |
| 16A (addition of well log of 1960 Knox well) | | 15,335 |
| 279 (Hydrograph of Well No. 6) | 15,346 | 15,367 |

| For the Defendants | Identified | Received |
|---|---|---|
| Knox's E (2 letters and tabulations of Mr. Green) | 15,315 | 15,315 |
| Knox's F (4 pumping reports of Calif. Elec. Power Co. on Knox wells) | 15,335 | 15,335 |
| Knox's B, C & D (photographs) | 15,283 15,284 | 15,336 |

15,252(a)

Index of Defendants' Exhibits continued:

| | Identified | Received |
|---|---|---|
| Knox's A (a map) | | 15,337 |
| Fallbrook's L-1 (Addition to L) | 15,356 | 15,358 |

P 3

1    SAN DIEGO, CALIFORNIA, Tuesday, March 14, 1961, 10:00 A. M.

2         THE CLERK:  1-1247-SD-C United States vs Fallbrook.

3         THE COURT:  Mr. Veeder, here are a couple of other letters

4    that came in this morning.

5         MR. VEEDER:  Thank you.

6         THE COURT:  What is your suggestion as to procedure

7    today?  Take up the pro pers that may have come in first?

8         MR. VEEDER:  I think that would be desirable, your Honor.

9         I have here several letters in response to your --

10        THE COURT:  Before you go into them, then what next?

11        MR. VEEDER:  Then I would tender the thought, your Honor,

12   that following those, Mr. Kenney, Mr. Hepburn and Mr. Hamilton,

13   who are here, might raise questions in regard to their proper-

14   ties.  Have you  explained to them what is the meaning of

15   your statements of gross and irrigable acreages -- Mr. Hamilton

16   is here -- based upon your conversation with Judge Doherty

17   yesterday, and it occurrs to me that if those gentlemen could

18   have the advantage of your consideration now it would be the

19   better way to proceed.

20        THE COURT:  Then after that Mr. O'Malley is inquiring

21   about his reservations back.

22        MR. VEEDER:  Mr. O'Malley, Mr. Anderson and Mr. Stark

23   are here representing, respectively, the Oviatts, the Sunny-

24   brook, the Knox properties and the Gibbon and Cottle properties.

25   If your Honor desires to proceed with them immediately after

P 4   1   these pro per matters, the United States is agreeable.

2        THE COURT:  All right.

3        MR. VEEDER:  I would like to have marked these letters,

4   if I may, however, that have come in.  We have been using

5   the E series.  It would be 207E, as we have been marking these

6   for the purposes of the case.  These are letters that came

7   to your Honor that are now being offered as part of 207E.

8        THE COURT:  Received in evidence as part of 207E.

9                                (The letters above referred to were)
                                 (marked and received in evidence as)
10                               (part of Plaintiff's Exhibit 207E. )

11       MR. VEEDER:  Your Honor, Mr. Hamilton -- would you stand

12   up, Mr. Hamilton -- Mr. Lincoln Hamilton is here based on the

13   conversation with Judge Doherty yesterday in regard to the

14   Anza property.  I told him it would be better for him to have

15   instructions from you as to the best way to proceed under the

16   circumstances.

17       THE COURT:  I understand, Mr. Hamilton, you are sort of

18   a spokesman for a number of property owners up in the Anza

19   Valley?

20       MR. HAMILTON:  That is right your Honor.

21       THE COURT:  And according to the conversation I had with

22   Judge Doherty yesterday -- he, of course, could no longer

23   represent you, since he is on the Bench -- I understood that

24   you property owners had prepared a study by Dr. Mann.

25       MR. HAMILTON:  That is right.

P 5

1    THE COURT:  And that you may want later to offer that in

2  evidence in this proceeding.

3    MR. HAMILTON:  Yes.

4    THE COURT:  We have a rule that these exhibits should be

5  made available for inspection of other counsel so many days

6  before they are admitted.  Do you have that report so that

7  it could be lodged and other counsel have a chance to see it

8  before the continued hearing that we set for your properties?

9    MR. HAMILTON:  I don't have the report with me, but it

10  could be made available.

11    THE COURT:  Could you mail it in to the Clerk?

12    MR. HAMILTON:  I could.

13    THE COURT:  What number would we assign to this?

14    MR. VEEDER:  It would suit me, your Honor, if it would

15  be agreeable, Exhibit 278, as I recall, is the Anza map, the

16  geology for the Anza area, and I would suggest that we might

17  assign that 278C or D now.  At least, it would have all of

18  the geology together.

19    THE CLERK:  278 A was the last one, your Honor.

20    MR. VEEDER:  It would be 278B when it came in.

21    THE COURT:  Do we have a 278A, Mr. Clerk?

22    THE CLERK:  Yes your Honor.

23    MR. VEEDER:  That is the tabulation of wells, I believe.

24    THE COURT:  It will be assigned the number -- it is a

25  Government number, but that doesn't make any difference whether

P 6   1   it is called defendants' exhibit or Government's exhibit --

2   it will be assigned the number 278B.  If you will mail it

3   to the Clerk, the Clerk will be instructed to mark it for

4   identification and then it will be available for counsel to

5   inspect before our next hearing.

6   (The document above referred to )
    (was marked Plaintiff's Exhibit )
7   (278B for identification.        )

8   THE COURT:  You may be seated, Mr. Hamilton.  You don't

9   have to stand.

10   I will also have Exhibit 15 brought out, Mr. Clerk, to

11   give you a little idea of what the problem is.

12   (Plaintiff's Exhibit 15 was placed on the easel.)

13   THE COURT:  Can you gentlemen see that map where it is

14   now located?  This is the map of the geology of the this

15   watershed -- the line here is the watershed.

16   First, there are two problems involved in this case.  One

17   is surface water, water that falls down on the ground and runs

18   off through the ravines, canyons, gullies, streams down the

19   watershed.  The second problem is what we speak of as ground

20   water, water underneath the surface of the ground.

21   Now, as to surface water, the water that falls by rain

22   in this area, the evidence all indicates that this is the

23   watershed and that all of this watershed is tributary as far

24   as surface water to the Santa Margarita, and the Court would

25   propose to find, as to any properties in the Anza Valley, as

P 7

1   elsewhere, that the surface water is part of the stream system.

2   All that means is that you can't build dams unless you get

3   permits from the Department of Water Resources.  As to stock

4   dams, we have not yet decided on that.  Technically, I think

5   a permit would have to be obtained.  The Court probably will

6   take continuing jurisdiction over any sort of stock dams or

7   dams of any sort in the watershed.  So much for surface water.

8   And this, I don't think, creates any problem.

9        Now, as to ground water, the blue area, according to

10   the evidence in the case, is what is called "basement complex,"

11   and that is relatively an area of big solid rock, with maybe

12   a thin veneer of loose material on top.  The Court has been

13   informally finding that any ground water found in the blue

14   area is what we speak of as "local, vagrant, percolating water

15   and not part of the stream system."  It would only occur in

16   cracks or fissures or possibly seepage through decomposed

17   granite or old granite and matters of that sort.  So if you

18   own land in an overlying blue area and you get a well you are

19   just lucky to have a well, and if you are not part of the stream

20   system you are not part of any continuing jurisdiction of this

21   Court as to that well.

22        The only other type of geology that appears in this area

23   is the yellow, which is spoken of as "younger alluvium."  This

24   is the loose kind of material that appears in the bodies or

25   in the beds of the streams and appears in this area in the

P 8

1   nature of a water basin.  These apparently are areas of loose

2   material which hold water and feed the stream.  The Court

3   proposes to find that the water in those areas is part of the

4   stream and that the Court would retain continuing jurisdiction

5   of water contained in those areas and you, as a land owner,

6   would have correlative rights with all other persons who have

7   rights to water on the stream system.

8       Have I made myself clear?

9       MR. HAMILTON:  I don't think there can be a bit of argu-

10   ment about that.

11       MR. HEPBURN:  May I ask, Judge, all users of the stream

12   system, does that mean everything from the ocean clear back,

13   or the immediate area?

14       THE COURT:  No, that means everything from the ocean on

15   up, you have correlative rights.  This is California Water Law.

16   It gets complicated in a big stream system.  But if you could

17   imagine a little stream three miles long, with eight or ten

18   people living on that stream and all taking water out of the

19   stream, no one has a right to take more water than his fair

20   share.  His fair share would depend upon how much ground he

21   had that was riparian, what usage he was making of the water --

22   the use must be a beneficial use.  This is California law that

23   goes back even beyond the formation of the State.  It was

24   Mexican Water Law -- that everybody who has rights to water

25   out of a stream system has to share correlatively.

P 9

1       MR. HEPBURN:  Would that be State or Federal ruling on

2  that?

3       THE COURT:  We follow State law in that respect.

4       MR. HEPBURN:  Another question.  Then if you are in the

5  yellow area or alluvium -- is that what you call it?

6       THE COURT:  Alluvium.

7       MR. HEPBURN:  If you put a well there, there is a possi-

8  bility that they could put regulations on you and curtail your

9  amount of water.  Is that right?

10      THE COURT:  That is a possibility.  How immediate that

11  is or how certain is another question that involves a lot of

12  other factors.  For instance, as I recall the evidence, these

13  are relatively shallow basins -- there is not as much water

14  in here as there is in this larger ground water body down in

15  here, and there is not doubt that there is a great amount of

16  riparian land.  Obviously, any fair regulation, if one had to

17  be made, would take into account how much water is available,

18  how much land there is to be irrigated.  I might hazard a

19  guess.  It is very difficult for me to see how there could be

20  any real restraints placed on these upstream users.  Mr. Veeder

21  may not agree, but I think the figures on the amount of land

22  and the relatively small amount of water as compared with the

23  larger ground water bodies downstream would mean that any fair

24  distribution would probably take care of your needs without

25  restraints.  But that I am not passing on presently.

P 10

1       MR. VEEDER:  The Coahuila Indian Reservation, too.

2       THE COURT:  You have another problem on the Indians.  You

3  have an Indian Reservation in here, and if anybody has good

4  water rights it is an Indian.  I haven't looked at the Supreme

5  Court cases recently, but the Supreme Court cases seem to

6  indicate that the Indians are entitled to all the water they

7  can use and all they could reasonably or in any situation use

8  in the future.  Probably the best water rights in that valley

9  up there will pertain to these Indian reservations.  And there

10  could conceivably be a problem.  I understand they are down-

11  stream from this area.  They must be in here, aren't they?

12       MR. VEEDER:  They border right at the Anza Valley.  Move

13  back further.  Right about where you have your --

14       THE COURT:  They don't cover this area of Terwilliger?

15       MR. VEEDER:  No, they run like that (indicating on the

16  map ).

17       THE COURT:  Yes.  So there could be a problem downstream

18  from that Indian Reservation and there could be a problem

19  upstream -- I mean, you might find a situation where you would

20  have to share with the Indians.  However, I would not think

21  there is anything immediate there.

22       MR. HEPBURN:  When we received the original suit some

23  years ago, if I remember correctly, the Federal Government

24  asked that a certain number of acre feet be allocated to the

25  Reservation that is in Government property rather than the

P 11

1    Indians.  Is that correct?

2        MR. VEEDER:  We are trustee for the Indians.

3        THE COURT:  The Government is representing the Indians.

4    In all matters concerning the Indians the Government has a

5    supervisorial power, and they are representing the Indians in

6    this suit.

7        MR. HEPBURN:  In filing an answer to this suit, that was

8    the basis that we went on.  There was something like four

9    acre feet a year for a certain number of acres.

10       THE COURT:  The complaint asks for a lot of rights, but

11    that doesn't necessarily mean that everything asked for in

12    the complaint is granted.

13       MR. HEPBURN:  The thing I was concerned with -- if you

14    don't mind my going ahead and explaining this -- I received

15    this notice to sign and mail back to you, Judge Carter, and

16    approve the findings you propose.  The only thing I am con-

17    cerned about, I don't own most of the land included in here.

18    I have sold off part of the land already and I don't own it.

19       And another thing is, I have always questioned the sub-

20    surface water as to who owned it or where it went or anything

21    else.  I believe that from looking at this map it sort of

22    clarifies it, if the person who made the map knew what he

23    was talking about.

24       THE COURT:  In that connection, as to geology let me say

25    that the State of California, the Government, the Vail Estate

P 11

1 and Fallbrook have all participated in the taking of evidence

2 on geology, and I don't think there is any real dispute on

3 that.  It is practically conceded that this is the geologic

4 nature of the valley.

5   MR. HEPBURN:  It looks very reasonable.

6   Now the question I want clarified before I sign this and

7 turn it in is the matter of ownership of the land.  Can I sign

8 this legally when I don't own that much?

9   THE COURT:  No, you should talk to the Government's Office,

10 give them the names of these people you have sold to and what

11 part you have sold recently, and anything that you sign should

12 concern only yourself.  The Government should then contact

13 these other owners.

14   MR. VEEDER:  If he will talk to my secretary in Room 303,

15 that will be taken care of.

16   THE COURT:  Mrs. Tooker in Room 303, you can give her

17 that information.

18   MR. HEPBURN:  It says to get this in here to you by today.

19   THE COURT:  Well, there is no hurry on that; within a

20 reasonable time.  Mrs. Tooker can probably correct it, if you

21 have the legal descriptions with you of what you own.

22   MR. HEPBURN:  Yes sir.

23   THE COURT:  She can probably modify it.

24   MR. HEPBURN:  Mr. Kenney here is a little hard of hearing

25 and he hasn't heard what we have said.

P 12

1    THE COURT:  I wish you had told me that earlier.  We
2    would have tried to talk louder.
3    MR. KENNEY:  I can't hear a word anybody has spoken here
4    yet.  When you come from a higher altitude it is hard to hear.
5    But if anybody will speak right up I can hear them.  I am sorry
6    about that.
7    But this is not a true facsimile of the questionnaire I
8    filled out, so I didn't want to sign it.
9    THE COURT:  Mr. Hepburn, you can explain this to him in
10   detail?
11   MR. HEPBURN:  He seems to be concerned about the acreage
12   recorded there.  I don't think the acreage is right on mine,
13   but I don't see where that would make a lot of difference if
14   it varied an acre or two one way or the other.
15   THE COURT:  I don't either.  When you transfer land by
16   sections and parts of sections you think you have 160 and
17   actually you may have 150 or you may have 170, but that doesn't
18   make a lot of difference.  The legal description shows what
19   property you have.
20   MR. HEPBURN:  Tom is a little concerned about the acreage
21   allocated to irrigation.
22   MR. KENNEY:  It says 146 acres of irrigable land.  I
23   haven't put anything like that in the questionnaire.  I haven't
24   got that.
25   THE COURT:  You have nothing to worry about.  There is

P 13

1  not enough water to water all the irrigable land in this water-

2  shed anyhow.

3      MR. HEPBURN:  He is like the lady who said to the tax

4  assessor, "Well, this furniture is worth $2000.  What are you

5  talking about $100?"

6      THE COURT:  You take care of that.

7      MR. KENNEY:  I will sign it as far as that goes, if there

8  is no damage.

9      THE COURT:  In what section is your property, Mr. Hepburn?

10     MR. HEPBURN:  In Section 13 7 South 2 East, and it nips

11  me on that alluvial deal there, too.

12     THE COURT:  Section 13 is right here (indicating the

13  map).  What part of Section 13?

14     MR. HEPBURN:  In the Northwest Quarter.

15     THE COURT:  How many acres?

16     MR. HEPBURN:  The West 80 of the Northwest Quarter

17  (indicating the map).  You see these lines.  These are soil

18  conservation lines.

19     THE COURT:  You presently have eighty acres?

20     MR. HEPBURN:  No, I have sold a lot of this land.

21     THE COURT:  How many acres do you have?

22     MR. HEPBURN:  I have actually an acre and a half in one

23  spot, and 24 acres in another off of one eighty.  Mr. Holland,

24  I think, has four acres.

25     THE COURT:  I have marked my own map on Section 13.  You

P 14    1    originally had this 160 in the Northwest Quarter?

2    MR. HEPBURN:  Yes.

3    THE COURT:  What do you have now -- one eighty?

4    MR. HEPBURN:  Yes, I wound up with the west eighty, but

5    actually there is four acres out of the corner of that eighty,

6    there is 32 acres in one plot, and I still own 24 acres and

7    14 acres on the south side.

8    THE COURT:  What do you suggest, Mr. Veeder?

9    MR. HEPBURN:  I can give/the exact legal description of
       you

10    all of these.

Take A2    11    MR. VEEDER:  If you would do that, then we willcheck it

12    out and mail out another letter  to you and that will take care

13    of the whole matter.

14    THE COURT:  Mail the letters to the different parties.

15    MR. VEEDER:  That is right.  And if you will just leave

16    those names and addresses.

17    MR. HEPBURN:  I think there are two of them already

18    received them.  At least, I see Mr. Holland's name somewhere

19    on some of the maps.

20    MR. VEEDER:  We have complete legal descriptions in there.

21    If you could point that out on the map to Mrs. Tooker, then

22    we would be able to write you or send you a copy with the

23    correct description as nearly as we can calculate it.

24    MR. HEPBURN:  That is all I was concerned about.

25    THE COURT:  For instance, you still have four acres in

P 15

1   the far corner. As far as those four acres are concerned, it

2   would be completely out of the case because that is in basement

3   complex.

4       MR. HEPBURN: And there is another acre and a half south

5   of that, and 32 acres.

6       THE COURT: Any other questions?

7       MR. HEPBURN: I don't think so. I think that satisfies

8   me.

9       MR. VEEDER: Does that take care of Mr. Hamilton, Mr.

10   Kenney and Mr. Hepburn then?

11       MR. HEPBURN: I think Mr. Kenney is not through.

12       MR. KENNEY: Could we have a little more time on this?

13   When do you want to set that?

14       THE COURT: This would hinge on our next hearing. Shall

15   we fix a date now?

16       MR. VEEDER: Your Honor, I think we are going to have

17   quite a bit to do on the next hearing, and I think we will at

18   least need thirty days in which to prepare the material that

19   would be involved. So it would be any time after 30 days, so

20   far as we are concerned.

21       THE COURT: We could set April 11th. That is not quite

22   30 days. Or we could set April 18th. April 11th?

23       MR. VEEDER: I am going to prefer the 18th, if we could

24   have it, your Honor. It is up to you.

25       MR. GIRARD: I have a two weeks jury trial in that period

P 16

1    of April 11th through the 23rd or something like that.

2        THE COURT:  We are supposed to go to trial on the Grocers

3    case, it looks now, on the 25th of April.  I would like to

4    hold this hearing before that date.  That case will take four

5    to six weeks.

6        MR. VEEDER:  On the basis of my conversation with Judge

7    Doherty, I would guess they will need thirty days themselves.

8    Why don't we set it down for one day, then, for this Hamilton

9    matter?  Whatever your Honor desires.

10       MR. GIRARD:  Didn't your Honor reserve Monday, the 3rd

11   of April for the Master's hearings that week?

12       MR. VEEDER:  It was not reserved.  It was just continued

13   to the 3rd.

14       MR. SACHSE:  I have some indication that his Honor is

15   planning on something for the week of the 3rd.

16       MR. VEEDER:  I know the Master's hearings were continued

17   to the 3rd.

18       MR. HEPBURN:  Your Honor, may we report to Mrs. Tooker?

19       THE COURT:  Yes -- Room 303.

20       Can't you get a lot of work done between now and the week

21   of April 4th?

22       MR. VEEDER:  All right, let's set it down for April 4th.

23   It suits me.  I am not saying we will have everything done,

24   but we will get as far as we can.  That is going to be just

25   two weeks.  I don't know how far we can get, but we can try it.

P 17

1    THE COURT:  What are you thinking about?

2    MR. VEEDER:  We are just continuing on this Temecula and

3    Wilson Creek from the standpoint of going up those areas.  You

4    see, the geology is not completed in the Upper Temecula yet.

5    And then the question of irrigable land, gross acreage on all

6    the riparians for the Temecula area is involved.  We will go

7    as far as we can.  The matter of notice to those people is

8    what I am concerned about.

9    MR. GIRARD:  I realize that that takes a lot of time, but

10   as far as I, myself, Mr. Sachse and Mr. Stahlman are concerned,

11   that is a relatively minor issue as far as the over-all law-

12   suit is concerned, as far as irrigable acreage is concerned.

13   I would like to know if there is any other factor of informa-

14   tion that takes time other than cataloguing irrigable acreage.

15   MR. VEEDER:  Is he addressing that to me?

16   THE COURT:  He is making a statement.

17   What other water cases are you now working on?

18   MR. VEEDER:  There are two or three.  But your Honor, I

19   always give your Honor precedent in all these matters, and so

20   far as I am concerned we will adjust to your desires but I

21   think before the day is through we will find that there are

22   quite a number of matters to be reviewed and discussed, parti-

23   cularly in view of your Honor's ruling on the Vail Stipulated

24   Judgment.  I am not prepared now to say, in response to what

25   Mr. Girard has raised, what the issues will be.

P 18

1    MR. GIRARD:  This is a lawsuit.  I think we are entitled

2    to proceed without waiting for Mr. Veeder to make up his mind

3    how he wants to try it.

4    MR. VEEDER:  The point I am trying to make is I don't

5    know what the issues are going to be until you rule.

6    THE COURT:  Mr. Hamilton, what is your address up there?

7    MR. HAMILTON:  Post Office Box 28, Anza.

8    THE COURT:  We are going tentatively to set the hearing

9    for April 4th, but before we finish this week's work we might

10   have to change it, in which event we would try to notify you.

11   Can you be ready by the 4th?

12   MR. HAMILTON:  I imagine we could, yes.  I really don't

13   know, but I think so.  I don't have the attorney here with me,

14   but I think it will be okay.

15   THE COURT:  As you see from the map, the geology is all

16   in.  It has not been questioned by any of the major parties,

17   and I doubt very much if you will find any errors in that.

18   MR. HAMILTON:  I doubt it very much whether we will send

19   in a geology report.

20   THE COURT:  I understood that your report indicated that

21   some of the underground water flowed out of the watershed.

22   MR. HAMILTON:  Well, we kind of think so.  But one report

23   against a dozen others isn't going to make much difference.

24   THE COURT:  We haven't taken testimony on that.  Does Dr.

25   Mann say that some of the underground water flows out of the

P 19

1  watershed?

2      MR. HAMILTON:  I have a letter stating the fact that it

3  is possible that some of it does.

4      THE COURT:  You lodge that report and letter, any document

5  you want to use, include them all in and we will look at them

6  and we will set the hearing for April 4th.  If we have to

7  change it we will notify you.

8      MR. HAMILTON:  All right, thank you a lot.

9      THE COURT:  All right.

10     MR. VEEDER:  That, for the moment, terminates the sort

11  of housekeeping things we have to do.  I think Mr. O'Malley

12  and Mr. Anderson are anxious to leave as soon as they can, and

13  so far as we are concerned let them proceed.

14     In regard to Mr. Stark, I think tomorrow Mr. Grover wants

15  to argue.  Isn't that correct?

16     MR. STARK:  I will be prepared to argue, your Honor, but

17  I would appreciate having the matter set for tomorrow, since

18  Mr. Grover is coming south and would be available to be present

19  in the courtroom and I am having some difficulty bringing my-

20  self up to date on this.

21     THE COURT:  Mr. Anderson is here and Mr. O'Malley?

22     MR. O'MALLEY:  Yes your Honor.

23     THE COURT:  Who wants to be heard first?

24     MR. O'MALLEY:  If your Honor please, I am here pursuant

25  to the request of your Honor.  I don't have a great deal to add

P 20

1  beyond the memoranda which we have heretofore submitted, to-

2  gether with the proposed findings.  We have heretofore sub-

3  mitted memoranda indicating our claims with respect to pre-

4  scriptive rights and with respect to our appropriative rights.

5  I don't think there is very much we can add beyond that.

6      Of course, I don't think there is any dispute whatsoever

7  with respect to our rights as riparian owners.  So beyond the

8  memoranda we have already submitted and the arguments we have

9  had before, your Honor, on two separate occasions, I have

10  nothing further, unless there is something particular your

11  Honor wishes to raise at this time or some particular problem

12  with which your Honor is concerned.

13      THE COURT:  You saw the memorandum of the State of

14  California?

15      MR. O'MALLEY:  That is correct.  Of course, we differ from

16  it.  But there is very little I can add in reply to that beyond

17  the memoranda I have heretofore submitted.  I can refer to

18  about two or three cases which, I think, are particularly

19  pertinent, but they are already in our points and authorities,

20  unless your Honor wishes to have something further with respect

21  to it.

22      THE COURT:  Let me look over this brief of Mr. Girard's.

23  (A pause).

24      It is refreshing to find a bit of humour.

25      MR. O'MALLEY:  I saw your Honor smiling.  I think I know

P 21  1   what your Honor has reference to.  I showed it to Mr. Oviatt

2   on the plane coming down and I think he enjoyed it.

3   THE COURT:  Quoting Mr. Girard's reference to Vail and

4   Oviatt,

5   ". . the most that could be said of the evidence on

6   this point is that Vail and Oviatt were friends of

7   long standing; that they visited each other fre-

8   quently; that they mutually preferred other

9   refreshments to water; and that there were non-

10   committal discussions . . "

11   Have you anything further to add, Mr. O'Malley?

12   MR. O'MALLEY:  If your Honor please, we would rely

13   principally on Silva vs. Hann, which I can summarize in about

14   two or three minutes here -- I have referred to this before,

15   but I will summarize it very briefly -- (10 C. A.544 at 552)

16   for the proposition that after showing the contention of the

17   plaintiff and use of water as though he were the owner for

18   more than five years the land owner established a prima facie

19   case and it devolves upon the opposing parties to show that

20   the use was permissive or without the knowledge of such party.

21   And Pabst vs. Finmand (190 Cal. 124 at page 130), which

22   holds

23   ". . . the circumstances are such, as for

24   instance the use of all of the water of the creek,

25   that such party must be presumed to have known of

P 22

1        the adverse claim."

2            We submit that that is our situation here, and I think

3        those cases have particular relevancy insofar as Oviatt is

4        concerned because our takings, if your Honor please, go back

5        prior to the year 1928.  Your Honor will recall the testimony

6        insofar as, first, Rancho Ramona, we adduced evidence of the

7        takings of all the water in the stream took place at least as

8        far back as 1920 and were continuous thereafter; and so far

9        as the so-called Bailey Ranch at Oak Grove the takings began

10       sometime back around 1880.  Of course, it is the law that

11       prior to the amendment of the constitution, Article 14 Section

12       3 in 1928, a lower riparian owner was entitled to the undimin-

13       ished flow of the stream even though he didn't have any possi-

14       ble use for it.  It was his duty at that time and prior to the

15       enactment of the Constitutional Amendment to come in if he

16       wanted to estop upper riparian owners from taking water out of

17       the stream -- he had to institute some kind of action.

18           I submit that in the light of those three cases is the

19       basis of our claim for a prescriptive right.

20           I understand there is no controversy about our claim as

21       a riparian owner.  I understand there is no controversy with

22       respect to our claim as to appropriative rights.  I have lodged

23       an alternative finding that if your Honor does not go with us

24       so far as our claim of a prescriptive right is concerned, then

25       it would seem appropriate that your Honor make the alternative

15-274

P 23

1   finding we have suggested, namely, that water diversions and

2   extractions of Defendant James Oviatt as required to irrigate

3   riparian land of said defendant do not cause any injury to

4   lower riparian owners on the Santa Margarita River system.

5   It seems to me that that is a logical corollary of our claim

6   to a prescriptive right.

7      With that I have nothing further to add, except to refer

8   to the points and authorities and the proposed findings I have

9   already lodged.

Take A3

10      MR. VEEDER:  Your Honor, on the claim on Finding No. 5 of

11   Mr. O'Malley, the United States at one time raised a question

12   in regard to that.  We believe that so far as the $3\frac{1}{2}$ miners

13   inches are concerned, based on the date of the diversion and

14   the information we have, I believe they would have an appropri-

15   ative right, I understand, to 1914 on the $3\frac{1}{2}$ miners inches.

16   That would be the ceiling in regard to the Kohler diversions.

17      THE COURT:  The Government concedes that?

18      MR. VEEDER:  Yes.  The facts will support the finding on

19   that particular Kohler diversion.

20      On the others, I think they are matters that have to be

21   resolved by your Honor when they are submitted to you.

22      THE COURT:  Anybody else want to be heard on the Oviatt

23   property?  Mr. Stahlman?  Mr. Girard?

24      MR. STAHLMAN:  Your Honor, I feel that Mr. Girard has set

25   it down in his brief.  There are evidentiary matters here,

P 24

1  however, that support his findings.  You recall the testimony

2  of Mr. Bookman that there always was water flowing downstream

3  not withstanding the surface diversion.  That has a bearing

4  on whether or not there was water to downstream owners.

5       Answering Mr. O'Malley in connection with the cases he

6  has cited, I think the circumstances of this entire case show

7  that there is nothing more than merely a means of diversion

8  by diverting surface flow for riparian use.

9       MR. O'MALLEY:  Your Honor, I may say that <u>Silva vs. Hann</u>,

10  which I have referred to, is almost exactly analgous here.  You

11  have two upper riparian owners and a lower riparian owner and

12  they had a falling stream.  But the principle would be exactly

13  the same.

14       MR. STAHLMAN:  You did not have an underground flow also.

15       MR. O'MALLEY:  The case does not show one way or the other

16  with respect to that, if your Honor please.

17       THE COURT:  If there is nothing further on the Oviatt

18  matter, we will pass on to Mr. Anderson.

19       MR. ANDERSON:  Mr. Knox's claim.

20       MR. O'MALLEY:  May I be excused your Honor please?

21       THE COURT:  Yes, you may be excused.

22       MR. ANDERSON:  Your Honor, I have prepared a brief outline

23  of the testimony that Mr. Knox is able to give, and I should

24  like to submit that to the Court for your examination.  The

25  question always is raised, with a land owner testifying in his

P 25

1   own behalf, as to whether or not there are matters the Court

2   may consider to be proper expert testimony.  Maybe a few minutes

3   examination would be of help (handing document to the Court).

4       THE COURT:  All right.  Mr. Clerk, file this.

5       First, as to the parcels, are they correctly described in

6   the order to show cause?

7       MR. ANDERSON:  As I have read them, they are, your Honor.

8       THE COURT:  And how many acres altogether are involved in

9   the two parcels?

10       MR. ANDERSON:  We compute this to be approximately 600

11   acres.

12       THE COURT:  How many of that in Parcel 81W13?

13       MR. ANDERSON:  We think it is all in what your map

14   describes as Parcel 23, your Honor.

15       THE COURT:  Does the Government have a figure on this?

16       MR. VEEDER:  I don't have a figure in the courtroom, your

17   Honor.  It may be that we have.

18       THE COURT:  Has there been a survey made on this property?

19       MR. VEEDER:  There has been no engineering report on it.

20       THE COURT:  Can we identify it on a map?

21       MR. ANDERSON:  I have a map, your Honor, that shows it.

22       MR. VEEDER:  The exterior boundaries of the property are

23   clear, your Honor, and we have the geology that has been in-

24   troduced in regard to it.  Exhibit 275 locates the property

25   as being part of Aguanga Basin.  It is Parcel 23, which is in

**P 26**

1  Section 13.  It comes down like that.  I will get you a picture

2  (handing document to the Court).

3  MR. ANDERSON:  Your Honor, this is an enlargement of the

4  U.S.G.S. sheet.

5  MR. VEEDER:  Here it is right here in Section 13.

6  Mr. Anderson says he has a title policy on that.

7  MR. KNOX:  I believe it is about 613 acres (indicating

8  on the map).

9  THE COURT:  This is Section 24, Colonel?

10  COLONEL BOWEN:  Yes sir.

11  THE COURT:  It would take the entire north half of Section

12  24; is that correct?

13  COLONEL BOWEN:  Except the Easterly 80 acres.

14  THE COURT:  I would be prepared to find, Mr. Anderson,

15  on the basis of the geology, that practically all this property

16  -- I think there are two little pieces in the basement complex

17  -- overlie a ground water body that is part of the stream system.

18  Do you have any objection to that finding?

19  MR. ANDERSON:  No your Honor.

20  THE COURT:  And as far as those two areas of basement

21  complex are concerned, in drawing the findings you could refer

22  to -- what is the name of this exhibit?

23  MR. VEEDER:  275.

24  THE COURT:  This colored one?

25  MR. VEEDER:  275.  That is the geologic map.

P 27

1    THE COURT:  We could provide that any water found in the

2    areas of basement complex as shown on Exhibit 275 was vagrant,

3    local, percolating water and not part of the stream system.  I

4    doubt if you could get any kind of well up there.  But you

5    would be entitled to that finding.

6    MR. ANDERSON:  I think there is one that produces a very

7    small amount of water that is in the blue area, your Honor.

8    THE COURT:  The rest of it would be overlying an area of

9    ground water that is part of the stream system.

10    Do you want to call your client?

11    MR. ANDERSON:  Yes, your Honor, I would.  And your Honor,

12    I would like to offer the map.

13    THE COURT:  Yes, we will call it Knox's Exhibit 1.

14    MR. VEEDER:  Your Honor, it would be helpful for the

15    United States and I believe all parties if Mr. Anderson would

16    state whether he is claiming appropriative or prescriptive

17    rights over and above his riparian and overlying claims.  I am

18    not sure from his pleadings exactly the status he wants to take

19    in that regard.

20    MR. ANDERSON:  I haven't seen the pleadings.

21    MR. GIRARD:  I looked at the law and I think all of his

22    water uses were riparian.  The only storage was ten acre feet,

23    wasn't it?

24    MR. ANDERSON:  Yes.

25    THE COURT:  Are you prepared to say whether you claim any

P 28

1  appropriative or prescriptive rights?

2      MR. ANDERSON:  Your Honor, I think that the claim indicates

3  that there is appropriative rights, that there has been an

4  appropriation over a long period of time.

5      THE COURT:  You are using the term "appropriative" in its

6  technical sense, or are you talking about a prescriptive right?

7      MR. ANDERSON:  There has not been a claim for a pre-

8  scriptive right filed as far as any application to the Division

9  of Water Resources or the State Agency.  But I think there has

10 been a use which your Honor might find has ripened into a

11 prescriptive use.

12     THE COURT:  To get our terminology lined up, the rights

13 secured by an application to the State Agency would be an

14 appropriative right.  What is the break line on that?

15     MR. VEEDER:  1914.

16     MR. GIRARD:  1914.

17     THE COURT:  Prior to 1914 it could be done by self help,

18 and since 1914 there is required a procedure through the State

19 Agency.

20     Now, the prescriptive right, if any, is one that the

21 Water Resources Board doesn't pass on.  It is an appropriative

22 matter.  It is a question whether there has been an adverse

23 user for a statutory period of at least five years to give

24 you a right.

25     This is further complicated by the matter which Mr.

P 29

1  O'Malley was discussing and which Mr. Stark will discuss

2  tomorrow, and that is whether or not by the exercise of a

3  riparian use you can secure a prescriptive right.

4      Now I ruled at pre-trial in this matter that the exercise

5  of a riparian use could not lead to a prescriptive, and I

6  hedged a little bit in the absence of some controlling authority.

7  Mr. Stark is going to undertake the job of showing me I was

8  wrong.  There is a nice question there.  There is no doubt but

9  that the rights you have been exercising are riparian rights.

10 Your memorandum indicates that there was some diversion made.

11     MR. ANDERSON:  Yes your Honor.

12     THE COURT:  We will take proof on that.

13     MR. ANDERSON:  And that is what I think, your Honor,

14 would possibly ripen into a prescriptive right.

15     THE COURT:  All right, you may proceed.

16                 GARNER L. KNOX,

17 one of the defendants herein called as a witness on behalf of

18 his own behalf, having been first duly sworn, on his oath

19 testified as follows:

20     (See next page)

21

22

23

24

25

DIRECT EXAMINATION

BY MR. ANDERSON:

Q   Mr. Knox,   what is the common name of your ranch?

A   Sunnybrook.

Q   When did you first see the Sunnybrook Ranch?

A   Early in December, 1958.

Q   At that time will you describe what agricultural activity was under way there?

A   Well, I was shown the diversion dam on the upstream of Temecula, and the pipe system for bringing it into the ranch, and the two lakes, and the ranch, and the concrete flood irrigation system, pipe irrigation system that was in use.   They were not using it, of course, in December.

THE COURT: Was that diversion point on this property?

THE WITNESS:  It was above.

THE COURT:  On whose property was it?

THE WITNESS:  At that time I believe his name was Davidson.   I don't know who owns it now.

MR. ANDERSON: Does your Honor wish to mark it on that map?

THE WITNESS:  I believe Ritchie is the owner.   I don't know his initials.

THE COURT:  Do you have before you Knox Exhibit 1?

MR. VEEDER:  Will you give us the point of diversion, and we will try to find it, your Honor, where the diversion is made.

MARIE G. ZELLNER, OFFICIAL REPORTER

1    THE COURT:  Will you take this red pencil and indicate

2  where the diversion is.

3    THE WITNESS:  Yes.

4    THE COURT:  Mark an "X".

5    THE WITNESS:  I would say about here (indicating).  Here

6  is the boundary of our property (indicating).

7    MR. ANDERSON:  Just outline it in black on Exhibit 1.

8    THE WITNESS: Yes.  (Witness complies)

9    THE COURT:  Can you draw a line showing approximately---

10  we will not hold you to exact lines?---where this pipe line

11  runs?

12    Make that "X" bigger, and then draw your line.

13    (Witness complies.)

14    MR. ANDERSON:  Do you want to follow this?  Will that

15  help you?

16    THE WITNESS:  No, I will get this located like this.

17  (Witness draws on map.)

18    THE CLERK:  Your Honor, that is Exhibit A, instead of

19  Exhibit 1.

20    THE COURT:  All right.  Let the record show that the

21  Exhibit is Knox Exhibit A, instead of Knox 1.

22    MR. VEEDER: That is the map on which he is now drawing?

23    THE COURT: Yes.

24    THE WITNESS: That is the pipe line.  From the dam there

25  is an open ditch part way, and then a short length of pipe,

1  and a sand box, and at the sand box there is a steel pipe for

2  possibly for a quarter of a mile, and then it goes underground

3  and a concrete pipe the rest of the way here underneath the

4  road, and it follows this (indicating), all concrete pipe into

5  this first lake, and then the overflow goes down into this

6  lake (indicating), and the overflow there back into the stream

7  MR. VEEDER: The number one lake, could I ask you to mark

8  that?

9  THE WITNESS: To mark it, yes.  This is number one (indi-

10  cating), and this is number two (indicating).

11  MR. STAHLMAN: Your Honor, may the record show when he

12  referred to a sand box he was drawing a circle in the vicinity

13  of the "X" on Exhibit Knox A?

14  THE COURT: All right.  The record will so show.

15  Now I interrupted you.  You said you first saw this pro-

16  perty in December of 1948.  You may proceed, Mr. Anderson.

17  MR. ANDERSON: Your Honor, it seems to me that the circle

18  indicating the sand box is drawn at the end of the number

19  1600 which  appears westerly of the word "Radek" on the map.

20  THE COURT: All right.

21  MR. ANDERSON: Now, I have here two photographs.  Do you

22  want to mark these?

23  THE COURT: Those will be Exhibits Knox B and C, for

24  Identification.

25  (The two photographs referred to were marked Knox Exhibits

1  B and C, for Identification.)

2     BY MR. ANDERSON:

3     Q  I show you, Mr. Knox, a photograph which the Clerk

4  has marked Exhibit B.  Will you tell us when you first saw

5  that photograph?

6     A  Early in 1949.  It was given to me by the previous

7  owner of the ranch.  It shows the trestle works supporting the

8  steel pipe line some distance below the diversion dam.

9     Q  Can you tell whether that picture shown in Exhibit B

10  is on your property or off of your property.

11     A  That picture is on the property.

12     Q  And approximately where is it, can you tell us?

13     A Just a short distance inside the property line, about

14  an eighth of a mile inside.

15     Q  You pointed to a line or to a place on the red line

16  between 1600 and---

17     THE COURT: Let him put a "B" here, which will tie it in

18  with the photograph marked Knox B.

19     THE CLERK: There are three Exhibits, your Honor, which

20  have been marked.  There are B, C and D.

21     (An additional photograph was marked Knox Exhibit D for

22  Identification.)

23     THE COURT: All right, B. C. and D.  Will you let me see

24  B now?

25     THE WITNESS: All right.

THE COURT: Is this a wooden or a steel trestle?

THE WITNESS: It is a wood trestle and a steel pipe.

BY MR. ANDERSON:

Q Will you describe whether the timber at the time you saw it appeared to be new or old?

A No, they were well worn, and in a good many places in the cross-planking the nails had come loose.  It was definitely old.  It had been there for sometime, a few years, from the appearance of it.

Q Now, I hand you the one marked Exhibit C, and will you tell us about that?

A C is upstream a little further than where B was taken from, and is just off of our property, and I will mark it on the map.

THE COURT:  Mark it "C" on the map.

THE WITNESS: I will mark it "C" on the map.

MR. ANDERSON: The witness is marking a point immediately to the right of number 1600.

THE WITNESS: Immediately to the left of it.

MR. ANDERSON: Immediately to the left of it.  Excuse me. Does your Honor wish to see Exhibit C?

THE COURT: Yes.

(The photograph was handed to the Court.)

BY MR. ANDERSON:

Q Now, I hand you Exhibit D, a photograph so marked,

1   and will you tell us from what point that was taken, as far

2   as you are able to state?

3       A  It was taken from a hill to the north of Lake number

4   1, and evidently it was taken in 1947.  It was at the time

5   they drilled for oil, and shows the oil derrick.

6       Q  Can you mark on this defendant Knox A, the point

7   from which you believe that photograph to have been taken,

8   and mark it with a "D"?

9       (Witness complies.)

10      MR. ANDERSON: Your Honor, he has marked a point immedia-

11  tely below and to the right of number 1736, which appears at

12  the upper left of the map.

13      THE COURT: With a "D"?

14      MR. ANDERSON: Yes, your Honor.

15      THE COURT: All right.  Thank you.

16      BY MR. ANDERSON:

17      Q  Mr. Knox, at the time that you first examined this

18  ranch, can you tell his Honor what areas appeared to be de-

19  voted to the growing of irrigated crops?

20      A  All the land down to the sandy area, to the west and

21  south of this pipe line after it crosses the road, the main

22  highway.  In other words, this was the area. (witness indi-

23  cating.)

24      THE COURT: Do you have a blue grease pencil?  Here is a

25  black one, and will you just draw that in?      . . . . .

1    Do you have a blue one, Mr. Clerk?

2    THE CLERK: No, your Honor, I don't.

3    THE COURT: Just draw a dashed line around there where

4    the field was.

5    (Witness complies.)

6    THE WITNESS: That shows the approximate area that was

7    irrigated at that time.

8    THE COURT: That is shown enclosed with a dashed black

9    line drawn by the witness on the map, Exhibit Knox A, and

10   within the area drawn by the witness is the figure "1" in a

11   large number.   Proceed.

12   BY MR. ANDERSON:

13   Q  Now, did you form an opinion as to the number of acres

14   in that area, Mr. Knox?

15   MR. VEEDER: Is there a foundation/to this?  I do not want

16   to object any more than I have to, but I don't know that Mr.

17   Knox is a farmer at all.  I don't know how much farming he has

18   done.

19   THE COURT: He says he has owned the property from 1948.

20   Can you estimate land in acreage?

21   THE WITNESS: I can now.

22   THE COURT: You couldn't in 1948, but you can now?

23   THE WITNESS: That is right.  I was told it was about

24   48 acres.  I am convinced now it was nearer 30.

25   THE COURT: You estimate there were thirty acres irrigated?

1      THE WITNESS: Yes, sir.

2      BY MR. ANDERSON:

3      Q   Now, will you tell the Court what system of pipes

4   there was involved in that irrigation at that time?

5      A   Well, the usual concrete irrigation system with risers

6   every---well, they varied---thirty feet up to I would say

7   sixty feet, and it required flood irrigation.  And there were

8   no electric pumps on the ranch, but they did have a windmill

9   and gasoline driven jet pump for domestic primarily, and it

10  was also used to irrigate a small garden near the houses, and

11  to supply water for the cattle in certain locations.

12      MR. ANDERSON: Does your Honor wish to have that marked

13  on the map,---the windmill and the well?

14      THE COURT: Yes, we might as well have that, too.

15      THE WITNESS: All right.   (Drawing on the map.)

16      THE COURT:  Mark the windmill "W.M." And you have two

17  other wells?

18      MR. VEEDER: Could he have a finer pencil to mark with?

19      THE WITNESS: I can use this.

20      THE COURT: I don't know whether that will write on that

21  or not.

22      MR. ANDERSON: Do you want to use this?

23      (Witness marks on map.)

24      MR. VEEDER: We might have him identify it on Exhibit 275.

25      MR. ANDERSON: Let the record show he is trying to make a

1    mark right below and right south and a little bit left of the

2    lake he has marked 1.

3         THE COURT: That is the windmill?

4         THE WITNESS: That's the windmill.

5         THE COURT: I will mark an "X" there, with an arrow indi-

6    cating the windmill.

7         I show you Exhibit 275.  It is my copy, but it is the

8    same as the one in evidence.  There are two wells shown on

9    there, one identified as Q-1, and the other as Q-2.

10        THE WITNESS: Q-1 is the one we have just been referring

11   to as the windmill.

12        K-1 is the oil well.

13        THE COURT: And Q-2?

14        THE WITNESS: And Q-2 is a well that was drilled in

15   February,---completed in February of 1954.

16        THE COURT: Now, you have a third well there?

17        THE WITNESS: And a third well that was completed in

18   August last year.

19        MR. VEEDER: Was that August of 1960, or 1959?

20        THE WITNESS: 1960.  It should be 1960.

21        THE COURT: Can you locate that?  If not I will have the

22   witness transpose that on to the Offical 275.

23        MR. VEEDER: Yes.

24        MR. ANDERSON: For the benefit of the Court, please, may

25   I say that the picture of the oil well is not intended to

1  indicate a further water well, although there is still a

2  casing there.   That is not one of those wells in the memorandum

3  that I have submitted to the Court.

4  THE COURT: All right.

5  MR. ANDERSON: Does your Honor wish me to proceed with

6  the testimony?

7  THE COURT: Yes.

8  BY MR. ANDERSON:

9  Q  In 1948, at the time you first saw the ranch, will you

10  describe what facilities there were for the storage of water

11  on the premises?

12  A  There were two lakes; number 1 approximately an acre

13  in area, and number 2 about half an acre.

14  Q  Do you happen to know how deep either of/lakes is?
the

15  A  Yes, the average depth of number 1 is between five

16  and six feet, and number 2 is a little deeper, about six or

17  seven feet.

18  Q  Is there any storage facility on the premises?

19  A  A small concrete reservoir for the domestic system,

20  and it was about six by eight, by five feet deep, I would say.

21  Q  Did you form any opinion as to the age of the storage

22  tank?

23  A  This concrete?

24  Q  Yes.

25  A  No, there is no way I could tell the age on that. It

1    was not new.

2        Q  What about the windmill?  Did you observe anything as

3    to the age of the windmill?

4        A  The windmill you are referring to?

5        Q  Yes.

6        A  The well I was informed was there before 1947 at the

7    time Mr. Tyrrell acquired the ranch.

8        MR. VEEDER: That is hearsay, your Honor.

9        THE COURT: It does not make any difference about the wind-

10   mill well.  Now, Mr. Anderson---

11       MR. ANDERSON: Yes, your Honor---

12       THE COURT: ---on the matter of storage we have been dis-

13   tinguishing between two sorts of storage.  If the two so-

14   called lakes were used to put water into to build up a head

15   to irrigate, where the water might remain twenty-four or forty-

16   eight hours for irrigation purposes, we ordinarily had no

17   problem.  It is a customary adjunct to irrigation.  If, on

18   the other hand, the lake was used to husband water from a wet

19   season into a dry, where they take the two extremes, then we

20   had a more difficult problem.

21       What is your contention?  That these lakes were used

22   only to put water into to build up a head to irrigate, or were

23   they used to store water from a wet season into a dry season?

24       MR. ANDERSON: Just used as a part of the irrigation

25   system, your Honor. We won't say it was a twenty-four hour

1    matter, but certainly it wasn't necessary to store from a wet

2    season to a dry.

3        THE COURT: The water was run into them for the purpose

4    of using the water within a reasonable period of time, to

5    irrigate with?

6        MR. ANDERSON: Yes, your Honor.

7        THE COURT: Do you have any problem on that?

8        MR. VEEDER: I have no problem, your Honor.

9        THE COURT: Does anyone have any problem on that?

10       MR. GIRARD: No, your Honor.

11       THE COURT: Then with that understanding we can save a

12   lot of time on that.

13       MR. VEEDER: Just so it is not a precedent for later years.

14       THE COURT: You will have to get used, Mr. Anderson, to

15   irrelevant interruptions here.

16       MR. ANDERSON: I have heard of oaks growing from acorns,

17   your Honor, but I don't have any thought that an acorn here

18   would grow into one of those oaks.

19       MR. VEEDER: You don't this crowd, Mr. Anderson.

20       THE COURT: Do you have any estimate in acre feet of what

21   these lakes contained in water in bulk?

22       MR. ANDERSON: Yes, your Honor.  Here is a statement based

23   on one acre and the average depth of five to six feet, would

24   equal approximately five and one-half to six acre feet, and

25   the one-half acre, with a depth of six to seven feet, would

1  indicate another three and a half acre feet perhaps.

2  THE COURT: I will ask my experts here.  Colonel, does

3  that sound reasonable?

4  COLONEL BOWEN: Yes, your Honor; it sounds reasonable.

5  THE COURT: With that understanding I think we have enough

6  proof on the size of the lakes, and the use of them.  I take

7  it that water has been run down this pipe line into what you

8  show as Lake No. 1, and then Lake No. 1 feeds into Lake No.

9  2?

10  THE WITNESS: That's right.

11  THE COURT: And then the water is permitted to run from

12  Lake No. 2 back into the sandy area?

13  THE WITNESS: Into the stream; in behind the stream bed,

14  yes.

15  THE COURT: Now, how much water would run back into the

16  stream bed from the end of the line?

17  THE WITNESS: It would depend entirely upon how much was

18  diverted by the intake of the flow of water, and how much we

19  were using, of course.

20  THE COURT: Is the diversion at the intake a static one?

21  Do you always divert the same amount, or do you have some way

22  of diverting more or less?

23  THE WITNESS: No, we divert all the stream, unless there

24  is a larger flow, it flows over the dam and then on down the

25  stream.

1    THE COURT: Does this wash out in the winter time, and do

2    you have to reconstruct it?

3    THE WITNESS: Only in the---it has only washed out twice

4    since I have had the ranch.

5    THE COURT: What kind of a dam is it?

6    THE WITNESS: It is an earth and rock dam.

7    THE COURT: And each time it has washed out you have re-

8    constructed it?

9    THE WITNESS: Yes.

10   THE COURT: Now, this dam does not go down to bedrock

11   does it?

12   THE WITNESS: Oh, no.  There is water below the dam

13   always, even when we are diverting all the stream.

14   THE COURT: So you are diverting the surface flow?

15   THE WITNESS: That's right.

16   THE COURT: And on occasions the water has flowed over

17   the top of the dam but not washed it out?

18   THE WITNESS: Yes, sir.

19   THE COURT: Then the water goes down this pipe into the

20   two lakes, and then from the last lake back into the creek

21   bed?

22   THE WITNESS: Yes.  There are a good many measurements

23   that have been taken over the years by Mr. Green, copies of

24   which I have received covering---well, from 1943 up through

25   1948, two or three measurements a year.  Then in 1949 and

1  1950, after I had the ranch there were three or four measure-

2  ments a year.

3      THE COURT: Has he taken them since 1950?

4      THE WITNESS: I will have to look at the---I think there

5  were some in possibly 1951.  Am I right?

6      MR. ANDERSON:  April 5, 1950.

7      THE COURT: How many others do you contend are irrigable

8  besides the thirty acres?

9      THE WITNESS: We have been irrigating since 1950 seventy

10  acres with sprinkler irrigation.

11      THE COURT: Since 1950?

12      THE WITNESS: That is right.

13      THE COURT: With sprinklers?

14      THE WITNESS: Yes, with sprinklers.

15      THE COURT: Where is the other forty?  The thirty you

16  have marked off on the map, and where do the other forty lie?

17      THE WITNESS: It is all this white area above and to the

18  east of the red line, all through here, (indicating.)

19      THE COURT: Specifically, some north of Lake No. 2?

20      THE WITNESS: Yes, all these fingers, we call them, north

21  of Lake No. 2.  And north of Lake No. 1 in this area in here,

22  (indicating.)

23      MR. VEEDER: Will you/relate that for us on Exhibit 275, be-

24  cause that is the alluvium, I believe, that he is on.

25      THE WITNESS: Yes, it is all alluvium.

1    THE COURT: And what about this white area that you have

2 your finger on, above your finger, at 1554?

3    THE WITNESS: Yes, that is all irrigated.

4    THE COURT: Then that has been by sprinkler system since

5 1950, you say?

6    THE WITNESS: Yes.  We tried irrigating in 1949 with flood

7 irrigation, but practically all of that soil, particularly

8 that below the pipe line that could be irrigated by flood

9 is a very sandy silt.

10    THE COURT: Which are you referring to now?

11    THE WITNESS: To area No. 1.

12    THE COURT: Area No. 1.  Your original thirty acres?

13    THE WITNESS: That is right.

14    THE COURT: Now, you showed me south of the area marked

15 as the thirty acres with the No. 1 in the center of it that

16 is a sandy area?

17    THE WITNESS: Yes.

18    THE COURT: That is not subject to irrigation, I take it?

19    THE WITNESS: Much of it is.  Underneath there, rather,

20 there is possibly six inches of sand, but there is quite a

21 bit of soil, and we have found that alfalfa did very well

22 there.  You could not go too far, and you had to stay where

23 there was silt underneath the sand.

24    THE COURT: Have you irrigated any of that area?

25    THE WITNESS: Yes.

THE COURT: Is that a part of the additional forty acres?

THE WITNESS: That is all a part of the additional forty acres.

THE COURT: A part of the additional forty acres.

THE WITNESS: That is right. We have also irrigated a bench along here (indicating) that is, we showed a mark here in the sand. Actually there was quite a drop, a sudden drop at this point, and this is all white soil here, and we irrigated it.

THE COURT: Is that a part of the forty acres?

THE WITNESS: Yes, that is a part of it.

THE COURT: Then what is your contention? That you have seventy irrigable acres?

THE WITNESS: We have seventy acres that we are irrigating and have been irrigating since 1950. We don't feel we are using any more water than we did in 1949, when we were trying to flood irrigate.

THE COURT: How many additional acres do you contend are irrigable besides the seventy that you have already put under irrigation?

THE WITNESS: There are about thirty more acres possible to irrigate, and we have occasionally irrigated them in the winter, but this winter there has been no rainfall. We have planted them to winter crops.

THE COURT: Where do they lie?

THE WITNESS: They lie in this area here. (Indicating)

MR. ANDERSON: Immediately west of the area "B. M." at 1554.

MR. VEEDER: I think we ought to have a map on which to draw the seventy acres in, your Honor.  I don't know where he has been on the seventy acres.

THE COURT: I do.  If you will bear with me a minute here, I will mark it.

Mr. Knox, will you look over my shoulder here?  This additional forty acres are these fingers on here?

THE WITNESS: That is correct.

THE COURT: So that if I put a line around like this, would that be it?  Is that right?

THE WITNESS: Right.

THE COURT: And ending here?

THE WITNESS: Yes.

THE COURT: And then like this?

THE WITNESS: Yes.

THE COURT: This is off the record.

(Discussion between Court, Counsel and the witness at the bench off the record.)

THE COURT: Now, we have marked on the map, Exhibit Knox A, an area lying northerly of Lakes 1 and 2, and easterly and westerly, which has been outlined in a dashed red line, and then filled that in with cross red lines; and an area south

1   of the stream --

2       THE WITNESS:  And north of the road.

3       THE COURT: --and running to the westerly edge of the

4   property, which also has been enclosed with a red dashed

5   line and cross marked.

6       THE WITNESS:  There is some more there too, this (indi-

7   cating).   That area, too, is in that forty.

8       THE COURT:   There has been an additional area with a

9   red dashed line filled in with red cross lines which is super-

10  imposed, or, rather, in the middle of which, or the bottom

11  portion of which appears the number 1554  which lies immediate-

12  ly north of the road.   That is also a part of the forty acres?

13      THE WITNESS:   That is right.

14      THE COURT:   Now, does that comprise the forty that we

15  have talked about?

16      THE WITNESS:  Yes, that comprises the forty, yes, your

17  Honor.

18      THE COURT:   Now, where would the other acreage be, --

19  the additional thirty that you say is irrigable, but not yet

20  irrigated?

21      THE WITNESS:   This bottom land here (indicating), which

22  is sandy, all except the very end here. We haven't touched

23  that.  We have put that into winter crops for half a dozen

24  years, and we have irrigated it when the rains were lacking.

25      THE COURT:   Where would you say that was?  In this area

here (indicating)?

1   THE WITNESS: Yes.  All of this area up to here (Indicating).

2   THE COURT: Whereabouts?

3   THE WITNESS:  And down here (Indicating) which is close

4   to the stream, and then it cuts across here.

5   THE COURT: All right.  Put a black line there.

6   (Witness complied.)

7   THE COURT:  All right.  You have now marked an area

8   lying immediately south of the stream with a dark line and

9   cross marked in black.  Clear down to here (Indicating), or

10   right to there (Indicating)?

11   THE WITNESS: Yes, right to there, but it goes down here

12   (Indicating).

13   THE COURT: Which is the additional thirty acres that you

14   have referred to?

15   THE WITNESS: That has been winter irrigated at one time

16   or another.

17   THE COURT: We are doing all of this on Exhibit Knox A.

18   This is the oil well there (Indicating)?

19   THE WITNESS: Yes.

20   THE COURT: Do you think this covers it, Mr. Veeder?

21   MR. VEEDER: I think it reflects what he has testified as

22   to.  Is that on the record?

23   REPORTER: Yes.

24   MR. ANDERSON: It is a mighty qualified endorsement.

25   Now, your Honor, do you wish to ask further questions?

1    I am certainly agreeable to your doing so, but I have some,

2    of course, that I wish to ask him.

3        THE COURT: I am just trying to shorten the time, and

4    there does not seem to be much dispute about it.   Maybe I

5    could give you my reactions right now, or do you want any

6    cross-examination before you go into more detail?

7        MR. VEEDER: There is one point that I had in mind.   I

8    know that Mr. Anderson would like to get away.

1    In regard to this new well, which I understand is quite

2    a productive structure, in that it produces a great deal more

3    water now, as I think I mentioned to the Court, I think that

4    what he testified to was that the riparian owner is using

5    water on riparian land by means of a structure which has been

6    there for quite awhile. That is what I think it was.

7    THE WITNESS: May I make a comment on what I think it was?

8    THE COURT: Yes, sir.

9    THE WITNESS: Up until the time we drilled this well in

10   1954, we were irrigating through sprinklers by using booster

11   pumps and taking the water out of the lakes and supplementing

12   that by water from a five horsepower pump that was installed

13   at the original windmill well.  That gave us about one hundred

14   gallons a minute, and that was just pumped into the lake,

15   because the flow from the stream, particularly after 1951,

16   got so low about the end of August or September there wasn't

17   enough water without this supplemental help to take care of

18   our needs.

19   In 1953 it was even worse so far as the stream flow, and

20   I am not sure whether it was in approximately 1953 or approxi-

21   mately 1954 that the stream dried up.  Finally it ceased to

22   flow at all, and it was around that time, that is, this flow

23   during the months of August and September, so we drilled this

24   well and put a fifteen horsepower motor in it.

25   THE COURT: This is the 1954 well?

1     THE WITNESS: This is the 1954 well. (Continuing)  And

2 pumped direct from it to the sprinkler system, with the excep-

3 tion of the land irrigated from Lake No. 2.  We continued to

4 use the booster pump, and take water out of that lake, and

5 when the stream dried up, we had to pump water down to that

6 lake by pumping into the outlet at the No. 1 lake.

7     That worked fine from 1954 up through 1958, but by then

8 the amount of water that we would get after April or May at

9 the latest from the stream was nil.  She dried up that early.

10     THE COURT: About when?

11     THE WITNESS: About April or May, and the water from this

12 one well was probably ample in quantity---

13     MR. VEEDER: When you say the one well, will you tell us

14 what you mean?

15     THE WITNESS: The 1954 well, because that was the main

16 irrigation well by that time, and we were using the old wind-

17 mill well to keep the little lake supplied with water for

18 irrigation in that area of the ranch.  The rest of the ranch,

19 the main portion of it, was irrigated by the production from

20 the 1954 well.

21     In 1959 the water depth in that well had increased from

22 about forty or forty-five feet, when we were pumping, to

23 nearly ninety feet.  The result was we had insufficient

24 pressure to irrigate the upper areas of the field where the

25 elevation was high.

1    THE COURT: So you drilled the next well in what?

2    THE WITNESS: Well, we tried to get by, and in 1960---

3  we put in a twenty-five horsepower motor and tried to increase

4  the pressure, and that helped a lot for the balance of 1959,

5  and in 1960, I believe it was about the end of August, we

6  were down to the ninety-five or ninety-eight feet depth, and

7  our suction was only one hundred five feet in that well, so

8  either the well was sanding up, and we didn't want to shut it

9  down, as it was the only source of our water, so we drilled

10  this other well, and put the fifteen horsepower motor and

11  pump which we had on the original 1954 well in this new well,

12  and used it, shutting down the twenty-five horsepower at least

13  from continuous duty.

14    MR. VEEDER: Mr. Knox, and, your Honor, may I interrupt,

15  because he is referring to the 1954 well.   Exhibit 275-C

16  refers to a 1952 well.

17    THE WITNESS: It should be 1954.

18    MR. VEEDER: Could I leave him make the correction so

19  that the record may be reflective of what is correct?

20  Exhibit 275-C is the Government's tabulation of wells, and

21  the Knox wells are in the top column, and there are three

22  wells, but I don't have 1954 reflected there, and I think it

23  should be corrected because he says 1954 and we say 1952.

24    THE COURT: Yes.   Now, this tabulation which the Govern-

25  ment has put into evidence previously showed a well here

1    completed in 1947.

2         THE WITNESS: That is the oil well, and that is not in

3    use.

4         THE COURT: That is the oil well?

5         THE WITNESS: That is the oil well.

6         THE COURT: That is not the windmill well?

7         THE WITNESS: No.

8         THE COURT: Q-1?

9         THE WITNESS: That is K-1.

10        THE COURT: No, it is 13  Q-1.  That is this well here

11   (indicating).

12        THE WITNESS: That is the windmill well.  K-1 is the 1947

13   well.

14        THE COURT: That is the oil well?

15        THE WITNESS: Yes.  K-1 is the oil well, and Q-1 was an

16   original well which was there when I bought the ranch.

17        THE COURT: All right.  It is shown as completed in 1952.

18        THE WITNESS: Well, I know it was there in 1948, because

19   I saw it, and Mr. Tyrrell tells me it was there when he bought

20   the ranch, which was in 1946 or 1947.

21        THE COURT: And Q-2 is the next well?

22        THE WITNESS: That is the first one that I drilled.

23        THE COURT: And that was 1952?

24        THE WITNESS: No, that should be 1954.

25        MR. VEEDER: May we correct that, your Honor, because we

1   have it as 1952.

2   THE COURT: I will correct it and put in there on Q-2

3   "February, 1954" and you say Q-1 was there when you bought the

4   ranch?

5   THE WITNESS: That is right.   I know it was there in 1948,

6   in December, because I saw it.

7   THE COURT: Shall we correct that to read "Prior to 1948?

8   MR. VEEDER: Yes, your Honor.   We just used the best data

9   we could get.

10   THE COURT: "Prior to 1948."

11   Is the date right on the oil well, 1947?

12   THE WITNESS: I believe it is.

13   THE COURT: I will write "Oil well" after that, and I have

14   initialed the corrections which I made.

15   Now how deep did you go on this new well?

16   THE WITNESS: One hundred seventy-two feet, I believe.

17   I have the test report of the driller.

18   THE COURT: Now, Gentlemen, I have to go to a Diplomatic

19   Corps luncheon this noon at Point Loma, so I will have to

20   leave.   You can identify this drilling log he has referred to,

21   and you can probably include it with the other logs he has,

22   and also line out whatever else there is in discussion with

23   Mr. Anderson for this afternoon.

24   MR. VEEDER: Fine, your Honor.   Shall we resume at two?

25   THE COURT: At two o'clock.

1       (Whereupon, at 11:55 o'clock A. M., a recess was taken

2  until 2:00 o'clock P. M., of the same date.)

Take Cl
P31

1    MR. VEEDER:  Your Honor, are you ready to proceed.

2    THE COURT:  Yes sir.

3    MR. VEEDER:  Mr. Snow from Los Angeles is here.  He is

4  one of the gentlemen whom we notified.  I didn't know he was

5  in the courtroom this morning.  He received your letter.  He

6  has talked to Colonel Bowen.  I think he and Colonel Bowen

7  can outline the respective locations of the property, the

8  irrigable acreage, etc.

9    MR. SNOW:  This notice that I received, your Honor, stated

10  that in my property there were 35.3 acres that were irrigable,

11  and I didn't know whether that was a quota or whether it was

12  the considered opinion of the people that made the investiga-

13  tion that that is all that would be practical to irrigate.

14  Talking with Colonel Bowen we looked at the map and it seemed

15  that there is only a little strip along the north side that

16  is involved in this deal.  The underlying formation there is

17  of the blue structure you pointed out which wouldn't be affect-

18  ed by this ruling.

19    I was wondering what my rights would be in that strip

20  along the edge; whether it would be possible to put down

21  domestic wells, or whether I could develop any water there,

22  or what the restrictions are in regard to that.

23    THE COURT:  Colonel, do you have the property located on

24  the map?

25    COLONEL BOWEN:  Yes, I do, your Honor.

P 32

1      Referring to Plaintiff's Exhibit 278, Mr. Snow's property

2  comprises the Northwest Quarter of Section 7 Township 7 South

3  Range 3 East, which is illustrated on Plaintiff's 278.  It is

4  primarily overlying basement complex.  A portion of the property

5  is outside of the watershed of the Santa Margarita River, and

6  a small portion of it is overlying older alluvium, as de-

7  lineated on Plaintiff's Exhibit 278.

8      THE COURT:  How many acres -- 160 acres?

9      MR. SNOW:  That is 176, your Honor.

10      THE COURT:  How many acres, Colonel, in your opinion, is

11  irrigable?

12      MR. SNOW:  If the water were available --

13      THE COURT:  Wait.  You haven't been sworn yet.  Let me

14  ask the Colonel.

15      Swear Mr. Snow, Mr. Clerk.

16                      ROLAND EDWARD SNOW,

17  one of the defendants herein, being first duly sworn, on his

18  oath was examined and testified as follows:

19      THE CLERK:  State your full name please.

20      THE WITNESS:  Roland Edward Snow.

21      THE COURT:  How much do you think is irrigable?

22      MR. SNOW:  If the water was available and we were per-

23  mitted to, I think there would be a hundred acres or so that

24  would be irrigable.

25      THE COURT:  Colonel, what do your findings indicate as

P 33

1   to irrigable acres?

2       COLONEL BOWEN:  About 35 acres, your Honor.

3       THE COURT:  It is a matter of very little moment.  There

4   would never be enough water to irrigate all the irrigable acres

5   in this valley.

6       MR. SNOW:  I understand that.

7       THE COURT:  Mr. Veeder has wanted to catalogue irrigable

8   acres, which doesn't seem to be too important, particularly

9   in the basement complex.

10      Where does this 35 acres lie?  Over the older alluvium?

11      COLONEL BOWEN:  Primarily, your Honor.

12      THE COURT:  The land is all riparian?

13      COLONEL BOWEN:  Well, it is right up on the crest of the

14  divide, your Honor, there is little significant surface stream

15  flow across it, except during and immediately after heavy

16  precipitation and runoff.

17      THE COURT:  As far as that portion of this property that

18  lies in the area colored blue, which is the basement complex,

19  the Court would find that any ground water you get there is

20  vagrant, local, percolating water, not part of the stream

21  system.  You can do with it as you please, subject to any

22  rights that some immediate neighbor might feel are being

23  impinged, and there would be no restraint on how much water

24  you get or whether you could use it.  But you will not get

25  much water, if any, in there.

P 34

1    MR. SNOW:  After checking the geology, I have changed

2    my opinion somewhat as to what is available.

3    THE COURT:  We haven't finished the geology in that part

4    of the area of the older alluvium.  Probably it will be found

5    that any water in it would be part of the stream system -- the

6    small portion under the orange colored part of the map.  And

7    I would be prepared to follow Colonel Bowen's testimony as to

8    how many acres are irrigable.  But that means very little.  I

9    wouldn't be worried about that.

10   MR. SNOW:  I was wondering if it would be possible to

11   develop domestic water in that area.  There are very few acres

12   that are involved.

13   THE COURT:  Certainly.  And your right to domestic water

14   has a priority over irrigation.  You would have no problem

15   there, if you could get domestic wells.

16   As I say, I haven't fully seen all the geology in this

17   upper part of the watershed, but if that area under the orange

18   -- if the water there is held to be part of the stream system,

19   that portion of your property would be in the lawsuit and

20   subject to the continuing jurisdiction of the Court.  You would

21   have correlative rights with everybody else who had rights on

22   the stream system.  As far as the property in the blue, you are

23   on your own.

24   Does that answer your questions?

25   MR. SNOW:  Well, yes.  I understand, though, that there

P 35

1   is a hearing on April 4th on the Anza Valley, and I was wondering

2   if I could be heard at that time, too.  It would give me a

3   little more time to do a little investigating.

4       THE COURT:  Yes, if you have some additional matter to

5   offer I will be glad to hear you.  I have found that Colonel

6   Bowen's testimony is very accurate with reference to irrigable

7   acres, and most of the major parties in the action have been

8   content to accept his judgment.  I would be very much surprised

9   if he went wrong on your property.

10      Now, what is irrigable, of course, is subject to a lot of

11  variations.  Technically speaking, I suppose you could plant

12  a tree up on top of a hill and run a sprinkler up there and

13  irrigate.  But when you talk about irrigable acres we are

14  talking about acres that are reasonably susceptible of irriga-

15  tion with an economic purpose in mind and not some esthetic

16  value.

17      MR. SNOW:  I was basing my previous question on wells in

18  the neighborhood that are probably 150 feet deep there and the

19  water rises to within about 70 feet and it seemed to be pretty

20  much available.  Whether that is under that same type of soil

21  or not I don't know.  About 30 years of my life has been devoted

22  to subdivision work and irrigation, supply and manufacturing.

23  So I have a little basic knowledge of those things.  And of

24  course this is the first that I have had an insight into the

25  geology, which makes quite a bit of difference.  But from the

P 36

1    standpoint of being able to irrigate it, I know I could

2    economically irrigate more land than the report states there.

3        THE COURT:  I will hear you further on the 4th, if you

4    want to look into it further.

5        MR. SNOW:  Thank you your Honor.

6        MR. VEEDER:  I believe Mr. Anderson is ready to proceed.

7        THE COURT:  All right.

8        MR. ANDERSON:  Your Honor, would it help the Court if I

9    could outline his testimony a bit?

10       I have here some reports by Mr. F. E. Green indicating

11   the diversions of water in the ditch and pipeline that we have

12   previously discussed.  I also have some water well drillers'

13   reports on the wells on the property, and I wish the witness

14   to testify to the practice he followed with a flood type

15   irrigation in the year 1949 and as to the quantum of water.

16   I will go at it chronologically, then, your Honor.

17       THE COURT:  Yes.

18                   GARNER L. KNOX,

19   having been previously duly sworn, on his oath was examined

20   and testified further as follows:

21                DIRECT EXAMINATION RESUMED

22   BY MR. ANDERSON:

23       Q  Will you tell the Court what acreage you planted in

24   the year 1949?

25       A  I planted between 30 and 40 acres -- I believe it was

P 37

1  nearer 30 by actual measurement -- and flood irrigated it.

2  The soil was such an open, porous soil that flood irrigating

3  was a very wasteful as well as difficult thing to do a satis-

4  factory job.

5      Q  Will you tell the Court at what time of the year you

6  started the irrigation?

7      A  I can't be sure now in 1949.  Usually irrigation

8  would start down there some time in April, depending upon when

9  the last rain occurred.

10     Q  Did you make any observations as to the quantum of

11  water in the ditch during the 1949 season?

12     A  We had these measurements that Mr. Green has been

13  taking along about June when the water in the ditch got down,

14  according to his report, to about a half cubic foot per second.

15     MR. VEEDER:  May I inquire here, counsel, before I make

16  an objection, if you are going to offer Mr. Green's records?

17     MR. ANDERSON:  I am going to offer them.  I will be pleased

18  to offer them now.

19     MR. VEEDER:  Why not offer them now?

20     THE COURT:  How many reports by Mr. Green?

21     MR. ANDERSON:  There are two letters from him, your Honor.

22  One of these letters is dated July 9, 1949, and one is dated

23  July 16, 1949.  Does your Honor wish the originals or the Court

24  copies?

25     MR. GIRARD:  Is a copy available, Mr. Anderson?

P 38

1    MR. ANDERSON:  Yes.  Now do you mean?  Or if you want a

2  copy later I will photostat it and make a copy for you.

3    MR. SACHSE:  I would like a copy of that also.

4    MR. ANDERSON:  Will you give me your cards?

5    MR. VEEDER:  You are speaking now of the Green reports?

6    MR. ANDERSON:  Yes.

7    MR. VEEDER:  We have agreed that they can go in subject

8  to our check.

9    MR. GIRARD:  I have no objection.  I would like a copy.

10    MR. SACHSE:  I have no objection to their going in, but

11  I would like a copy.

12    THE COURT:  The tabulations and the copies of the two

13  letters just in the order they were handed to me will be marked

14  as Knox's Exhibit E and received in evidence.

15                          (The documents above referred to were )
                            (marked Defendant Knox's Exhibit E and)
16                          (received in evidence.                )

17  BY MR. ANDERSON:

18    Q  Now, you are looking at the original of these two

19  letters from Mr. Green.  Did you receive those on or about

20  July 1949?

21    A  I did.  The first letter was a reply to an inquiry of

22  mine regarding these measurements and --

23    THE COURT:  Let me see the exhibit, Mr. Clerk.

24    THE WITNESS:  The July 9th letter from Mr. Green --

25  BY MR. ANDERSON:

P 39

1      Q  Now you have referred in your testimony to measurements

2  made by Mr. Green in 1949?

3      A  Yes.

4      Q  Will you tell his Honor which document you are

5  referring to?

6      A  On the last sheet of measurements, at the bottom of the

7  sheet, in 1949 there are two measurements:  One on May 4th

8  showing 92 miners inches in the Knox ditch, and on June 15

9  showing 33 miners inches.  It was that marked drop in the flow

10  that occasioned my letter of July 5th and Mr. Green's reply of

11  July 9th -- correction -- my letter of July 12th and his reply

12  of the 16th, in which he said, "The minimum flow in the creek

13  at your diversion this summer should not be as low or any

14  lower than last summer's minimum on September 3rd of .45

15  second feet, which is the all-time low in my records."

16      Q  Will you tell us, during what period of time you

17  irrigated this parcel in the year 1949?

18      A  Well, it was irrigated all summer up through until

19  the rains came that year.  Just the exact date I don't know.

20  Probably through October and early November.

21      Q  Did you make any observations at any other times than

22  May 15th and June -- what is that date in June -- as to the

23  flow of water in the ditch?

24      A  Yes, we were up at the diversion about every month to

25  be sure that we were getting as much water as we possibly could.

P 40

1   The dam was not down to bedrock, so there was always a flow

2   of water on the lower side of the dam, and the water after

3   dropping down to about this half second foot ran fairly steady

4   and then picked up as Fall came on.

5       Q  Did you have an opinion as to the quantum of water

6   taken into that ditch during this period of irrigation in the

7   year 1949?

8       A  I think these records are the most reliable testimony

9   on that.  I haven't any way to add to it, beyond knowing that

10   we were using all the water and not too effectively in the

11   irrigation of this 30 acres.

12       Q  Did you also do any pumping during that season?

13       A  1949 very little.  We used the auxiliary gasoline

14   driven jet pump some, but it was not until 1950 we really used

15   the -- we put an electric pump in to increase the available

16   water.

17       THE COURT:  I notice that Exhibit E refers to the Tyrrell

18   ditch.

19       THE WITNESS:  Tyrrell is a predecessor owner.

20   BY MR. ANDERSON:

21       Q  Mr. Knox, did you form any opinion as to the total

22   volume of water in acre feet applied to that land in the 1949

23   season?

24       A  Subsequently I have estimated as best I could from the

25   information available and it looked to me like we were using

P 41

1    about twice as much water per acre as we should on account of

2    the sanding condition of the soil we were attempting to flood

3    irrigate.

4        THE COURT:  What acre feet do you estimate you used in

5    1949 -- total acre feet?

6        THE WITNESS:  Somewhere around 240.  I am basing that on

7    30 acres of about 8 feet to the acre.

8    BY MR. ANDERSON:

9        Q  In 1950 you made some changes in the operation of the

10   ranch?

11       A  Yes.

12       Q  Will you tell his Honor what they were?

13       A  In the winter of 1949-1950 we put in a steel pipe water

14   distributing system and two electric booster pumps that would

15   take the water out of the lake and distribute it to the land

16   both below and above the lake level and went over to sprinkler

17   irrigation.

18       Q  When you say above the level of the lake, are you

19   referring to some of the area that his Honor put the cross marks

20   on the map?

21       A  Yes, right above the line of the pipeline.

22       Q  How many acres did you irrigate that year 1950?

23       A  About 70 acres, and we have been irrigating the same

24   quantity ever since.

25       Q  Did you make any test of the quantum of water used in

P 42

1   the year 1950 during the irrigation season?

2       A  Not then but later when the water was becoming more of

3   a problem, particularly in 1953, when the water we were getting

4   from the ditch was --

5       Q  Let me ask you if you have a report from Mr. Green of

6   a test made on April 5, 1950?

7       Your Honor, I believe that is included in the Exhibit E.

8       A  Yes, and he shows that there was a diversion of 103

9   miners inches at that time.

10      Q  Is there another test report for that year?

11      A  On June 28th.

12      MR. ANDERSON:  I believe that is also included, your Honor,

13  in Exhibit E.

14      THE WITNESS:  It dropped to 22 miners inches, and on

15  August 16, 1950 it was down to 14 miners inches.

16  BY MR. ANDERSON:

17      Q  Are you able to state whether the diversion of water

18  through that pipe continued throughout the season of 1950?

19      A  It did.

20      THE COURT:  Those figures don't seem to be in this material

21  you submitted.  They show only one date in 1950.

22      MR. ANDERSON:  Your Honor, I have no intent to short

23  change the Court.  I am sorry if I did so.

24      THE COURT:  That is the sheet for 1950.  I don't see

25  anything with the April date.  Have you left out one sheet?

P 43

1    MR. ANDERSON:  I think I have, your Honor.  Excuse me.  I

2    will find the other sheet.

3    THE COURT:  Did you have sufficient water in 1950 to

4    irrigate the 70 acres all during the irrigation season?

5    THE WITNESS:  With the aid of the water we took out of

6    the so-called windmill well.  We had a similar situation

7    through 1951 and 1952, and I am not positive whether 1953 the

8    creek finally went dry or whether it was 1954.  The total amount

9    of water was exceedingly low, almost a trickle there in mid-

10   summer, and that led us to put down the second well.  The first

11   one I put down in February 1954.

12   MR. ANDERSON:  Your Honor, apparently I have misplaced the

13   other two sheets and I will ask leave, if I may, to have them

14   phototated and bring them back this afternoon.

15   THE COURT:  Do other counsel have copies?

16   MR. ANDERSON:  No, your Honor, I short-changed everybody.

17   THE COURT:  Do you have the originals here?

18   MR. ANDERSON:  I do have, your Honor.

19   THE COURT:  Where are the originals?

20   MR. ANDERSON:  The originals are right here, your Honor.

21   THE WITNESS:  Here, your Honor.

22   THE COURT:  There are three sheets here then -- four

23   sheets; is that right?

24   THE WITNESS:  There are three for one year and two for the

25   other, I think.

P 44

1    MR. ANDERSON:  We have two here for 1949 and three for

2    1950.

3    THE COURT:  And two for 1951?

4    MR. ANDERSON:  Yes your Honor.

5    THE WITNESS:  Yes your Honor.

6    MR. GIRARD:  Let me ask a question.

7    THE WITNESS:  The two for 1949 are on this general summary.

8    THE COURT:  These are the sheets we don't have, Mr. Clerk.

9    Can you make some copies?

10   THE CLERK:  Yes your Honor.

11   THE COURT:  How many want copies?

12   MR. SACHSE:  I do.

13   THE COURT:  One, two, three, four, five, six.

14   MR. ANDERSON:  I will be happy to do them.

15   THE COURT:  Counsel, don't you have any?

16   MR. GIRARD:  We don't have any, Judge Carter.  I would be

17   willing to wait until Mr. Anderson gets back.

18   MR. SACHSE:  I am in no rush, but I think they are im-

19   portant for the record.

20   THE COURT:  Just make a copy for the original on those

21   four sheets and let Mr. Anderson supply counsel with copies

22   later.

23   THE CLERK:  May I be excused then?

24   THE COURT:  Yes.

25   MR. ANDERSON:  Thank you your Honor.  I apologize for my

p 45

1   misfiling of the copies.

2       Q   Now Mr. Knox, can you state whether you pumped any

3   water in the year 1950?

4       A   Yes, we did.

5       Q   And how did you pump it?

6       A   With a five horsepower pump that later tests showed

7   was pumping about 100 inches -- 100 gallons per minute.

8       Q   For what period of time during the year 1950 did that

9   pumping continue?

10      A   1950 we only used it during the -- I would say it was

11   about the middle of July to about the middle of September.  We

12   had enough water.  It was probably not used continuously all

13   that time.

14      Q   In the year 1951 did you continue substantially the

15   same?

16      A   The same procedure was followed through 1951, '52, and

17   in 1953 we were running short of water.

18      Q   I wish to ask you, in the year 1950 did you make any

19   computation as to the amount of water you were using for irri-

20   gating this parcel of land?

21      A   Not at that time.

22      Q   Have you since?

23      A   I have since, yes.

24      Q   How did you make the calculation?

25      A   Well, we had tests run on the wells we were using.

P 46

1   We were irrigating the same land in the same method, and from

2   the reports of the tests it would indicate that we were using

3   between 300 and 350 gallons per minute throughout the irriga-

4   tion season.

5       Q  When you say the same method you mean the sprinkler

6   method?

7       A  Yes.

8       THE COURT:  Did you make a computation as to how many

9   acre feet you used in 1950 with the sprinkler system?

10      THE WITNESS:  Well, as I say, we were irrigating 70 acres,

11  and with the sprinkler system, I would say we would vary from

12  three to possibly four feet per acre, depending upon the

13  weather and how early or how late the rains occurred that year.

14      MR. VEEDER:  May I inquire here?  If I understand what

15  he has testified to, -- I am not trying to cross examine, Mr.

16  Anderson, but I want to get on the sled myself -- he said he

17  used about the same quantity for the 70 acres that he used for

18  the 30.  About 240 acre feet in the aggregate a year, is that

19  right?

20      THE WITNESS:  Yes.

21      MR. ANDERSON:  If anything, I would say he used less by

22  the sprinkler system.

23      MR. VEEDER:  I just wanted to be sure I have it right.

24      THE COURT:  Do we need to go any further on this matter?

25  What other matters do you have to present?

P 47

1    MR. ANDERSON:  That is the essence of it, your Honor.

2    One other thing, your Honor.  The pumping from the well

3    that originally had the windmill on it was so designed that it

4    could also fill the lakes.  I don't think we had any testimony

5    as to that earlier; merely that the pipelines were so situated.

6    THE COURT:  Is that correct?

7    THE WITNESS:  That is correct.  The overflow from the

8    concrete reservoir went down into the No. 1 lake.

9    THE COURT:  Before lunch I think you said the new well

10   was 172 feet deep?

11   THE WITNESS:  Yes.

12   THE COURT:  What size casing?

13   THE WITNESS:  Ten inch.  It tested at 720 gallons per

14   minute, with a 66 foot draw  down from an initial level of

15   -- just a minute.  Let me look at the record on that.

16   MR. ANDERSON:  I have the well report on that, your Honor,

17   which we would be pleased to offer.

18   THE COURT:  Sixty-three or sixty-four?

19   THE WITNESS:  Sixty-three foot draw down with a 33 foot

20   initial water level.  That was the result of a test last August

21   after the well was completed, and as I said, we were told that

22   the motor and pump we had on the ranch, 15 horsepower, and

23   during about the middle of September used this well primarily

24   for water because the original 15 horsepower well the water

25   level was down around 90 to 95 feet.

P 48

THE COURT:  I have added the four sheets to the exhibit. Mr. Anderson, you make copies for counsel and see that they get all of them.

MR. ANDERSON:  Thank you.

THE WITNESS:  I would like to make it clear that we have increased the use of water.  We have increased the pressure available in the distribution system to reach some of this higher land.

THE COURT:  I have one question.  It is not our function to determine your rights-of-way across this adjoining property, but we are concerned about the matter from the standpoint that you divert on another piece of ground.  You have had no complaints from this neighbor about using this place of diversion upstream on another man's land?

THE WITNESS:  No.  I understand there is some sort of easement in their deed.  I have never seen it.

Take C 2

THE COURT:  At any rate, since 1949, since you have owned the property, no one has interfered with your diversion upstream on the other man's ground?

THE WITNESS:  Correct.

MR. VEEDER:  It doesn't appear in his title report, I don't believe.  I looked at it there and it is not there.

You said there is an easement?

THE WITNESS:  I was told by, I believe, Mr. Richey or Mr. Roman -- Mr. Roman owned it at one time -- that there was

Px 49

an easement in their deed where the diversion is.

MR. VEEDER:  I think it would show up in his title report.

THE COURT:  It might not.  It is appurtenant to his land if it is an easement, but it doesn't burden his land.  It might not be shown.

MR. VEEDER:  I would think he would want it shown.

THE WITNESS:  I would want it to show.

MR. VEEDER:  I thought if a man owned an easement he would like to have it shown.

THE COURT:  He would like to have it, but maybe it didn't get shown.

MR. VEEDER:  I am not arguing the point, your Honor.  If the man has an easement, I am for him.

MR. ANDERSON:  Your Honor, in furtherance of the answer to your question, this witness can state what was told to him by the prior land owner, if the Court will allow such testimony.

THE COURT:  He has already testified -- oh, pardon me, he has not.

BY MR. ANDERSON:

Q  Do you know whether or not Mr. Tripp owned the property at a prior time to you?

A  Yes, I know it from the reports from various people living down there and from the report of the Referee in the Barbee vs Oviatt.  They refer to this diversion -- they call

50

1    it the Knox diversion -- as the Tripp or Tripp with some other

2    name diversion.

3        Q  Did you ever talk to Mr. Tripp?

4        A  Yes, Mr. Tripp visited the ranch early in the fifties

5    -- I would say about 1953 or '54.  He was then well up in his

6    eighties.  He told us his recollections, and I believe I am

7    right when he said that it was his father that first settled

8    in that area.  Anyway, he was on the ranch in 1916 when they

9    had the flood, he was on it in 1925 or '26 whenever that flood

10   at that time occurred, at which time he pointed out to me that

11   where the ground extended toward the creek is now all washed

12   away he said he had a big peach orchard there and when that

13   went with the flood, he says, I gave up and we moved out.

14       Q  Did he tell you anything about the history of the

15   pipeline and the diversion works?

16       A  Yes.  He said that up until about the start of this

17   century there was an open ditch, but that early in the 1900's

18   -- he was not sure of the date, but he thought it was prior to

19   1905.

20       MR. VEEDER:  Your Honor, my own view is that this, of

21   course, is interesting, but I think it is purely heresay and

22   I don't believe it is going to add anything to the record.  Mr.

23   Tripp testified at one time.  He didn't testify in regard to

24   this.  If he wants to testify, they can bring him in and swear

25   him.  I don't believe this is adding anything probative in the

P 51

1   record.

2          MR. ANDERSON:  Your Honor, I offer it on the theory that

3   it is a statement of a prior owner which might be admissible.

4          THE COURT:  Have you looked up any law?  I haven't.  Do

5   you have any authority besides Anderson on Statements of Prior

6   Owners?

7          MR. ANDERSON:  Your Honor, I didn't exactly say you had

8   to listen.

9          THE COURT:  I don't think, Mr. Anderson, it makes a lot

10  of difference.  In other words, it is a possibility, of course,

11  that you might produce testimony at one time that that dam

12  went down to bedrock and diverted all the water, but the

13  chances are that it never did.

14         MR. ANDERSON:  No sir.

15         THE COURT:  It doesn't do it now.  My tentative view is

16  that you have a riparian right.  I doubt if you have an appro-

17  priative right or a prescriptive right.

18         MR. ANDERSON:  Your Honor, I was offering this testimony,

19  however second hand it might be, on the premise that it

20  establishes the length of time the pipeline has been there and

21  to that extent -- frankly, I thought Mr. Tripp was no longer

22  available as a witness.  We had made some effort to find him.

23  If he is available I would prefer to call him as a witness.

24         MR. GIRARD:  The length of time the pipe had been there

25  wouldn't give him any right to a prescriptive or an appropriative

P 52

1    water right.  It might give him a prescriptive right to go

2    across this man's land.  But that has nothing to do with a

3    water right.

4        MR. ANDERSON:  Our position would be that this would

5    indicate the use of water, coupled with the reports of Mr.

6    Green, indicating that water had been diverted, and therefore

7    it would indicate a prescriptive right.

8        THE COURT:  Again, my tentative view is that there is

9    nothing wrong with your diversion if you have an easement or

10   a right that is not contested to do this on this other man's

11   land and divert the stream.  The map shows that you are picking

12   up the water in a small stringer of younger alluvium.  You are

13   transporting the water by pipe and flume, it looks like, at

14   least a mile, and during the time you are transporting it

15   there is no waste at all; while otherwise, if it ran down

16   the creekbed, there would be a loss of water from evaporation

17   and from these phreatophytes.  So that the use you are making

18   is an efficient use of the water.  And accordingly I would be

19   prepared to hold that you have a riparian right, and that

20   there is no evidence in the record that your use of that water

21   has injured anybody as of this date.

22       Do you object to those findings, Mr. Veeder?

23       MR. VEEDER:  I will reserve comment, your Honor.

24       THE COURT:  You may reserve comment.

25       MR. VEEDER:  I think what you have stated is correct.  I

P 53

1    am not sure that he hasn't shown that somebody was injured.  It

2    seems to me that if you divert water away and use it on 70

3    acres, as it has been done, it could be injuring the Vail

4    Company and also it might be injuring us.  I don't know.

5         THE COURT:  There would be undoubtedly a return flow.  He

6    has told us about the porous nature of the soil.

7         MR. VEEDER:  Your Honor, now he is using sprinklers, and

8    that is the point I make.

9         THE COURT:  There could be a return flow there with

10   sprinklers, too, couldn't there?

11        MR. VEEDER:  There could be, but I think it would be very

12   small in comparison.  That is the reason I asked him about the

13   240 acre feet.  He was using 240 acre feet in the swale area.

14   I think his estimate was that he was using 8 acre feet to the

15   acre.  Now he is using it up on the hillside with a set of

16   sprinklers and I think he is using more water than he did.

17        MR. GIRARD:  He may be.  But that is a perfectly proper

18   riparian use.

19        MR. VEEDER:  From the standpoint whether it is injuring

20   anybody or not, that is a matter that has to be considered on

21   later testimony.  That is all I ask of the Court.

22        MR. ANDERSON:  Your Honor, we are willing to rest at this

23   point as far as the evidence we have to show is concerned.

24        THE COURT:  All right.

25        You may cross-examine.

P 54

1    MR. STAHLMAN:  Your Honor, I have one question I would like

2  to ask Mr. Knox.

3                     CROSS-EXAMINATION

4  BY MR. STAHLMAN:

5      Q  Mr. Knox, do you know or can you tell us the elevation

6  of the land at the point where you drilled this well in 1960

7  -- the surface elevation?

8      A  By referring to a map here I can come very close to it,

9  yes.

10     Q  The one in 1960 is the one I am concerned about.

11     A  About the same elevation.

12     Q  By the way, have you indicated on this map where this

13  1960 well is drilled?

14     A  I did, yes, on the map they had.

15     MR. VEEDER:  It will show up on 275.

16     THE WITNESS:  Yes.

17  BY MR. STAHLMAN:

18     Q  According to this, then, your elevation would be

19  something a little under 1554, would it?

20     A  Yes.

21     Q  It would be in the vicinity of 1550 feet?

22     A  Yes.

23     THE COURT:  Did you get your answer Mr. Stahlman?

24     MR. STAHLMAN:  Yes, your Honor, I think we have it.

25     THE COURT:  Any further questions Mr. Stahlman?

P 55

1     MR. STAHLMAN:  No your Honor.

2     THE COURT:  Mr. Girard?

3     MR. GIRARD:  I have only one brief one for my own

4 clarification, your Honor.

5                 CROSS-EXAMINATION

6 BY MR. GIRARD:

7     Q  As I understand, you have testified in regard to these

8 reports of Mr. Green and from your own knowledge that these

9 amounts in second feet or miners inches were the actual diver-

10 sions you made on your property?

11     A  Where the measurement is on the Knox ditch that was

12 the amount diverted.

13     Q  And there was part of the amount above that diversion

14 which went downstream?  In other words, you didn't take the

15 entire amount on the ground; some of it went through the

16 ground?

17     A  Some always went through the ground, yes.

18     MR. GIRARD:  That is all.

19     MR. SACHSE:  I have no questions.

20     THE COURT:  Mr. Veeder?

21     MR. VEEDER:  I have no questions.

22     THE COURT:  Thank you Mr. Knox.  Before you leave the

23 stand, Mr. Anderson, have they pointed out to you the line

24 we arbitrarily drew for this ground water body?

25     MR. ANDERSON:  Yes your Honor.

P 56

1   THE COURT:  And the fact that all of the Sunnybrook Ranch

2   is within this area we demarked as a ground water body?

3   MR. ANDERSON:  I thought substantially all of it was.  I

4   was not sure that every bit of it was.

5   THE COURT:  I am sure all of it is, if you look at that

6   map.

7   MR. ANDERSON:  If your Honor wishes to know whether we

8   have any quarrel with the Colonel's geology, we don't.  It

9   looks reasonably accurate.  But I am not in a position to go

10  forward with proof.

11  THE COURT:  As you can see from Exhibit 275, there are

12  some areas of basement complex in there, but we tried to draw

13  a line which would be of ease in conveying property, following

14  section lines and ownership lines, and this means that certain

15  basement complex has been thrown in to this ground water body

16  which we all know technically wouldn't belong there.  You have

17  no objection to that?

18  MR. ANDERSON:  No your Honor.

19  May I say one thing, though.  We showed you a picture of

20  the oil well.  The oil well was finally converted to a water

21  well -- it is not one of the three wells I discussed in my

22  memorandum and its production of water is very limited and it

23  may very well be in what would otherwise not be considered

24  ground water area.  I don't know as it has any great importance

25  in this hearing, but I think probably it should be excepted

P 57    1    from that category because of its limited water production.

2    MR. VEEDER:  Did you say that was 13K1?

3    MR. ANDERSON:  The oil well, yes.

4    MR. VEEDER:  That is in the older alluvium.

5    THE COURT:  It is in the older alluvium and it only went

6    275 feet, according to the exhibit on file.

7    MR. ANDERSON:  Originally it was drilled to 2500 feet.

8    Then it was cemented in.

9    THE COURT:  Was there a well log on it, too?

10    MR. ANDERSON:  Yes your Honor.

11    THE COURT:  We haven't received your well logs yet.

12    MR. ANDERSON:  I think very possibly your Honor would be

13    interested in having them and I would be interested in offering

14    them.

15    MR. VEEDER:  13K1 is in, based upon the U.S.G.S. canvass

16    in that area, your Honor.

17    THE COURT:  The canvass.  But have the well logs?

18    MR. VEEDER:  The well logs are in, too, your Honor.

19    THE COURT:  Including the new well?

20    MR. KUNKEL:  Not the new one.  The oil well is in.

21    THE COURT:  Let's have the well log  on the new well

22    drilled in 1960.

23    MR. ANDERSON:  All right, your Honor.  This is No. 55385 of

24    the State of California, by Lynch Well Drilling.

25    THE COURT:  Do you want to give it a Knox number or do

15,335

P 58

1   you want to add it to the well log exhibit, Mr. Veeder?

2        MR. VEEDER:  I think it would be 16A.  It should be

3   included in 16A.

4        THE COURT:  It will be made part of Exhibit 16A and

5   received in evidence.

6                          (The documents above referred to  )
                           (were received in evidence as part)
7                          ( of Plaintiff's Exhibit 16A.      )

8        MR. ANDERSON:  Your Honor, I also have four pumping reports

9   from the California Electric Power Company dated July 1, 1960

10  and July 24, 1959.

11       THE COURT:  What wells do they concern?

12       THE WITNESS:  The five horsepower well and the first well

13  I drilled, the 15 horsepower.

14       MR. ANDERSON:  The 1954 well and the one that was pre-

15  existing with the windmill, your Honor.

16       THE COURT:  Can we identify them and receive them?

17       MR. VEEDER:  I have agreed that they should go in.

18       THE COURT:  That will be Knox's Exhibit F received in

19  evidence.

20                         (The documents above referred to were)
                           ( marked as Defendant Knox's Exhibit )
21                         (F for identification and received   )
                           (in evidence.                        )
22

23       THE COURT:  Let me see those.

24       MR. ANDERSON:  Do you wish to ask the witness any questions

25  on them, your Honor?  He is certainly willing to testify.

P 59

1 THE COURT:  I would just like to match them up with the

2 numbering system we used.  Which two of these, Mr. Knox,

3 concern the well you drilled in 1954?  I think that is Q2, is

4 it not?

5   (Mr. Veeder hands a document to the Court.)

6 THE WITNESS:  This report dated July -- that will not

7 help you.

8  THE COURT:  If you know what they are I will just mark

9 them.

10  THE WITNESS:  These two.

11  THE COURT:  These concern the well you drilled in 1954?

12  THE WITNESS:  Yes.

13  THE COURT:  That is Well Q2?

14  THE WITNESS:  These concern the original windmill well.

15  THE COURT:  The original windmill well was --

16  THE WITNESS:  Five horsepower.

17  THE COURT:  -- Q1.

18  Clip these together, Mr. Clerk, as Exhibit F received

19 in evidence.

20  MR. ANDERSON:  Photographs B, C and D, the Clerk says I

21 didn't offer, and I meant to.

22  THE COURT:  They will be received in evidence.

23    (Defendant Knox's Exhibits B, C and D)

24    (were received in evidence.  )

25  THE COURT:  E is already in evidence.

P 60

1 ·     F is in evidence.

2     And the Exhibit A was your map.

3     Those will be received in evidence.

4                          (Defendant Knox's Exhibit A was)

5                          (received in evidence.        )

6   MR. ANDERSON:  Thank you  your Honor.

7   THE COURT:  I propose to find that all your land is

8 riparian; that unless the Government, under our stipulation,

9 turns up the fact that some of it isn't, the arrangement there

10 is that we start out with the premise that it is all riparian

11 unless the Government digs up evidence that because of some

12 severance sometime along the line it is not; I propose to find

13 that all of the surface water is part of the stream system;

14 that your Sunnybrook Ranch is within the limits of this ground

15 water body we have laid out as shown on Exhibit 277; that you

16 have the riparian rights; that you have 70 acres that have

17 been irrigated and that unless there is some contrary evidence

18 you have 100 acres irrigable and that the use you can make of

19 the water is a reasonable riparian use and that there is no

20 evidence in the record that anyone, as of the present time,

21 has been damaged by the use you have made.

22   MR. ANDERSON:  I have this question to ask of the Court.

23 My question is one perhaps of time.  If there is any question

24 in the Court's mind as to the length of time this user has

25 been going on, we would possibly be better off to ask Mr.

Tripp to come in as a witness.

P 61

1    THE COURT:  The length of time the user has gone on would

2    have no effect on your riparian rights.  If you could prove

3    a prescriptive right or an appropriative right we would be

4    interested in time.  But the essential fact that convinces me

5    that you have only a riparian right is the fact that this

6    diversion, in the time that Mr. Knox has known it, did not

7    divert all of the water in the stream.  It took the surface

8    water, and even then some flowed over the top, and the witness

9    testified that water always ran down the stream into the under-

10   ground flow.  So you were not taking all the water in the stream,

11   and therefore what you were doing was making a riparian use

12   or a reasonable use of water, and accordingly I can't see that

13   there is anything that could give rise to prescriptive rights

14   or appropriative rights.  It is as if you had taken and brought

15   water in from out of the watershed to the property.

16       MR. ANDERSON:  That is right.

17       THE COURT:  You went upstream above your property to

18   start the diversion.  Is there anything about that that would

19   smack of an appropriative right?

20       MR. GIRARD:  I agree a hundred per cent with your Honor.

21       MR. VEEDER:  I am not trying to make any suggestion to

22   Mr. Anderson about this, but the Government is interested in

23   seeing that they get all the rights they are entitled.

24       I think the case of Rindge vs. Crags Land Company case is

25   in point, that if a man goes upstream and appropriates water

P 62

1   in addition to that to which he is entitled under his riparian

2   right he is entitled to an appropriation to that extent.

3        The point that I would make is that if there is a deter-

4   mination of this man's correlative share of the water and it

5   is found that his riparian right as relating to all other

6   riparians would not take care of 70 acres, he might very well

7   desire to go back -- he was talking about 1900 -- and prove

8   up a right for an appropriative claim. I think, in fairness

9   to Mr. Anderson, that is a point that is essential to consider.

10       THE COURT: Mr. Veeder, if you will look at Exhibit 275

11  you will see that there is a very narrow strip of younger

12  alluvium running through basement complex. He has diverted in

13  that area upstream from his property line, the same stream

14  that runs downstream of his property line, he went upstream

15  apparently to get enough height, I speculate, to run the water

16  around to where he wanted to run it, or he went upstream because

17  it was easier to divert at that place than on his own property.

18       But I don't see how you could argue that there would be

19  more water at the place where he diverted than there would be

20  had he diverted within his property line. There is nothing

21  to feed it there. There is nothing but basement complex.

22       MR. VEEDER: Certainly he would be in a position, though,

23  of avoiding losses throughout that reach of the stream, and

24  moreover my understanding of the Rindge land company case is

25  that during the short period of the year he might be in a

P 63

1  position of asserting against other riparians that he had made

2  a prior appropriation up there which would be water in addition

3  to his riparian right.

4       As I said, I am not trying to talk Mr. Anderson into

5  anything, but that is the rule in the Rindge land company case,

6  and I think it is an important case and I think it is a factor

7  that sooner or later the proposition in regard to Mr. Grover's

8  claim is going to raise this point.  That is what I have been

9  waiting for him to raise.

10      THE COURT:  What is the citation of the Rindge case?

11      MR. VEEDER:  I will give it to you.

12      THE COURT:  Mr. Stark, since you have a somewhat related

13  problem, do you find objection to the findings I propose to

14  make?

15      MR. STARK:  Your Honor, the thing that bothers me at this

16  stage is that there is no proof of the thing that Mr. Veeder

17  is hypothesizing on as to whether there was a use going back

18  to 1900.  I certainly would be inclined to agree with Mr.

19  Veeder that if Mr. Anderson wanted to go to the trouble of

20  making the proof that he might at least have an argument

21  predicated on it, if the facts exist.  I have some doubt, from

22  our contact with Mr. Tripp, first, whether he would be able

23  to get him down here again.  We don't know, in fact, what his

24  testimony would be.

25      THE COURT:  What additional fact do you think would have

P 64

1   to be supplied to cause an appropriative right to exist here?

2       MR. SACHSE:  Use prior to 1914.

3       MR. STARK:  I would like to know when the land was patented.

4   I think that would make a difference.

5       MR. GIRARD:  Unless he could firm it up all the way back

6   preceding to his patent, he would be foolish to try it.

7       MR. VEEDER:  I think if he showed, certainly under the

8   California Law, that after 1911 all of the unappropriated

9   water was available for appropriation.

10      Your Honor, the citation of the case is <u>Rindge vs.</u>

11  <u>Crags Land Company, 56 Cal. App. 247 (205 Pacific 36)</u>.

12      MR. STARK:  That is cited in our memorandum, your Honor.

13      THE COURT:  Mr. Girard, you made a remark that I didn't

14  follow.

15      MR. GIRARD:  This gentleman does not have any storage.

16  Everything that he does is a proper riparian use.  Therefore,

17  the only time it would be to his benefit to show an appropria-

18  tion would be if his appropriative right preceded his riparian

19  right.

20      (See next page.)

21

22

23

24

25

P 1
Take D1

1    THE COURT:  Proceed.

2    MR. GIRARD:  Yes.  If it was a priority higher than the

3    riparian right, it would be as a result of the patent.  Now,

4    unless he can go all the way back and show an appropriation

5    prior to the execution of the patent, he would be crazy to do

6    it, because his riparian right has a higher priority than an

7    appropriative right, unless he has certain storage, and he

8    doesn't have storage.

9    MR. VEEDER:  But, your Honor, the Rindge Land Company case

10   says that a riparian owner, in anticipation of the attempt of

11   subsequent riparians, can go ahead and make an appropriation

12   in addition to his riparian rights, and that appropriation

13   would be antecedent and prior to subsequent riparian rights.

14   That is the rule in the Rindge Land Company case, and it

15   said that a riparian could anticipate future developments and

16   therefore make an appropriation.

17   I think this gentleman has put in evidence here which

18   caused me to believe that that rule might be operative.

19   MR. GIRARD:  He can certainly go ahead.  I mean --

20   THE COURT:  Mr. Anderson, some of these counsel sitting

21   at counsel table are just itching to argue this particular

22   point, and, therefore, I will certainly not cut you off at

23   the pockets, but will leave the matter open so that you may

24   listen to the argument, or read some of the transcript, or

25   look into the law, and see whether you want to put in any

P 2

1   further evidence.  However, I personally think that your

2   riparian right is probably adequate protection, but I don't

3   want to cut you off if you think you have some other appropri-

4   ative right.

5      MR. ANDERSON:  Your Honor, my file comes to me from my

6   father, and my note is to try to find Mr. Tripp, and his theory

7   was that if we could prove this back far enough, there would

8   be an additional right.

9      I haven't been able to find Mr. Tripp, and I am frankly

10  very pleased to learn here that I might be able to find him

11  now, and then if I might ask leave to come back, I would like

12  that.

13     THE COURT:  He lives up in Tulare, doesn't he?

14     MR. STARK:  My recollection is that he lives somewhere

15  toward Tulare County, and my recollection also is that it

16  requires going out to get him, or to make a couple of round

17  trips, which Mr. Grover did.

18     MR. ANDERSON:  Then I can look into it.

19     MR. STARK:  We could pass on to you whatever information

20  we have on Mr. Tripp, and Mr. Grover might have it.

21     THE COURT:  Then could we pass your matter with that

22  understanding?

23     MR. ANDERSON:  Yes, your Honor.  I would appreciate your

24  allowing us to argue, and this is something we had hoped for

25  and did not have.

P 3

1          THE COURT:  I think you should immediately get busy and

2    decide whether you want to put on any further proof or not.

3          MR. ANDERSON:  We will do so.

4          THE COURT:  And probably you should try to shoot for that

5    week --

6          MR. ANDERSON:  The week of April 4th?

7          THE COURT:  The week of April 4th, if you can find Mr.

8    Tripp and can make him available.

9          MR. ANDERSON:  Yes, your Honor.  We will try to find him

10   and advise you then by April 4th.

11         THE COURT:  Yes.

12         MR. ANDERSON:  Now, do I have cards from each of you?

13         MR. GIRARD:  I think they are all stapled together here.

14         MR. VEEDER:  And I think you have my address, don't you,

15   Mr. Anderson?

16         MR. ANDERSON:  Yes.

17         THE COURT:  All right, gentlemen, what is your pleasure

18   now?

19         MR. VEEDER:  The next thing on the agenda, your Honor, is

20   the Lake O'Neill right with relation to Fallbrook, and the

21   question of whether we should enjoin Fallbrook from invading

22   the Lake O'Neill right.

23         THE COURT:  I was trying to find this Knox matter.  Where

24   did we have it on the agenda?

25         MR. VEEDER:  Your Honor, it was on the order to show cause,

P 4   1    at Number 8, your Honor.

2    THE COURT:  Oh, yes.  Are you ready to proceed on this

3    next matter, or does anybody have any other suggestion?

4    MR. VEEDER:  I have none, your Honor, except I would like

5    to call Colonel Bowen.

6    THE COURT:  Come forward, Colonel.

7    MR. SACHSE:  What are we on then?

8    MR. VEEDER:  We are one 2 and 3.  The Colonel has already

9    been sworn, I think.

10                    ALLEN C. BOWEN,

11   recalled as a witness on behalf of the Government, having been

12   previously duly sworn, testified further as follows:

13                  DIRECT EXAMINATION

14   BY MR. VEEDER:

15       Q  You have with you, Colonel Bowen, the 29-series,

16   showing the lands immediately above the enclave?

17       A  I have before me, Mr. Veeder, Plaintiff's Exhibits

18   29-F, 29-G, and 29-K.

19       Q  Colonel Bowen, would you state the procedure and the

20   methods which you have utilized in connection with the opera-

21   tion of Lake O'Neill since the year 1956?

22       A  Since 1956 I have discharged water from Lake O'Neill

23   in the fall of the year, generally in September, October and

24   November, and attempted to recharge the lake with fresh water

25   from the Santa Margarita River diverted through the O'Neill

P 5

1    ditch during the period when water was available for diversion.

2    MR. VEEDER:  Now, I would like to have marked for identi-

3    fication a hydrograph of Well No. 6 in the Santa Margarita

4    basin.  I think that would be 279.

5    MR. SACHSE:  Have any of these been marked?

6    MR. VEEDER:  No sir.

7    MR. SACHSE:  Then I would like to invoke the ten-day rule.

8    I think that you should observe the ten-day rule, and give me

9    the opportunity of examining these exhibits first.

10   MR. VEEDER:  Then we will not make the offer, your Honor,

11   but simply make a request that I would like to have this marked

12   as Exhibit 279.

13                    (Thereupon the document referred to)
                      (was marked Plaintiff's Exhibit 279)
14                    (for identification.              )

15   BY MR. VEEDER:

16   Q  Colonel, would you state the procedure --

17   MR. SACHSE:  What is the number of this again?

18   MR. VEEDER:  279.

19   THE COURT:  Do you have a copy for me?

20   MR. VEEDER:  Yes, your Honor.

21   (The document was handed to the Court.)

22   MR. GIRARD:  And do you have a copy for me, Mr. Veeder?

23   BY MR. VEEDER:

24   Q  Colonel, would you state the effects which you have

25   observed in connection with the releases of water from Lake

P 6

1    O'Neill during the period you mention upon the elevation of

2    the ground water table in the basins underlying Camp Pendleton?

3         A  If water is discharged from Lake O'Neill in the Fall

4    of the year, there is a very rapid rise of the ground water

5    levels in the upper basin.

6         Q  And would you explain the reason for the phenomena, based upon

7    your observations?

8         A  The reason for that is that the valley field in the

9    upper basin is very absorptive, and the water discharged from

10   Lake O'Neill penetrates rapidly to the ground water body and

11   raises the level of the water plane.

12        Q  Now, would you compare the practices which you have

13   adhered to in the years 1956, 1957 and 1958, and 1960 with

14   the procedure -- I beg your pardon -- with the procedure that

15   you adhered to in the Fall of 1960 in the administration of

16   Lake O'Neill.

17        Do you want the question again?

18        MR. SACHSE:  I would like to have it again?

19   BY MR. VEEDER:

20        Q  Would you compare the procedure that you followed in

21   the years 1956, 1957, 1958 and 1959 with the procedure that

22   you followed in 1960 insofar as the operation of Lake O'Neill

23   is concerned?

24        A  Well, the operation of discharging water from Lake

25   O'Neill was similar in 1956, that is, the Fall of '56, and the

P 7

1 Fall of 1960, but in 1960 particularly I desired to discharge

2 the water as rapidly as possible in order that it would move

3 the maximum amount of it which would move with the surface of

4 the stream, and penetrate farther down the valley, in order

5 to help build up the hydraulic barrier at the Ysidora Narrows.

6     Q  Why is that hydraulic barrier at the Ysidora Narrows

7 essential in your operation?

8     A  That is essential in order to prevent the intrusion

9 of salt water into the ground water basin.

10     Q  From the standpoint of the rapidity of the releases

11 would you compare your operation in the Fall of 1960 with the

12 operation of Lake O'Neill antecedent to that time?

13     A  Well, in the Fall of 1960, October and November, water

14 was discharged in a matter of a few weeks as compared to

15 previous years, when lesser amounts of water were discharged

16 over a longer period of time.

17     Under the latter operation most of the water is absorbed

18 in the upper portion of the valley field.

19     Q  And what has the rapidity of the releases got to do

20 with the recharge in the Chappo Basin area?

21     A  It takes a substantial volume of water in order to

22 flow over the pervious gravels of the upper basin or for a

23 portion to flow over those gravels and to reach the Chappo

24 Basin, and the less percentage loss in transportation with a

25 greater flow than there is with a smaller flow.

P 8

1    THE COURT:  To refresh my recollection of these basins
2    down in the enclave, there is what is called the upper basin,
3    the Chappo Basin, and the lower basin?

4    THE WITNESS:  The Ysidora Basin is the lower basin, your
5    Honor.

6    THE COURT:  There are three of them?

7    THE WITNESS:  They are sub-units of the same basin, your
8    Honor.  They are connected geologically and hydrologically.

9    THE COURT:  I know they are connected, but we talked about
10   them as two or three basins.  Which were they?

11   THE WITNESS:  We spoke of them as three segments of the
12   basin, your Honor, the upper, the Chappo, and the Ysidora,
13   which is the lowest of the three.

14   THE COURT:  All right.

15   BY MR. VEEDER:

16   Q  Were there other factors than the recharge of the
17   basin to prevent saltwater intrusion that guided you in the
18   release of water from Lake O'Neill in the manner that you
19   pursued in 1960, Colonel?

20   A  Yes sir, there were.

21   Q  Would you state those into the record, please?

22   A  Well, we had some early rains in 1960, November and
23   December, and it looked like a good year for recharging the
24   lake, so one factor that guided me in discharging the maximum
25   quantity of water was the tempting thought that I could

P 9

1  recharge the lake with fresh water from the Santa Margarita

2  River.

3  A corollary benefit from discharging the waters of the

4  lake is to allow us to clean up the phreatophytes and hydro-

5  phytes which grow particularly along the margins of the lake

6  and in the shallower and upper end; the arundinaceous plants

7  in particular form a breeding ground for mosquitoes, which is

8  difficult -- makes the control of mosquitoes difficult because

9  of the growth, so it is necessary periodically to remove

10  those to effect adequate mosquito control. Also, the water

11  in the lake was of rather poor quality because of two prior

12  years of droughty condition, and a consequent limited inflow

13  of fresh water, and it was my desire to get assweet a pond

14  as possible this winter.

15  Q  Colonel, referring now to the exhibits, Fallbrook's

16  D, I ask you to refer to the document marked License 4906;

17  THE COURT:  Is that Fallbrook's E?

18  MR. VEEDER:  That is Fallbrook's D, as I remember it.

19  THE COURT:  D or E?  I think you said E.

20  MR. VEEDER:  Fallbrook's D, your Honor.

21  THE WITNESS:  Fallbrook's D, your Honor.

22  BY MR. VEEDER:

23  Q  Are you acquainted with the location of that?

24  A  Yes sir.

25  Q  Of the structure that is referred to there?

P 10

1    A  Yes sir.

2    Q  Would you state into the record what the structure

3  is, and where it is located?

4    A  Referring to Fallbrook's D, License No. 4906, the

5  point of diversion is described as located north 1920 feet

6  and west 1550/from the center of Section 7 Township 9 South,

7  Range 3 West, San Bernardino Basine meridian being within the

8  Northwest Quarter of the Northwest Quarter of said Section 7.

9    Q  Colonel, have you observed in the vicinity of that

10  structure to which you made reference any other pumps operated

11  by the Fallbrook Public Utility District?

12    A  Yes sir.

13    Q  Would you state where those pumps are located, and

14  would you kindly refer to the Plaintiff's Exhibits 25-K, -F

15  and -G, I believe they are.

16    THE COURT:  Those are parts of Exhibit 25?

17    MR. VEEDER:  The 29-series, your Honor.

18    THE COURT:  You said 25.

19    MR. VEEDER:  The 29-series.  I am sorry.

20    THE WITNESS:  29, your Honor.

21  BY MR. VEEDER:

22    Q  U.S.G.S.?

23    A  Referring to 29-K, the Fallbrook Diversion is indicated

24  at the legal point that I described, and the map shows the

25  word "Well" with a blue circle below "Well," and below that is

P 11

1    the word "Pumping" and the abbreviation for station, "Sta."

2         Located at a point about 610 feet north of the well shown

3    on Exhibit 29-K, and about 100 feet east of that well is

4    another pump which has been referred to as the Sawday Diversion.

5         Q  What has been your observation with regard to the

6    operation of those pumps to which you have just testified,

7    Colonel, since January of 1961?

8         THE COURT:  He hasn't said that there are any pumps at

9    the Sawday Diversion.  What is the Sawday Diversion?

10   BY MR. VEEDER:

11        Q  Would you describe the Sawday Diversion, and locate it

12   as it relates to the structure referred to in License 4906?

13        A  I have already given the location with reference to

14   the structure recited in 4906.

15        Q  Would you describe the pumps, then, that you have

16   observed at the location mentioned?

17        A  The Sawday Diversion consists of a 50 horsepower,

18   3-phase, 220/440 volt, 1500 to 1800 rpm U.S. motor driving

19   a deep well turbine type of pump.  The water is discharged

20   through a 4-inch pipe, which increases to six inches at a

21   pressure of about 340 psi.

22        Q  When have you observed that structure in operation,

23   that pump in operation, Colonel Bowen?

24        A  I last observed that pump in operation last Friday,

25   the 10th of March, 1961.

P 12

1    Q  And had that pump been previously observed by you in

2    operation since January of 1961?

3    A  No sir, but it had been observed by people under my

4    direction.

5    MR. SACHSE:  Object as hearsay.

6    THE COURT:  Now, is there any dispute that the pump is

7    in operation?

8    MR. SACHSE:  There is extreme dispute as to how much.

9    If Colonel Bowen is prepared to say, I am going to put on

10    testimony as to how much it pumped.  If he is prepared to say,

11    I would like to have him say it, but I think he is going to

12    give the impression that people under his direction have seen

13    the pump running since January, and I don't want that im-

14    pression left with the Court.

15    THE COURT:  The objection is sustained.

16    MR. VEEDER:  Colonel Bowen, --

17    MR. SACHSE:  I am going to cross-examine him at some

18    length about how much it has run.

19    BY MR. VEEDER:

20    Q  Colonel Bowen, what other pumps have you seen person-

21    ally in operation near the Sawday pump, which you have just

22    described?

23    A  Well, with reference to the point of diversion

24    described in Fallbrook's Exhibit D, there is another diversion

25    called the Callaway Diversion, which lies about 1300 feet east

P 13  1    and about 250 feet south of the Fallbrook Diversion, that

2    being upstream from the diversion described in License 4906,

3    which is a part of Fallbrook's Exhibit D.

4    MR. SACHSE:  Your Honor, before we go further with

5    Callaway, this is not an objection, but just simply to clarify

6    the matters between Mr. Veeder, Colonel Bowen and myself, I

7    believe I have already stipulated for the record, and I will

8    now if I haven't, that the Sawday operation is now being

9    conducted by us, and it would be appropriate and material

10   evidence on a request of Mr. Veeder for a restraint against

11   Fallbrook.  The Callaway Diversion that has been referred to,

12   I will simply state for your record that we have absolutely

13   no control over it, and if you are attempting to lay a

14   foundation against Fallbrook, I think you may have irrelevant

15   matter here.

16   MR. VEEDER:  May I inquire, though, is that not situated

17   on lands of Fallbrook?

18   MR. SACHSE:  The pump is situated on lands condemned by

19   the Fallbrook Public Utility District, but it is on an easement.

20   MR. VEEDER:  Aren't you exercising control over that?

21   MR. SACHSE:  We exercise no control whatsoever over that

22   pump.

23   THE COURT:  Now, Fallbrook owns the land?

24   MR. SACHSE:  Yes, your Honor.

25   THE COURT:  And someone else has an easement?

P 14

1    MR. SACHSE:  Yes, your Honor.

2    THE COURT:  Who has it?

3    MR. SACHSE:  At the time of the acquisition by a

4 negotiated purchase, as distinguished from an acquisition by

5 condemnation, those individuals who sold voluntarily to us,

6 we granted a revocable license, revocable at our election, to

7 continue to cross the land they sold to us, and they reserved,

8 or they attempted to reserve their water rights, as you have

9 heard discussed here previously, until such time as we provided

10 an alternative service.

Take D 2

11    This has been put into evidence way back in   Fallbrook's

12 case, as you will recall.  These land owners sold us the land,

13 and we put in evidence their purported reservation to riparian

14 rights, and we granted them a license to cross the acquired

15 property for the purpose of exercising that right until such

16 time as we could provide an alternative service, which meant

17 when the reservoir gets in.

18    THE COURT:  Now, is the Callaway Diversion on other land,

19 or land that belongs to Fallbrook?

20    MR. SACHSE:  It is on land belonging to Fallbrook and on

21 which Callaway reserved riparian rights.  On the Sawday Diversion

22 that is not true.  That is individually run.

23    THE COURT:  So that Callaway has a revocable license --

24    MR. SACHSE:  From Fallbrook.

25    THE COURT: -- to cross your land, and also to maintain

P 15

1    this diversion?

2        MR. SACHSE:  Yes, your Honor, but the riparian right is

3    reserved by it, and we have nothing to say about it whatsoever.

4    We have simply given them a revocable license, the right to

5    cross the land.

6        MR. VEEDER:  Mr. Sachse, you advised me that you would

7    deliver to me the diversions in acre feet that have been made

8    this year.

9        MR. SACHSE:  I did, and I advised you I would, and I will.

10        I think we should lodge these as an exhibit, if the Court

11   please, of Fallbrook.  I have given it the number L-1, because

12   it will be attached to Fallbrook's Exhibit L, which is the

13   prior record of ours.

14                              (The document referred to was marked)
                                (Defendant's Fallbrook's Exhibit L-1)
15                              (for identification.               )

16        THE COURT:  This is a list of the diversions in 1960?

17        MR. SACHSE:  This brings up to date Exhibit L, and it has

18   by months Fallbrook's diversions commencing with January, 1959

19   and ending with February, 1961 in acre feet.

20        THE COURT:  May I have a copy?

21        (The document was handed to the Court.)

22        MR. VEEDER:  And you will agree that the pumping shown

23   for January and February, that is, the 67.5 acre feet for

24   January, and February 44.1, are the waters that have been

25   pumped measured by Fallbrook Public Utility District out of

P 16

1    the Sawday pump.  Is that correct?

2       MR. SACHSE:  It was the two pumps, Mr. Veeder.  It was

3    Fallbrook's own pump, the first one that Colonel Bowen described,

4    and the Sawday pump.

5       THE COURT:  This Exhibit L-1 is a combination of those?

6       MR. SACHSE:  The combination of those two.  It does not

7    include anything from Callaway, but it does include the Sawday

8    and the Fallbrook pumps.

9       THE COURT:  We will now take a recess.

10      Colonel, will you mark on your Exhibit 29-K and also on

11    mine, the Fallbrook point of diversion, the Sawday well, and

12    the Callaway well, and off to the side put arrows showing

13    where they are.

14       THE WITNESS:  Yes, your Honor.

15       (A fifteen minute recess.)

16       MR. VEEDER:  Your Honor, the Fallbrook Public Utility

17    District, through its counsel, handed to me, and I assume

18    your Honor got a copy, Exhibit L-1 brought to date.

19       THE COURT:  Yes sir.

20       MR. SACHSE:  It is Exhibit L brought to date.  Exhibit

21    L-1 is an addition to L.

22       MR. VEEDER:  And, of course, we agree that this data can

23    be made a part of the exhibit, and if it is amenable to your

24    Honor, it may be received --

25       THE COURT:  It will be received, then, as Fallbrook's

P 17

1  L-1 in evidence.

2                    (Thereupon the document heretofore marked)
                         (Fallbrook's Exhibit L-1, was received in)

3                    (evidence.                      )

4  BY MR. VEEDER:

5     Q  Colonel Bowen, I hand to you Fallbrook's Exhibit L-1

6  in evidence, and ask you to read into the record the diversions

7  made by the Fallbrook Public Utility District out of the Santa

8  Margarita River, as shown in October 1960 through February of

9  1961?

10     A  Referring to Fallbrook  Public Utility District's

11  Exhibit L-1, it shows diversions by months from the Santa

12  Margarita River under Permit No. 7033, and the quantities are

13  in acre feet:  October of 1960 is shown as 46.7.  November of

14  1960 shows 28.0.  December of 1960 shows 61.9.  January of

15  1961 shows 67.5, and February of 1961 shows 44.1.

16     Q  Colonel, when you released the water from Lake O'Neill,

17  would you state into the record the quantity that you left in

18  that lake at the time of the release?

19     MR. SACHSE:  Are you speaking of this past year?

20     MR. VEEDER:  In 1960.

21     THE WITNESS:  In the Fall of 1960 I discharged all of the

22  water from the lake that I possibly could with the existing

23  outlet structure.  The quantity left in dead storage was less

24  than 100 acre feet.

25     THE COURT:  How much would you approximate you released?

P 18

1     THE WITNESS:  Approximately 900 to 1000 acre feet, your

2  Honor.

3  BY MR. VEEDER:

4     Q  Colonel Bowen, would you state into the record the

5  effect of the Fallbrook diversions which you have read from

6  Fallbrook's L-1 upon the quantity of water reaching the Naval

7  enclave and the quantity of water which you could have impounded

8  in Lake O'Neill if it had been available?

9     A  The quantities which I read from Fallbrook's Exhibit

10  L-1 diminished the water available to recharge Lake O'Neill.

11     Q  What quantity of water, Colonel Bowen, is required --

12     THE COURT:  Let me ask a question there.  From October on

13  through February was there any water at all running in the

14  Santa Margarita that could have been diverted by the O'Neill

15  ditch into Lake O'Neill?

16     THE WITNESS:  Your Honor, the moment that water was

17  available to divert at the O'Neill diversion, we commenced

18  diverting it, and that was on the date of 26 January, 1961,

19  when the first water flowed through O'Neill ditch, and that was

20  a quantity of 1.6.

21     THE COURT:  Acre feet?

22     THE WITNESS:  Acre feet.

23     MR. SACHSE:  Acre or second feet?

24     THE WITNESS:  1.6 acre feet.

25     MR. SACHSE:  In what period?

P 19

1   THE WITNESS:  On that date, or on that day.

2   MR. SACHSE:  On that day.

3   THE COURT:  And did it flow on succeeding days?

4   THE WITNESS:  Yes, your Honor.  It has flowed continuously

5   through the ditch since that date except for the days of 25,

6   26 and 27 of February, 1961.

7   THE COURT:  And what total in acre feet has been diverted

8   through the ditch since the first water in January, 1961?

9   THE WITNESS:  In January of 1961, your Honor, we diverted

10   17.6 acre feet, and in February of 1961 we diverted 59.10 acre

11   feet, and through the 13th of March 1961 we diverted 25 acre

12   feet.

13   The total diverted through O'Neill ditch this water year

14   to and including 13 March 1961 is 101.7.

15   THE COURT:  Ordinarily what time of the water year are you

16   able to completely fill Lake O'Neill, or can you answer that

17   question?  Is there an ordinary time when this occurrs?

18   MR. VEEDER:  Your Honor, from the Santa Margarita River?

19   THE COURT:  Pardon?

20   MR. VEEDER:  From the Santa Margarita River?

21   THE COURT:  Yes.

22   THE WITNESS:  This year certainly is not ordinary, your

23   Honor.

24   THE COURT:  I understand that, but I mean in other years

25   by this time you would have had much more water, would you not,

P 20

1   in your lake?

2          THE WITNESS:  Oh, yes sir, indeed.

3          THE COURT:  All right.

4   BY MR. VEEDER:

5          Q  Colonel Bowen, what is the maximum capacity for a

6   single filling of Lake O'Neill, based upon the data that you

7   have?

8          A  About 1200 acre feet.

9          Q  To what uses has the water from the Santa Margarita

10  River, which you divert and impound in Lake O'Neill, -- to

11  what uses is that water applied by the United States?

12         A  The water in Lake O'Neill is put to a military use.

13         Q  And when the water is released from Lake O'Neill, as

14  you have described, what use is made of the water after the

15  original military use?

16         A  It is picked up in our production wells and delivered

17  to the service areas served by the Santa Margarita well field,

18  and used again for military purposes.

19         THE COURT:  You mean that this water is picked up out of

20  the lake and used for domestic purposes?

21         THE WITNESS:  After it goes into the ground and joins the

22  ground water body, your Honor, it commingles with the water

23  in the ground water basin and is extracted by pumps and de-

24  livered for use within the service area.

25  BY MR. VEEDER:

P 21

1    Q  During your years at Camp Pendleton, would you compare

2    the runoff and the availability of water in the river this

3    year as it relates to previous years of which you have made

4    observation?

5    A  This is the lowest year of rainfall and runoff that

6    I have ever seen on the Santa Margarita River.

7    Q  When was the last date that you would say that your

8    basins have received any substantial recharge?

9    A  Three years ago in March and April of 1958.

10   Q  What has been the general result of this drouth from

11   the standpoint of the water level in the basin underlying

12   Camp Pendleton?

13   A  A decline of elevation of the ground water plane in

14   the Santa Margarita basin within Camp Pendleton.

15   MR. VEEDER:  I have nothing further.

16   THE COURT:  I interrupted you when you started to ask

17   a line of questions about the effect, in the Colonel's opinion,

18   of the Fallbrook diversions, and you started with some other

19   questions after I interrupted.

20   MR. VEEDER:  The question was the maximum quantity that

21   could be impounded there, your Honor.

22   THE COURT:  What has been the practice in the use of

23   water in Lake O'Neill by the military, let's say in a year

24   when there was considerable runoff during the late Fall and

25   early part of the following calendar year?  Would the lake be

P 22

1   filled and emptied at various times, or what would be done?

2   THE WITNESS:  Yes, your Honor, the pratice is and has

3   been, when the lake has been filled fairly early in the runoff

4   period, water is discharged from it to provide storage for

5   additional flow that might come into it.

6   THE COURT:  Now, how many times would this be done, or

7   can you calculate it that way?

8   THE WITNESS:  Well, it is difficult to calculate, your

9   Honor.  It depends upon the regimen of the weather.  We try

10   to wind up at the end of the so-called rainy season with a

11   full lake.

12   THE COURT:  So that if, for instance, you had ample water

13   flowing down the Santa Margarita, and we will say the water

14   was flowing down at least across Ysidora Basin, then there

15   would be no particular pressure so long as that water flowed

16   over the Ysidora Basin, to empty O'Neill and to keep O'Neill

17   full, and there would be no sense in having further water, I

18   take it, to charge the basin.  But if, on the other hand, you

19   would fill O'Neill, and then there came a period in which the

20   water was not running down over the Santa Margarita Basin, at

21   least the lower part of it, then I take it you would release

22   water from O'Neill and again fill up O'Neill, and work it out

23   on a basis of what water was recharging the basin.  Is that

24   what you mean?

25   THE WITNESS:  Yes sir, that is taken into consideration.

P 23

1   Of course, we don't desire to have any water wasted by running

2   out to the ocean, and we can effect some control by regulating

3   the water level within Lake O'Neill during the period of runoff.

4        MR. VEEDER:  We have nothing further on this point, your

5   Honor.

6        MR. SACHSE:  I have some cross-examination.

7                        CROSS-EXAMINATION

8   BY MR. SACHSE:

9        Q  Colonel Bowen, first I would like to direct your

10  attention to your Exhibit 279.

11       MR. VEEDER:  Your Honor, I had that prepared to be of

12  assistance, but the ten-day rule was invoked, so we went on

13  on oral testimony.   I have not offered 279.

14       MR. SACHSE:  But I may inquire about it on cross-examina-

15  tion, may I not?

16       MR. VEEDER:  If it is in the record.  Your Honor, he can

17  do it if he wants to, but it should be in the record if he

18  wants to cross-examine on it.

19       MR. SACHSE:  I just want to ask a few questions.

20       THE COURT:  He can say he wants to do it on voir dire

21  before the exhibit is offered.

22       MR. SACHSE:  Exactly.

23       MR. VEEDER:  That suits me.

24  BY MR. SACHSE:

25       Q  Colonel Bowen, am I correct that the well indicated on

P 24

1    Exhibit 279 is at surface ground elevation about 100 feet?

2        A   That is about the elevation of the ground level at

3    that well, Mr. Sachse.

4        Q   All right.   Then looking at your elevation in feet

5    above the mean sea level column on the left of the exhibit,

6    that indicates the elevation of the water table above mean sea

7    level at that well?

8        A   Yes sir.   That heavy wavy line traversing the upper

9    portion of Plaintiff's Exhibit 279 indicates the monthly mean

10   static water level at that well.

11       THE COURT:   At sea level?

12       THE WITNESS:   With reference to mean sea level, yes sir.

13   BY MR. SACHSE:

14       Q   In other words, to be sure I understand this now, look

15   at the calendar year 1952, where the blue line clearly inter-

16   sects the horizontal line at 90, do I read this exhibit to

17   mean that between March and April of 1952 the water table at

18   the well indicated was within ten feet of the surface?

19       A   Yes sir, that is a correct interpretation.

20       Q   And likewise, when I go over to the very end of your

21   exhibit, --

22       MR. VEEDER:   Would you read the month again, please?

23   BY MR. SACHSE:

24       Q   - - in February of 1961, do I read your exhibit to mean

25   that the water table at this well was about 15 feet 4 inches

P 25

1    from the surface?

2        A   Four or six, yes sir.   It looks like about 15 feet

3    six inches.

4        Q   From the surface, from the ground surface?

5        A   Below the surface of the ground, yes sir.

6        Q   At what ground surface elevation in the vicinity of

7    this -- I withdraw that, please.

8        At what elevation does the water table have to stand in

9    the vicinity of this well to encourage natural phreatophytic

10   growth?

11       MR. VEEDER:   I will object to that, your Honor.   That goes

12   beyond the scope of the direct examination.

13       MR. SACHSE:   I will withdraw it, your Honor.   When the

14   exhibit is in, we will go into it.

15       MR. VEEDER:   The exhibit is not going to be offered.

16       MR. SACHSE:   Oh, isn't it?

17       THE COURT:   You mean not offered to day.

18   BY MR. SACHSE:

19       Q   Who prepared this exhibit, Colonel Bowen?

20       A   It was prepared in my office.

21       Q   And under your supervision?

22       A   Yes sir.

23       Q   Is the data thereon indicated correct, to the best of

24   your knowledge and belief?

25       A   Yes sir.

P 26

1       MR. SACHSE:  Your Honor, I will offer this as Fallbrook's

2   next exhibit in order, if the United States does not want to

3   offer it.

4       MR. VEEDER:  I knew he would do it.

5       MR. SACHSE:  Now, may I cross-examine on it?

6       THE COURT:  Now, what number shall we give it?  A Fallbrook

7   number?

8       MR. VEEDER:  Oh, no, your Honor. That is a good exhibit.

9   Give it our number.

10      MR. SACHSE:  I will take 279.

11      THE COURT:  279.  It is received.

12                      (The document heretofore marked Plaintiff's)
                        (Exhibit 279, for identification, was       )
13                      (received in evidence.                      )

14  BY MR. SACHSE:

15      Q  Now, Colonel Bowen, at what elevation in the vicinity

16  of this well does the water level have to stand to encourage

17  phreatophytic growth?

18      MR. VEEDER:  I object to that, your Honor, as incompetent,

19  irrevelant and immaterial, and it has nothing to do with the

20  issues here.  Your Honor, it goes far beyond the scope of the

21  direct examination.

22      MR. SACHSE:  Your Honor, I will concede that it goes

23  beyond the scope of the direct.  If we are going to have to

24  start to haggle about scope of the direct, why, I will have to

25  call him myself. But it is a proper question.  Colonel Bowen has

P 27

1   testified at length about pheatophytes, water tables, and so

2   on.  It is a simple fundamental under California Water Law

3   that all water uses must be reasonable, under our Constitutional

4   Amendment of 1928, and if I can attempt to establish that this

5   witness is seeking to maintain a water level table resulting

6   in a lake which encourages the growth of phreatophytes, he

7   won't get an injunction.

8       Now, I don't think that the Court should foreclose me

9   from trying to prove --

10      MR. VEEDER:  Your Honor, he is killing the clock, and I

11  realize that, but what we are talking about is Lake O'Neill.

12  We are not talking about ground water levels, or anything else.

13  The sole and only issue that I have brought here is to request

14  your Honor to  enjoin the illegal diversions of the Fallbrook

15  Public Utility District, which are interfering with the water

16  going into Lake O'Neill, which is either an appropriative or

17  riparian right antecedent, prior, paramount and better than

18  anything Fallbrook has.

19      (See next page.)

20

21

22

23

24

25

Take D3

1  THE COURT: Mr. Veeder, you can't segment          the
2  Colonel's testimony.  He has been on the witness stand many
3  times, and whether it is proper cross-examination or is just
4  a limited question on this occasion, I am not impressed by
5  your objection, and it certainly goes to the merits of this
6  litigation.  The objection is overruled.  You may treat it,
7  if you want to, as additional cross-examination of some of
8  his earlier testimony.

9  MR. SACHSE: Do you have the question, Colonel Bowen?

10  A  Could I have the question read, please?

11  Q Let me rephrase it.  I am not sure that I stated it
12  properly.

13  In the vicinity of well 10-4-7J1, bearing in mind the
14  soil characteristics, and so on, at what elevation does the
15  ground water table have to stand in order to encourage
16  phreatophytic growth.

17  A It depends a lot upon the phreatophytes.

18  Q  Let's take them one at a time, then.  How about
19  cottonwood trees?

20  A  I think the cottonwood trees were to grow on a phreato-
21  phytic branch of the water table, that is, at certain eleva-
22  tions.

23  Q  In other words, within fifteen or sixteen feet of the
24  surface they would, would you say?

25  A  Yes, sir.

Q  How about big willows?

A  Big willows would do the same.

MR. VEEDER: In other words, your Honor, until there is a showing

that there are big willows and cottonwood trees growing out

of there, this seems to be entirely irrelevant.

MR. SACHSE: How about tules.

A  Tules would not grow in that.  They are more of a

hydrophyte, and generally they seek water on the surface of

the ground.

Q  Would I be correct in saying that if the water level

approaches ten feet below the surface, the growth of one or

another kind of phreatophytes would be substantially increased

there?

A  Yes, sir.

Q  Now, still with reference to this Exhibit, in March

of 1958 or April of 1958, I observe a large upward jog in the

heavy blue line.  Do you see the one to which I refer?

A. Yes, sir.

Q  Am I correct in stating that that jog represents the

same year in which we had runoff to the ocean at Ysidora.

A  Yes, sir, and that jog is a tribute to my water-

spreading structure.

Q  I will accept that answer, and I agree.  Colonel, I

think it is a tribute, but notwithstanding that there was

runoff to the ocean, your water-spreading structure---will

1    you explain to me---you would not entirely credit with this

2    recharge of the lake?

3        A  No, sir.  If there was no water to spread, why, I

4    would not get the jog.

5        Q  Back to 1952, Colonel.  The jog in 1952 represents

6    another runoff to the ocean, does it not?

7        A  Yes, sir.  That high elevation of about ninety feet

8    above sea level in March and April of 1952 represents a

9    period of excessive rainfall and runoff.

10       Q  Now, Colonel, your present diversions to Lake O'Neill

11   are not the same as the diversions that we all viewed on our

12   view of the premises at Camp Pendleton prior to the 1958

13   rains, are they?

14       MR. VEEDER: May I have that question again?

15       THE COURT: Read it, please.

16       (The question referred to was read as follows:

17       "Q  Now, Colonel, your present diversions to Lake O'Neill

18   are not the same as the diversions"---)

19       MR. SACHSE: Diversion works, I will make it diversion

20   works.

21       THE COURT: Rephrase it.

22       MR. SACHSE: I will rephrase it.

23       Q  The diversion works that we viewed when the whole

24   group of us toured Camp Pendleton under your guidance, which

25   was, I believe in 1958, are no longer in existence, are they?

1    They were washed out by the high water?

2         A  What month of the year did we make that tour, Mr.

3    Sachse?

4         Q  I cannot say, but I specifically recall that we ob-

5    served the diversion dam, Colonel Bowen, and I know that

6    diversion dam is not in existence today.   I am not trying to

7    trap you, but I just want to get this clear.

8         MR. VEEDER: Is that a speech?

9         BY MR. SACHSE

10        Q  (continuing) Is it not true that the diversion dam was

11   washed out in the high water of 1958 and '59?

12        A  Yes, sir, that is true, and I did not want to be

13   difficult, Mr. Sachse.   I just wanted to pin the date down.

14   Our diversion dam did reach in the March and April rains of

15   1958, and later on in 1958 we did construct a new type of

16   diversion structure  at a site a little upstream from the

17   previous structure that you observed.

18        Q  It is how far upstream?

19        A  Oh, about two hundred yards.

20        Q  Could you describe it for us, please.

21        A  Yes, sir.   Our present diversion structure is a rock

22   weir.

23        The former attempts at diverting water by us was to con-

24   struct an earth fill type of dam, a low earth fill dam, 

25   usually with some sort of spillway which would carry water of

1    comparatively low flows without damage to the structure.

2         However, there were years, like 1952 and 1958, when major

3    damage was created by the stream flow of the river, and to

4    attempt to get away from this occasional replacement of the

5    structure, I decided to put in a rock weir which would pass

6    a designed flow of water over the full crest of the weir

7    without substantial damage to the structure, and still retain

8    the potential of diverting surface stream flow into the

9    O'Neill ditch.

10        This rock weir that is constructed extends about fourteen

11   feet below the elevation of the stream bed, and extends about

12   four feet above that point.

13        Q  Now, your diversion, which I believe you testified,

14   commenced 26 January, 1961, this year, are from the surface

15   flow, and they are not intercepted water by this rock weir

16   fourteen feet below the surface, are they?

17        A  Oh, No, sir.  The depth of the valley fill there is

18   about eighty feet.

19        Q  Now, do you have handy the Exhibit, the U. S. G. S.

20   Exhibit, and I don't know the number, which would show the

21   location?  I don't know the numbers, but I believe it is the

22   29- series.

23        A  I have them here, Mr. Sachse.

24        Q  What is the number?

25        A  29-G.

1   Q  Can you indicate on Exhibit 29-G the approximate

2  location of your present diversion works?

3   A  Yes, sir.

4   Q  Would you do so, please.

5   A  With a red pencil I will mark a straight line normal

6  to the thread of the Santa Margarita River, as shown on

7  Plaintiff's Exhibit 29-G, and that being in the southwest

8  quarter of the northwest quarter of Section 5, Township 10

9  South, Range 4 West, San Bernardino Baseline Meridian.

10  THE COURT:  Will you draw a line over to the left and

11  put a title in there?  When was this weir constructed?

12  THE WITNESS: In 1958, your Honor.

13  THE COURT: Approximately when?   In the fall?

14  THE WITNESS: Yes, sir, it was completed about October

15  of 1958.

16  THE COURT:  Then put there "Weir, October of 1958."

17  THE WITNESS: Pursuant to your Honor's instructions I

18  have drawn a red line on the left hand margin of Plaintiff's

19  Exhibit 29-G, with an arrow  indicating the approximate site

20  of the Weir, and on the margin I have written, "Diversion

21  weir, October '58."

22  BY MR. SACHSE:

23   Q  Did you just state, Colonel Bowen, a moment ago that

24  the sands you found in that area were about eighty feet deep?

25  MR. VEEDER: Did you say eighty?

R

1    MR. SACHSE:  Yes.

2    THE WITNESS:  Yes, sir, I observed that.

3    BY MR. SACHSE:

4    Q  Now, I observe on  Exhibit 29-G that an area, which

5    would appear to be younger alluvial extends clear up to the

6    junction of DeLuz Creek.  Is that a deep basin of alluvium?

7    MR. VEEDER:  Your Honor, I am going to object to that

8    as incompetent, irrelevant and immaterial, and I think it has

9    nothing to do with the issues before your Honor.

10    THE COURT: Overruled.

11    MR. VEEDER: And I think this examination has gone far

12    beyond the direct.

13    THE WITNESS: Yes, sir, that alluvium field upstream from

14    the site of the weir marked on 29-G, up to the confluence of

15    DeLuz Creek and the Santa Margarita River is of considerable

16    depth.

17    THE COURT:  What sub-basin is that weir in?  The Upper,

18    Chappo, or what?

19    THE WITNESS: Your Honor, that is in the upper Basin.

20    BY MR. SACHSE:

21    Q  Colonel,Bowen, isn't there a concrete slab of some

22    sort across the Santa Margarita River in the vicinity of the

23    road that is shown on the Exhibit as Camp DeLuz Road?

24    A  No, sir.

25    Q  Is there a culvert there, or what?

1    A   That slab no longer exists.   That was washed away in

2  1952.

3    Q   Perhaps you can help me.   What would be the best point

4  upstream from your weir,---the first point upstream from your

5  weir at which it would be practical to measure or estimate the

6  surface flow in the Santa Margarita River?

7    A   The best point at the present time, Mr. Sachse, is

8  the so-called Fallbrook Gage near Fallbrook on the Santa

9  Margarita River.

10    Q   I am aware of that, that is the best.   What I asked

11  you, Colonel, what would be the first point upstream?   Is

12  there any point upstream between your  weir and the Fallbrook

13  Gage at which it is practical to attempt to make a reasonable

14  estimate of the surface flow of the stream?

15    A   Yes, there are several points.

16    Q   What would be the first one upstream from that?

17    A   Upstream from the weir?

18    Q   Yes.

19    A   Well, I would say the best point would probably be

20  about the location of the Camp DeLuz Road, the intersection

21  with the river, as shown on 29-G.

22    Q   Have you been on that location lately, to observe the

23  flow?

24    A   Yes, sir.

25    Q   Would you care to make an estimate to me as to what you

1    would feel the surface flow at that point was on Tuesday of

2    last week, if you know?  Were you there Tuesday of last week?

3        A   No, sir.

4        Q   Well, when was the last time you were there?

5        A   The last time I was there was Friday of last week,

6    the 10th of March.

7        Q   All right.  Could you give us an estimate of what you

8    feel the surface flow was at that time?

9        A   Well, it is a little difficult to estimate that because

10    we had breached Naval Ammunition Depot Dam, and we had a

11    little increase in water there.  It was subsiding at the time

12    I noted the flow, but it was not typical of the flow we have

13    had this winter.

14       Q   Can you give us a date which was   more typical?

15    What was the most recent occasion when you examined it that

16    was fairly typical?

17       A   I would say about the week before that.  In other

18    words, on the 2d of March I was up there, and at that time

19    the flow of water near the Camp DeLuz Road, as shown on 29-G,

20    was about 2 to 2½ second feet.

21       Q   Now, at that same date, March 2d I think you said,

22    did you have any occasion to check the Gages at the Fallbrook

23    Gaging Station?

24       A   I didn't go and check that, but I have that record

25    with me, Mr. Sachse.

1   Q  Will you tell us what the flow was at the Fallbrook

2   Gaging Station?

3   A  Well, I was in error, Mr. Sachse. The records I have

4   terminate with the end of March.  I would have to bring that

5   March and---

6   MR. VEEDER: You mean the end of February?

7   THE WITNESS: The end of February.  I would have to bring

8   that down with me.

9   THE COURT: Where is this Fallbrook Gage with reference

10  to your point of diversion?

11  MR. SACHSE: Below the point.

12  THE COURT: Below your point.

13  BY MR. SACHSE:

14  Q  Colonel Bowen, what was the last date you say you

15  observed the Sawday pump?  Last week you said, I believe?

16  A  Yes, the 10th of March, last Friday.

17  Q  Did you cross the slab of the Santa Margarita River

18  that is immediately below the Fallbrook and Sawday pumps?

19  A  Yes, sir.

20  Q  Could you make an estimate for us of the surface flow

21  of the river at that point on last Friday?

22  THE COURT: Where is this?

23  MR. SACHSE: This is below our pumps, but above the gage.

24  There happens to be a concrete slab across the river where it

25  is easier to estimate it.

1   THE COURT:  Does the slab go down to bedrock?

2   MR. SACHSE: Yes.  Well, I don't know whether it goes

3   down to bedrock.  It is the surface flow that I am asking

4   about.  I don't know whether it goes to bedrock or not.

5   MR. VEEDER: So long as the record is clear that you don't

6   know.

7   THE WITNESS:  I would estimate it was in the neighborhood

8   of 2½ to 3 second feet.

9   BY MR. SACHSE:

10   Q  You did not have occasion on that same date to com-

11   pare the situation at the DeLuz, the Camp DeLuz Road crossing?

12   A  No.  At the DeLuz Road Crossing on that day, as I

13   stated, it was abnormally high because of this release I had

14   made within the enclave of the Naval Reservation.

15   Q  You say abnormally high.  What do you think it was?

16   A  We breached the little structure up there at the Depot's

17   diversion at about 1340 hours on Thursday the 9th, and then

18   let go and peaked up to about 31.6 second feet momentarily,

19   and was flowing through O'Neill ditch about 10 second feet
          it

20   as of 0700 on the 10th, and rapidly diminished over the hours

21   to the normal flow which we have experienced in that ditch

22   this year.

23   For example, on the 11th of March we had 8 acre feet

24   pass through the O'Neill ditch into Lake O'Neill.

25   THE COURT: How many second feet would that be?

1    THE WITNESS: That would be an average of 4 second feet,

2    Your Honor, which far exceeds any previous records, and that

3    reflects our release from this little structure on the Naval

4    Ammunition Depot.

5    BY MR. SACHSE:

6    Q   Colonel Bowen, I don't know if you can estimate this,

7    but do you feel that you could give us a reasonable estimate

8    of what percentage of the surface flow of the Fallbrook Slab

9    of, say, 3 second feet is lost in seepage, transpiration,

10   evaporation, and so on, below the slab of Fallbrook, and be-

11   fore the DeLuz Road Crossing?

12   MR. VEEDER: Your Honor, the more I think of it, this does go

13   beyond the direct examination.

14   MR. SACHSE: I don't know if he can answer it or he can't.

15   MR. VEEDER:  If he can answer it, we certainly have no

16   objection.

17   THE COURT: All right.  If you can answer it, you may

18   answer it.

19   THE WITNESS: May I enquire to make sure that I understand

20   the reach up the stream: when you say the Fallbrook Slab, do

21   you mean the one at Sandia Creek?

22   BY MR. SACHSE:

23   Q   The one at Sandia Creek, the one in which you testified

24   you thought the estimate was 3 second feet.

25   A   $2\frac{1}{2}$ to 3.

Q  2½ to 3.  Between that point and the DeLuz Crossing
on the Military Reservation, what percentage of the stream
flow is lost, if you can estimate?

A  Well, That is a little difficult to estimate.  I
haven't actually made a measurement flow at those points,
and particularly the low flow spread over a broad surface like
that.

THE COURT:  What good would an answer that he would give
us be, because you were talking about  stream flow and surface
flow      and we don't know how much water is flowing under-
ground.

MR. SACHSE:  We derive our entire appropriative right
by a standard directed to the surface flow, your Honor.

MR. VEEDER:  Your Honor, the point I make now and here
is what difference does it make whether they are claiming
riparian or appropriative right?  If they are invading either,
we are certainly entitled to the injunctive relief that we
are now seeking.  It makes no difference whether it is under-
ground flow, or surface flow, or what it is.  We have a right against
their invasion.

MR. SACHSE: If we are going to start arguing the case
now, and the law, I might present the proposition that it is
conceivable that Lake O'Neill could be an improper riparian
storage without an appropriative right.  It is conceivable.

MR. VEEDER:  Not when you are making an illegal diversion,

1    like you are at Sawday.  I don't believe that it is at all

2    relevant, what you are saying.

3         THE COURT: This is a good time to quit, isn't it?

4         MR. VEEDER: I like the tone, your Honor.

7    (See next page)

Take D4
P 28

1    MR. SACHSE:  I would like to go just a little further, if

2    I can, your Honor, with another question or two.

3    THE COURT:  All right.

4    BY MR. SACHSE:

5    Q  Skip that one then, Colonel Bowen, and I would appreci-

6    ate it if you would look into that and give us your best

7    estimate, if you can.  I have one or two more questions I would

8    like to ask you.

9    A  I might suggest, Mr. Sachse, that we do have a record

10   of the surface stream flow at the Fallbrook Station on the

11   Santa Margarita River, and a record of the diversion into

12   O'Neill ditch, and that gives us the recorded loss between

13   those two stations.

14   Q  All right.  Perhaps we will take that then tomorrow

15   instead, if you will have that handy for me, so we can get to

16   it.

17   But now one more question on your present diversions to

18   Lake O'Neill.  Do I understand, then, that for the entire reach

19   of the Santa Margarita River, at least between the Deluz Road

20   crossing and your present diversion weir, there is surface flow?

21   A  Yes sir, at the present time.

22   Q  How much above the Deluz Road crossing is there surface

23   flow?

24   A  There is continuous surface flow from the Sandia Ford,

25   which is below the Fallbrook pump, or from the Fallbrook pump

P 29

1   on down to the Lake O'Neill Diversion at the present time.

2      Q  And I suppose, as you testified a moment ago, at least

3   between the Deluz Road crossing and the weir over an area of

4   some depth, containing a good deal of deep alluvium; isn't

5   that correct?

6      A  Yes sir.

7      Q  How long a stretch of the stream is that that has this

8   deep eighty-foot alluvium in it?

9      A  Just eyeballing it from the map, from the confluence

10  of Deluz  Creek into the Santa Margarita River and down to

11  the O'Neill Diversion weir is about a mile and a half.

12     Q  From the fact of the surface flow in that stretch of

13  the river, do you conclude that the sands in that stretch of

14  the river are reasonably full?

15     MR. VEEDER:  What do you mean now?  Colonel, don't answer

16  that for a moment.  When you say the sands are reasonably full,

17  are you talking down to eighty feet below?

18     MR. SACHSE:  I will rephrase the question.

19     Q  From the fact of the surface flow  through that stretch

20  of the river, can you calculate for us how full you think that

21  particular alluvial basin is?

22     MR. VEEDER:  I object to that again, your Honor.  How can

23  he estimate how deep he thinks it is.

24     MR. SACHSE:  Your Honor, when water runs on top of sand

25  continuously for 24 hours a day, I take it for granted, that

P 30

1  the sand is reasonably full.

2      I will withdraw the question.  I think his Honor has lived

3  long enough with California Law to know it.

4      THE COURT:  If it was a flash flood, and you had it run

5  across the sand, you might not have a basin that is full, but

6  if you had it running 24 hours a day, I would not have any

7  doubt but what there is a continuous body of water from the

8  surface of the stream on down.

9      MR. SACHSE:  I have no further questions.

10      THE COURT:  Absent some unusual formation.  Does that

11  not follow?

12      MR. VEEDER:  Not necessarily.  It could be sealed, your

13  Honor, to a degree.

14      THE COURT:  I have said absent some unusual formation.

15      MR. SACHSE:  If Colonel Bowen wants to assume that for

16  the purpose, he can.

17      MR. VEEDER:  As a matter of fact, we would like to have

18  that flow going into our basin.  We also have to have the sur-

19  face flow going into O'Neill.  We certainly have a prior and

20  paramount right over Fallbrook with both of those rights, and

21  they are interfering with it.

22      THE COURT:  All right.   Ten o'clock tomorrow morning.

23      THE WITNESS:  Your Honor, I made the additions to 29-K

24  that you requested be done during the recess.  Do you want

25  that in the record, sir?

P 31

1    THE COURT:  Yes, state it for the record.

2    THE WITNESS:  Pursuant to his Honor's direction, during

3  the recess I took Exhibit 29-K, and the Judge's copy of that

4  exhibit, and on the lefthand margin I wrote in red pencil,

5  "Sawday Pump,"         "F.P.U.D. Pump,"         "Callaway Pump,"

6  and from each of those I drew a straight line terminating in

7  an arrowhead also in red pencil at a dot with a circle around

8  it, the dot and circle also in red for Sawday Pump and Callaway

9  Pump.  The F.P.U.D. Pump indicates the well printed on Exhibit

10  29-K with a blue circle under the word "Well," previously

11  alluded to.

12    THE COURT:  All right.  Ten o'clock tomorrow morning.

13    MR. SACHSE:  Before we stop this, your Honor, for the

14  convenience of Mr. Grover, I will say that I was going to

15  bring some witnesses down.

16    THE COURT:  I take it that we are going to hear Mr. Grover

17  tomorrow?

18    MR. STARK:  He will be available for the next two days,

19  your Honor.

20    MR. SACHSE:  This is solely for his convenience that I am

21  stating this.

22    MR. VEEDER:  Let's don't interrupt this then for that.

23    THE COURT:  Why don't you, Mr. Veeder, and Mr. Stark,

24  and Mr. Sachse talk about this?

25    MR. SACHSE:  All right, your Honor.

(Whereupon, at 4:40 o'clock P.M., Tuesday, March)
(14, 1961, an adjournment was taken until 10:00 )
(o'clock A.M., Wednesday, March 15, 1961.        )

- - - -

P 32

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California, this 14th day of March, A.D., 1961.

_John Swader_
Official Reporter

_Marie G. Zellner_
Official Reporter