# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

                                        Plaintiff,

vs.                                                     No.   1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                        Defendants.

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Wednesday, March 15, 1961

Pages:      15,388 to 15,540

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court,
325 West F Street
San Diego, California
BElmont 4-6211 - Ext. 370

Take A1
P 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - -

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
vs.                            )        No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                 Defendants.   )
_____)

- - - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, March 15, 1961

- - - -

APPEARANCES:

    For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                             Special Assistant to the
                             Attorney General

                             LCDR. DONALD W. REDD.

    For the Defendants:

        Vail Company               GEORGE STAHLMAN, ESQ.

        Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
        District, et al.,

P 2

1    APPEARANCES (continued)

2        For the Defendants:

3            State of California          FRED GIRARD, ESQ.

4            Defendant Oviatt            JESSE R. O'MALLEY, ESQ.

5            Defendants Gibbon &         GEORGE GROVER, ESQ.,
             Cottle                              and
6                                         DONALD D. STARK, ESQ.

7            Defendant Knox              TRENT ANDERSON, JR., ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX TO WITNESSES

| Plaintiff's | D | X | RD | RX |
|---|---|---|---|---|
| Bowen, A. C. | | | 15,390 (Sachse) | |
| | | | 15,448 (Girard | |
| | 15,451 (Court) | | | |
| | | | 15,452 (VEeder) | |
| | | | | 15,458 (Sachse) |

INDEX TO EXHIBITS

Plaintiff's

280-A & 280-B          15,423

P 3

1   SAN DIEGO, CALIFORNIA, Wednesday, March 15, 1961, 10:00 A.M.

2        (Another matter.)

3        THE CLERK:  3-1247-SD-C United States vs. Fallbrook.

4                    ALLEN C. BOWEN,

5   previously duly sworn, on his oath was examined and testified

6   further as follows:

7        MR. STARK:  Your Honor, after the close of the session

8   yesterday we discussed briefly the procedure, and it appeared

9   possible, and perhaps profitable, that this aspect of the

10  case would go through at least until noon today, this in-

11  junction matter, and I wondered if I might be relieved to do

12  some work in the law library this morning, if possible.

13       THE COURT:  Yes.

14       MR. STARK:  I plan to be here this afternoon at two

15  o'clock then.

16       THE COURT:  Yes.

17       MR. SACHSE:  May I proceed to cross-examine?

18       THE COURT:  You may.

19              FURTHER CROSS-EXAMINATION

20  BY MR. SACHSE:

21       Q  Colonel Bowen, the primary and immediate uses of Lake

22  O'Neill at the present time are, I believe you testified

23  earlier, recreational and training of a bridge platoon; is

24  that correct?

25       MR. VEEDER:  I object to that as being an incorrect

P 4

1    statement.   The Colonel said the use was military.

2          MR. SACHSE:   That is correct.   And the Colonel's earlier

3    testimony a year or more back was that it was used for train-

4    ing a bridge platoon and for recreational purposes.

5          THE COURT:   Overruled.

6    BY MR. SACHSE:

7          Q  Is that not correct?

8          A  Yes sir, I have so testified.

9          Q  And the secondary use to which the water was put, you

10   testified yesterday, is to discharge it through your spreading

11   works or otherwise and recharge the ground waters of the basin?

12         A  Yes sir.

13         Q  Now that ground water that is put back into the basin

14   is then used for the normal military uses of Camp Pendleton;

15   is that correct?

16         A  Yes.

17         Q  Which includes use outside the watershed?

18         A  Yes sir.

19         Q  In excess of 60% of the use in 1960, for instance,

20   outside the watershed; is that correct?   If you want to

21   refresh your recollection from your Exhibit 151-A (handing

22   document to the witness).

23         A  You are speaking of military use, Mr. Sachse.   Exhibit

24   151-A shows water used for irrigation from the Santa Margarita

25   River.

P 5

1    Q  Pardon me, 152 or is it 150?  It is 150-A (handing

2    exhibit to the witness).

3    A  Yes sir.  As shown by Plaintiff's Exhibit 150-A, the

4    water year 1960, water used for military purposes from the

5    Santa Margarita River outside the natural watershed line,

6    2600 acre feet, which exceeds that used inside the natural

7    watershed line by 560 feet.

8    Q  And the same figures, please, for the irrigation use?

9    A  Referring to Plaintiff's Exhibit 151-A for water year

10   1960, 680 acre feet of water were used outside the watershed

11   of the Santa Margarita River and 430 acre feet were used in-

12   side the watershed of the Santa Margarita Rivers for irri-

13   gation.

14   THE COURT:  Then there would be about 2,040 acre feet

15   inside the watershed?

16   THE WITNESS:  That is correct, your Honor.

17   THE COURT:  You say that was the water year 1960 also?

18   MR. SACHSE:  That was military use, the first one.  The

19   second one was irrigation use.

20   Q  Colonel Bowen, what is the depth of water in Lake

21   O'Neill now, approximately?

22   A  Well, I would say approximately four feet at the

23   deepest point.

24   Q  And what is the surface area?

25   A  May I refer to the Plaintiff's Exhibit 88, I believe,

P 6

1    the area capacity curve of Lake O'Neill?

2         MR. GIRARD:  I have that, I think, if this is the one

3    (handing document to the witness).

4         THE WITNESS:  The depth of four feet which I testified

5    to is not the same as the gauge height.  That would be, as I

6    testified, the approximate maximum depth in the lake.  The

7    gauge height would be about two.  And referring to Plaintiff's

8    Exhibit 88, the gauge height of Lake O'Neill is two feet.

9         THE COURT:  You mean the water is two feet above the

10   gauge?

11        THE WITNESS:  Two feet in depth at the gauge, which is

12   located right at the outlet structure.  Then the area at that

13   depth is about 62 acres.

14   BY MR. SACHSE:

15        Q  That is as best you estimate it today?

16        A  Yes sir.

17        Q  That doesn't leave much of a lake for recreational

18   purposes, does it?

19        A  No sir, it doesn't leave too much for recreational

20   purposes.

21        Q  Does it leave enough for bridge platoon training

22   purposes?

23        A  It would be very difficult adequately to train a

24   bridge platoon.

25        Q  But it has made possible the tule eradication and

P 7

1   mosquito control you spoke of yesterday?

2        A   Yes sir.

3        Q   What is your official title at Camp Pendleton, again,

4   please, Colonel Bowen?

5        A   My primary duty at Camp Pendleton is that of Officer

6   in Charge of the Office of Ground Water Resources.

7        Q   And as such I understand your responsibilities include

8   all the water conversation measures on the reservation?

9        A   Yes sir.

10       Q   You pointed out yesterday that you were responsible

11  for the off-channel spreading operations; is that correct?

12       A   Yes sir, that is correct.

13       Q   Who decides, Colonel Bowen, when and whether to

14  empty Lake O'Neill?

15       A   Well, that is varied through the years, and generally

16  decided on my recommendation, but I have a Commanding General

17  who makes the ultimate decision in these matters.  I make

18  recommendations to him and he either accepts or rejects them

19  in whole or in part.

20       Q   Let's take last October that you drained the lake?

21       A   Yes sir.

22       Q   What was the date?

23       A   We drained the lake in October and November 1960.

24       Q   You made recommendations to the Commanding General

25  and he accepted them?

P 8

1  A  Yes sir.

2  Q  Was the Commanding Officer of the bridge platoon or

3 the bridge platoon Training Officer consulted?

4  A  No sir.

5  Q  Who is in charge of mosquito control?

6  A  The Base maintenance officer.

7  Q  Was he consulted as to the wisdom of draining the

8 lake?

9  A  Yes sir.

10  Q  Who is most concerned with the recreational uses of

11 the lake?

12  A  The Base  Special Services officer.

13  Q  Was he consulted as to the wisdom of draining the lake?

14  A  Well, he was informed that the lake would be drained,

15 but I don't think he had a voice in the matter as to whether

16 it would be or not.

17  Q  Colonel Bowen, do you have a staff officer, such as

18 that in the Air Force, who is called the Weather Officer in

19 the Marine Corps?

20  MR. VEEDER:  Objected to as being incompetent, irrelevant

21 and immaterial.  It has not one thing to do with the question

22 before the Court at this time.

23  THE COURT:  How do we know?

24  MR. VEEDER:  A weather officer?

25  THE COURT:  How do you know?  Overruled.

P 9

BY MR. SACHSE:

Q  Do you have a staff officer who advises the Commanding General or is able to advise him on prospective meteorological conditions, such as they have in the Air Force?

A  It is not exactly the same as in the Air Force, but we have a surf and weather station located at Camp Del Mar to make meteorological observations and observations of surf conditions.

Q  Did you consult them prior to the decision to drain Lake O'Neill as to the likelihood of getting some winter rains to fill it up?

A  No, I believe the Good Lord himself is the only one who can tell us whether we are going to get rain in the winter in this section of the world.

Q  But in arriving at the decision when to drain Lake O'Neill and whether to drain Lake O'Neill, one of the factors you consider is the possibility of its recharge, is it not?

A  Absolutely.  I always live in hope that we can recharge it.

Q  Who analyzes the status of the ground water basins and the need for the recharge of the ground water basins?

A  I do.

Q  You considered that factor also at the time of your recommendation to the Commanding General?

A  Indeed I did.  I think I testified yesterday that one

P 10

1   reason that I discharged the lake in the manner that I did

2   was to get water lower down in the valley to bring up the

3   hydraulic barrier which had dipped to an alarming level in

4   October 1960.

5        THE COURT:  I don't have before me the map of those

6   sub-basins and I don't remember exactly the situation.  You

7   have the Upper Basin, you have the Chappo Basin, and you have

8   the Ysidora Sub-basin?

9        THE WITNESS:  Yes your Honor.

10       THE COURT:  Where in that line of sequence is Lake

11  O'Neill located?

12       THE WITNESS:  Lake O'Neill is located in the Upper Basin,

13  your Honor.

14       THE COURT:  And so the discharge that you described

15  yesterday was made in sufficient amounts to let the water run

16  over the remaining part of the Upper Basin and the middle

17  basin so that there would be water to enter the material at

18  the lower Ysidora sub-basin?

19       THE WITNESS:  Yes sir, your Honor.

20       THE COURT:  This well that was described in Exhibit 279,

21  in what basin is that?

22       THE WITNESS:  That is in the Upper Basin, your Honor.

23       THE COURT:  Have you made computations as to water levels
                                                              in
24  in the middle of the Chappo sub-basin and/the Ysidora sub-basin?

25       THE WITNESS:  Yes your Honor.

MARIE G. ZELLNER, OFFICIAL REPORTER

P 11

1   THE COURT:  Are those going to be offered here?

2   THE WITNESS:  I don't know your Honor.

3   MR. VEEDER:  If your Honor desires we can put in the

4   elevations of Ysidora and, I assume, Chappo.  I don't have

5   those figures with me.

6   THE WITNESS:  Yes, we measured wells throughout the

7   reach of the basin, your Honor.

8   THE COURT:  What sub-basin does the sewage affluent

9   return to -- the lower sub-basin?

10   THE WITNESS:  We return some to the Upper Basin, some

11   to the Chappo Basin, and some to Ysidora, your Honor.

12   THE COURT:  Do you have any up-to-date information as

13   to further salt water encroachment in the lower sub-basin,

14   or is the situation about the same as it was when we took

15   the testimony earlier?

16   THE WITNESS:  It is about the same as it was when I

17   gave earlier testimony, your Honor.  I think since 1956 we

18   have been fairly successful in maintaining a hydraulic barrier

19   to prevent sea water intrusion.

20   THE COURT:  Go ahead Mr. Sachse.

21   MR. SACHSE:  Your Honor anticipated a few questions and

22   may have shortened the cross-examination.

23   Q  Colonel Bowen, if I understand your past testimony,

24   that is, your testimony in response to my questions, a command

25   decision was made considering the training needs, the recreational

P. 12

1   needs, the recharge needs of the basins, mosquito control,

2   tule eradication, rainfall possibilities, considering all

3   these factors, it was decided to drain Lake O'Neill last

4   October; is that right?

5       A   That is correct.

6       Q   It was decided, all those factors being considered,

7   it was to your best interest to do so; is that not correct?

8       A   That is correct.

9       Q   Did you consider, in making that decision, the records

10  you have had available to you through this case of Fallbrook

11  pumping in the past?

12      A   I don't believe that we took those into consideration,

13  Mr. Sachse.  We had hoped that maybe Fallbrook would stop

14  pumping.

15      Q   But you didn't consider that as a dominant factor,

16  then, in your decision one way or the other, did you?  If

17  you didn't take it into consideration, I assume that it was

18  not a dominant factor.

19      A   I assume that that would be a correct statement.

20      Q   Do you have before you there, Colonel Bowen, Fallbrook's

21  L-1?

22      THE COURT:  Here is a copy of it, Colonel.

23      THE WITNESS:  Yes sir, I have the Judge's copy before me.

24  BY MR. SACHSE:

25      Q   When was your draining of the lake completed?  You

15,400

P 13

1    say in November -- early November?

2        A  I would say it was about mid-November.

3        Q  Then you have Fallbrook's total extractions from the

4    river for November, December, January and February as shown

5    on L-1 -- check me if I am incorrect, please, Colonel.  I

6    find that they total 201.5 acre feet for those four months.

7    Is that right?

8        A  You named the months of November, December, January

9    and February?

10       Q  Yes.

11       A  You arrived at the sum of 201.5?

12       Q  Yes.

13       A  Yes sir.

14       Q  Now Colonel, assuming that there had been no extractions

15    by Fallbrook whatsoever during those four months, is it your

16    opinion that Lake O'Neill would have received an additional

17    201.5 acre feet of water?

18       A  No sir.

19       Q  Can you tell us how much additional you think it would

20    have received?

21       MR. VEEDER:  This is limited to November.  It does not

22    include October; is that right?

23       MR. SACHSE:  That is correct; it is November, December,

24    January.

25       THE WITNESS:  Of that 201.5 acre feet diverted by

P 14

1    Fallbrook in the four months of November, December 1960 and

2    January and February 1961, it is my opinion that we would have

3    received about 190 acre feet.

4         MR. VEEDER:  Into Lake O'Neill?

5         THE WITNESS:  Into Lake O'Neill.

6    BY MR. SACHSE:

7         Q  Now, please refer to your area and capacity curve

8    which you have before you, Colonel Bowen.  How would the

9    surface area and depth as it presently exists compare with

10   what it would have been if you had had that extra 190 acre

11   feet of water?

12        A  If we had had at the present time in Lake O'Neill an

13   additional 190 acre feet of water, the area of the lake would

14   be approximately 82 acres.

15        Q  As compared to what you testified earlier is now?

16        THE COURT:  Sixty-two.

17        THE WITNESS:  Sixty-two.

18   BY MR. SACHSE:

19        Q  What would the depth be?

20        A  The depth at the gauge would be about 5.2 feet.

21        Q  As against 2 feet you testified earlier; is that right?

22        A  Yes sir.

23        Q  Do those calculations, Colonel, take into consideration

24   the fact that you would suffer some seepage and evaporation

25   loss in Lake O'Neill itself, or have you just added a flat

P 15

1  190 acre feet to your totals in one single slug?

2  A  I have just added 190 acre feet.

3  Q  In a single slug as though you had it all at once.

4  Then the figures you have just given us do not correctly

5  reflect waht the condition of Lake O'Neill would be if

6  Fallbrook had pumped nothing?  It wouldn't be that high,

7  would it?

8  A  I took into consideration the transmission losses.

9  Q  But you did not take into consideration evaporation

10  loss in the lake?

11  A  No, but this period of the year they are generally

12  rather low.

13  Q  There are some; is that right?

14  A  Yes sir.

15  Q  Furthermore, the dry part of the lake has been dry

16  since October, hasn't it?

17  MR. VEEDER:  We started calculating from November.

18  BY MR. SACHSE:

19  Q  All right then, the dry part of the lake has been dry

20  since October, hasn't it, the dry portions of the lake bottom?

21  A  It has been drying out, let us say.

22  Q  And would you not anticipate some additional seepage

23  losses when water is put on top of that dry area?

24  A  Undoubtedly there would be some bank storage and

25  seepage loss as the level of the lake rises.

P 16

1      Q  Now Colonel Bowen, is it not a fact that the present

2   unhappy condition of Lake O'Neill is due to a shortage of

3   runoff rather than the Fallbrook pumping we have just discussed?

4      A  I would say it is a condition arising from a drouth

5   aggravated by Fallbrook's diversions upstream.

6      Q  If you had had the runoff that you anticipated in

7   making your command recommendation, what would be the condi-

8   tion of Lake O'Neill today?

9      MR. VEEDER:  That is too speculative, your Honor.

10      THE COURT:  What difference does it make, Mr. Sachse?

11      MR. SACHSE:  It makes a great deal of difference, your

12   Honor.

13      THE COURT:  If we had had the runoff all the basins

14   would be charged, the lake would be full.  So how does that

15   take us anywhere?

16      MR. SACHSE:  I appreciate your Honor's question, and I

17   am going to take a minute to tell you.  The thing that confuses

18   me about what we are doing today is that Mr. Veeder announced

19   yesterday when I inquired, when he put Colonel Bowen on the

20   stand, that we were considering items 2 and 3 on the agenda.

21   Items 2 and 3 are, first, the extent of the appropriative

22   rights of the United States of America to the use of water

23   from Lake O'Neill, and second, the matter of the restraint

24   of Fallbrook.

25      It seems to me a little backward to consider the

F 17

1    possibility of restraining a right which your Honor has

2    adjudicated and which is entered as an interlocutory judgment

3    because of an alleged interference with the right your Honor

4    has not even determined to exist as yet, namely, an appro-

5    priative right in Lake O'Neill.  Your Honor has made no

6    determination that there is any right in the United States,

7    any right of any kind to hold this water in Lake O'Neill.

8    All that we know at this minute is that there is pond that

9    the United States itself decided to empty, and now the United

10   States says, "We want to ask Fallbrook to put the water back

11   in that we drained out."

12       THE COURT:  You can't do everything at one time in a

13   lawsuit.  Because the two items are being considered together,

14   I take it that eventually the Government would seek, first,

15   that there be a finding that there was an appropriative right.

16       MR. SACHSE:  I so concur.  That is why I didn't object

17   initially.  But I have to conduct my cross-examination, I

18   have to conduct my proof on the assumption that they haven't

19   any rights.  That is the assumption on which I am working

20   at this moment, because there is nothing to tell me otherwise,

21   in your Honor's pre-trial opinion or in any testimony offered

22   by Colonel Bowen or in any ruling in this Court since it

23   started, and I intend to proceed on that basis until there is

24   a contrary ruling, that they emptied the lake and now they

25   want us to fill it.

P 18

1    THE COURT:  This is all in relation to the question of

2   runoff and the hypothetical questions supposing there had been

3   a big runoff, what would have happened?

4    MR. SACHSE:  It would be full.  In other words, their
        period.
5   troubles are due to a bad guess/  And they have no right to

6   ask anything of anybody, because your Honor has not yet given

7   them that right.

8    THE COURT:  If I follow you, your point is that if they

9   have no appropriative right in Lake O'Neill, then if there

10   had been a big runoff and the water was available, of course,

11   Lake O'Neill could have been filled.

12   MR. SACHSE:  They could take it anyway.  They don't need

13   a right to take it.

14   THE COURT:  Your inquiry is directed to the contrast

15   between the two positions:  One they have appropriative rights

16   and (2) they do not have appropriative rights.

17   MR. SACHSE:  Yes, your Honor.  And we must constantly

18   remind everyone in this case, because I find myself forgetting,

19   that there is a tremendous distinction between what the United

20   States can properly do and what they have a right to reach

21   upstream and ask someone else to do for them.  No one

22   quarrels with their right to put water in Lake O'Neill.  They

23   are the last user.  They can't hurt anyone.  No one quarrels

24   with their right to empty Lake O'Neill anytime they want to

25   and take a chance of filling it again.  They are the last user

P 19

1   on the stream.  But the fact that they have the power to do

2   these things does not give them the right to reach outside

3   the reservation boundary and until your Honor gives tham a

4   right or spells it out interlocutorally, at least, what their

5   rights are, I am operating on the assumption that they are

6   exercising their sovereignty over the reservation in emptying

7   the lake when they think it is necessary and gambling on

8   filling it up.

9       MR. VEEDER:  May I be heard for just a moment your Honor?

10      THE COURT:  Yes.

11      MR. VEEDER:  I think the United States of America has

12   already made a prima facie case, and I think your Honor has

13   recognized, indeed Mr. Sachse himself has recognized, that

14   the United States of America is the successor in interest to

15   the Rancho Santa Margarita, that as such we have riparian

16   rights.  He has made that admission into the record repeatedly.

17      MR. SACHSE:  Repeatedly, and I will concede it again.

18      MR. VEEDER:  Now, in regard to those riparian rights

19   we are asserting here that we have the right prior and superior

20   to the Fallbrook Public Utility District under the circumstances

21   that exist to permit the water to come down to recharge our

22   basin, to supply us with the riparian water to which we are

23   entitled, and we assert that whether the right in Lake O'Neill

24   is appropriative or riparian we are entitled to have that

25   water come to us ahead of and superior and prior to anything

P 20

1     that Fallbrook has.

2        Mr. Sachse has made these admissions to me, he has made

3 them into the record. He has lodged with us here proposed

4 findings of fact and conclusions of law in regard to Lake

5 O'Neill in which he says that the Lake O'Neill right is a

6 riparian right. Now, with that concession in the record, I

7 don't care whether this is a riparian right at this juncture

8 or whether it is an appropriative right. Either one of those

9 rights, whatever they are, are presently being invaded by

10 the Fallbrook Public Utility District, and we are entitled to

11 have those rights protected by an injunctive order for the

12 invasion which we have proved here continues to transpire.

13        It occurrs to me that it makes no difference whether your

14 Honor recognizes the riparian right or the appropriative right

15 in regard to the present issue before you.

16        THE COURT: I have a little trouble following you. I

17 would state your position this way. You claim that you have

18 a riparian right and that therefore you have a right to have

19 your basins charged. That would be a right apart from Lake

20 O'Neill entirely.

21        I also understand it is your contention that you have a

22 right to fill Lake O'Neill under your contention of an

23 appropriative right.

24        But how do you spell out your right to restrain Fallbrook

25 to fill O'Neill on the basis of a riparian right?

1    MR. VEEDER:  There is one or the other.  Certainly it is

2    either an appropriative right, giving us the right to seasonal

3    carry over, or it is, as Mr. Sachse has said in the proposed

4    findings that he filed with us, that the impounding of water

5    in Lake O'Neill was only a proper riparian use and not an

6    appropriative use.

7    MR. SACHSE:  That is not correct, Mr. Veeder.  Go ahead.

8    That is not correct.  I will reserve the criticism.

9    MR. VEEDER:  Just reserve the criticism.

10    The point that I make is that it is either a riparian

11    right or an appropriative right.

12    THE COURT:  It may not be.  When you start to talk

13    categories, you say it is one or the other.  It may be an

14    appropriative right.  It may not be a right at all.  You just

15    assume by that kind of statement that it is a riparian right.

16    Now whether Mr. Sachse said this or did not say it doesn't

17    help me in trying to spell out what you mean by a riparian

18    right to store water in Lake O'Neill.

Take A2   19    MR. VEEDER:  We had yesterday on the stand, and we have

20    had on the stand other witnesses, and indeed we have, in

21    regard to the Vail Company, the impoundment for a short period

22    of time.

23    THE COURT:  Yes.

24    MR. VEEDER:  And for the purposes of utilizing the

25    riparian right.  Now here we have a situation where we did

p 22

1    succeed --

2        THE COURT:  I can do a better job for you than you are

3    doing.  Let me go as far as I can.

4        MR. VEEDER:  If you can, I wish you would.

5        THE COURT:  In other words, if a military use is a

6    proper use of riparian water, then you have a riparian right

7    to fill the lake so that it can be used for bridge training.

8        MR. VEEDER:  That is exactly it.

9        MR. SACHSE:  Has your Honor determined this to be the

10   fact?

11       THE COURT:  No, I have not determined it.  I am spelling

12   out what his positions might be.  Now, likewise, there would

13   be no doubt that you would have a right to use the water on

14   a cyclic basis -- query as to how long -- but certainly not

15   to hold it from one wet season to a dry season under the

16   general right to store water for irrigation purposes or other

17   type of uses.  You would a right to make use of Lake O'Neill

18   probably in a different way than you have made use of it,

19   because your storages have been --

20       MR. VEEDER:  Cyclic.

21       THE COURT:  -- for long periods, if that is what you

22   mean by "cyclic," from wet to dry periods.  In fact, Colonel

23   Bowen has testified that some of this water was getting pretty

24   old, which was one of the reasons that he wanted to get it

25   out of the lake.

P 23

1      MR. VEEDER:  From our standpoint, your Honor, it is

2  either a riparian right or an appropriative right.  I assure

3  you that it is one or the other.  That is the only point I

4  am addressing to your Honor now; that we do have this right

5  that we succeeded to, and that Fallbrook is invading whatever

6  kind of right it is.

7      THE COURT:  I have trouble following you, Mr. Veeder.

8  Not that I am against you; I am sympathetic to you, giving

9  you what rights I can in Lake O'Neill.  But when you say it

10  is either one or the other, I don't follow your logic.  It

11  doesn't necessarily have to be one or the other.  There is a

12  possibility that you don't have a riparian right at Lake

13  O'Neill, except in the limited statements that I have made.

14      Do you have any other theory on which Lake O'Neill would

15  be a riparian use?  We have listed two:  (1) Storage for

16  reasonable periods, and (2) military activity -- bridge

17  training.  Any other?

18      MR. VEEDER:  Certainly the method of impounding the

19  water and releasing it, if your Honor should so order, is

20  part of the riparian use properly to recharge the basin.

21      The point that I tried to make, and perhaps I failed, is

22  this.  At the moment we are asking Fallbrook to let water

23  down to us because we have invested a legal right of some

24  kind to carry it which is prior to and paramount and superior

25  to Fallbrook.

P 24

1    As your Honor said, you can't possibly determine all

2   these factors at once, but I do believe that your Honor is

3   now in the position to make a determination that the right,

4   whatever the United States has, is prior and in addition it

5   is prior to Fallbrook.

6    Moreover, I think that the status of the basins themselves

7   as proved here, the overlying rights that we have and the

8   riparian rights, are such that Fallbrook should be required

9   to permit that water to come down to us even if we don't put

10  it in Lake O'Neill.  That is the additional fact.

11    THE COURT:  I have that position in mind.  Let's go

12  ahead.  We are going to argue it later, I take it.

13    MR. SACHSE:  I would add only one further thought, your

14  Honor, if I may, because I think this pertinent to some of

15  my questions that are about to be asked.

16    One of the aspects of at least the appropriative feature

17  of this right is an amount.  If they have an appropriative

18  right at Lake O'Neill, that may be a right until your Honor

19  rules.  It may be a right to store 1200 acre feet.  It could

20  be phrased by your Honor in many different ways.  If, for

21  instance, they have a right to store 1200 acre feet and just

22  empty it, that doesn't give them a right to do it again.

23  Appropriative rights are limited on a seasonal basis.

24    I agree that we can't settle this all at once.  But Mr.

25  Veeder launched this inquiry this way.  I am trying to go

P 25

1　ahead with it.

2　　　　THE COURT:　Back to the objection that was made, I now

3　overrule the objection.　If you can remember the question --

4　it was a hypothetical question, what would happen if there

5　had been good runoff?

6　　　　MR. SACHSE:　I will rephrase my question your Honor.

7　　　　Q　Colonel Bowen, if you had received the runoff you

8　anticipated you would be in great shape, wouldn't you?

9　　　　A　Yes sir, we would probably have Lake O'Neill pretty

10　full by now.

11　　　　Q　Now Colonel, I want you to assume that you had never

12　drained Lake O'Neill at all last October.　What would its

13　present condition be -- assume all other conditions as they

14　are, Fallbrook's pumping, your diversions, everything else

15　as they are?

16　　　　A　Well, we would have a pretty good pond of water there

17　if we hadn't drained it at all.

18　　　　Q　It would be full, wouldn't it?

19　　　　A　Well, not quite, but it would be reasonably full.

20　　　　Q　It would be receiving inflow and letting out outflow,

21　would it not, if all other conditions were the same?

22　　　　A　No, I don't believe it would be discharging water,

23　because it was not full to start with when we discharged the

24　water from it last Fall.　I think my testimony yesterday was

25　that we discharged about a thousand acre feet.

P 26

1    Q  In other words, you would have been adding water and

2    it would have been very close to full.  I think you are correct.

3    You said you had about a thousand, and I think your total

4    intake, you testified, was about 101 acre feet, so it wouldn't

5    be quite full.  Is that right?

6        A  That is correct.

7        Q  You would still have the tules around the edge,

8    wouldn't you?

9        A  Yes sir.  We wouldn't have been able to clean that

10   swamp out from the upper end there.

11       Q  But you would have a great place for training a bridge

12   platoon?

13       A  It would be real fine, but we would have a lot of

14   complaints from the hospital about the mosquitoes.

15       Q  The lake water would have freshened somewhat by

16   reason of your hundred odd extra acre feet going in; is that

17   right?

18       A  Well, "somewhat" is de minimus.

19       Q  And the total amount of water, Colonel, available

20   to the uses of Camp Pendleton, both above and below ground,

21   would it be greater or less if you hadn't drained the lake?

22       A  It would have been about the same.

23   MR. VEEDER:  May I have the question?

24   THE COURT:  Read the question and answer back.

25       (The Reporter read the last question and answer.)

P 27

1  BY MR. SACHSE:

2      Q  Now, assuming that you had left Lake O'Neill full in

3  October, will you spell out for me some of the injuries Camp

4  Pendleton would have suffered by reason of Fallbrook's pumping?

5      MR. VEEDER:  I object to any more questions along this

6  line, your Honor.  The relief that we are asking is in futuro,

7  naturally, any injunction that is requested has to operate

8  on what follows and not on what has preceded.

9      THE COURT:  Mr. Veeder, the premise of your application

10  for an injunction is the factual situation of what has

11  preceded, and of course the relief is prospective.

12      MR. VEEDER:  That is correct.

13      THE COURT:  What is wrong with his question?

14      MR. VEEDER:  I think we are delving into something that

15  has already transpired.  What we are asking now is to prohibit

16  future pumping by the Fallbrook Public Utility District which

17  is injuring us.

18      THE COURT:  You have been making a showing of what has

19  transpired.

20      MR. VEEDER:  Yes.

21      THE COURT:  You want to make a showing of what has trans-

22  pired, but you don't want Fallbrook to make a showing of what

23  has transpired.

24      MR. VEEDER:  All I desire is to have the record show

25  that I have objected on the grounds that what we want to have

P 28

1    shown here is that if Fallbrook continues pumping we are going

2    to suffer greater injury.

3        THE COURT:  Overruled.   You put me in the position

4    where, to an observer, it would look as if I am just dead

5    against you.  I am not.  But when you object that Fallbrook

6    cannot show past situations as bearing on prospective relief,

7    and when your showing is based on past situations as a ground

8    for prospective relief, what alternative do you leave me?

9        MR. VEEDER:  I have made the record, your Honor.

10       MR. SACHSE:  Would you read the pending question Mr.

11   Swader?

12       (The Reporter read the pending question as follows:

13   "Q  Now assuming that you had left Lake O'Neill full in

14   October, will you spell out for me some of the injuries

15   Camp Pendleton would have suffered by reason of Fallbrook's

16   pumping?")

17       THE WITNESS:  Well, if I had left the lake full last

18   Fall, I believe that we would have had salt water intruded

19   in the lower basin.  As I have testified, that was one of

20   the deciding factors that the monitoring well in Ysidora

21   Narrows showed an alarming approach to the safe head of

22   fresh water necessary to keep salt water from intruding.

23   BY MR. SACHSE:

24       Q  Do you have the hydrographic charts of that well

25   available, Colonel?

P 29

1   MR. MR. VEEDER:  I would like to have the exhibit marked

2   280.

3          THE WITNESS:  I didn't hear the question.

4   BY MR. SACHSE:

5      Q  Do you have graphs or charts, a hydrograph of that

6   well available?

7      A  Yes sir.

8          MR. VEEDER:  He has asked if there was a hydrograph

9   available.

10         MR. SACHSE:  Have you got a copy?

11         THE COURT:  Exhibit 280, marked for identification.

12  BY MR. SACHSE:

13     Q  Is this it, Colonel?

14     A  Yes sir.

15     Q  What year did you testify previously you experienced

16  your greatest salt water intrusion, your greatest hazard of

17  salt water intrusion?

18     A  1951, and previously on into 1952, up until the period

19  when the heavy runoff of 1952 recharged the basin.

20     Q  In other words, am I correct in saying that as long

21  as the hydrographic line appears below the point zero you

22  are getting salt water intrusion?  Is that correct?

23     A  Actually, as long as it appears below the elevation

24  about 4½ feet above sea level.

25     Q  When was it you testified you thought you had the

P 30

1  problem pretty well under control?  In answer to his Honor's

2  question earlier you said 1956 or 1957, I believe?

3      A  I said since about 1956.

4      Q  You had the problem of salt water intrusion pretty

5  well under control.  Does the righthand end of your hydrograph

6  in the year 1961 reflect the present water elevation?

7      A  Yes.

8      Q  Is that higher or lower than it was in 1956?

9      A  Referring to Plaintiff's Exhibit 280, the elevation,

10  the monthly low elevation for the year or for January of 1961

11  is about 7.5 feet above mean sea level for the same --

12      Q  What was the highest elevation in 1956?

13      A  The highest elevation in 1956 at that well is shown

14  in the month of March 1956 as 5.2 feet above mean sea level.

15      Q  In other words, the water level was lower in 1956

16  than it is today?

17      THE COURT:  Of course, we have to take into account that

18  beginning in October or November, whichever it was, Lake

19  O'Neill was emptied into the basin.

20      MR. SACHSE:  I am going to take into account that beginning

21  in October or November Lake O'Neill was emptied into the basin

22  in a minute.

23      Q  Am I correct that the highest water level in 1956 was

24  lower than the present water level today?

25      A  Yes sir.

P 31

1    THE COURT:  The Colonel said after 1956.  That could be
2    interpreted to mean the year 1956, or it could  mean the year
3    1957 and thereafter.  The chart shows the years 1957, 1958,
4    1959 and 1960 were under fairly good control until the latter
5    part of 1960.

6    BY MR. SACHSE:

7        Q   The chart also shows, am I not correct, that at the
8    time you filled it up was 1958 when we had runoff into the
9    ocean at Ysidora?  Is that not right?  That is when it reached
10   its highest point?

11       A   The maximum elevation of the water in Well 11-5-2M4,
12   as shown on Exhibit 280 -- correction -- it is not the maximum;
13   it is the maximum monthly low, was about twelve feet above
14   mean sea level in March 1958.

15       Q   So you felt that the conditions indicated on the
16   hydrograph in October -- In other words, at that time you
17   had an elevation of about just under five feet?

18       A   About 4.7 feet for the month of October, as shown on
19   Plaintiff's Exhibit 280.

20       Q   That was a very important factor in your decision that
21   Lake O'Neill should be spilled?

22       A   Indeed it was.

23       THE COURT:  Wait a minute.  You said what?  It is a little
24   over six feet at the beginning of October.

25       MR. SACHSE:  Does the Court have the wrong hydrograph?

P 32

1    THE WITNESS:  Yes, the Court has a different one.

2    MR. SACHSE:  The same well?

3    MR. VEEDER:  Would you check that?

4    THE COURT:  I have one marked 280.  What have you got?

5    MR. SACHSE:  280.  What is your Honor's well number?

6    THE WITNESS:  There are two graphs, your Honor.  The one

7    your Honor has before you is the monthly mean elevation at

8    that well.  The one I was reading from is the monthly low

9    elevation.

10    THE COURT:  Where is the other copy for me?

11    MR. VEEDER:  Your Honor, I am having copies made of that.

12    MR. SACHSE:  Let's put this aside, if your Honor will

13    permit, until we can dig into this a little further.  Which

14    of the two are in evidence?

15    MR. VEEDER:  None of them have been offered in evidence.

16    MR. SACHSE:  Which of the two are marked?

17    MR. VEEDER:  Would you read into the record, Colonel,

18    the wells that are there?

19    THE COURT:  They have both been marked here by the Clerk

20    280.

21    MR. VEEDER:  I have asked that both of them be marked.

22    THE COURT:  You have the same number on them.

23    MR. VEEDER:  As far as I am concerned, both of those are

24    reflective of the levels at Ysidora Basin.

25    THE COURT:  Mark them 280-A and 280B.  But let's not give

P 33

1   them the same number.

2         MR. VEEDER:  The question came up as to whether there was

3   a hydrograph for Ysidora, and I gave you one -- in fact, I

4   gave you two.

5         THE COURT:  Just a mistake.  I am looking at one.  Some-

6   body else is looking at another.

7         When was the date that you started releasing water from

8   Lake O'Neill?  October or November?

9         THE WITNESS:  It was in October, your Honor.

10         THE COURT:  When?

11         THE WITNESS:  The latter part of October.  I can't recoll-

12   ect the exact date.

13         THE COURT:  Let's straighten this out.  If you want these

14   both marked 280, make one A and one B.

15         We will take a short recess.  How many other charts?

16         MR. SACHSE:  Are we going to have a recess?

17         THE COURT:  Yes.

18         MR. SACHSE:  May I ask Mr. Veeder now -- maybe he can do

19   it during the recess period.  This is difficult stuff to

20   cross-examine on.  You can't do it off the cuff and do justice,

21   and again I am going to ask that we start to comply with the

22   ten-day rule.  I am willing to cooperate and let you argue

23   your question of restraint, but I think you owe me the courtesy

24   of giving me a chance to look at these exhibits and have them

25   properly identified so that I know what I am doing and so that

P 34

1    the Court knows what I am cross-examining about.  Will you

2    bring them in and lodge them?

3        MR. VEEDER:  The question came up in regard to hydro-

4    graphs.  I offered them here to be observed.  But I will

5    withdraw those hydrographs, because I don't want Mr. Sachse

6    to have any basis for saying that we shouldn't get a ruling

7    on this matter now.

8        MR. SACHSE:  I don't them withdrawn.  I want to see them.

9        THE COURT:  I want the hydrograph.  Why don't you lodge

10   all the documents you have in the ordinary course?

11       MR. VEEDER:  In the ordinary course, I will be perfectly

12   candid with your Honor, I had the Colonel present these during

13   the day for me to view.  I see no reason why whatever, though,

14   in regard to this matter, for even introducing those into

15   evidence, because he can testify orally to why this was done.

16   I thought the hydrograph would be helpful to you.  I do not

17   want this matter delayed by reason of the ten-day rule.  I

18   don't believe these exhibits are essential to the decision on

19   this matter.  I think it is highly important.  I think we have

20   an aggravated situation which is causing us irreparable damage.

21   I don't believe the ten-day rule should be invoked here to

22   prevent a ruling.

23       MR. SACHSE:  I don't want to invoke it.  I want them now.

24   I will took them over during the recess and at noon.

25       MR. VEEDER:  I have no other exhibits to offer in regard

P 35   1    to this case.

2    MR. SACHSE:  Then will you give me a copy and put them

3    in here, so we will know it.  If the principal of injury is

4    salt water encroachment, I believe I have a right to know

5    what the status of salt water encroachment is.

6    MR. VEEDER:  You certainly do.  It was an error.  I was

7    trying to help your Honor when I offered these.  I shouldn't

8    have done it.  I should have let him testify orally on it.

9    MR. SACHSE:  You don't want the Court to have the facts.

10   Bring in the exhibits and let's see them.

11   THE COURT:  I asked the Colonel if he had well levels in

12   the lower basin.

13   MR. VEEDER:  All right, your Honor, I am sorry if there

14   was any difficulty caused by it.  I am very sorry.  I will take

15   care of it.

16   THE COURT:  Get them marked properly.

17   Take a recess and proceed after the recess.

18   (Morning recess.)

19   (See next page)

20

21

22

23

24

25

Tape
B1

1    MR. VEEDER:  Your, Honor, Colonel Bowen has a statement

2    to make with regard to the calculated quantities of water

3    entering Lake O'Neill.

4    MR. SACHSE:  What is that?

5    MR. STAHLMAN:  I didn't hear that, Mr. Veeder.

6    MR. VEEDER:  Colonel Bowen has made a recalculation of

7    the quantity of water going into Lake O'Neill, and I asked

8    him to correct the record from that point.

9    MR. STAHLMAN: I am sorry.  I didn't hear you.

10   THE CLERK:  Just a moment.  I have numbered these two

11   Exhibits. The graph showing the monthly low measurements have

12   been marked Exhibit 280-A, and the monthly mean measurements

13   have been marked 280-B.

14
15   (The graphs referred to were
     marked Plaintiff's Exhibits
16   280-A and 280-B, for Iden-
     tification.)

17   THE COURT:  All right, Colonel.

18   THE WITNESS:  Your Honor, I made an error in my calcula-

19   tion, and one of my young engineering officers picked it up

20   for me here.

21   In response to Mr. Sachse's request as to how many of

22   the 201.5 acre feet of water diverted during the months of

23   November and December, 1960, and January and February of 1961,

24   by Fallbrook, -- how much of that would have gone into Lake

25   O'Neill, and my response to him was 198 acre feet.

1    My error in calculation is entered into the record, and

2    I would like to correct that to show that of the 201.5 acre

3    feet only about 127 would have entered Lake O'Neil, and that

4    added to the water presently in the lake would have brought

5    the elevation of the lake up to peak height 4.4 feet, and

6    the area of the lake at 4.4 feet would be about 78 acres, as

7    shown on Plaintiff's Exhibit 88.

8        THE COURT:  Where would the other waters go?  Where

9    would be the loss from 201 to 127?

10       THE WITNESS:  Your Honor, Mr. Sachse asked me yesterday

11   if I could estimate the transmission losses through the reach

12   of the river below the Fallbrook diversion, and I responded

13   at that time that the best measure of loss would be between

14   the Fallbrook gage on the Santa Margarita River and the O'Neill

15   ditch gage.  For the period calculated since then for  the

16   period of 26 January through 28 February, 1961, there were

17   126.5 acre feet discharged at the Fallbrook gage below Fall-

18   brook's diversion point, and for that same period of time

19   there were 76.7 acre feet of water measured at the O'Neill

20   ditch gage.

21       Taking the diversion by the Navy Ammunition Depot for

22   that period at 5 acre feet, the natural losses from the stream

23   between the Fallbrook Gage and the O'Neill gage then would

24   figure about 37%, so I assume that 63% of the water passing

25   the Fallbrook gage reached the O'Neill ditch gage in the

     period of 26 January through 28 February , 1961.

Take B2
P 1

1    THE COURT:  How does it work?  At the Fallbrook gauge

2  only the surface flow is checked, is it not?

3    THE WITNESS:  That is correct, your Honor.

4    THE COURT:  You don't check the underground flow?

5    MR. VEEDER:  May I interrupt for just a moment, your

6  Honor?  I don't think your question was responded to, your

7  Honor.  You asked where the rest of the water went.  Wasn't

8  that the question?

9    THE COURT:  Yes.

10    MR. VEEDER:  And I was hopeful that the Colonel would go

11  on and explain where the water did go that was the loss at

12  the point of measurement.

13    THE COURT:  The loss was 37% of the surface water?

14    THE WITNESS:  Yes sir.

15    THE COURT:  Where does it go?

16    THE WITNESS:  If I can respond to your question about

17  the gauge and carry on to the principal place where the water

18  loss occurrs, the alluvial fill at the gauges is very shallow,

19  or there is a very limited underflow at that point, and it

20  remains shallow on down through the Santa Margarita Canyon

21  until about the confluence of De Luz Creek with the Santa

22  Margarita River, and there the alluvium deepens substantially,

23  and the principal losses in stream flow are encountered in

24  the reach below the Camp De Luz Ford and the O'Neill ditch

25  gauge.

P 2

1    THE COURT:  Then there is some loss, I suppose, due to

2    evaporation and the plants, the phreatophytes, and so forth,

3    but the major part of it is water which ceases to be surface

4    flow and goes into the alluvium?

5    THE WITNESS:  That is correct, your Honor.

6    THE COURT:  Does the Clerk have Exhibit 29 --

7    MR. SACHSE:  -G?

8    THE COURT:  Is it -G?

9    MR. SACHSE:  I think it is.

10   THE WITNESS:  I have -F, -G, and -K, your Honor.

11   THE COURT:  I have -K, but I never had the ones below

12   -K, and I wanted to see how the thing operates below.

13   (The documents referred to were handed to the Court.)

14   THE COURT:  29-F is next to -K, isn't it?

15   THE WITNESS:  Yes, your Honor.

16   THE COURT:  That is this chart here?

17   THE WITNESS:  29-F shows where the Santa Margarita River

18   channel and the easterly boundary of the Naval enclave coin-

19   cide.  29-F shows the gauging stations on the Santa Margarita

20   River near Fallbrook, which is within the --

21   MR. SACHSE:  It has been moved, hasn't it, Colonel Bowen?

22   It is no longer correct on that exhibit, is it?

23   THE WITNESS:  The location, as shown on Exhibit 29-F is

24   the correct location at the Fallbrook-De Luz road ford, or

25   just above that ford.

P 3

1    THE COURT:  It is also shown on 29-K.  That is the old

2    gauging station, I take it, up here, upstream?

3    MR. SACHSE:  Yes, the original.

4    THE WITNESS:  That is the older station, and 29-K, your

5    Honor, indicates that station as being discontinued June 22,

6    1955.  New station installed 1.7 miles downstream.

7    THE COURT:  Yes, I have that.  Then we will have to go

8    to -G.

9    THE WITNESS:  Yes, your Honor.  29-G joins 29-F on the

10    south.

11    THE COURT:  So the flow from the present gauging station

12    on down through 29-F is the area of probably a small amount

13    of alluvium?

14    THE WITNESS:  That is correct, your Honor.

15    THE COURT:  Then down near where De Luz comes in, you

16    get into this larger amount?

17    THE WITNESS:  The greater depths of alluvium, your Honor.

18    MR. VEEDER:  How is that related to the upper basin,

19    Colonel Bowen?  Is that the upper basin?

20    MR. STAHLMAN:  I didn't hear you, Mr. Veeder.

21    MR. VEEDER:  I said, is that a part of the upper basin?

22    MR. SACHSE:  He so testified yesterday.

23    MR. VEEDER:  That is what I want.

24    THE COURT:  29-G does not quite take us to the ocean?

25    THE WITNESS:  No, your Honor, it does not.

P 4

1    THE COURT:  All right.  That answers my questions.

2    MR. SACHSE:  May I proceed, your Honor?

3    THE COURT:  Yes.

4  BY MR. SACHSE:

5    Q  Back, Colonel Bowen, to the decision to drain the

6  lake.  Were the legal implications of that decision considered

7  with Mr. Veeder, or others?

8    A  Mr. Veeder was not consulted when the decision was

9  made to discharge the water from Lake O'Neill in 1960.

10   Q  Now, back to the Ysidora Basin.  If I recall correctly,

11  your testimony and that of Mr. Cannon, who in 1957 or '58

12  took this matter up, it appeared at that time, or prior thereto

13  -- I will withdraw that -- it appeared that prior to 1956

14  there had been wells in the Ysidora Basin pumping water for

15  agricultural purposes for the Stuart and South Coast Mesa;

16  is that not correct prior to 1956?

17   A  I will say that is correct without ascribing it to

18  Mr. Cannon.

19   Q  I am not sure who said it, but is that a fact?

20   A  That is a fact, yes sir.

21   Q  Then in 1956, am I not correct in saying that a

22  number of those wells were discontinued, stopped pumping, --

23   MR. VEEDER:  In Ysidora?

24  BY MR. SACHSE:

25   Q  -- in Ysidora Basin, those wells in Ysidora?

MARIE G. ZELLNER, OFFICIAL REPORTER

P 5

1    A   Yes, I believe we discontinued pumping about two wells

2   in the lower Ysidora ground at that time.

3    Q   Have you resumed pumping from any of those wells since

4   then?

5    A   No.  As a matter of fact, Mr. Sachse, we have dis-

6   continued yet another well since that time, and moved the

7   pumping for irrigation water further upstream.

8    Q   But you are still pumping from the Ysidora Basin for

9   irrigation purposes, -- right?

10    A   Yes sir.

11    Q   And that water --

12   THE COURT:   That is a proper riparian use.

13   MR. SACHSE:   Is it, your Honor?

14   THE COURT:   On the south Mesa.

15   MR. SACHSE:   That is my next question.  Where is Exhibit

16   151, or Exhibit 150?

17   THE CLERK:   Here it is.

18   MR. SACHSE:   May I have both of them, please.

19   (The documents referred to were handed to counsel.)

20   BY MR. SACHSE:

21    Q   With reference to the United States Exhibit 151-A,

22   irrigation use, you showed that in 1960 you pumped a total of

23   1,110 acre feet for irrigation; is that correct?

24    A   Yes sir.

25    Q   And that 680 acre feet of that total went outside the

P 6

1  watershed; is that correct?

2      A  Yes sir.

3      Q  Where did that go, -- the irrigation water?

4      A  Primarily on the Stuart Mesa.  That water that was

5  pumped outside of the watershed I believe almost wholly went

6  to the Stuart Mesa.

7      Q  And it was wholly obtained from wells in the Ysidora

8  Basin, was it not.

9      A  In the water year 1960 we moved the wells supplying

10  Stuart Mesa upstream, that is, I should say, we moved the

11  contractor to wells located upstream, actually in the lower

12  Chappo Basin.  That is where the Stuart Mesa water is pumped

13  now.  The only water pumped in Ysidora at the present time

14  for irrigation use is on South Coast Mesa.

15      Q  But when did this move take place?

16      A  The wells were completed and put into production

17  about September of 1960, as I recall it.

18      Q  So treating September of 1960, -- that is last

19  September; is that right?

20      A  Yes sir.

21      Q  So that during the irrigation season last summer your

22  Stuart Mesa irrigation was wholly from Ysidora Basin?

23      A  Yes sir, it was largely from the Ysidora.

24      Q  Largely or wholly, Colonel?

25      A  Well, I would say largely, because there was a period

P 7

1    of test pumping those new wells, and at times some water

2    pumped from them was introduced into the system.  They were

3    tested for a period of several months before the wells were

4    accepted from the contractor.

5    THE COURT:  My figures show here from Exhibit 151-A that

6    860 feet went out of the watershed, and that went to Stuart

7    Mesa?

8    MR. SACHSE:  680, your Honor, and not 860.

9    THE COURT:  680?

10    MR. SACHSE:  680 as against 430, your Honor.

11    THE COURT:  That went to Stuart Mesa, and the 430 went

12    to South Mesa?

13    THE WITNESS:  Yes sir.

14    THE COURT:  And the South Mesa is in the watershed?

15    THE WITNESS:  Some of this 430, your Honor, inside the

16    watershed went to Stuart Mesa.  There is a very small part

17    of Stuart Mesa inside the watershed, so that the 430 did not

18    entirely go to the South Coast Mesa.

19    BY MR. SACHSE:

20    Q   But all of South Coast is within the watershed?

21    A   All of the irrigated land on the South Coast Mesa is

22    within the Santa Margarita watershed.

23    THE COURT:  Now, who makes the decision as to where the

24    water should be pumped from these sub-basins to Stuart Mesa?

25    Is that your authority?

P 8

1    THE WITNESS:  Well, there is again a command decision.

2  I make a recommendation each year to the Commanding General,

3  firstly considering our military requirements, and if we have

4  any water over that needed for military use, I recommend that

5  it can be made available for irrigation use.

6    THE COURT:  Have you pointed out to the Commanding

7  General that under California Water Law unless you have an

8  appropriative or prescriptive right you can't make a riparian

9  use of water outside the watershed?

10    THE WITNESS:  Yes sir, I have done that many times.

11    THE COURT:  What does the Marine Corps do?  Enter into

12  contracts with farmers up on Stuart Mesa?

13    THE WITNESS:  Yes sir, lands up there are leased,

14  generally, I believe, on the basis of sealed bids, the highest

15  bid being accepted, and the water is pumped by a contractor

16  subject to the control of the Camp Pendleton authorities, of

17  course.

18    THE COURT:  What kind of revenue does the Marine Corps

19  get from these farmers on Stuart Mesa?

20    THE WITNESS:  The Marine Corps gets no revenue, sir.

21  The income all goes into the general fund.

22    THE COURT:  Do you know what that revenue amounts to,

23  that these contracts provide?

24    THE WITNESS:  I don't know in detail, your Honor, just

25  what the current rental for that land is at the present time,

P 9

1   but I do know that by about 1951 or '52 there had been

2   sufficient revenue from rental of lands to more than pay for

3   the initial cost of acquisition of the Camp.  It is a fairly

4   substantial amount and runs into six figures a year.

5       THE COURT:  Six figures.  That would be about ten

6   thousand to ninety thousand?

7       THE WITNESS:  Yes sir, one hundred thousand.

8       THE COURT:  One hundred thousand.  How many acres in

9   the South Coast Mesa?

10      THE WITNESS:  Well, the area of irrigated land up there

11  varies with the water supply made available.  I would say

12  generally not more than a third of the lands that are leased

13  are irrigated.  Farmers farm very intensively up there, your

14  Honor.  They grow flowers, vegetables, and since it is a

15  frost free area, there is generally a crop in the ground year

16  around somewhere on the Mesa.

17      (See next page.)

18

19

20

21

22

23

24

25

Tape
B 3

1    THE COURT:  This revenue which you say up until 1951 or

2    1952 was  enough to pay for the initial acquisition was both

3    from the irrigated and non-irrigated land?

4    THE WITNESS:  Yes, but the revenue from non-irrigated

5    land is very small.

6    THE COURT: All right.

7    BY MR. SACHSE:

8    Q  Colonel Bowen, with reference now to Exhibit 151-A

9    do I read there -- .  I withdraw that.  Taking 150-A and 151-A

10   together, they both refer to the water year, do they not?

11   A  Yes, sir, as indicated on those Exhibits the years

12   are water years.

13   Q  So is it a correct statement to say that the total

14   ground water extractions of the Marine Corps for all purposes

15   for the water year 1960 would be the total of 150-A plus

16   151-S?

17   A  That is correct, from the Santa Margarita River.

18   Q  Yes, from the Santa Margarita River.  In other words,

19   your total extractions for 1960 were 4640 plus 1110 acre feet;

20   is that right?

21   A  That is right.  That would add up to 5750 acre feet.

22   Q  And of the total extraction --

23   THE COURT:  What were those two figures again?  4640?

24   MR. SACHSE:  For military purposes, and 1110 irrigation

25   purposes, total extractions.

R 5

1      THE COURT:  That made a total of what?

2      MR. SACHSE:  5750 acre feet.

3      Q  And of that total 2600 acre feet of the military use

4  went outside the watershed?

5      A  Yes, sir.

6      Q  And 680 of the agricultural use went outside the

7  watershed?

8      A  Yes, sir.

9      Q  Or a total of 3280 acre feet outside the watershed?

10     A  Yes, sir.

11     Q  That is, I think, eyeballing my arithmetic, better

12  than 60% outside of the watershed -- right?

13     A  No, sir.

14     Q  No?  How close?

15     MR. VEEDER:  What was it?  5750 total?

16     MR. SACHSE:

17     Q  5750 total and 3280 outside.

18     A  About 57%, Mr. Sache.

19     Q  So if Fallbrook had not diverted during the past four

20  months, you would have gotten back about 127 acre feet you

21  had exported through the watershed?

22     MR. VEEDER:  I object to that, your Honor. There is

23  absolutely no basis for that conclusion whatever. There is no

24  foundation for it, and we are in that situation --

25     THE COURT:  It is argumentative.  He is pointing out

1    that there have been 126 acre feet obtained, and that you

2    exported 3280 feet.  It is argumentative, and the objection

3    is sustained.

4        MR. SACHSE:  I will withdraw it, your Honor.

5        THE COURT:  This water year of 1960, that starts in October,

6    or in September?

7        THE WITNESS:  It starts on the 1st of October, 1959, and

8    runs through the 3d of September, 1960, your Honor.

9        BY MR. SACHSE:

10       Q  Colonel Bowen, do you in your records -- you, as a

11   part of the Office of Ground Water Resources, maintain ground

12   water contour maps showing ground water fluctuations in the

13   several sub-basins of the period?

14       A  No.

15       Q  You do not?

16       A  I do not.

17       Q  Have you prepared for this litigation at any time maps

18   showing the fluctuations of the ground water in the several

19   basins?

20       A  I believe that all that work was done by Mr. Works and

21   his associates.

22       Q  You have nothing of that sort at all in your records?

23       A  I do not maintain any data in that form.  I have all

24   of the basic data necessary to make such maps, however.

25       Q  The reason for the question -- I will withdraw that.

1    With reference to Exhibit 280-A --

2         THE COURT:  Do you have a copy?  Oh, we don't have copies,

3    do we Mr. Clerk?

4         THE CLERK: That is right.

5         BY MR. SACHSE:

6         Q  Exhibit 280-A tells us the monthly low of the well in

7    question, doesn't it?

8         A  That is correct.

9         Q  It does not purport  then to indicate the average

10   static water level at that well, does it?

11        A  280-A, Mr. Sachse, was not prepared for a  Court Ex-

12   hibit.  This was prepared so that I can better control and

13   manage the extraction of water from the ground water basins

14   and the monthly low is a critical point which is important to

15   me at the 11/5-2N4 well, which monitors the level of the hy-

16   draulic barrier at the Ysidora Narrows.

17        Q  But this Exhibit, as I understand, or no exhibit that

18   you have presently available can show us how the average

19   static water level in Ysidora Basin today, compares with the

20   static water level in 1956.

21        A  I think the other graph of 2N4    there shows the

22   monthly mean elevation of water at that well.

23        Q  Of which well?

24        THE COURT:  That is 280-B.

25        BY MR. SACHSE:

MARIE G. ZELLNER, OFFICIAL REPORTER

R 8

Tape
B 4

1      Q   Of wells 2N4?

2      A   That is Exhibit 280-B.  This is the same well as on

3   280-A, and this shows the monthly mean static water level at

4   the well differentiated from the monthly low, as shown on

5   280-A.

6      THE COURT: That "mean" would come pretty close to average,

7   wouldn't it?

8      THE WITNESS: Yes, sir.  We make calculations of the

9   static water level at this well at least weekly, and the mean

10  elevation for the month would be the  average of all of the

11  observations made during the month.

12     THE COURT: Then it is an average, and it is not a mean?

13     THE WITNESS:  Well, the mean is an average, your Honor.

14     THE COURT:  Oh, not necessarily.

15     MR. SACHSE: I have heard this argument before.  I will

16  sit down.

17     THE COURT: But if you tell me that is an average, that

18  is all right.  But a mean figure is not necessarily an average

19  figure.  Is that right?

20     MR. VEEDER: There is a difference between a median and

21  mean.  Is it the median that you were talking about?

22     THE WITNESS:  No, I am not talking about the median.   I

23  am talking about the mean.

24     THE COURT:  Is a mean an average figure?

25     MR. GIRARD:  Mr. Illingsworth says not always.

1    THE COURT: It could be, but not necessarily.

2    THE WITNESS: In this instance, your Honor, the monthly

3    mean is the average of all observations made of the static

4    water level at this well.

5    BY MR. SACHSE:

6    Q  Now, however, that is a well which is located just

7    about at the site of the Ysidora  Gage, is it not?

8    A  Yes, sir.  It is shown on Plaintiff's Exhibit 280-B

9    under the well number 11/5-2N4.  It locates the well, and

10   states as follows:

11   "Located at   Ysidora Narrows 100 feet downstream from

12   Dike No. 1, just across from the Ysidora Stream Gage, and

13   2½ miles upstream from the Pacific Ocean."

14   Q  And you extract no water for any purpose below Well

15   2N4, do you, downstream?

16   A  We do not.

17   Q  Now, am I correct in assuming that there is a seaward

18   hydraulic gradient extending from the upper basin through the

19   Chappo and Ysidora Basins to Well 2N4?

20   A  Do you mean at the present time, Mr. Sachse?

21   Q  Yes.

22   A  Today?

23   Q  Yes.

24   A  I would respond affirmatively, then, to your question.

25   Q  So that the average elevation of water at Well 2N4

1    above mean sea level in -- what am I at?  Is that February

2    there?

3        A  Yes, sir.

4        Q  In February --

5        A  Of 1961.

6        Q   -- of 1960 was how many feet?

7        A  That is February, 1961, Mr. Sachse.

8        Q  In February, 1961, it was how many feet?

9        A  About 7.6 feet.

10       Q  And all other wells from which you pump would have

11   an average elevation above mean sea level above that?

12       A  Speaking of static level now, I presume, Mr. Sachse?

13       Q  Static, yes.

14       A  The answer is affirmative.

15       Q  So you consider that today you are experiencing salt

16   water intrusion in the Ysidora Basin?

17       A  No, sir, I do not.  I have attempted to control the

18   situation so we do not get it.

19       Q  I think you have done an outstanding job, Colonel.

20       A  Thank you, sir.

21       Q  And do you consider that -- I withdraw that.

22       How much would the water level have to drop in Ysidora

23   Basin before you would start to experience salt water intru-

24   sion?

25       A  Well, the critical point at Well 11/5-2N4 is 4½ feet

R 11

Tape
B 5

above mean sea level.  It takes about that differential ele-
vation in order to keep the heavier sea water from flowing
back into the basin.

Q  In other words, if the level dropped three feet from
where it is now, you would be worried; is that correct?

A  Yes, sir, I would begin to get worried long before
that  though, Mr. Sachse.

Q  How much water would you have to take out of Ysidora
Basin to make it drop 3-*- some feet, -- 3.7 feet?

A  Well, it would depend a lot on where I took it out.
If I pumped fairly close to this well, I could take very
little out.

Q  From your existing pumping wells?

A  I could take out more if I took less at a time over
a longer period of time than if I took a large amount in a
short period of time.

Q  Well, what are you talking about if you did it in a
short period of time?

THE COURT:  It would be a very difficult thing to estimate,
I take it.

MR. SACHSE:  Well, we are fighting over 127 acre feet of
water that Fallbrook is using, and I am curious whether he
could stand a reduction of 100 acre feet or 1000 acre feet,
or how much of a reduction in acre feet of water in storage
you can stand without trouble.

1    MR. VEEDER:  Your Honor, the more I think of it: I think

2    if he wants to put a hypothetical question, he should frame it

3    properly and fit all the aspects together: for example, Lake

4    O'Neill, when Lake O'Neill was full, when Lake O'Neill was

5    empty, the quantity of water coming down there; and the 127

6    acre feet, as I said to your Honor before, is something that

7    has transpired in the past, and our sole interest now is to

8    protect ourselves in the future.

9        THE COURT: I think that the question is too broad, and

10   that you will agree.

11       If you took 100 acre feet, if this was possible in twenty-

12   four hours out of this particular controlled well, and we all

13   agree that you undoubtedly have --

14       MR. SACHSE:  But that wasn't my question, your Honor.

15       THE COURT:  But your question is so broad.  What period

16   do you mean?

17       MR. SACHE:  All right.  I will ask it specifically.

18       THE COURT: If you want to take so many acre feet out

19   over a period of three months, and evenly spaced, or how do

20   you mean to take it out?

21       MR. SACHSE: Permit me to phrase it this way, your Honor.

22       THE COURT: All right.

23       BY MR. SACHSE:

24       Q  If you withdrew from the Ysidora Basin wells which

25   pump irrigation water -- do I make myself clear -- just the

1    wells that pump irrigation water?

2        A   Yes, sir, I am with you.

3        Q   If you withdrew from those irrigation wells as they

4    exist today the full 1960 irrigation load, 680 acre feet in

5    the rapidest time you could do it with the pumps you have on

6    the wells, what would the effect be on your salt water intru-

7    sion?

8        A   I would probably be in trouble next week.

**B 6**

9        Q   If you withdrew the same amount of water from your

10   military purpose wells in Chappo Basin, how soon would you be in

11   trouble if you took it out as fast as you could?

12       A   680 acre feet?

13       Q   Yes.

14       A   If I took it out of Chappo Basin, I don't think it

15   would hurt me at all.

16       Q   And if you took it out of Upper Basin, 680 acre feet

17   as fast as you could get it, would it have any effect on your

18   salt water intrusion, -- Immediate effect?

19       A   I don't think it would have any immediate effect.

20       Q   But you do feel, Colonel Bowen, that if you had had an

21   additional 127 acre feet in the Upper Basin during the last

22   two months, that your salt water intrusion situation would be

23   better?

24       A   I think that my situation with Lake O'Neill would be

25   better.   I improved the salt water intrusion situation last

1  fall when I discharged the water from Lake O'Neill.

2      Q  But the availability of an additional    127 acre

3  feet of water over the past four months would have had no

4  effect upon your salt water intrusion problem would it?

5      A  It might be very helpful next fall when I am faced

6  with the same problem.

7      MR. SACHE: I would like the witness to answer the ques-

8  tion.  I am asking about today?

9      MR. VEEDER: He has answered it.

10     BY MR. SACHSE:

11     Q  I will repeat it again, and I don't want to be diffi-

12  cult, but you stated that the extraction of 680 acre feet

13  from the Upper Basin would have no effect; is that correct?

14     A  That is correct.

15     Q  But you are insisting that the introduction of 127

16  acre feet has an effect?

17     A  No, Mr. Sachse, I wouldn't insist on that.  I said

18  it would be very helpful next fall.

19     I will go on and give you your answer.  It would not

20  affect us today, but  I think we are entitled to have it for

21  next fall.

22     Q  If you had received this additional water,  127 acre

23  feet, how much would your water table in the Upper Basin have

24  gone up, if you received it without putting it into Lake

25  O'Neill?

A   Well, the losses in transit of that 201.5 acre feet which the Fallbrook District diverted during that period would have primarily gone into the Basin.

Q   Let me rephrase the question to you.  You pointed out an error I made.

Let's say you got the whole 200, and let's assume all the losses in transit were percolation and forget transpiration and evaporation.   Just suppose another 200 additional acre feet over the past four months would have passed into the Upper Basin.  How much higher would your water level be?

A   At which point?

Q   At any measuring well.

A   The elevation of the water plane would increase the greatest amount, of course, where the fill is more constricted laterally.   Then as it fairly widened out and the water flowed downstream underneath the surface of the ground, it would have a continuing lessening effect on the elevation of the ground water level.

Q   If you had received 200 acre feet additional water running down across the Upper Basin during the past four months, what effect would it have had on the water levels shown for Well 7J1 on Exhibit 279?

A   If the transportation losses occurred in an area quite remote from Well 10/4-7J1, the effect therefore would be delayed.   10/4-7J1 is in the broader portion of the Upper

1  Valley or Upper Basin.  It is difficult to state exactly what

2  --

3      Q  Would I be correct in saying that if you had had that

4  additional 200 acre feet spread over the past four months you

5  would not expect to see any difference?

6      A  There wouldn't be very much difference --

7      Q  Today?

8      A  -- in this well, that is correct, at Well 4/10-7J1.

9      Q  Colonel Bowen, you stated yesterday to the Court, I

10 believe, that you agree we are in an extremely dry year.  I

11 think you said the driest of your experience; is that right?

12     A  That is correct.

13     Q  Now, Colonel Bowen, I want to ask you again the ques-

14 tion I asked you earlier.  I would like you to tell the Court

15 in your own words, regardless of rights, assume that Fallbrook

16 had no rights whatsoever, please, and assume that the Navy

17 have all rights, what injuries, and spell out to the Court,

18 if you please, the United States has suffered today by reason

19 of Fallbrook's diversions of 201 acre feet in the past four

20 months.

21     A  The primary injury I would say at the present moment

22 is the shorthage of about 127 acre feet of water in Lake

23 O'Neill which we could have had if Fallbrook had not diverted

24 that water, and, of course, the additional increment in the

25 ground water basin.  That would be taking the total of surface

1   storage in  ground water storage, it would be fairly close to

2   the 201.5.

3       MR. SACHSE: I think I am finished.  It is 12:00 o'clock,

4   or five minutes to, and if you care to adjourn now I think we

5   can save some time if you would bring us back early.  I would

6   like to review my notes.  I might have just one or two more

7   questions, but I would like to review my notes.

8       THE COURT:  All right.  We will take an adjournment until

9   2:00 o'clock.

10       (Whereupon at 11:55 o'clock A. M., an adjournment was

11   taken until 2:00 o'clock P. M., the same date.)

Take C1

P 36

1    SAN DIEGO, CALIFORNIA, Wednesday, March 15, 1961, 2:00 P.M.

2        MR. SACHSE:   I have no further questions of Colonel

3    Bowen at this time, your Honor.

4        THE COURT:  Mr. Girard?

5        MR. GIRARD:  I have just a couple of questions your Honor.

6                    CROSS-EXAMINATION

7    BY MR. GIRARD:

8        Q  Colonel Bowen, concerning U. S. Exhibit 279, it is

9    true, isn't it, that if this water had been stored in Lake

10   O'Neill, had just gone on down the stream, some of it at

11   least would have recharged the basin?

12       A  May I see Exhibit 279, Mr. Girard?

13       Q  In other words, Colonel, here in this month of April

14   1958 I understand this reports when you released a large

15   amount of water out of Lake O'Neill?

16       A  No sir.  The month of April 1958 shows the natural

17   runoff from the Santa Margarita River and the recharge of

18   the Upper Basin --

19       MR. VEEDER:  Don't you have a copy, your Honor?

20       THE COURT:  Yes, I have one of Exhibit 279.

21       THE WITNESS:  --subsequent to that natural runoff.  In

22   March and April 1958 was when we had the above normal preci-

23   pitation and runoff in the Santa Margarita River.

24   BY MR. GIRARD:

25       Q  And when you use the water in Lake O'Neill when you

P 37

1   recharge your basin with it, as you did in November or October

2   of this year, you put it all at one time or within a relatively

3   short period of time, you release it all out?

4        A  Yes sir, that is what I did in October and November

5   1960.

6        Q  What I am saying is, if you didn't store it in Lake

7   O'Neill it still would have gotten in the basin, a substantial

8   portion of it, just by going down the stream?

9        A  Well, the water in 1959 and 1960 that was diverted

10  into Lake O'Neill, had it not been diverted to that surface

11  storage unit, would have got into the underground basin.  Yes

12  sir.

13       Q  That is what I mean.

14       THE COURT:  Of course, this depends, Mr. Girard, on how

15  the water is husbanded in Lake O'Neill.  If you had, as you

16  had in 1958, large flows and you put water in Lake O'Neill,

17  the releasing of that water or the failure to store it would

18  not have added anything, because the water went into the ocean.

19       MR. GIRARD:  That is right.

20       THE COURT:  On the other hand, if you stored water in

21  Lake O'Neill at times when there was water available in the

22  stream, which might not otherwise go into recharge, it could

23  be released in dry periods, which definitely would save that

24  amount of water for the basins.

25       MR. GIRARD:  Yes, certainly, if the basins are full it

P 38

1    would have run out.  But assuming that the basin is not full,

2    it would have recharged it.

3        Q  Now, one other point that I wanted to ask you, Colonel.

4    As I understand it, when you released this water in October

5    and November 1960 out of Lake O'Neill, you released it for

6    the purpose of getting it to the Lower Basin in regard to the

7    salt water intrusion; is that correct?

8        MR. VEEDER:  Chappo Basin.

9        MR. SACHSE:  Chappo Basin.

10       THE WITNESS:  Yes sir.  It was my intent to get it as far

11   down the valley as I could in order to add it as much as

12   possible to the hydraulic barrier at Ysidora.

13   BY MR. GIRARD:

14       Q  Will the necessity of that type of release be lessened

15   by the fact that you now are not pumping from Ysidora Basin?

16       A  I testified, Mr. Girard, that we are at the present

17   time pumping water from the Ysidora Basin to the South Coast

18   Mesa.

19       Q  Didn't you also testify, Colonel, that you had stopped

20   a couple more pumps and gone up in the middle of the basin?

21       A  I did.  I said that we had moved some of the draft

22   for irrigation upstream into Lower Chappo.

23       Q  Would you expect, as a result of this charge, that the

24   future problem of salt water intrusion would be lessened,

25   Colonel?

P 39

A   It will be lessened to a degree by the well that still remains in operation to provide irrigation water out of the Ysidora.   The South Coast Mesa has a decided effect on the water level in the Ysidora Narrows.

MR. GIRARD:   That is all.   Thank you.

THE COURT:   Colonel, there was some cross-examination of you by Mr. Sachse with reference to Exhibit 279, in which you were asked about phreatophytes and other plant life that grow where the water level in the basins is at various levels. My inquiry is, has it been the practice of the Marine Corps at Pendleton in the areas overlying the three sub-basins periodically to get rid of these phreatophytes?

THE WITNESS:   We have a very vigorous phreatophyte control program on that area, your Honor.

THE COURT:   What does the program consist of?   What do you do?

THE WITNESS:   We have an engineering battalion, a pioneering battalion and an artillery regiment, your Honor, each of whom desire to have some bulldozer work in order to train operators.   So they have assigned bulldozers -- TD18's and TD 24's -- and operators, and with this equipment these people physically uproot the phreatophytes and pile them in windrows in the margin of the valley.

THE COURT:   It is done on a periodic basis?

THE WITNESS:   Yes sir.

MARIE G. ZELLNER, OFFICIAL REPORTER

P 40

1    THE COURT:  Do you have some supervision over the control

2    of phreatophytes?

3    THE WITNESS:  I lay out the program, your Honor, and

4    designate the areas where this control will be exercised, and

5    then the actual removal is done on a training basis and

6    generally as troops and equipment are available.

7    THE COURT:  As the program is carried out, is it efficient

8    on a periodic basis, so that you do generally control phrea-

9    tophytes over these basins?

10   THE WITNESS:  Yes sir.  I would say it is an efficient

11   program.  Every year we have crews working on some portion

12   of the valley in there.

13   THE COURT:  Mr. Veeder.

14   MR. VEEDER:  Is that all the cross-examination?

15   THE COURT:  Mr. Stark?

16   Mr. Grover?

17   Redirect.    REDIRECT EXAMINATION

18   BY MR. VEEDER:

19   Q  Colonel Bowen, would you state whether it necessarily

20   follows that if the basin is full to an elevation within ten

21   feet of the surface that phreatophytes do grow and permeate

22   the surface of the basin area -- speaking of the entire basin

23   area now?

24   A  I don't believe I captured your question, Mr. Veeder.

25   Q  I'll start again.  Would you state, Colonel Bowen,

P 41

1    what is the effect of the higher water elevation near the

2    surface of the ground upon the growth of Bermuda grass and

3    other grasses in the area?

4         A   As the zone of the ground water body approaches the

5    surface under natural conditions, it would stimulate the

6    growth of plants which draw water from that source.

7         THE COURT:   Ask him to read your mind, Mr. Veeder.

8         MR. VEEDER:   It is not necessary, your Honor.

9         Q   Would you describe the sump and construction work at

10   the point of diversion of the Fallbrook Public Utility District's

11   pump that takes water out on the south side of the Santa

12   Margarita?

13        A   The District has built a rather crudely constructed

14   earth dike comprised of the stream washed materials, sort of

15   an L-shaped structure, providing a pool of water in which

16   they operate a deep well turbine type pump powered by a large

17   horsepower motor -- two motors and two pumps, I believe.

18        Q   Would you describe the channel from which the so-called

19   Sawday pump operates?

20        A   The so-called Sawday pump, which is north and a little

21   east of the main Fallbrook pump, diverts or pumps from the

22   water that runs around the end of the earth-filled structure

23   or sand-filled structure that I have previously described and

24   takes water from that stream flow.

25        Q   Would you compare the area in which the Fallbrook

P 42

1    pumps are situated from the standpoint of phreatophytic losses,

2    evaporation losses, with the remainder of the stream or down

3    to the point of diversion of Lake O'Neill?

4        A   The canyon bottom in the vicinity of the Fallbrook

5    and Sawday diversions is rather heavily overgrown with

6    phreatophytes, and that condition is generally true on down-

7    stream throughout the canyon reach.

8        Q   Would you state whether, in your opinion, there are

9    losses by reason of the water being impounded and backed up

10   behind this sump that has been described?

11       A   You mean at the present time?

12       Q   Yes.

13       A   Well, it undoubtedly encouraged some loss, of course,

14   because it does impound water.

15       Q   Colonel Bowen, have you made an estimation or a

16   calculation as to the second foot flow which would have to be

17   maintained as the Fallbrook Gauging Station for the purpose

18   of meeting the demands of the United States of America strictly

19   within the watershed of the Santa Margarita River and upon

20   lands which are riparian to the stream?

21       MR. SACHSE:   Just a minute please. Does that question

22   imply --

23       MR. VEEDER:   Exclusive of Lake O'Neill.

24       MR. SACHSE:   Does that imply the demands are to be met

25   from surface flow or in their present fashion of pumping from

P 43    1    the basin?

2    MR. VEEDER:  I am asking him how much water is required

3    at the Fallbrook Gauging Station throughout the balance of

4    this year to equal the uses and the demands of the United States

5    of America within the watershed of the Santa Margarita River,

6    exclusive of Lake O'Neill.

7    MR. SACHSE:  I object to the question because there has

8    never been the slightest suggestion, and I don't believe it is

9    proper to say, that for the balance of this year the demands

10   of any riparian, such as the United States, could be met

11   entirely by surface flow.  If I understand Mr. Veeder's question,

12   that is exactly what he is asking.

13   MR. VEEDER:  Your Honor, in that regard, I am simply

14   asking Colonel Bowen whether he has made a determination of

15   the actual water required within the enclave and within the

16   Santa Margarita River watershed to meet the needs --

17   THE COURT:  I understand.  Are you talking about the

18   balance of the calendar year?

19   MR. VEEDER:  I am talking about from this day, March 15th,

20   on down to the end of the water year.

21   MR. SACHSE:  To the end of September 30th; is that right?

22   MR. VEEDER:  That is right.

23   MR. SACHSE:  Is that your question?  Because I still have

24   an objection then, Mr. Veeder.

25   MR. VEEDER:  That is the question.

P 44

1    THE COURT:  Is it the same objection?

2    MR. SACHSE:  It is the same objection, but let me phrase

3    it differently.  This question does not face up to the fact --

4    THE COURT:  I realize that.  In other words, the question

5    would be directed, in one sense, to the question of meeting

6    all the demands of the United States from a surface flow at

7    the Fallbrook Gauging Station.

8    MR. SACHSE:  If I understand the question correctly, that

9    is it.

10   THE COURT:  But I don't see any objection to having it

11   answered and get some idea as to what it would be.  Overruled.

12   You may answer the question.

13   BY MR. VEEDER:

14       Q  You made a determination?

15       A  I have made an estimate; yes sir.

16       Q  Would you state into the record the second foot flow

17   at that point which, in your opinion, would be required to

18   meet the demands to which I have made reference?

19       A  It would be about 5 second feet.

20   THE COURT:  What miners inches would that be?

21   THE WITNESS:  It would be 250 miners inches, your Honor.

22   THE COURT:  And a continuous flow of 5 second feet, 24

23   hours a day?

24   THE WITNESS:  It would be about ten acre feet a day, your

25   Honor.

P 45

1    THE COURT:  And how much would that equal by September

2    30th?

3    THE WITNESS:  Oh, about 190 days would be about 1900

4    acre feet.

5    THE COURT:  In answering this question, you were assuming

6    that the sole source of water to supply the needs of the

7    Marine Corps within the watershed would come entirely from the

8    surface flow passing the Fallbrook gauge, and you were not

9    counting on any use of water out of basins?

10   THE WITNESS:  That is right your Honor.

11   BY MR. VEEDER:

12   Q  Colonel Bowen, have you considered the quantity of

13   sewage return into the Santa Margarita River basins in the

14   year 1960 with the quantity of water exported, for example,

15   out of the basin for agricultural purposes?

16   THE COURT:  Are you talking again about the water year

17   1960?

18   MR. VEEDER:  I am talking about the water year 1960.

19   THE WITNESS:  Yes sir.  We have brought up-to-date

20   Plaintiff's Exhibit 119-A, which shows the sewage affluent

21   discharged from the various plants in acre feet by water years.

22   Plant No. 1, for example, the water year 1960, discharged

23   728.22 acre feet.

24   Plant No. 2 discharged 677.38 acre feet.

25   Plant No. 3 discharged 390.42 acre feet.

P 46

1       There are some other minor discharges to the basin, but

2   the sum of those far exceeds the amount of water pumped out-

3   side of the watershed for irrigation in the 1960 water year.

4   BY MR. VEEDER:

5       Q   Would you state what use is made of that sewage

6   affluent that is returned into the basin?

7       A   The affluent which is returned into the basin is re-

8   circulated through the water distribution system and used

9   for the various military purposes heretofore described.

10      THE COURT:  Just a minute.  Do you have that before you?

11   You say it was brought up to day.

12      (The witness hands a document to the Court.)

13      MR. VEEDER:  That is 119-A; isn't that right?

14      THE WITNESS:  119-A; yes sir.

15      THE COURT:  Go ahead.

16      THE WITNESS:  I would like to add that there is an addi-

17   tional use, of course, as I mentioned heretofore, but to make

18   it clear we do use a portion of this to maintain our hydraulic

19   barrier at Ysidora Narrows.

20      MR. VEEDER:  I have no further questions.

21               RECROSS-EXAMINATION

22   BY MR. SACHSE:

23       Q   Colonel Bowen, I am not quite sure I understood your

24   answer on this 1900 acre foot figure that you gave Mr. Veeder.

25   What does that represent?

P 47

1     A  That represents, to the best of my knowledge, the

2 estimated amount of water that we would need to use on riparian

3 land within the Santa Margarita watershed and the Naval enclave

4 from now until the end of the water year.

5     Q  Regardless of how you obtained it, you would estimate

6 that you would use 1900 acre feet within the watershed on

7 riparian land between now and the end of the water year; is

8 that right?

9     A  Yes sir.

10     Q  One further question regarding sewage affluent.  You

11 testified that the affluent returned to the basin substantially

12 exceeds the agricultural water exported?

13     A  Yes sir.

14     Q  It does not substantially exceed total exports, does

15 it?

16     A  No sir, it does not.

17 MR. SACHSE:  That is all.

18 MR. VEEDER:  Are there any further questions?

19 MR. GIRARD:  I have none.

20 MR. VEEDER:  Your Honor, we ask that your Honor enter an

21 order enjoining Fallbrook Public Utility District.

22 MR. SACHSE:  Just a minute.  Have you rested?

23 MR. VEEDER:  Yes.

24 MR. SACHSE:  You have rested on this phase of it?

25 MR. VEEDER:  On this phase of it, yes.

P 48

1      MR. SACHSE:  I want to be sure we get a "rest" in here

2 for the first time in the history of this lawsuit.

3      MR. VEEDER:  Your Honor, we move for the entry of an

4 order restraining Fallbrook Public Utility District from

5 diverting above the Naval enclave any of the waters of the

6 Santa Margarita River under the circumstances that prevail

7 today and any diversions in the future which would reduce the

8 quantity of water reaching the Naval enclave.

9     We think that we have shown clearly that our riparian

10 needs within the enclave are such that any pumping by the

11 Fallbrook Public Utility District at this time would reduce

12 the quantity of water reaching the Naval enclave and required

13 for use on the riparian lands.  That is wholly separate and

14 apart from the requirements, the needs and the demands for

15 Lake O'Neill.  We believe that added to that demand are the

16 needs for Lake O'Neill and that they simply add to the fact

17 that the United States of America is suffering irreparable

18 damage by any diversions above us by Fallbrook Public Utility

19 District.

20     I would like to add, moreover, that the diversions that

21 are made by Fallbrook Public Utility District through the

22 Sawday Diversion are clearly in violation of the laws of the

23 State of California and clearly in violation of the licence

24 which was granted to Fallbrook.

25     Moreover, the licence which was granted to Fallbrook was

P 49

1    strictly and entirely limited to prior vested rights.  Cer-

2    tainly the rights of the United States of America have been

3    admitted here by these parties from the standpoint of surely

4    the riparian rights.  So that there is a violation, there is

5    an invasion, and we do believe we are entitled to the injunction

6    we prayed for in the original complaint and we are entitled

7    to the injunction that we asked in the agenda, and that matter

8    has been tried by agreement of counsel on the issue in question.

9    THE COURT:  That was going to be my inquiry.  There were

10   no formal documents other than the original prayer of the

11   complaint for the injunction.  But I take it it is understood

12   that by placing this on the agenda the motion might be made

13   in this fashion.

14   MR. SACHSE:  I do not object to the form of the motion.

15   I would like to be heard briefly, if I may.

16   MR. VEEDER:  I would like that to be clear.  There was

17   agreement by Mr. Sachse.

18   MR. SACHSE:  There is no objection to the form of your

19   motion.

20   THE COURT:  Then it is probably before me.

21   The Government has rested.  Does Fallbrook or any other

22   defendant have any further proof to put on?

23   MR. SACHSE:  First, before any proof, I will state as

24   follows:

25   I concede that it is impossible for your Honor to grant

P 50   1   an injunction on the basis of any appropriative right, because

2   your Honor has not determined that one exists.  So I will not

3   even discuss that.

4         If you intend simultaneously to make a determination as

5   to an appropriative right and grant an injunction on the basis

6   of an appropriative right on the issue of the appropriative

7   right I would like some rebuttal testimony.

8         If, however, we are confining ourselves to this riparian

9   question, I am ready to submit it right now and argue it, on

10   the fundamental rule of law that there has been no showing

11   such as a riparian must make to enjoin an upstream diversion.

12         Do I make myself clear?

13         THE COURT:  I get your point.

14         Mr. Sachse makes a good point.  It is a question whether

15   you want to have this argued solely on the basis of the

16   Government's riparian rights without reference to an alleged

17   appropriative right.  Apparently it is in shape to be argued

18   on that phase.

19         If, however, you want to base your claimed right on

20   riparian and appropriative rights, then we would have to

21   spend some time.  Mr. Sachse says that he has some evidence

22   to produce, and we would take that.  We would also have to

23   then argue that issue along with the proposed findings you

24   have submitted on that question.

25         MR. SACHSE:  May I add, your Honor and Mr. Veeder, it

P 51

1  would seem to me that it would be critical before we could

2  argue an injunction on the basis of an appropriative right,

3  that we know what the appropriative right is -- the amount,

4  the element of time -- all of the other factors involved.  So

5  we would have to have some kind of interlocutory finding, if

6  this is on an appropriative right.

7  THE COURT:  I understand.  You are not ready to submit

8  that because you have some further proof on this.

9  MR. SACHSE:  Yes your Honor.

10  MR. VEEDER:  I had understood, from talking with Mr.

11  Sachse, that he did not have any rebuttal.  Of course, if he

12  does, he is free to do it.

13  THE COURT:  He says he does not have rebuttal, if you

14  are resting entirely on your riparian rights.

15  MR. VEEDER:  I comprehend.  The point I make is that he

16  said there is nothing in the record.  I don't know whether we

17  are ready to argue the matter or not.  The point I make is

18  that we have introduced extensive evidence into the record

19  which is before your Honor of the use of water within the

20  Naval enclave.  That record has been made a good many months

21  ago, showing that there are water uses which are Marine Corps

22  uses within the area, -- that there are hospital uses within

23  the area, that there are requirements for agricultural uses

24  within the area -- that to meet those needs we are entitled

25  to have water released down to us.  There has been not a

P 52

1    scintilla of evidence offered, nor has there ever been

2    objection made, that the uses of the United States within the

3    watershed were unreasonable.  I don't think Fallbrook would

4    raise the point anyway.  But I don't think it can be challenged

5    that we do have riparian lands and that we are making the uses

6    of the water.

7        THE COURT:  Before we argue the motion, can we decide

8    whether or not you are going to argue it now based upon your

9    claim of riparian rights, or do you want to wait until the

10   issue of appropriative rights has also been fully completed?

11       MR. SACHSE:  Perhaps I am not quite fair to you.  I am

12   not sure that your Honor understands what I say.  I don't want

13   either your Honor or Mr. Veeder to misunderstand.

14       I will submit, as it were, the appropriative question

15   also on the state of this record right now.  However, that

16   would then, as I understand the necessary order of proof,

17   require your Honor to make a finding of the appropriative

18   rights enjoyed by the Rancho Santa Margarita.

19       Now I will have some very substantial proof, after your

20   Honor has made that finding, to the effect that these rights

21   have been lost -- I mean proof, not just argument -- that

22   they have been lost, that they have been abandoned, and that

23   they do not exist.

24       But I can't offer that proof, I can't be intelligently

25   asked to do so, until I know what kind of right it is.  Is it

P 53   1   a right to hold it in storage?  Is it a right to put it to

2   irrigation use?  What right did the Rancho have?  Once your

3   Honor makes that ruling, then I wish to present my contentions

4   with regard to it.

5       THE COURT:  You have cleared it up in my mind.  In other

6   words, this further proof that you have would go to situations

7   that occurred after the time --

8       MR. SACHSE:  The present validity.  I concede that the

9   evidence of the rights of the Rancho, whatever they have been,

10   is in -- unless Mr. Veeder has more.  I have nothing to

11   contradict the evidence already in the record as to the rights

12   of the Rancho.  But the question what those rights are today

13   I have proof on.  I think your Honor must first determine

14   what were the appropriative rights of the Rancho.

Take C 2   15       MR. VEEDER:  I will ask Mr. Sachse one question and then

16   I will make my decision on this point.

17       How long will it take you to put in your evidence in

18   regard to the appropriative rights, Mr. Sachse?  Will it be

19   an hour or --

20       MR. SACHSE:  Mr. Veeder, I don't know what the appropria-

21   tive rights are.  If the appropriative rights are what you have

22   contended, every drop of water in the stream, that you can

23   acquired by self-help, then there will be a lot of evidence.

24   If the rights are, as I might imagine his Honor could con-

25   ceivably do, I might have none.  I might be delighted to buy

P 54

1  that.

2  THE COURT:  Mr. Sachse's point is this --

3  MR. VEEDER:  I comprehend his point, your Honor.

4  THE COURT:  That he can't be asked to put this proof on
because it is proof that would only become admissible if
the Court found that sometime in the past there had been an
appropriative right.

8  MR. VEEDER:  All right, your Honor.

9  THE COURT:  So that he would not be prepared, nor would
it be, in his opinion, the logical time to put this proof on.

11  MR. VEEDER:  One thing I don't want is stalling here.

12  MR. SACHSE:  This is no stall.

13  MR. VEEDER:  The point I make is that I tendered to your
Honor a set of findings of fact and conclusions of law and an
interlocutory decree in regard to the uses by the Rancho Santa
Margarita prior to the acquisition, and whatever rights those
were the United States of America succeeded to them.  I am
perfectly willing to stand on those proposed findings of fact
and conclusions of law.

20  There has been raised an extremely important legal
question that I will tender to your Honor for cogitation at
the moment and perhaps you could rule on it.  It is our view
that whatever rights were succeeded to by the United States of
America from the Rancho Santa Margarita are necessarily residing
in the National Government as of today -- whatever they are.

P 55

1   They couldn't be lost, they couldn't be in any way extinguished

2   or abandoned by the United States of America by reason of the

3   rule in the case of United States vs California (332 US pg 19),

4   which declares that the activities of any agent, employee or

5   officer of the National Government could in no way affect the

6   title of the United States.  The case was very fully con-

7   sidered in 243 US, Utah Power and Light vs the United States.

8   I didn't think we would get into this matter.  But the fact

9   remains that whatever rights we succeeded to, they reside in

10  the National Government today.  They couldn't be abandoned.

11  They couldn't be lost.

12      So I am perfectly willing to stand on the record as

13  introduced by Colonel Bowen, Mr. Whitman, Mr. Salsbury and

14  others.  The summarization of that evidence I have set forth

15  in the findings of fact and conclusions of law.  If we could

16  dispose of this matter without prolonging it I would be very

17  pleased to go ahead at this juncture and to argue the pro-

18  positions which I have advanced in those findings of fact,

19  conclusions of law and judgment, which would outline and

20  which do outline our position in regard to our appropriative

21  claim for Lake O'Neill.

22      Have I made myself clear?

23  THE COURT:  You have made yourself clear.

24  MR. SACHSE:  I am ready, your Honor --

25  THE COURT:  You and Mr. Sachse would have issue joined

P 56

1    on the question if appropriative rights were found.  It would

2    be Mr. Sachse's contention that certain things would happen.

3        MR. SACHSE:  Make them unenforceable, let us say.

4        THE COURT:  Make them unenforceable.

5        Your contention is that if such appropriative rights were

6    found to exist at some time in the past in the United States,

7    they never could be lost.

8        MR. VEEDER:  That is the position, your Honor.

9        May I make just one point.  There are three bites out

10   of the apple.  We claim an appropriative right for Lake

11   O'Neill.  If we don't have the appropriative right, we claim

12   a riparian right for it.  We also claim, in addition and over

13   and above the claims for Lake O'Neill, riparian rights within

14   the watershed of the Santa Margarita River which, in themselves,

15   would entitle us to an injunction of any diversion of water

16   by the Fallbrook Public Utility District this water year at

17   any time the flow was under approximately six second feet.  I

18   have put it as six second feet because we have to take care of

19   the channel losses between the point of measurement and the

20   enclave.

21       THE COURT:  Well now, we apparently are prepared to

22   argue these issues.

23       MR. SACHSE:  If I may respectfully offer a suggestion.

24   I hope I have never suggested, by any silence, that I am

25   ready to accept the findings of fact -- even the findings of

P 57

1   fact, not the conclusions drawn from them -- but the findings

2   submitted by Mr. Veeder, and I would respectfully request

3   your Honor, before you make a ruling, that you will give us

4   the opportunity of making some inquiry -- simply into the

5   findings now.  I am not asking leave to argue the conclusions.

6   But I want to find out about some of these findings that he

7   has put in which I think are not substantiated by the record.

8        MR. VEEDER:  You want to inquire of me?

9        MR. SACHSE:  Of you before the Court to discuss the

10  matter.

11       MR. VEEDER:  Start right now.

12       MR. STAHLMAN:  Just a moment.

13       THE COURT:  Mr. Stahlman.

14       MR. STAHLMAN:  Your Honor, I appreciate that this matter

15  has raised en issue as far as the Fallbrook Public Utility

16  District is concerned.  But Mr. Veeder has proposed certain

17  findings that have a far-reaching effect as it may affect

18  other people on the stream.  If there is to be a determination

19  as to what the findings are in relation to Lake O'Neill, and

20  if there is to be determined an appropriative right, Mr. Veeder

21  has not rested in this case as far as other defendants are

22  concerned.

23       MR. VEEDER:  I have rested in regard to this case on

24  Lake O'Neill and in regard to the claim for an injunction

25  against Fallbrook.

P 58

1    MR. STAHLMAN:  Just so it does not affect any of the

2    other situations in regard to the findings as to what the

3    impoundment of waters were which were used in Lake O'Neill

4    and the uses that were made thereof.  That subject is still

5    open to further testimony.

6    MR. SACHSE:  I don't know how Mr. Veeder can rest on

7    appropriative right as to Fallbrook without resting on appro-

8    priative right as to Vail.  How can he rest as to Fallbrook and

9    not rest as to Vail?

10    THE COURT:  Mr. Girard.

11    MR. GIRARD:  Your Honor, I am just going to comment

12    briefly, not on anything that has been said as far as the

13    particular merits of this subject are concerned.  But I have

14    read Mr. Sachse' findings in regard to the United States'

15    O'Neill appropriation.  I just got Mr. Veeder's yesterday

16    morning and I have read them.  I might say, frankly, that my

17    present inclination is not to agree with either one of them,

18    and I would like to be heard a little bit on it.

19    THE COURT:  Mr. Stahlman, I had looked over hurriedly

20    the findings that Mr. Sachse prepared, and I read the ones

21    that Mr. Veeder prepared, and I had contemplated sometime

22    going over the findings and conclusions with you and give

23    everybody a chance to be heard.

24    Now you and Mr. Sachse raise a further point whether we

25    can wrap this thing up and hear your argument and eventually

P 59

1  this decision, if the Government has not rested as far as

2  these appropriative rights are concerned as to other defendants

3  and if other defendants have not yet completed their record

4  on this matter.

5     MR. STAHLMAN:  That is the point, your Honor.  If this

6  is going to be argued on the matter of their riparian rights,

7  as Mr. Sachse first indicated, then I am completely out of it.

8  I have no further concern with the question between Fallbrook

9  and the Government in relation to that question as far as it

10  may affect the riparian rights.  But the appropriative rights

11  is a different  situation.

12     THE COURT:  Do you have further proof?

13     MR. STAHLMAN:  Your Honor, I desire to review these

14  findings.  I have just obtained these findings also.  I think

15  that the evidence in this case does not comport with that which

16  existed in the previous case, and they have expanded by far

17  what their demands are as to appropriative right in this case

18  as compared with what it was in the other case.  I want some

19  time to explore that.  I am quite sure I am right on that,

20  that it does not comport with the testimony which existed in

21  the previous case.

22     THE COURT:  Would you have any further proof?  Any

23  further proof you have, Mr. Sachse, would be in this sort of

24  confession and avoidance?

25     MR. SACHSE:  Yes, I do not intend to quarrel with any of

P 60

1     the evidence the United States has as to the activities of

2     Rancho.  I can't disprove it, and I am not going to argue

3     with them.

4         THE COURT:  We have another problem.  We have **Mr. Stark**

5     and Mr. Grover waiting to be heard.  I anticipate that if you

6     gentlemen square off on this appropriative and riparian argu-

7     ment, they will not be heard today.

8         MR. SACHSE:  I am sure they will not.

9         MR. GIRARD:  I think that is correct.

10        MR. VEEDER:  They said they were agreeable, if necessary,

11     to give up the afternoon.

12        Is that not right, Mr. Grover?

13        THE COURT:  Let's hear from them.

14        MR. GROVER:  Yes, we can be here tomorrow, but I will not

15     be able to be here Friday, your Honor.

16        THE COURT:  Counsel is going to have to be here anyhow.

17     Would your convenience be suited better by being heard this

18     afternoon or tomorrow morning?

19        MR. GROVER:  Tomorrow morning, if everyone is in agree-

20     ment.  That one day would be enough.  As far as we know, it

21     would be enough.

22        MR. SACHSE:  I don't think we are going to finish our

23     discussion of the adequacy or the inadequacy of the United

24     States' findings the rest of this afternoon.

25        THE COURT:  If we don't finish, can we suspend and let

P 61

1   Mr. Grover go on tomorrow morning?

2       MR. SACHSE:  Yes.  No objection whatsoever.

3       THE COURT:  Is that agreeable, Mr. Veeder?

4       MR. VEEDER:  Your Honor, I will adjust myself to your

5   Honor and Mr. Grover.  They are here and waiting.

6       MR. GROVER:  We have a couple of other things that we can

7   do here.  We would just as well come back in the morning.

8       THE COURT:  All right, tomorrow morning at ten o'clock.

9       MR. GROVER:  Fine.

10      THE COURT:  Can we go ahead with this argument with the

11  understanding that Mr. Stahlman wants to look into some proof

12  in the earlier case and may want to call the Court's attention

13  to it.  I take it that that would be the extent of any showing

14  that you would have.

15      MR. STAHLMAN:  Yes, that is right.

16      MR. SACHSE:  I think we could.

17      Insofar as the findings themselves are concerned, it

18  seems to me that I can make my point, Mr. Veeder can reply

19  as to where it is in the record or that I am mistaken, and we

20  can put it up to you, and take them one at a time and start

21  going down the line.

22      MR. STAHLMAN:  I do think that anyone else who has an

23  appropriative right on the river, it might be necessary, in

24  as much as Mr. Veeder has not rested yet.

25      THE COURT:  In as much as what?

P 62

1          MR. STAHLMAN:   I am just thinking about the technicality

2     of the record here.  As I have indicated to your Honor, all I

3     want to do is to check the record.  I am quite certain it

4     doesn't comport with this.  But I am just wondering of the

5     advisability of going ahead if there is something in relation

6     to this determination of appropriative rights, without the

7     others being notified.  We are here.  We know it ourselves.

8     I am not concerned.

end of C2

1          THE COURT:  All Counsel that have been participating on

2     this agenda got notices.

3          MR. STAHLMAN:  Yes.

4          THE COURT:  I told them early in the case that I was not

5     going to lead them by the hand.  Who else do you suggest

6     should be here?  Mr. Stark and Mr. Grover seem to be getting

7     ready to depart.  They are claiming an appropriative right.

8     Mr. O'Malley wanted to get out; he didn't want to stay around

9     to hear anything more.  Mr. Anderson was here but left.

10         Colonel, I think you may get down off the witness-stand.

11         COLONEL BOWEN:  Thank you, sir.

12         THE COURT:  Mr. Veeder has proposed some findings.  Are

13    you prepared to shoot at them, Mr. Sachse?

14         MR. SACHSE:  I am ready to do it any way your Honor wants

15    to proceed.  I would suggest this -- I have had some very

16    limited discussion with Mr. Girard and even more limited with

17    Mr. Stahlman -- and if I might propose as a suggested method

18    of orderly procedure, I will go through these things paragraph

19    by paragraph, express my comments or objections or approval

20    -- it so happens that I concur completely in one or two of

21    them -- and then we might ask Mr. Girard if he has anything

22    to say on the particular one, and ask Mr. Stahlman, and maybe

23    hammer them out one at a time as we go along, rather than

24    have me go through the whole list and then Mr. Girard go

25    through the whole list, etc., if the meets with your Honor's

      approval.

1  THE COURT:  That sounds all right to me.

2  MR. VEEDER:  I would like to hear the "ground rules."

3 Are they going to interrogate me as to the basis of these

4 findings and go on to each one?

5  THE COURT:  I think they may interrogate you.

6  MR. VEEDER:  That is what I would like to have them do.

7 I think it would save time.

8  MR. SACHSE:  I think that is the idea.

9  MR. GIRARD:  Before we start going into each specific

10 findings, maybe each of us ought to make a very brief state-

11 ment as to how we think these appropriative rights should be

12 approached.

13  THE COURT:  That is fair enough.

14  MR. VEEDER:  May I make the opening statement?  I am

15 the movant.

16  THE COURT:  If you want to make the opening statement,

17 direct yourself to the so-called appropriative rights.

18  MR. VEEDER:  I will address myself to them, your Honor.

19  The point that I was very specific about in the pre-

20 liminary statement to the Court, on page 1, is that the

21 United States of America, in regard to this injunctive

22 process against the Fallbrook Public Utility District and in

23 regard to the findings that you are asking us to prepare,

24 strictly limited the claimed appropriative rights to those,

25 whatever they may have been, which were acquired by the

1   Rancho Santa Margarita through a non-statutory appropriative

2   act.

3       In other words, we say that we bought and paid for the

4   maximum appropriative right that could have been acquired.

5   We have taken the position, in the preparation of these

6   findings -- a position that I have already expressed to you

7   -- that when the United States of America purchased these

8   rights to the use of water for Lake O'Neill it succeeded to

9   them. And it could not abandon them -- it could not lose

10  them by abandonment. It could not lose them by estoppel.

11      I do not believe there has been any proof that would

12  show that there was abandonment. But even so, I don't

13  believe the law would apply to the United States of America,

14  under the circumstances. We addressed ourselves strictly and

15  entirely to the date of priority, which, we believe, is

16  completely supported by the report of the State Engineer of

17  the State of California when he reported that in 1883 the

18  Rancho Santa Margarita was diverting water for appropriative

19  rights into Lake O'Neill -- he referred to it as an

20  "appropriative right" -- and he said that from that source

21  300 acres of alfalfa and 12 acres of vineyard and garden were

22  being irrigated. At that time the carrying capacity of the

23  Lake O'Neill diversion ditch was 20 second feet, according to

24  the State Engineer of the State of California.

25      MR. SACHSE:  How much?

1    MR. VEEDER:  Twenty second feet.  You will find that in

2    paragraph 12.

3       MR. SACHSE:  You have 22.

4       MR. VEEDER:  No, the carrying capacity of the Lake

5    O'Neill ditch in 1883 was approximately 20 second feet.

6       MR. SACHSE:  I find it.

7       MR. VEEDER:  We claim that that would be the maximum

8    diversion that could be effectuated through that ditch and

9    structure.

10      We take the position that that water was diverted and

11   impounded for seasonal use.

12      We take the position that the water, at any time that

13   the head of the flow at Lake O'Neill and the Santa Margarita

14   was below 20 second feet, the evidence would show that they

15   put in a temporary structure and diverted all the surface

16   flow.  We are strictly limiting ourselves to the surface flow

17   for this claimed appropriative right.

18      The beneficial use of the water from Lake O'Neill was

19   for three purposes:  the first was domestic, the second was

20   stock watering, and the third was for the purposes of irriga-

21   tion.  Each of those uses contemplated cyclic storage,

22   storage from the Spring runoff for use in the months of July,

23   August and September.  Although there was, of course, water

24   used in May and June.  However, the phenomenon of the Santa

25   Margarita River situation, as I understand it, was that at a

1   period of high runoff the sands and the basins were recharged

2   and for a period of several months after the high runoff

3   there was quite a head of water flowing down the stream,

4   and when the stream got to the point that they could handle

5   it through the 20-second-foot diversion they did so.  They

6   impounded all of the water.  But there was no specific date

7   when that impoundment started.  It depended upon the runoff.

8       So we take the position that our predecessor in interest

9   acquired an appropriative right for the maximum quantity

10   that could be diverted and the maximum quantity that appears

11   to have been stored and applied to beneficial use.  Between

12   the periods 1883 and 1914 it appears that there had been an

13   increase of 250 acres.  In other words, the best evidence we

14   have is that there were 300 acres of land in alfalfa in 1883;

15   that by 1914 it had increased to 550 acres.  Colonel Bowen

16   testified, in regard to the 300 acres of land that were

17   irrigated in alfalfa, that that would require 2600 acre feet

18   of water properly to irrigate that by reason of the climate,

19   by reason of the diversion used, by reason of the quantity of

20   water requisite for five cuttings of alfalfa.

21       THE COURT:  Twenty-six hundred acre feet for how many

22   acres?

23       MR. VEEDER:  For 300 acres.  And that is his express

24   testimony in the record.

25       However, of the 550 acres of land which were irrigated,

15,480

according to Mr. Salsbury's testimony, at the time when he
first went there, there was 150 acres of alfalfa, 200 acres
of sugar beets, and 200 acres of lima beans.. He testified
that there was 3-year rotation, and that that was the
general practice.  So we could assume, based upon the practices to which he testified, that there was probably upward
of 400 acres of alfalfa at a minimum at sometime cultivated
in that area.

So from the standpoint of diversion and use of water
we have taken the position that it would not be unreasonable
to assume that the greatest quantity ever diverted would be
20 second feet.  The greatest quantity ever impounded and
utilized in cyclic storage would be approximately 3400 acre
feet.

It is true that we do not have a period of measurements
prior to 1914.  But we do have a consistent set of measurements from the year 1931, and it appears that the maximum
quantity that was ever diverted and stored by Rancho Santa
Margarita was 3340 acre feet.

We realize that we have to depend upon the best evidence
that was available.  We realize that the best evidence that
was available prior to 1914 was the data to which I made
reference.  It is our position that the limiting factor, the
size of the structure, would of course be the controlling
factor.  If your Honor would look at the diversion records

1    that were maintained, you would observe that from 1931 that is

2    just about what transpired -- the 20 second feet.  The fact

3    is that there is evidence that at one time they diverted as

4    high as 30 second feet.  That was all Rancho Santa Margarita;

5    none of the uses by the United States of America.

6        I will not touch on the questions of law.  I assume that

7    you want those separately argued.

8        But that was the general basis upon which I proceeded

9    in the drafting of these findings.

10       THE COURT:  If the Court finds an appropriative right,

11   of course, the Court has to find the amount and the extent

12   of that right.  Lake O'Neill holds only 1200 acre feet, as I

13   recall.  Is that right?

14       COLONEL BOWEN:  Yes, sir.

15       MR. VEEDER:  The maximum at that time was 1200.  It was

16   filled and re-filled.

17       THE COURT:  You are talking about the flow of 20 second

18   feet.  Twenty second feet is a thousand miner's inches?

19       MR. VEEDER:  That is right.

20       THE COURT:  If your right is a thousand miner's inches

21   continuously, twenty-four hours a day, that is one thing.

22   You are obviously not claiming that.  But you are claiming a

23   storage right.  How many times do you claim that you have a

24   right to store 1200 acre feet in Lake O'Neill?  Store it

25   once?  You talk about a storage right of 3400 acre feet, and

15,482

1   you have a lake that holds 1200 acre feet.

2        MR. VEEDER:  That is right.

3        THE COURT:  I have some problems there.

4        MR. VEEDER:  It was filled and re-filled.  There is no

5   question that that was how it was operated.

6        THE COURT:  Any proof as to how many times it was

7   filled?

8        MR. VEEDER:  No.  But the best evidence that can be is

9   the quantity of crops that were raised.

10        THE COURT:  Let's hear Mr. Girard's approach to this

11   problem.

12        MR. GIRARD:  I am not going to discuss the facts at

13   this time.

14        Our approach to the problem is this.  The stipulation

15   filed by the United States states that California water law

16   applies.  Therefore, the crucial issue to be determined is

17   the exact amount and period of time etc. that the appropria-

18   tive right existed in 1914.  Any activity, any uses after

19   1914 cannot add one iota to the appropriative right that

20   existed in 1914, because of course after 1914 under California

21   law you would have to make an actual filing with the State

22   Water Rights Board or its predecessor.  And that was not

23   done.  Therefore, the crucial factor we have to determine is

24   whether or not an appropriative right existed in 1914 in

25   the ownership of the predecessor of the United States, and

1  if that is answered in the affirmative exactly how much water

2  was actually used, to determine the appropriative right..

3       Now you can't base an appropriative right on the capacity

4  of the ditch.  You gain a non-statutory appropriative right

5  by putting water to use.  If you took just the capacity of a

6  ditch, a person could build a Sacramento River channel down

7  there and claim an appropriative right for a volume of water

8  which never did exist.  You have to find the actual amount of

9  water that has been used.  The capacity of the ditch doesn't

10  mean anything.

11       Then once we determine the appropriative right, it is

12  the State's position that under California law a non-

13  statutory appropriative right is privileged to change uses

14  and places of diversions, etc.  I think Mr. Sachse and I

15  will have some disagreement on this.

16       There is a question of abandonment.  I think again Mr.

17  Sachse and I will have some disagreement.

18       But the crucial thing that has to be determined is the

19  exact amount of water that was beneficially used by storage

20  by the United States' predecessor.  Once we get that figure,

21  that will be the extent of the appropriation -- and the time

22  that it occurred.  Anything after 1914 is completely

23  immaterial on an appropriative right.

24       MR. VEEDER:  I stipulated that when I started, your

25  Honor.

1   The reason that I am commenting on that is that in your

2   findings, Mr. Girard, there is a lot of language about the

3   capacity of the ditch.  In Finding No. 26, for example, are

4   set forth specific amounts in acre feet -- 3340 and 3700.  Not

5   one of those years that you set forth is prior to 1914.  It

6   is completely immaterial on the appropriative right.

7        THE COURT:  Mr. Veeder agrees that we look at 1914 and

8   the years before.

9        MR. VEEDER:  That is it.

10       THE COURT:  The right might have been acquired in 1890.

11       MR. VEEDER:  That is right.

12       THE COURT:  And it might have been used differently in

13  1914.  But if it had been acquired before 1914 --

14       MR. VEEDER:  Would one observation be all right now?

15  The only thing I said in regard to the 20 second feet, Mr.

16  Girard, is that that is the maximum conceivable that could

17  ever be claimed for diversion.  We don't say there was a

18  continuous flow.  We know there was not.  I gave your Honor

19  a ceiling on the cubic feet per second of diversion, and I

20  gave what I thought was a proper ceiling for the maximum

21  quantity that could ever be stored under the claimed right.

22  That is why those statistics are important.

23       MR. STAHLMAN:  I want to ask a question of Mr. Veeder.

24  Do you claim that as a storage right?

25       MR. VEEDER:  It is a storage right, and that is what we

1   are claiming as an appropriative storage right.

2   MR. STAHLMAN:  Right to store water.

3   MR. VEEDER:  To store water and cyclically carry it over

4   for future use -- in the same year in this case.

5   THE COURT:  What other terms do we apply to these two

6   types of storage?  Is this what you call seasonal storage?

7   MR. VEEDER:  It is used interchangeably.  I would just

8   as soon use "seasonal storage."  That is, from the Spring

9   to the Summer and Fall.

10   THE COURT:  Contrasted to a storage merely to build up

11   a head for irrigation purposes.

12   MR. VEEDER:  That is correct, your Honor.  Also, I don't

13   believe there is anything to show that there was a large

14   carryover into another year.

15   MR. SACHSE:  I hate to worry about semantics.  But my

16   concept of seasonal storage is storage that may be just to

17   build up a head for irrigation purposes.  Cyclic storage is

18   when you carry it over from one year to the next.  Seasonal

19   is from winter to summer.  That is my concept of the meaning

20   of the words, and I think the cases bear me out.

21   THE COURT:  Is there any different law that applies to

22   seasonal storage?

23   MR. SACHSE:  Yes, it is absolutely different.  Cyclic

24   storage can only be carried under appropriation.  Seasonal

25   storage may be carried as a proper exercise of a riparian

right.

1      MR. VEEDER:  Of the riparian right.

2      MR. SACHSE:  Of the riparian right.

3      THE COURT:  Do you contend that the cyclic storage must

4  be from one year to the next?

5      MR. SACHSE:  Yes, your Honor; it is cyclic.

6      THE COURT:  But if the storage is within the water year

7  then it is seasonal.

8      MR. SACHSE:  That is my understanding.

9      THE COURT:  Both these types are different from the

10  minor type of storage that is used to build up a head.  You

11  don't call that seasonal, do you?

12      MR. SACHSE:  Seasonal storage may also be the one that

13  is used to build up a head.

14      MR. VEEDER:  There is no agreement on that.

15      MR. SACHSE:  I think we are getting to the points about

16  which we are going to argue.  I am willing to take up this

17  one now, if your Honor is interested.

18      My concept and understanding of this storage problem,

19  and as regards the evidence on Lake O'Neill, is this.  In

20  1883 there weren't any pumps short of steam pumps and any

21  irrigator anywhere found it necessary to take his water out

22  of the stream from an elevation at a distance substantially

23  above the place where he was going to use it.  That is why

24  on our old appropriative rights usually you have entry on

25  someone else's land or on public land to put in a diversion

1   works and flume.

2       Here Rancho Santa Margarita did not have to do this.

3   This was all on their own property.  But to get a head so

4   that the water would fall by gravity to the bench lands in

5   Chappo Flats they had to take the water from the River at a

6   substantial distance above Chappo Flats, or else they would

7   have to go to the Egyptian mechanism of the water wheel or

8   something of the kind.  That is about what they did.  They

9   put a diversion in well upstream in about its present

10  location and they ran a ditch.  I don't think there is any

11  disagreement that that is what they did.

12      Now as irrigators they have a second problem.  The

13  second problem, as irrigators, is to put the water on the

14  land when it is needed -- to put the water on the land when

15  the land is dry.  You can't irrigate 300 acres of alfalfa or

16  500 acres of alfalfa by putting a dribble on twenty-four

17  hours a day seven days a week thirty days a month.  Your

18  Honor, I think, as a boy has seen irrigation of alfalfa.  You

19  have got to put the water on.  You have got to get a head to

20  put it on.  So as an irrigator they are confronted with a

21  second problem:  not just the flow in this ditch to let it

22  drizzle over their fields, but a place to put it where they

23  can let it out in greater volume than they received it from

24  the River.

25      That is the second thing that the Rancho had to accomplish.

1  That is what O'Neill did.  Whatever water the River pro-

2  duced could go into Lake O'Neill at a constant, co ntinuous

3  flow.  But when the alfalfa field was due for flooding they

4  could open the gates.  And the findings are quite specific,

5  if we will check Vail's A3 -- that is the old findings in the

6  original case.  It even describes their outlet works.  So

7  does the Engineer's report to which Mr. Veeder refers.  It

8  says that their outlet works were a series of boards, and

9  by pulling out one board or another they could increase the

10 flow out of Lake O'Neill into the ditch.

11      It is going to be my position that that type of

12 operation in 1883 or 1886 -- although I think we ought to

13 check these dates, because there is a conflict here -- that

14 type of operation was an absolutely natural, normal, proper

15 riparian use of water.  Not only was it natural, normal and

16 proper, but it was the only way.

17      Now maybe Lake O'Neill was a few hundred acre feet

18 bigger than they needed for their purpose.  Maybe he had a

19 little more water behind it than he needed to flood his

20 500 acres when he wanted to flood all his alfalfa.  But that

21 was what it was for -- as an integral part of an irrigation

22 system on riparian land.

23      I do not call that storage, and if we are arguing

24 semantics I think we at least should get our terms in agree-

25 ment, because I will call it whatever your Honor wants to

15,489

1   call it.

2        THE COURT:  You call that seasonal.

3        MR. SACHSE:  I call that seasonal.  I don't call that

4   cyclic.

5        THE COURT:  Then under your position today the United

6   States could use Lake O'Neill for that same purpose as long

7   as the use of the water did not extend beyond September 30

8   in the Fall.

9        MR. SACHSE:  For the same purpose.

10       THE COURT:  Well, for riparian purposes.

11       MR. SACHSE:  Yes, as a riparian, it could do it.  Yes,

12   your Honor.

13       THE COURT:  It could use Lake O'Neill in the same

14   fashion.

15       MR. SACHSE:  Yes, your Honor.

16       THE COURT:  And could use it to greater extent than had

17   been used in days prior to 1914, because as a riparian the

18   only limit on it would be its riparian uses.

19       MR. SACHSE:  I don't know whether your Honor is

20   realizing the word that I am emphasizing.  If the United

21   States wants to start using Lake O'Neill as an adjunct to an

22   irrigation system and irrigate Chappo Flats, which is today

23   built up solidly with warehouses, structures, parade grounds,

24   landing fields, I think they have a perfect right to do so

25   as a proper riparian use.

I don't think they have a right -- and please don't misunderstand me. The O'Neills as a riparian, the Rancho as a riparian had no right whatsoever to store that Lake for recreation. The Rancho as a riparian had no right to store water in that Lake to train a bridge battalion. The Rancho as a riparian had no right to store water in that Lake for the purposes of letting it out later to recharge the underground. The Rancho didn't.

But as a riparian, and without acquiring an appropriative right at all, the Rancho could do what it did.

That is my position on the broad issue.

THE COURT: If military uses are proper riparian uses, then why can't the water, instead of being used to irrigate Chappo Flats, be used for military purposes within the Reservation?

MR. SACHSE: Because, your Honor, military uses may be proper riparian uses. I have never conceded that issue, but for the purpose of this argument I will say that they may. But storage, if there is one thing that is not a proper riparian use it is storage. That is not a proper riparian use.

THE COURT: You just told us that seasonal storage was.

MR. SACHSE: For irrigation purposes; not for storage to give them a bridge-training space or a recreational lake. No. As an adjunct to the irrigation system, this is a

1   proper operation.

2        THE COURT:  Wouldn't a reasonable use of water be the

3   seasonal storing of water when water was plentiful and the

4   running of it into the underground basins when water is

5   short?

6                    (see next page)

R 18

Tape
D 1.

1    MR. SACHSE:  Not a riparian use.  The only circumstance

2  is -- I won't say the storage for floating logs, and things

3  like that, but we are confining ourselves at the moment, your

4  Honor, to irrigation, which is all the Rancho did.  The only

5  way that a storage facility can be tied in to a riparian

6  right is when the storage facility is an integral part of the

7  irrigation system and a necessary adjunct to it, or it is a

8  day-to-day routine operation.  Now, that is the only way.

9    THE COURT:  Has the use of a pond for floating logs, or

10  for a sawmill been held to be a proper riparian use?

11    MR. SACHSE:  Yes, expressly.

12    THE COURT: Then isn't the situation this: aren't we

13  bound by the older riparian uses that came along at a time

14  when they floated logs down ponds and now they haul them down

15  on trucks?  When we had a small Continental Army we didn't

16  train them in bridge building.  Now we train the Marines in

17  bridge building.  As time goes along and the world moves for-

18  ward, aren't the uses of water which are logical uses of water

19  as much riparian as the floating of logs in a pond?

20    MR. SACHSE:  You are completely right, your Honor.  Your

21  Honor is hitting the real guts of this answer, and that is

22  why the United States could not.

23    I said they had a right to do it, but your Honor could

24  not go out today  under the constitutional amendment since

25  1928 because since 1928 the use of water must be reasonable.

A riparian could no longer insist -- if O'Neill were still there, and if the United States was not, O'Neill could no longer insist against Vail, he could not, that the surface flow come to him and permit him to irrigate by surface flooding.

Now, your Honor, the best reference to it is practically the first case.  May I have the book, George, please?  (The volume was handed to Counsel.)

MR. SACHSE:  The first case that was decided after the 1928 constitutional amendment was Chin Chow v. Santa Barbara, 217 Cal., 673, where the express question was whether Mr. Chin Chow, at the lower end of the Santa Ynez River, could for ever and a day insist on taking his water out  and run it into a small pond, and thereafter irrigate.  It was expressly held, in the light of the constitutional emendment, that while that was a proper riparian use, that was a perfectly proper thing for him to do, he could not enforce that right against an upstream appropriator, because it was not reasonable and beneficial, and the burden could not be placed upon him of starting to pump and of starting to use water in less wasteful ways, making it possible for others to use it.

Now, your Honor apparently misunderstood me, or maybe Mr. Stahlman did.  While it is proper for the United States today, or, instead of the United States let's say if O'Neill were still there, it would be perfectly proper for them to use this method of irrigation but if they did, they could

1   never object to anything that Vail, an upstream appropriator,

2   or Fallbrook did, because it would be an unreasonable use under

3   the constitutional amendment.

4       THE COURT:  So you understand the law to be that we now

5   have two yardsticks, that one is a reasonable riparian use,

6   based upon all the old law of the State, and the second is,

7   under the constitutional amendment of 1928, is it reasonable.

8       MR. SACHSE:  I think there is no question that that is

9   the law, and I am sure that Mr. Girard will agree.

10       The question of what is a proper riparian use has not

11   changed.  The riparian uses are still within the watershed.

12   There are still certain things/criteria, but whether it is a

*that are*

13   proper and reasonable  exercise of the right under the 1928

14   constitutional amendment is the second yardstick that must be

15   applied, and it has been spelled out in countless cases.  I

16   could rattle some of them off, your Honor, starting with Vail

17   v. Margarita.

18       THE COURT: So you would not concede then, that the United

19   States could legally, in the exercise of a riparian right,

20   use O'Neill Lake for seasonal storage, as long as they used

21   the water before October 1st of the following year?

22       MR. SACHSE:  Your Honor, I would hate to quibble about

23   semantics, but you used a word I don't like, -- concede.  I

24   would like to concede that they can do it.  Well, they can

25   do it.  They are the last user on the stream, and I can't

1    stop them and you can't stop them.  But they cannot reach up

2    and say to Mr. Vail or say to Fallbrook, "You let us have

3    water to do it."  I say that is what they can't do.

4         THE COURT: I accept your amendment to the statement.

5         MR. SACHSE:  On that amendment, you are correct.

6         THE COURT:  There is no doubt about, once the water gets

7    there, what they can do with it, because it is there.  But

8    the  whole question is what right does the Government have to

9    reach upstream and insist that other water come down solely

10   so they can do these things.

11        MR. SACHSE:  I am ahead of myself, your Honor, because

12   we got into this.  I do suggest, very respectfully, before we

13   get into a battle on some of these flood purposes, your Honor,

14   that I think there are things in these findings that are wrong.

15   Mr. Veeder may have some answer to some of my suggestions,

16   that he feels he may be able to make.  It rarely happens, but

17   the question is whether he will.

18        THE COURT:  Let's start in on them then.

19        MR. SACHSE:  Number one is on the first page, your Honor.

20        MR. VEEDER:  Let's go this way so that we will keep to-

21   gether on it: what page and line?  Where is that?

22        MR. SACHSE:  Number one would be on page one, line 23,

23   the date, March,      1883.

24        I have checked the record, and Mr. Veeder's statement is

25   correct.  That date appears in the report of the State Engineer

1        to which Mr. Veeder referred.   However, the findings of fact,

2        and conclusions of law in Santa Margarita v. Vail give us a

3        different date.

4                MR. STAHLMAN:  Let's see where you are so that I can catch

5        up with you here.

6                MR. SACHSE:  It is page 1, line 23.

7                THE COURT:  Line 1, page 23.

8                MR. SACHSE:  Now, the findings of fact in Santa Margarita

9        v. Vail give us a date in 1886.   This means nothing to Fall-

10       brook, but there happened to be  two or three old, old,

11       appropriative rights upstream.   I don't know whether any are

12       older or not.   There may not be.

13               MR. VEEDER:  There is no use in quibbling over dates, and

14       1883 or 1886 makes no difference to any other appropriator.

15               MR. SACHSE:  O. K.   Then I will skip that.   My only

16       thought was that there may be some        upstream that were

17       prior to that.

18               MR. VEEDER:  I will say this, that I investigated and I

19       haven't found anyone.

20               Have you found anyone before that, Mr. Illingsworth?

21               MR. ILLINGSWORTH:  I haven't checked that.

22               MR. VEEDER:  I will take 1886 or 1883.   It certainly

23       does not give us any problem.   I do not want to relinquish 1883

24       if I can avoid it.

25               MR. SACHSE:  I will also say what I approve of, and

1    somebody else may want to  interrupt me.

2         I have no objection on page 2, to the first section of

3    page 2, "Findings of Fact, Conclusions of Law, and Interlocu-

4    tory Judgment respecting Lake O'Neill."

5         MR. VEEDER:  Mark it O. K.

6         MR. SACHSE:  That is O. K.  The next paragraph I -- be-

7    fore I was not referring to the whole of page 2.  I am now re-

8    ferring to paragraph Roman I on page 2, and that I find O.K.

9         Paragraph Roman II I have no objection to, but I believe

10   there is a case under appeal, it may be the State of Califor-

11   nia has an objection to something that appears in paragraph

12   Roman II.  I don't.

13        MR. GIRARD:  I don't have any objection to it from my own

14   personal view, I will put it, but for the record I will just

15   say that we have this milk control suit involving Camp Pendle-

16   ton.  I don't have anything to do with it, but the Court, I

17   believe,     the three-judge Federal Court held/that these argu-

18   ments made by the State of California were not valid, in that

19   the United States does have exclusive jurisdiction.  However,

20   that case, I understand, and Captain Libby said he wasn't sure,

21   but I have been led to believe that we are going to appeal

22   that case, and I would just as soon that we have some type of

23   language in here that would allow the Court to change that

24   ruling on exclusive jurisdiction if the Supreme Court reverses

25   the three-judge Court.

1    THE COURT:  This would be an Interlocutory Judgment.

2    If that unlikely situation came about, the final judgment

3    could take  care of it.

4        MR. GIRARD:  You  Honor, for the purposes of this law

5    suit it does not make the slightest bit of difference to me.

6        THE COURT: Now, so far as we have gone through II,

7    then you have no other objection?

8        MR. GIRARD:  No.

9        SACHSE:  No.

10       THE COURT:  All right.  Mr. Stahlman, do you have any-

11   thing through paragraph II.

12       MR. STAHLMAN:  No.

13       THE COURT: Paragraph III?

14       MR. SACHSE:  Number III I have no objection to.

15       THE COURT:  Mr. Girard?

16       MR. GIRARD:  No.

17       THE COURT:  Mr. Stahlman?

18       MR. STAHLMAN:  No.

19       MR. SACHSE:  Number IV I have no objection to.  That

20   is IV on page 3.   I have no objection to that.

21       THE COURT: Mr. Girard?

22       MR. GIRARD:  I don't have any objection to it, al-

23   though I don't see any real necessity for the last sentence,

24   that there is no dependable repetitious pattern of rainfall.

25       MR. VEEDER:  Do you want me to explain?

1   MR. GIRARD:  If you have any reason for that, Mr. Veeder.

2 If he has a reason for it we can leave it in.

3   THE COURT:  It is true, isn't it?

4   MR. GIRARD: It certainly is.

5   MR. VEEDER:  Then I don't see why I have to explain it.

6   THE COURT: All right.

7   MR. STAHLMAN: They say when it rains in Southern Cali-

8 fornia it is an accident.

9   MR. VEEDER: I would just as soon have that.

10   THE COURT: Paragraph V?

11   MR. SACHSE:  V I disagree with.  I think it is an in-

12 correct statement  of fact, and I think it has to be corrected,

13 V reads:

14   "Historically and at present, the Santa Margarita River

15 within the Naval Enclave is usually dry during the period

16 from March through October for much of its twenty-one (21)

17 mile reach within the Naval Enclave."

18   I would like to explain to you briefly some of the

19 reasons why I  think this is wrong. In the first place, it

20 contradicts subsequent findings.

21   If your Honor will turn to page 5, Finding XIII, you

22 will find that Mr. Veeder is asking you to find that histor-

23 ically they diverted all the waters by means of temporary

24 diversion dams that varied with each irrigation system, but

25 that they diverted water all the time from the spring until

1    the very late fall.

2            Then  if you will turn to the next page, paragraph XIV --

3            MR. VEEDER: On page 6?

4            MR. SACHSE:  Wait until I am through, Mr. Veeder.

5            MR. VEEDER:  XIII is the one you just referred to.

6            MR. SACHSE:  XIII is the one I just referred to, and I

7    am using it to contradict V.  Then XIV is the same thing.

8    He spells out that they were diverting water all the time. Now,

9    there is the inconsistency in these findings themselves.

10   Secondly, I don't think that this is the evidence.

11           MR. VEEDER:  Furthermore, -- pardon me.

12           MR. SACHSE:  Vail A. B. Again to go back to the best

13   single narrative of the circumstances as they existed in 1914,

14   very clearly spells out that the river all the way down through

15   its entire stretch was depended upon by the O'Neill interests

16   for stock water, and that the river for all its full length

17   had ponds and water in it, puddles, and sometimes dry, and

18   sometimes not.

19           THE COURT:  That is Vail A. B?

20           MR. SACHSE: Yes.

21           MR. VEEDER:  That was in the earlier case.  I think

22   that I can straighten this out, your Honor.

23           MR. SACHSE:  One other thing, -- your Honor.

24           MR. VEEDER:  Go ahead.

25           MR. SACHSE:  They are talking about the river, and that

1    the underground is not dry.

2         MR. VEEDER:  Let me straighten  this out, and I think

3    I can do it very rapidly.

4         As I remember the historical situation on the reach

5    of the river, to which I am making reference, and for the

6    record I will read what I have put in here:

7         "Historically and at present, the Santa Margarita River

8    within the Naval Enclave is usually dry during the period from

9    March through October for much of its twenty-one (21) mile

10   reach within Naval Enclave."

11        The word "much" is extremely flexible so far as I am

12   concerned.  As I understand the record, it shows that there

13   was a point where the river was not a going stream down to

14   about maybe a few miles above Ysidora .during the historical

15   period.

16        Then/was an area in which the stream did flow, that
                there
17   there were intersperced up and down the area between the Lake

18   O'Neill diversion and this area where the stream did rise an

19   area in which at sometime there were stock watering ponds.

20        Now, if you want to change the language to be reflec-

21   tive of that, it suits me.  I just said that much of the area

22   was dry because I believe that was true.

23        MR. SACHSE:  We can --

24        MR. VEEDER:  I have no quarrel there.

25        THE COURT: Of course when you say, "Historically and

1  at present," you throw together two things that are entirely

2  inconsistent. "Presently" speaks as of the date of this in-

3  junction, and you could very easily describe what water flows

4  in a dry year like this.

5      Historically, there have been times undoubtedly when

6  this stream flowed the year around, and there were times when

7  there were pools of water here and there up and down the stream.

8      MR. VEEDER: That is right.

9      THE COURT:  And there have been other times when,

10 Historically the stream was as dry, and where the water ceased

11 to run as it is today.  There is no water in the stream; that

12 is on the surface.   So when you say "Historically and at

13 present," and lump that together, you are in trouble.

14

15

16

17

18

19

20

21

22

23

24

25

R 28

Tape
D 2

1   MR. VEEDER: I am not in trouble, your Honor.  I say

2   "usually" and "much."  I will be glad to adjust the language.

3   It is not worth quarreling about.

4   THE COURT:  No.  And you might take a longer paragraph,

5   if you wanted to, to describe this stream.

6   MR. VEEDER:  I will do whatever you want me to, and I am

7   not going to quarrel about that particular point, nor do I

8   believe that it is inconsistent.  But I will certainly work

9   with anybody who wants to have better language on a point.

10   THE COURT: What is your view, Mr. Girard?

11   MR. GIRARD:  Well, I don't think, as I understand the

12   evidence, that      historically the river was usually as dry

13   in that period as it is now.  I think the record will show

14   that in the old days there was a lot greater surface flow than

15   there is now, and I think when that dried up, that that was

16   what brought on the original Vail suit.

17   THE COURT: I am not as familiar with the Santa Margarita

18   back in the early forties as I was with the San Luis Rey back

19   in the early forties, when we would go to Poly we would cross

20   the ford, where the water ran across the cement ford, and I

21   imagine correspondingly that was true with the Santa Margarita.

22   MR. VEEDER:  Let's strike out  V, your Honor.

23   MR. GIRARD:  They were not pumping in those days.

24   MR. VEEDER:  I will tell you what we can do: why not

25   strike out  V.

R 29

1    THE COURT:  It is not a big problem, but if you are

2  going to use V, then you are going to have a little more work

3  in describing it.

4    MR. VEEDER:  I will say to drop out V.

5    MR. STAHLMAN:  I want to make this statement:  I will

6  say that we have records at the Ranch which will show what

7  the condition was in various years in the past as to the stream

8  flow.

9    MR. VEEDER:  I say let's take V out.

10    MR. SACHSE:  If it is not a good point, yes, let's take

11  it out.

12    THE COURT:  I think it is time for a recess.

13    MR. GIRARD:  I might say that we also made a check on

14  the appropriation date as between 1883 and 1886, your Honor.

15  There were two appropriations.  There was one appropriation

16  given to Coddle in 1885.

17    MR. VEEDER:  Well, we are fighting it.

18    MR. SACHSE:  If that is a part of the appropriation,

19  your Honor, and Mrs. Coddle is one that was  in Court, so

20  there is an exact date on that one.

21    THE COURT:  This is not Mrs. Coddle here, but Mrs.

22  Gibbon, isn't it, who is here in this Court Room on this matter?

23    That date in that case that was given was to Coddle in

24  1885?

25    MR. GIRARD:  That is what appears in/Bulletin 57.  I don't

R 30

1    recall the exact exhibit.  I presume that it is right, but

2    maybe it isn't.  I think they do refer to it also in their

3    briefs as an 1885 appropriation.

4         THE COURT:  We will take a short recess.

5         MR. GIRARD:  We don't have any quarrel with the first

6    date at all.

7         MR. VEEDER:  Do you have any quarrel with our date?

8         MR. GIRARD: I don't, no.

9         THE COURT:  We are in recess.

10        (A short recess.)

11        MR. VEEDER:  I think the Court has Exhibit 29-G, doesn't

12   it?

13        THE COURT:  No, I don't have it.  I handed it back to

14   the Clerk.

15        MR. SACHSE:  Your Honor, before I go ahead, I will have

16   to take something back.  I didn't check my authorities, and

17   Mr. Girard pointed out to me there is an express case in law

18   which uses the words "seasonal storage," and says that it is

19   not a proper exercise of a riparian right, and that it must

20   be exercised only as an appropriation.

21        I am referring here to Hutchins  at page 246, and he

22   cites the old log floating case that I referred to, and then

23   he says:

24        "Other California cases, all much later than the case

25   just cited, distinguish between temporary storage of water" --

THE COURT: Just a moment. Speak slower and louder so that I can hear it and the reporter can get it.

MR. SACHSE: (Reading):

"Other California cases, all much later than the case just cited" -- that is the log case -- "distinguish between temporary storage of water in the lower basin, which was held to be within the riparian rights, and seasonal storage, which is not a riparian right, which must be exercised only under an appropriation of water. These cases are noted below."

And there are many cases cited. So I don't think I care to change in any way my remarks as to what I think the exercise of this right was, but I think I was evidently wrong in my use of the word "seasonal."

THE COURT: One thing more, that in talking about what they considered proper storage under a riparian right, they are talking only about the storage to build up a head to irrigate?

MR. SACHSE: Right.

THE COURT: And for a relatively short time, and not for a season.

MR. GIRARD: I think that is my opinion, and I think that Mr. Sachse is in disagreement.

THE COURT: That is the opinion which I had when I came in here, and I think Mr. Sachse wants to tell me I was wrong. All right.

1      MR. SACHSE:  As to paragraph VI on page 3, your Honor,

2   I don't know anything about the description, whether it is

3   accurate or not, but I assume it is.  I haven't any objection

4   to the rest of the language.  I think some of it perhaps

5   is not fully indicative of the facts.  It says:

6          "Some water from Fallbrook Creek ... may enter

7          that Lake during the winter and spring months

8          at the infrequent times it carries water."

9      Well, as far as I am aware, it would be a more truthful

10   statement to say that during the infrequent times that  Fall-

11   brook Creek carries water does it --

12      MR. VEEDER:  I will take that.

13      THE COURT:  But another point: you have changed now in

14   late 1960 the method of diversion, so that with the underground

15   weir that you have, you in substance still catch the surface

16   water, but do I understand that this weir is now constructed

17   so that it does not pick up underground water?

18      MR. VEEDER:  Your Honor, the weir, as I comprehend it,

19   goes down 14 feet which is considerably lower, of course,

20   and there was no footing for the temporary structure. However,

21   it is 80 feet to the bottom of the Upper Basin storage area.

22   In other words, the alluvium is 80 feet deep there.  However,

23   I have attempted --

24      THE COURT:  But my point is are you now by the weir not

25   only taking the surface flow but at least taking the top

R 33

1  ten or twelve feet off of the storage in the basin.

2      MR. VEEDER:  May I repeat on this, your Honor: that I

3  have attempted strictly to limit the diversions to the surface

4  flow, of the kind and type of surface flow that would be taken

5  prior to 1914, and we are avoiding any reference to any diver-

6  sion by reason of the new structure.

7      THE COURT:  The Colonel wanted to say something, I be-

8  lieve, of a factual matter.

9      COLONEL BOWEN:  Your Honor, I simply wanted to state that

10 there is no possibility of diverting underground flow at Lake

11 O'Neill because the inlet structure of the Lake is still the

12 same.  That is comprised of a concrete division box with a

13 culvert that goes up into and encloses the box.

14     THE COURT:  So the new weir does not change the situation?

15     COLONEL BOWEN:  No, your Honor.

16     THE COURT:  You are still taking the surplus flow?

17     COLONEL BOWEN:  Yes.

18     THE COURT: All right.

19     MR. SACHSE:  Then with that very minor correction about

20 the water flow at Fallbrook Creek, I have no objection to

21 paragraph VI.

22     THE COURT:  Mr. Girard, do you have any problem on VI?

23     MR. GIRARD:  No, your Honor, no problem so far as I am

24 concerned.

25     THE COURT:  Mr. Stahlman?

1     MR. STAHLMAN:  No, your Honor.

2     MR. SACHSE:  Your Honor, the next one which is VII, I

3 have some serious quarrel with.

4     THE COURT:  VII, all right.

5     MR. SACHSE:  I think it simply is not supported by the

6 record.

7     The word "impounded" as I understand it means, held

8 behind.  It does not mean diverted, if we are not getting our

9 semantics mixed up.  This means, if I interpret it correctly,

10 that Mr. Veeder misses the point, in that those waters were

11 held in Lake O'Neill ever since 1883, and not diverted to the

12 Lake.

13     MR. VEEDER:  The word "impounded," as it is there used,

14 is interpreted to mean that it is synonmous with the word

15 "stored."

16     MR. SACHSE:  All right.  Now, the citations that Mr.

17 Veeder gives us for this have absolutely nothing to do with it.

18     The first one is an 1888 citation.  Sure, up to 1888.

19     The next one is U. S. A. Plaintiff's Exhibit 125-A,

20 which is the diversions through the O'Neill ditch, and do not

21 date back prior to 1930.  There is no record of diversions

22 through the O'Neill ditch prior to 1930.

23     So when Mr. Veeder says that there have been waters im-

24 pounded in Lake O'Neill every year since 1883, he gives us

25 evidence to support that in the form of Exhibit 125-A, and,

R 35

1   gives for the year 1888, but no other evidence to my knowledge,

2   and I know of nothing in the record that says that ever year

3   to 1914 there was water in the Lake.

4       MR. VEEDER:  I think, your Honor, in that regard if you

5   would like to have me add some more documentation, I surely

6   can, and there is the report, and I think your Honor will take

7   cognizance of it, in the report in Rancho Santa Margarita v.

8   Vail, in 11 Cal., that does advert to the fact that the waters

9   have been impounded in that Lake since 1886.  I think it says

10  1886 there.

11      I will also say that Vail's A. B., has a statement in it

12  about they have been impounding  water in that Lake from back

13  in 1886.  I think that appears on page 41 and on page 8 of

14  Vail's A. B., if you want that additional documentation.

15      MR. SACHSE:  If that is so, I would like to see it.

16      MR. VEEDER:  The record is here.

17      THE COURT:  I do not think there is any real dispute

18  about it, is there?

19      MR. VEEDER:  I didn't think there was.  That is why I

20  didn't inquire.

21      MR. SACHSE:  Well, I don't think you ought to find any-

22  thing unless you have some evidence.

23      THE COURT: Are the findings here in the old Vail-Santa

24  Margarita suit?

25      MR. VEEDER:  If you will look at page 41, and I think page

1   8 is the first reference to it, but on page 41 -- I am speaking

2   from memory on this, but I am quite sure that you will find that

3   on those pages reference is made to the impounding of water in

4   the reservoir.

5       MR. GIRARD:  I would like to comment on this too, your

6   Honor, on the term "impounded."

7       As I understand it, it would mean that you would put the

8   water in each year as it comes up down there you would put it

9   in the reservoir, and then use it subsequently.

10      I think the record shows that at least for many years

11  they just ran the ditch right through Lake O'Neill.  In other

12  words, what went in came out at the other end.  It wasn't

13  impounded.

14      MR. SACHSE:  That is my point exactly, that it wasn't

15  impounded.

16      MR. GIRARD: It is just a question of running the ditch

17  through the Lake, and the outlet was there, and whatever came

18  in just ran right out.

19      THE COURT: Not the same water.

20      MR. GIRARD:  Yes, practically.

21      MR. SACHSE:  Except for a little bit of dead puddles,

22  your Honor.

23      THE COURT: Was the Lake full in those days?

24      MR. SACHSE:  No.

25      MR. VEEDER:  Your Honor, if we are to argue, I would like

1   to take time to argue this point now.

2        MR. SACHSE:  I want to get the evidence in first.

3        MR. GIRARD:  Let's get the evidence before we argue it.

4        MR. STAHLMAN:  This might be of some use in connection

5   with the findings, in relation to what you suggest.   Shall I

6   read it, your Honor?

7        THE COURT:  If you have them there, yes.

8        MR. STAHLMAN:  Yes, your Honor.

9        THE COURT:  What are you reading from?

10        MR. STAHLMAN:  I am reading from Vail  A. B.

11        THE COURT:  Vail  A. B.

12        MR. STAHLMAN: This is page 41, finding 19, and starting

13   at line 15.

14            "The plaintiff and its predecessors in interest

15            have continuously maintained for approximately

16            forty-four years last past," -- that would be

17            1886 -- "and the plaintiff yet maintains,

18            adjacent to but not along the said water

19            course and in the plaintiff's lands riparian

20            to the same, certain works consisting of a

21            reservoir having a capacity of about 1140

22            acre feet of water, and ditches and other

23            conduits and appliances for the control and

24            distribution of such water, and during such

25            time plaintiff and its predecessors in in-

R 38

terest and ownership have continuously used

and plaintiff yet uses, such works in handling

and controlling except when interrupted and pre-

vented by the acts of said defendants as here-

in found, the water of the said stream nat-

urally descending therein for the watering

of livestock, for domestic use, and for the

irrigation of lands riparian to and in the

watershed of said stream in the said Santa

Margarita Ranch; all of which works are con-

venient and necessary for the utilization of

the said water for such purposes."

MR. VEEDER:  We were talking about the period of impound-

ment.   I think that covers it.

MR. SACHSE:  There is no word of any impoundment.

MR. VEEDER:  All right.   Storage, or whatever you want

to call it.

MR. SACHSE:  That indicates no storage there.   That in-

dicates they are using it merely as a part of the irrigation

system.

MR. GIRARD: Your Honor, may I make a point now?   I just

want to get a factual matter.

This is Plaintiff's 25, Colonel Bowen, and is that the

Exhibit which gives the measurement where the outlet works were?

MR. VEEDER:  Exhibit 25 is the measurement into Lake

R 39

1    O'Neill.

2        MR. GIRARD:  It is the Lake O'Neill gaging station right

3    at the point where --

4        MR. VEEDER:  At the point of diversion.

5        MR. GIRARD:  Or is it water that goes in that would be

6    downstream from the gaging station, which might not go into

7    Lake O'Neill?

8        MR. SACHSE:  Oh, yes.

9        THE COURT:  The gaging station is on the ditch.

10       MR. SACHSE:  It is on the ditch, your Honor.

11       THE COURT:  And into Lake O'Neill.

12       MR. GIRARD: But isn't it correct, Colonel Bowen, that

13   the probable water that is measured at that gaging station may

14   not go into Lake O'Neill?

15       In other words, is this the factual situation, or am I

16   wrong here?  Maybe I am completely all wrong here, but I just

17   want to get my own mind straight.  Here is your river here,

18   and here is your ditch here, and your gaging station is here;

19   is that correct?

20       A   That is correct.

21

22

23

24

25

1    MR. GIRARD:  And there is a ditch in here into Lake

2    O'Neill, and a ditch that goes straight down?

3    COLONEL BOWEN:  Yes.

4    MR. GIRARD:  And some of the water gauging station, --

5    the gauging station measurement does not necessarily reflect

6    what goes into Lake O'Neill; that is correct, or isn't it?

7    COLONEL BOWEN:  Mr. Girard has shown me a diagram here

8    with the gauging station located on the ditch upstream from

9    the division box, which may divert water into Lake O'Neill,

10   or it is possible to bypass Lake O'Neill.  A division box

11   is simply a concrete T, with, say, the upright bar of the T

12   going into the lake, and the cross bar of the T allowing a

13   bypassing of water.

14   THE COURT:  That is correct?

15   COLONEL BOWEN:  That is correct, yes sir.

16   THE COURT:  And, therefore, it would follow that the

17   figures of the gauge on the ditch, the Lake O'Neill gauge,

18   would not necessarily be the figures of the water that went

19   into Lake O'Neill?

20   COLONEL BOWEN:  That is correct, your Honor.

21   MR. SACHSE:  That is right, your Honor.  Now, if I can

22   continue on this "impoundment," I still don't like the word.

23   If Mr. Veeder is asserting a storage right, -- well, to me

24   "impoundment" means that something is flowing along, or

25   flowing by, and you stop it and impound it.  That is to me

P 2

1    what it means.

2         I don't think that there is a word in Vail AB again,

3    or in the evidence that says this at all, your Honor, and

4    the language that Mr. Stahlman so clearly just read to you

5    spells it out in words of one syllable what they did.

6         Sometimes when there were large flows of water, Lake

7    O'Neill built up, yes, and other times it didn't.  It sat

8    there as a little wide place, and as the water ran on down,

9    it was to irrigate the fields below.  But there is no proof

10   of impoundment every year, as Mr. Veeder says.

11        MR. VEEDER:  Does your Honor want me to argue that?

12        THE COURT:  Not until we find out if there is any more

13   factual material that will bear on it.  Let me see those

14   findings in Vail AB.

15        MR. SACHSE:  This is Mr. Stahlman's copy, your Honor,

16   at this page, and it continues on to the next page (handing

17   document to the Court.).

18        THE COURT:  Of course, you did not read all the way down

19   in the findings.  The finding starts out, paraphrasing it,

20   Finding 19 at page 41 in this way:  The plaintiff and its

21   predecessors have continuously maintained for approximately

22   forty-four years, and yet maintains, and so forth, certain

23   works consisting of reservoir having a capacity, and so forth,

24   and during such time plaintiff and its predecessors in

25   interest and ownership have continuously used, and plaintiff

P 3

1   yet uses, such works in handling and controlling, except

2   when interrupted and prevented by the acts of the defendants,

3   as herein found, the water of the said stream naturally

4   descending therein, and so forth.

5   Now, we don't yet know what they mean.  They have used

6   it for handling and controlling, but the finding then goes

7   on and says:  By reason of the diversions of water made by

8   the defendants on and to said Pauba Grant, Temecula Grant,

9   Little Temecula Grant, and so forth, as herein found, and

10   their practice of winter irrigation during the Autumn, winter

11   and Spring of the seasonal years 1923-1924, 1924-1925, 1925-

12   1926, and 1927-1928, the defendants so reduced the natural

13   flow of said stream that, beginning about June 1st of each of

14   said calendar years 1923, 1924, 1925 and 1928, the plaintiff

15   could not receive and did not receive from the natural flow

16   of said stream sufficient water to fill its said reservoir,

17   and to furnish water for livestock; and in consequence

18   plaintiff had not enough water, and so forth.

19   That in 1926 a rainfall of runoff of great quantity

20   occurred, and so forth, and in February in 1927 rainfall of

21   unusual amount.

22   So at least that part of it would indicate that what they

23   mean by handling was to fill the reservoir, and that in the

24   years mentioned they were not able to fill it because of the

25   acts of the defendants.

P 4

1    MR. SACHSE:  Your Honor can draw the conclusion.  I
2    don't draw the same conclusion.

3    THE COURT:  I don't know how else you can read that.

4    MR. SACHSE:  I draw the conclusion that the handling of
5    the flow of the stream would mean to put it where he wanted
6    it at the time that he wanted it.  What is a more natural
7    word?  Why not say "store" instead of "handling"?

8    THE COURT:  I am only saying that I think that you can
9    read that finding to indicate that except for those years
10   mentioned that water was used to fill the Lake O'Neill
11   reservoir.

12   MR. SACHSE:  I would respectfully contradict your Honor
13   to this extent:  That we must look to common ordinary usage
14   of informed people.  These were water lawyers and a water
15   judge, and if there is any word that is a word of art that
16   is well understood in the water business it is "store."  Why
17   do we say "handle"?  Why do we say we handle the water if we
18   are storing it?  Why not say that we store it, instead of
19   getting a judgment and a decree and findings of fact that
20   were that sloppy?  If they were that sloppy, possibly they
21   were, but I can't find a support for the conclusion, or, I
22   mean, for the finding as set forth.

23   THE COURT:  Have you any other proof as to the operation
24   of Lake O'Neill?

25   MR. STAHLMAN:  Your Honor, I think we may be able to find

P 5  1   some information.  That is one of the reasons why I indicated

2   that we would like to have an opportunity to see if we can

3   find something else that will throw some light on it from our

4   records.  If so, we would like to do it.

5       I would like to put out the thought to the Court that

6   the first thing that occurrs to me in relation to this matter,

7   and I am concerned about the matter only in so far as it

8   might establish a right --

9       MR. VEEDER:  Appropriative?

10      MR. STAHLMAN:  -- other than an appropriative right, and

11   other than a riparian right.

12      However, in viewing this dam, I cannot see where it does

13   anything that other reservoirs have done in other cases in

14   which Mr. Veeder has taken a position opposite to what he is

15   taking here.

16      In other words, this has merely been a system of appli-

17   cation of riparian water to be utilized for reasonable and

18   beneficial purposes, as it was at that time.

19      Now, in addition to the fact that the riparian water

20   must be reasonably and beneficially used, we also must not

21   lose sight of the fact that it must be applied by reasonable

22   means, and that those means change.

23      I am just wondering if we would take this situation,

24   using an illustration to see if there is not some comparison;

25   that is, assuming that some riparian today attempted to do

P 6

1    what has been done down on Camp Pendleton, that it would not,

2    in the light of the present method of distributing irrigation

3    water, be a reasonable and beneficial method -- a reasonable

4    method of distribution.  And I think that that changes from

5    time to time, and I believe the cases demonstrate that the

6    means and methods of distributing water in a locale is a

7    standard job that determine what the means are.

8         For instance, down there now we are running in water

9    through ditches in this day and age, when it is conserved as

10   the Constitution indicates it should be, by using modern

11   means and methods, where everybody is using pipe, and so

12   forth, and we are still down there with this antiquated

13   system that they used for irrigation in the method by which

14   they are utilizing this water.

15        The question in my mind is as to whether there is not

16   only not the reasonable and beneficial use, but that the use

17   has been completely changed, and whether we have to consider

18   whether or not it is a military use even for riparian purposes,

19   and as to whether or not the means by which they are doing

20   that is not a reasonable means.

21        Now, when we take into consideration the evidence in this

22   case, by which the large quantity of water was used, and there

23   was a tremendous amount of evaporation in the old ditches in

24   old days, and that would be all right at that time, and I

25   presume that was a reasonable means at that time, but it

P 7

1    certainly is not today.  So it does affect the quantity of

2    water, and if it is riparian water, and they are using it

3    after it gets down there for riparian purposes, as I say,

4    if it is to establish an appropriative right, then I think

5    these other questions become quite important, as to whether

6    it is a reasonable means, and then, of course, we have all

7    of these questions, as to whether or not there was an abandon-

8    ment, because they have changed the use of the water, and so

9    forth.  They didn't use it in the ditch, as they did in those

10   days.  However, those things just struck/and came to my mind,
                                                    me

11   as we went along here.

12         THE COURT:  What language do you think should be used,

13   Mr. Sachse?

14         MR. VEEDER:  Your Honor, if these gentlemen are through

15   with their argument, I would like to present our views and

16   our position on the meaning of the word "impoundment," and the

17   meaning of the word "reservoir," and the operation, your Honor.

18         THE COURT:  All right.

19         MR. VEEDER:  I can't possibly accept what has been said

20   here as being correct.  The term "reservoir" itself carries

21   the connotation of storage in the reservoir.

22         THE COURT:  This finding does not mention "reservoir."

23   It says "Lake O'Neill," and it says "first stored in Lake

24   O'Neill."

25         MR. SACHSE:  Where does it say it?

P 8

THE COURT:  Go ahead.

MR. VEEDER:  I have already described Lake O'Neill as

a reservoir, your Honor, an off channel reservoir, and when

we use the word, if you will observe it there, I don't believe

it is repeated each time, unless your Honor directs me to do

that.

THE COURT:  No, no.

MR. VEEDER:  The description of Lake O'Neill in VI

states:

> "Lake O'Neill is an off-channel artificial
>
> storage reservoir."

Now, if you want me to say that each time, I will.

THE COURT:  No.

MR. VEEDER:  Certainly, when we use the term "Lake

O'Neill," we mean "reservoir."

THE COURT:  Go ahead.

MR. VEEDER:  I just wanted to be sure that that point is

clear.

When I pointed out the reference to page 41 of AB, and

42 of AB, and on through, you will find, as you pointed out,

repeatedly the statement that the reservoir was filled for

purposes of irrigating these lands, and for domestic purposes,

and for stock watering purposes, and certainly it is manifest

that when you impound water for stock watering purposes, and

domestic purposes, and for irrigating alfalfa, you are

P 9

1    contemplating seasonal storage.

2        If your Honor would look at Exhibit 125-A, which is the

3    report of the State Engineer in 1888, the statement is dis-

4    closed there as to how this operation is conducted, and it

5    is entirely different from the description given by Mr. Girard

6    and by counsel for Fallbrook.  It says:

7           "This dam is about twelve feet high, one thousand

8           three hundred and forty feet long, and is provided

9           with an outlet near the south end, consisting of

10           a wooden opening four feet four inches wide,

11           reaching from top to bottom, with loose plank

12           four inches thick set one above the other to

13           retain the water and enable it to be drawn off

14           from the top by removing one plank after the other."

15    MR. SACHSE:  That is exactly as I described it.

16    MR. VEEDER:  Why don't you let me finish?  I realize

17    that --

18    THE COURT:  Just go ahead.

19    MR. VEEDER:  This harrassment -- I have gotten used to

20    it from this crowd -- but the point that I make -- and to me

21    it is not funny any longer, your Honor.

22    THE COURT:  Go ahead.

23    MR. VEEDER:  The idea that you would impound a reservoir

24    to be sufficiently full, so that you would release the water

25    one board at a time would evidence the fact that they intended

P 10

to store to the full extent of the capacity of the reservoir, and in so doing they certainly were not in the position of running a continuous stream, as has been stated by California, for the purposes of operation.

Indeed, if you would look at the references in this same exhibit, you will find that the quantity of water that was being impounded had a surface area of 160 acres, and that the aggregate, as the record shows, is upwards of 1200 acre feet.

Now, it is obvious, your Honor, on the basis of the run-off in the Santa Margarita River that the operation as here described is totally incorrect.

Anyone who has had any experience in regard to the irrigation of alfalfa would know that you impound the water, and that there will be a period when the cuttings have been made that you will store the water for two or three weeks perhaps before you will even put it back on the land. And you will also note, your Honor, in regard to the irrigation of sugar beets, that it takes a late irrigation to mature a crop.

Now, to me the important factor -- and we are down now to a point where I can't agree to abandon language -- Lake O'Neill is a reservoir, and in it water was impounded.

Now, if we say "stored," -- certainly, it cannot be denied on the basis of the record that water has been stored and impounded.

P 11

Take D4

1   THE COURT:  Does the report that you are reading from

2   go any further?  Do they, for instance, in this report point

3   out that it is used to irrigate alfalfa?

4   MR. VEEDER:  It starts with the first sentence up there,

5   your Honor, if you want to read it into the record.

6   (Handing document to the Court.)

7   THE COURT:  (Reading)"and about three hundred acres of

8   alfalfa and twelve acres of orchard and vineyard are thus

9   irrigated."

10   Of course, I think the Court could reasonably infer

11   from that that alfalfa must have been irrigated in -- what

12   is the date of this?

13   MR. VEEDER:  The report is 1888, and it is first dis-

14   closed there as 1883.

15   THE COURT:  It must have been irrigated in 1888 as it

16   is today.  In other words, alfalfa has the characteristic of

17   being a crop that can be mowed several times a year, and,

18   therefore, I don't think that it would be an improper inference

19   to infer that alfalfa was grown then as now, and that it was

20   watered inbetween cuttings.

21   Do you think that is too big an inference, Mr. Sachse?

22   MR. SACHSE:  No, your Honor, but I say if we accept the

23   inference, what does that mean?  That the water was stored

24   in the lake more than necessary to go ahead and flood the

25   field.  The size of this lake is perhaps --

P 12

1    THE COURT:  We have taken only one position at a time.

2    The point that you have been raising right now is that there

3    is a dearth of evidence as to how this has started out, to

4    show how much water was put in this lake, yet this lake was

5    then even full, and that someone suggested water merely ran

6    by it or --

7        MR. VEEDER:  Through it is what he said.

8        THE COURT:  Or ran through it.

9        MR. SACHSE:  That is right.

10       THE COURT:  And I am just directing my attention to that

11   question.

12       MR. SACHSE:  My attention was with the language "each

13   year," and I say that this exhibit from which your Honor

14   read is excellent.  That is plenty of evidence that it

15   happened in 1888, and each year prior thereto, if you so

16   desire, but there is not a word of evidence, and the only

17   inference I can draw from the other written instrument, the

18   findings in <u>Santa Margarita vs. Vail</u> is that that is not how

19   it was done, and the language I object to is not the impound-

20   ment.  The language I object to is Mr. Veeder's language that

21   it has been impounded each year since 1883.

22       MR. VEEDER:  I think that there is a rule and a principle

23   of evidence to the effect that if it is shown that activity

24   has been conducted at one time, that the idea is that it will

25   be carried on through, and it might be that this is that --

P 13

1    MR. GIRARD:  I would like to --

2    MR. VEEDER:  -- unless they introduce evidence to show

3    abandonment.  I think the burden was on him, and that there

4    was an establishment here of the impoundment of this water.

5    MR. GIRARD:  Your Honor, I think in quoting that letter

6    you asked us if you could draw an inference.

7    I think if you go a little further and read the last

8    paragraph of the article, you might draw the inference that

9    they quit irrigating at all.

10   THE COURT:  I just read that.  I had never seen that

11   before.

12   MR. GIRARD:  It says that it was used for purposes of

13   eradicating gophers, and that the actual moisture of the

14   sub-irrigated areas made irrigation unnecessary.

15   THE COURT:  It says:

16   "This is probably the only old irrigation ditch in

17   the county irrigating any considerable area, which

18   has any pretense of a systematic utilization of

19   water, and in this case its use is rather more

20   required for exterminating gophers than as an

21   absolute necessity for plant growth, because the

22   bottom lands on which it is used are naturally

23   moist and sub-irrigated."

24   MR. STAHLMAN:  Is that Mr. Veeder's exhibit?

25   MR. VEEDER:  That is the State's Exhibit 125-A.

P 14   1     MR. STAHLMAN:  That is your exhibit.

       2     MR. VEEDER:  I put the whole exhibit in, your Honor.

       3     THE COURT:  How did the gophers get in this?

       4     MR. VEEDER:  I have been wondering.  They haven't made

       5  any claims.

       6     THE COURT:  Don't we have some further testimony?  We

       7  have some of the men who farmed this ranch, and didn't you

       8  interrogate them?

       9     MR. VEEDER:  Oh, yes, your Honor.  We have evidence by

     10  Mr. Salisbury, who testified that the water was impounded

     11  each year.

     12     THE COURT:  What period did he testify to?

     13     MR. VEEDER:  From 1911 to 1914.  You would have an

     14  extremely difficult time finding people who go back any

     15  further than that, your Honor.  But the fact does remain,

     16  and the testimony clearly shows that in 1911 they were im-

     17  pounding water to raise alfalfa, to raise lima beans and to

     18  raise sugar beets, and they did apply and did acquire -- they

     19  did apply this water to a beneficial use in 1911.

     20     THE COURT:  I will make a further check.  Let's not

     21  spend all our time on this.

     22     MR. SACHSE:  I will bring those transcripts down to-

     23  morrow.

     24     MR. VEEDER:  I have those transcripts here, if you want

     25  to see them.

P 15

1    MR. SACHSE:  Let's take up something else.

2    MR. VEEDER:  No, I can't imagine anything more important

3 than this single issue right now.

4    MR. SACHSE:  I would like to have a minute and check it

5 up, and I think we might save a little time.

6    MR. VEEDER:  All right.

7    THE COURT:  Then why can't we pass it, and go on to VIII

8 and come back to it.

9    MR. VEEDER:  That is fine with me.

10    MR. SACHSE:  To make Mr. Veeder happy, I have no objection

11 to VIII.  In fact, I am very pleased with it, and I hope it

12 stays in.

13    THE COURT:  There must be something wrong with it, Mr.

14 Veeder.

15    MR. VEEDER:  No, I think the findings are pretty good,

16 your Honor.

17    MR. SACHSE:  It describes exactly the operation.

18    THE COURT:  Any objection to VIII Mr. Girard?

19    MR. GIRARD:  No, your Honor.

20    THE COURT:  Mr. Stahlman?

21    MR. STAHLMAN:  Not to VIII, your Honor.

22    MR. SACHSE:  Now, on Number IX, my only objection would

23 be that I think Mr. Veeder should change the date.  It is

24 undoubtedly correct to say:

25    "Surface area of Lake O'Neill in the year 1883 was

P 16   1          160 acres and was substantially the same in 1914."

2          I think that is the important date, and not today.  I

3     am willing to so find.

4          MR. VEEDER:  Make it 1914.

5          MR. SACHSE:  Now, the next question I was going to ask

6     is this:  It says, "Surface area of Lake O'Neill," and I

7     don't know what that means.

8          THE COURT:  When full.

9          MR. SACHSE:  "when full" is the question, "surface area

10    when full."

11         MR. VEEDER:  I am still referring to the --

12         THE COURT:  Well, obviously, it is when full, isn't it,

13    Mr. Veeder?

14         MR. VEEDER:  Yes, certainly.  It says, "The main ditch

15    is three quarters of a mile in length," -- I am reading from

16    125-A -- "and terminates in a reservoir, covering 160 acres,

17    built in 1883."

18         That is from 125-A, your Honor.

19         MR. SACHSE:  Then you can say, Mr. Veeder:

20         "The surface area in 1883 was 160 acres, and, if full,

21    was substantially the same in 1914."

22         But I don't know if it was full in 1914, and neither

23    do you, and neither does the Court.  That is my point.

24         MR. VEEDER:  Now, what language do you want.

25         MR. SACHSE:  "The surface area of Lake O'Neill when

P 17

1  full."

2      THE COURT:  Mr. Girard, do you have any suggestions on

3  IX?

4      MR. GIRARD:  No, just with the correction that the Court

5  and Mr. Sachse have indicated.

6      THE COURT:  Mr. Stahlman?

7      MR. STAHLMAN:  No, your Honor.

8      MR. SACHSE:  Roman X, your Honor, is I think a **Veeder**

9  booby-trap.  I am very curious about this:

10     "Storage capacity in Lake O'Neill historically

11     and at the present time is approximately 1200

12     acre feet for one filling."

13     Now, what is the capacity of a bucket?  Is the capacity

14  of a bucket a 5-gallon bucket, or is it a 5-gallon bucket

15  for filling?  And if the capacity of the reservoir is 1200

16  acre feet, and the reason for this trick language beyond any

17  question is that Mr. Veeder has dreamed up this new theory

18  of combining a storage appropriative right with also some

19  sort of a diversion appropriative right that lets him keep

20  us in the dark.

21     MR. VEEDER:  Your Honor, I don't mind the abuse from

22  Mr. Sachse.  I don't credit/ him with very much intelligence, so

23  I don't mind him shooting off his mouth a certain amount of

24  time, --

25     THE COURT:  Well, now, --

P 18

1    MR. VEEDER:  -- but what I was saying is that if it

2    takes 1200 hundred acre feet to fill the reservoir once, when

3    it is released, you can build it up to its maximum quantity

4    of whatever your Honor says.

5        Now, Colonel Bowen testified that it would take 2600

6    acre feet to irrigate 300 acres of alfalfa.  I simply put

7    that language in there, and there is no booby-trap, although

8    -- well, I won't say it.  I think that the question about

9    operation is the important thing.

10    MR. SACHSE:  Then if Mr. Veeder hasn't any reason for

11   it, let's delete the words "for one filling."

12    MR. VEEDER:  I would say this, if it is going to make

13   anybody happy, or unhappy, or anything else:

14        "Storage capacity in Lake O'Neill at the

15    present time is"-- you don't have any objection to the

16   1200 acre feet?

17    MR. SACHSE:  No, not a bit.

18    MR. VEEDER:  And that the operation historically has

19   been --

20    MR. SACHSE:  That is another thing.  Let me see that

21   finding in writing before we agree on it.

22    THE COURT:  I think we will take our adjournment now.

23   We are down to that time.

24    MR. GIRARD:  We have got to X.

25    THE COURT:  Of course, if the Government were to use this

P 19

1    reservoir merely to build up a head to irrigate alfalfa, --

2    as to the riparian use, there would be no question about it.

3         MR. VEEDER:  I don't think that it did.  I think what

4    it did was to store water.  It acquired a right to store water

5    in the spring and use it in the summer and fall.

6         But may I just renew one point here, your Honor:  If

7    I comprehend what Mr. Sachse has done, he has at least agreed

8    that there is a riparian right to use water, and we have

9    succeeded here.  They are invading our right at the present

10   time, and I think it is certainly a ground to grant the

11   injunction that I have petitioned, at least in regard to the

12   riparian right.

13        THE COURT:  Let's follow the orderly course and not have

14   these arguments now.

15        MR. VEEDER:  They are hurting us today if they are

16   pumping, I am certain.

17        THE COURT:  I am not going to grant it tonight.

18        MR. VEEDER:  I wish you would.

19        THE COURT:  Of course, I think I know in my own mind

20   what happened in the operation of this reservoir.  I think

21   we all know.  The only question is what is in the record?

22   That here was the Rancho in a dry area, and they knew the

23   value of water, and they got a ditch that would carry 1,000

24   inches of water, and they had a reservoir that would hold

25   as much as 1200 feet, and I think they husbanded water just

P 20

1    like the Colonel does today.  In other words, when they got

2    a chance to get the reservoir full, they got it, and if it

3    was full and there was water in the stream, then they said,

4    "We will run water in the reservoir," and when the reservoir

5    and when the stream flow of the river went down, they un-

6    doubtedly had to use this reservoir to irrigate, for domestic,

7    and for other uses.  If there was water flowing, or if they

8    used water out of the reservoir, and there would be some

9    water in the stream that they could pick up, they replaced it.

10   I would wager that they kept this reservoir just as full

11   as they could at all times, and many times they did not have

12   to use it for their alfalfa, and as the dry season came along,

13   they probably had to use it, and sometimes they could replace

14   it, and sometimes they could not.  I haven't any doubt that

15   this is what they did, but whether the record bears all this

16   out, I can't say.  I don't know how else they would have

17   used it.

18   This wasn't just an ornament that they had.  They may

19   have gotten some aesthetic satisfaction out of it, but this

20   was a working part of the ranch.

21   MR. SACHSE:  A part of the ranch irrigation system.

22   THE COURT:  A part of the ranch irrigation system, and

23   this was an operation in the days when the dude ranches had

24   not yet arrived.  It was a down-to-earth proposition.

25   MR. VEEDER:  May I make one correction, your Honor?

P 21

1    THE COURT: Do you have any doubt that this is what they

2  actually did? I don't think that there is any doubt, but

3  whether the record shows all this, and what flows from it

4  are the questions.

5    MR. VEEDER: The statement has been made by Mr. Stahlman

6  that I have objected to this temporary impoundment. I have

7  agreed that upon the Vail Company Ranch, where they have

8  built up the 24 hours, as they have done, for the purpose of

9  building up a head, and releasing it for use, I have never

10  said that that wasn't a proper riparian use. And when Mr.

11  Stahlman says I have taken a different position --

12    MR. STAHLMAN: No, I was thinking of the Gibbon and

13  Cottle situation.

14    MR. VEEDER: But that is not storage. They did what

15  you do, as I comprehended the Gibbon and Cottle position,

16  and I haven't said that that would not be a proper riparian

17  use.

18    MR. STAHLMAN: I haven't said yours was not a proper

19  riparian use. I haven't said yours wasn't.

20    MR. SACHSE: The significant thing on this question is that

21  we are liable to forget the size of this reservoir is relevant.

22  When we heard evidence that my client, Stardust, has about

23  20 acres and two farms, Mr. Veeder readily accepted the fact

24  that if you put 40 acre feet of water on the two farms, and

25  thereafter have it available to irrigate perhaps 40 acres and

P 22

sow it with alfalfa downstream, that that is a reasonable riparian use.

Where is the difference if your ranch gets bigger?  Then your reservoir is going to get a little bigger for exactly the same purpose, and when you are farming an area with thousands of acres, thousands, I think it is reasonable to have a 1200 foot head.

MR. VEEDER:  The question is, how long did you store it?

MR. SACHSE:  On a 40-acre ranch you accepted the size of the ranch that we were involved in.

THE COURT:  We will recess.  In fact, we have been in recess from just when Mr. Stahlman spoke a little while ago.

(Thereupon at 4:25 o'clock P.M., Wednesday, March 15, 1961, an adjournment was taken until 10:00 A.M., Thursday, March 16, 1961.)

P 63

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California, this 15th day of March, A.D, 1961.

_____
Official Reporter

_____
Official Reporter