VOLUME NO. 137

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

　　　　　　　　　　Plaintiff,

vs.　　　　　　　　　　　　　　　　No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

　　　　　　　　　　Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:　　　San Diego, California

Date:　　　Thursday, March 16, 1961

　　　　Pages:　　15,541　to 15,662

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 137

Take A
P1

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

- - - -

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

- - - -

7
8
9
10
11
12

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
vs.                            )        No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                 Defendants.   )
_____

13

14

REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

San Diego, California

16

Thursday, March 16, 1961

17

- - - -

18

APPEARANCES:

19

        For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                        Special Assistant to the
20                                      Attorney General

21                                      CDR. DONALD W. REDD.

22

        For the Defendants:

23

            Vail Company              GEORGE STAHLMAN, ESQ.

24

            Fallbrook Public Utility  FRANZ R. SACHSE, ESQ.
            District, et al.,

25

            State of California       FRED GIRARD, ESQ.

P 2

1    APPEARANCES   (continued)

2         For the Defendants:

3            Defendants Gibbon &          GEORGE GROVER, ESQ.,
             Cottle                                and
4                                         DONALD D. STARK, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## ORAL ARGUMENTS

MR. GROVER                                  L%, 15,547

MR. VEEDER                                      15,619

MR. GIRARD                                      15,620

MR. SACHSE                                      15,626

MR. STAHLMAN                                    15,634

MR. VEEDER                                      15,638

MR. GROVER                                      15,642

## INDEX OF EXHIBITS

| Defendants' Exhibits | Identified | Received |
|---|---|---|
| Gibbon & Cottle's Exhibits C, D and E substituted with corrected copies. | | 15,546 |
| Gibbon & Cottle's Exhibits D and E received. | | 15,546 |

## INDEX OF WITNESSES

| Plaintiff's Witness | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | 15,619 (The Court) | | | |

P 4

SAN DIEGO, CALIFORNIA, Thursday, March 16, 1961, 10:00 A.M.

(Other matters.)

THE CLERK:  6-1247-SD-C United States vs. Fallbrook.

THE COURT:  Are Mr. Stark and Mr. Grover here this morning?

MR. GROVER:  Yes your Honor.  Mr. Stark was here a minute ago.

MR. VEEDER:  Mr. Stark is on the telephone in my office.

THE COURT:  Let the record show that we are honored to have a high official of the present Democratic Administration present in Court.  I haven't seen you personally, George, since you were appointed to the Public Utilities Commission. May I say, whether I agree with your argument today or not, I think you are well qualified for the position.  I think you will do an excellent job for the people of the State of California, and I thoroughly approve of the appointment.

MR. GROVER:  Thank you, your Honor, I appreciate that very much.

THE COURT:  Again I say, that doesn't mean that I am going necessarily to follow every argument that you make and so rule.

MR. GROVER:  I think it is apparent to everyone, however, that this will be my last appearance in this case and that it will be necessary in the future for Mr. Stark to represent Gibbon and Cottle.  We thought that the only proper way to

P 5

1 proceed this time, however, was for me to complete the work

2 I have been doing and give the Court the benefit of my views,

3 since I was the only one who was here when the case was pre-

4 sented.

5     First of all, I would like to complete the introduction

6 of exhibits.  Your Honor will recall that there was a clerical

7 error in one of the exhibits of Gibbon and Cottle, which was

8 carried over into another exhibit which totaled the one in

9 which the error appeared, and I might say, to facilitate

10 this, that on page 13,698 of the record the Court gave us

11 authority to substitute corrected exhibits and anyone who

12 has any question about it can refer to that page and be sure

13 we have made the proper correction.

14     I have here the corrected versions and I would like to

15 have the Clerk check to be sure that we got the proper exhibit

16 numbers.  They are C, D and E of Gibbon and Cottle.

17     THE COURT:  My records show that C was received and

18 D and E were not.  C was a tabulation of water diversions by

19 Gibbon from 1947 to 1958.

20     MR. GROVER:  Yes.  D, then, was the tabulation of the

21 wells, and E was the summary of C and D.

22     THE COURT:  Yes.

23     MR. GROVER:  So that C was correct and was received.  D

24 I have here in corrected form, and E in corrected form.

25     On an earlier occasion I gave Mr. Veeder copies of these

P 6

1  corrected exhibits.  I have not yet given them to other counsel.

2  How many should I give the Clerk?

3      THE COURT:  I want one, and the Clerk wants one, and

4  then pass the rest out to counsel.

5      MR. GROVER:  Here are two copies of D, then, as corrected,

6  and they have the word "corrected" at the bottom.

7      THE COURT:  Fine.

8      MR. GROVER:  And two copies of E as corrected.

9      And with those changes, then, I would ask that D and E

10  be received in evidence.

11      THE COURT:  You have them reversed here, I think.  D

12  was the ground water extractions, which would be the wells.

13      MR. GROVER:  Yes.

14      THE COURT:  That should be D.  At least, that is the

15  way the record was previously made.  Then E is the total.

16      MR. GROVER:  That is the way I understood it.

17      THE COURT:  At least the ones the Clerk marked for me

18  are reversed in order.

19      MR. GROVER:  Apparently I handed him the wrong ones,

20  your Honor.

21      THE COURT:  Do you offer them in evidence?

22      MR. GROVER:  Yes, your Honor.

23      THE COURT:  D and E received in evidence.

24                      (Gibbon & Cottle's Exhibits C, D & E    )
                        (were substituted with corrected copies,)
25                      (and Gibbon & Cottle's Exhibits D & E    )
                        (were received in evidence.              )

P 7

1    MR. GROVER:  In connection with the argument today, we

2    submitted to counsel and sent also a  copy to your Honor of

3    a memorandum.  We got it out just as soon as we could, but

4    it was not a great deal in advance of this hearing.  But I

5    would like to file the memorandum.  This time  I did not send

6    a copy to the Clerk.  I would like to have the record show

7    that copies were sent to Messrs. Veeder, Stahlman, Sachse,

8    Girard and O'Malley.

9        THE COURT:  Did you send me a copy?

10       MR. GROVER:  And I sent you a copy, your Honor.  You

11   should have received it Monday.  I have another one if you

12   need it.

13       THE COURT:  I have it here, yes.  It is being filed as

14   of today.

15       MR. GROVER:  Yes.

16       THE COURT:  All right.

17       MR. GROVER:  As the memorandum indicates, the purpose

18   of this discussion today, as we understand it, is not to go

19   into elaborate detail on findings and conclusions regarding

20   the claimed appropriative and prescriptive rights of Gibbon

21   and Cottle, but to nail down the general approach which the

22   Court will take.  And we start from the fact that your Honor

23   previously indicated that, absent a stronger showing later

24   in the trial, there would be no recognition of an appropria-

25   tive or a prescriptive right for use on riparian lands.  And

P 8

1    I take it that that means without storage.  The reference to

2    your Honor's comment is at 165 F.Supp 806, at page 863, and

3    we are taking advantage, your Honor, of the suggestion there

4    that stronger authority might be presented later in the trial.

5    Four cases are cited there by your Honor to the effect

6    that a riparian cannot gain an appropriative right presumably

7    for reasonable beneficial use on his own riparian land.

8    I would like to point out, first of all, two distinctions

9    which must be borne in mind when we look at the statements

10   and cases.  First of all, these cases were injunction cases,

11   and we get such comments -- I might give one as an example.

12   That was the Half Moon Bay case in 173 Cal.

13   MR. VEEDER:  Is that the Half Moon case?

14   MR. GROVER;  Yes, Half Moon Bay Land Company vs California,

15   173 Cal. 543.  And speaking of riparian owners, at page 549

16   the Court said:

17        "Each owner has the right to use the whole

18   or any part of the water on his own riparian land

19   at any time when such use does not interfere with

20   the actual use by the other owners of their due

21   shares."

22   The point that I would like to make now is that in the

23   context of that case, of course, the purpose of the Court is

24   clear; but when we take that out of context, then we get

25   into trouble.  In other words, it is dictum.

P 9

1          Now in that particular case I would like to read on

2     page 549 a little more detail about what the Court was saying

3     there.  This was a decree which was being affirmed with one

4     modification, and it was an apportionment case in which an

5     injunction was involved.  In referring to the decree, the

6     Supreme Court says, page 549:

7               "The decree, in effect, declares that each riparian

8          owner shall be entitled to a share of the water

9          equal to one inch for each ten acres of his riparian

10         land capable of profitable irrigation, if there is

11         enough from the stream to serve all at that rate;

12         that when there is not enough for all, each shall

13         share the water in the proportion that his area of

14         land so irrigable bears to the total area so irri-

15         gable, but that when only twenty-three miners inches

16         are flowing they shall be respectively entitled to

17         only the specific amount stated."

18    Apparently when the flow got down low there was a practical

19    problem which was taken care of in a special way.

20              "Provided that either one may take a greater

21         quantity so long as none of the other parties

22         objects."

23    This comment taken from the case has to do with the word

24    "objects."

25              The Court goes on:

15,550

P 10

"The mere objection by one riparian owner in such

case is not sufficient to deprive any other riparian

owner of the use of the water of the stream."

And then the statement I quoted earlier:

"Each owner has the right to use the whole or any

part of the water on his own riparian land at any

time when such use does not interfere with the

actual use by the other owners of their due shares.

If any such owner is not using water himself, he

has no right to object to the use of it by another

riparian owner on riparian land."

When we view that comment in the light of the injunctive

aspect of the case we see that it is obviously correct.   No

one has a right to sit in his rocking chair and require the

water to go into the ocean.

THE COURT:   There was no defense contention of pre-

scriptive right raised in the case.

MR. GROVER:   No, it was an apportionment case that in-

volved an injunction and obviously correct as far as it went

in that case.

Gould vs. Eaton, also cited by your Honor, was a case

which is even less like ours.   In that case there was an

upper riparian who was diverting to non-riparian land, and

consequently we don't even have the problem of use on riparian

land.   But in commenting on it later in the case the Court

P 11

1    said, speaking of the upper riparian:

2         "If he does not, in fact, use any of the water

3         himself, the inferior (in the sense of lower on

4         the stream) proprietor has a right to the flow

5         of the entire stream."

6    And of course, that is correct.  If the man above is not

7    using it, it will flow automatically without any court action

8    to the lower man.  And so it was a gratuitous comment which

9    had no bearing on prescription for use on riparian land,

10   particularly when we see that the diversion was to non-

11   riparian land.  He happened to own the land at the point of

12   diversion which was riparian, but he was taking it to non-

13   riparian land.

14        Then there is the _Joerger_ case, also cited by your Honor.

15   That involved an injunction, and it involved opposite riparian

16   owners -- that is, instead of being above and below each

17   other they were, the Court says, in effect, opposite each

18   other on the stream.  The water was being taken out by one

19   riparian owner for power purposes, as I recall, in a flume

20   and returned further down the stream but still above the low-

21   er line of the property owned by the opposite owner.  There

22   are some comments there, again, but they have no bearing on

23   the issue of prescription.  The other owner was not using

24   the property, and the point made that one is entitled to the

25   full use when the other isn't using it was merely in the

P 12   1   context of that particular case.

2       I believe it is not necessary, because this is just

3   cumulative, to make the point with  quotations from the case.

4   It is distinguishable on that ground.

5       Then there is Rancho Santa Margarita vs Vail at 11 Cal.

6   2nd, and there the Court made a similar type statement.  At

7   page 555 the Court says:

8       "If the non-riparian has no present need for water,

9       the others may use it all.  The lower riparian

10      cannot secure an injunction against the upper

11      riparian unless the upper owner is using an ex-

12      cessive portion of the waters of the stream,

13      resulting in actual damage to the lower proprietor."

14  And goes on to say, then, the same principles apply to

15  underground waters.

16      Well, as your Honor is thoroughly aware, I am sure, in

17  that case the point was made in connection with the claim of

18  the Rancho Santa Margarita that they didn't have to use the

19  basins on the Rancho in order to entitle them to an injunction

20  with respect to the surface flow.  The Court said that you

21  have got to use the basins, in effect, in order to get in

22  there and claim a share of the surface flow. As long as your

23  basins are full, it is not right for you to take your full

24  share of the upper waters.  There, again, we have an in-

25  junction case, a case where the basins were full.  That asset

P 13

1   was, in effect, going to waste and water was being required

2   to go down which was not needed had the basins been used.

3   And your Honor may note that in that particular quotation it

4   speaks of an "excessive" portion, which is of course the

5   point we are making.  It doesn't really say that you can't

6   get any prescriptive right.  It says that you have a right

7   only to a reasonable proportion.

8        Well, the first point we make is that these dicta come

9   from injunction cases, and it is obvious that when one

10  riparian is not using the water the other riparian can use

11  it all to prevent its going into the sea, and that is the

12  extent of those cases.  They don't bear directly on this

13  point of prescription.

14       Another point that needs to be borne in mind is that

15  there are many statements in the cases that as against a

16  non-riparian a riparian has a right to all of the water, and

17  these cases bear merely upon the point that the riparian use

18  is paramount, is first, and so long as some riparian can make

19  reasonable beneficial use of the water then there is no room

20  for appropriation for the non-riparian -- there is no surplus

21  over riparian rights.  The fact that only one riparian is

22  using the water, so long as it is reasonable and beneficial,

23  is immaterial.  The appropriator can't take the share of the

24  other riparians.

25       You see, you take these statements out of context which

P 14

1    are designed to give the "club," you might say, the members

2    of the riparian club, exclusive rights as against the rest

3    of the world, and put them into a case involving relation-

4    ships among the members of the club, among riparians, and

5    you see that you have a different situation and must be careful

6    in using those statements.

7         Now before 1928 riparians didn't even have to be reason-

8    able as against non-riparians, as against appropriators; and

9    the Herming Haus case, of course, is the climax of that

10   doctrine (Southern California Edison vs Herming Haus).   That

11   was one of the cases, perhaps, as much as any other, that

12   precipitated the amendment.   There for a slight beneficial

13   use tremendous quantities of water were forced to go down

14   by an injunction to     benefit the riparian because it was

15   not required to be reasonable with respect to the proposed

16   appropriator.

17        The major point, then, is that these dicta must be

18   carefully examined and that we can't take these comments out

19   of context in connection with prescriptive rights and rely

20   upon them.   Well, of course, we all know that no matter how

21   hard the judges try, and we know they do try hard, they say

22   things that, in the context of another factual situation,

23   are not, strictly speaking, correct.

24        That is the first point we make.

25        In connection with an appropriative right, is it possible

P 15

1   to have an appropriative right for reasonable beneficial use

2   on riparian land?  We say that there is a clear adjudication

3   that that is possible.

4       In the case of <u>Rindge vs. Crags Land Company (56 Cal.App.</u>

5   <u>297)</u> the plaintiff was downstream from the defendant and

6   while the plaintiff had riparian land, she or her predecessor

7   had earlier gone upstream when the upper land was in Government

8   ownership and had appropriated, in the ordinary appropriative

9   way, a certain amount of water, brought it down to the ripar-

10  ian land, and then later on the upper land, the Government

11  land, was patented and the defendant is claiming under a later

12  patent.

13      THE COURT:  The defendant being the party on whose land

14  the diversion was made.

15      MR. GROVER:  I am not sure of that.  But it was made

16  when it was Government land and when the defendant's was

17  also Government land.  And the Court then said that the

18  plaintiff is entitled to do this, and on page 253 it says:

19          "And thus it may happen that a riparian owner,

20      being insufficiently supplied with water by the

21      flow of a stream and anticipating the attaching

22      of other riparian claims when the Government land

23      above him may be transferred to private ownership,

24      may, upon such Government land, make an appropriation

25      which will be good, although it may have the effect

P 16

1    to rob entirely the upper property of any riparian

2    right in the stream; this to be qualified only

3    when the condition that the total water claimed

4    under the combined rights does not amount to more

5    than is reasonably necessary to satisfy the necessary

6    use to which it is designed to be put."

7  The net effect of the case is that if you don't think

8 your riparian share is going to be big enough you can go on

9 Government land, make your appropriation and add it to your

10 riparian entitlement.

11  Now, in presenting the problem here today we would like

12 to explain what we think the effect of granting our appro-

13 priative rights would be and compare them with the order of

14 the Court in the Rindge case.

15  I might say, before I complete the Rindge comments, that

16 the trial court had merely apportioned the water between the

17 two riparians, and the order of reversal is to allow this

18 appropriative right to the lower riparian.

19  Our feeling is that, on the present record, there is no

20 need for an apportionment.  There is no occasion for the

21 exercise of an injunction to force the release of water from

22 an upper to a lower riparian.  But we all know that that is

23 an eventuality that may come, and your Honor has commented

24 on the fact/there is insufficient water to supply all the

        that

25 riparians.  We know from the former Vail case and from the

P17

1   findings of Judge Yankwich in the earlier case -- although

2   they are not strictly binding on us -- that indications are

3   that there is much more demand than can possibly be satisfied

4   from this stream.  Consequently, we are anticipating that at

5   some time there might be a set of facts which would require

6   apportionment.  Until that time, as far as our riparian land

7   is concerned, we are entitled to reasonable beneficial use,

8   and obviously we don't claim a right to more than reasonable

9   beneficial use.  But if that time of apportionment should

10   come, we would want not to be cut back below the amount of

11   use we have made in the past, and, as put in the memorandum,

12   we think that would be the floor below which we could not be

13   cut, in view of the fact that we have these appropriative

14   and prescriptive rights.

15       THE COURT:  Refresh my recollection on the factual

16   situation in which you claim an appropriative right.

17       MR. GROVER:  In 1885 Samuel B. Tripp, as Exhibit Gibbon

18   and Cottle O shows, recorded a water claim.  He went up on

19   Government land above his land and from that upper Government

20   land diverted water.  The evidence is that the upper ditch

21   was finally completed in 1897, and our contention, of course,

22   is that the construction work on it was reasonably diligent

23   in the interval, and that in 1897 the appropriative right

24   was perfected with a priority date, under the doctrine of

25   relation, to 1885.

P 18    1    THE COURT:   And what amount of water do you think the

2    facts show?

3    MR. GROVER:   Your Honor, we think they show that they

4    have taken the capacity of the ditch when the water was

5    available, and the testimony is that the ditch is the same

6    ditch that it was in 1897.

Take A2    7    THE COURT:   Assuming that I found with you on this, how

8    would I describe it?   The capacity of the ditch?   That doesn't

9    tell us very much.

10    MR. GROVER:   The ditch is there.   It would be material

11    only if an effort were made to increase the capacity of the

12    ditch.

13    THE COURT:   Suppose the ditch has changed in size.   Then

14    the question arises, when the decree says "the capacity of

15    the ditch," we would certainly have to have some evidence as

16    to just what the capacity of this ditch was, wouldn't we?

17    MR. GROVER:   Well, your Honor, it would be handy.   Well,

18    let me tell you the practical problem we came up against.   As

19    your Honor may recall, there has been this dispute between

20    Mr. Cottle and Mrs. Gibbon regarding the exact boundary be-

21    tween their two portions of the ranch.   That is in another

22    court and, as your Honor said, it is not one of the issues

23    here.   But in connection with that a survey was made of the

24    land -- it cost us several hundred dollars, and one of the

25    things we asked them to do was to give us some survey

P 19

1    information that would enable Mr. Rowe, the witness here, to

2    compute the capacity of the ditch.  I asked Mr. Rowe here if

3    he had that information.  It was objected to as being hearsay.

4    We would have had to have brought the original surveyor, even

5    though Mr. Rowe himself was licensed as an engineer, to come

6    down and back up, over the hearsay objection, his work on

7    the survey.  And in view of that practical and expense problem

8    we didn't go ahead.

9        THE COURT:  He couldn't go and observe the ditch himself

10   there with the calculations made by the other surveyor?

11       MR. GROVER:  That is exactly what he was going to do.

12       THE COURT:  And give his opinion himself from what he

13   saw?

14       MR. GROVER:  But he was relying on the calculations of

15   the other surveyor.

16       THE COURT:  He didn't take a look at the ditch himself?

17       MR. GROVER:  Of course he did.

18       THE COURT:  Measured the ditch?

19       MR. GROVER:  My understanding was that, as an engineer,

20   he used these calculations.  I don't know that he did a

21   calculation of the capacity without the assistance of those

22   survey measurements.

23       THE COURT:  Well, Mr. Rowe was an engineer, wasn't he?

24       MR. GROVER:  That is right.  But he didn't do this

25   survey.  I grant you that we would have been in a better

P 20

1   if it had been done.  But the issue comes up when a claim is

2   made that more water is being taken and if a change in the

3   ditch should be made.

4       THE COURT:  It is hard for me to remember without going

5   back the facts in all these cases.  Is this the case in which

6   there was a pipe for a certain area?

7       MR. GROVER:  Yes.

8       THE COURT:  A steel pipe?

9       MR. GROVER:  Yes.

10      THE COURT:  And there was no more water than flowed

11  through the steel pipe?

12      MR. GROVER:  Exactly.

13      THE COURT:  We had in evidence the dimension of that

14  steel pip, didn't we?

15      MR. GROVER:  Yes.

16      THE COURT:  I believe it was a ten-inch, wasn't it?

17      MR. VEEDER:  Twelve.

18      THE COURT:  Ten or twelve inch pipe.

19      MR. GROVER:  The point was the gradient, your Honor.

20      MR. STAHLMAN:  The head.

21      MR. GROVER:  The head.

22      THE COURT:  How did the water leave the area of the

23  diversion?

24

25      MR. GROVER:  By a ditch, and then at one place through

this pipe, which was the place for measuring the maximum

P 21

1    capacity.  But it had a head through the pipe.

2        THE COURT:  The head backed up in the area where it went

3    through the pipe?

4        MR. GROVER:  Yes, through the pipe.  In the pipe itself

5    it had a head so that the pipe could take more than the pipe

6    would take if it were just lying on the ground.

7        Now of course, your Honor, if it is essential, we would

8    want to bring that measurement in.  But unless there is some

9    change made at that point in that ditch and the size and

10   gradient of it, the question would never arise, and it didn't

11   seem to be worth the expense of bringing Mr. Davidson down

12   to testify directly to this survey.

13       THE COURT:  Then there was evidence, as I recall, on

14   how many acres were irrigable?

15       MR. GROVER:  Yes your Honor.

16       THE COURT:  This was done by flooding.

17       MR. GROVER:  In the early days, and more recently by

18   sprinklers on parts of it.

19       THE COURT:  Proceed with your argument.  That refreshes

20   my recollection on the factual situation.

21       MR. GROVER:  Now in the Rindge case the formula used by

22   the Court was of a particular type, and the point I am trying

23   to make now -- and I want to be clear on it, although it is

24   hard to explain -- is that we think that at some future time

25   the exact operative effect of this appropriative or

P-21

1    prescriptive right will come up.  That it is enough now to

2    declare the right.  Now assuming that at a future time there
                                    you
3    is apportionment, how/would add to the apportionment by the

4    amount of the right, or whether you would add it on or merely

5    make that a minimum, or how you would treat it is a question

6    for the time of apportionment.  But in the Rindge case,  I

7    might say, that the maximum possible effect of the appropria-

8    tive right was given to the appropriative owner.  On page

9    253, at the bottom, it says:

10        "In other words, the judgment should be that the

11        land of the Crags Company (that is, the defendant

12        against whom appropriation had run), by reason of

13        the prior appropriation by May K. Rindge, has had

14        its riparian right to waters flowing into Malibu

15        Creek diminished by the amount of the appropriation

16        while the riparian rights of the plaintiffs are not

17        diminished at all on account thereof."

18    So that, in effect, the plaintiff got her riparian share,

19    her apportionment share, plus her appropriative right.  We

20    are not sure that your Honor would want to do that.  That

21    would be what we would like to have your Honor do, but we

22    are not sure that that is the way your Honor would want to

23    do it when an apportionment came up.  There is authority for

24    doing it that way by reason of the Rindge case, but we think

25    that is an argument that will come up in the apportionment

P 23

1    case.

2    Certainly, however, whatever formula we used, we would

3    not be cut down below the amount of the appropriative right.

4    One last thing on the appropriative claim, and that is

5    that under the doctrine of the <u>Rindge</u> case and by reason of

6    the fact that this appropriation was made on Government land

7    and this notice was recorded, it is as clear that this water

8    was taken under a claim of an appropriative right.

9    Now, your Honor's opinion makes/ one other comment on that

10   same page. It says that the same use may not be both riparian

11   and appropriative. Well, our answer to that would be simply

12   that use doesn't help us on a riparian right anyway. So our

13   claim would be that this past use is appropriative and we

14   would not be foreclosed by that comment of your Honor's,

15   even if it were not changed, as we hope the other comment

16   there will be. This is important, however, in connection

17   with the claimed prescriptive rights, because of course,

18   some of the cases say that there must be a non-riparian use

19   in order to form the basis of a prescriptive right. And our

20   use was appropriative.

21       THE COURT:  Do you concede that that is the law?

22       MR. GROVER:  What is that, your Honor?

23       THE COURT:  That there must be a non-riparian use to

24   secure a prescriptive right.

25       MR. GROVER:  It all depends on what you mean by non-riparian

P 24

1  use, and I will go into that in connection with the prescrip-

2  tive rights.

3      THE COURT:  You are not ready to go into it?

4      MR. GROVER:  I am about to go into it right now.  I was

5  going to say that on account of the reporter you might want

6  to have a recess now.  I am about to leave appropriative and

7  go into prescriptive.

8      THE COURT:  Then this would be the good time to take our

9  break and take up the prescriptive claim after the recess.

10      (Recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Proceed.  We don't need the Clerk.

2    MR. GROVER:  In going to the matter of prescriptive

3    rights now, your Honor, I would like to indicate what I think

4    is the difference in effect between the appropriative right

5    and the prescriptive right.

6    I wonder if it might not be helpful to use the black-

7    board.

8    THE COURT:  Yes, you may.

9    MR. GROVER:  Now, I am sure your Honor knows from prior

10   discussions in this case that an appropriation that is made

11   on or above a Government land has a different effect than one

12   that is made below Government land.  That point is brought

13   out in Holmes vs Nay 186 Cal. 231.  I don't have the exact

14   page, I am sorry, but I think that it is at about 235.

15   THE COURT:  What is the difference?

16   MR. GROVER:  The difference is simply this:  as the

17   Court there points out, the statutes under which we now view

18   Governement land appropriations, as opposed to the squatters'

19   rights that applied before the statutes were passed -- the

20   statutes of 1886, '70 and '77 -- those statutes under the

21   California theory were in a sense a consent by the Federal

22   Government to an invasion of its rights.  Hence, if there

23   was no invasion of its rights, the statute was simply

24   irrelevant to the situation, and in Holmes vs Nay they go

25   into that, and the earlier case of Cave vs Tyler is referred

A2

1   to there.  Now, suppose this is the stream (drawing on black-

2   board), and here is the Government land, the public domain,

3   with the stream going down here, and you make an appropriation

4   here (indicating).  Now, under the doctrine that we discussed

5   in connection with a prescriptive right, there is no invasion

6   against the  upstream proprietor, the Government, because the

7   appropriative statute does not give them anything.  They had

8   the right to do that before/if, however, you make the

9   appropriation on Government land, then, of course, you do

10  gain a right.

11      THE COURT:  You come within the statute?

12      MR. GROVER:  You come within the statute.  As I under-

13  stand it, there is no California case concerning appropriations

14  made on Government land, but there is one concerning a similar

15  doctrine with respect to State land, and it has been held that

16  an appropriation above Government land does give him that type

17  of appropriative right under comparable State statutes, and

18  hence we believe if it came to the California Supreme Court,

19  they would say that the appropriation above Government land

20  would have the same effect, and logically it should.

21      THE COURT:  To the same effect as if made on Government

22  land?

23      MR. GROVER:  To the same effect as if made on Government

24  land.

25      THE COURT:  Of course, that is not involved in our case.

A3

1      MR. GROVER:  No, it is not.

2      THE COURT:  And now you are going to talk about an

3 appropriation made below Government land?

4      MR. GROVER:  No, ours is made on Government land.

5      THE COURT:  On Government land?

6      MR. GROVER:  On Government land.

7      THE COURT:  But you are going to discuss the

8 Holmes case where the appropriation was not made on Government

9 land?

10      MR. GROVER:  That is right, and I am distinguishing

11 it from our situation.

12      Now, if you take this as the flow of the Temecula here,

13 and here is the public domain, -- I am not sure that this is

14 true, but I am assuming that there was land above and below --

15 Government land both above and below our land here, and this

16 appropriation was made on Government land.  I probably should

17 show it as having intervening land.  They went on Government

18 land and brought the water down here (indicating).  Because

19 it was on Government land, it would have been without the

20 statute an invasion of the rights of the United States, and

21 hence that appropriation is good against all of the public

22 domain, and later patentees, or patents and withdrawals of

23 that land.

24      The important point in distinguishing it from a

25 prescriptive right is that that appropriation is both upstream

A4

15,568

1    on Government land, as well as downstream, wherever the

2    Government had the right, absent these statutes to prevent it.

3        Of course, a prescriptive right does not work upstream,

4    as your Honor has proved, that is true, and consequently, to

5    the extent that this might be a prescriptive right, it would

6    go only as against downstream owners.

7        Now, the appropriation would have one other effect.  It

8    would be in the modern situation, where we would not have the

9    Government appropriations so much, but rather appropriations

10   for surplus water storage, and that sort of thing.  It would

11   be an appropriation against surplus waters, to have a priority

12   against later appropriators; for example, the Fallbrook Dam,

13   if it should be built, and the Vail Dam since it was built.

14   That would be a good appropriation strictly without regard to

15   the riparian rights which carry a priority as against

16   appropriators.  But it is also good against present riparian

17   lands which come from Government lands subsequent to the

18   effective date of the appropriation.

19       As a prescriptive right, of course, it would also be

20   good against the Vail's, or Santa Margarita Rancho, and some

21   others of private ownership, since the appropriation, and

22   hence would not be affected by the Public Land Statutes.

23       MR. VEEDER:  Counsel, would you kindly say that again.

24       MR. GROVER:  I would say that as a prescriptive right

25   it would be good against the Rancho below, who were not

1  controlled by the Public Lands Statutes --

2      MR. VEEDER:  Thank you.

3      MR. GROVER:  -- because of the private ownership

4  statute at the time of the appropriation.

5      MR. VEEDER:  I didn't hear your introductory words.  I

6  am sorry to interrupt.

7      MR. GROVER:  Now, your Honor, in connection with a

8  prescriptive right now, there is an opportunity, I believe,

9  to strike a blow, and I want to start out a little theoreti-

10 cally, because I don't think we have an absolutely controlling

11 case that tells your Honor exactly what you have to do.

12     So I would like to start out with Wiel, and refer to

13 some other authorities, and this is why I have also come to

14 the Pasadena case, the Raymond Basin case, which we know is

15 a prevailing case and which we think is a philosophy that I

16 think is applicable to our problem here.

17     First of all, I would like to start with a comment that

18 Chief Justice Shaw made in his speech before the American

19 Bar Association in 1922.  It is reported  at 189 Cal. 779,

20 at page 792.

21     Now, it is just the philosophy and flavor of this

22 comment in which he reviews the history of water rights in

23 California that I wish to emphasize.  You may recall that in

24 the first quarter of the twentieth century Justice Lucian

25 Shaw was perhaps the leading water jurist in California, and

A6

15,570

1   so often, because of the way in which it was put, in sensible,

2   understandable language, it gives the result of cases which

3   were a little hard to understand, and that were adjudicated.

4       He discusses Lux vs Hagen, and the great controversy

5   that gave rise to it, and then -- and  this in effect is what

6   he says -- perhaps there aren't one hundred percent benefits

7   from the doctrine of riparian rights, and he alluded to the

8   struggle afterwards to keep the doctrine of riparian rights

9   from becoming effective; but he says that the important thing

10  is that under the 14th amendment and our due process there is

11  a theory of property, that we have to stick to what we started

12  out with.  Then he goes on to say: but it hasn't been so bad

13  because many prescriptive rights have arisen, and then he

14  discusses prescriptive rights, which have nothing to do with

15  the nature of our prescriptive problems here, but I think it

16  sets out a general review of California law, and he states

17  that one of the greatest benefits of prescriptive rights is

18  that it is an ameliorating doctrine which prevents the doctrine

19  of riparian rights from becoming oppressive.

20      Weil in his book has a categorical endorsement of the

21  principle that he proposes, namely, that a riparian owner

22  by making a use on his riparian land in excess of that which

23  would be apportioned/him immediately starts a definite
                        to

24  litigation.

25      In discussing it in Volume I, at pages 859 and 860,

A7

1   Section 802 -- this is the citation which I believe is/our

2   memoranda -- he points out that as of the time of the writing

3   of his work, the cases to this effect had to do with non-

4   riparian use, or the cases had to do with the use of non-

5   riparian land, I should say, and that he didn't know of a

6   case which squarely held that use on riparian land could have

7   this effect.   But he cites the case of <u>Wiggins vs Muscupiabe</u>

8   Land and Water Company, 113 Cal., at page 182, and he points

9   out that this case was decided on the trial level by Lucian

10  Shaw, and was affirmed on appeal, and then he points out

11  there that there was a declaratory protection in the judgment

12  in a portion of the case, and supports his theory that the

13  other riparians by declaratory rights have the right to pre-

14  vent excessive use by another riparian, and, consequently,

15  that there is a cause of action, and the statute starts running.

16      Then he goes on to say, of course, this is beneficial

17  -- and this is in other parts of his work -- because this

18  prior   use, if allowed to go for five years is not destroyed

19  at a later date, absent that it would be harmful to establish

20  development.

21      Now, there is a similar discussion not bearing on our

22  immediate problem of riparian use of riparian land, but

23  generally about the doctrine of prescriptive rights, and the

24   use of declaratory causes of action starting the running of

25  the statute.   There is a similar discussion in 22 Cal. Law

1   Review, page 251, by Professor Bingham, who discusses it in

2   an article entitled "Some suggestions concerning the California

3   Law on Riparian Rights."

4        Then it is apparent from a recent case, in 1955 or

5   1956, the case of Hudson vs West, 47 Cal.2nd 823, -- it is

6   apparent from Mr. Justice Shauer's decision in that case that

7   there has been some recent controversy about this general

8   doctrine in the Supreme Court, although the majority opinion

9   in that case found there were no riparian rights, and hence

10  did not get into the problem.

11       But it is, as I say, an opportunity for your Honor to

12  take the correct position, and I think it should be approached,

13  not in the light of precedent alone, but also in the light of

14  what kind of doctrine we want to have.

15       Now, there are two or three things about these cases

16  in connection with prescriptive rights which make it difficult.

17  We want to be sure that these cases that say the right of the

18  lower riparian to the full flow of the stream is put in its

19  context because the theory is that if you have a right to the

20  full flow -- or, I should say the right of any riparian to

21  the full flow when others are not using it, that if you

22  say that he has this absolute right, then there is never any

23  action against him, there is never any cause of action against

24  him, and the statute does not start running. And, naturally,

25  the theory then goes that because he has this right to use

1   all the water when others are not using it he cannot get

2   prescription.

3         As I say, these cases come out of injunction cases, and

4   they are obviously true.  They also come out of cases where

5   non-riparian use is involved.

6         But let's look at some of these statements.  I suppose

7   that one that we have had difficulty with in the past would

8   be <u>Pabst vs Finmand</u>, which has been cited by others, for

9   instance, Mr. Girard's brief in connection with the Oviatts,

10  --

11        THE COURT:  Will you give us these citations so that

12  we will have it?

13        MR. GROVER:  It is 190 Cal.124, and we get this remark

14  from the Court on page 130.

15        "Even if the upper riparian owner is using all the

16        water of the stream, still, if the lower riparian

17        owner is not then using any and has no desire to

18        do so, such use by the upper riparian owner would

19        not be adverse, and, if continued five years, would

20        not gain him a prescriptive right."

21        That would be it if that statement were correct, or

22  even incorrect, if it had been the holding of the case, but

23  it was not, of course, necessary to the case.  Over on page

24  129   the statement is made:

25        "The fact that there was always sufficient water coming

1   down the creek for the Pabst lands."  --The lower

2   lands --        "with the exception of the two years

3   prior to the trial is undisputed by any evidence

4   offered by the defendants."

5   The case is then decided on the fact that there was

6   plenty of water up to two years before, as yet, for his use.

7   THE COURT:  Wouldn't that be considered as an alter-

8   native finding in that case, or an alternate holding?

9   MR. GROVER:  Well, your Honor, the Court did not have

10   to say what would happen if there had been a more complete

11   invasion in the five-year period, and there was plenty of

12   water there.  But let's go on:

13   "And, so long as defendants left sufficient water in

14   the stream for the use of the lower riparian proprietors,

15   it cannot be said that they were using an unreasonable

16   amount, and, so long as they were not using an

17   'unreasonable' amount, the plaintiffs had no cause

18   to complain, nor was any right of theirs invaded."

19   Citing the Half Moon Bay case.

20   In other words, they are talking about the word "object"

21   there, which was an injunction case.

22   THE COURT:  What is your view of this Pabst case?

23   MR. GROVER:  My view of the Pabst case is that this

24   was just a gratuitous remark that did not have anything to

25   do with the case.  They had water up until two years ago, and

All

13,573

1    there had been no occasion of an unreasonable amount.

2         THE COURT:  What about the other language in the case

3    which you say was the holding of the case, that so long as

4    the upper owner left sufficient water for the lower riparian,

5    there was no adverse decree?  Do you agree with that holding?

6         MR. GROVER:  Yes, so long as he leaves a fair share,

7    their reasonable share.

8         Now, let's get back to the Muscupiabe case, the Wiggins

9    case, and see what happened there in that case.

Take B-2

10        In that case the river was more like the ones we have

11   here.  It was up in San Bernadino County, and it was a little

12   stream that sometimes ran for months, and sometimes didn't

13   run, and when it got down to one hundred inches the holding

14   of the Court was that it did not do any good to the lower

15   owner anyway, because in the course of going on further down

16   to his land, it proceeded up again, and the judgment only

17   goes down to the one hundred inch level.  But in connection

18   with the decree the Court said on page 549:

19        "The decree declares in effect that each riparian

20   owner" --

21        I beg your pardon.  I have here the Half Moon Bay case

22   now.  I am sorry.  This is the Wiggins case, and it is in

23   113 Cal., and this is about page 195:

24        "The amount of irrigable land belonging to each party,

25        rather than the amount of land already under cultivation,

1    would be properly made a controlling element in

2    adjusting their respective rights to the flow of

3    the stream;  otherwise a readjustment would be

4    necessary whenever either party should cultivate

5    a greater or less area.  The finding of the Court that

6    'the only method by which the plaintiff can be given

7    the reasonable use of said stream is to divide the

8    flow of the stream by time, and allow him the full

9    flow of the stream during such time as may be reasonable,'

10   furnishes the principle upon which this portion of the

11   judgment rests; and the further finding that 'the

12   amount of water required to irrigate said lands of

13   the defendant and of the plaintiff as are properly

14   susceptible of irrigation is the equivalent of a

15   constant flow of one miner's inch measured under a

16   four-inch pressure, to each five acres of said land,'

17   gives the basis for the application of the principle

18   in behalf of the respective parties.  The judgment

19   protects the plaintiff against any waste or unnecessary

20   diversion by the defendant in case it shall not

21   cultivate its land, or only a small portion thereof,

22   by the provision that, when it shall not actually

23   use all or any portion of said waters upon its

24   irrigable land, the plaintiff shall be entitled to

25   use the same."

13,577

1    The plaintiffs being downstream in this case.  This is

2    the declaratory judgment of Judge Shaw that Mr. Wiel relies upon

3    in saying that it is his position that by declaratory relief

4    you can protect yourself and get a right to even the water

5    that you are not using.

6        Now, compared with the Pabst case where there was no

7    use of an unreasonable amount, this case is a much more

8    significant precedent, even though it was not of a prescription

9    case, as the Pabst case was.

10       Now, it seems to me that the closest case we have is

11   Morgan vs Walker, and this is in 217 Cal. at page 607.  This

12   is a case after the Pabst case, and it reverses the Pabst

13   case, and it goes a little bit on the same theory, but it does

14   completely settle and puts at rest, it seems to me, the

15   contention that mere non-use by the lower owner is the end

16   to any claim of prescriptive right by the upper owner.

17       The reason for that is    this:  There was a ditch that

18   had more water than could be used on the irrigable land, the

19   cultivated, cleared land, and the prescriptive right decreed

20   in that case is that the acres irrigated times the water

21   is agreed on by parties, which would be in effect the most

22   that they would use for their irrigable land, in fact, the

23   findings of the Court were that no more land could be properly

24   irrigated, so any further irrigation presumably would have

25   been unreasonable.  So this was the maximum they could have

1   had under their riparian rights, and yet there was a decree

2   of prescriptive right for that amount.   This is the upper

3   owner against the lower owner, the upper owner getting a

4   prescriptive right.

5       Let's look at some of the evidence here.   On page 616

6   of the case the Court says:

7       "There is practically no conflict in the evidence that

8       they, " -- this is the upper owners -- "and their

9       predecessors in interest, used upon their lands

10      continuously for a period of over thirty four years

11      substantially all the water of said creek flowing

12      therein at the intake of the Childs ditch.   The

13      amount thus diverted was in the neighborhood of two

14      hundred inches of water measured under a four-inch

15      pressure.   The amount of the stream which was not so

16      diverted was negligible and consisted only of the

17      seepage through the Childs dam.   The evidence is

18      equally conclusive that the plaintiffs and their

19      predecessors in interest made said diversion and

20      used said amount of water upon their lands under a

21      claim of right, openly, notoriously and adversely to

22      the defendant and all lower owners on said stream;

23      that the defendants and their predecessors in interest

24      had actual knowledge of said diversion and of the

25      adverse claim of plaintiffs and their predecessors in

1          interest to the amount of water so diverted; and that

2          plaintiffs and their predecessors in interest for more

3          than twenty years, immediately prior to the commencement

4          of the action paid all taxes assessed against said

5          water so used by them as aforesaid."

6          Now, those are just routine findings and standard

7     findings in a prescription case, but they do set at rest the

8     claim that you can never get any prescriptive right.  Notwith-

9     standing this remark in the Pabst case, they set at  rest the

10    claim that you can never get any prescriptive right.

11         THE COURT:  Do you attach any significance to the fact

12    found there that practically all the water received except

13    what is termed seepage was diverted?

14         MR. GROVER:  To this extent, your Honor, that obviously

15     if you cut off the whole stream, it is easier to show that

16    you took the whole stream, and it is easier to establish a

17    case with respect to the effect downstream, with the knowledge

18    of the downstream people.  I attach no significance to it so

19    far as your right to get a prescriptive right.  If you cut

20    the stream in half, you can get a prescriptive right to that

21    amount, if you had the other elements for prescription.

22         Now, the Court goes on immediately after this, and this

23    I think is the interesting part of it:

24          "As against this evidence of the plaintiffs, the

25          defendant Walker had made at best an indifferent

1       showing.   She and her grantors made but slight use

2       of the land now owned by her."

3           Now, this was exactly the opposite of the theory before.

4   You see, the Court is using a slight use as an argument to

5   establish the prescriptive right, whereas before they said if

6   you didn't use the water, then they couldn't get a prescriptive

7   right because the upper owner had the complete right to use

8   it.

9           Here we have a case where the prescriptive right is

10  decreed, and we have the Court dealing with the very situation

11  that we have presented here, and we have the Court thinking

12  correctly along the same line as Mr. Wiel:

13      "Only about twelve acres had any irrigation at all.

14      The use of the water on these few acres was inter-

15      mittent and comparatively slight."

16          This is the argument of the Court against the defendant,

17  you see.   (Continuing):

18      "A considerable part of the time the land was occupied

19      by the village blacksmith, who used the ranch more as

20      a place of residence and made no attempt to cultivate

21      any part of it, . . . "

22          You see,  if the former cases  , the former dicta, were

23  to be followed this would cinch the death of the prescriptive

24  claim, because the lower owner made no effort to use any part

25  of it, but instead the Court is using it to cinch the

1    establishment of a prescriptive claim.   It goes on to say:

2              "--except that he irrigated a small garden patch and

3              raised hay sufficient for one cow.   Prior to his

4              occupancy the property was owned and occupied by a

5              Mr. Meeder for eighteen years  from 1892 to 1910, and

6              there is no evidence that during this period of time

7              any attempt was made to irrigate any part of it."

8         The whole point the Court here is making is non-use

9    below.   Non-use below is the indifferent showing that

10   established the prescriptive claim above.

11        Now, there are, of course, factual questions which we

12   have to resolve in every case, and in that case they cut the

13   water off.   In this case the water has not been completely

14   cut off all the time because there are many times when we

15   can't take the water in our ditch.   But that is a factual

16   point.

17        On the legal point here, the significant thing is that

18   we have gotten  away from these erroneous dicta which had

19   origin in the injunction cases.   And have gotten to the real

20   basis of the prescriptive right of an upper riparian against

21   a lower riparian, and when we get to there we find non-use

22   below, agricultural inactivity, as a basis for the prescriptive

23   claim instead of a reason against the prescriptive claim.

24        THE COURT:   There has to be non-use with knowledge of

25   the adverse user.

1     MR. GROVER:  That is another element, your Honor. There

2  are several points involved.  I want to put at rest completely

3  right now that you can get such a right in the face of non-use.

4     THE COURT:  Who wrote that opinion in 217 Cal.?

5     MR. GROVER:  Mr. Justice Curtis, I believe.  Yes.  As

6  your Honor knows, he was a San Francisco Judge.

7     THE COURT:  San Bernardino.

8     MR. GROVER:  Or a San Bernardino Judge.

9     THE COURT:  Yes, he came out of San Bernardino.

10    MR. GROVER:  And he went to the Supreme Court.

11    Consequently, I think at this point we have reached the

12  place where we can throw out the window those dicta that say

13  you can never get a prescriptive right nor beneficial use on

14  your riparian  land.  We can throw out the window also those

15  cases that you can't get such a right when the people below

16  are not using, because you have the right to use when they

17  are not using, and that the questions now turns, as the

18  Morgan case indicates, upon the facts of the case.

19    THE COURT:  How do you justify the theory of an adverse

20  user when the man below is not using it?

21    MR. GROVER:  Because it is adverse.  You see, the word

22  "adverse" is the key word.  What do we mean by "adverse"?

23  Adverse to his use or adverse to his legal rights?

24    When you walk over the corner of my  lawn, I am not

25  using it, but if you do it long enough you may get a pre-

scriptive right, and you are invading my right to the

exclusive possession of that lawn.  I may not get an injunction

against you for certain types of invasion, but I do have the

right to protect my right by declaratory relief.

THE COURT:  But what about the fact that there have

been so many expressions in the water law of the state that

a riparian right is not acquired by use or loss by non-use?

That is coming up again.

MR. GROVER:  Yes, but it is loss by prescription.  The

point is that the mere non-use, with nothing else, does not

destroy the riparian right, as it does the appropriative

right.

THE COURT:  But suppose I own some downstream land,

and I am riparian.  I live somewhere else, but it is assumed

that I know that the riparian upstream is taking all the

water.  Relying on some of these general statements about

use does not create a riparian right, and non-use cannot

forfeit it, I sit back and do nothing because I am not ready

to use the water.  And then I wake up and find/merely because

that

I didn't plant a crop when I didn't need to, that I didn't

irrigate a field that I had no need to irrigate, that the

upstream riparian has now acquired water rights in that

stream by prescription.

MR.  GROVER:   I think the Pasadena case is the perfect

answer to that,/I  would like to get to that, your Honor.

and

1    That is exactly what they said there.  And, of course, another

2    answer to it is, to put it one way, you ought to have a

3    better lawyer, that is, you ought to have a lawyer that tells

4    you that these statements of non-use do not destroy the right,

5    and have bearing only on the question of whether the mere

6    non-use by itself for so many years will lose you the right,

7    that if you have a appropriative right non-use will lose it

8    after three years, a prescriptive right after five years, --

9    just non-use.  But the cases with respect to riparian rights

10   say that any type of mere non-use will not forfeit your

11   right, and that is far as those statements go.  Because we

12   know that/an upper non-riparian land diversion or an upper
     with

13   storage on riparian land, in spite of your non-use, you lose

14   that after five years.

15        THE COURT:  Through prescription?

16        MR. GROVER:  Through prescription.

17        THE COURT:  Of course, the non-riparian use I see.

18   Are you  postulating the storage on non-riparian land or on

19   riparian land.

20        MR. GROVER:  On riparian land.  That is Moore vs

21   California Power Company in 22 Cal. 2d, where it was held to

22   be proper riparian storage except for the fact that they

23   stored at night for power in the daytime.  They held that it

24   had a seasonal aspect, an encyclic, and hence it was an
                                        aspect

25   invasion of the rights below, or might be an invasion of the

1   rights below even though it was on riparian land, and that

2   is the anomalous thing about it, your Honor.   Why should

3   use of more than your share on riparian land, which is an

4   invasion of other people's shares, have any different effect

5   with respect to prescription than use on non-riparian land

6   or storage on riparian land?   There is no logical way to

7   distinguish it.   And the origin of these remarks is: Counsel

8   brought injunction cases where they said, "Well, you have the

9   right to use it all."   Or they come from those cases where

10  they are talking about the riparian owners as opposed to the

11  rest of the world.   They say, "Well, you can get it all even

12  if only one of you is doing it; just one riparian has the

13  right to all of it as against all appropriators."

14      But logically you can't distinguish the non-riparian

15  land cases and the storage cases, because they are beyond

16  the riparian rights of the owner involved.   And using more

17  than your share is just another way of seeing beyond your

18  riparian rights.

19      Now, Hutchins makes that clear, the citation in the

20  memorandum,/points out that the riparian user's use of more
                and
21  than his share is a non-riparian right.   That is page 325

22  of Hutchins cited on page 13 of the memorandum.

23      Now, we come to the cases that say, and I think that
                is
24  this/conceded by now, that it is merely presumed that your

25  use on riparian land is pursuant to your riparian right, and

Take B-3

1    that the lower owners will be entitled to presume that unless

2    the adverse character of your claim is brought out in some

3    way.

4       Now, in that connection I would like to read again

5    from Morgan vs Walker with respect to the procedure that we

6    follow in such a case.  This is on page 615:

7       "Turning now to the law of the case, we find certain

8    principles of law well established.

9       "The use of water upon riparian lands is presumed to

10       be riparian, and the burden of proving prescriptive

11       rights is upon the person asserting them."

12    Then it cites cases.

13       "'While one who asserts a prescriptive right to take

14       water from a stream or other source must assume the

15       burden of establishing it, proof of the continuous

16       occupancy and use of the water as though he were the

17       owner, for more than five years, establishes a prima-

18       facie case.  It then devolves upon the original owner

19       to show that the use of the water was permissive only

20       or without his knowledge.' "

21       We have approved continuous use of the water, to the

22    extent that we have shown that, which is a question of fact

23    in this case.  It devolves upon the lower owners then to show

24    that it was either permissive or without their knowledge.

25       In that connection we do feel that it is absolutely

1   clear that it was adverse, any use over our share, and we

2   also feel that it is absolutely clear that everyone should

3   be presumed to know about it.   They had constructive know-

4   ledge of it.

5        Of course, there are thousands of people in this case,

6   and there are, I don't know how many owners of riparian

7   rights below us, and there might be some who don't actually

8   know about it.

9        But there are cases that hold, as the Morgan case does,

10  that long continued use raises a presumption of knowledge,

11  and we have a number of other circumstances in this case all/of

12  which leads us to say fairly confidently that that question

13  of knowledge and spelling out the presumption of riparian

14  ownership and riparian rights is to be decided in our favor.

15       Now, in the record we go into some of those facts. At

16  page 13, your Honor, I point out that it was adverse or

17  hostile, that is, that it was more than our share.   Now, we

18  don't know whether it is more than our share or not right

19  now, because your Honor has not decreed an apportionment.

20  But if your Honor later says that it is more than our share,

21  that it later turns out to be, that is the only time the

22  problem comes up, and in that respect we differ from Mr.

23  Oviatt.   I think Mr. Girard makes a good point.   Mr. Oviatt

24  says that he didn't hurt anybody, "But I was using more than

25  my share," so it is prescriptive, and the two ideas are a

1    little bit inconsistent.  If you don't hurt anybody downstream,

2    then you don't get any prescriptive right is the theory.

3         Now, instead of being caught on the horns of the

4    dilemma,we pass the dilemma back, and we say, "We will use

5    pursuant to riparian rights until someone else says that it

6    was more than our share, and then that very fact being

7    established, it establishes the adverse character.

8         I don't think there is any doubt though, barring some

9    inability of the water to get down to the lower owner, that

10   there is some difficult problem there, that our use was more

11   than our share, and I think the Rancho Santa Margarita case

12   points that out, and I would like to start with a quotation

13   from your Honor on it.  This is page 12, 579 of the transcript.

14   Your Honor in speaking to me said:

15        "Do you apprehend that there is enough water in this

16        water system to let all the irrigable acres in the

17        water system have 4.0 per acre?

18        "Mr. Grover:  I suppose not, your Honor.

19        "The Court:  You suppose not.  It is absolutely certain

20        that there is not.  There is not enough water to take

21        care of all the irrigable acres in the water system

22        at 4.0 acre feet per acre."

23        Now, I am not telling your Honor what your findings

24   will be, but I am just reminding your Honor of the fact that
                                                            is
25   it/fairly definite in this case that the demands for riparian

1   acreage are far in excess of anything that the stream system

2   could supply.  And your Honor may recall that Judge Yankwich's

3   findings in that connection were that the Vails had a water

4   duty for their riparian acres of sixty nine thousand acre

5   feet -- I beg your pardon -- seventy nine thousand acre feet,

6   and the Government sixty nine thousand acre feet, making a

7   total of  almost one hundred fifty thousand acre feet, and

8   Judge Yankwich's view of the stream system supply was an

9   annual supply of twelve thousand five hundred.  Those are the

10   figures which have been gone over and which will be different,

11   I am sure, in this proceeding.  But they do point out that

12   with the one hundred forty eight thousand demand by those two

13   owners alone, there is nothing like that in the stream system.

14        This was so definite and clear in the Santa Margarita

15   case that there was actually a holding by the Judge there that

16   there were some small owners, the intervenors, whose apportion-

17   ment would be so small that there was no point in giving it

18   to them, and that was not contested on appeal; that the only

19   people that had a big enough share to amount to anything were

20   the Rancho Santa Margarita and the Vails.  That was the

21   longest case in the history of the San Diego Superior Court,

22   a case of great notoriety, and I don't think it can be said

23   that since that litigation any reasonable man owning land in

24   this watershed is not put upon notice that anyone who uses

25   a substantial portion of riparian acreage is exceeding his

13,590

1   share.  That is our theory of bringing home to people the

2   adverse character of our use.  Judge Yankwich said it would

3   be less than ten percent that we would be entitled to irrigate.

4        In the Santa Margarita case, on one computation there,

5   it was about one-seventh, that you are entitled to irrigate

6   about one-seventh of your land.  I am not going into detail

7   on these, because I think from your Honor's remarks that it

8   is established, and everybody recognizes it.

9        Now, to come along to our ranch, it is right at the

10  junction of two State Highways.  We have Exhibit 29-R, the

11  U.S. G.S. Map.  We have the Exhibits of Colonel Bowen, 229

12  and 230, which relate to the Gibbon and Cottle properties,

13  and show by aerials that this is out in the open, and I don't

14  think there is any doubt that anyone traveling there on this

15  State Highway can see that we are irrigating much more than

16  a tenth or a seventh of the irrigable land.  Not only that,

17  but the original notice that said this was an appropriative

18  taking was recorded in the Office of the County Recorder,

19  then in San Diego County.  Of course, that land is in

20  Riverside County today.

21       THE COURT:  How would that help your prescription, the

22  fact that the recorded notice claimed an appropriative right?

23  It would be noted that you claimed an appropriative right.

24       MR. GROVER:  A non-riparian right, an adverse type

25  right.

1      THE COURT:  It probably put people on general notice to

2   make further inquiry on the ground.

3      MR. GROVER:  There is a little more to it than that,

4   your Honor.  Let me get it.  It is Exhibit O.  This is the

5   notice:

6           "Notice to whom it may concern is hereby given that

7            I hereby claim the water entire of this creek with

8            its tributaries the same being the water running

9            from the Bergman Ranch and streams entering below

10           said Ranch from the north side of Smith Mountain.

11           The said stream or streams are by me claimed for

12           Agricultural and Milling purposes on land below here

13           said water is by me intended to be conveyed in a ditch

14           and with capacity of four and one half feet in width

15           at bottom with depth of one foot and five and one

16           half feet width of top and place of entrance or of

17           turning from stream."

18      It is a clear indication that he going to take all that

19   he can with this ditch, and, as I  pointed out, it was an

20   appropriative claim made on Government land.

21      Consequently, I think there is all the notice and

22   presumptive knowledge and notoriety in the world to bring

23   home to downstream owners that there was an excessive taking,

24   -- excessive in the sense that it was more than would be

25   given had there been a riparian apportionment.

1    I would like to come back again to the Morgan case that

2  says once you show your continuous use and occupancy, it

3  devolves upon the other owner to show that he did not know,

4  and in face of the fact that the burden of going forward is

5  on the other owner, I think we clearly established our case.

6    THE COURT:  What do you say about our procedural problem,

7  in trying to get due process, that the claim that you are now

8  making for an appropriative and prescriptive right is adverse

9  to everybody below you on this stream?  Do you think your

10  appropriative right is also adverse to the people above  you,

11  and these people are not around and they do not know that you

12  are making this claim.

13    MR. GROVER:  Your Honor, with all deference, that is

14  the point I made in my memorandum of a couple of years ago,
                    is
15  that this/really an impossible case to try.

16    We did plead our rights as to the statute of limitations,

17  and our appropriative claim, and so forth.  We did expressly

18  plead them, but even haven't we pleaded them, Judge Yankwich's

19  ruling, which your Honor renewed, that all water claims are

20  adverse to all other people makes that addition.  The only

21  way you can protect your rights in this suit is to be here

22  every day.  I am not complaining to your Honor at this stage,

23  because we have been here as much as we reasonably thought

24  necessary.  But your Honor can see the advantage that I would

25  have today if I had the other one hundred and some     days

1 of attendance.

2 THE COURT:  I don't know how else we could have tried

3 it than we did.  Do you?

4 MR. GROVER:  No.  I did make the suggestion, your Honor,

5 that you might limit the trial and let these other people

6 out, because it was an  equitable proceeding, and that it

7 was inequitable and oppressive to face these people with

8 their situation.  But aside from letting them off the hook,

9 I think your Honor has gone ahead in a commendable fashion.

10 THE COURT:  In view of the command of the Circuit that

11 no final judgment be entered until it be entered as to all

12 parties?

13 MR. GROVER:  Yes.  If your Honor will recall, in my

14 memorandum I made the point that that wasn't the proper

15 interpretation of the Circuit Court order.  The Circuit

16 Court took as the starting point of its decision the fact

17 that the United States had instituted a comprehensive type

18 of proceeding, and named three thousand defendants, as it

19 was then, and that then you can't have a judgment without all

20 of them.  But the Circuit did not say that that was the way,

21 the equitable way to adjudicate the problems of the United

22 States.

23 THE COURT:  It said to make all the owners come in.

24 MR. GROVER:  Yes, and in fact,     it went on to say --

25 THE COURT:  To make all of the defendants come in.

1      MR. GROVER:  -- that you haven't got all the people

2  you ought to have for this kind of an adjudication.  But my

3  point in that memorandum was that the Court could just have

4  said to the United States, in considering whether the action

5  could be entertained at all, -- it could just have said,

6      "Why, if we let you do this, it would be oppressive

7  and inequitable to let you do it.  Now, come back with a case

8  against the Vails or "-- I am not picking on the Vails but

9  they are obviously a substantial owner -- against the people

10  where there is some probability that they could protect

11  themselves and in the amounts involved that might be sustained.

12      That is water under the bridge, your Honor.  But to go

13  back to the point that we are making claims and these people

14  are not here, that is one of the inherent difficulties of

15  the proceeding.

16      THE COURT:  Of course, we still have the possibility,

17  which we contemplate, on some kind of notice, in which there

18  would be reference to interlocutory judgments, and if it

19  should be adjudicated interlocutorily as to some prescriptive

20  or appropriative rights, we might even attach another sheet

21  saying, "The interlocutory decree awarded an  appropriative or

22  prescriptive right,and the hearing date will be set, and if

23  you have evidence you will be entitled to be heard."

24      MR. GROVER:  I think that would be a good way to handle

25  it.

THE COURT:  There is still a possibility to do that
because this is the type of right in connection with which
they could be lulled to sleep, and as riparians they are not
too concerned, and even though our evidence shows that they
are riparians, we are going to take care of those who do not
even appear.  But if your contentions are right as to the
appropriative and prescriptive rights, where they could be
lulled to sleep, they could be cut off at the pockets.

Take B-4
P 1

1     MR. GROVER:  But that would be true if there had been

2   a dam put up there, a substantial dam, and a diversion made

3   through the San Luis Rey watershed.  Certainly that type of

4   right could be adjudicated here.  There are so many cases on

5   that point that we do not think of them as being lulled to

6   sleep.

7     THE COURT:  It is twelve o'clock.  Do you have further

8   argument?

9     MR. GROVER:  I did want to discuss just briefly the

10  Pasadena case.

11    THE COURT:  We will do it after lunch.  I have to go

12  to Rotary today.

13    MR. GROVER:  Two o'clock, your Honor?

14    THE COURT:  Two o'clock.

15    (Whereupon, at twelve o'clock noon, an adjournment

16    was taken until two o'clock P.M. the same day.)

17

18

19

20

21

22

23

24

25

Take Cl

P25

1   SAN DIEGO, CALIFORNIA, Thursday, March 16, 1961, 2:00 P.M.

2        (Other matters)

3        THE CLERK:  6-1247-SD-United States vs Fallbrook.

4        THE COURT:  Mr. Grover, the jury in box has been hanging

5   on your every word and anxiously awaiting the conclusion of

6   your arguments.

7        MR. STAHLMAN:  Very interesting.

8        MR. GROVER:  Thank you.

9        MR. VEEDER:  Fallbrook has pumped another 300 acre feet.

10       MR. GROVER:  I wanted to say a word of summary before

11   mentioning the Pasadena case.

12       First of all, on this matter of prescriptive rights, we

13   do have a lot of dicta in prior cases that indicate that

14   without use below there could be no prescriptive right above.

15   And I think the point that I made, so far as the Morgan case

16   is concerned, is exactly contrary to that and indicates that

17   you can get a prescriptive right to the full reasonable

18   beneficial use on your riparian land, and the Court even

19   stresses in its discussion that non-use below establishes

20   a circumstance on which a prescriptive right would be based.

21   And we have in the Wiggins case, as explained by Mr. Wiel

22   particularly, the vehicle for this doctrine which is the

23   declaratory protection which was given by Judge Shaw in that

24   case.

25       Now there is one little difference between our case and

P 26

1    the <u>Morgan</u> case, and that is in the <u>Morgan</u> case they cut off

2    all the water.  We have indicated that our invasion of rights

3    below, if there was any, was using more than our share, and

4    that to that extent we have just as clearly invaded the rights

5    below as if all the water had been cut off.  Because of the

6    nature of this stream, the cutting off of the water doesn't

7    tell a great deal.  It is like the Wiggins case (<u>Wiggins vs</u>

8    <u>Muscupiabe</u>).  It is a stream that runs part of the year.  As

9    your Honor commented, it runs at one time of day more than

10   at another time, and with storms it runs more than without

11   storms.  A great deal of it is underground flow.  Consequently,

12   you don't have the ability to cut off the full way that took

13   place in the <u>Morgan</u> case.  However, as a result of this

14   common knowledge of the shortage of water in the stream, our

15   contention regarding the invasion of rights below and the

16   notoriety of those invasions, the knowledge of them, the

17   acquiescence in them, would be based upon the fact that

18   irrigation at all of a substantial part of the riparian land

19   is apparent and it is apparent that we are getting more than

20   we would have an apportionment right to irrigate.

21        THE COURT:  Allow me to interrupt a minute.  Is this a

good place?

22        MR. GROVER:  Yes your Honor.

23        THE COURT:  If you are arguing for a doctrine that every

24   time a riparian uses more than his share adversely to downstream

25

P 28

1    riparians, in short order you would completely kill the

2    traditional riparian doctrine, would you not?  Because when

3    you say "more" that just means what it says -- some appreciable

4    amount more than what his share would have been, and therefore

5    his use is adverse to persons with notice, and therefore his

6    use ripens into a prescriptive right.  In short order you

7    would have a stream with prescriptive rights on the stream

8    rather than riparian rights.

9         MR. GROVER:  That is why I want to go to the Pasadena

10   case, because that is exactly what they had.  They prescripted

11   everybody in that case, and they had an overdrawn basin.  We

12   have an overdrawn stream, or at least to the extent we have

13   drawn on it, and the philosophical doctrines in the Pasadena

14   case are identical to those I am advancing here.

15        I would like, first of all, to read a few words from

16   the Pasadena case.  I know that it is a basin case and that

17   it doesn't necessarily control here.  I could, if we were

18   going to quote dictum out of context, remind the Court that

19   in the Rancho Santa Margarita case they made the point I

20   quoted earlier that I was distinguishing that underground

21   was the same as surface.  If we took that literally, of course,

22   the Pasadena case would be controlling here.  But I understand

23   that the Court was not even thinking of that situation.  So

24   I am not saying literally that the Pasadena case would apply.

25   But the philosophy of it would.  On page 929 (33 Cal.2nd) the

P 29

1  Court says:

2      "Although no owner was immediately prevented from

3      taking the water when he did, the report demonstrates

4      that a continuation of the overdraft . .

5  That is a key word, your Honor, "overdraft."

6      " . . would eventually result in such depletion

7      of the supply stored in the underground basin

8      that it would become inadequate.  The injury,

9      thus, did not involve the immediate disability

10     to obtain water, but rather it consisted of the

11     continual lowering of the river and the gradual

12     reducing amount of stored water, the accumulated . .

13  That is the key word.

14     ". . . the accumulated effect of which after a

15     period of years, would be to render the supply

16     insufficient to meet the needs of the riparian

17     owners."

18  The essence of that case is simply this, that we have

19  a basin -- and I am going to simplify it for the purpose of

20  illustration -- and I will say that it is just a rock basin,

21  it is just a hole.  It is a "bucket," as all the witnesses

22  have said.  The basin isn't literally a bucket, but let us

23  suppose one here.  And let us suppose that it has a capacity

24  of 5,000 acre feet.  And let us suppose, also, that it is

25  not so deep but that anyone can reasonably bear the expense

P 30

1   of a well clear to the bottom of the basin.  I would rather

2   not get into this problem of deepening wells, which is a

3   secondary consideration.  We all know that a reasonable

4   lowering of wells would be required.  And let us suppose that

5   the overlying owner up here, the plaintiff -- we won't make

6   him a party, we will just call him overlying -- has a need for.

7       THE COURT:  I take it that there is water running into

8   this basin at some time.

9       MR. GROVER:  There is in some years, your Honor.  We are

10  about to hit a fifteen-year dry spell.  That is my postulate.

11  He needs a hundred acre feet annually, and in the fifteen

12  years he would need 1500 acre feet.  I think it is obvious,

13  your Honor, that we are not going to let this basin go to

14  waste when 3500 acre feet would not be used, because when the

15  next rains come along it will be up to the 3500 mark after

16  he has taken out this 1500, and instead of storing that other

17  3500 it would waste to the ocean.  In other words, you could

18  only make good use of the basin if you draw down a reasonable

19  amount.  So he is going to need 1500 acre feet.  Obviously

20  3500 may be taken out.  But the defendant over here, the

21  appropriator, needs for his uses 500 per year.

22      THE COURT:  Is he an overlying owner also?

23      MR. GROVER:  No.  We could make him one.

24      THE COURT:  He is an outsider?

25      MR. GROVER:  He is an outsider.  He is an appropriator

P 31   1    in this case.

2                THE COURT:  Outside the watershed?

3                MR. GROVER:  Outside the basin.

4                THE COURT:  Outside the basin, but within the watershed?

5                MR. GROVER:  Well, let's say it is outside the watershed.

6       In other words, he is an appropriator.  He has no right to

7       the water except to surplus.

8                All right, he is taking 500.  The overlying owner isn't

9       taking any at all, and we know that in ten years this will

10      be 5,000.  The basin will be depleted.  The draft on this

11      basin is 500.  It is a draft in the fifteen-year dry cycle

12      or dry period before rains can be expected that will deplete

13      the basin.  The basin is overdrawn.  And yet we know that

14      for seven years down to the fifteen-year mark there will be

15      no invasion of the water needed by this man, by the overlying

16      owner.  And yet at the end of seven years, under the doctrine

17      of the Pasadena case,  prescription will have run against

18      this man.

19               Now what the Court is really thinking about in the

20      Pasadena case is the society that is being built up on this

21      basin.  They are looking at the harmful effect of letting

22      this go seven years and then, "Now wait, you are going to

23      have to cut off your uses for the remaining eight years."

24      The accumulated effect of a rate is the invasion.  It is the

25      rate of invasion.  You could stop it after seven years and

P 32

1  still have all the water you need.  In fact, you would need

2  only 800 by then, if you, the overlying owner, had taken

3  your 700 out in the meantime.  But the Court doesn't give

4  us the test that way.  The Court gives us the test in terms

5  of the safe annual yield, which is 5,000 divided by 15, and

6  that was being depleted by the draft of 500.

7      THE COURT:  Of course, you are postulating a fifteen-

8  year dry spell, and with hindsight could go back and say,

9  "Yes, there was a 15-year dry spell and it was being overdrawn;"

10  but a court can't look ahead and say what is going to be.

11      MR. GROVER:  In these basin cases they have to do that.

12  That is the burden of the engineering testimony in these basin

13  cases:  What is the safe annual yield?  What is the total

14  inflow?  What is the natural outflow through leaks and that

15  sort of thing?  And then the remainder over a period of wet

16  and dry years, a complete cycle, is the total amount availa-

17  ble divided by the number of years of safe yield.  That

18  obviously is a rough formula, but that is what they do in

19  the basin cases.  And you have an overdraft, as the Court

20  points out, when you exceed the average annual supply from

21  rainfall.  The very next paragraph, at page 929, goes into

22  that:

23          "The proper time to act in preserving the supply is

24          when the overdraft commences and the aid of the

25          Courts would come too late and be entirely inadequate

P 33

1      if, as Appellants seems to suggest, those who

2      possess water rights could not commence legal

3      proceedings until the supply was so greatly

4      depleted that it actually became difficult or

5      impossible to obtain water.  Where the quantity

6      withdrawn exceeds the average annual amount

7      contributed by rainfall it is manifest that the

8      underground storage will be gradually depleted

9      and eventually exhausted and, accordingly, in

10     order to prevent such catastrophy it has been

11     held proper to limit the total use by all con-

12     sumers to an amount equal, as near as may be,

13     to the average supply and to enjoin takings in

14     such quantities or in such manner as would destroy

15     or endanger the underground source of water."

16     Now here we have the surface situation and at the same

17     time, however, we do have variations in the flow -- some years

18     there is more, some years there is less -- and we have people

19     who are not using their share.  But the point is that on the

20     theory of the Pasadena case you must act when you see that

21     there is a rate of extraction up above here which, if continued

22     into the future, would prevent you from getting the water

23     when you are ready for it.

24     Now in the case of the basin case we say that is different,

25     because we are talking about stored water.  And yet the Court

P 34

1  doesn't go into the question how much stored waterhhe needs.

2  He merely says that when the rate of use of this water source

3  exceeds the amount we can expect to get from that water source,

4  then you have to sue to establish your right.  There again,

5  although the Court speaks of injunction, obviously you couldn't

6  get an injunction if you were not going to use the water.

7  You could get a declaratory action and injuntion against

8  assertion of an adverse right.

9    THE COURT:  Of course, if this theory that you advance

10  is sound, and you look at the Temecula Basin, if it is a

11  basin -- if it is a part of the stream system, and there has

12  been overdraft going on in excess of five years, then pre-

13  scriptive rights have been obtained.

14    MR. GROVER:  Yes, your Honor, if all the other factors

15  of prescription are available.

16    THE COURT:  If you follow this out in other parts of

17  the watershed, Roripaugh and some of these big pumpers in

18  the basin who pump to such an extent that we have a reverse

19  flow in the Temecula -- there is evidence that the gradient

20  has been reversed in the Temecula。

21    MR. SACHSE:  Murrieta.

22    THE COURT:  -- in the Murrieta.

23    MR. GROVER:  I am not familiar with that evidence.  But

24  there is just one difference between a stream and a basin.

25  In a straight basin everybody is adverse to everyone else

P 35

1    because his pumping does hydrologically, physically affect

2    them.  Here, you ordinarily don't affect a person upstream.

3    But of course by pumping you might be able to do that.

4         THE COURT:  The evidence has shown here, and the Court

5    has found, in the Murrieta area hydrological connection be-

6    tween these various wells.  It has been demonstrated that

7    there are pumping holes in this area from excessive pumping.

8         MR. GROVER:  That would be fact question, your Honor.

9         THE COURT:  You are liable to be associated as other

10   counsel by somebody in this case, if you can still practice

11   law.

12        MR. GROVER:  I believe I can, technically, but as a

13   practical matter it is impossible.

14        Now, in order to overcome all these dicta which your

15   Honor just must understand in order to get down to the

16   philosophy of the Pasadena case  and see how it applies here,

17   I have gone into this philosophically.  One more point in

18   that connection.

19        There was confusion during the last century -- Professor

20   Bingham brings this out in his article -- as to the theory

21   of prescription.  Originally, apparently, it was long continu-

22   ed use -- the mind of man runneth not to the contrary.  But

23   finally they got a theory that there was a lost grant.  As

24   late as the Pabst case they are still talking about a lost

25   grant, although the Pasadena case makes it clear that the

36

1    statute of limitations not the lost grant is the real theory.

2    But they are still talking about relying on old remarks.

3        But in 1881, Professor Bingham says, in <u>Angus vs Dalton</u>

4    the theory of prescription as being based upon the statute

5    of limitations really was settled in the English Courts and

6    since then in the Anglo-American system.   Therefore, we have

7    to be careful in reading the cases before that time.   You

8    get this bootstrap type argument in the old days.

9        In the <u>Herming Haus</u> case the riparian down below is

10   entitled to an injunction even though he isn't using the

11   water against the appropriator upstream, because if they

12   don't give him an injunction prescription will run.   Then

13   they turn around and say that the man upstream gets a pre-

14   scription because the man down below has the right to an

15   injunction.   And the result was waste, as Professor Bingham

16   points out.   And that is why Weil was so strong for the

17   philosophy of the <u>Wiggins</u> case that shows declaratory pro-

18   tection for these people.

19       MR. STAHLMAN:   May I ask Mr. Grover a question?

20       THE COURT:   If this is a good place to interrupt.

21       MR. GROVER:   Certainly.

22       MR. STAHLMAN:   Do you contend that you can obtain a

23   prescriptive right when you are exercising a permissive use?

24       MR. GROVER:   A literal permissive use?   No, that isn't

25   my point at all.

P 36

1   MR. STAHLMAN:  If it is filed, you are also **extracting**

2   under a permit.  You contend that you were extracting **under**

3   a permit filed in the County so as to give notice **to every-**

4   body that you were exercising an appropriative right.  Now

5   you are contending that the taking of the water **under an**

6   appropriative right ripened into a prescriptive **right.**

7   MR. GROVER:  I say that the consent was given **by the**

8   United States with respect to the public lands.  **As against**

9   them I am satisfied to rest on the so-called appropriative

10   right which arises from that consent.  But as against **other**

11   people I didn't have their consent.  I didn't have **the consent**

12   of the Vails in 1885, and as against them we **are not acting**

13   permissively.

14   MR. STAHLMAN:  Appropriate surplus water, **though.**

15   MR. GROVER:  No sir.  Today we usually have **appropriations**

16   of surplus because the rest of the water is all **taken.  But**

17   this 1885 appropriation on the public domain **is superior to**

18   any right of the public domain thereafter.

19   MR. STAHLMAN:  I am not talking about public **domain.  I**

20   am talking about any rights down below.

21   MR. GROVER:  But that is a form of appropriation.  As

22   against people below I have the right of appropriation.

23   MR. STAHLMAN:  If there is surplus water above **their**

24   needs.

25   MR. GROVER:  Yes, I have the right to **appropriate.**

P 38

1      MR. STAHLMAN:  That is what I said.

2      MR. GROVER:  Under the _Peabody_ case I can now take

3  surplus water over their needs.  But if I take more than is

4  surplus over their needs, then I am invading their rights;

5  the prescription period starts.

6      THE COURT:  Have you completed your argument?

7      MR. GROVER:  I would want to apply it to the facts in

8  this case, briefly, your Honor.  And I don't want to go into

9  that too much because the memorandum has set that out.

10      The question then comes up:  What is the specific

11  appropriative right?  On page 7 of the memorandum we go

12  through the point of intent, which is established clearly by

13  this notice.

14      We go through the point of diligence.  The testimony of

15  Mr. Tripp was that as well as they could they extended the

16  ditch, all of the time working, as you will recall, under

17  severe conditions, and in the flood of 1891 everything was

18  wiped out, even their land down there along the stream.  And

19  then the testimony is that they took up to the full capacity

20  of the ditch, they fully used it each year.  And at the

21  bottom of page 7 the various witnesses who testified to that

22  are referred to.

23      Mr. Tripp testified that it is the same ditch as it

24  was in the old days, and he had seen it himself personally

25  the day before he testified in this Court.  Going over to the

P 39

1   next page, during the irrigation season water was allowed to

2   go to waste.  And then water from the upper ditch was also

3   taken to the lower ditch.  These went on to the lands of

4   Cottle then, and from the upper lands of Cottle flowed into

5   the lower ditch.  And then water from the lower ditch was

6   also taken directly for irrigation of fields I, J and H.  As

7   Mr. Cottle testified, since about 1951, I believe it was,

8   there has not been enough water there to use the lower ditch.

9        To go over to the prescriptive rights, detailing this on

10  page 13 and following, we pointed out that the adverse or

11  hostile character is established if the Court should establish

12  that we are taking more than our share.

end of Cl  13

14

15

16

17

18

19

20

21

22

23

24

25

C2 take

P 40

1    Then to go over to the next period, the five year period,

2  that is clearly there, because since 1897 they have been

3  using the upper ditch to the full capacity where water was

4  available.  It has been continuous year after year and unin-

5  terrupted.  Itthas been open and notorious right there in

6  plain view of everybody.  And as I went over this morning, in

7  face of well known litigation  which indicated that any

8  substantial use was beyond the riparian share.

9    THE COURT:  Do you have any authority that the fact that

10  someone could see a ditch and water works and irrigation

11  going on, on an adjacent roadway, that is proof that the

12  person operating the ditch and the water works is taking more

13  than his share?  I drive by and see a man running ditch water

14  and watering an alfalfa field, and I am a lower riparian.

15  There is a presumption of law that persons act lawfully, and

16  therefore if I had any knowledge of law I would assume that

17  this, instead of being a taking of more than his share, was

18  the taking of his proper share.

19    MR. GROVER:  Yes, but that is impossible in the face of

20  the fact that for that acreage there that you can see he is

21  using far more than what his share would be under the circum-

22  stances of this watershed.

23    THE COURT:  How could I see away from the road?

24    MR. GROVER:  In the Pasadena case all they could see

25  was water going down in their wells.  They said that that was

15,612

P 41

1    enough notice.

2    MR. STAHLMAN:  That is different.

3    THE COURT:  Do you have any authority that the mere use

4    of water in the field, regardless of the size of the field,

5    puts some lower riparian on notice that there is an adverse

6    user against him?

7    MR. GROVER:  No, I don't have any literal authority, a

8    case that I know of where that has come up in exactly this

9    way.  But in the Morgan case they gave him exactly the amount

10   of reasonable beneficial use on his riparian land.

11   THE COURT:  He took all the water.

12   MR. GROVER:  But suppose he had taken only half of the

13   water, and it had been obvious all of a sudden one day that

14   half of the water was no longer coming down.  Take these big

15   cases in the Sacramento and San Joaquin Valleys where they

16   take water out of the watershed, how is notice brought home?

17   Not by taking all of the water, but by their works and by long

18   continued use.  Hutchins in the places cited  here on that

19   point emphasizes that long continued use is an important

20   factor.  And that was emphasized in the Morgan case.  And

21   that anyone, any reasonable owner of land, in view of the

22   status of this watershed, would know that if any substantial

23   use by an upper riparian owner were being made it would be

24   more than his share.

25   I don't have a case where that exact point was made, no.

P 42

THE COURT:   Go ahead.

MR. GROVER:   At the beginning of page 15 we go over the various facts about the details of the quantity and the nature of the diversion, and the important point there is to note that you can make changes in your means of diversion, your place of diversion, your place of use, provided that no one is injured.   I believe the usual remark is that that is hornbook  law, and I have cited on page 15 what I think are undisputed authorities on that point.

Now then we go over the changes that we have made.   There was some talk about the change of the point of diversion from the junction where Smith Canyon Creek comes down. To conform with the exhibit, the river runs roughly north and then Smith Canyon or Long Creek comes in this way.   The original diversion was in this area, but it was found that floods joining the river here made it difficult to maintain the diversion structure.   Consequently, the change was made, and finally the present diversion is upstream.   The only possible water effect that can have  is to eliminate from the diversion the water of Smith Canyon Creek.   So obviously no one was injured.

Now the Tripp testimony is that changes in the ditch have not been substantial -- it is the same ditch, and he walked every foot of the ditch the day before he came in here.

Now, there have been some changes in the diversion

P 43

1   structure.  Your Honor will recall that some changes in the

2   dam were made here and there was quite a bit of talk about

3   it when Mr. Spaniol was on the stand and, as we point here,

4   there was no injury of any person from the standpoint of the

5   amount of water they got.  The main purpose was to prevent

6   damage to the structure.  That is when they put the pipes in

7   the structure.  There was testimony on that.  Then on one

8   occasion there was some digging down and putting clay there

9   in order to get a full ditch.  As the point was made in the

10  Santa Margarita case about the basins down at the bottom,

11  it was the same supply; these basins were part of the river

12  and had to be figured into the riparian.  It is the same river

13  right at the diversion whether it is underground or above

14  ground.  The thing they have done here, year after year, is

15  to fill their ditch.  And when they were unable to do that

16  during the drouth, in an effort to get their ditch full they

17  put some clay in the bottom.  Mr. Spaniol was of the opinion

18  that they got more water.  Mr. Strange said he hoped so, but

19  was not certain.  The important point was that they still

20  didn't get as much as they had in prior years when there was

21  more surface flow.

22      Another point there is that this subsurface water wouldn't

23  reach the lower owners anyway for two reasons:  (1) That it

24  came up again as rising upstream from the intake of the lower

25  ditch where it went into fields I, J and H.  At the time this

P 44

1   change was made the flow in the lower ditch was so negligible

2   that they had temporarily stopped using the lower ditch.

3   Consequently, they obviously weren't hurting anyone if they

4   had picked up a little of that flow here.

5       Finally -- and this is perhaps the most important point

6   -- Dr. Mann testified that there was large phreatophytic loss

7   in that area and suggested that good management would call

8   for an effort to prevent that loss going to those plants,

9   trees, etc.  Consequently, if it had backed up a little here

10   it was merely less for these plants to consume wastefully

11   on the way down.  So I don't think there was any change

12   there.

13       Now we come to the last point, which is the changes in

14   place of use, and this is why we believe that an actual acre

15   by acre analysis of the amount of water taken isn't the

16   realistic way to appraise the quantity of the right.  Because

17   the testimony was that all through these years they used all

18   that was available during the irrigation season.  Of course,

19   they didn't use it during floods, they didn't use it during

20   rains, etc.  But during the irrigation season when they needed

21   water for irrigation they took all that was available up to

22   the capacity of the ditch.  And the testimony was that from

23   time to time they used more or less in the fields, depending

24   upon the amount available.  Sometimes they got over to field

25   A -- they haven't gotten there recently -- a way up at the

P45

1    end up above that big rock.  Sometimes they had enough for

2    the lower ditch and to go into fields I, J and H.  Beginning

3    at least in 1929 they were pumping from the upper ditch up

4    into fields above the upper ditch, which was not the original

5    place in 1897 when the ditch was completed, Mr. Johannsen

6    testified.  Beginning in 1934 they pumped up some more --

7    Mr. McCaw's testimony was to that effect -- up in fields 1

8    and 7.  They were able to use more fields then.  But the

9    point was that they were using whatever water was available.

10   And finally in 1951 when they went to sprinklers they were

11   able to make a much more substantial use above the upper ditch.

12   But the testimony is that that is a more efficient method of

13   irrigating and, as Mrs. Gibbon pointed out, the same amount

14   of water was merely spread over more land.

15       So the real quantitative measure of the right is the

16   capacity of the ditch to the extent available during the

17   irrigating season, plus the lower ditch when it is available

18   for fields I, J and H.

19       I have one last point, and it is in the brief, but I

20   will just mention it summarily, and that is that there was

21   something about not qualifying under the Civil Code appro-

22   priation procedure that was in effect in 1885.  As the

23   memorandum points out, that bears only on the doctrine of

24   relation.  Between 1885, when the notice was posted, assuming

25   it was not an adequate notice when it was recorded, in 1897

15,617

P 46

1   when the ditch was finally completed there is a lapse of

2   time, the appropriation was perfected in 1897.  It dates

3   back in priority to 1885.  But if we didn't comply strictly

4   with the Civil Code procedures we could not get that 1885

5   priority as against someone who in the meantime had complied

6   with those procedures.  That is the only effect of that.  So

7   that as of 1897 certainly the appropriation under the Civil

8   Code has nothing to do with it, and I don't know of anyone

9   between 1885 and 1897 who had complied.

10      MR. VEEDER:  I do.

11      MR. GROVER:  I have argued it this way because I don't

12   know of any such person.  But if there is such person, we

13   would contend that we told him that we had complied.  But

14   even if we didn't, it would be only as against him that we

15   would lose our 1885 priority.

16      THE COURT:  I take it that you would hope that I would

17   find both appropriative and prescriptive right.

18      MR. GROVER:  Yes your Honor.

19      THE COURT:  But if I found only one, you feel you would

20   have more protection with a prescriptive right than with an

21   appropriative right.

22      MR. GROVER:  Oh, I think so, your Honor.  The really

23   big people here are the Vails and the Government downstream.

24   I would much rather have a prescriptive right that would

25   prevent their taking away from us by apportionment than the

15,618

P 47

1   appropriative right, which would, as far as riparians go,

2   only be binding on those in the public domain as of the time

3   of our priority.

4       THE COURT:  Let me follow that through for a minute.

5   All the water that you take by this ditch comes off of the

6   property which was originally Government land?

7       MR. GROVER:  Yes.

8       THE COURT:  You claim an appropriative right?

9       MR. GROVER:  Yes.

10      THE COURT:  If you have an appropriative right, then

11  isn't it good as against anybody on the stream?

12      MR. GROVER:  As to surplus waters over riparians, yes.

13  But as to riparians who took later from the Government, it

14  is good against them -- surplus and everything -- it is

15  good against them completely.

16      THE COURT:  Do you mean as to riparians who had rights

17  at the time you appropriated.

18      MR. GROVER:  It is not good except as to surplus.

19      THE COURT:  But as to other riparians who got land that

20  came out of the Government domain, it is absolute.

21      MR. GROVER:  It is absolute, that is right -- paramount.

22      THE COURT:  We know what that situation is.  For instance,

23  the Vail Estate goes back to the Spanish Grant.

24      MR. GROVER:  That is right.

25      THE COURT:  And the Government domain situation.  Was

P 48

1   the property upstream from Vail all at one time part of the

2   public domain, or were there other Spanish ranchos up there?

3        MR. GROVER:  I don't know of any rancho above Vails.

4        THE COURT:  Colonel?

5        COLONEL BOWEN:  There was one up above there.

6        MR. GROVER:  But there might have been other owners by

7   earlier patents.  I believe that is the case.

8        THE COURT:  Patents that antedated your priority date

9   that you claim of 1885?

10       MR. GROVER:  Yes.

11       THE COURT:  We don't know that.  We haven't any record

12  of that.

13       MR. SACHSE:  I think we can safely guess.  Mr. Grover

14  says there are mighty few of them that are of any size.  The

15  big ones are the Government and Vail.

16       THE COURT:  We will take our afternoon recess and

17  shortly thereafter you will be torn limb from limb by Mr.

18  Sachse, Mr. Veeder, Mr. Girard.

19       (Recess)

20       MR. VEEDER:  Are you ready to resume your Honor?

21       THE COURT:  Yes.

22       MR. VEEDER:  Your Honor, in the closing moments of

23  yesterday's hearing I moved for judgment on the basis of

24  the riparian rights of the United States and asked the entry

25  of an injunction based on the proof in the record at that

P 49

time.  I renew that motion.  I believe the record would

support it.  With all due regard to Mr. Grover and his clients,

we are running out of time, your Honor.

MR. SACHSE:  Without letting me argue it, Mr. Veeder?

THE COURT:  Mr. Veeder, we haven't even heard from other

counsel on this since the request was made.  Your motion is

denied without prejudice.  Let's proceed to hear the rebuttal

argument as to Mr. Grover.

MR. VEEDER:  Who is to proceed?

THE COURT:  I don't care.  Who wants to proceed?  Mr.

Girard, do you want to start?

MR. GIRARD:  I will comment just very briefly your Honor.

I have drawn a few little diagrams here.  Mr. Grover's

basic contention, insofar as his prescriptive rights are

concerned, is that a riparian gets a prescriptive use for

proper riparian uses for every amount of water which he uses

above the judgment allocation of apportionment which might

subsequently be entered.

I think every single case that ever held a prescriptive

right, you find a situation where there was a complete cut

off of water and substantial injury.  There is certainly no

indication in any of these cases as to that type of approach.

This represents the stream.  This is Gibbon and Cottle's

outlet here.  This is the Gibbon and Cottle property.  Even

with Gibbon and Cottle's works, there has always been water

P 50

1    here, there has always been water here, there has always been

2    water here, when it comes out of Gibbon and Cottle's property.

3    Mr. Knox yesterday testified that at least up to 1953, which

4    was after the commencement of this lawsuit, there was always

5    water here.  This is Nigger Valley.  There is water here.

6    In other words, it cannot be shown that the use or the diver-

7    sion of surface flow at this point dried up the stream down-

8    stream at all.

9        THE COURT:  "This point" being Gibbon and Cottle's

10   diversion?

11       MR. GIRARD:  Gibbon and Cottle's diversion.  In fact,

12   I think it is shown pretty conclusively just on the downstream

13   boundary of Gibbon and Cottle's property there has been water.

14       So you can't approach it on the basis that there is a

15   prescriptive right gained because Gibbon and Cottle's use has

16   adversely, actually, physically hurt someone downstream

17   beyond what might normally be anticipated in a riparian use.

18       Now, if the suggestion by Mr. Grover were to become the

19   law, I think you would have a situation where you would

20   absolutely be required in every stream in this state auto-

21   matically to get an apportionment and a master type situation

22   to administer the stream.  In order to determine, let's say,

23   a downstream riparian examining an upstream riparian land, if

24   Mr. Grover is correct, he has to determine, in order to make

25                      whether
     up his mind/to bring litigation and stop the prescriptive

MARIE G. ZELLNER, OFFICIAL REPORTER

P 51

1  period from running, the first thing he has to determine is

2  what the judgment allocation among riparians as to one

3  particular parcel would be.  I think if you took Colonel

4  Bowen, Lee Illingworth, Sandy, Mr. Mann, every expert in this

5  case, if you took them up to Gibbon and Cottle's property

6  today and asked them to make a determination as to what

7  Gibbon and Cottle's allocation as a riparian would be, if

8  a judgment were entered, you couldn't get an answer from them.

9  You wouldn't get any possibility of an answer.  They would

10  have to consider every other use on the stream.  They would

11  have to consider economic feasibility factors.  It would be

12  a decision which would probably take five years for a court

13  to decide, and then the court would decide it on conflicting

14  evidence.  There would be no possible way that anyone could

15  determine an allocation as to one particular piece of property

16  with any degree of certainty at all.

17    But let's assume that that can be done.  We have here

18  a piece of property, and all of this is riparian, and looking

19  at this property perhaps now with Gibbon and Cottle's present

20  use, let us assume they are irrigating all of their riparian

21  acreage -- well, I think you could probably say that maybe

22  in excess of what a judgment allocation might be, if there

23  ever was one.  But let's get a situation a little bit different

24  where a fellow is using only about three quarters of his

25  irrigable acreage.  It would be a little difficult for another

P 52

1   downstream riparian to determine in that case whether the

2   particular individual was using his water over what a judgment

3   allocation would be.

4        THE COURT:  Because his judgment allocation would be

5   based on his irrigable acreage and he might, therefore,

6   take his riparian rights and use them on a smaller portion

7   than his total irrigable acreage.

8        MR. GIRARD:  Your Honor just brought up another point.

9   How is he going to assume, with any degree of certainty, that

10  a court would make a judgment of allocation on irrigable

11  acreage?  They usually do, but not always.  But I assume that

12  in this case.

13       Then you get this case where the fellow is using just

14  a little bit more than his judgment allocation would be.

15  Certainly no one could possibly make that estimate with any-

16  thing other than a non-educated guess.  But in each case,

17  under Mr. Grover's theory, there would be a prescriptive

18  right for this amount, this amount, and this little fraction

19  here -- if his theory is right.  Frankly, I just don't think

20  it is.

21       I think the basic element of a prescriptive right -- and

22  I think it is evidenced in all of the cases -- I think the

23  crucial factor where a prescriptive claim was upheld was

24  that there was substantial injury right downstream from the

25  appropriator -- downstream from the prescriptor.  You didn't

P 53

1   have any water for the five year period.  And unless you can

2   show that, I don't think you can get a prescriptive right.

3   And I certainly don't think you can get a prescriptive right

4   to all the water that you use above a judgment allocation

5   determination which, of necessity, could not be determined

6   with any possible degree of accuracy.  It would be nothing

7   more than the wildest guess.  It would be completely beyond

8   the economic feasibility of most people to even determine it.

9   Certainly Mr. Knox could not finance himself.  A study to

10  determine what Gibbon and Cottle's allocation judgment would

11  be on this stream.  He just couldn't do it.  The only thing

12  he could do, along with everybody else, is just bring a suit

13  right now and get the judgment of allocation.  I just don't

14  think it can possibly be supported on the realistic approach

15  to the problem, and certainly there is nothing in any case

16  to indicate that that is the test.  The test has always been

17  substantial adverse use.

18      I am not going to comment on the particular legal points

19  that Mr. Grover made.  I think generally I would agree with

20  most of them, other than the situation where Mr. Grover

21  attempted to treat a surface stream use of excess water the

22  same as a basin.  I don't think the problems there are synon-

23  ymous at all.  I don't say that I could anticipate whether

24  the Supreme Court would put the basin rule over to the stream.

25  There is no such case.  But you can certainly distinguish the

P 54

factual situation.  The reason that they held in the basin

case that an overlying owner has to commence his action to

stop the running of the prescriptive period was on the fact

of that case the basin had been actually used to the extent

that the safe yield was affected.  Next year or ten years or

fifteen years from now people who use that particular basin

would not be able to get water because it had been extracted

previously and the carry over storage etc. would not be

accomplished to satisfy the needs.  As far as a surface

stream goes, a person can use every drop of water in one year

and there will be surface water the next.  The substantial

use one year of a surface stream does not have the drastic

subsequent effects that the substantial overdrawing of the

basin has.  And I think that is the basic distinction between

the two situations.  I don't say, as emphasized, that the

Court might not make it.  But it can be distinguished.

Take C2

THE COURT:  Are you agreed, generally, with his analysis

of his pappropriative right?

MR. GIRARD:  Yes.  I think Mr. Grover or his clients

filed their appropriative right, and I say the question

whether it was valid in terms, I think he would have an

appropriative right of an 1885 priority.  Any subsequent

patentees would be junior to that.  I don't think as far

as the State is concerned it is too much, because I am sure

that most of the major water users are under a situation where

P 55

they couldn't possibly be controlled by that.  Vail and the United States both are private ownerships long before 1885.

THE COURT:  What do you say as to how you describe the extent of the right?  The capacity of the ditch?

MR. GIRARD:  Personally, I do not like the idea of the capacity of a ditch.  I don't think it tells you anything.  I think you would have to figure out some way as to how much water they actually put to use.  If it is all of the waters of the stream at this particular point, I would like that a little bit better than the capacity of the ditch.  Capacity of a ditch doesn't mean anything, as you pointed out the other day, your Honor.  Suppose the ditch is destroyed ten years from now and we have to determine what the capacity of a non-existent ditch is.  You may be able to describe it, but I would prefer to have the amount spelled out, if possible.

THE COURT:  Thank you.

Mr. Stahlman.

MR. SACHSE:  If you don't mind, I will be very brief.

I want to say something about this appropriative thing that you just asked Mr. Girard about.  I posed this question to Mr. Grover himself.  I have no law on it.  He said he doesn't.  This the question:  Can the use by the same man of the same quantity of water, on the same piece of ground, for the same purposes, at the same time, on the same crops, adding same, same, same for as many such generic terms

P 56

1    as you can think of, can that give this gentleman three entire-

2    ly separate and distinct rights which your Honor is ultimately

3    going to write down in three entirely separate and distinct

4    fashions?

5         THE COURT:  Riparian, appropriative and prescriptive.

6         MR. SACHSE:  Riparian, appropriative and prescriptive.

7         Your Honor's pre-trial order tells us that when a riparian

8    right is determined we shall find that the property is riparian

9    and find the irrigable acreage.  That is enough.  When a

10   prescriptive right is determined, we shall find a fixed

11   amount of water and the date of the prescription.  When an

12   appropriative right is determined, we shall find a great many

13   things -- the time of appropriation, the method of diversion,

14   etc.

15        Now I asked, as I say, this question, is it possible?

16   Mr. Grover's answer was, why not?  And I am sorry I cannot

17   answer this point with legal authority to back me up.  I have

18   looked hastily, not exhaustively.  But to me it is incompre-

19   hensible that your Honor is going to be asked to catalogue

20   on one parcel of ground three sets of rights which are

21   absolutely and diametrically opposed to each other; that

22   they have entirely separate characteristics in their effect

23   on others on the stream system; that they have entirely

24   different benefits and prerogatives.  One of them can't ever

25   be lost.  Another one is lost by mere non-use, as Mr. Grover

P 57

1    points out, for a period of three years, another is lost by

2    non-use for five years.  What is this cataloguing going to

3    mean then when you finish with Gibbon and Cottle, can you tell

4    me?

5        Let's say one of my downstream clients.  Not Fallbrook

6    for the moment; now they have these rights.  What good is

7    it to our cataloguing process?  What has Mr. Veeder learned

8    about the period of this stream, which he says, and I believe

9    him, is the prime consideration that the United States is

10   concerned with finding out?  You are going to have a hopeless

11   situation.  These gentlemen have possibly two kinds of rights.

12   They might have, I think, possibly even all three.  But not

13   all three for the same water, at the same place, at the same

14   time, for the same purpose, for the same thing.

15       That is my point number one on the appropriation.

16       THE COURT:  May I interject something before you go to

17   the next one?  You postulated this business of sameness.  Of

18   course, there is one difference.  Gibbon and Cottle, astride

19   the stream, if they picked up riparian water they would pick

20   it up at their boundary.

21       MR. SACHSE:  Not nessarily.  They could get an easement.

22   They could go to the fellow up above.

23       THE COURT:  But the haven't.  They either have an

24   appropriative right to bring it on the property from above,

25   or they exercise a riparian right when the water reaches their

P 58

1   property.

2   MR. SACHSE:  No, your Honor.  With all due respect to

3   your Honor, and I don't think Mr. Grover will disagree, your

4   Honor is confusing the method by which they may get the water

5   to the land with the right.  The riparian has a perfect right,

6   and it was usually done in the earliest days of riparian use,

7   by going off your own land to get your own riparian water for

8   the practical reason, I think I mentioned yesterday in argu-

9   ment, that you had to find a way to bring it down to you.  The

10  mere fact that you are five miles on someone else's land

11  taking water doesn't mean that it is not a proper riparian

12  taking.  It might well be.  I am sure that Mr. Grover, Mr.

13  Veeder and everyone will agree that your Honor is mistaken.

14  THE COURT:  You don't see any distinction?

15  MR. SACHSE:  No.  The going on other land might constitute

16  an appropriation, yes.  But the mere fact that a man goes on

17  other land and takes water for use on his riparian land, that

18  of itself is not an appropriation.

19  THE COURT:  I can see that.  But I am asking whether or

20  not it is a proper riparian use.  And secondly, whether or

21  not you have this identity of use that you are talking about.

22  MR. SACHSE:  When the project was first started I would

23  say there was, without question, identity of use, because it

24  is the only practical way that Gibbon and Cottle's predecessor

25  could irrigate -- unless they are going to pick it up in a

P 59

1    bucket. Possibly today they could put a sump on their land

2    and pump it out. But I submit that it is still a riparian

3    use even at the earliest stages of the taking.

4        Now the second matter relates to what Mr. Girard said,

5    and I am not going to repeat it. I agree with everything

6    he said. I think the theory suggested by Mr. Grover would

7    force a "Fallbrook Case" instanter in every watershed in

8    California. Because absent and exact knowledge on my part

9    -- treating me as a riparian owner for the moment -- absent

10   exact certainty as to what the rights of each upstream

11   riparian are, I couldn't take a chance, and I would be

12   compelled to bring a "Fallbrook Case" against every riparian

13   owner in the watershed if I wanted to protect myself. There

14   would be absolutely no other way for me to proceed. None.

15   And I don't think that can be the law, and I don't think it

16   should be the law.

17       Now on the facts, there is one other fact that, I

18   believe, was not mentioned by Mr. Girard, but which is

19   pertinent -- it was pointed out in connection with some of

20   our arguments on the Oviatt claims -- the question of know-

21   ledge. In the first place, it is my understanding of the

22   law established by the Supreme Court in Scott vs Fruit Growers

23   Supply, 202 Cal. 47 at page 52, which is a prescription case

24   -- I am reading from the language under the heading "Headnote

25   4" in the text of the opinion:

P 60

"The presumption is that in the use of water the
upper riparian proprietor is exercising his riparian
rights and no title by prescription can be given
unless it is brought home to the lower riparian
proprietor that the upper riparian proprietor
asserts a right other than his riparian right." (citing
many cases).

Now if -- and this goes to the same water proposition
-- if this is the very water which Gibbon and Cottle would
have a right to use as riparians, it is used on the very land,
it is used through the identical diversion works, how is that
brought home to a downstream riparian?

end of
C takes

Take D1

P 2

1    Through a downstream riparian, how has he knowledge?  I

2    don't care if they took substantially all of the water from

3    the stream, because it is fundamental that a riparian has

4    the right to the use of all of the water so long as he does

5    not take water that another riparian needs.

6        So I say that we must remember that presumption that I

7    have referred to that is protecting the downstream riparian.

8    He has a right to presume that the upstream riparian is using

9    no more than his proper riparian use, in the absence of

10   something to give him knowledge.  If this use is on his own

11   riparian land, on property for irrigation, and all of it is

12   used on irrigable land, and none of it is exported, where is

13   the knowledge?

14       Also, dealing on knowledge, the cases cited by Mr. Grover

15   here were substantially where all of the water of the stream

16   was taken, the Morgan case and others.  With this law I do

17   not have any quarrel.  But I do not believe that they are

18   applicable to a stream of this kind.  I don't.

19       I don't think that the Vail Ranch, let us say, forgetting

20   for a moment that they probably had very good technical

21   assistants, or a person in the position of the Vail Ranch,

22   I don't think they have to assume that water will be above

23   ground or below ground at any given time on their property.

24   They know it changes.  Sometimes it is there, and sometimes

25   it isn't.

P 3

1    I don't think they have the burden of maintaining

2  consistent measurements of the surface flow to determine

3  whether somebody else upstream has unnecessarily depleted

4  the amount that is coming down.

5    I would say, to close right now, that the prescriptive

6  claim must fail -- must -- because of the lack of one absolute

7  essential, no evidence of knowledge on the part of anybody

8  downstream.  Adversity without knowledge.  There is none,

9  and there cannot be, and in the absence of it, the pre-

10  scriptive claim I think must fail.

11    As to the appropriative claim, I think you can't have

12  all three of them.  I don't think you can have appropriative

13  and riparian for the same water on the same place and at the

14  same time.  I don't think you can.  And I think he had better

15  decide which one he wants, and I think there is no question

16  that the one he wants and the one he needs is the one with

17  riparian rights.  And on that I can give your Honor a cita-

18  tion of authorities, and I don't think that Mr. Grover can.

19    Mr. Girard has given me text authority for the point

20  your Honor questioned me about before, and this is from

21  Hutchins at page 248:

22      "So far as downstream riparian owners are

23    concerned, the upstream can make a diversion of

24    water at a point above his own land provided no

25    unreasonable loss of water is caused by such diversion."

P 4

1    That is, without any violation of the riparian rights.

2    THE COURT:  Now, you say that if Mr. Grover had to make

3    a choice you think he would choose riparian on the ground

4    that the riparian is not lost by a non-user, and it is un-

5    limited except by correlative use, while the appropriative

6    right can be lost by a non-user.  I am not sure that I

7    follow you.  You argue that the riparian right may be better

8    than the appropriative.

9    MR. SACHSE:  Well, his appropriative right may not be

10   good as against Vail.

11   MR. GIRARD:  It is available to the United States.

12   MR. SACHSE:  I don't think it is good against Vail.

13   THE COURT:  Or against the Santa Margarita?

14   MR. SACHSE:  Or against the Santa Margarita, whereas

15   his riparian right is as good as gold against both, so I

16   would say offhand that he would be in bad shape if he gave

17   up his riparian rights for the sake of possibly squeezing

18   out a few small land owners who may have come in, and may

19   have a patent, and then the patents would be in a sorry state

20   of affairs.

21   THE COURT:  All right.  Mr. Stahlman.

22   MR. STAHLMAN:  Your Honor, I think that Mr. Grover has

23   personally prepared a very excellent treatise on water law

24   in his memorandum, and I think he made a very good talk.  I

25   am trying to go along with him so far as the law is concerned

P 5

1    but in its application to the present situation is where I

2    have to widely depart from him.

3        In the first place, in relation to the appropriative

4    right, I don't think there has been sufficient evidence.   I

5    am not too much concerned about that, because I don't think

6    it has any effect upon Vail because of the limitation to the

7    appropriation, being for surplus waters and not, of course,

8    being effective to a private owner prior to the appropriation.

9        However, I would like to point out that I don't think

10   he has made  sufficient proof of the quantity of water that

11   he has diverted to even establish what his appropriative

12   right would be, and I think that the burden is upon him, and

13   I think the cases show that it must be substantially proved.

14   It isn't something that can be just guessed at, and I think

15   that the entire evidence in this case/I dare say that nobody
                                        and

16   can sit down right now with this record, and say how much

17   water, surplus water, has been appropriated there, because

18   it isn't the size of the ditch or the size of the pipe that

19   determines it, but in order to establish an affirmative right

20   it must be for a beneficial use.

21       Now, so much for that, and going to the question of the

22   prescription.  This thing sort of threw me.  When I heard

23   his theory here, I thought he took the championship for

24   ingenuity away from Mr. Veeder, when he came forth with his

25   theory of the riparian owner who was able to apply a greater

P 6

1  quantity of water to his land than some other riparian owner

2  did, and did it for a period of time, for five years, and then

3  would be able to diminish the right of other riparians on the

4  stream.

5      I thought of the difficulty that the courts have had in

6  putting some orderly process into making a determination of

7  these rights, and the situation is a complex situation to

8  start with.  It had its origin, insofar as California is

9  concerned at least, in a great deal of violence, and some

10  order came out of it, and now then, to put it into a state of

11  chaos, which Mr. Grover's theory would do, where every riparian

12  would immediately, if this were known to be the theory of

13  riparian law in California, everybody would certainly go out

14  and immediately use all the water that they possibly could,

15  in order to gain some advantage over some other riparian, and

16  have a right to do it, and completely destroy and subvert the

17  entire theory of riparian rights.

18      I also thought of what would happen up there in the

19  Feather River district, when people would get to thinking of

20  what an appropriation would do up there, and then do it for

21  a period of five years, and what effect it would have on

22  riparian rights and to every stream in the country.  With

23  that situation, instead of our Government having to appoint

24  some seventy judges over the country, they had better appoint

25  about 1700.

P 7

1     Now let's just analyze it to see how sound it is.  A

2  right of prescription has its basis upon the principles of

3  trespass.  I am now directing myself to the situation where

4  I don't think that even if there were a possibility of ac-

5  quiring a prescriptive right under the circumstances, that

6  it is possible to fulfill the requirements and make the

7  necessary showing in order to obtain a prescriptive right.

8     As I say, prescription has its basis in trepass, and

9  the elements of the open, notorious, and hostile -- I don't want

10 to forget that -- use then becomes a question of fact that

11 has its application to the circumstances of each particular

12 case.

13    So we take our particular case here, and then here Mr.

14 Grover has attempted to apply situations that have existed

15 in other cases.  I submit that it is possible for a riparian

16 to obtain a prescriptive right, but it has to be under certain

17 circumstances and certain factual situations, and it must be

18 a trespass, it must be an invasion of the rights of the other

19 riparian owner against whom the prescription is to run.

20    Now, it is true that in some of these cases there was

21 such a factual situation whereby it not only was probably

22 known in the community, but the public at large would know

23 that there was a diversion of water to such an extent that

24 it would destroy the rights of the people who had/rights upon

25 the stream.  And, of course, we had cases, and some of them

P 8

1   right in San Diego County, where people have surreptitiously

2   invaded the rights of others.  They have gone in and put in

3   ditches and pipes, and surreptitiously taken out certain

4   waters.  Of course, that does not meet the requirements.

5       So we take the factual situation in each case, and we

6   come to the case here, where we have an intermittent stream

7   that has both a surface and sub-surface flow, and where, as

8   Mr. Sachse has already mentioned, Mr. Knox testified as late

9   as 1953 he was receiving sufficient water from the surface

10   stream to irrigate his ranch, and then take the testimony

11   of others as to the natural situation that exists here, as

12   to what the underground flow is that extends downstream, a

13   downstream owner would not be put upon notice that someone

14   was diverting the entire surface flow at some place upstream,

15   because there is still water that rises to the surface and

16   breaks downstream.  There is still seepage coming down under-

17   neath in these alluvial fills on the stream.  So we do not

18   have the elements that are necessary in order to establish

19   a prescriptive right, to show the open, and notorious, and

20   adverse, and hostile use.  It has not been shown in this

21   case at all.

22       I think that is all I have to say.

23       THE COURT:  Thank you.  Mr. Veeder.

24       MR. VEEDER:  Your Honor, the matter that has concerned

25   me I expressed earlier, in regard to the proof by Mr. Grover

p 9

1  in seeking to establish an appropriative right.  I believe

2  that the only thing that is established by proving the

3  carrying capacity of a structure is to prove the maximum

4  demand that could be made upon the stream by that appropria-

5  tive right.

6      I have undertaken that in regard to the O'Neill ditch.

7  I have established in my view that you would be entitled to

8  divert not more than twenty      second feet.

9      We have attempted to prove the second element that I

10  think is essential, the maximum quantity beneficially applied,

11  and I believe that that is where the claimed appropriative

12  right, and, indeed, the claimed prescriptive right failed.

13      I think that there is no doubt that the 12-inch pipe

14  establishes the maximum quantity that could be diverted, but

15  I don't believe that he took the additional step and showed

16  by any proof how much water, and I believe that that is where

17  his case breaks down; and when it breaks down on the basis

18  of failing to prove, as we have undertaken to prove by our

19  Lake O'Neill storage and the crops that were raised, I believe

20  that there -- there is the crucial point which would throw

21  him necessarily back upon a riparian right, and only a riparian

22  right.

23      If your Honor would consider the ground rules which you

24  established, the pre-trial order on issues and exhibits,

25  there was set out at page three the elements which must be

P 10

1   proved, and element No. 6 is the maximum quantities of water

2   utilized.  Absent that proof, I believe that there is no

3   basis whatever for an appropriative or a prescriptive use,

4   or over.

5       I believe that the effort to come within the <u>Rindge</u>

6   <u>Company</u> case falls at precisely that time, because the

7   Rindge Company case as we pointed out the other day in regard

8   to Mr. Anderson's claim, and I think it is very important in

9   this lawsuit, is that first he had to have apportioned to

10  him his riparian right, which would be limited by his

11  correlative share.  In other words, in that case if he had

12  2 acre feet to the acre that he could enjoy with the other

13  riparians, he could go upstream, as he did there, and appro-

14  priate another acre foot and a half for each acre of land.

15  But there he would stop.

16      Now, had there been proof of his correlative share as

17  a riparian, then he would have had to proceed and prove the

18  extent of his appropriation, and that is why I believe, your

19  Honor, irrespective of all the law that has been cited, and

20  I enjoyed the treatise very much --

21      THE COURT:  The what?

22      MR. VEEDER:  The treatise.  I think that Mr. Grover, I

23  compliment him, I think he did fine, but he had a problem.

24  He didn't show the measure of his appropriative right, and

25  failing to do that, I think his case failed.

P 11

1    In other words, he could show that he could take only

2    twelve inches through his pipe.  He didn't show the gradient

3    on it, he didn't show the fall, and he didn't show how much

4    water could be carried through there, he didn't show the

5    head.

6    But, in any event, he did encounter this problem.  He

7    didn't show how many cuttings of alfalfa he had, he didn't

8    show the acreage, and if I recall the testimony of the lady,

9    she said, "We use our water a great deal more efficiently

10    than we did before."  And to that I say, "Amen."  But the

11    point of it is that when these rights adhered, when the

12    rights that attach now were acquired, there was a tremendous

13    amount of return flow going into the creek and I think that

14    that was conceded.  I think that if you recall they have

15    what they call the upper ditch, and I think any right used

16    above and beyond that upper ditch is necessarily precluded

17    at this time.

18    I think that was riparian land, and I think that is

19    the extent of the right they could claim under the circumstances.

20    The burden of proof is fully with them, and I think that they

21    have failed in that burden.

22    THE COURT:  You don't want to be misunderstood to argue

23    that they could not use their riparian rights on any of that

24    land?

25    MR. VEEDER:  Not at all, your Honor, no.  But I don't

believe that you could increase that burden.

THE COURT:  All right.  Now, Mr. Grover.

MR. GROVER:  Yes, your Honor.  I would like to respond to these seriatim.  I think it will save time rather than to try to organize them before I do it.

THE COURT:  Can you finish this evening?

MR. GROVER:  Pardon me?

THE COURT:  Do you think you can finish this evening?

MR. GROVER:  I think so, your Honor.

MR. STAHLMAN:  Can we finish by 4:30, your Honor?  Some of the lawyers have quite a meeting scheduled at the hotel, and I wanted to attend, and I am half an hour late now.

THE COURT:  I am half an hour late too, so we will see.

MR. GROVER:  I will see if I can do that, your Honor.

THE COURT:  All right.

MR. GROVER:  First of all, in answer to Mr. Girard, he said that in every case of prescription there was a substantial cut off of water.  But how about the non-riparian land cases?  You take the non-riparian lands, and nobody complains about that.  Nobody complains so much about bringing it home to you, and about this knowledge, and presumptions, and so forth.  But the fact that we are using it on riparian land, by using more than the share that we would be allotted if someone sued us is as much a violation of right, and storage on riparian land is just as much a violation of right, and --

P 13

THE COURT:  Except when you use it on non-riparian land out of the watershed, then immediately a red flag goes up, while when you use it on riparian land, a person might say, "Well, he is just using it on his riparian land."

MR. GROVER:  Your Honor, how about a case like Stuart Mesa down there, and places like that, where they had to take instruments to tell whether it was riparian or non-riparian land?  There is no problem of law sustained there.  You have to have instruments.  How about cases where you have a complicated title and you don't know whether the land is riparian or not?

I imagine before our present U.S.G.S. maps were as good as they are today that in many cases the watershed line in complicated areas would be extremely difficult, but the law is sustained, and it seems odd that when there is a difficult question of fact as to whether it is riparian or non-riparian land, that is one law, but when there is a difficult question of fact as to whether you are using more or less than your share, we somehow have to have meters to answer that question.

What is a safe speed, your Honor?  That is a tough question. And this litigation does nothing more than to show, and it certainly does nothing less than to show that there are tough questions in water cases.

But take the Raymond Basin case, the Pasadena case,  and I have been through them, your Honor, and they are tough

P 14

1   factual cases, and the only way you know a basin is overdrawn

2   is to hire an engineer and spend thousands of dollars to

3   have him make a comprehensive hydrological study, because it

4   is much more complicated in a basin case than it is in a

5   surface flow case, and yet the Pasadena case shows that you

6   have to know, at your peril, whether or not there is an

7   overdraft.  And the only thing that he noticed in the Pasadena

8   case, and the Supreme Court relied on the notice, "Well, he

9   noticed the water table was lowering in his well."  That is

10   not much notice when you realize that the use of the basin is

11   going certainly to lower the water table.

12       Now, Mr. Girard stated there has always been water below

13   the diversion.  I believe there is some evidence of cut off

14   of water at some time.  Mr. Johanson talked about some years

15   there wasn't this rising water below the Gibbon and Cottle

16   ranch.  But, you see, the difficulty that it makes here is

17   that the nature of the stream makes it impossible to make

18   that the test of notice, because there is cut off and not

19   cut off all the time.  So we just don't have the convenience

20   of a case where there is a surface stream on a rock ledge,

21   and you know whether there is an invasion or not.  So it

22   is just a question of a difficult fact as  opposed to an easy

23   fact, and that does not change the law.

24       Now, suppose that Mr. Knox, for example, decided that

25   he was only getting half as much water as before, because we

P 15

1  were taking more than our share.  How would he go about

2  proving that?  He certainly could prove it, he certainly should

3  prove it if he wants to get that extra half.  We don't have

4  to cut him down to nothing.  You see, he has that cause of

5  action all the time.  He is at the peril of losing the water,

6  losing the value of his land, and I am not talking about

7  losing a right, but losing the water year after year.  Does

8  he have to look at that water every year and say, "Am I

9  getting my fair share?"  Every time he does not sue, he says,

10  "Well, I will let the east forty go this year because nobody

11  is invading my rights, and I couldn't get any more water."

12  That is a judgment he makes as a farmer every year because

13  he does not sue the person above him.

14      And it is no more difficult in the case of prescription.

15  It is just the other side of the action for injunction.

16      Now, the statement is made that every stream would

17  require an adjudication.  This is the parade of the horribles,

18  and if you want to get some good language on this just go to

19  the Jesse Carter dissent in the Pasadena case, because/was
        that

20  the philosophy that was rejected in the Pasadena case.  And

21  we have had some good adjudication since on the Raymond Basin

22  case theory, and the water owners on the basin say, "I don't

23  know whether it is overdrawn or not.  Maybe we will take

24  another chance because it will cost us $50,000 to find out."

25      That is the factual situation.  But with all that parade

P 16

1    of the horribles, the Court there, following the lead suggested

2    by Mr. Wiel, the great man in California Water Law, the great

3    water authority, saying that it would be good to preserve past

4    uses by giving the people a declaratory right to protect their

5    future rights, if they want to, but preserve past uses, and

6    not let them be destroyed because somebody 25 years later,

7    when he finally gets around to being a good farmer, finally

8    decides that he wants some water.

9        That is the other side of the policy:  That communities

10   and farms and values are set up on past use, and if you set

11   these up on non-riparian land, why, that is fine.  We honor

12   those past uses, as Justice Shaw says in his article to the

13   American Bar Association.  We honor these past uses on non-

14   riparian land when they become prescriptive.  On riparian

15   land for some reason we don't honor them.  It is an inconsis-

16   tent philosophy.

17       Now, I might add too that we have only the word of this

18   gentleman here that there would be an adjudication on every

19   stream.  I doubt that that is the case.  The fact situation

20   is quite different.  Ours is a clean-cut case from the <u>Santa</u>

21   <u>Margarita vs Vail</u> decision,  a clear-cut case that the major

22   land owners here -- maybe there are some people who were not

23   actually noticed, but the major land owners here knew in the

24   twenties that they weren't getting all the water they wanted,

25   and they went to elaborate expense to find out what the charge

P 17 1    on the stream system was, and they were certainly aware that

2    anyone using water might be using more than his share.

3        Now, whether or not they took the trouble to go on and

4    look at the various diversions made by other people is another

5    question, but certainly it was up to them to do that.

6        When the Rancho Santa Margarita down there decided to

7    sue the Vails, what did they say?  What did they think? "Now,

8    is this the Vails, or somebody else, or what," when they saw

9    the situation and realized that there wasn't enough for all,

10    and it was back in the twenties that they took action to find

11    out who was responsible, and they went after them, and sued

12    them.

13        Now, the question of the difficulty of determining an

14    allocation is just a factor.  Mr. Girard has given us a tough

15    question here.  If I was presenting this case, I would have

16    a lot less confidence in your Honor's decision on the fact

17    question as to whether I was going over the amount, than here

18    where I have it over the edge.  Granted, I am not using all

19    the water in this case, and we think we have a clear case

20    here.  But not only that, the convenience, the utility of

21    this approach that we are making is manifest.  We don't want

22    prescriptive or appropriative rights if your Honor will declare

23    that they are not adjudicating it in this judgment, that you

24    are not adjudicating any prescriptive or appropriative rights;

25    that as against those riparians, we could use our riparian

P 18

1    rights on our riparian land, and as far as our riparian land

2    is concerned, we are willing to sit with that.

3         As we pointed out in the memorandum, however, we don't

4    want to let it go by silence and get an implied adjudication

5    of the non-existence of these rights, in case someday in the

6    event of apportionment we have to fall back on them.  All we

7    are asking is that we be allowed to remain on our settled

8    uses in the event of an apportionment.

9         Now, Mr. Girard says the Basin cases are different be-

10   cause each year is the same in the Basin cases, that each

11   year shows that you are going down, and it affects the future.

12   But each year on a stream is the same too, if you postulate

13   a continuation of the diversions, and if you postulate that

14   some day you may want the water.

15        As I pointed out in the analysis of the Pasadena case,

16   the case does not say that you have to wait until your

17   particular water is invaded.  It says the minute you see the

18   draft on the basin will, if continued as a draft, if the

19   violation continues, they will take your water, that is the

20   time to sue.  You don't wait until the violation actually

21   takes your water.

22        I will agree with Mr. Girard that capacity within should

23   be shown.  I did not actually think of the possibility that

24   through some disaster the ditch might be destroyed, or a part

25   of it, and it would be better to have a judgment here in the

P 19

1  courthouse as a backstop against the capacity of that ditch.

2  All I was thinking was that if there were ever a change in

3  the ditch, the question would come up then, and at that time

4  we would see if it was the same ditch, and we would respect-

5  fully ask an opportunity to go ahead and put in that proof of

6  measurement.  Perhaps Colonel Bowen has made the measurements,

7  and I don't know, but if/that/be better.  However, as the
   [so  would]

8  gentlemen have pointed out, it is actually the amount applied

9  to beneficial use that is the test, because the capacity of

10  the ditch is merely a maximum, as Mr. Veeder says.

11      In the _Morgan_ case it was more than the amount allowed,

12  because the amount of irrigation was less than the amount of

13  the ditch.

14      As pointed/in the memorandum, we would be happy to supply
   [out]

15  cases how field by field we show the irrigation of these lands.

16      Now, we didn't have quantities of water.  We don't know

17  Mr. Veeder's proof, or the O'Neill crop back in the eighties,

18  but I rather imagine he doesn't have quantities of water put

19  to beneficial use; not just stored, but put to beneficial use

20  either.  But, your Honor, to be realistic and to make a true

21  judgment in this case, you have to take the best that the

22  circumstances will offer, and weigh the proof.

23      We have witnesses that show that for every year they put

24  the full beneficial use as best they could, and irrigated as

25  many acres as they could up to the maximum of the ditch, up

15,650

P 20

1   to the availability of the water.

2        And in 1951, when they put in the sprinklers, of course,

3   they got more acres, and that is why I say the number of

4   acres isn't the real test.  They still apply that quantity

5   of water.  But if it would help if we would put in the acre

6   by acre showing for each year, as we established it in tables,

7   it is in the record, but with the additional observation that

8   with sprinklers we are going to have more acres.  Mrs. Gibbon

9   testified it is the same amount of water, but they are doing

10  it more efficiently, and Colonel Bowen backed her up on that

11  by saying that since flooding was one of the most wasteful

12  methods, at the same time sprinklers were more efficient.

13       Now, Mr. Sachse's point:  I think he was just sensualis-

14  tic about this you can't have three rights.

15       Now, if I have due process of law rights in California,

16  and I also have them under the Federal Constitution, do I

17  have to waive the one in order to assert the other?  That is

18  not the point at all.  In the Rindge case the Court puts the

19  real limitation that says that it must be a total which is

20  not more than reasonable and beneficial use.  They have

21  riparian and appropriative, but the total cannot be more than

22  reasonable and beneficial use.  But it is Mr. Sachse's ipse

23  dixit that we can't have the three rights at the same time.

24       If a postman goes down the street driving a car, under

25  the Johnson case he does not need a licence if he is driving

P 21

Take D3

1    a mail truck, but he has probably got one in his pocket.  He

2    has two rights but it does not mean a thing.  If he tries

3    to drive two cars at once, yes.  Then I will admit he will

4    get into a problem.

5         Now, we have the appropriative and the riparian.  That

6    is the Rindge case.  We have appropriative and prescriptive.

7    Gosh, all your big dams and your projects start with the water

8    rights application, and they become prescriptive as against

9    lower people if the necessary additional facts come into the

10   picture, but they don't cease to be appropriative.

11        Rank vs. Krug involved alleged conditions of that type.

12        Then we have prescriptive and riparian in effect in the

13   Morgan case.  They got a prescriptive right, which is exactly

14   what their riparian right would have been.  But suppose they

15   would still have some acreage that had not been cultivated.

16   They would still have the right under the Morgan case to

17   cultivate that acreage at a later time under their riparian

18   right.

19        Now, on the point of:  Can you go on other lands to

20   exercise riparian rights?  I concede the law on that.  As to

21   whether or not you can get an appropriation in going on

22   Government land under these statutes, that is one thing.  As

23   against lower riparian owners you can go to a higher point with

24   consent to make your diversion, but the appropriation is

25   effective not against lower owners, but against the public

P 22

1    domain.   That is where the appropriation becomes significant.

2    But I can't see that that has any bearing at all on whether

3    you can have three rights to do the same thing.

4        Mr. Sachse used an odd phraseology when he said it would

5    force instanter a Fallbrook case in every watershed in

6    California, and I would like to state the opposite in my

7    theory in having a Fallbrook case in this watershed, and at

8    the same time I think the real answer is that the facts are

9    not as clear in that case.   Here we have a clear case where

10    there is not enough water to go around.

11        On the Scott case Mr. Sachse comes to the key which is

12    this knowledge of the people down below, and I think that the

13    principle that they must have knowledge is important, but as

14    the quotation from the Morgan case shows, once we show the

15    continuous use, the burden shifts to them to show that they

16    did not know about it.   That was the quotation from the Morgan

17    case, and I can't see how in the face of their litigation the

18    other owners here, particularly the substantial owners, can

19    say they did not have knowledge or should/have been put on
                                     not

20    notice that any upper diversions might not be excessive.

21        Mr. Stahlman went to this question of quantity, as Mr.

22    Veeder did, and accused me, I felt, of ingenuity.   But I

23    started out with Wiel, your Honor.   I started out with Wiel,

24    and I wasn't ingenious at all.   I was merely giving the

25    theory the sound analysts have used from the beginning.

P 23

1    The suggestion was made that it would force everybody

2    to start using water, and I can't see that that would be a

3    horrible thing.  The whole idea of the appropriative doctrine

4    and the prescriptive doctrine is to encourage development in

5    the use of water, so long as the water is put to a beneficial

6    and reasonable use.

7        Now, Mr. Veeder alluded to the tremendous amount of return

8    flow, and I will say, your Honor, if we had a moment I could

9    give the record citation in which Mr. Veeder tried to make

10   Mr. Tripp say there was return flow, and Mr. Tripp refused to

11   say there was return flow.  All of the witnesses said that

12   they exercised all the diligence they could in order to get

13   full use of the water, and that up to the limit of the avail-

14   ability of the water, why, they irrigated all of those fields

15   each year, and I think the record is that there was negligi-

16   ble return flow to the stream.

17       I almost made it by 4:30.

18       THE COURT:  Now, you don't intend to come back tomorrow?

19       MR. GROVER:  No, your Honor, I will not be able to be

20   here.  I have a hearing tomorrow in Los Angeles.

21       Mr. Stark, of course, is acquainted with this, and I

22   have only presented this because it was my project originally,

23   and I wanted to carry on with the project.

24       THE COURT:  Yes.

25       MR. STARK:  I will be here if it is necessary, your Honor.

P 24

1          THE COURT:  I think we are going back to the other issues

2     tomorrow, unless you have something to present on this.

3          MR. STARK:  No.

4          THE COURT:  I am not going to decide this finally, but

5     following the practice that I have adopted in this case, I

6     will give you my impressions on this.

7          I don't think you have a prescriptive right.  I think

8     you probably have an appropriative right, if we can describe

9     it and measure it, and I would want to  review the record.  I

10    remember the testimony about fields it was used on.  You

11    certainly have riparian rights.

12         I have a little trouble following Mr. Sachse in having

13    the two rights at one time.  In other words, they certainly are  not

14    cumulative.  You can't say that an owner may have an appro-

15    priative right for so much, and then in addition to that have

16    him say, "I will take everything else as my riparian right."

17    I think they have to run together in some way, and I agree

18    with that.  In other words, supposing you had an appropriative

19    right that you could measure, of, well, as close as this

20    20-inch pipe, and then supposing that there was an apportion-

21    ment on the river on riparian rights, I don't think you could

22    insist that you should get your full appropriative rights, and

23    then also get the same kind of riparian right you would have

24    gotten if you had not had the appropriative right.

25         MR. GROVER:  Your Honor, the theory would work this way,

P 25

1    I believe:  As to the appropriative right there is, let us

2    say, Parcel X, which was in the public domain at the time of

3    the effective date of our appropriation, but now has been

4    patented and has riparian rights.  It would share with us

5    the water available under the riparian doctrine.  In the event

6    of an apportionment, we would not be cut back below our

7    riparian entitlement and full riparian usage, full riparian

8    demand, so long as that man was getting any riparian water.

9    In other words, if we were to be cut back to 50%, we would

10   say that that wasn't right, because we have the right to take

11   the full amount of the appropriative before he gets anything.

12   That is the effect of the appropriation as against him.  So

13   that would mean that in supplying uses below Parcel X and

14   below us, and giving them their share, if there is an in-

15   junction forcing an apportionment, we would have to supply

16   the share for those lower people if any other rule would make

17   us get less than our appropriative.

18       THE COURT:  If you have an appropriative right, it is

19   not good against the Vails and it is not good against the

20   Government.

21       MR. GROVER:  No, but Parcel X and I together have to

22   supply a certain amount to Vails, because Vails and the other

23   users use a certain amount.

24       THE COURT:  But are you getting anything when you seek

25   to sustain an appropriative right in view of the fact that

P 26

1   you have a riparian right?

2   MR. GROVER:  Yes, because the appropriative right is a

3   floor as against Parcel X as to the amount I will be cut back

4   to.

5   Suppose I have to deliver 50 inches to the Vails and

6   Parcel X 50 inches to the Vails, and my appropriative right

7   is 80 inches.  All right, that means that 100 inches must

8   be delivered to the Vails, and I will say that they will have

9   to deliver the whole amount and leave me the 80 inches.  We

10   have to deliver 100 inches, the two of us together, to the

11   Vails, but if we do that I will get below my appropriative

12   right, and consequently he has to make up the difference in

13   order to keep me at my appropriative right.

14   THE COURT:  I think all I will let you do now is to

15   suggest -- you haven't drawn findings?

16   MR. GROVER:  No, I haven't, your Honor.

17   THE COURT:  I would suggest that you start to prepare

18   suggested findings, proposed findings, so that we will have

19   something to look at and see how they read.  I am not deciding

20   the matter.  I want to go over the transcript and give it

21   some study, and I am merely giving you my impressions.

22   MR. GROVER:  On the prescriptive right, if I may

23   ask, your Honor, is it your feeling that we have failed to

24   come up to the Morgan case in some way?

25   THE COURT:  My feeling on it, first, is that I don't

P 27

1   think you can equate a basin and a stream.  A stream, -- as

2   you draw down on a stream, that is a seasonal thing, because

3   next year you may have a crisis.  And, secondly, I can see

4   nothing but trouble in the doctrine that you get a prescriptive

5   right because you used more than what a court might later say

6   was your proportional riparian share.  I think that would be

7   a troublesome doctrine that would have to be avoided.

8       I also have trouble in seeing hostility and adversity

9   in your using that riparian right, and in the absence of a

10  complete shut-off of the water in the stream, and in the

11  absence of a substantial showing as to someone below, which I

12  don't think has been shown so far, and I don't think even

13  the Government has shown a substantial injury which would

14  indicate the existence of a prescriptive right, I have,

15  therefore, all these difficulties with your prescription

16  theory.

17      This again is tentative.

18      MR. GROVER:  Could we file a supplemental brief on those

19  points, your Honor.

20      THE COURT:  Oh, if you want to, but I think we have got

21  your argument well documented with your citations.  If you

22  want to, I will not say you can't.  You can file it simul-

23  taneously with these proposed findings that you are going to

24  submit, and give me something to look at.

25      I will give you permission to file a brief at the same

P 28

1  time with your findings.  How much time do you want to submit

2  some findings here?  Again, assuming I am going to decide as

3  my present informal remarks indicate, there is no assurance

4  that is what I am going to do, however.  This is a troublesome

5  problem.

6      I would like to say I may be in error but I am seldom

7  in doubt, but I can't say that about this.

8      How much time do you want?

9      MR. STARK:  Could we have until the 15th of April on

10  them, your Honor?

11      THE COURT:  Why don't you do it so that they are filed

12  before our next hearing?  We have a hearing date set for,

13  I think, April 4th, 5th, 6th and 7th.  Why don't you get

14  them in by April 6th?

15      MR. SACHSE:  I think your Honor might make it clear to

16  Mr. Grover and Mr. Stark that they do not have to prepare

17  their findings in final verbatim form for signature.

18      THE COURT:  Oh, no, just something tentative to start

19  to work at.  As a matter of fact, we have sets of them

20  kicking around, except on the appropriative and prescriptive

21  end, that you could look at.  It is not a difficult job, and

22  does not have to be in final form.  It is called "proposed

23  findings," and just gives us something to look at.

24      MR. STARK:  Yes, we can do that, and in the findings

25  I think we can raise the problem that Mr. Grover referred to

P 29

1    briefly.  I gather from all of the comments that the Court

2    has indicated tentatively that so far as the pre-trial ruling,

3    you could not have a prescriptive and an appropriative right

4    and use it on riparian land.

5        THE COURT:  I did not go quite that far.  What I said

6    today was that in the absence of taking all the water in the

7    stream and in the absence of showing substantial injury to

8    downstream riparians, in both instances I think the proof

9    here failed.

10       MR. STARK:  Yes, I see, and we are now in the position,

11   not where the law precludes the establishment of these other

12   rights, but where your Honor is stating a tentative opinion

13   that our proof has failed on these points.

14       MR. STAHLMAN:  May I be excused, your Honor?  It is

15   getting close to five o'clock.

16       THE COURT:  You may go, yes.  This is very tentative,

17   Mr. Stark.

18       MR. STARK:  Yes, I realize that.

19       THE COURT:  You may also submit, if you want to, a

20   proposed finding on the prescriptive rights, and we can try

21   it out for size.  This has been done by Mr. O'Malley for

22   Oviatt, and Mr. Veeder has proposed such findings.

23       MR. VEEDER:  May I make one comment, your Honor?  Is

24   that April 4th date firm so that I can start notifying people

25   for that date?  I am sorry to interrupt, but I have some work

P30   1    that I must do.

2         THE COURT:  If you can make it, yes.

3         MR. VEEDER:  All right.  Then I will use that as the

4    date for the next notification.

5         THE COURT:  Do you think we can wind up the discussions

6    on this other matter we started yesterday, involving the

7    downstream basins and Fallbrook pumping tomorrow?

8         MR. SACHSE:  Your Honor, in all fairness I think we

9    took yesterday afternoon, -- didn't we take the full afternoon

10   just on the findings so far as we got?

11        THE COURT:  No, a part of the afternoon.

12        MR. SACHSE:  Well, I have a lot more, and some of the

13   roughest arguments are on the sections that are left.

14        MR. VEEDER:  I would be willing to restrict the matters

15   to the riparian right.

16        MR. SACHSE:  I am not willing to.  I made you that

17   proposition two days ago, that I was willing to submit, and

18   I made you the proposition, on riparian rights, and you said,

19   "No."

20        MR. VEEDER:  Now, you are stalling.

21        MR. SACHSE:  I am not stalling.

22        MR. VEEDER:  You are stalling.

23        MR. SACHSE:  Your Honor, the record will clearly show

24   that I offered to submit it immediately on riparian rights.

25        THE COURT:  Well, this has been a long day.  Let's start

P 31    1    tomorrow at 9:30.

        2            MR. VEEDER:  Nine-thirty?

        3            THE COURT:  Yes.

        4            MR. VEEDER:  Good.  Fine.

        5            MR. GIRARD:  I will have to tell Mr. Stahlman.

        6            THE COURT:  Oh, you will see him.

        7            MR. SACHSE:  Nine-thirty?

        8            THE COURT:  Yes, 9:30 tomorrow morning.

        9            (Whereupon, at 4:45 o'clock P.M., Thursday, March 16,

       10    1961, an adjournment was taken until Friday, March

       11    17, 1961 at 9:30 o'clock A.M.)

       12

       13                        - - - -

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

MARIE G. ZELLNER, OFFICIAL REPORTER

P 61

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California, this 17th day of March, A.D. 1961.

_John Swader_
Official Reporter

_Marie G. Zellner_
Official Reporter