# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No.   1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         Friday, March 17, 1961

Pages:     15,663 to 15,817

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

Take A1
P 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C. |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, March 17, 1961

- - -

APPEARANCES:

For the Plaintiff:

WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney General

CDR. DONALD W. REDD.

For the Defendants:

Vail Company — GEORGE STAHLMAN, ESQ.

Fallbrook Public Utility District, et al., — FRANZ R. SACHSE, ESQ.

State of California — FRED GIRARD, ESQ.

15,663-A

1

<u>I N D E X</u>

2

3

4

(No witnesses and no exhibits on this date)

5

6

(General Discussion)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 2

1    SAN DIEGO, CALIFORNIA, Friday, March 17, 1961, 9:30 A.M.

2        THE CLERK:  1-1247-SD-C United States vs Fallbrook.

3        MR. VEEDER:  Has your Honor given consideration as to

4    the course to pursue this morning in the injunctive matter?

5    We had thought perhaps you might consider the element of the

6    riparian rights at this point, because if we go as slowly as

7    we have in regard to the findings of fact, conclusions of

8    law and judgment on the appropriative rights I don't believe

9    we can get through today, and we are most anxious on that

10   injunctive matter, whether it is riparian or appropriative.

11       THE COURT:  I haven't had time to think any further

12   about it.  How much more time would it take to go through

13   this?

14       MR. VEEDER:  Your Honor, when I found out we were hung

15   up arguing the word "impound," if we go at the same rate that

16   we went yesterday afternoon we will not be through until

17   Friday of next week.

18       THE COURT:  That doesn't follow.

19       I am not prepared actually to sign any findings on this

20   matter anyhow.  We are just going over the proposed findings.

21   I think you might as well go ahead with it.

22       What thoughts does anyone else have?

23       MR. VEEDER:  Did I understand you to say you wouldn't

24   consider the matter of the injunction today?

25       THE COURT:  I didn't say that.  I said we are not ready

P 3

1    to sign findings such as we are going over today.

2         MR. VEEDER:  I didn't comprehend.

3         THE COURT:  We realize that this was a rough draft of

4    these findings.  Whether I am prepared to rule on this

5    injunctive matter or not, I will decide when the time comes.

6         What are your desires, other counsel, as to proceedings?

7         MR. SACHSE:  My desire is to continue in the manner in

8    which we started, your Honor.  I suggested to Mr. Veeder two

9    days ago -- I checked it and it is clear in the transcript --

10   I advised him that I was ready immediately, without further

11   delay, to argue the riparian right, if he wished to base his

12   injunction solely upon that.  Your Honor asked him if he

13   wanted to answer that.  He said no.  Now I am not about

14   voluntarily to consent to switching procedures that we

15   adopted two days ago.  I would like to finish the job that

16   we started.

17        MR. VEEDER:  I believe the view that I now express is

18   entirely appropriate, your Honor, in the light of the element

19   of time.  I had not realized that it was going to take so

20   long to consider these appropriative findings.  I had no

21   thought that there would be that kind of quarrel.

22        THE COURT:  Can't we go on until noon on these findings,

23   or as much time as there is, and start your argument this

24   afternoon on this question of the injunction?

25        MR. VEEDER:  Whatever your Honor directs.

P 4

THE COURT:   Of course, I will say right now I have trouble and I want you to explain your position as to how you can justify pumping 680 acre feet out of the Camp Pendleton Basin out of the watershed and then making a fuss about 125 acre feet.  Maybe I don't put things together properly.

MR. VEEDER:   I am ready to argue it whenever you direct, your Honor.

MR. SACHSE:   May I offer one further suggestion, so that Mr. Veeder will be ready to argue this and your Honor can be thinking about it.

I say, with all due respect to your Honor, I don't think you could any more enter an injunction on the basis of the riparian right, in the present state of the record, than you could on the basis of the appropriative.  I think you could be prohibited, if need be, in the Circuit from so doing, for one simple reason:  Your Honor has reserved for decision and has not yet decided whether a military use is a proper riparian use at all.  That is expressly reserved.

Now we have here a Fallbrook diversion under a right on which you have entered an interlocutory judgment, and we are being requested to enjoin that right to protect something which you haven't determined to be a proper use of water, and until you make that determination I don't think you can give an injunction on a riparian right.  And that is why I was perfectly willing to submit the thing yesterday that fast,

P 5

1   if Mr. Veeder wanted.

2       We started this way, and I want to go this way.  That

3   is my desire.

4       THE COURT:  Let's proceed with these findings and let's

5   figure that at two o'clock we will start about this other

6   matter.

7       MR. SACHSE:  Very well then, your Honor.

8       According to my notes, we finished X on page 4.  Do

9   you have anything further on that, Mr. Veeder?  I think we

10   agreed to the deletion of the words "for one filling."

11       MR. VEEDER:  And to substitute the additional language

12   "in regard to the filling and re-filling."

13       MR. SACHSE:  Which is to be rewritten by you.

14       MR. VEEDER:  That is right.

15       MR. SACHSE:  Item XI on page  4.

16       MR. STAHLMAN:  In regard to this filling and re-filling,

17   what is the language to be?

18       MR. SACHSE:  He is going to submit it.

19       MR. STAHLMAN:  We have some evidence in the record on

20   the way in which the dam was operated.

21       MR. SACHSE:  Yes.  We will come to that in a minute.

22       I have no objection to XI on pages 4 and 5.  It is

23   largely technical.  In fact, I don't know that it is material.

24       MR. GIRARD:  I have a comment on it.  Apparently

25   paragraph XI is the paragraph that deals with diversions in

P 6

1    to Lake O'Neill.  This is probably not a policy comment, but

2    I think it should indicate when the diversions occur.

3        MR. VEEDER:  We have a separate finding on that.

4        MR. STAHLMAN:  Furthermore, in connection with that

5    finding, if the Court please, in relation to lines 4 and 5,

6    "A part of the diverting ditch is in flume five feet six

7    inches wide and 22 inches deep," I think there is probability

8    that there may be some conflict in that evidence, because as

9    I indicated the other day we would like to have an opportunity

10   to do some checking and we have started that and from the

11   information we get it indicates that this may not be correct.

12       MR. VEEDER:  Mr. Stahlman, if you will observe, on line

13   3, page 5 "That ditch in 1883 was . ." that is a quote from

14   the United States Exhibit 125-A.

15       MR. STAHLMAN:  As far as the length is concerned, I am

16   thinking about the size of it.

17       MR. VEEDER:  I am talking about 22 inches deep.  That is

18   a quote.

19       THE COURT:  You may check it further and when a new set

20   of findings is submitted have your references to other parts

21   of the record.

22       Mr. Girard, you have no objection, except that it didn't

23   go far enough.

24       MR. GIRARD:  It is probably taken care of in XIII.

25       MR. VEEDER:  You will also find it on XIII and XIV at the

P 7

1   top of page 6.

2      MR. SACHSE:  On paragraph XII, I think as written it is

3   completely immaterial. As Mr. Girard pointed out, the date

4   with which we are concerned is 1914.  Mr. Veeder is quite

5   correct in saying that the capacity of the ditch gives a

6   ceiling, as it were, to the amount of the appropriation.  But

7   the capacity in 1883 doesn't give the ceiling on  the capacity

8   today.  The capacity in 1914 gives the ceiling.  It may well

9   be that they are the same.  But I think this has to be re-

10   written to reflect the date 1914.

11      THE COURT:  Why would  you have to have evidence exactly

12   as of 1914?

13      MR. SACHSE:  I don't think you do, your Honor.  I am

14   not quarreling with this.  I think it probably stayed the

15   same.  I am not quarreling with the evidence.  I am saying

16   that this finding as written is immaterial and Mr. Veeder

17   should say "the carrying capacity since its construction has

18   been approximately 20 cubic feet per second" or something of

19   that kind.  The dates he has in there now are immaterial.

20   That is my only point.

21      MR. VEEDER:  I would just as soon write in there

22   "Continuously since that time the size of the structures has

23   been 20 second feet."

24      MR. SACHSE:  I couldn't rebut it, and I wouldn't try.

25      MR. GIRARD:  The size of the ditch has nothing to do

P 8   1    with the amount of the appropriative right.

2         MR. VEEDER:  Yes, it does have.  It is the amount we

3    are claiming, and it must be in there as the maximum appro-

4    priative right we claim.

5         MR. GIRARD:  In other words, you could not have gotten

6    any more water out of the river than the capacity of this

7    ditch, but it doesn't mean that you have the capacity of this

8    ditch.

9         THE COURT:  I think I understand.  In other words, Mr.

10   Veeder contends that this only a ceiling on the amount of the

11   diversion.

12        MR. GIRARD:  That is right.

13        THE COURT:  And if this stays in probably there should

14   be some legal conclusion that decides that the ditch only

15   concerns a ceiling and does not concern the amount of the

16   appropriative right.

17        MR. VEEDER:  I think you have to establish a ceiling

18   for appropriative right.

19        MR. GIRARD:  That is right.

20        MR. SACHSE:  So much for XII.

21        I have some very serious objections to XIII.  Taking

22   them one at a time, the first one, I think, Mr. Veeder

23   probably will stipulate that the language "divert all the

24   waters of the Santa Margarita River" is wrong, and it should

25   at least be "all the surface waters."

P 9

1     MR. VEEDER:  On line 16 of my copy:

2         "Historically it was the practice after the

3     winter and spring rains to divert all of the surface

4     waters . . "

5     MR. SACHSE:  Okay for that one.

6     MR. VEEDER:  "surface" immediately ahead of the word

7 "waters" in line 16.

8     MR. SACHSE:  Now, however, what is much more significant

9 is the last word in that line, the word "into" Lake O'Neill.

10 That is not only not established by the transcript citations

11 given by Mr. Veeder --

12     MR. VEEDER:  Should we change that to "for Lake O'Neill"?

13     MR. SACHSE:  Just a minute.  Wait until you hear the

14 evidence I have, because this may, I think, be entirely wrong

15 and have to be rewritten.

16     Does your Honor have before you Vail's AB?

17     THE COURT:  No.

18     MR. SACHSE:  I think it would be helpful to the Court

19 if you had one.

20     MR. STAHLMAN:  I have a copy.

21     MR. SACHSE:  That is the file copy isn't it?

22     MR. STAHLMAN:  No, that is a filing mark of the Superior

23 Court.

24     Here is our copy, your Honor.

25     MR. SACHSE:  Referring to page 44, your Honor, at the

P 10

1    end of line 21 -- the whole paragraph is on this subject,

2    but the particular language is at line 21:  "and that at

3         times during said year when said lake or reservoir

4         became filled said diversions continued and said

5         water was bypassed around said lake and used for

6         the watering of stock, the irrigation of riparian

7         land and the growing of wild grasses."  This is the

8    very point I made some time earlier in discussing these

9    findings, that the diversion was used as an integral part of

10   the irrigation system.  Here is a specific statement that is

11   diametrically opposite and opposed to Mr. Veeder's contention

12   that they diverted all the waters into the lake, and this is

13   extremely pertinent again on this refilling proposition which

14   we discussed two days ago -- filling the lake three times, etc.

15        THE COURT:  Is this Vail's AB or United States' AB?

16        MR. SACHSE:  It is Vail's AB.

17        MR. VEEDER:  What line?

18        MR. SACHSE:  It starts at the end of line 21 and continues

19   through line 25.

20        MR. VEEDER:  "that at times during said year when said

21   lake or reservoir became filled said diversions continued . . "

22        MR. SACHSE:  " . . and said water was bypassed around

23   said lake . . "

24        MR. VEEDER:  I will agree there was a bypass and that

25   once the reservoir was filled for the purpose of subsequent

15,873

P 11

1   and later irrigation that it couldn't hold any more, the

2   water would bypass down on to riparian land.  I will agree to

3   that.

4   MR. SACHSE:  I am very happy, but let's be sure we know

5   what this agreement means, Mr. Veeder.  This is coming up

6   again.  You say the total appropriation was, I think, 3400

7   or 3600 acre feet, and earlier you say 1200 for one filling.

8   Here we say when they built it they didn't empty it and refill

9   it; they bypassed it when it was filled.  So this is more

10   than a simple matter of agreement to paragraph XIII.  This

11   attacks your entire concept of the operation of the lake.

12   THE COURT:  The 3400 acre feet was a measurement of the

13   diversion out of the surface flow.

14   MR. VEEDER:  No, it was not.

15   MR. SACHSE:  We haven't gotten to that yet.

16   MR. VEEDER:  The basis upon which we are claiming 3400

17   or whatever acre feet your Honor finds for our early diversion

18   was based upon  testimony, first, by Colonel Bowen that to

19   irrigate 300 acres of alfalfa it would require 2600 acre feet

20   of water.  We have taken the position, moreover, that the

21   crops which were raised necessarily require later irrigation.

22   That 3400 acre feet, we believe, can be supported by the

23   crops which were raised and the rotation practices which

24   were adopted.  It is not a matter of the measurement into

25   Lake O'Neill.  It is the crops which were raised --

P 12

1    THE COURT:  I think I understand you.  In other words,

2    you have come up with a figure of 3400 acre feet by saying

3    that this amount of water was used on riparian land, water

4    coming from the diversion dam going through the O'Neill ditch,

5    and then, without specifying, some of it went through the

6    lake, some of it was bypassed; but the gross amount of water

7    used was 3400 acre feet.

8    MR. VEEDER:  I think that would be correct, your Honor.

9    And I think in addition a supplementary finding to meet Mr.

10   Sachse's objection would be along this line, that there is

11   absolute proof that Lake O'Neill, to the extent of 1200 acre

12   feet, was first filled and then any surplus water was used

13   to irrigate the lands, and when the surface water was no

14   longer available the 1200 acre feet impounded was used for

15   purposes of irrigation.

16   THE COURT:  This points up a contention that Mr. Sachse

17   is going to make, and that is that when you diverted water

18   from the dam through the ditch and either bypassed the lake

19   or went through the lake, that all you have shown is a

20   riparian use on 3400 acres and that this is no proof at all

21   of any appropriative right.  This is what he is going to

22   contend.

23   MR. VEEDER:  The point that I make is that he has

24   conceded that there was impounded and stored 1200 acre feet

25   of water in Lake O'Neill.  So we concede that the runoff of

13

1    the year was in the early spring and through April.  So you

2    have proof that in the early spring you impounded for future

3    uses 1200 acre feet of water.  Now it may be true that after

4    you created your storage in Lake O'Neill that you simply

5    exercised a riparian right to irrigate some of the land,
                              water
6    assuming that/was available.  But certainly the proof is

7    that you would drain out the 1200 acre feet to take care of

8    sugar beets and also to take care of later irrigations of

9    alfalfa.  So at least there is proof that there is an

10   appropriative right up to 1200 acre feet.  That is the point

11   I make.  I am not abandoning the larger claim.

12       THE COURT:  I see your point.  And if you find a claim

13   for an appropriative right, it is going to concern this

14   lake and is not going to concern what you bypass.

15       MR. VEEDER:  Not at all, your Honor.

16       THE COURT:  Mr. Sachse is merely trying to point up

17   that when you say 3400 acre feet this is a riparian situa-

18   tion, except for the lake, which we haven't talked about yet,

19   really.

20       MR. SACHSE:  That is exactly my position.

21       MR. VEEDER:  That is totally elementary.

22       THE COURT:  Let's get this criminal matter out of the

23   way.

24

25       (Another matter.)

P 14

THE CLERK:   1-1247-SD-C United States vs Fallbrook.

MR. VEEDER:   Did your Honor have Vail's AB before him?

THE COURT:   Yes.

MR. VEEDER:   I truly believe the language which I have brought to your Honor's attention by our references and also on the page to which Mr. Sachse referred bears out completely the position of the United States in this matter.   True, when the reservoir has been filled there was water bypassed. But the language, if you start on line 10, is very clear. The 1886 I don't agree with.

Take A2

But you will see that this says:

"It has been the practice of the plaintiff and its predecessor in interest since about the year 1886, when said Lake O'Neill reservoir was constructed, to commence, about the middle of March of each year, by means of a temporary diverting dam, to divert the surface flow, . . "

Now that is what we are claiming.

" . . or that portion of the surface flow capable of being carried in said diversion ditch or canal . ."

That is the 20 second feet.

" . . from said river into said lake or reservoir, at a point approximately eight miles below its easterly boundary line, and to continue such diversion continuously thereafter during the entire

P 15

1   remaining portion of the calendar year or until
                                             in
2   the temporary dam diverting said water/to said

3   ditch was destroyed by flood waters in the following

4   rainy season, and that at times during said year

5   when said lake or reservoir became filled said

6   diversions continued and said water was bypassed

7   around said lake and used for the watering of stock,

8   the irrigation of riparian land, and the growing of

9   wild grasses.  It is not true that the methods

10  employed by the plaintiff and its predecessors in

11  interest for the diversion or storage of said waters

12  have at all times, or at any time, been crude and

13  inefficient, or that the storage of water experienced

14  on said Santa Margarita Ranch during the summer and

15  irrigation" etc.

16  THE COURT:  Not "storage," "shortage."

17  MR. VEEDER:  Shortage.

18  The point that I make -- and that is why the maximum

19  diversion capacity is so important to us -- that any time,

20  as we  see it, that there was 20 second feet in the stream

21  it was appropriated and diverted into Lake O'Neill until it

22  was filled.  And true, when it was filled, naturally they

23  used the water for a riparian use.  Then in the later dry

24  season, as is reflected by these findings and by the crops

25  which were raised, there was a seasonal storage and use.

MARIE G. ZELLNER, OFFICIAL REPORTER

P 16

THE COURT:  But in the later findings there were no references that I know of that tell how Lake O'Neill was emptied.  We can infer that it was emptied for irrigation purposes.

MR. VEEDER:  I have already made that offer in regard to the exact method it was operated, by the State Engineer's report, Exhibit 125-A, which said that when it was filled you took off one board and released the water down for uses of irrigation.

THE COURT:  Let's go back to the suggestion.  The word "into" is what Mr. Sachse objected to, and he has called your attention to the fact that all surface waters were not diverted into Lake O'Neill but were done in the method as shown on page 44.

MR. VEEDER:  Your Honor, I will tender the thought that historically it was the practice after the winter and spring rains to divert all surplus waters of the Santa Margarita River into Lake O'Neill until that reservoir was filled, and when it was filled any waters above that required for filling were bypassed and used on the riparian land.

End of A

Take Page 1
A1

1      MR. SACHSE:  Very good .

2      THE COURT:  All right.  What is your next finding?

3      MR. VEEDER:  Just a moment before we go ahead.  I want

4  to make some notes here so that I will put it in correctly.

5      MR. SACHSE:  I want you to take your time because this

6  will come up again and again.  I mean it will come up like-

7  wise.

8      MR. VEEDER:  But I do believe based upon the facts

9  that we have now agreed to that there was an appropriative

10  right for twelve hundred acre feet, at least, and I think the

11  the proof will support that.

12      MR. SACHSE:  And this is what we are trying to do here.

13  They started out with thirty four hundred feet, and now we

14  are down to twelve hundred acre feet.

15      MR. VEEDER:  However, you don't appreciate this point,

16  that I have tried to do this --

17      THE COURT:  Well, let's submit it.  Let's go ahead

18  with the rest of the findings.

19      MR. VEEDER:  At least, I want to make the point that

20  there is an appropriative right for twelve hundred acre feet.

21      THE COURT:  I understand you claim that, and if I can

22  find some way to give it to you, I am going to give it to

23  you.  If I can find some way to give you more than the twelve

24  hundred, I will give it to you, but I am going to be bound

25  by what is in this record.

1   . . . . . I have made no secret of the fact that I am trying to

2   establish some kind of a right for you down there, but I

3   don't know how far we are going to get.

4   What is your next? XIV?

5   MR. SACHSE:  Yes, your Honor.  The problem is exactly

6   the same on line 6 or 7.  There again are the words "all of

7   the water of the Santa Margarita River into Lake O'Neill," and

8   I think that it is all of the surface water.

9   MR. VEEDER:   Will you give me the line again?

10   MR. SACHSE:  It is line 6, I guess, as to all of the

11   surface water in the Santa Margarita, and again the words

12   there are "All of the water."

13   THE COURT:  It is the same problem.

14   MR. VEEDER:  The language will be -- I will work out

15   the language along this line, just so long as it is clear

16   that if it was filled -- there was excess water to bypass,

17   and if it was filled, it was bypassed.

18   MR. SACHSE:  I have nothing to quarrel about as to XV.

19   THE COURT:  Has anybody any other suggestions on XIV

20   before we pass it?

21   (No response.)

22   Any other suggestions as to XV?  Mr. Sachse is satisfied,

23   Mr. Girard.

24   MR. GIRARD:  I am satisfied, your Honor.

25   THE COURT:  Mr. Stahlman?

1        MR. STAHLMAN:  I am satisfied.

2        THE COURT:  XVI?

3        MR. SACHSE:  I have some quarrel on that.  I have some

4   comments on XVI.  Mr. Girard just pointed it up a moment ago

5   in the conversation with Mr. Veeder.

6        Your Honor made very clear that we have evidence that

7   the waters on the Santa Margarita were diverted through the

8   ditch for irrigation purposes, but your Honor questioned

9   whether we have evidence that the water stored in Lake O'Neill

10  was used for the purposes of irrigation.

11       That I very pointedly wish to object to.  Mr. Veeder

12  cites 125-A.  I will remind your Honor that if you will read

13  125-A over to the end, it wasn't for irrigation.  It was to

14  drown gophers, and that the lands were subirrigated there,

15  your Honor.

16       That is the Government's Exhibit, your Honor, and if

17  that is what he relies upon, then I think you will find it

18  very difficult to find that water was stored in Lake O'Neill

19  for irrigation.

20       MR. VEEDER:  Not at all, your Honor.  I think if you

21  will look at Exhibit Vail AB at pages 40 and 41, you will

22  find statements clearly showing that the water was impounded,

23  and it was used for --

24       THE COURT:  Now, where in Vail AB?

25       MR. VEEDER:  It is finding 19 on page 41.

1      MR.  SACHSE:   Line what?

2      MR.  VEEDER:   It is finding 19 at page 41.

3      MR.  SACHSE:   I don't think it says that.

4      MR.  VEEDER:   It says, "certain works consisting of a

5  reservoir" --

6      THE COURT:   Let me look it over.

7      MR. VEEDER:   I beg pardon?   I think it should be read

8  all the way through.

9      THE COURT:   Let me look it over.

10      Paraphrasing again at line 15, finding 19; the plaintiff

11  and its predecessors in interest have continuously maintained

12  for approximately forty four years, and the plaintiff yet

13  maintains, certain works consisting of a reservoir, and ditches,

14  and conduits and appliances for the control and distribution

15  of such water, and during such time plaintiff and its

16  predecessors have continuously used, and plaintiff yet uses,

17  such works.

18      Now, referring back, it says certain works consisting

19  of a reservoir, and ditches and other conduits and appliances.

20  So I take it that "works" means all of them -- in handling

21  and controlling, and so forth, the water for domestic use and

22  for the irrigations of lands; all off which works are con-

23  venient and necessary for the utilization of the said water

24  for such purposes.

25      You may there have a finding which would mean that the

1    reservoir was used for domestic and irrigation purposes.

2        What do you think of that, Mr. Sachse?

3        MR. SACHSE:  Your Honor, I argued this at some length

4    two days ago in connection with "handling" and "controlling".

5    This is going to come up again when we reach the finding as

6    to intent to appropriate.  The question is whether at any

7    time these works did or were intended by O'Neill to do any-

8    thing more than serve a proper riparian function.

9        Now, I am perfectly willing, and would in fact suggest

10   that rather than try to resolve this question now -- it is

11   the same one that I argued with regard to "handling" two days

12   ago, and if you want to wait until you go through these, then

13   we will have to back  up to this, because we have several

14   others that we will have to make a note of, because we are

15   now face to face with the fundamental issue of whether this

16   was an appropriation at all, or simply a riparian use, and

17   no single finding is going to determine that for your Honor.

18       THE COURT:  I would suggest that Mr. Veeder give

19   particular study to 19, because there is some language there,

20   and particularly, "all of which works were necessary for the

21   utilization of said water."

22       MR. VEEDER:  Certainly, your Honor.

23       THE COURT:  In other words, this says: which works in

24   handling and controlling the water for domestic use and for

25   irrigation or land.

1    MR. VEEDER:  I think we are now down, however, to this

2    point:  Mr. Sachse has agreed that when the reservoir was

3    filled, the water was held there, and the water was bypassed

4    down for a riparian use.

5        I think it is a question of law now as to whether the

6    impoundment of that water in the Spring of the year and

7    carried over for use in the Fall and Summer, as/conclusion

8    of law, whether that was an appropriation or not, and I think

9    that is where we are on this matter.

10       I think quantitywise we will have to struggle with it,

11   but I don't believe that there is any doubt that there was a

12   storage and an appropriative right.

13       MR. SACHSE:  If you will permit me to disagree, as I

14   do, I would like to finish with the rest of the findings and

15   show you why I do.

16       THE COURT:  We are now on XVI.

17       MR. SACHSE:  Your Honor, I would respectively suggest

18   that you pass XVI, and I think Mr. Veeder is right, that the

19   issue now is whether any appropriative right was acquired,

20   and I don't think there is any sense  in trying to correct

21   XVI until we have gone through a few more of these.

22       THE COURT:  Go ahead then, and we will come back. XVII.

23       MR. SACHSE:  In XVII we have exactly the same problem

24   we had on XIV and XIII: stored in Lake O'Neill, that water

25   was diverted from the Santa Margarita River and was stored.

1    MR. VEEDER:  Is there any doubt -- I think you have a

2    different problem here.  I think if your Honor will look at

3    pages 8 and 41 of Vail AB, to which I have already referred,

4    there the statement is made that the water was placed in the

5    reservoir and used for stock watering purposes.  I don't

6    think there is any question, in that it is the same situation,

7    and I think the water that was impounded was used for stock

8    watering purposes.

9        MR. SACHSE:  I won't quarrel with the fact that water

10   that was impounded was used in part for stock watering purposes.

11   I am unhappy about the language.

12       THE COURT:  You object to the word "stored"?

13       MR. SACHSE:  Well, I am unhappy with the language. If

14   water is diverted and stored, I want to be quite sure as to

15   the statement, and as Mr. Veeder has now twice said he will

16   correct it, I am satisfied.  But if water is diverted and

17   stored, I want to be sure that is what it is.

18       MR. VEEDER:  What is the objection to XVII, if these

19   are to be rewritten?

20       MR. SACHSE:  I will not object to XVII, in other words,

21   if you make it clear in your proposed findings that the water

22   was not stored and re-stored.

23       MR. GIRARD:  In other words, that you didn't store

24   twelve hundred feet for irrigation, and twelve hundred more

25   for stock watering, and twelve hundred more for domestic

1    MR. VEEDER: Well, I think I said twelve hundred.

2    MR. GIRARD: All right.

3    MR. SACHSE: Now, on XVIII, your Honor, I seriously

4 doubt that the record, and I say this not because I checked,

5 but just on the matter of suggesting, that I want to point

6 to the fact that in spite of the fact that finding XIX says

7 that this water was used for domestic purposes --

8    THE COURT: You mean XVIII?

9    MR. SACHSE: XVIII, yes. I mean that in spite of the

10 fact that VAil AB in finding 19 uses the word "domestic,"

11 it does use it with regard to a lake. In 19 they say that

12 the water is diverted in conduits and ditches, and so on,

13 handled and controlled, and was used for domestic uses, but

14 I don't believe that anybody drank the water out of Lake

15 O'Neill -- period. I think they just pumped it out of wells

16 near the ranch house, and I don't think they ever used water

17 for domestic use out of Lake O'Neill.

18    THE COURT: "Domestic" would be broader than just

19 merely drinking water.

20    MR. SACHSE: Yes, your Honor. It would include one

21 or two cattle and your garden.

22    THE COURT: It would take care of the water that was

23 used around the immediate area, for the cow that was milked,

24 the saddle horse, and for washing the buggy.

25    MR. VEEDER: And for the baths that were had.

1      MR. SACHSE:  All of which is a proper riparian use,

2   and all of which I do not think was done with Lake O'Neill

3   at all.   I think it was done with the water diverted by the

4   riparian works.  I don't think under the foggiest stretch of

5   the imagination can we give Lake O'Neill a domestic priority.

6   This is critical, your Honor.

7      MR. VEEDER:  We reject apparently that which we don't

8   like from Vail AB.   That is what it amounts to because the

9   language "domestic use" is fairly stated.

10      MR. SACHSE:  The language "domestic use" is stated with

11   relation, as his Honor pointed out, to certain works consist-

12   ing of a reservoir, and conduits, and ditches, and so forth,

13   which were used for domestic purposes.

14      I don't think Vail AB says the reservoir was used for

15   domestic purposes, and I don't think anybody can

16   intelligently so contend.

17      THE COURT:  When you say "domestic" do you mean for

18   drinking water?  Is that what you are talking about.

19      MR. SACHSE:  Your Honor, I mean for all domestic.  The

20   lake is nowhere near the ranch house.  The lake is way up

21   above.  The water that supplies the garden, and the water

22   that supplies the domestic stock, and the water they used

23   to wash their clothes in outside, and I don't know whether

24   they had pumps or what not, came from the ranch house.  They

25   didn't march up a mile and a half to Lake O'Neill to do it,

1    and they didn't bring it down in a pipe.  The waters that

2    supplied the ranch house were waters that were diverted

3    through the ditch and not stored in Lake O'Neill.

4         THE COURT:  Now, Mr. Sachse, whether we can find this

5    in the record or not, let's see if we can find out what

6    actually happened.  When the water was running in the creek,

7    in the river, they would fill the lake up, and then when the

8    lake was full they would use the diversion ditch ultimately.

9    Did that ditch go down as far as the ranch house?

10        MR. SACHSE:  Yes, and beyond.

11        THE COURT:  All right.  Then along comes the summer,

12   the hot summer, and the water in the stream dries up, and

13   there is no more being diverted that passed the lake.  So

14   what do they do?  They take and run water out of the lake

15   down the same ditch to the ranch house.  And this probably

16   was the use in the fall of the year, when they no longer had

17   water flowing in the stream so they could divert it.  Now,

18   that may not have happened every year.  There may have been

19   years  when water was running in the stream.  But there were

20   undoubtedly dry years when this was the water supply.

21        MR. SACHSE:  Your Honor, I can't concieve of this, and

22   when we were on the earlier matters that we argued two days

23   ago, I pointed out that I did not believe that there was

24   anything in the record to support Mr. Veeder's very early

25   point, and in fact, he agreed to strike out this number V,

and it was stricken:

"Historically and at present, the Santa Margarita River within the Naval Enclave is usually dry during the period from March through October for much of its twenty one (21) mile reach within the Naval Enclave."

Mr. Veeder agreed to strike that out.

MR. VEEDER: Let's go back to the record and find the basis on which I struck it.

THE COURT: He struck it and was going to add a more detailed description of the reaches of the river.

MR. SACHSE: Yes, your Honor, but I don't know what these more detailed descriptions are.

Mr. Stahlman suggested -- and these are important things -- Mr. Stahlman suggested that it might be possible to find more evidence on some of these issues. There is more, and we know it. We know that there are volumes and volumes of photographs and maps of what the conditions were at least in 1924, and photos for years prior. I happen to know there is more evidence. And I think that when Mr. Veeder faces up to this issue we have just discussed of try-ing to really delineate where that stream was throughout the summer, he will run himself up against a stone wall. I am simply giving your Honor notice that I cannot concede on my knowledge of this record that Lake O'Neill was used for

1   domestic purposes.  I can't.. Now, your Honor is assuming it

2   was, but the evidence.that is before you --

3   .. .. THE COURT: .I have looked over this page 41, which is

4   subject to some interpretation, but I think that page 41 of

5   the Vail AB will support some kind of a finding of that sort.

6        MR. SACHSE:  I will not argue further on that, then.

7        THE COURT:  This is a tentative ruling, but I would like

8   to see what further evidence could be produced.

9        MR. SACHSE:  Now, finding XIX -- pardon me.  Maybe

10  other counsel will have something to say about XVIII.

11       (No response.)

12       MR. SACHSE:  As to XIX, I think XIX is a hodge podge

13  of immateriality, and has statements in it, erroneous state-

14  ments, and let me start through it and point them out.

15       "Alfalfa, raised to feed live stock was a principal

16  agricultural crop . . ."

17       All right.

18       "Alfalfa requires periodic irrigation throughout the

19       entire irrigation season, particularly during the

20       latter months of the dry season." Fair enough.

21       (continuing)

22       "There were produced . . . five cuttings of alfalfa

23       each irrigation season with the last cutting being

24       made in October."

25       That is not substantiated by the record.  Don't forget,

1    your Honor, our date is 1914, our cut-off date.  Our date is

2    a date at which there was no mechanical equipment beyond

3    mule-drawn hayrakes, and whatnot, at the best.

4         I don't believe that five cuttings were produced, and

5    I don't think the record shows it.

6         But to continue for just a minute and get the rest of

7    it:

8         "The cuttings would yield about one ton to the acre

9         or a gross of five tons to the acre for each irrigation

10        season."

11        The one ton to the acre may well be true.  The gross

12   of five tons I disagree with for the same reason I just stated,

13   that there weren't five cuttings prior to 1914.

14        Now, again:

15        "Waters stored in Lake O'Neill were used to produce the

16   crops of alfalfa referred to in these findings."

17        Now, that is absolutely untrue under page 41 of Vail AB.

18   The water certainly did not produce five crops of alfalfa.

19   Mr. Veeder has just conceded that after the twelve hundred

20   acre feet went into Lake O'Neill, the rest of it was bypassed

21   for proper riparian use, so the water stored in Lake O'Neill

22   did not produce five crops of alfalfa.

23        This one is going to take a complete rewriting, as far

24   as I am concerned.

25        MR. VEEDER:  Now, are you through?

1      THE COURT:  This reference to Witman's testimony, that

2 is referred to under note 14, what is that?

3      MR. VEEDER:  His testimony was, I think, that he came

4 there in 1918.  He testified prior to the testimony of Mr.

5 Salisbury, and he testified that it was one ton to the acre.

6 Mr. Witman testified it was one ton to the acre, and there

7 were five tons to the season per acre.

8      Now, in the cross examination that was conducted by

9 Mr. Sachse, he refers back and he ties the two together, the

10 Salisbury testimony with the Witman testimony.

11      THE COURT:  What period did Salisbury testify to?

12      MR. VEEDER:  Salisbury testified to 1911 to 1914.

13      THE COURT:  And what is this tying together business

14 that you refer to?

15      MR. VEEDER:  Here, your Honor, if you will observe on

16 page 7035 --

17      MR. SALISBURY:  May I go over it with you?  I don't have

18 the transcript.

19      MR. VEEDER:  Yes (reading):

20      "By Mr. Sachse:

21      "Mr. Salisbury, on the operation of the O'Neill Ditch,

22      did you hear Mr. Witman's testimony about it?

23      "I believe so.

24      "Q  Then am I correct in stating that the O'Neill

25      diversion would be put into operation in the early

1   spring of each year after the high water had ended?

2   "A Yes sir."

3   And it was continued on down. As I read the testimony

4   on cross examination, there is this situation: I had called

5   Mr. Witman to testify in regard to the operations of the

6   system and to the operation of Lake O'Neill and the ditch in

7   particular.

8       Now, it is apparent to me -- I am not saying specifically

9   in regard to this alfalfa -- but it is apparent to me that

10  Mr. Sachse in his cross examination tied the Witman testimony

11  to the Salisbury testimony for the purpose of demonstrating

12  the correctness of the Witman testimony in regard to this

13  operation.

14      THE COURT:  Unless you have got more than you just

15  read --

16      MR. SACHSE:  Your Honor, this is less than a page.

17  Would you mind reading it, the whole cross examination?

18      MR. VEEDER:  I have no objection.  This was for the

19  purpose of confirming the Witman testimony.

20      THE COURT:  He didn't say that.  He said, "Did you

21  hear" --

22      MR. SACHSE:  You will see it, your Honor.  It is less

23  than a page.

24      (The transcript was examined by the Court.)

25      THE COURT:  There is probably nothing in the record that

1    shows five cuttings before 1914, but you certainly have

2    successive cuttings of alfalfa, multiple cuttings of alfalfa.

3    I don't think the characteristics of alfalfa have changed from

4    1914 to the present.

5         MR. STAHLMAN:  Your Honor, this is one of the matters

6    on which I think we can give some clarification.  I can't

7    conceive the old case not having  the matters in it.  It is

8    a little bigger than we figured going into, but we can look

9    into it.

10        MR. GIRARD:  Your Honor, one of the points inherent in

11   this paragraph XIX, and it is also in paragraph XVI, and it

12   is also in paragraph XX through XXIII, -- in other words,

13   any of these paragraphs which deal  specifically with crops

14   grown, or number of acres in a particular crop.

15        Now, insofar as relevancy to the United States appropriative

16   right is concerned, the only way that they could be relevant

17   to that is to show or to reasonably conclude that the waters

18   in Lake O'Neill were actually put to use to irrigate the

19   entire crop.

20        I think the record shows here pretty well that because

21   you have three hundred acres in alfalfa, or five hundred acres

22   in alfalfa, that does not mean Lake O'Neill irrigated that

23   entire alfalfa.

24        MR. STAHLMAN:  Your Honor.

25        THE COURT:  Just a minute.

15,699

1          MR. STAHLMAN:  I am sorry.

2          MR. GIRARD:  As pointed out from the record, it could

3    have been irrigated from Lake O'Neill, and it could have

4    been irrigated by  water in a riparian dam after Lake O'Neill

5    was filled, and then there is the additional problem if it

6    was in a sub-irrigated area, it might not have been irrigated

7    at all for many periods.

8          MR. STAHLMAN:  I think you have to find in connection

9    with water coming down there/the sub-irrigation area is con-

10   cerned.

11         MR. SACHSE:  It is just impossible to conclude that

12   because you have one hundred fifty acres in alfalfa, and so

13   forth that the use of water from Lake O'Neill is a certain

14   amount.  You just can't conclude that.  Even after 1934, your

15   Honor, where we have the exact measurements of the Santa

16   Margarita River just upstream, or just at the diversion point

17   into Lake O'Neill, even with those measurements of the exact

18   amount, you can't conclude there that this particular amount

19   of water ever got into Lake O'Neill, even after 1934.  You

20   don't know where it went.  All you know is that at that point

21   of the River there was measured this particular amount of

22   water, but you don't know that that particular amount of

23   water, or any particular proportion of it got into the lake,

24   was stored, and then subsequently was irrigated on a specific

25   number of acres of a particular crop.

15,696

THE COURT:  Well, you are probably correct --

MR. SACHSE:  Now, I am not saying --

THE COURT:  -- that you have that proof.  But it just
sticks out like a sore thumb that in an arid country with a
diversion and with a ditch which could fill a lake or a
reservoir, and then you flow it by when the reservoir is full,
that they would go ahead and use the water flowing by to
irrigate so long as you had water in the stream, and then when
they were short of water in the stream, as they undoubtedly
were in the late summer and early fall, then they would use
the reservoir to irrigate.  It would be put to a beneficial
use, but I can't imagine that the water stored in Lake O'Neill
was wasted.

MR. SACHSE:  That to me, your Honor, is the critical
part.

MR. GIRARD:  Let me clear this up a bit.  I was not
contending, and did not want to indicate that I agree with
Mr. Sachse that this water at Lake O'Neill was not used for
irrigation.  All I am saying is that you can't determine
the amount of water that was used for irrigation to show the
amount of the appropriative right by looking at the crop or
the acres involved.  That's all I said.

If you are going to find an appropriative right to
Lake O'Neill, I think you have to find it on the basis of
what they did with the rest of it, and having nothing to do

1   with the crops.   I didn't mean to infer that I felt that Lake

2   O'Neill water was not used for irrigation.

3     MR. SACHSE:   To me, your Honor, this is a critical

4   point.   There will be authorities cited to you, which I think

5   your Honor is familiar with already.   Mr. Grover mentioned

6   yesterday, and I think Mr. Veeder did, that storage alone

7   is not a beneficial use.

8     MR. VEEDER:   Let's not waste time on that.   There is

9   no proof of beneficial use of the water impounded.   Obviously

10   storage is not a beneficial use, so let's not waste any more

11   time on that.

12     MR. SACHSE:   So now Mr. Girard's point becomes of great

13   importance.   Unless we can find a way of determining what

14   part of the stored water was put to a beneficial use, presto,

15   no appropriative right.

16     I am getting ahead of myself.   This is getting into

17   conclusions of law.   But that is why findings of this sort

18   are so critical.

19     THE COURT:   Don't you think, Mr. Sachse, that we could

20   sustain a finding that the water stored in Lake O'Neill was

21   used for a beneficial use in irrigation and for domestic uses,

22   without having to pin-point the exact fields and the exact

23   year in which it was used?

24     MR. SACHSE:   I think you could, if your Honor so finds.

25   I do not think your Honor has any evidence, and I don't think

1   your Honor can find that the water -- if by "the" you mean

2   "all" -- that the water stored in Lake O'Neill was put to

3   any beneficial use.  I do not think you can/so find on any

4   state of the record whatsoever.  I don't think you can so

5   find.

6      Now, if you could, if Mr. Veeder had proof that the

7   water was stored in Lake O'Neill, and, let us say, by August

8   of every year the ditch itself was dry, and thereafter from

9   August to November of every year they by plug and by plug/pulled out the

10  boards and used that water for irrigation, he would probably

11  end up -- basing this on Colonel Bowen's admissions, he would

12  probably end up with about one thousand to eleven hundred

13  acre feet of appropriative rights, because there was about

14  two hundred acre feet of dead storage, as I understood it.

15     So then you would have a record on which you could

16  find a beneficial use of about one thousand to eleven hundred

17  acre feet of water, and then you would have an appropriative

18  right.  But you don't have that record, your Honor, and I

19  don't think your Honor is going to find what we have no

20  evidence to support.

21     MR. VEEDER:  I desire to argue this, but I suppose we

22  are just to continue on, your Honor, I take it?

23     MR. SACHSE:  Yes, we might as well continue on and tie

24  it all up.

25     THE COURT:  Yes, go ahead.  XX.

1      MR. VEEDER:  Now, may I inquire in regard to XIX, what

2   disposition have you indicated that you want made of that,

3   your Honor.

4      THE COURT:  I haven't indicated at all.  I don't think

5   the record that you cited supports this finding of five

6   cuttings, with the last cutting in October.  I think there

7   could be a finding that there were successive or multiple

8   cuttings of alfalfa, and that they ran generally, as alfalfa

9   does, over a period of time, but when you get down to the

10   specifics of five cuttings in October, I don't think that is

11   supported.

12      MR. VEEDER:  May I inquire right there then as to the

13   Witman testimony as to 1918, and the matters concerning which

14   I believe your Honor, if you don't find it in the record,

15   could take/judicial notice of, the practices in regard to the

16   production of alfalfa, and the cuttings of alfalfa, and the

17   period of operation of alfalfa in San Diego County at that

18   time.

19      MR. STAHLMAN:  May I  ask what the necessity of that

20   finding is?

21      MR. VEEDER:  May I go on?

22      MR. STAHLMAN:  I am sorry.  I thought you had concluded.

23      MR. VEEDER:  The fact that I am trying to establish

24   here, your Honor, is that it is indisputable that there were

25   one hundred fifty acres of alfalfa, for example, in 1911.

1    It is also indisputable that there were two hundred acres

2    of sugar beets and alfalfa.  Now, those two crops require

3    later irrigation, after the dry season.

4        THE COURT:  I could find things like that, but we still

5    have the things that Mr. Sachse is putting his finger on:

6    what proof do you have that it was the water from the Lake

7    that irrigated them, and not the water which bypassed the

8    Lake.

Take B-3

9        MR. STAHLMAN:  I don't see the necessity for that

10    finding at all.

11        MR. VEEDER:  Your Honor, in regard to the water which

12    bypassed the Lake, I think the fact remains, and, certainly,

13    the record supports this, and the whole history of this area,

14    that after the spring and winter run-offs the Santa Margarita

15    River simply did not carry water in quantities adequate to

16    produce these late season crops.

17        THE COURT:  Well, Mr. Veeder, I think that is true,

18    but it isn't true every year.  I don't know that we have

19    got a record on that, and certainly, we couldn't say "Every

20    year."

21        MR. VEEDER:  But an appropriative right does not call

22    for that, your Honor.  An appropriative right calls for this,

23    that during the dry season water was diverted and impounded

24    into Lake O'Niell -- during the spring season water was

25    diverted and impounded in Lake O'Neill, and released and

1  utilized in the dry season.  That, to me, is the crux of the

2  matter that is before us.

3      THE COURT:  Where do you find that?

4      MR. VEEDER:  Pardon?

5      THE COURT:  Where do you find that, that it was released

6  in the dry season?

7      MR. VEEDER:  Well, certainly the testimony in the record

8  shows that this water was used for purposes of irrigation, and

9  it was shown that these crops were late crops, and Salisbury

10  testified that in 1911 to 1914 they raised these crops with

11  the operation of Lake O'Neill.

12      I certainly think that there is a basis for a finding

13  that there was an appropriative right to that extent.  I

14  believe there is no question about that.

15      THE COURT:  Well, to what extent?

16      MR. VEEDER:  To the extent of at least one filling,

17  your Honor.  I am not backing away from the original state-

18  ments I have made, but certainly I think Mr. Sachse himself

19  nailed it down beyond question that the waters of the Santa

20  Margarita River were diverted into Lake O'Neill, and that

21  Lake O'Neill was filled.  Certainly from the record that we

22  have before us in Vail's AB and also the testimony of

23  Salisbury as to 1911, that there were crops raised by the

24  use of the water from Lake O'Neill.  There is no question

25  of that.  That is there, and it is spelled out.  Secondly,

1    --

2         THE COURT:  Mr. Veeder, it is not spelled out.  You

3    have something in the record which shows that all the water

4    from the Lake was beneficially used sometime during the dry

5    season.  But now let's stop talking about this business here.

6    If necessary, we can reopen this case, and we can bring in

7    something, because I haven't a doubt that it can be proved

8    that at least one filling of Lake O'Neill was beneficially

9    used, and if we have to suspend and take further proof, I

10   am willing to do it.  But I have no doubt about it.   I

11   would bet money on  that.

12        Now, are you going to argue about this, Mr. Sachse,

13   or are you going to concede that one filling of Lake O'Neill

14   was beneficially used?

15        MR. VEEDER:  Mr. Sachse.

16        MR. SACHSE:  I heard what the Court said, but I have

17   just been shown something by Mr. Stahlman that to me is

18   fascinating.

19        I have here Government's Exhibit 88, the area and

20   capacity curve of Lake O'Neill, and the minimum elevation

21   at the flash bolts of the spillway, the evidence from which

22   Mr. Veeder wouldn't produce twelve hundred acre feet, as I

23   read it.

24        MR. VEEDER:  It is an entirely different structure,

25   Mr. Sachse.  It is completely different.

1          MR. SACHSE:  Oh, you have found it is substantially

2     the same.  Let's go back to the very first finding on this.

3          MR. VEEDER:  That is in regard to capacity, Mr.

4     Sachse.  I said the capacity was --

5          MR. SACHSE:  I beg your pardon.  You say the dam is

6     substantially the same, "When constructed was approximately

7     'twelve feet high, one thousand three hundred and forty

8     feet long . . . .'  It was provided 'with an outlet near the

9     south end, consisting of a wooden opening,'" and so on.  You

10    say the surface area is substantially the same.

11         MR. VEEDER:  Let's go back to it.

12         MR. STAHLMAN:  We don't have any evidence as to what

13    the Court wants.

14         MR. GIRARD:  That is just an explanation --

15         MR. SACHSE:  If your Honor wants to take a recess

16    now, I am willing to talk to Colonal Bowen about this and

17    find out.

18         MR. VEEDER:  Mr. Sachse, let me conclude one of these

19    things.  Mr. Sachse said that I said that the operation was

20    the same, or that the structure was substantially the same,

21    and I am looking for it.  I see where I said that the

22    surface area of the lake is substantially the same, and

23    the storage capacity is substantially the same, and they

24    are the same, but I don't find where I said that --

25         MR. SACHSE:  Well, his Honor asked for a finding,

1    and let's get it.

2    THE COURT:  Now, just a minute.  Cool down.  You can

3    talk about this in the recess if you want to.

4    MR. VEEDER:  I don't see where I said that

5    the release structure was the same.

6    MR. SACHSE:  Then let's get a finding.

7    MR. VEEDER:  But, Mr. Sachse, the point I make --

8    THE COURT:  Now, let's cool down, and, as I say, you

9    can talk about this in the recess.  I want an answer to my

10   question:  I said that I have no doubt but what if you

11   wanted to take the time, we could reopen the case, and bring

12   people in, and you could produce proof that one filling of

13   Lake O'Neill had been beneficially used, and I asked Mr.

14   Sachse and Mr. Girard if they were going to argue about the

15   matter, or whether we could terminate this and you would

16   concede that one filling of Lake O'Neill had been beneficially

17   used.

18   MR. SACHSE:  Your Honor, I don't like to disagree with

19   your Honor, and I want to do this honestly and frankly.

20   I told your Honor two days ago when we started this

21   that it was my contention that no part of Lake O'Neill was

22   beneficially used; that  it was my contention that Lake

23   O'Neill was nothing but an integral part of an irrigation

24   system.

25   Now, of course, your Honor can disagree, and no doubt

1  your Honor will, and you can draw your conclusions and

2  findings as you suggest, but I don't think, with all due

3  respect to you, sir, that it is fair to ask me to abandon

4  this contention I am making.  I am not going to abandon

5  it.

6  THE COURT:  You contend that in the dry time of the

7  year in those years when water did not run down the Santa

8  Margarita, after August and September, that the water in

9  Lake O'Neill would not be used for irrigation purposes?

10  MR. SACHSE:  No, but the point I make, sir, is that

11  I have contended, and I still contend, and will continue

12  to contend that there wasn't any appropriation.

13  If your Honor over rules me on that, and if your Honor

14  says, "Mr. Sachse, I disagree, it was a valid appropriation,"

15  then I am going to have to say with all due respect, "All

16  right, your Honor, let's find the amount of the appropriation."

17  So my point is that it isn't an appropriation at

18  all.

19  THE COURT:  That is a legal question.  I am talking

20  about the factual question.  What we are trying to do now

21  is to look through and try to find specifically where the

22  water in Lake O'Neill was used, and when it was used, and

23  so forth, and the record is meager.

24  Now, from a factual standpoint I am asking whether

25  or not you are willing to concede that at least one filling

1  of Lake O'Neill was beneficially used for irrigation pur-

2  poses?  You still have your right to argue whether or not

3  it was an appropriation.  We are talking now about the

4  factual end of it.

5  MR. SACHSE:  I would concede this, your Honor, that

6  the --

7  THE COURT:  I have no doubt that we could call

8  witnesses and prove it.

9  MR. SACHSE:  I will concede this, that whatever the

10  physical facts are, that Colonel Bowen would explain about

11  it, I don't know whether the capacity was twelve hundred,

12  what the dead storage would mean, or what the facts are,

13  but I would concede within the limits of the physical

14  structure in 1914 the extractable capacity of Lake O'Neill

15  was probably put to a beneficial use.  Now, not necessarily

16  an appropriative use.  That is what I want in the record.

17  THE COURT:  You want to reserve a legal point, is

18  that it?

19  MR. SACHSE:  Yes, your Honor, definitely, but I would

20  not ask Mr. Veeder to prove that -- let me rephrase that.

21  I would not ask Mr. Veeder to attempt to prove that Lake

22  O'Neill did not just stand there idle.  I don't think it

23  stood idle.  I think they used it, and I am not going to

24  ask him to put in proof to that effect.  But I am going

25  to have considerable argument about how much they used,

1   and the facts; I mean, as to the effect of their use.

2   THE COURT: I will think about this. I think you

3   will concede that a filling of Lake O'Neill, and such

4   amount as could then be extracted from it was used for

5   beneficial irrigation purposes.

6   MR. STAHLMAN: Your Honor --

7   MR. VEEDER: Let the Court finish.

8   MR. STAHLMAN: I am sorry.

9   THE COURT: I think if you will factually concede

10   that, then we don't have to search the record to find out

11   what field it was on, and in what month, because I just

12   have no doubt that if you wanted to work hard enough you

13   could show that the water flowing in/Lake O'Niell, or at

14   least one filling, was beneficially used. It wasn't

15   dumped late in the fall and allowed to run down into the

16   ocean.

17   MR. STAHLMAN: Could you take this approach to it:

18   could you say that such waters as were released from the

19   Dam were used for beneficial uses?

20   THE COURT: That does not tell you what was released.

21   MR. STAHLMAN: I know it does not. We haven't any

22   evidence to show for it.

23   MR. SACHSE: Your Honor, may I suggest that during

24   the recess I will ask Colonel Bowen what the effect of this

25   admission may be, and maybe I will concede it.

A36                                                                                  15470

1          THE COURT:   We will take a short recess.

2          (A short recess.)

Take C
follows

MR. VEEDER: Are you ready to proceed, your Honor.

THE COURT: Yes.

MR. GIRARD: Your Honor, I talked to Mr. Stahlman and Mr. Sachse, and as far as the State, the Vail Company and Fallbrook Public Utility District are concerned, we are willing to stipulate that during any year in which water was available the Rancho, prior to 1914, diverted from the Santa Margarita River into Lake O'Neill annually 1100 acre feet of water and subsequently put that amount of water during that particular year to beneficial use, leaving open to Mr. Sachse the question of arguing whether or not that had the legal effect of being an appropriation or a riparian use. But as far as the amount of water and the fact that the water was put to a beneficial use is concerned, we will stipulate to that.

The reason for the 100 acre feet difference was that Colonel Bowen advised us that the present dead storage of 100 acre feet is, in his opinion, approximately the same as it was under the Rancho's operation.

MR. SACHSE: I will also stipulate, if Mr. Veeder will accept it.

MR. VEEDER: I will certainly accept the 1100 acre feet. I would like to reserve the right to urge, though, that the evidence would support a greater quantity of water as an appropriative right.

P 18

1      MR. SACHSE:  Then there is no stipulation.  I am offering

2  this in the hope that we can strike all this next foolishness,

3  paragraph after paragraph of crops, that we don't have to

4  talk about.  I am not going/argue anymore whether every drop

5  would go into crops.  I'll buy it.  I'll take your Honor's

6  theory.  But not if he has the privilege --

7      THE COURT:  I think we have solved that problem here.

8  With the skimpy record, I think this is something you ought

9  to be able to stipulate to.

10     What is this reservation that you make, Mr. Veeder?

11     MR. VEEDER:  I feel, as Mr. Sachse feels, that there

12  are matters -- I think that it is clear that there was at

13  least 1200 acre feet went in there, and I think that during

14  the low runoff period that is going to occur.  I truly hate

15  to abandon  anything above.

16     THE COURT:  But what can you argue about?  What proof

17  have you got of any greater amount than the 1100 acre feet

18  -- which would be the difference between 1200 and the dead

19  storage?  You certainly can't claim that diverting the water

20  -- well, of course you could argue this:  Diverting the water

21  into the ditch and not running it through Lake O'Neill gave

22  you some kind of right.  Those facts are available to you.

23  But I don't know that you have any measurement of how much

24  it was, except the size of the flume, that was diverted.

25  Even then, at best that would be just a riparian use.

P 19

1    What other views do you have that you want to talk about?

2    MR. SACHSE:  My own view on the record, your Honor, is

3    that this later irrigation was conducted this way, and I am

4    just laying it out.

5    THE COURT:  To go one step further, I take it that this

6    stipulation entered into, of course, would reserve to Mr.

7    Sachse his legal position.  But is it going to be your legal

8    position that this running of water into Lake O'Neill and

9    then later using it beneficially was merely the type of

10   storage that we had observed in the reservoir upstream?

11   MR. SACHSE:  No, your Honor.

12   THE COURT:  Where the head had to be built up for a

13   couple of days?

14   MR. SACHSE:  No, no sense in my holding any more secrets.

15   We are going to come to it in the next two or three items

16   anyway.

17   My legal position is going to be simply this:  That the

18   first essential of an appropriation does not exist, namely,

19   intent.  And I think I have positive evidence to establish,

20   incidentally, that there was no intent to appropriate.  On

21   the contrary, the intent was at all costs to avoid appropri-

22   ation.  Therefore, this act carried out by the O'Neills was

23   nothing more nor less than an illegal act which no one could

24   prevent their doing because they were the last user on the

25   stream.  They created that lake for their own convenience

P 20

1   only, and there was no time when they acquired any right

2   in excess of their riparian right.  I am not going to argue

3   that this lake was part of the riparian right.

4        MR. VEEDER:  I think your Honor would agree, and I

5   think counsel agree, that the lake did hold 1200 acre feet,

6   that 100 acre feet may be dead storage.  But assuming that

7   by reason of a drouth the lake became completely dry, we

8   would have a right to 1200 acre feet to fill it.  Isn't that

9   correct?

10        MR. GIRARD:  I wouldn't argue about that.

11        MR. SACHSE:  I wouldn't argue that.

12        MR. VEEDER:  All right, I will agree to the 1200 acre

13   feet, your Honor.

14        MR. SACHSE:  Eleven hundred.

15        MR. VEEDER:  All right, make it 1100.

16        THE COURT:  Eleven hundred acre feet was used benefi-

17   cially, and that if the lake were dry there would be a right

18   to fill the lake, which would be 1200.

19        MR. SACHSE:  That is right.

20        MR. VEEDER:  I will agree to that.

21        THE COURT:  Well then, we have made a lot of progress.

22        MR. SACHSE:  We surely have.

23        MR. VEEDER:  Your Honor, may I refer to page 15,461 of

24   the transcript of March 15, 1961.  I hand it to your Honor.

25        THE COURT:  What line?

P 21

MR. VEEDER:  Line 20.  The question arose as to this matter for injunction that is now before you.  I had understood your Honor to say that based upon the agenda and upon the original complaint this injunctive matter was before you on motion from me, and Mr. Sachse said "There is no objection to the form of your motion."  Then you said, "Then it is probably before me."  I interrupted your Honor to say, and I thought you said, "Then it is properly before me."

THE COURT:  I think that is what I said.  I was just inquiring as to the procedure on the agenda.  The word "probably" will be changed to "properly."

MR. VEEDER:  At line 20 on page 15,461.

THE COURT:  I have made the correction here, and counsel will make their corrections.

MR. SACHSE:  With that stipulation, I think/a great
many of these paragraphs I am going simply to say they are utterly immaterial from now.  No need for them whatsoever.

THE COURT:  Well, just a minute.  The major parties -- Fallbrook, Vail, California and the Government -- stipulate. Of course, this doesn't bind any other party on the stream, and I would think that there should be some findings drawn on such evidence as there is in the record.  I don't think we have to spend time on it, but I think there should be something more than a statement that three or four parties have stipulated and the Court therefore finds.

P 22

1    MR. SACHSE:  I would suggest that Mr. Veeder can

2    unquestionably rewrite these findings.

3    THE COURT:  Without spending more time on it, let him

4    rewrite it, with the idea in mind of trying to  keep it as

5    close to the facts as he can, and he can also recite the

6    stipulation between the four parties here.

7    MR. GIRARD:  His findings should indicate that while

8    these facts existed and this irrigation took place, that the

9    findings should not indicate the water used was from Lake

10   O'Neill in its entirety, but that Lake O'Neill contributed.

11   MR. STAHLMAN:  Your Honor, one short finding would do

12   it:  Such waters as released from Lake O'Neill were used

13   for reasonable beneficial use.

14   THE COURT:  Mr. Stahlman may have the easiest way to do

15   it,  a short finding that the 1100 acre feet of water, that

16   amount which could be released from Lake O'Neill, was

17   beneficially used.

18   MR. SACHSE:  I think with that, and with another simple

19   finding, perhaps lumping a number of paragraphs together,

20   that the waters were used for the raising of alfalfa, that

21   the waters were used for the raising of sugar beets, that

22   the waters used for the raising of row crops, that the waters

23   were used for watering of livestock etc., without trying to

24   spell out acreages.

25   MR. GIRARD:  So that there would be no doubt, this

P 23

1  stipulation, of course, would not place this appropriation,

2  if it is an appropriation, on a priority date higher than

3  the date when Lake O'Neill was instigated.

4      MR. VEEDER:  1883.

5      MR. GIRARD:  Whatever date Lake O'Neill was instigated.

6  In other words, we are not, certainly, going to indicate

7  that the United States has a right to storage to the dis-

8  advantage of upstream riparians in a drouth year.

9      MR. SACHSE:  In other words, we will have to fix, Mr.

10  Veeder -- this doesn't concern Fallbrook, this doesn't

11  concern Vail -- we will have to fix this with a date.  We

12  haven't decided yet whether it is 1886 or 1883.  Either one

13  leaves Vail safe.  Their patent certainly was in advance of

14  those dates.  That is the point we are making.

15      MR. VEEDER:  I would say, on the basis of the record

16  I have here, that certainly the report by the State Engineer

17  would support the 1883 date.

18      MR. GIRARD:  I am not quarreling with it.

19      MR. SACHSE:  But of course Gibbon and Cottle will.  They

20  have an 1885 date.  They may point to other things, and his

21  Honor will have to decide.

22      MR. VEEDER:  If there is agree/ment among us as to 1883 --

23      MR. SACHSE:  There is not with me.  I can't.  My client

24  also has an 1885 date.  I can't agree, Mr. Veeder.

25      MR. GIRARD:  I don't think Gibbon and Cottle would be

P 24

1  in too much of a position to argue about it, because the

2  major downstream users, the United States and Vail, wouldn't

3  be subject to their appropriation anyway.

4  MR. SACHSE:  I am not going to argue with your Honor.

5  All I say is that I can't stipulate to 1883.  I just have

6  to leave it in your Honor's lap.

7  THE COURT:  I would take  the 1883 date.

8  MR. VEEDER:  Did you accept it?

9  THE COURT:  Yes.

10  MR. SACHSE:  I think XX, as I say, we can eliminate,

11  subject to Mr. Veeder's including it in a broad one.

12  XXI the same.

13  THE COURT:  Yes.

14  MR. VEEDER:  XXII.

15  XXIII.

16  MR. VEEDER:  It does go to beneficial use and the

17  continuity of the beneficial use.

18  MR. SACHSE:  Well, we stipulate you had.

19  MR. VEEDER:  All right.

20  MR. SACHSE:  XXIII.

21  MR. VEEDER:  I think the Court has to have something

22  more than just an agreement that there was beneficial use.

23  MR. SACHSE:  I think you should make some findings

24  putting all this together that you did have crops, etc.

25  MR. VEEDER:  What number are you on?

MR. SACHSE:  I have gone down to XXIV.  As far as I am concerned, the same thing there.  That is taken care of by the stipulation.

THE COURT:  Except for the area.

MR. SACHSE:  Except for the area, yes.

THE COURT:  Here again the problem would be to show that the water that bypassed Lake O'Neill and the water which was stored was stored in Lake O'Neill and then released.  I think you can work something out on these other facts and then go on to the legal questions and get to Mr. Sachse's point.

MR. SACHSE:  The next one, XXV, I have a little trouble with.  The very first, again, is the "all."  Is it the same amendment, Mr. Veeder, "all the surface"?

MR. VEEDER:  Yes, that is correct.

MR. SACHSE:  And the same problem, in a little different form, appears in the second sentence of XXV at line 7: " . . . controlling factor as to the quantity of water diverted and stored in Lake O'Neill was the availability of it in the stream.  During periods of maximum runoff the quantity of water diverted and stored was increased. . . "  I don't know what that means.  If that again is a go-back to three times filling the bucket, I object.

MR. VEEDER:  No, I will point out what that means. Frankly, I am using the period of record that we have.

P 26

1    During periods when you had, in March, high runoff, it

2    appears that they took the maximum quantity that could be

3    diverted into the structure.

4        MR. SACHSE:  But you used the word "stored" here.  You

5    say "quantities of water diverted and stored was increased".

6    In other words, I don't want this to go beyond our stipula-

7    tion now that you filled your lake.

8        THE COURT:  You will have to revise it.

9        Look at the next sentence:  "There was an attendant

10   reduction in the quantity diverted and stored during periods

11   of drouth and low runoff."

12       MR. SACHSE:  I don't know quite what the purpose of it

13   is.

14       MR. VEEDER:  The point of it is that, as I said in an

15   earlier finding, once they put the temporary structure across

16   the stream they took all of the water.  The maximum they

17   could possibly take would be 20 second feet.  If the water

18   dropped down to 2 second feet running in the stream, that

19   reduced it.

20       THE COURT:  But the ambiguity is this, what do you mean

21   by "period."  If you mean by a "period" that in the months

22   or the days when there was low runoff there was a reduction,

23   that is one thing.  If you mean by a "period" a season of

24   drouth and no runoff, then you have a finding that at the

25   very time they needed to divert water they didn't store any.

P 27

1    You will have to revise this whole paragraph.

2        MR. VEEDER:  All right.

3        MR. SACHSE:  XXVI, I contend first, is all immaterial.

4    Everything is since 1914, and furthermore we don't need it

5    now.

6        MR. VEEDER:  If there is agreement as to the continuity

7    and the continuous use, impounding and use, when the water

8    was available of 1200 acre feet annually in Lake O'Neill,

9    then there is no need for it.

10       MR. SACHSE:  No.

11       MR. VEEDER:  I put this in, I think it was under the

12   claims we had started out with, reflective of at least the

13   period of history during the ownership of the Rancho.  I

14   would just as soon delete XXVI.  Is that all right?

15       THE COURT:  It's all right with me.

16       XXVII.

17       MR. SACHSE:  Now we come to the sixty-four dollar

18   question for the first time.

19           "Records disclose that the diversions of all

20           the surface waters of the Santa Margarita River into

21           Lake O'Neill for storage, . . "

22   Which of course is not true.  All of the surface waters were

23   not diverted, etc.  Mr. Veeder has agreed to that.  Some of

24   them bypassed it.

25           ". . were frequently far in excess of that

P28

which could be applied to a beneficial use . . "

MR. VEEDER:  At the time it was diverted and stored.

MR. SACHSE:  All right.

MR. VEEDER:  That is where you get your water for impoundment, Mr. Sachse.

MR. SACHSE:  Now here we come to the issue that I intend to press very vigorously to your Honor -- the intent. But before I do that there are a couple of little technical things about this paragraph.

"Records disclose . ." -- that is untrue.  The only records are subsequent to 1914.  There aren't any records disclosing diversion of all the surface water.  I raised that earlier.  If we are going to stick to our stipulation of 1100 or 1200, I think it is all right.  But if we go beyond it, no.

MR. VEEDER:  The genesis of XXVII, Mr. Sachse, was XXVI, and you will observe that in 1931, 1932, 1933, etc., as the footnote discloses, I was reflecting in XXVII the fact that it was disclosed in United States of America Plaintiff's Exhibit 25 that during the period of record they diverted as high as all of the water into the Lake O'Neill diversion ditch, during the early period in March, and they couldn't have been applying that water to beneficial use at that time.  That is what that says.

MR. SACHSE:  Except you say that all of that evidences

15,721

P 29

1     intention of storing water for future use, which I presume

2     has to do with intention to appropriate.  And how activities

3     of the Rancho in 1932, which is away after 1914, can be

4     held to evidence an intent to appropriate in 1888 I don't

5     know.  That is the point I am making.  I don't think this

6     has anything to do with intent to appropriate.

7          MR. VEEDER:  My own view is that you can knock out

8     XXVI and you can knock out XXVII.

9          MR. SACHSE:  Knock them all out.  They are all after

10    1914.  1914 is the cut-off date on non-statutory --

11         MR. VEEDER:  I know that.

12         THE COURT:  Do you mean that the Government isn't going

13    to have to have a finding that there was an intention to

14    store this 1200 acre feet in Lake O'Neill?

15         MR. SACHSE:  Yes, your Honor.

16         May I reply to his Honor, Mr. Veeder?

17         I am sure that Mr. Veeder won't argue that the abso-

18    lutely first essential of any non-statutory appropriation

19    was an intent to appropriate.  In discussing Gibbon and

20    Cottle here Mr. Grover brushed it off very easily in his

21    case because he had the best possible evidence -- he had

22    a written instrument.  They posted it on the creek and it

23    was recorded.  It was Number 2 in the records in this county.

24    It doesn't have to be certain, but without an intent there

25    could be no appropriation.  The mere act of the riparian

P 30  1    using water on his land wouldn't be appropriation.  No one

2    can argue that proposition.  Mr. Veeder is asking us to

3    accept records in the thirties.

4         THE COURT:  We have got past the records.

5         MR. VEEDER:  They are out.

6         THE COURT:  The records are out.

7         MR. SACHSE:  What is it, then, that evidences an intent

8    to appropriate?

9         May I say one more thing, your Honor.  If I were writing

10   a finding, finding an appropriative right in Rancho, I would

11   say that in 1888, or whatever the date was, the Rancho

12   intended to appropriate.  In the findings that I submitted

13   to your Honor I have an express finding that says there was

14   no intent to appropriate.  I didn't double talk around that

15   something evidences intent and in the next paragraph some-

16   thing else evidences intent.

17        THE COURT:  You tie yours down.  What the finding should

18   be would be to the effect that the Court finds that there

19   was an intent on the part of the Rancho, at the time of the

20   construction and first use of Lake O'Neill, to use the lake

21   for storage, one of the intentions was to use it for storage

22   for the dry season, and there was an intention to appropriate

23   water.

24        MR. SACHSE:  I concur.  I think there should be such a

25   finding.

P 31

1    MR. VEEDER:  I will buy that finding the way you stated

2    it, your Honor.

3    THE COURT:  What did you say, Mr. Sachse?

4    MR. SACHSE:  I say, I will buy that kind of finding.

5    Now I want to argue whether it is justified.

6    THE COURT:  Whether it should be made, yes.

7    MR. SACHSE:  All right.

8    MR. GIRARD:  Before we go into it, I would like to ask

9    Mr. Sachse.

10   When you talk about there must be the finding of an

11   intent to appropriate, by that do you mean that there must

12   be a finding as to an intent to store water for a contemplated

13   beneficial use, or do you mean that there must be an intent

14   to appropriate in the sense that the guy must have intended

15   it in a legal sense?  What are we talking about?

16   MR. SACHSE:  It is very simple, Mr. Girard.  I am

17   surprised.  There is a clear distinction between an appropria-

18   tive right and a riparian right.  If a riparian were to seek

19   to appropriate today, he files an application which evidences

20   his intent to get something greater than his riparian right.

21   In the early days of non-statutory rights he would do some-

22   thing to evidence to someone that he was looking for something

23   greater than his riparian rights.  That is what I mean by

24   intent to appropriate -- an intent to take something beyond

25   that which/enjoyed as a riparian.  I don't think there is
            he

P 32

1   the slightest argument that that is the law.

2   THE COURT:  Isn't the intent that has to be found the

3   intent to do a certain thing?  A man could be entirely

4   ignorant of the law, but if he intended to do a certain thing,

5   and if the thing he intended to do fit within the framework

6   of the law, then he had the necessary intent.  I don't think

7   the law required these early farmers and miners who made

8   appropriations of water to know all about the law.  They had

9   an intent to take some water for their use and for certain

10  purposes, and if what they intended to do was an excess of

11  their riparian rights then there was the necessary intent.

12  MR. SACHSE:  And then they acquired what?  An appropri-

13  ative instead of a riparian right?

14  THE COURT:  Yes.

15  MR. SACHSE:  Instead of/ a riparian right on the same

16  land?

17  MR. VEEDER:  In addition to?

18  THE COURT:  In addition to.

19  MR. SACHSE:  We discussed this somewhat yesterday and,

20  with all due respect, I think you are wrong.  I would like

21  a chance to dig up a little law.

22  But if I may continue now with this evidence, I will

23  ask you to assume I am right that there must be a finding

24  of some kind of intent at least to appropriate to get some-

25  thing beyond a riparian right.  And the only appropriation

P 33

1    we are discussing at this moment, your Honor, is Lake O'Neill.

2          Now, the way this idea, if you can call it that, came

3    into my mind, I would like to tell your Honor because it

4    will perhaps make it easier for me to bring out my rationale.

5    I argued before your Honor two days ago in connection with

6    the use of the words "handle" and "control."  I pointed out

7    to your Honor that here were concededly some of the best

8    water lawyers in California, and why would they use such

9    inept language when there were readily available words of

10   art, your Honor will recall, and driving home I, myself,

11   brooded about this thing.

12         THE COURT:  You are working overtime.

13         MR. SACHSE:  All of the time.  I always work overtime

14   for my clients, your Honor.  I have two of them in the box.

15   Thank you.

16         I wondered, why did Mr. Cosgrove do this, and I put a

17   lot time in over it, and all of a sudden a light dawns.  You

18   wonder why you didn't think of this earlier.  And the reason

19   is very simple.  Once you know the reason you can find all

20   kinds of evidence to support it.  If the Rancho had had an

21   appropriative right in Lake O'Neill and had pleaded it as

22   such, their 444-day lawsuit would have been over with before

23   it began.  Because Vail Ranch, as a riparian using water

24   upon riparian land, using water for proper riparian purposes,

25   could have said, "So what if you don't have water enough to

P 34  1      fill up your appropriative lake?"  That is all that Vail

2      Ranch would have had to say, "So what?  You are a junior

3      appropriator.  And what is the difference if our upper

4      riparian dries you up?"  Their case would have ended before

5      it began.

6            THE COURT:  Because the Vail rights antedated --

7            MR. SACHSE:  The Vail patents antedated the Santa

8      Margarita appropriation.

9            So your Honor speculated two days ago as to how you

10     thought the Rancho operated their lake.  I will speculate

11     that Terry Cosgrove sat down with Jerome O'Neill and said,

12     "Boys, if you whisper 'appropriation,' if you even open your

13     mouth on appropriation, if you ever had an appropriative

14     intent, you are licked, you haven't got a case, you are

15     through, you are finished."  Because the complaint, the

16     findings, -- I can take an afternoon now to find you evidence

17     to back this up.  If you will go through these findings you

18     will again and again and again find that they didn't get

19     water enough for Lake O'Neill because of the acts of Vail.

20     Well, if their right to put water in Lake O'Neill is appro-

21     priative, so what?  They didn't get water enough in the

22     O'Neill ditch because of the wrongful acts of Defendant Vail.

23     Appropriative?  So what?  What are we going to have 440 days

24     of trial for?

25           THE COURT:  I am following you part of the way.  But

P35   1   here was a fight between the Santa Margarita and Vail, and

2   assuming that Terry Cosgrove knew it would be no good to

3   assert an appropriative right against Vail, which would be

4   junior to Vail's right, and therefore he tried the case on

5   the riparian theory alone.

6   MR. SACHSE:  In other words, he dreamed up a right that

7   didn't exist.

8   THE COURT:  No, certainly Santa Margarita had riparian

9   rights.

10   MR. SACHSE:  My point is that they didn't have an

11   appropriative right, and unless your Honor can find something

12   here that shows that they intended to acquire something more

13   than this good riparian right they had, something more than that,

14   there is no appropriation.

15   As I say, I can literally take hours going through this

16   Vail's Exhibit AB.  Right at the beginning on page 4 -- one

17   of those things you read hastily because it is all single

18   spaced, and I ran through it the first time -- down at the

19   bottom on line 27 is a very specific finding that the normal

20   flow was insufficient for all of their riparian needs -- the

21   flow of the river was insufficient for all of their riparian

22   needs.  So in spite of that they made an appropriation when

23   the river is insufficient.

24   Now let me point out the _Rindge_ case which Mr. Grover

25   discussed.

P 36   1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

THE COURT:  Of course, you are talking two different periods of time.  The insufficiency for the needs was the time the lawsuit was filed, but the appropriation had occurred much earlier.

MR. SACHSE:  But if it is an appropriation that occurred much earlier, their riparian uses had long since taken all the water, then that appropriation has lapsed -- it is finished.

If there is no more surplus, if the river is like Fallbrook now, one that Mr. Stahlman enjoined.  At one time we had a good right in the San Luis Rey, and the time came when there was not enough for their rights, and now it is gone and they lost them because there was no water to appropriate.

THE COURT:  You have urged upon me that there are still at times surplus waters in this river in the wintertime.

MR. SACHSE:  Yes, your Honor.

THE COURT:  If there is surplus in the river, then an appropriative right could attach to something.

MR. SACHSE:  I would like to take that up in a minute and confine myself, if I can, to intent for the moment.  You can go through the pleadings -- I'll ask your Honor to take my word for it, because it is a mountainous task to read -- you can go through the pleadings.  There is not one word of appropriative right.  You can go through the findings.  There is not one word of appropriative right.  You can go through

P 37

1  the judgment.  There is not one word of appropriative right.

2  I haven't yet done the evidence, I assure you.  I don't know

3  whether there is any discussion of appropriative right in

4  the evidence.

5  But how do you prove an intent to appropriate?  Usually

6  it might be difficult to try to establish the intent in some-

7  one's mind seventy years ago, particularly when it is purely

8  a mental intent, when there is no document of record, such

9  as Mr. Grover's clients had.  But here we don't have to have

10  a crystal ball and try to think what that man thought.  Here

11  we have the best possible kind of proof -- 444 days of trial

12  where, believe me, he was asserting all his rights.  There is

13  not a mention of it.  I concede that this is negative evidence.

14  But now, your Honor, I want respectfully to point out

15  to you something.  Mr. Veeder has very artfully, in the

16  course of this trial, succeeded in constantly pushing the

17  defendants in the front until the day before yesterday, when

18  I whipsawed him into saying/he rested on this issue, the

that

19  word "rest" had not been applied to a single issue or a

20  single defendant in this case.  That is perfectly proper.

21  Your Honor is the sole controller --

22  THE COURT:  He did rest on several issues.  He did

23  rest on the geology.

24  MR. SACHSE:  No, your Honor, he hasn't thrown the

25  geology in Coahuila, and he told you two days ago that

P. 38

1    he wants some more somewhere else.

2         THE COURT:  No, there.  But he rested on Domenigoni

3    Valley, he rested on the area of the underground water on

4    a number of them.

5         MR. SACHSE:  All right.

6         THE COURT:  But put it this way, he has been reluctant

7    to rest.

8         MR. SACHSE:  Very well, I will accept your more charitable

9    statement.  I will say this.  The only issue involving a

10   specific defendant on which he has rested is the one day

11   before yesterday when I said, "Are you resting on the question

12   of appropriative rights?"  And he said, "Yes."  Now the

13   significance of that is pretty important to me.  Your Honor

14   has, of course, the complete authority to conduct this trial

15   in any manner in which you desire, and it is perfectly proper

16   to do this.  But your Honor, I conceive, has not the authority

17   to transfer the burden of proof.  And I will be prepared when

18   we come back after the recess to cite you a number of author-

19   ities that he who asserts the existence of a non-statutory

20   appropriative right must prove -- what burden he must assume.

21   I will cite you some cases that spell it out specifically

22   item by item.

23         Now, I concede that it is the duty of the United States,

24   which has a perfectly valid riparian right that no one has

25   quarreled with and is now seeking to enlarge that right,

P 39

1    not to say to me, "Fallbrook, prove that I don't have one."

2    I conceive that it is not his privilege to say to Vail, "Sure,

3    you have a good appropriative right dated in 1946, but prove

4    that mine isn't earlier, prove the negative that mine is not

5    earlier than yours." That is not Mr. Veeder's privilege,

6    and it is not your Honor's privilege to place that burden

7    upon us. It is his burden to prove the existence of this

8    right and to prove every single element of this right, and

9    until he does so we have a perfect right to sit in our chair

10   and ask for a nonsuit, so to speak, on that single issue.

11       Now I would like your Honor, as you consider these

12   findings on appropriative rights, to ask yourself if Mr.

13   Veeder has met the burden of establishing any of these things.

14   I don't believe he has. I don't believe there is any evidence

15   on these issues. We are constantly being placed in the

16   position of saying, "Well, I will find this that shows he

17   didn't have them." That is wrong. It is not our job to say

18   that he didn't have it. It is his job to say that he has

19   it, and it is his job to satisfy your Honor, by a preponder-

20   ance of the evidence, that he had it, and until he has done

21   it he has not met the burden of proof, and we would have a

22   perfect right to sit here and say, "We ask for a nonsuit."

23       We haven't tried the lawsuit in this fashion. We have

24   perhaps been sloppy. But before we come to a final deter-

25   mination of this case, your Honor is going to have to ask

P 40

1   yourself, first, has the plaintiff met its burden?  Your

2   Honor has several times reprimanded counsel -- I think it

3   has happened to me, and I know it has happened at least once

4   to Mr. Veeder for twisting -- you have said, "You can't win

5   the case on the weakness of your adversary's title.  You

6   must win it on the strength of your own."  We will have to

7   face up to that.  The plaintiff in this case can't win an

8   appropriative right by saying to Fallbrook, "Disprove it."

9         THE COURT:  There is no dispute about that.  The burden

10  would be on the Government.

11        MR. VEEDER:  Has anybody denied that?

12        MR. SACHSE:  I am now.

13        THE COURT:  I will be glad to see the cases as to the

14  elements.

15        MR. SACHSE:  I will undertake to give you -- in fact,

16  I am sorry I didn't know this was going to pop this fast.  I

17  should have had them right this minute.  But I can readily

18  do so.

19        MR. VEEDER:  On page 108, I think, counsel.

20        MR. SACHSE:  Thank you.  It is right here on 108.  Mr.

21  Girard has just handed it to me.

22             "To constitute a valid appropriation of water,

23        three elements must always exist:  An intent to

24        apply it to some existing or contemplated beneficial

25        use, an actual diversion from the natural channel by

P 41

1      some mode sufficient for the purpose, and an

2      application of the water within a reasonable

3      time."

4      Now that, I submit, cannot be done by the simple act

5      of the riparian using the water to which he is properly en-

6      titled as a riparian.  It cannot.

7      The best example I can give you is the case that Mr.

8      Grover cited yesterday, your Honor, of the Rindge Land Company.

9      The Rindge Land Company was on Malibu Creek.  And I am sure

10      your Honor knows what Malibu Creek must be like.  The Rindge

11      lands were down toward the ocean, and they were riparian.

12      They had a riparian right.  There was a surface flow in the

13      creek on the Rindge lands, but like many of our coastal

14      streams in California there was more water in the stream in

15      the upper reaches than there was in the lower because trans-

16      piration, evaporation and seepage had taken a lot of it be-

17      fore it reached Rindge.  What did Rindge do?  Rindge went

18      onto public land obove its own where there was more water in

19      the stream and took some of the water on public land where

20      there was more water and had brought that down onto the Rindge

21      lands.  This is why I made the point yesterday during the

22      Grover argument that it can't be the same water, at the same

23      place, at the same time.  It can't.  It was not the same

24      water on the same place.  It was water that never would have

25      reached Rindge's.  They went up where there was more water

15-734

p 42

1    and brought it down.  And the Court very properly found that

2    Rindge had a riparian right in the water that was flowing

3    through it.  It was using that.  That was a riparian use.

4    And when it went to a place and got water that it wouldn't

5    have previously had, then it exercised an appropriation, even

6    though it was on riparian land.

7        Now that is not the case here.  Every drop of this water

8    was on their land at all times, was perfectly accessible to

9    them as a riparian, at all times was entirely within their

10   riparian right .  There was not one single aspect of the use

11   of that water that requires any kind of appropriation.

12       THE COURT:  I take it that the Government is claiming

13   an appropriative right to store the water.

14       MR. VEEDER:  That is correct, your Honor.

15       THE COURT:  It is true that the water was there, but

16   the water was flowing downstream and underground.

17       MR. SACHSE:  I will answer you this, your Honor.  O'Neill

18   had absolutely no right to store, and I'll say -- let's

19   assume that O'Neill was still the plaintiff, to make this

20   simple, forgetting the United States for the moment -- and

21   if we were fighting as a new Rancho Santa Margarita vs Vail

22   today, Vail couldn't say, "You can't store."  Your Honor

23   couldn't tell them to knock their dam out.  Why?  Because

24   it hurt nobody, because they are the last user on the stream,

25   because they could have done anything they wanted to with

P 43

1    that water.  When that water reached them they could have

2    bottled it up in tankers and shipped it to the Sahara Desert

3    and Vail couldn't have said boo.  They could do anything

4    whatsoever they wanted with that water once it was within

5    their boundaries.  They didn't need a right to store.  Abso-

6    lutely no need whatsoever to store that.  They didn't have

7    to.  Why should you have an intent to do nothing, to do some-

8    thing that is utterly useless and meaningless?  There was no

9    need whatsoever, and it granted them nothing.  No one could

10   have stopped them.

11       The only way they could get an appropriative right was

12   to somehow take water that was not their's to use as a

13   riparian.  They could even have taken this water and, as I

14   say, exported it into another watershed.  Vail couldn't stop

15   them.  No possibility.  They were the last user on the stream.

16       So unless Mr. Veeder can show your Honor that the Rancho

17   had an intent to take some water to which it was not other-

18   wise entitled, or to put it to a use to which it was not

19   otherwise entitled or a use that somebody could stop, they

20   haven't got any appropriation and they can't have any appro-

21   priation.  They have the finest possible water right that

22   exists in the State of California, that is, a riparian right,

23   and they can't superimpose on top of that for the identical

24   water on the identical land an appropriative right.  And as

25   far as Lake O'Neill is concerned, they can keep O'Neill, they

P 44

1   can enlarge it, they can blow it up, they can make it ten

2   times as big, and no one in this case can stop them.  Your

3   Honor can't.  They can do whatever they want with it.  But

4   what rights it gives them to reach upstream to Fallbrook or

5   to Vail and say, "Open your gates, Vail.  We don't have

6   enough water to fill O'Neill, and your appropriation likewise

7   is junior, just as is Fallbrook's," that right they do not

8   have.

9        To me, your Honor, this is the heart and soul of this

10   whole appropriative issue, and I believe with all my heart

11   that the fundamental intent is utterly and absolutely lacking.

12   We have only to ask ourselves the logical thing, would they

13   express an intent to do something that would have completely

14   destroyed the value of their property?

15        THE COURT:  Of course, you are considering the meaning

16   of the word "store" as if it gives no additional rights to

17   water, as if it gives only a right to handle certain water

18   which is then present.  But in this western country where

19   water flows by you and gets away, the right to store water,

20   doesn't it have a broader meaning than merely to do with

21   certain water that might come by?  It means a right to con-

22   tain that water.  You say that it is silly to talk about an

23                             right
     appropriative/to store water since they had a right to store.

24   Being the last owner on the stream, they could store anything

25   that came down.  But if there was evidence of an intent to

P && 45

store water in the sense of containing it and making it available for later use, doesn't that right reach upstream? Isn't it more than just a right to do with water that is there, but a right to have water come down to be stored for future use?

MR. SACHSE: Let me answer your Honor this way. The storage right as such is not an appropriative right at all. The mere naked storage is not a beneficial use. Storage is an instrumentality of a vehicle for putting water to beneficial use. Your appropriation to store is nothing unless, as a part of it, as an integral part of the storage -- and there is plenty of law on this -- that storage of itself is not a beneficial use unless you can graft onto it the beneficial use.

If the beneficial use he is grafting on it is one that he has already, a use that nobody can take away from him, a proper riparian use, every single thing he is using is a proper riparian right, then I say the storage, of and by itself, is not appropriative.

Take C3

I will concede, in my analysis of this, where it is conceivable that a riparian in the O'Neill shape could have done what your Honor says. I think if O'Neill had impounded in the lake as he did and had run a resort and had made an appropriation for recreational purposes, which can be done under California Law, maybe then we could squeeze one out.

P 46  1   And I have honestly tried to figure out what the appropria-

2   tion could be here.  If the uses today for their operation of

3   O'Neill as it is now conducted dated back to 1888, I wouldn't

4   argue that they have a recreational appropriation.  But I

5   don't think Mr. Veeder will argue that O'Neill made a

6   recreational appropriation.  He didn't.  There was no such

7   thing at that time.  That was the last thought in his mind.

8   And the mere act of impounding that water and thereafter

9   using it on riparian land for riparian purposes gave him

10   absolutely nothing, your Honor.

11       Does your Honor want a recess?  I will say, with that,

12   I am finished, unless your Honor would like me to give you

13   the exact cases.

14       THE COURT:  We will adjourn, say, until a quarter of

15   two.

16       (Noon recess.)

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, FRIDAY, MARCH 17, 1961 at 1:45 PM.

2         THE COURT:  Proceed.

3         MR. SACHSE:  Your Honor, I will be very brief.  Your

4    Honor is apparently not really impressed with the argument

5    about intent.

6         I would like to make one further point on the question

7    of whether or not it is possible for the Rancho to acquire

8    an appropriative right at all, and this, I suppose, relates

9    also to the intent.

10        This relates to the decision in Santa Margarita vs

11   Vail.  I speak now of the decision, and I realize your

12   Honor has told us that we are probably going to set this

13   aside, so what effect the quotations may have upon your Honor

14   I don't know, but it seems to me that they do conclusively

15   establish that Lake O'Neill was an exercise of a riparian

16   right, and was so regarded by the O'Neills.  In the reported

17   decision, 11 Cal. 2d 508, and that is at the very beginning

18   of the case, the Court says:

19        "At the outset it should be mentioned that  on this

20        appeal the questions presented for review all pertain

21        to the rights of the parties as riparians."

22        Then I am not going to cite you every example, but

23   I will take the next one in order.  We go to page 516, and

24   this same thing happens again.  There comes a long dis-

25

1   cussion about the O'Neill reservoir, the type of reservoir,

2   the use of the reservoir, how the water is put in, and so

3   forth.   In other words, the Supreme Court of California,

4   apparently, on the basis of the record in Santa Margarita

5   vs Vail, and the contentions of the parties, at all times

6   treated this as a perfectly proper riparian use, and as

7   an exercise of a riparian right.

8        THE COURT:  I think you are right, and wouldn't this

9   naturally follow:  that here was a law suit which was

10   essentially one between Santa Margarita and Vail.  Now, as

11   to Santa Margarita, the plaintiff, it would have been of no

12   use to assert against Vail an appropriative right because of

13   Vail's antecedent patenting, and therefore, Santa Margarita

14   asserted a riparian right.  Therefore, appropriative rights

15   were never put in issue, were never litigated, were never

16   considered, and no decision was written on them.

17        I don't have too much trouble with that.  Because of

18   the very nature of the law suit that was started, Santa

19   Margarita was suing Vail, and there were a few other parties

20   in there, and I don't know presently --

21        MR. SACHSE:  They were all riparians.

22        THE COURT:  Yes, but I don't know what the state of

23   their title was.  For instance, downstream from --

24        MR. GIRARD:  They were intervenors.

25        THE COURT:  Yes, they were intervenors.  They weren't

1    sued and came in as intervenors, and the Court, of course,

2    denied the request to bring in other parties, so it was

3    essentially a lawsuit between Vail and Santa Margarita, in

4    which some intervenors came into the case later.   I think

5    your statement that the decision talks only of riparian

6    rights is absolutely correct.

7        MR. SACHSE:   I think your Honor misapprehends my

8    point.   It is this:   that if Lake O'Neill is an exercise

9    of a riparian right -- Lake O'Neill is an exercise of a

10   riparian right, then we are back to the situation of where

11   it is simply an adjunct and an addition, and it is not any

12   longer considered as an appropriative right to store.

13        In its discussion of riparian rights, the Court spells

14   out in great detail the operation of Lake O'Neill, in the

15   reported decision, and not only in the findings.   In fact,

16   many of these findings I have already quoted to your Honor.

17        Now, that would conclude my argument on the question

18   of whether the Rancho could have acquired any appropriative

19   right by reason of this operation at Lake O'Neill/when I
                                                    and

20   say that/concludes my argument, I want to be very clear
         that

21   that Mr. Veeder does not misunderstand me.

22        I realize that there remains an exceedingly and

23   tremendous important question.   Assuming, and I hope I am

24   wrong, that your Honor disagrees with me and says that they

25

1    did have the right to Lake O'Neill, the next thing we have

2    to argue is, what were the rights?

3        Then we come into this vital issue of the time element.

4    What was their appropriative right despite their acts up

5    to and including 1914?

6        There is a great deal of law on the question of the

7    limitation of appropriative rights by time, even by days,

8    let alone by seasons.  So if your Honor determines  they

9    have a right, then we must determine exactly what it was,

10   -- exactly.

11       Then having determined that, I will again remind your

12   Honor of a caveat I left in two days ago.  Once your Honor

13   tells me what that right was, I intend to vigorously urge

14   that it has been lost either by abandonment -- and Mr.

15   Veeder says abandonment is legally impossible -- or by

16   operation of law.  But I cannot offer proof -- on those

17   issues I have proof, but I cannot offer proof unless I

18   know what the extent of that right was.

19       So again I will now rest my argument as to whether

20   it is possible for the Rancho to acquire a right.  I would

21   like to reserve to myself further argument on how much

22   right and what kind of a right they acquired timewise.  I

23   have stipulated to amount-wise, but timewise we have not

24   stipulated.

25       THE COURT:  What do you mean by timewise?

MR. SACHSE:  Your Honor, every appropriation has a time element; every appropriation.

In Hutchins, at page 141, he says:

"In an early case there was adopted the principle that the right to the use of a specific supply of water might be acquired by one person for certain months, days, or parts of days, and by other persons for other specified periods of time."

He cites many, many cases.

This is something that is so fundamental I don't think it is arguable.  For example, today Fallbrook has certain carriage permits which are time limited.  We can only take water under our permits at certain times of the year.

Every appropriator, even in the old mining days, in the very simplest appropriation, he diverted water from the stream to wash gold in his flume, and did it on Wednesdays. That didn't mean that the next man could not take it on Thursday, Friday, Saturday, and so on.  Each appropriation has a time element.

And Mr. Veeder himself knows very well, with the two of us sitting down together with Mr. Moskovitz and others, were working out your Honor's pre-trial order, and that pre-trial order on issues expressly states as to one of the elements that your Honor shall find on every appropriative right the time at which the appropriation was effective.

1         Now, the evidence is pretty clear.  I don't want to

2    argue the day of the month, but the Rancho diversion was a

3    summer diversion.  It was a low water diversion. Let's

4    put it this way:  maybe it started in March, maybe it

5    started in April, or maybe sometimes it started in February.

6    It was never a high water diversion.

7         The evidence is also extremely clear that the United

8    States diversion has been a high water diversion, -- always.

9    The United States has filled Lake O'Neill consistently and

10   regularly with water after the heavy run-off, which is the

11   exact opposite time of year from when the Rancho did it.

12        I don't want to get into an argument just now, but

13   this is a very complicated question, and I want some

14   evidence on it again, to refresh your Honor's recollection,

15   I think, unless the United States will stipulate as to the

16   times.  But there is no doubt in my mind that the waters

17   used by the Rancho in Lake O'Neill, the waters we are

18   discussing as appropriative rights, were summer rights,

19   low flow water.  The waters  sought to be used by the United

20   States under the Rancho right were winter waters, high flow

21   waters.  They are two entirely different appropriations,

22   in my judgment.

23        THE COURT:  Then you also have the problem of a

24   military use.

25        MR. SACHSE:  Then we have that, although appropriative-

1    wise I do not think that is of any importance, because I

2    must concede without argument that it is perfectly proper

3    to appropriate water for military use.   There is no

4    question of that.   But whether it is a proper riparian use

5    does remain a substantial question.

6                    THE COURT:  Now, tell me this:  what is your view of

7    the law as to an appropriative right for storage purposes,

8    to gather water and carry it over a period of months and

9    later use it?  Is that kind of a right possible?

10             MR. SACHSE:  Yes, your Honor.

11             THE COURT:  An appropriative right?

12             MR. SACHSE:  Yes, your Honor.

13             THE COURT:  And if they acquire that kind of a right,

14   what right is obtained?  Is it merely a right to do certain

15   things with the water, or does it carry with it a right to

16   the water itself, which is stored?

17             MR. SACHSE:  That is answered very clearly in our

18   Code.  The Water Code, Section 1706 -- your Honor asked

19   a  question  which I have to admit, but which I don't

20   like.

21             THE COURT:  That shows you are a good lawyer.

22             MR. SACHSE:  But there is no sense in not admitting

23   it.

24             The Water Code at 1706 expressly provides that:

25             "A person entitled to the use of water by virtue

of an appropriation other than under the Water

Commission Act." --

In other words, a non-statutory appropriation --

"A person entitled to the use of water by virtue

of a non-statutory appropriation may change" --

and here is the stickler --

"may change the point/diversion, the place of use,

or the purpose of use, if others behind you are

not injured, etc., etc."

So I must concede to your Honor that if the Rancho

had an appropriative right, that right was non-statutory,

and the United States, the successor in interest, could change

the place of diversion, could change the place of use, and

it could change the purpose of use.  But it can't change

the appropriation itself, and that is where the time element

come in.  The statute pointedly does not say anything about

it, that you can change the time of taking.  It does not

say you can switch from a summer taking to a winter taking.

The statute expressly limits what this man can do.  And

this is very important, your Honor, because the only

appropriator who has that privilege that I have just read

to you is the non-statutory appropriator.  The statutory

appropriator cannot change place of use, time of use, or

purpose of use without permission.

That is a little extra gravy given to the non-statutory

1    appropriator, and he is not given the privilege of changing

2    the time of taking.

3         That is why I say this time element is very critical,

4    and the time element is far reaching in water law in

5    general in the State of California, and I am sure that the

6    State would have something to say about that aspect of it.

7         THE COURT:  Now, I think I know what you are talking

8    about as to the time of the taking.

9         The evidence showed that after the heavy freshets

10   were over, and this was the old operation, and the diversion

11   dam had been filled, then it would catch the late spring

12   and summer flow, and it would stay in operation until the

13   first big freshet of the next water year washes it out.

14        MR. SACHSE:  Or until it went dry.

15        THE COURT:  Or until it went dry, and then after it

16   is washed out with the first big freshet, it wasn't

17   reconstructed until after the big floods for that year had

18   come down.  And, therefore, your argument would be that if

19   the Government had an appropriative right, it has the right

20   to take, and I am not being definite now, some time in

21   the spring and on through the summer.

22        MR. SACHSE:  Without pinning it down --

23        THE COURT:  And without the right to take the flood

24   waters.

25        MR. SACHSE:  Right, your Honor.  Without pinning

1  anybody down to a date, in March to October, something like

2  that.

3      THE COURT:  And I think that your point in this matter

4  is because of the fact that you have a right to appropriate

5  surplus flood waters, you do not want anyone interfering

6  with your right to take flood waters which would come down

7  ordinarily between, say, December and February to March.

8      MR. SACHSE:  You are anticipating, but that is not

9  at issue in Mr. Veeder's injunction request at the moment

10  but that is definitely implicit in my reasoning.

11      THE COURT:  But it would seem to me that the Government

12  would not quarrel with you on this:  the time that they

13  would want to take this appropriative right would not be in

14  the wintertime when the flood waters were coming down, but

15  it would be  from the late spring on through the summer.

16      MR. SACHSE:  I would love to hear it.

17      THE COURT:  That is when they would like to take it.

18  And, in fact, this is March, and they have requested an

19  injunction, of course, which is prospectively looking towards

20  the summer months, which are going to be dry months.

21      MR. SACHSE:  I would love to hear it.  That isn't what

22  they have done in the past.  That isn't what the O'Neill

23  diversion has been, and that isn't by the United States.

24      THE COURT:  This is what it was prior to 1914, isn't

25  it?

A 41                                                                                      13,749

1          MR. SACHSE:   In answer to your question, yes, it was

2    prior to 1914.

3          MR. VEEDER:   I don't believe, -- if I may interrupt --

4          MR. SACHSE:   Your Honor, this is fine.  This tells

5    me it was before 1914, and that I agree with.  But what I

6    am saying is that I have not yet heard Mr. Veeder say,

7    nor can I recall any testimony of Colonel Bowen, that their

8    use of the O'Neill diversion is geared to the summer months.

9    The simple obvious fact is that it isn't, and that it is

10   geared to the wintertime, and that is when they have been

11   using it.

12         THE COURT:   What they have been using since 1914 may

13   not be too important, but isn't it a fact, Mr. Veeder, that

14   if you do have an appropriative right, it is geared to that

15   time?

16         MR. VEEDER:   Yes, your Honor.

17         THE COURT:   From, say, March or April on until the

18   first big flood, when it washes out the diversion?

19         MR. VEEDER:   Precisely, and we put that in, that the

20   termporary diversion dam was placed across the river as

21   early as January and February, and in those years it was

22   placed across the river in March.  In other words, we have

23   asked the finding that whenever the end of the winter run-

24   off is would be the date when our appropriative right

25   commenced, dependent upon the precipitation of the year,

Take D-2

1    just like this year, and we claim after the winter run-off.

2       MR. SACHSE:   Now, this is fascinating to me, your

3    Honor, because it seems to me that if Mr. Veeder buys your

4    Honor's proposition, he is digging a most tremendous hole

5    for himself, because this is great, if that is what he wants

6    today.

7       But the question is, since their acquisition of the

8    Rancho -- or, the question will be:  since their acquisition

9    of the Rancho in 1942, have they abandoned or lost by non-

10    use an appropriative right, and are trying to substitute

11    therefor one that they never had?

12       The fact remains -- I don't care what he asked for

13    on this piece of paper -- the facts remains, and the evidence

14    shows, and we have the most perfect record in evidence of

15    when they divert to Lake O'Neill, because we have O'Neill

16    Ditch diversion records and gage records ever since the

17    Government has been there.  We know when they have been

18    putting water in.  And that is what I have got to learn,

19    so that I can refresh your Honor's recollection.

20       THE COURT:   When have they been putting water in, --

21    In the winter months?

22       MR. SACHSE:   They have been putting it in basically --

23    and I will ask the Colonel to correct me if I am wrong --

24    in the wet season, probably starting in January and driving

25    on through February, March and April, depending on how much

15,751

1    water was at stake.. I think that is probably correct.

2         Now, isn't that true?

3         THE COURT:  They probably were doing that because

4    there wasn't any summer flow.

5         MR. SACHSE:  That is not probably, your Honor. . I

6    would like to offer some proof on this question when we

7    get to that stage of the question.

8         THE COURT:  Let me go back to the question I asked:

9    do you concede there could be an appropriative right to

10   storage, and I don't know that I have made myself clear,

11   and I want Mr. Girard and Mr. Veeder also to think about

12   this:  if those appropriative rights exist, is that merely

13   a right to do something to riparian water, namely, store

14   it for more than just the day or two to get ahead, or is

15   it a right to take water, the appropriated water and store

16   it?  I think it is the latter.

17        MR. SACHSE:  I have expressed myself, your Honor.

18   Let somebody else express himself.

19        MR. GIRARD:  I disagree with your Honor, and I don't

20   want to disagree any more than I have to.

21        THE COURT:  I don't know that I know your position

22   then.

23        MR. GIRARD:  My position is that they have nothing

24   more nor less than a right to take and use ordinary riparian

25   water, and that is all.

1    THE COURT:  I imagine what you are saying, and what

2  you contend now, I think, is: absent that there could exist

3  somewhere a right to appropriate water for storage, this

4  must mean to take water itself and store it?

5    MR. GIRARD:  Oh, yes, your Honor.  There isn't any

6  argument there.  The right to appropriate water means to

7  take.

8    MR. SACHSE:  I will have to again agree with something

9  I don't like.  If they had a right, the California Courts --

10  and I am quoting from Pasadena vs Alhambra, the California

11  Courts use the term "Appropriation" as referring to the

12  taking of water for other than riparian or overlying use.

13  So it has to be  a taking of water for something other than

14  riparian use.

15    THE COURT:  All right.

16    MR. VEEDER:  Are you through, Mr. Sachse?

17    MR. SACHSE:  I am through with the argument on whether

18  or not you could acquire a right, yes.

19    MR. VEEDER:  Your Honor, the question arose as to

20  intention, and I think that the matter of proving intention

21  is well taken care of in a citation in Wiel on Water Rights,

22  Volume 11, Third Edition, page 412.  It says:

23    "How is intent shown?" --

24    That is the intent to appropriate --

25    "First, of course, from the notice, but it may be

drawn also from the appropriator's acts, the manner
in which they work; in general, the general size
of the ditch, etc.   "--

Which is a part of the quote --

"It becomes then the duty of the court to try the
question of the claimant's intent by his acts."

Now, that seems to me to be the specific statement
of the law covered by the general axiom of the law that
every sane man is presumed to intend the ordinary, natural,
probable or necessary consequences of his voluntary,
intentional and deliberate acts.

In other words, I believe the facts to which Mr.
Sachse stipulated today are the facts which would constitute
an investiture in the Government by reason of its succeeding
to the rights of the Rancho Santa Margarita of a right to
divert from the Santa Margarita River and to impound water
up to the eleven hundred acre feet.  And I think it is
clearly shown that water was diverted into Lake O'Neill, and
Lake O'Neill was filled, and that in the summer months that
water thus stored was used.  And I believe that your Honor
would be fully warrented in finding that the course of
conduct agreed to and stipulated to today evinces an
intention on the part of the Rancho Santa Margarita to
appropriate water -- I beg your pardon -- to appropriate
rights to the use of water.

1    What did it do?  Shortly after, or right at the time

2  that the winter run-off ceased, if there was any winter run-

3  off, the predecessor in interest constructed a diversion

4  dam and diverted all of the surface flow.

5    It is our contention that it diverted all of the

6  surface flow up to   20   second feet  because that was

7  the maximum capacity of the structure.  So you have the

8  one element essential.  You have the element of the max-

9  imum capacity in cubic feet.  We could not claim above

10  that flow, in our view.

11    Then they said upon the stipulation, we have the

12  maximum storage capacity for carry-over in later use of

13  eleven hundred acre feet of live storage, and one hundred

14  acre feet of dead storage.

15    The California Court in 80 Cal. 397, De Necochea vs

16  Curtis, says in regard to the validity of appropriation:

17

18    "It was sufficient that the water was actually

19    appropriated and used for the intended purpose

20    before anyone else intervened or claimed a right

21    to use it."

22    That was prior to any statute at all in regard to the

23  appropriation of water.  So I think it naturally follows,

24  your Honor, that you can find the intention based strictly

25  upon the activities of the Rancho Santa Margarita, and I

    believe that there would be an investiture there of a right

1    in real property.

2         I further refer in support of our contention that an

3    intention is proved by the acts of the parties by referring

4    to Hutchins, pages 86 and 87.  There it says:

5         "Although it was customary in mining areas and

6         in some other portions of the State to post

7         notices of proposed appropriation, such rights

8         could be initiated by other acts that manifested

9         the intention of the appropriator in such manner

10        as to put a prudent man upon inquiry, such as

11        surveys, stakes, blazing of trees, and actual

12        construction of works, as well as notice."

13        I don't believe there is any doubt that the act of

14   constructing the earthen embankment demonstrated an

15   intention to impound and store water.

16        I don't believe I need to labor that proposition any

17   further.  I think it is quite elementary, in view of our

18   agreement that water was actually stored.

19        It is also clear in my view that the water was stored

20   in the spring of the year, when it was in excess of that

21   which could be applied beneficially, that is, during the

22   normal year.  If they impounded during the month of March,

23   it would be antecedent to the normal irrigation  season,

24   so what they did was, as we discussed this morning, divert

25   all of the water that was required to fill the dam, make

the reservoir to the full twelve hundred acre feet capacity, and when the stream had fallen to such a point that water could no longer be used directly from the stream, it was then released from the reservoir.  The seasonal storage we believe thus established the appropriative right.

We believe that when the United States of America purchased that right, it succeeded to this kind and type of usufructory interest in the Santa Margarita River.

We acquired the right of the riparian to have the water flow down to us, but in addition we acquired the right as against all subsequent appropriators.  That is the right to demand that after the winter run-off, the high winter run-off had ceased, we could take and divert up to a maximum of    .20  second feet, all of the water in the stream until we had accumulated a full reservoir.

Now, that is a right, and it is a right which cannot be interferred with.  It is a right, in our view, of insisting that no one could possibly claim that we were not making a beneficial use of the waters thus diverted and stored. The riparian use is a use of almost immediate diversion and application.

It is true that you can impound waters for twenty four or forty eight hours to build up a head.  You cannot store long term, as was demonstrated by the practices of the Rancho Santa Margarita, and I believe that the true value

1    of the storage right, the true value of the storage right

2    of the Vail Company, is that it can demand that after its

3    date of priority no one above it interfere with the surplus

4    waters over and above the immediate demand or the riparian

5    who has rights prior and paramount to Vail Company's storage

6    right.

7         THE COURT:  Your appropriative right, if you have one,

8    would not be effective as to Vail, would it?

9         MR. VEEDER:  Our appropriative right, if we had one,

10   would be effective  -- well, I don't follow you.

11        MR. GIRARD:  The Vail Dam would be junior, but not

12   the riparians.

13        THE COURT:  Not the riparians.

14        MR. VEEDER:  Their 1946 priority would be much later

15   than 1883.

16        THE COURT:  Oh, yes.  But you would not affect their

17   riparian rights in your appropriation --

18        MR. VEEDER:  Not at all.

19        THE COURT:  -- because their patents antedate  you.

20        MR. VEEDER:  That is right.  Now, here is an additional

21   factor:  one of the elements of appropriative rights your

22   Honor has already touched upon.  When are we entitled to

23   exercise this right?

24        We cannot change the period of the diversion and

25   storage of water to place a greater burden upon the stream

1        than that which we succeeded to.

2              I believe the evidence is very clear that while it

3        was not what you would call a low water right, in the sense

4        we didn't have the right to impound until June or July, it

5        was this kind of a right, that when the winter rains were

6        over and a temporary diversion that could divert up to 20

7        second feet would stay in the river, then that measured

8        our appropriative right.

9              Now, I don't know, your Honor, what additional factors

10       or statements you want from me on this point.  I think these

11       points have all been covered.  I have cited to you the cases

12       which I think are governing the first storage right with

13       which I am acquainted, which is Rupley vs Welsh.

14              THE COURT:  Where did you cite these cases now?

15              MR. VEEDER:  Those will appear on the findings that

16       I prepared.

17              THE COURT:  In the proposed findings?

18              MR. VEEDER:  In the proposed findings.  I went back

19       to the earliest dates I could find for the purpose of show-

20       ing that a man could build a dam and store water for

21       agricultural purposes, and he would take the water while

22       it was in the stream, when he couldn't use it at the time,

23       when it was there, and he would back it up and release it

24       onto his lands, and he had an invested right in real

25       property, recognized and sustained by the laws of the State

1    of California.

2    THE COURT:  Have you finished on the appropriative

3    end of it?

4    MR. VEEDER:  I have nothing more on that, your Honor.

5    THE COURT:  I would like to hear Mr. Girard's view

6    on this.

7    MR. GIRARD:  Well, I think my views are going to be on

8    some things parallel to Mr. Veeder, and on some things

9    parallel to Mr. Sachse.

10    In the first place, I don't think it can be contended,

11    and I think Mr. Sachse is correct in his position of

12    yesterday, that a seasonal storage, such as is shown

13    the Rancho practiced, is a proper riparian use.  It has

14    to be a non-riparian use.

15    Then Mr. Sachse makes the contention that because the

16    United States is the downstream user, and that they were

17    permitted to store this water, not on the basis of a

18    riparian right, but on the basis that no one was in a

19    position to complain, that they thereby are not in a

20    position where they can acquire an appropriative right.

21    I don't agree with that statement for two reasons,

22    or one reason basically, the one reason being that the

23    appropriative right that they acquired under appropriation

24    would be a right which ran upstream and could be asserted

25    against upstream           people.  For example, Gibbon and

1  Cottle, as I recall yesterday, and I think Mr. Grover cited

2  quite a few cases on it, they had a pre-1914 appropriative

3  right, or asserted a pre-1914 appropriative right.

4      Now, if you assume that that right was a storage

5  right, which it wasn't, but assume that it was at that

6  stage, certainly any upstream owner as against Gibbon and

7  Cottle would not have been able to prevent Gibbon and

8  Cottle from storing water, under the doctrine that whatever

9  got down to Gibbon and Cottle they could put in a reservoir.

10     Now, downstream people could have objected, but

11 upstream people couldn't object.  I think the same situation

12 is true when you go/the last owner on the stream.  Merely
       to

13 because there are no downstream people to object does not

14 permit the downstream owner, such as the United States in

15 this case, to acquire an appropriative right which can be

16 asserted against junior upstream users.

17     I think, as pointed out by Mr. Sachse, the changes

18 in uses by the United States from irrigation to other uses

19 are certainly permitted  under Water Code Section 1706.

20     Mr. Veeder apparently conceded that the time of

21 actually taking the water would be, in so far as his right

22 is concerned, the same that the Rancho had when they

23 acquired their right in 1914, or the right the Rancho had

24 in 1914.

25     Now, as I understood Mr. Sachse's position -- and he

Take D-3

1   can correct me if I am wrong -- his position was, as I

2   understood it, all right, if you conclude that in 1914

3   an appropriative right existed in the Rancho, that he was

4   going to attempt    by evidence to show that the practices

5   after the year 1914 have destroyed that right either

6   through non-use or abandonment.

7   I am not going to comment on that because I think it

8   will be premature until we see what Mr. Sachse's evidence

9   is.  But I think the record would sustain an appropriative

10   right, non-statutory, in O'Neill as of 1914, and the

11   priority date, of course, would relate back to the 1883

12   date, which is the date which your Honor has to set, too.

13   But if Mr. Sachse's argument is correct, that merely

14   because you are permitted to do this because you don't hurt

15   anybody, then in no case would a person be able to acquire

16   an appropriative right which would run upstream.

17   THE COURT:  That is really the distinction in one

18   sense between the appropriative right and the prescriptive

19   right?

20   MR. GIRARD:  That is right.

21   THE COURT:  Anything further on this?

22   MR. VEEDER:  The United States has nothing further,

23   your Honor.  We can have the matter submitted.

24   MR. STAHLMAN:  I have nothing on this, your Honor.

25   However, when it comes to this matter:  if your Honor does

1    determine the question of time, I think that is going to

2    raise some problems for us unless it is determined   at the

3    time of the judgment on it.

4         THE COURT:  My inclination is to find that there is

5    an appropriative right for storage, limited to the filling

6    of Lake O'Neill, which would be eleven hundred acre feet

7    ordinarily, or twelve hundred acre feet if it was entirely

8    empty. That as of 1914 this right timewise was generally

9    after the rains in the spring, as the evidence shows in

10   March or April is when they would ordinarily put it in,

11   when there was ample water in the stream and at a time

12   when it   wasn't particularly needed for irrigation.  It

13   was retained in the Lake and was used in the dry season.

14        Now, if there is any dispute about the point of

15   diversion, or the place of use, which was in the Chappo

16   Valley, Chappo sub-basin -- was it all in the Chappo sub-

17   basin?

18        MR. SACHSE:  The use, your Honor?

19        THE COURT:  Yes.

20        MR. SACHSE:  No, I think it was both Chappo and some

21   in Ysidora, as I understand it, was it not?

22        MR. VEEDER:  The use?

23        MR. SACHSE:  By the Rancho   extended to Ysidora.

24   I don't think it is terribly important because the same

25   use is not being made today, and they can change it.

1    THE COURT:  And at the flume, of course, -- I think

2   Mr. Veeder  is correct about that -- limits the maximum

3   amount that can be taken at any time.

4        I would propose that you prepare some findings along

5   that line.

6        Now, we have never finished going over these con-

7   clusions.

8        MR. SACHSE:  I think your Honor expressed

9   conclusion of law when you said they have an appropriative

10  right.  The only problem is how are we going to write up

11  some of these limiting factors that are involved into

12  language?

13       MR. GIRARD:  Of course, just because the Rancho had

14  it in 1914, and I do not take a position on it, but I want

15  to make clear what I understood Mr. Sachse said.  It was

16  my understanding that he said that even if the Rancho had

17  it in 1914, that if your Honor concludes that, that it was

18  his opinion that the use by the United States was of a

19  type that resulted in the destruction of the appropriative

20  right.

21       MR. SACHSE:  That is correct, your Honor.

22       MR. GIRARD:  And that he wanted to introduce evidence

23  on that.

24       THE COURT:  That is an issue we will have to come to.

25  In other words, I am not passing on that.

1      MR. GIRARD:  I don't say that I agree with him, but  --

2      THE COURT:  And I didn't understand that Mr. Sachse

limited himself to only a contention that the United States

by its conduct had lost the right; that it was the things

that happened by any owner of it after 1914, --

6      MR. GIRARD:  Yes.

7      THE COURT:  -- which would mean use by the Santa

Margarita itself, or non-use, plus the military use or

non-use.

10     MR. SACHSE:  In other words, again, I think we

understand each other, but what I am saying, accepting

your Honor's ruling, and this isn't the first time I have

been ruled against, it seems to me we have to come up with

a set of findings that say as of December 14, 1914, or

whatever the critical date is, the Rancho Santa Margarita

was the owner of a certain appropriative right.

17     THE COURT:  Without prejudice to further evidence

and further argument as to what thereafter happened to the

right.

20     MR. SACHSE:  Exactly, your Honor.

21     THE COURT:  Do you understand that, Mr. Veeder?

22     MR. VEEDER:  Your Honor, I think I heard what you

said, but I don't quite understand it.

24     Is Mr. Sachse now asserting that he desires to put

in evidence to show that the Rancho had lost the right?

1    THE COURT: Mr. Veeder, from the beginning of this

2    discussion Mr. Sachse made it clear to you that he had

3    evidence to present, and the Court said it would hear the

4    evidence, but you said, "I do not think it is appropriate

5    to present the evidence until the Court has ruled on the

6    question as to whether in 1914 there was an appropriative

7    right." And then he said, as I recall, "If the Court so

8    rules, I propose to show by evidence that the right no

9    longer exists."

10    MR. SACHSE: Evidence and argument, your Honor. In

11    other words, it is partly legal and partly evidentiary.

12    THE COURT: And I talked about it, or I made the

13    remark that it was sort of a confession and avoidance, that

14    he wasn't confessing that the right existed, but if the

15    right existed, then he reserved the right to offer evidence

16    that something else had happened to that right, and I

17    expect to give him that opportunity. You heard this. You

18    were here. This was the basis on which the discussion

19    proceeded.

20    MR. VEEDER: Well, your Honor, --

21    THE COURT: And I would propose that we go ahead with

22    the preparation of an interlocutory judgment. Maybe we

23    will later change our mind and put in what happens at our

24    hearing, but there is no reason why an interlocutory

25    judgment could not be entered that as of 1914 -- a finding

1   that this right existed, without prejudice to the receipt

2   of additional evidence and argument as to whether that

3   right continues to the present.

4        MR. VEEDER:  Your Honor, we are very interested in

5   the pumping upstream right now by the Fallbrook Public

6   Utility District, and I believe we have shown that we are

7   being irreparably damaged by it, and if we have an

8   appropriative right I think that we are entitled to have

9   Fallbrook enjoined as of now.  That matter is pending before

10  your Honor, and this idea of introducing evidence later

11  would preclude us, I assume, on the proposition of our

12  motion for an injunction.

13       THE COURT:  It might.  It might if your motion was

14  to be based upon an appropriative right which has only been

15  decided up to 1914.  If the injunction was predicated upon

16  a riparian right, it might or it might not.

17       MR. VEEDER:  Your Honor, I don't know if this is

18  the appropriate time or not, but I renew the request for

19  an injunction on both our riparian rights and upon our

20  appropriative right for this reason --

21       THE COURT:  Now, we agreed we would hear you this

22  afternoon on this matter, and I might as well   inform

23  you now that I am not going to issue any injunction today

24  based upon an appropriative right which has only been

25  argued as of 1914, and on which counsel expressly reserved

1    the right to put in additional evidence as to whether it

2    continues down to the present, and the matter is not so

3    pressing that you are entitled to relief on that score,

4    and that relief early in April would not be as good as

5    on the 17th of March, and we will proceed that way.

6          MR. VEEDER:  I dislike to argue the issue with your

7    Honor on that, but I do believe that the evidence will show

8    that every acre foot of water that is diverted above us now,

9    and taken out of the watershed, taken out of the stream

10   above us, causes irreparable damage to that extent, and I

11   believe  Colonel Bowen would testify to that for sure, and

12   any pumping now --

13         THE COURT:  Are your prepared now to proceed to argue

14   your request for an injunction?

15         MR. VEEDER:  Yes, I am, your Honor.

16         THE COURT:  All right.  Then I will hear you.

17         MR. VEEDER:  The United States of America, your Honor,

18   has introduced evidence, which I believe is not contested

19   here, that it needs as of this moment to meet its riparian

20   rights -- I mean, to meet its riparian needs a minimum of

21   ten second feet a day.

22         Colonel Bowen testified to that yesterday, and I heard

23   no cross examination in particular on it, and no evidence

24   has been offered in rebuttal on that claim.  I believe it

25   is a very reasonable claim.  I believe it is a very realistic

claim.

We are in this  position, your Honor, of asking **only**
that the Fallbrook Public Utility District refrain **from**
diverting these waters out of the creek, Santa Margarita
River, above   us, because we are confronted now **with a**
grave need for water to meet the lowering of the ground
water table.

Now, anticipating to a degree the assertions that
are being made that we are diverting water out of **the**
watershed, and therefore we should not be allowed **any**
injunction I refer to the fact, your Honor, that we **are**
living today off of water that was impounded **from the**
high run-off in 1958, and by the conservation practices
that we have followed most assiduously on the Camp by **putting**
every drop of water underground as rapidly as it came to **us.**

**Take E
follows**

P &£ 47

1      Moreover, we have been returning to the ground water basin

2      approximately -- well, over 2,000 acre feet of water a year.

3         Now, we should not be prejudiced, we should not be

4      required to experience irreparable damage and be required to

5      trade an acre foot of sewage for an acre foot of fresh water.

6      We believe that had it not been for bringing the sewage

7      effluent into the ground water basin the need for injunctive

8      relief would have occurred much sooner.  I believe that your

9      Honor will agree, based on the hydrographs that are in evidence

10     in this case today that there has been continuous depletion

11     of ground water and that it is a natural consequence where

12     water must pass out to the ocean as part of our barrier.  I

13     don't believe a scintilla of evidence, I don't believe there

14     is any basis for assuming that the meager quantity of water

15     that would flow down past the diversion works of the Fallbrook

16     Public Utility District is anywhere near the full riparian

17     use that we could actually and validly claim against Fallbrook.

18     I believe, moreover, that it is clear beyond question, based

19     on the record in this case, that the diversions through the

20     Sawday pump are themselves invalid and are not in accordance

21     with the licence that has been issued.

22        I believe, your Honor, turning now strictly to the Lake

23     O'Neill right, I believe that if you should declare that

24     there has not been an abandonment of the appropriative right

25     by the Rancho Santa Margarita or even by the United States,

P 48

1    we would still be entitled as a riparian owner, to have

2    water to come into Lake O'Neill.

3        THE COURT:  Now Mr. Veeder, I don't want to interrupt

4    your argument, but I would like to have you address yourself

5    to the things that worry me about this.

6        MR. VEEDER:  I want to do that, your Honor.

7        THE COURT: I have no doubt -- I don't know whether we

8    have it in the record yet or not -- but that this year has

9    been a very dry year, one of the driest I have ever known

10   in my lifetime in Southern California, and it doesn't look

11   like we are going to get any appreciable amount more of rain.

12       MR. VEEDER:  I think the evidence will support that.

13       THE COURT:  And so we have had a situation where there

14   have not been flood waters coming down to recharge the basin

15   of the United States, and there is a small amount of water --

16   it is still spring -- running down.  A certain amount of it

17   is being pumped by Fallbrook, and it only can be taken by

18   Fallbrook on the theory that it is surplus under its permit,

19   an appropriative right which is subject to the Government's

20   riparian right.

21       However, the thing that bothers me is the matter  of the

22   pumping of water from the basins outside the watershed, from

23   Ysidora, and the pumps have been, of course, I understand,

24   moved up further now.  I understand that 680 acre feet are

25   pumped there and a larger amount pumped out, I take it, from

P 49

1    further up in the basin, for military uses outside the water-

2    shed.

3        Now, can a riparian who has substantial riparian rights

4    pump water out of a stream system -- and your basin is part

5    of the stream system -- and deprive yourself of this water

6    which would be in the basins, and then come into court and

7    say, "Now, we are short of water.  Therefore, we want water

8    which is being taken by the appropriator to come down and

9    fill our basins"?  This is what bothers me.  Had you not

10   pumped out -- what is the total for last year?  Six hundred

11   eighty plus?

12       MR. SACHSE:  The total is something like 2,000.

13       THE COURT:  Twenty-six hundred for miltary uses; is

14   that right?

15       MR. VEEDER:  That is correct.

16       THE COURT:  And 680 --

17       MR. SACHSE:  For agricultural.

18       MR. VEEDER:  Thirty-two hundred roughly.

19       MR. GIRARD:  Roughly a thousand more than their sewage

20   return.

21       THE COURT:  I get 3280.  Your sewage return was about

22   3,000.  Or was it that much?

23       MR. SACHSE:  About 2,000.

24       MR. VEEDER:  Between 2,000 and 3,000, your Honor.

25       THE COURT:  And now you come in and say, "We want

P 50

1    injunctive relief."  Now of course I see your part of it.

2    The decision to empty Lake O'Neill was made last fall before

3    the rainy season.  No one, I think, would reasonably con-

4    template that we would have as dry a year as we did, and

5    knowing the Colonel and having respect for his abilities

6    and having seen how he has husbanded water on the reserva-

7    tion, I certainly can't even have the faintest thought that

8    he used any bad judgment.  I think he has done a terrific

9    job on the reservation.  This decision was made last year

10   and, of course, it has been a continuing decision to pump

11   the water out of the watershed.

12        Now again, what is going through my mind, as to whether

13   the fact that 2,000 acre feet of this is restored in the

14   way of effluent to the basins is ipso facto an answer, at

15   least to the extent of 2,000 acre feet.  I have some trouble

16   with that.  I sort of have a feeling that once riparian

17   water has been used and become sewage, that as sewage it is

18   no longer riparian water, and that if the military had desired,

19   for instance, to pump the sewage out into the ocean I don't

20   think anybody could say they were making an improper use of

21   riparian water.  Because the water has been used -- it has

22   become sewage.  I don't think it was any longer riparian

23   water.

24        But of course the Government is taking a most reasonable

25   position in saving this water and returning it to the basin

P 51

1   as affluent.  I have often wondered why, in view of the

2   installations built outside the watershed, in view of the

3   ruling of the court -- which I can't conceive any court would

4   upset -- that you can't demand riparian water for use out-

5   side the watershed, some thought might not have been given

6   to have built some sort of plant where this sewage could

7   have been reclaimed and better treated so that the sewage

8   itself, the water therefrom, be used for this exportation

9   outside the watershed for military uses.  I don't think

10   anybody could complain in that situation.  Maybe what you

11   have done is the equivalent of that.

12        MR. VEEDER:  I think it is, your Honor.

13        THE COURT:  Maybe it is the equivalent.

14        MR. VEEDER:  I think it truly is.

15        THE COURT:  But we still come back to the fact that

16   you exported 3280 acre feet outside the watershed.  You have

17   put back in 2,000 acre feet, you have used, therefore,

18   riparian waters outside the watershed, and now you seek the

19   aid of equity to have water come down to take care of your

20   shortage.

21        MR. VEEDER:  But your Honor, that is not what we are

22   asking here.  The quantity of water that Fallbrook is taking

23   out is water that is in the stream, to which we certainly

24   are entitled as riparian owners to have flow down to us

25   during this time of the year, whether we pumped outside the

P 52

1   watershed or not.  What difference does it make, your Honor,

2   from our standpoint or from Fallbrook's standpoint, that we

3   are in need of riparian today?  The water that we pump out

4   of the watershed was water that they couldn't have handled

5   and had no right to whatever.  It was water which flowed

6   down during the wintertime that went into our basin.  And

7   you will find, your Honor, that from 1958 to 1961 the water

8   that we have been living on were the full basins in 1958.

9   Certainly Fallbrook didn't have any right to that.  And that

10  water having reached our enclave you, yourself, have said

11  that no one can restrict you from using it outside the water-

12  shed.

13       THE COURT:  That is right.  But you have missed my point.

14       MR. VEEDER:  No, I haven't, your Honor.  I see your

15  Honor's point.

16       THE COURT:  Get to it.

17       MR. VEEDER:  Here we are now claiming, based upon

18  indisputable evidence, that our riparian demands today are

19  equal to 5 second feet, wholly and entirely aside from the

20  uses outside the watershed.  If I contemplate your Honor's

21  approach, you are in substance saying, "You forfeited to

22  Fallbrook Public Utility District your riparian rights to

23  meet your riparian needs because you pumped water out of the

24  watershed."  And I respectfully submit, your Honor, that

25  that is not a logical sequitur.

P 53

1    THE COURT:  I am not talking about any forfeiture.  I

2    am talking about your seeking the aid of equity.

3        MR. VEEDER:  Isn't it the same thing?

4    THE COURT:  The water in your basins, as well as the

5    water that is flowing down that stream, is riparian water.

6    You can't separate the basins from the flow and say, "We

7    are only looking at the one.  We are only looking at the

8    flow coming in.  Forget about our basins, because that is

9    already down there.  We can do as we please."  Your basins

10   are part of the stream system.  It is riparian water.

11       Now, can you export water outside the watershed and then

12   claim that your basins are lowered, namely, that your riparian

13   water is now short, and then predicate upon that a claim to

14   terminate the use by a licencee of water that is being taken

15   under appropriation?

16       MR. VEEDER:  But your Honor, I am trying to make this

17   point to you, that the waters in our basins today, sure it

18   may have been riparian water coming down three years ago.

19       THE COURT:  You mean it is not riparian today?

20       MR. VEEDER:  Well, your Honor, we had the right to have

21   that come down to us and it went into our basins and we had

22   the right and the benefit of it.  Surely we are not going to

23   be precluded, three years from now, for water that enters

24   our basins today.  The riparian right is a day to day momen-

25   tary right which we have, and that momentary right is the

P 54

1    right to have it flow down to us if we can apply it to

2    beneficial use, and most assuredly we can apply it to bene-

3    ficial use.  That is the whole thing I am urging on your

4    Honor today.

5       THE COURT:  Go ahead.

6       MR. VEEDER:  I don't see that there is any need --

7       THE COURT:  Let's be quiet now.  Go ahead.

8       MR. VEEDER:  The point that I make, your Honor, is that

9    this momentary right of a riparian -- I'll not get angry,

10    your Honor -- this momentary right of a riparian, that is,

11    the right to have the water flow down to us surely is measured

12    by the ability to use that riparian water today.  Suppose we

13    had a surface reservoir that was full of water down there.

14    Do you mean to say that we couldn't demand to have the ful-

15    fillment of our riparian right, too?  Does anyone purport

16    to say that we don't have the right to have that water in

17    the basin down there now?  We most assuredly do.  And having

18    that right in the basin, I assure your Honor that we can

19    still say, "We have another right.  We have that right to

20    3, 4 or 5 second feet that is flowing in the river today to

21    meet our riparian demands today."  If we don't have that

22    right, then what do we have?  Do we sacrifice it?  Is it

23    gone?  I don't think so.

24       Your Honor has written an opinion to the effect that

25    the water having reached us we can use it.  I think there

P 55

1   has to be two sides to each of these coins, your Honor.

2   Either we don't have the right in the basin, or we do have.

3          THE COURT:  Again, I am asking for help on my dilemma.

4   I am definitely sympathetic to your position.  I am trying

5   to get some lawyer-like help in the matter.  If you will

6   pause a moment and let me proceed with something else going

7   through my mind and see if I can get an analogy.

8          MR. VEEDER:  All right.

9          THE COURT:  Let us assume that here is a property owner

10  upstream who has a riparian right on the stream, and let us

11  assume, for argument, that he has a good sized reservoir

12  full of water, and he has a neighbor who lives right over

13  the divide and the neighbor is in trouble for water, and the

14  land owner says, "Well, put a pipe on the end a tractor,

15  run it down to my reservoir and pull out what I have in my

16  reservoir."  And this is done -- it is pulled out of the

17  watershed.  The owner now is asking to use his riparian right

18  to the water flowing in  the stream against an upstream

19  appropriator, and the appropriator says, "Well, you had a

20  whole reservoir full of water.  You gave it away to a fellow

21  outside the watershed."  Query:  Is that any reason why we

22  should deny to this riparian owner the right to his reasonable

23  use of water flowing in the stream?

24          This example is in your favor.

25          MR. VEEDER:  I think that it is perfectly proper, because

P 56

1  you would add one more thing to that reservoir that was

2  filled, as in the case of our basins, Fallbrook was not in

3  the position and could not use the waters that charged our

4  basins, the waters which are now being pumped out of the

5  watershed.  They were not in a position and did not undertake

6  to use that water.  So that water has reached us and it is

7  in our basin and we take advantage of it.  We husband that

8  water very carefully and we have been most assiduous, as I

9  said before, in how we have used our water.  We are not

10  making unreasonable demands.

11      Now we are in this position, that we certainly should

12  be permitted to take advantage of that water that came to

13  us in 1958 and, at the same time, to conserve that water by

14  using our riparian rights of today to meet our demands.

15  There is certainly nothing inequitable about it.  And the

16  thing that concerns me grievously, and the situation with

17  which we are now confronted, your Honor, is that there is

18  no showing that Fallbrook could have used that 1958 water.

19      Now Fallbrook is using water, the subject matter of

20  which is our riparian rights that are being adjudicated here.

21  That yield of water is the subject matter of this case.  We

22  have asked injunctive relief to preserve that subject matter,

23  the res or the subject matter in the case, and we are saying

24  that it is being destroyed as of this moment by the Fallbrook

25  Public Utility District, that is, it is being taken out of

P 57

1    the stream above us.  So when we are denied a relief that

2    we ask, and to which I truly believe we are entitled because

3    we are experiencing irreparable damage today -- as Colonel

4    Bowen has indicated, for each acre foot that is taken out

5    -- we are in this position:

6        THE COURT:  You see, you talk about this irreparable

7    damage you are suffering because you are losing 10 acre feet

8    a day, and at the same time you must, therefore, have

9    irreparably damaged yourself by pumping out of the watershed

10   3280 acre feet last year.

11       MR. VEEDER:  But your Honor, the point that I make is

12   that that water came down to us.  We put it under ground.

13   I don't believe you would deny that we have the right to use

14   it once it gets to us.  And that is all I am saying, that we

15   do have a riparian right.

16       THE COURT:  Maybe I should look at it as of the present.

17   An injunction speaks as of the hour it is issued.

18       MR. VEEDER:  And in futuro.

19       THE COURT:  And in futuro.  And in that sense, what do

20   we have?  We have a riparian who, in a very dry year, demands

21   the right to use the little bit of riparian water coming

22   downstream.  And on the other side we have an appropriator

23   whose rights are junior to those of the riparian, who says,

24   "No, I have an appropriative right, and even though you have

25   a riparian right because you were a bad boy in the past you

P 58

1   can't interfere with my use."

2        Maybe I am guessing at Mr. Sachse's position.  Why don't

3   we take a short recess and let him tell us what his view is,

4   and Mr. Girard.

5        (Recess.)

6        MR. VEEDER:  There was one additional point that I would

7   like to make, your Honor.  I alluded to the fact that

8   Fallbrook was violating its licence No. 4906 at the present

9   time.  It is surely clear that it is not authorized to change

10  the point of diversion and place of use of the water as

11  spelled out in that licence.  The Sawday diversions, as I

12  emphasized, are clearly violative of that claim.  So if they

13  undertake to invoke equity against us under these circumstances,

14  I don't believe they can rely upon an illegal right of the

15  nature that they are here asserting.

16       I have nothing further on that point, your Honor.

17       MR. SACHSE:  If it please the Court, first on this last

18  point of Mr. Veeder's, I would, under no circumstances,

19  concede that we have changed the place of use.  The place of

20  use is described -- Colonel Bowen read it to you -- as being

21  within the quarter of a quarter a certain number of feet

22  distant from so and so.  The Sawday pump is within a hundred

23  yards or less of our own pump.  It is no more a change of

24  point of diversion than to push a pump back and forth from

25  one side to another of a small sump in a stream.  That is

P 59

1    what it is.  If that were a material or a serious issue, if

2    your Honor were really concerned about that, I would simply

3    say to your Honor it would be utterly unjust to grant an

4    injunction on that basis.  Instead give me thirty days to

5    get a permit from the State of California.  There isn't the

6    slightest question that that permit would be granted instan-

7    ter.

8        But I would like to get to the merits of this, if I

9    may.  Either Mr. Veeder hasn't read, or he doesn't want the

10   Court to remember, one of the milestone cases of water law

11   in California and the 1928 Constitutional Amendment.  So a

12   little history might not be out of order.

13       In the case of <u>Herming Haus vs Southern California Edison</u>,

14   which was the last of a long line of cases, in the case of

15   <u>Lux vs Hagen</u> and others,  the court for the last time --

16       THE COURT:  The citation?

17       MR. SACHSE:  It is so well known, your Honor.  I can

18   give it to you in one moment.

19       THE COURT:  It is in the briefs in many places, but it

20   will be useful if we have it here.

21       MR. SACHSE:  200 Cal. 81 (Certiorari Denied 275 US 486).

22   That was the last case in which the California Courts recog-

23   nized the rocking chair theory of riparian rights; that the

24   downstream riparian had the right to the full and uninterrup-

25   ted flow of the stream at all times regardless of what he did

19,781

P 60

1   with the water.   In 1928 the Constitutional Amendment was

2   passed, with which your Honor is familiar.

3       Immediately thereafter the case of <u>Tulare vs Lindsay</u>

4   <u>Strathmore(3 Cal. 2nd 489)</u> -- both these cases are very

5   applicable to our facts here -- and at about the same time

6   <u>Chin  Chow vs Santa Barbara</u> (217 Cal. 673) were decided,

7   and those two cases and many others once and for all put

8   the quietus on this rocking chair theory of riparian rights.

9   And I know of no better quote than the statement taken from

10  the case of Lindsay vs Strathmore, found in Hutchins on page

11  279:

12      "It is clear that when a riparian brings an action

13      against an appropriator it is no longer sufficient

14      to find that the plaintiffs in such action are

15      riparian or overlying owners and on the basis of

16      such finding issue an injunction.   The trial court

17      must now determine whether the complaining or over-

18      lying owner, considering all the needs of those in

19      the particular field, is putting the water to reasonable

20      beneficial uses, giving consideration to all factors

21      involved, including methods of use and methods of

22      diversion.   The court then must determine whether

23      there is a surplus in the water field subject to

24      appropriation.   As to future or prospective bene-

25      ficial uses, the court does not attempt to fix in

Take E3

P 61

1    advance the quantity needed, but declares such

2    prospective uses paramount to any right of the

3    appropriator by which the rights of the riparian

4    owner will be fully protected against the possible

5    ripening of the adverse appropriative right to a

6    use by prescription。  But the appropriator in

7    the meantime (I am paraphrasing at the end) is

8    not subject to injunction。"

9    It is stated much more succinctly in another case:

10   "Before one can evoke the power of a court of

11   equity to restrain a diversion above his lands,

12   it is necessary for him to show (1) that there is

13   a wrongful diversion of water above such lands,

14   (2) that the amount wrongfully diverted would be

15   rightfully used by him, and that the water is

16   being used or would be used for reasonable and

17   beneficial purposes。"

18   Now please observe, there are two things that he must

19   show about his own situation:  (1)  That the amount wrong-

20   fully diverted would be rightfully used by him, and reasona-

21   bly and beneficially。  Now I might concede -- I will not,

22   but I might concede -- that Mr。 Veeder's riparian use outside

23   the watershed is reasonable and beneficial.  I might。  I am

24   not doing it。  But I will never concede that it is rightful。

25   Your Honor has cleared that up and, as you said a moment ago,

P 62

no court will reverse you.  Before he can invoke the power

of a court of equity, he must show that the amount wrongfully

diverted would be rightfully used by him.

Now there is the first absolute stumbling block on the

position taken by Mr. Veeder.

THE COURT:  Is there any doubt that 125 acre feet,

which might come in within the next couple of months, could

be rightfully used as riparian uses?

MR. SACHSE:  There is no doubt that it could be.  There

is considerable doubt that it would be.

Let me put it to you very simply, your Honor.  I don't

think you can grant an injunction under any circumstances

for another reason that I will advance in a moment.  But if

you granted one, I think the only circumstance under which

you could do it would be a conditional injunction and say,

"Mr. Veeder, I will issue an injunction against Fallbrook's

diversion which will immediately become operative the moment

you cease diversion of waters outside the watershed."  That

you might be able to do, absent one or two other factors

which I am going to mention which I think would prevent

even that.  But you have no right to grant an injunction as

long as it is admitted by the United States that the water

that comes down to them will be wrongfully used.  No single

ten acre feet in any day is used entirely in the watershed.

Colonel Bowen says that the ten acre feet is for the military

P 63

1    needs.  Well, military needs are more than 60% outside the

2    watershed.

3        THE COURT:  Suppose the Government says, "All this water

4    that comes down, if you grant this injunction, we will catch

5    and put into Lake O'Neill."

6        MR. SACHSE:  Now we come to the next interesting

7    question.

8        THE COURT:  "And from Lake O'Neill it will not be pumped

9    out of the watershed.  It will be used in the watershed."

10       MR. SACHSE:  If they are in such desperate riparian

11   straits, you pose this next question:  What is the rest of

12   the water going into Lake O'Neill for anyway?

13       THE COURT:  So that it can be earmarked and used in

14   the watershed.

15       MR. SACHSE:  That is an appropriative right, and your

16   Honor is not granting an injunction on an appropriative right.

17       THE COURT:  I am not talking about an appropriative

18   right.  I am merely using Lake O'Neill as a vessel to channel

19   the water for use within the watershed.

20       MR. SACHSE:  Lake O'Neill can't be a vessel to channel

21   the water for use within the watershed, unless it is held

22   there.  If it goes through Lake O'Neill and down, it is

23   thereafter extracted by their pumps and goes into the

24   distribution system.  There is no way the water can be

25   channeled for use inside the water shed, unless Lake O'Neill

P 64

1    is shut up, and if it is shut up in Lake O'Neill it is an

2    appropriative right and not a riparian right.  Your Honor has

3    so held.

4        Now, the second reason that you could not grant, under

5    the law as it presently exists --

6        THE COURT:  What would prevent the Government from just

7    building a big couple of thousand gallon storage tank and

8    running the water into the tank and immediately pumping it

9    into the system for the use within the watershed?

10       MR. SACHSE:  The system won't let them do it.

11       THE COURT:  The system runs in and out of the watershed.

12       MR. SACHSE:  That is right.  As I say, if your Honor

13   could issue an order that would say that as soon as any

14   diversions outside the watershed stop, an injunction against

15   Fallbrook would be operative, that might -- although there are

16   some fundamental reasons that it can't be issued at all.  The

17   first one your Honor pointed up yourself.

18       You said that this outside-the-watershed problem is

19   worrying you, and it should worry you, because, as the cases

20   clearly point out, it is absolutely essential that the

21   riparian show a wrongful act above -- let's concede it for

22   the sake of argument -- and second, a proper use by him, if

23   it did come down to him, and also he must show a damage.

24       Now, what is the damage in this case?  What harm is

25   the United States suffering?  I don't know what the March

P 65

extractions are, but let us say, for the sake of argument, that by Fallbrook they were the same as in February.  Then they would be losing 1½ acre feet a day by reason of a wrongful act of Fallbrook.  And they are diverting 3200, they are diverting pretty close to ten or eight acre feet a day outside the watershed.  What is the damage they have suffered by reason of this supposed wrongful act?

THE COURT:  Your permit was for how much?

MR. SACHSE:  Two and a half second feet.  That was my next point, your Honor.  I might point out that in an entire year, if we got it all, which we never have in our history -- last year we took a hundred -- but if we took it all, it would be 1800.  If we got the full flow of 2½ second feet, it would be 1800.  It would be just barely over the net extractions from the watershed of the United States.  Actually, what we got last year, for example, last year we got 1861, and the year before we got 950 in the total year.  Actually, the amount we took is less than the net wrongful exports of the United States from the watershed.

THE COURT:  Last year you took how much?

MR. SACHSE:  Eight hundred sixty-one point seven.

THE COURT:  And the year before?

MR. SACHSE:  Nine hundred fifty point zero.  Actually, what we took is less than the net wrongful exports of the United States.

P 66

Now, if there is any rule that is basic, it is that an injunction is an exercise of equitable power.  And all of these rules relate back to the old-fashioned clean hands doctrine.  We are not acting wholly without right.  We are acting under the authority of a right which your Honor has found to exist.  We are acting under such right.  Here is a party who is violating absolutely the rights that they have. Your Honor has found that also to exist -- unless you change your ruling on exporting water.

THE COURT:  Well, once the water gets there, they can do as they please with it.

MR. SACHSE:  That is right.

THE COURT:  The question is, can they do this and then demand that other water replace it?

MR. SACHSE:  The Circuit answered it for you, your Honor.  The Circuit made this express point and said there is a distinction between the right to do as the United States pleases, and they gave two reasons:  They said sovereign within the enclave, as well as the last user on the stream; the right to do as they please with the water once it reaches them, and secondly the right to reach upstream and compel someone else to let water down to it for an improper purpose. Your Honor cited it in your own pre-trial opinion.

I think this is so cut and dried that it is impossible, literally, for the Court to grant an injunction, and the

P 67

1  primary reason, again, the clearest reason in the world,

2  is that, for all we know in the present state of the record

3  and in the present state of your Honor's findings, 100% of

4  the United States uses -- not 57%, but 100% of the United

5  States use -- may be improper.  Your Honor expressly reserved

6  that question for determination.  He has expressly ruled.

7  Your statement I can almost quote.  You pointed out that I

8  was contending that military uses were per se non-riparian.

9  You pointed out that the State of California, through Mr.

10  Moscovitz, made the point that they were not per se wrongful,

11  but that they might be unreasonable, under the Constitutional

12  Amendment.  Your Honor then said something to this effect:

13  The Court is presently inclined to agree with the views of

14  the State of California.  However, in any event, the deter-

15  mination of this question depends upon facts, and therefore,

16  this is deferred to the final determination of this cause.

17      Now, when your Honor has told us already that you

18  aren't sure whether any of these uses of the United States

19  are proper, how is your Honor going to say, "Well, I am not

20  sure they are proper, but I am still going to issue an

21  injunction against an upstream user whose use I find is

22  proper"?  And you have entered such interlocutory order.

23      As I say, to me it is beyond comprehension how the

24  Court could issue an injunction on the riparian right basis.

25  And that is why, your Honor, two days I immediately stated

P 68

1    to Mr. Veeder, "I am ready to argue and submit right now

2    the matter of an injunction on your riparian right." Not

3    on the appropriative right -- I stalled on that. I wanted

4    hammering out the facts.

5        But it is utterly and absolutely incomprehensible how

6    any court could issue an injunction in favor of a riparian

7    who (1) the court has not even determined is making any

8    proper use of water and (2) the court knows that 57% of the

9    use of water is outside the watershed. With those two facts

10   before a court, where it knows that 57% is wrong and the

11   other 43% it is not sure is right, it is beyond comprehension.

12       I will argue the matter no further. I would like to

13   ask the State of California, for myself, what he thinks

14   about this.

15       MR. VEEDER:  Your Honor, may I make one point here --

16   I am sorry, Mr. Girard -- if I may. It will take just a

17   moment.

18       I didn't desire to bring up this proposition, but if

19   I may interject it now, because we haven't got down to the

20   items 4, 5 and 6.

21       The water which we are, and have been, diverting outside

22   the watershed were waters which, in our view, were subject

23   to the stipulated judgment, which provides certainly as

24   against Vail Company the right to use the water outside the

25   watershed, and at the time that that water came  to us

P 69   1    certainly the stipulated judgment was in effect and our

2    diversions outside the watershed down to this time.

3        MR. SACHSE:   Then ask Vail to release water to you.

4    We are not bound by the stipulation.

5        MR. VEEDER:   Let me go on.   The water we are using

6    outside the watershed is certainly not water that Fallbrook

7    could have ever used.   It came down in 1958.   That water is

8    under the stipulated judgment.   I submit that the use of

9    water outside the watershed and in the quantities we are

10   using is entirely within the yield of the stipulated judgment.

11   Fallbrook certainly couldn't make any claim in regard to

12   that water under the provisos of the stipulated judgment.

13       I just interjected that at this point because I don't

14   want anybody to say that I came back a couple of days later

15   with another point.   It is matter that is going to be im-

16   portant in this case before it is through.   If Mr. Sachse

17   wants to respond to it, he may.   I was hopeful to avoid it

18   because we hadn't got to this point yet.

19       THE COURT:   Mr. Girard.

20       MR. GIRARD:   I would be repeating some of the things

21   that have been said, but I think it has to be clearly

22   emphasized, and I think this principle has been enunciated

23   in every case by the California Supreme Court after the 1928

24   constitutional amendment, which concerns the use of water

25   in the State, and the principle that is inherent in this

P 70

1    constitutional amendment was that this section was to

2    accomplish ultimate beneficial utilization of the water

3    resources of the State consistent with rights.

4         Now Colonel Bowen testified yesterday that insofar as

5    riparian needs only -- and when we are considering riparian

6    needs we are not, in my view, considering the Lake O'Neill

7    problem, which is an entirely different thing; Lake O'Neill

8    is an appropriative right, and I think Colonel Bowen would

9    certainly show some damage there -- he said that the United

10   States needs a minimum of ten acre feet a day within the

11   watershed to satisfy its riparian requirements.

12        Now, implicit in Mr. Veeder's suggestion that this

13   water should come down to him in the surface flow is that

14   the United States has an absolute right to satisfy this

15   minimum of ten acre feet a day as a matter of law, without

16   resorting to ground waters.

End of
Take E

17

18

19

20

21

22

23

24

25

1          Now, the ground waters are a part of the stream the

2     same as the surface waters are, and while there is evidence

3     certainly that some of these basins have dropped slightly

4     insofar as the ground table is concerned, there is certainly

5     no evidence which would even remotely support a finding that

6     those ground water basins, a part of the riparian water,

7     would not support, and in fact they have supported, uses

8     substantially in excess of the ten acre feet per day.

9          Now, I can see no justification whatsoever for cutting

10    off a beneficial use of the Fallbrook Public Utility District,

11    serving domestic people, to require them to release water

12    to the United States for its riparian needs, when the

13    evidence is uncontradicted that the United States can

14    satisfy those riparian needs, has satisfied those riparian

15    needs, and the riparian needs are certainly in no substantial

16    danger insofar as the ground water is concerned from Fallbrook's

17    uses.  There is no factual basis from which it can be shown

18    that this ten acre foot per day requirement can't be sat-

19    isfied out of ground water.  That is certainly the most

20    efficient way to do it.

21         I think the Court has recognized the problem that if

22    Mr. Veeder's statement is correct, and we vigorously support

23    the fact that the ground water table is drastically lowered

24    so that they can't meet their riparian needs --

25         THE COURT:  You say you support it?

1    MR. GIRARD;   I mean I vigorously disagree with it.

2    I don't think the evidence is even anywhere near on it.

3    The evidence, I think, almost without contradiction is that

4    the ground water basin within the military reservation is

5    more than adequate to satisfy on a safe annual yield basis

6    the riparian needs within the watershed, and for that matter

7    there is evidence in the record which is uncontradicted

8    that the ground water basins on a safe annual yield are

9    satisfactory and sufficient to satisfy not only the United

10   States', uses, present uses in the watershed, but also their

11   present uses, period.

12          THE COURT:   Where is that evidence?

13          MR. GIRARD:   I think it was on Mr. Illingsworth's

14   run-off figures, and that, incidently, was cut-off at the

15   Gorge, assuming there was no run-off other than incidental

16   from the Gorge on down.

17          I am not sure of the Exhibit Number, but it was one

18   of these hydrologic run-off studies that was introduced

19   in the case.

20          I might add that their present uses within and with-

21   out the watershed are substantially in excess of the ten

22   acre feet per day within the watershed, and I don't believe

23   that evidence is contradicted in any manner whatsoever by

24   any Exhibit or testimony of the United States.

25          I will not reiterate --

1      THE COURT: Mr. Girard.

2      MR. GIRARD: Yes sir.

3      THE COURT: What is your view on this:  supposing that

4  the sewage return was two thousand acre feet, and supposing

5  the United States limited itself to two thousand acre feet

6  export from the watershed, balancing what they returned by

7  way of sewage with what they took out, what is your view

8  then?  Are they still in the position of exporting water

9  from the watershed, or could a Court of Equity  say, "This

10  sewage was not riparian water; they reclaimed it and put it

11  into the basin, and thereforewhen they take out the amount

12  which they put in they are only taking out water that is

13  salvaged."

14      MR. GIRARD:  I am not sure of the facts.  As I recall,

15  they pumped the water out of the watershed from the lower

16  basin on the mesa lands, and then they returned the sewage

17  which was taken from the -- originally it was water probably,

18  but the point that has to be remembered is that if they

19  didn't pump the water out of the watershed there probably

20  would not have been any need to put the sewage back in to

21  stop the salt water intrusion.

22      Now, whether they get a credit under those circumstances,

23  I don't know.  I would want to look that up a little bit

24  more, your Honor.

25      THE COURT:  Let's take it one step at a time.  Will

1  you agree that once water has been used and becomes sewage,

2  it is no longer riparian water?

3      MR. GIRARD:  Yes.

4      THE COURT:  Now, if they then took this water and had

5  an immense reservoir that they put it in, and took it out

6  of the watershed, of course, they could do as they pleased

7  with it.

8      So what is the difference between sticking two

9  thousand acre feet a year into a basin, which is inter-

10  connected with three sub-basins so they are really all one,

11  -- sticking two thousand acre feet in the bank, as it were,

12  and taking two thousand acre feet out?

13      MR. GIRARD:  Probably none.  But let me approach it

14  on this basis, your Honor:  this is before my time in this

15  suit.  As I recall, Mr. Moskovitz in writing whether a

16  military use was a proper riparian use, indicated that it

17  could be in certain circumstances.

18      Now, you take a stream like the Santa Margarita River,

19  where everybody else but the United States is using water on

20  irrigation, where you have return flow, and the United States,

21  because of their particular water requirements, uses the

22  water domestically, which may or may not, determined on

23  their own election, result  in no return of flow, quite

24  possibly here is what might be concluded under the theory

25  suggested by Mr. Moskovitz: that in order for military use

1   on a stream such as this, where everyone else contributes

2   to the ground waters by riparian waters, in order to be a

3   proper military use the Court might conclude also that in

4   order to get that result they would have to return the

5   water to the watershed.

6       If that is correct, then of course, my answer that I

7   gave previously would be that they don't have the right to

8   do with the return flow as they choose.

9       MR. SACHSE:  May I comment on that question, your

10  Honor?

11      THE COURT:  Yes sir.

12      MR. SACHSE:  I am glad Mr. Girard changed his state-

13  ment, because I was going to have to disagree with it very

14  vigorously.  There is some very clear law on it, and I think

15  he was wrong in that you are incorrect when you say that

16  sewage water is not any longer necessarily riparian.  It

17  may or may not be.  Let's forget sewage for the moment in
                          of
18  the sense/flowing in an organized sewer, such as at Camp

19  Pendleton.  We have many cases of riparian uses where the

20  water goes into a septic tank, and then percolates back out
                          and
21  through the ground/then back into the flow.

22      An implicit part of every riparian use is that you try

23  to return to the stream everything that you reasonably and

24  practically can.  I believe that is an implicit right, and

25  I believe that any riparian use in the form in which it was

15,797

1    carried out, which resulted in the complete removal of the

2    water from the watershed so that it can't possibly go down and

3    help the man next down below is an improper riparian use.

4    That is the whole basis for this argument of exporting water.

5         I have in mind, but I can't give you the citation

6    without digging into one of my briefs on military use, but

7    when I was digging back into that, your Honor, way back in

8    the early days of this trial, I dug up an English case where

9    they went so far as to say that the use of the waters of a

10   river, to which a railroad was riparian, the use by the

11   locomotives stopping on the river and sucking up the water

12    of the river to fill the water boilers of the locomotive

13   was an improper riparian use because, so help me, it could

14   not be returned to the stream.  The locomotive runs on to

15   Scotland, and the water does not come back.

16        Now, that is the common law philosophy of the riparian

17   right, and any use which completely takes it away from the

18   watershed of the stream is an improper riparian use.  That

19   would be my first answer, and I think that it can be very

20   well briefed.

21        Now, the second comment I would give to you is this:

22        "The claim of the riparian owner upon the natural

23        flow of the stream" --

24        This is page 392 of Hutchins --

25        "The claim of the riparian owner upon the natural

1          flow of the stream is such that he may enjoin

2          an upstream diversion of water out of the watershed,

3          to a point from which the excess waters after their

4          use cannot return to the stream above his riparian

5          lands . . . "

6          That is the whole philosophy of it, that he can't

7    take the waters to a place where they won't get back.

8          Now, so much for that.  The second point that I

9    wanted to make, and I am grateful to Mr. Girard for his

10   remarks, because it reminded me of something I had forgotten,

11   and that is the question of the Chin Chow case, which I    .

12   previously cited and gave your Honor the citation.  That

13   is the exact all-fours situation that Mr. Veeder seeks to

14   ask your Honor to enforce.

15         He says, "We can use ten second feet of surface flow.

16   Therefore, we choose to stop Fallbrook.  We are not going

17   to pump our basin.  We want Fallbrook to let us have this

18   in surface flow."

19         Assume for a minute that Fallbrook could give ten

20   second feet, which your Honor knows we can't, but assume

21   it could.  That is his position, that he has a right to

22   ten second feet a day surface flow, and, therefore, he

23   does not have to pump his basin and chooses to take the

24   surface flow.

25         Now, Chin Chow was a farmer at the mouth of the Santa

1  Ynez River who used surface flow of the river in irrigating

2  his field. It is the clearest kind of a riparian right.

3  The Gibraltar Dam was constructed by the City of Santa

4  Barbara, or I forget whether it was the Water District or

5  the City, and it does not matter, on the upper Santa Ynez,

6  and its operation immediately stopped surface flow to the

7  ocean; and Chin Chow was down at the mouth of the river.

8  The operation was regulated and the city was required to

9  release sufficient from Gibraltar to keep the sand reason-

10 ably recharged, and so on, but the surface flow stopped.

11   Chin Chow came in and said, "Gentlemen, I need so

12 many miner's inches a day to irrigate my crops of vegetables."

13   The Supreme Court said, "You have no right, since the

14 passage of the 1928 Constitutional Amendment, to demand

15 that. You have the responsibility and the interest in the

16 preservation of the waters of this State to put yourself

17 to a little additional expense, Mr. Chin Chow, you have no

18 longer a right to demand that this water flow undiminished

19 so that you can irrigate by surface means. You shall put

20 in a pump, and pump."

21   The case, I believe, is another certiorari denied

22 Supreme Court case. I am not quite certain. No, it is

23 not, your Honor. I am in error. But there is the answer

24 to Mr. Veeder's contention.

25   Now, that same situation was considered in

Peabody vs Vallejo.  There they demanded the surface flow

across their lands in the tidal flats across Suisuin Bay,

and dreamed up as a reason that it was going to wash out

the surface salts.  The Court said, no, we won't let you

force this water to come down and wash out the surface

flow.

They said, "Well, we are not quite ready to use all

the lands today, and we are afraid if we don't make this

water come down to us, the upstream user, the City of Vallejo,

will acquire a prescriptive right."

So it was in Peabody vs Vallejo that the Court adopted

the principle that now is a, b, c in water injunction cases,

that while actual injunctions are very rare in situations

such as this, very rare, it is entirely proper for the Court

to issue a declaratory decree which says that the right of

the United States to ten second feet of flow, or whatever it

is they may or may not need, as ultimately established, can-

not be enforced by injunction, that you have got to take it

out of the sands; but the use by Fallbrook of the ten second

feet, or whatever it may be, cannot give you, Fallbrook,

a prescriptive right.

That type of decree is common.  I would say that is

it in 90% of the cases where injunctions have been sought.

That is what they did in Peabody vs Vallejo.  They

said, "No, you cannot force the City of Vallejo to release

1    you water, you shall get it out of the sands.  But, Vallejo,

2    we will tell you right now that you are not getting a

3    prescriptive right by continuing to do this."

4         That has been the practice in this State ever since

5    the passage of the Constitutional Amendment.

6         MR. VEEDER:  If I comprehend the situation as it

7    prevails now in the record before your Honor, it is this:

8         Fallbrook Public Utility District is making one

9    illegal diversion in Sawday as I see it.  You have ruled,

10   your Honor, that the United States of America in your

11   opinion is entitled -- and this, of course, is a tentative

12   ruling -- to an appropriative right to Lake O'Neill.

13        THE COURT:  As of 1914.

14        MR. VEEDER:  Yes.

15.       THE COURT:  We haven't passed on the situation since.

16        MR. VEEDER:  Yes, as of 1914.  So in the event that

17   that becomes final, the appropriative right in an inter-

18   locutory judgment, the invasion by the Fallbrook Public

19   Utility District by that diversion is subject to an

20   injunction as of now.

21        Truly, we are entitled to Lake O'Neill, as I

22   comprehend it.  As I understand it, moreover, you have

23   asked me to prepare and submit to you findings of fact and

24   conclusions of law and an interlocutory   decree setting up

25   the decision that you have rendered in regard to the

1   appropriative right to Lake O'Neill.   I will undertake to

2   do it.

3         It is our opinion, however, from the standpoint strictly

4   of our riparian right that we have a perfect example of

5   where the riparian user is entitled to claim a right to

6   have the water come down to us.   If you deny that we can

7   have an injunction in that regard, I will, however submit

8   to your Honor the findings of fact and conclusions of law

9   in regard to the appropriative right, and to tender to you

10   the kind and type of an injunction that we think we are

11   entitled to.

Take F-2   12         I will serve copies of that on Mr. Sachse and as I

13   comprehend it we will have a hearing on that on April 4th.

14   Is that correct?

15         MR. SACHSE:   Now, am I utterly unable -- I hope I

16   am not utterly unable to make your Honor comprehend it.

17         THE COURT:   I understand you.

18         MR. SACHSE:   I am not going to accept service, Mr.

19   Veeder, on any foolishness about an injunction until I

20   get a chance to offer evidence on the appropriative issue.

21         MR. VEEDER:   That is precisely what I said.   I am

22   going to send to him a copy of the proposed findings of

23   fact and conclusions of law.   However, if he doesn't meet

24   them, surely then we are entitled to the injunction.   I

25   will put it that way then.

1    THE COURT: Do you want me to say yes? I don't know.

2    MR. VEEDER: I say that is the procedure I am going

3 to follow.

4    THE COURT: Mr. Veeder, I don't know what kind of

5 lawyers you tangled with in some of these other water

6 right cases, but I think you have found out by now that

7 you are running into a pretty good lawyer when you run

8 into Franz Sachse. He points out two things, and there

9 is just no way to get around them. It is true that I have

10 not ruled on military uses, and therefore I do not have a

11 right today to support any kind of an injunction because

12 I haven't decided the military use question. Maybe it is

13 too bad we didn't get to that, too bad that we didn't

14 schedule it so that we could get at it, and it may be too

15 bad that I didn't decide it earlier. It could be put on

16 the agenda for April 4th.

17    Secondly, I am very much impressed with the arguments

18 of Mr. Sachse and Mr. Girard as to the effect of the

19 Constitutional Amendment, and the fact that this might

20 well prevent an injunction. I am not going to grant an

21 injunction today.

22    I am very interested in what attitude the Government

23 is going to take in the future in respect to this export

24 from the watershed. It is true I haven't formally filed

25 that opinion, and I haven't had a chance to work it over.

1    I hope maybe next week to be able to do that.  With you

2    gone and a lighter calendar, I may have some time to work

3    on it.  I have more work to do that I can do, but I will

4    try to get at that.  Possibly after that is filed and

5    findings and an interlocutory judgment are entered, we will

6    know whether that will make a change in the activities or

7    not.  I got the impression that you were still operating

8    under the old law, as the boys say down south:  In other

9    words, that you were still operating, if I understood your

10   remarks, under the theory of the stipulated judgment.

11        MR. VEEDER:  I certainly think, your Honor, that if

12   you do not give us an appealable order the status quo should

13   be maintained.

14        THE COURT:  I do not pass on whether the fact that

15   you continue to operate on the stipulated judgment has

16   any merit or not.  I will not pass on that, but I made

17   that inference from what you said.

18        MR. VEEDER:  Do you want a response to that?

19        THE COURT:  No, you don't have to respond.

20        Your application for the injunction is denied without

21   prejudice, and will be further considered after a decision

22   is made as to military uses and after rebuttal evidence

23   is heard as to the attempt at avoidance by Fallbrook of

24   your appropriative right.

25        Can the military use problem be put on the agenda for

the week of April 4th?

MR. VEEDER: Did you say can it?

THE COURT:   Can the military use problem be put on the agenda?

MR. SACHSE:   Before you make a decision on that, your Honor, may I be heard very briefly?

I am also going to have to give Mr. Veeder a notice which I don't like to give.  We have on the unfinished docket findings which your Honor directed me to prepare in October on Tucalota Creek, which I conceive are of considerable importance to those little people.  Mr. Veeder hasn't found time to get going on that.

MR. VEEDER:   The decree was left --

MR. SACHSE:   Mr. Veeder, I don't want to be offensive, and I don't want to be interrupted.

They have been lodged for a long time, and I have had copies served.  I would like to finish this, if I may, and I am nearly through.

On the 9th of December your Honor gave a judgment from the Bench on Diamond and Domenigoni Valleys.  I doubt if there is an area in the watershed with as     much con- centrated wealth produced from the soil as that area. I think those people have a right to know what is going to happen.

A number of other things are cluttering up this

1 record which have not yet been finished, and I think they

2 are of considerable importance.  I think the stipulated

3 judgment ought to be dusted off.

4     Now, all of these things, as your Honor will recall,

5 were on this week's agenda, and then Mr. Veeder brought

6 in this new issue.

7     MR. VEEDER: By consent.

8     MR. SACHSE:  Yes, we consented.  Your Honor asked me

9 the question, and gave me the opportunity, and I believe

10 you were opening the door for me to say, "No, your Honor, I

11 want full and proper notice."  I didn't ask for it, and

12 I consented to the injunction proceedings coming up in

13 the manner in which it did because I am anxious to see

14 this case finished.  But the only thing I want to say now

15 that I personally have indulged Mr. Veeder as long as I

16 can, and I would like you to know, Mr. Veeder,

17 and I would like the Court to know, that if you intend to

18 make any other request for ancillary orders of any kind

19 against my client, I would like it done in strict compliance

20 with the Federal Rules, and on notice, on motion, on order

21 to show cause, or whatever else maybe necessary.

22     MR. VEEDER:  That suits me very well.

23     MR. SACHSE:  Okay.

24     THE COURT:  Now, can we put on the agenda for

25 April 4th the matter of military use?

1    MR. VEEDER:  As a riparian use?

2    THE COURT:  Yes.

3    MR. VEEDER:  Yes.

4    MR. GIRARD:  I certainly am agreeable, and I am sure

5    Mr. Sachse is.

6    MR. SACHSE:  I would love it.

7    THE COURT:  Are there to be any further briefs then

8    in the matter?

9    MR. SACHSE:  I won't file any more.  I think the

10   brief I filed is as comprehensive as I can make it.

11   MR. VEEDER:  Let me review the brief that we filed.

12   I think the brief we filed was filed in September of 1958.

13   MR. SACHSE:  It was filed before the pre trial order.

14   THE COURT:  I wonder where we would find these.

15   You had better at least give me the chronological dates

16   they were filed.

17   MR. SACHSE:  I think we can perhaps get you another

18   copy, your Honor.  That was duplicated.

19   THE COURT:  Then can't we wind up Domenigoni Valley?

20   MR. VEEDER:  I have already said, your Honor, in

21   regard to the findings on Domenigoni Valley that if you

22   change the word "divert" to "barrier" in the findings that

23   have been submitted, subject always to the ultimate question

24   that will come at the end of the trial, they can be entered.

25   And Tucalota Creek the same way.  I have explained to Mr.

1    Sachse that point.  I realize that this outburst of his is

2    strictly for his clients.

3         MR. SACHSE:  This outburst is so that I won't be put

4    on the spot.  This is simply so I don't get to defending

5    a matter on short notice, as I was fool enough to accept

6    this last time.

7         MR. VEEDER:  You had full opportunity, Mr. Sachse.

8         MR. SACHSE:  Don't misunderstand me.  You were a

9    gentleman, Mr. Veeder.  I don't mean to imply that Mr.

10   Veeder didn't call me.

11        THE COURT:  All right, both of you.  When are you

12   leaving town?

13        MR. VEEDER:  Whenever you tell me.  I have a flight

14   scheduled in an hour and twenty five minutes, but I will

15   cancel it if you want me to.

16        THE COURT:  I am thinking about this.  As to

17   Domenigoni Valley you say there is only one word involved.

18   Have you talked to Sachse about this?

19        MR. SACHSE:  I think I know what he is talking about,

20   and so far as I am concerned, they are ready to rip.

21        MR. VEEDER:  I put them on the agenda at this time,

22   your Honor.  I thought that the matter had been agreed

23   to actually the last time we were here.

24        THE COURT:  Is the matter in any form so that I can

25   decide it without your being present?  Have there been

1    some written objections made to it?  Is there anything that

2    I can look at?

3        MR. VEEDER:  I will tell you what I will do on that,

4    your Honor.  I will write a letter and get it to your Honor

5    on the precise points raised in the transcript at the time

6    this came up.

7        MR. SACHSE:  I thought that was what you were going

8    to do before this week.

9        MR. VEEDER:  That will be done, your Honor.

10       THE COURT:  All right.  Then what is the loose end on

11   Tucalota Creek?

12       MR. VEEDER:  I don't think there is any, your Honor.

13   I don't know what he is talking about.

14       THE COURT:  Are they ready to be signed?

15       MR. VEEDER:  They are lodged with you .

16       MR. SACHSE:  If Mr. Veeder says they are ready, I

17   surely do.

18       THE COURT:  All right.  Then I will sign them.

19       What else goes on the agenda next time?

20       MR. VEEDER:  I think everything that is not up to

21   date.

22       I would strongly recommend, and I think it is highly

23   important -- do you have a copy of the agenda, your Honor?

24       THE COURT:  Yes.

25       MR. SACHSE:  Number 1 is done and 2 and 3 have been

1    argued.

2         MR. VEEDER:  I think the most important single issue

3    that will come up, in our view, is 4, 5 and 6, relating to

4    the opinion, findings of fact and conclusions of law

5    respecting the stipulated judgment with the Vail Company.

6         MR. SACHSE:  I am inclined to agree with Mr. Veeder.

7    I would like to see that cleaned up first.  That is a

8    ghost that rides up and confronts me all the time.

9         THE COURT:  All right.  Now, Mr. Girard, you were

10   going to prepare findings and conclusions, weren't you?

11        MR. GIRARD:  Yes.

12        THE COURT:  And, of course, I assume you are waiting

13   until I file the opinion.

14        MR. GIRARD:  That was the principle basis, but perhaps

15   I can do it without that.

16        THE COURT:  You can start to work on it, --

17        MR. GIRARD:  Yes, I could start to work on it.

18        THE COURT:  -- because I will not, in my opinion,
                                                    it
19   be making a change in it.  I am going to work/over.

20        MR. GIRARD:  I don't see any need to see your final

21   draft.

22        THE COURT:  Yes.  Then if there were changes, we

23   could make them later, but you could start to work on

24   that, if you will.

25        MR. GIRARD:  Although I am not sure that those --

1   as I understand, this question on 5 and 6 would not concern

2   the findings.

3   THE COURT:  I understand.  But you have to get the

4   findings out of the way first before Mr. Veeder proceeds

5   with what he talks about as the further course of the

6   litigation.

7   Now, we have the Oviatt matter ready to be decided,

8   -- right?

9   MR. SACHSE:  Yes, your Honor.

10   MR. GIRARD:  That is correct.

11   THE COURT:  Then we have the Knox matter , subject

12   to this loose end we allowed Mr. Anderson.  He should be

13   put on the agenda and told to be back here on the 4th, or

14   whatever date we fixed for him to be here, to see if he

15   has done anything about it.

16   We have the Gibbon and Cottle matter, and that, if

17   I recall, is submitted, isn't it?

18   MR. GIRARD:  No, I think that Mr. Stark requested

19   the opportunity to file findings of  fact, conclusions of

20   law and a brief on his prescriptive right, and I understood

21   he said he would have that in by the 4th.

22   In my view, that Gibbon and Cottle, Oviatt and Mr.

23   Anderson will probably be concerned with the same thing, and

24   if you are going to hear them, perhaps we could hear them

25   all at once.

1　　　　THE COURT:　Right.

2　　　　MR. SACHSE:　Certainly Oviatt and Gibbon and Cottle.

3　　　　THE COURT:　Now, what about Stardust and Sill Brothers?

4　Is that in Domenigoni Valley.

5　　　　MR. SACHSE:　No.　Sill Brothers is in Domenigoni

6　Valley.　Stardust is in Wilson Creek.　Your Honor, on

7　Stardust I don't think there will be any problem.　I only

8　requested that the findings be delayed until your Honor

9　ruled on the appropriative right as to Gibbon and Cottle,

10　because mine happened to be County Filing Number 1, and

11　theirs County Filing Number 2, so I was curious what you

12　were going to do.

13　　　　I did not press appropriative rights as to Stardust,

14　and I think I might have some difficulty in establishing

15　it, but I am asking your Honor to delay the findings --

16　　　　THE COURT:　Did you submit some proposed findings

17　on that?

18　　　　MR. SACHSE:　Yes.　That is in the Wilson Creek find-

19　ings.　They are included right in the Wilson Creek findings.

20　　　　MR. VEEDER:　Then the Wilson Creek findings will be

21　revised now based on the data that has come in?

22　　　　MR. SACHSE:　That is correct.　I have a question,

23　your Honor, of you and Mr. Veeder on the request of Mr.

24　Krieger.　He 'phoned me and is particularly concerned about

25　Item 9.　I wasn't sure at that point, and I am not sure now

1    that there is any problem involved.  Is there any recon-

2    sideration of this basin that would require his presence?

3         MR. VEEDER:  We have prepared the exterior boundary

4    description of it.  That was one of the things that was

5    going to come up.

6         THE COURT:  I understood it was to be in the form of

7    findings and an interlocutory judgment also.

8         MR. VEEDER:  I think on that, your Honor -- no, I

9    didn't understand that.

10        THE COURT:  How are we going to heal it up?

11        MR. VEEDER:  I was going to first tender to you the

12   description of the exterior boundary of the basin, and then

13   if you made the finding, I think he would probably like to

14   be present.

15        MR. STAHLMAN:  I think your Honor raised some

16   question last time as to whether or not there would be

17   some distinction between the younger alluvial basin and

18   the exterior outer boundary.

19        THE COURT:  There was some question as to the

20   interrelation of the two ground water bodies, and there

21   was also the question as to whether this was a basin or

22   a ground water body and a part of the stream system, which
                                      to
23   somebody was /look into.

24        MR. SACHSE:  Your Honor, I told Mr. Krieger that it

25   was my impression that this matter that is referred to was

1    referred to as a division within the basin.

2          Second, I thought there were certain minor changes in

3    the outside boundary that Colonel Bowen determined were

4    necessary by reason of roads and physical conditions, but
                                                    there
5    that/was no drastic change in the line as we had drawn it.

6    Mr. Krieger said if that was the fact, he had no further

7    concern, but if there was a major reconsideration he wanted

8    to be advised.

9          THE COURT:  Well, are there changes contemplated

10   other than minor ones?

11         MR. VEEDER:  Not to my knowledge.  Colonel?

12         COLONEL BOWEN:  No, no major changes.

13         THE COURT:  We also have the problem:  is this in

14   terminology to be called a basin, basins, or a ground water

15   body and a part of the stream system.

**Take F-3** 16    MR. VEEDER:  I think on that we will have to argue

17   the law.  That is contemplated in 9.

18         MR. SACHSE:  I think on that we will have to get

19   Mr. Krieger.

20         MR. VEEDER:  Well, I will be back here and I will

21   call Mr. Krieger.

22         MR. STAHLMAN:  One other thing also:  did you want

23   to order Mr. Hamilton back here on --

24         MR. VEEDER:  On the 4th?

25         MR. STAHLMAN:  On the 4th.

1    . .   THE COURT:  Yes.  Before we leave this basin thing,

2    wouldn't it be your thought when you finally determined

3    the matter and got the boundary and description, we ought

4    to have a separate interlocutory judgment on it? ... ... (..

5    ..... MR. VEEDER:  I think we will have a separate inter-

6    locutory, and I think we will have a separate interlocutory

7    in regard to the exterior boundary of every land owner in

8    the basin.  I think that has to be done.  But I certainly

9    don't think that you will have one single finding of fact

10   and conclusion of law on that.  I think what you do, as I

11   see it, is to have a determination that this is a single

12   ground water party, and decide the exterior boundaries of

13   the Roripaugh Camp, the Jack Roripaugh, and everyone else.

14   I think that has to be done.

15       THE COURT:  Mr. Veeder, might I suggest that if you

16   had an interlocutory judgment in which you described the

17   boundaries of the basin, and that we determined that it

18   was what you characterize as a part of the stream system,

19   or a part of the basin, one or the other, and that that

20   was No. X and we got that out of the way, then the house-

21   keeping work of cleaning up individual owners in that area

22   would be simplified, because you would have one finding that

23   you would have to deal with, and just say that he was within

24   the boundary of the area set forth in Interlocutory Judgment

25   X, and then just incorporate it by reference.  Then we would

1   go on with the others.

2       MR. VEEDER:  Then we will go ahead with that for the

3   next hearing, your Honor, and we will undertake to write

4   that kind of a finding.

5       THE COURT:  There were two additional letters that

6   came in.  Do you want to check them off on your records

7   before we put them in evidence?

8       MR. SACHSE:  If it would help, Mr. Veeder, I have

9   two here.  They are Harry Kohn and Harry Bergman, who have

10  answered the letter which was sent out.  I appear of record

11  for both of them.

12      MR. VEEDER:  Thank you.  We will check them off on

13  the record.

14      THE COURT:  All right.  April 4th, gentlemen.

15      (Whereupon, at 4:10 o'clock P.M., Friday, March 17,

16      1961 an adjournment was taken until Tuesday, April

17      4, 1961, at 10:00 o'clock A.M.)

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5          I hereby certify that I am a duly appointed, qualified

6   and acting official court reporter of the United States

7   District Court for the Southern District of California.

8          I further certify that the foregoing is a true and

9   correct transcript of the proceedings had in the above

10  entitled  cause on the date or dates specified therein,

11  and that said transcript is a true and correct transcription

12  of my stenographic notes.

13         Dated at San Diego, California, this 18th day of

14  March, A.D. 1961.

15

16                                        _Marie G. Zellner_
                                            Official Reporter

17

18                                        _John Swader_
                                            Official Reporter

19

20

21

22

23

24

25