# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

No. 1247-SD-C.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     April 4, 1961

Pages: 15,818 to 15,961

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By ......................... DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

Case 3:51-cv-01247-JO-SBC   Document 4642   Filed 09/24/63   PageID.30767   Page 1 of 146

VOLUME 139

15,818

Take A-1
T 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,      )
                               )
                  Plaintiff,   )
                               )
vs.                            )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                  Defendants.  )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, April 4, 1961

— — —

APPEARANCES:

For the Plaintiff:              WILLIAM H. VEEDER, ESQ.
                               Special Assistant to the
                               Attorney General

                               CDR. DONALD W. REDD.

For the Defendants:

  Vail Company                 GEORGE STAHLMAN, ESQ.

  Fallbrook Public Utility     FRANK R. SACHSE, ESQ.
  District,, et al.,

  State of California          FRED GIRARD, ESQ.

15,819

t-2

| | |
|---|---|
| 1 | In propria persona:     MR. R.  W.   SNOW |
| 2 | MRS.  HAZEL  A.  MARTEL |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

15,819a

P 66

# INDEX

| WITNESSES | D | X | RD | RC |
|---|---|---|---|---|
| **For the Plaintiff:** | | | | |
| Col. Allen C. Bowen | 15,821 | | | |

## EXHIBITS

| Plaintiff's Exhibits | Identified | Received |
|---|---|---|
| Additions to 207-E | | 15,834 |
| 208-E  (Tabulation of irrigable acreage in Upper Murrieta & Warm Springs Creek) | 15,836 | 15,836 |

| Defendants' Exhibits | Identified | Received |
|---|---|---|
| Fallbrook's O | 15,913 | 15,913 |
| Fallbrook's P | 15,914 | 15,914 |
| Fallbrook's Q | 15,915 | 15,915 |
| Fallbrook's R & S | 15,916 | 15,916 |
| Fallbrook's W | 15,918 | 15,918 |
| Fallbrook's X & Y | 15,920 | 15,920 |

15,820

t-3

1    SAN DIEGO, CALIFORNIA, Tuesday, April 4, 1961, 10:00 A.M.

2          (Other cases called.)

3          THE CLERK:  Number 7, 1247-SD-C, United States of

4    America versus Fallbrook.

5          MR. VEEDER:  Are you ready for us to proceed, your Honor?

6          THE COURT:  Yes.

7          MR. STAHLMAN:  I would like to call your Honor's

8    attention to the fact that Mr. Girard is not here yet.

9          THE COURT:  He will probably be here later.

10         MR. VEEDER:  Your Honor, in the courtroom is Mr. Snow,

11   a defendant whose property is situated generally in the Anza

12   area.  And also Mrs. Martel; is that correct?

13         MRS. MARTEL:  That is correct.

14         MR. VEEDER:  Mrs. Martel has received a letter from your

15   Honor, and I just saw her a moment ago, and she wants to have

16   explained what is meant by the letter from your Honor which

17   she received.  I explained to her that you would talk to her

18   about it.

19         I haven't had an opportunity to run down the precise

20   location yet, but I thought your Honor might explain the

21   general thought of the letter that was sent these people, and

22   also to have  Colonel Bowen explain the location of the

23   property of Mr. Snow, and have that matter taken care of.

24         THE COURT:  Mr. Snow is from the Anza Valley, you say?

25         MR. VEEDER:  That is correct, yes.

1    THE COURT:  Have we sent letters out to the Anza Valley?

2    MR. VEEDER:  Yes, sir.

3    MRS. MARTEL:  Mine is also in Anza Valley.

4    THE COURT:  Oh, yours is in the Anza area, too?

5    MRS. MARTEL:  Yes.

6    MR. VEEDER:  You see, that is the Wilson Creek area.  We

7    have gone all the way up the Valley as far as we could go and

8    as rapidly as we can.

9    THE COURT:  Is anyone else here in response to any

10    letters that have been sent out?

11    (No response.)

12    THE COURT:  Could we have the maps?

13    MR. VEEDER:  Exhibit 278 is the Anza Valley, and I

14    believe Colonel Bowen could explain to your Honor the location

15    of Mr. Snow's property, because we have already talked about

16    it.

17    Also, I would like to have Exhibit 211-C.

18                     COLONEL ALLEN C. BOWEN,

19    recalled as a witness on behalf of the plaintiff, having

20    been previously duly sworn, testified further as follows:

21    THE COURT:  You have been sworn, Colonel.

22    THE WITNESS:  Yes, your Honor.

23    (Thereupon the witness placed certain maps on the

24    blackboard.)

25    THE COURT:  Do these people want to see this?

t-5                                                          15,822

1          Mr. Snow, can you see from back there?

2          THE WITNESS:  Mr. Snow was here at the last hearing,

3     your Honor, and we went into this matter briefly at that time.

4          THE COURT:  Did we locate the property?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  Where is it located?

7          THE WITNESS:  Referring to Plaintiff's Exhibit 211-C,

8     shown as Parcel Number 221, it consists of the Northwest

9     Quarter Section Seven, Township Seven South, Range Three East,

10    and as shown on 211-C the crest of the Santa Margarita water-

11    shed traverses the northerly portion of that quarter section.

12         Referring to Plaintiff's Exhibit --

13         THE COURT:  This is in Section Seven, you say?

14         THE WITNESS: Yes, sir.

15         MR. VEEDER:  The record should show that Mr. Snow is up

16    here and can see what is going on.

17         THE COURT:  All right.

18         THE WITNESS:  Referring to Plaintiff's Exhibit 278, your

19    Honor, the Northwest Quarter of Section Seven, Township Seven

20    South, Three East, is shown as underlain largely by basement

21    complex, with a very small area of  older alluvium in the

22    northeast corner of that quarter section.

23         THE COURT:  That is approximately 160 acres?

24         THE WITNESS:  Yes, sir.

25         MR. SNOW:  176.

t-6

1       THE COURT:  Well, you have a quarter section there?

2       MR. SNOW:  With a little correction.

3       THE COURT:  It may be more or less, depending on how the

4  survey checks out?

5       MR. SNOW:  Yes, sir.

6       THE COURT:  What is your inquiry about of this?

7       MR. SNOW:  Well, I thought since there was so little

8  involved in the Santa Margarita Basin there, it would save a

9  lot of difficulty and technicality, and so forth, if I could

10  have that area pared out of that district, and it would simplify

11  everything; and there isn't enough water recovered in there

12  to help the situation, being right on the boundary, with part

13  in and part out.

14       THE COURT:  Of course, you understand that a part of

15  this is the blue area which is defined clearly that any water

16  you find there is your own.  The only question is the area of

17  the older alluvium up there.

18       MR. SNOW:  There is so little of that.

19       THE COURT:  Have you made a personal inspection of this

20  property, Colonel?

21       THE WITNESS:  Yes, your Honor, in anticipating your

22  Honor's direction, I have drawn a tentative boundary for that

23  basin in the ends of the Terwilliger Valley area, following

24  the same principles as those adopted on the Murietta-Temecula

25  watershed basin.

t-7

1 THE COURT:  And does his land fall outside of that area?

2 THE WITNESS:  Yes, sir.

3 THE COURT:  Do you have any opinion, Mr. Kunkel?  You

4 have been sworn.  Do you have any opinion on this matter?  He

5 has the northwest quarter section of seven, and the area in

6 question is this small part of older alluvium right in there

7 (Indicating).

8 MR. KUNKEL:  In my opinion, the quantity of water

9 involved is minimal and inconsequential.

10 THE COURT:  Do you have any questions of the experts?

11 MR. VEEDER:  I am delighted.  We have a map of it.

12 THE COURT:  All right.  I propose to find, Mr. Snow,

13 that all of the water in your property is local, vagrant,

14 percolating water and not a part of the stream system.  Now,

15 the surface flow and any part that flows on the surface  is a

16 part of the stream, and any dam you want to put up, or anything,

17 you understand you have to get a permit.  But any underground

18 water you find, have at it, and you are lucky if you can find

19 any.

20 MRS. MARTEL:  You can say that again.

21 MR. VEEDER:  Now, here is Mrs. Martel's, 281 and 285.

22 They are overlying--

23 THE COURT:  14 and 15.  That is the point right up

24 there in 14, and it would be what?

25 THE WITNESS:  That is the Northwest of the Northwest

15,825

t-8

A3

1    of Section 14, Seven South, Three East.

2         MRS. MARTEL:  There are 40 acres between the two, 40 on

3    one side of the road, and 40 on the other.

4         THE WITNESS:  Parcel 285, as shown on Plaintiff's Exhibit

5    211-C is the Northeast of the Southeast of Section 15, Seven

6    South, Three East.

7         Referring to Plaintiff's 278, both of those sixteenth

8    of a section parcels overlie younger alluvium.

9         THE COURT:  That means the younger alluvium is the

10   looser material, sort of a fill, and that is the type of a

11   material that holds the water.

12        MRS. MARTEL:  Yes.

13        THE COURT:  You therefore overlie a water body which is

14   a part of the stream system, so you are  in the  case,
                              rights
15   and you have correlative/with everybody else, and you have

16   rights on the stream.

17        MRS. MARTEL:  Oh, I see.

18        THE COURT:  That is about as far as we can go on it.  It

19   means so long as you have any rights at all, you have a right to

20   the correlative right of water, but you are in a different

21   position than the other gentleman.

22        MRS. MARTEL:  Yes.
                                              and
23        THE COURT:  So your property is in this case,/his is not.

24        MR. VEEDER:  May I inquire, could Mrs. Martel tell us

25   where her property is located with regard to the Hamilton

t-9

1    property?

2         MRS. MARTEL:  Oh, Hamilton is here (Indicating).

3    Hamilton is down here.

4         MR. VEEDER:  You are pointing at--

5         MRS. MARTEL:  Here is Hamilton right here (Indicating).

6         THE COURT:  What bearing has that on this?

7         MR. VEEDER:  Your Honor, the reason is this, that Mr.

8    Hamilton was in my office, and I was going to report this to

9    you.  He is bringing in an expert, Dr. Mann.  He wants to

10   bring along an expert in May, and the evidence, as I comprehend

11   it, at least as he reported it to me then, will also relate

12   to Mrs. Martel's property, and I thought it was necessary at

13   this point to tie those two matters up.  There are about

14   twenty different defendants in that same group.

15        He has asked me to report to Judge Doherty as to the

16   next hearing, and also asked me to keep in touch with him in

17   regard to it.  I think it might be important to Mrs. Martel.

18        MRS. MARTEL:  May I speak at this point?  I pulled out

19   of that group.  I decided that I didn't want to foot the bill.

20        THE COURT:  Well, whatever should be decided after

21   hearing Dr. Mann's testimony, of course, every person affected

22   by it in that category, as might be developed, might have the

23   benefit of it.  I don't know what the purport of his testimony

24   is going to be.

25        Do you?

t-10

1   MR. VEEDER:  I haven't the slightest idea, your Honor,

2   but I am simply reporting it.

3   THE COURT:  You have approximately 80 acres, is that it?

4   MRS. MARTEL:  Yes.

5   THE COURT:  Two forties?

6   MRS. MARTEL:  Yes.

7   THE COURT:  More or less?

8   MRS. MARTEL:  Yes.

9   THE COURT:  And it is all flat and irrigable?

10  MRS. MARTEL:  Yes, it would be.  It is on the alluvial

11  flow.  It is next to Sherman's property.

12  THE COURT:  There would be no question about her being

13  in the --

14  THE WITNESS:  No, your Honor, there is no question about

15  that.

16  MRS. MARTEL:  I know they are irrigating on the property

17  right behind us there.

18  THE COURT:  The letter reported that 33.6 of one 40-acre

19  parcel was irrigable, and all of the other is irrigable.  Is

20  that about right?

21  MRS. MARTEL:  Yes, I think so.

22  THE COURT:  I propose to so find.

23  Do you have any other questions that you want to ask now

24  that you have come all the way down here?

25  MRS. MARTEL:  I wanted to be sure I had the right to the

t-11

1   water, you know, because I want to put down a deeper well for

2   my house, because the one I have won't even pump a 50-gallon

3   barrel. At this point we asked for a survey, when my father

4   was living, and they told him to pull the well, and he told

5   them to pull it themselves.

6       THE COURT:  The Marines are kind of independent, you

7   know.

8       MR. VEEDER:  I don't think the Marines ever said that.

9       THE WITNESS:  No, we never asked anyone to pull a well.

10      MRS. MARTEL:  Well, that is what he told me.

11      THE COURT:  You understand, first, that so far as all

12  of the surface water is concerned, that falls into one category,

13  and it has to be permitted to flow down the natural channels.

14  As to the underground water, if it is a part of the stream

15  system, then I anticipate you overlie a ground water body that

16  is a part of the stream system, and in that event you and your

17  property are in the case internally, because everybody who

18  has rights on the stream has correlative rights, and no one

19  has a right to take it all.

20      MRS. MARTEL:  I see.

21      THE COURT:  I might say that my own view is that in

22  these upper basins which are relatively shallow there is

23  probably sufficient riparian land whose entitlement would be

24  such that it is pretty hard for me to see a situation where

25  they would be constrained, whatever it was, to take care of

15,829

1  some downstream owner.

2  　　　MR. VEEDER:  I always suffer on this, your Honor.

3  　　　THE COURT:  If you follow me, there is a large amount

4  that is irrigable land.

5  　　　MRS. MARTEL:  Yes.

6  　　　THE COURT:  And then there is a relatively shallow water

7  basin.

8  　　　MRS. MARTEL:  Yes.

9  　　　THE COURT:  So there is a relatively small water basin

10  to recharge, and if you gave enough rights or correlative

11  rights to people who own  riparian land to use water, the

12  chances are that they would all suffer from the shortage of

13  water here, so that there would be no sense in restricting

14  their use in order to let water run downstream to other people.

15  　　　That is an offhand guess just on the present state of

16  the record.

17  　　　MR. VEEDER:  I am pointing to the Coahuila Indian

18  Reservation.

19  　　　THE COURT:  They are downstream.  Are they in the same

20  basin?

21  　　　MR. VEEDER:  Here is the Coahuila Indian Reservation,

22  and certainly the alluvium extends down in there.

23  　　　THE COURT:  Then I should call your attention to that.

24  Now, if anybody has good water rights in California, it is

25  the Indians.  The Supreme Court has said that the rights of

t-13

the Indians to water is all that they can conceivably use now or at any time in the future, and if anybody has good water rights, it is the Indians.

Now, this is the Coahuila Indian Reservation (Indicating), and how much of that land is irrigable, and how much is used, I don't know.

MRS. MARTEL: Yes.

THE COURT: Nor do I know what would be the answer in a final showdown if the demand from the Indians was for more water as against the other persons overlying the same basin. I do not conceive in a situation of overlying lands that the Indians would be entitled to it all, but all I can tell you is that the Indians have pretty good water rights.

MRS. MARTEL: If I might say so, right here in the middle of the Coahuila Indian Reservation it is more or less of a volcanic formation, right in there (Indicating).

THE COURT: Up here, all this blue part is not basin area. That is basement complex.

The only parts of that Indian Reservation that overlie water is from this yellow part here (Indicating).

MRS. MARTEL: They have the mineral water that flows from beneath, and it flows the year round.

THE COURT: Let's hope it keeps on flowing, then, and then we would not have any problem.

B fls.

Belt B1
P 1

1      MR. VEEDER:  It was not clear to me whether you want to

2  sign these letters or not.  It is up to you of course.

3      MRS. MARTEL:  All right.  I think it doesn't leave

4  us much choice here, because there is a nice little clause

5  that you set things up in exactness and then right beneath

6  it there is a goodie here.

7      MR. VEEDER:  His Honor wrote that letter, so I am just

8  warning you.

9      MRS. MARTEL:  I apologize to his Honor.

10     THE COURT:  Are you referring to the last paragraph?

11     MRS. MARTEL:  No.  Let's see if I can find it.  It is

12  this:

13         "The evidence as to the character of the ground

14         waters varies.  In some locations it is clearly

15         local and vagrant, not part of the stream system.

16         In other locations the water rights in underground

17         basins are otherwise clearly part of the stream

18         system.  Finally, there are other locations where

19         the answer is difficult to find."

20     THE COURT:  We had the example of the two situations

21  here today, your case and most of Mr. Snow's.

22     MRS. MARTEL:  Yes.

23     THE COURT:  The little angle at the top is that in-

24  between situation and we resolved it in his favor.  We can't

25  be much more definite than that.  However, we have told you that

your land is over a body of water that is part of the stream

system.

P 2

1   THE WITNESS:  I wanted to establish a right.  I have

2   eight children, and if we cut that up into eight pieces and

3   put down eight wells I wanted to be sure that they can have

4   some water.

5   MR. VEEDER:  If you want to sign that, I will be glad

6   to give you a pen.

7   MRS. MARTEL:  All right.

8   MR. VEEDER:  It is up to you entirely.

9   MRS. MARTEL:  May I ask one more question.  I happen to

10   know what the Hamiltons are proposing.  In the event that

11   they establish a difference of opinion in reference to this

12   conclusion here, how will that affect me as to the direction

13   of the flow of the water from that basin?

14   THE COURT:  I would just say generally that any findings

15   I make as to geology or underground water or direction of

16   flow will apply to everybody evenly.

17   What is Mr. Hamilton proposing?  To offer proof that

18   some of this water flows out of the watershed?

19   MRS. MARTEL:  Well, they have come to some conclusions

20   from wells that they have put down themselves, they and

21   other people in the valley, and there are differences of

22   opinion as to the direction of flow.

23   THE COURT:  I would attempt to treat you all equally.

24   The fact that you signed this, actually, largely concerns

25   the tabulation as to irrigable acreage.

P 3

1    MR. VEEDER:  Relieving her  of having to come in again.

2  And certainly the United States would agree that whatever

3  findings are ultimately entered would be controlling as to

4  Mrs. Martel.  I just want to save her a trip, if I can.

5    THE COURT:  If I found in favor of some theory they had,

6  I would treat everybody equally.  If you were in an area that

7  was affected by this testimony, and I so found, you would get

8  the same treatment that everybody else did.  Merely because

9  you signed this, I wouldn't exclude you from some benefit

10  that they might get.

11    Does that make it clear?

12    MRS. MARTEL:  Yes.  Well, it is a matter of establishing

13  the rights for a permanent record, you know, to clear the

14  title on it.

15    MR. VEEDER:  This is the original, Mrs. Martel.  This

16  is for your Tract 281, this one here, and this is for your

17  Tract 285.

18    MRS. MARTEL:  All right (signing).

19    MR. VEEDER:  Thank you very much.

20    MRS. MARTEL:  And thank you for your patience.

21    MR. VEEDER:  I am glad you came in, Mrs. Martel.  I

22  appreciate it.

23    MRS. MARTEL:  Thank you.

24    THE COURT:  We have some other housekeeping matters,

25  Mr. Veeder?

P 4

1      MR. VEEDER:  I do your Honor.

2      THE COURT:  All right.

3      MR. VEEDER:  We have quite a number of letters where the

4   parties have indicated acceptance of the irrigable acreages

                                   time
5   set forth.  I would like at this/to offer them as part of

6   Exhibit 207-E.  That is for the Wilson Creek area.

7      THE COURT:  They will be received as part of Exhibit

8   207-E.

9      MR. VEEDER:  We have received, since the last hearing,

10  some additional acceptances of your Honor's letter for the

11  Upper Murrieta area, and I would like to offer those as part

12  of Exhibit 207-E.  We are putting them all into that one

13  exhibit.

14     THE COURT:  You are putting them all in there, whatever

15  creek they are on; is that what you are doing?

16     MR. VEEDER:  Yes your Honor.  Exhibit 207-E are the

17  acceptances.

18     THE COURT:  All right, received in evidence as part of

19  Exhibit 207-E.

20                         (Whereupon, the documents above re-    )
                           (ferred to, including that of Mrs.     )
21                         (Hazel A. Martel, were marked and       )
                           (received in evidence as part of Plain-)
22                         (tiff's Exhibit 207-E.                  )

23     MR. VEEDER:  Your Honor, we have completed a tabulation

24  of irrigable acreages within the Upper Murrieta and Warm

25  Springs Creek sub-area.  These tabulations are the composite

P 5

1  of the irrigated and irrigable acreages found -- they are set

2  forth, rather, in the letters that went out. I would like

3  to offer those tabulations and have them marked as 208-D.

4  They are nothing more nor less than a composite.

5  THE COURT:  What purpose will it have?

6  MR. VEEDER:  I will hand your Honor his copy.

7  MR. STAHLMAN:  Is that Colonel Bowen's work?

8  MR. VEEDER:  That is correct. This is the completion

9  of the area from the standpoint of irrigable and non-irrigable

10  and total acreages.

11  MR. SACHSE:  Does it have all the parcels?

12  MR. VEEDER:  It is all those that are involved in this

13  matter.

14  THE COURT:  These are all the parcels on what map?

15  MR. VEEDER:  It would be 208-C, your Honor.

16  THE COURT:  This would cover all of the Domenigoni

17  Valley?

18  MR. VEEDER:  That is correct.

19  MR. SACHSE:  Do you have copies for counsel?

20  MR. VEEDER:  Yes.

21  THE COURT:  Is this copy for me?

22  MR. VEEDER:  That is what is offered, your Honor. I am

23  offering 208-D.

24  THE CLERK:  There is a 208-D. It would be 208-E Mr.

25  Veeder.

P 6

1    MR. VEEDER:  208-E then.

2    THE COURT:  208-E received in evidence.

3                (The document above referred to was marked)
                 (and received in evidence as Plaintiff's  )
4                (Exhibit 208-E.                           )

5    THE COURT:  Doesn't this solve your objections to the

6    findings on Domenigoni Valley?  Can't we now wind it up, since

7    you have the irrigable acreage all tabulated?

8    MR. VEEDER:  I think it can be amended, and I think they

9    should be tabulated and set forth as part of the Domenigoni

10   Valley findings and conclusions of law.  That is one reason

11   why I had this matter brought up today.

12   THE COURT:  We will take that up later.

13   What other matter do you have?

14   MR. VEEDER:  I have a letter here from Mr. Littleworth

15   that I would like to have you view, your Honor.  You have

16   asked me to prepare findings and conclusions in regard to the

17   Murrieta-Temecula basin on March -- well, yesterday I got

18   the letter.  Mr. Littleworth has stated that he is extremely

19   interested in the kind and type of findings we are going to

20   prepare.  He said he would be happy to consult with me in

21   regard to them.

22   He also said that he would submit findings himself, if

23   we desired him to do so.

24   I attempted to contact him.  He is going to be away and

25   I can't even find out where he is.

P 7

1    I don't know what your Honor's desires are in this matter.

2    Of course, Mr. Littleworth and Mr. Krieger are representative

3    in this case of a large number of the largest operators in

4    the Murrieta basin.

5    THE COURT:  How near are you/being in a position to start

6    to draw those findings?

7    MR. VEEDER:  We have now duplicated and completed the

8    exterior boundaries of the Murrieta basin.  I understand that

9    we are to make one change and eliminate the basement complex

10   for Erle Stanley Gardner.

11   THE COURT:  No, I don't think so.

12   MR. VEEDER:  If you say no, that is fine.  As drafted,

13   then, we have completed that work.

14   I have consulted with Mr. Girard in regard to his

15   conclusions as to the rights to the use of water on and off

16   the overlying lands.  There is some disagreement on that.

17   But I think that we can, by the end of the week, have at least

18   a tentative form for you, if you want me to prepare them as

19   I am now preparing them and offer them to you for considera-

20   tion.  That would relate both to Murrieta, Temecula, and the

21   Aguanga ground water basin.  I think it becomes extremely

22   important, however, the question where the water can be used

23   from those basins, and I think it is a matter that should be

24   reviewed with Mr. Littleworth before there is a conclusion

25   of law on it.

P 8

1    MR. SACHSE:  I can't speak for him, of course, but I

2    was in touch with him on this issue.  I don't know where they

3    are.  They are both out of town.  And I am quite sure that

4    you may be worrying unnecessarily, Mr. Veeder.  He is very

5    much concerned, you are correct, in having an opportunity to

6    check and to be heard on the question of what yardstick is

7    to be applied to the use of the water out of the basin, whether

8    it can be used on a single ownership outside and inside.  But

9    on the boundary issue he is not concerned.  He assumes that

10   if the boundary changes are as I described them to him,

11   namely, just minor corrections worked out by Colonel Bowen for

12   the purpose of clarity of delineation for title purposes, he

13   would have no objection.  Frankly, I don't see any reason why

14   you shouldn't go ahead and prepare them and submit them to

15   him, because he is going to have to be heard on the question

16   of the conclusions of law.  I think several of us may want

17   to be heard on that.

18        THE COURT:  I think you should start to prepare them.

19        MR. VEEDER:  They are started, your Honor.

20        THE COURT:  And that would be for the whole area within

21   the boundaries.

22        MR. VEEDER:  It would be for the whole area, and it
                                   be
23   would certainly/preliminary to the individual findings and

24   conclusions of law based on the data already in the record.

25

Belt Bq2

P 9

1        THE COURT:  Preliminary to the individual findings --

2   what are you talking about?

3        MR. VEEDER:   I don't know what your plans are in regard

4   to it, your Honor, but there are a large number of defendants

5   in there, who, I would assume, would want some kind of find-

6   ings in the composite.

7        THE COURT:  I misunderstood you.  You are talking now

8   only about the basins.

9        MR. VEEDER:  The exterior boundaries of the basin.

10       THE COURT:  That is all you are talking about.

11       MR. VEEDER:  Yes your Honor.

12       THE COURT:  I thought you were preparing that already.

13       MR. VEEDER:  We are.  I don't believe there is any

14   disagreement on it.

15       THE COURT:  I understand now what you are talking about.

16   We still have the loose end whether these are two bodies and

17   can be described as such, or whether they are one body.

18       MR. VEEDER:  That is correct.

19       THE COURT:  That has never been decided.

20       MR. VEEDER:  That is correct.

21       THE COURT:  I see no reason why you shouldn't go ahead,

22   and let's get at that some time this week.

23       MR. VEEDER:  We are moving on it.  We will have it

24   ready for you.

25       THE COURT:  When are you going to be ready to draw

P 10

1    findings on these individual owners in the Murrieta?

2        MR. VEEDER:  I think we are ready.  It is just a matter

3    of doing it.

4        THE COURT:  Have we been over the whole area in the

5    Murrieta?

6        MR. VEEDER:  Yes, we have.  We have the problem of one

7    or two.  I have a map made up, if your Honor would care to

8    look at it, indicating the parties who have been contacted,

9    who have been noticed, who have been advised, who have made

10   their complaints, who have appeared here -- 207-C, as I

11   remember it -- and Colonel Bowen's office has delineated and

12   outlined these areas of the parties who have been served and

13   who have appeared.  There are some of these people who we

14   simply can't find.  I think what we will have to do, though,

15   at the end of the making of these findings is to have publica-

16   tion of some kind or some kind of notice, and if there is no

17   objection I think I would request your Honor to just proceed

18   to make findings in regard to these people based on the evi-

19   dence in the record.

20       THE COURT:  Haven't you already published against people

21   you couldn't serve?

22       MR. VEEDER:  Oh yes, in regard to the service of the

23   complaint.

24       THE COURT:  What type of publication are you talking

25   about?

P 11

1    MR. VEEDER:  I think when these findings are ultimately

2    entered we should have some kind of notice as to the ultimate

3    disposition of these individual cases.  A great many of these

4    people live in Canada and we have been unable to contact them.

5    I am going into detail that I didn't expect to get into at

6    this point, but I will show the problem on the map that

7    Colonel Bowen's office has prepared.  I think everyone should

8    be notified once more, if we can find any way of doing it,

9    so that there will be no question of due process.

10   THE COURT:  I don't see how these people could be hurt.

11   The evidence clearly shows that they are within the confines

12   of this area where there is a water body.

13   Let's see this map you are talking about.

14   MR. VEEDER:  I am sending for it now, your Honor.

15   THE COURT:  While we are waiting for that map, the map

16   you laid on my desk, the findings and conclusions regarding

17   Rainbow Creek, and I take it that you followed the practice

18   as you did before.  We have lodged them along with the three

19   other sets that have been lodged.

20   MR. VEEDER:  That was done yesterday morning at ten

21   o'clock.

22   THE COURT:  It was not done.  Here is the original right

23   here.

24   MR. VEEDER:  Didn't he sign it?

25   THE COURT:  It is signed, but it has not yet been lodged.

P 12

MR. VEEDER:

I thought he had given them to Mr. Luddy.

THE COURT:
I will hand them to Mr. Luddy, the original and copy, and ask that they be lodged.

MR. STAHLMAN:  How do we get copies?  I didn't get one.

MR. VEEDER:  They are being prepared and we will see that you get one, Mr. Stahlman.

Is Mr. Girard going to be here today?

THE COURT:  I understood that he was.

MR. SACHSE:  I understood that he was.  The only assumption I can make is that he is fogged up.  The coast is very bad.  I checked the hotel and he hadn't come in.  I imagine he will show up in mid-morning.

THE COURT:  Another matter, so that we can go ahead, the findings on the appropriative rights of the Fallbrook Public Utility District were lodged on February 8th and they were filed on February 14th, and this is in the nature of an interlocutory judgment and I think it should be numbered as an interlocutory judgment in the series of judgments.

MR. SACHSE:  I think that is a good suggestion.  I didn't think of it at the time.  I just identified it.  I don't know what the last number is.  Mr. Veeder has had so many of them.

THE COURT:  Do you have any in work where you are using numbers now?

MR. VEEDER:  Yes, I do, your Honor.  I would have to

P 13

1   check the last number we used.

2       THE COURT:  The last number we used was 22 for the

3   Mexican water rights.

4       MR. VEEDER:  Then let's use 23.

5       THE COURT:  You have no papers being mimeographed that

6   show No. 23?

7       MR. VEEDER:  No your Honor.

8       THE COURT:  Then the Fallbrook Interlocutory Decree will

9   be called No. 23, and the clerk will so number the original.

10      How did you miss that, Mr. Clerk?  Are there any more

11  that you missed now?

12      MR. SACHSE:  I think, your Honor, that he will find that

13  on some that are in his files.  The ones that I have prepared

14  I have not numbered.  For example, the lodged judgment for

15  Diamond and Domenigoni Valley has no number.  The lodged

16  judgment for Tucalota Creek has no number.  I would suggest

17  that since Mr. Veeder has the numbers it would be easiest for

18  Mr. Luddy to pick up the last number from Mr. Veeder each

19  time and then advise me.

20      MR. VEEDER:  That is very satisfactory, your Honor.

21      May I refer to the record on this matter.  As I see it,

22  we are speaking now of Item 16, page 4, of the Agenda.

23      THE COURT:  I don't know what you are talking about, as

24  far as the Agenda is concerned.

25      MR. VEEDER:  I am trying to keep track of it.

P 14

1      THE COURT:  What page?

2      MR. VEEDER:  Page 4, Item 16, the procedure to be

3  followed in regard to entry of interlocutory judgments which

4  have been signed and presently filed with the clerk.

5      THE COURT:  It is on for discussion.  We might  as well

6  talk about it now.

7      The practice has been --- I didn't know whether you

8  gentlemen knew this or not -- but these 23 interlocutory

9  judgments have been filed.  They are stamped "filed."  None

10  of them has been entered.

11     MR. SACHSE:  I was not aware of that, your Honor.

12     THE COURT:  That is what we want to talk about.  Should

13  they be entered as we go along, or should they not?  This is

14  a different problem from the Master's findings.  We lodged

15  those because the rule provides that after the Master's

16  findings are filed then certain things must be done on notice

17  and there is a time limit on it.  So the Master's findings

18  have been only lodged to date.  This now I think makes four

19  of them, and the clerk has them in a separate file.

20     These interlocutory judgments have been filed.  They have

21  not been entered.  The entry, of course, is one of the steps

22  that have to be taken before an order could be appealable.

23  These are not appealable even if entered.  But I am wondering

24  whether the clerk should be instructed to enter them as we

25  go along, which would be the customary way, or hold them up.

p 15

1    I didn't realize they were not being entered.

2        MR. VEEDER:  They are not effective until they are

3    entered, under the Rules.

4        MR. SACHSE:  They are not effective even finally, are

5    they?

6        MR. VEEDER:  I am simply saying there is a rule that

7    says that until Mr. Luddy has entered them the order is not

8    effective.

9        THE COURT:  Mr. Luddy, what view do you have on this?

10       THE CLERK:  That is correct your Honor.  That is my

11   understanding, that the judgment is not effective until it

12   is entered.

13       MR. VEEDER:  By the clerk.

14       THE COURT:  And if these are entered, then they are

15   only effective as an interlocutory decree which is subject

16   to modification and is not appealable until a final judgment

17   is entered.

18       THE CLERK:  That is correct.

19       MR. VEEDER:  That is right.

20       THE COURT:  Wouldn't the ordinary course of your office,

21   though, be to enter interlocutory judgments?

22       THE CLERK:  Well, I would say yes, your Honor.  However,

23   in this case, the reason I have never entered them or had

24   them entered, it was my understanding that those were going

25   to be filed and then included in the final judgment, and that

15,846

P 16

1    they were not to be entered as we went along.

2        THE COURT:  I think what we intended to do is to in-

3    corporate them by reference to avoid a lot of extra work in

4    the final decree.

5        MR. SACHSE:  That is the thought that occurred to me.

6    Unquestionably, many pages of these are going to be entirely

7    satisfactory, even after final argument.  Why should they

8    all be reproduced again?  Think of the waste of paper.  You

9    could simply say interlocutory judgments 2, 6, 9, 10, 11,

10   etc., are hereby made final and you have it done, if they

11   are now entered.

12       THE COURT:  They are final and made part of this decree

13   and incorporated by reference.

14       MR. SACHSE:  It would occur to me -- I have no strong

15   feelings in it, frankly -- that that would be the logical

16   thing to do.

17       MR. STAHLMAN:  If you don't do it that way, you are

18   going to have a tremendous problem.

19       MR. SACHSE:  If you do it any other way it is going to

20   be terrific.

21       MR. VEEDER:  You can say that again.

        I don't know what is your Honor's power.  Suppose you

22   want to withdraw one of these once they are entered.

23       THE COURT:  I couldn't withdraw it.  I could modify it.

24       MR. SACHSE:  You could modify it by striking every word

25   in it, as far as that goes.

15,847

P 17

1   THE COURT:  I think I will instruct the clerk to enter

2   these judgments as they are filed.

3       Do you see any objection, Mr. Clerk?

4   THE CLERK:  No, your Honor.  However, I do have a question.

5   When they are entered it is customary to notify all parties

6   involved about the entry of the particular judgment.  I

7   wonder if this is going to be necessary.

8   MR. VEEDER:  I hope it is not.

9   THE COURT:  You say this is customary.  Do you have any

10  rule that requires this?

11  THE CLERK:  Not that I know of, your Honor.  However,

12  the reason why we notify them is to notify them when the date

13  of appeal starts.

14  MR. SACHSE:  That wouldn't be pertinent to this situation.

15  THE CLERK:  I know it wouldn't.  But any judgment that

16  we enter, we always notify any parties involved, whether

17  they appear by attorney or pro per.

18  THE COURT:  We don't have the addresses.  We just have

19  the legal descriptions, don't we?

20  MR. VEEDER:  Oh yes.

21  THE COURT:  In these judgments?

22  MR. VEEDER:  No. I thought you were looking at me -- do

23  we have addresses?

24  THE COURT:  I mean in the judgments.

25      I think the purpose of the notice of the clerk is to

P 18

1    advise the person that his time for appeal is starting to run.

2        THE CLERK:  That is correct.

3        THE COURT:  Since that is not involved here, I don't see

4    any reason for worrying about the notice.

5        THE CLERK:  That is right.

6        THE COURT:  There will have to be notice later of a

7    hearing on the final judgment and the incorporation of these.

8        Then Mr. Clerk, as these interlocutory judgments are

9    signed and filed, will you enter them?

10        THE CLERK:  Yes your Honor.

11        THE COURT:  And enter those that have already heretofore

12    been filed.

13        THE CLERK:  Yes.

14        MR. STAHLMAN:  I wonder if it wouldn't also be convenient

15    if there were a list made up of those that could be kept up.

16        THE COURT:  Yes, I have one here, rather rough, but I

17    will have the clerk make some copies for you, and then you

18    can keep your list up to date yourself.

19        I had the clerk look to see if we could find any, again,

20    that had not been numbered.  You didn't pick up this one of

21    Fallbrook's appropriative rights.  Are there possibly any

22    more that have been signed that don't have numbers on them?

23        MR. SACHSE:  I doubt it.  Everything Mr. Veeder has

24    prepared is numbered, and the only ones I have prepared have

25    been findings without judgments for Diamond and Domenigoni

P 19   1   Valley and Tucalota.  And they are not judgments, anyway.

2   They are just findings.   The judgment is not attached.

3   MR. VEEDER:  I think there is one attached to Tucalota

4   Creek.

5   MR. SACHSE:  Is there, Mr. Veeder?

6   Well, anyway, I would suggest on those if it has been

7   done, it would be simple to ask Mr. Luddy to check with Mr.

8   Veeder for the last number and stick it on it.

9   THE COURT:  That is right.  If Mr. Veeder has in the

10   mill an interlocutory judgment with a certain number on it,

11   Mr. Veeder, give him an additional number so that he will

12   not have to revise.

13   MR. VEEDER:  That is right.

14   MR. SACHSE:  You are quite correct, Mr. Veeder.  There

15   is a judgment also on Tucalota Creek.  But it has not been

16   approved.

17   THE CLERK:  It has not been approved?

18   MR. VEEDER:  No.

19   MR. SACHSE:  It is lodged.

20   THE CLERK:  As I understand, you only want the numbers

21   assigned after they have been signed and approved by your

22   Honor.  On these that are submitted and lodged it is not

23   necessary.

24   THE COURT:  No, ordinarily.  However, Mr. Veeder will

25   come out with numbers on some when he puts them on.

P 20

1     MR. VEEDER:  We are working on those on Fallbrook.  We

2 are virtually completed, and except for the riparian rights

3 in Fallbrook Creek, and we are going to wind those up.  That

4 will take another number.  I will let you know, Mr. Clerk.

5     THE COURT:  Now where do we go next?

6     MR. VEEDER:  We have taken care of No. 1 on the Agenda.

7     MR. SACHSE:  Number 16.

8     MR. VEEDER:  I would like, if we can, to move on to

9 No. 2:  The question of the claim of the United States of

10 America to appropriative rights to the use of water for Lake

11 O'Neill.  I have lodged with your Honor proposed findings.

12 I have delivered them to Mr. Sachse.

13     Let the record show that Mr. Girard walked in.

14     I think everybody has copies of those.

15     MR. STAHLMAN:  I wonder, your Honor, if we could take

16 our morning recess.   I would like to speak, if I may, off

17 the record to the Court about recesses.

18     (Mr. Stahlman off the record.)

19     THE COURT:  All right, we will be in recess for a few

20 minutes.

21     MR. CLERK:  What about that judgment on the Guadalupe-

22 Hidalgo treaty?

23     MR. VEEDER:  That has been mailed out, your Honor.

24     THE COURT:  Mailed out to all these people?

25     MR. VEEDER:  Yes your Honor.

P 21

1        THE COURT:  It has been signed?  Have I got a copy of

2   it yet?

3        MR. VEEDER:  The original is in.

4        THE CLERK:  I will have to check it, your Honor.

5        (Morning recess.)

15,852

MR. GIRARD: Your Honor, I have served counsel with copies, and have given the Clerk and the Court a copy, of the Findings of Fact regarding Gibbon, Cottle, Oviatt and Knox.

I apologize for being late, but my plane was over San Diego at 9:00 o'clock, and we finally got down at 10:30, after stopping at Miramar.

MR. VEEDER: Your Honor, that is Item 8, Page 2 of the agenda, and that is the findings as to Gibbon, Cottle, Oviatt, Allen and Knox.

I have talked to counsel for Knox-- his name is Trent Anderson-- and I asked him if he was going to talk to you, and I don't know whether Mr. Anderson called you or not.

THE COURT: No.

MR. VEEDER: He said that he would not be here today, but he would try to be here tomorrow.

I talked to Mr. Stark, who represents Gibbon and Cottle, and I understand that he had a conversation with Mr. Girard in regard to the findings, and that he will be here on Friday. Is that correct, Mr. Girard?

MR. GIRARD: That is what he told me. He told me he was going to communicate with the Court.

MR. VEEDER: I talked to Jesse O'Malley, who represents James Oviatt, and I think he also talked to Mr. Girard about those findings.

MR. GIRARD: That is correct.

15,853

t-15

MR. VEEDER:  And he asked that copies be sent to him, and that he would make objections later.

MR. GIRARD:  Copies have been sent as of last night airmail.

MR. VEEDER:  Then I believe there is nothing to be done with regard to 8 at this time, your Honor.

THE COURT:  I was just thinking that I had a letter from one counsel.

MR. GIRARD:  I believe you had a letter from Mr. O'Malley, your Honor, and I got a copy of it.

THE COURT:  And he said he would not be here.

MR. GIRARD:  He said he would not be here, and if he had any objections, he would ask for a date later, and if he did not, he would let us know in writing.

THE COURT:  Yes, I understand that is it.

MR. VEEDER:  Then Number 2, Sir, may we proceed on that on the agenda?  That is a carry-over from the last time.

THE COURT:  All right.

MR. VEEDER:  I have served Messrs. Sachse, Girard and Stahlman with copies of the right claimed by the findings of fact, conclusions of law and proposed interlocutory judgment in regard to the claimed appropriative right by the United States of America for Lake O'Neill.

I have talked generally to Mr. Girard about them.  I have talked to Mr. Sachse in regard to them.

T-16

1        Based upon a conversation with Mr. Sachse, I have

2    suggested a substitute Page 8, and I gave your Honor a copy

3    of that.

4        MR. SACHSE:  You were not under the misapprehension

5    that those were my only objections, were you?

6        MR. VEEDER:  Not at all.  That is why we are here, Mr.

7    Sachse.

8        I think they are in form where we could proceed, however,

9    your Honor, and find out the objections that are made, and I

10   would like to wind them up as soon as we could.

11       Does your Honor have a copy of them?

12       THE COURT:  Yes, I have the original and a copy, but

13   they have not yet been lodged with the Clerk, and I was looking

14   for the substitute page that you mentioned.

15       MR. VEEDER:  I have an extra copy which I will hand to

16   your Honor.  The Clerk is not here, so I will just hand it up.

17       THE COURT:  Oh, here it is, Page 8, right here.  Have

18   counsel had a chance to look at these?

19       MR. SACHSE: Yes, your Honor.

20       MR. GIRARD:  I have.

21       THE COURT:  I will substitute this page.

22       MR. STAHLMAN:  That changes what?  Paragraph IV?

23       MR. VEEDER:  I gave you a copy of that.

24       MR. GIRARD:  Where is that?

25       MR. SACHSE:  Here it is, Paragraph IV, Line 7.

t-17

MR. VEEDER:  It is Page 8.  I not only gave you a copy, but you acknowledged receipt, Mr. Girard.

THE COURT:  Was it your thought, Mr. Veeder, to have an interlocutory judgment entered as to the right of the Rancho as of 1914 before we heard from Mr. Sachse and what rebuttal he had to offer?

MR. VEEDER:  I thought if you could enter it on that basis-- let me start again.  I would like to see you enter it as of today, and if Mr. Sachse has-- and I think I am entitled to know-- if Mr. Sachse intends to introduce evidence on the point, that would be important.  If he has other data he desires to offer, I would suggest that he might offer it now. I don't know what  possible evidence he could offer, but I am certainly willing to hear him on the point.

THE COURT:  Why I call it to your attention is this:  As the interlocutory judgment reads, it starts out in Paragraph 1, Page 9:

"The United States of America is the owner of, and title resides in it," --

MR. SACHSE:  That wasn't our understanding, your Honor.

THE COURT:  (Continuing reading.)

"-- to the above described non-statutory appropriative right, and so forth.

It is written as if we had already heard Mr. Sachse. When are you  prepared to go forward?

t-18

MR. SACHSE:  I am prepared to go forward at any time after I know what the extent of the rights of the Santa Margarita Rancho are, which I tried to make clear to Mr. Veeder six times in the record.

I cannot offer my evidence, which your Honor has character-ized as a sort of a confession and avoidance, which is quite correct, until I know what the rights are which the United States alleges were owned by the United States predecessor in interest.

THE COURT:  How do you want that to be?  Do you want that to be a draft of findings which we have approved, or the extent to which the Court says, "This I am willing to accept," or do you want it entered as an interlocutory decree?  How do you want to proceed with that?

MR. SACHSE:  I want to make it as easy as I can for everybody.  I want to state right now that I called Mr. Veeder, and I think this should be on the record, and offered him a stipulation.  I will state now what I offered him, which would eliminate all necessity, as I understand it, of any further evidence.

I discussed this stipulation, or, rather, I advised Mr. Girard in writing, and Mr. Stahlman in writing of my intention, because obviously my stipulation is not enough, since any prior rights of the Rancho are, of course, good against Vail also, so I did turn this over  to Mr. Stahlman sometime ago and told him

15,857

t-19

1    to think about it.

2          The substance of the offer I made was this:

3    I would stipulate that the Rancho acquired appropriative

4    rights to store water for irrigation purposes in the amount of

5    1,100 acre feet annually, as set forth in our stipulation of

6    March 17th.

7          I would stipulate that the United States, as successor

8    in interest to the Rancho, acquired that right.

9          I would stipulate, or perhaps the better word would be

10   withdraw any objection-- I would withdraw any contention that

11   the change in use from irrigation by the Rancho to recreational

12   ground water storage uses by the United States worked a

13   forfeiture.  I would withdraw that contention.

14         I would withdraw any contention that the change in place

15   or method of diversion by the United States worked a forfeiture.

16         I would ask that the time of the United States

17   appropriative right be limited-- I suggested in my letter to

18   these gentlemen-- to the period 31 March through 30 September

19   annually.

20         THE COURT:   31 March?

21         MR. SACHSE: 31 March through the 30th of September.

22         I would ask, and this is the critical part of the offer

23   of the stipulation, your Honor, -- I would ask that the Court,

24   however, make an additional order as a part of the determina-

25   tion of the existence of this right in the United States,

t-20

1    directing the United States to commence diversions into Lake

2    O'Neill at the earliest possible date in each water year.  In

3    other words, that the Court direct the United States to make

4    diversions into the lake even at a time when they had no

5    appropriative right to do so.  Now, --

6         THE COURT:  You mean on dates prior to March 31st?

7         MR. SACHSE:  Yes.  In other words, that the United States

8    would be directed by an order of this Court to immediately

9    start diverting water into Lake O'Neill in November, if there

10   was water in the river.

11        Now, there are two reasons for this, if I can go on:

12   Number One, I assume, and this is the way I understand, that

13   this is the way that Colonel Bowen wants to operate, he wants

14   to fill the lake as early as he can.

15        My purpose is quite obvious.  I would like to have the

16   rights of the United States, the rights which they can

17   enforce upstream, limited in such a manner that they would

18   cause the least possible interference with the winter storage

19   rights of Fallbrook, and I believe Mr. Stahlman would feel

20   the same way about Vail.

21        On the other hand, I would like to have the United States

22   required, and I am sure I might add that this has been your

23   Honor's jurisdiction under the reasonable use constitutional

24   amendment,-- I would like to have the United States required

25   to attempt to satisfy its rights to the fullest extent

15,859

t-21

1    possible from waters that accrue to it below the Fallbrook

2    reservoir, De Luz Creek, and other sources, to satisfy its

3    appropriative rights to the fullest extent.

        I believe that this sort of a limitation would serve to

5    be the most efficient possible method of conserving the waters

6    of the stream, because you can only store waters by storing

7    them.   In other words, Colonel Bowen can always unstore Lake

8    O'Neill if he fills it up.   That is easy.   But if he doesn't

9    fill it, he can't bring it back into O'Neill, and I think

10   your Honor in your ultimate decree should require that at the

11   earliest possible date, and from the sources available to it,

12   without interference from other appropriators it should attempt

13   to satisfy its rights to the fullest extent.

14       Now, I would expect that in the majority of the years

15   that would be accomplished without any interference with any

16   rights upstream.   I think I would have to honestly admit that

17   there will be years when it would not be accomplished, as

18   this year.   And then the United States would have a right,

19   commencing March 31st, on which it could predicate a claim

20   for restraint against upstream diversions during the summer-

21   time.

22       I have made that tender, and Mr. Veeder-- I won't say he

23   rejected it, but he listened, and that's all.   I think if we

24   could hammer out something of that kind, I am perfectly

25   willing to abide by most of the claims in the findings the way

15,860

t-22

2 C-2

1   they are with some minor changes, and I think then something

2   should be done to eliminate this as to surface.

3       MR. VEEDER:  Your Honor, the position of the United

4   States of America is this, as reflected in the findings of

5   fact, conclusions of law, and proposed interlocutory judgment:

6   We bought and paid for an appropriative right.  That right we

7   have agreed would be limited to the 1,200 acre feet annually.

8       That right, in addition to our riparian right,-- that

9   right has a priority of 1883.  It has a priority during the

10  months of the irrigation season, as we asserted, as early as

11  January.  We claim that the facts will support that appropria-

12  tive right.

13      In regard to Mr. Sachse's thought that the United States

14  should impound water when it arrives, during the winter, is

15  one that we necessarily could not accept in lieu of the

16  appropriative right.

17      Surely, if water comes down there, we will utilize it

18  and get it in the ground as fast as we can, but that would be

19  riparian water normally that would come down at that time.

20  So he is in effect asking us to exchange an appropriative

21  right, with a priority from, what we say is March, 1883, --

22  to exercise that appropriative right or to abandon that

23  appropriative right, and to actually use riparian water to

24  which we are already entitled.

25      For that reason I would be unable to agree to the

15,861

t-23

1   suggestion that he has made.

2       MR. SACHSE:  Then, to answer your Honor's question

3   specifically, I will be perfectly satisfied-- I don't want to

4   delay anybody -- if your Honor cares to go through these

5   findings to the extent that they affect the Rancho's appropria-

6   tions.

7       MR. STAHLMAN:  Pardon me, before you get off to another

8   subject.  I want to throw out a thought that I have for what

9   it is worth.  There may be some other alternative that would

10  be just as practical, and that would be that in filling Lake

11  O'Neill the Government would be held accountable for water

12  that went into the ocean.  In other words, if water was

13  being spilled into the ocean that they should be willing to

14  put /into Lake O'Neill.
        it

15      MR. SACHSE:  That would not be satisfactory to me at all,

16  Mr. Stahlman,

17      To answer your Honor's question as to how specifically

18  I would want findings before I would present what matters I

19  have in opposition, I would be perfectly satisfied if we

20  could go through all these findings insofar as they affect

21  O'Neill, and at that point stop, and your Honor tell me -- I

22  wouldn't consider that it need be drafted, but your Honor

23  simply state for the record in general terms what you intend

24  to find as an appropriative right, in so many feet for such-

25  and-such daily or periodic limitation.

t-24

1   With that announcement I would be willing to go ahead and

2   present what I have in opposition to any rights in the United

3   States.   I will not insist that Mr. Veeder prepare--

4   THE COURT:   How long will it take you to present the

5   matters that you have in mind?

6   MR. SACHSE:   Very quickly, because most of them are in

7   evidence, or will involve new tenders.   There are certain

8   matters in evidence, which were marked for identification,

9   offered, and not admitted by your Honor, and I will retender

10   them.

11   MR. VEEDER:   What is that?

12   MR. SACHSE:   I will retender them.   There are five

13   Fallbrook exhibits on which the United States on each one has

14   stated, "We have no appropriative rights."

15   I will reoffer them, and I am quite sure they are properly

16   admissible at this time.   The United States in each of those

17   protests to the Vail application, to the Fallbrook application,

18   and stated, in answer to the specific question, "What rights

19   do you assert to the waters?", they say, " The riparian rights"--

20   I have the copies of them right here-- "The riparian rights

21   to the waters of the Santa Margarita River."

22   I conceive that to be a declaration against interest by

23   the holder of the title himself, not even his predecessor,

24   but the holder of the title at the time it was made, and I

25   will offer those.

15,863

t-25

1      I will offer them also as evidence of an intent to

2  abandon any right that may have existed in the Rancho, because

3  they say now, "We don't have it."  And I think that is very

4  good evidence that they intend to abandon it.  And I will have

5  very considerable argument and law to offer to your Honor.

6      THE COURT:  Then let's go through these findings and see

7  what you come up with.

8      MR. SACHSE:  Do you want me to do the same thing I did

9  before, to tell you where I am happy, and where I am not?

10     MR. VEEDER:  Go ahead in any way you want to, Mr. Sachse.

11     MR. SACHSE:  I want to do it in any way that is best.

12     MR. VEEDER:  I want you to do it in the most expeditious

13  way, and that's all I ask, and let's be on with it.

D fls.

14

15

16

17

18

19

20

21

22

23

24

25

Take D1

p 22

1    THE COURT:  The first change will be on the first page:

2    The Court makes the following findings of fact, strike out

3    "concludes as a matter of law".

4    MR. VEEDER:  I didn't get that.

5    THE COURT:  On page 1, at line 23, you have:  The Court

6    makes the following findings of fact, and you say "and con-

7    cludes as a matter of law".  These are the findings, you see.

8    MR. VEEDER:  All right.

9    THE COURT:  That should come preceding the findings.

10   Put it in at about line 27:  "The Court finds . . "

11   Strike out the reference to -- well, as a matter of fact, you

12   can leave it in.  "The Court finds," and then on page 7

13   "The Court concludes . . "

14   MR. VEEDER:  The Court concludes as a matter of law,

15   or the Court concludes?

16   THE COURT:  As a matter of law.

17   All right, Mr. Sachse.

18   MR. SACHSE:  I have no objection to Paragraph I on page

19   1.

20   THE COURT:  Anyone else have objection to it?

21   MR. STAHLMAN:  No.

22   MR. SACHSE:  I have no objection to II, III, IV.

23   MR. VEEDER:  These are paragraphs now?

24   MR. SACHSE:  These are the paragraph numbers.  I have

25   no objection to II, III and IV on page 2.

P 23

1    MR. GIRARD:  I have an objection to Paragraph II.  As
2    has been evidenced in the record, the State does not concede
3    in this case that we have ceded exclusive jurisdiction to the
4    Naval area.  However, I am perfectly willing to have this
5    finding as it is stated, subject to the right to correct it
6    either before the final judgment is entered or after the
7    final judgment is entered, if the Supreme Court in that three
8    judge case changes the law.

9    THE COURT:  All right.

10   MR. GIRARD:  Mr. Veeder has agreed to that.

11   THE COURT:  The objection will be overruled without
12   prejudice to its being renewed at some other time.

13   MR. VEEDER:  All right.

14   MR. GIRARD:  That is all.

15   THE COURT:  Roman numeral V.

16   MR. SACHSE:  My objection is perhaps a matter of
17   semantics.  I question that actual findings as drafted should
18   say "water is stored by means of an embankment of earth."  It
19   is not stored by means of an embankment of earth now.  Colonel
20   Bowen described it to us.  Mr. Veeder is quoting here from
21   an old, old thing.  I have no objection to the heart and soul
22   of the paragraph.  I just think it is not the proper language.
23   I think we should describe how water is presently stored.  I
24   don't think it is by an embankment of earth.

25   THE COURT:  By "embankment of earth" do they refer to

P 24

1   the diversion across the stream, or do they refer to the dam?

2      MR. VEEDER:  It is the dam.

3      MR. SACHSE:  Is that it?

4      MR. VEEDER:  All right, let's change it.

5      MR. SACHSE:  When you write it, write it the way you

6   want.  But while we are going through I will make my point,

7   so you will know I object.

8      THE COURT:  Do you have it properly described?  Situated

9   in the Northwest Quarter?

10      MR. VEEDER:  That is correct.

11      THE COURT:  By means of a dam.

12      MR. VEEDER: "Dam" suits me.  An earthen dam.

13      THE COURT:  An earthen dam.  I don't know what the

14   objection is.

15      MR. VEEDER:  Neither do I, your Honor.

16      THE COURT:  An embankment of earth, to wit, an earthen

17   dam.

18      MR. STAHLMAN:  Mr. Sachse's thought is that there might

19   be confusion.

20      THE COURT:  I think so, too.  After "embankment of

21   earth" insert "to wit, an earthen dam."

22      MR. STAHLMAN:  In that same paragraph, just as matter

23   of information for myself -- I have forgotten just how the

24   topography of that is -- when you specify here, "water from

25   Fallbrook Creek, a tributary of the Santa Margarita River,"

P 25

1    where does it come in?

2    MR. VEEDER:   Fallbrook Creek actually enters Lake O'Neill

3    from the south.

4    THE COURT:   This is another.  "Fallbrook Creek . . flows

5    into that Lake during the winter and spring months . . "

6    MR. VEEDER:   Where are we now?

7    THE COURT:   Talking about Fallbrook Creek.

8    MR. VEEDER:   All right.

9    MR. STAHLMAN:   Would that be according to your understand-

10   ing, Bill, part of the water to make up the 1200 or 1100 acre

11   feet?

12   MR. VEEDER:   I don't know how much water comes in there.

13   As far as I am concerned, when it is filled.

14   MR. STAHLMAN:   Whether it is filled from your diversion

15   ditch or from Fallbrook Creek?

16   MR. VEEDER:   If you hit 1200 acre feet, you have it.  I

17   think that is very fair.

18   THE COURT:   This Fallbrook Creek confused me.  I thought

19   you were talking there about the diversion from the Santa

20   Margarita River.  Reading it carefully, you are talking about

21   another creek that flows into this dam.

22   MR. SACHSE:   That is correct.

23   MR. STAHLMAN:   It doesn't go through the diversion works.

24   It goes directly into the dam.

25   MR. VEEDER:   That is right.  How much water goes in there

P 26

I don't know, but Fallbrook Creek is tributary to Lake O'Neill and if any water comes down there it goes into the reservoir. I can't describe it other than it is.

THE COURT: You have an appropriative right to fill Lake O'Neill from the Santa Margarita River.

MR. VEEDER: That is right.

THE COURT: Then you would not be required to use water from Fallbrook Creek to fill it.

MR. VEEDER: My own view on that, your Honor, is that if any water comes down there -- I'll start again. We have the right, in my view, based on the evidence to divert 1200 acre feet from the Santa Margarita River. If there should be any water come in from Fallbrook Creek, that just goes into the reservoir. I think that is what the record shows.

MR. STAHLMAN: In other words, you are going to use the capacity of the reservoir each year as to what you divert.

MR. VEEDER: Our diversion will measure up to 1200 acre feet from the Santa Margarita River.

THE COURT: Anything else as to V?

MR. SACHSE: Not from me, your Honor.

THE COURT: Underline Fallbrook Creek to call attention to the fact that it is not the Santa Margarita River.

MR. VEEDER: All right.

THE COURT: Then going to VI, here we talk about Santa Margarita River water.

15,869

P 27

1    MR. VEEDER:  That is right.  That is what we are talking

2    about.

3    THE COURT:   I don't want to be unduly technical, but

4    Fallbrook Creek water is Santa Margarita River water.

5    MR. STAHLMAN:  Yes, it is tributary.

6    THE COURT:   I think it would be better to say "water

7    from the Santa Margarita River."

8    MR. VEEDER:   I say that: "Continuously . . water from

9    the Santa Margarita River . . "

10   THE COURT:  You say here "Santa Margarita River water".

11   MR. VEEDER:  It is first stored in Lake O'Neill.

12   "Continuously since that year, water from the Santa Margarita

13   River has been diverted . . "

14   THE COURT:  All right, I'll not be technical.

15   MR. SACHSE:   My big objection to this is the second

16   sentence, because I think this is a good faith error on Mr.

17   Veeder's part.  In the the first findings he drew he had this

18   exact language, and he also had extensive findings on how

19   much water was stored.  So at the last hearing we very care-

20   fully stipulated to an amount.  I think this is completely

21   immaterial to say "Water from the Santa Margarita River has

22   been diverted at times and in amounts which are found in

23   subsequent findings."  He hasn't got subsequent findings on

24   it.

25   MR. VEEDER:  I don't know what you are talking about.

P 28

1  If you look at Paragraphs VIII and IX you will find the
2  capacity of this structure.

3      MR. SACHSE:  That does not tell the amount diverted
4  into the lake at the time.  Now you show me where your find-
5  ings say the amounts diverted into the lake at the times.
6  They don't.

7      MR. VEEDER:  If you will read the finding.

8      Your Honor, can we go one at a time?

9      THE COURT:  Let me hear your objection to VI, Mr. Sachse.

10     MR. SACHSE:  My objection to VI can be most readily
11 understood if you look at his original one, if you have it
12 there.  In his original findings he had the language that
13 he has now in VI.  He also had extensive findings -- he had
14 a table saying how many acre feet were diverted each year,
15 he had his Paragraph XXVI, 3340 acre feet, 3050 acre feet --

16     MR. VEEDER:  That was after 1914.  You objected to it.
17 I took that out.  Those are the recorded figures.

18     MR. SACHSE:  Exactly, I objected to it.

19     MR. VEEDER:  And they are out.

20     MR. SACHSE:  Well, Mr. Veeder, you have no where in
21 these findings -- please look at them -- any statement saying
22 "Water has been diverted into the lake at times and in the
23 amounts which are found in subsequent findings," you haven't
24 any subsequent findings.

25     MR. VEEDER:  Just stick with it.  You will find that we

P 29   1    have set it out.

2         MR. STAHLMAN:   I am not personally or particularly

3    concerned, but I feel that this is a matter that I should

4    call the Court's attention to, and that is the matter in

5    relation to the year 1883.   I don't think it affects Vail

6    Company, I am not bringing it up for that purpose, but I do

7    feel that there may be other people on the stream who might

8    be affected by the use of 1883 and 1886.   I think the first

9    diversion started in 1886 by reason of the fact that the

10   matter was undoubtedly gone into in the first trial and Vail's

11   AB, the Findings of Fact, indicate that as the time in which

12   Lake O'Neill was initiated.   I am personally making no objection

13   to it on the part of Vail, but I just call it to the Court's

14   attention.   It may affect some other people.

15        THE COURT:   What do you rely upon?   The State engineer's

16   report for the 1883 date?

17        MR. VEEDER:   That is what we rely upon.

18        THE COURT:   Has anybody taken the trouble to see what

19   evidence was presented to the Court in the former trial?

20        MR. STAHLMAN:   We tried to do that, your Honor.   We have

21   had other things we were checking in connection with the

22   evidence.   We haven't found that.   It is quite a difficult

23   job looking for it.   But the findings undoubtedly were

24   predicated on testimony in that case.   And I don't know

25   whether there is any big concern about 1883 or 1886, unless

P 30

1  Mr. Veeder has some point there to try to exclude some others

2  during those dates.  However, it doesn't affect us.

3  MR. SACHSE:  Mr. Veeder, will you take a minute and run

4  through the next four pages of your findings and tell me

5  where it says how much water you are diverting into the lake

6  at any time and in any amount.

7  MR. VEEDER:  Can't we go ahead through these one at a

8  time?

9  MR. SACHSE:  Let's get them done.  This is absolutely

10  a misstatement.

11  THE COURT:  Where does it appear?

12  MR. VEEDER:  You mean where the diversions are made?

13  THE COURT:  Where is this that you refer to "in the

14  amounts and at the times found in subsequent findings" --

15  where are those subsequent findings?

16  MR. VEEDER:  Turn to XIII:

17  "Continuously, since March, 1883, whenever that

18  quantity of water was available in the Santa Margarita

19  River, the predecessor in interest of the United

20  States, after the winter runoff, if any, diverted

21  into the headworks of the Lake O'Neill diversion

22  ditch, a quantity of water not to exceed 20 cubic

23  per second and stored in Lake O'Neill a quantity of

24  water which did not exceed 1200 acre feet per year,

25  100 acre feet of which is dead storage.  That water

P 31

thus diverted and impounded was stored in the spring
of the year and held over in Lake O'Neill until the
dry months of summer and fall, and was beneficially
used for domestic, stock watering and irrigation
purposes."

The record completely supports that finding.  It says
this in so many words, if you want a distillate of it, that
the United States of America, after the spring runoff, diverts
all of the water in the Santa Margarita River into Lake
O'Neill up to the capacity of the ditch, 20 second feet.  I
don't know how I could be more explicit than that.  There were
no measurements until 1931.

XIII is the composite of the appropriative right.  It is
stated as succinctly and carefully and expressly as I can.

THE COURT:  What is wrong with that as a finding?
Doesn't it go far enough?

MR. SACHSE:  I don't think it ties into what VI says.
VI says that there have been continuously diverted waters
at times and in amounts to be found in subsequent findings.
The subsequent findings don't find times and amount.

MR. VEEDER:  XIII says it.

MR. SACHSE:  Mr. Veeder, please.  This was the whole
point of our lengthy discussion last time when we finally
agreed that since there was no evidence of amounts, there
couldn't be evidence of amounts, your Honor said, "What can

P32

1   you come up with?" We said we will say the amount was 1100

2   acre feet, which we did.

3       MR. VEEDER:  And that was based upon the diversions

4   from the stream to the point that the reservoir was filled.

5   Now that is written into XIII as expressly as I know how.

6       THE COURT:  First of all, what we came up with, as you

7   speak of it last time, was on another point.  That is, whether

8   or not there was proof of beneficial use of this water.  I

9   don't recall that we were particularly concerned about the

10  fact that there had been stored --

11      MR. SACHSE:  Yes, your Honor, I made very strongly the

12  point that there was absolutely no evidence of any amounts

13  of water diverted into Lake O'Neill because there were no

14  records -- I made that very clear; that the records all

15  started long after 1914, so that there could be no proof to

16  your Honor on the amount diverted.  And Mr. Veeder was re-

17  lying for proof of the amount.

18      THE COURT:  There is an engineer's report which tells

19  how the lake was filled by the boards, and when they got

20  ready to use the water they were taken out one by one.

21      MR. SACHSE:  Yes, but no evidence whatsoever of the

22  amount in any single year.  And I made the point that you

23  had to find an amount.  And Mr. Veeder, as I understood his

24  arguments two weeks ago, argued that you could infer the

25  amount from the types of crops grown and the water duty.

P 33

1    And I started to argue about that and your Honor said, "Take

2    a recess and see if you agree with Mr. Sachse that some

3    amount was diverted, how much was diverted." So we did agree

4    that an amount was diverted.

5        THE COURT:  My recollection was that it centered more

6    upon whether this was put to beneficial use.

7        MR. SACHSE:  I am not going to quarrel about it.

8        MR. VEEDER:  May I express what occurred on this?

9        THE COURT:  Mr. Veeder.

10        MR. VEEDER:  The question was whether there was seasonal

11   storage. We turned to Vail's AB and it said that the

12   reservoir was filled, and at that point it was agreed that

13   the maximum appropriative right we would have would be 1200

14   acre feet in one filling. That is exactly what I say in

15   Finding XIII. In other words, the maximum quantity that

16   would ever be diverted and stored under this right, irrespect-

17   ive of the right of diversion, would be 1200 acre feet. I

18   can't be more express than that. And that is what the record

19   shows today.

20        MR. SACHSE:  All right, I am not worried about it.

21        MR. STAHLMAN:  Would this satisfy you perhaps, if you

22   put in there "at the times and in the amounts as hereafter

23   found in Item XIII."

24        MR. VEEDER:  I don't like to limit it to XIII just

25   because --

P 34

MR. SACHSE:  Let it go.  It is immaterial.

MR. VEEDER:  All right.  Okay.

THE COURT:  Again, I don't want to be technical, but you have on page 3 at line 3 "Continuously since that year water has been diverted . . . " Actually, water was not diverted continuously.

MR. VEEDER:  Let's take out the word "continuously."

THE COURT:  That does part of it.  But you want a finding that it was diverted year by year.

MR. VEEDER:  Well, say each year.

MR. SACHSE:  No, your Honor, because we have specific evidence in the record already that it was not diverted every year; that there were some years when no water was diverted to Lake O'Neill.  There is evidence to that effect.  The record, in the United States' own exhibits, is that in several years, I guess because they didn't choose to empty it, but that there was no water through the ditch into Lake O'Neill.

THE COURT:  Not since 1914.

MR. SACHSE:  Yes your Honor.

MR. GIRARD:  Maybe this should say that since the year 1883 and through until 1914, if we are dealing here with what appropriative rights the Rancho had -- if that is the purpose of these findings.

THE COURT:  Well, strike the word "continuously" and say

P 35

1    "since that year" and let it go at that.

2         What about VII?

3         MR. SACHSE:  No objection.

4         MR. GIRARD:  No objection to VIII or IX.

5         MR. SACHSE:  I will make the same comment as I made the

6    last time on VIII.  I don't think the 1883 is material.  I

7    think the year should be 1914, because that is the date with

8    which we are concerned.  I don't care if Mr. Veeder wants to

9    leave it this way, but I don't think it is a proper finding.

10         THE COURT:   Mr. Veeder.

11         MR. VEEDER:  As far as I am concerned, it is reflective

12    of the fact that the surface area of Lake O'Neill had filled

13    in 1883 and in the year 1914.

14         MR. SACHSE:  Unless you get 1914, Mr. Veeder, you don't

15    have an appropriative right.

16         MR. STAHLMAN:  This is one of the things I had in mind

17    when I had indicated to your Honor that there may be other

18    evidence on this matter.  I would like to call the Court's

19    attention that I think there is some error here.  According

20    to an exhibit in the early case, the areal extent of Lake

21    O'Neill in 1925, when completely filled, was 128 acres, and

22    there was a tabulation at that time as to the number of feet

23    at each elevation and gauge height and area in acre feet and

24    what the capacity was in relation to each of those different

25    measurements.  The maximum capacity was 1140 acre feet.

P 36

1    MR. VEEDER:   I will be perfectly willing to take out

2    VIII entirely, if it is going to make any -- I don't see what

3    difference it makes.  I'll take it out.  I am extremely

4    concerned about Fallbrook's pumping today.  Take it out.  I

5    don't care.  I think it is unimportant.  I think it is re-

6    flective of a fact.  But I know we are killing the clock and

7    --

8    MR. SACHSE:  Let's have/more of that.  The only man who

_no_

9    has dragged this case is you, not me.

10    MR. VEEDER:  That is not true.

11    THE COURT:  All right, both of you.

12    This matter to which Mr. Stahlman was referring is not

13    in evidence in this case.  We have proof that presently 160

14    acres is the area.

15    MR. STAHLMAN:  But the finding says that since Lake

16    O'Neill has been full since 1883.

17    THE COURT:  Do we have other proof in the record that

18    the lake today is the same as it was in years past?

19    MR. GIRARD:  Colonel Bowen testified that he thought

20    it was.

21    THE COURT:  What does the State engineer say it was in

22    1883?

23    MR. VEEDER:  One hundred and sixty acres is what he said.

24    THE COURT:  And Colonel, your survey currently?

25    COLONEL BOWEN:  Our area capacity curve, which is in

P 37

1    evidence, is that Lake O'Neill does not show quite that area.

2    THE COURT:   How much does it show?

3    COLONEL BOWEN:   As I recall, it is about 135 acres, your

4    Honor, at the maximum.

5    MR. VEEDER:    I put down "substantially."   I don't know

6    what it would be.   But so far as I am concerned, the capacity

7    is the only thing that is important, and rather than have a

8    dispute about it I would rather go ahead.

9    MR. STAHLMAN:   It is not a question of dispute.   It is

10    a question whether we should find something in here that we

11    think does not conform to the facts.   We should take time to

12    mention it, shouldn't we?

13    COLONEL BOWEN:   Plaintiff's Exhibit 88, your Honor, the

14    area capacity curve for Lake O'Neill, shows the spillway

15    crest area to be about 125 acres.

16    MR. VEEDER:   Let's change it then.   The surface area of

17    Lake O'Neill when full in 1883 was 160 acres, and today it

18    is approximately -- 125 acres?

19    COLONEL BOWEN:   Yes sir.

20    MR. VEEDER:   And today it is approximately 125 acres.

21    MR. STAHLMAN:   Isn't it larger than that?

22    MR. VEEDER:   That is what it says.

23    MR. STAHLMAN:   In the face of no evidence that it was

24    ever modified?   I am not going to be concerned with that.

25    THE COURT:   All we are doing is ignoring an estimate

P 38

Take D2

made by the State engineer in 1888 when he said it was 160 acres. We are finding that it was probably about the same as it is today, 125 acres.

MR. VEEDER:  We put in the word "substantially" because I was not quite sure.  The storage capacity is the important thing, your Honor.

MR. STAHLMAN:  Furthermore, the evidence in the previous case -- which is not here, however -- the evidence of the curve there, I would think you are putting in something there that has not been substantially proved.  It is just some engineer's report that says it is a certain area.  The other adjudication is a smaller amount.  I don't think the preponderance of the evidence is that it was 160.  It makes no difference to us.

THE COURT:  Do you want to put some reference to 1914 in there?

MR. VEEDER:  I don't think it makes enough difference, your Honor.

THE COURT:  All right, IX.

MR. SACHSE:  Before we go to IX --

MR. STAHLMAN:  What is VIII going to be then?

THE COURT:  One hundred and twenty-five acres.

MR. STAHLMAN:  Good.

MR. SACHSE:  Before we go to IX -- as long as I am getting the blame -- Mr. Veeder, I withdraw my offer.  I want

15,881

P 39

1   some written findings on the extent of the rights of the

2   Rancho before I decide what evidence I am going to put in,

3   in rebutting it.   I tried to be cooperative and decent about

4   this.  You don't want it.  All right, now let's play it

5   formally.

6       I have no objection to IX, your Honor.

7       THE COURT:   What is this all with reference to?

8       MR. SACHSE:  Your Honor inquired how formally I wanted

9   to know what the findings were going to be before I would

10   decide about putting on any evidence.  Mr. Veeder is persisting

11   in accusing me of being the party who is trying to stall

12   these proceedings, which is an absolute falsehood, and I am

13   telling him now and I am respectfully stating to the Court,

14   in fairness to my client, I would like to see in black and

15   white the exact rights acquired by the Rancho Santa Margarita

16   before I decide what rebuttal evidence I am  going to put in

17   attacking the United States' interest in it.  I think it is

18   a proper request.  I shouldn't be asked to do it just on

19   notes taken in a courtroom.  I want it in black and white.

20       MR. VEEDER:  He says that he doesn't object to IX, your

21   Honor.

22       THE COURT:   Of course, I am interested in getting

23   findings here that are accurate and will solve this problem.

24   Mr. Girard is here for the State of California.  I want your

25   views in this as we go along.  You aren't particularly a

P 40

1   litigant in the matter.

2       MR. GIRARD:  My views on Mr. Sachse's request for formal

3   findings you mean?

4       THE COURT:  That and also on these factual matters in

5   these findings.

6       MR. GIRARD:  Except as I have commented, I agree with

7   the findings.  As far as the State of California is concerned,

8   the findings are satisfactory to us.  We agree with Mr. Veeder

9   that the surface area of Lake O'Neill, for example, in Finding

10  No. VIII, is a fact that has nothing to do with appropriative

11  right, and the crucial issue is the storage, not the surface

12  area.

13      THE COURT:  Go to IX.

14      MR. SACHSE:  No objection to IX.

15      THE COURT:  By that you mean that you think this is a

16  correct finding of fact?

17      MR. SACHSE:  I stipulated last time that he could have

18  this finding.

19      THE COURT:  All right.

20      X.

21      MR. SACHSE:  No objection, except for the 1883 date again.

22  Mr. Stahlman has mentioned it.  I don't care one way or the

23  other.

24      THE COURT:  Unless I am convinced to the contrary, I

25  am going to accept the 1883 date.

P 41

1        XI.

2        MR. SACHSE:  I have no objection to XI.

3        MR. STAHLMAN:  You have some asterisks in there that

4    come from some place.

5        MR. VEEDER:  That is from the State engineer's report

6    and you will find that in footnote No. 7.

7        THE COURT:  All right, XII.

8        MR. SACHSE:  No objection.

9        MR. GIRARD:  No objection.

10       THE COURT:  I  think that is accurate, but it doesn't

11   tell us very accurately when this occurred.

12       MR. VEEDER:  Thirteen, your Honor, is/what you are speak-

that

13   ing of?

14       THE COURT:  No, I am talking about XII, when the diver-

15   sion dam was put in.

16       MR. VEEDER:  Your Honor, on that point, the diversion

17   dam, as I gather from reviewing the record that is available,

18   was put in at any time when an earthen structure would not

19   be washed out by the flow of the creek, and the only point

20   that is important to us is to get and to obtain the most

21   accurate date possible.  Now if you have any suggestions as

22   to how you want that done --

23       THE COURT:  Well, we will pass that.

24   What about XIII?

25       MR. SACHSE:  I have one correction to make it conform

P 42

1    to XII.  On line 4 it should say "After the winter and early

2    spring runoff".  That is exactly the language used in XII.

3        MR. VEEDER:  Which one are you on?

4        MR. SACHSE:  XIII line 4.

5        MR. VEEDER:  We have been on XII.

6        MR. SACHSE:  To make XIII conform to XII, on line 4,

7    "After the winter and early spring runoff".

8        MR. VEEDER:  That suits me.  That will follow the word

9    "winter," "and early spring runoff."

10       MR. SACHSE:  Now I don't like the language, frankly.  I

11   am sorry I don't have the transcript of last week here.  I

12   don't think this is exactly what we stipulated to.  I think

13   we could word it more nearly correctly. As I understood the

14   stipulation, it was that since there was 100 acre feet dead

15   storage the annual diversion would be 1100 acre feet, subject

16   however to the right that if the thing was bone dry they had

17   a right to fill it.  So that the right to divert isn't 1200

18   acre feet.  It is a question of terminology.  It is 1100.

19       MR. VEEDER:  I think in claiming an appropriative right

20   you have to claim the maximum.  If there is a hundred acre

21   feet of dead storage, it will only take 1100 acre feet.

22       MR. SACHSE:  My idea was that the appropriative right

23   was 1100, and if you get down to dead storage you are going

24   to get that 1100 acre feet out of just taking the water,

25   which you have a perfect right as a riparian.

15,885

P 43

1    THE COURT:  You are not going to quibble about a hundred
2    acre feet, are you?

3    MR. SACHSE:  Will you direct the question to Mr. Veeder?
4    He has a basin with pumps in it down there.  Why direct it
5    to me?

6    THE COURT:  I am directing it to you.

7    MR. SACHSE:  He is squawking about 40 acre feet a month.
8    I will quibble about a hundred acre feet, yes, your Honor.
9    The stipulation was 1100 acre feet.

10   MR. VEEDER:  No, I asked for a hundred acre feet dead
11   storage.  I will revise it to the end that we will get pre-
12   cisely what is desired.

13   MR. SACHSE:  Well, get precisely the stipulation, then,
14   Mr. Veeder.

15   THE COURT:  One suggestion and we will take our recess.
16   Line 4 says "diverted into the headworks of the Lake O'Neill
17   diversion ditch, " "and thence into Lake O'Neill" should be
18   added.

19   MR. SACHSE:  No your Honor.  Number XI expressly points
20   out that the water did not necessarily go into Lake O'Neill,
21   and didn't have to.

22   THE COURT:  That is true.  But he is now talking about
23   1200 acre feet being diverted into the headworks of the O'Neill
24   diversion ditch, and thence into Lake O'Neill, a quantity of
25   water not to exceed 1200 acre feet a year.

P 44

1        MR. SACHSE:   I see what you mean.

2        MR. GIRARD:   Between the words "second" and "stored"

3  you say after the word "second," "and thence stored in Lake

4  O'Neill;" is that right?

5       THE COURT:   Work something out.   I am just pointing it

6  out.   Look up your stipulation, gentlemen, and see if you can

7  resolve this argument before two o'clock.

8        MR. GIRARD:   All right.

9        THE COURT:   Take an adjournment.

10       (Noon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15,887

SAN DIEGO, CALIFORNIA, Tuesday, April 4, 1961, 1:45 P.M.

(Another case called.)

THE CLERK:  Number 7, 1247-SD-C, United States versus Fallbrook.

THE COURT:  Any further suggestions on Paragraph XIII?

MR. SACHSE:  Yes, your Honor, before we come to this 1,100 and 1,200 acre feet matter from the transcript, I would like to have the first line amended to read --

MR. VEEDER:  Mr. Sachse, would you give me that again? Where are you now?

MR. SACHSE:  Paragraph XIII on Page 5, the very first line, which I would like to have amended to read this way:

"Continuously, from  March, 1883 to December 19, 1914," et cetera, et cetera, et cetera.

Now, the purpose of that amendment, your Honor, is to make it clear that this is the non-appropriative right acquired by the Rancho, which right may or may not have been subsequently lost either by the Rancho or by the United States.

THE COURT:  What date in 1914?

MR. SACHSE:  That is the effective date of the Water Commission Act, December 19, 1914.

THE COURT:  All right.  I am agreeable to that.

MR. GIRARD:  And the word "since" is changed to "from."

MR. SACHSE:  "Continuously, from March 18, 1883 to December 19, 1914," and the rest of it can go on in the same

15,888

t-27

1   way, subject to any other corrections that anyone wants to

2   make.

3       THE COURT:  Any objection, Mr. Veeder?

4       MR. VEEDER:  I am just trying to think on that for a

5   moment, your Honor.

6       MR. SACHSE:  Well, your Honor, I understand we are still

7   going to talk about the 1,100 acre feet.

8       THE COURT:  Yes.

9       MR. VEEDER:  I am perfectly willing to formulate a

10  question of law, your Honor, on that proposition.

11      THE COURT:  This does no violence to your position.  The

12  word "since" is changed to "from" because it is from a certain

13  date to a certain date.

14      MR. VEEDER:  "Continuously from March, 1883 to December,

15  1914" --

16      MR. SACHSE:  To December 19, 1914.  That is the effective

17  date of the Water Commission Act, after which time they should

18  have appropriated and formally appropriated.

19      MR. VEEDER:  Let's go ahead and see, then, if that be

20  the understanding.

21      Now you were going to talk about the 1,100 and 1,200

22  acre feet?

23      MR. SACHSE:  Yes. It is my understanding that the whole

24  thing is boiled down after a lot of argument on Page 15,712

25  of Volume 138.  I have your Honor's transcript here.

15,889

t-28

1    MR. VEEDER:  Look at Lines 16, 17 and 18.

2    MR. SACHSE:  That is what I am doing.  (Reading):

    "MR. VEEDER:  All right, I will agree to the 1200

acre feet, your Honor.

5    "MR. SACHSE:  Eleven hundred.

6    "MR. VEEDER:  All right, make it 1100.

7    "THE COURT:  Eleven hundred acre feet was used

beneficially, and that if the lake were dry there would

be a right to fill the lake, which would be 1200.

10    "MR. SACHSE:  That is right.

11    "MR. VEEDER:  I will agree to that.

12    "THE COURT:  Well then, we have made a lot of

progress."

14    That is what this says.

15    MR. VEEDER:  I will say this, Mr. Sachse, that I attempted

to say that in the findings.

17    MR. SACHSE:  I am satisfied with that understanding, that

18    that is what it means.

19    MR. VEEDER:  I don't know how I could say it otherwise.

20    THE COURT:  Let me look at it.

21    MR. SACHSE:  I think perhaps it could be phrased more

22    clearly, but, frankly, I have no suggestion.

23    THE COURT:  I am still troubled on Line 6 about the

24    language that water was diverted into the headworks and stored

25    in Lake O'Neill.  It is a relatively minor matter, but I would

15,890

t-29

1    suggest something like this:

2        ". . . a quantity of water not to exceed 20 cubic feet

3    per second, which was thereafter diverted into and stored

4    in Lake O'Neill."

5        MR. VEEDER:  'Which was conducted to and stored in Lake

6    O'Neill"?

7        THE COURT:  That is all right.

8        MR. STAHLMAN:  That is Number 6?

9        MR. GIRARD:  Line 6.

10       MR. VEEDER:  'Which was conducted to and stored in Lake

11   O'Neill."

12       THE COURT:  You will have to get it out of the ditch and

13   into Lake O'Neill.

14       MR. VEEDER:  That is right.  ". . . conducted to Lake

15   O'Neill and there stored"?

16       MR. SACHSE: "Conducted to and stored."

17       MR. VEEDER:  "Conducted to and stored."

18       MR. SACHSE:  Now, that is the point that confuses me

19   about the 1200 acre feet.  I don't think the 1200 was diverted

20   and stored if it was dead storage.  The only time it was

21   diverted and stored was when the lake was bone dry.

22       THE COURT:  All right.  ". . . did not exceed 1200 acre

23   feet per year at the outside, 100 feet of which is dead

24   storage."

25       Then you can make it clear by adding something there.

15,891

MR. SACHSE:  You can say, "A sufficient quantity of water to fill Lake O'Neill, not to exceed 1200 acre feet per year."  But that would not be quite correct either.  Well, I guess it would, because if they emptied the lake, it could not get lower than 100 feet.

THE COURT:  It is dead storage.

MR. VEEDER:  It is very hard to state, your Honor.  I went up and down on that quite often myself.

THE COURT:  All you will have to do is to define what is meant by "dead storage":  that when the 100 acre feet of dead storage was present in Lake O'Neill, the appropriative right was to be 1100 acre feet; that when the dead storage was 100 acre feet or less down to zero, the appropriative right also encompassed the right to bring the dead storage up to 100 feet.

MR. VEEDER:  I consider that as a conclusion, your Honor.

MR. STAHLMAN:  What is the reason to be concerned about dead storage?

THE COURT:  Now, what is wrong with the suggestion?

MR. VEEDER:  I think that is good.  I think that smacks of a conclusion of law, does it not?

THE COURT:  It is a fact in finding what this appropriative right is.  It is ordinarily 1100 acre feet, unless the dead storage has been used up, in which event it is 1200 acre feet.

15,892

t-31

1     MR. VEEDER:  The right to divert the 1200 acre feet

2  would be reduced to the extent of the dead storage in the lake

3  at the time it commenced the diversions.  That is what it

4  amounts to.  If there were 20 acre feet of dead storage, it

5  means you could divert 1180 acre feet.

6     MR. SACHSE:  That is what it means.

7     THE COURT:  What is wrong with what I said?  Didn't I

8  say that?

9     MR. SACHSE:  I think it is good.

10     THE COURT:  Didn't I say it very clearly?

11     MR. SACHSE:  I agree, your Honor.  I think that is what

12  you said means.

13     THE COURT:  all right.

14     MR. VEEDER:  I would give my right arm to have it re-

15  stated.

16     THE COURT:  Maybe the reporter can read it.

17     (The record was read.)

18     MR. SACHSE:  That does it.

19     THE COURT:  With a little dressing up, that is what you

20  mean?

21     MR. VEEDER:  Yes, your Honor.

22     THE COURT:  All  agreed?

23     MR. SACHSE:   Okay.

24     MR. GIRARD:  Yes.

25     MR. STAHLMAN:  Yes.

15,893

t-32

THE COURT:  Now, anything else on XIII?

MR. SACHSE:  Not from me.

THE COURT:  Mr. Girard?

MR. GIRARD:  No, not from me.

THE COURT:  Mr. Veeder?

MR. VEEDER:  Nothing, your Honor.

THE COURT:  All right.   XIV?

MR. SACHSE:  Now, we come to a great many paragraphs that I think are immaterial, and if they are immaterial, unless there is some strong reason for them, it would simplify my problem to try to get rid of them.

Number XIV I think says simply the same thing that has been said before, except again it lacks the qualification that the right of the Rancho was determined on December 19, 1914.

MR. VEEDER:  Mr. Sachse, this is a finding--

MR. SACHSE:  You say, "The Rancho Santa Margarita and its predecessors in interest, from 1883 until the dates the Rancho was transferred to the United States of America in 1942 and 1943, continuously practiced seasonal storage . . ."

I don't think they did, Mr. Veeder, continuously until the date it was transferred to the United States.  I intend to try to present some evidence to the Court that they did not.

THE COURT:  Why don't we limit it, then, to 1914?

MR. SACHSE :  That is what I am proposing.  If we could

t-33   1    again say, "The Rancho Santa Margarita and its predecessor

2    in interest, from 1883 to December 19, 1914 continuously

3    practiced seasonal storage." That pins it down to the Rancho's

4    right.

5        THE COURT: That is what we will do, because we are

6    talking now about as of 1914. So it will just read, "The

7    Rancho Santa Margarita and its predecessors in interest, from

8    1883 to December 19, 1914," and so forth.

9        MR. SACHSE: "continuously practiced."

10       THE COURT: "-- continuously practiced," and so forth.

11   You have no objection to that, Mr. Sachse?

12       MR. SACHSE: Pardon me?

13       THE COURT: You have no objection?

14       MR. SACHSE: No objection to that.

15       MR. VEEDER: May I have that line again, your Honor?

16       THE COURT: It strikes out from Lines 16 and 17, so it

17   reads, "from 1883 to December 19, 1914," and then you drop

18   down to the word "continuously."

19       All agreed?

20       MR. VEEDER: Yes.

21       MR. GIRARD: Yes.

22       THE COURT: All right.

23       MR. SACHSE: Now, XV is purely immaterial. We have agreed

24   to the amount, and I think this is true of the rest of Page 4,

25   and of 5, your Honor. That is the next page. If Mr. Veeder

15,895

t-34

1   insists on it, I have no objection.

2       MR. VEEDER:  I am going to ask for them, your Honor.  I

3   think it is reflective of the beneficial use, and I would like

4   to have them.

5       THE COURT:  All right, leave them in.

6       MR. SACHSE:  Leave them in.

7       MR. VEEDER:  Will you call them off?

8       MR. SACHSE:  XV, XVI, XVII, XVIII, XIX, XX, XXI, and

9   XXII.

10      MR. VEEDER:  And down to XXIII.  I want to locate where

11  the waters were actually applied beneficially for the purposes

12  of irrigation.  I think that is a part of the findings, and I

13  think it is essential.

14      MR. GIRARD:  I hate to throw cold water on this, and I

15  don't think there is really any necessity for this, but I

16  don't see how from the state of this record it is possible to

17  say that waters from Lake O'Neill were applied on these

18  particular acreages at any particular locations.

19      There are no records at all where the water came from

20  that irrigated those lands.  All we know is that it was

21  diverted from the ditch, but we don't know whether it went

22  into Lake O'Neill, or it went straight on in.

23      MR. VEEDER:  Your Honor, I referred to Mr. Salisbury's

24  testimony, where he stated that the water came from Lake

25  O'Neill and was applied to this 550 acres.  It is in the

t-35

15,896

1    record.

2       THE COURT:   Now, as I understand the matter, as far as

3 the litigants now appearing before the Court, no one is going

4 to contest these findings.

5       MR. SACHSE:   That is correct, your Honor.

6       THE COURT:   Anyone else in the watershed, if they wanted

7 to, could protest any part of these findings.   If Mr. Veeder

8 is satisfied, and the record shows this, I am content to put

9 it in the findings.

10       MR. VEEDER:   I think that it is supported by Mr.

11 Salisbury's  testimony, and he used the word "historically,"

12 and that will take it back to 1911.

13       MR. GIRARD:   I have no objection so long as the

14 diversion figure is set.

15       THE COURT:   That takes us down, then, through what?

16       MR. GIRARD:   Down to Page 7, "Conclusions of Law."   I think

17 it concludes the findings.

18       MR. SACHSE:   Down to the Conclusions of Law, your Honor,

19 to which there are many, many objections, because the

20 conclusions are drawn, as your Honor will observe --

21       THE COURT:   Well, let's take up I.   Is there anything

22 wrong with I?

F fls.

23

24

25

Take F1

P 45

1          MR. GIRARD:   I think you should have "winter and early

2     spring," to conform with the other three.   That is on line

3     21 right after the word "the".

4          THE COURT:  Well, it is late winter, isn't it?

5          MR. SACHSE:  Yes.  I don't know that that is so terribly

6     important in a conclusion of law anyway.

7          MR. VEEDER:  My point, frankly, is to get a definition

8     of what is meant by "seasonal storage."

9          MR. SACHSE:  I see nothing wrong.  This conclusion alone

10    gives nobody any right.  It is just a statement of law.

11         THE COURT:  All right, Mr. Girard, are you content?

12         MR. GIRARD:  Yes.

13         THE COURT:  LL.

14         MR. SACHSE:  No objection.

15         THE COURT:  All right.

16         MR. VEEDER:   Do you have the subsequent page 8 everyone?

17    George, do you have it?

18         MR. STAHLMAN:  Yes.

19         THE COURT:  Any objection to Paragraph III?

20         MR. SACHSE:  I have some objections.  They are perhaps

21    semantics.  I don't write just propositions of law in the

22    conclusion unless it means something.  I know what this

23    means.

24         MR. GIRARD:  Under California law, injunctions may or

25    may not be entered, your Honor.

P 46

1    MR. SACHSE:  Yes.

2    MR. GIRARD:  It is true that injunctions may be entered,

3    as cited here, but it is also true that they may not be.

4    THE COURT:  I see a more glaring defect.  There should

5    be inserted "an appropriative right of storage".

6    MR. VEEDER:  I am not going to haggle about it.  If there

7    is objection to it, take it out.

8    THE COURT:  Let's put in "an appropriative right of

9    storage".

10   MR. SACHSE:  An appropriative storage right to the use

11   of water, isn't it?

12   MR. VEEDER:  That is what I have written.

13   THE COURT:  An appropriative storage right to the use

14   of water for agricultural purposes may be protected by in-

15   junction against invasion or injury by a junior appropriator.

16   Any objection to that?

17   MR. VEEDER:  Your power is discretionary, yes.

18   THE COURT:  IV.

19   MR. SACHSE:  I believe IV is the only one you have

20   changed, on my request.

21   MR. VEEDER:  I used your language that you desired.

22   MR. SACHSE:  We have also this 1200 and 100 dead storage

23   clause, and I suggest that we again use your Honor's language

24   that you gave us a moment ago.

25   THE COURT:  Any objection to that?

P 47

1    MR. VEEDER:  No. I think it should go in.

2    THE COURT:  Put it in.

3    Anything else on IV?

4    MR. SACHSE:  Not on IV.

5    THE COURT:  V.

6    MR. SACHSE:  I have no interest in V. Perhaps Vail or

7    somebody else does have.

8    MR. GIRARD:  When you use the word "is" in the second

9    line, you might be contending that there presently is.  I

10    am assuming that Mr. Sachse's position is wrong and that "is"

11    is correct.

12    THE COURT:  Strike "is" and say "was, as of December

13    19, 1914".

14    MR. SACHSE:  Where does that go now?

15    THE COURT:  On line 14, "The non-statutory appropriative

16    storage right . . ."

17    MR. SACHSE:  I see.

18    MR. VEEDER:  ". . acquired by the Rancho was prior,

19    superior and paramount to . . "

20    THE COURT:  ". . was as of December 19, 1914. . "

21    MR. VEEDER:  Would it be all right with you if I sent

22    someone out to get the reporter to get your exact language?

23    She has gone out now.

24    THE COURT:  You can get it later.

25    Again, you say "storage rights in the Santa Margarita

P 48

1   River". It is "rights in the use of the water of," isn't

2   it, if you want to be technical?

3   MR. VEEDER: "The non-statutory or appropriative storage

4   right to the use of water," that is better language.

5   THE COURT: Of the Santa Margarita River. You reminded

6   me several times that we are talking about the rights to the

7   use of water, not the water itself.

8   MR. VEEDER: That is correct, your Honor.

9   THE COURT: Anything else on V?

10   VI.

11   MR. SACHSE: On VI we have a lot of trouble.

12   THE COURT: Let me read it.

13   Well, all of the water to the extent of the appropriative

14   right herein found. It is not all the water without quali-

15   fication.

16   MR. VEEDER: I say maximum quantity of water which could

17   be impounded. That is the caveat I intended, what your Honor

18   just expressed. I will change it any way you want.

19   MR. SACHSE: I would suggest that you say "there was

20   invested in the Rancho Santa Margarita the right to divert,

21   impound and store in Lake O'Neill as an appropriative right

22   waters in the Santa Margarita to the extent found elsewhere

23   in these findings".

24   THE COURT: That is all right. Or all of the waters,

25   meaning that the Rancho could take all the waters up to the

P 49

1   extent of fulfilling the appropriative right herein found.

2   MR. GIRARD:  You would have to have the other condition,

3   -- up to the extent of the 20 second feet.

4   THE COURT:  All right.

5   MR. GIRARD:  I think you also would not be able to take

6   all of the waters which might be subject to prior riparian

7   vestees.

8   MR. VEEDER:  May I follow through here for a moment.

9   At any time the flow of the Santa Margarita River is 20 cubic

10  feet a second or less.

11  THE COURT:  We are on the one before.  We are on VI, and

12  we are talking about the words "all the waters".

13  MR. VEEDER:  I wanted you to read this.

14  THE COURT:  I will read it then.

15  MR. VEEDER:  I think VII qualifies VI.

16  MR. GIRARD:  It does, but I, personally, object to the

17  all-inclusive statements in one finding which are not modi-

18  fied by direct reference to the other.

19  MR. VEEDER:  These are conclusions, and I will be glad

20  to put it in.  Why not put in, presently except as otherwise

21  qualified in VII?   I broke them up because there was too

22  much for one single conclusion of law.

23  MR. SACHSE:  That would take care of that particular

24  objection, if you add that to the end -- except as modified

25  in Paragraph VII.

P 50

1    MR. VEEDER:  All right.

2    THE COURT:  Put that at the end of VI.

3    MR. SACHSE:  Yes, at the end of VI.

4    MR. VEEDER:  Except as modified by conclusion of law VII.

5    THE COURT:  That takes care of the 20 second feet.  But

6  that doesn't take care of what Mr. Girard pointed out, that

7  the statement is all-embracive.  What about some modification

8  to take care of other rights?

9    MR. VEEDER:  Subject to existing prior rights, then.

10  Why not put that in?

11    MR. SACHSE:  We all have different ideas as to how to

12  say the same thing.  I would say, first of all, if you simply

13  deleted the word "all," "the right to impound and store in

14  Lake O'Neill waters of the Santa Margarita under the appro-

15  priations herein found to exist" etc., because it is not all.

16  That is the real point.

17    MR. VEEDER:  I have just taken it out.

18.    THE COURT:  All right.

19    On line 20, "the waters of the Santa Margarita River

20  after the high winter runoff to the extent of the appropria-

21  tive rights herein found."

22    MR. VEEDER:  I would like "appropriative rights herein

23  decreed."

24    MR. SACHSE:  All right.

25    THE COURT:  Okay.

P 51

And then add at the end of it "except as modified in Paragraph VII" or "except as limited by Paragraph VII" would be better than "modified." And then somewhere early in VI why don't you show the caveat , maybe at the beginning, "subject to vested prior rights, if any"?

MR. VEEDER: "Subject to prior vested rights"?

THE COURT: "Subject to prior vested rights as determined in the final decree to be entered in this case," and then swing into this about the acquisition of a non-statutory appropriative right. Would that do it, Mr. Girard?

MR. GIRARD: Yes, your Honor, except I do have one other suggestion, so that it should be clear. On line 18 where it says "there was invested in the Rancho Santa Margarita" I would add, after the word "Margarita" "on December 19, 1914."

THE COURT: That is agreeable.

MR. VEEDER: And that goes "Santa Margarita the right to divert . . "

MR. GIRARD: " . . the right to divert, impound and store" etc.

THE COURT: All right.

Can we pass to VI now?

MR. SACHSE: It is all right with me.

MR. GIRARD: Yes, VI is fine.

MR. SACHSE: I disapprove of VII.

THE COURT: All that you need to do with VII -- VII

P 52

1    adds the element of the 20 second feet.

2        MR. VEEDER:  Why not take out VII and run it into VI?

3        MR. SACHSE:  Before you make a determination, again I

4    am concerned with the problem of December 19, 1914.  Instead

5    of "at any time the flow is," the rights existing on December

6    19, 1914 may no longer exist.  That is my whole point.

7        THE COURT:  I think if we run  VII in as part of VI

8    we can take care of that then, because we have then in VI

9    this date December 19, 1914, and then it all becomes a part

10   of the same paragraph.  ". . all of the water may be diverted

11   and stored in Lake O'Neill in the exercise of the appropria-

12   tive right subject to prior vested rights," put that in,

13   "and all the waters subject to prior vested rights may be

14   diverted," and then you can either add the language about

15   the date of storage or you can refer back to one of the prior

16   paragraphs where we tried to describe it.

17       MR. VEEDER:  I would like to refer back to Conclusion

18   IV to avoid the repetition, if that is all right.

19       THE COURT:  All right, let's go back to IV, then.

20   Is VII agreeable with those changes?

21       MR. VEEDER:  Are we deleting VII?

22       THE COURT:  I mean, making it part of VI.

23       MR. SACHSE:  Yes, it becomes part of VI.

24       THE COURT:  Is that agreeable?

25       MR. SACHSE:  It sounds all right, your Honor, but I

P 53

1    want the one caveat that I feel is critical to my case that

2    this thing must ultimately read so that it is clear that we

3    are talking about December 19, 1914.

4        THE COURT:  Agreed.

5        Then we go to VIII.

6        MR. SACHSE:  VIII, of course, is the whole issue.  There

7    is the case.

8        THE COURT:  We just insert in front of "The United States"

9    the"Rancho".

10       MR. SACHSE:  Was on December 19 --

11       THE COURT:  The predecessor in interest to the United

12   States was, on December 19, 1914, the owner and entitled to

13   exercise the above described right.

14       The Rancho, predecessor of the United States, was, on

15   December 19, 1914, entitled to change the place of use, the

16   purpose of use and the means of using the storage right.

17   That makes this an interlocutory decree up to the date of

18   the passage of the California statute on December 19, 1914.

19       Is that agreeable, Mr. Veeder?

20       MR. SACHSE:  As I understood it, your Honor, line 4 you

21   changed further by saying "The Rancho --

22       THE COURT:  -- predecessor to the United States of

23   America, was, on December 19, 1914, entitled to change the

24   place of use, purpose of use, etc.

25       MR. SACHSE:  That is right.

P 54

1   THE COURT:  Then that brings it up to that date.

2   MR. GIRARD:  They didn't have an absolute right to
3   change the place of use.  I don't think the change of use,
4   in this particular factual situation, was improper, but I
5   think the statute provides that the change of use had to be
6   such that it didn't interfere with any rights vested in the
7   meantime.  I think there is a specific section of the Water
8   code on it.

9   MR. VEEDER:  1706.

10  MR. GIRARD:  When was that enacted, Bill?

11  MR. SACHSE:  I have the Code.

12  MR. VEEDER:  I think it has been on the books since
13  the Water Commission Act.

14  MR. SACHSE:  1943.

15  MR. GIRARD:  So that statute was not in effect at that
16  time.

17  THE COURT:  Then in 1914 it did have this right.

18  MR. GIRARD:  Yes, in 1914 it did have this right.

19  MR. SACHSE:  It may have.  We don't know.  They may have
20  had it.

21  MR. VEEDER:  I will say this, that it had the right but
22  could not increase the burden on the stream or impair the
23  rights of any other party.

24  MR. GIRARD:  That is right.

25  MR. SACHSE:  I agree.

P 55

1    MR. GIRARD:  They didn't have the absolute right.

2    THE COURT:  Do you want to put that in?

3    MR. VEEDER:  I don't want to, but --

4    THE COURT:  Well, if that is the law, and these are

5    conclusions of law, put it in.

6    MR. VEEDER:  I think here it is not necessary, but I

7    will put it in.

8    MR. SACHSE:  Just add something at the end, then, without

9    increasing the burden on the stream, to that effect.

10    MR. VEEDER:  Subject to prior vested rights.

11    MR. SACHSE:  Subject to prior vested rights, all right.

12    MR. VEEDER:  Because that is what it amounted to.  If

13    a man had a prior right to put a greater burden on the stream

14    you couldn't change the point of use.

15    MR. GIRARD:  The prior vested right could have occurred

16    after December 19, 1914.

17    MR. VEEDER:  I was wrong in what I said.  You couldn't

18    change the point of diversion or place of use if it injured

19    a junior appropriator.

20    MR. GIRARD:  That is correct.  I don't think there are

21    any junior appropriators.

22    MR. VEEDER:  No.  We can work out some language to take

23    care of it.

24    MR. STAHLMAN:  Aren't we going to have trouble with

25    this situation, though?  Referring back to VII, the dam

P 56

1   diverts all the surface flow to the Santa Margarita River

2   after the winter and early spring runoff, if any, how are

3   you going to determine that?  When is "after the winter and

4   early spring runoff"?

5      THE COURT:  You have a point.  But we know what did

6   happen, and that is that they would wait until, in their

7   opinion, the floods as such had come down and they would

8   throw up an embankment.  If they guessed wrong out it came

9   and two weeks later they would throw up an embankment again.

10     MR. STAHLMAN:  Today we have an embankment that is not

11  going out like it did in those days.

12     THE COURT:  Do you want me to specify some period of

13  time?

14     MR. STAHLMAN:  What I am thinking about is that it is

15  going to run into a conflict.  For instance, Vail Company

16  has a storage right up to April 1.  You are going to run

17  into conflict now with the right to store water during that

18  period of time.  I submit that after the April 1 date, then

19  we are completely divested of any right to store surface

20  water.

21     MR. SACHSE:  That is why I picked the date March 31.

22     MR. STAHLMAN:  I think we are going to run into conflict

23  if you don't set it out.  In the early days they had an

24  entirely different type.  They took some horses and mules

25  and loaded dirt into cowhides and had a lot of loose dirt and

P 57

1    it went out.  We visited Camp Pendleton.  They have put in

2    a permanent structure over there and bedded it down, the

3    object being that it not wash out.  We have a changed condi-

4    tion.  And that interests me only because of the date and

5    the uncertainty as to making a determination when they would

6    be privileged in diverting the summer flow.

7        MR. VEEDER:  I think, your Honor, one of the most valua-

8    ble aspects of the appropriative right here is the date when

9    we could put in that dam, and I think the controlling factor

10   was runoff.  If you want to put in when the flow got down

11   to 20 second feet, that suits me.

12       THE COURT:  I don't understand what you mean.

13       MR. VEEDER:  The point of it is that we want to be able,

14   for example, in a year like this, we don't want to be bound

15   by any April 1 date.  We want to start taking water when it

16   is available, and if it is on January 1 when the Colonel

17   sees we are running into a very dry season we want to start

18   diverting and we want to be able to divert as a matter of

19   right as against upstream claimants.  I think that is very

20   essential.

21       MR. SACHSE:  I think this may be partly taken care of

22   when I put on some of my own arguments as to what    right

23   the Rancho owned in 1943, Mr. Veeder.  We have what they had

24   in 1914.

25       And since it is so long ago, I am willing for the moment

P 58

1   to defer consideration of that date, Mr. Stahlman, on the

2   idea that when we spell what right, if any, was transferred

3   to the United States we are going to have so much better

4   evidence.  Because we have pretty good evidence since 1914

5   of what happened.  And that is one of the important parts

6   of my case.  It is in the record already.

7   THE COURT:  Aren't we leaving open two things:  Leaving

8   open this matter whether we should fix a date or whether we

9   should leave it in the broad language, when the danger winter

10   floods --

11   MR. SACHSE:  Why keep any secrets?  After 1914 the

12   Rancho could only acquire a right by appropriation, and after

13   1914 the Rancho could lose a right under Water Code 1241 by

14   non-use for a period of three years for the purpose for which

15   adjudicated.

16   Now if we will check U.S. 25, which gives us runoff

17   figures of the stream for the period 1931 through 1943 --

18   that is, twelve years prior to the United States' acquisition

19   of the Rancho -- you are going to see some very interesting

20   things about what kind of right they have, what they had

21   either way.  If it was not jelled and they had to make it

22   definite, they didn't appropriate.  If it did jell, it was

23   lost by non-use over a consistent period of months which,

24   just to give you my conclusion, would run not nearly as good

25   as I offered, Mr. Veeder, non-use from approximately 26

P 59

1   October to approximately 15 May each year non-use at any

2   time.  Now that right, I say, the Rancho never had to give

3   the United States from 26 October to 15 May each year, and

4   we have the evidence introduced in the record by the United

5   States clearly that for the period of twelve years they

6   didn't use it.

7        THE COURT:  Leaving open this matter of trying to fix

8   some date, on which your presentation may throw some light on

9   evidence, leaving open also whether or not we should also in

10  these findings describe the present diversion method which

11  is now in use, which again would be something after 1914,

12  are you now sufficiently certain of what I am preparing to

13  find as of 1914 that you can go ahead now with  your figures?

14       MR. SACHSE:  Yes your Honor.

15       THE COURT:  Is that agreeable Mr. Veeder?

16       MR. VEEDER:  Yes.

17       THE COURT:  All right, let's go.

18       MR. SACHSE:  First, I would like to get a little evidence

19  in the record.

20       Mr. Clerk, would you get Fallbrook's Exhibits O, P, Q,

21  R and S.

22       These were all long since lodged, your Honor.  Mr. Veeder

23  has copies.

24       I offer in evidence Fallbrook's Exhibit O previously

25  marked for identification.

15,912

P 60

1          The purpose of this statement appears right there, Mr. Veeder.

2  Veeder.

3          MR. VEEDER:  When you say "right there" --

4          MR. SACHSE:  "Protestant claims a right to the use of

5  water from the source from which applicant proposes to

6  divert, which right is based upon" the statement of the United

7  States, etc.

8          MR. VEEDER:  Does your Honor have a copy of this?

9          THE COURT:  Just a minute.  I am looking.  Fallbrook's

10  O, P, Q, R, and S.

11          MR. SACHSE:  I think this one is in, incidentally.  I

12  think Vail put this in.

13          MR. STAHLMAN:  We have it in as --

14          THE COURT:  Is this O?

15          MR. SACHSE:  This is O, yes.  Vail already has this

16  one in evidence.  But the rest of them are not in evidence.

17          THE COURT:  What is the part of O?

18          MR. SACHSE:  If your Honor will read right down to the

19  middle you will see the printed text:  "Protestant claims

20  a right to the use of water from the source from which

21  applicant proposes to divert, which right is based upon . . "

22  Vail has it in as AK1 or AK6.

23          THE COURT:  Do you offer O?

24          MR. SACHSE:  I offer O.

25          THE COURT:  Received in evidence.

P 61

                            (Fallbrook's Exhibit O received in)
                            (evidence.                    )

     MR. SACHSE:  I now offer P.  I will have to go a little slow here, your Honor, because I have to refresh my recollection as I go.

     THE COURT:  No objection to the use of these copies, Mr. Veeder?

     MR. VEEDER:  I have no objection to the use of them.

     THE COURT:  All right.

     MR. VEEDER:  May I inquire?

     Mr. Sachse, you are using these to demonstrate loss by the National Government of a vested right by reason of these?

     MR. SACHSE:  No.

     MR. VEEDER:  I am/entitled to know what you are offering.

     MR. SACHSE:  I am going to offer them for all purposes.

     THE COURT:  He is offering them, I take it, as admissions against interest.

15,914

F-2
t-1

1      MR. SACHSE:  That you didn't get a right from the Rancho

2  or for any purpose you choose to get it; not only that you

3  lost it, but that you at no time ever claimed an acquisition

4  of an appropriative right from the Rancho.  There is not one

5  word of evidence of any claim by the United States, until your

6  verbal claims or until the pleadings of the United  States

7  asserting that it acquired an appropriative right.  I am

8  saying that this shows, on the contrary, that they didn't

9  acquire one.

10      MR. VEEDER:  Let them go in.  They are public records

11  and you are entitled to look at them.

12      THE COURT:  What is P?

13      MR. SACHSE:  P would be the fourth paragraph down:

14          "Protestant claims a right to the use of water

15      from the source from which applicant proposes to divert,

16      which right is based upon the . . ."

17      THE COURT:  The same language, isn't it?

18      MR. SACHSE:  Yes, your Honor.  This is a protest to the

19  Santa Margarita Mutual's appropriation, please observe.  The

20  first one was Vail.

21      THE COURT:  Do you offer it?

22      MR. SACHSE:  I offer it.

23      THE COURT:  P received in evidence.

24                          (The document referred to was marked)
                            (Fallbrook's P and received in      )
25                          (evidence.                           )

15,915

t-2

1    MR. VEEDER:  Let me see it.

2    MR. SACHSE:  That is the Santa Margarita Mutual.

3    THE COURT:  Q.

4    MR. SACHSE:  Q is the same language, in the same place

5  you found it on the Vail protest.

6    THE COURT:  Just copying the same language?

7    MR. SACHSE:  This is a protest to Fallbrook's applica-

8  tion for  two and a half second feet.

9    THE COURT:  Do you offer Q?

10    MR. SACHSE:  I offer Q.

11    THE COURT:  It is received in evidence.

12                              (The document referred to was marked)
                               (Fallbrook's Q and received in       )
13                              (evidence.                           )

14    MR. VEEDER:  I will want to keep these copies, Franz.

15    MR. SACHSE:  Sure.

16    THE COURT:  Subject to the right to make corrections if

17  the copies aren't accurate.

18    R.

19    MR. SACHSE:  R.  This you have to practically read the

20  whole thing.  This is a protest prepared by the Special

21  Assistant Attorney General David Agnew, in which he asserts

22  again certain rights of the United States in protest to

23  Fallbrook's proposed applications, without one word of any

24  appropriative right.

25    MR. VEEDER:  In addition to the appropriative right under

t-3

1   the stipulated judgment.  If he wants to take your time, it

2   suits me.

3       THE COURT:  There would be no appropriative right under

4   the stipulated judgment.

5       MR. VEEDER:  We will argue that.  But certainly there

6   has been no abandonment.

7       THE COURT:  I see, on the top of the second page,

8   "Entitled as a riparian proprietor".

9       MR. SACHSE:  Yes.

10      THE COURT:  Do you offer R?

11      MR. SACHSE:  Yes.

12      THE COURT:  R received in evidence.

13                      (The document referred to was marked)
                        (Fallbrook's R and received in      )
14                      (evidence.                           )

15      MR. SACHSE:  Fallbrook's S is the identical language on

16  the same page by the same Special Assistant.

17      THE COURT:  Is it offered?

18      MR. SACHSE:  It is offered.

19      THE COURT:  S received in evidence.

20                      (The document referred to was marked)
                        (Fallbrook's S and received in      )
21                      (evidence.                           )

22      MR. SACHSE:  I have a few others.  Mr. Veeder can

23  probably help me.  These are certified copies and I don't

24  know if they are part of your--

25      MR. VEEDER:  What are they?

15,917

MR. SACHSE:  I will show you.  I think they are part of of the United States' 138-A, B and C, if we could see that.

MR. VEEDER:  Aren't these yours?

MR. SACHSE:  These are mine.  As I say, I think you put them in.  These are your Navy Department appropriations.

MR. VEEDER:  Those are in.

MR. SACHSE:  What I am interested in is all these letters.

MR. VEEDER:  I have to check.

MR. SACHSE:  I will have to check, because I don't know. Do you want to look with me as I check?

THE COURT:  What exhibit are you looking at?

MR. SACHSE:  138-A, B and C, and they are apparently not in, so I have some certified copies here I will offer in evidence.

THE COURT:  What number?

MR. SACHSE:  United States' 138-A, B and C.

15,918

G-1
t-36

1      THE COURT:  Wait just a minute.

2      MR. SACHSE:  They do not include what I want, your Honor.

3 There is no sense in getting them out.  I was just checking

4 them.

5      I now would like to offer as Fallbrook's next in order--

6 what would our next number be?

7      THE COURT:  See what the next number would be on

8 Fallbrook.

9      THE CLERK:  W.

10      MR. SACHSE:  Exhibit W?

11      THE COURT:  That is the way I have it.

12      MR. SACHSE:  I will offer in evidence a certified copy of

13 a letter dated 13 September 1948 from the United States Marine

14 Corps Headquarters, signed G. B. Erskine, Major General, U.

15 S. Marine Corps, Commanding, the same being a four-page

16 document amending and modifying a Navy application.

17      THE COURT:  Any objection to its receipt subject to being--

18      MR. VEEDER:  That is all right.  On all of these matters

19 that are on file I think we could save some time.  I have no

20 objection.

21      THE COURT:  Received in evidence.

22                              (The document referred to was marked)
23                              (Fallbrook's Exhibit W and re-         )
                                (ceived in evidence.                  )
24      MR. SACHSE:  I couldn't find it in the record, Mr. Veeder.

25 I am trying to help you out.  I am trying to hurry this thing

15,919

t-37

1  along, and I am trying to handle it as best I can, and if

2  they are in, I don't care.

3      THE COURT:  Do you have a copy for me?

4      MR. SACHSE:  I am sorry, your Honor.  I thought every one

5  of these were in evidence.

6      THE COURT:  Is this the same thing where the Marines

7  only talk about riparian rights?

8      MR. SACHSE:  Yes, your Honor, and, furthermore, some of

9  this is pertinent to a subsequent claim that I have in

10  connection with military use, and I think it ought to be in

11  evidence at this time.

12      THE COURT:  What is that?

13      MR. SACHSE:  It is on military use.

14  Then I have a similar letter of 13 July 1949, which would

15  be Fallbrook's X.

16      THE COURT:  July 13th--

17      MR. SACHSE:  1949.  And a similar letter dated 3 November,

18  1948.

19      THE COURT:  That would be Exhibit Y?

20      MR. SACHSE:  That would be Exhibit Y.

21      THE COURT:  The letter of July 13, 1949 would be X, and

22  the letter of November 3, 1948 would be Y.  You offer them

23  both?

24      MR. SACHSE:  I offer them both, your Honor.

25      THE COURT:  Received in evidence.

15,920

t-38

(The documents referred to were        )
(marked Fallbrook's Exhibits X and Y)
(and received in evidence.              )

THE COURT:  You must have had some previous other exhibits marked with these numbers.

MR. SACHSE:  I withdrew some, X, Y, Z, and so on.

THE COURT:  Because I see we have an AB, for identification, or Exhibit AA, and we have AB and AC in evidence.

MR. SACHSE:  Yes, your Honor.

THE COURT:  If there is any difficulty, you will have to straighten it out.  Do you have any other evidence?

MR. SACHSE:  At the moment what I want to do beyond that is to call your Honor's attention to some evidence that is already in the record.

G2

THE COURT:  All right.

MR. SACHSE:  This smacks perhaps more of argument.  I have no other evidence to offer at this moment.

MR. VEEDER:  May I interrupt at this moment?  Mr. Sachse, are you intending tomorrow, and the next day, and the next day to put in evidence?

MR. SACHSE:  I doubt it, Mr. Veeder.  I doubt it.  I will take a minute, if you will permit me right now, and I will tell  you what my contentions will be in as brief language as I can.

I will contend, first, that the Rancho lost under the provisions of Section 1241 of the Water Code--

t-39

THE COURT:  What Section?

MR. SACHSE:  1241.  -- any rights it may have had, or, in the alternative, that it never had, and I think the alternative is equally effective, your Honor, because I don't think there is any evidence beyond what Mr. Stahlman pointed out in the late winter or early spring.  But the point is--

THE COURT:  That is your first contention.  What is your other contention?

MR. SACHSE:  My second contention would be that if the Rancho didn't lose this prior to the acquisition of Pendleton by the United States, the United States lost it under the provisions of the same Section, Section 1241 of the Water Code.

Those are the two fundamental objections to it.  I have your Water Code here, your Honor.

If your Honor wants to take a recess now, I can write on the board some of the figures on the exhibit, which will make it a little easier.

THE COURT:  All right.

MR. SACHSE:  Is this a good time for a recess?

THE COURT:  Yes.

(A short recess.)

MR. SACHSE:  Your Honor, this is a tabulation taken from United States Exhibit 25 for the six years immediately preceding the United States acquisition of Camp Pendleton.  If the principles  enunciated in 1241-- was it?

15,922

t-40

1      THE COURT:  Yes, 1241.

2      MR. SACHSE:  -- are applicable, your Honor will observe

3  that in the three years immediately preceding the acquisition,

4  for the period from the latest date in the fall, October 26,

5  1940, until the earliest date in the spring, which was June

6  10th, that there were no diversions during this period by the

7  Rancho-- none-- from the  River.

8      THE COURT:  I don't see/you obtain the date June 30th.

9      MR. SACHSE:  That is the date shown by the records of the

10  United States Geological Survey.

11      THE COURT:  You say that is the latest date that there

12  were no diversions?

13      MR. SACHSE:  There were no diversions; none.

14      THE COURT:  During those periods?

15      MR. SACHSE:  During those periods for the years indicated.

16      THE COURT:  The latest date is June 12th?

17      MR. SACHSE:  Yes, but to give the United States their

18  biggest break, I would say that their right accrued at the

19  earliest possible date in the spring-- the earliest late

20  winter or early spring date, and ended at the latest possible

21  fall date.

22      THE COURT:  And the earliest possible spring date was

23  May 10th or May 11th?

24      MR. SACHSE:  I am taking the first three years, those

25  three years, so for this three year period there was no use for

15,923

t-41

that period of time lost under 1241.

For the next three years it would be May 15th to   10/26 again.

For the next three years it would be May 11th to November 2nd.

THE COURT:  You mean that--

MR. SACHSE:  I mean, your Honor, for any of those appropriative rights--

THE COURT:  So far as any use of the water, that it was not made by the United States before those dates, May and June?

MR. SACHSE:  Not by the United States, your Honor.  By the Rancho.

THE COURT:  I see.  By the Rancho.

MR. SACHSE:  Now, it is worth observing also that in every one of those months for every year indicated there was water running at Fallbrook in every one of these months for every year indicated by the evidence/the United States in this record.

THE COURT:  What can you deduce from that?

MR. SACHSE:  That the water was there.

THE COURT:  Well, Fallbrook is upstream from the point of diversion.

MR. SACHSE:  Correct.

THE COURT:  Do you want to argue that if there was water running at Fallbrook, there would be water running at the

15,924

t-42

1    point of diversion?

2        MR. SACHSE:   When you hear the next fact, your Honor, I

3    think you will accept it.   I want to make clear that in every

     month there was water running at Fallbrook.

5        Now, let's start in 1943, and see when there was water

6    at Ysidora.   There was water at Ysidora from November 22nd

7    through June 12th.

8        THE COURT:   What exhibit is that from?

9        MR. SACHSE:   U. S. 26.   From November 22nd through June

10   12th.

11       For the preceding water year there was water at Ysidora

12   from October 6th through June 15th.

13       For the next year there was water at Ysidora from

14   December 1st through July 31st.

15       For the next year there was water at Ysidora from October

16   1st through May 23rd.

17       For the next year there was water at Ysidora from-- there

18   were two runs at Ysidora, broken.   There was water from

19   September 25th to September 30th, and also from November 12th

20   through June 5th.   That is the water year 1939.

21       This is for the last year, and there was water at Ysidora

22   from October 8th through July 10th.

23       Now, if there is any clearer evidence obtainable in any

24   record that the Rancho had not the slightest intention of

25   appropriating water at those periods of time, I don't know

t-43

1    where it is, and if they did have such an intention, they

2    lost it, because here was water practically all of the time

3    available to them, but they never appropriated it.  They did

4    not put it into the Lake O'Neill ditch, and  your Honor will

5    please recall the point that Mr. Girard pointed out, because

6    it went in the O'Neill ditch does not necessarily mean that

7    it went into Lake O'Neill.  It is even stronger than it looks

8    on this board.

9         This just says they didn't put it into the ditch.  We

10   don't know what they put into Lake O'Neill, and here is a

11   perfect demonstration that this late winter-early spring thing

12   just is ridiculous.

13        That is not true.  There was water available for

14   appropriation at all of these times at Ysidora, and yet for

15   none of those six years did the Rancho take any of it in the

16   wintertime.

17        Now, I offered Mr. Veeter the dates of March 31st--

18   April 1st through October 31st.

19        THE COURT:  As what?

20        MR. SACHSE:  And I think that is more than he can get

21   if your Honor finds the facts as delineated in the evidence

22   before you.

23        THE COURT:  You offered him what?

24        MR. SACHSE:  The dates of April 1 through October 31, and

25   that is better than he can get if he takes the facts from the

t-44

G-3

1    evidence.

2        THE COURT:   And you offered to say that the appropriative

3    right of the United States would have to be exercised--

4        MR. SACHSE:   Between those periods of time.

5        THE COURT:   -- between April 1st and October 31st?

6        MR. SACHSE:   And I asked, as a corollary to it, if he

7    won't buy it, I will go without that, because I feel it is a

8    proper order for your Honor to make as one of the ultimate

9    findings, that in putting water in the stream is a reasonable

10   use, and I asked that it be impounded at the earliest possible

11   date, so that the waters are not permitted to go to waste, as

12   they did under the Rancho.

13       Now, they have not done that under the United States

14   except that it was true surplus water.   Colonel Bowen testified

15   that it was his desire to empty that lake in such a way as

16   to accomplish the maximum running water reach, your Honor.   I

17   think those were his exact words.   He said, "We got some

18   rather nice early rains, so it looked like we had a chance

19   of really filling it up," and he let it all out at once, and

20   let it go down to Ysidora.

21       I think without any order from your Honor that any

22   intelligent ground water officer would do the same thing, but

23   I would like such an order anyway.

24       I will now repeat the offer, and/if Mr. Veeder wants to

25   take it, I will for myself stipulate to an appropriative right

t-45

15,927

G-4

1   in the United States, waiving any objection to the loss of

2   rights, -- an appropriative right in the United States for

3   recreational and training purposes in the amounts we have

4   previously covered extending from April 1 annually through

5   October 31 annually.

6      MR. VEEDER:  Does that finish your argument, Mr. Sachse?

7      MR. SACHSE:  That is all on this phase, your Honor.

8      MR. VEEDER:  Now, let's quite piecemealing this, your

9   Honor.

10      I feel this way:  Mr. Sachse should proceed and wind up

11   his case, and then let me answer.  I can't see why at this

12   juncture it is desirable to interrupt his discussion or his

13   offer of evidence.  I am perfectly willing to let him go

14   ahead.

15      THE COURT:  We will let him go ahead, but  he thought you

16   might see the light, the one that he is pointing out to you,

17   and that we could shorten the case to the extent of his

18   proposal, and without passing on it, it seems to me that he is

19   talking pretty reasonably.

20      Now, if the Court found that your appropriative right

21   was one that should be exercised strictly according to law,

22   between April 1st and the end of October, and if the Court

23   also suggested or ordered that if it would not be violative

24   of other persons' rights, that you fill up Lake O'Neill at

25   the earliest possible moment and before April 1st, I don't see

15,928

t-46

1   how you could be hurt, while if there is merit to his

2   argument here, you could very well be hurt.

3       I haven't heard the rest of his argument, but the first

4   part of his argument is that you have lost an appropriative

5   right, insofar as that right has to be exercised at any time

6   before sometime in June, and that any water you put in in the

7   rest of the year, you would have to put in after June of the

8   year.

9       Then he may have a further argument that in view of the

10  nature of the testimony of what your right was historically,

11  or what the Rancho's right was, you have lost the whole right.

12      MR. SACHSE:  That is exactly correct, your Honor.  That

13  is exactly correct.

14      MR. VEEDER:  Lost the whole right?

15      THE COURT:  Well, I am not going to argue the case for

16  you, but I can sit up here and I can see what he is talking

17  about.  He is going to argue that your appropriative right

18  under the findings which we have just been over was as to late

19  winter and early spring, and early spring would certainly not

20  run as far as June, to fill Lake O'Neill, and that by periods

21  of more than three years you did not exercise that right, and

22  you never exercised the right until the first part of June,

23  or late May.  May 15th, I believe, is the earliest date

24  shown here in this whole list, which you can't call early

25  spring or late winter, either one, and, therefore, by nonuse--

15,929

t-47

1    and I am not passing on this now-- by nonuse you have lost the

2    appropriative right in toto; or, receding one step that, at

3    any rate, you have lost, if this is an appropriative right

4    that has its origin over a period of time in a year, -- you

5    have lost the right to exercise it at any time before June of

6    a given year, at which time, of course, the flow of water in

7    the stream is likely to be minimal.

8    MR. SACHSE:  The only modification I would make, your

9    Honor, is when you say, "You have lost the right."  I have

10   taken the position not that the United States has lost the

11   right, but that the Rancho itself, which was certainly liable

12   to lose rights under our Code, -- that the Rancho itself lost

13   it before the United States ever acquired it.

14   THE COURT:  And, of course, this argument which he

15   advances cuts across any contention you have about any rights

16   of the United States, because this all happened before the

17   United States acquired Pendleton.

18   If you want me to ask Mr. Sachse to go ahead with any

19   other points he has, and then let you answer in toto, or let

20   you sleep over this and confer with your experts and advisors,

21   that is agreeable, too.

22   MR. VEEDER:  Your Honor, I have to say this:  I am

23   anxious for Mr. Sachse to go ahead and conclude his argument.

24   I certainly would want to talk to Colonel Bowen about

25   these runoff records.  I do not believe, from what has been

15,930

t-48

1    shown here yet, it would convince me that there was an

2    abandonment or there has/a statutory forfeiture.  I don't mind
                been

3    being pressed to argue this proposition now, and I will.

4        I don't believe, as nearly as I can comprehend the law

5    of California today, based upon Mr. Sachse's agreement, that

6    there could have been or that there was an appropriation

7    up to 1914.  I can confess to you that this is a technical

8    problem which involves a view of the runoff at Fallbrook.

9        I think that the basic element that is entailed here is

10   the fact, as Mr. Whitman testified, during this very period,

11   the period from-- I guess it was from 1913 down to date, he

12   said depending on the runoff they put the dam in to the bed

13   of the stream, and diverted the water into Lake O'Neill, and

14   that their practice was just that; that it was controlled by

15   the availability of water in the stream.

16       Now, an appropriative right is just of that character.

17   In other words, when the water was in the stream to such an

18   extent that you could not buck up an earthen dam, they didn't

19   put it in, but as soon as it dropped down to the point the

20   earthen dam could be put in, they put it in and they diverted

21   the water and applied it beneficially.  That is what Mr.

22   Whitman testified to, and during this period.  But I referred

23   to a proposition that I have considered, and I believe that

24   the law, as it is in California today, is as follows:  That

25   the statutory--

15,931

t-49

1    MR. STAHLMAN:  What page are you on?

2    MR. VEEDER:  Page 295.

3    THE COURT:  Of what?

4    MR. VEEDER:  Of Hutchins.  I believe that the law, as I

5    comprehend it, and I have looked at it, is that the statutory

6    forfeiture does not apply to the non-statutory right.

7    MR. SACHSE:  I will give you six citations that is not

8    true, Mr. Veeder, immediately, and save you time, if you want.

9    MR. VEEDER:  In any event, the position that we take here

10   is that the right exercised by the Rancho was the vested

11   appropriative right exercised when water was required, and

12   that the statutory forfeiture never did contemplate and never

13   was considered to be effective where water was available to

14   the riparian user.

15        In other words, as was true in the years to which Mr.

16   Sachse makes reference, you will find that they were years of

17   high runoff, that the basins were charged full, that there

18   was water running at Ysidora by reason of the intermittent

19   character of the waters in the stream; that when the basins

20   were full, you did have runoff.

21        We know that there was a high water table in the Chappo
                                      that
22   area, and/there was no need of diverting and applying water

23   prior to the time while subirrigation was taking place.

24        Now, there is a not a single case that Mr. Sachse can

25   cite, and certainly I have not found a single one, where the

15,932

t-50

g-4

1   law contemplated a forfeiture of a man's appropriative right

2   by reason of the fact that you had a series of wet years.

3       Suppose this:  Suppose this transpired, and it is not

4   out of the question, and the fact is it did transpire.   You

5   have these years of 1938 and 1939, and you have your years of

6   1940 and 1941, and 1942, the very years upon which he is

7   relying you have years of high runoff in which you could not

8   maintain that earthen dam.

9       I respectfully submit that equity, which abhors a

10  forfeiture, would not require and would not say that the law

11  was applicable here; this harsh, this very harsh police

12  regulation would not say that there would be a loss of the

13  right because there was a period of such high runoff that the

14  earthen dam could not be maintained.   And I believe, in equity,

15  your Honor would not so decree, nor do I think your Honor in

16  his discretion would so decree, that this three-year forfeiture,

17  which was  enacted for the purpose of protecting people who

18  wanted to initiate an appropriation, because some dog in the

19  manger was controlling the water that he was not himself

20  using.   That situation does not prevail here, your Honor.

21      If your Honor will look at Exhibit 23, you will find that

22  water in large quantities was running by the Fallbrook Public

23  Utility District gaging station, and in such quantities that

24  it was above the 20 second feet that we are claiming.   That is

25  why we put a ceiling on it.  We knew that they couldn't

15,933

51-6

1  maintain that diversion in there.

2      So from our standpoint, your Honor, for Fallbrook to come

3  along now and say there was a forfeiture of that right during

4  a period of high runoff, I simply say that your Honor in his

5  discretion would say that equity certainly would not impose

6  such a harsh rule as to deprive the Rancho of that appropriative

7  right.

8      Observe what it means, your Honor; observe what it means.

9  Here are these years, these years to which Mr. Sachse has

10 made reference, in which you would be saying that although

11 these rights have been exercised in each year from 1883 to

12 date, you are now going to invoke a principle which was enacted

13 many years later, many years after this right was vested, and

14 for an entirely different purpose than what is effective here

15 and what is involved here.

16     It is stated in this Alhambra case, Pasadena vs.

17 Alhambra, in regard to this forfeiture, and I will have to

18 check these cases out for you:

19         "This section, however, is not applicable here.

20     The primary purpose of the act was to create a system

21     for issuing licenses and permits for appropriation of

22     surplus water . . ., and it is reasonably clear that

23     section 20a was intended to refer only to water which

24     had been appropriated under such a license or permit."

25     The point that I will make, your Honor, --

15,934

t-52

1       THE COURT:  Now, wait.  By that you think that case

2   stands for the proposition that the section we are talking

3   about only applied to appropriations made after 1914 under

4   the Water Rights Act?

5       MR. VEEDER:  That is right.

6       THE COURT:  And not to self-help appropriations prior

7   to 1914?

8       MR. VEEDER:  I would want to run those cases down, but

9   that is my interpretation, your Honor.   Hutchins then goes

10  on and says:

11          "From that same premise, it would follow that the

12      forfeiture of an appropriative right in a surface stream

13      that had vested prior to the effective date that the

14      Water Commission Act come in that therefore was not

15      acquired by virtue of a license or permit, would be

16      governed by the judicially recognized five-year

17      period rather than by the statutory three-year period,

18      even though the period of nonuse began after the Water

19      Commission Act went into effect."

20      Now, to me that would be a sound principle of law.

21      THE COURT:  Let me ask a question there.  Do you think

22  the record as to the amount of runoff during some of these

23  wet years is sufficient to show what the amount of that

24  runoff was at the place where the diversion dam was thrown up;

25  and, secondly, is the  record sufficient to show that the

15,935

T-53

1   runoff was of such an extent that it would have washed out

2   that earthen fill had it been put in?

3       MR. VEEDER:  Yes, your Honor, I think that is correct

4   if your Honor will view that, and let's take 1941, which shows

5   up here immediately:  March --

6       MR. SACHSE:  Well, let's start on October 1st, if you

7   don't mind, Mr. Veeder.  Start at the first date.

8       MR. VEEDER:  Why can't I be permitted to continue my

9   argument, your Honor?

10      THE COURT:  Let him go ahead, Mr. Sachse.

11      MR. SACHSE:  All right.

12      MR. VEEDER:  Because we are talking about the period of

13  when this appropriative right will commence, and this is

14  extremely important.  As I said, March, or maybe earlier,

15  depending on the runoff.

16      If your Honor will look at the year 1940, in February

17  the high was 151 second feet.  This is the Fallbrook gaging

18  station.  In March it was 29 to 33.  In April it was 132

19  second feet down to 18.  In May it was 16 down to 7.

20      MR. SACHSE:  And this was for the year 1940-1941, or--

21      MR. VEEDER:  This was for the year--

22      MR. SACHSE:  Or 1939-1940?

23      MR. VEEDER:  That was for  1939-1940.

24      MR. SACHSE:  1939-1940.

25      THE COURT:  How many second feet would have to be flowing

t-54

1   to wash out your earthen diversion dam?

2      MR. VEEDER:  Your Honor, we have taken the position, and

3   I think this:  They certainly did not build the capacity at

4   the diversion ditch greater than they could reasonably divert.

5   In other words, they put in a structure of 20 second feet

6   capacity, and it can be assumed they did not dig out any more

7   dirt than they needed to.  And I have been operating upon the

8   principle, and have tendered to your Honor findings to the

9   effect that 20 second feet is the point at which the dam would

10  go out.  That is my understanding.

11     THE COURT:  You haven't proposed any finding on that yet?

12     MR. VEEDER:  I said up to 20 second feet.

13     THE COURT:  I know, but you haven't proposed any finding

14  as to when the earthen dam would go out.

15     MR. VEEDER:  I didn't think I needed to, your Honor, but

16  I will say this:  That from our standpoint, when we said the

17  maximum quantity that could be diverted out of the Santa

18  Margarita River was 20 second feet, it was assumed, and I

19  tender that thought now, that the earthen dam would not and

20  could not stay in when more than 20 second feet flowed in

21  there.  I take the position --

22     THE COURT:  These earthen dams have no excess spillway?

23     MR. VEEDER:  There was nothing.

24     THE COURT:  They cut off all the water, and if the water

25  did not go down in the ditch, it would go over the top and the

15,937

sides of the dam.

MR. VEEDER:  And it would wash it out.

THE COURT:  And the dam would go out.

MR. VEEDER:  That is right, and that is what Mr. Whitman testified to, and he testified that during the period Mr. Sachse referred to it was their practice, and, in fact, your Honor interrogated him yourself on it, and said, "What was your practice, Mr. Whitman?"

And he said, "Well, depending on the runoff, we put in this earthen dam."

And your Honor said, "Sometimes in April and June?"

And he said, "Yes." But he always went back to this one proposition that I am advancing that certainly there was an intention at all times, except when the water was at such a level that it washed out the dam, to exercise, and that they did exercise this right.

H fols.

15,938

MR. VEEDER:  Referring again to some other years that
Mr. Sachse has here, we have the year 1941, the water year
October through September.  Here is 1941.  This is one of the
crucial years.  I'll tell you, I'm glad I was not in the
Santa Margarita Valley in those years.  You will find that
there was an extremely high runoff in February.  It hit as
high as 1380 second feet at Fallbrook.  1630.  At the end of
April it was 137.  Throughout May it was 132 and 134 second
feet.  There goes one of these prime years.

THE COURT:  When did it get down to 20 second feet?

MR. VEEDER:  It got down to 20 second feet about the
21st of June.  Then it went up, your Honor.  It went down to
19.

MR. SACHSE:  16.

MR. VEEDER:  All right.

THE COURT:  But it was at the 20th of June that it finally
got down to 20 and stayed there?

MR. VEEDER:  It got down to 20.  It fluctuated around
there for a while.

MR. SACHSE:  It stayed below 20.

MR. VEEDER:  But it went down to 19.

Now we take another of Mr. Sachse's years.  The same
thing.

Did you ever hear Mr. Sachse pant?

MR. SACHSE:  I want to be sure that your figures are

15,939

t-6

1    right, Mr. Veeder.

2         THE COURT:  Let's go ahead.

3         MR. VEEDER:  I don't mind.

4         Here we go.  This is water year 1942; February, 25, 25,

5    got down to 21, then it hit 40, 191, 106.

6         THE COURT:  In February?

7         MR. VEEDER:  Yes, sir.  Over in March it was 38, 34,

8    183.  The lowest was 24.

9         Throughout April, 23, 31, 75, 58, down to 21.

10        Through the month of May it went on down.  It went to

11   May 2nd.

12        But in each of those years, your Honor, the quantity of

13   water that was coming down that stream was such that the

14   methods of appropriation couldn't have been effective, and

15   it certainly is within the power of your Honor in exercising

16   equity to say very frankly, in justice and equity, that the

17   law never contemplated that the Rancho Santa Margarita would

18   be deprived of the right to use water during the bad years

19   simply because during the good years the method of diversion

20   was impossible to effectuate.

21        Now, there are no cases on this particular point, your

22   Honor, to my knowledge, but I will assure your Honor that

23   there are thousands of cases on the general proposition that

24   a court of equity would not demand a forfeiture under the

25   circumstances I have just elucidated here.  There is not a

t-7

1   three year period there where it would have been possible

2   to exercise the appropriative right that is claimed, and the

3   entire objective, as I said before in these opening statements,

4   the entire objective of the law was to prevent a man during

5   the dry seasons sitting on his water rights.   Now, I can't

6   see us perverting the law to the end that it would deprive

7   the Rancho of this invaluable right.

8       THE COURT:   Well, so much for that.

9       MR. SACHSE:   May I make a comment on one or two things

10   that Mr. Veeder has said, your Honor.

11      First, Mr. Veeder is wrong in emphasizing the phrase

12   "forfeiture," and if your Honor is doing so I want to disabuse

13   you.   This is not only offered by me as evidence that the

14   Rancho lost its rights under 1241, but let us please remember

15   that the burden of proof on this appropriative right is on

16   Mr. Veeder.   It is not on me to disprove his right.   Mr.

17   Veeder told your Honor-- he has been very frank about it-- he

18   has nothing better than this nebulous statement of "late

19   winter and early spring."

20      Now, I am first inviting your Honor's attention to the

21   fact that that isn't true.   We have something a great deal

22   better.   These are the U.S. Geological Survey records.   So

23   Mr. Veeder's nebulous idea that "late winter and early spring"

24   is controlling isn't true.   We have something specific.

25      So, Number One, I say that this incontrovertible evidence

15,241

t-8

1   must be accepted by your Honor instead of the loose figures

2   of Mr. Salisbury and Mr. Whitman.

3        Number Two, there is a forfeiture.

4        Number Three-- I want to correct some of these things,

5   because I just believe it is ridiculous to snap books up and

6   read your Honor a quotation when they have absolutely no

7   relationship to the case at bar.  Mr. Veeder says he cites

8   this Pasadena versus Alhambra, and that 1241 of the Water

9   Code has nothing to do with it.  I will surely agree.

10  Pasadena versus Alhambra is the Raymond Basin case, which is

11  the biggest single case reported in volumes in the State of

12  California, and it is absolutely nothing but the question

13  whether extractive rights out of a basin were lost by San

14  Gabriel, South Pasadena, Pasadena, San Marino.  If he would

15  read the case, he would know it.  But that is the fact.  That

16  case has nothing to do with this.

17       In the second place, he raises the five year pitch.  I

18  will concede that there are cases in California that suggest

19  that the three-year might control.  It might be five.  I will

20  take the five.  It is just as good for my position if we

21  apply five.  I will cite your Honor, however, a decision of

22  the United States Court of Claims from 1948 (Certiorari

23  denied by the United States Supreme Court), East Side Canal

24  versus United States, one of the Friant Dam cases.  I will

25  read only the headnote number three:

15,942

t-9

1      "Under the California Statute providing for

2      reversion of appropriative water on non-user for

3      three years at the time of trial, abandonment need not

4      be shown and it is only necessary to show failure to

5      beneficially use the water."

6      THE COURT:  What is the citation?

7      MR. SACHSE:  76 Federal Supplement 837 (Certiorari

8  denied by the Supreme Court).

9      If that doesn't take care of this argument of Mr. Veeder's,

10 I don't know what.  Mr. Veeder misses the whole point.  An

11 appropriator cannot do the very thing he says he can.  An

12 appropriator cannot go in and say, "I want all the water of

13 this river no matter how much it is, in wet seasons and dry

14 seasons, because in some dry seasons that is going to be only

15 enough, that would be barely sufficient."  That is what he

16 can't do.  That is the very dog in the manger he speaks of.

17     So this appropriator didn't do that.  This appropriator

18 went in there with slip scoops and fresnos, he threw up a

19 sand bank.  It had no spillway over the top.  It could divert

20 water into the ditch, and if there was more water than the

21 ditch could carry it flowed over the top and washed the sand

22 bank out and they had no more dam.  When did he do this?

23 Let's be reasonable and practical men.  They didn't have a

24 crystal ball, certainly not as good as Colonel Bowen has

25 today with weather advice.  They didn't know.  They had no idea

15,943

1   when that stream was going to get to 20 second feet.  They

2   could judge on their past experience that at about a certain

3   time of year they were safe.  If they had been foolish enough,

4   in some of these years that Mr. Veeder talks about, to throw

5   up the dam every time the flow reached 20 second feet-- for

6   example, in 1942 it was 2000 second feet at Fallbrook;  I

7   don't think it would be unreasonable to say there might have

8   been a second foot lost between there and a day later it

9   jumped up to 12000-- if they had been boobs enough to put in

10  that dam, they would not have had any dam.  That is not what

11  they did.  As practical men they wouldn't had their runoff

12  experience and they said, "Well, maybe April, May, we may get

13  away with it."

14      Now, that is exactly what I have offered to accept.

15  That is exactly what I think they did.  I think they said,

16  "Well, along about the first of April we can take a chance

17  and it may work, and if it does not we have lost a few days

18  labor."

19      THE COURT:  Of course, in support of your view, and

20  having lived out here most of my life, you generally figure

21  you have had your rain by the end of March.  It is seldom

22  that you get a storm, in my experience, of any size after

23  the first of April.

24      MR. SACHSE:  But wouldn't you say it is equally true,

25  based on your experience out here, that if you were depending

t-11

1   for this diversion on nothing but a sand embankment thrown

2   up with slip scoops and fresnos, that you might hesitate to

3   put it up before the end of March?  You wouldn't be out

4   there with a crystal ball trying to guess.

5   THE COURT:  I would take a guess on that.  If I were

6   guessing, I would say about the first of April would be about

7   the time I would want to spend any money to put a dam across

8   one of these intermittent streams.

9   MR. SACHSE:  May I again remind you and Mr. Veeder that

10  this is not a case of my disproving his right.  This is a

11  case of proving it.  He has given your Honor nothing except

12  a nebulous statement "late winter and early spring."  That is

13  why I was so careful to tie this down to December 14, because

14  prior to that time we have no records.  But, subsequent to

15  that we have them.

16  THE COURT:  "Late winter and early spring," is an

17  ambiguous statement.  What is "late winter"?  If you talk to

18  various people they might disagree.

19  MR. SACHSE:  The first day of winter is Equinox, the

20  21st of December.

21  THE COURT:  Well, the Equinox between winter and spring

22  is about the 21st or 22nd of March.  So late winter, I would

23  take it, would be just before the Equinox, and early spring

24  would be right after the Equinox.

25  MR. SACHSE:  I offered March 31st.

t-12

1      MR. STAHLMAN:  There is no standard.  In the various

2  storage permits they set the dates in relation to when persons

3  could appropriate runoff, and you will practically in all

4  permits, as it is in the Vail permit, that they can appropriate

5  between November 1 and April 30th.

6      THE COURT:  That is a different proposition, Mr. Stahlman.

7      MR. STAHLMAN:  I know it is.

8      THE COURT:  That is a situation where the permit has been

9  given as a result of a hearing, and obviously they are going

10  to fix the period of time to appropriate when the winter

11  rains are running off.

12      MR. STAHLMAN:  Yes.

13      THE COURT:  And they fix, therefore, a period that runs

14  to-- April 1st?

15      MR. STAHLMAN:  April 30th.

16      THE COURT:  April 30th?

17      MR. STAHLMAN:  Yes.  By the same token, though, your

18  Honor, a person certainly wouldn't want to put up a dam until

19  the winter rains were over.

20      THE COURT:  I see your point.

21      Mr. Sachse, what further matters do you have to present

22  on this matter?

23      MR. SACHSE:  I have nothing further to present on this

24  issue of the appropriative rights.

25      I would ask, then, that your Honor tell me what dates

15,946

t-13

1    you intend to fix, and I might want to present exactly

2    similar evidence based on what is already in the record on

3    whether or not the United States has lost this right.   I

4    don't see any reason for crossing these bridges if I don't

5    have to.   I don't see why we should argue whether or not the

6    United States can abandon, if there is no need to.  If your

7    Honor fixes the dates satisfactorily, I am not going to

8    quarrel about them.   I think they have some kind of right.

9         THE COURT:   Let me say this.   I think we have to fix

10    some dates, even if we do it arbitrarily, and we have to

11    find out what was meant by "late winter and early spring," I

12    think, to make any kind of judgment and understanding.   We

13    are going to have to try to crystalize some dates.

14         I don't look upon your proposal, Mr. Sachse, as

15    unreasonable.

16         I think any talk about forfeiture of a right in years

17    of heavy runoff, I'll say very frankly, leaves me cold, for

18    the reason that equity is not going to require a man to do an

19    idle act, and there would be no sense of throwing an earth dam

20    across a stream when there was any reasonable expectation that

21    the dam was going out.   And we know from the testimony that

22    apparently on occasion they would put the dam in too early

23    and it went out.

24         I think Mr. Veeder on reflection might find your proposal

25    fairly acceptable, particularly in view of the fact that you

15,947

t-14

1    fix the date and yet you ask the Court to urge that the

2    United States pick this water up at an earlier date, if

3    possible.

4        MR. VEEDER:  That is the thing that gives me a lot of

5    pause, your Honor.  I think that as a riparian owner we have

6    the right to diverttwater into Lake O'Neill.  I think as a

7    riparian owner we can come in and control and handle the

8    water as we see fit.  So I don't want to be in this position--

9        THE COURT:  You mean to divert it into Lake O'Neill for

10   a temporary--

11       MR. VEEDER:  For the  purpose of recharging the basins

12   and controlling --

13       MR. GIRARD:  The law is squarely against that.

14       MR. VEEDER:  Just let me finish, Mr. Girard.

15       I think that the operation at Lake O'Neill could be,

16   under the rules that we have discussed here, a proper

17   riparian matter.  I also think -- well, I will wait until

18   they are through with their talk.

19       I also think, though, your Honor, that in regard to

20   the appropriative right that we have discussed, that it is

21   impossible for your Honor to declare that in years like this

22   year it wouldn't be proper to put in the earthen dam and to

23   divert the water under the claimed appropriative right.

24       So, we are in this position.  The point that I make, your

25   Honor, is that during a year like this, as a riparian owner

15,948

t-15

1     we are entitled to demand that the water come down to us.

2     We believe also that we should be permitted to exercise this

3     appropriative right as against an interloper like Fallbrook

4     which just started its rights in 1946.  We believe that the

5     law never contemplated what Mr. Sachse has here urged.

6         I view it this way.  That certainly the findings could

7     be made on this April 1 date for some of the years.  But on

8     a year like this, I think it would be entirely proper, and

9     I think Vail Company would agree on it, that you have to

10    take the water when it is there, and that is exactly what we

11    think we are entitled to do.  We believe that when Mr. Whitman

12    testified in regard to those years we are looking at right

13    here he demonstrated completely that runoff is the factor

14    that fixes the date when you have to start exercising this

15    seasonal storage right.

16        MR. SACHSE:  Should I restate my proposition, your Honor?

17    Sometimes I think it is impossible for me to make Mr. Veeder

18    comprehend.

19        THE COURT:  Restate it briefly.

20        MR. SACHSE:  I suggest, Mr. Veeder --

21        MR. VEEDER:  Mr. Sachse, may I interrupt.  I didn't get

22    a copy of the letter you sent theother people.

23        MR. SACHSE:  I didn't send it to anyone except the

24    other appropriate or involved.  I didn't think it was

25    appropriate to send it to you.  I just gave Colonel Bowen one

so you could have it.

I fls.

H 2

P 62

1    THE COURT: Restate it. Mr. Veeder didn't see the

2    letter. This has been sprung on him today. He wants to

3    think about it.

4    MR. SACHSE: Colonel Bowen has it now.

5    The proposition is that you shall be given a right to

6    appropriate commencing 1 April and ending 31 October; that

7    the Court shall, as a part of its basic duty to attempt to

8    compell reasonable and beneficial uses of water, not only

9    give you the permission but direct you to take water at the

10   earliest possible date, because in that manner the Court can

11   compell the conservation of water that accrues below both

12   the Vail and the proposed Fallbrook reservoir site.

13   That is my proposition. I don't want anybody to say

14   you can't do it in December. I want the Court to say you

15   shall do it in December. But you will have no right, Mr.

16   Veeder, in December or anytime prior to 1 April, to reach

17   upstream or to say to Fallbrook or to Vail, "Stop your

18   diversions. Let me have it." Your right to do that would

19   accrue 1 April.

20   Have I made myself clear, your Honor?

21   THE COURT: You have to me. And I take it, of course,

22   that you are motivated not only by what you think is in the

23   record, but by self-interest  and accordingly you are thinking

24   about the fact that when you build a dam you want to appro-

25   priate flood waters and you are willing, in the years when

P 63

1   there is water, to let the 1200 acre feet go.  On the other

2   hand, you are thinking of your permit to take water out of

3   the stream and in other  years you want to require the

4   Government to postpone its taking where there is a shortage

5   of water until April 1 and permit Fallbrook, I take it, to

6   continue --

7        MR. SACHSE: -- their stream flow diversions.  I would

8   face the fact, I think, beyond any question, that our stream

9   flow diversions in one year out of five, let us say -- I

10  guess that is our most recent average -- one out of five or

11  one out of six, under the proposal I have made, would be

12  subject to injunction from 1 April to 31 October.  That is

13  part of the deal.

14       But the reasons seem to me so obvious because, as I

15  said when I first broached it this morning, once Colonel

16  Bowen stores that water in Lake O'Neill or once Fallbrook

17  does in its reservoir and Vail in its reservoir, you can

18  always let it go.  But once it has gone past you, you can't

19  take it  back and put it into storage.  So the reasonable

20  and intelligent method of managing any storage facility is

21  to fill it as fast as possible, and I would hope and pray

22  without Court order Colonel Bowen and those who succeed him

23  would do just exactly that.  But I think your Honor should

24  direct him.

25       THE COURT:  I would guess whether I directed it or not,

P 64

1    if the Government had a right to fill that dam, or rather to

2    fill Lake O'Neill, they would be interested in getting it

3    filled and insure that they had a full lake and not take a

4    chance on waiting until April, May or June, thinking maybe

5    they would get it filled up.

6        MR. SACHSE:  I don't know why Mr. Veeder doesn't like

7    the idea.

8        THE COURT:  I don't see how the Government can too

9    strenuously object to the proposal.

10        I think maybe you ought to sleep on it tonight.

11        MR. VEEDER:  I would just as soon have a ten minute

12   recess and talk to Colonel Bowen about it.

13        THE COURT:  It is 4:15 and we are going to quit at 4:30.

14        MR. STAHLMAN:  We might as well take the recess.  I have

15   to go to the State court at 4:30.

16        THE COURT:  We have the further problem that if we try

17   to define "late winter and early spring," which is the nature

18   of your appropriative right, you are going to get down pretty

19   close to April 1.  I don't know what they are going to tell

20   you winter is, but what is the Equinox?  Isn't the Equinox

21   supposed to be the dividing line between winter and spring?

22        MR. SACHSE:  That is right.

23        THE COURT:  And if you say "late winter and early

24   spring" you are talking about the last week in March and

25   the first week in April.  You are getting very close to what

P 65

1   Mr. Sachse has mentioned.  There is value in this decree of

2   having something in black and white and not a decree that you

3   may take water in the later winter and early spring.  That

4   is only going to be a further cause of controversy.

5       MR. VEEDER:  I would like to talk to Colonel Bowen about

6   it.  I am anxious to get as much done today as we can.

7       MR. SACHSE:  Let's take ten minutes, and if we come

8   back we can at least decide what we are going to do tomorrow.

9       THE COURT:  Colonel Bowen, can you take over the job

10  of presiding officer over a little discussion, and incidentally

11  also be heard yourself?

12      MR. VEEDER:  I would like to talk to him myself for a

13  moment.

14      THE COURT:  You may.  You can talk together.  But I

15  mean I want somebody with a little bit of authority to see

16  that you don't all talk at the same time.

17      MR. VEEDER:  I think if he goes in my office with me

18  we can sit down and talk this thing through.  That is the

19  only way to handle it.

20      THE COURT:  All right, take a short recess.

21      (Recess).

22

23

24

25

t-55
I-1

1    MR. VEEDER:  Your Honor, I have told Mr. Sachse that we

2    would like to withhold the final conclusion on this matter

3    until in the morning, but I would like to know whether the

4    stipulation in regard to the April 1 date would be applicable

5    as of this year, which would be very important to us in our

6    consideration this evening.

7    MR. SACHSE:  In other words, I am taking my chances on

8    an injunction this year?  Is that your question, Mr. Veeder?

9    MR. VEEDER:  In other words, I would assume that if you

10   agree to this thing, the next result is that you are going to

11   stop pumping this year.

12   MR. SACHSE:  Oh, by agreeing to this, that you have an

13   appropriative right, I am not agreeing that his Honor can or

14   should give you an injunction.  I am agreeing that you can

15   ask for one, and I am not asking you to waive your right to

16   ask for it.

17   THE COURT:  In other words, the answer to your question

18   is that it applies to this year.

19   MR. VEEDER:  That is all I am asking.

20   THE COURT:  But whether or not the Court grants an

21   injunction is another matter.

22   MR. VEEDER:  I realize that.

23   THE COURT:  This injunction involves various things.

24   What bothers me about this injunction matter, and there is no

25   secret about it and I will tell you right out loud, -- what

t-56

1    is bothering me is if you weren't exporting all this water

2    out of the watershed, I would give you an injunction in a

3    minute.

MR. VEEDER:   What has that got to do with Lake O'Neill,
your Honor?

THE COURT:   It hasn't a thing in the world to do with it.
That is a separate problem.   That is a pretty broad statement,
but I will say this:   You have a lot of water in your basins,
and when those basins get down to where you have a dangerous
problem of further salt water intrusion, or depletion of the
basins, that is one thing.   But right now you are not hurt.

12   MR. VEEDER:   We are hurt at Lake O'Neill, your Honor.

13   THE COURT:   This Lake O'Neill is something else again.
That is entirely different.   It has nothing to do with the
problem of an injunction.

16   MR. VEEDER:   But the problem of filling Lake O'Neill now
and getting water down there is what the injunction would be
about.

19   MR. SACHSE:   To put your mind at rest, Mr. Veeder, I will
have no objection to your filing an order to show cause for
an injunction as to Lake O'Neill, but I don't think you can
get it, for some very sound reasons that I will enlarge on
when you request it.   But I do not ask you to waive your right
to request an injunction.

25   MR. VEEDER:   And do I also understand that this offer with

57

1  regard to April 1 or March 15th, or whatever should wind up

2  as the priority date, would have nothing whatever to do with

3  the riparian rights of the United States of America?

4  MR. SACHSE:  I don't know how it can.  All it is going

5  to say is that the appropriative right of the United States,

6  if the offer is accepted, from the way I understand it to be,

7  is that his Honor would write an order to say that the Rancho

8  acquire an appropriative right to appropriate water from

9  April 1 through October 31 annually, and that the United

10  States, as successor in interest to the Rancho, owns that

11  right, period.  It would have nothing to do with your

12  appropriative rights.

13  MR. VEEDER:  Riparian rights?

14  MR. SACHSE:  Riparian rights.

15  THE COURT:  And to have this have any effect on other

16  people in the watershed, it would probably be a matter for

17  the Court to interpret what the late winter and early spring

18  would mean, as to that date.

19  You gentlemen may stipulate, but I have to get here some

20  sort of a record to hold that up, if somebody who was not a

21  party to the stipulation decided to appeal.

22  I think it is a reasonable interpretation of late winter

23  and early spring, but, as Mr. Sachse says, it is just that

24  simple, plus the fact that I would so interpret the testimony

25  that I heard on the right that you have.

58

1      Now, shall we adjourn for this evening?

2          MR. VEEDER:  Your Honor, may I suggest that I thought

3      possibly Mr. Sachse --

4          MR. SACHSE:  I would say just one more thing, your

5      Honor, and I will get it over with now, and that might

6      influence Mr. Veeder a little.

7          I think that your Honor is unequivocally wrong, and I

8      would ask your Honor to reconsider this, when your Honor says

9      that an appropriative right is not lost in time of high water.

10     I think you are absolutely wrong.  Your appropriative right is

11     to take the water, and you take it.  You don't lose the

12     appropriative right if you can't get it because the water is

13     not there.  Then you don't lose it.  But if you have a right,

14     and the water is there and the need is there, you still take

15     your water.

16         THE COURT:  I think in each instance when you interpret

17     an appropriative right, you have to go back as to how it was

18     acquired, and I will wager that an analysis of the cases will

19     show that a right has a characteristic depending on how it was

20     taken.

21         Here was a particular kind of a right that could only be

22     taken and was taken by throwing up an earthen dam at the time

23     when there were not high waters.  I think that the self-help

24     right is stamped with the way it was used by self-help, and

25     I would hazard the guess that you will find authorities to

t-59

1    that effect.

2    　　　Now, there could be other appropriative rights, where

3    we will say a stream flowed by and a man was taking water out

4    to run a gold mine around the side of a hill some place, where

5    water was available there all the time, which is a different

6    thing.  But I think your appropriative right growing out of

7    self-help is stamped indelibly with the way it was acquired.

8    　　　MR. SACHSE:  Your Honor, may I finish in short order?

9    Excuse me, George, and I don't want to steal this from you,

10   but I want to say this:  The appropriative right is stamped,

11   yes, your Honor, but it is also stamped with the fundamental

12   constitutional provision as to the method of diversion.

13   　　　Now, if it were only physically possible for the Rancho

14   to have taken water by this silly method, even in those days,

15   maybe your Honor would be right but you have seen enough

16   diversions on rivers such as the Yuba, the Sacramento, the

17   Feather, and so on, that are big ones, and when they divert

18   water into a little ditch, they don't do it by trying to dam

19   the whole river.  They do it by slinging a few sandbags or

20   something out like this, and into a sluice box , and let the

21   river go on by, and the water goes in here (Indicating).  I

22   think that could have been done by the Rancho.  It wasn't done.

23   The water was there, and I think that they have lost any right

24   they had.

25   　　　THE COURT:  Maybe this is academic, but how can you go

t-60

1    back to 1883, and with our present knowledge of methods, and

2    all, in a dry area tell the people with hindsight how we

3    think they should have done?

        MR. SACHSE:   They did it on the Sacramento, and the Yuba,

5    and so on.

        THE COURT:   We know what they did, and there is not much

7    dispute as to what they did, but this was carried on as a

8    practice.   Maybe this business that you talk about may be

9    workable.   I have seen these little streams with intermittent

10   flows in the spring, and as a kid we used to dam them up and

11   make swimming pools out of them, and the big characteristic

12   about them, when they come down through a dry alluvial plane,

13   is that the course of that stream is  continually changing.

14   It does not follow a well defined pattern year after year.

15   One year it is over on one side, the area where the water is

16   running, and the next year it is 300 yards over on the other

17   side.   One year it comes down at a little bend at a place

18   where you can take it out with a few sandbags, and the next

19   time you would have to throw a dam across the whole stream to

20   get it.   That is the characteristic in Southern California

21   of an intermittent stream, particularly in areas where it runs

22   through an alluvial or a sandy fill.   The Big Tujunga or Big

23   Snake is a similar type of deal to what you have here.   The

24   Big and Little Tujunga I have seen ever since I was a kid, and

25   if anybody could tell me in the spring where the water would

t-61

1    be running in the next spring, I would say he would be doing

2    pretty well.  They don't follow the same pattern.

3        MR. VEEDER:   The case that Mr. Sachse cited, the

4    East Side Canal Company on the San Joaquin River, coincides

5    precisely with what your Honor has said.  They put in a sack

6    dam, and they called it a sack dam.  Each year  Miller and Lux

7    went in there and put in these dams, and it varied from month

8    to month and year to year.  What you said is correct.  That is

9    how the East Side Canal Company, and I know that situation

10   very, very well--

11       MR. SACHSE:  I have the case right here.

12       MR. VEEDER:  That is how they got an appropriative right.

13       THE COURT:  If Mr. Veeder is agreeable with your

14   suggestion, Mr. Sachse, are you abandoning your contention?

15       MR. SACHSE:  Not a bit.  Just like you said, I am hoping

16   that the fact that he knows that I have another shot in my

17   locker might encourage him to pick up my suggestion.

18       THE COURT:  If he picks up your suggestion, are you still

19   going to contest on appeal the abandonment?

20       MR. SACHSE:  No, your Honor.  I will stipulate that the

21   United States is the owner of the right I have just described,

22   limited as I have described it.  My only request at this

23   moment is that if he does not accept my stipulation, your

24   Honor will let me put in some points and authorities on this

25   abandonment issue, because I think the abandonment issue is

t-62

1    good.   That is my only request.

2            THE COURT:   All right.   10:00 o'clock tomorrow morning.

3            (Whereupon, at 4:30 o'clock .p.m., Tuesday, April 4, )

4            (1961, an adjournment was taken until 10:00 a.m.,      )

5            (Wednesday, April 5, 1961.                             )

6

7                            - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t-63

# C E R T I F I C A T E

    I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

    I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

    Dated at San Diego, California, this 4th day of April, A.D., 1961.

_____
**Official Reporter**

_____
**Official Reporter**