VOLUME NO. 140

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:  San Diego, California

Date:  April 5, 1961

Pages:  15,962 to 16,122

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 140                                                      15,962

A-1
t-1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
vs.                             )        No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                Defendants.     )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, April 5, 1961

- - -

APPEARANCES:

    For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney General

                                    CDR. DONALD W. REDD.

    For the Defendants:

        Vail Company               GEORGE STAHLMAN, ESQ.

        Fallbrook Public Utility   FRANZ R. SACHSE, ESQ.
        District, et al.,

        State of California        FRED GIRARD, ESQ.

BOOK P68

## INDEX TO WITNESSES

| For the Plaintiff | D | X | RD | RX |
|---|---|---|---|---|
| Col. A. C. Bowen | 16,090 | (The Court) | | |
| Fred Kunkel | 16,095 | (Veeder) | | |
| | | 16,099 | (Stahlman) | |
| | | 16,101 | (Sachse) | |

| For the Defendants | D | X | RD | RX |
|---|---|---|---|---|
| Col A. C. Bowen | | 16,074 (Stahlman) | | |

## INDEX TO EXHIBITS

| For the Plaintiff | Identified | Received |
|---|---|---|
| 281, 281-A (geologic maps) | | 16,098 |
| 29-AE, 29-AF (USGS maps) | | 16,105 |
| 280-A, 280-B (hydrographs of Ysidora) | | 16,106 |
| 282 (land riparian to Tucalota Creek and Valley) | 16,113 | 16,113 |
| 283 (Warm Springs), 284 (Tule Creek), 285 (Chihuahua), | | |
| 286 (Wilson Creek), 287 (Coahuila). | 16,115 | 16,121 |

| For the Defendants | Identified | Received |
|---|---|---|
| Vail's BE-1, BE-2 (maps) | 16,073 | 16,073 |
| Vail's BF-1 through 6 (plane table sheets) | 16,074 | 16,074 |
| Vail's BG (report of Sonderegger) | 16,075 | 16,075 |
| Vail's BI (Santa Rosa Grant) | 16,076 | 16,079 |
| Vail's BJ (Sandia) | 16,079 | 16,081 |

1    **Defendants' Exhibits (continued)**

2                                    <u>Identified</u>              <u>Received</u>

3    **Vail's BK**                                               **16,086**

4    **Vail's C-1 (addition to Coit Report)**                    **16,071**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t-2

1   SAN DIEGO, CALIFORNIA, Wednesday, April 5, 1961, 10:00 A.M.

2       THE CLERK:  Number 1, 1247-SD-C United States vs

3   Fallbrook.

4       THE COURT:  I have filed this opinion, and I have copies

5   here for Mr. Sachse, Mr. Girard, Mr. Veeder and Mr. Stahlman.

6       (The copies were handed to respective counsel.)

7       MR. VEEDER:  Are you ready for us to proceed, your Honor?

8       THE COURT:  Yes, sir.

9       MR. VEEDER:  Your Honor, I have checked the law on the

10  proposition that we were discussing last night, namely, the

11  applicability  of Section 1241, which is the three-year

12  forfeiture statute.

13      I have looked at the California cases on the proposition,

14  and I believe the statements which I referred to in Hutchins

15  are reflected in the law, namely, that the forfeiture

16  provisions were written into the law and enacted for the

17  issuance of licenses and permits, and that that what was

18  contemplated by the forfeiture proviso.

19      Now, your Honor, in regard to the Alhambra case, which it

20  is true relates to ground water, nevertheless the language of

21  that case I think is extremely important.  The declaration is

22  based upon an assertion that this Act--

23      THE COURT:  The citation on that, please?

24      MR. VEEDER:  That is 33 Cal. 2d 980, at Page 933:

25          "The primary purpose of the Act was to create a

15,964

system for issuing licenses and permits for appropriation of surplus water * * *, and it is reasonably clear that Section 20a" -- which is now Section 1241 of the West's Annotated Code, Water -- " was intended to refer only to water which had been appropriated under such a license or permit."

Now, in Hutchins at Page 295 there is a review of the law, and Hutchins points out that the same premise, adopted in the Alhambra case, would follow in regard to forfeitures of an appropriative right in a surface stream.

And I believe, your Honor, that the rationale of the decisions would bear that out.

In the case of Tulare Irrigation District vs. Lindsay, at 3 Cal. 2d 489, 530, there was an interesting review of the forfeiture statute in regard to riparian rights.  That case held that the forfeiture riparian right law was unconstitutional because it was violative of the spirit and intendment of the 1928 amendment.

However, the precepts enunciated in the Tulare case are fully in accord with the principles your Honor referred to last evening, namely, that equity abhors a forfeiture and will construe that forfeiture strictly.  That is in 19 Equity, Am. Jur., Paragraph 84.

The same principles are enunciated in California Jurisprudence, 22 Cal.Jur. 2d 5, Forfeitures, and there it says it is a general rule that statutes imposing forfeitures

15,965

t-4

1    are strictly construed.

2         Your Honor, on the basis of those provisos of the law,

3    and in the light of the actual history of the operations, I

4    believe that the contention advanced by Fallbrook that there

5    had been a forfeiture by the Rancho in the late thirties and

6    early forties certainly can't be borne out.

7         You put your finger on it again when you said, well, they

8    couldn't with the high flow that we demonstrated from the

9    exhibits, the Fallbrook runoff would not permit the construc-

10   tion of the diversion waters.

11        Now, under those circumstances I believe your Honor would

12   be entitled, and it would be  wholly appropriate in the name

13   of justice to construe the statutes as I have recommended, and

14   I petition your Honor to so construe.

15        MR. SACHSE:  Mr. Veeder, excuse me, but are you saying,

16   in other words, that you are not interested in accepting the

17   stipulation, or are you asking his Honor to rule first, and

18   then you will decide on whether you will accept the stipulation,

19   because the stipulation is an offer?

20        MR. VEEDER:  I would like to conclude these statements

21   if I could, your Honor.

22        THE COURT:  Conclude, if you will, and then I would ask

23   you the same question that Mr. Sachse has asked you.

24        MR. VEEDER:  Well, I brought these factors to your

25   attention, your Honor, and I view it this way, and I will state

15,966

t-5

1   what I believe would be a fair appraisal of our position in

2   this matter:

3   　　It is essential in the operation of Lake O'Neill to

4   drain it in the month of October.  That is what has been the

5   practice.  It has been the practice to fill Lake O'Neill as

6   soon thereafter as water was available to fill it.  It would

7   be the operation of the United States to fill the reservoir

8   as soon as it could.  If the water was available in November,

9   December, January, February, it would most certainly fill the

10  reservoir when that water came to it.

11  　　I can't abandon what I think is an appropriative right,

12  however.  I would say that if the reservoir was filled, on

13  whatever date you should select as the date the priority,

14  then, of course, there would be no demand for water at that

15  time.

16  　　We would, however, request that the decree, recognizing

17  the appropriative right, award to us a sufficient quantity of

18  water to maintain the level of Lake O'Neill at 1200 feet.  If

19  it took 10 acre feet a week to do that, that would be the

20  extent of our claim; if it took more, or if it took less, but

21  we would ask--

22  　　THE COURT:  There wouldn't be 10 acre feet of evaporation

23  a week, would there?

24  　　MR. VEEDER:  I used 10 as purely illustrative.

25  　　THE COURT:  Are you talking now about losses from

t-6      1    evaporation?

2       MR. VEEDER:  That is right.  If there were losses from

3    evaporation, of if we could only get 600 acre feet during the

4    winter runoff, our claim would be to the extent of 600 acre

5    feet, and whatever was necessary to maintain the 1200 acre

6    feet.

7       I think that is a reasonable offer, your Honor.  I think

8    that we can make the adjustments on that basis, and it occurs

A-3      9    to me that would be in keeping with fairness and justice.

10       THE COURT:  What do you say to this:  What proof has been

11    put on to establish the appropriative right?  It was not

12    proved that the reservoir had ever been filled in November or

13    December.  It was proved that in the late winter or early

14    spring, after the dangers of the dam washing out by floods

15    had been overcome, then the dam was put in.  That is the

16    appropriative right that has been proved.

17       That is why I cannot see what all the fuss is about, when

18    Mr. Sachse says he is willing to fold up and play dead here

19    on the proposition that your appropriative right, as of a

20    right, is one which historically has been exercised, and he

21    willing to concede that it may be exercised from his

22    suggested date of April 1st.   But he goes further and states

23    that he has no objection to the Court directing that you fill

24    the dam as early as possible, and that the only thing there

25    would be then in filling the dam earlier you would not be

15,968

t-7

1   exercising an appropriative right, except by using the

2   appropriative right which existed as of a later date; using

3   it sort of by an agreement or courtesy at an earlier date,

4   but that you would not be able to insist on the filling of

5   the reservoir at an earlier date.  That if you are going to

6   stand strictly on your appropriative date, you would start to

7   fill it in late winter or early spring.

8      However, it was the thought that if there was water

9   available in the winter, that is when you would fill it up,

10   and that is what you say you want to do.

11      MR. VEEDER:  That is what I said.

12      THE COURT:  Then I can't see, for the life of me, where

13   there is any real margin for discussion here.  You have

14   suggested findings of late winter or early spring.  What is

15   late winter or early spring?

16      MR. VEEDER:  That is before you to decide, your Honor.

17      THE COURT:  What do you think it is?

18      MR. VEEDER:  Well, certainly late winter would be-- I

19   think it would run around the first of March, or thereabouts.

20   I have no --

21      THE COURT:  What would early spring be?

22      MR. VEEDER:  I have always figured that this is early

23   spring right now.

24      THE COURT:  This is April.  Now, you are getting right

25   down to the suggestion that Mr. Sachse has made, and I do not

think any of us are going to sit around here and spend a lot
of time on a one week differential.  The point is that the
proof of your appropriative right established it as of late
winter or early spring, and if you came in with an injunction
to restrain the junior appropriator, you would strictly then
have to stand on your appropriative right as of the time of
use, which would be late winter or early spring.

However, Mr. Sachse has proposed by stipulation, by
agreement with you to say, or, not only to say but to ask the
Court to direct you to fill the reservoir earlier, and, of
course, what he has in mind when he says that is that if  you
fill it earlier, then when the smaller flows come down in
April and May, you have already filled the reservoir, and so
there is no problem then about having to use that flow to fill
the reservoir.  I don't think you are very far apart.

MR. VEEDER:  Neither do I, and it seems to me that the
statement I just made would be in keeping with the right.  I
confess that years of experience have taught me to be a little
gun shy, but I truly believe that there is no great
disparity between the position of Fallbrook today and the
United States in this matter.

I want it very clear that whatever I am talking about is
strictly an appropriative right, and has nothing to do with
our riparian rights.

THE COURT:  We all know that.

15,970

t-9

1    MR. SACHSE:  Your Honor, may I add only one thing to

2  the Court's statement on the physical facts that have been

3  mentioned, and that is Mr. Veeder has repeatedly conceded

4  that the maximum  inflow he could take into Lake O'Neill was

5  the ditch capacity, which is 20 cubic feet per second maximum.

6  Obviously, he could not get that much, because it would not

7  stay at 20 cubic feet per second for every minute, and at 20

8  cubic feet per second it would take in excess of 30 days to

9  fill this thing up.

10    I get my figures from Colonel Bowen.  Am I not correct

11  that it would take considerably in excess of 30 days to fill

12  it up?  So this early filling is advantageous to the United

13  States.

14    Now, I don't want Mr. Veeder to misunderstand.  He says

15  there is very little difference between Fallbrook and the

16  United States.  There is a fundamental difference.  I am not

17  conceding that I am wrong on the law, your Honor, and that is

18  why I respectfully asked Mr. Veeder, and this is an effort

19  to get this thing buttoned up.

B fls.    20

21

22

23

24

25

B 1 Pl

1    This is an effort to arrive at a date, an amount, and certain

2    restrictions, and I will not quarrel if you get them -- if

3    you take that much.  If you don't choose to take it, I want

4    to try the case, because there are still some very fundamental

5    arguments in my mind.

6        MR. VEEDER:  I have outlined to your Honor what I think.

7    I think really the date of diversion should be -- I like

8    my term -- later winter and early spring March 15th.  I think

9    it makes a difference.

10       MR. SACHSE:  I will submit it, then, without a forfeiture

11   issue.  I will state the forfeiture issue.  The forfeiture issue

12   I will hang on to.  We can argue that.  I will state it now

13   as a matter of factual evidence and ask your Honor to tell

14   me the dates of the Lake O'Nell appropriation factually,

15   and then I will come in with my forfeiture.

16       THE COURT:  Let's get as many issues out of the case as

17   we can.  It is one thing to decide it and have somebody say,

18   "We are going to go up on some issue here and have some fur-

19   ther litigation about the matter."  It is another thing when

20   you are so close to getting the thing wound up.  It is

21   desirable to reach this agreement, if possible.

22       MR. VEEDER:  What is Mr. Sachse's objection to what I

23   have just said?

24       THE COURT:  Mr. Veeder, Mr. Sachse made a fairly definite

25   proposal, and you then in reply talked about the law and he

talked about the law too.  But then we come down to specifics.

P 2

1    I asked you what you meant by "late winter and early spring."

2         MR. VEEDER:  I said March 15, your Honor.

3         MR. SACHSE:  March 15th to when?

4         THE COURT:  After I questioned you, I don't know that

5    we have had a specific statement from you in reply to Mr.

6    Sachse's proposition.

7         MR. STAHLMAN:  I would think, your Honor, it would be

8    more realistic to go with what has been the pattern when the

9    winter rains are finished, as established by the issuing of

10   permits by the State Water Rights Board, and that is the 30th

11   of April.  However, I will not quarrel if it is moved back

12   some.  I will go along with this.  But if it is going to go

13   back into March, then we run into conflict between the

14   appropriative right of Vail and that of the United States.

15        THE COURT:  What conflict do you run into?

16        MR. STAHLMAN:  We have a right to appropriate water up

17   until --

18        THE COURT:  You would be a junior appropriator.

19        MR. STAHLMAN:  Yes, and there could be years when the

20   rainfall was such that there would be a conflict created.

21   If it is a matter of thirty days, I don't think it is going

22   to make any difference.

23        THE COURT:  Your right starts April 30th?

24        MR. STAHLMAN:  Up until April 30th, yes.

25        THE COURT:  Until April 30th?

15,973

P 3

1    MR. STAHLMAN: Yes.  If it is moved back a month, the
2    further it gets back the more chances there are of getting
3    into conflict on the two appropriative rights.

4    MR. SACHSE:  That is why I submitted it to Mr. Stahlman
5    before I even discussed it with Mr. Veeder.

6    MR. STAHLMAN:  I will go along with the proposition.  I
7    realize that there could be years when there would be some
8    sacrafices necessary on the part of Vail.  I think there would
9    be few.  But the further back you move the date into the
10   winter months, in recognition of the rainfall pattern, the
11   more chances there are of getting into this difficulty.

12   THE COURT:  I haven't heard from Mr. Girard.

13   MR. VEEDER:  I will say this, your Honor, that I will
14   take the April 1 date.

15   MR. SACHSE:  You will take what?

16   MR. VEEDER:  The April 1 date.

17   MR. SACHSE:  Then I will restate it.

18   MR. STAHLMAN:  One thing, if I may, Mr. Sachse, before
19   you restate it.  There has been some mention of evaporation
20   loss.  It has been my impression, and I think the cases bear
21   it out, that the appropriator who appropriates stands his
22   evaporation losses.

23   MR. SACHSE:  Leave that aside for the moment.  I am in
24   agreement.  But first to state the fundamentals, Mr. Veeder
25   -- please check me now -- I am offering to stipulate, and I

P 4

1    understand that you will agree --

2         MR. VEEDER:  Agree to an April 1 date.

3         MR. SACHSE:  I am trying to state this whole thing.

4         That the United States of America, as successor to the

5    Rancho Santa Margarita, owns an appropriative right to im-

6    pound 1100 acre feet of water annually.  Please leave aside

7    for the moment the evapo, and leave aside the matter of

8    filling up the other 100 acre feet.

9         THE COURT:  Which you have already covered.

10        MR. SACHSE:  Right.  Eleven hundred acre feet annually

11   commencing April 1 of each year and ending November 1 of

12   each year.

13        MR. VEEDER:  All right.

14        MR. SACHSE:  That as a corollary thereto the Court will

15   direct, as a part of the final judgment in this cause, the

16   United States to commence its diversions into Lake O'Neill

17   at the earliest possible date that water is available in the

18   fall or winter.

19        Fallbrook will raise no contention of forfeiture or

20   loss of right by abandonment on the part of the Rancho Santa

21   Margarita or on the part of the United States.  In other

22   words, Fallbrook will stipulate that this right presently

23   exists in the United States.

24        Is that the sum and substance of our agreement?

25        Is that the way you understood it, your Honor?

P5

1    THE COURT:  That is the way I understood it.

2    MR. VEEDER:  That is my understanding.

3    MR. SACHSE:  Okay, it is done.

4        Now, on the issue of the evapo-transpiration loss, my

5    understanding is just like that of Mr. Stahlman.  For example,

6    Fallbrook's permits permit it to impound the inflow during

7    certain winter months of the year, but not to impound any-

8    thing during the dry months of year.  In fact, they require

9    that we shall maintain gauges and know how much comes in

10   and see that the same amount can be allowed to go out.  I

11   don't know how much we are quarreling about.

12       Let me ask Colonel Bowen.  What is the total evapo-

13   transpiration on a thing like Lake O'Neill, assuming you had

14   it full and during the period of appropriative right we have

15   stipulated to -- that is, 1 April to 31 October?

16   COLONEL BOWEN:  I would estimate it at about 2 to 2½

17   feet.

18   MR. SACHSE:  Two to 2½ times 160.  Two to 2½ an acre.

19   COLONEL BOWEN:  One hundred and twenty-five.

20   MR. SACHSE:  On 125.  So it would be up to 250 to 300.

21   COLONEL BOWEN:  About 325.

22   MR. SACHSE:  The way we haggle over small quantities

23   here, it seems to me so little I can't conceive of the United

24   States wanting to spend the money to come in and ask for an

25   injunction to try to put that amount of water in the pond.

P 6

1    I don't know.

2        THE COURT:  I think there is a distinction between an

3    appropriative right obtained from the Water Board under pro-

4    cedures whereby the Water Board then specifies how the right

5    may be claimed and how it will be used and how the dam will

6    be operated and all that sort of thing, and an appropriative

7    right obtained by self-help.  The appropriative right obtained

8    by self-help, going back to what I said yesterday, was a

                                                    and
9    situation where you took certain facts as they were/by the

10   man's own industry he appropriated water and acquired a right,

11   and accordingly the measure of that right is really what he

12   did, what he acquired, what he got.  And I am of the tentative

13   view, at least equitably and maybe legally, that the appro-

14   priative right to fill Lake O'Neill and then maintain it

15   seasonally until it could be used in the fall would be a

16   right, if possible, to have it full during the winter season,

17   which would absorb and take care of the evaporation losses.

18       MR. SACHSE:  Your Honor, I think you are right, but we

19   have to anticipate these things.  Let me just pose a question

20   to you.  Let us suppose the river is dry now, in July or

21   August, and it is impossible for the Colonel to put any water

22   in Lake O'Neill.

23       THE COURT:  Then of course Lake O'Neill might be 800

24   acre feet by the time October came along, and that would be

25   the end of it.

P 7

1    MR. SACHSE:  But now we run up against a question.  It

2    might still well be that the physical condition exists that

3    there is still some water upstream at Fallbrook.  The condi-

4    tion might well exist.  I am sure Colonel Bowen will agree

5    that the river has been dry many times on the Rancho when

6    there has been some water at Fallbrook.  Now we run up against

7    the reasonable and practical question:  Is it practical to

8    stop a beneficial use or a reasonable use for domestic,

9    irrigation and municipal purposes to supply water for evapo-

10   ration purposes?  We get into an awfully tricky thing here

11   is what I am saying, on a question of law.

12   THE COURT:  I can see that.  You raise a nice point,

13   and you could have a whole lawsuit over a thing that didn't

14   involve very much water.

15   Again, looking at it equitably, there is no doubt but

16   that Fallbrook is a junior appropriator and is junior to these

17   rights that this old Rancho acquired.

18   MR. SACHSE:  No question about it.

19   THE COURT:  And if I had to decide these things legally,

20   I would try to follow the law, but by the same token I am

21   going to say I haven't got much concern about a junior appro-

22   priator over the appropriators whose rights go back to the

23   1880's.

24   MR. SACHSE:  I am not going to quarrel about it, your

25   Honor.  I don't know how you would word it, frankly.

P 8

1    I don't know how in the decree we word this right to water

2    to take care of evapo-transpiration loss.  I am not quite

3    sure how we do it.

4        MR. VEEDER:  There was a phase, though, that I brought

5    up that was in keeping with your Honor's statement, that if

6    we find ourselves with 600 acre feet of water on April 1,

7    we claim the right to claim that we can get it filled after

8    April 1 and that we maintain it at 1200 acre feet.  Is that

9    understood?

10       THE COURT:  Wait.  There is a give and take here.  Mr.

B 2   11    Sachse, in stipulating that an appropriative right would

12    begin April 1, has also wanted to have the Court direct you,

13    and this was in line with your desire, to fill the lake

14    earlier.

15       MR. VEEDER:  That is right.

16       THE COURT:  Obviously, when you fill the lake earlier

17    there would be more evapo-transpiration loss than there would

18    be if you filled the lake later, and it seems to me that one

19    is a quid pro quo for the other.  If you want the Government

20    to fill the lake earlier, it seems to me that you ought to

21    stand still for the additional evapo-transpiration losses that

22    occur.

23       MR. SACHSE:  I am not going to fight about it.  I don't

24    know how you are going to word it.  It is tricky.

25       MR. VEEDER:  I am fully capable of writing it on these

P 9   1   words.

2   MR. SACHSE:  I am afraid we may end up with something --

3   MR. VEEDER:  The point I want to make is that there be

4   understanding as to the continuity of this appropriative

5   right after the lake has been filled or half filled.  Do

6   I comprehend that that exists?

7   MR. SACHSE:  That isn't the right, your Honor.  The right

8   is to fill the lake starting a certain date.  You don't also

9   have the right to fill the lake and then to have something

10   beyond filling the lake.

11   How do we say this?  I am curious, Mr. Veeder.  Let's

12   say it.  How would you say it?

13   MR. VEEDER:  I will simply say this -- John will put it

14   down and I may have to take it all back -- but here would be

15   my view, that the United States of America would, in keeping

16   with this practice, along in October release the water from

17   Lake O'Neill; that as soon thereafter as it could it would

18   immediately start filling the lake.

19   Isn't that right, Colonel Bowen?

20   COLONEL BOWEN:  Yes.

21   MR. VEEDER:  Just as soon as we had released it, we

22   would undertake to recharge it and to refill it, and that

23   is our desire, and this is quid pro quo from us, too, because

24   I hate to do it.  But we go ahead and fill it as full as we

25   can.  If we can get 1200 acre feet by Christmas, fine.  We

P 10

1  will try to maintain that 1200 acre feet as long as we can.

2  Now come April, though, and we find we have only 600 acre

3  feet --

4      MR. SACHSE:  It wouldn't evaporate that much.

5      MR. VEEDER:  I am saying there isn't enough water to

6  fill the lake this year.

7      MR. SACHSE:  I see.  Then you have an appropriative

8  right from that point forward to fill it.

9      MR. VEEDER:  Yes.

10      MR. SACHSE:  Okay, I'll buy it.

11      THE COURT:  Here is a thing that is going to be hard to

12  word.  Suppose you start in December and January and you fill

13  the lake, and come April 1 the lake is full, and we have a

14  real hot spring, like this April started, and then you have

15  a hot summer and along about July or August the lake has a

16  thousand acre feet of water in it.  This is where the rub

17  comes.  And so meanwhile there is a small trickle up at

18  Fallbrook and Fallbrook is using it.  The United States says,

19  "Now we have a right to have our lake full, and it is now

20  down to a thousand feet.  We want a couple of hundred acre

21  feet of water.  Stop pumping, Fallbrook, so we can get that

22  200 acre feet."

23      MR. VEEDER:  I think on an order to show cause we have

24  to demonstrate reasonableness.

25      MR. SACHSE:  I think it is fair enough.  Let's go.

P 11

1      THE COURT:  The gist of this understanding, as I get

2   it, is this:  That in view of the fact that there has been

3   the suggestion that the Government fill the lake earlier,

4   in view of the fact that the Government wants to fill the

5   lake earlier, in view of that fact that actually its right

6   to fill it earlier is only one that you can exercise by

7   sufferance, that there shouldn't be a lot of squabble about

8   the transpiration losses, if they occur.

9      MR. SACHSE:  I agree.  I think Mr. Veeder has put his

10   finger on a point.  I think an act such as your Honor out-

11   lined might well be ridiculous and one that I could resist

12   on the ground of utter unreasonableness.  On the other hand,

13   the state of facts such as he outlined where he tries as hard

14   as he can and by the first of April he still has only 600

15   or 500 acre feet of water in it, then Mr. Veeder can come in

16   and ask for an injunction and might perhaps reasonably expect

17   to have you enjoin pumping.  I think we have to leave some

18   holes in this.  I don't think it is going to be humanly

19   possible to write it perfectly.  And I am willing to accept

20   the understanding we have at this time.

21      I still don't know how we word this power.  But if this

22   appropriative right exists after April 1, I guess he can

23   come and ask for restraint at any time he wanted to.  If his

24   deficiency was only a hundred acre feet, I don't think he

25   would get it, under the circumstances.  But I think he could

P 12

1   ask for it, and I will take the chance.

2       MR. VEEDER:  As I said, if there was not enough water to

3   fill the lake we immediately would have to call on water after

4   April 1.

5       MR. SACHSE:  That I concede.

6       THE COURT:  That is agreed.

7       As I understand Mr. Sachse, if, for instance, your lake

8   is only half full on the 1st of April, there is going to be

9   no argument on his part that you are entitled thereafter to

10  fill the lake.

11      MR. SACHSE:  Don't say there is going to be no argument.

12  I have half a dozen reasons this year why Mr. Veeder can't

13  have an injunction.  We are not trying an injunction case.

14  What I said yesterday is that he is not foreclosed from

15  attempting to enjoin.  He has that right.  But as your Honor

16  expressly pointed out, whether or not an injunction is or is

17  not an issue in any given set of cases is governed by many

18  things besides the naked rights themselves.  And I cannot

19  say that I waive the  right to resist all requests for in-

20  junction at such time as Lake O'Neill isn't full.  That I

21  can't do.

22      MR. VEEDER:  Is there agreement on this thing now?

23      THE COURT:  Well, there is agreement, apparently, and

24  maybe there is not agreement.

25      Mr. Girard, do you have any suggestions?

P 13

1  MR. GIRARD:  I think maybe it would be a good idea to
2 state exactly what is agreed to.  During the lunch hour I
3 will try to write it out, if anybody wants me to.

4  MR. SACHSE:  I think there is agreement, your Honor.

5  THE COURT:  I would like to see it written out.  And I
6 would like also, if possible -- this is one way of doing it
7 -- postulating a couple of situations that might exist and
8 what the rights would be under those situations.

9  MR. VEEDER:  Let's postulate the situation that exists
10 now, your Honor.  I think this is the time to look at the
11 moment now.  We have come to an agreement here.  What is the
12 situation?

13  MR. SACHSE:  I will meet that, Mr. Veeder.  I think that
14 is a fair request, and I told you two weeks ago that I wanted
15 formal notice of an injunction, and I do.  But I am perfectly
16 willing to express to you --

17  MR. VEEDER:  All right, I will file notice for an in-
18 junction or temporary restraining order at this time.

19  MR. SACHSE:  How many days have I got?

20  MR. VEEDER:  The temporary restraining order has an
21 aspect of immediacy.

22  MR. STAHLMAN:  Before we get into this surprise move
23 here, let's see if we are going to do what his Honor suggested.
24 Mr. Veeder has a way of getting everybody off of the track.

25  MR. VEEDER:  I am not getting you off the track.

P 14

1    MR. STAHLMAN:  Just a moment.  I think your Honor sugges-

2    ted that this be put in writing.  Let's see what it looks

3    like.

4       MR. SACHSE:  I am still quite willing to take this up

5    before the week is over.  I think what we have wanted to do

6    is the nature of the right that the United States has.  We

7    have agreed to that.  I think there is no question.  I think

8    the United States are going to come in and say, "Your Honor,

9    this is the right we have.  The physical condition is that

10   the lake is not full.  We now request your Honor to enjoin

11   Fallbrook."  I assume that is the basic idea.

12      MR. VEEDER:  Yes.

13      MR. SACHSE:  Your Honor has just agreed, "Mr. Sachse

14   has stipulated to an existing right in the United States.

15   That right is prior to Fallbrook's right."

16      "Now your Honor, I want you to enjoin all pumping by

17   Fallbrook until the lake is filled up."

18      I think that is the substance of it, isn't it, Mr. Veeder?

19      MR. VEEDER:  Yes.

20      MR. SACHSE:  I am quite willing to take that one on.

21   I am ready.  I am loaded.  And your Honor can't give it to

22   him.

23      MR. VEEDER:  All I wanted to do is to get this thing

24   down so that we know where we are operating on it, and I

25   thought that by giving this bouquet to Franz it would

P15

B 3

1    precipitate --

2        MR. SACHSE: Mr. Veeder, I hope you told the press this

3    time that you are asking for an injunction, too, because it

4    is not going to look very good when you don't get it again.

5        MR. VEEDER: I didn't tell the press anything at anytime.

6        THE COURT: Mr. Girard.

7        MR. GIRARD: I think right now, on the state of this

8    record, it is conceded by Fallbrook that the United States

9    has a right, a prior vested right which water has not been

10   available to fulfill because, in part, of Fallbrook's use,

11   and we are just faced right now squarely with whether or

12   not that is the type of infringement by Fallbrook on the

13   rights of the United States that you would enjoin.

14       THE COURT: As to the agreement we think we arrived at,

15   will you try over the noon hour to see what you can draft?

16       MR. GIRARD: Yes, I will draft that.

17       THE COURT: Anyone else can work on it, too. But

18   somebody work on it and put something out to shoot at.

19       MR. GIRARD: Now it is a question whether injunction

20   should issue.

21       THE COURT: Now, to attempt to clean up this matter as

22   to other parties, other than those who might agree and stip-

23   ulate, I think I should indicate the findings that I might

24   make.

25       MR. SACHSE: I will simply not bring up any objections.

P 16

1    THE COURT:   There are other parties.

2    I have just been looking at Webster's New Collegiate

3    dictionary, and the word "winter" is defined:   "North of

4    the Equator winter is popularly taken to include the months

5    of December, January and February; but astronomically winter

6    may be considered as lasting through the winter solstice

7    about December 22nd until the Vernal Equinox about March 21st."

8    And I take it probably the definition of "spring" would follow

9    much the same way.

10   I would be prepared to find, therefore, that the evidence

11   showing this historical use of the appropriative right in

12   late winter and early spring actually was centered around

13   the Equinox about March 21st, and that a date of April 1,

14   taking into account the contingencies of getting a dam in

15   to be sure it wouldn't wash out, would probably be a reasona-

16   ble date for the beginning of the exercise of this appropria-

17   tive right.

18   I would also find that as to the possibility of any

19   other party raising the contentions that Mr. Sachse has

20   raised about the loss of the right, that the appropriative

21   right is measured by the way in which it was acquired, if it

22   was acquired by filling a dam on the date the floods seemed

23   to be over, that the dam would not stay in if there was in

24   excess of 20 second feet of flow, and that accordingly the

25   failure to build a dam during wet seasons when there was

P 17

1   high flow resulted in a loss of that right, and that the

2   material submitted by Mr. Sachse indicates that in various

3   of the years involved in the three year or five-year period

4   there were high flows of water, say, in excess of 20 second

5   feet, which obviously delayed the erection of the diversion

6   dam.

7       Mr. Girard, do you think of anything else I should find

8   in that connection, in connection with other parties who

9   might be involved in this?

10      MR. GIRARD:  No, but I would like to think about it a

11  little bit.

12      MR. SACHSE:  Your Honor, will you instruct me or tell

13  me what your desires are as far as this motion is concerned.

14  We have an agenda and I want to know whether you want me to

15  apply this thing or not, whether you want me to argue it and

16  so on.

17      MR. VEEDER:  Could we go on with your Honor's findings?

18  You are not through with them yet.

19      THE COURT:  I am practically through with them.  Do you

20  have any further suggestions?

21      MR. VEEDER:  No, I don't.  I think we should put these

22  findings together as rapidly as possible.

23      MR. SACHSE:  I believe, as a matter of fact, that the

24  motion is probably demurrable at this very instant, because

25  it does not recite the --

P 18

1    MR. VEEDER:  Your Honor, you gave the beginning date,

2    but you didn't say the ending date of this appropriative

3    right.

4       MR. SACHSE:  October 31?

5       THE COURT:  October 31 would be a reasonable date there.

6       So that the findings are, in substance, in line with

7    the stipulation.

8       MR. SACHSE:  I think the motion is probably technically

9    defective, but I am certainly not going to try to attack it

10   on this ground, in that it does not recite the right your

11   Honor has just found.  It recites in the abstract the ex-

12   istence of a right.

13      MR. VEEDER:  Your Honor, I pleaded the ultimate fact

14   in that.

15      THE COURT:  Let's not get into the motion  until, first

16   of all, we see if we can heal up this agreement we reached

17   this morning.

18      MR. SACHSE:  Can we just hold this up.

19      THE COURT:  We will talk about it tomorrow.  We will

20   see.

21      MR. VEEDER:  Do you have time next week is what I was

22   going to inquire.

23      THE COURT:  I will be able to make time any time you

24   have time.  I think probably I could.

25      It would seem to me also that these findings that we

P 19    1    worked heretofore could be supplemented by additional findings

2    for the period from 1914 on to take care of the defenses that

3    Mr. Sachse has been talking about, and the findings would

4    also be supplemented by the agreement reached between the

5    United States and Fallbrook, which might well be a separate

6    written document but reference made to it here.

C fls.   7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C-1
t-10

1     We would then be in a position to button up a complete

2  set of findings and an interlocutory decree.

3     MR. VEEDER:  That would be my hope, your Honor.  The

4  mechanical business of putting these things together is one

5  reason why I inquired if there is no objection to the first

6  several pages of these, based on what we have done.  We could

7  then start having those run in final form in my office now.

8  That is the only thing I had in mind.

9     MR. SACHSE:  That wasn't it, as I recall.

10     THE COURT:  I think we cleaned everything up down as far

11  as we went, but we went to 1914, and I see no reason why you

12  should not start to redraft the first part of these and get

13  that part done.

14     MR. SACHSE:  I don't think you could do it directly to

15  1914.   I think it would be more of a correct statement if

16  Mr. Veeder took them very much as he had them, and right at

17  the end added the finding by the Court that the rights as

18  heretofore found existed on--

19     MR. VEEDER:  That the United States is the present owner.

20     MR. SACHSE:  That the United States is the present owner.

21     THE COURT:  That is what I have in mind.  We have used

22  what we have, which has the 1942 date in it, but then I would

23  want additional findings to take care of this difference

24  between 1914 and the present.

25     MR. SACHSE:  Yes.   I think your Honor could find that

t-11

1    everything in here is indefinite, and your Honor could then

2    add a finding and say:  Based on all of the evidence, the

3    Court finds that the actual dates of the appropriative right

4    of the Rancho Santa Margarita were from the 31st of March or

5    the 1st of April to the 31st of October, and then make one

6    more finding that all of those rights are the present

7    property of the United States, and then that is practically

8    done.

9         THE COURT:  But I want you to go further than that.  You

10    have made a record here, and this record is being typed up,

11    that "X" upstream may decide that he is going to make a fight

12    about this, and if he wants to fight about it, all right.  Then

13    I want findings which say that although there was a delay in

14    putting the dam in in some of these wet years, and so forth,

15    and so on, that the Rancho did not lose its appropriative right,

16    which is a conclusion of law, between 1914 and the date it

17    passed on to the Government, and that the Government has not

18    thereafter lost the right.  Then I wanted you to reach an

19    agreement as to the fact that there is an agreement between

20    Fallbrook and the United States.  But I don't see any reason

21    why you can't start on this, plus adding on some of these other

22    matters.

C-2

23         MR. VEEDER:  Just for my own edification, would your Honor

24    let me look at his copy on Page 1, as to how you want that

25    "The Court finds" set up?  I have notes, but they do not show.

t-12

THE COURT:  Oh, I just stuck it in as, "The Court finds."

MR. VEEDER:  I thought you deleted a part.

THE COURT:  No, I put it back in, because I noticed the way you had it was all right, so I stuck it back in.  That does not matter.  That is just a matter of form.

MR. VEEDER:  I just wanted to see what you did because my notes did not show it.

MR. STAHLMAN:  This is it?

MR. VEEDER:  No, this is the one I proposed.

MR. STAHLMAN:  Thank you.

THE COURT:  And then down at the Conclusions to say, "The Court concludes as a matter of law," and then you state the conclusions.

MR. VEEDER:  Yes.

THE COURT:  Now, as a predicate, I suppose, to the hearing of this injunction matter there probably would have to be a decision on this military use.

MR. VEEDER:  That is the next thing we have on the docket, your Honor.

MR. SACHSE:  Then I have to-- if we are going to discuss military use, I have to make a short statement for the record, your Honor.

THE COURT:  What is that?

MR. SACHSE:  I have to make a statement for the record, and this isn't mine, but I have been requested to make it.  I

15,993

t-13

1   want to make it very clear that I have no request of any kind

2   of delay on the military use argument.  If your Honor would

3   give me another 30 days, I don't think I could improve on my

4   briefs and my argument.  However, this is not I.

5       Then I want to invite your Honor to a couple of things,

6   and I guess now the love feast is over.

7       On June 27th of last year your Honor may recall an

8   extremely lengthy and heated discussion at the time that Mr.

9   Littleworth was putting on the case for his clients over the

10  phrase "regulation and apportionment."

11      I have the transcript here.  This argument lasted over

12  pages.  Finally the Court on Page 13,869, Volume 121--

13      THE COURT:  Page 13,869?

14      MR. SACHSE:  Yes, Volume 121, directed as follows,

15  speaking to Mr. Veeder:

16      "THE COURT:  You had better get yourself some boys,

17  because I am going to require you to go through this

18  record and submit me a list of those landowners who on

19  the basis of the present record you think are using an

20  unreasonable amount of water to the extent that you would

21  ask apportionment as to them, and submit to me their

22  names, the acreage that they have, how many inches they

23  are pumping, all of the pertinent data as to each one of

24  them."

25      Then there was some more colloquy, and on the next page,

15,994

t-14   1  13,870, there is this:

2        "THE COURT: " Mr. Veeder, "You are going to seek

3  apportionment right now of certain areas?

4        "MR. VEEDER: " In substance, yes.

5        "THE COURT:  Or regulation.  You get me the list of

6     names, areas, size of wells.  Let's get the whole dope

7     together and have it before August-- what day is it we

8     are going to be back?

9        "MR. VEEDER:  11th and 12th.

10       "THE COURT:  Serve copies on counsel."

11    Now, this has never been done.  Furthermore, by direction

12  of your Honor there was submitted to all counsel in this case

13  an analysis of issues and proposed order of proof, prepared

14  by me, dated December 28th, and in that analysis of issues

15  and proposed order of proof I listed all of the issues on law

16  stated in the pre-trial order, including the issue:  Does the

17  United States as a  riparian have the right to use water for

18  military purposes on a military reservation?

19    I described that issue as being immaterial unless and

20  until a request for a regulation was made.

21    Your Honor will recall that Mr. Veeder has expressly

22  stated in the same transcript that I have before me that he

23  felt regulation of Gibbon and Cottle was essential, and

24  regulation of Roripaugh was probably desirable, and that Star-

25  dust he felt was an outstanding case for regulation, et cetera.

t-15

1       Now, if there is to be regulation on this stream, the

2   one critical fact above all others to everyone, your Honor,

3   riparian and appropriator alike, is the propriety of the uses

4   of the United States.  This issue does not apply just to

5   Fallbrook.

6       If the United States' uses as a riparian are improper in

7   fact, they then have no right to assert any request for an

8   apportionment or regulation against any person upstream,

9   riparian or appropriator.

10      All this adds up to is this:  I said a moment ago that

11  I am ready to go ahead, and, as I say, I don't think I can

12  improve on my argument.  But I remember a story that my mother

13  told me a long while ago.  I don't want to be  facetious and

14  serious at the same time, but this is it:  There were three

15  gentlemen who went on a camping trip, and they rolled up in

16  their blankets and tried to go to sleep.  The ground was very

17  hard, and the rocks stuck in their backs, and they were cold,

18  and they couldn't sleep.  Finally in the small hours of the

19  morning two of them fell asleep, and no sooner had they dozed

20  off, than the third dozed off, but the third one  woke the

21  other two up and said, "Wake up, wake up."

22      They said, "What is the matter?"

23      He said, "Do you smell that skunk?"

24      They said, "You mean to tell us you just woke us up to

25  smell a skunk?"

t-16

C-3

1  　　　And he said, "You bet your life.  Do you think I want to

2  smell him all alone?"

3  　　　Now, I am ready to go ahead, but this issue goes a little

4  beyond Fallbrook, your Honor, and I think, no matter how

5  proud I may be of my own law and my own argument, I think

6  perhaps Mr. Roripaugh would like to have Mr. Krieger represent

7  him here, perhaps Mr. Oviatt would like to have Mr. O'Malley

8  here, and perhaps a few of these other people ought to be

9  heard, particularly in the light of the record that the United

10  States in ten months, or, rather, in nine months have never

11  complied with the express direction contained in the transcript

12  I just cited, and I think we should defer this issue until all

13  counsel know where Mr. Veeder is going to ask for regulations,

14  against whom, and so on.

15  　　　THE COURT:  Of course, somewhere along the line Mr.

16  Veeder filed some document as to what he meant by "regulation."

17  　　　MR. SACHSE:  That is right, but not the material that

18  your Honor asked for.

19  　　　THE COURT:  I know, but he sort of backed away, as I

20  recall, from what we  thought he meant when he first talked

21  about it.

22  　　　MR. SACHSE:  That is the position of Mr. Krieger and

23  Mr. Littleworth, and on the basis of the analysis of the proof,

24  which Mr. Veeder did not object to in his reply to my state-

25  ments, that this is the first that they have had any idea that

15,997

t-17

this issue was being thrown at them.

MR. VEEDER:  Your Honor, Mr. Sachse grabs a handful of sand and throws it into my eyes.  I sent out to all counsel--it is true that I don't know what he is talking about, but I sent out to all counsel a statement that the question of whether a riparian use was a military use was going to be heard today.

MR. SACHSE:  You did that last week.

MR. VEEDER:  Yes.

MR. SACHSE:  But you have never complied with the direction of last June.

MR. VEEDER:  May I go ahead, your Honor?

THE COURT:  Proceed, Mr. Veeder.

MR. VEEDER:  Now, he can harrass me if he wants to, I don't care, but the fact is there is no relationship between what he is saying now and the proposition that I am asking your Honor to determine.

You will see in the motion that I filed against the Fallbrook Public Utility District in the final paragraph the statement that we are only claiming in regard to the Naval Ammunition Depot and in regard to Lake O'Neill in this injunctive process that we are now asking--

MR. SACHSE:  Are we arguing injunction now, Mr. Veeder?

MR. VEEDER:  Just let me go ahead, please.

THE COURT:  Go ahead.

t-18

1          MR. VEEDER:  -- that the question of military use, that

2     is, whether we can use riparian water for military use is

3     something that was going to be reviewed today.

4          Now, I don't think that Mr. Krieger or anyone else could

5     properly object to a consideration of that right now.

6          If Mr. Sachse wants to bring up something else about

7     apportionment, fine.  But this single issue was presented by

8     your Honor when we talked about an injunction to protect our

9     Bases.

10          Now, that is all that is involved in the item which would

11     be Number 3 on our agenda today.  I don't want this confused,

12     and I want it to be very clear, that I believe your Honor has

13     already ruled on the matter, and if he hasn't, I would like

14     to have an explanation, for in your opinion in 165 F. Supp.,

15     you agreed with the State of California, -- as to what?  That

16     the matter of military use is a matter of  semantics largely,

17     and the only thing that the State of California announced

18     that it was interested in, and what I comprehended your Honor

19     to say in his opinion is:  Is it a reasonable use?

20          Now, if there has been some change in your Honor's

21     opinion in that regard, I think we are entitled to know it.

22     If not, I think that we should proceed on the basis that

23     absent proof that the military use which we are making is

24     reasonable or unreasonable, I think the burden is on people

25     contesting the matter in that regard.

t-19

1        I think that it is necessary, or, I think that your

2   holding is governing.  You said here at Page 824, and this is

3   165 F. Supp. 824 that Fallbrook has raised a question as to

4   whether the riparian proprietor, that is the United States,

5   could use the water for military purposes, and then you quote

6   what the State said, or you say:

7            " 'The State of California does not contest that

8        military use of water by the United States when made on

9        riparian land owned by the United States may be a

10       beneficial use within the riparian right.' "

11       Then this is your opinion:

12           "The real question is the reasonableness of the

13   use.  This is a question of fact.  Whether the military use

14   is reasonable depends on the circumstances of the case. . .

15   The Court does not propose to rule on this issue until the

16   trial of this case delineates through the evidence precisely

17   what the military use consists of."

18       Now, on item Number 3, and I don't want to digress from

19   this, your Honor, because I think it is extremely important,--

20   on item Number 3, I think your Honor has already ruled, and I

21   believe, moreover, that Mr. Sachse in his letter to your Honor,

22   dated March 20, 1961, has agreed that a riparian use is a

23   proper military use.

24       THE COURT:  Don't you mean the converse of that?

25       MR. VEEDER:  What?  That a military use is a proper

16,000

t-20

1   riparian use.  He said, "The evidence and the arguments last

2   week on the issue of possible restraint" --

3       MR. SACHSE:  Your Honor, this document is not in

4   evidence, and this was a proposal asking your Honor to consider

5   the possibilities of agreement, and I believe it is improperly

6   in the record, so I am going to ask your Honor to instruct

7   Mr. Veeder that it is not in the record.

8       THE COURT:  It is not in the record, Mr. Veeder.

9       It is time for a recess, but there are two or three things

10  that stick out like a sore thumb.  It is true that there is

11  some language in that opinion about military use.  However, I

12  do not feel that I finally closed the door on the question of

13  military use.  I don't think I even cited the various cases

14  referred to in the briefs on the question of military use,

15  and my intent was not to decide that issue.

16      It is true that I have a view that it is probably the

17  reasonableness of the use rather than the strict military

18  character of it that probably determines the question.  That

19  is one thing.  Number Two, I think that even though the agenda

20  went out, I think that we should tell these gentlemen that we

21  would hear this on Thursday or Friday, or some other day, and

22  again give them an opportunity to be here, if they want to.

23      MR. VEEDER:  Do you want me to call them, then, your

24  Honor?

25      THE COURT:  You may.  Thirdly, you have not complied with

16,001

t-21

1   my instructions to you on this matter as to what regulation

2   you were going to seek, unless this document which you later

3   filed, and I can't put my hand on it right now, was a

4   retraction or a withdrawal of your position, or that the issue

5   is not before us.

6       As I recall, and you will have to check the record to be

7   certain, after you were pressed as to what you meant by

8   "regulation and apportionment," there were comments by several

9   of the counsel, "Well, if that is all you are talking about,

10  that is something different."  They didn't  apprehend that

11  that was what you had in mind.

12      Now, whether there was a meeting of the minds as to what

13  you mean by "regulation and apportionment," I don't know.   I

14  definitely recall the fact that at one time it looked as if

15  you and other counsel were talking about two different things.

16      So then finally we come down to the fact:  What is it you

17  are going to ask on matters of regulation or apportionment

18  other than this thing against Fallbrook, this injunctive

19  matter?

20      Then we have the further fact that Mr. Sachse declared,

21  and I don't know how accurately he followed up his declaration,

22  that he was not going to put on any proof as to irrigated or

23  irrigable  acreages in the case of some of his clients.   Of

24  course, if you got into a full fledged regulation, whether he

25  puts it on or not, I think you should get some evidence.

t-22

1      MR. VEEDER:  Your Honor, I want to make this very clear,

2  and it is extremely important, that I have considered through-

3  out this litigation that it was essential that the irrigable

4  acreage of every defendant be put in, and I have myself,

5  working with Colonel Bowen, obtained the data in regard to

6  every irrigable acre of land that we have reached.  And we

7  are going to put in-- I comprehended why Mr. Sachse did not

8  want the irrigable acreage in, but I also conprehend  that

9  this is a general adjudication, and I have seen to it with

10  great care, and with a great deal of work, that there is in

11  this record up to the point where we are now full and

12  complete data  for a general adjudication.

13      Now, if there is need for apportionment, that is in the

14  record, when we have completed the entire proceeding, so that

15  your Honor could enter such an order.

16      Now, I have said repeatedly that the course of this

17  litigation from our standpoint was governed entirely-- and I

18  wrote Mr. Stahlman a letter to that effect in March of 1959--

19  the course of the United States of America in this litigation--

20  and I sent your Honor a copy of that letter-- depended entirely

21  upon your disposition of the question of the stipulated

22  judgment.

23      I have no  qualms about saying that the course of this

24  litigation did 180 when you filed the opinion this morning

25  in regard to the Vail Company, but I also have a nice and a

16,003

t-23

1  clear conscience that as I went through this litigation, I

2  carefully saw to it that the record was complete for each

3  individual, so whatever has to be done ultimately is in the

4  record so it can be done.

5      THE COURT:  Specifically, what have you done about the

6  request I made of you in August?

7      MR. VEEDER:  I think your Honor will find as we have

8  progressed we have put in the irrigable acreage  of each party

9  that was in.

10      THE COURT:  Yes, but I asked you to point out who the

11  people were that you would ask regulation against.

12      MR. VEEDER:  At that time I truly couldn't and didn't

13  know, and I don't know to this moment, and I have never known,

14  and I will never know until we find the full impact of the

15  disposition that your Honor has made of the stipulated judgment.

16      If the stipulated judgment is operative, there is no

17  question in my mind there will be no need for us, -- as I told

18  your Honor repeatedly, there would be no need for us asking

19  a general apportionment.  Why?  We had a guaranteed  20 second

20  feet at the mouth of the gorge under the stipulated judgment,

21  and we had a right as against the Vail Company to use the

22  water outside of the watershed.

23      Now, whatever transpired, the record is clear in this

24  matter, that I have seen to it that the record is complete

25  in every regard for every individual in the matter.

t-24

THE COURT:  Mr. Veeder, you have done a pretty good job in trying to protect the rights of the various parties, of those that did not have counsel, but the record is also clear that I asked you specifically where these areas were on which you were going to ask regulation, and you have done nothing about it.

MR. VEEDER:  I have done nothing about it, your Honor? I have put the data in just as fast as we could accumulate it, and I have put it in precisely and carefully.  And I want to say this, your Honor:  The abuse that I get from the other side bothers me not at all, but I have fulfilled my responsibility to you the best way I know how.

I could not conceivably have sat down and said, "We will regulate Mr. Lincoln, and we will not regulate Jack Roripaugh," until I knew what your Honor has done.  And, your Honor, you did it this morning when you filed the Vail Company statement, and when I see the full impact of that, and when I see the full impact of the findings of fact and conclusions of law, then I will know.  I don't know what the effect is going to be.  I can't say this--

THE COURT:  You are just going round and round, Mr. Veeder.

MR. SACHSE:  I am ready to argue this, your Honor, if Mr. Veeder wants to.

MR. STAHLMAN:  Let's have a recess, your Honor.

THE COURT:  All right.  And then let's talk about when we

16,005

t-25

D-fls.

1    are going to argue military use.  We will recess.

2         (A short recess.)

16,008

Take D1
P 20

1        THE COURT:  When do you propose to argue this military

2    use matter?

3        MR. SACHSE:  I will take it up at any time Mr. Veeder

4    wants to.

5        MR. VEEDER:  I think now is the time.

6        THE COURT:  Now is not the time until you call Mr.

7    Krieger and some of these people to see if they want to be

8    present.  If they say no, you may so report.  Today is

9    Wednesday.  Do you want to take some time Thursday or some

10   time Friday?

11       MR. VEEDER:  All right, your Honor, I will call them.

12   I may say this, that I have been unable to run down Mr.

13   Krieger or Mr. Littleworth.  But I talked to Mr. Anderson.

14   He was going to be here today.

15       MR. SACHSE:  Mr. Veeder, at the risk of hurting my own

16   client, I am going to come up with a proposal to your Honor.

17       Mr. Veeder in his remarks just before the recess said,

18   "There is in the record when your Honor has completed the

19   entire proceedings, or there will be in the record when your

20   Honor has completed the entire proceedings sufficient evi-

21   dence for your Honor to create an apportionment or regulation

22   of anybody," something to that effect.

23       Now I think if we will face squarely the issue of what

24   we are doing in this case and stop running off on side issues,

25   then this question whether Mr. Krieger is here is not

P 21

1   important. And what I am saying is that this piece of paper,

2   this injunction -- I do not at this time desire to forclose

3   myself from submitting a proper brief, but I am going to say

4   now, at the risk of tipping my hand completely, what I think

5   is involved here and the reasons why your Honor could not

6   possibly enjoin or restrain any party in this proceeding until

7   you are finished. Now if we can accept that fact, and if I

8   am right, then it doesn't matter how these things come up.

9   But if implicit in the argument on military use is the pro-

10   posed restraint of Roripaugh or someone else, then it is

11   very important, due process wise and for other reasons.

12      I am not going to try to argue -- I am just going to

13   state them, your Honor -- the reasons why I am absolutely

14   convinced that your Honor cannot enjoin anybody until there

15   is a final decree are just exactly three.

16      Number one. The United States code itself expressly

17   makes any order granting an injunction appealable. The

18   United States Circuit Court of Appeals has expressly directed

19   your Honor that in the conduct of this case you shall not

20   enter a judgment until all of them are entered, and your

21   Honor, in you own opinion that you handed us this morning

22   has relied upon it in denying Mr. Veeder's request for an

23   appeal on the stipulated judgment. That is point one why

24   you can't do it.

25      Now point two is what I might say the logic behind the

16,008

P 22

1   Circuit Court's direction and what I conceive to be the

2   California law.  This proceeding, your Honor, is one to

3   adjudicate rights in a stream system.  When this proceeding

4   is over we will presumably have a cataloguing of all rights

5   -- all of them.  We will have a determination unquestionably

6   that some rights or some exercises of use are absolutely

7   improper.  I am sure we will find them where people have

8   taken water without right.  I am sure we will find them

9   where they have taken water in excess of right.  Mr. Veeder

10  has evidence before your Honor that last fall the Murrieta

11  Basin actually had a reverse gradient.  Whether that was due

12  to excessive uses by riparians or due to the weather I don't

13  know.  But the point is that your Honor can't single out one

14  person and say that if a deficiency exists you alone will be

15  called upon to make up this deficiency when you have not yet

16  determined, for all I know, whether the Vail dam is legal.

17  I know it is legal, we all know it is legal, but there is no

18  judgment here yet.  There is no determination that Gibbon and

19  Cottle are taking water legally.  There is no determination

20  that Oviatt is taking water legally.  There is no determina-

21  tion that anyone, except at this particular moment two people:

22  Lake O'Neill on the basis of a stipulation -- and you haven't

23  signed that yet -- and Fallbrook.  Those are the only two

24  judgments that anyone is taking water under a right.  And

25  O'Neill isn't a judgment yet.  This is the identical argument

P 23

1    I gave you two weeks ago. How could/conceive enjoining a
*you*

2    legal right in Fallbrook in favor of a right you haven't

3    adjudicated yet? How can you conceive restraining a legal

4    exercise of a right when, for all we know at this moment, the

5    deficiency that exists at Camp Pendleton is a result of

6    completely and utterly illegal acts?

7        I hate to tip my hand, but my sympathy is with Mr.

8    Veeder in getting this show on the road and hurrying it up,

9    and I think this is the way to do it -- tip my hand at this

10   time. I want to get this case over with.

11       Number three. Your Honor is trying this case under the

12   constitutional provision of the State of California which

13   has this reasonable and beneficial use clause. You cannot

14   issue an injunction in favor of an unreasonable or a non-

15   beneficial use. You can't. You can issue an injunction that

16   would prevent the running of a prescriptive right, that is,

17   a declaratory decree, and when the use became reasonable and

18   beneficial they would be protected. But Section 106 of the

19   Water Code of the State of California provides that the

20   highest use of water in this state is domestic, and the second

21   highest use is irrigation.

22       Now, we have just stipulated to a right in the United

23   States for recreation, training and ground water replenishment.

24   You cannot, your Honor, under the constitutional provision,

25   restrain the second highest use of water in favor of a use

P 24

1   that comes in a way down the line somewhere and say that that

2   is reasonable -- that is putting water of this state to a

3   reasonable use. It is not.

4   All of these three things are worthy of deep, careful

5   briefing and exhaustive argument. I am going to be prepared

6   to do it. But I think if we can be honest with ourselves

7   for a minute, if Mr. Veeder will face what this lawsuit is

8   all about, if we can stop running off on tangents every time

9   we come to a new issue, if we can clean up the half dozen

10  half-cooked pots we have sitting on this stove, we can do

11  exactly what Mr. Veeder asked your Honor to do here before

12  the recess -- get this case to a final decree.

13  Then Mr. Veeder can come to your Honor and he can say,

14  "Your Honor, enjoin Fallbrook. Your Honor, put in a water

15  master." Then he can do it. But until these rights have

16  been determined as to their nature and extent we are wasting

17  our time, we are whistling Dixie, we are throwing around

18  pieces of paper like this that nothing is going to come of.

19  I can't ask your Honor to pre-judge without the briefs. But

20  I will bet Mr. Veeder a good hat. It can't go under the law

21  and under the order of the United States Circuit Court of

22  Appeals. Now is he will stop jumping around like a flea on

23  a hot stove, if he will settle down and try to knock out

24  some of these issues that have been here now for six months

25  -- let's get them finished one at a time. We have decided

D 2

P 25

1   today what the rights of the United States are.  Let's

2   decide what the rights of Roripaugh and these gentlemen are.

3   Let's get these findings that Mr. Girard worked up on people

4   he asked for a restraint against, let's get them done and

5   let's find out what they are.  But let's not pick on one

6   individual at a time against whom he apparently has a ri-

7   diculous and bitter resentment.  Let's not say, "There is a

8   shortage.  You make it up," although sixty-five hundred other

9   defendants, for all I know, are taking water without any

10  color of right whatsoever.  That is so simple and so obvious

11  that I think that if Mr. Veeder really wants this case tried

12  and really wants to get it finished, he should face up to

13  it and acknowledge that your Honor can't grant this restraint.

14  It is impossible and he is only wasting time.

15      I would be interested to know what some of the other

16  counsel think about it.  As I said, I want to brief it.  That

17  is not my argument on the injunction.  I am making this ar-

18  gument now in the interest of getting this trial over with

19  and having us do it in an intelligent and proper manner.

20      THE COURT:  Mr. Girard.

21      MR. GIRARD:  As I recall, Mr. Sachse's third point was

22  to the effect that municipal use is a higher use.

23      MR. SACHSE:  No; irrigation.

24      MR. GIRARD:  That irrigation and municipal use is a

25  higher use than recreation use, and therefore, you cannot

P 26

1    enjoin under any circumstances a junior appropriator.

2         I believe that the highest and best use approach is

3    only applicable insofar as rights which are identical in

4    time.  Merely because a prior appropriator has an appropria-

5    tion for a use of a lesser standard than the subsequent

6    appropriator doesn't mean that the higher appropriator can

7    enjoin.  It may be a question of reasonableness and the

8    equitable powers of the Court, etc.  But I don't think the

9    highest and best use argument is particularly valid, unless

10   the rights are identical in time.

11        MR. VEEDER:  I think that is right.  The only way you

12   could have it would be by condemnation.

13        MR. GIRARD:  The second one that Mr. Sachse raised, I

14   think, has a good deal of merit, and that was to the effect

15   that it is pretty difficult to say to Fallbrook, "You make

16   up the shortage in the stream because your right is junior

17   to my right," when you don't know yet whether other water

18   users upstream have rights junior to Fallbrook or, for that

19   matter, have any rights at all.  Clearly there is no question

20   at all that if Fallbrook is the junior user on the stream

21   and all other users are riparians and there is a shortage

22   and the United States has a senior right, Fallbrook would

23   have to make it up.  But at this stage we don't know that

24   there are all senior users upstream from Fallbrook.  We don't

25   know that somebody else is using the water without any right

P. 27

at all.  And Fallbrook at least does have a right, it has a recognized appropriative right, and unless you can say clearly that Fallbrook is the last right on the stream, the junior right on the stream, unless you can say that, I think it is rather difficult to have Fallbrook bear the burden of keeping the stream up to satisfy a higher right.

The other point I haven't looked up enough law on.  Mr. Sachse's position is, essentially, that under a section in the United States code an injunction is appealable to the Circuit Court.  Under Rule 54-A, a judgment is defined as an order or judgment which is appealable.  The Circuit Court said no judgment until the final judgment.  Now I am not sure in my own mind -- I don't know enough about the Federal rules -- whether or not it would be possible for this Court to enter a judgment effectively enjoining someone from doing something immediately and not make it appealable.  I don't know whether you could or not.  As I view the stipulated judgment question and the interlocutory order, that judgment will not be operative right now.  In other words, as I have viewed this stipulated findings of fact and judgment, we just wrote the interlocutory judgment to get the issue out of the way, but it doesn't mean that it is operative.  In other words, Vail is not going immediately to change their operation.  It wouldn't be entitled to.  If you enjoin Fallbrook they are in the situation where they are going to

P 28

1    stop using water right now.  Now whether or not you could

2    make that kind of order saying, "Fallbrook, stop using water

3    right now," and not make it appealable, under the Federal

4    Rules, I don't know.  But if it has to be appealable, then

5    it is a judgment, and the Circuit Court expressly said no

6    judgment until the final judgment.  But I would like to look

7    that up a little bit more before I can be sure of it.

8        I don't think Mr. Sachse's third point is too good.

9        I think his second point is one that is going to be very

10   difficult for Mr. Veeder to face up to.

11       The first point may or may not, depending on what the

12   cases show.  I am not sure of the law.
                                  interested
13   - THE COURT:  I am particularly/in Mr. Sachse's remarks

14   about doing something to bring this case to an end and get

15   rid of it, and I think, also, that we should clean up some

16   of the matters we have pending.  We have proposed findings

17   on Domenigoni Valley.  In view of Exhibit 208-E, you could

18   almost attach that exhibit to the findings we have and get

19   Domenigoni Valley out.

20       MR. VEEDER:  I believe I have worked harder than any

21   man in this case keeping this case going, your Honor.  I am

22   certainly pressing as hard as I know how.

23       I would like to respond, though, to some of these thoughts

24   that are being expressed here.  I will guarantee that the

25   Circuit didn't say that the United States would sit by and

P 29

1 experience irreparable damage without remedy or recourse, in

2 view of the basic principles of equity.  I think that the

3 temporary restraining order that I have asked, the preliminary

4 injunction, is fully in keeping and entirely proper under the

5 circumstances.

6   I don't know why we got into this issue.  There are other

7 things we can start doing now.  I have no objection to it.

8 I do want to be heard on the restraining order, though, when-

9 ever your Honor can do it.

10   MR. SACHSE:  I am ready to be heard on the restraining

11 order, if you will give me a little time to prepare.  This is

12 an important issue.  I think I am entitled to some time to

13 brief it and not do it off the cuff.

14   I am ready to be heard on military use today.

15   MR. VEEDER:  As I understand, we can't.  So let's take

16 something else.  I am dying to get at something else.

17   MR. SACHSE:  If you will face up to the fact, which

18 apparently you will not -- I am going to repeat it -- if you

19 will face up to the fact any attempt to apportion, restrain,

20 enjoin, regulate, in a basin-wide or stream system adjudica-

21 tion is out of place, is ridiculous, can't be done until

22 you have the facts for the entire stream system before the

23 Court.  If you face up to that simple reality, which you have

24 tried enough water cases to know, then we can probably knock

25 this case off and quick.

16,016

P 30

MR. VEEDER:   I haven't had a problem of getting a pendente lite order in my life, under the circumstances. That is all that involves.

THE COURT:   Give this some thought and consideration, Mr. Veeder.

What can we go to next?

MR. GIRARD:   Irrigable and irrigated acreages.

THE COURT:   That is a loose end that I don't think has ever been worked out.

MR. STAHLMAN:   It will not take but a few minutes to put it on, your Honor.

MR. VEEDER:   I think while we are pondering that -- and it is an element that I have worked with Colonel Bowen on and discussed with him and we have reviewed it -- your Honor has proposed what I think is a very essential aspect of this litigation and it will entail, in my view, a specific interlocutory judgment on your part, namely, the question of the illusory riparian rights.   I have always agreed with your Honor on that proposition that it is essential that we delineate some place where, as a matter of court order, you would say it is unreasonable to consider these people having rights to the use of water.   I think that is imperative, in the light of Judge Fee's opinion.

THE COURT:   I'm mighty glad that you have now come around and at least agree with me on one matter.   I was a

15,017

P 31

1   voice crying in the wilderness.

2         MR. VEEDER:  Not with me, your Honor.

3         THE COURT:  You wanted to show how many riparian acres

4   there were, and I kept trying to tell you that they are up

5   in the basement complex -- what difference does it make?

6         MR. VEEDER:  Your Honor, in that regard, I simply wanted

7   to be sure there is everything in the record for a complete

8   adjudication.  I think it would be entirely proper for your

9   Honor to say that these areas, for example, in the Wilson

10  Creek area, with which we are very familiar, that there are

11  areas there that have riparian rights, but they are traversed

12  by arroyos which carry water only very seldom, and that from

13  the standpoint of an adjudication of the respective rights of

14  the parties you would put those lands into a category in

15  which you would declare and determine that they could not

16  be in a competitive basis with, for example, the valley lands

17  of Vail Company.  I think that is true.  If anybody disagrees

18  with me I know they will shout as they always do.  We have

19  the Rawson lands, large areas of property up there.  Colonel

20  Bowen has told me that as a practical matter you couldn't

21  get Santa Margarita River water up to it.  I would be willing

22  to go ahead on the basis of the data we now have of checking

23  out to you the names and the parcel numbers that I think would

24  fall into such category and submit it to you in keeping with

25  this irrigated and irrigable acreage that the Vail Company

P 32

1    has.

2        MR. STAHLMAN:  You are getting two things mixed up, Mr.

3    Veeder.

4        MR. VEEDER:  Let me continue.

5        MR. STAHLMAN:  The one his Honor has talked about, and

6    now you are bringing something else into it.

7        THE COURT:  I know, but Mr. Stahlman, here is what Mr.

8    Veeder is indirectly getting at.

9        MR. STAHLMAN:  I know what he is getting at.

10       THE COURT:  He is going to contend that although a

11   number of the Vail acres are riparian they are not irrigable.

12   He is leading up to this very gently.

13       MR. STAHLMAN:  I understand it.  That is why I said he

14   is getting two different things mixed up -- he is getting off

15   the track again -- where water is not available, and where a

16   person desires to put his water, as long as it is reasonably

17   and beneficially used, are two different things.

18       MR. VEEDER:  My thought was going to be advanced along

19   this line, that most of the Santa Rosa land would come within

20   the illusory category, and I think this would be a good place

21   to start.

22       MR. STAHLMAN:  I will concede that there may be land

23   on Santa Rosa that falls into that category, and probably

24   considerable acreage.

25       MR. VEEDER:  I am trying to advance this case and all

P 33

1    I get/heckling.

2        MR. STAHLMAN:  There is a lot of it at Pendleton, too.

3        THE COURT:  Are we going into this matter of the irri-

4    gated and irrigable acres of Vail or not?

5        MR. STAHLMAN:  Here is where we left off, if you recall.

6    I prepared a memorandum showing the status of the record in

7    regard to Vail's irrigable acreage and filed it some months

8    ago, and there was left open the matter relative to the

9    determination of the acreage on Santa Rosa.  It had been

10   determined on the De Luz and Sandia Creek.  However, there

11   was a report filed and I think that is in the record.

12       Colonel Bowen has since made a study of the balance of

13   the Santa Rosa.  Mr. Wilkinson has looked at it.  We are in

14   agreement on it.  We can put that in.

15       Then the only other remaining matter is the transpo-

16   evaporation loss of the reservoir area of the Vail Lake.  We

17   have practically all our evidence in, but Mr. Veeder didn't

18   want a certain exhibit to go in until he has had a chance to

19   check it.  I think that has been done.

20       MR. VEEDER:  What is the number of that?  That is the

21   Sonderegger summarization:  If you had some water, you would

22   lose so much water.  Is that right?

23       MR. STAHLMAN:  That is right.

24       MR. VEEDER:  You haven't had that much water, so you don't

25   know how much you would lose.

        MR. STAHLMAN:  That is right.  But that was graduated in
relation to the reservoir area.

E fls.

JOHN SWADER, OFFICIAL REPORTER

E-1
t-26

THE COURT:  I would have to get this document that you have filed and look it over, unless somebody can sum this up for me.

MR. STAHLMAN:  I would like to do this, your Honor, and that is, I thought the most efficient approach to this would be when this evidence is in I would then make a supplement to that memorandum which I filed, showing the entire Vail holdings and what the irrigable acreage was, and the waste lands, and so forth, in accordance with the record in the case.  However, we can get all the evidence in here in 10 or 15 minutes.

THE COURT:  In this summary that you filed, is there a reference to some agreement reached with the Government as to the irrigated lands in Pauba Valley?  Is that out of the way now?

MR. STAHLMAN:  I think it should be.  The memorandum I filed showed the result of the Coit report, and the testimony of Colonel Bowen in relation to it.

MR. VEEDER:  He is not talking about that now.

THE COURT:  I am talking now about the irrigated lands of the Pauba Valley.  Has that been added to this report?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  And then there was the matter of the lands not in the Pauba Valley, and where you relied on the Coit report and you relied on some testimony at the other trial, and the status of that was that I, in substance, told Mr. Veeder

16,021

t-27

1    that you had made a skin case, and if he was not satisfied,

2    he would have to make a survey.  Now, did they make a survey?

3        MR. STAHLMAN:  Not except on Santa Rosa.  They did make

4    it on Santa Rosa.

5        MR. VEEDER:  Just on Santa Rosa.

6        THE COURT:  Was there any attempt to get together with

7    Vail?  As I recall, there was about a 10 per cent differential.

8        MR. STAHLMAN:  There was no difference really.  The only

9    difference--

10       THE COURT:  Not Santa Rosa now.

11       MR. STAHLMAN:  No, there was no difference because the

12   Government put in their own figures, and the testimony by

13   Colonel Bowen was that he made a spot check and went upon the

14   ground and said that the Coit report was substantially correct,

15   and there were instances cited in the record where in some

16   of the blocks he found a greater acreage.

17       THE COURT:  That is all right.  But what I am inquiring

18   about is this:  Number one, was there ever any understanding

19   reached between Vail and the Government as to the irrigable

20   acreage, and if there was not such an understanding arrived

21   at, Number two, does the Government propose to put on

22   evidence as to the Vail lands, irrigated and irrigable, outside

23   of Santa Rosa on which I understand there is agreement?

24       MR. STAHLMAN:  There is agreement on that.

25       MR. VEEDER:  Your Honor, from the standpoint of the

t-28

1    record as it is, I think the Coit report has been reviewed by

2    Colonel Bowen, and he has approved it.

3        MR. STAHLMAN:  That disposes of it, then.

4        THE COURT:  Not on the record here.  Is this some

5    subsequent review?  He testified, and you were very unhappy

6    about this.

7        MR. VEEDER:  I still am unhappy about it, but it is in

8    the record.

9        THE COURT:  And you contended that this was wrong, and

10   the matter was left on the basis of whether you were going to

11   do something more about it or not.  That is what I am trying

12   to find out now.

13       MR. VEEDER:  As I see the state of the record, I don't

14   think there is anything to be done about it.  I think the

15   question of the  illusionary acreage is still before the

16   Court.  But I am not attacking, and Colonel Bowen has said

17   he is satisfied within 10 per cent with the Coit report.

18       MR. STAHLMAN:  He didn't say within 10 per cent.  He said

19   it was substantially correct.

20       MR. VEEDER:  Did he?

21       MR. STAHLMAN:  I think the evidence is quite clear, your

22   Honor, that there is nothing in the record to controvert the

23   Coit report.

24       THE COURT:  Do you have any other evidence with reference

25   to Santa Rosa?

t-29

1    MR. STAHLMAN:  Yes, your Honor.  It is very short.

2    THE COURT:  Let's do it.

3    MR. STAHLMAN:  I think Colonel Bowen can help us on this.

4    MR. VEEDER:  If he hasn't got his figures ready, why

5    don't we take the noon recess now and come back and do it?

6    MR. STAHLMAN:  He says he has to get his other copies,

7    your Honor; two other copies.

8    THE COURT:  All right.  Come back at 1:30, then.

9    (Whereupon, at 11:50 o'clock a.m., an adjournment was )
10   (taken until 1:30 p.m. of the same date.                )

11

12                    - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

t-30
E-1

SAN DIEGO, CALIFORNIA, Wednesday, April 5, 1961, 1:30 P.M.

MR. VEEDER:  Your Honor, I was talking to your Honor about illusionary acreages, and we have, that is, the Office of Ground Water Resources, has gone ahead and developed what I think are the basic details upon which you could make your determinations.

We have gone into each one of these watersheds, and I will just hand you, if I may, because I want you to see the progress we are making in connection with these matters, doing as we did in connection with the proposed findings of fact and conclusions of law on Wilson Creek.

In other words, we made it on the basis of the records available, where Colonel Bowen made an engineering survey, and I think we are at a basis now at which your Honor can proceed, if you will, to outline the ground rules which would be guides to us in tabulating the lands which you would declare riparian or overlying, but nevertheless illusionary in character because of the short water supply.

THE COURT:  This shows only irrigated and irrigable acreage, and I take it none of it is riparian?

MR. VEEDER:  Well, where it traverses or abuts upon any stream, we are saying it is riparian.   We are showing the gross and irrigable acreage, and there is very little that is irrigated.

THE COURT:  I don't know as I understand your remark, but

16,025

t-31

1    if we were tabulating, and we were at one time tabulating

2    riparian acres, then we would have a lot of land that has

3    riparian rights, but where you say the right is illusionary?

4    In other words, in this tabulation you have shown  gross acres,

5    irrigable acres, and irrigated acres.

6         Now, these are the initial exhibits that you have used?

7         MR. VEEDER:  That is correct, and that is where we

8    obtained it.

9         THE COURT:  Would you contend that some of the so-called

10   irrigable acres possess only an illusionary right?

11        MR. VEEDER:  I think that is what we would say.

12        THE COURT:  You mean irrigable as contrasted to riparian,

13   and I can agree with you, but of those that are riparian that

14   have illusionary rights, that means nothing because there is

15   no water there.  But what about the irrigable acreage?

16        MR. VEEDER:  I would think this:  You would have the

17   situation on some of these minor tributaries that you are

18   looking at where you would have a piece of property that was

19   technically riparian and that was irrigable, but nevertheless

20   illusionary.

21        THE COURT:  No water.

22        MR. VEEDER:  By reason of a want of water.

23        MR. SACHSE:  You say minor.  I am just inquiring if you

24   think that would be so in regard to some of the tributaries

25   that are in the major areas?

1    MR. VEEDER:  I would think that is conceivable to be the

2    case, but I think we are down where, with good luck, we should

3    be in a position so that we can hand you a tabulation of

4    these, and proceed on the basis that through these areas and

5    all the aspects of it, they have the right to participate

6    in the available supply, except there is no water available.

7    THE COURT:  What would you propose to do?  Go through

8    each one of these areas and add a further reference which might

9    call for an order on both of those, and other feasible

10   irrigable acreage?

11   MR. VEEDER:  Something like that; say, practically and

12   profitably irrigated, or not practically and profitably

13   irrigated.

14   THE COURT:  And would you attempt to do that as to each

15   of the sheets in these documents?

16   MR. VEEDER:  I would do that, and I think that Colonel

17   Bowen's office would undertake that.

18   THE COURT:  Let me ask you this:  Do these pamphlets

19   you have handed me cover the whole Valley?

20   MR. VEEDER:  I think you are holding the one that covers

21   the Coahuila Valley, and that covers everything in that area,

22   in those watersheds .

23   MR. SACHSE:  May I inquire, where do we get off on the

24   individual landowner?  Do I understand I will get a copy, and

25   that we will know what you do, say, as to  Stardust, and so on?

E2

t-33                                                                16,027

1      MR. VEEDER:  I think we will have to notify them.

2      THE COURT:  In other words, all the work that we have

done in the past in bringing them down here all goes out the

window?

5      MR. VEEDER:  I don't think so, your Honor.

6      MR. STAHLMAN:  I think it could be expedited.  I think

7  it could be done in another way.

8      MR. VEEDER:  One thing is certain, that we are required

9  by the mandate to serve everyone with a copy of the complaint,

10  and they were required to answer, but on the basis of the

11  facts we have I think that there are a lot of areas in there

12  where, as a matter of fact, your Honor could make a determina-

13  tion that they really don't have any rights in the Santa

14  Margarita River, even though they are riparian land.

15      MR. SACHSE:  Your Honor, I think this is a distortion

16  of your Honor's question.

17      MR. STAHLMAN:  Yes.

18      MR. SACHSE:  The question your Honor posed was not a

19  negative one, but your question was, "Mr. Veeder, will you,

20  in representing the United States, concede that in totaling

21  the irrigable acreage among which the water has to be divided,

22  you won't ask for certain irrigable acreage to be included in

23  this     total?"

24      MR. VEEDER:  That is the next step I was going to come

25  to, your Honor, on that very proposition.

t-34

16,028

1    MR. SACHSE:  If we do that in that way, your Honor, that

2    would entail just a disclaimer by the United States.

3    MR. VEEDER:  I don't say by the United States.

4    MR. SACHSE:  That is it, and then you don't have to

5    bring these defendants in, but they still have offered their

6    proof.

7    THE COURT:  Except that if the Court then found pursuant

8    to the position of the United States that there was only

9    500,000 irrigable acres instead of a million, we would, in

10   substance, be finding with reference to many of these people,

11   although they had land which in theory would be irrigable,

12   that had no water.

13   MR. SACHSE:  What I think would happen arithmetically,

14   you would come up with a figure like this here (Indicating),

15   where if you had 100 irrigable acres as a fact, and 10 owners,

16   on an arithmetical basis each one would have 10 acre feet.

17   Now, Mr. Veeder disclaims and says there are really only

18   80, but still 10 owners, and he says he is going to be

19   entitled to 10 per cent of this thing, and he is going to be

20   entitled to a greater percentage of the water as you shrink

21   the diversion.

22   THE COURT:  I know what he is saying.

23   MR. VEEDER:  I hate to be accused of being such a bum all

24   the time, but I am working at it.

25   THE COURT:  The point I am getting at is this matter of

t-35

1    notification, that is, if we proposed to make such a type of

2    finding, if we make a finding, and we probably should make

3    some finding.

4         MR. STAHLMAN:  Your Honor, let me see if I comprehend

5    this thing.  As I understand, we know there are some

6    tributaries where there is no surface flow, and that the lands

7    which are riparian at this time can receive no benefits from

8    the stream because at the time they use the water there is no

9    water there.  That is one category.  After that we go to other

10   types of land, where a man has 100 per cent usable acreage,

11   and then we  have the condition where there are many different

12   types and sizes of land, and different uses of land, requiring

13   putting the water on at different places on the land.

14        I think the only thing we can do is to characterize those,

15   and we know from the exhibits which are available as to the

16   water to use on land which is riparian.

17        THE COURT:  All three of you are talking about different

18   things now.

19        MR. STAHLMAN:  I say if we go any further with that, your

20   Honor, you conflict with the law.

21        THE COURT:  I say you are talking about different things.

22        Number one is the proposal that Colonel Bowen and the

23   United  States, or somebody, take these proposed exhibits

24   and add a further designation as to how much could be

25   practically irrigable.  Number two is the question how do we

1    give notice to these various owners.  Number three is the

2    question that Mr. Sachse is bringing up about how you treat

3    the total irrigable acres with the available water, and that

4    sort of thing.

5         Of course, you have injected the interests of Vail,

6    because you have a stake in how much of your irrigable lands

7    could be practically irrigated.

8         MR. STAHLMAN:  Right.

9         THE COURT:  I understand there is a little different

10   situation with Vail than with a person with 100 acres up in

11   the basement complex, all nice and flat, that could be

E-3    12   irrigated and with no water to irrigate it.

13        Now, I would make a couple of suggestions.  A lot of

14   this land in these particular upper parts of these watersheds,

15   and I think I could designate a couple, where counsel can

16   sit down and all you would have to do is look at the map, and

17   you would know in a moment what the situation was, and then

18   you could get a consensus that they fit into a certain category.

19   In other parts of the watershed that may not be the case.

20        MR. VEEDER:  Here is Exhibit A on that, your Honor, if I

21   may interrupt.

22        THE COURT:  What is Exhibit A?

23        MR. VEEDER:  Exhibit 207-C, which is the Murietta Basin,

24   in substance.  I am sorry to have interrupted your Honor, and

25   I should not have done so, but we have so many complex problems

16,031

1    there.    There are the Jack Roripaugh lands, and there are

2    the Cass and Roripaugh lands which come into a different

3    category than what you are speaking of.

4         THE COURT:  Most of that is probably irrigable.

5         MR. VEEDER:  That is the point I am making, so it would

6    be simple to do what you say.

7         THE COURT:  In other areas?

8         MR. VEEDER:  Yes.  I mean, there is a suggestion here--

9         THE COURT:  Oh, they are way ahead of you.  He under-

10   stands what you were talking about so far as Vail is

11   concerned.

12        MR. VEEDER:  Right.

13        THE COURT:  Now, once some tentative finding is made of

14   a designation of the land, it might be possible to send out

15   to the people in the area a copy of a proposed set of findings,

16   and they would again have to be given a chance to be heard.

17        MR. VEEDER:  I think that should be done.  If you are

18   going to say that these lands cannot be practically and

19   profitably irrigated from the Santa Margarita River, I would

20   like to have those people notified, based upon a determination

21   by your Honor to that effect, which would in effect tell these

22   people that there is their judgment and decree in this case.

23        THE COURT:  Do we have now or do you have now the parcel

24   maps worked out for the whole watershed?

25        MR. VEEDER:  We have, your Honor.

t-38

THE COURT:  The owners, and everybody in the watershed?

MR. VEEDER:  That is correct.

MR. STAHLMAN:  You are going to raise a storm here.

MR. VEEDER:  I don't know what else to do.

MR. SACHSE:  I think there is a simpler thing to do, if I can say something for a minute.  If we are going to confine ourselves to some of these minor tributaries that is one thing, but I know it is going to get difficult when we get to the riparian lands on  Temecula Creek, say.

THE COURT:  Just a moment.

MR. SACHSE:  The point I am trying to make, your Honor, is that this problem can be a critical one beyond any question.  Let's say your property, such as Vail's, is riparian to a major stream, but we can put that aside for a moment, and on these minor tributaries, your Honor, I think the problem is truly nonexistant, because if they are riparians, and if you bear in mind the Tucalota Creek owners, places up there where your Honor was trying to hit what you call the slivers of alluvium, then if we are talking about these minor tributaries, where/are only these slivers of alluvium, I think your whole matter is resolved by a finding they are riparian to Tucalota Creek, that they are not riparian for their purpose to Murietta.  True, someone in Murietta could reach up against them, but if the Court finds that the riparian flow was only the surface flow, as are supposed on these

16,033

t-39

1   slivers, you have taken care of it no matter how many

2   irrigable acres they have got.  So the waters in which they

3   are entitled to share can be easily adjudicated by your

4   Honor to be only the surface flow.  That won't solve the

5   big ones, but that would take care of all of these little

6   fellows.

7       THE COURT:  Yes and no.  Why couldn't we take your idea

8   and say that is the finding as to Tucalota Creek, and merely

9   add some additional findings of fact that on some of these

10  perhaps originally we had some language about how there was

11  a certain right, and maybe it could be in the Master's

12  findings.

13      MR. VEEDER:  You are right on that, your Honor.  I am

14  thinking, for instance, of Occidental College, which has lands

15  up on Tucalota Creek, and I think they have some kind of

16  rights up there.  I believe there is some right to impound

17  water by the successors in interest of Occidental College

18  up there.

19      I think a finding has to be made in regard to those

20  people if we do our job, and do it fairly as to all of those

E-4

21  people.

22      That is the reason why I think this method we are proposing

23  would give your Honor an opportunity to review each one of

24  these things so that no one would be deprived of his vested

25  right.

16,034

t-40

1     MR. SACHSE:  If I have to submit these to all of the

2  people again, -- well, your Honor, there is one paragraph

3  of the draft I prepared which was controlling as to Tucalota

4  Creek, you understand, where there is a little irrigable land

5  on a small creek, and all the waters underlying the land

6  described in Plaintiff's 7, except  where any water in the

7  area of saturated younger alluvium from the bed of Tucalota

8  Creek, and so on, as shown in Exhibits 10 and 15-A, are

9  vagrant, local, percolating waters not a part of the surface

10  or subsurface flow of any subsurface basin of the Santa

11  Margarita River, or its tributaries, and such waters do not

12  directly feed or support, and are not necessary to the

13  continued surface or subsurface flow of the Santa Margarita

14  River.

15       Now, what that would mean, your Honor, would be--

16       THE COURT:  Just a moment.   .

17     MR. SACHSE:  What that would mean, your Honor, as I

18  understand it is we have the Murietta running down here, and

19  we have Tucalota and the upstream part about which we were

20  talking, and somebody is riparian, then the only riparian

21  right which he asserts is to water that may be present in

22  the saturated younger alluvium; in other words, only water

23  present when there is water flowing in that stream, so any

24  extractions he takes out, Roripaugh or Vail, or the United

25  States, cannot be objected to, and they can't object to

t-41                                                          16,035

1   extractions, and we don't care how many irrigable acres he

2   has got.

3       Now, if he gets into a quarrel with a fellow here over

4   the tiny quantity of surface water that flows, let him use

5   his actual irrigable acreage.  We don't need to make a

6   finding that is nebulous.  They will be dividing up so little

7   water that it can't possibly be taking care of either one of

8   them, and if your Honor finds that the water they are using

9   is vagrant and local, then the United States cannot complain.

10  Only when he takes a bigger quantity of water will the United

11  States have a right to complain.

12      THE COURT:  I agree with everything you have said, except

13  that what Mr. Veeder is talking about is a part of this

14  cataloguing, so as to be able to say there are so many acres

15  of irrigable ground that have some reasonable chance of using

16  the water in the stream system.  That is his objective.

17      MR. VEEDER:  That is the entire objective, and when you

18  say that those lands in that book that you have there before

19  you could not be practically and profitably used in any

20  future division of the water, or anything else, they would not

21  be included.  I am not trying to --

22      MR. SACHSE:  Then may I inquire once more, to be sure I

23  understand:  You say in any future division of the water they

24  would not have?

25      MR. VEEDER:  In any division.

t-42

1      MR. SACHSE:  Don't you concede, Mr. Veeder, that what is

2   today practically and profitably subject to irrigation may

3   change tomorrow?

4      MR. VEEDER:  That is just exactly right.  So if a man

5   would find that he could irrigate 40 acres of land in 1970,

6   he could come into this Court and ask to have that right

7   recognized.  Even if you said--

8      MR. SACHSE:  Oh, you were telling him he has to come back,

9   in other words, and start a proceeding to get something which

10   he has got already, and which we hope his Honor is going to

11   find?

12      MR. VEEDER:  What I am trying to make clear is that this

13   Court has continuing jurisdiction, and if somebody is hurt,

14   and wants to come in and have his right adjudicated, and you

15   say, "You have an illusionary right," and he comes in and says,

16   "My right is not illusionary, I am going to use it in this

17   manner," then I think his Honor or somebody else should

18   entertain his request, just as you would in regard to any

19   litigation on riparian rights.  But for the purpose of this

20   allocation, or change, or whatever it is going to be, we would

21   have, say, 100,000 acres of land which you would say are so

22   saturated it would participate in the available supply of water

23   on a given day in a given month.

24      THE COURT:  Then next year all the work we have done on

25   determining how much was irrigable would go out the window,--

t-43

MR. STAHLMAN:  Right.

THE COURT:  -- because if an application was made next year, and there has been an allocation, you would have to do it all over again next year.

MR. STAHLMAN:  Not only that, your Honor, but if you are going to use standards to determine what can be profitably and practically irrigated, you are going to have to do it to the same extent as to all of these people.  Some people will want to go ahead and take their land, and convey it, and others will take it right on the stream, and you are going to get into a multiplicity of factors that I don't think need be in this lawsuit.

THE COURT:  Let me ask you, Mr. Veeder:  I know what you are thinking about, and you were thinking that you were going to knock out a lot of ground that is not practicable to irrigate, and, therefore, not irrigable so far as the Court is concerned, and you were going to try to whittle down Vail. But this will work both ways.  Maybe some lands in the Rancho and Pendleton that are riparian are not subject to practicable irrigation.  I don't know.  But if we came to that situation, do you think that it would be difficult to show me a computation of lands that you had made, of the lands you have excluded in your computation without having to go through all of this?

MR. VEEDER:  This is the only way you can go through it

16,038

t-44

1    anyway, your Honor.

2        THE COURT:  Then why do we need to worry about it now?

3    You could ascertain at that time as well as you could now

4    that this irrigable land laying up on this basement complex,

5    which is riparian but where there is no water, should be

6    excluded from any computation, and you could do it on the

7    basis of maps-- in most cases by the maps in evidence.

8        MR. VEEDER:  I wouldn't want to do it that way.  If your

9    Honor wants to do it that way, it is fine with me.  I want it

10   done for some of the very reasons you have touched upon.

11       My own view is that I have never taken a short-cut in

12   a lawsuit in my life that it didn't take me time to recover

13   from it, and from my standpoint Colonel Bowen is now equipped

14   and ready to do what we have tendered to you.

15       THE COURT:  Mr. Veeder, wait.  You talk about this matter

16   of taking a short-cut.  You have had these studies made, and

17   you never worried before, and the Colonel could just as well,

18   when he made these studies, have given his opinion as to how much

19   was practicable.  This comes as an afterthought.  This comes

20   from other thinking you have been doing on it.  This talk

21   that you do not want to take a short-cut does not fool me in

22   these things.  I have been in this case as long as you have,

23   at least since 1956.

24       MR. VEEDER:  The point I am trying to make, your Honor,

25   is that I have always insisted on this irrigable acreage every

16,039

t-45

1  moment of every day, and every time it came up.

2      THE COURT:  Irrigable, yes, but not until now on the

3  question as to whether it was practical to irrigate it.

4      MR. VEEDER:  I have always.  I think your Honor will find

5  that I made the same observation quite a while ago on that

6  point, that you had to take into consideration the economic

7  feasibility of the practical and profitable character of the

8  land, that you could irrigate it.

9      MR. STAHLMAN:  You are going to have to fight out every

10  piece of land that has already been fought out before this

11  Court, and you are going to have the same storm again, and you

12  are going to revive the case and put it in the same inflammatory

13  condition it was in in 1951 and '52.

14      MR. VEEDER:  I just want everyone to know I am attempting

15  to press this case forward to completion, that we have taken

16  a long, long step already in regard to what we think is the

17  irrigable and irrigated acreage, and I think it can be done.

18  If your Honor would want with a broad stroke to eliminate

19  a lot of land, fine.

20      THE COURT:  It means backing up.  You had me write and

21  sign letters in which you would say, "You have, according to

22  our records, 40 acres of land, and according to our records

23  35 acres are irrigable."  Nothing was said to these  people

24  about breaking up these categories.  My original talk about

25  this was on the riparian end of it.  I wasn't thinking so much

t-46

about the practical aspect of the irrigable land, but I was thinking about all this land being riparian. Now you want to back up.

MR. VEEDER: No , I don't want to back up.

THE COURT: What are we going to do with these people that we have had here before, where we took the time to explain to them what we were doing?

MR. VEEDER: I think a large proportion of the people who came in, and who were actually in here, your Honor, -- I think they are going to have some kind of an interest that will be worthwhile protecting.

I think that is what you are going to find, but I am also going to say to you that there are innumerable people who were notified and did not come in at all, but whose lands I know, based upon my observation at least, are riparian in character, whether there is any water available for them.

Now, I am not backing up, and I am not changing a bit. I am simply saying that from the standpoint of determining the acreage entitled to participate in available supply on any given day I know of no other course to pursue. Or you can even include them all. It is up to your Honor.

MR. GIRARD: May I be heard just briefly on this, your Honor.

THE COURT: Yes.

MR. GIRARD: Of course, as your Honor realizes, the State

t-47

1    has always felt that irrigable acreage was completely

2    irrelevant and immaterial in this State, unless someone

3    specifically wanted a watershed allocation.

4         THE COURT:  What did you say was immaterial?

5         MR. GIRARD:  Irrigable acreage, and we have always made

6    that objection.  However, despite our objection, it has gone

7    in and I don't think it has hurt any, but if Mr. Veeder is

8    going into this additional step and start putting in evidence

9    which has only one real purpose, and that is to be used as a

10   tool to limit somebody's water right, or use to water on

11   riparian land, I think he ought to say right now whether he

12   wants an allocation or does not want an allocation on the

13   watershed basis, and if he does not want an allocation on a

14   watershed basis, then this evidence should not go in now.

15        MR. VEEDER:  The evidence is already in, Mr. Girard.

16        MR. GIRARD:  There is no evidence in, and no one has

17   testified as to what particular land of Vail is economically

18   irrigable, or what particular land of  Oviatt can be

19   economically irrigated.  There is land in there that is

20   riparian and irrigable, certainly, but not that it can be

21   economically farmed.

22        MR. VEEDER:  I think in regard to what you have touched

23   upon right now, the situation is very plainly this:  You are

24   not going to enforce the stipulated judgment in regard to Vail.

25   So where are we?  We are back to a point where there is no

1   criteria which would tell us what we can expect from the

2   Vail Company.

3       We are to this proposition, that you have rolled us back

4   to 1926 now, and let's see actually what has transpired.  The

5   remand from the Supreme Court of the State of California said

6   this, and it said it specifically, "You are wrong, Mr.

7   Trial Judge, in saying that the lands on Temecula, Little

8   Temecula, and  Pauba are not all riparian.  We are sending it

9   back to you to correct that error, but we are not saying

10   that it would be reasonable to irrigate those lands."

11       Now, there is where you are today on the basis of your

12   Honor's opinion that was filed here.  You are back to 1926--

13   although I disagree with your Honor's opinion, we are back to

14   a point where there must be a determination of what quantity

15   of water is the Vail Company entitled to.

16       MR. GIRARD: If that is his position, I am going to move

17   to strike every bit of evidence that he has offered on

18   irrigable acreage in this case, including the evidence he

19   offered on the United States property.

20       It came in under a specific assurance from him in this

21   case that he was not going to seek an allocation, and we did

22   not cross-examine on that basis, because we had a right to

23   assume that in the event anybody subsequently attempted to

24   allocate, it would be based on the conditions that existed

25   then.  That went in on his express assurance, and if he is

t-49

1   going to use it as a judgment allocation now, I am going to

2   move to strike every bit of it.

3        MR. SACHSE:  I positively concur.  This is back again to

4   something that was hammered again and again, and is the thing

5   that I brought up this morning.

6        It is possible for your Honor to do two things in this

7   lawsuit.  Your Honor can catalogue the rights that exist;

8   catalogue them.  As a part of that cataloguing, you can tell

9   Mr. Veeder, "I find so many irrigable acres," and I could

10   object to that, but you can do that.  Your Honor can then

11   stop, and your Honor can leave future regulation or apportion-

12   ment to any individual party who feels he is suffering by

13   reason of the acts of someone else.

14        Now, that is what I have always conceived this case

15   would be, and that is what I conceive it is today.  Or your

16   Honor can go a step farther.  You can, or you have to

17   reopen this case, and you have to find evidence as to the re-

18   charge, let us say, of Pauba, the recharge of  Santa Gertrudis,

19   and a great many subjects on which you have no knowledge at

20   the present time, and then your Honor could legally, but I

21   don't think practically, you could say, "Roripaugh, you are

22   entitled to so much water.  Vail, you are entitled to so much

23   water.  And somebody else, so much."  But we can't mix these

24   two things up.

25        If this is an apportionment, your Honor, practically you

t-50                                                                                16,044

1   are not going to be able to write an immediate decision.  If

2   this ends up in an apportionment, you are going to have to

3   appoint a Water Master, who will have to take evidence for a

4   long time, and start measuring wells, and start regulating

5   every diversion, and to start measuring every inflow to

6   determine what the safe yield of every one of these basins is,

7   including the United States basin.

8        If this is an apportionment, your Honor, that is what

9   you are going to have to do.  But if it isn't, and if it is

10  what I have always assumed this is, what Mr. Veeder has so

11  often requested, a cataloguing, then they are cataloguing, and

12  if he comes in and says Fallbrook is the last one on the

13  stream, then he can come in with an injunction, and he can

14  come in with anything that he wants to against anyone he thinks

15  is making an unlawful diversion, and if somebody is  proceeding

16  utterly without right, he can proceed against him.  But if

17  this is an apportionment, we are starting all over again.

18       THE COURT:  We have to bear in mind also that way back

19  in the record when I thought there was some possibility that

20  we could dispose of this matter by some sort of a settlement,

21  and Mr. Veeder assured me that the reason why there was no

22  settlement in this litigation that could be made was that the

23  United States had to find out what its rights were, had to

24  have its rights catalogued, and that was the purpose of this

25  lawsuit, as I understood it.  It is true that Mr. Veeder

t-51

E-5

1  disclaimed time and time again until sometime last year that

2  there was sought an apportionment or allocation of water, and

3  the case has not been tried on that kind of a basis.

4      MR. VEEDER:  I think it has, your Honor.

5      MR. STAHLMAN:  Furthermore, your Honor asked him to

6  submit a list of the people against whom he would seek an

7  apportionment.

8      THE COURT:  And he has not done it yet.

9      MR. STAHLMAN:  He has not done it.  There is another

10  situation, the matter of whether/water is put on land it is a

11  reasonable use.

12      THE COURT:  Now, quit thinking about the Vail Company,

13  will you?  I know what you are thinking about.

14      MR. STAHLMAN:  I have to look out for my client.

15      THE COURT:  I know, but when we cross that bridge, you

16  will have plenty of chance to be heard.

17      Did I read your mind correctly?

18      MR. STAHLMAN:  Yes.  I am going to put you on the stage

19  as a good mind reader, your Honor.

20      MR. GIRARD:  I think frankly, your Honor, unless Mr.

21  Veeder can come right out point-blank, without fishing or

22  cutting bait, and say, "I want an allocation," this evidence

23  should not come in.

24      MR. STAHLMAN:  You can't pin him down on it.

25      THE COURT:  I think that is what he is trying now.

-52

16,046

MR. GIRARD:  I think he is, too, but then he says--

THE COURT:  Do I interpret it wrong?

MR. VEEDER:  Your Honor, I am going to be very, very explicit in this matter.

I never dreamed, and it never occurred to me in all the wide world that you would refuse to enforce the stipulated judgment.  But I assure you that two years ago, more than two years ago, when Georgie came up with the idea that they were going to get out of the stipulated judgment,  I said, "Just bear in mind that when you do that we are going to have a determination of our rights."  And that is in a letter to Mr. Stahlman, with a copy to your Honor.  And I say this to your Honor with all respect, and I have no qualms in my conscience on this matter, I said in the original instance that as long as we are with the stipulated judgment and there was a guaranteed 3 second feet at the gorge during the dry season, and Vail Company's respective rights in regard to the National Government as set forth in the stipulated judgment, fine.

I saw no reason, and I could see a very good reason for Vail worrying about Roripaugh, and I can conceive of the Vails having a complaint against Stardust, but I saw no reason, and I see none now, with the guarantees we had under the stipulated judgment.  But I assure your Honor--

MR. SACHSE:  Why do we argue the stipulated judgment?

16,047

t-53

1       MR. VEEDER:  I am not arguing it.  I intend to argue it

2  in the Ninth Circuit.

3       MR. STAHLMAN:  Well, I will be there.

4       MR. VEEDER:  The point that I am making is that when I

5  saw the way the wind was blowing, it became very apparent to

6  me that it was going to be essential to find some way of

7  determining how much Vails had delivered to the Gorge.  Now,

8  if you can find some way of making that determination, that

9  is all I am asking you to do.

10       MR. SACHSE:  Mr. Veeder, did you write this letter to me?

11  Did you tell Mr. Krieger that this was implicit?  Did you

12  tell me when I put my case on on Stardust that this was

13  implicit?  You did not.  I want to reopen Stardust, your Honor.

14       THE COURT:  Mr. Veeder, regardless of the stipulated

15  judgment, you knew at all times that the stipulated judgment

16  at best affected only your rights as against Vail, and it had

17  no bearing whatsoever on all of these other people in the

18  watershed who were users of water, and who were in the

19  Murietta Basin, and who were substantial users of water, and

20  the stipulated judgment had no effect on them.  You knew that,

21  and you knew that no matter how we drew the decree, this would

22  be a problem as to where these other people were big users of

23  water.  I can't follow you.

24       MR. VEEDER:  All I say is that the record is clear from

25  my standpoint, and that we could proceed on forward , just so

t-54

it is clear.  So far as I am concerned, you can take up something else on the agenda.

MR. GIRARD:  I think we are entitled to a little intellectual honesty from the United States Counsel, your Honor.  Either he is asking for an apportionment, or he isn't, and this five-minute speech about how he feels, and he has done this, and how he needs to protect the United States does not tell me whether he wants an allocation, and before we proceed on with this evidence, I think he ought to say yes or no to that.

MR. VEEDER:  I will be very simple, and I will be very specific on it.  Before we are through, we are going to have to know how much water is delivered at the Gorge for the United States of America under the present status of this case.  If that involves and entails an adjudication of each individual right, I say that is all we can ask.

MR. STAHLMAN:  You didn't make God a party to this suit, Mr. Veeder.

MR. VEEDER:  The point that I make now, and I have always reserved this right, and you will find it in every statement that I have ever made is that we are relying primarily on the stipulated judgment for a guarantee of water.

Now, if Mr. Girard wants a statement as to whether there is going to be an allocation, I think this is a complete answer to Mr. Girard.  He attacked the stipulated judgment.  He

t-55

1  did it, I assume, with full knowledge that there would

2  certainly be an impact when this came about.

3      I am convinced there should be some kind of regulation

4  that will guarantee us a supply of water.  I believe there

5  is enough in the evidence, I believe that the record is

6  complete, so that your Honor could now make an allocation.

7  I think that the record is there, and we are going to put in

8  the rest on Temecula Canyon and on up through  Dameron Valley,

9  and I would like to put that on this afternoon, if you want

10 me to.  But the fact remains, your Honor, that with great care

11 I put into the record, and there is in the record the data

12 that would be requisite to regulate and deliver to the United

13 States at the Gorge the quantity of water required.

14     MR. GIRARD:  But you put it in under an express  statement

15 in the record that you were not going to use it for that

16 purpose, and that, frankly, is intellectually dishonest.

17     MR. VEEDER:  Your Honor, may I go ahead on this?

18     THE COURT:  Yes.

19     MR. SACHSE:  Your Honor, excuse me, but I have a motion

20 to make.  When you are through, Mr. Veeder, will you tell me?

21     MR. VEEDER:  In regard to the situation with Stardust,

22 in regard to the situation with Oviatt, in regard to the

23 situation with any of the large users, I assure your Honor

24 that there is full and complete data in the record so that you

25 can make any kind or type of regulation or apportionment on

t-56

this record.

I am not saying right now that you are going to have to allocate and make an adjudication as to every parcel of land.

I am saying that before this party is through, we are going to have to have some assurance that we don't have now that there will be water delivered to the Marine Corps, and the basis upon which that determination will be made will be up to your Honor.

I have no desire-- I realize what these lads will do-- I have no desire to walk out of this court when this case is concluded and simply say, "Well, I thought we had a stipulated judgment, but we don't.  I don't know how much water you are entitled to receive," because I think that it can be determined, and I think it should now be determined that if we don't have the relief under the stipulated judgment, we have to have it from some other source.

THE COURT:  Mr. Veeder, this is your answer to Mr. Girard's express question, --

MR. VEEDER:  That is right.

THE COURT:  -- do you or do you not seek an allocation?

MR. STAHLMAN:  He is not going to answer you that, your Honor.  I think it is time that we probably have somebody from the Department of Justice in this Court who would be fair with the Court and answer the Court fairly.

MR. VEEDER:  I am fair with the Court.

t-57

16,051

MR. STAHLMAN:  We have repeatedly in this Court been confronted with the situation where Mr. Veeder has gone off the track in this case, he has not been fair with the Court, he has not conducted himself as you would expect of one who has a high position with the Department of Justice of the United States, and we have reached a point where, by reason of this conduct and other conduct on the part of Mr. Veeder, I believe it would be perfectly proper for your Honor to indicate to the Department of Justice that it should have a lawyer here who can participate in this case and do it as a lawyer and as a gentleman.

MR. VEEDER:  Your Honor, I accept these attacks from these people.

MR. STAHLMAN:  I know you do.

MR. VEEDER:  And I am completely accountable.  I say to your Honor that if you can get us an assurance of a quantity of water at Temecula Gorge without an allocation, fine.  I don't know how you can do it under the circumstances that exist.

I am not petitioning your Honor for that now.  I am saying to your Honor that under the present status of this case, how do we know how much Vail Company is going to be required to deliver to us?  If there is an answer to that, if someone can answer it, I will be glad to have them tell me now.

MR. SACHSE:  I would like to tell you what I think.  I think you don't know, and I don't think you are going to know

t-58

1  until his Honor reverses what he wrote in the pre-trial

2  opinion, when he said that all uses by the United States to

3  riparian or to private watershed are improper, and until you

4  yourself accept the control which his Honor is seeking to

5  impose on upstream users, you will not, nor will his Honor

6  impose any control on upstream users, and if you would face

7  that fact and realize it, you would know you are not going to

8  get what you ask for.

9  Your Honor, I am going to make a motion.  I did this

10  once before.  I did it on June 27th.

11  THE COURT:  What year?

12  MR. SACHSE:  This last year, 1960.  I said, and I am

13  going to read it.

14  "Your Honor, I want to make a motion for the record,

15  and I am going to ask your Honor-- I am not an expert

16  on Federal Procedure, but I believe that it is proper to

17  ask the Court to make a ruling as to issues and what are

18  or are not involved.  And I am going to ask your Honor

19  for a ruling on whether or not the question of quantitative

20  apportionment is involved.  I have a specific reason.

21  I tried one of the largest landowners in this Valley,

22  Stardust, in about two hours, on the express   statement

23  of Mr. Veeder that there was going to be no request for

24  an apportionment . . .:

25  "THE COURT:  You will be protected, so don't make

16,053

t-59

1   your motion now."

2   I think this is the time for this, and I can read you a

3   quote from the same day, a statement by Mr. Littleworth:

4   "MR. LITTLEWORTH:   . . . When we put on our cases

5   we made no effort to prove great quantities of water." --

6   on the express representation by Mr. Veeder that there would

7   be no quantitative apportionment.

8   I think we are entitled to this, your Honor.  If Mr.

9   Veeder is going to constantly go back, go back, and go back

10  to this same dead horse, we deserve a little protection; not

11  only those of us who are in the courtroom today, but those

12  not in the courtroom who tried their cases on this assumption.

13  MR. VEEDER:  I precipitated this thing today, your Honor,

14  because I thought it was highly desirable to get this matter

15  out and let us look at it, besides you filed your decision

16  today.

17  Now, I asked Mr. Sachse a question, and he hasn't

18  answered it yet.

19  MR. SACHSE:  Oh, you have been asked a dozen of them.  I

20  will try.  What is it?

21  MR. VEEDER:  How can there be a determination of water

22  to which you are entitled under the present status of the

23  case?

24  MR. SACHSE:  There can't.

25  MR. VEEDER:  I think this:  I think that before your Honor

t-60

16,054

1  is through, he is going to have to enter some kind of an

2  order directing the delivery of water into Temecula Gorge.

3  If it can be done without an apportionment, fine.

THE COURT:  So that you may pump outside the watershed?

MR. VEEDER:  I am not talking about pumping outside the

watershed, your Honor.

MR. SACHSE:  Let's talk about it.

THE COURT:  Do you think I can order people upstream to

release water to you, the Government, so that you may pump it

outside the watershed?

MR. VEEDER:  Limited strictly, your Honor, now to our

claim for water uses within the watershed, I think that under

the present circumstances-- I am not talking about outside

the watershed now-- I am saying that in regard to those

riparian lands we are entitled to know the quantity of water

that would be delivered to us with a given quantity of water

on a given day.  I think we have to know that.

Now, on this question of outside the watershed, we will

get into that later, but from our standpoint I truly think we

will reverse his Honor in his decision, so that I don't think

I am worried at all about using water outside of that

watershed.  But I am saying this, that in regard to our

riparian lands we have to know how much water is going to be

delivered by Vail Company for our riparian lands.

THE COURT:  Mr. Veeder, you have sat around here and tried

t-61

16,055

1   this case, and you have listened to the evidence.  Here is

2   the Government sitting in a very favorable position with one

3   large basin of  three parts right on the ground.  Here are

4   basins which are fed not only by flood waters which come down

5   Temecula, but are fed by tributaries that come in below the

6   Gorge.

7        Even with three dry years, and, of course, the impact

8   of this year will be great, much greater, but with three dry

9   years in a row, three water years, the basins on the Government

10   property are down very slightly.  There is a very slight

11   decrease in the basins.  You did not submit to me any figures

12   of acre feet that are in storage.  There is evidence of how

13   many acre feet when the basins are full, but here is an

14   immense amount of water.

15        Now, if there are legitimate users upstream, and if there is

16   water coming off the wild country and in the tributaries that

17   come from below the Gorge, I am not passing on that.  I am

18   just throwing out the suggestion that there may be people

19   upstream who would have the right to use practically all of

20   the water that might otherwise reach the Gorge, and that in

21   the ordinary situation, absent a string of dry years, the

22   flowoff from the other tributaries might be sufficient to

23   recharge the basins below.  You can't sit on a bunch of water

24   and not use it, and then say, "We have got so many acre feet

25   in storage, and we are not going to use any of it."

t-62

It is true that you have a limitation on your lower basin, and that I agreed that further salt water intrusion should not be permitted, but this does not apply to the middle and upper basin.  Those basins can be pumped without salt water intrusion because of the gradient.

MR. VEEDER:  Which brings us to another question which I think we should have adjudicated, too.

THE COURT:  Let me say this, and you may not believe it: I am probably as anxious as you are that the Camp gets a fair share at the use of water, and I will protect them as far as I can protect them.  But I will say you do not make my lot any easier.  I have some notes on my desk now in regard to matters to discuss later on, about the sewage flow and how I can take that into account.

E-6

MR. VEEDER:  That was the next thing.

THE COURT:  It may be that by revising the operation at Pendleton there may be ways in which these things could be solved.  I think that once water is used and becomes sewage, I could properly hold that it is no longer riparian water, and the effluent itself could be pumped out of the watershed, if you wanted to.  I don't know about that.  This is just a tentative thought at least, it is no longer riparian water if it is sewage.  You would have a right to dump it into the ocean, and if you would have a right to dump it in the ocean, it would seem to me you would have a right to take it out of

16,057

t-63

1   the watershed.  But that is not what is being done with the

2   effluent.

3       MR. VEEDER:  It is being put back into the basins, and

4   we are being penalized for it.

5       THE COURT:  It is being put back in the basin, and,

6   of course, other waters taken out of the basin.

7       MR. VEEDER:  I concede that on that there is a tremendous

8   problem, your Honor, and I am also stating, and I state

9   unequivocally--

10      THE COURT:  Let me give you another example.  Supposing

11  the pumping in the Murietta increased considerably, and let's

12  forget about the United States downstream.  Do you think Vail

13  would be in a very sound position at the end of a dry year

14  or two to come in and seek to restrain pumping over in the

15  Murietta merely because they had to use up a little water out

16  of the  immense basin that they overlie?

17      Wouldn't it be reasonable to say, "Don't cry until you

18  are hurt.  Let's see what happens.  Pump the water out of your

19  basin.  It is stream water, and use it a while, and let's see

20  what happens."  There is no salt water intrusion up there.

21      MR. VEEDER:  The only point that I make, your Honor, on

22  the proposition that I am advancing here is that we do use

23  water outside of the watershed.  We do need to use water

24  outside of the watershed, and that we are returning sufficient

25  effluent into the watershed that has prevented a most critical

t-64

1  situation at Camp Pendleton, and I think that that is a fact

2  that must be taken into consideration in any disposition that

3  you make of this case.

4       MR. SACHSE:  I think that we are now up to whether this

5  is a military use or not.

6       MR. VEEDER:  I am perfectly prepared to argue military

7  use.

8       MR. SACHSE:  I am getting a little tired of flopping

9  around like a flea on the griddle, and would like to know what

10  we are doing.

11      THE COURT:  So am I.

12      MR. VEEDER:  All right.

13      MR. SACHSE:  I am serious in the motion I submitted to

14  your Honor.  I think all counsel are entitled to it.  I think

15  your Honor should take charge of this case and should tell us

16  what we are doing in this case.  I think until you do and

17  until you tell Mr. Veeder that every time he opens his mouth

18  on a certain subject he is subject to a motion to strike,

19  that until you do that we are not going to get this case

20  finished, because he is going to dredge these things up again

21  and again, and we have had three years experience in watching

22  him.

23      I think it is time that we stopped indulging  him and

24  stopped permitting him to act like a little boy who, if he

25  can't be captain of the team takes the ball and goes home.  I

16,059

t-65

1   think we have to tell him that he has to play by our rules,

2   by the rules that your Honor prescribes, and you tell us what

3   they are.   I am quite sincere, and I believe we are entitled

4   to it.

5        MR. VEEDER:  Your Honor, I agree with Mr. Sachse on that.

6        THE COURT:  Is there a middle ground on this, and I take

7   it there is, that one thing we could do in this case is

8   catalogue the   various rights, and that you could eliminate

9   a great number of people who would not be in any future

10  litigation.   The second thing that we could do would be to

11  go all the way, and Mr. Veeder is indirectly suggesting as

12  his theory of a physical solution an allocation or apportion-

13  ment, a Water Master, or whatever it might entail.

14       Now, I take it there is a middle ground:  That we might

15  catalogue the rights, and eliminate the various people out

16  of the lawsuit that would not thereafter have to be in it,

17  and in a few instances where there is an obvious successive

18  use of water make some interlocutory finding or decree in

19  that respect, without going into a complete water allocation

20  case.

21       Is that possible?

22       MR. SACHSE:  I think it is, your Honor.

23       MR. GIRARD:  I think it is possible, your Honor, certainly.

24       MR. SACHSE:  I think it is perfectly possible, your

25  Honor, and that is what I have been urging, and that once the

1    determination is made maybe the first complaint is going to be

2    on Santa Gertrudis -- and I don't know, but maybe, when Mr.

3    Veeder finally lets go of this case, someone is going to quit

4    stirring up so much trouble.  But maybe the Roripaugh's next

5    neighbor is going to complain against them, and at that time

6    it is perfectly possible for your Honor to open the case

7    upon Santa Gertrudis; but before you could make an apportion-

8    ment on Santa Gertrudis, you would have to know a great many

9    things.  And if Mr. Veeder were to be the first one to

10   reopen the case and attempt a proceeding against Fallbrook,

11   I conceive the rule to be that you would first of all have

12   to look at the catalogue which you had made of rights, and

13   that you would have to say, "Well, Fallbrook is the junior,

14   I have found no one more junior, and I have found no illegal

15   uses, so all right, I restrain Fallbrook."  If you did find

16   illegal uses, you would jump up and bring them in, whether

17   Mr. Veeder brought them in or not.

18        That is the way these things are done.  First you

19   catalogue the rights, and then if these rights are infringed,

20   one or another party complains.

21        MR. VEEDER:  Let me say this, your Honor:  I have

22   suggested in the past to your Honor that the control of  the

23   water levels in the Murietta Basin, and one reason we went

24   into it in great detail on our geology about that basin is

25   that it is of prime importance to us.

16,061

t-67

1    We have before us the situation in which by reason of

2    unlimited pumping, and perhaps the physical phenomenon, there

3    has been eliminated for practical purposes Diamond and

4    Domenigoni Valleys as a source of water supply downstream.

5    I think that exactly the same situation is well on the

6    way in regard to Murietta Basin.  I have never responded

7    categorically to Mr. Girard's outbursts, or Mr. Sachse's

8    outbursts on the question of apportionment, because I truly

9    believe that an order which would provide that X-point on

10   certain wells scattered throughout the Murietta Basin might

11   be the way of guaranteeing to us an assured supply of water.

12   That would require continuing jurisdiction, it would require

13   measurement of the wells in much the same manner as Mr. Green

14   has measured the wells of the Vail Company.

15   I would think that the Vail Company would be just as

16   interested as we are in seeing where the water level stands

17   at Roripaughs,and at Wilson, and at other places.

18   It may be that your Honor could work out an injunctive

19   process of that kind, and would thereby effectuate the control

20   that would be essential to prevent a repetition of  Domenigoni

21   and Diamond Valleys.

22   THE COURT:  How?  The situation there is a physical

23   phenomenom.

24   MR. VEEDER:  Pumping had a lot to do with it, your Honor.

25   THE COURT:  Mr. Veeder, the depth  of that alluvial filled

t-68

16,062

channel running into that other basin is so deep and is so far below the rim that it cuts off the underground flow in this watershed.  It is silly to talk about that.

MR. VEEDER:  Then I will drop the analogy.

MR. STAHLMAN:  Furthermore, there is no evidence in that area that 280,000 acre feet of water may be found in water Storage.

MR. VEEDER:  Your Honor, then I will eliminate the Diamond and Domenigoni  corollary, and say to your Honor that the ground water levels in the Murietta Basin are falling, and we know it.  They are falling, and we think that to protect the National Government there has to be some control at some level which would prevent the repetition-- or, I won't say repetition, where the water drops down below the granatic lip, and there is no water coming down to us.

MR. SACHSE:  I haven't observed that yet.  Can I ask Mr. Veeder a question?

Mr. Veeder says he thinks that by measuring a few wells in Murietta your Honor could make an order that would require a certain amount of water to come down to the United States.

Do you think that this Court  could ever make an order guaranteeing any certain amount of water to you as a riparian?

MR. VEEDER:  I think this, your Honor, --

MR. SACHSE:  Well, can it?  Will you answer my question?

t-69

16,063

1    MR. VEEDER:  Yes.

2    MR. SACHSE:  Guaranteeing you a certain and absolute

3    right as a riparian?

4    MR. VEEDER:  No.  No, I think there can be a requirement

5    on the basis of water levels that there would be water at all

6    times coming down the Gorge to us, and that these key wells

7    would be so operated in such a manner that they would never

8    pull it down to the end that there would be a complete

9    depletion of summer flow coming down to us.

10   MR. SACHSE:  Then, your Honor, may I be heard briefly?

11   I don't think that is possible, or that that is a proper

12   order.

13   If you are going to regulate this entire watershed, you

14   are going to regulate the entire  watershed, and you are going

15   to regulate Ysidora, Chappo, Upper, Pauba, Murietta, Aguanga,

16   and everybody in it.  You are not going to regulate Pauba

17   and Aguanga and Santa Gertrudis and Murietta for the benefit

18   of Chappo and Ysidora.

19   Your Honor, then you are going to have to put a Water

20   Master on the Government wells, and you are going to have to

21   do the same thing you just said to Mr. Veeder, you are going

22   to have to calculate the inflow he is getting from all sources,

23   and the outflow from all sources, and you are going to say

24   to yourself, "With the best engineering brains I can get, must

25   I require them to pump from their basin and hope the basin will

1   refill in the next wet cycle, or shall I restrain the

2   upstream diverters?"  That is what your Honor will have to

3   do if you start apportionment.

4       MR. STAHLMAN:  Furthermore, Mr. Veeder  has said in the

5   record in this case not more than two or three months ago

6   that the summer flow was not important to them, that they

7   relied on the winter runoff.

8       MR. VEEDER:  I never said that.

9       MR. STAHLMAN:  You did not?

10      THE COURT:  I have listened to you, and we will decide

11  what course the case is to take from here on out.  If it did

12  not start as an apportionment case, then we would have to open

13  the whole case as to much of the evidence that has been taken.

14  If it began as a complete reapportionment case, then we are

15  not going into that, and I will consider isolated minor

16  situations where there are minor problems.  But I do not intend

17  from what I have heard in this case so far to make any

18  general order of apportionment.  If that is done, it will be

19  done after the final decree is entered and all the rights are

20  catalogued.

21      MR. SACHSE:  That is fine.

22      THE COURT:  That is that right there.  This is further in

23  reliance upon the assurance that you gave other counsel in

24  this case, and in the calling of witnesses, where cross-examina-

25  tion was foregone and evidence was not put in based upon your

16,065

t-71

1   position.  I don't think that the change in condition

2   resulting from the opinion and proposed findings on the

3   stipulated judgment that was entered changes it one whit.  I

4   can't follow you on that.  You knew all along that this

5   judgment only concerned one other user on the stream; a big one,

6   it is true, but you knew that none of the other parties were

7   bound by that judgment.

8       In addition, you assured me at the time when, early in

9   this case I was trying to figure out some solution other than

10  a long trial, that the Government could not act on any

11  proposal at the time until there was a catalogue of what

12  their rights were, and we would propose to find out when we

13  catalogued them.

14      It is true at this stage of the case to reopen and permit,

15  as I would have to do, Mr. Krieger's and Mr. Littleworth's

16  clients, and Mr. Sachse's clients, and various other people

17  to come in and make showings based upon your present contentions

18  would not, it seems to me, be an orderly method, and, therefore,

19  in my opinion the orderly method would be to proceed to a

20  decree, catalogue the rights, -- the middle ground, as it

21  were, that I outlined a few moments ago, and thereafter, if

22  you have problems where you think injunctive relief or that

23  a restraint,or some limited portions at the watershed require

24  attention, that can be taken up, but it will be done after

25  the rights are catalogued.

16,066

t-72

1    Now, this does not preclude you, and I am not

2    indicating any limit, from presenting the contentions you

3    make as to the use by Fallbrook by being an appropriator where

4    you have a situation downstream, and that is a situation that

5    could be handled without having to apportion waters in this

6    watershed.

7    There may be other situations where some individual

8    obviously, or, water user is not entitled to far more than

9    his share, where, as in the case of one of the large Ranchos,

10   they are using most of the water and the man downstream has

11   practically none.  Those situations I will consider, but I

12   do not intend/this stage of the litigation to make an

13   apportionment of the waters in the watershed.  After the

14   rights are catalogued, if that is necessary, it can be gone

15   into.

16   MR. VEEDER:  Your Honor, the cataloguing of the rights

17   and the irrigable acreage must necessarily be antecedent to

18   any injunctive process, and that is--

19   THE COURT:  The amount of irrigable acres can vary from

20   year to year.

21   MR. VEEDER:  Right.

22   THE COURT:  And by the time the matter came up that

23   involved, say, the Murietta, it might be necessary to re-

24   catalogue what the irrigable acres are.  This is not a static

25   thing.

t-73

1      MR. VEEDER:  That is right, and I am asking for a

2   cataloguing of them.

3      THE COURT:  You are happy with my ruling, and you are

4   content.

5      MR. VEEDER:  I think your ruling is A, B, C.  I have no

6   complaint about it.

7      MR. SACHSE:  What have we been talking about all day,

8   then?

9      THE COURT:  Now, let me say this again:  When you make

10  broad statements, they are subject to exceptions, and all of

11  that.  Actually, after a final decree and the cataloguing

12  of various rights on this river, the Santa Margarita, there

13  arise problems on the proper allocation of this water, believe

14  it or not, it is going to concern largely three areas.  It is

15  going to concern the relative use in the Murietta, the  Pauba,

16  and the basins downstream.

17     I have a feeling from what I have seen of the evidence

18  in this case that you will never be able to restrain people

19  in Anza Valley, people upstream in the small shallow basins,

20  with the amount of  riparian land that they have from making

21  practically a full use of the water that is available up

22  there.  They have a right to the use of the water the same

23  as the Government does, the same as  Vail does, and the same

24  as the farmers in Murietta, and to say to these little people

25  who overlie shallow basins that they have got to so use their

16,068

t-74

1   water that the water runs over the lip of their basin and

2   runs downstream, well, I think you would have no difficulty

3   in compiling data as to the amount of the irrigable acreage

4   and the amount of water that they could use, and even with all

5   they have got, they haven't the share of the water that the

6   big owners have downstream.

7       So when you got down to the problem that is there, and

8   if you got it to a physical solution, I think the physical

9   solution is going to concern the Pauba Valley and Vail, and

10  it will concern the Murietta Valley and Chappo, and the basins

E-7  11  downstream.

12      MR. VEEDER:  Your Honor, I think the record will show

13  that I have done everything in the world to protect the

14  people upstream, that I have never suggested anything at all

        that
15  and I think I am the only one that has produced evidence for

16  those people.

17      THE COURT:  I am just hazarding a guess, and I am not

18  called upon to decide it, but I can't imagine me telling some

19  little farmers up in the Anza Valley in shallow basins that

        to
20  they have/curtail their uses to such an extent that water runs

21  over the lip of their basin and must come downstream.  All

22  you have to do is look at the area of their ground, and the

23  potential use they can make of the water.  So if we are going

24  to be realistic about this case, I think that you have to

25  write off not only the Domenigoni Valley, but I think you are

16,069

t-75

1   practically going to have to write off all of the upper part

2   of the watershed except for surface flow in winter weather,

3   which will come downstream and charge the basins in the

4   Murietta, the Pauba, and the Government land.

5          Maybe this is an over simplification of the case, but

6   that is the way it looks to me after sitting here for a long,

7   long time.

8          MR. VEEDER:  We have tendered all that material to you

9   today with one thought in mind, your Honor, that that is

10  what you may have to do.

11         I don't know what the ultimate result is going to be,

12  but I think when you look at Vail dam that is the key to

13  everything upstream.

14         THE COURT:  You think what?

15         MR. VEEDER:  I think Vail dam may be the key to the

16  whole thing upstream above their property.

17         THE COURT:  What do you mean by that?

18         MR. VEEDER:  From the standpoint of whatever regulations

19  might be necessary up there.  I don't know, because they

20  certainly have cut the watershed in half, and certainly the

21  situation is entirely different above that Valley, above that

22  structure.

23         THE COURT:  Vail dam is only to pick up flood waters,

24  Mr. Veeder.

25         MR. STAHLMAN:  It is the simplest  thing in the world to

16,070

t-76

1    regulate Vail dam.

2         THE COURT:  Vail dam is subject to my regulation.  Maybe

3    I am wrong about this, but I apprehend that if you had some

4    tremendous flood upstream, and you didn't get water out of

5    Sandia, and these other canyons that fed your basins directly,

6    and if you could show that the water level in your basins was

7    going down and that Vail dam was full of water, I haven't

8    any doubt but what you would find Vail dam running a pretty

9    good stream of water right back to fill up your basin, because

10   that is water that they catch there that would ordinarily fill

11   your basin.  I have no doubt but when Fallbrook builds a dam,

12   with the rights of the United States, if they have a proper

13   use, that they would have a problem on that, a junior appropria-

14   tor catching flood waters and stopping the natural flow of

15   the stream, and if you make a showing that your uses are

16   proper and your basins are going down, you would have water

17   running out of Fallbrook's dam.  You can't be hurt by these

18   dams, they are an insurance for you.  They insure that the

19   water will not go into the sea, and that you will get a fair

20   share of it to recharge your basins if you are rightly

21   entitled to it.

22        I would like to go now to the windup of this matter of

23   irrigable acreage on the Vail property.

24        MR. STAHLMAN:  That will take only a few minutes, your

25   Honor.

1    THE COURT:  Are you ready on that?

2    MR. STAHLMAN:  Yes.  Before I do, there is one other

3 thing.  I noticed in checking over the exhibits that there

4 was the Coit report that is in evidence, and that is Exhibit

5 C, and then we made a reformation of it in another map,

6 marked  as C-1, and we included those lands which came into

7 use after the original Coit report was made.  That is the

8 only difference between that, so I will offer Exhibit C-1 in

9 evidence.   C is already in, I believe.

10    THE COURT:  Has this  been lodged?  Has the Government

11 seen it?

12    MR. STAHLMAN:  Yes.  Your Honor, it was put in and lodged

13 to be put in evidence, and we talked about it this noon.  It

14 was put in in June, 1959, I believe or maybe longer ago than

15 that.  March 31, 1959.

16    THE COURT:  Have we previously marked it for identifica-

17 tion?

18    THE CLERK:  Yes, your Honor, C-1.

19    MR. STAHLMAN:  It was marked for identification and

20 testified to.

21    THE COURT:  When was it identified, Mr. Clerk?

22    THE CLERK:  March 31, 1959.

23    THE COURT:  And you now offer it in evidence?

24    MR. STAHLMAN:  Yes, your Honor.

25    THE COURT:  Any objection?

16,071

(No response.)

THE COURT:  Received in evidence.

(The document was received in        )
(evidence and marked Vail's          )
(Exhibit C-1.                         )

MR. STAHLMAN:  I will call Colonel Bowen.

ALLEN C. BOWEN,

recalled as a witness on behalf of the Defendant Vail, having been previously duly sworn, testified further as follows:

THE COURT:  This is a supplement to the Coit report, or is it Coit plus the supplement?

MR. STAHLMAN:  It is Coit plus the supplement; the map only, your Honor.

THE COURT:  Did you make a copy for me, or can I see it?

MR. STAHLMAN:  Your Honor, it is this tremendously big map.  This is the Coit survey report.

THE COURT:  Oh, I see.

MR. STAHLMAN:  And all this has marked in is the additional lands which were put down here in yellow, I think, at one point.

THE COURT:  All right.  Proceed.

MR. STAHLMAN:  Your Honor, we had the testimony of Colonel Bowen  in connection with the evapo-transpiration loss on the Vail reservoir, and we had offered certain of these exhibits in evidence previously.  They have been testified to by Mr. Wilkinson and Colonel Bowen, and they are Exhibits

t-79

1  BE-1 and-2.

2      THE COURT:  BE-1 and BE-2?

3      MR. STAHLMAN:  BE-1 and BE-2, and BF.

4      THE COURT:  What is BE-1 and BE-2?

5      MR. STAHLMAN:  BE-1 and BE-2 are aerials of the

6  reservoir near the base, and they are one of the factors taken

7  into consideration in working the evapo-transpiration loss

8  in the area.

9      THE COURT:  All right.

10      MR. VEEDER:  Just for my own edification, could I have

11  Colonel Bowen look at each one of those to which you are now

12  referring and tell me if he has reviewed them.  The Colonel

13  told me he had reviewed them, but I would like to have the

14  record show that he has reviewed each of those, and when he

15  says that I will have no objection to those going in, and I

16  won't complicate it at all.

17      MR. STAHLMAN:  BE-1 and BE-2 are maps which we have made

18  from the master map.

19      THE COURT:  You need not put it up.  Which is the one

20  you were trying to put on the board?

21      MR. ILLINGSWORTH:  BE-1 and -2.  They are two photostatic

22  copies, each one being half of the large original.

23      THE COURT:  In other words, what you have in your hand

24  was originally marked BE?

25      MR. STAHLMAN:  No, your Honor, this was never marked.  We

1   put in the maps we had made from it, but this map is not in

2   evidence.

3           THE COURT:  Then what is BE-1 and-2?  The ones in front

4   of the Colonel?

5           MR. STAHLMAN:  Yes, the ones in front of the Colonel.

6           THE COURT:  Then what do we have the big map for, if you

7   are not offering it?

8           MR. STAHLMAN:  We don't need it, your Honor.

9           THE COURT:  BE-1 and -2 are in front of the Colonel?

10          MR. STAHLMAN:  Yes.

11          THE WITNESS:  Your Honor, I have examined the originals

12  of BE-1 and BE-2.

13          THE COURT:  Do they appear accurate to you, from your

14  knowledge of that territory?

15          THE WITNESS:  Yes, your Honor.  That is a vertical aerial

16  photograph of the Nigger Valley area.

17          THE COURT:  Do you offer them in evidence, Mr. Stahlman?

18          MR. STAHLMAN:  Yes, we offer them in evidence.

19          THE COURT:  No objections, I take it?

20          MR. VEEDER:  No, as long as the Colonel identifies them.

21          THE COURT:  BE-1 and BE-2 received in evidence.

22                              (The maps referred to were marked as)
                                (Vail's Exhibits BE-1 and BE-2 and  )
23                              (received in evidence.               )

24

25

t-81                                                                16,074

1                          DIRECT EXAMINATION

2   BY MR. STAHLMAN:

3       Q    I will show you also these maps, Colonel, which have

4   been identified, and regarding BF-1 to -6 will you state to

5   the Court what those maps are?

6       A    Your Honor, BE-1 through -6 are photostatic copies

7   of original plane table sheets which I examined, that is, I

8   examined the originals of these.  These plane table sheets

9   show portions of the Nigger Valley area, and indicate the

10  type of vegetative cover, the depth of water, and the general

11  areas in each of these types of cover, and these photostatic

12  copies, your Honor, are made off the originals which I have

13  seen.

14      MR. STAHLHAM:  We will offer these in evidence, if your

15  Honor please, as BF-1 through BF-6.

16      THE COURT:  Any objection?

17      MR. VEEDER:  No, your Honor.

18      THE COURT:  BF-1 to BF-6, inclusive, received in

19  evidence.

20                         (The documents referred to were marked as)
                           (Vail's Exhibits BF-1 to BF-6, both      )
21                         (inclusive, and received in evidence.     )

22  BY MR. STAHLMAN:

23      Q    I will show you Exhibit BG, and will ask you

24  whether you have previously seen and testified in regard to

25  that exhibit?

        A    Yes, Mr. Stahlman.

16,075

Q     Will you state to the Court what it is?

A     Exhibit BG is a report to the Vail Company, prepared by Mr. A. L. Sonderegger, reporting examples of evapo-transpiration loss, and the date thereon is July, 1948.

Q     And the data that is contained in that exhibit, was that examined by you and considered by you in reaching the conclusion which you have previously given in your appearance here before, as to your opinion as to evapo-transpiration loss  at the Vail Company?

A     It was.

MR. STAHLMAN:  I will offer Exhibit BG in evidence, your Honor.

THE COURT:  Mr. Veeder?

MR. VEEDER:  It is all right so long as the Colonel identifies it.

THE COURT:  Exhibit BG received in evidence.

(The document referred to was marked)
(Vail's Exhbit BG and received in    )
(evidence.                           )

BY MR. STAHLMAN:

Q     Now, Colonel Bowen, have you made a study of the Santa Rosa grant in making a determination of the irrigable acreage?

A     I have.

Q     That is contained in three different reports, is it?

A     Yes, sir.

t-83                                                                            16,076

Q    Which would be the most convenient to take first?

A    Well, that portion of De Luz Creek which is within the Santa Rosa grant was the first report prepared.

Q    Is that contained in one of these three volumes there?

A    Yes, sir.

Q    Which volume is it?

A    This (Indicating).

Q    What is the Vail's Exhibit next in order?  Is it BI?

THE CLERK:  BI, your Honor.

THE COURT:  That will be marked BI, for identification, Vail's BI.

MR. STAHLMAN:  Vail's  BI.

(The document referred to was marked )
(Vail's Exhibit BI for identification)
(                                    )

BY MR. STAHLMAN:

Q    Will you state to the Court, first, as to Exhibit BI for identification, was that compiled by yourself or under your direction?

A    It was prepared under my direction and supervision.

Q    And what does it contain, generally?

A    It contains generally a report of the general description, geology, soil types, land classification, irrigable and non-irrigable acreage, development of water,

t-84                                                                    16,077

1    and a tabulation showing the future potential development of

2    type of crops adapted to the area, and the data therefor.

3        Q    And what area is this confined to?

4        A    Vail BI is confined only to that portion of Santa

5    Rosa which lies within the watershed of the De Luz Creek

6    tributary of the Santa Margarita River.

7        Q    Are the matters contained therein true, to the

8    best of your knowledge?

9        A    They are.

10       Q    Will you tell us generally what you found in

11   relation to the total sum of acres, the amount of irrigable

12   land, waste land, and so forth?

13       A    Yes, sir.  I might add to the description of the

14   report, if I may, Mr. Stahlman, that there was originally an

15   index sheet showing the location of the aerial photographs

16   immediately preceding the photographic reproduction of the

17   aerial photos used, and on those photos are shown the soil

18   type symbols, the land classification symbols, and the red

19   lines which appear on each photo are either the watershed line

20   that is, the De Luz Creek watershed line or the capacity line

21   of the photographs, in each instance.

22       Now, the report indicates that for this portion of Santa

23   Rosa in the De Luz Creek watershed there are   298.7 acres of

24   Class 2 land; 169.9 of Class 3 land; 17.5 of Class 4 land;

25   1,521.7 of Class 6 land; 7,851.9 acres of Class 7 and 8 land;

16,078

or a total of 9,859.7 acres.

THE COURT:  9,859.7?

THE WITNESS: Yes, sir.  Then the following pages, 6 on through, contain tabulations which show the land classes and acreages for each aerial photograph used on this survey.

THE COURT:  Your Class 2, 3 and 4 were for irrigable lands?

THE WITNESS:  2, 3 and 4, and some of 6, your Honor.

The total irrigable land within this portion of the Santa Rosa Ranch is shown on Page 15 of Exhibit BI as 830.5.  Of that a part is suited to the production of row crops, a part to irrigated pasture, and a part of it, by virtue of soil depth, internal drainage and air drainage, is suited to citrus and avocado.

BY MR. STAHLMAN:

Q    And the amount of land which is non-irrigable would be what?  27,000-some acres?

A    No, sir.  That would be the difference between 830.5 and the total.

THE COURT:  9,000?

THE WITNESS:  9,000-plus.

THE COURT:  A little over 9,000 not irrigable?

THE WITNESS:  Yes, sir.  It would be 9,029.2 non-irrigable.

THE COURT:  What water use would you figure on in this?

THE WITNESS:  There were 458.8 acres of row crops,

16,079

t-86

1    requiring four feet per year, or a total of 1,835.2.    27.3

2    acres of irrigated pasture, which would require 104.6 acre

3    feet of water per year, and 344.4 acres adapted to citrus

4    and avocados, which would require 809.3 acre feet of water

5    per year.  This is the  field duty, your Honor.

6    BY MR. STAHLMAN:

7        Q    And the total of those three is what?

8        A    The total of those is 2,749.1 acre feet per year.

9    THE COURT:  That was two thousand what?

10    (The answer was read.)

11    MR. STAHLMAN:  Your Honor, we will offer Exhibit BI in

12    evidence.

13    THE COURT:  Received in evidence.

14                    (The document referred to and heretofore )
15                    (marked as Vail's Exhibit No. BI,         )
                       (was received in evidence.              )

16    BY MR. STAHLMAN:

17        Q    Will you take Sandia next?
                            that
18        A    Yes, sir.  Would/be Exhibit BJ?

19    MR. STAHLMAN:  BJ.

20    THE CLERK:  BJ, marked for identification.

21                    (The document referred to was marked    )
22                    (Vail's Exhibit BJ for identification  )

23

24

25

E & Pl 1    BY MR. STAHLMAN:

2        Q  Now, taking Exhibt BJ, marked for identification,

3    will you give us the same data?  Of course, that is/a study

4    of the Sandia watershed, is it?

5        A  The Sandia, and what we call the main stem.

6        THE COURT:  Now, this is marked what?

7        THE WITNESS:  This/is Vail BJ, for identification, your

8    Honor.

9        THE COURT:  All right.  And it is Sandia?

10       THE WITNESS:  It is an engineering report on that

11   portion of the Santa Rosa Ranch which drains into Sandia

12   Creek and minor drainage directly into the Santa Margarita

13   River, which would lie easterly of the Sandia Creek water-

14   shed.

15   BY MR. STAHLMAN:

16       Q  And this is a study of the same nature as you made

17   in connection with Exhibit BI?

18       A  Yes sir.  This contains the same data, the general

19   description, legal description, geology and soils, with

20   land classifications and aerial photographs used in making

21   the surveys of this portion of the Santa Rosa Ranch included

22   in the report.

23       Q  It was made under your supervision and direction?

24       A  Yes sir.

25       Q  And is it, according to the best of your knowledge,

P 2

1  true and correct?

2      A  Yes sir.

3      Q  Will you give us the same data there that you did in

4  connection with the other exhibit, that is, the amount of

5  acreage, water duty, and break it down to the same extent

6  as you did on Exhibit BI?

7      A  Yes sir.  On page 5 of Vail's BJ is included a

8  tabulation by land classes of the total acreage within this

9  portion of the Santa Rosa Grant.

10      The total area included in this report is 14,046.8

11  acres.  Of that amount 2,680.9 are irrigable, and the balance,

12  11,365.9, are non-irrigable.

13      On page 22 of Vail's BJ appears a tabulation showing

14  the crops adapted to the area, the requirements in acre feet

15  per year, and the total acre feet per year.

16      THE COURT:  What is that total acre feet?

17      THE WITNESS:  The total for row crops, irrigated pasture

18  and citrus, your Honor, amounts to 8,938.5 acre feet per year.

19      THE COURT:  All right.  Let me see Exhibit BI.

20      (The document referred to was handed to the Court.)

21      THE COURT:  Are you offering this exhibit?

22      MR. STAHLMAN:  Yes, we will offer BJ.

23      THE COURT:  BJ received in evidence.

24              (The document heretofore marked Vail's)
25              (Exhibit BJ was received in evidence. )

BY MR. STAHLMAN:

P 3

Q  I will ask you to mark the next document as Vail's BK, for identification, and ask you to state what that is.

A  Vail's BK, for identification, is an engineering report on that portion of the Santa Rosa Grant within the Vail Ranch which drains into the Murrieta Creek watershed. This contains a general description of the portion of the grant reported on, the legal description, geology, soils, land classifications, with the accompanying aerial photographs.

Q  Would it be correct, Colonel, to say that this Exhibit BK, together with Exhibits BI and BJ, which have been introduced in evidence, comprise all of the lands within the Santa Rosa Grant?

A  Yes sir.

Q  All right.  Now, if you will go ahead on that.

THE COURT:  By that you mean these three exhibits together?

MR. STAHLMAN:  The three together, yes, your Honor.

THE COURT:  All right.

BY MR. STAHLMAN:

Q  Then if you will continue with Exhibit BK, Colonel, and first tell us whether it was made under your supervision and direction?

A  Yes sir.

Q  And is it correct, according to your best knowledge?

A  Yes sir.

16,083

Q   I will ask you, then, to take the exhibit and give us the information there relative to the acreage and the water duty that you found.

A   On page 5 of Vail's BK appears three separate tabulations.   The first one shows by land class the acreage in each land class map in that portion of the Santa Rosa Grant which drains into the Murrieta.   The total acreage in that portion of the grant is 13,928.7.

The second tabulation on page 5 is a tabulation of some acreage outside of the Santa Rosa Grant, namely, a portion of the Vail property lying west of Highway 395, and the final tabulation is the sum of the first two.

Q   By the way, did you from your study find that there were some lands on the Santa Rosa Grant that were not within the watershed of the Santa Margarita River?

A   Oh, yes sir.

Q   Are they classified in any one of these three documents, BI, BJ and BK?

A   No sir, they are not.

Q   In other words, you eliminated the lands which are without the watershed from your classification?

A   Yes sir.   My earlier statement on whether it included all of the land was incorrect.   It includes all of the grant inside of the Santa Margarita watershed.

THE COURT:   Approximately how much of the grant is

P 5   1       outside of the watershed?

2                    THE WITNESS:  About 10,000 acres.

3                    THE COURT:  Approximately?

4                    THE WITNESS:  Roughly, your Honor.

5                    THE COURT:  You just said that you had, first, a total

6       acreage in this Exhibit BK of 13,928, which was a part of

7       the Santa Rosa which drained into the Murrieta, and then you

8       had another figure not a part of the Santa Rosa which drained

9       into the Murrieta?

10                    THE WITNESS:  Yes sir.

11                    THE COURT:  What figure is that?

12                    THE WITNESS:  That is a total of 1,558.4, your Honor.

13                    THE COURT:  Now, did you break this down as to irrigable

14      land, -- either of these figures?

15                    THE WITNESS:  Yes sir, I did.  The irrigable lands shown

16      in here include that which was within the Temecula Grant.

17                    THE COURT:  The part of the 1500 acres?

18                    THE WITNESS:  Yes sir, that part of the 1500 acres which

19      I found to be irrigable is included in the total irrigable,

20      as shown on page 6.

21      BY MR. STAHLMAN:

22            Q  Is that the land, Colonel, that was not classified

23      in the Coit Report?

24            A  No sir, it was classified.

25                    MR. STAHLMAN:  It was classified.  I see.

16,085

THE COURT:  Then this is a duplication, -- this 1500 acres that appears in the Coit Report and that also appears in this report?

THE WITNESS:  Yes sir, that duplicates the acreage already put in the Coit Report.

THE COURT:  Can you tell us how much of the 13,928 acres is irrigable?

THE WITNESS:  Yes, your Honor, I can.  All of the class 1 land, which is  12.4 acres; all of the class 2 land, which is 1,215.8 acres; and all of the class 3 land, which is 741.9 acres; all of the class 4 land, which is 855 acres; and a portion of the class 6 land.

Your Honor, I would have to go through this report and extract that portion of the class 6 land which by virtue of soil depth  and position is suited to citrus and avocado development.

THE COURT:  How much class 6 land is there altogether?

THE WITNESS:  Within the Santa Rosa Grant, your Honor, there is 3,958.6 acres.

THE COURT:  Within this part of the grant?

THE WITNESS:  Within this part of the grant, yes, your Honor.

THE COURT:  Three thousand what?

THE WITNESS:  3,958.6, your Honor.

THE COURT:  Then you can't tell us how much of that is

MARIE G. ZELLNER, OFFICIAL REPORTER

16,086

p 7

1   irrigable, nor can you give us a figure on water duty at

2   this time?

3         THE WITNESS:  I can do it in the recess, your Honor.

4         MR. STAHLMAN:  It can be obtained out of that report?

5         THE WITNESS:  Yes sir.

6         THE COURT:  You offer Exhibit BK in evidence?

7         MR. STAHLMAN:  Yes, your Honor.  Before we recess I have

8   just one question.

9         Q  What was the reason for including the acreage in the

10  Vail Company land within the Pauba land?

11        A  Just a matter of convenience.  We had to cross that

12  area to get the rest of it.

13        MR. STAHLMAN:  We will offer Exhibit BK in evidence,

14  then, your Honor.

15        THE COURT:  Received in evidence.

16                        (The document heretofore marked Vail's)
                          (Exhibit BK was received in evidence. )

17

18        MR. VEEDER:  Is that is, Mr. Stahlman?

19        MR. STAHLMAN:  That is it.

20        MR. VEEDER:  Your Honor, I have a call from Mr. Anderson,

21  who is Knox counsel.  Shall I tell him that he should also

22  be here in regard to this military-riparian use?

23        THE COURT:  Have you talked to the others yet?

24        MR. VEEDER:  They are being called.  They are being

25  called and they are being told to be here Friday.

16,087

P 8

1      THE COURT:  Friday morning?

2      MR. VEEDER:  Friday morning at ten o'clock.

3      THE COURT:  All right.  Do that.

4      MR. VEEDER:  Should I tell Anderson that?

5      THE COURT:  Yes, if he wants to be heard.  We will now

6  take a recess.

7          (A short recess.)

F fls.   8

F 1 P 34  1     MR. STAHLMAN:  May I proceed your Honor.

2     THE COURT:  Yes.

3     MR. STAHLMAN:  Your Honor, those are all the questions

4  I have of Colonel Bowen.

5     I would like to suggest to the Court --

6     THE COURT:  Just a minute.  The Colonel was going to

7  make some computations.

8     MR. STAHLMAN:  That's right.

9     THE WITNESS(Colonel Bowen):  Your Honor, I have ex-

10  tracted from Vail's BK the area of lands suited to the pro-

11  duction of row crops, irrigated pasture and citrus on that

12  portion of the property represented in BK which lies within

13  the Santa Rosa Grant.

14     THE COURT:  How much did you come up with for irrigable

15  land?

16     THE WITNESS:  Irrigable, your Honor, is 3,241.2 acres.

17     THE COURT:  And water duty?

18     THE WITNESS:  And the water duty for that, your Honor,

19  is 11,929 acre feet per year.

20     MR. STAHLMAN:  What was the amount of land which was not

21  suitable for irrigation?

22     THE COURT:  It would be over 10,000 acres.

23     THE WITNESS:  Yes sir, that is right.

24     MR. STAHLMAN:  What I had in mind doing, if your Honor

25  will recall, on June 2, 1960 I submitted to the Court a

P 35

1  memorandum with a tabulation of the then state of the record

2  in relation to the Vail Holdings.

3  THE COURT:  What was the date of that?

4  MR. STAHLMAN:  June 2nd, 1960 was the date of the letter

5  I sent to your Honor, which contained a memorandum referred

6  to as "Memorandum Re Irrigable Acreage of Vail Company."

7  THE COURT:  That was filed June 3, 1960?

8  MR. STAHLMAN:  Yes.  I propose now with this additional

9  evidence to bring this up to date, make a tabulation of the

10  entire thing, and submit it to the Court.

11  THE COURT:  Can you do that?

12  MR. STAHLMAN:  Yes sir.

13  THE COURT:  How soon?

14  MR. STAHLMAN:  I can have it the next time we return

15  to court.  I might be able to have it by the end of the week.

16  THE COURT:  All right.

17  MR. VEEDER:  Is that all for the Colonel?

18  MR. STAHLMAN:  That is all, yes.

19  MR. VEEDER:  I would like to report that Mr. O'Malley

20  was advised in regard to this matter of the hearing as to

21  whether military use is a proper riparian use.  He said he

22  would not be able to appear.

23  We have not been able to catch up with Mr. Krieger or

24  Mr. Littleworth.  However, we have been assured that the

25  message would be delivered to Mr. Krieger in regard to the

P 36

1    matter.

2          I just talked to Mr. Anderson, and he was calling in

3    regard to the proposed findings which were served upon him.

4    He says he will undertake to have objections filed and in

5    your hands on Friday or not later than Monday.  He will not

6    be here.  And he was advised in regard to this riparian

7    question that is coming up, and he said he would attempt to

8    be here but he didn't think he would be.

9          THE COURT:  You didn't call Mr. Stark?

10         MR. VEEDER:  Mr. Stark, as I was told, was going to be

11   down here Friday.  I will call him, if you want me to, but

12   I was assured he was going to be here on Friday.

13         THE COURT:  Have your secretary call him.

14         MR. VEEDER:  The same message will be given to Mr. Stark.

15         THE COURT:  All right.

16         Is there some cross-examination of the Colonel?

17         MR. VEEDER:  I have none.

18         THE COURT:  Well, I do have.

19         Colonel, I am sorry to have to represent the Government

20   in these matters, but I am just interested.

21         Let's take De Luz watershed where you have a total of

22   -- I think I have it right -- 830 irrigable acres.

23         THE WITNESS:  Yes your Honor.

24         THE COURT:  Which would have a water duty of 2,749 acre

25   feet a year?

P 37

1    THE WITNESS:  Yes sir.

2    THE COURT:  Is there any reasonable expectation of that

3    amount of acre feet of water out of De Luz Creek without

4    the construction of a dam to satisfy that water duty?

5    THE WITNESS:  No sir.

6    THE COURT:  I take it De Luz Creek is, most of the year,

7    a dry creekbed, with water running in it only during and

8    after rain or precipitation?

9    MR. VEEDER:  It depends upon the area, doesn't it?

10   THE WITNESS:  There are locally within the Santa Rosa,

11   your Honor, some little areas where rising water flows in De

12   Luz Creek following a wet year until into the summer months,

13   but by and large it is confined to flow throughout its reach

14   in the Santa Rosa Grant to periods immediately during and

15   shortly after periods of high rainfall and runoff.

16   THE COURT:  Does any of the Santa Rosa Grant come down

17   and border on the Santa Margarita?

18   THE WITNESS:  No sir.

19   MR. STAHLMAN:  Wait a minute.  Yes, you are right.

20   THE COURT:  So that to satisfy riparian uses for this

21   830 acres the water would have to come out of De Luz and not

22   out of the Santa Margarita River?

23   THE WITNESS:  That is correct, your Honor.

24   THE COURT:  In Sandia Creek you have total irrigable

25   acres 2,680.9, with a water duty of 8,938.5 acre feet or

P 38

1  thereabouts.  Is the situation on Sandia much the same as on

2  De Luz?

3      THE WITNESS:  Yes your Honor.

4      THE COURT:  Now, as to the part of the Santa Rosa that

5  drains into the Murrieta, as I recall the testimony, part of

6  that Santa Rosa Grant borders and overlies part of the

7  Murrieta Valley?

8      THE WITNESS:  That is right.

9      THE COURT:  There is small stringer or piece of ground

10  there in one place.

11      THE WITNESS:  Yes sir.

12      THE COURT:  To satisfy the water duty for the 3,241

13  irrigable acres, a water duty of 11,929 acre feet, I take

14  it that that could only be satisfied, if at all, out of the

15  Murrieta and no other surface streams or water sources in

16  that part of the Santa Rosa?

17      THE WITNESS:  You are correct, your Honor.

18      THE COURT:  Now Mr. Veeder, isn't this the kind of

19  riparian land that, at least in the Sandia and Santa Rosa,

20  you have been so concerned about?

21      MR. VEEDER:  Yes sir, and I think the evidence presently

22  in the record demonstrates completely that it is illusory.

23      MR. STAHLMAN:  Your Honor, I think De Luz and the Sandia

24  unquestionably are just what your Honor said.  We have it in

25  other parts of the watershed.  It is in the De Luz area.  In

P 39

1   fact, I might go even further and say we have exploited that

2   area to determine whether or not we might be able to obtain

3   water up there by putting in dams etc., and found out and

4   satisfied ourselves that it was not economically feasible,

5   except for cattle watering and small extractions.

6   THE COURT:  All right.

7   Any other questions of the Colonel?

8   MR. GIRARD:  No your Honor.

9   THE COURT:  Thank you.

10  Now Mr. Veeder, of course Mr. Stahlman is going to make

11  a new computation of the Coit Report, plus this additional

12  matter; but are you at least reasonably satisfied with the

13  testimony of Colonel Bowen concerning the Coit Survey and the

14  Coit Survey?

15  MR. VEEDER:  Yes, your Honor.  I think there are going

16  to be questions in regard to the basin that has been de-

17  lineated.

18  MR. STAHLMAN:  What?

19  MR. VEEDER:  The delineation of the basin.  I think

20  there may be some of those areas which would be outside the

21  basin that are in the Coit Survey.

22  Isn't that correct?  Have you compared the exterior

23  boundaries?

24  MR. STAHLMAN:  I don't know, to tell the truth.  We

25  will check it, though, to see.

16,094

P 40

1    MR. VEEDER:  I think that is a matter that will probably

2  come up.

3    THE COURT:  With the exception of that, can we say that

4  you do not propose to put on any evidence?

5    MR. VEEDER:  I propose not to put on any rebuttal evidence.

6    THE COURT:  And you are content, generally, with some

7  very minor variations, if any, with the Coit Survey and the

8  testimony of Colonel Bowen as to irrigable acres in the Vail

9  property?

10    MR. VEEDER:  Yes your Honor.

11    THE COURT:  And I think you heretofore got into the

12  record somewhere an agreement on the irrigated acres in the

13  Pauba Valley.

14    MR. VEEDER:  Yes.

15    MR. STAHLMAN:  That is already in the record.  That is

16  in agreement, your Honor.

17    THE COURT:  That is already taken care of.

18    Is there still reason to keep this matter on the agenda,

19  this Vail acreage, the loose ends that you are talking about?

20    MR. STAHLMAN:  As far as I am concerned, I don't think

21  it is important.

22    MR. VEEDER:  I see no reason.  I think it is completed.

23    THE COURT:  All right, cross it off.

24    MR. VEEDER:  We have some geology we could put on now,

25  if your Honor desires.

16,095

P 41

1    MR. STAHLMAN:  What are we going into now?

2    MR. VEEDER:  Number 12.

3    MR. STAHLMAN:  Wait a minute.  What about the findings

4    and conclusions?

5    MR. VEEDER:  May I make a statement on that, your Honor.

6    I have about ten minutes of evidence to put on in regard to

7    the geology above Aguanga Basin.  Then I can excuse Mr. Bader.

8    Is there agreement that I can do that?

9    THE COURT:  Yes, you may.

10                   FRED KUNKEL,

11    a witness for the plaintiff, having been previously duly

12    sworn, on his oath was examined and testified further as

13    follows:

14                DIRECT EXAMINATION

15    MR. VEEDER:  Mr. Clerk, I believe the next number would

16    be 281; is that correct?

17    THE CLERK:  282.

18    MR. VEEDER:  We have already had this marked and lodged.

19    MR. STAHLMAN:  What is this?

20    MR. VEEDER:  This is the geology above Aguanga Basin

21    on up Temecula through Damron Valley to the watershed line.

22    It has been lodged for ten days.  These have already been

23    lodged, with the numbers 281 and 281-A.

24    THE WITNESS:  There is another copy that has been given

25    to the clerk for an exhibit.  It is better than that.

P 42

1    MR. VEEDER:  Did you mark that, Mr. Clerk?

2    THE CLERK:  This has already been marked.

3    MR. VEEDER:  Let me put it on the easel.

4    MR. STAHLMAN:  Do you have copies for us?

5    THE COURT:  281 is the map.

6    MR. VEEDER:  281 is the map, and 281-A is the tabulation,

7    your Honor.

8    You have been sworn, Mr. Kunkel.

9    May I proceed now your Honor?

10   THE COURT:  Yes.

11   BY MR. VEEDER:

12   Q  Mr. Kunkel, would you step to the easel and refer

13   to the exhibit marked 281 for identification and read the

14   title block into the record and then proceed to state the

15   circumstances under which it was prepared.

16   A  Government's Exhibit 281 marked for identification

17   is entitled "Map of Damron, Oak Grove, Dodge and Chihuahua

18   Valleys Showing Geology and Wells."  In the lower righthand

19   corner of the map is indicated "Geology and Location of

20   Wells by Fred Kunkel, J. S. Bader and F. W. Giesner, 1960-61."

21   At the base on the lower lefthand corner it says "Base

22   prepared from U.S.G.S. Survey topographic maps."  The base

23   maps from which these are prepared are advance blue line

24   prints of the topographic maps for this area, which will be

25   offered in evidence as part of the 29 series.  I believe

P 43

1      they have been lodged with the clerk.

2          MR. VEEDER:  Yes.

3          THE WITNESS:  The geologic units as indicated by the

4      colores red, orange, blue and grey are the same as used in

5      previous Government exhibits showing geology:  The yellow

6      being younger alluvium, the orange older continental deposits,

7      the blue basement complex, the grey deeply weathered basement

8      complex.  The deeply weathered complex is not everywhere

9      differentiated, and where not differentiated it is included

10     as part of the basement complex.  Also, in the margin, as I

11     have testified for other areas, along the margins of the

12     valleys where there is both basement complex and older

13     alluvium, the two are frequently difficult to distinguish,

14     the main criterion being whether the deposits have been

15     transported or have been weathered in place without trans-

16     portation.  In either case the older alluvium in the

17     weathered basement complex, as indicated on Exhibit 281, are

18     relatively thin.

19         The wells are shown by single circles for domestic,

20     stock or unused wells.  Wells used for irrigation purposes

21     and equipped with a pump of 5 horsepower or more are shown

22     by a double circle.  Points of rising ground water are shown

23     by solid red circles, and the extent of the stream flow in

24     1960 is shown by a solid red line.

25         THE COURT:  What time of year 1960 was it?

P 44

1    THE WITNESS:  It would be in the fall or late winter.

2    THE COURT:  Fall or late winter?

3    THE WITNESS:  Fall or early winter, before the rains.

4    BY MR. VEEDER:

5    Q  I hand you Exhibit 281-A.

6    A  Exhibit 281-A is entitled "Data On Water Wells In

7    Damron, Oak Grove and Dodge Valleys."

8    Q  Under whose direction was that prepared?

9    A  It was prepared under my direction by persons working

10   on the staff of the Geological Survey.  It consists of three

11   pages and a fourth page entitled "Addendum," and it is data

12   on water wells in Damron, Oak Grove and Dodge Valleys,

13   California, and also a little addition entitled "Data On

14   Water Wells in Chihuahua Valley, California."  This tabula-

15   tion summarizes the data collected for the wells shown on

16   Exhibit 281.

17   Q  Are those exhibits correct, to your personal know-

18   ledge, Mr. Kunkel?

19   A  To my personal knowledge, these exhibits are correct.

20   MR. VEEDER:  We offer in evidence exhibits marked 281

21   and 281-A your Honor.

22   THE COURT:  281 and 281-A are received in evidence.

23          (The documents above referred to and heretofore    )
            (marked for identification as Plaintiff's Exhibits)
24          (281 and 281-A, were received in evidence.          )

25   MR. VEEDER:  I have nothing more, your Honor.

P 45

1          MR. STAHLMAN:   I have a couple of questions.

2                          CROSS-EXAMINATION

3     BY MR. STAHLMAN:

4          Q  What generally was the determination as to depth of

5     the younger alluvium in the larger areas shown upon this

6     Exhibit 281?

7          A  There were very few well logs available for the area.

8     In general the younger alluvium was relatively thin.

9          Q  When you say "relatively thin" can you give us some

10    little better opinion?

11         A  I would estimate on the order of 100 feet or less.

12         Q  Do you have an opinion as to what the storage

13    capacity of the younger alluvium in that area is?

14         A  I would have to refer to Government's Exhibit, I

15    believe it is, 17.  I don't recall right off.

16         Q  Have we previously had testimony on that?

17         A  We have previously testified to that.

18         Q  That is one you had listed?

19         A  That is one I had listed.

20         Q  And your opinion is now the same as it was after this

21    further examination?

22         A  That is correct.  There is no change in my opinion.

23         Q  Directing your attention to the diversion which

24    terminates the flowing, the termination of the rising water

25    that flows through this area here, referring to section 12

P 46

1    and I guess that is Range 1 East Township 9 South, whose

2    property is that located on?

3        A    I don't recall the name of the person.  I would have

4    to check.  Let me see if I can refresh my memory.  I believe

5    that is the Ward property.

6        Q    And this sump that is indicated in Section 1 Range

7    1 East Township 9 South, do you know whose property that is?

8        A    To my best recollection, that also is the Ward

9    property -- A. A. Ward.

10       Q    Then there is another dam that is in Section 1, also

11   further to the west immediately behind the point of rising

12   water.  Do you know whose property that is on?

13       A    I am not certain on that.

14   MR. STAHLMAN:  That is all I have.

15   THE COURT:  I noticed that on the map there is dam shown

16   there, and then instead of rising water being above the dam

17   the point of rising water is below the dam.  How do you

18   account for that?  This water is released from the dam?

19   THE WITNESS:  I am not certain of the circumstances.  I

20   have an opinion as to what I think it was, but I certainly

21   don't --

22   THE COURT:  Of course, the basement narrows down there

23   and you probably have water that might be running over rocks?

24   THE WITNESS:  That is correct.

25   THE COURT:  What is this opinion that you have that you

P 47

1    think?

2           THE WITNESS:  I am of the opinion that perhaps the

3    downstream user of that rising water is not the same owner

4    as the person that put up the earthen dam, and the owner

5    above the person who diverts in Aguanga Valley put the dam

6    there to catch whatever little flow he could and then would

7    pump it back up for use on Damron Valley.  I do not know this

8    for a fact, but just from examining the physical set-up that

9    is what I assume was being done.

10   BY MR. STAHLMAN:

11          Q  Have you seen the structure that was put in?

12          A  I haven't seen it recently.

13          Q  What type of dam is it?

14          A  It is just an earthen dam, a sort of bulldozed out

15   sump.  It is very similar in character to the sump.  It is

16   not a major structure type.

17          MR. STAHLMAN:  That is all.

18          MR. SACHSE:  Just one moment please, your Honor.

19                    CROSS-EXAMINATION

20   BY MR. SACHSE:

21          Q  Mr. Kunkel, I would like to ask you the same question

22   that Mr. Stahlman just asked you about the depth of the

23   alluvium up in Chihuahua Valley.  Do you have any opinion as

24   to how deep that is?

25          A  No, except that it is relatively shallow.  The exact

P 48

1   depths, again, I could give you an estimate.  There are

2   several dug wells there, and one of them, Well 9 South 3

3   East 9M-1, had a depth of nine feet.  Well 9M-1 started in

4   the weathered basement complex.

5       Q  And I observe that the younger alluvium at the

6   western end of Chihuahua Valley in Section 7 9 South Range

7   3 East appears to terminate and the water then flow over

8   basement complex; is that right?

9       A  That is correct; virtually no fill.

10      Q  On the otherhand, on the eastern end of Chihuahua

11  Valley I observe that the younger alluvium appears to extend

12  outside the watershed; is that right?

13      A  That is correct.  The younger alluvium extend to the

14  crest of the watershed.

15      Q  Does it extend beyond the crest of the watershed?

16      A  Yes, it does extend beyond.

17      Q  So the ground waters found in that younger alluvium

18  might move either way?

19      A  In the absence of definite well control, I do not

20  know, however, the probability is that there is a ground

21  water divide that closely corresponds to the surface water

22  divide, and that water would in general move within the water-

23  shed within which it falls.

24      Q  Have you any information from which you could tell

25  us the surface elevation at the lip on the extreme western

P 49

1    end where the younger alluvium ends and basement complex

2    begins?

3         A   Yes.  I would like to refer/the lip on 28 series or
                                              to

4    29.

5         (Mr. Sachse hands a document to the witness.)

6         THE COURT:  Are you talking about Chihuahua?

7         MR. SACHSE:  Yes your Honor?

8         THE COURT:  What is the name of that stream that runs

9    out in Chihuahua, when and if it runs?

10        MR. SACHSE:  Chihuahua Creek, your Honor.

11        THE WITNESS:  The divide on the watershed -- I am re-

12    ferring to Government's Exhibit 29-AE -- the divide in

13    Section 15 9 South 3 East about a quarter mile or slightly

14    less northwest of the triangulation point labeled "Mecca,"

15    the triangulation point "Mecca" is 4,351 feet above sea level.

16    It is on a contour that, in general, is running in a north-

17    westerly direction across the divide through the alluvium,

18    and this would be the altitude of the alluvium at that point,

19    about 4,350 feet.

20        THE COURT:  The surface of the alluvium?

21        THE WITNESS:  The surface of the alluvium.

22        THE COURT:  I thought Mr. Sachse's question concerned

23    the basement lip at the other end.

24        MR. SACHSE:  He is now doing that, I think.

25        THE WITNESS:  The basement lip at the other end in the

P 50

1    West half of Section 8 Township 9 South 3 West is about

2    4,330 or perhaps 4,340.

3          MR. SACHSE:  In other words, it is within 150 feet?

4          THE WITNESS:  No, it is closer than that.  It is a

5    matter of 20 feet.

6          MR. SACHSE:  Within 20 feet of the elevation?

7          THE WITNESS:  Twenty or 30 feet.

8          MR. SACHSE:  I have nothing further.

9          MR. VEEDER:  I have no questions.

10          THE COURT:  What about the upper end of Dodge Valley?

11    The younger alluvium there runs into the other watershed,

12    does it not?

13          THE WITNESS:  There is the same occurrence and again

14    the same lack of wells, and again it is my opinion that there

15    is a ground water divide and in all probability closely

16    approximates the surface divide.

17          MR. SACHSE:  For the record, I should clarify, Mr.

18    Kunkel, the other watershed we are talking about would be

19    the San Luis Rey watershed, is it not?

20          THE WITNESS:  It would be the San Luis Rey watershed in

21    this particular case, yes.

22          MR. SACHSE:  That is all.

23          THE COURT:  Any further questions?

24          MR. VEEDER:  I have none.

25          THE COURT:  Step down.

P 51

1   What item was this that you took up on the agenda?

2   MR. SACHSE:   Item 12.

3   Is that right Mr. Veeder?

4   MR. VEEDER:   Twelve.

5   THE COURT:   Where do we stand on the findings on

6   Tucalota Creek?   Can we dispose of those?

7   MR. VEEDER:   Your Honor, there have been lodged the

8   U.S.G.S. maps which are new.   They have been marked for

9   identification 29-AF.   They haven't been entered in evidence.

10  THE COURT:   You mean 29-AF?

11  MR. VEEDER:   29-AE and 29-AF, from which Mr. Kunkel

12  has just testified, and for the purpose of the record I

13  want to make the offer.   They are the new maps.

14  THE COURT:   May they be received?   Hearing no objection,

15  they will be received in evidence.

16  Exhibits 281, 281-A, 29-AE and 29-AF all in evidence.

17          (Plaintiff's Exhibits 281, 281-A, 29-AE and)
18          (29-AF received in evidence.                )

19  THE COURT:   I don't find that Government's 280-A and

20  280-B are in evidence -- those hydrographs of Ysidora.   Does

21  your record show they are in evidence, Mr. Clerk?

22  THE CLERK:   No your Honor.

23  THE COURT:   Do you remember there was some objection at

24  the time?

25  MR. VEEDER:   That is correct, there was.

P 52

1    THE COURT:  Do you want to get them in?

2    MR. VEEDER:  Yes, I will offer them now, your Honor.

3    THE COURT:  280-A and 280-B received in evidence.

4         (Plaintiff's Exhibits 280-A and 280-B are)
         (received in evidence.                    )
5

6    MR. VEEDER:  It was brought to my attention again in

7    regard to 29-AF and 29-AE that those are advance sheets that

8    are subject to correction by the U.S.G.S.

9    THE COURT:  If later ones come out, you may substitute.

10   MR. VEEDER:  Thank you.

11   THE COURT:  Where do we stand on Tucalota Creek?

12   MR. SACHSE:  Mr. Veeder wrote a memorandum dated March

13   31, with a copy to me, in regard to the findings.  Do you

14   have it before you?

15   THE COURT:  Yes, I have it here.  That brings up these

16   documents that you handed me to look at this morning.  Here

17   is a compilation of lands riparian to Tucalota Creek and

18   valley.  Is that the same area that is covered by your

19   interlocutory judgment?

20   MR. VEEDER:  That is correct.

21   MR. SACHSE:  Your tabulation covers more.

22   MR. VEEDER:  That is correct.  But all the parcels that

23   are involved are presently there.

24   THE COURT:  What map will show us this Tucalota?

25   MR. VEEDER:  You mean the geology of it?

P 53

1    THE COURT:  Yes, and the section numbers.

2    MR. VEEDER:  I think 15-E will give you Tucalota Creek,

3    your Honor.

4    THE COURT:  Get 15-E out, Mr. Clerk.

5    Well, this does not show what I am trying to get at.

6    Your findings start, "Tucalota rises in Section 26 Range 1

7    West 6 South," and Section 26 is clear over in here.

8    MR. VEEDER:  Here is Exhibit 15.  They are not numbered

9    on this, but I think we can figure them out.

10    THE COURT:  I think I have them numbered on my copy.

11    Let's see if I have.

12    My copy is pretty beat up, but I think it will show

13    what I am getting at.

14    Here is Section 16 that you are talking about, isn't it,

15    1 West 6 South?  So your findings say that it starts here

16    in Section 26, it runs down through 34 and 33 and then it

17    runs down through 4987.

18    MR. SACHSE:  This is where we started.

19    THE COURT:  Oh, 1 East.

20    MR. SACHSE:  Yes your Honor.

21    THE COURT:  Section 26 comes down through here, and

22    then down through 46, etc.

23    MR. SACHSE:  Yes.

24    THE COURT:  If these findings were drawn up on this

25    creek, which would take Tucalota, where do you take it to?

P 54

1    MR. SACHSE:  Colonel Bowen drafted this for me and we

2    took it to the junction with Santa Gertrudis, I believe.

3        Did you take it right to there, to the barrier (indica-

4    ting)?

5        COLONEL BOWEN:  Yes.

6        THE COURT:  Which is almost to the basin line.

7        COLONEL BOWEN:  Yes.

8        THE COURT:  Then that leaves out, if this finding is

9    signed, it leaves all this area in here which might be

10   tributary to the creek but which should be out of the case.

11   How do you propose to do that?

12       MR. SACHSE:  I think I can partly answer that.  Colonel

13   Bowen supplied me with a list of names.  All this was in-

14   tended to be was those land owners who are riparian to

15   Tucalota, and you will observe the tabulation.  We ignored

16   completely in this finding people who might be just overlying

17   basement complex with no riparian right.

18       THE COURT:  So this was the area of stringers of

19   alluvium.

20       MR. SACHSE:  This was the form, if you remember, we were

21   going to use as a test to try to draft something that would

22   apply some of the stringers.

23       THE COURT:  So it would follow on down to practically

24   the basin line.

25       MR. SACHSE:  That is right.

P 55

1    THE COURT:  So why can't it be signed up and get rid

2    of it?

3        MR. VEEDER:  I suggested that there be added to it the

4    irrigable acreage.  I see no reason why it shouldn't be done.

5    We have the descriptions there.  If you will notice what I

6    said there.

7        THE COURT:  I notice in Finding VII, which says that

8    this land described is all riparian, and then it says on

9    line 9, "The amount of water which can be drawn from Tucalota

10   Creek and put to beneficial use during and immediately after

11   such periods of heavy precipitation and runoff is negligible

12   and such withdrawal left no material effect on the flow of

13   Tucalota Creek or the Santa Margarita River."  Does that

14   take care of our problem?

15       MR. SACHSE:  Mr. Veeder's memorandum on the 31st says

16   that he wants a basis for determining the respective rights

17   of these riparian claimants, and frankly when I drew these

18   it was on the assumption that these were being thrown out of

19   the case, that their rights were negligible.  But in his

20   memorandum of the 31st he has this same thing that we argued

21   about so heatedly a little while ago.

22       THE COURT:  I would see no objection to listing this

23   irrigated and irrigable acres as long as VII reads as it

24   does, that any use that they make of the surface waters of

25   this stream -- and I take it this is largely concerned with

P 56

1  surface water in that paragraph -- is negligible.

2  MR. SACHSE:  It was my intention to write this, and I

3  hope I succeeded, in such a way that each of these land

4  owners would have a riparian right only at such time as there

5  was surface flow when the alluvium was saturated; that any

6  other water they took was outside the case.  That is what

7  I tried to write.

8  MR. GIRARD:  I don't think it does any harm to list the

9  irrigable acreage.

10  MR. SACHSE:  I don't think it does any harm.

11  THE COURT:  Aren't we ready to do this?

12  MR. VEEDER:  Yes, and they are there now.

13  MR. SACHSE:  Except you also say if the irrigable

14  acreage is added then there will have to be revisions in the

15  findings.  What revisions in the findings now?

16  MR. VEEDER:  They are not in the findings, Mr. Sachse.

17  The irrigable acreage involves an addition which is a change

18  in the finding.

19  MR. SACHSE:  You say if irrigable acreage is added

20  revisions in the findings and related documents will be

21  necessary.  Do you contemplate any changes in the paragraph

22  his Honor just read and the others where I am, in effect,

23  saying that riparian is negligible and does not exist except

24  when there is surface water?

25  MR. VEEDER:  There would be no reason for additional

P 57

1    findings on that proposition.  If you put in that irrigable

2    acreage, I think there are complete findings there.

3         THE COURT:  You mentioned also prescriptive and appro-

4    priative rights.  As I recall, we haven't had any up there,

5    have we?

6         MR. VEEDER:  Yes.  I think this, and I put in the

7    caveat on that because I believe Mr. Sachse's former client,

8    Occidental College, has some impoundments up there, and I

9    want to be sure that your findings are reflective.

10        Wasn't Occidental your client?

11        MR. SACHSE:  Yes, but they aren't on that stream, are

12   they?

13        MR. VEEDER:  I may be in error.

14        MR. SACHSE:  Well, they were my client.  I have nothing

15   whatsoever to do with the case.  I have no authority to

16   speak for them.

17        MR. VEEDER:  The only reason I put that in there is

18   that we have an engineer's report on Tucalota and I thought

19   you would want to have that reflective.

20        THE COURT:  What could we say in here?  That no attempt

21   is made herein to find on or to draw these conclusions or

22   do anything about any appropriative or prescriptive rights?

23        MR. SACHSE:  I think we could, your Honor.

24        THE COURT:  If they exist, they will be taken care of

25   at some later interlocutory decree.

P 58

1    MR. SACHSE:  I think they could.

2    MR. VEEDER:  That would be all right with me as long

3  as it is held open that way, because I do think those people

4  are entitled to recognition.

5    MR. SACHSE:  The only reason I ever had this job, if

6  your Honor will recall, is that that was where I didn't have

7  anybody by that time.  I had absolutely nobody upon this

8  creek.  I don't care what we do with it.

9    THE COURT:  Let's identify these documents on riparian

10  and irrigable land.

11    Come forward, Colonel Bowen.

12    Shall we identify them?

13    MR. VEEDER:  I hadn't intended to go that far this

14  afternoon.  I was simply showing what was being done.  If

15  you want them offered in evidence, fine.  I think it would

16  be all right to put them in.  They are a summation, and I

17  think they are important.

18    THE COURT:  You don't object, do you?

19    MR. VEEDER:  Mr. Sachse shook his head.

20    THE COURT:  The next number would be 282?

21    THE CLERK:  282, your Honor.

22    THE COURT:  Colonel, I show you a booklet and tabulation

23  entitled "Land Riparian To Tucalota Creek and Valley."  Was

24  this prepared under your direction and supervision?

25    COLONEL BOWEN:  Yes your Honor.

P 59

THE COURT:  It marked 282 for identification.  And the material in there is correct, to the best of your information and belief?

COLONEL BOWEN:  Yes your Honor.

THE COURT:  Any objection to receiving it in evidence? It will be received in evidence as Exhibit 282.

(The document referred to was marked Plaintiff's)
(Exhibit 282 and received in evidence.            )

THE COURT:  Now, are you prepared to revise, to add your other Tucalota findings?

MR. VEEDER:  That is right.

THE COURT:  And submit it?  Do you have a decree in this, too?

MR. VEEDER:  There is an interlocutory judgment attached.

MR. SACHSE:  I think your Honor should leave a caveat for Mr. Krieger.  He has some clients there.  He approved them in their present form.

THE COURT:  We can try to get him down here by Friday. We can probably have them drawn up.

MR. STAHLMAN:  Do you take in the entire Tucalota Creek? Some of that goes through the Vail Ranch.

MR. SACHSE:  Colonel Bowen could show you.

COLONEL BOWEN:  In clarification, your Honor, I would like to state that the Vail are not included in this tabulation Plaintiff's Exhibit 282.  Tucalota Creek does flow

P 60

1    through a portion of the Pauba Grant.

2         THE COURT:  So you have not listed the Vail property

3    in it?

4         COLONEL BOWEN:  No sir.

5         MR. STAHLMAN:  It is not contained, then, in these

6    findings either, is it?

7         THE COURT:  What would be your thought on that?  To put

8    in a paragraph that a portion of the Vail land --

9         MR. STAHLMAN:  I think when the Vail findings are drawn

10   that should probably go into the Vail findings, whatever the

11   situation is.

12        MR. SACHSE:  I would think that Vail's rights would be

13   the same there, no greater and no less than the rights of

14   these other people on the stream.

15        THE COURT:  Except this.  These people on these creeks

16   will be interested in these findings and there should be a

17   caveat in there that the Vail property borders on this creek

18   and it is not included in here and will be taken care of in

19   a later judgment.

20        MR. SACHSE:  Definitely.

21        THE COURT:  A warning to them.  Otherwise, this is

22   supposed to be all the land on this creek, and my name doesn't

23   appear in there.

24        MR. SACHSE:  I follow you.

25        THE COURT:  Can you do that?

COLONEL BOWEN:  Yes sir.

THE COURT:  What about these others?  Are you prepared to do the same?

MR. VEEDER:  I am prepared to let them go in.

THE COURT:  All subject to correction.  Is that understood?

MR. GIRARD:  Yes.  I have no objection.

THE COURT:  Let's mark Warm Springs as 283, Tule Creek as 284 --

MR. SACHSE:  Does this Warm Springs, Mr. Veeder, include Diamond and Domenigoni Valleys?

MR. VEEDER:  Yes.

MR. SACHSE:  Then I move to strike all parts that relate to Diamond and Domenigoni Valley in light of your Honor's previous decision as being immaterial.

THE COURT:  I don't think it makes a lot of difference. I would just as soon include it.

MR. SACHSE:  I don't want to make a lot of work.  I don't want any misunderstanding that I am admitting --

THE COURT:  I understand your position.

Chihuahua 285 -- I am just marking them now -- Wilson 286, Coahuila 287.

Colonel Bowen, these exhibits 283 to 287 were compiled by you or under your direction?

COLONEL BOWEN:  Yes your Honor.

62

1    THE COURT:   And are they correct, to the best of your

2    information and belief?

3    COLONEL BOWEN:   Yes your Honor.

4    THE COURT:   And they show riparian land on those creeks,

5    together with irrigable and irrigated acres?

6    MR. VEEDER:   And gross acres.

7    THE COURT:   And gross acres?

8    COLONEL BOWEN:   Yes your Honor, together with surface

9    diversions and wells, if any.

10   THE COURT:   Is there any big land owner who is riparian,

11   who is left out in any one of these studies, as Vail was

12   left out in the Tucalota?   (A pause.) Well, you could check

13   it later.

14   What I am thinking about, if we draw similar findings

15   on other creeks and there is somebody left out to be included

16   in another judgement, I think the caveat should be there.

17   MR. VEEDER:   I think you are right.   I think we will

18   sooner or later have to cross-reference each one of those

19   to be sure there are no duplications and that there is

20   nothing left out.

21   COLONEL BOWEN:   I believe, your Honor, that we left out

22   such defendants as Oviatt, Stardust -- I was checking through.

23   THE COURT:   This can be checked at the time we get our

24   interlocutory findings and judgment.

25   COLONEL BOWEN:   Yes your Honor.

P 63

1   THE COURT:  Put in a caveat as to who is left out.  If

2   we already have a judgment as to them, we will refer to it.

3   If not, we will refer to it as a prospective judgment.

4   MR. VEEDER:  You are going to find that that occurred

5   in Aguanga Valley with those overlying rights.

6   THE COURT:  Is there any objection to receipt of exhibits

7   283 through 287 in evidence?

8   MR. SACHSE:  May I ask a question of your Honor?

9   THE COURT:  You want to object on Domenigoni Valley.

10   Warm Springs Creek 283 --

11   MR. SACHSE:  What is the effect of putting this in now?

12   THE COURT:  I want this material so that we can draw

13   these interlocutory judgments on these creeks.  Here we have

14   the names and the descriptions and the irrigated and irrigable

15   acres.

16   MR. SACHSE:  What about a creek in which your Honor has

17   indicated in your interlocutory judgment that the waters

18   aren't part of the stream system unless they are running on

19   the surface.  That is Diamond and Domenigoni.

20   THE COURT:  It may be surplusage, but I have no hesi-

21   tancy in listing the irrigated and irrigable acreage.  It

22   will do no harm.

23   MR. SACHSE:  I will not object to them.

24   I want to ask one additional question, for this record,

25   because I have ordered the record for Mr. Krieger.  Assuming

16,118

P 64

1   that parties have objections to Colonel Bowen's findings,

2   how does your Honor want those objections presented?

3          THE COURT:  You mean --

4          MR. SACHSE:  Disagreement with his figures.

5          THE COURT:  These are subject to correction.  Any party

6   may raise a particular parcel and call it to our attention.

7   Then we will be glad to hear it --

8          MR. SACHSE:  Or bring in additional evidence.

9          THE COURT:  And at the time    the interlocutory

10   judgments are prepared I think we should probably send the

11   proposed judgment out to everybody on the creek.

12          MR. SACHSE:  Very well.

13          THE COURT:  Don't you think so?

14          MR. VEEDER:  I think so.  I think we will cut the

15   stencils and get it done that way.  I don't know of any other

16   way, your Honor.

17          THE COURT:  Where is Tule?

18          COLONEL BOWEN:  Tule Valley, your Honor, is north of

19   the Oak Grove Valley, and the drainage from that valley enters

20   Temecula Creek approximately at Aguanga.

21          MR. SACHSE:  Have we a geological exhibit covering

22   Tule Valley yet?

23          MR. VEEDER:  Didn't it just go in?

24          MR. SACHSE:  Not the one you put in today.

25          MR. VEEDER:  Exhibit 275 is the Aguanga Valley.

p 65

1    MR. SACHSE:  Is it in evidence?

2    MR. VEEDER:  Yes it is.

3    MR. SACHSE:  May I see it for just a minute then.

4    Then, your Honor, I would have a moment or two of

5    questioning of Mr. Kunkel.

6    MR. VEEDER:  In regard to 275?

7    MR. SACHSE:  In regard to a possible objection to this.

8    MR. VEEDER:  To 275?

9    MR. SACHSE:  No, to the thing his Honor is looking at.

10    MR. VEEDER:  What is his Honor looking at?

11    MR. SACHSE:  This tabulation.  I don't know the number.

12    THE COURT:  The tabulation on Tule was 284.

13    MR. SACHSE:  284.

14    THE COURT:  Where is Tule shown on Exhibit 275?  Or is

15    it shown?

16    MR. SACHSE:  I have a client there, your Honor.

17    THE COURT:  What is your objection?

18    MR. SACHSE:  If I observe this Exhibit 275 correctly --

19    and I don't know what is in your tabulation -- if I observe

20    275 correctly, all my clients' lands are in basement complex,

21    and if he is in that tabulation I don't want his irrigable

22    acreage in -- if he is in basement complex.  Can you tell

23    me whether Tule Land and Cattle is in your tabulation?

24    COLONEL BOWEN:  I believe it is, Mr. Sachse.

25    MR. SACHSE:  Here we come to it, your Honor.  There is

P 66

1   a parcel that by the United States' own exhibit is 100%

2   basement complex, but they want to put in the irrigable

3   acreage.

4       THE COURT:  Well, it is shown in the exhibit, Mr. Sachse,

5   as a gross acreage of 1400 acres, irrigable 387.5, irrigated

6   none.  Now I would anticipate that, as in Tucalota, there

7   would be the same language, at least as to this property and

8   others in the same category, that you used in Paragraph VII

9   on Tucalota.

10      MR. SACHSE:  That is absolutely all I want.  If Mr.

11  Veeder will tell me that that is what they are going to do --

12      MR. VEEDER:  I have every reason to assume we are cutting

13  a pattern for that kind of situation.

14      THE COURT:  Except that here you may have two different

15  kinds of situations.

16      MR. VEEDER:  That is right.

17      THE COURT:  You may have property here over this younger

18  alluvium further south than Tule.

19      MR. VEEDER:  That is right.

20      THE COURT:  And then you have some further north.

21      MR. VEEDER:  It is extremely hard to draw a general

22  finding on it.

23      THE COURT:  Have you made any attempt, Colonel?  You

24  have outlined these parcels on another map, haven't you?

25      COLONEL BOWEN:  Yes, your Honor, those parcels are all

P 67

1   delineated on exhibits before the Court.  Those parcel

2   numbers on the Exhibits 282 through 287, your Honor, are

3   shown in the upper lefthand corner of each page by township,

4   range and section.

5       THE COURT:  There are very few parcels here.  Couldn't

6   you take your pencil maybe/check with Mr. Sachse on this and

7   show just what these few parcels are that you have included

8   on this Tule Creek set-up?

9       COLONEL BOWEN:  Yes your Honor.

10      MR. SACHSE:  That is satisfactory, your Honor.

11      THE COURT:  All right, exhibits 283 to 287 are received

12   in evidence.

13              (Plaintiff's Exhibits 283 to 287 inclusive were)
14              (received in evidence.                          )

15      THE COURT:  Have you got facilities to start to draw

16   interlocutory decrees on some of these other creeks?

17      MR. VEEDER:  We have, your Honor -- if you call me a

18   "facility".

19      THE COURT:  I doubt if you are going to do very much

20   typing.

21      Anything further tonight?  All right, ten o'clock

22   tomorrow morning.

23              (Adjournment until Thursday April 6, 1961 at)
24              (10:00 A.M.                                 )

25

P 69

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California this 5th day of April A.D 1961.

_____
Official Reporter

_____
Official Reporter