VOLUME NO. 141                                                    MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                    Plaintiff,

                                          No. 1247-SD-C

    ~LLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                    Defendants.

·

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         April 6, 1961

          Pages:    16,123 to 16,248

## FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
                              DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

- - -

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                  )
                    Plaintiff,)
                                  )
vs.                                )          No. 1247-SD-C
                                  )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                  )
                  Defendants.)

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, April 6, 1961

- - -

APPEARANCES:

    For the Plaintiff:               WILLIAM H. VEEDER, ESQ.
                                    Special Assistant to
                                    the Attorney General

                                    CDR. DONALD W. REDD.

    For the Defendants:

      Vail Company                     GEORGE STAHLMAN, ESQ.

      Fallbrook Public Utility      FRANZ R. SACHSE, ESQ.
      District, et al.,

      State of California             FRED GIRARD, ESQ.

P 2

## INDEX

(Discussion of Findings of Fact and)
(Conclusions of Law.                     )

(No witnesses.)

(No exhibits identified or received.)

P 3

SAN DIEGO, CALIFORNIA, Thursday April 6, 1961, 10:00 A. M.

(Other matters.)

THE CLERK:  3-1247-SD-C United States of America vs.
Fallbrook Public Utility District et al.

MR. SACHSE:  Your Honor, before we start proceedings
today, I am going to request your Honor to dismiss Mr. Veeder's
notice of motion, temporary restraining order and preliminary
injunction on the grounds that it is neither prepared nor
filed in accordance with the Federal Rules.

The Rules provide for a notice of five days, and as your
observed it was served, filed and noticed for yesterday.

Second, the Rules provide that the motion shall be
based upon either a verified complaint or a petition and or
affidavits.  We have no verified complaint, we have no
petition, we have no affidavits.

I realize that two weeks ago I permitted an argument
on an injunction with nothing but a verbal request.  I thought
at the time that I might be subject to the severest criticism
in not protecting the rights of my client.  At that time,
your Honor will recall, I asked Mr. Veeder to make any further
requests for ancillary relief in strict compliance with the
Code.  I think I will have to request that your Honor in-
struct him to comply with the Code.

THE COURT:  Motion denied.  It has been filed.  We can
fix a date which will give you five days notice.  Mr. Veeder

P 4

1   will be instructed to support the motion by an affidavit or

2   a verified petition.

3   　　　MR. VEEDER:  I don't believe the Federal Government has

4   to file a verified statement, your Honor.  I will do what

5   you want.

6   　　　THE COURT:  That is news to me.

7   　　　MR. SACHSE:  If the motion is denied on the time ground,

8   I will waive the verification, your Honor.

9   　　　MR. STAHLMAN:  One matter which is --

10   　　　THE COURT:  Are you talking about this injunction?

11   　　　MR. STAHLMAN:  No, I thought we passed it.

12   　　　MR. VEEDER:  Your Honor, in regard to the time --

13   　　　THE COURT:  He is entitled to notice on it.

14   　　　MR. VEEDER:  That is right.

15   　　　THE COURT:  When are you going to present it?

16   　　　MR. VEEDER:  I would like to have it set for next week.

17   The only reason I put the day yesterday is that we, having

18   a full agenda, I asked that it be put on some time next week,

19   if that is possible.  So your Honor, I spoke to you about

20   it in court yesterday in regard to time.  I have no idea

21   when your Honor would have the time.  I simply put yesterday's

22   date on it simply for the purpose of having it on the calendar.

23   　　　THE COURT:  What about Wednesday or Thursday next week?

24   　　　MR. SACHSE:  It is all right with me.

25   　　　MR. VEEDER:  That would be all right with me, your Honor.

P 5

1      MR. GIRARD:  I can't be here.  I presume --

2      THE COURT:  You will be excused.

3      Put it down for 9:30 on Thursday next week.  What date

4 is that, Mr. Clerk?

5      THE CLERK:  That will be the 13th, your Honor.

6      THE COURT:  All right.

7      MR. VEEDER:  Your Honor, in regard to the record in the

8 case -- and I want Mr. Sachse to be fully apprised of what

9 I would like to do -- I would like to have the testimony of

10 Colonel Bowen that we have already put in the record utilized

11 at that time, unless you want me to call him again and put

12 in the same evidence that went in.

13      THE COURT:  You intend to rely on that?

14      MR. VEEDER:  To a marked degree.

15      THE COURT:  You might as well prepare and serve on

16 counsel a reference to the parts of the evidence in the

17 record upon which you are going to rely.

18      MR. VEEDER:  That is what I will do.  It may be that

19 there will be further developments that I will want to put

20 into the record, but certainly from the standpoint of what

21 is in the record now I don't think we should have to repeat

22 it.

23      MR. SACHSE:  If you will advise that you depend upon the

24 transcript of Colonel Bowen for a certain day --

25      MR. VEEDER:  And for such additional --

P 6

1     MR. SACHSE:  And anything else you want in the transcript.

2     MR. VEEDER:  Yes.

3     THE COURT:  Mr. Stahlman.

4     MR. STAHLMAN:  In the interest of not overlooking the

5     situation, in connection with the preparation of these findings,

6     as we proceed through these various subdivisions of the water-

7     shed, your Honor will recall, some time ago there was in

8     contemplation a program, the Government was going to see

9     whether there were variances on various properties, etc.  I

10    merely desire to call it to your attention to see if we have

11    any of those situations or whether they have checked it, so

12    that the title record of riparian status will be established.

13    MR. VEEDER:  I have discussed the matter with the title

14    insurance companies, and I don't believe there are at this

15    point any that we should spend the money on, Mr. Stahlman.

16    MR. STAHLMAN:  All right.

17    MR. VEEDER:  I will notify the parties and we will under-

18    take designation of any areas that I think is requisite.

19

20

21

22

23

24

25

THE COURT: What shall we take up next? Shall we go over the findings proposed at my request on the Vail judgment?

MR. GIRARD: Yes, your Honor.

THE COURT: Mr. Veeder, are you prepared?

MR. STAHLMAN: Maybe Mr. Veeder will waive findings, your Honor.

MR. VEEDER: Am I prepared? Yes, I guess so, your Honor. Yes, indeed, I am.

THE COURT: What suggestions do you have with respect to the draft that has been proposed?

MR. VEEDER: Are we looking at --

THE COURT: Findings of fact and conclusions of law.

MR. VEEDER: From Mr. Girard? That is what we are talking about?

THE COURT: Yes. As a matter of fact, we should probably lodge them, Mr. Clerk. Will you stamp them "Lodged," and they will be lodged as of this date although you have received copies of them heretofore?

MR. GIRARD: Maybe Mr. Veeder may choose to go through these one by one and just express his objections. If he wants to do it that way, and the same with Mr. Sachse, fine.

THE COURT: Do you have anything to add?

MR. GIRARD: I would have a change in the page, your Honor, on the interlocutory decree.

THE COURT: The last page?

t-2

1    MR. GIRARD:  Yes, Page 2 of the interlocutory decree.

2    THE COURT:  Yes.

3    MR. GIRARD:  This is just a suggested decree?

4    THE COURT:  Yes.

5    MR. GIRARD:  On Line 5, something to the effect that this interlocutory decree is not presently operative, is not appealable and is not final.  In other words, I think if there is to be an injunction here we don't want to get into the problem of enjoining the United States right now from not giving us an appeal.  In other words, the main purpose of the interlocutory decree was just to dispose of this now.

12    MR. STAHLMAN:  Why not say, "Not to become operative"?

13    MR. SACHSE:  "Not presently operative."

14    MR. STAHLMAN:  How would this be, "not to become operative until the final decree in this action."

16    THE COURT:  I would suggest this after the words "is not final" --

18    MR. VEEDER:  On which are you now, your Honor?

19    THE COURT:  The last page of the decree, Page 2 of the decree.  Do you have it before you?

21    MR. VEEDER:  Yes.

22    THE COURT:  On Line 5, after the words "is not final" insert "and shall not be operative until made a part of the final decree".

25    MR. GIRARD:  Fine.

t-3

THE COURT:   "and this Court expressly reserves", and so forth.   Or maybe we should say "final judgment" as we said below instead of "final decree."

Is that satisfactory?

MR. GIRARD:  Yes.

THE COURT:  Any objection, Mr. Veeder?

MR. VEEDER:  There is one thing that I would like to inquire about.  Your Honor asked me the other day whether they are still exporting water from the watershed, and, of course, they are.

MR. GIRARD:  Who is exporting water from the watershed?

MR. VEEDER:  The Marines, the United States of America, and I wasn't quite sure of the implications of your Honor's inquiry at the time.

If I understand it correctly, it is understood by all parties that we are exporting water from the watershed, and certainly as against Vail Company there is no basis for a complaint, based upon this interpolation into the decree. Isn't that correct?

I am speaking only of the Vail Company's relationship with the United States.

THE COURT:  The point is this:  Since I am not making this immediately appealable, I felt, and Mr. Girard is correct that there should be something indicated in here that this is not effective until made a part of the final

16,132

t-4

decree, at which time you would get your appeal.  That means we continue to live with the stipulated judgment until this becomes a part of the final decree.

MR. VEEDER:  I just did not want to be flying under false colors, because we are thinking, at least, that we live with it.

THE COURT:  Do I draw the implication that you are thinking of ceasing to export water from the watershed?

MR. VEEDER:  Not at all; not at all.  I would not want anybody to have any false ideas about that.  Colonel Bowen is the one that is running the show out there.

THE COURT:  Then starting with the first page, of course, it starts out with the word "Proposed" in the title.  Are there any other additions or corrections, Mr. Girard or Mr. Sachse?

MR. SACHSE:  Your Honor, I have none particularly.  I think the party critically concerned is the United States, and if there is any objection as to form, I think Mr. Veeder might have some.

MR. GIRARD:  If you have any as to form, Mr. Sachse, I wish you would point them out.

MR. SACHSE:  I don't have any.

THE COURT:  I had a couple, and then as I read further along they were taken care of, and, of course, it could not all be put in one paragraph.

16,133

On Page 12, Line 31, and this is a very minor matter, but the word "its" in the last line probably should be "this."

On Page 13, Line 16, apparently the test is between November 1 and April 30th, and "and" should be corrected, too. It looks like "land."

MR. STAHLMAN: Your Honor, there is also one addition that I think can be made in Line 14.

THE COURT: Of what page?

MR. STAHLMAN: The same page, Page 13, where starting on Line 13, after the words "with the Department of Public Works, Division of Water Resources," I think there should be inserted there "of the State of California."

THE COURT: I will insert it.

MR. STAHLMAN: Yes. And on Page 14, Line 28 there is a misspelling. The word intended to be used is "utilized."

THE COURT: And I have a note here, too. Just a minute.

MR. GIRARD: Has everybody's copy on Page 14, Line 30, got the Roman numeral VIII?

MR. VEEDER: Mine has.

MR. SACHSE: Yes.

MR. GIRARD: All right. Your Honor, while we are at it, and while it is fresh in my mind, in your memorandum opinion I think there is one word omitted.

t-6

THE COURT:  Again?

MR. GIRARD:  I think it is omitted.  It is on Page 2 at Line 7.  It says, "This action was commenced January 25th, 1951 by the United States of America to quiet to its rights to water", and so forth.  It should be "to quiet title," I think.  That is the only mistake I found.

THE COURT:  Now, referring to the bottom of Page 14, Lines 28 to 31.  Well, just a minute.

MR. GIRARD:  I think, your Honor, when I drafted those last lines the opinion was changed slightly.

MR. SACHSE:  There was an addendum to the opinion.

MR. GIRARD:  Yes, there was an addendum to the opinion, so that when I drafted this, it wasn't in there, to the effect that the latest evidence on this shows they are down some.  Footnote 11.

THE COURT:  Footnote 11.

MR. STAHLMAN:  You have footnotes?

MR. GIRARD:  To the opinion.

MR. STAHLMAN:  Oh, to the opinion.

THE COURT:  My first inquiry here is whether since you refer to the safe annual yield, whether we should make some finding as to the amount of water in the basins and flow, or, on the other hand, I don't know that I am prepared to say that we can on the present record say what the safe annual yield of the basins is.

t-7                                                                          16,135

1      MR. GIRARD:  I don't think you can either, your Honor.

2   The evidence that I was thinking about when I drafted this

3   finding was the testimony of Mr. Illingsworth with respect

4   to the fact that with the present uses and amounts of water

5   that could be taken from the basins without complete deple-

6   tion, and I don't think that is the same as the safe annual

7   yield.  You are probably right.  I don't think he did make

8   an estimation as to the safe annual yield.

9      THE COURT:  What about substituting this at Line 28:

10   There is the word "has" and then insert "in large part" -- I

11   don't like this, and I am going to change it-- "satisfied

12   its needs from said basins"or "has been able to satisfy its

B-3   13   needs from said basins as recharged."

14      MR. GIRARD:  Would you state that again, your Honor?

15      THE COURT:  Let's try it again.  So it will read some-

16   thing like this:  First, I would insert on Line 28 after the

17   word "has" the following, "been able in large part to

18   satisfy its needs from said basins as annually recharged."

19      MR. SACHSE:  And delete what?

20      THE COURT:  And delete "not fully utilized the safe

21   annual yield of said basins".

22      MR. SACHSE:  "has been able in large part to satisfy

23   its needs" or " has been able to fully satisfy its needs"

24      MR. VEEDER:  Now, we are not using, your Honor, all the

25   water we could use.  That is the point.

t-8

THE COURT:  Let's go back.  There has been a flow maintained at the narrows.  It is true that that flow may in some small part have done some recharging.  I don't think it has done very much in view of the loss of water from the narrows on down, and in view of other uses between the narrows and the Government use, and I think that if the Government had to rely upon that to recharge its basins, they would not have been recharged.  They would been recharged by runoff, also in the winter, both from the main stream of the Temecula, and from the Sandia, and-- what is the other one?

MR. SACHSE:  De Luz.

THE COURT:   -- De Luz, and other creeks below there.

C fls

16,137

C

P 7

1    MR. SACHSE:  May I get this straight as to the language.

2    THE COURT:  ". . has been able, in large part, to

3    satisfy its needs from said basins as annually recharged."

4    MR. SACHSE:  I see.

5    MR. VEEDER:  Perhaps I failed to make myself clear.

6    The needs of the United States have not been met.

7    MR. STAHLMAN:  Put in there "legal needs".

8    MR. VEEDER:  No, I am saying that the needs have not

9    been met.

10   THE COURT:  What needs have not been met?

11   MR. STAHLMAN:  There is more than you need in the water-

12   shed.

13   THE COURT:  Just a minute.  What needs have not been met?

14   MR. VEEDER:  They are certainly not using all of the

15   water that could be beneficially used on the Camp.  There

16   have been limitations and restrictions.

17   THE COURT:  If you haven't been able to use all the

18   water you need, it is about time you quit exporting water

19   to irrigate on the mesas.

20   MR. VEEDER:  There is nothing wrong with using water

21   for agriculture.

22   THE COURT:  Outside the watershed.

23   MR. VEEDER:  Certainly under the stipulated judgment

24   as against Vail Company we could do that.

25   Leave it in the way it is.  I am not agreeing to it,

P 8

1   but I want my objection noted as we go through all the other

2   findings.

3       THE COURT:  Well, insert "lawful" in front of "need" --

4   "lawful needs."

5       Now I don't know.  This better satisfies me in that it

6   gets away from a finding on safe annual yield.

7       MR. SACHSE:  I think you are correct.  There was no

8   testimony from anybody on safe annual yield.

9       THE COURT:  There may have been from Mr. Illingworth.

10      MR. SACHSE:  I don't think he stated it as safe annual

11  yield.

12      MR. GIRARD:  He testified that the amount of water the

13  United States was using was within the safe annual yield,

14  but he didn't say what it was.

15      MR. STAHLMAN:  That is right.

16      THE COURT:  Now, I am wondering if we should add to

17  this paragraph that since May 1958 there has been a slight

18  lowering of water levels, but that a great amount of water

19  still remains in the basin.  The effect of the impact of the

20  water year of 1960 is not yet apparent.

21      MR. SACHSE:  I think you could take the last five lines

22  of your footnote 11 of your opinion and add them to reflect

23  that fact.

24      THE COURT:  That is what I am thinking about -- add them

25  on to XIV.  I would be interested to see what happens here

P 9

1  this summer, because this is certainly a dry year and how

2  much these basins will be affected, I think, still remains

3  to be seen.   There has not been a great lowering of water

4  levels.

5      MR. STAHLMAN:  Which page?

6      MR. SACHSE:  The very last page, the last five lines.

7      MR. GIRARD:  Copy footnote 11.

8      MR. SACHSE:  Not the whole footnote.

9      THE COURT:  The last five lines.  Well, you would have

10  to say, "There has been since May 1958 . ."

11      MR. SACHSE:  "There has been since May 1958 . . "

12      THE COURT:  Now Mr. Stahlman, you had a suggestion?

13      MR. STAHLMAN:  Yes, your Honor, on page 7, I think, was

14  a word out of context on line 9.  Starting on line 8, it says,

15  "The waters of said Santa Margarita River have been made by

16  persons who are not parties to the litigation before the

17  Superior Court. . "  It should be "were not parties".

18      THE COURT:  Well, I suppose "were" would be better than

19  "are".  Is that what you are suggesting?

20      MR. STAHLMAN:  Yes your Honor.

21      THE COURT:  Any other suggestions?

22      I have one other here.  On page 15, XLI, "That it is

23  not true that the rights of the United States of America to

24  the use of waters of the Santa Margarita River and its tribu-

25  taries have been lessened, endangered or affected . . "

16,140

P 10

1    What I have put in doesn't add a thing, because this speaks

2    as of the date it is signed.  I said "as of this date".  I

3    don't think that adds anything.

4        MR. STAHLMAN:  You could say "heretofore".

5        THE COURT:  Well, does it add anything?

6        MR. STAHLMAN:  I don't think so.

7        THE COURT:  It speaks as of the date it is signed.

8        MR. SACHSE:  What is the change, then?

9        THE COURT:  I was going to insert, after the word

10   "affected," "as of this date" --  "as of the date of this

11   decree".  Well, I think I will put it in.  It may be surplusage,

12   but it may make it clear:  "as of the date --

13       MR. GIRARD:  As of the date of these findings.

14       THE COURT:  " . . as of the date of these findings".

15       Any other suggestions?

16       Mr. Veeder, do you want to make any record on this?

17       MR. VEEDER:  I thought the plan was that we would go

18   through and make comments.

19       THE COURT:  Yes.

20       MR. STAHLMAN:  Yes.

21       MR. VEEDER:  From the standpoint of not editorial changes.

22   I think there are statements in here --

23       THE COURT:  Well, start out.

24       MR. VEEDER:  -- that should be clarified.  For example,

25   as to the quantity of water (on page 2, Paragraph II) the

P 11

1   statement is made "apportions the entire waters of said

2   river and its tributaries . . " Obviously, it would be

3   impossible  for the Court, and the Court did not undertake

4   in the case, to apportion.  It could not have apportioned

5   all of the waters.  The only rights that could have been

6   affected were the rights before the Court, and I think the

7   connotation that there was an effort to do more than that

8   is an error.

9       THE COURT:  All right, your objection is overruled.

10      What is the next one?

11      MR. VEEDER:  Your Honor, here is what I would like to

12  do, and it might save some time for your Honor.  I think

13  that we ought to file, if you desire me, a formal set of

14  objections.  If you want me to do that, I can do that.

15      THE COURT:  What good does that do?

16      MR. VEEDER:  All right, I want the record to show that

17  I am trying to cooperate with your Honor.

18      THE COURT:  What other objections do you have?

19      MR. VEEDER:  If we can go to page 3, line 25, starting

20  there, "provided for a minimum surface stream flow, and as

21  to the Rancho Santa Margarita provided that said Rancho

22  could use the waters allocated to it both within and without

23  the Santa Margarita River watershed."  Now the Vail Company

24  was permitted to do the same thing.

25      MR. SACHSE:  That is right.  That is a proper correction,

P 12

1     as to both parties.

2          MR. VEEDER:  Without regard to the watershed.

3          MR. SACHSE:  That is right.

4          MR. STAHLMAN:  Although we never did.

5          MR. VEEDER:  Yes, you did.  You irrigated Government

6     ground up there.

7          MR. STAHLMAN:  Not outside the watershed.

8          MR. VEEDER:  It is non-riparian land.

9          MR. STAHLMAN:  That is right.

10          MR. GIRARD:  Then we would just strike out "provided --

11          THE COURT:  Wait.  Vail was not permitted to use water

12     outside the watershed.

13          MR. VEEDER:  Yes.

14          THE COURT:  Your were permitted to use water on non-

15     riparian land within the watershed.

16          MR. STAHLMAN:  Within the watershed.  And it was desig-

17     nated.

18          MR. VEEDER:  But the stipulated judgment surely permitted

19     them to use it outside the watershed.

20          MR. STAHLMAN:  No.

21          MR. VEEDER:  It says "upon any lands of either of the

22     parties."

23          MR. STAHLMAN:  No, it does not.

24          MR. VEEDER:  Read it.

25          MR. GIRARD:  I have it here.

P 13

1    MR. VEEDER:  It will be Paragraph III, I believe, Mr.

2    Girard.

3        MR. STAHLMAN:  The stipulated judgment indicates the

4    lands upon which Vail may apply the water.

5        MR. VEEDER:  I think it says to any lands.

6        MR. GIRARD:  It says "any of the lands hereinafter

7    mentioned".

8        MR. STAHLMAN:  Then it mentions the lands, which are

9    not outside the watershed.

10       MR. VEEDER:  I think if you check, you will find that

11   they are outside the watershed.

12       MR. GIRARD:  It specifies the lands.

13       MR. STAHLMAN:  The Santa Rosa is the only place there is

14   water outside the watershed.

15       THE COURT:  It did not provide that you use it outside

16   the watershed.

17       MR. STAHLMAN:  No sir.

18       THE COURT:  But it provided that you might use the water

19   on non-riparian land.

20       MR. STAHLMAN:  Yes.

21       MR. VEEDER:  All right, put that in.  I think that is

22   important.

23       THE COURT:  Then add to the end on line 29 "and as to

24   Vail provided that Vail could use the waters allocated --

25       MR. SACHSE:  Could use its allocated waters?

16,144

P 14

1      THE COURT:  -- could use its allocated waters on non-
2  riparian land."

3      MR. STAHLMAN:  As specified.

4      I am glad Mr. Veeder brought that up.

5      MR. SACHSE:  On specified non-riparian land I think
6  would be correct.

7      MR. GIRARD:  On specified non-riparian land.

8      THE COURT:  All right, " . . on certain specified
9  non-riparian land."

10     MR. VEEDER:  And those lands were, in fact, irrigated.

11     MR. GIRARD:  That is not in this finding.

12     MR. SACHSE:  That has nothing to do with this finding,
13  Mr. Veeder, I don't think.

14     MR. VEEDER:  All right.  May we go ahead?

15     THE COURT:  Yes.

16     MR. VEEDER:  Page 3, Paragraph V.

17     THE COURT:  At the bottom of the page.

18     MR. VEEDER:  "That the waters subject to the litigation
19  set forth in the above findings are the same waters which
20  are in litigation before this Court; . . "  I believe that
21  is an incorrect statement.  I believe the only waters that
22  were in litigation between Vail Company and Rancho were the
23  respective rights of those two parties and the intervenors;
24  and here all of the water rights of the entire watershed
25  are involved.

P 15

1    MR. STAHLMAN:  Certainly the waters that were in liti-

2    gation in that case certainly are in litigation in this case.

3    MR. VEEDER:  But they are not the same waters.

4    MR. SACHSE:  They are the same waters, Mr. Veeder.  They

5    are different water rights.  They are the same waters.

6    MR. VEEDER:  The waters were never in litigation, your

7    Honor.

8    THE COURT:  If you want to be technical -- those waters

9    have long passed -- if you want to be technical, it should

10   read, "that rights to the use of waters of the Santa Margarita

11   stream system were the subject of the litigation above set

12   forth and are the same rights to the use of water which are

13   in litigation before this court; . . "

14   MR. VEEDER:  You can overrule my objection.

15   MR. SACHSE:  I don't that is correct, your Honor.  I

16   think yours is much more nearly correct.  I think your

17   prepared finding is much more nearly correct than your

18   corrected one.  I think that the waters, which the findings

19   themselves say, were in litigation in the Santa Margarita-

20   Temecula stream system.  The waters were.

21   THE COURT:  Mr. Veeder is being technical, and this is

22   true.  You don't litigate about a particular bucketful of

23   water.  You litigate about the right to use water.

24   MR. GIRARD:  That is correct when you are talking about

25   rights.  But I still think it is proper to say "The Santa

P 16

1   Margarita River is in litigation," in the finding, even

2   though technically speaking it is the rights to the use of

3   the water of the Santa Margarita. But I think it is proper

4   to say that the waters are the same. Because this finding

5   isn't meant to deal with rights. It is meant to deal with

6   the corpus of the stream itself.

7       MR. VEEDER:  But the corpus was never before the Court,

8   and it could never be before the Court.

9       MR. SACHSE:  There have been a lot of findings on it.

10      MR. VEEDER:  I don't believe you follow what I am saying.

11      THE COURT:  Say it again.

12      MR. VEEDER:  Is it all right if I don't stand up when

13  I address the Court?

14      THE COURT:  Yes sir.

15      MR. VEEDER:  There are two basic factors that are in-

16  volved in my objection. The litigation, the res, the subject

17  matter in the case of Rancho Santa Margarita vs. Vail were

18  the respective rights of the ranchos and not the waters at

19  all. But if you want to use the word "waters" as being

20  synonymous with "rights," you should then say "The waters of

21  the two ranchos," because there could not be in litigation

22  rights of parties who were not before the Court. That is

23  my objection.

24      MR. STAHLMAN:  What are the "waters of the two ranchos,"

25  then?

16,147

P 17   1          THE COURT:  Take a short recess.  I think we can improve

2     upon the sentence.  See what we can figure out.  Maybe by

3     an addition by a preliminary line to the effect that the

4     rights on the Santa Margarita were the subject matter of the

5     litigation and the waters, etc.

6          (Recess.)

D fls.  7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16,148

D-1
t-9

1    THE COURT:  All right.

2    MR. GIRARD:  Mr. Sachse has suggested a change that I

3    think is a good one, and which makes clear the actual intent

     of this particular claim, and that is to add after the word

5    "waters" on Page 3 in Line 31.  It says, "That the waters

6    subject to", and instead of that say, "That the waters in-

7    volved in the litigation set forth in the above findings are

     the same waters which are involved in litigation before this

9    Court."

10   I don't think that is an improper statement.  I think

11   the waters of the Santa Margarita are involved in this

12   litigation.

13   MR. VEEDER:  They are not the same waters, and that is

14   important.

15   MR. STAHLMAN:  I disagree on that.

16   MR. SACHSE:  I think they are.  I can see a little

17   logic to your argument on rights, but not on waters to which

18   the rights apply.

19   MR. VEEDER:  Your Honor, I hate to take your time on

20   this.

21   THE COURT:  Is it your point now that those waters back

22   in 1930 and 1940 are those --

23   MR. VEEDER:  Not at all.

24   THE COURT:  That is not your point?

25   MR. VEEDER:  No.  I will use the term "waters" as

16,149

t-10

synonymous with "rights," and I will say this, that all of the rights to the use of water in the entire watershed are before this Court.

That was not true in regard to the Santa Margarita case.

MR. STAHLMAN:  This does not say that.

MR. SACHSE:  This does not say that.

THE COURT:  We say that at other places in these findings.

MR. VEEDER:  Let me go ahead because I want to know the meaning of this.  You say "are the same waters," -- on Page 4 in the first line "are the same waters."

What does that mean?  Does that mean they are coextensive and identical with?

MR. SACHSE:  The waters, not the lake.  In other words, I can say that the Sacramento River is involved in a lawsuit, and it still involves the waters of the Sacramento River, and not the rights.

MR. VEEDER:  Then take out the word "same".

MR. SACHSE:  No, they are the same.

MR. GIRARD:  They are not the same technically, in the sense that they passed down a long time ago.

THE COURT:  He has waived that point.

MR. GIRARD:  But they are the same in the sense of the res.

MR. SACHSE:  Mr. Veeder, I think that the clearest

16,150

1    answer would be that Mr. Veeder asserts rights to all of the

2    waters from the highest point of this watershed, and that

3    the Rancho asserted rights to all of the waters.

4         THE COURT:  I agree.

5         MR. VEEDER:  No, you have pointed up the point.  When

6    the Santa Margarita instituted its proceedings against the

7    Vail Company, it was claiming only its claim, and the Court

8    had jurisdiction only of the extent of the Rancho's rights,

9    which were much less than the rights which are involved in

10   this litigation.

11        THE COURT:  All right.  Your objection is overruled.

12   I will make the amendment suggested by Mr. Girard in Line 31,

13   after the word "waters" to insert "involved in," and to

14   strike out "subject to," so that it will read, "That the

15   waters involved in the litigation set forth in the above

16   findings are the same waters which are involved in litigation

17   before this Court."

18        MR. VEEDER:  Now, I am on Page 4, Roman numeral VI.

19   That in my view is a conclusion of law, and I don't believe

20   it is appropriate in findings, and if you want to treat it

21   here as a finding rather than as a conclusion of law, I

22   would, of course, object to it on the ground that I do not

23   believe that the conclusion expressed is correct, but that

24   what transpired was that everything was merged and super-

25   seded by the judgment ultimately stipulated to.

t-12

THE COURT:  Now, have we carried this over as a conclusion of law?

MR. GIRARD:  Yes, there is a conclusion.  I don't know whether it is as lengthy as this one.

THE COURT:  Let's check it a minute.  It is true that we should try to separate them, but if is a repetition, that is not fatal.  Sometimes it is difficult to say whether they are conclusions of fact or conclusions of law, and this adds

D-2

continuity to the story told by these findings.

MR. GIRARD:  Yes, the first one is a conclusion of law:

"That the 1930 findings of fact and judgment and the 1940 judgment must be considered as one judgment."

THE COURT:  All right.  Your objection is overruled, Mr. Veeder.

What is the next matter?

MR. VEEDER:  Page 5, Roman numeral X.  May I read it, because I think we can pick it up faster in this way:

"It is true that as a result of the pumping of said ground waters as set forth in Finding VIII above the normal flow of the Santa Margarita River downstream from Temecula Gorge has not reached the Ysidaro Narrows but has instead recharged the ground waters within the military enclave with the result that the normal flow at Ysidaro Narrows (Station 6) during the irrigation season has been zero and therefore of no practical use

t-13

16,152

1       in allocating the waters as provided in the 1940

2       judgment."

3       Now, your Honor, I don't think that is a proper

4  conclusion.  I think that Station 6 is important, and will

5  always be important in the administration of the stipulated

6  judgment, and our view is that if there is more water going

7  out -- if there should come a time when water does go to the

8  ocean, that would become extremely important.

9       THE COURT:  Just a minute.

10      MR. VEEDER:  I don't see that it adds anything, and

11  I think it is very, very confusing.

12      MR. STAHLMAN:  Certainly it straightens out something

13  that was confusing, the stipulated judgment.

14      THE COURT:  Just a minute.  There should be a comma

15  after the word "above" in Line 22.

16      I am satisfied with it except that I think the words

17  "normal flow" tell the story if you want to insert after

18  "normal flow" "as contrasted with flood flow."

19      MR. GIRARD:  All right.  That is fine.

20      MR. SACHSE:  "Normal as contrasted with flood"?

21      MR. GIRARD:  "As distinguished from flood."

22      THE COURT:  Yes.  I think "distinguished" would be

23  better, "as distinguished from flood flow."

24      MR. VEEDER:  On Page 6--

25      THE COURT:  Wait a minute.  Is there any objection to

t-14

1    that?

2    MR. SACHSE:  No.  If I have it right, it will read,
3    "the normal as distinguished from flood"--

4    THE COURT:  No, "the normal flow as distinguished from
5    flood flow".

6    MR. SACHSE:  I see.

7    THE COURT:  All right.  What is next?

8    MR. VEEDER:  Page 6, Line 13, Finding XII.  I have a
9    comment on that for this reason, and I think it is extremely
10   important:  You are saying that the ground waters will be
11   recharged by runoff without regard to the maintenance during
12   the irrigation season of three second feet surface flow.

13   Your Honor, there is not any evidence in the record
14   that would support that conclusion, in my view.  The 3 second
15   feet during the period from April through November certainly
16   contributes substantial quantities of water to the ground
17   water body.

18   THE COURT:  Now, the 3 second feet--

19   MR. SACHSE:  Two and a half of which we can take.

20   THE COURT: -- over a period of a year would be how much?

21   MR. GIRARD:  1100 acre feet, is it not?

22   MR. VEEDER:  It will run 1800 acre feet a year.

23   THE COURT:  If it all went down?

24   MR. VEEDER:  That is right.

25   THE COURT:  First of all, you certainly have a loss from

t-15

phreatophytes?

MR. VEEDER:  Some loss.

THE COURT:  You also have an evaporation loss, and you have other users on the stream.  If you were dependent upon the 3 second feet to recharge your basin, you would not have anything.

MR. VEEDER:  I am not saying, your Honor, that we are relying entirely upon it, but it is important to us, and it is the only water in the stream during a good share of the summertime, and we think that it is important, and I want my objection to be noted in the record, that we believe that that 3 second feet is important.

Secondly, we believe that there is an increment into the Santa Margarita River in addition to the 3 second feet for a good share of the period after April 1st; there is runoff, and there has been some increase in surface flow during some of the months-- during the months from April maybe on down to July, so I don't believe it is right to say that the 3 second feet is unimportant.

MR. GIRARD:  Your Honor, I would like to just state briefly that I understand the exhibits of Mr. Illingsworth, which the State introduced, made the assumption that you just cut off all water at the Gorge, and the testimony was that the ground water basins of the military would be recharged.  I think that is the only evidence in the case

16,155

t-16

on that point.

MR. STAHLMAN:  And I think Mr. Veeder stated in the record of this case that the summer runoff is not important.

MR. VEEDER:  Well, I would like to say that if I said that I was in complete error.

THE COURT:  Mr. Veeder, you said it.

MR. VEEDER:  I would have to see it in the record, your Honor.

THE COURT:  You said it, and I think you were speaking honestly, that actually this 3 second feet was not important to you in the summer, that as to your ground water basins you were recharging them, and I think you were then concerned with the Fallbrook dam and the question was as to the recharging of these basins.

MR. VEEDER:  I retract it.  I don't recall saying it, but if I said it I retract it as being an error.

Let me proceed though on this point.  The evidence in this record put in by Colonel Bowen most recently shows that the release of the waters from Lake O'Neill make a very substantial increment into the Upper Basin, and it is highly important when we release that water into the basin for recharging.

Now, the accumulation of the 3 second feet into Lake O'Neill is of immense importance to us, and I believe that the facts show that the Upper Basin is recharged very

16,156

t-17

materially.  In addition, we must remember that the United States Naval Ammunition Depot is supported  entirely by summer flow.

So I do object to this.

THE COURT:  What about this on Line 13?  Before we doctor it all up, I will give you my thought, starting with the semicolon:  "that as of the date of these findings said ground waters" -- instead of "will be" -- "have been recharged by runoff following precipitation," and so forth.

MR. GIRARD:  Fine.  That is very good.

MR. COURT:  And we could also add "recharged also by increment below the Narrows," and we could also add "increment from release of waters from Lake O'Neill".

MR. VEEDER:  "And large quantities of sewage effluent."

THE COURT:  I am willing to add that.

MR. VEEDER:  I think it should be in there, and this is the time to talk about it.

MR. STAHLMAN:  Here, your Honor, this sewage effluent is going to have a great impact when it comes to arguing military use.

THE COURT:  Now, I think that is true, but now we are talking about what has recharged the ground waters of these basins, and what has recharged them has been the flood flow, and the increments below the Narrows, and this increment would be not only from flood flow, but seepages and so forth that

D-3

16,157

1   would come out of the hills that collect the waters during

2   the rainy season.

So there has been a flow at the Narrows, there has been
the release of the waters from Lake O'Neill, and also the
return of sewage, and in the findings we are trying to point
out that the 3 second feet is a very minor matter in the
recharge of these basins.

MR. VEEDER:  I think that the 3 second feet, your Honor,
during the period when there is a requisite that it be
delivered pursuant to the stipulated judgment will yield
upward of probably 1300 acre feet, and I am not talking about
the full year, but I am talking about the period when it is
required to be delivered, and I believe that is probably
20 to 25 per cent of the actual water used during that period.

MR. SACHSE:  You said it will yield that after going all
the way down the stream and with all the other uses?

MR. VEEDER:  I am just making that point, and I want to
be of assistance to you, and I don't believe your language
here is reflective of what is actuality now.

I believe that the 3 second feet during that period--
I would have to ask Colonel Bowen -- but I think the 3 second
feet is probably from, oh, 12 to 15 per cent of the water
used actually during that period.

Am I right, Colonel?

COLONEL BOWEN:  During the winter or the summer period?

16,158

t-19

1    MR. VEEDER:  During the summer period.

2    COLONEL BOWEN:  About that, yes.

3    MR. SACHSE:  Just a minute.  Let me ask Colonel Bowen a

4    question.

5    MR. VEEDER:  Now, do you mean --

6    MR. SACHSE:  Just a minute.  Colonel Bowen, is what you

7    were saying that the 25 per cent -- is that your figure, 25

8    per cent?

9    COLONEL BOWEN:  For the year.

10   MR. SACHSE:  For the year.

11   COLONEL BOWEN:  12 or 15 per cent for the summer

12   months.

13   MR. SACHSE:  For the summer.  Are you saying that 3

14   second feet of water for the summer months represents 25

15   per cent of the use at Pendleton for the summer months?

16   COLONEL BOWEN:  No, I wouldn't say 25 per cent.

17   MR. SACHSE:  15 per cent?

18   MR. VEEDER:  I changed that to 12 to 15 per cent.

19   COLONEL BOWEN:  12 to 15 per cent.

20   MR. SACHSE:  3 second feet at Pendleton represents 12

21   to 15 per cent of Pendleton's summer use; is that right?

22   COLONEL BOWEN:  It is about that.

23   MR. SACHSE:  Does 3 second feet of water at the Narrows,

24   at the Gorge, with the riparian withdrawals, between the

25   Gorge and Pendleton, with the Fallbrook appropriation between

16,159

t-20

the Gorge and Pendleton, with the evapo-transpiration loss between the Gorge and Pendleton, -- what percentage does that represent?

MR. VEEDER:  He can't answer that now.  He doesn't have his records.

MR. SACHSE:  I want to demonstrate that your answer that you have in the record here is meaningless.

THE COURT:  Have you made any calculations at any time, Colonel?

COLONEL BOWEN:  Yes, sir.  On Mr. Sachse's representation there, I know that we get zero flow during the summer, and starting with 3 second feet measured at the station on the Santa Margarita near Temecula, extracting the riparian uses, the Fallbrook two and one-half second feet, evapo-transpiration and seepage losses, we get no inflow at Camp Pendleton.

MR. VEEDER:  But that is because the water is stolen from us.  If it came down there--

MR. STAHLMAN:  Assuming your 600 or 700 acre feet that Fallbrook pumped out, you still would be --

MR. GIRARD:  Oh, let's not--

THE COURT:  One other question, Colonel:  Your answer presently is that in actual operation with 3 second feet at the Narrows, at Temecula, that equals zero at Pendleton?

COLONEL BOWEN:  Under present operation, that is correct

t-21

in the summertime, your Honor.

THE COURT:  Now, have you made any calculations as to what would be the result if Fallbrook did not take water from the stream?  They have not taken the two and one-half second feet, but they have taken -- we have figures here -- certain acre feet per year.  Do you have any idea if Fallbrook took nothing, and after the movement of water from the Narrows at Temecula, taking into account  phreatophytes, evapo-transpiration, --

MR. SACHSE:  And riparian.

THE COURT:  -- and riparian use, excluding Fallbrook use, what the net result would be at Pendleton?

COLONEL BOWEN:  I haven't made any calculations of that, your Honor.

I think the records, the U.S.G.S. records of the stream flow would give an indication, that is, those records prior to 1950.  It varies, of course, from year to year dependent upon the winter rainfall, and it also varies with the efforts to reduce losses by phreatophyte control, and so on, and substantial losses in the summertime  due to transpiration loss from the willows that grow in the canyons.

THE COURT:  Wouldn't it be a fair general conclusion that even if we excluded the Fallbrook use, a relatively small part of the 3 second feet would ever reach Pendleton in the summertime?

16,161

t-22

COLONEL BOWEN:  No, sir.  I don't believe that is logical, because there is only about a mile distance between Fallbrook's point of diversion and our easterly boundary where the river enters there.  As a matter of fact, the present location of Fallbrook's gaging station is well inside Camp Pendleton, and you take at the present time we have had a few hot days; for example, this spring I think there have been increased losses by evapo-transpiration and Fallbrook taking a lesser quantity than they ordinarily take in the dry months of the year, and we still have had a flow of around 3 to 4 second feet at the Fallbrook gage, which is inside Camp Pendleton.

THE COURT:  Of course, that flow is not made up entirely of waters coming from the Narrows.  That is made up undoubtedly of some of the flow--

MR. SACHSE:  Rainbow Creek and Sandia I think are in there.

THE COURT:  -- into the stream from the big area below the Narrows.  This is a difficult thing to do, but if we were to separate the  3 second feet at the Narrows, and just consider all these matters, that that was all the water that could possibly come down to the Camp, and excluding accretions to it  coming out of the creeks flowing into the Santa Margarita, water seeping in from areas that have been wet during the winter, isn't it true that by the time

16,162

t-23

E.fls

1    the specified 3 second feet started out at the Narrows, what

2    was left of it when it got to the Camp, even excluding

3    Fallbrook's use, would be far from 3 second feet?

Take   E

P 19

1    COLONEL BOWEN:  It would be less than 3 second feet,

2    yes, your Honor.

3        THE COURT:  I don't like to have you guess, but have

4    you ever made any calculations or figured what part of the

5    3 second feet would arrive, taking into account the riparian

6    uses that exist?

7        COLONEL BOWEN:  Well, it varied from day to day, almost

8    from hour to hour, your Honor.  It is rather difficult to

9    make any estimate.  I have not made any calculations.  It

10   would be possible to make some estimates by reviewing the

11   reported flow at the gauging stations.  But as your Honor

12   pointed out, they don't report any augmentation of stream

13   flow from tributaries between the stations.

14       THE COURT:  That is an unknown factor.  It would be

15   very hard to estimate.

16       THE WITNESS:  Yes sir.

17       MR. GIRARD:  It should be remembered also in considering

18   this that it is not proper for us to isolate Fallbrook's

19   application, because Fallbrook's application to take water

20   from the Santa Margarita River could not have been endangered,

21   affected or impaired in the slightest by the agreement between

22   Vail and the United States.

23       MR. VEEDER:  Of course, I disagree with that.

24       MR. SACHSE:  Mr. Veeder may disagree, but the Court

25   said --

P 20

1    THE COURT:  If you had a contract with Vail, how could

2    that bind Fallbrook?

3    MR. VEEDER:  Your Honor, the matter to me is extremely

4    simple.  Two riparians can certainly contract in regard to

5    the delivery of water, and that water is not open to appro-

6    priation.  It is that simple.

7    THE COURT:  This is your theory, Mr. Veeder, that when

8    the water was released at the narrows this was delivered to

9    the United States and that nobody else had any right to use

10    the water running down that stream.  That is the theory,

11    isn't it.

12    MR. VEEDER:  No; the riparians certainly had a right

13    to, but not the appropriator.

14    MR. GIRARD:  Why not the appropriator?

15    MR. VEEDER:  Because the stipulated judgment so provided.

16    MR. GIRARD:  The waters of the State are owned by all

17    the people, not by Vail.

18    MR. VEEDER:  That is contract water between two

19    riparians.

20    THE COURT:  Well, to follow your theory to a logical

21    conclusion, you have to assume that the Santa Margarita

22    River from the narrows on down is a conduit that belonged to

23    the Government and no one else had a right, either as a

24    riparian or as an appropriator, to take any of that water.

25    MR. VEEDER:  The point that I make is that that water

16,165

P 21

1      is in there, by and large, by reason of the stipulated

2      judgment, because certainly the Vail Company had power and

3      facilities to dry up that river at any time.  It is deliver-

4      ing water into the canyon on that basis.

5          THE COURT:  So what?  It is delivering the water to the

6      canyon.  After it is delivered to the canyon, can a riparian

7      use part of that water?

8          MR. VEEDER:  The stipulated judgment certainly recog-

9      nizes that.

10          THE COURT:  Leave out the two intervenors who were

11      allocated a certain amount.  Can other riparians use part

12      of that water?

13          MR. VEEDER:  Yes.  But not an appropriator.

14          THE COURT:  Why not an appropriator?

15          MR. VEEDER:  Because there is no surplus water there

16      available for appropriation.

17          MR. GIRARD:  Isn't that fact for the Water Rights Board

18      and the courts to determine, not for Vail and Rancho?

19          MR. VEEDER:  As between them, they can make that agree-

20      ment.

21          MR. SACHSE:  All you would have to do is to have

22      Sacramento make a contract to deliver half of the water of

23      the Sacramento River to Antioch downstream and nobody could

24      appropriate it inbetween.

25          MR. VEEDER:  I would like to renew my objection.  I am

P 22

1. not backing away from the proposition, because it will come
2. up again. But I am looking at the clock, and watching the
3. time in regard to this matter. As far as I am concerned, I
4. don't believe the statement is correct, because I do believe
5. that the 3 second feet is an important factor in the recharg-
6. ing of the basin. If you want to overrule it, that is cer-
7. tainly your Honor's discretion. But I want the record to
8. show that I am objecting to it.
9.    MR. GIRARD:  I think it is an essential finding, your
10. Honor, and I have no doubt that there is evidence in the
11. record and I think Mr. Illingworth's testimony is the only
12. testimony on that point, and his testimony assumed that you
13. cut off all surface flow right at the gorge. With even no
14. surface flow at all, his testimony was that the ground water
15. would be recharged sufficient to maintain the present uses,
16. which is as of the date of these findings, made by the United
17. States. I don't think there is any other hydrologic evidence
18. at all directed to that point.
19.    MR. VEEDER:  I don't believe it is true that the basins
20. are fully recharged. I believe that water goes in there.
21. I think year in and year out the contribution is important.
22. I can do nothing more than make that offer. The sewage
23. effluent is important -- the release from Lake O'Neill.
24.    MR. GIRARD:  I recall what Mr. Illingworth testified.
25. He said he did not take into account even the sewage effluent

P 23

1   return in his studies, because he thought it would be
2   negligible; that the basin was charged primarily by the
3   winter runoff.

4       MR. VEEDER:  What is your citation?  Do you have that?

5       MR. GIRARD:  No, I don't.  It is California's AC or
6   something.

7       MR. VEEDER:  I realize your Honor wants to move along.
8   I have my objection in there.

9       THE COURT:  All right, let me read just a minute.

10       MR. STAHLMAN:  Here is the point (examining documents).

11       MR. VEEDER:  There is an increment to the 3 second feet.

12       THE COURT:  I would propose to change XII something as
13   follows:  On line 10 insert "probably" -- "That the United
14   States has satisfied . . and probably can continue to
15   satisfy its reasonable and beneficial water requirements . .;"
16   insert "that as of the date of these findings said ground
17   waters have been recharged by" insert "winter runoff at the
18   gorge following precipitation . . " and then insert "and by
19   runoff and accretion downstream from the gorge".

20       MR. SACHSE:  Winter runoff at the gorge and by runoff
21   and accretions downstream --

22       THE COURT:  And by runoff and accretion downstream from
23   the gorge would be sufficient, etc.

24       MR. VEEDER:  Your Honor, I think that certainly after
                                               feet
25   April the release of 3 second/contributes.  I don't think

16,168

P 24

1    if your winter runoff is construed to mean that the delivery

2    by Vail at the gorge of the 3 second feet is unimportant,

3    I would necessarily have to object to that.

4        THE COURT:  I am overruling your objection as to the

5    fact that the 3 second feet is any material consideration

6    to the recharge of these basins.  I don't think an appre-

7    ciable amount gets down to do it.  That your basins are

8    recharged by flood waters that pass the gorge and, of course,

9    by flow following rains in excess of your present required

10   3 second feet, by flood waters that come down the tributaries

11   downstream from the gorge, and by other accretions from that

12   large area that probably continue, to a certain extent, to

13   feed into the stream and the basins below.

14       MR. VEEDER:  Well, you have overruled my objection.  I

15   have interposed my thought on it.

16       THE COURT:  I am not too satisfied with it, as I have

17   suggested.

18       What is your reaction, Mr. Girard?

19       MR. GIRARD:  I have no objection to the language you

20   suggested, Judge.  As I read it now, it reads, "That as of

21   the date of these findings said ground waters have been

22   recharged by winter runoff at the gorge and by runoff and

23   accretions downstream from the gorge following precipitation

24   to a degree sufficient to meet said reasonable and beneficial

25   water requirements . . "

P 25

1  THE COURT:  Yes.

2  MR. SACHSE:  That is what I have.

3  MR. GIRARD:  And I think that is perfectly true.

4  THE COURT:  The objection is overruled, Mr. Veeder.

5 What is your next point?

6  MR. VEEDER:  Turn to page 8, please, Finding No. XVII.

7 The statement there is that there are many parties who were

8 joined in the original Santa Margarita vs. Vail.  If you

9 look at lines 1 through 9, you will observe the statement

10 that there are a substantial number of persons who were not

11 parties to the litigation.  I would like to have added to

12 that "The Court, however, found that it was not necessary

13 to have a joinder of additional parties than those before

14 it".  I think that would be reflective of what actually

15 transpired.

16  THE COURT:  I am not concerned with how they didn't get

17 in there.  I don't think that adds anything.

18  MR. VEEDER:  I think that it is important that the

19 Court said that it had the proper parties before it pursuant

20 to which it could render judgment.

21  MR. GIRARD:  That Court said that, the Supreme Court

22 said that, and the Trial Court said it in 1930; but there

23 is not one word in the 1940 judgment about other parties,

24 and this is expressly conducted on 1940 and it was in the

25 1940 judgment that we are inserting the allegation.

P 26

1    MR. VEEDER:  I want you to read what was said there:

2    "It is true that in 1940 there were a substantial number of

3    parties (numbering several thousand) who were not parties

4    to the litigation in the Superior Court of the County of

5    San Diego . . "

6    MR. GIRARD:  That is right.

7    THE COURT:  It talks about 1940.

8    MR. VEEDER:  But your Honor, we are talking about the

9    litigation that was started in 1926, and the ruling in that

10    regard --

11    THE COURT:  Your position has been that the 1940

12    judgment wiped out everything that went on ahead.  Let's

13    not be inconsistent.

14    MR. VEEDER:  I am not being inconsistent, your Honor.

15    I am simply saying -- let's straighten this out, then.  Let's

16    forget about what is said here.  It is true that in 1940

17    when the stipulated judgment was entered there were many

18    people who were not parties to it.  Say it that way, then.

19    Because the connotation is extremely important here, because

20    in my view this sounds as if the question of parties had

21    not been considered by the Trial Court.

22    THE COURT:  I don't think it adds anything to insert

23    "after 1940 when the stipulated judgment was entered".  I

24    am willing to put it in, if that is what you are talking

25    about.

P 27

1     MR. GIRARD:  I have no objection to it.

2     MR. VEEDER:  I would like to have it in because of the

3 earlier statement that it is not true that the 1940 judgment

4 looked back, on page 4, Paragraph VI:  "It is not true that

5 the 1940 judgement referred hereinabove is a separate and

6 distinct judicial document isolated from the 1930 findings. ."

7 We have to be consistent, if we are going to break the

8 National Government's back here.

9     MR. STAHLMAN:  Just a minute.  Mr. Veeder is putting

10 something in there that shouldn't be in that.  This reads

11 just as it should.

12     THE COURT:  I am only inserting, and this is what we

13 mean by it, "that it is true that in 1940 when the stipulated

14 judgment was entered . . "  I am willing to put that in.

15     Any other objections to XVII?

16     MR. VEEDER:  Yes, on line 9 through 11 it is stated:

17 "it is true that the 1940 judgement expressly allocated

18 all of the natural flow of the Santa Margarita River to

19 the four parties to the proceeding; . . "  It should be

20 added there, in my view, that "however, the stipulated

21 judgment could not have legal effect upon parties other than

22 those before the Court at that time."

23     THE COURT:  The objection is overruled.  It is not a

24 finding of fact.

25     MR. VEEDER:  I agree that this partakes of a conclusion

P 28

1    of law.

2        THE COURT:  The objection is overruled.

3        MR. SACHSE:  It is in the conclusions of law, Mr. Veeder.

4        THE COURT:  What is your next one, Mr. Veeder?

5        MR. VEEDER:  I, of course, disagree with the legal

6    conclusion that is contained at line 11 through 15.  It is

7    strictly a conclusion of law: " . . it is true that said

8    allocation of all of the natural flow of said river to the

9    four parties as provided in said 1940 judgment is the basic

10   provision therein and cannot be isolated from the remainder

11   of said 1940 judgment."  It is strictly a conclusion.  I

12   don't think it is proper.

13       THE COURT:  Haven't we also got it in the conclusions?

14       MR. GIRARD:  Yes, we do have, your Honor.

15       THE COURT:  The objection is overruled.

16       MR. VEEDER:  Finding No. XVIII is entirely a conclusion

17   of law.

18       MR. GIRARD:  Just a moment.  Yes, it is conclusion IV

19   on page 17, your Honor, which is related to Finding XVII.

20       MR. VEEDER:  On page 8 Finding XVIII is entirely a

21   conclusion of law: "It is not true that the 1940 judgment

22   was a contract between the United States of America . . "

23       THE COURT:  The objection is overruled.

24       MR. VEEDER:  I want to object also to the balance of

25   the sentence: " . . it is true that said 1940 judgment was. ."

P 29

1    Is that a typographical error?

2        ". . it is true that said 1940 judgment was and was

3    intended to be . . "

4        Is that correct?

5        THE COURT:  That is right.

6        MR. GIRARD:  Yes.

7        MR. SACHSE:  Yes.

8        MR. VEEDER:  You intended it that way.

9        THE COURT:  The objection is overruled.

10       What is the next one?

11       MR. VEEDER:  XIX is also a conclusion of law and I

12   object to it.

13       THE COURT:  The objection is overruled.  It could be

14   a finding of fact also.

15       What is your next one?

16       MR. VEEDER:  I object entirely to Finding No. XX.  I

17   don't think it is properly paragraphed.  I think it should

18   be broken down from the standpoint of the rules of Civil

19   Procedure as to how that should be written.  But I don't

20   believe that there is anything in the record that will

21   support the statement from line 10 through 15.

22       MR. STAHLMAN:  On page 9?

23       MR. VEEDER:  Yes.  ". . it is true that the United

24   States of America by bringing this action and by naming Vail

25   Company thereto and by forcing Vail Company to defend this

P 30

1    action and its water rights on the said river, not only as

2    against other parties but against the United States of America,

3    has forced Vail Company to engage in and defend a lengthy

4    and costly litigation." I believe, your Honor, that this

5    should be considered also with an objection that I would

6    like to bring to your Honor's attention to his opinion (page

7    30, paragraph 6), and also additional points appearing on

8    page 39 under the heading -- does your Honor follow me on

9    that?

10        THE COURT:  I don't have it in front of me, but go

11   ahead.

12        MR. VEEDER:  May I give it to your Honor.

13        THE COURT:  Mr. Clerk, will you get it for me.

14        Wait just a minute.

15        Page 30?

16        MR. VEEDER:  Yes, your Honor, if you are looking at

17   page 30, under the heading VI, "If The 1940 Judgment Is A

18   Contract, The United States Of America Has Breached And Vail

19   Has Rescinded."  Then on page 39 "(c)  Vail made a party

20   defendent."  The record should be clear on the proposition

21   that in October of 1951, subsequent to extensive conversations

22   with O'Melveny and Myers, who were then representing the

23   Vail Company, it was stipulated that the only proof the Vail

24   Company would be required to make in the case was filing a

25   copy of the stipulated judgment, and that agreement was

P 31

1   expressly for the purpose, as is reflected by that stipula-

2   tion of October 1951, to avoid cost to the Vail Company,

3   and they willing/agreed to it and I willingly accepted their

4   agreement, that the extent of their participation would be

5   exactly what I said, namely, the filing of the stipulated

6   judgment.  I think that should be considered in connection

7   with the answer filed by Vail Company at that time. Now

8   there was attached by Vail Company's lawyers then a copy

9   of the stipulated judgment and made a part of their answer

10  to the end that there be no question that their rights were

11  fixed by the stipulated judgment.

12       In other words, the connotation that somehow or other

13  the United States abrogated the judgment by this lawsuit

14  is not supported by the record, and I think that if you look

15  at the first answer that was filed --

16       THE COURT:  What part of the first answer?  The fact

17  that they set up the stipulated judgment as an exhibit?

18       MR. VEEDER:  Yes, and also by the fact that they stipu-

19  lated with the United States as to what their proof would be.

20  Certainly they were not forced into expensive litigation by

21  this lawsuit, and it was a factor that I talked to Bill Clary

22  about in Washington at the time this suit was started.  So

23  I don't believe there is any real basis for your Honor's

24  findings or your conclusions.

25       THE COURT:  I don't know what happened too much about

P 32

1   this case before I got into it, but from the time I got into

2   it and began to conduct pre-trial you have had a good bit

3   to say about the theories of sovereignty that you advanced,

4   the rights of the United States based on sovereignty, the

5   bucket-at-the-end-of-the-river theory, the water originating

6   on Government lands and Indian reservations, the severance

7   of water, incorporeal hereditaments -- my mind is not dull

8   about those matters.

9       MR. VEEDER:  I am just interposing these objections,

10   your Honor.  I owe it to your Honor, and certainly I want

11   the Court of Appeals to have knowledge that I brought these

12   to your attention and that they were overruled.

13       MR. GIRARD:  Does that stipulation, Mr. Veeder, say

14   that you are claiming only as against Vail what the stipula-

15   ted judgment provides?

16       MR. VEEDER:  I am quite certain that is what it says.

17       THE COURT:  What stipulation?

18       MR. GIRARD:  This letter.

19       THE COURT:  Is that stipulation in the record here?

20       MR. STAHLMAN:  Yes.

21       MR. VEEDER:  Yes.

22       MR. STAHLMAN:  After the stipulation they filed a

23   supplemental and amended complaint and included many more

24   people in it.  We battled that out here.

25       MR. VEEDER:  It has not been battled out at all.

P 33

1       In any event, the stipulation was in effect at the

2  time shortly after the suit was brought, it was in effect

3  at the time the complaint was amended, and Vail Company

4  themselves decided that this is not too expensive of a

5  litigation -- unless George charges pretty heavily.

F fls.  6

t-24
F-1

MR. STAHLMAN:  I charge all I can.

MR. VEEDER:  In any event, I am bringing that to your Honor's attention, and I renew it on the ground as to certain of the basins, charging the United States with violation of the stipulated judgment.

THE COURT:  The session is over with.

MR. VEEDER:  Yes, your Honor, I observe that it is noon.

THE COURT:  We are now down to Page 9, and we will take our adjournment.

MR. VEEDER:  Do you desire me to continue with the objections?

THE COURT:  No, I have to go to a Rotary lunch today.

MR. VEEDER:  I mean after.

THE COURT:  After lunch, yes.

I would like to have Mr. Girard look over XII again and see if he is satisfied with it.

(Whereupon, at 12:00 o'clock noon, an adjournment   )
(was taken until 2:00 o'clock p.m. of the same date.)

- - - - -

F-2
T-25

<u>SAN DIEGO, CALIFORNIA, THURSDAY, APRIL 6, 1961, 2:00 P. M.</u>

MR. GIRARD:  Your Honor, I rewrote Section XII.  It is quite a bit different than yours.

THE COURT:  Let me see it.

(The document referred to was handed to the Court.)

MR. GIRARD:  The essential difference is that it just says that the ground waters are recharged primarily from the spring and winter runoffs, and I think the record certainly supports that.

THE COURT:  Have other counsel seen this?

MR. GIRARD:  Your Honor, Mr. Stahlman has seen it, but Mr. Sachse had not come in yet, and Mr. Veeder had not come in either, so they have not seen it.

THE COURT:  We will have a couple of copies run off.

Let's go ahead.  We were on Finding XX.

MR. VEEDER:  I have made my statement in regard to that. The paragraph I am referring to is XX (a), your Honor, and it is our position that there was a stipulation between Vail Company and the United States which relieved them of all costs.  In that connection I refer specifically to the exhibit in this case, Plaintiff's Exhibit 158, and that stipulation was in effect until the Vail Company asked to be relieved of it, so if it did cost them-- if this case has cost the Vail Company money, it was their own undertaking and not any responsibility on the part of the United States,

16,180

t-26

1    because we had agreed that their rights be fixed by the

2    stipulated judgment.

3        THE COURT:  But nowhere in any of your assertions as

4    to rights of sovereignty did you exempt Vail.

5        MR. VEEDER:  Of course, I did by the stipulated judgment.

6    Every claim both in the amended and supplemental complaint

7    envisaged-- and I think it might be well to refer to the

8    terminology of that stipulation so that the record is clear

9    on it.

10       THE COURT:  Was the stipulation terminated after the

11   second amended complaint was filed?

12       MR. VEEDER:  It terminated in March of 1959, yes, your

13   Honor.

14       THE COURT:  After the second amended complaint?

15       MR. VEEDER:  Yes.

16       MR. STAHLMAN:  The facts are that after the second

17   amended complaint was filed, and the amended answer to the

18   original complaint, and then the answer again to the

19   supplemental complaint asked for the abrogation of the

20   judgment, and then the motion was made and Mr. Veeder

21   consented that the stipulated judgment be asked to be with-

22   drawn.

23       THE COURT:  Well, the stipulation be withdrawn?

24       MR. STAHLMAN:  The stipulation be withdrawn, and he

25   consented to it.

t-27

MR. VEEDER:  Well, the point being that they asked to be relieved of it.  The fact remains that this stipulation is signed by counsel for the Vail Company, Willard W. Clary and Lauren M. Wright, and it specifically provided that the respective rights would be those set forth in the stipulated judgment and:

"That neither plaintiff herein nor said Vails claim or will claim, in the within action, any rights or duties as against the other, other than or different from, those fixed, determined and declared in said judgement of December 27, 1940."

and which is the stipulated judgment.

16,182

t-28

So I respectfully submit that Finding XX (a) and (b), and the references that I made to your Honor's opinion at Page 30, et sec., Page 39 and following, truly do not reflect, in my view, the real situation between the Vail Company and the United States.

THE COURT:  Mr. Veeder, I think the record is replete with what your contentions have been.

MR. VEEDER:  Never against the Vail Company, your Honor. I must, with all due respect to your Honor, say that it never dawned on me that I would ever make an assertion, and I never did make an assertion.

THE COURT:  I never recall at any time in the pressing of your various claims where you said, "We are pressing these claims against other people in the watershed, but not against Vail."

MR. VEEDER:  It was a part of the stipulation in the record.  It would have been superfluous to say it.  It was in effect until March of 1959, during which time we were putting in our case.

However, I have tendered my thoughts on it, your Honor.

THE COURT:  All right.  Your objection is overruled. What is your next one?

MR. VEEDER:  Finding Number XXI, which I object to on the same grounds that I objected to XX, namely, that it is an incorrect statement in view of the fact that the United

F-3

16,183

t-29

States of America and the Vail Company had resolved their rights in this litigation.

Do you have the stipulation?

MR. STAHLMAN: I just put it on the Clerk's bench.

MR. VEEDER: - - by U. S. Exhibit 158, which was signed on the 23rd of October, 1951, and, certainly , in our view took care of any conflict with the Vail Company.

THE COURT: Does anyone else want to be heard?

(No response.)

THE COURT: Objection overruled. What is your next one?

MR. VEEDER: I would like to have considered Findings XXII, XXIII and XXIV together because they relate to the ground waters underlying Vail Company's properties.

It is our view that the stipulated judgment resolved all differences between the parties, and whether it was more or less ground water makes no difference. We could not claim and did not claim any more water by reason of the large quantities of water that were found to underlie the Vail Company's land. And in that connection I refer to the Pemberton Report which, if I remember correctly is Exhibit-- your Honor, may I supply you with the correct exhibit number on the Pemberton Report for the record?

THE COURT: Yes.

MR. VEEDER: And which was prepared in August of 1950 by Vail Company, in which Pemberton was the geologist for

16,184

t-30

1   the Vail Company and said there was an abundance of water

2   under the 35 sections of land, and that this knowledge was

3   available to the Vail Company, and they had it long before

4   we started the litigation, and it was certainly available to

5   them then.

6       THE COURT:  How long before?  You started the litigation

7   when?

8       MR. VEEDER:  In 1951.   So you see they had the informa-

9   tion available at least six or eight months before we

10  started the case.

11      I won't labor that point any longer, your Honor.

12      THE COURT:  Overruled.  What else?

13      MR. VEEDER:  May I have just a moment?  Again, I would

14  like to have your Honor consider together Findings XXXIII --

15  I beg your pardon --  XXX, XXI, and XXXII, because they are--

16      MR. SACHSE:  Excuse me.  Are we okay on XXVI, XXVII,

17  XXVIII and XXIX?

18      MR. VEEDER:  I reserve the right there to object.  I

19  am trying to hurry along on these things, your Honor, as much

20  as I can, and there is no purpose in my reading each and

21  every finding and saying that I disagree, because I surely do.

22      On XXXIII --

23      MR. STAHLMAN:  Why don't you just say you disagree with

24  all of them?

25      MR. VEEDER:  I do, most specifically.

16,185

t-31

F4

THE COURT:  All right.   You say XXXI and XXXII?

MR. VEEDER:  XXXI and XXXII, they all relate to the drilling of the Naval well pursuant to the revocable license, which was dated March 8, 1951, pursuant to which it was agreed that the Naval well would be a part of the water resources-- would be a part of the rights under the stipulated judgment.

That is an exhibit in the record, and, again, I believe it is a revocable permit signed by the Navy and by Mahlon Vail, and that is Exhibit 157, if I remember correctly.

Again, I would like to have the right to identify that more correctly for the record.

THE COURT:  Yes.

MR. VEEDER:  The gist of these findings I believe is summarized in XXXII, Finding XXXII.  There it is stated:

"It is true that at the time the United States of America was negotiating with Vail Company to acquire the Vail Company's consent to drill said Navy well, the United States of America had filed its lawsuit naming Vail Company as a defendant, but had not served Vail Company with a copy of summons and complaint."

Now, that is clearly an error.  I am referring, for your Honor's edification, to Page 12, Finding XXXII, Lines 28 through 31, and Page 13, Lines 1 and 2.

The facts show that the complaint was filed on January

16,186

t-32

25th--

THE COURT:  The complaint?

MR. VEEDER:  The complaint was filed January 25th, 1951.

The Vail Company answered on March 12, 1951, and the revocable permit was signed on March 8, 1951.

I respectfully submit, your Honor, that it would be an error to say that Vail Company did not know that the lawsuit had been filed.  Most assuredly it did, and most assuredly O'Melveny & Myers would not have answered without notifying the Vail Company of the fact of the answer.

THE COURT:  Mahlon Vail testified that he did not know of the lawsuit during the negotiations for the permit.

MR. STAHLMAN:  And he stated that the negotiations started as early as August.

MR. VEEDER:  1950.

MR. STAHLMAN:  Yes.

MR. VEEDER:  But I want it to be very clear that Mahlon Vail-- I don't recall exactly what his testimony was-- but I think it was most equivocal to begin with, and, certainly the Vail Company had notice of the filing of the litigation, because their answer was filed March 12th, and they were served on the 14th of February, almost one month before they signed the revocable permit.  And I think, your Honor, there is serious error in Finding XXXII for that reason.

THE COURT:  What do other counsel have to say on that?

16,187

t-33

1    MR. GIRARD:  Assuming Mr. Veeder's statements are
2    correct, and I will take his word for it because I have never
3    been able to find that date in the evidence, I think we
     should then delete that.
5    THE COURT:  Where does the date of service appear in
6    this record?
7    MR. GIRARD:  In any event, apparently the answer was
     filed just a few days before Vail gave his consent.
9    MR. VEEDER:  That is right.
10   MR. GIRARD:  Was it after or before?
11   MR. STAHLMAN:  It was after, from the 8th to the 12th?
12   MR. VEEDER:  I will be glad to give you the dates.  The
13   8th it was signed, and on the 12th of March, four days later,
14   the answer was filed.
15   Our records show that service was made February 14, 1951.
16   THE COURT:  You say your records.  But does this record
17   show?
18   MR. STAHLMAN:  Your Honor, I tried to find that date,
19   and never could find it.
20   MR. VEEDER:  The records are in Los Angeles, your Honor.
21   THE COURT:  Then they are not records in this case, they
22   are your records.
23   MR. VEEDER:  This is the information that I have--
24   excuse me-- may I proceed?
25   THE COURT:  Yes.
     MR. VEEDER:  The return of the marshal, I am advised,

F5

16,188

t-34

which is certainly a matter concerning which this Court has notice, is February 14, 1951.  That was when the marshal made his return to this Court.

Certainly, since the answer is March 12th, it would have been impossible, obviously, to have-- well, it would be an impossibility to have the revocable permit on March 8, and the answer then filed on March 12th without them having previous notice.

THE COURT:  Is there any evidence in the record as to when Vail actually signed this permit?

MR. VEEDER:  Yes.

THE COURT:  The permit is dated, but I suppose it went through the usual circuitous circle of being sent back East to be signed, and so forth and so on.

MR. VEEDER:  Please let me get the exhibit on that because Mahlon Vail's signature, I am quite sure, is dated.

Yes, it is.  This says that it is executed on behalf of Vail Company "this 8th day of March, 1951," with Mahlon Vail signing for the Vail Company.

16,189

t-35

THE COURT:  Let me see it.

(The document was handed to the Court.)

THE COURT:  What would you do?  Suggest to strike out Lines 2 through 6?

MR. GIRARD:  Yes, your Honor.  If it turns out that the summons was served as stated by Mr. Veeder.  But I recall Mr. Vail did state that he wasn't aware of it, that he had no knowledge of being aware of it.

THE COURT:  And he also used on that, as I recall, the negotiations for this permit that had gone on for some time earlier.

MR. STAHLMAN:  Yes, the fact of the matter is--

THE COURT:  The fact is I recall checking that this is right.  Apparently the lawsuit was filed while the negotiations were going on.  Is that correct, Mr. Veeder?

MR. VEEDER:  I had no knowledge at all of the Pauba well, your Honor.  I knew nothing about the negotiations, and I knew nothing about why the well was drilled.  I had no knowledge of it until some two years later.

MR. STAHLMAN:  And your Honor will recall that the lawsuit was filed and the summons was not issued until some considerable time after the complaint was filed.  Is that right?

MR. VEEDER:  I don't think so, George.

MR. STAHLMAN:  Oh, yes.  You will find the date of the

16,190

t-36

1    issuance of the summons.  This is the time of the filing of

2    the complaint, but I was trying to check to find out the

3    date of service on Vail, and I ran into that in the Clerk's

4    office.

5         MR. VEEDER:  I think the best evidence on that is the

6    answer that was filed, and I will read this so it will be

7    clear:

8              "Defendants Mary Vail Wilkinson, Mahlon Vail,

9         Edward N. Vail, Margaret Vail Wise and Nita M. Vail,

10        as Trustees under that Indenture of Trust dated

11        December 31, 1912 . . . ."

12        MR. STAHLMAN:  What are you reading from?

13        MR. VEEDER:  I am reading from the answer.

14        MR. STAHLMAN:  We will accept the date of the filing

15   of the answer.

16        MR. VEEDER:  I would like to complete this, if I may:

17             " . . . for themselves alone, for answer to the

18        complaint herein, admit, deny and allege as follows:"

19        In other words, the trustees on March 12, a date

20   virtually concurrent with the signing of the license, answered

21   the complaint.

22        THE COURT:  What was the date of the filing of the

23   lawsuit?

24        MR. VEEDER:  January 25, 1951.

25        MR. GIRARD:  What was the date of the filing of the

t-37                                                                                   16,191

1        supplemental complaint?  Your pleadings were extended by

2        about 25 counts against the defendants.

3              MR. VEEDER:  I would have to check that.

4              MR. SACHSE:  I think I have got it.  No, it does not

5        show the filing date on the copy I have.

G-fls    6

16,192

G Take
P 34

1    THE COURT:  The amendment to that was filed after I

2    took the case over.

3    MR. SACHSE:  Yes, your Honor.  It seems to me that that

4    is a critical fact that we are overlooking. By the amended

5    and supplemental complaint some six thousand additional

6    bodies were brought in, every one of whom was necessarily

7    adverse to everybody else.  Everybody was necessarily adverse

8    to Vail.  Everybody upstream from Vail was brought into the

9    lawsuit, and they were never in it before.  Everybody on

10   the Murrieta was brought in, and they were never in it.

11   MR. VEEDER:  That is not correct.

12   MR. SACHSE:  "Everybody" is probably not correct.

13   MR. VEEDER:  That is right.

14   MR. SACHSE:  But the large majority were not in it

15   before.  That is correct.

16   MR. VEEDER:  May I tender a thought.  I see that time

17   is moving by on this thing.  I would like to make a specific

18   objection and then anybody can argue anything he wants to

19   about what was done.

20   MR. GIRARD:  Before you object to this, why don't we

21   just see what the facts are?  If you can find the return,

22   I would certainly accept that.  Apparently it is not in

23   evidence anywhere.  The only evidence is Mr. Vail's statement,

24   isn't it?

25   MR. VEEDER:  I don't recall as to what Mr. Vail said.

P 35

1   I do say, however, that the statement in the finding to which

2   I am referring bears with it a very strong connotation in

3   opposition to the United States which the facts do not bear

4   out.   I think that when it declares, as it does, "It is true

5   that at the time the United States of America was negotiating

6   with Vail Company to acquire the Vail Company's consent to

7   drill said Navy well, the United States of America had filed

8   its lawsuit . . " --

9       MR. STAHLMAN:  Why not do this -- this will conform

10   with the evidence -- starting on line 2:  ". . it is true

11   that at said time Vail Company gave its consent to the

12   drilling of the Navy well by the United States of America"

13   and put in there instead of Vail Company "Mahlon Vail was

14   not aware of the fact that the United States of America . . "

15       MR. VEEDER:  I think it is unimportant, because certain-

16   ly Mahlon Vail is not the Vail Company.

17       But let me go on with this proposition, before we start

18   changing what I just read, let me point out what follows.

19   On page 13, line 2, it says:  " . . it is true that at said

20   time Vail Company gave its consent to the drilling of the

21   Navy well by the United States of America, Vail Company was

22   not aware of the fact that the United States of America had

23   filed this lawsuit naming Vail Company as a defendant; . ."

24       THE COURT:  I have stricken that.

25       MR. VEEDER:  I didn't know that, your Honor.

P 36

1    THE COURT:  I propose to change XXXII as follows, on

2    page 12:  "At the time the United States was negotiating

3    to acquire Vail's consent to drill the well, the United

4    States of America was preparing this lawsuit for filing

5    and on January 25, 1951 filed this lawsuit naming Vail

6    Company as a defendant but had advised Vail Company of its

7    intention to file the lawsuit and did not serve Vail Company

8    with a summons and complaint until February 14, 1951."

9    Is that correct?

10    MR. VEEDER:  I don't believe it is, your Honor.

11    MR. STAHLMAN:  That is what he said.

12    THE COURT:  How is it incorrect?

13    MR. VEEDER:  Would you read it back to me?  There is a

14    point in there that I think is in error.

15    THE COURT:  "It is true that at the time the United

16    States of America was negotiating with Vail Company to

17    acquire Vail Company's consent to drill said Navy well, the

18    United States of America was preparing this lawsuit for

19    filing and on January 25, 1951 filed this lawsuit naming

20    Vail Company as a defendant but had not advised Vail Company

21    of its intention to file the lawsuit and did not serve Vail

22    Company with a copy of the summons and complaint until

23    February 14, 1951."

24    MR. VEEDER:  I don't believe there is anything affirma-

25    tive in the record that would support the position that the

P37

1    Vail Company had not been advised that the suit was going

2    to be filed.

3         THE COURT:  I am confident of that.  Mahlon Vail

4    testified that he knew nothing about this.

5         MR. VEEDER:  You are talking about Mahlon Vail  I am

6    talking about the Vail Company, your Honor.  I can put in

7    the statement for this reason, that I was dealing at all times

8    -- I was personally dealing from 1949 with Vail Company, with

9    Loren Wright, who was their lawyer, and with Mr. Hall, who

10   was their engineer, and I can't believe that Vail Company

11   didn't know that this lawsuit was coming.  They were involved

12   at that time in the litigation of <u>Barbee vs Oviatt.</u>  We were

13   at that time concerned about Barbee vs Oviatt.  We were,

14   moreover, concerned with an agreement that was being worked

15   out between the Navy and Fallbrook in which at all times

16   Vail Company was participating through authorized agents.

17   Now I can't believe that the record would support what your

18   Honor said for that reason, and I make objection on that

19   ground.

20        MR. SACHSE:  Your Honor, I think if we are going to

21   modify this, as Mr. Veeder suggests, we then should strengthen

22   the findings, because I am interested in no appeal, with

23   another paragraph which would say, in substance, this:  That

24   in March 1958 the United States of America filed its amended

25   and supplemental complaint in which it asserted the following

P 38

1    rights against Vail -- I am just picking out a few of them

2    against Vail now.

3        In Count XV they asserted riparian rights on the

4    Coahuila Indian Reservation for 17,000 acres.  That is

5    upstream from Vail.

6        In Count XVI they asserted riparian rights in the

7    Pechanga Indian Reservation.

8        In Count XVII they inserted the Ramona.  I don't know

9    whether that hits Vail or not.

10        In Count XVIII they asserted rights to an acreage of

11    34,000 acres in the Cleveland National Forest, most of which

12    is upstream from Vail.

13        They asserted rights to 11,000 acres in the San Bernardino

14    Forest, which is mostly upstream from Vail.

15        In Count XX they asserted that they had prescriptive

16    rights in the Indian reservation upstream from Vail in the

17    Coahuila.

18        In Count XXII they asserted that Camp Pendleton had

19    appropriated, in addition to all of the rights alleged --

20    they first repleaded the whole original complaint -- they

21    said that, in addition to that, the United States had appro-

22    priated at Camp Pendleton 12,300 acre feet of water from the

23    surface and subflow of the Santa Margarita.

24        Now that is clearly contrary to the Vail Judgment.

25    They didn't say in here, "We appropriated this as against

P 39

1   everybody except Vail." They said, "We appropriated 12,300

2   acre feet."

3       We can go right down the line. All these allegations

4   hit Vail, let me say, harder than anybody else, because

5   Vail is the largest land owner on the stream between the

6   places that are asserted and the Federal Government.

7       If we are going to weaken this on the lawsuit pitch --

8   because I am interested in no appeal, if possible -- I think

9   we should put in, which doesn't even take evidence, the

10  United States' pleadings.

11      MR. VEEDER:  I read into the record again the statement

12  that was controlling at that time (Exhibit 158, paragraph 2):

13  "That neither plaintiff herein nor said Vails claimed, or

14  will claim, in the within action, any rights or duties as

15  against the other, other than or different from those fixed,

16  determined and declared in said judgment of December 27, 1940."

17      Paragraph 3:  "That no issue is, or will be, raised

18  in this litigation as to the operations of the parties under

19  said judgment, it being understood that neither party will

20  claim in this litigation that the other has failed in any

21  way to comply with said judgment of December 27, 1940.

22

23

24

25

16,198

P 40

1    THE COURT:  What is the date of that instrument?

2    MR. VEEDER:  The date of this instrument is October

3    23, 1951.  The instrument was in full force and effect until

4    it was amended.

5    THE COURT:  What was the date that the Court granted

6    the motion to relieve Vail of that stipulation?

7    MR. VEEDER:  It was in March 1959.

8    THE COURT:  The stipulation then was set aside in

9    March 1959.  The Government's position prior to the recision

10   of the stipulation, it could be argued, was as set forth

11   in the stipulation.  However, in 1958 you asserted the

12   additional rights.  You did not oppose the request of Vail

13   to be relieved and --

14   MR. VEEDER:  I can't be shot for that.

15   THE COURT:  And you thereafter asserted these rights

16   against everybody.

17   MR. VEEDER:  I have not asserted these rights against

18   Vail.  I never have.  I was bound by the stipulation.  We

19   lived by it.  Vail Company wanted to be relieved of it

20   themselves, so they were the movants.

21   THE COURT:  After they were relieved of it, then what?

22   MR. VEEDER:  After they were relieved --

23   THE COURT:  Did you still abide by the stipulated

24   judgment?

25   MR. VEEDER:  So far as I am concerned, I believe the

P 41

1   stipulated judgment is in full force and effect and I believe

2   the stipulated judgment governs us.  We have made no claim

3   against Vail, and we make none outside the stipulated judgment.

4        MR. GIRARD:  How could you possibly get water -- assuming

5   that your rights in your supplemental complaint were valid,

6   how could you possibly get water on those rights without

7   interfering with Vail?  Are you going to run it around the

8   Vail Company land some way?

9        MR. VEEDER:  The measure of our rights against Vail

10   Company was set out in the stipulation.  We stand on it.

11   You can rule on my objections.  However, before you rule on

12   them, I would like/cover, to the end that there is clarity

13   --

14        MR. STAHLMAN:  Wait a minute.  Have we got the other

15   one set?

16        MR. VEEDER:  Didn't you overrule my objection to that?

17        THE COURT:  On what?

18        MR. STAHLMAN:  The Court read to you what he had proposed

19   there.

20        MR. VEEDER:  I have objected to that.  I said I didn't

21   think it was reflective of the situation, and I thought you

22   said you overruled me.

23        THE COURT:  I did.

24        The suggestion now made to put in another finding

25   doesn't really concern this permit.  It is an additional

P 42

1  matter.

2       MR. SACHSE:  That is right.

3       THE COURT:  And unless there is objection I propose to

4  amend this XXXII to read something like I have indicated.

5       MR. GIRARD:  I have no objection to the amendment you

6  read, your Honor.

7       MR. VEEDER:  Then your Honor, how much remains in XXXII?

8  You read the first sentence and then you deleted from the

9  first semi-colon to the second --

10       THE COURT:  I am trying to find something else.  But

11  presently it will read:  "It is true that at the time the

12  United States was negotiating with Vail Company to acquire

13  Vail Company's consent to drill said Navy well, the United

14  States of America was preparing this lawsuit for filing and

15  on January 25, 1951 filed this lawsuit naming Vail Company

16  as a defendant but had not advised Vail Company of its

17  intention to file this lawsuit and did not serve Vail Company

18  with a copy of the complaint and summons until February 14,

19  1951."

20       MR. VEEDER:  I don't think the record supports that,

21  your Honor.

22       THE COURT:  Then the next phrase is out.  Then pick up

23  again:  "It is true that much of the information . . " remains

24  in.

25       MR. VEEDER:  I propose, then, that an additional sentence

P 43

1    be put on there, because this matter of appeal is just as

2    important to me, more so than it is to Mr. Sachse. I think

3    that it should be reflective of the fact that the United

4    States of America and Vail Company cooperated in the drilling

5    of the well for exploratory purposes and that by evidence

6    presently in the record signed by representatives of the

7    Vail Company they acknowledge their obligations after the

8    drilling of the well, said that they wouldn't violate the

9    stipulated judgment anymore -- yes, anymore, Mr. Sachse --

10   because they had violated it by failing to deliver the 3

11   second feet. And so for your finding to be reflective of

12   what I think the Court of Appeals should review I think that

13   the whole story should be set out.

14        MR. STAHLMAN:  Of course, I think Mr. Veeder's premise

15   is completely wrong. The Navy had complete charge of the

16   drilling of the well, paid for the drilling of it, and Vail

17   had nothing to say about it. It was turned over to them

18   afterward.

19        MR. VEEDER:  I disagree on that. The record is contrary

20   to it. You find all the way through that Mahlon Vail --

21        MR. STAHLMAN:  If he wanted to put a little piece of

22   pipe in there he had to ask their permission.

23        MR. VEEDER:  Mahlon Vail bought into the well and asked

24   that the well be perforated the full length of the casing,

25   and that was done at tremendous cost which he himself paid.

P 44

1     MR. STAHLMAN:  When he has to go over with hat in hand

2    it doesn't show that he was a party to the drilling of this

3    well.

4     MR. VEEDER:  It doesn't show that he had his hat in

5    his hand.

6     MR. STAHLMAN:  The total facts show the picture.  It

7    doesn't support your contention.

8     THE COURT:  Let's get the transcripts of February 10,

9    1960 and maybe the following date.

10    (Whereupon the reporter momentarily left the courtroom

11    and returned with the transcripts for February 10 and 11th,

12    1960, which were given to the Court.)

13     THE COURT:  While I am looking at it, get me also the

14    one of June 27, 1960.

15    (The reporter again left the courtroom and returned

16    with the transcript for June 27, 1960.)

17     MR. VEEDER:  May I be excused from the courtroom for

18    just a minute to pick up something?

19     THE COURT:  Yes.

20    On page 11,816 Mahlon Vail testifying:

21    "Q  Now then, at the time you signed this revocable

22    permit you had not been served with a copy of the

23    complaint in the case of the United States vs Fallbrook,

24    had you?

25    "A  No, I don't believe so."

P 45

1          And later on he says that he has no memory that he was,

2     etc.

3          However, I don't believe there is anything in the record

4     that the complaint was served on February 14, 1951, but Mr.

5     Veeder assures me that February 14th is the date and I am

6     willing to accept that date and make modifications of these

7     findings accordingly.

H fls.

t-38

H-1

1      MR. VEEDER:  I would like to have this in the record.

2  I have had our records checked.  Our evidence of return

3  shows February 14, 1951.  I am advised that the return is in

4  Los Angeles.  I am arranging to have that checked out again.

5      That is the basis of my information, your Honor.

6      THE COURT:  Then there is further testimony on Page

7  13,772 and following about Mr. Dubber.

8      MR. VEEDER:  Mr. who, sir?

9      THE COURT:  Colonel Dubber.

10      MR. VEEDER:  Colonel Dubber.  Isn't that where Mahlon

11  Vail said that data was desired in connection with the

12  litigation?

13      THE COURT:  It was not.  It is just the reverse.  It

14  was desired to find out what kind of water there was and

15  what would be available in the case of an emergency.

16      MR. VEEDER:  I don't believe it was the reverse from

17  what I said, though, your Honor.  It has been brought to my

18  attention that Mahlon Vail testified that he understood

19  that there was litigation.

20      MR. STAHLMAN:  No, no.

21      MR. VEEDER:  I have no recollection on the matter at

22  all.

23      MR. STAHLMAN:  I recall what Vail said, and there was

24  an exhibit in the file or a letter that was written in

25  connection with it as to Mr. Hall, and showing what his

t-39

1    understanding with Colonel Dubber was at the time he was out

2    at the ranch.

3        MR. VEEDER:  That is Vail Company's Exhibit -13, is it.

4    I believe that is in the AS- series.

5        MR. STAHLMAN:  That is in the AK or AR-series.

6        MR. VEEDER:  George, that was AK-13.

7        MR. STAHLMAN:  I have it right here.

8        THE COURT:  I don't know that we can do much else to

9    Section XXXII, and I think a finding along the lines suggested

10   by Mr. Sachse should be incorporated somewhere in here, and

11   I don't know where the logical place would be, as to what

12   transpired as to the claims made by the Government.

13       MR. GIRARD:  There are findings as suggested by Mr.

14   Sachse, your Honor.  They are not as detailed as suggested

15   by Mr. Sachse.

16       THE COURT:  Where do you refer to them?

17       MR. GIRARD:  Well, XXI, specifically, your Honor on

18   Page 9.  We could go in and delineate them as set forth in

19   the supplemental complaint, but I don't have any preference.

20       MR. SACHSE:  I think Mr. Girard is probably right, that

21   it would probably be finding evidence.

22       THE COURT:  That is right.

23       MR. STAHLMAN:  It would be the ultimate fact.

24       THE COURT:  That is right.  I think XXI would cover it.

25       XXXII we have concluded.

16,206

t-40

1   What about XXXIII?   Is there any objection, Mr.

2   Veeder, as to XXXII  or XXXIII?

3   MR. VEEDER:  I would refer to XXXII, which relates to

4   the application --

5   THE COURT:  XXXIII you mean?

6   MR. VEEDER:  XXXIII, which relates to the application

7   of the Vail Company  for the construction of the dam.

8   If you will go to Line 16 on Page 13, "April 30; that

9   protests to said application" --

10   THE COURT:  Wait a minute.  All right, go ahead.

11   MR. VEEDER:  "that protests to said application were

12   duly filed by the United States of America, and others;

13   that subsequently the United States of America advised

14   that its protest was being withdrawn; that thereafter

15   hearings on said application were held and evidence in

16   support of and in opposition to said application was

17   received; that despite the attempted withdrawal of its

18   protest, the United States of America appeared at said

19   hearings and presented evidence in opposition to said

20   application; . . . "

21   That is contrary to the fact.

22   MR. GIRARD:  Wait a minute.

23   MR. SACHSE:  Oh, no.

24   MR. VEEDER:  That is contrary to the fact, and it is

25   contrary to the clear record in the case.

t-41

THE COURT:  Now, we have the transcripts here.

MR. VEEDER:  I hand you Exhibit 161, your Honor.

MR. GIRARD:  There is the transcript, and also a couple of letters.  But Mr. Veeder may be correct.  It is a very close question whether they opposed the application, or whether they didn't oppose the application.  Maybe to satisfy Mr. Veeder we could just say "presented evidence in regard to said application."

MR. VEEDER:  They did not offer evidence in regard to the application at all.

MR. GIRARD:  Now, wait a minute.  What happened was there were two applications, one for Fallbrook and one for Vail.

MR. VEEDER:  That is right.

MR. GIRARD:  They offered to introduce evidence in regard to Fallbrook, and the same Water Rights Board also said/was it applicable to Vail.

MR. VEEDER:  That is not correct.

MR. GIRARD:  I think it is correct.

MR. STAHLMAN:  Here is the thing that puts the cap on it, your Honor, --

MR. VEEDER:  Let's finish with Mr. Girard first, if we can.

MR. STAHLMAN:  Well,  you were talking about--

MR. GIRARD:  And I think there were some other letters,

t-42                                                                16,208

1        too.  I think they wrote a letter to the State Water Rights

2        Board.

3            MR. STAHLMAN:  Certainly.  They followed it up with a

4        letter, which is Vail's Exhibit AK-11, and it says:

5                "As a result of a telephone conversation between

6            Mr. H. M. Hall, Vail Company, Los Angeles, California,

7            and Lt. Comdr. M. H. Aubey, Public Works Officer,

8            Camp Pendleton, it is understood that the Division of

9            Water Resources desires further information in regard

10           to the water requirements of Camp Pendleton as an aid

11           in considering the matter of Applications Nos. 11518

12           and 11586 . . ."

13       And then it goes on for two pages here with all of the

14       claims and reasons for the wanting of water and the denying

15       of the application on their part.

16           MR. VEEDER:  There is not a word that says they want a

17       denial of the application; not a word.

18           THE COURT:  Let me see it.

19           (The document was handed to the Court.)

20           MR. STAHLMAN:  Then, your Honor, there is an inter-

21       departmental communication in the Water Resources Board

22       which says that they understood that they were protesting

23       both of them.  There is that interdepartmental communication.

24           THE COURT:  Has anybody checked the transcript and do

25       you know what it says in the transcript?

16,209

MR. GIRARD:  I have checked it and read the record through, and I don't think I am in error when I say that the evidence by the Navy, I believe, was put in first as to Fallbrook, and then subsequently the Water Rights Board issued an order incorporating all of that evidence as to Vail.

THE COURT:  Is that about your opinion, sir?

MR. SACHSE:  That is my opinion, and that is my exact recollection.  The gentleman appeared on both cases.

MR. VEEDER:  I will object to this statement unless he is sworn.  I want him sworn because he is trying to impeach evidence that is in the record today.

THE COURT:  We will not take it as evidence, but as a statement of counsel as to what is in the written transcript that was recorded.

MR. VEEDER:  I want him sworn.  You will find in here that a statement was made there was a withdrawal and the record shows it here.  There was a withdrawal of the objection to the Vail application, and Zander, or whoever was hearing it, specifically stated so, and a report came down, and George has it in his hand.

MR. STAHLMAN:  Just a minute.  I am reading something here.

MR. VEEDER:  Exhibit AK-3 will show how right I am.

THE COURT:  Let me read Exhibit AK-11.

t44

(The document was examined by the Court.)

MR. STAHLMAN:  Isn't that the one I gave to your Honor, AK-11?

THE COURT:  Yes.

MR. STAHLMAN:  I see.

THE COURT:  Which was the Vail application?

MR. GIRARD:  11518, I believe.

MR. STAHLMAN:  11518 was Vail.

THE COURT:  11518.  All right,  I will just read it.

MR. STAHLMAN:  Then, if your Honor wants to read it, here is an interdepartmental communication where in the very last paragraph it states that the Navy did not recede from that protest one bit.

MR. VEEDER:  That is twisting that exhibit.

THE COURT:  Let me just read it.

MR. STAHLMAN:  Then, your Honor, AK-1 shows --

THE COURT:  Shows what?

MR. STAHLMAN:  That they sent a notice to the Navy in connection with both applications, showing that they were denied and the protests were dismissed.  It refers to both of them.

(The document was handed to the Court.)

MR. VEEDER:  Your Honor, I would like to refer to the fact that in the reporter's transcript, Plaintiff's Exhibit 161, which is the transcript of the hearing on the application,

16,211

t-45

this statement is made by the Examining Officer:

"The Eleventh Naval District's protest against the Vail Application No. 11518 has been withdrawn."

Subsequently on Page 134, in addressing the representatives of the Vail Company, the Examining Officer continued to repeat what was said originally, that it was withdrawn, and he said:

"As the record now stands, the protests against your" -- Vail Company's application -- "No. 11518 have boiled down to those of the Schloss Estate and the Fallbrook Public Utility District."

Now, in a letter dated December 24, 1947, or in a memorandum, rather, dated December 24, 1947 from the principal hydraulic engineer reporting on that hearing that I just made reference to, he said this:

"The Navy has withdrawn its protests against the Vail Company application, and at the hearing in Los Angeles on December 16th both Fallbrook Public Utility District and the Murray Schloss Estate took the position that they did not want to stand in the way of the immediate construction of the reservoir by the Vail Company at Nigger Canyon."

"The Fallbrook Public Utility District is particularly anxious for early action on its Application No. 11586 for two and one-half cubic feet per second

t-46

1        direct conversion from the Santa Margarita River."

2            MR. STAHLMAN:   Period.

3            MR. VEEDER:  What do you mean?

4            MR. STAHLMAN:   Period.

5            MR. VEEDER:   " -- Santa Margarita River", period.

6                "At the hearing the Navy did not recede from its

7        protests in any particular but the transcript will be

8        in by the first of the year and the record will then

9        be adequate to permit this Office to make its

10       decision."

11       Now, it is manifest from the very language that in

12   regard to the Vail Company's application, and I will quote

13   again:

14           "The Navy has withdrawn its protests to the Vail

15       Company application."

16       It did not withdraw its protests--

17           MR. STAHLMAN:  It did not withdraw its protests, but

18   it receded from them.

19           THE COURT:  Let Mr. Veeder finish.

20           MR. STAHLMAN:  I am sorry, your Honor.

21           MR. VEEDER:  It did not withdraw its protests to the

22   Fallbrook application.  That is what this states without a

23   doubt.

24           THE COURT:  Any other comment?

25           MR. GIRARD:  I think if you just take Line 24 of the

16,213

findings of fact Number XXXIII and just change the word "opposition" and say "in regard to," there would be no question at all on the evidence, and I don't think it would make any difference in this finding.

MR. VEEDER: Would you give me that?

MR. GIRARD: We have already said to withdraw it, and it is just uncontested that you presented evidence in regard to that application. Your letter is pretty clear on that, and refers to it specifically by number.

MR. SACHSE: That is all right.

MR. VEEDER: There was no evidence introduced by the United States on the application in opposition to the application.

MR. GIRARD: I didn't say in opposition. I said you presented evidence in regard to the application.

MR. VEEDER: I would want to check that. I don't believe that that is correct.

THE COURT: As I understand it, what you did is that there were the two applications pending at the same time, and you presented AK-11 in which you talked about your need for water at the Base.

MR. VEEDER: AK-11, your Honor, is much after this report, which is AK-3, which is December 24, 1947.

THE COURT: When was the permit granted?

MR. STAHLMAN: The notice went out on February 2, 1948,

H-4

16,214

T-48

1  when the Navy was notified by the letter in relation to the

2  issuance of the permit.  The permit is right here in Vail's

3  A, and the date of the permit is --

4    MR. ILLINGSWORTH:  The 18th of February.

5    MR. STAHLMAN: The 18th of February, 1948.  The letter

6  went out on the 5th, and the permit is dated the 28th, and

7  that was the letter to Fallbrook, the Commandant of the

8  Eleventh Naval District, and it refers only to the Vail

9  application, and yet it went out to all three of the people.

10   THE COURT:  What I think you should do -- or, wait.  The

11 United States appeared through a Navy Officer?

12   MR. GIRARD:  Yes, your Honor, a Captain Hall and a

13 Colonel Schwindler of the Marines.

14   THE COURT:  They appeared at the hearings, which

15 hearings were joint hearings on  Vail's Application 11518

16 and Fallbrook's Application 11586, and thereafter on January

17 6th, 1948 there is Exhibit AK-11, at the request of the

18 Division of Water Resources in their consideration of

19 Applications '518  and '586.  They presented Exhibit AK-11,

20 pointing out the needs of the United States on the River,

21 and pointing out the hardships that would be entailed if

22 '586, the Fallbrook application, was granted.  This evidence

23 was before the Water Resources Board at the time it thereafter

24 decided the matter of both Application '518 and '586.  That

25 is really what happened.

16,215

t-49

MR. VEEDER:  Then I object on the ground that the finding is totally irrelevant and has absolutely nothing to do with this case.

THE COURT:  Overruled.  That is what happened, and I think there is no doubt about it.

MR. VEEDER:  If it is overruled, it is overruled.  I just want our strong opposition to the innuendoes that are in the findings.

THE COURT:  There are no innuendoes.  I am just trying to tell you what actually  happened.

It is true that you suffer from the granting of the one permit, but they were presented jointly, and they heard the evidence.

MR. VEEDER:  The reason being, and I will read Exhibit 162, why we could withdraw our objection to the Vail Company application, and the reason is as follows:

It is a letter signed by, "Vail Company, by Mahlon Vail, Managing Trustee," to the Commanding General of the Marine Corps, and I read:

"Following a conference in the office of Public Works Officer, 11th Naval District, we wish to state that in the Superior Court Judgment now in effect, apportioning the waters of the Santa Margarita River between us, it is our understanding and belief that the 1/3 and 2/3 division is of the total water crop

16,216

t-50

of the stream system, including flood water.  Any diversions that we may make by means of Vail Dam and reservoir will not mature into an appropriative right as against you, over and above or superseding the proportion of water allotted to us by the Judgment.

"It is our understanding that this statement will enable you to withdraw your Protest of August 14, to our Application No. 11518.  This will enable us to proceed more promptly with the dam construction, and the earlier impounding and beneficial use of flood waters.

"It is understood that a detailed method of operation of Vail dam and other measurements necessary to the division of the stream in accordance with Judgment will be the subject of a later agreement between us."

That is the reason why the United States of America withdrew its opposition to the application made by the Vail Company.

MR. GIRARD:  I don't think that Mr. Veeder understands what this finding does.  As I understand it, this finding does not hold that the United States did not successfully withdraw its protest.  It just sets forth exactly what happened.  There is no conclusion of law, Mr. Veeder, that says that your protest was not withdrawn.

t-51

1    MR. VEEDER:  I believe there is a statement in his

2    Honor's opinion that I want to cover on that.

3    THE COURT:  All right.  Let's go to XXXIV.  What is

4    your next objection?

5    MR. VEEDER:  If I may have just a moment, your Honor,

6    because these are related.

7    I am turning now to XXXVII, your Honor, in which the

8    statement is made, and I would like to read it, if I may,

9    because you made a revision in it.   This is on Line 22,

10   after the semicolon:

11   " . . . that the ground water basins within the

12        military enclave and used by the United States of

13        America to satisfy almost all of their reasonable and

14        beneficial water requirements as previously found

15        herein have been recharged periodically since the year

16        1948 to such an extent that the United States of

17        America", and then you made a change there.

18   THE COURT:  "has" - -

19   MR. VEEDER:  "has been able"?

20   THE COURT:  "has been able in large part" --

21   MR. VEEDER:  I wanted to be sure that I have it right.

22   THE COURT:  --"to satisfy its lawful needs from said

23   basins, as annually recharged".

H-5

24   MR. VEEDER:  Well, I would like to have reflected the

25   date when these findings are being entered.

t-52

THE COURT:  Well, we do that, and then we say that in fact as of May the ground water basins were full, and then we add the five lines off of Note 11.

MR. VEEDER:  That I am asking to have clarified.

THE COURT:  The five lines off of Note 11--

MR. VEEDER:  That is from?

THE COURT:  From the opinion.

MR. GIRARD:  That is from the last page of the opinion:

"There has been some slight lowering of water levels but there still remains a great amount of water in the basins.

"The water year of 1960 has been one of the dryest in history.  Its impact on the basins cannot immediately be determined."

MR. VEEDER:  Is that what you are adding on there?

THE COURT:  Yes.

MR. VEEDER:  I think there we should put in the fact that sewage effluent has been utilized to a large extent to recharge the basins, that waters impounded in Lake O'Neill have been used largely to recharge the basins, and I think that that would clarify that finding.

MR. STAHLMAN:  I think it will confuse it.

MR. SACHSE:  I will object strongly.

MR. VEEDER:  I am requesting that change be made to show that.

t-53

MR. STAHLMAN:  Then you can go ahead and say about your taking water outside of the watershed.

MR. VEEDER:  Wouldn't it be better for me to finish my objections, your Honor, and then let the comments come?

THE COURT:  Yes.

MR. VEEDER:  I think that a sentence following the last sentence in XXXVII would be reflective of what actually exists.  That sentence, in my view, should be substantially to the effect that the sources of the recharge have been very substantial sewage effluent returns to the basin by the Marine Corps, by the release of waters impounded in Lake O'Neill, and that the basins have been maintained at their present level by the careful husbanding of the resources by the Marine Corps.

MR. STAHLMAN:  I think if you are going to put the sewage in there, you might say that the sewage is the result of water that has been exported out of the watershed in large quantities, and a small quantity then returned to the watershed as sewage.

MR. VEEDER:  All of the diversions out of the watershed were subject to the stipulated judgment.  I would like to have that.

MR. SACHSE:  I would suggest then we add that 50 per cent of the use is now currently outside of the watershed.

MR. GIRARD:  There is one thing we have to consider in

t-54

1   this finding.  There is only one bit of evidence that came

2   in on the recharge of the ground water basins in Camp

3   Pendleton in this case, and that was not put in by the

4   United States, but by the State of California, and Mr.

5   Illingsworth specifically said that when he made his

6   computations that sewage was not included in his computations

7   because he did not think it was important enough to make

8   a great impact on the basins' recharge.  I am not talking

9   about geology.  I am talking about hydraulics.

10      MR. VEEDER:  We put in a great amount of evidence on

11   that.

12      MR. GIRARD:  But this finding was drafted on Mr.

13   Illingsworth's evidence, and if there is a conflict, I would

14   like to rely on him.

15      MR. VEEDER:  I don't believe that there is a conflict.

16   If you will check the exhibits put in by Colonel Bowen, we

17   put in acre foot recharge, and also extensive from runoff.

18      MR. SACHSE:  That is right.

19      MR. STAHLMAN:  I still think that if you are going to

20   talk about the recharge, you have to state that the sewage

21   is a part of the water which has been taken out of the

22   watershed, and not only that, that if it had been used for

23   farming, and so forth, you would have had a natural recharge

24   into the basin.  So you are adding nothing to it by reason

25   of the return of the sewage.  If this had been used for

16,221

t-55

1    farming, you would have had a much larger percentage return

2    than your sewage return.

3         MR. VEEDER:  I am trying to make it clear that the

4    findings are of immense importance to this Court, and from

5    my point of view, I desire to have them reflective of the

6    facts, as I am sure your Honor is.

7         MR. STAHLMAN:  The ultimate facts.

8         MR. VEEDER:  The ultimate facts.

9         MR. GIRARD:  I think the evidence will sustain the

10   finding that these things are so recharged.

11        MR. VEEDER:  From 1952 and 1958; is that it?

12        MR. STAHLMAN:  We went over this thing this morning,

13   your Honor, when Mr. Veeder was right here, and you made

14   these corrections.

15        THE COURT:  There is no question but what the major

16   recharge is from the runoffs.

17        Now, whether we should mention recharge from the sewage

18   return or from discharge from Lake O'Neill, then raises

19   other questions.  If you say that you recharge it from the

20   sewage, then you are back to what?  That you have taken it

21   out of the watershed, and that it is brought back in by

22   sewage return.

I fls.

23

24

25

I take

P 46

1    MR. GIRARD:  I, personally, don't think we should change

2  this finding as suggested by Mr. Veeder.

3    MR. VEEDER:  I feel this way, your Honor, on this propo-

4  sition, that there are only two years of recharge in the

5  last twelve.

6    THE COURT:  Well now, Mr. Veeder, that is not correct.

7  There are only two years when water ran into the ocean.

8  There have been other years when flood waters came down

9  somewhere or some waters came down in the winter.

10    MR. VEEDER:  Some waters.

11    THE COURT:  Which recharged your basins.  The only two

12  years you are talking about is when it passed clear over your

13  bottom basin and went into the ocean.  The evidence does

14  not show that there was not water that came down in freshets.

15    MR. VEEDER:  Your Honor, here is the position that I

16  think should be reflective here, in the name of justice.

17  We are returning around 65% of the water utilized.

18    MR. SACHSE:  So are we.

19    MR. VEEDER:  By sewage effluent.  That is far higher

20  than any agriculture return, and I think that failure to

21  put in those aspects to which I allude, namely, the careful

22  husbanding of the water -- give us credit for the return

23  of the sewage effluent.

24    THE COURT:  Of course, this finding was directed at

25  the Vail Dam, whether Vail Dam has adversely affected any of

P 47

1   your rights, and has to be viewed in that light.  That is

2   the purpose of that finding.

3       I am getting tired and weary of this.  Maybe you are,

4   too.  Take a short recess.

5       MR. VEEDER:  I am extremely tired.

6       THE COURT:  Here is this proposed XII which has been

7   typed up.  You may look at it.

8       (Recess.)

9       THE COURT:  I just dictated a proposed finding to my

10  secretary.  I will have it here in a minute.

11      I want to find the facts as they are, and as to sewage

12  effluent I am going to refer to how much went out and how

13  much came back in.  I am going to refer also to the flood

14  waters that ran across your basin in 1952 and 1958 and spilled

15  into the ocean.  I am going to refer to winter rains in other

16  years which raised your basin but did not spill into the

17  ocean.

18      MR. SACHSE:  Do I understand that you are going to make

19  findings on sewage effluent?

20      THE COURT:  I have just roughly knocked out something

21  here.  I'll give it to you.  We ought to have an end to this.

22  I don't mind finding facts which are true.

23      Let's go into some other matter and I will have it here

24  in a minute for you to look at.

25      MR. VEEDER:  I am going to have to inquire as to what

16,224

P 50

1    is meant in this XXXIX.  If there is some implication I don't

2    get it.  I would like to read it:

3            "That it is not true that the United States

4        of America withdrew its protest as found in Finding

5        XXXIII above upon an assurance that the Vail Company

6        would never seek to modify, change or enjoin the

7        water allocation and provisions of the 1940 Judgment

8        referred to in Finding IV above; it is not true that

9        the actions of the Vail Company in obtaining a permit

10       for the storage of water at Vail Dam and constructing

11       Vail Dam and constructing Vail Dam and storing water

12       therein were in conflict with any provision of said

13       1940 Judgment."

14   I don't get the implication of that.  Is it not just a

15   negative finding?

16       MR. GIRARD:  Yes.  As I understood, you contended that

17   you withdrew your protest on the idea that Vail would never

18   seek to get out of the stipulated judgment.  As I understand

19   the facts, you may have withdrawn your protest on an assump-

20   tion that Vail would still comply with the stipulated judgment

21   at that time.  But I don't think there was any discussion,

22   certainly no evidence, that indicated that Vail would be

23   bound forever by the stipulated judgment.

24       MR. VEEDER:  Is there anything in the evidence -- that

25   is what I am shooting at -- to support the first half of this

P 51

1   finding down to line 11, from 7 to 11?

2       MR. SACHSE:. Didn't you file, Mr. Veeder -- I am just

3   asking, I don't recall -- didn't you file an old memorandum

4   and set of points in which you made this very contention?

5       MR. VEEDER:  No, I made the contention that we had

6   changed our position by reason of it; that it would be in-

7   equitable now to make the change.  But I have never said

8   that Vail Company had agreed that it would not modify it.

9       THE COURT:  I am satisfied with XXXIX.

10      MR. VEEDER:  All right, I am objecting to it, because --

11      THE COURT:  The objection is overruled.

12  What is the next one?

13      MR. GIRARD:  XII is the next one.

14      MR. STAHLMAN:  XXI.

15      THE COURT:  What is the next one?

16      MR. VEEDER:  I certainly object to XL, which says:

17          "It is not true that the mere withdrawal of

18      the protest by the United States of America as found

19      in finding above, . . "

20  What is that above you have there?

21      MR. GIRARD:  It should be XXXIII.

22      MR. VEEDER:  You are going to enter XXXIII now?

23      MR. GIRARD:  Yes.

24      MR. VEEDER:  ". . . was of any benefit to the Vail

25      Company in the acquisition of the permit referred

P 52

1          to in said Finding XXXIII above."

2          THE COURT:  Isn't that a correct conclusion?  The

3    permit was granted not to impinge on any vested rights.

4    Why wouldn't they grant a permit for a dam on this stream?

5    I think it was very sensible to permit a dam, and whether

6    the Government had objected or not it is my opinion that a

7    permit would have been granted.

8          MR. VEEDER:  It is my view, however, that there passed

9    a valuable consideration from the United States when it

10   made the withdrawal, and I protest and object to the finding

11   as written.  I think the cases support that.  That we changed

12   our position in reliance upon the representation by the Vail

13   Company, and that they are continued to be bound by the

14   judgment.

15         THE COURT:  Are you satisfied with it?

16         MR. GIRARD:  Yes, I am, your Honor.

17         I might point out that I believe the judgment itself

18   provides that you could build storage reservoirs.

19         THE COURT:  Yes, we found that.  The objection is over-

20   ruled.

21         What is the next one?

22         MR. VEEDER:  Well, of course, XLIII is entirely, in my

23   view, in error for this reason, that there has been no en-

24   joining of the enforcement of the judgment.  That language

25   is improper in my view.

P 53

1    MR. SACHSE:  Change it to "will in any way interfere".

2    MR. VEEDER:  I don't believe you can foretell or fore-
cast or that there is any evidence in the record upon which
you could foretell or forecast that it will not affect us.
Of course it will.  But I don't think there is anything in
the record to support your conclusion.

7    THE COURT:  Overruled.  Insert "will impair" instead
of "impairs."

9    Conclusions of law.

10    MR. VEEDER:  Well, your Honor, I object to each one of
them.  I will be glad to run through and give you my statement
on them, if you want it.

13    THE COURT:  Yes.

14    MR. VEEDER:  To begin with, I of course object that
there is any reason for viewing the 1930 findings with the
1940 judgment.  I believe that it is a contract complete in
itself, and that there is no relationship between the old
finding and the judgment, which included the --

19    THE COURT:  You might somewhere make a pretty good
argument on other matters, but this one, I think, is open
and shut.  Your objection is overruled.

22    MR. VEEDER:  I object to II because I don't believe
that this what you would call an equitable riparian alloca-
tion of water between the parties.  I think that the statement
is correct that was made that the stipulated judgment was

P 54

1 entered into for the purpose of concluding the litigation

2 among the parties and that it was agreed that the waters

3 could be used upon riparian and non-riparian land; that water

4 could be stored in violation of our riparian right; and I

5 think that is what was done and not an equitable apportion-

6 ment of riparian right.  That is my objection to No. II.  I

7 don't think it is reflective of what is meant.

8       THE COURT:  Overruled.

9       MR. VEEDER:  III.  It is true that there are parties

10 certainly other than the United States of America and Vail

11 Company, and at the time the 1940 judgment was entered into

12 there is a specific finding by the trial judge, and it is of

13 course recognized by everyone that the stipulated judgment

14 related only to two people and could have no effect upon

15 anyone else.  No effort was ever made to enforce it upon

16 other people.

17       THE COURT:  Overruled.

18       MR. VEEDER:  In addition, on page 17 in regard to

19 conclusion of law III, where the statement is made that it

20 is not a fair riparian apportionment between the Vail Company

21 and the United States of America, I want to say that there

22 is no finding to support that conclusion of law nor to which

23 that could relate.

24       MR. GIRARD:  There are several findings in there, one

25 in particular as to the uses of other people who were not

P 55

1    parties to the original judgment where those uses had

2    substantial effect on the stream and on the amount of water,

3    and in fact as Mr. Kunkel testified the way the water moves

4    itself.  In other words, it goes in reverse gradient.  And

5    if those peoples' uses have changed the stream to such an

6    extent that there has been an actual factual change from

7    that which existed in 1940, I think the 1940 judgment could

8    very well be inequitable on the basis of these other persons'

9    uses, proper or not.

10       THE COURT:  What is the next one?

11       Overruled.

12       MR. VEEDER:  The next objection that I have, and I

13   believe it is in error again, in my view, because there are

14   no facts to support it, upon which it would function.  It

15   says:

16           "That to the extent the 1940 Judgment attempted

17       to allocate all of the waters of the Santa Margarita

18       River to the parties thereto it is void in that other

19       persons not parties to that action had substantial

20       rights thereto."

21   Now, I don't know what that means.  Does this mean that it

22   is void because other people had rights?  What does it mean?

23       MR. SACHSE:  What it says.

24       MR. GIRARD:  I think, as pointed out in the opinion, the

25   judgment says that it allocates all the waters, and it does;

P 56

1   it makes an allocation of a total of 100% of all of the

2   waters of the river, and obviously it could not have done

3   that, and to the extent that it did it is void.

4       THE COURT:  I am satisfied with it.

5       MR. VEEDER:  Is that all it is?

6       THE COURT:  That is what it is.  Overruled.

7       MR. VEEDER:  I object to Conclusion of Law V.  We say

8   that the judgment was and is a contract and --

9       THE COURT:  Overruled.

10      MR. VEEDER:  Your Honor, where did this idea of a pooling

11  agreement come from?  I have never advanced that.

12      THE COURT:  You have never said it in so many words,

13  but as I understand your arguments, your arguments have been

14  to the effect that actually what the Government and Vail did

15  was to say whatever rights the United States of America and

16  Vail may have we are sharing those rights two-thirds to the

17  United States and one-third to Vail.  You have said that many

18  times.

19      MR. VEEDER:  If that is what you mean by that, I

20  strenuously object to it, because we have never advanced that

21  thought.

22      THE COURT:  Not in those words, but I can show you

23  many places where you have -- in fact, in answer to some of

24  my questions as to how this was to work this was your answer,

25  that between the United States and Vail -- it doesn't make

P 57

1    any difference what other peoples rights may be -- just

2    between these two parties you took the whole bundle of rights

3    that the United States and Vail might have had and those

4    rights were then shared between you one-third and two-thirds.

5    So that if, taking into account other riparians, the uses

6    of these two major users had to be cut down, you still then

7    took the position -- in fact, your last little memorandum

8    on blue paper calls attention to Paragraph XII, I think,

9    which said that at all times the use of Vail shall be one-

10   half.

11        I am satisfied with it.

12        MR. VEEDER:  I have objected.

13        THE COURT:  Overruled.

14        MR. VEEDER:  I, of course, object to Conclusion of

15   Law VI.  I believe that the California law and the law in

16   general holds that a stipulated judgment of the character

17   here involved is a contract, and certainly under the circum-

18   stances which exist Vail Company could not rescind, it

19   being totally inequitable on the basis of requesting us to

20   change our position, which we did in reliance upon their

21   representation that they would be bound by the stipulated

22   judgment.

23        THE COURT:  Overruled.

24        MR. VEEDER:  Number VII.  I continue to state that

25   the 1930 findings have nothing to do with the 1940 judgment.

P 58

1    THE COURT:  Overruled.

2        MR. VEEDER:  There is nothing to support the statement

3    in Paragraph VIII that it would be inequitable as to Vail

4    Company to enforce the provisions of the 1940 judgment and

5    at the same time allow the United States to not be bound

6    by the provisions of the 1930 findings.  There is nothing

7    whatever which would show that the 1930 findings have any

8    relationship at all to our position in this matter.  That

9    is my position there.

10       THE COURT:  Overruled.

11       MR. VEEDER:  We, of course, disagree.  We think that

12   Vail's are estopped by laches and they are estopped by

13   affirmative representations to the United States that they

14   would be bound by the judgment.  Particularly, I refer to

15   the relationship with the Naval well and for the construction

16   of the dam and to repeated cooperative acts of the United

17   States and Vail Company under the stipulated judgment.

18       THE COURT:  Overruled.

19       MR. VEEDER:  And of course I disagree that the divesti-

20   ture of an invaluable right to the use of water is completely

21   contrary  to the statement in Conclusion of Law X.

22       THE COURT:  Overruled.

23       The form of the decree.

24       MR. VEEDER:  Your Honor, the decree is nothing more nor

25   less that a feflection of your findings of fact and conclusions

P 59   1    of law, and of course I object to that.

2        MR. GIRARD:  I should point out there to your Honor and

3    everyone here, you will note that the decree -- and this is

4    primarily for the benefit of the United States -- specifically

5    provides that all parties, successors and parties in this

6    litigation are enjoined from attempting to enforce any

7    provision of the judgment or stipulated judgment.  That

8    would have reference, in essence, to people like Mr. Sachse

9    who might have tried to raise the res adjudicata issue on

10   the 1930 findings --

11       MR. SACHSE:  You stab me to the heart.

12       MR. GIRARD:  And it is my understanding that everybody

13   felt that the 1940 judgment went out.  It would be just too

14   inequitable to let anyone raise the 1930 findings on estoppel.

15       THE COURT:  All right, have you looked over proposed

16   No. XII?

17       MR. GIRARD:  I think if you are going to make in this

18   suggested finding that you just dictated specific reference

19   on sewage, maybe the objections to XII might disappear and

20   we can consider those sewage things in that finding of yours.

21   But this finding primarily just says that the recharge occurs

22   primarily from the winter and early spring runoff.  It

23   doesn't conclude that it comes entirely from that, but

24   primarily from that.  That is the only change in it over

25   what your Honor did.  I think it is a little better just to

P 60

1    use the words "primarily by the late winter and early

2    spring runoff."

3        MR. SACHSE:  I think the words "following precipitation"

4    don't add anything and make it hard to read, frankly.  I

5    think if you scratch them out it will read better.

6        MR. GIRARD:  All right.

7        MR. VEEDER:  Where?

8        MR. SACHSE:  In the middle, it says "winter and early

9    spring runoffs to a degree . . "  I suggest that we delete

10   "following precipitation."  We know that runoff must follow

11   precipitation.  It is more logical reading without it.

12       THE COURT:  Finding VIII is the right finding?

13       MR. GIRARD:  Yes, that is the finding that basically

14   describes the ground water pumping.

15       THE COURT:  You say "at the present time."  " . . up

16   to the present time" or "up to the date of these findings."

17       MR. GIRARD:  Or "as of the date of the findings," I

18   guess.

19       THE COURT:  We are really talking about the few years

20   past, and you say that at the present time they have been.

21       MR. SACHSE:  You refer to the past.

22       THE COURT:  It looks all right to me, subject to

23   how this other one looks.

24       MR. STAHLMAN:  Here it is now.

25       THE COURT:  Somebody pass these out.

16,235

P 61

1    MR. GIRARD:  What number was this, do you recall, your

2    Honor?

3         THE COURT:  I'll tell you in a minute.

4         MR. SACHSE:  It is XXXVII.

5         THE COURT:  Yes, it is XXXVII.  " . . basins of the

6    United States within Camp Pendleton . . "

7         MR. SACHSE:  "Within" in place of "hear;" is that it,

8    your Honor?

9         THE COURT:  Yes.  " . . that on other years" instead

10   of "intervening years".

16,236

J-1
T-56

MR. VEEDER:  Your Honor, on that sewage effluent matter, I think, for example, in years like this year, or years like last year and the years previous the sewage effluent was far in excess of the natural recharge.  For that reason we say that in a small part the basins have been recharged by the return of sewage recharge to the basins.

I cannot accept that this is quite reflective of the situation that exists.

THE COURT:  What was your total acre feet used last year in and out of the watershed?

MR. VEEDER:  Colonel Bowen, could you give that to his Honor?

COLONEL BOWEN:  Referring to Plaintiff's Exhibit 150-A, a copy of which I have before me, it shows for the water year 1960 a total of 4640 acre feet pumped from the Santa Margarita River for military purposes.  Of that amount 2600 was used outside the watershed.

MR. SACHSE:  That doesn't include agricultural, though, Colonel, does it?

COLONEL BOWEN:  That is just for military purposes.

THE COURT:  Then what is the total for agricultural?

COLONEL BOWEN:  Referring to a copy of Exhibit 151-A, which I have here, for the water year 1960 it shows a total of 1110 acre feet pumped from the Santa Margarita River for

t-57

1    agricultural use or for irrigation.  Of that amount 680 was

2    used outside the watershed land.

3        THE COURT:  And the return of sewer effluent has been

4    how much?

5        COLONEL BOWEN:  Referring to Plaintiff's Exhibit 119-A

6    it shows this by plants and by water years, the amount of

7    sewage effluent discharged at the plant.

8        Plant Number 1 shows 728.22 acre feet discharged for

9    the water year 1960.

10       Plant Number 2 shows 677.38 acre feet of effluent

11   discharged for the water year 1960.

12       THE COURT:  677.38?

13       COLONEL BOWEN:  Yes, sir.

14       THE COURT:  All right.

15       COLONEL BOWEN:  The only other plant which treats sewage

16   effluent originating from usage outside the watershed is

17   Plant Number 13, and for water years 1959 and 1960 Plant

18   Number 13 has treated sewage effluent arising from uses

19   both within and without the watershed.  So I go back to

20   1958, when it treated only sewage originating from outside

21   the watershed.  It was 229.08.

22       THE COURT:  Then is it correct to say that by the water

23   year of 1960 you mean you were in the water year commencing

24   April 1, 1960 and running through April 1 of 1961?

25       COLONEL BOWEN:  No, sir.  The water year is September

J-2

16,238

1      1st to October 30th.

2          THE COURT:  Then you mean the water year commencing in

3      September of 1959 and running to October of 1960?

4          COLONEL BOWEN:  Of 1960, yes, sir.

5          THE COURT:  During that year you used a total of 5,740

6      acre feet?

7          COLONEL BOWEN:  That is for all military and agricultural

8      use.  That is 5,750 acre feet.

9          MR. SACHSE:  One other point:  All of this sewage is

10     not returned to the basin, is it?

11         COLONEL BOWEN:  No.  These figures I read are the

12     measurement of the sewage discharge.

13         MR. SACHSE:  In other words, some of it is  used outside

14     the watershed and is not returned?

15         COLONEL BOWEN:  That is correct.

16         MR. GIRARD:  You mean some of the sewage discharge?

17         COLONEL BOWEN:  Was used outside.  For example, the

18     sewage from Plant Number 2 was used to irrigate the golf

19     course which is in Windmill Canyon.

20         THE COURT:  So the return to the watershed is 728 and

21     677--

22         MR. SACHSE:  It is less than the total, your Honor.

23         MR. STAHLMAN:  This is the total they discharged from

24     the plants, as I understand it.  Then they used some of it

25     outside of the watershed.

1   THE COURT:  Then this is not the return to the watershed?

2   COLONEL BOWEN:  Your Honor, I very clearly stated that
3   this is effluent discharged from the plants.  I can only
4   make an estimate on that.

5   THE COURT:  Well, what would be your estimate in the
6   year 1959-1960 of effluent returned to the watershed?

7   COLONEL BOWEN:  Did I make that estimate on your
8   examination?

9   MR. SACHSE:  I don't recall it; not to my recollection.

10  COLONEL BOWEN: There is approximately 400 acre feet
11  used, say, to irrigate the golf course.  Then there are
12  evapo-transpiration losses en route, which probably amount
13  to around 50 per cent, so my rough calculations, your Honor,
14  indicate about, oh, 625 acre feet.

15  THE COURT:  Returned to the watershed?

16  COLONEL BOWEN:  Returned to the ground water basin, your
17  Honor.

18  THE COURT:  To the ground water basin.

19  COLONEL BOWEN:  More than that, of course, returned to
20  the watershed.  The major losses, of course, occurred after
21  it had been returned to the watershed, and while it was being
22  conducted to the ground water basin.

23  THE COURT:  Then the amount of water taken out of the
24  watershed is about 3280 feet?

25  MR. SACHSE:  That is our figure as of last year.

16,240

t-60

1     MR. STAHLMAN:  That is for last year.

2     COLONEL BOWEN:  That is the sum of both irrigation and

3  military uses, yes, your Honor.

4     THE COURT:  Then in the water year 1959-1960 out of

5  approximately 3200 acre feet exported out of the watershed

6  by the United States only approximately 625 acre feet have

7  been returned to the basin?

8     MR. STAHLMAN:  That makes your finding correct.

9     MR. GIRARD:  What was that water year?

10     MR. SACHSE:  1959-1960.

11     THE COURT:  So that out of a total of 5750 acre feet

12  there were only 625 that had come from return?

13     COLONEL BOWEN:  No, your Honor, if I may be so bold,

14  sir?

15     THE COURT:  Yes.

16     COLONEL BOWEN:  There are other sewage treatment plants,

17  your Honor, which treat the effluent used inside the water-

18  shed.  I believe your Honor read the total figure of water

19  pumped.  If you want the amount of sewage effluent returned

20  to the basin,  used within the watershed, then we would have

21  a higher figure.

22     THE COURT:  What is that figure?

23     COLONEL BOWEN:  Well, in addition to those plants I

24  have given your Honor, there would be 390.42 acre feet of

25  water discharged from Plant Number 3 in the water year 1960.

t-61

252.04 acre feet of water discharged from Plant Number 8 in water year 1960.   277.12 acre feet of water discharged from treatment plant Number 9 in 1960.   216.03 acre feet of effluent discharged from Plant Number 10 in 1960.   357.50 acre feet of effluent discharged from Plant Number 11 in 1960.   And 303.31 acre feet of effluent discharged from Plant Number 12 in water year 1960.

All of these figures I have read from Plaintiff's Exhibit 119-A.

MR. SACHSE:  If you utilize those figures, though, you will have to change your Honor's draft.

MR. VEEDER:  Franz, that is the point that I am making that when you say that in a small part the basins have been recharged by the return of sewage effluent to the basin, -- the point I make is that it seems to me when we use the word "recharge," you look to all sources, and what proportion of the sewage in the year 1960 is related to the fresh water that went in there.   So I think in years of drought it is not a small part of the recharge, but, rather, a substantial part of the recharge.

MR. GIRARD:  Your Honor, of course, it wouldn't be proper to consider the recharge on a yearly basis.

COLONEL BOWEN:  The last figure, your Honor, to bring the   effluent return to the basin from Plant Number 15 indicated that in 1958 it was 229.08, which is the last year

t-62

1    that they handled sewage arising wholly outside of the

2    watershed.   In 1960   513.03 acre feet of effluent was

3    discharged from Plant Number 3.

4         THE COURT:  Plant 13, you mean?

5         COLONEL BOWEN:  From Plant Number 13, yes, sir.  That

6    would be 283 acre feet more than the 230 I estimated earlier.

7         THE COURT:  By that you mean that the 283 acre feet

8    probably came from uses within the watershed?

9         COLONEL BOWEN:  That's right, your Honor.

10        THE COURT:  And 230 from uses outside the watershed?

11        COLONEL BOWEN:  Yes, sir.

12        THE COURT:  So you would have a total of a little over

13   2000 acre feet; is that right?  Would it be 2079 acre feet?

14   Do you want me to read the figures I have?

15        COLONEL BOWEN:  The total that I have, your Honor, is

16   2,309.45 acre feet from sewage effluent.

17        MR. SACHSE:  Two thousand what, Colonel?

18        COLONEL BOWEN: 2,309.45.

19   MR. SACHSE:  Is that the same figure as the last one?  In

20   other words that is the discharge from the plants, and

21   subject to modifications from losses in transit?

22        COLONEL BOWEN:  Yes, sir, all these figures are

23   discharge from plant.

24        THE COURT:  I must have a mistake.  The figures I have

25   down now are for water use in the water shed, and then in

t-63

16,242

1    turn from effluent, and they are 390.42 from Plant 3;

2    252.04, Plant 8; 277.12, Plant 9; 216.03, Plant 10; 357.50,

3    Plant 11; 303.31, Plant 12; and 283 approximately, estimate,

4    from Plant 13.

5        COLONEL BOWEN:  Yes, sir.  Does that total 2,079, your

6    Honor?

P 1

J 3

1    THE COURT:  That is what I have.

2    MR. SACHSE:  Thank you.

3    COLONEL BOWEN:  My error, sir, is that my clerk here

4    added 283 for Plant 13 here, and it has been corrected now

5    to read 2,079 discharged from plants.

6    THE COURT:  He had 283 in there twice, then?

7    COLONEL BOWEN:  Yes sir.  So it now is 2,079 within

8    the watershed and 1,635 without the watershed.

9    THE COURT:  1,635?

10    MR. SACHSE:  From which he deducted the 400.

11    COLONEL BOWEN:  That was discharged at the plant again.

12    THE COURT:  I thought he said 625.

13    MR. SACHSE:  Yes, your Honor, but he arrived at that

14    figure in this way.  He took gross discharge from 1,635,

15    deducted from that 400 which never came back to the watershed

16    at all because it was on the golf course, and then cut the

17    balance approximately in half.

18    MR. STAHLMAN:  Let me ask, what would be your opinion

19    as to the loss; in other words, the amount that would actually

20    enter into the storage unit from that which is abstracted

21    from within the basin?

22    COLONEL BOWEN:  Most of that that is within the basin

23    is discharged directly from the plant to the basin or a very

24    short distance below the basin, and the losses, in my opinion,

25    would be somewhat less.  I would say they would be in the

P 2

1    neighborhood of 40% rather than 50%.

2         MR. SACHSE:  Do you find 1,135 then for your net figure,

3    -- 1,133.6?

4         COLONEL BOWEN:  No, it would be 1,247 approximately.

5         MR. SACHSE:  1,248.  So the losses would be somewhat

6    less.

7         COLONEL BOWEN:  The losses would be somewhat less because

8    they are discharged to the basin directly from the plant.

9         THE COURT:  Do I understand now you mean of the 2,079

10   feet that would leave your plants as reclaimed sewage effluent

11   that the return to the basin would be about 1,240 acre feet?

12        COLONEL BOWEN:  Let's make it 1,250, your Honor.

13        THE COURT:  1,250?

14        COLONEL BOWEN:  Yes.

15        MR. GIRARD:  1,248, so it is close to 1,250.

16        THE COURT:  1,250 acre feet?

17        COLONEL BOWEN:  Yes.

18        MR. VEEDER:  We are pinning him down.

19        THE COURT:  1,250 acre feet, and 625 acre feet would

20   come back into the basin.

21        COLONEL BOWEN:  From that treated outside, yes sir.

22        MR. GIRARD:  It is closer to 620.

23        MR. SACHSE:  The way I figure it it is 617.

24        COLONEL BOWEN:  Well, make it 600, your Honor, and that

25   would be 1,850.

16,245

t-65

THE COURT: 1,850. So of the total use, then, last year of 5,750 acre feet, 1,850 of this was sewage effluent that had been returned to the basin?

COLONEL BOWEN: Yes, sir.

THE COURT: 8,900 acre feet of other water?

COLONEL BOWEN: That is recirculated, your Honor, and, if I may be facetious, it sometimes makes the bourbon clear.

THE COURT: Somewhat what?

COLONEL BOWEN: Sometimes the detergent makes the bourbon clear.

MR. STAHLMAN: Your Honor, it might be well to consider that if this were operated normally or as it had been at the time of the stipulated judgment, there probably would have been a greater amount of water than this returned to the watershed.

MR. VEEDER: There is no evidence to support that, your Honor.

MR. STAHLMAN: There is, too, because there is that evidence that the ke effluent returned as much as 50 or 60 per cent.

MR. SACHSE: I don't know that we have any evidence as to what the return from cattle water was.

THE COURT: Well, I am too tired to think about it any more tonight.

16,246

t-66

MR. GIRARD:  Do you want us to try to work this out?

THE COURT:  See what you think about it.

MR. GIRARD:  All right.

THE COURT:  I don't know whether it is necessary to go into this or not.  The facts are in the record.

MR. STAHLMAN:  I think we are going slightly beyond ultimate facts, your Honor.

MR. SACHSE:  I feel strongly that way, your Honor, and I think it may rise to haunt you at a later date when you are writing findings on other things, and I don't think it was essential for the purposes of your decision on the Vail stipulated judgment.  I don't think it was at all essential.

THE COURT:  Let's think about it until tomorrow morning, and we will meet then at 9:30.

MR. VEEDER:  Your Honor, I talked to Don Stark, and this should be in the record, and he said he will be here tomorrow morning, but he said at 10:00 o'clock.  That was his understanding.

16,247

J-4
t-64

THE COURT:  We can start on these things at 9:30. Give it some thought tonight so tomorrow morning early we can see what we can do with it.

MR. SACHSE:  Then we go into military use after we close this, is that the idea?

MR. VEEDER:  I would guess, if we are going to have company, and certainly Don Stark is going to be here, I would assume that your Honor would want to hear those findings.  I don't know.

MR. SACHSE:  That is right.

MR. VEEDER:  And I think, if your Honor desires, we could consider the  Oviatt findings, and the others that have been prepared.  They are not going to show up.

I have a letter from Mr. O'Malley asking me to have some identification, or, rather, I mean some work done in regard to Exhibit 15.  I think we will have to tell him that Exhibit 15, and that is the geology one and he wants us to outline the Oviatt property on 15, and I don't believe that is practical, so I would like to advise him so, if that is all right with you.

MR. STAHLMAN:  It has so many marks on it already.

MR. VEEDER:  The scale on 15 would not help him any, I don't think, but I will read the letter to you in the morning, your Honor, if that is all right.

THE COURT:  All right.

16,247a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

(Whereupon, at 4:20 o'clock p.m,    )
( an adjournment was taken until    )
(Thursday, April 6, 1961, until     )
(                                    )
(9:30 a.m., Friday, April 7, 1961.  )

- - - - - -

P 18

16,248

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

Dated at San Diego, California, this 6th day of April A.D. 1961.

_Marie G. Sellner_
Official Reporter

_John Swader_
Official Reporter