VOLUME NO. 142

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,
             Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,
             Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      April 7, 1961

Pages:   16,249 - 16,357

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIF.

By _____ DE.

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

A Take

P 1

1                    IN THE UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF CALIFORNIA

3                              - - -

4              HONORABLE JAMES M. CARTER, JUDGE PRESIDING

5                              - - -

6     UNITED STATES OF AMERICA,        )
                                       )
7                         Plaintiff,   )
                                       )
8     vs.                              )         No. 1247-SD-C
                                       )
9     FALLBROOK PUBLIC UTILITY         )
      DISTRICT, et al.,                )
10                                     )
                          Defendants.  )
11    _____

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                      San Diego, California

14                      Friday, April 7th, 1961

15                              - - -

16    APPEARANCES:

17          For the Plaintiff:           WILLIAM H. VEEDER, ESQ,
                                         Special Assistant to
18                                       the Attorney General

19                                       CDR. DONALD W. REDD.

20          For the Defendants:

21            Vail Company              GEORGE STAHLMAN, ESQ.

22            Fallbrook Public Utility  FRANZ R. SACHSE, ESQ.
              District, et al.,
23
              State of California       FRED GIRARD, ESQ.
24
              Gibbon & Cottle           CLAYSON, STARK & ROTHROCK
25                                      by DONALD D. STARK, ESQ.

t-47

16,249-A

# I N D E X

(Further Argument on Findings & Conclusions)

(Argument on military use.                    )

    (Mr. Sachse          16,275  )

    (Mr. Veeder          16,303  )

    (Mr. Stahlman        16,338  )

    (Mr. Girard          16,339  )

(No Witnesses.)

(No exhibits identified or received.)

P 2   1   <u>SAN DIEGO, CALIFORNIA, Friday, April 7th, 1961 9:30 A.M.</u>

2        (Other matters.)

3        THE CLERK:  4-1247-SD-C United States of America vs

4   Fallbrook Public Utility District and others.

5        MR. VEEDER:  Your Honor, may I tender to your Honor the

6   language which I have proposed for Finding XIII (page 5, as

7   I remember).

8        MR. STAHLMAN:  Is this on the stipulated judgment?

9        MR. VEEDER:  No, this is the findings that we are work-

10  ing on for Lake O'Neill (handing copy to the Court and a

11  copy to Mr. Stahlman).  The substance of that would be put

12  into Conclusion IV.

13       MR. SACHSE:  Then I don't think this is correct.  In

14  the conclusion of law someplace we are going to spell out,

15  I trust, the terms of the agreement, with April 1 as the

16  date.  This is all right for a finding.  But when we draw

17  the conclusion as to the extent of their right, I think we

18  should use the dates.

19       MR. VEEDER:  Mr. Girard has already tendered to us the

20  language, which we haven't got to yet.  I am just trying to

21  get this done.  There is no question that we will put in

22  that the diversion will commence April 1 and run through

23  October 30th.  Didn't he give you a copy of this?

24       MR. SACHSE:  Yes, exactly.  But I think this is just

25  a stipulation.  Now the judgment itself and the conclusion

P 3

1   of law, I think, should limit the terms of the appropriation

2   in accordance with the stipulation.  I don't object to this,

3   Mr. Veeder.  I think this is correct.  But somewhere in the

4   document, I think --

5       MR. VEEDER:  We certainly have to cover that.  There is

6   no question, Mr. Sachse.  What I am trying to do is to get

7   Finding XIII agreed upon so we can start running.  When we

8   get down to the proviso where we agree to divert as of April

9   1, that will be spelled out in the stipulation.  But we have

10  to have this agreed to, as I see it.

11      MR. SACHSE:  I think the finding is correct, your Honor,

12  for a finding of fact.

13      THE COURT:  It is all right with me, except that further

14  along in these findings there will have to be a finding as

15  to the stipulation or agreement.  There will have to be a

16  further finding by the Court that the Court interprets the

17  appropriative right as to date; the words "after the winter

18  or early spring runoffs from April 1 on to October 31," we

19  have to have that in there, too.  But this comes earlier in

20  the document.  If you want to get started on it, it's all

21  right with me.

22      MR. VEEDER:  Do you want a finding as to your interpre-

23  tation, or do you want a conclusion of law?  That is important.

24  This will be the last finding.

25      THE COURT:  Well, you have to have the finding on the

P4

1    agreement.

2         MR. VEEDER:  Isn't that going to be a stipulation?

3         THE COURT:  But the findings that we draw are based,

4    in part, upon a stipulation as to Fallbrook, and as to

5    other people upon findings of the Court.

6         MR. GIRARD:  Actually, Mr. Veeder, you could take care

7    of this entirely consistently, because in this finding you

8    have "early spring runoff from April 1 to October 31" and

9    in Finding XIV state that a stipulation has been entered

10   into and agreed between the United States and Fallbrook.

11   But if you just put these dates in here instead of "early

12   winter spring runoff" --

13        THE COURT:  No, the evidence shows after the winter

14   and early spring runoff.

15        MR. STAHLMAN:  There is going to be a finding as to

16   the date, I suppose.

17        MR. VEEDER:  That is what he said, that he will make

18   a finding that the period of this appropriation is from

19   April 1 --

20        MR. STAHLMAN:  Yes.

21        THE COURT:  It seems to me that you should just add

22   another finding that Fallbrook and the United States have

23   agreed, by a separate document, that the period for the

24   exercise of this appropriative right is April 1 to October

25   31, and that the Court finds that this period is consistent

P5

1   with the evidence in the case referring to "after the winter

2   and early spring runoff" and accordingly finds that this is

3   the period that the appropriative right was heretofore, and

4   shall hereafter be, exercised, etc.

5       MR. VEEDER:  All right.

6       THE COURT:  Something like that.

7       MR. VEEDER:  All right.  What I will do then, your

8   Honor -- well, I will just hold them up until I get a chance

9   to rewrite them.

10      I mentioned the letter yesterday, your Honor, from Mr.

11  O'Malley.  I would like to hand it up to your Honor, as it

12  relates to these findings which are now being considered

13  (handing document to the Court).

14      THE COURT:  As to Mr. O'Malley's letter, we have, of

15  course, an exhibit in more detail than Exhibit 15.

16      MR. VEEDER:  That is correct.

17      THE COURT:  What is that exhibit number?

18      MR. VEEDER:  It would be 275.  We also have the title

19  data, which, as I remember, is Exhibits 208-A, 208-B and

20  208-C.  I will check that out.  I think that would be the

21  better reference.

22      MR. STAHLMAN:  It shows on there, too, doesn't?

23      MR. VEEDER:  Yes.

24      MR. STAHLMAN:  It is already on there.

25      MR. VEEDER:  That is correct.  Our title records will

P 6   1   take care of it.

2       THE COURT:  Well, they don't take care of what he is

3   asking.  He is asking for a map that shows where the base-

4   ment complex is.

5       MR. VEEDER:  I think they all have to be read together.

6   That is the point I am trying to make, your Honor.  And I

7   don't think Exhibit 15 is a proper reference for that purpose.

8       THE COURT:  No, it is not detailed enough.

9       MR. VEEDER:  I don't think Exhibit 15-E relates to it

10   at all.

11       THE COURT:  It doesn't go far enough east.

12       MR. VEEDER:  That is correct.

13       THE COURT:  What do you propose to do?  Start on these

14   findings, or start on the matter of military use?

15       MR. SACHSE:  Your Honor, before we start on military

16   use, I received a call last night from Mr. Littleworth at

17   home.  I read him your Honor's remarks from the transcript

18   of April 5th where you stated, in substance, that you would

19   consider isolated minor situations where there are minor

20   problems, but that you do not intend, from what you have

21   heard in this case so far, to make any general order of

22   apportionment.  I advised him of that.  He said that under

23   those circumstances he didn't care to be heard on military

24   use.

25       THE COURT:  All right.

P 7

1    MR. VEEDER:  I had thought we would start on the
2    proposed findings this morning, your Honor.  It is up to
3    you.  Mr. Stark is in the courtroom.
4        MR. STARK:  Your Honor, may I clarify?  I am in the
5    courtroom because I had indicated we would do our best to
6    have our findings by the hearings this week.  I have Mr.
7    Girard's draft and I have Mr. Veeder's draft, and I have
8    been working on this.  There are still some exhibits that I
9    didn't have in our file that I wanted to check today, and
10   I am not prepared today to argue the Gibbon and Cottle find-
11   ings and would request that this matter be put over to the
12   next hearing.
13        There is a substantial difference between Mr. Girard's
14   draft and what I believe the record will support.
15        MR. GIRARD:  Those are Mr. Veeder's findings.  I never
16   saw those.
17        MR. VEEDER:  Yes, I prepared a set of what I thought
18   were findings.
19        MR. SACHSE:  Away back.
20        MR. VEEDER:  Yes.
21        MR. STARK:  They related basically to the riparian right.
22   They didn't involve the appropriative or prescriptive right.
23        MR. VEEDER:  I said I didn't think it was an appropria-
24   tive or prescriptive right.  That is what was said in there.
25        MR. STARK:  I have encountered one question, your Honor,

P 8

that I must apologize we aren't able to follow the case
closely enough and perhaps I jumped into the middle of an
argument that has already been settled.  But it seems to me,
from what I can find from the state of the record, that
there is not sufficient record, particularly with regard
to the available water supply in the watershed, to justify
a watershed-wide apportionment.  Part of the transcript that
Mr. Sachse read would indicate that your Honor has indicated
something of that nature.

The other thing is that although there is an inventory
in progress of irrigable acreage, as I understand it, this
does not involve any inventory or consideration of what may
be ultimately one of the substantial riparian uses in the
watershed, which is non-irrigable use on non-irrigable
riparian land -- that is, subdivision use of water.  As I
understand, this has not been considered in the inventory.
And in the absence of testimony on this part of the use or
potential use in the watershed, and in the absence of
adequate evidence of the available total water supply, it
would seem to me that an over-all apportionment is impossible
on the present record as I understand it.  And in the absence
of apportionment -- I can see the value of making findings
in as much as the parties have been before the Court for a
decade and the evidence is in, but so far as conclusions on
appropriative rights or on prescriptive rights, in the

P 9

1    absence of a general apportionment, I wonder somewhat as to

2    their materiality. I realize this statement is made after

3    we have used the better part of a day a month ago arguing

4    the question of the existence or extent of both the appro-

5    priative and prescriptive rights on Gibbon and Cottle and

6    you would propose to prepare findings as to what the facts

7    disclose. But as far as the legal conclusion as to whether

8    a right existed or didn't exist, since its materiality is

9    only in the event of an apportionment, it has occurred to

10   me since the arguments that perhaps --

B fls.   11        THE COURT:   Let's look at it this way, Mr. Stark:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16,258

I have indicated that I am not going to go about or make any findings on apportionment or the physical solution until after the decree is entered cataloguing the rights of the people in the watershed.  Of course, what is irrigable and what are beneficial uses will vary from time to time, and at various times there may be entirely different uses in the Valley.  However, your appropriative and prescriptive rights do not vary.  If you have one, you have got it.  If you haven't got it, you have not got it.  You may lose some of those rights, but at this time you either have them or you don't.

Now, from the standpoint of your clients, your record is sketchy enough now on this appropriative right, and before some people die and further time goes on, it would seem to me you would be well advised to face the issue as to your appropriative right and get it out of the way.

I might tell you that there is not much doubt about an appropriation and there being some water put to some beneficial use, but I don't think the record is sufficient to tell us how much.   We can't even tell how many acres it was used on, and we can't even work backwards and say that it was used on so many acres, and, therefore, you have a right to so much.  The record is too sketchy to say what the amount of this right is, and unless we can fix the amount of the right, then we have got another problem.

16,259

t-2

MR. STARK: Without anticipating getting into argument on the findings, I believe that the record is sufficient from reading Mr. Rowe's and Mr. Tripp's testimony to get to the quantitative amount of the right from an acreage basis. I am apologetic that I wasn't able to get this together for this hearing, but I have been working on the record since it was referred to me, in trying to put this together, but it is just a slow process, coming to me at this stage.

Now, this may be correct as to the appropriative right. As to the prescriptive right, as I understand it the Court indicated that a ruling on that is essentially a question of law, whether such a right could be acquired.

THE COURT: And a question of fact, also.

MR. STARK: Well, what I had intended to do was to submit our findings on an alternative basis, so perhaps I had best just simply ask the Court's indulgence to put this over until the next hearing, with the understanding that I will complete the work today on the exhibits.

I have talked to Mr. Veeder about using his copies of the exhibits, and I will talk to Mr. Girard some today, when he is not involved in here, and have the matter ready for the next hearing.

THE COURT: Could you be ready by next Thursday or Friday?

MR. STARK: No, your Honor. I am sorry, but when I said the next hearing, I was going on the assumption, which is based

16,260

t-3

1   on the last two hearings, that you were holding a hearing for

2   approximately a week each month.

3       THE COURT:  I want to go along as fast as I can on this,

4   and the reason why I suggested Thursday of next week was the

5   fact that the Government wants to argue an injunctive matter

6   on that date against Fallbrook.

7       MR. STARK:  Mr. Girard indicates that he cannot be here

8   next Thursday.  Also, I couldn't be prepared in this case

9   between now and Thursday because I have another matter that

10  is going to consume a substantial amount of time.

11      THE COURT:  Then we will have to fix some other date, but

12  it seems to me the first thing you will have to do is to

13  analyze whether you have enough of a record now, and whether

14  you can get a better record, and if you haven't enough of a

15  record, why not labor on that.

16      MR. STARK:  This was the next thing.

17      THE COURT:  For instance, if you can't get Mr. Tripp down

18  here, you might make a motion on it.

19      Is Mr. Tripp your witness who goes back before 1914?

20      MR. STARK:  Yes, he goes back to the 1800's.

21      THE COURT:  And he is the man from Tulare somewhere?

22      MR. STARK:  Yes, outside of Tulare, in that area.

23      THE COURT:  Then you might be able to make a motion to

24  take his deposition on interrogatories.

25      MR. STARK:  Well, Tripp's testimony, your Honor, is this,

16,261

t-4

1    I think:  He says at about three places that after the upper

2    ditch  went in, which was completed in '97, that after it

3    went in they brought under irrigation from the  upper ditch,

4    or, he made it clear he could only irrigate downward because

5    he didn't pump.  However, they brought under irrigation every-

6    thing between the upper ditch and the lower ditch.

7    Then Rowe's testimony has set forth the acreages on all

8    of those fields to that extent.  It is not precise, but Tripp

9    himself indicated that he did not have specific acreages,

10   and actually the big problem with Tripp's testimony is that it

11   is somebody's recollection back to the 1800's and early 1900.

12   THE COURT:  How are you going to relate acreages to flow?

13   MR. STARK:  I thought we were first talking about the

14   total consumption, the total acre feet measurement.  As I

15   understand it, the Government has fairly settled on an

16   average figure of -- what is it -- 4.0?  I think Mr. Veeder

17   has cited 4.0 and 4.1, but I was assuming using that as an

18   index applied to the acreage under irrigation, since there

19   was testimony by Colonel Bowen, as I understand it, that this

20   is the average of what had been applied in the watershed for

21   diversion purposes from whatever source.

22   MR. VEEDER:  Do you mean the rate of diversion and the

23   measurement of quantity?  Isn't that what you mean, your Honor?

24   THE COURT:  Yes, that is what I mean.

25   MR. STARK:  The rate of diversion, and what I would like

B-2

16,262

t-5

1   to do is to point out that the place that has been put in was

2   on the hearsay objection to Mr. Rowe's testimony, and I would

3   be willing to bring Mr. Rowe down, or to attempt to work it

4   out by a stipulation with Mr. Veeder.

5       Mr. Rowe has defined the smallest part of the pipe, which

6   was the limitation on how much water they could take, and the

7   only question that Rowe was unable to testify to without the

8   use of hearsay was as to the gradient of the pipe at that

9   point, and without knowing the gradient he was unable to give

10  the capacity in second feet because of the gradient.

11      THE COURT:  Then you have the further problem of the

12  head.  In other words, if you had a pipe ten inches in diameter,

13  and you had a lot of water coming in there, you would get

14  much more than if you had a 10-inch pipe and the water just

15  came to the top of the pipe.

16      MR. STARK:  I think the  testimony and the physical fact

17  there is that there is no-- my own recollection goes back

18  about eight years at looking at this, and my recollection is

19  that there is a fairly steady gradient into the channel, so we

20  are not talking about any substantial head on the pipe, but

21  we are just talking about whether the gradient itself increases

22  or builds up the amount of the flow, and I don't know what the

23  answer to that is.

24      I am sure I can get it from Mr. Rowe, and, if necessary,

25  we could bring him down to the next hearing and put him on for

16,263

t-6

1  that purpose then.  Mr. Grover at the time this came on was

2  unable to do it, and from an economic standpoint he wasn't

3  sure that he could afford to go ahead and have Mr. Davidson

.  come down just to check on the gradient.

5  Mr. Tripp's testimony, I think, is probably as complete

6  as his recollection can make it.  It necessarily has to be

7  general, and it was quite specific as to the use, but as to

8  acreages he has said everything below the upper ditch, or

9  from the upper ditch to the lower ditch was irrigated, and

10  the record is fairly clear as to the number of acres involved

11  in those fields, and I don't think any variance in that

12  area could be very material.

13  THE COURT:  Then it is a matter of fixing a date when you

14  can be back; is that it?

15  MR. STARK:  Yes.  Would it be possible that the Court

16  would be having a hearing in the first week or two of May?

17  THE COURT:  Oh, there is a lot of work that can be done

18  here if I can get the lawyers to do it.  We have sets of

19  findings proposed on different things, on the stresses on the

20  alluvium, and so on, and we now have the Colonel's testimony

21  on the amount of the irrigable acres, and we have the plat map

22  showing ownership, and so forth, so it is just a matter of

23  getting down to the mechanical business of drawing up some of

24  these things.  Is that correct, Mr. Veeder?

25  MR. VEEDER:  Yes.

16,264

t-7

THE COURT:  All right.  When can you come back, Mr. Veeder?

MR. VEEDER:  When can I come back?

THE COURT:  And Mr. Stahlman, Mr. Sachse, and Mr. Girard?

MR. STAHLMAN:  I am available.  I have some other cases set, but they can be taken care of.

MR. VEEDER:  I will be here all the rest of this week, your Honor, or, rather, I mean next week.

What is your Honor's convenience in this matter?  I will try to meet it.  I have to go to San Francisco on some other matters, but I will try to be available.

MR. STAHLMAN:  May I ask your Honor this:  I presume you will expect findings on the Vail Ranch, as such?  I mean, we now have all the acreage in, and so forth, and those can be started?

THE COURT:  A lot of things can be started.  What about this:  Can we set the week of April 25th, and the week of May 9th and keep moving on this thing?

MR. SACHSE:  Now, you are beginning to stab me, your Honor.

THE COURT:  What?

MR. SACHSE:  I say you are beginning to stab me.

THE COURT:  If you are going to go to Europe, why, you go ahead, and by then I hope we will have most of your matters out of the way.  When do you intend to leave for Europe?

MR. SACHSE:  I leave myself from New York City on May 15th,

t-10

1   but tentatively I have plane reservations to fly from here to

2   Washington to see my children on Thursday, the 11th, but I am

3   sure that last can be arranged.

4       THE COURT:  What about this:  Instead of making it the

5   week of the 25th and the week of the 9th, how about making

6   it two weeks in a row, say, the weeks of April 25th and May

7   2nd?

8       MR. SACHSE:  That, so far as my personal convenience is

9   concerned, would be much the best.  I don't want to ask other

10  counsel to indulge me too much, but I think Mr. Veeder and I

11  will get rid of the injunctive matter next week.  Then I think

12  it will take me probably about two hours or so to argue the

13  other matter that I have mentioned, and that will take care of

14  it.

15      MR. GIRARD:  I might say, your Honor, I do not object

16  to the date of April 25th, but I have a two-parcel condemnation

17  suit starting on April 17th.  It is scheduled to start at that

18  time, but based on 90 per cent of my experience they usually

19  settle those matters, so I don't think it will go as to both

20  parcels, although I don't know.  I think I will be able to make

21  it, and even if we go ahead as to both parcels, I would not be

22  more than a day late, I don't think.

23      MR. STARK:  May I request, your Honor, as to Gibbon and

24  Cottle that they be assigned somewhere in the range of the

25  4th or 5th of May for their matter?  I have a matter set on the

t-11

1   2nd.

2        THE COURT:  Why is it going to take you that long?  I

3   hate to put you over to the tail end of the two weeks.  What

4   about the week of the 25th sometime?

5        MR. STARK:  In the week of the 25th I am tied up, all

6   that week.  I will be back on the 27th.  Your Honor, I realize

7   that the Court has a much more serious problem of timing here,

8   but from Mr. Grover I not only inherited this case but I

9   inherited some fairly substantial water condemnation cases

10  that are right at the pre-trial stage, and there is a

11  considerable amount of pressure that has been going on in those.

12  I have been working forward on this, but I haven't been able

13  to drop everything for it, and, consequently, that is the

14  situation.

15       THE COURT:  Are those weeks agreeable, Mr. Veeder?

16       MR. SACHSE:  That is perfectly agreeable to me, your Honor.

17       MR. VEEDER:  Your Honor, I am extremely anxious to move

18  this as fast as I can, and I think you understand that.  Our

19  problem is the mechanical problem of getting together the data

20  that we have to obtain for the area, the balance of the area in

21  Wilson Creek and the balance up in Temecula Creek, the data

22  that we have been using in these letters that your Honor

23  sends out.

24       I have talked to Colonel Bowen's office, and to Commander

25  Redd, and that data will not be available until the first week

16,267

t-12

1    in May.  Isn't that correct?

2            COMMANDER REDD:  I believe so.

3            MR. VEEDER:  Now, I want to say that the task of writing

4    these findings and getting these data together is progressing

5    right now, but I could not impose upon your Honor's time, and

6    I don't think I should impose upon the Court's time if this

7    other data is not going to be ready.

8            My own view is on these things we are progressing as

9    rapidly as we can, and we are ready to go ahead with Gibbon

10   and Cottle whenever they are ready, on Oviatt we are ready

11   to proceed, but the other task of these matters with which

12   your Honor is fully acquainted would not make, in my view,

13   very productive days.  That is my concern.

14           I will be here, but I would simply have to state to your

15   Honor that from the standpoint of finishing up the work in this

16   upper area, it is just mechanically impossible, and I can't

17   see any reason for working days in court when nothing could

18   be accomplished from the standpoint of the material that has

19   to be presented.

20           Now, you have the matter of Mr. Hamilton, you have the

21   matter of the Anza Valley, and I have forgotten--

22           THE COURT:  Will they be ready by the 25th?

23           MR. VEEDER:  What I will do is get in touch with him, and

24   I will call him right away, and find out.  If he is ready by

25   the 25th, we can go ahead on that.

16,268

t-13

THE COURT:  There is going to be time spent in either informal conferences with counsel or with the Court on some of these various findings.  That is going to take some time.

MR. VEEDER:  That is what I am speaking of.

THE COURT:  Therefore, I am going to fix the week of April 25th to the 28th and the week of May 2nd through the 5th.

I want Mr. Sachse to work with you so you will have listed everything that he has listed, so that if he wants to go to Europe, we can excuse him and let him go.

MR. VEEDER:  He can leave now, so far as I am concerned.

MR. STAHLMAN:  Yes, and he can take Mr. Veeder with him, as far as I am concerned.

THE COURT:  Now, as far as Mr. Stark is concerned, we can put Gibbon and Cottle on on May 4th.

MR. STARK:  Thank you, your Honor.

THE COURT:  But I would like to have your summation and the material that you will submit before that date.

MR. STARK:  I have in mind getting to Mr. Veeder and Mr. Girard sometime within the next week to ten days a rough draft, and I think we can have that.

THE COURT:  Not so much a draft.  It is going to be a simple matter to draw the findings.  It is what this evidence will be.

MR. STARK:  I am talking about an annotated draft, your

16,269

t-14

B-3

Honor.

THE COURT:  All right.

MR. STARK:  Has Mr. Veeder prepared the findings?

THE COURT:  Yes.

MR. GIRARD:  Maybe this will mean throwing work on other people's shoulders, but I realize from previous experience that we may not have a great deal of work to take up unless we have further findings prepared.  It seems to me with the record that we could pretty well make complete findings right now, although perhaps not conclusive, on Vail and the lands of the United States.

MR. STAHLMAN:  Right.

MR. GIRARD:  I think you still have the military use problem on that, but that does not affect those findings, and I  am willing to work with anyone on that.

MR. VEEDER:  I am perfectly willing to go ahead on whatever the assignments are.  You just gave me yesterday assignments on all these small creeks and told me to prepare findings on those.  I am perfectly willing to do that, but that is going to take some time.  I will do it as readily as I can, and I am trying to set up a procedure so that Colonel Bowen's office can run those things through.

THE COURT:  What Mr. Girard is asking about now is whether we can assign other counsel to do some of these tasks while you are working on the creeks, and the irrigable acreages,

16,270

t-15

1   and all that, and that is a task that you had/probably do.

better

2   But let's take this question of the Vail Rancho, and

3   the Santa Margarita, Pendleton, and there you have a little

4   different situation on this ownership business, you have the

5   matter of irrigable and irrigated acres, and I don't see any

6   reason why somebody could not at least prepare a draft on that

7   and give us something to shoot at.

8   MR. VEEDER:  Anybody who wants to start on Vail Company,

9   that is fine.  I would prefer to work with Colonel Bowen and

10   Commander Redd in regard to our matter.  As I say, on the matter

11   of the Vail Company, you can assign that to anyone you want,

12   but I would prefer to write our own findings.  I had Mr. Sachse

13   write my findings on Lake O'Neill, and I would just as soon

14   make my own mistakes.

what

15   THE COURT:  Nobody says we are going to accept/someone

16   proposes, but I think we should at least let someone give

17   assistance on that.

18   MR. GIRARD:  It might not be controversial, your Honor.

19   I would say 90 per cent of it would not be controversial, or

20   maybe 95 per cent.

21   MR. VEEDER:  Whatever you say, your Honor.  We will

22   certainly do whatever you say.

23   THE COURT:  Also, there has to be some finding as to what

24   is this watershed, and that is either going to have to be done

25   with reference to some general map, or a reference to a series

t-16

1  of maps.  There has to be a finding on that.

2      MR. VEEDER:  That is correct, your Honor.  Also, I am

3  working on the finding on the  Aguanga Basin and for the

4  Murietta Basin.  That is progressing.  We are getting that done.

5  I just hope that we don't get such a traffic jam that my

6  office will not be able to accomplish as much as you want me

7  to.  That is what I am worried about now.   I am just as

8  anxious as anyone to get this finished.

9      THE COURT:  Mr. Girard, will you and Mr. Stahlman

10  promptly undertake to roughdraft the findings concerning the

11  Vail Ranch and Pendleton?  I understand that Mr. Veeder may

12  ultimately reject what you do.

13      MR. GIRARD:  I will try to get that done between now and

14  then.

C fls

15

16

17

18

19

20

21

22

23

24

25

16,272

C-1

P 10

1    THE COURT:  Will you work on it, Mr. Stahlman?

2    MR. STAHLMAN:  Yes.

3    MR. GIRARD:  I wonder if I could have your secretary

4    type this up.

5    THE COURT:  Go ahead.

6    MR. GIRARD:  This is that final finding of Mr. Sachse.

7    MR. SACHSE:  Mr. Veeder, I appreciate that you don't

8    care too much for my O'Neill Lake findings, but I have a

9    couple that I worked on years ago with which I think you are

10   pretty much in agreement.  I will take a small responsibility

11   myself of re-doing them in form for all counsel.

12   Mr. Veeder, you and I did a lot of work on what to do

13   with the soil conservation dams.

14   MR. VEEDER:  That is right.

15   MR. SACHSE:  I will be happy to take that up again and

16   prepare some suggestions, at least, and distribute them.

17   THE COURT:  All right, you take that on.

18   MR. SACHSE:  I will take that on.

19   THE COURT:  Incidentally, on these findings of stringers

20   of younger alluvium, it seems to me that we agreed on this

21   but let's understand it:  That we provide in there that no

22   finding is made here on appropriative or prescriptive rights

23   in this particular set of findings, but that if such right

24   exists it is covered by another finding and judgment.

25   MR. VEEDER:  A general finding.

P 11

1    THE COURT:  Well, it might be one, or it might be

2    several.  In other words, a caveat that we are not finding

3    on appropriative and prescriptive rights when we deal with

4    these stringers.  And what made me think of this is that

5    there should also be the caveat that no findings are made

6    with reference to the legality of stock ponds or diversion

7    dams, and that these are taken care of in a separate set of

8    findings.

9    MR. SACHSE:  I would like to suggest one other chore

10    that I think Mr. Veeder might be willing to give me, because

11    if there is any one stream in this watershed on which the

12    United States and Fallbrook see absolutely 100% eye to eye

13    it is Sandia Creek -- if Colonel Bowen will give me an

14    ownership map and description of the creek.  There isn't any

15    question that I am going to be rough on Sandia Creek, or

16    just as rough as Mr. Veeder would be, because they are all

17    right in back of our dam.  I will write a set of findings

18    that he will love on that.

19    THE COURT:  Didn't the Master write findings on Sandia?

20    MR. SACHSE:  No your Honor.

21    MR. VEEDER:  Those are all in the record, Franz,

22    ownerships, legal descriptions, everything is ready to go

23    on this kind of thing.

24    MR. SACHSE:  As I say, I will help Mr. Veeder on that,

25    and that is another place where I know he and I will be

P 12

1   a hundred per cent in agreement in trying to hold them down

2   on that creek -- both of us.

3   MR. STAHLMAN:  These findings you spoke about, Mr.

4   Sachse, in relation to these small dams, I think the question

5   which is on the agenda today might tie into that on stock

6   water.  We have had some discussion on that and I think we

7   are fairly well in agreement regarding stock watering ponds.

8   MR. SACHSE:  I will work out the Sandia question with

9   Mr. Veeder some time next week.

10   THE COURT:  Mr. Stark, did you want to be heard on

11   military uses or not?

12   MR. STARK:  No, your Honor, I have reviewed this

13   matter and I think it is very well handled before and I

14   don't think there is anything that we would add to what

15   counsel on both sides have said.

16   MR. VEEDER:  Are you going to have a recess before the

17   argument your Honor?

18   THE COURT:  Yes, take a recess.

19   (Recess.)

20   THE COURT:  What are we going to talk about -- military

21   use?

22   MR. SACHSE:  Do you want me to kick off your Honor?

23   THE COURT:  Yes.  What is date of that brief you filed?

24   MR. SACHSE:  That brief, your Honor, I can't tell you

25   the filing date.

P 13

1    MR. STAHLMAN:  Filed August 4, 1957, I think, and the

2    stamp on here is August 12th.

3        MR. SACHSE:  I owe you an opology, your Honor.  You

4    expressly directed all counsel to file separate instruments.

5    Mr. Swing had this reproduced and bound.  You will find ours

6    is a single document.  In other words, military use is not

7    separate; it is part of the brief on all of the issues you

8    raised.  It is headed "Memorandum On Issues" and starts on

9    page 7 of a single memorandum instead of separate ones.  It

10   is "Memorandum On Issues Listed In the Court's Order On

11   May 8, 1957."  We inadvertently bound it in a single instru-

12   ment and it starts on page 7 as to the military use portion.

13       THE COURT:  All right.

14       MR. SACHSE:  I have a spare copy here I could hand you,

15   your Honor.

16       THE COURT:  If you would.

17       When was the United States' brief filed?

18       MR. VEEDER:  August 21, 1957, and it is captioned

19   "Memorandum Of The United States In Regard To The Court's

20   Order Re Procedure Page 4 Paragraphs 8-A, B, C, D, E And F."

21   That is the way your Honor gave the directions on it, and

22   we broke it down and you will find our summation on the

23   subject on page 5 and following through on military use.

24       THE COURT:  All right.

25       MR. SACHSE:  When you posed this question to counsel,

P 14

1   your Honor, you stated it in the language that appears under

2   the heading "E" of our brief, whether the use by the United

3   States of water for military purposes on riparian lands is

4   a riparian use. Fallbrook in substance answered this question

5   no. The State of California answered in a very brief

6   memorandum, only a page and a quarter long, by pointing out

7   that the question, in fact, should be whether or not the

8   particular use was reasonable under all the facts of the

9   case.

10       At the very beginning I want to make clear my position

11   in this. I think California is probably more nearly correct

12   than I was in my unequivocal no. Truly, however, there is

13   very little difference between the two positions.

14       The term "military use" is not a word of art. As far

15   as I am aware -- and I have checked this through Words And

16   Phrases and every way I know how -- this term has been used

17   in case law only and in decisions in this very proceeding

18   -- decisions of Judge Yankwich, decisions of the Circuit

19   Court, and your Honor in the pre-trial opinion. So when

20   I use the term "military use" in the brief and in this

21   discussion I am referring to the present and past uses of

22   water on the military reservation at Pendleton. I am not

23   referring to a theoretical or hypothetical case of a platoon

24   of soldiers or marines on a creek somewhere.

25       I would like to take just a minute on some history,

P 15

1  which is perhaps old hat but I think is important in the

2  light of the analysis of the cases.  In the earliest English

3  Common Law the riparian law was simply a right to use water

4  as it flowed past the lands in question.  Practically, a

5  riparian right in England was applied only to domestic uses

6  -- stock watering and mill wheels.  They didn't even use

7  irrigation; not because they didn't recognize it perhaps,

8  but because irrigation was not a practice in England.  There

9  is no argument that irrigation is, in our law, a proper

10  riparian use.

11  Now, in controversies between riparians, if you check

12  the old English law, you will find continuously this sort

13  of phrases:  Riparian use is a natural use, it is an ordinary

14  use, it is a reasonable use; as distinguished from an

15  unnatural or extraordinary or an unreasonable use.  The

16  rights were an incident to the land and were a part and

17  parcel of the land.  They were not held separately from the

18  land, and they cannot be held separately from the land.

19  Actually, much of the language in the old English cases is

20  very similar to the language in our Article 14, Section 3,

21  of the California Constitution, the 1928 Constitutional

22  Amendment.  That amendment limits the right to a reasonable

23  use even as against an appropriator.  In controversies

24  between riparians and riparians, or riparians and appropria-

25  tors, the riparian use must be reasonable and must be

P 16

1    beneficial.

2       I will interject that you will not hear me talk about

3    beneficial, because I concede freely that this military use

4    is a beneficial use.  I will not argue that point at all.

5       That constitutional amendment, for once and for all,

6    destroyed the rocking chair theory of riparian rights in

7    this State, and it specifically limited all riparian uses

8    by the requirement that they must be reasonable and

9    beneficial and that any waste or any unreasonable use was

10   prohibited.  This, as I said a moment ago, is not very

11   different from much of the language that is in the old

12   common law cases.  They, too, used the word "reasonable."

13      Now, how has this yardstick been applied?  I don't

14   think there is any use of water that has been more clearly

15   recognized as riparian since time immemorial than stock

16   watering.  I cite in my brief the case of <u>Cowell    vs</u>

17   <u>Armstrong (210 Cal. 218)</u>.  In that case the plaintiff used

18   his riparian lands for pasturing about 2,000 cattle, which

19   he brought down from the hills each summer.  The defendants

20   in that case were upstream users -- upstream.  Plaintiff

21   brought the lawsuit and complained that there was not

22   sufficient water for him to water his cattle and he prayed

23   for an apportionment.

24      THE COURT:  This is a downstream user?

25      MR. SACHSE:  This is a downstream pasturer of cattle

P 17

1    who sued the upstream riparians and prayed for an apportion-

2    ment.  He was non-suited.  It was affirmed by the State

3    Supreme Court.  The Court specifically stated that his

4    riparian/right covered the use of the water for an "ordinary"

5    number of animals and did not extend to extraordinary or

6    artificial uses.

C2

7         Now, a most interesting thing about this case to me

8    is that, although it was decided in 1930 after the consti-

9    tutional amendment, the constitutional amendment is not

10   even mentioned in the case.  The decision of the court is

11   based solely on the basic principles of the riparian right,

12   and that even under the basic principles when he placed an

13   unreasonable number of cattle upon his land he was not

14   entitled to relief against an upstream riparian.

15        THE COURT:  How much land did he own downstream?

16        MR. SACHSE:  It does not make it clear in the case, but

17   I think we can, unquestionably, agree that he did not have

18   enough to leave a lot of room for 2,000 cattle.

19        THE COURT:  That would be a pretty important factor,

20   wouldn't it?

21        MR. SACHSE:  I can give you the next case that I have.

22   I can tell you the acreage they owned there.

23        It might or might not be, your Honor.  I think it would

24   depend more on the amount of water  available than the amount

25   of land.  It would depend on both factors:  The amount of

P 18

1    water available in the stream, and the amount of land on

2    which he placed his cattle.

3         In the Salem Mills vs Lord, an Oregon case (69 Pacific

4    1033), the state of Oregon owned 147 acres through which

5    a mill creek flowed.  Initially the state put a penitentiary

6    on the land, apparently, as far as I can tell from the case,

7    without any objection from anybody.  Subsequently they added

8    an insane asylum on the same land and the case tells us

9    that from 1300 to 1500 inmates were confined in the two

10   institutions.  The uses were strictly what we would call

11   domestic -- drinking, cooking, washing, sanitation, and

12   minor garden irrigation.  The Supreme Court of Oregon held

13   that the riparian right does not extend so far as to justify

14   such a use.

15        Wiel on Water Rights in the Western States, at page

16   804, cites this very case in connection with the proposition

17   that the so-called natural (quoting again) uses of water

18   for domestic purposes must give way on the facts when they

19   become unreasonable, and cites as a similar example a

20   watering of large bands of cattle, although oddly enough

21   he doesn't cite the case of Cowell vs Armstrong.  He cites

22   similar cases elsewhere.

23        Again, there is no question here of the constitutional

24   limitation, because that is not in existence in Oregon --

25   that type of limitation that we have in this state.  We are

P 19

1    still on fundamentals of riparian law.

2       Now, an even more interesting decision on basic riparian

3    law is cited in the brief, and that is <u>McCord vs Big Brother</u>

4    <u>Movement</u> (<u>New Jersey 1936, 185 Atlantic 480</u>).  I might say

5    in passing the Big Brother isn't Orwell's 1984 Big Brother,

6    but it was an organization that took underprivileged boys

7    from the cities and gave them summer vacations.  They moved

8    seventy boys onto riparian lands -- again the case doesn't

9    tell us how much -- for eight or more weeks.  Their water

10   use was entirely domestic and recreational swimming.  The

11   Supreme Court of New Jersey held that the use was an improper

12   exercise of a riparian right, and it said, "The transfer to

13   a large number of invitees of the bathing use exceeds the
                 use
14   reasonable /to which a riparian owner is entitled."

15      Now, in California we can find a similar problem.  It

16   is a case which, I believe, Mr. Veeder cited against me,

17   although I do not think it is such and I rely on it myself,

18   and that is the case  of <u>Prather vs Hoberg</u> (24 Cal, 2nd 549).

19   Now Prathers and Hobergs are the two biggest, I believe,

20   resorts in the Lake County resort area north of San

21   Francisco, and they were in a controversy over the alleged

22   excessive uses of the stream for recreational purposes.

23   The court refused any relief, but it said in effect, a

24   plague on both your houses, because the entire stream was

25   owned by the plaintiff and defendant -- the two of them

P 20

1   controlled the entire stream.  No other parties were involved.

2   And both plaintiff and defendant were making identical uses;

3   both of them were large resort operations.  There was

4   specifically, therefore, no determination made by the court

5   as to whether either use was unreasonable or either use

6   non-riparian.  This case was after the constitutional

7   amendment.  However, in a dicta, a pure dicta, the Supreme

8   Court did state:  "Use for resort purposes is an artificial

9   commercial use, a use not within the natural uses of a

10   riparian owner."

11   Now so far I am, let us say, skirting the edges of

12   what Camp Pendleton does.  Camp Pendleton isn't a resort,

13   we know.  And it is not an operation with excessive numbers

14   of cattle.  It pastures large numbers of cattle.  I don't

15   think their cattle pasturage could be determined unreasona-

16   ble.  But it does pasture cattle.

17   But there is a much more fundamental reason for object-

18   ing to the use by the Marines or for contending that the

19   use of Pendleton is not properly riparian, and that is that

20   the use by the Marines is, in fact, municipal.

21   Now, while I do not rely on these statements, your

22   Honor will find -- and Mr. Veeder, I know, will agree --

23   that there are in the exhibits I introduced in evidence the

24   other day a great many statements from the Commanding

25   General of the Marine Corps in amendments to their application

P 21

1    for their original permit, and in one letter General Erskine

2    states, in substance, to the Division of Water Resources:

3    Your list of purposes for which water can be appropriated

4    does not include military -- I presume that such use is

5    slight -- and we, therefore, are describing ours as

6    "municipal (military)".  In another letter you will find

7    the statement that the use on Camp Pendleton is very similar

8    and partakes of the character of a municipal use.

C 3

9    I am not able at this moment to put my finger on the

10    exact point of the citation because I didn't note it.  But

11    as a matter of fact the Circuit Court of Appeals, in

12    describing the uses at Camp Pendleton, said that the use

13    would appear to resemble a municipal use.

14    Now, what is the law, here, on municipal uses?  The

15    first big test of it was in litigation over the water rights

16    of the City of San Bernardino and the City of Riverside,

17    and there were a lot of cases cited -- Katz vs Walkinshaw,

18    San Bernardino vs Barton, I think, and finally San

19    Bernardino vs Riverside (186 Cal. 7) that wound up this

20    long controversy.

D fls.

21

22

23

24

25

t-17
D-1

1      Let me interrupt that meanwhile to say that this is a

2   lengthy case, and it is a confusing case to understand,

3   because the Court constantly talks about a basin.  But the

4   Court also makes it very clear that it is talking about a

5   combination of a basin right and a riparian right, because

6   the Court spells out the fact that this basin is of a

7   particular supply and could be recharged by the waters of

8   the Santa Ana River and Lyttle Creek.  So while the Court

9   speaks constantly of an overlying owner of the basin, I

10   suggest to your Honor, and I don't believe this could be

11   contradicted, that they are talking about the exact type of

12   situation that by implication you are going to find on this

13   stream, that is, where you have a basin, and all the water in

14   it  is an integral part of the stream.  In any event, they

15   held that the rights of the City of  San Bernardino to waters

16   in the Santa Ana River and Lyttle Creek, they lumped them

17   all together, were neither the rights of a riparian nor of

18   an overlying owner, but must be purely an appropriative right.

19      The Court used some new terms in defining the rights of

20   the City in supplying water as "Governmental rights", and it

21   distinguished them very carefully from the "private rights"

22   of a riparian owner.

23      The identical words "Government rights" and "Private

24   rights" were used several years later in the case of Antioch

25   vs. Williams Irrigation District, 188 Cal. 451.

t-18

There is a case where Antioch owned land, the city itself owned land, on which it had its pumping works, that was riparian to the Sacramento River. The defendant was an upstream appropriator, the Williams Irrigation District, many miles away, as your Honor is no doubt aware.

The City brought the action objecting to the diversions of the upstream appropriator as being junior to their riparian rights to the water. The Court stated that the fact that the City abutted upon the San Joaquin River and owned riparian land was absolutely immaterial, that the City's rights must depend entirely upon its appropriative status with relation to Williams, and on its appropriative status-- it had some appropriations-- it happened to be junior to Williams.

In the City of Lodi vs. East Bay Municipal Utility District, 7 Cal. 2d 316 you have the same proposition, and they use the same words, a Governmental right as distinguished from a private right.

The Lodi case is much more nearly parallel to the San Bernardino case, because there again you had a basin and a stream combination. It was the Mokelumne River, which flowed through an area which was held to be a part of it. The defendant was an upstream appropriator, the East Bay Municipal Utility District, with its dams on the Upper Mokelumne .

The City of Lodi just pumped its waters out of the basin,

16,286

t-19

1    and in attempting to divert the waters from the stream, as
2    East Bay did, the City of Lodi objected, and the Supreme
3    Court held that although the City acquired a Governmental
4    status, that fact was utterly immaterial, and it disregarded
5    the City's objection and held that its rights were those of
6    an appropriator.
7            This rule is general.  141 A.L.R. 640 has an exhaustive--
8            THE COURT:  You say A.L.R.?
9            MR. SACHSE:  A.L.R.
10           THE COURT:  141 A.L.R. 640?
11           MR. SACHSE:  Yes.  It has an exhaustive analysis of the
12   provisions of every State in the Union on this question of
13   how a municipal right can be exercised, and the A.L.R. states:
14           "The weight of authority sustains the view that
15           a municipality as a riparian owner has no right to
16           divert or abstract the waters of a stream for   public
17           purposes."
18           It goes on to state there are certain minor exceptions,
19   but that the weight by three or four to one is to the contrary.
20           One of the authorities cited, and one discussed at great
21   length is a Washington case.  That is the City of New Whatcomb
22   vs. Fairhaven Land Co.   Here the City owned a great deal of
23   riparian land.
24           THE COURT:  What is that citation?
25           MR. SACHSE:  64 Pac. 735.

16,287

t-20

1    This is interesting because here the City owned a great

2    deal of riparian land, the City of New Whatcomb.  The City

3    was on a lake and on a stream, and the City owned the bed of

4    the lake, owned the lake physically, as well as much of the

5    bed of the stream,and much of the land abutting on the

6    stream was physically owned by the City, not just by City

7    taxpayers and residents.  Nevertheless, the City was

8    enjoined from extracting water from the lake or the stream

9    for use by its inhabitants.

10    The Court uses language very similar to the California

11    cases cited.  They speak of a municipal use as being

12    distinguished from a private riparian use.  It speaks of the

13    city's public use as being different from a private riparian

14    use, and it quotes from Farnham on "Water Rights" the

15    following language:

16        "The rule giving an individual the right to consume

17        water for his domestic needs is founded upon the needs

18        of a single individual and the possible effect which his

19        use will have upon the rights of others, and it cannot

20        be expanded so as to render a collection of persons

21        numbering thousands and perhaps hundreds of thousands

22        organized into a political unit a riparian owner."

23    I respectfully submit if we delete from this quotation

24    the immaterial phrase "organized into a political unit" we

25    have a perfect description of the situation that exists at

16,288

t-21

1  Pendleton, and we can quote Farnham as saying:

2      "The rights cannot be expanded so as to render a

3      collections of persons numbering thousands and perhaps

4      hundreds of thousands a riparian owner. "

5  That is what Farnham says.

6      There isn't any dispute as to the uses on the Reservation.

7  We know what they are.

8      THE COURT:  I know, but do we have that in the record.

9      MR. SACHSE:  I say we know what they are.

10      THE COURT:  I am just asking, do we have that in the

11  record?

12      MR. SACHSE:  I am not going to go into them now, your

13  Honor.

14      THE COURT:  Do we  have them in the record?

15      MR. SACHSE:  Oh, yes.  I personally cross-examined

16  Colonel Bowen at great length.

17      THE COURT:  On the uses?

18      MR. SACHSE:  Yes, sir, at great length.  We know that they

19  have barracks, warehouses, shops, gas stations, bowling

20  alleys, clubs, a hospital, dispensaries, dental clinics,

21  dry cleaning  establishments, laundries, stores, a sewer

22  system, a water system, a fire department, and we know what

23  they are.

24      But before we think of what they are, let's consider why

25  the water needs of Pendleton exist, your Honor.  The water

16,289

needs of Pendleton exist because of the fact that large numbers of water consumers have been imported onto the riparian land.

I don't care whether Camp Pendleton has one hundred thousand acres or ten acres.  It is all relative.  In the Big Brother Movement case 70 users were imported on riparian land, and the use was held excessive.

In Cowell vs Armstrong 2000 cattle were imported onto riparian land, and it was held excessive.

In Salem vs. Lord 1300 patients were imported onto the riparian land, and it was held excessive.  In fact, and I may be wrong, but it is my best recollection that the complaint itself in these proceedings states that the capacity of the Naval Hospital is 1550 beds.  Well, they have got more patients in the Naval Hospital than the whole Oregon penal and mental institution combined.

The Reservation consists of thousands of individuals. The earliest testimony of Colonel Robertson, I think in the first trial, was to the effect that it had been at a minimum of approximately 11,500 to 12,000 to a maximum of something in excess of 105,000 at the peak during the Korean War. Again, I am subject to correction by Mr. Veeder if I am wrong.  I am trying to be accurate.

Those people were imported on the land for training purposes.  While they are there they make perfectly normal

-23

16,290

1    uses of water for eating, drinking, culinary and sanitation

2    purposes.  The fact of their presence and the nature of their

3    activities requires other uses.  It requires industrial uses,

4    and the fact that you have put so many people over there

5    immediately requires that there be shops, that there be

6    warehouses, that there be garages, that there be facilities

7    for the repair of weapons, of vehicles, of equipment, and

8    their  presence creates those essential uses.

9       Their presence makes necessary recreational facilities

10   which have nothing to do with the private riparian character

11   of the land.  Their presence, their mere presence requires

12   extensive medical facilities.  Their mere presence requires

13   landscaping and irrigation.  Their mere presence requires a

14   sewer system.  It has to be there because of this tremendous

15   importing of people to this real property.  Their mere

16   presence creates a wholly new use, such as fire prevention.

17   That has to be there, obviously.  It has to be there.  You

18   could not have them there without it.  But every one of those

19   uses, your Honor, are entirely, so far as the record of the

20   whole case is concerned, unnatural.  They are entirely foreign

21   to ordinary, natural or usual uses of the land.  They have

22   nothing to do with a private use of land.

23       Assume, your Honor, for example, that the Rancho Santa

24   Margarita leased, before the Government was ever here, this

25   area to a very large corporation, and permitted the corpora-

tion to import somewhere between 12,000 and 100,000 workers,

d-2

16,291

t-24

and to build houses for them, to put in a street system, to put in a sewer system, to put in a fire prevention system, and to provide recreational facilities, to put up its industrial plant, and do all of these things as a tenant of a riparian owner.

Would your Honor say that such was a proper riparian use by the Rancho Santa Margarita?  It is obvious it is not.  It cannot be.  Any other rule would completely destroy and defeat the riparian right itself, your Honor.  Any other rule could be a vehicle to destroy the concept we have had since the earliest English common law of what the riparian right is.

If the riparian by the mere subterfuge of leases or by the gimmick of owning a little land could take away the private character of this water, the damage and destruction that he could do to the legitimate private riparian operators downstream would be monumental.  There isn't any question about it.  If we permitted this type of use, we would once and for all destroy the riparian right, and our California Constitution has very clearly indicated that we are not destroying it. The purpose of the reasonable requirement is our full recognition of the fundamental riparian right.

Now, from the cases cited, the case of the City of San Bernardino,  Antioch, the City of Lodi, and so forth, you must conclude that the uses on the Reservation are not proper riparian uses.

16,292

t-25

1   Now, I haven't argued the reasonableness, but I can

2   simply ask your Honor to reconsider everything I have said,

3   and instead of drawing therefrom the conclusion that a

4   municipal use is necessarily non-riparian, let's not go quite

5   that far, but let's say:  Is a municipal use reasonable?

6   I repeat what I said a moment ago, that a municipal use

7   exercised on the part of a riparian cannot be reasonable.   It

8   would envision the complete destruction of the riparian rights

9   of everyone else on the stream.

10   THE COURT:  Has that holding ever been made by the

11   Supreme Court of California, that they justify a municipal

12   use as a riparian use, and that as the city grew it could

13   absorb and wipe out upstream riparian users?

14   MR. SACHSE:  To the best of my knowledge, your Honor,

15   that point has never been made.  I have tried to read every

16   case in California on it, and they have not made that point.

17   Their arguments, your Honor, 100 per cent have swung

18   on the use of these words  of art;"Governmental" "private"

19   "riparian" and so forth.

20   THE COURT:  Is there a difference between cities that

21   had a pueblo status and others?

22   MR. SACHSE:  Yes, your Honor.

23   THE COURT:  There is such?

24   MR. SACHSE:  I am throwing those out because the pueblo

25   right is a different kettle of fish.

t-26                                                                        16,293

1          THE COURT:  Because the City of Los Angeles is one of

2   the biggest.

3          MR. SACHSE:  But the pueblo status is not involved, your

4   Honor.

5          MR. STAHLMAN:  It was in that case.

6          MR. SACHSE:  San Diego is a pueblo, but I am not

7   discussing the pueblo right.  I don't think anyone contends

8   that the Rancho Santa Margarita has a pueblo status.

9          THE COURT:  Then there is a solid basis for distinguishing

10   the pueblo situation?

11          MR. SACHSE:  Yes, your Honor.  It is clearly distinguish-

12   able under our California law.

13          MR. GIRARD:  That right is considered considerably ahead

14   of other appropriators.

15          MR. VEEDER:  Not ahead of the Indian tribes.

16          MR. SACHSE:  Not ahead of the Indian tribes, but maybe

17   even that.  That is one that has never been satisfied.  But

18   Hutchins goes into that at some length and points out that

19   the pueblo right is a peculiar thing which we have to push off

20   to one side, that that is a right which is way ahead of the

21   standard riparian right.

22          But back to Camp Pendleton.  It seems that 57 per cent

23   of their total use is non-riparian, it is outside of the

24   watershed.  57 per cent of the total use is non-riparian.

25

e fls

16,294

Take E
P 22

1    The use outside the watershed is not riparian.  It is

2    conceded that this non-riparian use is an absolute essential

3    of the operation which they run.  They can't have it there

4    unless they make a non-riparian use of the water.  You have

5    to take the water out of the watershed.  It is pleaded in

6    Mr. Veeder's complaints.  The use at Pendleton, the way

7    the Camp is constructed, the functions require, Mr. Veeder

8    has repeatedly urged on the Court recently, the use of this

9    water outside the watershed on non-riparian lands.  We have,

10   therefore, a use which concededly must be fifty per cent,

11   not 57% of it as of today, non-riparian.  It has got to.

12   It is and it has got to.

13       Now, how your Honor can find that part of Pendleton's

14   use is proper and a part of Pendleton's use is improper I

15   don't know.  It is Pendleton's use.  That is what Camp

16   Pendleton is.  It is a military camp.  Your Honor is going

17   to be compelled to say, just like the court said in the

18   New Whatcomb case where the city overlaid a lake in the stream,

19   or in the Antioch case, your use of water for municipal

20   purposes is improper; not just that part of that water that

21   goes off the land that you own, but the use of the water of

22   the lake owned by the city on the portion of the land is

23   improper.  The use by the City of Antioch of the water on

24   riparian land for municipal purposes is improper.  It is

25   that type of use that is outside the riparian right.

P 23

1 THE COURT:  You would exempt the use by Pendleton of

2 water on the mesas within the watershed for irrigation?

3 MR. SACHSE:  Yes, your Honor, I think there is no

4 connection between the irrigation of the lemon groves --

5 Mr. Veeder might agree with me -- and the operation of the

6 Camp.  The United States could irrigate the lemon groves

7 whether or not the military camp were there.  So I say that

8 can be separated, if you want to separate it.  But you can't

9 separate the use of water by the Marines one kind from

10 another.

11 THE COURT:  You would not equate building a radiator

12 to watering a horse.

13 MR. SACHSE:  No, I would not.  And I have cited a case

14 from England that went so far as to say that the locomotive

15 that crossed the River Dee, I think it is, couldn't suck

16 water out of the River Dee to fill its boiler.  That was

17 an improper riparian use.  The case is before your Honor

18 in the brief.

19 I am almost finished.  I think I will close just about

20 in time to let Mr. Veeder think about it over the lunch

21 hour.

22 THE COURT:  Don't spoil his lunch.

23 MR. SACHSE:  I want to say one more thing on the

24 question your Honor asked me.  I think we ought to recognize

25 that the use asserted by the United States isn't only

P 24

1   military.  We should recognize that the United States is

2   asserting vigorously the right to irrigate riparian land.

3   It is also asserting vigorously the right to pasture stock.

4       THE COURT:  Well, those rights you object to?

5       MR. SACHSE:  I don't.  But now it superimposes on them

6   this utterly different and unnatural thing and says, "Because

7   we have this riparian right, because we have a right that

8   is proper for these, now I want it for this."

9       I would like to pose pretty ridiculous example, your

10  Honor.  Fallbrook owns about 800 acres of riparian land on

11  the Santa Margarita River.  I have never suggested this to

12  the Court, that as a riparian we have the right to take that

13  water and put it into our system, and we have it.  I have

14  never suggested it, and I conceded that we have no such

15  right.

16      THE COURT:  Is this land on the Santa Margarita River?

17      MR. SACHSE:  Yes, your Honor, it is land that will be

18  flooded when the dam goes in.  But let's assume that the dam

19  isn't built.

20      MR. VEEDER:  That's right.

21      MR. SACHSE:  And Fallbrook says, "I am going to lease

22  to you and you and you and you town lots.  We will lease

23  them to you."  Would your Honor let us put the water into

24  our system to serve our riparian land, to serve the munici-

25  pal needs on our riparian land?  If your Honor did, Mr.

P 25

1   Veeder could reverse you so fast you wouldn't what hit you.

2   You would have absolutely no right to give us that power.

3   You simply couldn't permit us, as a municipal agency exer-

4   cising our riparian right, to serve our municipal customers.

5   And Mr. Veeder can't exercise the riparian right on Camp

6   Pendleton to carry out a municipal function. There is no

7   distinction between them.

8       Now, I am going to conclude very briefly. There are

9   three sets of principles your Honor can apply, as I see it,

10  and each one comes up with the same answer.

11      You can say that even under the old common law --

12  forgetting the Constitution of California -- this is not a

13  proper riparian use, it is not a natural use, it is not an

14  ordinary use; it is an unnatural use, it is extraordinary,

15  and it is artificial. There is lots of law for it, your

16  Honor.

17      You can apply the test of the Constitution of California.

18  You can say, is it reasonable to permit a riparian owner by

19  subterfuge or by his sovereign power to move from twelve to

20  100,000 people onto a parcel of land, is it possible to

21  permit a riparian owner by doing that completely to destroy

22  the riparian rights in the water system? Is that reasonable

23  under the California Constitution? I think there is only

24  one answer. It is unreasonable. And I respectfully suggest

25  again that you think about the aspect of this if this were

16,298

P 26

1   not the United States.  If this were someone whom we can

2   conceive of, if this were General Motors or the largest

3   corporation in America doing this as a private individual,

4   you wouldn't permit it, you couldn't permit it.

5         And third, your Honor can apply the absolute statement

6   of law -- not dicta -- the absolute statement of law contained

7   in the California cases to the effect that municipal uses

8   cannot be riparian.  They simply cannot be.  They must be

9   appropriative.  They are not natural or ordinary.  They are

10  unnatural and extraordinary.  They are not private.  They

11  are public.

12        The uses on Pendleton are not reasonable since, by

13  their nature, they require more than half to be an improper

14  riparian use.  They are municipal, and they are nothing but

15  municipal, and they have to be treated as such.

16        And I again respectfully invite your Honor's attention

17  to the fact that the United States itself has so described

18  them.  The United States, before this unfortunate litiga-

19  tion ever started, attempted properly to acquire rights

20  for this military enclave by filing with the State of

21  California an application to appropriate waters for munici-

22  pal (military) purposes.  The United States itself did it.

23        I insist that your Honor is compelled by the law and

24  the facts to say, "Gentlemen, you are fortunately last on

25  the stream.  I can't make you do anything, and whatever I

P 27

1  do I can't hurt you.  You may do as you will with the water.

2  But you have no right that can reach upstream, that can

3  touch any other person, riparian or appropriator, until you

4  comply with the laws on appropriation of the State of

5  California."

6  THE COURT:  Of course, this isn't a legal question.

7  But what is the military to do for water?

8  MR. SACHSE:  They use all the water that comes to them,

9  your Honor.

10  THE COURT:  That is right.

11  MR. SACHSE:  And they take the very steps, they perhaps

12  take the very steps that they, themselves, applied to the

13  State of California to do.

14  THE COURT:  And then they become junior to Fallbrook?

15  MR. SACHSE:  That is correct.

16  MR. STAHLMAN:  And they can condemn.

17  MR. SACHSE:  They can exercise their power of eminent

18  domain, if need arises.

19  THE COURT:  And they can put a pipeline --

20  MR. SACHSE:  -- to the Metropolitan Water District, if

21  they want to do that.

22  MR. STAHLMAN:  The Navy bought that line.

23  MR. SACHSE:  The Navy -- Mr. Stahlman's point is well

24  taken -- the first aqueduct to San Diego was bought and

25  paid for by the Navy and it has an absolute right to hook

P 28

1   on to it if it wants to.

2        THE COURT:  Are they close together?

3        MR. SACHSE:  Yes, the two lines are very close together

4   in the Fallbrook area at least.  They get wide apart down

5   here in the San Diego area.  In the Fallbrook area they are

6   a quarter of a mile or less apart.

7        THE COURT:  It is probably not material, but it would

8   probably cost less to hook on to the Navy line than to have

9   brought this lawsuit.

10        MR. VEEDER:  The record should show --

11        THE COURT:  What about that question first?

12        MR. STAHLMAN:  He will not answer your Honor.

13        MR. VEEDER:  Your Honor, the Marines and the Navy

14   approached the Metropolitan Water District for a supply of

15   water, and they could not purchase a supply of water from

16   the MWD.  I think that may be in evidence right now.

17        THE COURT:  Why couldn't they/purchase it?

18        MR. VEEDER:  Because you can't get a firm supply from

19   them, under the circumstances.  The allotments are over and

20   above and beyond that which the United States could acquire.

21   The record is clear on it.

22        MR. SACHSE:  Mr. Veeder is right.  He can't get a firm

23   supply.

24        MR. VEEDER:  That is right.

25        MR. SACHSE:  And I don't think he can get a firm supply

P 29

1    out of the Santa Margarita River.

2        The Metropolitan, in other words, will not guarantee

3    him or anybody that he can get X acre feet. He shares.

4    And if we don't build the Feather River we will all be a

5    little short in a few years. Up to now they have at all

6    times supplied everybody with everything they needed.

7        But I don't think he can get everything he needs out

8    of the Santa Margarita River.

9        Mr. Veeder is quite correct that the Metropolitan will

10   not guarantee him 12,000 acre feet a year.

11       MR. VEEDER:  Or any amount.

12       MR. SACHSE:  Or any amount. He is quite correct. They

13   will not do that.

14       MR. VEEDER:  But that is the answer to your Honor's

15   question as to why.

E 2

16       MR. SACHSE:  I think, if I may say so, the security of

17   Fallbrook's supply or the Navy's supply or that of any other

18   imaginary user from the aqueduct is a little safer than from

19   the River. We have seen what the Good Lord does to us with

20   a few dry years. The aqueduct, fortunately, goes to places

21   where it isn't so serious.

22       THE COURT:  Well, do you want to come back at 1:30?

23       MR. VEEDER:  Not particularly, but we will, your Honor.

24       MR. SACHSE:  One-thirty.

25       (Noon recess.)

P 30

1    SAN DIEGO, CALIFORNIA, Friday, April 7th, 1961, 1:30 P.M.

2        MR. STAHLMAN:  Before Mr. Veeder starts, your Honor --

3    the matter may be neglected -- in writing these findings

4    on Vail Ranch, I think the record should show that the

5    Government has rested.

6        You have rested on that, have you, Mr. Veeder?

7        MR. VEEDER:  No indeed.

8        MR. STAHLMAN:  How are we going to draw findings if

9    you haven't rested?

10       THE COURT:  What additional proof do you have?

11       MR. VEEDER:  Your Honor, it may be that I will let the

12   matter reside as it is.  I have told your Honor that I want

13   to take time to consider what you have done in regard to

14   the stipulated judgment, and it won't hold up the undertaking

15   of writing findings, as far as I see it.  I think I am

16   entitled to some time on this matter, and you will be advised.

17       THE COURT:  You may look into it further.  There comes

18   a time, however, where you have to say "I am through."

19       MR. VEEDER:  That is right.

20       THE COURT:  Like you said on the stipulated judgment:

21   You have said all you are going to say, you have put on all

22   you are going to put on.  But I see no reason why we can't

23   start drafting the findings.

24       MR. VEEDER:  Neither do I, your Honor.  But I want to

25   ponder it.

P 31

1      Do you desire me to go ahead on the argument?

2      THE COURT:  Yes.

3      MR. VEEDER:  The crucial point in this matter in regard

4   to the question whether a military use is a proper riparian

5   use has, in my view, already been ruled upon by your Honor.

6   In the opinion in <u>United States vs Fallbrook Public Utility</u>

7   <u>District</u> (page 824) you quote as follows: --

8      MR. STAHLMAN:  What volume?

9      MR. VEEDER:  165 Fed. Supp.

10          "The State of California does not contest

11      that military use of water by the United States,

12      when made on riparian land owned by the United

13      States, may be a beneficial use within the

14      riparian right."

15   You said,

16      "Based upon California's position, the real

17      question is the reasonableness of the use.  This

18      is a question of fact.  Whether military use is

19      reasonable depends on the circumstances of the

20      case."

21      THE COURT:  Well, this doesn't decide anything, because

22   Mr. Sachse concedes that it is beneficial.  He contests the

23   fact that it is reasonable.

24      MR. VEEDER:  Mr. Sachse, if I may, with all respect to

25   your Honor, has denied that a military use by the United

P 32

1   States of America can be a proper military use. And if that

2   is not his position, I think he should take a moment and

3   explain it.

4       THE COURT:  I think I understood him.  He concedes

5   that the use is beneficial.  He is not even going to argue

6   that.  It is not a wasting of water.

7       MR. SACHSE:  That is correct.

8       THE COURT:  But he contests that it is a reasonable

9   riparian use.  That is his position.  And that is the point

10  that was left open in the pre-trial ruling.

11      MR. VEEDER:  I don't quite follow that rationale, but

12  I will go ahead on the premise that that is the status of

13  the case.

14      Could it be said that five Marines using water for

15  military purposes on the Naval enclave is a proper riparian

16  use?  If we could have a ruling on that, we would at least

17  be on the way.  It would be a recognition, then, that quanti-

18  ty of use is the sole and only question, and I believe that

19  necessarily your Honor would rule that if there were only

20  five men using water from the Santa Margarita and they were

21  Marines encamped on that stream that it would most assuredly

22  be a proper riparian use and that it would also be a military

23  use.

intend

24      THE COURT:  I don't/to rule piecemeal on this.  But

25  where you would draw the line would be a very difficult

P 33

1   problem.  We don't have to draw a line of that sort, because

2   we do not have five Marines temporarily encamped on the

3   stream.  We have an establishment built up which is in the

4   nature of a city, a municipality.  So the question where

5   you would draw the line isn't really before us.  We might

6   as well face the facts that you have -- a municipal set-up

7   there on the Base.

8       Now let me say this.  This may be one of the most

9   difficult and may be one of the crucial issues in this case.

10  As a matter of fact, it gives me a lot more concern than did

11  the stipulated judgment.  And I certainly don't/to be cast
                                               want

12  in the role of cutting the ground out from under the Marine

13  Corps.  But I have to decide this from the standpoint of

14  the law and not from the standpoint of sentiment.  So

15  forget about the Marines and their great record for this

16  country.  That is not the issue we have to decide.  We all

17  agree on that.  The question is, from the legal standpoint

18  what have we got here?

19      MR. VEEDER:  And I think, your Honor, that the

20  predicate must first be ruled upon, in my view, as to whether

21  the National Government could acquire a riparian right and

22  exercise that right for military purposes before you even

23  go to the question of reasonableness at all.  Your Honor

24  has said that he wouldn't rule on it.  At this point, you

25  said you would rule only on the situation of Camp Pendleton.

P 34

1      THE COURT:  That was not the proposition you submitted

2   a moment ago.  And more than that, the way you now pose it,

3   it merely begs the question.  The United States Government

4   is not without power to take care of its military men.  The

5   United States Government has the right of any other person

6   to buy.  The Government of the United States has the right

7   to condemn.  The Government of the United States has the

8   right to contract.  It is not powerless to take care of its

9   needs.  So we have the legal question, and your last

10   statement merely begs it.

11      MR. VEEDER:  I am just attempting to formulate an

12   argument, your Honor.

13      I believe, your Honor, that we will start with the

14   predicate, and we must start with the predicate, and I most

15   assuredly start with the predicate that a military use as

16   such is a proper riparian use.  I believe that the United

17   States of Americ can own and enjoy a riparian right the

18   same as anyone else.  The cases are clear on that.  I have

19   cited to your Honor in briefs previously submitted to the

20   effect that "The United States, with respect to lands which

21   it owns in this State (the State of California) is a

22   riparian proprietor as to the streams running through such

23   lands."

24      THE COURT:  From what are you quoting?

25      MR. VEEDER:  That case is <u>Palmer vs Railroad Commission</u>

P 35

1    (167 Cal. 163, 168).  I cited that to your Honor in 1957

2    on August 21.

3         THE COURT:  I don't think even Mr. Sachse is going to

4    quarrel with that general statement.

5         MR. SACHSE:  No.

6         THE COURT:  In fact, he has conceded in this argument

7    that the United States is a riparian owner and can be a

8    riparian user as to its cattle and as to its irrigated ground.

9         MR. STAHLMAN:  Furthermore, if the Department of

10   Agriculture put a farm down there for beneficial use, I

11   think they could do it.

12        THE COURT:  Go ahead.

13        MR. VEEDER:  The next question, admitting that we could

14   water livestock from the stream, I submit that we could

15   similarly provide water to the Marines.  I believe that the

16   law is clear on that.

17        I was pleased when your Honor referred to the Pueblo

18   rights of Los Angeles and San Diego.  History shows un-

19   questionably that one of the first uses by white men in

20   California was the use for military purposes, and they

21   maintained their forts and their camps.  So at least we do

22   know that.  That it is quite a normal use, it is an ordinary

23   use, and while I found no cases in this State saying that

24   you could appropriate water and exercise water rights for

25   military purposes I have in the past cited to your Honor

P 36

1  some cases in the State of Montana in which the military

2  use was recognized as a proper water use.

3      So we are down to the point where this Court must

4  resolve the question whether there will be separated and

5  segregated from all other uses the military use of the

6  National Government and then deny that that use can be

7  made -- that military use is a riparian use. There is

8  certainly no authority for that proposition. There is no

9  basis for such a conclusion. It would be a ruling de novo.

10  It would be, in my view, a ruling without precedent.

11      The cases which have been cited by Mr. Sachse in his

12  effort to compare the military uses with municipal uses are

13  not, in our view, applicable. The City of Antioch case

14  specifically recognizes that a municipality can exercise

15  and enjoy rights to the use of water riparian in nature

16  upon its riparian land. I believe that that is unquestioned,

17  and I believe that the Antioch cas so holds.

18      The rationale of the cases to the effect that a

19  municipal use is not a riparian use stems from the fact that

20  there has been a severance from the stream, that the lands

21  of the indivuals do not abut upon the stream, and thus being

22  severed there is no riparian right. That is what you find.

23  You will find that the laws are applied on that basis. We

24  do not challenge that.

25      We say, however, that we have a situation here where

P 37

1    the military, the National Government, is using the water

2    strictly and entirely upon its riparian lands.  So the

3    Antioch case has no application.  That is why I think it

4    was important that we consider whether the five Marines

5    would be a proper military use.

6        The cases which Mr. Sachse has cited, in the State of

7    Oregon, for example, and in the other states, entailed a

8    question whether these 70 boys or whether this penitentiary

9    was a proper use as related to other riparians.  There is

10   not a case that says, though, that those are not proper

11   riparian uses.

12       So we turn to the question, what is the guide?  What

13   is the controlling factor and element in regard to the

14   exercise of the riparian use?  And the cases are clear, and

15   I have cited them to you in my brief, that it makes no

16   difference what the use is, if the land is riparian in

17   character.  And that is the distinguishing element from

18   these municipal cases:  Is the land riparian in character?

19   Then you can apply it to any use.

20       THE COURT:  Well now, let me ask you, what is the

21   measuring stick of your military riparian use?  The amount

22   of water that could be used if the ground were used for

23   agricultural purposes?

24       MR. VEEDER:  No.  Is it reasonable to use it for military

25   purposes?

16,310

P 38

1    THE COURT:  Is the measure of the use the size of your
2    military establishment?
3        MR. VEEDER:  The point is that under all of the
4    circumstances that prevail you would determine whether it
5    is reasonable under the circumstances.
6        THE COURT:  But let's take by analogy irrigation uses.
7    If you were trying to determine an allotment on a reasonable
8    portion that could be used by two riparians who were irri-
9    gating, you would take into account, as part of all these
10   circumstances, using your words, the number of acres of
11   irrigated riparian ground, irrigable riparian ground probably,
12   that the one had, and the irrigable riparian ground that the
13   other had, what crops, what water duty, etc., and then you
14   would strike an equation.
15       MR. VEEDER:  That is right.  You would arrive at a
16   percentage.
17       THE COURT:  Suppose that you have upstream just one
18   riparian -- let's make it simple -- and downstream you have
19   a military establishment.  The man upstream is using water
20   to irrigate.  We would still take into account his irrigable
21   acres, his highest and best uses, and his water duty.  What
22   do we take into account downstream, under these circumstances?
23   The size of the military establishment?
24       MR. VEEDER:  I think that would be an important factor.
25   I think that where we have, as here, 21 miles of the River

P 39

1    and all of lands up to 38,000 being riparian in character,

2    I think that that would be an important aspect and feature

3    and circumstance to consider.

4    THE COURT:  I would think also that you would consider

5    how much riparian land you had.  But do you consider the

6    size of the military establishment population-wise?  Suppose

7    that instead of having 38,000 acres of riparian land, you

8    had 2,000 acres of riparian land downstream.

9    MR. VEEDER:  Most assuredly it would make a difference.

10    THE COURT:  It would make a difference.

11    MR. VEEDER:  Yes, it would.

12    THE COURT:  Well, suppose that on your 2,000 acres of

13    riparian land you had a thousand men for the military

14    establishment and all the types of services you would have

15    to have, on the one hand. Assume, on the other hand, that

16    on the 2,000 acres there had been erected a series of very

17    high buildings and instead of having 2,000 men you had 3,000

18    people.

19    MR. VEEDER:  That is right.  Would it be reasonable

20    under the circumstances, in the light of the other owners

21    and their correlative shares?

22    THE COURT:  What do you do?  Take into account the

23    size population-wise of this military establishment?

24    MR. VEEDER:  I think you would.  I think you would

25    do precisely what has been done in regard to the claimed

P40

1    commercial domestic use.  By that I mean an owner of a

2    hotel being riparian, you would look to determine whether

3    his paid guests placed upon the stream an unreasonable

4    burden.  In other words, I don't believe that the law would

5    discriminate against a hotel full of Marines and let a

6    hotel full of paid guests enjoy the benefits of the riparian

7    right.

8        THE COURT:  Well  now, what do you say to this?  Again

9    trying to look at a situation with only two claimants on

10   a stream, if they are both claiming water for agricultural

11   uses, nature has pretty well fixed the limits of their claims

12   -- nature in the sense of the climate, physical location,

13   the amount of irrigable ground.  This is all pretty well

14   established.  And so the downstream owner who, we will say,

15   had ten times the irrigable acreage that the upstream owner

16   had, and who could maybe use and grow a crop that took a

17   larger duty than the man upstream in colder areas, nature

18   has fixed the maximum that would be involved.  While under

19   your theory two riparians on a stream, the downstream owner,

20   by turning his riparian acres into a military establishment

21   or a city, or congregating an immense population, if you

22   took into account the size population-wise, could wipe out,

23   for all ostensible purposes, the rights of the upstream

24   owner.

25       MR. VEEDER:  Not at all.  There is certainly no reason

P 41

1    for implying that conclusion from what I have said.  I have

2    said that under the circumstances you would consider the

3    riparian land, the uses which were made, the reasonableness

4    of the uses from the standpoint -- let's take the case that

5    exists here.

6    THE COURT:  Well now, Mr. Veeder, you have said it all

7    when you say you would take into account the circumstances.

8    Let me ask you this.  What is your claim for acre feet

9    of water that you claim for this Base?

10   MR. VEEDER:  Well, we claim, both inside and outside,

11   a maximum of 23,000 acre feet during the maximum demand

12   during a military crisis.

13   THE COURT:  By "military crisis" do you mean when there

14   would be a large population.

15   MR. VEEDER:  The largest population for which the Camp

16   has been designed.

17   THE COURT:  And what population would that be?

18   MR. VEEDER:  I believe it ran to 125,000.

19   THE COURT:  So you have a demand, then, that it would

20   be the entire 23,000 acre feet of water because the popula-

21   tion at the Base had increased to 125,000 people.

22   MR. VEEDER:  And your Honor would then be called upon

23   to rule as to whether that would be a reasonable use as it

24   related to other riparians who are entitled to share

25   correlatively with us, and it is quite possible that your

P 42

1    Honor would decide that that is totally unreasonable use.

2       THE COURT:  What yardstick have I got to say what is

3    reasonable?  If you take agriculture land I have something

4    that I can compare one to the other.  But how can I compare

5    apples and bananas?

6       MR. VEEDER:  I don't think you have to compare apples

7    to bananas.

8       THE COURT:  Here is an agricultural use upstream.  Here

9    is your military use downstream.  How do I say what is

10   reasonable?  Do I say just arbitrarily, without a yardstick,

11   that it is reasonable if you have a military population of

12   5,000 people?  That it is unreasonable if you have 10,000

13   people?

14      MR. VEEDER:  I think this -- and I believe the state

15   of the record becomes extremely important on this point --

16   I believe that if the uses concerning which we introduced

17   evidence -- let me start with that statement again.  I

18   believe that the uses made by a riparian owner will be

19   considered reasonable absent proof that they are unreasonable,

20   and I believe that the burden was upon the defendants to

21   introduce evidence to show that the uses which we are claim-

22   ing are unreasonable, and I believe that under the circum-

23   stances and the state of the record we are entitled to have

24   you determine that, absent proof to the contrary, the uses

25   which we are making upon our riparian land are reasonable

P 43

1    riparian uses.

2       THE COURT:  Is that your answer to what kind of yard-

3 stick I use to determine what is a reasonable acre-foot

4 allotment downstream and what is a reasonable one upstream?

5       MR. VEEDER:  Your Honor, I think that is the complete

6 answer, because there is no, and never has been, and there

7 never will be, a single specific yardstick for making a

8 single specific determination in regard to riparian rights.

9       THE COURT:  At least you are comparing apples with

10 apples.  You have agricultural uses and domestic uses up-

11 stream, and you have similar uses downstream.  And you can

12 calculate water duty on the basis of the types of crops,

13 and you can take into account the amount of irrigable acres,

14 the potential use, and all that.  How can I say that there

15 is any way of comparing agricultural use with a military

16 use?

E 3

17       MR. VEEDER:  In the Hoberg case, your Honor, you have.

18       THE COURT:  What is the citation of Hoberg?

19       MR. VEEDER:  The Hoberg case which I have cited very

20 frequently to your Honor -- Prather vs Hoberg.

21       MR. SACHSE:  I cited it.  I have it right here.

22       MR. VEEDER:  I will give your Honor the citation.

23       MR. SACHSE:  24 Cal. 2nd.

24       MR. VEEDER:  24 Cal. 2nd 549.  Now, there is an

25 extremely important case which, I believe, constitutes a

P 44

1    pretty good guide to your Honor in considering the proposi-

2    tion that you are advancing here.  There was involved there

3    a use for agricultural purposes, there was a use for

4    commercial domestic purposes, and the court --

5        THE COURT:  But the uses on both sides were the same.

6        MR. VEEDER:  Not necessarily.  For there was 15 acres

7    or so of agricultural lands where the court had to make the

8    determination whether it was a proper agricultural use as

9    it related to the commercial domestic use of the other party,

10   and I believe that you have precisely that situation here.

11       And you asked me for a yardstick, your Honor, and I

12   believe that the yardstick has to be this, that the Marines

13   are presumed to be making a reasonable use unless there is

14   a contrary showing.  And I believe that we can say that if

15   a hotel were set up where our properties are now located,

16   and there were no showing that it was an unreasonable use,

17   your Honor would have no alternative but to say that it is

18   a reasonable use.  That is why I was so concerned, and I

19   have been hopeful that your Honor would rule that military

20   use was a proper riparian use and then leave the question

21   of reasonableness to be determined on the basis of the record.

22       One of the reasons why this matter of apportionment

23   has been one very very important in my mind for years is

24   this --

25       THE COURT:  We will pass the three years without

P 45

1    comment.

2        MR. VEEDER:   Ten years.

3        THE COURT:  Pass it even faster, because it has not

4    been ten years, it has not been three years that you have

5    talked about apportionment.

6        MR. VEEDER:  The apportionment would have required, I

7    believe, a determination as to the reasonableness of the

8    military use at the present time.

9        But I submit, your Honor, that we can look at it this

10   way, if you want a guide that I think you might utilize.

11   The Marines have been exercising their rights there for

12   twenty years.  There has never been a challenge as to the

13   reasonableness of those uses to this moment.  Mr. Sachse

14   has argued some academic propositions of law, but he has

15   shown no facts to demonstrate that we are making unreasona-

16   ble uses now.  So your Honor would have to proceed sans

17   (outside) the record to make the determination that those

18   rights are unreasonably exercised.

19       I submit again -- and I return to the briefs that I

20   filed originally -- that Wiel has summarized it in these

21   words:  "As to what is a proper riparian use, these include

22   fishing, bathing, boating, floatage, diversions for irriga-

23   tion, the running of machinery, and all the many other

24   varied purposes for which water can be used."  That is Wiel

25   on Water Rights in the Western States, Third Edition,

P 46

1     Volume 1, Section 743, page 803.

2          With that predicate in mind, I think that it necessari-

3     ly follows that this Court would have to rule, with all

4     respect to your Honor, that it is not a matter as to what

5     use we apply these waters. Mr. Sachse, I think, conceded

6     the argument in his first sentence. He said that it is

7     a beneficial use and that he will not challenge that. So

8     we are down now, is it reasonable.

9          I cannot follow your Honor's analogy -- it is not an

10    analogy -- your statement that if a municipality were

11    permitted to use the waters as it grew and expanded, that

12    ultimately it could dry up the riparians upstream. No. No,

13    I think that the moment that the facts disclosed that it

14    was an unreasonable use, at that point there could be no

15    more demands of the man upstream.

16         THE COURT: What would make you decide that it was

17    unreasonable? The size of the community?

18         MR. VEEDER: Yes, and the uses to which the water was

19    applied as they related to a large ranch or to a small

20    ranch or to a small farm or to a cottage the property of

21    which abutted on the stream.

22         THE COURT: I fell off the wagon somewhere. Here is

23    a small village and it grows into a big metropolitan center.

24    But the uses are the same.

25         MR. VEEDER: Yes.

16,319

P 47

1        THE COURT:  Domestic use, sewage, fire, equipment, all
2   the things that go with a community of people living together.
3   When did it become unreasonable?
4        MR. VEEDER:  On the basis of the facts as they relate
5   to all parties.  Here is the situation.  A man could very
6   well have a hundred acres of crop and the village could be
7   using one-fifth of that quantity of water that the man was
8   using on his hundred acres.  The village grew -- assuming
9   that this was all riparian land -- the village grew, and
10  pretty soon the burden became too great.  But I don't want
11  this analogy to be distorted.  It is this element with which
12  I started out, that the reason a municipal use is not a
13  riparian use is only because of severance.
14       I think the Antioch case is a good example.  If the
15  Town of Antioch owned a piece of land abutting upon the
16  stream, I am convinced that that piece of land would be
17  entitled to enjoy a correlative share of the available supply
18  the same as anyone else.  And here is what Antioch says on
19  that:  "The fact that the City of Antioch is situated upon
20  the San Joaquin River is wholly immaterial in the consider-
21  ation of its rights in this case.  The rights in a stream
22  or body of water which attach to land because it abuts
23  thereon are not of a political nature but are private rights.
24  They are vested exclusively and only in the owner of the
25  abutting land, and they extend only to the use of water upon

P 48

1    the abutting lands and none other."

2         And then Hutchins, in discussing that case, at page

3    207 says: "A municipality in California may have riparian

4    rights in the stream by reason of its ownership of riparian

5    land, but it has no greater right to the use of water than

6    a private owner of the same tract would have."

7         It is a striking analogy with what transpires here.

8    I think the City of Antioch could operate a park on the land,

9    which is truly a municipal use.  I think it could have a

10   municipal building upon that stream and use it for riparian

11   uses.  I think it would be entirely proper to operate, if

12   a municipality had the authority, a motel for domestic

13   commercial uses, and as to the correlative share of that

14   use of the stream the right would be no different.

15        I will repeat what I said before.  Here the Marines

16   own all the land upon which they are using, there has never

17   been a severance, the lands are riparian, and for that

18   reason it cannot be doubted that we start out with the right

19   to use it for military purposes in the inception.  Then your

20   Honor may be called upon, if someone says that it is an

21   unreasonable use, to rule upon that proposition.  But no one

22   has yet said, nor has anyone suggested any evidence, nor is

23   there any basis upon which you could rule, in my view, that

24   it is an unreasonable riparian use.

25        In the argument that was advanced by Mr. Sachse he

P 49

1   attempted to declare that the filing which was made by the

2   Department of the Navy in some way affected the rights of

3   the United States of America.  Let's analyze what he said.

4   He said that the Commandant or some official in the Navy

5   made the filing in which reference was made to a military

6   use.  It is manifest  at the very outset that the claim

7   that was being made was inceptive in nature, relating solely

8   to a surplus of water, if any, in the Santa Margarita River.

9   That is the first precept.  So it couldn't possibly affect

10   the vested riparian rights, under the 1928 Amendment of

11   the Constitution.

12      Secondly, assuming that the declarations in some manner

13   by an official of the Department of the Navy could be

14   considered --

15      THE COURT:  Well, the case isn't going to hinge on

16   that.  No use arguing that.  I am in agreement with you.

17   The fact that an application was made in which some officer

18   talked about wanting to appropriate water for a municipal

19   use, calling attention to the fact that there was no cate-

20   gory it would fit under except that it was like a municipal

21   use -- I don't think that is decisive of this matter.  I

22   want some help on the other part of it.

23      MR. VEEDER:  I have attempted to help your Honor on

24   the proposition, and I will summarize it very briefly,

25   because I don't believe there can be any changes made as we

P 50

1   go along.

2       I think I have cited to your Honor the <u>Palmer</u> case,

3   in which it says that the United States can exercise a

4   riparian right.  Then the sole and only question is whether

5   the United States can own a right to use water, a riparian

6   right to water cattle and to raise alfalfa, but cannot own

7   a riparian use for the military -- for the Marines, for

8   the Navy.  Now that is the sole and only question, I believe

9   that your Honor has.

10       You have asked me for the guides to make the determina-

11   tion.  I think that we should have had, if there was going

12   to be this question, I think there should have been intro-

13   duced evidence showing that it was unreasonable.  But there

14   was none offered.  We waited patiently, expecting some kind

15   of offer to be made that, based upon the facts, this was

16   an unreasonable use.  Absent such a finding, your Honor,

17   and absent evidence of the fact that this is an unreasonable

18   use, in the light of all the facts, I believe your Honor

19   has before him all that has to be before him to make a

20   finding that the United States of America is using the

21   waters of the Santa Margarita River for beneficial purposes

22   and then to declare that there is nothing in the record to

23   show that those rights are unreasonably exercised.

24       I have to refer, your Honor, to the proposition that

25   the question of reasonableness is a variant and depends upon

P 51

1   all the facts.  Assuming, as we must, that a Marine will be

2   treated as well as livestock in this State, the question

3   becomes, is it proper to water livestock -- exercise a

4   riparian right?  It is undoubtedly proper.  Next question

5   is, how many head of stock can be watered?  And that is a

6   question of fact, depending upon the claims of all parties.

7   Assuming that Vails water 5,000 head of stock, and we water

8   5,000 head of Marines, I doubt that it would be proper to

9   declare that those Marines were unreasonably using water.

10  If we raised it to 25,000 Marines, I believe that there

11  would have to be a challenge that it was unreasonable.

12      MR. STAHLMAN:  The difference is that the stock only

13  drink water.

14      THE COURT:  Yes, you over-simplify the problem.  The

15  herd doesn't have fire engines and fire equipment, they don't

16  take baths, they don't have water piped into buildings, they

17  don't make all the uses of water that 5,000 Marines would

18  use.

19      MR. VEEDER:  What you are touching on is reasonableness,

20  again, though.  That is the point.  If we can only get

21  through the point that this is a proper riparian use -- that

22  is all I am worried about now, because the record will not

23  show that it is unreasonable.

24      Let's take the case, though, of the commercial domestic

25  use.  I think there is a good example.  Although I think the

P 54

1   military use is different from the commercial domestic use.

2   I think it is different from the municipal use.  I think it

3   is just a common, ordinary beneficial use for military

4   purposes, and I think it comes within any riparian right

5   that is known.

6       Mr. Sachse, though, went one step beyond that.  He

7   says we have to look at the entire Camp.  No, we don't.  We

8   have put into the evidence the record showing the quantity

9   of water used for military purposes and agricultural purposes

10  within the watershed.  We know what those are.  They are in

11  evidence now.  Are those reasonable uses?  I respectfully

12  submit, on the state of the record, that they are reasonable

13  uses.  Conceivably, if we were to move a hundred thousand

14  Marines on that Base, put them on the riparian land,

15  conceivably then if we made a demand on Vail Company for

16  riparian water the objection could be raised on an order to

17  show cause.  But that is not the situation.  Mr. Stahlman

18  hasn't offered any evidence that this is an unreasonable

19  use.  Mr. Sachse hasn't offered any evidence that this is

20  an unreasonable use.  You must have a criterion, you must

21  have a guide to make that determination.

22      MR. STAHLMAN:  You haven't rested yet, Mr. Veeder.

23      MR. VEEDER:  And that criteria entails all the facts

24  of an apportionment, and unless and until that circumstance

25  arises any finding on the proposition, in my view, could not

P 53

1   be supported in the record.

2       The final question has been presented by Mr. Sachse,

3   and it is this.  The only way the United States of America

4   could obtain water for military purposes would be to file

5   for an appropriation.  An examination of the statutes in

6   this State will reveal the total impossibility of that

7   course.  In the first place, it goes to the question of the

8   Constitution.  Under the Constitution, such a ruling could

9   not be sustained, for if there is one thing that has been

10  determined finally in the field of constitutional law it is

11  that the National Government can proceed to carry out its

12  military responsibilities, indeed any responsibility,

13  independent of the veto power of the State of California.

F fls.  14

15

16

17

18

19

20

21

22

23

24

25

16,326

t-27
F-1

1    That, if I may use the term, is hornbook.

2    So it is not necessary for the National Government to come

3    hat-in-hand to the State of California and say, "Please may

4    we have some water?" for if we attempted to comply with the

5    State law there is a grave doubt whether under the statutes

6    on military use you would have acquired an appropriative

7    right, because surely it is not referred to in the statute.

8    Secondly, the statutes of the State of California

9    provide that at the end of 20 years a municipality could

10   come along and condemn the rights thus acquired, and I

11   respectfully submit, your Honor, when the National Government

12   acquires rights to the use of water for a great military

13   establishment, it is not acquired from the State.  It is

14   entitled to its rights being guaranteed to it by fee title,

15   and it should not be subject to a license by the State of

16   California or by any other entry of the State.

17   And again I say we are not subject to blackmail either.

18   We are not required to come in and pay whatever price

19   Fallbrook wants to impose upon us by reason of the fact

20   that six or seven years after we had acquired our rights and

21   were exercising our rights Fallbrook filed a piece of paper

22   with the State of California.

23   Now, if it is the law in this State that the Fallbrook

24   Public Utility District can divest the National Government

25   of riparian rights which it acquired by the mere filing of a

16,327

t-28

1   piece of paper, I am most anxious to have such a ruling,

2   because I think everybody in the world should know that the

3   National Government is impotent in the State of California,

4   and cannot operate.  Why?  Because land speculators can come

5   in and file a piece of paper and  divest the National

6   Government of the water that is required to defend the Nation.

7       Those are the basic principles that are involved here,

8   your Honor.

9       In summary, I think we should state that the uses which

10  are presently made on the military land must be presumed to

11  be reasonable under the circumstances.  We are making no

12  claim for riparian water for use outside the watershed.  It

13  is strictly within the watershed and no one   has challenged

14  the reasonableness of those uses.

15      Surely there is not a case, and Mr. Sachse has cited

16  no cases where a junior appropriator with no vested rights in

17  the stream could come in and take from a riparian the water

18  which was actually being applied to a beneficial use.  There

19  is no case in California.  He can cite no case in California,

20  he can cite no case anywhere in the world, where an established

21  riparian use was taken away from a man or from the National

22  Government by reason of the fact that a subsequent appropriator

23  who had no rights at all on the stream, came in and initiated

24  those rights and then said, "Look, the United States of

25  America is using more water than it should for its Marines,

t-29

1    and I want a part of it.  I want the Federal Court to order

2    'dry up a part of the Marine Corps Base, shut it down.  Shut

3    it down, and shut it down now, because I have filed a piece

     of paper, because Fallbrook filed a piece of paper."

5         If that is the law, your Honor, I think the ruling should

6    be made upon it as rapidly as possible, and let this one be

7    one that can be appealed.

8         MR. SACHSE:  Your Honor, I would like to be very brief

9    in reply to one or two points that Mr. Veeder made.  First,

10   I have never contended, and I thought I made it clear in my

11   very opening remarks, that military use is per se improper.

12        Now, when your Honor said our initial brief was carefully

13   drafted on the record, your Honor has analyzed my points

14   correctly.  I say that a municipal use is per se an improper

15   riparian use; not that a military use is per se an improper

16   riparian use.   Second, Mr. Veeder says that the only yard-

17   stick is, is the use beneficial?  He said that I conceded that

18   the military use is a beneficial use, and, therefore, my

19   argument has fallen.  I also concede that a municipal use is

20   a beneficial use, but the beneficial aspect alone does not

21   make it riparian.  We know that storage is a beneficial use,

22   but storage is not a proper riparian use.

23        Beneficial is not the sole and only test, and

24   reasonable and beneficial are not the sole and only tests.

25   There are certain uses which are both reasonable and

F-2

t-30

1    beneficial, but still non-riparian.

2         Now, Mr. Veeder read to your Honor a sentence from

3    Hutchins, but he didn't read the next sentence that immediately

4    followed, and I am going to reread the sentence which Mr.

5    Veeder read, and then read the next one, too.  This is Mr.

6    Veeder reading from Hutchins at Page 207:

7              "A municipality in California may have riparian

8         rights in a stream by reason of its ownership of riparian

9         land, but it has no greater right to the use of the

10        water than a private owner of the same tract would have."

11   End Veeder quote.  Next sentence:

12             "The private proprietor is not entitled solely

13        because he owns riparian land to divert water for use

14        on non-riparian land, and a city has no greater right to

15        do so.  Nor does the fact that a city borders upon a

16        stream give it riparian rights therein."

17        Now, I am going to read in some language from a Kansas

18   case, City of Emporia vs. Soden, 25 Kan. 588, which boils

19   down the whole argument of why a municipal use, regardless of

20   the city's ownership of land, cannot be riparian.  I am

21   quoting:

22             "The City cannot be considered a riparian owner

23        within the scope of the exception named.  The amount

24        of water which an individual living on the banks of a

25        stream will use for domestic purposes, is comparatively

t-31

trifling.   Such use may be tolerated upon the principle

de minimus non curat lex.   It is a use which must always

be anticipated, and may reasonably be considered as

one of the benefits of the ownership of the banks of a

natural stream * * *.   But the taking of water for the

supply of a populous and growing city, stands upon an

entirely different basis.   No man can foresee this.

* * *.   The city as a corporation may own land on the

banks, and thus in a sense be a riparian owner.   But

this does not make each citizen a riparian owner.   And

the corporation is not taking the water for its own

domestic purposes; it is not an individual; it has no

natural wants; it is not taken for its own use but to

supply a multitude of individuals."

Now, the United States or Camp Pendleton is not an

individual.   It is not taking the water for its own domestic

purposes.   It has no natural wants.   It is taking the water

not for its own use, but to supply a multitude of individuals,

up to 125,000.   I thought it was up to 105,000.

f-3

I want now to correct Mr. Veeder, unless your Honor thinks

it to be improper, but I respectfully request the right to do

so.   Mr. Veeder referred to the case of  Prather vs. Hoberg,

Prather vs. Hoberg, as I discussed at some little length in

my argument, is a clear controversy between two men    who

controlled an entire stream, both of their properties being

t-32

resorts, 100 per cent resorts.   True, they had some acreage where they raised hay for saddle horses.   Each of them did that; each one.

At Page 560 the Supreme Court quoted with approval the trial court's language, and I am going to quote it to your Honor:

>". . . a use for resort purposes was an artificial commercial use contributing to the land owner's profit in a business enterprise, a use not within the purview of a 'natural use' by a riparian owner arising out of the necessities of life on the riparian land, such as a household and drinking use and the watering of stock, and that here, so far as any purely domestic use or natural use is concerned, the issue may be eliminated as each party has a sufficient water supply for such purpose distinct from the supply in controversy."

Now, the Court in this case absolutely refused to decide an apportionment between them, and it went on to say, and this I think is the complete answer to Mr. Veeder.   I am reading from Page 562 of the Court's opinion, and, as I say, this is Prather vs. Hoberg, 24 Cal. 2d 549, at Page 562:

>" . . . The fact that human beings are occupants of hotels, apartment houses, boarding houses, auto camps, or resorts such as those conducted by the parties to this action does not necessarily exclude them from the

16,332

t-33

preferential class . . . But it may well be that the commercial character of the proprietor's business in serving his guests may be so extensive that a lower riparian whose domestic use, whether or not commercialized, would be prejudiced by the business activities of the upper riparian and to such an extent as to require the interposition of a court of equity to safeguard his rights . . . The question is whether under all the circumstances of the case the use of water by the one is reasonable and consistent with the corresponding enjoyment of the right by the other. ... . What constitutes reasonable use is, in the first instance, a question for the trier of facts."

Now, it is not true that the California Courts approved commercial use. They did not. They stated that the yard-stick to be applied to commercial use was exactly the same as anything else, and they further said it may be entirely improper.

Now, Mr. Veeder, do you have the Circuit Court decision before you?

MR. VEEDER: The Ninth Circuit?

MR. SACHSE: Yes.

MR. VEEDER: Oh, no.

MR. SACHSE: You don't have that?

MR. VEEDER: No. It is 235 Fed. 2d, though. Do you want

16,333

t-34

1    the citation?

2    MR. SACHSE:  No, I was asking if you had the book.

3    MR. VEEDER:  I don't have it here.  Do you want me to

4    go get it?

5    MR. SACHSE:  No.  I can tell his Honor the reference I

6    want to make to it.

7    MR. VEEDER:    Of course, it related only to the

8    jurisdiction problem.

9    MR. SACHSE:  If your Honor will observe the language

10   of the case, in the Headnote 25 you will find that Judge Fee

11   states that for the purposes of determining the water right,

12   the military use appears to be analogous to the municipal use.

13   He so states, and I will concede it is at this time, but I

14   will also remind your Honor respectfully of the fact that

15   your Honor pointed out in your initial pre-trial opinion,

16   that granted the only issue was the simple one, you found the

17   argument of the Circuit Court convincing, you had no doubt

18   they would reiterate it, and it would influence your Honor.

19   Now, granted it is dicta, that is what it says.

20   Now, Mr. Veeder says a riparian can make any reasonable

21   use.  Again, your Honor, that is not true.  He cannot.  He

22   cannot store water cyclically.  We know that.  Mr. Veeder has

23   conceded it.

24   Let me give your Honor a little example of what I think

25   is analogous in an odd way to a municipal use.  Let's suppose

16,334

t-35

that Gibbon and Cottle as a part of their riparian right have obtained an allocation, and under the allocation they set up a bottling works, and they took every drop of water they got as a riparian, no more, just every drop to which they were entitled, and shipped it all to the far reaches of the United States and they said it had some kind of radium in it, or something, and shipped it out. Is that a proper riparian use? That is not. And I don't care, your Honor, if it was no more than the amount they were entitled to. The amount has nothing to do with the propriety of use. They can't do it. They simply can't. And the United States as a riparian in Camp Pendleton cannot convert its riparian use to a municipal use.

Now, I disagree most vigorously with Mr. Veeder's pronouncement that the burden of proof or the burden of going forward, let us say, on the question of unreasonableness is that of the defendants.

This action is an action by the United States to quiet title to alleged water rights on the stream. This action has appended to it ancillary proceedings, a request for an injunction against one appropriator, and it has implicit in it, as Mr. Veeder has stated, a regulation of all other users.

Mr. Veeder has stated that he wants some kind of a mathematical quantitative formula from which he can determine how much water the United States is entitled to have.

t-36

Now, to get that, it is no longer sufficient for him to say, "I am a riparian." That was settled by the constitutional amendment of 1928, and by the case of Lindsay-Strathmore --

MR. VEEDER:   3 Cal. 2d?

MR. SACHSE:   Tulare vs. Lindsay-Strathmore Irrigation District, 3 Cal. 2d 489.

That case decided or that case spells out in the clearest of detail what a riparian must prove when he comes in seeking relief.   If he comes in and proves only one fact, "I am a riparian," and nothing more, he is entitled to this relief, and no more.   He is entitled to an adjudication from the court that says that this is a riparian right, this right to be protected in the future, and, "You, Mr. Defendant, no matter how long you may use water adversely to this riparian right will not prescript it.   I will give you, so to speak, Mr. Riparian, Mr. Plaintiff, I will give you a protective ruling."

If that is all he proves, that he is a riparian, that is all he is entitled to.

But to do more, he must come to the Court and he must prove that he is a riparian, and that he is putting, and, if it is prospective, would put the water to a reasonable and beneficial riparian use.   Now, that is the law.

Mr. Veeder, if he proves that he was nothing but a riparian, would be perfectly entitled to a prospective order

t-37

from your Honor that none of us could ever prescript it, although we could probably never persuade the United States of that, but he would be entitled to such an order, and that is all he is entitled to until he makes a test of the California Constitution.

Now, I am going to reply as briefly as I can to Mr. Veeder's dramatics.

I don't think the Fallbrook Public Utility District is divesting the United States of anything.  The Fallbrook Public Utility District has a permit which states that it can take and use water from the stream for prescribed purposes so long as such taking does not injure prior vested rights.

There isn't anything in that order that says that we can injure a prior vested right of the United States.  But it does say in that order that if the United States is erroneously or illegally or improperly exercising a right, then we don't have to respect it.  Now, that is all.  We are taking nothing. The order recognizes expressly the rights of the United States, and if they want this ranch for proper riparian purposes, and no more, their situation would be far different than it is today.

I think it is a little out of place to dramatize a Public Utility District of the size of Fallbrook in such a way as though it could in some way rob or bamboozle the National Government.

t-38

f-5

I will invite your Honor's attention to the fact that it wasn't a private in the ranks who decided to file an application to appropriate waters.  The Navy Department has orders. I am sure it wasn't some civilian clerk who  I suborned. Intelligent men, engineers, lawyers decided that the thing to do was to ask for an appropriation.

Maybe they were right, your Honor, and maybe Mr. Veeder is wrong.  Maybe the Justice Department fouled up this act. Maybe this is what happened.  Maybe it did.  But Fallbrook has taken nothing.

I believe your Honor is going to be compelled, not today, but I am  going now to come back to what I said in my memorandum on issues and order of proof.   I truly believe with all my heart that this whole subject we are arguing is probably immaterial.  The only time it will become material is if your Honor will reach upstream against either a riparian or an appropriator and impose upon him regulation, prescription, apportionment, for the benefit of the United States.

If your Honor never reaches upstream and never imposes such apportionment, this issue means nothing.  But if your Honor decides it is necessary to so reach upstream, then before you can do that you are going to have to meet the burden imposed by Tulare vs. Lindsay-Strathmore, and you will have to inquire of yourself:  Are the uses of the United

t-39

1   States reasonable, are they beneficial, and are they within

2   the riparian right?

3   THE COURT:  We will take a recess, and then I will hear

4   from Mr. Stahlman and Mr. Girard.

5   (A short recess.)

6   THE COURT:  Mr. Stahlman.

7   MR. STAHLMAN:  Your Honor, I will be very brief on this

8   matter.  I think it poses a very complex and intricate

9   question that may have a lot of implications to it, and can

10  have.  I think inasmuch as it is in issue here, I would like

11  to see it decided.

12  If Mr. Veeder is right, it may be of great benefit to

13  the Vail Company.  I think Mr. Veeder has abandoned the

14  proposition that a military use as such is a riparian use,

15  and then he goes on the proposition of its being a reasonable

16  use.  And I can envision-- no?

17  MR. VEEDER:  I am sorry, George, but you should not see

18  me shake my head.

19  MR. STAHLMAN:  I didn't see you, but I heard it rattle.

20  MR. VEEDER:  At least there is something in it, George.

21  That is where you and I differ.

22  MR. STAHLMAN:  Your Honor, as I say, if this principle

23  that is advocated by Mr. Veeder is correct, it might be of

24  great benefit to the Vail Company, so much so that I believe

25  in the very near future the Vail Company would be not only

16,339

t-40

a cattle  ranch, but it may be a municipality.  Then when the population has its increases, as it is bound to, and that is the history of other large ranches, the Irvine Ranch and the like, then under that system, your Honor, we would be privileged to be living in a community where we would be leasing out land, putting in industries, putting in the same types of operations that Camp Pendleton has, and resorts, and matters of that character.  So a large population can accumulate in that area, and then if the ranch carried on its own agricultural operations, and we built on that beautiful spot of Buck Mesa, then we would have the two types, and I am wondering how that would work.  I think it should be settled at this time, inasmuch as it is an issue in this case.  Mr. Sachse had advanced the proposition of apportionment, and it may not be necessary to decide it, but it is purely a legal question, and I think it should be decided at this time.

Thank you.

THE COURT:  Mr. Girard.

MR. GIRARD:  Your Honor, I agree with Mr. Sachse that the use of the term "military use" is not particularly relevant.  There is no such term under California law, and we have to look to the specific facts to see what we are talking about.

Now, assuming Mr. Sachse's facts are correct, and I

16,340

t-41

1   wasn't in the case then, as I gather his contention is that

2   the military use is in fact a use which is of a character

3   identical to a municipal use, and then Mr. Sachse states that

4   there are two principal reasons why this municipal use or the

5   use of water for purposes of a municipal character are not

6   proper riparian uses.   One test as outlined by him is the

7   reasonable use test.

8        Now, I think Mr. Sachse also pointed this out at this

9   time, that insofar as what we are doing now, which is the

10  cataloguing of water rights primarily, whether or not uses

11  by the Navy are of a character synonymous with municipal

12  uses is not pertinent right now.   The time that it becomes

13  pertinent is if and when there is ever an allocation between

14  the riparians, or if and when the United States were to seek

15  to enjoin another riparian to have water come down to them

16  to satisfy their riparian right.

17       That, of course, has nothing to do with the injunction,

18  as I understand it, insofar as Fallbrook is concerned, which

19  now I understand Mr. Veeder is primarily approaching on the

20  basis of the Lake O'Neill appropriative right.   But I think you

21  can make a pretty good argument from the facts of this case

22  that the present United States uses which it is conceded

23  insofar as they are within the watershed are municipal in

24  character, could be in an allocation suit reasonable, and, of

25  course, the basic approach to that would be what standards to

t-42

F-5

1   use to determine how much water the United States got.

2       Now, if you allocated water to the United States on

3   their irrigable acreage, a certain amount for all of their

4   irrigable acreage, and then an additional amount for all of

5   their uses which are synonymous with a municipal use, I take

6   it it would not be reasonable.  But if you allocated water

7   to them so that you do not put a burden on the stream any more

8   than you would on anybody else, and in most allocation suits,

9   well, if you ever had an allocation on this stream, I think

10  the way you would approach this, you would take your irrigable

11  acreages on everybody's property, and figure out your total

12  acres, and then work out some percentage.

13      Now, if that approach was made in this particular water-

14  shed on an allocation, I do not think that you could conclude

15  therefore, as a matter of law, that if the United States took

16  the amount of water that is allocated to them on the basis

17  of the irrigable acreage and used it for their military

18  purposes that would be unreasonable.  There would not be any

19  more drain on the upstream people than if they were irrigating,

20  and they would just have to substitute it to the extent

21  required on irrigated land and use it on military land, which

22  I believe is what Colonel Bowen testified he does, that each

23  year he figures out how much water he has, and on the basis

24  of how much water he needs for his military uses, and then he

25  cuts down on his irrigation leases.

t-43

16,342

I think if that practice were followed in/an allocation suit, you could very well conclude that that use was a reasonable use.

But Mr. Sachse raises one other defense, or one other principal reason, which is much more fundamental.

Mr. Sachse states, as a matter of law, regardless of reasonableness, a riparian cannot use allocated water within the watershed on riparian land-- or, within the watershed for uses which are essentially municipal in character. In other words, a use of riparian water for uses which are essentially of the same character as municipal uses he says is absolutely prohibited insofar as based on right.

Now, in all seriousness, right now I am not going to be able to help the Court much, because I am not ready to state an answer to it. I want to look it up a little more. I haven't actually done any major research on it.

If Mr. Sachse is correct on that point, I think that would dispose of it, regardless of reasonableness. If he is not correct, if that is not an absolute prohibition, then, of course, it is a question of fact.

Now, I would like next week to just spend a day on this and see what I can come up with, and I am not saying that I would agree or disagree with Mr. Sachse or Mr. Veeder, but I am not just ready to make a statement on this yet.

MR. STAHLMAN: I would have a point of inquiry.

16,343

t-44

1    MR. SACHSE:  Yes.

2    MR. STAHLMAN:  There was some discussion, I understand,

3    in the trial before  Judge Yankwich about some of these

4    questions, and one of them was the question of substitute

5    use, and it may have a bearing on it.  Do you know what

6    disposition was made of that?

7    MR. SACHSE:  I don't know.

8    MR. STAHLMAN:  Discussing whether or not a substitute

9    use was a proper use under California law?

10   MR. VEEDER:  You will find that in 109 F. Supp. in one

11   of the first rulings by the Court, and he said that the

12   military use was a substitute use and was a proper use.  That

13   is what Judge Yankwich did.

14   MR. STAHLMAN:  Was there a citation on that?

15   MR. VEEDER:  No.  When I say no, there were citations

16   to the effect along the line that I have advanced here.  In

17   fact, much of the same authorities that I have advanced here

18   I used there in my original argument.

19   MR. STAHLMAN:  You say that is in 109?

20   MR. VEEDER:  That is in 109, and you will also find it

21   covered in -- well, in fact, if you go to 108, 109, 110, the

22   Fallbrook cases, you will find a full review of the findings

23   and authorities upon which he relied, and    Prather vs.

24   Hoberg was one of the important cases cited there.

25   THE COURT:  I am going to read these cases and study the

16,344

t-45

1   problem, too.  I am not prepared to decide this at this

2   time.

3       MR. SACHSE:  Then, your Honor, if we are through on

4   this temporarily, my recollection is that we had only one or

5   two more paragraphs left in these findings, if we could go

6   to those.

7       THE COURT:  Yes, let's see if we can do that.

8       MR. VEEDER:  The findings?

9       MR. GIRARD:  Finding XXXVII.

10      MR. SACHSE:  Yes, on Finding XXXVII, I think the Court

11  has drafted an alternative finding.

12      MR. VEEDER:  Could I just ask one question about working

13  out of findings?   I talked to Mr. Sachse, and, as I under-

14  stand it, you will be down Monday?

15      MR. SACHSE:  I will come down Monday to work with you.

G- fls.

16

17

18

19

20

21

22

23

24

25

G Take

P 54

1      Here are my notes on what I am going to

2  do, your Honor.  I will try to get in to Mr. Veeder's hands,

3  so that possibly we could dispose of it by Thursday, a form

4  of judgment on Diamond and Domenigoni Valley.  The findings

5  are apparently agreed, but there is no judgment prepared.

6      For the future, on areas in early April, I will try to

7  work up the form of conclusions of law and a form of decree

8  to cover Searl's conservation dams, and I will, with Colonel

9  Bowen's help, try to work up the whole findings, conclusions

10  and judgment for Sandia Creek.

11      But for next Thursday all I am going to do is Diamond

12  and Domenigoni Valley.

13      MR. GIRARD:  While somebody was talking today I drafted

14  an alternative finding XIV which would go on the Lake O'Neill

15  appropriative findings of fact.  I laid a copy on your desk,

16  your Honor.  It is to the effect that it recites the

17  stipulation between Fallbrook and the United States, and it

18  also expressly finds that, based upon the evidence in the

19  case, the term "during the winter and early spring" would

20  mean a period from April 1 to October 30.  I don't know

21  whether it meets the way you wanted it, but I thought it

22  might be desirable to have some specific language.  Counsel

23  have all been given copies of it.

24      THE COURT:  Well, something like that, except the term

25  "during the winter and early spring," as set forth in these

16,346

P 55

1   findings, really refers to the starting date.  In other

2   words, that was the starting date that they started to take

3   water.  "During late winter and early spring" was the language.

4   And April 1 was fixed by the parties as reasonable date and

5   is in accord with the meaning the Court gives to "late

6   winter and early spring"; and that the evidence in the case

7   supports the finding that the appropriative right was there-

8   after exercised throughout the period which ran to approxi-

9   mately October 30, which is also in line with the stipulation

10   of the parties.  Something like that.  I think it can be

11   dressed up without spending time on it right now.

12      Don't you think so, Mr. Veeder?

13      MR. VEEDER:  Yes your Honor.  I am hopeful to have it

14   completed so that Mr. Sachse and I can review it.  I don't

15   know just what your desires are.  If Mr. Sachse is satisfied,

16   will there be a requirement that other parties pass upon it?

17      MR. SACHSE:  I think Mr. Stahlman is critically concerned

18   on the extent of your appropriative rights.

19      MR. VEEDER:  Do you want to review it, George?

20      MR. STAHLMAN:  Yes.

21      MR. VEEDER:  Would it be possible to be down here

22   Monday?

23      MR. STAHLMAN: I will be in Los Angeles on Monday.

24      MR. SACHSE:  If you and I get together, I can take it

25   up and deliver it.

P 56

1     MR. STAHLMAN:  Yes.

2     MR. VEEDER:  If it is agreeable with Mr. Sachse, Mr.

3 Stahlman and Mr. Girard, would that be acceptable to you?

4     MR. GIRARD:  Just mail it to me.  Don't wait for me

5 to comment.

6     MR. VEEDER:  Is that acceptable to your Honor?

7     THE COURT:  Yes, we can check it around informally.

8     MR. VEEDER:  It will not be necessary to have Mr.

9 Girard's approval if Mr. Sachse and Mr. Stahlman are in

10 accord, then?  I will send him a copy.

11     MR. STAHLMAN:  Mr. Girard will not be here on Thursday.

12     MR. SACHSE:  I will undertake, if necessary, to call

13 Fred -- if there is any need.

14     THE COURT:  All right.

15     Now, if we are going through the findings --

16     MR. SACHSE:  We were checking the one you had rewritten,

17 No. XXXVII.

18     THE COURT:  That is just a stab at it.

19     MR. STAHLMAN:  I think it is better the way it was

20 first.

21     MR. SACHSE:  With apologies to your Honor, I do, too.

22 I think you have too much language of evidence in the draft

23 you made.

24     MR. VEEDER:  Let me see that, Franz.

25     MR. STAHLMAN:  I can give you reasons for it, if your

P 57

1   Honor, if your Honor desires.

2       MR. GIRARD:  The basic purpose of Finding XXXVII, your

3   Honor, is just that the basins of the United States have

4   recharged, and the specific sources as to how they recharge

5   I don't think is too crucial to this particular finding.  I

6   think they are more detailed findings than should be used.

7       THE COURT:  We will still have the last five lines from

8   --

9       MR. GIRARD:  Yes, I agree there.

10      THE COURT:  And the other change that we made earlier:

11  The United States of America has been able, in large part,

12  to satisfy its lawful needs from said basins, etc.

13      MR. SACHSE:  In other words, we are back to the way we

14  originally amended XXXVII then.

15      THE COURT:  Yes, I think I will leave it that way.

16      MR. SACHSE:  Very well.

17      MR. STAHLMAN:  With the vast amounts of water, your

18  Honor, couldn't/knock the amount?

19      THE COURT:  Where is "vast"?  You are not talking about

20  my revision at all.  The purpose of this finding was only

21  to show that the storage in Vail Dam had not hurt the United

22  States.

23      MR. GIRARD:  I think that is all of them now, your

24  Honor.

25      MR. STAHLMAN:  That is all of them, isn't it?

P 58

1    MR. GIRARD:  Yes.

2    THE COURT:  What were you going to do?  Revise some of

3    the papers that had to be revised?

4    MR. GIRARD:  If you would like, your Honor.  I think I

5    have all the corrections listed on my copy, but I would

6    prefer to wait until --

7    THE COURT:  Before you duplicate any pages again, if

8    you would, submit the pages to us.

9    MR. GIRARD:  I was going to wait until I get a copy of

10   the transcript.  I guess I will get it Monday or Tuesday.  I

11   can type it, in final form, with the corrections that were

12   made yesterday, using the transcript and my notes.  I think

13   my notes were fairly accurate.

14   THE COURT:  Does the Government have further objection?

15   Or was XXXVII the last one?

16   MR. GIRARD:  I think your Honor had overruled or

17   modified Mr. Veeder's request on all of the others.

18   THE COURT:  We didn't get further than XXXVII?

19   MR. GIRARD:  Yes, we went through the conclusions of

20   law.

21   MR. VEEDER:  We even went through the form of judgment.

22   THE COURT:  All right.

23   MR. VEEDER:  Your Honor decided to reverse himself, as

24   I understand.

25   THE COURT:  What's that?

16,350

P 59

1   MR. VEEDER:  I was attempting humour at the end of a

2   hard week, your Honor.  I said you decided to reverse yourself.

3   THE COURT:  Now, in regard to doing this, some of these

4   pages wouldn't have to be redone.  Was this multigraphed or

5   mimeographed?

6   MR. GIRARD:  No, these were typewritten and then run

7   through our photo machine of some kind.

8   THE COURT:  Let's not worry about that.  Get the

9   original and several copies down here.

10   MR. GIRARD:  And I will send them to counsel.

11   THE COURT:  All right.

12   Now, have you talked anymore about the language of this

13   agreement between the Government and Fallbrook?

14   MR. SACHSE:  Stipulation.

15   MR. GIRARD:  I drafted up one.  Did you get a copy of

16   it, your Honor.

17   THE COURT:  I have a copy of it.

18   MR. GIRARD:  There will have to be a change on it to

19   reflect the definition of "dead storage" as Mr. Veeder used

20   it in Finding XIII.

21   MR. SACHSE:  I am perfectly willing just to insert it.

22   If you want to re-do it with that in, I am satisfied.

23   MR. GIRARD:  With that little addition there, other than

24   that I don't know -- I don't know whether Mr. Sachse or Mr.

25   Veeder feel that it is adequate.

P 60

1   MR. VEEDER:  I would like to tender one thought that
2   is not reflected in any of these and my understanding of
3   what was agreed upon, namely, that if, in the wintertime,
4   the Lake was not filled, then on April 1 we could divert
5   water until such time as it was filled.  Is that understood
6   by everyone?

7   MR. SACHSE:  Yes.

8   MR. VEEDER:  And maintain the Lake at a full level.

9   MR. GIRARD:  That is your appropriative right.

10  MR. VEEDER:  No one has written it down.

11  MR. GIRARD:  I think it is assumed that as of April 1,
12  if your Lake was not full, you would start exercising your
13  right.

14  MR. VEEDER:  All right.  That hasn't been written.

15  MR. GIRARD:  I think it should be clear, though, that
16  that stipulation entered into by you and Mr. Sachse would
17  not have anything to do with, say, prior upstream riparian
18  uses or something like that.

19  MR. VEEDER:  I think it will be reflected in the state-
20  ment.

21  MR. SACHSE:  What are we going to ask for?  I don't want
22  to pin George down.  But do we want to ask any other
23  appropriator to sign this?

24  MR. STAHLMAN:  I don't think so.

25  MR. SACHSE:  I don't care.

P 61

1   As I understand it, your Honor -- I don't want to

2   pre-judge this -- you are contemplating, in the absence of

3   somebody's vigorous objection, the finding of fact that

4   their appropriative right is in accordance with the

5   stipulation.  So they will all be stuck by it anyway.  Is

6   that correct?

7   THE COURT:  That is correct.  And I might say also, Mr.

8   Girard, in drafting some conclusions and the form of

9   judgment --

10   MR. GIRARD:  I think Mr. Veeder and Mr. Sachse are

11   going to draft those findings on Monday, your Honor.

12   THE COURT:  Yes.  In drafting them, this business about

13   the order of the Court directing the United States to fill

14   the lake, when you get to that the direction will be that

15   the United States fill the Lake, subject, however, to

16   objections, if any, from persons who were not parties to

17   this stipulation and who would be entitled to object.  Do

18   you follow me on that?

19   MR. SACHSE:  I follow you.  I don't think there is

20   anybody, because the Government is downstream and there is

21   nobody who could complain.  Wherever they put their water,

22   nobody could complain.  But I think it would be wise to

23   put it in.

24   MR. VEEDER:  Aren't you going to cover that with your

25   general caveat about it being interlocutory and not final?

P 62

1    Don't you cover that?

2        MR. SACHSE:  I think so.  I don't think you would have

3    to put it in.  You have a general caveat.

4        As Mr. Veeder says, this judgment is interlocutory,

5    subject to correction, objection, etc.  As far as the future

6    goes, I don't know who could object to what the Navy does

7    with it.  They have an unquestioned right.  Nobody can object

8    to their running water anyplace they want to.

9        THE COURT:  Do you think there is any need to have

10   anything in at all, Mr. Veeder?

11       MR. VEEDER:  My view is that when I get the language

12   written and the final conclusion of law -- and I have already

13   dictated it -- I am going to say that the right to change

14   the place of use, the purpose of use and the means of use

15   cannot be exercised in a manner that would infringe upon

16   rights vested at the time that the change is made.

17       Does that suit you, California?

18       MR. GIRARD:  Yes.  That is the exact requirement of

19   1406 of the Water Code.

20       MR. VEEDER:  That is the law.  Even a junior right

21   couldn't be affected.  I will write it that way, if it is

22   all right with you.

23       THE COURT:  All right.

24       You are going to be back next Thursday to talk about

25   this injunction again.

P 63

1    MR. VEEDER:  I am going to be here Monday morning your

2    Honor.

3    THE COURT:  I mean, we are going to hold court on

4    Thursday.

5    MR. VEEDER:  Yes.

6    MR. SACHSE:  I will try, if I can have the typing done

7    fast enough -- I realize that you will not want to do it

8    without other counsel -- but I will try to have  the Diamond

9    and Domenigoni Valley judgment, so Mr. Veeder can start

10   working on it.

11   MR. VEEDER:  On this matter of the Temecula and

12   Murrieta Basin, I am going to call Mr. Littleworth.  If he

13   doesn't come down, I am going to write it myself.  Is that

14   all right?

15   THE COURT:  That is what we will have to do.  Submit

16   it to him and let him look it over.

17   What are you going to do about Knox?

18   MR. VEEDER:  He is going to file objections.  I expected

19   him here.  He said he was going to be here, but apparently

20   he didn't make it.

21   THE COURT:  Gibbon and Cottle went over.

22   And Oviatt?

23   MR. VEEDER:  I gave you a copy of Mr. O'Malley's letter

24   there.

25   THE COURT:  He wanted a copy of Exhibit 15.  Could you

P 64

1    get him a copy of Exhibit 275?

2        MR. VEEDER:  Yes, I will, but it will not be a colored

3    copy.  I will ask the Colonel/delineate on Exhibit 275 the
                         to

4    Oviatt property.  Is that all right?

5        THE COURT:  Yes.

6        MR. VEEDER:  That is the only way I can show what he

7    wants.

8        THE COURT:  You can cover that part of it.

9        MR. VEEDER:  All right.

10       MR. STAHLMAN:  One other matter on the agenda, if your

11   Honor wants to take it up -- I think we have had some

12   discussions on it -- and that is the stock watering ponds.

13       THE COURT:  I would prefer to see what is drawn up.

14       MR. SACHSE:  What I want to try to do -- and frankly,

15   I don't know how I am going to do this -- I am going to try

16   to say that a pond of a given size, let us say of Vail Ranch,

17   for stock watering is proper.  That is a reasonable,

18   beneficial and proper use.  But I am going to  try at the

19   same time to say that a soil conservation dam that would be

20   of exactly the same size on a grove in Fallbrook or something

21   like that is improper and must remain under the continuing

22   jurisdiction of this court to take water out of it.  Just

23   how I am going to try to describe this in words, I don't know.

24   But that is the idea.

25       THE COURT:  Does that sound reasonable, Mr. Veeder?

16,556

P 65

1      MR. VEEDER:  I think that is a good approach.  We have
2  gone into it.

3      THE COURT:  Let's hold it up until we see what kind of
4  language you produce.  Maybe we can wind it up without
5  spending a lot of time on it.

6      Will there be anything else heard on Thursday except
7  the injunction matter?

8      MR. SACHSE:  Unless Mr. Veeder and I might have very
9  brief discussion on Diamond and Domenigoni Valley.  I doubt
10  that we will be that far along.

11      THE COURT:  Then the case is continued to Thursday
12  morning for the injunction matter, and until April 25 for
13  further hearing.

14      MR. VEEDER:  That is right.  At ten o'clock?

15      THE COURT:  Ten o'clock.

16      (Adjournment until Thursday, April 13, 1961, 10:00 A.M.)

16,357

t-46

# C E R T I F I C A T E

    I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

    I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date or dates specified therein, and that said transcript is a true and correct transcription of my stenographic notes.

    Dated at San Diego, California, this  7th day of April, A.D. 1961.

_____
Official Reporter

_____
Official Reporter