# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Thursday, April 13, 1961

Pages: 16,358 to 16,425, inclusive

FILED

SEP 24 19 3

CLERK, U.S. DISTRICT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

A1

VOLUME 143

1        IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3                    - - -

4        HONORABLE JAMES M. CARTER, JUDGE PRESIDING

5                    - - -

6   UNITED STATES OF AMERICA,        )
                                     )
7                      Plaintiff,    )
                                     )
8   vs.                              )        No. 1247-SD-C
                                     )
9   FALLBROOK PUBLIC UTILITY         )
    DISTRICT, et al.,                )
10                     Defendants.   )
    _____)

11

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13              San Diego, California

14            Thursday, April 13, 1961

15                    - - -

16   APPEARANCES:

17      For the Plaintiff:        WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to
18                                the Attorney General

19                                CDR. DONALD W. REDD.

20      For the Defendants:

21        Vail Company            GEORGE STAHLMAN, ESQ.

22        Fallbrook Public        FRANZ R. SACHSE, ESQ.
          Utility District, et al.,

23

24

25

1

# E X H I B I T S

2

## For the Plaintiff

3        Exhibit No. 288 entered in evidence        p. 16,365

4

5

# W I T N E S S E S

6

|                   | **D**            | **X**            | **RD**           | **RX**           |
|-------------------|------------------|------------------|------------------|------------------|
| Colonel Bowen     | 16,366 (Veeder)  |                  |                  |                  |
|                   |                  | 16,367 (Sachse)  |                  |                  |
|                   |                  |                  | 16,390 (Veeder)  |                  |
|                   |                  |                  |                  | 16,396 (Sachse)  |

1   SAN DIEGO, CALIFORNIA, THURSDAY, APRIL 13, 1961, 9:30 A.M.

2   THE CLERK:   1-1247-SD-C United States vs Fallbrook

3   Public Utility District, et al.

4   Hearing on the Government's motion for injunction.

5   MR. VEEDER:  Are you ready for us to proceed, your

6   Honor。

7   THE COURT:  Yes sir。

8   MR。 VEEDER:  Has your Honor considered the proposed

9   stipulation between the Fallbrook Public Utility District

10  and the United States of America and the proposed findings

11  of fact, originals of which I have lodged with your Honor,

12  and I have notified Mr. Sachse as to the lodging of those

13  and the basis upon which they were lodged.

14  THE COURT:  Yes, I have looked them over last night.

15  Is there any objection to them?

16  MR. SACHSE:  Your Honor, there were two very minor

17  corrections I asked for, for clarification.  Mr. Veeder

18  has written them in his copy.  I don't know whether he

19  has written them on the Court's copy.  There is no further

20  objection, though, and they would not in any way this

21  mornings hearing.

22  MR. VEEDER:  I would like to have your Honor, if

23  he would, look at page 1 of the stipulation, at line 29.

24  Mr. Sachse has asked that that line be revised.  Does your

25  Honor have that?

A 3

16,360

THE COURT:  Yes.

MR. VEEDER:  ". . . and to restore that water in Lake O'Neil in a quantity" strike "of water".

Is that right, Mr. Sachse?

MR. SACHSE:  That's right.

MR. VEEDER:  We have no objection to that, your Honor.

If your Honor would look at page --

THE COURT:  What do you propose to do?  Sign this up and later retype this page?

MR. VEEDER:  That is what I would do, if it is agreeable with Your Honor, and then I would file it with the Court.  You want the stipulation filed, I assume

THE COURT:  In other words, you would not sign it up until it was --

MR. VEEDER:  Couldn't you make the revisions?  We could sign it.

THE COURT:  All right.

MR. SACHSE:  I am not raising any objection to the lack of a formally signed order for the purpose of this injunction hearing.  I am not going to raise it directly or indirectly.

THE COURT:  We might as well do it this way.

How will it read, "twenty cubic feet per second and annually . . ."?

1    MR. VEEDER:   ". . . to store that water in Lake

2  O'Neill" after "O'Neill" put "in a quantity," strike out

3  "of water".

4    THE COURT:   ". . . annually to store that water in

5  Lake O'Neil in a quantity . . . ."

6    MR. SACHSE:   That is right.

7    THE COURT:   Any other?

8    MR. VEEDER:   On page 13 --

9    THE COURT:   Nothing else in the stipulation?

10    MR. VEEDER:   Nothing else in the stipulation.

11    MR. SACHSE:   Page 12.

12    MR. VEEDER:   On page 12 of the proposed findings

13  of fact and conclusions of law and interlocutory judgment

14  you will find the reference.   On line 10 Mr. Sachse has

15  asked that this be added:   after the word "right," "for

16  the purposes of military training, recreation and sub-

17  sequent ground water recharge".

18    I would like to read that aloud to see whether you

19  got the point in that proper place.

20    THE COURT:   ". . . to the use of water" -- it should

21  come after "the use of water," "right to the use of water".

22    MR. VEEDER:   That is my view.

23    THE COURT:   That would be better, wouldn't it?

24    MR. SACHSE:   I think that is correct.   Put it in

25  after "the use of water".

1    THE COURT:  ". . . for the purpose of military

2    training, recreation, . . ."

3    MR. VEEDER:  ". . . and subsequent ground water

4    recharge,"  I would like to add on there "and use" after

5    the "recharge" because that is what occurs.

6    THE COURT:  ". . . recreation and ground water

7    recharge and use"?

8    MR VEEDER:  ". . . and subsequent ground water

9    recharge and use".

10    There are no other objections, then, Mr. Sachse?

11    MR. SACHSE:  No.

12    MR. VEEDER:  You tell me, Mr. Stahlman, you have

13    no objection?

14    MR. STAHLMAN:  I have read it over and I think it

15    is in good form.

16    THE COURT:  You can sign the stipulation, approve

17    the judgment, and later the Clerk will permit you to sub-

18    stitute a page for the one I have corrected.

19    MR. VEEDER:  All right, your Honor, I will do that.

20    Is your Honor executing the interlocutory judgment then?

21    THE COURT:  Let's approve it.

22    This will be judgment Number what, Mr. Clerk?

23    THE CLERK:  I believe this is Number 24, your Honor.

24    THE COURT:  Approve it and I will sign it.

25    What is Fallbrooks VJ?

1          MR. STAHLMAN:  That is Vails, your Honor.  It merely

2   straightens out a matter that was in the nature of duplica-

3   tion.  We will just lodge it now -- in relation to the

4   acreage.

5          THE COURT:  Take care of it later.

6          MR. STAHLMAN:  Yes.  Colonel Bowen and Mr. Veeder

7   know about it.  It just straightens out a situation.  We

8   can do it right now and have it over with and then we can

9   go ahead.

10          MR. VEEDER:  Let's wait.

11          What is the next number?

12          THE CLERK:  288.

13          MR. VEEDER:  May we proceed, your Honor.

14          THE COURT:  Yes.

15          MR. VEEDER:  May the record show that the order has

16   now been entered?  Is that correct?

17          THE COURT:  It has not been entered.  It has been

18   signed.  We agreed that the Clerk would go ahead and enter

19   these, didn't we?

20          MR. SACHSE:  Yes, your Honor.

21          MR. VEEDER:  And I can have Mrs. Tooker rewrite

22   those pages, submit them, and they can be entered in the

23   record then?

24          THE COURT:  Give      copies to Mr. Sachse, Mr.

25   Stahlman, and have some other copies available for other

counsel.

MR. VEEDER:  In connection with the motion of the United States of America for the temporary restraining order and preliminary injunction against the Fallbrook Public Utility District, I would like to have marked as United States of America plaintiff's exhibit 288, and I am serving on counsel for the Fallbrook Public Utility District and the Vail Company an affidavit signed by Colonel Bowen in which he swears that the facts contained in the petition or motion of the United States for this temporary restraining order and interlocutory judgment are true to his personal knowledge.  There has been no filing by the Fallbrook Utility District and no challenge to the facts which are averred in that motion of the United States of America, and therefore I believe that the facts will be accepted as being true.

THE COURT:  Do you want this received in evidence as part of this hearing?

MR. VEEDER:  Yes, your Honor.

THE COURT:  It doesn't have to be in evidence as part of the record in the case generally, does it?

MR. VEEDER:  I think it would be perfectly proper to give it that designation, and it comes in order.

THE COURT:  Well, plaintiffs' Exhibit 288 received in evidence.

(The document referred to as
Plaintiffs' Exhibit 288 was
received in evidence.)

THE COURT:  Let me read it.

MR. SACHSE:  This is simply the petition that has already been filed, notice of motion for temporary restraining order and preliminary injunction. Now, I think the affidavit on the face of it -- I don't know that it is proper evidence.  I raised the question of there not being a sworn affidavit, verified petition or affidavits.  Now I withdraw that.  This in substance simply verifies the petition, and I don't know that it is proper evidence.

MR. VEEDER:  I think it is proper evidence, your Honor, under the request that I verified this.  It is established practice followed --

THE COURT:  Mr. Sachse said he would do that.  Now you have verified it.

MR. SACHSE:  I am not objecting to it.  I am curious whether a motion itself is evidence.  It is a part of the record without question.  But I doubt that it is evidence.

MR. VEEDER:  I called Colonel Bowen.

A. C. BOWEN,

a witness for the plaintiff, having been previously been duly sworn, on his oath was examined and testified further as follows:

# DIRECT EXAMINATION

MR. VEEDER:   I have advised Mr. Sachse as to the part of the record upon which we will rely, your Honor, of the testimony previously offered.

And I will ask Colonel Bowen to supplement that testimony and ask him to state whether, at the present time, there is water in the Santa Margarita River which would flow on down to Lake O'Neil and there be diverted and stored.

Q     Would you answer that question, Colonel Bowen?

A     There is.

Q     What is the effect of Fallbrooks pumping from that water that flows by their pumping plant, Colonel Bowen?

A     The effect of their diversion of water reduces the quantity of water available for use within the Naval Enclave.

Q     Would you state into the record, Colonel Bowen, the quantity of water presently stored in Lake O'Neil?

A     About 190 -- 190 -- acre feet.

Q     Would you compare that with the total capacity required for Lake O'Neil?

A     The total capacity of the Lake is about 1200 acre feet.

Q     Would you state whether the conduct of the Fallbrook Public Utility District in pumping water out of the Santa Margarita River  at the point mentioned has the

effect of reducing the quantity of water reaching Lake O'Neil?

A    It does.

MR. VEEDER:  Your Honor, we have no further evidence in this regard.

We believe that the matter stands submitted on the pleadings and on the testimony of Colonel Bowen showing that the United States of America is presently suffering irreparable damage by reason of the acts of Fallbrook Public Utility District, and we believe that it would be proper, appropriate and necessary for the ends of justice that an injunction be entered against Fallbrook Public Utility District at this time restraining further pumping by that entity of Santa Margarita water.

MR. SACHSE:  May I cross examine before you argue, Mr. Veeder?

MR. VEEDER:  Yes, you may go ahead.

CROSS EXAMINATION

BY MR. SACHSE:

Q    Colonel Bowen, I observe that you or Mr. Veeder have put on the board some exhibits of the twenty-nine series.  I wonder if you could sit down here so I can point to some of these things.

A    (The witness stepping down to the blackboard)

Q    I observe in Section 27 Township 10 South Range 4 West on Exhibit 29-G what appears to be a large

1    water impoundment. Are you familiar with that?

2       A     Yes sir, I am.

3       Q     Has it got a name? What do you call it?

4       A     I think the Naval Amunition Depot within which

5 that pond is situated refers to it by number, and I am not

6 certain of the number.

7       Q     Is there any water in it?

8       A     A little.

9       Q     The water impounded in this pond, if not

10 impounded, would in a state of nature flow to the Santa

11 Margarita River and be available for impoundment in Lake

12 O'Neill, would it not?

13       A     Yes sir.

14       Q     And there is no State permit for this impound-

15 ment of any kind, is there?

16       A     There is no State permit.

17       Q     Do you know what the capacity of that

18 impoundment is?

19       A     No sir; I haven't calculated that.

20       Q     Following this stream down, I observe another

21 impoundment. The water impounded in that, if any, would

22 in a state of nature also be available to recharge Lake

23 O'Neill, would it not, Colonel?

24       MR. VEEDER: Would you refer to what stream you

25 are pointing to?

MR. SACHSE:  I am referring to an impoundment in Section 33 Township 10 South Range 4 West.

THE WITNESS:  9 South, Mr. Sachse.

MR. SACHSE:  9 South Range 4 West.

THE COURT:  Both of which are shown on Exhibit 29-G.

MR. SACHSE:  I repeat my question:

Q     Any water impounded in that impoundment would also be available for recharge of Lake O'Neill, would it not, Colonel?

A     Yes sir.

Q     You are aware, are you not, that there is no State permit for this impoundment?

A     Yes sir.

Q     It is not shown on 29-G, but I am under the impression that there is some sort of impoundment -- I believe you call it Lake Huron, or something like that?

A     It is Lake Urine.

Q     All right.  Between the 17 area and Lake O'Neill. Could you indicate on 29-G about where that is located, Colonel?

MR. VEEDER:  I object to these questions on the grounds that it goes far beyond the direct examination and has no relationship whatever to the question.  That is obviously sewage effluent involved there.

MR. SACHSE:  Until he answers it isn't obvious.

MR. VEEDER:  It is in the record.

MR. SACHSE:  If Mr. Veeder is going to object to it as being improper cross examination, I will concede it is improper examination and call Colonel Bowen as my own witness.

THE COURT:  The objection is overruled.

### DIRECT EXAMINATION

BY MR. SACHSE:

Q    Is there such lake or impoundment, Colonel?

A    Yes sir.

Q    Where is it?

A    Lake Urine is situated in Section 9 Township 10 South Range 4 West.  It is near the bench mark number 278.

Q    What is the capacity of the Lake?

A    It has a surface area of about six acres and an average depth of, roughly, ten feet; say sixty acre feet, approximately.

Q    It is full, is it, Colonel?

A    Yes sir.

Q    And that impoundment also intercepts the surface water run off in the 17 area, doesn't it?

A    We should get the areas correctly, Mr. Sachse.

1    Q      Maybe I read the wrong area.

2    A      The 14 area and the 12 area.   And that pond

3    does intercept some surface runoff in those two areas.

4    Q      There is no State permit for that impoundment,

5    is there, Colonel?

6    A      No sir.

7    Q      60 acre feet of water; is that right?

8    A      That is my estimate.

9    Q      Now, Colonel Bowen, I observe a number of

10   other impoundments on the reservation; one in Section 2

11   Township 10 South Range 5 West, another one in Section 1

12   Township 10 South Range 5 West.   Are there State permits

13   for those impoundments?

14   A      No sir.

15   Q      I may be mistaken as to my facts on this,

16   Colonel, but I know of personal knowledge that there is a

17   rather large break after you follow Basilone Road northerly

18   where you hold field trials sometimes.   Is that outside the

19   Santa Margarita River watershed?

20   MR. VEEDER:   I renew my objection to all these

21   references to small impoundments on the Rancho Santa

22   Margarita, your Honor.   There is nothing to show that they

23   have any relationship whatever with Lake O'Neill.

24   THE COURT:   Overruled.

25   THE WITNESS:   I think you are referring to Lake

1  Pulgas, Mr. Sachse, just south of the Piedra de Lumbre Creek,

2  a tributary of Las Flores Creek and outside the Santa

3  Margarita watershed.

4      Q    Let's move to De Luz, Colonel Bowen.  I am

5  correct in saying that any water that flows down De Luz

6  Creek is available for filling Lake O'Neill, isn't it?

7      A    Any that comes as a surface stream, yes sir.

8      Q    Also, the Fallbrook diversion has nothing

9  whatsoever to do with the amount of water flowing down

10  De Luz Creek, does it?

11      A    None.

12      Q    You are aware, are you not, Colonel, that

13  there are many inferior appropriations or uses of the

14  De Luz Creek -- inferior to Fallbrook?

15      MR. VEEDER:  What do you mean by "inferior"?

16      MR. SACHSE:  Junior.

17      MR. VEEDER:  There is not a thing in the record

18  regarding --

19      MR. SACHSE:  There is, and I am going through it,

20  Mr. Veeder.  Don't tell me there is nothing in the record.

21  It is in the record.

22      Q    Are you aware of that fact, Colonel Bowen?

23      MR. VEEDER:  I object on the grounds that this

24  goes beyond the scope of the direct examination and has

25  nothing to do with the issue.

1    THE COURT:  He is now calling him as his own witness.

2    Your first objection goes out.   The other objection is

3    overruled.

4    BY MR. SACHSE:

5        Q    Are you aware that there are many, or let

6    us say, any diversions and uses on De Luz Creek that are

7    subordinate, junior and inferior to the Fallbrook diversion?

8        MR. VEEDER:  I object to that as calling for a

9    conclusion of law.  How can you say "junior"?  How can you

10   say "subordinate"?  How can you say "inferior"?

11       THE COURT:  Reframe it.  You mean --

12       MR. SACHSE:  Junior in point of time.

13       Would you get me Californias AS, Mr. Clerk, please.

14       Q    Are you aware of that fact?

15       A    I would have to refresh my memory by referring

16   to that exhibit, Mr. Sachse, if you are speaking of filed

17   applications for appropriations.

18       MR. SACHSE:  Let the record show that I am handing

19   the witness Californias AS.

20       Q    I invite your attention to the second page,

21   Colonel Bowen.  The first appropriation appearing on the

22   second page is the Fallbrook appropriation to which you

23   have been referring, is it not, the two and one half second

24   foot diversion?

25       A    Yes sir; that is Application 11586.

Q      And it has a priority date of what?

A      Date filed October 11, 1946.

Q      Let me invite your attention to the fifth diversion shown on that page.  Tell me what this is, Colonel?

A      That is a filing by Felix R. Garnsey and Theodora L. Garnsey, application number 13505, dated December 12, 1949.

Q      Stop there for a moment, please.  That is junior and subsequent to October 11, 1946, is it not?

A      Yes sir.

MR. VEEDER:  Before you answer that --

Don't you represent the Garnseys', Mr. Sachse?

MR. SACHSE:  I do, and this is what Garnsey --

MR. VEEDER:  Why didn't you implead them into this proceeding then?

MR. SACHSE:  I don't think I am required to implead anybody into this proceeding, Mr. Veeder.  I am here to show that your request for an injunction should not be granted on equitable grounds.

THE COURT:  Which one is this now?

MR. VEEDER:  This is the fifth one on the second page, your Honor, Application 13505.

Q      Am I correct in saying that Garnsey has the permit to divert three-quarters of a second foot stream flow, Colonel?

1    A    Yes sir.

2    Q    And that water, if not diverted, would be

3  flowing down De Luz Creek and available for Lake O'Neill;

4  is that right?

5    A    This winter, Mr. Sachse, we haven't had any

6  surface stream flow down De Luz Creek to its confluence

7  or its confluence with the River, and I doubt if Mr.

8  Garnsey has been diverting that much.

9    Q    Would you answer the question?  If Lake O'Neill

10  --

11    MR. VEEDER:  Let him finish.

12    THE WITNESS:  I doubt that if he had not been

13  diverting that, not knowing whether he has had that amount

14  available to him or not, that it would have come down to

15  us, to Lake O'Neill.

16  BY MR. SACHSE:

17    Q    You also observed that he has a forty two

18  acre foot impoundment permit?

19    A    Yes sir.

20    Q    Have you been up to see how much water is

21  in his Lake?

22    A    I haven't been up there since last fall,

23  Mr. Sachse.

24    Q    So you don't know how much winter impoundment

25  there is?

    A    No sir.

16,375

P 1

1    Q    Colonel Bowen, you are aware of other impoundments

2    on De Luz Creek that exist without any State permit, are

3    you not?

4    A    Yes sir.

5    Q    Specifically, may I invite your attention -- we

6    will use this again later, sir -- may I invite your

7    attention to what is known as the Butler Ranch.  Are you

8    familiar with that?

9    A    Yes sir.

10   Q    Am I not correct in stating that Butler has either

11   three or four lakes which are filled by diverting water out

12   of the Fern Creek watershed into his lakes?

13   A    Yes sir.

14   Q    Do you know the capacity of those impoundments,

15   Colonel?

16   A    Those were calculated and are in the record, Mr.

17   Sachse, but I don't recall them at the moment.

18   Q    Are you familiar, Colonel, of your own knowledge,

19   with the most recent beneficial use to which the Butler

20   impoundments have been put?  To refresh your recollection --

21   A    Well, the movie set up there?

22   Q    Yes.  Did you see the full-page picture on the

23   last page of Life Magazine showing the use of the lake for

24   purposes of building a fake volcano and blowing it up?

25   A    No sir, I didn't see it.

P 2

1      Q    It is in this week's Life.  But you are familiar

2    that the most recent beneficial use is to use it as a movie

3    set?

4      A    Yes.

5      Q    And you don't know how much water is in those

6    impoundments?

7      A    No sir, at the present moment I can't recall.

8      Q    Refreshing your recollection with Exhibit AS,

9    do you find any permits for those impoundments?

10      A    I find none in California's AS.

11      Q    You are familair with the impoundments on the

12    Matthews Ranch on De Luz Creek?

13      A  Yes sir.

14      Q    Am I correct in stating that Matthews impounds

15    approximately 50 acre feet of water diverted from De Luz

16    Creek into reservoirs in an adjoining canyon tributary to

17    De Luz Creek?

18    MR. VEEDER:  May I have the question read.

19    (The reporter read the pending question.)

20    THE WITNESS:  The volume is somewhat in that neighbor-

21    hood.  Again, that is in the record, and I don't recall

22    exactly at this moment.

23    MR. SACHSE:  For the record, your Honor, in case your

24    Honor wishes to check these, I will refer your Honor to

25    Special Master's Finding No. 13 on De Luz Creek.

P 3

1    Q    Have you any personal knowledge, Colonel Bowen,

2    as to the date of patent of any of the riparian land holdings

3    on De Luz Creek?

4    A    No sir.

5    Q    Based on your knowledge of the development of

6    that area, etc., do you believe they are prior to 1883?

7    MR. VEEDER:  I object to that.  That is too speculative.

8    There is no basis for that question.

9    THE COURT:  If you know, Colonel.

10   THE WITNESS:  I don't know, Mr. Sachse.

11   BY MR. SACHSE:

12   Q    Now, you know, Colonel Bowen, that there are many,

13   many surface diversions from De Luz Creek by riparians, do

14   you not?

15   A    Yes sir.

16   Q    And you also, Colonel Bowen, that there has been

17   no determination made in the Master's Findings as to

18   either the reasonableness or the unreasonableness of any

19   of those diversions?

20   A    Yes sir.

21   Q    Now you know that there are impoundments on

22   Fallbrook Creek, do you not, outside the military reserva-

23   tion?

24   A    Yes sir.

25   Q    Do you know the amount of those impoundments?

P 4

1      A     I don't recall at this moment what the volume of

2   storage on Fallbrook Creek is.

3      Q     Any impoundments on Fallbrook Creek serve to stop

4   water which would, in a state of nature, flow to Lake O'Neill,

5   do they not?

6      A     Yes sir.

7      Q     And the water that they stop has no relation what

8   so ever to the Fallbrook diversion, does it?

9      A     No sir; that would come into the River below the

10   Fallbrook diversion.

11      Q     Sandia Creek likewise comes into the River below

12   the Fallbrook diversion, does it not, Colonel?

13      A     That is correct sir.

14      Q     And any water that flows down Sandia Creek would

15   be available to supply Lake O'Neill without any effect on

16   the Fallbrook diversion, would it not?

17      A     It wouldn't affect the Fallbrook diversion, no.

18   That is true.

19      Q     Let me invite your attention to the impoundment

20   shown in Section 31 Township 8 South Range 3 West indicated

21   on United States Exhibit 29K.

22      A     Yes sir.

23      Q     Are you familiar with that impoundment, Colonel?

24      A     Yes sir.

25      Q     That is the so-called Sawday impoundment, isn't

P 5  1    it?

2         A    Yes sir.

3         Q    I will invite your attention to the fifth and

4    eleventh entries on the second page of California AS.  Can

5    you tell me whether or not those refer to that same impound-

6    ment?

7         A    That is Application 14561.

8         Q    And 18156?

9         A    And 18156.  Yes sir.  They refer to that Brian

10   Creek impoundment.

11        Q    And that impoundment is 70 acre feet total permit,

12   is it not?

13        A    Yes sir, the total of the two is 70.

14        Q    Do you know whether there is any water in that

15   pond at present?

16        A    No sir, I haven't been up there this winter.

17        Q    And the date of the earliest of those two permits

18   is subsequent to the date of the Fallbrook permit, is it not?

19        A    That is correct.

20        Q    Back to De Luz Creek and Exhibit AS.  I observe

21   Application 18151, Emory and Betty P. Cook on Nelson Creek.

22   That is in the De Luz watershed, isn't it, Colonel --

23   Nelson Creek?

24        A    Yes sir.

25        Q    And that impoundment of 4 acre feet and diversion

P 6   1   9300 gallons per day is junior in time to the Fallbrook

2   permit, is it not?

3       A     Yes sir.

4       Q     Back to Sandia Creek.

5       THE COURT:  Where do you see 4 acre feet?

6       MR. SACHSE:  It is the total of the four different

7   items, your Honor.

8       THE COURT:  I see.

9       MR. SACHSE:  Back to Sandia Creek and the last appli-

10   cation appearing on California's AS.  Are you familiar with

11   the Yackey-Taylor operation on upper Sandia Creek?

12       A     Yes sir.

13       Q     You are aware, are you not, Colonel, that this

14   Exhibit AS indicates the application as "incomplete," but

15   that since the date of this exhibit --

16       MR. VEEDER:  I object to this.

17       MR. SACHSE:  Let me finish the question before you

18   object, Mr. Veeder.

19       MR. VEEDER:  Go ahead.

20   BY MR. SACHSE:

21       Q     You are aware, are you not, Colonel Bowen, that

22   since the date of California's AS a permit has been issued

23   to Yackey for 1800 acre feet?

24       MR. VEEDER:  I object to all of this; the issuance

25   of the permits, all these matters which he has read from

P 7

1    the State's AS are immaterial, incompetent and irrelevant.

2    The fact that a permit is issued has nothing whatever to do

3    with the quantity of water impounded or the quantity of

4    water that might reach the Naval enclave.

5         MR. SACHSE:  That is my next question.

6         THE COURT:  Overruled.  You apprehend what he is trying

7    to show, don't you?

8         MR. VEEDER:  Obviously.  But when he starts talking

9    about "permit" he is not talking about water.  That is one

10   thing I want to make clear.

11        MR. SACHSE:  I will clear this entirely up.

12        Q    You know that a permit has been issued, do you

13   not?

14        A    I haven't seen the actual permit, but it is my

15   understanding.

16        Q    I brought it down and introduced it for Mr.

17   Yackey.

18        A    Yes sir, I recall seeing it.

19        Q    However, you are also aware, are you not, Colonel,

20   that there is no present impoundment under that permit?

21        A    Yes sir.

22        Q    But you are also aware that there is a small

23   impoundment on the Yackey Ranch, are you not?

24        A    Yes sir.

25        Q    Do you know the capacity of it?

P 8

1    A    I believe that is in the record, too.  I don't
2  recall at the moment what that volume is.

3    Q    You are aware that the Yackey property is riparian
4  to Sandia Creek, are you not Colonel?

5    A    Yes sir.

6    Q    At least a part of it?

7    A    Yes sir.

8    Q    And you also know that his Honor heard the evidence
9  and has not yet made any finding as to the reasonableness or
10 unreasonableness of the Yackey uses, do you not, Colonel
11 Bowen?

12   A    Yes sir.

13   Q    Going up to Rainbow Creek, Colonel Bowen, any
14 water contributed to the stream by Rainbow Creek comes in
15 above Fallbrook's diversion, does it not?

16   A    Yes, it does.

17   Q    You are aware that there are a number of impound-
18 ments on Rainbow Creek without any State permit, are you not?

19   A    Yes sir.

20   Q    Specifically, are you aware of the impoundment
21 on the boundary of the Hays-Capra property where we had a
22 little confusion as to whose land it was on?

23   A    Yes sir.

24   Q    Do you remember the size of that impoundment?

25   A    I don't recall the size of that.

P 9

1   Q   Do you know whether there is any water in it now
2   or not?

3   A   No sir, I haven't seen it this winter.

4   Q   Do you recall the Halde impoundments, Colonel
5   Bowen -- there were about four of them -- property formerly
6   owned by Halde on Rainbow Creek?

7   A   Yes sir, I do.

8   Q   You are aware that there is no permit for those
9   impoundments, are you not?

10   A   Yes sir.

11   Q   Do you know whether or not there is any water in
12   those, or how much?

13   A   No sir, I haven't checked them recently.

14   Q   But you also are aware that any water impounded
15   in those impoundments depletes the supply of the Santa
16   Margarita River at the Fallbrook diversion, doesn't it?

17   A   Yes sir.

18   Q   Will you please look again at the second page of
19   California's AS, Application 13577, Borel, 100 acre feet.
20   Do you know anything about that impoundment?

21   MR. VEEDER:  Just a moment.  Let me see that.  That is
22   marked "pending," is that correct?

23   MR. SACHSE:  As of 2-24-59, Mr. Veeder.  That is why
24   I am asking him if he knows anything about it.

25   THE WITNESS:  I am not aware of any change on that,

P 10    1    Mr. Sachse.

2    BY MR. SACHSE:

3    Q    You are aware that there are literally hundreds

4    of impoundments in the upper watershed of the Santa

5    Margarita River, are you not, Colonel Bowen?

6    A    Yes sir.

7    Q    Some of them of rather substantial size?

8    MR. VEEDER:    I object to that as being too vague.

9    MR. SACHSE:    All right.

10    Q    Will you tell me what some of the largest impound-

11    ments you know of in the upper Santa Margarita -- forgetting

12    the Vail Dam?

13    A    Well, I would say that around a hundred acre feet

14    in that area is a large capacity reservoir. Most of them

15    are much less than that.

16    Q    Do you know of any specific ones that approach

17    a hundred acre feet?  May I suggest McKinley?  Are you

18    familiar with the McKinley impoundment on Wilson Creek?

19    A    No sir, at the moment I don't recall that one.

20    Q    Are you familiar with the Occidental College

21    impoundments or Sage Ranch impoundments, I should say, on

22    Tucalota Creek?

23    MR. VEEDER:    I object to this line of questioning.

24    Mr. Sachse has repeatedly requested findings to the effect

25    that any uses in that area would have no repercussions on

P 11

1  the enclave, and that therefore he has asked that findings

2  be entered that diversions and uses up there are immaterial,

3  and I object on the grounds that this is incompetent,

4  irrelevant and immaterial and has nothing to do with the

5  issues in this injunction case.

6  MR. SACHSE:  This is an absolute misstatement, your

7  Honor.  My findings for Tucalota Creek, which are lodged,

8  very expressly provide that any surface activities are

9  within the jurisdiction of the Court and are of an effect

10  on the stream.

11  THE COURT:  I am familiar with that.  We also talked

12  about that we sign Tucalota excluding diversions, ponds,

13  etc.  The objection is overruled.

14  BY MR. SACHSE:

15  Q   How big are the Sage Ranch impoundments, in your

16  estimate?

17  MR. VEEDER:  You represent Occidental.

18  MR. SACHSE:  I do not.

19  MR. VEEDER:  Didn't you?

20  MR. SACHSE:  I represented them at one time and have

21  been replaced as counsel.  Look to your own ethics, not

22  mine.

23  THE WITNESS:  I don't recall the volume of those

24  reservoirs up there.  They are, I believe, a matter of

25  record in the case.

P 12

1   BY MR. SACHSE:

2       Q    Have you ever made, as a part of your work in

3   connection with this case, an estimate, Colonel Bowen, of

4   the total capacity of unlicensed or un-permitted impoundments

5   in the watershed?

6       A    I have not.

7       Q    Colonel Bowen, if the Fallbrook diversion, $2\frac{1}{2}$

8   second foot diversion, were stopped today, is it your opinion

9   that Lake O'Neill would fill up and nothing else done, no

10  other impoundments stopped, just Fallbrook?

11      A    No sir, it would not. By "fill up" do you mean it

12  would reach its maximum volume of storage?

13      Q    Yes.

14      A    It of course would physically add some water.

15      Q    It would add water, but it wouldn't fill; is that

16  right?

17      A    It wouldn't fill completely, no.

18      Q    Now Colonel Bowen, if all junior permits or

19  diversions without permit --

20      THE COURT:  Junior to Fallbrook?

21      MR. SACHSE:  Yes.

22      Q    -- or diversions without permit at all, illegal

23  diversions, were released, do you believe Lake O'Neill would

24  fill up?

25      MR. VEEDER:  I object to that, your Honor.  That is

P 13

1   asking for an opinion that is inadequate.  The only way

2   he could possibly have proper opinion evidence would be to

3   say after April 1st.  That is when we are claiming our

4   appropriative right.

5       MR. SACHSE:  After April 1st.

6       MR. VEEDER:  The quantity of water presently impounded,

7   the quantity of water coming down the stream at the present

8   time, the losses between the points of diversion and the

9   places of impoundment -- all those factors have to be put

10   in his hypothetical question, or I object to it as being

11   improper.

12       THE COURT:  Overruled.  You may cross-examine.

13       THE WITNESS:  I believe your question, Mr. Sachse, was

14   with all parties junior to Fallbrook?

15   BY MR. SACHSE:

16       Q   Or without any right.

17       A   Or without any right.  If they were to discontinue

18   diverting or --

19       Q   Release the impoundment.

20       A   -- impounding water.

21       MR. VEEDER:  I am going to object to that, your Honor

22   -- release the impoundment.  There is no evidence to show

23   that they impounded it at a time that it interfered with

24   our Lake O'Neill right, and unless that is in there the

25   question is totally irrelevant, incompetent and immaterial.

P 14

1      THE COURT:  Overruled.

2      THE WITNESS:  It is my opinion that this year, if none

3    of those diversions and impoundments had been made, that

4    Lake O'Neill would still not have filled to maximum stage.

5    BY MR. SACHSE:

6      Q    Colonel Bowen, I believe you testified on the

7    earlier injunction hearing two weeks ago, a month ago, that

8    the flow of the River rose markedly when you opened the

9    little dam at the Ammunition Depot.  Do you recall the

10    testimony I refer to?

11      A    Yes sir.

12      Q    Would you tell me again what you said you did at

13    the Depot diversion?

14      A    We simply breached that earth fill that the

15    Ammunition Depot had thrown across the Santa Margarita at

16    their point of diversion in order to allow the water im-

17    pounded there to flow downstream and enter Lake O'Neill.

18      Q    How many acre feet was in that impoundment?

19      A    I haven't surveyed that.  It is rather deceptive.

20    I think, an estimate, possibly forty to fifty acre feet.

21      Q    Does the Ammunition Depot divert from that

22    impoundment or from a gallery underneath it?

23      A    They make no draft on the surface impoundment

24    itself.  They have an infiltration gallery laid in the

25    gravels of the stream bed normal to the stream bed.  This

P 15

1    gallery feeds water to their sump, from which they pump it

2    into their service area.

3         Q    To your best knowledge, the Ammunition Depot has

4    no authority from the State of California to impound 30 acre

5    feet on the main stem of the Santa Margarita River, does it?

6         A    No sir.

7         Q    Based on the effect that you observed, the River

8    recharge when you released 30 acre feet on the Ammunition

9    Depot, what do you think would happen if you released 70

10   acre feet on Sandia Creek at the Sawday diversion?

11        MR. VEEDER:  I object to the question.  There is not

12   a scintilla of evidence in the record that there is 70 acre

13   feet impounded at the Sawday reservoir.  Unless that evidence

14   is in the record he is just conjuring up these matters, and

15   I object to it.  There is no basis for that question, your

16   Honor.

17        THE COURT:  Do you know how much is in the Sawday

18   diversion now?

19        THE WITNESS:  No sir, I don't know how much is in this

20   pond on Brian's Creek, which is Sawday's principal reservoir.

21        THE COURT:  Sustained.

22   BY MR. SACHSE:

23        Q    In other words, Colonel, you don't know then, to

24   save time, how much is in any of these impoundments at the

25   moment.  Do you know whether Matthews is full, for instance?

P 16

1      A   No sir, I haven't checked those De Luz Creek

2  reservoirs this winter.

3      MR. SACHSE:  That is all your Honor.

4              REDIRECT EXAMINATION

5  BY MR. VEEDER:

6      Q   Colonel Bowen, would you compare the quantity of

7  runoff on De Luz Creek, Sandia Creek and Brian Creek and

8  the other small tributaries upstream -- may I start that

9  again.

10      Would you compare the amount of runoff in the Santa

11  Margarita River watershed since April 1 with any of the

12  previous years that you observed since you have been at

13  Camp Pendleton?

14      A   Generally, beginning about the 1st of April,

15  these minor tributaries cease to flow or at best flow very

16  little.

17      Q   And would you say that in April 1961 there has

18  been very little flow, if any, in any of these tributaries?

19      A   In April 1961 there is no flow from De Luz Creek

20  reaching the Santa Margarita River on the surface.

21      Q   And have you observed the runoff since April 1st

22  in the area of De Luz Creek in general, Colonel Bowen?

23  Wouldn't it be correct to say that the water in that area

24  would be de minimis at this time since April 1st?

25      THE COURT:  You mean upstream from the Santa Margarita?

P 17

1    MR. VEEDER:   Upstream.

2    THE COURT:   All the way up?

3    MR. VEEDER:   All the way up.

4    MR. SACHSE:   How far?

5    MR. VEEDER:   The full length of the stream.

6    MR. SACHSE:   The question is, would it be de minimis?

7    BY MR. VEEDER:

8    Q    The quantity of water going into De Luz Creek,

9    would it not be an infinitely small quantity of water since

10   April 1st?

11   THE COURT:   I don't understand your question.  First,

12   the Colonel said he hadn't been up there.

13   MR. VEEDER:   Your Honor, he has.  He has observed the

14   whole area during this period.  He hasn't been up there

15   every time it rained maybe.  But it has not rained -- that's

16   the point.

17   Q    Isn't it true Colonel Bowen, that the diversions

18   since April 1st would be very, very small due to the fact

19   that there has been virtually no precipitation in the

20   general area of the De Luz Creek?

21   A    This has been an extremely dry year, Mr. Veeder.

22   MR. SACHSE:   I would like an answer to Mr. Veeder's

23   question from Colonel Bowen.  This question I like, your

24   Honor.  Mr. Veeder doesn't know what he is getting into.

25   THE COURT:   Read it.  It is indefinite in my mind as

p 18

1   to whether it meant had there been rain since April 1st.

2   Read it.

3        (The reporter read the pending question.)

4        THE COURT:  What do you mean?  No precipitation at all

5   this winter, or do you mean since April 1?

6        MR. VEEDER:  I said since April 1st.

7        THE COURT:  Are you talking about precipitation since

8   April 1st?

9        MR. VEEDER:  That is right.

10       MR. SACHSE:  I am interested in the first half of the

11  question where he says, "Isn't it true, Colonel Bowen, that

12  the diversions from De Luz Creek would be very, very small?"

13  That is what I want to get Colonel Bowen's answer to --

14  which is Mr. Veeder's question.

15       THE WITNESS:  At this time, Mr. Veeder?

16  BY MR. VEEDER:

17       Q    That is right.

18       A    Small with reference to what?

19       Q    To the quantity of water in De Luz Creek or any

20  other creek up in that area?

21       A    Well, I would say that the diversions being made

22  would be very large at this time, considering that there is

23  very little flow in De Luz Creek, if the present flow of

24  De Luz Creek is the reference point.

25       Q    Colonel Bowen, based upon your observation, is it

P 19

1    not true that there be virtually no water flowing in De

2    Luz Creek within Camp Pendleton at this time -- speaking

3    of April 13th?

4         THE COURT:  There would be, or there is no -- what

5    are you talking about?  There is no water?

6         MR. VEEDER:  There is no/flowing in De Luz Creek within
                                    water

7    Camp Pendleton at the present time that could reach Lake

8    O'Neill.

9         Q    Isn't that correct, Colonel Bowen?

10        A    That is correct, in as much as there is no surface

11   flow in De Luz Creek within the boundaries of the Naval

12   enclave at this time.

13        Q    Colonel Bowen, have you observed Sandia Creek at

14   this time, during this April, from April 1 to this present

15   time?

16        A    No sir, not this year.

17        Q    Colonel Bowen, based upon your observations in

18   this area, would you state whether, in your opinion, the

19   Fallbrook Public Utility District is presently diverting

20   water which would come down to Lake O'Neill were it not for

21   that pumping and diversion?

22        A    They are.

23        Q    Colonel Bowen, is it not true that if all the

24   impoundments that you have observed on the Naval enclave

25   were released, that they would not fill Lake O'Neill?    I

P 20

1    am referring to these little ponds up here that Mr. Sachse

2    referred to.  If they were full, they would not fill Lake

3    O'Neill at the present time, is that correct, if they were

4    released?

5        A    That is correct.

6        Q    Have you seen the impoundment at Sawday's on

7    Brian Creek this year Colonel?

8        MR. SACHSE:  He said no.

9        THE WITNESS:  No sir.

10   BY MR. VEEDER:

11       Q    Assuming that that were full, it would not fill

12   Lake O'Neill if it were released and were permitted to

13   flow down to Lake O'Neill; isn't that correct, Colonel Bowen?

14       A    That is correct.  Because, referring to California's

15   AS, the combined total for the two permits is 77.0 acre

16   feet, which is far less than is required to fill Lake

17   O'Neill at maximum stage.

18       THE COURT:  This is the type of question you objected

19   to when Mr. Sachse was asking -- that there was no proof

20   of what water was in it.  Now you say, assuming that all

21   of them were full, what?

22   BY MR. VEEDER:

23       Q    Is it not true, assuming that the Garnsey

24   reservoir was full, in the light of the condition of the

25   bed of De Luz Creek at the present time, even if that water

P 21

1    was released, it wouldn't fill or approach filling Lake

2    O'Neill; isn't that correct, Colonel?

3         A    California's AS shows the amount that can be

4    stored by the Garnseys under Application 13505 as 42 acre

5    feet, with a continuous diversion of .75 second foot.   In

6    view of the present conditions of the De Luz stream bed

7    within the Naval enclave, it is my opinion that if this

8    pond were full on the Garnsey Ranch and if it were released

9    it would be absorbed in the gravels of the creek before it

10   got to Lake O'Neill.

11        Q    And isn't it true that if all of the waters that

12   are impounded on Rainbow Creek were drained out and released

13   down Rainbow Creek, would they not also be lost in the

14   gravel of the streams before they got to Lake O'Neill?   I

15   am speaking of those little impoundments up there.

16        A    Well, some of the lower ones might possibly flow

17   as a surface stream for a distance down Rainbow Creek.

18        Q    I am talking about all the way down to Lake

19   O'Neill.

20        A    They would be insufficient to bring Lake O'Neill

21   to maximum stage.

22        Q    Is it not true that in the aggregate, Colonel

23   Bowen, there probably is not more than ten acre feet im-

24   pounded in that Lake O'Neill in the Rainbow area if those

25   impoundments were full?

P 22

1      A      There is more than 10 acre feet, Mr. Veeder.

2      Q      What would you say they would be if they were

3  full?  But you don't know whether they are full.

4      A      You are speaking of all the reservoirs in Rainbow

5  Creek watershed?

6      THE COURT:  That is what he is speaking of.

7      THE WITNESS:  I would estimate the total volume of

8  storage of all the surface storage in reservoirs in Rainbow

9  Creek.  Most of that is in the record, I believe.

10     MR. VEEDER:  I have no further questions, your Honor.

11                      RECROSS-EXAMINATION

12  BY MR. SACHSE:

13     Q      Colonel Bowen, apropo of Rainbow Creek, there is

14  water in the Santa Margarita River immediately below Rainbow

15  Creek, isn't there?

16     A      Yes sir.  At the confluence and above the con-

17  fluence and below the confluence of Rainbow Creek with the

18  Santa Margarita River.

19     Q      So any water that came out of Rainbow Creek today

20  would contribute to the flow clear to Lake O'Neill, would

21  it not, Colonel?

22     A      Yes sir.

23     Q      Mr. Veeder was wrong when he said it would have

24  no effect on the flow to Lake O'Neill?

25     A      Water that reached the River would, of course,

P 23

1    have an effect on the amount diverted into Lake O'Neill.

2        Q    And there is some surface in Sandia Creek and

3    Rainbow Creek at the River today, is there not?

4        A    At the confluence with the Santa Margarita?

5        Q    Yes.

6        A    Yes sir.

7        Q    So any water released on Sandia Creek would

8    contribute to the water to Lake O'Neill, would it not?

9        MR. VEEDER:  If it reached the creek.  You have got

10   to put that in.

11       MR. SACHSE:  There is water in the creek.  He just

12   answered it.

13       Let's do it again.

14       Q    There is water in Sandia Creek at the confluence

15   of Sandia Creek and the Santa Margarita River; is there

16   not?

17       A    Yes sir.

18       Q    So if we release 70 acre feet upstream in Sandia

19   Creek you would expect that to be reflected at Lake O'Neill,

20   would you not?

21       MR. VEEDER:  I object that there is nothing in the

22   record to show that there is any 70 acre feet impounded

23   on Sandia Creek.

24       MR. SACHSE:  This is Mr. Veeder's express question --

25   Sandia Creek.

P 24

1    THE COURT:  You asked the same kind of question.

2    MR. SACHSE:  He asked the very same question.

3    THE COURT:  Overruled.

4    BY MR. SACHSE:

5    Q    If you release 70 acre feet on Sandia Creek, you

6    would expect to see considerable effect at Lake O'Neill

7    immediately, would you not?

8    A    Some of it would get to the Lake O'Neill; yes sir.

9    Q    Considerable part of it, would it not?

10   A    Seventy acre feet?

11   Q    Yes.

12   A    Probably more than half of it would get there.

13   Q    You testified a month ago that you saw an immediate

14   substantial effect in the stream flow when you released about

15   30 acre feet at the Ammunition Depot?

16   A    Yes sir.

5 fls.

17

18

19

20

21

22

23

24

25

Take 4

1    Q     And you would expect to see immediately

2    substantial increase in the stream flow if you released

3    seventy acre feet on Sandia Creek, wouldn't you, Colonel?

4    A     If by immediate you mean within a period of

5    hours, yes sir.

6    Q     Mr. Veeder, asked you a number of rather

7    indefinite questions about De Luz Creek -- asked some

8    general ones first.  Isn't it a fact that in the area

9    immediately upstream where the Military Reservation

10   boundary is, De Luz Creek customarily has surface flow all

11   year around, some surface flow?

12   MR. VEEDER:  I object to that as being  incompetent,

13   irrelevant and immaterial here.

14   MR. SACHSE:  This is preliminary to the next

15   question, your Honor.

16   If you will, let it in preliminarily and then move

17   to strike.

18   THE COURT:  Overruled.

19   THE WITNESS:  There is surface flow at certain

20   reaches of De Luz Creek the year around, but it is not a

21   continuous surface stream; intermittent in time and place.

22   BY MR. SACHSE:

23   Q     I forget sincerely whether you told me could

24   recall the approximate capacity of the several Butler

25   impoundments.  Do you say you could or could not, Colonel?

1          A          I said I could not, Mr. Sachse.

2          Q          If you released forty two acre feet of Garnsey

3     impoundment and fifty acre feet of Mathews impoundment,

4     would you expect to see water reach the confluence of the

5     DeLuz Creek and Santa Margarita?

6          MR. VEEDER:  I renew my objection, your Honor, unless

7     he puts in "on April 1st."

8          MR. SACHSE:  On April 1st.

9          MR. VEEDER:  Unless all of this evidence that has

10    been requested is related to impoundments and diversions

11    after the first of April, it is incompetent, irrelevant

12    and immaterial, and I move to strike all of this evidence

13    because he hasn't prefaced his questions on that basis.

14          MR. SACHSE:  I would like to make a point in this

15    connection before you rule, your Honor. An impoundment

16    that is completely illegal, whether it is before or after

17    the first of April, has no effect.

18          THE COURT:  The objection is overruled, Mr. Veeder.

19          THE WITNESS:  I believe, as I testified, Mr. Sachse,

20    that the sands and gravels in the De Luz stream bed within

21    the Naval conclave are in such state now that they would

22    absorb it before it reached the River.

23    BY MR. SACHSE:

24          Q          Colonel Bowen, do you believe that a part

25    of the reduced flow of the Santa Margarita River at

1  Fallbrook is occasioned by the condition of the Murrieta

2  basin upstream?

3        MR. VEEDER:  I am going to object to this, your

4  Honor; it goes far beyond the scope of the direct examina-

5  tion.

6        MR. SACHSE:  This is my witness.  This isn't your

7  witness.

8        MR. VEEDER:  Oh yes.  At the present time?

9        MR. SACHSE:  At the present time.

10       Q     The present condition of the flow at Fallbrook

11  is, in part, influenced by the condition of the Murrieta

12  basin?

13       MR. VEEDER:  Are you talking about Vail pumping

14  and Vail impoundments?

15       MR. SACHSE:  I am asking the question about the

16  Murrieta basin, Mr. Veeder.

17       MR. VEEDER:  Is it going to be the area --

18       MR. SACHSE:  Let's get out Exhibit 15-E.

19       Withdraw the question.

20       THE COURT:  Take a recess.

21       MR. SACHSE:  You are making this offer difficult,

22  Mr. Veeder, but I will stay here as long as you want to.

23       THE COURT:  I am only going to be here until noon.

24       MR. VEEDER:  Until noon?

25       THE COURT:  That is right, until noon.

1        MR. VEEDER:  And when will you be back?

2        THE COURT:  Tomorrow.

3        MR. VEEDER:  I will have to hold the witnesses here

4  then, your Honor.

5        THE COURT:  Do you have some other witnesses?

6        MR. VEEDER:  I am through with my case.

7        THE COURT:  What witnesses are you going to hold?

8        MR. VEEDER:  If we are going to have to reopen this

9  thing, I am not going to go until there is a ruling, with

10  all respect to your Honor, on this motion for an injunction.

11        THE COURT:  You have practically completed your

12  evidence?

13        MR. VEEDER:  It is completed.

14        THE COURT:  I can hear some arguments before 12:00

15  o'clock.

16        MR. SASCHE:  If you quit monkeying around and let

17  me ask a few questions.

18        MR. VEEDER:  I move to expunge that from the record,

19  your Honor.

20        MR. SACHSE:  What -- the monkeying?

21        MR. VEEDER:  That is right.

22        THE COURT:  It may go out.

23        Take a short recess.

24        (Recess)

25  BY MR. SACHSE:

1    Q    Colonel Bowen, do you believe that the con-
2    dition of the Murrieta Basin upstream from the Gorge has
3    anything to do with the present inadequacy of the water
4    supply to Camp Pendleton?

5    A    No sir.

6    Q    You do not?

7    A    No sir.

8    Q    You do not think that the existance of a
9    reverse water radient has any effect on the amount of water
10   flowing through the Gorge?

11   MR. VEEDER:  I object to that as being argumentative.

12   MR. SACHSE:  I am asking him.

13   THE COURT:  Overruled.

14   THE WITNESS:  During the recess, Mr. Sachse, I
15   referred to plaintiffs Exhibit 22, which is the recorded
16   stream flow at Murrieta Creek at Temecula, and except for
17   every year being different in rainfall and run off they
18   appear to be about the same flow in Murrieta Creek today
19   as there was thirty years ago.

20   BY MR. SACHSE:

21   Q    In other words, you are saying that except
22   for its being a very dry year the run off in Murrieta is
23   no different than it would be ordinarily?

24   A    I am saying that I don't believe that dewater-
25   ing the gravels in the Murrieta Basin has yet had any visible

1    effect on the flow of water in Murrieta Creek, which rises

2    at approximately the same point now on the Vail Ranch or

3    a little above as it has done for many years.

4          MR. SACHSE:  Nothing further.

5          MR. VEEDER:  I have no questions.

6          THE COURT:  Step down, Colonel, if you please.

7          MR. SACHSE:  I have no evidence.  I am prepared to

8    argue.

9          MR. VEEDER:  Your Honor, has declared as a matter

10   of law that an appropriative storage right may be protected

11   by an injunction, and that the Court in substance has held

12   that where the facts warrant injunctive process rights of

13   the nature of Lake O'Neill will be protected in that manner.

14         It is extremely important to the United States to

15   emphasize this fact.  There is not a scintilla of evidence

16   that there has been any diversion or any impoundment of

17   water after April 1 in 1961 which could in any way affect

18   the rights of the United States of America, other than the

19   Fallbrook Public Utility District.  All this interrogation,

20   all this approach that has been taken by counsel for Fallbrook

21   today is meaningless because your Honor is not to presume

22   that these people would do an illegal act.  There is no

23   showing that these people have diverted or impounded water

24   after April 1st.  The sole and only divertor, the only one,

25   who could be invading the rights of the United States today

is the Fallbrook Public Utility District, in the light of
the conditions of the stream in this grave drought.

For that reason, your Honor, it is our view that
the injunction should issue and should issue at once,
because Fallbrook, and Fallbrook alone, is invading the
rights of the United States of America. Every element and
every factor is presently before your Honor on the sworn
statement on the affidavit of Colonel Bowen and in the
motion that we have filed, and it is not contested in any
way by Fallbrook. We have alleged irreparable damage, we
have alleged every element requisite for an injunction, and
the proof supports it entirely.

More than that, there is now a stipulation that
any claimed appropriative right of the Fallbrook Public
Utility District is junior in time to the rights of the
United States.

For that reason, I urge that your Honor, in equity,
enjoin the pumping by the Fallbrook Public Utility District
as prayed.

MR. SACHSE: I am going to try to make this brief,
your Honor, and I will start right out by conceding certain
elements of the moving party's case.

In a case such as this the moving party must
establish four things:

First, the existance of his right. It is established.

16,406

I am not arguing that.

Second, that his right has not been satisfied. I concede that that is established.

Third, that the acts of the junior appropriator or the wrongful divertor who is sought to be enjoined have caused the deficiency. That I do not concede.

And, fourth, that if the junior appropriator or the wrongful divertor is enjoined the water thus made available would be put to reasonable and beneficial uses within the limitations of Article 14, Section 3, of the Constitution. I do not concede that fact.

Now, I am going to present to your Honor three arguments. The first one is purely legal and technical. The Circuit Court of Appeals in 235 Fed Sup. 664, at the very conclusion of the case, stated: "the cause is therefore reversed and remanded with directions to take further proceedings in accordance with this opinion and enter no judgment until the entire suit can be disposed of at the same date." Federal Rule 54A reads: " 'judgment,' as used in these Rules, includes a decree and any order from which an appeal lies." And Title 28, Section 1292, of the United States Code provides specifically that inter-locutory orders granting an injunction are appealable.

We are thus in a situation where your Honor is being requested by Mr. Veeder to enter the exact type of

order which the Circuit Court prohibited.  Your Honor,

yourself, recognized this in the pre trial opinion when

you expressly stated that the holding of the Court was

that it was error to enter a separate judgment, and a

judgment, in the express language of the Federal Rules,

is any appealable order.  You further expressly pointed

it out in the last section of your opinion filed April 5th

on the Vail stipulated judgment where you state, "moreover,

the Court of Appeals for the Ninth Circuit in remanding this

case for retrial expressly directed that no judgment be

entered 'until the entire suit can be disposed of at the

same time' ."

        I am still quoting from your Honor's opinion:

"the term 'judgment' would include a decree only if an

appeal therefrom will lie (Rules of Civil Procedure, Rule

54A), and thus if this Court were to provide that the decree

be appealable it would be directly contrary to the express

direction of the Court of Appeals."

        It takes, I think, no further argument that under

the United States Code any order in this case would be

appealable by me and it would constitute a repudiation

within less than ten days of the very statement that you

filed in this very proceeding in your last written opinion.

        Now, this is a technical out and I believe you are

prohibited by the Rules from grabbing it.

16-408

But I don't think you have to base your decision on this fact. I am going to go a step further. This action is a river-system-wide adjudication. As such it has two simple parts:  first, the determination of what rights exist to the use of the water of Santa Margarita River and the cataloging of those rights; and second, the taking of steps to provide for regulation, apportionment or whatever other action may be necessary to protect prior rights against infringement by  junior rights or -- and I wish to emphasize this -- or by those who have no right at all. Part of this determination is to determine what I know we all know  as a fact -- that there are uses on this River without right, without a shadow of right.  Part of your Honor's task is to determine those.

Now, the cataloging process is not complete. As of today just two, just exactly two, rights on the River are covered by even an interlocutory order, and that is two that are the subject of this  injunction hearing here today.  Those are the only two.  Even the Vail Dam -- we all know, as intelligent human beings, that is under a permit.  But your Honor hasn't said so.  That has not been determined.  The United States itself has urged that endless numbers of upstream diversions and extractions are illegal, that they are improper, that they are excessive. The United States in its objections to the Masters findings

1    for example, on February 3rd Mr. Veeder filed objections

2    to the findings on Fallbrook Creek with this quotation:

3            "It is observed that impounding reservoirs

4            referred to above now exist on Fallbrook

5            Creek.  They reduce the quantity of water

6            reaching the enclave."

7    He said it in objecting to the Masters findings -- illegal,

8    impounding reservoirs.  He has introduced evidence of the

9    pumping holes, he has contended that least parts of

10   Stardust and Gibbon and Cottle diversions are excessive,

11   if not illegal.  Not one, not a single one of these

12   contentions of the United States has yet been determined

13   by this Court.  For all that we know today, any deficiency

14   in the water supply is not due even to the dry year, let

15   alone Fallbrook; but any deficiency may be due entirely to

16   excess or illegal diversion by literally hundreds of other

17   parties who haven't a shadow of a right to the diversion

18   they are taking.  Your Honor hasn't determined it.

19           Nevertheless, he asks you to use your equity power

20   to restrain the only one defendant, other than the United

21   States, that has today an/    entered    judgment -- in fact, the

22   only defendant with an entered judgment defining its rights.

23   He wants you to restrain that one and ignore everything else

24   on the stream system.

25           Now, I am compelled to make an accusation which I

am going to make deliberately.  I am saying that Mr. Veeder
isn't a bit interested in getting water for the Naval enclave.
Mr. Veeder wants a scalp on his belt when he goes back to
Washington, and that is all he wants.  Mr. Veeder know these
facts that I pointed out on cross examination exist.  Mr.
Veeder, himself, filed written objections to De Luz Creek
findings, to Fallbrook Creek findings.  Mr. Veeder, himself,
has stood in this Courtroom and talked about the illegal
Sawday acts.  But Mr. Veeder is seeking nothing more nor
less than a scalp, no matter how small, that he can take
back.  He doesn't want a determination forcing those act-
ing without right to release water.  That isn't what he
wants.

The simple logic behind the decision of the Circuit
Court is in complete accord with the strict rule that I
cited a moment ago from the decision of the Circuit Court.
How, in a system-wide adjudication, how can a Court
intelligently reach out and enter a judgment against one
single defendant?  In the decision of the Circuit Court,
under headnote 33, the Circuit Court  states: "It is, in
fact, somewhat shocking in litigation where a whole stream
system with various types of ownership -- land, water,
appurtant and gross vested and incohate, overlying riparian,
appropriative, by permit and by prescription -- that the
Court should attempt to adjudicate one."  They say it is

shocking, and it is shocking.   This is a systemwide adjudication.

The reason for the Circuit Courts decision is much more clearly stated in the paragraph immediately preceding the one I earlier read:  "After a review of the record, the outstanding fact is that all of the riparians and appropriators in the watershed are vitally interested in certain of the findings and most of the declarations of the judgment.   Since this action includes the entire watershed, it is in the nature of the pleanary suit to settle the relative right of everyone intereste in the waters.   The standard course in such a proceedings is to enter a decree setting up all rights as of the same date."

And as of this date, only one right is entered in the records of this Court, and that is the right that is being sought to be enjoined.

Now, nearly two thousand years ago a single individual took on himself the sins of mankind.   Maybe it was a good thing for all of us.   But your Honor, it was not equity.   And you are sitting on that Bench as chancellor in equity and you are not going to say to a single defendant, "Fallbrook, you are going to be the scape-goat for every sin of omission and commission of every water user in this watershed."   On the contrary, you are going to hear all of the evidence.   You are going to apply the law, and having

1    done so you will sift the wheat from the chaff and you will

2    separate the sheep from the goats and you will mark the

3    just and the unjust, and then, and not until then, are you

4    going to swing the axe of apportionment or regulation.  But

5    when you do swing it, the chips can fall where they may.

6        These points seem to me so conclusive, particularly

7    when considered with the decision of the Circuit Court, as

8    to permit no argument.  The Circuit by its order prevented

9    any Court from going off half-cocked and imposing premature

10   regulation before the case was ready for it.  The Circuit

11   prevented it by its order, and the law would prevent it

12   in any event.

13       But there does seem one additional reason that is

14   particularly applicable.  Because of your Honor's ruling

15   of two weeks ago -- it was argued at length on the prior

16   injunction and I am not going to repeat that again at this

17   time -- in this Court we are completely bound by the pro-

18   visions of the California Constitution as to reasonablness

19   of use, and your Honor has not yet determined whether a

20   military use is reasonable or, in fact, is a proper riparian

21   use.  That doesn't apply to Lake O'Neill.  That would apply

22   to the Ammunition Depot.  But the Constitutionprovision

23   has also imposed on the Court implicit in it the duty of

24   seeking a physical solution.  It is recognized in many,

25   many, cases, and it is even recognized in the decision

1    of the Circuit Court.   I refer to the language in headnote

2    12:

3              "We are not, therefore, prepared to say, on

4              the basis of the findings of the Trial Court

5              and the record in this case, that the uses

6              to which the water was put by the United

7              States were valid as compared with the

8              inchoate appropriative rights of Santa

9              Margarita Mutual."

10   The Court then cites Peabody vs Vallejo and goes on to

11   point out these omissions:

12             "There were no definite findings as to how

13             much water had been used at any time.  There

14             was no finding that allowing the flood waters

15             to plunge over this land where a reasonable

16             method of application and use.  There was no

17             finding that a physical solution could be

18             found for the problem."

19             It is implicit in the duty imposed on your Honor in

20   this case under the law of the State of California to seek

21   a physical solution.  You, yourself, presented this proposal

22   four years ago.  Before this case is over it will be forced

23   upon all of us again -- consideration of this problem, and

24   such a physical solution will take into consideration all

25   of the facts; not just the facts involving Fallbrook and

the facts involving the United States, not just the date
of Fallbrooks permit and the date of the United States non-
statutory appropriative right, not just the question of
military use, not just the question of the share of the
riparian, not just the question of prescriptive rights.
Such consideration is going to take into consideration
everything in this case, and until it is done and until
the interlocutory judgments have been entered giving every
party here a chance to object to any action entering a
judgment against any individual defendant is contrary to
law and contrary to the express mandate of the Circuit,
and until the final conclusion and determination of the
rights on this stream have been made any apportionment,
any regulation, any restriction is improper.

Now, I respectfully request that your Honor deny
this motion for injunction, and in denying it, go a step
further and put this case back on the keel where it belongs
and advise counsel for the United States that this motion
is being denied with prejudice until such time as the
cataloging and inventorying process has been complete and
until such time as your Honor is in a position where you
can distinguish between prior, junior and no rights --
which is not the condition existing today.

MR. VEEDER:  Your Honor, we have placed before your
Honor undisputed allegations in the motion.  Counsel didn't

even respond to those.  We have fulfilled our burden of
proving an invasion by the Fallbrook Public Utility District
of our rights by the fact that they are diverting immediately
above the point where water crosses into our enclave.  They,
themselves, are taking water today, and that is undenied,
and it is proved conclusively that they are taking water
that would flow down to us and that we would apply to
beneficial use at Lake O'Neill and exercise an appropriative
right which you now find has a priority of 1883.

The burden resided with the Fallbrook Public Utility
District to show that other people, after April 1st, as
of today in fact, were using  water that otherwise would
flow down to us.  There is not a scintilla of evidence in
the record on that.  The fact is your Honor realizes,
based on Colonel Bowens testimony, that under the circum-
stances prevailing today the waters to which Fallbrook has
made reference would not reach the Lake O'Neill at this
time; that the principle invasion is the Fallbrook Public
Utility District; that we are being irreparably damaged
by the invasion by the Fallbrook Public Utility District
today.

Counsel is stating that because this would be an
appealable order you have no jurisdiction to prevent
irreparable damage, and I submit that there is not any
authority to support his conclusion.

P 25

1      The whole concept of a preliminary injunction is this:

2   To avoid damage during the process of the trial; and that is

3   what we are asking for.  We have demonstrated conclusively

4   that there is irreparable damage.  It is admitted in the

5   record -- that irreparable damage.  We are being hurt today

6   by what Fallbrook is doing today.  And certainly it was

7   never in the contemplation of the law or even of the opinion

8   of the Ninth Circuit that you would permit irreparable

9   damage to occur where we know that it will take a long,

10   long time to complete the chronicling of these rights.  The

11   preliminary injunction was designed for and has as its

12   objective the prevention of irreparable damage during a

13   trial, and that is exactly what we are asking here.  And

14   the evidence, I respectfully submit, your Honor, and the

15   undenied pleadings, the whole matter that is before you,

16   bear out our contention that Fallbrook is today, by its

17   pumping causing us irreparable damage, and I respectfully

18   request your Honor to enter an injunction as of today

19   preventing that damage.

20      MR. SACHSE:  May I say just one thing.

21      MR. VEEDER:  I am through, your Honor.

22      MR. SACHSE:  Mr. Veeder, this will not disappoint you.

23      I do not suggest -- and I think Mr. Veeder misunderstood

24   me -- I do not suggest by my cross-examination of Colonel

25   Bowen that the United States should have reached up De Luz

P 26

1    Creek or reached anywhere else.  Mr. Veeder apparently

2    misunderstood the purpose of it.  I hope your Honor did not.

3    The purpose was simply to point up the legal argument which

4    I have made that until this cataloguing process is complete

5    we can't know what should or should not be done.  I think

6    an injunction against Garnsey, an injunction against anybody

7    else would be equally as improper as an injunction against

8    Fallbrook.

9          THE COURT:  You talk about the undenied pleadings.

10   Of course, what you had was a motion.  Then you submitted

11   your clarification.

12         Have you looked into the situation, Mr. Sachse, as to

13   whether some of these allegations should have been denied?

14         MR. SACHSE:  I would say that I perhaps should have

15   denied the allegation of irreparable damage.  I believe the

16   basic essential factual allegations, your Honor, -- I want

17   to be clear about this -- are probably correct.  The United

18   States has, I conceded -- your Honor has approved a judgment

19   with a prior in time appropriative right.  The allegations

20   as to the fact that the Lake isn't filled, of course, are

21   not just allegations.  Colonel Bowen testified to that this

22   morning.

23         Now, if this is to be taken as uncontradicted pleadings,

24   I would respectfully point out to your Honor that conclusions

25   of law don't have to be denied.  And the question of

1 irreparability and the question of unlawful pumping by

2 Fallbrook and unlawful diversion by Fallbrook I have not

3 taken the trouble to deny because I believe they are im-

4 plicitly denied in the pleadings of this case.

5   THE COURT:  How long will it take you to catalogue

6 the rights in this River?

7   MR. VEEDER:  Well, we have been at it two years now,

8 and it will probably take another two or three years to get

9 all the appeals done and going to the Supreme Court, etc.

10 Does it mean that we are not going to have any relief for

11 this whole period?  How could we catalogue all rights, your

12 Honor, at this juncture?

13   THE COURT:  We can't do them today.  But we can take

14 care of a lot of it in a big hurry and still get some

15 findings in here.  You have all the geologic evidence in.

16   I think Mr. Sachse's arguments are good, Mr. Veeder.

17   MR. VEEDER:  And we can't have an injunction until

18 that is all done?

19   THE COURT:  There is some doubt about it, in view of

20 the nature of this case.  I don't think you are entitled

21 to an injunction presently.

22   MR. VEEDER:  Your Honor, then I am going to ask -- I

23 don't know where your Honor is going, but I think that the

24 Rules require that the successful party prepare findings of

25 fact and conclusions of law in this kind of proceeding.  I

P 28

1     think it is requisite that it be in the record.

2         THE COURT:  I will direct that there be findings,

3     conclusions and judgment prepared by Mr. Sachse.

4         MR. SACHSE:  I will do it.

5         MR. VEEDER:  When will that be available, Mr. Sachse?

6         THE COURT:  For your information, I am going up to

7     the Federal Correctional Institutional at Lompoc this

8     afternoon.  I will be back here at noon or one or two

9     tomorrow.

10        MR. SACHSE:  I will not have it ready by tomorrow,

11     your Honor, and I am in court on Monday.

12        We are not back until a week from Tuesday, is that

13     right, Mr. Veeder, for our next hearing here?  I believe so.

14        THE COURT:  I don't see how my absence has anything

15     to do with this matter.  You have both apparently completed

16     your arguments.

17        MR. VEEDER:  I think this is an appealable order and

18     I think we are being irreparably damaged by your Honor's

19     ruling and I think it is a matter that should be reviewed.

20        MR. SACHSE:  I will get you your order as fast as I

21     can, Mr. Veeder.

22        THE COURT:  You have that right.

23        What was the import of this letter you wrote, Mr. Veeder,

24     about the water at the Ammunition Depot?

25        MR. SACHSE:  The import of that letter was no more nor

P 29

1   less than the duty imposed upon you and everyone of us,

2   before this case is over, to face the facts and try to

3   arrive at a physical, if possible.  My frank and honest

4   belief is that there will never be regulation of this stream.

5   My frank, sincere and honest belief is that there will be

6   a solution which will result in the conservation of all the

7   waste flood water, both by Fallbrook and, by Vail Dam, and

8   by probably conservation methods within the Reservation,

9   and that those facts, together with the blessing of imported

10  water, we now can put into this watershed over 400 second

11  feet a day in new water.

12      MR. VEEDER:  I object to this going into the record,

13  your Honor.  I don't want this in the Ninth Circuit.  I

14  don't think it has anything to do with this matter.

15      MR. SACHSE:  I think it has a lot to do with it, Mr.

16  Veeder.

17      MR. VEEDER:  This slaughtering of the National Government

18  has been going on here, I object.

19      MR. SACHSE:  The Ninth Circuit pointed out that it was

20  the duty of the Court to make findings on the issue of

21  physical solution.  I read you the sentence that pointed it

22  out.

23      To complete my statement, I believe, sincerely, that

24  with   intelligent conservation and the blessings of the

25  imported water and intelligent planning this thing is going

P 30

1   to be solved, and it is going to be solved without slapping

2   injunctions on any legal beneficial use.  I also believe

3   that it may well be, when your cataloguing process is

4   completed, that a great many --

5       MR. VEEDER:  Your Honor, I do object to this.

6       THE COURT:  I have had it noted.

7       MR. VEEDER:  I am asking for a record for the Ninth

8   Circuit.

9       THE COURT:  You have your record.

10      MR. VEEDER:  Yes, and I know what this will be.

11      THE COURT:  The objection is overruled.

12      MR. SACHSE:  I have nothing further to say.  I am not

13  going to fight with Mr. Veeder.

14      THE COURT:  Mr. Veeder, I have been trying to see what

15  I could do to protect your rights downstream.  I worked

16  hard to get you your appropriative right.  You got that

17  healed up.  But you come in here half-cocked on an applica-

18  tion for an injunction against an appropriator where, with

19  the knowledge I have of what is going on in this watershed,

20  why would Fallbrook be the only one who should be before

21  this Court, if we are going to restrain appropriators?

22      MR. VEEDER:  For this reason, they are the only ones

23  who are diverting right now and causing us irreparable

24  damage, and it is admitted into the record as of now.

25      THE COURT:  You didn't take the trouble to check what

P 31

1   waters there are in the various dams upstream.

2   MR. VEEDER:  We did take the trouble, your Honor.  We

3   took the trouble to check on what was happening as of April

4   1st and down to date.  And that is certainly adequate.

5   THE COURT:  There is no proof as to how many people

6   are wrongfully impounding water -- have water stored on

7   this stream.

8   MR. VEEDER:  The evidence is in the record to show

9   that there is no water except that running down by Fallbrook

10   now.  There is not a thing in the record now.

11   THE COURT:  The record speaks for itself.

12   MR. VEEDER:  And this attack on me I don't like.

13   THE COURT:  I am attacking you.  Be a lawyer.

14   MR. VEEDER:  I am a lawyer, your Honor.

15   THE COURT:  When do you think you can have these

16   findings and conclusions ready?

17   MR. SACHSE:  I think I could probably submit something

18   to Mr. Veeder in time, by airmail, that he could have it

19   in his hand in Washington and be able to tell your Honor

20   a week from Tuesday that he has agreed or disagreed.

21   THE COURT:  You can do it sooner than that, can't you?

22   MR. SACHSE:  Yes.

23   If you are here, I will deliver them to you here.  If

24   you are in Washington, I don't know what else to do.

25   He has a right to see them before I present them to

P 32

1    your Honor.  I can probably get it done by the middle of

2    next week.  But I am thinking that if he is not here it

3    doesn't do me any good to give them to your Honor.

4         Are you going to be here or not?

5         THE COURT:  I might call your attention, Mr. Veeder,

6    that there is evidence in this record as to the amount of

7    acre feet that these basins hold.  You put on some proof

8    as to the present condition of these basins -- that the

9    waters haven't gone down too far.

10        MR. VEEDER:  I am talking about Lake O'Neill entirely.

11        THE COURT:  How can you suffer irreparable damage as

12   long as you are sitting on thousands of acre feet of water

13   in your basin?

14        MR. VEEDER:  I don't like this to go into the record

15   on this particular injunction, your Honor.

16        THE COURT:  Why not?

17        MR. VEEDER:  All right, your Honor.

18        THE COURT:  When you made your prior application I

19   indicated to you that you that you had water in these basins

20   and that I didn't feel that an injunction was now in order.

21   It might be at some other time.

22        MR. VEEDER:  It has nothing to do with Lake O'Neill,

23   which is a 1200-foot acre appropriative right agreed to

24   by Fallbrook, for which we have a priority.  You can't

25   relate it in any way, nor should the record be distorted

P 33

1    to have it appear that the waters in the basin has anything

2    to do with the impounded water in Lake O'Neill.

3         (Another matter -- the Court gave the clerk directions)
     (in another matter.                                      )

4

5    MR. VEEDER:  Are we adjourned or recessed?

6    THE COURT:  Yes, we are recessed.

7    MR. SACHSE:  Until Tuesday the 25th?

8    THE COURT:  Yes.

9    Do you have any matters you want to present tomorrow,

10   Mr. Veeder?  No reason to continue this until some time --

11   MR. VEEDER:  I hadn't heard your Honor say whether

12   we had recessed or adjourned or what had transpired.  I was

13   waiting.

14   THE COURT:  You are recessed until April 25th at

15   ten o'clock.

16        (Adjournment until Tuesday, April 25, 1961, 10:00 A.M.)

17                        - - -

18

19

20

21

22

23

24

25

P 34

## C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date specified therein, and that said transcript is a true and correct transcription of my steno-graphic notes.

Dated at San Diego, California, this 13th day of April, A.D. 1961.

_John Swader_
John Swader, Official Reporter