# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Tuesday, April 25, 1961

Pages:     16,426 to 16,540

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, April 25, 1961

- - -

APPEARANCES:

For the Plaintiff:  
WILLIAM H. VEEDER, ESQ., Special Assistant To The Attorney General

CDR. DONALD W. REDD.

For the Defendants:

Vail Company  
GEORGE STAHLMAN, ESQ.

Fallbrook Public Utility District, et al.,  
FRANZ R. SACHSE, ESQ.

State of California  
FRED GIRARD, ESQ.

P 2

1   APPEARANCES:   (continued)

2       For the Defendants:

3           Nan Bohlen, et al,                JAMES H. MITCHELL, ESQ.

4           Sawday, Parcel 60                 LUCE, FORWARD, HAMILTON &
                                              SCRIPPS
5                                             by
                                              ROBERT E. MCGINNIS, ESQ.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16,428

P 57

## INDEX TO WITNESSES

| For the Defendants. | D | X | RD | RX |
|---|---|---|---|---|
| JOHN F. MANN | 16,440 (Mitchell) | | | |
| | | 16,460 (Veeder) | | |
| | | 16,493 (Girard) | | |


## INDEX TO EXHIBITS

| For the Plaintiff | Identified | Received |
|---|---|---|
| 211-D (Acreage tabulation of Anza Valley & Wilson Creek, generally.) | 16,461 | 16,497 |

| For the Defendants | Identified | Received |
|---|---|---|
| Hamilton's A (Photo map of Anza Valley.) | 16,442 | 16,497 |
| Hamilton's B (Mosaic of 9x9" photographs) | 16,446 | 16,497 |

Take A-1

P. 4

1   SAN DIEGO, CALIFORNIA, Tuesday, April 25, 1961, 10:00 A.M.

2      (Other cases called.)

3      THE CLERK: Number 5, 1247-SD-C, United States of

4 America vs Fallbrook.

5      MR. SACHSE: Mr. Veeder, do you have a schedule we are

6 going to be working on today?

7      MR. VEEDER: I have prepared a tentative agenda that I

8 hand to the Court and to the reporter.

9      (A document was handed to the Court and to counsel.)

10      MR. GIRARD: Have you got another one, Bill?

11      MR. SACHSE: You can use this one.

12      MR. GIRARD: All right. I will use Mr. Sachse's copy.

13      MR. VEEDER: Your Honor wasn't in yesterday, so I did

14 not have an opportunity to see you, but I have just tenta-

15 tively run through what appeared to me to be the items that

16 were undisposed of or partially undisposed of at the last

17 hearing.

18      THE COURT: That is satisfactory, and we can supplement

19 it, or change the order, as necessary.

20      MR. SACHSE: Your Honor, before we start with Mr.

21 Hamilton and many of these other items on the agenda, I would

22 like to take just a moment, if I may, to make a statement

23 for the record that I think may eliminate one of these items

24 from further consideration.

25      I want to advise the Court and counsel for the United

P 5

1   States that last night the board of directors of the Fallbrook

2   Public Utility District directed its chief engineer and

3   general manager to immediately construct facilities necessary

4   to make possible service of Colorado River water to those

5   areas of the District north of the Santa Margarita which had

6   heretofore been served by pumping from the River.

7       We expect this work to be completed in 48 hours, and

8   at that time Fallbrook will discontinue all use of water from

9   the Santa Margarita River for the balance of this year's dry

10  season.

11      Now, we find it possible to take this action because

12  we have available to us the supplemental supply from the

13  Colorado River Aqueduct, and although all of this water is

14  more expensive and although some capital outlay on our part

15  is required, we are taking this action voluntarily at this

16  time because we believe that in a year of extreme drouth,

17  such as this one, and in the absence of any adequate storage

18  facilities on the River, a spirit of cooperation requires

19  that the best use be made of all the available supply re-

20  gardless of any technical rights.  And since we have this

21  alternative source available, and the United States does

22  not, we will for the balance of this year leave the limited

23  stream flow available to Camp Pendleton.  We hope, however,

24  that the experience of this dry year will indicate to the

25  Navy the wisdom of making some sort of connection with the

P 6

1    Colorado Aqueduct so that it too can have this emergency

2    protection to add to its supply.

3         MR. VEEDER:  Why don't you write President Kennedy?  He

4    is the one that would have to pass on it.

5         THE COURT:  That remark will go out of the record.

6         MR. SACHSE:  I have one further report to make to Mr.

7    Veeder which I will present in writing later this week.

8         Six weeks ago Mr. Veeder raised the question on the

9    hearing at that time of what he termed the Callaway pump,

10    and at that time I advised him that we had no control over

11    the Callaway pump.

12         However, I can now advise him that we have completed

13    construction of a line of pumps over to Callaway, and the

14    Callaway pump has been physically closed, and the Callaway

15    pipelines have been physically pulled, and from now on and

16    for the indefinite future Callaway is off the River and is

17    receiving his entire supply from Fallbrook.

Take A-2  18         I will later this week tender to Mr. Veeder and lodge

19    with the Court a tabulation containing a statement to the

20    effect that Callaway is off and can be disregarded so far

21    as his riparian claims in this proceeding are concerned.

22         I am his attorney, and if you feel a disclaimer of

23    some sort is required, that can be filed.

24         MR. VEEDER:  Thank you.

25         THE COURT:  I think there should be a further statement

P. 7

1   made for what it is worth, and I direct this question to

2   you:   That is, whether this action taken by Fallbrook has

3   been taken because of Mr. Veeder's threat to appeal, or

4   because of a feeling on the part of Fallbrook that its

5   position was legally untenable at the time the Court denied

6   the Government's injunction, or whether this has been done

7   in a spirit of cooperation to assist in this matter?

8       MR. SACHSE:   I tried to make it clear in my statement,

9   your Honor, that I am not concerned with Mr. Veeder's appeal,

10  or proposed appeal; that I am not concerned with the

11  adequacy of the legal showing we have made because I think

12  our legal position is correct, and I still believe the Court

13  should deny any injunctive proceeding as against anybody,

14  whether Fallbrook or not, until this case is completed.

15      The fact is that there is not enough water in the River,

16  as any honest analyst has to admit, and we do have an

17  alternative water supply available, and the United States

18  presently does not.   The additional cost probably will be

19  relatively little, and I do not think we could squeeze more

20  than two or three hundred acre feet out of it for the rest

21  of the summer, no matter how hard we try.

22      The proposal is being made in an honest and sincere

23  effort to try to avoid friction and to make it possible to

24  get this case closed up.

25      THE COURT:   Now, the next question is, should there be

P 8        1    findings drawn up in any event?

           2         MR. SACHSE:  I never requested them at all, your Honor.

           3    It seems to me it is moot.

Take B-1   4         THE COURT:  I have no fear about my position in the

           5    matter, unless the court puts a different aspect on it.  I

           6    think I rightfully denied your injunction.  On the same set

           7    of facts I would have to do it again.

           8         MR. VEEDER:  I haven't said a word, your Honor.

           9         THE COURT:  If you want findings, I have looked over

          10    Mr. Sachse's proposed findings, I have my secretary now

          11    working on a paragraph or two in addition which I would add

          12    to them, and I will prepare findings and a decree.  We can

          13    pass that up and think about it before the session is over

          14    this week.

          15         MR. VEEDER:  There is another proposition that I would

          16    like to bring up, if I may.  I realize that Judge Doherty

          17    and Mr. Mitchell are desirous of moving as rapidly as

          18    possible.

          19         However, you had asked that we work in regard to the

          20    Murrieta Basin.  I spent yesterday all afternoon with Mr.

          21    Krieger and his geologist and engineer, Mr. Kirk Webb.  Mr.

          22    Krieger has asked that we have an opportunity to be heard

          23    in regard to that basin on the 2nd of May, if that is

          24    agreeable.

          25         MR. GIRARD:  Is that Tuesday, Bill?

P 9

1    MR. VEEDER:  That is Tuesday.

2    MR. GIRARD:  You couldn't make it Wednesday, could you?

3    MR. VEEDER:  We can talk to him about it.  It makes no

4    difference to me whether it is Tuesday or Wednesday.

5    But the findings have not progressed to the point where

6    we were ready to argue about it and there are some points of

7    disagreement on it.

8    THE COURT:  You are talking about the limits to the

9    ground water bodies?

10   MR. VEEDER:  Yes, that is correct, and also the

11   conclusions of law that he was going to ask in regard to

12   them.  And he would like to be heard on the 2nd of May, if

13   that is agreeable with your Honor and counsel.

14   THE COURT:  How far have you progressed?  Have the

15   descriptions been drawn up?

16   MR. VEEDER:  Yes, they have.

17   THE COURT:  In writing?

18   MR. VEEDER:  That is right.  The exterior boundaries

19   have been prepared.

20   THE COURT:  Did you make any determination as to whether

21   we would consider this as being one or two ground water

22   bodies?

23   MR. VEEDER:  Based upon consultation with Mr. Kunkel,

24   Colonel Bowen and also with Mr. Webb, it seems to be that

25   whether there is hydrological and geological interconnection

P 10

1   between Aguanga Basin and Murrieta Basin, that the better

2   practice from actuality would be to divide the basins and

3   have two basins rather than one.

4   THE COURT:  We have the proof that there is an under-

5   ground divide of some sort.

6   MR. VEEDER:  That is correct, your Honor, on the exhibits

7   in the record.  Now there is evidence of a ground water

8   divide separating Aguanga and Murrieta.

9   THE COURT:  All right, then, May 2nd, unless some

10  arrangement with Mr. Krieger changes it to May 3rd.

11  MR. GIRARD:  The reason is that I have to be in

12  Sacramento on Tuesday night.  I can be here on Tuesday, but

13  I may have to take off early to get back that night.

14  MR. VEEDER:  Is there some difficulty here, George?

15  MR. STAHLMAN:  This isn't the matter that you have on

16  the agenda that you referred to?

17  MR. VEEDER:  No, this is something that I thought we

18  had better have a special direction on now.

19  THE COURT:  Have you seen the proposal, Mr. Stahlman?

20  MR. STAHLMAN:  Yes, your Honor.  This isn't No. 6,

21  then.  This has nothing to do with that.  You talk about

22  Aguanga upstream.

23  MR. VEEDER:  He was asking you, have you seen the

24  proposed findings?

25  MR. STAHLMAN:  No, I have not seen the findings.

P 11

1      MR. VEEDER:  That will be available to you.

2      THE COURT:  They haven't been mailed out?

3      MR. VEEDER:  No, they haven't.

4      THE COURT:  Are you ready to go on No. 1?

5      MR. VEEDER:  Yes your Honor.

6      THE COURT:  Judge Doherty, you want to make some

7  statement, I take it, and be relieved of responsibility in

8  this case?

9      JUDGE DOHERTY:  Yes.  If it please your Honor, I

10  represented a number of defendants in the Anza Valley, and

11  since I have served as a judge I withdrew from the case and

12  the work that I was performing was taken over by Mr. James

13  H. Mitchell.  Therefore, I ask the Court's permission to

14  withdraw from the case, or to approve my withdrawal from

15  the case, and also that the Court approve Mr. James H.

16  Mitchell's taking over to represent all of the defendants

17  of record for whom I have made appearances.

18      THE COURT:  That is agreeable with the defendants, I

19  take it.

20      JUDGE DOHERTY:  Yes, it is agreeable with the defendants,

21  your Honor.

22      THE COURT:  Had the two of you appeared under the name

23  Mitchell and Doherty, or did you just appear individually?

24      JUDGE DOHERTY:  Appeared individually, as I recall it.

25      MR. MITCHELL:  Individually, your Honor.

P 12

1    THE COURT:  Unless there is some objection, Mr. Mitchell

2    will be substituted for Judge Doherty in the matter.

3    MR. VEEDER:  That will relate to the named defendants

4    set forth in the answer of August 20, 1958; is that correct?

5    JUDGE DOHERTY:  Yes, all appearances.  I don't recall

6    the dates off hand.  However, I wish the record to show that

7    my withdrawal is not as of this date.  I am stating as a fact

8    to the Court that my withdrawal from active practice became

9    effective at the time I was on the Superior Bench, which was

10    about a year ago or a little more.

11    THE COURT:  I understand, Mr. Doherty.  We are sorry to

12    have lost you in the case.  But Mr. Mitchell is an old friend

13    and acquaintance of mine and I know he will adequately

14    represent your clients.

15    JUDGE DOHERTY:  Thank you.

16    MR. MITCHELL:  The defendants to whom Mr. Doherty

17    refers, as I understand, are set forth in the amended answer

18    to the complaint and supplementary and amendatory complaint

19    of certain defendants.  If you don't have a copy, I have.

20    MR. VEEDER:  I, myself, don't have a copy.  It was

21    never received.  But I found it in the record.  It is August

22    20, 1958.

23    MR. MITCHELL:  Let me give you a copy.

24    MR. VEEDER:  Thank you.

25    MR. MITCHELL:  If your Honor please, this last weekend

P 13

1   I, together with our geologist, went up to this area, and

2   after coming back yesterday we prepared what is called an

3   Outline of our Contentions, which is a two-page affair, a

4   copy of which I have given Mr. Veeder, and which I thought

5   might be of some help to the Court in understanding our

6   position in this matter.  I don't know whether it is unique

7   or not, but at least this is our position and will be the

8   testimony that will be presented.

9       THE COURT:  Do you have any other copies?

10      MR. MITCHELL:  Yes, I do have.

11      I might tell the Court that we intend to call only one

12  witness, and that is Dr. Mann, who is the geologist, and

13  that will be our case.  If it is satisfactory, I will call

14  him at this time.

15      THE COURT:  Yes.

16      MR. MITCHELL:  Unless your Honor would like to read

17  that over.

18      THE COURT:  Let me read this over, if you will.

19      (A pause.)

20      THE COURT:  All right.

21      MR. MCGINNIS:  Your Honor, might I be heard on one

22  matter for just a moment.

23      THE COURT:  Yes.

24      MR. MCGINNIS:  I have a brief matter of scheduling,

25  and if there will be some convenient time today or tomorrow

P 14

1    that I could address the Court for a few moments I would

2    appreciate it.

3         THE COURT:  This is on Sandia Creek?

4         MR. MCGINNIS:  Yes, that is right.

5         THE COURT:  How long do you think your matter will take,

6    Mr. McGinnis?

7         MR. MCGINNIS:  All I was going to do was to ask for

8    some date next week when I could come in with my client and

9    be heard.  That is all.

10        THE COURT:  What about Tuesday of next week?

11        MR. MCGINNIS:  That would be fine with me.

12        THE COURT:  Is that agreeable?

13        MR. SACHSE:  It is all right with me.

14        MR. VEEDER:  It is all right with us, your Honor.

15        THE COURT:  All right, we will hear you on Tuesday of

16   next week, May 2nd.

17        MR. MCGINNIS:  Thank you.

18        THE COURT:  Who are your clients, Mr. McGinnis?

19        MR. MCGINNIS:  Sawday and the others on Parcel 60 and

20   Parcel 59.

21        THE COURT:  May 2nd.

22   You may proceed.

23   You have been previously sworn, Dr. Mann?

24        THE WITNESS:  Yes I have.

25                   JOHN F. MANN,

P 15

1   called as a witness on behalf of Defendants Hamilton, having

2   been previously duly sworn, on his oath was examined and

3   testified further as follows:

4       THE CLERK:   John F. Mann, is it?

5       THE WITNESS:   John F. Mann.

6       THE CLERK:   Sworn on March 23, 1960, your Honor.

7                DIRECT EXAMINATION

8   BY MR. MITCHELL:

9       Q   State for the record your full name.

10      A   John F. Mann, Jr.

11      Q   What is your business or profession?

12      A   I am a consulting ground water geologist.

13      MR. MITCHELL:   I understand, your Honor, that Dr. Mann

14  has testified before and has testified with regard to his

15  qualifications and that the Court knows about them.

16      MR. VEEDER:   We will stipulate to his qualifications.

17      THE COURT:   Yes. All right.

18      MR. MITCHELL:   That is in the record, I understand.

19      THE COURT:   Is there any objection to waiving any

20  further proof as to qualifications?

21      MR. STAHLMAN:   No.

22      MR. GIRARD:   It is in the record.

23      MR. MITCHELL:   I understand it is in the record.

24      THE COURT:   All right.

25  BY MR. MITCHELL:

P 16

1    Q    Dr. Mann, are you acquainted with the Anza Valley

2    area as it applies to this particular case?

3    A    Yes I am.

4    Q    Do you have a map to which you might refer as being

5    descriptive or coupled in with your testimony?

6    A    Yes, I am prepared to submit a photographic map

7    covering the area, but I will be glad to indicate the

8    position of the valley on any other map that might be availa-

9    ble.

10    Q    I might just now put that on the board so that

11    when you wish to you can refer to it.  Do you have a copy of

12    the map?

13    A    (Witness indicating.)

14    Q    Do you have other copies, Dr. Mann?

15    A    Yes, I have several more.

16    MR. MITCHELL:  I think we have enough.  That is rather

17    a small-scale map, your Honor, and I have another map which

18    your Honor can use, if you wish.

19    THE COURT:  I would like to have a copy of the small-

20    scale one you have put up on the board.  Shall we call this

21    Hamilton's exhibit?  We have to get some numbers to these

22    exhibits.  We can call it Anza Valley 1, 2 and 3, or

23    Hamilton's.  What is your desire, gentlemen?

24    MR. VEEDER:  Are you going to offer this in evidence?

25    MR. MITCHELL:  We will mark it for identification at

P 17

1    this time.

2        MR. VEEDER:  The point of it is that we have the 29

3    series in already, all of the U.S.G.S. maps.  I have no

4    objection if we duplicate it.

5        THE COURT:  It would be more logical to have it in this

6    part of the case if we have a series.

7        MR. VEEDER:  I have no objection.

8        THE WITNESS:  I do have available here a paste-up of

9    aerial photographs on a somewhat larger scale, which I think

10    would be helpful in appreciating some of the features of the

11    valley.

12        THE COURT:  You may use that, too.  But let's decide

13    what number series we are going to use.

14        Do you want to call these Anza 1, 2 and 3 or Hamilton

15    1, 2 and 3?

16        MR. VEEDER:  That will be satisfactory -- Hamilton, the

17    name of the defendant.

18        THE COURT:  The map on the board will be marked Hamilton's

19    A.

20                   (The document above referred to was marked)

21                   (Hamilton's Exhibit A for identification. )

22   BY MR. MITCHELL:

23        Q   Dr. Mann, you have inspected this area, have you?

24        A   Yes I have.

25        Q   Will you tell the Court briefly what you have done

P 18

1  along that line to acquaint yourself with the topography and

2  the general layout of the basin, both surface and subsurface?

3  A   Well, my studies of this valley started before I

4  was employed by my present clients in Anza Valley.   I visited

5  the valley first in 1952 at which time I worked on well

6  location problems for a Mr. Pursche --- who, I understand,

7  no longer lives in the valley but was a defendant at one

8  time.   I started working on this case for the present

9  defendants in Anza Valley in August 1958, at which time,

10  under my direction, a canvass was made of all the water wells

11  in the valley, both abandoned, inactive and pumping.   I made

12  a study of all the information that was available about those

13  wells.

14  In August 1958 water levels were made of all those to

15  which access could be had.   I studied the geology of the

16  area.   I made some studies on precipitation and runoff, also

17  some studies on agricultural areas and consumptive use.   More

18  recently I visited the valley several times, the lastest

19  last Saturday, April 22nd, to review the physical features.

20  Q   What do you understand the general geology of the

21  Anza Valley to be?

22  A   Well, Anza Valley is an alluvium filled basin in

23  highly faulted area.   The faults trend very sharply in a

24  northwesterly direction.   The grain of the country is very

25  marked.   Anza Valley consists, basically, of two parts:   A

P 19

1  northeasterly smaller alluvium-filled part, and a larger

2  southwesterly alluvium-filled part, with a ridge of basement

3  rock inbetween.   Near the southwestern portion of the valley

4  is a bedrock bench on an uplifted fault block of basement

5  rock.   This bench has been uplifted along an important fault

6  which has not expressed itself in the alluvium which shows

7  today on the surface, but is easily recognized from well

8  logs.   To the northeast of this fault there are gravels as

9  much as 200 feet deep.   To the southwest of this fault on

10  the bedrock bench the alluvium is much shallower.

B 2

11  Q   Dr. Mann, would you indicate by a pencil line or

12  a pen line on Exhibit Hamilton's A the location of this

13  fault that you referred to?

14  A   I am indicating on Hamilton's A the position of

15  the fault, which trends from approximately the south quarter

16  corner of Section 21 to the northwest corner of Section 21.

17  THE COURT:  From the quarter section, you say?

18  THE WITNESS:  The south quarter corner of Section 21 to

19  the northwest corner of Section 21.

20  THE COURT:  It would start, then, right to the right

21  of the word "Spring"?

22  THE WITNESS:  Yes sir.

23  THE COURT:  And would go up to the end of the word

24  "Barham"?

25  THE WITNESS:  That is right, your Honor.

P 20

BY MR. MITCHELL:

Q    Will you also indicate on Hamilton's A, please, the location of this bench that you referred to?

A    The bench is to be found southwest of the fault primarily in Sections 20 and 29, and I am labeling Hamilton's A "Bench".

Q    Will you mark that line indicating the fault with the word "Fault" please?

A    I will (marking the map).

THE COURT:  Is this going to be defined by a line, or does it cover an area?

THE WITNESS:  It is a rather large area of approximately two square miles, your Honor, but the entire southwestern corner of Anza Valley lies on this shallow basement bench.

THE COURT:  You say 20 and 29?

THE WITNESS:  Yes sir; all of Section 20 and the north half of Section 29.

THE COURT:  I notice according to    Hamilton's A a streambed coming right across about the middle of 29.

THE WITNESS:  That is correct.

THE COURT:  The bench lies northerly of that?

THE WITNESS:  Northerly of the indicated stream line.

MR. MITCHELL:  Will you resume the stand again, Dr. Mann.

Q    Have you finished your testimony with regard to the general geology of that area?

P21

1    A    I wonder if I might put up, to assist in visualizing

2    this, a paste-up mosaic that I have made of the aerial

3    photographs of this valley.

4    Q    If that will be of help to the Court.

5    THE COURT:  That will be Hamilton's B.  You may put

6    it up.

7                    (The document above referred to was marked)
                     (Hamilton's Exhibit B for identification. )
8

9    MR. VEEDER:  Do I understand that you are not going

10   to offer that?

11   THE WITNESS:  No, Mr. Veeder.

     BY MR. MITCHELL:
12

13   Q    That would be described as photo map of that area?

14   A    I think we had better describe it, Mr. Mitchell,

15   as an uncontrolled mosaic of nine-inch by nine-inch photo-

16   graphs.

17   Q    Is that the same scale as the geodetic map?

18   A    No, it is approximately $2\frac{1}{2}$ times larger.  This is

19   about 1 inch to 2000 feet or $2\frac{1}{2}$ inches per mile.

20   THE COURT:  You say you are not going to offer it in

21   evidence?

22   MR. VEEDER:  We will reproduce that, your Honor, and

23   then it can be returned to him.  But if he is going to

24   testify from it, I think we should have him hold it until

25   that is done.

THE COURT:  Marked Hamilton's B.  It will be reproduced

P 22   1        by the Government so that your original can be returned.

2              THE WITNESS:  Thank you.

3              MR. MITCHELL:  Thank you.

4              Q      What portion of Hamilton's A is covered by

5        Hamilton's B, generally speaking?  I don't mean to mark on

6        the exhibit, but generally speaking, what portion of

7        Hamilton's A is covered by Hamilton's B?

8              A      Hamilton's B would constitute a portion of the

9        southwest one quarter represented on the topographic map

10       Hamilton's A.

11             Q      There are markings on that Hamilton's B, are

12       there not?

13             A      There are markings on Hamilton's B indicating in

14       red the section numbers, and by means of small black letters

15       and circles the well numbers.  Those are the main --

16             Q      The small circles indicate wells and then each

17       well is numbered, is that correct, as indicated on the map?

18             A      That is correct.

19             THE COURT:  The record will show that the fault drawn

20       by the witness on Hamilton's A extends northwesterly from

21       the word "Barham Road" and extends northwesterly and south-

22       easterly from the area I described when you first drew it,

23       running about a half section in length in either direction

24       from the word "Barham" and the word "Spring," is that right?

25             THE WITNESS:  Yes, your Honor.

P 23

1    I am not, Mr. Veeder, indicating that this -- this

2    represents the position of the fault primarily in subsurface.

3    The fault that I have indicated on Hamilton's A I am not

4    suggesting ends at the position that I have drawn in here.

5         Q    On Hamilton's A.

6         A    It would extend in both directions beyond the

7    indicated length on Hamilton's A.  It is my opinion that

8    this fault is part of a series of a fault trending northwest

9    from the indicated position of Hamilton's A and also to the

10   southeast through the gap that extends down into Terwilliger

11   Valley.  It is one of a group of faults.

12        MR. VEEDER:  May I inquire as to the time of this aerial

13   of which you made this composite?

14        A    1939.

15   BY MR. MITCHELL:

16        Q    Dr. Mann, will you explain the present surface

17   drainage condition in that area?

18        A    The present surface drainage, all of which is

19   within the Santa Margarita, the present surface drainage

20   constitutes about 35.7 square miles.  Most of the runoff to

21   Anza Valley is derived from the large fault block on Thomas

22   Mountain, which lies north of Anza Valley.  Most of the

23   runoff comes from that direction.  It is my opinion that the

24   source of all the waters in Anza Valley is rainfall within

25   this indicated area.  The surface runoff leaves Anza Valley

P 24

1  on relatively steep slopes and in leaving the valley passes

2  out through a gap in the southwest corner of the valley,

3  which would be in Section 29.

4      Q    Go ahead, Dr. Mann.

C fls.  5

16,450

A   This is the gap which leads to the Santa Margarita system.

Q   Is there a checking gauging station at that place?

A   No, there is not.

Q   Just continue, Dr. Mann, with your testimony on that subject.

A   There is no artificial interference which tends to reduce the amount of surface flow in Anza Valley. The flow is able to move out of the Valley-- the surface flow is able to move out of the Valley without restriction, except for a small portion of the runoff which is ponded in the southern part of the Valley, in the eastern part of Section 28, and in the western part of Section 27. There in a natural shallow basin that portion of the runoff which naturally collects in the shallow basin is evaporated.

THE COURT:  Now, do you have the range and township there?

THE WITNESS:  These are all T7 South, R3 East, your Honor.

THE COURT:  I see. And you say this is in 27 and 28?

THE WITNESS:  And 28. On Hamilton B this area of evaporation of the surface water is indicated by a very prominent white pattern.

THE COURT:  And this area of ponding then lies easterly of this fault line that you have described?

16,451

t-2

THE WITNESS:  Easterly of the fault line, that is correct, your Honor.

BY MR. MITCHELL:

Q     Have you classified the various waters in that area?

A     Yes, I have.  In addition to the surface runoff, I have classified the ground waters into shallow waters and deep waters; the shallow waters being confined to zones within 50 to perhaps as much as 100 feet of the surface, and the deep waters generally from 100 to 200 feet or so.

Q     What interference, if any, is there in the Valley with regard to surface water?

A     There is no interference with surface flow.  Some of the channels have been improved to the effect of increasing and speeding the surface flow through the Valley, but I know of no structure which will tend to restrict the outflow of the surface waters.

Q     Now, with regard to the shallow ground waters, what are they?

A     The shallow ground waters are found within 100 feet or so of the surface and in material which has a relatively low permeability.  It is characteristic of the southern part of Anza Valley that the near surface materials have quite a bit of clay and silt in them, and so their permeability is low; and the shallow waters I consider those which are within

16,452

t-3

1   100 feet of the surface, and which quite often appear so

2   close to the surface that phreatophytes are using these.

3       Q    What is a phreatophyte?

4       A    A phreatophyte is a plant which has its roots in

5   the ground waters or in the capillary fringe.

6       Q    How do those shallow ground waters move at the

7   present time in that area?

8       A    The shallow ground waters move generally south-

9   westerly from the main part of Anza Valley into the Santa

10  Margarita system.

11      Q    In what quantity, would you say?

12      A    The quantity that moves out in this direction is

13  small.  The gap through which these shallow waters move is

14  located near the west central part of Section 29.

15      Q    With regard to those waters, is there a gauging

16  station in that area or in that vicinity-- in the vicinity of

17  the Anza Valley area?

18      A    The nearest gauging station is downstream at the

19  west side of Coahuila Valley.

20      THE COURT:  Just a minute.  I have a long distance call

21  which I have to take, so we will take a short recess.

22      (A short recess.)

23      THE COURT:  You may proceed.

24  BY MR. MITCHELL:

25      Q    Dr. Mann, you might take the stand again.

t-4

1   What happens to this shallow ground water that is

2   present in the Valley?

3       A   I might point out here that any water, if it is to

4   get out of Anza Valley and move into the Santa Margarita

5   system, must cross this shallow bedrock bench which occurs

6   in the southwestern portion of the Valley.   The water then

7   must flow through shallow zones because the bedrock in this

8   bench area is at a shallow depth.

9       The shallow ground waters which leave Anza Valley pass

10  into a rather narrow gap with a thin cover of alluvium, and

11  in this gap essentially the entire Valley is covered by

12  phreatophytes, mainly wire grass.

13      Q   Are there some cottonwood trees in that area, too?

14      A   They are relatively few.   The water in the gap is

15  consumed largely by wire grass, the small amount of shallow

16  ground water which is able to get out of Anza Valley .

17      Q   What about the deep ground waters?

18      A   The irrigation wells lying to the northeast of the

19  fault that I have indicated on Hamilton A, they tap gravel

20  aquifers which are not present southeast of the fault.   The

21  deep ground waters cannot flow southwesterly because in order

22  to do so they would have to flow through the fault and into

23  the uplifted barrier of basement rock.   These deep ground

24  waters would have difficulty in moving vertically upward also

25  because of the capping layers of clay which are indicated in

C2

16,454

t-5

the well lines.  It is my opinion that irrigation pumping causes little, if any, depletion of ground water spill into the Santa Margarita system.

Now, at the present time, because of adverse gradients, there is no flow southeasterly from Anza Valley into Terwilliger Valley.  There are gravels in this path.

MR. VEEDER:  May I interrupt for just a minute?  I am trying to get back into the testimony in regard to Terwilliger Valley.

MR. MITCHELL:  May the witness finish his answer, please?

THE COURT:  Just a minute.  Let's read the answer up to now.  We have been talking up to now about surface waters and shallow waters running through the gap into the Santa Margarita system, and now we are going into Terwilliger Valley, another valley.

MR. MITCHELL:  We are referring to the deep ground waters, your Honor.

THE COURT:  Will you read the answer up to now?

MR. MITCHELL:  And would please read the question first, please.

(Whereupon the record was read as follows:

 "Q  What about the deep ground waters?

 "A  The irrigation wells lying to the northeast of the fault that I have indicated on Hamilton A, they tap deep gravel aquifers which are not present southwest

t-6

of the fault."

THE COURT:  Wait a minute.  They lie northeast, and do not run southwest  of the fault?

THE WITNESS:  That is correct.

(Thereupon the balance of the answer was read as follows:

"The deep ground waters cannot flow southwesterly because in order to do so they would have to flow through the fault and into the uplifted barrier of basement rock.  These deep ground waters would have difficulty in moving vertically upward also because of the capping layers of clay which are indicated in the well lines. It is my opinion that irrigation pumping causes little, if any, depletion of ground water spill into the Santa Margarita system.

"Now, at the present time, because of adverse gradients, there is no flow southeasterly from Anza Valley into Terwilliger Valley.  There are gravels in this path.")

BY MR. MITCHELL:

Q    Now, will you finish your answer, please?

THE COURT:  Just a minute.  I think there was something omitted there, and let's get it into the record.  As I understood you to say, these deep aquifers lay northeast of the fault, and did not exist southwest of the fault?

t-7

THE WITNESS: That is correct, your Honor. I think at this juncture I might explain the main change in stream pattern in this area because it bears very importantly on these deep aquifers.

BY MR. MITCHELL:

Q     Please do so.

A     At the present time the surface drainage is into the Santa Margarita River. There is no question about this.

Now, in the past, in what would be considered late Pleistocene or older alluvium time the streams draining Anza Valley did not go into the Santa Margarita system. They went instead southeasterly, joining Coyote Creek and becoming a part of the desert drainage  area.

Q   That is Terwilliger Valley?

A     That is through Terwilliger Valley to Coyote Creek and then into the desert drainage. The deep aquifers were deposited by the southeasterly flowing stream.

There are remnants of this former stream channel in the paths between Anza Valley and Terwilliger Valley in Section 34, on either side of the low topographic gap, which occurs trending northwest and southeast through Section 34.

Q     Now, at the present time, Doctor, if the deep ground waters would flow out of the Valley, where would those waters be inclined to go?

t-8

1          A    At the present time the gradients are adverse to

2     a southeasterly outflow of ground water; in other words, a

3     flow through the deep aquifers southeasterly into

4     Terwilliger Valley.  That cannot happen now because the

5     gradient slopes downward towards the northwest.

6          However, as late as 1950, and that is about as far back

7     as the information is available, water levels in the south-

8     easterly portion of Anza Valley did have a southeasterly

9     slope, so the picture generally, as I see it, is if the

10    water levels were to rise again in Anza Valley--

11         Q    That is the deep ground waters?

12         A    -- the water levels in the deep aquifers, the

13    spill would tend to be through these old gravels southeasterly

14    towards Terwilliger Valley.

15         THE COURT:  And then out of the watershed?

16         THE WITNESS:  They are already out of the watershed

17    when they pass through Section 34, your Honor, because

18    Terwilliger Valley currently is in the Coyote Creek or

19    desert watershed.  The saddle is within Section 34 in the

20    narrow gap.

21         THE COURT:  Well, according to other evidence that we

22    have, Exhibit 278 shows the watershed line to be further to

23    the southwest.  If you will look at 278 here--

24         MR. VEEDER:  Here is Exhibit 278 on the board.

25    (Indicating)

THE COURT: -- you will see that this shows the watershed line down about a section southeasterly.

THE WITNESS: The topographic saddle which is indicated on Hamilton A, the latest topographic map, shows by the position of the stream lines to be close to the northwest corner of Section 2.

THE COURT: Now, referring to Hamilton A, I see a dotted roadway there in the northwest corner of Section 2, lines running between two lines of water, and that is where you say the saddle would be?

THE WITNESS: Yes, sir. The slope there is quite flat, and there have been some some flood control activities, dikes and things, put in there, and it is quite difficult to mark it precisely, but it is close to that.

THE COURT: Then I take it that little stream of the dotted blue line, as showing water, are lines to the west of what you say to be the divide, and would flow to the bottom part of the map easterly, and then northerly, and then northwesterly into Terwilliger Valley?

THE WITNESS: No, that would be into Anza Valley, your Honor.

THE COURT: Or into Anza Valley?

THE WITNESS: Yes, sir.

THE COURT: And the little stream on the right of what you say is the watershed would flow, or, is out of the

16,459

t-24

1   watershed and would flow into another watershed?

2         THE WITNESS:  That is correct, your Honor.

3         MR. VEEDER:  Is there a disparity, may I inquire,

Counsel, between 278 and Hamilton A on that basin?

5         MR. MITCHELL:  I don't know.

6         MR. VEEDER:  I can't see that there is.

7         THE WITNESS:  I don't believe that there is.

8         THE COURT:  No.  Now the witness has said it is in

9   Section 2.

10        MR. VEEDER:  Yes.

11        THE COURT:  Previously I thought he had said Section 34.

12        THE WITNESS:  I said the narrow gap passes through

13  Section 34.  The actual topographic saddle, the drainage

14  divide, is near the northwest corner of Section 2.

15        THE COURT:  Then apparently they are in agreement.

16  Have you inspected Exhibit 278?

17        MR. VEEDER:  It is here (Indicating).

18        THE WITNESS:  Exhibit 278?

19        THE COURT:  Exhibit 278.

20        THE WITNESS:  Yes, I have, your Honor.  I see no

21  substantial disagreement, your Honor.

22        THE COURT:  All right.

23  BY MR. MITCHELL:

24        Q    Dr. Mann, as I understand the testimony that you

25  have just given, if the water level of the ground waters was

t-25

1    high enough to run out of Anza Valley, it would flow south-

2    easterly through Terwilliger Pass; is that correct?

3      A·   That is correct; through the old gravel channel.

4      Q   Now, have you inspected the area to determine to

5    what depth or what areas these wells are dug for irrigation?

6      A   Yes.

7      Q   Are they all in the deep ground water areas?

8      A   All of the wells but one -- one on Pursche's place

9    is in fractured rock, and I don't consider that this is

10    within the Anza alluvial basin, but all of the others that I

11    know of are tapping the deeper aquifers in Anza Valley to the

12    northeast of the fault indicated on Hamilton A.

13      Q   And those wells for domestic use are located to

14    what depth?

15      A   Well, they are to various depths, and in many parts

16    of the Valley some of those would be within the shallow

17    aquifers.

18      Q   Have you anything further to say, Dr. Mann, with

19    regard to this drainage area?

20      A   No, I believe I have completed my testimony.

21      MR. MITCHELL:   Thank you.  You may cross-examine.

22

23                  CROSS-EXAMINATION

24      MR. VEEDER:   Your Honor, I would like to have marked

25    for identification Exhibit 211-D.  That is the tabulation of

16,461

t-26

1   total acreage, irrigable acreage and non-irrigable acreage,

2   in the vicinity of Anza Valley and Wilson Creek generally.

3       This is the same material we have offered on the other

4   valleys, and I will get copies for counsel.

5       THE COURT:   211-D marked for identification.

6       MR. VEEDER:   The Court can use this copy, and I will

7   substitute copies for this tomorrow or the next day.

8                           (The document referred to was      )
                            (                                  )
9                           (marked Plaintiff's Exhibit 211-D  )
                            (                                  )
10                          (for identification.               )

11  BY MR. VEEDER:

12      Q    What was the evidence of the fault that you

13  depict on Hamilton A, which appears to traverse Sections 28,

14  21 and 17, generally in a north and westerly direction; is

15  that correct?

16      A    The evidence is based mainly on the difference in

17  the depth to basement along the line, and my personal

18  experience in working in Section 20 in 1952 for Mr. Pursche,

19  who had drilled quite a number of wells and was unable to

20  get production of any substantial quantity.

21      Q    Now, I am referring to United States Plaintiff's

22  Exhibit 211-C, and the fault, as you see it, would traverse--

23  I will ask you to mark where you think the fault would be

24  on 211-C.

25      A    The line I am drawing on 211-C will pass near the

16,462

t-27

1    south quarter corner -- near the south quarter corner of

2    Section 21, trending northwesterly to the northwest corner of

3    Section 21, and I am indicating this by a black ink line on

4    211-C.

5        Q    Now, in regard to the properties in Section 17,

6    which would be a continuation along there, would you say that

7    those properties are affected by the fault from the standpoint

8    of ground water?  Can you locate those properties here now?

9        A    Yes.   In general, the northeasterly portion of 17

10   would be within the deep aquifer area, and the southwesterly

11   portion of 17 where bedrock is at the surface would be on

12   the uplifted or southwestern block.

13       Q    And would you say that there would be a difference

14   in the drainage from -- ground water drainage -- I will start

15   that again.

16        Would there be a difference in the ground water

17   drainage, the direction of ground water drainage, in those

18   areas in the southwest section of Section 17, and the ground

19   waters in the northeast of Section 17?

20       A    No, I would expect that the drainage through both

21   mentioned areas of Section 17, the direction of movement of

22   ground water would be southeasterly, following the slope.

23       Q    Through the fault line?

24       A    Through the fault line, yes.  I do not believe the

25   fault line has affected the youngest alluvium.

d fls

D-1

1    Q    You don't believe, in other words, that, though

2    there is a fault there, it is not a barrier; is that what you

3    are saying?

4    A    It is not a barrier to the movement of the shallow

5    water.   It is a barrier to the movement of the deeper water.

6    Q    Now, would you say that the source of recharge for

7    the so-called deeper waters is different than the source of

8    recharge of the shallower waters?

9    A    No, there is essentially no difference in that both

10   are derived from precipitation and runoff on the surface of

11   Anza Valley Basin.

12   Q    Did you take any quality tests or anything to

13   determine whether those waters were separate and segregated,

14   that is, the shallow and the deep waters?

15   A    I have studied over those chemical analyses, but

16   I wouldn't be able at the moment to answer that question for

17   you.

18   Q    So you don't know whether there is any difference,

19   actually, between the shallower waters and the deeper waters;

20   isn't that right?

21   MR. MITCHELL:   In what regard?

22   BY MR. VEEDER:

23   Q    From  the standpoint of quality.

24   A    I could form an opinion on that very quickly, Mr.

25   Veeder, if I were to consult Bulletin 57.

16,484

Q    We don't do that around here.

A    The appendices?

MR. GIRARD:  I have a copy, if you would like to look at it.

MR. SACHSE:  We all have copies.

MR. STAHLMAN:  Since it has been referred to, it probably should be introduced in evidence.

THE WITNESS:  As I recall, in my previous testimony here the appendices of Bulletin 57 were presented by Mr. Veeder.

MR. VEEDER:  That is correct -- if that is all you are going to look at.  I don't want any of this  harranging from the State.

THE COURT:  Mr. Veeder didn't object to the appendices. He objected to what he thought were some of the conclusions that had been drawn.

MR. VEEDER:  That is right.  I have never deviated from that position.

THE WITNESS:  I can see, in the comparing on Page H37 of Bulletin 57, a difference, for example, between Well 20H1, which is on the bench, a difference in nitrate. 20H1 shows two parts per million nitrate.  Well 21K1, which is northeast of the indicated fault, a nitrate of seven and a half times as much or 15 parts per million.

t12

BY MR. VEEDER:

Q    And what is the difference in depth of those two wells?

A    I would have to check.  20H1 is on the shallow basement shelf and the depth of alluvium there is very small -- in fact, hard rock was reached there, as I recall, at about 50 feet.  21K1, I would have to check the log for its depth.  The depth is given in Bulletin 57, Page F26, as about 300 feet.  I might say, Mr. Veeder, I don't feel necessarily that since these waters are derived from a common source that the quality approach to the problem is going to be very definitive.  I think they could well be the same quality or they could easily be different.

Q    What does this nitrate difference mean?

MR. MITCHELL:  May Dr. Mann finish his statement?

Have you finished your statement, Doctor Mann?

THE WITNESS:  I say, if you wish to look for quality evidences, I believe it would be possible to find them with a detailed study.  But I don't believe that this line of reasoning is very definitive that you should expect the qualities to be entirely different, because these waters are derived from   much the same source .

BY MR. VEEDER:

Q    And you would say that actually it is a single aquifer; there is no separation by a clay bed or anything?

16,466

t-13

1    A   There are clay beds and there effects of artesian

2  pressure.  For example, in Well 27M1 the water level in this

3  well, which is drilled into the older alluvium, rises above

4  the surface of the surrounding lake.  Actually Well 27M1 --

5  and I can indicate it on Hamilton's B -- is on an island of

6  older alluvium almost completely surrounded by the dry lake

7  bed.  In Well 27M-1 in the past the water level in this well

8  has risen above the surface of the surrounding lake bed,

9  indicating that it is under some artesian pressure.

10    Q   But you would say, though, that the clay beds were

11  lenticular in nature and not a continuous  clay body; is

12  that right?  Or, do you know?

13    A   Well, it is going to be, with the number of wells

14  that are involved here, it would be impossible to say that

15  the things didn't pinch out.  I expect they do pinch out

16  in the upslope direction.

17    Q   And there is no separation between the deep and

18  the shallow?

19    A   There are indicated separations at places where we

20  have the well control.

21    Q   But nothing continuous?  In other words, this is

22  one single ground water body, isn't it?

23    A   No, I would not consider it that way.  I would

24  consider it separated.  The fact that artesian pressures are

25  able to be built up indicates that the heads from the higher

16,467

t-14

1   aquifers cannot be dissipated into the shallow ones.  I

2   think there is a good deal of separation between these two

3   zones.

4        MR. MITCHELL:  Will you resume the stand, Doctor.

5        THE COURT:  Where was it that the artesian situations

6   occurred?

7        THE WITNESS:  In Well 27Ml.

8        THE COURT:  In what section is that?

9        THE WITNESS:  Section 27.  This well is plotted on

10  Hamilton's B.

11       MR. MITCHELL:  What  portion of the section, Dr. Mann?

12       THE COURT:  That is the area in the Indian reservation

13  where you said the ponding occurred, is it not?

14       THE WITNESS:  Yes, sir.  It would be close to the west

15  quarter corner of Section 27.

16       THE COURT:  West quarter corner -- what does that mean?

17       THE WITNESS:  That is the center of the west line ,

18  halfway down, a half mile south of the northwest corner.

19  BY MR. VEEDER:

20       Q    You would say, though, that the pumping of the water

21  from the deep areas, the deep ground water -- which you said,

22  I think was, was 200 feet; isn't that what you said?

23       A    Approximately 200 feet.

24       Q    If you pumped out of the deeper ground waters it

25  would have the effect, would it not, of reducing the ground

t-15

water table even in the shallower waters?   Isn't that right?

A    It doesn't appear to do this.

Q    Are you saying that there is a perched water table there?

A    At the present time the water table is -- the correct terminology is "semi perched," because the aquifers below are completely saturated.   But the head differential in response to Anza Valley pumping maintained between the deeper aquifer and the shallower aquifer, a head differential on the order of 20 to 25 feet -- in other words, the deeper aquifer maintains a lower head than the head that is present in the shallow aquifer.

Q    Let's be specific on this, if you would.   I will ask you to come down and look at Exhibit 278 and refer to the well in Section 20Q2 and I will ask you whether, in your view, the water pumped from 20Q2 taps the same aquifer as 20E1?

A    I would say essentially the same shallow aquifer which here I am considering to be the alluvium plus the underlying decomposed granite.   In that area there is actually very little alluvial fill.   A great deal of the shallow material which is drilled through in Section 20 is actually decomposed granite rather than alluvium.

Q    You say it is pumping from the same ground water body then, those two wells to which I have alluded, 20E1 and

16,469

t-16

1  20Q2, are part of the same ground water body as 16K2?

2      THE COURT:  Is that a shallow well?

3      THE WITNESS:  If K2 is shallow.

4  BY MR. VEEDER:

5      Q   Will you check and see whether that is shallow or

6  not?

7      A   That was 16K2?

8      Q   16K2.  By the way, Dr. Mann, did you check these

9  wells out yourself, or were you relying entirely on --

10     A   This well survey was made by a man who was in my

11  employ in August, 1958.

12     THE COURT:  What did you find out about K2?

13     THE WITNESS:  It is not in the list, your Honor, and I

14  have no information on its depth.

15     THE COURT:  While we are here, does the Governement

16  have it?

17     MR. VEEDER:  It is in the evidence now, your Honor.  I

18  will give it to you.  That would be Exhibit --

19     THE WITNESS:  Yes, in answer to your question, Mr.

20  Veeder, I would say that 16K2, since it is in the shallow

21  aquifer and just a windmill well, would be in the same

22  aquifer as in previously indicated wells in Section 20 --

23  that would be 20E1 and 20Q2.

24  BY MR. VEEDER:

25     Q   And you would say, then, that both those wells are

t-17

1    taking water from this basin that you have described?

2        A    If the wells are actively pumping.

3        Q    Yes.

4        A    They would be taking water from what I consider to

5    be the shallow aquifer.

6        Q    And as a result of that pumping, it would be your

7    opinion that it would affect the ground water flow out of

8    Anza Valley and down the Santa Margarita River down into the

9    system; is that correct?

10       A    It would affect the outflow from Anza Valley itself,

11   but I would not feel that it would affect materially the

12   outflow into the Santa Margarita system, because of the gauge

13   control at the west of Coahuila Valley where the record

14   indicates that very little water gets by.  There is a very

15   large area of phreatophytes, mainly wire grass, between the

16   outlet of Anza Valley and this gauging station at the west

17   side of Coahuila Valley.

18       THE COURT:  Is it the west side?

19       THE WITNESS:  The west side.

20       THE COURT:  After it leaves --

21       THE WITNESS:  After it leaves Coahuila Valley.

22       THE COURT:  These shallow wells that you refer to -- and

23   we have already talked about three of them, 20Q2, 20E1 and

24   16K2 -- none of these are heavy producers, are they?

25       THE WITNESS:  To my knowledge these shallow wells will

16,471

t-18

1    not produce much water.   I worked for Mr. Pursche on

2    Section 20 and I would hate to have to admit how poorly I

3    did there trying to get them a good producer.

4        THE COURT:  The good irrigation wells they have in the

5    Valley are wells that go down into the deeper aquifers?

6        THE WITNESS:  That is correct, except for this one into

7    the fractured rock I have previously mentioned.

8        THE COURT:  Where was that located?

9        THE WITNESS:  I believe it is in Section 20.   I believe

10   it is Well 20C2.   It is in the north central portion of

11   Section 20 and it starts in rock.   There is no alluvial

12   cover there at all.

13       MR. VEEDER:  Section 20?

14       THE COURT:  I don't see 20C2.   I see 20C1.

15       THE WITNESS:  I believe I have the record here, your

16   Honor.   I can get the exact number of it.   It is 7 south

17   3 east, 20C2 is the number of the deep well into the

18   fractured basement rock.

19       THE COURT:  It is not shown on 278, then, apparently,

20   is it, Mr. Kunkel?

21       MR. KUNKEL:  I don't believe it is, your Honor.   I

22   suspect the well is in Section 20 near the "O" in the word

23   "Road," but I am not certain of that.

24   BY MR. VEEDER:

25       Q    Did you say the water would move, the shallow

16,472

t-19

1    ground water would move, however, from Sections 28 and 29

2    on down through to Coahuila Valley; is that the general

3    course of the shallower water?

4        A     From the northwest portion of Section 28 through

5    29.  Now, the movement of water in the northeastern portion

6    of 28 could be southeasterly, because--

7        Q     But you don't know that, do you?  It could be, but

8    you don't know that?

9        A     It could be.  I have expressed the extent of my

10   knowledge -- it could move, yes.

11       THE COURT:  Then you have a basement complex in there

12   in cutting off the northeast part of Section 28.  Water

13   would either have to run sort of northerly to get out or it

14   would have to run southeasterly?

15       THE WITNESS:  Your Honor, on Hamilton's B there is

16   indicated in the northern portion of Section 34, within the

17   low alluvial area, an area of phreatophytes, and at some

18   time water was moving in the shallow zones southeasterly

19   because the water was wasted in the northeastern portion of

20   34.

21   BY MR. VEEDER:

22       Q     Now, in regard to the well in Section 21L5, whether

23   that well is taking water from the shallow or deep aquifer,

24   the differences that you speak about would be dependent on

25   the perforation of the well and several other factors,

16,473

t-20

1    wouldn't it?

2        A    Yes, remembering, of course, that the shallow

3    aquifers are of rather little permeability.  A well which

4    is perforated both shallow and deep is going to get

5    practically all of its water from the deep zones and very

6    little from the shallow zones.

7        Q    Have you made any tests along that line?

8        A    I have indications from some of the wells on the

9    Hamilton Ranch.

10       Q    Would you show us where the Hamilton Ranch is?

11       A    It would be approximately -- it would be in the
                                of
12   southwest quarter/section 21.

13       THE COURT:  It would be east of the fault?

14       THE WITNESS:  The fault actually passes through the

15   Hamilton lands, your Honor.   Part of the lands are north-

16   east of the fault and part of them are southwest of the

17   fault.

18       THE COURT:  You were referring to a particular well,

19   indicating the well east of the fault?

20       THE WITNESS:  The well was east of the fault, yes.

21   BY MR. VEEDER:

22       Q    I think Hamilton's property is 365 and 366 on

23   211C.

24       A    The fault would pass through both Parcel 356 and

25   366.

t-21

1       Q     But you say in the shallow zones it would make no

2  difference?

3       A     What would make no difference?

4       Q     The zone.  There would be no barrier?

5       A     The fault is not a barrier in the shallow zones,

6  no.

7      THE COURT:  You started to tell us something about some

8  deep w ater east of the fault on Hamilton's property and you

9  got interrupted.

10     THE WITNESS:  There is in Bulletin 57 a hydrograph

11  indicating that the water in the deep zone upon being pumped

12  will remain at a low level, 20 to 25 feet lower than the

13  shallow waters in this vicinity.  Now, this indicates to me

14  not much interconnection between these two aquifers, if

15  a head like this can be maintained.

16  BY MR. VEEDER:

17      Q     It is not correct to refer to different aquifers

18  in this manner, is it?  You have been talking about the deep

19  aquifer and the shallower aquifer.  It is all the same

20  ground water body, isn't it?

21      A     No, I would say it is correct to speak of two

22  aquifers here.

23      Q     And that the pumping from the deep aquifer would

24  not affect the shallower ground water body?

25      A     I don't believe there would be any appreciable

t-22

1    effect.  I don't believe I could say categorically that there

2    would be no effect.

3        Q    Then how could there be recharge into this lower

4    aquifer if that separation existed?

5        A    The lower aquifer is recharged in the higher areas

6    of the Valley.  I am not indicating that this separation of

7    the two aquifers exists over the entire area of Anza Valley.

8    The main developed portion in the southern part of Anza

9    Valley, yes; but higher up the deeper aquifers are recharged

10   from the same streams that come by.

11       Q    Will you point out to me on 278 where you think the

12   deeper aquifer on the Hamilton property is recharged?  Where

13   would you say generally that would be located?

14       A    I would say generally along the stream courses in

15   Section 5 and the northern part of Section 8 and in Section

16   4 and the westerly part of Section 9.

17       Q    You would say that was where the water generally

18   came from to recharge the Hamilton --

19       A    To recharge the deep aquifers, yes.

20       Q    And have you observed any general decline in the

21   water tables for the deeper aquifers in this Anza Valley?

22       A    Well, no, no general decline.  There is, of course,

23   a decline during the pumping season.  But in general the

24   levels have responded year by year fairly well.

25       Q    And the recharge has continued to come in there.

t-23

1    Is that true with regard to the shallow aquifer?  Is that

2    true with regard to the shallower wells?  Has there been a

3    general decline there?

4        A    I don't recall right offhand the actual trend in

5    water levels, but from the appearance of the phreatophytes

6    I would say that there has been a lowering of the shallow

7    water table over the last ten years, the time that I have

8    been watching it, because the phreatophytes right now are not

9    as vigorous as they have been in the past.

10       Q    Could you just very rapidly state the sections that

11   you think are part of the Anza Basin, referring to the

12   township and range?  Because I am not quite sure of the area

13   you are referring to as being the ground water body.

14       A    I would consider the single ground water body --

15   and we would bear in mind the aquifer differential that I

16   have been maintaining through here -- the shallow aquifer

17   would correspond to the area in Anza Valley above about the

18   center of Section 29, which is indicated in yellow on

19   Exhibit 278.

E fls    20

21

22

23

24

25

P 25

1    Q    That would be the southern extremities; is that

2  right?

3    A    The center of Section 29 would be the approximate

4  southwestern corner of the alluviated Anza Basin.

5    Q    Where would you say would be the -- well, just

6  run on around the exterior boundaries of it, what you say

7  would be the single basin in that area.

8    A    With regard to the shallow aquifer only, --

9    Q    Can't we have both?

10   THE COURT:  Let him answer the question as he wants to,

11  Mr. Veeder.

12   MR. VEEDER:  All right.

13   THE WITNESS:  No, I don't believe we should consider

14  these both, Mr. Veeder.

15   MR. VEEDER:  All right.  Go ahead.

16   THE WITNESS:  There is a situation of two layers of

17  shallow.  The shallow aquifer is indicated by the distribution

18  of the QYAL, the younger alluvium on 278.  The deeper aquifer

19  is confined to a northwest trending gravel channel just to

20  the northeast of the fault that I indicated on Hamilton A.

21  It is a rather narrow strip of good producing gravels at a

22  depth greater than this continuous sheet of alluvium at the

23  top.

24   THE COURT:  As I understand it, this deeper aquifer is

25  not co-extensive with the area of the younger alluvium?

P 26

1      THE WITNESS:  No sir, it is not co-extensive at all.

2      THE COURT:  And it lies to the east of the fault line?

3      THE WITNESS:  East of the fault line.

4      THE COURT:  How wide is it?  How far does it go?

5      THE WITNESS:  It would approximately somewhat less than

6  a half a mile wide, your Honor.

7      THE COURT:  So that it would line inbetween that fault

8  line, and that area of basement complex shown in 278?

9      THE WITNESS:  Yes sir, between the fault line and this

10  ridge of basement rock which divides Anza Valley in two.

11      THE COURT:  Yes.  Then, I take it, these various wells

12  shown to the east of that area of basement complex, wells in

13  Sections 15 and 22, are all shallow wells?

14      MR. VEEDER:  And 14.  Wells also in 14, 15, 22 and 23.

15  Is that what you were speaking of there, your Honor?

16      THE COURT:  Yes.

17      THE WITNESS:  The wells in 15 and 22 are northeast of

18  this bedrock ridge that I mentioned that trends northwesterly

19  through Anza Valley, and those would be in a separate area

20  apart from the deep gravel stringer which occurs northeast

21  of the fault in Section 21.

22      THE COURT:  Then those are shallow wells?

23      THE WITNESS:  They are a little bit deeper than the

24  wells would be in this southwest bench area that I referred

25  to, but they are not as deep, nor as good producers as the

P 27

1    wells in Section 21 northeast of the fault.

2        THE COURT:  And the good wells lie in 21 and in a part

3    of 17, the westerly part of 17; is that right?

4        THE WITNESS:  Yes; mainly in Section 21.  The alluvium

5    is not so permeable to the northwest in Section 17.

6    BY MR. VEEDER:

7        Q    Now, you would say, then, that 15-K-1, assuming

8    that is a shallow well, and 20-G-2 are tapping the shallow

9    aquifer, and that it is a single aquifer; is that correct?

10   I mean where I am pointing now?

11       A    Yes.  The wells in 15, the better producing wells

12   in 15 have a somewhat thicker alluvial section, and they

13   would tap the shallow aquifer.  There may be some deeper

14   gravels in there also which are isolated from the other deep

15   gravels that I mentioned.

16       Q    Would you answer the question for me, then?  The

17   question is, would that be the same aquifer that was being

18   tapped by those wells?

19       A    I would consider it to be the same, yes.

20       Q    And you would also say that 20-G-2 and 17-C-1 are

21   tapping the same aquifer, would you?

22       A    If 17-C-1 is a shallow well, yes, they would be

23   tapping the same aquifer.

24       MR. VEEDER:  Your Honor, I believe I could shorten the

25   cross-examination very materially if we could take our noon

P 28

1 hour recess now.  I don't know that we have much more.

2   THE COURT:  We will, but after all, isn't this a lot of

to-do about nothing?

4   MR. VEEDER:  It may --

5   THE COURT:  How could a downstream owner contend that

6 there were excessive uses upstream here?

7   Here are large areas, a part of the area with a few deep

8 wells that are good producers, and a lot of shallow wells,

9 poor producers.  Certainly you are not going to take the

10 position that the Pursches are taking more than their share.

11   MR. VEEDER:  Your Honor, I am trying to analyze this

12 from this standpoint:  As Dr. Mann has now testified, the

13 north half of Section 29 and the northwest of 28 -- I mean,

14 the northeast of 28 and the northwest of 27 are a part of a

15 single ground water body, and that ground water body extends

16 into the sections which I have just referred to, and those

17 lands are in the Coahuila Indian Reservation.

18   THE COURT:  I see that.  Dr. Mann, I drew a very crude

19 mark here on Hamilton A.  Is that about the area where the

20 deep wells occur?

21   THE WITNESS:  Yes, your Honor.  There is a rather narrow

22 strip there tending through Section 21.

23   THE COURT:  So that it actually starts down in the

24 Indian Reservation, in a part of 28 and 27 probably?

25   THE WITNESS:  Well, it may extend down there, but there

16,481

P. 29    1      are not enough deep wells down there to be sure.

2              THE COURT:  Then it extends across Section 21, and

3      across a part of 16, and maybe into 17?

4              THE WITNESS:  That would indicate it.

5              THE COURT:  Roughly?

6              THE WITNESS:  Yes, your Honor.

7              MR. VEEDER:  Could I ask that be put on the exhibit?

8      You say it is not more than a half a mile wide?

9              THE WITNESS:  About a half a mile.

10             THE COURT:  All right.  You can do it, and we will take

11     our recess.  You can do it now, but we will take our recess

12     until two o'clock.

13             (Whereupon, at 11:55 A.M. a recess was taken until)
                (2:00 P.M. of the same date.                      )

14

F fls.   15

16

17

18

19

20

21

22

23

24

25

16,482

1   SAN DIEGO, CALIFORNIA, TUESDAY,  April 25, 1961, 2:00 P. M.

2                              - - -

3        (Other cases called.)

4        THE CLERK:  Number 5, 1247-SC-C, United States versus

5   Fallbrook.

6

7                      JOHN F. MANN,

8   the witness on the stand at the time of adjournment, having

9   been previously duly sworn, testified further as follows:

10

11                  CROSS-EXAMINATION (Continued)

12       MR. VEEDER:  Has your Honor had an opportunity to see

13   this?

14       THE COURT:  Yes, I see what he has sketched on Exhibit

15   Hamilton A.

16   BY MR. VEEDER:

17       Q    Now, you have stated that that area which is

18   cross hatched on Hamilton A is not more than a half a mile

19   wide; is that about right?

20       A    That is correct.

21       Q    And you would say that was an ancient stream bed;

22   is that correct?

23       A    That is correct.

24       Q    And that half mile, the area that is described as

25   about a half mile wide is highly permeable; is that the

t-29

1    situation?

2         A    In the area that is indicated on Hamilton A it is

3    highly permeable .

4         Q    So, as a matter of fact, when the ground water

5    level is reduced in the area depicted on Hamilton A --

6         THE COURT:   In what area?

7    BY MR. VEEDER:

8         Q    -- in the crosshatched area, that permeable portion

9    of the Valley would be receptive to recharge from the areas

10   around it; isn't that right?

11        A    The area of recharge is beyond the indicated cross-

12   hatched area, because at this position in the crosshatched

13   area the deep aquifer is a confined aquifer, and there would

14   be no dewatering within this indicated area.  Now, --

15        THE COURT:   By dewatering within the area, you mean in

16   the semi-perched area above?

17        THE WITNESS:   Yes.

                                           of
18        THE COURT:   There would be no dewatering/that?

19        THE WITNESS:   There would be no dewatering within the

20   area which is crosshatched.

21        Now, somewhere, where this is recharged, there would

22   obviously have to be a lowering of the water level because

23   as the water is flowing into this area, it would have to be

24   replaced from somewhere, but that would be in the area I spoke

25   of before, which would be the recharge area.

16,484

t-30

1    MR. VEEDER:  Just for the good of the cause, would you

2    draw a line on Hamilton A, where you think the area of re-

3    charge is.  I don't know where it is.

4    Why don't you use your pen?

5    THE COURT:  As I recall his testimony, when he was

6    referring to this, he was referring to the area of the older

7    alluvium?

8    THE WITNESS:  It is easier to see on Exhibit 278, your

9    Honor, because it is indicated in yellow there.

F fls.  10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 30

1    Q    The point that I would suggest, though, if I may,

2  Mr. Witness, if you could indicate on Hamilton's A, because

3  of the --

4    THE COURT:  Here is a copy of 278 you can look at.

5    THE WITNESS:  All right sir.

6    THE COURT:  And transpose it onto Hamilton's A.  That

7  is the same as the one on the board.

8    THE WITNESS:  I am drawing three elipses on Hamilton

9  A which are indicated on 278 as yellow alluvium.

10    THE COURT:  Yellow or orange colored?

11    THE WITNESS:  Yellow, your Honor.  I feel that the

12  recharge is going to take place in the younger alluvium

13  along primarily those three streams.

14    THE COURT:  In other words, they are right southerly

15  of the edge of the older alluvium?

16    THE WITNESS:  They actually are flowing through a cut.

17  They are flowing through arroyos cut in the older alluvium.

18  BY MR. VEEDER:

19    Q    Would you sort of draw lines down to how that

20  water reaches this confined aquifer?  This confined aquifer

21  is something that is extremely interesting.  How does the

22  water get in there?

23    A    It moves from the surface of the ground downward.

24  I don't feel that there is any confinement this far up in

25  the basement.

P 31

1    Q    There is no confinement?

2    A    I don't feel there is any confinement, no.  The

3    confinement is mainly in the southerly portion of Anza Valley,

4    down where the clays have been deposited.

5    Q    The water that comes out of these elipses goes

6    underground and enters this sort of tube-like --

7    A    A gravel channel, a buried gravel channel.

8    Q    And it is completely confined; is that right?

9    A    It is covered by clays in the contact area.

10   Q    How thick is the clay?

11   A    There are various clay layers in here, as indicated

12   by the logs of the water wells to the east of the fault line.

13   Q    So as a matter of fact when this is de-watered no

14   water from any other source gets in there; is that right?

15   A    I believe that the downward movement in this area,

16   if you are suggesting a shallow zone, the downward movement

17   in here is very small.

18   Q    Would you say that there is no downward movement

19   in the area immediately south and west of those two elipses?

20   THE COURT:  By downward movement, are you talking about

21   water from the shallow zone?

22   MR. VEEDER:  Moving into this confined --

23   THE COURT:  And you are not talking about water coming

24   down the gradient from the areas that he marked out to the

25   north?

P 32

1       MR. VEEDER:  That is right.

2       THE WITNESS:  I am not able to put an exact line, your

3    Honor, where these clays pinch out.  A situation like this

4    is a rather common occurrence that the clay layers become

5    thinner and eventually pinch out in the upslope direction.

6    And I am not able, because of lack of well control, to

7    specify exactly where the upslope limit of these clay layers

8    is.

9    BY MR. VEEDER:

10       Q    Are you saying that the wells that are piercing

11    this confined aquifer, so to speak, take no water at all from

12    the shallower zone?

13       A    Not in the area where the high producing wells are

14    pumped.  They would upstream.

15       Q    In other words, what we are looking at here now

16    -- and I am going to ask you to come over, unless your Honor

17    wants him there.

18       Just generally would you state where those wells are,

19    what section they are in?

20       A    Primarily in Section 21.

21       Q    And you would say that this confined aquifer is

22    a half mile wide and a mile long?

23       A    The area indicated on Hamilton A, the cross-hatched

24    area represents the area of good permeability within these

25    deep gravels, not necessarily the limit of the gravels

P 33

1    themselves.

2    Q    What I am talking about is the area, the very,

3    very exclusive and confined area would not be more than

4    half a mile long and a mile wide; is that right?

5    A    The half mile width would be correct, but as in-

6    dicated on Hamilton A, the length would be closer to two

7    miles.

8    Q    And where it extends down -- and there are no other

9    good wells, in your view, in Anza Valley other than that very

10    restricted area?

11    A    These are the best irrigation wells.  There are

12    some better producing wells, nowhere near as good as in this

13    area in the northeastern portion.

14    Q    What section would that be in?

15    A    That would be in Section 15 and 22.

16    Q    And you would say that those wells in Section 15

17    and 22 are not in competition with the wells in Section 21,

18    is that right?

19    A    I feel that they would be in separate areas because

20    of the bedrock ridge which occurs inbetween the two.

21    Q    Would you state into the record how deep down

22    that confined aquifer is situated beneath the surface of

23    the land?

24    A    Oh, on the order of as much as 200 feet, probably

25    starting at a hundred feet or so.  It is not possible to

P 234

1    state precisely.  But roughly between 100 and 200 feet would

2    be the best gravels.

3        Q    And those wells then that are piercing this aquifer

4    are in direct competition with each other, are they not?

5        A    Yes; yes, they would be.

6        Q    Have you found any correlation between the water

7    levels in those wells -- the static level?

8        A    Yes.  I can't say for all of them, but for some,

9    some will respond to the same pumping hole that develops in

10   the irrigation season.

11       Q    And even though a pumping hole is created within

12   the confined aquifer, you are saying that no water from the

13   shallow zone would go into that aquifer and recharge it; is

14   that right?

15       A    So long as there is -- let me understand that

16   question, Mr. Veeder.  Are you asking me if I feel that water

17   is moving down from the shallow zone into the pumping hole?

18       Q    That is right.

19       A    I don't believe that very much is.

20       Q    And you would say that there is an interconnection,

21   would you not?

22       A    I don't believe, unless there is a physical inter-

23   connection.  There is an interconnection of the two bodies

24   of water, you might say, because everything below the water

25   table is saturated.  But as far as the amount of water which

15,490

P 35

1   moves downward from the shallow zone into the deep zone, I

2   just don't feel there is very much because --

3       Q    You would have to guess, wouldn't you, as to how

4   much?

5       A    Well, I prefer to use the term "estimate" rather

6   than "guess."

7       Q    That is a technical way of saying "guess." Earlier

8   in your testimony you told me that these clay beds were

9   lenticular in nature. Are you changing that, Doctor?

10      A    No sir. You suggested that they were lenticular,

11  and I suggested that I would have no definite way of proving

12  that they were not, although from the evidence of the

13  maintenance of the head differential between the two zones

14  it would be an indication to me that there is a difficulty

15  experienced in the shallow ground waters moving down into

16  the deep zone when the deep zone is pumped.

17      Q    But you would say that the ground waters would

18  move down there, wouldn't you?

19      A    It would tend to move down. I think the magnitude

20  of this movement is very small.

21      Q    So you would no longer say, then, that this is

22  a totally confined aquifer; isn't that right?

23      A    Mr. Veeder, I don't think any aquifer is totally

24  confined, if you wish to put it on a purely semantic basis.

25      Q    So you wouldn't say either that this area in here

P 36

1   that we are talking about now, this confined aquifer, is

2.   completely impermeable either, would you?

3       A    The aquifer itself will be very permeable, if you

4.   are referring to the clay.

5       Q    I am talking about the clay.

6.      A    The clay layers above.

7.      Q    These clay layers.

8       A    Nothing in nature is completely impermeable.

9.      Q    So the fact that you have layers would indicate

10   that there would be water pass from the confined zone, I

11   mean from the upper zone into the confined zone; isn't that

12   right?

13.     A    There would be some small amount of water.

14      Q    And you don't know how much?

15      A    I would estimate/as being a very small quantity
                    it

16   compared to the total amount of water which is pumped from

17   the deep zone.

18      Q    Now, have you observed the vegetative cover in

19   Sections 27, 28 and 29 on the Indian Reservation?

20.     A    I have.

21      Q    You have not?

22      A    I have observed it, yes.

23      Q    And have you observed the condition of that?   Have

24   you noticed the phreatophytes in the area?

25      A    Yes.

P 37

1  Q    What has transpired in regard to those phreatophytes, do you know?

3  A    Well, as of last Saturday they didn't look too good.

4  Q    They looked unwatered, didn't they?

5  A    Well, let us say they are having some difficulties compared with what they would do in a normal period of the rainfall cycle.

8  Q    Did you observe, was there any way of your estimating how long they had been in sort of this dead condition that you observed?

11  A    Well, sir, I think the "dead condition" is a poor way of expressing it.  The phreatophytes were living, but they were not vigorous, and I would have no way of knowing how long they had been undergoing this apparent shortage of water.

16  Q    But there is water being pumped out of this zone that would support them, is that right, right off of the Indian Reservation?

19  A    From the shallow aquifer, yes.

MR. VEEDER:  I have no further questions.

(Another matter.)

G fls.

t-31
G-1

1          THE CLERK:   Number 5, 1247-SD-C, United States versus

2    Fallbrook.

3          (Thereupon the witness resumed the stand.)

4          THE COURT:   Any further questions of Dr. Mann?

5          MR. MITCHELL:   No redirect examination, your Honor.

6          THE COURT:   Any further questions of Dr. Mann?

7          MR. GIRARD:   I have a couple that I would like to ask.

8          THE COURT:   All right, Mr. Girard.

9

10                         CROSS-EXAMINATION

11   BY MR. GIRARD:

12         Q     I take it, Doctor, you said the hydraulic gradient

13   was into Anza Valley now; is that correct?

14         A     From the direction of Terwilliger Valley, that is

15   correct.

16         Q     And your opinion was based on the 1950 studies of

17   those well measurements and 1950 as to the other well?

18         A     That is correct.

19         Q     I take it there has been no exhibit of that well

20   information submitted?

21         A     The information that I refer to appeared in the

22   appendices of Bulletin 57.

23         Q     Have you any estimate, Dr. Mann, of how many feet

24   per year the water would move toward Terwilliger Valley under

25   that circumstance?

t-32

1     A     I would think no more than 500 feet per year.

2     Q     No more than 500 feet per year.  One other question,

Doctor:  Addressing myself now to the shallow younger alluvium,

where the water passed out of the watershed into Coahuila

Valley, is that it?

6     A     Coahuila.

7     Q     How deep is that at the actual point where it goes

out of the Anza Basin into that basin of the younger alluvium?

9     A     I do not have any well information right there.

10    Q     Would you have an estimate?

11    A     Yes, I would say 20, no more than 30 feet.

12    Q     Is that to the bedrock or to the bench?

13    A     The spot of which you speak I would consider to

be the edge of the bench.  It is where the Valley narrows down

to a very small width.

16    Q     Now, addressing myself only to the recharge aspects

of this deep ground water body which you have testified to,

insofar as recharge is  this situation in Anza Valley

essentially the same as Pauba Valley?

20    A     I don't believe I would-- I am able to comment on

the similarity at this time.

MR. GIRARD:  I have no further questions, Doctor.  Thank

you.

THE COURT:  Any other questions?

MR. MITCHELL:  No further questions.

16,495

t-33

1    THE COURT:  I was interrupted and did not hear that

2    answer.  Will you repeat the answer, please?

3    (The answer was read.)

4    THE COURT:  You say you do not think you would be able

5    to comment on this?

6    THE WITNESS:  Not at this time, your Honor, because I

7    have not made as detailed a study of the water supplies in

8    this -- this was Pauba Valley?

9    THE COURT:  Yes.

10   THE WITNESS:  I don't believe I have a sufficiently

11   thorough knowledge of Pauba Valley to comment upon the

12   similarity between that and Anza Valley at this time.

13   THE COURT:  Let me ask you this question:  The evidence,

14   as I recall it on Pauba Valley, shows that there were

15   lenticular layers of clay, not complete, but they existed in

16   layers, sometimes overlapping and sometimes not.  Now, if there

17   were lenticular layers of clay, would that in your opinion

18   be a different situation than that which you found in Anza

19   Valley?

20   THE WITNESS:  I think there is one  difference, from

21   my knowledge of the two areas.  The artesian conditions in

22   Pauba Valley seem to be much better developed than they are

23   in Anza Valley, and that would indicate thicker clays, and,

24   of course, we know in Pauba Valley the deep well area is

25   2478 feet deep, and we are speaking in Anza Valley only of

16,496

t-44

1    200 to 250 feet deep.

2        THE COURT:  Where would it indicate the thicker clays?

3    Which one?

4        THE WITNESS:  Well, thick clays would be down in --

5        THE COURT:  Which valley are you talking about?

6        THE WITNESS:  The thicker clays would be in Pauba Valley,

7    your Honor.

8    BY MR. GIRARD:

9        Q    In other words, Pauba would be tighter?

10       A    Pauba would be tighter, especially over toward the

11   fault against which the head of the Navy deep well has been

12   built up; in that area especially.

13       THE COURT:  Any further questions?

14       MR. GIRARD:  No further questions.

15       THE COURT:  Thank you, Dr. Mann.

16       THE WITNESS:  Certainly, your Honor.

17

18       THE COURT:  Now, does the Government have other evidence

19   to offer on Anza Valley?

20       MR. VEEDER:  No, your Honor.

21       THE COURT:  The Government says, "No."  Does anyone else

22   have any evidence on Anza Valley?

23       (No response.)

24       THE COURT:  Colonel Bowen, you have been sworn.  I take

25   it Exhibit  211-D was prepared under your supervision?

t-35

1    COLONEL BOWEN:  Yes, sir, it was.

2    THE COURT:  And is it correct, to the best of your

3  knowledge and belief?

4    COLONEL BOWEN:  Yes, sir.

5    THE COURT:  Mr. Mitchell, I suppose you want to offer in

6  evidence Hamilton's A and B?

7    MR. MITCHELL:  Yes, your Honor, with the understanding

8  that the Government will reproduce B, and I understand Mr.

9  Veeder will arrange to have that mailed back to Dr. Mann.

10    THE COURT:  That will be the understanding.  Exhibits

11  Hamilton A and B are received in evidence, and Exhibit 211-D

12  is received in evidence.

13                                    (Thereupon the documents referred  )
                                      (                                  )
14                                    (to were received in evidence and  )
                                      (                                  )
15                                    (marked Exhibits Hamilton A and B   )
                                      (                                  )
16                                    (and received in evidence, and     )
                                      (                                  )
17                                    (Plaintiff's Exhibit 211-D received)
                                      (                                  )
18                                    (in evidence.                      )
                                      (                                  )

19    THE COURT:  While we are on this, do you want to discuss

20  what findings I should make on Anza Valley?  Let's dispose of

21  it while it is fresh in mind.

22    MR. MITCHELL:  I am willing to submit the matter to your

23  Honor.  I feel that your Honor knows a whole lot more about

24  it than I do or than I ever will.

25    THE COURT:  Do you want me to start out with some

1    suggestions, or do you want to discuss it?

2    MR. VEEDER:  Well, I would just as soon that your Honor

3    start off with firing a few shots for liberty, and let's see

4    what happens.

5    THE COURT:  I would be prepared to find, first of all,

6    of course, as to the surface water that the surface water in

7    the Anza Valley feeds the Santa Margarita as a part of the

8    stream system.

9    As to ground waters I would make the finding that any

10   waters found in the area of the basement complex are vagrant,

11   local, percolating waters and not a part of the stream system,

12   including the Well 20-C-2, the deep well in the fractured rock

13   which is not shown on Exhibit 278, but which was testified to

14   by Dr. Mann.

15   MR. VEEDER:  Do you want me to check that   out and put

16   it on, your Honor?

17   THE COURT:  By the way, whose property is that on?

18   DR. MANN:  It is on Property, your Honor, formerly owned

19   by Mr. Pursche.

20   THE COURT:  And he has transferred it to somebody else?

21   DR. MANN:  Yes, sir.

22   MR. MITCHELL:  Do you know who that is?

23   LINCOLN HAMILTON:  Clay Kellogg.

24   MR. MITCHELL:  It is Clay Kellogg.

25   THE COURT:  Clay Kellogg is the present owner?

t-37

1    LINCOLN HAMILTON:  That's right.

2    MR. MITCHELL:  Is Mr. Kellogg in the courtroom?

3    (A gentleman raises his hand.)

4    MR. MITCHELL:  You are the owner of that property, are

5    you, Mr. Kellogg?

6    MR. KELLOGG:  Yes.

7    THE COURT:  I would find as to ground waters that the

8    areas of the younger alluvium depicted on Exhibit 278, the

9    ground water there was a part of the stream system as far as

10   the shallow waters are concerned.  I have serious doubt as to

11   whether the aquifers reached by the deep wells are actually a

12   part of the stream system.  There is undoubtedly some inter-

13   play, but the testimony of Dr. Mann, which I credit, indicates

14   in this whole Valley this stream channel is now filled with

15   permeable material and leads off towards Terwilliger Valley;

16   that up to 1950 there was a gradient towards Terwilliger, and

17   presently the gradient is the other way because of the pumping

18   in the wells.

19   I would be prepared to find also that there is no

20   evidence to indicate any unreasonable or excessive uses by

21   riparians or overlying owners in the Anza Valley, and it would

22   be pretty hard for me to visualize a situation where with that

23   much irrigable ground the people who are riparians and over-

24   lying would not be entitled to use what water they could get.

25   There has been no evidence that there is a great abundance of

t-38

1   water there or that it is being wasted.  Certainly those

2   people there have the same right to water in the stream as

3   anybody else.  Then your shallow wells are the major wells in

4   the Valley, and the testimony is that none of them are

5   excellent wells, but largely for domestic use or for small

6   pieces of ground.

7        The only remaining good wells, according to the testimony,

8   appear to be in the deep aquifers, and there is some question

9   if you restrain pumping in the deep aquifers that you might

10  be losing the water out of the watershed.  So, so far as I am

11  concerned, you could practically cross this off, from the

12  present testimony, as any area that would be subject to

13  regulation except as to surface flow.

14       I would also find that this area of deep aquifers

15  extends down into the Indian Reservation, and that the Indians

16  would have access to that deep water, and there is no water

17  right better than that  that obtains as to an Indian, and if

18  their land lay over the bottom end of that aquifer, they would

19  have the right to use plenty of water out of that deep aquifer.

20       That is about what I would propose to find.  Does anybody

21  object to those findings?

22       MR. STAHLMAN:  Another victory for Mr. Veeder.

23       MR. VEEDER:  I would like to have -- if we could have it,

24  I would like to have the basin, the surface area of the basin

25  defined more completely, but if I comprehended what you said,

16,501

t-39

1   you were excluding the lower continental alluvium?

2          THE COURT:  No, I would include the older, as well as

3   the younger, as a part of the water bearing area, the ground

4   water body.

5          MR. VEEDER:  The basin?

6          THE COURT:  As the basin, and define it as shown on 278.

7          I would find the existence of the fault, and the discharge

8   of the surface water, and probably a very small amount under-

9   ground through the gap there in Section 29.

10         Is that sufficient?

G-2

11         MR. VEEDER:  I think that covers it.

12         MR. GIRARD:  I have no objection to it.

13         THE COURT:  Mr. Veeder?

14         MR. VEEDER:  I said I think that covers it.

15         THE COURT:  Any objection to those findings?

16         MR. VEEDER:  I would like to think about that some, your

17   Honor.

18         THE COURT:  Unless I hear from you tomorrow, why, let's

19   heal it up.

20         MR. VEEDER:  All right.  You want us to go ahead and

21   prepare findings on that area?

22         THE COURT:  Yes.  Now, I take it that we have in

23   Exhibit 211-D all the legal ownerships?

24         MR. VEEDER: That is correct.

25         THE COURT:  Then we have the irrigable acreage?

1    MR. VEEDER:  That is right.

2    THE COURT:  I don't see how anyone in that area is

3    presently hurt by these findings, or the necessity to mail

4    any of these out to people other than those represented by

5    Mr. Mitchell.  Mr. Mitchell, you do not represent everybody

6    in that Valley, do you?

7    MR. MITCHELL:  I represent those, your Honor, for whom

8    Judge Doherty has appeared, and those names are contained in

9    the Answer filed by him.  There are about 37 defendants.

10    THE COURT:  Then I would suggest this:  That when we

11    draw findings, conclusions of law and interlocutory judgment

12    on this Valley, a copy, or more than one if Mr. Mitchell wants

13    it, be sent to him, but that those names be checked against

14    the other owners, and that the other people in the Valley who

15    may not be represented by Mr. Mitchell be sent a copy of these

16    findings, and that you file an affidavit of mailing that they

17    were mailed a copy of these findings, and that they be mailed

18    to them after I have signed them.

19    MR. VEEDER:  Then we will go ahead that way, your Honor.

20    THE COURT:  So then they will know what we find as to the

21    facts.

22    MR. MITCHELL:  Would your Honor prefer that Mr. Veeder

23    prepare the findings rather than I prepare them?

24    THE COURT:  With all due respect to you, Mr. Mitchell, you

25    have been sort of tossed into the middle of this case.

16,503

t-41

1    MR. MITCHELL:  That is correct.

2    THE COURT:  And I think we can do a better job of it than

3    you can do, because we have the tools at hand, and then you

4    can check it over.

5    MR. MITCHELL:  How much time would I have to check them

6    over, your Honor?  Ten days?

7    THE COURT:  You can have as much time as you want.  Will

8    ten days be sufficient?

9    MR. MITCHELL:  Ten days will be sufficient.

10   THE COURT:  All right.  Now, are there any other findings

11   that we ought to make on this Valley, Mr. Veeder?

12   MR. VEEDER:  Your Honor, we have Coahuila Valley, this

13   area extending south and westward, as you will notice on 278.

14   I believe that that is a basin area, and, frankly, I

15   believe that the geology and hydrology is about the same as

16   the Anza Basin.

17   Isn't that correct?

18   MR. KUNKEL:  About the same.

19   MR. VEEDER:  Is that agreeable with you, Colonel?

20   So long as we are on this map, I thought we might as well

21   cover it.

22   THE COURT:  We have the record of the geology, and as to

23   the balance of the area shown on 278, I would likewise find

24   as to the areas westerly of Anza Valley that again all surface

25   water is part of the stream system, that water found in the

t-42

area marked basement complex is vagrant, local, percolating water and not a part of the stream system, and that the areas of older and younger alluvium shown on 278 are ground water bodies, a part of the stream system; that persons owning land thereon, or overlying or riparian -- you can fill in a lot of loose ends on that with the other basins -- that again the Indian Reservation embraces a large area of younger alluvium immediately easterly of the fault described by Dr. Mann at the west side of Anza Valley, and other areas of younger alluvium in the Coahuila Valley, and areas of  older alluvium and that the Indians, or the United States as a representative of the Indians, have water rights therein.

Now, we have never spelled out in so many words what the legal conclusion/as to the rights of these Indians, except that it is a pretty good right.

H fls

1    MR. GIRARD:  Is the evidence in on the date that these

2  reservations were set aside?

3    MR. VEEDER:  That is correct.

4    MR. GIRARD:  What exhibit is that?

5    MR. VEEDER:  I will have to look.  It is one of the

6  early exhibits.

7    Did I understand that the older and younger alluvium --

8    THE COURT:  Would be part of the stream system, part of

9  the water body.

10    Again, there has been no evidence of any unreasonable

11  use.  As I recall, the evidence is that the younger alluvium

12  is very shallow in Coahuila Valley, and I cannot visualize

13  a situation where you could restrain pumping so that water

14  would flow over the lip down into the stream system and

15  deprive these people of the right to use water.

16    MR. VEEDER:  I believe the physical situation is as

17  your Honor has described it.

18    MR. MITCHELL:  May I ask Mr. Veeder, about how soon

19  conveniently with him would he have these findings prepared?

20    MR. VEEDER:  I will get them together as fast as I can.

21    MR. MITCHELL:  Within thirty days?

22    MR. VEEDER:  Yes.  It depends on how much time we are

23  going to have this week outside the courtroom, frankly.

24    THE COURT:  It depends.  If we draft somebody else to

25  draw findings here we may get them faster.

P 39

1    MR. MITCHELL:  Within thirty days will be plenty of time,

2    as far as I am concerned.

3    THE COURT:  How about Mr. Girard having a hand in this.

4    MR. GIRARD:  I would appreciate it, if I am to be

5    drafted for this, if I got copies of your exhibits.

6    MR. MITCHELL:  You certainly could have them.

7    MR. GIRARD:  Because I will probably have to do it in

8    Sacramento.

9    MR. MITCHELL:  Those two exhibits, A and B?

10   MR. GIRARD:  Yes.

11   MR. MITCHELL:  Yes, certainly.

12   I understand from Mr. Hamilton that four other parties

13   would like to be joined in our answer.  Their names are Mr.

14   J. D. Sherman and Mrs. Laura Sherman, husband and wife I

15   assume; Mr. Robert L. Holcomb and Mrs. Virginia Holcomb.

16   THE COURT:  Are they here?

17   MR. MITCHELL:  They are not here, are they, Mr. Hamilton?

18   MR. HAMILTON:  No, they are not here.

19   THE COURT:  Does it make a lot of difference?  They may

20   send in a letter to Mr. Mitchell, which would be approved

21   by him, that they may be considered as part of the answer,

22   or if they don't they are not defaulted because we find the

23   same things as to them that we find as to the rest of them.

24   MR. MITCHELL:  I don't see where it makes any difference

25   one way or the other.

P 40   1        THE COURT:  How to save time, Mr. Veeder?

2        MR. GIRARD:  I would like to have those names left in

3    my office.

4        MR. MITCHELL:  I will give them right now.

5        MR. VEEDER:  It would be simpler for us to check out

6    their status later on.

7        Of course, your Honor, if anybody wants to write findings,

8    I am glad to have them do it.  I have plenty to do.  If Mr.

9    Girard would like to write the findings, it is all right with

10   me.

11       THE COURT:  All right.

12       Dr. Mann, how far would you say Anza Valley goes?  Does

13   it go down to the juncture with Durasno Valley?

14       THE WITNESS:  It is a little upstream from that, your

15   Honor.

16       THE COURT:  Could you show us on 278 what would be the

17   limits of Anza Valley?

18       MR. MITCHELL:  Or maybe Hamilton's A would show it.

19       THE WITNESS:  I am drawing a line extending from the

20   bedrock outcrop on 278, which is near the center of Section

21   29, northwesterly across the alluvial valley to the other

22   bedrock outcrop.  In other words, it would be the throat of

23   that narrowed alluvial valley.

24       THE COURT:  Are you sure you are not talking about 30?

25       THE WITNESS:  No, your Honor; 29.

P 41

1        MR. VEEDER:  My I inquire, why did you select that place

2    rather than farther down?  I am not arguing with you, Dr.

3    Mann.  But is there a geological formation there that would

4    make the constriction there, or farther down where the

5    constriction becomes even more apparent?

6        THE WITNESS:  It is where the large area of alluvium

7    throttles down markedly, and this is the beginning of the

8    area of high water table and phreatophytes here.

9        MR. VEEDER:  The point I am trying to make is that you

10   have a wider area than you have pointed out farther down.  I

11   am not arguing with you.

12       THE COURT:  I take it, Dr. Mann, that westerly of the

13   line you have drawn in Section 29, this alluvium is much

14   shallower?

15       THE WITNESS:  Oh, yes sir.

16       THE COURT:  And it is deeper on the other side.  You

17   have wells on the other side.  You have none immediately

18   westerly.

19       THE WITNESS:  And I think an important consideration

20   on Hamilton's B is the fact that along this line, the dark

21   color on the aerial photo indicates that phreatophytes are

22   beginning to use water because of the shallowing of the

23   alluvium.

24       THE COURT:  I asked the question for this reason.  I

25   would suggest that the findings on Anza Valley be separate

P 42

1   from those on Coahuila, and that we adopt that line as the

2   approximate boundary of the Anza Valley so that we would

3   wrap up Anza Valley in one package.

4       MR. GIRARD:  On these findings, are you envisioning,

5   your Honor, separate findings for each ownership, or setting

6   forth the ownerships in the over-all findings, or using some

7   type of boundary?

8       THE COURT:  Well, we have the plat map in evidence.

9   What is that exhibit number?

10      MR. GIRARD:  This is the Wilson Creek.

11      MR. VEEDER:  211-C.

12      MR. GIRARD:  Yes, 211-C.

13      THE COURT:  And we have 211-D with irrigable and

14  irrigated acres.

15      Mr. Veeder, maybe the two of you could work together.

16  You could prepare the part of it with the wells of owners

17  and irrigable acres, and Mr. Girard the findings.

18      MR. VEEDER:  We will do that.

19      MR. GIRARD:  We will work it out.

20      MR. VEEDER:  I will handle the irrigable, gross irrigated

21  acres to the extent that we have information.  I will make

22  that available to him at Sacramento as soon as we can.

23      THE COURT:  Prepare it in such a way that it could be

24  put right with the findings.

25      MR. VEEDER:  We have that set up right now, your Honor,

16,510

P 43

1    just that way.

2         I hate to go back and raise the point on this now. It

3    was not clear to me, though, exactly what was said by your

4    Honor as to the finding of the waters within the confined

5    aquifer which, as I comprehend it now, due to pumping or

6    due to the drouth or whatever it is the water levels are so

7    reduced that there would not be any water escape to Terwilliger

8    Valley. Isn't that right?

9         THE COURT: I know what you are talking about. We are

10   going to make a finding. I am not sure what we are going to

11   do. I think the evidence shows that as of 1950 there was

12   a gradient of water from the area of deep aquifer running

13   down through Terwilliger Valley at least within the water-

14   shed, which would probably mean it was running out of the

15   watershed; that presently there is a reverse gradient so

16   that the water is not running into Terwilliger Valley but

17   running northwesterly.

18        MR. VEEDER: And under the circumstances that prevail

19   then that water would be part of the water system of the

20   Santa Margarita, wouldn't it?

21        THE COURT: Under the present situation it is. In other

22   words, you probably can do it just that way. Find what the

23   situation was in 1950 and what it is today, and therefore

24   at some future time you would obviously have to find what

25   the gradient was before you could determine whether the

16,511

P 44

1   watershed was losing water or not, and leave the door open

2   for further wells that might be drilled.   There might be

3   further wells drilled down there in Terwilliger where we

4   would have more knowledge of that end of it.

5   MR. VEEDER:  I just wanted to be sure that the findings

6   will be reflective of the situation that prevails today.

7   THE COURT:  Is that definite enough?

8   MR. VEEDER:  I think that is definite enough.

9   THE COURT:  What else can we find?

10   MR. VEEDER:  I don't think you can do more.

11   THE COURT:  What do you want to do with Coahuila?  Do

12   you want to throw it into the Wilson Creek matter?

13   MR. GIRARD:  I have no preference, your Honor.  I think

14   as far as the ground waters go it is a different situation

15   there than in Anza, because you don't have anything running

16   off into the other watershed.

17   MR. VEEDER:  That leakage was not very great there.  But

18   if that is the difference, why, all right.

19   MR. GIRARD:  As I understand it, your Honor, as far as

20   the Coahuila Valley is concerned, all of the ground waters

21   underlying the younger and older alluvium as depicted on

22   U.S. 278 are part of the stream.

23   THE COURT:  That is right.

24   MR. GIRARD:  It is a little different situation in Anza.

25   THE COURT:  That is right.

P 45  1      MR. GIRARD:  It is a simpler situation in Anza.

2      THE COURT:  What I am thinking about is whether you

3  want to have a separate interlocutory judgment on Coahuila

4  or whether you want to throw it into what I am talking about

5  as your Wilson Creek?

6      MR. GIRARD:  I have no preference.  Whichever your Honor

7  wants.

8      MR. VEEDER:  By reason of the fact that that intersects

9  the full length of the Coahuila Indian Reservation, I would

10  like to have a separate set of findings, if I could, because

11  I think you have a different legal situation.

12      THE COURT:  I think it might be desirable to have a

13  separate set on Coahuila then.

14      MR. VEEDER:  That is right.  We are writing those now.

15  They are in the process of being written.

16      MR. GIRARD:  I will not direct my attention to Coahuila,

17  just Anza.

18      MR. VEEDER:  That is right.  We are trying to set those

19  up now.

20      THE COURT:  Dr. Mann, what about this Burnt Valley area

21  on the other side of that fault line as shown on 278?  There

22  is younger and older alluvium in there.  Have you made any

23  study of that?  Does water out of there run down into Anza

24  Valley?

25      THE WITNESS:  I have been in there, your Honor.  I have

P 46

1   made no detailed studies, but I note that any water which

2   gets out of that must flow on the surface through a rock

3   canyon along one of the main fault lines there.  So any spill,

4   surface or underground, has to appear on the surface as

5   surface flow.

6      THE COURT:  You testified about this, did you not, Mr.

7   Kunkel?

8      MR. KUNKEL:  Yes, I did.

9      THE COURT:  And that surface flow and any water that

10   spills out of that valley feeds the river.

11      MR. KUNKEL:  That is correct.  And on the occasions I

12   have observed the valley there has been a surface stream

13   also.

14      THE COURT:  There is a very shallow area of younger

15   alluvium, is there not, in Burnt Valley?

16      MR. KUNKEL:  It is my opinion that it is shallow.  Again,

17   I have no good log data to come up with an exact estimate.

18      MR. MITCHELL:  Your Honor, does the record show that

19   these four people have been joined in our answer?

20      THE COURT:  We can't join them without their consent.

21   If they want to write you a letter that they want to be

22   joined, and you consent, we will join them in your answer.

23      MR. MITCHELL:  Very well.

24      THE COURT:  I don't know that we can very well join

25   them without their consent.

P 47

1       MR. MITCHELL:  May we be excused, your Honor?  Is that

2   all on the Anza Valley matter?

3       THE COURT:  I think so -- unless you want to stay around

4   and see some of the other fireworks.

5       MR. GIRARD:  I want to talk to him before he goes,

6   your Honor.  Maybe we can have our recess.

7       THE COURT:  All right, take a short recess.

8       (Recess.)

9       THE COURT:  I don't know what we are going to do with

10  these findings, but here is a rough draft that I am going

11  to suggest we add to Mr. Sachse's findings.  I will pass it

12  out to counsel.  It is not artfully drawn, but you will get

13  the idea of what I am talking about.  You may look it over

14  tonight and we will talk about it in the morning.

15      What do we have next on the agenda?

16      MR. VEEDER:  Riparian use and military use.  Have you

17  read Mr. Girard's offering, your Honor?

18      THE COURT:  Yes sir.  I suppose you adopt it in toto,

19  do you, Mr. Veeder?

20      MR. VEEDER:  I wouldn't adopt anything in toto, your

21  Honor, but I assure you that I think Mr. Girard is in full

22  agreement with the United States of America.  I couldn't

23  improve on what he said.  Let me say it that way.

24      THE COURT:  That is being a little more generous.

25      Well, do you want to be heard further on that?  We have

P 48

1   argued it and talked about it, etc.

2        MR. VEEDER:  We have nothing further.

3        THE COURT:  These things have got to be decided.  I am

4   willing to decide it right now.  I will decide it in accord-

5   ance with Mr. Girard's memorandum.  I don't know how I could

6   do anything else, with the state of the law that is not too

7   well settled.  Contrary to Mr. Veeder's attitude and state-

8   ments a time or two that I was apparently out to scalp the

9   Marine Corps, I don't know how I could do anything else but

10  find that military use is a proper riparian use and that

11  on appeal if that was decided adversely then that would have

12  to be it.  I think Mr. Girard's memorandum was excellent and

13  I think he draws the distinction shown by those cases.

14        Do you want an interlocutory judgment on military use?

15        MR. VEEDER:  We would like to have that, yes, your Honor.

16        THE COURT:  You could prepare that pretty shortly,

17  couldn't you?

18        MR. SACHSE:  Your Honor, an interlocutory judgment on

19  military use, if I understand Mr. Girard's brief correctly

20  the whole principle of Mr. Girard's argument was that it

21  would be wrapped up in a statement that military use can be

22  a proper riparian use.  In other words, this couldn't be a

23  judgment, just a statement of a conclusion of law.  Are you

24  contemplating a set of findings on whether the present use

25  is or is not reasonable?  That would be the critical question,

P 49   1    I think, if we are going to draw findings.  Am I not correct

2    in my analysis of Mr. Girard's brief that that is what his

3    position was -- that military use could be a proper riparian

4    use?  The question is one of reasonableness.

5        MR. GIRARD:  That is correct.

6        MR. STAHLMAN:  I think there is another situation that

7    has a bearing on it, and that is that we should look forward

8    as to whether or not in the future there is an apportionment

9    and the basis upon which that would be.  In other words,

10   your determination as to the manner in which division would

11   be made between military use and other uses on the stream,

12   whether that theory advanced by Judge Yankwich of substitute

13   use would be put into play or what the measure would be.

14       THE COURT:  I don't think we cross any bridges on

15   apportionment at this time.

16       MR. STAHLMAN:  If we don't, then I think --

17       THE COURT:  Go ahead, Mr. Girard.

18       MR. GIRARD:  I was going to say on the findings etc.,

19   I have been doing a little work in Sacramento, as requested

20   by the Court at the last hearing, and intend to do a lot

21   more here next week.

22       On the findings which concern themselves solely with

23   the United States over-all, I think a finding, or conclusion

24   as Mr. Sachse indicated, I could work that in there on this

25   to the effect that this Court does not make a finding at this

P 50

1   time whether military use is or is not proper -- is or is not

2   reasonable, put it that way, at this time.  I think that

3   issue has to be faced, as Mr. Sachse stated, when and if it

4   is contended by the United States that an allocation or a

5   cut-back is going to occur.

6        THE COURT:  In other words, your proposed conclusion

7   would be that a military use is a proper riparian use.

8        MR. GIRARD:  If it is reasonable under all of the

9   circumstances.

10        THE COURT:  The question whether the use made by the

11  military on the Government Reservation is reasonable is not

12  now before the Court because there is no matter of apportion-

13  ment requested.

14        MR. GIRARD:  That is correct.

15        THE COURT:  That at such time as apportionment would be

16  requested it would be necessary then to find the number of

17  military situated on the base and the uses made at that time.

18  There is no reason to believe that they would be the same

19  as the uses now made.

20        MR. GIRARD:  You would have to look at the facts as they

21  existed at that time.

22        THE COURT:  Is that satisfactory, Mr. Veeder?

23        MR. VEEDER:  I believe the rule of law is this, if I

24  may state it in our own terms, as we argued to you before,

25  that the whole question of reasonableness has to be ultimately

P 51

1   determined if there is a contest between riparians; but that

2   as a matter of law, a military use is a proper riparian use,

3   and I think that you could decide today.

4       THE COURT:  That is what I am deciding.

5       MR. VEEDER:  All right.

6       THE COURT:  And that is exactly what Mr. Girard is

7   talking about.  But that we don't cross the bridge as to

8   whether this military use, the extent of it, is reasonable

9   in connection with other riparians until we have a problem

10   presented on apportionment.

11      MR. VEEDER:  And you will presume that our present uses

12   are reasonable, in the absence of facts to the contrary.

13      MR. STAHLMAN:  What is the reason for making such a

14   presumption at this time?

15      THE COURT:  It doesn't add anything.

16      MR. GIRARD:  It should be emphasized also that this

17   question of military use would be valid against any prior

18   upstream right.

19      MR. VEEDER:  It is a paramount right.

20      MR. GIRARD:  In other words, if the United States --

21   and I only put this in/a surmise -- if it were contended

22   that twenty years from now their military use was not a

23   reasonable riparian use, they could not enjoin even an

24   appropriator, let alone a riparian.

25      THE COURT:  What was that?

P 52

1    MR. GIRARD:  If twenty years from now, the United States,

2    for example, tried to enjoin Vail or Fallbrook from storing

3    water under their permits on the basis that their riparian

4    right was not being satisfied at that time, if you were to find

5    that their present operation, the military base, was not a

6    reasonable riparian use, you couldn't enjoin the appropriator,

7    let alone the riparian.

8        MR. VEEDER:  Why take that additional step now?

9        THE COURT:  Let's see if I understand you, if our

10   thinking is alike.  I am prepared to hold that military use

11   is a proper riparian use.  Now the only question that is

12   open is, what is the extent of this use?  Have they got

13   200,000 people camped on the mesa and supplying them all

14   with water and demanding, therefore, a riparian use of a

15   riparian right sufficient to satisfy the whole 200,000?  Or

16   have they got 10,000 men up there and they are demanding

17   water correlatively with other riparians?  In other words,

18   the only thing that is open is the extent of the use and

19   the extent only becomes material when you get down to a

20   question of apportionment and where you try to say to some

21   farmer upstream, "You have got a right to irrigate a thousand

22   acres, but we are now short of water.  You are going to have

23   to cut yourself down to 500."  And the question is, what

24   are going to say as to the military?  How much use can they

25   make?  Are we thinking about the same thing?

P 53

1    MR. GIRARD:  I see your point, your Honor?  I didn't

2    see it before.

3    I am sure Mr. Sachse is thinking primarily about the

4    military use outside the watershed.  That, of course, we

5    concede is not a proper riparian use.

6    THE COURT:  Right.

7    MR. GIRARD:  And under those circumstances the United

8    States could not enjoin an appropriator.  But if the military

9    use is a proper riparian use within the watershed --

10   THE COURT:  Right.

11   MR. GIRARD:  Then I believe they probably, being senior,

12   could enjoin an appropriator.

13   THE COURT:  Right.

14   MR. GIRARD:  Maybe you don't agree with that, Franz.

15   Of course, Franz doesn't agree with the basic premise.

H -2
16   MR. SACHSE:  I don't agree with the basic premise.  I

17   am not going to debate the matter further.  You have given

18   your opinion, and I concede, frankly, that the law is not

19   conclusive.

20   THE COURT:  I distinguish, first, between use in and

21   outside the watershed.  I don't think there is any argument

22   about that.  I don't care whether you call it military or

23   agricultural use, use outside the watershed is not a proper

24   riparian use.  A military use within the watershed, I am

25   prepared to hold, is a proper riparian use.  And we don't

P 54

1    cross the bridge as to how extensive a use can be made by

2    the military of this riparian right until we have presented

3    a question of apportionment and what other claims and demands

4    on the stream are.  I don't think the law is that any one

5    riparian can take all the water, whether his use is military

6    or agricultural.

7        MR. SACHSE:  I differ with what Mr. Girard said and with

8    what you stated to this extent -- and I realize we are

9    borrowing trouble in anticipating here -- the question of

10   reasonableness not only, your Honor, on apportionment.  If

11   we can visualize the motion for injunction of two weeks ago,

12   when I reviewed for your Honor what is the initial responsi-

13   bility of the party seeking the injunction, and let us say it

14   was the riparian right, not the appropriative right for the

15   moment, on which the United States sought the injunction.

16   It is the burden of the party seeking the injunction to

17   show that the use to which he will put the water, if it comes

18   down, is reasonable.  So I think your Honor and Mr. Girard

19   are both in error, with due respect, when you say that this

20   can only arise between riparians on a question of apportion-

21   ment.

22       THE COURT:  That is right.  We are using "reasonable"

23   in two different senses.  I am prepared to hold today that

24   a military use is a proper riparian; that it is a beneficial

25   use; and that in the sense that it is necessary to say

P 55

1    whether abstractly it is a reasonable or unreasonable use I

2    am prepared to say that it is a reasonable use.  Now

3    "reasonable" in the other sense, in the sense of apportion-

4    ment, referring only to amount, would arise only when we had

5    an apportionment.

6         But right or wrong, I am prepared to say that a military

7    use is reasonable and is beneficial.

8         And I think the findings should also show a finding as

9    to the return to the watershed of sewage effluent.  In so

10   far as we can apportion any of that to uses made within the

11   watershed, it wouldn't do any harm to throw in the return of

12   the fluid from areas outside the watershed.

13        MR. VEEDER:  That will all be in the findings -- the

14   sewage?   May I have that last read.

15        MR. STAHLMAN:  I don't want to complicate this further,

16   but when you say "military" what do we mean by "military"?

17        THE COURT:  The findings will have to show that.  That

18   this is an establishment operated by the Government; it is

19   not a city lot proposition as in a municipality.  The find-

20   ings would have to show as to what the waters are being used

21   for -- for personnel on the base, for use on vehicles.

22        (The reporter read for Mr. Veeder the portion of the

23   Court's comments as follows:  "And I think the findings

24   should also show a finding as to the return to the watershed

25   of sewage effluent.  In so far as we can apportion any of

P 56

1   that to uses made within the watershed, it wouldn't do any

2   harm to throw in the return of the fluid from areas from

3   outside the watershed.")

t-43
I-1

1    MR. STAHLMAN:  And housing projects, and so forth.

2    THE COURT:  And for housing projects.

3    MR. VEEDER:  I would like to raise a point now that

4    these housing projects have been referred to.  Our view on

5    this, your Honor, -- and I am pleased with your ruling, but

6    I am saying that everything is a military use on the Camp

7    other than the water that is actually sold by the United

8    States for agricultural purposes.  I think that is the only

9    approach we can take.  I think everything else is military.

10    THE COURT:  Aren't your housing projects outside the

11    watershed?

12    MR. STAHLMAN:  No, they are within the watershed, your

13    Honor.

14    MR. VEEDER:  The De Luz housing is within the watershed,

15    your Honor.

16    THE COURT:  Well, as to the De Luz housing, none of

17    those people own the houses, but the houses are owned by the

18    United States, aren't they?

19    MR. SACHSE:  Oh, your Honor, on the Wherry housing

20    projects, they are not.  They are taxed by the State of

21    California.  Under a fairly recent decision the De Luz-Wire

22    Mountain homes were taxed as to a possessory interest, and so

23    on.  They are a private enterprise.  Built with Federal funds

24    or guaranteed by the Federal Government, yes.

25    MR. VEEDER:  It is military personnel and military

16,525

t-44

1   dependents though that are using the water in that area is

2   what I mean.

3       MR. SACHSE:  So does a military dependent use the water

4   when they are living in a house in Fallbrook, but I don't

5   think that makes the Fallbrook use a military use.

6       MR. GIRARD:  The finding will just state what exists, and

7   not refer specifically to military use, but will say that the

8   soldiers are quartered there, and that.

9       THE COURT:  You will have to start it out that way.

10      MR. SACHSE:  I would strongly urge that, your Honor,

11  because if there is anything that I discovered in my study

12  on this brief, and I would like to repeat it again, it is

13  the fact that the only reported case that has ever used the

14  words, "Military use" is this case, the several reports in

15  this decision.  It is not a word of law.  I think we are on

16  very dangerous ground when we use it as a generic term, and

17  I think that it is just a broad term.

18      THE COURT:  Let's try it out and see how it looks on

19  paper.  This is a part of thefindings you are working on

20  on behalf of the Government?

21      MR. GIRARD:  That is correct, your Honor.  I will try to

22  get it all included in there.

23      THE COURT:  Is there anything further on this matter?

24      MR. SACHSE:  Nothing for me.

25      MR. GIRARD:  Nothing from me.

t-45

THE COURT:  No. 3 we have passed until tomorrow morning so that Mr. Veeder can --

MR. SACHSE:  That isn't 3, your Honor.  The one you are passing until tomorrow morning is 10.

MR. STAHLMAN:  No. 3 has all been finished.

THE COURT:  Yes.  Have you looked it over, Mr. Veeder?

MR. VEEDER:  What is that now?

THE COURT:  No. 3 is the findings on the stipulated judgment.

MR. VEEDER:  Your Honor, I reserved the right, of course, to make objections.  Your Honor has made revisions in accordance with your comments on the day that we went through the final draft.

MR. STAHLMAN:  And you have the copy Mr. Girard drew with the corrections.

MR. VEEDER:  And they are reflective of the changes that were made, but as I pointed out as we went along on that day--

THE COURT:  You have preserved your objections.

MR. VEEDER:  Yes.

THE COURT:  But isn't it a fact that the revision made by Mr. Girard pretty well reflects the discussion that we had?

MR. VEEDER:  They reflect what your Honor said at that time.

THE COURT:  Then I propose to sign it.

MR. GIRARD:  What number is it, your Honor?

t-46

1    THE COURT:  That would be No. 25.  Does anybody have

2    anything else to say about my signing it?

3        (No response.)

4    THE COURT:  Under our local court rules you don't have

5    to put in the signature three times.  You put in your findings,

6    put in your conclusions, and   put in your judgment all under

7    one signature, but there is no harm here, and I have signed

8    it three times.  If you have an extra copy for the Clerk, let

9    us have it.

10    MR. GIRARD:  Yes, I have some copies here.

11        (The copies were handed to the Court.)

12    MR. VEEDER:  That was No. 25, your Honor?

13    THE COURT:  No. 25.  We will interrupt a minute here and

14    call a criminal matter.

15        (Another case called.)

16    THE COURT:  All right.

17    MR. GIRARD:  On the next item, your Honor, so far as

18    Oviatt and Knox are concerned, I served counsel today with

19    amended copies of the findings of fact, conclusions of law

20    and interlocutory judgment as to Oviatt and Knox.  I think

21    the changes in the draft I submitted incorporate all the

22    suggestions by Mr. O'Malley and Mr. Anderson.

23        I talked to Mr. O'Malley on the phone, and told him what

24    I had done, and he stated that I should advise the Court that

25    so far as he was concerned it could be signed insofar as

16,528

t-47

1  Oviatt, subject, of course, to the fact that the does not

2  waive his right to always contend that he had a prescriptive

3  right.

4          THE COURT:   I understand.   He is going to a hospital.

5          MR. GIRARD:   I talked to him yesterday, your Honor.

6          THE COURT:   I called him also, and told him that I was

7  going to overrule his prescriptive rights, and we would adopt

8  his suggestions.

9          MR. GIRARD:   I think his suggestions are adopted word

10  for word.   I   did change slightly the suggestion of Mr.

11  Anderson.

12          In his suggestion on Paragraph V he says something to the

13  effect that the water is stored the year around, and I put

14  it in to say that, "It is true that said water is diverted

15  into said reservoir continually throughout the year . . ."

16          In other words, I think the diversion is yearly, and

17  the storage is for head purposes.

18          THE COURT:   I think that is what he meant.

19          MR. GIRARD:   I think that is what he meant because if he

20  meant otherwise --

21          MR. VEEDER:   Let me catch up on that.   Just exactly where

22  are you reading from now?

23          MR. GIRARD:   I am reading from Paragraph V of the

24  Anderson findings.

25          MR. VEEDER:   Of the Anderson findings?

t-48

MR. GIRARD:   I mean of the Knox findings.   Now, Mr. Anderson submitted his proposed findings, Mr. Veeder, if I can find them here, --

MR. VEEDER:   Oh, we are no longer on Oviatt?   That is the only thing I want to make sure of.

MR. GIRARD:   No, we are not.   Mr. Anderson submitted on behalf of Mr. Knox a proposed finding V which stated as follows, going down to Line 21, where he said, "And that storage is year around and is not seasonal."   I changed that to state, "that said water is diverted into said reservoir continually throughout the year and is stored in said reservoir for purposes of obtaining a head for irrigation and that said storage is not seasonal."

In other words, I think his finding had that ambiguity, and I think mine takes care of it.

MR. VEEDER:   "That storage is year around/not seasonal"?

MR. GIRARD:   I knocked that out.

MR. VEEDER:   You knocked that out?

MR. GIRARD:   I knocked that out and put in that diversion is continuous throughout the year.

I-2

MR. VEEDER:   Is that actually the situation?

MR. GIRARD:   I believe it is.   I believe that is what the witness testified to.

Now, I haven't heard from Mr. Stark at all.   At the last hearing I believe he said he was going to have to me this week

16,530

t-49

1   or last week the findings to go over, or copies of his

2   suggestions on the findings that I drew, but I haven't heard

3   from him at all on Gibbon and Cottle.

4       THE COURT:  Let's take Oviatt now.  Is there any objec-

5   tion to signing the Oviatt findings?

6       MR. SACHSE:  Not from me.

7       MR. GIRARD:  Not from me.

8       THE COURT:  Mr. Veeder?

9       MR. VEEDER:  No.

10      THE COURT:  It will become Interlocutory Judgment No. 26.

11      Who will take the responsibility of seeing to it that

12   copies of this go out to Mr. O'Malley and to the various

13   attorneys who have appeared in this case?

14      MR. GIRARD:  I have sent them to Mr. O'Malley, and I

15   have also sent them to Mr. Stahlman, Mr. Veeder, Mr. Sachse,

16   and Mr. Stark.  The people I sent it to are in the record in

17   the affidavit.  I sent Mr. O'Malley a corrected copy last night.

18      MR. VEEDER:  Did I understand your Honor's inquiry to

19   be, should we send these to all parties, to all counsel?  Is

20   that what you are asking?

21      THE COURT:  That is what I am thinking about.

22      MR. VEEDER:  I think that is a good idea.  I have talked

23   to quite a number of counsel, and they like to receive copies

24   of the material that is being issued.

25      THE COURT:  You have extra copies, Mr. Girard, do you

16,531

t-50  1    not?

2         MR. GIRARD:  Yes, I believe I do, your Honor.

3         THE COURT:  As to those where you have sent this out and

4    there have been no changes, you could merely drop them a

5    letter and say that the Court today signed Interlocutory

6    Judgment No. 26, the Oviatt judgment, without change, and they

7    have copies of it, so far as they are concerned.

8         MR. GIRARD:  I take it that does not apply to Court and

9    counsel in court now?

10        THE COURT:  What do you mean?

11        MR. GIRARD:  Mr. Veeder, Mr. Sachse and Mr. Stahlman.

12        THE COURT:  No.  They are present here and they have

13   copies.

14        MR. GIRARD:  Mr. Veeder, if I can ask to have your

15   secretary give me the names and addresses of counsel in this

16   case?

17        MR. VEEDER:  There are 101.

18        MR. GIRARD:  I don't have them .

19        MR. VEEDER:  Yes, we have them.

20        THE COURT:  101?

21        MR. VEEDER:  I didn't hear what you said.

22        THE COURT:  Do you want to send them out to all of them?

23        MR. VEEDER:  No, we don't send them to all of them.  Some

24   of them have not participated for a good long while, but there

25   are about 40 or 50 who have been active in one way or another

t-51

1   in this litigation, and we have sent them the material that

2   we have, of what the United States has filed, and what has

3   been done, and they have said that they appreciated receiving

4   it.

5       THE COURT:  What is the name of the Oviatt ranch?

6       MR. STAHLMAN:  Ramona.

7       THE COURT:  Ramona, and what else?

8       MR. GIRARD:  It is in the first finding, your Honor.

9       MR. STAHLMAN:  And Oak Grove.

10      MR. GIRARD:  Rancho Ramona, Oak Grove, and also the

11  Bailey Ranch.

12      MR. STAHLMAN:  Do these have to be filed under the ground

13  rules that your Honor established about leaving so many

14  copies in the Clerk's office?

15      THE COURT:  How many copies do you have available?

16      MR. GIRARD:  I only had seven, your Honor.  I had to

17  have my secretary do this yesterday morning.

18      THE COURT:  You have already sent this to most of

19  counsel who have participated here.  Who else is on this

20  list?  Well, you can check with Mr. Veeder on the list.

21      MR. VEEDER:  We have the list in my office, and it is

22  available.

23      MR. GIRARD:  All right.  I will have more copies made.

24      THE COURT:  Then let's take up the Knox findings.  Did

25  you understand what Mr. Girard was talking about on Page 2,

t-52

1  Paragraph V?

2      MR. VEEDER:  Yes, certainly, your Honor.

3      THE COURT:  Is there any objection to the Knox findings?

4      MR. GIRARD:  I might add, your Honor, I haven't

5  communicated with Mr. Anderson further.

6      THE COURT:  I haven't either, but I am sure that was his

7  understanding, and whether it is his understanding or not,

8  if he can talk about a continuous storage, he hasn't got that

9  right, and if it is a seasonal storage, he has, so I see no

10  problem there.  So it will become Interlocutory Judgment No.

11  27, and the Court will sign it.

12      It is possible, Mr. Girard, if you need only a few

13  additional copies that the Clerk can run it off on his machine

14  for you, -- copies of the Oviatt and Knox judgments.

15      MR. GIRARD:  All right.

16      THE COURT:  I would like to get them mailed out to those

17  counsel who had any real participation in this case.

18      MR. GIRARD:  Yes, your Honor.

19      THE COURT:  Mr. Clerk, here are the Knox findings.

20      (The document was handed to the Clerk.)

21      THE COURT:  What is this Allen matter?

22      Well, before we leave   Knox, what is the name of his

23  ranch?

24      MR. GIRARD:  Sunnybrook.

25      THE COURT:  Sunnybrook.

t-53

1     MR. VEEDER:  And we have been carrying this Stardust

2     on here, your Honor.

3     MR. SACHSE:     I don't believe that is the proper

4     designation.  There are separate findings as to Wilson Creek

5     which have never yet been finished.

6     THE COURT:  Are they a part of Wilson Creek?

7     MR. SACHSE: Yes.  And the way Mr. Veeder was writing

8     them, he stuck in all the land owners, big and little.  Now,

9     we have come down to one of them, who would be in the --

10    MR. VEEDER:  Franz, I don't think there is any dis-

11    agreement about this.

12    MR. SACHSE:  I just want to be sure that it is going to

13    be in the Wilson Creek.

14    MR. VEEDER:  It has to be in the Wilson Creek, because

15    we start at the headwaters and go down to the Vail Ranch.

16    MR. SACHSE:  We have agreed on the --

17    MR. VEEDER:  I thought they would be consolidated in the

18    Wilson Creek and Lancaster Creek.

19    MR. SACHSE:  Then we can eliminate the Stardust matters

20    here now.

21    MR. VEEDER:  That suits me.  I just wanted to be sure

22    that we are covering it.

23    THE COURT:  How about Wilson Creek?  How are we coming

24    on Wilson Creek?

25    MR. VEEDER:  Wilson Creek is done, your Honor.

16,535

t-54

1　　THE COURT:  Has it been lodged?

2　　MR. VEEDER:  No, but this concludes -- correct me on

3　this, Franz, if I am in error -- I think this concludes the

4　full length of Wilson Creek now that you have approved the

5　Oviatt findings.  I think there is a continuous ownership

6　throughout the entire Wilson Creek area.

7　　THE COURT:  Plus Coahuila and Anza Valleys?

8　　MR. VEEDER:  And Coahuila and Anza Valley.  We are

9　preparing separate findings on those, and they will be

10　tendered to you.

11　　THE COURT:  Then are you in a position to take Wilson

12　Creek, to get it dressed up, and have it lodged so that we

13　can look it over?

14　　MR. VEEDER:  We are prepared now to put Wilson Creek in

15　final form, and to put in the names of all owners along the

16　full length of that stream.

17　　THE COURT:  Now, No. 5 on the list is  for May 2nd.

18　　MR. STAHLMAN:  May 2nd.

19　　THE COURT:  I think that is at Mr. Krieger's request.

20　　MR. VEEDER:  I don't know whose, but somebody's request.

21　　THE COURT:  Mr. Krieger.

22　　MR. VEEDER:  I think Mr. Krieger wants this for May 2nd,

23　but I think this:  That maybe Mr. Stahlman would want to

24　talk with me about these findings before May 2nd, because

25　Mr. Krieger is extremely busy and will not be down until May

t-55  1  2nd.

2       MR. STAHLMAN:  Where do you have them?

3       MR. VEEDER:  I am working on them now.  You will be in

4  tomorrow, won't you?

5       MR. STAHLMAN:  Oh, yes, sure.

6       MR. VEEDER:  There is a point I think we ought to

7  bring up on this, and it is related to No. 6.  Mr. Girard at

8  one time expressed his opinion that the Murrieta Basin would

9  be considered a stream, an underground stream.  It would be

10  helpful if anyone has any further thinking on that, because

11  Mr. Krieger and I went over that matter, and he and I didn't

12  come to an agreement to treat it as a ground water stream.

13       I expressed my view on it,   that it was a body of

14  water-- a ground water body which was in effect a basin,

15  and in fact a basin similar to the situation in the San

16  Fernando Valley which was litigated in several of the Los

17  Angeles cases.

18       MR. STAHLMAN:  I don't know if you can draw that

19  comparison.

20       MR. VEEDER:  That is what I am kicking around here, if

21  somebody has some ideas on it.

22       MR. STAHLMAN:  Mr. Mann has sort of given his opinion

23  of the area, as he testified to here today, and I think that

24  throws some light on what we have down there in relation to

25  what the facts are from your own witness, and particularly

16,537

t-56

1    on the geology of the State, where you have a situation

2    where the continuity may exist in some form, but that the

3    transmissability is deminimus, and you don't recharge the

4    one area.   It may be that if you included it at this time,

5    you may get yourself into difficulty by putting into the same

6    pot your overlying owners and your riparian owners.

7         THE COURT:  Here are six more copies of the stipulated

8    judgment, Mr. Girard.  The Clerk will put his stamp on those

9    and give those to you.

10        Now, have we done enough for today?

11        MR. STAHLMAN:  Yes, sir.

12        THE COURT:  We haven't resolved this yet, I know.

13        MR. VEEDER:  I brought it up because I would like to

14   have any thoughts that they have on it.

15        MR. STAHLMAN:  I think we ought to kick it around a

16   little.

17        MR. SACHSE:  I think there is a lot to it, your Honor.

18        THE COURT:  How are you coming on Domenigoni Valley?

19        MR. SACHSE:  I would like just a word on that before we

20   adjourn, your Honor.

21        I think we are at another one of those impasses where

22   Mr. Veeder or I, one or the other of us, is not understanding.

23        MR. VEEDER:  What is the problem?

24        MR. SACHSE:  My question is simply this:  I prepared

25   and submitted findings which I headed "Diamond and Domenigoni

t-57

1 Valley" but as your Honor is well aware, my only clients

2 were Garbani and Searle. So my findings, while they purport

3 to cover the geological question which would be applicable

4 to all landowners, I don't know anything about these other

5 defendants and I haven't talked to them. So, we were trying

6 to submit findings on the geological question, and then I

7 assumed that Mr. Veeder would have to pick up the findings

8 and bring in the other ranches, because I don't know anything

9 more about them.

10 MR. VEEDER: If that is what he wants done, we will do

11 it.

12 THE COURT: That is what I thought we were going to do,

13 because the last time we met we put in evidence the record

14 of the ownerships.

15 MR. SACHSE: So I left Paragraph VII so that you can

16 run it for 20 pages, if you want to, to put in all those

17 parties.

18 THE COURT: Will you have any of these ready to submit

19 tomorrow?

20 MR. SACHSE: I think we can take a quick look at

21 Domenigoni Valley.

22 THE COURT: If not, I can give you some time off to work

23 on some of them.

24 MR. VEEDER: I think that we should, your Honor. We

25 have  Tucalota Creek in form, and we have Coahuila Creek

16,539

t-58

1    far enough along so that we could get those in shape.

2         THE COURT:   Suppose we meet here at 10:00 o'clock

3    in the morning and see.   Maybe we will put you to work on

4    some of these matters.

5         MR. STAHLMAN:   Your Honor, we are rapidly coming to the

6    end of this case.

7         THE COURT:   We are making progress.

8         MR. STAHLMAN:   We are.   At one time I thought we would

9    never get there.

10        (Whereupon, at  3:50 o'clock p.m., Tuesday, April 25, )
         (                                                      )
11       (1961, an adjournment was taken until 10:00 o'clock  )
         (                                                      )
12       (a.m., Wednesday, April 26, 1961.                     )

13

14                        — — —

15

16

17

18

19

20

21

22

23

24

25

P 3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
vs.                             )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY DISTRICT,)
                                )
et al,              Defendants. )

- - -

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are,
and on the date herein involved, to wit:  April 25, 1961,
were duly qualified, appointed and acting official reporters
of said Court;

That as such official reporters we did correctly
report in shorthand the proceedings had upon the trial of
the above entitled case; and that we did thereafter cause
our said shorthand notes to be transcribed, and the within
and foregoing 115 pages of typewritten matter constitute a
full, true and correct transcript of our said notes.

WITNESS our hand at San Diego, California this 25th
day of April, 1961.

_John Swader_
Official Reporter

_Marie B. Zellner_
Official Reporter