# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                       Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

                       Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      **April 27, 1961**

Pages:     **16,563 to 16,601**

*FILED*

SEP 24 19 3

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

16,563

t-1

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>FALLBROOK PUBLIC UTILITY<br>DISTRICT, et al.,<br><br>    Defendants. | No. 1247-SD-C |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, April 27, 1961

- - -

APPEARANCES:

  For the Plaintiff:      WILLIAM H. VEEDER, ESQ.,
                   Special Assistant to the
                   Attorney General

                   CDR. DONALD W. REDD.

  For the Defendants:

   Vail Company        GEORGE STAHLMAN, ESQ.

   Fallbrook Public Utility   FRANZ R. SACHSE, ESQ.
   District, et al.,

   STATE OF CALIFORNIA    FRED GIRARD, ESQ.

MARIE G. ZELLNER, OFFICIAL REPORTER

16,563 (a)

<u>INDEX</u>

(No witnesses)

<u>INDEX TO EXHIBITS</u>

| For the Defendant | Identified | Received |
| --- | --- | --- |
| Exhibit BJ-1 which corrected Exhibit BJ. | 16,599 | 16,599 |

16,564

SAN DIEGO CALIFORNIA, THURSDAY, APRIL 27, 1961, 10:00 A.M.

- - -

THE CLERK:  Number 1, 1247-SD-C, United States versus Fallbrook.

MR. VEEDER:  Your Honor, I have been working with Mr. Sachse in regard to the Sandia findings, and I brought to his attention a situation that I think points up one of the biggest problems we have in this litigation, and if I can refer to a copy of Exhibit 212-C -- this is our office copy on the board, but we have it so that you can see the problems presented.

THE COURT:  212-C, I will look at it later.

MR. VEEDER:  In any event, we now have engineering reports on the Vail Ranch in the Sandia watershed, we have engineering reports on Mr. Yackey's property, we have engineering reports on the Sawday property, and the Fall-brook Public Utility District for practical purposes owns the rest of the watershed, sub-watershed.

MR. SACHSE:  Of the riparian watershed.

MR. VEEDER:  I didn't hear that.

MR. SACHSE:  Of the riparian watershed.

MR. VEEDER:  That is correct.  Mr. Sachse has asked for a finding to the effect that there is data in the record which would support a determination as to the respective rights of the riparians in that sub-watershed.

I pointed out to him in our conversations, and I have also asked him to be prepared to respond to the things I am saying so that you can see the problems with which we are confronted, -- it has been pointed out that there is far, far more riparian land than there is conceivable water for it; that from our standpoint we believe that a declaration could be made on this matter that the riparian acreage is such that except in most extraordinary years there would be no water over and above the demands of those riparians.

I believe, moreover, that on the basis of the data that we have from the standpoint of hydrology, it would be necessary that a finding be entered that there is no repetitious pattern of runoff and for that reason -- may I start again -- that based on the fact that there is no repetitious pattern of runoff, there could be no allocation under those circumstances.

Your Honor has used the term in the past "illusory riparian rights," and I believe that this would be the point where such a finding would be entirely appropriate, and that only those lands that are now irrigated  probably ever would be irrigated in that watershed from Sandia Creek.

Is that correct?  Is there a possibility of further irrigation, Mr. Stahlman?

MR. STAHLMAN:  My engineer tells me there is.  I presume

16,566

he has reported out the situation that exists.

THE COURT:  I can't hear you.

MR. STAHLMAN:  Pardon me just a moment.  Mr. Wilkinson says it is not proper to assume that it never would occur.

MR. VEEDER:  On the basis of the data we have, and Colonel Bowen has made four reports, or, in fact, he has made five reports, including the Vail property, so I believe we have complete information on the watershed of any possible riparian uses, and in the light of Mr. Sachse's proposed finding, which I will read to you, we are in need of some direction from your Honor right now.

MR. STAHLMAN:  Pardon me.  Mr. Veeder, in order to clarify what we are talking about, there is some surface flow on that creek.  Are you aware of that?

MR. VEEDER:  Yes.  I will put in an additional fact that I would like to have you consider, your Honor.  The stream is perennial in some places; that is, on the Vail Company's Ranch there appears to be an area where there is a perennial stream rising, if your Honor will look at Exhibit 69.  It also appears to be perennial commencing at a point in Section 25, 8 south, range 4 west.

16,567

t-5
B

1    However, the information that I have is that the

2    runoff is very meager there, in the perennial stage.

3    Is that correct, Mr. Wilkinson?

4    MR. WILKINSON:  That is correct.

5    MR. STAHLMAN:  One question, Bill.  Do you recall what

6    the testimony was as to what the extent of the younger

7    alluvium is in this area?

8    MR. VEEDER:  The facts are these on that.  The stringer

9    of younger alluvium extends a distance of perhaps five and

10   a half or six miles.  The younger alluvium is shallow.  It

11   is on basement complex or overlying residuum.  And we have

12   stated that, in our view, while the ground water in that

13   stringer  -- the balance of the ground water would not be

14   part of the Santa Margarita system.

15   THE COURT:  The ground water would not be part?

16   MR. VEEDER:  With the exception of that in the stringer.

17   THE COURT:  With the exception of that in the stringer?

18   MR. VEEDER:  Yes.

19   So here is why I ask your Honor for some time on this.

20   Here is Mr. Sachse's proposed Finding No. 12.

21   MR. SACHSE:  Do you have the findings, your Honor?

22   MR. VEEDER:  Do you have a copy?

23   THE COURT:  Yes.

24   MR. SACHSE: It is No. 11 on Page 6 to which he is

25   referring.

16,568

t-6

1    MR. VEEDER:  "The evidence introduced at the trial is

2    insufficient to enable the Court to determine the extent of

3    the riparian rights to the land described in ~~Paragraphs~~ Pages

4    7 and 8 (it should be) of these findings,  . . . "

5    THE COURT:  It is in my copy.

6    MR. VEEDER:  ". . and upon such insufficiency of the

7    evidence the question of determining the proportion of

8    water to which such lands are now, or may be in the future,

9    entitled is left open as an undetermined issue which may

10   hereafter be determined in these proceedings upon proper

11   showing by any party to this cause, his heirs, successors

12   and assignees."

13   I will be candid with your Honor on that point.  We

14   have asked to the extent possible that your Honor chronicle

15   the rights.  I have said that, in our view, at least until

16   the time you ruled on the stipulated judgment, I saw no

17   reason for an apportionment because I didn't see how it

18   would do any good.  But I do believe we are at the point

19   now, at least as far as my knowledge of California law is

20   concerned, that we have run out beyond the point where

21   there has ever been any decision.  I think it is truly an

22   illusory situation where one looks at present developments

23   and sees the magnitude of, for example, the Vail Company's

24   properties.  And I think that you do have enough to make a

25   finding here that the riparian development on Sandia Creek

t-7

has gone as far as it can on the basis of available water supply, with the exception of the point of Mr. Wilkinson's ranch.

THE COURT:  This is Sandia Creek?

MR. VEEDER:  Yes, this is Sandia Creek in 69.

THE COURT:  And it runs in here, and another part comes in here?

MR. VEEDER:  Yes.

THE COURT:  There is a little creek up here above the Sawday.

MR. VEEDER:  That is right; that is Brian's Creek.

THE COURT:  That is not part of it?

MR. VEEDER:  Yes, that is Brian's Creek that comes down this way.  It goes in, I think, in the northeast quarter of the northeast quarter of Section 1.

THE COURT:  Now, the Fallbrook dam, of course, is below this?

MR. VEEDER:  Yes.

MR. SACHSE:  Just immediately below the confluence.

THE COURT:  And Yackey's permit is on this creek somewhere?

MR. VEEDER:  Yackey's permit is in Section 36.

MR. SACHSE:  36 and 25.

MR. VEEDER:  Yes, 36 and 25.

THE COURT:  So this, if you want to be honest about

1    what we are talking about, has impact upon the proposed

2    Fallbrook dam, it has impact upon Yackey's diversion and

3    permit, it has impact upon the future regulation that might

4    come up such as the application heretofore made for

5    injunction when we were talking about these tributaries

6    south of the gorge that contribute to the Santa Margarita.

7        MR. VEEDER:  You are right.  And in addition, it has

8    an impact on our Lake O'Neil, on which you have already made

9    a determination.

10       THE COURT:  Yes.

11       MR. VEEDER:  It is a genuine problem, but I think it is

12   the kind of thing where you could make a final determination

13   in regard to Sandia Creek which would be helpful to us.

14       THE COURT:  I don't have a copy of this 212 -- this is

15   a plat map -- the reason I couldn't find it.  But on how

16   much of this have you got a soil survey?

17       MR. SACHSE:  Your Honor, you just gestured.  That

18   whole thing isn't Sandia, you know.

19       MR. VEEDER:  No, it is not.

20       MR. SACHSE:  This is Sandia.

21       MR. VEEDER:  It is the Sandia sub-watershed.

22       We have an engineering report.

23       THE COURT:  Then the Sandia watershed --

24       MR. VEEDER:  Here is the Sandia watershed, your Honor.

25   It would be about five miles from the Vail Company's

t-9                                                                16,571

properties, and then it would cross over in Section 25-8-4,

about the center of that, and proceed directly south down

to its  confluence with Brian Creek to the northeast quarter

of one.

THE COURT:  The divide would be in here somewhere, I

take it.

MR. VEEDER:  That is right.  You are pointing to

Parcel 54, 58.

MR. SACHSE:  Actually, the divide is in Parcel 60

through the Sawday land.  Part of it is in the Sandia

watershed and part of it isn't.

MR. VEEDER:  The Sawday property is 60.  Yackey is 66.

THE COURT:  How much of this land in the watershed,

leaving out Vail, do you have soil reports on?

MR. VEEDER:  We have soil reports on Sawday, we have it

on Yackey, we have it on Vail.  I think it blocks out very

nicely.  I have those soil surveys here, your Honor.

THE COURT:  I can't visualize how much of this there is.

What about this land over in here?  Is this very rough?

MR. VEEDER:  This land here, with this unnamed

tributary, -- you are now pointing over here to Parcel 76

in part of Section 1.

MR. SACHSE:  It is undeveloped, your Honor.  I so

stipulate.

MR. VEEDER:  It is extremely wild country.  If it is

t-10                                                    16,572

riparian land, it is certainly of the character that you would call "illusory."

THE COURT:  What is your position, Mr. Sachse?

MR. SACHSE:  First, I believe that the statement contained in Paragraph 12 of the findings is the fact. Perhaps it is ineptly worded, but I think this is the fact -- that there is insufficient evidence for this Court to determine today the proportion of water to which any of such lands are now or may be entitled.

THE COURT:  Well, it may be an inaccurate apportionment, but was Mr. Veeder asking me to go that far, or merely making a statement that there was obviously water, any amount, in that stream only at times of rainfall and runoff, at which time it wouldn't be used, and that as far as there being sufficient water in this stream to satisfy the present existing riparian needs, there just isn't.

MR. SACHSE:  Of course, I don't believe that is the evidence today, because today there is surface water flowing, as Mr. Veeder pointed out, in places.  There is a very minor riparian use made by Vail for stock watering on Sandia watershed.  True, when Vail begins to irrigate on the stringers of alluvium this situation might arise. But it does not exist today.  This is not the fact today.

Furthermore, we have no evidence whatsoever of how much water is in this alluvium, how much might be extracted.

16,573

t-11

1    To me the real significance of this is not in

2    connection with this insignificant little watershed.  The

3    real significance of this Paragraph 12 is in its relation-

4    ship to what we are going to do elsewhere in this watershed.

5    That is why it is important.

6        MR. VEEDER:  Yes.

7        MR. SACHSE:  Mr. Veeder recognizes it -- as to how we

8    are going to face up to this problem.

9        It is my conception that your Honor could not, in any

10   sub-watershed, make a finding of the kind Mr. Veeder

11   requests, unless you have a great deal more evidence than

12   you have.  For instance, there has never been a gauge on

13   this stream, to the best of my knowledge.

14       MR. STAHLMAN:  In order to get myself oriented, what

15   is your proposed finding, Mr. Veeder?

16       THE COURT:  How do you word it?  Do you have anything

17   we can look at?

18       MR. VEEDER:  I have undertaken, first, to present to

19   you the problem, and as I told Mr. Sachse, I can't agree with

20   what he has suggested.  I am saying that we could have a

21   finding to the effect that there is no repetitious pattern

22   of runoff.  No one knows what the yield of this stream would

23   be, but it is known that the riparian acreage, except in

24   times of extraordinary flood, is far in excess of any

25   available water supply.  That is the finding that I think

16,574

will be totally supported.   I believe it is reflective of
the Vail situation.

I hope to spend some more time with Mr. Sachse today
in working up these things, but I couldn't see any reason
for going ahead further without a  direction from you.

THE COURT:  Would it be your purpose -- you understand
that that wouldn't be any apportionment.

MR. VEEDER:  No, it wouldn't be an apportionment.

THE COURT:  Would it be your purpose to try to run in
a similar finding in other watersheds?

MR. VEEDER:  I would not try to run something in.  I
think that would probably be the situation -- certainly in
the Coahuila area.  I think it is the situation on Warm
Springs Creek and on Túcalota Creek.

THE COURT:  The only value I see to it -- it still
would mean that you eventually would have to take a lot more
evidence before you could make an apportionment -- but
there would be this value.  If we had a set of findings on
this creek and we pointed out in the findings that the
large majority of this area of younger alluvium is on the
Vail property and that Vail has riparian rights and that
when you add the irrigable acres of Vail and the other
owners in this property, some general conclusions such as
you make, this would be the only apparent decent thing to
have of record -- if people go down in there and think they

16,575

are going to buy land and get water out on this area,
because there just isn't going to be water for them.  As a
matter of fact, if Vail starts to develop or use the water
out of that stream, my guess is that the people downstream
are going to be in real bad trouble.

c fls

16,576

C-1

Most of that water is probably coming out of that stringer of younger alluvium.

MR. SACHSE:  I think so.

THE COURT:  And Vail, with its tremendous acreage upstream, would have riparian rights.

MR. SACHSE:  That is right.

THE COURT:  And when they begin to make a reasonable use of the water upstream, these people downstream -- of course, they are entitled to water, but they are in trouble, bad trouble.  If we had a decree on this Creek sort of pointing out the danger signals, it might be very helpful to innocent purchasers who might come in here thinking they were buying ground where they had some substantial riparian rights.

MR. SACHSE:  Your Honor,  before Mr. Veeder discussed the finding -- I stated this before, and I will state it again-- it appears that if maximum riparian use were made of the water, there would probably be insufficient water in this watershed.

MR. VEEDER:  I would like to have it go even further than that, that there is insufficient water probably even to meet the Vail demands.

THE COURT:  I think we can get together on something in the broad terms which you use, and you can have the reporter prepare you a copy of it.

16,577

I think it should go further than you did, and I think it should point out that this stringer of younger alluvium runs through Sections 3, 24 and 25 of the Vail property, and a part of it is up in 12, and that no development has yet occurred there; in other words, pointing up these danger signs. And if you want it in general terms, I don't think either Mr. Sachse, or any of us are going to object.

If you are going to try to make it more specific, where it becomes some kind of an apportionment --

MR. VEEDER: No.

THE COURT: -- that is something else again.

MR. VEEDER: When we get through with this, I would like to hand the Marine Corps a decree which says: Basically and fundamentally, these are the exterior limits of the waters that you can expect, and with further development there is going to be an attendant reduction in the availability of water.

THE COURT: Mr. Veeder, I don't know what you are going to hand the Marine Corps, but if I were advising the Marine Corps, I would have to advise them that although they could have a pretty good claim to having water come down at times of rainfall and charge basins below, that so far as ever counting on any substantial amount of water out of Sandia Creek, they had better write it off, because when you take into account the Vail acreage as riparian, obviously the small

16,578

amount of water that would exist  in this younger alluvium,
with the lands between Vail and the confluence of the
Santa Margarita, and when you throw  the Santa Margarita in
as a riparian user, you are not going to have a right to
take the water from these people up there.

MR. VEEDER:  That is precisely what I want.

THE COURT:  And when you start to make some reasonable
apportionment, when you divide three by four, you haven't
got very much left.

MR. VEEDER:  I want it reflected in whatever findings
or decree we have, because anyone who has spent any time in
this Valley at all knows that  Sandia Creek is quite
representative of very many of the streams.

THE COURT:  Have I made a fair statement --

MR. VEEDER:  Yes.

THE COURT:  -- that so far as the Marine Corps is
concerned, they can't count on very much water except in
flood time out of Sandia?

MR. VEEDER:  I think that is the situation, but I
certainly want it reflected in our findings and in our
decree, and I hate to have --

THE COURT:  I thought you were going the other way,
that you wanted to give the Marines some kind of a decree
that would look as though they could count on some substan-
tial water out of the year around flow of Sandia.

1    MR. VEEDER:  To begin with, your Honor, I have a very

2    intelligent client in Colonel Bowen, and I would not try

3    that.

4    THE COURT:  Colonel Bowen, --

5    MR. VEEDER:  What I am trying to say -- excuse me, your

6    Honor.

7    THE COURT:  Colonel Bowen, with your knowledge of this

8    watershed, do you expect that the Marines could ever count

9    on very much water except in flood time out of Sandia?

10    COLONEL BOWEN:  You would have to define "flood time,"

11    your Honor, before I could answer the question.  I would

12    say that the only time that we could count on water out of

13    Sandia Creek is during or shortly after periods of high

14    precipitation which would contribute to runoff, which may

15    or may not be what you would call a flood.

16    THE COURT:  I will accept your modification.

17    COLONEL BOWEN:  Yes, sir.

C-2    18    MR. VEEDER:  That is what we are shooting for.

19    THE COURT:  Can't you get together then on this?

20    MR. SACHSE:  Before we do that, your Honor, may I

21    express my concern.  I think we can get together on this, but

22    I think we might as well face up to the problem.

23    I intend to argue for the concluding paragraph of the

24    judgment, Paragraph V, the last paragraph on the whole, and,

25    as I understand it, Mr. Veeder does not object to that, and

16,580

I think there must be some kind of a finding to support that.

MR. VEEDER:  Mr. Sachse, in view of what the Court has said, why don't you and I try to work out some language and make an approach to this problem?

THE COURT:  I don't see anything wrong with V, and I don't see anything wrong with a finding that supports that judgment, and also what Mr. Veeder is talking about.

MR. SACHSE:  Then I think we can get together.  I would like to add only one thing further, lest your Honor think or Mr. Veeder think that I have any particular pride in the authorship of the language of this particular paragraph, the language of XII.

It so happens that it was taken verbatim from something Mr. Girard dug up about three years ago that was in the archives.  He dug up the findings in the case of Bigelow vs. Mertz.  I had a purpose in using this express language in the findings, and the purpose was to try to smoke out what Mr. Veeder's future intentions are, which I don't know.

Bigelow vs. Mertz was an action where the plaintiff sued and requested an apportionment.  The Trial Court found the rights, found who was riparian and who wasn't and who had appropriative, but refused to apportion, and these were the findings.  They appealed, and the Appellate Court said that this is right, this is what a Court ought to do  when those facts exist.

16,581

1  THE COURT:  I don't see any  objection to the language

2  of this XII, plus this other matter.  In other words, we are

3  not making an apportionment.  Mr. Veeder agrees that if that

4  time ever comes he has to take additional evidence and has

5  to see what the situation is at that time, and by that time

6  there may be an entire change.  Vail may have developed land

7  upstream.

8  MR. VEEDER:  I just want it to be reflective of this,

9  and I want to protect the record as it appears today, that

10  basically and fundamentally there is a lack of hydrological

11  data upon which you could make a determination of a fair

12  supply from Sandia Creek.  That is one thing.  We have put

13  in all the evidence that there is.  We have undertaken to

14  do that.

15  THE COURT:  I think it is just a matter of semantics,

16  and that we agree in principle that we are not going to make

17  an apportionment.  We agree that the evidence is now

18  insufficient to make one.  We keep continuing jurisdiction.

19  But we do point out in a few findings the potential demands

20  on this stream as a warning to other people who may come in

21  here and buy, and as a caveat to Colonel Bowen's superiors

22  that except for times of precipitation and runoff, there is

23  not going to be much available.

24  MR. SACHSE:  Mr. Girard has just handed me this, and has

25  requested me to read it, and it suits me, and it may suit you,

Mr. Veeder:

> "It is true that due to the nature of the stream
> system itself there is insufficient water to irrigate
> all irrigable riparian land or even a substantial
> amount of such riparian land within the Sandia Creek
> watershed.  It is true that the evidence in this case
> is insufficient at this time to enable this Court to
> determine the proportion of water to which such lands
> are now or may/in the future entitled."

MR. VEEDER:  My only objection to that language is
that, simply stated, we have put into the record all of the
evidence that can be obtained and that is available for
presentation now.  We can't determine a firm supply in
Sandia Creek because there is no way of determining it.  But
we do say that there are claims on there, if exercised --

THE COURT:  Let's not be too technical.  I think we
are all agreed in principle, and let's sit down and get
something down in black and white to shoot at, and see if
you can work it out.

MR. VEEDER:  Thank you, your Honor.  That is what I
wanted to bring up this morning.

THE COURT:  Don't you think we are in general agreement,
Mr. Sachse?

MR. SACHSE:  This sounds pretty good to me.  I think we
are in general agreement.  I think Mr. Veeder now should

16,583

1   write it out, it will take only a minute, and I think

2   perhaps we can agree on it.

3        MR. VEEDER:  I will go ahead on that basis.

4        THE COURT:  Now, what else do you want to take up this

5   morning?

6        MR. VEEDER:  I have nothing more right now, your Honor.

7        THE COURT:  Have you got any other matters on the

8   subject of preparation nearing completion?

9        MR. VEEDER:  We are moving on Tucalota Creek, and on

10  the rest of them.

11       MR. GIRARD:  And I will have the findings on Anza and

12  the other Valley ready next Tuesday, your Honor.

13       MR. SACHSE:  Maybe we ought to talk about some exhibits

14  that should go in at this time, and that would help out.

15       MR. VEEDER:  I think I had better refer to our

16  conversation with Mr. Krieger.  Mr. Krieger has said that he

17  would not be prepared to come down today.

18       THE COURT:  Did he say when he would come down?

19       MR. VEEDER:  And he said he wanted to/me extensively
                                          talk to

20  on the telephone sometime today.

21       THE COURT:  Did you pass on to him  what I had said?

22       MR. VEEDER:  I did, and with the same emphasis, your

23  Honor, but he said that he simply could not be ready until

24  Tuesday, but that then he wanted to argue the points of law.

25       THE COURT:  But he will be here Tuesday?

1    MR. VEEDER:  He will be here at 10:00 o'clock on

2  Tuesday.

3    THE COURT:  That is all right, just so we get him down

4  here at that time.  That is the main thing.

5    MR. SACHSE:  Can we possibly -- I don't want to ask

6  Mr. Veeder on something that he is not ready on, but maybe

7  we can take a minute or two on this business of the

8  miscellaneous impoundments.  I would like to find out

9  whether Mr. Veeder thinks I am way off base on it, or what.

10    THE COURT:  On what?

11    MR. SACHSE:  My proposed findings on these miscellaneous

12  surface ponds, and so on, which your Honor directed me to

13  prepare.

14    MR. VEEDER:  I didn't bring those with me into the

15  courtroom, and if I may be excused, I will get them.

16    THE COURT:  Yes.

17    (Thereupon Mr. Veeder left the courtroom.)

18    MR. STAHLMAN:  What is bothering me is whether or not

19  you are running in the stock water with the other types of

20  impoundments, that is, the flood control conservation dams

21  that are set up, and there I think your principle is entirely

22  different.    In other words, the watering of stock I take it

23  is a reasonable and necessary beneficial use of riparian

24  water.

25    THE COURT:  Let's wait until Mr. Veeder gets back on

16,585

1    that.

2         I should probably know the answer to this:  Searle

3    Brothers are in Domenigoni Valley, aren't they?

4         MR. SACHSE:  They are in Anza Valley.

5         THE COURT:  That is Searle Brothers.  And the Stardust

6    Ranch?

7         MR. SACHSE:  That is in Wilson Creek, the bottom of

8    Lancaster Valley downstream into Wilson Creek.

9         THE COURT:  And that will be included in the Wilson

10   Creek findings?

11        MR. SACHSE:  In the Wilson Creek findings, yes, your

12   Honor.

13        (Thereupon Mr. Veeder returned to the courtroom.)

14        THE COURT:  Who is the owner of Stardust?

15        MR. SACHSE:  The present owner is a man named Allen, but

16   the defendant in this suit, I believe, is a man named

17   Sievers.

18        MR. VEEDER:  Allen appeared and testified on it.

19        MR. SACHSE:  Yes, Allen appeared and testified.  He is

20   the present owner.

21        THE COURT:  That answers my question.

22        Now, as to the stock ponds, Mr. Stahlman, you started

23   to say something?

24        MR. STAHLMAN:  I started to say that I think that there

25   has to be a distinction made between the two types of

structures.  In other words, the watering of cattle in my
view is a reasonable and proper riparian use, and that the
means by which it is used must be reasonable and proper.
Therefore, the pattern and history of the country in damming
up some of these little ponds that have existed for so long
has sort of established the reasonableness of the use,
because practically all people do it in the same way.

I would like to point out to your Honor that the way
these ponds are operated for the watering of cattle, they
will accumulate a small amount of water, they are not large,
-- they will accumulate a small amount of water during the
period of rainfall, and the cattle then utilize them while
they are grazing, while there is feed in that area, and the
structure of them is such that it sort of works out that
when the feed is gone and there is no necessity for watering,
the ponds are usually dried up.

You will have a little different situation there.  In
other words, it is my view that is a beneficial and
reasonable use, and comes under the riparian rights.

But the other thing, if you will, is merely impounding
water for the purpose of soil conservation, and those dams
in my view serve the purpose, when they have held back the
water so as to prevent the erosion of the soil,      then
the water in those ponds should properly be released, and
the control would be different in each     case.

16,587

Therefore, I thought the findings should -- I don't know whether you would want to put that in the same findings or not, but they should be separated as to the reasons for use.

THE COURT:   What does this minimum regulated by State law refer to?

MR. SACHSE:   Your Honor, I raised that question and I called the State Water Rights Board on it.   I could not locate it in the Water Code.   There is a two-way or three-way minimum, a certain height and a certain area.

However, I called the State Water Rights Board to ask what they did on this, and did they regard this minimum as having anything to do with permit statutes.

First, I understand that the minimums which are contained in those provisions of the Water Code dealing with the regulation of dams appear nowhere in the Water Rights Section, and I was advised by Mr. Gavin Craig that it is the position of the State Water Rights Board that all of these impoundments should be under permit.   They don't have any power to go out and make you do it, but, in other words, they have no minimum below which no permit is required, and he cautioned me and said that as far as they were concerned he hoped I would not suggest a finding that any minimum was exempt from regulation.

I can see the merit of his contention because this

16,588

minimum business on one stream might be very different from that on another.

THE COURT:  Did you ask him what their position was on stock watering ponds?

MR. SACHSE:  Yes, and this is the answer, I think, to Mr. Stahlman's argument on the question.

Stock watering is unquestionably a proper riparian use; unquestionably, and no one would argue otherwise.

Again, however, we cannot say that every pond that is created for stock water can be created without a State permit.  Maybe some stock water ponds used for stock watering have 100 acres behind them, but the purpose is for stock water, and under such cases under our California law a State permit might be required, because then it becomes more than --

THE COURT:  Then why don't we put in findings to that effect, taking both Mr. Stahlman's statement and your statement, and incorporate that, because I think that is the law.  In other words, that historically where lands have been used for grazing, land that is riparian, ponds have been created to catch a supply of water to carry the stock through the season if grass is available, and that the use of stock watering ponds is a proper riparian use, and it is a reasonable use and a beneficial use, and that we do not pass on any particular --

MR. SACHSE:  Size.

16,589

THE COURT:  -- size of pond for the reason that if the size of the pond exceeded what was reasonable on a particular watershed, it might be subject to regulation by this Court, or it might be -- we don't have to say yes -- subject to the requirement of a permit.

MR. SACHSE:  I think we could very readily do that.

THE COURT:  What about that, Mr. Veeder?

MR. VEEDER:  I think that is correct, so long your Honor, as he has indicated, continued to exercise continuing jurisdiction throughout the watershed.

THE COURT:  The net result of that would be that if some farmer had a small pond, he could pretty well rest assured that he was exercising a proper riparian use, and there would be no problem, but if he wanted to build a big one, he would take his chances on it.

MR. SACHSE:  To me the critical part of these findings, the one that concerns me, although I have no client on it, but I think the most important is Paragraph IV of the findings, and the first paragraph of the judgment.

Is your Honor willing to find that none of these structures have resulted in a prescriptive right?   I think you are going to have to make some sort of a finding on this, or we will keep this case open forever.

THE COURT:  I am prepared to make that, because suppose a person for a century, he and his predecessors have used

a small stock watering pond.  How has he acquired a
prescriptive right?  He has made a proper riparian use of
water.

MR. SACHSE:  But I wanted to call it to your Honor's
attention, and similarly in the last paragraph of the
judgment, or the first paragraph of the judgment itself,
that is my attempt to draft one of the prospective injunctions
such as was discussed in Peabody vs. Vallejo, which says
that no matter how long they do it in the future, they never
get a prescriptive right.

THE COURT:  I get that point.  I think that is proper.

MR. SACHSE:  What did you think of that, Mr. Veeder?
I mean I certainly have no pride in this language, but I
want that kind of a clause myself, and if you can write a
better one, I would surely like it.

MR. VEEDER:  I have no basic disagreement with what you
have said.

MR. STAHLMAN:  We were talking about a general clause
this morning for everything, the effect of the Court main-
taining continuing jurisdiction during the period of time
when any prescriptive right could not be obtained unless
there was notice to the Court.

THE COURT:  I have a couple of other suggestions.
First, there should be language that this is interlocutory.

MR. SACHSE:  Oh, yes.  Your Honor please, you will notice

1   that this is proposed only.

2        THE COURT:  The next question I had should be the

3   exception that it did not apply to those reservoirs which

4   were expressly referred to in other findings where they were

5   used for the purpose of creating a head for irrigation.

6        MR. SACHSE:  Yes.

7        THE COURT:  And the next thing I had was:  What about

8   swimming pools?  A swimming pool is an artificial diversion

9   of water.

10        MR. SACHSE:  I thought of that, your Honor, and I think

11   it is covered.  If it is a swimming pool on a stream, I think

12   it is covered.  That is recreational; use for recreational

13   purposes.

14        MR. STAHLMAN:  I don't know whether there is a wide

15   spread use of swimming pools, but it is almost a domestic

16   use.

17        THE COURT:  I am thinking about the swimming pools not

18   in the stream.

19        MR. SACHSE:  I have no intention of attempting to cover

20   those here.  This intends to cover   only miscellaneous

21   impoundments on the stream.

22        MR. GIRARD:  And you are going to cover your stock

23   water separately, because I understand you are contending

24   that is a riparian storage.

25        MR. SACHSE:  Yes.  But on the Court's question on the

swimming pools, if you had a swimming pool like the one

Mr. -- oh, his name slips me -- Falde had, which was by a

damming up on Rainbow Creek, then I can see he should be

under your control.

THE COURT:  I see you are limiting yourself to

diversions in the stream channel?

MR. SACHSE:  That was my intent, your Honor.

THE COURT:  I think you ought to make that clear.  That

comes more nearly under the category of the reservoir, and

not in the channel.

MR. STAHLMAN:  Your Honor, a lot of swimming pools --

well, there are two or three types.  There is the ordinary

pool that you find in Palm Springs or in Los Angeles, where

they fill it up, and sometimes they fill it up and purify

the water, and that water stays there for a year.  Then

there is the other type where they don't purify it, but

where they fill it up; and then again there is another type,

and there are quite a few of them in our area, where they

impound water and use it for a swimming pool, and at the

same time they use it for a head for irrigation, and they

have a diving board on it, and all sorts of things.

MR. SACHSE:  I have one.

THE COURT:  There is no problem on that.  Essentially

it is a head for irrigation, and if they want to swim in it,

that is their business.

I think probably the better thing would be just to use this general language, and not talk about those swimming pools.

What do you think, Mr. Veeder?

MR. VEEDER:  I think you are right, your Honor, but I didn't quite follow some of the things.

You are not speaking at all of off-channel reservoirs, is that the situation?  I didn't quite follow what he said on that.

MR. SACHSE:  That is a good question, Bill.  I don't know.  My key language was that this would be in the second sentence of the first paragraph, "The impoundment of any surface runoff."

Now, I hadn't thought of your question.

THE COURT:  Actually, you are going to have to break this up into about three categories.  You are going to have to talk about findings on stock ponds, and you are going to have to make some findings on diversions in the stream channels, and you are going to have to talk about off-channel reservoirs, and there should there be a similar finding that the continued use of  off-channel reservoirs, except where used only to create a head or as specifically found in other findings, do not and will not in the future create a prescriptive right, and get that out of the case.

MR. SACHSE:  All right.  I will try to do that, your

1    Honor.

2         THE COURT:  Do you disagree on that?

3         MR. VEEDER:  No, I think that is desirable, but those

4    off-channel reservoirs are going to -- they take this runoff

5    here as the map shows, but I think there are some pieces

6    that are on the channel.

7         MR. STAHLMAN:  Oh, yes.

8         THE COURT:  The next question I have is this:  To whom

9    is this going to be sent out?

10        MR. SACHSE:  I didn't think this was to be mailed to

11   anyone, your Honor.  I thought that what I was doing here,

12   and perhaps I understood it wrong, was simply anticipating

13   something that would be wrapped up as  a finding to be

14   included in a final judgment that could be sent to everybody,
                          an
15   whether he was in /appropriative, a riparian , or whatever

16   status he was.  This would be a part of the judgment.

17        THE COURT:  This is the problem we have talked about in

18   the past.  What are you going to do, send copies of all of

19   the interlocutories out to everybody, or are you going to

20   notify them that they are on file and they can come down and

21   look at them?  What are you going to do?

22        MR. VEEDER:  I would prefer to notify them.

23

24

25

16,595

D       1          We have found -- Mr. Sachse was proving that the other

        2     day -- that when one of your letters goes out they don't

        3     read; them -- they run for cover, and if you send a  decree

        4     six inches thick they probably will call the White House.

        5     I think it desirable if we could find a means of education

        6     of sending out notices to people and saying that their

        7     properties are affected, that the decree is available.  If

        8     you wanted to have us make it available, at the school house

        9     or some other place, I think that might be the way to do it.

       10     I don't think we should demand that they come all the way

       11     into town.  But I have no sympathy at all with the idea of

       12     sending out a 50-pound document and then bracing ourselves.

       13          THE COURT:  All right.

       14          I think, then, on this matter of these impoundments

       15     and dams, we ought to send copies of this interlocutory out--

       16     and it would be incorporated by reference in the final

       17     judgment -- we ought to send it out to the bigger cattle

       18     ranchers, we ought to send it out to those people where we

       19     know there are stream diversions, and have an affidavit

       20     of mailing it for what value it would be later on that they

       21     actually got a copy of this interlocutory decree.

       22          MR. VEEDER:  And to all counsel who have appeared?

       23          THE COURT:  Yes.

       24          MR. STAHLMAN:  We have reached the point of eliminating

       25     these people, to some extent, by notification, too.

16,596

MR. GIRARD:  We are not going to eliminate anyone on surface diversion.

THE COURT:  No.  Mr. Girard is right, you see.  This is surface diversion and this affects them all.

So I would think you should start to compile what kind of list you could -- some for reservoirs and some for diversions, and when you get this one dressed up, get it mailed out to them, if you want to do it after it is signed, with an affidavit of mailing, and the record will show they had notice of it.

MR. SACHSE:  I would like to go slow, your Honor.  This is Mr. Veeder's problem, not mine.  But I don't know if that is so wise, because you are going to miss some of these people.  Mr. Veeder doesn't know, I am sure, and Colonel Bowen, how many of these soil conservation dams there are, and when we once start with notice to some people in this class and miss half of them aren't we worse off than if we didn't send a special notice to any of them?  That is the problem in this matter of due process.  I know you are going to miss some of them.  There are ponds built by Soil Conservation money, and there are ponds built by the man himself all over this area.  If it ends up with just half the people receiving the notice, then it seems to me that we are worse off than if we sent no notice at all.

MR. STAHLMAN:  What is the practical result going to be?

16,597

1  What are you going to do with these ponds?

2      MR. SACHSE:  Just keep continuing jurisdiction of

3  them.

4      MR. STAHLMAN:  But we are going to eliminate all the

5  people in the case in the basement complex.

6      MR. SACHSE:  Not as to ponds.

7      THE COURT:  Not as to surface water.

8      MR. STAHLMAN:  You are going to keep them in the case?

9      THE COURT:  Yes, the whole area is in as far as surface

10  water is concerned.  It has to be.

11      MR. STAHLMAN:  You can stop them in the future.

12      MR. VEEDER:  Just save having to serve them again

13  and start all over, George.

14      MR. STAHLMAN:  All right.

15      THE COURT:  See if we can sign this up.  It seems to

16  me that as a very minimum when a final judgment is entered

17  which incorporates by reference some of the interlocutories

18  and has other provisions in it, there has to go a notice

19  to everybody in the watershed -- let's say before it is

20  signed.  When it is ready to be signed, that they have a

21  chance to be heard, and it may be that you will have to

22  publish notice of meetings in certain areas so that people

23  who have some question can come in and see what the proposed

24  judgment is that affects their property.

25      MR. VEEDER:  This is one of the general problems with

16,598

1    which we are confronted.

2        THE COURT:  Many people all of you know and    will

3    not be concerned.

4        MR. VEEDER:  But at the same time we have another

5    element that shows up on this Sandia Creek.  There are

6    people who have been served, who haven't shown up.  We don't

7    know where they are, who they are, and we are going to have

8    to find some way of getting some general notice to take care

9    of the due process aspect on these people.

10       THE COURT:  You published notices in the papers.

11       MR. VEEDER:  That is right.  But I just want to be very

12   sure.  I can't see our piecemealing this general notice.

13       THE COURT:  Do everything you can.

14       MR. VEEDER:  I would like the record to show that

15   Hamilton's B has been reproduced, and that I would offer

16   into the record the reproduced copy and withdraw the

17   Hamilton  B that was offered in that case.

18       THE COURT:  All right, Hamilton's B will be substituted

19   and the original sent back.

20       Anything further?

21       MR. VEEDER:  We have "Hamilton" on the top of the

22   exhibit, I want you to notice.

23       MR. STAHLMAN:  Your Honor, I lodged the other day

24   Vail's BJ-1, which was a correction of overlapping of some

25   of the report that Colonel Bowen made, and this exhibit here

16,599

1    shows the correction of it, if I may offer that in evidence.

2         THE COURT:  All right, Vail's BJ-1 received in

3    evidence.  Is that a substitution for another BJ-1?

4         MR. STAHLMAN:  No, your Honor.

5         THE COURT:  Or is it in place of BJ?

6         MR. STAHLMAN:  It is merely supplemental.

7         THE COURT:  Well, has there been a BJ-1 heretofore,

8    or just a BJ?

9         MR. STAHLMAN:  There has been a BJ.

10        THE COURT:  So this is a new exhibit called BJ-1.

11        MR. STAHLMAN:  A new exhibit called BJ-1, which

12   corrects BJ, and when we draw the final compilation of the

13   irrigable acres this will be reflective of it.

14        THE COURT:  All right.

15        Mr. Ramsey Clark is coming down tomorrow, and Mr.

16   Minton told me this morning that he wants to have lunch

17   with me, and I would like to have him meet counsel in this

18   case and have some little conference with you about it.  I

19   assume you will all be on your best behavior, with the

20   Assistant Attorney General present.

21        MR. STAHLMAN:  Your Honor knows I will be.

22        THE COURT:  And I hope you will each say kind things

23   about your fellows and        comrades at the bar.

24        MR. STAHLMAN:  I want to leave a little early

25   tomorrow.

16,600

MR. VEEDER:   I assured Mr. Clark that he would be missing something if he doesn't attend the session.

THE COURT:   You mean you have promised him a little flurry of some kind?

MR. STAHLMAN:   If he plays golf, I would like to invite him to Borrego with me.

THE COURT:   We will adjourn until 10:00 o'clock tomorrow morning.

(Whereupon an adjournment was taken until Friday, )
(                                                  )
(April 28, 1961, at 10:00 A.M.                     )

- - -

16,601

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

— — —

5     UNITED STATES OF AMERICA,              )
                                             )
6                    Plaintiff,              )
                                             )
7     vs.                                    )     No. 1247-SD-C
                                             )
8     FALLBROOK PUBLIC UTILITY DISTRICT,     )
      et al.,                                )
9                                            )
                                             )
10                   Defendants              )

— - -

11

12                      CERTIFICATE OF REPORTER

13         We, the undersigned, do hereby certify that we are,

14     and on the date herein involved, to wit: April 27, 1961,

15     were duly qualified, appointed and acting official reporters

16     of said Court;

17         That as such official reporters we did correctly

18     report in shorthand the proceedings had upon the trial of

19     the above entitled case; and that we did thereafter cause

20     our said shorthand notes to be transcribed, and the within

21     and foregoing 40 pages of typewritten matter constitute a

22     full, true and correct transcript of our said notes.

23         WITNESS our hand at San Diego, California this 27th

24     day of April, 1961.

25
                              _____
                              Official Reporter

                              _____
                              Official Reporter

JOHN SWADER, OFFICIAL REPORTER