VOLUME NO.   148

MR.  VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE  JAMES M.  CARTER,  JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

                Plaintiff,

                               No.  1247-SD-C

BROOK PUBLIC UTILITY DISTRICT
...,

                Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      May 2, 1961

         Pages:  16,626 to  16,735

## FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 148                                                  16,626

t-1

1                 IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3                       SOUTHERN DIVISION

4                          - - -

5        HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                          - - -

7   UNITED STATES OF AMERICA,        )
                                     )
8              Plaintiff,            )
                                     )
9   vs.                              )    No. 1247-SD-C
                                     )
10  FALLBROOK PUBLIC UTILITY         )
    DISTRICT, et al.,                )
11                                   )
                                     )
12             Defendants.           )
    ─────────────────────────────── )

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   San Diego, California

16                   Tuesday, May 2, 1961

17                          - - -

18  APPEARANCES:

19      For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
20                                  Attorney General

21                                  CDR. DONALD W. REDD

22      For the Defendants:

23      Vail Company                GEORGE STAHLMAN, ESQ.

24      Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
        District, et al.,
25

t-2

1

2    State of California:          FRED GIRARD, ESQ.

3    Defendant Sawday:            ROBERT E. McGINNIS, ESQ.

4    Defendants Gibbon & Cottle:   BEST, BEST & KRIEGER
5                                  By: JAMES KRIEGER, ESQ.

6

7                       ,    - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 61

# INDEX

| Witness for the Plaintiff | D | X | RD | RC |
|---|---|---|---|---|
| Fred Kunkle | 16,648 | | | |

| Witness for Defendant Vail | D | X | RD | RC |
|---|---|---|---|---|
| James Vail Wilkinson | 16,645 | | | |

(No exhibits)

## ORAL ARGUMENTS

| | |
|---|---|
| Mr. Krieger | 16,651 |
| Mr. Veeder | 16,659 |
| Mr. Girard | 16,662 |
| Mr. Sachse | 16,664 |

P 1

1    SAN DIEGO, CALIFORNIA, Tuesday, May 2, 1961, 10:00 A.M.

2            (Other matters.)

3        THE CLERK:  2-1247-SD-C United States vs. Fallbrook

4    Public Utility District and others et al.

5        MR. VEEDER:  Your Honor, I have tendered to your Honor

6    a proposed agenda for today and succeeding days.  I call

7    your attention to No. 1, the suggested findings for Katharine

8    C. Gibbon and William W. Cottle.  The status of that is not

9    entirely clear to me.  I have been trying to get in touch

10   with Mr. Don Stark.

11       THE COURT:  I have a note on my calendar that Gibbon

12   and Cottle was to be heard on Thursday, the 4th.  Was that

13   your understanding?

14       MR. VEEDER:  It is not clear to me, and I have been

15   trying to get in touch with Mr. Stark for that purpose.  I

16   have been unable to do so.  It is on the agenda, however.

17   As I understand, he hasn't talked to Mr. Girard either.

18       MR. GIRARD:  At the last hearing -- of course, he had

19   the proposed findings of fact, conclusions of law and

20   interlocutory decree I had prepared -- he had some comments

21   and some suggestions on them and he was going to send them

22   to me and we were going to try to get together and work out

23   any ambiguities.  It was to be heard this week.  I don't

24   recall whether it is Tuesday or Thursday.  Quite probably

25   your notes are correct, your Honor.  But as of this time I

P 2

1   have heard nothing from Mr. Stark.

2        THE COURT:  Mr. Veeder, keep after him.  Let's get him

3   in here this week.

4        MR. VEEDER:  I'll do that, your Honor.

5        Bob McGinnis called me in regard to his matter.  He is

6   in the courtroom, so I will let him proceed.

7        MR. MCGINNIS:  On the Sandia Creek findings, we have no

8   objection to them as proposed by Mr. Sachse, and if there is

9   going to be a hearing at some later time I would like to

10  attend.  Other than that, I have nothing further to add.

11       MR. SACHSE:  I will give Mr. McGinnis a corrected copy.

12  I don't think you will find any material change.  There are

13  some changes that his Honor suggested, particularly in

14  Paragraph XII of the findings.  They are all in the one place.

15       And at this time, your Honor, I will lodge the corrected

16  Sandia and the corrected miscellaneous surface impoundments.

17  The first ones, I think, should be destroyed.  We don't need

18  them anymore.

19       THE COURT:  What do you mean by "the first ones"?

20       MR. SACHSE:  The ones I left here last week that were

21  proposed.  That is now included in the suggestions your

22  Honor made and I think would be a basis for specific con-

23  sideration of them.

24       THE COURT:  First, let's find out from Mr. McGinnis.

25       You represent Sawdays?

16,630

P 3

1    MR. MCGINNIS:  That is right your Honor.

2    THE COURT:  And who else?

3    MR. MCGINNIS:  The Sawday parties, doing business as

4    the Rock Mountain Ranch, as set forth in the Answer.

5    THE COURT:  I assume from your letter and statement in

6    court that you are abandoning any claim to a prescriptive

7    right?

8    MR. MCGINNIS:  That is true.

9    THE COURT:  And you are doing this having looked into

10   the matter and discussed the matter with counsel and there

11   is no further need to make adjudication on that issue?

12   MR. MCGINNIS:  That is correct.

13   THE COURT:  All right.  We spent some time going over

14   these Sandia findings, with the exception of your part of

15   it, and we are pretty well agreed just what we are going to

16   do.  Would you like to look these findings over that have

17   been handed you and let us know later this morning.

18   MR. MCGINNIS:  Certainly.  The only change is in

19   Paragraph XII.

20   MR. SACHSE:  You have all the material changes in XII

21   and XIII.

22   MR. MCGINNIS:  Fine.

23   MR. VEEDER:  I would like at this time to tender the

24   suggested finding and a suggested conclusion of law directed

25   to the Yackey claim.  But I believe it would be equally

16,631

P 4

1   applicable to Mr. McGinnis' situation.  The Sandia matter is

2   of a great deal of importance to the United States, as I

3   had suggested at our hearing on Friday, particularly in view

4   of the fact that Mr. Yackey is proposing to build a structure

5   which would impound 1800 acre feet of water.  It is our

6   position that Mr. Yackey had the burden of proof that there

7   was water available for appropriation in Sandia Creek.  He

8   hasn't done that.  Indeed, I believe Mr. Yackey is agreed

9   that there is no evidence upon which a finding could be

10   predicated on Sandia Creek.

11        MR. SACHSE:  Mr. Veeder, I will not agree at all.

12        MR. VEEDER:  Let the record show that Mr. Sachse will

13   not agree at all.

14        THE COURT:  Mr. Sachse represents Yackey?

15        MR. SACHSE:  No, your Honor.  But this is exactly the

16   same situation that your Honor --

17        THE COURT:  On the Fallbrook situation?

18        MR. SACHSE:  On the Fallbrook situation.  It is not

19   his duty, and I oppose Mr. Yackey's permit as vigorously

20   as I know how, but I don't think it ever was his duty to

21   come into this court and prove surplus anymore than it was

22   mine.

23        MR. VEEDER:  As far as the United States is concerned,

24   there is, in our view, that responsibility of any appropria-

25   tor.  I don't believe the permit, whatever it may be , that

P 5

1    was issued by the State of California took from this court

2    the obligation of making that determination.

3        THE COURT:  Mr. Veeder, this is a small horse soon

4    curried, as far as I am concerned.  We are not now talking

5    about apportionment, and we have to view the matter with

6    that thought in mind.  If we were today talking about an

7    apportionment, then I might see where there was some merit

8    in requiring the appropriator to show that there was water

9    so that some apportionment might be made for his appropria-

10   tive right.  But we are not prepared to make an apportionment.

11   And accordingly, on this state of the record, we merely

12   catalogue the rights.  He has secured an appropriative right

13   from the State for surplus on waters over and above riparian

14   uses.  As far as I am concerned, he has pretty much of an

15   illusory right, but he is not required to come into this

16   court to establish an appropriative right.  He does that

17   through the State Agency -- I passed on this in the case of

18   Fallbrook -- and he now has his application granted.  That

19   still means that this court controls the apportionment that

20   might be made of water, and when the time comes when we

21   have to say what apportionment is going to be made among

22   riparians and also persons who claim rights to surplus water

23   then I will agree with you.  He would have to make some

24   kind of showing that there is water over and above the

25   riparian uses before he can store water in his dam.

16,633

P 6

1      That is my view of it.  Mr. Girard, are you agreed?

2      MR. GIRARD:  I agree a hundred per cent, your Honor.

3  And in addition, I think, as pointed out in our brief on

4  the Fallbrook matter, there is uncontradicted evidence that

5  there is surplus water at times in the winter, which is the

6  period of Mr. Yackey's permit.

7      MR. VEEDER:  In Sandia Creek?

8      THE COURT:  There isn't any question that at times of

9  high rainfall and rapid runoff there is surplus water in

10  any creek up here you want to look at.  You have never been

11  around here when we had a good rain, Mr. Veeder.

12      MR. STAHLMAN:  They have a road down there that you

13  can't cross.

14      THE COURT:  There are some of these dry creeks that

15  you wouldn't think water would run in, you wouldn't dare take

16  an automobile across them.

17      MR. VEEDER:  I have only been looking at them for

18  twelve years, your Honor.  However, I made the point.  It is

19  in the record.  I want my conclusion of law that I tendered

20  here applicable to the Yackey claim and to the Sawday claim.

21      What is the name of that, Mr. McGinnis?

22      MR. MCGINNIS:  The Rock Mountain Ranch, Parcel No. 60.

23      THE COURT:  I don't even know whether I want to do this.

24  Of course, you could say that the Defendant Yackey, who

25  claims an appropriative right, if and when an apportionment

P 7

1   is to be made, has the burden of proof.  That is sort of an

2   idle thing, unless you want to serve notice on Mr. Yackey

3   right now that he has a problem.

4       MR. VEEDER:  He has, indeed, a problem, your Honor.  I

5   am always amicable and willing to deal a little bit.  Could

6   we have the conclusion that you just expressed?

7       MR. SACHSE:  I put it in, not in this language, but in

8   the language you gave us before.

9       THE COURT:  Mr. Clerk, do you have a copy of these?

10      MR. SACHSE:  I just handed them to him.

11      THE CLERK:  I haven't stamped it, yet, your Honor.

12      THE COURT:  I will mark my copy "Lodged."

13      MR. SACHSE:  It starts on Number XII, XII and XIII,

14  on pages 6 and 7.  The point then comes over on the next

15  page.

16      MR. VEEDER:  On page 7?

17      MR. SACHSE:  Yes, at line 16.  This is the verbatim

18  language that the Court gave us last week.

19      MR. VEEDER:  Any resemblance between that and what I

20  said has to be purely coincidental.

21      THE COURT:  What are you referring to now?  I am look-

22  ing at page 7.

23      MR. SACHSE:  It is all your language starting on line

24  4 through line 25 on page 7.  That is all the Court's language.

25      MR. STAHLMAN:  It goes even further than what you have

P 8  1    indicated, Mr. Veeder.

2         MR. VEEDER:  It doesn't establish the burden of proof

3    on Mr. Yackey or on the Rock Mountain Ranch, or whatever it

4    is.

5         THE COURT:  You can't do everything at one time.  What

6    good would my suggestion do, except to further, as it were,

7    serve notice on Mr. Yackey that he has a problem?  He can

8    read the transcript.  You can get a certified copy of this

9    transcript and send it up to him, if that is what you are

10    interested in.  But I am not going to find -- your finding

11    that you propose is already in here.  Your conclusion is

12    not correct in that there is no burden on Mr. Yackey at

13    this time to present any evidence here on available supply.

14        MR. GIRARD:  There were a couple of comments -- one

15    that your Honor made and one that Mr. Veeder made -- that

16    apparently assumes that in an apportionment proceeding

17    brought by a riparian or a prior appropriator the burden

18    of proof shifts to the subsequent one.  I don't think that

19    is correct.  I think if an allocation proceeding were brought

20    by a riparian to limit an appropriator upstream who was

21    junior to the riparian, the burden of proof would be on the

22    riparian.  I find specifically the discussion in Hutchins

23    commencing at page 282 and 283:  He has to prove every

24    element, including reasonable and beneficial use, before he

25    can enjoin a subsequent appropriator.

P 9

MR. VEEDER:  I don't think you are talking about the same thing I am, Mr. Girard.  There is a man here making a claim.  There are cross-pleadings one against another.  Every man is, in effect, a plaintiff against every other party.  A person setting up an appropriative right, as is true in the case of Mr. Yackey, there resides the obligation of pleading and proving the availability of water for appropriation.

MR. GIRARD:  We just disagree completely on that point, Mr. Veeder.  We think the appropriative right is proved by filing the permit.

MR. SACHSE:  That is my position.

THE COURT:  Yes, and I have already passed on it in Fallbrook.  You made the same contention that Fallbrook had a duty to show that there was surplus water in the stream.

MR. VEEDER:  I just wanted everybody to understand.

THE COURT:  The objection is overruled.

However, in looking over these findings -- I have just now seen them -- two matters that we talked about have not been taken care of.  On page 6 where we talked about these sections, we will have to insert "projected" sections.

MR. SACHSE:  This is non-surveyed, that is right.  Your Honor told me that and I overlooked it.

THE COURT:  We probably should refer to Exhibit 69.

MR. SACHSE:  " . . . begins in projected Section 12 and

P 10

1    extends through . . "

2        THE COURT:  So you would insert "begins in projected

3    Section 12 and extends through projected Sections 13, 14,

4    25 . . "

5        MR. VEEDER:  Section 25 is surveyed.

6        THE COURT:  Part of 25 is surveyed, and into --

7        MR. SACHSE:  The northwest quarter of Section 36.  That

8    is not a projected section.

9        THE COURT:  Wait a minute.  And into surveyed section

10   -- put in the word "surveyed" at line 25 -- into surveyed

11   Section 25 and northwest quarter of Section 36.  That does

12   it, doesn't it?

13       MR. GIRARD:  Would you read the paragraph completely?

14       THE COURT:  "The major stringers of younger alluvium

15   referred to above begins in projected Section 12 and extends

16   through projected Sections 13, 24 and 25 and into surveyed

17   Section 25/and into the northwest quarter of Section 36."

18   Doesn't that do it?

19       MR. GIRARD:  It is a way over my head.  I don't under-

20   stand it.

21       MR. VEEDER:  I believe the word is "alluvium" rather

22   than "alluvial" on line 23.

23       MR. STAHLMAN:  The overlay would tell.

24       THE COURT:  Do you have it now, Mr. Girard?

25       MR. GIRARD:  Yes your Honor.

P 11

1    THE COURT:  Doesn't that sound right?

2    MR. GIRARD:  As far as I am concerned, yes.

3    THE COURT:  You have to do it in the next paragraph,

4    too:  That that portion of the last described stringers of

5    younger alluvium in projected Section 12 lying in projected

6    sections 13, 24 and 25 south to the line between Riverside

7    and -- do you want to make reference to Exhibit 69?

8    MR. SACHSE:  The first error you called my attention

9    to was my fault and my carelessness.  I left out the exhibit

10   for the express reason that I must have misunderstood it.

11   I thought we were not going to use Exhibit 69.

12   THE COURT:  We don't have to.  I think this is pretty

13   clear.  You wouldn't have any trouble finding that stringer

14   of alluvium in that area.

15   MR. SACHSE:  No.

16   MR. VEEDER:  You would have trouble finding it in Sandia.

17   THE COURT:  Well, I haven't looked over the rest of it.

18   Maybe I can do it at the recess.

19   MR. SACHSE:  I don't think there is any great pressure

20   on it.  Mr. Krieger is here with his clients and we can

21   push this aside.

22   THE COURT:  We don't have to attach it to any of the --

23   MR. SACHSE:  No, your Honor.  The exhibits that are

24   referred to here are part of the MT          series.  Of

25   course, those are that thick, but the owners on Sandia are

16,639

P 12

1    only fourteen.  We do have the exhibits in evidence.

2         THE COURT:  The document is ready to sign, if we are

3    satisfied with it.

4         MR. SACHSE:  We would have to tear apart from one of

5    Mr. Veeder's MT series the particular parcel numbers that

6    are referred to in your judgment.

7         MR. VEEDER:  I am going to object to these findings

8    and conclusions as they are, for the record, and if you

9    want us to submit -- I will show you, Mr. Sachse, and the

10   Court, the preparation that we are making in regard to the

11   individual parcels.  If you desire to have those made part

12   of the findings, we will go ahead and complete them.

13        MR. SACHSE:  Do you intend to do this with every owner

14   in the watershed?

15        MR. VEEDER:  I was going to, yes.  It seems to me that

16   it is more reflective and you will have it in a single

17   document, whereas you have to go to the ABC series.

18        MR. GIRARD:  These are taken out of Colonel Bowen's

19   soil surveys; is that right?

20        MR. VEEDER:  Yes, and also taken out of the exhibits

21   respecting titles and locations.  So the work would be

22   completed on this original parcel.  If you want to go ahead

23   and enter the findings over my objection, then I will file

24   these additional descriptions in regard to the individual

25   properties, if you want me to do that.

P 13

1    THE COURT:  But there are only eleven.

2    MR. VEEDER:  There is also the Vail Company.  I haven't

3  had a chance to analyze completely Colonel Bowen's report

4  on the Vail Company's lands, showing the lands.

5    MR. STAHLMAN:  That will be in the Vail findings.

6    MR. VEEDER:  Do you want to keep that entirely separate?

7    MR. STAHLMAN:  I assume that is what we are going to do.

8    MR. VEEDER:  The fact is, thought, George, that we do

9  refer in these findings to the Vail Company and the stringers

10  of alluvium running up there, and it seems to me that is the

11  way to do it.

12    MR. STAHLMAN:  We can't put Vail there.  The Vail

13  findings would have the same thing on De Luz.  You would

14  have the same problem on both those.

15    MR. VEEDER:  My only thought is that we are going on

16  a sub-watershed by sub-watershed basis.  I don't care.  It

17  is up to your Honor how it is done.

18    MR. SACHSE:  If your Honor will observe, I made our

19  findings that Vail is excluded.  We can put it back in.

20  That is exactly what the Master did on De Luz Creek, and I

21  was trying to be consistent.  As far as Mr. Veeder's

22  suggestion is concerned, I like this technique very much,

23  but sooner or later somebody has to type these things.

24    MR. VEEDER:  I say go ahead and get them done, because

25  I think it is essential for us to know the status of each

P 14

1   parcel.  It is a big job to do this work.

2   THE COURT:  How long would it take you?  There are about

3   eleven parcels.

4   MR. SACHSE:  There are about 20 or 22, your Honor.

5   THE COURT:  All right.  How long would it take you to

6   prepare the exhibit sheets you have here to attach to a

7   revision of these Sandia findings?

8   MR. VEEDER:  We will have it done by tomorrow afternoon.

9   MR. SACHSE:  All right, let's do that.

10   THE COURT:  What would you contemplate if you put the

11   Vail property in there?

12   MR. VEEDER:  I would simply take that portion -- and I

13   have talked to Colonel Bowen about it -- I would simply take

14   that portion of his report which relates to Sandia Creek

15   and attempt to reflect the irrigable acreage as found on

16   Sandia Creek.

17   MR. STAHLMAN:  I thought the Vail findings would be

18   all in one finding.

19   THE COURT:  There is no reason that it has to be done

20   that way.

21   MR. STAHLMAN:  No.

22   THE COURT:  And I see some merit in the Vail property

23   in this finding, for this reason:  People who live in this

24   watershed can get a copy of a set of findings that involves

25   this little watershed and Vail property up in Sandia isn't

P 15   1    affected at all by other parts of the watershed, and they

2    would know therefore the story as to Vail, if you have been

3    trying to tell them that those people downstream have a

4    problem.   There might be merit if you can do it in three or

5    four paragraphs and take care of Vail in these findings on

6    Sandia Creek.

7         What do you have to talk to Colonel Bowen about?

8         MR. VEEDER:  I just wanted to be sure that my areas are

9    correct from the standpoint of the report he has made, that

10   is all.

11        THE COURT:  He has testified that they were.

12        MR. VEEDER:  It is a matter of designation of the areas.

13        THE COURT:  When will he be available?

14        MR. VEEDER:  He will be down some time this morning.

15        THE COURT:  Then you ought to be able to do this and

16   take what Mr. Sachse has, revise it to include your exhibit

17   sheets and to include the Vail findings.

18        MR. VEEDER:  I'll do that.

19        THE COURT:  Is that agreeable?

20        MR. STAHLMAN:  It is agreeable with us.

21        THE COURT:  All right.

22        MR. MCGINNIS:  Is some time going to be set for further

23   hearing on these?

24        THE COURT:  There will be no further hearing.  There

25   will be merely a checking to see that the matter is right.

P 16

1    Have you looked them over?

2    MR. MCGINNIS:  I have looked these over and I see no

3    objection at this point.  I was thinking more about these

4    exhibit pages that he is going to prepare and wanted to see

5    those before they are filed.

6    MR. VEEDER:  Yes.

7    MR. GIRARD:  I think Mr. Veeder will give you right

8    now a copy for your client.

9    THE COURT:  Your page is prepared.

10   Will you give him a copy of it?

11   MR. VEEDER:  I will.

12   MR. STAHLMAN:  What is the status of De Luz?  You are

13   going to have the same thing there, I assume.

14   MR. VEEDER:  I intend to do that.

15   THE COURT:  Do you have a copy for Mr. McGinnis?

16   MR. VEEDER:  I am looking for that.

17   THE COURT:  It was up here in front of me a minute ago.

18   (Mr. Veeder hands document to Mr. McGinnis.)

19   MR. VEEDER:  Could I have this back?  I'll get you a

20   copy.

21   THE COURT:  Mr. McGinnis, if you want to check with

22   Mr. Veeder, he says he should have these tomorrow or

23   Wednesday, and then look them over and let me know that

24   you are satisfied and we will proceed with the matter.

25   MR. MCGINNIS:  Thank you, your Honor.

P 17   1          THE COURT:  What is the next matter?

       2          MR. VEEDER:  Mr. Krieger is here and I would just as

       3   soon that he proceed.

       4          THE COURT:  Go into the matter of this outline of this

       5   basin?

       6          MR. VEEDER:  I have prepared -- this is the first time

       7   I have seen Mr. Krieger, so I haven't been able to hand it

       8   to him -- I have prepared some suggested findings in regard

       9   to the Murrieta-Temecula Basin (handing copies to the Court

      10   and counsel).

      11          MR. KRIEGER:  Your Honor has received the proposed

      12   findings that we sent down?

      13          THE COURT:  Yes sir.  You sent an original to me.

      14          MR. KRIEGER:  Yes.

      15          THE COURT:  Do you have any copies?

      16          MR. KRIEGER:  I have handed copies to all counsel.  I

      17   have another copy (handing document to the Court).

      18          MR. VEEDER:  Should we put Exhibit 277 up, your Honor?

      19   That is the Temecula Basin.  It might be helpful to you.

      20          THE COURT:  Put it up and I will be looking over what

      21   you have in here.

      22          (Plaintiff's Exhibit 277 was put up on the board.)

      23          THE COURT:  What is the number of that map?

      24          MR. VEEDER:  277 your Honor.

      25          THE COURT:  That must be the photostat I have here.

P 18

1      MR. VEEDER: May I see that. We had that reproduced,

2  your Honor. With minor modifications, it is the same.

3      THE COURT: 277.

4      MR. VEEDER: 277. And the exterior boundaries are set

5  out on 277-A.

6      I know we are going to have to make some revision of

7  that 277-A by reason of some changes in it, and when those

8  changes are made I will substitute, with your Honor's

9  permission.

10      MR. STAHLMAN: What will the changes relate to?

11      MR. VEEDER: Just minor description changes, and Mr.

12  Wilkinson has proposed the additional change in the exterior

13  boundaries as shown on 277. I really don't know what the

14  change is.

15      MR. STAHLMAN: What we have in mind, there is a road

16  that is not a dedicated road. It just appears to be a road

17  that was followed. It might be better if that road might

18  be changed, the way these country roads are up there. It

19  would be better to have some lines drawn from one point to

20  another.

21      MR. VEEDER: Would that be from here?

22      I would like to ask Mr. Wilkinson, if I may, which is

23  the area as shown on 277, so that we can get some geological

24  connection on it.

25      MR. WILKINSON: It takes off from the corner of the

JOHN SWADER, OFFICIAL REPORTER

P 19  1     Grant, and it is in Section 5 7 South --

2     MR. VEEDER:  Isn't that 8 South?  It is 8 South.

3     THE WITNESS:  Eight South 1 West.

4     THE COURT:  Is that a projected section?

5     MR. WILKINSON:  As shown on Exhibit 15, it is all

6     projected sections.  There is a possibility of going to the

7     intersection of the Grant boundary and the northerly line of

8     Section 33 to some other area in the Grant line intersected

9     by a section line.

10     MR. STAHLMAN:  What is this up in here?

11     MR. WILKINSON:  Where it says "reservoir" here is the

12     point here.  Here is the reservoir that is shown on 15.

13     THE COURT:  This reservoir?

14     MR. WILKINSON:  That reservoir right there.

15     THE COURT:  Is where?

16     MR. WILKINSON:  Is right here, your Honor.

17     THE COURT:  Then actually this area in here is all

18     basement complex.

19     MR. WILKINSON:  That is right, your Honor.

20     THE COURT:  Your line actually runs something like this.

21     MR. WILKINSON:  The simplest expedient would be to go

22     from the corner of the Grant to this bench mark 1521 to

23     the corner of Section 13, draw a straight line.

24     MR. VEEDER:  I want to be sure I get that.

25     MR. STAHLMAN:  Why should Pauba be in the Murrieta

P 20    1        area?

2                MR. WILKINSON:  A straight line just between this bench

3        mark at the southeast corner of Section 13, BM 1521 here, to

4        the corner of the Grant by Section 5, Southeast corner of

5        Section 13 to --

6                MR. VEEDER:  If that is going to be done, why can't

7        we just take a straight edge and do that now?  It suits me.

8                THE COURT:  Anybody have any objection to it?

9                MR. SACHSE:  What is this, your Honor?

10               THE COURT:  Talking about changing the line on this

11       water unit here.

12               MR. SACHSE:  Yes.  I think it should be changed more

13       drastically than this conversation.  I don't understand.  I

14       have never understood that your Honor was suggesting that

15       Pauba Valley and Murrieta would be regulated as a single

16       unit.  That is what it means, if we leave it where it is.

17               THE COURT:  What we are talking about now has nothing

18       to do with that problem.

19               MR. SACHSE:  This line has to do with it.

20               THE COURT:  We are not talking about that.  We are

21       talking about this line which presently runs over here.

22       The younger alluvium runs like that.  To change it there is

23       a suggestion made that we run a line from bench mark 1521

24       right down to the corner of --

25               MR. SACHSE:  That is all right with me.

16,648

P 21

1    MR. KRIEGER:  That seems to be very intelligent, because
2    we have done the same thing along the whole area of the
3    boundary, haven't we?  The rest of the lines don't coincide
4    with the contact.  This one, of course, is a little different.
5    THE COURT:  If there is no objection, that is what we
6    will do.  Take a straight edge.
7    MR. VEEDER:  I would like to have Mr. Kunkel --
8    THE COURT:  Are you going to use this same map?  If so,
9    you can put it on very lightly with pencil.
10   MR. KUNKEL:  I am sorry, I didn't follow.
11   MR. VEEDER:  It is going to run from the Grant line
12   corner to bench mark No. 1521.  Is that the proposal?  Then
13   you would extend this line on out there.  Is that right?
14   MR. WILKINSON:  That is right.
15   MR. VEEDER:  I see no objection to it.  I think it
16   would be a whole lot better for description.
17   THE COURT:  All right, put it in.  Use the road.  If
18   it turns out not to be a dedicated road, just a road on
19   private property, a road can be changed at any time.  We
20   are trying to tie those marks to stay.
21   MR. KUNKEL:  For the record, I am drawing a long dashed
22   line from bench mark 1521 to the top of a hill whose altitude
23   is indicated as 1344.
24   THE COURT:  And which is an angle in the line of the
25   Vail Company's property.

P 22   1        MR. KUNKEL:  I am also extending the east west line

2        along a road or along Buck Grant boundary to bench mark 1521.

3            MR. VEEDER:  Would you put your initials on it?

4            MR. KUNKEL:  What is the date today -- the 2nd?  Shall

5    we indicate deletion of the other line or just let it stand?

6            MR. VEEDER:  That can be taken off.

7            THE COURT:  It will be taken off when we change the map.

8            MR. VEEDER:  Your Honor, there has been brought to my

9    attention another matter in regard to the exterior boundaries

10    of this ground water basin.  In regard to Section 24 Township

11    7 South Range 3 West you will see where the line drops down

12    in sort of a triangular form.  Actually, the line should be

13    extended on across to the road and then joined, if you will

14    observe Section 24-7-3 as set forth on Exhibit 277.  Actually,

15    this description should be straightened out so that it runs

16    across the northern boundary of Section 24, joining the

17    road, and then coming on across.

18            THE COURT:  There may have been some good reason why

19    that was done.

20            MR. VEEDER:  Well, this is alluvium that is right here,

21    and you will observe on Exhibit 15-E where that is, your

22    Honor.

23            THE COURT:  Whose property is it?  It is up around the

24    Hot Springs.

25            MR. KRIEGER:  Is it Shamel?

JOHN SWADER, OFFICIAL REPORTER

P 23   1          MR. VEEDER:  Serafino Nicholas.

2          MR. KRIEGER:  Is there any water up there?

3          MR. STAHLMAN:  There is a reason if Mr. Veeder wants

4     to move it.

5          MR. KRIEGER:  I think we ought to wait until Colonel

6     Bowen gets here if we are going to change that line, because

7     this does affect our people.

8          THE COURT:  Whose wells are those?  They are shown as

9     R-1 and R-2.

10          MR. KRIEGER:  We could find it on Roripaugh's A.

11          THE COURT:  This is off the record.

12          (Discussion off the record.)

13          THE COURT:  Before we take a recess I think this line

14     should be straightened out here.  I understand there is no

15     objection.

16          MR. KRIEGER:  No.

17          THE COURT:  Running the line westerly between Sections

18     23 and 14 and down to the road.  Mr. Kunkel, you can make

19     the changes and we will put it in the record after the

20     recess.

21          (Recess.)

22          THE COURT:  Let the record show that Mr. Kunkel has

23     made the change there.

24          Can you describe it, Mr. Veeder?

25          MR. VEEDER:  He has run the line straight out on

16,651

P 24

1    Section 24 Township 7 South --

2         THE COURT:  Between 13 and 24.

3         MR. VEEDER:  Between 13 and 24, that is correct.

4         THE COURT:  Running directly west of the road and then

5    south along the road.

6         MR. VEEDER:  That is right.

7         MR. KRIEGER:  That is right.

8         THE COURT:  And that takes in a portion of Shamel's

9    property.

10        MR. KRIEGER:  That is right.

11        THE COURT:  And you represent Shamel?

12        MR. KRIEGER:  Yes, I do.

13        THE COURT:  And you have no objection to that?

14        MR. KRIEGER:  No objection.

15        THE COURT:  Are we prepared now to discuss this basin

16   situation?

17        MR. KRIEGER:  I wonder if we could, your Honor.

18        THE COURT:  All right.

19        MR. KRIEGER:  I want to say first of all that the

20   proposed findings that I submitted were simply to get to

21   what I considered to be the real issue as far as our people

22   on the Murrieta-Temecula Basin are concerned.  They are not

23   as detailed as I would hope to make them eventually.

24        I would like also to point out that since we have been

25   in this case we really have had two objectives.  The first

P 25

1   objective has been to see if we couldn't eliminate those

2   people who pump ground water but without any real success

3   who are either in the basement complex or on the fringe of

4   the contact and whose pumping does not really contribute

5   materially to the stream system.

6      And the other phase of it is the phase we are here on

7   today, which is to see what effect, if any, there is by

8   embracing within this so-called area some of the lands where

9   the water is really percolating ground water but really a

10   part of the stream system.

11      Now, in order to prepare these findings what we did

12   was this.  We went back and studied every case we know of

13   in California that touches on this subject, starting a way

14   back with the early Pomeroy case where they used to hold

15   that anyone sitting over a ground water body had an absolute

16   right to that water and all water he could find beneath him.

17   We pushed on through Katz vs Walkinshaw and came up with

18   what I think is the leading and the controlling case even

19   today in this matter, which is Hudson vs Daley in 1909.

20      It seems to me that Hudson vs. Daley is just about as

21   close to the instant case as we could find.  In that matter

22   there was a downstream riparian user very much like the

23   United States is in this case and they were suing some up-

24   stream people who were pumping not out of a stream bed but

25   they were pumping out of land adjacent to the stream, which

P 26

1   the plaintiff had charged was really a part of the stream

2   system, and in the course of the proof in that case they

3   had exactly the same troublesome problem that we have here,

4   which is to determine how much of the pumping in the lands

5   adjoining the stream would have an effect on the stream system.

6   And they finally concluded their analysis of that case, which

7   seems to me again is germain to our problem here, that we

8   still have two kinds of rights:  That we have riparian rights

9   for the lands that border on the stream or on the subsurface

10  streams in known and defined channels, and then we have a

11  second body of rights consisting of those overlying rights

12  on non-riparian lands, which rights when exercised do affect

13  the stream system.  And as they point out in that case, it

14  is virtually impossible to make a distinction between those

15  two sets of rights.

16      As a matter of fact, they conclude, and I have warped

17  the findings proposed here almost around the language of

18  that case to say that pumping in the Murrieta-Temecula area,

19  while in over-lying lands and lands that are not riparian

20  to the stream, do affect the stream system, and to that

21  extent the overlying land owners have correlative rights

22  along with the actual riparian owners in the common source

23  of supply of the Santa Margarita stream system -- not just

24  the Murrieta-Temecula area, but, as we see it, in the entire

25  stream system.

P 27

1   If that thesis is correct -- and I was talking with Mr.

2   Girard here a moment ago -- I don't believe a finding like

3   that in any way, shape or form affects the State Water Rights

4   Board's jurisdiction over percolating ground waters, because

5   under the Water Code I think the only jurisdiction that

6   Board has is over strictly riparian rights, a stream system

7   an underground stream in known and defined channels, and

8   would not have any jurisdiction over these lands that are

9   on the outskirts.

10  MR. VEEDER: When you say "outskirts" --

11  MR. KRIEGER: The word "outskirts" means away from the

12  stream system, Mr. Veeder, and outside the channel, and

13  perhaps to this line which we have been establishing on

14  the board on Exhibit 277.

15  Well, now, if that analysis is at all correct, then it

16  seems to me that we are faced with the problem that we have

17  been faced with all along as to whether there is at this

18  time any proof that there is any damage that has been done

19  to anybody along the way. Our people, if they are truly

20  contributing to this stream system as our findings suggest

21  they do contribute, nonetheless have a right to their

22  reasonable proportion of the stream system. Whether they

23  take it from the stream by diversion -- and I don't believe

24  any of us do -- or whether they take it from pumps in the

25  non-riparian land, they still have a right to their

P 28

1    proportion of the stream system.

2        Now there has been no showing that the amount of water

3    that they have used or intend to use is unreasonable.  There

4    is a showing agreed to by the United States that their rights

5    have been properly exercised overlying beneficial use has

6    been made of these waters.  We do not know how much effect

7    the pumping of our people has on the stream system.  We don't

8    even know what effect the pumping has on adjoining wells in

9    the same community.  We don't know how much water gets into

10   this so-called area and we don't know what effect it ultimate-

11   ly has down the gorge where it finally goes out.  All we do

12   know, on the basis of the evidence presented by Mr. Kunkel

13   and by our own witness Mr. Webb, is that pumping in that

14   area does affect the stream system.  And this ties in with

15   one of the statements in the Pomeroy case that it materially

16   affects the stream system and therefore should be considered

17   as supporting the stream system.  While all of the other

18   lands lying outside the now famous Kunkel line have been

19   said not to contribute to the stream system because pumping

20   outside there would be either non-productive or if it were

21   productive it would be in such small amounts that nobody

22   would tend to develop his land anyway.

23       Now, if I am thinking correctly, your Honor, to this

24   point, it seems to me that we have done no more than to

25   define a part of the stream system that remains under the

P 29

jurisdiction of this Court, until that day arrives when there is going to be an apportionment on the stream system, and when that day of apportionment comes it seems to me that the first thing that has got to happen is that the United States or some interested party is, first of all, going to have to show that there is not enough water in the stream system for all the needs of all the riparian and non-riparian overlying users.  If they come to that conclusion, then the first thing that will have to happen, I suppose, is that all appropriators on the stream system will have to cease their appropriations.  Then we will come down to talk about the total of water available, the total of water needed for all the purposes on the stream system, and if there is to be a reduction everybody will be reduced.

As an example, if the day comes when some person shows that the yield on the Santa Margarita stream system over a hydrologic period -- and I think it has almost got to be over a long term period -- is, say, 30,000 acre feet, and at the same time that aggrieved party demonstrates the total use of all the people on the stream system, including our people, is 40,000 acre feet, and there has got to be a reduction on everybody's part by 25% of his taking so that the stream system gets into balance, then I think we have some kind of regulated stream system.

But the emphasis that I would like to make is that our

P 30

people here are no different than anyone else on the stream system, but your Honor's finding that their pumping supports the stream system doesn't put us in any particularly unique category except as it puts a burden on us it also gives us some right and that right is to continue to pump or divert water for our reasonable and beneficial uses for overlying purposes.

And I want to make just one more point, if I may.  There are cases where our people pump water on this side of, let me call it, if I may, for convenience, the Kunkel line, even though it is on the new map 277.  Take Guenther and Murrieta Hot Springs.  For his fresh water purposes he will be pumping water southwest of the line and using it on the other side of the line for his hot springs.  I don't see any problem here at all.  You may remember that Art Littleworth has argued this point before you on another occasion and you have a letter in the file briefly setting forth our opinion on that, and that is that as long as the water that we use is used in the watershed nobody is going to be damaged because that water, like all other water, is going to be used on the land and get back into the watershed.  As long as the water is used in the watershed of the basin, it is a proper overlying use.

And then one thing more.  When I was down the other day Mr. Veeder and I were talking about these problems, and

16,658

P 31

1    we immediately found ourselves in conflict on this terminology

2    whether this is a basin, and you will notice that I very

3    carefully avoided the word "basin," just as Mr. Veeder used

4    to avoid it when the trial first began.  Mr. Kunkel even used

5    to talk about storage water units.  But I don't believe this

6    term "basin" or "area" or "ground water body" is extremely

7    important.

8          THE COURT:  I don't think so either.

9          MR. KRIEGER:  You remember last December when I reviewed

10   the record on this there was another argument over that

11   terminology, and Mr. Sachse, Mr. Stahlman and the State and

12   everyone else got into that argument, and you finally con-

13   cluded that for convenience sake let's call this a ground

14   water body.  I don't think it makes a great deal of difference

15   what we call it, whether it is "basin," "ground water body"

16   or "area." But it does seem to me that we should avoid any

17   indication that by using the terminology "basin" we have

18   suddenly a private supply of water that we are going to

19   adjudicate.  This case doesn't begin to have the elements

20   of proof that you would need for a ground water basin

21   adjudication.  As a matter of fact, it was not filed on that

22   basis, it is not being tried on that basis, and the evidence

23   is not in the record that would support that kind of deter-

24   mination.

25         So our conclusion is, as we have set out in the proposed

P 32

1   findings, that the Court is merely to set out the area where

2   pumping does affect the stream system.  To that extent we

3   will agree that all our people who own wells and pump water

4   out of that area are under the same rules as a riparian would

5   be.  But at this time there is no evidence that would support

6   any kind of apportionment for our people or any other people

7   on the stream system.

8        THE COURT:  I don't find much to object to what you

9   have said.

10       Let's hear from Mr. Veeder.  Where is this area of

11   difference between you and Mr. Krieger?

12       MR. VEEDER:  Your Honor, I have listened very carefully

13   and I am quite delighted that Mr. Krieger and I have -- I

14   am glad that he has joined us, because from the outset we

15   have said that we feel there is a continuous ground water

16   body and that it is a common source of supply for the

17   National Government, Vail Company and all of us.  I don't

18   know why he is reticent to call it a "basin."  Originally

19   I did not use the term "basin" because we had set up so-

20   called "storage units" simply for the purpose of identifying

21   the areas where there was a hundred feet of saturated

22   material.  I believe now, though, that we have progressed

23   to the point where your Honor could properly make the

24   finding that this is a basin.  It has all the elements.  It

25   has the impervious bottom that is requisite, it has the

P 33

1   impervious sides which are requisite.  The fact that your

2   Honor has, and I think very properly, indicated a desire to

3   have the basin enclosed within legal subdivisions for the

4   purpose of clarity should not make any difference in desig-

5   nating the basin, calling it a basin, and proceeding on the

6   basis that it is a basin.

7       I think that he is correct when he says that pumping

8   in the area has and will affect surface runoff.  Our concern,

9   of course, has always been that if you reduce the quantities

10   of water in that basin to too great an extent the water will

11   drop below the granitic loop at Temecula Gorge and that will

12   become a barrier over which water will not flow except in

13   extremely high floods.

14       I don't know that there is a great difference on the

15   basis of what Mr. Krieger has said from the legal standpoint.

16   I have checked through the cases as carefully as I know how,

17   and there seems to be terminology in the cases where they

18   say that -- I think it is in <u>Peabody vs Vallejo</u> -- that they

19   talk about the rights of the ground water owner as being

20   comparable to the riparian right, and I assume that that is

21   about the status that each of these owners occupies.

22       If you will observe, your Honor, on page 5 of the

23   proposed findings that I tendered, it occurred to me that,

24   subject to your Honor's direction on this matter and on the

25   basis of the data that is already in the record, that we

P 34

1   would go through and put the irrigable gross acreage in a

2   form similar to that which I showed you this morning, and also

3   set forth the references to the wells to the extent that we

4   have the data, that is, the location of the wells and the

5   well designations.  In other words, you would have one

6   complete set of findings for the Murrieta-Temecual Basin,

7   if that would be proper.

8        THE COURT:  You mean that you would not only have your

9   legal description, which could be incorporated by reference

10  to the exhibit.

11       MR. VEEDER:  That is correct.  That is Exhibit 277-A.

12       THE COURT:  But you would have the names of the owners

13  and the irrigable acres for this whole basin?

14       MR. VEEDER:  It occurs to me that that would be a

15  simplification, rather than attempting to have separate

16  findings of fact for each one.  Because we do have the data.

17  We have Exhibit 207-E, in which we have set forth the

18  Riverside subdivisions in lots and blocks, and then we do

19  have the data in which those properties are described, and

20  we have notified people of their gross and irrigable acreages.

21       THE COURT:  I have no objection to that procedure.

22  Originally I thought you were going to have just one where

23  you would define the area of the ground water body and then

24  later on pull these ownerships into separate judgments.  If

25  you do it all in one, that is even better.

P 35

1      MR. VEEDER:  Your Honor is correct in what you said,

2  because this is new and that is why I brought it to your

3  attention.

4      THE COURT:  Then you are backing away from some of the

5  proposals in your set of findings?  Or is that just in there

6  for window dressing?  For instance, at the top of page 5,

7  that Vail's use of water in Pauba Valley is far in excess of

8  the quantity of water --

9      MR. VEEDER:  Not at all.  No, I am not backing away

10  from that at all.  I thought if you wanted me to go into that

11  phase of it --

12      MR. GIRARD:  No, I don't.  I want to be heard before

13  Mr. Veeder goes into these findings, your Honor.  I think

14  these are just an effort to delay and thwart and switch the

15  burden of going ahead with this case.  It is a typical

16  example.

17      THE COURT:  Are you through, Mr. Veeder?

18      MR. VEEDER:  Yes, your Honor.

19      THE COURT:  Mr. Girard.

20      MR. GIRARD:  On the problem presented by your Honor's

21  question as to how we treat these basins, I am in general

22  accord with Mr. Krieger.  I think the suggestion as to how

23  this should be handled set forth by Mr. Krieger is adequately

24  and I think completely discussed <u>Hutchins</u> on page 450-451.

25      I would like to point out one thing.  When we were on

P 36

1   Exhibit 15-E  and I believe Mr. Kunkel was on the stand and

2   I asked him specifically if the ground waters within these

3   areas are within known and defined channels, he answered it

4   "no."  I have had a chance to check with him informally, and

5   I think that is correct.  If that is correct, if there is no

6   known and defined channel of ground water within this area,

7   then these waters would all be percolating waters which, in

8   essence, support the surface flow and I think they would be

9   treated generally just about the way Mr. Krieger outlined.

10  Each person would have correlative rights to them, including

11  the United States.  I think the only practical difference

12  between saying they are percolating waters -- not vagrant

13  and local, just percolating -- that then the State Water

14  Rights Board would have no jurisdiction to grant permits

15  or licenses to appropriate these ground waters because the

16  State Water Rights Board's jurisdiction is limited solely

17  to waters within the ground which are in known and defined

18  channels.  And if none of these ground waters are in a

19  known and defined channel, then of course they would be

20  percolating waters not subject to the jurisdiction of the

21  State.

22       I think, frankly, that Mr. Krieger's findings are

23  going to have to be more detailed, as he suggested.  But

24  other than working out the language of the findings, I think

25  his approach to it is correct.

P 37

1      THE COURT:  Mr. Sachse.

2      MR. SACHSE:  I am in accord with Mr. Krieger basically,

3  also.  But I think that we are overlooking something that is

4  quite serious here.  Mr. Krieger points out that the perco-

5  lating waters, to use Mr. Girard's word, contribute to and

6  support the stream and can be regulated and treated as part

7  of it.  But we have to say what stream?

#4
T-4

1        Now, Mr. Veeder has drafted his findings with the

2    idea that from the surface divide indicated on Exhibit 277

3    to the upper end of the watershed on the northwest and to

4    the limits of the Kunkel line on the northeast is a single

5    stream to which all these ground percolating waters

6    contribute.  He states that as a finding.  It is not a

7    finding based on any evidence that he offered.  Because,

8    I will invite your Honor's attention to Exhibit 15-E and

9    as large as life we have a line drawn by his own witness

10   which indicates that in 1959 this starred line or asterisked

11   line is the approximate position of the divide between

12   ground waters tributary to     Temecula Canyon and the

13   ground waters no longer tributary to Temecula Canyon.  Mr.

14   Veeder has drawn us a package in these findings which is

15   spelled out very clearly at the end that the sharp decline

16   in ground water level in Pauba Valley, which I don't

17   concede there is any evidence on, has not yet been reflected

18   up here.  Mr. Veeder wants this to be a single package, and

19   I think before we go any further it is going to be

20   imperative that we discuss what are these percolating

21   waters to which Mr. Girard refers?  What waters do they

22   support?

23       Now, if my interpretation of Mr. Kunkel's evidence is

24   correct, ground water northwest of the line on Exhibit

25   15-E might well be held to be percolating and to  contribute

16,666

t-5

1    to and support the Upper Murietta, the area with which

2    Mr. Krieger is concerned.  Waters to the southeast of the

3    same line would not be held to be supporting the Murietta.

4    They would be held to be supporting the Temecula.  I can't

5    overemphasize the fact that to me this set of findings

6    represents --

7         MR. VEEDER:  You are speaking of mine now?

8         MR. SACHSE:  Yours.

9         -- represents a complete departure from what I, at

10    least, had assumed we had arrived at, and if these even

11    remotely approach your Honor's thinking, I think you ought

12    to tell us, because this certainly isn't what I thought we

13    were coming to.

14         MR. GERARD:  I agree with Mr. Sachse.  I didn't dis-

15    cuss that point because I thought we went into that.

16         THE COURT:  Did we not have evidence that that so-called

17    divide on the ground water had varied from time to time?

18         MR. SACHSE:  Yes.

19         MR. VEEDER:  And that was a temporary line.

20         THE COURT:  Now, I see your point, but I am not too

21    impressed with it, because as I view this evidence that we

22    have taken the direction of movement of this water is toward

23    the southwest.  This particular map shows some of the arrows.

24    Up here it is true you have water coming around a piece of

25      basement complex.  Here you have a situation -- well, it

16,667

t-6

1   is still generally southwest in the northwest corner where

2   we note there was a reverse gradient.  But your water

3   movement is to the southwest, and your well levels show

4   the general situation.  Now, it may be that there is an

5   underground divide that moves from time to time, depending

6   upon pumping.

7       For instance, this particular map I am looking at, 15-E,

8   purports to show a couple of two or three pumping holes, two

9   pumping holes, and also what might well be a pumping hole

10  here in the  Santa Gertrudis, and this might well cause

11  this line to move this way.  By the same token, with less

12  pumping in the area of the Santa Gertrudis and more pumping

13  down here, we will say, in Long Canyon, your line might well

14  move the other way.  I don't know that that line is too

15  significant, in view of the testimony that that line was a

16  movable line.  It was put on there also in connection with

17  the line across the Murietta Valley and the proof that was

18  offered of a reverse gradient in Murietta Valley because of

19  the great amount of pumping in the Murietta Valley.   And

20  you will notice a portion of that line over here across

21  the Murietta which showed a reverse gradient to the northwest

22  of the Murietta and then a gradient to the southeast of the

23  Murietta.  And, again that line is not a stationary line.

24  If you had a wet year and plenty of water coming in,

25  undoubtedly the gradient would have all been to the southeast.

t-7

1    So, how can you do anything with that so-called underground

2    water divide there?

3        MR. SACHSE:  This is my reply to your Honor.  I attach

4    no significance to the location of that line, none whatso-

5    ever.  The significance that you have to attach to this

6    question is to go right back to the fundamental statement

7    of Mr. Krieger and Mr. Gerard.  These are, let us say,

8    percolating waters which support and contribute to the

9    stream.  To what stream do they contribute and support?  If

10   the line is here, they perhaps kcontribute to the Santa

11   Gertrudis.  If it is clear up here, they might contribute

12   to the Santa Gertrudis.  The point is that each drop of this

13   percolating ground water is contributing to some stream.

14   But every drop isn't contributing to every stream in the

15   watershed.  There has to be some line of demarkation that

16   this water might contribute to Pauba and this water might

17   contribute to Murietta.

18       THE COURT:  Why don't we just say they contribute to

19   the Santa Margarita?

20       MR. KRIEGER:  That is what our findings say, your

21   Honor.  They don't try to make an apportionment.

22       MR. SACHSE:  I have no objection to that, if that is

23   what we say.  Mr. Veeder says he agrees, but Mr. Veeder

24   agrees with what?

25       THE COURT:  Can't we say that these waters contribute

16,669

t-8   1    to the Santa Margarita?

2         MR. KRIEGER:  Definitely.

3         THE COURT:  Without splitting up the Pauba and Murietta.

4         MR. SACHSE:  And without calling it a "basin."

5         THE COURT:  We are calling it a ground water body.  I

6    thought we had agreed long ago.

7         MR. VEEDER:  If somebody will tell me the difference

8    between a ground water body and a basin, I'll be glad to

9    be educated.

10        MR. SACHSE:  I will try to tell you.  I think there

11   has been too much dodging on the part of the United States

12   as to what they are trying to accomplish with this.  The

13   significance of calling this a basin is, to be very

14   specific, that Mr. Veeder can come down here to the

15   Windmill Well or the China Garden Well or any other well

16   on the Pauba Ranch and attempt to regulate that in connec-

17   tion  with the pumping hole that exists up on the Murietta.

18   If this is a basin, Mr. Veeder can try to do it.  If it is

19   not a basin, if it is what Mr. Krieger says it is, then he

20   can't do it.  It is that simple.

21        MR. STAHLMAN:  May I say something, your Honor.  In

22   the first place, the significance of this line -- Mr. Veeder

23   never gave an explanation or a reason for it -- the very

24   fact, as we commented at the time, that it went up here

25   into the basement complex et cetera put some reliability on

it, and in the second place it is confusing by reason of
the fact that it does not follow the natural contour.  I
attempted to go into this at one time and your Honor said
you didn't know what I was talking about, and that may occur
again.

However, in attempting to determine in the future what
would occasion        various conflicts between different
parties who had interests in here -- and I don't want to
get shot for this statement -- we talked with Mr. Mann,
spent a day with him up there and endeavored to get some
more information.  Because I always did feel that the
evidence here, particularly in view of the fact that there
was conflict between the geologists from the 's State,
although there may be some sense in what they said -- in
talking to Mr. Mann, he said that this area in through here,
referring to this older alluvium in there, is an area which
is highly faulted, that there are faults far in addition
to those which have been shown on the maps and which are
known and that they fault in various directions, that the
waters contained in this ground water body are high
compartmantized.  In other words, you have situations where
within a short period of time and a short distance from
one well to the next you would not follow a pattern of
pumping that you would expect to find if we had a free flow
of water in connection with the different properties on the

t-10

1   older alluvium.  I submit that it looks logical that the

2   water does -- particularly Mr. Girard's theory  I like that

3   it does flow down and contribute to the stream system.

4   But in order avoid whatever may be the conflicts in the

5   future between these people where somebody has a good well

6   and somebody who is going to have a bad well next door, I

7   think we haven't reached the point where we can specifically

8   define just what that area is.

9        THE COURT:  Why don't we draw our findings and show

10   what the facts are, good or bad?  In other words, we could

11   say that this area is not a basin in the sense that the

12   water levels generally are the same throughout the area;

13   that the evidence shows that there are water levels running

14   in a staggered manner with the water level being higher

15   as you go to the northwest; that the general ground movement

16   of the water is to the southwest; that this movement is

17   affected by wells that are pumped for a large amount of

18   water and for a considerable period of time; that there have

19   been on occasion pumping holes develop; that pumping in the

20   Murietta, particularly in 1960, was such that there was a

21   reverse gradient in the Murietta; that in a wet year with

22   ample water recharging the basin there  probably would not

23   be the reverse gradient.   Stick to the facts on it.

24        MR. STAHLMAN:  I would go on that.

25        THE COURT:  That this is a ground water body of

16,672

t-11     1

percolating water part of the stream system; that there are

2    correlative rights.

3        I am not concerned about trying to visualize these

4    arguments that are going to come up.  When they come up it

5    is going to depend on the particular facts.  If it is a

6    contest between Vail in the Pauba Valley and somebody up

7    here in the Murietta, it has very little relationship.  On

8    the other hand, you could actually find that the closer

9    the wells were one to the other, the more effect they had

10    on each other.  This is how this works.  You could have a

11    real conflict in this area.

12        MR. VEEDER:  Where are you pointing?

13        THE COURT:  I am pointing right to the north of the

14    Santa Gertrudis and northeast of the Murietta.  The areas

15    where pumping holes are supposed to be -- well, I don't

16    know how you could approach any particular problem until

17    that particular problem arises.

18        MR. KRIEGER:  May I say this one thing, your Honor.

19    I think we made an effort in drawing these findings to do

20    just what you are saying.  We made no effort at all to

21    treat this as one basin, because we don't think it is a

22    basin, and we thought we disposed of some of the problems

23    by calling it an "area."

24        To go back to Hudson vs. Dailey, here again you are

25    concerned with basins, necessarily.  You are concerned with

t-12

1    lands that adjoin the stream system, whether they are

2    basins or not, pumping from which affects the stream system.

3    It seems to me that that is the way you have to draw this

4    line.

5        THE COURT:  I am in agreement.

6        MR. KRIEGER:  Why call it a "basin"?

7        THE COURT:  I didn't say call it a basin.  I say a

8    body of ground water or an area containing waters which are

9    a part of the stream system.

10       MR. GIRARD:  I like that better than the "body."

11       MR. KRIEGER:  We use the "area."

12       MR. STAHLMAN:  I am thinking about these cases that

13   tell us that a stream system, whether it is surface or sub-

14   surface, must have a well defined channel.

15       THE COURT:  Are you talking about the Murietta?

16       MR. STAHLMAN:  Yes, and the Pauba is the same way.

17       THE COURT:  I wouldn't propose to find any well

18   defined channels.  The closest you could get to it would

19   probably be down in the younger alluvium of the Murietta and

20   the Pauba, and I don't think that aids us a bit.

21       MR. VEEDER:  I have never followed the significance of

22   why we are talking about a well defined channel.  You do

23   have a single continuous ground water body, which your

24   Honor has already found.  Isn't that correct?

25       MR. STAHLMAN:  I think there is some logic and sense in

t-13   1    those cases.

2        THE COURT:   What cases?   That talk about well defined

3    channels?

4        MR. STAHLMAN:   Yes.

5        THE COURT:   If we were to define well defined channels,

6    all we could do would be to say, as Mr. Veeder suggested,

7    that the northeast touches basement complex and the south-

8    west touches basement complex and it feathers out up in the

9    north.   That is the only channels we could define.

10       MR. STAHLMAN:   No, you could define the channel as

11   being the younger alluvium, and that adjacent thereto there

12   is a material of a more compact nature.

13       MR. GIRARD:   Mr. Kunkel says there are no known and

14   defined channels.

15       THE COURT:   I don't think there are any channels in the

16   younger alluvium.

17       MR. GIRARD:   No, sir.

18       THE COURT:   The evidence shows that the only difference

19   between it and the older alluvium is that the water moves

20   through it more easily.   That is the only difference.   There

21   are lenticular setups in the younger alluvium.

22       MR. STAHLMAN:   I think we are getting some place on

23   this now.

24       THE COURT:   We will talk about it further after lunch.

25   We will adjourn until 2:00 o'clock.

         (Noon Recess.)

16,675

1    SAN DIEGO, CALIFORNIA, TUESDAY, MAY 2, 1961, 2:00 P.M.

2                        - - -

3        MR. KRIEGER:  Your Honor, during the lunch hour I have

4    tried to draft a couple of thoughts along the lines that you

5    were discussing before we adjourned, and while these are

6    not in any way ready to be put down, they go along these

7    lines:

8        One, to the effect that the ground waters within the

9    Murietta-Temecula area move slowly in a generally south-

10   westerly direction, but the movement is not uniform either

11   as to direction or rate of flow but is influenced by many

12   factors, including but not limited to the density of the

13   deposits underlying the area and the existence of faults

14   and barriers beneath the surface of said area.

Z fls  15

16

17

18

19

20

21

22

23

24

25

t-15
B-1

1    Then the other proposed finding or suggested finding

2  is along these lines:

3        That the Murrieta-Temecula area is not a basin

4    in the sense that pumping in one part thereof can

5    be shown necessarily to affect water levels in another

6    part of the area in any degree, or at all, but the

7    area has this in common, that all of the percolating

8    ground waters support the Santa Margarita stream

9    system.

10   THE COURT:  Yes and no.  You are having this written

11  out for me, are you?

12   MR. KRIEGER:  I do not have them written out except

13  just penciled down, your Honor.

14   MR. VEEDER:  If you want to send that in to my office,

15  my girl will type it   out.  What kind of a writer are you?

16   MR. KRIEGER:  I am a very poor writer.

17   THE COURT:  I had better dictate it.   Call my

18  secretary in, and tell her to bring her book.

19   MR. KRIEGER:  You can have it written out, too.

20   (Thereupon the secretary entered the courtroom.)

21   THE COURT:  Now, she is not quite as good as a court

22  reporter, but if you will go slowly, why, I will tell you

23  where to stop.  You can have it written up, too.

24   MR. KRIEGER:  These suggested findings are like this,

25  and I have numbered the first one 5-A.

16,677

t-16

1     THE COURT:  Make an original and a half a dozen copies

2 in triple space so that all counsel can have a copy.  The

3 first one we will call 5-A.

4     MR. KRIEGER:  All right:

5         "The ground waters within said area move slowly

6 and in a general southwesterly direction, but the

7 movement thereof is not uniform either as to direction

8 or rate of flow, but is influenced by many factors,

9 including but not limited to the density of deposits

10 underlying the area, and the existence of faults and

11 barriers beneath the surface of said area."

12 Then proposed 5-A --

13     THE COURT:  That was 5-A.

14     MR. KRIEGER:  5-B.  I beg your pardon.

15     MR. VEEDER:  This is 5-B?

16     MR. KRIEGER:  5-B:

17         "The Murrieta-Temecula area is not a basin" --

18     THE COURT:  Stop.

19     MR. KRIEGER:  That is a splendid finding, your Honor,

20 if you will just leave it right there.

21     THE COURT:  " -- in the sense that water levels

22 throughout the area are uniform."  I will start over again.

23     "-- in the sense that water levels throughout the area

24 described stand at or about the same level . . ."

25     Now, what is the next that you have?

16,678

t-17

1      MR. KRIEGER:  " -- or that pumping in one part of said

2      area necessarily affects the water levels in any other

3      part of said area."

       THE COURT:  "In every part of the area."  Well, leave

4      it as you have it.  Go ahead.

5      MR. KRIEGER:  " -- but said area has this in common -

6      that all of the ground waters thereof support the

7      Santa Margarita stream system."

8      MR. VEEDER:  Contribute to.

9      MR. KRIEGER:  That is all right; support or contribute

10     to.

11     MR. VEEDER:  Are a part of?  Isn't that what you mean?

12     MR. STAHLMAN:  No, they aren't all a part of.  I don't

13     think that is it.

14     MR. KRIEGER:  I think the thing we were trying to show

15     was that they do support in some degree the stream system,

16     but how much nobody knows.

17     THE COURT:  You are not suggesting that I find they are

18     a part the stream system?

19     MR. KRIEGER:  They automatically become a part of the

20     stream system if they support that stream system.

21     THE COURT:  Become a part of and support the stream

22     system.

23     MR. VEEDER:  And that is the physical fact.

24     THE COURT:  Now, 5-C:

t-18

"That the evidence shows ground water contours within the area run in generally a southeasterly-northwesterly direction; that water levels on the various contours stand at higher levels as we proceed towards the northeast."

You can type that up.   Does anybody want to take a stab at something before she leaves?

MR. STAHLMAN:   I don't want to take a stab at it, but I believe that we should decide what we have done here with respect to Hutchins.

THE COURT:   You can go ahead.   What is that?

MR. STAHLMAN:   I am just wondering if your Honor has read Hutchins on percolating waters, the nature of percolating waters.   There are about two pages here that I think would throw some light on this situation.

THE COURT:   What are you contending for?   I will be glad to read it, but what are you contending for?

MR. GIRARD:   What page are you at, George?

MR. STAHLMAN:   Page 424, I think.

MR. VEEDER:   Is that mine?

MR. STAHLMAN:   Yes, your book.

MR. VEEDER:   Thank you.

THE COURT:   Will you let me read it now without interruption?   This is Page 426.

MR. SACHSE:   What page is your Honor referring to?

t-19

1    MR. GIRARD:  At Page 424 I think is the distinction

2  between percolating waters and the stream system.

3    THE COURT:  Do you both have the same edition?  At

4  Page 422 begins "Underflow of Surface Streams."

5    MR. GIRARD:  Yes.

6    THE COURT:  And at 426 starts "Percolating Waters."

7    MR. GIRARD:  That is right.

8    THE COURT:  I am in accord with this.  I would like to

9  make findings along the nature of 426 and 427.  We could use

10  some of this language, for instance, on 426:

11    "a vast mass of water confined in a basin

12    filled with detritus, always slowly moving downward

13    to the outlet or outlets."

14  With some modification, that is what happens here.

15    MR. VEEDER:  Is that the San Bernardino case?

16    THE COURT:  That is Eckel vs. Springfield Tunnel &

17  Development Company language.

18    MR. GIRARD:  That is Footnote 21.

19    THE COURT:  Footnote 21.

20    MR. STAHLMAN:  What struck me there, your Honor, --

21    THE COURT:  Another term here is:

22    "but also in so broadening the concept of

23    percolating water as to include within that term well-

24    defined subterranean basins filled with loose water-

25    bearing materials through which the ground waters are

16,681

t-20

1      broadly diffused."

2      That is Katz vs. Walkinshaw, and, in fact, the

3 description given in Katz vs. Walkinshaw in many ways covers

4 the situation here.

5      MR. STAHLMAN:  That is what I thought, that there was

6 such a similarity there.

7      MR. KRIEGER:  I wonder if I could add, though, the

8 actual case upon which I have proceeded here, and that is

9 Hudson vs. Dailey, 156 Cal. 617, and on Pages 627 and 628

10 you find these sentences, and let me paraphrase the first

11 one just for context:  There is no rational ground for any

12 distinction between percolating waters and the waters in the

13 ground immediately beneath and directly supporting the

14 surface flow, and no reason for applying a different rule

15 to the two classes with respect to such rights, if, indeed,

16 the two classes can be distinguished at all.

17      "Such waters, together with the surface streams supplied

18 by them, should be considered a common supply, in which all

19 who by their natural situation have access to it have a

20 common right, and of which they may each make a reasonable

21 use upon the land so situated, taking it either from the

22 surface flow, or directly from the percolations beneath

23 their lands.  The natural rights of these defendants and the

24 plaintiff in this common supply of water would therefore

25 be coequal, except as to quantity, and correlative."

t-21

1    MR. STAHLMAN:  May I ask you this question, Mr. Krieger:

2    Was the basic situation in that case similar to this?  I

3    mean, were there two different types of alluvium?

4    MR. KRIEGER:  Oh, yes.  Yes, indeed, there were.  It

5    was very much like this because this arose out of the

6    Sierra Madre Mountains.

7    THE COURT:  This, what you have described, is in the

8    nature of what your legal conclusions would be rather than

9    your findings.  I see nothing wrong with that general

10    language.  Do you, Mr. Veeder?

11    MR. VEEDER:  It may be that would be your legal

12    conclusion predicated upon the facts that we are discussing.

13    I really don't know what this is here.  I haven't

14    followed it.

15    THE COURT:  I don't know either, but it is a question

16    of getting some language together, and maybe we should start

17    in with some of this.

18    MR. GIRARD:  I think somebody will have to sit down and

19    work with this for a little while.

20    MR. VEEDER:  Your Honor, really hasn't there been some

21    confusion about a basin here, that is, the cup in which the

22    water-bearing material is held; that is, they are getting

23    confused?  Actually, there is a basin here in which water-

24    bearing materials are found, and we have found that it is

25    all a part of the same body, and that everyone has a share

t-22

1    and interest in it.

2        Aren't we in agreement on that?

3    MR. STAHLMAN:  We have a situation that has a complex

4    geological situation, and aren't you going to over-simplify

5    it, as though you had just one material there, and where you

6    have a different rapidity of movement?

7    MR. VEEDER:  I believe that that would be true in

8    regard to any ground water basin, that is, where you have a

9    combination of sand, silt, clays and gravels, you are going

10   to have water moving at different rapidities.

11   MR. STAHLMAN:  That is true, and I go along with that.

12   That is right, you do, but when you have a different type

13   and character of material, then there is a different context.

14   If it is flowing in one direction, we have a different

15   situation.   It is a question of finding what your facts

16   are in relation to what we have established in the case.

17   THE COURT:  I can't yet see what the big argument is

18   about, and what the difference is between various of your

19   contentions here.  It is just a matter of formulating some

20   language so we can start to look it over.  Where is this

21   difference between you and Mr. Krieger?

22   MR. VEEDER:  I think Mr. Krieger's statements were

23   in conformity with our position.

24   THE COURT:  You informed me that there was some

25   difference of opinion.

t-23

MR. VEEDER: Not now. I will be perfectly candid with you. The reason I thought that was on the basis of what Mr. Krieger was saying, and maybe he can straighten me out on it.

I have said to him that in my view this is a single unit in which a lot of people had an interest. He said there could never be an apportionment without an adjudication of every single right in the whole Valley.

Isn't that what you said?

MR. KRIEGER: I went further than that. I don't see how you can have an apportionment unless you determine the rights of all of the people on the stream system, including the Murrieta-Temecula area.

MR. VEEDER: The point that I am making is that at this juncture I don't believe that there is a disagreement. I think the particular situation is in regard to the areas where there is a complete cut-off, at least a large part of the year, by reason of the stream being dry, and a lot of other things. Above the Murrieta-Temecula basin I think there might be some --

THE COURT: Let me dispel some doubts right now. Mr. Krieger, you made a broad statement.

You stated there could not be an apportionment without an apportionment of the whole watershed. Let's just take one little situation to show you how wrong you are.

t-24

1    Let's take Sandia Creek, which we have been talking

2    about.  Suppose matters come up on Sandia Creek, and Vail

3    makes use of its riparian land up above, and there is a

4    real water shortage for riparians in the Sandia watershed.

5    It is entirely possible to have an apportionment in the

6    Sandia watershed without having an apportionment up in

7    Anza Valley or in the Upper Temecula.

8        MR. KRIEGER:  That could be done, I would agree.

9        THE COURT:  All right.

10       MR. KRIEGER:  Upon a unique showing like that, it could

11   be done.

12       THE COURT:  It is likewise entirely possible that in

13   view of the big holdings on the Upper Temecula, Vail, and

14   the big ranches, and others, you might have a situation

15   where the Temecula itself would not require apportionment,

16   but where with the small holdings and the large amount of

17   pumping in the Santa  Gertrudis area, you might have to

18   have an apportionment in the area of this ground water body

19   without having to apportion the Upper Temecula.

20       Would you concede that?

21       MR. KRIEGER:  I think I would concede that, but we

22   would have to go a long way before we ever reached a factual

23   situation .   that would bring that into being.

24       THE COURT:  I am not saying it would come into being.

25   But I think you have a bigger problem when you come to

t-25

apportionment in the area we are now talking about, the ground water body or the basin in Exhibit 277.  However, you would probably have to treat that pretty much as a unit, and it would depend entirely on the circumstances.

I think you can conceive of a situation where one or two wells might be used so extensively that it was pretty obvious they were getting more than their fair share of water as compared with other persons who were seriously affected by this pumping, and I can conceive of a situation where you might have a hearing on apportionment and might leave much of the so-called basin area alone, but do some leveling up between two or three wells that were in immediate proximity to each other.

MR. KRIEGER:  Am I right that in order to get to a situation like that you would first have to show what the safe yield of the stream system was?  I am assuming that somebody downstream has --

THE COURT:  I don't think so.  Let me tell you my thinking on it.  I think it is just as simple as a case of-- well, let's forget even about riparian rights.  Let's take two owners who are pumping out of an area where there is underground water, and each of them have riparian ground in an equal amount, and each of them have a well, but the water strata below is so constituted that if the A-well is pumped, the B-well does not produce any water.

t-26                                                                    16,687

1        It is entirely possible with a situation of that kind

2   that a Court might make some adjudication of the correlative

3   rights between these two people, and say that "A" would not

4   have the right to pump his A-well continuously so that "B"

5   does not get any water at all.  Here are just two people

6   concerned with a problem that concerns the two of them.

7        I think that would be a situation where a Court could

8   say that it is obvious that both share in the same under-

9   ground strata, and both have wells, and by some reasonable

10  regulation of the pumping, both can pump out of this water

11  strata.

12       I think an appropriate order of that kind could be

13  made, and maybe order that "A" could pump every other day,

14  and "B" would then get water on the days in between.  There

15  are a variety of situations that you can have involving

16  water, and I don't think you can make any broad statements

17  that there can be no apportionment without apportioning

18  every right, as I say, within the so-called basin.

19       MR. KRIEGER:  Now, let me discuss another situation

20  with you along these lines:  I certainly agree with what you

21  have said if you are talking about one person in the

22  Murrieta Valley claiming that another person is using too

23  much water.   He could do it by joining in his own water

24  level, or   going down and pumping across the Creek.  That

25  is a simple case.

B-2

16,688

t-27

He could also do it by trying to demark the geological area, where he could prove the exact amount of water that came into that, and the exact amount of water that went out, and how much each person was entitled to.  That could conceivably happen.

THE COURT:  That is not susceptible of proof.  In this area how could you take any part of that basin and try to mark it out, as water is moving in and water is taken out?  How could you ever prove that?

MR. KRIEGER:  It would be very difficult, but there has been some suggestion made at some time here that this was like the Raymond Basin case, and that is precisely what they did in that case.  They could measure the inflow and outflow and hence determine the safe yield.  But the thing that I am mostly concerned with here is the United States, which has commenced this action because of its interest downstream.

Now, what interest has the United States got in the Murrieta-Temecula area until it first shows what its own water requirements are in comparison with all other people on the stream, and that also have an equal right?

That is the point that I was driving at when I said earlier there could not be an adjudication of this isolated area, or any isolated area on the stream system without the United States first showing what its rights were correlative to those     other rights.  That was my thrust.

16,689

t-28

1    THE COURT:  I go this far with you, that the further

2    downstream you go on the stream, the more area upstream is

3    affected.  If somebody up above Vail Dam is talking about

4    being short of water and trying to get some fair apportion-

5    ment, he is not talking about the people downstream, because

6    they don't affect him at all.  He is only concerned with the

7    people upstream.

8    MR. KRIEGER:  Right.

9    THE COURT:  In that sense, therefore, the United States

10   being the last user on the stream is conceivably concerned

11   with everybody's use upstream?

12   MR. KRIEGER:  That is right.

13   THE COURT:  You were not here the other day, but in

14   case you did not read the transcript, I opined that actually

15   when we were all finished with this stream system, insofar as

16   regulation by the United States is concerned, it is going

17   to consist largely of this ground water body we are marking

18   out, Vail Dam, of course, which has the junior appropriative

19   right and is subject to regulation, and surface water, of

20   course, of the whole watershed -- of course, the basement

21   complex is out -- but so far as ground waters in the smaller

22   alluvial areas upstream are concerned, such as Anza,

23   Domenigoni, and so forth, most of them  are so small in

24   comparison with the irrigable acreage, it is inconceivable

25   to me that the people there could ever be said to be taking

t-29

1    too much water.

2        So, when you get right down to it, your stream system

3    would be subject to some later adjudication, and it is

4    going to concern largely this basin, Vail Dam, which will be

5    subject to regulation, and that is about it.  As a practical

6    matter, I don't know how you could reach upstream and tell

7    a fellow in Anza to cut down on his pumping correlatively

8    because he is getting too much water.  In other words, things

9    would have to be awful dry downstream to have to make any

10    of those fellows up in Anza give up any water that they were

11    using, because of the size of the basin and the fact they

12    have riparian land and riparian overlying rights.  This is

13    the area that might be subject to regulation.

14        Now, if it was to be subject to future regulation, the

15    case would have to be reopened, and I think what you were

16    thinking about is that before we could tell one man, "You

17    have to cut down on pumping," you would have to have a

18    pretty complete picture of all of the water users in that

19    basin.

20        MR. KRIEGER:  That is the point I am making, your Honor.

21        THE COURT:  I kind of agree.  Mr. Veeder, do you?

22        MR. VEEDER:  I have no violent disagreement with

23    what your Honor has said.   I think that it is reflective

24    of where the area of disagreement with Mr. Krieger came

25    about the other day.  In other words, I think that the chief

t-30

1    source of water upon which the National Government relies

2    is the older and younger alluvium, and call it ground water

3    body, if you wish, I think that is where we are, and I

4    think with Vail Dam in it, we look more to that by far than

5    any other place.

6        THE COURT:  And ground waters.  Of course, you can't

7    forget that you have to take into account your natural ground

8    water reservoirs down below, and your sources of supply for

9    recharging those as a part of the water in the stream.

10       MR. KRIEGER:  I think that the only disagreement we had,

11   your Honor -- the only thing that Mr. Veeder and I had any

12   disagreement on was that there had been no showing in any

13   way, shape or form, first, that any of the uses of our

14   people in that area had been unreasonable, certainly no

15   place anything about their not being beneficial, and there

16   was no evidence to show that they had harmed anybody so far,

17   and, therefore, that they were taking too much.

18       I said in another way what you have just said now, that

19   before that day will come we will have to show what everyone

20   on the stream system who is within these boundaries you will

21   ultimately describe -- will have to show what their uses

22   are before there can be any curtailment.

23       MR. VEEDER:  But not as to Anza Valley, Diamond and

24   Domenigoni, and Oak Grove, they are out.  That is where you

25

t-31

1    and I disagree.

2        MR. KRIEGER:  Well, I didn't know where they were.  I

3    thought everybody outside of the famous Kunkel line was.

4        THE COURT:  Technically, all of the younger alluvium

5    we have kept in the case.  There is no argument about that.

6    But what I am saying is that as a practical matter I can't

7    visualize the Government coming in with that kind of an

8    application, and, secondly, I can't visualize that that

9    applies as to these relatively minor uses in these shallow

10   basins upstream.  But I can visualize your situation, and

11   anything could happen here.  This is the Santa Margarita

12   River here we are talking about right now.

13       Now, can we go over some of these?  Let's get this out

14   of the way in some way.

15       MR. SACHSE:   Whose set are we working on, your Honor?

16   Mr. Krieger's?

17       MR. KRIEGER:  And may we have copies of the ones you

18   have, your Honor?

19       THE COURT:  Yes, pass these out.

20       (The documents referred to were handed to counsel.)

21       THE COURT:  About this word "basin," have any of you

22   looked into it sufficiently?  Should we avoid the use of

23   "basin"?

24       MR. SACHSE:  Yes, I think we should at all costs, your

25   Honor.

t-32

1      MR. VEEDER:  I would like to be enlightened on that

2  proposition, and what legal factors run from the term "basin,"

3  as distinguished from a ground water body contained in a

4  relatively impervious area of basement complex.  What is the

5  point?

6      THE COURT:  I don't know.

7      MR. SACHSE:  I will make a stab at telling you, your

8  Honor.

9      THE COURT:  Has anybody researched it?

10      MR. SACHSE:  I will make a stab at telling you a few of

11  them.  For instance in Katz vs. Walkinshaw, the case that

12  Mr. Stahlman read you the footnote on, on the same page the

13  Supreme Court just one year later -- if you will look at

14  Footnote 24, just one year later the same Court in discussing

15  its own decision said, "the condition presented was that of

16  a well-defined underground catchment basin, a subterranean

17  lake, so to speak, loosely filled with gravels."

18      Now, that is not our case.  The most important basin

19  case in California is the Raymond Basin case, Pasadena vs.

20  Alhambra, and one of the consequences, or the heart and soul

21  of the Raymond Basin case was the determination that these

22  pumpers were all prescripting against each other because it

23  was a basin.

24      THE COURT:  I get the impression that when you talk

25  about a basin, you have much as is mentioned in the footnote--

16,694

t-33

1      MR. KRIEGER:  Yes.

2      THE COURT:  -- a catchment basin in which a water level

3  is generally uniform throughout the body.

4      MR. SACHSE:  Right.

5      THE COURT:  With the result that if "X" is pumping over

6  in one corner, he could be adverse to --

7      MR. SACHSE:  He could be prescriptive.

8      THE COURT:  -- and could be affecting a fellow way over

9  in the other corner because of the nature of it.

10     (Thereupon  the Court draws upon the blackboard.)

11     For instance, here is the ground level, and here is the

12  loose material below, and here is a fairly uniform water

13  level, and if a fellow puts a well down here, he is

14  affecting a man on the other corner that has a well on the

15  same basin.   That is the sort of impression that I get of

16  a basin.

17     Now, we have a little different situation.  We have a

18  catchment area.  We have the Santa Rosa down here (Indicating)

19     MR. VEEDER:  I didn't hear what you said about

20  catchment, your Honor.

21     THE COURT:  We have a sort of a catchment area .   We

22  have the outlet up here, but what you have in the nature of

23  a water level -- here is your land level, and I will keep

24  this up high here (Indicating), -- what you have in the nature

25  of a water level is a level coming down like this (indicating),

16,695

t-34

1   and then down towards the bottom, leveling off, and our

2   water contours show different elevations at different places.

3   But you don't have a basin like this.  You have an area of

4   ground water that is moving to an outlet, the Gorge.

5       MR. KRIEGER:  May I add one thing to that, your Honor?

6       THE COURT:  Let me finish this first.   It may be that

7   you could argue that at the very bottom part you do have

8   some sort of a basin; at the Murrieta, for instance, or the

9   bottom of Pauba, but it is so connected with this other area

10  that you can't separate it.

11      MR. STAHLMAN:  You have two different materials and two

12  different rates of flow.

13      MR. VEEDER:  You have the younger and older alluvium.

14      THE COURT:  Yes.

15      MR. KRIEGER:  Your Honor, I think there is one more

16  fact that distinguishes these two situations, and I think it

17  is a critical one.

18      Now, Franz Sachse mentioned the Pasadena case.  We are

19  working on that Pasadena case right now on a re-determination

20  of one fellow who has put down a well in that basin, and

21  we have been through all the Referee's findings from the

22  beginning of that case, and there is one thing that

23  characterizes this basin, and it is that you can, due to

24  its unique curvature, determine not only the water level in

25  it, but you can determine the amount of water that gets in it

16,696

t-35

and the amount of water that goes out at the other end, and you have to determine the amount that goes in over a hydrologic cycle, and the amount that goes out, and correlate it with the pumping to determine what the safe yield is.

This you cannot do in an area like this, and for that reason we have avoided the word "basin", because it implies that you can regulate it, and I say you can't regulate it unless you know what goes in and what goes out.

MR. VEEDER:  I don't follow that.

MR. SACHSE:  I would go one step further, your Honor. The only trouble is that your Honor's catchment is only of one dimension.  But this basin extends -- this ground water body extends many miles between Pauba and the upper limits of Murrieta.  As we know, Mr. Kunkel has agreed and your Honor has agreed that there  are within it many different little additional ground water divides where water runs in one direction and another, and where you simply cannot in an area of this immensity find anything approaching that kind of a thing.

What you would have here instead of this picture, you would have a ground water level like this (Drawing on blackboard), and you say that is a basin.  It isn't a basin. The pumping over here does not affect immediately this fellow over here (Indicating).      It might affect this well,

16,697

t-36

1   and that well, and that well, but not this one.   And that is

2   what we have in the ground water body we are discussing.

3       THE COURT:   I don't think it is that extreme either, or

4   you would not have the contours as shown on the wells.

5       MR. SACHSE:   Granted, it is exaggerated.

6       THE COURT:   Yes.

7       MR. STAHLMAN:   But they are at different elevations,

8   your Honor.

9       MR. VEEDER:   What difference does it make?

10      MR. STAHLMAN:   You can take it from very few wells at

11  this time, and we don't know too much about it.

12      THE COURT:   That is true, there are few wells, but,

13  Mr. Stahlman, the pattern is there.   If you had a water

14  level down in the bottom of 1150 feet, and then going up at

15  the top of 1000 feet, and then if you reversed them with

16  two other wells, with one at 1000 feet at the bottom and

17  the other of 1150 feet at the top, I would go along with

18  some of the diagram that Mr. Sachse has drawn.   But that

19  isn't what you have.   You have a water level showing a

20  gradual movement of water down the gradient towards the

21  outlet westward, and, of course, eventually toward the outlet

22  at the north.

23      MR. SACHSE:   I think 5-A tells the story, your Honor.

24  I really do, with one minor typographical error there.

25      MR. KRIEGER:   That word is "influenced" in the fourth

t-37

1    line instead of "uniform."

2       MR. VEEDER: Have you looked at my VII?

3       MR. STAHLMAN: Gosh, can't we go through this one first?

4       THE COURT: What are you looking at? 5-A?

5       MR. VEEDER: Yes, 5-A.

6       MR. SACHSE: VII is about as different as it can be.

7       MR. VEEDER: Add in there, "the difference in

8    permeability."

9       THE COURT: That is "influenced" instead of "uniform"

10    on the fourth line?

11       MR. KRIEGER: Yes.

12       MR. GIRARD: I don't think Mr. Veeder's sentence is,

13    well, reflective of the facts.

14       THE COURT: Of course, if we wanted to be factual about

15    this, we could find the two faults in the Murrieta, and we

16    could find the fact that the fault at the northwest forms a

17    sort of barrier, and that water goes through and over that

18    barrier, which is the cause of rising water, then, in the

19    Murrieta.

20       You can find all that thing, if you want it in the

21    findings, and there is no dispute about that.

22       MR. KRIEGER: You can find those things, but there are

23    other faults in the area. I think there are a couple that

24    Mr. Kunkel has pointed out, which are not quite as clear as

25    the Wildemar fault and the Elsinore fault, which you would

16,699

have to find in a general way, it seems to me, as we are proposing here.

THE COURT:  I don't recall any testimony of faults in the area between the Pauba and the Murrieta.  There were faults down around the Pechanga and Wolf Valley.

MR. KRIEGER:  I think there was a question of faults here in connection with Murrieta Hot Springs.

THE COURT:  Yes, but that fault is above the basin we have laid out here.

MR. VEEDER:  That constitutes the northern boundary here, what he is talking about.

THE COURT:  Yes.

MR. KRIEGER:  I think there are others below that.  I think we have some testimony on that, or doesn't Bulletin 57 show other faults in that area?

MR. GIRARD:  But I think Dr. Mann testified last week that Pauba Valley has much tighter faults.

MR. VEEDER:  This is the Wildemar fault right here, and this is the Elsinore fault that he mentioned (Indicating).

THE COURT:  Will you talk one at a time, please?

MR. VEEDER:  May I ask a question, please, that I think is extremely important, because I am trying to find out the principles of law that would be attendant upon those facts. Assume that there are variances in elevation in the ground water body that we have here, concerning which we have now

t-39

delineated the exterior boundaries, what difference does that make from the legal standpoint?  Is there a difference?  I haven't found that in the case.

B-3

P 42

1    MR. GIRARD:  From the standpoint of the United States,

2    I don't think there is any difference.

3    MR. VEEDER:  All right.

4    MR. GIRARD:  But there may be a difference between

5    people in the area.

6    MR. STAHLMAN:  It makes a difference.

7    MR. VEEDER:  We have cleared up one thing.  In other

8    words, the United States of America, sitting at the stream

9    with your Honor's bucket there, -- isn't that what you called

10   it?

11   THE COURT:  That is not my bucket.  It is always your

12   bucket.

13   MR. VEEDER:  All right.  In any event, we are down

14   there, and I don't care whether there are different eleva-

15   tions in this ground water body or not, if somebody is

16   interfering with the water that is reaching us, we are

17   concerned with it.  We would like to have a nice smooth

18   ground water body.

19   MR. STAHLMAN:  The difficulty is this --

20   THE COURT:  Mr. Stahlman, will you speak up?

21   MR. VEEDER:  What is the difference in law?

22   MR. STAHLMAN:  I think, as his Honor pointed out here,

23   where you have a basin and where the water seeks its own

24   level in that basin, you have different factors that enter

25   into it, and there is no question whether each party pumping

P 43

1   from that pumps from the quantity that is contained within

2   that basin there.  But when you have a basin such as you have

3   here, and this (indicating) is the two fault lines, and then

4   you have a hill that slopes up here, and then you come down

5   with your water level, and you have a surface here that

6   graduates down, pumping up in here (indicating) is entirely

7   different than pumping down here (indicating).

8        MR. VEEDER:  In what regard, George?

9        MR. STAHLMAN:   Because the first place that it goes

10   dry is up here (indicating).

11        MR. VEEDER:  But that simply means you are pumping from

12   the edge of the bathtub, or the edge where the alluvium has

13   feathered out.  You are still taking water from the same

14   retainer, aren't you?

15        THE COURT:  Now, gentlemen, let's spend the rest of the

16   day in this way:  That some of you fellows draw some findings,

17   and somebody get a notebook out, and let's make some notes

18   here.  You have a lot of stuff to work with, and I will tell

19   you what I want to find, and I don't think you will get into

20   any disagreement.

21        Let's look at Veeder's I, and let's forget about calling

22   it a basin, and we will call it a ground water --

23        MR. GIRARD:  Area.

24        THE COURT:  - - a ground water area.   That is better.

25        MR. VEEDER:   A ground water what?

P 44

1    THE COURT:  Area.

2    MR. VEEDER:  I don't think that "area" has a legal

3    connotation to it, your Honor.  Can't we call it a ground

4    water body?

5    THE COURT:  I don't care whether you think "area" has

6    a legal connotation or not.  We can use that term, if we

7    want to, if it shows what we are doing.  Let's try out "area"

8    and if that does not work, you might say "body."  But "body"

9    sounds too much like a basin, so let's say "ground water

10   area."

11   I have no objection to a finding that this area is

12   bounded, or, you can say it is comprised of deposits, and

13   let's call them, among other things, older and younger

14   alluvium, and that this area is bounded on the west by

15   Santa Rosa Plateau, to the northeast by basement complex,

16   and so forth, and to the south and east by the surface water

17   divide between the area above Vail Dam and those below the

18   structure -- that is not a very good description -- and

19   bounded on the north and west by the watersheds of the

20   Santa Margarita, and so forth.

21   MR. STAHLMAN:  According to that finding, it looks like

22   all of it is the same thing, the same material.

23   THE COURT:  We will just go ahead now:  That within

24   this area there is the valley of the Murrieta, and the two

25   major faults, and encompassed in the area between them is

P 45

1   this area of younger alluvium; then a finding on the Pauba

2   Valley with the younger alluvium; then the younger alluvium

3   in Santa Gertrudis, and if necessary, refer to a map, and

4   then the other areas of younger alluvium; that the remaining

5   parts of the area are the older alluvium and that there is a

6   difference in the permeability, and the rate of flow, and

7   so forth, of the water.

8       Then let me see what else we have in this one of Veeder's.

9       Then there is this finding II as to the exterior boundar-

10   ies as set forth in Exhibit 277, and in 277 there is the

11   description.

12       Then we have Veeder's III:  The material throughout the

13   body, and so forth, not in continuous layers, lenticular,

14   sediments at great depths near the southwesterly side, and

15   becomes thinner towards the northeast, and so forth.  That

16   is all right.  But meanwhile somewhere in here we are going

17   to talk about the younger and older alluvium.

18       Now, 5-A, that the ground water within this area moves

19   slowly and in a general southwesterly direction, is not

20   uniform, and so forth.

21       MR. VEEDER:  Does someone have a copy of 5-A that he

22   is not using?

23       MR. KRIEGER:  Yes.

24       (The document was handed to Mr. Veeder.)

25       THE COURT:  It moves in a general southwesterly

16,705

p 46

1   direction but is subject to variations in movement.  You

2   have /contradiction there.   First, you say it moves south-
        a

3   westerly, and then that the movement is not uniform.

4        MR. STAHLMAN:  But it is influenced --

5        THE COURT:  It moves in a general southwesterly direction,

6   and the movement is subject to variation as to direction and

7   rate of flow, and is influenced by many factors, including

8   but not limited to, and the one thing I want in here is the

9   existence of wells and the extent of pumping thereon, which

10  obviously influences the flow of this water, and the density

11  of deposits.

12        Now, on the existence of faults and barriers, I will

13  have to have my recollection refreshed, if there are any up

14  in that area of older alluvium.

15        If you are the same as I am, you can say that we do not

16  have sufficient information that the underground character

17  is such -- I believe it is not uniform, that there are

18  undoubtedly obstacles and barriers that influence and affect

19  the movement of this water, and put in something more general,

20  because I don't like the use of this word "faults," because

21  I don't know that we have got faults up in there.  If you

22  can show me that there are, why, all right.

23        MR. GIRARD:  We can ask Mr. Kunkel.  Are there, Mr.

24  Kunkel?

25        MR. KUNKEL:  I found none that I mapped.  I wouldn't

P 47

1   say that there weren't any.

2       MR. STAHLMAN:  I think your Honor is probably correct

3   because we do have evidence of a visualization of the cut

4   which shows there was some barrier.

5       MR. VEEDER:  That is lenticular.

6       MR. GIRARD:  Would it be more advantageous to use

7   "ground water divides" rather than "faults"?

8       MR. KRIEGER:  There are lots of ground water divides.

9       MR. VEEDER:  Now, wait a minute.  We had a connotation

10  to a "ground water divide" that I think we ought to stick

11  to.

12      THE COURT:  This is something we will have to straighten

13  out later, but let's go ahead.

B-4

14      Then on this 5-B I think you ought to say that it is

15  not a basin in the sense that water levels throughout the

16  area stand at or about the same level -- and you may want to

17  change the wording -- or that pumping in one part of the

18  area necessarily affects the water levels in all or any other

19  part.  But with the general substance of B I have no quarrel.

20      MR. STAHLMAN:  Then I think there is one word that ought

21  to be changed in the last part, that all of the ground waters

22  thereof support the Santa Margarita stream system.  I think

23  that is too broad.  I think they contribute to it.

24      THE COURT:  What is the difference, - - contribute to

25  and supports?  Then those people who like the words "contribute

P 48

1   to" can take those, and those who like "support" can take it.

2   I don't care.  It makes no difference.

3        MR. GIRARD:  I think it is of no great consequence.

4        MR. STAHLMAN:  But there is a difference between

5   supporting and partially supporting.

6        THE COURT:  All right.  I want something drawn up so

7   that we can start to tear it apart.  So somebody put it

8   together.

9        MR. VEEDER:  I can tear apart 5-B right now.

10       THE COURT:  What is wrong with 5-B?

11       MR. VEEDER:  "The Murrieta-Temecula area is not a

12  basin in the sense that water levels throughout the area

13  described stand at or about the same level," -- that is a

14  non sequitur.  The mere fact that there are variations in

15  water levels does not mean that it is not a basin.

16       MR. SACHSE:  He says it is not a basin, and that's it.

17  It is not a non sequitur.

18       MR. KRIEGER:  It is not a basin in the sense that Judge

19  Carter has drawn it on the board here.

20       THE COURT:  That is my idea.  You can dress it up in

21  any way you want to.

22       On 5-C I want a finding that these water contours

23  extend in a southeasterly-northwesterly direction, and the

24  water levels to the northwest are the highest, and those

25  to the southeast are the lowest, and they vary progressively

P 49

1    from one direction to the other.

2        Now, I don't see any fault in the sources of recharge in

3    Mr. Veeder's findings.

4        MR. KRIEGER:  The only difficulty with that one, your

5    Honor, is that here again we have the basin concept, and we

6    are talking about recharging it as though it were something

7    that was a regulatable recharge.

8        MR. VEEDER:  Oh, no.

9        MR. KRIEGER:  That is the impression that I get here.

10       THE COURT:  What we are trying to find is:  Where does

11   this water come from?

12       MR. GIRARD:  The sources of the ground waters within

13   the area are from these places.

14       THE COURT:  The sources of ground water.

15       MR. SACHSE:  I find some serious fault with it when we

16   get over to the next page.

17       THE COURT:  Wait a minute.  I am just looking at page

18   2 now.  On page 3 what serious fault do you find?

19       MR. SACHSE:  On page 3, your Honor --

20       THE COURT:  Where?

21       MR. VEEDER:  Is page 2 all right, Franz?

22       MR. STAHLMAN:  Just a minute.

23       MR. SACHSE:  Page 2?  I am on Paragraph IV.  Is that

24   what we are talking about, Paragraph IV?

25       THE COURT:  Yes.  He is on Paragraph IV, and he is down

P 50

1    now to Temecula Creek below Vail Dam.

2         MR. SACHSE:  Right, yes.

3         THE COURT:  I haven't got that far, but what is your

4    objection to that?

5         MR. SACHSE:  I think it misstates the facts in the record,

6    your Honor.

7         MR. VEEDER:  Give me a minute to read it again:

8              "Temecula Creek is a natural stream, the surface

9         flow of which is controlled completely by Vail Company

10        Dam" - -

11        MR. SACHSE:  Yes.

12        THE COURT:  I don't understand this "and by the pumping

13   from wells of that Company."  Other than that I don't see

14   anything wrong with it.  Is that what you are talking about?

15        MR. SACHSE:  Well, I don't like the word "completely."

16   I don't think that your Honor can make such a finding.

17        THE COURT:  "the surface flow of which is controlled

18   completely"?

19        MR. SACHSE:  Completely, yes.  It isn't.  It is not

20   controlled completely by the dam.

21        MR. VEEDER:  Why not?

22        MR. SACHSE:  Because the dam is not allowed to store

23   any surface water for approximately six months of the year,

24   so for about six months of the year the dam does not control

25   the surface flow.

P 51

1    THE COURT:  That is easily solved:  That the dam is

2    capable of completely controlling the surface flow, but that

3    under present regulation the dam is --

4        MR. VEEDER:  It is certainly a fact since they closed

5    the dam.

6        THE COURT:  The dam has been closed.  They just release

7    water.  The dam catches the water and they release it.

8        MR. SACHSE:  Your Honor, to the best of my knowledge

9    we have never had any evidence to say whether the Vails do

10   or do not legally comply with the terms of their permit, but

11   we know that the terms of their permit allow them to inter-

12   cept the surface flow until April 30th -- is that it, George?

13       MR. STAHLMAN:  Yes.

14       MR. SACHSE:  And after April 30th it is not intercepted.

15       THE COURT:  They actually intercept it, but they release

16   it.

17       MR. VEEDER:  So it is absolutely controlled.

18       THE COURT:  This is a simple matter.  The point is the

19   dam is physically capable, since it goes to bedrock, of

20   cutting off the surface flow on the stream.

21       MR. GIRARD:  Isn't surface flow controlled somewhat by

22   the upstream users, too?

23       MR. STAHLMAN:  It is controlled by the upstream users,

24   and in addition to that, I think the evidence in the record

25   shows --

P 52

1   THE COURT: All right. The surface flow at Vail Dam --

2   MR. VEEDER: I buy that. I buy that.

3   THE COURT: - - at Vail Dam. The dam is capable, and

4   it goes to bedrock, of completely intercepting the surface

5   flow at Vail Dam.

6   MR. STAHLMAN: Your Honor, there is one other point.

7   According to the engineering records that went into the dam,

8   and this is in the record in the case, it should flow and

9   spill an average of 6,000 acre feet a year in normal times.

10   MR. VEEDER: It does not work that way.

11   MR. STAHLMAN: In normal times, in the period of years

12   over which it was developed, that is what it would do. I

13   know it stops everything on the stream, and has since it was

14   built.

15   MR. SACHSE: The other thing I don't like, your Honor,

16   and you have pointed it out yourself, is this pumping of

17   the wells.

18   MR. VEEDER: Let's kill one snake at a time. What about

19   the control of Vail Dam?

20   MR. GIRARD: I think we just ought to state the physical

21   facts as they exist.

22   MR. STAHLMAN: That is right.

23   MR. VEEDER: That is the physical fact.

24   MR. GIRARD: This is a barrier across the stream. That

25   is the fact.

P 53

1        MR. VEEDER:  That is the fact, and it has controlled

2    every drop of water.

3        MR. SACHSE:  But the pumping part I think is simply not

4    true.

5        THE COURT:  Strike out that part about the pumping of

6    the wells.

7        As to Pechanga Creek, I don't see anything wrong with

8    that.

9        We will throw out your V in lieu of some of these

10   other findings and conclusions.

11       VI, -- generally I don't have much objection to that.

12       MR. SACHSE:  I don't think that the last sentence can

13   be found, your Honor, if it means what it says.

14       Does he mean that during every irrigation season the

15   extractions exceed the recharge of every rainy season?

16       MR. VEEDER:  For that period.

17       MR. SACHSE:  For what period?

18       MR. VEEDER:  During the irrigation season the extractions

19   from the basin far exceed the recharge, if any, for that

20   irrigation period.

21       MR. SACHSE:  Oh, you mean there is less recharge during

22   irrigation?  Sure, I will find that, but it does not say that.

23       MR. VEEDER:  I was wondering about that.  I thought I

24   was saying one thing and indicating another.

25       MR. SACHSE:  All right.  Then you simply say that during

P 54

1   the irrigation season the recharges exceed -- the extractions

2   exceed the recharges in the irrigation season.

3       THE COURT:  All right.  VII, as to the gradient, some

4   of that can be fitted into what I said about these water

5   levels.  There is no dispute about the gradient.

6       MR. VEEDER:  We can put in "except where it is inter-

7   fered with" -- what did you call it -- "artficially by

8   diversion."  There are some maps that show barriers in there.

9       THE COURT:  VIII, hydraulic continuity, there you can

10  say instead of "basin" "area."

11      MR. STAHLMAN:  And IX?

12      THE COURT:  This, in part, partakes of apportionment,

13  and we are not ready for that.

14      MR. VEEDER:  What are you on now, your Honor?

15      THE COURT:  IX.

16      MR. STAHLMAN:  IX.

17      MR. VEEDER:  I want to be heard on that.

18      MR. GIRARD:  I think we ought to wind up these claims

19  on the Murrieta area before we get into whether one particu-

20  lar user is excessive or not.

21      MR. VEEDER:  All right.  That suits me.

22      THE COURT:  All right.  X is out.

23      MR. SACHSE:  And you say IX is out, too?

24      THE COURT:  Yes.

25      MR. VEEDER:  Are you going to permit me to be heard on

16,714

P 55

1    those?

2         THE COURT:  Yes, I will hear you.

3         MR. VEEDER:  If you want to go on through them, and

4    then give me time, I will be glad to do it.

t-40
B-5

MR. SACHSE:  Let's dispose of these first, your Honor.

THE COURT:  Let's go straight on down, then, and I will tell you what I think about them.

MR. SACHSE:  X was  out, was it, your Honor?

THE COURT:  Yes.

MR. KRIEGER:  X is out?

THE COURT:  Yes.

MR. VEEDER:  I think if you will read IX, X and XI together, -- wait a minute.  I see there is a misnumbering there.

MR. KRIEGER:  Are you on/XI, your Honor?  I don't think there is evidence of that.  There could be many other reasons for the decline of water levels, including a drought.  That is one of the things that is missing in the proof, I think.

MR. SACHSE:  I agree.

MR. STAHLMAN:  That is why all of these should attach responsibility to other users upstream.

MR. SACHSE:  And, your Honor, I don't think you could possibly find anything being in excess of the recharge, because we/haven't got one word of evidence of the recharge on any part of these basins; not a word.

MR. VEEDER:  Does your Honor want to hear me now?

THE COURT:  Wait a minute.  I will throw out XI, as it is worded, and X, the next number, which is actually XII.

MR. VEEDER:  Then the next one is XIII.

t-41

1    MR. KRIEGER:  The same way with XII, your Honor.

2    THE COURT:  XI is out, and I have renumbered that X and

3    made it XII, and the next one I have renumbered XIII.    XIII

4    is all right.

5    Now, on Mr. Krieger's findings, I am going to expect

6    you to work some of this together.    No. 1 is somewhat

7    similar to something that Mr. Veeder had.

8    No. 2 is shorthand of some of the material that Veeder

9    had in his here.

10    Then he has segregated the younger and older alluvium,

11    and the substance of his No. 3 is all right.

12    No. 4 is all right, and I suppose that Mr. Veeder does

13    not object to it.

14    MR. GIRARD:  There is only one question on 5, your Honor.

15    I think from the evidence in this case right now that in the

16    Murrieta-Temecula area there is no subsurface flow of the

17    stream, if we are using "stream" to mean a channel defined

18    in a bed.

19    MR. SACHSE:  You can say, "Both the surface and sub-

20    surface flow of the waters within the Murrieta-Temecula

21    area," --

22    MR. GIRARD:  I am not sure that they do.  They might

23    catch a common supply for people below the Gorge, but not

24    within the area.  But I think we can work this out.

25    THE COURT:  You can dress that up.

t-42

1    Then we come to No. 6.

2    MR. VEEDER:  What is the significance of that?

3    MR. KRIEGER:  Of No. 6?

4    MR. VEEDER:  Yes.

5    MR. KRIEGER:  The significance of that is there is no

6    proof    at this time to show that any pumper in that area

7    is affecting any other pumper adversely, and I think this

8    is a very important finding so far as our people are

9    concerned.

10    MR. VEEDER:  Well, the rate of movement is what I was

11    asking about.

12    THE COURT:  I am willing to make a finding that there

13    is no evidence of any diversion of water that is so un-

14    reasonable, on the present state of the record, as to support

15    an apportionment at this time.  I don't think I want to put

16    myself on record as saying that all uses present are

17    reasonable.  But this would be the same thing except I am

18    not then confronted with the fact that I would have found

19    so-and-so, and was told it wasn't reasonable.

20    In other words, there is no evidence showing there was

21    any diversion or extraction of water that is so    unreasonable

22    in amount, based upon the present record, as to support at

23    this time an application for apportionment; all uses are a

24    proper exercise of riparian or overlying rights, nor is there

25    any evidence of any uses which have injured any party to this

t-43

1    proceeding, -- something like that.

2        MR. SACHSE:  I hate to quarrel with that, your Honor,

3    and this is very minor, but we are going to have to say that

4    all such uses -- you are going to have to add a caveat --

5    because we don't know yet, and the title searches are not

6    in, so we may find someone who is a proper riparian, or we

7    may find a transfer of riparian rights, so that the finding

8    should be written that all uses are proper, and then you

9    have to add the caveat, unless in the findings elsewhere

10   found to the contrary.

11       THE COURT:  Unless the findings made by the Court

12   specifically, and so forth, -- in other words, you have to

13   have some caveat there.

14       Now, I think we might get further if somebody would

15   take a stenographer, and I would even let you use mine, and

16   sit down and start to work something out, and then we can

17   try to see what we can do to tear it apart.

18       Can you be here tomorrow?

19       MR. KRIEGER:  I had not intended to be, your Honor.

20       THE COURT:  Did you say you had?

21       MR. KRIEGER:  I had not intended to be, but I could be.

22   I would just as soon go to work on this right now.

23       THE COURT:  All right.  I will be here all afternoon.

24       MR. KRIEGER:  I will stay as long as is necessary.  I

25   prefer not to be here tomorrow.

THE COURT:  Now, Mr. Veeder, you want to be heard on a couple of paragraphs.

MR. VEEDER:  I would like to make reference to proposed findings IX, X, XI, and renumbered XII, and I will try to be brief on it, and I will try to be as definitive as possible.

I believe that the area at Vail Dam on south and westerly to the Pauba Valley, the area of the Vail principal pumping, is a prime example of where your Honor has before him evidence of the exact quantity of water reaching the Pauba Valley.

THE COURT:  How?

MR. VEEDER:  From -- I will finish this, if I may, sir.

THE COURT:  All right.

MR. VEEDER:  -- the exact quantity of water reaching the Pauba Valley from Temecula Creek.

THE COURT:  From V$_a$il Dam?

MR. VEEDER:  That is right.

THE COURT:  All right.

MR. VEEDER:  We have with the greatest exactitude, I believe, that you can find in a water litigation the measured quantities of water coming to the Vails.

THE COURT:  But you have no evidence of what water would flow into this watershed in times of rain from the areas sloping into the Pauba Valley; no evidence at all.

16,720

t-44

B6 fls

MR. VEEDER:  If your Honor will observe, I have attempted to, and I have put it down on the basis of the last five years.

If you have there Exhibit Vail N, with the additions to it, you will note that commencing in 1952 Vails have offered in evidence the gross use of water and the fields upon which they are used.

B-6
P-56

1    You will also observe that written in on Exhibit Vail

2    N is the contribution of water to Vail land from Temecula

3    Creek.   That is 1,908 acre feet.   Then you have the next

4    year, and in 1953 there is a contribution, or there is a

5    use of water of 7,957, and there has been an increment into

6    the lake of 5,712.

7         THE COURT:   Into the lake?

8         MR. VEEDER:   Well, this is the water that is measured

9    at Vail Lake.

10        Then, next you will observe in 1955 their use was

11   9,607, and the contribution was 1,638.

12        THE COURT:   You mean sixteen hundred feet was released

13   from Vail Dam?

14        MR. VEEDER:   Sixteen hundred feet was measured into

15   Vail Dam.   These are measurements into Vail Dam that I have

16   given.

17        THE COURT:   I don't follow you on that.   I could under-

18   stand some relationship between water released from Vail

19   Dam and water pumped by --

20        MR. VEEDER:   Your Honor, if you will get our Exhibit 20,

21   which is the measurement there, --

22        THE COURT:   Vail Exhibit 20?

23        MR. VEEDER:   No, it is USA Plaintiff's Exhibit 20.   It

24   is the runoff records at Vail Dam, and they summarize --

25        THE COURT:   Your Exhibit 20?

P 57

1     MR. VEEDER:  Yes, the United States Exhibit 20.

2     THE COURT:  I have it.  I have my copy.

3     MR. VEEDER:  You will note there that --

4     THE COURT:  This is a big exhibit.  What part of it?

5     MR. VEEDER:  I am calling the years so that you will

6 get them, your Honor.  That is why I am referring to the

7 years.

8     The fact is if your Honor has Vail N before you, you

9 will see -- I have the exhibit, but I am sure that you have

10 your own copy of it -- you will find that these figures I

11 am giving are already set forth on Exhibit N, and you can

12 compare them with USA Plaintiff's 20, and you will see what

13 I am talking about.

14     There you have a situation where the Vail Company is

15 using a quantity of water far in excess of the yield of

16 Temecula Creek for each of those years on down to the year

17 1958, where the quantity is 9,247 acre feet used against

18 an increment of 11,057.  That is the only year out of these

19 years that I have been reading where it is shown that Vail

20 Company has used water not far in excess of the --

21     THE COURT:  Of the water they caught in the dam?  That

22 is what you were talking about?

23     MR. VEEDER:  That is right.  Now, if you will look at

24 California's Exhibit AC --

25     THE COURT:  Mr. Veeder, can't we terminate this now?

P 58

1    MR. VEEDER:  You can tell me not to argue, and I will

2    have my objection, and that is all I care.

3    THE COURT:  Can't we terminate it by this:  You have

4    urged upon me, and we have found that the older alluvium is

5    a part of the water body, and, as I understand it, that the

6    waters from the older alluvium will go into the younger

7    alluvium.  Pauba Valley we have decided is an area of older

8    alluvium, and a recharge to this older alluvium occurs in

9    areas all around there.  How could you estimate in any way

10   what amount of recharge to the older alluvium has occurred,

11   and how much of the water in the older alluvium has then

12   moved down to the younger alluvium to replace the water

13   pumped out of Pauba Valley?

14   MR. VEEDER:  All right, your Honor.

15   THE COURT:  You can't mathematically.  There is no

16   evidence.

17   MR. VEEDER:  Will you hear out, then, in regard to Vail's

18   AN as it relates to --

19   THE COURT:  Vail's AN?

20   MR. VEEDER:  I am sorry.  I mean Vail's N as it relates

21   to USA Plaintiff's Exhibit 20.

22   THE COURT:  All right.

23   MR. VEEDER:  You will observe that Vail's uses run:

24   For example, in 1957 they used 5400 acre feet, and the

25   increment into Vail Dam was 909.

P 59

1          Now, you have Vail's AC -- I mean California's Exhibit

2     AC, and you will note that since 1948 there has been a most

3     sharp decline in the water levels of Pauba Valley; most

4     sharp; obviously an overdraft by Vail Company.

5          THE COURT:  What map is this?

6          MR. VEEDER:  This is the hydrograph put in by California,

7     which shows the fact that Vail is pumping and has pumped

8     since it closed the Vail Dam in large quantities, to the

9     point that the water level has dropped very materially by

10    reason of their overdraft.

11         So your Honor can observe beyond question two principal

12    facts, that Vail is using more water, many times more water

13    than Temecula Creek produces.  He can also observe that the

14    elevations in Pauba Valley have dropped -- the ground water

15    elevations have dropped extremely sharply in the last few

16    years.

17         Now, the next question relates to whether, under the

18    circumstances, there has been a recharge from the older

19    alluvium in quantities sufficient to offset Vail Company's

20    overdraft.  Obviously, there have not.  Obviously, the

21    increment has not been sufficient to offset these extravagant

22    uses.

23         If your Honor will note what has transpired, you have

24    a situation like this, and I am now pointing to Exhibit 15-E:

25    The area of overdraft is Pauba Valley.  Proceeding northward

P 60

1   you get to Santa Gertrudis.   There is another area of what

2   we say is a sharp overdraft.   The ground water levels have

3   declined very sharply.   You will find, however, that there

4   is a ground water mound between the overdraft area of Pauba

5   Valley and what we consider to be an overdraft in Santa

6   Gertrudis.

7   So the fact remains that the waters have not moved in

8   from the older continental alluvium in quantities sufficient

9   to offset the overdraft, and that is the reason why I spelled

10   out in my proposed findings XI and XII that there has been

11   a sharp decline in the ground water levels due to pumping

12   throughout the Murrieta-Temecula Basin, and the area of

13   Santa Gertrudis and north from that creek along the Murrieta

14   Valley, and adjacent areas.

B-7 fls.   15

16

17

18

19

20

21

22

23

24

25

Also, that is the reason I spelled out proposed finding IX:

"Vail Company, for at least the last five years, has pumped water from the Pauba Valley, a portion of the Murrieta-Temecula Basin, far in excess of the recharge to the ground water of that Valley.  Result of that overdraft has been a sharp decline in the elevation of the ground-water table in the Pauba Valley."

That is summarized in my proposed finding which is XII:

"The sharp declines in ground water levels in the Pauba Valley  of the Murrieta-Temecula Basin has not as yet been reflected in the ground water levels in the  Santa Gertrudis Creek area and north and west from that Creek.  Similarly the sharp declines in the ground water levels in the Santa Gertrudis Creek areas, and elsewhere in the Murrieta-Temecula Basin, have not been reflected in Pauba Valley."

The result of these facts proved in the record is this: That Vail Company is now using quantities of water far in excess of those quantities of water that enter Pauba Valley. True, you have an overall area which is interrelated, but Vail Company has in fact used far more than its reasonable share of the water.

16,727

t-46

1     I am speaking strictly now of the United States of

2   America, which is downstream from Pauba Valley.  It has

3   in effect -- Vail Company has in effect dewatered large

4   areas of the Pauba Valley, and that dewatering of those

5   water-bearing strata has not been reflected beyond the

6   surface water divide between the Pauba Valley and probably

7   Long Canyon.

8       For that reason I do believe that the facts would support

9   what I have asserted here, and I believe that while your

10  Honor may feel that these -- strike that -- I do believe

11  that if you are going to reflect conditions of the Valley,

12  of the Murrieta-Temecula ground water body, if that is your

13  choice of words, that the phenomena that I have just

14  described are important.  And I think, moreover, that many

15  of these questions that have come up are reflective of

16  the problem that is going to be before your Honor.

17      We have tendered to your Honor about six months ago

18  our meaning of the word "regulation" as distinguished from

19  a basin-wide apportionment, and I say while the circumstances

20  are such that the Roripaugh well should not be regulated

21  at this time on the basis of the  facts, I certainly believe

22  that regulation is requisite for the protection of the

23  United States of America insofar as the Vail wells are

24  concerned.

25      Those are the reasons why I have recommended the

t-47

1    findings that I have just read to your Honor.

2        MR. STAHLMAN:  Does Your Honor want to hear a response

3    to this?

4        THE COURT: Make it brief.

5        MR. STAHLMAN:  It is going to be hard to make it brief

6    because he has provoked something here that I think has so

7    many facets it is going to be hard to overcome it in just

8    a few minutes.

9        THE COURT:  Do it after the recess, then.  If we keep

10   on with this, we are not going to get --

11       MR. STAHLMAN:  I think his approach to this thing stems

12   from something besides the facts in this case, and maybe

13   there is another issue before this Court which should be

14   heard before we have an attack on Vail's pumping.

15       THE COURT:  What is that?

16       MR. STAHLMAN:  The Hall matter and Mr. Veeder.

17       THE COURT:  Oh, let's not kick that over.

18       MR. STAHLMAN:  I think that is the thing that has

19   provoked the situation.  I don't think that this is a sincere

20   approach to the problem that we have here.  I think that he

21   has singled out the Vail Company because he is smarting

22   over several things that have occurred.

23       MR. VEEDER:  Oh, you flatter yourself.

24       THE COURT:  This does not concern Mr. Krieger.

25       MR. STAHLMAN:  Oh, yes, it does.  You mean this point

MARIE G. ZELLNER, OFFICIAL REPORTER

16,729

here?

THE COURT: Yes. He does not think it does, and I don't think it does either.

MR. KRIEGER: The only part that concerns me is that I think that the findings are speculative. I have no objection to reciting in one of those findings that the water levels in certain areas have gone down -- period.

MR. STAHLMAN: Certainly.

MR. KRIEGER: But what effect they have, or why they happened, or where they might not be recharged, all of those things I think are in the nature of speculations.

THE COURT: Of course, we know of at least two causes: One, pumping, and another the dry season we have had.

MR. SACHSE: Your Honor, might I suggest that Mr. Veeder might be very interested if we take Finding IX and changed just one word in it:

"The United States, for at least the last five years, has pumped water from the Upper, Chappo, and Ysadaro Basins, a portion of the watershed of the Santa Margarita River, far in excess of the recharge to the ground water of those basins. The result of that overdraft has been a sharp decline in the elevation of the ground-water table in the Upper, Chappo and Ysadaro Basins."

We can add to that point, and indicate another thing,

t-49

1    the extra fact that they pumped 57 per cent of that outside

2    of the watershed.

3         If you want to write that finding on behalf of the

4    United States of America, Mr. Veeder, I will not argue with

5    you any further.

6         MR. VEEDER:  Franz, the trouble is that you talk too

7    much.

8         THE COURT:  Let's postpone until tomorrow morning any

9    talk about these further findings between Vail and the

10   United States, and you gentlemen see if you can work out

11   something this afternoon.

12        I will be in here, and maybe we can get something by

13   4:30 or 5:00 o'clock to look at.  If not, Mr. Krieger will

14   have to come back.

15        MR. KRIEGER:  Are you going to help us, your Honor?

16        THE COURT:  Yes.

17        THE CLERK:  Are we going to adjourn until tomorrow

18   morning?

19        THE COURT:  No, but unless we come back we are

20   adjourned until 10:00 o'clock tomorrow morning.

21        (A recess.)

J fls
22

23

24

25

P 38 1        THE COURT:  I am sorry to have delayed you.  Maybe you

2    made good use of your time.  The Chief Judge of the Circuit

3    came by, and he takes precedence over the members of the Bar,

4    in case you don't know it.

5        What is the thought as to No. I?  What is this reference

6    to A?  I take it that is Exhibit 277.

7        MR. KRIEGER:  That is right.

8        MR. GIRARD:  And B is 277-A.

9        THE COURT:  And you are going to substitute those

10    numbers?

11        MR. KRIEGER:  Yes.  And that should be done right now

12    I think.

13        THE COURT:  Any objection to I?

14        II?

15    MR. GIRARD:  Exhibit C would be 15-E.

16    MR. KRIEGER:  15-E.

17    THE COURT:  15-E.

18    II looks all right to me.

19    III looks all right.

20    IV.

21    MR. SACHSE:  Some of these were mis-stapled.  Mine is.

22    Maybe nobody else's is.  Be sure you get IV instead of VI.

23        THE COURT:  Yes, IV.

24    MR. KRIEGER:  There is no V.

25        THE COURT:  IV looks all right.

P 39

1        VI.  It should be "moves slowly" instead of "solely."

2    Is that right?

3        MR. KRIEGER:  That is right.

4        Is your copy correct on the third line?

5        THE COURT:  Yes.

6        MR. VEEDER:  I don't know of any physical ground water

7    divide in that area, your Honor.

8        MR. SACHSE:  It is on the map.

9        THE COURT:  Why don't we say "physical ground water

10    barriers" and strike out "divides and other"?

11        MR. VEEDER:  Well, they are not impermeable barriers.

12        MR. STAHLMAN:  Well, they are barriers.

13        THE COURT:  We don't say that.  We say that "the

14    direction and rate of flow are influenced".

15        MR. GIRARD:  The next sentence says it is insufficient

16    to say what that influence is.

17        THE COURT:  Yes.  Generally it looks okay to me.

18        VII.  VII generally looks okay.

19        MR. VEEDER:  I am hoping that I can reserve some comment

20    on VII, your Honor.  I realize that you are in a hurry.

21        THE COURT:  Yes, we will do the best we can tonight

22    and we will study these over in the morning.

23        VIII ". . . go progressively lower from the extreme

24    north and easterly boundaries of said area" downward toward

25    Temecula Gorge.

16,733

P 40

1    MR. KRIEGER:  Can we say "as they proceed from the
2    extreme north and easterly boundaries toward Temecula Gorge"?
3    THE COURT:  Yes.  I think that is a fair statement of
4    what the record shows.
5    IX.  This is just a copying of what Mr. Veeder had.
6    MR. GIRARD:  It is a little bit different on Vail Dam.
7    MR. SACHSE:  Yes.
8    THE COURT:  IX, page 1, is about the same, isn't it?
9    MR. GIRARD:  Yes.
10   MR. SACHSE:  Yes.
11   THE COURT:  And then on the next page, under "Temecula
12   Creek," then you would take out everything about Vail Dam
13   and findings will be made elsewhere.
14   MR. KRIEGER:  That is right.
15   MR. GIRARD:  When Mr. Stahlman and I draft the findings
16   on the Vail Company there will be detailed findings on Vail
17   Dam.
18   THE COURT:  Yes.
19   This is about what I asked you to do.
20   MR. GIRARD:  Do you have No. X, your Honor.
21   THE COURT:  Yes.  By "lands contiguous" you mean to
22   take care of the situation where a man owns land in and
23   land out?
24   MR. KRIEGER:  That is right.
25   THE COURT:  That is what it means to me.

P 41

1    MR. GIRARD:  I felt that it would be the same type of

2    land as riparian land.  It would be the same chain of title

3    contiguous and within the watershed.

4    MR. VEEDER:  You are saying that you go back to the

5    patent on each parcel.  If you have two parcels and on each

6    you can have a well, you couldn't take that water from that

7    land and take it to other land deraigning from another patent;

8    is that right?

9    MR. GIRARD:  That is right.

10   THE COURT:  But if it has a common source of title,

11   then the land in and the land without would be treated as

12   being within.

13   MR. KRIEGER:  The only situation we know about really

14   is Mr. Guenther's Murrieta Hot Springs.

15   THE COURT:  We know what we are trying to do.  We want

16   to say it so that other lawyers and other people will know

17   what we mean by it.

18   Well, gentlemen, it is late.  Why don't all of us take

19   a little time before court tomorrow?

20   You can come down again, can't you, Mr. Krieger?  This

21   is important.  We have excused you from a lot of appearances.

22   MR. KRIEGER:  You have, and you have been very courteous

23   to me, and I appreciate it.  I will be here, if you say so.

24   THE COURT:  All right, ten o'clock tomorrow morning.

25   And let's try to go over this beforehand.

(Adjournment until Wednesday, May 3, 1961 10:00 A.M.)

t-3

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,                )
                                          )
            Plaintiff,                    )
                                          )
      vs.                                 )      No. 1247-SD-C
                                          )
FALLBROOK PUBLIC UTILITY DISTRICT,        )
et al.,                                   )
                                          )
            Defendants.                   )
                                          )

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are, and on the date herein involved, to wit: May 2, 1961, were duly qualified, appointed and acting official reporters of said Court;

That as such official reporters we did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that we did thereafter cause our said shorthand notes to be transcribed, and the within and foregoing 111 pages of typewritten matter constitute a full, true and correct transcript of our said notes.

WITNESS our hand at San Diego, California this 2nd day of May, 1961.

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER
_____
Official Reporter