Case 3:51-cv-01247-JO-SBC   Document 4652   Filed 09/24/63   PageID.37708   Page 1 of 133

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LLBROOK PUBLIC UTILITY DISTRICT,
al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       May 3, 1961

Pages:      16,736 to 16,865

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,           )
                                    )
                        Plaintiff,  )
                                    )
vs.                                 )      No. 1247-SD-C
                                    )
FALLBROOK PUBLIC UTILITY            )
DISTRICT, et al.,                   )
                                    )
                        Defendants. )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, May 3rd, 1961

- - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Vail Company | GEORGE STAHLMAN, ESQ. |
| Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |
| State of California | FRED GIRARD, ESQ. |
| Defendants Gibbon & Cottle | BEST, BEST & KRIEGER By: JAMES KRIEGER, ESQ. |

16,736 (a)

t-61

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

(No Witnesses.)

INDEX TO EXHIBITS

| For the Plaintiff | Received |
|---|---|
| Exhibit No. 15-I | 16,806 |
| Exhibit No. 277-B | 16,843 |
| Exhibit No. 277-C | 16,843 |

- - -

P 2

1    SAN DIEGO, CALIFORNIA, Wednesday, May 3, 1961 10:00 A.M.

2        THE CLERK:   1-1247-SD-C United States vs Fallbrook.

3        MR. VEEDER:   Pursuant to your direction, your Honor,

4    I talked to Don Stark, who represents Gibbon and Cottle.   He

5    advises me that he would like to have additional time for

6    the purpose of bringing down Mr. Rowe, his engineer, and

7    introducing evidence regarding his claimed appropriative

8    right for Gibbon and Cottle.   He stated that he would like

9    to be here at the next date set for hearing, to which I

10   stated I didn't know what the next date would be but I would

11   call him this afternoon if you should set the time.   He said

12   that he was very sorry that he simply hadn't been able to

13   get the work done, and I told him I would so advise your

14   Honor.

15       THE COURT:   Well, let's not forget about it and we will

16   try to think about it more this afternoon.

17       MR. VEEDER:   Yes your Honor.

18       THE COURT:   I have a letter from James H. Mitchell in

19   which he submits an order providing that Robert Holcomb,

20   Clara B. Holcomb, Jasper D. Sherman and Laura Sherman have

21   asked that their names be included in the Answer filed by

22   Emmet E. Doherty.   He doesn't have anything signed by them

23   except his letter, but I see no harm, and I will instruct

24   the Clerk to file his letter as well as the order.

25       Do you have those names -- the two Holcombs and the

P. 3

1    two Shermans?

2          MR. VEEDER:  I have a copy of that that was submitted

3    to your Honor.

4          THE COURT:  All right.

5          MR. VEEDER:  We will proceed on the basis that those

6    defendants are in the same category as others listed in the

7    general answer signed by Judge Doherty.

8          THE COURT:  That is the purpose of this order.

9          MR. VEEDER:  May I proceed on to something else for a

10   moment, your Honor?

11         THE COURT:  Yes.

12         MR. VEEDER:  I have prepared a form which will con-

13   stitute, I think it is, Exhibit C of the proposed findings

14   for the Murrieta-Temecula ground water basin, or whatever

15   we shall call it now, and I have shown it to Mr. Girard.

16         Have you seen this (handing document to Mr. Stahlman).

17         It is prepared in accordance with the form I showed

18   your Honor last night.  I would like to have you now take

19   one more look at it before we proceed, because it is going

20   to be a very expensive job.

21         THE COURT:  How many different attachments of that sort

22   will be in this judgment?

23         MR. VEEDER:  If I remember correctly, your Honor, there

24   will be two maps, Map 277 --

25         THE COURT:  I am not talking about the map.  I am talking

16,739

P 4   1    about this.

2        MR. VEEDER:  How many pages?

3        THE COURT:  Yes.  How many different parcels are involved?

4        MR. VEEDER:  There will be several hundred.  I haven't

5    counted them.

6        MR. STAHLMAN:  Commander Redd says a couple of thousand.

7        MR. SACHSE:  There are lots and everything in Murrieta.

8        MR. STAHLMAN:  There are a lot of small parcels in that

9    area.

10       MR. VEEDER:  How many did you say, Commander?

11      COMMANDER REDD:  About a thousand.

12       MR. VEEDER:  And I said several hundred.  I'm not too

13    far off.

14       THE COURT:  That makes a very bulky document, but I

15    don't think there is anything we can do about it, except

16    that since this is going to be on 32-line paper it would be

17    possible probably to put three of these on a page.

18       MR. VEEDER:  We will try to get as many as we can on a

19    page, yes, your Honor.

20       THE COURT:  Are you going to mimeograph the form or

21    just type them as you go?

22       MR. VEEDER:  It appears that it would be just as easy

23    to type them.  That is what we are doing now on Diamond and

24    Domenigoni.  It is just as simple.

25       THE COURT:  I would suggest for ease of picking out

16,740

P 5

1   names that you probably underline that last name and draw

2   some break lines between the different setups.  Put as many

3   as you can on a page.

4   MR. VEEDER:  On that point, the question came to my

5   mind how would we serve notice on these people.  I realize

6   you can't rule on it now, but I think if we simply notified

7   them that these are going to be entered in the courtroom

8   and that if they want to examine them that will be all right

9   -- will that take care of it?  We don't want to send out

10  one to each person, if we can avoid it.  It is probably

11  premature.  If this is all right, we will go ahead this way.

12  THE COURT:  Do you mean before or after the interlocutory

13  judgment is signed?

14  MR. VEEDER:  After the interlocutory judgment is signed

15  I would like to be able to notify each individual that this

16  has been entered.

17  THE COURT:  We will say there are 350 pages of that

18  material.  Is any of it going to be alphabetical?

19  MR. VEEDER:  We will follow the parcel numbers as

20  nearly as we can, as they are set up in the exhibits that

21  are on file.

22  THE COURT:  Somebody would have to help them if they

23  came down to see it.  Somebody would have to find it for

24  them.

25  MR. VEEDER:  We would have the facilities.

p 6

1    THE COURT:   You would have the parcel numbers where you

2    could locate it for them?

3    MR. VEEDER:   That is right.   There would be no problem,

4    because the parcel numbers will be in consecutive order as

5    nearly as we can place them.

6    MR. STAHLMAN:   Put down an alphabetical list that they

7    can refer to.

8    MR. VEEDER:   We do have an alphabetical list now of the

9    names.   So if Joe Doakes comes in we look under the name

10   Joe Doakes and turn here and get it.   So there will be no

11   difficulty there.   It will not be a difficult matter of

12   locating each of these parcels in the interlocutory judgment.

13   THE COURT:   Then you contemplate sending out a letter

14   notice --

15   MR. VEEDER:   Over your signature.

16   THE COURT:   -- to each of these people whose addresses

17   you have, and the best you have for those you can't locate,

18   advising them that an interlocutory judgment is signed and

19   entered.

20   MR. VEEDER:   Yes.

21   THE COURT:   It doesn't tell them much.   That they can

22   then inspect the judgment and see what has been done.

23   Have all these people received letters to come in for

24   a hearing?

25   MR. VEEDER:   They have your Honor.

P 7

1    THE COURT:  In the entire area?

2    MR. VEEDER:  That is right, in this whole area here to

3    which we are now directing attention, we have mailed out

4    notices, with your name, and the gross and irrigable acreage

5    and the question of their ground water rights.

6    THE COURT:  Have you filed with the Clerk affidavits of

7    service with a list of names and a copy of the letter?

8    MR. VEEDER:  I would have to check that.  I directed

9    that it be done.  I have never asked Mrs. Tooker whether

10   she made that filing.  But I know it is our direction.

11   THE COURT:  There is not much use to do it unless you

12   follow it up.

13   MR. VEEDER:  I think it has been done, but I wouldn't

14   want to say that on each of these matters it has been done.

15   I would have to check.

16   THE COURT:  Don't you think that is all we can do,

17   gentlemen?

18   MR. SACHSE:  I am curious, your Honor.  This is going

19   to be done just a little differently, is it not, from what

20   was done in the others?  In the others you sent them a

21   letter over his Honor's signature that asked them if they

22   approved the judgment.  This time you can't do that.

23   MR. VEEDER:  We can't do that.

24   THE COURT:  It has to be a different type of letter.

25   MR. SACHSE:  Yes, it has to be a different type.

P 8

1   THE COURT:  Of course, the previous letters didn't

2   tell them anything about the ground water area, but merely

3   told them that they had so many acres according to our

4   records, so much was irrigable and so much was irrigated,

5   and that we proposed to so find unless they had objection.

6   It would seem to me that we could formulate this other

7   letter to say that this interlocutory judgment has been

8   entered which demarks what we call the Murrieta-Temecula

9   ground water area, and that all defendants included in that

10  judgment, including you, have been found to own land in this

11  area and to have generally correlative rights to the use of

12  water, and that we have taken from our records the number of

13  acres and the irrigated and irrigable acres, that pursuant

14  to our previous communications with you judgment has now

15  been entered and if you would like to inspect it the Clerk

16  or your office would be glad to go over the matter if they

17  want to come in.

18  MR. VEEDER:  I think we could.

19  THE COURT:  Something like that, so that they know what

20  the story is.

21  I think you should also mention both surface and ground

22  waters:  That all surface waters are found to be part of the

23  stream system, that all ground waters are part of the stream

24  system, and that they have correlative rights with all other

25  persons to the use of that water.

P 9

1    MR. VEEDER:  That would complete the story on your first

2    letter, because in your first letter you refer to the

3    irrigable acreage, the gross acreage, and said that subse-

4    quently you would make a finding in regard to the ground

5    waters under their lands.

6        MR. STAHLMAN:  Would it be any advantage --

7        MR. VEEDER:  I will prepare a letter for you along that

8    line.

9        MR. STAHLMAN:  Would it be any advantage to send a copy

10   of that up in that area someplace like the Post Office or

11   someplace?

12       THE COURT:  Well, you would have to have somebody

13   available to help these people.  But that could be done.

14   Or it could be done at the time of the final judgment.  Have

15   somebody available up there.

16       MR. VEEDER:  We had an office, but that is now closed.

17       THE COURT:  You can get another one.

18       MR. VEEDER:  We could open it up, your Honor.

19       THE COURT:  I think either at the time of this inter-

20   locutory, probably better at the time they get notice that

21   the final judgment has been entered.

22       MR. SACHSE:  I definitely agree with the latter, your

23   Honor.

24       THE COURT:  Probably at the time they get notice that

25   the final judgment has been entered, that there is a copy of

P 10

1   the judgment and all interlocutory judgments have been made

2   part of it by reference; that they are available at the place

3   in Temecula; that an officer of the Marine Corps or an agent

4   of the Government will be present to show them where they

5   appear in the judgment and give them such assistance as they

6   need.

7       MR. VEEDER:  We will do that, your Honor.  I will prepare

8   a letter along the line that you want and have it to you for

9   your review.

10      THE COURT:  We will have a letter go out that the

11  procedure of having the judgments up there at Temecula or

12  at Murrieta be done at the time of the final judgment.

13      MR. VEEDER:  We will do that.

14      MR. KRIEGER:  Will that letter go out to our clients

15  in the Murrieta area, too?

16      MR. VEEDER:  We didn't send letters to those represented

17  by counsel.  We sent counsel letters.

18      MR. KRIEGER:  You might at the same time let us have a

19  copy of that letter, because we probably will communicate

20  along pretty much the same lines with our own people.

21      And in addition to that, I would like to make this one

22  comment, your Honor.  I was particularly pleased with this

23  Exhibit C as far as the fringe area around the northeast

24  line is concerned, because that will take care of some of

25  the parcels like Guenther that we were talking about yesterday,

P 11

1    and in as much as they are expressly attached to these

2    proposed findings we will know the parcels that have the

3    right to take water across that line.

4    MR. VEEDER:  On that, it may be that if we find that

5    that is not under one chain of title, Mr. Krieger --

6    MR. KRIEGER:  We understand that.

7    MR. VEEDER:  Just so it is clear.  There might be a

8    question of exportation there on non- riparian land.

9    MR. KRIEGER:  I don't think we have any.

10   MR. VEEDER:  I don't know what that situation is going

11   to be.

12   MR. KRIEGER:  But we can solve that problem by this

13   device that you have, and I say it is a very good one as

14   far as I am concerned.

15   MR. VEEDER:  We will go ahead that way then.

16   THE COURT:  All right.

17   MR. VEEDER:  One other point.  We informally discussed

18   personnel to accomplish this job expeditiously, your Honor.

19   I have had discussion with Mr. Clark.  You may be assured

20   that whatever is necessary will be done to go as rapidly

21   as we can to accomplish these purposes.

22   THE COURT:  I saw Mr. Clark in Los Angeles and he told

23   me you had assured him that you need no additional personnel.

24   MR. VEEDER:  I told him that, but after talking to

25   Commander Redd, he has two girls who will work on it, so

B 12

1    the personnel is taken care of entirely.  I don't believe we

2    need anymore.

3        THE COURT:  There is a lot of typing to be done.  It is

4    a mechanical job.  I will not tell you your business, except

5    that I tried to get you all the help you need.

6        MR. VEEDER:  I don't think we need more than three girls

7    on it.

8        THE COURT:  We will see how fast this comes through.

9        MR. VEEDER:  If it doesn't come through fast, we will

10   get more.

11       MR. KRIEGER:  We will get a chance to look at Exhibit

12   C and those parcels that affect us before they become an

13   official part of this exhibit?  I want to check the acreages,

14   the irrigable acreages, et cetera that he has on that list

15   as far as our people are concerned.

16       THE COURT:  By Exhibit C you mean 277-C?

17       MR. KRIEGER:  Yes, that is the one Mr. Veeder is talking

18   about now in which he sets forth all this data.  I will want

19   to verify it before it becomes a part of that exhibit.

20       THE COURT:  You are talking now about the little sheet?

21       MR. KRIEGER:  Yes.

22       THE COURT:  Yes, you have a right to check it over for

23   your clients.

B fls.   24

25

B-1
t-1

1    MR. VEEDER:  The fact is that we invite that.

2    THE COURT:  We have the practice of having counsel

3    approve the judgment as to form.  It is a simple matter.

4    MR. VEEDER:  I see no problem there at all in regard to

5    his clients that have engineering reports.

6    THE COURT:  He is talking largely about a clerical

7    matter.

8    MR. KRIEGER:  I want to be sure it goes with the

9    engineering reports, that is all.

10    MR. VEEDER:  Mr. Krieger, we will do our best.

11    MR. KRIEGER:  I know you will, but I think it is my

12    duty to see that that is conformed, naturally.

13    THE COURT:  All right.  Any further suggestions now

14    about this set of findings on the area, the ground water

15    area?

16    MR. VEEDER:  May I turn, your Honor, to touch upon the

17    ones that I think are most serious?  Then I have a few

18    editorial suggestions, if I may make them.

19    THE COURT:  Yes.

20    MR. VEEDER:  Paragraph VII or Finding VII, I truly am

21    not quite sure of the implications of that, and may I read

22    it aloud:

23        "Said area is not a basin or a ground water body

24        in the sense that water levels throughout the area

25        described stand at or about the same level, or" --

16,749

t-2

1   Well, I will stop right there.  I am certain that in

2   Rainbow Basin there are different ground water levels, and

3   I don't believe that it is a fact that in the natural

4   process of a ground water formulation, or the formation of

5   a ground water basin there are bound to be changes in

6   elevation, with simple elevations of the ground level and

7   changes in ground level elevation, so the fact that the

8   recharge is going to go into a basin would necessarily

9   create a situation where there would be differences in

10   water elevation.  So I just don't believe that the facts are

11   such that you could ever say that water in basins are all

12   at the same elevation, and so I do object to this for these

13   reasons:  One, I don't think it is meaningful; Two, it casts

14   doubt on the kind and character of the formations that we

15   have here.

16   MR. KRIEGER:  I think it is true, your Honor, that the

17   exact uniformity of the water level is not a condition of

18   having it proven, but I think there is the uniformity of

19   water level throughout the area, and perhaps the word to use

20   is "uniformity," that shows that it is a single body of

21   water, and I think that is absent, and I think maybe we could

22   further amplify that finding by suggesting that the

23   quantities of water that came into the area and went out were

24   not known and could not be determined, at least with the

25   evidence that we have, and, as I understand the ground water

16,750

t-3

1    basin, difficult as it is to describe, it is basically an

2    area where the yield can be determined by hydrologic data,

3    and there is no suggestion here -- I don't think Mr. Veeder

4    even has suggested that we could actually determine the

5    amount of water that goes into this specific area, and the

6    amount of water that goes out, or the amount of water that

7    is involved in that area, so we might amplify the finding

8    to describe other things that this area has not got.

9        MR. SACHSE:  May I offer the suggestion that since Mr.

10   Veeder seems  particularly concerned here about "basin,"

11   perhaps we could say something like this:

12       Within the said ground water area water levels do not

13   stand at or about the same level, and pumping in one area

14   does not necessarily affect the ground water levels in any

15   other part of the area.  And just leave out the word "basin"

16   entirely, so that you will not have any basin referred to,

17   but you will have the finding of the Court stating that

18   levels do not stand at or about the same level, and pumping

19   in one part does not necessarily affect any other, which I

20   think is a fact, and which I believe your Honor is willing

21   to find.

22       MR. GIRARD:  I will buy that.

23       THE COURT:  It sounds all right to me, and I think Mr.

24   Krieger's suggestion could also be incorporated.  What do

25   you think of that, Mr. Veeder?

16,751

t-4

1    MR. VEEDER:  I am trying to get the elements of this

2    ground water body, whatever it is, as clearly defined as

3    possible.  The fact that we don't know, and I  don't believe

4    that anybody knows, and I don't believe you could ever

5    prove the exact quantity of water going into the basin and

6    the exact quantity of water going out because of your

7    finding that there is no repetitious runoff in this area.

8    So I don't believe that has anything to do with whether there

9    is a single ground water body or not.  That is the point.

10    To me, ground water elevations, a variety of ground

11    water elevations, and the fact that you do not know exactly

12    how much water comes in or exactly how much goes out has

13    nothing to do with the geological factors and facts that

14    are here involved.

15    I will go along with whatever -- well, I can't say that

16    I will go along because I have made my point here, and if

17    it isn't accepted, that is it.

18    MR. KRIEGER:  May we take just a minute to draft this

19    out?

20    THE COURT:  Yes, if you will, and see what you can add

21    in there.

22    MR. VEEDER:  If your Honor would look at Line 4 of

23    VII:

24        "or that pumping in one part of said area

25        necessarily affects the water levels in any other" --

16,752

THE COURT:  I have a change there that I am going to suggest.  I was going to suggest this on that part of it:

"or that pumping in one part of said area necessarily affects water levels in other parts of said area distantly removed".

I say that because I think there is evidence that pumping in certain parts of the area very definitely affects wells nearby.

MR. VEEDER:  That is correct.  I think the evidence on 23-K-1 upon Mr. Roripaugh's place shows that.

THE COURT:  But, as worded now, the word "necessarily" tells the story, so technically it is all right now, "that pumping in one part of said area necessarily affects the ground water levels in any other part of said area, or at all."

That same thing bothered me, this sort of a finding that there is necessarily no effect from pumping in one area on any other part of the area.  That is not true, because very definitely the evidence shows that pumping in certain parts of the area affects wells nearby.

What I was proposing was to say, "or that pumping in one part of the area necessarily affects the ground water levels in other parts of the area distantly removed."

MR. GIRARD:  Wasn't there some testimony, your Honor, as I recall, that in certain areas it could not be shown that

16,753

t-6

pumping nearby hurt it?   Wasn't that true at Murrieta Hot Springs?

THE COURT:  Yes, there are all sorts of individual situations, but the way that it is worded now would sort of leave open the pumping, or the  effect of pumping nearby; in other words, that pumping in one part of said area necessarily -- wait a minute.  We have a "not" in there.

MR. KRIEGER:  We suggested the word "necessarily" for the reason that you mentioned, your Honor.  Certainly we would agree that it is shown that there is pumping effect immediately around some of these wells, if you were pumping them hard enough, but we don't know how far it goes, and it would seem to me that if you use the word "distantly", it leaves a rather loose term as to how far the effect is.

MR. SACHSE:  May I suggest, "may affect the pumping in close proximity thereto, but not in remote areas."

THE COURT:  Since we are not making any finding as to specific wells, it does not seem to  me to make a lot of difference.

MR. KRIEGER:  I don't think it makes a great deal of difference either.  Again it rests on the fact that we have no evidence here of what the pumping effect is.  Maybe we can state it negatively in  just that way, "and that there is no evidence of the effect that pumping has on other parts of the area."

t-7  1       THE COURT: But that is not true, stated that way.

2    There is evidence as to what pumping does in certain parts of

3    the area, and when you say "other parts," it is too vague

4    and ambiguous.

5        We are agreed we are not going to make findings on

6    particular wells. Again, it seems to me    if we are going to

7    do it and do it right, we can merely state the facts:  That

8    although there is evidence that pumping in certain parts of

9    the area or ground water body -- that the evidence taken

10   shows effects on nearby wells, there is no evidence that

11   such pumping affects wells more distantly removed,    in the

12   far parts of the area, and that water levels throughout the

13   area are not uniform, but are staggered in contours, as

14   shown in other findings, and that because of these

15   characteristics, the Court characterizes this as a ground

16   water area, and not necessarily a basin, on the present

17   evidence before the Court.

18       MR. KRIEGER: Shall we try to polish that up, your

19   Honor?

20       THE COURT: Something like that. Isn't that sticking

21   pretty close to the facts? And then we can follow up with

22   the fact that the ground waters do support and contribute

23   to the River.

24       MR. VEEDER: I think this, that the elements of a

25   basin have been proved. You have the bottom and the sides

t-8

1   requisite to prove a basin.  You do have the content of this

2   basin; that is the alluvial fill in this area of varying

3   degrees of permeability, and I think that is what we are talk-

4   ing about.

5       This "area" thing worries me, because I don't know in

6   the law anything that could be called a ground water area.

7   It is true that on the present state of the record, in the

8   Santa Gertrudis area there is evidence of interaction between

9   wells.  In the Pauba area there is evidence of interaction

10  between wells.  There is no evidence of interaction between

11  Santa Gertrudis and Pauba.

12      I believe that that is the situation that prevails.

13  But so far as a basin is concerned, a basin is the container

14  and the alluvium is the fill.

15      THE COURT:  We have evidence and we have findings that

16  you proposed of what you would talk about as a basin, for

17  instance, in the Santa Rosa Mountains, the basement complex

18  feathering  out, and we have the findings as to the fill,

19  and all of that, and we have decided that we are not going

20  to call it a basin.

21      Now, a name is only a handle, and the important thing

22  is to find our facts.

23      I would have no objection, if counsel have no objection,

24  to further findings along the line that Mr. Veeder has just

25  stated that generally, without specifying as to particular

16,756

t-9

wells, there is evidence of interaction between wells in
the Santa Gertrudis area, one upon the other; that there is
evidence of interaction of wells in the Pauba Valley, one
upon the other; that there is presently no evidence of
interaction between wells in the Pauba Valley and wells in
the Santa Gertrudis Valley.

MR. VEEDER:  I suggest that we have Mrs. Zellner run
that off, and then I think we can take a look at it.

MR. STAHLMAN:  We have something ready right here now.

MR. VEEDER:  All right.

MR. KRIEGER:  Let me make just one comment about the
statement you made, your Honor.  I think if we are going to
say that there is some evidence of interaction between wells
in the Santa Gertrudis area, that ought to be tied down
pretty thoroughly.

THE COURT:  As of the date this is stated.

MR. KRIEGER:  Yes, and to a very limited degree.  For
example, there is no showing that a well in the bottom part
or the southwesterly part of that area affects one far up
on the Santa Gertrudis.  There is very local interaction
between those wells, as demonstrated, and, therefore, a
finding that went into the local effect within the Santa
Gertrudis area, of one well on another in close proximity,
would be all right; and in Pauba also.

I further agree with the other thing --

16,757

THE COURT:  Maybe we could do it this way:  Maybe we could say that there is evidence in the record that in various parts of this ground water area the pumping of one well has an effect upon another well or wells in close proximity; that there is no evidence that the pumping of any well has an effect upon wells which are located, we will say, a distance of a mile away or more.

MR. KRIEGER:  Whatever that measurement was; or not in close proximity, yes.  A finding like that would be broader, because it would not only cover Pauba and Santa Gertrudis, but would cover the other areas up further on the Murrieta.

MR. VEEDER:  I think we are getting along to where we want to be on this, because I will be candid with your Honor, I know there is no great problem as to why I am taking the position that I am.  I hope that when we get through with the findings on this ground water area or body, or whatever we call it, that if the day comes on an order to show cause to regulate that area, we will have enough evidence in the record so that we won't have to retry the case.  I will be perfectly frank about that.

MR. SACHSE:  That is what we want to watch out for. That has got me scared.

MR. VEEDER:  All right.

MR. SACHSE:  And I don't think we have got it in the

16,758

t-11

1    record yet.

2        MR. VEEDER:  Well, I have made myself clear, and I have

3    given it in all candor, so there you are.

4        THE COURT:  You would have to start again.   There are

5    certain things we have accomplished in this case, namely,

6    this ground water area.   Then you have to start again in the

7    area, and you would have to get your evidence as of the

8    date that the matter was heard, which would mean getting new

9    evidence.   You would have to show what these various wells

10   produced, and you would have to put on proof as of that

11   date of the interaction between pumpings, and practically

12   you would have to do the whole thing over except for the

13   fact that we have laid out an area which we call a ground

14   water area.   But the evidence that you present as to what

15   happened in 1959 or 1960 would not be pertinent to the

16   specific effect that would happen at some other time.

17   Historically, it might be of some value, but historically

18   only.

19       MR. VEEDER:  I think also from the standpoint of res

20   judicata.

21       THE COURT:  How?

22       MR. VEEDER:  In regard to the area that is involved,

23   in regard to the manner --

24       THE COURT:  The area would be res judicata.

25       MR. VEEDER:  Pardon?

t-12

1      THE COURT:  The area would be.

2      MR. VEEDER:  That is what I am saying.

3      THE COURT:  And that is all of it.

4      MR. KRIEGER:  That is all.

5      MR. VEEDER:  The point that I make to you is if that

6 can be res judicata from the standpoint of a single source

7 of water, I think we have gone a long ways.

8      THE COURT:  That is about all we do have.  We get a

9 res judicata effect that here is a ground water area, and

10 this ground water area supports a stream.  From there on it

11 seems to me the matter is wide open, and you would have to

12 go in and see what the facts are on that date.  By that

13 time, for instance, you have talked about the Roripaugh

14 well, and by that time the Roripaugh well might be producing

15 only a small amount of water, or only a small amount of it

16 might be used.  Meanwhile some other wells might be put

17 in which would create some entirely new effect upon this

18 whole thing.

19      Don't you agree with that?

20      MR. SACHSE:  I think that is entirely correct.

21      MR. GIRARD:  Correct.

22      MR. VEEDER:  To return to II for just a moment, then, --

23      MR. STAHLMAN:  Are we leaving this?

24      MR. VEEDER:  No, but I thought you wanted to shift these

25 things around.

16,760

t-13

THE COURT:  All right, II.

MR. VEEDER:  Shouldn't we say that the whole area is underlain by an impervious body of basement complex?  That would complete the three sides requisite to a basin.

MR. SACHSE:  I think everything is underlain, and the whole watershed is underlain with basement complex if you go deep enough.

MR. KRIEGER:  I don't think it adds anything, but I have no objection.

MR. VEEDER:  I want to add a bottom to this ground water area.  It isn't in there.

MR. SACHSE:  We have got a bottom to the water shed.

MR. VEEDER:  Fill up the record, Mr. Sachse.  All I am asking is to say that it is underlain by basement complex.

MR. SACHSE:  I don't care.

MR. STAHLMAN:  There is no evidence that you are going to hit the bottom.

MR. GIRARD:  Maybe there isn't any.

MR. STAHLMAN:  Maybe we will wait until the mole-hole experiment is made.

MR. SACHSE:  We will have to find out what is underneath.

THE COURT:  We were going to try some language out here. Has somebody worked it out?

MR. GIRARD:  We have got two suggestions, and maybe we

16,761

t-14

1    had better pool our thoughts before we submit a final one.

2         MR. SACHSE:  Let's go on to some of Mr. Veeder's

3    other ones first.

4         MR. GIRARD:  Yes.

5         THE COURT:  Do you have some others?  I have some

6    suggestions to make, too, when you get through, Mr. Veeder.

7         MR. VEEDER:  I have got some marked here, your Honor.

8    We are working on VII presently.  I would like then to refer

9    to X, if I could.

10        I would say this, your Honor, that Finding X is pre-

11   mature until such a time as we have findings in regard to

12   the rights to the use of water of the United States of

13   America, and I would like to have that X left off and out

14   until the other findings are completed.

15        THE COURT:  Well, if you are having in mind that the

16   record is such that an apportionment could now be made --

17        MR. VEEDER:  I am not talking about apportionment, your

18   Honor.

19        THE COURT:  Then what are you talking about?

20        MR. VEEDER:  I am talking about the situation where I

21   truly think that the Vail Company is using more than a

22   reasonable quantity of water.

23        MR. SACHSE:  What has that got to do with Finding X?

24   Oh, I see.  In other words, your objection is that the

25   finding, as I understand it, is that on riparian lands --

t-15

1  I am paraphrasing -- waters are being applied to reasonable

2  beneficial uses and are reasonable in amount.  Is that your

3  objection to it?

4      MR. VEEDER:  That is my point, and I think it is

5  premature at this time to make it.

6      MR. SACHSE:  I would answer Mr. Veeder only in this

7  way, your Honor:  It may be premature, but if you don't make

8  it in that way, you have to state it in the negative, that

9  there is no evidence that any of the uses are reasonable or

10  in any reasonable amount, which is the way I stated it in

11  the impoundment finding that I prepared.  It says exactly

12  the same thing.

13      If Mr. Veeder objects to the lack of evidence that

14  everyone is reasonable, I must agree with him.  I don't think

15  we have that evidence.  But we have no evidence that any use

16  is unreasonable, and we could state this finding exactly in

17  the same way in the negative.

18      MR. VEEDER:  Your Honor, on Page 16,717 of yesterday's

19  transcript I said this, "I don't think I want to put myself

20  on record as saying that all uses presently are reasonable."

21      THE COURT:  I think what Mr. Sachse says has some

22  merit.  I like the other language better.  I am not very

23  happy about making a finding that a use that is being made

24  is reasonable, for this reason:  Not that we are presently

25  able to apportion, but later on on some matter a situation

16,763

t-16

1    may come up, and counsel may say, "You found that a use by

2    'X' in 1960 was reasonable, and here is what 'X' was doing

3    in 1960.   Now we are talking about apportionment, and there

4    is a problem between two or three of these people, and they

5    are doing no differently now than they were doing then, and

6    you found that it was reasonable."

7         Actually, we are not at this stage of the case trying

8    to determine reasonableness of use, one as against the

9    other.  We are trying to catalogue rights, and to see

10   whether uses are beneficial.   Of course, a negative

11   finding --

12        MR. SACHSE:   I sincerely believe in these cases that

13   the exact language that I used on the impoundment could be

14   used, and it was:

15             "There is no evidence that any of such structures

16        or impoundments presently constitute an unreasonable

17        waste or non-beneficial use of water."

18        I think that is what the Court is going to have to find

19   as to every water user in this area.   You can't find they

20   are non-beneficial.

21        THE COURT:   If I find that the uses are beneficial and

22   are reasonable riparian uses, why do I have to find that

23   anybody's use is reasonable or unreasonable as to amount at

24   this time? Why don't I merely say that I am not making

25   a finding at this time as to whether uses are excessive or

16,764

t-10

not excessive, and that this is a matter which would only come up on the matter of apportionment, and would there be met and faced by the Court.

MR. SACHSE:  The only thing is that Mr. Veeder was very frank in saying that he is looking for ammunition on an order to show cause, and I say that I just don't like it at this time.

I would rather have a finding here that would, so to speak, spell out the fact that if Mr. Veeder expects to go against Roripaugh, or to go against anybody else, it is going to be the burden of the party going against him to show that they are doing something wrong, and not the burden of the party that is being sued to prove that he is doing right.

MR. KRIEGER:  Isn't it true, your Honor, that there has been no evidence that the uses are unreasonable?

THE COURT:  We are getting down to a matter of semantics. If by "unreasonable" you mean that there is no evidence that any of this water is being used for other than irrigation uses, that a reasonable riparian use is being made, and they are beneficial users, that is one thing.  But if you mean "unreasonable" in the sense that there is any evidence that one person has got more than his share of the water over somebody else, I don't know that I want to make that finding. The case has not been tried on that issue.  I don't think I

16,765

t-18

1   would be prepared in any situation on the record to make

2   such a finding. But I don't want to make a finding which

3   would preclude a later consideration on an apportionment

4   problem. That is what I am thinking about.

5       MR. KRIEGER: I am wondering, though, if we don't leave

6   open that very problem by finding it in that way. First, you

7   have already found that the uses of the people in this

8   area are beneficial uses, and proper riparian or overlying

9   beneficial uses. That is a positive finding.

10      THE COURT: That is right.

11      MR. KRIEGER: And that has been agreed to by the United

12  States. Now we come to the question of amount. But you

13  said yesterday the same thing that you said here today, and

14  which was quoted in the transcript, namely, that you did not

15  want to make findings that these were affirmatively

16  reasonable amounts, and you  suggested the phrase "existing

17  conditions," and we put that into this finding, but it

18  seems to me that is still objectionable. You leave open

19  the opportunity, your Honor,by saying --

20      THE COURT: It has to be left open.

21      MR. KRIEGER: Well, your Honor, --

c fls

22

23

24

25

16,766

Take C-1

P 13

1    THE COURT: All through these judgments we point out

2    that this Court takes continuing jurisdiction. We do not

3    now face the apportionment problem and there is nothing now

4    closing the door in the future.

5    It would seem to me that what I should do in these

6    findings is to find that the uses that have been made have

7    been proper riparian uses and reasonable riparian uses in

8    that sense; that they are beneficial uses; that the Court

9    is not now adjudicating any apportionment as to the relative

10   extent or amount of use made by various parties. The Court

11   therefore, since this is a matter that would have to be

12   considered on evidence at the time when such application

13   was made, now makes no findings as to whether, as of this

14   date, one user is using more than his share or is getting

15   less than his share.

16   I just don't make any finding on it. I would just be

17   completely frank in the findings.

18   You don't contemplate that we can get some judgment

19   here that would shut the door to some later application to

20   apportion, do you?

21   MR. KRIEGER: I should say I don't. But I do feel that

22   there has been enough of a showing here, there has been

23   enough evidence to show that nobody can be demonstrated to

24   have used more water than he is entitled to. There has been

25   no evidence that he has, because to show that we would have

P 14

1    had to show the entire amount that is being used and the

2    total amount to which each person is entitled.  Now by

3    stating it negatively I feel a little bit with Mr. Sachse

4    that this is a protective finding only to show that nobody

5    yet to this date is guilty of taking any more water than he

6    has been entitled to take.

7           THE COURT:  I would be willing to do that.  I think

8    generally you are correct.

9           If there was also put in the judgment the statement that

10   on any subsequent application for apportionment the finding

11   heretofore made that there was no unreasonable use in amount

12   would, in no sense, be binding on the Court, whoever the

13   judge might be.

14          MR. SACHSE:  Your Honor, in all of the judgments

15   affecting riparians I have worked on I have always put a

16   clause that says that the exact proportion of the water of

17   Sandia Creek to which the owners of riparian lands are now,

18   or may in the future be, entitled has not been determined

19   and is left open for future determination on proper showing.

20   I think that has got to go in this one as well.

21          THE COURT:  Well, let's be honest.  Here is the thing

22   I am afraid of.  Here is what I don't want to happen.  We

23   didn't try this case on the basis of an apportionment --

24   not withstanding what Mr. Veeder has said from time to time.

25   It has not been tried on that basis.  I don't want a

16,768

P 15

1    situation to come up a year or two years from now where there

2    will be proof put on that X is pumping so much water on so

3    many acres -- let's take the Santa Gertrudis area -- and

4    they bring in the facts on this area and then they show that

5    what is being pumped at that time is just about what is being

6    pumped today, and then to have counsel, Mr. Krieger, or

7    somebody go back and say "Now here was the situation that

8    existed in 1961 and you found that the uses were not un-

9    reasonable, and therefore we have the same factual situation.

10   We must now today in 1963 find that unreasonable." Now the

11   fallacy of such a contention by Mr. Krieger would be that

                       been
12   we haven't /trying the case as an apportionment. We haven't

13   been weighing any relative amounts of water that the Santa

14   Gertrudis farmers are entitled to as compared to Vail or

15   as compared to the depot further up in the Murrieta or as

16   compared to the United States, and when you get to a time,

17   if you do, where you have to talk about who is going to be

18   restrained and who isn't going to be restrained then you

19   have to have a lot more evidence. You have got to find, if

20   you can, I would take it, the amount of water in this

21   ground water area, the amount in the basins and downstream,

22   the amount in the Pauba area, the recharge, the total uses

23   made and some fair equitable arrangement then so that equity

24   is done to all.

25        That is the only thing I am afraid of. I don't want

P 16

1    that to come up.

2       MR. SACHSE:  I think you could just put a caveat in.

3  I agree that there should be, your Honor.  I do think there

4  must be some finding, either phrased negatively or positively,

5  that as of today there is nothing unreasonable, and leave

6  it open for the future.  But as of today there is no un-

7  reasonable use.

8       Mr. Veeder, what do you think of the suggestions that

9  have been made here?

10      MR. VEEDER:  I believe that the situation is such that

11  the question whether Mr. Roripaugh is using an unreasonable

12  quantity of water should not, and in my view could not, be

13  found at this time.  I think that is what you said.  Isn't

14  that right?  So that if at some future time a request for

15  regulation -- I beg your pardon -- for apportionment through-

16  out the area comes about and he says, "Well, I am not using

17  any more water than I did in 1960," then the answer is this,

18  "Well, the matter is not res adjudicata and we will review

19  it again and the question of reasonableness as to quantity

20  was not determined."

21      Isn't that about what you were saying?

22      MR. SACHSE:  That is it as long as we include with it

23  the statement that there is no evidence that any of the

24  present uses are unreasonable.  That is the point.

25      MR. KRIEGER:  May I suggest that it might be accomplished

P 17

1    this way?

2        MR. VEEDER:  May I finish on this point?

3        Why not just put it straight forward as it is?  That

4    there is no finding that any of the uses that there have

5    been now and are now being made are an unreasonable quantity

6    of water in regard to Mr. Roripaugh.

7        THE COURT:  You are just talking about Mr. Roripaugh.

8        MR. VEEDER:  I am looking at that, because I do think

9    the Vails are using an unreasonable quantity of water.

10        MR. GIRARD:  I don't agree with Mr. Sachse or Mr. Veeder.

11    I think when you make the finding which says, as this says,

12    that the waters are being applied to reasonable and beneficial

13    uses, you don't have to go any further and say anything as

14    suggested by Mr. Sachse.  I think that takes care of it.

15    If they are being applied to reasonable and beneficial uses,

16    it doesn't make any difference at all.

17        THE COURT:  And that the Court makes no findings on

18    apportionment and the jurisdiction is reserved.

19        MR. VEEDER:  I didn't hear that last part.

20        MR. GIRARD:  I agree.  The reasonable amount you cannot

21    say now -- and I didn't see this before, but I see it now --

22    you cannot say now whether Roripaugh is or is not using an

23    unreasonable amount.  Maybe the present amount of water he

24    is using, under present conditions, if there were an

25    apportionment, would be unreasonable.  And I don't think it

P 18

1   is correct to say that he is not now using water in an

2   unreasonable amount, because we can't face up to the issue.

3   Maybe he is right now using water in an unreasonable amount

4   if we were making an apportionment today.

5       MR. KRIEGER:   I think that misses the main point.   The

6   main point is that there is no evidence.

7       MR. SACHSE:   That is the language that I suggest:   There

8   is no evidence that any of such structures or uses presently

9   constitute unreasonable, wasteful or non-beneficial use of

10  water.   That is a must, because it is a constitutional

11  provision.

12      MR. GIRARD:   If we say it is reasonable and beneficial

13  use, aren't we saying the very thing you are saying?

14      MR. SACHSE:   No, because reasonable and beneficial

15  riparian use may be grossly unreasonable with relation to

16  other people as to quantity.   It could be.   And we have to

17  state that there is no evidence at this time.

18      THE COURT:   Can't we say that there is no evidence that

19  the amount is reasonable or unreasonable?

20      MR. SACHSE:   Fair enough, as long as we make it clear.

21      THE COURT:   All right, will you go that way?

22      MR. SACHSE:   Yes.

23      MR. KRIEGER:   Yes.

24      MR. SACHSE:   It is all right with me.

25      MR. GIRARD:   I presume that this finding will apply

P 19

1    throughout, including the lands of the United States when

2    we draft their findings.

3    MR. SACHSE:  We are at the heart of the whole problem.

4    If this is sauce for anyone, it is sauce for everyone.  I

5    say in all sincerity I don't see how Mr. Veeder can single

6    out Vail anymore than he can single out the United States or

7    anyone else.

8    THE COURT:  I don't think he can.

9    MR. SACHSE:  This is a fact with which we are confronted

10    in adjudicating this whole case.  We are setting a pattern

11    that we are going to use for the Vail findings/that we are
                                                    and

12    going to use for the United States' riparian findings and

13    we had better recognize it.

14    THE COURT:  Where is that language that you have used,

15    Mr. Sachse?

16    MR. SACHSE:  The exact language I read was from my

17    language on miscellaneous impoundments.

18    MR. VEEDER:  What is the number?

19    MR. SACHSE:  It is Finding 4 on page 2 under

20    "Miscellaneous Impoundments."  Paraphrasing it --

21    MR. VEEDER:  Why don't you read into the record what

22    you have in 4?

23    MR. SACHSE:  What I have in 4 is this:

24         "There is no evidence that any of such structures

25    or impoundments presently constitute an unreasonable,

P 20  1        wasteful or non-beneficial use of water."

      2        Now I would suggest that you could rephrase it to say:

      3             "There is no evidence that any of such uses are

      4        presently reasonable or unreasonable."

      5        THE COURT:  As to amounts.

      6        MR. SACHSE:  In amount.

      7        MR. VEEDER:  No.

      8        MR. SACHSE:  How are you going to say wasteful or

      9   not wasteful, beneficial or non-beneficial?

     10        MR. VEEDER:  I think the word "quantity" or "amount"

     11   has to be in there, whatever you want to put in.

     12        MR. SACHSE:  I think if we say there is no evidence

     13   that they are unreasonable, you have left the door wide

     14   open to anybody to prove it in the future.

     15        MR. GIRARD:  You can't say that there is any evidence

     16   that they were reasonable unless we were considering this

     17   case in the light where that was an issue.

     18        MR. SACHSE:  I am not saying that it is unreasonable.

     19   I am saying that there is no evidence that they are unreasona-

     20   ble.

     21        MR. GIRARD:  And there is no evidence that they are

     22   reasonable.

     23        THE COURT:  Why don't we say that this case was not

     24   tried on the basis of an apportionment.  It was tried for

     25   the purpose of cataloguing the rights on the River.  That

P 21

1 therefore the matter has not been considered from the stand-

2 point of the reasonableness or the unreasonableness of the

3 amount of use, but that the uses of water that have been

4 made have been beneficial and proper riparian uses, and the

5 question of any apportionment is postponed to another day?

6     MR. SACHSE:  That will suit me.

7     MR. GIRARD:  That is fine.  I think that is what

8 happened.

9     MR. VEEDER:  I would want to read the language, but I

10 think you are getting close.

11     THE COURT:  Let me make a couple of other suggestions

12 of things that I thought about on looking this over.

13     In No. II have we sufficiently described the younger

14 and older alluvium that make up these deposits?  I just

15 throw that out.  Maybe we have.  No. II says "consisting

16 of sand, gravel, silt, clay and other materials which vary

17 in permeability. . " Actually, the only real difference, as

18 I recall the evidence, between the older and the younger

19 alluvium was the question of permeability.  Isn't that true?

20     MR. STAHLMAN:  That is correct.

21     THE COURT:  It was a tighter material laid down earlier.

22 Maybe we should say that the older alluvium is less permeable

23 but of much the same character as the younger alluvium.

24     MR. STAHLMAN:  The evidence shows, of course, that there

25 is a definite line of demarkation between the younger and

P 22

1    the older alluvium.  Whether that should also be considered

2    in there.

3        MR. VEEDER:  Would the evidence support that?

4        MR. STAHLMAN:  This finding here sort of runs it in

5    together.

6        THE COURT:  I think the evidence does show that there

7    is in most cases a line of demarkation, and the maps we have

8    show it.

9        MR. SACHSE:  I don't see that it is very significant,

10   since we are going to treat it all as a single body.  I

11   don't think that point is too important.

12       THE COURT:  To go a step further, I think there also

13   should be something in here, a finding that what we now call

14   the "older alluvium" is the same material which was referred

15   to as "mesa silt" in the prior findings.  And if Mr. Veeder

16   wants to take up the stipulated judgment, I want some

17   finding here which will indicate that this "mesa silt" or

18   "older alluvium" is the type of material referred to in that

19   old judgment.  That is why I am thinking that we should

20   further define the two and refer to "mesa silt."  There is

21   no dispute that this older alluvium is the same as the mesa

22   silt referred to in the 1930 and 1940 judgments.

23       MR. VEEDER:  I will object to that, your Honor.

24       THE COURT:  Why do you object?

25       MR. VEEDER:  Because I don't believe those findings

P23

1    have a thing in the world to do with this lawsuit.

2         THE COURT:  They don't have a thing to do with it?

3    You have spent a lot of time relying on the 1940 judgment

4    and trying to divorce yourself from the 1930 judgment, and

5    now you tell me they have nothing to do with the lawsuit.

6    If you want to stand on that and make a record here that you

7    are not concerned with the 1940 judgment --

8         MR. VEEDER:  I am not concerned with the 1940 judgement?

9    I am greating concerned with the stipulated judgment of

10   1940, but it has no relation whatever with the findings that

11   came down, sir.

12        THE COURT:  This is off the record.

13        (Comment off the record.)

14        MR. VEEDER:  Let's get on the record on that, your

15   Honor, because I might want to take you up on it.

16        THE COURT:  Anyhow, I want something on the mesa silt.

17        MR. VEEDER:  You can have it over my objection, that's

18   all.

19        THE COURT:  Over your objection.

20        I suggest also in No. I -- we start talking about the

21   Murrieta-Temecula ground water area -- we ought to say

22   "Hereafter called the 'area'" or better yet "Hereafter called

23   the 'ground water area'" and then use that terminology

24   throughout the ground water area.  We do use "area," but

25   I think we should make it clear that we are talking about

16,777

P 24

1    ground water area.

2        MR. VEEDER:  As long as we are doing some editorial

3    work, why do we start in with "It is true"?  Can't we say

4    "The Murrieta-Temecula ground water area"?

5        THE COURT:  Yes.

6        Before going ahead with some of this matter, let's take

7    a recess.

8        MR. VEEDER:  I would like to have it written up.

9        THE COURT:  What do you want written up?  The last

10   statement I made there?

11       MR. KRIEGER:  Yes.

12       (Discussion off the record about having the reporter

13   write up portions of the comments.)

14       MR. VEEDER:  I would hope that we could get at least

15   one copy of what was said by the three or four of us on

16   this matter, because I think we are getting close to where

17   I think we can come to agreement on this finding.

18       MR. KRIEGER:  Why don't we draft this now rather than

19   go back into the record?

20       MR. SACHSE:  I think we can write some of these without

21   the transcript.  Our notes are pretty good.

22       MR. VEEDER:  We will be able to look at it this after-

23   noon.

24       THE COURT:  Do you think you will make better progress

25   if we adjourn now and work on this?

p 25

C-2

1    MR. GIRARD:  Have we got all of your comments, your

2    Honor?

3    MR. SACHSE:  Could we be free to come storming into

4    chambers?

5    THE COURT:  Yes.

6    Let me go ahead with some of my comments.

7    On No. II, at line 6, "These sedimentary materials are

8    found from the surface to great depth" instead of "found at

9    great depth."  It looks like they are only at great depth.

10   At line 8, "which is marked by the Elsinore Fault,"

11   instead of "they" say "such materials are some 2500 feet

12   in depth."

13   MR. VEEDER:  They are really all over.  Isn't that the

14   situation?  We don't know how deep they are.

15   THE COURT:  Well, we know they are 2500 feet.  Let's

16   not quibble.  That is deep enough, isn't it?

17   Then I think you already have 15-E substituted there

18   with C.

19   And I am willing to add a finding to the  effect that

20   it is probable that basement complex underlies the whole

21   area.  I may go further than that.  We know that somewhere

22   down there there is basement complex under the whole area.

23   That is your suggestion.  You can have that.

24   MR. VEEDER:  That is right.  There is one thing that

25   I would like to bring up in regard to this Exhibit 15-E.

16,779

P 26   1    Exhibit 15-E is as of 1959.  There is a great deal more on

2    it than the limits of the ground water area.  If you will

3    observe, you have a lot of arrows and other factors.  So if

4    we could just use the colored areas showing the younger and

5    older alluvium, and residuum and the basement complex -- I

6    don't believe that you want everything that is on there.

7        THE COURT:  I don't care.

8        MR. VEEDER:  It is 1959 -- that is the point, and I

9    think what you want is the general location of the sedimentary

10   deposits.  Isn't that it?

11       THE COURT:  And I want the water contours.

12       MR. SACHSE:  And the most recent water level contours.

13   So you want your 1959 map.

14       THE COURT:  I don't care about those arrows and the

15   pumping holes.

16       MR. VEEDER:  We have a reproduction problem.

17       MR. SACHSE:  You can make 15-E without his red marks

18   on it.

19       MR. VEEDER:  Then it is not 15-E.  That is the point.

20       THE COURT:  We will let the record show what we did

21   and there will be no problem about that.

22       MR. VEEDER:  All right.

23       THE COURT:  On VI, at about line 4 or 5, it starts,

24   "including but not limited to pumping within said area, the

25   density of the deposits underlying said area, and the" I

P 27

1   would insert "probable existence of physical ground water

2   barriers beneath the surface of the area," and then I would

3   insert something like this, starting a new sentence,

4   "Although in some areas the movement of such ground waters

5   can be, and has been, definitely determined, there is

6   insufficient evidence to show as to the whole area to what

7   extent the movement and rate of flow . . "  In other words,

8   I would add, on line 8, after the words "to show," insert

9   "as to the whole area" or "as to the major portion of the

10  area" or something like that.  And then I would go back and

11  put in front of the words "There is insufficient evidence"

12  the following, "Although in some areas the movement of such

13  ground waters can be, and has been, definitely determined,

14  there is insufficient evidence to show as to the area as a

15  whole . . "  There are certainly areas where we know pretty

16  well what the ground water movements are.  I don't like a

17  finding that says that there is no evidence to show the

18  movement or flow when there is some in certain areas.  But

19  we are not finding what they are.  It is not too important.

20      MR. KRIEGER:  There is no evidence as to rate of flow,

21  however.

22      THE COURT:  I am not so sure but that in certain of

23  these instances you wouldn't be able to figure a certain

24  rate of flow in some of these wells.  But what difference

25  does it make?  It is just a general finding that as to the

F 28

1   area as a whole we haven't got this evidence.  We do have it

2   in isolated cases.

3       That is a suggestion.  Think it over.

4       Number VII.  I told you about this problem of other

5   parts distantly removed and there were some other suggestions

6   about No. VII.  I will not go into that further.

7       Now, on No. VIII, at about line 4, "The altitude of

8   the water contours in said area," strike "go" and say "are

9   progressively lower," insert "as they proceed," and going

10  ahead after "from the extreme north and easterly boundaries

11  of said area" insert "downward to Temecula Gorge."  And then

12  make a reference to 15-E showing the ground water contours

13  and that it is incorporated by reference.  I have written

14  here "Exhibit 15-E showing the ground water contours as of

15  1959 is incorporated by reference."

16      Is that 1959?

17  MR. VEEDER:  That is right.

18      THE COURT:  We have 15-E also for the other area of

19  younger and older alluvium.  We will incorporate also to

20  show the ground water contours.

21      Now on IX, at the very beginning --

22  MR. STAHLMAN:  May I make a suggestion on No. VIII,

23  your Honor.  I am just wondering, in view of your concern

24  about the fact that someone picking these up at some future

25  time would be confused, I think possibly your reference to

P 29 1    the exhibit will to some extent straighten it out, but the

2    contour levels does not necessarily mean the depth to water.

3    That is the point I am getting at.

4    THE COURT:  The ground water contours don't show depth

5    to water from the surface; they show contours at which water

6    stands in the well.

7    MR. STAHLMAN:  I understand.

8    THE COURT:  If you want to make it clear, you could say

9    that the ground water contours showing the elevation of

10    waters in wells -- that is what you are talking about.

11    MR. STAHLMAN:    That is it.

12    THE COURT:  I have no objection to that.  I would like

13    the findings to say "showing the elevation of water in wells

14    in said area."

15    Now, going to IX, I would change this in the second

16    line "The sources of said ground water are primarily

17    precipitation within the area, and runoff" and then you

18    are going to have to insert "from other parts of the water-

19    shed outside the said ground water area," going ahead

20    "during or immediately after periods of precipitation from

21    -- "

22    MR. VEEDER:  I didn't feel that the first time around,

23    your Honor.

24    THE COURT:  I didn't think you did.

25    MR. VEEDER:  "The sources of said ground water are

P 30 1   primarily precipitation" -- you mean falling on the surface

2   of the area?  Is that what that means?

3       THE COURT:  You wrote this first part.  This part is

4   yours.  "The sources of said ground water are primarily

5   precipitation within the area . . "

6       MR. VEEDER:  Within the watershed.

7       MR. SACHSE:  No.

8       THE COURT:  You didn't have it worded right.

9       MR. VEEDER:  I am riding with you on this.

10      THE COURT:  All right.  " . . precipitation within the

11  said ground water area, and runoff from other parts of the

12  watershed outside the ground water area . . "  In other

13  words, it is what rain falls within that area and it is

14  runoff from other parts of the watershed.

15      MR. GIRARD:  Occurring during or immediately after.

16      THE COURT:  Yes.

17      MR. VEEDER:  Your Honor, what I said was this:  The

18  principal sources of recharge to the Murrieta-Temecula

19  (whatever it is) are the main tributaries of the Santa

20  Margarita River.  And that is what I think is correct.  Read

21  it as it is -- that the sources of ground water are primarily

22  precipitation within said area.

23      MR. SACHSE:  Not precipitation.  And then in a separate

24  sentence the two are the primary sources.

25      MR. GIRARD:  There is no question at all that the major

P 31

1    portion is not precipitation.

2    MR. SACHSE:  I think there is no argument.  If you are

3    afraid of putting precipitation first, let's switch it

4    around the other way.

5    MR. VEEDER:  That is how I read it when I heard it read

6    aloud.

7    MR. SACHSE:  I think you should just reverse it and say

8    "The sources of ground water are primarily runoff from areas

9    outside said ground water area, and precipitation within

10   said ground water area."

11   THE COURT:  That is all right.

12   MR. SACHSE:  Nobody is trying to say that precipitation

13   is the biggest source.

14   MR. VEEDER:  I would say it is much smaller than that

15   which flows in.

16   MR. SACHSE:  Then let's reverse it.  What is the

17   difference?

18   THE COURT:  Does 15-E give us enough of a showing of

19   the creeks?  I am wondering next as to whether we should

20   incorporate 15-E here also as describing these creeks?

21   MR. VEEDER:  They will show up.  Your problem comes in,

22   your legal subdivisions don't show up well.  That is the

23   big problem.

24   THE COURT:  You don't trace the streams?

25   MR. VEEDER:  No, because I think that is going to be in

P 32   1       a general finding in regard to the whole watershed.

2              THE COURT:  Yes.  You merely point to where these

3        streams occur and where they join, et cetera.

4              MR. VEEDER:  That is right.

5              THE COURT:  Then why could we not say that the stream

6        system has been or will be described in other findings and

7        interlocutory judgments?

8              MR. VEEDER:  More fully described in a general descrip-

9        tion of the watershed.

10             THE COURT:  You have findings on various of these

11       streams.  That is what you have.

12             MR. VEEDER:  It would occur to me that -- and this is

13       a thought, if you want to entertain it now -- that when you

14       start it you should have a general definition, a general

15       finding as to the exterior limits of the watershed of the

16       Santa Margarita River and its principal tributaries, where

17       they rise and their general course.

18             THE COURT:  Somewhere we do.  But take Wilson Creek

19       and Tucalota Creek your findings that you are proposing

20       there, start those right out and trace them right on down.

21             MR. VEEDER:  That is right, your Honor.

22             THE COURT:  So why don't we merely say -- what you have

23       in here is all right, but make a general reference that

24       "Other findings have been or will be made on the areas of

25       the watershed and the courses of various streams in the

P 33   1   watershed and are incorporated by reference"?

2        Those are the only suggestions I had.  Let's take a

3   recess.  I will be available.  We will meet again at two

4   o'clock.  See what you can do to work something out.

5        (Adjournment until 2:00 P. M.)

6         - - - - - - - - -

t-19

16,787

D-1

- - -

THE COURT:  Do you have any new drafts ready?

MR. GIRARD:  I think we have them all written, your Honor, but they are not yet in final form.

MR. KRIEGER:  Have you gotten any of them at all?

THE COURT:  No.

MR. SACHSE:  Here is a set (Indicating).

MR. KRIEGER:  Is that I, III and IV?

MR. SACHSE:  It is I, III, IV and VI.

MR. KRIEGER:  There is I, III, IV and VI.   The rest of it is coming, your Honor.

(The documents were handed to the Court.)

MR. KRIEGER:  And here are II, VII and VII.

(The documents were examined by the Court.)

MR. KRIEGER:  There is a perfectly obvious mistake on Line 7 of VII.  The word is "export" instead of "apart."

These are all the copies we have.  I think that is all that is done.

MR. SACHSE:  It is a full set now.

THE COURT:  Yes.  Are you ready to go over them?

MR. KRIEGER:  Ready.

MR. VEEDER:  Your Honor, Mr. Stark called me again, and I told him that I assumed that a future date would be arrived at sometime this afternoon, and when it was arrived

16,788

t-20

1    at, I would let him know, if that is all right with you.

2          THE COURT:  Did he give you some indication as to when

3    he would be ready to put on his additional evidence?

4          MR. VEEDER:  He did not, your Honor.  He said he would

5    be ready the next time you set down a hearing.

6          THE COURT:  Do you want to talk about this date now?

7          MR. VEEDER:  I don't care, your Honor.  I just thought

8    I had better report what Don Stark told me just a few

9    minutes ago.

10          THE COURT:  Where is our agenda?

11          MR. VEEDER:  Do you have a copy of the agenda?

12          THE COURT:  Does somebody have a copy of the agenda?

13    I have lost mine.

14          MR. GIRARD:  I have a copy here, your Honor.

15          (The document was handed to the Court.)

16          MR. VEEDER:  May I be excused from Court for a minute?

17    I would propose to put in a Number V or Number X, whichever

18    you want me to do.

19          There is a Number V missing now.  This reads:

20              "There is attached, marked Exhibit C, and made

21          a part of these findings by reference, the names of

22          apparent owners, their gross and irrigable acreage

23          and the pumps which are located and used upon

24          their properties."

25          THE COURT:  This relates to the wells?

MARIE G. ZELLNER, OFFICIAL REPORTER

16,789

t-21

1    MR. VEEDER:  Yes, your Honor, wells.  We want to put

2    that in there.

3    THE COURT:  We have no number V, so we will move these

4    other numbers up, and call this X, then, and you can get

5    started.

6    MR. VEEDER:  All right.

7    MR. STAHLMAN:  You exclude Vail, I suppose, in these

8    findings because that will be in their findings?

9    MR. VEEDER:  Yes.

10   MR. SACHSE: We will move everything up then one number,

11   and use X for this list; is that right?  What is it?

12   MR. VEEDER:  The names of apparent owners, with the

13   exception of Vail Company.

14   THE COURT:  We will move everything up after IV.   In

15   other words, VI will become V, VII will become VI; VIII

16   will become VII; IX will become VIII; and X will become IX,

17   and then you will have  X prepared.

18   MR. VEEDER:  George has asked to make a change in this

19   proposal, which is agreeable, so that this now is:

20          "There is attached, marked Exhibit C, and made a

21       part of these findings by reference, the names of

22       apparent owners with the exception of Vail Company,

23       whose properties are described in other findings, their

24       gross and irrigable acreage and the wells which are

25       located and used upon their properties."

16,790

t-22

1     MR. KRIEGER:  Where does that insertion come?

2     MR. VEEDER:  That would come after "apparent owners."

3     THE COURT:  Now, that is not Exhibit C.  We changed

4  "A" to 277, and changed "B" to 277-A, so you will have to

5  say, "There is attached, marked Exhibit A", -- is that right?

6     MR. VEEDER:  That is right.  I will go ahead and have

7  this run, your Honor.

8     THE COURT:  All right.

9     (Thereupon Mr. Veeder left the courtroom, and

10  subsequently returned.)

11     THE COURT:  Now, let's talk about  our next date.  The

12  work is now largely a matter of drawing findings, and it is

13  convenient to have counsel here to go over them, to iron out

14  these matters in them.  Some of these are supposed to be

15  pretty well ironed out except for the mechanical job of

16  attaching the ownerships.  That is k true as to Domenigoni,

17  Wilson, Tucalota, and so on.

D-2    18     MR. VEEDER:  And Sandia is virtually finished.

19     THE COURT:  But I want to keep going on this thing.

20  When do you want to come back?

21     MR. VEEDER:  When does Mr. Sachse get back?  You get

22  back in July; is that right?

23     MR. SACHSE:  That is right.

24     MR. VEEDER:  There is no reason -- I will start again.

25  This work will progress right straight through now without

16,791

t-23

1   any hesitation, all of this work, all that is being done now

2   with reference to findings.  It is a purely mechanical job,

3   but we do have evidence to put in in regard to the ownerships

4   on Temecula Creek above Aguanga, and that data we are

5   prepared to put on there, with the exception of the letters

6   we have to send out to all parties.  We will send those out

7   in advance of whatever date your Honor sets.

8        THE COURT:  Letters to whom?

9        MR. VEEDER:  To the owners in Temecula Creek.

10       THE COURT:  Above Aguanga?

11       MR. VEEDER:  That is right.  That would be the end of

12   all the evidence on all the tributaries.  I would like, if

13   possible, --

14       THE COURT:  We have other findings that I haven't seen

15   any drafts of.  There have to be findings on Vail, there

16   have to be findings on the Government land and the basins

17   therein, and so forth.

18       MR. VEEDER:  That is right.  Anza is completed, isn't

19   it?

20       MR. GIRARD:  Anza should be ready to go now.  My

21   secretary was typing up Anza when I left Monday morning.

22       But his Honor is correct, there are considerable

23   findings, and I am sure that some of them will require

24   comment in Court after they are drafted.  They will be

25   available here within the next month.

16,792

t-24

THE COURT:  How soon can we get these out?  You are working on them, and you say it is only a mechanical job.

MR. GIRARD:  I want to make it clear that drafting the findings on the United States and Vail is not just a mechanical job.

THE COURT:  I am not talking about those.  I am talking about Wilson, Tucalota, Domenigoni Valley, and the balance of the ownerships in the basin area, the ground water area. Can we wind these findings up soon?  It is supposed to be just a mechanical job.  I know it is a big one, but I want to ask the Colonel and Mr. Veeder if they are prepared to go full speed ahead on drawing these up?

MR. VEEDER:  That is now in process, your Honor.  It is now going ahead full speed.

THE COURT:  How long will it take?

MR. VEEDER:  To complete Domenigoni, I am convinced that we will be through on that by the end of next week. That has been approved as to form.  I see no reason why that could not be signed as soon as the mechanical task is done. I see no reason for holding that up.

On Sandia Creek --

THE COURT:  Did we approve the form on Domenigoni?

MR. VEEDER:  Yes, your Honor.

MR. SACHSE:  Mr. Veeder and I were in agreement, and, as I understood, he was redrafting them in this new format.

16,793

t-25

1    THE COURT:  Now, what about Wilson and Tucalota?

2        MR. VEEDER:  Tucalota Creek is complete.  It is being

3    put in final form, and it will be in final form.

4        Wilson Creek is to be --

5        THE COURT:  When?  When will it be in final form?

6        MR. VEEDER:  I am just trying to figure from the

7    standpoint of secretarial help, your Honor.

8        THE COURT:  You mean the rough draft of our general

9    findings are complete, and we are just waiting for you --

10       MR. VEEDER:  On Tucalota Creek, yes.

11       THE COURT:  -- to add the ownerships?

12       MR. VEEDER:  That is right.

13       THE COURT:  How long will it take you to do that?  It

14   is just a copying job, isn't it?

15       MR. VEEDER:  You are asking me an extremely difficult

16   question, your Honor, and I would have to consult with

17   Colonel Bowen and try to figure this out.  When anybody asks

18   me days or dates on how long it will take, that is something

19   I hesitate your Honor because I can't be sure of it.

20       THE COURT:  Then the Colonel knows more about this than

21   you do?

22       MR. VEEDER:  I don't think so, your Honor.

23       THE COURT:  Well, he is running the copying department

24   out there, isn't he?

25       MR. VEEDER:  He can certainly answer.

16,794

t-26

THE COURT:  Who is running it?  You or the Colonel?

MR. VEEDER:  Your Honor, from my standpoint, I am directing how it is being done.

THE COURT:  I know, but who is the one who supervises the amanuensis?

MR. VEEDER:  Commander Redd is the one immediately in charge of directing the work on Murrieta Basin area right now.  That is what is being worked on.

My girl is working and is continuing to work on Diamond and Domenigoni Valleys.

If you ask me how long it is going to take them, I can't tell you.

I will say this that I think that the whole thing will be done in two months, but I would be very foolish to do more than that, and I dare say that the Colonel is too smart, and so with Commander Redd, to make a guess on time any more than that.  They can say what they want to.

MR. STAHLMAN:  They haven't got a chance now.

MR. VEEDER:  Is that right, Colonel?  They both say, or at least Commander Redd says, "Okay" on two months.

THE COURT:  How is it going to take you two months?  You had a list, or you had an exhibit of the owners in Domenigoni Valley.  As far as I am concerned, you could have attached that list that you had as an exhibit to the findings on Domenigoni Valley, and have been finished with

t-27

1    it right then.

2         Isn't that what you had, the list of all of the owners

3    in Domenigoni Valley?

4         MR. VEEDER:  Yes, we do have, but we have the legal

5    descriptions, and we have the --

6         THE COURT:  You had those all on this list, did you

7    not?

8         MR. VEEDER:  No, not all of them, and the point of it

9    is this:  Your Honor, you can put in the whole list of some

10   of those lands that are up in the basement complex, and if

11   you want this, I will put it on there, but it isn't meaning-

12   ful.  I am only putting on those tracts of lands that are

13   overlying or riparian.  That is pursuant to your Honor's

14   direction.

15        If I would put them all on there, it would be very

16   simple for us, but then you have to sit down and run these

17   out as to the lands that are abutting upon or traversed by

18   the stream.  If they happen to be overlying, you have to

19   check those, too.

20        Now, I said two months.  If you want me to get more

21   help, I will tell Mr. Clark that we need more help.  I will

22   do that.   I thought the three girls working on it would

23   be enough.  Mr. Sachse will not be back anyway until July.

24        I am not arguing with your Honor.  I will do what you

25   tell me to do.

16,796

t-28

THE COURT:  This is just a mechanical job after you agree upon these other findings, and I want this done just as rapidly as it can be done.

MR. VEEDER:  If there is anyone who is more desirous of that than you, your Honor, it is I.  I want to get through.  But I assure you that it won't save time to go back and do them over again because we find errors.

THE COURT:  Colonel, are you familiar with this problem?

COLONEL BOWEN:  Yes, sir.

THE COURT:  Let me hear from you on this.  As to whether you agree or disagree, speak frankly.

COLONEL BOWEN:  Your Honor, I think the biggest task that confronts us from a mechanical aspect is this cataloguing of rights that lie up in this Murrieta-Temecula ground water area.

There are a multiplicity of owners in there, and in making this catalogue we have worked out a form with Mr. Veeder, in which we indicate the parcel number, the exhibit number, the number of the engineering report if one was made, the legal description of the property, the name of the apparent owner or owners, the gross acreage, the irrigable acreage, the irrigated acreage, and a description of the wells and surface diversions, if any.

Commander Redd has immediate supervision, as Mr. Veeder has indicated, of this job, and he will give his undivided

16,797

t-29

1   attention to this, the major task on the watershed.  He has

2   assigned his number one clerk, who is already working on it,

3   to proceed with it.

4          It is the type of a job where it is difficult to have

5   several people working on it, because they get in one

6   another's way.  They have to refer to the same books for the

7   information they extract from them, and place it on a

8   catalogue sheet.

9          I believe that this one woman can complete this job

10  on the Murrieta ground water basin by about the 1st of July.

11  She will be assigned no other duties between now and then.

12         I think that these others can be brought along and

13  probably completed about the same time.  Most of these other

14  sub-watersheds have fairly minor problems as far as

15  preparation of this catalogue of rights is concerned.  The

16  other clerk we have with experience in these matters will

17  do such work on such sub-watersheds as Mr. Veeder indicates

18  to us he would like to have done, and I assume, of course,

19  Mr. Veeder will have some of it done down here by his girl

20  in San Diego.

e·fls

21

22

23

24

25

Take E-1

P 34

1   THE COURT:  I realize there is a supervisorial problem

2 where this work has to be laid out and checked, and that you

3 could have a dozen stenographers and you could go only so

4 fast.  The only thing is that I don't want the matter delayed

5 for any lack of clerical help.  You can't break in some new

6 man and make an expert out of him.  I realize that.  But I

7 don't want the thing delayed just because it takes time to

8 type.  If you gentlemen will assure me that you, yourselves,

9 and your clerks are going to work in laying out the work

10 and checking it as rapidly as you can and that you will at

11 all times have sufficient stenographic service to do the

12 typing job, the mechanical jobs, I will have to be content.

13 But I don't want this thing just to drag along for two

14 months merely because you are waiting for some typists to

15 type this up.

16   MR. VEEDER:  Your Honor, I have to say, in defence of

17 myself, my office and Colonel Bowen's office, that you are

18 getting very good service, and certainly we want to get this

19 thing through.  I explained to my own superior this whole

20 thing all the way through.  I told him the task.  I am not

21 going to be a party to a slip-shod job, and I don't believe

22 you want us to do this in a slipshod way.

23   THE COURT:  We are in agreement on that.  But I don't

24 want to see the matter held up because of a shortage of

25 typists to do the mechanical typing job.  I can't insist

P 35

1    that there be two Colonel Bowens or two Mr. Veeders or two

2    Commander Redds, but I can insist that you have expert typists

3    do all of the typing work you can possibly feed to them.

4        MR. VEEDER:  I have insisted on that, too, and I assure

5    you that you can't get more efficient help out of three very

6    competent girls.  That is what we are doing.

7        THE COURT:  While we are on the date of another hearing,

8    we should have some of these matters in Domenigoni, you

9    probably would have Wilson and Tucalota Creek, would you

10   not, within a reasonably short period of time?

11       MR. VEEDER:  Yes, we will.  We will have Sandia, I am

12   hoping, by tomorrow, if something doesn't happen.

13       THE COURT:  We have to afford Mr. Stark the opportunity

14   of putting on some more evidence.

15       I would suggest that you be back then the week of May

16   23rd.  How does that sound?

17       MR. GIRARD:  I have a case in the District Court of

18   Appeal on the 24th.

19       MR. VEEDER:  I don't have a calendar in here.

20       MR. GIRARD:  If that would be only one day, I don't

21   mind.

22       MR. VEEDER:  Today is the 3rd.

23       THE COURT:  If you leave, will this work progress while

24   you are gone?

25       MR. VEEDER:  It will probably go faster, your Honor.

P 36   1    THE COURT:  Let's find out if there is agreement on

2    that.  Colonel Bowen, do you agree that the work will move

3    just as fast whether Mr. Veeder is here or not?

4        MR. STAHLMAN:  Faster.

5        COLONEL BOWEN:  He took the words out of my mouth,

6    your Honor.  In the presence of such a master of repartee

7    as Mr. Stahlman I am speechless.

8        THE COURT:  In other words, this work will go ahead

9    whether Mr. Veeder is here or not?

10       MR. VEEDER:  It always has, your Honor.

11       COLONEL BOWEN:  Yes sir.

12       THE COURT:  You gave me to understand that you were

13   the --

14       MR. VEEDER:  Well, I am.

15       MR. GIRARD:  There is a lady in the courtroom.

16       THE COURT:  What about May 23rd for a day or two or

17   three days for whatever we can do, and have Mr. Stark down

18   here on the 23rd.  How does that look?

19       MR. VEEDER:  That gives us ten days.  We would want to

20   wind up on the Temecula Creek material, your Honor, on that.

21       THE COURT:  I would hope that by the 23rd we would have

22   Wilson and Tucalota.

23       MR. VEEDER:  I am talking about evidence now.

24       THE COURT:  Yes, we would want to finish that up.

25       MR. VEEDER:  I would like to give ten days notice to

P 37

1     the people who might want to object.

2         THE COURT:  Would you rather do it on the 30th?  When

3   do you leave, Mr. Sachse?

4         MR. SACHSE:  A week from today.

5         THE COURT:  Well, you are gone now.

6         MR. SACHSE:  I am probably of very little use to you

7   at this moment anyway.

8         THE COURT:  It would suit you better then on the 30th?

9         MR. VEEDER:  I would rather have it the 30th, from the

10   standpoint of getting the job done.

11         THE COURT:  Is that agreeable?

12         MR. VEEDER:  Isn't that a holiday?  We work on holidays.

13   It doesn't make any difference.  And nights.

14         THE COURT:  It would be the 31st then.

15         MR. VEEDER:  The 31st is fine.

16         THECOURT:  Will you notify Mr. Stark?

17         MR. VEEDER:  I will.

18         THE COURT:  He should be ready to go on the 31st.

19         MR. VEEDER:  He surely should.

20         THE COURT:  And you will send out notices?

21         MR. VEEDER:  To everybody on Temecula Creek.

22         THE COURT:  All right.  You will let me see the form

23   of letter?

24         MR. VEEDER:  Yes sir.

25         THE COURT:  All right.

16,802

P 38

1   MR. STAHLMAN:  How long are we going to go this week?

2   Is there any indication?

3   THE COURT:  We ought to be through here tonight or

4   tomorrow.  Have we got something to do tomorrow?

5   MR. SACHSE:  Mr. Veeder thinks we can finish Sandia

6   tomorrow, and so do I.  I don't think there are any obstacles.

7   We can also finish, if you care to -- it's not critical,

8   you can do it without me -- those little miscellaneous

9   impoundments.  I think that is in perfectly good shape.

10  MR. VEEDER:  We will get Sandia done.

11  THE COURT:  We will go tomorrow and not Friday then?

12  MR. VEEDER:  All right.

13  THE COURT:  All right, let's see what we have on this

14  redraft.

15  Anyone any objection to Number I?  I don't hear any.

16  Apparently everybody is satisfied.

17  MR. VEEDER:  I have made my objection already to the

18  use of the word "area" and I will let it stand all the way

19  through.

20  THE COURT:  All right.

21  Number II.

22  MR. VEEDER:  On Number II I would like to change the

23  language to call it the "valley fill" or "the deposits."

24  You say "the land".  It is the first line.  You can call it

25  "valley fill" or "the deposits within the ground water area

P 38

1    of the older and younger alluvium composed of sedimentary

2    material."

3        MR. GIRARD:  Change the word "lands" to "deposits"?

4        MR. VEEDER:  Is that satisfactory?

5        MR. GIRARD:  I have no objection.

6        MR. VEEDER:  And strike "in."

7        MR. STAHLMAN:  No, you don't "in."

8        MR. VEEDER:  " . . the deposits within the ground water

9    area . ."

10        MR. GIRARD:  " . . the deposits within . . "

11        THE COURT:  All right, "the deposits within said ground

12    water area . . "  Is that agreed?

13        MR. GIRARD:  Yes.

14        THE COURT:  What is your next item?

15        MR. VEEDER:  I am going to object, of course, to any

16    reference to the old case and the reference to mesa silt.

17    I want that objection in the record.

18        THE COURT:  Overruled.  I want "mesa silt" in here every

19    chance I get.

20        MR. VEEDER:  That is where you have the advantage.

21        THE COURT:  I have the last word on "mesa silt."

22        MR. VEEDER:  There is one thing I would like to inter-

23    pose.  As I see the situation, your Honor, is it not true

24    that, by and large, the water-bearing strata is the older

25    alluvium?  Is that a proper finding?

P 40

1     MR. STAHLMAN:  Certainly not.

2     THE COURT:  The younger and the older are water bearing.

3     MR. VEEDER:  I said the major source of water supply.

4  As I recall the evidence in the case, the wells may have

5  started in the younger alluvium, but they always wound up,

6  except in rare instances, in the older alluvium.

7     MR. STAHLMAN:  The best wells are in the younger alluvium.

8     MR. VEEDER:  That is not true in regard to Mr. Roripaugh.

9     THE COURT:  Some of the Vail wells are in the younger

10  alluvium, some of the Santa Margarita start in younger

11  alluvium and go down into older.

12     MR. VEEDER:  All right, I am overruled.  I want that

13  objection, however.

14     Now, if you will look on line 11, United States Exhibit

15  15-E, I referred to the fact that 15-E is a much marked

16  exhibit.  If we could use the base map -- I don't know what

17  phraseology you would use, but I don't believe you want this

18  burdened 15-E that is presently in the record.

19     MR. GIRARD:  I agree with Mr. Veeder, but I don't think

20  it is important.  I think finally when we get this in the

21  final judgment, when we start getting our real judgment,

22  what we are going to have to do is to make an appendix for

23  the exhibits, which will not be entitled 15-E or anything

24  else.  They will just be separate exhibits prepared for the

25  judgment.  I don't know that it is too important now.

P 41  1      MR. VEEDER:  Mr. Girard, isn't it ultimately, even if

2      you call it Exhibit A of the judgment, it will be a re-

3      produced 15-E?

4          THE COURT:  Do we have a 15-F?

5          MR. GIRARD:  Yes.

6          THE COURT:  15-G?

7          MR. GIRARD:  I think we do, your Honor.

8          MR. SACHSE:  You must have one like this without any

9      marks on it.  We have clear down to H.

10          THE COURT:  Mr. Clerk?

11          THE CLERK:  15-K is the last series.

12          MR. VEEDER:  But that is not a map.

13          THE CLERK:  No.

14          THE COURT:  15-L.  Mark a new exhibit exactly the same

15      as 15-E, except that it doesn't have the red material put

16      on during the trial.  Is there any objection to that?

17          MR. GIRARD:  No your Honor.

18          MR. SACHSE:  No.

19          THE COURT:  It will be received in evidence as 15-L.

20          MR. VEEDER:  We will bring formally and put into the

21      record and have the Clerk mark it 15-L and it will become

22      part of these findings; is that right?

23          THE COURT:  We will receive in evidence now Exhibit

24      15-L, which is the same as 15-E, except that it doesn't

25      have the markings that you objected to.

16,806

P 42

1      MR. VEEDER:  And I have to get a copy of that and tender

2  it to you?

3      THE COURT:  Yes, and have it colored up.

4      MR. VEEDER:  All right.

5      (The map above referred to was marked Plaintiff's)

6      (Exhibit 15-L and received in evidence.

7      MR. VEEDER:  Mr. Stahlman is raising the ten-day rule

8  now.

9      THE COURT:  And this becomes Exhibit 15-L instead of

10  15-E.  Any objection to that?

11      What else in Number II?

12      MR. VEEDER:  What would you think, your Honor, on this

13  last, when you get down to the semicolon after "San Diego,"

14  on line 20, "said younger alluvium consists of permeable

15  material which is water-bearing while the older alluvium

16  consists generally of less permeable material"?

17      MR. STAHLMAN:  Not "generally."

18      MR. VEEDER:  I say put in "generally," because I think

19  that is the case.

20      MR. SACHSE:  Consists generally of less permeable

21  material; is that right?

22      MR. VEEDER:  Yes.

23      MR. KRIEGER:  All right.

24      THE COURT:  All right.

25      Anything else on Number II?

P 43

1      Now there was not added to Number II your prize suggestion,

2    Mr. Veeder, about the basement complex underlying this deposit.

3    Have you forgotten that?  Do you still want it in?

4      MR. VEEDER:  I was asked if we shouldn't have another

5    "general" in here.  I didn't hear what your Honor said.

6      THE COURT:  Finish your question.

7      MR. VEEDER:  The point of it was that Colonel Bowen said

8    that some younger alluvium consists --

9      How would you want that?

10     COLONEL BOWEN:  Said younger alluvium consists generally

11   of permeable material.

12     MR. VEEDER:  Consists generally of permeable material.

13     THE COURT:  Any objection?

14     MR. SACHSE:  No objection.

15     THE COURT:  I was just reminding you that you made a

16   great battle to have a finding in Number II of the fact that

17   the floor under all this deposit is basement complex.

18     MR. VEEDER:  That is right.  That should be in there.

19     THE COURT:  Have you forgotten about it?

20     MR. VEEDER:  No, I haven't forgotten about it.  I was

21   going to be very bitter about it later.  I hate to have it

22   tied to "mesa silt."

23     THE COURT:  Where do you want to put it?

24     MR. VEEDER:  Let's just put it right at the end here

25   -- "alluvial deposits are underlain by basement complex."

P 44

1    How about that?

2         THE COURT:  All right.

3         MR. SACHSE:  The ground water area is underlain; isn't

4    that your point?

5         MR. VEEDER:  All right, the ground water area -- I don't

6    like the  term.

7         THE COURT:  Make a new paragraph.

8         MR. GIRARD:  Alluvial deposits.

9         MR. VEEDER:  All right, alluvial deposits.

10        MR. STAHLMAN:  In the ground water area.

11        MR. KRIEGER:  The alluvial deposits in the ground water

12   area are underlain with --

13        MR. VEEDER:  In the ground water area, the man says,

14   are underlain by basement complex.

15        THE COURT:  Underlain -- is that a correct word?

16        MR. VEEDER:  Yes.

17        THE COURT:  Are underlain by basement complex?

18        MR. VEEDER:  That is right.

19        THE COURT:  Any objection?

20        MR. SACHSE:  No objection.

21        THE COURT:  All right.

22        Number III.

23        MR. STAHLMAN:  The only thing I can see about Number

24   III is the word "material" between lines 4 and 5.  It is

25   confusing.  "The surface flow from the stream can affect

P 45

1    the flow of the flow of the Santa Margarita River."  You

2    have a quantitative something in there which is not tied to

3    anything.

4         THE COURT:  I don't see any objection to it.  A thimble

5    full of water could affect the flow of the river, but it

6    wouldn't be material。

7         MR。KRIEGER:  That phrase is barred from the Pomeroy

8    case.

9         THE COURT:  I am satisfied with Number III.  Anybody

10   want to make any changes?

11        Number IV.

12        MR. VEEDER:  May I tender this thought in regard to

13   Number IV?  We would delete "surface and subsurface flow --

14        MR. SACHSE:  I think it is changed on his Honor's copy.

15        THE COURT:  No, mine reads "both surface and subsurface

16   flow."

17        MR. VEEDER:  We would delete the "surface and subsurface

18   flow of the stream" and change that first line to read

19   "both the stream flow and the ground water within the ground

20   water area" -- knock out "and the ground water therein" --

21   "constituting a common source of supply which is part of the

22   water of the Santa Margarita River system."

23        THE COURT:  Is that agreed?

24        MR. GIRARD:  Yes.

25        THE COURT:  Read it slowly。  I haven't got it.

16,810

P 46

1     MR. VEEDER:  "Both the stream flow and the ground water

2   within the ground water area constitute a common supply" --

3   knock out "and the ground water therein."

4     THE COURT:  All right, agreed.

5     Renumbered Number V.

6     MR. VEEDER:  We want to change the words "density of

7   permeability" on line 6.

8     THE COURT:  That has been done on my copy.

9     And I suggest on line 10, where it reads "said movement

10  and rate of flow" to insert the following "in the major

11  portion of the ground water area."

12    MR. VEEDER:  Said movement in the major?

13    THE COURT:  So that the last sentence would read:

14  "Although in some areas the movement of such ground water

15  can be, and has been, definitely determined, there is

16  insufficient evidence to show to what extent said movement

17  and rate of flow in the major portion of the ground water

18  area is affected by such underground and subterranean

19  conditions."

20    Any objection to that?

21    MR. VEEDER:  I want to read it, though.  "Although in

22  some areas the movement of such ground water can be, and has

23  been, definitely determined, there is insufficient evidence

24  to show to what extent said movement in the major portion --

25    THE COURT:  No, "said movement and rate of flow," then

P 47   1      insert.

2           MR. VEEDER:  All right, "in the major portion of the

3      ground water area is affected by . . "

4           THE COURT:  Yes.  Is that all right?

5           MR. GIRARD:  Yes your Honor.

6           THE COURT:  Number VI.

7           MR. VEEDER:  Number VII becomes VI.

8           THE COURT:  Renumbered VI.

9           MR. VEEDER:  Does that make sense, your Honor, the final

10     sentence?

11          MR. KRIEGER:  That word is "export."

12          THE COURT:  Are you looking at new VI?

13          MR. VEEDER:  I am looking at new VI.

14          THE COURT:  It should be "export" instead of "a part."

15          MR. KRIEGER:  Yes.

16          THE COURT:  And then it makes sense.  But to be con-

17     sistent I suggest, on line 4 or 4½, 4½ I guess, after the

18     word "involved, possible underground barriers," insert

19     "possible underground barriers," so that it would read:

20     "Pumping in one part of said area may or may not affect

21     water levels in other parts of said area" -- well, it should

22     be "parts of said ground water area," to be consistent; the

23     first "area" at least should be "ground water area" --

24     "pumping in one part of said ground water area may or may

25     not affect water levels in other parts of said area, depending

P 48

1   upon the distances involved, possible underground barriers

2   and the transmissibility of the water-bearing deposits."

3       MR. KRIEGER:  Possible underground barriers.

4       THE COURT:  This is a factor that undoubtedly we don't

5   know much about.  These things indicate that they are here

6   and there.  Is there any objection to it?

7       MR. VEEDER:  I would like to read that Number I again,

8   if I may, your Honor.

F fls.   9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t-30
F-1

1    MR. VEEDER:  I would like to read that number one

2 again.

3    THE COURT:  Number what?

4    MR. VEEDER:  On Finding VI the first sentence.  May I

5 read it aloud?

6    THE COURT:  Yes.

7    MR. VEEDER:  "The ground water levels within said

8 ground water area do not stand at or about the same level."

9    Well, some of them do.  Every contour throughout 15-E

10 is drawn in on the basis that they are substantially -- the

11 elevations of the wells are substantially the same.

12    THE COURT:  All right.  After the word "level" say

13 "except as found in Paragraph VII."

14    Does that do it?

15    MR. VEEDER:  I am going to object to it, your Honor,
                              irrelevant,
16 because I think it is totally/       and I don't believe

17 it means a thing, and I don't see that there is any reason

18 for such a finding.

19    THE COURT:  Overruled.  It is:

20    "The ground water levels within said    ground

21 water area do not stand at or about the same level,

22 except as found in Paragraph VII."

23    That is the section about the contours.  Any other

24 changes on VI?

25    MR. VEEDER:  Can I also take another shot at this last

t-31

1    sentence , your Honor:

2         "There is no evidence of the total water supply

3    to, consumptive use within, . . ."

4    Where does your "export" go?

5    MR. KRIEGER:  Instead of "apart" the word is "export".

6    THE COURT:  "and export from said ground water area."

7    MR. VEEDER:  It says, "There is no  evidence of the

8    total water supply . . ."

9    Don't we mean there, where we say "hydrologic cycle"

10   that there is no repetitious pattern of precipitation or

11   runoff rather than "hydrologic cycle"?

12   MR. KRIEGER:  By "hydrologic cycle", all we mean is

13   to cover the highest and lowest over any period that would

14   seem reasonable.  It might be five, ten, twenty or forty

15   years, whatever it would be.

16   MR. SACHSE:  Wait a minute.

17   MR. VEEDER:  But there is evidence in the record --

18   MR. SACHSE:  I think Colonel Bowen has another idea

19   on this "hydrologic cycle."  I think "hydrologic cycle" is

20   water taken out of the ground, taking the water up into the

21   air, and the riparian use of water on the watershed.

22   MR. KRIEGER:  What is the proper term?

23   MR. SACHSE:  Cycle of water years, or something of that

24   sort.

25   MR. KRIEGER:  "averaged over a period of years."  You

16,815

t-32

1    can say it that way just as well.

2        THE COURT:  Yes.

3        MR. VEEDER:  Now, wait.  Let's just wait a minute.  If

4    we are talking about precipitation, we have all the evidence

5    that there is --

6        MR. SACHE:  We are not doing that, Mr. Veeder.  Read

7    the sentence.  We are talking about consumptive use and

8    export from the watershed.

9        MR. VEEDER:  We are talking about the total water

10   supply.

11       MR. KRIEGER:  The total water supply.

12       MR. VEEDER:  That is what I am saying to you.  I am

13   saying there is in evidence all the information available

14   on these points.

15       MR. SACHSE:  That does not mean it is enough.

16       MR. VEEDER:  There is sufficient evidence if somebody

17   wanted to take an average supply.

18       MR. SACHSE:                    No.

19       MR. VEEDER:  Yes, there is.    You have in the record,

20   your Honor, every single measurement of precipitation,

21   runoff, evaporation loss, and everything that was possible

22   to show.

23       MR. STAHLMAN:  That isn't what we are talking about.

24       MR. VEEDER:  All right.  You tell me what you are

25   talking about.

t-33

1    MR. STAHLMAN:  We are talking about the consumptive

2  use.

3    THE COURT:  Now, wait.  You have used three different

4  phrases.  You have used "total water supply to," and that

5  is what Mr. Veeder has been discussing.  And the second

6  matter is "consumptive use," and the third is "export from."

7    MR. VEEDER:  And "There is no evidence that the total

8  water supply" is incorrect.

9    MR. SACHSE:  I would like to be heard on that, your

10  Honor, because, as I see it, that is exactly wrong.

11    You have extensive exhibits in here on rainfall.  Not

12  necessarily on this area, but you have the best you could

13  get, and it was scattered all over Southern California for

14  a long period of time.  You have exactly one gauging station

15  in this whole area on every stream in it, and that's all you

16  have got.

17    You can "guesstimate", if you chose, but you don't have

18  in evidence what percentage of the rainfall ran off and came

19  into the stream.  You don't have any expert who told us

20  that.

21    You haven't a gauge on any creek in this ground water

22  area except Murrieta Creek.  So I say you don't have

23  evidence of the recharge of this ground water area.  Maybe

24  you have the best you could get, but it isn't evidence.

25    MR. VEEDER:  I think this that, "There is no evidence

t-34

that the total water supply" is incorrect, because you have a complete and a long range history of runoff for Temecula Creek, which is one of the principal sources of recharge for this basin.

MR. STAHLMAN:  It says, "total water supply to" --

MR. SACHSE:  And you have nothing at all from Murrieta.

THE COURT:  As I read this, the emphasis is on the "total water supply," and there is an absence of certain evidence.  There is no evidence of how much water comes in here from Santa Gertrudis in time of flood, or Tucalota, or any of these others, Pechanga, and other creeks.  We have evidence that rain fell up in the back country, but we don't know if that rain came into the surface cover of six inches to two feet of tillable soil, or whether some of it ran off down in these gulleys.

It would be impossible for even --

MR. VEEDER:  An expert?

THE COURT:  -- a scientist or an expert to make any calculations of this recharge.

It is true we have some evidence.  There is evidence that we could calculate how much water at one time was within the 100 foot strata of this ground water area.  You could calculate, and we have in the record how much has been pumped on certain of the wells, but we don't have the pumping records on all of them in the sense of what they

16,818

t-35

1    have actually pumped.  We have the capacity.  There are

2    even very few of them where you could make an estimate of

3    how many acre feet they pumped out in the course of a

4    particular year.

5        This is what is meant, but if you want to change the

6    language of it, all right.

7        MR. STAHLMAN:  I think you have said it all when you

8    say:

9            "There is no evidence of the total water supply

10       to, consumptive use within, and export from said area."

11       You don't have to say what period of time, or anything

12   else.

13       MR. KRIEGER:  The whole point of this finding is to

14   point out that you don't have the data necessary to make any

15   finding concerning this area.

16       THE COURT:  "There is not sufficient evidence" --

17       MR. KRIEGER:  I don't think there is any evidence, as a

18   matter of fact, your Honor, when it is confined to this area.

19       THE COURT:  "There is no evidence of the total," and

20   that is a play on the words "no" and "total."

21       It is true there is evidence of this and that as to some

22   of the water supply, so you could probably word it better.

23       You could just state the facts:  although there has been

24   introduced evidence of the precipitation in parts of the area,

25   for certain periods, and runoff from Temecula and Murrieta,

16,819

t-36

there is no evidence as to what portion of the rainfall found its way into the ground water area, and there is, therefore, not sufficient evidence to make a calculation of the total water supply to the area.

By the same token, although there has been some evidence of consumptive use here and there through the area, and evidence of the capacity of wells, and some evidence as to how much is pumped, there is not sufficient evidence from which you could estimate the total consumptive use in the area.

MR. VEEDER:  Mr. Veeder  suggests, "There is not sufficient evidence . . ."

MR. SACHSE:  I will buy that.  I don't see any objection to that.

MR. KRIEGER:  Actually, it is a little misleading when you say there is not sufficient evidence, because when you confine it to the exact area that we are talking about, there is no such evidence at all, because when this case was presented to your Honor, it was never presented as to this ground water area that we are talking about.  That ground water area was never considered.  It starts as a watershed, and it came back to the Kunkel line, and wound up on Colonel Bowen's line.

THE COURT:  So strangers will understand it, why don't we find the facts as I suggested:  That there has been

16,820

t-37

1 evidence of rainfall in parts of the area, and for certain

2 years, but there is no evidence of how much rainfall found

3 its way into this ground water area.

4     MR. SACHSE: And there was no evidence on surface

5 runoff except the one.

6     THE COURT:  And there was no evidence on surface

7 runoff except on the Temecula and the Lower Murrieta.  There

8 was no evidence of surface runoff at the tributaries to the

9 Murrieta or the Temecula.

10     MR. STAHLMAN:  It has been suggested to say, "There is

11 not sufficient evidence to determine the consumptive use."

12     MR. VEEDER:  Could we just take one shot that I think

13 we can agree upon, and then address ourselves to the

14 recommendations which I think are correct.

15     We knocked out "the average over a hydrologic cycle".

16     THE COURT:  It has been changed to "either annually or

17 on the average over a period of years."

18     MR. VEEDER: All right.

19     MR. KRIEGER:  What do you think of just eliminating

20 any reference to  either "annually or over a period of

21 years," because someone might come along with the fact that

22 there is no evidence of the year, or what period it is.  You

23 can just end it with the words "ground water area."

24     MR. STAHLMAN:  The engineers tell me that "consumptive

25 use" is not accurate, and that the better term would be

16,821

t-38

1    "total use" rather than "consumptive use."

2         MR. KRIEGER:  It would be what?

3         MR. STAHLMAN:  "Total use."

4         MR. KRIEGER:  Well, "consumptive use" is the net that

5    is used.  The rest of it is put back into the basin, and I

6    think "consumptive use" is a word of art to indicate just

7    that fact, how much of it gets back, 40 per cent, 60 per

8    cent, or what.

9         THE COURT:  What did you say, Colonel?

10        COLONEL BOWEN:  We were discussing the use of the term

11   "consumptive use" in this interpretation.

12        THE COURT:  Speak up so that we can hear you.

13        COLONEL BOWEN:  Your Honor, I was discussing over here

14   the use of the term "consumptive use."  Consumptive use is

15   a quantity that can be calculated, and I believe there is

16   sufficient evidence in the record to permit calculations

17   of consumptive use for various types of plants within this

18   area, and used in that fashion I would say that would be

19   incorrect to include it in this finding.

20        MR. STAHLMAN:  That is not what you had in mind, was

21   it, Mr. Krieger?

22        MR. KRIEGER:  No.

23        MR. STAHLMAN:  That is what I thought.  He means the

24   use by the usual beneficial extractions of water.

25        THE COURT:  What we are talking about is not "consumptive

16,822

t-39

1    use" if by that you mean how much alfalfa would use, and how

2    much avocados would use.  We are talking about how much

3    human beings pumped out of the ground.

4        MR. VEEDER:  Then I think we ought to change the

5    language.

6        COLONEL BOWEN:  That would be the total draft or total

7    withdrawn from the basin, and, as Mr. Krieger points out,

8    some of that returns to the basin.

9        MR. KRIEGER:  Consumptive use, your Honor, is the amount

10    that you take out of the ground and put to some use after

11    the balance is returned to the underground.

12        THE COURT:  The Colonel does not understand it that

13    way, and if he does not, someone else might not.  Let's use

14    language that they will understand.

15            "There is not sufficient evidence to calculate

16        the total " --

17        MR. VEEDER:  "water supply and total use"?

18        THE COURT:  " --the total amount of water extracted

19    from the ground or diverted from the stream."

20        MR. SACHSE:  I think you could simply strike the word

21    "consumptive", and you are all done, -- total supply to,

22    use within, and export from, and that would be it.

23        THE COURT:  Colonel, how does that sound?

24        COLONEL BOWEN:  I think that cleans up that suggestion

25    or objection that I had, that it might be misconstrued to be

16,823

t-40

1    a calculable amount.  You might put in "net draft on the

2    basin," which would mean what I think Mr. Krieger wants to

3    say.

4        MR. KRIEGER:  That is the ultimate effect of that

5    finding, that you don't know what the net draft is.

6        MR. GIRARD:  If you don't know the ultimate use, then

7    you can't conceive of the net draft anyway.

8        MR. KRIEGER:  That may be a word of art, too.  I would

9    go along with the suggestion of striking out just the word

10   "consumptive" and just put in the word "use."

11       THE COURT:  Strike out the word "consumptive" and strike

12   out the "and" before "export", and put a comma after

13   "export," and then say, "or net draft upon the ground water

14   area."

15       MR. VEEDER:  "Export from or net draft upon"?

16       THE COURT:  Well, "from," -- you have "from" in there

17   already.  "net draft from the ground water area," wouldn't

18   that do it?

19       MR. SACHSE:  "export from or net draft on," is that the

20   way you want to put it?

21       MR. KRIEGER:  That is all right.  Then the annual or

22   period of years does go out?

23       THE COURT:  What about that?

24       MR. KRIEGER:  That is all right.

25       MR. SACHSE:  That is all right with me.

16,824

THE COURT:  I would just as soon leave it in myself, if there is no objection.

What do you want to do about that first part that Mr. Veeder talked about, "the total water supply to"?

MR. VEEDER:  The reason I have for that is that I think it is totally confusing.

"There is not sufficient evidence of the total water supply to, use within, and export from or net draft upon the ground water area."

MR. GIRARD:  "said ground water area."

MR. KRIEGER:  May I suggest language that I think would do that whole thing, your Honor, in this way:

"There is not sufficient evidence that the total water supply to, the use within, or the export from said area to determine the net draft on the entire ground water area."

MR. SACHSE:  I think it is better just the way it is.

MR. KRIEGER:  Won't that do it?

THE COURT:  What are you going to do, use the words "not sufficient evidence," or are you going to take my suggestion?  Mr. Veeder complains about this.

MR. VEEDER:  I say there is not sufficient evidence, but that is --

THE COURT:  Are you satisfied with that finding "not sufficient evidence"?  Oh, come on and say, "Yes."

16,825

t-42

1    MR. VEEDER:  Well, I will just reserve the right to
2 make objection later on, your Honor.
3    THE COURT:  That does not do any good.  Let's settle
4 it now.  If you are not satisfied, why, we will --
5    MR. VEEDER:  All right, let her go.
6    THE COURT:  By that you mean you are satisfied?
7    MR. VEEDER:  As satisfied as I ever am, your Honor.
8    THE COURT:  All right.  So I take it, it will read:
9        "There is not sufficient evidence of the total
10    water supply to, use within, export from or the net
11    draft upon said ground water area, either annually
12    or on the average over a period of years."
13    MR. KRIEGER:  Is that a complete sentence, your Honor?
14 If it is, that is fine.  I don't think it is.  There is
15 not sufficient evidence to do what?
16    MR. SACHSE:  I think it is a complete sentence.
17    MR. KRIEGER:  That is why I suggested the change in it,
18 your Honor.  I think it has to have it in.
19    THE COURT:  "There is not sufficient evidence to
20 enable the Court to find the total water supply to, use
21 within, export from or net draft upon said ground water
22 area . . ."
23    Does that do it?
24    MR. KRIEGER:  Yes.
25    THE COURT:  Now, let's go to VII.  First, are there any

16,826

t-43

1   other suggestions on VI?

2       (No response.)

3       THE COURT:  Hearing none, we will go to VII.

4       MR. VEEDER:  "some" in Line 2 at the end of the line

5   has to go out, I think:  "They are predicated on actual

6   well levels . . ."

7       MR. KRIEGER:  The word "some" should go out?

8       MR. VEEDER:  Yes.

9       MR. KRIEGER:  Yes, I think that is so.

10      THE COURT:  I would suggest that you say, "These

11  contours" and insert " As of ".  This again is for the

12  stranger reading this thing, who will say what is the date

13  of it.

14      MR. SACHSE:  October 1st, 1959?

15      MR. KUNKEL:  Autumn, 1959.

16      THE COURT:  "As of Autumn, 1959".

17      MR. VEEDER:  Where are we putting that?

18      THE COURT:  "these contours as of Autumn of 1959, as

19  shown on Exhibit 15-L" strike out "as" "incorporated herein,"

20  and so forth.  All right?

21      MR. KRIEGER:  Where did the insert come in?

22      THE COURT:  Change the second "as" to "and", so that

23  it will read:

24          "These contours as of Autumn, 1959, and as shown

25      on Exhibit 15-L," and so forth.

16,827

MR. VEEDER:  Let me read the second sentence to you, your Honor:

"They are predicated on actual well levels from which the contours are determined" -- not "estimated."

MR. KRIEGER:  They are estimated.

MR. GIRARD:  Let's say "calculated," or something like that.

MR. KRIEGER:  They are certainly projected.  Of course, there is some question about how accurately one could project that.

THE COURT:  How about "projected"?

MR. VEEDER:  "Projected" is all right.

THE COURT:  "Projected" is all right.  That is what you actually do, you project the line in between the points that you measure.

Any other suggestions on VII?

MR. VEEDER:  Let's have it read back again.

THE COURT:  Well, starting with the second sentence:

"They are predicated on actual well levels from which the contours are projected.  These contours as of Autumn, 1959, and shown on Exhibit 15-L, incorporated herein," and so forth.

Now, VIII.

MR. STAHLMAN:  I think there is some word there "and."

THE COURT:  Strike it out.  You don't need it, -- "shown

t-44                                                                16,828

1      on Exhibit 15-L, incorporated herein."

2           VIII which used to be IX.  In the first line the word

3      "water" is to be added after the word "ground."

4           MR. VEEDER:  I would like to go to Line 5, if I may,

5      "of precipitation, and to a lesser degree precipitation

6      within said ground water area."

7           MR. SACHSE:  What is this?

8           MR. KRIEGER:  That is correct.

9           THE COURT:  That is on Line 5 of the new VIII, which

10     occurs,"  and so forth, "and to a lesser degree precipita-

11     tion within said ground water area."

12           Any objection?

13           (No response.)

14           THE COURT:  All right.  Has anybody checked these

15     legal descriptions?

16           MR. SACHSE:  They were taken from --

17           MR. VEEDER:  I had them checked, but I will check them

18     again before it goes to final form.

19           THE COURT:  You had better check them again.  Are

20     there any other suggestions on this?

21           The only one I have is at the end of the page, the

22     second page:

23           "These streams are a part of the Santa Margarita River

24     system and are more particularly described in other findings."

25           "Herein" is deceiving to me.  What do you mean, or do

- 16,829

t-45

1    you agree?

2        MR. VEEDER:  "Other findings", period.

3        MR. GIRARD:  We would mean other findings in the

4    judgment.

5        THE COURT:  "other Findings," and strike out "herein."

6    Any other objections to VIII?

7    (No response.)

8        THE COURT:  I take it you are satisfied if I don't

9    hear any complaints.

10       IX?  Would it add to or confuse to break this first

11   part down into two parts, so that we knew a little better

12   what we were talking about?   For instance, as follows:

13           " . . . all uses of water (1) in said area, and

14           (2) on lands contiguous thereto but within the water-

15           shed of the Santa Margarita River and held under one

16           chain of title, are reasonable and beneficial."

17       It is a hard sentence to read otherwise.  Does that

18   aid in any way?

19       MR. SACHSE:  I think it does.

20       THE COURT:  Do you see what I mean, Mr. Veeder?

21       MR. VEEDER:  I do, and I see what the finding purports,

22   and reserving an objection in regard to Vail Company's

23   property --

24       MR. GIRARD:  There is an objection in there because it

25   says, "Except as otherwise found by this Court," and if you

16,830

t-46

1   can prove what you apparently think you can, that would be

2   an exception.

3        MR. VEEDER:  Let me ask a question on that.  Assume

4   that there was somebody pumping out of the basin onto non-

5   riparian land; in other words, if we went through and found

6   that Gunther was taking water out of the area and applying

7   it on lands that had  in effect been severed, what would

8   that mean to the State from your standpoint, California's

9   standpoint?

10        MR. GIRARD:  It would mean that Gunther is not using

11   water properly as a riparian, or as an overlying owner; that

12   he is in fact appropriating water under no claim of State

13   appropriation.

14        MR. VEEDER:  But is applying it to a beneficial use?

15        MR. GIRARD:  He is still applying it to a beneficial

16   use.  Any downstream riparian who could show injury would be

17   able to enjoin him.

18        MR. VEEDER:  What about a subsequent appropriator?

19        MR. GIRARD:  Or anyone who had a vested right senior

20   to him.

21        MR. VEEDER:  All right.

22        THE COURT:  I would suggest on Line 2 after the words

23   "uses of water (1) in said area, and" and then insert "(2)

24   on lands contiguous thereto", and so forth.

25        Are there any other objections to IX ?

16,831

t-47

1    MR. SACHSE:  I think, to be consistent, you had better

2    insert "ground water area" again.

3    MR. GIRARD:  I don't know what you have done.

4    THE COURT:  Yes.

5    MR. SACHSE: Then it will read:

6         "Except as otherwise found by this Court, all

7    uses of water (1) in said ground water area, and

8    (2) on lands contiguous thereto but within the

9    watershed of the Santa Margarita River and held under

10   one chain of title, are reasonable and beneficial."

11   THE COURT:  And then make a new paragraph starting with

12   the word "At."  I don't like these long paragraphs.

13   MR. STAHLMAN:  A new paragraph, your Honor?

14   THE COURT:  Yes, a new paragraph on Line 4:

15   "At the present status of this case," and so forth.

16   That is about it, is it?

17   MR. VEEDER:  Your Honor, I do ask to have a continuing

18   objection to IX in regard to the Vail Company, and I am not

19   going to interpose further objections to these as they

20   stand.  But I want that clear, that we do retain an objection.

21   MR. STAHLMAN:  I wonder if this does not affect what

22   you went on about for so long yesterday.  This is the

23   description of the property which will be in the Vail

24   findings.

25   MR. VEEDER:  I am not going to argue the matter now.

16,832

t-48

1          THE COURT:  So I understand your objection, you think

2     that I can on the present record make findings that Vail used

3     too much water?

4          MR. VEEDER:  That is correct, your Honor.

5          THE COURT:  Overruled.  Under the present record, I

6     don't think I can so find.

7          We will take a short recess.

8          You have one that you were going to have ready, but it

9     has not come in yet?

10          MR. VEEDER:  It is:  "There is attached, marked Exhibit

11     A, and made a part of these findings by reference" --

12          THE COURT:  Nobody has given me a copy of it yet, and

13     we will take it up after the recess.

14          (A ten-minute recess.)

e fls

G take

P 49

1      THE COURT:  Do you have another sheet there?

2      MR. VEEDER:  I have Number X myself.  Didn't one come

3  in to your Honor?

4      THE COURT:  No.

5      MR. VEEDER:  Here is a copy of Number X, your Honor.

6      THE COURT:  All right.

7      MR. VEEDER:  I would like to suggest that we start the

8  sentence in this way:

9          "With the exception of Vail Company, whose

10         properties are described in other findings, there is

11         attached, marked Exhibit A and made part of these

12         findings by reference, the names of the apparent

13         owners, descriptions of their properties, their gross

14         and irrigable acreages and the wells which are located

15         and used upon their properties."

16     MR. STAHLMAN:  It sounds better.

17     MR. VEEDER:  It is less awkward.

18     Now your Honor, in some instances we have more complete

19  data in regard to individual parcels than we have as to

20  others.  I don't know whether a failure to elicit that

21  additional data, or those additional data, would have any

22  effect upon incorporation by reference.  You might add on

23  there "and other information" to the end that incorporation

24  would embrace everything that is put on the exhibit.

25     MR. KRIEGER:  Isn't that information in the record from

P 50   1    the Government's reports?

2    MR. VEEDER:  It is.  I am thinking particularly about

3    your client, Mr. Krieger, where we have extensive engineering

4    reports with much more precise data than we have on the people

5    who didn't even show up.

6    THE COURT:  "and other pertinent information"?

7    MR. VEEDER:  Yes sir, if we may have that on there.

8    THE COURT:  Any objection to X?

9    MR. SACHSE:  No.

10   THE COURT:  Have we got all we need in this?

11   MR. VEEDER:  One thought that we discussed with the

12   reporter and with counsel.  We thought that the better way

13   to proceed would be to have your Honor's copy of the form

14   that you were using turned over to the reporter and made

15   part of the transcript, because we have in the past read

16   off a variety of proposed findings.

17   THE COURT:  I would like to suggest that wherever the

18   word "area" is used, use the words "ground water area,"

19   whether we have done it or not.

20   MR. SACHSE:  Yes.  We have tried to check it.

21   MR. VEEDER:  I know of no other way to get consistency

22   on the forms, if we don't do that.

23   MR. STAHLMAN:  If the reporter copies it into the record,

24   he ought to make some additional copies.

25   THE COURT:  You may order whatever copies you want.

P 51

1    It just means that instead of my shorthand there has

2    to be more legible writing.

3    MR. VEEDER:  I thought I would give him my writing,

4    and then I thought why torture him.

5    MR. GIRARD:  I can give him mine.  I think mine is

6    fairly legible.

7    THE COURT:  I think this will work all right.

8    (The Findings herein referred to are at this point

9    incorporated and are as follows:)

I

11    The Murrieta-Temecula ground water area, hereinafter

12    called the "ground water area" is comprised of older and

13    younger alluvial deposits; the exterior boundary of said

14    ground water area is graphically set forth in U.S.A.

15    Exhibit No. 277 attached hereto and is specifically described

16    in U.S.A. Exhibit No. 277-A attached hereto, both of which

17    exhibits are incorporated herein and made a part of this

18    finding as if set forth in full.

II

20    The deposits within said ground water area consist of

21    older and younger alluvium composed of sedimentary materials

22    consisting of sand, gravel, silt, clay, and other materials

23    which vary in permeability and are not continuous layers but

24    are lenticular; these sedimentary materials are found from

25    the surface to great depth; near the Southwest extremity

P 52

1    of the ground water area, which is marked by the Elsinore

2    fault, such materials are some 2500 feet in depth; proceeding

3    North and Northeast across said ground water area these

4    sedimentary deposits become progressively thinner and feather

5    out as they reach the contact with basement complex and

6    weathered basement complex as depicted on U.S. Exhibit 15-L

7    attached hereto and made a part of thesefindings; that the

8    areas within said ground water area consisting of said older

9    alluvium and younger alluvium are separately depicted on

10   U.S. Exhibit 15-L; that these areas of older alluvium as

11   depicted on said U.S. Exhibit 15-L, are the same areas which

12   were designated by the term "mesa silt" as used and found

13   in the 1930 Finding of Fact, Conclusion of Law and Judgment

14   in the case of <u>Rancho Santa Margarita v Vail</u>, et, case

15   Number 42850 in the records of the Superior Court of the

16   State of California in and for the County of San Diego;

17   said younger alluvium consists generally of permeable

18   material which is water bearing, while the older alluvium

19   consists generally of less permeable material which is also

20   water bearing to a lesser degree.

21        The alluvial deposits in the ground water area are

22   underlain by basement complex.

23                              III

24        The ground water area contains ground water which

25   feeds and supports the Santa Margarita River, and the

P 53

1   pumping in any part of said ground water area, or the

2   diversion of surface flows from the streams therein can

3   materially affect the flow of the Santa Margarita River.

4   The Santa Margarita River and its tributaries, in turn,

5   feed and support said ground water area.

### IV

6

7   Both  the stream flow and the ground water within

8   the ground water area constitute a common supply of water

9   which is part of the waters of the Santa Margarita River

10  system.

### V

11

12  The ground water within said ground water area moves

13  slowly and in a general southwesterly direction, but both

14  the direction and rate of flow thereof are influenced by

15  many factors, including but not limited to pumping within

16  said ground water area, the permeability of the deposits

17  underlying said ground water area, and the *probable* existence

18  of physical ground water barriers beneath the surface of

19  said ground water area.  Although in some areas the movement

20  of such ground waters can be and has been definitely

21  determined, there is insufficient evidence to show to what

22  extent said movement and rate of flow in the major portion

23  of the ground water area is affected by such underground

24  or subterranean conditions.

25

P 50   1

## VI

2          The ground water levels within said ground water area

3     do not stand at or about the same level except as found in

4     Number VII herein.  Pumping in one part of said ground water

5     area may or may not affect water levels in other parts of

6     said ground water area depending upon the distances involved,

7     possible underground barriers and the transmissibility of

8     the water-bearing deposits.

9          There is not sufficient evidence to enable the Court

10    to find the total water supply to, the use within, export

11    from, or net draft upon said ground water area, either

12    annually or on the average over a period of years.

13                              ## VII

14         Ground water contours in said ground water area run

15    in a general Southeast-Northwest direction.  They are

16    predicated on actual well levels from which the contours

17    are projected.  These contours, as of Autumn 1959, shown

18    on Exhibit 15-L incorporated herein, are progressively

19    lower as they proceed from the extreme North and Easterly

20    boundaries of said ground water area downward to Temecula

21    Gorge.

22                             ## VIII

23         The sources of said ground water are primarily runoff

24    from other areas of the watershed outside of said ground

25    water area, which occurs during or immediately after periods

P 55

1   of precipitation, and to a lesser degree precipitation within

2   said ground water area.

3      The principal contributing streams to said ground water

4   area are:

5      a. <u>Murrieta Creek</u>

6         Murrieta Creek is a natural stream rising in

7   Section One (1) Township Seven (7) South, Range Four (4)

8   West, in Riverside County, California.  It proceeds from that

9   point southeasterly for a distance of approximately thirteen

10  (13) miles to its confluence with Temecula Creek, subsequently

11  to be described, where they form the Santa Margarita River.

12  Murrieta Creek is an intermittent stream, both as to time

13  and place for most of its length.  At the point where the

14  Channel of the stream crosses the northwestern boundary of

15  the Vail Company Ranch, it becomes a perennial stream,

16  flowing throughout the year from there to the point where

17  it joins Temecula Creek.  The principal tributaries of

18  Murrieta Creek are:

19     1. Warm Springs Creek, flowing from the northeast,

20  enters Murrieta Creek in the Southeast Quarter (SE ¼) of

21  Section Twenty-Seven (27) Township Seven (7) South, Range

22  Three (3) West.

23     2.  Santa Gertrudis Creek enters Murrieta Creek from

24  the northeast in the Northwest Quarter (NW ¼) of Section

25  Thirty-four (34) Township Seven (7) South, Range Three (3)

P 56

1    West.

2        3.   Cole Canyon Creek, flowing from the southwest enters

3    Murrieta Creek in Block 74 at Temecula Land & Water Company

4    subdivision, Riverside County.

5        4.   Slaughterhouse Creek likewise flowing from the

6    southwest enters Murrieta Creek in Block M, Rancho La Laguna

7    Subdivision, Riverside County.

8        b.   Temecula Creek

9            Temecula Creek is a natural stream which flows in

10   a southwesterly direction across Pauba Valley to its

11   confluence with Murrieta Creek, a short distance east of

12   Temecula Canyon where, as stated, the Santa Margarita River

13   is formed by the two last mentioned streams.  Vail Dam is

14   located across said stream at Nigger Canyon.  Findings

15   concerning said dam are made elsewhere.

16       c.   Pechanga Creek

17           Pechanga Creek rises in Sections Thirty (30) and

18   Thirty-One (31) Township Eight (8) South, Range One (1) West,

19   and flows in a generally north and westerly direction through

20   the Pechanga Indian Reservation through Wolf Valley to its

21   confluence with Temecula Creek east a short distance upstream

22   from the juncture of Murrieta Creek and Temecula Creek, all

23   as found above.

24       These streams are a part of the Santa Margarita River

25   system and are more particularly described in other Findings.

P 57

## IX

Except as otherwise found by this Court, all uses of water (1) in said ground water area, and (2) on lands contiguous thereto but within the watershed of the Santa Margarita River and held under one chain of title, are reasonalbe and beneficial.

At the present status of this case the issue of apportionment has not been presented and this Court has taken no evidence directed to establishing whether any beneficial use of water is reasonable or unreasonable as to amount of water used and this issue is left open, is not decided herein, and shall be litigated if and when in the future it becomes necessary to do so.

## X

With the exception of the Vail Company, whose properties are described in other findings, there is attached, marked Exhibit A, and made a part of these findings by reference, the names of apparent owners, the descriptions of their gross and irrigable acreage and the wells which are located and used upon their properties, and other pertinent information.

- - -

THE COURT: All right.

Now, we have the ground water area of Pechanga. This is only half of the ground water area.

P 58

1    Now, the rest of it is shown on the same map, on 277

2    and 277-A, isn't it?  Hold the end of the map out.  Doesn't

3    it take in all of this?

4         MR. VEEDER:  Is your Honor saying Pechanga?  You mean

5    Aguanga?

6         MR. SACHSE:  No; Pechanga.

7         THE COURT:  Aguanga.

8         MR. VEEDER:  All of Pechanga is in.

9         THE COURT:  Yes, pardon me, Aguanga.

10        MR. VEEDER:  The rest of it is on 277, yes, your Honor.

11        THE COURT:  And it will be in 277-A?

12        MR. VEEDER:  That is correct.  I think we have to re-

13   run 277-A and I was going to suggest that we do that.

14        THE COURT:  What do you mean, "re-run,"?

15        MR. VEEDER:  Make another copy and cut it down to the

16   Murrieta-Temecula ground water area, because it does in-

17   clude the exterior limits of Aguanga, and I think it has

18   to be separated.

19        MR. GIRARD:  Couldn't you add then to this finding?

20        MR. VEEDER:  I think you are going to make findings on

21   the Aguanga ground water area just like you are doing this,

22   aren't you?

23        THE COURT:  This is going to be so big, as a practical

24   matter, that I think we ought to break it down and have

25   another interlocutory judgment on the eastern end of the

P 59

1    area. That doesn't mean that you have to break this map

2    down. This same map could be attached to both, or you could

3    take a picture of the part of the map that concerns this area.

4    MR. VEEDER: I believe we have an exhibit that covers

5    the full Aguanga/water area, your Honor. I think it is
     ground

6    Exhibit 278.

7    THE COURT: Including the legal descriptions?

8    MR. VEEDER: No, not including the legal descriptions.

9    But the exterior boundaries. I will show you what I am

10   talking about. We will break 277-A down -- this is 277-A

11   right here -- we will divide that up and we will make it

12   into another exhibit that will be attached.

13   THE COURT: What my list of exhibits shows now is that

14   you have one map, Exhibit 277, you have one exhibit of the

15   legal description for both Murrieta, Temecula and Aguanga,

16   277-A.

17   MR. VEEDER: That is right.

18   THE COURT: Now do you want to break it down? If so,

19   we will give it some new numbers.

20   MR. VEEDER: I would prefer to do that. I think it

21   would be too unwieldy otherwise.

22   THE COURT: Do you want to use the same series, 277-B

23   and C?

24   MR. VEEDER: It would be all right with us.

25   THE COURT: Then the next would be 277-B, and 277-B

P 59x
60

1   can be the map proportion, if you decide to break the map

2   down into two parts, the map of the Aguanga ground water area.

3       And 277-C will be the legal boundary of the Aguanga

4   ground water area.

5       Is that agreeable?  Any objection?  I will consider

6   them in evdience.  Reproduce them and have the Clerk mark

7   them later.

8                   (Plaintiff's Exhibits 277-B and C are)
9                   (received in evidence.                )

10  THE COURT:  How much of the findings that we have used

11  here will be suitable?  They will not be.  We will have to

12  work on another set.

13  MR. STAHLMAN:  They will be different, I think.

14  MR. VEEDER:  Yes, there will have to be a separate

15  set.

16  THE COURT:  Has anybody tried his hand at that yet?

17  The answer is no, apparently.

18  MR. VEEDER:  The answer is no.

19  MR. GIRARD:  I haven't done it, no, your Honor.

20  THE COURT:  Take what we have on Murrieta and start in

21  and see what you can do tonight.

22  MR. GIRARD:  Do when?

23  THE COURT:  Tonight or tomorrow morning.  You get up

24  at six-thirty, don't you?  That's what you told me.

25  MR. GIRARD:  Five-thirty usually, your Honor.

P 61

1          THE COURT:  Five-thirty.

2          MR. KRIEGER:  What about conclusions of law on the

3    Murrieta findings?

4          THE COURT:  That is right.  We haven't talked about the

5    conclusions of law.  Have any of you spent any time on Mr.

6    Krieger's conclusions?

7          MR. GIRARD:  I have looked at them.  I think he has a

8    little addition on some of them.

9          Don't you, Mr. Krieger?

10          MR. KRIEGER:  Yes I do.

11          THE COURT:  The first line of your conclusions has to

12    be changed.  "The owners of the land" insert "within the

13    ground water area shown on Exhibits 277 and 277-A and

14    described in Exhibit A . . "

15          Exhibit A is the list of the ownerships of the land,

16    is it not, Mr. Veeder?

17          MR. VEEDER:  That is right.

18          THE COURT:  " . . have riparian or overlying rights."

19          Where is there any change in that?

20          MR. VEEDER:  May I have the reporter read that back,

21    your Honor?

22          (The reporter read back as follows:  "The owners of

23    the lands" insert "within the ground water area shown on

24    Exhibits 277 and 277-A and described in Exhibit A . . ")

25          MR. VEEDER:  I am worried about that "described in

16,845

P 62

1   Exhibit A," your Honor, because Exhibit A, as we have set

2   it up, shows the tabulation of the individual parcels.

3        THE COURT:  "which owners are listed in Exhibit A."

4        MR. VEEDER:  Yes.

5        THE COURT:  Do you want to put this over until tomorrow

6   morning?

7        MR. VEEDER:  I think we can go faster in the morning,

8   your Honor.

9        MR. STAHLMAN:  I think so.

10        MR. KRIEGER:  I can't do it tomorrow, your Honor.  I

11   have to be at the Public Utilities Commission in Los Angeles

12   tomorrow.

13        THE COURT:  All right, let's get rid of Mr. Krieger.

14        MR. VEEDER:  I am not sure what Mr. Krieger means when

15   he says "which are co-equal."

16        What does that mean, Mr. Krieger?

17        MR. KRIEGER:  I think "co-equal" is the same as

18   "correlative."

19        MR. VEEDER:  The same as "correlative"?

20        MR. KRIEGER:  Yes.

21        MR. VEEDER:  Why don't we say "have riparian and

22   overlying rights which are correlative rights in the common

23   supply"?

24        MR. GIRARD:  He says that in the next sentence.

25        MR. VEEDER:  I am objecting to "which are co-equal

P 63

1   except as to quantity," because I don't know what "co-equal"

2   means.

3         MR. KRIEGER:  It means that each is equal to the other

4   except as to the amount.

5         MR. VEEDER:  Then what does "correlative" mean?

6         MR. SACHSE:  It deals with the amount.

7         THE COURT:  It takes into account equality as modified

8   by acreage held and uses to which it is put, location on

9   the stream, and all that sort of thing.

10        MR. VEEDER:  My understanding of "correlative" is just

11  what your Honor has said.

12        MR. KRIEGER:  The phrase is an exact take from <u>Hudson</u>

13  <u>vs. Daley</u>, just as it appears, "co-equal except as to

14  quantity and correlative."

15        MR. VEEDER:  Why should we perpetuate the error?

16        MR. KRIEGER:  I am not so sure that the Supreme Court

17  made an error there, Bill.  I think they said the right

18  thing.

19        MR. VEEDER:  I don't know what it means.

20        THE COURT:  Mr. Girard, what is your view?

21        MR. GIRARD:  I haven't any trouble understanding it.

22  I think it is proper.

23        MR. VEEDER:  "co-equal"?

24        MR. GIRARD:  Yes.

25        MR. SACHSE:  Except as to quantity.

P 64

1    THE COURT:  There is nothing ambiguous about it.

2    "co-equal" -- the rights are the same, have the same antecedents,

3    no one is prior in time, there is equality except as to

4    quantity.

5    MR. VEEDER:  I have no knowledge as to whether someone

6    has subordinated his rights or conveyed them away or what he

7    has done with them.  I don't know anything about them.  I

8    think there are instances where you might have exceptions or

9    reservations that would make them not co-equal.  That is my

10   point.

11   MR. KRIEGER:  I would like to see it stand, your Honor,

12   because I think it means that no one has a preference over

13   anybody else as far as these water rights are concerned.

14   MR. VEEDER:  Would it mean, Mr. Krieger, that a party

15   who is not riparian would be permitted to divert water from

16   the surface stream as part of his claim?

17   MR. KRIEGER:  No, I don't think it means that.  It

18   means that in the common supply, whether you are an over-

19   lying owner or a riparian owner, you have the same right

20   to the total amount of water that is available in that area.

21   MR. VEEDER:  Well, Mr. Roripaugh is riparian to Santa

22   Gertrudis.  Guenther is not.  Guenther overlies a basin.

23   Would he be permitted, under this language, to participate

24   in the surface supply, if any, in Santa Gertrudis Creek?

25   MR. KRIEGER:  No, he has no right to do that, unless

P 65

1  his land happens to be riparian; and in your statement of

2  facts you said it was not.  No, he doesn't have that.  We

3  are not trying to change the law.  The word "co-equal," I

4  think, is trying to put together the two rights we have been

5  working for the last two days to put together in these

6  findings -- the riparian and the overlying; not to extend

7  the right of either, but in the common supply they have equal

8  rights.

9      THE COURT:  Do I understand this is what you mean:  That

10  you mean the word "co-equal" qualifies "riparian and over-

11  lying"?  Are you talking about the fact that the words

12  "overlying and riparian" --

13      MR. KRIEGER:  Yes.

14      THE COURT:  Well then, that gives me a different view

15  of it entirely, and I don't think you had made that clear.

16  In other words, as I read it, "The owners of the lands . .

17  have . . rights which are co-equal."  In other words, as

18  I first read it, the rights of all these owners are co-equal.

19  What you are trying to say is that we equate riparian and

20  overlying rights as being an equivalent one to the other.

21      MR. KRIEGER:  Yes.

22      THE COURT:  Why don't we say it in so many words and

23  have no ambiguity about it?  Why don't we start out, "The

24  Court concludes that the riparian or overlying right of an

25  owner within the ground water area is the same right, and

P 66

1 that the riparian right and the overlying right are co-equal

2 or equate on another," and then go ahead with the language

3 that "The owners of the lands have riparian or overlying

4 rights and correlative rights to the common supply. . "?

5     MR. KRIEGER:  That is all right.  It is clear.  That

6 is better.

7     THE COURT:  That is what you meant, wasn't it?

8     MR. KRIEGER:  Yes.

9     THE COURT:  When you said "co-equal" you were not talking

10 about so much the owners being co-equal as the fact that a

11 riparian and an overlying right are co-equal.

12     MR. KRIEGER:  That is correct.

13     THE COURT:  Do you understand that?

14     MR. VEEDER:  Your Honor clarified it by what you said.

15     THE COURT:  Wouldn't it be better to say it the way

16 I suggested?

17     MR. VEEDER:  Very much better.

18     THE COURT:  Don't we have to point out also that not

19 only do these owners have riparian and overlying rights,

20 correlative rights, to the common supply, but that these

21 rights are correlative with other persons on this water

22 system?

23     MR. VEEDER:  That was the next thing I was going to

24 ask about.  What is the status of a downstream riparian

25 whose supply is dependent upon this ground water area?

P 67

1    MR. SACHSE:  I think there should be a finding that a

2    riparian downstream has correlative rights.

3    THE COURT:  What about upstream riparians?  We can't

4    leave it one way or the other.  We have got to say that not

5    only these overlying owners have their rights which are

6    correlative among themselves and correlative with all other

7    persons having riparian or overlying rights on the stream

8    system, upstream or down -- isn't that the law?

9    MR. SACHSE:  No.  The rights are correlative downstream

10   from the juncture only -- strict riparian rights.  A strict

11   riparian right, if we forget the basin or the ground water

12   concept, which is treated as a surface stream -- Murrieta

13   is not correlative with Aguanga.  It is correlative with

14   everybody downstream from the juncture of the Temecula and

15   the Murrieta.  That is where we are getting ourselves

16   beautifully fouled up with this single water body.

17   MR. STAHLMAN:  We also have watersheds within there.

18   MR. SACHSE:  For example, Roripaugh, on a strict

19   riparian basis, as I understand it, would have a correlative

20   right with everybody downstream from his land on Santa

21   Gertrudis Creek and downstream on the Murrieta from the

22   junction of the Santa Gertrudis with the Murrieta and down-

23   stream on the Santa Margarita from the gorge, from the

24   junction of the two rivers.

25   THE COURT:  Doesn't he have correlative rights with

P 68

1    people upstream?

2        MR. SACHSE:  On Santa Gertrudis only.  Not on the

3    Murrieta.

4        In other words, it works this way.

5        THE COURT:  I know what you are talking about.

6        MR. SACHSE:  It works like this (drawing on the board).

7    This gentleman whom I have marked with a big X has rights

8    upstream on his tributary and downstream from the junction.

9        THE COURT:  That is right.

10       MR. SACHSE:  But he has no rights in the other tribu-

11   taries.

12       THE COURT:  That is right.

13       MR. SACHSE:  There is our situation that exists in the

14   Pauba and in Aguanga, where I think some of the consequences

15   of this common water body have not been faced.

16       MR. KRIEGER:  I think the answer to that proposition

17   is that what you are doing, in effect, legally is to broaden

18   out those who have, in effect, riparian rights as far as

19   the balance of the stream system goes.  Instead of taking

20   the narrow thread of the stream, you are broadening it out

21   and saying these people also have the same right in that

22   stream system.

23       MR. STAHLMAN:  That is the point I brought up several

24   times.  We drew this "sputnik" map to show the difficulties

25   that would ensue in reaching conclusions of law in relation

P 69

1    to this.  But I was --

2              THE COURT:  What map are you talking about?

3              MR. STAHLMAN:  I think it was for illustration here.

4    We had it on the board at one time to illustrate some of

5    the discussion.

6              THE COURT:  Is it an exhibit?

7              MR. STAHLMAN:  No, we didn't put it in evidence.  We

8    used it for illustration.

9              THE COURT:  I didn't understand it when you first showed

10   it to me, and I don't understand it now.

11             MR. SACHSE:  I am sure Mr. Veeder is going to agree with

12   me.  I have been looking at this map a minute to try to

13   find a physical situation.  We haven't got it yet, but we

14   are going to have it the minute he talks about Aguanga,

15   because there we have some surface uses by riparians --

16   surface stream flow.  My client Allen diverts surface water,

17   and yet he is within what we have delineated as a ground

18   water body.

19

20

21

22

23

24

25

1  Mr. Oviatt diverts surface water, and yet he is within

2  the boundary.  Mr. Allen's rights to take the surface water

3  of Wilson Creek will be regulated by this riparian concept

4  I drew on the wall.  But if this is a common ground water

5  body, how does the surface diversion tie into the right to

6  take ground water?  There is the problem.

7  MR. VEEDER:  He will participate relatively with the

8  other surface -- with the other riparians abutting on the

9  stream.

10  MR. SACHSE:  In the surface water?

11  MR. VEEDER:  Yes, and those who do not abut  upon the

12  stream will not be permitted to participate in the surface

13  flow.

14  MR. SACHSE:  But they do participate  correlatively in

15  the ground water?

16  MR. VEEDER:  That is right.

17  MR. SACHSE:  All right, just so we know that is it.

18  MR. KRIEGER:  That is the way I understood it.

19  MR. VEEDER:  But, Jim, that   isn't what you said.

20  MR. KRIEGER:  I think I did.  I said the whole stream

21  system, and I didn't say just the Murrieta.

22  MR. GIRARD:  I think what you should do is to write

23  your conclusions, one to deal with surface, and one to deal

24  with ground.

25  MR. VEEDER:  I think you have to, because Franz at

t-50

1   Stardust is in the precise situation.

2       MR. SACHSE:  He pumps from the ground and also uses

3   surface.

4       MR. KRIEGER:  You can only take from the stream system

5   if you abut on the stream as a riparian.  If you don't, you

6   can take from the ground water.  But the amount of water to

7   which you are entitled is your proportionate share of the

8   entire amount, surface flow and ground water supply.

9       All that you are saying is that no non-riparian owner

10  can by reason of his overlying right come back to the stream

11  and claim that he can divert it, and I agree with that.  You

12  are just dead right.

13      MR. VEEDER:  That is where you were having your

14  difficulty.

15      MR. KRIEGER:  But we have no difficulty on these findings.

16  I think the conclusions of law should be drawn to reflect

17  that, your Honor.   I wonder if we should not try to draw

18  these conclusions of law in view of the findings of fact

19  that have been drafted, and submit them one to the other

20  before we submit them to you.

21      THE COURT:  That is all right.  I think you should.

22  I don't think we can do it overnight, but I think you have

23  further problems up between the Murrieta and the Pauba, and

24  what we would find.  Now, in a way it is a kind of an

25  illusory thing, but let's take somebody over here who is on

16,855

t-51

1    Santa Gertrudis, and let's say he has land riparian to

2    Santa Gertrudis.

3        Strictly speaking, he is a riparian owner and would be

4    entitled to take surface flow, except there isn't any

5    except in the wintertime.  That is why it is illusory, but

6    his legal right is to use surface flow.  He must share that

7    right probably with all upstream riparians in the Santa

8    Gertrudis watershed and all downstream riparians on the

9    Santa Margarita, and maybe we had better say that in just

10   so many words.

11       It may be that there might be a situation where a

12   fellow had a right, and if we did not take care of it he

13   might lose it.  It is probably illusory, but we would probably

14   then have to show a watershed line within this ground water

15   area as to surface waters.  I suppose we would have to show

16   a water shed line within the ground water area that we have

17   marked out.

18       MR. VEEDER:  We have got a situation right here, your

19   Honor, with Mr. Barnett.  I think Barnett is a surface

20   diverter and impounder, is he not, Allen?

21       COLONEL BOWEN:  Yes.

22       THE COURT:  Let me say that I think you are going to

23   have to show a watershed boundary between the Pauba and

24   the Murrieta, and show it on the map, and then you will have

25   to have a finding that those persons owning land within the

t-52

1   ground water area, who are riparian, whose land is riparian

2   to the stream have correlative rights with those persons

3   upstream on that watershed and downstream on it, and the

4   same thing as to persons on the Murrieta who have a riparian

5   right.   I am just thinking out loud, but I am saying as to

6   those who have, you would probably have to say who they are.

7       MR. VEEDER:   That is   right.

8       MR. SACHSE:   Your Honor, I don't think you have to

9   draw the line literally.   These rights are so illusory.   I

10  don't think you would have to do more than to say you are

11  riparian to Tucalota Creek, you have riparian rights with

12  other riparian owners on Tucalota Creek.   And if you are

13  not, that is a matter to be settled in future litigation if

14  they start in with that.

15      MR. VEEDER:   On the parcels we can say whether they

16  abut or divert from the stream, and I think that would take

17  care of the riparian situation your Honor is talking about.

18      MR. SACHSE:   We could say the same thing on Pauba,

19  because suppose it is broken up and you have a lot of

20  separate owners of surface flow, and one thing and another.

21      MR. VEEDER:   Well, we have a guy back here who does

22  not abut on the stream, and what is his relationship to the

23  other persons up here (Indicating)?

24      MR. STAHLMAN:   There is another thing.   Someone who

25  abuts on the stream now may at some future time not abut,

16,857

t-53

1    and you will have that situation to take care of.

2        MR. VEEDER:  We will have to have a Court order to

3    prevent that.

4        MR. STAHLMAN:  That is what you will have to get.

5        MR. VEEDER:  The point I am trying to make is that we

6    had better reflect in the individual findings that Colonel

7    Bowen is working on, and we are all working on, that they

8    show, for instance, that Mr. Roripaugh is, in fact, riparian

9    to the stream.

10       I think your father is not, is he?

11       MR. RORIPAUGH:  No, he is not.

12       THE COURT:  That does not concern me as much as another

13   problem, and I think Mr. Sachse's suggestion is the better

14   one, that we have a general statement that those who are

15   riparian on a certain stream have correlative rights with

16   those upstream and those downstream.  But the thing that

17   concerns me is this:  How are we going to take care of the

18   correlative rights of the fellow sitting up here, say, in

19   Section 29?  Presently I don't know whether that is in

20   the Pauba or Murrieta watershed.

21       MR. SACHSE:  Murrieta.

22       MR. VEEDER:  It is in the Santa Gertrudis runoff or

23   drainage.

24       THE COURT:  Now, actually, since he has been permitted

25   to share as an overlying owner in the ground water area,

t-54

because it is a part of the stream, his rights are correlative with upstream owners.  They have to be.  In other words, you have to equate him to the equivalent of a downstream riparian.

MR. GIRARD:  As for ground water, his rights would be correlative with everybody upstream to the extent of the basin.

MR. SACHSE:  To the extent of the ground water?

MR. GIRARD:  Yes.

MR. SACHSE:  How do you then equate him where he is in an area where the finest well drilled can only get 20 gallons a minute?  How can you equate him with the fellow with a Pauba well that will pump a great amount?

MR. GIRARD:  If there isn't any water under his land, there is nothing you could do for him.

MR. STAHLMAN:  He probably feels that is so because somebody is getting his share.

MR. VEEDER:  Well, at this juncture, your Honor, we are only concerned with writing a conclusion of law.

MR. KRIEGER:  I was just asking whether there are any diversions in this area.  There are no stream diversions up in this area that we are talking about, up in Santa Gertrudis.

MR. VEEDER:  Maybe not up in Santa Gertrudis, but you do have diversions here (Indicating), and there are

t-55

1   impoundments and diversions.

2       MR. KRIEGER:  There is the Barnett diversion.

3       MR. SACHSE:  That is from the stream.

4       MR. VEEDER:  That is from a part of the stream system,

5   and right down there (Indicating).

6       MR. KRIEGER:  I don't think that creates any problem.

7       THE COURT:  What I am trying to say is that a fellow

8   in this ground water area has correlative rights on that

9   stream system.  They have to be correlative rights with

10  people upstream within the watershed and people downstream.

11      MR. KRIEGER:  But does this create any problem, your

12  Honor, until there is a determination made that there wasn't

13  enough water for all of them to go around.

14      THE COURT:  Well, isn't that correct?

15      MR. GIRARD:  If you are assuming and you are talking

16  about correlative rights to ground water.  I don't think

17  any person up here (Indicating) would have any correlative

18  right to waters on the surface in a stream unless he was

19  riparian.  He might have a right to prevent people from

20  diverting out of the stream, but he would have no right to

21  the water in the stream.

22      MR. KRIEGER:  As I see it, the only difference between

23  an overlying owner and a riparian is the method of taking

24  water.  The rights to the common supply are the same; one

25  can divert and the other can pump.

t-56

1     THE COURT:  What I am thinking about, and it is

2  probably an impossible situation, because I don't think the

3  upstream users are going to be subject to any future

4  regulation, but I am trying to think of a situation where

5  this fellow on Tucalota or in some younger alluvium has a

6  big well and gets a lot of water.  Well, we had better take

7  somebody on Tucalota.  He gets a good well, but he is out-

8  side of the ground water area, and here is a fellow down-

9  stream who is not in the watershed of the Tucalota, but he

10  is in the ground water area.  He gets a good well.

11     Then somebody below both of them, somebody further down

12  here then complains that these two people are the ones who

13  are seriously preventing him from getting his fair share of

14  water.

15     It may be silly to think of that thing happening, but

16  in that instance you must regard your ground water as a

17  part of the stream system, and then this man up in the

18  younger alluvium and the other chap who is up there all have

19  correlative rights.

20     MR. GIRARD:  No, this man here cannot have, your Honor,

21  this man here (Indicating).

22     MR. SACHSE:  Not if he is on the ground water.

23     MR. GIRARD:  He is up here in local, vagrant,

24  percolating water.

25     MR. VEEDER:  I thought he was drilling in the younger

t-57

alluvium.

MR. SACHSE:  Just a minute.  We found in my Tucalota findings, and I wrote them, that the only time when the ground water in the alluvium is a part of the stream system is when it is saturated, the younger alluvium is saturated. When you pump through it and go out of it, it is entirely out of it.

THE COURT:  Well, I am supposing his putting in, say, a big sump in here (Indicating).

MR. SACHSE:  Then he couldn't do it because he is interferring with the stream.

THE COURT:  Then his rights have some correlation to the rights of the man who has water on the ground water system down here (Indicating).  Also, the man who is down here (Indicating) would have a right to say that both of these men were interferring with him.

MR. SACHSE:  Maybe the plaintiff could, but I can't see where this man has any relation to the man on Tucalota, because he is no part of the ground water body.  He is either in water that is local, vagrant, percolating water, but not the ground water body.

THE COURT:  In other words, the way you have written the findings on younger alluvium, they are not ground water?

MR. SACHSE:  No.

THE COURT:  They are a part of the stream system?

t-58

MR. SACHSE:  They are a part of the stream system, and, for instance, it becomes a part of the Santa Gertrudis or a part of the Murrieta, so this gentleman up here can only look to vagrant, local, percolating water, but not ground water.  He could be interferring with the recharge if he takes stream water, but if he takes vagrant, local, percolating water he is not interferring with the recharge.

MR. VEEDER:  If it is not physical interference.

MR. SACHSE:  Oh, Mr. Veeder, you have found that vagrant, local waters are not a part of the stream system. If he takes vagrant, local waters he is not interferring with the stream system.

MR. KRIEGER:  I think your Honor's question is different.  Your question is whether a person who is off of the stream but within the area that supports the stream actually has a right to stop or limit the pumper who is riparian up above by reason of the finding that it was a common supply, that the stream supports the ground water, and the ground water supports the stream.

MR. VEEDER:  Let's go back and be specific about that.

THE COURT:  I think you have to say that these people who have rights to ground water have correlative rights upstream to the stream water such as the saturated younger alluvium?

MR. KRIEGER:  I think they do, exactly.

t-59

1    THE COURT:  But how are you going to say it?

2    MR. KRIEGER:  And wouldn't it go further, and if we

3    had a situation upstream where by the same token we

4    enlarged the concept of a riparian to say there were other

5    lands that supported the stream system.  You would have then

6    the identical situation, wouldn't you?  You would have a

7    class of water rights broader than a riparian right, which

8    was correlative with these people both on and·off the

9    stream down below.

10   I don't know that we haven't said it already, in the

11   first place, but I think the conclusions of law would have

12   to be drafted that way, your Honor.

13   THE COURT:  I think we are all getting tired.  It is

14   after 4:30.  So, let's think about it, and Mr. Krieger, you

15   can go back, but I suggest that you write something out

16   and submit it.  Give us some help on this.

17   MR. KRIEGER:  Let me make a redraft of that, and I can

18   have it in your hands next week.  Will that be all right?

19   THE COURT:  Fine.

20   MR. VEEDER:  I didn't hear that.

21   MR. KRIEGER:  I will have a draft of the conclusions

22   for your consideration and for the Court's consideration by

23   next week.

24   THE COURT:  All right.

25   MR. VEEDER:  Mr. Sachse, are you going to be down at

t-60

1    about 9:30 tomorrow morning?

2        MR. SACHSE:   Probably so.   I usually am.

3        MR. VEEDER:   Will you come in, and we will talk about

4    Sandia.

5        THE COURT:   10:00 o'clock tomorrow morning.

6

7        (Whereupon, at 4:35 o'clock p.m., Wednesday, May 3,    )
8        (1961, an adjournment was taken until Thursday, May 4,)
9        (1961 at 10:00 o'clock a.m.                            )

10

11                        - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t-61

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA, )
)
                    Plaintiff, )
)
vs. )      No. 1247-SD-C
)
FALLBROOK PUBLIC UTILITY DISTRICT, )
et al., )
)
                    Defendants. )
_____)

### CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are,
and on the date herein involved, to wit: May 3, 1961,
were duly qualified, appointed and acting official reporters
of said Court;

That as such official reporters we did correctly
report in shorthand the proceedings had upon the trial of
the above entitled case; and that we did thereafter cause
our said shorthand notes to be transcribed, and the within
and foregoing 132 pages of typewritten matter constitute a
full, true and correct transcript of our said notes.

WITNESS our hand at San Diego, California, this 3rd
day of May, 1961.

_John Swader_
                    Official Reporter

_Marie G. Zellner_
                    Official Reporter