VOLUME NO.   150                                    MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       May 4, 1961

Pages:    16,866 to  16,952

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
                              DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 150

16,866

t-1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, May 4th, 1961.

- - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Vail Company | GEORGE STAHLMAN, ESQ., |
| Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ., |
| STATE OF CALIFORNIA: | FRED GIRARD, ESQ. |

- - -

1   SAN DIEGO, CALIFORNIA, Thursday, May 4, 1961, 10:00 A. M.

2   THE CLERK:  1-1247-SD-C United States vs Fallbrook.

3   MR. VEEDER:  Your Honor, are you ready for me to

4   proceed?

5   THE COURT:  Yes.

6   MR. VEEDER:  The present ruling of this Court is that

7   the stipulated judgment between the Vail Company and the

8   United States is presently in force and effect and will remain

9   so until the final judgment in this case.

10   Our reports indicate that on May 2nd the gauging

11   station at Temecula Gorge showed a reading of less than 3

12   second feet, and on May 3rd the decline continued and the

13   last measurement which we have is 2.5 second feet.  The

14   matter is presently being checked by the U.S.G.S. right at

15   this moment.  And we are making formal demand into the

16   record upon the Vail Company that they comply with the

17   stipulated judgment.  In that regard I call your Honor's

18   attention to Section 11 of the document.

19   This matter has been brought to Mr. Stahlman's attention

20   and also to Mr. Wilkinson's attention.

21   MR. STAHLMAN:  Are you through?

22   Your Honor, this morning he comes in and calls it to

23   our attention, yes.

24   Your Honor, in the first place, I think before anything

25   should be done here that we should be heard on the matter.

P 2

The physical facts should be checked. It is not a violation of the stipulated judgment because for a short period of time the flow can go down to as much as 2 second feet. And I think all these other factors should be checked. We concede, of course, that we must comply with the stipulated judgment at this time. I think the factors that enter into what has caused this flow should be fully determined. First, what is the flow from Murrieta? Secondly, what is the condition of our irrigation? We have curtailed it and that may be the reason why. Also, one of our pumps in the lower area has been out of operation for a time. That may have contributed to this.

MR. VEEDER: All I did was make the formal request.

MR. STAHLMAN: Let's check it thoroughly to see what the circumstances are.

THE COURT: Yes, and I assume that you will comply with the judgment.

MR. STAHLMAN: Certainly. And then there is the Querry pump and all those things that should be checked.

We will cooperate in the checking. If you will designate who it is, we would like to check it with you, and let's get good, solid facts and bring them in.

MR. VEEDER: The data will be made available to you, Mr. Stahlman, and as we continue to take measurements we will report.

P 3    1          MR. STAHLMAN:  We have no objection to cooperating with

2      you to the extent of mutually checking these matters and

3      determining what the true physical situation is.

B fls  4

16,870

t-3
B-1

1     MR. VEEDER:  May I report on another matter for a

2     moment, your Honor?

3          Mr. Sachse has been with me on the telephone --

4     MR. SACHSE:  Before we start, we have the Sandia on

5     the agenda, but I would like to bring up one thing more on

6     yesterday's session.

7          MR. VEEDER:  I think I owe it to Mr. McGinnis to say

8     this.  He called me and asked me to bring it to the Court's

9     attention, and I will make it very brief, Mr. Sachse.

10         Mr. McGinnis called me today and stated that he

11    desired to have two matters checked by Colonel Bowen with

12    Mr. Sawday.  Both of those matters relate to the findings

13    on Sandia Creek presently lodged with your Honor, and the

14    first of which relates to the capacities of the impounding

15    structures of the Sawdays.

16         We have no information other than that which we

17    tendered to Mr. Bob McGinnis, but Colonel Bowen has agreed

18    to call Mr. Sawday and to check out the capacities in

19    question.

20         There was a reference also made to the irrigated

21    acreage of Sawday, a matter concerning which we do not have

22    exact information, and that matter will be similarly

23    discussed between Colonel Bowen and Mr. Sawday.

24         Mr. Sachse was on the telephone a part of the time, so

25    he is fully advised, but that is the statement I wish to

16,871

make on the record at this time.

MR. SACHSE:  And I would have no objection to getting the correct facts in, your Honor.

MR. VEEDER:  That is all I have at this time, your Honor.

THE COURT:  Do you have something to take up, then, Mr. Sachse?

MR. SACHSE:  Yes, your Honor.  I want to take a few minutes of the Court's time, if I may, and it concerns some of yesterday's work, and what I know you are going to be doing in the next month during my absence.

I want to say at the outset that I have no client involved in this, and what I say here I sincerely believe to be a sincere effort to help your Honor and everybody concerned.   I think we are in danger of creating a monster if we are not very careful in these Murrieta findings, and I would like to try to explain what concerns me, and then propose what I think might be a solution.

Let us assume that in two or three or four years from now a group of land owners up in the Roripaugh area on Santa Gertrudis get into a real bitter pumping race -- and let's  leave Vail and the United States entirely out of this for the moment -- a real race where some people are taking far more water than they are entitled to, and water levels are down, and you have all the troubles that lead to

1   litigation.

2       One of these gentlemen consults counsel, and they are

3   going to take action.   The first problem with which this

4   attorney is going to be confronted is that we have a

5   finding here that, first of all, all of these people share

6   correlatively, all of them, in this entire ground water

7   body.

8       Counsel will come down and talk to the Court, and

9   let's skip for the moment whether they have to join all of

10  these people in the proposed regulation, and let's assume

11  that the Court and counsel work out an arrangement, by an

12  order to show cause, and an interpleader, an intervention,

13  and what have you, where finally we arrive at a group of

14  defendants who feel that they represent, let us say, the

15  area where the problem arises, and the Court goes to work

16  on it and takes evidence on the amount of water available,

17  takes evidence on the amount of extractions, and finally

18  arrives at regulation.   And to make it easy, let's say that

19  the Court says that you can pump 100 gallons a minute per

20  100 acres, 100 irrigable acres, and the people on the

21  Santa Gertrudis cut back, and everything is fine and dandy;

22  they cut back on the use of water.

23      Now, you can't do that without having involved some

24  people who don't pump and can't pump that quantity.  We

25  know that in the older alluvium you can't get it.   So in

t-6

this hypothetical case we will find a gentleman up on the older alluvium who is getting maybe 25 or 30 gallons a minute, but he happens to have a little more money than his neighbors, and he puts in three more wells and sticks a pump on each of them, and runs his 25 or 30 gallons a minute up to 60 or 70, and he does that pumping there. Now, in that area you can dewater it fast, and he dewaters the people around him completely.

So the fellow next door comes in, and he says, "Your Honor, you said I can have 100 gallons a minute. I am only getting five now, and I want this man stopped."

Then the other man comes in and he says, "Your Honor, you told me I could have 100, but I am still only getting 60. What is wrong with what I am doing?"

B2

We are going to find ourselves in situations which are just like the old Greek proposition of logic, where the law student hired a lawyer to teach him, and said, "I will pay you when I win my first case." And then he didn't practice law, so the teacher sued him, and he said, "No, I won't pay you, because if you win the case I don't owe you anything, and if you lose the case, then I have won, and I am not going to pay you on the judgment."

We are not dreaming. Every bit, or 99 per cent of the litigation in water today is over nothing but pumping races, and with this concept we are going to force pumping races

t-7

in these areas.  There isn't any other way out of it.  I didn't dream this up with the idea of throwing a monkey wrench into the situation, and I think there is a solution.

A long time ago I suggested the solution was, in effect, to non-suit the older alluvium, but I am throwing that out and I am /thrusting that on your Honor.  That is settled, and your Honor has held that the older alluvium is a part of the stream system.

But it seems to me that the solution is that these findings must be expanded to include some sort of a definition of the stream system in the Murrieta, in addition to this finding of the ground water area.

Now, we know that basically the good wells are in the younger alluvium, and we know that basically the younger alluvium does constitute the stream system; at least, the broad channels of the streams.

So if we modify these findings to provide a finding of the extent of the stream system, then we don't have to get trapped in this hole where everybody shares in everything.

We can then make a finding that those people whose lands are on the stream system exercise what we know as conventional riparian rights, and the rest of them on the outside don't share in this, which would avoid my problem, and in the hypothetical case I have presented the pumper would not sue anyone in the older alluvium.  He would not

16,875

t-8

1    want to unless the thing was so wide that  he felt that

2    they had to join everybody.

3        THE COURT:  I have no trouble seeing the problem, but

4    you go ahead.

5        MR. SACHSE:  I think this would be a positive blessing

6    to the United States, for example.

7        MR. VEEDER:  Would you say that again, Franz?

8        MR. SACHSE:  I think this would be a positive blessing

9    to the United States, this type of a finding, for this

10   reason --

11       MR. VEEDER:  Fallbrook blesses the United States.

12       MR. SACHSE:  Mr. Veeder, please.

13       MR. VEEDER:  Excuse me.

14       MR. SACHSE:  I have no client here, and I am trying to

15   be sincerely helpful, and I would appreciate it if you would

16   try to follow the problem.

17       With this entire concept, as I conceive it, if Mr.

18   Veeder or the Marines ever feel that pumping must be

19   regulated, and I am not talking now about appropriators and

20   I am not talking about storage, but if they ever feel that

21   pumping must be regulated, they are going to have to bring

22   another miniature Fallbrook case with all these people in it.

23       But if we stick to this concept that I am suggesting

24   of spelling out the stream  system, they could go against

25   Vail, and Roripaugh, and any other pumper, and leave alone,

t-θ

1   if they felt it so desirable, the people in the older

2   alluvium.    But if we don't define the stream system, and

3   if we don't distinguish between the percolating right and

4   the riparian right, we are going to be right smack up

5   against the pronouncement of the Circuit, and we will

6   ourselves have created an area in which we say every person

7   shares correlatively with everyone else, and we are going

8   to force any regulation to be ground-water-area-wide ,

9   whereas if you distinguish between the stream system and

10  the percolating waters, you are not.

11      Now, I offer that for what it is worth, and, as I say,

12  I am not going to press this thing, and I haven't any

13  client who is interested in it in the slightest, but I

14  think that for   future control of this stream and the

15  protection of the interests of the parties, everybody who

16  is a real user of water, from the United States at the

17  bottom on up, will be better off if we could spell out the

18  stream system in the Murrieta Basin.

c fls

19

20

21

22

23

24

25

Tae C

P 4

1     THE COURT:  Well, Mr. Sachse, it would be a simpler

2     problem if you had only the area of younger alluvium.  But

3     that isn't the fact.  Some of the good wells up in the Santa

4     Gertrudis Creek area are actually in older alluvium.

5         MR. SACHSE:  Your Honor, I don't think that is true.

6         THE COURT:  And some of them start in younger alluvium

7     and go down into older alluvium.

8         MR. SACHSE:  I am discussing only where they start.  I

9     don't think there is anything unreasonable in drawing a

10    distinction between a well that starts in the younger

11    alluvium and goes down into the older alluvium, because we

12    know that anything that is in the younger alluvium, by the

13    mere nature of the contour, is going to get more recharge

14    than is the older.  It is at the bottom.  It is going to be

15    a better place.  The water goes down.  It is bound to be a

16    better place.  The older alluvium sits on the bottom, not

17    on the top of the hill.  So I am not talking about what they

18    go in to or what they take water from.  I am saying that we

19    could define a stream system -- and I will leave it to Mr.

20    Kunkle, I don't know, but I will bet you that 90%, if not

21    more, of the good producing wells will be found to be

22    spudded in younger alluvium.

23        THE COURT:  How can we arbitrarily say that if you

24    start your well in younger alluvium then you are in a certain

25    category, and if you start it in older alluvium you are in

P 5    1    another category.

2    MR. SACHSE:   There is nothing arbitrary about it, your

3    Honor.   It is the most fundamental concept that you shall

4    first define the stream, and all you have to say, as you say

5    on Tucalota or as you say anywhere else, is that there are

6    many, many streams that flow intermittently and the stream

7    channel is the area of younger alluvium which is on each

8    side, the more permeable material of the older alluvium --

9    those are the streams.   The people who are taking water in

10    those areas are taking from a stream system and taking under

11    the riparian right concept.   Whereas a person taking up here

12    may be doing it.   I am not saying to throw him out.   Don't

13    misunderstand me.   I would give Roripaugh, I would give the

14    United States, I would give Vail a perfect right to go after

15    this gentleman, if they want to.   I am just saying that they

16    don't have to.   I am just saying that if they do seek some

17    protection they can first have the right to seek protection

18    on the basis of the stream system rather than the ground water

19    body.   That is all I am saying.

20    And again I will repeat, I think it would be a tremendous

21    benefit to the United States.   It would mean that they don't

22    have to take everybody, that they can say, "Right now, your

23    Honor, this moment, all I want you to adjudicate is the

24    riparian right, the stream right."   And you could do it.   Then

25    if that was not enough they could say, "Yes, now, your Honor,

P 6

1    we want to go a step further and also regulate the man whose

2    rights are only in percolating water," draw the distinction

3    between the two waters -- not vagrant local percolating;

4    percolating, part of the ground water area.

5          As I say, I am not going to press this.  I have no

6    interest, directly or indirectly, for any client.

7          THE COURT:  I appreciate your interest.  It presents a

8    lot of problems.

9          MR. VEEDER:  Mr. Girard said that he had some views.

10   I would rather hear from California before I say anything on

11   this, because this catches me in a position where I want to

12   analyze what Mr. Sachse has said.

13         MR. GIRARD:  Of course, I talked this over with Mr.

14   Sachse this morning and last night I was doing a little

15   thinking on it myself, and I think it might be very desirable,

16   if it is possible to do so, to actually set forth in a find-

17   ing what the stream consists of in the ground water and then

18   treat them separately in conclusions of law.

19         MR. SACHSE:  That is the point.

20         MR. GIRARD:  As to different rights, depending on

21   whether they were overlying or riparian or owners which

22   actually own wells which pump from the stream.  And there is

23   a difference.  You do run into a great deal of practical

24   problems when you say that all these people have "co-equal"

25   or "correlative" rights when, in fact, they are not in a

P 7

1    factual position where they can possibly be equal.

2        THE COURT:  Is there any difference in a situation where,

3    if you had a single stream and you had a fellow at the top

4    and a fellow at the bottom, and they have entirely different

5    acreages and all that sort of thing, and yet you say they

6    have correlative rights?  The very word "correlative" takes

7    into account the distance between them, the amount of land

8    they can irrigate, how much water is in the stream at the

9    particular place where they are taking water.  Is there any

10   difference between that situation and a situation like this?

11       MR. SACHSE:  Yes, your Honor, the difference is that

12   in the stream, if you are talking surface stream, and sure,

13   that appears; you will find in California that many of our

14   surface streams have more water at the head waters than they

15   have at the bottom, and further north where it is rainier

16   it is the opposite -- there is less at the top than there is

17   at the bottom.  But there we are always dealing with a

18   known quantity of water.  We can say, by gauging and measure-

19   ment, as long as we are talking of surface flow, we can say

20   that there are so many cubic feet per second at this stage,

21   at this stage, and at this stage, and we can attempt to

22   correlate.

23       THE COURT:  Let's not take that kind of stream.  Let's

24   take one of our streams.  Let's take Tucalota.  A fellow at

25   the far end of this alluvial stringer has a piece of ground.

P 8   1    A fellow down at the bottom has a piece of alluvial ground.

2    Now the amounts of water available here and there are probably

3    widely different, and yet we have found that the younger

4    alluvium was saturated with water and was part of the stream.

5    They have correlative rights.  But the differences are

6    immense -- they are miles apart, there is tremendous loss of

7    water by evaporation and phreatophytes between them.  It

8    would be a very impractical thing to say that this fellow

9    up here probably was affecting the man down below.

10   MR. SACHSE:  I would answer you on Tucalota this way,

11   by saying that you pick a bad example, because Tucalota is

12   one of these nebulous riparian rights.  The only time the

13   alluvium is saturated is at the very time when he can't

14   exercise his riparian right anyway -- it is raining.

15   But take this Gertrudis or Pauba.  If we imagine three

16   different owners on the Pauba Ranch, that is no problem.  If

17   the lower one finds that he is not getting enough water he

18   would not be compelled to sue everybody up in here.  If he

19   chose to, he would go only up against what I will call the

20   middle Vail , and the middle one and the next one.  Now, if

21   he wants to, yes, he can go after everyone.  But he can do

22   it.  That is the point I am trying to make.

23   And this applies to the United States.  As the last on

24   the stream, as Mr. Veeder said, the United States can dis-

25   tinguish between its rights in the stream system, which

P 9

1   are riparian, and it can go against any other person in the

2   stream system -- Vail, Roripaugh, any well stuck in the

3   younger alluvium -- without at the same time being compelled

4   by this finding of a single ground water area to go against

5   everybody else in the whole shebang.  If they want to do it,

6   they can do it.  You are finding that it is a ground water

7   area.  I have surrendered on it.

8       THE COURT:  Let me go one step further and see if this

9   might be some answer.  First, you are talking about a finding

10   that all the younger alluvium is part of the stream system.

11       MR. SACHSE:  I would draw a finding something like this:

12   That I find the ground water area which you have, and I would

13   say that I find within the ground water area the existence

14   of a large number of intermittent streams -- I think they

15   are intermittent with minor exceptions; we find a perennial

16   in here, but a large number of intermittent streams.

17       I said, Mr. Veeder, that we would find a perennial

18   stream where you have already found the stream runs on the

19   surface.  All the rest are intermittent streams which flow

20   on the surface only during and immediately after precipita-

21   tion and runoff, but which represent large amounts of under-

22   ground flow.

23       And I will delimit these streams, if I am the Court,

24   by saying that the area in which this underground stream

25   flow exists is the area on the surface of younger alluvium,

P 10

1   and the underground flow of those streams is to be treated

2   in a riparian status, whereas the percolating waters of the

3   basin or the ground water area, which I don't find are in

4   any stream -- I don't find any stream, for instance, in

5   Section 3, or I don't find any up here -- those are perco-

6   lating.  To those I apply the percolating rules.  But all

7   the ones that are on the surface, younger alluvium, I apply

8   stream rules to.

9   THE COURT:  Let's go further.  I have wondered about

10   this.  We could make a finding, of course, on these two

11   fault lines in the Murrieta and Wolf Valleys.

12   MR. SACHSE:  You could do that and say everything inside

13   the faults.

14   THE COURT:  And those fault lines undoubtedly have a

15   different character, the area between them has different

16   characteristics than the area outside -- I mean, the permea-

17   bility is most in the younger alluvium, the permeability is

18   greater in the younger alluvium.

19   But be that as it may, going ahead with your idea,

20   would it be possible in this judgment, in the findings, to

21   make this differentiation between the older and the younger,

22   and then provide, as part of the judgment, that in the event

23   there was an application for apportionment, because of this

24   finding as to stream system as contrasted to a ground water

25   area, that a first application might be made only in the area

P 11

1    of the younger alluvium on the stream system without joining

2    all the other parties in the older alluvium?

3         MR. SACHSE:  I think you could do that.

4         THE COURT:  Not prohibit them from joining, but that the

5    Court would entertain such application involving only younger

6    alluvium without the necessity of joining all the parties in

7    the percolating area.

8         MR. SACHSE:  I think you could do that.

9         THE COURT:  And if it became adjudicated and final, then

10   it would become the law of the case that this could be done,

11   where you wouldn't have to bring in all these thousands of

12   people.  Of course, a lot of them are right in that Murrieta

13   Valley anyhow.

14        So is that in line with what you are talking about?

15        MR. SACHSE:  Yes.  I don't think you would have to

16   even say that, your Honor, although this would be my view

17   and Mr. Girard's, too.

18        THE COURT:  What I am specifically asking is, is there

19   anything we could say or do that would facilitate this at

20   a later date, whereas if you put it in a part of the judg-

21   ment there is a difference between the two areas and that

22   in an action on apportionment, because of the difference,

23   it will not be necessary that all parties in the ground

24   water be joined, that the Court feels that there is enough

25   uniformity in the younger alluvium and the stream beds that

P 12

1   this is, in substance, a subunit within the ground water area

2   and part of the stream system, that there will be jurisdiction

3   over that group as a group without a requirement that the

4   parties in the older alluvium are necessary parties -- they

5   may be brought in as parties if the plaintiff or the applicant

6   desires, but they need not be brought in?

7       MR. SACHSE:  The only trouble with that, your Honor, is

8   that you leave us still hanging in the air as to what the

9   conclusion of law is on the whole thing.  You would still

10  have to make, to accomplish this purpose, a conclusion, as

11  I understand it, that gives the people in the younger

12  alluvium a different correlative right than the people in the

13  older alluvium.  Just to say that you can sue one without

14  suing the other, if their rights are the same, is no help.

15  But if we spell out the stream system and say that anyone

16  on the stream system can exercise his rights on the stream

17  independently of his rights as an owner of percolating water,

18  then we have done it.  But if we leave them with the same

19  rights and say that you can sue separately, you haven't

20  accomplished anything, in my judgment.

21      MR. GIRARD:  On this point of a special provision in

22  the judgment, your Honor, I have been thinking and I have a

23  couple of other special provisions that I have never brought

24  up that I would like to suggest for the judgments, which

25  may affect basically some things.  And I checked it out

P 13   1   myself and I think that you can do it.  I don't think there

2   is any doubt that you can put a condition in the judgment

3   which would be binding on the parties in the future.

4        MR. VEEDER:  As to future joinder of parties?

5        MR. GIRARD:  Yes, you could put in a provision that

6   said that if the United States wants to it can sue the

7   people in the younger alluvium on a stream basis or on a

8   riparian basis, but that you don't have to.  You could, if

9   you desired, join everybody.  But that would have the effect

10   that if you sued, for example, the people within the younger

11   alluvium -- Vail, for instance -- Vail could not then say,

12   "Well, United States, you can't sue me on my pumping unless

13   you bring in everybody else."

14        MR. VEEDER:  This is completely new to me.  This

15   catches me -- it is seldom -- it catches me.

16        Mr. Girard, I don't believe that you could possibly

17   enter a decree which would be res : judicata which would

18   preclude the rules respecting third party practice.  In

19   other words, I think you would be in this situation, that

20   if we proceeded against somebody and he said, "Well, this

21   fellow owns some land across the fault.  I want him joined,"

22   I think the man would be joined.

23        THE COURT:  I agree.  I don't think you can prevent

24   somebody from bringing all these people in.  We are merely

25   trying to see if there is some way that we can set up a

P 14  1     procedure where you wouldn't have to bring them all in.

2          MR. GIRARD:  That is right.

3          THE COURT:  Where we could make a judicial determination

4     at this time that these people were in a certain class and

5     could be considered by themselves -- you have to bring all

6     of them in, but the others would be proper but not necessary

7     parties.

8          MR. GIRARD:  Yes.

9          THE COURT:  That is the thought they are proposing.

10         MR. GIRARD:  Yes.

11         MR. VEEDER:  Maybe you can straighten me out on this,

12    your Honor.  As I comprehend the evidence in this case, we

13    have a vast area about which you have drawn a line on Exhibit

14    277, and we say that within that area all the water is in

15    hydrologic continuity, and therefore the interests are

16    correlative -- I will use the term "correlative" rather than

17    "co-equal."

18         THE COURT:  "Co-equal" does not apply to the individuals.

19    He is using "co-equal" to apply to overlying and ripairan.

20         MR. GIRARD:  Yes.

21         MR. VEEDER:  Now, the element that is not taken into

22    consideration when we proceed on the basis that you could,

23    in effect, separate and segregate the waters in the younger

24    alluvium from that in the older continental ignores what I

25    believe to be an extremely important physical fact, namely,

P 15

1   the matter of piezometric pressure, which we talked about

2   at great length when we put in the evidence.  The proposi-

3   tion, as I comprehend it, is this, that a lowering of the

4   head of pressure in Well 23-K-1 in this lawsuit, which is

5   in Township 7 South Range 2 West, has an effect far beyond

6   the quantity of water that is involved.  In other words,

7   I believe that the question of pressure and the question of

8   head is just as important in this lawsuit as the matter of

9   availability of the corpus of the water.  In other words,

10   lower the pressure and you lower the quantity of water that

11   is available.  Now the pumping far removed from the younger

12   alluvium, in my opinion, based on the evidence before us,

13   would have just as much an effect on the downstream user

14   as the extraction of water, perhaps even more.  So I think

15   you would have to make findings along those lines.  There

16   is certainly a great deal of evidence in the record on that

17   point.

18       My point is that here is being tendered an extremely

19   complex thought, one that had never been brought up until

20   -- I noticed the clock -- until about twenty-five minutes

21   after ten.

22       THE COURT:  Let's understand, to start with, it is

23   nothing that can hurt the Government.  You don't need to

24   get too excited about it.

25       MR. VEEDER:  I am not excited in the slightest, your

P 16  1   Honor.

2        THE COURT:  It can't hurt the Government.

3        MR. VEEDER:  That will have to be demonstrated to me,

4   because I am not sure that it can't hurt the Government,

5   because of the elements to which I made reference.

6        And further, I have a difficult time in comprehending

7   how we could accomplish that to which reference has been

8   made.  You have a situation where you have the outcropping

9   of the basement complex -- I am now pointing below the point

10  where Murrieta Creek rises.  We are in this position.  We

11  are downstream from Vail and from the other users, and a

12  lowering of the head at Temecula Gorge is what we are afraid

13  of more than anything else, and I believe it may involve

14  everyone above us.

15       MR. SACHSE:  Mr. Veeder, all I am suggesting -- and I

16  will say again, I believe this is a benefit to you -- is

17  that we devise a means by which either you or any other

18  claimant -- but you are the ideal one, because you are the

19  last on the stream, as you said -- whereby either you or

20  any other claimant to water from the stream system  can,

21  if he so desires, assert a right based on stream water

22  without the necessity of being forced to bring in all of

23  the rights in percolating waters.  I am not saying that

24  you are foreclosed from asserting your rights against all,

25  if you wish.

P 17

1    MR. VEEDER:  If that can be accomplished.  There are

2    some elements of interest there.

3        THE COURT:  Mr. Veeder, just analyze how this would

4    work.  If, with the proper finding on the stream water as

5    compared with water in the ground water area, you could

6    provide that certain owners in a certain area were the

7    necessary parties and that other owners were not necessary

8    but proper parties, and get an adjudication on that, who

9    could be hurt?  The owners whom you listed as being the

10   necessary parties can't complain.  They are thrown in there,

11   and they can't complain.  Each one of them would have a

12   right, under the law, to bring in somebody else.

13       MR. VEEDER:  You are using the term "necessary" as

14   "indispensable"?

15       THE COURT:  Yes.  They may have a right to bring in

16   somebody else if they wanted to.  You couldn't stop that.

17   And so the persons who are called only proper but not

18   indispensable parties are not hurt.  They would have a right

19   to come in, if they wanted to.  But the point is that you

20   would segregate this out and you would say that there are

21   certain people here who are indispensable parties, that the

22   other parties are only proper parties and may be brought in

23   by any party to the litigation.  So that everybody still has

24   the right to get into the lawsuit, if they want to.

25

D. fls.

t-10

Vail is made a party, and Vail can say, "Well, if you
are going to make us a party, we want a couple of fellows
up here who are pumping in, we want you to bring them in,
and you could bring in some people down here in the younger
alluvium."

And they say, "Well, all right, if you want to make us
parties, we are going to have you bring in these people
down here," and they bring them in.

But if you start out and demark it,    then your only
value is when the thing will become final, it will stick,
and where you could have a smaller area of your  indispen-
sable parties in a future litigation, and you might be able,
without having to bring in all of these people, accomplish
what you want to have accomplished.

MR. VEEDER:  A more wieldy area is what you are
speaking of, your Honor.

THE COURT:  Right.  And where nobody can be hurt, and
everybody has a right to get into this, and everybody has a
right to bring somebody else in, if they want to.

MR. VEEDER:  Please understand, your Honor, I am not
arguing it.  I am simply trying to bring out the proposition
for discussion.

t-11

the fellows in the ground water area," and I suppose you would have them all in.

MR. SACHSE:  Your Honor, to jump a step further upstream, and we haven't got it here, of course, but the very next one is Aguanga, and let's take Vail in this case instead of the United States.

As I conceive this rule, if we put it into effect, if Vail feels that my client  Stardust, or Oviatt, or anyone else, some of these surface diverters, are taking too much water, Vail does not have to join the whole Aguanga body, but Vail goes after Stardust, and says, "Look, you are taking more than your share of surface water," or against Oviatt, and they adjudicate the surface and subsurface flow of that stream.

Now, the only problem, and I think this is purely one of definition, and it will have to be more or less arbitrary, is how you define these stream systems, how you do it.

I suggest as a way that your Honor find  that the bed is the younger alluvium, the banks are the contact between the younger and older, and those are the stream system. Granted, it isn't perfect.  I think truly the stream system is perhaps inside a smaller part of the younger alluvium. It isn't the whole thing, to be very honest.  But I don't think we need to worry about that.  All you have to do is to define the system, and define it as bed and banks, and if

t-12

1    you find that the beds are the younger alluvium, and the

2    banks are the contacts, the job is done, and we then reach

3    up to those streams within their beds and banks, that is

4    all.

5        MR. VEEDER:  Let me ask you, what was Mr. Krieger's

6    reaction to this?

7        MR. SACHSE:  I haven't sprung this on Mr. Krieger.  You

8    say this is new, Mr. Veeder.  It isn't new.  In 1958 there

9    is a 12-page memorandum of mine when his Honor asked us

10   all to write an analysis of the proposed findings on

11   geology, and I brought this out, and that is when I came out

12   with that goofy idea which you have all rejected, and which

13   I am abandoning now myself, of a sort of a non-suit status.

14   Your Honor will recall that I said you make a res judicata

15   finding on basement complex, a res judicata finding on

16   younger alluvium, and, in fact, non-suit the older, placing

17   the burden on anyone who wanted to bring them in to make a

18   new case.  I will abandon it and I think it is not a sound

19   concept now, but the principle is still the same.  You have

20   to find a different way to treat them than the people in

21   the older alluvium.

22       THE COURT:  Let me raise this point.  Judge Fee called

23   this action an action for a general --

24       MR. VEEDER:  Adjudication.

25       THE COURT:  No, he called it a plenary suit, in the

t-13

1   sense that the water rights of everybody in the watershed

2   were involved.  Can we assume that he was talking about a

3   cataloguing of rights?

4      MR. VEEDER:  He called it a quiet title suit, which to

5   me meant a cataloguing of rights, as we have undertaken.

6      THE COURT:  Mr. Sachse suggests another matter.  In

7   future litigation, and after the rights are catalogued, is

8   there any requirement such as this:  Suppose a fellow here

9   in the Murrieta in the younger alluvium has a good well, and

10   it goes dry, and he says, "Well, that is going to mean I

11   have to put in two new wells."  Is there any reason that in

12   order to get some relief he has to join everybody on the

13   stream system?

14      MR. STAHLMAN:  No; no.

15      MR. SACHSE:  No, your Honor, I don't think so.

16      MR. STAHLMAN:  No, we have done that on the San Luis

17   Rey.

18      MR. SACHSE:  No, I will concede that, your Honor.

19      MR. STAHLMAN:  He suggests two plants as against one.

20      THE COURT:  Of course, the man upstream would probably

21   have a right to bring in this fellow further up, and say,

22   "Look," --

23      MR. GIRARD:  Your Honor, are you talking of this

24   factual situation on the  basis that there should be a

25   finding as suggested by Mr. Sachse, or just on the present

t-14

findings?

THE COURT:  On the findings suggested by Mr. Sachse.

MR. SACHSE:  That is what I meant.

MR. GIRARD:  I thought your Honor was thinking of the other.

MR. STAHLMAN:  Your Honor, so long as we feel that something should be done here, I broached this at one time, and your Honor said, "You don't know what you are talking about," and I probably didn't express myself clearly.  But I think to try to accomplish what you are attempting to accomplish can be simply done, and be done in accordance with the law of California, and be done by modifying to some extent the findings in this case, in determining as to what the stream is, the stream bed confined to banks.

I think the Katz vs. Walkinshaw case is a similar situation as to a factual situation, and so with the Lodi case, and there are several expressions here in Hutchins that will throw some light on what I am about to project myself into.

You first have to define the water course, and the water course must be within certain defined channels. This expression here, which is followed up later in the book, is:

"The underflow is the sub-surface portion of a water course comprising water flowing beneath the surface in close

t-15

1   association with the surface flow.   Underflow of surface

2   stream below, of course, are substantive rights."

3   In other words, we first have to find where does the

4   water flow after a rainfall.  We define the  channel.  Now,

5   by reason of the fact that this younger alluvium has been

6   deposited here in recent years by water flow, we know that

7   that is a part of the stream channel.  We know that it must

8   be true, and that anyone having rights there would have

9   riparian rights.

10   Now, of course, that would be true up through this

11   Santa Gertrudis, or these other subdivisions, because you

12   have to take into consideration the watersheds in these

13   cases in the determination of what the rights are.

14   Now, these waters up in here (Indicating), they are not

15   the same waters we have been referring to as the local,

16   vagrant, percolating waters, but they are waters that are

17   flowing, and uninterrupted, become a part of this flowing

18   stream system.

19   THE COURT:  Referring now to the older alluvium?

20   MR. STAHLMAN:  The older alluvium.  So I think without

21   having to put in whom you can sue, or what you can do, you

22   would merely have to define what the stream system is, which

23   would necessarily imply that those who overlie that stream

24   system would have riparian rights, and they would have

25   overlying rights as well of the waters over which the

t-16

confines of that channel extended.

Now, the people who are not a part of the defined stream system would have overlying rights.  They may have -- I would say with the condition of the record at the present time there is not sufficient evidence to determine whether they are a part of this channel, because there is a presumption in the law that unless the land adjacent to a basin is proven to be a part of the basin, the presumption is it is not.

So you would merely have then two different kinds of rights.  You would have this person who had the riparian rights, and who would have also overlying rights, and then the other persons who are away from the stream system would have the overlying rights, and, as I say, this water that flows through there, we know it becomes a part of the stream channel eventually, but it is water which is finding its way to the stream, and has not as yet become a part of the stream; at least, according to the present status of this record.  So if that is done, there is no necessity for us saying who can sue whom.  We have had this on other stream systems.  We have had it on the San Luis Rey, and we have persons there who overlie basins, and persons who abut upon the stream channel.

THE COURT:  They have correlative rights, then, don't they?

16,898

MR. STAHLMAN:  How do you mean "correlative rights"? They have correlative rights, yes;  the overlying owners have correlative rights with the overlying owners, and those on the stream system have riparian rights.

THE COURT:  And there is a relationship then between those two classes, is there not?

MR. STAHLMAN:  Yes, but when you get a situation where you have a line of demarkation as to which waters flow into which watershed, you then are able to determine the differentiation between your riparian and your overlying rights.

THE COURT:  What is the relationship between, or isn't there a relationship between the persons having overlying rights and the persons having riparian rights?

MR. STAHLMAN:  Provided they are both overlying and riparian.

THE COURT:  No, isn't there some correlation?  Aren't they correlative?

MR. VEEDER:  Yes, they are.

THE COURT:  "Correlative", as I understand it, does not mean that they are equal/ and the same?

MR. VEEDER:  Nor identical.

THE COURT:  "Correlative" means there is some relationship between them.

MR. VEEDER:  And they participate in a single subject

16,899

t-18

matter.

MR. SACHSE:  There I agree with Mr. Veeder.  To be correlative you have to have the same subject matter.  You can't have two different subject matters and be correlative.

MR. VEEDER:  That is why I think your Honor has before him at least two different thoughts.  I don't follow Mr. Stahlman, or I don't believe Mr. Stahlman has pursued the same path as Mr. Sachse did.  But I may be in error.

THE COURT:  Here is what I can't get in my mind, and maybe somebody can straighten me out on this.  Suppose you found, as Mr. Sachse suggested, beds and banks of younger alluvium constituted the stream system; that the younger alluvium was a part of the stream system, and that the water underneath was stream water, and then you found that the older alluvium was in the ground water area.

There is still a correlative status between a    person who had a well down in that stream, and the person who had his well up in the ground water area.

MR. SACHSE:  Not necessarily, your Honor.  Let me put it this way --

THE COURT:  Wait.  They must have some correlative rights.  The person up in the ground water area could not put in a whole series of wells that would have a major effect on the flow down on the stream system.

MR. SACHSE:  That is right.

16,900

t-19

1    THE COURT:  Nor could the man on the stream system

2  pump his stream so heavily that he would drain all of the

3  water underneath the ground water area.  So their rights

4  are correlative, are they not?

5    MR. SACHSE:  No, your Honor.  Their relationship is

6  sic utere tuo.

7    MR. VEEDER:  Will you say that again?

8    MR. SACHSE:  Sic utere tuo.

9    MR. VEEDER:  Thank you.

10    MR. SACHSE:  I am now reading out of my memo of some

11  time ago:

12        "The fact that storage exists within unit form

13    does not make such storage a part of the stream

14    system."

15    Now, that is the thing we have to remember.  The

16  stream system can be fully correlative, and there can be

17  wild water -- we can take Mr. Kunkel's analysis -- there

18  can be a great deal of water in the older alluvium which

19  contributes to the stream, but it does not necessarily make

20  it a part of it.  The thing that makes it a part of it is

21  how materially, how directly it affects this fellow.

22    If we have a case -- and I think there may be one,

23  although I am not sure -- isn't it the Pauba well that is

24  actually spudded in older alluvium?

25    MR. VEEDER:  Right.

16,901

t-20

MR. SACHSE:  Okay.  There we find one where we would have a freak.  You would say, "Well, gee, that is not in the stream system automatically.  It is spudded in older alluvium."

Well, all that any person who wanted to restrict the Pauba well would have to do would be to come in, and say, "I want to go after this, and I intend to show that it has a direct correlation with the waters immediately alongside," and you can do it.  But if some other poor little fellow has a well a mile away in the older alluvium from which he is getting 10 gallons a minute, you couldn't very well do that.

MR. STAHLMAN:  Your Honor, may I give another illustration?

THE COURT:  Let's first  follow along with this.  I go along, but what do you call the relationship between the man who has his wells in the older alluvium, and his neighbor who has his wells in the younger alluvium on the stream system?  Don't they have correlative rights in this water?

MR. SACHSE:  No.  If it is close enough to affect it, yes, then he has correlative rights.  But if it is somebody that is way out in the sticks, he hasn't got correlative rights.

THE COURT:  This is a factual matter that you decide later when you hear the evidence.  But as a legal matter,

16,902

t-21

1   aren't there correlative rights to start with?

2       MR. SACHSE:  No.

3       MR. GIRARD:  I don't think that we are exactly

4   quibbling on terms, but what the right is is that the people

5   out here in the older alluvium would have a right to see

6   that the pumping out here (Indicating) did not adversely

7   affect them beyond some reasonable amount, and, conversely,

8   the people within the stream system would have the right to

9   limit pumping in the older alluvium.

10      THE COURT:  Then they have correlative rights.

11      MR. GIRARD:  Now, whether that right -- whether you

12  want to call it correlative or a right to prevent injury, or

13  something else, I don't know, but that is the particular

14  right that they have.

15      THE COURT:  I have always considered that to be a

16  correlative right.

17      MR. GIRARD:  That isn't what I would call correlative.

18  By "correlative" -- I would ordinarily take the term

19  "correlative" to mean people who have equal rights to use

20  water within a certain area.

21      MR. STAHLMAN:  Right.

22      MR. SACHSE:  That is the way I interpret it.

23      MR. GIRARD:  Such as riparians have correlative rights

24  to use riparian water on riparian land, and overlying

25  owners  have rights, correlative rights or equal rights, to

t-22

1    use overlying water on overlying lands.  But this right is

2    a right to prevent injury.

3        MR. SACHSE:  That is all.

4        THE COURT:  Isn't the right of the man at the top of

5    the stream and the bottom of the stream --

6        MR. STAHLMAN:  Right.

7        THE COURT:  Aren't they correlative?

8        MR. STAHLMAN:  Yes.

9        THE COURT:  And yet their waters are being used on

10   different lands.

11       MR. GIRARD:  But they are riparians.

12       MR. STAHLMAN:  Your Honor, may I give an illustration?

13   This might point up something as to why there would be

14   that difference.

15       Up in here on the Santa Gertrudis we will take the

16   Roripaugh well, and we know it is a good producing well, and

17   we have no indications of any wells in the older alluvium,

18   up here, away from the stream system that would produce such

19   quantity.

20       Now, by reason of the difference between the two types

21   of material here, this material -- when this well is pumped

22   here, it is taking the water from this area here (Indicating),

23   and, consequently, this area is charged quickly from this

24   stream system because that is where the flow is.  But when

25   you get back in this older alluvium here, if you would

16,904

t-23

dewater that to the same extent that you did this, then you don't have the basis of charge that you have when you are on the stream system.

THE COURT:  I agree now. Therefore, what?

MR. STAHLMAN:  Therefore, I think that the stream system has to be demarked, or should be demarked, and that these people (Indicating), would have their riparian rights, and these would have overlying rights.

MR. GIRARD:  And each would be under a duty not to exercise those rights beyond an unreasonable effect on the others.

THE COURT:  We will take a short recess.

(A 10-minute recess.)

e fls

Take E

P 18

1     MR. VEEDER:  May I interpose a thought here, your Honor.

2     In talking with Mr. Stahlman and Mr. Wilkinson in regard to

3     the compliance with the stipulated judgment, they advise me

4     that Mr. Querry -- your Honor will remember the location of

5     the Querry property and the Querry well -- they advise me

6     that he has been pumping and that he is irrigating a

7     substantial acreage in that area.  We had an order filed on

8     June 23, 1959 for the purpose of taking well measurements.

9     Mr. Querry was one of those whose well was measured.  If we

10    can go to him and secure a right to obtain data not only as

11    to the periods of pumping but well levels and other required

12    information, I would like to do that, with your permission.

13         THE COURT:  Do you want an order on it?

14         MR. VEEDER:  If necessary, I would like to get an order

15    on it from your Honor.

16         THE COURT:  All right.

17         MR. VEEDER:  Is that permissible?

18         THE COURT:  That is satisfactory.

19         Mr. Sachse, going back to our discussion, you sort of

20    premised your proposal on the thought that if the Government,

21    for example, sought an apportionment they would have to bring

22    everybody in, in this area.  Does that necessarily follow?

23    Even without what you are proposing, why couldn't the person

24    who was petitioning select those persons he wanted to bring

25    into the proceeding?

P 19

1    MR. SACHSE:  And then work it out by interpleader,

2    intervention, et cetera?

3    THE COURT:  Yes.

4    MR. SACHSE:  I think they probably could.  But the

5    horrible example that I gave you, and which I think would

6    be the fact, is that even if we devised a way where they

7    didn't have to join everybody, it is almost a certainty that

8    you are going to find some of this other brought in.

9    THE COURT:  Can we ever prevent it, no matter what we

10   did?  If, for instance, the United States should bring an

11   action and should limit their parties to those with the

12   big wells in the younger alluvium, nothing would prevent a

13   fellow in the younger alluvium proceeding as a defendant

14   from bringing/the fellow up in the ground area who, he

15   claimed, was affecting his water.

16   MR. SACHSE:  Yes.  But then you would have this situa-

17   tion, that to bring him in we would have a finding now that

18   he is not part of the stream system, and so when someone

19   drags him in your Honor is not going to give any serious

20   consideration to restraining this gentleman or to restricting

21   him, until somebody proves that he is having a clear,

22   significant effect on the stream system.

23   I think you might devise a way where you wouldn't have

24   to sue everybody.  But I am going a step beyond that.  I

25   am trying to devise a way where you wouldn't have to

P 20

1  adjudicate everyone.  And when you say you have a correlative

2  right in the same thing, you are going to have to adjudicate

3  everyone.  If we say you have correlative rights in two

4  different things, then you can, on the one hand, adjudicate

5  the correlative rights on what we call the stream system,

6  and if you feel it necessary adjudicate the other.  But you

7  are not going to be forced to.  That is the critical point,

8  I think.

9      THE COURT:  I don't think you are forced to bring in

10  any more parties than those who supposedly affect the down-

11  stream user.

12      MR. SACHSE:  But let me pose this to your Honor.

13      THE COURT:  So I am abandoning my thought now of setting

14  up some class, if necessary, as contrasted to proper parties.

15      MR. SACHSE:  I don't think you need to set up a class.

16  Let me pose this to you.  If the United States joined a

17  number of people in what I call the stream system and

18  several of them brought in me, an owner in the older alluvium,

19  or I came in on my own hook, and if your Honor has before

20  you only the finding that we approved yesterday that we all

21  share correlatively in a common source of supply, aren't

22  you going to have to give me a finding as to my share in the

23  water that the United States is having adjudicated?  I say

24  you are.  I say that if I get into this proceeding, one way

25  or another, by my own act or by the act of the petitioner,

P 21

1    then because you have already found a common supply you are

2    going to have to tell me what my share is in that common

3    supply. And that is what I say you cannot do intelligently.

4    That is why I say you have got to distinguish between the

5    two supplies.

6        There was this question as to what we meant by

7    "correlative rights," and I would like to take a second to

8    tell you what I mean.

9        Every land owner has a correlative right with every

10   adjoining land owner which goes much beyond water.  We have

11   correlative rights and duties on lateral support and every-

12   thing else.  And every land owner has a correlative right

13   in water with his adjoining land owner.  In other words,

14   he has a right to have his adjoining land owner use the

15   water in such a way that he doesn't unjustly injure him.

16       But that isn't what I mean by "correlative."

17                                 he
         THE COURT:  Doesn't/have a correlative right as to

18   the land owner once removed?

19       MR. SACHSE:  Possibly, again.  But that is a right to

20   have him so reasonably use his property that he doesn't

21   injure his neighbor.

22       What I mean by "correlative right" is the right to

23   share, on some basis, not necessarily equally, in a common

24   supply -- in a common source.  Now you don't have to have

25   common sources to exercise this right against your neighbor

P 22

1   that he doesn't use it unjustly.  But you do in order to

2   share in it.  That is the correlative right I am talking

3   about.

4        And I think we are writing findings which, in effect,

5   will force the first court to hear a request for apportion-

6   ment, if anybody wants to get tough and come in and do it,

7   it is going to force the court to tell somebody in the middle

8   of Section 34 what is his share of the water of the whole

9   thing.  And I don't think a court can do it.  And I think

10   the court has to devise a way to avoid that problem.

11        Now that is the whole idea.

12        MR. STAHLMAN:  You would accomplish that by also

13   providing there that although you have found to this extent

14   that this vagrant water does contribute to the stream system,

15   you are unable to find at this time to what extent any

16   particular area in there participates.  In other words, the

17   correlative rights of these people here would then be

18   established.  You would have that completely established.

19   You would not have the correlative rights of these people

20   established until there is found evidence as to the effects

21   and conditions that exist in the area of the older alluvium.

22        MR. GIRARD:  Your Honor, I agree generally with Mr.

23   Sachse that what he has suggested goes far beyond the

24   actual question whether one person now, under the existing

25   findings, could go against another.  But I am not so sure

P 23

1   right now, under our existing findings, that the United States

2   could go against Vail alone and have Vail limited to the

3   amount of water they were using from the common ground water

4   area -- assuming, of course, that Vail was using water

5   beneficially.  I think Vail might well be able to interpose

6   an objection that you cannot limit my beneficial use of

7   water unless you limit everyone's beneficial use of water

8   to the common source.

9       THE COURT:  I agree with you exactly.  But this is

10  what could happen.  Let's just take a case.  The United States

11  could start against Vail.  Vail would say, "Why pick on me

12  alone?  You should bring in the people in the Murrieta."

13  And so then the people in the Murrieta are brought in.  And

14  people in the Murrieta, with their wells south and west of

15  the Santa Gertrudis, say, "Just a minute now.  There is

16  great pumping going on up here in Santa Gertrudis.  We want

17  to bring them in."  I don't know that there would be any

18  way to stop the extent of this as one after another brought

19  other people in.

20      MR. GIRARD:  Unless you define the sources of the water

21  separately.

22      THE COURT:  Even if you define the sources of water

23  separately, you could still bring them in.  Suppose we had

24  findings as Mr. Sachse suggested.  So the Government says,

25  "We are talking about the stream system now in Pauba," and

P 24

1  they go against Vail.  Vail says, "All right, the stream

2  system of the Murrieta, bring them in."  So they are brought

3  in.  Then the people up in Murrieta say, "Wait a minute, we

4  are in the stream system, but our source of supply is being

5  materially affected by these people in the Santa Gertrudis,

6  bring them."

7  MR. GIRARD:  Yes, you would bring them in, But you

8  would not be required, if the facts were shown or if it

9  weren't proved that the uses in the older alluvial area --

10  if they were brought in, you wouldn't have to make an

11  allocation to the owners of land on the older alluvium.

12  THE COURT:  You might.

13  MR. GIRARD:  You might, but you would not necessarily

14  have to.  You would if it were found that their uses were

15  unreasonable and excessive in so far as they were unreason-

16  ably depleting the amount of water which was the common

17  source of supply to the stream.  But if you found that their

18  uses were not so excessive and so unreasonable, you would

19  not then have to tell them each to use a certain amount of

20  water.

21  THE COURT:  The same rule would apply on the stream

22  system.

23  MR. SACHSE:  No.

24  THE COURT:  If you found that the uses on the stream

25  system were not excessive, you would not be required to

P 25    1        delimit.

2            MR. STAHLMAN:  Some people would be using an excessive

3        amount of water, and some people would not be using an

4        excessive amount of water.

5            MR. SACHSE:  That is the distinction.  You would be

6        confronted with the situation on the stream where, granted

7        that you found a non-excessive use, couldn't he restrict

8        that particular pumper.  But you might find that that pumper

9        needed restriction, and that pumper was entitled to more.

10        But on the older alluvium you don't find such connection

11        where you need concern yourself with my pumping.

12            THE COURT:  Each case would depend on the facts.

13            MR. SACHSE:  That is correct.

14            THE COURT:  You could have the same result in either

15        situation.

16            MR. SACHSE:  No, because, as I said a moment ago, there

17        is the one distinction that your right to share correlatively

18        is in the common source of supply, and if we start by

19        distinguishing between the sources of supply you are given

20        an extra defense, the Court is given an extra escape hatch

21        when I, the man in the older alluvium, force myself into

22        this litigation on the stream and I say, "Your Honor, now

23        you have told me, you have a finding that this is a common

24        source of supply.  Now you tell me what my share of this

25        common source of supply is."  I can ask for it if there is

P 26

1    an apportionment and we have only a common source, and you

2    will have to give me one.

3        THE COURT:  Mr. Sachse, I am not going to reject entire-

4    ly your suggestion.  I think it has some merits.  But this

5    exact thing could happen if we found the stream system and

6    if a man in Santa Gertrudis area in the older alluvium is

7    brought in as a defendant, and he is now in the ground water

8    area, and we separated that from the stream system, and

9    contentions are made that he is pumping too much and proof

10   is made that as soon as he opens up his pump the well water

11   of the fellow in the younger alluvium drops and he doesn't

12   get any water.  I am assuming a set of facts.  So we are

13   going to have to say to the man --

14       MR. SACHSE:  When you have found that.

15       THE COURT:  But it is going to be a factual situation

16   in every case.

17       MR. SACHSE:  No, the distinction that the case you have

18   just stated is that you have found now that even though he

19   is in the older alluvium he is sharing the other supply that

20   you have found.  You have found in the case you have stated

21   that he is taking water from the stream supply.  What I am

22   saying is, give me a case where I am not, but I can still

23   come in to you, under the present findings we have, and say

24   to your Honor, "You have told me now . . "  You will have to

25   set aside your whole set of findings suddenly and say, "No,

P 27

1  you are not in the common supply anymore."

2      THE COURT:  It would be simple.  I would say, "You are

3  drawing from the common supply, but the uses you are making

4  and the amount of land you have are unreasonable uses.  You

5  are so far removed from the other parties that the Court

6  doesn't feel that you are affecting their pumping, and I

7  will not restrict you."

8      MR. SACHSE:  So now I take the next step.  I say,

9  "Your Honor, in this area you are defining to people what

10  their share is in the common supply.  Based on my irrigable

11  acreage, what is my share in the common supply?"  And since

12  it is a common supply, you are going to have to tell me my

13  bigger share, and I put in my bigger pumps, and I don't get

14  my share but I can sure get enough to dry up my neighbor.

15      I can see nothing but disaster if we confuse the

16  places where water is hard to get with the places where

17  water is easy to get, and I know of no way around it other

18  than to distinguish between the two sources of supply.  It

19  would be fine if we could say that all the people who have

20  good wells have to sue each other first.  Well, we can't

21  say that.  Such a judgment means nothing.  But we can say

22  that all the people who take water from the areas where we

23  know there are good wells have to go after each other first.

24      MR. VEEDER:  It is a matter of joinder of parties.  I

25  think Mr. Sachse has taken one step beyond that which is

P 28

1    necessary.  In other words, the day that it is decided to

2    trigger a proceeding to restrict pumping, we would probably

3    name the parties that we thought were causing the damage,

4    and then if they wanted to implead other parties it would

5    be entirely up to those who were named in the injunctive

6    process.  Isn't that right?

7    THE COURT:  There is merit to that.  It is the same

8    thought that I have expressed.

9    MR. VEEDER:  So it is a matter of deciding on the

10    motion for joinder.

11    MR. SACHSE:  Suppose I force myself in.  It is a

12    common supply.  We have a finding that says it is.  And I

13    am up in the older alluvium and I say, "I want you to tell me

14    what my share is."

15    THE COURT:  Let's study the transcript, and I suggest

16    that you tell Mr. Krieger that some matters happened this

17    morning.

18    MR. SACHSE:  I am going to order this transcript for him.

19    THE COURT:  That is of great interest to him.  He had

20    better get a copy.

21    Let's go to something else.

22    MR. SACHSE:  Yes.

23    THE COURT:  I have tried my hand at some conclusions

24    of law here.  I will pass them out to you in just a minute,

25    with the understanding that it is subject to all that we

P 29   1    talked about.  I am just reading it over.

2         (A pause.)

3         Will you pass these out to counsel, Mr. Clerk?

4         (The Clerk passes out documents to counsel.)

5         THE COURT:  Parts of this that concern your problem

6    that we have just been discussing we might as well skip,

7    because the first conclusion hits head on to that.

F fls.   8

t-24
F-1

1      Maybe while we pass 1, we might add there "except

2  as to amount" -- or maybe there is no distinction, no

3  material distinction -- add after the word "distinction"

4  "except as to amount."

5      2 is as to correlative rights between themselves.

6  Now, 3 is the one that I am really submitting this for.

7  Maybe I have a different view entirely of what "correlative"

8  means, but this sort of expresses my view.

9      Have you read it through yet?

10  MR. SACHSE:  Yes, your Honor.

11  THE COURT:  You have the awkward situation that if we

12  take Tucalota Creek, it comes into the ground water area,

13  and it could be argued that persons up in the northwest

14  corner of the ground water area were not particularly

15  affected by what happened on Tucalota Creek.  But it would

16  seem to me that if you found as to all the creeks that fed

17  the area, the riparians on them had correlative rights with

18  the overlying riparian owners in the area, then to solve

19  problems like that it would be only a matter of evidence,

20  and although legally there would be some correlation between

21  their rights, as a practical matter the fellow up in the

22  northwest corner of the ground water area would not be

23  complaining about what happened on Tucalota Creek.

24  MR. SACHSE:  Just so I understand, on 3 you say, "said

25  owners."  That refers to all the owners in the ground water

t-25

1    areas; is that correct?

2        THE COURT:  That is right.  First I found that all of

3    these owners in the ground water area have these correlative

4    rights among themselves in the ground water area.   Number

5    3, then, attempts to take care of all of the rights they

6    have upstream and downstream.

7        MR. SACHSE:  I follow it.

8        MR. GIRARD:  I can't understand this situation, your

9    Honor, and assuming that this is a ground water body, and

10   assuming that we don't get into the problems as suggested

11   by Mr. Sachse, what right would the landowners within this

12   ground water area have that they could assert against a

13   downstream owner?  Say the United States.  What right do

14   they have?

15       THE COURT:  They don't.  I will announce again my

16   definition of "correlative rights."  You say that their

17   rights and those of downstream owners are correlative, but

18   as a part of this right is the fact there are upstream

19   owners, and so that the right can be enforced by the down-

20   stream owner -- I mean the upstream owner -- he has nothing

21   he can do about the downstream owner.  But it is my under-

22   standing    as to this "correlative right," that this

23   relationship exists between them.

24       Now, there is a different kind of relationship in

25   different situations.  Again, take the simple case of a

t-26

stream, with ten people on the stream, and you found they had correlative rights.  It automatically follows that the upstream owner can't do anything to the downstream owner in the way of seeking any relief, but the downstream owner can certainly complain about the upstream owner.  I think this is inherent in the word "correlative."

MR. VEEDER:  As against the Tucalota owner, certainly, the man who has the adjudicated right in the ground water basin, or body, or area, that man has a right against the Tucalota user if he is using more than his correlative share.

THE COURT:  Yes, but as to the Tucalota user --

MR. VEEDER:  There is no action he can take.

THE COURT: -- there is no action he can take.

MR. VEEDER:  Because the water has gone by his place.

THE COURT:  Has gone by.

MR. VEEDER:  That is the principal reason.

THE COURT:  When I say there is no right, there would be a right.  For instance, he could ask for a declaratory judgment that he was not using more than his share of water. So the words "correlative rights," as I understand them, define this very broad situation, but must be developed then factually, and I think that his rights exist even if in many cases they are illusory.

I think that the right is there; such as with the

t-27

1     fellow up in the northwest corner of the   Murrieta, the

2     ground water body that he is in is fed by Tucalota, but,

3     as a practical matter, it may be that the elevation of his

4     well is higher than where Tucalota comes in, but rather

5     than make findings on each of these wells, you merely say

6     that correlative rights exist, and if litigation arises,

7     you solve it.  Either he is too far away to affect it, or

8     the water level of his well is far above where Tucalota

9     comes into the ground water area.

10        MR. VEEDER:  It is not unusual in a creek   such as

11    this for A, B and C to sue X, Y and Z because they happen

12    to be in a situation where their respective rights and

13    interests come in conflict under a momentary operation.

14        Now, I haven't followed entirely what Mr. Sachse was

15    saying.

16        THE COURT:  On the other hand, let's just analyze this

17    for a minute, to show what I am thinking about.  Let's take

18    the man up in the top corner of Murrieta.

19        MR. VEEDER:  He will be "A".

20        THE COURT:  We will call him "A", and there is excess

21    use on Tucalota, and what I should have said before, and I

22    say now, he has no remedy.  But is that true?   Supposing

23    he has proved that in the past there has been so much

24    water coming in to Tucalota that it had supported the water

25    gradient, and that water therefore  had very slowly left

16,921

t-28

the area of his well because    there was this support
below.  But since / dried up Tucalota the movement of water
from his area had been so extensive that now his well had
gone down to where he had no water in it at all.  Conceivably you could have a situation of that sort, where the
fellow in the far corner would have a right to complain
about the source of supply to this ground water body.

MR. SACHSE:  Let me ask you this in this way, your
Honor:

This is your stream system (drawing on blackboard),
and just as Mr. Veeder says, here is "A" down here, who is
unhappy, and he does --

THE COURT:  Mr. Veeder?

MR. SACHSE:  Bill, he does just what you say, he sues
B and C, and this is D, and they are all upstream, and he
says, "I want an apportionment."

Remember, now, we have a finding which says that this
is a common source of supply.  But this is "X" way on out
here in the older alluvium, and he has a real smart head,
he has got a lot of money, and he hires a lawyer and doesn't
mind the litigation, so he comes in and says,  "All right,
your Honor, adjudicate my right, too."  And he can
intervene, and he can step in.

Now, what are we going to do?  How do we tie him into
this?

16,922

t-29

1     THE COURT:  Why do we have to adjudicate his rights?

2 We find that what he is pumping has no material effect on

3 the people downstream, so we just lift him out of the

4 suit, and we tell him, "We don't at this time adjudicate

5 your  rights, because we don't find that your activities

6 have caused any injury to any party at all."

7     MR. SACHSE:  I am not asking to be enjoined.  I am

8 coming in and saying, "Your Honor, I want you to tell me

9 what kind of correlative rights I have in this common

10 source of supply."  And this is a common source, and you

11 just found it.

12     THE COURT:  We say, "We don't find that what you are

13 doing is injuring anybody."

14     MR. SACHSE:  Then I can do anything I want.

15     THE COURT:  What is that?

16     MR. SACHSE:  Then I can do anything I want to, so I

17 start pumping like mad.

18     MR. VEEDER:  All right, then you are in --

19     THE COURT:  Then we bring you back in.

20     MR. SACHSE:  And bring in these other people?

21     THE COURT:  Then we bring you back in and we say,

22 "Now you have gone too far this time, and we have to throw

23 you in with the injunction."

24     MR. VEEDER:  I want to be sure, Mr. Sachse, that I

25 follow you.  We have gone past the chronicling of all rights,

16,923

t-30

1   and everybody is in before the Court?

2        MR. SACHSE:  Right.

3        MR. VEEDER:  That is the way we are now, and we have

4   a situation where somebody downstream deems it desirable

5   to have regulation, and you  name X, Y and Z, and you bring

6   them in before the Court, and they say, "Well, you have got

7   to bring in" --

8        MR. SACHSE:  No, I didn't say that.

9        MR. VEEDER:  "-- Q, R, S and T."

10       MR. SACHSE:  No, I don't say that at all, Mr. Veeder.

11  I say maybe you do, or maybe you don't.

12       I am saying that "X" here wants to come in because

13  this Court has made an initial finding that this is a

14  common source of supply, and if it is a common source of

15  supply, and we have a finding that I have a correlative

16  right in it, I will come in and say, "I want you to tell me

17  what my right is."

18       MR. VEEDER:  He comes in and says, "You have catalogued

19  my rights.  Now, I want to be a party to the apportionment."

20  Is that what you are saying?

21       MR. SACHSE:  I want to know how much water you are

22  going to give me.   I don't want to drill wells, and then

23  wait, and maybe have you tell me it is no good.

24       I say, "Tell me how much money I can spend in

25  developing this water, how much water I can take."

16,924

t-31

1       Now, what are you going to do?

2       THE COURT:  I would throw him out and say, "It is

3 premature to talk about that.  See how much water you are

4 going to get, and how much water you use, and then talk

5 about it."

6       MR. VEEDER:  I think that is the modus operandi.

7       MR. SACHSE:  This is very interesting.

8       MR. GIRARD:  Assuming, therefore, it is a common

9 source of supply, it is the same as -- well, let's take,

10 for example, the Sacramento River.  I guess the Feather

11 River and the Sacramento River are the common source of

12 supply of the Delta area.  But you have to find separately.

13 You can't just say that the common source of supply is all

14 the surface water within the area.  You have to find a

15 separate stream and delineate it, because the rights as

16 related to the entire picture are not the same, even

17 though it is the common source of supply.  But when you

18 just treat the whole area, because it is a common source

19 of supply, you treat the waters as all having the same

20 effect throughout, I think you are making a lot of trouble

21 for yourself.

22       THE COURT:  Gentlemen, let's pass this up and see what

23 we can do on some other things, because this may require

24 some study.

25       I am impressed by Mr. Sachse's suggestions, and I would

16,925

t-32

1   like to see some of you try your hand at this kind of a

2   finding, and I will try my hand at it.

3       MR. GIRARD:  I will do that.

4       THE COURT:  I have a little trouble in convincing

5   myself that it is necessary, and that I don't think in an

6   apportionment everybody has to be brought in, but I think

7   that under the rules of joinder, and interpleader, and

8   intervention if somebody else wants somebody else in, they

9   have the right to do it.  But I think this is worth study,

10   and I don't think we can conclude it this morning.

11       MR. GIRARD:  I don't either.

12       MR. VEEDER:  They have a right to bring them in by

13   motion and a showing that they are essential to the

14   apportionment.  Isn't that what you say?

15       MR. SACHSE: Well, if you tell me in a judgment that I

16   have a correlative right in the source of supply, you will

17   have a pretty hard time telling me that I am not essential

18   to an apportionment of that share.

19       THE COURT:  Are you ready to look at the miscellaneous

20   surface impoundments?

21       MR. GIRARD:  I might add, before we start in on that,

22   that there is a distinction now between what is the correct

23   law as between the Attorney General's office, as represented

24   by myself, and the  State Water Rights Board.

25       THE COURT:  Oh, no.  You mean on this matter of

16,926

t-33

1    impoundment?

2         MR. GIRARD:  Yes, your Honor.  I hope we can avoid it,

3    and maybe we can, because I am setting up a meeting as soon

4    as I get back to Sacramento and have a day to give to it,

5    which I haven't had lately, and will try to straighten it

6    out.  But the State Water Rights Board takes essentially

7    the position that there is no prescription under California

8    law.

9         MR. VEEDER:  That is Gavin Craig?

10         MR. GIRARD: Yes.

11         MR. SACHSE:  That is Gavin Craig.

12         THE COURT:  You mean there can be no prescription?

13         MR. GIRARD:  Unless you file with the State Water

14    Rights Board.  There are two articles on it in the Law

15    Review, one written by Mr. Craig, and the other one written

16    by a gentleman I don't know.  That is in California Law

17    Review, and there has been a split among the various

18    attorneys.  I think Mr. Sachse would say essentially the

19    same thing that I have.

20         MR. SACHSE:  Yes, I am anti-Craig.

21         MR. GIRARD:  But I want to get this problem resolved

22    out of my State agency, your Honor.

23         THE COURT:  All right.  Have you all looked these

24    findings over?

25         MR. VEEDER:  Yes, your Honor, I have.

16,927

t-34

1    THE COURT:  Who has suggestions on them, or do they
2    read pretty well?

3    MR. GIRARD:  I am generally satisfied with them, your
4    Honor, subject to the fact that if I am directed by the
5    Attorney General to take a different position than I feel
6    now, I will have to back right around from my own personal
7    belief.

8    MR. STAHLMAN:  The only suggestion I had was, as I
9    recall, that we had this stock watering and salt thing
10   altogether, and I think there is a distinction.

11   MR. SACHSE:  You haven't got the right one.  You have
12   the old one.

13   MR. STAHLMAN:  I have the old one?

14   MR. SACHSE:  Yes.

15   (Thereupon a document was handed to Mr. Stahlman.)

16   MR. GIRARD:  Do you still have your old one there,
17   George?

18   MR. STAHLMAN:  Yes.

19   MR. GIRARD:  Let me have it for a minute.  I want to
20   look at Finding IV.

21   (The document was handed to Mr. Girard.)

22   MR. GIRARD:  Your Honor, I think that we can take care
23   of the objections of the State Water Rights Board on these
24   by merely changing slightly the language in Section VI --
25   I mean in Paragraph VI on Page 2, without in any manner

16,928

t-35

affecting the substantive meaning of that paragraph.   I would like to suggest -- and maybe I can avoid a problem that I will face -- to change that to:

"Except as may be otherwise provided in these Findings . . ."

MR. SACHSE:   To change what?

THE COURT:   To change what?

MR. GIRARD:   The commencement of Paragraph Six and just say:

"Except as may be otherwise provided in these Findings, none of such structures or impoundments have been maintained adversely to any other water user downstream therefrom."

MR. SACHSE:   Or you can just delete "prescriptive", and that is enough.

MR. GIRARD:   "Except in cases covered elsewhere in these Findings in which this Court has specifically found a right" -- and delete the word "prescriptive."

MR. SACHSE:   Mr. Craig wrote me a memo on this, your Honor, and his reasoning was simply that he didn't want anything that even by implication implied a prescriptive right might exist without the State Water Rights Board.

I told him, "You are going to get it by more than implication because his Honor has some very specific findings in this case, anyway."

16,929

t-36

1      I don't think that it is important, really.

2          THE COURT:  You say just to strike out "prescriptive"?

3          MR. SACHSE:  To strike out "prescriptive," and it

4      certainly has not hurt the findings any.  In fact, if you

5      strike out "prescriptive" it becomes a broader finding.

6          THE COURT:  Then wouldn't you say, "Except in cases

7      covered elsewhere in other Findings"?

8          MR. GIRARD:  I think you are right, your Honor, "in

9      other Findings."

10         MR. VEEDER:  Can  we read it into the record as

11     revised?

12         THE COURT:  And then after "Findings" insert "in this

13     case".   So that VI would read, "Except in" -- I don't

14     like "cases".

15         MR. SACHSE:  Situations.

16         THE COURT:  Instances or situations.  Do you want

17     "situations" or "instances"?

18         MR. VEEDER:  I think either one is all right.

19         THE COURT:  All right, "situations":

20             "Except in situations covered elsewhere in other

21         Findings" -- then insert "in this case" -- "in which

22         this Court has specifically found a right to maintain

23         such structures, none of such structures or impound-

24         ments have been maintained adversely to any other

25         water user downstream therefrom."

t-37

1      Now, I was going to suggest on Conclusion I, and maybe

2  it isn't necessary, the question of whether or not to

3  insert "the amount of any such individual use is reasonable

4  or unreasonable has not been determined in these proceedings."

5      MR. SACHSE:  I think that would be a good suggestion,

6  "the amount of any such individual use."

7      THE COURT:  Yes, the amount.  We hold that the stock

8  dam is a proper riparian use.

9      MR. SACHSE:  I think that is better.

10      MR. VEEDER:  Doesn't that sentence eliminate the word

11  "prescriptive" again?

12      THE COURT:  We are in Conclusions of Law, now.

13      MR. VEEDER:  I realize that, your Honor, but I am

14  looking at them, and if you make no determination that they

15  are reasonable or unreasonable, you couldn't have a

16  prescriptive right without it.

17      MR. SACHSE:  I have got a finding that there aren't

18  any prescriptive rights.

19      THE COURT:  Further down.

20      MR. VEEDER:  I simply make that comment.

21      THE COURT:  Now, on II, which refers to the irrigation

22  setup, maybe we will not put "the amount" in it, because

23  there should be other things besides the amount, time and

24  all of that.  So I think I will let II remain:

25      "The question of whether or not any such individual

t-38

use is reasonable or unreasonable under the circumstances has not been determined in these proceedings."

Then on Line 22, where you talk about retaining jurisdiction, the line reads: "purpose of regulating, controlling, restricting or prohibiting," I would insert "if necessary."

MR. SACHSE: At the end and after "prohibiting"?

THE COURT: Yes. It reads that this Court retains jurisdiction for the purpose of doing this very thing, but it is only going to do it if necessary.

MR. SACHSE: Then "in these Findings", if you will refer to the next one, your Honor?

THE COURT: You mean in IV?

MR. SACHSE: IV to read:

"Excepting as may have been specifically found elsewhere in other Findings in this case . . ."

THE COURT: Yes.

MR. VEEDER: Where was that last one?

MR. SACHSE: In Line 28, to read, "Excepting as may have been specifically found elsewhere in other Findings in this case, . . ."

THE COURT: And we have again the word "prescriptive."

MR. GIRARD: I think we are going to have to face up to it; at least, the State is, because, as I understand it, your Honor has already entered one finding specifically

16,932

t-39

1      finding a prescriptive right,

2          MR. SACHSE:  No, your Honor, this is all right.  This

3      does not bother the State.  This is a conclusion of law that

4      no prescription exists, and they don't care about that.

5      They just care about the implication as to how you get it.

6          MR. VEEDER:  I thought Mr. Girard was going to ask for

7      a prescriptive right himself for a fire station up there.

8          MR. STAHLMAN:  Also, I think that Craig's opinion is

9      that the prescriptive right cannot be had since the 1928

10      constitutional amendment; that there was nothing that you

11      could find a prescriptive right before.

12          MR. SACHSE:  I am not sure of that, but I know that he

13      had no objection to the phrase in this conclusion of law.

14      He had no objection to that.

15          THE COURT:  Then this judgment is about ready to go,

16      isn't it?

17          MR. SACHSE:  I felt it was.  The only thing I didn't

18      know, your Honor, I wrote it as a judgment, and I didn't

19      know whether your Honor wanted to make it an interlocutory

20      of his own, or simply approve it, so to speak, and have it

21      at the conclusion  at the appropriate place,

22          THE COURT:  Let's make a judgment out of it and get it

23      done.

24          MR. GIRARD:  Mr. Sachse, I presume, in his limited time

25      before he leaves of one day is not going to have time to put

t-40

1    it in final form, and I will offer to do it for him.

2         MR. SACHSE:  Oh, I have more than  a day.

3         THE COURT:  Do you have the corrections?

4         MR. SACHSE:  Yes, your Honor, I have them, and I will

5    get it done before next Wednesday.  I think I had better

6    cut a stencil on this, I guess, so we can have more of them

7    made.

8         THE COURT:  We agreed not to send out copies because

9    we might miss somebody, didn't we?

10         MR. SACHSE:  Well, this is the type of thing that Mr.

11    Veeder might want to have a number of copies    , and I

12    would just as soon have the stencil cut.

13         THE COURT:  All right.  Mr. Clerk, what is the next

14    judgment number in order.

15         THE CLERK:  The next one will be No. 28.

16         THE COURT:  Are you sure we haven't a 28 now?

17         THE CLERK:  Yes, sir.

18         THE COURT:  What?

19         THE CLERK:  Yes, I am positive, your Honor.

20         THE COURT:  This will be No. 28, then.

21         Now, after "Interlocutory Judgment" put in "No. 28."

22         It has been approved, Mr. Sachse will cut the stencil,

23    and submit it.

24         Any objections?

25         MR. VEEDER:  No objections.

16,934

t-41

THE COURT:  I suppose we should have the extra copies, because somebody might write in, and then the advantage of having them separately is that you can say, "Well, here is story on salt beds," or "here is the story on reservoirs," and so forth.

Now, gentlemen, what else do we have?  We have fixed the continued date, haven't we, which will be May 31st, and we will have Mr. Stark here at that time.

Then we have Sandia.  Are we going to talk about Sandia this afternoon?

MR. SACHSE:  I think that is about done, isn't it, Bill?

MR. VEEDER:  It is about done, yes.

THE COURT:  Then let's come back at 2:00 and see whether we can clean it up and get out of here by 3:00 o'clock.

MR. SACHSE:  I am sure it won't take long on Sandia, your Honor.

MR. VEEDER:  At 2:00.  Then the get-away day is today; is that right, your Honor?

THE COURT:  Yes.  All right, 2:00 o'clock.

(Whereupon, at 12:10 o'clock p.m., a recess was taken )
(until 2:00 o'clock p.m. of the same date.                )

- - -

P 30

SAN DIEGO, CALIFORNIA, Thursday, May 4, 1961, 2:00 P.M.

1

2     THE COURT:  What is the next matter?  Sandia?

3     MR. VEEDER:  Yes, I think that is proper.  I would like

4  to explain the basis upon which Mr. Sachse and I have come

5  to agreement as to how this would be handled.  If your

6  Honor would look at page 2, Findings IV and V.

7     THE COURT:  Let me find it.  Yes.

8     MR. VEEDER:  What we are doing is taking the names and

9  legal descriptions from an exhibit presently in the record

10  which sets forth the names and descriptions from all the

11  properties from Temecula Gorge on down to De Luz Creek.

12  What we are doing is simply extracting the names of those

13  parties, and will the Court take the pages from that exhibit

14  and that will be marked Exhibit A and made a part of the

15  findings.

16     THE COURT:  Then you will cut out some of the references

17  to the owners and parcels elsewhere?

18     MR. VEEDER:  That is correct, where they are not

19  relevant we will strike them.

20     THE COURT:  Yes.

21  What else is to be done on it?

22     MR. VEEDER:  That work, I think, is completed now.

23  And in regard to the non-riparian lands, I have checked

24  those out.  I have no return on those.

25  I referred to Finding No. VI where there are listed a

P 31

series of parcels of land apparently riparian, but I have
discussed this matter with Colonel Bowen and he is of the
opinion that, for practical purposes, these are purely
illusory rights, to use your Honor's term, and that we could
proceed on the basis that it would be impossible to irrigate
them.  For that reason I would recommend that we would leave
Finding No. VI as it stands.  Is that agreeable, Mr. Sachse?

MR. SACHSE:  Yes.  I have found that there are riparian
intermittent streams with water in them only at the time of
rain.

MR. VEEDER:  Colonel Bowen checked those out, and it is
extremely tough terrain up there and there is no possibility
of utilizing the water that is available.

THE COURT:  I have a note also where Vail lands are to
be added in Sandia.

MR. VEEDER:  The aggregate of Vail lands will be added
from the Vail report on Sandia, and that has been prepared
or is being prepared now.

THE COURT:  And as a description of Vail lands what
are you going to say?  The lands in the watershed north of
the County line?

MR. VEEDER:  Within the watershed of the Sandia and
of course north of the County line.

MR. STAHLMAN:  I presume that in these Vail findings
we are going to treat Sandia and De Luz as separate entities.

P 32

1     MR. VEEDER:  That is my understanding.

2     MR. STAHLMAN:  Yes.

3     THE COURT:  Actually, then, to define the Vail lands,

4  it is all the lands in the watershed of Sandia north of the

5  line of Riverside-San Diego Counties.

6     MR. VEEDER:  That is correct, and we will set forth

7  the gross and irrigable acreage.

8     THE COURT:  I suggest that you ought to say what the

9  lands are and that that description is everything in the

10  watershed north of the County line, as I remember the map.

11     MR. STAHLMAN:  That is correct.

12     MR. SACHSE:  The County line is the Vail boundary.

13     MR. VEEDER:  I thought you had De Luz property in there

14  that was also in Riverside County.

15     THE COURT:  De Luz isn't in this watershed.

16     All the lands in the Sandia watershed north of the

17  County line.

18     MR. VEEDER:  We are now in accord.

19     COMMANDER REDD:  That line jogs, though, your Honor.

20  The County line is not the entire boundary line of the Vail

21  Ranch there.

22     MR. STAHLMAN:  We will put in a description.

23     MR. VEEDER:  Will you supply us with that?

24     MR. STAHLMAN:  Yes.

25     Will you want it in this also?  You say in Paragraph

P 33   1   3 --

2   MR. VEEDER:  That has to be deleted.  "With the ex-

3   ception of Vail Company" is out.

4   MR. SACHSE:  Yes.

5   MR. STAHLMAN:  In other words, you leave out "with the

6   exception of the lands of Vail Company"?

7   MR. VEEDER:  That is right.

8   MR. STAHLMAN:  And put in a description.

9   THE COURT:  Am I wrong in this?  The County line -- oh,

10   I see.

11   MR. STAHLMAN:  You could say all lands within the Santa

12   Rosa Grant within the watershed of Sandia Creek, and then

13   you have it.

14   THE COURT:  That is true.  There is a jog there, so

15   that it is not all lands north of the County line.

16   MR. STAHLMAN:  All within the Santa Rosa Grant.

17   THE COURT:  Put some general description in.

18   MR. STAHLMAN:  Yes.

19   THE COURT:  When do you think this will be ready?

20   MR. VEEDER:  It will be ready just as soon as Mr. Sawday

21   and Colonel Bowen --

22   THE COURT:  The first of the week sometime?

23   MR. VEEDER:  I am hoping by the middle of the week, yes.

24   Franz doesn't leave until Wednesday.

25   MR. SACHSE:  I will say this.  You can sign this in my

P 34

1   absence, Mr. Veeder. As I said before, I believe truly that

2   the interests of Fallbrook and the United States are identical.

3   There is only one parcel over which I have any concern, and

4   that is the one covered by Finding VIII, your Honor.  That

5   is my client Mr. Sill, and that is one of these cases again

6   where there is a reservation of a riparian right.  I have

7   tried to draw the finding in such a way that if Mr. Veeder

8   later has evidence to show that this reservation, if there

9   is any left, is not effective, we can do it.

10   THE COURT:  All right.

11   MR. VEEDER:  I brought that to Mr. Sachse's attention

12   and I have tendered the thought that if we put the words

13   "purportedly reserving" in line 30 on page 4 -- "reserving"

14   is a conclusion of law.

15   MR. SACHSE:  If you are going to do that, then you will

16   have to draw also the conclusion of law that says that Mr.

17   Sill is riparian, and I think we have got to say that he is

18   or that he isn't.  That is the point.

19   MR. VEEDER:  As I explained to you earlier, Franz, I

20   have checked these things out, and while there is a general

21   principle that you can reserve riparian rights there are

22   some of those, it seems to me, in which your attempted

23   reservation was nunc pro tunc.

24   MR. SACHSE:  That is not the Sill case. As I say, if

25   you can satisfy on Mr. Sill, then I would have no further

P 35

1   concern with these findings.  If you are going to argue that

2   this is not a good riparian reservation, I would like to be

3   heard.

4     MR. VEEDER:  What would be wrong in saying "purported,"

5   because that matter has to be passed on?

6     MR. SACHSE:  Then what are we going to do with the

7   judgment as far as Mr. Sill is concerned?  Then we have no

8   judgment for Mr. Sill.  In other words, we don't have a

9   Sandia judgment.

10     MR. VEEDER:  Subject to our argument, then.

11     MR. SACHSE:  I am so certain that Mr. Veeder will find

12   that this is a proper riparian reservation that I would

13   prefer to let us just sign this.  If you find something

14   wrong with it, I'll go on record that you can reopen it.

15     MR. VEEDER:  Well, certainly this is interlocutory and

16   if it comes out differently it will have to be changed.

17     MR. SACHSE:  And I have no objection, Mr. Veeder, if

18   you let them rip this way with your new  Schedule A.  Don't

19   worry about my attendance on it at all.

20     THE COURT:  What is the problem -- I don't know whether

21   I got it -- that is going to be discussed between Colonel

22   Bowen and Mr. McGinnis?

23     MR. VEEDER:  In regard to the capacity of two reservoirs,

24   in regard to irrigated acreage.

25     THE COURT:  Just ironing out some discrepancies?

P 36

1    MR. VEEDER:  That is all.

2    MR. SACHSE:  That is all, your Honor.

3    MR. STAHLMAN:  I would like to see the Sandia findings

4    before they are signed.

5    MR. VEEDER:  You will.

6    MR. GIRARD:  I want a copy, too.

7    MR. SACHSE:  Just so that I am clear, you are going to

8    take care of this mechanical work?

9    MR. VEEDER:  This will be done.

10   MR. SACHSE:  Before next Wednesday I will do the

11   miscellaneous impoundments, and you are going to do this one.

12   Is that right?

13   MR. VEEDER:  That is right.

14   THE COURT:  What is next?

15   MR. VEEDER:  I want to make reference to a point that

16   Mr. Sachse and I have discussed.  If you will observe the

17   statement in Findings No. IX and X in regard to rights to

18   the use of water.  Now Mr. Sachse and I are not in agreement

19   as to the connotation --

20   THE COURT:  Are you looking at Sandia again?

21   MR. VEEDER:  Yes, I am still on Sandia, your Honor.

22   THE COURT:  What page?

23   MR. GIRARD:  Page 5, Paragraph IX.

24   MR. VEEDER:  "The following parcels of land, an exact

25   description of which is set forth in Exhibit A attached,

P 37

1   have appropriative rights to the use of water in Sandia

2   Creek and its tributaries as hereinafter set forth."

3       It is my position, your Honor, that the issuance of a

4   permit does not give rise to an appropriative right.

5       I talked to Mr. McGinnis on the point. I asked him

6   how much water had been used, and under what permit. He said

7   he didn't know. I said, "Well, are you exercising your

8   claimed right under both permits? And if so, how much?"

9   He didn't know. I made the point to him that, in our view,

10  unless water is diverted and applied to beneficial use you

11  can't say there is an appropriative right of any kind.

12      If your Honor will now turn to page 6, Finding No. X,

13  the statement is made:

14      "There are no presently vested or inchoate appropriative

15  rights to the use of water in Sandia Creek or any of its

16  tributaries other than as set forth in Paragraph IX."

17      Again, these are interlocutory. As I comprehend it,

18  we have the right to raise objection before they become

19  final. I would like to be heard again on that proposition.

20      I would also want to be heard again in regard to my

21  assertions as to Finding No. XII. In my view, there is

22  enough information in regard to Sandia Creek to resolve the

23  respective rights of the parties, if there came a time for

24  an apportionment. If I have that reserved right to press

25  that point, I will not discuss it further, because this is

P 38

1     the language that your Honor handed to us, it is the language

2     you approved, to which I have made objection. So I see no

3     reason for labouring the matter further here.

4         THE COURT: Any other comments on this now? Have you

5     looked over the language, Mr. Sachse and Mr. Girard? Are

6     you satisfied with it?

7         MR. GIRARD: Yes.

8         MR. SACHSE: I am satisfied with the language of No.

9     XII.

10         And as far as Mr. Veeder's comments on the appropriative

11     rights are concerned, I am in agreement with him. I believe

12     that the mere issuance of a permit does not vest the final

13     right. I have no other way to say it. We are trying to

14     spell out what they have -- namely, a permit.

15         MR. STAHLMAN: Instead of saying that they have

16     appropriative rights, say they have a right to appropriate.

17     It is a different thing -- having an appropriative right

18     and having a right to appropriate.

19         THE COURT: What about that language?

20         MR. SACHSE: It is all right with me.

21         MR. VEEDER: I would just rather recite what the facts

22     show. I don't know whether they do have a right to appro-

23     priate.

24         MR. STAHLMAN: They have if they can find the water.

25         MR. VEEDER: How could they have a right to appropriate

P 39

1   water when obviously we are downstream from them?

2      MR. STAHLMAN:  I know, but it is subject to vested

3   rights.  If the water is there, they are limited in what

4   they can appropriate.  They can't appropriate water that is

5   not there.  They have not an appropriative right, but they

6   have a right to appropriate.

7      THE COURT:  Do we find that these rights to appropriate

8   are appropriative rights and subject to all prior vested

9   rights?

10     MR. SACHSE:  I haven't said so specifically, your Honor,

11  but as a matter of law all appropriative rights are subject

12  to prior vested rights.  If you want to add it, there is

13  certainly no objection.

14     THE COURT:  It would be a conclusion of law, wouldn't

15  it?

16     MR. SACHSE:  It is just a part of the description of

17  the permit, your Honor.

18     MR. GIRARD:  I think any appropriative right would be

19  subject to prior vested rights.

20     THE COURT:  We could solve it and make everybody happy

21  by changing the preliminary of No. IX to recite the facts,

22  that in regard to the parcels and properties referred to

23  below the owners thereof as set forth below have filed

24  applications for permits to appropriate water, with priority

25  dates as herein specified and such    permits to appropriate

P 40

1    water have been issued.

2        MR. SACHSE:  I have absolutely no objection.  If Mr.

3    Veeder can write it more strongly, it suits me.

4        MR. GIRARD:  And that as of this date no permit has

5    developed into a license.

6        THE COURT:  And that no permit has developed into a

7    license.  And then a conclusion of law that any rights

8    arising by reason of the permits and any license which

9    thereafter flows therefrom, if any, are subject to all prior

10   vested rights in the River.

11       MR. SACHSE:  That is right.

12       THE COURT:  Would you be satisfied with that, Mr.

13   Veeder?

14       MR. VEEDER:  I think that would be reflective of what

15   the law is.

16       MR. SACHSE:  I am in favor of it.

17       THE COURT:  All right, modify No. XI, the preliminary

18   part, to recite the facts and then draw your conclusion,

19   and be sure to get in that on the present state of the

20   record none of these permits has ripened into a license.

21       MR. STAHLMAN:  What is the language you used in your

22   Fallbrook findings?

23       MR. SACHSE:  That is about what I said.

24       MR. VEEDER:  I think if that language is used, it is

25   reflective of the facts in the case.  As I said before,

P 41

1    though, your Honor, I do have general objections to these

2    findings, and I want those preserved.

3         THE COURT:  This would mean that in the interlocutory

4    judgment -- we would have to look at that language again.

5         MR. SACHSE:  I think that can stand the way it is,

6    because that simply says they are the owners of the rights

7    previously described, whatever they are, and if Mr. Veeder's

8    finding says they are inchoate or whatever they are it will

9    refer back to that description.

10        THE COURT:  Yes, I think that is all right.

11        MR. VEEDER:  I want to be sure that what we have done

12   is curative of the objection I made.  "There are no presently

13   vested or inchoate" -- that is all right.

14        MR. SACHSE:  Yes, it is all right.

15        THE COURT:  Except as

16        MR. SACHSE:  Yes.

17        THE COURT:  And in No. IX we recite the facts that

18   they got permits and that none of the permits ripened into

19   a license.  And then in the final judgment we merely provide

20   that they are the owners of such rights as are found in

21   paragraph so and so.

22        MR. VEEDER:  On the basis of what I have said, it is

23   all right with me.

24        Your Honor, I have run off a rough draft of a suggested

25   form of order in connection with this Querry matter.  I have

P 42

1  talked to the men about it and they think it would be better

2  if your Honor would consider an order.  I am just giving

3  you the general form.  I will have it put in final form.

4      MR. GIRARD:  And copies of this will sent to Mr.

5  Stahlman and myself before Judge Carter has this submitted

6  for signature; is that correct?

7      MR. VEEDER:  Yes.  But what about you, Franz?

8      THE COURT:  What are you talking about now?

9      MR. SACHSE:  Sandia.

10      MR. VEEDER:  If you leave town before they are signed.

11      MR. SACHSE:  You sign them.

12      MR. VEEDER:  I would rather have the Court sign them.

13      MR. SACHSE:  Have them signed.  I just gave a note to

14  Commander Redd that as finally signed I want six copies.

15  That's all.

16      MR. VEEDER:  So your departure date is not the crucial

17  date then?

18      MR. SACHSE:  Not at all.  If you can toughen it up a

19  little on the appropriative rights, I am satisfied.

20      MR. VEEDER:  I am just trying to keep everybody happy.

21      THE COURT:  That looks all right.  Is that the general

22  form we have used before?

23      MR. VEEDER:  It is really more definite than before.

24  The next session is May 31?

25      THE COURT:  May 31 at ten o'clock.  I expect to see a

P 43

1    lot of material in here before that date.  Am I wrong in

2    my expectations?

3        MR. VEEDER:  You are not wrong in your expectations,

4    your Honor, and I hope that I am able to fulfill them.

5        MR. GIRARD:  I will have at least three or four sets

6    of findings by that time.

7        MR. VEEDER:  Your Anza Valley are not here now?

8        MR. GIRARD:  My Anza Valley are being typed for mailing

9    by my secretary and they should have been mailed now.  When

10   I left Monday morning -- I was only in the office half a

11   day, and I gave them to her.

12       MR. VEEDER:  It would save me time to mail them here,

13   whatever copies you have.

14       MR. GIRARD:  As a matter of course, I sent it to

15   Washington and here both.  Do you want me to discontinue

16   sending them to Washington?

17       MR. VEEDER:  It doesn't make any difference.  If you

18   will just send them here, my secretary is in constant touch

19   with me and I will get them.

20       MR. GIRARD:  All right, I will send my copies from now

21   on down here to Mrs. Tooker.

22       MR. VEEDER:  That is all right.

23       May I inquire, do you want comments on what was said

24   today in the arguments about findings on Temecula, or do

25   you want to hold that up until May 31st?

P 44

1      THE COURT:  What I think is more useful than comments

2  would be a proposed draft of how we are going to word this

3  and see if we can work out something along the line of Mr.

4  Sachse's suggestions.

5      I think also -- and I would like to ask Mr. Girard to

6  take a hand at this -- let's see what we can do as to getting

7  some definition of correlative rights.  I still have a fixed

8  idea that a right up in one corner miles away from another

9  right where the same source is involved is a correlative

10  right.  As a practical matter, it may never be called into

11  play, but from the strict legal standpoint I still think it

12  is a correlative right.

13      MR. STAHLMAN:  Whether a correlative right is a

14  quantitative right?

15      THE COURT:  It doesn't mean quantitative.  I am sure

16  of that.

17      MR. GIRARD:  You want us to try to work out some

18  definition as used in your judgment of "correlative."

19      THE COURT:  That is right.  We might put the definition

20  in so we will know what we are talking about.

21.      And I am going to try my hand at this on the Temecula-

22  Murrieta ground water area.  Of course, once we get some-

23  thing we are satisfied with, we could work out the Aguanga

24  fairly easily.

25      MR. VEEDER:  The same problem.

P 45

1    THE COURT:  Do you want to try your hand at some finding?

2    MR. GIRARD:  Wasn't I directed yesterday to start draft-

3  ing that? Is that the area just upstream?

4    THE COURT:  Yes.

5    MR. GIRARD:  I think your Honor told me to start draft-

6  ing findings on that yesterday.

7    THE COURT:  That is right.  But of course we were

8  thinking yesterday of the type of findings we had on the other

9  end of it.  If we are going to change, you may wind up with

10  a couple of sets.

11    MR. GIRARD:  I might add also that as far as the findings

12  I will draft on Murrieta on the one upstream from Vail Dam,

13  those, I am sure, will be mailed before next meeting and

14  maybe Mr. Krieger should be advised to be here so we can

15  iron this out, whether he wants to be here or not.

16    THE COURT:  Mr. Veeder, do you want to try your hand

17  and give some thought to these suggestions made and try

18  your hand at something?

19    MR. VEEDER:  All right, I would like to, your Honor.

20  I truly have to comprehend the points that were made, because

21  I didn't follow all the nuances that might be involved, if

22  you know what I mean.

23    THE COURT:  There are a lot of them.  But essentially,

24  that there is a difference between rights on the stream as

25  contrasted to rights on the ground water area.

T 42

1    MR. VEEDER:  In the percolating areas.

2    THE COURT:  The question I raised, that whether, even

3    if there is such a difference, the rights aren't correlative

4    in the sense that correlative means that you take into

5    account a lot of things -- your position on the stream,

6    amount of acreage, all the things that factually wind up

7    in getting some decision on the matter.  Looking ahead,

8    what would the future be if we go one way or the other?

9    And the problem I tried to raise in my one-page matter of

10   pointing out that these people in this ground water area

11   certainly have correlative rights as to the surface stream

12   with upstream owners and with downstream owners.

13   All right, anything further?

14   Have a good trip, Mr. Sachse.

15   MR. SACHSE:  Thank you, your Honor.

16   MR. VEEDER:  Yes, have a good trip, Mr. Sachse.

17   MR. SACHSE:  Thank you all.

18   THE COURT:  And I will expect to see this work

19   progressing.  Colonel Bowen, will you report to me

20   occasionally as to what progress you are making if Mr.

21   Veeder is not around here?

22   COLONEL BOWEN:  Yes, sir.

23   THE COURT: All right, May 31st at 10:00 o'clock.

24   (Adjournment until May 31, 1961 at 10:00 a.m.)

25        - - -

t-2

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DISTRICT

- - -

UNITED STATES OF AMERICA, )
          )
     Plaintiff, )
          )
vs.          )   No. 1247-SD-C
          )
FALLBROOK PUBLIC UTILITY DISTRICT, )
et al.,        )
          )
     Defendants. )

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are,
and on the date herein involved, to wit: May 4, 1961,
were duly qualified, appointed and acting official reporters
of said Court;

That as such official reporters we did correctly
report in shorthand the proceedings had upon the trial of
the above entitled case; and that we did thereafter cause
our said shorthand notes to be transcribed, and  the within
and foregoing  87  pages of typewritten matter constitute a
full, true and correct transcript of our said notes.

WITNESS our hand at San Diego, California, this 4th
day of May, 1961.

        _John Swader_
         Official Reporter

        _Marie G. Zellner_
         Official Reporter

MARIE G. ZELLNER, OFFICIAL REPORTER