VOLUME NO. 151                                            MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                              Plaintiff

                                                    No. 1247-SD-C

BROOK PUBLIC UTILITY
RICT, et al.,

                              Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         May 31, 1961

        Pages:    16,953  to  17,065

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 151

16,953

t-1

1      IN THE UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF CALIFORNIA

3      SOUTHERN DIVISION

4      - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6      - - -

```
7   UNITED STATES OF AMERICA,        )
                                     )
8                    Plaintiff,      )
                                     )
9   vs.                              )    No. 1247-SD-C
                                     )
10  FALLBROOK PUBLIC UTILITY         )
    DISTRICT, et al.,                )
11                                   )
                                     )
12                   Defendants.     )
    _____)
```

13

14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15      San Diego, California

16      Wednesday, May 31, 1961.

17      - - -

18  APPEARANCES:

19      For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
20                                  Attorney General

21                                  CDR. DONALD W. REDD

22      For the Defendants:

23          Vail Company            GEORGE STAHLMAN, ESQ.,

24          STATE OF CALIFORNIA     FRED GIRARD, ESQ.

25          Roripaugh, et al.,      BEST, BEST & KRIEGER
                                    BY:  JAMES KRIEGER, ESQ.

16,954

1   APPEARANCES:     (Continued)

2       For the Defendants:

3           Sawday in re Parcels          ROBERT E. McGINNIS, ESQ.
            59 and 60:
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16,954-A

t-69

## I N D E X

| WITNESSES | DIRECT |
| --- | --- |
| Robert Poore | 16,956 |
| John Lewandowski | 16,966 |
| Harold A. Andersen , Jr. | 16,973 |

## E X H I B I T S

No exhibits offered or received.

t-3                                                                    16,955

- - -

(Other cases called.)

THE CLERK:  Number three, 1247-SD-C, United States of America vs. Fallbrook.

MR. VEEDER:  May we proceed, your Honor?

THE COURT:  Yes.  Are any persons present from areas in the watershed to whom letters have been sent?

MR. VEEDER:  Yes.  Mr. Poore is here, your Honor.  You will remember the Gibbon and Cottle matter.   They put in their evidence, and the property immediately downstream from Gibbon and Cottle is the Poore property.

We sent notices to them, and I have a letter here from them that I would like to hand up to your Honor, and Mr. Robert Poore, the son of Mr. Poore, is in the courtroom, so I suggest you might want to talk to him about this matter so long as he is here.

He tells me he does not have intimate knowledge respecting the individual tracts, but I think it might be helpful to him to have you outline the circumstances there, or if you want me to, I will.

THE COURT:  Will you come forward, Mr. Poore?  You may come up here, and it will be a lot easier to talk to you.  You can sit down here on the witness stand.

Do you work for the Forest Service?

t-4                                                                16,956

1       ROBERT POORE:  Yes, sir.

2       THE COURT:  You are the son of the people who own this

3  property?

4       ROBERT POORE:  Yes, sir.

5       THE COURT:  They apparently have one parcel of about

6  forty-nine and one-half acres, and another of about fifty-four

7  and one-half acres?

8       ROBERT POORE:  Yes, sir.

9       THE COURT:  These areas, as you may guess, are the

10  approximate areas.  Sometimes these quarter sections run more

11  or less, depending upon the survey.

12       Do you have a map showing the area of this Poore property,

13  Mr. Veeder?

14       MR. VEEDER:  I will try to find it here.

15       THE COURT:  You might as well swear Mr. Poore as a

16  witness.

17

18                    ROBERT POORE,

19  called as a witness herein, having been first duly sworn,

20  testified as follows:

                    DIRECT  EXAMINATION

21       THE CLERK:  Would you state your name, please.

22       THE WITNESS:  Robert Poore, P-o-o-r-e.

23       MR. VEEDER:  I have this map, your Honor.

24       THE COURT:  What is the parcel number?

25       MR. VEEDER:  Do you have the letter there?

t-5                                                                              16,957

1        THE COURT:  I have the letter.  Parcel 81E-19-46 and

2   81E-20-59.   19 and 20, are those the section numbers?

3        MR. VEEDER:  Yes, that is right.  And you said the number

4   was what?

5        THE COURT:  81E-19-46, and 81E-20-59.

6        MR. VEEDER:  I will put this up on the board here, your

7   Honor.

8        (Thereupon Plaintiff's Exhibit 210-C was placed on the

9   blackboard.)

10        THE COURT:  Let me take a look at it.

11        MR. VEEDER:  Maybe we had better move this down a little,

12   but I think this will show that the land is basement complex,

13   although he does have a claim that he is riparian.

14        Now, you see it is Township 8, Range one East, Section

15   19 and Section 20, and the numbers are 46 and 59.  Here is

16   46 (Indicating).

17        THE COURT:  Is this 44 supposed to be erased?

18        MR. VEEDER:  No.

19        THE COURT:  There is a circle around it.

20        MR. VEEDER:  46 is the right one here (Indicating).

21        THE COURT:  And 59 is here (Indicating).  These two

22   pieces corner on each other?

23        THE WITNESS:  Yes.

24        THE COURT:  They have a common corner is all, and are

25   adjoining?

16,958

t-6

1   THE WITNESS:  Yes, sir.

2   THE COURT:  Is this the watershed line here, Mr. Veeder?

3   MR. VEEDER:  No, this is the watershed line here of

4   Temecula and Wilson Creek.

5   THE COURT:  This must be Section 19?

6   MR. VEEDER:  Right.  Then you find 42, and 42 is the

7   one that is riparian, you see.   These two pieces are up here

8   (Indicating).

9   THE COURT:  In 19?

10  MR. VEEDER:  That is right.

11  THE COURT:  Or one is in 19 and one is in 20?

12  MR. VEEDER:  Yes, and 42 is in 19, and that is the one

13  over here (Indicating),  I mean Parcel 42, and that is

14  traversed by the stream.  The other two parcels up here are

15  obviously not riparian.

16  THE COURT:  We ought to have section numbers on these.

17  MR. VEEDER:  We will find these.  We will take this.

18  THE COURT:  This is 46 and this is 59 (Indicating).

19  They are up in the northwest corner of 19.  I have a map with

20  the sections on it.

21  MR. VEEDER:  Yes, we have that.  Can you hold that?

22  MR. GIRARD:  Surely.

23

B fls

24

25

16,959

1    THE COURT:  I have it here on my Exhibit 15 -- I have

2 all the sections.  Radec is in 19, isn't it?

3    MR. WILKINSON:  Yes, Radec is right there (Indicating),

4 the intersection of those two.

5    THE COURT:  I have it here in 19 and 20.  It is all in

6 the older alluvium, and part of it is in the younger.

7    MR. WILKINSON:  Except 42.

8    MR. VEEDER:  Your Honor, Exhibit 275 is the map to look

9 at to line this up.

10    THE COURT:  Do you want to step down here, Mr. Poore?

11    THE WITNESS:  Yes, sir.

12    (Stepping down from the witness stand.)

13    MR. VEEDER:  Here is 42.

14    THE COURT:  Now, Mr. Poore -- if you will come around

15 here -- are you familiar with the colors we used on these

16 maps?

17    THE WITNESS:  No, sir, I am not.

18    THE COURT:  The blue is what we refer to as basement

19 complex.  That is, it is practically solid rock.  There may

20 be a little loose material on top, but it is essentially a

21 rock formation, maybe sometimes weathered on top.

22    The yellow is the younger alluvium.  It is the type of

23 thing you find in the bottom of little streams, loose gravel

24 and loose material, and permeable and water bearing.

25    The orange is what is called older alluvium, and it is

t-8

16,960

1    an older fill, more compact and less permeable, but still

2    water bearing.

3         First of all, we have two problems on the stream:  One,

4    surface water and, two, ground water under the ground.

5         As to surface water, water that comes by rain and runs

6    down the gullies into the streams, that is all part of the

7    stream system of the Santa Margarita.

8         As to ground water, any water found in the blue area, the

9    basement complex, we refer to it as local, vagrant, percolating

10   water and not part of the stream system.  Because, anybody who

11   gets any water in there is just lucky to have it.

12        So taking the parcels of your folks -- here is 59, which

13   lies entirely over the older alluvium, and here is 42 -- the

14   stream traverses 42.  So that what we would find as to 42

15   would be two or three things:  We would find, first, that

16   since the stream traverses 42 all that ground is riparian,

17   whether it is basement complex or not, and any of it that is

18   irrigable would have a right to share in the water on the

19   stream because it is all adjacent -- the stream traverses it,

20   and the owners of that property would have correlative rights

21   with other people on the stream to their fair share of water

22   out of that stream for 42.   As to any wells that could be

23   drilled in the area of the blue, omitting the stream bed here,

24   that water would belong entirely to that land owner, subject

25   only to some neighbor next door who might complain.  But,

16,961

t-9

1   actually, it is vagrant, local, percolating water under-

2   ground and not part of the stream system.  We would so find.

3       This little corner over here is over the older alluvium

4   and technically, of course, that water in there --

5       Let's see how this map differs.

6       MR. VEEDER:  This would be in the Aguanga ground water

7   basin, your Honor.

8       THE COURT:  Would 42 be in the basin, too?

9       MR. VEEDER:  No, sir, I don't think that should be.  I

10  think we should have a finding to that effect.

11      THE COURT:  Eliminate that?

12      MR. VEEDER:  I would do that.

13      MR. GIRARD:  There wouldn't be any possibility of any

14  of this water affecting anybody in here, I wouldn't think.

15  I don't know.

16      THE COURT:  As to the other two parcels up here, 46

17  and 49, they are not riparian to this stream and they have

18  have no riparian rights to the stream.  However, from the out-

19  line of this ground water basin that takes in generally this

20  orange and yellow and we are holding that everybody in that

21  area have a right to share correlatively in that ground water.

22  So that as to 46 and 49, although they would not be riparian

23  to the stream, they would have correlative rights with other

24  persons in that ground water body to share water.  But the

25  water under those parcels is not local, percolating water but

16,962

t-10

1    is part of the stream system.

2       Now, have I made any sense?

3       THE WITNESS: Yes, you have helped quite a bit.

4       THE COURT: I would ask that the reporter write up this

5 page or two, and you can take it back and talk to your Dad and

6 Mom about it and give them some idea of what we would be

7 finding.

8       THE WITNESS: All right.

9       THE COURT: Have I omitted anything there about what we

10 would find?

11       MR. VEEDER: No, I think that is correct, your Honor.

12 The geology has been depict and the riparian lands have been

13 testified to. There is one problem, though, that I think is

14 extremely important, and that would be the relationship of

15 the findings that Gibbon and Cottle are going to tender some

16 day, because they are immediately upstream from Mr. Poore.

17       THE COURT: I might add that as to Gibbon and Cottle

18 there is a loose end.

19       Does Mr. Stark represent Gibbon and Cottle?

20       MR. VEEDER: That is Mr. Stark, your Honor.

21       THE COURT: There is a loose end in that that case has

22 not been completed. Mr. Stark has asked for more time.

23       Gibbon and Cottle are claiming a prescriptive right.

24 They have claimed that they have used water out of that

25 stream for a long time. And we have indicated -- and I don't

think I am overstating it -- we have indicated that the

Court doesn't think they have a prescriptive right.  However,

the door has been left open for them to bring in more

evidence.  Obviously they have riparian rights.  But we have

so far not found any prescriptive rights, have we?

MR. GIRARD:  We specifically found that they didn't have

any prescriptive rights, your Honor.  The open thing is a

possible appropriative right, which would only run against

upstream people.

THE COURT:  We have found that they do not have a

prescriptive right based upon long user which would give them

a right, as they claim, to all of the water they have been

taking from the stream.

They are now claiming an appropriative right, a right to

reach upstream and take water.  And that is left open.  If

they don't have an appropriative right, and they don't have a

prescriptive right, then they are in exactly the same position

that your parents are in, in that they have riparian rights

which must be shared correlatively.

MR. VEEDER:  May I inquire from Mr. Poore for just a

moment, your Honor.

Is it correct that your folks -- the stream has been

dried up to the point where you don't even get domestic water

down there?

THE WITNESS:  That is right.  It goes completely dry.

t-12

16,964

1    That is where the biggest majority of the difficulty has

2    been.

3          THE COURT:  Do they live on that property?

4          THE WITNESS:  My parents do, yes, sir.

5          MR. VEEDER:  May the record show that I have called Mr.

6    Stark and told him of this hearing.  I realize that I am

7    giving myself a hand here, but I want it clear that Mr. Stark

8    was notified.  And also that Mr. Poore was represented here.

9          THE COURT:  Mr. Poore was present, you mean?

10         MR. VEEDER:  That is what I mean.  I think he is

11   representing his father, so far as we are concerned.

12         THE COURT:  Yes.

13         If -- I say "if" because the Gibbon and Cottle case is

14   not closed -- if Gibbon and Cottle do not have an appropria-

15   tive right, and we have found that they do not have  a

16   prescriptive right, then they wind up with a riparian right,

17   which would be the identical right that your parents would

18   have to Parcel 42; and the essence of this right is that each

19   has a correlative right to the use of water -- nobody could

20   take it all, but each could make a reasonable use -- and you

21   would have no problem in enforcing the right to use water in

22   42.

23         What about the rest of Parcel 42?  It runs over.  I am

24   talking about the end of it here.  Where does this big piece

25   of older alluvium run to?  Is that outside of the ground

t-13                                                                        16,965

1    water area?

2         MR. VEEDER:  That would be.

3         MR. GIRARD:  This is it here (Indicating map).

4         THE COURT:  It is pretty isolated.

5         MR. GIRARD:  I would certainly think that we could

6    regard that isolated piece of vagrant, local, percolating

7    water, the whole thing.

8         THE COURT:  Mr. Veeder, this is the area we are talking

9    about.  Is there any objection to treating that whole area

10   as being vagrant, local, percolating?

11        MR. VEEDER:  I would think it is not part of the stream

12   system, your Honor.

13        THE COURT:  All right, I will so find.

14        So that as to Parcel 42, then, you would ignore this

15   piece of older alluvium here and consider the entire area of

16   Parcel 42, except the stream bed, any ground water is local,

17   vagrant, percolating water and not part of the stream system.

18   The stream bed of younger alluvium is different.  Any ground

19   water in there is part of the stream system.  Also, that the

20   whole area is riparian to the stream and you have a right to

21   use that water on that.

22        Do you have any questions that we can answer for you?

23        THE WITNESS:  No, sir, I don't believe so.  It helps

24   quite a bit.

25        THE COURT:  All right.

t-14

16,966

1   MR. VEEDER:  Mr. Lewandowski.

2   Mr. Lewandowski is in the courtroom, your Honor.

3   Could you step forward, please?

4   THE COURT:  Swear him, Mr. Clerk.

5

6                    JOHN LEWANDOWSKI,

7   one of the defendants herein, being first duly sworn, on his

8   oath was examined and testified as follows:

9   THE CLERK:  State your name, please.

10   THE WITNESS:  John Lewandowski.

11   THE COURT:  Where is your property located, Mr. Lewandow-

12   ski?

13   THE WITNESS:  This is wrong, to begin with.  It should

14   be Township 9 rather than Township 8 (Marking the map).

15   MR. VEEDER:  Let the record show that he is drawing the

16   outside boundaries of his property on Plaintiff's Exhibit

17   281.

18   THE COURT:  Exhibit 281.

19   Where is the stream?

20   MR. VEEDER:  This is Chihuahua Valley.

21   THE COURT:  Does the stream run through your property?

22   THE WITNESS:  No, sir; it is down below.

23   MR. VEEDER:  He is on land that appears to be overlying

24   in there.

25   Will you state the developments that you are making?

1  THE WITNESS:  Since then I have been clearing this land.

2  I wanted to know how they arrived at this figure.  I have

3  been clearing this land for the sole purpose of irrigating

4  pasture.

5  MR. VEEDER:  Do you have a well?

6  THE WITNESS:  There is an old existing well which we

7  put down to 16 feet.

8  THE COURT:  A dug well?

9  THE WITNESS:  Yes, a dug well.

10  THE COURT:  How much water do you get out of it?

11  THE WITNESS:  I have never measured it.

12  THE COURT:  Do you have a pump on it?

13  THE WITNESS:  No.

14  THE COURT:  You are not going to get very much water out

15  of it.

16  THE WITNESS:  No.  I intend to go deeper.  When I get

17  more money I want to have wells drilled there.  I want to
                    start
18  know when I ^irrigating pasture.  Every week they are taking

19  aerial photos and give me a different figure.  I am up every

20  weekend now.

21  THE COURT:  Are you familiar with how much of this is

22  irrigable, Colonel Bowen?

23  COLONEL BOWEN:  Not on that specific property, your

24  Honor.  I can state, though, that the information came

25  primarily from aerial photographs and topographic maps.  We

t-16

16,968

1   have done some detailed surveys on other properties in

2   Chihuahua Valley.

3   THE COURT:   I understand that these areas of irrigable

4   ground are not res judicata at a later hearing.   Isn't that

5   correct?   Changed conditions can change the findings as to

6   irrigable ground?

7   MR. VEEDER:   I think that is correct, your Honor.

8   THE COURT:   The only concern that I think he would have

9   would be whether there would be anything res judicata in this

10  finding of five acres of irrigable ground.

11  MR. VEEDER:   I would rather have it checked out and

12  straightened out and to notify him.   I think he is entitled

13  to know.   It is entirely possible that a check would show

14  something contrary, your Honor.

15  THE WITNESS:   Contrary to what?

16  MR. VEEDER:   Show a larger irrigable acreage.

17  THE WITNESS:   That is right.

18

c fls

19

20

21

22

23

24

25

t-17

C-1

1        THE COURT:  All right.  Do that.  Let me show you what

2    the colors mean on this map.  Are you familiar with this?

3        THE WITNESS:  No.

4        THE COURT: The blue is basement complex area where there

5    is underground solid rock.  You may have some soil on top,

6    but that isn't very much.  Then "B.C." is a very similar

7    area, and it is basement complex, but there is a little more

8    soil   on top, but down below is rock.  So taking only these

9    two colors for the time being, we are uniformly finding that

10   any ground water you find in areas of basement complex or

11   basement complex weathered is local, vagrant, percolating

12   water and not a part of the stream system, so on that part

13   you have no problem.  You might have a problem with a

14   neighbor if you had a well here ten feet from the line, and

15   he had one ten feet on the other side, and you might have

16   to share with him.  But so far as the stream system is

17   concerned, the major portion of your ground is in basement

18   complex or weathered basement complex, and if you get any

19   appreciable amount of water out of it, you are welcome to it.

20   You might get some seepage, or something like that, down in

21   the decomposed rock or the granite below, because some of the

22   area often carries water.

23       Now, in the area of the yellow, this is called younger

24   alluvium, and there is a fill of looser material there which

25   is water bearing, so any ground water in the yellow is a part

1   of the stream system.

2       It looks from the map like you have one little sliver in

3   here in the south part of Section 9, and then up towards the

4   center or above the center of Section 9, it looks also like

5   you overlie some of this looser same material.  Are you

6   familiar with that material on your property?

7       THE WITNESS:  Right.

    THE COURT:

8   Now, ordinarily, if you have got a well there, the

9   holding would be that any ground water out of that area is

10  a part of the stream system, which would mean that you would

11  have correlative rights with other people on the stream system,

12  and particularly the other people in a similar kind of an

13  area.  Do you understand that?

14      THE WITNESS:  Yes.

15      THE COURT:  Now, this is just sort of a guess, but I

16  have extreme difficulty in thinking or ever imagining a

17  system where with an area such as the Chihuahua Valley, and

18  the amount of irrigable acreage that exists up there, there

19  could be a limitation of uses for the benefit of people down

20  below.

21      What is your view, Colonel?  Do you think with the

22  shallowness of the younger alluvium up here, and the area of

23  irrigable ground that, as a practical matter, there would

24  ever be a regulation of that area for downstream areas?

25      COLONEL BOWEN:  I would like to add one more limiting

t-19

16,971

1    factor, the very small area up above that may contribute to

2    the alluvium.  The alluvium is of a character, as you

3    mentioned, shallow, and is indicated by the outcroppings of

4    the basement complex through there, and there is no question

5    in my mind that the limited amount of water overlying

6    Chihuahua Valley could be utilized on riparian land.

7         THE COURT:  What this means is that all the people in

8    this area (Indicating), clear on down to Vail and Santa

9    Margarita, have correlative rights, but, as a practical

10   matter, if you are right at the rim of the watershed, you

11   don't have back country to fill there.  You have a lot of

12   irrigable ground and a very shallow basin, so as a practical

13   matter it seems to me there couldn't be a limitation put on

14   Chihuahua Valley for the benefit of people below.  You may

15   have some problems between yourselves.

16        Do you have any other questions?

17        THE WITNESS:  The only other question is the amount of

18   the acreage.

19        MR. VEEDER:  We will check that.

20        THE WITNESS:  Because I keep knocking this brush down,

21   and this weekend there is a bulldozer coming down on that.

22        THE COURT:  There is no limitation as to what you do.

23   Suppose you have 40 acres that are irrigable now, and ten

24   years from now you get into a row with some of your friends

25   up here, but you can prove that you have 60 acres.  Our

t-20

16,972

1   findings on the irrigable acres are not res judicata.  It is

2   not that kind of a finding.

3          THE WITNESS:  No.  That is what we wanted to know.

4          THE COURT:  But if you were going down in the area of

5   the younger alluvium --

6          THE WITNESS:  No.  It is in this area (Indicating).

7          MR. VEEDER:  That is surface water over here, and you

8   are going over here (Indicating)?

9          THE WITNESS:  Down into here (Indicating).

10         THE COURT:  In that corner?

11         THE WITNESS:  Not in that particular corner, but right

12  close to it is one of them -- is one that I intended to go

13  into because it did look prospective.

14         THE COURT:  Are there any other questions?

15         THE WITNESS:  No.

16         THE COURT:  All right.

17         MR. VEEDER:  Is this the correct address shown here?

18         THE WITNESS:  No, sir.

19         MR. VEEDER:  Then would you state the correct address,

20  please.

21         THE WITNESS:  6307 Lake Arrowhead Drive.

22         MR. VEEDER:  San Diego?

23         THE WITNESS:  San Diego, California.

24         MR. VEEDER:  All right.

25                                  (Witness excused.)

16,973

MR. VEEDER:  Mr. and Mrs. Andersen are in the courtroom, your Honor.

THE COURT:  Will you come forward, Mr. Andersen?  You speak for the family, I suppose.

MR. ANDERSEN:  Yes.


HAROLD A. ANDERSEN, JR.,

called as a witness herein, having been first duly sworn, testified as follows:

THE CLERK:  Will you state your name, please.

THE WITNESS:  Harold A. Andersen, Jr.

THE COURT:  What is your problem, sir?

THE WITNESS:  Well, we just acquired this land; myself and another real estate broker, I should say.

MR. VEEDER:  That is Parcel 145, your Honor, in Sections 7 and 18, Township 9 south, range two east.

THE COURT:  As I see it on the map here, apparently it is all riparian to the stream.

THE WITNESS:  Yes, it is, and we have two wells on it.

MR. VEEDER:  What is your thought on it?

THE WITNESS:  Well, we just acquired it, and they just forwarded this letter to us, so I didn't want something to happen before we knew what we were going to do, so I thought I ought to come down and see about this.  Now, we have a well here (Indicating).

t-22                                                                                16,974

1        MR. VEEDER:  You are pointing to Section 7, --

2        THE WITNESS:  Yes.

3        MR. VEEDER:  -- Township 9 south, range two east.

4        THE WITNESS:  Yes.  We have two wells.  One down by the

5    house, a domestic well, 140 feet, and then we have one here

6    that goes down 376 feet, and it is capped.   We don't know

7    what it will do.  I have talked to the well fellows that put

8    the well in, and we are going to test it, and we were

9    thinking of putting a reservoir in there, that is, if we have

10   enough water.

11       THE COURT:  What is the township and range again?

12       MR. VEEDER:  9-2-east.

13       THE WITNESS:  9-2-E.

14       THE COURT:  Do we have it shown on a better sketch?   Is

15   it on this plat over here?

16       MR. VEEDER:  This is Section 7, 9-2E.  This is it right

17   here (Indicating).

18       THE COURT:  Mr. Andersen, did you hear what I had to

19   say about the colors on these maps?

20       THE WITNESS:  No, I didn't.

21       THE COURT:  Your property is partly in 7 and partly in

22   18?

23       THE WITNESS:  Yes, a little piece here (Indicating).

24       THE COURT:  In 18?

25       THE WITNESS:  Yes.  The whole creek runs through it

1    except for two little points.

2        THE COURT:  Now, there are two kinds of water in this

3    watershed that we are interested in.  One is surface water,

4    and the other is water that you find under the ground.  All

5    surface water is a part of the stream system, and that means

6    that everybody that has rights in the stream system has

7    correlative rights in the surface water that flows there.

8        As to the ground water, the blue area, that is basement

9    complex.  That is essentially rock.  There may be a little

10   weathered on top, that is, there may be a foot or two of

11   some kind of soil on top, but actually it is an area under-

12   lain by practically solid rock, and any water that you find

13   in the blue area is local, vagrant, percolating water, not

14   a part of the stream system, so you can have at that, if you

15   can get a well in there.

16       THE WITNESS:  We can pump it right out if we have got

17   it?

18       THE COURT:  If you are in the blue area, in the basement

19   complex.

20       THE WITNESS:  We are.  This is the area here (Indicating).

21       MR. VEEDER:  Your Honor, suppose there was a well right

22   here in the basement complex (Indicating), and it was shown

23   that the Conant depression really affected the surface stream

24   as far as that is concerned.

25       THE COURT:  If the well was affecting the stream system,

16,976

t-24

1    that is a different story.  But what I am talking about is

2    getting into an area where you are not affecting the stream,

3    and you are in the basement complex area.

4        The yellow area is what we speak of as younger alluvium.

5    It is a looser material, the type of thing that you find at

6    the bottom of stream beds.

7        THE WITNESS:  We go through solid rock, because the well

8    driller told me in '60 they went through solid rock to 376

9    feet, and hit water, and it is supposed to have run 100

10   gallons a minute, so we are going to put a test on it and

11   see what it will do.

12       THE COURT:  All your land is riparian.

13       THE WITNESS:  Yes.

14       THE COURT:  Which means that you would have a right to

15   water from off of the stream system for your irrigable land.

16       THE WITNESS:  Does that mean we can put in a reservoir

17   and do what we want with it?

18       MR. GIRARD:  No.

19       THE WITNESS:  Yes and no.  You can put in a reservoir

20   to create a head, and irrigate with it, but not to store

21   water seasonally from dry periods to wet periods.

22       THE WITNESS:  What I meant is to put in a fish pond.

23       MR. GIRARD:  That is seasonal.

24       THE WITNESS:  That is right.

25       THE COURT:  You were talking about the stream system?

t-25

16,977

THE WITNESS: No, out of this well. We have got running water down in the river, and we thought to dam it up, but they told us we had better not, but we have lots of running water down there, and there is a little pond, and someone told me you could probably build a small six foot or four foot reservoir, or dike or dam, just so you don't stop the flow of the water, but hold it back a little bit, because 50 feet after our property you go underground.

THE COURT: You haven't been up there when we have had a flood?

THE WITNESS: No, but you can see it comes through.

MR. VEEDER: You would have a hard time catching up with your fish. They would stop at Vail's reservoir, that is one thing.

THE COURT: If you get a runoff, you get a tremendous amount in a narrow canyon like that, and everything goes out.

MR. VEEDER: There is a problem though, is there not, and I am not trying to throw any cold water on your fish, but I do feel that there is not very much water up there, and if you try to pump it, you might have some difficulty.

MR. GIRARD: Of course, if he does not use consumptively any of the water, then, of course, it is a different situation. In other words, if you put up a dam, and such water flows in its natural course over here, you are not losing any except your slight evaporative loss.

16,978

t-26

1      (Discussion between the Court and Colonel Bowen off the

2  record.)

3      THE COURT:  We are trying to find out what this is, and

4  we will want this on the record later.

5      Mr. Veeder, apparently he has this quarter of a quarter,

6  and this quarter section, and the road angles up and into

7  all of that.

8      MR. VEEDER:  In other words, in Section 18 -- let's

9  straighten this out on the record -- on Exhibit 281 your

10  Honor has drawn in the property of Mr. Andersen, which is

11  Tract 145, and we can put the tract number on it.  145 is

12  your tract number.

13      THE COURT:  Here is what I propose to find, Mr. Andersen:

14  To find, unless the Government turns up some evidence that

15  there has been a severance of title in the past, that all of

16  your land is riparian, and as a riparian you have correlative

17  rights to theuse of the water in the stream system with all

18  other persons who have rights in the stream system.

19      How much irrigable land is there there?

20      THE WITNESS:  Well, there is more than 48 acres.  We

21  think there is more than that, too.

22      MR. VEEDER:  We will check that out, your Honor.

23      THE COURT:  Check it out again, Mr. Veeder.  These are

24  not what we call res  judicata findings.  Later on, if you

25  find that you have more irrigable acres, or changed conditions,

t-27

16,979

1   or matters of that sort, you will be able to show it.

2       As far as the number of acres is concerned, they have

3   been doing that by aerial photographs. Is that not right,

4   Colonel?

5       COLONEL BOWEN:  Yes, sir.  We used aerial photographs

6   and maps, and spot checking in the field.

7       THE COURT:  These sections, you know, do not always run

8   true.  They may run more or less.

9       THE WITNESS:  We found that out.

10      THE COURT:  And you have an angling line here, which is

11  a question.

12      I will find also that as to any of your land overlying

13  the blue, the basement complex area, that any water over it

14  is local, vagrant, percolating water, not a part of the

15  stream system, and you can do with it as you please.  That

16  as to the area of your land overlying younger alluvium, this

17  portion in the south, this portion along the stream bed, and

18  this portion up in the northwest corner --

19      MR. VEEDER:  In Section 7.

20      THE COURT:  -- in Section 7, that any underground water

21  is a part of the stream system, and you would have to share

22  that, the same as you would any water in the stream.

23      As to putting down a well, if you put it down in the

24  stream bed that goes down in the basement complex, but at the

25  same time catches water out of the stream bed of the younger

16,980

t-28

1  alluvium, you are going to be subject to correlative rights

2  with all other persons on the stream, which would not be

3  true with a well over -- well, for instance, I don't know if

4  K-1 is on your property.

5  THE WITNESS:  We have a well here and a well here

6  (Indicating) by the house.  This one is 140 feet, and the

7  other is 376 feet deep, and that is the one we are going to

8  test.

C-3

9  THE COURT:  You are designating it as K-1 in Section 7?

10  THE WITNESS:  Yes.

11  THE COURT:  You can have at that one.

12  MR. VEEDER:  Are you pumping that one now?

13  THE WITNESS:  No, it is capped.  They have never pumped

14  it.

15  MR. VEEDER:  I can't understand that, but it is probably

16  because it hasn't much water.

17  THE WITNESS:  There is water there.

18  MR. VEEDER:  Well, I don't know.

19  THE WITNESS:  We will find out in a week or so.  There

20  is water 46 feet from the top of the well, and it is 376 feet

21  deep, so we will have it run.

22  THE COURT:  You will find out how much it will yield?

23  THE WITNESS:  Yes.  They say about 100 gallons a minute,

24  so we will let it run for a week or two, and fill up a little

25  reservoir.

THE COURT:  Now, in regard to the well, if you have got 100 gallons a minute out of that well, you have a gold mine; that is, for any period of time.   Of course, they may have pumped 100 gallons for a minute.

THE WITNESS:  Well, they told us that.

MR. VEEDER:  But you do have a well up here (Indicating) do you?

THE WITNESS:  By the house, yes, and we have a submergible pump on it, and they are pumping it, and it seems to  have irrigated a few trees there by the house, and there seems to be plenty of water there, too.

THE COURT:  That might be D-1, -3, or -4?

COLONEL BOWEN:  It is D-3, your Honor.

THE COURT:  D-3.

MR. VEEDER:  Now, with respect to the last owner, you acquired this property from a grantor named Roberts?

THE WITNESS: That is right.

MR. VEEDER:  I wanted to straighten that out.

THE COURT:  Can we answer any other questions for you?

THE WITNESS:  I think that is good enough.

THE COURT:  All right.

(Witness excused.)

MR. VEEDER:  Your Honor, this letter from Mr. Poore, the letter dated May 29, 1961 to your Honor, signed by Paul R. Poore, which you have read, I would like to make that a

1   part of Exhibit 207-E.

2        THE COURT:   In the series of other similar letters?

3        MR. VEEDER:   Yes.

4        THE COURT:   It will be made a part of U. S. Exhibit

5   207-E.

6        MR. VEEDER:   And the letters signed by Mr. Poore in

7   which there is reflected agreement as to the irrigable

8   acreage, I would also make that a part of 207-E, --

9        THE COURT:   All right.

10       MR. VEEDER:   -- together with the letters that your

11  Honor has received showing agreement as to the irrigable

12  acreage.

13       THE COURT:   All right.

14       MR. VEEDER:   Will that be done, your Honor?

15       THE COURT:   That will be done, and they will be made a

16  part of Exhibit 207-E, Mr. Clerk.

17       THE CLERK:   Yes, your Honor.

18                            (Thereupon the documents        )
                             (referred to were made a part )
19                            (of Plaintiff's Exhibit 207-E.)

20       THE COURT:   All right.   That takes care of all of these?

21       MR. VEEDER:   I want to check if there is anybody in my

22  office, your Honor.   I think that will be all of them.

23       MR. GIRARD:   I might add that I drafted up the proposed

24  findings in regard to the Murieta-Temecula area, and I passed

25  them out also to counsel, and put a copy up on your Honor's

1   desk for whatever value it may have for your Honor's

2   discussion.

MR. VEEDER:  May we wind this up first?

4   MR. GIRARD:  I wasn't suggesting that we discuss them

5   now, but just pointing out to his Honor what we have.

6   MR. VEEDER:  I think that may be next.  That is all,

7   your Honor.

8   THE COURT:  These people who have written letters to me

9   and who are essentially people who do not live in the area,

10  that is, you probably noticed they came from elsewhere, do you

11  have any suggestion as to replies?

12  MR. VEEDER:  I will prepare replies for your Honor's

13  signature.

14  THE COURT: Then what is the next matter for us to

15  consider?

16  MR. VEEDER:  It seems to me that the next matter would

17  be the Murieta-Temecula ground water or basin, whatever your

18  Honor has designated it.

19  THE COURT:  Let me read what Mr. Girard has prepared

20  here.

21  MR. KRIEGER:  In that connection, your Honor, --

22  MR. VEEDER:  May I be excused from Court for just a

23  minute, your Honor?

24  THE COURT:  Yes.

25  MR. KRIEGER:  In that connection, your Honor, I have

t-32

16,984

prepared again just some conclusions of law to follow up on these same findings, and why don't I make them available at the same time.

THE COURT:  Yes, sir.

(Thereupon the document was handed to the Court, and the documents referred to were examined by the Court.)

D fls

Take D

P 1

1   THE COURT:  Where did you get your definition of

2   "correlative rights"?  You drew that up yourself?

3   MR. GIRARD:  Yes, your Honor, I worked that up after

4   reading some cases and general background knowledge.  I

5   didn't find any definition in any specific case, and I

6   didn't find any in Words and Phrases.  But the language here

7   used I have to claim myself.

8   THE COURT:  Has counsel had a chance to look at the

9   material submitted here?

10   MR. KRIEGER: Yes.  I have a few comments on them, your

11   Honor.  I have compared them with the findings that were

12   put in the record on May 3rd and see that Mr. Girard has

13   amplified those findings to some extent, but I don't think

14   he has changed them.  I do think he has made them more

15   definitive, and from my point of view they are, I think,

16   better than they were.

17   I do have one or two comments, if I may address myself

18   to them.

19   THE COURT:  All right.

20   MR. KRIEGER:  On page 3, Finding No. V really says

21   that pumping in the older alluvium affects, to a limited

22   but presently undetermined degree, the flow in the Santa

23   Margarita River.  I think the same thing is true as to

24   pumping in the younger alluvium in both the Murrieta and

25   the Pauba Valleys, to an undetermined degree.  I think we

P 2

1 could either add that phrase "presently undetermined" or

2 simply strike, on line 12, so that it would read "to a

3 limited degree the surface flow of the Santa Margarita

4 River and the pumping from the younger alluvium in Murrieta

5 can affect the flow of the Murrieta Creek." And the same

6 thing with Pauba.  So I would simply suggest deleting those

7 three words "but presently undetermined." I think it

8 either ought to be deleted or added in all three places.

9    THE COURT:  What do you think, gentlemen?

10    MR. GIRARD:  I don't have any objection to it.  The

11 reason I drafted it as it was, as I understand the case,

12 that the feeling of most of the experts is that pumping

13 from the younger alluvium has affected more adversely than

14 pumping from the older alluvium, and I attempted to

15 differentiate.  But I would agree that the effect of pumping

16 in Murrieta and the Pauba, in the younger alluvium, has not

17 been presently determined either.  So maybe it ought to be

18 added, as suggested by Mr. Krieger.  I would prefer to add

19 it to all three than to delete the language, as he suggested.

20    MR. VEEDER:  So that on line 14 after the word "affect"

21 would be added the words --

22    THE COURT:  Well, before we do it, let's find out

23 whether we are going to do it or not.

24    MR. VEEDER:  Yes.

25    THE COURT:  I think the evidence shows a vast difference,

½P3   1   and I think we could make a finding that pumping in the

2   younger alluvium in the Murrieta Valley not only can but

3   does affect the flow, and that pumping from the younger

4   alluvium in the Pauba Valley not only can but does affect

5   the flow of Temecula Creek.  I don't think there is any

6   problem about that.  The words have been used "can affect"

7   in all three instances.

8       MR. VEEDER:  But wouldn't you add "presently undeter-

9   mined degree," because it has not been determined?

10      THE COURT:  Well, we don't say anything about the

11   degree of it.  So what difference does it make?  If you want

12   to put in "undetermined degree" I wouldn't object.  I think

13   there should be a distinction, though, which Mr. Girard has

14   tried to point out, by saying that pumping from the older

15   alluvium can affect, to a limited degree, the surface flow,

16   and then he leaves out the words "limited degree" in the

17   case of the younger alluvium.  He is trying to make a

18   distinction.

19      What about a finding that the pumping in the Murrieta

20   and the Pauba, in the younger alluvium, does affect the

21   flow of these creeks in an undetermined degree?

22      MR. GIRARD:  I have no objection to it.  The whole

23   purpose was to treat them differently.

24      THE COURT:  Leave the first one that it can affect, to

25   a limited degree, from the older alluvium.

P 4

1          MR. GIRARD:  Then you would leave the pumping from the

2    younger alluvium in Murrieta Valley can and does affect, in

3    an undetermined degree, the flow of Murrieta?

4          THE COURT:  That is right.

5          MR. GIRARD:  And the same thing for Pauba?

6          THE COURT:  Yes.

7          MR. STAHLMAN:  Instead of "can," "may be more"?

8          THE COURT:  I don't think there is any difference.

9    "May" is a permissive thing.  "Can" comes from "could" and

10   indicates ability.  "May" and "might" are possibilities.

11         Mr. Veeder, what is your view?

12         MR. VEEDER:  I think that the terminology is contrary

13   to the actual fact, your Honor.  The wells may start in the

14   younger alluvium, but they are pumping out of the older

15   alluvium, and that is what the evidence shows.  Even in

16   Pauba Valley there is a mantle of younger alluvium, but it

17   is underlain by the older alluvium, and I think that is

18   what the evidence shows.  In other words, as I see the

19   terminology used in Finding No. V, it is these wells -- I

20   haven't had a chance to talk to the geologist about this or

21   to Colonel Bowen about it, but the wells, though they may

22   start in the younger alluvium -- I will use the Roripaugh

23   example again.  Mr. Roripaugh's well is situated at the

24   extreme northwestern line of Santa Gertrudis Creek.  It

25   surely is not a well that is in the younger alluvium.  It is

P 5

1   a well that is in the older alluvium, even though there is

2   a possibility that it was spudded into the younger alluvium.

3   MR. GIRARD:  I think, Mr. Veeder, that your problems

4   are more theoretical than anything else, because back in the

5   other finding any pump that goes down in younger alluvium

6   would be treated as being in younger alluvium, for purposes

7   of this finding of fact.

8   MR. VEEDER:  You see, I haven't had a chance to analyze

9   this.

10   MR. GIRARD:  In other words, this would not mean that

11   if you dropped your pump down deep into what was tighter

12   stuff than the younger alluvium, that could be under the

13   first paragraph.  You would still be protected under the

14   second.  We haven't differentiated between the ground water

15   underlying younger alluvium, though.  Any ground water

16   underlying younger alluvium on the surface would be treated

17   as underlying completely alluvium throughout.

18   MR. VEEDER:  The record would not bear that out.  The

19   record is to the contrary.  The record is to the effect that

20   the sources of water in the Murrieta Basin and Temecula are

21   the older continental alluvium.

22   MR. STAHLMAN:  No; quite to the contrary.

23   MR. VEEDER:  The evidence will show that the younger

24   alluvium may have a depth, at the outside, of a hundred feet

25   in Murrieta Valley, and that thereafter it is underlain by

P 6

1    older continental alluvium.  Now I believe that is what the

2    record will sustain.  You will not find that any of these

3    areas in the younger alluvium are younger alluvium to the

4    depth of the water-bearing strata.  You will find that there

5    is a shallow mantle of the younger alluvium underlain by

6    the older continental deposits.

7        MR. STAHLMAN:  When you say "these" you are talking

8    strictly about Murrieta?

9        MR. VEEDER:  I am speaking of the area that I have been

10   pointing to of the Roripaugh well.  I am speaking of the

11   geology that has gone into the record, and I believe that

12   it has been uncontested that these stringers of younger

13   alluvium are not at great depth.

14       MR. GIRARD:  In the first place, on Murrieta and Pauba

15   you certainly can't refer to those areas of younger alluvium

16   as stringers.  They are a little bit more than that.  But as

17   I recall the testimony was that these areas of younger

18   alluvium were interspaced with particular areas of different

19   type of rock composition -- sand, gravel -- all the way down.

20   I didn't regard that there was any testimony that you could

21   go down a hundred feet and divide everything up into older

22   alluvium.  I thought you would go down maybe fifty feet and

23   run into some silt and clay, go through that and run into

24   younger alluvium, and go through that and hit silt and clay.

25   I don't know.

P 7   1      MR. VEEDER:  The evidence that is in the record, I

2      believe, is what I outlined.  I believe that the whole area was

3      the geology as disclosed on Exhibit 15-E and on 15 will

4      demonstrate that the sedimentary deposits in the whole valley

5      were laid in at a particular time when the stream ran north

6      and west, that there has been a complete reversal of the

7      stream, and that the deposits from which the water is

8      presently pumped, after you go down a short distance, is the

9      same as the --

10      THE COURT:  Well, I can't recall exactly.  We know,

11      without dispute, that the older alluvium was laid down first.

12      MR. VEEDER:  That is right.

13      THE COURT:  And that the younger alluvium was thereafter

14      laid down on top of it.  I don't recall that there was any

15      testimony where they attempted to show the break line or

16      differentiation between the Murrieta and Pauba Valleys,

17      between going down vertically, the younger and the older.

18      MR. VEEDER:  Oh, yes.

19      MR. STAHLMAN:  I think in the Pauba Valley that the

20      evidence shows that the wells on the Vail Ranch, with the

21      exception of the Navy well, are drilled in younger alluvium.

22      They are shallow wells.

23      MR. VEEDER:  That statement is incorrect.  The Pit

24      well is started in older alluvium.  I have been there.  It

25      is a side hill which is cut out and the actual pumps and the

P 8

1    pump house -- there are three wells there, as I recall, that

2    actually start in the older alluvium.

3        MR. STAHLMAN:   There are wells on the ranch, however,

4    that the testimony shows are in the younger alluvium.

5        MR. VEEDER:   Start in the younger alluvium.

6        THE COURT:   Let us not have a lot of furor about

7    something that is not too difficult.   As I recall the

8    testimony about the lenticular deposits, interstices of

9    clay, gravel, et cetera, was more descriptive of the older

10   alluvium than the younger.

11       MR. VEEDER:   That is correct, your Honor.

12       THE COURT:   That it was more uniform in character.   And

13   I don't say that there might not be some of this lenticular

14   formation.   But I got the impression that the lenticular

15   bodies were different in characteristics from the older

16   alluvium.

17       MR. VEEDER:   That is correct.

Take D-2    18       MR. GIRARD:   If we are going to say that all the pump-

19   ing in the younger alluvium is really pumped from the older

20   alluvium, why did the United States of America go to such

21   an extent to differentiate the geology?

22       MR. VEEDER:   We didn't go to such an extent to differenti-

23   ate the geology.   We simply put in the areas showing the --

24   let's put up 15-E and C.

25       MR. KRIEGER:   Isn't the whole problem here that these

P 9

1   maps were all dealing with surface layers of younger or

2   older alluvium?  There is some testimony about what happens

3   down below, but there is precious little evidence where these

4   wells are perforated, in the first place.  I think you have

5   it only on a few wells.

6   THE COURT:  What is the real issue between you?  Some-

7   body state what is the issue between the findings of Mr.

8   Girard and Mr. Veeder's objection.  What is the problem

9   there?

10   MR. VEEDER:  If for no other reason, your Honor, I

11   want it clear that we do have evidence which is contrary to

12   the statements that are made, and that the whole basis of

13   the geology in this proceeding has been that the water-bear-

14   ing strata is the older alluvium.

15   THE COURT:  Well, the younger is water-bearing also.

16   MR. VEEDER:  It may be.  But when you put a well down

17   more than fifty or seventy-five feet in the Murrieta Basin,

18   the Murrieta area, you are going to go into the older

19   alluvium.

20   THE COURT:  Well, Mr. Girard's findings take care of

21   that.

22   MR. GIRARD:  Any well that goes down into the younger

23   alluvium, even if it goes down into older alluvium, if you

24   want to say that, it still can and does affect the flow of

25   the Murrieta Creek, and can and does affect the flow of

P 10

1    Pauba Valley. All we are saying is that when the well goes

2    down here in the older alluvium the effect is to a limited

3    degree as contrasted with the well going down here.

4       MR. KRIEGER: Can't we reach that point by simply

5    saying "overlain with"?

6       MR. GIRARD: Yes.

7       MR. KRIEGER: I think that will do it. Then it ties

8    right into your 15-E map.

9       MR. GIRARD: The purpose was to show that the wells

10    that were drilled in this area of Murrieta have really affected

11    a great deal more the surface flow of the Santa Margarita

12    River than the well that was drilled in the older alluvium.

13       MR. KRIEGER: Where the surface shows on the map to be

14    younger alluvium instead of older alluvium. Is that right?

15       MR. GIRARD: Yes.

16       MR. KRIEGER: I think that is a good finding.

17       MR. VEEDER: You ask what is the importance, your

18    Honor. It is our view that a well that goes down anyplace

19    in the Murrieta Basin, that is, the whole area on 15-E, is

20    actually drawing from -- there is a single water-bearing

21    strata undistinguished and indistinguishable whether it is

22    in the older or the younger alluvium.

23       MR. KRIEGER: But the pumping is certainly distinguish-

24    able, and if our evidence showed anything it showed that

25    when you put a well down from the older alluvium, even

P 11

1   included in the Murrieta-Temecula area, the pumping is far

2   less productive than it is when you go down between the two

3   faults overlying the creek. While it all affects the stream

4   system, there is a vast difference in the productivity. And

5   that is all Mr. Girard is pointing out, it seems to me.

6   MR. STAHLMAN:  That is also demonstrated by a comparison

7   between the irrigation wells in the Pauba Valley and the

8   artesian belt.  If you go down in the younger alluvium with

9   a small well to a small depth you get a large amount of

10   water.  You have to do down -- in the Navy well you are down

11   2500 feet and it is not as productive as one of the wells

12   that go down nearly 200 feet.  There is a difference in the

13   amount of productivity or extraction of the amount of water.

14   THE COURT:  Mr. Veeder, if you are concerned about what

15   the effect of this finding might be later on on the question

16   of apportionment, I can't see that there is anything that

17   precludes you from showing that the Roripaugh well or any

18   other particular well makes a heavy drain upon the common

19   water supply.  This, apparently, is what your concern is.

20   We are not making an apportionment now.  You don't want

21   something that will embarrass you at the time of an applica-

22   tion for apportionment.

23   MR. VEEDER:  That is right.

24   "That pumping in the areas of older alluvium

25   within said ground water basin or area affects the

P 12

1        surface flow of the Santa Margarita River to an

2        undetermined degree."

3    I think it does.  I think the evidence supports that, that

4    every pump in the older and in the younger alluvium does

5    affect the surface runoff.

6        MR. STAHLMAN:  But there is a difference.

7        MR. VEEDER:  The reason, Mr. Stahlman, I would question

8    what you are saying is that you put down the Pit well and

9    that Pit well is down to considerable depth, but the pumping

10   of the Pit well does show an interaction through the whole

11   area.

12       MR. STAHLMAN:  Certainly Mr. Krieger pointed it out,

13   and I think there is a difference in the pumping of water

14   from one material and the other.

15       THE COURT:  Let us find out what other suggestions Mr.

16   Krieger has.  We have talked about No. V.

17       MR. KRIEGER:  I was going to suggest on page 5, Finding

18   No. XIII, that that be filled out with the clause we have

19   used heretofore, with the words "but constitute vagrant,

20   local, percolating ground water."

21       THE COURT:  Yes, the same phraseology that we used.

22   What else?

23       MR. KRIEGER:  And then it occurred to me, in the last

24   part, -- I talked to Mr. Girard about this -- on page 6 I

25   think he has a useful finding, but he has confined it to

P 13

1  the ground water area shown on 277, and I think that this

2  finding would serve a better purpose if it applied to the

3  tributaries outside the area, because we have already made

4  a finding that all of the area designated on 277 does

5  contribute to the stream system, and I think this finding

6  should reach those tributaries like Warm Springs and Santa

7  Gertrudis and the others outside and above that reach the

8  area.

9        So my suggestion on XVI would be that we simply add

10 the phrase, on line 3, and say that "outside and supporting

11 said ground water area are areas of younger alluvial deposits."

12        MR. GIRARD:  The reason I drafted this finding the way

13 it was, I assumed -- I didn't have a copy of 277 when I

14 drafted it -- I thought that all of Santa Gertrudis, all

15 of Long Canyon, all of these areas were included within the

16 ground water areas set forth in 277.  If they were not, then

17 Mr. Krieger is correct.

18        THE COURT:  Does anyone else have any suggestions?  I

19 am going to have to study this over before we come back at

20 two o'clock.

E fls.

21

22

23

24

25

16,998

t-33

E-1

1   MR. KRIEGER:  Those are the only comments I have.

2   THE COURT:  I want to comment on Page 1, Lines 29 and

3   30.  Grammatically  we have a problem there.  It reads:

4       "that the areas of younger alluvium within said

5   ground area are primarily those waters " --

6   MR. KRIEGER:  Where is that?

7   THE COURT:   The areas   are those waters, -- something

8   has to be done about that.

9       "in those areas the waters" or "with waters," or

10  something like that.

11  MR. STAHLMAN:  Where is that?

12  THE COURT:  Page 1, Lines 29 and 30.

13  Then, Page 3, in VII, I think we ought to point out

14  that these ground water contours are worked out on the basis

15  of the elevation of the water above sea  level, so that it

16  is more understandable what we mean.

17  And in Line 28, where it says "are progressively lower,"

18  the contours are lower.

19  MR. GIRARD:  Worked out on the basis of the elevation

20  of the water above sea level?

21  THE COURT: That is what they are worked out on.

22  MR. GIRARD:  We will work that out.

23  THE COURT:  Let me see what else I have.  Then on Page

24  4, Line 3, at the end of Line 3, "that pumping from one well

25  or from several wells in the same general area" -- I don't

t-34

1    like the phrase, because we are talking about a ground water

2    area.   I thought about using "in a particular area."   I know

3    what you are talking about.   You are talking about a little

4    chunk of this ground water area, where in some cases there is

5    an immediate effect, and in other cases there is not.

6        You may toy around with what to do with that.

7        MR. KRIEGER:   "In relatively close proximity," or

8    something like that?

9        THE COURT:   Yes, "in local areas where wells are in

10    close proximity," or something to make that a little clearer.

11        Then on Page 5, Line 12, that is all right, but we are

12    talking about reasonable use in two senses.   We find as to

13    all of the water that the uses of water are reasonable and

14    beneficial.   If you are going to leave the language as it

15    is, I would like to add "are reasonable and beneficial uses"

16    or "are in character," or something like that, to distinguish

17    it from when we use the word "reasonable" in the other

18    context, as to whether a person is getting more than his

19    share of the water.   Your word "reasonable" is used in two

20    senses, that a riparian use must be reasonable and it must

21    be beneficial.   That pertains to the character of use.

22        Then we get to the word "reasonable" as it pertains to

23    how much a fellow could use.

24        MR. STAHLMAN:   "The manner of use."

25        MR. GIRARD:   I see what your Honor is driving at, your

t-35

Honor, and I will work something out on that.

THE COURT:  All right.  Other than that, without putting a final stamp of approval on it, I think you have brought us along the road.  You distinguish Pasadena vs. Alhambra, and, as I recall, that is a case where you have a true basin, and you want to show the basin here, and you cite that case to show that this is not.

Now, I was talking the other day with Mr. Veeder about this "correlative" matter, and on your definition of "correlative", if we are going to define it, we may have to go further.

MR. GIRARD:  I think we can go further if you want to, your Honor.   I don't think Mr. Veeder and I are in any real disagreement on what is meant by "correlative."

THE COURT:  It takes into account riparian rights, the location on the stream, whether upstream or downstream, and all that sort of thing.  In the limited thing we have here, they have rights in common with each other to a common supply of water, but, of course, the  rights are not necessarily equal in amount.

Actually, as I explained, when we say people have "correlative rights," the rights may run one way and not the other, but you cover it all with the term "correlative rights."  For instance, take a single case of a stream system, with people downstream and upstream, they have

17,001

t-36

1    without doubt correlative rights, but the upstream owner

2    has no right to complain about what the downstream owner

3    has, because of the very nature of the fact that he can't be

4    hurt.  They have correlative rights, but the upstream owner

5    cannot complain about what the downstream owner does.

6        You might spell out a situation where they were in such

7    close proximity that a downstream owner was pulling all of

8    the water out of an upstream well, but ordinarily a down-

9    stream owner cannot be hurting the upstream owner.

10       Now, we say very glibly that they have correlative

11   rights.  I think we have to say that there must be taken into

12   account the complete factual situation, the location, and

13   the distance up or downstream, much as you and I talked about

14   it in kicking this around.

15       MR. VEEDER:  That is right.  I was wondering whether

16   there would be any benefit accrue from what appears at least

17   to be the historical concept of correlative rights.  Correct

18   me on this if I am in error, you California lawyers.  If I

19   read the cases correctly, the term "correlative" is a term

20   originally stemming from the use of ground waters, and that

21   a right in common is usually a term used in regard to surface

22   riparian rights.

23       Now, in the progression from the original decision in

24   Katz vs. Walkinshaw, they came up with this idea of

25   correlative rights as a ground water right.

t-37

THE COURT:  That may be true, and it may be that when they first talked about riparian rights the word "riparian" told the story, with which I do not agree.  This was a right in the stream, and obviously a downstream  user could not hurt the upstream user.  So maybe the word "riparian" tells the whole story on a stream.

MR. VEEDER:  On the surface flow.

THE COURT:  On the surface flow, and many of our earlier cases on water involved surface flow.  They did not talk about ground water bodies, and they did not know about them. They were talking about surface flow of water, and so maybe the word "correlative" did come into the law in connection with ground water bodies and basins, and common sources of supply, and things like that.

MR. VEEDER:  If we are using "correlative", then it embraces the idea of riparian rights in common with all other users to a reasonable quantity of water from the stream based upon a vast number of circumstances.

THE COURT:  Not only that, but we have to correlate the riparian right to the storage or the ground water right.

MR. VEEDER:  I think your Tucalota Creek situation  is going to bring that out very clearly.  You have a very illusory riparian right situation on Tucalota Creek, but your overlying rights I think are of great value.

THE COURT:  I think it would be safer if we tried to

t-38

1    tell future generations and subsequent lawyers and judges

2    what we meant by the use of some of our terms.

3        MR. VEEDER:  I think we need to.  I think they have to

4    be defined.  I think if we are going to apply the term

5    "correlative" to both surface and ground waters, we should

6    spell that out clearly.

7        MR. GIRARD:  I think Mr. Veeder and I can get together

8    on this, and I don't think we disagree at all.

9        THE COURT:  Can you get together before 2:00 o'clock?

10   I am in no hurry to come back on the bench.  I have plenty

11   of work to do in my chambers.

12       MR. GIRARD:  Have you finished your article on the big

13   case?

14       THE COURT:  This is off the record.

15       (Discussion between Court and counsel off the record.)

16       MR. KRIEGER:  Then can we get to the conclusions of law

17   this afternoon, too, your Honor?

18       THE COURT:  Yes.  I would like to have you gentlemen

19   look over the conclusions here, and I will do the same

20   before we come back at 2:00 o'clock.

21       MR. KRIEGER:  All right.

22       (Whereupon, at 12:00 o'clock noon, a recess was taken

23   until 2:00 o'clock p.m. of the same date.)

24

25                        - - -

t-39
E-2

- - -

THE COURT:  All right.

MR. GIRARD:  Mr. Krieger, Mr. Veeder and I have worked up some changes, your Honor, and I don't say that Mr. Veeder agrees with all of them, because he hasn't had time to go through them all, but for what they are worth, as suggested by your Honor, we can go through these.

On Page 1, Line 30, where there was some ambiguity, I think if you will just cross out the word "waters" in Line 30, it will read correctly.  So that it will read now:

"that the areas of younger alluvium within said ground area are primarily those which underlie Murieta and Pauba Valleys."

If you take out the word "waters," it makes sense.

Then going over to Page 3, Finding V, this would, I think, clarify it.

THE COURT:  First, you have no objection to this first one, Mr. Veeder?

MR. VEEDER:  The first finding?

THE COURT:  The one he was just talking about.

MR. VEEDER:  To the change?

THE COURT:  To the change.

MR. VEEDER:  If you are asking about objections, I am going to object to the reference to Pasadena vs. Alhambra in

t-40

1    the finding.

2        MR. GIRARD:  Then going over to Paragraph V, I think

3    this would take care of the problem Mr. Veeder points out.

4    It will read as follows:

5            "That pumping in the areas overlain with older

6        alluvium within said ground water area" -- strike out

7        the word "of" and substitute "overlain with" --

8    THE COURT:  Wait a minute.

9    MR. GIRARD:  That is at Line 11.

10   THE COURT:  All right.

11   MR. GIRARD:  (Reading):

12           "That pumping in the areas overlain with older

13       alluvium deposits" -- maybe that should be "older

14       alluvial."  Which should it be, Colonel, "alluvial" or

15   "alluvium"?

16       COLONEL BOWEN:  Older alluvium.

17       MR. GIRARD:  (Continuing):     ". . . within said ground

18   water area can affect to a limited degree the surface flow

19   of the Santa Margarita River.  That pumping from areas over-

20   lain with younger alluvium" --

21       THE COURT:  Wait a minute.

22       MR. GIRARD:  ". . . younger alluvium in Murieta Valley

23   can and does affect to an undetermined degree the flow of

24   Murieta Creek."

25       THE COURT:  Just a minute.  What was that?

t-41

1    MR. GIRARD:  ". . . can and does affect to an undetermined

2    degree . . ."

3    THE COURT:  Yes.

4    MR. GIRARD: "That pumping from areas overlain with

5    younger alluvium in Pauba Valley can and does affect to an

6    undetermined degree the flow of Temecula Creek."

7    Those would be the suggested changes in Paragraph V.

8    THE COURT:  Just a minute.  All right.

9    MR. GIRARD:  Now, dropping down to Finding VII on Page

10    3, I think the United States will agree with these suggested

11    changes:

12    "That ground water contours in said ground water

13    area" -- then cross out the word "run" and substitute the

14    language "show that ground water moves," so that it will

15    read:  "That ground  water contours in said ground water

16    area show that ground water moves in a general Southeast-

17    Northwest direction; that said contours" -- then add this

18    language "show the altitude of water levels in wells above

19    sea level."

20    THE COURT:  ". . . show the altitude above sea level".

21    MR. GIRARD:  "of the water levels."

22    THE COURT:  You have "above sea level" at the wrong

23    place, -- "show the altitude above sea level."

24    MR. GIRARD:  ". . . of the water levels in the wells."

25    THE COURT:  Yes.

t-42

1     MR. GIRARD:  All right.  Let me check that one again:

2         ". . . show the altitude above sea level of the

3 water levels in the wells."

4     MR. VEEDER:  Let's have that just once more, because I

5 don't follow what is being said there.

6     MR. GIRARD:  ". . .that said contours show the altitude

7 above sea level of the water levels " -- and should we say

8 "in wells" -- "and are predicated on such well levels as are

9 presently available from which the contours are projected..."

10     THE COURT:  I added, as I went over it, the following

11 language.  I don't find fault with what you have done, but I

12 added this, and I will read it first.

13     MR. GIRARD:  Where does this go, your Honor?

14     THE COURT:  At the very end of the paragraph:

15         "that the contours of 1959 show a definite pattern

16         of downward water grading in a southwesterly direction."

17 That is, of a downward water grading.

18     MR. GIRARD:  "That the contours of 1959" --

19     THE COURT:  " -- show a definite pattern of downward

20 water grading in a southwesterly direction."

21     MR. GIRARD:  "of downward water grading in a south-

22 westerly direction -- in a general southwest direction"?

23     THE COURT:  " -- in a general southwesterly direction."

24 I think there is no doubt about that.

25     MR. GIRARD:  I don't quarrel with it.

E2

t-43

1    THE COURT:  All right.  Go ahead.

2    MR. GIRARD:  Then we would skip over to Finding VIII,

3    and the language we are concerned with is in Line 4.

4    THE COURT:  Line 4?

5    MR. GIRARD:  In Line 4 on Page 4.  As it reads now, it

6    says:

7        "that pumping from one well or from several wells

8        in the same general area" --

9    I would suggest to delete the phrase "in the same general

10   area," so that it will read:

11       "that pumping from one well or from several wells

12       within said ground water area has not been shown to

13       have a noticeable effect on other wells within said

14       ground water area which are not in close proximity

15       to the well or wells being pumped."

16   THE COURT:  All right.

17   MR. GIRARD:  Then going over to Page --

18   THE COURT:  Well, you have the same thing down on Line

19   8.  Let's read the last phrase there.

20   MR. GIRARD:  "within that same area," yes, I see that.

21   THE COURT:  ". . . or from several wells in a

22   particular locality within the ground water area."

23   MR. GIRARD:  "pumping from one well or from several

24   wells" --

25   THE COURT:  " -- in a particular locality in the ground

t-44k

1    water area".

2        MR. STAHLMAN:  Should we say "in some locality," instead

3    of "a particular locality"?

4        THE COURT:  All right, "in some locality within the

5    ground water area."

6        MR. GIRARD:  Would you read it now the way you have it,

7    your Honor?

8        THE COURT:  I haven't anything definite.  I am just

9    thinking about it.    Why not again do it the same way:

10            "that in some instances pumping from one well or

11        from several wells" then strike out "in the same area"--

12        "has not affected the water levels in other wells near-

13        by."

14        MR. VEEDER:  Could I tender a thought right along there,

15    your Honor?  Couldn't you have affirmative findings to the

16    effect that in the Pauba Valley there is a sharp and definite

17    interrelation between pumping?  That has been demonstrated,

18    so that there could be a finding, that there was an inter-

19    relation in the ground water area.

20        Then we have demonstrated, in my view, in regard to the

21    areas south and west, well, right at the area where Santa

22    Gertrudis comes in and where Warm Springs Creek comes in.

23    Those are areas which are definitely shown.

24        I am thinking of the future, frankly, in regard to these

25    maps, and I think where we can be specific, it is the finest

t-45

1    kind of idea to be specific.

2         In other words, there is no question of interrelation-

3    ship in Pauba, and I don't think there is any doubt about

4    any interrelationship in the area within the vicinity of

5    Warm Springs Creek and Santa Gertrudis.

6         MR. STAHLMAN:   No.

7         MR. KRIEGER:   I don't think you should jump that one.

8         MR. VEEDER:   I will be more specific.   I think there has

9    been an interrelation shown between Well 23-K-1 and the wells

10    in that general vicinity.

11        THE COURT:   Mr. Veeder, if we wanted to take the time

12    and dress up a particular finding of that sort, I have no

13    doubt but what the record would show there is a certain inter-

14    relationship, but if there is an application for apportionment,

15    it would be necessary again to see what the situation is at

16    the time that the application is made, and the interrelation

17    that exists presently would not necessarily be controlling to

18    the relationship which exists then, and you would again have

19    to put on your proof to show the interrelationship, and you

20    might as well do it all without cutting any particular ice

21    here on it.

22        MR. VEEDER:   I don't propose to argue it, your Honor.

23        THE COURT:   Isn't that right?

24        MR. VEEDER:   No, I really feel this way about it, with

25    all respect to your Honor:   I think the evidence in the

t-46                                                          17,011

1    record today would support affirmative findings in regard to

2    an interconnection between the areas to which I made

3    reference.

4         I will admit, and I will say this, that there is nothing

5    to demonstrate at this time that the Roripaugh pumping affects

6    the Naval well, as near as I can tell, but I am convinced that

7    you can make a finding today that would show, and which

8    should be res judicata in a future proceeding, that there is

9    an interrelationship between these --

10   THE COURT:   Mr. Veeder, you missed the boat when you

11   said "res judicata."   How could a finding today, based upon

12   what is the evidence gathered, say, in 1960, be res judicata

13   at a time when the matter might come up for an apportionment?

14   By that time there might be other wells,and the pumping hole

15   might have been moved over in this area (Indicating), and

16   the relationship between Well A and B may now be very minor

17   as compared to the relationship between Well A and C.

18   MR. VEEDER:   I am not speaking of res judicata as from

19   well to well.   I am speaking of res judicata in regard to the

20   water bearing strata and its interconnection.   You wouldn't

21   say Well 23-K-1 and the wells up here at Murieta Hot Springs

22   are so interrelated that it would be res judicata, but you

23   could say, and I believe the evidence will support it, that

24   there is a single water bearing strata in which the first

25   well, and the Roripaugh wells and the Murieta Hot Springs wells

17,012

t-47

are so interrelated, and I believe the evidence would support that.

MR. KRIEGER: Your Honor, that has not been demonstrated in this case, and there has been no attempt to demonstrate it, because Mr. Kunkel did not conduct a transmissibility test. Now, had he done it, it would have taken months and months of time, because we have certain data in our area up there in the Valley that would show there is no relationship, and certainly there is no proof so far on this score.

MR. VEEDER: I am not talking about the rate of transmissibility. I am not talking about that at all. I am talking about the fact that you have a ground water strata that has been proved to be a single ground water bearing strata, out of which these people are pumping.

THE COURT: I am prepared to find, and at your request I am finding that there is an interrelationship in the ground water area, to some degree at least, with all of the other areas within this area. How do I add anything when I go further?

The very purpose of this finding is to show your contention that this is a ground water area which supplies the Murieta and the Temecula River, and this water is in hydrological contact with the portions of the stream. Haven't I said it all when I say something like that?

MR. VEEDER: Well, I would say --

t-48

F fls

THE COURT:   Then the only thing that remains -- that then becomes res judicata, and the thing that remains is that you can show the particular impact at a particular time of this well on that well, and that can change from time to time. The fact that one well today is having some effect on another well may be changed completely by the digging of a new well, or the capping up of an old one.

Take F

P 14

1   Does this make sense or not?  It seems to me to be so clear.

2        MR. VEEDER:  Your Honor, I would like to refer to the

3   language that gives me concern.  I am looking at page 4,

4   starting at line 3:  "That pumping from one well or from

5   several wells in the same general area but in said ground

6   water area has not been shown to have noticeable  effect

7   on other wells within said ground water area."

8        THE COURT:  I have my secretary typing up some pro-

9   posals here.  I think that it ought to be both sides of the

10  coin.  I think it ought to show that in some areas it has

11  and that in some it has not, without specifying.

12        MR. GIRARD:  I think you are right, your Honor.

13        MR. VEEDER:  You have heard my objection.  I think it

14  is directed to the same thing your Honor is talking about.

15        THE COURT:  I think you are right on that.  But I don't

16  think it can be particularized, and if we did particularize

17  it would be lost motion.

18        MR. GIRARD:  It doesn't do us any good.

19        THE COURT:  No.  At a time when a matter would come up

20  on an attempt to restrain Roripaugh, say, there would have

21  to be then proof of the situation as of that date.  We

22  presently have found that there is this ground water area,

23  that there are some relationships that exist.  The burden

24  is then on the complainant to say, "All right, this pumping

25  is clearly out of line and adversely affects these other

P 15

1   parties," and that is a finding that would have to be based

2   upon proof as of that time. Because any equitable decree

3   speaks as of the time the decree is entered and doesn't

4   speak as of the time the lawsuit is filed. While in a legal

5   action it speaks as of the date the lawsuit is filed.

6       MR. VEEDER:  Your Honor has stated it well.  I under-

7   stand you are writing new language.  I think that closes my

8   statement.

9       MR. GIRARD:  Then going over to page 5, Finding No. XII,

10  on line 8, the paragraph commencing at line 6, it would read:

11  "At the present time the status of this case on the issue of

12  apportionment has not been presented and this Court has

13  taken no evidence directed to establishing whether such"

14  and then cross out the words "reasonable and beneficial,"

15  and then on page 9 "whether such water uses" instead of

16  "use" and change the word "is" to "are."  So it would read:

17  "At the present time the status of this case on the issue of

18  apportionment has not been presented and this Court has

19  taken no evidence directed to establishing whether  such

20  water uses are reasonable or unreasonable as to the amount

21  of water used in the light of rights which may exist."

22      THE COURT:  That is all right.

23      I would like to go up to line 5:  ". .U.S. Exhibit

24  15-L, are" insert "in nature and character," something like

25  that, "reasonable and beneficial."  Maybe you can think of

P 16

1   better wording.  I want to make it clear when I say "uses

2   are reasonable and beneficial" that I am not finding now

3   that they are reasonable in amount.  Maybe it is inferentially

4   there.

5   MR. VEEDER:  May I ask you to say again just what you

6   said in your last sentence?  Could I have the reporter read

7   it.  I didn't follow what your thought was.

8   THE COURT:  Read it.

9   (The reporter read the Court's last statement.)

10  MR. VEEDER:  Could I ask that you drop out the word

11  "reasonable" and say "beneficial," because I will agree on

12  that.  I think if you take out "reasonable" you are over the

13  fence.

14  MR. KRIEGER:  I think you should do that, because you

15  have the reasonableness covered later on.

16  THE COURT:  Don't we say it all when we say "beneficial"?

17  MR. VEEDER:  You say it all when you say "beneficial."

18  MR. KRIEGER:  Yes.

19  THE COURT:  Mr. Girard?

20  MR. GIRARD:  I am not so sure that you do.

21  THE COURT:  If there is any doubt, then I would put it

22  at the end of line 5, after "Exhibit 15-L," "are in their

23  nature," or "as to their nature."

24  MR. KRIEGER:  You could add the word "character" of

25  uses are reasonable and beneficial, which is the usual legal

P 17   1    phrase.  That would cover it in another way.

2          MR. VEEDER:  I would necessarily object to that.  I

3    don't know what the word "reasonable" means.  What does your

4    Honor mean?

5          MR. GIRARD:  If you use more than a reasonable amount

6    I don't think your use is beneficial.

7          MR. VEEDER:  You are getting into amount.  I think you

8    can have a beneficial use.  "Beneficial" is a word of art

9    and means something.  "Reasonable" means that quantity-wise

10   you are going beyond what would be your correlative share.

11         THE COURT:  Why don't we just say "beneficial"?

12         MR. GIRARD:  All right.  ". . are beneficial"?

13         THE COURT:  "Are beneficial."

14         MR. GIRARD:  All right.

15         MR. STAHLMAN:  You are still leaving something out.

16         THE COURT:  Why?

17         MR. STAHLMAN:  Because you have not only considered

18   the use as to where the water is applied, but the means of

19   application.  It has a connotation in California Law as to

20   reasonable means of supplying the water.  So I think your

21   word "reasonable" does have some implication besides

22   quantitative.  It is a reasonable means of applying the water.

23   If somebody had a big open ditch and wasted a lot of water

24   in it, it would be different from the type and kind of method

25   of transportation that would be used in other cases.  So the

P 18

1   means of transportation is a factor that the word "reasonable"

2   can apply to.

3   THE COURT:  I am going to back up then.  I am not going

4   to spend a lot of time on this, because I think my suggestion

5   is the one that makes it clear:  "are, in their nature,

6   reasonable and beneficial," at the end of line 5.  But we

7   are not passing on whether they are reasonable or unreasonable

8   in amount.

9   MR. VEEDER:  Would you add that this would not relate

10  to amount?

11  THE COURT:  I said that.

12  MR. VEEDER:  Have you written it in?

13  THE COURT:  That is what I say.  "The Court has taken

14  no evidence directed toward establishing . . as to the

15  amount of water used."

16  MR. STAHLMAN:  Yes, that covers the whole thing.

17  MR. GIRARD:  Then Finding XIII, at the end of the

18  finding add "but constitute vagrant, local, percolating

19  waters".

20  THE COURT:  I said "and are local, vagrant, percolating

21  waters," and then I picked up your language "not part of

22  said River or said River system."

23  MR. GIRARD:  All right.

24  THE COURT:  What is the next suggestion?

25  MR. GIRARD:  The next one is on page 6.  On line 3

P 19

1    strike the word "within" and add the word "outside," so

2    that it will read:  "That outside said ground water area

3    there are areas of younger alluvial deposits other than

4    such deposits in Murrieta and Pauba Valley," comma instead

5    of semicolon, "which contribute water to said ground water

6    area.

7    THE COURT:  After the comma then there is another line.

8    MR. GIRARD:  Yes, then there would be a semicolon.

9    THE COURT:  Read it again.

10    MR. GIRARD:  "That outside said ground water area

11    there are areas of younger alluvial deposits other than

12    such deposits in Murrieta and Pauba Valley, which contribute

13    water to said ground water area; . . "

14    THE COURT:  All right.

15    MR. GIRARD:  " . . that such alluvial deposits are

16    depicted on U.S. Exhibit 15-L and are located in," strike

17    out "Long Canyon".

18    THE COURT:  Have you looked at 15-L and checked it?

19    MR. GIRARD:  I believe Mr. Veeder and Mr. Krieger did.

20    I was writing it.

21    MR. KRIEGER:  We looked at 15-L and we superimposed

22    it over 277 so we could see exactly what was included and

23    what was outside.

24    THE COURT:  All right.

25    MR. GIRARD:  "Long Canyon" is stricken out.  So it

P 20

1  would be "Santa Gertrudis, Warm Springs, Cole Canyon,

2  Slaughterhouse Canyon, Wolf Valley-Pechanga Creek".

3      MR. VEEDER:  You want an "and" in there, don't you?

4      MR. GIRARD:  I don't care.  It should be a dash or

5  "and."

6      COLONEL BOWEN:  Wolf is part of Pechanga.

7      MR. GIRARD:  A dash then.

8      MR. VEEDER:  Does it run all the way?

9      MR. GIRARD:  Yes.

10      THE COURT:  All right.

11      MR. GIRARD:  "That all," and add the word "said,"

12  "ground water within the younger alluvial deposits in,"

13  "Long Canyon" is stricken, "Santa Gertrudis, Warm Springs,

14  Cole Canyon, Slaughterhouse Canyon, are percolating waters

15  but add to and support Murrieta Creek, and the ground waters

16  within," strike out the word "younger" so it will read

17  "within the alluvial deposits in Murrieta Valley; that all"

18  insert the word "said," "ground water within the younger

19  alluvial deposits in Wolf Valley-Pechanga Creek are perco-

20  lating waters but add to and support Temecula Creek and

21  the ground waters within" strike the word "younger" so it

22  will read "alluvial deposits in Pauba Valley."

23      THE COURT:  Does it sound all right to you, Mr. Veeder?

24      MR. MEEDER:  May I inquire as to why we make the

25  separation there "and support Temecula Creek and the ground

P 21

1    waters within the alluvial deposits of Pauba Valley"?

2    Doesn't it support the ground waters in the ground water area?

3        MR. GIRARD:  I don't think there is any evidence that

4    it supports the ground water away up in the top of Murrieta

5    Valley.

6        MR. VEEDER:  Isn't it a composite of all the waters

7    coming in that supports the whole area?

8        THE COURT:  You have this evidence that you put on

9    about the water divide between the two.

10        MR. VEEDER:  All right.

11        MR. GIRARD:  As far as the United States is concerned,

12    it would certainly be water to which they were entitled,

13    because they add to and contribute to the river.

14        I think that takes care of our suggestions, Mr. Krieger's

15    and mine and your Honor's comments.

16        THE COURT:  Let's go back to page 1 again.  On line 4

17    it should be "alluvium," should it not, instead of "alluvial"?

18        MR. GIRARD:  Yes.

19        THE COURT:  On line 24, starting at 23, "that the area

20    within said ground water area consists of older and younger

21    alluvium," and I think you mean the location of each is

22    depicted on 15-L.

23        MR. GIRARD:  All right.  That is what was intended.

24        THE COURT:  Not just the area is depicted, but the

25    location.

P 22

1        Now, I have a little trouble when I get to the bottom

2   of the page. At the very last line, after the words

3   "younger alluvium" insert "in the Murrieta Valley and the

4   area of younger alluvium in the Pauba Valley."

5        MR. GIRARD:  All right.

6        THE COURT:  The thing gets a little complicated as

7   you read it.  So that it would read:  "There is no ground

8   water movement between the areas of younger alluvium in the

9   Murrieta Valley and the areas of younger alluvium in the

10  Pauba Valley."

11        MR. GIRARD:  Would you read what you have written again

12  please?

13        THE COURT:  I have inserted after the word "alluvium"

14  the following, "in the Murrieta Valley and the area of

15  younger alluvium in the Pauba Valley."

16        MR. GIRARD:  That is what was meant by it.

17        THE COURT:  Then we really get into trouble, I think:

18  ". . in that there is a ground water divide," you say "in

19  the older alluvium."  I worked around on this thing and

20  finally I thought maybe we could strike the words "in the

21  older alluvium" and say "there is a ground water divide"

22  and refer to the map, or not refer to the map.  But anyhow

23  there is a ground water divide between said valleys of

24  younger alluvium.

25        MR. GIRARD:  Just strike out "in the older".

P 23

1   THE COURT:  Yes, because you are talking now about

2   younger alluvium and you later talk about older alluvium

3   and you talk about the ground water divide.  If there is a

4   ground water divide it is apparently in waters that would

5   be in either or both.  Mostly, however, it is up there in

6   the older area.  "There is a ground water divide between

7   the valleys of younger alluvium which separates the waters

8   from Murrieta . . "

9   MR. GIRARD:  All right.

10   THE COURT:  Now that means that we may have to make a

11   little change down in III. The first thing I have noted,

12   however, is merely a grammatically thing, on line 14.  You

13   throw the word "either" over after the word "younger

14   alluvium."

15   MR. GIRARD:  All right.

16   THE COURT:  " . . move slowly toward the younger

17   alluvium either within the Murrieta or Pauba Valley."  I

18   don't know whether we need "either."  They move slowly.  It

19   depends on where they are where they move.

20   MR. GIRARD:  All right, very agreeable, although I

21   think "either" should be in there.

22   THE COURT:  All right, put it in then after "younger

23   alluvium."

24   MR. GIRARD:  All right.

25   THE COURT:  And also on line 28 a very minor matter,

P 24

1    on line 28 at page 2, in front of the words "the probability"

2    I think you should insert "by the probability".

3      MR. KRIEGER:  Didn't you have some additional language

4    for one of those paragraphs?

5      THE COURT:  Yes, I have a lot of language here.  I

6    will pass them out to you in just a minute.  Well, I will

7    pass them out and we can read them over together.

8      If you will pass these out, Mr. Clerk.

9      There is one for you to pass out, Mr. Bailiff.

10      Now these I don't even vouch for.  I just sat down at

11    one-thirty and dictated the three of them, and where they

12    would come in I don't know.  It would seem to me that if

13    we are going to find the facts in this watershed we ought

14    to find some of these things.

15      MR. VEEDER:  We have 1(a), 1(b) and 1(c).

16      THE COURT:  1(a), 1(b) and 1(c).

17      In some instances some of this material fits in.

18    There may be some duplications.

19      At the beginning of 1(a) it should be "northeast" in-

20    stead of "northwest," at about line 4.

21      MR. STAHLMAN:  On page 1 in 1(a) I call your attention

22    to the first paragraph.  Oh, you corrected that.

23      THE COURT:  Yes.

24      Let's just read them generally for content to see what

25    I am getting at and then see if there is any value in them.

P 25

1        Have you looked over 1(a)?

2        MR. VEEDER:  Isn't that a ground water lake or reservoir

3    -- "that the alluvial fill which constitutes said ground

4    water reservoir"?

5        THE COURT:  That is a mistake of transcription.  That

6    is the Murrieta Valley instead of "fill."  That is the first

7    line on 1(b).

8        MR. STAHLMAN:  That is the Wildomar Fault?

9        THE COURT:  Yes.  I just dictated this -- "that the

10   Elsinore Fault to the West and the Wildomar Fault to the

11   East . . "

12       On 1(c), the first line, "entirely" should be "younger."

13       MR. GIRARD:  I don't see any objection to either 1(a)

14   or 1(b), or even 1(c), and I think they can be worked in,

15   your Honor.  But I think this provision on 1(c), I understand

16   that it is correct that excellent wells have been drilled

17   that pierce only the older alluvium, but I think it should

18   be worked in with the general finding, that generally

19   speaking, the older alluvium produces less good wells than

20   the areas of younger alluvium.

21       THE COURT:  I myself haven't finished reading 1(c) to

22   see what other errors she has made.

23       MR. GIRARD:  In other words, it shouldn't give the idea

24   that you would get these good wells in all three.

25       MR. STAHLMAN:  That such wells in the three categories

P 26

1    vary in the amount of water they produce.

2       THE COURT:  There is something wrong in 1(c) at the

3    top part of it and I can't figure out what it is.  "The

4    younger alluvium was laid down at a later date than the --

5       MR. STAHLMAN:  "at a later date than the older alluvium."

6       THE COURT:  Maybe this does it.  Ordinarily she is

7    fairly accurate, but I was going pretty fast.  On line 3

8    strike "an" and put in "in".

9       MR. VEEDER:  You are on 1(c) now?

10      THE COURT:  1(c).  Strike out "entirely," so that it

11    would read "was laid down at a later date in said ground

12    water area as overlying deposits . . in the older alluvium."

13      Those are some thoughts.  It would seem to me that we

14    ought to have some findings on this Murrieta Valley and

15    these faults and the effect of the Wildomar Fault.  And Mr.

16    Veeder is talking about the younger alluvium as a fill on

17    top of the older.  I think we have covered that.  This is

18    only a starter -- I mean, some ideas.

19      For instance, 1(a) could well come in right after 1,

20    1(b) would follow along about the same place.  Parts of 1(c)

21    would come on later.

22      MR. GIRARD:  I think they can all be worked in, your

23    Honor.

24      MR. KRIEGER:  The only part of 1(c) that concerns me

25    is the last sentence.  I guess this is all because I fear

P 27    1    that the evidence we put on, which was all directed at well

2    tests, shows that you just don't get good wells out of the

3    older alluvium.   Theoretically maybe you are supposed to,

4    but the fact is that you don't.   And when you got wells in

5    the younger alluvium you got pretty good water production.

Take  G   6
      fls.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17,028

t-49
G-1

1    First of all, the word "excellent", I don't know

2    exactly what that would mean.  Water producing wells, yes,

3    but I think there is a considerable difference, your Honor,

4    as to how much water you get.

5    THE COURT: First of all, there is no doubt; and it may

6    well be true of younger alluvium areas that there are not

7    particularly good wells, particularly in the northwestern

8    part of the Murieta area.

9    MR. KRIEGER:  They are not good wells, some of them,

10   you say?

11   THE COURT:  They are not good wells.

12   MR. KRIEGER:  No.

13   THE COURT:  And the wells over in Santa Gertrudis and

14   the Roripaugh wells, do they start in younger alluvium?

15   MR. KRIEGER:  Yes.

16   MR. VEEDER:  Just a thin mantle.

17   THE COURT:  That starts in younger alluvium.  Is there

18   any one well delineated entirely in older alluvium?

19   MR. VEEDER:  The Pit  well.

20   THE COURT:  The Pit  well.  I think this is generally a

21   fair statement.  I don't think that you can say that all wells

22   in younger alluvium are good and all wells in older alluvium

23   are poor.

24   MR. VEEDER:  No.

25   MR. KRIEGER:  No.

17,029

t-50

1     THE COURT:  And if I were to drill a well, I would

2    drill it in younger alluvium first, because that would be my

3    best bet to get some water there, but I don't think the way

4    this runs that there is any pattern.

5     MR. KRIEGER:  But the real problem we are dealing with

6    here again, all the geological maps we have show the aerial

7    extent of the various types of alluvium we are talking about.

8    We are not concerned on any of those with the depth of that

9    layer, and, therefore, don't we have to relate all of our

10    findings to the maps that are in evidence?

11     THE COURT:  Yes, except we have in evidence well logs,

12    and although a more detailed study could be made, I would

13    wager that if you would want to look at a lot of the well

14    logs you would find where the well had pierced the older

15    alluvium and gone to the younger alluvium.

16     MR. KRIEGER:  I think that is true, but I don't think

17    that study really has been made, or I don't think it has

18    been correlated to some of the geological exhibits.

19     MR. VEEDER:  I think some of Mr. Krieger's own evidence

20    will bear that out.  If you check on the Guenther wells, he

21    has some good ones, and they still are in the younger

22    alluvium.

23     MR. KRIEGER:  Whether they are good or not, I think that

24    is questionable, because most of those wells are not

25    particularly good.  The only really good ones we have are the

17,030

t-51

1    ones down on the Santa Gertrudis River.

2         MR. STAHLMAN:  And you will find that the location of

3    the well has something to do with it, too.

4         MR. KRIEGER:  And the misleading part of your finding

5    will indicate that we are talking about the underground strata,

6    and if we are supposed to say that, it should be from an

7    analysis of the well logs rather than the maps which show

8    the aerial extent.

9         THE COURT:  We are just making a general finding as to

10   the character of the ground water area, and if some issue

11   comes up on a particular well, then we have to study logs

12   and see where he is on the water course, and take into

13   account the entire pattern.  But there is nothing here, I

14   take it, that can hurt anybody.

15        MR. KRIEGER:  I was not concerned with its hurting any-

16   one.  I was more concerned with the accuracy of it, and I

17   agree there is nothing in the finding that hurts anyone.  But

18   I think it tends to be a little misleading for the reasons

19   that I have stated, when we speak of the surface as compared

20   to the underground strata.

21        THE COURT:  That is the reason I tried to make this

22   finding, that the younger alluvium overlaid, and varied as

23   to depth.

24        MR. KRIEGER:  I think up to the last sentence it is fine.

25   It is the last sentence that bothered me.

t-52

1      THE COURT:  I think evidence is lacking to show in

2  detail the depth of the younger alluvium, and to show in many

3  cases the perforations of the wells.  It is true you have had

4  no detailed evidence as to the depth of the younger alluvium

5  in this particular area.  We have in the case of some of the

6  smaller basins, I think, a little more information than we

7  have here.

8      MR. VEEDER:  But, your Honor, I think there is one

9  thing that was clearly developed by all witnesses, that it

10  was just impossible to differentiate really where the younger

11  alluvium left off in many instances, and where the older

12  began.  But it was obvious in many of these instances that

13  the source of the water was the older alluvium.  I think you

14  are right in what you say.

15      MR. KRIEGER:  If the last sentence were to read, "that

16  wells have been developed in all of the three categories

17  named above with varying degrees of success," I think that

18  would about cover it.

19      THE COURT:  I think that is saying the same thing.  I am

20  not going to spend a lot of time in worrying about this, Mr.

21  Krieger.  I am not making any particular finding about any-

22  body's well.

23      Now, it does not pertain to this area, but in the ground

24  water area one of the best wells we heard about was the well--

25  and you weren't here at the time -- that was up in the older

17,032

alluvium, and it was a terrific well.  When you looked at the map, it was in a large area of older alluvium, sort of upgrade.  This well had apparently been drilled in some place where it may have caught the convergence of the percolating waters.

What well was that?  You know the one I am talking about, where the fellow had a house down in the Valley?

MR. GIRARD:  That was in Anza Valley, your Honor?

THE COURT:  No, not in Anza.

MR. STAHLMAN:  In Murieta, wasn't it?

THE COURT:  No, not in Murieta.  He has a house down in the Valley.

MR. VEEDER:  I know where it is.  It was Mr. Sachse's client Allen up at the Stardust Ranch, and I can show you where it is.

THE COURT:  Let's look it up on the map.

MR. VEEDER:  It was up in the Aguanga Valley, your Honor.

MR. KRIEGER:  Not in this area we are talking about right now.

THE COURT:  What is that map number?

MR. VEEDER:  275.  That is up in Section 8, Township 8, range one east.  It is K-2, or 8-K-2.  That is Section 8, Township 8, range one east.

THE COURT:  Was it Knox?

MR. VEEDER:  No, it is on Stardust.  It is Well K-2,

17,033

t-54

1    8-K-2, on Exhibit 275.

2         THE COURT:  K-2?  K-2 does not mean anything, Mr.

3    Veeder.  You have to have the Section number.

4         MR. VEEDER:  As I say, it is 8-K-2.  It is Section 8,

5    Township 8, range one east.

6         MR. STAHLMAN:  Right here, your Honor.

7         THE COURT:  Yes.

8         MR. STAHLMAN:  And here it is again (Indicating).

9         MR. GIRARD:  There is another one, though, and I thought

10   that was up in Anza Valley.

11        MR. KRIEGER:  That is on younger alluvium.

12        THE COURT:  Is there another map of this besides 275?

13   Is there another map besides 275 which would show this area?

14        MR. VEEDER:  277 shows it.

15        THE COURT: What?

16        MR. VEEDER:  277 shows it, your Honor.  It shows the

17   area, but not the well.

18        THE COURT:  Let's take a short recess and look some of

19   this stuff over, and that will give us time to think about

20   it more.

21        (A ten-minute recess.)

22

H fls.

23

24

25

Take H

1     THE COURT:  Have you had a chance to look those over

2  any further?

3     MR. GIRARD:  I looked them over, your Honor.  I think

4  they can be worked into the findings in appropriate spots.

5  I would be glad to undertake it.

6     THE COURT:  Instead of revising all the findings, why

7  don't you work out excerpts where they would go in?

8     MR. GIRARD:  All right.

9     THE COURT:  Do that and have it ready tomorrow.

10     MR. GIRARD:  I'll do that tonight.

11     THE COURT:  Do you have any thoughts on it, Mr. Veeder?

12     MR. VEEDER:  I think A, B and C are reflective of the

13  facts that are in the record.  I think they are very good.

14     THE COURT:  I don't think they are very good.  They

15  were just knocked off.  They have to be dressed up.

16     MR. VEEDER:  They are certainly, in my view, important,

17  and I think they reflect the geological situation that

18  prevails.

19     THE COURT:  They would be read in conjunction, in part,

20  with --

21     What was the section you objected to?

22     MR. GIRARD:  The other addition?

23     THE COURT:  Page 4, at the bottom of Paragraph VIII.

24     MR. GIRARD:  That is correct.  I think you were going

25  to draft up some language and I think it should go in there,

P 29

1       that shows that in some areas there has been effect.

2               THE COURT:  I didn't do it.

3               MR. GIRARD:  I can do that.

4               THE COURT:  I thought I had it.  But work out something

5       on that.

6               MR. VEEDER:  Is it proper at this point to raise a

7       further objection?  I would like to go back, if I could,

8       to Finding No. II on page 1, in which reference is made to

9       Pasadena vs. Alhambra.

10              THE COURT:  All right, what is your point there?

11              MR. VEEDER:  It is my view, your Honor, that there is

12      nothing in the record to support the conclusion in the

13      first instance.  It says:

14              "That said ground water area is not an under-

15              ground basin as defined in the case of Pasadena vs.

16              Alhambra, 33 Cal. 2nd 908. . "

17      I think it is entirely negative, and I don't think it is a

18      proper statement to appear in findings.  I think the facts,

19      as I read the case of Pasadena vs. Alhambra, indicate that

20      it is much the same as this case in that it is an alluvium

21      filled area surrounded by or underlain by impervious materials

22      such as we have here.

23              THE COURT:  I thought we had been all over this.  And

24      I thought we had debated out the question whether we are

25      going to call this "basin" or "ground water area," and that

P 30

1    we had all been in agreement that we would call it "ground

2    water area" and try to stay away from "basin." Whether you

3    think it is proper form in a finding doesn't impress me at all.

4    It is added by Mr. Girard to say that this is not the kind

5    of basin talked about in Pasadena vs. Alhambra.

6        MR. VEEDER:  With all respect to your Honor, I have

7    never bought that "ground water area." If you want to find

8    that way, certainly it is within your prerogative. But my

9    own view is that the principles of Pasadena vs. Alhambra

10   are going to be extremely important in this litigation.

11       I think, moreover, that --

12       THE COURT:  Let's resolve the conflict the simple way.

13   State in just so many words what we are talking about. Why

14   don't we state something like this:  That we have in these

15   findings adopted the term "ground water area" to cover the

16   factual situation, rather than the word "basin." But we

17   do this for the reason that the word "basin" ordinarily

18   connotes an alluvial fill surrounded by impervious materials

19   in which the ground waters generally have about the same

20   level throughout the basin, although it may vary from place

21   to place; that in this particular area which we call a

22   "ground water area" the situation is one where water is

23   moving downward through this area in hydrological contact,

24   so that there is even no approximation of a water level in

25   the basin, although, as we find later on, there are water

17,037

P 31  1      contours showing that certain contours of water stand at

2      certain level above sea level, and we find later the down-

3      ward gradient of water throughout this area.  We, therefore,

4      have not inadvertently used the word "ground water area"

5      rather than the word "basin."  That is all we are talking

6      about.

Take I fls. 7

t-55
I-1

1    MR. VEEDER: That is all I intended to complain about.

2    THE COURT: Doesn't that conform with the facts?

3    MR. VEEDER: Well, I will say --

4    THE COURT: Now, you take in some of these other areas

5 where there are ground water bodies, the situation is going

6 to be different. There are some of those that may well be

7 the equivalent of basins, where there is a lip or something

8 where water comes out. There is some general approximation

9 of water levels within the area. That is true of smaller

10 alluvial fills up in the upper regions, but here we have an

11 entirely different picture. We have a large movement of

12 water in a downward gradient, and that is all we are saying.

13    Would you accept some finding along the line that I have

14 just stated?

15    MR. VEEDER: I think what your Honor has stated is

16 correct geologically and hydrologically, but I think it is

17 the same source which exists in any basin with which I have

18 had any acquaintance.

19    MR. STAHLMAN: Certainly it is as to Pendleton.

20    MR. KRIEGER: Certainly, there is some movement there,

21 but this says this is parallel to the Raymond Basin, and I

22 think the distinguishing thing about the Raymond Basin is

23 that the Raymond Basin then was and still is a basin that

24 you can regulate and control. You know how much water is

25 coming in, how much is being used, and how much is going over

t-56

the lip and into the San Gabriel River.  You also know how much is imported from non-tributary sources into that basin, and by carefully checking the wells, they are at different elevations.  In fact, there are sub-basins within the Raymond Basin, but by checking the well levels throughout that whole area you can determine exactly how much water there is -- well, not exactly, but substantially how much water there is in the basin, how much is coming in, and how much is being used.

You have an entirely different situation here, because you have water coming in, so to speak, from a vast area, and we are not trying to regulate a basin in this case, but we are trying to demark an area where pumping affects the Santa Margarita River, which is entirely different than the Raymond Basin, I think.

THE COURT:  We certainly don't have the facts to support the kind of a finding you talk about in regard to the Raymond Basin.  I am not sure that it would not be within the ingenuity of man to some day do it, but it has not been done, and that is what I say.

Are you satisfied with the statement that I made, gentlemen?

MR. KRIEGER:  I am satisfied generally with the statement that your Honor made in distinguishing it from the Raymond Basin case, as to why we are not calling it a basin.

t-57

1    THE COURT:  Then let's do it that way.  I don't see

2 anything wrong in saying what you mean.

3    MR. VEEDER:  Neither do I.  But the reason I say this is

4 that I got the report of the Referee in the Raymond Basin case,

5 and I went back and read it through, because I couldn't

6 follow what was said in regard to the differentiation.

7    Now, the contours, as established in the Spring of 1937

8 on the Raymond Basin, are even sharper, and the elevations are

9 greater, there is a greater disparity in elevation than there

10 is on the Murieta Basin.

11    Now, the only thing that Mr. Krieger has said is this:

12 He has said that we are able to measure the waters that

13 came into Raymond Basin, and we are able to measure the

14 waters that go out of Raymond Basin, and we are able by a

15 long period of checking to determine the wells that are

16 important in Raymond Basin, but he gives no differentiation

17 hydrologically, geologically, or legally as to why this

18 alluvial filled area to which we are making reference is

19 any different except for the precision in the measurements

20 of the water coming in.

21    MR. KRIEGER:  It may be the same, Mr. Veeder, geologically,

22 but none of the factors which you have even mentioned in your

23 own statement have come close to measuring the input, the out-

24 put, and the use within.  You don't have that data.

25    MR. VEEDER:  That does not make it a basin, Mr. Krieger,

t-58

I-2

1    and that is the point I am trying to make.

2    MR. KRIEGER:  It makes it a basin for the purpose of

3    regulation within the State.

4    THE COURT:  And I am also conscious of the fact that

5    there is certain evidence in the record.

6    MR. GIRARD:  I will have to find it, your Honor.

7    THE COURT:  Do you want to tie it in there, when we

8    call it a ground water area?

9    MR. VEEDER:  The only point that I make, your Honor, is

10   that when I find in the finding, observe in the finding

11   language, the legal import of which I am not sure of, I

12   simply object to it, and I will object to this.

13   Now, there is one other factor that I would like to

14   interpose.  Is there any legal connotation to the words

15   "ground water area", so far as your Honor is concerned?  This

16   is percolating water.  Would the principles of law be any

17   different as between Pasadena vs. Alhambra and this area?

18   THE COURT:  Do you think so?

19   MR. VEEDER:  I wouldn't think so.

20   THE COURT:  Have we solved this now?  We have taken

21   the ground water area, and maybe you want to talk about the

22   basin in the Raymond case.  I don't look at this so much as

23   a basin as I do a ground water area.  Is there any objection

24   to doing what I have stated?

25   MR. VEEDER:  I can go ahead and say that I think the more

T-59

1  specificity there is in the finding, the better off I think

2  it is from the standpoint of law.

3      THE COURT:  All right.  Another thing we had not

4  mentioned before, and I think there should be a finding on

5  it, and that is that the evidence shows that depending upon

6  the level of water in the older or younger alluvium, there

7  could be an exchange either way.  We don't have that in the

8  findings.

9      We went over this for some time, and there was proof

10  that if, for instance, Pauba Valley was dewatered, there

11  would be a movement of water from the older into the younger

12  alluvium, and that if on the other hand there was an area

13  of younger alluvium and you dewatered the older alluvium

14  adjacent thereto, you could have a movement the other way.

15      Do you recall this?

16      MR. VEEDER:  I recall it, and, as I remember, there was

17  agreement that you couldn't tell what was the older and what

18  was the younger in most places, and that there was a free

19  movement depending upon the gradient.

20      THE COURT:  There was a movement dependent upon the

21  gradient, and depending upon the  permeability of the

22  material, but the difference in the cataloguing of the older

23  and younger does not mean there cannot be a movement of

24  water either way between them.

25      MR. VEEDER:  And that there is complete continuity

t-60

1  between the two.

2      MR. STAHLMAN:  There has been no determination of the

3  rate.

4      THE COURT:  All right.  I think there ought to be a

5  finding on that.

6      Now, do you have any other serious objections, Mr.

7  Veeder, to what we are doing?

8      MR. VEEDER:  I think that we are improving on them, and

9  I think we are going along very well, but I certainly

10  petition your Honor to take out the first few lines of

11  Finding II.

12      MR. GIRARD:  I don't have any objection to taking them

13  out.

14      THE COURT:  We have passed that bridge.

15      MR. VEEDER:  Have we taken them out?

16      THE COURT:  We have taken them out, and we will put

17  something in along the lines I have stated.

18      MR. VEEDER:  All right.  That is fine.

19      THE COURT:  Now, in regard to the conclusions of law, I

20  went through the findings and sort of made some notes as to

21  what conclusions I thought there should be, and whether these

22  are covered in Mr. Krieger's suggestions, on some of these

23  there is doubt.

24      For instance, I think there should be a conclusion that

25  this ground water area -- it is part conclusion and part

t-61

fact -- is water bearing, and the water is in hydrological

contact with the waters of the Santa Margarita River.   In a

sense that is a conclusion of law.   If there is any doubt

about it, it does not hurt to have something like that in on

either side.

Then I am wondering whether the conclusion of law

involved in the fact that this ground water area is dependent

on runoffs from streams and the underground movement of

water is probably factual, and whether that is a problem

entirely of a factual matter.

MR. GIRARD:   I think Mr. Krieger's conclusion is stated

in Conclusion  Four.

THE COURT:   Then outside of the terminology, outside of

calling it the Murieta-Temecula area, or calling it the

ground water area or the Murieta-Temecula area, the only

problem I have is when you get down here to three:

"Such overlying and riparian rights are correlative

with all of the owners of land riparian to the Santa Margarita

River below the confluence of the Murieta and the Temecula."

Now, it is true that there are those people downstream

who can complain, but when we get to making findings of

people upstream, we are going to find that their rights are

correlative with these persons in the ground water area, and

I am of the opinion that this word "correlative" takes in the

whole bundle of situations.   I think that the upstream and

t-62

1   downstream users have correlative rights, although in

2   practice the upstream user cannot complain about the down-

3   stream user.

4       MR. KRIEGER:   I have tried to cover that, your Honor,

5   and if your girl has the draft that I gave to her at noon

6   that covers Number Two, it is an effort to cover the point

7   that you were talking about.

8       Would you excuse me a minute to ask her if she has it

9   finished?

10      THE COURT:   Did you ask her to type it up?

11      MR. KRIEGER:   Yes.

12      THE COURT:   I have her working on something else.

13      MR. KRIEGER:   Then maybe I will just take it back.

14      (Thereupon Mr. Krieger left the courtroom and returned

15  shortly.)

16      MR. KRIEGER:   As a matter of fact, your Honor, I wanted

17  to try to put a little sketch on the board to see if I could

18  illustrate some of the conclusions that I tried to put

19  together here, to show how they might arise.

20      The last time I was here we got into quite a discussion

21  as to what would happen in a hypothetical case, and I think

22  that can be pretty well illustrated by a sketch on the black-

23  board, if I may do it.

24      THE COURT:   Do you think it will assist us in this

25  matter?

.I3

t-63

1    MR. KRIEGER:  Yes, that is the only reason I wanted to

2  do it.

3    THE COURT:  All right.  Put it on the board.

4    MR. KRIEGER:  This will be very simple.

5    (Counsel draws on the blackboard.)

6    This is a rather crude sketch, but I think it is

7  essential to point out the varying rights that we are

8  concerned with here when we talk about correlative rights.

9    By this "Y" on the board I have indicated Murieta

10  Creek, the Temecula River, the confluence, and the Santa

11  Margarita River.  The dotted line I have used to indicate the

12  outward boundaries of the Temecula-Murieta area, the ground

13  water basin area we are talking about.

14    The importance of the streams that I have indicated

15  coming into this area will become apparent because there are

16  some rights upstream.  These are the upstream rights

17  (Indicating).  For instance, this would be Tucalota Creek,

18  and this would be Santa Gertrudis, and this Long Valley, all

19  of which contribute water into the Murieta Creek area.

20    THE COURT:  Let's mark them.  Actually, they are Warner

21  Springs.

22    MR. KRIEGER:  Warner Springs.

23    MR. VEEDER:  Warner Springs is our first one.

24    THE COURT:  And the next one is Tucalota?

25    MR. KRIEGER:  Tucalota Creek.

B-64

MR. VEEDER:  And Tucalota adjoining Santa Gertrudis.

MR. KRIEGER:  And Santa Gertrudis, if I can put it that way, and that last one would be Long Valley.

MR. WILKINSON:  That is a tributary of Santa Gertrudis.

MR. VEEDER:  The next is Temecula.

MR. KRIEGER:  Then there are no others besides those two.

THE COURT:  Those two, but Santa Gertrudis has several branches.

MR. KRIEGER:  Yes.  Let's take it the way it is, then, with those two, and they have branches.

THE COURT:  Put the branches up on Santa Gertrudis.

MR. KRIEGER:  Okay.

THE COURT:  Outside of the basin.

MR. KRIEGER:  All right, just about like that, (Indicating).

Now, it would seem to me that what we are trying to achieve here is to say that the Temecula -- the Murieta-Temecula ground water area is in effect like any other riparian user on the stream.

We are trying to lump all of these rights together, and that is why initially we have set forth, and I set forth in this conclusion overlying rights, which would be the pumping right in the Murieta-Temecula area, which would be very much like the riparian rights of the rest of the stream,

t-65

1   except you are not diverting water, you are taking it out by

2   pumping.

3      Now, what are the rights in the Murieta-Temecula area

4   compared, first of all, with other users on the stream system?

5   We have to say that they are correlative rights in the sense

6   that they have some right to the common supply of the whole

7   stream system.

8      Now, to me that means, first of all, that any user down-

9   stream, -- and if this is the United States down here at the

10   end of the stream, the United States has the right to come

11   up and declare, and have declared the rights of the users on

12   either branch of this stream system.  Not necessarily both.

13   They could take just one if they chose to do it.  If the

14   United States came up into the Murieta-Temecula area, and

15   said, "We want those rights adjudicated," they could do so,

16   and these people that I am talking about would have to share

17   their rights in the entire stream system with other stream

18   users below them, below the confluence of these two streams

19   in this case.  That would be one situation that you might

20   have.

21      Another situation would be that the people within the

22   Murieta-Temecula area themselves would want to adjudicate

23   their rights, and they would have an absolute right to do

24   that, and their suit would not involve the United States or

25   any other user downstream below them.  All that their suit

t-66

would involve would be a question of how much each parcel of land that is overlying or riparian is entitled to have in the way of a water supply, and this in turn would depend upon the amount of water that came into the area.  They could have in effect a separate adjudication all to themselves; very much, Mr. Veeder, like they had in the Raymond Basin case.

Now, a third situation arises, and I have tried to cover all three of them in these conclusions, where the people in the Murieta-Temecula area were concerned with the amount of water that came down from the little streams above them, and here again we have tried to define how much of these tributaries are still in this litigation, and the quantity of water used on the tributaries outside of this area is important to a settlement of all of our rights in this suit. So if somebody on one of these tributaries outside starts to use more water than we think he is entitled to, because he would find a nice place to pump it, then he can be controlled by the group below on the Murieta stopping him. So, we have the United States stopping either branch of the river, we have either branch of the river stopping people above it, or conceivably one massive determination of all of the rights of all of the people.

Now, there is one other situation that I think is crucial to a determination of this suit, and that is, what happens when you want only a part of the rights determined in

17,050

t-67

1   the Murieta-Temecula area?   Because this water moves in a

2   general way downstream like this (Indicating), there is no

3   showing that the use up in the northwestern part of the area

4   would affect somebody down in the middle of the area.   Say,

5   at Santa Gertrudis, for example, where it comes into Murieta

6   Creek.   Nor is there any showing that somebody over on the

7   Temecula River would have an effect on the person at the

8   Santa Gertrudis confluence with the Murieta.

9   There are various pockets of interests within the

10  Murieta-Temecula area that have to be taken care of, and in

11  our conclusions of law, when we recite that people have

12  correlative rights, we have got to say that their rights are

13  in common one with the other, as affecting the area in which

14  they may be interested at the time.   So you could conceivably

15  have an adjudication of the most northwesterly part of the

16  Murieta-Temecula area independent of any other interest on

17  this stream, or you could have one neighbor suing another

18  neighbor within this area.

19  THE COURT:   To my thinking, that is all included in the

20  word "correlative."

21  MR. KRIEGER:   For that reason we have tried to define

22  the word "correlative," and I would like to leave this point

23  that we are talking about now, and I would like to give you

24  this definition of "correlative," which is a combination of

25  both Mr. Girard and myself.

17,051

t-68

1     THE COURT:  All right.  Read it.

2     MR. KRIEGER:  And I would like to do it in the context,

3  if I may, of my proposed Finding Number Two, to take the

4  place of Number Two, and avoid the word "co-equal."

J fls

Take J

17,052

P 32

1          It would read like this:

2                  "Such overlying and riparian rights are

3          correlative.  As used herein, 'correlative'

4          means corresponding rights and duties either to

5          the common supply of the Santa Margarita River

6          or that portion thereof in which such claimants

7          have some right or duty."

8     By that I am trying to divide it down into the areas of use.

9                  "Such rights are not necessarily the same as to

10         quanity of entitlement, character of use, method

11         of diversion or extraction, but on the contrary

12         the quanity of water, type of use, method of

13         diversion or extraction, or any other term or

14         condition of use peculiar to the individual

15         parcel of land under consideration shall be

16         determined by this Court from time to time in

17         the excercise of its continuing jurisdiction,

18         the facts as they may then appear, and pursuant

19         to California Law."

20         Now, if we could agree on a definition of "correlative

21    rights," then I think it would follow that the next two

22    conclusions of law would seem to follow automatically from

23    that one.

24         THE COURT:  The only problem I had in my mind was this

25    situation.  Suppose on your diagram that people were pumping

JOHN SWADER, OFFICIAL REPORTER

P 33

1   excessively on the tributaries of the Santa Gertrudis and

2   they were dewatering the upper end of the Santa Gertrudis

3   and the area around.  Somebody on Warm Springs Creek, which

4   is upwater gradient, wants to complain.  And we have said

5   that there were correlative rights in these people in the

6   ground water area with other users upstream.  I still think

7   that, although it may be improbable, it might even be --

8   there would be a right there which might be enforced.

9       In other words, the persons down in the ground water

10   area on what amounts to Warm Springs could contend that the

11   water coming down Santa Gertrudis way had, as it were,

12   supported the water moving downward by having a sufficient

13   head downstream in Santa Gertrudis that prevented an

14   excessive amount of water from bleeding out of the Warm

15   Springs area within the water area, and that therefore the

16   excessive uses, to take an extreme case, had caused a greater

17   movement of water down gradient from the Warm Springs area

18   and therefore had affected the people in the Warm Springs

19   area.

20       It is factually conceivable in the extreme case, although

21   as practical matter those persons up-gradient ordinarily

22   aren't going to have any complaint against people down

23   gradient.  It is the same as on the stream.  The upstream

24   owner ordinarily, except as to an immediate neighbor, can

25   have complaint against the downstream riparian user.  Although

P 34

1   I suppose you could spell out a case of two land owners

2   immediately adjacent where a downstream riparian, with a

3   big well, might wreak havoc with the man immediately next to

4   him upstream.

5   MR. KRIEGER:  Where he was sucking water out or bleeding

6   the underground or something like that.  That could conceiva-

7   bly happen.  And I think we have covered that.

8   THE COURT:  I don't think we are wrong when we say that

9   they have correlative rights in the waters of the river.

10   Do you have any problem on this, Mr. Veeder?

11   MR. VEEDER:  I can accept the idea that Mr. Roripaugh

12   has a correlative right with Mr. Guenther, and that Mr.

13   Roripaugh could so operate his pump that he would deprive

14   Mr. Guenther, who is upstream from him, of water that Mr.

15   Guenther is entitled to.  I don't think that has occurred.

16   But I do believe that each of them participates in a common

17   supply of water, and that that common supply of water is

18   derived from Warm Springs Creek, Santa Gertrudis Creek,

19   Tucalota Creek, and I think they all participate correlative-

20   ly in the available supply.

21   THE COURT:  I see no harm in putting in some definition.

22   Have you looked this over, Mr. Girard?

23   MR. GIRARD:  Yes.

24   THE COURT:  Mr. Stahlman?

25   MR. STAHLMAN:  I just heard it.

P 35

1    THE COURT:  Mr. Veeder?

2    MR. VEEDER:  I have looked at it.  I would like to

3    consider it a little more.  I think it is getting close to

4    what is involved.  Mr. Girard and I have talked about this

5    in the past.  I think there is general agreement between us.

6    THE COURT:  Can you work on that a while this evening?

7    MR. VEEDER:  I would like to have a copy, if we could

8    run that off.

9    MR. GIRARD:  Maybe your girl could type it.

10   MR. VEEDER:  Why don't we give it to her now and she

11   can run it off.

12   THE COURT:  In one sense, however, you don't want to

13   change some of your language in II, where you say that

14   overlying and riparian rights are co-equal.  In other words,

15   we are equating riparian and overlying rights.

16   MR. VEEDER:  Isn't there a material difference, though?

17   In writing the findings on Tucalota Creek I tried to

18   differentiate on the grounds that the riparian right is

19   riparian only during a time when the water is in the stream,

20   which is very short and, as you have said, illusory in

21   character.  Whereas, the man who is riparian may also be

22   overlying and he will share correlatively with another man

23   who is overlying but who is not riparian.

24   Do you follow what I am saying your Honor?

25   THE COURT:  Yes.

P 36

1        Well, this to me is all included in the word

2    "correlative."  I think in each instance, and if you finally

3    got a definition of "correlative," I think we could use the

4    word "correlative," and we know that all these things are

5    involved.

6        The word "riparian" probably was earlier in use than

7    "correlative."  But you could say that these people had

8    correlative rights, but as a practical matter some of them

9    might not be legally enforceable -- there is no damage to

10   them.  But we have got to take care of those people who are

11   riparian on the Murrieta who are actually riparian on a

12   stream where there is a little water, with overlying owners

13   who aren't riparian to the stream.

14       MR. KRIEGER:  Isn't the only difference that a riparian

15   can divert his water and an overlying user has to pump it?

16       MR. VEEDER:  No, I don't think so.  I think that there

17   is a sharp limitation.  Correct me if I am in error on that.

18   You take the situation on Murrieta, where I think you can

19   probably say a channel which has been made along Murrieta

20   here, if you will observe, I think you can say that the

21   people abutting upon or traversed by that area are riparian

22   and they can divert the water out of the stream and apply

23   it on any part of their riparian land.  But I think you

24   would encounter a situation where a man who was overlying

25   would only be permitted to take -- wouldn't he be limited

P 37

1    entirely to the exterior boundaries of the particular tract

2    that was overlying?

3        MR. GIRARD:  That is a question that isn't answered

4    under California Law.  I looked it up very carefully.  There

5    is some dicta in one case which would indicate that an

6    overlying owner can use on land which is not overlying the

7    basin as long as it is held in the same type of ownership

8    as the riparian.  I think you are not going to find any case

9    on it.  I'll tell/you that right now.

10       THE COURT:  Was part of it outside the watershed, though?

11       MR. GIRARD:  No, limited solely to the watershed, your

12   Honor.  But I think it is a question really which affects

13   the United States as well as anyone else, because I presume

14   that a lot of their land which would overly a ground water

15   area or a ground water basin -- I mean, all of their land

16   down there does not overly the basin, even though much of

17   it is irrigable.

18       MR. VEEDER:  That is true.

19       MR. GIRARD:  I think we will have to have a standard

20   rule.

21       My position is just frankly that an overlying owner

22   can use it on any land within the watershed as long as it

23   is in the same general category as riparian.

24       MR. VEEDER:  And if you take it out of the watershed

25   it becomes an appropriation.

P 38

1    MR. GIRARD:  Out of the watershed, it is clear.

2    MR. VEEDER:  It becomes an appropriation.

3    MR. GIRARD:  Yes, it becomes without right as an over-

4    lying or riparian owner and the right, if any, would have to

5    be prescriptive or appropriative.  But not as an overlying

6    owner, clearly.

7    MR. VEEDER:  I think you have a situation along the

8    line you have described.

9    MR. KRIEGER:  I think you have a situation, too.  But

10   I don't think it has come up so far, and it will come up

11   in the future, and I think one day we will have to grapple

12   with the fact that a land owner takes water off the land

13   where he pumps and takes it to another parcel and maybe sells

14   it to a neighbor, clearly it is an appropriation of water,

15   even though it is overlying a basin.  The only way you can

16   stop him is to demonstrate that the whole area is overdrawn.

17   Because the only thing that he can appropriate, even though

18   it is not under the Water Commission Act, is the surplus

19   amount of water.  If it is not there, he can't do it.

20   MR. VEEDER:  That is right.  But he could have an

21   antecedent right over a subsequent appropriation.  Isn't

22   that right?

23   MR. KRIEGER:  In talking about ground water basins

24   you have the same rule:  The first in time, the first in

25   right.

P 39

1       MR. VEEDER:  I think you do.

2       Here we are working on cataloguing --

3       MR. GIRARD:  I would like to get the United States'

4   position on this, though.

5       MR. VEEDER:  I was talking on one point I would like to

6   bring up with Mr. Krieger.

7       I think Mr. Guenther is an appropriator out of Murrieta

8   ground water area, and I think in chronicling the rights,

9   as we are attempting to do now, that is the situation.

10  Because Mr. Guenther has four wells situated in the northeast

11  corner of Section 23 Township 7 South Range 3 West and he is

12  pumping that water from Section 23 -- I am quite sure that

13  that is right -- up into Section 14, which is outside the

14  ground water basin.

15      MR. KRIEGER:  He can do it.  He is not appropriating.

16  Just as if there were no lawsuit here at all.  If Mr.

17  Guenther wanted to pump his water from a low well to a high

18  point on his land and he owned that land, certainly nobody

19  would raise any question about the legality of that export.

20  It is on his land.

21      MR. VEEDER:  I am not asking you about the legality of

22  the export.  I am asking you, what is the connotation? Isn't

23  it an appropriation? Certainly it is not an overlying

24  situation.

25      MR. KRIEGER:  It is an overlying situation.

P 40

1        MR. VEEDER:  No, that isn't an overlying situation.

2    The land does not overlie.  There is a legal connotation to

3    the word "overlie;" it overlies the basin.

4        MR. KRIEGER:  Well, overlies the watershed, Mr. Veeder.

5    You keep saying "the basin."  I say there is no basin.  I

6    think, again, we have established this line, if I am not

7    mistaken, for the purpose of saying that pumping within this

8    area does materially affect the stream system.  This is for

9    convenience more than anything else.  Because nobody conceives

10   that as being a razor sharp line, do they, where on one side

11   the pumping doesn't affect and on the other side it does?

12   Certainly it is a line of convenience, and as long as it is

13   within the watershed we have no problem.

14       MR. GIRARD:  I would like to ask a couple of questions,

15   if I may.  We have two situations.  Here you have a ground

16   water body.  Now this land here overlies this ground water

17   body.  This is Parcel 1 and this is Parcel 2.  Now if the

18   owner of Parcel 1 purchased Parcel 2 he certainly couldn't

19   bring more drain on the basin.  But now let us say we have

20   this in single ownership here, the same situation except

21   that it was not a purchase such as you have down on Camp

22   Pendleton and many other people have, where this land over-

23   lies the ground water body -- this land doesn't.  Can he take

24   water here and put it here?  As an overlying owner, not as

25   an appropriator.  As an overlying owner.  I would agree that

P 41

1   he can't -- assuming that the watershed boundary in both

2   cases is within the watershed boundary.

3       MR. VEEDER:  I think that we are getting down now to

4   where you begin to differentiate between underflow and

5   percolating water.  I think that is where you are now, and

6   I think that is where the distinguishing question comes up.

7       MR. GIRARD:  If this is stream water underflow there

8   is no question that you could do this, because you would be

9   doing it as a riparian, not as an overlying owner.

10      MR. VEEDER:  That is right.  You are talking about

11  percolating water.

12      MR. GIRARD:  I am talking about percolating water.

13      MR. VEEDER:  In that ground water basin or area.

14      MR. GIRARD:  Not in a defined channel.  In other words,

15  it is not part of the stream.

16      MR. VEEDER:  In other words, like we have down at

17  Camp Pendleton.

18      MR. GIRARD:  I don't know.  I have never seen your

19  geology.

20      MR. VEEDER:  But in any event, I think that you have

21  that question, and I think that where you have a severance,

22  as you have demonstrated there, I don't believe that you

23  could take the water out without making an appropriation.

24      MR. GIRARD:  I would agree.  You can't add to, by

25  purchasing land, put a duty on the people who overlie.  But

P 42

1    the basic question is, are you going to treat overlying rights

2    in percolating water the same way as you would treat it if

3    it were a riparian use?

4        MR. VEEDER:   I don't think you can, under California

5    Law.   I think Katz vs. Walkinshaw, I think Alhambra, I think

6    the Peabody case, I think those cases are to the effect that

7    if you are taking percolating water off overlying land it

8    assumes the nature of an appropriation and that it is an

9    appropriation, and that if you take it out of the watershed,

10   as we are doing it --

11       MR. GIRARD:   I don't mean out of the watershed.

12       MR. VEEDER:   Let me go ahead.   If you take it out of

13   the watershed, as we are doing it, it is an appropriation,

14   under California Law.

15       That is my thought for the day.

16       THE COURT:   But where does that leave you?   If you

17   take that position, where does that leave you, since you

18   have ground water bodies in Pendleton and there is no proof

19   to show any known or defined channel of underground flow?

20   What does that leave you with taking water out of your basins

21   on ground that overlies this basin within the watershed?

22       I think you had better think this over tonight before

23   you take that position.   I know what is going through your

24   mind.   You are still talking about self-help appropriation,

25   which we said long ago you couldn't have.   And you are

P 43

1   talking about the fact that you are appropriating. But I

2   think you had better get down to brass tacks and talk about

3   whether or not, as Mr. Girard suggests, an overlying owner

4   with a piece of property in one unit probably has much the

5   same as the riparian or the person who overlies land on a

6   known defined channel or stream.

7       MR. VEEDER:  I am willing to consider this whole thing,

8   your Honor.  But I am tendering this thought to you, that I

9   truly believe that in regard to the Marine Corps' use of

10  water outside the watershed, when they are taking water out

11  of the basin, it is an appropriation, under the California

12  Law, and I think that that is something that we ought to

13  think about in regard to this matter.

14      MR. GIRARD:  I am not concerned with the watershed

15  question.  I am concerned basically with this question

16  where it is still within the watershed.  Maybe I am all

17  wrong.  But take some of your waters within your ground

18  water bodies which are not in known defined channels and

19  used within the watershed.  That is the question I want to

20  know.

21      THE COURT:  Marine Corps is doing a lot of that?

22      MR. GIRARD:  And I think it is a proper overlying use.

23  But I want the United States to consider whether it is a

24  proper overlying use.

25      THE COURT:  Think this over for a while.

17,064

P 44

1       MR. VEEDER:  I have been reading the cases over very

2  carefully on this, your Honor, and I agree with you that

3  it is a difficult problem.

4       THE COURT:  Can we adjourn for today?  Have we kicked

5  this around enough?

6       MR. GIRARD:  I will try to work these in tonight.

7       THE COURT:  I will try to get some work done this

8  evening.

9       Before you leave, Mr. Krieger, will you discuss with

10  Mr. Veeder and Mr. Girard this definition on which you have

11  been working?

12       MR. VEEDER:  If he will come into the office we have

13  that typed off right now.

14       MR. KRIEGER:  Yes.

15       THE COURT:  Ten o'clock tomorrow morning.

16       (Adjournment until Thursday, June 1, 1961, 10:00 A.M.)

17       - - -

18

19

20

21

22

23

24

25

17,065

t-70

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DISTRICT

- - -

UNITED STATES OF AMERICA,                )
                                          )
                    Plaintiff,            )
                                          )
          vs.                             )          No. 1247-SD-C
                                          )
FALLBROOK PUBLIC UTILITY DISTRICT,        )
et al.,                                   )
                                          )
                    Defendants.           )
_____   )

CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are,
and on the date herein involved, to wit: May 31, 1961, were
duly qualified, appointed and acting official reporters of
said Court;

That as such official reporters we did correctly
report in shorthand the proceedings had upon the trial of
the above entitled case; and that we did thereafter cause
our said shorthand notes to be transcribed, and the within
and foregoing  114  pages of typewritten matter constitute a
full, true and correct transcript of our said notes.

WITNESS our hand at San Diego, California, this 31st day
of May, 1961.

_John Swader_
Official Reporter

_Marie G. Zellner_
Official Reporter