VOLUME NO. 132                                          MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

D STATES OF AMERICA,

                              Plaintiff,

vs.                                                    No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

                              Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Thursday, June 1, 1961

Pages:   17,066  to  17,159

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                          DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                    Plaintiff, )
                               )
vs.                            )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                    Defendants.)
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, June 1st, 1961

- - -

APPEARANCES:

 For the Plaintiff:   WILLIAM H. VEEDER, ESQ.,
           Special Assistant to the
           Attorney General

           CDR. DONALD W. REDD

 For the Defendants:

  Vail Company     GEORGE STAHLMAN, ESQ.

  State of California  FRED GIRARD, ESQ.

17,067

Take A
P 3

1    SAN DIEGO, CALIFORNIA, Thursday, June 1, 1961, 10:00 A.M.

2         (Other matters.)

3         THE CLERK:  2-1247-SD-C United States vs. Fallbrook.

4         THE COURT:  Did you get a chance to look over Sandia

5    that I handed you?

6         MR. VEEDER:  Yes I did.

7         THE COURT:  Could you read my writing?

8         MR. VEEDER:  Yes, I could, your Honor.  I haven't had

9    it redrafted because --

10        THE COURT:  These are suggestions.  I didn't have a

11   chance to do more than go through it.  Do you find some merit

12   in them?

13        MR. VEEDER:  I think your Honor has touched on very

14   crucial points there, and I know that Mr. Girard has some

15   comments, too, along the line, and I thought we might review

16   them together, if you want to do that now.  Or do you want to

17   go on to the other matter of Temecula-Murrieta?

18        THE COURT:  Mr. Krieger didn't see fit to honor us

19   with his presence this morning?

20        MR. GIRARD:  Mr. Krieger advised me that he couldn't

21   be here.  He has a legislative appearance.  He was hopeful

22   that it would have terminated yesterday.

23        These are suggested inserts on the findings on Murrieta-

24   Temecula (distributing copies).

25        (The material above referred to is here set forth and

     is as follows:)

B fls.

P 4

## ADD TO FINDING I LINE 8

That said ground water area is bordered on the
Southwest by the Santa Rosa mountains which in essence  are
composed of basement complex; that the alluvial deposits
immediately Northeast of the Santa  Rosa Mountains are of
considerable depth and one well, the Navy well which was
drilled in 194__ and is located in Section _____ of _____,
evidenced alluvial deposits at a depth in excess of 2,400
feet; that said alluvial deposits overlie basement complex;
that proceeding north and northeast the alluvial deposits
show a gradual lessening in depth to basement complex and said
alluvial deposits terminate at the Northeasterly area of the
ground water body at that point where the basement complex
becomes apparent at or near ground surface.  That the geologic
evidence in this case establishes that many years ago the
older alluvial deposits were laid down by stream actions at
a time when the surface waters ran Northernly into the Elsinore
area and that at some point in the past said streams changed
their course to the present stream condition  by accomplishing
a break-through of the basement complex at the place now
known as Temecula Gorge and that at all times thereafter the
surface water flow has been westerly down the present
Santa Margarita River into the Pacific Ocean; that thereafter
the younger alluvial deposits as depicted on U. S. Exhibit

P 5

1  277 were laid down by stream action.  That Murrieta Valley

2  extends in a Northwesterly and Southeasterly direction

3  parallel to and immediately adjacent to the Santa Rosa

4  Mountains referred to herein; that there exists two well

5  defined fault lines approximately parallel, one immediately

6  to the Northeast of the Santa Rosa Mountains which is

7  generally referred to as the Elsinore Fault and one which runs

8  in the same direction and is parallel thereto but which is

9  separated therefrom by some approximate _____ miles and

10  which is generally referred to as the Wildomar Fault; that

11  the major portion of the younger alluvium in Murrieta Valley

12  lies between these two faults; that these two faults are

13  depicted on U. S. Exhibit _____,  That the Wildomar Fault

14  which is located on the Northeast side of Murrieta Valley

15  consists of or has adjacent to it material which is so

16  lacking in permeability so as to constitute in many places

17  along said Fault line a barrier or semi-barrier to the

18  movement of ground waters in a Southwesterly direction, and

19  that as a result thereof there are numerous instances of

20  rising waters along or near said Fault line which waters

21  flow on the surface or immediately thereunder over said

22  Fault and into Murrieta Valley; that the barrier or semi-

23  barrier effect of the Wildomar Fault on ground water

24  movement has also resulted in an artesian condition in

25  certain areas immediately Northeast of said Fault line and

P 6

1    wells which are drilled in said areas have water flow

2    therefrom without the necessity of pumping.

4                          - - -

t-3

## INSERT IN FINDING II   LINE 10

That the term "ground water area" as used in these findings has been adopted intentionally to represent the existing factual situation rather than the word "basin" which appears in many recorded decisions which concern ground waters; that generally the term "basin" connotates an alluvial fill containing ground waters which are surrounded by impervious materials and one in which the ground waters stand at or about the same level throughout and one in which there is a more or less uninterrupted continuity of the ground waters throughout said alluvial fill; that in this ground water area while the alluvial deposits are surrounded by impervious materials, the waters within said alluvial deposits are in general moving downward in a Southwesterly and Southeasterly direction and as a result thereof there is no such thing as a consistent or related ground water level throughout said area, and because of faulting and substantial differences in the permeability of the alluvial deposits and the fact that there are two main bodies of alluvial fill separated by a divide with the result that the ground waters within these two bodies of alluvial fill move in distinct and not identical directions, there is a considerable variance in the physical continuity of the ground waters from that which exists in the ordinary basin.

-1-

T 4

## ADD TO FINDING II, PAGE 1, LINE 25

That wells which have been dug or drilled in said ground water area are of three categories:   (A) Wells in younger alluvium only, (B) Wells in older alluvium only, (C) Wells which were started in younger alluvium but have been drilled through the deposits of younger alluvium and into the older alluvial deposits.  That there is no specific or absolute pattern of water productivity from said wells and there is considerable variance in the water produced in each of the said categories of wells and substantial variances of water production within each of said single well categories; that some wells which have been drilled in younger alluvium only produce little, if any, water; that some wells which have been drilled in older alluvium only have produced water in quantities sufficient to irrigate lands; conversely some wells which have been drilled in younger alluvium only have produced water ample for irrigation and some wells which have been drilled in older alluvium only have been dry or produce water barely sufficient for domestic use; that the same results as to water production from wells which have been commenced in younger alluvium and extend down into the older alluvium has been evidenced; that generally in areas where older alluvium is apparent on the surface a lesser amount of ground water is found than in areas which underlie

-1-

MARIE G. ZELLNER. OFFICIAL REPORTER

younger alluvium in that generally the younger alluvium
consists of more permeable materials than the older
alluvium, and that in most instances the areas of younger
alluvium are in close proximity to a surface stream and have
a substantial source of recharge as contrasted to the areas
of said older alluvium which in the usual case are located
at considerable distances from surface stream channels.

-2-

## ADD TO FINDING VIII, PAGE 4 LINE 3

; that pumping from one well or from several wells within said ground water area in some instances has been shown to have a noticeable effect on other wells within said ground water area which are in close proximity to the well or wells pumped; in some instances under conditions apparently similar no noticeable effect has been evidenced in wells in close proximity to the wells being pumped; in some areas of said ground water area there has been evidenced an effect on one well when another well approximately one mile therefrom was pumped; in some areas of said ground water area no effect has been shown in one well when another well approximately 300 feet therefrom was pumped.

- - -

-1-

t-1
B

1    THE COURT:  The finding to be added to VIII on Page 4,

2    Line 3, -- I think that is Line 7, I suppose?

3    MR. GIRARD:  No, I would delete -- some of these

4    involve deletions.  I would delete everything after the

5    word "considerably" in Line 3, and then add this.

6    THE COURT:  I see.

7    MR. GIRARD:  The same way where it says, "Insert in

8    Finding II, Line 10," you would also delete Lines 10 and 11

9    as presently stated with reference to Pasadena vs. Alhambra.

10   As to Finding II, Page 1, Line 25, that would be

11   inserted at the point where it says on Line 25, "Exhibit

12   15-L,"and then I would delete all of the remaining language

13   on Lines 25, 26, 27 and 28, and down to the words "older

14   alluvium" in Line 29.  That should be deleted, and then I

15   would add the insert.

16   THE COURT:  As to the finding, or the addition to

17   Finding I, Line 8, the first one, I don't know whether it

18   serves any purpose to talk about the approximate distance

19   between the two faults, particularly if we are going to say

20   that the faults are shown on a certain exhibit, by exhibit

21   number, so we can cut some of that out, and I suppose we

22   should say "are generally or approximately parallel", because

23   they do bend around a little bit.

24   MR. GIRARD:  "generally parallel thereto."

25   THE COURT:  Other than that, I think that these could

t-2

well go in.

MR. STAHLMAN:  There is one suggestion I have in connection with this finding, "Add to Finding I, Line 8" on Page 2 at the top where it refers to and says:

"That Murrieta Valley extends in a Northwesterly and Southeasterly direction parallel to and immediately adjacent to the Santa Rosa Mountains."

They are not the Santa Rosa Mountains, and it may become confusing because over past Aguanga, that series of mountains which take off with the San Jacinto Mountains are designated on all maps as the Santa Rosa Mountains, so it may be confusing to have a series in this area called the Santa Rosa Mountains.  I would merely say "the lands that are high on the Santa Rosa Ranch," or something like that.

THE COURT:  We don't have to call it the Santa Rosa Mountains.

MR. VEEDER:  Santa Rosa Plateau.

MR. STAHLMAN:  "Plateau" is all right.

MR. VEEDER:  If you call it the Santa Rosa Plateau, you would be using the designation of the U.S.G.S.  Isn't that what it is?

MR. STAHLMAN:  I couldn't find it.

MR. VEEDER:  I think that is right.

C fls

1    MR. GIRARD:  I can't claim credit for that error.

2    THE COURT:  I put that in.

3    MR. STAHLMAN:  Here is a map.

4    MR. GIRARD:  I think also while they are looking it up,

5    the Navy well was drilled in 1951 and is located in projected

6    Section 17 of 8 South 2 West.

7    MR. WILKINSON:  You can say "The mountains on the Santa

8    Rosa Rancho."

9    MR. STAHLMAN:  Yes, you can say "The mountains on the

10   Santa Rosa Rancho."  Just turn it around.

11   THE COURT:  I don't care what you do with that -- one or

12   the other.

13   Another general matter that I would like to comment on

14   is that I don't like long paragraphs.  I am not talking

15   necessarily about 1, 2 and 3.  They can be shortened and use

16   any number series that you want.  But I don't like long

17   paragraphs and I would like to have some of this broken up

18   for easier reading.

19   MR. STAHLMAN:  I am very good at that -- a man of few

20   words.

21   THE COURT:  Mr. Veeder, what do you think about these

22   additions now?

23   MR. VEEDER:  Your Honor, I feel as I did about the Sandia

24   Creek.  I was not entirely satisfied with them.  I expect to

25   make objections to them.

P 8

1       But I would like to have you refer to your page 1 for

2   Finding II, line 10.  I don't believe that some of these

3   things are borne out by the actual cases and by the geology.

4   If you will look at line 9, it says:  "the term 'basin'

5       connotates an alluvial fill containing ground waters

6       which are surrounded by impervious materials and one

7       in which the ground waters stand at or about the same

8       level throughout and one in which there is a more or

9       less uninterrupted continuity of the ground waters".

10      Your Honor, I am convinced and I believe the record will

11  bear out that you have an impervious basin filled with

12  alluvial material and that there is a continuous ground water

13  body throughout the whole designated area.  If there is going

14  to be used the words "ground water area," we should say, if

15  I may recommend it, "the term 'ground water area' is used by

16  reason of the fact that we have arbitrarily designated the

17  exterior boundaries of this basin."  That is the reason I

18  think that we call it a "ground water area," is it not?

19      I interpose my objection, your Honor.  You have heard

20  me and I will not take any more of your time.  I do feel very

21  strongly, though, that we are making a distinction where none

22  exists in regard to this terminology.  I think it is a ground

23  water reservoir.  It has all the features and aspects of it.

24  It is true that there are areas of higher permeability than

25  other areas.  But I don't believe that is any reason for not

P 9

1    using that terminology.

2         MR. GIRARD:  I would agree that there has been some

3    variance from the language suggested by the Court.  I don't

4    think it is material.  I took the language primarily from

5    page 17,036 of the transcript of the Judge's comments.

6         THE COURT:  The mere fact that I said something about it --

7         MR. GIRARD:  I think it is correct.

8         MR. VEEDER:  May I refer to lines 17 and 18:  ". . there

9    is no such thing as a consistent or related ground water level

10   throughout said area . ."  Dropping down to line 18: ". . and

11   because of faulting and substantial differences in the permea-

12   bility of the alluvial deposits and the fact that there are

13   two main bodies of alluvial fill separated by a divide with

14   the result that the ground waters within these two bodies of

15   alluvial fill move in distinct and not identical directions, . ."

16   I don't follow that, your Honor.

17        MR. STAHLMAN:  The map shows it.

18        MR. GIRARD:  It is your own evidence.

19        THE COURT:  That is what you have proved.

20        MR. GIRARD:  That is right.

21        MR. VEEDER:  That there are two main ground water bodies?

22        THE COURT:  The result of it would be that if there was

23   a water divide with water moving both ways.

24        MR. VEEDER:  Your Honor, the physical situation -- and

25   I want to be corrected by the geologists, if I am in error on

P 10

1  this -- we have a condition of a ground water divide so called.

2  That is not a physical division of the water.  The result of

3  pumping north and west of this line -- I am pointing now to

4  15-E -- has resulted in the gradient going down this way

5  toward the north and west.  Vail Company pumping has caused

6  the gradient to go down south and east.  But it is still a

7  single ground water body.  The only thing you have is a

8  ground water mound.  This area where the line is drawn on

9  15-E simply being nearer the surface and not a separated body

10  of water.

C 2

11  MR. GIRARD:  That is not correct.  Mr. Kunkel testified

12  that a drop of water falling here would go this way, and that

13  a drop of water falling here would go that way; but that the

14  ground water divide would fluctuate, depending on pumping,

15  recharge, et cetera.

16  MR. VEEDER:  Mr. Kunkel is here.  He can be asked.

17  THE COURT:  Is the red line shown there the surface

18  divide?

19  MR. GIRARD:  No.

20  MR. VEEDER:  No.

21  MR. GIRARD:  The surface divide is apparently in this

22  same general area.  I think the testimony was that it is

23  pretty close to the surface.

24  MR. VEEDER:  That is the highest point in the ground

25  water mound which was created by pumping on both sides of that

P 11

1   mountain.  That is all.  It is one body of water.

2       MR. STAHLMAN:  This is also based on the fact that there

3   is faulting.  You have this fault all the way through here.

4       MR. VEEDER:  I don't believe that it is reflective of the

5   fact, your Honor, and Mr. Kunkel is sitting here and he can

6   be interrogated, if I have misstated it.  I have checked.

7       MR. GIRARD:  If I am going to interrogate him I want to

8   go over the transcript first.  Because I know that he said

9   that a drop of water falling on that line would go that way,

10  and that a drop of water falling on this line would go this

11  way.  But that the thing fluctuates depending on pumping.

12      MR. VEEDER:  If he said that, I will impeach him.

13      MR. GIRARD:  And regardless whether it is caused by

14  pumping or not, you still have the divide, and it is physically

15  separated regardless of the cause right now.  There is no
                                        waters
16  question in Pauba Valley right now/go one way and the waters

17  in Murrieta Valley go another.  There is no question about it.

18  Even if you assume that it is caused by pumping, it is a fact.

19      I don't think it is astonishing.  It follows exactly the

20  lay of the land, really.

21      If you want to get technical, I guess you could say

22  "two bodies of younger alluvial fill."  I don't object to

23  inserting that.  But I think there are certainly two bodies

24  of younger alluvial fill.

25      MR. STAHLMAN:  The waters were deposited by the water

P 12

1  running in one direction and in another direction from two

2  different sources.

3  MR. VEEDER:  I am not responding to that.  I know your

4  Honor wants to consider what has been said.

5  THE COURT:  Well, I could quote Shakespeare:  A rose

6  by any other name smells as sweet.  If you find the facts, it

7  doesn't matter what we call it.  It is not the name that we

8  apply to it.  It is the facts that we find.

9  MR. VEEDER:  I think your Honor is completely correct

10  on that.  These are not idle observations by me.  I am con-

11  cerned about the legal conclusions that necessarily will flow

12  from them.  I don't know what it would mean to say -- for

13  example, if I were just simply to remain quiet on this matter,

14  I would know that there is an error contained in the last

15  quoted statement and the fact that there are two main bodies

16  in alluvial fill separated by a divide.

17  THE COURT:  Let's skip that for a minute.  We started

18  out in this case and you put on maps showing what you called

19  "ground water units;" is that right?

20  MR. VEEDER:  We put those on for the purpose of showing

21  that in this basin, this alluvial fill, there were areas in

22  which we would find 100 feet of saturated material and those

23  were designated as "units" -- you have Storage Unit No. 4.

24  THE COURT:  If I recall right -- and this is no criticism,

25  because you may have studied the matter further since then --

P 13

1  we were going to talk about those as "basins," and we corrected

2  them to "ground water units."  They weren't "basins."  That

3  was the early position in the case.  Then when we get down to

4  the drawing of findings on it, in following the Government's

5  testimony as to the existence of this ground water area, we

6  are trying to find a handle for it.  I can't remember now what

7  the position of counsel was on the word "basin."

8      MR. VEEDER:  May I go into the record on that?  I can

9  tell you my position on it.  To avoid the possibility of

10  confusion between the ground water storage units, which were

11  arbitrary lines setting up a hundred feet of saturated material,

12  we did avoid that reference.

D fls. 13

14

15

16

17

18

19

20

21

22

23

24

25

t-7
D-1

It didn't mean, however, and it couldn't mean that these alluvial deposits contained in basement complex are not ground water reservoirs, because they are, or a single ground water reservoir.

As I say, I regret that we put in our -- well, I don't regret, but when we put in our Exhibits 17 and 17-A, why, we delineated those storage areas for the sole purpose of showing that --

THE COURT: This is getting us nowhere. I am not asking for any explanation on it. I can't recollect now what the position of the various counsel was on the words "basin" and "storage" and "ground water area."

What was your position?

MR. GIRARD: Both Mr. Sachse and I -- I don't believe Mr. Krieger was here at any of those times -- felt that this was not a basin, as that term is used in the California cases.

We have a basic disagreement with Mr. Veeder. Mr. Veeder has always pictured this as a bath tub full of water that is saturated and moves freely, and Mr. Sachse and I felt that kind of a situation connotated the word "basin", and that this situation factually does not fit that description.

How the term "ground water area" was drawn up or arrived at, I don't know. It was discussed here, and it may

t-8

1    have been your Honor, or it may have been mine, or it may

2    have been Mr. Sachse's definition.

3         MR. VEEDER:   It came from Mr. Krieger.

4         MR. GIRARD:   It was argued in the transcript here one

5    day before the findings were tendered, and maybe Mr. Krieger

6    was here, but, in any event, we agreed on this term of

7    "ground water area."

8         Now, this finding, of course, is set up to show the

9    reason why that term is used as distinguished from "basin."

10   Legally, I don't think it makes an awful lot of difference

11   as far as the United States is concerned.   It may make an

12   awful lot of difference as far as the people in the area

13   are concerned.

14        MR. STAHLMAN:   If this is referred to as a basin, and

15   is going to be consistent with other cases where the term

16   "basin" is used and where the geological and hydrological

17   conditions are entirely different than this, it is going

18   to cause confusion as a matter of law.   This is not a

19   basin.   Their own evidence shows that.

20        The word "basin" is applied to a body of water that

21   just exactly fits what the simple little word "basin" means.

22   It is in effect a vessel created by nature in the earth,

23   which the waters flow into, and which, like any other basin,

24   if you take it out of one part, it affects the other part.

25   That is not true here, and we have demonstrated that.

t-9

1    I think all you are going to do is to confuse people

2    if Mr. Veeder insists on the word "basin."

3        MR. VEEDER:  I don't insist, your Honor.  I simply

4    want the record to show I want this to move along, and I am

5    as anxious as you are to get it done.

6        I have interposed my objection.  I will probably file

7    formal objections, but I feel that my comprehension of this

8    area is not the same as reflected in Finding II, to which I

9    have been directing my attention, and I owe it to your

10   Honor and I owe it to our client to say that.  But let's go

11   ahead and write it up.

12       MR. STAHLMAN:  I am sure that Mr. Veeder's position

13   today is not consistent with the position that he took in

14   the early part of this case when the geologists were telling

15   about the different water bodies there.  As your Honor

16   pointed out, when the 16 or 17-Series Exhibits were offered--

17       THE COURT:  I am not concerned about consistency.

18       MR. GIRARD:  I think the question is whether these are

19   supported by the record, and I think they are.  I think these

20   are just factual descriptions, and maybe there is something

21   erroneous there that someone could point out, but that

22   Exhibit 15-L supports that last paragraph.

23       MR. VEEDER:  When you say the last paragraph, Mr.

24   Girard, you refer to the last part of the one that is

25   designated as "Insert in Finding II, Line 10"?

t-10

1  MR. GIRARD:  Yes.

2  MR. VEEDER:  Well, I have been heard on it, your

Honor, and I think we ought to move along.  I will preserve

my objection, and that is all I can do.

5  THE COURT:  All right.  We will go ahead.

6  MR. STAHLMAN:  I have a matter, if you have passed

that now.

8  THE COURT:  Let me finish reading this.

9  MR. STAHLMAN:  Oh, I am sorry, your Honor.

10  THE COURT:  What was the date of this ground water

divide?

12  MR. GIRARD:  The Autumn of 1959 or 1960, I am not sure

which.

14  MR. BADER:  The Autumn of 1959.

15  THE COURT:  Was it the Autumn?

16  MR. GIRARD:  Yes, it is in one of the findings.

17  THE COURT:  What is that exhibit there, 15-L or 15-E?

18  MR. VEEDER:  That is 15-E.

19  THE COURT:  Of course, there has to be an end to all

things.  Where is Mr. Veeder?

21  MR. VEEDER:  Right here.

22  THE COURT:  It would probably be easiest for me to read

what I have here, and then have it re-typed.  I want to

shorten up some of these sentences.  On Line 7 after the

word "waters" we will put a period.

1   MR. GIRARD:  That is which one?

2   THE COURT:  Finding II.

3   MR. VEEDER:  II-10?

4   THE COURT:  II-10.  A period after the word "waters" in

5   Line 7, and the word "that" will be stricken, and the next

6   sentence would then begin, "Generally the term' 'basin'

7   connotates", and so forth.

8       Then in Line 12 there would be a period after the word

9   "fill" and the word "that" stricken out, and the next word

10   capitalized, so that the next sentence would begin, "In this

11   ground water area," and we probably should make a new

12   paragraph there.

13       Now, I will read this because I have made some

14   substantial changes, and I am beginning at Line 12:

15       "In this ground water area while the alluvial

16       deposits are surrounded by impervious materials, the

17       waters within said alluvial deposits in the South-

18       easterly portion of the area" --

19   MR. VEEDER:  That is "in the Southeasterly portion"?

20   THE COURT:  Wait a minute.

21       ". . . the waters within said alluvial deposits

22   in the Southeasterly portion of the area are in general

23   moving downward in a southwesterly direction", and then

24   beginning at Line 16 insert, "and the waters in the

25   Northwesterly portion of the area are in general moving

t-12

1   downward in a Southeasterly direction and as a result thereof

2   there is no such thing as a consistent or related ground water

3   level throughout said area."

4        Then put a period there, and strike out the "and" and

5   make the small "b" a capital, so that it will read, "Because

6   of faulting and substantial differences in the permeability

7   of the alluvial deposits" -- and from here on you will have

8   to follow this -- "and the fact that there existed in the

9   Autumn of 1959, as shown on Exhibit 15-E a 'ground water

10  divide' across the ground water area with the result that the

11  ground waters on either side of the ground water divide move

12  in distinct and not identical directions, there is considerable

13  variance in the physical continuity of the ground waters from

14  that which exists in the ordinary basin."

15       In other words, cut out this business about there being

16  two main bodies of alluvial fill by merely finding that there

17  existed a ground water divide.   As a matter of fact, I

18  probably should insert the word "fluctuating" -- a fluctuating

19  ground water divide.

20       MR. GIRARD:  I don't know that that is necessary, your

21  Honor, because in Finding III I have changed it to say that

22  the ground water divide referred to in Finding II fluctuates.

23       THE COURT:  Oh, you did.  All right, then that can come

24  out.  That meets some of your objections, Mr. Veeder?

25       MR. VEEDER:  It does, your Honor.  It meets some of them.

t-13

1    THE COURT:  And the only other change I really made was

2    the language on 15 and 16, where you talk about the waters

3    moving downward in a southwesterly and southeasterly direction,

4    and that is sort of confusing.

5    MR. GIRARD:  It was intended to mean exactly what you

6    say.

7    THE COURT:  Can you give us another try on that?

8    THE REPORTER:  Yes, your Honor.

9    THE COURT:  Now, what about the other additions?

10   MR. GIRARD:  I would like to ask on this Finding I, Line

11   8, where it concerns and where we go into the laying down of

12   deposits by stream action, that the material I had last night

13   was not too clear, and I was wondering whether that was

14   geologically correct.

15   I just have a question on it.  Is it true that the older

16   alluvium was deposited by the stream when it went through,

17   and the younger alluvium was deposited after that?

18   MR. KUNKEL:  In general, that is correct.

19   MR. GIRARD:  That is what I found.  I couldn't get it

20   clear from the records I had.

21   THE COURT:  Let's take Finding I, Line 8, and solve this

22   Santa Rosa Mountains business.  It "is bordered on the south-

23   west by the Mountains of the Santa Rosa Rancho," -- that is

24   good enough, isn't it?

25   MR. STAHLMAN:  Do you have that title?  I found this out

t-14

1   in working out the titles, your Honor, that the Title Company

2   refers, for instance, to Pauba as Rancho Pauba, Temecula as

3   Rancho Temecula, the Little Temecula as Little Temecula

4   Rancho.  We just had this set up for the Pauba, but on the

5   Santa Rosa designation of the title, I don't know just what

6   they call it.

7      THE COURT:  Can we say "the mountains of the Santa Rosa

8   Plateau"?

9      MR. STAHLMAN:  That would be it, I think.  I think so,

10  because in the grant from Mexico that they cite the excerpts

11  from, they did refer to it as Rancho Santa Rosa or Santa Rosa

12  Rancho.

13     MR. VEEDER:  On 29-E there is reference to the Elsinore

14  Mountains.

15     MR. STAHLMAN:  That is probably what they would be,

16  although we --

17     MR. VEEDER:  I have never used the term.

18     MR. STAHLMAN:  I would say if you merely say "the

19  mountains of the Santa Rosa grant," it would be right.

20     MR. VEEDER:  I think they are sufficiently identified.

21     MR. STAHLMAN:  Or, of the Santa Rosa Rancho.

22     THE COURT:  All right.  We will say "the mountains of

23  the Santa Rosa grant."

24     MR. VEEDER:  Did you say "grant", your Honor?

25     THE COURT:  Grant.  The Navy well was drilled in 1951?

17,092

t-15

MR. VEEDER:  May I make an inquiry as to Line 4, where it says "which in essence are composed of basement complex . . ." aren't they composed of basement complex in essence?

THE COURT:  Strike it out, "which are composed of basement complex."

MR. GIRARD:  I understand the Navy well was drilled in 1951, and was located in projected Section 17, 8 south, 2 west.

MR. VEEDER:  I didn't get that.  8 south --

MR. GIRARD:  -- 2 west.

E fls

take E

P 14

1   THE COURT:   In line 10 put in a period and start a new

2   paragraph:

3       "That said alluvial deposits overlie basement

4   complex."

5   Let that go on to the end of line 10.   At the end of line 10

6   put in a period.

7   Start a new sentence on line 11, with a paragraph:

8       "That said alluvial deposits terminate near" instead

9   of "at," "the northeasterly edge or side" instead of "area,"

10  "of the ground water area."

11  MR. STAHLMAN:   What is the word your Honor is going to

12  use after "northeasterly"?

13  THE COURT:   Side.   ". . side of the ground water area at

14  that point where the basement complex becomes apparent . . "

15  A break again for a paragraph at line 16:

16      "That the geologic evidence in this case discloses

17  that many years ago the older alluvial deposits were

18  laid down by stream actions at a time when the surface

19  waters ran northerly into the Elsinore area and that

20  at some point in the past said streams changed their

21  course to the present stream condition by accomplishing

22  a break-through of the basement complex at the place

23  now known as Temecula Gorge and that at all times

24  thereafter the surface water flow has been westerly

25  down the present Santa Margarita River into the

P 15

1      Pacific Ocean."

2      MR. STAHLMAN:  There may be some confusion as to what

3      waters you are talking about.  The surface flow of the

4      Murrieta thereafter was westerly, because all of the waters

5      did not change, only that in Murrieta Creek.

6      THE COURT:  I am not so sure but that the waters from

7      the Temecula as well as the Murrieta didn't run out the other

8      way, from the evidence we heard.

9      MR. STAHLMAN:  They did run out the other way.  But the

10     reversal is in the Murrieta.

11     THE COURT:  We are not talking about any reversal.  We

12     are merely talking about the fact that the drainage area, the

13     watershed above, has been thereafter drained through the

14     Gorge.  Maybe we haven't said that.  Let's go back:  ". . the

15     surface waters ran northerly into the Elsinore area and that

16     at some point in the past said streams changed their course

17     to the present stream condition by accomplishing a break-

18     through of the basement complex at the place now known as

19     Temecula Gorge . . "  That is correct so far, isn't it?

20     MR. STAHLMAN:  That is correct.

21     THE COURT:  Start a new sentence:  "That at all times

22     thereafter the" --

23     MR. STAHLMAN:  Murrieta Creek.  That was the only one

24     that changed.

25     THE COURT:  There is nothing said about changed.  Let me

P 16

1    show you what to do with it.  "That at all times thereafter

2    the," after the word "the" on line 23 and before "surface" on

3    line 23½, "the drainage of the watershed above the Temecula

4    Gorge and the surface flow has been westerly down the present

5    Santa Margarita into the Pacific Ocean."

6         MR. STAHLMAN:  But in the Murrieta Valley.

7         THE COURT:  The drainage of the watershed above the

8    Temecula Gorge would take in Murrieta and everything else,

9    wouldn't it?

10        MR. STAHLMAN:  Yes, it would take in this area here.  This

11   didn't change, as I understand it.  When the break-through came

12   here, the waters at that time came down through here and flowed

13   in this direction.

14        THE COURT:  George, if we had said in a finding that some

15   stream had reversed its course.  But we didn't say that.  We

16   don't talk about that.  We say they changed their course.  We

17   don't say that one reversed it.  "At some point in the past

18   said streams changed their course to the present stream

19   condition by accomplishing a break-through . . "

20        MR. STAHLMAN:  That is right.

21        THE COURT:  That is the only thing we are talking about.

22        MR. STAHLMAN:  That is right.

23        THE COURT:  "But at all times thereafter the drainage of

24   the watershed above the Temecula Gorge and all surface flow

25   has been westerly down the present Santa Margarita. ."

P 17

1      MR. STAHLMAN:  That is all right.

2      MR. VEEDER:  You refer to "surface flow."  We could put

3  in there "and there is no subsurface flow at that point."  The

4  ground is on basement complex.

5      MR. GIRARD:  This is only for surface flow description.

6  It doesn't have anything to do with ground water.

7      THE COURT:  Do you want it in there?

8      MR. STAHLMAN:  You are going to have a finding on your

9  stream system.

10      MR. VEEDER:  All right.

11      THE COURT:  Start a new paragraph on line 24 with the

12  word "that:"

13          "That thereafter the younger alluvial deposits

14      depicted on Exhibit 277 . ."

15  Is that the right one?

16      MR. GIRARD:  I hope so.

17      THE COURT:  No.

18      MR. GIRARD:  Oh, that is the map.

19      MR. VEEDER:  15-E is the one.

20      MR. GIRARD:  That is right.

21      THE COURT:  " . . Exhibit 15-E were laid down by stream

22  action" insert "on top of the older alluvium."

23  Then start a new paragraph:

24          "That Murrieta Valley extends in a northwesterly

25      and southeasterly direction immediately adjacent to

P 18

1     the mountains of the Santa Rosa Grant".

2     MR. GIRARD:  Say "the mountains referred to herein".

3     THE COURT:  ". . the mountains of the Santa Rosa Grant

4     referred to herein; that there exists two well defined fault

5     lines," which is named -- there is no dispute about its name,

6     is there?

7     MR. GIRARD:  Yes sir.

8     MR. STAHLMAN:  There is when you get to the Wildomar.

9     It has been called several different things.  It has been

10     called "Willard".

11     THE COURT:  All right.  " . . which run in the same

12     direction and generally parallel thereto" -- you don't need

13     any distance -- "but lying further to the northeast," strike

14     out "separated by blank miles," "which is generally known as

15     the Wildomar Fault."

16     Start a new sentence and new paragraph:

17          "That the major portion of the younger alluvium

18          in Murrieta Valley . . "

19     MR. VEEDER:  Does your Honor intend to start those

20     paragraphs with "That"?

21     THE COURT:  That is all right.  I don't care.  Take it

22     out or leave it in.  I just want some of it broken up and I

23     don't want these long sentences.

24          "That the younger alluvium in Murrieta Valley lies

25     between the two faults.  These two faults are depicted

P 19    1        on U.S. Exhibit . ."

2        MR. GIRARD:  What exhibit number is it?

3        THE COURT:  They are on all of these.

4        MR. VEEDER:  15-E has it.

5        MR. GIRARD:  I don't know.  Are they?

6        THE COURT:  Yes.

7        MR. STAHLMAN:  Roripaugh's A has it.

8        MR. VEEDER:  Here is your Willard Fault all the way
9    through.

10        MR. WILKINSON:  Basic 15 shows it a way up here.

11        MR. VEEDER:  Well, let's use 15 then.  15 has it.

12        MR. GIRARD:  Yes.

13        MR. STAHLMAN:  Yes.

14        THE COURT:  Make it U.S. Exhibit 15.  On line 18 strike
15    the comma and the "and."  Start a new sentence:  "That as a
16    result thereof there are numerous instances of rising water
17    along said fault line, which waters flow on the surface or
18    immediately down, over or through. ."  We had testimony that
19    there was some passage of water there, you will recall.

20        MR. STAHLMAN:  Yes.  I think that starting on line 14 --

21        THE COURT:  " . .over or through said fault and adjacent
22    material. ."  I don't think it is the fault itself.  I think
23    it is the adjacent material that creates the problem.

24        MR. VEEDER:  Why don't we, rather than use the term
25    "rising water," which is correct, why don't we use the word

P 20

1   "springs"?  "As a result thereof there are numerous springs

2   along or near the fault, which waters rise to the surface . . "

3       THE COURT:  All right, springs.

4       MR. VEEDER:  That is what they are.

5       THE COURT:  A new sentence beginning on line 22:  "That

6   the barrier effect of the Wildomar Fault and adjacent materials

7   on ground water movement has resulted in an artesian condition

8   in certain areas northeast of the fault line. . "

9       Do you think we can pass that up, then, with those

10  changes?  Anybody object?

11      MR. STAHLMAN:  I don't object.  I don't see the necessity

12  of "water flow therefrom without the necessity of pumping".

13  Some of these wells that were artesian are not now artesian.

14  Some that are now artesian probably will not be.  Some wells

15  that are artesian they do pump.

16      THE COURT:  All right.  " . . artesian condition in

17  certain areas northeast of said fault line."  Strike the rest

18  of it.

19      Anybody have any other suggestions on this?

20      Let's look at Finding No. II now, page 1, line 23.

F fls.

21

22

23

24

25

t-16
F

MR. VEEDER:  I think your Honor's last sentence in 1-C takes care of almost everything on the older alluvial deposits, where in Line 8 you said:

"That excellent wells have been developed in all three of the categories named above and that poor wells have been developed in all three of the categories named above."

MR. GIRARD:  What is an excellent well varies an awful lot.  As pointed out yesterday by somebody, an excellent well can be a trickle of water in the desert.  I don't know. I don't like to just say --

MR. VEEDER:  We can say, "Wells that produce substantial quantities of water have been developed in all three categories."

MR. GIRARD:  I don't care.  I tried to do it specifically. You said to do it in detail.

MR. STAHLMAN:  As you know, there are wells where there is no water in all three different categories.

MR. VEEDER:  Simply say, "In the deposits poor wells have been developed."

MR. STAHLMAN:  That is the case at my home.

MR. VEEDER:  That is a poor well.

THE COURT:  All right.  In Line 12 strike out the semi-colon there, and start with a capital "T" and make a new paragraph.

t-17

1      Can't we shorten it in some way?

2          MR. GIRARD:   I have no objection to the idea suggested

3      by Mr. Veeder to the effect that in all three categories --

4          MR. STAHLMAN:   We have no pattern at all.   We have bad

5      wells and dry holes.

6          MR. GIRARD:   "In all three categories both good producing

7      and poor producing wells have been drilled."

8          MR. STAHLMAN:   "are experienced."

9          MR. GIRARD:   "Are experienced," and cross out everything

10     after the word "that" down to Line 22 --

11         THE COURT:   Are you suggesting to strike out everything

12     from Line 12 to Line 22?

13         MR. GIRARD:   Line 12 through the word "evidenced" on

14     Line 23, and just substitute for that language that:

15             "In all three categories both good producing and

16         poor producing wells have been experienced."

17         THE COURT:   Agreeable?

18         MR. VEEDER:   It suits me.   I would like the word

19     "drilled" rather than "experienced."

20         MR. STAHLMAN:   I don't care.

21         MR. VEEDER:   I don't know how you can experience a well.

22         MR. STAHLMAN:   After you have drilled it, you experience

23     it.

24         MR. GIRARD:   What do you want?

25         MR. STAHLMAN:   Take what you want.

1          THE COURT:   What is your language, then, "In all three

2     categories" --

3          MR. GIRARD:   " -- both good producing and poor producing

4     wells have been experienced", and Mr. Veeder says "drilled,"

5     and I don't have any preference.

6          THE COURT:   If he wants "drilled" put "drilled" in.

7     Then start a new sentence in Line 23 after the word "evidenced":

8               "Generally in areas where older alluvium is

9          apparent on the surface a lesser amount of ground

10         water is found than in areas which underlie younger

11         alluvium in that generally the younger alluvium

12         consists of more permeable materials than the older

13         alluvium. . ."

14         MR. VEEDER:   I think that covers it.

15         MR. STAHLMAN:  Yes.

16         MR. VEEDER:  Down to the end of Page 2.

17         THE COURT:  All right.  Then you are all satisfied with

18    that one?

19         MR. GIRARD:  Yes.

20         THE COURT:  Now, let's look at Finding VIII.

21         MR. GIRARD:  I should check this out with Mr. Kunkel.

22         MR. VEEDER:  You have another page that I don't have.

23    Do you have an extra copy?  I don't seem to have one, your

24    Honor.  Can I step out and get it?

25         THE COURT:  Oh, use mine, and see whether it is

t-19

17,103

1   satisfactory.

2       MR. GIRARD:   There is one suggestion on that.   Change

3   "300" in the last line to "150."   That was intended to show

4   the extremes.

5       THE COURT:   Are you satisfied with it?

6       MR. GIRARD:   I checked with Mr. Kunkel.   That is where I

7   got the figure.

8       THE COURT:   Mr. Veeder, are you satisfied with it?

9       MR. VEEDER:   I haven't had a chance to finish   reading

10  it, your Honor.

11      MR. GIRARD:   Didn't I give you a copy of it?

12      MR. VEEDER:   No.

13      MR. GIRARD:   Have you got one now?

14      MR. VEEDER:   Yes, I borrowed the Court's.

15      THE COURT:   Are you satisfied?

16      MR. VEEDER:   I think that is all right.

17      THE COURT:   Then all we have left is the conclusions.

18  Have you done any work on those?

19      MR. STAHLMAN:   Your Honor, before we get to that, there

20  was another matter yesterday that we had some discussion on,

21  and it never got settled.

22      THE COURT:   That is what?

23      MR. STAHLMAN:   I say we had discussion on a matter, and

24  we didn't quite settle it.   That referred to the matter of

25  the determination of correlative rights.   Do you want to hear

1    that now?  I have some ideas on it, and it will be brief.

2         THE COURT:  I want to hear it after lunch.  I have to go

3    to the Rotary Club.  That is a part of the conclusions of

4    law that I said we would take up after lunch.

5         Have you passed your ideas on to Mr. Girard and Mr.

6    Veeder?

7         MR. STAHLMAN:  I have, yes.  Mr. Veeder thought we had

8    a good start on it, and I don't know what Mr. Girard has in

9    mind, but I don't like the definition that Mr. Krieger brought

10   in.  I think it would be --

11        MR. GIRARD:  Mr. Krieger drafted these conclusions last

12   night, and showed them to Mr. Veeder and me.  I could say for

13   myself that I am not in complete agreement with him.  I don't

14   know about Mr. Veeder.

15        MR. VEEDER:  I am not.

16        THE COURT:  Is this a new set?

17        MR. GIRARD:  Well, it is a set with substantial changes

18   written in in pencil on the old one, your Honor.  I will hand

19   it to you.

20        I don't think Mr. Veeder had a copy of most of the

21   changes that Mr. Krieger suggested on it.

22        MR. VEEDER:  We were talking about "correlative".

23        MR. GIRARD:  That, yes.

24        THE COURT:  All right.  Talk it over, gentlemen, and I

25   will see you at 2:00 o'clock.

1       (Whereupon, at 12:00 o'clock noon, a recess was  )
           (                                               )
2       (taken until 2:00 o'clock p.m. of the same date. )

4                             - - -

17,106

t-22
F

1  SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 1, 1961, 2:00 P. M.

2                              - - -

3        THE COURT:  Have you read this over?

4        MR. VEEDER:  I think that it is reflective, so far as

5  it goes of the facts.

6        THE COURT:  What other facts should we find?

7        MR. VEEDER:  My own thought, and I don't know whether

8  your Honor has looked at the Tucalota findings that I

9  delivered to you, but it occurred to me that you might want

10 to put in, as we put in the Tucalota findings, a statement to

11 the effect --

12       THE COURT:  Is this a new set of Tucalota findings?

13       MR. VEEDER:  I sent them to you last week, I think it

14 was, or some days back.

15       MR. STAHLMAN:  We haven't gone over them here.

16       MR. GIRARD:  No.  I think Mr. Sachse submitted the

17 findings, and Mr. Veeder worked on them.

18       MR. VEEDER:  We re-ran the whole set, but we attempted

19 in there to cover the ground water basin in Tucalota Valley.

20 That would be in addition to what has been said here.

21       THE COURT:  I don't have them before me.  I don't know

22 what you are talking about.

23       MR. VEEDER:  I can summarize briefly, then, what I would

24 like to see added:  That the waters in this basin, or, again,

25 in this ground water area are composed of three kinds:  The

t-23

1   surface stream, the sub-flow immediately below the surface

2   stream which supports it, and the percolating waters through-

3   out the water bearing strata which are not a part of the

4   stream, but nevertheless feed and add to it.

5       Now, I haven't found that spelled out with particularity,

6   and I think that it is important from the standpoint of --

7       MR. GIRARD:  You won't find anything here on the second

8   one, Bill, which is your sub-surface waters which support the

9   stream, and I couldn't find any evidence that any of the

10  waters below the ground, even though they are right beneath

11  the stream, are in a known and defined channel.

12      THE COURT:  In fact, there is a finding which --

13      MR. GIRARD:  That is right.  We treat them as percolating

14  waters.

15      MR. VEEDER:  It is percolating water, and there are

16  three kinds of waters, and I think it follows because they

17  have riparian rights, and the reason I am interested in it

18  here is, of course, in connection with the basins which

19  underlie Camp Pendleton.

20      MR. GIRARD:  There is a finding, Bill, which specifically

21  says that all ground waters and all percolating waters --

22  that the ground waters within the areas of younger and older

23  alluvium in said ground water area are percolating waters

24  which add to and support the Santa Margarita River, and

25  constitute a supply of water for said River; that said ground

t-24

1    waters are not in a known and defined channel.

2        MR. VEEDER:  But number two is important for this

3    reason --

4        THE COURT:  Let's point it up.  The number two you are

5    urging is that underneath the surface of the stream there is

6    ground water flowing in an underground stream --

7        MR. VEEDER:  Which supports the surface flow.

8        THE COURT:  In other words, it would require a finding

9    that there is water flowing in a known and defined channel.

10       MR. VEEDER:  Yes.  In regard, for example to Murrieta

11   Creek that water would be riparian --

12       THE COURT:  But there is no evidence that there are

13   known and defined streams.

14       MR. VEEDER:  I think this, your Honor,  the evidence

15   that is in there in regard to both Tucalota -- I mean

16   Temecula and Murrieta is that the water is flowing across

17   permeable, highly permeable soil, and that there is the water

18   immediately beneath it which supports that surface flow.  I

19   am sure there is evidence on that.

20       THE COURT:  I don't recall any expert ever so testifying.

21   There might be instances where that is true, but the movement

22   of this ground water, percolating ground water into the

23   younger alluvium would be supporting water in a large area of

24   younger alluvium, and I don't think you can say it is known

25   and defined channels.

t-25

1    Now, this is going to be very important to you.

2    MR. VEEDER:  That is what I said yesterday.

3    THE COURT:  I know, but in the reverse proposition, when

4    you get down to the areas in Pendleton, where there is a

5    ground water area, and if you get findings that there are

6    known and defined channels of water underlying the surface

7    stream, this is going to have an impact on any possible claim

8    you might have for an appropriative right outside of the

9    watershed.

10   MR. VEEDER: Well, your Honor, I will say --

11   THE COURT:  And if you are pumping out of the ground water

12   area without known and defined streams, I don't know what may

13   come up.  This really hasn't been argued.

14   MR. VEEDER:  Well, I have been waiting for 11 years on

15   this one, and it is extremely important to us that the areas--

16   excuse me -- I think there is percolating water throughout

17   the whole ground water area, but I believe that your riparian

18   right does contemplate the water immediately beneath the

19   surface flow.

20   Now, if you disagree with me as a matter of law, why,

21   it strengthens our position in Camp Pendleton, I will say

22   that.

23   THE COURT:  I don't think it strengthens your position

24   at Camp Pendleton.  You can't have your cake and eat it, too.

25   If you are going to have a finding here that there are known

17,110

t-26

1    and defined channels of underground water underneath these

2    stream beds, then I think the same thing would apply to

3    Pendleton, that there are known and defined channels.

4         MR. VEEDER:  Well, I will drop it then, because I will

5    not fight for that.

6         THE COURT:  I have felt all along, and I did want to call

7    this to your attention, that I wanted to call these areas

8    ground water areas.

9         MR. VEEDER:  All right.  It suits me, your Honor.  There

10   is only one thing I want to be sure of, and that is that the

11   words "percolating waters not in defined subterranean streams"

12   be a part of the findings; certainly, for us, and in this area

13   we are now dealing with, because I think that is a highly

14   significant question, that you need no filings to appropriate

15   that water.

16        I think Mr. Girard agrees, and he said, "Yes."

17        MR. GIRARD:  I mean this is a new argument, and we want

18   to think about it for a while.

19        THE COURT:  This has never been fully argued and

20   discussed.

21        MR. VEEDER:  I think it is the use.  I think 60 per cent

22   of our water used comes within the purview of the principle

23   that we are now discussing; in other words, that you do make

24   a valid appropriation when you export the water from the over-

25   lying land to surplus water.

t-27

1   THE COURT: I am content with the findings, unless

2 there is some other suggestion.

3   Now, what about the conclusions of law?  Was there some

4 revision made of that?

G-fls 5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Take G

P 21

1    MR. GIRARD:  Mr. Krieger worked last night.  Mr. Veeder

2    and I were here when he discussed this matter with us on some

3    conclusions of law.  I have also been working here and have

4    drafted some.  I don't know whether it would be helpful to

5    anyone as to how we want to approach this.  I can read Mr.

6    Krieger's suggestions in here and I would anticipate that

7    everyone is going to comment on them.

8    THE COURT:  We haven't had copies of them made?

9    MR. GIRARD:  No your Honor.  Mr. Krieger served copies

10   of these original ones on counsel.

11   THE COURT:  I have a copy of that.

12   MR. GIRARD:  But there have been substantial changes in

13   every one of them.  No. 2 is out.  And he has redrafted

14   considerable language on No. 2.  Number 3 has had considerable

15   language added to it.  Number 4 is added to.  Number 5 is

16   changed.  Number 6 is changed.

17   THE COURT:  Wouldn't it save time to have one of the

18   reporters run off some copies of these drafts so that we can

19   all be looking at the same thing?

20   MR. GIRARD:  I don't think it could possibly do anything

21   but expedite it.

22   THE COURT:  Let's do that.

23   MR. VEEDER:  We still have No. 2 that we can talk about.

24   MR. GIRARD:  We still have No. 2 which Mr. Krieger has

25   drafted in final form.

P 22

1      MR. VEEDER:  I have the copies here, I believe.

2      MR. GIRARD:  I have a copy of it here.

3      MR. VEEDER:  This is what we worked up last night (handing

4   document to the Court), but there was no agreement on it.

5      THE COURT:  Is the word "coequal" stricken out?

6      MR. STAHLMAN:  No, he had it in there.

7      MR. VEEDER:  I have asked to have it taken out because I

8   don't believe that it is correct.  I think when you are talking

9   about overlying and riparian rights it is not, in my view,

10  correct to use the term "coequal."  I don't believe they are

11  coequal.

12     MR. STAHLMAN:  I don't think that where there is a word

13  that has been of widespread usage, such as "correlative,"

14  that anybody -- I know I wouldn't have the ability to define

15  the word.  I think you are sticking your neck out when you try

16  to define that word.

17     If it becomes necessary that the word "correlative" be

18  used, I have used this language as a basis of starting:

19          "Correlative rights to the common supply of the

20      ground water basin as used herein are not used in the

21      sense that the rights to the use of such waters are

22      coequal because of the natural and physical character-

23      istics of the area as found in other findings herein."

24     THE COURT:  Let me read this.

25  Have you gentlemen looked for a definition of "correlative

P 23   1   rights" in California Water Law?

2        MR. GIRARD:  I have looked, your Honor.  There is some

3   discussion in the cases.  But "correlative" really depends

4   so much on the facts.  I have drafted something which comes

5   as close as anything, without being specific:

6            "The owners of lands which have overlying or

7        riparian rights must, in the exercise of said rights,

8        share correlatively of the waters to which their

9        respective rights attach.  As used herein, the term

10       'share correlatively' does not mean that they shall

11       necessarily be entitled to an equal amount of water

12       or that two or more persons must possess identical

13       rights to the same water, but shall mean that their

14       respective rights shall be exercised with due regard

15       to the rights of all other persons to said waters

16       whose rights would be physically adversely affected

17       by the use of water pursuant to the exercise of the

18       respective overlying or riparian right."

19   Without defining it.

20       MR. VEEDER:  That is too fast for me.

21       THE COURT:  It is too fast.  Let's do this.  Let's have

22   the reporters type up what Mr. Stahlman has written out, with

23   the name (Stahlman).  Have your definition, Mr. Girard,

24   written up.  Have this one by Mr. Krieger, No. 2, written up.

25   And have Mr. Krieger's conclusions written up.

P 24

1        MR. GIRARD:  All right.

2        THE COURT:  The three different definitions on separate

3    pages, and Mr. Krieger's material on one sheet.  And have

4    something before us so we can look this over.

5        MR. GIRARD:  All right.

6        THE COURT:  Do you want to make any comment on this

7    before we --

8        MR. VEEDER:  Mr. Krieger's statement?  I would disagree

9    with it on the grounds that it confuses the usufructuary right

10   with the right to exercise and use of water.  I believe they

11   are entirely different.  I don't believe there is any relation-

12   ship.

13       THE COURT:  You have lost me on that.  Let me ask you

14   this.  Hasn't it been our feeling all along -- let's take the

15   ground water area -- that we felt that a person who had a

16   right as an overlying owner in a ground water area had the

17   same kind of right regardless of the extent of it as to amount,

18   et cetera --

19       MR. VEEDER:  The same dignity.

20       THE COURT:  -- as the riparian had, his land overlying

21   a supply of water to the stream.  In that sense, he had rights

22   which we equated to that of a riparian.

23       Now, it is true that in judging the riparian's right you

24   have to take into account all the facts -- who the other user

25   is of whom he is complaining, the use he makes, all of these

P 25

1   things.  We do the same thing with the overlying owner.

2        Regardless of how we word it, isn't that what our theory

3   has been all along?

4        MR. VEEDER:  That is right; that those rights are of

5   equal dignity with the riparian right.  I think that is correct.

6        THE COURT:  In the abstract sense, the rights are of

7   equal dignity.

8        MR. VEEDER:  That is right.

9        THE COURT:  And have equal connotations and are judged

10   much the same way.

11        MR. VEEDER:  That is correct.

12        THE COURT:  That is what we are trying to accomplish.

13   Now, say again what you said.

14        MR. VEEDER:  I said my objection to what Mr. Krieger has

15   tendered, and as expressed to him last night, is that he is

16   attempting to confuse a legal right to water with the measure

17   of that right, the quantity of water you would receive in

18   exercising the right, and I don't believe that there is any

19   relationship between the two.  I think you can say that you

20   have an overlying right.  Then the measure of that right is

21   dependent upon the character of use and a great many other

22   things.

23        THE COURT:  Of course, this is exactly what he tried to

24   say, whether he did it well or not.  He said, on line 5,

25   "The exercise of such rights is not necessarily the same as

P 26

1  to quantity, . . "  In other words, he was distinguishing

2  between the abstract right, which he defined as concerning

3  the common supply to which other claimants had some right or

4  duty.  That was the abstract right.

5      MR. VEEDER:  That is right.

6      THE COURT:  Then he talks next about the exercise of the

7  right.  I think he was trying to say the same thing you are

8  talking about.  Whether he did it artfully is another thing.

9      MR. VEEDER:  As I told him last evening -- and forgive

10  me if I sound like God -- I said, "Let's first define what

11  you have as an interest in real property, because that is all

12  your overlying right is -- it is part of your over-all title

13  to a piece of land.  Then the measure of your right, how much

14  you are going to get in the exercise of the right, is something

15  entirely separate and distinct."

16      THE COURT:  I would agree in that.

17      MR. VEEDER:  There is one difference that I think should

18  be emphasized, though, in regard to these overlying rights --

19  and the cases bear that out; that if a man owns an overlying

20  right he hasn't any right, title or interest to go upstream

21  and divert water out of the surface stream to apply the water

22  to the land.  There is the distinguishing element of a riparian

23  right.  But a riparian owner can have an overlying right to-

24  gether with a riparian right.

25      THE COURT:  There is no dispute about that.  We could

P 27

1   solve that very easily.  That no overlying owner has a right

2   to go upstream and divert surface flow.

3       MR. VEEDER:  That is why I say the use of this word

4   "coequal" between riparian and overlying rights is so much

5   narrower.

6       THE COURT:  Let me ask you this.  In the discussion of

7   riparian rights in the early cases where they considered

8   strictly riparian rights, the flow of the stream, was the

9   word "correlatively" used?

10      MR. VEEDER:  I have looked for it.  I didn't find it

11  until the later cases came down.  It may be that Lux vs Hagen

12  has it, but I haven't found it, and it didn't come into

13  general use in the cases until after the abrogation of the

14  common-law right in Katz vs Walkinshaw, where --

15      MR. STAHLMAN:  I think you are wrong, Bill.  I think I

16  can show you common-law cases where "correlative" is used.

17      MR. VEEDER:  The word I have found in those cases, George,

18  was that they said they had an interest in common in the surface

19  stream.  The word "common" was used in connection with riparian

20  and "correlative" with reference to ground water.  I may be in

21  error on that.  But I believe the term "correlative" grew up

22  more with ground water than it did with riparian participation

23  in the available supply.  They used the words "the common

24  supply."

25      MR. STAHLMAN:  I don't know how much this is going to

P 28

1    help the case, but I think I can go to the library and show

2    you that the common-law cases use "correlatively." There is

3    where it had its origin on surface streams.

4         MR. VEEDER:  I have found in reading these ground water

5    cases that the California law originally said they would

6    follow the common-law right, that the overlying owner had

7    absolute title to the ground water underneath his land.

8         MR. STAHLMAN:  I think, in view of what we have done here,

9    we are just talking.

10        MR. GIRARD:  Hutchins cites half a dozen cases, starting

11   with a case in 1907, where the term is used.  I don't know

12   how far you want to go.

13        THE COURT:  Have you looked at them?

14        MR. GIRARD:  I think I have read most of these cases:

15   Cohen vs. La Canada, Burr vs. Maclay, Katz vs. Walkinshaw.

16        MR. VEEDER:  Those are ground water cases.

17        MR. GIRARD:  Yes.

18        MR. VEEDER:  George is talking about surface water cases.

19   Weren't you, George?  Those are all ground water cases.  In

20   1907 Katz vs. Walkinshaw said that everyone who owned overlying

21   land had correlative rights.  That is when it started.

22        MR. STAHLMAN:  But the term is one of ancient origin.

23        THE COURT:  Can you put your hand on that language in

24   Katz vs. Walkinshaw where that particular thing is discussed?

25        MR. VEEDER:  Yes.  It is Volume 141 --

P 29

1    THE COURT:  The decision is about so gross.  It is a

2    question of finding the place in it.  That is what I am

3    interested in.

4        MR. VEEDER:  If you will excuse me.

5        THE COURT:  Let's take a recess.  Have the reporter write

6    up this material.  Mr. Stahlman, you hand your paper in.  Give

7    the reporter    Mr. Krieger's.  I will hand him mine here and

8    Mr. Krieger's conclusions.  Let's get them typed up so that

9    we can look at them.

10       I will be in chambers.  Bring me what you have in <u>Katz</u>

11   <u>vs. Walkinshaw.</u>

12       MR. STAHLMAN:  How long is this going to be?  I think I

13   can settle this question by going to the library.

14       MR. VEEDER:  George, I am not arguing about it.  The only

15   point I made is that the words "correlative use" came in when

16   California abrogated the ground water doctrine of the old

17   common-law.

18       THE COURT:  Mr. Veeder, here are a couple of other letters

19   that came in this morning.

20       Let's take a short recess and see if we can get this out

21   so that we can look it over.  Is there another copy of Mr.

22   Krieger's definition that I can be studying over?

23       MR. GIRARD:  You may use my copy, your Honor.

24       (During the recess typed up, duplicated and distributed

25   amoung counsel the following material:)

(Mr. Krieger)                                    17,121

P 30

UNITED STATES OF AMERICA v. FALLBROOK UTILITY DISTRICT
MURRIETA-TEMECULA AREA
CONCLUSIONS OF LAW

1.   The owners of the lands within the ground water area shown on U.S. Exhibit 277, as described in U.S. Exhibit 277-A, and as further listed and described individually on Exhibit A attached hereto, have riparian or overlying rights, or both, in the common supply of the Murrieta-Temecula ground water area and of the Santa Margarita Stream system to divert, extract or produce water therefrom, for reasonable and beneficial uses on their respective lands as described in Exhibit A.

2.   Such overlying and riparian rights are correlative with all other overlying and riparian rights in the Santa Margarita River below the confluence of Murrieta Creek and Temecula River.

3.   The rights of all overlying and riparian owners within the Murrieta-Temecula ground water area are correlative with the owners of all riparian and overlying rights upstream from the Murrieta-Temecula ground water area as the same are found to contribute or add to the ground water of the Murrieta-Temecula ground water area, as the same may be found by this Court in other Findings of Fact affecting such area.

4.   The rights of all overlying and riparian owners within the Murrieta-Temecula area are correlative as to each other.

P 31

1          5.  The quantity or proportion of water to which the

2     lands in the Murrieta-Temecula ground water area are entitled

3     cannot be determined at this time by reason of the insufficiency

4     of the evidence, nor is there any evidence at this time that

5     any apportionment or regulation of riparian or overlying rights

6     and uses within the Murrieta-Temecula area is required.

7          6.  The court shall retain jurisdiction for the purpose

8     of determining the quantity or proportion of water from the

9     Santa Margarita River system to which the lands and owners

10     thereof in the Murrieta-Temecula area may be entitled, and as

11     to such other matters as may be relevant to any issues raised

12     by the Findings of Fact.

13                         - - -

14                    (Mr. Stahlman)

15        Correlative rights to the common supply of the ground

16     water basin as used herein are not used in the sense that

17     the rights to the use of such waters are coequal because of

18     the natural and physical characteristics of the area as found

19     in other findings herein.

20                         - - -

21

22

23

24

25

P 32

## DEFINITION   (by Colonel Bowen)

CORRELATIVE RIGHT:

The owner of a correlative right shares proportionately with other correlative owners of his class in the common supply of water available for use.  The measure of the portion is determined by the ratio of the maximum amount of water that could be put to reasonable and beneficial use on the lands of one correlative owner to the maximum amount of water that could be put to reasonable and beneficial use on the combined lands of all correlative owners in the same classification.

- - -

(Mr. Krieger)

2.  Such overlying and riparian rights are correlative. As used herein "correlative" means corresponding rights and duties either to the common supply of the Santa Margarita River or that portion thereof in which such claimants have some right or duty.  The exercise of such rights is not necessarily the same as to quantity, character of use, method of diversion or extraction, availability of supply, but, on the contrary, in the exercise of such rights the quantity of water, type of use, method of diversion or extraction, availability of supply, or any other term or condition of use peculiar to the individual parcel of land under consideration shall be determined by this Court from time to time in the exercise of its continuing jurisdiction, the facts as they may then appear, and pursuant ot California law.

P 33

(Judge Carter)

2. Such overlying and riparian rights are abstractly correlative. The owner of a correlative right shares equitably with other correlative owners in the common supply of water available for use. As used herein, "correlative" means mutually related rights and duties pertaining to the land involved and to either the common supply of the Santa Margarita River or that segmet of the River system as to which the overlying or riparian or both overlying and riparian rights or duties attach.

The proper exercise of such rights will not necessarily involve the same quantity of water, character of its use, method of diversion or extraction, or availability of supply. The Court, if called upon later to decide upon the proper exercise of such rights, will consider all factual matter pertaining thereto, including but not limited to the quantity of water, type of use, method of diversion or extraction, availability of supply, other term or condition of use peculiar to the individual parcel of land under consideration, the location of the parcels involved as to lying over the ground water area, or being up or downstream or gradient. In the exercise of its continuing jurisdiction, the Court will judge and pass upon the lawful exercise of such rights, based on the facts as they may then appear, pursuant to California law.

P 34

(Mr. Girard)

The owners of lands which have overlying or riparian rights must, in the exercise of such rights, share correlatively of the waters to which their respective rights attach as amongst themselves and as related to downstream riparian or overlying lands which are a part of the Santa Margarita River and as to any upstream riparian or overlying lands which pursuant to other findings in this case are found to contain water in or upon lands and which water is a part of the Santa Margarita River or which adds to and contributes to such River. As used herein, the term "share correlatively" does not mean that they shall necessarily be entitled to an equal amount of water or that two or more persons must possess identical rights to the same water, but shall mean that their respective rights shall be exercised with due regard to the rights of all other persons to said waters whose rights would be physically adversely affected by the use of water pursuant to the exercise of the respective overlying or riparian rights.

- - -

t-28
H

1      (The following proceedings were had between Court and

2  counsel in Chambers.)

3      THE COURT:  We are now talking about Sandia  Creek, and

4  this is Proposed Judgment 29.  I have a suggestion on Page 1.

5  Does anyone else have anything on Page 1?

6      MR. VEEDER:  I think the point George raises is good.

7      THE COURT:  What is that?

8      MR. VEEDER:  That there are two points of perennial

9  runoff on Sandia Creek, and I think we can identify them on

10  Exhibit 69.  That is the simplest way of doing it.

11      MR. STAHLMAN:  What would you state in there, though?

12      MR. VEEDER:  "There are reaches of the stream that are

13  perennial as disclosed on 69."

14      THE COURT:  Where would that come in?

15      MR. VEEDER:  Probably at the end of the sentence.

16      MR. STAHLMAN:  Probably at the top of Page 2.

17      MR. VEEDER:  Of course, most of Sandia is an intermittent

18  stream.

19      THE COURT:  That is in Section I.  I would add to it

20  on Line 29 the following words:

21      "The  sub-watershed drained by Sandia Creek is shown

22  on Exhibit 69, attached hereto and made a part hereof."

23      MR. GIRARD:  "The sub-watershed drained by Sandia

24  Creek."

25      THE COURT:  I thought probably if we put some of these

t-29

1    on the record, we could have them up later.

2        MR. VEEDER:  That is Exhibit 69.

3        THE COURT:  Then we go to II, and "This is an intermittent

4    stream," and so forth.  I would insert on Line 2 after the

5    words "Sandia Creek," in the sentence, "the surface waters

6    of Sandia Creek and the area drained thereby are  part of the

7    Santa Margarita River."  Now, at the end of that sentence --

8        MR. GIRARD:  Wait a minute.

9        THE COURT:  Or "from the area drained thereby."

10       MR. GIRARD:  I think the waters would be a part of the

11   river, not the area; the surface waters of Sandia Creek.

12       THE COURT:  "from the area drained thereby."

13       MR. GIRARD:  "and from the area . . . "

14       THE COURT:  You don't need "and," just "from."  You talk

15   about the surface waters of Sandia Creek, and yet there are

16   a lot of little gullies and tributaries.  "The surface waters

17   of Sandia Creek" --

18       MR. VEEDER:  "-- from the area drained thereby" --

19       THE COURT:  " -- and the waters of the area drained

20   thereby . . ."

21       MR. GIRARD:  That is what I thought, "and the surface

22   waters".

23       THE COURT:  ". . . and the surface waters" --

24       MR. VEEDER:  Not necessarily.  There is alluvial fill up

25   there.

t-30

1  MR. GIRARD:  Haven't you a different finding on alluvial

2 fill?  I presume you have, Bill.

3  MR. VEEDER:  I think we have, and if you want to limit

4 it to that, that is all right.

5  MR. STAHLMAN:  Where would you bring in the perennial

6 stream?

7  MR. VEEDER:  That would be the place to bring it in.  Of

8 course, it is an intermittent stream with two reaches of it

9 that are perennial, as shown on Exhibit 69.

10  THE COURT:  It should go in at the end after the word

11 "runoff."  Insert, "there are two reaches" --

12  MR. STAHLMAN:  I think the best place to put it is right

13 after the word "stream."

14  THE COURT:  It becomes too involved, then.

15  MR. VEEDER:  You would have to have another sentence.

16  THE COURT: "There are two reaches of the stream that are

17 perennial," is that what you say?

18  MR. VEEDER:  Yes.

19  THE COURT:  ". . . as shown on Exhibit 69".

20  MR. VEEDER:  Yes.

21  MR. STAHLMAN:  Sandy, does 69 comport with your knowledge

22 of the situation?

23  MR. WILKINSON:  I don't know enough about 69.

24  MR. VEEDER:  Do you want me to get it?  It is U. S. 69,

25 a geology map.  I don't think you will not have any complaint on

t-31

1   that.

2       THE COURT:  Does anyone have anything on III?  I have one

3   at the end of III.   I would add at the end of III the

4   following sentence, "The areas of younger alluvium are shown

5   on Exhibit 69 above referred to."

6       MR. GIRARD:  Of course, maybe this isn't called for, but I

7   think these findings are beyond those of Mr. Sachse, and he

8   did submit findings which are different.  I presume he will be

9   given an opportunity to talk about these?

10      MR. VEEDER:  I will tell you what I will do.

11      MR. GIRARD:  Unless there is no difference between these

12  and Sachse's.

13      MR. VEEDER:  If you want me to prepare what I will call

14  an errata sheet, I will do it, because there are changes.

15      MR. GIRARD:  Are there any major changes on Sandia?

16      THE COURT:  This is what we worked over in the courtroom.

17      MR. VEEDER:  Yes.

18      THE COURT:  I didn't check them all, but most of the

19  things we talked about are in there.

20      Now, do you have anything on III, anybody?

21      (No response.)

22      THE COURT:  On IV I don't have anything.

23      MR. VEEDER:  There is quite a change in that.  That was

24  changed quite a lot from what was stated in the courtroom, be-

25  cause we set up a new system of identification.

t-32

1    MR. GIRARD:  You haven't changed the lands, have you?

2    MR. VEEDER:  No, but I spelled out here how the lands

3  are identified, and their descriptions, and it becomes

4  extremely important when you get over to XIII.

5    MR. WILKINSON:  This one I corrected there (Indicating),

6  but this is close enough.  It is not exactly right, but it is

7  close enough.

8    THE COURT:  What difference does it make, because what

9  might be perennial now might not be perennial two years from

10  now.

11    MR. WILKINSON:  And if you got a fire up there, it would

12  be more so.

13    THE COURT:  Does anybody have any objection to IV?

14    MR. VEEDER:  No.

15    THE COURT:  Does anybody have any objection to V?

16    MR. STAHLMAN:  Where is Exhibit A, please?

17    MR. VEEDER:  Here is Exhibit A.  The Court has Exhibit A,

18  and I will supply everybody that wants it a copy of Exhibit A.

19    MR. STAHLMAN:  I have Exhibit A, but "B" I think comes

20  in farther down.

21    MR. VEEDER:  Here is Exhibit B.

22    THE COURT:  Let's wait until we get to it.

23    Now, VI is all right, and when you follow through you

24  find that later on these intermittent streams, tributaries

25  to Sandia, and where people are riparian thereto, -- we later

t-33

1   find these are illusory rights, and that is taken care of

2   in XII.

3       MR. VEEDER:   There is one thing that I would like to be

4   permitted to do on these findings, if it is agreeable to you,

5   when we rewrite them.  The two parcels are set up in Exhibit

6   A, and if you will just turn to Exhibit A, you will see what

7   I am talking about.  You will find on the first page there

8   Parcel 83W-23 and 24-3.  You see what I am talking about?

9       THE COURT:   Yes.

10      MR. VEEDER:   Now, in setting up the description in VI,

11  coming back to Finding VI again, I would, if agreeable to your

12  Honor, and I have done it in the riparian findings, I would

13  show Parcel 58, Section 23, because 24 is not riparian.

14      Do you see what I am saying?  In other words, you have a

15  poor description in A; only a part of the land would be

16  riparian.

I fls.

17

18

19

20

21

22

23

24

25

I take

P 35

1    THE COURT:  Well, I don't follow you.  You have used here

2    parcel numbers which apparently come out of 212-B.

3    MR. VEEDER:  That is right.

4    THE COURT:  But the parcel numbers that you put down

5    don't correspond with the parcel numbers shown in the findings.

6    MR. VEEDER:  Yes, they do.

7    THE COURT:  How do they correspond?  What I am pointing

8    out -- let's take the first parcel.  You list on page 3, and

9    it is 59, and it is therefore Parcel 59 of 212-B.

10   MR. VEEDER:  Parcel 59.

11   THE COURT:  Yes, but you have a lot of material before it.

12   Somebody might be able to figure out that that was Parcel 59.

13   But you have here Parcel 83W --

14   MR. VEEDER:  But your Honor, there is only one way that

15   you would ever find this parcel, and that is to know how to

16   handle it.  This is Township 8 Range 3 West Section 31.

17   MR. STAHLMAN:  Why don't you say Parcel 59 and then say

18   "located in the town of"?

19   MR. VEEDER:  I will be glad to do it.  But I think --

20   THE COURT:  These are all drawn up.  Let's us not go to

21   more work on it.

22   MR. VEEDER:  You see, your 59, if you know the key, you

23   have no problem.  In other words, you look for the township,

24   range and section, and then the parcel number.  Then in the

25   section you may have eight or nine parcel numbers.  Do you

17,133

P 36

1    follow me on that?

2         THE COURT:  All right, then, go back in Section 4 and add

3    to Section 4 "that in the listing of the parcels set forth

4    hereafter there has been, in addition, inserted, the first

5    letter being the township, the next the range, the next the

6    section, and finally the number indicating the parcel."

7         MR. VEEDER:  All right, I'll do that.

8         THE COURT:  So that this will be understandable.  Will

9    you do that?

10        MR. VEEDER:  Yes, we will.  I think it is essential that

11   it be comprehended.

12        Now let me add the point I started to bring up.

13        THE COURT:  And you can even follow it up, to make it

14   clearer, that in each of the descriptions here set forth the

15   last number is the parcel number.

16        MR. VEEDER:  Within the particular section.

17        THE COURT:  That is referred to therein.

18        MR. VEEDER:  Yes.

19        The point that I want to make clear, and the one objection

20   that I have to these findings is this:  That where we referred

21   to Parcel 74 as being riparian, you see, if you check through

22   it will be found that there are several pieces of land involved.

23   Like here, Section 35, Section 2 and Section 3; now only Section

24   35 in that Parcel 74 will be riparian, the other two will not

25   be.  I propose to rewrite them simply to put in the section

P 37

1    that has riparian land and omit the other sections which are

2    not riparian.  If I don't do that, you are going to have a

3    hard time.

4          THE COURT:  All you have to do is to strike out.

5          MR. VEEDER:  That will be done.

6          THE COURT:  You will take care of that.

7          All right, anybody have any further suggestions as to

8    Plot 4 or 5?

9          We were down to VI and I commented that the finding as

10   to illusory right is contained over in Finding XII.

11          Anybody have any objections to VII?

12          MR. STAHLMAN:  With this exception.  Parcel 3, Vail

13   Company, Exhibit B -- where is Exhibit B?

14          THE COURT:  Show him Exhibit B.

15          MR. VEEDER:  I think I gave you your Exhibit B.  This is

16   your Exhibit B.  I gave you Exhibit B this morning, George.

17          MR. STAHLMAN:  Yes, that's right.

18          MR. VEEDER:  This is all it is.  Do you have a copy there?

19          MR. WILKINSON:  I have a copy.

20          MR. STAHLMAN:  You want to check it is all.

21          MR. VEEDER:  I want you to check it.

22          THE COURT:  Check it.

23          COLONEL BOWEN:  It came out of the report, which you have

24   already accepted.

25          MR. STAHLMAN:  Have you checked it?

P 38

1      MR. WILKINSON:  No.  You have to break it down.

2      THE COURT:  Do that.

3      MR. WILKINSON:  I am sure it is right, your Honor.

4      THE COURT:  Any suggestions as to VIII?

5      MR. GIRARD:  I think the word "purportedly" ought to be

6  dropped out at line 10.  As I recall, the question whether

7  these riparian rights were reserved was going to be briefed.

8  But Bill has back in here in his conclusions of law that they

9  are good.  So "purportedly" ought to go out.

10      MR. VEEDER:  "Purportedly" is in there in error.  Mr.

11  Sachse and I have agreed in the record that if this land

12  should be found not riparian the revision would be made.

13      MR. GIRARD:  Yes.  To be consistent, it should be out.

14      MR. VEEDER:  Take "purportedly" out.

15      THE COURT:  I assume from these findings that you were

16  going to concede that this reservation is good, because it is

17  an illusory thing anyhow.

18      MR. VEEDER:  Let me show you, though.  These are documents

19  that I would like to talk to Mr. Sachse about.  These are the

20  ones purporting to reserve.

21      THE COURT:  You haven't conceded, then?

22      MR. VEEDER:  Now I want you to get these entered.

23      THE COURT:  All right.  They will be amended later.

24      MR. VEEDER:  If there is need for amendment.

25      THE COURT:  Strike out "purportedly."

P 39

1   MR. VEEDER:  As long as that is understood by everybody.

2   THE COURT:  Anything else on VIII?

3   IX.  I think on IX, on line 24, after the word "Sawday"

4   you should make that a comma, and you should insert the words

5   "based upon".  In other words, it has got to read like English.

6   MR. VEEDER:  I want to to back to line 19 on  IX:

7       "The following parcels of land, the exact legal

8       descriptions of which are set forth in Exhibit A

9       attached hereto, have appropriative rights to the use

10      of waters of Sandia Creek and its tributaries as

11      hereinafter set forth: . . "

12  I would like again to reserve the right further to discuss

13  this with Mr. Sachse.  I didn't want to change it in the

14  absence of Mr. Sachse.  But I reserve the right because I

15  will say that those lands do not necessarily have appropriative

16  rights and at most they would be inchoate in regard to these

17  lands which have only an application and have not such rights.

18  MR. GIRARD:  I don't think the appropriative right is

19  appurtenant to the land.

20  MR. VEEDER:  That is right.

21  MR. GIRARD:  An appropriative right is to an individual.

22  Like the Fallbrook Public Utility District owns the appropria-

23  tive right.  It is not appurtenant to the land.

24  THE COURT:  You should say "The owners of the following

25  parcels of land".

P 40

1    MR. STAHLMAN:  Why don't you state the facts -- you have

2    a permit?

3        MR. VEEDER:  I think George is right, and then draw the

4    legal conclusion.

5        THE COURT:  Let's stick to one thing at a time.  Shouldn't

6    we say, on line 19, "the owners of the following parcels"?

7        MR. GIRARD:  For example, Mr. Yackey has a permit.  He

8    owns some land.  He could sell that land tomorrow and still

9    hold his permit.  The permits are owned by individuals and

10   they are not related to the land.

11       THE COURT:  That is what I say, "the owners of the

12   following parcels."

13       MR. VEEDER:  Are holders of permits.

14       THE COURT:  We change it by saying that the land does

15   not have the permit, but the owners of the following parcels

16   have appropriative rights.

17       MR. VEEDER:  I wouldn't say "appropriative rights".

18       THE COURT:  We will get to that in a minute.  Are you

19   willing to insert "the owners of the following parcels of

20   land"?

21       MR. VEEDER:  Yes.

22       THE COURT:  Why don't we say "have secured permits to

23   appropriate"?

24       MR. VEEDER:  That is good.

25       MR. GIRARD:  All right.  There are no licenses here, are

P 41

1    there?

2        MR. STAHLMAN:  No.

3        MR. VEEDER:  No.

4        THE COURT:  ". . have secured permits . . "

5        MR. VEEDER:  From the State of California.

6        THE COURT:  ". . from the State of California to

7    appropriate rights to the use of water from Sandia Creek and

8    its tributaries as set forth herein".

9        MR. VEEDER:  That is a good statement.

10       MR. GIRARD:  Have secured permits from the State of

11   California to appropriate waters.

12       MR. VEEDER:  To appropriate rights to the use of water.

13       MR. GIRARD:  You don't appropriate rights.  You appro-

14   priate waters.

15       THE COURT:  Just say "appropriate waters from Sandia

16   Creek".

17       And then on line 24, after "Sawday" say "based upon

18   permit so and so".

19       MR. GIRARD:  Yes.

20       THE COURT:  And then we say use is presently made under

21   the permit.

22       And then down at line 13, on page 6, after "Taylor" make

23   a comma "based upon permit . . has not been constructed and

24   no present use is being made . . "

25       Anybody got any thoughts about X?

P 42

1    MR. GIRARD:  Yes.

2    MR. VEEDER:  There are no vested appropriative rights,

3    in my view.

4    THE COURT:  Other than as set forth.

5    MR. VEEDER:  I don't believe they are vested.  Moreover,

6    I think you would want to say that there are presently no

7    other holders of permits from the State of California, if you

8    want to say that.

9    MR. GIRARD:  I don't agree with Mr. Veeder that it is not

10   vested.  I think the priority date is at least vested.  It may

11   be subject to divestment by the cancellation of the permit.

12   MR. VEEDER:  When you say "appropriative" that

13   means that you have appropriated and diverted the water to

14   beneficial use.

15   MR. GIRARD:  That is not right.  I have another comment

16   on that section, too.  You have a property right in a permit.

17   MR. STAHLMAN:  Use is presently being made under said

18   permit, and then you go further and say in X that he has no --

19   MR. GIRARD:  It is an existing right which can only be

20   set aside by the State Water Rights Board.

21   MR. VEEDER:  I think you will find that there is a

22   difference, and I think you will find that even in rules and

23   regulations issued by the State Water Rights Board.

24   THE COURT:  We have crossed the hump as to what they

25   have, because we have said they have the permit.  Now we are

P 43

1    trying to say there is nothing else.

2        MR. GIRARD:  I think there is something else.

3        MR. VEEDER:  Are you saying that Mr. Sachse has --

4        MR. GIRARD:  Yes, Mr. Sachse has a permit to appropriate

5    water from Sandia Creek.

6        MR. VEEDER:  No; from the Santa Margarita.

7        MR. GIRARD:  But Sandia is tributary.  And for example,

8    Mr. Yackey's permit is expressly junior to Mr. Sachse's.  For

9    example, your Lake O'Neill might be in the same situation.

10       MR. VEEDER:  Well, he says Sandia Creek.  That is why

11   I have no objection to it.

12       MR. GIRARD:  We are not quarrelling on the facts, I think.

13   But I want to make clear that, for example, Mr. Sachse's

14   Fallbrook diversion, which is actually not on Sandia Creek,

15   is based upon water from Sandia Creek.  For example, Mr.

16   Yackey's permit is expressly junior to Fallbrook's permit in

17   the terms of the permit.  I think you could go further and say

18   that even the United States' Lake O'Neill appropriative right

19   has rights to the waters of Sandia Creek.

20       THE COURT:  This is a good point.  We are talking about

21   the use of waters of Sandia.  These also involve these downstream.

22   So I think you are going to have to revise X.  And I would

23   suggest that in revising X you start in and say that as found

24   in interlocutory judgment so and so Fallbrook has secured a

25   permit from the State of California to waters which would

P 44  1   include --

2        MR. VEEDER:  Downstream from the confluence of Sandia.

3        THE COURT:  Which would, therefore, include waters from

4   Sandia, and that as found in judgments so and so the Government

5   has an appropriative right to Lake O'Neill, which involves

6   waters downstream of Sandia.  And such judgments are incorpora-

7   ted by reference -- some way to tie them in here.  Maybe you

8   don't want to do that, but just refer to the judgments.

9        MR. VEEDER:  I am perfectly willing to do what your Honor

10  has suggested.  I think we should say, however, that all these

11  rights on Sandia Creek are subject and subordinate to prior

12  rights, something like that.

13       MR. GIRARD:  Yes.  As a matter of law, they are.

14       THE COURT:  All right.  Are Fallbrook and the United

15  States both prior in time to these permits?

16       MR. VEEDER:  Yes.

17       MR. GIRARD:  I don't know for sure when Fallbrook's is.

18       MR. VEEDER:  Yes, Fallbrook is October 1946.

19       MR. GIRARD:  Then both of them are prior.

20       THE COURT:  Then start out X and say that the permits

21  listed above and any rights flowing therefrom are subject and

22  subordinate, junior in time to the following:  Permit to

23  Fallbrook --

24       MR. VEEDER:  Appropriative right.

25       THE COURT:  -- referred to in judgment so and so, the

P 45

1   appropriative right of the Government referred to in judgment

2   so and so.  Then say that no other permits involving Sandia

3   Creek have been issued by the State of California.

4       MR. GIRARD:  I am not sure now.  As I recall, when Mr.

5   Sachse was arguing this injunction that Bill brought, he

6   introduced an exhibit which showed quite a few State filings

7   which were upstream from his diversion a way down there on

8   the river.

9       MR. VEEDER:  There were two of them on Bryan Creek.  Those

10  were the only ones.

11      MR. GIRARD:  Were any of those senior to these?

12      THE COURT:  They are on another tributary.

13      MR. GIRARD:  I don't know whether they were or not.  If

14  they weren't on the Santa Margarita, then they wouldn't be

15  applicable.

16      MR. STAHLMAN:  I have an appointment tonight, your Honor.

17  How long are we going to go?

18      THE COURT:  I am going to try to go through these.  We

19  will be through then in a minute.  You may leave at any time.

20      MR. STAHLMAN:  I will stay with these.

21      COLONEL BOWEN:  They were on De Luz Creek.

22      MR. GIRARD:  They would have no application.  But there

23  were no others on Santa Margarita other than Fallbrook's and

24  yours?

25      COLONEL BOWEN:  Yes.

P 46

1       MR. GIRARD:  That takes care of it then.

2       THE COURT:  Then I think you could say something like you

3   have here "that other than as set forth above, there are no

4   other appropriative rights to the waters of Sandia".  And I

5   think you save a lot of trouble by just striking out "vested

6   and inchoate;" just "no other appropriative rights".

7       MR. GIRARD:  All right, I am not concerned with it too

8   much, really.

9       THE COURT:  But put those others in.

10      Now, what about XI?

11      MR. VEEDER:  So far as the record shows, that is correct.

12      THE COURT:  All right.

13      Now XII.  You say, "The record of runoff in the Santa

14   Margarita River watershed" and I would insert "including

15   Sandia subwatershed".

16      MR. VEEDER:  There are no records for Sandia.  That is

17   why we used the term.

18      THE COURT:  We are talking about Sandia.  Now you talk

19   about Santa Margarita.  Say "There are no records of runoff

20   in the Sandia subwatershed".  Then go ahead with what you have.

21   Insert that "There are no records of runoff of Sandia sub-

22   watershed."  Then go ahead and put in what you have.

23      Anything else on XII?

24      MR. GIRARD:  I don't think so.

25      THE COURT:  XIII.

P 47

1    MR. VEEDER:  This is the one that worried me a lot, and

2    I see that you picked up what I was worried about.

3    THE COURT:  I have suggested here that you take out the

4    words, on line 12, "extent of" and insert --

5    MR. GIRARD:  I would still like, before we start changing

6    it too much, I still think we ought to use that same identical

7    finding which we used in the Anza, which we used in the Murrieta,

8    which says that this issue of apportionment was not in issue.

9    THE COURT:  All right, put that in.

10   MR. GIRARD:  Put in that same identical finding that you

11   have in the Anza finding.

12   MR. VEEDER:  I want to show affirmatively, however, in

13   this finding that there is sufficient evidence to determine

14   the lands to which there are appurtenant riparian rights.

15   MR. GIRARD:  You have already defined your lands which

16   are riparian.

17   MR. VEEDER:  You are not seeing what I am talking about.

18   It says, "The evidence introduced at the trial (this is Mr.

19   Sachse) is sufficient to enable the Court to determine . . "

20   You can determine the riparian rights.  You make a determination

21   of those in another part.

22   MR. GIRARD:  Yes.

23   MR. VEEDER:  I would rewrite the whole thing, putting in

24   the language that this question of apportionment was not

25   raised in regard to Sandia Creek.  I would like to substitute

P48

1   something and take that out of there, because this is contra-

2   dictory to other language we have.

3        MR. GIRARD:  This finding?

4        MR. VEEDER:  Yes.

5        MR. GIRARD:  I agree that we ought to take this finding

6   out entirely and use that same finding that the issue of

7   apportionment was not presented at this stage of the case.

8        MR. VEEDER:  Yes.

9        MR. GIRARD:  It is used in Anza, and it is used in

10   Murrieta.

11        THE COURT:  All right, that solves that problem.

12        Conclusions of Law, IV on page 9.

13        MR. GIRARD:  I have a conclusion on III.  You are going

14   to have to change your Conclusion of Law III to comply with

15   your position on the Fallbrook and Unites States appropriations.

16        MR. VEEDER:  It has to be brought around to line up with

17   Finding X.

18        MR. GIRARD:  Yes.

19        MR. VEEDER:  I will put "correspond with Finding X."

20        MR. GIRARD:  That is right.

21        THE COURT:  Now, on IV, I suggest that at the end of

22   IV there be added this language that we used in the stock dam

23   matter.  In other words, we would say "No prescriptive rights

24   to the use of the waters of Sandia Creek or any of its tribu-

25   taries have been perfected.  No adverse users exist and no

P 49

1   uses now existing may lead to prescriptive rights.  Reference

2   is made to prescriptive rights in Interlocutory Judgment No.

3   28 in this respect."

4   MR. GIRARD:  Yes.

5   MR. VEEDER:  Could I refer your Honor to Exhibit B --

6   Millicent Taylor.

7   THE COURT:  B is Vail.

8   MR. VEEDER:  I beg your pardon -- E.

9   THE COURT:  Yes.

10  MR. VEEDER:  In fairness to Mr. Yackey, I don't know

11  whether he was claiming prescriptive rights for her dam or not,

12  and when we wrote this in here, if they have a reservoir up

13  there, I don't know how long it has been put in there.

14  COMMANDER REDD:  It was put in under Hanson's original

15  application to appropriate, I think.

16  MR. VEEDER:  Was it?  They may have something there.

17  THE COURT:  Is there a permit to appropriate up there?

18  MR. VEEDER:  No.

19  COMMANDER REDD:  There was an application which was later

20  declared abandoned.

21  MR. STAHLMAN:  It was not abandoned.  I think the State

22  Water Rights Board took action on it.

23  MR. VEEDER:  That is right.  The State Water Rights Board

24  took action on it while we were up there, wasn't it?

25  MR. STAHLMAN:  Yes.

P 50

1    MR. VEEDER:  The point I make to you, this is a non-
2    riparian use, because she is storing water up there.  Isn't
3    she?

4    MR. STAHLMAN:  Yes.

5    THE COURT:  How long has she had that reservoir in there?

6    COLONEL BOWEN:  For quite a few years.  I don't remember
7    the exact date that it was constructed.

8    MR. GIRARD:  But she apparently claimed originally under
9    an appropriation, and that appropriative finding was revoked
10   during this lawsuit.

11   MR. VEEDER:  That is correct.

12   MR. STAHLMAN:  That is correct.

13   MR. VEEDER:  I am just saying, in fairness I am bringing
14   it up, because we have this thing on Tucalota Creek, too.

15   THE COURT:  Let's dispose of it and let him read it
16   and let Yackey come in and fight about it.  Do we have enough
17   in the record?  He hasn't got anything in the record now.

18   MR. GIRARD:  If all you have is a reservoir, you don't
19   have enough  to base a prescriptive right on it, because you
20   would have to show that it is adverse.

21   COLONEL BOWEN:  Would it clear up anything if I said
22   that this masonry concrete dam is within the reservoir area,
23   within his proposed reservoir area?  I don't think he is going
24   to press for anything here.

25   MR. VEEDER:  When I am writing the findings I want to be

P 51

1    fair with these people.

2        THE COURT:  We can amend them later, if we have to.

3        So as to IV we will add what I suggested.

4        Now, as to V I would strike out VIII to start with, and

5    say "The lands described in Finding No. VII of the findings

6    herein are riparian to Sandia Creek," and then I would add

7    "and the lands described in Finding VIII, though no longer

8    adjacent to the creek, have riparian rights pertaining thereto

9    by reason of the reservations contained in the deeds of record."

10       MR. VEEDER:  I don't know whether "adjacent" is synonymous

11   with "abutting" or not.

12       MR. GIRARD:  I think you should say "are no longer

13   contiguous or abutting".

14       THE COURT:  Abutting.  But you get my point.  There is

15   a little difference between them.

16       MR. GIRARD:  Yes.

17       THE COURT:  I will read it again:  "The lands described

18   in Finding No. VII of the Findings of Fact are riparian to

19   Sandia Creek".  I think I am right about VIII there.

20       MR. GIRARD:  Yes, that is a reservation.

21       THE COURT:  "And the lands described in Finding VIII,

22   though no longer abutting the creek, have riparian rights

23   pertaining thereto by reason of the reservations contained in

24   deeds of record."

25       MR. VEEDER:  That is right.

P 52

1      MR. GIRARD:  That is right.

2      THE COURT:  You can fight it out with Mr. Sachse later.

3    We can amend it, if we have to.

4      MR. VEEDER:  I don't expect to fight it out.

5      THE COURT:  Actually, in this particular case it is

6    immaterial.  The reservation of those riparian rights doesn't

7    mean anything.

8      I have a suggestion on VI.  Starting on line 14,

9    "correlatively with all other owners of lands riparian to

10   Sandia Creek," insert "and with owners of land riparian to

11   Santa Margarita River, and with owners of overlying ground

12   water areas supporting the Santa Margarita River below its

13   confluence with Sandia Creek".

14     MR. VEEDER:  That is good.

15     THE COURT:  Did you get that?

16     MR. GIRARD:  Yes.

17     THE COURT:  You might have to use extra words.  You

18   might have to say "and with owners of land riparian to Santa

19   Margarita below its confluence with Sandia Creek, and with

20   owners of overlying ground water areas supporting Santa

21   Margarita below its confluence with Sandia Creek".  I mean,

22   you might have to repeat in order to make it clear what you

23   are talking about.

24     MR. VEEDER:  Yes.

25

J fls.

t-34
J-1

1    THE COURT:  On VII, what do you have?

2    MR. GIRARD:  I would suggest we knock this whole thing

3    out, and put in the language we have in the other, and say

4    that the issue of apportionment has not arisen.

5    THE COURT:  All right.  That takes care of that.  Now,

6    does anybody have anything on VIII?  I have one on IX.

7    MR. VEEDER:  I was going to ask for some direction on

8    that, whether you wanted us to go through and make negative

9    findings as to defendants that have no rights at all.

10   You see, on everyone of the watersheds you have the

11   people in the basement complex over whose land there is no

12   stream, no  arroyo and nothing.

13   THE COURT:  You say, "The owners of the land described

14   in Finding V . . . have no rights in or to the waters of

15   Sandia Creek or any of its tributaries."

16   MR. VEEDER:  What I am saying, where a man has no

17   interest, to so declare it.

18   MR. GIRARD:  I don't think you have to in every instance.

19   If you get into an area where you have many hundreds in

20   basement complex, you can just say "Those in basement complex".

21   MR. VEEDER:  Well, that is going to be a real job.

22   MR. GIRARD:  I think you should say it, then.

23   MR. VEEDER:  All right.  It suits me.  I just want to

24   know where we are going.

25   THE COURT:  Then we go to the end of Page 9 where you

t-35

1   say, "for all reasonable and beneficial riparian uses and

2   purposes correlatively with all owners of land riparian to

3   said intermittent streams," and then strike "or" and put in

4   "and" --

5        MR. GIRARD:  "and riparian to Sandia Creek"?

6        THE COURT:  Is "and" better than "or" or not?   Do you

7   have rights correlative with owners, or that you have rights

8   correlative with lands riparian to the streams and riparian

9   to Sandia Creek?

10       MR. GIRARD:  Wait a minute.  I presume you made a

11  finding of fact that some of these riparians were on

12  tributaries to Sandia?

13       MR. VEEDER:  That is correct.

14       THE COURT:  ". . . and with owners of land" -- insert

15  that -- "riparian to Sandia Creek," and then insert "and

16  overlying owners and riparian owners below the confluence,"

17  and so forth.  In other words, you go back to the text,

18  "below the confluence of such intermittent stream with Sandia

19  Creek."

20       Then I would add there a conclusion of law:

21       "That such riparian rights described in VI are illusory

22  and of no real value."

23       MR. VEEDER:  I think I can do that.

24       MR. GIRARD:  And the same thing, then, the factual

25  statement that water exists only when the rain comes?

t-36

1      THE COURT:  That is a fact.  These are the conclusions,

2  and here we say that the rights are illusory and of no real

3  value.

4      Now, in X --

5      MR. VEEDER:  May I just ask this question, your Honor?

6  I go along with the idea of saying they are illusory, but

7  would that statement be res judicata if a changed condition

8  came about?

9      THE COURT:  Well, you can say "are presently illusory."

10      MR. VEEDER:  I think we had better say "under present

11  conditions".

12      MR. GIRARD:  For example, the Vail Company has some

13  riparian land on a stream, and it would be useless there, but

14  I guess the cattle drink out of it.

15      THE COURT:  We will say "are presently illusory."

16      MR. VEEDER:  Yes, because it might be of some value some

17  day.

18      THE COURT:  Now, as to this last finding, I would add --

19      MR. VEEDER:  I don't like that.  Excuse me.

20      THE COURT:  "The United States of America, and all other

21  parties in this action," and so forth, "have no rights in or

22  to the ground waters described in the Findings of Facts

23  herein as  vagrant, local, percolating waters not a part of

24  any surface or sub-surface stream or sub-surface basin or

25  ground water area" --  I have inserted "or ground water area"--

t-37

1    "of the Santa Margarita River or any of its tributaries."

2        MR. VEEDER:  I would like to put in, for politics, if

3    for no other reason, this:  "The United States of America,

4    and all other parties in this action claim no right and have

5    no right . . ."  We never claimed any right to percolating

6    waters, and I think that should be demonstrated in these.

7        THE COURT:  All right.  If you want it, "have claimed

8    no rights" -- this is at Line 7.

9        MR. VEEDER:  ". . .claim no right . . ."

10       THE COURT:  ". . .have claimed no rights" --

11       MR. VEEDER:  "And have no right" --

12       THE COURT:  " -- and have no rights in or to the ground

13   waters," and so forth, "as vagrant, local, percolating waters",

14   and so forth.   That is all right.

15       Then that is all I have.  Do you have anything else?

16       MR. WILKINSON:  That is a little contrary to some of the

17   other things that have been done, I think, although maybe I

18   am all wrong.

19       MR. GIRARD:  Well, how about some of your theories on

20   your paramount right factors, where you made these claims?  You

21   did not exclude Sandia Creek from that.

22       MR. VEEDER:  No, the only reason why this is important

23   is that we set up our claims to water rights in the Santa

24   Margarita watershed.  These come along, and these waters in

25   the residuum and in the weathered basement complex show there

MARIE G. ZELLNER, OFFICIAL REPORTER

t-38

1 was no claim made to those rights, and we made none.

2  MR. STAHLMAN:  You did in your Pleadings.

3  MR. VEEDER:  Oh, no, we didn't.

4  MR. STAHLMAN:  You named the parties.

5  MR. VEEDER:  We named the parties, but we did not claim

6 those rights.

7  THE COURT:  Let's leave it in that way.  You have been

8 really cooperating, and if you want it in, I will leave it in.

9  MR. VEEDER:  I have been, certainly.

10  COLONEL BOWEN:  May I ask a question about IX?

11  THE COURT:  Yes, sir.

12  COLONEL BOWEN:  Do you add to IX that if land is riparian

13 to or overlying ground water areas adjacent to the Santa

14 Margarita River --

15  THE COURT:  Let me read it as I have it, beginning from

16 the bottom of Page 9, and paraphrasing.  Bear in mind that VI

17 is the intermittent streams.

18  COLONEL BOWEN:  Yes, sir.

19  THE COURT:  "The owners of the lands described in

20 Finding VI .. . are entitled to the use of the surface waters

21 of the intermittent streams . . . , for all reasonable and

22 beneficial riparian uses and purposes correlatively with all

23 other owners of land riparian to said intermittent streams,

24 and with owners of land riparian to Sandia Creek, and with

25 overlying owners and riparians below the confluence of such

t-39

1    intermittent stream with Sandia Creek."

2    That took care of the works?

3    COLONEL BOWEN:  Yes, sir, right.

4    MR. GIRARD:  I still have some problems in connection

5    with that "claimed no rights," your Honor.  There are an

6    awful lot of those lands that are Vail Company lands.

7    THE COURT:  What difference does it make?

8    MR. GIRARD:  Well, the United States has asserted that

9    Vail is entitled to use only one-third of the waters they are

10    entitled to, and you have the vagrant, percolating waters --

11    THE COURT:  This is simply Sandia Creek.  I would not

12    make this finding in connection with Murrieta, because you did

13    claim it there, and you have claimed everything up there, but

14    this is Sandia Creek.

15    MR. VEEDER:  Your Honor, this is just for the record now,

16    and I realize it is getting towards the end of the day, but

17    we never made any kind of claim, and as we are on the record,

18    we did not make any claim to anything but the water resources

19    in the Santa Margarita River and its tributaries, and if

20    these waters are not a part of the Santa Margarita and its

21    tributaries --

22    THE COURT:  Maybe Bill is right.  Maybe his bucket of

23    water at the end of the stream theory -- and pardon me for

24    being facetious this late in the day -- the bucket at the end

25    of the stream theory was based upon the waters of the stream

t-40

1    system and not upon percolating waters.

2           MR. VEEDER:  That is right.

3           THE COURT:  And his claims to waters on  Indian and

4    forest lands, --

5           MR. STAHLMAN:  And the metaphysical theory.

6           THE COURT:  -- and the metaphysical theory of some

7    severance, and so forth, all talked about stream waters, and

8    I don't know of any case where the Government has made any

9    claim to what was called local, vagrant, percolating waters

10   in the ground, and actually -- and this may have been before

11   you came into this case, Mr. Girard -- the thing that quieted

12   the whole furore in Fallbrook was the Government's position,

13   and Colonel Bowen had a lot to do with it, in going down

14   there and finding a lot of water for these little farms that

15   was local, vagrant, percolating water, and Fallbrook quieted

16   down like a doll.

17          MR. VEEDER:  The reason I asked for the language we used

18   there is that is the language we used in the interlocutory

19   judgment in Fallbrook.  Do you want to take a look at it?

20          COLONEL BOWEN:  Even the incorporeal hereditaments made

21   no claim to the local, vagrant, percolating water.

22          THE COURT:  Don't you think this is all right?

23          MR. VEEDER:  Yes.

24          MR. GIRARD:  Also, your Judgment Number 5 should again

25   correspond to the same language.

t-41

MR. VEEDER:  Oh, that is in there, and I have added some things here that were not on Sachse's, and I will do the same thing with them.

MR. GIRARD:  I think V is all right.  The more I read it, and I have read it rather carefully, I think it is all right the way it is.

MR. VEEDER:  All right.

THE COURT:  Then I suppose the only thing to do is to take this with you.  Take this with you, and this was the redraft I made, and I suggest you sleep on it.

MR. STAHLMAN:  10:00 o'clock in the morning?

THE COURT:  10:00 o'clock.


(Whereupon, at 5:00 o'clock p.m., Thursday, June 1, )
(                                                     )
(1961, an adjournment was taken until 10:00 o'clock  )
(                                                     )
(a.m., Friday, June 2, 1961.                          )

- - -

17,159

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiff,　　)
　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　)　　No. 1247-SD-C
　　　　　　　　　　　　　　　　　)
FALLBROOK PUBLIC UTILITY DISTRICT,)
et al.,　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　)

CERTIFICATE OF REPORTER

　　　We, the undersigned, do hereby certify that we are, and on the date herein involved, to wit:  June 1, 1961, were duly qualified, appointed and acting official reporters of said Court;

　　　That as such official reporters we did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that we did thereafter cause our said shorthand notes to be transcribed, and the within and foregoing 93  pages of typewritten matter constitute a full, true and correct transcript of our said notes.

　　　WITNESS our hand at San Diego, California, this 1st day of June 1961.

_John Swader_

_Marie B. Zellner_