MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

> Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

> Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      June 2, 1961

Pages: 17,160 to 17,276

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 153

17,160

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, June 2nd, 1961

- - -

APPEARANCES:

For the Plaintiff:                WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney General

                                 CDR. DONALD W. REDD

For the Defendants:

    Vail Company                 GEORGE STAHLMAN, ESQ.

    State of California          FRED GIRARD, ESQ.

P 44

## INDEX TO WITNESSES

| For the Plaintiff | D | X | RD | RX |
|---|---|---|---|---|
| Mrs. Annie E. Bergman | 17,162 (by Veeder) | | | |
| Col. Allen C. Bowen | 17,165 (by Veeder) | | | |
| Warren L. Wyman | 17,185 | | | |
| Col. Allen C. Bowen | 17,212 (by Veeder) | | | |
| James Vail Wilkinson | 17,230 | | | |

## INDEX TO EXHIBITS

| Plaintiff's Exhibits | Identified | Received |
|---|---|---|
| 289- Engineering Report, Annie E. Bergman, | 17,162 | 17,180 |
| 290- Engineering Report, Trennell | 17,189 | 17,202 |
| 15-L - Map - | | 17,213 |

JOHN SWADER, OFFICIAL REPORTER

17,162

p 2

SAN DIEGO, CALIFORNIA, Friday, June 2, 1961, 10:00 A.M.

(Another matter.)

THE CLERK:  1-1247-SD-C United States vs. Fallbrook.

MR. VEEDER:  May I proceed?

THE COURT:  Yes.

MR. VEEDER:  Your Honor, Colonel Bowen hasn't arrived, but Mrs. Annie Bergman is here and Mr. Wyman is here.  I would like to call them and proceed to produce their soil reports.  They have looked them over and they say that they are satisfactory.  So I could put them in that way, if it is all right with you.

MR. GIRARD:  So stipulate.

THE COURT:  All right, call them.

MR. VEEDER:  Call Mrs. Annie Bergman, please.

Take the stand, Mrs. Bergman.

MRS. ANNIE E. BERGMAN,

one of the defendants herein, being first duly sworn, on her oath was examined and testified as follows:

THE CLERK:  State your name please.

THE WITNESS:  Annie E. Bergman.

MR. VEEDER:  May I have that for just a moment, Mrs. Bergman.

THE COURT:  Be seated.

THE CLERK:  Plaintiff's Exhibit 289.

(Plaintiff's Exhibit 289 for)
(identification.              )

P 3

### DIRECT EXAMINATION

BY MR. VEEDER:

Q   Mrs. Bergman, would you state your full name into the record.

A   Annie E. Bergman.

Q   And where do you reside Mrs. Bergman?

A   At the Aguanga Post Office.

Q   Do you own property in the Aguanga area?

A   Yes I do.

Q   I hand you the exhibit marked for identification 289, which is designated "Engineering Report On The Property Of Annie E. Bergman," and I ask you, Mrs. Bergman, have you reviewed that report?

A   Yes I have.

Q   Does it relate to all of your property?  Have you checked that out?

A   Yes.  It has all my property in that area, in the Temecula Creek drainage.

Q   Now, have you considered the contents of the engineering report, Mrs. Bergman?

A   Yes I have.

Q   And is it satisfactory to you?

A   Yes.

MR. VEEDER:  Your Honor, the properties that are here involved --

P 4

1    THE COURT:  How many acres?

2    MR. VEEDER:  I would have to check it, your Honor.

3    Colonel Bowen hasn't arrived yet.

4    THE COURT:  Let me see the report.

5    Go ahead, Mr. Veeder.

6    MR. VEEDER:  The properties are riparian to Temecula

7    Creek, and a large overlying area in the Aguanga area.  They

8    are identified and shown on Exhibit 210-C, and the location

9    of the properties appears on Exhibits 275 and 281, if your

10   Honor would care to view their location.

11   THE COURT:  Can you point them out to us?

12   MR. VEEDER:  It is Parcel 69 and Parcel 81.  Parcel 69

13   is the Trunnell property.  Here is Parcel 81.

14   THE COURT:  That is 61.  What are the parcel numbers

15   again?

16   MR. VEEDER:  Parcel 76.

17   THE COURT:  There is a whole series of them.

18   MR. VEEDER:  The properties of Trunnell were originally

19   owned by Mrs. Bergman.  I will call Mr. Wyman, who represents

20   them.  But there are the locations of the properties in the

21   Aguanga area.  You will observe that they are overlying.

22   Sections 33 --

23   MR. GIRARD;  Thirty-four, 27, 28.

24   MR. VEEDER:  Township 8 South 1 East.  Those lands are

25   overlying in Sections 33, 22, 27, 34.

P 5    1      THE COURT:  You haven't checked them all out, but you

2    advise that they have been all checked out?

3        MR. VEEDER:  They have.

4        THE COURT:  And they all lie either in older alluvium

5    or younger alluvium?

6        MR. VEEDER:  Section 33 is riparian, you will observe.

7        THE COURT:  Does she have all of Section 33?

8        MR. VEEDER:  I will have to check that.  The property

9    she owns in Section 33 is riparian.

10        THE COURT:  This is 69-A.  Is that one of her parcels?

11        MR. VEEDER:  No; that is the Trunnell property.

12        I observe that Colonel Bowen is here now.  May I with-

13    draw Mrs. Bergman from the witness stand and put Colonel

14    Bowen on the stand?

15        THE COURT:  He can testify from right there.

16        You have been sworn already.

17                ALLEN C. BOWEN,

18    recalled as a witness on behalf of the plaintiff, having

19    been previously duly sworn, testified further as follows:

20               DIRECT EXAMINATION

21    BY MR. VEEDER:

22        Q    Colonel Bowen, will you refer to Exhibit 210-C and

23    Exhibit 281 and Exhibit 275 and locate for the record the

24    properties of Mrs. Annie Bergman as reflected in Exhibit 289?

25        Does your Honor have that?

        THE COURT:  I handed it to the Colonel.

t-1

1          Do you have that list of parcel numbers?

2          THE WITNESS (COLONEL BOWEN):  Yes, I do, your Honor.

3     The legal description on the Annie E. Bergman property is

4     given in Plaintiff's Exhibit 289, beginning on Page 1 and

5     continuing through the first half of Page 5.  The description

6     by parcel numbers is also included in --

7          MR. VEEDER:  I will get you the parcel numbers on it.

8          THE WITNESS (COLONEL BOWEN):  -- in the Plaintiff's

9     Exhibit entitled "Temecula Creek Watershed," showing the

10    names of the apparent owners and the tabulation of the

11    properties by parcel number, as shown on Plaintiff's Exhibit

12    210-C.

13         In Township 8 South, 1 East, Section 33, Parcel Number 76.

14         THE COURT:  75 and 74?

15         THE WITNESS (COLONEL BOWEN):  76.  In Township 8 South,

16    1 East, Section 22, Parcel Number 76-A, as delineated on

17    Exhibit 210-C.

18         In Township 8 South, 1 East, Section 27, Parcel Number

19    76-B and Parcel Number 76-C, which are delineated on Exhibit

20    210-C.

21         8 South, 1 East, Section 34, Parcel Number 76-B is

22    delineated on 210-C.

23         8 South, 1 East, Section 27, Parcel Number 80, delineated

24    on 210-C.

25         Your Honor, would it be all right if I checked these as

17,177

t-2

1. we go through them on the exhibit?

2. THE COURT:  Yes.

3. MR. VEEDER:  I have a list here, Colonel, if that will

4. help (Handing document to the witness.)

5. THE WITNESS (COLONEL BOWEN):  With a pen I will put a

6. check mark by each one of these parcels I have read and will

7. read, and the check marks will appear on Plaintiff's Exhibit

8. 210-C to indicate the Annie Bergman property.

9. 8 South, 1 East, Section 34, Parcel Number 88.

10. 8 South, 1 East, Section 23, Parcel Number 97.

11. THE COURT:  Let me look at that one a minute.  That is

12. in 23?

13. THE WITNESS (COLONEL BOWEN):  Yes, sir.  It is in 23,

14. your Honor, and it continues on into Section 24, the north

15. half of the north half of Section 24, 8 South, 1 East.  It is

16. all in Parcel 97.

17. 8 South, 1 East, Sections 25, 26, 35 and 36, Parcel

18. Number 101.  The parcel contains only portions of each of

19. those four sections I named.

20. 8 South, 1 East, Section 35, and 9 South, 1 East, Section

21. 2, Parcel 101-A.  That parcel comprises a portion of each of

22. those sections I named.

23. 9 South, 2 East, Sections 5 and 6, and 8 South, 2 East,

24. Sections 29, 30, 31 and 32, Parcel Number 138.  That parcel

25. comprises a portion of those sections which I have read.

17,178

t-3

1   9 South --

2      THE COURT:  Is that in another range?  Is that in Range

3   2 East?

4      THE WITNESS (COLONEL BOWEN):  Yes, sir, in Range 2 East.

5      THE COURT:  That is clear over the basement complex,

6   then?

7      THE WITNESS (COLONEL BOWEN):  Yes, sir.

8      THE COURT:  All right.

9      THE WITNESS (COLONEL BOWEN):  In 9 South, 2 East, Section

10  Number 17, Parcel Number 152.

11     9 South, 2 East, Section 16, Parcel Number 183.

12     9 South, 2 East, Sections 21 and 22, Parcel Number 184.

13  That parcel contains a portion of each of those sections

14  named.

15     9 South, 1 East, Sections 18, 19 and 20, Parcel Number

16  303.

17     THE COURT:  That is way over here somewhere, -- 303?

18     THE WITNESS (COLONEL BOWEN):  No, sir, that is in 9

19  South, 1 East.  That parcel contains a portion of those

20  Sections 18, 19 and 20 in 9 South, 1 East, as shown on

21  Plaintiff's Exhibit 210-C.

22     In 9 South, 1 East, Sections 27, 28, 29 and 30, Parcel

23  Number 303-A.  That parcel is comprised of portions of those

24  four sections named.

25     THE COURT:  Is that the watershed line (Indicating)?

17,179

t-4

THE WITNESS ( COLONEL BOWEN):  Yes, your Honor.  Referr-ing to Plaintiff's Exhibit 210-C, the crest of the watershed of the Santa Margarita drainage area traverses a portion of Parcel Number 303-A.

THE COURT:  Well, as a matter of fact, most of 303-A is outside the watershed?

THE WITNESS:  Yes, sir.

MR. VEEDER:  And that would not be included in the report, as I understand it?

THE WITNESS (COLONEL BOWEN):  No, that portion outside of the watershed is not included in the tabulations.

c fls

Take C

P 6

1      303-A, your Honor, is not included in Plaintiff's Exhibit

2   289.

3      THE COURT:  Exhibit 289 is correct, to your best informa-

4   tion and belief?

5      THE WITNESS:  Yes your Honor.

6      THE COURT:  And it lists the land which is riparian,

7   the parcels that are riparian and the parcels that are over-

8   lying?

9      THE WITNESS:  Your Honor, there is no tabulation which

10  specifically lists the parcels which are overlying or riparian

11  and which are not overlying or riparian, but all of the parcels

12  that are listed in Exhibit 289 are either riparian or over-

13  lying, or both.

14     MR. VEEDER:  We will work out findings on that, your

15  Honor.

16     THE COURT:  Do you offer the exhibit in evidence?

17     MR. VEEDER:  It is offered in evidence, yes, your Honor.

18     THE COURT:  Received.

19                    (Plaintiff's Exhibit 289 was)
20                    (received in evidence.       )

21     MR. VEEDER:  I was going to ask Mrs. Bergman one question.

22     Q    The data that appears in Exhibit 289 is satisfactory

23  to you; is that right, Mrs. Bergman?

24     A    Yes it is.

25     MR. VEEDER:  I have no further questions.

P 7   1       THE COURT:  Have you had explained to you the colors on

2   these maps?

3       THE WITNESS (Mrs. Bergman):  Yes, I understand them.

4   No, not on these maps; on the little book that I have.

5       THE COURT:  All of her property is not shown on Exhibit

6   275, but I take it that most of the land is shown on Exhibit

7   281.

8       MR. VEEDER:  Exhibits 281 and 275 both.

9       COLONEL BOWEN:  Plaintiff's Exhibits 275 and 281 will

10   show all of the Annie Bergman property which is overlying or

11   riparian, or both.

12       THE COURT:  Do you propose a separate judgment in this

13   case, or part of some other judgment?

14       MR. VEEDER:  I would tender to your Honor this thought,

15   that the Annie Bergman is so situated that it would necessari-

16   ly, in my view, be correlated with some of the Oviatt proper-

17   ties and certainly with the properties of Gibbon and Cottle,

18   who are downstream from Mrs. Bergman's property.

19       Isn't that right, Mrs. Bergman?

20       THE WITNESS (Mrs. Bergman):  Yes.

21       THE COURT:  It is satisfactory to run the findings

22   concerning her riparian and overlying land or land that is

23   both riparian or overlying into those findings.  But let's

24   get out of the case with one simple judgment all of this

25   property in the basement complex.

P 8

1    MR. VEEDER:  That is right your Honor.

2    THE COURT:  You can do that in a page.

3    MR. VEEDER:  We can do that, your Honor.  It will be done.

4    THE COURT:  Just get it out of the case.

5    MR. VEEDER:  Yes your Honor.

6    THE COURT:  What these colors mean is this.  The blue

7    color is an area of what we call basement complex.  It is

8    practically solid rock.  There may be a little soil on top.

9    Below there is solid rock.  I am uniformly finding that in

10   any area of basement complex any underground water is local,

11   vagrant, percolating water and not part of the stream system.

12   So if you get a well in any of this area that comes under

13   basement complex, you are just lucky.

14   THE WITNESS (Mrs. Bergman):  Yes, we have one such well

15   which is just above the Horst, just above the Aguanga Store,

16   right in that area.

17   THE COURT:  In that rock?

18   THE WITNESS (Mrs. Bergman):  No, just beyond it.  Just

19   right above in there, I would judge.

20   THE COURT:  You are probably up in the orange?

21   THE WITNESS (Mrs. Bergman):  Yes.  We really have a

22   nice well there.

23   THE COURT:  The orange colored material is called older

24   alluvium.  It was laid down by stream years ago, and it is

25   sedimentary and it is lenticular.  It contains water and is

P 9

1    water bearing.

2    Then the yellow material, which we call the younger

3    alluvium, was later laid down by streams on top of the older

4    alluvium.   It is the best water-bearing material that we have.

5    We are also marking out -- we haven't done this yet by

6    area, have we? -- the Aguanga ground water area.

7    MR. VEEDER:  Yes, that is on Exhibit 277.

8    THE COURT:  We are marking out the area to include most

9    of this yellow and orange colored material as the ground water

10    area, and we will describe it by metes and bounds and we will

11    have a map of it.  And any ground water located within that

12    area is part of the stream system and the people there have

13    correlative rights with all other people on the stream system.

14    Now, as to the findings of the Court, they would be that

15    certain of this land that you have is riparian -- where you

16    have a strip of ground, for instance, you have a piece of

17    ground, as I recall it, in Section 22 that cuts down across

18    the corner.

19    THE WITNESS (Mrs. Bergman):  Yes.

20    THE COURT:  That is riparian.  But it also overlies this

21    ground water area.  We would find that as to your overlying

22    and riparian ground, as to the ground water, you have

23    correlative rights with other persons who have an interest

24    in the stream system.

25    And as to the blue material and much of this which is

P 10

1    shown in the report is basement complex, there would be

2    findings and a judgment that this ground water is not part of

3    the stream system, and this would separate that property from

4    any future litigation on the stream.

5        Of course, you understand that all surface water, wherever

6    it flows, is part of the stream system.

7        THE WITNESS (Mrs. Bergman):  Yes.

8        MR. VEEDER:  Your Honor, Mr. Wyman is in the courtroom

9    and I think he would probably be interested in what you are

10   saying to Mrs. Bergman, because his property is part of the

11   lands originally held by Trunnell.

12       THE COURT:  Who else is here?

13       MR. VEEDER:  This is Mr. Wyman, your Honor.  He is the

14   other large land owner.  I didn't realize that you were going

15   to go into this statement now.

16       THE COURT:  Mr. Wyman, you were here before, were you

17   not?

18       MR. WYMAN:  No.  I just acquired this property in the

19   last couple of months.

20       THE COURT:  Did you hear what I was explaining about

21   colors?

22       MR. WYMAN:  Not too much, frankly, I didn't.

23       THE COURT:  Are these other men interested in this case?

24       MRS. BERGMAN:  They are my sons.  They might be interested

25   in seeing it.  They could understand it probably better than

P 11

1    I could explain it later.

2       MR. VEEDER:  We might as well swear Mr. Wyman your Honor.

3       THE COURT:  Yes, swear Mr. Wyman.

4             WARREN L. WYMAN,

5    one of the defendants herein, being first duly sworn, on his

6    oath was examined and testified as follows:

7       THE CLERK:  State your name please.

8       THE WITNESS:  Warren L. Wyman.

9       THE COURT:  Let me start all over again.

10      On all of these maps with colors we have used the uniform

11   system of blue, grey, orange and yellow.  Wherever the blue

12   appears --

13      Let me go back a step further and say there has been

14   really no dispute in the case between the experts for the

15   Government and the experts of the State of California on the

16   geology.  That is one thing on which we are pretty well in

17   agreement.

18      Wherever the blue appears, this is area of basement

19   complex.  It is marked on these maps "b.c." That means it is

20   practically solid rock.  There may be a little cover of

21   decomposed material on top.  And any water that is found in

22   the ground there is only found in fissures or fractures or

23   seepage of some sort.  We are holding that that water is not

24   part of the stream system.  If you get a well in any area of

25   that kind you have no further concern in the lawsuit.  Of

P 12

1    course, all surface water that flows within the watershed is

2    part of the stream system.  Dams, of course, can't ordinarily

3    be built without a permit from the State, except a dam to

4    build a head for irrigation, things of that sort.

5        The next category is the grey, basement complex and

6    weathered.  It is essentially the same material as the blue,

7    except that the weathering on top is a little deeper, a little

8    more soil on top.  But underneath it is rock.  And the same

9    thing applies to it.  Any water found in the ground is vagrant,

10   local, percolating water and not part of the stream system.

11       The yellow material is called older alluvium.  It is

12   sedimentary material that was laid down by stream action

13   many centuries ago.  It comes in layers -- sometimes courser,

14   sometimes finer -- and it is water bearing and permeable.

15   And generally the orange and the yellow colored material are

16   the two water-bearing parts of the ground setup.  The yellow

17   is a younger alluvium that was laid down later by stream

18   action on top of the orange and it is the best water-bearing

19   material in the valley.  It is the type of thing that you

20   find along streambeds where the soil is loose, sometimes

21   gravelly, sometimes sandy.  It is the best water-bearing

22   material.

23       So that when we draw up these findings -- we are going

24   to make findings in that connection -- we will refer to this

25   map 275 and 281 in connection with Mrs. Bergman's property

P 13

1    to show the geology.

2         We have done a further thing, and that is this large

3    area lying north of Vail Lake in the yellow and orange, we

4    propose to find is a ground water area.  You will notice that

5    they have charted the water elevations.  In other words,

6    across here the water stands at about 2100 feet elevation,

7    right here it is 2,000, 1900, 1700 -- In other words, there

8    is a water gradient downward.  We feel that this is a ground

9    water area that is part of the stream system.  Any people

10   who own property in that area will have overlying rights,

11   and if they are on the stream they have riparian rights which

12   are correlative, mutually related to other people who have

13   rights in the stream system.  So as part of this matter on

14   the ground water we have marked out here the areas of this

15   ground water body.

16        What are we going to call this?

17        MR. VEEDER:  277, Aguanga ground water area.

18        THE COURT:  A surface divide sort of divides this from

19   Pauba Valley.  And so this area would follow up along the

20   surface divide, and we arbitrarily put in lines to follow

21   where we put ownership lines or section lines, and you will

22   notice that it winds up and around.  We get over in here and

23   this area is part of Mrs. Bergman's.  Some of this is within

24   the ground water area.  Down in here it is all younger alluvi-

25   um.

P 14   1          MR. VEEDER:  You are referring to 277 now.

2          THE COURT:  Yes.

3          MR. VEEDER:  And we have also the exterior boundaries

4     on 277-A.

5          THE COURT:  Yes, you have a written legal description

6     of it.

7          Oak Grove is up here.  We don't consider Oak Grove in

8     this ground water area.  However, in Oak Grove you have the

9     same situation of yellow, orange and blue.

10          MR. VEEDER:  Which appears on 281, your Honor.

11          THE COURT:  Here, again, people who own land over this

12     yellow would be held to be overlying owners of water-bearing

13     ground and would have correlative rights with the other

14     people in the stream system.  But the blue area will be out

15     of the case, as will be the grey.

16          MR. ARLIE BERGMAN:  Does this mean that the land owner

17     would have the rights down to the water level as these lines

18     show in here?

19          THE COURT:  No, those water levels are merely part of

20     the geology, showing that there is a downward gradient of

21     the water, the water moving underground downward from that

22     direction.

23          MR. VEEDER:  They would participate correlatively in

24     that, wouldn't they, your Honor?

25          THE COURT:  He asked about land owners up here, something

P15

1   about that.

2        MR. WYMAN:  So far, all this yellow area is the stuff

3   that really has water underlying, we are just accepting the

4   geologist's opinion.  It is just the valley ground.

5        THE COURT:  Incidentally, I might say that the State of

6   California's evidence on this, from studies that they made,

7   corresponds very closely to the Government's geology.  There

8   is not much dispute about that.

9        Where do you own property?

10        MR. WYMAN:  In the Aguanga area.  I have some further

11   up here.  I believe it is about in here.  But the main ranch

12   I have is in the Aguanga area, the Trunnell Ranch.

13        MR. VEEDER:  May I call Colonel Bowen and introduce the

14   Trunnell soil survey?

15        THE COURT:  All right.

16        Colonel Bowen, tell us about the Trunnell property and

17   the report.  Have you prepared a report?

18        MR. VEEDER:  Yes.  That will be Exhibit 290, your Honor.

19        THE COURT:  Exhibit 290 marked for identification.

20                              (Plaintiff's Exhibit 290 marked)
21                              (for identification.          )

22        THE COURT:  Where is your yellow sheet?

23        MR. VEEDER:  Here it is, and here is Exhibit 290, Colonel.

24        COLONEL BOWEN:  Plaintiff's Exhibit 290 is an engineering

25   report on the property of Donald Trunnell.  A portion of that

P16

1   property, I understand, has now been transferred to Wyman.

2   MR. WYMAN:  It is a partnership, myself and Mr. E. J.

3   Brown.

4   THE COURT:  Have you been sworn?

5   MR. WYMAN:  Yes.

6   THE COURT:  E. J. Brown.  You and Mr. Brown own it

7   together fifty-fifty?

8   THE WITNESS (Mr. Wyman):  It is a partnership, yes.

9   THE COURT:  What parts of it do you own together?

10  THE WITNESS (Mr. Wyman):  We own 305 acres, and there is

11  220 over the phone I heard we bought last night.  So we own

12  525 acres.  I think this report covers 800.

13  THE COURT:  We are only going to find the apparent owners.

14  There was a lis pendens filed, so we don't have to be concerned

15  about your transfers.

16  COLONEL BOWEN:  Plaintiff's Exhibit 290, your Honor,

17  shows that the Trunnell property consists of approximately

18  810 acres, and that is shown on Plaintiff's Exhibit 210-C

19  as lying in 8 South 1 East Sections 28 and 29, Parcel No. 69.

20  Someone has marked a T by the Parcel No. 69 on Plaintiff's

21  Exhibit 210-C.  The T stands for Trunnell.  That parcel

22  comprises only a portion of Sections 28 and 29.  Also in 8

23  South 1 East Section 33 Parcel No. 69-A, comprising only a

24  portion of Section 33, with the letter T marked in that parcel

25  on Plaintiff's Exhibit 210-C.  And also in Section 33 8 South

P 17

1 East Parcel No. 69-B, with the letter T marked within the outer perimeter of that parcel, as shown on Plaintiff's Exhibit 210-C.   These parcels, your Honor, are either overlying or riparian to Temecula Creek or to Cottonwood Creek.

THE COURT:   The parcels you have shown me are the 800 acres?

THE WITNESS (Col. Bowen):   Yes sir.

THE COURT:   What is this other property you own?

THE WITNESS (Mr. Wyman):   I own a way up north here at Oak Grove.

D fls.

17,192

t-5
D-1

1    There is no identification on here so that I can tell,

2    but I think it is probably this 60 over here (Indicating).

3    THE COURT:  You say that you acquired this property

4    from MacFarland?

5    THE WITNESS (MR. WYMAN):  Yes, Mr. MacFarland.

6    THE COURT:  What is his first name?

7    THE WITNESS (MR. WYMAN):  Eldon E., I believe, MacFarland,

8    M-a-c-F-a-r-l-a-n-d.

9    THE COURT:  And is that M-a-c?

10   THE WITNESS (MR. WYMAN):  Yes.

11   MR. VEEDER:  It does not appear on here, your Honor.

12   THE COURT:  This will be picked up under the name of

13   MacFarland, and the same rules that we were talking about will

14   apply.  Is Exhibit 290 correct to the best of your knowledge?

15   THE WITNESS (MR. WYMAN):  Yes, sir.

16   THE COURT:  Mr. Wyman, have you looked the report over,

17   and are you satisfied with it?

18   THE WITNESS (MR. WYMAN):  Yes, it is a wonderful report.

19   THE COURT:  Do you have any questions?

20   THE WITNESS (MR. WYMAN):  Not as far as the geology

21   matter, no.

22   THE COURT:  Let me say one thing more about this:  Around

23   Oak Grove -- we haven't made findings yet on this Oak Grove

24   area, but my recollection of the testimony is that these

25   valley fills of younger alluvium are very shallow, that there

t-6

1  can't be a lot of water retained in them because they are not

2  at great depths.  There is an immense amount of irrigable

3  land, and, as a practical matter, I have serious doubts

4  whether there could ever be a limitation placed upon use by

5  downstream owners by persons in the vicinity of Oak Grove.

6  They don't have a lot of back country to feed up there, and

7  since an overlying riparian owner is entitled mutually to

8  his fair share, what you have got up there is that you will

9  each have, and it can't ever be more than your fair share.

10      You might have a different situation  in this ground

11  water area.  This is an immense ground water area, and that

12  definitely feeds the stream, and there will be situations

13  where in the future at some time, although we don't propose

14  to do it at this time, some regulation might have to be made,

15  so that not only you upstream users, but other people down-

16  stream will have to be regulated so that you will each get

17  your fair share of water, but you will all share equitably

18  in the stream.

D-2

19      THE WITNESS (MRS. BERGMAN)  Do I understand that the

20  persons who live in Oak Grove Valley would divide the existing

21  water according to their acreage?  Is that what you meant?

22      THE COURT:  That is one factor.

23      THE WITNESS (MRS. BERGMAN):  That is one factor?

24      THE COURT:  That is one factor, but if you get into a

25  real pinch, of course, domestic use would take preference over

17,194

t-7

1    everything, even irrigation.

2        THE WITNESS (MRS. BERGMAN):  But downstream from there

3    they would have no real right to limit our uses, those land-

4    owners in the Valley?

5        THE COURT:  In theory, yes.  In theory, if you are on a

6    stream system and you have water bearing ground that feeds

7    the stream, in theory that would be possible, but, as I say,

8    as a practical matter it is my opinion that those areas up

9    there are so shallow in the fills, and so little water comes

10   into them that when you divide that among the people who have

11   the right to use it in that area, you don't get around to

12   limiting them for the benefit of downstream owners.

13       MR. GIRARD:  That rationale, however, applies only to

14   ground waters, and not surface waters.

15       THE COURT:  That does not mean surface waters.  They are

16   entitled to go downstream.

17       THE WITNESS (MRS. BERGMAN):  I understand that.

18       THE COURT: And to feed these areas, and, of course, it

19   affects everyone downstream somewhat.

20       THE WITNESS (MR. WYMAN): The difficulty in the part of

21   the Valley that I own is that the stream goes through both

22   ways.

23       THE COURT:  You are in a pretty good position there.

24   You have some of the best ground in the area.

25       You see, all that "correlative rights" means -- and that

t-8

1   is what we are fighting over some right now -- technically,

2   it just means that your rights and those of other people,

3   downstream and upstream from you, are mutually related, and

4   if this relationship ever gets into an apportionment, you

5   have to take into account all sorts of factors:  How much

6   ground you have, how much water you have, what use you are

7   making of it, how much ground the fellow downstream has, how

8   much water he has, and what use he is making of it, and the

9   theory is to have everyone have an equitable share of the

10  amount of this water.  That is the theory under California

11  Water Law, and, obviously, a man with one acre of land is

12  not entitled to the same amount of water as a man who has

13  100 acres of land.

14      THE WITNESS (MR. WYMAN):  This may not be the time to

15  bring this up, but there is a party downstream from me by the

16  name of Mrs. Gibbon.  I understand she holds water rights on

17  Bergman Springs, and that I don't think defines anything

18  really specific, but I own probably half of Bergman Springs,

19  and they go downstream, and she has developed a lot of water.

20      I have never met the lady, but on my particular piece

21  of ground Mr. Trunnell -- and this is hearsay -- drilled a

22  well, and I understand that Mrs. Gibbon filed a lawsuit and

23  stopped him from drilling.

24      Now, I understand further that within the last year

25  Mrs. Gibbon has drilled two wells on her own property.  I

17,196

t-9

1   understood also that there was an agreement at the time the

2   lawsuit was filed, or the injunction, whatever it would be,

3   that Trunnell, my property owner, agreed not to drill any

4   more wells.  As I say, this is hearsay.

5       THE COURT:  And you are downstream from her?

6       THE WITNESS:  No, I am upstream.  I have lots of water

7   there.

8       THE COURT:  What is this Bergman Springs?  Does anyone

9   know of Bergman Springs?   Where is Bergman Springs?

10      MR. VEEDER:  If you recall, when the evidence went in,

11  your Honor, and this is my recollection of the Gibbon and

12  Cottle case, there were repeated references to the fact that

13  the waters that were coming down to Gibbon and Cottle arose

14  from Bergman Springs, about a mile upstream from that

15  property.

16      THE COURT:  These springs are in the bed of the stream,

17  then?

18      MR. GIRARD:  Gibbon and Cottle went up and made a

19  diversion from Temecula Creek above their lands.

20      MR. VEEDER:  But not above Bergman's property?

21      MR. GIRARD:  I don't know where Bergman's property is.

22      THE WITNESS (MR. WYMAN):  Not on my property.

23      THE WITNESS (MRS. BERGMAN):  No.

24      MR. GIRARD:  But there was no evidence introduced

25  concerning Gibbon and Cottle in the case so far as diversions

17,197

t-10

1    go, other than that one diversion upstream on the Temecula.

2        THE COURT:  And that prescriptive issue has been

3    decided.

4        MR. VEEDER:  Against them.

5        THE COURT:  Against Gibbon and Cottle.

6        MR. VEEDER:  But you have the appropriative question,

7    however.

8        THE COURT:  They contended they had -- and this, of

9    course, would only affect people downstream, but they claimed

10   a prescriptive right by taking all of the water of the stream,

11   and we found they had not acquired a prescriptive right.  We

12   still have the matter open as to an appropriative right, but

13   that appropriative right concerns that diversion that they

14   made on some other property in a ditch, and that has not

15   been settled, and that is not involved in the Bergman property.

16       THE WITNESS (MRS. BERGMAN):  It is downstream, on the

17   other end.

18       MR. GIRARD:  That Gibbon and Cottle diversion is in the

19   northeast corner of the southwest quarter of the southwest

20   quarter of Section 29, Township 8 South, Range 1 East.

21       THE COURT:  You went pretty fast.  Start again.  I didn't

22   get it.

23       MR. GIRARD:  It is in the northeast corner of the south-

24   west quarter of the southwest quarter --

25       THE COURT:  The southwest quarter of the southwest

17,198

t-11

quarter --

    MR. GIRARD:  Of Section 29.

    THE COURT:  That is up in here (Indicating)?

    MR. GIRARD:  Township 8 South, Range 1 East.  It is somewhere up in there.

    MR. VEEDER:  You will find it up here on Parcel 65, which shows on Exhibit 210-C.

    THE COURT:  They would not be able to reach upstream and restrain you just ipso facto from using water upstream.  If there was an apportionment to come around, there would have to be some apportionment, but they have no prescriptive rights upstream.

    THE WITNESS (MRS. BERGMAN):  There is quite a bit of riparian land up there.

    THE COURT:  Do you have any other questions?

    THE WITNESS (MR. WYMAN):  I am repeating myself, I am afraid, but just the fact that there is about a half a mile of stream through my property in here (Indicating).   The stream rises on my property and runs through.

    Another point I wanted to repeat is they have rights to the Bergman Springs.  Now, those Bergman Springs they have rights to is more water than is available.

    THE COURT:  Wait a minute.  They say they have rights to them, but if these springs are springs in the bottom of the stream bed, there is a serious question about that.

t-12

1    MR. GIRARD:  They didn't assert any rights in this case.

2    THE COURT:  There is nothing in the record.  They

3    claimed, as I recall, the diversion from Rattlesnake Creek.

4    MR. GIRARD:  No, Rattlesnake Creek was Knox.

5    MR. VEEDER:  They claimed a diversion from the main stem.

6    MR. GIRARD:  That is right, the main stem.

7    MR. VEEDER:  Right here, your Honor.  This is where the

8    Creek comes in, and this confluence is on Parcel 65, and then

9    you have your Schroder property, and you will find that they

10   divert their water out of there and conduct it about a mile

11   and a half down through Tracts 54 and 43 on 210-C.

12   THE COURT:  I don't recall in the presentation made by

13   either Grover or Stark that there has been any contention

14   made about any Bergman Springs.

15   MR. VEEDER:  No, that is correct, your Honor.  There is

16   no matter on that at all.

17   THE COURT:  So I think that is just talk.

18   THE WITNESS ( MR. WYMAN):  I don't know, but my Title

19   Policy shows, and I don't have it with me here, but it shows

20   that the Title Company considers there is a claim by the

21   Gibbons on that ground on the Bergman Springs.  It shows on

22   my Title Policy.

23   MR. STAHLMAN:  May I suggest that it shows that there

24   was a lawsuit on it.

25   THE COURT:  You had better bring your Title Policy down

17,200

t-13

1    and let us have a look at it.

2        MR. VEEDER:  You will remember, your Honor, that Mr.

3    Grover was representing the Title Insurance Company in this

4    case, and that is undoubtedly the reason for it, because

5    they have issued a title insurance policy, as I comprehend

6    it, to Gibbon and Cottle reflecting, I think, the right to

7    the use of water.   This is the first I ever heard of such a

8    thing.

9        THE COURT:  Was he employed by the Title Company?

10       MR. VEEDER:  Oh, yes.  He was their counsel here, and

11   that is why they were having the difficulty.

12       THE COURT:  There is your answer.  The Title Company has

13   probably inadvertently put something into the policy, and

14   Gibbon and Cottle have called upon them to defend it.

15       MR. VEEDER:  I wouldn't necessarily say that it was

16   inadvertent.

17       THE COURT: But there was no showing, however, as I

18   recall it, that talked about Bergman Springs.

19       MR. GIRARD:  No, there is no other diversion other than

20   out of Temecula Creek.

21       THE COURT:  Any other questions that we can answer for

22   you?

23       MR. STAHLMAN:  May I ask a couple of questions, your

24   Honor?

25       THE COURT:  Yes.

t-14

1   MR. STAHLMAN:  On any of your property have you made any

2  water developments?

3   THE WITNESS (MR. WYMAN):  Water developments?

4   MR. STAHLMAN:  Yes.

5   THE WITNESS (MR. WYMAN):  No.

6   MR. STAHLMAN:  Mrs. Bergman, have you?

7   THE WITNESS (MRS. BERGMAN):  No.

8   MR. STAHLMAN:  You have owned the property there for

9  quite some time?

10   THE WITNESS (MRS. BERGMAN):  Yes, sir.

11   MR. STAHLMAN:  And you are the owner for how long?

12   THE WITNESS (MR. WYMAN):  I have only owned it for about

13  three or four months.

14   MR. STAHLMAN:  Is there a golf course being built up in

15  that area?

16   THE WITNESS (MR. WYMAN):  No, sir.

17   THE COURT:  Let's not inject pleasure into this.

18   MR. STAHLMAN:  I want to find out, because, if so, it

19  would be another place forme to play golf.  It is quite

20  convenient.

21   THE COURT:  Mr. Veeder just handed me a copy of another

22  interlocutory judgment, Interlocutory Judgment Number 28,

23  which deals with ponds, and reservoirs, and so forth.  You

24  can take this with you.  These are extra copies.

25   (The documents were handed to the witnesses.)

17,202

t-15

1     MR. GIRARD:  Mrs. Bergman, none of the property that we

2   have presently discussed is owned by Harry or Alice Bergman?

3     THE WITNESS (MRS. BERGMAN):  No.

4     MR. GIRARD:  That is entirely different?

5     THE WITNESS (MRS. BERGMAN):  That is different, yes.

6     MR. VEEDER:  I have no further questions.

7     MR. GIRARD:  I have nothing further.

8     THE COURT:  How about Exhibit 290?

9     MR. VEEDER:  We offer 290 in evidence, your Honor.

10     THE COURT:  And 289?

11     MR. VEEDER:  Yes.

12     THE COURT:  They will both be received in evidence.

13                              (Thereupon the documents marked)
                                (Plaintiff's Exhibits 289 and   )
14                              (290 were received in evidence.)

15     THE COURT:  Is that Trinnell or Trunnell?

16     THE WITNESS ( MR. WYMAN):  Trunnell.

17     THE COURT:  Are you a Colorado Trunnell?

18     THE WITNESS (MR. WYMAN):  No, I am Wyman.  Trunnell is

19   actually Mrs. Bergman's son-in-law.

20     THE COURT:  Mr. Veeder, while we are at it, let's get

21   at Mrs. Bergman's findings.  Can't we knock out some findings

22   on the basement complex and get that out of the way somehow?

23   We keep putting it off.  Here is the chance to throw that

24   right out of the case.

25     MR. VEEDER:  I am perfectly willing to have your Honor

t-16

1    say what you said to Mrs. Bergman, that these lands which

2    are basement complex and through which no surface stream or

3    tributary flows, from the standpoint of the litigation are

4    actually no longer a part of it, now that those facts are in.

5        THE COURT:  I am not talking about that.  I am talking

6    about getting something signed up, and getting it out of the

7    way.  Or do you have too many more important matters to work

8    on?

9        MR. VEEDER:  I haven't anything more important than your

10   Honor's case, and I will put something together for you, your

11   Honor, if you want me to.  Do you want me to write it out

12   now?

13       THE COURT:  No.  Thanks for coming in.

14                    (Witnesses excused.)

15       THE COURT:  Now, what is next?

16       MR. VEEDER:  Well, we had findings of fact and conclusions

17   of law.

18       MR. GIRARD:  Is there any thought about the schedule from

19   now on?  Today will be the last day this week, I am sure.

20       THE COURT:  I have a notion to just continue this case

21   from day to day, and keep Mr. Veeder here, and he and I and

22   anybody else who wants to can start to work on these things,

23   and we can sit down and get a lot of it done.

24       MR. GIRARD:  I think Mr. Veeder told me that he has to

25   get out of here tonight, I believe, your Honor.  I don't know.

17,204

t-17

1    THE COURT:  When can you come back again?

2    MR. VEEDER:  I will be back just as soon as I can, your

3  Honor.

4    THE COURT:  What do you have to take care of now?

5    MR. VEEDER:  I want to get back to Washington in regard

6  to some matters that I have up in Seattle, and then I will

7  come right back down.  I imagine I will be gone a week, and

8  at the outside ten days, but that does not mean that the work

9  will stop at all.  I think we are moving along, and I think

10  moving rapidly in getting these things done, and I will be

11  back here and I will work day to day with your Honor.

12    THE COURT:  Much work does not seem to get done when you

13  are not around.  Of course, there may be some work that I do

14  not see.

15    MR. VEEDER:  I will assure your Honor that I will be back

16  just as rapidly as I can, and I will be here, I am hopeful,

17  in a week.  I will try very hard to be back here a week from

18  Monday, and the matters will proceed, and we will get it done.

19    THE COURT:  What do we have to work on now?

20    MR. VEEDER:  Your Honor, I put Tucalota Creek on your

21  desk, and we had this Sandia matter.  We will put Sandia

22  together, and have that ready for you.

23    THE COURT:  A redraft of this matter that we worked on

24  yesterday?  Is there anybody working on that?

25    MR. GIRARD:  You mean on Murrieta and Sandia?

17,205

t-18

1    THE COURT:  Yes.

2       MR. GIRARD:  I was under the impression that as far as

3    Murrieta and Sandia are concerned, I would stencil that up

4    in final form and send it out from Sacramento next week.  I

5    think everything was cleared up.  I didn't draft any changes

6    other than those that were approved yesterday.

7       THE COURT:  We never finally passed on the conclusions

8    of law.  We had a discussion.

9       MR. GIRARD:  I will tell you this, I could get them right

10   now to Mr. Luddy, or, rather, to the reporter, and have them

11   here at 1:00 or 2:00 o'clock, so far as the conclusions of

12   law go.

13      THE COURT:  No, I am talking about this matter where we

14   stopped last night when we were talking about the correlative

15   rights, and we ran into a sentence that the Colonel drafted,

16   and never talked about it afterwards.

17      MR. GIRARD:  Oh, we got the draft back, your Honor.

18      MR. VEEDER:  I didn't get a copy of it

19      MR. GIRARD:  We got that draft back, I am sure.  As I

20   have it now, it is:

21          "Such overlying and riparian rights are abstractly

22      correlative.  The owner of the correlative right shares

23      equitably with other correlative owners in the common

24      supply of water available for use."

25   That is the Colonel's language.

t 19

1    THE COURT:  Well, can we --

2    MR. GIRARD:  (Continuing)  "as used herein 'correlative'

3    means mutually " --

4    THE COURT:  Well, we all have copies of that.

5    MR. GIRARD:  Yes, sir.

6    MR. VEEDER:  Yes.

7    THE COURT:  Are you willing to pass this now?

8    MR. GIRARD:  As far as the State is concerned, yes, your

9    Honor.

10    MR. VEEDER:  I haven't had a chance to read this through,

11    but I am reading it right now, your Honor.

12    I think, your Honor, from the standpoint of general

13    terminology and language, that that is reflective of what--

14    as close as we can get to the meaning of correlative

15    participation by overlying rights, or riparian rights, or both.

16    THE COURT:  All right.  What about that last phrase

17    "pursuant to California law"?  It seems like it is sort of

18    tagged on at the end, and perhaps should come in earlier, or

19    does it read all right, -- the last sentence?  I guess it does.

20    MR. STAHLMAN:  It sounds all right to me.

21    THE COURT:  Then let's adjourn now until 2:00 o'clock,

22    and let me go over the Tucalota findings which I just started

23    to read this morning, and then talk about those afterwards.

24    MR. STAHLMAN:  Is your Honor coming back to the agenda

25    this afternoon?

17,207

t-20

1    THE COURT:  I don't know if we have any agenda.

2    MR. STAHLMAN:  I just wanted to remind your Honor that

3  we are now writing the findings on Vail Ranch, and a good

4  many of them are finished.  We are in the midst of it, and

5  we are doing it up at my place as we have time.

6    THE COURT:  I am pleased that you are working on it.

7    MR. STAHLMAN:  They will be getting ready.

8    MR. VEEDER:  I think what we need, and what I was

9  wondering about is when the next formal session that we would

10  have would be.  In other words, what would be the available

11  dates for your Honor towards the end of June for these things,

12  or the middle of June, or whenever you want it?  I will

13  schedule myself strictly to what your Honor's desires are,

14  of course.

15    MR. GIRARD:  I might add also that I have received

16  approval from the Attorney General to hire a secretary down

17  here in the last part of June, and just stay here and keep

18  working on this, so starting with the last of June I am going

19  to rent a cabin on the beach, and stay here with my family

20  and be here right along.  I don't know where I will put my

21  secretary.

22    THE COURT:  Fine.  Where are we at on Domenigoni Valley?

23    MR. VEEDER:  Your Honor, on Domenigoni Valley, we have

24  finished Exhibit A on Domenigoni Valley, and I have been

25  waiting for the determination in regard to the correlative

t-21

1    rights, your determination in regard to the right to

2    participate in the percolating waters, and I think as soon as

3    your conclusions of law are completed in regard to the over-

4    lying rights in the Murrieta-Temecula, they will be simply

5    incorporated into Diamond Valley and Domenigoni Valley.  You

6    will recall there has been no judgment tendered in regard to

7    that.

8         THE COURT:  Only some findings.  There were no

9    conclusions or judgment.

10        MR. VEEDER:  There were some general conclusions, but

11   certainly they do not comport with what we are talking about

12   now.

13        MR. GIRARD:  Well, wasn't it agreed -- as I recall,

14   Domenigoni Valley is one of these areas that is clearly a

15   basin, and all of this is going to be percolating water.

16        MR. VEEDER:  That is the point that has not been

17   determined, Mr. Girard.

18        MR. GIRARD:  Here are some findings of fact and

19   conclusions of law which were submitted by Mr. Sachse.

20        MR. VEEDER:  That is right, and I think the same general

21   principles that your Honor is talking about here in regard

22   to the ground water area --

23        MR. GIRARD:  He refers to them as a ground water basin.

24        MR. STAHLMAN:  That is just the findings, that is all.

25        MR. GIRARD:  No, he has some conclusions of law.

t-22

1    MR. VEEDER:  He has some conclusions there, George.

2    MR. STAHLMAN:  Oh, yes.

3    MR. VEEDER:  But you will find they do not comport with

4    what we have been talking about in the last three or four

5    days.

6    MR. GIRARD:  I think there is a lot of difference as to

7    whether it is a basin or a ground water area as between

8    Domenigoni Valley and the area which we have been talking

9    about in regard to the Murrieta and Temecula.

10    I have no objection at all to treating Domenigoni Valley

11    as a basin, although I think we know enough right now so we

12    can draft the conclusions.  They went out of the watershed

13    anyway.

14    THE COURT:  I thought we went ahead and approved the

15    findings on the matter, and we were waiting only for the list

16    of ownerships, and that you had an exhibit in here from which

17    you could obtain that, and the only thing that remained was

18    to draw some conclusions of law and a judgment.

19    MR. VEEDER:  Your Honor, the data that has been lodged

20    with your Honor will not comport  entirely with that, and

21    you will find also, I think, that there are going to be some--

22    THE COURT:  What has been lodged?  What did you say?

23    MR. VEEDER:  Findings and conclusions have been lodged

24    with your Honor.

25    THE COURT:  By Mr. Sachse?

17,210

t-23

1    MR. VEEDER:  That is correct.

2    THE COURT:  I am familiar with that.

3    MR. VEEDER:  And that is the extent of it.

4    THE COURT:  I thought we had gone over those findings.

5    MR. VEEDER:  No, there has been some agreement on the

6  findings, but there has been no agreement as to the conclusions

7  of law.

8    MR. GIRARD:  Have you stated in writing your objections?

9    THE COURT:  What I was going to say is we went over, as

10  I recall, the findings, and we were satisfied with them, and

11  then there was Exhibit 20-E received in evidence, from which

12  all the ownerships were available, and the only thing that

13  remained --

14    MR. VEEDER:  The conclusions of law and judgment.  That

15  remains, and those matters, I believe, turn upon the question

16  that we are dealing with now in regard to Murrieta and

17  Temecula.

18    THE COURT:  You see, Mr. Sachse first lodged these on

19  January 31st.  Then on February 8th a new set was lodged, and

20  he wrote, "Findings of fact corrected in accordance with

21  Judge Carter's instructions.  I understand these findings

22  are now approved except for the additional material to be

23  included in Paragraph VII setting forth the details of

24  individual landownerships."

25    MR. VEEDER:  That Exhibit A has been prepared.  I have

17,211

t-24

1    it in my office.

2        THE COURT:  Then, Mr. Girard, will you see what you can

3    do on some conclusions of law and a judgment on that?

4        MR. GIRARD:  On Domenigoni Valley?

5        THE COURT:  Yes, sir.

6        MR. GIRARD:  All right.  This is one of these cases where

7    the February 8th date probably happened, but I did not

8    receive a copy of the last findings of fact and conclusions

9    of law.  I have the earlier ones from Mr. Sachse.

10        THE COURT:  I will probably have you in again on the

11    20th or the 27th of June.  But let's adjourn now until 2:00

12    o'clock and look over these other findings.

13        MR. VEEDER:  All right.

14

15        (Whereupon, at 11:50 o'clock a.m., a recess was taken )
16        (                                                     )
         (until 2:00 o'clock p.m. of the same date.            )

17

18                              - - -

19

20

21

22

23

24

25

Take 6

P 18

1   SAN DIEGO, CALIFORNIA, Friday, June 2, 1961, 2:00 P.M.

2     MR. VEEDER: May I proceed your Honor?

3     THE COURT: What do you want to do?

4     MR. VEEDER: I would like to call Colonel Bowen and

5 introduce into the record Exhibit 15-L.

6     THE COURT: I thought 15-L was already in evidence.

7     MR. VEEDER: You said that it would be admitted in

8 evidence. Exhibit 15-L is going to be an exhibit without all

9 of the data that is on 15-E.

10     THE COURT: All right, come forward, Colonel Bowen.

11     You have been sworn.

12         ALLEN C. BOWEN,

13 a witness for the plaintiff, having been previously duly

14 sworn, was recalled and testified further as follows:

15     MR. VEEDER: Do you want me to explain what it is, George?

16     MR. STAHLMAN: You eliminated the red marks, as I recall

17 it.

18     MR. VEEDER: That is right. But I think we had better

19 have it identified and offered.

20     THE COURT: Let's do it.

21         DIRECT EXAMINATION

22 BY MR. VEEDER:

23     Q  Colonel Bowen, I hand you the exhibit marked for

24 identification 15-L and ask you to state into the record an

25 explanation of what that exhibit comprises.

P 19

1    A    Exhibit 15-L is a map of the Murrieta-Bachelor

2    Mountain, parts of the Wildomar, Pechanga and Temecula

3    Quadrangles of California, showing the geology, locations of

4    wells, and water level contours for Autumn 1959.

5    Q    Would you compare that with 15-E, which is in

6    evidence?

7    A    Exhibit 15-L is the identical base as 15-E.  The

8    same color code has been used -- blue showing the basement

9    complex, grey the weathered basement complex, orange the

10   older alluvium, yellow the recent alluvium.  It differs from

11   15-E in that the red marks entered in the court on 15-E are

12   absent from 15-L.

13   THE COURT:  The red marks put on by witnesses who testi-

14   fied.

15   THE WITNESS:  Yes sir.

16   THE COURT:  All right, 15-L received in evidence.

17                    (Plaintiff's Exhibit 15-L)
                      (received in evidence.    )
18

19   MR. VEEDER:  Here is a copy for your Honor.

20   Exhibit 15-E is still in evidence, but we were going to

21   use 15-L in the findings.

22   THE COURT:  That is right.

23   Anything futher?

24   MR. VEEDER:  Nothing on that, your Honor.

25   MR. GIRARD:  Exhibit 15-L doesn't run the fault line all

1    the way up, does it, Colonel?

2         MR. VEEDER:  It is supposed to be exactly the same as

3    15-E.  I believe it is.

4         MR. GIRARD:  Nothing else.

5         THE COURT:  Can we take up Tucalota Creek?

6         MR. GIRARD:  I am ready to take it up.

7         THE COURT:  All right.

8         As we go down the line, if you have suggestions you may

9    make them.  I think Mr. Veeder has done a very fine job on

10   this.  I can't see any possibility, as a practical matter,

11   that there would have to be regulation upstream.  As we

12   proceed along, if you have suggestions point them out.

13        Paragraph I.

14        Paragraph II.  The thing I have there is this.  You say

15   "surface waters in Tucalota Creek and in the groundwater

16   body comprising Weber Valley".  We don't know where Weber

17   Valley is, unless we refer to some exhibit.

18        MR. VEEDER:  Your Honor, that would be in Exhibit 15.

19        THE COURT:  Exhibit 15 would do it -- which is a big

20   overall map.

21        MR. VEEDER:  That is right.

22        THE COURT:  Let's see if Exhibit 15 does it.

23        MR. STAHLMAN:  I don't think it is marked with Weber

24   on 15, is it?

25        MR. VEEDER:  If you look on the 29 series.  I think

P 21

1    29-Q is the best place to find it, your Honor.

2          THE COURT:  Exhibit 15 will not do it.  The 29 series

3    will not show your younger alluvium.

4          MR. VEEDER:  I will show you the best place to find it.

5    If your Honor will look on 206-D-3, which is in evidence.  I

6    am using your copy.   It was on the Bench.

7          THE COURT:  I guess it is my copy.

8          MR. VEEDER:  The exhibits are here.

9          You will find Weber Valley right up there.

10         THE COURT:  But there is no description here of what the

11    area of younger alluvium is.

H.fls

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17,216

t-25
H

1    MR. VEEDER:  Your Honor, you will find the white area

2    corresponds to the area of younger alluvium.

3    THE COURT:  It isn't marked in any keys, and it could be

4    marked with the proper keys to it.  It does not show all of

5    Weber Valley at that.

6    MR. VEEDER:  You do not have the part that fits right on

7    there.  206-D-3, I believe, will do it.

8    THE COURT:  No , that is not it.

9    MR. VEEDER:  I am looking for the one that hooks right

10   along on there.

11   MR. GIRARD:  Bill, let me ask you this:  Are all of the

12   lands in Weber Valley which are in younger alluvium within

13   the sections here in Finding XXIII?

14   MR. VEEDER:  That is right.

15   THE COURT:  That still does not do it because it merely

16   tells us it is within a section, and it might be a corner of

17   a section.

18   MR. GIRARD:  That is right, too.

19   THE COURT:  206-D-3 here says that the adjoining one is

20   the Hemet one at the top, and Aguanga at the bottom,

21   quadrangles.

22   MR. VEEDER:  Your parcel number, your Honor, the

23   upper parcel number here will give it to you.

24   THE COURT:  You have Parcel Number 54, and 24, and 27,

25   and 58, and 57.

t-26

1    MR. VEEDER:  I think Parcel 60 and 58 --

2    THE COURT:  This should give it to you here, -- Hemet

3 and Aguanga.

4    MR. VEEDER:  Those are the ones I used in writing the

5 findings, your Honor.

6    THE COURT:  What you want is the Hemet quadrangle.

7    COLONEL BOWEN:  That is a 1 to 62,500 scale, your Honor,

8 as shown on the right hand margin of 206-D-3.

9    MR. VEEDER:  I will get you a better one than that, your

10 Honor.  Here is the whole thing, as set forth on 277.

11    COLONEL BOWEN:  206-D-6, your Honor, adjoins 206-D-3 on

12 the east.

13    THE COURT:  Put it down, Colonel.  You have something

14 wrong here.  Lay it down, and I will show you that this is

15 not the same map.  This is not the same map (Indicating).

16    MR. VEEDER:  This is the office copy that I used, your

17 Honor.

18    COLONEL BOWEN:  Your Honor, it corresponds in part.

19 Looking at 206-D-6 the upper portion of Weber Valley is shown

20 in Section 34, Township --

21    MR. VEEDER:  That would 7 South, wouldn't it?

22    THE COURT:  Wait.

23    MR. GIRARD:  6, 1 East.

24    COMMANDER REDD:  6 South.  This is 6 South here.

25    COLONEL BOWEN:  This is Township 6 South, Range 1 East.

THE COURT:  Then can we do this:  Can we take Exhibits 206-D-3 and 206-D-6, which together would give us the northeast end of Weber Valley, and have the originals covered in to show this younger and older alluvium?

MR. VEEDER:  That can be done, your Honor.

THE COURT:  And then fasten the copies, and it would only need to be that portion of 206-D-3 and 206-D-6 that we are concerned with.

MR. VEEDER:  That is correct.

THE COURT:  Some of the outer limits of them could go off.

MR. VEEDER:  And you want to have those added onto Finding II, then?

THE COURT:  Yes.  206-D-3 and 206-D-6, so that at the end you will say, "As shown on U. S. Exhibits" -- and you should say "U. S." each time -- "206-D-3 and 206-D-6".

MR. GIRARD:  206-D- --

THE COURT:  206-D-3 and 206-D-6.  Now, on III, has anyone any suggestions there?

(No response.)

THE COURT:  Number IV.  I haven't checked these Townships, but I assume they are right.

MR. VEEDER:  I have checked them out, your Honor, but before I put them in final form I will see that every description and every course is run through.

t-28

THE COURT:  All right.   V, you call this "Tucalota Ground Water Basin."    Does anyone have any objection to calling it a "basin"?

Nobody does.

MR. GIRARD:  I don't, but I would like to ask a question. This says, "the alluvial filled valley."  Is that all a younger alluvial filled valley?

MR. VEEDER:  That is correct.  That area -- the importance in regard to that basin is that that is the Sage Area, the Occidental College Area, and there are quite a number of developments in it.

THE COURT:  Then I would add to V --

MR. GIRARD:  Just a minute, your Honor.

THE COURT:  I would add to V that "said Tucalota ground water basin is shown on U. S. Exhibits 206-D-3 and 206-D-6."

Now, later on you have some general finding about the ground waters, and if we could turn to it, because I have a second addition, and that would be to add to V that the ground waters -- you see, you found that the ground waters of Weber Valley were a part of the River, and I think it would be logical to add here "the ground waters of the Tucalota ground water basin are a part of the Santa Margarita River."

MR. VEEDER:  I think in IV we cover it.  We say:

"Continuing in a westerly and southwesterly

direction, Tucalota Creek proceeds across the Tucalota

t-29

1          Ground Water Basin, the ground waters of which are a

2          part of the Santa Margarita River . . ."

3          THE COURT:  It is covered in IV.  All right.

4          MR. STAHLMAN:  Are they shown on the map?

5          THE COURT:  They will be shown on these two maps, I

6     think.

7          MR. STAHLMAN:  In other words, the same as Weber Valley?

8          THE COURT:  Yes, Tucalota will be shown there.

9          MR. STAHLMAN:  15 shows the alluvium , does it not?

I fls.

17,221

Take I

P 22

1    MR. STAHLMAN:  When you get down there, you can refer to

2    15.

3    MR. VEEDER:  I incorporate 15.

4    THE COURT:  Let me ask, for the time being is this shown

5    on the same two that we have here?  The Town of Sage is shown

6    here on 206-D-3.

7    MR. VEEDER:  That is right, and that is the ground water

8    body lying immediately upstream.

9    THE COURT:  It is much more detailed, Mr. Stahlman, than

10   on 15.

11   MR. STAHLMAN:  Okay.

12   MR. GIRARD:  Is it going to be colored in on those, too?

13   MR. VEEDER:  We will have those ground water areas

14   colored in.

15   THE COURT:  Going ahead with VI, I don't see anything

16   there.  Anybody have anything?

17   MR. GIRARD:  One question.  I am not too familiar with

18   the facts.  Is this outlet of the Tucalota ground water basin

19   in the sense that it just has a younger bit of alluvium over

20   the bedrock lip, or how does it work?

21   MR. VEEDER:  That is correct, and it runs right by the

22   State Fire House.  I thought you would be interested in that.

23   MR. GIRARD:  But the point is that the ground waters,

24   if any, which would move into the surface or downstream would

25   only do so if the ground waters were at the level above the

P 23  1   lip.

2     MR. VEEDER:  That is correct.

3     THE COURT:  He covers this later on, I think.

4     MR. GIRARD:  All right, if it is covered later on, I

5  will reserve it; but if it is not, I would like it described.

6     THE COURT:  Now we go to Paragraph VII, the Tucalota

7  Valley.  What is that shown on?

8     MR. STAHLMAN:  It is shown on 15-E, whether it is in

9  sufficient detail or not.

10     THE COURT:  Tucalota Valley is shown at least in part

11  on D --

12     MR. VEEDER:  Tucalota Valley extends into the Vail

13  properties, your Honor.

14     THE COURT:  Yes.  Let's see the Bachelor Mountain --

15  let's see whether we have all of the Tucalota Valley on this

16  206-D-3.

17     MR. VEEDER:  No, you don't.

18     The Sage Quadrangle.

19     THE COURT:  You have most of it on Sage, but does it

20  go across?  A little bit of it runs across into the Bachelor.

21     Colonel, look at this, will you, and see if Tucalota

22  Valley runs across into the Bachelor Mountains.

23     COLONEL BOWEN:  There is a constriction there, your Honor,

24  which might well terminate the lower end of Tucalota Valley,

25  marked by bench mark 1745 appearing in Parcel No. 95 on 206-D2,

P 24   1      a constriction in the valley there, and then the valley again

2      opens and broadens partly in Parcel 67 and Parcel 95, as shown

3      on 206-D-2.

4            THE COURT:  But that part of the valley downstream from

5      the constriction is still part of Tucalota Valley?

6            COLONEL BOWEN:  Yes sir.

7            THE COURT:  And it is an area of younger alluvium?

8            COLONEL BOWEN:  Yes sir.

9            THE COURT:  Then I think we will have to use 206-D-2.

10     Add to the end of Paragraph VII, "Tucalota Valley is shown

11     on Exhibits 206-D-3 and 206-D-2, made part hereof."

12           MR. VEEDER:  I hadn't thought about incorporating those

13     exhibits by reference, but Colonel Bowen tells me we can make

14     a composite into a single map so there will be just one

15     incorporation by reference, if that would be agreeable to you.

16     I think it would be very bulky.

17           THE COURT:  And cut it down in size or --

18           MR. VEEDER:  Could you pull it down and still show it?

19           THE COURT:  Or it could be folded up.  I wouldn't worry

20     about that.

21           MR. VEEDER:  If that is agreeable, we will do that.

22           THE COURT:  Would you show the same exhibit numbers or

23     make a new exhibit?

24           COLONEL BOWEN:  Make a new exhibit.

       MR. VEEDER:  Or we could make a composite, either one.

P 25

1   THE COURT:  Either way you do it, it is all right with
2   me.  If you want to give it a new exhibit number, you may, or
3   you may use the old exhibit numbers and make a composite and
4   show the exhibits on the composites.

5   COLONEL BOWEN:  We will make a composite and show the
6   sequence with reference to those exhibit numbers 206.

7   THE COURT:  All right.

8   MR. VEEDER:  And then show the younger alluvium, if you
9   will.

10   THE COURT:  The younger and older alluvium.

11   COLONEL BOWEN:  Yes sir.

12   THE COURT:  I don't see anything wrong with VIII.

13   MR. GIRARD:  Again, on all of these findings, in most
14   instances the westerly outlet, as far as the ground water
15   basin is concerned, is not particularly described, and if it
16   is not described there I would like to have it described.  I
17   don't think it is.

18   MR. VEEDER:  You mean the exact location of it?

19   MR. GIRARD:  The factual situation to the effect that
20   the water in the ground water body does not go outward unless
21   it is over the lip, and that the only ground water movement
22   you will have in these basins is when they are full.

23   MR. VEEDER:  I have tried to make a general finding on
24   it.

25   THE COURT:  Later on I think it is covered.  Let's see.

17,225

P 26

1            IX, Auld Valley.  We are getting down now to where we

2     could refer to 15-E, aren't we, or 15-A?

3            MR. VEEDER:  Yes.  I think it would be better, because

4     I drew everything off these, to stay with the 206 series,

5     your Honor.

6            THE COURT:  All right.  Where would Auld Valley be

7     shown?

8            COLONEL BOWEN:  206-D-2, your Honor.

9            THE COURT:  Is it all shown on that exhibit?

10           COLONEL BOWEN:  Yes, your Honor, all of Auld Valley

11    appears on 206-D-2.

12           THE COURT:  And what he calls the Los Alamos ground

13    water basin all appears on there?

14           COLONEL BOWEN:  Yes your Honor.

I-2    15           THE COURT:  I suppose you would add to the end of IX,

16    on page 4, "as shown on exhibit" -- well, for the time being,

17    we will just call it 206-D-2.  If you are going to make a

18    composite, that will do it.

19           Now, in the next section you do find where the water

20    leaves the valley.

21           MR. VEEDER:  Speaking of IX now?

22           THE COURT:  X.

23           MR. GIRARD:  Where surface water leaves the valley.

24           THE COURT:  Yes, or where the creek leaves the valley.

25           MR. GIRARD:  Yes.

P27

1    THE COURT: XI.  First of all, I think you should add

2    this language to the end of XI:  "The ground waters in the

3    area of younger alluvium above described are part of the

4    waters of the Santa Margarita River system."

5    MR. VEEDER:  All right.

6    THE COURT:  Is that area shown on --

7    MR. VEEDER:  Yes, it would be on your 206 -- what is

8    the series that brings you down to the confluence of Santa

9    Gertrudis?

10   THE COURT:  We need the Murrieta.  Probably 206-D-1.

11   MR. VEEDER:  Here it is.  This brings you down to the

12   Santa Gertrudis confluence on the Murrieta Quadrangle.

13   THE COURT:  Again, these are my copies, apparently.

14   All right, as shown, then, on Exhibits 206-D-1 and

15   206-D-2 -- part of it is on D-2.  Is that right?

16   COLONEL BOWEN:  Yes sir.

17   THE COURT:  Willow Creek.

18   MR. VEEDER:  It is simpler to describe the tributaries,

19   simply going all the way down the main stem of Tucalota, and

20   then go back to Willow Canyon and Willow Creek, and they have their

21   confluence in the Tucalota ground water basin at  or near

22   Sage.

23   THE COURT:  There are some stringers of younger alluvium

24   in Willow Creek?

25   MR. VEEDER:  That is correct.

P 28

1      THE COURT:  But you don't mention them, do you?

2      MR. VEEDER:  If your Honor will observe, there is a

3  part of Willow Creek in Section 6 Township 7.  Willow Creek

4  has its confluence right down into the ground water area

5  there, your Honor, if you will notice, in Section 6.

6      THE COURT:  At about Sage.

7      MR. VEEDER:  That is correct.  Finding V says that

8  Tucalota ground water basin extends northward along Willow

9  Creek, a tributary of Tucalota Creek, in Section 6.  Of course,

10  we treat that whole thing as ground water in that description.

11  If you would like to have me add that, I will.

12      COLONEL BOWEN:  That is in D-3, your Honor.

13      THE COURT:  I see Willow Creek part way here.  Then is

14  this Willow Creek here?

15      COLONEL BOWEN:  No, Willow Creek rises in Section 33,

16  34, 27, 28, 6 South 1 East.

17      THE COURT:  That isn't the way you have Willow Creek on

18  15.  You have Willow Creek rising in Section 32.

19      COLONEL BOWEN:  I think on 15, your Honor, it just

20  wasn't continued up as far as the actual drainage exists on

21  the ground.

22      THE COURT:  Then Willow Creek is sufficiently shown,

23  the younger alluvium, on 206-D-3.

24      MR. VEEDER:  That is my thought, your Honor.

25      THE COURT:  What do you want to do about it?

P 29

1      MR. VEEDER:  I would incorporate it.  I would simply make

2   a reference to this exhibit that the Colonel is going to make,

3   this composite, and that would be it.  It is extremely diffi-

4   cult to put in the tributaries without first running through

5   the full stream.

6      THE COURT:  What you have done in Finding XII is merely

7   to describe how it runs, and we would simplify it by saying

8   "There are stringers or areas of younger alluvium on Willow

9   Creek as shown on 206-D-3."

10     MR. VEEDER:  All right, we will do that.  There are quite

11  a few people claiming water out of Willow Creek, surprisingly

12  enough.

13     THE COURT:  Now, unnamed tributary of Tucalota Creek --

14  is that shown on 206-D-3?

15     MR. VEEDER:  That is Rawson Canyon.

16     THE COURT:  Wait a minute.

17     MR. VEEDER:  Oh, you mean the unnamed tributary of

18  Willow Creek.  That has its confluence in Section 6 with Willow

19  Creek, your Honor.

20     COLONEL BOWEN:  That appears also on 206-D-3.

21     THE COURT:  We would add the same thing to the end of

22  Paragraph XIII.

23     MR. VEEDER:  All right.

24     THE COURT:  "There are areas of younger alluvium on such

25  tributary as shown on Exhibit 206-D-3."

P30

1         Now, you have used 15 and 15-E here in XVI. I have

2  turned to Paragraph XVI.

3        MR. VEEDER: I would like to substitute the composite,

4  if we may.

5        MR. STAHLMAN: You are passing over XIV?

6        THE COURT: We will not pass it over if you have some-

7  thing?

8        MR. STAHLMAN: I have some comments.

9        MR. GIRARD: I have some comment, too.

10       MR. STAHLMAN: I want to read it myself, first.

11       It says "flowing only ... during and after periods of

12  heavy precipitation and runoff." But there are places where

13  it flows continuously, as shown on the map.

I-3  14       MR. VEEDER: I will bring to your Honor's attention the

15  reference to Exhibit 15-E, and there is shown a point of

16  rising water in the southwest corner of Section 8 in Township

17  7 South Range 2 West. However, I checked further on that and

18  I have been unable to find that that runs perennially. Maybe

19  Mr. Wilkinson or Colonel Bowen knows. But the data that I

20  had indicated that that dried up at times, so I didn't use

21  the term "perennial runoff."

22       THE COURT: Is anybody going to insist that we put that

23  little spot of rising water in, even if it is there? Do we

24  need it?

25       MR. STAHLMAN: Mr. Wilkinson tells me there is a pool

P 31

1   up there.

2       MR. WILKINSON:  On the Pauba Grant there is a pool of
3   water in the streambed, your Honor.

4       MR. VEEDER:  All year long?

5       MR. WILKINSON:  Sufficient to water cattle in.  It is
6   minor in amount, but it is there.

7       MR. VEEDER:  I ask that the Colonel, when he makes this
8   composite, put that point of rising water in the Pauba Grant,
9   if that is the case.

10      THE COURT:  That isn't in the Pauba Grant, the one you
11  pointed to.

12      MR. VEEDER:  That is correct.  But this one here, I had
13  no data and there is nothing in the record to show that that
14  is a continuously flowing stream.

15      THE COURT:  Where would this be on the Pauba Grant?

16      MR. WILKINSON:  The northernmost portion.

17      COLONEL BOWEN:  206-D-3, your Honor.

18      THE COURT:  Is there anything in the record about this
19  pool of water on the Tucalota in the north part of the Pauba
20  Grant?

21      MR. VEEDER:  At one time Mr. Wilkinson said there was
22  water up there, I remember that.

23      THE COURT:  You have been sworn, and we will take your
24  statement as evidence.

25      MR. WILKINSON:  Yes, there is a pool of water in the

P 32   1   northernmost portion of the Pauba Grant in Tucalota Creek.

2       THE COURT:  Which exists year around?

3       THE WITNESS:  Which exists year around.

4       THE COURT:  Colonel Bowen, if you will add that, then,

5   to the other point of rising water shown on -- just look at

6   15-E.

7       COLONEL BOWEN:  Yes, your Honor.

8       MR. GIRARD:  My comment is a little different, your Honor.

9   In the phrase, on page 6, "Both the surface and subsurface

10  of flow,"  I agree that there may well be subsurface flow,

11  but if there is subsurface flow it has to be in a known and

12  defined channel, and I think you would have to define it to

13  be part of the stream.

14      MR. VEEDER:  Could you bring me up where you are on that?

15      MR. GIRARD:  Yes, XIV, Mr. Veeder, on page 6, it says,

16  "both the surface and subsurface flow contribute and are

17  part of the Santa Margarita River."  My point is that if there

18  is water underneath the surface, in order to be a part of the

19  Santa Margarita River as such, as a stream, it has to be in

20  a known and defined channel, and I don't know that there is

21  any such thing.

J fls.   22

23

24

25

17,232

t-30
J

1    MR. VEEDER:  I would be perfectly willing to change

2    that to "both the surface and the percolating waters in

3    the ground water bodies. . ."

4    MR. GIRARD:  I don't think it makes much difference,

5    but --

6    THE COURT:  Strike out "and subsurface flow" on Line 2

7    on Page 6, so it will read "both the surface flow"and then

8    why don't you say "and waters in younger alluvium . . ."

9    MR. GIRARD:  All right.   ". . .waters in younger

10   alluvium contribute to and are a part of . . ."

11   THE COURT:  Yes.  What is the next one?

12   MR. GIRARD:  That is on XV.  I do not pretend to be an

13   expert on it, but it says, "there is not a repetitious

14   pattern of precipitation and runoff upon which there could be

15   a finding of firm supply of water."

16   Now, as I understand the term "firm supply of water," it

17   is not necessary that there be a repetitious pattern.

18   THE COURT:  Does the second sentence add anything?  Why

19   don't we just stop with, "There are no records of runoff

20   from Tucalota Creek."

21   Isn't that enough, Mr. Veeder?

22   MR. VEEDER:  Well, I believe that the record will bear

23   out there is no way of saying that I could look at a five

24   year average and then ask for a judgment that you are going

25   to have a repetition of it.

17,233

t-31

1    MR. GIRARD:  But I think on most reservoirs they say

2    that the planned capacity -- well, for example, on Fallbrook's

3    reservoir there is no record of a repetitious pattern of

4    precipitation, but they did make an estimate as to how much

5    of a firm supply they could get over an essentially long

6    period.

7    THE COURT:  Listen, I don't care one way or the other.

8    I am going to strike out "sub-surface" again.  It doesn't mean

9    a thing one way or the other.  You can take it out or leave

10   it in.   In the second sentence strike out the word "sub-

11   surface."

12   MR. VEEDER:  All right.  Strike out "sub-surface."

13   I would like to leave the rest of it in, if I could.

14   THE COURT:  All right.  Leave it in.  It is a negative

15   finding.

16   MR. STAHLMAN:  What is a firm supply of water?  Unless

17   you have a demand for it, what is a firm supply of water?

18   THE COURT:  What difference does it make?

19   MR. STAHLMAN:  Then why have it in?

20   THE COURT:  All right.  Strike out everything after

21   "runoff" -- "there is not a repetitious pattern of

22   precipitation and runoff."   Strike out the rest.

23   MR. VEEDER:  All right.

24   THE COURT:  Now, going to XVI, we will substitute for

25   Exhibit 15 and 15-E in Line 12-1/2 or 13 this composite

17,234

t-32

1  exhibit of 206-D-1, -2, -3 and -6.  I think that is all we

2  have, isn't it?

3          COLONEL BOWEN:  And F, your Honor.

4          MR. VEEDER:  I think then, your Honor, -- are you ready

5  to go on?

6          THE COURT:  And, also, on Line 19 we will change 15 and

7  15-E to the 206-Series.  Then what is next?

8          MR. VEEDER:  Did you say 19?

9          THE COURT:  On Line 19, again, you refer to 15 and 15-E.

10         MR. VEEDER:  Yes, we will do that.

11         Then have we gotten to XVII?  We might as well show on

12  the composite, if we can, the basement complex and the

13  weathered basement complex, to the end that we won't have to

J-2

14  make any -- that is, to say there:

15              "Ground waters, if any, found in the lands

16          described in 'Exhibit A' of these Findings of Fact,

17          Conclusions of Law and Interlocutory Judgment, which

18          are classified . . . as basement complex or weathered

19          basement complex, are vagrant, local, percolating

20          waters . . ."

21         Why not just designate on your 206-D-composite which is

22  the basement complex and the weathered basement complex, and

23  we wouldn't need to make any reference to 15 or 15-E?

24         THE COURT:  Would that be easier?

25         COLONEL BOWEN:  Yes, your Honor.

t-33

1    THE COURT:  All right.

2    MR. VEEDER:  And for the record, I will say that that

3  appears in Lines 22 through 27, so that the Colonel will

4  have that, on Page 6.

5    THE COURT:  Now, XVIII.  There is a list of parcel

6  numbers of apparent owners, and the only thing I have to add

7  there is again that there you might have an explanation of

8  your numbering system, although here I see that when you list

9  the parcels you are using the same numbers as you used in your

10  other numbering system.

11    MR. VEEDER:  I did that, your Honor, because I think it

12  simplifies it.

13    THE COURT:  But I think a sentence explaining that would

14  be well.

15    MR. VEEDER:  We will do that.

16    THE COURT:  That the first is the Township, --

17    MR. VEEDER:  And that the second is the Range.

18    THE COURT:  The first is the Township South, that all of

19  those sixes and sevens refer to the Township, for example,

20  6 South, and the next number with the "E" refers to the Range,

21  and the number beyond the slant line is the Section, and the

22  last number --

23    MR. VEEDER:  Is the parcel.

24    THE COURT:  -- is the parcel, as shown on 206-D, or

25  something like that.  Can you do that?

17,236

t-34

1    MR. VEEDER:  Yes, your Honor.

2    THE COURT:  Now, going to XX, and this is trivial I know,

3    but you will have to rewrite this, so instead of saying,

4    "These parcels," I think you could start it out by saying,

5    "The following parcels of land described" instead of "These

6    parcels."

7    MR. VEEDER:  All right, "The following parcels . . ."

8    THE COURT:  And I think that should also be done on

9    XXI, "The following parcels of land" instead of "These

10   parcels . . ."

11   MR. VEEDER:  Yes, your Honor.

12   THE COURT:  Then on Line 22 in Paragraph XXI you have

13   something wrong there about "tributary, tributaries".

14   MR. VEEDER:  Let me reread that.

15   ". . . abut upon or are traversed by Willow Creek and

16   tributary, . . ."

17   There is an unnamed tributary there, so I will put in

18   "unnamed tributary."  You will recall we put in evidence

19   about an unnamed tributary along Willow Creek, so I will say

20   "an unnamed tributary. . ."

21   THE COURT:  All right, "unnamed tributary," and then

22   say "both tributaries to Tucalota Creek," so that we will

23   know what you are talking about.

24   MR. VEEDER:  Yes, your Honor.

25   THE COURT:  Then the same thing on XXIII, "The following

t-35

1   parcels of land. . ."

2      MR. VEEDER:  Yes.

3      THE COURT:  The same thing on --  apparently you have

4   No. XXIII or, rather, you have XIII.

5      MR. VEEDER:  That should be --

6      THE COURT:  That should be XXII.  That one on Page 9

7   should be XXII.

8      MR. VEEDER:  That is correct, your Honor.

9      THE COURT:  Then in Paragraph XXIII, "The following

10   parcels of land . . ."  Then down to XXIV.

11      MR. STAHLMAN:  On XXIII, I would like to ask as to the

12   parcel numbers on Vail Company,how is that to be covered?

13      MR. VEEDER:  I am going to ask you to give me the

14   projected section, or however you would describe it yourself.

15   Vail Company does not come in on the parcel series for the

16   Lower Murrieta, so we will simply give you your Township,

17   Range and Section.

18      THE COURT:  "Projected section" does not mean very much,

19   so why not say, "Exhibit 206-D-3"?  That is the only place

20   it appears.

21      MR. VEEDER:  All right.

22      THE COURT:  Just say, "Exhibit 206-D-3".

23      MR. VEEDER:  All right, your Honor.

24      Does anyone have any information about the present

25   status of the Tommy Rawson property at this time?  I see it

17,238

t-36

1    appears in some places as "Rawson, Tommy (or Lewis Rawson)".

2         As to Tommy Rawson, isn't Tommy dead?

3    COLONEL BOWEN:  He is dead.

4    MR. VEEDER:  I don't know how to put it down, but I

5    think I will just put it "Deceased," and let it go that way.

6         THE COURT:  Then on XXV --

7    MR. GIRARD:  On XXIV I have a question, your Honor.

8    THE COURT:  What is that?

9    MR. GIRARD:  This is not an objection, but the footnote

10   says, "The water year in this case . . ."  Maybe that was

11   something that came in long before I came in here, but I

12   don't know what a water year in this case means.

13        MR. VEEDER:  Your Honor, that is in all of our Series

14   XIX, XX, XXI.

15        THE COURT:  He suggested that you strike out "in this

16   case."   The water year is from October 1st to September 30th.

17   Strike it out.

18        MR. GIRARD:  Then it says, "Those rains occur usually

19   between the first of November and the first of April of each

20   water year."

21        MR. VEEDER:  Isn't that correct?

22        MR. GIRARD:  I guess it is correct, but I wondered

23   whether each water year changes the date.  I don't know.

24        THE COURT:  No, it does not.  The water year starts the

25   first of October.

17,239

t-37

1       On XXIV, or on XXV, rather, I would make a few changes.

2       On the first line, "recharge for the" -- and then I

3   would insert -- "younger alluvium . . ."

4       MR. VEEDER:  "Recharge for the younger alluvium . . ."?

5       THE COURT:  Yes.  Then go ahead, "ground water basin and

6   ground water bodies which have been described above . . ."

7   Then we are apt to say, "except for direct rainfall."

8       MR. GIRARD:  Or add "primarily" instead of that.

9       THE COURT:  Or say "is primarily", -- that is better.

10      MR. GIRARD:  ". . . is primarily the surface flow . . ."

11      THE COURT:  " . . . of Tucalota Creek", and then I

12  would insert, "and its tributaries."

13      MR. VEEDER:  All right.

14      MR. GIRARD:  So that it reads, "Recharge in the ground

15  water basins and ground water bodies . . ."?

16      THE COURT:  Not "in."  "Recharge for the" --

17      MR. VEEDER:  ". . . for the ground water basins . . ."

18      THE COURT:  " . . . for the younger alluvium . . ."

19  There is younger alluvium in both the basins and in the

20  stringers.

21      MR. VEEDER:  That is right.

22      MR. GIRARD:  That is right.

23      THE COURT:  So you could say, "Recharge for the younger

24  alluvium in the stream channels and in the ground water

25  basins and bodies . . ."

17,240

t-38

MR. GIRARD:  Fine.

MR. VEEDER:  All right.

THE COURT:  That would make it clearer, "stream channels and in the ground water basins and bodies," and so forth.

MR. GIRARD:  ". . . basins and bodies. . ."

THE COURT:  And so forth, "which is primarily the surface flow of Tucalota Creek and its tributaries."

Then I would say, "That ground water can be" -- strike out "can be" -- "is classified in two categories."

MR. GIRARD:  That strikes me, your Honor, that that is where we should stop, right there, and that your Honor is not going to find -- well, in the other finding I think  you have deleted the term "sub-surface flow," and treated it all as underground water, and if we do that, then there is no need to break it down into categories.

MR. VEEDER:  That would suit me.  There is only one question that came to my mind in regard to these, and this primarily relates to the individual use of it.

THE COURT:  We will thresh that out later, and just make it one category.  We will revise it, and strike out the two categories, and say, "That ground water" --

MR. GIRARD:  I don't think you even have to add anything.

THE COURT:  Let me see.

MR. GIRARD:  I think maybe you could just strike it out.

MR. VEEDER:  You mean strike out the whole finding?

17,242

t-40

1      MR. VEEDER:  ". . . and a part of the water of the Santa

2   Margarita River."

3      THE COURT:  ". . . and a part of the water of the Santa

4   Margarita River."

5      Can't we simplify it down that way?

6      MR. VEEDER:  That is fine.

7      THE COURT:  Now the next one I have is XVIII, and this

8   I think is what answers what Mr. Girard is talking about.

K fls

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t-37

On XXIV, or on XXV, rather, I would make a few changes.

On the first line, "recharge for the" -- and then I would insert -- "younger alluvium . . ."

MR. VEEDER:  "Recharge for the younger alluvium . . ."?

THE COURT:  Yes.  Then go ahead, "ground water basin and ground water bodies which have been described above . . ." Then we are apt to say, "except for direct rainfall."

MR. GIRARD:  Or add "primarily" instead of that.

THE COURT:  Or say "is primarily", -- that is better.

MR. GIRARD:  ". . . is primarily the surface flow . . ."

THE COURT:  " . . . of Tucalota Creek", and then I would insert, "and its tributaries."

MR. VEEDER:  All right.

MR. GIRARD:  So that it reads, "Recharge in the ground water basins and ground water bodies . . ."?

THE COURT:  Not "in."  "Recharge for the" --

MR. VEEDER:  ". . . for the ground water basins . . ."

THE COURT:  " . . . for the younger alluvium . . ." There is younger alluvium in both the basins and in the stringers.

MR. VEEDER:  That is right.

MR. GIRARD:  That is right.

THE COURT:  So you could say, "Recharge for the younger alluvium in the stream channels and in the ground water basins and bodies . . ."

Take K

17,243

P 33

1      In XVIII I would insert, on 27, after "alluvium,"

2  "when the surface flow of Tucalota Creek has fully recharged

3  the alluvium in the ground water basins and bodies the stream

4  receives effluent seepage from the alluvium. . "  I changed

5  "the" to "said;" we are talking about the particular alluvium

6  now -- "the said alluvium supporting the surface discharge".

7      MR. VEEDER:  May I ask you --

8      THE COURT:  I am inserting after the word "alluvium,"

9  on line 27½, the words "in the ground water bodies and basins".

10      MR. VEEDER:  That should be 28, on page 12.

11     MR. GIRARD:  So that it will read how?

12      THE COURT:  So that it will read "When the surface flow

13  of Tucalota Creek has fully recharged the alluvium in the

14  ground water bodies and basins," -- that is the insertion --

15  "the stream receives effluent seepage from the alluvium".

16      MR. GIRARD:  This Finding XXVII has me bothered a little

17  bit, too.  I am not sure that the reduction of surface flow

18  while the stream is recharging the dewatered alluvium is

19  directly proportionate to the amount of water needed to

20  recharge the alluvium.  I think you will find that the amount

21  of water that goes into the alluvium is a lot less than needed

22  to do it when it rains.  I don't think there is a reduction

23  in surface flow directly proportionate to the extent of the

24  water which is needed to fill the basin.  As I understand,

25  the basin will not fill --

17,244

P 34

1      THE COURT:  Let me read it.  I agree with you on that.
2   So it is not the water needed.  "The reduction of surface
3   flow while the stream is recharging the dewatered alluvium
4   is directly proportionate to the amount of water " --
5      MR. GIRARD:  " -- which percolates down and recharges
6   the alluvium".
7      THE COURT:  Yes, "which percolates down and recharges
8   the alluvium".  That doesn't do violence to your thought,
9   does it, Mr. Veeder?
10      MR. VEEDER:  No, it doesn't.  I was worried about the
11   "directly proportional," but I was working late at night.
12      THE COURT:  Then of course you can strike "except in
13   times of intensely high precipitation".
14      MR. VEEDER:  I talked to the Colonel about that and he
15   says that when you have extremely high intense runoff your
16   alluvium doesn't take the water.
17      THE COURT:  But we have taken care of it, you see, by
18   saying that the reduction of the surface flow is proportionate
19   to the amount which percolates and recharges.
20      MR. VEEDER:  All right, that suits me.
21      MR. GIRARD:  Also, I guess, if you want to be technically
22   accurate, your ground water basins are reduced naturally aside
23   from pumping.
24      MR. VEEDER:  I think we have that in.
25      MR. GIRARD:  Do you have that in another finding?

P 35

1    MR. VEEDER:  We have that, that the reduction from the

2    transpiration and -- you will find that further over.

3    THE COURT:  Now, on XXVIII.

4    MR. GIRARD:  Wait a minute.  Colonel Bowen tells me

5    that this word "proportionate" is in error, in XXVII.

6    THE COURT:  It equals.

7    COLONEL BOWEN:  That is correct; it equals the amount

8    that percolates into the alluvium.

9    MR. GIRARD:  Is equal to.

10   THE COURT:  Yes.  All right, we have it straightened

11   out now.

12   Now, we talked about XXVIII already.

13   I don't have anything on XXIX or XXX.

14   MR. GIRARD:  I am baffled somewhat by XXIX.

15   THE COURT:  Before we go to that, we have this "subflow"

16   here again, in XXVIII.

17   MR. GIRARD:  That is right, too.

18   THE COURT:  Strike out "subflow" and say "the percolation

19   of waters in the alluvium support and feed".

20   Now XXIX.  Strike out "subflow waters".

21   MR. VEEDER:  We should hyphenate "evapotranspiration,"

22   on line 4.

23   THE COURT:  Okay.

24   MR. GIRARD:  It says, in a sense, that you have your

25   effluent seepage into the stream that is directly related to

P 36

1   the natural losses which occur from the plants and as a

2   consequence that these waters are a part of the surface

3   drainage of Tucalota Creek.  Now I would agree that these

4   waters probably are part of the surface drainage of Tucalota

5   Creek, but I don't see that the mere fact that some effluent

6   is used by evapo-transpiration --

7       THE COURT:  The words "as a consequence" should go out,

8   on line 5.

9       MR. GIRARD:  Yes.

10      And I would like to know also --

11      MR. VEEDER:  I want to talk about it, because I think

12  this may be helpful in others.

13      THE COURT:  Can't you/merely say that there is also natural

14  dewatering of the alluvium by evapo-transpiration?  Well,

15  that's all right.  Take "as a consequence" out.  The rest of

16  it reads all right.

17      MR. GIRARD:  Also, is it true -- maybe it is -- that the

18  natural dewatering by evapo-transpiration is directly related

19  to the seepage in the stream?

20      MR. VEEDER:  Very simply, what I was trying to say there --

21  and if we can simplify it, it suits me -- is that the fact

22  is that directly affect the surface flow of Tucalota Creek

23  and recharge of the basins, there are not only pumping, but

24  Mr. Wilkinson testified that there are phreatophytes.

25      THE COURT:  Can we take out the word "directly" and just

P 37

1    say "there is a relationship"?

2           MR. STAHLMAN:  Do they support the surface?

3           MR. VEEDER:  Yes, if your basins are only half full and

4    the water comes in and they are filled up and you have surface

5    flow, even though you have pulled the basins down, they do

6    support the surface runoff.

7           MR. GIRARD:  They don't.  When the waters in the alluvium

8    drop below your basement rock lip, they don't support the

9    surface discharge.

10          MR. VEEDER:  But when they begin recharging they become

11   part of the stream and they do support the surface runoff.

12          MR. GIRARD:  The only time that they physically support

13   the surface runoff is when they reach the level of the basement

14   lip.

15          MR. VEEDER:  You are right.

16          THE COURT:  Well, I am not going to spend a lot of time

17   on it.  We could take out "and support" and say "are a part

18   of the surface discharge."  I don't care how low the water

19   is in the basin, it is part of the waters.

20          MR. GIRARD:  It is part of the Santa Margarita River.

21   They are not part of the discharge unless they have gone over

22   the lip.

23          MR. VEEDER:  Okay.

24          THE COURT:  "The percolating waters, irrespective of

25   their elevations, are part of the waters of the Tucalota Creek."

P 38    1    Is that sufficient?

2        MR. GIRARD:  Yes.

3        MR. STAHLMAN:  That is all right.

4        COLONEL BOWEN:  We could simplify that a lot more, your

5    Honor.  Finding XXIX could be simplified a great deal more if

6    you desire it, by stating that "effluent and influent seepage

7    is related to natural and artificial discharge of water from

8    the alluvium."

9        MR. GIRARD:  That is fine.

10        THE COURT:  Say that.  And say also that "The percolating

11    waters, irrespective of their elevation, are part of the waters

12    of the Tucalota Creek".

13        MR. GIRARD:  Again, I am being a little technical, your

14    Honor, but they are not part of the waters of Tucalota Creek.

15    They add to and support Tucalota Creek.

16        THE COURT:  You just kicked about "support" and I struck

17    it out.  I took out the word "support" so let's say they are

18    part of the waters of Tucalota Creek."  They are part of the

19    stream system of the Santa Margarita, or anything you want

20    to say.

21        MR. VEEDER:  Say "part of the stream system of the Santa

22    Margarita".  Would that make you happy?

23        MR. GIRARD:  Yes.

24        MR. VEEDER:  All right.

25        THE COURT:  "part of the stream system of the Santa

17,249

P 39

1 Margarita".

2    Here there is a reference to the outlet of Los Alamos

3 ground water basin.

4    MR. VEEDER:  That appears in the 206 series, your Honor.

5    THE COURT:  On XXXI.

6    MR. VEEDER:  Let's take out "subflow".

7    THE COURT:  Yes.  You could also say "percolating waters

8 in the ground water basins and bodies and the stringers of

9 younger alluvium."

10    MR. VEEDER:  Yes.

11    MR. GIRARD:  Are we on XXX still?

12    THE COURT:  No, we passed it.  What do you want to talk

13 about?

14    MR. GIRARD:  It says "There is no subflow of that stream

15 which leaves . . "

16    THE COURT:  There is not.

17    MR. GIRARD:  There is no subflow at all, as I understand

18 it.  There would be no movement of the ground waters within

19 the alluvium.

20    THE COURT:  All right, strike out "subflow".  So it will

21 read, "That stream as it leaves Los Alamos ground water --

22    MR. VEEDER:  " -- is entirely surface flow."

23    THE COURT:  " . . flows for a distance of a mile over

24 basement complex".  That is all you have to say.  Have you

25 got that?

P 40

1          MR. GIRARD:  Yes.

2          MR. VEEDER:  Yes.

3          THE COURT:  "That stream, as it leaves Los Alamos ground

4     water basin, for a distance of approximately one mile flows

5     over and across basement complex".  You don't have to repeat

6     "ground water basin."

7          MR. GIRARD:  On XXX I have some strong objections to

8     some of the language.

K-2   9          THE COURT:  First, the suggestion I have is a very

10    technical one.  In the last sentence, "The principal sources

11    of the recharge of the Murrieta-Temecula ground water area

12    are Tucalota Creek" insert "feeding into Santa Gertrudis

13    Creek."  Tucalota Creek itself doesn't run into that area.

14         MR. VEEDER:  I want your Honor to observe why we used

15    that language.  There is about a mile there --

16         THE COURT:  Oh, it does.  All right, I take it back.  I

17    thought it joined outside the basin.

18         What are your objections, Mr. Girard?

19         MR. GIRARD:  I don't think there has been any inter-

20    connection at all between the percolating waters.  If you are

21    talking about interconnection underground between the perco-

22    lating waters in the ground water basins and the ground waters

23    in the Temecula ground water area --

24         MR. VEEDER:  No, I am using terminology out of some of

25    the California law to the effect that there is an interconnection

P 41

1    from the standpoint of sources of water.

2         THE COURT:  You really mean there is a relationship.

3         MR. VEEDER:  All right.

4         THE COURT:  It has the wrong connotation.

5         MR. VEEDER:  All right.

6         THE COURT:  There is a relationship between the surface

7    flow.

8         MR. VEEDER:  There is a direct relationship.

9         MR. GIRARD:  There is no relationship between the

10   percolating waters, because the only way that any waters could

11   get down to the Temecula ground water area is as surface

12   waters.

13        THE COURT:  But you miss the point.

14        MR. GIRARD:  No, I don't miss the point, your Honor.

15        MR. VEEDER:  Yes, you do.

16        MR. GIRARD:  I agree with you that the ground waters

17   support the surface flow of Tucalota Creek, and you have

18   already found that above.

19        THE COURT:  But all we are saying is that there is a

20   relationship between the surface flow of these creeks and

21   the percolating waters in the basins and the waters in the

22   ground water area.  There is a relationship.  If you want to

23   spell it out further, that relationship is just what you said.

24        MR. GIRARD:  Yes.

25        THE COURT:  The fact that there is water in the basins

P 42

1   permits less water to go into the basins and more water to

2   come down the stream.

3   MR. VEEDER:  That was the thought.

4   THE COURT:  That is the way I understand it.

5   MR. VEEDER:  That is right, and that is what was intended.

6   It ties to your definition of "correlative," on which we

7   worked so hard.

8   MR. GIRARD:  Maybe it is quibbling with words, but I

9   can envision ten years from now somebody up there saying,

10  "This finding said that Tucalota Creek was a principal source

11  of recharge for the Murrieta-Temecula ground water area."  I

12  think it is a source of recharge, but I think this word

13  "principal" puts an entirely wrong connotation on the contri-

14  bution made by Tucalota.

15  THE COURT:  Strike out "principal."  We have no figures

16  on how much.

17  MR. VEEDER:  That is right.  But the point I would like

18  to make, since you have Vail Dam, sources of recharge for

19  Murrieta-Temecula basin are Warm Springs Creek, Santa Gertrudis

20  and Tucalota.

21  THE COURT:  Adjectives often don't add very much, anyhow,

22  "The sources of recharge are Tucalota and other streams in

23  the watershed."  What else do you have?

24  MR. GIRARD:  Again, this is another quibbly point.  The

25  Murrieta-Temecula ground water area can only be recharged on

P 43   1    the Murrieta side by Tucalota Creek.

2          MR. VEEDER:  Would you say that again?

3          MR. GIRARD:  I don't think any surface flow of Tucalota

4    Creek will ever reach into the Temecula basin area or the

5    Temecula ground water area.

6          THE COURT:  All right, for the northwestern portion.

7          MR. VEEDER:  I don't see how we could say that.  I think

8    if your streams come in there, as it does for a mile across

9    a broad plain of younger alluvium, I think it contributes to

10   the whole ground water body, doesn't it?

11         THE COURT:  You have put in evidence of a water divide.

12   We have already found that.  So I am going to make the finding

13   read, "Sources of recharge for the northwestern portion of

14   the Murrieta-Temecula ground water area . . "  You got one

15   area and you split it with a ground water divide.  I don't

16   think it hurts anything.

17         What else do you have?

18         MR. GIRARD:  I have no more on that one.

L fls.   19

20

21

22

23

24

25

17,254

T-41
L

1   THE COURT:  XXXII.  This is merely grammatical, and it

2   is on the second line.  After "Tucalota Creek" add "and other

3   streams . . ."

4       "The surface waters of Tucalota Creek" and then add

5   "and other streams" -- end insert -- "which enter Santa

6   Gertrudis Creek . . ."

7       MR. STAHLMAN:  Where are we at?

8       MR. VEEDER:  Page 14.

9       MR. GIRARD:  "The surface waters of Tucalota Creek" --

10      THE COURT:  That does not do it either.  "The surface

11  waters of Tucalota Creek which enter Santa Gertrudis Creek

12  and those " -- what do you mean by "those"?  Are you talking

13  about other waters, and which waters enter the alluvium?

14      MR. VEEDER:  Your Honor, there is that mile of younger

15  alluvium where Tucalota Creek undoubtedly loses water into

16  the alluvium, which does not get into the Santa Gertrudis.

17      THE COURT:  All right.  Instead of "and those" say,

18  "and which waters . . ."

19      MR. VEEDER:  " . . . and which waters enter the alluvium

20  . . ."

21      MR. GIRARD:  "May enter."  Oh, all right.

22      THE COURT:  All right, "may enter."  We will be

23  technical.

24      MR. GIRARD:  I withdrew my technicality, your Honor.

25      THE COURT:  " . . . enter the alluvium of the northwesterly

17,255

t-42

1   portion of the Ground Water Area contribute to the flow of

2   the River."   I don't know about that last.

3       MR. GIRARD:  Why not just put a period after "River"?

4   The Santa Margarita River commences at the Gorge.

5       THE COURT:  All right.  Strike out "which rises at the

6   point of confluence of Murrieta Creek and Temecula Creek

7   immediately east of Temecula Gorge."

8       Now, this last sentence, that it is the aggregate of

9   the yield that constitutes the  principal source of supply,

10   I think this ignores entirely the recharge from the irriga-

11   tion of Pauba Valley.

12       MR. STAHLMAN:  Yes.  I don't think that sentence belongs

13   in there.

14       MR. GIRARD:  I think you ought to strike out the whole

15   last sentence.

16       THE COURT:  Suppose we strike it out, Mr. Veeder.

17       MR. VEEDER:  What is that?

18       THE COURT:  The whole last sentence in XXXII.

19       MR. VEEDER:  Okay.

20       THE COURT:  Then do you have anything on XXXIII and

21   XXXIV, -- anybody?

22       MR. GIRARD:  Yes, I do.

23       THE COURT:  What?

24       MR. GIRARD:  Well, it says in there --

25       THE COURT:  Which one?

17,256

t-43

1      MR. GIRARD:  XXXIII and XXXIV incidentally, too.

2      I will concede, certainly that the amount of irrigable

3  land up there is a lot more than you are going to get or that

4  is ever going to be irrigated out of any of the water

5  available.  I think that is true throughout the watershed.

6  But I don't think it is correct, for example, to say as to

7  Pauba, "in that connection, that the water uses by those

8  landowners exceed the yield of the stream."

9      If they are using water, it can't exceed the yield of

10  the stream.

11      I think so far as XXXIII and XXXIV are concerned --

12      MR. VEEDER:  Where is that?

13      MR. GIRARD:  It is right in the middle of XXXIII.  It

14  says, "It is found, in that connection, that the water uses

15  by those landowners exceed the yield of the stream."

16      If you are using water, it can't exceed the yield of the

17  stream, and it is so evident that that --

18      MR. VEEDER:  I can say, "the annual yield of the stream."

19      MR. GIRARD:  You haven't got one  iota of evidence here

20  as to the annual yield of the stream.

21      MR. VEEDER:  Well, Mr. Girard, it is late in the

22  afternoon, and don't get yourself upset about it.  When you

23  pump down the ground water basin, you are certainly pumping

24  more water than is the yield of the stream.

25      MR. GIRARD:  Oh, that is not true.

t-44

1    THE COURT:  He means, and he is talking about the fact

2  that you are drawing down the basin.

3    MR. GIRARD:  Certainly.

4    THE COURT:  And he is talking about a stream without

5  the basin, and you are talking about a stream within the

6  basin.  Let's see if we can work this out.

7    MR. GIRARD:  I would like to suggest that I know Mr.

8  Krieger has an extremely violent objection, and I know Mr.

9  Sachse will have, too, to XXXIII and XXXIV.

10    THE COURT:  Why?

11    MR. GIRARD:  Because it is an attempt to find right now

12  that there isn't enough water for any further uses, and that

13  anybody that starts using it is going to be subject to some

14  kind of a burden to come in and prove that they can't use

15  their land.

16    I think that the kind of a finding that ought to be

17  used in here was agreed to, and I think suggested by Mr.

18  Sachse and Mr. Veeder in the past as to Sandia Creek.  Mr.

19  Sachse's was supposed to meet the same purpose, and what that

20  said, in essence, was that the --

21    THE COURT:  That there probably would be trouble in the

22  future.

23    MR. GIRARD:  That there may be trouble in the future,

24  that the amount of irrigable land exceeds -- that the water

25  available is not sufficient to irrigate the total number of

17,258

t-45

1    acres of irrigable lands, and I think that is just as true

2    anywhere on the stream.  But I object to this kind of finding,

3    which would seem to indicate that further development of

4    land is under some type of a burden of proving that there is

5    water there.  I think we have had no evidence at all and no

6    issue as to apportionment.

7        THE COURT:  Suppose we struck out the sentence, "It is

8    found, in that connection, that the water uses . . . exceed

9    the yield . . ."  Suppose we say --

10        MR. GIRARD:  "and the demands for water by landowners of

11   properties which abut upon or are traversed by Sandia Creek

12   far exceed the available supply."

13        Now, Vail, for example has substantial irrigable lands

14   up there, but there is no evidence that they made any demands

15   upon the stream to irrigate those.  There is no evidence --

16        MR. VEEDER:  Do you know what "demands" means?

17        MR. GIRARD:  I know what it means.  It means "asked for."

18        MR. VEEDER:  Oh, no, "demands" as used in water

19   litigation means --

20        MR. GIRARD:  This is just an attempt to put an apportion-

21   ment issue on Tucalota Creek before the issue is there.

22        THE COURT:  Look at the last sentence, though.  If you

23   strike out the word, "however," it says, "under prevailing

24   conditions reduction of those uses through regulation by this

25   Court would not materially increase the quantities of water

17,259

t-46

1   which would flow down to . . . Ground Water Area . . ."

2       MR. GIRARD:  All right.  Let's look at that,and let's

3   say you have a change in conditions, and that Vail starts

4   using some water, and we don't have a prevailing condition.

5       Does that mean that the conditions are changed, and now

6   you are going to regulate it?

7       MR. VEEDER:  No.

8       MR. GIRARD:  You are saying that under prevailing

9   conditions we are not going to regulate it.  Well, the issue

10  of regulation isn't even before this Court now.

11      THE COURT:  I would prefer, if it can be done without

12  taking a lot of time, to put a caveat in something like we

13  have in Sandia.

14      MR. GIRARD:  I would like to write one exactly like we

15  have in Sandia.

16      THE COURT:  Do we have Sandia here?

17      MR. VEEDER:  Well, your Honor, could I do this:  If we

18  have to rewrite these, I would like to work over some language

19  for that XXXIII, and tender it to you.

20      THE COURT:  When?

21      MR. VEEDER:  Well, as soon as I can, which would be

22  Monday.  I will work on the language, and I will send you a

23  copy of it.

24      MR. STAHLMAN:  Will you be here Monday?

25      MR. VEEDER:  No.

t-47

1    THE COURT:  We are not making any apportionment.

2    MR. VEEDER:  No, we are not asking for it.

3    THE COURT:  I want some caveat here where people who are

4    on this watershed, and who get copies of these findings, will

5    realize what the situation is.  I don't think, as a practical

6    matter, that you are ever going to get very much water out of

7    Tucalota Creek except in times of flow.

8    MR. VEEDER:  I think that is true, and I put in that

9    language at the end to show that, from the standpoint of the

10   United States of America, when we look at Warm Springs,

11   Tucalota, and the upper areas of Santa Gertrudis, it would not

12   make any sense to regulate them, certainly, under the

13   conditions that prevail.

14   THE COURT:  Well, you can both take a crack at it and

15   spend some time on it.  Both of you can write something out

16   on it.

17   MR. GIRARD:  All right.

18   THE COURT:  And I will take one or the other, and I will

19   indicate that it is XXXIII in the Tucalota Findings.

20   MR. VEEDER:  What about XXXIV now?

21   THE COURT:  It comes in in the same category.

22   MR. GIRARD:  Yes, XXXIII and XXXIV.

23   MR. VEEDER:  All right.

24   THE COURT:  Yes, XXXIII and XXXIV.

25   I have only one other suggestion.  In XXXVII you are

t-48

1   going to find that these people have, or you are proposing to

2   find that these people have prescriptive rights?

3      MR. VEEDER:  Mr. Krieger is very hostile to that

4   language that I used there.

5      MR. GIRARD:  I am, too, because I don't think that there

6   is any evidence that these storages were open, notorious,

7   hostile or adverse, and may not have been used on riparian

8   land.  They may have, but I don't think there is any proof

9   on it.

10      MR. VEEDER:  I think if you went out and read the

11   transcript of the testimony of Boral, and what Ceas has said,

12   and what the evidence would show, and their pleadings --

13      MR. GIRARD:  Pleadings are not evidence.

14      MR. VEEDER:  Just a minute.  The people have filed

15   Pleadings in which they are claiming some interests in these

16   impoundments, and as counsel for the United States, I can't

17   turn my back on all of those things.

18      I admit that the happy thing to do would be just to say

19   they don't have any, and then we would not have anything to

20   worry about, but Occidental College has a big operation there.

21      MR. GIRARD:  Occidental College did not put in a

22   scintilla of evidence here.

23      MR. VEEDER:  All right, but I have told your Honor, and

24   I am telling the State of California that I am not going to

25   ask for a default judgment against anybody.

t-49

THE COURT:   I am not either.

MR. STAHLMAN:   But you are asking for a judgment in their favor.

THE COURT:   But I am not happy about finding a prescriptive or an appropriative right unless it is pretty clear.

MR. GIRARD: That is right.   Gibbon and Cottle, Knox, and Oviatt have come in and have worked hard, and counsel spent days of time to try to establish one, and lost.   Now, somebody comes in and   you say to give them one.

MR. VEEDER:   Don't blame me.   All I am doing is doing what I think is right.   I think if these people have been making some use of water, they are entitled to some kind of a benefit from it.   And I find that the new purchasers of Occidental College have lawyers, and that they are Hammock and Pugh.

THE COURT:   Where did you find out all of these things? They are not on the record.

MR. VEEDER:   Because I got on the phone, and did it directly, your Honor.   I called Mr. Sachse's office and found out who has the property, and who their lawyers are, and I am sending them notice.

MR. STAHLMAN:   And you know who Vail's lawyers are.

THE COURT:   I should say this off the record.

(Statement off the record.)

L-3

1    MR. GIRARD:  There is one fellow here who even has a

2    filing with the State.

3        MR. VEEDER:  Who is that?

4        MR. GIRARD:  Boral has a petition for an appropriative

5    right.

*72W/6  NW of SW (Pending) dated 2/10/50 (Par. 397-Upper Murrieta area)*

6        MR. VEEDER:  Who?

7        MR. GIRARD:  Boral.

8        MR. VEEDER:  Boral's has been abandoned.

9        MR. GIRARD:  It has never been held to be abandoned.

10       MR. VEEDER:  All I am trying to do is to protect the

11   taxpayers.

12       THE COURT:  Now, wait, wait.  We don't know what

13   Occidental has got, and we have asked them to come down and

14   make some showing.  Did the Colonel make the soil surveys?

15       MR. VEEDER:  We have the soil surveys.

16       THE COURT:  Do we have that in evidence?

17       MR. VEEDER:  No, it is not in evidence.  I would like

18   to put it in at our next hearing.

19       MR. GIRARD:  I think all the soil surveys are made.  I

20   don't think the Colonel ever discussed any legal results.  He

21   just says there is a storage reservoir of ten acre feet,

22   which is used to irrigate land, or whatever it is used for.

23       MR. VEEDER:  I have done all that I can do, and I have

24   tendered the detailed rights to the use of water, and I think

25   they would be hurt if we give them nothing at all.

1      MR. GIRARD:  I haven't any objection to giving it to

2  them if they prove it.

3      THE COURT:  Now, all of you quiet down.  Have you asked

4  the Occidental lawyers to be here?

5      MR. VEEDER:  I haven't called them yet.  I have just

6  found out who they are.  I will call them for the next hearing,

7  your Honor.  I called Mr. Sachse's office and that is what

8  I said to Mr. Girard.

9      THE COURT:  Does your report show how this reservoir is

10  used, Colonel?

11      COLONEL BOWEN:  Yes sir.  The report shows the uses to

12  be either domestic, or irrigation, or both.

13      THE COURT:  To create a head to irrigate?

14      COLONEL BOWEN:  Yes sir.

15      THE COURT:  Or is this a seasonal thing, where they save

16  it up from the dry season to the wet?

17      COLONEL BOWEN:  I think the reservoirs up there are

18  primarily used as regulating reservoirs in the irrigation

19  system.

20      THE COURT:  What was this testimony that you speak of,

21  Mr. Veeder, about Ceas?

22      MR. VEEDER:  Ceas says that he has a storage, I think

23  he called it a storage bank or a reservoir for 8,000 gallons

24  of water, and he sets up in his pleadings a claim for the

25  right to store that water, as does Boral.

1        THE COURT:  Don't the facts show that this is also used

2   for irrigation purposes, for a head?

3        MR. VEEDER:  Again, Mr. Girard, I can't laugh at these

4   people because they are small claims.

5        THE COURT:  Talk to me, and don't talk to Mr. Girard.

6   Who represented Ceas?

7        MR. VEEDER:  Mr. Krieger.  And that is why I stated to

8   your Honor when it came up that Mr. Krieger has violent

9   objections to my findings.  He has not told me what they are.

10  I have asked him --

11       THE COURT:  How could Krieger have an objection to this

12  finding as to Ceas?

13       MR. VEEDER:  Your Honor, this is a strange lawsuit, and

14  I can't comprehend why the man would feel that way, but he

15  said he did not want any part of it, and I said, "All right."

16       MR. STAHLMAN:  Maybe he thought he had proof.

17       THE COURT:  All right.  Let's wind this up by saying

18  that you have asked the lawyers for Occidental College to be

19  in here next time, and we will continue the matter to Tuesday,

20  June -- what will it be -- the 21st or the 20th?  The 21st is

21  it?

22       THE CLERK:  June 19th is Monday.  The 21st is Wednesday.

23       THE COURT:  And you have the Occidental Soil report

24  here, and you might advise these lawyers that we are going to

25  put this soil report in whether they are here or not.

1    MR. VEEDER:  I will do that.

2    THE COURT:  And ask Ceas, or rather, ask Krieger to

3    come in in connection with Ceas.  And who represents Boral?

4    MR. VEEDER:  He represents Boral, Krieger does.

5    THE COURT:  And you can tell Krieger, when you talk to

6    him, that I don't propose to find, unless there is convincing

7    proof, that any of these fellows have prescriptive rights.

8    MR. VEEDER:  All right.

9    THE COURT:  And if I don't so find, then I want him to

10   hear the language that we had in other findings, that none

11   of these have been adverse, and there are no prescriptive

12   rights, and if Boral has a filing with the State, it should

13   be listed.

14   MR. GIRARD:  It is in evidence.

15   MR. VEEDER:  I have checked on it, though, and they tell

16   me that it is not current.

17   MR. GIRARD:  I understand he is going to abandon  it,

18   but it is still pending on the records of the State.

19   THE COURT:  It should be listed.

20   MR. VEEDER:  I think Boral said that it was abandoned,

21   but let's check.

22   Now, this is at ten o'clock on June 20th your Honor?

23   THE COURT:  Yes.  I don't know how much time I will have

24   for you then.  I may sit you down to work on this among your-

25   selves.

1       MR. VEEDER:   That suits me, your Honor, if we can sit

2 down and work on these, and let's get along like we did this

3 afternoon.

4       MR. GIRARD:   Oh, we didn't get along too bad.

5       THE COURT:   Now, I went over Mr. Girard's stab at Anza

6 Valley.   Have you looked it over?

17,268

t-50
L4

1    MR. VEEDER:  I have looked it over, your Honor, but I

2  can't agree with a lot of it, and he tells me he wants to re-

3  write it.

4    MR. GIRARD:  I want to rewrite one finding, your Honor.

5  I think I am wrong.  I think I gave the Forest Service more

6  than they are entitled to.  I put them in the category, as

7  you will note in there, with Indians, and I may be wrong.

8    THE COURT:  Mr. Veeder, in the Anza Valley matter, will

9  you want two exhibits, one where you list owners, and one

10  where you list the data concerning wells, and that?

11    MR. VEEDER:  Yes, your Honor.

12    MR. GIRARD:  I did send those, incidentally, to the

13  attorney for them, and also suggested that he check them

14  over with Dr. Mann, and I haven't heard a word from him.

15    THE COURT:  Let's spend a little time on this because I

16  personally think these are in pretty good shape, with a few

17  changes.

18    The first thing I want done is that reference to Exhibit

19  278.  I have a copy of it here, and the finding says that the

20  area of the basement complex is vagrant, percolating water.

21  The exhibit has not been filled out, but I take it the water-

22  shed line runs clear over in here (Indicating).

23    MR. VEEDER:  I think that is correct, your Honor.  It

24  is correct.

25    THE COURT:  It ought to be filled out with those sections.

17,269

t-51

1 Do you follow me on that?  I assume that most of that is

2 basement complex over there?

3     COLONEL BOWEN:  That is correct, your Honor.

4     THE COURT:  But I don't think that there are symbols

5 on the map which show it, and you ought to take our Exhibit

6 278, and complete it with those sections.  Will you do that?

7     COLONEL BOWEN:  Yes, your Honor.

8     THE COURT:  I am going to let Mr. Girard look at my

9 corrections.

10     MR. GIRARD:  All right, your Honor.

11     THE COURT:  And it will save a lot of time.  Do you want

12 to take this?

13     MR. VEEDER:  No, I am going to tender some revisions in

14 them.

15     THE COURT:  In Finding IV, Mr. Girard, on Line 8 -- we

16 are talking now about the Anza ground water body, after 278,

17 the figure "278," I would insert, "upstream of a line

18 approximately the center of Section 29, Township 7 South,

19 Range 3 West, and running to the northwest quarter of Section

20 29.  This line marks the downstream limit of Anza Valley and

21 its ground water body."  I think that is shown on the exhibit

22 in the file and that is in evidence.  I put it on mine, and

23 it was the testimony of the witness, and he put the line down

24 the center right about here (Indicating), and said that marks

25 the downstream limits of the Anza  ground water body.  I am

17,270

t-52

1    talking about this line right here (Indicating).

2        MR. GIRARD:  That is a slanted line that he used some-

3    where.  Yes, that is what Dr. Mann drew, and that line was

4    drawn in the record as showing where the basement lip is.

5        THE COURT:  Now, you have some errors in description.

6    On page 2, Line 22, it should be the southeasterly border of

7    17.

8        MR. GIRARD:  The southeasterly --

9        THE COURT:  Border of 17.

10       MR. GIRARD:  Instead of what, your Honor?

11       THE COURT:  Instead of the northwesterly half.

12       MR. GIRARD:  The southeasterly border.  Yes, I find that.

13       THE COURT:  Then I think you should insert after "17,"

14   "the northeast quarter of Section 28."

15       Then down at the bottom of Page 3, I prefer to find that

16   the deep aquifers extend southerly --

17       MR. GIRARD:  Into those sections?

18       THE COURT:  Into the northwest quarter of Section 27.

19       MR. VEEDER:  That is on the Coahuila Indian Reservation?

20       MR. GIRARD:  Yes.

21       THE COURT:  That is the northwest quarter of Section 27,

22   and we have already taken care of 28 on the other side.

23       MR. GIRARD:  All right.  28 would be deleted, then,

24   wouldn't it?

25       THE COURT:  Then down at Page 4, at the end of 11, I think

17,271

t-53

1   the evidence shows not only that the elevation of this water

2   in the deep aquifers is lower than the lip between the

3   Santa Margarita watershed and the desert watershed, but I

4   would also be prepared to find it is lower than the bedrock

5   bench marking the downstream limits in Anza Valley, as

6   described in Finding VII.

7   MR. GIRARD:  That would be Section 29, wouldn't it?

8   THE COURT:  I don't think that water in the deep aquifers

9   could ever get out of that Valley.

10   MR. VEEDER:  I am going to have to fight about that.

11   MR. GIRARD:  It is in evidence, Bill.

12   THE COURT:  On Page 4, Line 28, instead of "west quarter"

13   it should be "northwest quarter."  You can check them again.

14   On Line 27 of the same page, it should be "north half,"

15   instead of "northwest half," -- "north half."

16   MR. GIRARD:  All right.

17   THE COURT:  On Page 5, Line 2, I think it should be

18   "The northwest quarter" instead of "west quarter," again.

19   On Line 4, the water moves "in a southwesterly direction"

20   instead of "westerly."

21   On Line 19, I think it is "northwesterly," as contrasted

22   to "southeasterly."

23   I made a note also that you should put in an exhibit

24   number for these summaries, like you did in Tucalota.  Wasn't

25   it Tucalota?  Yes.

17,272

t-54

1      Tucalota is where he has one exhibit for the names and

2  description, and another exhibit for the summaries of wells.

3      MR. VEEDER:  That is now being prepared.

4      MR. GIRARD:  Yes, that is right.

5      THE COURT:  I have some others here, and you can look

6  these over.

7      Now, in Conclusion 11, I think you  should make it clear

8  that the owners of the land over the deep aquifers have

9  correlative rights with other owners using the deep aquifers,

10  and no others.

11      MR. GIRARD:  All right.

12      THE COURT:  Then you can send me back my set, and I will

13  let you use this.

14      MR. GIRARD:  All right.

15      THE COURT:  I will also let you use my map, and you may

16  withdraw for the purposes of your work Exhibit 278.

17      MR. GIRARD:  I did ask Dr. Mann to check me out very

18  carefully on the section numbers because I do not have any

19  confidence in my ability along that line, but I haven't heard

20  from him yet.

21      MR. VEEDER:  May I put in some of the letters that have

22  just come in, in Exhibit 207-E, your Honor?

23      THE COURT:  Yes, they may be included.

24                          (The documents referred to were )
                            (attached to and made a part of )
25                          (Plaintiff's Exhibit 207-E.     )

MARIE G. ZELLNER, OFFICIAL REPORTER

17,273

t 55

1    THE COURT:  When were you going to make your suggestions

2    and criticisms of Mr. Girard's findings?  You apparently are

3    not happy about them at all.

4        MR. VEEDER:  I am not.

5        THE COURT:  What are you disgruntled about?  The findings

6    as to the deep aquifers?

7        MR. VEEDER:  Yes, in part, and also in part I think I

8    would like to make a little more definite description of some

9    of the water uses down there that are in the evidence.

10   Frankly, I want to review them entirely, though, and I will

11   have them for you as fast as I can.

12       I can't -- your Honor has been too many years in this

13   business so you know I can't just skip across these.

14       THE COURT:  Can't you lay aside some of these other

15   cases of yours and get yourself a boy to take care of the

16   others, and devote yourself to this case?

17       MR. VEEDER:  Your Honor, I give you one hundred per cent,

18   and I can assure your Honor I will get this in, and the work

19   will go on.

20       THE COURT:  While you are here, but when you are gone

21   everything stops.

22       MR. VEEDER:  I will see that it moves while I am away,

23   your Honor.  I will get at them, but I do not want the record

24   to appear that I am not bearing my burden in this case.

25       THE COURT:   When will Vail have some findings to submit

17,274

t-56

1     on the Vail Rancho?

2       MR. STAHLMAN:  On the 20th, your Honor.

3       THE COURT:  And before, if you can?

4       MR. STAHLMAN:  Before?  Well, I can have -- well, I don't

5     know.

6       MR. GIRARD:  I think we are preparing to get them all

7     done in one package, your Honor.  We have a lot of them done

8     now.

9       MR. STAHLMAN:  There are a lot of different problems

10    here, your Honor.  We have different filings, and we want to

11    get the Title Company's work, and we have to contact them, and

12    there is a lot of work to be done like that.  It takes time

13    just writing these findings.

14       MR. VEEDER:  May I call to your Honor's attention the

15    findings of fact on Diamond and Domenigoni Valley, which are

16    on your desk?  Do you want to have those lodged, your Honor?

17       I frankly was working with another set.

18       MR. GIRARD:  Do you have a copy for me?

19       MR. VEEDER:  I have a copy made for you.

20       THE COURT:  They were sent to me on February 8, 1961,

21    and counsel have had copies ever since.  Lodge them, Mr.

22    Clerk.

23       MR. GIRARD:  These are the ones you want me to try to

24    work some conclusions out on, your Honor?

25       THE COURT:  Yes.  You can look the findings over again,

17,275

t-57

1  but according to Mr. Sachse's letter they were revised once

2  according to a hearing we had on them, and Mr. Veeder says

3  he has ready a list to go with them, which is what again?

4  Is it in two forms?  (A) owners, and (B) summaries?

5       MR. VEEDER:  That is right.    10:00 o'clock on the

6  20th, your Honor?

7       THE COURT:  Yes.

8

9       (Whereupon, at the hour of 4:10 o'clock p.m., Friday,  )
                                                              )
10      (June 2, 1961, an adjournment was taken until Tuesday, )
                                                              )
11      (June 20, 1961, at 10:00 o'clock a.m.                  )

12

13                         - - -

14

15

16

17

18

19

20

21

22

23

24

25

P 45

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,      )
                               )
                    Plaintiff, )
                               )
vs.                            )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY DISTRICT,)
et al.,                        )
                               )
                    Defendants. )
_____)

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are, and on the date herein involved, to wit:  June 2, 1961, were duly qualified, appointed and acting official reporters of said Court;

That as such official reporters we did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that we did thereafter cause our said shorthand notes to be transcribed, and the within and foregoing 107    pages of typewritten matter constitute a full, true and correct transcript of our said notes.

WITNESS our hand at San Diego, California, this 2nd day of June 1961.

*John Swader*

*Marie B. Zellner*

JOHN SWADER, OFFICIAL REPORTER