VOLUME NO. 137
MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                                        Plaintiff,

        vs.                                                     No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                                        Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Friday, June 23, 1961

Pages:  17,338  to  17,371

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ , DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211 - - Ext. 370

P 1   1        IN THE UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF CALIFORNIA

3            SOUTHERN DIVISION

4                - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                - - -

7   UNITED STATES OF AMERICA,          )
                                       )
8                    Plaintiff,        )
                                       )
9        vs.                           )      No. 1247-SD-C
                                       )
10   FALLBROOK PUBLIC UTILITY          )
     DISTRICT, et al.,                 )
11                                     )
                     Defendants.       )
12   _____)

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            San Diego, California

15            Friday, June 23, 1961

16                - - -

17   APPEARANCES:

18       For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                         Special Assistant to the
19                                       Attorney General

20

21       For the Defendants:

22         Vail Company                 GEORGE STAHLMAN, ESQ.

23         State of California          FRED GIRARD, ESQ.

24

25

P 2

1    SAN DIEGO, CALIFORNIA, Friday, June 23, 1961, 9:30 A.M.

2         (Another matter.)

3         THE CLERK:  4-1247-SD-C United States of America vs.

4    Fallbrook Public Utility District and others.

5         THE COURT:  This final draft had better be dated the

6    23rd instead of the 22nd, because we had one around here

7    yesterday that had the 22nd on it.

8         MR. VEEDER:  We just had one page changed.

9         THE COURT:  I will make it the 23rd  so I will know this

10   is the final.

11        MR. VEEDER:  There is agreement with Mr. Girard and Mr.

12   Stahlman on this form, is there not?

13        MR. GIRARD:  I agree with it.

14        MR. VEEDER:  I am referring to Tucalota Creek Sub-

15   Watershed Interlocutory Judgment No._____A.  What would be

16   the next number?

17        THE COURT:  Tucalota itself would be 31.  This one on

18   the basement complex you figured to use 31-A.

19        MR. VEEDER:  That would be right.

20        THE COURT:  It is not ready even to be lodged yet be-

21   cause you don't have the exhibits.

22        MR. VEEDER:  I have a set of the exhibits on your desk,

23   your Honor.  I will assemble them and then we can lodge it,

24   if you want to sign it today.  As I recall, we originally

25   submitted them to you.

          THE COURT:  Is this what you are talking about (handing

P 4   1   document to Mr. Veeder)?

2        MR. VEEDER:  That is correct.  If I may take the whole

3   thing, I will assemble it.

4        THE COURT:  All right.

5        Now, the balance on Tucalota, I went through the new

6   draft that you prepared.  I take it, Mr. Girard, that you have

7   eliminated these suggestions that you had on the one sheet.

8        MR. GIRARD:  Yes.  Mr. Veeder and I went through his

9   draft.  I presume that is the one you have now.

10        THE COURT:  The draft dated June 22, 1961, Tucalota

11   Creek.

12        MR. GIRARD:  I don't think Mr. Stahlman has the changes

13   that we suggested because we just did them last night.

14        MR. STAHLMAN:  Do you have a new draft of it, Mr. Veeder?

15        THE COURT:  It is not a new draft.  They went through

16   and interlined.  I can step off the bench and let you have my

17   copy to see what they did.  Is that agreeable?

18        MR. STAHLMAN:  Yes.  I have some comments to make on the

19   general situation, when we get through.

20        MR. GIRARD:  I want to look carefully at the various

21   exhibits that are attached before I would indicate general

22   approval.  I am speaking particularly of some of these exhibits

23   -- for example, on Wilson Creek I know we would have objections

24   to the language on them.  I don't know what they are going to

25   have on Tucalota.  I would want to read them.  As I recall,

P 5   1   one of the exhibits on Wilson Creek, on Stardust Ranch,

2   concludes that all their water uses are unreasonable.  We

3   would object strongly to that.  And I want to look at all of

4   them on Tucalota.

5        MR. VEEDER:  Mr. Sachse and I have gone over that.

6        MR. GIRARD:  I know that you and Mr. Sachse have gone

7   over that, but I am sure, Mr. Veeder, that Mr. Sachse didn't

8   agree to a conclusion like that.

9        MR. VEEDER:  He hasn't agreed to it.  That is why I am

10   sending it to you.

11        MR. GIRARD:  That is what I say, I want to see them

12   before I approve them.

13        THE COURT:  Where does this appear?

14        MR. VEEDER:  You see, your Honor, I submitted to you

15   long ago copies of the Wilson Creek findings just tentatively.

16   Mr. Sachse and I, in this courtroom, reviewed the point to

17   which Mr. Girard is now making reference.  When Mr. Sachse

18   gets back, we can put these in final in regard to Stardust.

19   There will be no concern there.

20        MR. GIRARD:  And then there is another problem I have

21   on some of the exhibits insofar as they may pertain to

22   irrigable acreage and water duty.  I want to read them and

23   see exactly what they say before I am going to object to them.

24   But the general language of the findings as proposed by Mr.

25   Veeder, as we went through last night, I don't have any

P 6

1   objection to. But I will want to look at the exhibits that

2   he is going to attach and see how he is approaching them. I

3   don't have those.

4   THE COURT: There are still missing on the draft of June

5   22nd the conclusions of law and the form of interlocutory

6   judgment.

7   MR. GIRARD: Yes.

8   MR. VEEDER: That is correct.

9   MR. GIRARD: I think Mr. Veeder and I both agree that

10   it might be more desirable to get the findings approved

11   before we go into the conclusions.

12   MR. VEEDER: I regret that we departed from Tucalota

13   and went into Wilson Creek at this time.

14   MR. GIRARD: I just call that to your attention as a

15   reason why I want to look at those.

16   MR. VEEDER: Naturally.

17   THE COURT: So that I understand, the Wilson Creek matter

18   will be hooked on to Tucalota?

19   MR. VEEDER: No, the Wilson Creek matter will be made

20   up of part of Anza. There is no reason for this coming up

21   now. I have no comprehension of why it came up. There is

22   certainly no reason for injecting Wilson Creek into Tucalota.

23   THE COURT: Don't get excited about it.

24   MR. VEEDER: There is an important matter in regard to

25   the Anza findings and conclusions of law that I would like

P 7

1    to bring to your attention now, if I could.

2         MR. STAHLMAN:  Are you going to finish Tucalota?  Because

3    I have something to say on that.

4         THE COURT:  What did you do with the draft on the base-

5    ment complex?

6         MR. VEEDER:  31-A you handed to me.

7         THE COURT:  My copy?

8         MR. VEEDER:  Yes.  I was going to put the exhibits on it.

9         THE COURT:  That is right.  That will be my copy, and

10   you will send me the original, too.

11        MR. VEEDER:  That's right.

12        THE COURT:  All right.

13        MR. VEEDER:  Your Honor, if you have no objection to

14   this kind of duplication for signature.

15        THE COURT:  No, not a bit.

16        MR. GIRARD:  I might add that any comment as far as the

17   exhibits are concerned did not pertain to 31-A.

18        MR. VEEDER:  They didn't?

19        MR. GIRARD:  No.  Those exhibits, as I read the language,

20   will be just maps, statement of ownership and descriptions.

21        MR. VEEDER:  That is correct.

22        THE COURT:  Let's take up this Anza Valley problem.

23        MR. VEEDER:  Your Honor, I have put up for your Honor's

24   review the map which would be 211-C, which is the ownership

25   map on Anza and Wilson Creek.  I have put up with it

P 8

1    Hamilton's A.  You will observe and undoubtedly recall the

2    testimony of Dr. Mann in regard to the deeper aquifer in

3    Anza Valley.

4    THE COURT:  Right.

5    MR. VEEDER:  Now Colonel Bowen was requested to prepare

6    an exhibit for the Anza findings reflecting this deeper

7    aquifer.  By reason of the kind and type of testimony that

8    went in, which was most general, and indeed testimony that

9    cannot correlated with Hamilton's A, upon which Dr. Mann

10   depicted this deeper aquifer, we are in the position, at least

11   I am in the position, your Honor, where I would object to

12   any finding in regard to that deeper aquifer by reason of the

13   fact that the evidence simply is too indefinite to establish

14   the source of water, the uses of water and those who are

15   entitled to participate in that deeper aquifer.  I have gone

16   over this matter with Colonel Bowen very thoroughly and he

17   says --

18   Colonel Bowen, are you listening?  I am addressing the

19   Court and I want to be sure the Colonel hears what I am saying.

20   THE COURT:  He is listening.

21   MR. VEEDER:  The impossibility of determining those

22   lands which overlie the deeper aquifer, the parcels which

23   would be entitled to participate in it, has created an impasse

24   insofar as we are concerned.  I would object to a  definite

25   finding on this other than a statement that such a phenomenon

P 9

1    exists.  I would object to any conclusion of law that the

2    waters of this deeper aquifer are not part of the Santa

3    Margarita River Valley and watershed.

4        THE COURT:  I took my copy of Hamilton's A, as Dr. Mann

5    testified, I drew on it -- let me see the original -- what

6    is probably very similar to what is on the original Hamilton

7    A, and I think Mr. Girard's findings reflect my views in the

8    matter.

9        MR. VEEDER:  So far as I am concerned, your Honor, we

10   would of course necessarily object to them, because the

11   Coahuila Indian Reservation is directly and immediately

12   concerned.  I don't think the facts would support a determina-

13   tion of respective rights in the ground waters of the deeper

14   aquifer.

15       THE COURT:  This exhibit Hamilton A does not show wells,

16   but 278 did, and I don't think Dr. Mann marked 278; but

17   translating his diagrams from Hamilton's A to 278, it is

18   apparent that these good producing irrigation wells are the

19   deep wells and that they lie in Section 21, just as marked

20   out by Mr. Mann.  Look at the two exhibits together if you

21   want to see what I am talking about.

22       MR. VEEDER:  I have checked them thoroughly.  I have

23   tabulated the wells that are involved and the data that is

24   presented.  There is absolutely no way of determining whether

25   those wells tap the deeper aquifer.  There is no showing

P 10

1    where the well casings are perforated.  Indeed, one of the

2    principal objections that I would now interpose would be to

3    the effect that when those deep wells pump water out of the

4    deeper aquifer then the water becomes part of the Santa

5    Margarita River system necessarily because it is applied to

6    the shallower aquifer.

7        THE COURT:  Once it is applied, I would go along on that,

8    if you want that finding.

9        MR. VEEDER:  I will tender the kind and type of findings

10   that I think will be supported.  But I wanted to make it clear

11   while we are in court.

12       THE COURT:  We might as well settle some of these things

13   right now.  I am willing to find that once the water is pumped

14   from the deeper aquifer and applied for irrigation uses on

15   the surface, it then becomes part of the stream system.

16       MR. GIRARD:  Factually, I think they could.  But I want

17   to also make it clear that no one who had a right to the

18   stream system would have a right to compel anybody to pump

19   and put that on.  It is like exported water.

20       THE COURT:  I would so conclude and so find.  And I am

21   convinced that Dr. Mann made a proper analysis of it.

22       MR. VEEDER:  I am not saying that there is not such

23   a phenomenon as an ancient channel under there.  I am saying

24   that from the standpoint of those who are entitled to partici-

25   pate in it, the evidence will not support such a finding or

P 11

1   conclusion of law.  Your Honor may disagree, and I would

2   simply interpose an objection to it.

3        THE COURT:  I overrule your objection on that ground.

4        MR. GIRARD:  There is one thing on this deep aquifer that

5   I should point out.  Mr. Veeder and I discussed it at length

6   and I agreed, subject to the Court's approval, to add to page

7   3, Finding VI, "the northwest quarter of Section 27," which

8   would be portions of the Indian land.  Dr. Mann's testimony

9   indicated that it was probable that it went down that far,

10  but he was not certain.

11       THE COURT:  The northwest quarter of Section 27?

12       MR. GIRARD:  That would be inserted right after Section

13  28.

14       THE COURT:  That is agreeable.  I have it shown on my

15  two copies of the exhibit that I made as I heard the testi-

16  mony.  It is shown on Hamilton's A as described by Dr. Mann,

17  that it covers a portion of that northwest quarter.

18       MR. VEEDER:  That is correct.

19       THE COURT:  That is agreed.

20       MR. VEEDER:  I want to say this, that your findings are

21  very advantageous to the Indians.

22       THE COURT:  Not only that, but the Indians also have

23  property in the northeast quarter of 28.

24       MR. VEEDER:  That is correct.

25       THE COURT:  Therefore, in at least a half section they have

P 12

1. access to this deeper aquifer.

2. MR. VEEDER:  That is correct.  There is only one thing

3. I am concerned about, and that is these many small parcels

4. with which I have to deal, and I am interposing those objections

5. and I want the record to show it.

6. THE COURT:  I am willing to go further and say that any

7. time that conditions change, to the extent that deep wells

8. are found in other areas than the area of the deeper aquifer

9. that we know about, that this would be a changed condition

10. on which the Court would be willing to reconsider the findings.

11. MR. GIRARD:  Right.

12. MR. VEEDER:  I think we are getting closer all of the

13. time.

14. THE COURT:  If you want to put that in.  Suppose some-

15. body goes over into the middle of Section 22, which lies east

16. of this alleged deep aquifer, and gets a deep well.  Then we

17. know that this deep aquifer is not confined as Dr. Mann said.

18. It might change the whole picture.

19. MR. GIRARD:  In Finding X I say "It is impossible, due

20. to lack of sufficient information, to determine at this time

21. the exact extent of it."  Maybe we should throw in another

22. paragraph that the Court reserves jurisdiction to re-examine

23. it in the future, in view of the findings.

24. THE COURT:  In view of changed conditions.

25. MR. GIRARD:  Yes.

P 13

1      MR. VEEDER:   I don't want people foreclosed, that's all.

2      MR. GIRARD:   I have no objection to that.

3      MR. VEEDER:   I don't know what it is going to mean from

4  the standpoint of the ultimate conclusions.

5      THE COURT:   I will tell you what it is going to mean from

6  the standpoint of the ultimate conclusions.  I am going to

7  conclude from Dr. Mann's testimony     _, in the absence of

8  further evidence or changed conditions, that on the present

9  state of the record the waters of the deep aquifer aren't

10  part of the stream system.

11      MR. VEEDER:   I think if you will look again on Hamilton's

12  A you will find that Dr. Mann has indicated the sources of

13  the recharge for the deep aquifer is Section 6.  You see one

14  of those smaller loops there.

15      MR. GIRARD:   I think it is 4, 8 and 9.  There are find-

16  ings on it.

17      MR. VEEDER:   4, 5, and 6.

18      MR. GIRARD:   4, 5, 6, 8 and 9.

19      MR. VEEDER:   Section 6 is really outside the watershed

20  of Anza right there, that part of the sub-watershed.  So you

21  have a problem there.  I will show you on that, if you want

22  to see it.

23      THE COURT:   What kind of problem do you have there?  It

24  is part of the Santa Margarita River watershed.

25      MR. VEEDER:   It is part of the Santa Margarita River

P 14

1  watershed.  But this tributary, you will observe, is in

2  Section 6.  Here is the sub-watershed.

3      THE COURT:  Point out Section 6 on that map.

4      MR. VEEDER:  Here is Section 6 right here, your Honor.

5      THE COURT:  And it cuts right across the southeast

6  corner of it?

7      MR. VEEDER:  That is correct, and I believe you will find

8  that the loop is not in the southeast corner.

9      THE COURT:  That is just where the loop is.

10     MR. VEEDER:  I would like to have you check it.  The

11  real problem we have, Colonel Bowen tells me, is that the

12  maps are different scales and they create problems.

13      Isn't that correct, Colonel Bowen?

14     COLONEL BOWEN:  That is correct.

15     THE COURT:  The loop cuts down across the southeast

16  corner of Section 6.  So the loop actually, if you are going

17  to translate it, seems to straddle the line.  However, the

18  loop is shown on Hamilton's A as on both sides of a water

19  course.

20     MR. VEEDER:  A surface stream, which does not come down

21  this way.  It comes off --

22     THE COURT:  The surface stream, you think, lies north

23  of the watershed?

24     MR. VEEDER:  That is what this would indicate.

25     THE COURT:  Suppose that is true.  What flows from it?

P 15

1    MR. VEEDER:  It would seem to me that the question of

2    recharge might be raised.  I am just trying to bring these

3    things to your attention.

4        THE COURT:  Let's follow through.  Suppose that surface

5    stream lies out of the sub-watershed of -- what is this?

6        MR. VEEDER:  This would be Anza and Wilson Creek.

7        THE COURT:  All right.  Suppose that surface stream lies

8    outside of it and flows into Tucalota.  I suppose the next

9    one is Tucalota.

10       MR. VEEDER:  I would have to run it through, your Honor.

11   I don't know.

12       THE COURT:  And suppose the surface water flowing in

13   times of rain enters the ground and charges this deep aquifer,

14   and suppose the water in the deep aquifer flows out of the

15   watershed when the levels are high.  Is there any way in which

16   any party in this watershed could physically change the

17   conditions created by nature and prevent that water from

18   coming down?  He would have no right to go in.

19       MR. VEEDER:  No.

20       THE COURT:  Because this water also charges both the

21   shallow and the deep aquifer, doesn't it?  It charges both

22   of them.  So if somebody came in and with some sort of in-

23   junction to undo what God had done --

24       MR. GIRARD:  He would have to serve Him.

25       THE COURT:  He would have to serve Him, in the first

P 16

1  place, which would be a problem.  It would be like telling

2  the sun to stand still.  This water charges both the shallow

3  aquifer and the deep aquifer.  I can't see that there is any

4  problem there.

5      MR. VEEDER:  I don't know that there are any problems.

6  I am simply referring to some of the problems we are having

7  writing the findings and some of the disagreements we are

8  having.  You have taken care of the biggest problem we have,

9  and that is what we will do with these parcels of land.

10     MR. GIRARD:  I have no objection if Colonel Bowen can

11  draw this up to suit the little property owners, like he did

12  in the Murriet-Temecula, in this general area, because I

13  think it is pretty clear that it is indefinite.  If, in order

14  to describe somebody's land, he has to run it around a quarter

15  section or something, I don't care.

16     THE COURT:  The finding is based on his testimony that

17  the deep well demonstrated a deep aquifer, and we could make

18  a finding that the area had been approximated; that if there

19  were deep wells below -- what was it?

20     MR. GIRARD:  The shallow aquifer was a hundred feet.

21  Anything below that in that area was the deep aquifer.

22     THE COURT:  -- would be considered as penetrating the

23  deep aquifer.

24     MR. GIRARD:  Of course, you could run a well in over

25  here 200 feet down and you wouldn't be tapping the deep aquifer.

P 17   1        MR. VEEDER:  That is one of the problems.  There was no

2        definitive channel.

3        THE COURT:  All right, do it this way:  The Court reserves

4        jurisdiction to alter the area included within the deep aqui-

5        fer and to consider particular cases of wells which may be

6        allowed to penetrate and draw water from the deep aquifer.

7        MR. GIRARD:  I have no objection.

MR. VEEDER:  There may be some day an inter sese struggle over this.

MR. GIRARD:  Dr. Mann's testimony was that he couldn't be certain right now.

THE COURT:  Put in some words like that.

MR. GIRARD:  As I understand it, you approve these generally, but now Mr. Veeder says that he is going to re-write these things.  How are we going to do that?  Is he going to quote from these things that have been approved, or is he going to rewrite these?

THE COURT:  I understood that he wanted to put in descriptions of the stream system.

MR. GIRARD:  I agree with that, and that finding has been drafted.

THE COURT:  Can't the two of you work together?

MR. VEEDER:  I will be here all next week, your Honor.  They will be on your desk as fast as we can get them done.

THE COURT: Subject to minor matters you want to bring up, I have look these over and they look pretty good.  But that doesn't mean that there wouldn't be things that you might want to talk about.

MR. GIRARD:  I have some minor changes.

THE COURT:  The two of you work together.  The language of your interlocutory judgment has to be changed in light of what we are doing.

t-2

1    MR. VEEDER:  And the conclusions have to be changed.

2    THE COURT:  All right, you work together on it and bring

3    your disputes to me.

4    MR. STAHLMAN:  I think we have a situation in connection

5    with the findings on Tucalota as they affect Vail Company

6    that I would like to express briefly to the Court my concern.

7    I am not objecting at this time.  I agree with Mr.

8    Girard as to what he has stated regarding these findings.  I

9    want an opportunity to check them over and to check the

10   exhibits over.

11   But so far as the Vail Company is concerned, the way

12   Mr. Veeder is approaching this matter, he is now coming up

13   with figures as to the irrigable acreage within Tucalota

14   watershed on the Vail Ranch.  That gives me some concern,

15   because I don't know where we are going to stop and start.

16   That has been my objection to drawing the findings on Vail

17   Company to give the irrigable acreages of each of the

18   separate parcels of land which comprise the entire Vail

19   Company, and then making a general finding that insofar as

20   the creeks and tributaries, of which there are many within

21   the boundaries of the Vail Company's properties, that they

22   have riparian rights to those creeks to the extent of the

23   property contained within the watershed line.  If we are

24   going to break that down, we have the first hiatus that he

25   is breaking it down on the basis of a request that he has

t-3

1   recently made to Colonel Bowen to make a determination of

2   the acreage within the subwatersheds.

3       MR. VEEDER:   I have agreed that the Vail Company can be

4   out.

5       MR. STAHLMAN:   Just a minute.   I am drafting my findings

6   on the basis that I want to adopt the findings on these

7   various watersheds.   But if we are going to do it, let's

8   have some indication.   Are we going to do it on Slaughter-

9   house Creek and the various creeks that flow into other

10  watersheds?

11      THE COURT:   I don't know how much work is involved in

12  this and how valuable the result would be in comparison to

13  the work to be done.   But I think probably what Mr. Veeder

14  has in mind -- let's take Tucalota Creek.   A lot of people

15  have irrigable ground in Tucalota, and Vail has irrigable

16  ground in Tucalota.

17      MR. STAHLMAN:   That is right.

18      THE COURT:   Tucalota is a subwatershed.

19      MR. STAHLMAN:   That's right.

20      THE COURT:   In a dispute that would come up on Tucalota,

21  the people in Tucalota, Vail andothers, are not going to be

22  concerned about Warm Springs Creek.

23      MR. STAHLMAN:   I appreciate that.

24      THE COURT: This could be an area in which there could

25  be a dispute.   Whether these findings as to irrigable

1    acreage are going to advance our cause very much, I don't

2    know.  But there might be some value in having in the Court's

3    findings just how much irrigable acreage Vail has.  As a

4    matter of fact, it is hard for me to see how Vail could be

5    hurt, because the immediate result on inspecting those

6    findings would show a large area of irrigable ground owned

7    by Vail.  Here are some other people who have irrigable

8    ground.  Vail, therefore, is a very definite factor in anything

9    you have to do on Tucalota Creek.  And Mr. Veeder has

10   pursued the matter along the line that he wanted some day to

11   be able to catalogue the irrigable ground in this watershed.

12   I have never heard him enlarge upon the reasons for that.

13   One reason might be that the Congress of the United States

14   would determine whether they would secure water from the

15   acqueduct systems, whether they would condemn the Vail Ranch,

16   whether they would condemn some other property to add to

17   their water supply.  They might be interested in knowing

18   what the irrigable acres are, what the charge on this stream

19   could be.  How could Vail be hurt?

20        MR. STAHLMAN:  I am not contending that Vail can be

21   hurt.  But I see this situation.  The irrigable acreage on

22   Vail Company was based on the Coit study and the testimony

23   of Colonel Bowen approving that, and the testimony of Mr.

24   Wilkinson, and at that time we invited a study to be made by

25   -- Colonel Bowen said he would go along with it.  Now, that

study is being made on an entirely different basis than the

Coit report and we may run into conflicts there.

THE COURT:  I would imagine that the Colonel is probably

using the Coit survey along with what he is doing.

MR. STAHLMAN:  I would like to ask him that.

Have you used the Coit survey, Colonel Bowen?

COLONEL BOWEN:  We have made comparisons between our

field work and the Coit survey, yes, your Honor.

THE COURT: And I think when you get done with this you

are going to be in substantial agreement.  I suggest that you

wait until something comes up that you are hurt about.  For

instance, when we had the overall figures there was a ten

per cent spread between the Government figures and Vail's

figures.

MR. STAHLMAN:  No, the Government made no figures.

THE COURT:  Well, the Government then said --

MR. STAHLMAN:  No, Mr. Veeder made some statements.

THE COURT:  The Government said that he thought there

might be a ten per cent error in Coit's figures.  Now, a

ten per cent error in this manner of approximation is not

too bad.  Let's wait until you see.  I know the Colonel will

be glad to show you what he is doing and how he is doing it.

Mr. Wilkinson is familiar with this property.  He can check.

You have the Coit survey available.  Let's wait.

MR. STAHLMAN:  I am not raising any serious objection.

t-6

1   I just want to understand how we are going to do this, and

2   are we going to do this for all of the streams?

3       THE COURT:  That is what they have been doing on all of

4   the streams.  And Vail, of course, overlies a lot of them.  We

5   have been listing the irrigable acreage of other people.

6       MR. VEEDER:  I thought there had been agreement

7   yesterday with Mr. Stahlman that where these disputes arose

8   they will be resolved between Mr. Wilkinson and Colonel

9   Bowen.  I have no desire to participate in it.  They have

10  handled matters that way in the past.  I would like to see

11  it done in the future.  And I don't see any possibility of

12  Vail Company's being hurt.

13      MR. STAHLMAN:  I was not talking about Vail Company

14  being hurt, your Honor.

15      THE COURT:  You want to know what kind of pattern we

16  are going to follow.

17      MR. STAHLMAN:  I want to know what kind of pattern he

18  is going to follow, because I want to write findings on

19  Vail Company and I want to be consistent.

20      THE COURT:  Then I think if you follow this pattern

21  that the Government suggested when you draw your Vail

22  findings, you may call attention, incorporate by reference

23  or refer to other subwatersheds where Vail land is located.

24      MR. GIRARD:  I want to bring up one question.  I think

25  on most of these soil survey reports the United States has

1    introduced -- of course they haven't got one on Vail -- the

2    irrigable acreage in the soil report itself has not been

3    broken up into subwatershed or subtributary streams.   It is

4    purely a question, how long is it going to take to do all

5    this?   Are they going to have to re-evaluate every single

6    property ownership to get these irrigable acreages for each

7    of the minor subwatersheds?   The Government's whole problem

8    and statement has been that they want to know this so that

9    they can know the demand on the stream.   The United States is

10   downstream from Murrieta-Temecula and all land that is

11   irrigable up there is something that they would have to take

12   into consideration as far as their particular use is

13   concerned.   Irrigable acreage, as it would be used in an

14   apportionment, depends so much on who is raising the question.

15   Vail, for example,  as against the United States, could

16   consider all their land that is riparian to Tucalota Creek

17   without the watershed in making an allocation.

18       THE COURT:   You mean all the land upstream of the Gorge?

19       MR. GIRARD:   Yes, all the land upstream of the Gorge.

20   And the only one who has asked for this evidence is the

21   United States -- every other defendant has opposed it -- and

22   as a matter of fact, they are stuck with all the irrigable

23   acreage up there.

24       THE COURT:   We could reserve the right to make you break

25   it down at some later date, if the situation ever arose.

t-8

1    MR. STAHLMAN:  Yes.

2    MR. GIRARD:  We would have to do it.

3    THE COURT:  You have so much to do anyhow.  Why take on

4 this burden at this time?  From the United States' stand-

5 point, everything upstream of the Gorge, we are talking about

6 now, affects the United States.  If you are going to talk

7 about condemning one subwatershed, there is time enough then

8 to make your own calculation as to how much land is involved.

9    MR. STAHLMAN:  That is my point.

10    MR. VEEDER:  Is Vail Company going to have any claim

11 for irrigable acreage in their findings?  Are you making any

12 reference --

13    MR. STAHLMAN:  I merely am going to say that I think

14 a general finding to the effect that the lands in the

15 boundaries of these various creeks are riparian to the

16 creeks.  I can't see any reason, for instance, unless you

17 have a local fight up there, where there would be any

18 necessity for determining the acreage, and conditions might

19 change by that time again.  And why do it/all watersheds when

20 you may only have this fight, if any, on some particular

21 watershed?

22    THE COURT:  Colonel  Bowen , this would be a big job,

23 would it not, to break down in every watershed every piece

24 of ground that straddles a subwatershed?

25    COLONEL BOWEN:  These major subdivisions that we have

17,362

made of the Santa Margarita River watershed, we have already completed that breakdown.  This little parcel of 603 acres that Vail has in Tucalota Creek watershed was merely incorporated with the overall study.

THE COURT:  In other words, you have done all the work now in breaking it down.  Let's take Joe Doakes, who has 40 acres and he straddles a subwatershed line.  That has all been broken down as to how much is in one watershed and how much in the other?

COLONEL BOWEN:  Yes, your Honor.

MR. VEEDER:  Yes.

THE COURT:  And all that remains is this 600 acre parcel in Tucalota on Vail?

COLONEL BOWEN:  It may be riparian to the Temecula or the Santa Gertrudis, but we have completed it all on the Santa Rosa, for example.  Mr. Stahlman mentioned Slaughter-house Creek.  That has already been done.

THE COURT:  Most of the work has been done?

MR. VEEDER:  It is in the evidence, your Honor.

COLONEL BOWEN:  Yes, your Honor.

MR. GIRARD: Cole Canyon?

COLONEL BOWEN:  All of the Santa Rosa is done.

MR. GIRARD:  But is it broken down as to separate watersheds -- Cole, Miller Creeks?  Are they broken down?

COLONEL BOWEN:  We broke the Santa Rosa down into the

De Luz, the Sandia, the portion riparian to or draining into the Murrieta and the portion between the Temecula Gauging Station and the confluence of Sandia with Murrieta Creek.  Those reports are completed and in evidence.

MR. VEEDER:  They were delivered to the Vail Company and the Vail Company should know it.

COLONEL BOWEN:  We have not broken it down below these major sub-units that I have mentioned.

MR. GIRARD:  There is Coahuila and then there is Wilson Creek, in this area.  I take it that the land hasn't been broken down between those within this broad area of Anza-Coahuila Basin, has it?

THE COURT:  Vail doesn't go up into Coahuila.

MR. GIRARD:  No.  The problem is that in order to have anything meaningful , your Honor, you have to do it to everyone.  It doesn't do any good to say that Vail has 600 acres in a watershed unless you do it for everyone else.

THE COURT:  As I understood, the Government was not breaking down every little ravine or, as they say in the south, "run" into a subwatershed.  They were taking, first, starting from the east, the Anza-Wilson Creek subwatershed. Is that right?

MR. VEEDER:  That is correct.

THE COURT:  And then you are taking the Tucalota watershed?

t-11

1 MR. VEEDER:  That is right.  May I say in regard to

2 Tucalota, it just happened that was selected, for reasons

3 I don't know.  Your Honor referred to Tucalota and suggested

4 that findings be prepared on that.  We did that.  But Tucalota

5 itself is part of the subwatershed of the Lower Murrieta and

6 Santa Gertrudis Creek.  There is absolutely no problem.  We

7 would save a great deal of time if Mr. Girard and Mr.

8 Stahlman would acquaint themselves with the record.  These

9 things are in evidence.

10 THE COURT:  All right, you gentlemen talk about it as

11 the first order of business and get fully acquainted as to

12 what is going to be done.  I don't see any necessity to

13 break down each little sub-sub-subwatershed.

14 MR. VEEDER:  It has not been done.

15 MR. STAHLMAN:  Let me ask one question to get the record

16 on this.  Do you intend to do it for creeks that are entirely

17 within Vail property?  For instance, there is an unnamed

18 creek that flows directly into the Murrieta that lies between

19 Temecula and Santa Gertrudis.  It is over five miles long.

20 THE COURT:  I don't suppose they are going to do that.

21 MR. VEEDER:  I thought George was writing the findings.

22 What is he doing?

23 MR. STAHLMAN:  That is what I want to know.  Do I write

24 the findings to break down that watershed?

25 THE COURT:  I don't see any necessity to do that.

17,365

MR. STAHLMAN:  I don't either.

THE COURT:  We have taken some broad areas in this matter. We have taken, for instance, Domenigoni Valley and then followed it on down through Warm Springs, and that is sort of a subwatershed and there will be findings on that.  And I take it from what the Colonel has said that there is a break-down of irrigable land within that watershed.  Then we have taken Tucalota, which is another good sized subwatershed, which eventually goes into Santa Gertrudis, and we are making a separate set of findings on Tucalota and that is broken down.  We are taking Coahuila and Wilson Creek, which is a subwatershed, and breaking that down.

MR. GIRARD:  We have to take evidence on that, of course, to have a record to support the findings.

MR. VEEDER:  On what?

MR. GIRARD:  On the irrigable acreage.

MR. VEEDER:  That is in.

MR. GIRARD:  No, there is no evidence in here as to what the irrigable acreage is.  You merely come out with a figure or the finding and make it a part thereof.

THE COURT:  You talk to Mr. Veeder about this.

MR. VEEDER:  It is in evidence.

THE COURT:  I would guess that the figure is in evidence, but what has been done is that they have merely made a computation of the figures and therefore have the figures.

1    But   don't bother me about it.   Find out how they have done

2    it first.

3         MR. GIRARD:  We object to any of these irrigable

4    acreage figures unless Mr. Veeder says that this is pretty

5    much information only based on present conditions and not

6    intended to bind or affect anyone in the event there is

7    a subsequent attempt to apportion water.

8         MR. STAHLMAN:  As I said before, let Mr. Wilkinson

9    check these figures with Colonel Bowen.

10        THE COURT:  This can be done.  Mr. Veeder is rather

11   abrupt.  He just says, "Here it is."

12        MR. STAHLMAN:  He is worse than abrupt.

13        MR. VEEDER:  At least I know it is in the record, and

14   they don't.

15        THE COURT:  This doesn't mean that you can't talk to

16   Colonel Bowen and satisfy yourself as to how this is being

17   done and that the facts are in the record.

18        The next thing is Mr. Girard's comment.  This is going

19   to be Mr. Sachse's position, too, because Mr. Sachse

20   refused to put on evidence.

21        MR. STAHLMAN:  I would have gone along with him if Mr.

22   Veeder had told us he was going to do this.  But he didn't

23   tell us this.

24        MR. GIRARD:  I don't care if he does it, but I want it

25   clear that they are going to have that kind of finding before

t-14

4

1    I agree to it.

2         MR. VEEDER:  The law of California is that if there is

3    disagreement in regard to riparian acreage at some future

4    date, the Court has continuing jurisdiction to open up the

5    matter and to review it.  That can be done.  Riparian acreage

6    changes daily.

7         MR. STAHLMAN:  We understand that.

8         THE COURT:  If you are going to have that kind of

9    finding that this is subject to re-examination, neither Mr.

10   Girard nor Mr. Sachse are going to complain.

11        MR. VEEDER:  That is certainly the law of California.  I

12   couldn't do otherwise.

13        THE COURT:  Put it in so that they will be happy.

14        MR. VEEDER:  They will not be happy, but I will put it

15   in.

16

17

18

19

20

21

22

23

24

25

P 18

1    MR. GIRARD:  Mr. Veeder's idea of this irrigable acreage

2    is that if it is raised in the future, you have a finding,

3    for example, that Vail has 10,000 acres of irrigable land,

4    Vail has to make a showing that that figure is wrong or

5    someone who doesn't agree with it.

6    MR. VEEDER:  Let's do what your Honor said, and then

7    if he has something to complain about we can come back in

8    and he can complain.

9    MR. GIRARD:  Mr. Veeder takes the position that all these

10   figures are going to be prima facie evidence in case of an

11   apportionment.  That these are prima facie proof against the

12   person who doesn't object.

13   THE COURT:  Why don't we say that?

14   MR. GIRARD:  I don't want to say that, because Mr.

15   Sachse let all of this evidence go in without even cross-

16   examining and even without offering evidence on the basis that

17   it was not going to be used at all for apportionment.

18   THE COURT:  How are you hurt?

19   MR. GIRARD:  Say Vail, for example, who has 20,000 or

20   30,000 acres in the Pauba Grant of irrigable land, wants to

21   go against somebody upstream, one of Mr. Sachse's clients,

22   Stardust.

23   THE COURT:  Why can't we solve that by saying that in a

24   later suit to apportion water, to start with, this will be

25   prima facie unless some other proof is introduced that can be

P 19

1   accepted.  But that if an issue arises, then the burden of

2   proof will be determined at that time, depending on the status

3   of the case, who has the burden of proving it.

4         MR. VEEDER:  Your Honor just stated the California law.

5         MR. GIRARD:  How can you say it is prima facie and then

6   say the burden of proof is going to be determined at a future

7   time?

8         THE COURT:  I say it is prima facie if no issue is raised.

9         MR. GIRARD:  It is prima facie if no issue is raised,

10  but what if somebody raises the issue?

11        THE COURT:  If the issue is raised, then at that time

12  you determine the burden of proof based upon the posture of

13  the case.

14        MR. GIRARD:  Which would be ordinarily the moving party.

15        THE COURT:  The moving party probably would have the

16  burden of proof.

17        MR. VEEDER:  That is the law, no question about it, and

18  it will be reflected in the conclusions.

19        THE COURT:  Why don't you say that.

20        MR. VEEDER:  I said five times I want to put in a con-

21  clusion of law.

22        THE COURT:  Sit down and talk some of these things over

23  among yourselves.  Colonel Bowen, you are again appointed as

24  the arbiter, with the Marine Corps behind you, to keep them

25  in order while they discuss some of these problems.  The first

P 20

1    order of business is to discuss this matter of irrigable

2    acreage and how you are going to do this, and discuss the

3    watershed lines, what has been done and what remains to be

4    done -- these things you discussed with me this morning.

5        MR. GIRARD:  What is the schedule, your Honor.

6        THE COURT:  Continued to Tuesday morning at 9:30 A.M.

7    (Whereupon, at 10:30 a.m. a recess was taken until)

8    (9:30 a.m., Tuesday, June 27, 1961.                    )

9            - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
    vs.                         )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY DISTRICT,)
et al.,                         )
                                )
                Defendants.     )
_____

### CERTIFICATE OF REPORTER

I, John Swader, the undersigned, do hereby certify that I am, and on the date herein involved, to wit:   June 23, 1961 was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above-entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing  34   pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 23rd day of June, 1961.

_John Swader_
Official Reporter