# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                     No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

        Defendants.


## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Tuesday, July 25, 1961

Pages:  17,399 to 17,444

FILED

SEP 24 19⁶²

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ...

By ...

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P 1

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                                  )
                Plaintiff, )
                                  )
    vs.                              )       No. 1247-SD-C
                                    )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
                                    )
                Defendants. )

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, July 25, 1961

- - -

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ. Special Assistant to the Attorney General |
|  | CDR. DONALD W. REDD |
| For the Defendants: |  |
| Vail Company | GEORGE STAHLMAN, ESQ. |
| State of California | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |
| Roripaugh, et al. | BEST, BEST & KRIEGER BY: JAMES KRIEGER, ESQ. |

t-1

SAN DIEGO, CALIFORNIA, TUESDAY, JULY 25, 1961,  2:00 P. M.

- - -

(Another case called.)

THE CLERK:  Number thirteen, 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  Has your Honor had an opportunity to consider the Wilson and Coahuilla Creeks sub-watershed interlocutory judgment?

THE COURT:  Yes, and we approved that language, the 31-A language, but in reading it over again, what we have tried to say we haven't said very well.

MR. VEEDER:  At what line is that, your Honor?

THE COURT:  I went back to 31-A, and the same problem exists in 31-A.  It appears at various places, but the language does not state what we mean in this language:  in connection with the land referred to in Finding IV, which is described particularly in Exhibit C.

It appears in three places.  It appears first in Conclusion of Law I, but it is not as apparent there as it is in Conclusion III, and in the second paragraph of the Judgment.

Let's start with the Judgment, the second paragraph of the Judgment, which would be Lines 26 to 29.  It is a long involved sentence, but the gist of it is that the titles to the rights of the United States and all other parties, and so forth, in and to the surface and ground waters of the River, as

t 2

1   therein indicated, and so forth, shall be and they are

2   forever quieted against any and all adverse claims of the

3   defendants referred to in Finding IV, and who are listed in

4   Exhibit B, and so forth, and then this language comes in,

5   "in connection with the ground waters which underlie the lands

6   described in Exhibit C," and so forth.

7          In other words, we are quieting title there to the

8   rights of the United States and all other parties to the

9   waters of the River, and what we really meant to say, beginning

10  at Line 26 after the words "executors and assigns," striking

11  out the words "in connection with" and putting in, "who have

12  rights in the ground waters which underlie the lands described

13  in Exhibit C of these Findings of Fact . . ."

14      MR. VEEDER:  It would read, then:

15          "who are listed in Exhibit B, their heirs, successors,

16      administrators, executors and assigns, who have rights to

17      ground waters . . ."?

18      THE COURT:  Yes.  If you read it as you have got it, and

19  then read it by substituting "who have rights in the ground

20  waters", you will begin to see what I am talking about.  It is

21  most confusing to read otherwise.

22      Then there should be a semicolon after the words, "Inter-

23  locutory Judgment", to give any sense to it.  That is at

24  Line 27-1/2.

25          Have you read this?
        MR. VEEDER:  Yes.

B fls

Take B

P 2

1   THE COURT:  You see, what we are trying to do in that

2   paragraph is to quiet title to the rights of the United States

3   and all other people who have rights in the river system.

4       MR. VEEDER:  That is right.

5       THE COURT:  And we throw in this language "in connection

6   with the ground waters," and back to Exhibit C of that Paragraph

7   IV.  Then we are all confused, because the ground waters, in

8   Finding IV, Exhibit C, are the vagrant, local, percolating

9   waters.

10      MR. VEEDER:  I would want to have a little more time to

11  re-analyze this, but I think, your Honor, that is what was

12  intended when we discussed this matter.  In other words, here

13  is a man who owns two tracts of land, one of which overlies

14  ground waters and the other of which does not overly ground

15  waters.

16      THE COURT:  This isn't that situation.

17      MR. VEEDER:  I think it is, your Honor.  I think that is

18  why it was written that way to say that the man whose waters

19  are vagrant, local, percolating makes no claim against the

20  United States of America and other parties who have rights  in

21  and to the waters of the stream system.  This is quasi in rem.

22  Therefore, it has to run against the lands.  I believe that is

23  what was intended.  In connection with the Southwest Quarter

24  of Section 34, which is vagrant, local, percolating water, it

25  makes no claim against any of the waters in the Santa Margarita

P 3

1    River system.

2        THE COURT:  This is what we are trying to do.  But we have

3    various paragraphs in which to do it.  Each paragraph has a

4    different purpose.  Paragraph I of the  Judgment -- let's go

5    back to the Judgment -- is a finding that these defendants in

6    Finding IV, Exhibit B, have no right, title or interest in or

7    to the ground waters which feed or support the stream.  Now

8    Paragraph II of the Judgment is to quiet the rights of the

9    United States and other parties claiming rights in the stream

10   system.  Paragraph III is to find that the ground waters are

11   not part of the stream system.  And Paragraph IV is to quiet

12   the title of the rights of the defendants to the local, perco-

13   lating, vagrant waters.  We are all agreed what we are going to

14   do.  The question is, have we done it?

15       MR. VEEDER:  I truly think we have, but I am certainly

16   willing to clarify it in any way your Honor directs.

17       THE COURT:  Let's take a minute and all read the first

18   four paragraphs of the Judgment and see where we are.

19       MR. GIRARD:  Your Honor, maybe it will be of help.  I don't

20   know whether it will or not.  I drafted some quiet title

21   language in regard to the proposed Murrieta findings on vagrant,

22   local, percolating waters.  I didn't follow Mr. Veeder's form,

23   although I think we both accomplished more or less the same

24   result.  I haven't passed these out yet.  Mine is not quite

25   as long.  I think we accomplish the same result, if you want

P 4

1   to refer to these.  Or do you want to work on these?

2       MR. VEEDER:  Before we substitute these, let's see what

3   is the matter with them.

4       THE COURT:  Let's read the four paragraphs to ourselves.

5       MR. VEEDER:  All right.

6       (A pause.)

7       THE COURT:  Let me again point out what I think is awkward.

8   Don't try to follow.  Just let me paraphrase II as it now reads.

9       The rights of the United States in the surface and ground

10  waters of the River are forever quieted against all adverse

11  claims of the defendants referred to in Paragraph IV in

12  connection with the ground waters which underlie the land

13  described in Exhibit C.

14      The rights of the United States and all other parties are

15  forever quieted against the adverse claims of the defendants

16  in connection with the ground waters.  I don't think this makes

17  sense.  I think what we meant to say there is:  The rights of

18  the United States and all other parties in the stream system

19  are forever quieted against the adverse claims of the defendants,

20  strike "in connection with" and say "who have rights in the

21  ground waters described in Exhibit C." And then after the semi-

22  colon it is not so bad:  and those defendants in connection

23  with the ground waters (whatever that means) are forever re-

24  strained from asserting rights to the stream.  It would read

25  better:  and those defendants who have rights in the ground

P 5

1    waters are forever restrained from asserting rights to the

2    River.

3        MR. VEEDER:  But your Honor -- I don't intend to argue

4    with your Honor -- but I think we are at the point where we

5    are distinguishing between surface runoff, over which you will

6    have continued jurisdiction, and we are severing and separating

7    in connection with those lands claimed rights to the use of

8    the vagrant, local, percolating waters.  It may be that we could

9    improve the language, but that is what we attempted to do.

10       THE COURT:  That is what we are trying to do.

11       MR. VEEDER:  Yes.

12       THE COURT:  Tell me what this means:  The rights of the

13   United States are forever quieted against the claims of the

14   defendants referred to/Finding V in connection with the ground
                             in

15   waters underlying the lands described in Exhibit C.

16       MR. VEEDER:  I will be glad to change it in any way.

17       THE COURT:  What does it mean?

18       MR. VEEDER:  It means that in regard to the claimed rights

19   to the use of the vagrant, local, percolating waters, if any,

20   in connection with those properties, there will never be any

21   claims against the rights of the United States or any other

22   party.

23       In other words, as I see it, we are approaching this

24   matter -- as I said, this is a quasi in rem matter -- and we

25

P 6

1   quieting title against a particular interest in a particular

2   piece of real property.

3       In other words, there will never be a claim made against

4   the River by anyone whose ground water falls in the category

5   to which we have just made reference.  That is what that means,

6   in my view, and that is certainly what we intended.  Because

7   we are leaving the rights to the surface waters subject to

8   your jurisdiction.  But in regard to those vagrant waters there

9   will never be any claimed right against anything in the Santa

10   Margarita River.

11       To me it is clear, but I will certainly change it and

12   write it any way you want it.

13       THE COURT:  Isn't what we are doing quieting the rights

14   of the United States and other parties who have rights in the

15   River against these defendants who have rights in the ground

16   water which is vagrant, local, percolating?

17       MR. VEEDER:  We are quieting title one against the other.

18   That is what we are doing.

19       THE COURT:  Not in this paragraph.  In this paragraph we

20   are quieting title of the United States and other persons who

21   have an interest in the stream system against these defendants

22   in IV.  And you have to read IV because IV is a paragraph that

23   talks about the land in which the waters are only vagrant,

24   local, percolating.

25       MR. VEEDER:  That is right.  In other words, in Paragraph

17,407

P 7

1    IV, in the exhibit which is attached, we have the lands

2    described as the Southwest Quarter of Section 34. The owner

3    of those lands has vagrant, local, percolating waters. The

4    United States' claims against any of that water are quieted.

5    We can't assert anything against that right.

6        THE COURT: That is not what this paragraph does. That is

7    another paragraph that does that. That is Paragraph IV that

8    does that.

9        MR. VEEDER: That is correct.

10       THE COURT: I am not complaining about IV. I am talking

11   about II. I am talking about the paragraph that quiets the

12   rights of the United States and other persons interested in

13   the stream system.

14       MR. VEEDER: I comprehend it, your Honor. This simply

15   says "in connection with the ground waters which underlie those

16   lands there will be no claims against the United States or any

17   other party."

18       MR. KRIEGER: Are there any ground waters which underlie

19   those lands which are not vagrant, local, percolating?

20       MR. VEEDER: There are not supposed to be.

21       MR. KRIEGER: Then why do you have the finding in No. II?

22   Because you are quieting title to certain ground waters which

23   underlie the lands.

24       MR. VEEDER: What else would you do?

25       MR. KRIEGER: You are not quieting the title of the United

P 8

1     States as to the vagrant, local, percolating ground waters, and

2     you are saying that those are the ground waters.  Isn't that

3     the confusion that we have?

4         THE COURT:  Yes, I am suggesting to try it for size that

5     on line 25½ you strike "in connection with" and write it "who

6     have rights in".

7         MR. SACHSE:  That does it.

8         THE COURT:  And on line 27½ put a semicolon after

9     "Interlocutory Judgment" and proceed with the sentence "and

10     those defendants" -- strike "in connection with" -- "who have

11     rights in the ground waters . . "

12         Do you want to work on it over the evening and see what

13     you can come up with?

14         MR. VEEDER:  I would like to, your Honor.

15         MR. GIRARD:  Yes, your Honor.

16         MR. VEEDER:  I would like to take some time on it.

17         THE COURT:  That is the only thing I see in it.  And I

18     didn't see it when I read this before.  Mr. Veeder says that

19     we have a quiet title action.  It operates in  personam as well

20     as in rem.  But essentially it operates in rem.

21         MR. VEEDER:  That is right.

22         THE COURT:  What we are trying to do is to quiet title

23     of the people who have rights in the stream system against

24     persons who don't have rights in the stream system and I

25     suppose against land which is not part of the stream system.

p 9

1   MR. VEEDER:  That is what is meant by "in connection with

2   the ground waters."

3   THE COURT:  And vice versa, we are quieting title of those

4   persons who have rights in the vagrant waters to that water

5   against persons who claim rights in the stream system and I

6   suppose land in the stream system.

7   MR. STAHLMAN:  There was language used in the Sandia

8   findings.

9   MR. SACHSE:  The same thing was included in Fallbrook

10  Creek and the others.  I think it was shorter than this.

11  MR. VEEDER:  No, Franz.

12  MR. SACHSE:  Yes.

13  MR. GIRARD:  I think we are both trying to accomplish what

14  Mr. Veeder has, and I think we can work it out tonight.

15  THE COURT:  Let's study it over.

16  In that connection, again, let me point out where this

17  confusion appears -- at least in my mind.  I am talking now

18  about Wilson and Coahuilla.  And it would also apply in 31-A.

19  On page 3, the first conclusion of law, that language

20  "in connection with lands . . " doesn't seem to me to add any-

21  thing.  It looks to me like that almost could go out.  It

22  appears again in Conclusion of Law No. III, at line 14, and,

23  in my opinion, again could be corrected by saying "who have

24  rights to" in lieu of the words "in connection with," or you

25  might even eliminate it entirely in III.  Then when you come

P 10

1   to the Judgment it appears only in the Paragraph II that we have

2   been talking about.

3        That is the only thing that I saw about them that bothered

4   me.

5        MR. VEEDER:  I am anxious to get it straightened out,

6   your Honor.  I will confer with the other counsel on it.  I

7   think everybody knows what we are shooting for.

C fls.

t-3
c

1    THE COURT:  What is the  next thing we are to talk about?

2    MR. VEEDER:  The next thing, your Honor, that has come

3    up, and we have conferred about it, was your Honor's proposal

4    which was submitted to all counsel in your memorandum dated

5    July 5, 1961.

6    Do you have a copy of that?

7    THE COURT:  Yes, sir.

8    MR. VEEDER:  We have Paragraphs 18-A and 18-B included.

9    THE COURT:  Or did I lend it to you?

10   MR. GIRARD:  I have an extra copy, your Honor.

11   MR. VEEDER:  I will give you this copy here, and I can

12   get another copy for myself.  This is a reproduced copy, your

13   Honor.

14   MR. GIRARD:  I might add, your Honor, that I had drafted

15   up some findings of fact and conclusions of law pertaining to

16   Tucalota Creek, wherein I took Mr. Veeder's Tucalota Creek

17   Findings and your suggested comments and worked them into one

18   set of findings.  I don't know how accurate they are.  I think

19   Colonel Bowen has pointed out some factual aspects wherein both

20   you and I are wrong, in referring to basement complex lip, and

21   so forth.

22   THE COURT:  All right.

23   MR. GIRARD:  But I think before we consider the propriety

24   of the particular language there, we first more or less have

25   to discuss whether it is agreeable to reach the result which

t-4

1    you suggested, which in effect, as I understand it, treats the

2    areas of stringers of younger alluvium   essentially the same

3    as basement complex.

4      THE COURT:  No, that is one of the errors I made

5    originally and which I retreated from, because in the draft I

6    sent out I proposed to find that the waters in the stringers

7    are a part of the stream system, and although I originally

8    suggested those changes to go out in the proposed Findings and

9    Judgment, I think now they should be found to be a part of the

10    stream system, and I would find that there is no problem

11    either now or in the future as to any apportionment.

12      MR. GIRARD:  Then, as a practical matter, insofar as

13    these ground waters in these areas of younger alluvium are

14    concerned which are a part of the stream, there would be no

15    future limitation on their use for reasonable and beneficial

16    purposes, as a matter of law, except inter sese, among

17    themselves.

18      THE COURT:  There are just three or four things we have to

19    discuss.  First, is it factually correct from the evidence we

20    have in the record that there could not now or in the future

21    be any apportionment as to this water?

22      Secondly, should we accordingly cut the knot, and say,

23    "Fine"?

24      Thirdly, how should we draw them?

25      And then there is probably a fourth issue that fits in

t-5

1    there, and that is:  Is this an advisory judgment, or could we

2    so find on the record today?

3         Now, all we have here, and when we discussed this

4    informally, here was my thinking on it:  The Government brought

5    this quiet title action and spent a lot of money on it, and

6    caused a lot of other people to spend a lot of money on it,

7    and what is going to come out of it?  A finding that the Vail

8    Company is riparian?  Everybody knew that to start with.

9         Does that mean that some people have riparian rights in

10   this stream?  If that is all that is going to come out of it,

11   it does not mean a thing.  But what is going to come out of it

12   so far is the fact that the people in the basement complex, we

13   hope, are going to be removed from further litigation in the

14   case.

15        There has already resulted a finding and an interlocutory

16   judgment that the former State Court stipulated judgment is

17   ineffective, and, for the life of me, I can't see, as Court or

18   counsel, what we can do to justify all the work we have put in

19   here unless we come up with something.

20        Now, we have found, and I have followed the Government's

21   suggestion as to these ground water bodies in Temecula,

22   Murrieta and Aguanga.  They are definitely the waters or a

23   major portion of the waters in the water resources of the

24   stream system, plus the runoff.

25        Then we come down to these little stringers of alluvium

t-6

upstream. Now, what have we got? Presently we are in a dry year, a very dry year. Could anybody seriously contend that the people on the overlying land over these stringers in this kind of a year should be required to curtail their pumping in order that water would come down to the Vail Ranch overlying a big part of a water body, or to the Government with basins in the lower Santa Margarita, with still great amounts of water?

The answer is no. It is just inconceivable.

But what happens in a wet year? In a wet year these small basins, if you want to call them that, these stringers fill up with water, and the rest of the water goes on by. In a wet year you are not going to have a situation where there is going to be apportionment. There is enough irrigable ground up there so that with a reasonable use a lot of these people in a wet or dry year are going to be entitled to use all the water they can get out of these little areas.

If that is the case, why don't we cut them out of the case right now, and say they are not now or in the future going to be in an apportionment?

MR. GIRARD: I drafted my findings to accomplish exactly that, your Honor, and it is my opinion that as a practical matter and as an equitable matter, maybe that ought to be done, but if there is going to be any objection, I question whether it would be proper to say, as a matter of law, that in the

t 7

future you are never going to have any regulation or any apportionment of those waters.

I am perfectly willing as a practical matter to say that, but I don't know, in the light of the position which we took in arguing the stipulated judgment, where one of our arguments was that where you are considering overlying land or riparian land a judgment can never be res judicata because it is always subject to change, that is, whether it is correct to say now, based on our present knowledge, that conditions will be such in the future that they will never change.

Now, as I say, if all counsel are agreed that this is the practical way to do it, and I agree to that, I certainly think we should do it, but I think if one counsel were to object to this and say that you can't say now that there will never be facts upon which an apportionment can be based, I think we are leaving ourselves open quite unquestionably to a difficult question to be faced in the future should somebody decide not to accept the judgment of the Court.

THE COURT:  Is this conceivable --

MR. GIRARD:  So I think it might be theoretically wrong.

THE COURT:  -- that you could conceive of a major geological change where the valleys would tip over and where the water, instead of being up in Murrieta would be all up in Anza?  I could conceive of something like that, but other than that I can't think of anything that might happen.

t-8

1    MR. GIRARD:  As I read this, your Honor, and maybe I am

2    sounding like I am arguing with your Honor, but I am not, your

3    Honor, I am for it, but we are saying now that to the extent

4    that waters in these findings -- or, it is suggested that to

5    the extent that waters are used on lands overlying these

6    areas of younger alluvium for reasonable and beneficial purposes,

7    there will never be an apportionment to get water to people

8    downstream.

9        Now, this is awfully far-fetched, but suppose we get a

10   year where the whole area goes into domestic use except up

11   there, and let's say that right at Santa Gertrudis you have

12   a lot of domestic users.  Then in these areas under your

13   judgment they would have a permissive use of these waters for

14   irrigation.

15       Now, under California law quite possibly irrigation uses

16   might have to be cut down to supply the domestic use because

17   it is held to have priority.

18       I think that is extremely far-fetched, and I don't think

19   it would ever occur, but you can think of factual situations

20   which might occur, and I only point this out to say that if

21   there is going to be objection from counsel on this, I am a

22   little concerned about it.

23       MR. KRIEGER:  May I speak to that for just a moment, your

24   Honor?

25       THE COURT:  Yes.

t-9

1     MR. KRIEGER:  I think the situation which Mr. Girard

2 speaks about does not really focus upon the issue.  I think

3 the issue is how much of the water that comes down on the

4 surface is going to be used to recharge these little pockets

5 of alluvium.  I don't care whether you have a large irrigation

6 supply or a large domestic supply in the first place, or

7 whether you have a geological shift, the only waters you could

8 get for those purposes in any event would be from the pumping

9 in this younger alluvium, and I think the crux of the

10 suggestion that you made, your Honor, is that whatever water

11 is involved here that goes to recharge those basins in wet

12 years -- in dry years you don't have it -- in wet years is so

13 little that that net recharge, when measured against the right

14 that the overlying owners would have to participate, in any

15 event is so slight as to come within the definition of those

16 cases which say that you can exclude those waters which do not

17 materially affect the people down below.

18     So I am all for your suggestion, and I think it will

19 simplify the case enormously, and what is more, I think if we

20 keep these people out of the case, we have fewer people to

21 share in the bulk of the water that is left for adjudication,

22 and subsequently, when we do come to an apportionment.

23     THE COURT:  Let's hear the view of all of counsel on this.

24 Mr. Stahlman?

25     MR. STAHLMAN:  Your Honor, our position is simply this:  I

t-10

1    look at this as a factual matter.  I went to Mr. Wilkinson, who

2    has all of the records of the Vail Company, and has knowledge

3    of the lands upstream from us, and we cannot see or conceive

4    of any situation wherein in the future Vail might be affected.

5        In other words, as a practical matter I think we are

6    willing to go along with your Honor's suggestion.

7        THE COURT:  Mr. Sachse, have you had a chance to look it

8    over?

9        MR. SACHSE:  Yes, your Honor, and while I think it is a

10    wonderful idea, with these people in the lawsuit, I don't

11    think you can do it, and I don't for this very simple reason:

12    Your Honor's proposed Interlocutory Judgment says -- and I

13    will not go through all of it, but just a part of it, that the

14    rights of the riparian owners in Tucalota Creek and its

15    tributaries in and to the ground waters in the areas of younger

16    alluvium shall be and they are forever quieted.

17        Your Honor, if that is a stream, if those ground waters

18    are in a stream, you have no right  whatsoever to forever quiet

19    the right of a riparian upstream owner against the claim of a

20    riparian downsteam.  Now, you can't do it.

21        THE COURT:  Now, this is directed to some of the language

22    which I used.

23        MR. SACHSE:  Yes, your Honor.

24        THE COURT:  And I am just feeling around for some way to

25    accomplish a result.  The first question is can we accomplish

t-11

1  the result, and the next question is how we do it?

2      MR. SACHSE:  Your Honor, I think that the practical

3  result can be accomplished without attempting to forever by an

4  order, a res  judicata order, throw these people out of the

5  lawsuit.  I think you can.

6      I think Mr. Girard is going farther than you did in his

7  draft.  He has taken many, many more words to say that never in

8  the future can anyone inquire into the use of ground water by

9  these people.

10     Now, if they are riparians, and if this is a stream, and

11  these waters are a part of the stream, any downstream user can

12  inquire into it, and there isn't anything we can do about it.

13  He has that right.

14     I don't have the draft here before me, but in the original

15  draft which I first prepared when your Honor asked me to look

16  into the matter of the so-called stringers of younger alluvium,

17  I had some language to the effect that all ground water found

18  within the area of the saturated younger alluvium was a part of

19  the stream, and the use of such ground water was forever within

20  the jurisdiction of this Court, but that the ground water out-

21  side the areas of the saturated younger alluvium was forever

22  excluded, and so on.

23     We had some discussion here with your Honor on how to

24  word it practically  because many times wells are pumped in the

25  younger alluvium that go clear to the material below.

17,420

1     I offered this suggestion, that if a landowner scooped

2 out a large sump, let us say, way below the younger alluvium

3 and attempted to use that as a well, I believed your Honor

4 would have jurisdiction to stop him from doing it.  But if,

5 on the other hand. he had a one hundred foot well punched down

6 through ten feet of younger alluvium, your Honor might not

7 have jurisdiction, and I offered the proposal that the line of

8 demarkation be the line of younger alluvium.  That is the

9 proposal which I made way back in 1957, when your Honor asked

10 us to delineate what areas we thought should be in and should

11 be out of this case.

12     I don't think there is any other practical way for your

13 Honor to face up to this problem of determining riparian rights,

14 and if we say that that the younger alluvium is a part of the

15 stream. then it is forever in this lawsuit.  It has got to be,

16 and I think it would be clearly reversible error to enter a

17 judgment which, on the one hand, would find a man was a part

18 of the stream, and, on the other hand, say that he can never

19 be restricted in his use, because the two are not consistent.

20     Now, I hope we can work out a way to accomplish your

21 Honor's purpose, but I don't think we can by saying that they

22 are forever out of this lawsuit.

23     MR. KRIEGER:  May I respond to that, your Honor?

24     THE COURT:  Yes.

25     MR. KRIEGER:  We have chatted about this at some length

t-13

D fls

1   this morning, your Honor, and in what Mr. Sachse is saying he

2   is using the terms interchangeably here of riparian right and

3   overlying right over a ground water basin.  I don't think the

4   two are interchangeable at all.

5       Your language and Mr. Girard's language is very careful

6   to say that if you have riparian rights, it is the right to

7   use the surface flow, and these people are kept in the lawsuit,

8   and there is no quarrel about that.

Take D

P 11

1    What we are trying to eliminate are not those people, but

2    we are trying to eliminate those people on the side of the

3    stream who are in these tiny pockets of alluvium for the sake of

4    simplifying this lawsuit to accomplish something.  Therefore,

5    by leaving your riparian people in the suit you reserve the

6    jurisdiction that Mr. Sachse is so anxious about, and I think

7    that protects you.  I think you could exclude the other people

8    because, by very definition, they are not taking out of the

9    surface waters of these streams -- they are not doing that.

10   You have prevented them from doing that in many ways.  They

11   are taking from these non-surface sources and hence you have

12   the right to treat those people, in effect, very much like the

13   basement complex and the weathered complex people and say that

14   the waters, while part of the stream system, don't materially

15   contribute to it.

16       MR. STAHLMAN:  May I ask, Mr. Krieger, whether your

17   suggestion would include making a definition of the stream

18   system as including the stringers of younger alluvium that

19   follow the channel of the stream as part of the stream?  The

20   underground water that percolates therein is part of the stream;

21   is that it?

22       MR. KRIEGER:  Yes, I don't think we have that definition.

23   I think we have a big broad definition here in Murrieta-Temecula,

24   for example, that all of those percolating waters do contribute

25   to the stream system, but they are not the surface stream and

P 12

1   hence do not come under the narrow rules of riparian right

2   that Mr. Sachse is worried about.

3        THE COURT:  Mr. Veeder.

4        MR. VEEDER:  Your Honor, I feel this way, that in Findings

5   XLIII, XLIV and XLV --

6        THE COURT:  Of what document?

7        MR. VEEDER:  Of the findings which were prepared for

8   Tucalota, and the copies of which were delivered to your Honor.

9        THE COURT:  This is the document dated July 24th?

10       MR. VEEDER:  No, June 30, 1961 is the copy that was de-

11  livered to your Honor and to everyone else.

12       THE COURT:  What is this document on my desk?  Is this

13  yours?

14       MR. GIRARD:  That is the one I prepared, more or less

15  along with your suggested solution.

16       What page, Mr. Veeder?

17       MR. VEEDER:  Page 17, XLIII, XLIV and XLV, "Future Demands

18  For Water In Tucalota Subwatershed."

19       Now there we have attempted to be as factual as possible.

20  In other words, we recognize that when related to the supply

21  the demands from the subwatershed are of great magnitude.  We

22  say that due to that present large demand the riparian and over-

23  lying rights are illusory.  We point out, however, that during

24  the winter and shortly after periods of precipitation there is

25  contribution to the stream and certainly to the benefit of all

P 13

1    downstream owners.  Then we say that there has been no request

2    for apportionment in the Tucalota Subwatershed and under the

3    conditions that prevail we see no reason for an apportionment.

4         Now, I think that your Honor talked to Mr. Ramsey Clark,

5    the Assistant Attorney General, in Dallas, on this point, did

6    he not?   I know I talked to Mr. Clark about the matter.

7         THE COURT:  No, I didn't get a chance to.

8         MR. VEEDER:  Oh, didn't you?

9         THE COURT:  I have no recollection of discussing it in

10   any detail.

11        MR. VEEDER:  I was for a short time in Washington.  I

12   talked to him about it.  I pointed out this language and stated

13   that the net result of your proposal would be to say that while

14   there would be --

15        Let me start again.  That what you are saying is that

16   there would never be the right of anyone under any circumstance

17   below the point of confluence of Tucalota Creek or at least

18   where it enters  the Temecula --

19        THE COURT:  Below the northerly edge of the ground water

20   bodies.

21        MR. VEEDER:  All right.  That in that area there would

22   never be the right to request an apportionment.

23        I realize the technical aspect of this objection, but I

24   truly believe that    you would be restricting the injunctive

25   relief that anyone would have even though he might not be able

P 14

1   to enforce it.  I think for that reason we are inviting an

2   unnecessary difficulty.

3       Now I would turn your Honor's attention from Tucalota

4   Creek for a moment to Wilson Creek, to Coahuilla Creek, to

5   Temecula Creek.  And if you were to apply the same principles

6   there I think that there would be great difficulty encountered.

7   I think that there would be a more serious objection from the

8   United States.

9       But I really can't believe that we are accomplishing any-

10  thing by your proposal.

11      Mr. Krieger likes to say that these people would all be

12  out of the watershed.  That is a great comment at a schoolhouse

13  where you are talking to a whole group of people and saying

14  "You are all out of this lawsuit."  But your Honor has repeated-

15  ly said, and necessarily so, that you are going to retain juris-

16  diction in regard to surface runoff.  I don't know where you

17  are going to separate surface runoff and the ground waters --

18  I am not quite sure.  I think this, that you get the net result,

19  without the technical objection, by adopting substantially the

20  language that we have tendered on page 17.  That is our view.

21      I will say this, that if you direct me to I will take the

22  matter up again with Mr. Clark and if he will direct my activi-

23  ties I would necessarily do so.  You might want to talk to

24  him on the telephone.  I don't to be an obstructionist in this.

25  I think we are well on the way to accomplishing a

P 15

1   completion of this lawsuit.  I think this is a technicality

2   that is really not worth the struggle that could be involved

3   in it.

4      MR. GIRARD:  That is the point I wanted to ask Mr. Veeder.

5   I think he is correct when he says that what would be affected

6   would be a theoretical right, unwarranted probably.  But I

7   would like to know whether or not there is an objection by the

8   Government to this particular result.  As far as I am concerned,

9   I think basically it may be, as Mr. Sachse pointed out, a little

10  legally unsound, but I have no objection to it and I am agreea-

11  ble to it if all other counsel are.  I think it is an excellent

12  way to dispose of the matter practically, but I don't want to

13  be in a position of having someone object to it if we do it

14  this way.

15     MR. KRIEGER:  May I make one further comment along this

16  line.

17     I think Mr. Veeder in his Finding No. XLIV really states

18  the very fact that you stated that the waters of Tucalota Creek

19  make no material contribution to the stream system.  My view

20  of the law is that once you come to that finding -- that is on

21  page 17 of Mr. Veeder's proposed findings, your Honor -- once

22  you come to that conclusion, I think you have laid the founda-

23  tion for excluding these people.

24     Mr. Veeder speaks somewhat facetiously of this being good

25  talk at a schoolhouse.  Let me point out that this cuts so much

P 16

1   deeper than that.  Our whole aim here has been to get these

2   people out of the lawsuit insofar as possible where it would

3   not affect the rights of the United States or anyone else, and

4   in the second place for their own property values.

5       This is a matter, your Honor, of somebody coming into a

6   lawyer's office and he has on his title report showing that

7   the United States retains jurisdiction over all surface and

8   ground waters underlying this land, and he says to you or the

9   purchaser says, "What will this do to the value of the land?"

10  Well, you would have to tell that person that "You are under

11  the constant possibility of being brought back into Court, not

12  for surface runoff because you can say that that is not any

13  real possibility at all, but because somebody in the United

14  States might claim that the ground water right that you were

15  exercising through a well on your own property would be detri-

16  mental to the United States."  So there is a tremendous advant-

17  age here, if it can be equalized in the Court's mind, to get

18  rid of these people.  It will do them a great deal of good, and

19  I am inclined to think, by Mr. Veeder's own finding, it will do

20  the United States no harm.

21      THE COURT:  I have never discussed this with Colonel Bowen

22  in detail -- I think he has heard me talk about this -- and I

23  don't know anyone who has made a more thorough investigation

24  of this stream, certainly from a practical standpoint, and I

25  would like to ask the Colonel whether he can conceive of

P 17

1  possibilities where downstream owners could go upstream from

2  the edges of the ground water bodies and seek to limit use up-

3  stream for the benefit of these people downstream.

4      I take it you have given some thought to this problem,

5  have you, Colonel Bowen?

6      COLONEL BOWEN:  Yes, sir, I have.

7      THE COURT:  I would like to have your view on it.

8      COLONEL BOWEN:  Well, specifically, Tucalota Creek, your

9  Honor, even following the driest year of record, the winter just

10  preceding, there is some water discharging below these little

11  valleys along Tucalota Creek, and certainly as regards the

12  owners along that creek there could be some benefit by re-

13  stricting the use of water of an upstream owner -- might benefit

14  the adjacent downstream owner.  However, from the standpoint

15  of either the Vail Ranch, and certainly the United States, I

16  would say that no amount of regulation today along Tucalota

17  Creek would add one drop of water to the amount that reaches

18  us today or in the next few months.

19      THE COURT:  What about a wet year?  Can you conceive of

20  seeking regulation in a wet year for the benefit of the persons

21  within the ground water bodies we have defined downstream?

22      COLONEL BOWEN:  I can conceive it as against the owners

23  of land along Tucalota Creek, your Honor.

24      THE COURT:  You mean inter se, between themselves?

25      COLONEL BOWEN:  Yes, your Honor.

P 18

1　　THE COURT:  That I have excluded, because that could happen

2　anywhere no matter how small the amount of water.  Anywhere

3　along the stream you could have an inter se dispute and some

4　adjustment of it.  But in a wet year can you conceive of any

5　possibility of apportioning the use of water upstream from the

6　edges of the ground water areas as being practical from what

7　you know of this watershed?

8　　COLONEL BOWEN:  In order to benefit land owners of property

9　overlying the ground water area?

10　　THE COURT:  Or downstream?

11　　COLONEL BOWEN:  Or downstream?  I can see no benefit that

12　would accrue to those owners of land overlying the ground water

13　basin or below by attempting regulation of the ground water

14　area in a wet year.

15　　THE COURT:  Let's put it another way.  Suppose you were an

16　owner of land within one of the ground water areas or you were

17　a riparian owner down on the Santa Margarita River at or near

18　where the Government has land.  From what you know of this

19　watershed, wouldn't you be practically willing to kiss goodbye

20　to any rights to insist on an apportionment from these upstream

21　owners to benefit you?

22　　COLONEL BOWEN:  Yes, your Honor.

23　　MR. GIRARD:  By the "ground water area" you mean Murrieta-

24　Temecula ground water area?

25　　COLONEL BOWEN:  Murrieta-Temecula ground water area.

P 19

1    THE COURT: And Aguanga?

2    COLONEL BOWEN: Yes, sir.

3    THE COURT: Do you see any difference between the Tucalota

4  stream upstream from the ground water boundary and Wilson and

5  Coahuila stream or Temecula upstream?   Is there any difference,

6  in your opinion, as to those?

7    COLONEL BOWEN: No, there is no difference, in my opinion,

8  physically.  There is some difference in size, but the physical

9  situation is similar in each of those streams up above the

10  ground water area.

11    THE COURT: Do we have in the record, Colonel Bowen and

12  also counsel, do we have in the record the area of the amount

13  of acre feet of  these smaller basins of younger alluvium up-

14  stream as we talk about it?

15    MR. STAHLMAN: The State put in an exhibit.

16    MR. SACHSE: The United States had one, and Bulletin 57

17  has two sets of calculations.

18    MR. STAHLMAN: I think it is Exhibit 17.  Let me look.

19    THE COURT: Then if I understand you right, Colonel Bowen,

20  the resources to which the United States can look on this stream

21  system, are, essentially, the surface flow and the ground water

22  areas as we are demarking them in our whole findings?

23    COLONEL BOWEN: Yes, your Honor.

24    THE COURT: Mr. Swing, is there something you wanted to

25  present to the Court, or are you just here as a spectator today?

P 20

1    MR. SWING:  I am here in the capacity of absorbing as much

2    of this information as I can, your Honor.  It is very interest-

3    ing.

4        MR. SACHSE:  Your Honor, I hope nobody has misunderstood

5    me.  I think your Honor's purpose is one I am in complete

6    accord with, and if everybody in this case would say we want

7    this result and there will be no appeal on this basis I would

8    say go ahead and fire.  But I think there is fundamental error

9    in the way you are doing it.  That is my fear.  It is my fear

10   of future consequences.

11       MR. KRIEGER:  To rebut that, I can say I have no fear of

12   it.  I think we can have some cases supporting that, if it

13   would help.

14       MR. STAHLMAN:  Exhibit 18, your Honor.  But there is

15   another exhibit, and I don't know the number.  I think it was

16   compiled from State figures.

17       THE COURT:  This one outside of Oak Grove, they just don't

18   know.

19       MR. STAHLMAN:  That is the Government's exhibit.  There

20   was a State exhibit.

21       THE COURT:  The only one here that is upstream of the

22   ground water bodies that we are talking about is Oak Grove

23   Valley.  Is that upstream of Aguanga?

24       MR. STAHLMAN:  Yes, that is.  There are only two of them

25   in which I think they figured the capacity.  The State I think

P 20

1  figured more.

2  THE COURT:  I don't see anything on this exhibit that tells

3  what that letter A means.

4  MR. WILKINSON:  Here is one showing some of the basins

5  (showing a document to the Court).

6  THE COURT:  Mr. Veeder, I found my copy here.  Here is the

7  one you lent me.

8  Anybody any further suggestions on this matter?

9  MR. VEEDER:  How far would your Honor consider applying

10  this principle that you have tendered here?  Would you apply

11  it to the entire watershed?  For example, the overlying rights

12  in Anza Valley would be forever free from apportionment by Vail

13  Company or by anyone else?

E fls.  14

15

16

17

18

19

20

21

22

23

24

25

t-14
E

1    THE COURT:  Yes, that is my general thought.

2    MR. VEEDER:  In other words, my Indians up there would

3 never have to worry about apportionment of water downstream.

4    MR. SACHSE:  Except inter sese.

5    MR. VEEDER:  I am talking about below the tip of

6 Coahuilla Creek.

7    THE COURT:  I am no engineer, gentlemen, but all of us

8 have become semi-experts from studying this watershed, and my

9 view of this matter essentially is just exactly what Colonel

10 Bowen has stated.  I think most of us will honestly admit that

11 this is just about the situation.  Now, the question is, what

12 can we legally do  and what should we do in the matter?

13    I have looked at Mr. Girard's proposals here, and Mr.

14 Veeder's go a long way towards what we are talking about.

15    MR. VEEDER:  I haven't quarreled with your Honor.

16    THE COURT:  I know, and maybe I should not be so sensitive

17 about worrying about these little people, but there are a lot

18 of them in here, and just as Mr. Krieger says, someone will

19 come to them who wants to buy their property, and they say,

20 "What about this lawsuit?"  Then the lawyer would have to

21 honestly tell them, or the broker would have to honestly tell

22 them , "You are still a part of this lawsuit.  There is a

23 little piece of ground here that overlies a piece of younger

24 alluvium, and the Court has retained jurisdiction to apportion

25 your rights to water sometime in the future."

t-15

1    This is just a sad situation to happen, because I think

2    that if any one of us were asked how much we would wager as to

3    whether there could ever be an apportionment reaching upstream

4    past the lines of the ground water body that we are talking

5    about we would all be willing to put up a bet of one hundred

6    to one, or one thousand to one that this could never happen,

7    taking into account the amount of irrigable land and the amount

8    of water available.  We have seen a dry season, and we can

9    well imagine what will happen, or we have had evidence of what

10   happens in a wet season when the basins fill up and the water

11   runs over.

12       So I am thinking about it from the standpoint of what can

13   we do with these little people.  We have brought them into

14   the lawsuit, we have harassed them by serving them with papers,

15   and notices, and all.  You should see some of the letters that

16   I get from persons writing me and saying, "It does not make

17   any personal difference to me.  The Government is going to take

18   all my water, and I sold my property a year ago, and I want to

19   get out of this thing," and so forth.

20       This is a sad situation.  I don't feel so sorry about the

21   Vail Company, with the immense holdings that they have.  And

22   the United States can finance itself in litigation, and where

23   a number of clients have been able to get together, they have

24   been able to get representation through Mr. Krieger and Mr.

25   Sachse.  But there have been a lot of these people that have

t-16

1  not been able to be represented, and their interest is

2  dependent upon what the Court is going to do. and their question

3  is, "Is it going to protect our interests?"

4      Now, I don't want to draw an obviously illegal judgment,

5  but I would like to be realistic about this, and I would like

6  to say, for the benefit of the Marine Corps, "If you are

7  looking at your water resources here, gentlemen, it is the

8  surface flow of this watershed, and it is the big ground water

9  bodies that you look to.  Don't fool yourselves about the

10  thousands of acres of irrigable land and the little stringers

11  upstream, because you are never going to get any water out of

12  that."

13      MR. SACHSE:  Your Honor, if you said just that, if you

14  said, "Under the conditions that I have tried this lawsuit,

15  any use upstream of these groundwater bodies  is so small that

16  it is deminimus and it can't be hurt in any apportionment,"--

17  in the absence of some considerable affirmative showing that

18  it isn't deminimus, haven't you done it?

19      MR. VEEDER:  I think you would have it, and I tried to

20  write it that way, your Honor.

21      MR. SACHSE:  Saying that as of today it is deminimus,

22  that the uses of these people is so small that it is deminimus,

23  but I don't think you can say that it never again shall be

24  subject to apportionment.  That is the whole thing.

25      MR. KRIEGER:  I don't think that reaches it, your Honor.

17,436

t-17

1   I think that puts you back in the lawsuit along with everybody

2   else for all purposes, and I think that is exactly why you

3   asked Colonel Bowen the question you did, "Not now, but in the

4   future can you conceive of any uses?"  And he said he could not.

5       THE COURT:  Yes, but Mr. Sachse has a point.  How are you

6   going to say this?  Here is one last ditch thing we could do:

7   We could make such legal findings as would hold water presently,

8   and then I could just merely express some opinions, in  sort

9   of opinion language in these findings about what I presently

10  think of the future, which might be of some value to these

11  people.

12      MR. GIRARD:  You could also dismiss these people from

13  this lawsuit with the express finding that it is not res

14  judicata to any future attempt by someone to bring them in.

15      MR. SACHSE:  Now, if your Honor please, if you will

16  recall, way back in 1957 I drew a little picture, and I have

17  it here, as to how I think this should be done, and that this

18  would fall within three categories:  The ones who were forever

19  in, the ones who were forever out in a res judicata judgment,

20  and the ones who were out in a non-suit.

21      At that time I even drew a sketch, a simplified diagram-

22  matic presentation, and the non-suit would leave this case open

23  forevermore in the future for anyone who felt that, "Now, I

24  can make sufficient proof to bring them in." and file a new

25  action, but it would let them out of the case today.

t-18

1    I know Mr. Krieger remembers that, and I know Mr. Girard

2    does, and I have a note here, and I can even show you the

3    sketch.

4         MR. GIRARD:  I would not go for a non-suit, your Honor.

5         THE COURT:  That runs afoul of the fact that we do have

6    to keep jurisdiction of the surface waters of the stream.

7         MR. SACHSE:  Can't you say it is deminimus today?  I

8    mean, can't you say, on the basis of Colonel Bowen's statement,

9    on the case presented by the plaintiff herein, there is no

10   showing that the upper reaches of Tucalota Creek can have any

11   effect on this lawsuit?  Can you go that far?

12        MR. VEEDER:  No.

13        MR. GIRARD:  No, not on the surface flow.

14        THE COURT:  The surface flow in the winter is --

15        MR. SACHSE:  Well, I don't urge that, Bill.  I just threw

16   that out as a question.  Can't you non-suit them as to all

17   ground waters?

18        MR. VEEDER:  Why can't you do what we propose?  Colonel

19   Bowen and I went over the statement I made to your Honor, and

20   we are going as far, frankly, as I am permitted to go.  I

21   don't want to stop this or hold this up any more, but I think

22   I have outlined as liberal a position as we can have, and I

23   have said, "Here is our position."

24        THE COURT:  Is that what you have written up in here?  Is

25   that what you are talking about as your statement?

t-19

1        MR. VEEDER:  That is right.  I am anxious to move along

2   on each one of these tributaries.  I was in Camp Pendleton, and

3   we have done a great amount of work towards the culmination

4   of this lawsuit.

5        I would have to go back and straighten this language out

6   and get approval of what you have proposed, because I don't

7   think I have the authority now.  I would just as soon sit down

8   and work with Mr. Girard for the rest of the day, and in the

9   morning see if we can't get something up where we are in

10  complete agreement.

11       THE COURT:  Let's do this:  We are not making too much

12  progress here now.  Let's lay out the alternatives that we

13  have.  There is one alternative, and that is, give and take a

14  little bit, what you have proposed.

15       MR. VEEDER:  That is right.

16       THE COURT:  A second alternative is what Mr. Sachse has

17  suggested, and I suggest that you folks consider it.  We can't

18  have a dismissal of them and still retain jurisdiction of the

19  surface flow.

20       MR. GIRARD:  No.

21       THE COURT:  Now, as I say, I suggest that you consider it.

22  Then Mr. Girard has proposed something which I haven't even

23  had a chance to read yet, and, finally, there is --

24       MR. GIRARD:  I think mine goes a little bit further than

25  yours does, your Honor.

t-20

1    MR. SACHSE:  Your Honor, may I inquire:  If these people

2    abut the surface stream, they are not going to get out under

3    your theory either, are they?  Mr. Krieger is not getting a

4    man who abuts on the surface stream out, is he?

5    MR. KRIEGER:  No.

6    MR. SACHSE:  Then why won't my non-suit theory work?

7    Then everybody who abuts the surface stream stays in forever-

8    more, if necessary, but a person who does not physically

9    actually abut the surface stream, who is only extracting ground

10   water for his use of water, as to him we simply say, "The

11   plaintiff has not proved he is a part of the stream system,

12   and we are dismissing him."

13   THE COURT:  That is why we should explore the theory.

14   There would be a considerable area of ground that was overlying

15   but yet not riparian.

16   MR. SACHSE: That is what I am talking about, and that

17   comes under the non-suit, I take it.  That is what my original

18   proposal was, and, as I say, I drew the sketch with the sample

19   landownerships.

20   MR. KRIEGER:  Just keep this in mind, though, Mr. Sachse,

21   that if you non-suit these people, you are just opening the

22   door to more lawsuits, that is all.

23   MR. SACHSE:  Do you think anybody is going to sue them?

24   MR. KRIEGER:  Why, of course.  We have gone through a lot

25   of time, through months and days of hearings here, and it seems

t-21

1   to me that you have to come up with some substantial findings,

2   and if the case will support this theory, that no material

3   contribution can be sustained, and I think if we can get some

4   authority on that, then I think they ought to be taken out by

5   an express finding and a conclusion of law and a judgment,

6   and not be left hanging in the air to be brought in by a

7   subsequent lawsuit.

8       MR. VEEDER:  Mr. Krieger, are you now asserting the

9   theory that they can be dismissed in regard to surface water?

10      MR. KRIEGER:  Oh, no.

11      THE COURT:  He is not talking about that.

12      MR. KRIEGER:  We are not talking about that.

13      THE COURT:  He is talking about a judgment.

14      MR. VEEDER:  When Mr. Krieger says that they are out of

15  the lawsuit, I don't believe that is a correct statement or a

16  realistic statement.

17      MR. KRIEGER:  Bill, when I say they are out of the lawsuit,

18  I mean that I want my people who own these lands to be able

19  to put down a well and grow something on the land they bought,

20  without fearing that the United States is going to come in

21  here under a contempt proceeding and put them in jail.  That

22  is the thing I am trying to avoid, and nothing else.

23      THE COURT:  If we adjourn now, you can talk some more

24  about what you want to do about it, and it will give me a

25  chance to do some reading.

17,441

t-22

1      Are there other matters that you want to bring up this

2      afternoon or tomorrow?

3          MR. VEEDER:  At this juncture, your Honor, I may say that

4      Mr. Girard has directed a letter to your Honor.  That letter

5      is dated July 20, 1961 in regard to the memorandum which we

6      filed on June 30, 1961.

7          Have you had an opportunity to go over that?

8          THE COURT:  I have read the letter, yes.

9          MR. VEEDER:  That is the only other matter I had in mind

10     for this afternoon, as to what you wanted to do about it.

11     Mr. Girard presented to your Honor ∧eight questions, as I see

12     it.  Is that correct?

13         MR. GIRARD:  I don't know.  I submitted several questions

14     there.

15         THE COURT:  Let me suggest that you brief this before we

16     go into this problem.  There are some pretty good points

17     raised there by Mr. Girard, and they will require a little

18     attention in a brief, I believe.

19         MR. VEEDER:  If you direct me to file a memorandum, I will

20     do that, your Honor.  That is the only thing I am asking now.

21         MR. SACHSE:  Your Honor, I want to study what Mr. Girard

22     has presented.  This is a brand new theory, and I would not be

23     prepared to argue it tomorrow.  I have some thoughts on it, but

24     it seems to me that under your Honor's own pre-trial order it

25     is Mr. Veeder's responsibility to tell us, as counsel, exactly

t-23

what he is asking; that he shall tell us what he seeks to
appropriate, how much, what his priority date is, and so on,
and until he does that, I don't think we can answer, or can
attempt to argue the question.   But when he tells us in so
many words the source of his appropriation, the date of his
appropriation, the purpose of his appropriation, and the amount
of his appropriation, then we can perhaps intelligently
consider the record, and see if there is enough evidence to
support findings to give it to him, and see what the law is.
But if he comes in with a broad general statement that the
United States asserts broad appropriative rights in the water
that is exported, that is of no assistance to me, and I don't
want to come in here to rebut something when I don't know
what his contentions are.

MR. VEEDER:  I am perfectly willing to respond to the
letter, your Honor.

THE COURT:  I agree that I think you should respond.  I
think we should know what we are talking about before we get
into it.

I would suggest that you and Mr. Sachse, Mr. Girard, Mr.
Krieger and Mr. Stahlman should talk together and find out
whether it is the eight points that should be briefed, or
whether there are some additional points.

MR. VEEDER:  That is why I raised the point now, your
Honor.

t-24

THE COURT:  If you want to discuss that among yourselves, you can do that, or if you want to say what your suggestions are tomorrow morning, I will make some order on it.  It certainly cannot be argued at the present.

MR. VEEDER:  I was just seeking directions, your Honor.

THE COURT:  All right.

MR. GIRARD:  Is there any further information about Gibbon and Cottle, by the way?  Have you heard from them?

MR. VEEDER:  No.  I will call them again, your Honor, but I want you to order me to do so.

THE COURT:  I will direct you to call and find out, because I am not going to wait forever for Mr. Stark.

MR. VEEDER:  I will call him this afternoon, your Honor.

THE COURT: Now, do you want to come in tomorrow morning at 9:30?

MR. SACHSE:  That is fine, your Honor.

THE COURT:  Meanwhile you can talk among yourselves a little bit this afternoon and tomorrow morning.

(Whereupon, at 4:00 o'clock p.m., Tuesday, July 25, 1961,) (an adjournment was taken until Wednesday, July 26, 1961,) (at 9:30 o'clock a.m.)

- - -

P 21

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,        )
                                 )
                    Plaintiff,   )
                                 )
        vs.                      )       No. 1247-SD-C
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                                 )
                    Defendants.  )
_____

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are, and on the date herein involved, to wit: July 25, 1961 were duly qualified, appointed and acting official reporters of said Court;

That as such official reporters we did correctly report in shorthand the proceedings had upon the trial of the above-entitled case; and that we did thereafter cause our said shorthand notes to be transcribed, and that the within and foregoing 46 pages of typewritten matter constitute a full, true and correct transcript of our said notes.

Dated at San Diego, California, this 25th day of July, 1961.

_____
Official Reporter

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER