# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Tuesday, August 1, 1961

Pages:     17,474 to 17,506

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1          IN THE UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3                  SOUTHERN DIVISION

4                    - - -

5     HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                    - - -

7   UNITED STATES OF AMERICA,          )

8                      Plaintiff,      )

9        vs.                           )        No. 1247-SD-C

10  FALLBROOK PUBLIC UTILITY           )
    DISTRICT, et al.,                  )

11                                     )

12  _____Defendants._)

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              San Diego, California

15           Tuesday, August 1, 1961

16                    - - -

17  APPEARANCES:

18      For the Plaintiff:          WILLIAM H. VEEDER, ESQ.
                                    Special Asssistant to
19                                  the Attorney General

20                                  CDR. DONALD W. REDD

21      For the Defendants:

22        Vail Company             GEORGE STAHLMAN, ESQ.

23        Fallbrook Public Utility  FRANZ R. SACHSE, ESQ.
          District, et al.,
24

25

17,475

SAN DIEGO, CALIFORNIA, Tuesday, August 1, 1961, 9:30 A.M.

THE CLERK:   1-1247-SD-C United States vs. Fallbrook.

THE COURT:   Did you gentlemen have a chance to look over Sandia Creek, No. 29-A?

MR. SACHSE:   I have, your Honor.

THE COURT:   Anybody any objections to it?

MR. SACHSE:   No objections at all.

MR. STAHLMAN:   None.

THE COURT:   I will sign it and get it out of the way.

MR. SACHSE:   That will be today, then, your Honor?

THE COURT:   Yes.

Amended 31-A has been filed, has it not, Mr. Clerk?

THE CLERK:   Yes, your Honor, and entered.

THE COURT:   And entered.  All right.

What other matters do we have to take up?

MR. VEEDER:   As I understand it, your Honor, there is agreement between Mr. Sachse, Mr. Stahlman and me to proceed today with lodging with you the De Luz Creek vagrant, local, percolating water decree which has been prepared identically with Sandia Creek, and I comprehend that there will be no objection to that if it is in the same form.

THE COURT:   Do you have it already?

MR. VEEDER:   It is just a matter of reproducing it and attaching the exhibits to it, your Honor.  It has been retyped.

1  I will try to have it in your hands this afternoon.

2  THE COURT:  Have counsel seen it?

3  MR. STAHLMAN:  No.

4  MR. VEEDER:  No.  It is in my office, if they want to

5  look at it.

6  THE COURT:  Will you assign a number to that?

7  MR. VEEDER:  That would have, I think, 32 on it.

8  THE CLERK:  Your Honor, 32 will be the next number.

9  MR. VEEDER:  It will be 32-A.

10  THE COURT:  32-A will be De Luz.

11  MR. SACHSE:  Vagrant water.

12  MR. VEEDER:  That is right.  And as I explained to counsel,

13  we are simply adopting Mr. Cranston's findings in regard to

14  riparian and overlying rights in that sub-watershed, so that

15  those lands which are included in the De Luz Creek Interlocutory

16  Judgment would be identical with the findings of Mr. Cranston

17  in regard to that point.

18  THE COURT:  Yes.

19  MR. VEEDER:  I think that we are progressing on these

20  things, your Honor.

21  I have just been reviewing Mr. Girard's 31, which would

22  be the Tucalota Creek.  I didn't get it until very recently,

23  and I want to compare it back against the original that we

24  had submitted to your Honor.  However, that work is progressing.

25  THE COURT:  I went over it hurriedly.  We might spend a

17,477

1    minute or two on it.  I have some suggestions.

2         I understand that Mr. Stark has said that he would be

3    here the 8th?

4         MR. VEEDER:  That is correct.

5         THE COURT:  Ready to go?

6         MR. VEEDER:  That is my understanding.

7         THE COURT:  I wouldn't anticipate that it would take very

8    long, would it?

9         MR. VEEDER:  I have no idea, your Honor.  He said he is

10   going to have in your hands his proposed findings and he wants

11   to be heard on them on the 8th.

12        THE COURT:  That concerns what ranch?

13        MR. VEEDER:  That is the Gibbon and Cottle.

14        THE COURT:  Anything else we can do today, except possibly

15   look over this 31?

16        MR. VEEDER:  I don't think there is, your Honor, really.

17   I think we are working more rapidly out of Court than we are

18   in Court, now that we have the general forms prepared.

19        THE COURT:  I take it that 31, as far as the descriptions

20   of the valleys et cetera is concerned, is the same down to --

21        MR. VEEDER:  No, it is not, your Honor.  And that is one

22   of the things --

23        MR. SACHSE:  Wait a minute.  It is supposed to be.

24        MR. VEEDER:  It is not.

25        MR. SACHSE:  Where?

1      MR. VEEDER:   There are changes in it which I didn't

2  realize.   I had thought that was the case, but there are.

3      MR. SACHSE:   I don't know of any.   If there are, are they

4  in the descriptions?

5      MR. VEEDER:   Yes, there are, and I have necessarily to

6  work with Colonel Bowen's office on those things, and I don't

7  know how extensive the changes are.

8      THE COURT:   You are making those changes.

9      MR. VEEDER:   No, I think Mr. Girard made some changes.

10  I just spot checked it.

11      MR. SACHSE:   Mr. Veeder and I did this job together and,

12  to the best of my knowledge, there is not a mark on it that is

13  any different.

14      MR. VEEDER:   Mr. Sachse, I think the revisions came in

15  at some time after -- I don't know how serious they are -- they

16  came in after the form which I submitted to the Court on June

17  30, 1961.   I didn't realize it until this morning when I began

18  to proof read it back to be sure there was agreement.   There

19  are some changes.

20      MR. SACHSE:   That may well be.   We used the draft of July

21  24, 1961, and we corrected it off of that, the most recent one.

22      THE COURT:   This last draft that was handed to me you had

23  better mark July 31, 1961, when I got it.   Otherwise, we can't

24  identify these drafts.

25      MR. SACHSE:   Yes.

THE COURT:  So that we will all be talking about the same thing.

MR. VEEDER:  If Mr. Sachse and your Honor would look at the last two lines of the July 31st form, you will find "Those lands which overlie"--

THE COURT:  Are you talking about the first page?

MR. VEEDER:  The first page, line 21, "Those lands which overlie said alluvium filled valleys are depicted on U.S.A.Pl's Exhibit 206-C." If you look at the form of June 30, 1961, you will find a difference -- I don't know how big it is or what it means:  "Those lands are disclosed on U.S.A.Pl's Exhibit 206-C attached to these Findings of Fact . ." Until I read those back -- I don't know that there is going to be any objection to these forms, but I know there are changes in the valley, Mr. Sachse, and in regard to the areas of overlying land.

THE COURT:  I don't know how they got in, unless you made them.

MR. VEEDER:  I will tell you how it occurred, your Honor. I think Mr. Girard made a draft, in fact I am sure he did, came into Court, and then he said, "I am going to have to make another draft," and that is how it transpired.

MR. SACHSE:  Mr. Veeder is correct, your Honor. The draft we worked on -- I recognize the typing -- is a State of California draft.  I know it is not intended to be, let us say, any

17,480

1    different in the description. But there are some substantive

2    changes in it, as you well know -- not the descriptions.

3        MR. VEEDER:   I think there are changes throughout the

4    whole thing that have to be proof read back, Franz.

5        THE COURT:   On what page, Mr. Sachse, was it that you

6    started in really making some changes in line with the

7    discussion we had?

8        MR. SACHSE:   On page 6, Paragraph XII, /that is substantially

9    and drastically changed.

10       THE COURT:   Let me start to read it there.

11       MR. VEEDER:   What was the finding number you changed?

12       MR. SACHSE:   XII.

13       And XIII is also changed. The two go together. You have

14   to read them both.

15       And XIV.

16       THE COURT:   Talking about redrafting, the first thing that

17   comes to my mind is where we used the word "ground waters" as

18   we do at line 19, to make it clear what we are talking about

19   I suggest that we put in parenthesis there (except local,

20   vagrant, percolating ground waters dealt with in Judgment 31-A).

21   What do you think about it? You start out "All ground waters

22   within the areas of basins of younger alluvium as depicted on

23   Exhibit A." Exhibit A is a map, I guess.

24       MR. SACHSE:   Yes.

25       MR. VEEDER:   That is correct.

THE COURT:  And of course it would show these areas and I think technically reads all right, because it reads "ground waters within the areas or basins of younger alluvium." Do you think it is necessary or not in there?  If you read it carefully, of course, we talk about "ground waters."

MR. STAHLMAN:  It says in the first sentence ". . all surface waters and flows in Tucalota Creek and its tributaries and all ground waters in the area of basins of younger alluvium."

MR. VEEDER:  You will find further on that 31-A is incorporated into 31 by reference.

MR. SACHSE:  Yes.

THE COURT:  All right.

Do we have any problem on page 7, lines 23 and 24, where we talk about "at the beginning of a water year. . . October 1, the levels of the ground waters within said areas of younger alluvium are usually and customarily exceedingly low," -- here is what I am talking about -- "and in almost all of said areas of younger alluvium, insignificant quantities of water are discharged downstream." It looks as if you are talking about the period at the beginning of the water year.  At the beginning of the water year in many of these areas there is no discharge at all.

MR. SACHSE:  That is what we mean to say, that in almost all those areas only insignificant quantities are discharged. You probably will recall, your Honor, that Colonel Bowen said,

1  in response your Honor's questions last week, that there was

2  some surface flow in most of these streams for a short distance

3  downstream right now.

4      THE COURT: Are you talking, then, of this insignificant

5  discharge in the dry season at the beginning of the water year?

6      MR. SACHSE: Yes. And the next paragraph spells it out

7  that with the rainy season come the large flows.

8      THE COURT: All right.

9      On page 8 at lines 23 and 24 "from using all of the ground

10  waters contained in said areas of younger alluvium on overlying

11  riparian lands . . "  Should that be "overlying --

12      MR. VEEDER: " . . and riparian lands".

13      THE COURT: " . . and riparian lands"?

14      MR. SACHSE: Your Honor, before a correction is made --

15  let's see if I can find the exact spot where this comes in

16  later -- there is a finding in here somewhere to the effect

17  that in these small areas of younger alluvium, in these narrow

18  stringers or whatnot, the underground waters are also the

19  waters of the stream and that it constitutes a single source

20  -- in other words, that they are riparian waters.  I just want

21  to be sure, if we make a change, that we don't overlook some-

22  thing else.  I am trying to find it.

23      THE COURT: Of course, all this ground is not riparian,

24  is it?  It would be probably in the stringers, but you get

25  into some of these little basins up there, there might be some of

17,483

1  them that aren't strictly riparian.

2  MR. SACHSE:  The Judgment as it is here drafted -- I can't

3  put my finger right on that language -- would broadly state

4  that all land from the younger alluvium in this upper Tucalota

5  is riparian.

6  MR. VEEDER:  I would object to that.

7  MR. SACHSE:  But I haven't found it.  I think that is

8  what it says.

9  MR. VEEDER:  We have checked that out, and that would not

10  be true in regard to certain areas; that some of those lands

11  up there in the ground water body or basin underlying the

12  Occidental College properties overlie ground waters but are not

13  riparian to Tucalota Creek.

14  MR. SACHSE:  Here is the language for which I was looking

15  on page 19, Conclusion of Law VI, at the bottom of the page.

16  THE COURT:  That is a conclusion of law.

17  MR. SACHSE:  Presumably your Honor approved as far as what

18  we would do, it would be reincorporated then in the judgment.

19  Mr. Veeder's thinking and mine was that there is no practical

20  way, when you look at the physical situation, to distinguish

21  between the narrow stips of younger alluvium and the slightly

22  wider places -- that they are all the same, and if we are

23  going to hold that these waters of the stream all are and that

24  all should be under your continuing jurisdiction, and there is

25  no distinction in their rights, as I understand the law, whether

1   we hang the tag "riparian" or whether we hang the tag "overlying"

2   on them, if they are extracted from this same source.   Their

3   rights inter se are the same -- reasonable and beneficial uses

4   of the waters.

5   THE COURT:   If we haven't done it, we could make a finding

6   that all the land which overlies these stringers or areas of

7   younger alluvium are either overlying or riparian, or both

8   riparian and overlying, and that therefore we make no distinc-

9   tion and in these findings treat them and refer to them as

10  overlying riparian lands.

11  MR. SACHSE:   That might answer it.   I would like to get

12  Mr. Veeder's reaction to this.

13  MR. VEEDER:   I don't believe it would be sustained by the

14  facts, your Honor.

15  THE COURT:   Why wouldn't it be sustained by the facts?

16  If you say that all of the lands overlying these stringers are

17  either overlying -- well, of course, they all/overlying, to

18  start with; but some of the lands are riparian and some are

19  not.

20  MR. VEEDER:   That is right.

21  THE COURT:   But that the rights that they have are the

22  same and that therefore in these findings we make no distinction.

23  We merely refer to them as overlying riparian land.

24  MR. VEEDER:   I don't believe the cases will bear out the

25  proposition that an overlying right is the same as a riparian

17,485

right. I think they have a right to share correlatively in
the supply of water, but the measure of the right is entirely
different.

THE COURT: Well, we see what the problem is. Let me
pass on to another thing. Discuss it among yourselves.

MR. SACHSE: Your Honor, we might also note that on page
6, the one you already discussed, No. XII is a specific
finding that all the ground waters are a part of the River.
If this is true -- again, I don't think we ought to argue it
now -- but my point, Mr. Veeder, is that if they are all part
of the River, then I think you are in error that there is any
distinction between the right of a man who may overlie some
of this younger alluvium but not physically touch the surface
bank of the stream.

MR. VEEDER: The difference is very real. For one thing,
he can't divert surface flow.

MR. SACHSE: That is a physical fact.

MR. VEEDER: But you say there is no difference. There
is that very real difference, that he has no  power, he has
                          land
no authority, and the/is not riparian.

THE COURT: That is what he can do. But as far as his
rights to water that he can reach and get his hands on, there
is no real distinction in the quantum of their rights.

MR. SACHSE: I concede that if he starts pumping the
Navy would have a perfect right to object to his pumping that

1  he is taking River water, whether he touches the River stream

2  or not.  I would think that would be your own desire.

3      MR. VEEDER:  I will take a look at this language.

4      THE COURT:  All right.

5      MR. STAHLMAN:  As long as we are on page 6, one thing I

6  want to clear up here.  On page 7 at line 10, I think this

7  doesn't express what we intend.  Starting at line 10,

8  "reasonable and beneficial purposes on overlying lands riparian

9  to Tucalota Creek or a tributary thereto; . . ."  I think there

10  is more than one tributary.  That may be confusing.  It is on

11  line 11 at page 7.  I think it means "or tributaries thereto"

12  instead of "a tributary."

13      THE COURT:  I don't know.

14      MR. VEEDER:  I don't know either.  It doesn't make sense.

15      THE COURT:  On the bottom of page 9 -- some of these

16  things may be answered and maybe there is no merit to them,

17  but these are some of the things I thought about when I looked

18  this over -- at the bottom of page 8, rather, where it says

19  "could under any circumstances be limited or controlled so as

20  to attempt to provide waters for such persons who are downstream

21  from said areas of younger alluvium . . ."  Now what we are

22  talking about, of course, are downstream outside the area.

23  But it is broad enough to refer to situations where one fellow

24  overlies a stringer of younger alluvium and he is downstream

25  from another stringer, there is another person downstream from

17,487

1   him, and of course we are not going to affect his rights inter

2   se -- that would be reserved. But this is broad enough, you

3   see, to get an inconsistency in our findings.

4       MR. SACHSE:  I think you are right, and that it should be

5   corrected. The reason for this perhaps cumbersome language is

6   that Colonel Bowen pointed out that he didn't like the word

7   that Mr. Girard used of "lip" and so we started referring to

8   "areas downstream from the edge of the younger alluvium," and

9   that is where this clumsy language comes. I think that should

10  be corrected. I have to try to figure out to see what we

11  mean. What we mean is persons who are downstream from the

12  end of the younger alluvium and are not younger alluvium them-

13  selves.

14      THE COURT: Yes.

15      MR. SACHSE:  That is hard to say.

16      THE COURT:  Of course, that is why I was adopting the

17  language "the easterly edge of the Temecula-Murrieta ground

18  water body" as defining the areas we are talking about.

19      MR. SACHSE:  We have reserved their rights inter se

20  between the easterly edge of the Temecula ground water body

21  and the upstream end of the system.

22      THE COURT:  Then you might consider the possibility of

23  saying "upstream from the easterly edge".

24      MR. SACHSE:  That would be much better, instead of

25  "downstream from the easterly alluvium".

17,488

1    THE COURT:  Well, let's call the criminal calendar.

2    (Other matters.)

3    THE COURT:  Going ahead with the Fallbrook matter, on

4    page 9 at the top of the page, the first full paragraph there,

5    we get the same problem at line 4, "to require that the ground

6    waters within said area;" it should be "any area" or it should

7    be "areas".

8    MR. SACHSE:  Areas.

9    THE COURT:  " . . be kept at such a level so as to result

10   in such waters moving out of said areas of younger alluvium

11   downstream."

12   MR. SACHSE:  Have we taken care of that, possibly, your

13   Honor, by again the conclusion of law?  Your Honor will find

14   on page 21 the conclusion of law refers back to this finding.

15   It may take care of both these suggestions of yours.  It refers

16   expressly to this Finding XIV.

17   THE COURT:  A conclusion of law, technically, can't

18   modify a finding.  You are supposed to have your facts found

19   in one setup and your conclusions in another.

20   MR. SACHSE:  It is cumbersome language.

21   THE COURT:  I will merely note it.  Go ahead.  See what

22   you can figure out.  Maybe you will let it stand as it is.

23   Beginning at the apparent owners, there have been no

24   changes there.  It goes on for a number of pages.

25   MR. SACHSE:  The next changes are on Paragraph XXVIII on

1    page 16.

2        MR. VEEDER:  You omit quite a number of the original

3    findings, Mr. Sachse.

4        MR. SACHSE:  Again, Mr. Veeder, I am sorry, I will have

5    to pass/buck to Mr. Girard.  I see the document I was working

6    from apparently is not the same as you are referring to.

7        MR. VEEDER:  I am not entering any objection.  Let's go

8    ahead and then I will talk to you about the omitted parts.

9        THE COURT:  This is a matter of form.  We have Paragraph

10   XV here that talks about dams, then we come on over to page

11   16, in Paragraph XXVII and talk about impounding some diversions.

12   It might be better to do some pulling around here.

13       MR. VEEDER:  I think that we can do a lot along that line,

14   your Honor.  I think there are repetitions that can be avoided.

15       THE COURT:  In view of the position we take about this

16   insignificant amount of water that could be obtained, if any

17   regulation was ordered upstream from the Temecula-Murrieta

18   ground water basin, isn't it sort of silly to talk about

19   irrigable acres and water duty, et cetera?

20       MR. SACHSE:  Mr. Girard and I were strongly of the

21   opinion --

22       THE COURT:  It will confuse people if they think we

23   finding water duty and irrigable acres up there.  They may

24   think there is some merit to the proposition that this might

25   be curtailed and limitations placed.

17,490

1     MR. SACHSE:  We believed, your Honor, that XXIX -- it

2  jumps from XXIX to XXXI.

3     THE COURT:  Forget about that.

4     MR. SACHSE:  But XXIX, XXXI and XXXII were completely

5  unnecessary.  We left them in because Mr. Veeder had them in

6  his draft, but we think they could safely be eliminated and

7  have really no significance.  I think it is inappropriate to

8  discuss temperature, and semi-arid, warm to dry, and what kind

9  of crops.

10     MR. STAHLMAN:  I think so, too.

11     MR. VEEDER:  You remember, your Honor, we did all this

12  for the purpose of attempting to work out some kind of format.

13  These matters were all gone into at the hearing on June 30th.

14     THE COURT:  We didn't spend a lot of time on this.  You

15  inserted these provisions in here and they have been in ever

16  since.

17     MR. VEEDER:  I would tender this thought, your Honor.  We

18  have tried real hard for the last two months to work out some-

19  thing that could be used generally on these peripheral streams

20  to take care of as many of these problems as we can.  We have

21  spent literally hours, we have spent literally days trying to

22  work out a format here in regard to all these issues.  I think

23  when we get through the United States, and everybody downstream

24  should have a decree quieting their title against any claims

25  upstream.  I want to have adequate findings upon which to

predicate that.

THE COURT:  We are not talking about an A Series.  We are talking about 31.  Quieting title to lands upstream?

MR. VEEDER:  That is right.  When we get through with this the decree should read that to the extent of the rights of the United States of America these people in here will have their rights quieted; the United States, to the extent of these irrigable and riparian acres, will have its title quieted, and that will be the end of these claims up there.

MR. SACHSE:  Mr. Veeder, these people are riparian.

THE COURT:  I can't follow you on that.

MR. VEEDER:  To the extent of the measure of their rights as shown here.  I assure your Honor, that you can't have a quiet title decree in regard to riparian and overlying acreage without findings and proper conclusions.

THE COURT:  You can't have that kind of decree.

MR. VEEDER:  Why not?

THE COURT:  You don't quiet title to one riparian against the rights of another riparian.

MR. VEEDER:  To the extent of their riparian and irrigable acreage, you certainly do, your Honor, with all respect to your Honor.  And I think that is the only way to eliminate these people and to fix their claims against us.

THE COURT:  This isn't an A Series.

MR. VEEDER:  I am fully cognizant of that.

THE COURT: This has nothing to do with what we are talking about anyhow. We are talking about climate and that sort of thing.

MR. VEEDER: You said irrigable acreage, riparian acreage.

THE COURT: That is true. We did talk about that.

MR. SACHSE: I think Mr. Veeder has raised this. I would like to get it straight. He says he wants a decree quieting the title of the United States against some upstream riparian. I don't understand you.

MR. VEEDER: I will be glad to take you into the office and give you some of the language I am going to use.

MR. SACHSE: I think we can discuss it right here. You don't spell out the amount of water used -- you have said this many times -- to which a riparian is entitled. You have a lengthy phrase in here as to what you mean by "correlative rights".

MR. VEEDER: That is right.

MR. SACHSE: That they do vary. So you are not limiting any one of these people to X irrigable acres.

MR. VEEDER: But you most certainly are limiting them to their riparian acreage as spelled out in this decree; you most certainly/limiting them to their overlying acreage as spelled out in this decree.

MR. SACHSE: I have no objection to those two. The only ones I am talking about is water duty. There must be a finding

17,493

on riparian acreage.

MR. VEEDER:  And in regard to overlying rights to that same extent I have been insisting that you can't say their rights are identical.  They are not.

THE COURT:  I want you to write out something as to what you are thinking about as to a quiet title decree and that kind of language.

MR. SACHSE:  I can't understand the purpose of cropping pattern and water duty, unless, as Mr. Veeder has said many times, he wants this as, so to speak, an inventory to enable the Marines to know what potential burdens there are.  I see no objection to it.  I am only saying now that I think it is surplusage and wasting paper.

MR. VEEDER:  It is not wasting near as much paper as we have been wasting time.  These have been in here for going on two months now.  I am trying, as I said before --

MR. STAHLMAN:  They haven't been in here for two months. We just got it this morning.

MR. VEEDER:  George, the format that is here was lodged on June 30th and had been worked out before in the Court.

The only point I am trying to make is that I think we can get through this in a hurry, I think we can move along.  I think untimately you are going to have some kind of a composite decree.  If you have this kind of language in it now approved by you, we could put it into the decree and it will be

1   applicable throughout the areas.  I am just trying to speed

2   these things along, and every time we make a change I have to

3   sit down and work it out with Colonel Bowen's office as to

4   what has to be done.

5       THE COURT:  This isn't that kind of changes.  We have

6   never approved the Tucalota Creek.  It has never been complete

7   enough to approve.  We started with a bunch of findings on

8   these stream matters, and you didn't originally have any

9   conclusions.  Then later on we got some conclusions, and now

10  we don't even yet have any language on the judgment.  So this

11  has never been completed.

12      MR. VEEDER:  May I tender you this thought, your Honor.

13  Mr. Girard was told to go ahead and to do this.

14      MR. SACHSE:  That is what it is here for.

15      MR. VEEDER:  Where is the decreedal part of it?

16      MR. SACHSE:  The decreedal part is in my secretary's

17  hands being typed.

18      MR. VEEDER:  I have this thought.  If you direct us to

19  prepare findings for the whole area and then have them come

20  in and make objections, that may be the way to do it, and it

21  may be the simplest way.  I have spent two months trying to

22  arrive at these matters, working with Colonel Bowen's office.

23  I have had to change my direction repeatedly.  If Mr. Girard

24  wants to write them, fine, and I will file objections to them.

25  But I am sincere when I say that I want to get these things

17,495

done.  I think all of these changes that come up later on simply mean that we rewrite twenty to thirty pages.

THE COURT:  This is not an accurate statement, because this particular finding has never been in the shape that some of the others were where we had gone over it and said this and this and this.  We have never got that far on Tucalota.

MR. VEEDER:  Down to page 23, with all respect to your Honor, I have the record in there on this.

THE COURT:  You say you have a proposed judgment being typed up?

MR. SACHSE:  Yes, your Honor, it is in my secretary's hands in Fallbrook now.

THE COURT:  I know I have never been over a lot of this. You have brought your Tucalota stuff in and something was going to be written and something was going to be done.  Last night when I read this and today is the first time I have been going over it very closely.  I went over it at the time I made some of these other suggestions.  For instance, these conclusions I have seen now for the first time.

MR. SACHSE:  I have sympathy with Mr. Veeder's problem of redoing it, but I think this might be the very appropriate time to ask him rather to have to redo these things, why do we need in a general format the finding on what the climate is? I don't think it belongs in this kind of thing.

MR. VEEDER:  All right, I'll take it out and put it into

1    the over-all finding on the watershed.  I thought this was

2    going to be a guide.

3        MR. SACHSE:  And I don't think the cropping patterns

4    belong in there.

5        THE COURT:  If he is talking about this as a guide, I

6    see his point there.  We might establish a guide and still not

7    use part of it in this particular finding.

8        MR. VEEDER:  All right.  The only reason in the world

9    those things are written in there is to the end that we will

10   have at least a workman-like setup.  I don't want to be a

11   party to anything the way it has been going.

12       THE COURT:  On page 19 of the conclusions you take each

13   creek and you find that        as to land traversed or abutting

14   there are correlative rights in these owners.  You still have

15   that problem of what about the overlying owners.

16       MR. SACHSE:  That is in the last paragraph on the page.

17       THE COURT:  That is Conclusion VI.  Then you have the

18   further fact that certainly within an area of younger alluvium,

19   whether overlying or riparian, there are some correlative

20   rights that exist there.  And what about the correlative rights

21   between two pieces of younger alluvium one below the other?

22       MR. SACHSE:  Isn't that covered?  The owners of land,

23   any land, have correlative rights to the use of ground waters

24   contained in any younger alluvium is what this is supposed to

25   say in VI.

MR. VEEDER: Could I just ask your Honor to take a look at the conclusions of law I tendered to you with the original findings of June 30th? I don't believe you can say that everyone shares correlatively with riparians on Tucalota Creek and everyone shares correlatively with regard to overlying rights. I think it depends on where the land is situated as to the extent of its right to participate correlatively with rights upstream.

Again, it is a matter of format, it is a matter of seeing that the people on the main stem of Tucalota Creek above Willow Creek participate correlatively one with another. Below Willow Creek, anybody below that participates correlatively on Willow Creek and also on the main stem.

MR. SACHSE: We know that.

THE COURT: A given landowner has correlative rights with those upstream and those downstream.

MR. VEEDER: No, your Honor.

THE COURT: In other words, if there six stems above a landowner, as far as he is concerned he has correlative rights with everybody on all those six stems.

MR. STAHLMAN: That is right.

THE COURT: As to anybody on one of those stems. He is not concerned with somebody on another stream.

MR. VEEDER: But also in regard to the man above the first tributary on Tucalota. He doesn't share correlatively with

1   everybody downstream.  That's for sure.  That is what your

2   Honor said.  That is why I took issue.

3       THE COURT:  Why?

4       MR. VEEDER:  He doesn't share correlatively with everybody

5   downstream.

6       THE COURT:  Why not?

7       MR. VEEDER:  He doesn't share correlatively with everybody

8   downstream, and he couldn't physically share correlatively

9   with somebody who participates correlatively from Willow Creek,

10  too.

11      THE COURT:  That is the very thing "correlative" means,

12  to take care of that sort of thing.

13      Let's take an example.  Here is a man up on a little

14  branch that runs into another stream that runs into another

15  stream that runs into the Santa Margarita.  He shares corre-

16  latively with everybody downstream, and the fact that a down-

17  stream owner has certain rights on another tributary doesn't

18  mean that this man on the little tributary doesn't have

19  correlative rights with the man clear down at the bottom of

20  the stream.

21      As I understand, the whole theory of correlative rights

22  is that you take into account his location, what other streams

23  feed the water passing the man downstream.

24      MR. VEEDER:  I think, your Honor, we had all better read

25  again the case of Rancho Santa Margarita vs. Vail in 11 Cal. 2d.

1    on this point.  Because I want to be sure I comprehend what

2    you mean by "correlative rights."  I don't believe that the

3    man above Willow Creek can be said to be entitled to share

4    correlatively in any of the run-off from Willow Creek.

5         MR. SACHSE:  No, we don't say that.  We say that he has

6    correlative rights with people downstream.  You don't mean

7    the creek in which he has rights.

8         MR. VEEDER:  I think it is going to make a difference.

9         MR. SACHSE:  Otherwise you have to name every single little

10   tributary and rivulet and it becomes hopeless.  The standard

11   procedure in a statement on a riparian right is to say that

12   you have correlative rights in the common source of supply.

13   And the Navy has a right in the source of supply of Willow

14   Creek and it has rights in other sources of supply from

15   Temecula, and if I am on Willow Creek I have a correlative

16   right with the Navy in the source of supply contained in

17   Willow Creek.  It is that simple.  I don't have any right in

18   the Navy's claim against Temecula Creek, but I have a definite
                             right
19   correlative/with the Navy on Willow Creek.  I think his Honor

20   is completely correct.

21        MR. VEEDER:  I will not take any more of your Honor's

22   time on it.

23        THE COURT:  I have the language from the Vail case right

24   in front of me:

25        "Where two streams unite we think the correct rule to

be applied in regard to the riparian rights therein is
that each is to be considered as a separate stream
with regard to the lands abutting thereon above the
juncture."

MR. VEEDER:  That is what I said.

THE COURT:  Above the juncture.

MR. VEEDER:  That is what I said, above the junction.

THE COURT:  And that the lands lying within the watershed
of one stream above that point are not to be considered as
riparian to the other stream.  That is all the case says.

MR. VEEDER:  That is right.

THE COURT:  It doesn't talk about correlative rights.

MR. VEEDER:  I will say this.  I don't believe that there
are rights correlatively to participate on the branches of
the stream.

THE COURT:  Let me show you.

MR. STAHLMAN:  We are talking at cross purposes here,
I think.

MR. VEEDER:  I think we are.

THE COURT:  Have we got any chalk here?

Now, you have a stream system.  A man has some land up
here that is riparian, and a man has land down there that is
riparian.  They have correlative rights.  Do you agree?  On
a branch of a branch of a branch of the main stream, do they
have correlative rights?

MR. VEEDER:  Yes, they do.

MR. SACHSE:  Okay, that's settled.

THE COURT:  But X has no correlative rights with Y.

MR. VEEDER:  That is right.

THE COURT:  And if, as the Vail case said, you go above this juncture, I think you say it all when you say they have correlative rights.  Otherwise, you would have to take each little branch and say these people have correlative rights among themselves and they also have correlative rights with everybody downstream from the juncture.  And this little business the same way.

MR. VEEDER:  You are agreed, though, that there is no correlative participation above this confluence here and above this confluence here.  Maybe with the United States of America, but certainly not as against these people.

THE COURT:  Let me say this.  If you said that A, X and Y all have correlative rights on the stream, I think you would have said it.

MR. SACHSE:  I think you would have said the whole thing.

THE COURT:  Because as part of the concept of correlative rights is the fact that X and Y aren't concerned with one another.

MR. STAHLMAN:  You don't say each with the other.

MR. VEEDER:  I think that may be the difference.

THE COURT:  I think you have said it all when you say

17,502

1    that people who share in the common water of the stream have

2    correlative rights. And as part of that concept is the rule

3    of law that X can't be concerned with what Y does, or Y with

4    what X does.

5       MR. VEEDER: Let's take another look, then, at this

6    language that we wrote in here in the findings: The owners

7    of correlative rights share equitably among themselves in

8    the common supply of water available for use. Do you have

9    this language, your Honor? I want to be sure that that

10   language is correctly used to spell out the conclusion of law.

11      MR. STAHLMAN: This water over here is not available for

12   use to this. Y is not available for use to X. That takes

13   care of it.

14      MR. SACHSE: The key, I think, is what Mr. Stahlman just

15   said. It is the common/available for use. Y's is not part
                         supply
16   of X's common supply, but it is a part of A's common supply.

17      MR. STAHLMAN: The doctrine is predicated on the physical

18   features.

19      THE COURT: Haven't cases of California water law for

20   years drawn decrees on riparian rights? Would it be any

21   trouble to find an adjudicated decree in the language used?

22      MR. VEEDER: No.

23      MR. SACHSE: No, and they usually say "correlative rights"

24   for the very reason that your Honor pointed out, that if you

25   tried to spell it out there are fifty owners on this stream and

1    you would say owner No. 1 is entitled to his just proportion

2    of the share against owners No. 2, 3, 4, 5, 6, 7, 8, 9, and 10,

3    and not against so and so.  You end up with a piece of paper

4    that nobody can read.  So they use the broad, generic term

5    "correlative rights" as your Honor has used it here.  Those

6    three land owners designated on the board all have correlative

7    rights.  Their rights are correlative.

8         MR. VEEDER:  But not one with another.

9         MR. SACHSE:  That is correct.  X has no right against Y.

10         MR. VEEDER:  I think that is what we are saying.

11         THE COURT:  The language used "correlative rights to the

12    waters available in the common supply."

13         MR. SACHSE:  That is it.

14         MR. VEEDER:  If you get your "common supply" in there,

15    you are all right.  I'll go along with that.

16         THE COURT:  There is no water available to Y that is

17    available to A, or vice versa.

18         MR. VEEDER:  So there is no common supply on your two

19    tributaries above the confluence.  Is that correct?

20         MR. SACHSE:  That is correct.

21         MR. VEEDER:  All right.

22         MR. SACHSE:  And even further, Mr. Veeder, X and Y have

23    a common supply, but it is a very limited supply.  X's supply

24    is only this tributary.  A has a very large one.  So the word

25    "correlative" takes care of it.  The common supply of X and A

1    is only the one little stream, and in that they share

2    correlatively.

3         THE COURT:  I understand, Mr. Veeder, you say some of

4    the conclusions of law that Mr. Girard eliminated read a lot

5    better than some he has in here.  Is that your point?

6         MR. VEEDER:  I think they are more reflective of what

7    we are talking about on the correlative proposition.

8         THE COURT:  I will try to spend some time on them today.

9    What do you plan to do?

10        MR. VEEDER:  I'll be here the rest of the day.

11        THE COURT:  Do you want to come back this week or fix

12   some later date?

13        MR. VEEDER:  It is much better from the standpoint of

14   getting work done if Colonel Bowen and Commander Redd don't

15   have to run up and down Highway 101 any oftener than necessary.

16   I'll be here throughout.

17        THE COURT:  Let's say Friday morning, then, at 9:30, and

18   see what we have done.  Meanwhile maybe some of you can confer.

19   I am going to look these over again and some of the earlier

20   ones.  They are not in shape, in my opinion, now to do anything

21   about them -- that is, in the form they are in.  I think some

22   work has to be done.

23        MR. VEEDER:  I'll be in touch with Mr. Sachse in regard

24   to this decreedal matter.

25        THE COURT:  Let me have a copy of it when they are ready.

17,305

1          MR. SACHSE:  Yes, your Honor, when I get back to my office

2     I think I will put them in the mail, as soon as my secretary

3     types them.

4          THE COURT:  9:30 Friday morning.

5          (Whereupon, an adjournment was taken until Friday,)
           (                                                  )
6          (August 4, 1961, at 9:30 o'clock a.m.              )

IN THE DISTRICT COURT OF THE UNITED STATES

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
        vs.                        )      No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
                    Defendants.    )

## CERTIFICATE OF REPORTER

I, John Swader, the undersigned, do hereby certify that I am, and on the date herein involved, to-wit: August 1, 1961, was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing thirty-two (32) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 1st day August, 1961.

*John Swader*
Official Reporter