# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

                      Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                      Defendants

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      **Tuesday, August 8, 1961**

               Pages: 17,531 to 17,633

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ CLERK

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 165                                                              17,531

P 1

1                    IN THE DISTRICT COURT OF THE UNITED STATES

2                        SOUTHERN DISTRICT OF CALIFORNIA

3                              SOUTHERN DIVISION

4                                  - - -

5                 HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                                  - - -

7    UNITED STATES OF AMERICA,        )
                                      )
8                        Plaintiff,   )
                                      )
9            vs.                      )        No. 1247-SD-C
                                      )
10   FALLBROOK PUBLIC UTILITY         )
     DISTRICT, et al.,                )
11                                    )
                                      )
12   _____Defendants._____)

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                         San Diego, California

15                       Tuesday, August 8, 1961

16                                  - - -

17   APPEARANCES:

18        For the Plaintiff:           WILLIAM H. VEEDER, ESQ.
                                       Special Assistant to
19                                     the Attorney General

20                                     CDR. DONALD W. REDD

21        For the Defendants:

22         Vail Company               GEORGE STAHLMAN, ESQ.

23         State of California        FRED GIRARD, ESQ.

24         Fallbrook Public Utility   FRANZ R. SACHSE, ESQ.
           District, et al.,
25

1    APPEARANCES: (Continued)

2         For the Defendants:

3            Gibbon & Cottle                    CLAYSON, STARK, ROTHROCK
                                                  & MANN
4                                               By:  DONALD D. STARK, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 2

1    SAN DIEGO, CALIFORNIA, Tuesday, August 8, 1961, 10:00 A.M.

2

3        (Other matters.)

4        THE CLERK:   7-1247-SD-C United States of America vs.

5    Fallbrook.

6        MR. VEEDER:   May I inquire what we are looking at?   Are

7    we on Gibbon and Cottle?

8        THE COURT:   That is what I was looking at.

9        Mr. Stark is here and has lodged some proposed findings

10   and conclusions.

11       Do you have any further testimony to put on, Mr. Stark?

12       MR. STARK:   I don't have any testimony today, no, your

13   Honor.

14       There are two areas that I thought perhaps in connection

15   with the discussion I might call the Court's attention to.   One

16   is with regard to the description of the lands.   I am not

17   certain what the practice in the case has been.   You will

18   recall that there was some allusion in the transcript to a

19   border dispute between Gibbon and Cottle and there was litiga-

20   tion involved.   It is my understanding that that dispute has

21   now been settled -- in fact, I was furnished in the mail this

22   morning a copy of a map showing an adjustment of some five or

23   six acres one way or the other, but I don't have anything to

24   indicate who got what acreage.   But I assume we are going to

25   make findings on ownership of the property that as of the date

P 3

1   of the findings we should have the correct final legal descrip-

2   tion, and I will attempt to get that as soon as possible.  But

3   that would be a modification of the testimony as it exists.

4       MR. SACHSE:  Who got the well?  Do you know that?

5       MR. STARK:  I don't know.  As I say, I have a map and

6   there is a yellow and a blue area of roughly five acres each.

7   So I assume there was an exchange of lands.  But I don't have

8   any text to indicate who owns what.  So I would like to submit

9   that it is not a matter of contest at all, simply in some form

10  of testimony or an exhibit in the form of the agreement to

11  show their property.

12      THE COURT:  Either a legal description or an exhibit with

13  a legal description showing as between these two people how

14  they own this land.

15      MR. STARK:  Yes, your Honor.

16      Also, in that connection, in this draft of proposed find-

17  ings I have carried the description on the Gibbon land.  I have

18  referred to it as the description in the Gibbon answer.

19  Actually, I believe it is on the sixth course, over on page 4,

20  there was an erroneous direction.  I believe "Southwesterly"

21  was written "Southeasterly" in the Answer.  Mr. Grover informed

22  me that this was corrected on the transcript, he was quite

23  sure.  It was simply an error in description.  I searched the

24  transcript and couldn't find the point where the correction was

25  made.  I'll try to get from him a specific reference which will

P 4

1    show it.  But that modification was made.

2         THE COURT:  That is not too important.

3    Don't you have in the record, Mr. Veeder, a plat map and

4    a description of the total Gibbon and Cottle properties?

5         MR. VEEDER:  Yes, we do, your Honor, and you will find it

6    in -- it would be Temecula Creek above Vail Dam -- it would be

7    the 210 Series.

8         MR. GIRARD:  Exhibits 229 and 230 describe it also.

9         MR. VEEDER:   210-A, B and C will give the alphabetic list,

10   the map, and the ownership descriptions.  We have listed Gibbon

11   and Cottle separately.  So if there is to be a change in those

12   descriptions, I wish you would supply us with that and we would

13   amend those series to which I just made reference.

14        MR. STARK:  I will check those descriptions against this

15   draft of findings.

16        MR. VEEDER:  If you will do that.

17        THE COURT:  Or, alternatively, without amending it, you

18   could take the descriptions as shown on that map and merely

19   insert a finding that subsequently, by litigation or agreement,

20   whatever it was, between themselves, here was the new description

21   and the division between them.

22        MR. STARK:  Fine.

23        MR. VEEDER:  And then you would permit us to insert a

24   page reflecting that in the land description?

25        THE COURT:  If you want to amend the 210 Series, you may.

P 5

1    MR. VEEDER:  All right.

2    MR. STARK:  The other item which we had previously dis-

3    cussed was in connection with the appropriative right.  The

4    findings as now proposed state the quantitative amount of the

5    right, and then as to the limitation on rate of flow it is

6    stated, as is consistent with the California cases, simply in

7    terms not to exceed the capacity of the existing ditch,

8    recognizing that that leaves an area of some uncertainty or

9    some dispute at a later date as to what the existing ditch is.

10    I have checked with Mr. Rowe -- and this is simply a

11    matter of the cost of getting it into the record -- I have

12    checked with Mr. Rowe and he reviewed his work papers.  You

13    will recall there was a hearsay objection and that is why this

14    testimony didn't happen to get in at the time, because there

15    was a question on Mr. Davidson's survey.  But Mr. Rowe's figures

16    show 2.2 second feet.

17    As to the method of getting this in, I am a little bother-

18    ed, as far as taking a deposition on anything of this nature,

19    how you would take a deposition in this case and give notice

20    to all the parties.  So it seems to me that the only way to

21    get it in, I suppose, is to bring Mr. Rowe down here.  For the

22    defendant it is kind of a question whether the possible dispute

23    as to the capacity of this canal, the possibility that there

24    will be some day a dispute on the capacity of this canal, is

25    worth the cost of bringing an engineer down, going by the

P 6

1  property, taking a transit out to confirm the Davidson survey,

2  which would be cheaper than bringing Mr. Davidson down here.

3     I think the 2.2 second foot figure, as far as I can

4  determine, is within a reasonable rate, that is, it would seem

5  to be appropriate from the size of the ditch and the fact that

6  it follows a general contour of the land.  But that figure is

7  not in the record at the present time, and if the Court were

8  not willing to make the finding in the form in which it is

9  here proposed, we would of course have no alternative but to

10  request at least that we be allowed to bring Mr. Rowe down and

11  have him put in this testimony.

12     If there is any other way of getting the testimony in, I

13  would appreciate it.  But as I say, I don't really see how you

14  can take a deposition in the case without giving notice to the

15  parties, whereas in the courtroom they are, I suppose, pre-

16  sumably all present.

17     But those are the only two areas where there would be any

18  subsequent testimony or any possibility of subsequent testimony.

19     MR. VEEDER:  You are directing your statement to Finding

20  15; is that correct?

21     MR. STARK:  To Finding 16 --

22     MR. VEEDER:  And 17?

23     MR. STARK:  Yes, primarily Finding 16, at the top of page

24  9, lines 1 and 2.

25     As far as we are concerned, we are satisfied, from the

P7

1    nature and structure of this ditch -- it is cut in rock of the

2    side of a hill -- that we probably have a fairly permanent

3    measure of the quantity.  It is not practical in this area to

4    enlarge the ditch particularly, in view of the water conditions,

5    and it is not likely to be diminished simply because of the

6    bedrock nature of the canal in portions of its course.

7    MR. VEEDER:  Isn't the real factor, though -- on page 8,

8    lines 2 and 3, you say, "Approximately the first 550 feet is

9    carried in a 12-inch pipeline" -- so your maximum would be the

10   quantity of water carried in a 12-inch pipeline, depending on

11   the gradient and the head.  Isn't that right?

12   MR. STARK:  This is what would appear from the transcript

13   was the area that was generally considered to be the limiting

14   factor.  But you have a canal at one point and you have the

15   diversion works at another point, and you have a 12-inch line

16   between them.  So that your gradient is, to some extent, fixed.

17   The other point is that discussing the matter off the

18   record with both Colonel Bowen and Mr. Rowe I found some

19   question on their part as to whether the limiting factor might

20   not be about equally divided between this pipeline and this

21   narrower rock portion of the ditch.  I believe that was a

22   question that Colonel Bowen raised and Mr. Rowe raised the same.

23   But Mr. Rowe's calculation at least was that this was approxi-

24   mately the same limitation in that it would be, within a very

25   small variance, about 2.2 second feet.

Belt 2
P8

1    MR. STAHLMAN:  Isn't this a rather nebulous thing we are

2   talking about, anyway?  In other words, what I am thinking

3   about is that the diversion of a water appropriation would have

4   to be of surplus water.  In 1887 when they diverted there might

5   have been some surplus water in that creek.  But during the

6   irrigation season could anybody possibly contend that there

7   were any surplus waters there that would be subject to appro-

8   priation?  In the wintertime it may be.  But this is for

9   irrigation purposes.  I think it is a rather nebulous right.

10   MR. GIRARD:  If they have an appropriative right, it would

11   be back in 1885, which might be prior to some of the actual

12   riparian rights because they were patented subsequently.

13   MR. STARK:  That is right.  That is the basic purpose of

14   the finding, to establish, if at some time it has value, the

15   priority back to 1885.  And I should say that we worked on the

16   assumption that no appropriative right would be acquired

17   subsequent to the Water Commission Act without filings pursuant

18   to the Act, and therefore we used only the usage from 1885

19   until 1913 or 1914, the Water Commission Act.

20   MR. GIRARD:  There are a couple of questions that I would

21   like to ask on this.

22   As I understand it, and aside from the fact as to whether

23   it is clear enough in the record as to the amount of water

24   actually used as contrasted with the amount diverted, but as

25   I understand it they diverted this water and applied it to

P9

1   irrigation.

2        MR. STARK:   Right.

3        MR. GIRARD:   Wouldn't it be correct, then, that the

4   appropriative right, if it does in fact exist, would be limited

5   only to the irrigation season?

6        MR. SACHSE:   That is the same modification that I wanted

7   to suggest.   I don't think there is any contention that this

8   is a right to appropriate winter flood waters.

9        MR. GIRARD:   Although they may have gone through the ditch,

10  they probably weren't used benefically.

11        MR. STARK:   I don't recall from reading the transcript

12  anything regarding domestic use of this water, although there

13  may have been, during this period.

14        When we are dealing with an acre foot limitation, that

15  obviously doesn't mean storm waters in the wintertime.   If they

16  take storm waters in the winter it is going to deplete the

17  amount of water we have in the irrigation system.   And I see no

18  reason that the right has not, in fact, been limited by irri-

19  gation use and could not be limited to the irrigation season.

20  There is no right to storage, and without storage there is no

21  beneficial irrigation use in the storm periods, and the irriga-

22  tion season doesn't mean a great deal in a year such as this.

23  The irrigation season is probably twelve months of the year,

24  anyway.   So I see no objection to that.

25        THE COURT:   What irrigation season is twelve months?

P 10

1   MR. STARK:  I say the irrigation season, as I understand

2   it, is the period of time during which irrigation water is

3   required to be applied; and in the past two years most of the

4   mutual irrigation companies, for instance, have extended their

5   irrigation periods throughout the year, whereas normally they

6   deliver water for six to eight months.

7   THE COURT:  Mr. Girard's point is that the only showing

8   in the record is that this water was taken in the dry season for

9   irrigation purposes, and that therefore any appropriative right

10   that you obtained was a right limited to the use you made.

11   MR. STARK:  Yes.

12   THE COURT:  Which was not twelve months a year, but during

13   certain periods.

14   MR. STARK:  I believe the record does not restrict the

15   period of months.  It was used for irrigation purposes on this

16   land; and for what period of months it is used in a particular

17   year depends on the pattern of rainfall in that year, your

18   Honor.  I think a limitation of the right for irrigation pur-

19   poses and, therefore, necessarily during an irrigation season

20   is proper to prevent the use of this appropriative right to

21   store water for domestic purposes, for instance.

22   MR. SACHSE:  I concur, your Honor.  I don't think that a

23   date limitation of the kind involved in the United States'

24   right in Lake O'Neill is necessary.  I am not conceding the

25   appropriative right -- don't misunderstand me.  But if they

P 11

1   have an appropriative right, which is limited to irrigation

2   purposes and clearly and expressly prohibits any storage --

3   this is stream flow irrigation, take it out of the ditch, use

4   it and let the rest go back in -- then there would be no con-

5   ceivable interference with whatever appropriative rights Vail

6   or the United States have.

7       MR. VEEDER:  Are you saying that because it is used on

8   riparian land?

9       MR. SACHSE:  No, I am saying it because as an appropriator

10  he has to take the flow from the stream and use it for irriga-

11  tion purposes only, without storage.  The only time we can get

12  water is when there is water in the River and no irrigating

13  going on, practically speaking.  So I don't insist on a time

14  limitation.  The important thing, from my standpoint, would be

15  a purpose limitation and a clear restriction on no storage.

16      MR. GIRARD:  It must be remembered also, as far as this

17  appropriative right is concerned, if in fact it was found, it

18  would be junior to any right that the United States or that

19  Vail has, other than Vail Dam.  I think the United States'

20  Lake O'Neill right is what -- 1883, Bill?

21      MR. VEEDER:  Yes.

22      MR. GIRARD:  Of course, Vail's and the United States' land

23  was patented long before this.  But it would be senior to Vail

24  Dam and Fallbrook and, as I understand it, you are not contend-

25  ing --

P 12

1    MR. STARK:  It may have some minor, in the over-all sense,

2    but important to Gibbon and Cottle, implications with regard

3    to the lands immediately adjoining -- that is, the lands above

4    Vail.  If the day ever comes for an allocation, it may be

5    important that Gibbon and Cottle have their priority over lands

6    in that Upper Temecula Creek area.

7        MR. STAHLMAN:  Even eliminating such lands that do not

8    have riparian rights by reason of the patents antedating the

9    tentative appropriation, that there is ever surplus water in

10   there during the irrigation season.

11       Furthermore, they have done nothing more here that I can

12   see than merely take water out of the stream to which they were

13   entitled and put it on riparian land.

14       MR. VEEDER:  The matter becomes important in regard to

15   Mr. Poor and also in regard to Mr. Bergman.  Isn't that right?

16       MR. SACHSE:  I would like to make one other point.  I may

17   have left a misunderstanding.  I don't for one minute concede

18   this appropriative right.  I still think the fundamental

19   proposition is pointed out by Mr. Veeder.  I didn't realize

20   what you were saying when you asked me the question.  But I

21   have insisted, and still insist, that this use is a riparian

22   use.  It is nothing but a mechanical device in 1885 for getting

23   the water out of the River onto the land.  It was a proper

24   riparian use.  They may have acquired a prescriptive right to

25   the ditch, they may have acquired a prescriptive right to the

P 13

1   diversion also, but they did that in the proper exercise of a

2   proper riparian right.  I don't think there is any showing of

3   any use in excess of what would have been a normal and reasona-

4   ble riparian use at all times.  So I think this falls short of

5   what is required to establish an appropriative right.

6       MR. VEEDER:  How do you distinguish this, Mr. Sachse, from

7   your Stardust or your Allen right?  Is there any difference?

8   I am inquiring because I am trying to bring Oviatt, Knox, the

9   whole group concerning which we have testimony, into focus.

10      MR. SACHSE:  I have conceded to Mr. Veeder that in the

11  case of Stardust there was no proof by me of any appropriative

12  use of the waters.  Stardust was exactly the same as Gibbon and

13  Cottle, with one exception, that Stardust diversion was on its

14  own land, which is a minor matter.  Stardust went upstream

15  where the River was on the surface, took it by ditch down to

16  a canal and used it on riparian land.  And I have conceded to

17  Mr. Veeder, for the purpose of our discussion in drawing

18  findings, that that taking or that manner of use by Stardust

19  did not give rise to an appropriative right.  I have asked only

20  that Mr. Veeder make a finding of the fact that they also had

21  a non-statutory filing, just as Gibbon and Cottle did, although

22  on a different river, without drawing any conclusion that a

23  right arose therefrom.  Mr. Veeder agreed that that could be

24  in the record.  But I did not ask for a conclusion that they

25  had an appropriative right.

P 14

1      I don't think he has one either.

2      MR. STARK:  Without trying to restate the full argument

3  that Mr. Grover made, it seems to me that this particular point

4  that Mr. Sachse raises is generally answered in <u>Rindge vs.</u>

5  <u>Crags Land Co.</u>, in which there was a riparian owner who went

6  up on Government land and made an appropriation, and the Court,

7  in the quoted part of our memorandum on page 6, the memorandum

8  that was used before, stated:

9          "And thus it may happen that a riparian owner,

10         being insufficiently supplied with water by the flow

11         of a stream, and anticipating the attaching of other

12         riparian claims when the Government land above him may

13         be transferred to private ownership, may, upon such

14         Government land, make an appropriation which will be

15         good, although it may have the effect to rob entirely

16         the upper property of any riparian right in the stream --"

17         This is all we are saying.  Our riparian entitlement on

18  this river or on the Temecula Creek is sufficient to irrigate

19  all the lands.  We don't need an appropriative right.  But the

20  indications are that when, and if, in an appropriate case, the

21  testimony is ever developed and an allocation is ever sought,

22  that there is not, and has never been, sufficient water to serve

23  all the riparian lands, and therefore we don't have sufficient

24  water simply through our riparian right.  We are irrigating

25  far more than ten or 25 per cent of our lands.  We are

P 15

1   irrigating substantially all of the irrigable land. And to

2   support that larger quantity of water we have gone up and made

3   an appropriation which, in the event of an allocation, would

4   have the effect of wiping out junior riparian rights -- that

5   is, riparian rights on lands subsequently patented, which may

6   be a relatively small matter.  It may be a rather substantial

7   matter throughout the watershed as far as the comparatively

8   small quantity of water needed for Gibbon and Cottle is con-

9   cerned.  It might not help the Vails to have this much addi-

10  tional water, or the Government, but it would certainly help

11  Gibbon and Cottle.

12      But I think the Rindge case in California disposes of the

13  right to develop an appropriative right on Government land by

14  nothing more than the use of water pursuant to an appropriation

15  on riparian land.  The Rindge people were doing nothing other

16  than taking their appropriative water and making a reasonable

17  and beneficial use on their lower riparian land.

18      MR. SACHSE:  Your Honor, I do not read the Rindge case

19  that way.  Everything Mr. Stark says is correct.  But the

20  Rindge case is a typical example of one of our short Southern

21  California streams where there is water in the upper reaches

22  and there is not any in the lower reaches.  It is all percolated

23  or transpired.  So Rindge went on Government land because they

24  didn't have any adequate riparian water.  They went up on

25  Government land and appropriated water and brought it down to

P 16

1    them in a pipe.

2        That is not this situation.  He is taking the very water

3    that flows past his door.  It is only a few feet.  I don't have

4    the scale on this map.  How far is it?  It is a quarter of a

5    mile or less to his diversion.  This isn't the Rindge case.

6    Rindge went up where there was water and brought it down to

7    his land where there was no riparian water.  There was a very

8    real distinction.

Belt 3

9        THE COURT:  The purpose of the diversion in the Gibbon

10   and Cottle situation was to get the water higher up.  It was a

11   matter of elevation.

12       MR. SACHSE:  To get a head, for practical purposes.

13       THE COURT:  In other words, to get the water up to an

14   elevation where it could irrigate some of the riparian land.

15   The water was equally available below, but you couldn't get it

16   running up on this land.  Isn't that the purpose of the diversion?

17       MR. STARK:  This may have been one of the purposes, your

18   Honor.  We have Temecula Creek and Gibbon and Cottle land and

19   Government land up here.  It would have been possible for Mr.

20   Tripp, the predecessor of Gibbon and Cottle, to have gone on

21   the Government lands or to have gone across any lands and

22   created a ditch and acquired a prescriptive right which by now

23   would have been sufficient and to have diverted pursuant to

24   a riparian right, pursuant to a riparian claim, and have brought

25   this water down and we would have no more than a riparian right.

P 17

1   This is what we have on the Lower Ditch.   The Lower Ditch is

2   strictly an exercise of the riparian right, diverting the stream

3   and taking it to a little higher elevation and carrying it

4   around the land.

5   THE COURT:   You say that because the Lower Ditch is entire-

6   ly on your property.

7   MR. STARK:   Because it was not pursuant to a notice of

8   appropriation, because there was no expressed intention to

9   appropriate.

10   But in the case of the Upper Ditch there was an expressed

11   intention to appropriate.

12   Now Mr. Sachse says that the Rindge case is not like this

13   because there was water on the upper end of the river and by

14   the time it got down here the river was dry.

15   Assuming that to be so, there was nothing to prevent

16   Rindge, as a riparian to the stream and entitled to a propor-

17   tionate share of the water of that stream, to go up here and

18   make a diversion pursuant to his riparian right and to bring

19   it down in a ditch.   But Rindge didn't do that.   Rindge filed

20   and made an appropriation on Government land.

21   MR. SACHSE:   Just a minute, Mr. Stark.

22   MR. VEEDER:   Just a minute.   The riparian right is sus-

23   pended when there is no water in the stream.

24   MR. SACHSE:   That is correct.   As a riparian, you cannot

25   go one foot to bring the water to you if it is not there

P 18

1   naturally.  That is A, B, C.  Where there is no water in the

2   river, there is no riparian right.  So the distinction is very

3   clear, I think.

4       MR. STARK:  You find in the <u>Rindge</u> case that there was no

5   water in the river on the Rindge property?

6       MR. VEEDER:  I am not saying that.

7       MR. SACHSE:  I can't say that I find that as a statement

8   of fact.  But that is how I read the case, Mr. Stark.  I know

9   where the brief is.

10      MR. VEEDER:  As I recall the Rindge case, they had a right

11  to a second and a half under the riparian right.  It was

12  inadequate.  They appropriated an additional quantity of water

13  so that they would have more water over and above what the

14  riparian right would yield.  But you had to show the extent of

15  your riparian right, and anything above that was appropriative

16  -- if I remember.

17      MR. SACHSE:  I agree with Mr. Veeder.  It is a Malibu

18  Mountain stream.  They went up in the upper Malibu and got the

19  water and took it down to the lower coastal plain.

20      MR. STARK:  We quite apparently don't read the case the

21  same way.

22      The principle we contend for is that there is nothing in

23  the law which prevents a right to water from being both of a

24  riparian character, and in changed circumstances --

25      MR. VEEDER:  I agree on that.

P 19

1  MR. STAHLMAN:   That is right.   But here is the same water.

2 In just a few seconds that water would be down there where you

3 could take it on your place.   It was there at the time.

4  MR. STARK:   No, there is no testimony in this record that

5 there was this amount of water.   As a matter of fact, there is

6 rising water at the point of the Upper Ditch diversion, and

7 there was testimony as to some rising and some sinking water

8 below that point, and there is no testimony in this record to

9 indicate that Mr. Tripp at the time of his appropriation could

10 have taken water out of the stream as it passed his place.   He

11 had some water in the Lower Ditch.

12  THE COURT:   There is evidence that this stream from the

13 point of diversion down on to the Gibbon and Cottle property

14 was running in a stringer of younger alluvium overlying basement

15 complex.

16  MR. STARK:   Yes, sir.

17  THE COURT:   And so from this point of rising water, this

18 springs upstream where the diversion was made, there was no

19 place for this water to go but to go down either over or through

20 this stringer of younger alluvium into the Gibbon and Cottle

21 property.

22  MR. STARK:   But I presume if we are to follow that theory

23 that we are talking about underground flow.   Because when you

24 are talking about the younger alluvium, you are saying that the

25 water is in the stringer either on the surface or below the

P 20

1   surface.  I fail to see where that distinguishes it, then,

2   from the <u>Rindge</u> case, since there is no indication that in

3   Rindge the water was not flowing underground to the ocean as

4   is the normal course of these streams.

5        We are talking about 1897, and the problem whether water

6   in the underground in the younger alluvium and small inter-

7   mittent stream on the surface is water which can, as a practical

8   matter, be boosted onto the lands where the irrigation is done.

9        MR. VEEDER:  That question came up, though, if you

10  remember, on cross-examination, and it was not until the late

11  fifties that they put in a structure that cut off the ground

12  water or in the alluvial stringer, as your Honor referred to.

13  In other words, what they were doing at one time, they were

14  simply diverting water running on the surface.  Later they put

15  in a structure that went down to bedrock, and it was impervious

16  in character, and in effect increased whatever diversion they

17  were taking as it related to the proportion of water in the

18  stream.

19        MR. STARK:  It may be as it related to the proportion of

20  water in the stream.  It did not increase the taking.  The

21  taking was from the stream surface and sub-surface.

22        MR. STAHLMAN:  It was the same water.  That is the reason

23  it didn't increase it.

24        MR. STARK:  Mr. Veeder is coming up the other side of

25  the road, and I am talking about the water underground in the

P 21

1  younger alluvium not being part of the stream.  He wants to

2  know how, unless it was part of the stream, it increased our

3  dam above.

4  MR. VEEDER:  That is right.

5  MR. STARK:  I think it is part of the stream.  But my only

6  point is that if you are trying to distinguish the Rindge case,

7  I don't think you can distinguish it -- in the first place,

8  my recollection of the case is that it doesn't show that there

9  is no water flowing in the stream.  Secondly, there is no

10  finding that water could not have been recovered from the

11  stream by pumping in the stream bed on the Rindge property.

12  The case is fairly clear that these people had a riparian

13  right and it was not sufficient to serve all their irrigable

14  land, and so they went up on Government land and made an appro-

15  priation and thereby in effect acquired a prior right to what-

16  ever riparian rights might later attach to that Government

17  land, so that when that Government land was patented the

18  aggregate riparian right of those two parcels could be used on

19  the Rindge land.  And that is what the Court holds.

20  MR. VEEDER:  The Rindge case, I am convinced, said that

21  there was a ceiling to the quantity of the riparian water that

22  could be used on the Rindge property.  Then they went up and

23  got another second and a half feet which they could beneficially

24  use, and that second and a half was the extent of their appro-

25  priative right.  They didn't have enough water for their

P 22

1  riparian uses.  So they appropriated some water which would be

2  good against a subsequent acquisition of a riparian right.

3       MR. STARK:  That is right.

4       MR. VEEDER:  But you had to show, as I don't believe you

5  did in this case, that it was not all riparian water that you

6  were using.  I believe that is the distinguishing factor.

7       MR. SACHSE:  I would like to back up what Mr. Veeder says.

8  And Mr. Stark's own sketch here is the finest proof of it.  The

9  amount of water available to Gibbon and Cottle at the point of

10  the Lower Ditch and at the point of the Upper Ditch is, as far

11  as everything I am aware of in this case, practically the same.

12  I didn't hear anybody say that there was any distinction in the

13  amount of water here and here, if they didn't have a diversion.

14  They went very close to each other.  Every drop of water they

15  got from this Upper Ditch could just as well have been obtained

16  in this Lower Ditch, if they could have got it up on the hill.

17  That is the way I remember the testimony of Gibbon and Cottle.

18       So all they were doing was arriving at a convenient

19  mechanical method, back in 1885 when we did not have pumps to

20  bring down this water to them.

21       THE COURT:  You say they did not have pumps in 1885?

22       MR. SACHSE:  They didn't have electricity.  They had to

23  have steam pumps.  This was pretty far up in the boondocks and,

24  for practical purposes, all agriculture, I think you are aware,

25  was basically handled by gravity flow.

P. 23

1    They took the very same water to which they had a riparian

2    right and they put it to riparian purposes. They did not take

3    one bit more water than was perfectly normally available then

4    in the flow of the stream on their own land. There is the big

5    glaring distinction between Rindge and Gibbon and Cottle.

6        MR. STARK:  I would suggest that Mr. Sachse is combating

7    my suggesting that there is nothing in the record to show that

8    there was the same amount of water in the Lower Ditch and

9    substituting his testimony. I don't think the record shows

10   what was in the Lower Ditch. It shows what the purpose was

11   at the diversion above. The geology and the normal inferences

12   from it would run against what Mr. Sachse has said, since the

13   upper diversion was at a bedrock saddle whereas the lower

14   diversion is down in the younger alluvium, where the testimony

15   was that the soil was quite porous and would obsorb water.

16       But to come back to Mr. Veeder's comment,  I did shorten

17   my reading of the quote from the _Rindge_ case, and he raises a

18   point with which I should like to agree, and that is this.  In

19   discussing their right --

20       MR. VEEDER:  What page?

21       MR. STARK:  This is on page 7 of our prior memorandum.

22   This is the memorandum that Mr. Grover submitted for the prior

23   argument.

24       After the Court had said that "a riparian owner, being

25   insufficiently supplied with water by the flow of a stream,

P24

1   and anticipating the attaching of other riparian claims when

2   the Government land above him may be transferred to private

3   ownership, may, upon such Government land, make an appropriation

4   which will be good, although it may have the effect to rob

5   entirely the upper property of any riparian right in the stream

6   -- this to be qualified only with the condition that the total

7   water claimed under the combined rights (that is, the riparian

8   right of the lower land and the appropriative right) does not

9   amount to more than is reasonably necessary to satisfy the

10   necessary uses to which it is designed to be put."

11   All we are talking about is putting a floor under how

12   low we could be driven on an allocation, and our appropriative

13   right, as this is defined, is not a right to irrigate all of

14   the acreage of Gibbon and Cottle.

15   If you will look at Exhibit Gibbon and Cottle A, your

16   Honor, you will see that the fields which are involved are a

17   very narrow and comparatively restricted area.

18   THE COURT:  I have Exhibit A in front of me.

19   MR. STARK:  We are talking about Fields 2, 3, 4 and F,

20   which is a fairly narrow strip through the property presently

21   irrigated.

22   THE COURT:  What do you mean, you are talking about 2, 3,

23   4 and F?

24   MR. STARK:  That is all the fields which are claimed to

25   have been irrigated, on the basis of Mr. Tripp's testimony,

P 25

1  pursuant to this appropriation, and the total quantity of the

2  claimed appropriative right is the equivalent of that acreage,

3  some 36 acres, multiplied by Colonel Bowen's average annual

4  diversion duty in this area.

5      So that we are not talking about a claim of a right to

6  continue under an appropriative claim to irrigate all of the

7  lands of Gibbon and Cottle.  We are claiming that there are

8  36 acres of that total which were historically irrigated

9  pursuant to the appropriation.  So long as there is no alloca-

10  tion on the stream, so long as under the riparian right all of

11  the water would be available to irrigate the lands of Gibbon

12  and Cottle, this question is academic.  When, we will say,

13  there is an allocation and we are entitled to use only 98 per

14  cent of what would be our riparian entitlement, we could not

15  then add all of this appropriative right, because the aggregate

16  of all this appropriative right and our riparian entitlement

17  would be more than we could put to reasonable and beneficial

18  use on the land.

19      This is the limitation of the Rindge case.

20      But if, as would appear from the original Santa Margarita-

21  Vail and from the general attendancy of both the first trial

22  in this case and the testimony in the case to date, as I under-

23  stand it, if the watershed has ten to 25 per cent enough water

24  to serve all of the riparian needs, then we will need all of

25  our appropriative right in order to irrigate even a share of

P26

1   what we are now and have historically irrigated.  And this is

2   the only time that this appropriative right has significance.

3   But when the allocation comes, having expressed the intention

4   to appropriate from Government land, having prosecuted the

5   appropriation with diligence and having diverted through those

6   diversion works and pursuant to that appropriation during the

7   period from 1897, the date of the completion of the works,

8   until the time of the Water Commission Act, we believe that a

9   floor was created, that is, an appropriative right was created,

10  which may, under appropriate circumstances, be asserted.  Those

11  circumstances do not evidently exist at the present time because

12  of insufficiency of evidence to justify an allocation of

13  riparian waters.

14      THE COURT:  Let's see what we are talking about now.  The

15  land where this diversion was made was Government land and is

16  now owned by Schroeder.

17      MR. STARK:  Yes.

18      THE COURT:  I don't know, from the record, how much land

19  that is now.  But let us assume, for argument, that that was a

20  section.  If he had an appropriative right, your contention

21  is that it would certainly be good against the present owner

22  of that section and would be superior to any riparian rights

23  that the present owner has because they re-acquired their title

24  by grant after your diversion.

25      MR. STARK:  That is correct.

P 27

1      THE COURT:  What other land are we talking about?  What

2   other land is there up there that would be affected that was

3   patented after the date of your diversion?

4      MR. SACHSE:  Mr. Poor downstream.  Wouldn't he be affected?

5      MR. STARK:  Yes.  Upstream or downstream.

6      MR. VEEDER:  There is Trenell and Bergman.

7      THE COURT:  It could reach upstream, could it not?

8      MR. SACHSE:  And also downstream likewise.

9      THE COURT:  What other land?  Has any check been made as

10   to what lands you are talking about?

Belt 4

11      MR. STARK:  No, your Honor, I don't think we are talking

12   about a fairly substantial job, and I don't think we know.  We

13   don't know, for instance, that by the time the Government has

14   completed this case the state of exhaustion that will follow

15   will lead to the fact that we will never adjudicate this River.

16   This is a practical problem.  We may be talking about a wholly

17   academic matter, because if there is any allocation in this case

18   the cost of allocating may be so great that there is never an

19   allocation.  And if there is never an allocation, this appro-

20   priative right is never going to come into play in any significant

21   manner.  But if the day comes that the evidence goes in and there

22   is an appropriation, then to the extent that this is worth any-

23   thing --

24      THE COURT:  An appropriation you mean?

25      MR. STARK:  An appropriation.  It may be worth five acre

P 28

1   feet, in which case it is a pretty sorry thing to have spent

2   this time on it.  But we don't know.  We know that the right

3   is there -- that the parties have made their public filing in

4   1885, that they have proceeded since then on the assumption

5   that this was a right.  To be more specific, this is the right

6   which is insured by the title company which, as Mr. Grover

7   indicated at the outset, is the only occasion that a small

8   defendant such as this would be represented by separate counsel.

9       MR. STAHLMAN:  Counsel is overlooking something also if

10  I may say.  There is on file in the Superior Court of San Diego

11  County an action involving these properties up there -- that

12  is the Oviatt suit, and I don't know whether all the issues in

13  this case are going to determine all the issues in that case.

14  That is what they were fighting about up there -- the quantities

15  of these waters.  There may be an appropriation up there.  Your

16  Honor will probably take it over here, but there are issues

17  created in that suit already.

18      But using counsel's own illustration here, it is quite

19  evident when you apply the facts in this case as they have been

20  presented and the commonly accepted laws of physics, that what

21  we are doing here is nothing more than -- I mean, with the

22  short distance here, it is the same water.  It either flows

23  above or below ground.  It comes downstream, I don't care how

24  it flows.  But it is water that is coming down to this land,

25  and if you wait a little while it will be there, if you don't

P29

1    stop it upstream.

2         I think there is evidence also, from the facts in this

3    case, from which the deduction can readily be made, and I think

4    it is a forceful deduction and conclusion from these facts,

5    that the very manner in which they brought their water around,

6    that that is what it was for; not to appropriate water that

7    they were not entitled to or couldn't get, but it was merely

8    a matter of convenience of irrigating the higher land. They

9    had a ditch below and that ditch couldn't do it, so they put

10   in an Upper Ditch and took the water upstream and put it on

11   that higher land.

12        MR. GIRARD:  Mr. Stark, suppose you do have an apportion-

13   ment proceeding or allocation.  It will be conceded that no

14   one will get all his riparian rights.  Vail will never get all

15   the waters allocated to them for all the riparian uses they

16   could possibly make.  And say Vail gets ten per cent of their

17   irrigable rights in an apportionment proceeding to irrigate

18   their lands, and say under the riparian allocation Gibbon and

19   Cottle gets ten per cent to irrigate ten per cent of their

20   irrigable riparian lands.  Their appropriative right is junior

21   to Vail's riparian right.  Could Gibbon and Cottle in an alloca-

22   tion proceeding get their ten per cent riparian allocation and

23   then in addition get the 1885 appropriative right to use on

24   their lands when that is junior to Vail's riparian right?

25        MR. STARK:  No.

1    MR. GIRARD:  So the only possible benefit in an apportion-

2  ment proceeding of having an appropriative right would be an

3  allocation between these two people which did not involve another

4  riparian.

5    MR. STARK:  Not necessarily those two people.  Let's assume

6  that riparian to the stream there are three parcels which were

7  patented -- without regard to whether it is Schroeder.

8    MR. GIRARD:  Yes, anybody.

9    MR. STARK:  Let us assume that there are three parcels

10  which were patented subsequent to the appropriation.  And the

11  allocation is made, first a determination of ten per cent, and

12  then the ten per cent is converted into acre feet.  And this

13  parcel, under the allocation, is entitled to five acre feet,

14  and this one is entitled to 10, and this is entitled to 15.

15  Gibbon and Cottle are prior and paramount to these riparian

16  rights.  Then it is our position that we perhaps either with

17  other appropriators -- I am oversimplifying it -- we would have

18  a claim, therefore, to the use of this 30 acre feet.

19    Now our appropriative right is -- I don't recall what the

20  figure is -- 200 acre feet.  The 200 acre feet doesn't mean

21  anything except that within that 200 there are sufficient to

22  absorb the allocable weight of these other lands which are

23  junior to our lands.  It doesn't affect Vail's allocation at

24  all.  They have an allocation on riparian -- you have allocated

25  the riparian water.  And then the question is whether people

P 31

1  who have a junior riparian right are entitled to exercise that

2  on their land, or whether that riparian right was pre-empted

3  by our prior appropriation.

4  And that is essentially what Rindge says.  That you can

5  acquire the appropriative right, even though it means that

6  subsequently patented lands would be deficient entirely of the

7  proof of their riparian right.

8  MR. GIRARD:  Does the Rindge case run downstream?  As I

9  understood it, it only runs upstream.

10  MR. STARK:  As I understand it, it only runs upstream.  I

11  don't know anything in the principle of the Rindge case that

12  prevents it from running downstream.  Because the question is

13  that you have a mass of lands of the United States and there

14  is an appropriation on Government land and by law this is

15  prior and superior to the subsequently patented rights, and it

16  doesn't say "subsequently patented upstream."

17  But assuming that the law at the time of your later suit,

18  assuming it is determined that the law is that it only runs

19  upstream, we lose five acre feet but we will pick up these 25.

20  I don't know what is involved in acre feet in this.  But in

21  principle it seems to me fairly clear.

22  The important thing, I think, is what Mr. Stahlman alluded

23  to.  He said that it is primarily the way they got their water.

24  And I think this is the basic distinction here, your Honor.

25  The way they got this water was not to go up and make a riparian

P32

1   diversion, but they went up and went through the formality of

2   making an appropriation, filing a notice of intention to

3   appropriate, and moving forward with the statute, and we have

4   an expressed intention to appropriate this water and the fact

5   that the water was so diverted pursuant to the appropriation.

6       THE COURT:  How long is this Rindge case?  I haven't read

7   it.

8       MR. STARK:  It is not exceedingly long.

9       THE COURT:  Take a short recess.

10      MR. VEEDER:  It is 56 Cal. App. 247, your Honor.

11      (Recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t1
B

1      THE COURT:   I have read the case of Rindge vs. Crags

2    Land Co., and I have several comments to make.  On Page 252,

3    the Court states:

4           "An appropriator can gain nothing as against

5        riparian rights which have attached, and, once such

6        rights have become affixed. they continue and are not

7        lost, regardless of whether the water has been put to

8        any beneficial use upon the land; . . . There would

9        remain, then, as subject to appropriation. only the

10       excess water over and above what might reasonably be

11       subjected to a beneficial use by the lands bordering

12       the stream."

13       Now, to start with I doubt if it can be said that there

14   was any surplus water except flood waters which were not

15   taken in view of the large amount of riparian land downstream,

16   and whether the riparian rights downstream were used or not,

17   they had attached, and this may be what we have been talking

18   about.  But how could it be said in 1890 --

19       MR. STARK:   In 1885, your Honor.

20       THE COURT:   -- in 1885 that there was a surplus over and

21   above what could eventually be used as riparian rights

22   downstream?

23       MR. STARK:   First of all, your Honor, I would like to

24   distinguish this, because the same term is used as between

25   the two types of appropriative rights.  One is the appropriative

17,565

t2

1    right which is the one which we normally encounter today, an

2    appropriative right in the surplus water over and above the

3    riparian requirements.  The other is an appropriative right

4    which was acquired on Government land prior to its patent,

5    and this is an appropriative right which by its nature is

6    paramount and superior except as to riparian rights which

7    have attached.

8        Now, I don't find any disagreement with what your Honor

9    has quoted.  The only place that we acquire any priority from

10    this appropriative right which we claim is as against those

11    lands to which no riparian right had attached at the time of

12    our appropriation; in other words, as to Government lands

13    subsequently patented.

14        THE COURT:  You did not let me finish.  On Page 253,

15    in supporting your proposition, after we get over that first

16    hurdle, it is stated:

17        ". . . Upon the facts found we think the Court

18        should have determined first that the plaintiff, May

19        K. Rindge was  .entitled  to take from Malibu Creek

20        4.95 inches of water continuous flow; that this

21        appropriated water should be deducted from the proportion

22        assigned to the defendant, Crags Land Company for

23        riparian uses.  This would require a readjustment of

24        the proportions in which the parties would be entitled

25        to share in the remaining water.  In other words, the

t3

1      judgment should be that the land of the Crags Company,

2      by reason of the prior apportionment by May K. Rindge,

3      has had its riparian right to waters flowing into

4      Malibu Creek diminished by the amount of that appropria-

5      tion, . . ."

6      That supports your position.

7      Thirdly, I don't find anything in the case that is at

8      all definite as to the  point made by Mr. Sachse on the facts

9      as to whether there was a shortage where Rindge was concerned,

10     which caused the upstream apportionment.  We could probably

11     infer that there would not have been an attempt to apportion

12     water upstream if there had been ample below.  The Court did

13     say that a California person may have both riparian and

14     appropriative rights.

15     Then, finally, there still remains undecided by this

16     case the point in argument here that all your predecessors in

17     interest did was to take water which would ordinarily have

18     come to them and moved it up to a higher elevation to irrigate

19     some ground which they could not have practically irrigated

20     otherwise.

21     MR. GIRARD:  One question, your Honor.  Does that case

22     discuss at all the question as to whether, assuming that you

23     can acquire the riparian rights on the land where the

24     diversion has occurred, does it indicate whether you could

25     acquire the riparian rights of subsequent patentees of other

17,567

t4

1    lands?   In other words, the diversion here occurred on

2    Schroeder's land, or on Schroeder's prececessor's land.

3        THE COURT:   There is this language at Page 253:

4            "And thus it may happen that a riparian owner,

5        being insufficiently supplied with water by the flow

6        of a stream," -- and I may interject   that this backs

7        up Mr. Sachse's point, although there is no finding of

8        fact -- "and anticipating the attaching of other riparian

9        claims when the Government land above him may be

10        transferred to private ownership, " -- that expressly

11        says "above him" -- "may, upon such Government land, make

12        an appropriation which will be good, although it may have

13        the effect to rob entirely the upper property of any

14        riparian right in the stream -- this to be qualified

15        only with the condition that the total water claimed"

16        must not be more than is reasonably necessary.

17        MR. STARK:   I believe, your Honor, my recollection is

18    that in that case the Rindge lands were next to the ocean.   But

19    on this particular point we have not suggested any finding or

20    conclusion, and I don't think any is required or would be

21    proper here, as to the nature, scope and implication of the

22    right;   we areonly asking that the existence of the right be

23    declared, and when and if it becomes material, the Court in

24    that case will determine whether the right runs upstream.

25        The Rindge case on some argument could be limited only

t5

to the lands above, and if that argument is correct, then all we are talking about is the right against Schroeder, which is not very much. We think the Rindge case indicates a much broader principle, and, therefore, is of considerable more value. But there I think we are dealing with what are the full, future implications of the right, and that necessarily gives some merit to the case.

As we discussed here in the recess, the right which is asserted, as I understand it, does not in fact adversely affect any of the Vail interests, because all we are dealing with is who is going to receive the aggregate amount above Vail.

MR. STAHLMAN:   I can see all kinds of difficulties which would ensue in relation to an apportionment if this appropriation would be as counsel contends.

I will give you just one example of that. In the first place, we don't know from what Government lands he is entitled to the waters, and what the quantity is, how much. But let's assume that we know that there is insufficient water for all riparians, and we come to a case where we are going to have an apportionment, and we know we are going to be subjected to an apportionment. As he contends, it is only going to be effective when there is an apportionment, and that his right, he contends, would be junior to a downstream owner.

t6

1          Now, you have an apportionment.  What is the basis for

2      an apportionment?  Say there is an apportionment in relation

3      to the amount of irrigable acreage that you have, if you are

4      using the water.  But now let's take these lands up here

5      (Indicating), for example, and there   a number of parcels

6      up here, and they are not even using their riparian water.

7      Suppose they are not using it.  Who gets that riparian water?

8      I mean, would the appropriator get it, or would he be able to

9      divert that water?  No, I think that the --

10         THE COURT:  Now, wait, and go back to the appropriation.

11     At the time it was made, it was made on Government land.  It

12     was made on the portion of the section which now belongs to

13     Schroeder.  Let's look at it as if we were talking about

14     Schroeder's rights as compared to Gibbon and Cottle.  Wouldn't

15     it be true that this appropriation would be good and superior

16     to Schroeder's riparian rights. which attached after the land

17     came from the Government, downstream from the point of

18     diversion to the end of the Schroeder property?

19         MR. VEEDER:  I think that would be true only if there was

20     a showing that at the time the appropriation was made there

21     wasn't sufficient riparian water.

22             MR. STAHLMAN:  In other words, I don't think we have

23     sufficient facts here.

24         MR. VEEDER:  That is the whole crux of it.  In other

25     words, we know that they have a riparian right.  We know that

t7

1  in the exercise of their riparian right they can go upstream

2  and divert the water.  We think that is where this suit stops.

3  I think that they demonstrated it.  They have built a dam,

4  or, I mean, they have built a structure, and they diverted

5  water in the exercise of their riparian rights.  That is all

6  that it shows.

7      MR. SACHSE:  I think that the language which your Honor

8  read here where the riparian's supply would be insufficient,

9  shows that you can't do it.  I do not think there is proof

10  from which your Honor can find that at the time this was done

11  the riparian was insufficiently supplied with water.

12      THE COURT:  What would he have done it for?  There was

13  some argument you made on the Rindge case.  What was this

14  fellow's name?  What would Tripp have put the ditch in for --

15      MR. VEEDER:  To secure elevation.

16      THE COURT:  -- if he had not been insufficiently

17  supplied with riparian water?

18      MR. VEEDER:  To get elevation, your Honor.

19      THE COURT:  But he was, therefore, insufficiently supplied

20  with riparian water on     this area that he took the water to.

21      MR. VEEDER:  Oh, no.

22      MR. STAHLMAN:  No, your Honor.

23      MR. STARK:  The other significant factor, your Honor, if

24  he felt he was doing this under his riparian rights   that   he

25  went to the trouble in 1885, which was not a normal course of

t8

1    conduct, to make an express filing of an intention to

2    appropriate, and an appropriation is a matter of intention to

3    appropriate and to use due diligence in the appropriation

4    made.

5        THE COURT:  Let's talk about Schroeder for a minute.

6    Let's assume we are deciding Schroeder's rights as against

7    Gibbon and Cottle.   Is there any doubt but what he could go

8    up on this Government land, which later came into Schroeder's

9    ownership, and appropriate this water?  There were no

10   riparian rights attached while it was in Government ownership.

11       MR. STAHLMAN:  He could appropriate it, yes, but if he

12   was appropriating the same water, -- in other words, he would

13   have to be insufficiently supplied.  There is no evidence

14   here that he was insufficiently supplied, so the intention --

15   what his intention was is going to have to be determined from

16   the facts here in the case.  The intention here is quite

17   obvious, that if the water would come by his place, that same

18   water which he could have used on his land, but he went up

19   and moved this water up on the other place, and he filed, I

20   think it is quite conceivable that his intention in the filing

21   was merely because he was going on Government land.  The water

22   would have come down there anyway.  I think the physical facts

23   determine what the intention was at the time.

24       MR. SACHSE:  You can look at it as a leap-frog

25   proposition, your Honor.  If we had a surface stream, and we

t9

1    had three parcels which were down below here (Indicating),

2    and if in 1885 each one of them for simple purposes of getting

3    a head did this, what has happened to them in this type of

4    situation here?

5        He goes to Schroeder (Indicating), the next one goes to

6    him, and the next goes to him (Indicating).  I don't think

7    they have taken anything more than their basic riparian rights.

8        MR. STAHLMAN:  You might have a different basic situation

9    if you had gone into a basin and appropriated water that

10   would not have naturally gotten down to him.  Then that might

11   be some evidence that he wasn't sufficiently supplied.  But

12   I say that under the simple law of civics water runs downhill,

13   and it runs through younger alluvium, and these different

14   things, and it is the same stream, and it would have gotten

15   down there if he had not gone up and taken it.

16       MR. STARK:  Your Honor, may I suggest something about this

17   language "insufficiently supplied."  The argument has stressed

18   it as though the case turned upon it, but basically we know

19   that the Santa Margarita-Temecula River System has, and I just

20   use a round figure, 25 per cent of the water required.  All

21   riparian lands acquired on the Santa Margarita-Temecula River

22   are insufficiently supplied.

23       MR. STAHLMAN:  Oh, no.  Oh, no.  Pardon me.  I am sorry.

24       MR. STARK:  Just a moment, Mr. Stahlman.

25       MR. STAHLMAN:  Pardon me.  I am sorry.

t10

THE COURT: What he means is that there is insufficient water to supply all of the land.

MR. STARK: Now, the language in Rindge is perfectly compatible with this situation, and I will simplify it. The river coming down through the upper Government lands, comes through the Rindge lands. If the Rindge landowners look at their riparian acreage, and look at the water flowing in that stream, and determine that when the stream is wholly utilized there will not be sufficient water for their total lands, then regardless of what is flowing in the stream, their land is insufficiently supplied. And what the Court suggests is that while it is still Government land, the Rindges are entitled to go up here and make their appropriation, and thereby preclude that Government land -- preclude riparian rights from ever attaching to that Government land so as to cut into the supply of water  which is available to them. And looked at in the aggregate --

THE COURT: They did not go that far. They did not say that the riparian rights would never attach to those lands--

MR. STARK: No.

THE COURT: -- but they said that if the riparian rights did attach, they would be subject to the diminution.

MR. VEEDER: But the complete answer to Mr. Stark is this, your Honor: The only way you can acquire an appropriative right is to divert the water and apply it to a beneficial use.

tll

1    And if there was sufficient water in the stream in any case

2    to supply it at the moment, they were exercising their

3    riparian rights, and they could not initiate and they could

4    not acquire an appropriative right.  It is that simple.  The

5    only way you could acquire an appropriative right is if you

6    are irrigating your riparian land, and you do not have enough

7    water, and you go up and appropriate it and divert it to a

8    beneficial use.

9         THE COURT:  Can't we assume that the appropriation in

10   the Rindge case, and whatever was done on the Government land

11   by Tripp in our case would not have been done if there was

12   sufficient water that would have reached this land in question?

13   Do you think they did this just for fun, -- built a ditch two

14   three miles along this canyon?

15        MR. VEEDER:  They didn't build it that far, your Honor.

16   But the fact remains that all they did was to get elevation,

17   and we were very careful in this case to observe the lands

18   below the ditch that were irrigated, and it was very apparent

19   that they were simply bringing water down, and applying it to

20   a field, and the water was running back into the stream.

21        I don't believe there is a thing to show that they

22   diverted and applied to a beneficial use water above and

23   beyond that which they could normally have exercised as

24   riparians.

25        Here is the thing, that until the other riparians were

t12

1    taking water, they could take the whole stream themselves.  I

2    don't think that the fact of the use on the other side has

3    anything to do with it.

4         MR. STARK:  Your Honor, I will say that in Rindge there

5    is nothing to show that Rindge wasted the water.  They made

6    an appropriation, and used it on riparian land, and they used

7    it in a substantially analogous situation.

8         THE COURT:  Well, we will take an adjournment until

9    2:00 o'clock.

10        (Whereupon, at 12:05 o'clock p.m., a recess was taken )

11        (until 2:00 o'clock p.m. of the same date.              )

13                         ---oOo---

17,576

t12

SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 8, 1961, 2:00 P.M.

---oOo---

THE COURT:  I don't know whether it is going to do any good to discuss any further or not, but let's go back to what I suggested before, and let's talk about Schroeder's property, and this diversion.

The Schroeder property was Government land.  Tripp went up and put a ditch in, and diverted water off the surface of the stream and ran it down through Schroeder's land, or ran it down through Government land, and Schroeder or his predecessor later got a patent.

Now, as to Schroeder, hasn't there been an appropriation of water?  In other words, the patent which issued to Schroeder's land would ordinarily have covered all riparian rights, and in this Rindge case the riparian rights did not attach until the land was severed from the Government, so by the time thepatent issued the ditch was in there and the notice had been filed.  Therefore, wasn't there an appropriation, not of all of Schroeder's riparian rights, but of such of the riparian rights as would ordinarily have gone to what we call the Schroeder property for the benefit of Tripp?

MR. STAHLMAN:  Your Honor, I haven't checked this,but my understanding is that there were, prior to the issuance of the patents filings of homesteads up there for quite some time previous, and I am wondering, in the absence of evidence,

t13

1   if having filed a homestead, and a person had a good homestead

2   filing, whether that could antidate his filing?  Now, there

3   is no evidence on that.

4        THE COURT:  George, you are raising a problem which is a

5   very interesting one, but it is not the one that I want you

6   to talk about.

7        MR. STAHLMAN:  I am sorry.

8        THE COURT:  We know from the record that the land which

9   later became Schroeder's land was Government land when the

10  ditch was put in .  At least, there is in evidence the

11  affidavit of the daughter of Tripp, which is   Gibbon and

12  Cottle's Exhibit P, in which she refers to the notice, and

13  she states, "that at the time of the filing of said claim",

14  describing the land, "on which the property was taken from

15  Temecula Creek, and over which land the ditch was built

16  carrying said water to the land below was Government land."

17       I take it there wasn't any homestead on this piece of

18  ground.  It is pretty clear that as to the people who had

19  grants, and your question raises when that is effective, the

20  date of the filing, the date of the patent, or whatnot, but

21  as to those people who certainly had acquired Government

22  lands, this appropriation, if there is one, could have had no

23  effect because the riparian rights went with the land when

24  patented, and whether they were used or not, they could not be

25  appropriated away.

17,578

t14

1          Now, the question is, relating it only to the Schroeder

2     land, that if you look only at the Schroeder land we are not

3     going to be concerned with what they do with the  water

4     after it reaches the land, but they built a dam and they took

5     the water.  Isn't this an appropriation of rights that would

6     have passed with the Schroeder land when it was patented?

7     That is the question I want you to discuss.

8          MR. VEEDER:  I think it is true that if the patent was

9     issued subsequent to the appropriation, if there was one,

10     that is, the patent was issued after 1866 and 1870, the patent

11     would be issued subject to the appropriative right, if one was

12     established.  I think that is correct.

13          The question, though, that I see is whether the riparian

14     was using more water than he was entitled to, and I think

15     that is the whole question.

16          I would agree that if there was an appropriation, and

17     the patent issued subject to the appropriation, then to that

18     extent Schroeder's land would be subject to the Gibbon and

19     Cottle right.  But I think that the first thing that has to

20     be proved is that Gibbon and Cottle are using more than their

21     share of riparian water, bearing in mind that they could use

22     all of the water in the stream if other riparians weren't

23     using it.

24          I think that is where there is a weakness in the proof

25     of Gibbon and Cottle, that they didn't prove that aspect.  If

t15

1   they proved an appropriative right, then Schroeder's land

2   is certainly subject to that right if the patent issued

3   subsequent to the time   the water was diverted.

4      I believe that is what the rule is, your Honor.  But I

5   think they have to show as against the world that they were

6   actually using more than their share of riparian water.

7      MR. STARK:  I think this last point that Mr. Veeder

8   raised we went over a number of times this morning.

9      On the matter of the right as against Schroeder, it

10   seems to me your Honor has picked out the clearest-cut

11   demonstration of the appropriative right and its operation

12   on the subsequently patented riparian lands.

13      The only suggestion I would like to make is that we have

14   suggested a finding that the appropriative right exists, and

15   it seems to me to be unnecessary and I think invites a

16   dispute which need not be disposed of at this point as to

17   what the scope of that appropriative right is.  In other

18   words, it isn't an appropriative right against Schroeder, or

19   an appropriative right against any person or group of persons.

20   It is an appropriative right of this priority as against

21   subsequent patentees.

22      Now, perhaps you don't even need to say as against

23   patentees.  Perhaps you can just say that the appropriation

24   exists with this priority and this quantity.

25      I think certainly the Rindge case on its own facts goes

17,580

t20

1   to the situation you have raised with regard to Schroeder,

2   but the principle on which the case is based it seems to me

3   cannot be stopped at the specific lands on which the

4   appropriation was made, but the principle would extend to any

5   subsequently patented land, because the right, when acquired,

6   was superior not to the parcel where it was acquired, but

7   was superior to all of the inchoate riparian rights on all

8   of the Government lands then existing in the water system.

9       THE COURT:  Looking at it another way, let's forget about

10   Schroeder for a minute, and let's assume that Tripp was up

11   there on this piece of ground that he has got, and that there

12   were 100 inches of water flowing down this stream, but

13   because of the elevation of the stream he can't get the water

14   up on the major portion of his ground.  So he goes up to the

15   upstream edge of his property, and he puts in a ditch on his

16   own property, and diverts 100 inches and runs it over his

17   property, and what is left runs back into the stream.  You

18   would not argue that as an appropriative right?

19       MR. STARK:  No, because he is not on Government land.

20       THE COURT:  Let's take the second instance.  Supposing

21   he goes up 10 feet off his land on X's land, and adversely

22   puts in a dam   and diverts the whole stream across in order

23   to get this elevation.  He might acquire a prescriptive right

24   against X to maintain that dam in the ditch, --

25       MR. STARK:  Yes.

t21

1    THE COURT: -- but you would not claim he had any

2    appropriative right?

3    MR. STARK:  No.

4    THE COURT:  Now, you take a third situation, and say he

5    goes up 10 feet past his land onto Government land, and puts in

6    a ditch.  Obviously in that 10 feet of ground there can't be

7    very much water originating.  The water is originating up-

8    stream of this dam.  Your contention is that by just having

9    stepped off his ground and having put in a ditch on Government

10   land, he immediately recovers some different rights than the

11   right to use the stream?

12   MR. STARK:  No, if he simply steps up on Government land

13   and puts in some kind of a diversion, he probably acquires no

14   right, except that after the land is patented, he may

15   acquire the same kind of prescriptive use.  But if he steps

16   on Government land and files a notice in the statutory manner,

17   and expresses his intention to appropriate, and then proceeds

18   with due diligence, then he has given notice that he is

19   appropriating this water, and he has proceeded with diligence,

20   and he has made the diversion and the appropriation.

21   The intention to appropriate is a critical element here.

22   The mere fact that he takes water out of the stream away from

23   his riparian land would give him nothing more than an

24   exercise of the riparian right, except in an instance where

25   by declaration he seeks to appropriate.

t22

1    THE COURT:  We will concede that he expressed his intent

2    by this document.  But what was there to appropriate?  Can you

3    say now that there was surplus water over and above the

4    riparian needs of the Vail Rancho and the Santa Margarita

5    Rancho?

6    MR. STARK:  This is the thing that I tried to point out

7    a moment ago, or this morning, your Honor.  There are two types

8    of appropriative rights.  There is the appropriative right we

9    talk about now, which is the right to appropriate surplus.

10   That is when people make filings, like Fallbrook makes its

11   filings, and Santa Margarita Mutual.   But the pre-Water

12   Commission appropriations from public lands are another

13   type of right.

14       In the majority of the western states, California

15   excluded, you are dealing almost exclusively with appropriative

16   rights and with priority controlling.

17       In California you have a doctrine of riparian rights,

18   but before you get to the doctrine of riparian rights, there

19   are what are called appropriative rights, but what are a

20   different type of appropriative rights.  They are rights to

21   appropriate from Government lands which by statute are

22   superior to riparian rights which attach by state law after

23   the lands have been patented.

24       Now, our position is that this kind of a right is not

25   a right to divert surplus water.  It is a right to appropriate

t22

water from the stream, which is superior to riparian rights, and to the extent that it is superior to later acquired riparian rights, it is to some extent comparable to the earlier riparian right, because it pre-empts in part the later acquired riparian right, in order to satisfy its demands in the event of an apportionment.

MR. VEEDER:  Your Honor, I don't want to be arguing this beyond any reason, but the thing that has to be proved is that the diversion application of this water was above his riparian right, irrespective of the fact that he went onto Government land.  That makes no difference; not a bit.  The fact is that when he made the diversion and application to beneficial use, he did not need to make a filing at all, nor did he need to post.  The only thing that you acquire by the posting of a notice is under the doctrine of relation back.  It does not mean one thing other than that.   In other words, if he filed it with due diligence, he can relate the appropriative right back to that time, and that is all the filing did.

My point is that he would have to show that he was exercising his riparian right, that he needed three second feet for his full beneficial use, and the riparian right yielded him only a second and a half, and, therefore, he appropriated an additional second and a half.  That I think is the all-important thing.  In other words, it would be impossible to go up on Government land and appropriate rights

t-24

1    to the use of water for riparian lands which already had an

2    adequate supply of water by reason of their riparian rights.

3         I think that is the point.

4         MR. STAHLMAN:  That is a diversion here.

5         MR. STARK:  I was going to say that Mr. Veeder's argument

6    it seems to me is arguing a principle in a case where we have

7    a specific decision of the California Appellate Court to the

8    contrary in Rindge, where they did nothing which can be

9    distinguished factually from what was done here.  They went up

10   on higher land and they took water which, under Mr. Veeder's

11   analysis, would be a further exercise of their riparian rights,

12   and the Court holds that it is an appropriative right, and

13   that in effect what they did was to pre-empt what otherwise

14   would have attached, or would have been useful, having

15   attached, on the riparian right.  They say, "although it may

16   have the effect to rob entirely the upper property of any

17   riparian right in the stream."

18        That is what they said they did there, and yet their

19   total use did not exceed their riparian right.  There is no

20   holding that their total use did not exceed their riparian

21   right.

22        MR. VEEDER:  But when we go back and read the record on

23   this, and read the cross-examination, and read the analysis

24   of the water use, there is one thing that is clear, that the

25   upper ditch conducted the water to lands which lay between the

t-25

1   stream and the upper ditch, and that is where they were using

2   the water all the time.  True, they are using far more water

3   now, and upon different lands than they did then, but we can

4   only look back to the uses in 1885, or immediately thereafter,

5   because they could not increase their appropriations after

6   1914, and that is for sure.

7       They said upon the record, I believe that there was no

8   showing that he was using more than his riparian rights, and

9   I don't believe that you could go on Government land and you

10   could appropriate water where you had a sufficient riparian

11   right to take care of your lands.

12       MR. STARK:  And yet there is nothing in the Rindge case

13   which says --

14       MR. VEEDER:  There is.

15       MR. STARK:  -- that they appropriated anything in excess

16   of their riparian rights.

17       MR. VEEDER:  Mr. Stark, the statement is that there was

18   insufficient water in the riparian rights.  That is the point.

19       MR. STARK:  But only in the sense that only after

20   apportionment it was determined that there was insufficient

21   water.  I submit that it is fairly evident on this river that

22   in the event of an apportionment there is insufficient water

23   to serve the riparian needs of these lands or any other lands.

24       THE COURT:  Let me examine this.

25       (The Court examined the document referred to.)

C fls

Belt C

P 33

1    THE COURT:  Has anyone read the cases cited in Rindge vs.

2  Crags -- Senior vs Anderson and the series cited at the bottom

3  of page 253?

4    MR. SACHSE:  Not in many years, your Honor, but I have

5  read them at one time or another.

6    Your Honor, may I emphasize that the word is -- I think

7  that is the language the Court uses -- they say a riparian is

8  "insufficient"?

9    THE COURT:  It says, "And thus it appears that a riparian

10  owner, being insufficiently supplied with water . . "

11    MR. SACHSE:  That is the present tense -- the riparian

12  owner, being insufficiently supplied.  The case doesn't say

13  a riparian owner who may, in the future, because of development

14  of land in the watershed, find himself.  It says he is being

15  insufficiently supplied today.  He hasn't got the water he

16  needs.  I think we are straining at ordinary grammar if we

17  read into that Mr. Stark's contention.  It seems obvious to me.

18    THE COURT:  Mr. Girard, I haven't heard from you.

19    MR. GIRARD:  I am inclined to agree with Mr. Stark.  Maybe

20  this is wrong.  But look at the situation today.  Say you have

21  a riparian, such as the Vail Company, who is using proper

22  riparian water.  There is nothing to prevent Vail or any other

23  riparian from making an application with the State Water Rights

24  Board to get an appropriative right for that same identical

25  use.  They can get an appropriative right from the State Water

P 38

1  Rights Board even though they are riparian and even though the

2  right they get might be junior to other riparians.

3  But let's take the situation where you have some land on

4  a stream in California which is still not patented, still in

5  Government ownership.  The priority dates of patent have no

6  relevancy as among riparians.  But suppose that some fellow who

7  is riparian on a downstream piece of property did file and get

8  an appropriative right to that water which he diverted on his

9  own land and got an appropriative right for it.  It would be

10  a vested right which had already vested at the time of the

11  patent of the riparian land, assuming a patent was issued

12  today, to which that riparian land would be junior.

13  The evidence here which I think is so conclusive that Mr.

14  Tripp was claiming a lot more than a riparian right is this

15  Exhibit Gibbon and Cottle C.  He says he is claiming all of

16  the water of the stream.  I think he could do it, under the

17  law as it existed then.  It is no good as against people who

18  had prior vested rights.  But I don't see any reason to conclude

19  that merely because his water use was the same use he might

20  have made as a riparian it would prevent his getting a non-

21  statutory appropriation.

22  MR. VEEDER:  I think the Rindge case says exactly that.

23  It says in so many words that the only time he can get an

24  appropriative right is when his riparian right is proved to be

25  insufficient.  That is the point.

P 35

1    MR. GIRARD:   I don't think it meant that.   Right now you

2    can get an appropriative right.

3    MR. STAHLMAN:   Yes.   But you can prove now that it is

4    insufficient.

5    MR. GIRARD:   You don't have to prove that it is insufficient.

6    The Forest Service gets hundreds of appropriative rights for

7    springs in California on their land.   They don't have to do it.

8    They **are** probably not getting anything that is worthwhile.

9    MR. VEEDER:   The point I am trying to make is that if Vail

10   Company had riparian water sufficient to irrigate 40 acres of

11   land, they couldn't use their appropriative  right on that land

12   because they have an adequate supply.

13   MR. GIRARD:   There is nothing to prevent Vail Company from

14   making a filing to get an appropriative right for exactly what

15   they are doing right now.

16   MR. VEEDER:   Not if they had sufficient riparian water to

17   irrigate that land.   That is the whole crux of the Rindge case.

18   MR. GIRARD:   They could get an appropriative right right

19   now even though they had sufficient water to irrigate that land.

20   MR. VEEDER:   Not for that land.

21   THE COURT:   The Rindge case talks about this -- it is a

22   little hard to understand -- quoting from Senior vs. Anderson:

23   "Her riparian rights could only entitle her to a reasona-

24       ble use of the water upon her riparian lands, but having

25       before she acquired title from the United States

1    appropriated more water than was required for beneficial

2    use upon said lands, she could acquire no right to any

3    additional quantity"

4 Then here comes the language that makes it confusing:

5    "under the law of riparian rights."

6    MR. STAHLMAN:  I think that simply means that if she has

7 sufficient water she can't appropriate.

8    MR. VEEDER:  That is the whole thing.

9    MR. STARK:  What type of suit was it?

10    THE COURT:  It was a quiet title suit.

11    MR. STARK:  There was an apportionment of riparian waters?

12    THE COURT:  There were three things cited by the trial

13 court.  One was the building of the dam.  It is hard for me

14 to understand how they sustained the lower court on the dam.

15    This judge wrote it without paragraphs, you know.

16    The other was about a spring of water which the trial

17 court had found did not contribute to Malibu Creek.  That I

18 can understand.

19    And then finally she claimed the right under appropriations

20 to the extent of 100 miner's inches.  She established a point

21 of diversion, performing the necessary acts to complete the

22 appropriation.  From this time forward the water was regularly

23 taken and used for irrigation purposes on the land.  She took

24 a large quantity, but there was a lot of waste, and she actually

25 got 4.95 inches subject to beneficial use.  And the trial court

1    found that her appropriative right was measured by the quantity

2    of water put to beneficial use.  And the Court affirmed that.

3        You asked what type of action it was.  Equitable relief

4    of several kinds to protect rights asserted to be held to the

5    use of water flowing.

6        MR. STARK:  But since the Court affirmed the appropriative

7    right, with the limitation that the appropriative right could

8    not exceed the total quantity of water which could be put to

9    beneficial use on the riparian land, it is apparent that the

10   total right which was confirmed did not exceed what would be

11   the riparian right in the absence of an allocation.

12       THE COURT:  It doesn't say that.

13       There was a contention made that Mrs. Rindge could  not

14   claim both as a riparian and as an appropriator.  The trial court

15   determined the number of acres owned by each of the parties

16   which were riparian.  He determined that the available supply

17   of water was insufficient to meet the riparian needs.  He

18   determined that each should have continuous flow for a conse-

19   cutive period of hours.  So this was the apportionment.  And

20   the Court said:

21       "It is established in California that a person may be

22   possessed of rights to the use of water in a stream both because

23   of the riparian character of the land owned and also as an

24   appropriator."

25       MR. STARK:  Our position is that if you assume an

P38

1    apportionment, it is fairly clear that the Gibbon and Cottle

2    lands are putting to beneficial use more water than their

3    riparian apportionment would give them, as anybody else along

4    the stream who is using any substantial amount of water, and

5    the appropriation here is to make up the difference.

6        THE COURT:  Let me ask you this question.  Have any of

7    you in reading this law of water rights run on to authorities

8    to the effect that the proof to establish either a prescriptive

9    or an appropriative right should be clear and convincing?

10       MR. STAHLMAN:  That is correct.

11       MR. GIRARD:  I cited some cases on that in one the briefs

12   I filed.

13       THE COURT:  It would seem to me that this should be the

14   rule.  That the presumption would be in favor of the ordinary

15   uses, and if somebody asserts a right appropriative or pre-

16   scriptive in character the burden would be on them to present

17   by clear and convincing proof their right, and that difficulties

18   in proof or uncertainties should be decided against the person

19   asserting this superior right.

20       MR. STARK:  But assuming such a rule, your Honor, can you

21   be any more clear and convincing as to the intention to appro-

22   priate than the filing of a public notice?  There is no question

23   in this record that with due diligence under the circumstances

24   they completed the diversion works and that they continued to

25   divert.

P39

1      THE COURT:  We are agreed on this.  And I think Mr. Veeder

2  is correct that the only effect of the notice was for the

3  purpose of relation back.  Tripp had exactly the same rights

4  from the time he completed his ditch even if he hadn't filed

5  a notice.

6      MR. STARK:  And the only dispute we have with Mr. Veeder

7  is whether legally this can amount to the creation of an

8  appropriative right where the aggregate amount used is within

9  the riparian right and could have been asserted as a part of

10  the riparian right.

11      THE COURT:  Give me a minute to look this over.

12      Mr. Bailiff, get 97 Cal. 464.  Mr. Sachse, take a look at

13  that.

14      And 84 Cal. 585.  Mr. Girard, take a look at that.

15      And 133 Cal. 566.

16      Let's look at some of these cases.

17      Mr. Veeder, he cites Wiel "On Water Rights," page 346.

18      MR. VEEDER:  I have that.

19          (A pause.)

D fls.

20

21

22

23

24

25

t26
D

THE COURT:  Can either of you offer anything further on this that is pertinent?

MR. VEEDER:  The only thing in regard to the Wiel Report, and I showed it to Mr. Stark, it simply recognizes the fact that we all recognize, that an owner of riparian land can appropriate water for beneficial uses.

MR. GIRARD:  The only thing in that California case is that it says the proof must be convincing, and the question involved was whether or not the diversion was on private land rather than Government land, and it was reversed on the basis that it wasn't shown that it was on Government land.

THE COURT:  I don't know.  Do you want to talk about this any further?

MR. STAHLMAN:  Yes, I was going to say that in a case such as this, where the only record upon which the appropriation was made is as it is, whether or not there should not be some special notice for that purpose, so that there may be something shown from a historical background, if that is a point on which this case is going to turn.

MR. SACHSE:  133 Cal., your Honor, would expressly require a finding by your Honor, and I frankly don't know what the evidence is specifically, but it will require a special finding that the diversion was made on public domain.

THE COURT:  Would require an express finding what?

MR. SACHSE:  That the diversion was made on public

t27

1  domain.  I don't remember what the state of the proof is on

2  this matter, but you will have to find that the diversion was

3  made on public domain, and if we don't have that proof, we

4  are in bad shape.

5      THE COURT:  We have the affidavit of the daughter of

6  Tripp, that statement that the place where the water was

7  taken in the ditch was on land belonging to the Government.

8      MR. STARK:  We also have Tripp's direct testimony to

9  this effect.   On this whole matter of the question of proof,

10  it seems to me that the proof is there, certainly, as I

11  understand the matter of riparian rights and many other things

12  in this case, -- the proof is there in a sufficient state so

13  that in the absence of someone contesting it, it is more than

14  adequate.

15      In addition, to impose any greater burden on a small

16  defendant on a particular narrow area of proof -- in other

17  words, this turns on whether or not the proof is sufficient,

18  and, as your Honor knows, we ran down Mr. Tripp in Central

19  California, and knows the problem of getting him down here,

20  and the searching of the record.  I think we have done a

21  fairly good job establishing such things as the nature of the

22  appropriation, and the fact that it was on Government land.

23      THE COURT:  Actually, it is a very interesting point, but

24  probably, as a practical matter, it doesn't make a great deal

25  of difference.  If I find that you have an appropriative right,

t28

1    you certainly cannot affect the Vail Ranch, and there is a

2    serious doubt whether you can affect the Government lands

3    downstream which later were patented.  Your brief talks about

4    upstream, and at best you put your best foot forward when you

5    said that it was used upon Plots 2, 3, 4 and F, as shown on

6    Gibbon and Cottle's Exhibit A.   And in my notes made at the

7    time, and I think they are correct, I note that is the only

8    place it was used.

9        MR. STARK:  That is correct.

10       THE COURT:  And that totals only 38 acres.  I propose to

11   do a little more studying myself on it, and then decide it.

12        You have no other evidence to offer except the

13   matter of the division of title between Gibbon and Cottle?

14       MR. STARK:  The matter of the division of title, and if

15   your Honor desires specific second-foot testimony, and feels

16   that it is essential, we can bring Mr. Rowe down to testify

17   on that   question.

18        We are satisfied, as I say, with a finding in terms of

19   acre feet, which is the basic limitation, up to the capacity

20   of the existing diversion works.  The record does not have

21   a specific second-foot limitation on the rate of flow.

22        I don't know that Colonel Bowen would be in a position

23   to stipulate to it, and I am not sure what effect a

24   stipulation of this kind has.

25       MR. VEEDER:  I might say -- excuse me.

t29

1    MR. STARK:  I don't think it is necessary to have this

2    precise finding, that is, to have it in terms of second feet

3    or of inches.  You can define it in terms of the capacity of

4    the canal.  The California cases do this repeatedly, and that

5    is sufficient for our purposes.  It is true we may have an

6    argument some day as to what the canal was, and if we are

7    wrong and do not maintain our records, we may not have our

8    rate of flow very well.

9        MR. GIRARD:  There is a question there.  In 1955 they

10   changed their diversion rate, where prior to that time it

11   was different.

12       MR. STARK:  Not the capacity of the diversion works.

13       MR. GIRARD:  Not the capacity of the diversion works, but

14   prior to 1955 the diversion works' capacity did not take all

15   the water.

16       MR. STAHLMAN:  Not only that, but the diversion ditch

17   merely limits the extent to which you can appropriate.  It

18   fixes the maximum.  It does not say that you are entitled to

19   that because you have a ditch that can carry that much water.

20   You have to show it was put to beneficial application.

21       MR. VEEDER:  And that is the whole crux of the matter,

22   your Honor, and why I raise these points; that if we will

23   search the record very carefully, we will find out what they

24   raised as early as your evidence will support, and when you

25   get through, what do you find?  You find you don't know how

17,597

t30

1    much water was applied for beneficial uses.  And that is the

2    point that I have stressed from the start.

3        We know they had a riparian right, and we know they

4    exercised it, but how much of the water did they divert and

5    apply as a riparian, and how much is an appropriator?  And

6    I think that is where the case breaks down.

7        MR. STARK:  Apart from the point where Mr. Veeder's

8    argument overlaps his prior argument, the footnotes on this

9    Page 8 and Page 9 of the proposed findings show:  First, as

10   to the quantative right, I agree you can't define an

11   appropriative right by saying that you have a right to divert

12   the capacity of a canal.  The capacity of the canal limits

13   the rate only, not quantity.  But we have the testimony of

14   Mr. Tripp that from  '97 forward they irrigated the lands

15   between the two ditches, between the upper ditch and the

16   lower ditch, and we have Mr. Rowe's testimony in which he

17   has calculated the acreage of these fields.

18       As I say, there are the four fields indicated where the

19   footnote continues onto Page 9.  There are the four fields,

20   B, F, 2, 3 and 4.

21       It is B and F, your Honor.  Do you find that?

22       THE COURT:  Yes.

23       MR. STARK:  B, F, 2, 3 and 4, and we have applied to

24   that the 4.4 average annual diversion duty for lands in this

25   area.

t31

THE COURT:  Of course, you make a big assumption there. The question is, what did they apply to beneficial uses? The 4.4 figure is what could be applied.  I take it it was done much more inefficiently in those days than it is done today, and the mere fact that it is a good figure to take does not mean that it is what they used in those days.

MR. STARK:  The testimony is that they irrigated all of this acreage, and there was testimony respecting flood irrigation, and so forth.  But, your Honor, as a practical matter, they didn't have this type of operation, Weir measurements, meters, and so forth.  But we have brought the best testimony that is available as a matter of historic fact.  We found out what acreages were irrigated, and we maybe are claiming less quantity than was actually applied, but we have claimed the quantity of water which is in accordance with what the accepted testimony seems to be of the Government as to what is necessary to irrigate lands in this area.

That goes to quantity, but as to the rate of flow, the rate of flow is a limitation on the rate at which you can take this total quantity, and that maximum limitation can be expressed in second feet, in miner's inches, or any other rate of flow, or in the capacity of a given physical facility. And we suggest on this record, as it now stands, it should be defined with reference to the capacity of the existing diversion works.

17,599

t32

1     THE COURT:  That is the only way you could define it on

2  this record.

3     MR. STARK:  Yes.

4     THE COURT:  Do you have in the record sufficient evidence

5  to define these works?    Some time from now these works may

6  be gone.  If I do find that you have a right to take a

7  certain rate, what do you have to describe it?

8     MR. STARK:  The works are described generally and by

9  reference to the maps.  It seems to me that we bear the burden

10  under this circumstance of preserving evidence of the fact

11  that there are no changes in these works, in the face of this

12  record.

13     When we get to a time where this is material, we may

14  well have a difficult factual problem to determine what the

15  carrying capacity of this ditch was, although, as I said

16  earlier, I think the mere physical fact of its having been

17  cut out of rock probably eases that problem.

18     THE COURT:  That may not be your limitation.  The 12-inch

19  pipe may be your definite limitation on the works.

20     MR. VEEDER:  Even so, you have the heading on the

21  12-inch pipe, and all these other elements, your Honor, and

22  the gradient.

23     But I want it clear that the position of the United

24  States is that men like Poor, who is immediately downstream

25  from Gibbon and Cottle, have come to me and have talked to me

17,600

t33

1    about their rights, and they say, "Gibbon and Cottle take so

2    much water we can't even get domestic water."  Mr. Schroeder

3    was in here, and he made quite a vehement speech.  The point

4    I want to make is that if an appropriative right exists here,

5    I think that you can cut off Poor completely and entirely.

6        MR. SACHE:  Your Honor, Mr. Girard produced a finding

7    here, and it may be that that ought to be examined again, on

8    the definition of your appropriative right.   That is,

9    apparently, prior to 1955 this water was diverted, coming

10    from these temporary dikes, and they washed out each year,

11    the runoff went through them, and that there was rising and

12    surface water downstream from the diversion works prior to

13    1955.

14        THE COURT:  I think that is definitely established.

15        MR. SACHSE:  Let's make it very simple, then.  Supposing

16    the diversion works were just a loose works that let the

17    water run through them.

18        MR. VEEDER:  Cottle said that.

19        MR. SACHSE:  And that that was a proper appropriation,

20    conceded for the sake of argument.  Now, in 1955 he comes

21    along and puts in a concrete dam which stops all the water

22    from going down.

23        THE COURT:  I will not go for that.  There is no doubt

24    in my mind about the testimony that the original dam did not

25    go down to bedrock, and washed out periodically, and there was

t34

1   flow below.  The present status of the Gibbon and Cottle dam,

2   with this concrete clear down to bedrock has cut out what

3   otherwise went downstream, and this is why Poor and some of

4   these others suffered, and there will have to be some

5   correction of that, even if you got an appropriative right.

6       You have gone far beyond what was there historically.

7   You can't in 1955 increase a right which you claim originated

8   in 1855.

9       MR. STARK:  But, your Honor, we are not increasing a

10  right.  We have a right to take a quantity out of the stream;

11  not to take a given percentage of the stream.

12      THE COURT:  It is just this simple.  Poor is a riparian,

13  and assuming his title -- his antecedent's title went back to

14  prior to your date, or prior to the appropriation .

15      MR. VEEDER:  If it does not, he is in more trouble than

16  before.  That is the point that I make.

17      THE COURT:  If it goes back that far, then he is a

18  riparian, and he can probably use the water that comes down

19  that stream, and he certainly has a right to object to somebody

20  cutting it all off and putting it in a ditch.

21      MR. STARK:  This is conceivable, your Honor, that you

22  could have a separate problem.  Unfortunately, I was not here

23  when Mr. Poor's testimony went in.  In fact, I don't know

24  that I gather the substance of it.  This could be, I assume,

25  the subject of a separate lawsuit.

t35

1          I presume there will not be a mandatory injunction

2     issued in this lawsuit relating to how physical works ought to

3     be managed, will there?

4          I hadn't understood that this was within the scope of

5     what we are doing, and if we are not doing it, and if we

6     are just defining a right, your Honor, we can define it --

7          MR. VEEDER:  As what?

8          MR. STARK:  -- in terms of the quantity, the quantity

9     which has been diverted.

10         MR. GIRARD:  Your Honor, that is my problem.  I went

11    through Mr. Tripp's testimony, and I defy anybody to tell me

12    how much water was used in any year prior to 1914.

13         MR. STAHLMAN:  You can't do it.

14         MR. GIRARD:  And I think that it is very important for

15    these people, particularly Schroeder, to know what his riparian

16    right is conditioned upon by this 1885 appropriation.

17         MR. VEEDER:  That is what is being adjudicated.

18         THE COURT:  Have you changed your mind?  A few minutes

19    ago you were on Mr. Stark's side.

20         MR. GIRARD:  No, I take the same position that I did when

21    I drew the findings.  I drew Finding 13, which described the

22    facts, and I think I agreed with Mr. Grover that based upon

23    the facts of making a physical appropriation or a physical

24    diversion, you can get an appropriative right.  But I will go

25    a step further and say that you have to prove it with convincing

t36

evidence, how much water you got.  An appropriative right can't be defined in a vacuum.  You have to show it specifically, either through second feet, acre feet, or something that you can reasonably tie it down to, how much of an appropriative right it is.   In other words, what amount of water was beneficially used every year or in any year prior to 1914.

MR. VEEDER:  And it was Dr. Cottle's testimony, your Honor, that said that he always just bucked in an alluvium dam, that it wasn't just boards, but just in sand, and diverted water through their conduit.  Then they put in a structure where they put in a 12-inch overflow pipe and a 12-inch pipe going into the ditch.

Now, that is an entirely different situation from anything that was there in 1885.

MR. STAHLMAN:  In addition, I think the evidence does not show what the amount of water was that was used for beneficial uses.  As I recall the testimony, I think at one time he said there were some orchard trees at one place, but he did not state how much water was used there, and at another time there was a garden at some other place.

MR. GIRARD:  Mr. Tripp was an extremely poor witness. Mr. Grover had him leaning over there, and he had him on the property, and he still could not tell me how much water he had used in any year.

THE COURT:  Tell me at what page does this Cottle case

t37

1    start in the transcript?

2        MR. GIRARD:  Tripp's testimony is somewhere around

3    Page 13,400.

4        THE COURT:  Mr. Stark, can you tell me where your case

5    starts?

6        MR. STARK:  The Tripp testimony --

7        THE COURT:  I mean the whole case.  I have it in my

8    notes, and my notes are at Page 79-A, but I want to know at

9    what page of the transcript it is.

10       MR. STARK:  Rowe is the first, and it is at 12,267, I

11   believe.

12       MR. VEEDER:  Volume 108 through --

13       THE COURT:  12,267?

14       MR. STARK:  Yes, Volume 108 at the beginning.   And

15   Volume 109, Volume 119, and Volume 118.

16       MR. GIRARD:  It is the State's position, to make it

17   clear to the extent that your Honor can conclude, that if the

18   evidence establishes the actual physical use of water in any

19   year prior to 1914, they probably have an appropriative right,

20   and the burden is on them to prove it.

21       MR. VEEDER:  You will find William Cottle in Volume 109,

22   starting at 12,439.

23       MR. GIRARD:  Of course, you have to remember that it is

24   only pertinent to uses which occurred prior to 1914, and

25   Cottle was after 1914.

t38

1    MR. VEEDER:  Yes, but, Mr. Girard, the whole issue that

2    Mr. Stark has touched upon is to bring in evidence as of the

3    present situation from Mr. Rowe, and a description of the

4    structures as they presently exist.

5        MR. GIRARD:  Mr. Tripp testified to what went on before

6    1914.

7        MR. VEEDER:  But the additional matters that Mr. Stark

8    has alluded to are present-day matters.

9        MR. STARK:  Your Honor, since you are apparently going

10   to go back and go over this testimony, Mr. Girard has

11   characterized Mr. Tripp as a very poor witness.

12       I think you have to view this problem in a reasonable

13   context.  Mr. Tripp was about 80 to 90 years of age, and we

14   are talking about testimony of a water use some 60 years ago,

15   and we are talking of a water use in a period when the

16   country was in a very rudimentary stage.  Nobody who had a

17   ranch in the back country of San Diego County is going to be

18   able to give you a year by year statement of what crops he

19   grew on how many acres.  Here he had a high ditch and a low

20   ditch , and he irrigated from the high ditch to the low

21   ditch all the land between.  The only Rowe testimony that ties

22   into this is that Rowe estimated what that acreage was.  There

23   is no question that the land has not changed basically.

24       There is testimony that the ditches are in the same

25   place.  He testified that all of that land had been irrigated.

t39

        If your Honor please, there are a number of ways of
establishing it, particularly in the case of prescriptive
rights, where you are trying to establish what the use was.
It is very rare that you have any precise measure of the
quantitative amount of water.  You go generally to the matter
of water duty, and try to estimate what the crops were.

        Now, as I understand the testimony of Colonel Bowen, he
arrived at a reasonable average annual water diversion duty
of 4.4 acre feet per acre.  This was an average figure.  It
is not related to whether one piece happened to be in one
specific crop or in another specific crop.  There is some
variance in his figure.  But I submit that unless you are
to say there can be no early historic rights because
unfortunately you can't prove them, you have to take the best
proof which is reasonably possible.

        Mr. Tripp's testimony and Mr. Rowe's testimony and
Colonel Bowen's testimony, taken together make a reasonable
presentation.

        This is more of a burden on us than most of the other
parties in this case, -- some of them with considerably more
money, and considerably more resources.  And here again, when
we are talking about somebody bearing a burden,I think that
in a case of this size and proportion, you have to keep in
mind that the Government of the United States is one party,
a public district is another, and an immense ranch is another

17,607

t40

1    major party, and to put upon us the same burden that you put

2    on a major party would lead to an impossible situation, on

3    which no practical due process could be afforded.  I think

4    that the transcript which is quoted in the footnotes as to

5    the land and as to the area which was irrigated, and the

6    reasonable water duty which was testified to, gives a basis

7    upon which the Court can arrive at a reasonable quantity on

8    this right.

9            We are not talking about a  vast amount of water.

10   We are not talking about water that is in large quantities.

11   In fact, we are not talking about a right which affects either

12   Vail, or the Government, or any of the major  users.

13          MR. VEEDER:  May I ask counsel a question there?  How

14   much of the right he is asserting here is he claiming by

15   reason -- I will start again.   What quantity of water does he

16   assert that he is entitled to divert by reason of his

17   appropriative right based upon proof, and how much upon the

18   normal flow the stream that is in the record do you think is

19   your riparian entitlement?  I believe those things are

20   important.

21          I don't think you can come along and say that here are

22   36 acres of land where we are diverting water, and it is all

23   appropriative.

24          I think, as we point out in the reference on 346, if there

25   is an award here of an appropriative right, there must be a

17,608

t41

1   determination that it is over and above a particular riparian

2   right.

3       MR. STARK:   And when this Court or any other Court is

4   in a position to state what the riparian apportionment is,

5   then that answer can be given.  It can't be given before.  I

6   don't know what our riparian apportionment would be.  I would

7   suspect it would be rather small.

8       MR. VEEDER:  Are you going to say, then, that the award

9   that you are seeking will not show a ceiling as to your

10  appropriative right for the smaller quantity in your riparian

11  right?

E fls

12
13
14
15
16
17
18
19
20
21
22
23
24
25

P40 Belt E

1    MR. STARK:  It will show a ceiling as to the appropriative

2    right.

3    MR. VEEDER:  And what would that be?  Would that be the

4    full flow of the ditch throughout the irrigation season?

5    MR. STARK:  157.5 acre feet per year.

6    MR. VEEDER:  And that is for the full irrigation season

7    for the full capacity of the ditch?

8    MR. STARK:  It is acre feet per year.  It has nothing to

9    do with the season.  I take it the total flow until such time

10   as that has been taken.  In one year it may be taken in a hurry,

11   in another year it may not be.

12   MR. VEEDER:  You can't do that.  How many acre feet was

13   it?

14   MR. SACHSE:  157.5.

15   MR. VEEDER:  Your 157 acre feet cannot all be taken at

16   once, I assure you.

17   MR. STARK:  It cannot be taken faster than the capacity

18   of my ditch.

19   MR. VEEDER:  But not for your full irrigation season,

20   surely.  Because there is some riparian right there.  You can't

21   say you can take the whole flow of the stream as against Mr.

22   Poor until you get your 157 acre feet.  I wouldn't go for that

23   at all.  And I don't believe there is any criteria which would

24   permit you to do that.

25   MR. STARK:  In the first place, there is not that much

P 41

1  flow in the stream to take it all to the exclusion of somebody.

2  If we can take it all, there is water coming through.  The

3  testimony well indicates that.

4  MR. GIRARD:  I would agree with Mr. Stark that the amount

5  of water he is talking about doesn't mean much as far as

6  Fallbrook, Vail, the State and the United States are concerned.

7  But it might mean a lot as far as his neighbors are concerned.

8  He is a pretty big water user when you take into account

9  Schroeder and those other people.  He is the Vail Company of

10  this Upper Temecula area.

11  MR. STAHLMAN:  He is probably larger than that.  Mr. Poor

12  is not getting any water.

13  MR. STARK:  I am simply appalled at the interest the Vail

14  Company has acquired in Mr. Poor.

15  MR. STAHLMAN:  I am appalled at the argument that counsel

16  puts up to convince the Court that the weakness of his testi-

17  mony should acquire strength --

18  THE COURT:  Tell me this, Mr. Veeder.  You may answer it.

19  If not, Colonel Bowen may answer it.  This water duty, what do

20  you take -- 4.4 acre feet?

21  MR. STARK:  Diversion duty, yes.  I have used his term of

22  "diversion duty."

23  THE COURT:  Which is somewhat less after it gets there

24  because of loss?

25  MR. STARK:  Yes.

P42

1    MR. VEEDER:  It depends on the crops, your Honor.

2    THE COURT:  What does this 4.4 contemplate?  Irrigation

3    throughout the entire dry season?  Does it contemplate irriga-

4    ting a crop once or twice, or does it contemplate irrigating

5    alfalfa once every thirty days?

6    COLONEL BOWEN:  It contemplates, your Honor, supplying all

7    of the water necessary over and above rainfall.

8    THE COURT:  To grow a certain crop?

9    COLONEL BOWEN:  That is for an average season.  The normal

10   irrigation season runs, generally, from about the first of

11   April until the end of October.

12   THE COURT: What I am thinking about is this.  I want to

13   know how you relate this to certain crops.  For instance, where

14   irrigation water is difficult to obtain and there may be

15   enough for a small amount of irrigation if a crop is put in as

16   early as possible, a crop comes to fruition in late June or

17   July and would be irrigated once or twice before that time, and

18   thereafter the rest of the irrigation season the land lays

19   fallow.  On the other hand, some of the Japanese truck gardeners

20   will rotate crops and put in another crop as soon as one is

21   taken out.  What does the 4.4 mean translated to the growing

22   of a certain kind of crop?

23   COLONEL BOWEN:  That is the duty of water up in that area,

24   as I recall, your Honor, for a perennial irrigated pasture

25   crop, which might during seasons like last year require

P43

1   irrigation throughout the winter as well as during what we

2   normally consider the irrigation season.

3       THE COURT:  Then this 4.4 would contemplate irrigation

4   throughout the entire dry season, at least through the entire

5   dry season?

6       COLONEL BOWEN:  Yes, your Honor.  The 4.4, I note from

7   the table Mr. Veeder handed me, would be the requirement for

8   row crops, and that contemplated double-cropping, your Honor.

9       THE COURT:  This is not the way they irrigated in 1885.

10  I think that could be proved or demonstrated.  It is not the

11  way they irrigated even when I was a kid in 1914-15.  This

12  business of irrigating throughout the entire dry season, with

13  the exception possibly of permanent pasture, wasn't done.

14      What type of orchard was it?

15      MR. STARK:  He is referring to irrigating throughout the

16  year.  That is not the average year.  His 4.4, as I understand

17  it, was for an average year, of which this full year irrigating

18  is not an example.  And I would assume that the 4.4 would not

19  be more than the use of flood irrigating of fields.

20      THE COURT:  What type of orchard was it that he had up

21  there?

22      MR. STARK:  The orchard he testified to was off the

23  middle ditch, I believe.  That was prior to 1897.  And he

24  doesn't testify to orchards being in there.  He testifies to

25  pasture and field crops for the most part.

P44

1    MR. VEEDER:  He said there was an orchard there and it

2  was washed out.

3    MR. STARK:  The orchard was where the wooden flume was on

4  the middle ditch and was washed out in 1891.  There is quite

5  a good deal of testimony about that orchard.  But the majority

6  of it is field crop.

7    THE COURT:  What do you mean by field crops?

8    MR. STARK:  Pasture.  It is open, comparatively level land.

9    THE COURT:  What kind of crops does the evidence show they

10  grow?

11    MR. VEEDER:  The evidence shows that they were raising

12  alfalfa in there, your Honor, and they brought water down and

13  irrigated and released it, with a very substantial return flow

14  prior to the recent operation.

15    And here is the thing that concerns me.  They changed to

16  sprinklers.  Mrs. Gibbon testified that as distinguished from

17  the original uses they are taking water up on the benches now

18  with sprinklers and subjecting a great deal more land than had

19  previously been irrigated, with the attendant reduction in

20  return flow.  I think we have to look at the whole picture.

21  We can't talk about one phase and facet of this claimed

22  appropriative right.

23    MR. STARK:  You are running off down in a side alley here.

24  Basically, we talked about the use up to 1914.  And as I under-

25  stand the testimony on it, although general, it indicated flood

P45

1   irrigating, which was testified to by Colonel Bowen as being

2   the most wasteful form of irrigating of pasture and of alfalfa,

3   et cetera.

4   Now my point is that in this proposed finding we have

5   taken Colonel Bowen's figure, which, as I understand it, is

6   an average figure for field crops in this area for a year and

7   on the assumption that it may well be less than what was actually

8   spread on this land but it is the best conservative estimate of

9   what the duty of water is to irrigate the general variety of

10  field crops in this area.

11  THE COURT:  Well, we are getting nowhere fast.  I am going

12  to try to spend some time reading this transcript again.

13  Your findings on page 2 -- Radec, Faulting -- would have

14  to be read in connection with the ground water area, and this

15  property is in that ground water area.

16  MR. STARK:  But I understood, your Honor, in one of the

17  comments on one of the days I was here -- I believe you were

18  talking to one of the pro per defendants in one of the upper

19  valleys -- your Honor indicated you were finding the general

20  ground water area, recognizing that within that area there

21  might be, I think in this case you were talking about bedrock

22  areas where wells might be down crevices, et cetera, there were

23  areas of vagrant percolating waters which might exist within

24  the general ground water area.

25  THE COURT:  I am not prepared to find that as to this

P46

1    property.

2    MR. STARK:  What we are suggesting here, your Honor, is

3    that as far I know the only testimony regarding the geology of

4    this particular basin is Dr. Mann's testimony, in which he

5    pretty clearly indicates the existence of this northwesterly-

6    southeasterly fault -- the transcript references are referred

7    to -- in which he indicates that as to these three high wells

8    that are well away from the stream that they are beyond the

9    fault and that there is little, if any, underground flow or

10   connection of water between the stream, the new alluvium and

11   the adjoining older alluvium, and this older alluvium which is

12   northerly and easterly of the fault line, and his testimony,

13   I think you will find when you re-read it, is fairly definite

14   that in his opinion at least these three wells are fed by

15   vagrant percolating water -- that they are not fed by the

16   stream, that they don't support the stream and are not supported

17   by the stream.

18   THE COURT:  They are in the older alluvium, are they?

19   MR. STARK:  They are in the older alluvium, but the older

20   alluvium has been fractured by these fault lines, so that there

21   is a comparatively impervious dike separating that part of the

22   Radec basin from the stream.  His testimony is in the transcript

23   pages which are cited in Paragraph 4 particularly.

24   The point is simply that on the basis of his testimony I

25   think it would be entirely proper to make a finding that that

P47

1  portion of the basin of the older alluvium has been broken off

2  by the earthquake faulting and the creation of an impervious

3  dike, so that you have, in effect, an isolated small basin of

4  vagrant percolating water.

5    THE COURT:  I don't know what wells he is talking about.

6    MR. STARK:  The wells are shown on the exhibit which is

7  attached to these findings.

8    THE COURT:  You have the Valley Well and the Corral Well,

9  and the Field Well.  Are those the wells you talk about?

10    MR. STARK:  That is correct.

11    THE COURT:  According to Exhibit 275, those wells are all

12  in an area of younger alluvium, with the possible exception --

13    MR. STARK:  In the area of younger alluvium?

14    THE COURT:  Younger alluvium.  At least, they start in

15  that area, with the possible exception -- we could identify

16  the Field Well as being at the junction of Highway 74 and

17  Highway 71 immediately south of the juncture.  It is probably

18  J-1.  Here is Radec.  Here is the juncture.  According to your

19  sketch, here, your Field Well would have to be probably J-1,

20  your Corral Well would be K-2, and your Valley Well may not be

21  shown.  Here is the section line.  Your Valley Well is shown

22  as being just inside of 20.  Your Valley Well might be in 1

23  over here.

24    MR. STARK:  There is a variance.  Dr. Mann's testimony

25  shows the recent or newer alluvium only along the streambed

P48

1    itself, and the so-called Temecula arkose, which he said he

2    would classify, as he understood it, as older alluvium, the

3    Temecula arkose is a composition of the balance of the basin.

4    In any event, whether new alluvium or old alluvium, his testi-

5    mony is that it is fractured northwest to southeast by fault

6    lines which have created by the shearing of some clay soils

7    an   impervious dike.

8        THE COURT:  Even if that were true, that doesn't mean that

9    these wells that lay northeasterly of that line didn't tap

10   water that contributed further on down to the stream.

11       MR. STARK:  This is what he testifies to, that it is a

12   pocket with small local run-off.  He indicated there was

13   probably a limited amount of water available to those wells.

14       THE COURT:  All I can say is that I will review the

15   testimony and do some work on it.

16       MR. GIRARD:  The only other problem I see in the findings,

17   your Honor, is the attempt by Mr. Stark to defer a finding on

18   whether or not there is a prescriptive right.  I think that

19   was argued at length before.  I think your Honor ruled.  But

20   I think in a quiet title suit you either prove your prescriptive

21   right here or you don't prove it.  If you don't prove it, you

22   are found not to have one.  I think your Honor indicated be-

23   cause of the fact that there was water creeping through and

24   available downstream that there was no adversity which was

25   apparent.  Mr. Stark or Mr. Veeder, correct me.  I think that

P49

1   was the ruling before.

2       MR. STARK:  If your Honor recalls, the position of these

3   defendants with respect to the prescriptive right was predica-

4   ted on a theory different from what Mr. Girard mentioned.

5   Specifically, it was predicated on an analogy or argument from

6   mutual prescription.

7       MR. GIRARD:  That is right.  That was rejected.

8       MR. STARK:  Your Honor had indicated that he had considera-

9   ble doubt, in fact, you did not think you would find a pre-

10  scriptive right under these circumstances.  And rather than

11  submit an extensive finding at this time, I have simply

12  suggested, partly in view of the Court's comment that how could

13  you make such a finding which would be adverse to everybody

14  without giving everybody notice and bringing them in.

15      As I understand, there is one other area that may require

16  modification in these findings, and that is on the riparian

17  right we have set forth the irrigable acreage in the riparian

18  entitlement.  I understand there has been and will be further

19  argument as to whether any such finding as that should be made

20  as to any of these lands, since there is not an apportionment

21  proposed at this time.  And my feeling about the prescriptive

22  right is essentially the same, that the prescriptive right is

23  of significance only if there is to be some operative decree

24  entered -- that is, if there was to be an apportionment.  A

25  prescriptive right by nature is going to be enlarged, reduced,

P50

1   modified with each passing year.

2        THE COURT:  We can save a lot of time on this.  I am going

3   to find that you have no prescriptive right.  We'll get that

4   out of the case.

5        As far as your irrigable acreage is concerned, although

6   there is to be no apportionment, the Government has been draw-

7   ing these findings with the amount of irrigable acreage in-

8   cluded.  So if your figures are reasonably correct, we will

9   include those.

10       Has anybody made any check on the acreage he has submitted

11  in his findings on irrigable acreage?

12       MR. GIRARD:  On the findings I made I took them out of

13  Colonel Bowen's report.

14       MR. STARK:  We used Colonel Bowen's report.

15       THE COURT:  By the findings you made, you are referring

16  to those lodged on April 4th?

17       MR. GIRARD:  They were lodged a long time ago.  I don't

18  know whether it was April 4th or not.  There was only one set,

19  I think.  There are seven pages of them.

20       THE COURT:  Yes, seven pages.  Do you have them before you?

21       MR. GIRARD:  I have my copy.

22       THE COURT:  The first page ends with the word "River."

23       MR. GIRARD:  Yes.

24       THE COURT:  The second page ends with the words "Range 1

25  E A."

17,620

P51

1    MR. GIRARD:  Yes.

2    THE COURT:  I have that.

3    MR. VEEDER:  May I inquire.  Mr. Stark, on your Finding

4    No. 7 you are referring to Gibbon land as riparian, and Cottle

5    land as riparian on Finding No. 9.  Now you are duplicating

6    to some degree the same acreage for your appropriative right;

7    is that correct?

8    MR. STARK:  Yes.  We are not contending that the water

9    under the appropriative right was applied to anything other

10   than the lands which are described as irrigable acreage in

11   Findings 10 and 7.  They are riparian irrigable acreage.

12   THE COURT:  You have 107.6 irrigable acres for Gibbon,

13   and Girard has 110.

14   What do you have for Cottle?

15   MR. VEEDER:  62.

16   THE COURT:  I can't find it.

17   MR. GIRARD:  I have 72 in Finding 4 for Cottle.

18   MR. VEEDER:  Page 5, Finding 10, says 62.

19   MR. GIRARD:  And then 110 for Catherine Gibbon.

20   THE COURT:  Mr. Girard's findings were more favorable

21   to you in that respect than your own.

22   MR. STARK:  The Cottle figure 62 is taken from Exhibit

23   229.

24   THE COURT:  Your own exhibit.

25   MR. STARK:  This was taken from Colonel Bowen's exhibit,

P52

F fls.

1   page 4 of Exhibit 229.

2       MR. VEEDER:   That is Colonel Bowen's engineering report?

3       MR. STARK:   His engineering report.   That is the source

4   of the acreage figures which are used in both the findings on

5   both these properties.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17,622

t42
F

He comes up with 107.6 on Gibbon.

THE COURT:  Mr. Stark, supposing we do this:  If I go over these findings, and if I think that the case does not turn off on some other points, which it might well do, so that the issue becomes material as to how much this pipe or this ditch could carry, then I would advise you that I want to hear some testimony on it.

MR. STARK:  Fine.

THE COURT:  If it turns off on some other point, it is not material.  But, for instance, if the proof is insufficient to show how much you put to beneficial use, and you haven't sustained your burden, that is the end of it.  Then how much the ditch would carry wouldn't make any difference, -- right?

MR. STARK:  Right.

THE COURT:  And if Mr. Veeder is right that this is a riparian use and not an appropriative use, it does not make any difference.  So let's leave it that way.

MR. STARK:  I would appreciate it very much, your Honor.

THE COURT:  How promptly could you come back in if we needed you here?

MR. STARK:  On very short notice, your Honor.  It would be simply a question of Mr. Rowe's availability.

THE COURT:  And what about findings?  If we made some findings which we proposed to sign, and presented them to you, how soon would we hear from you?

17,623

MR. STARK:  I can respond there quite rapidly, your Honor.  I should apologize for the time which has intervened here, but, as I indicated before, it was because I was trying to digest Mr. Grover's and my practice, and I think I have finally gotten it.  I have now had an opportunity to go through this transcript, but it has taken much more time than I thought it would.

THE COURT:  Then let's submit this Gibbon and Cottle matter, subject to this reservation.

MR. STAHLMAN:  There is one other matter I think we ought to talk about, your Honor.  You will recall there was some testimony with respect to reservoirs, that a new reservoir was built.  As to these two reservoirs that you refer to on page 2, does that include the new reservoir?

MR. STARK:  There is a correction.  There is the Cottle reservoir.  This refers to the two Gibbon reservoirs.  There was a reservoir on the Cottle property.  The one he just built is the one on the Gibbon property.

MR. STAHLMAN:  There is no evidence here regarding that thing.

MR. VEEDER:  The fact is your Honor shut off the evidence on that.

THE COURT:  Isn't that the reservoir where I told her --

MR. GIRARD:  She was building it when the case was being put on, your Honor.

t44

THE COURT:  And I told her not to spend a lot of money on it.  Is that Reservoir No. 2 on your map at the present time?

MR. STARK:  I believe it is, your Honor.  That is my understanding of it.  It seemed to me the significant aspect of this is that the reservoir is not claimed as a storage reservoir, and we are not using it as a storage reservoir, and the finding is to that effect, so that no storage right could be predicated on it.  And if it is necessary to make a specific finding that there is no storage right predicated on the use of the reservoir, more specific than appears in these findings, we have no objection.

MR. VEEDER:  Your Honor, that becomes important, though, if you have a structure with a 10-inch pipe and you have a structure that impounds 10 acre feet.  This could build up quite a head there over quite a long period of time.  I think there should be -- if they fill that reservoir, it won't be just for regulatory purposes, because it will take the whole head of the stream, and it will take a long while to fill.

MR. STARK:  But it is not being used for regulatory purposes, it is not being used for storage, and there is no right to use it for storage.  We are not seeking that.

MR. STAHLMAN:  Up to this point the evidence is it is not in use -- period.

MR. GIRARD:  Regardless of the size of the reservoir, if

t45

1    they use it just for a head, I assume it is proper.

2        MR. STARK:   I take it nothing in this decree will prevent

3    any other riparian users from turning water into their land and

4    to put it into some sort of regulating --

5        THE COURT:   It would obviously be improper for you, in

6    my opinion, to put in a dam that went down to bedrock and take

7    the full flow of the stream, and put it in a reservoir.

8        MR. STARK:   Because this would be putting water in

9    storage, yes.

10        MR. GIRARD:   If you stored it.

11        MR. STARK:   If you stored it.

12        THE COURT:   I don't care whether you store it, or if

13    run it out and irrigate it, if you take the whole flow of the

14    stream to bedrock, and even if you run it through your

15    reservoir andthen use it for irrigation, I would think it

16    would be improper.   You have no right to the whole flow of

17    that stream.

18        MR. STARK:   What your Honor is referring to is the dam

19    going to bedrock, and not the reservoir.

20        THE COURT:   Well, they are tied in together.   I have

21    serious doubt that the water would run into the reservoir and

22    run out.   The changes are it would go to fill the reservoir,

23    and how long it would be before it was used for irrigation

24    would be a question.   I don't know.   And while water was

25    scarce, people would be grabbing what water was there.

t46

1    I don't think we are getting anywhere on this.

2    MR. GIRARD:  But even if the reservoir is one hundred

3    acre feet, so long as they are using the water for a reasonable

4    riparian purpose, with no storage, --

5    THE COURT:  So long as what they put into it is a

6    reasonable use.

7    MR. GIRARD:  The amount that is put into it would not be

8    determined in this suit, which is cataloguing the rights.  Is

9    that correct?  In other words, if they are using more water

10   in the reservoir than that to which they are entitled, they

11   would be cut down in an allocation proceeding, but not in

12   determining whether they have a riparian right.

13   THE COURT:  I don't propose to allocate, but I don't see

14   harm in mentioning the fact of  the dam going down to bedrock

15   and drying up the whole stream.  There isn't anything

16   involving apportionment there.  It is just a description of

17   what the riparian rights would be.

18   MR. GIRARD:  Yes.  I certainly think you could say that

19   no one would have the right to -- well, I could see a

20   situation where a person in exercising riparian rights could

21   take all the waters.

22   MR. STAHLMAN:  There is no evidence here as to how it was

23   operated, or anything at all.

24   THE COURT:  All right.  Let's stop on Gibbon and Cottle,

25   and take a recess on that, and after the recess, what do you

17,627

t47

1    want to talk about?  Do you want to talk about the documents

2    that Mr. Veeder has submitted on Tucalota?

3         MR. VEEDER:  I would prefer, if we could for the moment,

4    to consider Mr. Girard's and Mr. Sachse's findings of fact

5    on Tucalota.

6         MR.GIRARD:  My understanding is that a lot of work was

7    done, and I read it over, and there were a few changes.  It

8    is fine with me if you want to cover it.

9         MR. VEEDER:  If you are not ready --

10        MR. GIRARD:  I am ready.

11        MR. STAHLMAN:  Shall we go over until tomorrow, your

12   Honor?

13        MR. GIRARD:  I have also lodged the Diamond and

14   Domenigoni Valley findings, which I understand are ready to

15   be signed, and everybody agrees with me.

16        THE COURT:  There is no attachment to it at this time.

17        MR. GIRARD:  There is no exhibit attached, but I under-

18   stand that will be prepared as soon as Colonel Bowen can get

19   to it; that as soon as he can get off of Murrieta, he will get

20   at it.

21        THE COURT:  Will you please put a date on these?  On

22   Diamond and Domenigoni Valley is August 8th all right, Mr.

23   Girard?  Then we will know what we are talking about.

24        MR. GIRARD:  It was done in accordance with what had

25   been done before, and Mr. Sachse and Mr.Veeder , who were

t48

1   more specifically concerned with the decree, had left it

2   blank.

3       THE COURT:  Do you want to come in tomorrow?  What time

4   do you leave tomorrow?

5       MR. VEEDER:  I had planned to leave tomorrow afternoon,

6   but I will be available, your Honor.

7       THE COURT:  Do you want to take a recess and go on

8   further this afternoon, or do you want to go over until

9   tomorrow?  What do you want to do?

10      MR. VEEDER:  I would just as soon go over until tomorrow,

11  if we can.  I would like to leave around 4:00 o'clock

12  tomorrow, if I could.

13      MR. STAHLMAN:  If you want to go through Mr. Veeder's

14  brief, we have a lot to talk about on that.

15      THE COURT:  Over his brief?

16      MR. STAHLMAN:  His brief, yes.

17      THE COURT:  Did you file a brief?

18      MR. VEEDER:  Yes.

19      THE COURT:  When did you file it?

20      MR. VEEDER:  I filed it on Friday.

21      THE COURT:  I haven't got a copy of it yet.

22      MR. VEEDER:  I filed the original and a copy at around

23  noon on Friday.

24      THE COURT:  I haven't got a copy of it.

25      MR. SACHSE:  I have definitely some questions on it, on

t49

1   which we would want the Court's guidance, and if your Honor

2   will set a time for that, that will be fine.  If your Honor

3   could look at it tonight, maybe we could let you go into

4   Chambers now, and then let's talk about it tomorrow.

5       THE COURT:  Do you want to talk about the brief first, or

6   do you want to talk about the proposed conclusions on

7   Tucalota?

8       MR. VEEDER:  I will pass those out right now, your Honor,

9   and they can be looking at them.

10      THE COURT:  Have you got a date of 8-5 on this?  Is this

11  this second run that you have given me?

12      MR. VEEDER:  8-5-61, yes, sir.

13      THE COURT:  Again, we don't have any name on it.  This

14  is Tucalota?

15      MR. VEEDER:  Yes, your Honor.

16      MR. SACHSE:  The trouble is that this is to be attached

17  to a set of findings which we don't have before us.

18      MR. VEEDER:  The point being, Mr. Sachse, those are Mr.

19  Girard's findings.  I have tried to work something up to

20  attach to what he had.

21      MR. SACHSE:  Fine.

22      MR. VEEDER:  I assumed we could get some agreement on

23  the findings.

24      MR. SACHSE:  Good.

25      THE COURT:  I have got a civil case set for tomorrow.

t50

1    what time do you think you could be through tomorrow?   If

2    we start at 9:30, could we wind this up in an hour or an hour

3    and a half tomorrow?

4         MR. VEEDER:   I think so, yes, your Honor.

5         MR. GIRARD:   It depends on how many things we talk about.

6    If we talk about your brief, I will personally want some

7    assistance from the Court on how the new request from the

8    United States is to be handled.

9         THE COURT:   Mr. Girard, do you expect to be here the

10   rest of this week?

11        MR. GIRARD:   No, your Honor.

12        THE COURT:   I thought you were going to be down to do

13   some work.

14        MR. GIRARD:   I have been doing it, and I was prepared to

15   stay all week.

16        THE COURT:   You know you were gone all last week.

17        MR. GIRARD:   That is the first week, though, that I have

18   had.  I was here two weeks in a row when your Honor was gone.

19        MR. STAHLMAN:   I can vouch for that.  He was here, your

20   Honor.

21        MR. GIRARD:   And I will be here this week, or at least

22   Mr. Sachse and I planned to work some down here     while we are

23   in recess, and assuming we go into recess.

24        THE COURT:   How long a brief is this that you want me to

25   look over?

t-51

1      MR. VEEDER:  How many pages are there?

2      MR. SACHSE:  I have it right here.

3      MR. VEEDER:  It is a response to Mr. Girard's eight

4  questions.

5      THE COURT:  How many pages are there?

6      MR. SACHSE:  The total number of pages if 21.  However,

7  the matters with which we are particularly concerned are

8  embraced only in the first four.  I think it is four.  Let's

9  count them.  The first two or three --

10      MR. VEEDER:  Are preliminary.

11      MR. SACHSE:  There is a preliminary statement, two pages

12  of preliminary statements, and then two pages of the brief.

13      MR. VEEDER:  Now, I filed the brief on June 30th, Mr.

14  Sachse.  You realize that, of course.

15      MR. SACHSE:  You filed a motion, the way I am calling it.

16  Maybe I am just using different language.  I am referring now

17  to this one filed August 4th.

18      MR. VEEDER:  In response to Mr. Girard's eight questions.

19      MR. SACHSE:  In response to Mr. Girard's eight questions.

20      MR. VEEDER:  That is all you are interested in?

21      MR. SACHSE:  Yes.  I am sure his Honor has read your

22  initial document because he commented on it.  He hasn't this

23  latest one.

24      MR. VEEDER:  There are many pearls there.

25      THE COURT:  Do you intend to come back  tomorrow,

17,632

t-52

1   Mr. Stark?

2       MR. STARK:  No, I do not, your Honor.

3       THE COURT: All right.  Let's adjourn, then, until

4   9:30 tomorrow morning, and this afternoon or tonight I will

5   look over your brief.

6       MR. VEEDER:  Bill Luddy has it down there, your Honor.

7   I thought he always furnished you with the copy.

8       THE COURT:  Maybe he has, and I haven't gotten to it on

9   my desk yet.

10      MR. VEEDER:  If you don't have it, I have a reproduced

11  copy that I will get for you.

12      THE COURT: All right.

13      (Whereupon, at 3:50 o'clock p.m., Tuesday, August 8,   )
                                                               )
14      (1961, an adjournment was taken until Wednesday,August )
        (                                                      )
15      (9, 1961, at 9:30 a.m.                                 )

16

17                      ---o0o---

18

19

20

21

22

23

24

25

17,633

P53

IN THE DISTRICT COURT OF THE UNITED STATES

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
        vs.                     )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                    Defendants. )

CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are, and on the date herein involved, to-wit: August 8, 1961, were duly qualified, appointed and acting official reporters of said Court;

That as such official reporters we did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that we did thereafter cause our said shorthand notes to be transcribed, and the within and foregoing **103** pages of typewritten matter constitute a full, true and correct transcript of our said notes.

Dated at San Diego, California this 8th day of August, 1961.

Official Reporter _John Swader_

Official Reporter _Marie B. Zellner_

JOHN SWADER, OFFICIAL REPORTER