# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Wednesday, August 9, 1961

Pages:     17,634 to 17,674

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                         DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 166

P 1

1       IN THE DISTRICT COURT OF THE UNITED STATES

2           SOUTHERN DISTRICT OF CALIFORNIA

3               SOUTHERN DIVISION

4                   - - -

5       HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                   - - -

7   UNITED STATES OF AMERICA,      )
8                   Plaintiff,)
9   vs.                           )       No. 1247-SD-C
10  FALLBROOK PUBLIC UTILITY       )
    DISTRICT, et al.,              )
11                                 )
12                  Defendants.)

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              San Diego, California

15          Wednesday, August 9, 1961

16                  - - -

17  APPEARANCES:

18      For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
19                                  Special Assistant to the
                                    Attorney General

20                                  CDR. DONALD W. REDD

21      For the Defendants:

22          Vail Company            GEORGE STAHLMAN, ESQ.

23          State of California     FRED GIRARD, ESQ.

24          Fallbrook Public Utility FRANZ R. SACHSE, ESQ.
25          District, et al.,

17,635

t1
A

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, AUGUST 9, 1961, 9:30 A.M.

2                        ---o0o---

3        THE CLERK: Number one, 1247-SD-C, United States vs.

4    Fallbrook.

5        THE COURT: This document will be lodged.  I don't know

6    whether there is a copy there or not.

7        THE CLERK: Yes, your Honor.  Do you have a copy of it?

8        THE COURT: No.

9        MR. VEEDER: Are we ready to proceed, your Honor?

10       THE COURT: Yes.

11       MR. VEEDER: Your Honor, I have reference to the

12   stipulated judgment of December 26, 1940.  I have asked Mr.

13   Stahlman if he could provide us with a copy of Exhibit 265 of

14   the old trial, which is referred to in the stipulated judgment,

15   and he has agreed if he can find it, he will make it

16   available to us.

17       MR. STAHLMAN: I think we have it.

18       MR. GIRARD: That is what?

19       MR. VEEDER: It is Exhibit 265.

20       MR. STAHLMAN: I am not familiar with it by number.  You

21   say it shows the wells.

22       MR. VEEDER: Mr. Wilkinson is acquainted with it, and he

23   said he would cooperate with us on it.

24       MR. STAHLMAN: We will look for it.  I told you that.

25       THE COURT: What does this pertain to?

MARIE G. ZELLNER, OFFICIAL REPORTER

17,636

t2

1    MR. STAHLMAN:  I don't know.

2    MR. VEEDER:  The stipulated judgment, which is a part of

3    of the record in this case, had incorporated into it by

4    reference an Exhibit 265.   The pertinence of it now, in view

5    of the fact that the Vail Company has constructed its dam is

6    extremely doubtful.  However, to make the document complete,

7    I would like to have that document made available, if possible.

8    THE COURT:  All right.  Try to find it.

9    MR. STAHLMAN:  Yes, your Honor.

10   THE COURT:  Are we going to take up the matter of your

11   comments on the Government's brief?

12   MR. SACHSE:  Yes.  Did you have an opportunity to look at

13   it yet, your Honor?

14   THE COURT:  Yes, I have looked it over.

15   MR. VEEDER:  Are you referring to Mr. Girard's letter of

16   July 20th?

17   THE COURT:  He is referring to your brief of August 4th,

18   in reply to his letter.

19   MR. VEEDER:  That is what I mean.  Thank you.

20   MR. SACHSE:  Your Honor, this concerns me very much, and

21   I think we are compelled to ask your Honor for some direction

22   or consideration on where we go from here.

23   I refer particularly to the second numbered item of Mr.

24   Veeder's preliminary statement on the page numbered  ii:

25       "Percolating waters in the Basin underlying Camp

t3

1        Pendleton are those waters which have so far departed

2        from the bed of the Santa Margarita River as to have

3        lost their identity as part of the flow or sub-flow

4        of that stream."

5        Then on the next page he specifically -- pardon me, not

6 the next page, but on page 1 of the memo proper he specifically

7 states that the waters to which he refers are ground waters

8 within less than 10 feet from the bed of the stream.

9        He says those waters have lost their identity and the

10 distance in which the waters have lost their identity does not

11 exceed 10 feet, and lower down he says it is less than 10 feet.

12        Now, that is a factual question, and I am not aware that

13 this Court has even informally indicated any such finding, and

14 I believe that to waste time on the legal principles, many of

15 which I will say I think are correct as they are enunciated

16 in Mr. Veeder's brief, -- to waste time on the legal principles

17 before we have a factual determination from your Honor would

18 be wasting time on a moot proposition, because if these waters

19 are a  part of the sub-surface flow of the Santa Margarita

20 River, then all of the legal argument necessarily collapses.

21        Mr. Veeder starts right out by stating that these must

22 be waters that have lost their identity.

23        Now, on the other hand, this is more complex than it

24 looks at a glance.  If your Honor cannot find that these waters

25 are a part of the sub-surface flow of the Santa Margarita, and

1    if Mr. Veeder's factual contention should be found to be

2    correct, where are we?  That is the thing that shakes me,

3    because I will read to your Honor from your Honor's pre-trial

4    opinion, and I will state to your Honor that you will find

5    this same language throughout the stipulations, pre-trial

6    stipulations, and your Honor raised this question in these

7    words, reading from page 846 of 165 F. Supp.:

8              "The Law of Percolating Water, that is waters

9              Which Are not Part of the Santa Margarita River

10             or Its Tributaries or Underground Basins Which

11             are a Part of Said Stream.

12             The above problem was also posed to counsel. --

13       The Government responded as follows:  'This litigation

14       pertains only to the use of waters constituting part of

15       the stream system of the Santa Margarita River.'  As

16       a consequence, it would seem logically to follow that

17       the only rights to be adjudicated would fall within the

18       categories of (1) surface waters of the Santa Margarita

19       River, (2) its tributaries,(3) underground basins which

20       are a part of that river or its tributaries."  And so on.

21       Now, this case has been tried for six years on the

22  predicate --

23       MR. VEEDER:  Six?

24       MR. SACHSE:  The six that I can speak of. -- on the

25  predicate that all waters within areas, surface areas of

younger alluvium, would be held to be an integral part of the
stream.

We have findings, your Honor, -- findings, not just
proposed findings, but findings of the Special Master in
discussing the parcel of a client of mine, Garnsey, on
DeLuz Creek.  It is on the east fork of DeLuz Creek, and it is
a wide area of younger alluvium.  It is not as wide as
Pendleton, but neither DeLuz Creek as large a river as the
Santa Margarita.  It is said:

"Wide portions of this parcel overlie alluvial
ground water basins, which basins form a part of the
sub-surface flow of DeLuz Creek."

There is identical language throughout the Master's
findings, and it applies to every parcel which has younger
alluvium.

Belt B

P 2

1    In the Garnsey case, his biggest producing well -- all of

2    these matters can be readily identified from exhibits -- his

3    biggest producing well is more than 500 feet from the banks

4    of the stream.  Mr. Veeder talks about ten feet.

5        The most dramatic example of the problem -- I would like

6    to just put up an exhibit for one minute -- is in 7. (Mr.

7    Sachse puts up an exhibit.)  This is another area where I have

8    perhaps 30 or 40 clients and I am very much concerned.  I am

9    referring to the Rainbow basin, the Rainbow area shown in

10   yellow on the map.  There is no disagreement, the record will

11   clearly bear me out that the younger alluvium extends far over

12   into the San Luis Rey River watershed at this point.  Under

13   examination by the Special Master, Colonel Bowen stated that

14   it was literally impossible to know at what exact surface

15   point the ground waters might also change direction, but that

16   for all practical purposes we could take the surface divide

17   as the breaking point.

18       Now, if there is any place in this watershed, other than

19   perhaps also Diamond and Domenigoni Valley, where the theories

20   proposed by Mr. Veeder, are, in my judgment, applicable, this

21   is it.  Because here there might be a question, is a well here

22   taking water from the Santa Margarita -- a well on the edge?

23   Every single finding in Rainbow Valley, concurred in by all

24   parties, urged by the United States and concurred in by us,

25   has been to the effect that the ground waters underlying areas

P3

1   of younger alluvium are an integral part of the sub-surface

2   flow of Rainbow Creek.

3       Yesterday your Honor heard Mr. Stark propose a finding

4   that three wells in younger alluvium be excluded as not ex-

5   tracting waters from the stream because there is evidence in

6   the record of a fault.  They are more than ten feet and there

7   is a fault besides.

8       I don't think I have to belabour this course.  Your Honor

9   knows what is concerning me.  If it is sauce for the goose,

10  it is also sauce for the gander.  I can't imagine Mr. Stahlman

11  and the Vail Company sitting here and not seeking to re-open,

12  to tear up these findings and to re-open certain issues as to

13  what waters are subject to control in this litigation, if this

14  theory is adopted.

15      THE COURT:  The first thought I had as I read this was

16  that Mr. Veeder had urged that there were large ground water

17  bodies in the Temecula-Pauba area and in the Aguanga area and

18  that these were part of the stream system, and the Court

19  followed his contentions and so found.  And now with ground

20  water bodies downstream he is taking a different position.

21  However, I could see at least some possible distinction --

22  whether it be valid or not would be a question.  The ground

23  water bodies upstream, of course, would support the stream

24  through the Narrows.  It might be argued that the ground water

25  bodies downstream did not serve the same function.  However,

17,642

P 4

1   this raises lots of questions.  In other words, for a stream to

2   flow across that sandy gravel basin area there has to be water

3   in the basins to prevent the water from going on down.  So if

4   there is a relationship between the surface flow, as has

5   occurred in the past -- witness the gauging stations at Ysadaro

6   Narrows -- certainly there is an inconsistency.

7       MR. SACHSE:  I want to be brief, Mr. Veeder, and I will

8   sit down in a minute and let you go ahead.

9       But there are one or two other things I want to point out.

10  I will say frankly for myself, your Honor, that if this theory

11  is adopted the first thing I am going to do is to ask your

12  Honor to amend the pre-trial order to provide that one of the

13  subjects of this case is also the adjudication of rights in

14  waters, which, while not part of the stream, are part of the

15  basins which may support it and the delineation of the limits

16  of those basins.  And I will ask for a re-opening of Rainbow

17  Valley.  And I will ask for a re-opening particularly of

18  the Allen case.

19      Here is Lancaster Valley -- very similar in its physical

20  setup to Pendleton.  Water comes over basement complex in one

21  end and flows into the Valley and flows out the other through

22  a narrow constriction, as at Ysadaro Narrows.  I am going to

23  ask for a re-consideration of that one.

24      I want to toss out one or two other little facts.  In

25  Lancaster Valley the thread of the stream as such is confined

P 5

1   between levees -- this, again, is in an exhibit, old U.S.G.S.

2   maps show it -- but is that the stream within ten feet of that,

3   or is it the natural course of the stream before it was con-

4   fined?  Colonel Bowen testified and we have exhibits that in

5   Diamond-Domenigoni Valleys the thread of the stream in many

6   places is the Searl Ditch where they recapture tail waters.

7   Would anyone urge for one moment that the thread of the stream

8   at Camp Pendleton is where we see it today?  Or isn't it a

9   fact that the thread of a stream in a state of nature has been

10  that every time there was a freshet it swished around all over

11  that basin?

12       Now I think that the record is so replete with testimony

13  to this effect, it is going to be hard to find.  Because you

14  will find very few places where a specific question was asked.

15  But volumes of the transcript will bear out the factual

16  philosophy which I urge, and that is that these alluvial bodies

17  are nothing but wide places in the stream -- nothing more nor

18  less.  If it is a little stream, it is a little wide place.

19  Where it is a big stream, it is a big wide place.  But it is

20  the stream.

21       What do I think we ought to do about this?

22       One more thought.  To answer the question your Honor

23  just presented, I would like to ask Mr. Veeder anew to assume

24  a hypothetical fact.  Assume that there was a riparian land

25  owner on the Santa Margarita River immediately downstream from

P6

1    Ysadaro Narrows.  Now just answer this question.  Would that

2    landowner have a right to object to the pumping of the United

3    States from the wells in question to non-overlying land?

4         MR. VEEDER:  Will you read the question, please?

5         MR. SACHSE:  The question was this:  Assume that there is

6    a riparian landowner on the Santa Margarita River immediately

7    below the Ysadaro Narrows.  Would such a landowner have a right,

8    as a riparian, to object to extractions from the well herein

9    for use outside the watershed?

10        MR. VEEDER:  Did he direct the question to me?

11        MR. SACHSE:  Let me finish.

12        THE COURT:  Wait until he is through.

13        MR. SACHSE:  That is the guts of this whole problem.  If

14   we are going to assert a right in the United States to control

15   extractions, as a riparian now, in all the ground waters that

16   they can squeeze into this stream system, I think there is

17   such a thing as consistency and, let's say to Mr. Veeder,

18   intellectual honesty -- we had better ride the same horse at

19   both ends of the River.  And I will ask, unquestionably, if

20   this is adopted, that there be an amendment to the pre-trial

21   order and that this case be re-opened.

22        The reason I want to press this, your Honor, is that we

23   are fooling around with findings now, and we might as well

24   quit trying to write findings on stringers of alluvium on

25   Tucalota and on the Murrieta-Temecula until we have determined

17,645

P7

1   this as a matter of fact.  And I will quote Mr. Krieger, who

2   called me tremendously upset and said, "For heaven's sake,

3   alert me immediately.  I will get down there.  I don't want

4   the Temecula-Murrieta findings decided until we get this new

5   question determined."

C fls.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17,646

Now, if you are going to ask us what we should do about it, I would like to see your Honor make a finding now and tell us from the bench that all the waters underlying tributaries or underlying the younger alluvium are a part of the sub-surface flow of the stream.   I think the record supports it.

If you can't do that, and if you want to hear argument, and you want us to comb the record, and you want us to go through the exhibits, and have us, so to speak, submit a brief on the facts, that would be all right.  But I don't think that we should waste our time on findings of fact on these other upstream areas until we get rid of this question.

MR. STAHLMAN:  Your Honor, --

THE COURT:  Just a minute.

MR. VEEDER:  Can I respond to Mr. Sachse now, your Honor?

MR. STAHLMAN:  I did not want to interrupt, but I did want you to know that I would like to talk also.

THE COURT:  I will hear you later.

MR. STAHLMAN:  Very well.

MR. VEEDER:  Your Honor, the position of the United States of America in this is very simple.  I think that it would be well for everyone to read the California cases to which I have made reference.  There is a very clear distinction in the cases between sub-flow and percolating water.  Mr. Sachse is confused.

You will find, your Honor, in regard to the Ring Basin,

t7

1   for example, that that basin is fed by streams just exactly

2   the way the basin is which underlies Camp Pendleton, and that

3   the Court very clearly found that those waters were

4   percolating.

5       You will also find in the San Fernando Valley that

6   although the Los Angeles River is fed by percolating waters

7   through detritus deposits, nevertheless those waters are

8   percolating.

9       MR. SACHSE:  Will you cite which case it is that you are

10  talking about, because, as I understand the Los Angeles Basin

11  case, it is the exact opposite.  Is that Hunter or Pomeroy?

12      MR. VEEDER:  I will give you the citations.

13      MR. SACHSE:  Please do.

14      MR. VEEDER:  The point I am trying to make, your Honor,

15  is this:  That it is a question of fact as to at what point

16  waters so depart from the bed of a stream that they are

17  called percolating waters.

18      Now, the fact that they are percolating does not mean

19  that they are not a part of the waters of the Santa Margarita

20  River, and if your Honor will consider carefully the testimony

21  that went into this case, and we were very careful about

22  the testimony that went into this case in regard to these

23  ground waters, you will find that they are percolating waters.

24  You will find, moreover, --

25      THE COURT:  Now, wait.  How do you explain your position,

t8

1  where when I proposed that we throw out of this case some of

2  the stringers of alluvium beyond and upstream of the basins

3  that we marked out, you could not go along on that, and it

4  was younger alluvium and was a part of the stream system, and

5  yet you come in here now and urge that we take a different

6  position.

7     MR. VEEDER:  It is no different position, and that is the

8  point that I am trying to make, your Honor.

9     THE COURT:  Your position is one of after-thought.

10  Whether it is good or not is another thing.  We have never had

11  any testimony with reference to ten feet from the bed of the

12  stream.  It has never been brought up until you filed this

13  brief.  Will you show me a place in the record where it is?

14     MR. VEEDER:  Your Honor, throughout the entire record

15  and throughout the whole case -- before I get pulled off base

16  by some of these questions, let me go ahead and explain this

17  to your Honor.  I have no fear from the standpoint of the facts

18  that are in the record, and that is one reason why --

19     THE COURT:  Will you answer my question:  Was there ever

20  a word of testimony with reference to some area ten feet from

21  the bed of the stream?

22     MR. VEEDER:  I would ask for such a finding.

23     THE COURT:  Was there any word of testimony?

24     MR. VEEDER:  I don't believe anyone ever said "ten feet."

25     THE COURT:  I don't believe so either, and yet that is in

17,649

t9   1   your brief.

2        MR. VEEDER:  But the point that I make to your Honor is

3   this:  That water up here in the older alluvium is percolating

4   water, and yet it is a part of the stream.  Waters up here on

5   Tucalota Creek in the Sage Basin is percolating water, but it

6   is not in a well-defined stream, and it can't be defined in

7   any stream.  But, nevertheless, -- and the cases bear us out

8   on this proposition, and again I hope that you do not decide

9   against us before we consider these factors -- the point that

10   I desire to make is that in Tucalota Creek there are at least

11   seven owners of overlying lands whose properties are not

12   riparian to the stream.  Their pumping of the water has an

13   effect upon the flow, but I will assure you that they are not

14   riparian, and that the waters that they are pumping are not

15   in a well-defined channel, and that those waters are simply

16   percolating, vagrant waters in the younger alluvium.

17        THE COURT:  What do you say to this:  If I should adopt

18   the position you are urging, and let's take the Temecula-

19   Murrieta  ground water area, I then would have to find that

20   any waters -- this is an area of percolating waters

21   circulating in the area of the older alluvium outside of the

22   channels of the Murrieta-Temecula -- I would have to find

23   that any waters ten   feet from the   channel of the Murrieta

24   and the Temecula were percolating waters, and were, therefore,

25   subject to appropriation without going through the procedures

t10

1    of the State.

2         MR. VEEDER:  I believe, your Honor, and let's forget the

3    ten feet, and you can ask Colonel Bowen how many feet he

4    thinks it is from the bed of the stream that would no longer

5    be a part of the flow.

6         I think this.  I brought it up with Mr. Krieger, and I

7    understand why he is concerned, that he has the Gunther Well,

8    and the Gunther Well is drilled in the older alluvium, it is

9    tapping percolating water, and it is taking water out of the

10   basin area.

11        Now, I believe that under the law of California he has

12   an appropriative right to surplus water that is found there.

13   I believe that the law of California is this:  That in regard

14   to areas of percolating water appropriations of surplus water

15   over and above the paramount rights of the riparian and over-

16   lying owners can be acquired.

17        It is subject to any of those rights, but, nevertheless,

18   when those waters are found to be surplus, momentarily, when

19   those are pumped and applied to a non-overlying use, there is

20   acquired then an appropriative right, and I dare say that the

21   cases point out this fact, that the Court must make a finding

22   at the point, or should make a finding at the point where the

23   waters cease to be a part of the stream and become a part of

24   the mass of percolating water.

25        THE COURT:  Then a short answer to my question is that you

17,651

t11

1   would concede, then, under your theory that the waters in the

2   older alluvium in what we call the Temecula-Murrieta ground

3   water area would be subject to appropriation?

4       MR. VEEDER:  Surplus waters would be, that is correct.

5       THE COURT:  Why, if this is not an after-thought on your

6   part, didn't you ever mention this matter during all of the

7   time that we have spent on the Temecula-Murrieta ground water

8   bodies?

9       MR. VEEDER:  I don't believe the issue ever came up, your

10  Honor.  I don't believe the issue ever came up.

11      THE COURT:  I know that it didn't come up, but if this

12  was your theory all along, it would seem that with all the

13  time that was spent on it, where we beat it to death in

14  discussions and argument, it would seem that you at least

15  would have hinted at it.

16      MR. VEEDER:  I think you will find -- excuse me, your

17  Honor -- I think you will find, going back to the days of

18  Moskowitz, that the issue came up, and I will try to find it,

19  in which he said that the State of California is not interested

20  in regulating these pumpings of  appropriative rights.  That

21  is certainly the law.

22      THE COURT:  Let's without delay admit that Moskowitz

23  might have mentioned it.  I merely point out that you have

24  never mentioned it.

25      MR. VEEDER:  But, your Honor, I put in a lawsuit.  I put

t12

1   in a case as carefully as I know how, and I dare say that

2   your Honor can find, based upon the evidence that went into

3   this case, and if you want to interrogate further witnesses

4   it is fine with me, on the basis that maybe I didn't cover

5   this exactly, but I think you will find under the Federal

6   Rules of Civil Procedure that if the evidence will support a

7   claimed right, then it is essential that such a claimed right

8   be found.

9       THE COURT:  Mr. Veeder, the mere fact that this is an

10  after-thought does not mean --

11      MR. VEEDER:  It is not an after-thought.  May I tell you

12  when this matter first came up?  It first came up when Lauren

13  Wright was representing the Vail Company in this courtroom

14  ten years ago, and the question was what were the kind of

15  rights that the Rancho Santa Margarita had acquired antecedent

16  to the time that the National Government bought the property,

17  and the answer was very clear.

18      He said, "In the State of California," -- at least, he

19  said to me -- he said, "In the State of California when you

20  are pumping waters from the ground water basin there is no

21  need for a filing," and that is the explanation why the Rancho

22  Santa Margarita didn't make a filing with the State of

23  California.

24      THE COURT:  I say even if this is an after-thought, and I

25  think it is, that does not mean I should not seriously consider

t13

1   it.  It is obvious that in an after-thought you have spun out

2   all of your theories of the rights of the United States.  I

3   treated them in the pre-trial opinion.  You will recall your

4   metaphysical theory, and you will recall the puddle-at-the-

5   end-of-the-stream theory, that the United States in some way

6   had the right to catch at the end of the stream rain water

7   which fell over national forests and Government land upstream,

8   and you will recall your theory on incorporeal hereditaments,

9   that somehow or other it got severed and went floating around,

10  and that the United States had some rights there.

11      Now, if this had been a theory of the Government at that

12  time, I would have heard about it.  You were scratching the

13  bottom of the barrel with theories.  But that is beside the

14  point.  It should be considered, and we will have to decide

15  it on the basis of California law.  I am willing to look at

16  these California cases.  My inclination is to say that you are

17  wrong, but I am willing to read these cases.

18      MR. VEEDER:  Would you consider the facts, your Honor?  I

19  think the whole crux of this matter is this:  When the water

20  that is carried in the Santa Margarita River enters the

21  alluvial fill and departs from the stream to the point where it

22  can no longer be identified with the surface or sub-surface

23  flow, at that point it becomes percolating water.  It is a

24  question of fact.

25      MR. SACHSE:  It is a question of fact, I will say that.

t14

1          MR. VEEDER:  It is a question of fact.  And, your Honor,

2    I don't mind your sort of ribbing me a little bit about my

3    metaphysical theory, and my incorporeal hereditaments theory,

4    but I sincerely hope that from our standpoint and the

5    standpoint of the National Government your Honor will consider

6    the factual situation, and it is the facts that govern.

7          THE COURT:  Mr. Veeder, I would like very much, as far

8    as my visceral reaction in this thing is concerned, I would

9    like very much to find that there was some water that you

10   could appropriate, and that your appropriation was good, and

11   that there would be some way to supply water to a major part

12   of the installations of the Marine Corps built outside of the

13   watershed.  I would like to do it.  But, first of all, I am

14   a lawyer, and I have to look at the facts, and I have to look

15   at the law, and if you haven't got it, you haven't got it, and

16   that's all.  You have talked about the Colonels and the

17   Generals having built installations outside the watershed.

18         MR. VEEDER:  I am confronted with that fact, your Honor,

19   and I am --

20         THE COURT:  I am sympathetic with the position of the

21   Marine Corps, but I am not going to decide this just because

22   it is the Marine Corps.  I am going to decide it on the facts

23   and the law.

24         I went out all the way for you on Lake O'Neill, and I had

25   to use a club on Mr. Sachse and say that the Government would

t15

1   open the case and bring in more witnesses.  But if you haven't

2   got it, you haven't got it, and you don't decide the cases

3   on the basis of how you want to decide them.

4       I am willing to consider your point.  I think it is an

5   after-thought.  If there is some way that you can get two,

6   three or four thousand acre feet of water, and it is in the

7   cards, you will probably get it.  But I don't know that it is.

8       MR. VEEDER:  I don't know that it is either.  The only

9   thing that I am asking is that prior to making up any

10  decision on this that it be reviewed factually.

11      THE COURT:  All right.

12      MR. SACHSE:  May I add one thing?  Mr. Veeder didn't

13  give the citation of these cases, and I am going to give them

14  to your Honor right now.  The first one is Los Angeles vs.

15  Hunter.

16      MR. VEEDER:  I cited those, I am sure.

17      MR. SACHSE:  I asked you for them a minute ago, and you

18  said that the San Fernando River was held to be percolating

19  water.

20      THE COURT:  What are the citations?

21      MR. SACHSE:  Los Angeles vs. Hunter, 156 Cal. 603.  In

22  that case the Court said --

23      MR. VEEDER:  Now, if we are going to argue this thing

24  now, let's argue it.  I am prepared.

25      MR. SACHSE:  I resent misstatements to the Court.  This

t16

1   case says that all the waters of the San Fernando Valley are

2   a part of the stream, that none of them are percolating.

3       The other case is Los Angeles vs. Pomeroy, 124 Cal. 597.

4       THE COURT:   124?

5       MR. SACHSE:   124 Cal. 597.   That is the same thing.   The

6   best discussion of this problem -- and, believe me, I have

7   read the cases, and Mr. Veeder either is misinformed, or he

8   hasn't read them -- the best discussion of the broad problem

9   is San Bernardino vs. Riverside, and on that one I don't have

10   the citation.

11       MR. VEEDER:   I am asking to be heard on that after Mr.

12   Sachse is through.

13       THE COURT:   After this, unless you can proceed a little

14   more orderly, you will ask permission to be heard.

15       Is San Bernardino vs. Riverside the current case which

16   has been up --

17       MR. SACHSE:   No, your Honor.

18       MR. VEEDER:   San Bernardino vs. Riverside I have cited,

19   and that   is 186 Cal. --

20       MR. SACHSE:   That is the one.

21       MR. VEEDER:   -- 7, at page 20.

22       MR. SACHSE:   The whole case is an excellent discussion of

23   this whole subject of percolating water.

24       THE COURT:   We are not going to argue that any further

25   this morning.

17,657

Mr. Stahlman, you wanted to be heard?

MR. STAHLMAN:   I would like to just point out one thing, your Honor.  Mr. Sachse, in reading the pre-trial order, and on that portion of it I think he should have read just a little further in connection with what the issues were here, and this again is from Mr. Veeder's own statement.   He read down to where it was said:

> ". . .As a consequence, it would seem logically
> to follow that the only rights to be adjudicated would
> fall within the categories of (1) surface waters of the
> Santa Margarita River, (2) its tributaries, (3) under-
> ground basins which are a part of that river or its
> tributaries.  It would also seem logical to conclude
> that there would be excluded from the litigation
> '. . . percolating waters, that is waters which are not
> part of the Santa Margarita River or its tributaries.' "

Now, that is the state of the pre-trial order.

D fls

Belt D

P 8

1      Now I am not going to take a lot of time.

2      THE COURT:   I want it argued, if you want to make some

3  points.

4      MR. STAHLMAN:   I would like to point out that I think that

5  this afterthought that Mr. Veeder has had here, and it certain-

6  ly is that -- I question his sincerity to the Court when he

7  talks about things we can't lay our fingers on that are not

8  here.

9      But in connection with that matter we have this situation.

10  He made no such claim.   When Mr. Worts was on the witness stand

11  and was testifying in relation to this basin, he never opened

12  this question, so that we would have an opportunity to cross-

13  examine and expand upon the factors that would make a determi-

14  nation as to whether this was so or not.   He never urged this

15  matter in his pleadings to any extent at all.   He completely

16  excluded them in the pre-trial hearing.   He never at any time

17  in the discussion of the Vail judgment or even in the old case

18  ever made a claim that there was an appropriative right to take

19  water outside the watershed.   Never did he in any discussions

20  in this case pertaining to the stipulated judgment make such

21  a claim.   Never when they went before the State Water Rights

22  Board in opposition to the filing of the Vail Dam.   We have all

23  that matter fully before the Court in facts.   Was there ever any

24  claim made of an appropriative right?

25      When you get into this factual situation -- I am not going

17,659

P9

1   to expand, but he points out Mr. Worts' testimony, and Mr.

2   Sachse has made much of the fact that it is not just the thread

3   of the stream.   Mr. Worts testified that on the north shore

4   where there is the "bench lands," as he called them, that the

5   River had actually come over and cut into that.   Now if it

6   cut into that, and it is obvious that it cuts into that older

7   alluvium that surrounds the younger alluvium, the River, of

8   course, has been all over that basin.

9        And I would like to make one other indication, your Honor.

10  I think it is quite plain when you read the Pomeroy case and

11  the San Bernardino case what the courts have in mind is the

12  distinction between what is a basin from which an appropriation

13  may be made without the necessity of a filing and what waters

14  are part of the stream, the underground supporting waters.

15  It is true that all waters that travel underground do so by

16  reason of percolation.   But the percolating waters   are

17  the waters that have been part of the stream system and fall

18  within the channels, and I think the channel is well defined

19  here as being the younger alluvium -- I am not going to go

20  into it in great detail, because I will have a lot to say on

21  it when we get around to arguing the facts.

22      But I point out some of these things to follow up what

23  Mr. Sachse said and to indicate that this is a complete after-

24  thought.   It is something that Mr. Veeder has schemed up, that

25  he has not alerted anybody to during the entire case, and if

P10

17,660

1  this is to be considered by the Court it is going to be, I am

2  sure, a matter in which many counsel would want to come in, and

3  we will want to recall some of his witnesses and we will want

4  to present some of our own.

5      MR. VEEDER:  May I respond, your Honor?

6      THE COURT:  No.  Mr. Girard, do you want to say anything?

7      MR. GIRARD:  I think the crucial issue has been recognized

8  by Mr. Sachse, Mr. Stahlman and Mr. Veeder as to what the facts

9  show.  I think about the only way we can ascertain that is to

10  go into the record and see if there is any support for either

11  theory.  As I read the record of Mr. Worts' testimony in the

12  last couple of days, there are some excerpts there which would

13  be pertinent on the question.

14      THE COURT:  Why should we discuss it any longer?  Why not

15  put it over for discussion until some time when the record can

16  be checked and these cases can be checked?

17      MR. VEEDER:  I beg your Honor's pardon.  I have a right --

18      THE COURT:  You have a right to what?

19      MR. VEEDER:  To petition your Honor if I may be heard for

20  a moment.

21      THE COURT:  That is the only right you have.  I say, why

22  should you be heard further?  We are not going to argue it

23  today.

24      MR. VEEDER:  Because Mr. Sachse has challenged my state-

25  ments to the Court and my integrity in regard to these matters.

JOHN SWADER

P11

1    If your Honor will read these San Fernando cases you will

2    find it is referred to as a "lake." You will find that the

3    San Fernando is referred to as a "ground water lake."

4    Here is an additional factor -- I would like to cite the

5    case, because it is extremely important in this matter -- it is

6    City of Los Angeles vs. City of Glendale and City of Burbank

7    (23 Cal. 2d. 78).

8    Thank you, your Honor.

9    What are we going to do? Are they going to respond to my

10   letter?

11   MR. SACHSE: I would like to suggest that we emphasize

12   the factual aspect of it rather than the legal. There will

13   have to be some law, I agree. We will have to refer to cases

14   such as the Los Angeles cases. But we ought to look at the

15   facts.

16   THE COURT: When will the next hearing be held now?

17   MR. SACHSE: You have not set one yet.

18   THE COURT: That is what I am talking about right now.

19   You are going to be gone for a week, I understand?

20   MR. VEEDER: Your Honor, I have been out of Washington

21   for a month. I would like to have more than a week. I would

22   like to have as much time as you can give me. Mr. Girard and

23   I were talking about something after Labor Day.

24   Is that right, Mr. Girard?

25   MR. GIRARD: That is agreeable with me.

17,662

P12

1    THE COURT:  At this continued hearing I would request

2    that you submit your summary of what facts sustain your theory

3    and the law that applies to them, file a memorandum to that

4    effect, and Mr. Girard and Mr. Sachse have a right to file the

5    same kind of memorandum.

6    MR. SACHSE:  I am perfectly willing to file them simultaneously.

7    If it is a factual thing, I don't think it necessarily takes

8    a reply.  I don't think Mr. Veeder cares about a reply.  We

9    will comb the record and each give you a memorandum.  That is

10   all right with me.

11   THE COURT:  And apply the law.

12   MR. SACHSE:  And apply the law, too.

13   THE COURT:  Because I want to look at the cases on this.

14   Do you want to come in on the 6th, which is a Wednesday,

15   or on the 12th of September?

16   MR. VEEDER:  Is the 6th immediately following Labor Day?

17   THE COURT:  Labor Day is the 4th.  I have to be in Los

18   Angeles on the 5th.  Do you want to come in on the 6th?

19   MR. SACHSE:  The 6th.

20   MR. STAHLMAN:  Let's get this thing going.

21   MR. VEEDER:  The 6th is fine with me, your Honor.  Thank

22   you.

23   THE COURT:  The case will be continued to September 6,

24   1961 at 10:00 o'clock a.m., and I will plan, if necessary,

25   to use three days of that week and we will again continue the

P13

1   matter from time to time to see what we can do to wind it up.

2       MR. VEEDER:  Thank you, your Honor.

3       THE COURT:  What other matter do you want to take up this

4   morning?

5       MR. SACHSE:  Do you want to set times on this?  I don't

6   ask for it.  I am going to go to work on it.

7       THE COURT:  Yes.  I want the memoranda beforehand, so I

8   will have a chance to look them over before you get here.

9   When can you have your memoranda in?  Can you have them in by

10  August 25th?

11      MR. SACHSE:  I can, your Honor.  Monday is the 28th.

12  August 25th is a Friday.  I don't care.

13      THE COURT:  The point is, if I get them in by the 25th it

14  gives me two weekends to look at them.  Otherwise, I have only

15  the weekend before Labor Day to look at them.

16      MR. SACHSE:  I can get it in.

17      MR. VEEDER:  Yes, your Honor.

18      THE COURT:  August 25th for the memorandums.

19      We are not going into answering all the other matters in

20  Mr. Veeder's brief until we decide this factual issue.

21      MR. SACHSE:  That is my understanding.  We are approaching

22  the question of the law of percolating waters from the stand-

23  point of whether or not this is percolating water, factually.

24  But the other legal questions we will leave aside.

25      THE COURT:  All right.  Is there any further matter you

P14

1  can take up this morning?

2       Did you have time to look at the conclusions and the

3  findings on Tucalota, dated 8-5?  It was handed to me yesterday.

4       MR. VEEDER:  You mean the conclusions and interlocutory

5  judgment?

6       MR. GIRARD:  There were no findings, were there?

7       THE COURT:  No findings.  There were some conclusions of

8  law and provisions of a judgment.

9       MR. GIRARD:  I looked at them and discussed some of them

10  with Mr. Veeder, and the ones we specifically discussed both

11  Mr. Sachse and I are agreeable with.  I am planning on doing

12  some of that Tucalota, trying to wind it into one final docu-

13  ment during the recess.

14       THE COURT:  The only question I want to raise is this.

15  When Mr. Veeder brought it in to me I raised the question.

16  He has this language on quieting title.  Do you gentlemen find

17  any fault with that as contained in his conclusions and as

18  contained in his judgment?  This is the first water case I

19  ever tried.  It didn't seem to me that you quieted title as

20  between riparians.

21       MR. SACHSE:  I made the same comment to Mr. Veeder.  I

22  have never heard of it, and I have never seen it in a finding.

23       THE COURT:  You quiet title against persons who claim

24  against the riparians.  You quiet title of riparians against

25  others.  But these purport to quiet title between riparians.

P15

1    MR. VEEDER: May I explain on that. The point that is

2    brought out from the standpoint of quieting title is this, that

3    as between the parties named they will not claim greater rights

4    than those referred to.

5    THE COURT: I read it. That is what it says. But I am

6    questioning whether this is what you are doing. I would like

7    to have you show me some adjudicated cases where, in a water

8    rights case, this quiet title language you have used is used

9    as between riparians.

10    MR. VEEDER: I will get you some authorities on that.

11    THE COURT: A quiet title suit is an equitable proceeding

12    in which you declare rights. There is no reason that you would

13    have to use the words "quiet title."

14    MR. VEEDER: I don't think there is anything precious

15    about it.

16    THE COURT: All you have to do is to adjudicate the

17    rights and find that A, B, and C are riparians. For instance,

18    when Mr. Veeder brought it in to me I raised the question of

19    three people on a small stream -- A, B, and C. You wouldn't

20    quiet title in A, B and C. You would say that A, B and C are

21    riparians and have correlative rights, and you would quiet

22    their title against strangers -- non-riparians.

23    Anyhow, give that some further consideration and I would

24    like to have some authority for that type of language.

25    MR. VEEDER: All right.

17,666

P16

1   THE COURT: Mr. Girard, did you have any reactions on

2   these?

3   MR. GIRARD: There is one, on a conclusion of law to the

4   effect -- I think it is also in the judgment -- that you can

5   only use your allocated waters for agricultural purposes on

6   irrigable land. I think there is a case squarely against that

7   that says when persons are allocated waters under a claim of

8   riparian right, that what they do with it is their own business,

9   so long as they don't waste it. They can take it up and try

10  to grow tomatoes on rocks.

11  THE COURT: That is where there is an allocation.

12  MR. GIRARD: Yes.

13  THE COURT: This isn't an allocation.

14  MR. VEEDER: No.

15  MR. GIRARD: The language is not an allocation. But to

16  the extent that under a riparian right those land owners who

17  have a riparian right are limited to use it on irrigable land.

18  I think it is the conclusion of law on page 2, and also in the

19  judgment. I don't think it is too important, factually. But

20  it is not the law. There are a couple of cases squarely

21  against it.

22  THE COURT: We will give it some further thought.

23  Do you have some ideas on the matter, Mr. Stahlman?

24  MR. STAHLMAN: I think this language is not in accordance

25  with the law:

P17

1    "  . . there heirs, successors, executors, administrators

2    and assigns, in the exercise for agricultural purposes

3    of the riparian and overlying rights decreed to them . ."

4    THE COURT:  That is the same point that Mr. Girard made.

5    MR. STAHLMAN:  Yes.

6    THE COURT:  Plus the fact that "agricultural" is too

7    limited a term.

8    MR. VEEDER:  I can give you one thought on that, your

9    Honor.  It would be our view that lands which have been determ-

10   ined by Colonel Bowen to be non-irrigable, you couldn't apply

11   water to beneficial use for agricultural purposes upon those

12   lands -- for example, lands which are shale, lands which are

13   rock.

14   I am perfectly willing to argue this matter out at the

15   next hearing.

16   THE COURT:  All right.

17   The final matter is this.  Did you gentlemen discuss the

18   matter of filing the Master's findings and sending out a notice,

19   as I requested you to do?

20   MR. GIRARD:  As I told you, I will be down here working,

21   and I have a secretary.  Maybe this is pushing your Honor a

22   little, but if you can let me know how you are going to rule

23   on Gibbon and Cottle I can go to work and draft up complete

24   findings, et cetera, and get those out of the way.  You don't

25   have to do that today, of course, but sometime during the next

**17,668**

P18

1   time when I am down here.  We are faced somewhat with not

2   having an awful lot to do.  I don't presume your Honor has

3   read the record yet, as you have indicated yesterday you were

4   going to do.

5        THE COURT:  No.  I am talking about something else now.

6   I am talking about the Master's findings.

7        MR. VEEDER:  We haven't discussed it yet.

8        THE COURT:  I would like to have you do that.  I would

9   like to have you work out a program where these findings would

10  be filed -- check Rule 53 -- and that notice then be served to

11  persons who might object.  I think the Rule says within ten

12  days after being served with notice of filing any party may

13  serve written objection.  And possibly we could notice this for

14  September 7th or 8th or the 12th.

15       MR. SACHSE:  I don't think that is right, your Honor.  I

16  think it would verge on bad due process.  Beyond any question,

17  if your conclusions are in accordance with Mr. Veeder's,

18  Rainbow is going to be re-opened.  Because if anybody in the

19  world has percolating waters, Rainbow has.  Rainbow has

20  Master's findings here.

21       MR. VEEDER:  You are not even talking about anything but

22  De Luz, are you?

23       THE COURT:  I am talking about all of the Master's findings.

24       MR. SACHSE:  The four of them.

25       MR. VEEDER:  All of them?  Your Honor, I would say this,

P19

1    that in regard at least to two of his findings they are

2    simply inadequate for the want of evidence in them, and I

3    believe if we send out notices to those people it would be --

4         MR. SACHSE:  I looked them up for you when we were here

5    last, and I think we tentatively agreed that the Master's

6    findings that his Honor had reference to were Rainbow, De Luz,

7    Fallbrook, on which you agreed almost a hundred per cent, and

8    one other -- Pechanga.

9         THE COURT:  The Rule says that the Court may adopt, modify

10   or reject the report in whole or in part, et cetera.  But let's

11   wind it up.  We have lodged them.  I am suggesting that they be

12   filed, and once they are filed and notice of filing is served,

13   then you have a hearing, and let's wind this up.

14        MR. VEEDER:  Could we do this?  On September 6th it is

15   your idea, then, to have them entered?

16        THE COURT:  And if, for some reason, you don't want to

17   hear them at that time, we can continue them over.  I would

18   suggest not the 6th, not the day we argue this other matter;

19   I would suggest the 7th or 8th or preferably the 12th, follow-

20   ing that Tuesday.

21        MR. VEEDER:  All right.

22        MR. GIRARD:  You can still change them in any manner you

23   want.

24        THE COURT:  Yes.

25        MR. VEEDER:  But you are not going to file them now?

P20

1     THE COURT:  No, not today.

2     MR. VEEDER:  You are not filing them until the 6th?

3     THE COURT:  No, I am not saying that.  I am suggesting

4  that you confer and work out some program that they be filed

5  immediately.

6     MR. SACHSE:  For a hearing on the 6th and the 12th.

7     THE COURT:  And that a notice be prepared and go out for,

8  say, the 12th of September.

9     MR. SACHSE:  I don't like it, your Honor, for the Rainbow

10  findings.

11     THE COURT:  Why?

12     MR. SACHSE:  With this other question in the air, I think

13  you place an impossible burden on counsel, on me.  I have

14  clients up there.  I don't want to ask those findings be

15  re-opened -- I am happy with that decision, but I can't stare

16  those people in the face and not ask for an appropriative

17  right, if we have it.

18     THE COURT:  If we can't hear them on the 12th, the matter

19  will be continued.  Maybe we can take care of some of them on

20  the 12th.  If there is any problem about Rainbow, we can put

21  it over to some later date.  Let's get it on the calendar.

22     MR. STAHLMAN:  We might have this other question settled

23  by then.

24     MR. SACHSE:  We might.

25     MR. VEEDER:  I hate to see them filed, frankly.

JOHN SWADER. OFFICIAL REPORTER

P21

1   THE COURT:  You and I are in disagreement.  You want to

2   abort the whole works of the Master's findings.  I don't want

3   to.  I don't see that there are any problems.  If you don't

4   agree with his conclusions or his findings, we can modify them.

5       MR. VEEDER:  For example, when we go through them once

6   more and find some grounds ourselves to make objections to

7   them, would we be permitted to object to them?

8       THE COURT:  You can.  It is not too important.  Suppose

9   we accepted generally his findings and then subsequently we

10  drew an interlocutory decree, made other findings and judgments.

11  We have in substance modified them, haven't we?

12      MR. SACHSE:  I see your point.

13      THE COURT:  Just like I make an interlocutory judgment

14  today.  I could modify it today.  It is not a final judgment.

15      MR. GIRARD:  We can't do anything until we get the notice

16  out.

E fls.  17

18

19

20

21

22

23

24

25

t18
E

1    MR. VEEDER:  The thing that is concerning me, if I

2    remember correctly that rule, it is once these are filed we

3    have so many days in which to make objections to them.  Is it

4    ten days in which we would be required to make objections

5    to the Master's findings?  Becauúe I certainly disagree with

6    some of his statements in regard to the disposition to be

7    made of these claims.  I just think that he was in error on

8    some of his conclusions.

9    THE COURT:  Didn't you make those objections to him?

10   MR. VEEDER:  They were simply lodged, your Honor.  They

11   were never filed.

12   MR. SACHSE:  Wait a minute.  There was notice for hearing

13   before the Special Master.

14   MR. VEEDER:  Well, on this particular point, this is a

15   question of law now.

16   THE COURT:  Wouldn't it be a matter of simply copying the

17   objections you previously made before the Master?  You have

18   already formulated your objections to them.

19   MR. VEEDER:  All right.  Go ahead and file them.

20   THE COURT:  Now, you confer and see whether you can make

21   a schedule here.  I am not adamant on these dates, and if you

22   want other dates, that is all right, but let's get started

23   somewhere along the line here.

24   MR. VEEDER:  Is that all, your Honor?

25   THE COURT:  Yes.  I will see you on the 6th, gentlemen.

17,673

t19

1     MR. SACHSE:  Shall we just advise you informally, your

2 Honor, on what we are doing?

3     THE COURT:  Yes.  Mr. Girard, you will be around a day or

4 so?

5     MR. GIRARD:  Yes, your Honor.

6     THE COURT:  Then try to work on Gibbon and Cottle.

7     MR. VEEDER:  The briefs are to be in on the 25th?  I want

8 to be sure on that.

9     THE COURT:  On the 25th.  We will take a short recess

10 now, and, Mr. Clerk, you can tell me when counsel are ready

11 in the other case.

12     (Whereupon, at 10:35 o'clock a.m., Wednesday, August 9, )

13     (1961, an adjournment was taken until Wednesday,       )

14     (September 6, 1961, at 10:00 o'clock a.m.            )

15

16                 ---oOo---

17

18

19

20

21

22

23

24

25

17,674

p22

IN THE DISTRICT COURT OF THE UNITED STATES

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
        vs.                     )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTIRCT, et al.,               )
                                )
                    Defendants. )
_____

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are,
and on the date herein involved, to-wit:  August 9, 1961,
were duly qualified, appointed and acting official reporters
of said Court;

That as such official reporters we did correctly report
in shorthand the proceedings had upon the trial of the above
entitled case; and that we did thereafter cause our said
shorthand notes to be transcribed, and the within and foregoing
41 pages of typewritten matter constitute a full, true
and correct transcript of our said notes.

Dated at San Diego, California this 9th day of August,
1961.

_John Swader_____
Official Reporter

_Marie B. Zellner_____
Official Reporter

JOHN SWADER. OFFICIAL REPORTER