VOLUME NO. 167                                    MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                                        Plaintiff,

vs.                                                           No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                        Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Wednesday, September 6, 1961

Pages:  17,675 to 17,761

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
                      Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

t1

1

# IN THE DISTRICT COURT OF THE UNITED STATES

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, September 6, 1961

---

APPEARANCES:

For the Plaintiff:                    WILLIAM H. VEEDER, ESQ.,
                                      Special Assistant to the
                                      Attorney General

                                      CDR. DONALD W. REDD

For the Defendants:

    Vail Company                      GEORGE STAHLMAN, ESQ.

    State of California:              FRED GIRARD, ESQ.

    Fallbrook Public Utility          FRANZ R. SACHSE, ESQ.
    District, et al.,

17,676

t2

1   SAN DIEGO, CALIFORNIA, MONDAY, AUGUST 28, 1961, 10:00 A. M.

2                               - - -

3        THE CLERK:  1247-SD-C, United States vs. Fallbrook, et

4   al.  Master's Hearing.

5        SPECIAL MASTER CRANSTON:  The Master's Hearings were

6   continued until this morning at 10:00 o'clock.  I will now

7   continue the hearings before the Special Master until

8   Wednesday, September 6th, at 10:00 o'clock in this courtroom.

9        (Other matters.)

10        (Adjournment.)

11

12                               - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

17,677

SAN DIEGO, CALIFORNIA, WEDNESDAY, SEPTEMBER 6, 1961, 10:00 A.M.

- - -

THE CLERK:  One, miscellaneous criminal.  United States of America vs. Angel Cordova Telles.

THE COURT:  Let's pass that a minute.  Let's find out if any persons are here in the Fallbrook case to be heard on objections.

THE CLERK:  Nine, 1247-SD-C, United States versus Fallbrook et cetera, et al.

THE COURT:  Is there anyone appearing in connection with the notices sent out concerning the Master's Findings?

MR. STAHLMAN:  I might check Mr. Veeder's office, your Honor.

THE COURT:  The record will show that apparently no one has appeared to make objection, except the Government, who wants to be heard later.

(Other matters.)

17,680

MR. VEEDER:   I think we have to be consistent on the thing. I think basically there is no fundamental objection, as I see it.

THE COURT:   Since the United States is the only party that has asked to look into the matter further, is there any necessity of setting a date?

MR. VEEDER:   I will say this, that I will try to get my report to you next week.

THE COURT:   I have been thinking about what kind of an order I should make here in regard to the findings.  What I would like to do, if this is proper, is to say that the Master's Findings are approved generally, except insofar as the Court may vary them or depart from them in its interlocutory judgments or final judgment.

MR. SACHSE:   I think that would be perfectly all right.

MR. GIRARD:   That is correct.

THE COURT:   That leaves the door open so that if we ran into something that we had to take care of, the Court would have the authority to do it, and all of these people will eventually get notice of the entry of the final judgment, where they can be heard again.

MR. SACHSE:   No further notice would then be contemplated to individuals until either there was some conflict in their case or the final judgment was entered; is that correct?

THE COURT:   Does that sound all right, Mr. Veeder?

1          MR. VEEDER:  I think that is proper.  I think this, that

2     we are entering what amounts to quiet title decrees as against

3     the parties and against the United States in regard to the

4     local, vagrant, percolating waters, and I think that has to

5     be correlated with whatever has to be done, and I think what

6     your Honor has suggested is proper.

7          THE COURT:  Do you think any written order is necessary,

8     or do you think just a Minute Order to that effect?

9          MR. VEEDER:  I think a Minute Order would take care of

10    it.

11         MR. SACHSE:  I think a Minute Order will be ample.

12         THE COURT:  All right.  The Clerk will enter that Minute

13    Order.  Now, in view of that fact, I take it the Master can

14    be discharged or terminated?

15         MR. VEEDER:  I see no reason for not.  Mr. Cranston is

16    here.

17         THE COURT:  Yes, Mr. Cranston is present.  The Master,

18    having filed his report and it having been accepted except

19    for the minor limitations heretofore referred to, the Master's

20    services are completed, and I don't know what the proper term

21    is, but he is discharged, I suppose.

22         MR. VEEDER:  I will have an order prepared, your Honor.

23         THE COURT:  All right.  Thank you very much, Mr. Cranston.

24         MR. VEEDER:  And we want to thank Mr. Cranston for what

25    he has done.

17,682

C fls

1        (Thereupon another case was called.)

2        THE CLERK:   Number nine, 1247-SD-C, U. S. vs. Fallbrook.

3        MR. VEEDER:   There is the order revoking the appointment

of the Special Master, your Honor.

5        (The document referred to was handed to the Court.)

17,683

(Recess.)

THE COURT:  How do you propose to proceed, gentlemen?

MR. VEEDER:  I am the movant in this matter, your Honor.

THE COURT:  It looks like you have a group of witnesses around here.

MR. VEEDER:  I have the experts who testified in regard to these matters  here, yes.

MR. SACHSE:  I am going to object to any testimony.  We might as well thresh that out right now.

MR. VEEDER:  I am not expecting to put on any testimony. If you want to talk to them, you may.

MR. STAHLMAN:  I haven't seen Mr. Veeder's brief, your Honor.

THE COURT:  He filed a brief, didn't he?

MR. STAHLMAN:  I haven't received it.

MR. VEEDER:  What brief?

MR. STAHLMAN:  They were due on the 25th.

MR. VEEDER:  They were served by my office.

MR. STAHLMAN:  An affidavit of Colonel Bowen, but no brief.

MR. VEEDER:  Did you read the appended statement, Mr. Stahlman?

(A pause.)

THE COURT:  All right.

MR. VEEDER:  Your Honor, I don't know how much time will

P 1

1    be involved, but I would like to proceed on the basis of

2    having such time as may be required properly to review these

3    matters, if it is agreeable with your Honor.

4        The position of the United States in this particular phase

5    of the litigation is that under the California law when the

6.   Rancho Santa Margarita pumped percolating water from the basin,

7    the Santa Margarita coastal basin as referred to by the State

8    of California, it at that time acquired an appropriative right

9    to continue to pump that water with a priority ahead of any

10   subsequent appropriator; that when the United States of America

11   acquired the Rancho Santa Margarita and continued the use of

12   the water outside the watershed and continued to export it,

13   that it similarly acquired an appropriative right with a

14   priority which would be antecedent to any subsequent appropri-

15   ator up to the maximum quantity that the United States of

16   America had used water at the time when Vail Company made its

17   filing for Vail Company Dam and when Fallbrook made its filing,

18   both of those being for service of water.

19       I refer your Honor to the principal statute in the State

20   of California, which I cite in my briefs but I will read again,

21   which provides as follows (Water Code Section 1200):

22           "Whenever the terms stream, lake, or other body of

23       water, or water occurrs in relation to applications to

24       appropriate water or permits or licenses issued pursuant

25       to such applications, such term refers only to surface

P2

1     water, and to subterranean streams flowing through known

2     and definite channels."

3       Pursuant to the laws relating to the appropriation of

4 rights to the use of water, the State of California has adopted

5 rules and regulations and they have issued a pamphlet in re-

6 gard to those rules and regulations which is designated

7 "Rules And Regulations And Information Pertaining To

8 Appropriation Of Water In California" (California's Admini-

9 strative Code, Title 23).  At page 58 of that pamphlet on

10 rules and regulations there is a heading designated

11 "Appropriation Of Underground Water."  Then I quote:

12     "The jurisdiction of the Board to issue permits

13 and licenses for appropriation of underground water is

14 limited to Section 1200 of the Water Code to 'subterran-

15 ean streams flowing through known and definite channels.'"

16 It is then stated, under the same heading, and I further

17 quote:

18 "Underground water not flowing in a subterranean stream,

19 such as water percolating through a ground water basin,

20 is not subject to the Board's jurisdiction, and applica-

21 tion to appropriate such water, regardless of the place

22 of use, should not be submitted."

23 D fls.

24

25

17,686

T10

D

1       There has been a long history in California in regard

2   to the section which I just quoted, and there has been a

3   long history of administrative interpretation.

4       One of the most recent decisions of the State Water

5   Rights Board was adopted on June 30, 1960, Decision No. 968.

6   In that decision the State Water Rights Board had before it

7   Application No. 17666, pursuant to which the Mojave Public

8   Utility District proposed the appropriation of two cubic

9   feet of water per second for municipal purposes from an

10  "underground stream located in Kern County, tributary to

11  Cache Creek."

12      Contests were filed against that application -- the term

13  "protests" is probably better -- by the Monolith Portland

14  Cement Company, the town of Tehachapi, and the Tehachapi

15  Valley Citizens Committee.  Primarily they contended that

16  water at the point of diversion is percolating, not flowing,

17  and that the area where the well is located is a ground water

18  basin, not an underground stream.

19      The Board then referred to its jurisdiction under Section

20  1200, pointing out that it was limited "to subterranean

21  streams flowing through known and definite channels."

22      The Board then said:  When is a given area a stream, and

23  when is it an underground basin?  Then the next question:

24  Does the word "flowing" include water that is moving very

25  slowly?

tll

1    The State Water Rights Board, citing Tolman, quoted from

2    Tolman, Page 44, as follows:

3        "Percolation (laminar flow)" --

4    MR. STAHLMAN:  What was that page again?

5    MR. VEEDER:  44.  I will start again from the quotation:

6        "Percolation (laminar flow) is slow movement of

7    water in interconnected pores of saturated granular

8    material under hydraulic gradients commonly developed

9    underground."

10    Then it continued and referred to the fact in quoting

11    Tolman at Page 384 that, "No natural ground water basin

12    without discharge exists."

13    Then they quote from the International Dictionary as to

14    the meaning of the word "flow," declaring from that source

15    that "flow" means:

16        "To move with a continued change of place among

17        the particles or parts, as a fluid; to change place

18        or circulate, . . ."

19    Then citing also from the International Dictionary they

20    define the word "percolate".  "Percolate" they point out

21    means:

22        "To pass through fine interstices; to filter; as,

23        water percolates through porous stone.  Hence, to pass

24        as if by filtering; to seep . . ."

25    On that background the Board stated that it considered

17,688

t12

the Tehachapi Valley a ground water basin, and the facts concerning it, and the relationship of Cache Creek to that ground water basin.   Having reviewed the facts, the State Water Rights Board made this statement:

> "In deciding whether the point of diversion named in the application is located at and draws from an underground stream, it is not sufficient that there be evidence of the existence of an underground stream a mile or more away.  As Tolman points out, an underground basin may terminate in an underground stream. It is for the Board to decide the ground water status of the point of diversion specified in Application 17666."

Continuing, the Board referred to a principle of law which I believe is most important here.  It said:

> "The Board is mindful, not only of the above evidence and considerations but of the presumption that underground water is percolating, and finds that the applicant has not sustained the burden of proving that the source named in the application is an underground stream at the applicant's point of diversion."

In November of 1960 another instance arose before the State Water Rights Board, where an application was made to appropriate rights to the use of water by filing, and again the Board referred to the fact that based upon its investigation

17,689

t13

1   the applicant's well is located in Shadow Valley, and within

2   the Upper Kingston groundwater basin, with the result that it

3   rejected the application.

4       MR. SACHSE:  Would you give me the name of that

5   application?

6       MR. VEEDER:  It is, "In the Matter of Application

7   19161 of Warren B. Richardson to appropriate from an un-

8   named underground stream, tributary to Salt Creek, . . .

9   in San Bernardino County."

10      Now, the State Water Rights Board has a procedure which

11  it follows in regard to applications.  I have talked

12  personally with the men who handle the applications, and I

13  have had extensive investigations in regard to the procedures

14  that have been followed.  I think that the decision that I

15  referred to, your Honor, and from which I quoted extensively,

16  that is, Decision No. 968, is representative of the procedure

17  and the course of conduct and the interpretation of the

18  State of California in regard to the question of the

19  appropriation of percolating waters which are a part of a

20  stream system.  And I believe, your Honor, that the State of

21  California -- I know, your Honor, that the State of California

22  has repeatedly held and declared in regard to the basin

23  underlying Camp Pendleton that it is, in fact, a basin of

24  percolating water.

25      California's Exhibit L, which is Appendix B of its

17,690

1   Bulletin 57, describes at length at Page 63 the Santa

2   Margarita Coastal Basin.  Mr. Illingsworth testified at

3   length in regard to the percolating waters in that basin, and

4   the State of California made extensive studies in connection

5   with those percolating waters, and calculated the storage

6   capacity within the basin, and made estimates as to the

7   quantity of percolating water that could be derived from

8   that basin.

9        A review of the cases, your Honor, shows a virtually

10  unbroken line -- I believe an unbroken line -- of decisions

11  to the effect that waters which are percolating in character

12  in a ground water basin are subject to appropriation by the

13  simple process of the diversion application of that water

14  to a beneficial use.

15       I am advised that the General Assembly of the State of

16  California is presently considering the enactment of

17  legislation pursuant to which appropriations from ground water

18  basins of the character of the Coastal Basin underlying

19  Camp Pendleton would be enacted.  I have no personal knowledge

20  on that.  I have simply been advised of that by members of

21  the State Water Rights Board personnel.

22       I believe it is of interest that Mr. Krieger and

23  Mr. Littleworth have written a letter -- not a brief or a

24  memorandum -- in which they make statements in regard to the

25  position of the United States in this matter.   I called

t15

1    Mr. Krieger's office, and I called Mr. Littleworth yesterday,

2    and I inquired whether they were going to be here, and I

3    haven't been advised, and apparently they haven't come.

4        Nevertheless, I have read their briefs over in the

5    County Library in regard to what I think is an extremely

6    important case, Orange County Water District vs. City of

7    Riverside.  The citation on that case is 171 C.A. 2d 518.

8        MR. STAHLMAN:  Will you give me that again?  I thought

9    it should be in a brief.

10       THE COURT:  What is that citation?

11       MR. GIRARD:  It is in Mr. Krieger's letter, is that it?

12       MR. VEEDER:  No, this is an earlier case, Mr. Girard.

13       THE COURT:  What is the citation?

14       MR. VEEDER:  171 C.A. 2d 518.  That case, I believe, is

15   of importance.

16       THE COURT:  This is a case they participated in, and in

17   which they wrote briefs?

18       MR. VEEDER:  Yes, your Honor.

19       THE COURT:  You are not citing from the opinion now, but

20   from their briefs?

21       MR. VEEDER:  No, I am simply bringing to your Honor's

22   attention that they participated in these cases, and I think

23   that the issues there are very similar to the issues that are

24   involved here.

25       I wish they were here because the cases are extremely

17,692

complex.  However, I will give what, as I comprehend it, the factual situation is, and they can certainly correct it, and I desire to have them do so.

1    MR. SACHSE:   What is the name of this case?

2    MR. VEEDER:   Orange County Water District vs. Riverside.

3    MR. SACHSE:   That is the first appeal in the same case.

4    MR. VEEDER:   No, it is not the first appeal, Mr. Sachse.

5    MR. SACHSE:   All right, I am sorry.

6    MR. VEEDER:   One of the first appeals of that case was

7    154 Cal. 2d 354, I think.  Don't hold me to that last page

8    cited, but I will get it for you.

9    THE COURT:   Is this the same case in which a retired judge

10   here found a new opinion?

11   MR. SACHSE:   I could glance quickly.  I am certain this

12   is one of them.  There are now three, to my knowledge, maybe

13   more, printed appeals in Orange County vs. Riverside.   None

14   reverses the other; all on a new aspect.

15   MR. VEEDER:   I think I have the facts, and I would like

16   to proceed, if I may, your Honor.

17   THE COURT:   Is this the case in which a retired judge of

18   the San Diego County Superior Court, sitting pro tem on the

19   Fourth District Court of Appeals, recently handed down a

20   further decision?

21   MR. VEEDER:   This is Albert F. Ross who was the judge in

22   this case.

23   THE COURT:   The trial judge?

24   MR. VEEDER:   He was the trial judge.

25   THE COURT:   I am talking about the judge sitting pro tem

P4

1  on the District Court of Appeals.

2      MR. VEEDER:  I couldn't answer that, your Honor.

3      MR. SACHSE:  I think I can, your Honor.  That case to which

4  you refer is the third appeal, and that is reported as -- I

5  have it only as 189 ACA 13.

6      MR. VEEDER:  I think it is 188, Mr. Sachse.

7      MR. SACHSE:  I could be wrong on that.  There is a whole

8  string of Orange County Water District vs. Riverside.  I cite

9  this case in my brief.

10     MR. VEEDER:  The citation in your brief, I think, is 173,

11  Mr. Sachse.

12     I would like to go back and point out some of the history,

13  though.

14     MR. STAHLMAN:  Your Honor, I would like to make a comment.

15  It would seem to me, the Court having ordered briefs in this

16  case and we filed briefs, -- Mr. Veeder is completely prepared,

17  he is citing cases, he is even going to the extent of making

18  references to briefs that are filed in the library -- I think

19  that this matter should have been put into a brief, that we

20  would have the opportunity to respond timely to this matter.

21     THE COURT:  I would think so, too, unless these are matters

22  you have come on to in the last day or so.

23     MR. VEEDER:  I will say these are matters I came on to in

24  the last day or so.  But if you recall the circumstances under

25  which you directed the filing by us after my original brief,

P5

1    Mr. Sachse and I and the rest of us were directed simultan-

2    eously to file these matters.  So they are the ones who first

3    cited this series of cases, and I have the right to respond

4    to them.  You didn't direct me to file a reply brief, your

5    Honor.  You told me to file simultaneously with Mr. Sachse.

6         THE COURT:  What did you file simultaneously?  Just this

7    so-called statement?

8         MR. VEEDER:  Yes, I had already submitted the law to you,

9    and they come up in response  to that with a citation of these

10   cases.

11        MR. STAHLMAN:  You are making references to matters of

12   the State Water Rights Board that you say you have made ex-

13   tensive investigation on.  It is a matter that had to be done

14   in the past.

15        THE COURT:  I am not happy about the situation.  I would

16   think you would have submitted this in brief form so that

17   counsel would have been advised in the matter.

18        MR. VEEDER:  But they raised the point, your Honor.

19        THE COURT:  I don't care whether they raised the point.

20   The understanding was that both sides would have a chance to

21   study the problem.  I would assume that as a lawyer who had

22   practiced for a while you would understand that you should

23   have submitted these matters so that counsel could have read

24   them.  You haven't done it.  Let's proceed.  Tell me about

25   this case that is so important now.

MR. VEEDER:   This case cited by Mr. Sachse in his brief, cited by Mr. Krieger in his letter -- and may I point to the fact that the letter is dated August 30th, 1961, so that I have a right to respond to them -- involved there was this situation.   The City of Riverside had claimed prescriptive rights to water in the basin underlying that city and from which it had pumped for many years.   It undertook to increase over and above its prescriptive rights, as I understand the factual situation, and an injunctive suit was brought by Orange County Water District, that District having been organized under the Act of 1933.   Several questions were raised, but they are extremely important from the standpoint of the application of the California law -- Section 1200 and related sections.

One of the matters arose as to whether there could be changes of points of diversion by these water users' organizations who were proceeding in the case.   The matter was squarely considered from the standpoint of the applicability of Section 1200 and related sections.   On page 524 of the citation -- I will give it to you again, George, 171 CA 2d 524 -- the Court said that "For the most part, this legislation relates only to appropriations from surface water in subterranean streams, and the use of the water appropriated therefrom as distinguished from appropriations from underground lakes or basins."   That was a second appeal, as nearly as I can find.

1    However, the matter was again considered by the Court

2    and a very extensive review of the law and the facts of the case

3    was had at 173 CA 2d 137 at page 192.

4        MR. STAHLMAN:  What is the name of this case?

5        MR. VEEDER:  It is the same case, George -- Orange County

6    Water District vs. Riverside.

7        There the statement is made, "All of the appropriations

8    by appellant cities, except to a very limited extent the city

9    of Redlands, are of percolating waters, and so far as we know,

10   not even in the exceptional case of diversions by the city of

11   Redlands has the appropriation been made under the statutory

12   provisions referred to."

13       In other words, it has been the practice of the entities

14   and of the State of California that when percolating water is

15   pumped from a ground water basin, that there accrues an

16   appropriative right at that time and that the appropriative

17   right is in no way involved with a channel.

18       Again on page 195 from the same citation, the Orange

19   County Water District --

20       THE COURT:  Who is the judge who wrote this?  Judge Haines?

21       MR. VEEDER:  I will check, your Honor.  Yes, Judge Haines.

22   He wrote a very fine opinion on the San Joaquin about which

23   I have some knowledge.

24       At page 195 from this same citation this statement is

25   made:  "Insofar        as mutual companies or any other

P8

1   agencies appropriate water from underground basins, their

2   appropriations are not made under the authority of Sections

3   1200 and 1201 of the State Water Rights Code."

4        THE COURT:  Tell me, in your analysis of this case, did

5   Judge Haines accept certain facts as found by the trial court

6   and then proceed to apply the law to those facts as found?

7        MR. VEEDER:  That is how I comprehend it, your Honor.  I

8   went back and read the findings.

9        THE COURT:  Then the trial court found that this was

10  percolating water --

11       MR. VEEDER:  Indeed.

12       THE COURT:  -- and not part of the stream.

13       MR. VEEDER:  No, it did not find that it was not part of

14  the stream.  It found that all the percolating waters -- this

15  is extremely important -- it found that all of the percolating

16  waters were part of the stream system, just as I have insisted

17  throughout here, that these waters had left the surface flow

18  to the points that they were percolating waters as distinguished

19  from the subflow immediately underlying the surface flow.

20  These waters had so departed from that that they were perco-

21  lating.  And I think that the crucial question turns on that

22  point, that these are percolating waters, and it is extremely

23  interesting to observe, your Honor, that in every instance

24  where these matters arise the question is this:  Is it

25  percolating water in an underground basin?  And I am convinced

that the rules and regulations established by the State Water Rights Board in which they say that application to appropriate water from percolating waters in a ground water basin should not be submitted, I am sure that is where this comes from.

Now, they continued in this opinion, on page 196 -- and I must confess to your Honor that probably Mr. Krieger and Mr. Littleworth can give a more precise analysis, because I have never seen so many decisions in my life in regard to one factual matter, but I found in each instance that the rule was invariable -- at page 196 of the last cited decision it says:

"In so far, then, as mutual water companies or other agencies are lawfully enjoying the use of water appropriated otherwise than under the Water Commission Act or the Code, a change in/the place or purpose of use is not a new appropriation, nor does use by a transferee in such circumstances make him a new appropriator."

So we have these decisions.

THE COURT:  I think you borrowed from me the final decision written by Judge Haines in this same case.  Didn't I lend you the slip sheet?

MR. VEEDER:  Your Honor, I remember discussing it with you.  I don't recall that you lent it to me.

THE COURT:  Do you have it?

MR. VEEDER:  I will have to check.  That was a good many

P10

1   months ago.

2   THE COURT: Has he changed any of these statements? What

3   is this last decision he wrote?

4   MR. VEEDER: I don't believe he has changed anything. On

5   this point to which I am directing my attention it has not

6   been changed at all.

7   Now, the most recent decision on this matter is presently

8   in the advance sheets. I have it down here as 188 Advance

9   Sheets CA.

10   MR. GIRARD: The same title?

11   MR. VEEDER: Yes, it is. But it does not have any bearing

12   on this particular point. There is nothing there that is in-

13   volved, except that there is a continued recognition of these

14   rights of the municipalities and of the public agencies to

15   appropriate percolating waters which are part of the stream

16   system. And they are part of the stream system. And just

17   exactly like the basins here, they are part of the stream

18   system. Like the Murrieta-Temecula Basin, those percolating

19   waters feed and they do support and ultimately they come to

20   the surface as a surface stream.

21   But the crux of the matter is, what is the status of the

22   waters at the points of diversion or where the well penetrates

23   them? And that has been the criterion that has been followed.

24   It is interesting to note that all of these cases have as

25   references the City of Lodi -- I shouldn't say all of them,

P11

1   because somebody will make a check and they will say that you

2   missed this one -- I will say that one of the key cases is

3   the City of Lodi case which I cite in my brief as being

4   particularly responsive to one of the points of interrogation

5   by the State of California.

6       MR. STAHLMAN:  Is that City of Lodi vs. East Bay Public

7   Utility District?

8       MR. VEEDER:  I cite it as <u>Lodi vs. East Bay Municipal</u>

9   <u>Utility District, 7 Cal. 2d 316 (60 Pacific 2d 439)</u>.  That was

10  cited in my original brief of June 30th.  It has been repeated

11  in my response to California.  And it is, of course, a key

12  case.

13      THE COURT:  Repeated in your what?

14      MR. VEEDER:  In my response to California's twelve

15  questions, to which I responded at your Honor's direction.

16      THE COURT:  How does that differ from your so-called

17  original brief?  Do you have a brief besides these so-called

18  responses?

19      MR. VEEDER:  Yes, your Honor, on June 30th I wrote an

20  extensive brief.

21      THE COURT:  I remember now.  Somewhere I have it.  I don't

22  have it here.

23      MR. VEEDER:  When I am being berated, your Honor, because

24  I didn't follow instructions, I want it understood that I

25  have written two briefs plus this other statement.

P12

1    In any event, responding to California questions, we

2  referred to the Lodi case, and again it is of great importance

3  because it is this specific case all over again. Lodi, as a

4  municipality, pumped approximately 3,000 acre feet of perco-

5  lating water which percolating water the Court found was fed

6  by the Mokelumne River. Lodi made no filing. Nevertheless,

7  the State of California has recognized that it has an appro-

8  priative rights. The Supreme Court so declared and held that

9  the City of Lodi was entitled to have adjudged, declared and

10  determined that it had an appropriative right prior and ante-

11  cedent and paramount to the filings by the East Bay Municipal

12  District and by what are called later filings by the Pacific

13  Gas and Electric.

14    THE COURT: Do all these cases trace these so-called

15  appropriative rights back prior to 1914?

16    MR. VEEDER: No, sir, they do not.

17    THE COURT: The City of Lodi certainly must have been

18  operating --

19    MR. VEEDER: The City of Lodi went back to the thirties,

20  your Honor, the particular wells that are here involved. I

21  have read the briefs, I have read the findings, and I am

22  convinced that that is the situation.

23    THE COURT: The Orange County case you are talking about,

24  those rights must antedate 1914.

25    MR. VEEDER: Some of them probably do, but many of them

P 13

1    are new wells, your Honor.  There are about 3600 wells that

2    have been drilled in there.  The findings are not specific on

3    the particular dates.  However, I am convinced that many of

4    those wells were drilled many years after 1914.

5        But may I finish this Lodi case, your Honor.

6        THE COURT:  We are going to adjourn at twelve o'clock.  I

7    would like to be thinking about this.  I would like to ask

8    you a question.  How can you square this contention with your

9    contention that the water in the ground water body of the

10   Murrieta is part of the stream and is not local, vagrant,

11   percolating water?

12       MR. VEEDER:  I square it entirely, your Honor, with the

13   facts of the case that percolating water as determined by the

14   law of California is this:  It is water which has so far

15   departed from the surface flow or the immediate subsurface

16   flow as not to be part of the flow.  And that is the distin-

17   guishing element.

18       THE COURT:  If that is true, Vail Company can appropriate

19   water, then, can't they?

20       MR. VEEDER:  By all means -- definitely.

21       THE COURT:  And Vail Company could appropriate water out

22   of Pauba Valley, couldn't they?

23       MR. VEEDER:  It can, and I think that it has.

24       THE COURT:  Other people could appropriate water out of

25   that older alluvium up there in the ground water body.

P14

1   MR. VEEDER: No one denies that. It is true, and it is

2   simply a matter of priority. That is all that is involved.

3   THE COURT: We try this lawsuit, and then at the tail end

4   of it you come in with these contentions. There may be some

5   merit to it. I am going to consider them. But it is amusing.

6   MR. VEEDER: I am pleased that your Honor is amused.

7   THE COURT: Of course, I can see your position. Your

8   position now is, "Yes, Vail may appropriate. Roripaugh may

9   appropriate. Other people may appropriate. Because it is

10  a matter of priority and we have the priority downstream that

11  is ahead of them. Therefore, let them appropriate. They

12  come behind us."

13  MR. VEEDER: Your Honor, may I just, for the moment, refer

14  to this fact, that your Honor, working with me and working

15  with Mr. Girard, wrote what we considered to be a correct and

16  proper finding in regard to the Murrieta-Temecula Basin, and

17  I shall read it to you and I think that it is correct.

18  MR. SACHSE: I don't want to interrupt. I have never seen

19  or checked the Murrieta finding. I was in Europe. So maybe

20  you two agreed, but I did not. I have read it since.

21  THE COURT: Where is the finding to which you refer?

22  MR. VEEDER: It is Finding No. XI, and these findings were

23  lodged with the Court on June 19, 1961.

24  MR. SACHSE: I was in Europe.

25  MR. VEEDER: Mr. Sachse, your face is red. I hope you are

P15

1    not angry.

2        This is Finding No. XI:

3            "That the ground waters within the areas of younger

4    and older alluvium in the ground water area are perco-

5    lating waters which add to and support the Santa Margarita

6    River and constitute a supply of water for said River;

7    that said ground waters are not in a known and defined

8    channel."

9        MR. SACHSE:  That was submitted by you, Mr. Veeder.  I

10   have never seen it.  I never approved it.

11       MR. VEEDER:  This was written by Mr. Girard alone.

12       MR. GIRARD:  No, this was a combination, Mr. Veeder.

13       THE COURT:  It is not important.  I am trying to think.

14   If Vail could appropriate water out of the percolating waters

15   in the Pauba Valley -- of course, you get into the question

16   of answering the question whether there is any surplus, which

17   is of course a question we were not going to consider if this

18   is a factual matter.  You agreed that this was a factual

19   matter.  Factually, if your contention is right, then you

20   still have the question whether there is any surplus to

21   appropriate.

22       MR. VEEDER:  As between Fallbrook and the United States,

23   that is extremely important.

24       THE COURT:  What is important?

25       MR. VEEDER:  Whether this pumping by the United States

P16

1   which took place prior to the filing by Fallbrook constituted

2   an appropriation of percolating waters which are recharged by

3   the surface waters of the Santa Margarita River.

4      THE COURT:  How come, if the decision of the Water Rights

5   Board is so clear on this matter, that at the time that Fallbrook

6   was holding its hearings before the Water Rights Board you or

7   somebody didn't point out to them that you had an appropriative

8   right prior to that of Fallbrook?

9      MR. VEEDER:  Because anything that was issued to Fallbrook

10   would be subject to and subordinate to prior and existing

11   rights, your Honor.

12      THE COURT:  So you didn't consider it worthy to mention

13   it at that time.

14      MR. GIRARD:  The protest form you submit specifically

15   states on there that you are supposed to state your priority.

16      MR. VEEDER:  I didn't file any protest.

17      MR. SACHSE:  The United States Navy Department did.

18      THE COURT:  We will talk about it at 2:00 o'clock.

19      (Noon recess.)

20

F fls.

21

22

23

24

25

17,707

SAN DIEGO, CALIFORNIA, WEDNESDAY, SEPTEMBER 6, 1961, 2:00 P.M.

- - -

(Another case called.)

THE CLERK:  Number nine, 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  May I proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  It occurs to me, your Honor, that at this juncture it might be well to take a moment for the purpose of outlining our view in regard to the kinds and types of water, as distinguished from the rights to that water that are here involved.

The first kind of water that is involved obviously is the surface flow.  The second kind and type of water to which I refer is the water immediately beneath the surface flow, which is so in contact with the surface flow as to be viewed in the law as a part of the surface flow, or which supports and immediately supports the surface flow.  The third kind and type of water is that water which has so far departed from the surface or subsurface flow as no longer to be a part of the flow.  The fourth kind of water that is involved is the vagrant, local, percolating water which is not a part of the Santa Margarita River or a part of the waters of any of its tributaries.

The first three kinds and types of water to which I have

t18

1    alluded are a part of the stream, and we have always taken

2    that position in regard to it.

3        This matter, your Honor, in regard to the percolating

4    water, is not a part of the flow, apparently has caused some

5    difficulty and confusion with the State of California and

6    with counsel.  However, it is a matter which was thoroughly

7    and completely reviewed and discussed in hearings dating back

8    a good many weeks.

9        I refer to the proposed findings that were filed by the

10   Attorney General of the State of California, and I read to

11   your Honor Finding No. XI, and I will read it again, because

12   I think it is extremely important:

13       "The ground waters within the areas of younger and

14       older alluvium in the ground water areas are percolating

15       waters which add to and support the Santa Margarita

16       River, and constitute a supply of water for said river;

17       that said ground waters are not in a known and defined

18       channel."

19       Now, Conclusion of Law No. XIII was prepared by the

20   Office of the Attorney General of the State of California, and

21   this is the language that was used.  I beg your pardon.  It

22   is Conclusion of Law No. VI on Page 13 of the Findings of

23   Fact and Conclusions of Law lodged by the Office of the

24   Attorney General of the State of California:

25       "That the ground waters within the ground water

17,709

t19    1    areas as shown in United States Exhibit 277, and

2    described in United States Exhibit 277-A are

3    percolating waters not in a known and defined

4    channel, but said waters add to and contribute to the

5    Santa Margarita River."

G fls    6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Belt G

P17

17,710

1    Those findings proposed by California and conclusions

2    proposed by California were as a result of extended conferences

3    with the Attorney General's representative and at which were

4    present the Marine Corps representatives, representatives of

5    the United States Geological Survey and others. I don't

6    believe that there was any confusion in anyone's mind in

7    regard to those ground waters. The Vail Company was repre-

8    sented at the time these matters were discussed.

9    On July 27, 1961, if my records are correct, I was served

10   again with a copy of proposed findings, as I understand,

11   formulated by counsel for the Fallbrook Public Utility District.

12   MR. SACHSE: What date?

13   MR. VEEDER: July 27, 1961. They were formulated by the

14   Fallbrook Public Utility District and by the Attorney General's

15   Office of the State of California.

16   THE COURT: What area does this concern?

17   MR. VEEDER: This relates to the Temecula-Murrieta Basin.

18   All I can say is that I want the record to show that these

19   were handed to me on the 22nd day of July by Mr. Girard.

20   Again it is reiterated and repeated that the waters in

21   that ground water area within the areas of the younger and

22   older alluvium are percolating waters, and that said waters

23   are not in a known and defined stream.

24   Now, I undertook, your Honor, to go back and review the

25   three kinds of waters in the Santa Margarita River system and

P18

1   the fourth kind, which is the vagrant, local, percolating

2   waters which are not part of the stream system, because I

3   want it extremely clear that when I speak of the subflow I

4   am speaking of that water which has entered into the highly

5   porous stream bed and banks, that wetted perimeter which

6   supports the surface flow but which is not part of the mass

7   of the percolating ground water. Very shortly after it leaves

8   the wetted perimeter it does become part of the mass of the

9   percolating water and the detritus in all these basins. But

10   the fact remains that there is a kind and type of subflow,

11   very shallow, but which is part of the riparian right, in my

12   view. But the riparian right does not extend beyond that

13   wetted perimeter. I believe the cases bear us out, and I

14   believe that is the law of California, and certainly the

15   regulations which were formulated by the State of California

16   and from which I read this morning take into consideration

17   that very circumstance.

18      In Volume 152 at page 17,107 we reviewed at length the

19   very language which I read to your Honor from the findings

20   of fact and conclusions of law prepared by the Attorney

21   General's Office of the State of California.

22      THE COURT: All these findings you are talking about are

23   proposed findings.

24      MR. VEEDER: They are lodged, your Honor.

25      THE COURT: They are still proposed findings.

P19

1      MR. VEEDER:  Yes, definitely.   They represent the summer's

2  work.

3      MR. GIRARD:  On what page is that?

4      MR. VEEDER:   Volume 152 at page 17,107.   I will refer to

5  it at length and quote to some degree from this language,

6  because I think it is extremely important.

7      I had stated to your Honor that, in my view, the waters

8  which we were considering in regard to the Murrieta-Temecula

9  ground water area or basin, as it is, constituted three types

10  of water.   Certainly the vagrant, local, percolating water,

11  not part of the stream system, was not involved.   At that

12  time I stated to your Honor that there is the surface stream,

13  the subflow immediately below the surface, and the percolating

14  waters throughout the water-bearing strata.

15      MR. GIRARD:  Would you read your quote there, Mr. Veeder?

16      MR. VEEDER:  Yes, I will read the quote in its entirety.

17  It is at page 17,106, starting at line 23:

18          "Mr. Veeder:  I can summarize briefly, then, what

19      I would like to see added:  That the waters in this basin,

20      or, again, in this ground water area are composed of

21       three kinds:  The surface stream, the sub-flow immediately

22      below the surface stream which supports it, and the

23      percolating waters throughout the water bearing strata

24  which are not a part of the stream, but nevertheless feed

25       and add to it.

p20

1          "Now, I haven't found that spelled out with

2     particularity, and I think that it is important . . ."

3     And I was referring at that time to findings which were being

4     drafted and worked upon by Mr. Girard.

5          MR. GIRARD:  And that was the Murrieta Findings.

6          MR. VEEDER:  Yes.

7     Mr. Girard speaking from a happier day:

8          "You won't find anything here on the second one,

9     Bill (that is I), which is your sub-surface waters

10    which support the stream, and I couldn't find any evidence

11    that any of the waters below the ground, even though

12    they are right beneath the stream, are in a known and

13    defined channel.

14         "The Court:  In fact, there is a finding which --

15         "Mr. Girard:  That is right.  We treat them as

16    percolating waters.

17         "Mr. Veeder:  It is percolating water, and there

18    are three kinds of waters, and I think it follows because

19    they have riparian rights, . . ."

20    I am speaking here of sub-surface flow.

21    MR. STAHLMAN:  Is that in there?

22    MR. VEEDER:  That is mine.

23    ". . . and the reason I am interested in it here is, of

24    course, in connection with the basins which underlie

25    Camp Pendleton.

P21

1     "Mr. Girard:   There is a finding, Bill, which

2     specifically says that all ground waters and all

3     percolating waters -- that the ground waters within

4     the areas of younger and older alluvium in said ground

5     water areas are percolating waters which add to and

6     support the Santa Margarita River, and constitute a

7     supply of water for said River; that said ground waters

8     are not in a known and defined channel."

9     We went ahead from there, your Honor.  If you want me

10   to continue quoting, I will, because I think it is important.

11   I was interrupted by your Honor at that time on page 17,108.

12   You said:

13     "Let's point it up.  The number two you are urging

14     is that underneath the surface of the stream there is

15     ground water flowing in an underground stream --

16     "Mr. Veeder:  Which supports the surface flow.

17     "The Court:  In other words, it would require a

18     finding that there is water flowing in a known and

19     defined channel.

20     "Mr. Veeder:  Yes.  In regard, for example to

21     Murrieta Creek, that water would be riparian --

22     "The Court:  But there is no evidence that there

23     are known and defined streams."

24     I undertook to argue with your Honor in regard to the

25   sub-surface flow of the streams:

P22

1          "I think this, your Honor, the evidence that is in

2     there in regard to both Tucalota -- I mean Temecula and

3     Murrieta is that the water is flowing across permeable,

4     highly permeable soil, and that there is the water

5     immediately beneath it which supports that surface flow.

6     I am sure there is evidence on that.

7          "The Court:  I don't recall any expert ever so

8     testifying.  There might be instances where that is true,

9     but the movement of this ground water, percolating ground

10    water into the younger alluvium would be supporting

11    water in a large area of younger alluvium, and I don't

12    think you can say it is known and defined channels."

13         "Now, this is going to be very important to you."

14    You said to me, your Honor.

15         "Mr. Veeder:  That is what I said yesterday.

16         "The Court:  I know, but in the reverse proposition,

17    when you get down to the areas in Pendleton, where there

18    is a ground water area, and if you get findings that

19    there are known and defined channels of water underlying

20    the surface stream, this is going to have an impact on

21    any possible claim you might have for an appropriative

22    right outside of the watershed.

23         "And if you are pumping out of the ground water

24    area without known and defined streams, I don't know

25    what may come up.  This really hasn't been argued."

P23

1    Then I went on to say this:

2          "Well, I have been waiting for 11 years on this

3    one, and it is extremely important to us that the areas

4    -- excuse me -- I think there is percolating water

5    throughout the whole ground water area, but I believe

6    that your riparian right does contemplate the water

7    immediately beneath the surface flow."

8    Your Honor, the first time that we raised this point

9    about the appropriative right in the Murrieta-Temecula Basin

10   had nothing whatever to do with our client the Marine Corps.

11   The matter came up in regard to the Gunther property.  Mr.

12   Gunther  is Mr. Krieger's client.  At the time the Bowen line

13   was drawn around the Temecula ground water area I brought

14   to Mr. Krieger's attention a fact which I am sure will be

15   found in the record, namely, that Mr. Gunther had a well

16   within the ground water area and he was pumping the water

17   up onto an area of basement complex or weathered basement

18   complex, I guess it was.  I said at that time that I thought

19   under the California law Mr. Gunther had an appropriative

20   right to surplus water in regard to that pumping.  I think

21   Mr. Girard may have agreed with me at that time.  I am not

22   certain that that is in the record.

23         In any event, there is nothing new about the proposition

24   that I am advancing here.  I am simply saying that the State

25   of California in its regulations specifically declares that

P24

1    underground waters not flowing in a subterranean stream, such

2    as water percolating through a ground water basin, is not

3    subject to the Board's jurisdiction, and applications to

4    appropriate such water, regardless of the place of use, should

5    not be submitted.

6        Now your Honor asked me a question in regard to the use

7    of water by Vail Company, and I believe that in the same rules

8    and regulations the answer will be found.

H fls.

17,718

It says:

"If it is proposed to use ground water on non-overlying land and the source of water is a subterranean stream flowing in a known and defined channel, an application pursuant to the Water Code is required."

Then this:

"No application need be filed for the use of water of a subterranean stream on overlying land."

Now, I am not sure of the status that your Honor will find in regard to Pauba Valley, but I am convinced in regard to the question that you asked that if Vail Company was using more than its share of water, by its Navy well or by any other well, that it would have acquired, I believe, an appropriative right.

I believe that Vail Company is presently exporting water -- and if I am wrong, I am sure I will be noisily corrected -- I believe that Vail Company is exporting water at the time from the Pauba grant to the Little Temecula and maybe the Temecula.

I believe that that would be possibly, maybe probably, an appropriative right.

But in regard to the rights used and exercised by the Roripaughs, to which your Honor alluded, when they put in their very large well, I believe they are using that water largely on overlying land, and I believe it would be

t21

1   in the exercise of their overlying right.

2   The proposition which I do advance, your Honor, is that

3   where there is a non-overlying use of percolating ground

4   water, under the laws of the State of California there is

5   invested an appropriative right as of the day of the

6   diversion of that water and, more important, it is the

7   status -- I want to keep this gallery happy -- it is the

8   status of the ground water at the point of diversion that

9   is controlling, and as it is true in regard to the Mojave

10   River and Cache Creek, to which I made reference today, the

11   waters coming out of the Tehachapi ground water basin, just

12   as they come out of the Murrieta-Temecula Basin, and just as

13   they come out of the Santa Margarita Coastal Basin, they

14   converge into a narrow area and undoubtedly they form a

15   subterranean stream, and if they are on the surface, they form

16   a surface stream.

17   But that is not the controlling factor.  The controlling

18   factor is invariably is it percolating water at the point

19   where it is pumped?  And it is our view, and Colonel Bowen's

20   affidavit was extremely important in our view in regard to this

21   point, that the waters pumped by the United States of America

22   and by its predecessor in interest, the Rancho Santa Margarita,

23   are taken from percolating waters and not from waters in a

24   surface or well-defined subterranean stream.

25   Is there going to be a time limit, on this, your Honor?

17,720

t22

1     THE COURT:  There ought to be somewhere.  I ought to

2  hear from some of these other people, too.

3     MR. VEEDER:  Oh, I agree, but I wanted about two hours.

4     THE COURT:  What?  How much have you had now?

5     MR. STAHLMAN:  Oh, two hours.

6     MR. VEEDER:  I haven't had an hour yet, I don't think,

7  your Honor.

8     THE COURT:  You mean you want to talk all afternoon?

9     MR. VEEDER:  I don't want to get cut off in the middle

10  of a sentence, because I have some pearls here.  But, in any

11  event, I will go ahead until you cut me off.  Then I would

12  like to have a half hour for response.

13     I have considered very carefully the authorities which

14  have been cited by counsel in their briefs, and in Mr. Sachse's

15  brief in particular.   Repeated references are made in Mr.

16  Sachse's brief to the case of Los Angeles vs. Pomroy, the

17  case of Los Angeles vs. Hunter, and, particularly, with

18  reference to the San Fernando Valley, which I believe it is

19  agreed by all is a large ground water basin which is fed by

20  the Los Angeles River and some other tributaries.

21     The San Fernando Valley is described by the Court, the

22  California Supreme Court, as being a large ground water

23  reservoir.  It has also been described as being an area of

24  percolating water, -- percolating in the sense that it is

25  going through the interstices, and around boulders, and moving

17,721

t23

1   on down finally to converge with the Los Angeles River, where

2   it leaves the San Fernando Valley.

3       Certainly, there is no quarrel with that description.

4   Anyone who has spent any time in an airplane over the area

5   has seen the San Fernando Valley, and has seen the immense

6   development in that Valley.  It is one of the most litigious

7   valleys, if you can use such a term, that there is.

8       There is presently pending in the Superior Court of the

9   State of California, In and For the County of Los Angeles,

10  the case of City of Los Angeles, Plaintiff, vs. City of San

11  Fernando.   I don't know whether you are acquainted with

12  that.

13      MR. SACHSE:  I am well acquainted with it.  Local counsel

14  from San Diego, Bill Jennings, is an attorney in it.

15      MR. VEEDER:  I was addressing myself to Mr. Girard right

16  now.

17      MR. GIRARD:  No, I know nothing about it.

18      MR. VEEDER:  The matter is of great importance, in my

19  view, for there is not only involved in that litigation, as I

20  comprehend it, the imported water from Owens Valley, the

21  water from the Colorado, and whatever sources there may be,

22  but there is, however, primarily involved the paramount claim

23  of the City of Los Angeles to its pueblo right as that pueblo

24  right relates to all other claimants in the Valley.  That was

25  the initial claim made in Los Angeles vs. Hunter, Pomroy, and

17,722

t24   1 the related cases cited by Mr. Sachse.

2  There is also the primary basis for the litigation in

3 Los Angeles vs. Glendale.   These cases I have cited to your

4 Honor in my brief of June 30, 1961.

5  It is important, however, to review the preliminary

6 report by the State of California in this matter.

7  MR. SACHSE:  Mr. Veeder, let's get a ruling, so that I

8 won't have to interrupt.  How far are we going to go into

9 this?  Mr. Veeder has stated very fairly, and I happen to

10 know something about this, that this is a pending case before

11 the Superior Court.  There have not been even interlocutory

12 findings in it, and if Mr. Veeder purports to read into the

13 record testimony from an undetermined case in the State of

14 California, on which we have no chance to cross-examine in

15 the Superior Court, or anything else, I have some very strong

16 objections.  I think it is absolutely improper.

17  MR. VEEDER:  I am not proposing to do that, your Honor.

18 Your Honor asked a question of me this morning which I

19 thought was very significant.  You asked me this:  Were these

20 wells drilled before 1914?  You were speaking then of the

21 Santa Ana basin down here.

22  THE COURT:  I said:  Were the appropriative rights

23 acquired before 1914?

24  MR. VEEDER:  Well, I was simply alluding to the fact that

25 the cases which have been cited to support the proposition

t25

that the San Fernando Valley is a comparable situation with the United States of America's Santa Margarita Coastal Basin may be correct.   I am not going into the geology at all.   I am not sure.   But if they are compared by counsel, I do have the right to bring to your attention the fact that although appropriative rights are recognized in the San Fernando Valley, and although the State of California has participated for many years in regard to those appropriative rights, there are no applications filed under the practice in this state for appropriative rights in the San Fernando Valley.

MR. SACHSE:  And the case is not determined.  I say the case is not determined.  This has absolutely no propriety before your Honor.

MR. VEEDER:  I am not even referring to that now.  I am referring to Los Angeles vs. Glendale, which is in 23 Cal. 2d. I won't mention this again.

MR. SACHSE:  All right.

THE COURT:  What appropriative rights have been established in the San Fernando Valley?

MR. VEEDER:  The City of Glendale has appropriative rights, and the City of Burbank has appropriative rights.

THE COURT:  Growing out of what?

MR. VEEDER:  Growing out of the simple fact that they pumped and diverted water onto overlying land.

MR. SACHSE:  And how early?  Mr. Veeder, I know without

17,724

t26

1   looking at a book that every one is prior to 1913.

2       MR. VEEDER:  Those rights, your Honor, are rights which

3   have been expanding and increasing yearly.  Those rights which

4   back in 1910 were very, very small rights have increased

5   regularly.

6       MR. STAHLMAN:  Are you talking about the San Fernando

7   Valley?

8       THE COURT:  He is talking about the rights of Burbank

9   and Glendale.

10      MR. VEEDER:   They have increased regularly.

11      MR. SACHSE:  Your Honor, I don't know about this.  I

12  don't think Mr. Veeder knows either, and if he says the cases

13  show, let him bring the cases in.  I don't believe this is the

14  fact.  I think this is a bald faced misstatement of the fact.

15  I don't think Glendale's appropriative rights ever have been

16  increased materially, and I don't think Burbank's have.  Let

17  him bring in the cases and show us.

18      THE COURT:  Wouldn't it be fair to say, Mr. Veeder, that

19  Burbank and Glendale are contending that their rights have

20  been increased?

21      MR. VEEDER:  Your Honor, I am not speaking of the City

22  of San Fernando at all any more, but I am speaking simply

23  of the cases that I cited to your Honor.

24      THE COURT:  Where are the cases that show that the rights

25  of Burbank and Glendale, which were acquired before 1913 and

17,725

t-27

1   1914, have increased?

2       MR. SACHSE:  Show me.

3       MR. VEEDER:  You will find those cases in 23 Cal. 2d.

4   I believe that is the one that I cited.

5       THE COURT:  What case is that?

6       MR. STAHLMAN:  Why don't you put them in a brief?

7       MR. VEEDER:  Put them in a brief, George?  Do you want

8   me to put them in a brief?

9       MR. STAHLMAN:  No, I don't.

10      MR. VEEDER:  They are cited, your Honor.  I have cited

11  these cases.

12      MR. STAHLMAN:  You are citing these, and in a brief you

13  have stated that it makes a certain point in two different

14  cases.

15      MR. SACHSE:  Let me say that the Glendale case is in

16  23 Cal. 2d 68.

17      MR. VEEDER:  And the point is at Page 78.

18      THE COURT:  At Page 78, all right.

19      MR. VEEDER:  The important thing that I wish to bring

20  to your Honor's attention here is that although the Raymond

21  Basin, the San Fernando Basin, the Santa Ana Basin, and all

22  of these numerous basins from which water is being pumped

23  today, as to none of those rights are there filings with the

24  State of California.

25      THE COURT:  Mr. Veeder, to analyze those situations in a

t28

1   lawyer-like manner, we would have to find out whether those

2   rights were acquired before 1913 and 1914.  If they were,

3   then there was no requirement for a filing.  The law said it

4   was available entirely.  So this would be the first point of

5   inquiry, when were those rights acquired?

6       MR. VEEDER:  Do you want me to get the transcript, your

7   Honor?

8       MR. SACHSE:  You should have been prepared, if you were

9   making the point.

10      THE COURT:  You are making a very broad, bald statement,

11  and either you can support it, or you can't support it.

12      MR. VEEDER:  I read to your Honor, and let's go back

13  for a moment --

14      MR. SACHSE:  I would like for your Honor to read this

15  page that Mr. Veeder refers to, and you can see --

16      MR. STAHLMAN:  Yes, let's stop this.

17      MR. VEEDER:  Your Honor, I asked for two hours to be

18  heard on this.

19      MR. STAHLMAN:  And you are wandering all over and citing

20  different cases here.

21      THE COURT:  Let me see the case.

22      MR. VEEDER:  I didn't cite  Page 78 --

23      MR. SACHSE:  I just wrote it down here.

24      MR. VEEDER:  I gave you the page citation in regard to

25  the appropriation of water, your Honor.  That is the point I

t29

1    make.

2        MR. SACHSE:  Find it.  (Handing book to Mr. Veeder.)

3        It has to do with the appropriation of imported water by

4    the city.

5        (Thereupon Mr. Veeder handed the book to the Court.)

6        THE COURT:  Is this what you were talking about?

7        MR. VEEDER:  It is a part of the general statement, yes,

8    your Honor.  I want to say this --

9        MR. GIRARD:  I won't say you are incorrect, Mr. Veeder,

10   because I haven't read the case.   I don't know.

11       THE COURT:  You want to say what?

12       MR. VEEDER:  I want to say this, your Honor, that I

13   have investigated this matter in the only way I know how to

14   investigate it.  I went to the State Water Rights Board.  I

15   went to their office and I looked at their records, and I

16   checked their procedures.  I was particularly interested in

17   the San Fernando Valley, and I found that this case is

18   pending.

19       I have a right to say these things.  If you want me to

20   verify them in some other way, I will do it.

21       MR. STAHLMAN:  Show us the evidence.  Pardon me, your

22   Honor.

23       THE COURT:  This is only argument.  Go ahead.

24       MR. VEEDER:  You will find in regard to the records, of

25   which your Honor can take judicial notice, that there are

t30

1    numerous cases where pumping is being conducted in the San

2    Fernando Valley and/which the dates are as late as 1953, 1949,

3    1941, 1943, 1953.  Those are appropriative rights, your Honor,

4    for non-overlying uses.

5        THE COURT:  Now, first of all, --

6        MR. SACHSE:  May I inquire --  I am sorry, but I don't

7    quite understand what you say.  Did you say there are

8    appropriations?  I didn't follow that.

9        THE COURT:  He said there are cases, and I take it he

10    meant there are pending cases --

11        MR. VEEDER:  Your Honor, I will start again.

12        THE COURT:  -- where they have asserted appropriative

13    rights.  I had a little trouble following it myself.

14        MR. VEEDER:  All right.  There are rights now being

15    claimed, and water now being pumped from wells which were

16    drilled as recently as 1953.

17        MR. SACHSE:  Before the State Water Rights Board?

18        THE COURT:  That does not mean a thing.  Supposing a

19    man had a well at or about the same location back in about

20    1900, and in 1953 the old well had fallen, so he put in a new

21    one.  Is he claiming any different rights than he was

22    claiming in 1900?

23        Secondly, if you are talking about wells in the San

24    Fernando Valley, you have a situation where, first of all,

25    you have the imported water from Owens Valley.

17,729

t31

1    MR. VEEDER:  I know.

2    THE COURT:  And now you have imported water from

Tujunga, and what the law is claimed to be as to appropriated

water and imported water I don't know.   But this is certainly

enough to put you on notice that this is a different kind of

situation than we have here.

7    MR. VEEDER:  The situation is very clear, your Honor,

in these cases.  There is involved in the cases the right to

appropriate the normal flow that goes into the San Fernando

Valley.  The question --

11   THE COURT:  The normal flow from where?

12   MR. VEEDER:  From the Los Angeles River.  The right to

appropriate --

14   THE COURT:  That does not make sense to me.  There is

no Los Angeles River flowing into the San Fernando Valley.

The Los Angeles River flows out of it through the narrows.

The waters that contribute to the San Fernando Valley are

the Big Tujunga, the Little Tujunga, the Pacoima, and a few

other smaller streams.

20   MR. VEEDER:  And that is what I am speaking of in

relation to this, these waters that go into this area, and

then the question is whether the pueblo right would relate

to the flood waters.

24        When I used the term "Los Angeles River," I used it

25   in regard to all of the waters that come into the San Fernando

MARIE G. ZELLNER, OFFICIAL REPORTER

17,730

t32

Valley.

THE COURT:  Are these rights being asserted by Los Angeles by reason of a pueblo right?

MR. VEEDER:  The rights that Los Angeles is asserting is to quiet title against these various claims, appropriators, and she has asserted her pueblo right in each instance, and she has successfully asserted it in regard to the natural flow and to the flood flow of the Los Angeles River and all of its tributaries in the San Fernando Valley.  But there are rights which are subject and subordinate to this pueblo right, which are appropriative rights in character, and that is what I am saying.

THE COURT:  When do they date from?

MR. VEEDER:  I am almost afraid to open my mouth, but I will say this --

THE COURT:  I just wanted some information.

MR. VEEDER:  All right, I will give you the information. Some of the rights were initiated as recently as 1953, because the date when the well was drilled -- don't let's go back to 1890 -- some of these are by the very newest firms that have come in there, and they have drilled wells for industrial purposes.  They have made no applications with the State of California, and the reason why they don't have to make application is the Rules and the Regulations which I have just read to your Honor.

17,731

t33

1      THE COURT:  But they are overlying owners.

2      MR. VEEDER:  But they are not making overlying uses.

3  There are some of them that are exporting water out of the

4  watershed, and that fact remains, your Honor.

5      MR. SACHSE:  Name me one of them.

6      MR. STAHLMAN:  Name one of them.

7      MR. VEEDER:  The La Canada Irrigation District.

8      The fact remains, however, -- I am fully prepared,

9  and I was fully aware, and I came in here with a prayer in

10  my heart that I would not let these guys get me angry, and I

11  am not -- but I want to go ahead and finish with the rest of

12  this argument, if I may.

13      The fact remains that under the law of the State of

14  California as of this minute, as to percolating water of the

15  character that is in the Santa Margarita Coastal Basin you

16  can get an appropriative right by pumping and applying it to

17  a beneficial use for a non-overlying use.  That is the law of

18  the State of California.  It is not even doubtful on that

19  proposition.

20      THE COURT:  I don't think that there is any dispute

21  with the principle of law that if the water is percolating and not

22  a part of the stream in the first instance that you would not

23  have to comply with the State Water Act; and probably in the

24  second instance, even if the water contributed to the stream,

25  but did not flow in a known bed or channel, you probably could

17,732

t34

1   get a right by applying to the State Water Rights Board, but

2   the first thing you would have to decide is the question of

3   fact.

4        MR. VEEDER:  Yes, that is right.

5        THE COURT:  And you conceded that this was a question

6   of fact, and I would be interested in some comparisons of the

7   situation that we have on the Base with the ground waters, and

8   the situation on the Base with the San Fernando Valley,

9   situation as described in the Pomroy case.

10       MR. VEEDER:  I will turn to that now, your Honor.

11       THE COURT:  That was to be your next point?

12       MR. VEEDER:  What?

13       THE COURT:  That was to be your next point?

14       MR . VEEDER:  That is right.

I fls    15       THE COURT:  All right.

**Belt I**

p25

1  MR. VEEDER:  I think that the key exhibit in this phase

2 of the argument is Exhibit 38-A.

3  THE COURT:  This is United States Exhibit 38-A?

4  MR. VEEDER:  Yes, on the basis of Mr. Worts' testimony.

5 And I asked Mr. Worts to come down today not for the

6 purpose of putting in any evidence, unless somebody wanted

7 to undertake to sustain their burden to overcome the pre-

8 sumption that these are percolating waters.

9  MR. STAHLMAN:  The burden is upon you, Mr. Veeder.

10  MR. VEEDER:  The law is very clear that these waters are

11 presumed to be percolating waters, unless there is evidence

12 to the contrary.

13  MR. STAHLMAN:  Not when you are claiming an appropriation.

14  THE COURT:  Go ahead.

15  MR. VEEDER:  Are you speaking to me?

16  THE COURT:  I am speaking to you, Mr. Veeder.

17  MR. VEEDER:  If we can have this harassment shut off a

18 little bit it would help.

19  Is your Honor looking at Exhibit 38?

20  THE COURT:  Yes, I am looking at 38-A.

21  MR. VEEDER:  I have put Exhibit 38 up here.  If you will

22 get Exhibit 38 you will observe --

23  THE COURT:  What is the difference?

24  MR. GIRARD:  I thought you said the most pertinent

25 exhibit was 38-A.

p26

1    THE COURT:  Are you going to talk about Exhibit 38?

2    MR. VEEDER:  You will find they are identical.  I happened

3  to put 38 up here.  I couldn't find 38-A.  I think when these

4  gentlemen were preparing their material they didn't put back

5  the exhibits.  Isn't that right, Mr. Luddy?

6    At any rate, you will observe that there is an area

7  referred to on Mr. Worts' exhibit as the "upper member" of

8  alluvium.  You will find that that upper member is composed

9  of very fine deposits, very much clay, and you will also

10  observe that the perforated areas of those wells that are

11  shown on that exhibit are, by and large, in what is referred

12  to as the "lower member" of the alluvium.

13    It is the position of the United States in this matter

14  that the recharge for the basin from which the water is

15  pumped is at the upper or eastern end of the Santa Margarita

16  coastal basin where the coarser deposits are found.  The

17  water readily enters those coarser deposits, rapidly spreads

18  out, goes through the interstices of clay, silt and the other

19  deposits, and that having entered into those interstices the

20  water has departed from the surface flow of the Santa

21  Margarita and has departed from the subflow of that stream.

22    I think Colonel Bowen's affidavit on the proposition is

23  excellent.  He points out that those waters which have thus

24  departed from the Santa Margarita River are percolating

25  waters, and they are percolating waters at the points where

P27

1   they are pumped.  He didn't put that in his affidavit, so

2   don't jump up.  But that is the situation.  The water which

3   is proceeding through those interstices doesn't follow the

4   stream flow.  Indeed, for most of the years there is no

5   surface flow for a large part of the basin.  The stream is

6   dry.  The porous areas which constitute the bed and bank of

7   the stream are dry and the waters which are stored or impounded

8   in that ground water reservoir, cannot under any circumstances, be

9   considered part of the surface or subflow.

10   Now Tolman has referred to the fact that the waters when

11   they are progressing through these interstices, these lenticu-

12   lar layers, is not part of the stream.  The California Courts

13   have so declared.  Counsel for the State of California cited

14   California Jurisprudence (51 California Jurisprudence 2d 395).

15   He quoted:

16   "Waters of an underground lake or reservoir or waters

17   that form part of the body or flow of any stream, surface or

18   sub-surface, are not percolating waters."

19   He cited Los Angeles vs. Hunter.

20   MR. GIRARD:  This is Mr. Sachse's brief, Mr. Veeder.

21   MR. VEEDER:  Didn't I say Fallbrook?

22   MR. GIRARD:  No, you said the State.

23   MR. VEEDER:  But he stopped in his quotation too soon.

24   This authority proceeds, at page 395:

25   "But percolating waters do include those that have left

p28

the bed of the stream and are moving underground in such a fashion that they are no longer part of the flow." Now that is precisely the situation which exists in the Santa Margarita coastal basin. The waters which are being pumped today have departed from the stream and are not part of the flow. Indeed, during these dry periods there is no flow. The waters which are impounded and stored in the ground water reservoirs are percolating waters. And I submit that that is the law of California.

Continuing from this quote:

"The mere fact that the course of percolating water is changed by reason of the intrusion of an impervious seam of clay does not change their character as percolating waters. It is frequently the case that the course of percolating waters is in some definite direction, but as long  as they continue to percolate through pervious materials without bed or bank they remain percolating waters and are not part of a stream."

In other words, the criterion which I referred to on June 1 when I read what I thought was an important factor into the record, that there are three kinds of waters in which we are interested:  The percolating waters which ultimately come down and create a stream as they do in the Murrieta-Temecula and as agreed upon between counsel for California, your Honor and myself, that those waters were not in a definite stream.

1    MR. STAHLMAN:  May I ask a question?

2    MR. VEEDER:  I think I have a right to go ahead with my

3    argument.

4    MR. STAHLMAN:  I thought you might clear it up.

5    THE COURT:  Go ahead.

6    MR. VEEDER:  This authority cited by Mr. Sachse continues:

7    "The Courts have experienced great difficulty in fixing

8    the line beyond which water ceases to be a part of stream

9    flow or of the body of water that actively supports the

10   stream, and becomes percolating water.  Underground water is

11   generally presumed to be percolating, and the burden of proof

12   is on the party who asserts that underground water

13   constitutes a part of a water course."

14   That is the citation relied upon by counsel for the

15   Fallbrook Public Utility District.  That is the principal

16   citation.

17   But I submit, your Honor, that the facts of this case

18   warrant the finding identical with the finding that your

19   Honor approved in regard to the Murrieta-Temecula ground

20   water area, namely, that the waters in the basin are precolating

21   waters and not a part of a defined stream.

22   The record will show in this case, your Honor, that the

23   waters in the area, particularly in Chappo Basin and in

24   Ysidaro Basin, that those waters couldn't progress along with

25   the stream.  Indeed, as I said, there is no stream for much

1    of the year.

2    THE COURT:  Do I understand you to mean that you have a

3    stream of water flowing down over some gravel, one of these

4    western canyons, and while it flows down over the gravel in a

5    little water course you can see there is an underground flow,

6    but the minute the surface flow stops you say there is no

7    flow of water?

8    MR. VEEDER:  I say this, your Honor, based upon the

9    decision I referred to you on Cache Creek.  First, your

10   hypothesis, I would say, doesn't relate to this situation.

11   This isn't one of the small gravel-lined streams you are

12   referring to.  This is a stream which flows through a porous

13   area in the upper basin.  But very shortly the progress in

14   the course of the channel is across very fine materials which

15   are clay-like in character and the waters in the basin and

16   the stream are separated and apart; they are not flowing

17   together as one, as in the gravel-lined channel of a small

18   mountain stream.  And I believe that the record shows clearly

19   that California in its evidence recognized they used to be

20   percolating waters.

21   The point that I wish to emphasize heavily here, though,

22   is that the laws of California have distinguished between

23   these percolating waters and the waters which flow down in

24   well defined channels.

25   THE COURT:  The authority you just read -- I think it was

P31

1     Cal. Jur. -- referred to waters which support the stream as

2     being part of the stream flow.

3        MR. VEEDER:  Immediately beneath, your Honor.

4        MR. STAHLMAN:  What is the bed and bank you refer to?

5     What do you mean by "bed and bank"?

6        MR. VEEDER:  The bed and bank of the stream.  It is

7     simply the bed and the banks which form the channel.

8        MR. STAHLMAN:  In this case what would it be?  That is

9     the thing I am puzzled by.  In this case what are the banks

10    of the Pendleton Basin?

11       MR. VEEDER:  Well, is there any doubt about it?  It is

12    the channel of the stream across the surface of the basin,

13    the single narrow channel.

14      Am I right, Colonel Bowen?

15      THE COURT:  Mr. Veeder, do you have any belief that this

16    bed you speak of or channel across these basins remains in

17    the same place?

18      MR. VEEDER:  Not in the slightest.  Colonel Bowen's

19    affidavit covered that very nicely.  This channel may have

20    been on the south side or on the north side, but the fact

21    remains that the surface and sub-surface flow, whenever it

22    is in that stream, is progressing independently of the per-

23    colating water in the vast mass of detritus which fills the

24    basin.

25      THE COURT:  Bed and banks.  Do you have any doubt but that

P32

1    at least in the narrower stretches of the Santa Margarita

2    River there have been many times, flood times, when the water

3    has gone across those valleys from wall to wall?

4         MR. VEEDER:  Conceivably, yes.

5         THE COURT:  Maybe with Vail Dam it might not again do

6    that.  But again, what stream are you talking about?  The

7    stream of flood flow?  Or the stream when it is a trickle

8    about ready to dry up?

9         MR. VEEDER:  When I am referring to the bed and bank I

10   am referring to the bed and bank that is easily identified

11   as the channel of the stream in its natural flow.  You might

12   have a flow that would debauch out all over the bed and bank,

13   but I don't believe it is difficult to locate it.

14        THE COURT:  Most of these Southern California streams

15   change their course winter by winter -- this is a common

16   phenomenon -- as they flow across these sand and gravel

17   bottoms.

18        MR. VEEDER:  Perhaps I should start again, then, your

19   Honor, and avoid what might be a difficult proposition for

20   me.  I am talking about the surface flow and the subflow of

21   a stream in its natural channel.  I am not speaking here of

22   a flood that debauches out across the flood plain.  Even so

23   the percolating water in the basin during this period when

24   the water flows precipitously across is not flowing in the

25   course and with the course of the stream.  The course of the

P33

1    percolating water is through these interstices of clay, and

2    the course of these percolating waters is governed by the kind

3    and type of material through which it is progressing, and

4    that is the difference.  The percolating water as distinguished

5    from the surface and the immediate sub-surface flow.  The

6    sub-surface flow of a flood of the character you are talking

7    about would not be part of the percolating water, your Honor.

8       Now the important fact that I wish to bring out here is

9    that in the briefs which were filed by counsel it is interest-

10   ing to note that no reference was made to the testimony of

11   the principal witness, who was Mr. Worts.

12      MR. STAHLMAN:  Oh yes.

13      MR. VEEDER:  I am speaking of Mr. Sachse.

14      MR. GIRARD:  I didn't identify them by name, Mr. Veeder.

15      MR. VEEDER:  I don't believe any of your references are

16   to that.

17      But even so the important thing that I observe is that

18   there are throughout the briefs statements made in an effort

19   to support their conclusion that in some manner these perco-

20   lating waters were part of the flow of the Santa Margarita

21   River.

22      Mr. Sachse and counsel for Fallbrook and counsel for

23   the State of California both referred to the testimony of

24   Mr. McNearny.  Mr. McNearny is a plumber and he was not put

25   on for any purpose other than to demonstrate how the water

p34

1   was distributed.  But Mr. Sachse straightened out that himself

2   later on.  A few pages after Mr. McNearny's testimony Mr.

3   Sachse said in response to a question that was asked, "I will

4   object to this, your Honor.  The source I don't think is

5   material.  I don't know whether Mr. Veeder meant that the

6   source is all out of the basin.  What we care about here is

7   where does this come from, each well in the basin?"

8       In other words, there was no doubt when Mr. McNearny said

9   that it came from the Santa Margarita River, both counsel

10   for California and for Fallbrook knew very well it was perco-

11   lating water from the basin that was being talked about.

12      THE COURT:  Have you forgotten that historically and

13   before the military took Camp Pendleton there were pools of

14   water that formed at periodic intervals down the bed of the

15   Santa Margarita where cattle watered?

16      MR. VEEDER:  Yes.

17      THE COURT:  And that these pools were supported by the

18   water underneath?  This is what caused the water to come to

19   the top from which they watered their cattle.

20      MR. VEEDER:  That is precisely the reason why I started

21   this argument today with the ruling by the State Water Rights

22   Board that every basin must have an outlet, and that it is

23   whether the water is percolating at the point where it is

24   pumped as to whether you must file an application or not, and

25   they admit that these percolating waters do come down, are

P35

1   confined and come to the surface, that they do constitute a

2   stream there.

3       But the point that I make is that at the point where we

4   are pumping and the point where Santa Margarita pumped when

5   it started exporting water from the watershed was out of a

6   basin of percolating water.

J fls.

17,744

1   True, all this water ultimately -- it may take ten

2 thousand years, but this water all will ultimately, all this

3 percolating water in these interstices will all ultimately

4 move out and down into the channel.

5   THE COURT:  Haven't you forgotten that the testimony

6 shows that these are basins in the true sense, that there are

7 actual water levels, and that the water levels can be

8 calculated, so that you know exactly where your water level

9 stands in relation to these basins, so that you have a

10 continuity of water?

11   MR. VEEDER:  Well, your Honor, --

12   THE COURT:  You don't have water moving down sometimes

13 not in contact and other times in contact with other water

14 like you have in the older alluvium in Murrieta.  You don't

15 have that situation.  There you have waters moving generally

16 westward and southward, but you don't have a basin like you

17 have here.

18   MR. VEEDER:  Your Honor, in regard to this proposition --

19 and I am terribly concerned about the facts that you are

20 reciting now -- every single drop of water in the Murrieta-

21 Temecula Basin is interconnected, and we made that finding,

22 and every single drop of water in the Santa Margarita Coastal

23 Basin is interconnected.  But the fact remains that the

24 vast quantity of water contained in those basins is percolating

25 water which has so departed from the stream flow that it is

t36

1    not identified with the stream flow.  And that is the

2    difference, and that is the point that I am trying to bring

3    to your Honor's attention.

4        THE COURT:  We will take a recess.  When can you conclude

5    so that I can hear what the others have to say about this?

6        MR. VEEDER:  I will conclude in fifteen minutes.

7        THE COURT:  All right.

8        (A short recess.)

9        THE COURT:  I have put on the blackboard four diagrams,

10   cross-sections of the Santa Margarita Valley, and then the

11   basin areas.

12       The first one shows the valley fill, and it shows the

13   flood waters from wall to wall.  I take it with some possible

14   exceptions the water level in the fill would be right up to

15   the flood waters.  It might not be to start with, but the

16   flood waters could not run very long before the fill would be

17   filled up with water.

18       The second one is again the valley fill, and there is a

19   little water flowing in a course.  I take it thatthe waters

20   flowing in that course, because the water level in the fill

21   would be up in the course of that little stream of water,

22   and if the water level was down 12 or 15 feet, the water

23   would run down into the material and would not flow.

24       The third one shows the valley fill, and shows the

25   little stream now is dry, it is a dry bed, and the water level

t37

1   has dropped down so that it is not supporting the surface

2   flow of the waters down below.

3       In the fourth one you drop down still a little further,

4   and here we find the water flowing in the little course, and

5   you find a little water there, and again you can assume that

6   the water level in the fill is high enough to support the

7   flow.

8       You can comment on that now, or tomorrow, if you want to.

9       MR. VEEDER:   I assume that the opposition will be able

10  to use up the rest of the time after I finish.

11      THE COURT:   We are going to stop tonight at about 4:00

12  o'clock for special reasons, other than my own particular

13  desires.

14      You may proceed.

15      MR. VEEDER:   There have been comparisons made in the

16  briefs between the ground water basin underlying Camp

17  Pendleton, and the basins underlying the small areas in

18  De Luz Creek and in Rainbow Creek.   The important difference

19  in regard to those areas is this, your Honor:   Those are

20  extremely shallow areas.   For example, under the Garnsey

21  property, the area is shallow, but, more important, Colonel

22  Bowen testified specifically that in those narrow areas the

23  waters were a part of the sub-flow.

24      In regard to Rainbow Basin, referred to by Mr. Sachse,

25  the Master took testimony to the effect that the waters in

t38

1    that basin were a part of the stream flow when the stream

2    was flowing, and Colonel Bowen has shown, and it is a matter

3    of fact, that the homogeneous character of the deposits makes

4    a great deal of difference in regard to the progression of

5    the ground water in the course of the ground water.

6        In these shallow basins -- I am referring to De Luz, and

7    I am putting up Exhibit No. 67 -- the small areas which are

8    depicted in yellow are shallow.  Whatever water is in there

9    is close to the surface, and the waters during the period

10    when the stream is flowing probably are in immediate contact.

11        I am now putting up Exhibit No. 68, showing a cross-

12    section of De Luz Creek.

13        Similar situations exist in regard to Rainbow Creek, and

14    you will observe the very shallow nature of those fills, and

15    you will observe, moreover, that they are composed largely of

16    sand, which is a factor of great --

17        THE COURT:  How do you observe that?

18        MR. VEEDER:  By the legends, your Honor.  These deposits

19    are -- while there are some intersticed in there, these are

20    largely sand fill, as distinguished from the very great

21    differentiation of fill in the Murrieta-Temecula Basin or

22    ground water area and in the Coastal Area underlying Camp

23    Pendleton.

24        I think that your Honor has stated that in the older

25    alluvium the waters are not a part of the stream, or some of

t39.

1    it could be so situated.  We disagree, your Honor.  We

2    believe that these percolating waters are a part of the

3    stream, but we say this, that they are not in as well defined

4    a subterranean channel, they are percolating in character,

5    and that is precisely the situation  which exists down here

6    in the Coastal Basin.

7        Those waters, irrespective of their -- I will start

8    again.   Those waters, which you will find as far as a mile

9    from the stream in Chappo Basin, for example, are not a

10   part of the stream at all.  Ultimately they will return to

11   the stream, when they have  progressed in years to come down

12   to the confining limits of Ysidaro Narrows.   But as I

13   contemplate the law --

14       THE COURT:  How much difference in elevation of water

15   wells in any of these basins have you found?  Take a cross-

16   section north and south across either Upper, Chappo or

17   Ysidaro Basin, -- how much difference in water levels in these

18   wells have you found?

19       MR. VEEDER:  By elevations you mean different levels?  I

20   believe you can work contours out across the basin just like

21   we have --

22       THE COURT:  But the contours are fairly at right angles

23   to the canyon walls, aren't they?  You don't find the water

24   level at one side of Chappo Basin  50 feet lower than the

25   water level directly north of it, do you?

t40

MR. VEEDER:  I think that is correct, but I don't believe that is important at all, your Honor.  I think the important point is this:  We know this, we know that gravity will cause--

THE COURT:  How can you support a stream unless you fill up the basin below?  How can you support a stream so that you will ever have a surface flow unless you fill up the fill so that eventually the stream can run on top?

MR. VEEDER:  That is precisely the point, your Honor, that the courts have declared in California that there is an area immediately below which is in actual contact with the surface flow, and that water which is in actual contact with the surface flow is considered to be a part of the stream.

THE COURT:  Suppose there is no surface flow?

MR. VEEDER:  All right.  Suppose there is no surface flow, but that is a wetted perimeter, and it still might be a part of the flow of the stream, and it still might be progressing down this fine porous alluvial material, and you would have what you would call a sub-flow.  But a few feet out, your Honor, and/use a few feet advisedly, -- a few feet out in this clay blanket that extends out, and it isn't a continuous clay bed, there is an area of very fine materials, and when the water enters into that fine clay material, it doesn't flow with the stream any more.  Its progress may be a few feet a week, or it may be a few feet a month, or it may go horizontally --

t41

1          THE COURT:  What authority do you have on this besides

2     "Veeder on geology"?

3          MR. VEEDER:  What do you mean by that?

4          THE COURT:  Where in the record do you have anything on

5     that?

6          MR. VEEDER:  As to the rate of progression?

7          THE COURT:  Yes, and on this small wetted area along the

8     side of the stream?   Colonel Bowen's affidavit is not even

9     in the record.  It has been filed, but it is not a part of

10    the record, that is, it is not a part of the testimony.

11         MR. VEEDER:  Your Honor, the fact does remain that the

12    burden of proof as to anyone proving that a well supports

13    the subterranean stream is not with us.

14         The law will presume that it is percolating water, your

15    Honor, and I believe that your Honor has enough evidence in

16    the record to support this statement that I am making, namely,

17    that these are fine clay materials.

18         THE COURT:  Yes, there is some evidence of that, but

19    there is no evidence in the record about this wetted area

20    a few feet away.

21         Your Exhibit 38 has a line showing water levels.  Look

22    at it.  It is right there in front of you.

23         MR. VEEDER:  I have seen it, your Honor.

24         THE COURT:  And if you have water levels, that does not

25    mean you have small wetted areas beside the stream.   It means

t42

1   you have a water level, and you have these water line

2   profiles of 52, 51, 57, and all shown on Exhibit 38.

3       MR. VEEDER:  But all percolating water, your Honor, and

4   the word "percolating" is a word that is used throughout.  It

5   is a word recognized in the record.

6       Mr. Illingsworth testified in regard to percolating water.

7   These witnesses all testified in regard to these percolating

8   waters.  These witnesses all testified in regard to the kind

9   and type of material that was found in the basins.  And, your

10  Honor, I think this, that Finding No. XI, which you approved

11  and which you read, in regard to the Murrieta-Temecula Basin

12  is squarely in point throughout the whole area.

13      I think that the waters, once they leave the stream a

14  short distance, do not flow as a part of the stream.  They

15  are in fact impounded waters.  These waters that fill up

16  Chappo Basin, fill up Upper Basin, fill up Ysidaro Basin, are

17  waters which cannot flow through the constriction of the

18  narrows at any degree of speed.  One of the reasons is that

19  there is a very heavy clay area there.  Secondly, --

20      THE COURT:  When does water in the alluvial fill cease

21  to support the stream?  Let's take Diagram No. 2.  There is

22  a small stream flowing, and the water throughout the fill is

23  at a water level up near the surface of the ground, to support

24  the stream.

25      MR. VEEDER:  We are looking at No. 1 now, your Honor?

17,752

t43

THE COURT:  No, No. 2.  The water there is supporting the stream, is it not?

MR. VEEDER:  I am pointing here now, and where you have water flowing down this right here (Indicating), and there is a wetted area in there, which is a sub-flow --

THE COURT:  No, I am presupposing that you have got a water level, that there is water across the canyon from side to side; not just a little wetted area, but the fill is full of water, and the water is supporting the stream.

MR. VEEDER:  Yes.

THE COURT:  In that situation you will agree that the water supports the stream?

MR. VEEDER:  I won't say that the water at the southern edge of Chappo Basin is considered to be in contact with the flow of the stream.  No, I do not agree on that.

THE COURT:  When does it cease to support the stream? Take sketch No. 3.  The water level has dropped now just a couple of feet so that the stream bed is dry, so instanta- neously or as soon as water ceases to flow in the bed, then the water in the fill no longer supports the stream, and is no longer a part of the stream.

MR. VEEDER:  With water there?

THE COURT:  With no water there.  It is dry.

MR. VEEDER:  It is dry.  There is no stream at all?

THE COURT:  Yes.

17,753

t44

1    MR. VEEDER:  Then this area, which is the wetted

2    perimeter --

3    THE COURT:  There is no wetted perimeter, it is dry.

4    MR. VEEDER:  The wetted perimeter has now dried out.

5    Then any water that is found out in here (Indicating) --

6    THE COURT:  There is no water in there.  The water level

7    has dropped.

8    MR. VEEDER:  All right.  The water that is found in these

9    interstices in there is strictly percolating water, it is not

10   flowing, and it is not in a well defined stream.

11   THE COURT:  So then you concede that if the stream is

12   flowing and the water level is up to the top of the ground,

13   it supports the stream, that water supports the stream, but

14   the minute the stream ceases to flow because the water level

15   has dropped, that water level can no longer be said to

16   support the stream, even though going downstream water again

17   comes to the surface?

18   MR. VEEDER:  I am willing to answer, but may I have that

19   read back?  I think this may be the crux of the situation.

20   THE COURT:  I thought you admitted that.

21   MR. VEEDER:  No, I want to say this, that there is a

22   point on every one of these where the molecules of water,

23   the drops of water that are in the interstices of the basin,

24   the clays in the basin, -- where it is percolating water and

25   is not flowing water.  And it does not matter on 1, 2, 3 and

t45

1    4, but there is a point beyond which the waters are a part

2    of the percolating waters.

3         Do you want me to stop?

4    THE COURT:  No.

5    MR. VEEDER:  They are a part of the percolating waters

6    and can no longer be defined with or considered to be in

7    contact with the surface flow or the subsurface flow of the

8    stream.  And the subsurface flow has been defined by the

9    cases as that water immediately under and in contact with

10   the surface flow and supporting it.

11        Now, the important factor, as I see it, and I believe

12   that this is the crux of the matter in regard to percolating

13   waters -- can I put this on here, your Honor (Referring to

14   blackboard diagrams)?  May I make some marks on here, your

15   Honor?

16   THE COURT:  Yes, go ahead.  You can make some marks.

17   MR. VEEDER:  I will say this, that a well here

18   (Indicating) -- nor am I agreeing with your Honor's diagram

19   as to the way they appear, but we will draw a line across

20   here (Indicating), and this is the upper member, this upper

21   member is here, and I will put the word "upper" there.  This

22   area is halfway down Chappo Flat.  Then taking No. 4, the

23   waters which are out in this area (Indicating), which is  a

24   heterogeneous composite, are not in direct contact with and

25   they do not support the surface flow.

1          It may be true that, or it is true that there is

2     hydrological continuity between a well drilled over here on

3     the south side, and a well drilled on the north side, but

4     those molecules of water taken out of this well are not water

5     that immediately supports and is in contact with the

6     surface flow.  That water is the percolating water.  How fast

7     does it move?  No one knows.  What its course will be, no one

8     knows.

9          We realize, as the decision that I read into the record

10    this morning states, that water is progressing down the

11    gradient, and its course may be  zigzag all the way.  I am

12    talking about the percolating water by reason of the

13    interstices that it encounters, but it is not a flowing

14    stream, and it cannot be identified as being in contact with

15    the surface flow.

16         I think that your Honor has an abundance of evidence

17    in the record that will support what I have said.  I think

18    that if we refer back to the testimony that went into the

19    record in regard to the Murrieta-Temecula Basin, you will

20    find, first, that very extensive cross-sections, comprehensive

21    cross-sections were put into the record.  They showed, as

22    the cross-sections show here, that you may have a very highly

23    permeable area of gravel.  You may have a very dense area of

24    clay.  The water which enters the interstices of clay will

25    move at a very, very slow rate.  We know that.  So it

47

1    could not be said that that water in that interstices of

2    clay is a part of the surface or the immediate subsurface

3    flow.  That is why California has made the difference in the

4    rules in regard to appropriation, because it recognized, and

5    it has always recognized, in my view, --

6        THE COURT:  You were talking about the California Water

7    Board?

8        MR. VEEDER:  The California Water Board.

9        THE COURT:  You are a lot more complimentary of that

10   Board in the last 30 days than you used to be.

11       MR. GIRARD:  The California Water Board suddenly became

12   a great judicial body, your Honor.

13       THE COURT:  As I recall, I think we can find some rather

14   slighting remarks in the record about the California Water

15   Board.  But go ahead.

16       MR. GIRARD:  And while we are at it, your Honor, let me

17   also point out that Mr. Veeder quoted with a compliment from

18   the text of Bulletin No. 57.

19       THE COURT:  Oh, he did?

20       MR. GIRARD:  Yes.

21       THE COURT:  Have you had an examination lately?

22       MR. VEEDER:  I have had a very good combing today, if

23   you want to ask me.

24       THE COURT:  We have to have a little fun now and then.

25   Go ahead.

t48

MR. VEEDER:  I can laugh.  I can laugh heartily at it.

MR. STAHLMAN:  And enjoy it?

MR. VEEDER:  Well, yes, yes.  It would be dull if your Honor didn't reach across once in a while.  I said once in a while.

As I was saying, in regard to these deposits throughout the whole Santa Margarita Valley, they are composed of varying degrees of density and permeability, and once the water gets into those deposits, whether they are clay, or silty clay, the speed of that water changes, the course of that water changes, and you can't possibly say that it is a part of a well defined subterranean stream.

K fls

P36

1        I read at length from the cases for this reason.  The
2   California law has said that when water is found in these
3   detritus materials removed from the bed and bank of the stream
4   it is no longer considered to be part of the stream.  And I
5   think that that is the controlling factor today, your Honor.

6        THE COURT:  If you can find me a case which talks about
7   a flood plane of a Southern California coastal stream, a
8   stream that has a flood plane, such as we have in the case
9   of the Santa Margarita, that talks about the fact that water
10  found some distance removed from the stream is not part of
11  the flow of the stream, I will be interested.  You are going
12  to find that a lot of these cases don't involve streams that
13  have a flood plane in the sense that we have one in the Santa
14  Margarita or that you have in most of these Southern California
15  streams.

16       In the Los Angeles River you have a flood plane and you
17  have a lot of area upland over it that overlies water.  You
18  have a situation up on the Pauba and Murrieta where you have
19  a little flood plane and then you have a broader upland area
20  on either side.

21       You show me a case where a flood plane is involved on a
22  Southern California coastal stream that talks about this and
23  I will be very much interested.

24       MR. VEEDER:  I will look for it , your Honor.  This
25  approach that you have used here, I believe, is entirely

p37

1    foreign from the proposition that is involved, with all

2    respect to your Honor.  I think that the crucial factor that

3    you find from the cases is the picture that I put here of

4    the fact that the water has come down and the waters in the

5    Santa Margarita coastal basin, those waters which enter there

6    and recharge this area of clay, silt, sand, gravel, that area

7    is recharged from the upper more porous areas in the upper

8    basin.  And I think that the true question for your Honor to

9    consider here, and I think the controlling question is, is

10   this water percolating?  Has it so far departed from the

11   stream that it could be said to be in contact with it?  And

12   I think that you must say that, your Honor -- I wouldn't say

13   that you must -- but I think you could make findings to the

14   effect that the waters which are presently pumped out of

15   Chappo Basin, the waters which are pumped out of Ysidaro Basin

16   and exported from the Santa Margarita River watershed cannot

17   be called other than percolating waters in an underground

18   basin.

19       THE COURT:  When you read Pomeroy check it over again.

20       MR. VEEDER:  I have read it.

21       THE COURT:  He talks about the L.A. River.  The L.A. River

22   as it exists today is not the L.A. River at the time of Pomeroy.

23   The L.A. River back before they built these concrete contri-

24   vances to take off flood waters was a flat, sandy flood plane

25   full of phreatophytes and willows, and there was an old road

p38

1  that went down through it from Burbank where you could drive

2  through it almost to Elysian Park, and the ground was so damp

3  that in fact you could see water and moisture in the ground

4  as you went along.   It would be interesting to see what they

5  meant by the L.A. River in Pomeroy.  Did they mean by the L.A.

6  River in Pomeroy just a little channel that winds across this

7  flood plane?  Or did they mean the flood plane between the

8  banks and sometimes a mile or two wide?

9     MR. VEEDER:  In reading those cases, your Honor, I studied

10  those as carefully as I could, and when I brought the wrath

11  of the Gods down on me I am sorry.

12     THE COURT:  Do you want to be heard further tomorrow,

13  except in rebuttal?  Haven't you pretty well said two or three

14  times what your position is?

15     MR. VEEDER:  I hope I didn't repeat myself, your Honor.

16  I would like to point out that I didn't cover I and II on

17  that.  I would like to make some comment.  I will not take

18  more than ten minutes in the morning.

19     THE COURT:  10:00 o'clock.

20     (Whereupon, at 4:00 p.m., an adjournment was taken)

21     (until Thursday, September 7, 1961, at 10:00 a.m.)

22        - - -

23

24

25

P39

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,      )
                               )
                    Plaintiff, )
                               )
          vs.                  )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                    Defendants.)
                               )

## CERTIFICATE OF REPORTER

We, the undersigned, do hereby certify that we are, and
on the date herein involved, to wit: September 6, 1961, were
duly qualified, appointed and acting official reporters of
said Court;

That as such official reporters we did correctly report
in shorthand the proceedings had upon the trial of the above
entitled case; and that we did thereafter cause our said
shorthand notes to be transcribed, and the within and fore-
going 87 pages of typewritten matter constitute a full, true
and correct transcript of our said notes.

WITNESS our hand at San Diego, California, this 6th day
of September, 1961.

_____
Official Reporter

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER