VOLUME NO. 198                                                    MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

<div style="margin-left:3em">Plaintiff,</div>

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

<div style="margin-left:3em">Defendants.</div>

No.  1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         September 7, 1961

Pages:   17,762 to 17,874

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

17,762

IN THE DISTRICT COURT OF THE UNITED STATES

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )
                                   )
         vs.                       )     No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
                 Defendants.       )
                                   )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, September 7, 1961

- - -

APPEARANCES:

    For the Plaintiff:        WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to the
                                  Attorney General

                                  CDR. DONALD W. REDD

    For the Defendants:

        Vail Company           GEORGE STAHLMAN, ESQ.

        State of California:    FRED GIRARD, ESQ.

        Fallbrook Public Utility  FRANZ R. SACHSE, ESQ.
        District, et al.,

17,763

SAN DIEGO, CALIFORNIA, THURSDAY, SEPTEMBER 7, 1961, 10:00 A.M.

- - -

THE CLERK:  Number one, 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  Your Honor, yesterday the issue was raised during my argument in regard to increased diversions and uses of water by Lodi, Burbank and the other cities.  My statement that there had been increases of pumped water and appropriated water was challenged.

I think it is only fair to your Honor and fair to me that I have an opportunity to check out whether there have been those increases, and if there has been any increase since 1914, I think it constitutes a new appropriation.  I think that is the law.

THE COURT:  I read the Lodi case this morning, and this was not the issue in the case.  They talk about Lodi's prescriptive rights, and in the Lodi case the issue was what kind of a decree should be entered, and was the injunctive decree as granted a proper one, and that it was a waste of water in making the districts discharge   two hundred thousand acre feet when Lodi's prescriptive right was 3,600 acre feet.

MR. VEEDER:  Your Honor, it was an appropriative right, and the Supreme Court affirmed it was an appropriative right.

MR. SACHSE:  It was a prescriptive right.

t3

MR. VEEDER:  Furthermore, Tolman in his book --

THE COURT:  Listen, this was not the point in the Lodi case.  It was another issue.  More than that, obviously the right exercised by Lodi was a right -- I should not say overlying, because it wasn't.  They had acquired lands where they had their wells, and they pumped their water to the city, and they said it was appropriative or prescriptive.  But that is not the point in the case.  That is not the holding in the Lodi case.

MR. VEEDER:  But, your Honor, the Court in so many words affirmed the finding that there was an appropriative right acquired.  In so many words it did that.

THE COURT:  They did not talk about an appropriative right.  It was a prescriptive right.  I just got through reading the case.

MR. GIRARD:  Your Honor, there was a finding in the Lodi case where they determined whether the District could move the pumps closer to the river, and the Court found if they did that they would lose their prescriptive right, and the page for that in the Lodi case is at Page 331.

MR. VEEDER:  And the point is that that was in regard to two appropriators that this was done.

THE COURT:  This is not the issue in the case.  I just got through reading it.

MR. GIRARD:  It is obvious also that the Lodi case

t4

B fls

1    involved probably and almost certainly a prior-1914

2    appropriation, because the complaint was filed in 1928, and

3    the pleadings were not challenged which said that Lodi's

4    use had been for more than ten years, which would put it at

5    a minimum in 1918, and, in addition, it was the sole supply

6    of water for the City of Lodi, and I think we can take notice

7    that the City of Lodi was in existence before 1914.

MR. STAHLMAN:  Besides that, your Honor, Tolman in his book describes the physical, geological and hydrological characteristics of the area from which Lodi is pumping, and you have an entirely different situation than you have in this case.

MR. VEEDER:  The fact remains that it is percolating water.

MR. STAHLMAN:  There are different kinds of percolating water, Mr. Veeder.

THE COURT:  Let Mr. Veeder finish.

MR. VEEDER:  The fact is that it is percolating water. The fact is that this was an appropriative right that ran upstream against an application to impound water.  It was not a prescriptive right running upstream as against these people.  They talk about prescriptive rights in regard to other users in the Lodi area.  But as between the East Bay Municipal Utility District it was an appropriative right. The Court found that it was an appropriative right, and that appropriative right was affirmed.

THE COURT:  Mr. Veeder, there is language on page 331 where they speak of the prescriptive rights.  There is language on page 333 where the Court says:

"Without specifying in particular, the following subjects in the Findings are supported:  That Plaintiff's right as fixed by the Court as an appropriator is prior

P2

1    in time . . . ."

2    But this was not the point involved in the case. The

3    point was so unimportant to the Supreme Court that we don't

4    even know when this appropriation started. We don't even

5    know the basis for the prescriptive right. This is not the

6    authority of the case at all.

7    MR. VEEDER: I have/the Findings of Factand Conclusions
     checked

8    of Law in that case in the County Library, your Honor, and

9    the very point involved was this point whether, as a down-

10   stream appropriator, they could have a quiet title decree as

11   against a subsequent applicant for water. That was the issue

12   in the Lodi case, and that was the thing that was decided by

13   the Supreme Court. It was not a decision in regard to pre-

14   scriptive rights.

15   MR. SACHSE: You also read that it was prior to 1914, Mr.

16   Veeder.

17   MR. VEEDER: No, it is not prior to 1914. The Findings

18   of Fact and Conclusions of Law say that they have been pumping

19   for several years.

20   The thing I asked which opened up all this discussion

21   was whether, based upon the challenges that have been made to

22   the statements I put in my argument yesterday, whether I will

23   be permitted to check out these increases of water in Lodi,

24   the increases of water in Burbank, the increases of water in

25   the other places.

17,768

P3

1        And I might add the Riverside issue in the Orange County

2   case was this.  Riverside began using additional water above

3   its prescriptive right without taking a filing with the State

4   of California, and Mr. Krieger and those people were claiming

5   that they had an appropriative right to 30,000 acre feet over

6   and above their prescriptive right.

7        I think it is extremely important here -- the practice

8   that has been followed.

9        MR. GIRARD:  I don't think it has a thing to do with the

10  issue in this case.

11       MR. SACHSE:  If the finding is that this is not the type

12  of water which can be so appropriated, then it has nothing

13  to do with it.

14       MR. VEEDER:  It is percolating water.

15       MR. STAHLMAN:  There are different kinds of percolating

16  water, Mr. Veeder.

17       THE COURT:  I have also read the Pomroy case.  I don't

18  see how you get any solace from the Pomroy case.  The Pomroy

19  case talks about the rights of the Pueblos.  And Burbank and

20  others drilled wells.  The Court held that they had a right

21  to use this water as long as the city didn't need it.  They

22  didn't talk about getting any rights.  They didn't have any

23  rights.  Just the right of a person to use water when the one

24  who had the primary right was not using it.

25       MR. VEEDER:  There was an appropriative right, and they

1    didn't make a filing.

2    THE COURT:  They didn't say it was an appropriative right.

3    MR. VEEDER:  You gave me ten minutes, your Honor, and I

4    will take it.

5    THE COURT:  Before your ten minutes starts, let me take a

6    short recess.

7    (Brief recess.)

8    THE COURT:  Proceed.

9    MR. VEEDER:  Your Honor, I inquired as to whether I could

10   make some investigation about these additional appropriations

11   by these municipalities.

12   THE COURT:  We will see later.  You may renew your request

13   when you get through with this argument.

14   MR. VEEDER:  Your Honor asked whether there were different

15   elevations in the wells in the basin, if you recall, and I

16   stated that I thought that their contours indicated that the

17   elevation of the water throughout the whole basin, generally,

18   I think, would be the same.  I was in error when I said that.

19   Two wells close together within a very few feet one of

20   the other are referred to on Exhibit 46.  The Well 11/5-2A1

21   is at an elevation, below ground surface, of something like

22   25 feet.  A well right next to it in the shallow, in the

23   upper member, stands at 20 feet.  There is a very substantial

24   difference in the water levels of the two wells.  The one

25   which is in the deeper member stands at a different level than

P5

B2

1    the one right next to it.

2        THE COURT:  What is the difference?  Five feet?

3        MR. VEEDER:  Well 11/5-2A5 stands at 15 feet from ground

4    surface and the well right next to it 11/5-2A1, which goes

5    into the lower member, is probably about 27 feet below ground

6    surface.  There is a ten foot difference in the static well

7    levels.

8        MR. SACHSE:  Is the ground surface the same, or is this

9    elevation above sea level?

10       MR. VEEDER:  I think the elevations are the same.

11       MR. GIRARD:  Does the exhibit show that?

12       MR. VEEDER:  I am sure that the testimony does.

13       In any event, there is a marked difference in regard to --

14       THE COURT:  Where are these wells located?  They are down

15   in the Ysidaro Basin?

16       MR. VEEDER:  Yes, they are, your Honor.  You will find

17   them in Section 2-11-5.

18       THE COURT:  And as a matter of fact, this is one of the

19   areas where sewage is returned?

20       MR. VEEDER:  Yes.  It demonstrates that there is some

21   sewage, some effect in the shallow well in regard to sewage.

22   But nevertheless the wells do stand at different levels,

23   although they are right together.  So therefore it is manifest

24   that the waters are not, and could not be, flowing in a

25   subterranean stream, as would be required under the statute.

P6

1    MR. SACHSE:  What is the exhibit number again, Mr. Veeder, please?  I want to make a note of the exhibit number.

3    MR. VEEDER:  The exhibit number is 46.

4    MR. SACHSE:  Thank you.

5    MR. VEEDER:  There is another two wells that are paired which are close to the stream, which show an interaction between those two wells.  You will observe those at the top on Exhibit 46.  The reference to them is 10/5-35K4 and 10/5-35K1.  It is obvious that the alluvial deposits are entirely different in different parts of the valley and that the well levels are manifestly different.the further away you get from the well.

There is another feature that I think is important that I desire to bring to your Honor's attention, and that is that in the Chappo Basin Well 24M1 -- that would be Section 24-10-5, Wells N-1 -- that well, your Honor, was a flowing well.

THE COURT:  Was a what?

MR. VEEDER:  It was an artesion well.  That further demonstrates, your Honor, that your  picture of a flood and your pictures that you put up/of 1, 2, 3, 4, with all respect to your Honor, are not reflective of the true geological situation which prevails, are not reflective of the circum- stances which adhere from the standpoint of percolating water in this ground water basin.

p7

1    It is extremely important, from our standpoint, we believe,

2    to demonstrate that this could not be, and is not, a sub-

3    terranean stream and well defined channels.  Indeed, where

4    you have different elevations, depending upon whether the well

5    pierces the lower member where there is a higher or lower

6    permeability, or whether it is in the upper member which is

7    largely clay and silt and much tighter, the result is that

8    that water is under a different hydrological circumstance

9    and the effects of the stream, the effects of the pressure

10   are entirely different.

11   You could not, in my view, with all respect to your Honor,

12   make a finding that those waters are in a definite, well

13   defined stream.  Those waters are percolating through these

14   interstices without regard to the flow of the stream.

15   One other brief matter that I would like to allude to,

16   your Honor.  The question was brought up about the letters

17   that were sent out to these various people.  I call your Honor's

18   attention to the fact that the letters that were sent out by

19   you and which were sent out refer to the fact that these waters

20   were part of the Santa Margaritia River, they are part of the

21   stream system.  Your Honor invariably found that at the hear-

22   ings when these people came.  Your language is about like this:

23   I will find that your lands are overlying waters which are

24   part of the stream system.

25   MR. SACHSE:  Mr. Veeder, do you want the exact language,

P8

1    so that we have no misunderstanding?

2        MR. VEEDER:  I don't mind being interrupted.

3        THE COURT:  Let's get the exact language.

4        MR. SACHSE:  The exact language is --

5        MR. VEEDER:  What are you talking about?

6        MR. SACHSE:  The Murrieta Basin letters.

7        MR. VEEDER:  I was not talking about the Murrieta Basin

8    letters, I was talking about the findings that the Court made

9    when the people were here.  Now you should pay attention.

10       THE COURT:  Let's see the language in the letter while

11   we are at it.

12       MR. SACHSE:  The language in the letter is:  "This Court

13   proposes to find that your lands (paraphrasing "your lands")

14   overlie the ground water body sometimes referred to as

15   Murrieta Creek Basin, the waters of which are a part of the

16   Santa Margarita River."

17       MR. VEEDER:  And that is in regard to the Murrieta-Temecula

18   Basin.

19       When the people came in, you invariably made this finding:

20   That the waters underlying your lands are part of Santa

21   Margarita River system.

22       MR. SACHSE:  Not "system," Mr. Veeder; "River".

23       MR. VEEDER:  I said the findings the Court made into the

24   record was that.  And I think it is a finding that is important.

25   Nor do I care a great deal about this language.

1          THE COURT:   Just calm down a little bit.   Don't let these

2    people get you excited.

3          MR. VEEDER:   All right, your Honor.

4          THE COURT:   You will do a better job.

5          MR. VEEDER:   All right.   I realize the purpose of the

6    harrassment, and I assume I should take it.

7          THE COURT:   I am not harrassing you.

8          MR. VEEDER:   I said from over here.

9          THE COURT:   I don't think anybody is harrassing you. We

10   are trying to find out what the facts are here.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t5
C

1    MR. VEEDER:  I have no further comment at this time,

2    your Honor.

3    THE COURT:  Do you have an exhibit that shows where these

4    alleged appropriations have come from?

5    MR. VEEDER:  I didn't hear what you said, your Honor.

6    THE COURT:  Do you have any exhibit that shows where

7    these alleged appropriations have come from?

8    MR. VEEDER:  Which wells?   Yes, we have the wells that

9    are pumped, yes, your Honor.  That is in the record.

10   THE COURT:  Have you been pumping the same wells at all

11   times since you claim that you have had this appropriative

12   right?

13   MR. VEEDER:  There have been some changes in the location

14   of the wells, your Honor.  Yes, there have been some changes,

15   but there haven't been changes from the standpoint of the

16   kind and type of material out of which the pumping was done.

17   THE COURT:  I presume the exhibit shows whether you are

18   pumping from the lower member, so-called, or the upper member?

19   MR. VEEDER:  Yes, it does, your Honor.

20   THE COURT:  Which are you pumping from?

21   MR. VEEDER:  We are pumping from the -- I want Colonel

22   Bowen to correct me if I am wrong -- the pumping is from the

23   lower member, and you will observe from Exhibit 38 that after

24   the wells which are shown on that, we show the perforation,

25   and I believe invariably the perforation is in the lower

t6

1    member; and, as a matter of fact, the objective of that is

2    to get the purer water from the deeper levels, and to cut out

3    the waters nearer the surface.  So in each instance we are

4    pumping from the lower member.

5        THE COURT:  Are you pumping from all three sub-basins,

6    or just one sub-basin?

7        MR. VEEDER:  They are pumping from all three sub-basins

8    at the present time.  Is that not correct?  Yes, that is

9    correct.

10        THE COURT:  Do you have any exhibits which show what

11    basins you have pumped from in the past, and how long you

12    have pumped from these basins?

13        MR. VEEDER:  Yes, they are in the record, your Honor.

14    I will get that.

15        May I have just a moment?  I talked to Colonel Bowen

16    about this.

17        Your Honor, we do have that, and we can give you the

18    history of that, and we can show the precise wells which have

19    been pumped and any new wells that have been brought in.

20    But in every instance, your Honor, it is clear that the

21    pumping is from the lower member.

22        THE COURT:  And you some time back in making the showing

23    on the question of injunctive relief pointed out that the

24    well levels had dropped in these basins?

25        MR. VEEDER:  There has been a reduction in the well levels

1    induced in part by pumping, and, of course, --

2        THE COURT:  Which reduces the level of water in the

3    upper member, does it not?

4        MR. VEEDER:  I believe that -- I would want to check

5    that, your Honor.

6        THE COURT:  Your Exhibit 38 shows, for instance, the

7    difference in water levels between 1951 and 1952 in the

8    upper level?

9        MR. VEEDER:  There is undoubtedly, and as we have always

10   said, there is hydrological interconnection throughout the

11   whole basin, but the water is percolating.  We do have the

12   pumpage, your Honor; the percentages from each of the basins.

13       THE COURT:  What exhibit is that?

14       MR. VEEDER:  That is Exhibit 47.  But what I would like

15   to do is to get the precise well numbers from which the

16   pumping has been conducted, and in that manner we can more

17   readily demonstrate each well.  There have been some changes.

18   We have moved some of the wells upstream, and I would like to

19   tabulate those for your Honor.

20       THE COURT:  47 does not show it?

21       MR. VEEDER:  It shows the percentage of pumping, and

22   where the pumping has been conducted from, and the quantities

23   pumped.  I will get you, though, the exact wells and their

24   locations.

25       If we could have a moment, I would do that and mark them

t8

1   for your Honor.  Could we have a momentary recess?

2       THE COURT:  You can do that at the recess, and we will

3   take it up later.

4       MR. VEEDER:  I think that the point that you have raised

5   is of extreme importance because it does demonstrate the fact

6   that these waters that we are pumping from are separated

7   as much as 80 feet from land surface, and those levels

8   necessarily -- where the water is found, the water that is

9   being pumped, necessarily is not a part of the surface or

10  sub-flow of the stream.

11      THE COURT:  All right.  Who wants to be heard first?

12      MR. SACHSE:  I would, your Honor, if you have no further

13  questions of Mr. Veeder.

14      Mr. Veeder agrees, and I guess all of us do, and the

15  Court, that this is a question of fact, and I think it probably

16  would be most helpful to be as blunt and outspoken as I can

17  be from the very beginning and to say what I contend the

18  facts to be.  Let's do it by a  picture.

19      (Counsel draws on blackboard.)  This is "time."  There

20  was a canyon that the water ran down.  This was the bank,

21  and this was the bed.  As the water ran down, it filled it up.

22  What is the bank and what is the bed?  This (Indicating) is

23  the bank.  This is the bed.  This process has continued

24  through geologic time, and I believe, and I will insist to

25  the Court that the bed of the stream in the Santa Margarita

17,779

Coastal Basin is the basement complex, or whatever impermeable material lies at the bottom of this canyon, and the banks of the Santa Margarita, surface and sub-surface, are the same banks which confine the alluvial material deposited by this constant runoff.  That is what I am going to contend these facts show.

Now, I want to talk a little about the evidence to establish it.  I would like to modify one of your Honor's diagrams just a little, -- the second one.

Let's say that we are at the very start of a dry season, and there is in the bottom of the stream the merest trace of water -- the merest trace -- and that the water table would be about like so (Indicating).

Now, a well is put in here (Indicating), and starts to pump water to the Stewart Mesa for irrigation outside the watershed.  Is anybody going to tell me that this stream won't dry up?  That has been the gist of all of the testimony, of all of the United States witnesses in this case.

The very exhibits Mr. Veeder has on the board, plus one other most interesting one, United States 51-B, drawn by the man he characterized yesterday as his chief expert, Mr. Worts, shows the close interrelationship between stream flow and water levels in wells.

To make it even clearer, if your Honor will look at 51-B, Mr. Worts drew in in pen and ink, or with crayon, on 51

t10   1   an additional column, showing the stream flow, because it

2   wasn't on the original exhibit.  He just had the well levels.

3   There is a direct connection between the flow of the stream

4   and the elevation of water in the wells.

5       Now, I am sure Mr. Veeder won't deny that pumping this

6   hypothetical well will dry up the stream at this season of

7   the year.  So what is the yardstick that Mr. Veeder himself

8   gave us:  Percolating waters in the basin are those waters

9   which have so far departed from the bed of the Santa

10   Margarita River as to have lost their identity as a part

11   of the flow or sub-flow of that stream.

12       Now, when a well is pumped and the stream goes dry, is

13   your Honor prepared to find that the waters pumped from that

14   well have so far lost their identity as a part of the sub-

15   flow?  It is impossible.  If the physical fact exists, you

16   cannot say that the water pumped out here has lost its

17   identity with the sub-flow.  How can we?

18       I would like to step to a slightly different aspect of

19   the same thing.  Mr. Veeder yesterday at some length, and he

20   repeated it this morning, made the point, which I think I will

21   have to accept because I don't think there is any geologic

22   argument, that the tighter the materials, the shorter the

23   distance within which water might cease to be a part of the

24   stream and truly become percolating.  He made this point, that

25   the tighter the material, the shorter the distance.

tll

1   Now, there is also no argument among any of the

2 Government experts that the tightest materials in the Pendleton

3 Basins are in Ysidaro. We had much testimony about this,

4 of the coarse materials deposited at the top, and that the

5 stream lost its velocity and slowly deposited it at the

6 bottom, and that Ysidaro is the tightest. I am sure no one

7 will disagree with that.

8   I am going to make a little sketch. This is a surface

9 view, so to speak, which we will call Ysidaro Basin, and

10 this is the narrows toward the ocean. The river runs down

11 here (Indicating). This is the basin full of the very

12 tightest material. This is where Mr. Veeder's theory should

13 hold up the best. But what do we know? The exhibit which is

14 presently on the board, Exhibit 51, and particularly the two

15 top charts on 51 demonstrates this.

16   The United States pumped wells in Ysidaro upstream from

17 the outlet. What happened? There is some disagreement as to

18 whether it was entirely due to pumping, or entirely due to

19 drought, or what, but they not only, your Honor, affected the

20 sub-flow of the stream, they affected it so drastically in

21 1951 and 1952 that they reversed it, and that the salt water

22 came in. The pumping of wells in Ysidaro upstream -- upstream

23 from the outlet -- a substantial distance upstream so

24 seriously affected the sub-flow of the Santa Margarita River

25 that it turned around and the salt water came in.

t12

Then we have the testimony of Mr. Cannon, and I believe Mr. Worts, but I am not sure of that, but I know Mr. Cannon, that when the pumping was stopped, the heavy pumping, plus the effect of the sewage recharge, this phenomenon was reversed, and in order to prevent further salt water intrusion it is my understanding now that all pumping from Ysidaro Basin, as I understand it, except for a very minor amount for agricultural purposes has been discontinued.

This is the most dramatic and conclusive proof that the principle that has been insisted upon by the United States that to be percolating the waters must lose their identity as a part of the sub-flow of the stream.  Can your Honor say that these waters pumped by these wells in Ysidaro have lost their identity as a part of the sub-flow of the stream when their extraction reversed the direction of the stream?

The most recent water contour exhibit offered by Mr. Kunkel in the 15-Series, and I am not sure whether G, H or I, shows a pumping well with which we are all familiar in the lower Murrieta .   Mr. Kunkel pointed out that the extractions in the upper Murrieta had literally reversed the ground water flow north of the Murrieta, that it no longer was continuing down through Railroad Canyon or the Gorge, but was going in the other direction.

Can we say that when that physical condition exists, as to the waters extracted -- and this is the point Mr. Veeder

t13

makes -- are they percolating at the point of the well?  He said that several times yesterday:  Are they percolating at the point of the well?  Now, can your Honor say that the waters extracted at the point of the well had no identity with the sub-flow of the Santa Margarita River?  It is impossible.

Now, the question of what Mr. Veeder meant, or whether he has changed his mind is perhaps unimportant, but some of the things that have been said in this record by him and his witnesses are evidence that your Honor is going to have to consider, even if he does change his mind, which brings me to the fourth diagram, as Mr. Veeder has marked it up.

D

Take D

½p10

1        As I understood Mr. Veeder's comments, his position was

2   that, at some point in this basin area -- he didn't say

3   specifically -- that your Honor was wrong; that at some point

4   in this area these fine materials were such that the molecules

5   of water beyond that point were percolating, ceased to be part

6   of the subflow of the stream at some point laterally in this

7   area.  That is the way I understood him.

8        Well, if that is what he thinks now, that isn't what he

9   thought and it is not what his experts thought when they

10  started this case.  Before the Special Master (referring to

11  Special Master's Transcript Volume 6, Mr. Veeder, page 736) --

12       MR. VEEDER:  In regard to the Santa Margarita coastal

13  basin?

14       MR. SACHSE:  Yes, in regard to the Santa Margarita coastal

15  basin.  The witness is Colonel Bowen and there was extensive

16  examination of Colonel Bowen, which I know the Colonel will

17  remember, concerning the draft of the native vegetation on

18  these waters -- how much water did the native vegetation use?

19  This is the colloquy.  Colonel Bowen had testified that the

20  surface area of the basins was 4500 acres.

21       "By Mr. Veeder:

22       "Q  Now, would you state, for the record, the

23  quantity of water which you, in your opinion, have

24  determined to be derived from the Santa Margarita River

25  and consumed by the natural forage . . .?

P11

1       "A   (Colonel Bowen)   In my opinion, based on the

2     study of consumptive use of native vegetation growing

3     on the surface of the ground water basin of the lower

4     Santa Margarita River in Camp Pendleton, it is that

5     1.4 are consumed by the native vegetation; . . ."

6     Mr. Veeder isn't satisfied with that answer.

7       "Q   Now, would you state the aggregate, then, for

8     the record that is derived from the Santa Margarita

9     River and consumptively used by this native vegetation?

10      "A   The aggregate, therefore, is the area in

11     native vegetation, 4,500 times the draft on the ground

12     water basin, which is 1.4, which equals 6,300 acre feet

13     of water . . ."

14    That is what Mr. Veeder asked for.  He had to lead him

15   twice to get it.  There was never any future challenge or

16   question of this.  If Mr. Veeder's theory that he is today

17   presenting is correct, Colonel Bowen should not have multiplied

18   4,500 times 1.4; he should have multiplied the naked surface

19   area of the creek times 1.4.  And what that figure would be

20   I don't know, but it wouldn't be 6300 acre feet.

21    Now Colonel Bowen was not alone.  Mr. Cannon was on the

22   witness stand under cross-examination by counsel for the

23   State of California (Special Master's Transcript Volume 9,

24   page 1,174, Mr. Veeder).  Mr. Moskovitz asked him this:

25       "Q   Now, are there any other diversions, to your

P12

1   knowledge, which serve the military enclave either

2   within or without, either diversions present within

3   Camp Pendleton or which are outside of Camp Pendleton?

4        "Mr. Veeder:  From the Santa Margarita River?

5        "Mr. Moskovitz:  From the Santa Margarita River.

6        "The Witness (Cannon):  Diversions as I understand

7   them -- maybe you had better define the word 'diversion'

8   before I answer the question.

9   "By Mr. Moskovitz:

10       "Q  As I understand it, and as I intend to convey

11  it to you, a diversion is a taking away from the River."

D2   12  Still we aren't quite sure:

13       "A  surface diversions or --

14       "Q  Well, let's say all kinds of diversions,

15  surface or sub-surface.

16       "A  Of course, in that case, I presume you would call

17  all these wells diversions."

18  Did Mr. Veeder cross-examine or challenge or attack this

19  in anyway?  He did not.

20  THE COURT:  Was Cannon a Government witness?

21  MR. SACHSE:  A Government witness.

22  THE COURT:  Of course, what this illustrates, and in

23  fairness we should say so and Mr. Veeder will not concede it,

24  and that is that this point he is now making is an afterthought.

25  He had never thought about this at that time.  His questions

P13

1   might not have been framed that way.  That doesn't mean that

2   the Court shouldn't consider this contention and seriously

3   pass on it.  But I think Mr. Veeder ought to have courage

4   enough to admit that this is a theory that he has arrived at

5   lately and that therefore some of these earlier matters were

6   not presented with this point in mind.

7       MR. VEEDER:  Your Honor -- just a moment -- I have the

8   courage.

9       THE COURT:  I would have more respect for you if you would

10  do that.

11      MR. VEEDER:  I have the courage to respond to you with

12  the full facts and the truth.  The full facts and the truth

13  are that we have always contended that the Santa Margarita

14  River recharged the alluvium and that the waters in there

15  were percolating waters which we pumped out.  Now anybody

16  who tries to pervert the use of this testimony here to say

17  that we are talking about surface or sub-surface flow is in

18  error.  We have always said the source of water for recharge

19  was the Santa Margarita River; it recharged the dewatered

20  alluvium, and that is percolating water.

21      THE COURT:  I don't care whether you make this admission

22  or not.  I have tried lawsuits.  You can't blow hot and cold.

23      MR. VEEDER:  I am not blowing hot and cold, your Honor.

24      THE COURT:  You take one position.  Later something

25  develops in a lawsuit where you want to change your position.

17,788

P 14

1   You are a lot better off to say, "Your Honor, this is a

2   matter we had not seriously considered before.  We think now

3   it should be considered.  Proof such as Mr. Sachse has just

4   read was put on at a time when this point was not before us.

5   I didn't think of that point at that particular time.  The

6   word 'River' would never have been used.  We would not have

7   been talking about diversions from the River."  But this is

8   up to you.  It has nothing to do with the merits of it.

9       MR. VEEDER:  I want very clear, however, your Honor, in

10  this regard, that these waters are from the Santa Margarita

11  River and that they recharge the alluvium, and that has been

12  our position throughout this entire trial.  We put evidence

13  in on that basis.  This is percolating water, and I am sure

14  you must recognize it to be percolating water.

15      THE COURT:  Go ahead, Mr. Sachse.

16      MR. SACHSE:  Frankly, your Honor, I would only say this

17  to you.  I don't particularly care whether this is an after-

18  thought or not.  But the fact remains, afterthought or not,

19  that your Honor will be required, and afterthought or not you

20  cannot brush aside the evidence which is in the record.  You

21  can contradict it, but you can't brush it aside.

22      Now, rather than talk about conclusions -- and if your

23  Honor read my memorandum, I have many, many, citations of

24  testimony where this same type of language occurs  -- I am

25  going to go back to what I talked about here as the fundamentals

P15

1 and talk about some of the testimony that I think establishes

2 this absolute fundamental as to what is the bed and banks.

3 On the first day of the trial in this courtroom, as I

4 recall, Mr. Kunkel introduced Exhibit 15 and was asked what

5 was the yellow material, which we all know is the color used

6 for younger alluvium, and Mr. Kunkel said:

7 "The yellow areas are the youngest alluvial

8 deposits that occupy the flood plane of the present

9 day stream channels and their tributaries."

10 Present day. The stream channel once was here, later

11 here, later here, later here. The alluvial plane is the

12 present day stream channel. That is what he said at the

13 beginning.

14 MR. VEEDER: You are speaking of the Murrieta-Temecula

15 area, aren't you?

16 MR. SACHSE: I am speaking of Exhibit 15.

17 MR. VEEDER: Which has nothing to do with these lower

18 basins.

19 MR. SACHSE: We will come to the lower basins.

20 Before the Special Master Mr. Veeder asked Colonel

21 Bowen the same question as to the lower basin:

22 "Q Now Colonel, will you describe the subterranean

23 basin within the confines of the enclave, particularly

24 Camp Pendleton, stating the general surface area of the

25 basins?

P16

1       "A   (Colonel Bowen)  The subterranean basin within

2   Camp Pendleton is a long, relatively narrow Valley

3   originating at about the confluence of De Luz Creek and

4   the Santa Margarita River and continuing through the

5   confluence of the Santa Margarita River with the sea.

6   The entire unit is geologically and hydraulically

7   connected.  It is similar to all other streams on this

8   Southern Coast of California.  It is the result of

9   erosion through the containing bedrock subsequently

10   filled by alluvium precipitated out owing to the

11   rising of the sea concurrent with the melting of the

12   ice cap.  So we have an alluvium filled valley which,

13   for purposes of location, we define generally into

14   three segments.

15       "I will reiterate that there is no break in the

16   hydraulic and geologic continuity . . . "

17   Transcript reference was Special Master's Volume 3,

18   page 286.

19   Both Colonel Bowen and Mr. Kunkel were examined repeatedly

20   as to this same phenomenon elsewhere in the watershed.   In

21   Volume 27 of the trial transcript -- to refresh your recollec-

22   tion, Volume 27 of the trial transcript was about the second

23   day of the actual trial in this courtroom -- at page 2,570

24   Mr. Kunkel was making the following statement in an analysis

25   of what happens to surface and sub-surface flow, why the

P17

D3

1    streams change or how they change as they do.  He said:

2         "The ground water in places, as indicated in

3    earlier testimony, rises to the surface and is surface

4    flow, and the ground water under natural conditions

5    returns to the surface flow which was previously ground

6    water, again returns to ground water, maybe forced to

7    the surface at another point, flows a distance as surface

8    water, again enters the water body at a downstream

9    basin, moves as underground flow, may again rise as

10    surface flow. . . ."

11    He is characterizing the phenomenon that we find in

12    this kind of stream.

13    Colonel Bowen said almost the identical thing in

14    describing the Upper Temecula:

15         "The Temecula Creek extends through a series of

16    valleys such as Oak Grove Valley, which is a valley

17    characterized by alluvium fill, and into which the

18    creek may sink and flow as a sub-surface stream and

19    into a narrow rock defile below the valley then may

20    become a surface stream for a distance.  That charac-

21    terizes the extent of the Temecula Creek through Dodge

22    Valley, Radec, Aguanga Valley and the Pauba Grant. . ."

23    That is this same phenomenon that you have drawn here.

24    Perhaps it is only a careless word, but I still think I

25    should call it to your Honor's attention.  Mr. Veeder has

P18

1    twice interrupted me to ask me if I was referring to the Upper

2    area or the Lower area.

3        THE COURT:  Upper member?

4        MR. SACHSE:  No, upper portion of the watershed, or the

5    lower.

6        In Volume 130 of the trial transcript, at page 14,731,

7    this happens to be a discussion of Diamond and Domenigoni

8    Valley, away up.  These are questions by Mr. Veeder of Mr.

9    Kunkel -- the preliminary questions I have eliminated because

10   there are too many of them --.the basic question is, what

11   happens to the waters of Diamond and Domenigoni Valley?

12       "A   So far as I can determine from my own observa-

13       tions there is a continuous progression of ground water

14       unbroken from the area in the vicinity of Murrieta Hot

15       Springs along Warm Springs Creek up to the watershed

16       divide between San Jacinto and Diamond Valley on the

17       Searl property.

18       "Q  (By Mr. Veeder)  What is the course of that

19       progression of that ground water from Diamond and

20       Domenigoni Valley down Warm Springs Creek?

21       "A  (Mr. Kunkel)  The progression of ground water

22   is from Diamond Valley to Domenigoni Valley down eventually

23   to Murrieta Valley and ultimately to the Ocean, as described

24   in previous testimony."

25       Now, we are not going to say that the physical situation

P19

1    is so utterly different that the same principles don't apply

2    at both ends of the watershed.

3        Now, I have so far been talking only about evidence, but

4    it seems to me that much more important are findings that

5    you or the Special Master have made, your Honor, because you

6    have made these findings, I am certain, on the basis of the

7    evidence as we have all presented it to you and as I have under-

8    stood it.

9        Mr. Veeder brought up again this morning the question of

10   the Murrieta Findings.  I will say again, I never saw them,

11   I don't know anything about them, I don't know whether Mr.

12   Krieger checked them.  But I do know this.  I have clients

13   in the Murrieta/  I have a specific client in the Murrieta,

14   the location of whose property I just scaled off this morning

15   on a U.S.G.S. map and it is about three quarters of a mile

16   from the stream bank.  He has a well which is being used right

17   now and has continuously used.

18       MR. VEEDER:  Which client?

19       MR. SACHSE:  I can't give you the well number.  Ranchers

20   Tractor and Implement Company.  Also the two Gagnons        are

21   in the same area.  Town lots in Murrieta.  Ranchers Tractor

22   and Implement Company used to be the Chrome Plating establish-

23   ment.  It is a factory.

24       Your Honor wrote these people and the letter went two days

25   before I left for Europe, because I made a special point of

P20

1   calling these defendants and saying I was leaving, saying

2   "Don't worry about the letter.  I am familiar with what it

3   says.  You needn't check with me.  This is great."  And that

4   letter said, "Your lands overlie a ground water body sometimes

5   referred to as Murrieta Creek Basin, the waters of which are

6   a part of the Santa Margarita River."  If that is what Mr.

7   Veeder meant and intended when he drafted this letter for your

8   Honor, why the sudden monkey business with the proposed

9   findings he read to us yesterday?  Mr. Veeder knows -- he

10   talked about it this morning -- the many times your Honor

11   was called upon in this courtroom to explain your proposed

12   findings to individual pro per defendants.  There is not one

13   occasion in the record when Mr. Veeder ever objected or con-

14   tradicted the repeated statement that your Honor made that

15   the ground waters within the younger alluvium were all to be

16   treated as part of a river.  Exhibit 207-E -- it is so

17   enormous -- these people who have written you, who said they

18   accepted.

19      I don't know.  How many answers did you get, Mr. Veeder,

20   from people who said they liked that finding, before you

21   changed your mind on the question whether or not these waters

22   were or were not a part of the stream?  How many did you get?

23   Do you know?

24      MR. VEEDER:  I would have to count them, Mr. Sachse.

25      MR. SACHSE:  There is a pretty good bundle of them.

P21

1   MR. VEEDER:  They all said the same thing:  That their

2   waters were part of the stream system.

3   MR. SACHSE:  They said that their waters were part of

4   the river, Mr. Veeder, and I wish you wouldn't misstate it.

5   MR. VEEDER:  Better read it, Mr. Sachse.

6   MR. SACHSE:  I am reading it -- "the waters which are

7   part of the Santa Margarita River."

8   Now, I don't know who Mr. Veeder is trying to bamboozle,

9   whether it is the Court or whether it is these little people.

10  But is he now going to give everyone of them notice that they

11  have a right to come into this Court and seek to establish,

12  by the date they commenced pumping, that they have a prior

13  appropriative right to the United States?  If their date of

14  commencement of pumping was prior to the date of the commence-

15  ment of the pumping by the United States, they are prior

16  appropriators.  If he is going to do it, I think he ought to

17  tell us that he is going to and let us go ahead and let the

18  chips fall.  Just yesterday morning Mr. Veeder stated that

19  he had no objections to the Master's findings except to iron

20  out inconsistencies that might exist with interlocutory

21  judgments.  Your Honor approved the findings by a minute

22  order.

23  Can you help me with the number of the Rainbow map, Mr.

24  Veeder?

25  MR. VEEDER:  Which one?

17,796

P22     1          MR. SACHSE:  Geology.

        2          MR. VEEDER:  I think it would be 67 or 68.

        3          MR. SACHSE:  Thank you.

E fls.  4

        5

        6

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

t14
E

1      MR. VEEDER:   What is it you want?

2      MR. SACHSE:   The Rainbow geology.

3      MR. VEEDER:   The Rainbow geology?

4      MR. SACHSE:   Do you know what number that is?

5      MR. VEEDER:   Just a minute and I will get it for you.

6      MR. SACHSE:   Thank you.  Well, I don't know that I need

7  it actually because I am so sure of my facts.  I know there

8  is a Special Master's exhibit on it.   I thought I saw one

9  in here yesterday.   But I will go ahead.

10      The Rainbow Valley your Honor will recall, was something

11  like the Diamond-Domenigoni situation, in that the watershed

12  line ran in a large half circle, but the younger alluvium

13  extended clear out of the watershed into the San Luis Rey.

14  I took a scale, and scaled the distance from the stream channel

15  in Rainbow to the lands of some of my clients whom I have

16  named in Rainbow Valley along the perimeter of the watershed,

17  but their wells and residences are about four thousand feet

18  from Rainbow Creek at the nearest point.

19      I will also invite your Honor's attention to the fact

20  that coincidentally if I have done my scaling correctly on

21  United States Exhibit 37, the most remote well marked as a

22  producing well is about four thousand feet.  Coincidentally

23  the two check out just the same way, -- four thousand feet

24  from the level of the most remote well, if I am correct.

25      THE COURT:   In the basin?

Tkxx
t15

17,798

MR. SACHSE:  In Pendleton.

THE COURT:  In the Middle Basin?

MR. SACHSE:  In any basin of Pendleton.

MR. VEEDER:  We have it here.  It is Exhibit 70.  I am sorry.

MR. SACHSE:  That is the distance, and as I will point out again, this basin extends clear over the perimeter of the watershed of the San Luis Rey.

THE COURT:  You are talking now about Rainbow?

MR. SACHSE:  About Rainbow, yes.  I have clients' wells which are about four thousand feet removed from the thread of Rainbow Creek, which is a much smaller stream, I think you will all agree, than the Santa Margarita River at Camp Pendleton.

I think the findings of the Special Master in every case state -- and Mr. Veeder slightly misquoted this yesterday.  He stated to the Court yesterday that the findings on Rainbow Creek were that when the Creek carried water the overlying younger alluvium was taking water from the stream, or something like that.

MR. VEEDER:  I don't believe I said that.

MR. SACHSE:  If I am wrong, Mr. Veeder, I am sorry. What the findings say is:

"The following parcels of the parties", and so on, and so forth, "are not riparian to Rainbow Creek, but the waters

t16

1    underlying the alluvial deposits constitute a part

2    of the sub-surface flow of Rainbow Creek."

3    That is, the sub-surface flow of Rainbow Creek."

4    Now, this group of people, your Honor, were very

5    heavily represented at the first hearing of this case at

6    Ritchie School, which is close to where they live.  That is

7    just a mile or two away from them, and I can still hear the

8    bleeding-heart presentation of Mr. Veeder about how they were

9    going to look out for the interests of these people.

10    Is he now going to tell them that every one of them can

11    come in and say for how long a time he has been pumping, put

12    it in the record here, and not argue about burden of proof,

13    or anything, but come in, and "make your proof, ladies and

14    gentlemen, and you may have a prior appropriative right to

15    me, the United States of America."

16    THE COURT:  Of course, they would be overlying, and they

17    would be using the water on overlying ground, while the

18    Government claims it was taking the water out.

19    MR. SACHSE:  Not necessarily, your Honor, and that is

20    why I pointed out very clearly that this goes into another

21    watershed.  If we will get the Rainbow ownership map, I will

22    show you dozens of ownerships that go right across the

23    watershed into the San Luis Rey, and Mr. Veeder knows that

24    condition exists.  There isn't any carefully drawn property

25    line on the watershed line.  There isn't.  The property lines

t17

1   are based on sections, and on metes and bounds, and they go

2   right into the San Luis Rey, and they are using the water of

3   the San Luis Rey.

4       MR. VEEDER:  Mr. Sachse, didn't you abandon your

5   clients?  You abandoned five, as I remember, right in the

6   middle of Rainbow Basin.

7       MR. SACHSE:  What do you mean, abandon?  I don't know

8   what you mean by  "abandon."

9       MR. VEEDER:  You stipulated that they had no ground

10  water which was a part of the Santa Margarita River.  That was

11  in regard to Mr. Costello --

12      MR. SACHSE:  I think I did, yes.  I think as to one or

13  two of them I was very happy to stipulate that they had

14  vagrant, local waters.   Vagrant, local, percolating waters

15  is what I was stipulating to.

16      MR. VEEDER:  And not a part of the Santa Margarita

17  River system.

18      MR. SACHSE:  Correct; vagrant, local waters, correct,

19  as to some of them.

20      MR. VEEDER:  I am sorry.  That was right in the middle

21  of the basin that you abandoned them.

22      THE COURT:  If he did it in return for a finding that

23  you were going to stand still for that they had vagrant, local

24  waters, --

25      MR. SACHSE:  And they could pump anything they wanted to.

t18

1          THE COURT:  -- they would be better off.  You could not

2    call that abandoning your client, Mr. Veeder.

3          MR. VEEDER:  I meant abandon any claim to the Santa

4    Margarita River water.

5          MR. SACHSE:  I am going to ask your Honor to go back

6    over yesterday and this morning, and I will ask you if Mr.

7    Veeder has cited a single exhibit or a single word of

8    testimony in support of the physical proposition that ground

9    waters ten feet removed from the stream bank lost their

10   identity as sub-flow.

11         I don't think he has.  I don't think there is anything

12   that he has put on this board, and, to the best of my

13   knowledge, he hasn't put anything on from the transcript, and

14   I don't think any of it bears on this issue at all.

15         I think Mr. Veeder yesterday -- and now I am going to

16   come around sort of to the law -- Mr. Veeder did a very fine

17   job of presenting a legal proposition with which I  don't

18   think any of us are going to argue.  I am certainly not going

19   to argue now over the question of whether or not it is

20   possible to appropriate percolating waters without filing

21   with the State.  I am not going to argue about that.  I will

22   concede it for the sake of argument.

23         What I am concerned with is whether your Honor can find

24   the basic facts that make this legal proposition pertinent.

25   I am not going to quarrel with the Lodi case.  I can pick all

t19

1    sort of fly specks in it, as to why the Lodi case is not

2    applicable to this state of facts, but so far as the proposi-

3    tion which he questions, that a non-statutory appropriation

4    subsequent to 1914 might be possible as to percolating waters,

5    I will buy it.  I don't think it is subsequent, but let him

6    have the proposition.  I don't care.  The thing I am concerned

7    about is some law that would help us in interpreting the

8    facts that we have before us.

9         The file cabinet is full of exhibits, and there are

10   pages of testimony, and your Honor challenged Mr. Veeder

11   yesterday to provide the citation of a case, and you used the

12   phrase "dealing with a coastal stream or a flood plane where

13   the water was held to be percolating."

14        Now, I will state, frankly, that he can't do it.  I would

15   love to see him try.  And I will go farther and say I don't

16   think he can find a case which will approve  this theory off

17   a flood plane or on an inland stream in California, or

18   Southern California.  I have tried to read them all, and I

19   don't think he will find any.

20        Now, the one case that really makes a great deal of this

21   appropriation of percolating waters is the Raymond Basin case,

22   Pasadena vs. Alhambra.  Your Honor is a native Californian,

23   and you certainly know where the Raymond Basin is; the Cities

24   of Pasadena, South Pasadena, Alhambra, parts of San Marino,

25   San Gabriel, and so forth.  The Raymond Basin is described in

t20

1 the case as surrounded by a semi-circular ring of the San

2 Gabriel Mountains and the San Rafael Hills, into which flow

3 literally dozens of very short, steep canyons out of the

4 mountains, the Arroyo Seco, the Miller Canyon, and I can't

5 name them all, the Rio Hondo, all kinds of them that come

6 out of the mountains very fast in the winter with quite a

7 lot of water in them.  The western and southern end -- I

8 think my directions are right -- the lower end of the basin,

9 in any event, is the Raymond Fault.  That is why they call

10 it Raymond Basin.  It has no single outlet.  The outlet from

11 the Raymond Basin is either by percolation through the fault

12 or spill over the fault in the short shallow channels gouged

13 out by these miscellaneous streams.

14   There is no more physical resemblance between the

15 character of Raymond Basin, where this principle was really

16 applied, and the characteristics of the Santa Margarita than

17 there is between black and white.

18   THE COURT:  Was there anything in Pasadena vs. Alhambra

19 in 33 Cal. 2d that indicated that the Supreme Court was

20 departing from the Pomroy case in 124 California?

21   MR. SACHSE:  Not one word, your Honor.  It is completely

22 consistent with it.  The easiest thing is to compare the

23 physical descriptions of the areas involved in the Supreme

24 Court case in Raymond and the Supreme Court case in Pomroy,

25 and they are as different as night and day.  You might as well

t21

1  compare a pig and a banana.  They just aren't.  They aren't

2  even both animals.  They just can't be compared.

3      Now, Mr. Veeder has made a definite mistake.  I don't

4  accuse him of any evil motive in this, but he was mistaken

5  yesterday.  I checked yesterday's record and what he said

6  when your Honor asked him in connection with the Orange

7  County Water District case.  Your Honor asked him whether

8  these appropriations were prior to 1914, and his answer was--

9  well, let's do it right:

10          "THE COURT:  The Orange County case you are talking

11      about, those rights must antedate 1914?

12          "MR. VEEDER:  Some of them probably do, but many

13      are new wells, your Honor.  There are about 3,600 wells

14      that have been drilled in there."

15  He is one hundred percent wrong.  He hasn't read the

16  Orange County case.  The 3,600 wells are the plaintiffs'.

17  They are not the appropriators'.

18      The Orange County case was filed by the Orange County

19  Water District as a representative suit on behalf of each

20  overlying and riparian owner.  The 3,600 people are the very

21  ones whose wells were held to be a part of the river.  Those

22  are the very wells concerning which the Court at Page 458 --

23  pardon me, this is the Pacific citation page, so it won't

24  help you -- states that it treats the river system as the

25  entire natural flow of the Santa Ana River and its tributaries,

whether above or below the surface, together with all waters

t22

from time to time impounded in surface lakes or known or

ascertainable underground basins.

Those 3,600 wells that Mr. Veeder was talking about are

the people in whom the Court recognized the riparian right,

and I will invite your Honor's attention to the rather

lengthy quotation of the case in Mr. Krieger's letter.

MR. VEEDER: Did you say riparian rights?

MR. SACHSE: Riparian. Mr. Krieger is quoting, and he

has given you the California citation, which might help. It

is Pages 184 and 185 of 73 C.A. 2d:

> "The situation of the holders of overlying rights
>
> is, of course, in this respect no different from that of
>
> holders of riparian rights."

Those are the 3,600 wells that Mr. Veeder was talking

about. So to say, sure, some of these wells were drilled

subsequent to 1914 is a very fine answer, but he has got the

parties twisted.

F fls

Belt F.

P22

17,806

1    Really, he cannot possibly find any support in Orange

2  County Water District vs. Riverside.  If there is anything

3  we all know, and we know it judicial notice-wise, although

4  I can't quote you the date of incorporation of Riverside, I

5  can invite your Honor's attention to the first case between

6  San Bernardino and Riverside.  We can look back and see how

7  old it was and what it says then about the respective appro-

8  priative rights.  And Riverside was a non-statutory appropria-

9  tor and it still is.  So he can't find any assistance in that

10  case.

11    But let's look at some of the other cases that are like

12  our case.  Your Honor, of course, has already talked about

13  Pomeroy.  I like Los Angeles vs. Hunter, I might say, almost

14  better, because of the description that it gives of that basin,

15  and I think you can paraphrase it sentence by sentence and see

16  if it is not this one.  The Court said:

17    "San Fernando Valley may, indeed, be regarded as a

18    great lake filled with loose detritus . . ."

19  Pendleton may indeed be regarded as a great lake filled with

20  loose detritus.

21    ". . . into which the drainage from neighboring mountains

22    flows and the outlet of which is the Los Angeles River."

23  And the outlet of which is the Ysidaro Narrows.

24    "Impeded by the soils, these waters of course move more

25    slowly than they would in an open lake.  But unquestionably

P23

1   the general movement of practically all is southeasterly

2   to the Narrows, . . ."

3   We don't have to change a word.  We call it Ysidaro Narrows,

4   too.

5   ". . . . through and out of which flows the Los Angeles

6   River proper."

7   Through and out of which flows the Santa Margarita River

8   proper.

9   "Unquestionably, also, a serious interruption of or

10   interference with this supply would as certainly

11   impair the volume of water carried by the Los Angeles

12   River . . . "

13   Santa Margarita River.

14   ". . . as though the interruption and interference were

15   with a surface flowing tributary thereof.  The waters

16   of the San Fernando Valley, therefore, are not perco-

17   lating waters in the common law sense of the term --

18   vagrant, wandering drops moving by gravity in any

19   and every direction along the line of least resistance.

20   These waters percolate, it is true, but only in the

21   sense that they form a vast mass of water confined in

22   a basin filled with detritus, always slowly moving

23   downward to the outlet, in the effort, in conformity

24   with physical law, to attain a uniform level. . ."

25   If that isn't the Santa Margarita Basin, as described by

17,808

P24

1  Colonel Bowen, I don't know what is.

2      It is an interesting fact that it is dicta, albeit pretty

3  strong dicta in the Supreme Court case involving this very

4  River (Santa Margarita vs. Vail, 81 Pac. 2d 560-562).  The

5  Supreme Court was discussing the rights of the Rancho Santa

6  Margarita in what it called the "Sub-surface Flow" of the

7  Santa Margarita River, and the Supreme Court pointed out that

8  the trial court had apparently completely disregarded the

9  sub-surface flow on the Rancho and regarded it "as a matter

10  of law" as independent of the rights in the surface flow.  So

11  the Supreme Court then said:

12      "The rule is that as between riparians each party must

13      make a reasonable use of all the water and, as has

14      already been pointed out, that includes both surface

15      and sub-surface flow and likewise water in the under-

16      ground basins."

17      This, I grant you, is no part of the formal decision of

18  the case, because the case was sent back with a word of advice

19  that the trial court should consider on a re-trial.  But this

20  is our very river.

21      THE COURT:  Is 33 Cal. 2d. the last water rights case

22  decided by the Supreme Court?

23      MR. VEEDER:  Pasadena vs. Alhambra.

24      MR. SACHSE:  Pasadena vs. Alhambra.

25      THE COURT:  Yes.

P25

1    MR. SACHSE:  I would say the most recent pertinent ones

2  are the Orange County cases--

3    THE COURT:  I am talking about the Supreme Court of

4  California.

5    MR. SACHSE:  I beg your pardon.

6    THE COURT:  I haven't seen any citation to a California

7  Supreme Court case later than 33.

8    MR. SACHSE:  No, your Honor, I have not.

9    THE COURT:  Have you, Mr. Veeder?

10   MR. VEEDER:  I have not, your Honor.

11   THE COURT:  I think that very definitely the language of

12  the Supreme Court in these cases is more important than the

13  District Courts of Appeal.

14   MR. SACHSE:  I don't think you are going to find any

15  inconsistency, your Honor.  I think you are going to find

16  that the decision of the Supreme Court in Pomeroy has been

17  followed squarely and consistently right down the line.  It

18  has been followed and quoted with approval in Peabody vs.

19  Vallejo, 2 Cal. 2d.  It has been followed and quoted with

20  approval in Santa Margarita vs. Vail.  It has been followed

21  and quoted with approval in Cal. 2d.

22   MR. VEEDER:  Are you referring now to Pomeroy?

23   MR. SACHSE:  Yes.

24   A text quote on this exact same point from Hutchins, page

25  422:

P26

1     "The underflow may include the water moving not

2     only in the loose, porous material that underlies the

3     bed of the surface stream, but also the lateral ex-

4     tensions of the water-bearing material on each side

5     of the surface channel."

6     It doesn't say the lateral extension for ten feet, for 20

7     feet, or for a hundred feet.  It says the lateral extension

8     of water-bearing material.

9         Back to what I said at the beginning, I insist, your

10    Honor, that the evidence is such that applying the strictest

11    rule possible, underground stream with bed and banks, the

12    bed of the Santa Margarita River in Camp Pendleton is the

13    impervious material upon which the younger alluvium has been

14    deposited, and the subterranean banks are the far less per-

15    meable materials -- Terrace Deposits, the Breccias, and what-

16    not, I don't have enough geologic terms to do it correctly --

17    through which or out of which the channel was originally

18    incised and into which the alluvium has been placed and within

19    which it is now held.

20        Now, I think that is the physical fact, and that the law

21    requires your Honor to so find.

22        I believe that the Pendleton Basin is nothing but a wide

23    place in a stream.  There were undoubtedly times before it

24    filled up when there was a surface lake.  Debris came just

25    as we have little surface ponds gradually filled up in the

P27

1  mountains, then become a meadow.  So this was undoubtedly at

2  times a shallow surface pond.  And there is no difference,

3  in my judgment, legally between a wide space in a little

4  stream and a wider space in a bigger stream.  And that is the

5  situation with which we are confronted here.

6      Now there is one other matter that I think deserves a

7  little consideration, and that is the question of pleadings

8  and pre-trial orders.  I know that counsel for other defendants

9  have done a lot more work on it than I have and I will stop at

10  this point then and leave that for somebody else.

11      THE COURT:  All right.

12      How long do you want, Mr. Stahlman?

13      MR. STAHLMAN:  I will try to finish by noon.  I don't

14  know whether I can.

15      THE COURT:  How much time do you want, Mr. Girard?

16      MR. GIRARD:  Ten or fifteen minutes, your Honor.

17      THE COURT:  Are you going to cover material different than

18  Mr. Sachse has covered, Mr. Stahlman?

19      MR. STAHLMAN:  Yes, I will try to do that.  I will proceed

20  along.  If your Honor feels that I am sort of overlapping, it

21  won't bother me a bit if you call my attention to it and I

22  will switch to something different.  However, I will try to

23  avoid it.

24      Proceeding then, your Honor please, in order to interpret

25  properly the question that is presented here in this motion,

P28

1   it might be well to give some consideration to some of the

2   elemental principles that gave rise to the decisions of the

3   Court in connection with the determination of the matters

4   pertaining to underground water.

5       There were basic rights which attached to the physical

6   situation of these various underground water deposits which

7   are based upon logic, reason, common sense and the object

8   being that there would be a uniformity in the exercise of

9   rights to the waters which the various landowners would have.

10      So there is a reason and a logic behind this matter, and

11  there has been a trend as the awareness and the information

12  and the advancement of science has created a change in the

13  interpretation of the law as it applies to the rights to

14  these underground waters.  We had an entirely different

15  situation originating in the common law of England where we

16  had different physical factors, different geological situations

17  and different weather conditions.  The present decisions in

18  California are based upon the laws of the arid West as they

19  grew up and departed from the common law and as the cases

20  came to the attention of the higher courts as to what the

21  physical features were with relation to ground waters in this

22  part of the country, we found that the decisions became more

23  clarified.  I think that since the Pomeroy case there has

24  been a consistency and even a broadening, if I might say so,

25  in the intent of the Courts to demonstrate what science has

P29

1    developed that there are ground bodies of water that are

2    related. I should say there are percolating waters which were

3    formerly determined to be diffuse percolating waters which

4    now are found to be part of some body of water. There are

5    various types and kinds of underground bodies of water in

6    which landowners may participate.

7        Now I am going to depart from that a moment and come back

8    to it. But I think there is something else, and I am not

9    going to spend much time on this, but I do think there are

10    some things in the record of this case that demonstrate not

11    only that this was a lately conceived idea by Mr. Veeder but

12    that it has been hastily and poorly considered.

13        THE COURT: I am familiar with the extracts you quoted

14    in your brief and the extracts Mr. Sachse quoted, and not-

15    withstanding Mr. Veeder's protestations I am convinced that

16    this is a new theory originating some time in at least 1961,

17    that it has never been in the case before. So save some time

18    on that.

19        MR. STAHLMAN: It just happens that this morning when I

20    was in one of the libraries at home --

21        THE COURT: In one of the libraries?

22        MR. STAHLMAN: Yes. This library happens to be equipped

23    with a shower bath and a few other appurtenances. And I was

24    reading the morning paper and a quote reminded me of Mr.

25    Veeder. It said that there was an executive who had a little

P30

1    sign on his desk and it said, "It's too late to argue with me.

2    I have already changed my mind."

3    Now, to get back to the inception of this case, I believe

4    Mr. Veeder drew the complaint, and on page 7 of the original

5    complaint bearing upon this subject he made the allegation:

6    "For the purpose of this case, the United States of

7    America, adopting the findings of the Supreme Court

8    of the State of California, considers, and accordingly

9    claims that the surface stream and subterranean basin

10   constitute a single source of supply of water."

11   And then after a great deal of consideration on his part,

12   I presume -- I don't know whether he had the benefit of the

13   advice of his geologist at the time he drew the original

14   complaint, but certainly as late as the filing of the supple-

15   mentary and amendatory complaint, the geologist having

16   testified before Judge Yankwich and the facts having been

17   brought out there which I allude to in my brief, which your

18   Honor said he has read, I will not belabour the Court by

19   being repetitious with that.  But in his amendatory complaint,

20   at page 34, line 25, he makes this allegation:

21   "There have been, for beneficial purposes, annually

22   diverted, appropriated and used by the United States

23   of America approximately 12,300 acre feet of water

24   from both the surface and sub-surface flow of the

25   Santa Margarita River by the United States of America

P31

by reason of its riparian rights.  The quantity of
water is utilized for both military and agriculture
purposes, both within and outside the watershed of
the Santa Margarita River, depending upon demands."

Now there are other allegations contained both in the
original complaint and in the supplementary complaint that are
epitomized by those two allegations.  They are all, however,
consistent with the theory that the Government is depending
upon riparian rights, as had its predecessor in interest and
as they depended upon it and as they had fought for them in
the previous Santa Margarita vs. Vail case.

Now we have been using the term "percolating water," and
Mr. Veeder, I think, has used it.  He has not defined it.
He has merely mentioned the term "percolating water."

Now there are different kinds and types of percolating
water.  That is all water, of course, which is underground
and where the material is of such quality that water may
transmit itself and a gradient be established, and you will
find flow underground which, I presume, in its broadest sense
would be determined to be percolating,  The decisions have
made these various distinctions as to the kinds and types of
percolating waters.

There are percolating waters which are diffused.  There
are percolating waters which are not part of stream systems --
that is, there being no stream connected in any manner with

them.  There are streams underground which are not intermitt-

ent streams and therefore are wholly underneath the ground.

I had a word that I/sounded better, but I couldn't pick it up.

thought

But there are those types of streams in which there is no

flow and in which there are percolating waters and to which

water rights can attach.

But these cases in the broad concept and the objective to

which they trend is to define the rights of the parties in

relation to a common body of water.  That is what it means.

Whether this common body of water is a basin pure and simple

as such, not being part of the stream system, whether that

body of water may be a submerged stream in which there is no

surface flow or whether that body of water may be a surface

stream connected with the underflow, as referred to, as

percolation tributary to a stream, and then there are the

other areas of underground water that can be defined and that

is the matter of artesian belts.

I presume your Honor read in my brief the excerpts which

I had taken from Kinney.

THE COURT:  Yes, I read them.

MR. STAHLMAN:  There are, however, some others.  The fact

of the matter is, if I may say so, the subject of underground

waters in Volume 2 of Kinney's book or work on Irrigation And

Water Rights is most enlightening and I think is very ex-

haustive and authentic, because he has footnoted and referred

P33

1  to all matters which are very substantial -- decisions of

2  courts, many of the U.S.G.S Bulletins.  Some of those bulletins

3  I have referred to in the footnote would be very interesting

4  to read where people from the very same department as the

5  geologist in this case have prepared pamphlets and written

6  upon this same subject, all tending toward what has been

7  concluded by Mr. Kinney in his treatise on this subject.

G fls.

t28
G

1      Now, Mr. Veeder makes very reckless statements.  He says

2  the presumption of the burden of proof in this case is upon

3  the person claiming the water.  I refer to Kinney at Page 2118,

4  Volume 2, where he says:

5      "As to the underflow of surface streams, where

6      water has once reached the banks of a stream and there

7      disappears in the sands of the bed, the presumption is

8      that such water augments the flow of the surface stream;

9      and the burden of proving the contrary is upon the party

10     claiming and diverting the water. "

11  And he cites for that Perry vs. Calkins, 159 Cal. 175.

12      And then there is this short quotation, if I may give it

13  to your Honor, under the subject of "Subterranean Waters,"

14  in Section 1149, at Page 2090 of the same report:

15      ". . . These underground waters, either keeping

16      themselves within the underground channels of the

17      surface streams or by independent underground streams,

18      taking their sources in the higher lands, gradually

19      flow downward under the Valleys, where either by Nature

20      itself or by the hand of man aiding Nature, they are

21      brought to the surface, and thus augment the scanty

22      flow of the surface streams of these regions in the

23      reclamation of barren lands."

24  Another quotation that has a bearing upon this:

25      ". . . Some of the subterranean water is

t24

absorbed directly by such materials immediately after it has fallen or has melted, but much water passes underground by the sinking of streams, or water from streams; many of the surface streams lose a portion of their flow in crossing porous strata or coming in contact with fissures.  When the surface water comes in contact with the porous strata it is absorbed and immediately begins moving downward, or as nearly in that direction as is possible with the obstacles which it encounters.  Sooner or later it comes in contact with an impervious stratum below, and there-after can only move laterally down the incline of that surface.  The rapidity of motion of underground water depends principally on two conditions -- the angle of inclination of the impervious surface and the degree of porosity of the material through which the water moves. . . .  At times the water sinks under impervious strata of clay or rock, and is held by them underground oftentimes to a great depth, thus forming the artesian basins, . . . It matters not whether this porous stratum is on the surface of the ground in the form of a soil covering or whether it is deeply buried by impervious layers, the water movement within it is practically the same" --

I might as well read this additional part that I have marked--

t25

1    "When the porous layer is on the surface, as is often

2    the case on the Great Plains," -- well, I won't read

3    it because it has no bearing upon this particular

4    situation.   Again:

5    ". . . In and near the mountains many streams have

6    their beds underneath the surface of the earth, which

7    were formerly upon the surface.  This is caused by the

8    canyon or gorge after the stream has once formed, later

9    being filled up with rock, gravel, and other debris,

10   and while apparently the canyon is dry, the stream is

11   still there."   -- that is exactly what we have here --

12   "The movement of this water in subterranean streams,

13   owing to the declivity of their beds, is often quite

14   rapid and ofttimes nearly beneath that of the

15   surface stream, but usually the movement of water is

16   much slower."

17   THE COURT:  Have you found any specific authorities or

18   cases where this matter of self-help of alleged percolating

19   waters not supporting the stream and not a part of the

20   underground flow of the stream since 1913 and 1914 is

21   involved?

22   MR. STAHLMAN:  No, your Honor, I have not.

23   THE COURT:  The literature is full of descriptions of

24   stream beds, such as we have here, and such as you have just

25   read.

17,821

t26

1          MR. STAHLMAN:  Your Honor, I would like to emphasize

2      something that is in the brief, and it will take only a few

3      minutes.  Mr. Sachse has given a great deal of the testimony

4      that was given by Mr. Kunkel.  However, I think that the

5      testimony of Mr. Worts that has a bearing upon this very

6      situation is important.  Mr. Veeder made a statement yesterday

7      that nobody in his brief had referred to Mr. Worts'

8      testimony.  Your Honor is fully familiar with what is in the

9      briefs, but, however, I think to emphasize it I would like to

10      quote just two pages, and these excerpts I think will clearly

11      demonstrate --

12          THE COURT:  Will this then conclude your presentation?

13          MR. STAHLMAN:  Yes.  -- demonstrate clearly that Mr. Worts

14      has been consistent in his testimony as to the theory of

15      what existed in the Pendleton Basins up until the time Mr.

16      Veeder changed his mind.

17          This is in Volume 38, Page 3953, Line 14:

18          "Q (Mr. Veeder)  You used the term 'Terrace

19      Deposit'.  Would you state the meaning and the

20      connotation to be ascribed to it?"

21          "A  'Terrace Deposit' in this case, let's take

22      Chappo sub-basin and the Terrace Deposits that are

23      shown in Section 13 and 14, 10 south 5 west.  These

24      are all old alluvial deposits, deposited in much the

25      same manner as the younger alluvium is now being

t27

deposited.  The surface of the younger alluvium and underneath that surface is the terrace."

Page 3957, Line 23:

"Q   What is the next formation that you investigated, Mr. Worts?

"A   The next formation is the alluvium shown on the legend of the map symbol QAL on Plaintiff's 37. It is the principal water bearing deposit in which or from which the Camp and irrigation wells obtain."

Mr. Veeder interrupted, "That is Camp Pendleton."

"A   Camp Pendleton and irrigation wells obtain their supply and is shown by the legend.  These deposits yield water to wells at rates of up to 2,000 gallons per minute.

"Q   Where are these generally located?  Would you make reference?

"A   As shown by the color yellow on Exhibit 37, they extend along the thread of the Santa Margarita River up at and in as far North on this map as Section 23, 9 South 4 West, and in De Luz Creek, Section 29 extended continuously Southward through what is called upper basin, Chappo, sub-basin, Ysidaro sub-basin down to the coast."

At Page 3958, Line 25:

"Q   Would you state whether the younger alluvium

17,823

t28

1                extends away from the stream bed into the area which

2                you have depicted on there as the La Jolla formation?"

3                That is the type of material that could be concluded

4    to be the banks of the stream.

5                "A   The younger alluvium extends up the minor

6                tributaries, and minor drainages, that drain off

7                the La Jolla formation of the San Onofre Breccia of

8                the San Mateo formation and off the basement complex

9                in those places the deposits are fine grain, largely

10              sand and silt, and clay intermixed and not a source

11              of water compared to the quantities available out of

12              the deposits laid  down by the Santa Margarita River."

13    Page 3971, Line 22:

14              "Q   Would you state what is the relationship

15              between the Upper Chappo and Ysidaro Basins from the

16              standpoint of hydrologic and geological interconnection?

17              "A   Hydrologically and geologically they are

18              interconnected as is shown on Plaintiff's 38.  They

19              extend as one continuous unit even from above the

20              arbitrary upstream from the De  Luz dam site and down-

21              stream below Ysidaro Narrows to the coast.   Basic

22              geological principles provide no other way for a

23              deposit  such as the alluvium to be inplaced there

24              without there being a continuous unit through there.

25              After all, you have had a through flowing stream since

29

the time that the ancient Santa Margarita had cut down through the base of the alluvium.  There is no way geologically that you could deposit the alluvium in the valley without having it laid down as one longitudinally continuous unit."

Again on Page 3972, Lines 14:

"Q   Would you describe in the record the kind and type of container in which this alluvial deposit is presently residing?

"A   The alluvial shown in yellow in Exhibit 37 is surrounded by these materials that I have previously testified to.  These rocks, the consolidated rocks that form the sides and bottom of the water bearing unit very much like a generalized and badly bent bathtub. In other words, you have an elongated deposit down through here that is surrounded by these consolidated rocks from which, in testing them for their supply we could hardly get any water out of the wells so that it is more or less of a water-tight, well, you could hardly call it wholly water-tight, but it is nearly water-tight container.

"Q   From the standpoint of depth extending laterally, would you describe the characteristics of the younger alluvium?

"A   I think we have an  isopach map which shows

t30

the lateral extent of the alluvium.  Now the surface as expressed in the map in the field as shown on Exhibit 37 extends from the consolidated rocks along the sides from one side of the valley to the other. We then showed the Exhibit 38 the maximum depth down through the valley and Exhibit 39 shows the lateral extent of the younger alluvium as viewed from above."

There are only two more here, your Honor.  Page 4006, Line 8:

"Q   In regards to plaintiff's Exhibit 46 for identification, will you state the title of Exhibit?

"A   The title of the exhibit is Hydrographs of paired, shallow and deep wells in Ysidaro sub-basin, Camp Pendleton."

Then on Line 23 he continues in this same answer:

"A   I will refer to Exhibit 37 to spot the location.  We have here on Exhibit 46 wells 35-K-1, K, 4.  In Section 35, 10 South 5 West near the river to show how the shallow water on the west side of the basin near the river responds not only to re-charge from the river but also for pumping effects."

Again on Page 4009:

"If this were merely a pressure response in a confined  aquifer the deep well would shoot, rise rapidly, and the shallow well would not.  Now that is

t31

1    depicted on the East side of Ysidaro sub-basin where

2    the pressure effect of recharge from the river on the

3    east side is transmitted rapidly across the basin to

4    the other side."

5    So that I think we have Mr. Worts' testimony at a time

6    before this new theory came up that clearly depicted what

7    the condition of that basin was.  It is consistent with the

8    decisions, wherein there has been any decision by the

9    Supreme Court in relation to and in determination of the

10   rights on underground waters of any similar situation.

11   I respectfully submit, your Honor, that he certainly

12   has not met the issue here.  His evidence is completely

13   inconsistent with the position he now takes, and it is

14   inconceivable to me that Mr. Veeder can feel that we are

15   so stupid as not to realize that.

16   THE COURT:  Mr. Girard.

17   MR. GIRARD:  With all due respect, your Honor, I would

18   like to start at 2:00 o'clock.  Could we have our noon

19   recess now?  Or at 1:30.  I don't care.  I suppose I can

20   start now.

21   THE COURT:  I was going to skip Rotary Club today, and

22   I intended to come back and try to get this wound up early

23   this afternoon.

24   MR. GIRARD:  Fine, your Honor.

25   THE COURT:  Would you rather start at 1:00 o'clock?

17,827

t32

1    MR. GIRARD:  I can start at 1:00, yes, so far as that

2    goes, your Honor.  It makes no difference to me.  But I don't

3    think I could get through by noon.

4        THE COURT:  And do you want to be back at 1:00 o'clock?

5        MR. GIRARD:  Yes.

6        THE COURT:  And you say you want about 10 or 15 minutes?

7        MR. GIRARD:  About 10 or 15 minutes, that will be all.

8        THE COURT:  Mr. Veeder, how much time will you want to

9    reply?

10       MR. VEEDER:  Probably a half hour.

11       THE COURT:  I will give you a half hour.

12       MR. VEEDER:  I said probably a half hour, your Honor.

13       THE COURT:  And I said I will give you a half hour, but

14   unless you come up with something a little more convincing,

15   I am not going to sit and listen to it too long.

16       MR. VEEDER:  I will ask for half an hour, your Honor.

17       THE COURT:  I was just looking through the pre-trial

18   opinion that I wrote, and we expressed among other theories

19   the self-help theory, and there is nothing herein, and

20   apparently there was nothing called to my attention on any

21   talk about the fact that this self-help was an appropriation

22   of the percolating waters as a part of the stream.

23       I took up in that pre-trial opinion all of the various

24   theories that the Government advanced as to appropriations,

25   and this was filed in 1958.  The section on appropriative

rights has reference to the self-help theory, the state

t33

1  policing  regulation theory, the bucket at the end of the

2  stream theory, the Government's ownership of the incorporeal

3  hereditaments theory, the reserved land theory, the priority

4  in  time of filing theory, the direct and inverse condemnation

5  theory.   I believe I incorrectly named number three as the

6  bucket at the end of the stream theory.  That was on the

7  incorporeal hereditaments.  Number seven was the bucket at

8  the end of the stream theory.  But nowhere was there any

9  theory urged upon me that this was self-help on percolating

10  waters that were not a part of the stream system.

11    MR. VEEDER:  I have insisted they are a part of the

12  stream system, and I have insisted throughout that they are

13  a part of the stream system.  Every drop of percolating water

14  is a part of the stream system, and let's don't pervert the

15  position that has been taken consistently throughout by the

16  United States in all of its evidence.  There has not been

17  an instance --

18    THE COURT:  Oh, don't insult me.  If you had urged this

19  theory upon me at that time, I would have considered it in

20  this pre-trial opinion.

21    MR. VEEDER:  Your Honor, I will say this, that throughout

22  the entire area we have said there is hydrological inter-

23  connection, and I am now asserting the evidence will support

24  the matter I am now pressing.

25    THE COURT:  1:00 o'clock.

    (Whereupon, at 11:55 o'clock a.m., a recess was    taken )
    (until 1:00 o'clock p.m. of the same date.                )
    MARIE G. KELLNER, OFFICIAL REPORTER

Belt H-1
P24

1      SAN DIEGO, CALIFORNIA, Thursday, September 7, 1961, 1:00 P.M.

2                          - - -

3           THE COURT:  Mr. Girard.

4           MR. GIRARD:  First, I will state directly to the Court

5      that I made what was probably a mistake when we were drafting

6      the Murrieta Findings to which Mr. Veeder referred and quoted

7      correctly from Paragraph XI.  I was under the impression or

8      belief that the term "known and defined channel" meant essential-

9      ly a single, narrow channel in the nature of a limited surface

10     stream channel.  I don't think under that assumption the

11     record would support a contention that the ground waters were

12     in such a channel.

13          However, after doing some research and particularly

14     concentrating on the Pomeroy case, which, frankly, I hadn't

15     read at that time, I don't think there is any question but

16     that the Pomeroy case -- which, incidentally, is concerned

17     with the construction of the term "known and definite channel"

18     as used in Section 1200 of the Water Code, because they were

19     considering that Section's predecessor code -- that that

20     original belief on my part was just clearly erroneous, because

21     the Pomeroy case upheld the trial court's findings that

22     stated that the alluvium between the valleys was in a known

23     and defined channel.

24          Now insofar as the cases which have been cited by Mr.

25     Veeder and, to a certain extent, by the defendants, I still

P35

1    feel, as I stated in the brief, that the one case and really

2    the only case I have found which is squarely on the point is

3    the Pomeroy case.  There the Pomeroy case discussed and

4    considered the very question of what is factually necessary

5    to have ground water be determined to be in a known and

6    definite channel.

7        In essence, the Pomeroy case concerned a factual situation

8    which is almost synonymous with our instant case.  Both Mr.

9    Worts' testimony, which was read by Mr. Stahlman just prior

10   to the noon recess, and Colonel Bowen's statement, which was

11   read by Mr. Sachse, concerning Camp Pendleton, state that the

12   younger alluvium is contained.  There is no question at all

13   that the ground waters therein are interconnected.  I think

14   the United States' evidence and everyone else's evidence at

15   least in the younger alluvium is to that effect.  There is no

16   basis for any argument contrary to that, that the ground waters

17   and the younger alluvium flow and the surface waters flow in

18   essentially the same direction.

19       Consequently, based on the Pomeroy case, which, as I

20   emphasized, is, as far as I know, the principal and at least

21   the leading case on this very point --

22       THE COURT:  Did you Shepardize Pomeroy?

23       MR. GIRARD:  Yes, I have, your Honor.  I can find no

24   case whatsoever that distinguishes, modifies or affects in

25   any manner the Pomeroy case.  I think the Glendale case, the

P36

1    Lodi case, the Riverside case, none of them has anything to do

2    with the basic point of what determines what ground water is

3    in a known and defined channel.   I don't think any of those

4    cases even discuss it.   The Pomeroy case, as far as I know,

5    is the only case that discusses that point.   And unfortunately,

6    neither in any briefs submitted by Mr. Veeder, nor in his

7    argument, did he devote any discussion to the Pomeroy case.

8        I won't comment extensively at all on this problem whether

9    this business is an afterthought, because I agree with the

10   Court that whether it is or not it should be decided on its

11   merits.   However, I should, and I am going to, point out that

12   when we were arguing the stipulated judgment there were

13   numerous references by Mr. Veeder to the effect that he pumped

14   water outside the watershed acting upon and in reliance upon

15   the stipulated judgment, and that that pumping which he did,

16   under his own argument, under the stipulated judgment could

17   not and did not give him any rights whatsoever as to anyone

18   other than the parties to that.   If he is claiming an appro-

19   priative right now, that would be directly contrary to that

20   contention.

21       But I still feel whether it is contrary or not, the issue

22   should be faced.

23       I would like to comment briefly on the problem of the

24   two wells where your Honor mentioned that you would expect to

25   find a pretty synonymous water level in a well here and a well

P37

1    here.  And Mr. Veeder did point out in this exhibit that

2    there was roughly about an eight foot difference in these

3    wells which are shown on U.S. Exhibit 46.  However, if you

4    trace the confluence, you will find that the difference is

5    reversed on occasion.  One well will be higher than another

6    on various occasions, and quite often they are almost synony-

7    mous.  I don't view this exhibit as indicating any great

8    difference in water level measurements.  The major difference

9    is undoubtedly influenced by non-natural conditions, such as

10   pumping and sewage discharge.  But even if there is a

11   difference, the difference is the difference in depth to

12   water.  One well will be deeper at one time, the next well

13   will be deeper at another time, and it certainly doesn't show

14   any great difference of any material amount.

15       I am not going to reiterate at all any of the evidentiary

16   matters which are discussed in my brief and in Mr. Sachse's

17   brief and Mr. Stahlman's brief and that also were discussed

18   by Mr. Sachse today.

19       I will state that I think there is no substantial agree-

20   ment or any agreement on the law.

21       (An interruption.)

22       MR. GIRARD:  I don't believe there is any basic disagree-

23   ment between all counsel as to what the law is.  I don't

24   believe that any of the State Water Rights Board's decisions

25   or any of their rulings or any of the cases cited by Mr.

P38

1  Veeder, insofar as those holdings are concerned, are in the

2  slightest bit inconsistent with the position that we take in

3  this matter.  Clearly the State Water Rights Board has no

4  jurisdiction to grant permits to ground waters which are not

5  in a known and defined channel, and that is, as I view the

6  decision and the rules which Mr. Veeder cited from the

7  California Administrative Code, exactly what the State Water

8  Rights Board says.

9      However, I would like to emphasize that merely reiterating

10  that rule is not what we are concerned with here.  We are

11  concerned essentially with whether or not the ground waters

12  in the younger alluvium are in a known and defined channel or

13  are not in a known and defined channel.  The major case that

14  I think is in point is the Pomeroy case, where the facts from

15  which the Supreme Court concluded that the finding was proper

16  are pretty much identical to our facts.

17      I think that about winds up what I was going to say.

18  Anything else I would say would be repetitious.  Unless the

19  United States can come up with some case which limits or

20  modifies the Pomeroy case, I think the standard established

21  in that case is the law in California and that the facts in

22  this case fall within that standard, and that this is purely

23  a question of fact, and essentially I don't view the facts

24  in this case as being very much in dispute.  I think most

25  of the evidence which Mr. Sachse and Mr. Stahlman discussed

P39

1    verbally today, and all of the evidence which was cited in

2    the briefs by the various defendants are essentially United

3    States' witnesses.  I don't believe we cited, in my brief at

4    least, anything other than United States' witnesses.

5        I would agree, however, that that evidence, some of these

6    quotes that we cited, particularly from Colonel Bowen, the

7    answers that were given were really not at that time directed

8    to this issue.  I think that would have to be conceded.  But

9    I don't base the argument or the contention that these ground

10   waters are in a known and definite channel on that particular

11   evidence where a witness did or did not refer to ground waters

12   as being the stream.  I base it on pretty much uncontested

13   evidence that the younger alluvium and the ground waters

14   therein are substantially equivalent to what was determined

15   to be underground water in a known and definite channel in

16   the Pomeroy case, and I don't think there is any real basic

17   disagreement on those facts.

18      THE COURT:  What comment, if any, do you have on those

19   four diagrams that are on the board?

20      MR. GIRARD:  Well, I would certainly agree that in all

21   four cases there would be no distinction for saying that the

22   ground waters are in a known and definite channel in No. 1

23   and not in 2, 3, and 4, or vice versa.  Whether ground waters

24   are in a known and definite channel does not depend on whether

25   there is a surface stream at all.  It can't depend on that.

P40

1    I would certainly agree with Mr. Sachse.  I think his argument

2    was entirely based on uncontested evidence that if you would

3    put a well here or here or anywhere you would affect the

4    surface stream, if one in fact did exist.  So there has to be

5    a pretty strong connection between the waters in the entire

6    area.

7        The crucial element in whether or not it is in a known

8    and definite channel is the sides and the bottom, and pursuant

9    to the United States' own witnesses there is no question at

10   all that the ground waters in the younger alluvium are con-

11   tained on the sides and the bottom.

12       Now concededly, and I think there would be no question on

13   that, within this younger alluvium there are various degrees

14   of permeability.  But to the same extent even in a surface

15   stream there are various barriers, et cetera.  The requirement

16   of a known and definite channel does not mean that the water

17   has to be flowing identically without any impairment within

18   the body.  It obviously couldn't mean that, because in any

19   alluvium you might have a boulder which would prevent the water

20   from going directly through and it would have to go around the

21   same as in a surface channel of a surface stream.

22       But the crucial element is the sides, which in the

23   Pomeroy case were the valleys and the grounding in bedrock.

24   If you can determine that the ground waters are contained

25   under that factual situation under the Pomeroy case, I think

P41

1    you have a clear holding squarely on the point that would

2    justify finding that the ground waters are in a known and

3    definite channel.

4        I would agree with Mr. Veeder in some of his statements

5    to the effect that he never has contended that the ground

6    waters are not a part of the stream in the sense of being

7    regulated.  I think Mr. Veeder has always conceded, and I

8    would concede, that whether you treat them as part of the

9    stream or as adding to and supporting the stream, they are

10   still subject to regulation.

11       As I view Mr. Veeder's present argument, he is not con-

12   tending that these percolating waters are, in any sense,

13   vagrant, local, percolating waters.  But the question is not

14   so much whether they are percolating waters, but whether they

15   fall within the tests set by Pomeroy to determine whether they

16   are in a known and definite channel.

17       While I am not too familiar with the factual situation of

18   Pomeroy, as I understand the situation, the younger alluvium

19   was roughly a mile wide down there and approximately the same

20   size as the basins in Pendleton or possibly larger, and unless

21   the Pomeroy case, for some reason or other, is found not to

22   control, which I myself don't see, I think that case is the

23   only guide this Court has insofar as determining under the

24   California law what the term "known and defined channel"

25   encompasses.

H2

THE COURT:  Of course, the Pomeroy case was a condemnation case --

MR. GIRARD:  That is right.

THE COURT:  -- in which the Court was determining whether or not the city already owned this water and did not have to pay for it, or did not own it.

MR. GIRARD:  That is right.

THE COURT:  And if the water underground was in a known and defined channel, the city owned it.

MR. GIRARD:  Yes.

THE COURT:  So, although the posture of the case is different than ours, it nevertheless was a square holding on that point.

MR. GIRARD:  And they had to look to the identical Water Code Section which is now Water Code Section 1200.  At the time of the Pomeroy case they looked at that Section, I believe in the Political Code -- I don't have it with me, but that Section is the predecessor section to the present Water Code Section, and the issue was whether or not waters were in a known and defined channel.

Now, the only distinction between the cases, in the Pomeroy case that issue was for the purpose of establishing whether the city had to pay for that water.  In this case that issue is for the purpose of determining whether or not the United States had/to comply with the State law by filing an

P43

1   application for a permit.  But the basic issue whether or not

2   it was in a known and defined channel was squarely discussed

3   and considered, and insofar as I know that case is the only

4   case where the Supreme Court of California actually considered

5   the meaning of that term.

6   THE COURT:  Mr. Veeder.

7   MR. VEEDER:  Your Honor, the crucial question here for

8   your resolution is whether the water is percolating at the

9   point that it is pumped.  That is the only thing you have to

10  determine.  There is no other factor for you to take into

11  consideration in this argument.

12  THE COURT:  Mr. Veeder, we all concede that water in a

13  basin where there is a gradient, as there is here, is perco-

14  lating water.  There is no dispute about that.  That is not

15  the issue that has to be decided.

16  MR. VEEDER:  The point that is crucial, and I reiterate,

17  is whether the waters are percolating and have departed from

18  the channel to the point that they are no longer identified

19  with the surface or sub-surface flow.

20  I fls.

21

22

23

24

25

17,839

THE COURT:   Now you are stating it more accurately.

MR. VEEDER:   That is the crucial and crux point of this matter.   You have inquired whether there was any later case than Pomeroy, and there is most definitely a later case.   I cited it to your Honor, and I am going to reiterate what it contains.

THE COURT:   What case is it?

MR. VEEDER:   It is the case of United States vs. Hunter. It is a later case by ten years, it considers the precise question, and to a marked degree it comes up with a different legal controlling conclusion.

MR. SACHSE:   What is the citation?

MR. VEEDER:   156 California.

MR. SACHSE:   That is Los Angeles vs. Hunter.

MR. VEEDER:   What did I say?

MR. SACHSE:   United States vs. Hunter.

MR. VEEDER:   I am sorry.   It is Los Angeles v. Hunter.

MR. SACHSE:   This is a companion case.

MR. VEEDER:   Excuse me.   If I said United States, it is because I have it on my mind.

MR. SACHSE:   That is the one I quoted from.

THE COURT:   Is that the San Fernando Valley?

MR. SACHSE:   Your Honor, that is the one I quoted from, and I paraphrased it and struck out the words "Los Angeles River," and put in "Santa Margarita River,"   It is the

17,840

t35

1      companion case.

2            MR. VEEDER:  And the important thing about it is this.

3      It comes down with an independent ruling, independent from

4      the factual case in Pomeroy, which I will distinguish in a

5      moment.  It comes down with this statement, that ultimately

6      these waters are percolating waters, and they are a part of

7      a vast reservoir, and there is the distinguishing element,

8      and it is the distinguishing element that the State of

9      California has written into its rules and Regulations.

10           There is no doubt -- there is no doubt at all that the

11     waters which are moving through the San Fernando Valley are

12     percolating waters.  True, they come down, as every basin

13     must come down, to a point where the water emerges.  There

14     the waters may be in a confined and definite channel in the

15     sense that the statute uses it.  But when they are contained

16     in a mass detritus, such as in the San Fernando Valley, there

17     is no requirement that you file an application for the

18     purpose of appropriating those waters to acquire an

19     appropriative right.

20           THE COURT:  Is that what Hunter holds?

21           MR. VEEDER:  That particular issue.

22           THE COURT:  It could not have held that because the

23     Hunter case is in 156 Cal.

24           MR. VEEDER:  Your Honor, this was a suit by the City of

25     Los Angeles to quiet title against some adverse claims

t36

1    upstream.  Those people, however, who were pumping

2    unquestionably had rights which were subject and subordinate

3    to the pueblo rights, but don't say that they did not have any

4    rights because among themselves unquestionably the question

5    of priority does become important.

6         That is exactly the thing I am pointing to now, and

7    there hasn't been a single case cited by anyone in opposition

8    to this, that where the waters are percolating in a reservoir

9    or a lake, an underground lake, then you do not have to

10   file an application.  I would like to read to you and make

11   reference to an important distinction that Hutchins points

12   out between Pomeroy and Hunter.  He starts out and talks

13   about the ground waters.

14        THE COURT:  That is at what page?

15        MR. VEEDER:  It is on Page 420.  He says:

16        "Ground waters of the San Fernando Valley

17   constitute the chief source of supply of the Los Angeles

18   River, which flows out of the Valley through a compara-

19   tively narrow outlet.  These ground waters, while

20   literally percolating, were held to be not percolating

21   waters in the common-law sense of the term -- 'vagrant,

22   wandering drops moving by gravity in any and every

23   direction along the line of least resistance'" -- then

24   he makes the distinction --

25        "--but to form 'a vast mass of waters confined in a

17,842

t37   1                                    moving

basin filled with detritus, always slowing/downward

2    to the outlet.'  This water situation" -- this is

3    Hutchins' interpretation of Pomeroy and Hunter --

4    "This water situation was not likened to a definite

5    underground stream.  Rather, the Court's view was

6    that San Fernando Valley 'may indeed be regarded as

7    a great lake filled with loose detritus into which

8    the drainage from the neighboring mountains flows,

9    and the outlet of which is the Los Angeles River.'

10   The soil of the Valley under this view is a 'great

11   natural (underground) reservoir' supplying the

12   river."

13   THE COURT:  So what?  Where is the conclusion that any

14 different rights stem therefrom?

15   MR. VEEDER:  The difference is this, your Honor:  When we

16 apply the rules of the State of California in regard to the

17 appropriation of those waters, you don't have to file an

18 application, and that is the difference, and I petition your

19 Honor --

20   THE COURT:  What are these Rules you are talking about?

21 You have told me about a couple of water rights cases.  You

22 haven't cited me any Rules.

23   MR. VEEDER:  I will cite you the Rules.  I will read

24 them to you.  Here is the rule under Section 1200:

25      "Underground waters not in a subterranean stream,

t38

1   such as water percolating through a ground water

2   basin, is not subject to the Board's jurisdiction,

3   and application to appropriate such water, regardless

4   of place of use, should not be submitted ."

5   There is the difference, and there is the distinction,

6   and there is the controlling element in this  lawsuit.

7   MR. GIRARD:  One question.  Do those rules say which

8   statute they were enacted under?

9   MR. VEEDER:  Under Section 1200.

10  MR. GIRARD:  And what does Section 1200 say?

11  MR. VEEDER:  May I go on with my remarks, your Honor?

12  THE COURT:  I would like to know.

13  MR. GIRARD:  It says, "The ground waters not in a known

14  and defined channel."

15  MR. VEEDER:  I will read it to you:

16  "Whenever the terms stream, lake or other body of

17  water, or water occurs in relation to applications to

18  appropriate water or permits or licenses issued

19  pursuant to such applications, such term refers only

20  to surface water, and to subterranean streams flowing

21  through known and definite channels."

22  And the point of it is that Los Angeles vs. Hunter

23  modified it.

24  THE COURT:  Let me see that.

25  MR. VEEDER:  Los Angeles vs. Hunter modified the original

t39

1     rule as layed down in Pomeroy, and we will recall how

2     Pomeroy came down.

3          The question was this:  Was an instruction given in

4     regard to the San Fernando Basin clearly in error, and that

5     was the question.   Then you read the instruction.   But

6     what comes out of it is that the Court said, "Well, the

7     trial court was not clearly in error in calling this a

8     subterranean stream," but ten years later, when the matter

9     was not under an instruction, ten years later it said it was

10    a basin, it was a lake, it was a mass of detritus that was

11    saturated.

12         And I respectfully submit,  your Honor, that under the

13    rules of the State of California now, and I say that the

14    practice in the San Fernando Valley bears this out, you don't

15    have to file an application to appropriate water.

16         THE COURT:  Where is your authority that says Hunter

17    modifies Pomeroy?

18         MR. VEEDER:  The plain and simple language which is used.

19         THE COURT:  I will read it in a minute.

20         MR. VEEDER:  I have it marked here.

21         THE COURT:  You have given me to understand that some

22    authority says that Hunter modifies Pomeroy.

23         MR. VEEDER:  I say that.

24         THE COURT:  You say it?

25         MR. VEEDER:  Just a moment, your Honor.  Hutchins said

T40

1    it, and I just read it to your Honor.

2    THE COURT:  He didn't say that.

3    MR. VEEDER:  May I read it again, then, and I will point

4    out what it says.  He quotes about the water percolating

5    through the San Fernando Valley, first citing Pomeroy, and

6    then his statement is this:

7    "This water situation was not likened to a

8    definite underground stream."  -- and this is where he

9    cites Pomeroy -- "Rather, the Court's view was that

10   San Fernando Valley ' may indeed be regarded as a

11   great lake'" -- a great lake.

12   MR. STAHLMAN:  A part of the stream.

13   MR. VEEDER:  (Continuing) "' -- filled with loose

14   detritus, . . ."

15   That is the distinction, and there is the determinate

16   question.

17   MR. SACHSE:  Will you read the last sentence?

18   MR. VEEDER:  Yes, I will read the whole of it.

19   MR. SACHSE:  It says, "The soil of the Valley under

20   this view is a 'great natural (underground) reservoir supplying

21   the river.'"

22   Your Honor, I wish you would take time to read it.

23   THE COURT:  Relax a minute.  Let me look at Pomeroy,

24   and then I want to look at Hutchins.

25   MR. VEEDER:  All right.

t41    1        THE COURT:  Just wait a minute.

2        MR. SACHSE:  I wish you would read Hunter, your Honor.

3        MR. VEEDER:  He is reading Hunter.  I just handed him

4   Hunter.

5        THE COURT:  Now, if you will both be quiet, I can read

6   faster.

7        (The Court examined the books referred to.)

8        THE COURT:  Los Angeles vs. Hunter is a case in which

9   the City of Los Angeles brought an action for an injunction

10  to restrain certain 47 owners of land from pumping water,

11  asserting the paramount right of the city to the water in

12  the river.  The judgment was in favor of the city, and the

13  defendants appealed.  The judgment was affirmed.  The case

14  points out that some of these defendants pumped from wells

15  an average distance of 1,000 feet from the surface border of

16  the river, although in other instances the distances were

17  two and three miles.  The Court said on Page 607:

18        ". . . Unquestionably the cutting off of this

19        supply would as completely destroy the Los Angeles

20        River as would the cutting off of the Great Lakes

21        destroy the St. Lawrence" river.

22        It did not make any distinction, but whether it was a

23  reservoir or a river, it is one and the same, and the Court

24  affirmed the judgment.   Then they got into this matter of

25  percolating waters, and the Court said on Page 608:

t42

1             "If as here contended and found, the City of Los

2        Angeles has paramount right to the use of all waters

3        of the river, then, under the doctrine thus enunciated,

4        none of these so-called percolating waters may be

5        withdrawn to the invasion and injury of such right."

6        MR. VEEDER:  Do you want to see Hutchins on this, your

7   Honor?

8        THE COURT:  Yes, I would like to see Hutchins.

9        MR. VEEDER:  And I will show you where it starts.

10       (The book was handed to the Court.)

11       MR. VEEDER:  Your Honor, the distinction is that it

12  first cites Pomeroy in the footnote, and then it cites Hunter,

13  and then it points out it is not on the basis of a defined

14  stream, but on the basis of a reservoir.   Two, it is a

15  source of the Los Angeles River.

16       THE COURT:  Let me read it.

17       (The Court examined the book referred to.)

18       THE COURT:  The factual distinction, if one was made

19  in Hunter, does not overrule Pomeroy, certainly, and the

20  other case clearly held that this lake of water was a part

21  of the stream, and that the rule on percolating waters -- the

22  rule that they could be taken by whoever found them did not

23  apply, and the judgment was affirmed.

24       MR. VEEDER:  The point being, though, your Honor, that

25  it does say it is percolating water, and it does say that the

t43

1    percolating water cannot be taken to the injury of Los

2    Angeles.   And the point that I have made throughout this

3    entire lawsuit, and the point that I make now, and the point

4    made by Mr. Girard, and I thank him for it, is that we have

5    stated throughout that these waters -- and I am pointing right

6    here to the very edge of Chappo Basin -- I submit to your

7    Honor that is a part of the waters of the Santa Margarita

8    River, but it is not flowing in a well defined channel.   It

9    is a part of a lake, a part of a basin, and to acquire rights

10   by appropriative measures does not require the filing of

11   an application, and I think that is the only thing that is

12   required here.

13        There is not a case that has been cited here, your Honor

14   -- I think this is of extreme importance -- by California,

15   Fallbrook, or Mr. Stahlman, with all their facilities and

16   all their opportunities to check this matter out.   The State

17   of California does not cite a single case, not one single

18   case that is contrary to the principles of Lodi that I

19   submitted to you, or that is contrary to these cases, the

20   Orange County cases.   And this is extremely important.   There

21   is the question there of the change of the point of diversion

22   and place of use in the Orange County cases, and the point

23   was ruled squarely on that by reason of the fact that these

24   people were pumping percolating waters, which were a part

25   of the Santa Ana River -- yes, they were -- they said this is

t44

1   a part of the water resources of the Santa Ana River, and

2   they do not have to take the Code procedure for changing the

3   point of diversion and place of use.

4   THE COURT:  Which case held that?

5   MR. VEEDER:  The Orange County case, your Honor.

6   THE COURT:  Didn't they follow the Code Section?

7   MR. GIRARD:  I don't think they even cited Section 1200

8   in it.

9   MR. VEEDER:  Your Honor, I will get the books .

10   MR. STAHLMAN:  Your Honor, would you mind if I read

11   something while Mr. Veeder is on this.  I think this is

12   relative to it.  I am reading from Page 2117, Volume 2 of

13   Kenney:

14       "There are a number of methods whereby subterranean

15       waters may be proven to flow in well-defined channels

16       and thus become known.  Their courses may be distinctly

17       traced by the topographical features of the country,

18       and the geological character of the ground through

19       which they flow; also, by the trees, shrubs, bushes

20       and grasses which grow along their courses.  They may

21       also be traced by a series of wells or borings, or by

22       the means of tunnels. "

23   THE COURT:  Mr. Veeder, these explosions occur both by

24   the Court and by counsel, and I started it by challenging you

25   that the case did not so hold, but when you make these broad

t45  1    statements --

2         MR. VEEDER:  I will make the broad statement, your

3    Honor, and I will call to your attention the statement that

4    these are the things that call for explosions from me by

5    reason of the fact -- well, I won't say it, (Reading):

6              "Insofar as mutual water companies" --

7         THE COURT:  What case are you looking at?

8         MR. VEEDER:  Page 195, and the citation is 173 C.A. 2d

9    137.

10        MR. STAHLMAN:  What is the name of the case?

11        THE COURT:  173 C.A. 2d, and what is the page?

12        MR. VEEDER:  195.  That is where the quotation comes

13   from:

14             "Insofar as mutual water companies or any other

15   agencies appropriate water from underground basins

16   their appropriations are not made under the authority

17   of Sections 1200 and 1201 of the State Water Code.  It

18   is urged that when they divert water from agriculture

19   to urban uses this amounts to a new appropriation.

20   Such, however, appears to be the rule only as to water

21   appropriated under the Water Commission Act or now

22   under the Water Code (Section 1700).  Thus, according

23   to the Code Commissioner's note to the last cited

24   section 'The appropriator claiming by virtue of an

25   appropriation prior to the Act is neither required nor

t46

1    permitted to proceed under the Act to obtain

2    permission to change the purpose of use but may change

3    it without permission . . .,' and we have already

4    quoted the express provisions of Section 1706 of the

5    Water Code to that effect.

6         "Insofar, then, as mutual water companies or other

7    agencies are lawfully enjoying the use of water

8    appropriated otherwise than under the Water Commission

9    Act or the Code, a change in the place of purpose of

10   use is not a new appropriation, nor does use by a

11   transferee in such circumstances make him a new

12   appropriator.  It is true that such change in either

13   the place or purpose of use may not be made to the

14   detriment of others having superior rights."

15   But I want to call to Mr. Girard's attention the

16   citation of Section 1200, showing you are very much in error

17   there.

18        MR. GIRARD:  Didn't you also say they were referring to

19   prior-1914 appropriations?

20        THE COURT:  Let him finish.

21        MR. VEEDER:  The point being, your Honor, --

22        THE COURT:  No, go ahead with your reading.

23        MR. VEEDER:  All right, I will go ahead and read it:

24        "It is true that such change in either the place

25   or purpose of use may not be made to the detriment of

t47

others having superior rights.  Whether in any given case it amounts to such a detriment is a matter for decision on the merits . . . "

Now, the point that I wish to make, your Honor, insofar as this statement is concerned, is that it says those agencies which appropriate water from underground basins.

M R. SACHSE:  Prior to 1914.

MR. VEEDER:  No, it does not say prior to 1914.

MR. SACHSE:  Oh, Mr. Veeder.

THE COURT:  Earlier you read a reference to --

MR. SACHSE:  Section 1700 of the Water Code, which deals expressly with prior to 1914 appropriations.

MR. VEEDER:  May I refer for a moment to the --

THE COURT:  Let me look at it a moment.

(Thereupon the book referred to was handed to the Court.)

J fls

Belt J

P44

1 MR. GIRARD:  I would like read it to the Court.

2 MR. VEEDER:  Just a moment, because I have another --

3 THE COURT:  Just a moment.  Let me finish.  Will you both

4 be quiet.

5 MR. VEEDER:  Yes, your Honor.

6 (A pause.)

7 THE COURT:  All right, Mr. Veeder.

8 MR. VEEDER:  May I refer now to the other case I cited,

9 before anything else?

10 THE COURT:  Mr. Girard, do you have a comment?

11 MR. GIRARD:  Yes, your Honor.  Now Section 1700 of the

12 Water Code, which is concerned with changes in diversions,

13 is expressly limited/subsequent to 1914 appropriations.

14 Section 1706 of the Water Code permits changes in points of

15 use so long as harm does not result for prior to 1914

16 appropriations.  Looking at the index of West Annotated Code

17 -- they cite this Orange County case in there, incidentally

18 -- it is clearly stated in the case, too, I think, that the

19 appropriations they were concerned with here were prior to

20 1914 changes, so that Section 1700 didn't apply, and that

21 they were perfectly privileged to change their point of

22 diversion under Section 1706, which is concerned with prior

23 to 1914 appropriations only, which authorizes a change

24 providing no one is injured.

25 Here is the Code.  It is in the index that the Orange

P45

1    County case is cited.

2         MR. VEEDER:  I cited your Honor Orange County vs. Riverside,

3    171 CA 2d.

4         MR. SACHSE:  You said 173 first.

5         MR. VEEDER:  I intended to cite 171 first.

6         MR. SACHSE:  What the Court has is 173.

7         MR. VEEDER:  Yes.

8         THE COURT:  Now you are citing 171?

9         MR. VEEDER:  That is right, which is the same matter.

10        THE COURT:  What page?

11        MR. VEEDER:  523.

12        THE COURT:  Was this opinion written by Judge Haines,

13    judge pro tem?

14        MR. VEEDER:  I think it is.  No, this is by Judge Ross.

15    Here is what it says here:

16            "It is undoubted law that a lawful appropriator

17    of water may at his discretion alienate his rights as

18    such.  It has often been held that an appropriator may

19    at his discretion change the place of application of

20    his water, though not where the change causes injury . . .

21    It has likewise often been held that an appropriator

22    of water may at his discretion change the use to which

23    his water is put, . . . These decisions (cited decisions)

24    continue to state the law except as affected by subsequent

25    statutes.  Beginning with the State Water Commission

P46

1    Act of 1913, several times amended and afterward

2    superseded by subsequent legislation, the State has

3    undertaken extensive regulation of water appropriation

4    and the use of appropriated water.  For the most part

5    this legislation relates only to appropriation from

6    surface water and subterranean streams and the use of

7    the water appropriated therefrom as distinguished from

8    appropriations from underground lakes or basins. . ."

9    When you read these cases together it is obvious that they

10   are saying that those ground waters in the areas to which I

11   made reference are not subject to Section 1200.  That is why

12   I keep coming back time and time and time again to the dis-

13   tinction that was made in Hunter, in the Pomeroy case, dis-

14   tinguishing the Pomeroy case and alluding again to the practice

15   in the State of California.  I don't believe that we can turn

16   our back on this fact that these basins, these reservoirs

17   such as underlay Camp Pendleton, such as underlay the Murrieta-

18   Temecula area, are governed by an entirely different kind and

19   type of regulation.

20   THE COURT:  Just to correct the record, now we have Judge

21   Ross, who was the trial judge.

22   MR. VEEDER:  I beg your pardon.  It was the trial judge.

23   THE COURT:  The opinion in this case in 171 CA 2d is a

24   per curiam by the Court.  It doesn't tell us who the Court

25   was composed of at that particular time.

P47

1  MR. VEEDER:  I think, your Honor, that we must look further

2  in regard to the course of the trial of this case and what

3  actually transpired in regard to De Luz and Rainbow, to which

4  Mr. Sachse alluded extensively today.  In every instance

5  Colonel Bowen was interrogated by me -- perhaps it was on

6  cross-examination, I don't want to be held to that -- in every

7  instance the question was presented, are these ground waters

8  part of the sub-flow?  So there is proof in regard to those

9  streams.  You will not find a single statement in regard to

10 the basin underlying Camp Pendleton where the statement is

11 made that this is sub-flow of the Santa Margarita River.  In

12 every instance the proof is affirmative and it is clear, it

13 is just as clear as in the Hunter case, that this is a reser-

14 voir, and there is a difference.

15  THE COURT:  How do you distinguish Pomeroy?  Hunter cer-

16 tainly doesn't do it.  Hunter quotes with approval the history

17 of the litigation in the valley, cites Pomeroy, and then makes

18 this comment about maybe this was a lake but granted the in-

19 junction.  How do you distinguish it?

20  MR. VEEDER:  I distinguish it by the very fact that the

21 waters -- all you have to look at is the constriction in this

22 valley here, your Honor -- the water is backed up into a

23 reservoir and that is the difference.

24  THE COURT:  That is what you told me that Hunter says.

25 The constriction at the Narrows of the Los Angeles River was

P48

1   the constriction on this reservoir that you talked about in

2   Hunter.

3       MR. VEEDER:  And that is correct.  The waters come down

4   the Narrows where the Los Angeles River rises and it comes

5   out there, and as was stated by the State Water Rights Board,

6   which considered this point -- and again no one has faced up

7   to what the State Water Rights Board has interpreted this law

8   -- this is the only precise question on the point.

9       THE COURT:  What is "this"?

10      MR. VEEDER:  This is the decision that I cited you yester-

11  day, Decision 983, dated November 22, 1960, in which they took

12  into consideration the Tehachapi ground water basin and the

13  sub-basin of Cache Creek.  Cache Creek sub-basin was an area

14  about 1600 feet across, as I remember.  It was a very small

15  basin.  But the State Water Rights Board in interpreting

16  Section 1200, the crux of this whole matter here, said -- we

17  will adopt this point:

18      "In deciding whether the point of diversion named in the

19      application is located at and draws from an underground

20      stream, it is not sufficient that there be evidence of

21      the existence of an underground stream a mile/away.  As
                                                      or more

22      Tolman points out, an underground basin may terminate

23      in an underground stream.  It is for the Board to

24      decide the ground water status of the point of diversion

25      specified in Application 17666."

P49

1    THE COURT:  Isn't that a factual determination based on

2    the evidence before them in that case?  Was a diversion a

3    mile away?

4        MR. VEEDER:  A diversion a mile away?

5        THE COURT:  The well or whatever it is, a mile away?  You

6    just read it there.

7        MR. VEEDER:  No, it said:

8    "In deciding whether the point of diversion named in

9    the application is located at and draws from an under-

10   ground stream, it is not sufficient that there be

11   evidence of the existence of an underground stream a

12   mile or more away."

13   And that is what transpired.

14       THE COURT:  Well, this is a factual determination.  We

15   don't know what evidence was before the Board.  We don't know

16   where this place a mile away was.

17       MR. VEEDER:  I can demonstrate it to you.  I have a map

18   of it.  I have the report.

19       MR. SACHSE:  Mr. Veeder, I really think I can help you.

20   I would like to shorten this.

21       MR. VEEDER:  I would like to conclude my argument as

22   rapidly as I can.  I don't need any help from Mr. Sachse.

23       THE COURT:  Conclude it then.

24       MR. SACHSE:  I would like to say I agree with what he

25   says.  It is perfectly possible that there can be an

P50

1   appropriation of this kind of percolating water.  No one, to

2   my knowledge, has ever quarreled, Mr. Veeder, with the princi-

3   ple that there can be such appropriation.  What we are talking

4   is, are these waters percolating?

5     MR. VEEDER:  My point, your Honor, and I repeat to your

6   Honor, they did not file applications to appropriate water in

7   the San Fernando Valley, they did not file applications to

8   appropriate water in the Raymond Basin.  The procedures that

9   have been outlined here and read to your Honor point directly

10  to a situation where water is percolating through the basin,

11  such as underlies Camp Pendleton.

12    We can say, "Well, this is a well defined stream," or we

13  can say, "This is not a well defined stream."  There is a

14  great power with your Honor there.  But I submit to your Honor

15  that these waters which are backed up into this basin which

16  underlie it and from which we pump are percolating waters

17  within the contemplation of the rules and regulations as set

18  out by the State of California.  I submit to your Honor that

19  they have not cited a single authority or a single case that

20  is contrary to the principles that I have enunciated here.  I

21  presented your Honor what Hutchins said.  Hutchins said that

22  from his standpoint he viewed the San Fernando Valley as a

23  reservoir and a lake.  I do believe that these wells that

24  are punched down into this percolating water through these

25  clay lenses are clearly of the nature that are contemplated

P51

1   by the rules I have read to you.  This is a laminar flow,

2   your Honor.  This isn't a flow of a stream.  This is water

3   running through, trickling through these deposits.  They are

4   entirely different from a flowing stream.  And I think the

5   controlling factor -- read the statute.  The statute says

6   "flowing."  Certainly you are not going to say, your Honor,

7   that the water which we find in the subterranean basin under-

8   lying Camp Pendleton is flowing in the sense that a stream

9   flows.  That would be inaccurate.  It would be clearly erroneous

10   to say that those waters are flowing as a stream.  We admit and

11   we know that those waters go down the gradient, but it may be

12   years upon years upon years before the water two and a half

13   miles away from the channel can move down to the narrow neck

14   of Ysidaro Narrows.  The water that is backed up in there

15   behind that narrow constriction is impounded water.  It is

16   stored water.  It is not flow water.  California undertook to

17   compute how much water can be stored in the basin, how much

18   water can be stored in the reservoir.  Mr. Illingsworth used

19   the term "reservoir."  We can't call it a flowing stream as

20   the statute declares that it must be.  It is not flowing.  It

21   is percolating.  It is clearly percolating water, and it is

22   in a basin, and with those elements present I respectfully

23   submit that the State of California has denied that it has

24   jurisdiction under those circumstances and not a single case

25   has been cited to the contrary.

P52

1      I have nothing further.

2      THE COURT:  I have been very sympathetic to some reasonabl

3   presentation which would mean that there might be some rights

4   in the United States Marine Corps to appropriate water out of

5   that basin.

6      I can't say that you have been very much help to me, Mr.

7   Veeder.  You have bounced around here, you have cited cases

8   for propositions that they don't hold.  When you read them

9   carefully and see what the holdings of the cases are you find

10  it is an entirely different story.  I don't know whether you

11  attempt merely to confuse rather than to help, but you certain

12  ly haven't been much help.  You have been given an opportunity

13  to file a brief and you did not avail yourself of it.  You

14  presented a lot of new matters orally here.

15      I thought it might even be possible to make some distinctio

16  between the basins.  I have serious doubt whether that could

17  be done.  I thought possibly the lower two basins might be

18  treated differently than the upper basin.  I can't find any

19  way to do it.  And you haven't given me any help.

20      It is conceded that the water is all in hydraulic

21  continuity in the three basins.  And I see no escape from the

22  decision in the Pomeroy case -- the factual situation is almost

23  identical, and no Supreme Court case has modified the Pomeroy

24  case.  Hunter certainly does not.  The point in Hunter is not

25  as nearly in point as the one in Pomeroy.  In Pomeroy they

P53

1   had the question before them, is this underground water a

2   part of the stream flow? And they found it was.  In Hunter the

3   question was whether the city had a paramount right which would

4   permit the issuance of an injunction against pumping elsewhere

5   in the basin, and the Court held that the city had that right

6   and the injunction issued by the trial court was affirmed.

7   So that Hunter, as far as the legal issue before the Court

8   is concerned, was not exactly the same as Pomeroy.  In Hunter

9   the legal issue was not, is this water in the valley, be it

10   in a lake or be it part of the stream, the issue was not, is

11   this water a part of the stream?  The issue was, is this water,

12   water to which the City of Los Angeles has a paramount right

13   ahead of the pumpers because of its pueblo status?  And it

14   said it had and granted the injunction.  In the sense that

15   the Court in Pomeroy compared it to a lake in the factual

16   discussion, you can't say that overrules Pomeroy.  Your text-

17   book doesn't so state.  You have cited no other case that has

18   thrown any doubt on Pomeroy.  Apparently the last that went

19   to the Supreme Court was in 33 Cal. 2d.

20     I see no answer but that the area of the basin is an

21   underground stream of water with a known channel and bed in

22   which this younger alluvium is laid down.  So you can't get

23   away from the fact that if you have younger alluvium with

24   water filled up almost to the surface you have a stream

25   flowing.  Certainly that water underneath is supporting that

P54

1    stream.  The water drops and the level goes down two feet

2    below the surface because of, we will say, pumping.  Your

3    stream may dry up.  Does that automatically mean that where

4    a week before the water was a part of a stream, the underground

5    part of the stream, that now it is no longer an underground

6    part of the stream because the surface part has dried up?  And

7    yet you go downstream further and they have situations in this

8    kind of area and others in the coastal region and again the

9    water level in the younger alluvium will be higher and you will

10   see the stream again on the surface in the form of a pool.

11   How can you say that the water lying beneath the surface

12   supports the stream and is therefore a part of the stream,

13   the underground portion of it, in one instance and not in the

14   other?

15        Mr. Sachse's example of the reverse flow at Ysidaro was

16   a very pertinent example.  The reverse flow in the Murrieta

17   indicates clearly that these waters are a part of the stream.

18        I still have some doubt about this business between a

19   basin and a stream.  I haven't had too much help on that.  It

20   is hard for me to see how there would be any difference

21   between a basin and the stream itself.

22        You have done a lot of talking, Mr. Veeder, about how you

23   can appropriate since 1913 and 1914 waters out of a basin that

24   directly feeds and is a part of the stream.  Mr. Sachse for

25   argument concedes it.  I am not sure that that is the law.  I

P55

K fls.

1   would want somebody to show me that -- if you contend that

2   they can appropriate water out of a stream with known channels,

3   the surface flow or underground flow, without complying with

4   the requirement of an application for a permit.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t48
K

1      I don't know how you could take it out of a little

2   basin that was a part or substance of this stream upstream

3   therefrom, through which water passed from the stream above

4   to the stream below, so that it was an integral part of the

5   stream.  I can't see that.  I don't think there is any

6   doubt about that, and I don't think that you have any

7   appropriative right from pumping in the areas on the basin.

8      Now, if you want to take another try at it, and  present

9   some further document and summarize a lot of this argument

10   and talk, and pick out the cases that you rely upon, and try

11   to convince me that I am wrong, I will always be glad to hear

12   you.

13      MR. VEEDER:  I will be glad to undertake that, your

14   Honor.

15      THE COURT:  I am not inviting it, but I am just saying

16   that I don't think you are going to advance the cause of this

17   case by talking about cases on file which have not been

18   tried and I doubt very much that you are going to advance the

19   cause of this case by talking about decisions of the Water

20   Board, particularly where there is not a detailed statement

21   of the facts upon which the decision is based, and when you

22   read these to me, it just leaves me completely cold, unless

23   there was available a complete transcript of the facts on

24   which the decision was based.

25      MR. VEEDER:  I will submit it to you.

t49

1        THE COURT:  All right.

2        MR. VEEDER:  I will submit the report to you upon which

the State of California proceeded.

4        THE COURT:  Am I to lay over and play dead because the

State Water Rights Board made a decision in some case when

the Supreme Court of California has decided Pomeroy?

7        MR. VEEDER:  There is only one thing that I say, your

Honor:  I asked leave when I started this argument to check

out these facts which were raised against Lodi, and which

were raised against Los Angeles vs. Glendale.  I think that

those are extremely important.  I didn't realize, nor did I

think that those points would be raised against that

argument, because I know that those cities have all grown.

THE COURT:  I am not going to pick out isolated things

from a decision in a case as authority.  It is authority

upon the proposition based upon what the factual situation

was before the Court, and what the Court decided, and the

mere deciding of this or that in discussing a problem is not

the holding of the case.  Every case has one or more definite

holdings.  You are familiar with that.  And some of these

things you rely upon are at best some kind of a weak peg on

which to hang your hat that does not amount to an authority

at all.

I do not see anything in Lodi that takes us along the

road at all.  You say you want to check back and see what the

t50

1  dates of these rights were.  This was not what the Court

2  considered in Lodi.  This was not the problem in Lodi.

3  What is the case in 23 Cal.?  Is that Glendale?

4  MR. VEEDER:  Glendale is in 23, yes.

5  THE COURT: It was not considered in Glendale.  There the

6  question involved was the pueblo rights of the City of Los

7  Angeles, and the fact that these cities were pumping, and

8  they upheld the pueblo rights, and said there was nothing

9  wrong in these people pumping so long as the city was not

10  using the water.  They did not go into any discussion of the

11  origin of these rights, what these rights were, but it was

12  sufficient to say that they were inferior to the rights of

13  the pueblo, and that is all they had to hold.  They did not

14  have to go into great detail and say what kind of rights,

15  and how much better they were than someone else's.  That

16  was not before the Court.  The only question there was,

17  assuming for argument they had some rights by pumping, were

18  they good against the pueblo rights, and they said, no, they

19  weren't good against the pueblo rights.  If you want to

20  give me something on that, all right.

21  Now, what about tomorrow?  Are you prepared to talk

22  about any more findings tomorrow?

23  MR. SACHSE:  May I inquire as to the status of the

24  exhibit on Diamond, Domenigoni?  That is ready if the exhibit

25  is ready, the ownership exhibit.  Do you know what I am

t51

1   talking about?

2      COMMANDER REDD:   I know what you are talking about, but

3   it is not ready.

4      MR. VEEDER:   We are prepared to lodge with your Honor

5   tomorrow the basement complex and residual use rights in

6   Temecula.

7      MR. SACHSE:   The 31-A Series?

8      MR. VEEDER:   Yes.   I intend to remain here, and I will

9   be available to work on findings, and I intend to work on

10  them.

11     MR. GIRARD:   Your Honor, we have a lot of findings, --

12  Murrieta, Anza, Temecula.   I think at least with Murrieta

13  we can proceed and get those into final form.   I think they

14  are almost now except for the change to accord with your

15  Honor's ruling today.

16     Mr. Stahlman I am sure by next week, or I hope by next

17  week, will have the Vail findings ready.   I think we have

18  plenty of work to do on findings, and I think if we work

19  tomorrow, probably next week we can have a couple of sets

20  ready to come in with and to argue about.

21     THE COURT:   Let's continue the matter, then, to Tuesday

22  morning at 9:30.   I may have some other matters to try that

23  day, but, certainly, I could take some time out, and I would

24  like to see  beforehand what matters you are going to talk

25  about, and give me some chance to read them over.

t52

1      MR. STAHLMAN:  The Vail findings are ready except

2   merely for some matters to take up with Commander Redd

3   regarding acreages, and that is a minor thing, however.  The

4   only thing I am concerned about is if Mr. Veeder comes back

5   here again, this situation here.

6      THE COURT:  I am going to give Mr. Veeder permission at

7   his leisure to prepare a brief on this problem.  If after

8   reading his brief I feel I want further argument, I will

9   set it down for further argument.   If after reading the

10   brief I am still convinced there is no merit to his position,

11   I will so state, and that will be the end of it.

12      MR. GIRARD:  I presume in drafting the findings this

13   weekend and next weekend, that we can work on the assumption

14   that you are going to hold as indicated now, however?

15      THE COURT:  That is a pretty good assumption.  I haven't

16   found anything I can really use as a basis for finding

17   these appropriative rights.  Maybe Mr. Veeder is just

18   undertaking a hopeless chore, where he won't be able to.

19      MR. STAHLMAN:  Are we to get copies of that brief?

20      THE COURT:  Why, certainly.

21      MR. VEEDER:  Your Honor, I would like to straighten out

22   the record in one regard.   You sort of accused me of not

23   doing what I was supposed to do.  I filed the original brief

24   on June 30th, and I want this clear in the record.   I filed

25   the original brief on June 30th, and there was no requirement

t52

1   for anyone to do anything other than you directed me to

2   answer California's twelve questions, which I did.

3      THE COURT:  You filed the response?

4      MR. VEEDER:  I filed the response.  Then you said that

5   this is a factual situation, by and large, and for us to

6   submit some kind of a statement in regards to  this issue.

7   That is what I did, your Honor.

8      MR. STAHLMAN:  I understood you were to give us a brief

9   on it.

10     MR. VEEDER:  No.

11     THE COURT:  And what you gave me yesterday and today is

12  the factual statement?

13     MR. VEEDER:  The factual statement?  No, the factual

14  statement that I gave to your Honor, having already reviewed

15  the law in two previous briefs, was contained in Colonel

16  Bowen's affidavit in regard to the factual situation which

17  prevailed.

18     THE COURT:  Now, Mr. Veeder, Colonel Bowen's affidavit

19  was a statement of his views in the matter.  It wasn't a

20  submission of what evidence you had in the record on this,

21  that, or the other thing.

22     MR. VEEDER:  I had already done that, your Honor.  If

23  you will look at my brief of June 30th, and my answers to

24  California, you will find it.

25     THE COURT:  Then there are two other things.  First, there

t53

1   is Volume 119, which is the testimony of Tripp in the Gibbon

2   and Cottle matter.  I can't find my copy.  I thought maybe

3   Mr. Girard knew where it was, or somebody else.  I borrowed

4   Mr. Veeder's copy, and I wanted to read that.

5        MR. GIRARD:  I may have it in Sacramento.  I don't know,

6   but I will check.

7        THE COURT:  I have Mr. Veeder's copy now, so I don't

8   immediately need it.

9        Secondly, I would be interested in having the Colonel,

10   or somebody, prepare for me:  What is the status of these

11   parcels immediately downstream from Gibbon and Cottle title-

12   wise?  In other words, was this land homsteaded after the

13   alleged appropriation by Tripp?  In other words, Tripp, if

14   he has an appropriative right, it certainly is not good

15   against Vail, and it is not good against the United States.

16   It is only good against persons who homesteaded Government

17   land  subsequent to his date of appropriation.  We agree on

18   that, don't we?

19        MR. GIRARD:  It is a big question whether it runs

20   downstream, too.

21        THE COURT:  What?

22        MR. GIRARD:  It is a big question whether it runs

23   downstream, too, under that type of appropriative right.

24        THE COURT:  I am not so sure about that.

25        MR. GIRARD:  I think Mr. Grover argued and he pointed out

t-54

1   that he was claiming it against upstream people only.  Maybe

2   I am wrong about that.  But Mr. Stark advanced that he could

3   see no distinction between the two, although the cases that

4   were involved were upstream assertions.

5   THE COURT:  It seems to me it would be a lot clearer

6   against a downstream party than an upstream party.  The

7   water has been appropriated, and it does not get down to the

8   downstream owner.

9   You might, Mr. Girard, check Mr. Grover's position on

10   that.  But I would like to know how many parcels of ground

11   are downstream.  How far in miles is the Gibbon and Cottle

12   property from the Vail property?

13   MR. GIRARD:  Sandy says a mile and a half.

14   THE COURT:  How many parcels lie in between Gibbon and

15   Cottle and Vail?  We know of a couple who have not put on

16   any proof, who apparently have suffered very badly from loss

17   of water.  I would like to have that checked out.

18   MR. VEEDER:  We have undertaken to check out some of

19   these titles that go on riparian rights, and we will do that.

20   THE COURT:  All right.

21   MR. GIRARD:  The date of the patent is what we are

22   concerned with.

23   THE COURT:  What parcels of land, first of all, and the

24   acreage, and the owners, and the date of patent.

25   MR. VEEDER:  And do you want the chain of title?

t55

1 THE COURT:  We don't need the chain of title if it

2 starts out with a patent and we know the date of the patent.

3 MR. VEEDER:  It is the smallest parcels I am talking

4 about.

5 THE COURT:  All right.

6 MR. VEEDER:  And the riparian rights, and we have under-

7 taken to find out as to certain users in regard to those.

8 THE COURT:  How much time do you want to present this

9 further brief which you are going to file?

10 MR. VEEDER:  Two weeks, your Honor?

11 THE COURT:  Tentatively that will be all right, and we

12 will fix some later date, probably next week, when we get

13 to work on some of these findings.  I will probably ask you

14 to come back in several times during the week.

15 MR. SACHSE:  As far as my calendar is concerned, I

16 am completely available, your Honor.

17 MR. VEEDER:  And I intend to stay here, too.

18 THE COURT:  Tuesday morning.

19 (Whereupon, at 2:30 o'clock p.m., Thursday, September )

20 ( )
  ( 7, 1961, an adjournment was taken until Tuesday )

21 ( )
  (morning, September 12th, 1961, at 9:30 o'clock   a.m.)

22

23 - - -

24

25

t56

1                    IN THE UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF CALIFORNIA

3                         SOUTHERN DIVISION

4                            - - -

5    UNITED STATES OF AMERICA,          )
                                        )
6              Plaintiff,               )
                                        )
7         vs.                           )      No, 1247-SD-C
                                        )
8    FALLBROOK PUBLIC UTILITY DISTRICT, )
       et al.,                          )
9                                       )
               Defendants.              )
10   _____)

11                    CERTIFICATE OF REPORTERS

12        We, the undersigned, do hereby certify that we are,

13   and on the date herein involved, to wit:  September 7, 1961,

14   were duly qualified, appointed and acting official reporters

15   of said Court;

16        That as such official reporters we did correctly

17   report in shorthand the proceedings had upon the trial of

18   the above entitled case; and that we did thereafter cause

19   our said shorthand notes to be transcribed, and the within

20   and foregoing  113  pages of typewritten matter constitute

21   a full, true and correct transcript of our said notes.

22        WITNESS our hand at San Diego, California, this 7th

23   day of September, 1961.

24

25

MARIE G. ZELLNER, OFFICIAL REPORTER