VOLUME 169

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | Plaintiff, | |
| vs. | | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al, | Defendants. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:** San Diego, California

**Date:** September 12, 1961

**Pages:** 17,875 to 17,892

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )   No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY             )
DISTRICT, et al.,                    )
                                     )
                    Defendants.      )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, September 12, 1961

- - -

APPEARANCES:

    For the Plaintiff:        WILLIAM H. VEEDER, ESQ.,
                               Special Assistant to the
                               Attorney General

                               CDR. DONALD W. REDD

    For the Defendants:

        Vail Company:          GEORGE STAHLMAN, ESQ.

        State of California:   FRED GIRARD, ESQ.

        Fallbrook Public
        Utility District, et al, FRANZ R. SACHSE, ESQ.

17,876

1   SAN DIEGO, CALIFORNIA, TUESDAY, SEPTEMBER 12, 1961, 10:00 A.M.

2   ---oOo---

3   (Other matters.)

4   THE CLERK: One, 1247-SD-C, United States vs. Fallbrook.

5   MR. VEEDER: Your Honor, I have presented to your Honor
6   for signature the interlocutory judgment Number 34-A,
7   involving the properties on Temecula Creek watershed above
8   Vail Dam. Those lands are of the character that whatever
9   water is in them are vagrant, local, percolating waters, not
10  part of the Santa Margarita River or any of its tributaries
11  or ground water basins.

12  THE COURT: It is a tremendous job to get this ready. I
13  have been looking it over. I don't like to be super-technical,
14  but I thought we had a discussion sometime back where there
15  would be entered in these findings some sort of explanation
16  of how the maps and parcels and the descriptions worked.
17  Now, you know exactly what you have here. But even with my
18  familiarity with this case it took me about fifteen minutes
19  to figure out these hieroglyphics. It seems to me that there
20  is somewhere in the record where we agreed upon an
21  interpretation of these things to be put in the judgment, so
22  that a stranger would know about it.

23  For instance, your legal descriptions start -- I'll
24  just take one for example -- 81W-25, 36-27. Well, it happens
25  that you and I know that everything in that area is either

1  Township 8 South or Township 7 South, but somebody else
2  isn't going to know that. So 8 means Township 8 South. Then
3  your next one is 1W. We know that that means Range 1 West,
4  but who else knows it?
5     Do you know what I am talking about?
6  MR. VEEDER: Yes, your Honor, and I will say that the
7  form we have there, this 34-A Series, has not been amended
8  to include that language that has been included in the
9  Tucalota Creek and other findings involving waters which are
10 part of the Santa Margarita River. I will amend the form.
11    THE COURT: It could be done very easily.
12    MR. VEEDER: I will amend the form and have the page
13 rewritten to include the language your Honor refers to.
14    THE COURT: As part of the same problem, at the bottom of
15 Page 2:
16    "a. Attached to these Findings . . . made a part
17    of it, is a map . . ., designated Temecula River Water-
18    shed, Above Vail Dam, Ownership and Geology Map, upon
19    which are located all of the lands referred to in this
20    Finding."
21 There is no doubt that all the lands referred to in this
22 Finding are located on that map, but there is also located
23 on that map other lands.
24    MR. VEEDER: That is right, your Honor.
25    THE COURT: So that what we are really talking about is

17,878

1   that insofar as parcels are listed in the legal description

2   this Judgment concerns those particular parcels shown on that

3   map. Is that right?

4   MR. VEEDER: That is right.

5   THE COURT: We ought to give some attention to that, if

6   we are going to make these things understandable.

7   MR. VEEDER: If your Honor wants me to revise the form

8   that has been approved, I will do so.

9   THE COURT: It seems to me that the only revision has

10  to be in that a, b and c at the bottom of Page 2 and at

11  the top of Page 3. And I would like Counsel to work with

12  you on it, so that the thing would be intelligible. We have

13  been living with this matter so long that we know something

14  about it, but what about the next fellow who looks at it?

15  MR. VEEDER: I appreciate what your Honor says and I will

16  take care of it.

17  THE COURT: Does any other Counsel have any other

18  thoughts about this? This is the form we have been using.

19  It is true that we approved some of these before without

20  the explanatory matter in them.

21  MR. STAHLMAN: Your Honor, along this line, I think the

22  Findings could have been drawn with a great deal more

23  simplicity and more easily understood.

24  THE COURT: Is there something in the Findings other than

25  these descriptions that you had trouble understanding?

MR. STAHLMAN: No, using the general form that is now developed, making these corrections your Honor suggested would accomplish the purpose all right. I had that very same thought. These people up here don't know a great deal about the situation. It's like a Chinese puzzle.

THE COURT: With some explanations, it is fairly workable. They can look through here and find the name, and they find this hieroglyphic, which we can explain. Or they can figure it out by a little searching.

Well, it is in order as to parcel numbers, isn't it?

MR. VEEDER: Yes, your Honor.

THE COURT: You should say that. You should say that the legal descriptions are set forth by parcel number.

MR. VEEDER: As nearly as that can be accomplished, yes, your Honor.

THE COURT: You can find the parcel number and work back to the legal description.

I wonder while we are at this whether we should do something else. We say that these people named are the owners or the apparent owners of these properties, and of course we have a lis pendens on file. Are these the names of the prior owners or the names of the owners at the time of the filing of the lis pendens, or do these names also include changes of ownership that have occurred since the lis pendens was recorded?

MR. VEEDER: Where we were able to make a sufficiently definite determination and we knew that there had been a transfer, the Office of Groundwater Resources has picked up some names and made changes. However, the land description will coincide with the lis pendens. So I don't believe there is any trouble. But it is impossible for us to run every single title.

THE COURT: Then I wonder if it wouldn't be a wise idea, if we are going to have to redraw three or four pages of this matter, to follow the practice of stating that on such-and-such a date a lis pendens was recorded and put down the date and the O.R. reference to the lis pendens; that no search or apparent ownership or ownership since the date of the lis pendens has been conducted throughout the watershed, but that where a change of ownership has been brought to our attention in certain instances the new name has been run in-- in other words, some flag to people -- and that as of the date of the lis pendens this describes the ownership.

MR. VEEDER: We will do that, your Honor.

THE COURT: What other findings are we working on now? What about Domenigoni Valley? Is that progressing?

MR. GIRARD: It has been lodged in final form, your Honor. I think everyone has approved it. I think the only thing --- on that is the exhibit to be attached to it. Mr. Veeder and Colonel Bowen are working on it. I don't know the status of

1  it. The Findings are all lodged.

2  MR. VEEDER: That work is being done, your Honor.

3  MR. SACHSE: Similarly, I was going to ask, Bill, on Sandia Creek you redrafted them after I lodged them. I have gone over them. They are entirely satisfactory. Again, the exhibit is missing on that. That is a very short exhibit. I don't know how close that is to being ready, either.

MR. VEEDER: We are scheduling these as fast as we can.

MR. STAHLMAN: The one I am concerned about that will be integrated with the Vail Findings is the Murrieta.

MR. GIRARD: It will be ready this week.

THE COURT: Is that the ground water area?

MR. GIRARD: Yes, your Honor.

THE COURT: What were you proposing, in view of our discussion the other day?

MR. GIRARD: I would presume, your Honor, that you would treat it the same way. I don't care one way or the other. If you are going to find the younger alluvium at Camp Pendleton to be part of the stream, I presume you would treat Murrieta and Pauba Valley the same way.

THE COURT: The first part of the stream is not the real point of discussion. Mr. Veeder concedes that the younger alluvium --

Or do you concede that the water in the younger alluvium on Pendleton is part of the stream system?

17,882

MR. GIRARD: No, I am sure Mr. Veeder concedes it is part of the stream system.

MR. VEEDER: And I also --

MR. GIRARD: The real point of issue is known and defined channels and beds.

THE COURT: Yes.

MR. STAHLMAN: That is what concerns me.

MR. GIRARD: I have always felt personally that certainly between the fault lines is a pretty good barrier in Murrieta of a known and defined channel. As I say, I have not discussed this point with any counsel.

MR. VEEDER: I think it would be profitable if they would come into my office and talk for a moment on this, because I am extremely anxious on this.

MR. STAHLMAN: That has concerned me for some time, as I have expressed myself here. I don't think there is any question but that there could be a finding made that the younger alluvium as confined within the fault lines could be defined to confine the water in the banks and bed of the stream. Likewise in Temecula. Because I think we run into trouble. Mr. Veeder, as I understand is going to use the quad sheets and use the stream there to determine as to what would be riparian status of the land. I think you would have a more definite line in conformity with the decisions where the banks and bed would be determined by using the

younger alluvium. You are doing that throughout the watershed in the upper part.

THE COURT: You are talking about Murrieta Valley, are you, the fault lines in Murrieta Valley?

MR. STAHLMAN: Yes.

THE COURT: There wouldn't be much problem there. But when you get into the Pauba Valley where you don't have fault lines, you have a problem.

MR. STAHLMAN: The Court could then also say that as to whether or not there would be a riparian status to the lands where there is older alluvium, that that would not be determined. I think that would be in conformity with the decisions.

THE COURT: I would suggest that you meet somewhere and discuss this matter further. There may be a distinction in these areas. In other words, the Murrieta Valley and the two fault lines, between the fault lines and down to the basement complex where the banks and bed of the stream. In Pauba Valley you have an area that is much like the area on Pendleton where you have an alluvial fill lying between the older alluvium down to bedrock. In the Temecula-Murrieta groundwater area north and east of the fault line you have a little different situation. It may be that it can be distinguished as being water that is part of the stream system, but is not water in that area that is flowing in known

1  banks and channels.

2  MR. GIRARD: I think we are all right on that in the

3  findings now, your Honor, subject to some minor modifications

4  -- striking out words.

5  MR. VEEDER: What findings are those, Mr. Girard?

6  MR. GIRARD: The Murrieta findings. I have no doubt that

7  the older alluvium on the other side of the fault line would

8  be still part of the stream system, but it wouldn't be

9  water in a known and defined channel.

10 MR. VEEDER: Have you revised --

11 MR. GIRARD: I have in my own copy, but you haven't got

12 copies of it, Mr. Veeder.

13 MR. VEEDER: I just wanted the record clear.

14 THE COURT: How are you coming with the Vail findings?

15 MR. STAHLMAN: Very well, your Honor. The only thing I

16 have not battened down is the situation in relation to the

17 characteristics of certain parcels where we have a lot of

18 parcels in the Temecula Township, for instance. Commander

19 Redd, I understand, has made research into those titles and

20 also into the position of them, so that the Vail findings would

21 conform there.

22 Are you finished with that, Commander Redd?

23 COMMANDER REDD: We are pretty well tied down on the

24 riparian parts. There are other aspects of it that we are

25 still working on.

MR. STAHLMAN: But as I understand it, your riparian data that you are designating merely relates to the channel of the stream as it presently exists?

COMMANDER REDD: That is correct.

MR. GIRARD: Everything between the fault lines is riparian and you have no problem.

MR. STAHLMAN: That is correct.

MR. SACHSE: That is correct.

THE COURT: Suppose we found in the Murrieta Valley that all the area between the fault lines was riparian, namely, between known banks and beds. Does that alter a lot of work that is already done in that groundwater area?

MR. VEEDER: It would change very materially the work that has been done and the research as to those lands which are riparian.

THE COURT: You have been treating those lands as being riparian which were crossed or merely border on the stream bed?

MR. VEEDER: Which either abutted upon or were traversed by the stream as it is now situated.

THE COURT: It wouldn't be too difficult to back up on that, would it?

MR. VEEDER: It would be very difficult legally, in my view, your Honor. But I think that is a matter that we would have to consider in court after these findings are tendered.

1  I don't think it would cause too much difficulty to follow

2  the suggestion you are now making. That I don't subscribe

3  to it is unimportant at this point.

4  THE COURT: What about Anza Valley? Who is working on

5  that?

6  MR. GIRARD: I did Anza Valley, your Honor. I submitted

7  them to Mr. Veeder. He is going to incorporate them into

8  his Wilson Creek findings.

9  Is that right?

10  MR. VEEDER: Yes.

11  MR. GIRARD: I don't know the status of the Wilson

12  Creek findings. Anza Valley has been lodged.

13  MR. VEEDER: You also already have your nonoverlying,

14  non-riparian Anza Valley-Wilson Creek done and we are working

15  on the rest of them.

16  MR. GIRARD: Is Anza Valley and the next valley down-

17  stream -- is that Terwilliger?

18  MR. VEEDER: The whole sub-watershed has been taken care

19  of.

20  THE COURT: What are you working on? Warm Springs?

21  Or is that going to be part of it?

22  MR. VEEDER: We are working on Warm Springs, yes. Those

23  areas up there we have progressed on to the point where I

24  think we can have all the non-overlying material taken care

25  of. I am going to try hard to have that done by next week,

1   and to get the rest of this material done.

2   THE COURT: On these findings, the A-Series that involve

3   vagrant, local and percolating water not part of the stream

4   system, we have signed up a series of them already.

5   MR. VEEDER: Yes, your Honor.

6   THE COURT: And where we have not interpreted the sub

7   a, b and c that we talked about earlier rather than to amend

8   all those findings and redo them, do you think it would be

9   possible to prepare some sort of document signed by the

10  Court that would refer to the particular findings that do not

11  have this key and then say with reference to Findings 30-A,

12  31-A, 32-A, 33, whatever they are --

13  MR. VEEDER: Write a general order.

14  THE COURT: Yes, to sort of take care of that.

15  MR. VEEDER: I see no problem there at all, your Honor.

16  I think it would be very simple.

17  THE COURT: As a matter of fact, you might run that lis

18  pendens idea in there, too.

19  MR. VEEDER: I think we should take the whole thing. On

20  the 34-A Series I would like to have it consistent.

21  THE COURT: Well, think about this, gentlemen. We either

22  ought to go back and amend the ones we have already signed

23  up, or we ought to put on record a key to them to carry this

24  explanation. Discuss that when you meet, too, will you?

25  MR. GIRARD: Yes, sir.

MR. SACHSE: I have a question, your Honor. Perhaps this is as good a time to ask it as any. There is one area of this river that we have not discussed and I think perhaps we ought to talk about this privately and come up with how Mr. Veeder would like to handle it physically.

Bill, I am talking about the part, the river channel generally that lies from Pendleton up to the Narrows. In the Master's Findings the Master eliminated all consideration of lands that were riparian.

MR. VEEDER: That is correct.

MR. SACHSE: So we have a long strip of riparian ownerships. And when we get above the Sandia watershed we have a lot of upland material also which we have never characterized. I mean, it doesn't have a name.

MR. VEEDER: Here is how we have characterized it in the office, and here is the work being done on it. We characterized the lands between Temecula Gorge and Sandia Creek as we are going to have an A-Series on that.

MR. SACHSE: There will be both an A and a regular one?

MR. VEEDER: That is correct. And that work is going ahead.

THE COURT: Will you meet, then? You may use the Grand Jury room -- the jury will probably be in the Petit Jury room at recess -- or Mr. Veeder's office and discuss some of these things. Mr. Veeder says he wants to be gone --

1  MR. VEEDER: Until Friday morning, if I may, your Honor.

2  MR. SACHSE: Until Friday?

3  MR. VEEDER: Yes.

4  THE COURT: Do counsel know the nature of your trip?

5  MR. VEEDER: No, they don't, your Honor.

6  THE COURT: I think they should know.

7  Mr. Veeder has made appointments to talk to some of the people in the State Water Rights Board to see what he can figure out to bolster his position downstream on Pendleton.

10  MR. SACHSE: Would you like me to go along with you, Bill?

11  MR. VEEDER: No.

12  THE COURT: He is going to undertake this singlehanded.

13  MR. STAHLMAN: I think it would be a good idea if Mr. Girard were there.

15  MR. GIRARD: I trust my people. They can have complete freedom to talk to Mr. Veeder.

17  MR. VEEDER: I am glad the State of California trusts the United States.

19  MR. SACHSE: Do I understand that you are now going before the "Kangaroo Court," Mr. Veeder?

21  MR. VEEDER: Are you characterizing a state agency as a "Kangaroo Court'?

23  MR. SACHSE: You have. The State Water Rights Board you identified as the "Kangaroo Court."

25  MR. GIRARD: While you are up there you might file an

1  application. I think that is where you would do some good.

2  THE COURT: Times change, you know. I remember when the

3  Report of the State Water Rights Board was called --

4  MR. SACHSE: The "Buck Rogers Comic Book."

5  THE COURT: And I finally had to issue an order that they

6  not be referred to by that term any more. And the Board

7  itself was spoken of as a "Kangaroo Court." And now Mr.

8  Veeder and the Board are getting real chummy.

9  MR. STAHLMAN: Mr. Veeder appeared before the Court one

10 time and said they had no standing in this case whatsoever.

11 MR. GIRARD: We will open our State doors to him, your

12 Honor.

13 THE COURT: Suppose I continue this to 9:30 on Friday

14 morning. You will be back?

15 MR. VEEDER: Yes, I will, your Honor.

16 THE COURT: With the final word, I suppose, of what you

17 find out at the State Water Rights Board.

18 MR. VEEDER: Yes.

19 THE COURT: All right, 9:30 Friday morning.

20    Mr. Wilkinson, is something bothering you?

21 MR. WILKINSON: I just won't be here, your Honor.

22 MR. VEEDER: We can't move, then.

23 THE COURT: We will miss you.

24 MR. STAHLMAN: There will be a wedding going on in the

25 Wilkinson family.

1   THE COURT: Try to have a report for me on some of these
2   matters we have talked about this morning.
3       Are you going to be here all week, Mr. Girard?
4       MR. GIRARD: Yes, I think so, your Honor.
5       (Adjournment until Friday, September 15, 1961 at 9:30
6       o'clock a.m.)

----

17,892

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION.

UNITED STATES OF AMERICA, )
)
            Plaintiff, )
)
vs. ) No. 1247-SD-C
)
FALLBROOK PUBLIC UTILITY DISTRICT, )
et al., )
)
            Defendants. )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: September 12, 1961, was duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing 18 pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 12th day of September, 1961.

JOHN SWADER, OFFICIAL REPORTER