VOLUME NO. 171

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

--- --- ---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

--- --- ---

UNITED STATES OF AMERICA,

> Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

> Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Tuesday, September 19, 1961

**Pages:**   17,909 to 18,013

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 171                                              17,909

1                  IN THE UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3                         SOUTHERN DIVISION

4                              ---

5            HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                              ---

7    UNITED STATES OF AMERICA,        )
8                     Plaintiff,      )
                                      )
9            vs.                      )     No. 1247-SD-C
                                      )
10   FALLBROOK PUBLIC UTILITY         )
     DISTRICT, et al.,                )
11                                    )
12                    Defendants.     )
     ─────────────────────────────────)

13

14               REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      San Diego, California

16                 Tuesday, September 19, 1961

17   APPEARANCES:

18       For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
19                                    Special Assistant to the
                                      Attorney General.

20                                    CDR. DONALD W. REDD

21       For the Defendants:

22           Vail Company:           GEORGE STAHLMAN, ESQ.

23           State of California:    FRED GIRARD, ESQ.,

24           Fallbrook Public Utility
             District, et al:        FRANZ R. SACHSE, ESQ.
25

17,910

SAN DIEGO, CALIFORNIA, TUESDAY, SEPTEMBER 19, 1961, 10:00 A.M.

---o0o---

(Other matters.)

THE CLERK:  Eight, 1247-SD-C, United States of America

vs. Fallbrook,et cetera, et al.

THE COURT:  How are you progressing on this brief, Mr.

Veeder?

MR. VEEDER:  Very well, your Honor.  I am in the process

now of simply checking out statements which were made by

counsel in argument in regard to the Riverside case, in

regard to the Lodi case and in regard to the San Bernardino

case, the Pomeroy case and the others.  I am convinced that

they were mistaken in their comments that were made.  I am

convinced, based on extended conversation with Mr. Krieger,

that the case of Orange County vs. Riverside is completely

in support of the position of the United States; that my

statements to your Honor are correct -- that in connection

with that litigation the rights involved were rights which,

in part, might have been acquired prior to 1914, but

certainly a large proportion of the rights were acquired

subsequent to 1914.

Now I am confronted with this problem of obtaining copies

of the decree in that case, because it is essential that I

check back Mr. Sachse's statements with regard to the

initiation of rights.  However, I assure your Honor that any

doubt that might have entered my mind -- and I have never had

any doubt on the proposition -- that we are correct in the

position we have taken that the United States has an

appropriative right to export water from the watershed.   I

think it will be borne out entirely by these cases.   Certainly

the Pomeroy case, involving the San Fernando Valley, which

we tendered to you as being a leading case, upon review and

investigation it is entirely in favor of the United States.

There is no basis whatever for asserting that the entire

San Fernando Valley is a subterranean stream.

However, I am putting this brief into final now.   I am

gathering this material as rapidly as I can.   I assured your

Honor that I would have the brief finished this week, and I

will.

THE COURT:   The point is, will we have any chance to

argue it this week now?   I understand next week is State Bar

week and Mr. Stahlman, among others, wants to attend the

State Bar meeting.

MR. VEEDER:   I will try very hard to have it in your

hands on Thursday.   That is the day after tomorrow.

THE COURT:   Let me ask you this.   Do you apprehend that

if you have an appropriative right it has to pertain to

surplus water?

MR. VEEDER:   It has to, in regard to the Fallbrook

Public Utility District and in regard to the Vail Company Dam,

t4

1    that is correct.  We could not have an appropriative right

2    which would take precedence ahead of any overlying right or

3    any riparian right in the Valley.

4         THE COURT:  In other words, you are talking then, about

5    surplus water?

6         MR. VEEDER:  I am talking about water which was surplus

7    at the time we initiated this appropriative right.

8         THE COURT:  Surplus water.

9         MR. VEEDER:  That is correct, your Honor.

10        THE COURT:  How can you claim that water underground in

11   the alluvial fill in Pendleton is surplus water?  I can see

12   how Fallbrook might argue that there was surplus water when

13   water flowed down the river and went into the ocean; and in

14   the Fallbrook situation I decided that State law controlled--

15   they got a permit.  It is not my business to tell them

16   whether or not to build their dam.  But if they built a dam

17   and fill it with water, the only reasonable prospects they

18   have of filling it with water is the water which would

19   ordinarily flow into the ocean, the water which comes down

20   and is not absorbed by this alluvial fill and flows into

21   the ocean.

22        That is an entirely different kind of water than water

23   in the alluvial fill in Pendleton.  How can you claim that

24   there is any surplus water in the alluvial fill when at the

25   same time you are talking about how the water levels have

1   been lowered, how there has been salt water intrusion from

2   the downstream end of the basin?  How can you argue that there

3   is any possibility of any surplus water in there?

4        MR. VEEDER:  Your Honor, the point is very simple.  When

5   we started pumping water and exporting it from the watershed,

6   that is, percolating water, there was a lowering of the

7   general water table and there was surplus water that flowed

8   down and entered and recharged this basin just like it would

9   with a surface reservoir.

10       THE COURT:  When was this water pouring down?  In the

11   wintertime, you mean?

12       MR. VEEDER:  Yes, it comes down in the wintertime and

13   recharges this subterranean reservoir, just exactly like a

14   surface reservoir.  It is precisely the same principle.  In

15   other words, Vail Company couldn't acquire a right to impound

16   surface waters which would be prior and paramount to the

17   riparian and overlying rights in the Valley.  But it could

18   acquire an appropriative right to the waters which were not

19   required by the riparian and overlying rights.

20       And our situation where we pump water out of a basin is

21   exactly the same thing.  We pump water out of the basin in

22   addition to our riparian and overlying right, and to that

23   extent we claim the right to have it recharged by the surface

24   water in the winter and spring.  And that is the whole story.

25       THE COURT:  Assuming that at the time you started pumping

17,914

and assuming at the time you started to exercise this right

that you claim, this alleged appropriative right, that there

was a surplus of water in this alluvial fill/that you had
so

something to appropriate.  You mean that thereafter when you

get into a dry year such as we have just encountered that

there is still surplus water for you to appropriate?

MR. VEEDER:  Your Honor, the point I am trying to make

is that we are claiming that when we pump that water out of

the basin, that when we pumped that percolating water from

the basin, that effectuated an appropriation and we have the

right in regard to surplus water to have that recharge.

Now it is not exactly the same water, naturally.  But the

point of it is that there is an investiture of a right to the

use of water accomplished by that which is prior to and antece-

dent and paramount to any subsequent appropriators and any

water that is over and above the demands of the overlying

and riparian rights we can use as appropriated water.  And

that is the whole theory of all these cases.

THE COURT:  I want you to talk about it in your brief.

Here you have an alluvial fill with water in it.  You claim

that the water in there is insufficient to take care of your

needs, and at the same time you are talking that you can pump

water out of there and exercise an appropriative right, and

then you try by some system of transplantation to say,   "Well,

it is true we are putting water down in that basin," and you

automatically concede that there is no surplus in there

presently; but you say there will be surplus when the rains

come and therefore we have the right to have some of this

rain water come back in place of what we took out.  So,

actually, what you are talking about as being surplus water

is the flood water.

MR. VEEDER:  That is right, and it is the water that

comes down and recharges the basin.

THE COURT:  Let us not worry about where it goes.  It is

the flood water you are talking about that might be surplus;

not the water in your basin.

MR. VEEDER:  When we are talking about surplus water I

am talking about the water which is over and above the

riparian and overlying rights which does flow down and which

does recharge our basin and for which we make a claim for

appropriation.

THE COURT:  This is pretty mysterious to me.  In other

words, you talk about the right to appropriate surplus waters.

And where are you taking it?  You are taking it out of a

basin which you have to concede is not sufficient for your

needs -- the amount of water in that basin presently.  But

you say, "The water we are going to appropriate is the water

in this basin."  Where is the surplus?  "It is the water that

is going to come next year and replace the water we take."

MR. VEEDER:  That is an appropriative right, and it is a

t8

1    right in addition to our riparian right and it is recognized.

2         THE COURT:  Let's talk about what I am talking about.

3    You are talking appropriating certain waters, and you are

4    talking then about other water coming down as being the

5    surplus water which will replace the water that you appropriate.

6         MR. VEEDER:  May I start again?

7         THE COURT:  You appropriate certain water.  You don't

8    appropriate one water and then transplant it to some other

9    water.

10        MR. VEEDER:  Let me explain this, your Honor.  This is

11   so crucial and I am hoping your Honor will be patient with

12   me if I fail to get this across the first time.

13        THE COURT:  I wish you would stick to the thing I am

14   talking about.

15        MR. VEEDER:  I will stick to it right now.

16        THE COURT:  All right.

17        MR. VEEDER:  Here is the situation.  We had water in our

18   basin.  I'll start again.  Rancho Santa Margarita had water

19   in the basin when it owned the property.  It appropriated

20   water by diversion and application of that water to beneficial

21   use outside the watershed.  That is a right in addition to

22   their riparian and overlying right.  There is no question

23   about it.  And there is no question whatever that there is

24   a right there which was exercised prior to Fallbrook's filings

25   entirely.

t9

1    THE COURT:  Wait just a minute.  There is no doubt but

2    that if you had an appropriative right it is in addition to

3    your riparian right.

4    MR. VEEDER:  That is correct.

5    THE COURT:  There is no doubt about that.  Now, the

6    question is, what was this surplus that Santa Margarita

7    appropriated?  It had to be the actual water that they

8    appropriated.  Where was it?  It came out of the basin.

9    MR. VEEDER:  It came out of the basin.

10    THE COURT:  And then you mean that at that time there was

11    a surplus of water in the basin, more water in the basin than

12    was necessary for your riparian use.

13    MR. VEEDER:  I will say this.  I don't believe that the

14    issue that is really involved here is whether there was a

15    surplus in the basin for all riparian needs or not.  I think

16    that when they exported water from the watershed, this

17    percolating water from the basin, there was then accomplished

18    an appropriative right to the extent of the water that was

19    pumped out.  That is what there arose -- an appropriative

20    right.

21    THE COURT:  Wouldn't there have to be a surplus before

22    they could appropriate?

23    MR. VEEDER:  There has to be a surplus before they can

24    appropriate, and above the riparian and overlying rights,

25    for example, of the Vail Company.  You couldn't make a claim

17,918

t10

1   against Vail Company for this appropriative right as against

2   their riparian and overlying rights.  But you could claim a

3   right of recharge to recharge the basin for this appropriative

4   right, just like you would claim for a surface storage right

5   if you accomplished an appropriation.  There is no difference.

6          Your Honor asked me this question.  It is

7   extremely difficult for me to comprehend it.  Here we have

8   the situation of the Valley, and there is water in this

9   valley, and we decide to use the water outside the watershed

10  and we pump it outside the watershed.  To that extent there

11  is an appropriation.  And even if the basin -- I'll start

12  again -- and even if the basin was completely pulled down,

13  if the basin was completely pulled down and  we exported that

14  water from the watershed, we would acquire an appropriative

15  right for which we could claim a priority against any

16  subsequent appropriator upstream who would interfere with

17  the water required to recharge our basin.  That is the

18  situation.

19          The sole question here is, was there an appropriative

20  right accomplished by the pumping of this water?  You said

21  "surplus."  When you said "surplus" to me it meant surplus

22  over and above other people's riparian and overlying

23  rights.  And that is the point.

24          THE COURT:  Here is where we depart one from the other.

25  You take the view that in appropriating water you can look,

17,919.

t11

1    as it were, at the supply of the whole stream.

2        MR. VEEDER:  Yes, your Honor.

3        THE COURT:  And that you can look for flood waters that

4    are going to come down next year.

5        It seems to me in logic that to say there is a surplus

6    you have to show that there is a surplus at the place you

7    are getting the water, and you can't, as it were, live on

8    credit and bank on what is going to come down next year to

9    prove that there is a surplus.

10       MR. VEEDER:  But your Honor, on that point, we can claim

11   correlatively for our riparian and overlying rights.  But to

12   meet the demands of our appropriative rights we must look

13   to surplus.  That is a fact.

14       THE COURT:  Direct your attention to what I am talking

15   about.  You look at the surplus in the area where you get

16   the water, or are you entitled to look to next year or next

17   month?

18       MR. VEEDER:  Just like any other appropriative right,

19   we look to recharge when there is surplus in the entire

20   valley.  And that is what the cases bear out.

21       THE COURT:  If you can find a case that says this I am

22   going to be very much surprized.  Here is what the case

23   would have to say.  X is pumping out of the basin.  There is

24   an overdraft in the basin.  There is no surplus available over

25   the needs of the riparian and overlying owners.  But X by chart

17,920

shows that next year there will be floods and that next year there will be flood waters which come down and percolate back into these basins, and that these flood waters will replace some of the water which X now says he can appropriate. I don't know of any water case that talks about that.

MR. VEEDER: But that is precisely what transpires in all these cases.

THE COURT: We know that it transpires as an act of nature -- the water comes back. But show me a case where they let you make an appropriation, not based on what water is there at the time you appropriate, but based on what you anticipate will come down later and replace the water you take out.

MR. VEEDER: The whole concept of the appropriative right is this. You impound water. I'll draw this analogy once more. Vail Company puts in a dam. The dam is empty. Some water comes to them. They use the water. They use it that year. They have an appropriative right when surplus water is available next year to impound it and they can make the demands against upstream appropriators to impound it and they can make the demands to upstream appropriators to release that water to refill their dam.

Drawing the al analogy here again, surely it is exactly our situation. What did Vail Company do? They got an appropriative right for surface storage over and above their

t13

1   riparian rights if there was surplus water in the area.

2   THE COURT:  It has to be surplus.  What did you do?

3   MR. VEEDER:  We did exactly the same thing.  We pumped

4   water out of the basin and used it.  We could claim the

5   recharge water for that dewatered area -- our appropriative

6   3100 acre feet, if that is the case.  We can only demand from

7   the other riparians water for our riparian rights.  But once

8   every riparian and overlying right has been fulfilled and met,

9   then if there is a surplus we can have that surplus to

10  recharge our dewatered basin to the extent of our appropriative

11  right as against subsequent appropriators.

12  THE COURT:  I understand.  The thrust of your contention

13  and argument is actually directed only toward Fallbrook,

14  because the Vail Dam is prior in time to the alleged

15  appropriation, is it not?

16  MR. GIRARD:  No.

17  THE COURT:  Or are you talking Vail and Fallbrook?

18  MR. VEEDER:  I am talking about Vail and Fallbrook, for

19  this reason.  Our theory is this, that when we bought the

20  land they were exercising an appropriative right out of the

21  basin.  We continued to exercise that right down and are now

22  using it.  But Vail made their filing in August, 1946.  So

23  that as against Vail Company the ceiling of our appropriative

24  right would be as of August, 1946.  In other words, Vail

25  Company intervened right there and they claim a priority

t14   1   which would be antecedent and prior to any subsequent

2   increased uses by us.  So that would be the circumstance.

3       THE COURT:  What do you claim to be your feeling, as it

4   were, as of June, 1946?

5       MR. VEEDER:  If my memory serves me, it is right at

6   3,000 acre feet a year.  I would want to check it out, but

7   to the best of my last calculation that would be it.

8       THE COURT:  Let's see if I understand your argument.  In

9   substance, you are saying let's compare Vail Dam, an

10  artificial reservoir, with the basin that Camp Pendleton,

11  a natural reservoir.

12      MR. VEEDER:  Yes.

13      THE COURT:  Is this the gist of it?

14      MR. VEEDER:  The gist of this would be that, yes.  Or

15  assuming that there was a  surface appropriation -- somebody

16  just simply diverted the water out of a stream and used it

17  on a field -- and they had an appropriative right for it

18  prior to 1914.  They could demand next year as against any

19  subsequent appropriator the right to divert and use that

20  water.  It is exactly the same thing.

21      THE COURT:  When they diverted the stream there they

22  were using surplus at the time they made the   diversion, and

23  so they operate against surplus and they make a charge then

24  against the surplus.

25      What about a situation where you don't operate against a

t15

1    surplus?  You operate, if anything, against a deficit.  But

2    you talk about the surplus you are going to take and charge

3    next year's surplus with what you take.  Isn't that what you

4    are doing?

5        MR. VEEDER:  We will move it back to the year 1943 or

6    1944.  The United States is pumping water out of the basin.

7    There is a surplus that year and we use 3100 acre feet of

8    water in addition to our riparian rights, and so we can claim

9    upstream for the recharge to the extent of that 3100 acre

10   feet as against any subsequent appropriator.  That is all,

11   your Honor.  And it is the history of all these basins and

12   the history of all our appropriation and of all the cases

13   that are involved, namely, that when you start pumping from

14   a basin that act in itself, diverting the water out of the

15   watershed, that act in itself is an appropriation and as

16   against anyone coming subsequent to that time you can claim

17   surplus water to meet that demand.

18       Your Honor, I don't want to fail in making this thing

19   clear to you.

20       THE COURT:  Finally at least I have got some glimmer

21   of what you are talking about.

22       MR. VEEDER:  I am trying desperately, because this is

23   extremely important to us.  I am trying as hard as I ever

24   tried in a lawsuit right now.

25       THE COURT:  By the way, this is the first time I have

t16

1    heard this particular argument.  This is a new theory.

2         MR. VEEDER:  No, it is not, your Honor.

3         THE COURT:  It is to me -- on September 19th now.

4         MR. VEEDER:  I am terribly sorry about that.

5         THE COURT:  No use in being sorry.  But as you dig into

6    this you apparently get new ideas.

7         MR. VEEDER:  No, your Honor, I have never had a different

8    idea from the proposition -- I am pointing to Chappo Basin

9    where we have a well, where we are pumping, and we are

10   pumping percolating water, and we are using that water outside

11   the watershed -- and the proposition that we say here is that

12   to the extent that that percolating water is taken out under

13   an appropriative claim we can assert the claim as against

14   Fallbrook for the delivery  of an equivalent  amount of water

15   past their diversion to meet this appropriative claim.

16        You say, "Well, it has to be a surplus."  Indeed it has

17   to be a surplus to meet that dewatered strata.  It has to be

18   a surplus over and above prior and paramount rights to this

19   appropriative right.  But that is the extent of it, your

20   Honor.

21        The question of surplus goes on this basis.  Your

22   Pasadena vs. Alhambra is an excellent example of that factor.

23   The cases hold that when your basin is full and everyone is

24   using all the water that he needs, then a non-overlying use

25   from the Raymond Basin was a perfected appropriative right

t17

1    and as against any subsequent appropriator out of Raymond

2    Basin there you had a priority.   So if somebody came along

3    next year and used some of the surplus, then you would be

4    next in line in point of priority.

5        And that is the Riverside case, too, in which they said

6    there was an appropriation of surface water as of this

7    moment and you can make a claim upstream to have that water

8    come to you ahead of anyone who began pumping at a subsequent

9    date.

10       And that is the whole theory of all these cases.   It is

11   exactly what transpired in regard to the Mission Basin, in

12   which these people used water for a period of five years but

13   they were using water under a claimed appropriation, and it

14   was held that that would ripen into prescription.   But the

15   mere act of pumping out the water to a non-overlying use

16   effectuated the appropriation.   And the appropriation would

17   be totally barren if the next year they couldn't demand

18   as against anyone subsequent to that the use of water that

19   flowed in there over and above the riparian and overlying

20   rights.

2 fls    21

22

23

24

25

P 1   Belt
2

1       Now that is the whole theory of these cases, your Honor,

2   and I have read every one of them now and I have gone back

3   through and checked out the history of these things, and in

4   each instance the appropriation recognizes the right of

5   recharge to the extent of the appropriation and fixed in

6   regard to the quantity of water used for a non-overlying use

7   before the intervention of some subsequent appropriator.  That

8   is the whole theory, your Honor, and that is the theory that

9   has been adhered to in California and it is the theory that

10  was adhered to in the Riverside case.  I have checked that

11  case again.

12      In the Riverside case you had the situation where, with-

13  out making any filing with the State of California, they

14  acquired an appropriative right to use water.  Where?  They

15  simply pumped it out of a basin.  And anyone subsequent to

16  that first initiation, that use of water, then, was subject

17  to this appropriative right.

18      There is where your question of surplus comes in.  The

19  term "surplus," as used in the California cases and as used

20  by the State Water Rights Board, is surplus over and above

21  riparian and overlying rights.  Not that the basin itself

22  may have a surplus in it.  It might have a deficit in it,

23  really.  But a man can make an appropriation out of that and

24  his priority is fixed as of that time.  The only objection

25  that can be interposed is that he can only make a demand to

P2

1   fulfill that appropriative right if there is a surplus over

2   and above the prior rights in the valley.  That is all.

3       I have read these cases thoroughly.

4       THE COURT:  Well, this is not a full fledged argument.

5       Any comment?

6       MR. SACHSE:  I have one comment, your Honor.  Mr. Veeder

7   says he read these cases thoroughly.  I am going to respect-

8   fully ask your Honor at the earliest opportunity to read

9   Pasadena vs. Alhambra.  He has absolutely misquoted it. Judge

10  Gibson himself -- I can almost quote it -- says if these were

11  appropriations this would be a most simple matter.  All we

12  would have to do is to catalogue them and cut back the first

13  appropriator.  But they didn't do that in Pasadena vs.

14  Alhambra.  They held them to have mutually prescriptive against

15  each other.

16      The statement that these appropriators each could make

17  the later supply the earlier is just plain not true.  Mr.

18  Veeder, you said, clearly and flatly, that as appropriators

19  they had the right to demand the release by junior appropria-

20  tors.  Pasadena vs. Alhambra did not do that.

21      I have only one other comment, your Honor.  With all due

22  respect, I think we are off the base on this.  Mr. Veeder has

23  again created a straw man that makes for fascinating argument.

24  But I would like again respectfully to remind you that what

25  we are basically and fundamentally concerned with in this

P3

1    case is a question of fact.   That is what we are talking about.

2    I am perfectly willing to concede that -- I will say it for

3    the fourth or fifth time, and I hope we will not write pages

4    of brief on this because I am not going to argue it -- that

5    it is possible to obtain an appropriative right to percolating

6    water without compliance with any statutes -- that there is no

7    statute.   I will so concede.

8        So don't brief a lot of it, Bill.   There is no argument

9    about it.   I don't think Fred argues on it.   I don't think

10   George argues on it.

11       What I contend is that these are not percolating waters,

12   and that there is nothing in the record to so establish.   Let's

13   stick to that, your Honor.

14       THE COURT:   I understand that.   But I was thinking I would

15   like to understand his theory also that that factual finding

16   was not made or was overturned.   It would seem to me there

17   were further obstacles.

18       MR. SACHSE:   I think there are some tremendous obstacles.

19   I think you pointed up a few of them.   One of them is the

20   source.   If these are stream waters, you have to appropriate

21   under the statute.

22       MR. VEEDER:   Oh, no, that is the error.

23       MR. SACHSE:   If these are waters of an underground stream,

24   you must appropriate by statute -- or a surface stream, Mr.

25   Veeder.

P4

1     MR. VEEDER:  Your Honor, there is only one proposition

2  I wish to urge.

3     MR. SACHSE:  Would you give me a break, Bill.

4     MR. VEEDER:  All right.

5     MR. SACHSE:  If these are surface waters of a stream, you

6  must appropriate by statute.  Is that correct?  Surface waters.

7     All right.  What has Fallbrook appropriated?  Surface

8  water of a stream.

9     Now, if these are percolating waters so far removed from

10  the stream -- I don't have Mr. Veeder's brief here, but I

11  will paraphrase it -- as to have lost all contact therewith,

12  something like that.

13     MR. VEEDER:  Oh, no.

14     MR. STAHLMAN:  Please, Mr. Veeder, I would like to listen

15  to Mr. Sachse.

16     MR. SACHSE:  If these have become percolating waters and

17  are no longer part of the subsurface flow of a stream, then

18  they may be subject to this type of appropriation.  But he is

19  then appropriating waters that aren't part of the stream and

20  he is on the horns of a dilemma.  If the waters he is

21  appropriating aren't stream waters, what right has he got to

22  reach to someone who appropriates waters from an entirely

23  different source, an entirely different kind of appropriation?

24     You put your finger on what could become a very complicated

25  legal argument.  If your Honor finds that these are percolating

P5

1    waters, then we get into the very difficult question of what

2    he appropriated, how much, from what source, and against whom

3    does he have rights?  He has rights against some people and

4    for certain things.  But we can't even discuss it until we

5    determine the factual question of are these percolating waters

6    or are these waters confined within the banks and of the

7    subsurface flow of the stream.  Having determined that, as I

8    contend, the whole controversy is over, if it is part of the

9    stream.  If you determine it, as Mr. Veeder contends, we run

10   into some rather complicated legal questions about what his

11   rights are to reach upstream.

12      MR. STAHLMAN:  You have some other very complicated

13   question, too.

14      THE COURT:  Mr. Girard, do you have comments?

15      MR. GIRARD:  I am not going to get involved in this

16   argument on this point because I basically agree that it is

17   a factual question.

18      But I want to make one thing perfectly clear, your Honor.

19   Insofar as determining whether there are surplus waters is

20   concerned, in my opinion at least, you have to look solely

21   to the basins or the River or whatever you want to call it

22   at Camp Pendleton.  Now you have the three units, the one

23   basin at Camp Pendleton.  Now let's assume that the safe annual

24   yield of that basin is 10,000 acre feet of water.  Under no

25   stretch of the imagination can the United States reach up and

P6

1    demand from the upstream people that more than 10,000 acre

2    feet go back into that reservoir.  In other words, they cannot

3    in effect, have a 10,000 acre foot reservoir and demand

4    20,000 acre feet intake.  There may be a surplus on Camp

5    Pendleton, but the surplus was created not by the use outside

6    the watershed.  The surplus, if any existed and if there was

7    any unappropriated water on Camp Pendleton, and the only

8    reason there is surplus -- and I concede there might be -- is

9    because they haven't exercised their overlying rights.

10    THE COURT:  Is there proof in this record of the safe yield

11    of those basins in Pendleton?

12    MR. GIRARD:  The only evidence I am aware of -- and I was

13    not in the case originally -- Mr. Illingsworth put in some

14    testimony that showed the safe annual yield of the basin, if

15    you cut off the flow at Temecula Gorge.  There may have been

16    some other evidence.  I may not be right on that.

17    MR. STAHLMAN:  I think you are right.

18    MR. VEEDER:  I will tough on that in the brief.

19    MR. GIRARD:  But by no stretch of the imagination can you

20    get an appropriative right above the amount of water physically

21    available for use in your basin.

22    THE COURT:  What were the figures on the safe annual yield

23    of the basin?

24    MR. VEEDER:  10,000.

25    MR. GIRARD:  I would ask Colonel Bowen.

COLONEL BOWEN:  10,000.

MR. GIRARD:  That assumed a cutoff at the gorge rather than --

MR. VEEDER:  That point is not involved here, your Honor.

THE COURT:  Let me ask you this.  What are you going to contend for now?  What is your final position?  Are you going to contend for 3,000 acre feet?

MR. VEEDER:  It would be approximately 3,000 acre feet. I am checking with Colonel Bowen on this.  There was exportation of approximately 3,000 acre feet prior to the time that Vail Company made its filing.  I think there may be a few hundred acre feet more in regard to Fallbrook.

But your Honor -- do you want to hear from George -- I'd like to make one extremely important point here.

THE COURT:  Make it in your brief.

MR. VEEDER:  All right, your Honor.

THE COURT:  Let me ask you this.  The appropriative rights of Vail, how many acre feet in that reservoir?

MR. STAHLMAN:  There is about 49,000 capacity, but the appropriation is 40,000.

THE COURT:  And Fallbrook's is what?

MR. SACHSE:  The planned reservoir capacity is approximately 35,000.  The permits are not to exceed 30,000 acre feet of winter runoff annually.

THE COURT:  Is there any possibility that you gentlemen

could sit still and give the Marine Corps a right to 3,000 . acre feet?

MR. SACHSE:  Not me, your Honor.  I have given, your Honor, I have stipulated all over this place and I am tired of it.

THE COURT:  Somebody told me at one time that the proposition was made to Mr. Veeder to consent to an appropriative right of about 3,000 acre feet.

MR. SACHSE:  I'll go this far, your Honor.  I am perfectly willing to stipulate to certain appropriative rights in Mr. Veeder.  And it could be worked out, because let me remind you -- and what Mr. Girard said is of vital importance -- our permits, which I quoted and on which you have written a judgment, require that we make enough releases to maintain the basin.  Our State permits require that we do so.

Now the United States, being the last user on that stream, as we all know, can take it out whether they have an appropriative right or not.  And if Mr. Girard is right -- and I certainly think he is -- that you can't blow up your capacity by taking more out than there is in the basin, and if we are already required by the State to maintain the basin, I don't give a continental whether they take it out or use it in.  I don't.

But I do care very much of the United States gets a right which it can charge in to Washington on right now and try to louse us up with our financing -- try to prevent our

development of a project.  That is what has me scared.  And

if this case is going to get back to what we started a long

while ago of physical solutions, yes, there is all kinds of

room.  But if it is coming down to court orders where I have

to supply the Bureau of Reclamation on our small project loan

with your Honor's judgments and those judgments can ruin us,

then I am not about to concede anything.  It is that simple.

The physical fact is that having the water outside the

watershed they are going to get it and we can't stop them.

MR. GIRARD:  To point out my problem, your Honor.  Let's

assume this is the Pendleton Basin.  I am only throwing this

figure out for argument purposes.  Let's assume there is

10,000 acre feet safe annual yield in this basin.  In deter-

mining the crucial question of appropriation, the question is

whether there is surplus water.  Certainly there can't be

surplus above the 10,000 acre feet, because the size of the

basin completely prohibits anything above 10,000 acre feet

being surplus.  Let us assume there is enough irrigable land

where the exercise of overlying rights -- again assuming these

are percolating waters as distinguished from stream waters --

there is 20,000 acre feet of water that could be used on the

overlying land, let us assume.  As a matter of fact, I think

probably 4,000 acre feet of water is being used on the over-

lying land at Camp Pendleton now or somewhere in that neigh-

borhood.  Then there would be presently available for

P10

1   appropriation 6,000 acre feet of water, which would be surplus

2   water, not because of anything other than the fact that the

3   overlying uses were not being exercised.

4      THE COURT:  Of course, that doesn't mean a thing anyhow,

5   because since the United States is the last user on the basin

6   it doesn't make any difference if they are using only 4,000

7   acre feet and that the safe annual yield is 10,000 acre feet.

8   This 6,000 acre feet which they would have a right to use for

9   riparian uses they can take out of the basin.  Nobody cares.

10     MR. GIRARD:  There is no question on that.  But it does

11  make a difference to Mr. Veeder, I think.  Let us assume that

12  we have this situation:  4,000 acre feet of water here being

13  used, but all used on overlying land.

14     MR. VEEDER:  Within the watershed.

15     MR. GIRARD:  If it is used on overlying land, it would be.

16     MR. VEEDER:  That is what I am saying.

17     MR. GIRARD:  Proper overlying use.  You have a use outside

18  the watershed of 4,000 acre feet.  And assume there is a

19  valid appropriative right because of percolating waters, say,

20  of 1941.  Then the crucial question is whether they can reach

21  upstream and require recharge to the extent to satisfy their

22  overlying uses and their 1941 priority date by reaching

23  upstream.

24     Mr. Sachse has raised the one problem that if it is

25  percolating water it is not part of the stream water.  I am

P11

1    not going to get into that problem.  But if in fact it is the

2    same water I think they probably could -- in other words, they

3    would have a right to reach upstream.  They would have to

4    thoroughly show that the water they are reaching for is water

5    that could get in there.

6        But it is important to the United States, I think, in all

7    fairness, that if they do have an appropriative right it is

8    subject to surplus water which is the maximum amount of the

9    basin yield.  If overlying rights are raised and the surplus

10   has to be cut down, say overlying rights raised up to 10,000

11   acre feet, then regardless of any upstream  they have no

12   appropriative right because there is no surplus in their basin.

13   But if the overlying uses are within the safe annual yield,

14   assuming all these other facts, they would have an appropria-

15   tive right and quite possibly could reach upstream and make

16   a demand upon junior appropriators to the extent that they

17   could physically show something.

18        THE COURT:  This is based on the premise that this is

19   percolating water not part of a known and defined channel.

20        MR. GIRARD:  That is the crucial question.  I agree with

21   Mr. Sachse that these arguments are premature until that

22   factual question is decided.  At least I, myself, am not

23   too concerned with Mr. Veeder's arguments on this now, because

24   I would rather have the factual question briefed on what the

25   record in this case shows to indicate that these are

P12

1  percolating waters as contrasted to waters in a know and

2  defined channel.  As far as I am concerned, I would like to

3  emphasize my position that that will be made a lot clearer

4  when we argue this.

5      I don't care what the facts in another case show unless

6  the Court was specifically concerned in its decision with this

7  point of what is the known and defined channel.  We are

8  concerned with the facts in this case, not facts in other

9  cases, unless the Court was concerned with that very point.

10     I know, for example, in the decision by Judge Ault, I had

11  occasion to discuss that briefly with Judge Ault and he had no

12  recollection of anyone even citing the Pomeroy case.  If some

13  lawyer wants to try a case without citing the leading

14  authority on it, I don't want to be bound by any interpretative

15  analogies there when they didn't.

16     THE COURT:  I talked to Judge Ault.  He told me the same

17  thing.

18     MR. VEEDER:  I want the record on this point to bear out

19  my conversation with Judge Ault.

20     THE COURT:  Oh, well.

21     MR. VEEDER:  Now let me --

22     MR. STAHLMAN:  There is what we get into when we are

23  talking about hearsay.

24     MR. VEEDER:  Why can't I go ahead on this Pomeroy matter,

25  your Honor?  The question came up.  I said, "You were relying

P13

1    primarily on Pomeroy."  He says, "Well, Hutchins differentiates

2    between Pomeroy and --

3         THE COURT:  All right, you said it.

4         Where do we go from here?  Your brief, you say, will be in

5    by Thursday?

6         MR. VEEDER:  Yes, your Honor.

7         THE COURT:  Do you think we can argue this by Friday?

8         MR. VEEDER:  I am most anxious.

9         THE COURT:  Have you given counsel the data they asked you

10   to get on some of these matters?

11        MR. VEEDER:  Yes, your Honor.

12        MR. GIRARD:  He has given me the data by two phone calls

13   and by the conversation last week.  I am ready to argue it the

14   minute he puts it in my hand.

15        THE COURT:  I would like to have a chance to read it

16   before you argue it.

17        MR. VEEDER:  I think your Honor knows that Mrs. Tooker's

18   mother died and she was not here yesterday.  That held me up.

19   Mrs. Tooker is back.  Colonel Bowen very kindly provided me

20   with a secretary.  I have been progressing, but not as rapidly

21   as I thought I would.

22        THE COURT:  What other matters this morning?

23        MR. STAHLMAN:  The Murrieta findings.

24        MR. GIRARD:  Let me give Judge Carter the copy to be

25   attached to these last ones I filed.  These are the remaining

17,939

P14

1  conclusions of law on that September 15th document that should

2  be stapled on the end.

3      THE COURT:  This is part of the Murrieta findings?

4      MR. GIRARD:  Yes, the judgment and the last couple of

5  conclusions of law.  It should be stapled on to the copy I

6  left with your secretary to give to you last week.

7      THE COURT:  We will take a recess before we go into it.

8  I haven't studied them.

9      What else do you have to take up?

10     MR. VEEDER:  That is an extensive job.

11     MR. GIRARD:  I think that will require a couple of days.

12     MR. STAHLMAN:  I would like to make this suggestion.  Mr.

13  Sachse, Mr. Girard and I have gone over these findings and we

14  are substantially in accord with them.  There are some minor

15  changes that we will suggest.  I don't think they will affect

16  the basic fundamental objective of the findings.  But Mr.

17  Veeder has some objections to them.  I think we ought to hear

18  him, and when we straighten that out we will not have any

19  difficulty getting them in shape, as far as I am concerned.

20     THE COURT:  Let me look at them.  Take a short recess.

21     (Recess.)

22     (The matter was continued until 2 o'clock P.M. of the

23       same day.)

24

25

#3fls.

17,940

t18
3

1    SAN DIEGO, CALIFORNIA, TUESDAY, SEPTEMBER 19 1961, 2:00 P.M.

2                                    - - -

3         (Other matters.)

4         THE CLERK:  Eight, 1247-SD-C, United States vs.

5    Fallbrook.

6         THE COURT:  Mr. Clerk, you may be excused.

7         THE CLERK:  Thank you, Judge.

8         THE COURT:  Well, we are talking about proposed

9    Interlocutory Judgment No. 30, Murrieta-Temecula groundwater

10   area.  What are your views on this, Mr. Veeder?

11        MR. VEEDER:  Your Honor, I have studied this with great

12   care with Colonel Bowen and with the principal witness on

13   this particular matter, Mr. Kunkel, and I truly don't

14   believe that the record would support the findings as

15   proposed.  I will give your Honor an example of Finding No.

16   XI.

17        MR. SACHSE:  Give us the page and line, please, Bill.

18        MR. VEEDER:  Page 4, Finding XI, Line 22 to Line 29.

19   The statement is made:

20        "That the Elsinore and Wildomar faults consisting

21   of materials so lacking in permeability as to

22   constitute a barrier to groundwater movement effectively

23   contain the groundwaters within the areas of younger

24   and older alluvium which lie between said faults and

25   do in fact, as to said groundwaters, serve the same

t19

1          purpose as an impermeable bank of a surface stream

2          channel."

3            Well now, your Honor, our view is that certainly

4  the Elsinore fault, as depicted on any of the exhibits, can't

5  be treated as an unbroken line or fault which could

6  conceivably be viewed as a container.  That is also true

7  of the Wildomar fault, which is to the north and east of

8  Murrieta Valley, as used here.  But I truly believe that you

9  couldn't, and I don't believe your Honor could find facts

10  that would warrant the conclusion that the Elsinore fault

11  does border the Murrieta Basin, because it doesn't.

12          The fact is that on Exhibit 15-E it is only inferred

13  very lightly down here right at the canyon mouth of the

14  Temecula Gorge.

15          MR. STAHLMAN:  Exhibit 15 is more pronounced, Mr. Veeder.

16          MR. VEEDER:  The references here are to 15-E.

17          MR. GIRARD: I think there is a 15, Mr. Veeder.

18          MR. VEEDER:  In any event, whether it is 15 or 15-E, I

19  would say that you couldn't treat it as a boundary of the

20  stream.

21          I also believe that would be true, your Honor, and I

22  don't believe you could make that finding, that the Wildomar

23  fault would be an impermeable container.  In fact, the

24  testimony by the experts from the State of California

25  indicated that it was not an impermeable barrier and would

t20

1    not be a container of the character referred to.  I think

2    we must first look  at that conclusion that is embraced in

3    this finding, and I just don't believe it would stand up.

4         THE COURT:  Let me ask you.  Is your concern the fact

5    that ultimately there is a finding that there is a surface

6    and subsurface stream down in the Murrieta and Pauba?

7    Is that your ultimate concern?

8         MR. VEEDER:  My ultimate concern, your Honor, is to

9    have the facts found as they truly are.

10        THE COURT:  Mr. Veeder, how can we do business unless

11   you are frank about these things?   Are you going to attack

12   also the findings in Pauba Valley where there is no fault

13   line but where the older alluvium is given the characteristic

14   of some sort of container?

15        MR. VEEDER:  Again, I would say, as I say here, the

16   evidence will not support it.

17        THE COURT:  Then you are --

18        MR. VEEDER:  I am going to raise that point, yes, your

19   Honor.  And I don't want to be in the position of attacking

20   these.   I am truly concerned about them now -- I am greatly

21   concerned -- how to handle this thing without being charged

22   with being an obstructionist.

23        For example, look at Finding X:

24        "That the groundwaters within the younger and

25        older alluvial deposits between the two faults move

t21    1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

in the identical direction of the surface of

Murrieta Creek; i.e., southeasterly toward Temecula

Gorge."

I don't believe the move in identical directions.   I

believe, your Honor, that what occurs when water encounters

these highly permeable surface sands is that the water

entering those sands goes vertically down.   I think it goes

vertically down.

THE COURT:  After it goes down vertically, where does

it go?

MR. VEEDER:  Ultimately it goes to the groundwater

table, however deep it is.

THE COURT:  Then where does it go after it hits the

water table?

MR. VEEDER:  When it hits the water table its course is

controlled by the sands and gravels and the clays that it

encounters.

MR. GIRARD:  After it gets down to the bottom, where

does it go?  I would like to ask the Judge's question.

MR. VEEDER:  It goes out horizontally, it goes out in a

myraid of directions.

MR. GIRARD:  Does it go the same direction as the

surface stream?

MR. VEEDER:  No, not necessarily.

MR. GIRARD:  Then what you are saying, in effect, is that

17,944

t22  1    it doesn't contribute at all to Camp Pendleton.

2         MR. VEEDER:  No, I don't say that at all, your Honor.

3    I think the water that goes down to the ground water body

4    are in this shape -- referring again to Exhibit 15.  As you

5    view part of these findings, we have water -- it is entirely

6    possible to go in a reverse gradient.

7         MR. GIRARD:  I agree with that.

8         MR. STAHLMAN:  What is the natural state of the movement?

9         MR. VEEDER:  In the natural state, I believe that is the

10   situation.  In the natural state, your Honor, it is dependent

11   entirely upon the depth to groundwater.

12        THE COURT:  Some of the arrows placed on this map by your

13   own witnesses show the movement downstream, and your pumping

14   elevations -- one thousand feet, 1,025 feet, 1,050 feet --

15   show the movement in that direction.  There is no question

16   about that.

17        You do have a point on the  fault.  As I recall, Wildomar

18   fault, the evidence showed, is not completely impermeable;

19   that there is water that passes over and through the fault.

20   It is certainly more impermeable than the older alluvium.  But

21   I think the evidence showed that it passed over and through

22   the fault   from the older alluvium into the younger alluvium

23   at various places along the fault.  In fact, the fault was

24   the cause of the rising groundwater in various places

25   immediately near the fault line -- the Wildomar fault.

17,945

t23

1    I don't care.  That Wildomar fault is, in most places,

2    pretty close to the contact between the older and the younger

3    alluvium.  The Elsinore fault may be a little different.  If

4    you wanted to take the older alluvium as being the container

5    with the younger alluvium in Murrieta Valley representing the

6    surface and subsurface flow of the stream, I would be content

7    with that.

8        I want you to talk facts to me.  You know the evidence.

9    If you have some points about the use of those faults --

10   although I didn't contemplate  that you would even raise

11   any question about them, since I don't see how material it

12   is.  More important is the problem in Pauba Valley and Santa

13   Gertrudis  where the containers, in the findings as proposed,

14   would be the older alluvium. And there again, of course, the

15   evidence shows that there could be an interchange of water

16   between the older and younger alluvium in either direction.

17   It is more apt to be from the older to the younger because

18   most of the pumping is in the younger.  On the other hand,

19   the movement is not to the same extent as in the younger

20   alluvium, and the more permeable alluvium constitutes sort

21   of banks for the underground flow.

22       MR. VEEDER:  Your Honor, now to me, based on what I have

23   observed in this case, I truly can't believe that there is

24   evidence which would support a declaration that the surface

25   flow in the ground water percolating through the older and

17,946

younger alluvium are one and the same stream.  I just don't
believe the evidence supports that.

THE COURT:  You have no doubt that the groundwater
contributes?

MR. VEEDER:  I believe it does contribute.

THE COURT:  There is no doubt but that the groundw ater
and the surface water both contribute to the water which might
flow across at the Gorge?

MR. VEEDER:  I think that is true.

THE COURT:  What you have your mind on, then, are beds
and banks of streams and how these findings might affect
a finding down in Pendleton.  Is that correct?

MR. VEEDER: I think that the elements are there.

THE COURT:  Your concern with these findings is because
of the effect they might have on findings we draw on
Pendleton.

MR. VEEDER:  No, I truly believe this, your Honor,that
you can view this whole area as an area of percolating water
which moves on down and when it reaches the Gorge it comes
to the surface and flows on through.  But I truly don't
believe that we can say there is a  scintilla of evidence
which would say that the surface flow and the waters
percolating through Murrieta Basin -- when I say "basin" I
mean the whole area  -- could be considered together.   I
think that when you get down here where the waters come to

t25

17,947

1    the surface you have a surface stream.  But I believe back

2    here, your Honor, I don't believe there is any evidence in

3    the record  or that any witness ever testified that the sub-

4    flow was identical with the surface flow or that it proceeded

5    along with the surface flow.

6         THE COURT:  What is it you want me to find?  That this

7    is a groundwater area?  This is your idea?

8         MR. VEEDER:  Yes.

9         THE COURT:  And that this isn't in known or defined

10   channels?

11        MR. VEEDER:  That it is percolating water.  This is

12   what I would like to have you find, and I think it would be

13   supported.  I think that the area within the Bowen line is

14   a continuous body of percolating ground waters which are a

15   part of the Santa Margarita River system and that they

16   contribute to the flow at the Narrows.

17        MR. STAHLMAN:  That is in the findings notwithstanding.

18        THE COURT:  As a practical matter, if we went that

19   route and didn't go the route proposed by Mr. Girard in

20   these findings, as far as this groundwater is concerned

21   above the Gorge the net effect is no different one way than

22   it is the other.

23        MR. VEEDER:  I think it is.

24        THE COURT:  How are anybody's rights affected one way

25   or the other?

17,948

MR. VEEDER:  Because I have tried very hard in following these facts through to say that a man who borders upon the Wildomar fault is riparian to Murrieta Creek, and I simply said that that can't be.  Because he would be abutting upon the fault, and I believe that the law is that he must abut upon the bank of the stream.  And the bank of the stream, as used --

THE COURT:  But under your proposal that we find this ground water area, these people in that area are all either overlying owners or riparian owners.

MR. VEEDER:  That is correct.

THE COURT:  And there is no substantial difference between their rights, is there?

MR. VEEDER:  I think, though, that the man whose lands are traversed by or abut upon Murrieta Creek, actually upon the bed and banks of the stream as contemplated under the law, has a better right than the man who is just overlying.

THE COURT:  Why?

MR. VEEDER:  I think he is so situated that he does have a better right.  I think the riparian right plus the overlying right  is an advantage.

THE COURT:  Let's take an example.  You want us to find , if we do find there  is a stream down in Murrieta, that it is this little dry wash that meanders across the younger alluvium. Is that right?

17,949

t27

1    MR. VEEDER:  That is what I would ask, your Honor.

2    THE COURT:  And I take it that it would be 10 to 50 feet

3  wide at the best?

4    MR. VEEDER:  I wouldn't want to say  whether it is 50 feet

5  wide or not.

6    THE COURT:  Let's say it might be a hundred feet wide.

7    MR. VEEDER:  It might be.

8    THE COURT:  But this is the part of the stream you want

9  us to look at?

10    MR. VEEDER:  I think the bed and banks of the channel

11  of the stream is what makes land riparian.

12    THE COURT:  You say this man who borders  on this dry

13  creek has superior rights to the fellow who is just overlying.

14  Let's draw the Murrieta dry bed you are talking about.  Here

15  is the Murrieta Valley, and let us say that here is the

16  dry bed of the stream, of various sizes, that comes down.

17  Here is a man who has land that borders on this dry creek.

18  And upstream from the Gorge, except for rising water above

19  the Gorge, it is dry except in wintertime.  Is that right?

20  You have a little rising water down here near the Gorge.

21    MR. VEEDER:  You have rising water         right at the

22  Vail Company line.

23    THE COURT:  But you don't have any rising water up here

24  in this creek bed.  You have some rising water along the fault

25  line.  But you don't have any in this creek bed.

t28    1           MR. VEEDER:   I believe until it was pumped down the

2      water was further up Murrieta Creek.

3           THE COURT:   If we go back far enough we might find

4      that it ran all of the time.   But within the memory of man

5      there is no water in the summertime running up there that we

6      know anything about.   There is no water running in this bed

7      of Murrieta Creek, except the rising water down near the

8      Gorge.   That is what the evidence shows, isn't it?

9           MR. VEEDER:   By and large.

10          THE COURT:   Here is this man bordering on this creek.

11     And right next to him over here is a man with acreage who

12     doesn't border on the creek.   You mean that this man  A has

13     any better rights than B has?

14          MR. VEEDER:   I truly do, your Honor.

15          THE COURT:   If this creek ran with water --

16          MR. VEEDER:   Well, it runs with water during the winter.

17          THE COURT:   And that is an illusory right we all agree.

18          MR. VEEDER:   I would say if I came to you and said,

19     "Your Honor, you have your pick of Tract A or Tract B,"

20     and they are the same size, I think that you would take

21     Tract A.

22          THE COURT:   Mr. Veeder, you know we are never going to

23     get anywhere in this case in settling these problems unless

24     we all try to be honest.

25          MR. VEEDER:   I am trying.

t29

THE COURT:  The only water that runs in front of A's property is in the winter and then he can't use it.  And here is B, who is not riparian to this dry bed you are talking about but overlies just as A does.  If A wants to get water he has to put down a well.  If B wants to get water, he has to put down a well.  Neither of them is going to get any water out of the creek.  Actually, they are both overlying owners, and the fact that A happens to abut on a dry creek bed which has water in the wintertime doesn't do a think for him.  I don't know of any farmer in the Murrieta Valley who is taking irrigation water out of the creek, do you?   It is all by well pumping.

MR. VEEDER:  I think there is a man down there that has a small reservoir.

THE COURT:  Oh, there are some reservoirs up here along the fault line.

MR. VEEDER:  May I have the 29-Series.

THE COURT:  The reservoir and the little ponds are all up along the fault line.  They are not down at the bottom.  I don't know of anybody that is taking water out of the creek to irrigate even a garden.

MR. SACHSE:  If he has, we haven't found any appropriative rights, because there haven't been any suggested, your Honor.

MR. GIRARD:  Also I would like to point out to your Honor that Mr.  Veeder represents the United States.  He doesn't

17,952

t30

1    represent those people up there.  Every lawyer in the case

2    who represents those people up there wants to treat it this

3    way.  As far as the United States is concerned downstream, it

4    can't make any difference because they have a correlative

5    right to all that water regardless of what type of right it

6    is.

7         MR. VEEDER:  Mr. Girard, with no desire to be captious,

8    Mr. Krieger just received your findings, so I don't believe

9    he is aware of some of these things.

10        MR. GIRARD:  I think Mr. Sachse talked to him.

11        MR. SACHSE:  I talked to him yesterday.

12        MR. GIRARD:  He hasn't talked to me, that is true.

13        THE COURT:  The reservoirs that Mr. Veeder points out

14   are on the fault line and far removed from the dry bed of

15   the creek.  (Referring to map exhibit.)

16        MR. VEEDER:  I will say this, your Honor.  I can't

17   prevent a finding and I certainly don't want to be in the

18   position of obstructing.  I will say this, that I truly can't

19   believe that we can say that these people clear to the

20   faults both ways are riparian to Murrieta Creek.  You can

21   overrule me  and that would be it.  Because I don't want to

22   take any more time on it.  I have made my position to your

23   Honor and that is truly my belief, that as a matter of law

24   we simply can't say that those people who are overlying

25   owners and who do not abut upon or traverse the stream are

17,953

t31

1    riparian to the stream.  I don't believe it would be correct.

2    MR. SACHE:  May I offer a thought here, your Honor.  As

3    far as I am concerned now -- and on my very limited clients

4    in this area this would have no effect -- I frankly don't care

5    very much whether we use the fault line or whether we use,

6    as   your Honor said, the line of contact between the younger

7    and the older alluvium or the line of contact between the

8    older alluvium and the basement complex even, which is about

9    where Colonel Bowen drew his line -- at least on the west

10   side of the Murrieta.  It truly doesn't matter to me, because

11   I think your Honor has hit the nail right on the head that

12   the critical thing here is how will this decree be operating

13   in the years ahead.  I think some day some individual owner

14   -- if the United States is satisfied, Fallbrook is satisfied,

15   Vail is satisfied -- still the probability is that sooner or

16   later individual owners are going to come in here with orders

17   to show cause.  There probably will be  trouble.  And I think

18   it is going to be imperative that we define this stream with

19   its bed and its banks.

20   I want to say one thing on Mr. Veeder's first remark

21   about the bed and the banks.  He emphasizes the fault is not

22   impermeable and that it has breaks and fractures.  To me

23   that means nothing.  If your Honor will just consider for a

24   minute any one of the hundreds of little surface streams that

25   you have seen running in the Sierras or places like that.  In

17,954

t32

1   places they run between a couple of rocks that as nearly

2   impermeable as they can be.  I am talking about the surface

3   stream.  Right next to it is a little puddle of sand.  Has

4   the bank ceased to exist?  Then a little further on  there

5   will be a cut bank of clay.  It is still a bank.  That is

6   the bank of the stream.  In the springtime when the snow

7   melts the water percolates out of the adjoining ground into

8   the stream and when the snow is done melting and it gets

9   dry it percolates from the stream the other way.  But it is

10  still the bank of the surface stream and no one can argue

11  that.

12       And the bank of an underground stream can be exactly

13  the same kind of physical situation.

14       THE COURT:  Where is Exhibit 15?

15       MR. SACHSE:  That is the big one.  Here it k is.

16       THE COURT:  When you get down to the area within a mile

17  of the Gorge the younger alluvium narrows down and it is in

18  that area that part of the surface flow of Murrieta Creek

19  shows up and you have a large area of older alluvium inside

20  the fault line.  But I would say that in an area such as

21  the mile and a half above the Gorge the bed and the banks

22  of the stream would be definitely here -- the older alluvium

23  and basement complex -- and in fact the stream rises to the

24  surface there because the stringer of alluvium narrows and

25  you don't have the wide breadth of the younger alluvium -- it

17,955

t33

1   narrows down and is probably one of the reasons why your

2   stream is coming to the surface.  As a matter of fact, when

3   you get down to the Gorge itself it goes through a narrow

4   defile between the older alluvium and the basement complex.

5        MR. VEEDER:  The basement complex is very near the

6   surface.

7        MR. GIRARD:  I have no objection to that.

8        THE COURT:  Well, we have to settle this thing.  I would

9   say that I don't mind the findings on these fault lines and

10  how they run in many places parallel to the line between the

11  older and the younger alluvium.  But it would seem to me that

12  we would be more accurate to say that the underground stream

13  is the younger alluvium lying between the older alluvium on

14  either side.

15       MR. GIRARD:  The younger alluvium between the older

16  alluvium on each side in Murrieta.

17       MR. SACHSE:  That is what the findings would find in

18  Pauba Valley.

19       THE COURT:  Yes.

20       MR. GIRARD:  All right.

21       MR. VEEDER:  What would be the bottom, then, of this

22  stream?  Would it be basement complex?

23       THE COURT:  In most instances it is probably the older

24  alluvium.

25       MR. VEEDER:  Where would that be then, your Honor?

4 dls

P15 Belt4

1    THE COURT:  Lying beneath the younger alluvium.  We know

2  that this older alluvium was laid down first.  We know that it

3  goes to great depths.  We know also that on top of it was laid

4  the younger alluvium and the various wells in there indicate

5  various depths.

6    MR. VEEDER:  I don't believe the State or anyone else has

7  found where the contact is between the older and the younger

8  alluvium.

9    MR. GIRARD:  I would like to point out that I agree that

10  there is certainly some uncertainty as to the contact between

11  the older and the younger alluvium.  In the Pauba and the

12  other valleys I just said the ground waters lie beneath and

13  within the younger alluvium.  I realize there is possible

14  inconsistency there, but it was on the basis of efficient

15  management of the judgment.  I think you pretty well have to

16  be arbitrary there if you just say it is in the younger

17  alluvium and not in the older alluvium on the bottom everytime

18  somebody drills a well he doesn't know whether he is drilling

19  under a riparian or an overlying owner.  There may be some

20  areas where you might be able to test it on the basis of the

21  salt or some other change in the water.  Maybe in the Pauba

22  area.  But I just felt that in the interests of practical

23  aspects of it I would treat anything drilled in younger

24  alluvium and even if it went down into the older alluvium

25  the same as a younger alluvium well.  I am a little skeptical

P16

1   on how it would work if you had to say that the wells in the

2   older alluvium beneath the younger alluvium were not within

3   the stream, because I think in every case then you would be

4   arguing where the water came from every time you drilled a

5   well.

6       MR. SACHSE:  I agree, your Honor, and Mr. Girard's language

7   is on page 6, line 24, Finding XXI -- this is speaking of the

8   Pauba:

9           "That the ground waters which lie beneath and

10      within . . "

11  Maybe it would be better to say "within the areas of younger

12  alluvium and beneath them."  But he has it there.  In other

13  words, anything which lies within or beneath is part of the

14  stream.

15      MR. GIRARD:  I realize that it is somewhat inconsistent

16  to say that the banks on the side of the older alluvium act

17  as a bank and they don't at the bottom when you have the same

18  material.  But I don't know how else you would treat it.  I

19  don't think as far as the United States goes, again I

20  emphasize, that it makes the slightest bit of difference.

21  Their rights up there are the same whether it is overlying

22  or riparian.

23      THE COURT:  Then you wouldn't suggest that we merely say

24  that the bed and banks are the older alluvium and then if a

25  question ever should arise that some well is put down, face

P17

the issue at that time as to whether the well was within the stream or within the older alluvium. Modern drilling and proper logging would probably tell you. A lot of the old logging was not done efficiently. I don't know what difference it would make. There are correlative rights between the older and the younger alluvium.

MR. GIRARD:  It wouldn't make any difference to the person who owned the land at all.

THE COURT:  I don't know it could ever come up.

MR. GIRARD:  As Mr. Sachse pointed out, the only point that would ever come up would be in case somebody was appropriating outside the watershed. But that is not happening up there. It is not happening down at Pendleton because their's isn't founded in older alluvium.

MR. SACHSE:  It could happen, your Honor. I don't want to borrow trouble, but I guess let's face it. Someday the Vail Ranch will be broken up, and when it is broken up it will cease to be a single large riparian ownership. And let us say the Navy well, for all we know, he might pump out of the Navy well clear over into Long Canyon. And then what is he pumping? That is when your problem could arise.

MR. GIRARD:  Regardless, even if he did that, if he had one contiguous ownership.

MR. SACHSE:  That is two surface watersheds.

MR. GIRARD:  It would still be overlying. If he didn't

P18

1   have the contiguous ownership, he wouldn't have a right either

2   as overlying owner or as riparian owner.

3        MR. SACHSE:  I think we ought to hear from George on this.

4   He is the one concerned.

5        MR. STAHLMAN:  You have this situation, as I see it, your

6   Honor.  I think you have to define your bed and banks, as Mr.

7   Sachse said, sometime in the future.  You have to know where

8   your riparian rights attach as distinguished from your over-

9   lying rights.

10       THE COURT:  Why?  Why do we have to worry about this?

11  Why can't we say that there probably bed and banks on the

12  Murrieta and the Pauba, but that since the rights between the

13  older and the younger alluvium are correlative that we treat

14  them all as overlying rights?

15       MR. STAHLMAN:  And not define any stream system whatsoever?

16       THE COURT:  You can define the stream system of the streams

17  that flow down in winter in these areas of younger alluvium.

18  But suppose we didn't make a finding; just dodged the question

19  of riparian ownership.  How has anybody been hurt on these

20  dry streams?

21       MR. STAHLMAN:  I don't know whether I have a sufficiently

22  sound basis for making this statement, your Honor.  But you

23  have two different types of material.  We have found out from

24  the evidence here that those wells that are productive are

25  those which are near the stream system, like the Roripaugh

P19

1   well, and it would become a question then as to where you are

2   off the side your likelihood of getting it recharged from the

3   stream would be far less than it would be on the stream.  And

4   you attempt then to correlate the rights of those people with

5   those who are on the stream and the very basis of the riparian

6   right is that the person happens to be in the fortunate

7   position of owning property that is on the stream.  So I think

8   there is an advantage to being on the stream near the source

9   of recharge.

10      THE COURT:  There is an advantage in actuality for a man

11  who owns property over the younger alluvium.  But is there any

12  advantage to him for us to find that he is a riparian owner

13  rather than an overlying owner?

14      MR. SACHSE:  Not advantage to him.  But I can draw you a

15  picture where this problem can arise.  This is Temecula Creek,

16  this is Murrieta, this is Long Valley.  Here is your surface

17  water divide between the two.  The Vail Ranch is partitioned.

18  This is the older alluvium, this is Yal.  The Vail Ranch is

19  partitioned, we will say, and a man buys a piece of property

20  like this which includes the Navy well down here.  His adjoin-

21  ing landowner is right here.  If this man is riparian, can he

22  pump to here against the objection of B?  And then the same

23  question, if he is overlying, can he pump against the objection

24  of B?  It can arise.  There can be trouble.  If he is riparian,

25  it can't.  He is taking out of the watershed into another

P20

1   surface watershed.  But if he is overlying and this is a

2   single large basin, he can't.  So there is a distinction.  It

3   could create problems in the future.

4       I don't see any objection of your Honor says we will face

5   up to it when the times comes and at that time B will have to

6   object and we will have to decide whether or not he is taking

7   stream water.  But I think we have to realize/that there can be

8   the problem.

9   MR. STAHLMAN:  There is this further situation, your Honor.

10   THE COURT:  Wait a minute.  I want to follow Franz' thought.

11   MR. STAHLMAN:  All right.

12   THE COURT:  These findings of the proposed ground water

13   divide and the surface divide being very close together, the

14   findings would show how the water moves.  Although this is

15   all one area, how can you say that as an overlying owner he

16   can take water from the Navy well and use it across the ground

17   water divide?

18   MR. STAHLMAN:  By doing so, he can appropriate.  If you

19   hold that this ground water in the older alluvium is not a

20   part of the stream, then this might become an appropriative

21   act as well, under Mr. Veeder's theory of exporting it out of

22   the surface watershed by a non-statutory appropriation.

23   MR. VEEDER:  Let me inquire.

24   MR. GIRARD:  This is a surface water divide, not ground

25   water.

P21

1    MR. SACHSE:  It is ground water.  Your Honor points out
2  that they are nearly the same.

3    THE COURT:  That is what the evidence shows.  That they
4  are nearly the same.  That is what the evidence shows.

5    MR. GIRARD:  That is above Long Valley.

6    MR. VEEDER:  The surface water divide and the ground water
7  divide are two or three miles apart.

8    MR. SACHSE:  Are they?

9    MR. VEEDER:  Oh, yes, they are several miles apart.

10    MR. SACHSE:  Bill, I am only showing this as a sample.  I
11  agree that a problem can arise.  That is all I am saying.

12    MR. GIRARD:  If I may say so, using the old Santa Margarita
13  case -- well, here is the Murrieta, here is the Temecula, here
14  is Long Valley.  Aside from the ground water divide you have
15  a watershed here and a watershed here.  As to anyone downstream,
16  all of this land is riparian regardless.  A piece like this is
17  sold and you get a person upstream who is complaining that
18  taking water out of here into Long Valley watershed is improper.
19  And I think under the cases the land which is on the side of
20  the Long Valley watershed, as against upstream people, is not
21  riparian to Temecula Creek.

22    MR. SACHSE:  That is right.

23    MR. STAHLMAN:  The cases have consistently adhered, in
24  determining what constitutes a stream system, to this propo-
25  sition, that they would be the bed and banks and the water

P22

1   flowing in the same direction.  And the presumption is, of

2   course, that water in the vicinity is not a part of the stream

3   system.  I can conceive of a situation where, having sufficient

4   evidence by which the proof has established the fact that this

5   part is part of the stream.  There may be other waters in the

6   area that at this time there is not sufficient evidence by

7   which you could find that they are a part of the stream.  And

8   I think where you have a container such as you have here with

9   the older alluvium and the younger alluvium, that at least

10  insofar as those waters contained within the younger alluvium

11  the proof has fulfilled all of the requirements that the cases

12  have consistently held that there are beds and banks insofar

13  as that water contained in the older alluvium flowing down

14  in the same direction is concerned.

15      MR. VEEDER:  Ground water, George.

16      MR. STAHLMAN:  Yes, ground water.

17      MR. SACHSE:  You mean younger under the older?

18      MR. STAHLMAN:  I am talking about contained within the

19  younger alluvium.

20      We have prepared some findings in connection with the Vail

21  case -- I didn't want to get into that in arguing this, but I

22  think it shows the factual situation.  The factual situation

23  as established by the evidence is demonstrated in the finding

24  that we have.  I will read it if your Honor would like to hear

25  it.  It takes care of that situation, I think.

17,964

P23

1    THE COURT:  Don't read it.  Tell me how it takes care of

2    it.  Do you find just the younger alluvium is the stream bed?

3    MR. STAHLMAN:  The effect of it is that, yes.  However,

4    we do make a finding in relation to what the situation of the

5    other water is that is within the confined strata that is

6    underneath.

7    THE COURT:  Your suggestion, Mr. Veeder, is that we just

8    take the little dry bed of the stream and call that the stream.

9    MR. VEEDER:  I would suggest, your Honor, that we have

10   the Bowen line, which is Exhibit 277, based upon your Honor's

11   tentative findings that this is one ground water area in

12   which all the waters were hydrologically interconnected and

13   that that entire area was percolating water -- it all did feed

14   down through Temecula Gorge.

15   THE COURT:  No dispute about that.  What are you going to

16   do about the stream?  Are you going to just take the dry bed

17   of the stream?

18   MR. VEEDER:  I would take the bed and banks of the stream

19   as they are presently located.

20   MR. STAHLMAN:  What have you got to show where they are

21   located?

22   MR. VEEDER:  We have located them on everyone of these.

23   On this 29 Series you will find the stream.

24   MR. SACHSE:  May I ask a question.  This 29 Series shows

25   an artificial levee.  It has printed on it in large letters

P24

1   "Levee." Is that the bed and banks of the stream in a state

2   of nature?

3   MR. VEEDER:  I am not going to say in a state of nature.

4   It is certainly the bed and banks of the stream now.

5   MR. STAHLMAN:  We happen to know that there has been

6   equipment moved in up there.

7   THE COURT:  Suppose we do have in the record evidence that

8   shows where these little dry beds are, like in the Santa

9   Margarita, and your aerials might show them.  What are you

10   going to do if three years from now they have a flood up there

11   and it cuts a new channel?

12   MR. VEEDER:  The law takes care of that.

13   THE COURT:  How does it take care of it?

14   MR. VEEDER:  Where the channel is after the flood would

15   be the bed and banks of the stream.

16   MR. STAHLMAN:  May I read this finding, your Honor?

17   THE COURT:  All right.

18   MR. STAHLMAN:  Here is the finding we think evidence in

19   this case would support:

20   "Located on Vail Company lands throughout the Pauba

21   Valley, there exists a deposit of younger alluvium, as

22   shown on U.S. Exhibit 15-E.  This younger alluvial fill

23   is composed of porous detritus water bearing material

24   of relatively high transmissibility.  Underlying this

25   area of younger alluvium is a deposit consisting of

of older indurated alluvium, interspersed with aquifers

of porous alluvium.

"A portion of the subsurface waters flowing from

the mouth of Nigger Canyon, at the easterly end of

Pauba Valley, are confined as to their vertical movement

by the impervious lenticular bodies of indurated alluvium.

Waters moving or percolating downstream in the vertically

confined but porous aquifers of the Pauba Valley towards

the semi-barrier of the Wildomar Fault, produce an area

of artesian pressure upstream from said fault.  Said

area of artesian pressure and/or vertical confinement

is below the level of all irrigation wells but the

Navy (and we give the location) well in the Pauba Valley,

and is pierced only by wells over 5,000 feet in depth.

Said artesian waters of the Pauba Valley are part of

the waters of the Santa Margarita River system but do

not directly support the surface flow of said River,

except to the extent that said waters are allowed to

flow from, or are pumped from wells piercing said

vertically confined aquifers of the Pauba Valley."

I think that makes the distinction between the older and

the younger alluvium and comports with the testimony in the

case.

Then we have this finding in relation to Temecula Creek.

"The waters of said creek flow over or percolate

P26

1    through the younger alluvial fill in a westerly direction,

2    a portion of said waters cease to flow, as part of the

3    stream, as they become trapped or confined beneath the

4    impervious layers and bodies which create the artesian

5    belt in the Pauba Valley as described in Finding_____

6    herein.   The confining lenticular deposits, as described

7    in Finding_____here in, form the bed of the Temecula

8    Creek in the Pauba Valley.   This confining layer of

9    lenticular deposits lays gnerally at depths between

10   300 and 500 feet below the surface of the floor of

11   Pauba Valley and has its western terminus at the semi-

12   barrier of the Wildomar Fault.   Water from said confined

13   aquifer may be easily identified by its characteristic

14   high sodium content as compared to low sodium content

15   as is found in the waters from the shallower aquifers

16   in the younger alluvium above the confining, impervious,

17   lenticular bodies of indurated alluvium."

18       I think that is what the evidence in this case clearly

19   demonstrates.   That you have this younger alluvium through

20   which the water percolates with a higher degree of trans-

21   missibility, flows in the same direction within the confines

22   of the older alluvium, and that below that is the water from

23   which the artesian wells obtain their source.

24       THE COURT:   I would be inclined to agree with you, George.

25   I think those findings on Pauba Valley, subject to study,

P27

1    pretty well show what the story is.

2       MR. SACHSE:  I am inclined to agree.

3       THE COURT:  I am inclined to agree that the answer to this

4    is merely to find that the streams underground in Murrieta

5    and Santa Gertrudis are the younger alluvium.

6       MR. GIRARD:  I have no objection at all.

7       THE COURT:  Without necessarily being able to define every

8    place what that depth is.  In some areas we know it, and in

9    some we don't.  That this younger alluvium is the underground

10   stream.

11      MR. SACHSE:  Then if we can in any fortunate case, such

12   as Pauba Valley where we have better information, let's spell

13   it out.

14      THE COURT:  Yes.

15      MR. SACHSE:  I would certainly be satisfied with that,

16   your Honor.

17      THE COURT:  I don't see this business of taking a dry

18   wash and saying this is the stream bed.  Actually, it is not

19   the stream bed.  It varies from year to year.  Anybody who

20   has seen these dry washes in a state of nature knows that you

21   can't predict from one year to the next where the stream bed

22   is.

23      MR. STAHLMAN:  A large portion of this dry wash that Mr.

24   Veeder talks about is man made.  They have gone in there with

25   equipment and diverted the natural channel.

P28

1    THE COURT:  Where the levees are it is obvious that there

2    was flat spreading ground there and they put levees up and

3    attempted to confine the flood flow.

4    I don't see how anybody could be prejudiced by this.  It

5    leaves us open, it is true, for possible argument later on

6    whether a well was drilled into the older alluvium.  But if it

7    ever became material we would try to find out.

8    MR. GIRARD:  All right, your Honor.

9    THE COURT:  Certainly we don't have to decide that now.

10   MR. GIRARD:  That is the younger alluvium is the stream

11   bed up to the contact.  In other words, the stream banks would

12   be the contact with the older alluvium.

13   THE COURT:  Yes.

14   MR. GIRARD:  And the bed will be the contact that the

15   younger alluvium has with the older alluvium.

16   THE COURT:  And I think there can be some spelling out

17   of the function of this, particularly Wildomar Fault, factually.

18   I don't know of any reason why we can't describe the fault and

19   point out the fact that although it is not at all times the

20   exact demarkation, it many places it is very close to the

21   exact demarkation, and that it is more impervious than the

22   older alluvium and that the water from the eastern portion of

23   the ground water areas flows through it and over it.

24   MR. GIRARD:  The Elsinore Fault is, generally speaking,

25   westerly of the older alluvium.

P29

5 fls.

1    MR. STAHLMAN:  It follows fairly close.  There are only

2  a few places where the younger extends over the fault line.

3    MR. GIRARD:  It falls parallel to the contact of the older

4  alluvium and the basement complex.

5    This would, in effect, narrow your stream in Murrieta from

6  what I proposed.

7    THE COURT:  Yes.

8    MR. GIRARD:  I have no objection to it.  That is fine with

9  me.

10    THE COURT:  Mr. Veeder, I saw you consulting with your

11  experts.  Do you have any further comment?

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t34
5

17,971

1    MR. VEEDER:  Your Honor, we feel this way, that

2    alternatively we will simply file objections to these

3    findings as proposed or else we will write a set that we

4    think are appropriate.  I simply couldn't and wouldn't

5    accept these findings as written.  They can go ahead and be

6    filed.  I talked this through very thoroughly with Colonel

7    Bowen over the weekend and we feel that there is no evidence

8    to support this finding of a ground stream any place in

9    there, and we feel also that the evidence is of such

10   character that it couldn't possibly support the conclusion

11   that where wells, for example, the Roripaugh goes down 500

12   feet, that it is tapping a subterranean stream.

13       We suggest that you go ahead and enter these, if you

14   choose.  We will interpose our objections and it will be on

15   that basis.  I think that is the only way we will ever wind

16   the case up.

17       THE COURT:  To what other matters do you object in these

18   findings?  You got off on this one point.

19       MR. VEEDER:  Certainly, your Honor, I have to repeat

20   this once more, that the groundwaters simply do not  flow as

21   a stream.  We feel that it is impossible to accept the

22   terminology.

23       I am just skipping very rapidly because --

24       THE COURT:  Take your time.  Point out any other

25   objections that you have.

MR. VEEDER:  I will.  For example, on Page 6, if you will look at Lines 27, 28 and 29 of Finding VI, it says:

"That the surface flow of Murrieta Creek is between said two faults, . ."

That, of course, is contrary to fact.

". . . but within said area it may vary . .."

THE COURT:  Are you reading from Page 6?

MR. VEEDER:  Finding VI, Page 3, your Honor.

". . . but within said area it may vary considerably and it is quite common for the surface stream to shift its surface bed immediately after or during periods of considerable surface flow."

I don't believe that is correct.

MR. SACHSE:  You don't think that is true?

THE COURT:  I could even take judicial notice of that, I think.

MR. VEEDER:  I don't think the bed shifts after the flow.  It might shift during the flow.

MR. SACHSE:  Okay, take out "after."

". . . immediately during periods of considerable surface flow."

THE COURT:  All right, what is your next one?

MR. VEEDER:  I will give you a general one, to start. I think it is essential that we find the bed of the stream. Do I comprehend that you are going to find it as the older

17,973

alluvium?

THE COURT:  As the older alluvium.   I don't see any other way to do it.

MR. VEEDER:  I have already entered my objection to Finding XI on Page 4.  I say that simply wouldn't be supported. And as I understand it, you are going to change that to the older alluvium.

Now, do I comprehend that on the basis of these changes the waters in the older alluvium will be considered -- would you define for me, your Honor, what the waters in the older alluvium will be?

MR. GIRARD:  That would be covered --

THE COURT:  They are percolating waters, not vagrant waters; they support and feed the stream system, and that there are correlative rights existing between the persons who are overlying owners and the persons who are riparian and overlying on the stream bodies.  Have you any objection to that?  I think that is all spelled out.

MR. VEEDER:  Yes, I do, your Honor, because I truly believe that you have already found long ago in this record that all the ground waters are of the  same character and you didn't differentiate between the older and the younger alluvium.  I think this is a total change from June 1st when we made the finding that there was no evidence whatever for a subsurface flow.

t37

1    THE COURT:  The findings aren't made until they are
2    signed by the Court.  We have tried for size various proposed
3    findings.
4        MR. VEEDER:  Again on Page 6, Finding XVII:
5        ". . . that the surface channel or area of surface
6        flow of Temecula Creek within Pauba Valley is not
7        stable but is often changed during or immediately
8        following periods of considerable surface flow."
9    I don't  believe that it changes afterward.
10        Again I refer to  XXII and XXIII.
11        THE COURT:  "Immediately following" doesn't mean a lot,
12    but ordinarily these changes occur when the stream is at
13    flood, and if it is going to change its course it generally
14    changes it during the flood and not after it.
15        MR. VEEDER:  The very basic objection that I have now
16    that we have moved into the Temecula and Pauba area, and
17    findings that I have been working on in connection with the
18    overall program is that I think it is essential that these
19    findings to which you are now alluding reflect the fact, and
20    particularly XX and  XXI and starting from there forward,
21    that for practical purposes the most important physical
22    factor is Vail Dam; that Vail Dam and the operation of the
23    groundwater area below  Vail Dam is of such character , and
24    I recommend such a finding to your Honor, that Vail Dam since
25    its closure and since the method of operation which Vail

17,975

t38

1  Company is using, the most efficient method of operation is
2  that Vail Dam and their operation of the Pauba Basin are such
3  that for practical purposes they control the entire Temecula
4  Creek and that it no longer can be considered to be in a
5  state of nature.  I think that is the most important thing.
6      THE COURT:  Well, there should be something about Vail
7  Dam, but this is outside the groundwater area.  It should be
8  in the Vail findings, shouldn't it?
9      MR. VEEDER:  The point I make:
10         "That the groundwaters which are contained in
11         said alluvial deposits are recharged by the surface
12         flow of Temecula and its tributaries; . . ."
13  that is not correct any more, because the Vail Company
14  regulates the water that comes out of there, puts into their
15  system, and the water is taken down to irrigate.
16      THE COURT:  What line on Page 6?
17      MR. GIRARD:  The waters in Vail Dam are part of
18  Temecula Creek waters.
19      MR. VEEDER:  I find the first part on Page 5, Finding
20  XVII:
21         "That the ground waters which are contained in
22         said alluvial deposits are recharged by the surface
23         flow of Temecula Creekand its tributaries; . . ."
24  I don't believe this is reflective of the situation.  I think
25  that Vail Company regulates entirely Temecula Creek.  I don't

t39

1   believe that there is any such thing as a surface flow to

2   Temecula Creek any more.  I think Temecula Creek is impounded,

3   then it is released into the  distributive system, and as

4   such whatever recharge goes in there is primarily releases

5   from irrigation.

6       MR. STAHLMAN:  You don't remember the evidence.

7       We have this covered in the Vail Company's findings, your

8   Honor.

9       MR. VEEDER:  Your Honor asked me for my comments.  I am

10  trying to give them to you.

11      THE COURT:  Go ahead.

12      MR. VEEDER:  I think these findings should be reflective

13  of how Temecula Creek is presently operating.

14      THE COURT:  Isn't it true that Temecula Creek, even with

15  Vail dam there, often runs water  in the lower portion of it

16  just before the Gorge?

17      MR. VEEDER:  I think that is true.

18      THE COURT:  There are parts of it that are an intermittent

19  stream.  I have no objection to inserting an X, a statement

20  to the effect that Vail Dam controls Temecula Creek from Vail

21  Dam on down and make a reference to the fact that a full

22  description of Vail Dam and its operation will be contained

23  in another interlocutory set of findings.

24      MR. GIRARD:  That is what I was going to say, because

25  Mr. Stahlman has detailed findings on that.

t40

1    MR. VEEDER: ". . . that Temecula Creek is an intermittent

2    stream which flows on the surface, then disappears under-

3    ground, . . ."

4        I think we should say it is no longer a natural stream,

5    something to that effect, across Pauba Basin.

6        MR. GIRARD:  Because you put a dam on it doesn't affect

7    whether it is a stream in the state of nature.  The riparian

8    rights are the same.

9        MR. STAHLMAN:  The evidence showed, your Honor, that

10   under the permit that we have from the State we have filed

11   reports each year as to the amount of water released from the

12   dam that went into the underground.  I covered those in our

13   findings.

14       THE COURT:  Mr. Veeder conceded that you did a good job,

15   as I understand.

16       MR. VEEDER:  I think they are a very efficient operation.

17       THE COURT:  I suggest that there be a reference in

18   XVII to the existence of Vail Dam, but that further details

19   concerning its operation and effect on the stream below the

20   dam will be contained in another set of findings.

21       What is your next matter?

22       MR. VEEDER:  Of course, I renew on Page 7, Finding XXV,

23   where you say:

24           "That the groundwaters which underlie the  surface

25       areas of younger alluvial deposits over which Santa

17,978

Gertrudis Creek, Warm Springs Creek, Cold Canyon Creek, Slaughter House Canyon Creek and Wolf Valley-Pechanga Creek flow are recharged by the surface flows therefrom; and that in each instance said groundwaters are in direct physical and hydrological contact with the respective surface flow, and that in each instance said groundwaters move in the identical direction of the surface flow of the particular creek which flows over the respective younger alluvial deposits."

THE COURT: If there is a surface flow, they certainly are. But very often there is not a surface flow.

MR. VEEDER: The point being, and I think the record will show this, your Honor, that these streams, for example Santa Gertrudis, the groundwater table is well below the surface flow, and that when you have this flashy runoffs there is not hydrologic connection between the water table and the surface flow. I believe that is the case.

THE COURT: Mr. Veeder, there might be for a very short time when you had a dry season and then have floods, there might be a very short time when the water on its immediately hitting of these sandy alluvial areas is not in contact with water below. It would not be very long before the water would be. It has been demonstrated that in the dry years that we have had there has been very little runoff. All of the waters have gone into this younger alluvium. It is only

1    when you fill up this younger alluvium in these little

2    canyons that you get your runoff.  As long as water can go

3    into the ground, it certainly will go into the ground in

4    these alluvial canyons and creek beds.

5        MR. VEEDER:  I would, of course, interpose the objections

6    to the Pauba Valley, which appears in XX and XXI, and combine

7    these objections with Findings XXV and XXVI.  I would object

8    to these on the ground that surely on the basis of the

9    testimony it cannot be correctly stated that the older

10   alluvium constitutes the bed and banks of a subterranean

11   stream or subsurface flow.  The evidence is very clear that

12   in Pauba Valley, for example, the State put in evidence and

13   we put in evidence to the effect that there was an interchange

14   of water between the older alluvium and the younger alluvium,

15   dependent upon the hydrostatic pressure and the relationship

16   of the gradients.

17       THE COURT:  I think you are right.  But did you ever

18   see the bed and bank of a stream where there was not a great

19   deal of water from the bed and bank into the area on either

20   side of it, except where it was a concrete or steel conduit?

21   Take a stream that flows in a state of nature.  There is some

22   water that leaves the stream and goes into the bed and banks.

23   The words "bed and banks" don't mean that they have to be

24   absolutely impermeable.  If so, you could only have a

25   concrete storm drain or a steel conduit.  "Bed and banks" of a

17,980

t43

1   stream, I suppose, could consist, even under your theory --

2   just analyze this a minute.  You were going to say that the

3   little narrow creek beds are the bed and banks.  And these run

4   across flat alluvial plains and they are very permeable

5   material.  Suppose you had a year where you had rains and
                                        a
6   these little creeks ran for/considerable period of time.

7   Wouldn't you admit that that water would go from the bed and

8   banks of the streams, as you outline them, into the surrounding

9   material?  You would have to admit it.

10      MR. VEEDER:  I would say that there was, during the

11   period when the water was running out and percolating across,

12   yes, there would be.

13      THE COURT:  Well, there is nothing wrong with the fact

14   that -- the findings, I don't think, reflect this, one of

15   the suggestions I had -- there can be a movement from the

16   older to the younger and vice versa.  But because of the more

17   permeable nature of the older, they constitute the banks of

18   your underground flow.

19      MR. VEEDER:  I am just making the record, your Honor.

20      MR. STAHLMAN:  I think it is well illustrated by Mr.

21   Worts' testimony where he actually made tests in the Pendleton

22   Basin that showed how little they could get out of the LaJolla

23   Breccia.

24      THE COURT:  What is the next one?

25      MR. VEEDER:  On Page 9, Finding XXXIII, in regard to

17,981

t44

1    the Temecula-Murrieta groundwater area.  I believe, your

2    Honor, that based on the investigations which hav e been made,

3    that we would say that the area within the basement complex

4    and referred to as the Murrieta-Temecula groundwater area

5    is a basin in every sense of the word and that the facts show

6    that the waters, both in the older and in the younger alluvium,

7    are hydrologically interconnect and that they do constitute

8    a single groundwater body; that based on the evidence in the

9    Raymond Basin case and the cases in the San Fernando Valley,

10   the cases in the Santa Ana Valley, that they show that the

11   contours throughout those areas are at different levels;

12   that there is no basis whatever for concluding as is

13   concluded here --

14       THE COURT:  Well, I am not stuck or sold on XXXIII.  We

15   batted that out.  You were present and participa ted in it.

16   We debated whether we would  call it an "area" or "basin."

17   The language has been carried over by Mr. Girard.

18       MR. GIRARD:  I don't have any objection to striking the

19   whole thing,your Honor.

20       THE COURT:  I am willing to reanalyze it.  We were

21   feeling our way along on this thing.  Some of those are

22   suggestions that I made.  Maybe they are unsound.

23       MR. VEEDER:  I truly believe that from the standpoint of

24   the law it becomes increasingly clear to me as to what is

25   going to transpire.  It is very obvious to me that we have to

17,982

t45

1    interpose objections in regard to such terminology because

2    we don't believe that the factors alluded to in Finding XXXIII,

3    for example, "that generally the term 'basin' connates an

4    alluvial fill containing groundwaters which are surrounded

5    by impervious materials and one in which the ground waters

6    stand at or about the same level throughout."  There is no

7    basis for such conclusion:  "Moreover, the term 'basin' does

8    not usually connate an alluvial fill containing several

9    streams . . ."  That is not correct.

10        I am just interposing these to make the record, your

11    Honor.

12        MR. STAHLMAN:  Let's try to accomplish some good out

13    of it, though.

14        THE COURT:  Do you want it called a "basin"?

15        MR. VEEDER:  I would simply say yes.  I would say that

16    the first paragraph of XXXIII, starting on line --

17        THE COURT:  Here is what I would find.  I am not sold

18    on this language, which was tried for size at an earlier

19    date.

20        It would seem to me that we ought to find this ground-

21    water area to be in hydorlogical contact, that this water

22    feeds these streams that we have defined heretofore,   that

23    you have the situation where the streams as well as the ground-

24    water area are all an area.

25        MR. VEEDER:  I would say this picture -- I'm pointing

17,983

to 15-E -- Murrieta Creek, in particular, is strikingly similar to the San Fernando Valley.  I think that is what the Pomeroy case finds and declares; that the upper huge area is a groundwater basin.

THE COURT:  The Pomeroy case didn't consider the upper area.  Don't miscite the case.  The Pomeroy case considered 315 acres, or whatever it was, at the Narrows.

MR. VEEDER:  That is correct.  But it referred to the fact that there were 24 miles of basin 12 miles wide above the Narrows, and it said that those waters were percolating waters up through there and that when they came down they were confined in the two hills, a narrow confinement, and there arose a subterranean stream.

I think that is the situation you have here.

P30 Belt 6

1    THE COURT:   I am willing to find that the water in this
2  ground water area comes down and flows into the Murrieta and
3  the Pauba and the Santa Gertrudis and that those become the
4  streams that are similar to the streams found in Pauba.   I
5  don't know where we really differ.   You want me to find that
6  there is a stream bed, we will say, 20 to 50 feet wide down
7  through the Murrieta and that that is the stream, this little
8  dry bed; and apparently you heretofore argued at Pendleton
9  that the water immediately beneath may be ten feet on either
10 side, was the stream.

11   MR. VEEDER:   During the time water is being carried in it.

12   THE COURT:   If I were going to go your way, how would you
13 describe the rest of this ground water area?   Water in hydro-
14 logical contact which supports the stream.

15   MR. VEEDER:   Percolating water through the interstices
16 which constitute the basin, exactly.

17   THE COURT:   And support the stream?

18   MR. VEEDER:   And support the stream.   When they have
19 progressed down to the point where they meet this area of
20 confinement --

21   THE COURT:   Then you and I differ as to where it starts
22 to support the stream.   I want to go the same way you do,
23 except that I would say it is a portion of the stream in the
24 Murrieta and the Pauba and the Santa Gertrudis, and you want
25 to have it only support a little piece of stream down there a

P31

1    mile north of the Gorge.

2         MR. VEEDER:  That is one of the problems that I brought

3    up in regard to Temecula Creek.  I don't believe we should

4    treat Temecula Creek any longer on the same basis that we are

5    treating Murrieta, because I think there is such drastic and

6    tremendous change.  But I do believe that Murrieta Creek is

7    nothing more nor less than a drain out of a vast area of

8    alluvium; that all these percolating waters move on down and

9    do ultimately -- I would agree that there is a subterranean

10   stream down here at the point of confinement where your base-

11   ment complex is near the surface, where your older alluvium

12   is narrowing down, and where the escarpment of the Santa Rosa

13   to the south and west protrudes and narrows down.  But I

14   would say that everything above here, except during periods

15   when surface water is running, is percolating water in a large

16   basin, and I wouldn't distinguish at all by reason of the

17   slight compartmentation which exists where we have some of

18   these faults.

19        I think it is a matter of craftsmanship, as much as

20   anything.  I would like to see it done the way it is reflected

21   here and as the evidence went in.  I am not being critical of

22   your Honor.  You asked me to interpose my objections and I am

23   interposing them.

24        THE COURT:  All right.  You are being very helpful.  Some

25   of the matters you mentioned I find I am in agreement with.

P32

1    MR. VEEDER:  In regard to Santa Gertrudis Creek, we were

2    talking about the bed and banks.  I have been up Santa Gertrudis

3    Creek and there is a defined channel -- bed and banks.  It is

4    not a wide channel that we show here.  That is younger alluvium.

5    The bed and banks of the Santa Gertrudis Creek is a well defined

6    channel where you can find a bed and a bank and a channel.

7    There is a flood plane, yes.  But I believe, your Honor, that

8    the California law -- and I have been reviewing these cases

9    carefully -- says that you determine your bed and bank on the

10   basis of where the action of water has eliminated the vegetative

11   growth and that on the banks you find the vegetation.  That is

12   one of the elements.  And the fact that water may debauch out

13   of the bed and banks and create a meadow doesn't eliminate

14   the fact that Santa Gertrudis Creek and Warm Springs and these

15   others are truly narrow beds and banks and channels.  I think

16   the cases support that.

17        As I say, I have shown what we would do, and this is after

18   much consideration and much direction by the experts.  They

19   have told me that they couldn't, as experts, accept this.

20   Colonel Bowen has said he couldn't accept it.  He said it is

21   not a fact that that thing occurs that way or that these

22   waters progress down the stream that way.

23        THE COURT:  Where do they go?

24        MR. VEEDER:  They go straight down, your Honor.  When

25   there is water in the Santa Gertrudis sands, which is the

P33

1  channel, when the water goes into the sands and the porous

2  material which constitute the bed and banks, the water goes

3  straight down vertically.  It may go down 100 feet, it may

4  go down 150 feet.  It depends on where the water table is.

5  But it doesn't progress down the gradient.  It gets into the

6  vast mass of detritus.

7      THE COURT:  Are you talking about flood water now, or

8  are you talking about after the water arrives where the water

9  table is?

10     MR. VEEDER:  No, I am talking about where you have your

11 flood and you have rains and it starts raining and for the

12 first time you have a surface stream, and the waters which

13 enter and percolate through the bed and banks of the channel

14 go right straight down -- it goes down on the basis of gravity.

15 It doesn't follow the stream, it doesn't follow the surface

16 stream.  It goes all the way down.

17     THE COURT:  Then what happens to it when it gets down

18 there?

19     MR. VEEDER:  It spreads out horizontally.

20     THE COURT:  Well Mr. Veeder, I have observed many times

21 when I was a kid that when you irrigate in sandy soil -- I

22 don't know whether you ever noticed -- you put a little stream

23 of water in a furrow of sandy soil, and if you later take a

24 shovel and cut across that you know what you find.  You don't

25 find what you just talked about at all.  You can try this, if

P34

1     you want to, in somebody's sandy lot.

2        MR. VEEDER: I have tried it, your Honor.

3        THE COURT: Here is a sandy bed, and here you put a furrow

4     down, and you start a little stream of water running down.  You

5     know what happens.  When you cut a cross section after you let

6     that water run in there, here is what you find -- here is where

7     the water goes.  The water doesn't come down like this.  The

8     water is on about a 45 degree angle like this.  It will vary

9     one way or the other.  But you want to look in a furrow of

10     sandy ground where you have run water and that is the way the

11     water goes.

12       But that is beside the point.  We all know when these

13     floods come the water spreads and a lot of it goes down.  But

14     this is not the question.

15        MR. VEEDER: With all respect, I am not going to argue

16     about this 45 degrees.  But I am saying that this is what

17     transpires.  You have a stream here like this.  You have your

18     winter rains and it starts raining.  Your water table is down

19     here.  It is away down below.  Your water saturates this

20     permeable material, which is your bed and banks, and the water

21     goes straight down.  I don't know about your 45 degrees, but

22     I will guarantee your Honor that it would be physically im-

23     possible for that water to progress along as your findings

24     indicate -- I beg your pardon -- as Mr. Girard's findings say.

25     It just doesn't do that.

P35

1   THE COURT:  Mr. Veeder, it is true that this flood water

2   which only comes a few times during the year operates a little

3   differently.  But that is not what we are talking about.

4   MR. VEEDER:  I am talking about any water, that once it

5   leaves the surface flow and enters into the porous material it

6   does not progress as the findings say it does.  It couldn't.

7   Why?  Because there is only one force that is operative upon

8   it, and that is the force of gravity that pulls it down.

9   MR. STAHLMAN:  When it gets down there, where does it go?

10  THE COURT:  You have some merit to what you say.  But I

11  think you are missing the boat.

12  MR. VEEDER:  No, I am not.

13  THE COURT:  Let's take the flood plane here and instead of

14  having 200 foot depth here let us have 50 feet here, and here

15  comes a mass of water in flood time.  What is going to happen?

16  Some of this water is going to run clear across the top with-

17  out ever getting in.

18  MR. VEEDER:  Right.

19  THE COURT:  And some of this water is going to start to

20  percolate down.  Some of it may go down this way.  It may find

21  some little place where it can move over.  There is other water

22  up here coming down at various degrees.  Pretty soon when you

23  get this all filled up, instead of having the water level down

24  there, you have the water level here.  This is all now filled

25  up with water.  Then what happens?  The rest of your water goes

P36

1   on down.  And you have water in this area in contact with the

2   water that is flowing.  So there is a gap of time in there.

3       Now before this flood water comes, what has happened to

4   this water down here in the water claim?  This water in the

5   water claim is moving downstream.

Belt 7

6       MR. VEEDER:  No.  Let me show you on these contours.  Just

7   look at these contours.  You have water that goes down into

8   this mass which I call the percolating ground water basin and

9   fills it up perhaps.  But most years it doesn't and it goes

10  down vertically.  When it meets this mass, the whole mass is

11  proceeding south and westerly.  You will find here that your

12  stream and your contours here and your surface flow are

13  different.

14      MR. SACHSE:  But Mr. Veeder, you were drawing a picture

15  on the board of the water that falls on the younger alluvium

16  and how it goes.  Tell me, the water that falls on the younger

17  alluvium of Murrieta Creek, which direction do you think it

18  flows after it reaches the ground water level?

19      MR. VEEDER:  I think it would depend entirely.

20      MR. SACHSE:  Santa Gertrudis I meant.

21      MR. VEEDER:  It would depend on a vast number of factors.

22  It would depend on what it encountered down there.  Gravity

23  would be one of the principal factors.

24      MR. SACHSE:  Don't you recall your expert's testimony that

25  it always flows at right angles to the contour?

P37

1    MR. VEEDER:  Yes.

2    MR. SACHSE:  I said water was in the younger alluvium.

3    MR. VEEDER:  Here is one that is going this way.  But that

4    is surely not the way.

5    MR. SACHSE:  If this is the bank, it could go this way,

6    stop at the bank, and turn this way.

7    MR. VEEDER:  You don't see what is being said.  You have

8    your well level.  Your well levels are below your younger

9    alluvium and your water is going this way.  It naturally is

10   going down gradient.  It is not going off that way.  Here is

11   your ground waters moving this way.  You have your ground water.

12   Of course, if you want to talk about a state of nature, I

13   would just forget about pumping holes.  But I assure you that

14   you can't say that the waters in Santa Gertrudis Creek which

15   go down into the older alluvium and into the younger alluvium

16   are following exactly the same course, because they go verti-

17   cally down.

18   MR. SACHSE:  I would still like to ask a question, your

19   Honor.  You just pointed out, Mr. Veeder, that the well levels

20   in Santa Gertrudis, for instance, are below the bottom of the

21   younger alluvium.  Is that correct?

22   MR. VEEDER:  Yes.

23   MR. SACHSE:  All right.  Now we have, I thought, just

24   agreed that the bed of the stream --

25   MR. VEEDER:  I didn't agree to that.

P38

1    MR. SACHSE:  No, the thing you were arguing, the point to

2    which you were arguing was that the bed of the stream was the

3    contact of the younger alluvium with the tighter material

4    beneath it.

5    MR. VEEDER:  I didn't say that.

6    MR. GIRARD:  His Honor directed us on that.

7    MR. VEEDER:  I said I was certainly going to file objections

8    to such interpretation.

9    MR. SACHSE:  So if there is a tighter material beneath it,

10   Mr. Veeder talks about how the water moves through the older

11   alluvium.  You agree the older alluvium is tighter than the

12   younger.  When the water level comes down and fills up the

13   area above the older -- this is the older alluvium, all of

14   this is younger -- then where does it go?  Does it still keep

15   going straight down?

16   MR. VEEDER:  It has to.

17   MR. SACHSE:  Your witnesses won't tell you that.

18   THE COURT:  Take a short recess.

19   (Afternoon recess.)

20   THE COURT:  I am willing to find, Mr. Veeder, what I think

21   actually happens.  I am not trying to make some artificial

22   findings.  I am willing to find that in the younger alluvium,

23   in the streams like the Santa Gertrudis, that there is water

24   in this younger alluvium and that it moves downward to join

25   the Murrieta, and that when a flood comes, which doesn't come

17,993

P3039

1    very often, that if the winter flood water is just a slight

2    runoff it runs into this younger alluvium and eventually adds

3    itself to the water below, and if there is not much runoff

4    none of it even runs on the surface down the Murrieta; that if

5    you have a series of these freshets and water running in these

6    dry stream beds, the water level raises and that conceivably,

7    which doesn't very often happen, that if the younger alluvium

8    is entirely filled then water would continue to run on the

9    surface supported by the underground flow. That is what I

10   think happens. I don't think that last situation happens very

11   often, except in the stringers of younger alluvium where there

12   is a very small amount of it and then we do find occasionally

13   a little pond or a surface flow, a little bit of rising water;

14   but that this flood water adds to and becomes a part of the

15   underground flow of the streams.

16       I am willing to find that some of these rush over the top

17   without seeping, depending on the size of the flow and the

18   length and the amount of it, that more or less water seeps

19   down and joins the underground flow of these streams. I think

20   that is what happens.

21       I think there are situations where you could have a little

22   cloudburst and have a rush of water down and very little of it

23   gets down to the younger alluvium because it goes by so fast.

24   I think there are times, like this last year or two, where

25   we had rains and what little water came down the streams all

P40

1   seeped in and we had no flow.

2   MR. VEEDER: Surface or ground water?

3   THE COURT: Not ground, because I think there is water

4   moving. The very fact that the material is less permeable

5   than the surrounding alder alluvium would indicate that that

6   is the way the water would move. It would move faster in the

7   younger alluvium than it would through the older alluvium. It

8   is just axiomatic. We have heard all kinds of proof about

9   that.

10   MR. VEEDER: I desire to allude to an important factor,

11   your Honor, on the basis of what you have just said, that Mr.

12   James, Illingsworth, Mr. Kunkel, Colonel Bowen, have all said

13   that there is no means of differentiating between and no way of

14   knowing where your younger alluvium leaves off and your older

15   alluvium begins. Now I think that is a factor of importance.

16   THE COURT: That is not true on the sides of the stream

17   beds. It is true in the bottoms, and the fact that older well

18   logs didn't differentiate and when the older material is loosen-

19   ed up often they seem like the younger. But that doesn't mean

20   that there couldn't be a differentiation made.

21   MR. VEEDER: We say we couldn't have a finding that would

22   differentiate, because I don't believe we could.

23   THE COURT: We all have to admit that there is a contact

24   down there somewhere between the younger and the older; that

25   the older is laid down first and the younger is laid down on

P41

1    top of it at a much later period.  There is a distinct difference

2    between the two materials.

3        MR. VEEDER:  Your Honor, I have attempted to demonstrate

4    by diagram showing what we occurred.  We think the ground water

5    moves down vertically and that it does not move horizontally

6    in the stream beds.

7        THE COURT:  It goes down vertically, or reasonably so,

8    until it comes in contact with the water below.  Then where

9    does it go?   Does the ground water then just stay still?

10       MR. VEEDER:  No, but the water has proceeded vertically

11   down from Santa Gertrudis Creek through the porous bed and bank

12   goes down and then its course is governed by a multituted of

13   factors.  How it goes?  It may go around interstices, it may

14   go under them, it may be held up in them, it may do a great

15   many things.  But I assure your Honor that the course of that

16   ground water is not the course of the surface stream.

17       I have made that point, so I will not reiterate.  But here

18   is something that I would like to call to your attention.

19       THE COURT:  You don't think it runs in the opposite

20   direction of the surface stream, do you?

21       MR. VEEDER:  I think it would be entirely possible for a

22   short distance.  The course of the entire ground water body

23   is southwesterly to the outlet of the Gorge.  But certainly

24   there is nothing that would indicate that there is a well

25   defined subterranean stream anywhere.

P42

1    THE COURT:  The only reason you are straining, Mr. Veeder,

2    and that is all this amounts to, because no substantial rights

3    are involved -- and if you want to take an appeal on it, I

4    don't know where it would get you -- the only reason you are

5    straining at it, let's be honest, is the fact that you think

6    there is some resemblance between this situation and what you

7    want to contend you have in the area in Camp Pendleton.  Let's

8    be honest about it.

9    MR. VEEDER:  I'll be perfectly honest and completely and

10   I have always been with your Honor.  The point that I am trying

11   to make is that certainly here, as we all agreed on June 1st,

12   there is no evidence of a subsurface flow and there has been

13   no evidence since that date, and I assure your Honor that we

14   can't --

15   THE COURT:  Mr. Veeder, the file is full of evidence of

16   subsurface flow with areas of rising ground water at various

17   parts of the younger alluvium.  And I challenge you to show

18   me, outside of possibly where the Wildomar Fault runs at or

19   near the older alluvium, I challenge you to show me on any of

20   your maps a place of rising ground water that was not in

21   younger alluvium, with the exception of the Wildomar Fault,

22   where there may be rising water out of the older alluvium at

23   the fault line.

24   MR. VEEDER:  I don't see how that becomes important, your

25   Honor, because the evidence is clear through this whole --

P43

1   THE COURT:  This is what it means.  It means that there is

2   water in the younger alluvium moving downward and that it will

3   disappear entirely from the surface and later on it comes to

4   the surface in what is called a point of rising ground water.

5   MR. VEEDER:  Yes.

6   THE COURT:  You have a dozen of them on various maps.  Not

7   necessarily on this map here.

8   MR. VEEDER:  I agree entirely, your Honor.  But I also

9   respectfully submit to your Honor that the points of rising

10   water that we find in the stream beds -- and I use the term

11   "bed and banks" because that is what we find -- they occur

12   where the contributions from the older and the younger alluvium,

13   this great mass of ground water that you found within the

14   Bowen line comes from that source.  It comes from a variety

15   of places.  We can't say that the rising of the ground water

16   which appears on Murrieta has its sole source in the younger

17   alluvium.

18   THE COURT:  I am not going to say the sole source.  That

19   there is a flow from the older alluvium.

20   MR. VEEDER:  Yes.  But I will say this, your Honor, the

21   findings as written would comprehend that throughout the whole

22   surface of the yellow, the younger alluvium --

23   THE COURT:  In Murrieta.

24   MR. VEEDER:  -- of Murrieta is a stream.  Your Honor,

25   there is no evidence that the waters along the contacts flow

P44

1   as part of the Murrieta Creek. Those areas away from the bed

2   and bank of Murrieta are higher land.

3      MR. STAHLMAN: How did the younger alluvium get there?

4      MR. VEEDER: Deposited by the stream.

5      But the fact remains that the bed and banks as contemplated

6   by the California law are the area through which the stream

7   flows when there is water, and there is nothing to show that

8   the bed and banks are the contacts between the older and the

9   younger alluvium. Indeed, I don't believe you could find in

10  Murrieta Creek where that contact is with any exactitude at

11  all.

12     THE COURT: Your experts put it on the map.

13     MR. VEEDER: But your Honor, each one that made reference

14  to this younger and older alluvium said that where the contact

15  would be found was extremely difficult, and for that reason

16  it is put on there by the best calculation, the best estimate

17  that can be made. But what do we do on it? We take the

18  arbitrary line here and on that basis we make the land riparian

19  or non-riparian.

20     You say, "Well, it doesn't make any difference." To me it

21  does make a difference. I think it makes a difference from

22  the standpoint of the law. We come along here and we find a

23  variety and no one knows exactly where that is.

24     THE COURT: Let's go down the stream to the Gorge here.

25  You have shown on this map rising water for a mile and a half,

P45

1   to start with -- and in fact, about three miles.  Let's take

2   the first mile and a half.  There is water flowing, according

3   to that map, in that stream; is that right?

4       MR. VEEDER:  Yes.

5       THE COURT:  Wouldn't you say that the younger alluvium is

6   probably saturated with water right up to the bed of the stream,

7   or it wouldn't be running?

8       MR. VEEDER:  I would say the younger alluvium in the bed

9   and bank -- this bank here is deeply incised, your Honor, from

10  here on down.  I don't know how high the bank would be, and

11  I know George would jump down my throat but I would say it is

12  probably eight or ten feet high.

13      THE COURT:  From the bed of the stream across/that level at

14  the younger alluvium  would be full of water, wouldn't it?

15      MR. VEEDER:  No, the water is just running along.

16      MR. STAHLMAN:  He is missing the point.

17      MR. VEEDER:  Say it again.  I missed the point.

18      THE COURT:  Assume that there is a ten foot deep bed in

19  there.  At the level at which the water runs cross-wise either

20  way you would say the younger alluvium is filled up with water

21  to support that stream?

22      MR. VEEDER:  Yes.

23      THE COURT:  Otherwise, it would be running down into the

24  younger alluvium.

25      MR. VEEDER:  But this area ten feet above it or 15 feet

P46

1    or however deep it is incised is dry, your Honor, and is

2    certainly not part of the stream.

3        THE COURT:  Where does the water come from?  You don't

4    contend that this water is coming from the basement complex,

5    do you?

6        MR. VEEDER:  Certainly not.

7        THE COURT:  Do you think any of that water is coming out

8    of the older alluvium that borders this mile and a half?

9        MR. VEEDER:  I think there are contributions from it.

10       THE COURT:  I think so, too -- small contributions.

11       MR. VEEDER:  We never put any estimate on it.

12       THE COURT:  Let's go upstream another mile and a half.

13   The banks aren't so deep up here, are they?

8 fl.s   14

15

16

17

18

19

20

21

22

23

24

25

MR. VEEDER:  The banks up about where it begins to flow are pretty well deeply incised.

THE COURT:  Let's take the quarter mile.  No banks shown there?

MR. VEEDER:  It is deeply incised.

THE COURT:  Incised six or eight  inches or a foot.

MR. VEEDER:  No.  You are a tall man, your Honor.  You would be able to peer out of it.  And I can't see out of it. It is that deep.

THE COURT:  Again, at the level where that water flows, you would have to agree that the younger alluvium is full of water to support that flow, wouldn't you?

MR. VEEDER:  Where your water is coming from here, your Honor, there is water coming down , there is tail water from some irrigation to some degree.  The water table there becomes quite high.  But it is still 10 or 12 feet, in my view, below the land surface of the banks on both sides, I think you would have to say that.

THE COURT:  Let me ask you another question.  Let's suppose that they quit pumping all these wells shown in the younger alluvium in the Murrieta Valley.  You would  have a flow of water down Murrieta Valley, wouldn't you?

MR. VEEDER:  Surely, your Honor, you wouldn't have the flow of water from the older alluvium to the older alluvium a distance of a mile and a half across. That is what you are

t48

saying.

THE COURT:  No, I didn't say that.  But you would have a flow of water down the Murrieta Valley?

MR. VEEDER:  In the bed and banks of the stream.

THE COURT:  All right.  And if you had a flow of water halfway  up the Murrieta Valley, the chances are that you would have a flow of water clear up into here, if they quit pumping.

MR. VEEDER:  We don't know.

THE COURT:  If you had a flow of water, it would mean that the younger alluvium was filled up with water up to the level at least of the bed of that stream, would it not?

MR. VEEDER:  I don't know how deeply incised it is.

THE COURT:  I am not talking about incision.  I am talking about the bottom of the water flow.  And if that happened, if the water was flowing on the surface of the younger alluvium, filled up with water, wouldn't you also think the ground water was also coming to the surface, adding to the stream, so that by the time you got to the Gorge you would have a   real flow.

MR. VEEDER:  Yes, you would.  But I am sure you wouldn't say that the waters that are underlying these farm lands, which are percolating waters, you wouldn't say that they were part of the flow of the stream. That is the point that I am making.  I say that there is a distinguishing element between

18,003

t49

1    surface flow and the percolating water, and I think the

2    California cases support it, that there is a difference

3    between the percolating water and the surface flow.

4         THE COURT:  Well, do you want to back up and abandon

5    this water area that you have been fighting for, for so long?

6         MR. VEEDER:  No, sir.

7         THE COURT:  And find that the older alluvium is not

8    part of the water area?

9         MR. VEEDER:  Not in the slightest.  I want to be

10   consistent with the way we started out.  And I would say

11   that the proper finding would be that the waters throughout

12   the whole area are interconnected; that the fact that there

13   is a fault here makes no difference from the standpoint of

14   the subterranean basin, this reservoir.  But I would say

15   that you couldn't, in my view, distinguish between the waters

16   in the older alluvium and the waters in the younger alluvium

17   which fill up and make this vast lake.

18        THE COURT:  Can't we distinguish this way?  We know

19   that generally there is water running into that younger

20   alluvium from the older alluvium, because it is up gradient.

21   Water is running into the younger alluvium from the upper.

22        MR. VEEDER:  I would think it would depend on a great

23   many factors whether you would say it was running into the

24   younger alluvium.

25        THE COURT:  Let's say moving.

18,004

MR. VEEDER:  I would say it might be percolating.

THE COURT: All right, percolating into.   Then after it percolates into this younger alluvium, where does it go?  We know then that the movement is down in the direction of the Gorge down the Murrieta Valley and the movement is not from the younger alluvium up into the older alluvium.

MR. STAHLMAN:  Here is another thing, your Honor. When his witness Mr. Hall testified he showed the direction of water in Pauba Valley, for instance, and that is shown on Exhibit 15, and this is one of the things which characterizes and distinguishes the underground flow of water.  We know that this water is flowing in this direction.   But Mr. Hall shows that this water here flows in a different direction, that the water in the older alluvium is flowing in a different direction; but when it gets down to the younger alluvium it flows in this direction.

MR. VEEDER:  Here is the situation.

MR. STAHLMAN:  Why don't you let me finish?

As I say, it characterizes what the cases  show, that in addition to the fact of the bed and banks it flows in the same direction. And that is what we have here.  We have every fact established here that conforms to the cases in California.   Not as Mr. Veeder says.  I challenge what he says in regard to the California cases.  I think   Kinney has analyzed it in his treatise on the theory of underground

18,005

t51

1  water.

2  MR. GIRARD:  Your Honor, before George gets through I
3  want him to look at this exhibit on groundwater movement.
4  This, of course, has to be in Camp Pendleton.  Here are your
5  arrows of groundwater movement.  You have roughly a 35 foot
6  contour.

7  MR. VEEDER:  I would be very glad to argue those
8  contours you are looking at, Mr. Girard.

9  MR. GIRARD:  This shows the direction of groundwater.
10  This is all within the younger alluvium.  Here is the stream.
11  Here we come down here, we have a little -- what did he call
12  it -- eddy, and it switches around and goes right straight
13  down.

14  MR. SACHSE:  And you have a fall of 35 feet, 30 feet
15  in a mile.

16  MR. VEEDER:  That is not part of the basin.

17  MR. SACHSE:  Up to the junction of DeLuz Creek is the
18  way he has described it.  It goes beyond the junction.  Here
19  is DeLuz Creek.  So it is part of this basin.

20  MR. VEEDER:  I would be very glad to argue this.

21  But, your Honor, may I point out, your Honor's
22  attention was called to the course of the groundwater on
23  Exhibit 15 where Mr. Hall drew some lines.  I call your
24  Honor's attention to the fact that there has been a dewatering
25  up through the Pauba Valley and that the course of the

t52

1  groundwaters is governed by and is related by the reduction,

2  a very sharp reduction in the groundwater levels in the Pauba

3  Valley.

4  THE COURT:  Mr. Veeder, how can I find what you ask me

5  to find, that there is a little channel which is in the

6  Murrieta about ten feet wide and there is an underground

7  stream immediately underneath that little channel and

8  therefore the people who border on that little channel are

9  riparian and those other people in the Murrieta Valley between

10  the fault lines are not riparian?  That  is what you are

11  asking me to find.

12  MR. VEEDER:  I truly believe that is the law, your

13  Honor.

14  THE COURT:  What facts do you have that differentiate

15  this little ten foot strip of water down some distance from

16  the water on either side of it?

17  MR. VEEDER:  Because it is the bed and banks of the

18  stream.

19  THE COURT:  What are the banks of this stream that you

20  talk about?

21  MR. VEEDER:  The bed and banks of the stream, your

22  Honor, is where the channel is in its natural state.

23  THE COURT:  That is the surface bed and banks.  What is

24  the bed and banks of this underground stream you talk about?

25  MR. VEEDER:  I don't talk about any underground stream.

t53

1    I say, your Honor, that the groundwater table is not a

2    stream at all.  It is not a stream at all.  And I don't know

3    where some of these things come from. This whole area in here,

4    and I cut right across the fault, this whole area is a

5    single ground water area.

6        THE COURT:  You have your hand over Santa Gertrudis

7    older and younger alluvium.

8        MR. VEEDER:  No, I have my hand over Murrieta and I am

9    north from Santa Gertrudis, your Honor, this whole area.  The

10   whole point I am trying to make to you, this is something

11   entirely new to me that we would be viewing this large area--

12   and I am now pointing, it is a mile and a half wide,  it is

13   two miles wide -- and saying that the people are riparian

14   to this yellow area.  I don't believe that is the course of

15   any stream.  I truly don't believe it is the course of any

16   groundwater stream.

17       I think you have a map of groundwater moving through

18   these ventricular areas in a generally south and westerly

19   direction.  But it is not flowing.  It is percolating.

20   And the groundwaters proceed in that manner.  They do not

21   flow.  And I do not believe that there has ever been any

22   evidence on that.  I don't believe that there is any evidence

23   whatever to support the fact that there is a stream.  I

24   have researched this matter in regard to what is required

25   for a riparian right, and when I got through I came back to

18,008

t54

1    where I started from and where we began writing these

2    findings.   Bear in mind that in June we went back and had

3    Colonel Bowen, on the basis of agreement in this courtroom,

4    we ran out the lands that were riparian to Murrieta Creek,

5    and the guide which we pursued in running out those lands

6    was simply the guide that we have followed in the California

7    law that the bed and banks of the stream is a known today

8    bed and bank as you can observe it.

9        THE COURT:  That is the surface stream.

10       MR. VEEDER:  Yes, indeed, of the surface stream.  And

11   there is certainly a presumption that the waters are

12   percolating as distinguished from being in a well defined

13   stream.

14       We have the situation, which it seems to me is most

15   acute, because if we are going to have any riparian owners

16   in Murrieta Creek at all they will be determined by a

17   guess, and it will be strictly a guess and it will be a

18   guess in this courtroom as to the contact between the older

19   and the younger alluvium, and there's not a man in this

20   courtroom, there is no one here who can do otherwise than

21   generalize as to the contact between the older and the

22   younger alluvium.

23       You have that fact    even in regard to the  residuum.

24   We haven't a man who was able to do more .  Indeed, you

25   drew the Bowen line because we couldn't do more than speculate

as to the kind and type of soils which are involved.

18,009

P47 Belt
29

1    THE COURT:  The record would show a close resemblance in

2    the evidence put on by the United States and that in California's

3    charts on the younger and older alluvium.

4    MR. STAHLMAN:  You have the same thing in attempting to

5    define the surface stream banks.  You have places where it is,

6    well-incised, and you have places where it bellies out.  There

7    is always some indefiniteness.  You don't draw it with the

8    refinement that you make a line on the drawing board.

9    Now Mr. Veeder has pursued this same argument for some

10   period of time, and I would like to give your Honor an illustra-

11   tion of the case that we tried -- Carlsbad vs. San Luis Rey

12   Heights Water District, and show you what the factual situation

13   is there.  I happen to live right on this.

14   The San Luis Rey River as it crosses Highway 395 is a part

15   of the Bonsall Basin.  It bellies out and then it comes down

16   the Narrows at the Bonsall Bridge and flows into the Mission

17   Basin.  The San Luis Rey Heights Water Company has 80 acres of

18   land --

19   MR. VEEDER:  May I interrupt you just a moment, George.

20   I would like to have Commander Redd and Colonel Bowen

21   excused because the Colonel has the duty tonight and he is

22   half an hour late already.

23   THE COURT:  All right.  When do we start again?  9:30

24   tomorrow morning?

25   MR. VEEDER:  Whatever your Honor says.

18,010

P48

1    MR. STAHLMAN:  That is fine.

2    THE COURT:  All right.

3    MR. STAHLMAN:  Now your Honor, the actual channel of this

4 river after it comes through the bridge here is over here.

5 And this was all brought out in that suit.  The land that

6 supplies this 80 acres is riparian to the 80-acre field and

7 is 1600 acres up here, which is all part of the same tract.

8 Now this thing was thoroughly explored at that time.  Under

9 the factual situation that we have here, all this land was

10 declared to be riparian.  The stream is completely over here.

11 It is incised here.

12    MR. SACHSE:  The best man who can help you, Mr. Stahlman,

13 is I, because Mr. Stahlman's outfit enjoined us.  We have 40

14 acres like so, with wells in it.

15    MR. STAHLMAN:  Not on the channel.

16    MR. SACHSE:  We enjoin you because you are taking water

17 from the river.

18    MR. STAHLMAN:  And incidentally that case was tried by

19 Judge --

20    MR. GIRARD:  I am going to interpose the same objection

21 to this recitation of cases by Mr. Stahlman and Mr. Sachse as

22 I did to Mr. Veeder's recitation, to be consistent.

23    MR. VEEDER:  I am glad someone is consistent.

24    I have a posey here that I am going to put in my brief

25 that is very interesting in regard to this situation and in

P49

1   regard to the passage of time and what has transpired in

2   regard to the San Luis Rey litigation.

3       Do you want me to continue on this idea?

4       THE COURT: No, I am weary, it is 4:30 and I am weary.

5   9:30 tomorrow morning.

6       Before I forget it, though, Mr. Girard, in your findings

7   have you taken care of the little area in the northwest portion

8   of the Murrieta where the flow is to the north?

9       MR. GIRARD: I don't think so. I have not taken care of

10  that.

11      THE COURT: Secondly, check over your conclusions where

12  you find that various of these rights are correlative. Maybe

13  you can take care of it by the general statement in your

14  findings that all land described in A have correlative rights

15  to the use of water in Murrieta Creek, and by Murrieta Creek

16  maybe you included the creeks that feed into it. But it would

17  be correct to say that all lands riparian to Santa Gertrudis

18  have correlative rights. When you get down to the Murrieta,

19  the people on Murrieta have correlative rights with everybody

20  on the creeks above them.

21      MR. GIRARD: That is right.

22      THE COURT: I don't know whether you have done that or not.

23      MR. GIRARD: I thought a little bit about some of this

24  language in the conclusions on riparian rights on how far you

25  want to go in defining what a correlative right is. I don't

P50

1   have any objection to it.  My own view is that once you find

2   a fellow to be riparian that is enough.  As a riparian to that

3   creek, he has a right, under California law, to his correlative

4   share of all waters which contribute to that creek.

5       MR. VEEDER:  Your Honor gave us some good language in

6   regard to correlative rights in the old Tucalota findings.

7       THE COURT:  You might look those over.

8       MR. GIRARD:  I think you get into a little bit of trouble

9   when we say a man is riparian and he has correlative rights

10   here and correlative rights there.  I think when you say

11   riparian that is enough.

12       THE COURT:  9:30.

13       (Adjournment until Wednesday, September 20, 1961 at)
14       (                                                  )
        (9:30 o'clock A.M.                                 )

15

16                         - - -

17

18

19

20

21

22

23

24

25

P51

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA, )
                                          )
                         Plaintiff, )
                                          )
      vs.                         )        No. 1247-SD-C
                                          )
FALLBROOK PUBLIC UTILITY    )
DISTRICT, et al.,                 )
                                          )
                      Defendants. )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit:  September 19, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing 105 pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 19th day of September, 1961.

Official Reporter

JOHN SWADER, OFFICIAL REPORTER