VOLUME NO. 172

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al.,

        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:** San Diego, California

**Date:** Wednesday, September 20, 1961

**Pages:** 18,014 to

FILED

SEP 24 1963

CLERK SOUTHER

By [signature]

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, September 20, 1961

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General. |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Vail Company: | GEORGE STAHLMAN, ESQ. |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al: | FRANZ R. SACHSE, ESQ. |

1   SAN DIEGO, CALIFORNIA, Wednesday, September 20, 1961, 10:00 A.M.

2              - - -

3   THE COURT: Gentlemen, I forgot about the induction of two
4   new judges this morning. I am sorry to be late.
5       Mr. Veeder, had you finished going through these findings?
6   MR. VEEDER: Yes, I have, your Honor.
7   THE COURT: You have no other suggestions?
8   MR. VEEDER: I will summarize two basic suggestions, namely --
9       Did your Honor want to proceed now with the other matter?
10  THE COURT: Yes, I see that the Marshal has now arrived
11  with the defendant.
12      (Another matter.)
13  THE CLERK: 3-1247-SD-C United States of America vs.
14  Fallbrook.
15  THE COURT: The Clerk calls my attention to an interesting
16  phenomenon. Maybe we should do something about it in the future.
17  Over the course of the years that we have been trying the
18  Fallbrook case, Mr. Stahlman has been appointed in three or
19  four cases to represent "wetbacks," and not one of those,
20  according to the Clerk, has ever come back after he has been
21  ably represented by Mr. Stahlman in this Court.
22  MR. STAHLMAN: They are afraid to come back.
23  MR. VEEDER: That is a sentence worse than death.
24  MR. STAHLMAN: Yes, I give them the kiss of death. I
25  wonder if I couldn't represent Mr. Veeder.

1    THE COURT: It is possibly only a coincidence that they
2 don't return.

3    Yes, Mr. Veeder, do you have any further objections to the
4 proposed findings in No. 30?

5    MR. VEEDER: We simply say, your Honor, that the United
6 States cannot accept the basis upon which these findings have
7 been drawn. We don't believe that the facts support these
8 findings, and we believe that they are contrary to the law
9 in regard to the definition of bed and banks and channel of
10 the stream. I have reviewed, I believe, all of the important
11 cases on that subject and all the authorities on it, and there
12 certainly is no authority which would sustain the proposition
13 that the indefinite contact between the older and the younger
14 alluvium could be the bed and bank of the stream.

15    We believe, moreover, that to adopt such a criterion for
16 the bed and bank of the stream will open up numerous problems
17 in regard to work that has already been done. For example,
18 as to the findings in De Luz Creek, Colonel Bowen has pointed
19 out to me that there is one defendant there whose property
20 just touches upon some younger alluvium. He would then be
21 riparian to De Luz Creek for 160 acres. I don't believe that
22 would be correct. I don't believe the law would comprehend
23 such a distortion or permit such a distortion. I believe that
24 the whole concept of taking Murrieta Creek as being from the
25 older alluvium clear on across to the other side of the older

alluvium presents numerous questions in regard to individual properties.

Again, Colonel Bowen points out that he has made these soil surveys, and they are now in evidence, which reflect and he has testified to the fact that he could not discern the contacts between the older and the younger alluvium and could not discern where the faults were.

Now, under those circumstances, your Honor, we truly believe that we can't join in these findings. I have suggested to counsel this morning informally that perhaps the better way for us to do is for you to go ahead and enter the findings and then we would file comprehensive objections to them. I see no other way.

THE COURT: Mr. Stahlman? Mr. Girard? Mr. Sachse?

MR. SACHSE: I have nothing to add, your Honor.

MR. GIRARD: I think in their present state your Honor suggested certain changes yesterday that will have to be done, which I will do, before they are ready to be filed, assuming that they are approved.

THE COURT: What about the suggestion that Mr. Veeder makes about the difficulty in places in finding not necessarily the contact underground but the contact on the surface between the older and the younger alluvium?

MR. GIRARD: I don't see that that is insurmountable. Both the State and the United States have submitted evidence wherein

P5

1  the contact is delineated with fairly reasonable accuracy. I
2  don't think it requires a determination of a specific line or
3  description, and I don't see any insurmountable possibility
4  why it wouldn't be possible for them to list in a special
5  exhibit those pieces of land which touch on the younger alluvium
6  as shown on 15-L, 15-E, 15 and the State's exhibits. I would
7  concede certainly that the point of contact between the younger
8  and the older alluvium in many places is not an absolute
9  certainty, but I think it is certainly enough for this type
10 of proceeding. I think it is at least as certain as the
11 factual situation in Pomeroy.
12   MR. SACHSE: I will go a step further, your Honor. At the
13 time the De Luz findings were drafted we used the exact
14 language: "Large portions of this parcel overlie alluvial
15 ground water basins, which basins form part of the subsurface
16 flow of the De Luz Creek."
17   MR. VEEDER: Are you talking about the same parcel that
18 Colonel Bowen was talking about?
19   MR. SACHSE: I don't know what parcel Colonel Bowen was
20 talking about. I am talking about the De Luz Creek finding,
21 Mr. Veeder. I have the language of it right in front of me
22 in my brief: "Large portions of this parcel overlie alluvial
23 ground water basins, which basins form part of the subsurface
24 flow of De Luz Creek." If that was not insurmountable then,
25 I don't see why it is insurmountable now -- that was four years

P6

1  ago and the same exact language was used consistently through-
2  out the De Luz Creek findings.

3  MR. VEEDER: May I be heard, your Honor?

4  MR. STAHLMAN: Just a moment, Mr. Veeder. You argued
5  all day yesterday.

6  MR. SACHSE: That is the only point I care to make on that,
7  your Honor.

8  THE COURT: Mr. Stahlman.

9  MR. STAHLMAN: Your Honor, I think you have no more
10 difficulty in determining this situation than you had in
11 determining the De Luz Creek situation. You have here some
12 maps that can be gone by. I think they were as careful as
13 they could be in determining this younger alluvium. Assuming
14 that this were just a surface stream, without any underflow,
15 the determination of the banks of the stream is always a
16 difficult thing. There are always some uncertainties where
17 it bellies out and swales out. Just where the bank is, is
18 sometimes difficult to determine. We surmounted the situation
19 here in conforming with a ground water area when Colonel Bowen
20 put down the line there. There is no exactness. The line is
21 exact now as to where it is, but as to just what the situation
22 is there in relation to those contacts and whether it doesn't
23 slop over into some part of the underground area and the
24 percolations that are really outside the line and some that
25 are inside the line. So you can't be definite about

P7

1  establishing a characteristic that nature has constructed.
2  When man applies his intelligence to it he comes to a reasonable
3  and fairly definite line of demarkation, and I think it is
4  done in just the manner in which we are doing it here. Nature
5  has constructed it, nature deposited alluvium there with the
6  stream action, and therefore I think it can be determined with
7  reasonable accuracy so as to effect practically the objectives
8  of the litigation as to this ground water.
9      THE COURT: Anything you want to add Mr. Veeder?
10     MR. VEEDER: I wanted to put in, in regard to this situa-
11 tion which Mr. Sachse read from De Luz Creek, we did put in
12 specific facts and there were specific facts which were entire-
13 ly different from this situation here. Colonel Bowen testified
14 with specificity in regard to the very narrow area of younger
15 alluvium concerning which Mr. Sachse read. That is an entirely
16 different situation. There is no evidence here whatever, no
17 comparative evidence.
18     I will not make any further statement. I have interposed
19 my objections. I will follow whatever course you want. If
20 you want us to file new findings of our own, we will do it.
21 If you want us simply to file objections to what has been
22 offered, we will do that.
23     THE COURT: If we adopt this pattern in this ground water
24 area, has anybody given any thought to what situation will
25 develop in the Pechanga -- not the Pechanga.

1  MR. VEEDER: In Anza?

2  THE COURT: No, not Anza.

3  MR. SACHSE: Aguanga.

4  MR. VEEDER: Aguanga.

5  THE COURT: Aguanga.

6  MR. VEEDER: Yes, I have, your Honor.

7  THE COURT: Mr. Veeder has been thinking, and the rest of us have probably been thinking about the situation downstream at Pendleton.

10  MR. SACHSE: The pattern, as I understand it, that Mr. Girard has followed is, in its simplest essence, one of delineating the stream bed and banks as the contact between the older and the younger alluvium. The problem would be no different in Aguanga than anywhere else, unless there is some complicating fact such as the one that Mr. Stark, I believe, argued that the ground water body in Aguanga, the older alluvium was broken up by faults. It has not bothered me. But the pattern to me is a very simple one. It is that the bed and banks of a stream are the contact point between the younger and the older alluvium. It is no different in Aguanga than anywhere else.

22  THE COURT: Do you think the findings should be further enlarged to describe what is fairly clear and obvious as to how flood waters enter these bodies of younger alluvium?

25  MR. SACHSE: It couldn't do any harm. But again it is

purely surplusage, I think. The evidence is before your Honor in the record. It is a question of how detailed you want to make the findings. It would of course be possible to tell how this was laid down geologically and the geologic history of it. Mr. Girard has done some of that, if you recall, in the first paragraph or two of these very findings. I don't think any more than this would be needed.

MR. VEEDER: I think you have raised a question that is extremely important. The alluvium which appears -- for example, I am pointing now to Exhibit 15-E. Here are areas which are more younger alluvial fans, which have been washed in from the sides, not deposited in place by the main flow but brought in by action from the hills. We have that situation very clearly in the Diamond and Domenigoni area, and your point which I would necessarily raise when we come to considering those findings again.

It is our view that where an alluvial fan comes down --

MR. STAHLMAN: What are you pointing to, Mr. Veeder?

MR. VEEDER: I was pointing to an area here where it is obvious that the deposition of the alluvium was not by Temecula Creek.

THE COURT: What area is this?

MR. VEEDER: That would be the Pauba area up through here.

MR. STAHLMAN: When you say "up through here" --

MR. VEEDER: All right, I will point to this stringer that

goes up there. I would say that in regard to the Aguanga area we have a very complex picture there. Particularly in regard to Stardust, where again you have these alluvial fans that come down and branch out, which were not deposited by the main stream action; and nevertheless, applying the concept which is now being advanced, we would say that that land was all riparian to the stream simply by reason of this unusual phenomenon, not unusual really, throughout the whole area, where the younger alluvium is not a matter of having been deposited by Warm Springs Creek but rather simply a deposition from the hills.

MR. SACHSE: As far as Stardust is concerned, I don't know whether it is an alluvial fan condition. And if you recall, I had considerable cross-examination of Mr. Kunkel as to why ground water arose at the bottom, at the narrow end of it. But the whole ranch Stardust is riparian now. And the transcript contains a very clear question by your Honor, which I cited in the brief, where you asked me if I conceded that the ground water extracted by the well which was spudded in the older alluvium, if I conceded those ground waters were part of the stream. I did. And I did so because of this very assumption, and I had always assumed, that this area at the contact point was to be it, and this was so close to the contact point that I said I conceded. If Mr. Veeder is right, my concession should never have been made.

MR. VEEDER: No one ever dreamed, I never dreamed that I

P11

1  would be confronted with the proposition that we were going to
2  delineate the bed and bank by the contact between the older
3  and the younger alluvium. This is something so far away from
4  anything I have ever comprehended.

5  THE COURT: No one ever thought and no one ever dreamed,
6  until about June of this year, that you were going to make
7  this new point which required reanalysis of this whole matter.

8  MR. VEEDER: Why don't we go ahead and enter the findings
9  and I will follow the course I have outlined. I think I have
10 taken enough of the time of the Court.

11 MR. SACHSE: Some defendant did dream this. This express
12 suggestion was contained in my 1957 memorandum, written at the
13 Court's direction, when we all discussed how these waters
14 should be classified. I even drew a picture to spell out the
15 fact that we should treat the stream water as water underneath
16 the younger alluvium. You have always so contended, and it is
17 in a written instrument in the record -- not just the transcript,
18 a written memorandum with a sketch attached.

19 MR. VEEDER: I will have to see it.

20 THE COURT: Mr. Girard, proceed to remodel it again. I
21 want to have some time to go over them, too. This probably
22 won't be the final form, but might as well make copies for
23 counsel while you are working on it.

24 MR. GIRARD: Yes, your Honor.

25 THE COURT: What else do we have to take up?

1   MR. GIRARD: I was a little concerned with one statement
2   that Mr. Veeder made to the effect that he was going to argue
3   on the Diamond-Domengoni findings. It was my understanding that
4   those were acceptable to everyone. If that is incorrect, I
5   would like to know about it, because we had been holding up
6   submitting those to the Court until Colonel Bowen got his
7   exhibits attached and I was under the impression that there
8   were no objections to those findings.
9       THE COURT: Are you prepared to state now what objections
10  there are?
11      MR. VEEDER: I am going to make objections throughout that
12  there is absolutely no basis for having the contacts between
13  the younger and the older alluvium for riparian land.
14      MR. SACHSE: That isn't applicable to Diamond and Domenigoni.
15      MR. VEEDER: Where it is applicable.
16      The way you handle these things, your Honor, as I see it,
17  is that when a new issue comes up you have to confront it. We
18  have the picture of the lands in Diamond and Domenigoni Valley
19  which do not abut upon or are traversed by the stream, but
20  which would nevertheless be riparian. And I will simply say
21  I will interpose objection to that, because I never dreamed
22  of such a thing. I know when we were directed to proceed to
23  line up the riparian lands we never dreamed of this. We
24  always thought lands which were traversed by or abutted upon
25  the stream were riparian, and I will never change that position.

1  MR. SACHSE: That isn't in the Diamond and Domenigoni
2  findings -- that lands not abutting upon the stream are riparian.
3  MR. VEEDER: Certainly you are going to have this same
4  proposition involved there, that lands which are not traversed
5  by Warm Springs Creek are not riparian. I am going to inter-
6  pose that objection to those, because there are many parcels
7  of land in the Diamond and Domenigoni area which do not abut
8  upon or which are not traversed by the stream.
9  MR. SACHSE: I don't know whether Mr. Veeder has forgotten
10 what the basic decision in Diamond and Domenigoni Valley was.
11 It was that the ground waters -- I can't think of the exact
12 number of feet, twelve feet, I believe -- the ground waters
13 twelve feet below the surface were not part of the stream
14 system. So you can't have this physical condition in Diamond
15 and Domenigoni Valley. The ground water is twelve feet below
16 the surface. The finding of the Court specifically was that
17 they flowed the other way.
18 My twelve feet may be wrong, but there was a lip involved.
19 MR. VEEDER: He is very wrong.
20 MR. SACHSE: It is not very far wrong.
21 MR. VEEDER: When the waters are such that they flow over
22 the lip, those waters are part of the Santa Margarita River
23 system.
24 MR. SACHSE: That is correct.
25 MR. VEEDER: However, I have taken all the time that I can

P14

1  on it. I have made my point. You understand the point. Let's
2  go ahead. It is an appealable matter.
3      MR. STAHLMAN: I want to add one thing more, your Honor.
4  I am just as amazed that Mr. Veeder confines the stream to
5  these bed and banks he has argued about here for a day and a
6  half. I have had some litigation previously on these Southern
7  California rivers. I have had engineers who were well qualified
8  who have testified in relation to other streams where we have
9  this same situation, and not once, and there were pretty good
10 lawyers on the other side, like Mr. Swing and some of the
11 lawyers in well known water law firms, and never once did any-
12 one ever quarrel with the proposition that in those streams
13 like the Bonsall Basin, for instance, that the waters that are
14 flowing underground through the deposited alluvium where they
15 percolate in the same direction, that all the land that attaches
16 upon there is riparian. There have been decisions on that. I
17 can't understand how a man with the experience that Mr. Veeder
18 has cannot follow the things that have been followed in
19 California.
20     THE COURT: You are going to work on this brief and try to
21 have it some time tomorrow?
22     MR. VEEDER: I will try very hard, your Honor.
23     THE COURT: Then we will set that for Friday morning.
24     MR. VEEDER: Is that what you want, Mr. Girard?
25     MR. GIRARD: That is agreeable with me, although I would

P15

1  prefer to set it for Monday. Are we going to meet tomorrow?

2  THE COURT: Set it for Monday?

3  MR. GIRARD: If were not going to meet tomorrow I would
4  go home tonight and finish these up with my secretary in
5  Sacramento and be here on Monday to argue it.

6  THE COURT: On Monday?

7  MR. GIRARD: If it is possible.

8  I can be here Friday. I can stay here and be here Friday.

9  THE COURT: I understood you were going to be gone.

10 MR. STAHLMAN: I will be here Monday. I am leaving on
11 Tuesday.

12 MR. GIRARD: I realize that this is for my convenience and
13 no one else's, and I can be here Friday. Let's leave it
14 Friday, your Honor. I will withdraw that request and let's
15 have it on Friday. I hope we can get through with it in one
16 day. Mr. Stahlman and Mr. Sachse both would prefer Friday.

17 THE COURT: Friday morning at 10 o'clock.

18 MR. SACHSE: May I inquire, your Honor and Mr. Veeder,
19 because I have a couple of little cases that I ought to try to
20 get squared away, are we planning anything for next week in the
21 light of Mr. Stahlman's absence?

22 MR. VEEDER: I think it is entirely up to your Honor.

23 THE COURT: I think we probably should not. You have lots
24 of work to do.

25 MR. VEEDER: If we have no sessions in the week of the 25th,

P16

1  I would try to get my work pulled around and leave for a while.

2  MR. STAHLMAN: We can come down and pick it up.

3  MR. VEEDER: If I can find someone to deliver it to your
4  place, I will.

5  THE COURT: Let's decide on Friday what we do about next
6  week.

7  MR. SACHSE: All right.

8  MR. VEEDER: I will get it to you as fast as I can.

9  THE COURT: I would like to talk to you off the record.
10 You might as well come into chambers -- Colonel Bowen and Sandy
11 and all of you.

12  (Whereupon there was an adjournment into chambers.)

13  (Adjournment until Friday, September 22, 1961, 10:00)
14  (o'clock A.M.

15  - - -

JOHN SWADER, OFFICIAL REPORTER

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,      )
                               )
                  Plaintiff,   )
                               )
     vs.                       )   No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                  Defendants.  )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: September 20, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing ___17___ pages of type written matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 20th day of September 1961.

*John Swader*
Official Reporter

JOHN SWADER, OFFICIAL REPORTER