# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

– – – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – – –

UNITED STATES OF AMERICA,

               Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

               Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     September 22, 1961

Pages:    18,031 to 18,097

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
     vs.                       )     No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                 Defendants.   )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, September 22, 1961

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Vail Company: | GEORGE STAHLMAN, ESQ. |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE, ESQ. |

16,032

P2

SAN DIEGO, CALIFORNIA, Friday, September 22, 1961, 10:00 A.M.

--oOo--

(Other matters.)

THE CLERK:   3-1247-SD-C United States of America vs. Fallbrook.

THE COURT:  All right.

MR. VEEDER:  Your Honor, I would like to make a brief statement in regard to the position of the United States of America in this case, particularly in view of some of the questions that were raised in the earlier argument.

I believe, your Honor, that there is a single matter for determination here, and that is whether the waters impounded and stored in the Santa Margarita coastal basin are percolating in character.

There are two important factors which, we believe, are controlling in regard to the question whether these waters are percolating.  First, there is a presumption that they are, and there is no evidence to the contrary.  Secondly, there is positive proof that when waters leave a stream, fingering out through the interstices which comprise the basin, that water is percolating.  There is no question in my mind.  I believe your Honor could so find that these waters percolate.

So we turn to the question of how much water is there percolating in this basin?  The undisputed fact is that there are approximately 50,000 acre feet of percolating water in

18,033

P3

1    the basin.  The waters which percolate in the basin have an

2    outlet in the Ysidaro Narrows, through which not more than

3    100 acre feet a year would percolate under normal circumstances.

4         THE COURT:  Because you are pumping.  Don't say "under

5    normal circumstances."

6         MR. STAHLMAN:  That's the point.

7         THE COURT:  By "normal circumstances" do you mean in a

8    state of nature?

9         MR. VEEDER:  In a state of nature where the waters come

10   down, enter the clay, enter the detritus which is in the

11   Narrows of Ysidaro.

12        THE COURT:  Let's assume for argument that only a hundred

13   acre feet could go through the underground material at Ysidaro.

14   In a state of nature there would be a surplus flow at Ysidaro

15   brought up by the water from below coming down toward this

16   Narrows and it would flow across in a surface flow.  So it

17   would be more than a hundred acre feet.

18        MR. VEEDER:  I am speaking strictly of the water perco-

19   lating through these Narrows.  The evidence is in that there

20   would be a hundred acre feet go through there.

21        THE COURT:  Let the record show also the fact that the

22   evidence does not show 50,000 acre feet; it shows 25,000

23   usable acre feet of water.

24        MR. VEEDER:  Well, it shows approximately 50,000 acre

25   feet impounded, and that of that storage there is 24,000 acre

18,034

P54

1   useable.

2        THE COURT:  That is just what I said.

3        MR. VEEDER:  Now your Honor, the important point that I

4   desire to raise here, though, is that there is a vast quantity

5   of water impounded and percolating in  this basin, and of

6   that the evidence shows 100 acre feet would go through the

7   Narrows underground.

8        THE COURT:  If you didn't pump, where would the water go?

9        MR. VEEDER:  If we didn't pump?

10       THE COURT:  In a state of nature.  I just got through

11  reading again the Vail case and how the testimony showed that

12  for years they watered cattle; that the water ran in the

13  stream, and when it didn't run there were pools; and the thing

14  that the Santa Margarita Company was claiming was that for a

15  series of years in the 20's this water had ceased to run and

16  they had to go in, take a bulldozer, dig down a couple of feet

17  so they could pump water.

18       MR. VEEDER:  That is right, in the River.

19       THE COURT:  If you didn't pump, water would run out of

20  the Ysidaro Narrows.

21       MR. VEEDER:  There would probably be water running out,

22  yes.  But that is beside the point, your Honor.  As in the

23  Pomeroy case, the Los Angeles River, where it gets down to

24  the Narrows and to the outlet is a surface stream.  But that

25  court clearly holds, and the instructions were very clear, that

P5

1    the waters in the basin upstream above the stream came to the

2    surface and upstream above where water percolated through the

3    Narrows it said that was not a water course but was a basin.

4        And that is exactly what I am saying here.  That the

5    waters above the Narrows of Ysidaro are confined, and always

6    have been confined historically, in a ground water basin; and

7    this is a ground water basin full of percolating water.  It

8    doesn't matter, under the California law, that ultimately

9    this water comes down the Narrows, rises to the surface and

10   passes through.  The California State Water Rights Board has

11   ruled repeatedly, and the cases have ruled, that it is a

12   question whether the water is percolating at the point at

13   which it is pumped.  And that water is truly percolating

14   through the interstices of the basin.

15       THE COURT:  The question is, at the point of diversion

16   is there an underground stream?  All of this water, whether

17   it is percolating out in a basin which would not be part of a

18   stream or whether it is in place immediately below a stream,

19   is percolating -- moving slowly.  Water doesn't gush or flow

20   in underground channels.  It moves.  I don't think it is a

21   question whether it percolates at the point of diversion.  It

22   is whether there is a stream at the point of diversion with

23   known bed and banks.

24       MR. VEEDER:  Your Honor, the point that was made in the

25   Pomeroy and Hunter case is that above the Narrows the waters

P6

1  percolate in a basin, and that is the point of that case.  It

2  is clear beyond question that that was the instruction that

3  was given to the jury at that time.

4      THE COURT:  Isn't it just as easy to find that the entire

5  reach of the Santa Margarita River from the Gorge to the ocean

6  is the equivalent of the Narrows at Griffith Park?

7      MR. VEEDER:  No, indeed, your Honor, it is not.  The

8  point being that you have a basin 24 miles long and 12 miles

9  wide in the San Fernando Valley and naturally the outlet

10  through the Verdugo Hills would be larger than the outlet for

11  a basin of the size of the Santa Margarita coastal basin.

12      THE COURT:  We have upstream large ground water areas

13  and an immense watershed.  We have the equivalent of ground

14  water areas or basins upstream above the Gorge.

15      MR. VEEDER:  That is right.

16      THE COURT:  Is there any difference, then, between a

17  long narrow stream which leads out from the basin and a short

18  one?

19      MR. VEEDER:  Your Honor, if we are now talking about the

20  Murrieta-Temecula Basin upstream, I believe again the San

21  Fernando Valley or the Raymond Basin are precisely in point.

22  The waters before they come down to the constriction where

23  they rise and depart through the outlet are percolating waters,

24  and California's Rules and Regulations say that when the

25  water is percolating in the basin you do not have to file an

18,037

P7

1    application to appropriate that water.  That is the crux of

2    the matter.

3        In regard to our basin, though, the Santa Margarita coastal

4    basin, as designated by California, there is no doubt it is

5    two and a half miles wide at the widest point; that the waters

6    in that basin, just like in the Raymond Basin, just like in

7    the San Fernando Valley Basin, are slow moving down gradient,

8    it is true; but they are percolating, not in a well defined

9    stream, and that is the point.

10       I have checked out this matter of the bed and banks of

11   streams.  There is not a single authority that I have been

12   able to find which has ever declared that the bluffs on each

13   side of a ground water basin are the banks and that the sur-

14   face of the alluvial plane is the bed.

15        THE COURT:  I got down at eight o'clock this morning and

16   read some cases.  You say you checked them all out.  Your

17   statement is not correct.  I rechecked the Verdugo case, an

18   area with which I am familiar, where the canyon is 802,000

19   feet wide.  I checked some language in the Peabody case.  I

20   checked again some of the language in the Vail case.  I was

21   looking in particular for rivers in Southern California.

22        MR. VEEDER:  Yes.

23        THE COURT:  I checked the case on the Ventura River.  I

24   checked the case on the San Pasqual River up river from

25   Sawday.  And your statement is too broad.  I don't have the

18,038

P8

1    extracts here.

2    MR. VEEDER:  Your Honor, in regard to these cases, there

3    is one question and only one question here.  It is true that

4    California has ruled in a decision following Judge Ault's

5    decision in regard to Mission Basin.

6    THE COURT:  I am as competent as is the State Water Rights

7    Board to decide these matters.  You say California has ruled.

8    You mean the State Water Rights Board has ruled.

9    MR. VEEDER:  That is right.

10   THE COURT:  I would be much more impressed by what the

11   Supreme Court has to say.  And no reflection intended on the

12   State Water Rights Board.  It is not even a court of con-

13   current jurisdiction with my court -- or body.

14   MR. VEEDER:  It is not a court at all, your Honor.

15   THE COURT:  That is right.

16   MR. VEEDER:  But I think it is highly important in

17   ruling in regard to the Marines' pumping of percolating water

18   that the criteria adopted by California evinces the fact that

19   the controlling element is, is the water percolating at the

20   point of diversion, and the point of diversion where we are

21   pumping --

22   MR. GIRARD:  What case are you talking about?  Are you

23   talking about Application No. 17666?

24   MR. VEEDER:  That is correct.

25   MR. GIRARD:  All right.

P9

1    MR. VEEDER:   In Peabody the issue didn't arise.   In

2    Peabody vs. Vallejo that question was not present.   It did

3    arise, however, in Pasadena vs. Alhambra, and they said

4    specifically there that Section 1200 and related sections do

5    not relate to percolating waters.

6        I refer now to the Orange County cases.   During my

7    original argument I was repeatedly interrupted on the grounds

8    that the waters there, the rights there all related to

9    appropriations antecedent to 1914.   Those attacks during my

10   argument were incorrect.   I have the Santa Ana report here

11   which reviews the situation.   I have talked to Mr. Krieger

12   about it.   And the rights involved there, many of them, were

13   after 1914.

14       So I allude again to what was declared in <u>175 Cal. App.</u>

15   <u>2d 518, at page 524</u>, in which the court specifically declared

16   in regard to the Santa Ana River and the basins comprising it:

Belt 2    17       "* * For the most part this legislation relates only

18        to appropriation from surface water and subterranean

19        <u>streams</u> and the use of the water appropriated therefrom

20        as distinguished from appropriations from underground

21        lakes or basins (State Water Code Sections 1200, 1201.* *"

22       The matter was again before the court for review in 173

23   Cal. App. 2d at page 137 and page 192.   The court says:

24       "All the appropriations by appellant cities * * are of

25        percolating water * *"

P10

1    Therefore, the Court held that that Section 1200 did not apply.

2    I want to straighten those out because your Honor said I

3    was attempting to confuse you in regard to those cases.  The

4    fact remains that in these cases and in the interpretations

5    that have been placed upon them, in regard to Judge Ault's

6    ruling in connection with the Mission Basin, in every instance

7    it has been declared where the issue arose, where the issue

8    was before the Court, does Section 1200 relate to percolating

9    water in a ground water basin?  And the cases held that it

10   does not apply.

11        THE COURT:  Of course, you beg the question.  You start

12   with the premise that these are basins and not the underflow

13   of a stream, and of course if you accept your premise that

14   they are basins and not the underflow of the stream a lot of

15   what you say makes sense.  But you beg the question from the

16   very beginning.

17        MR. VEEDER:  Beg what question?

18        THE COURT:  Whether this water in the area of Pendleton

19   is the underflow of the River or whether it is a basin.

20        MR. VEEDER:  Your Honor, to begin with, California has

21   specifically called these the Santa Margarita Coastal Basins,

22   and California has declared that the waters stored in that

23   subterranean basin, the usable storage, is 24,000 acre feet;

24   that water in those interstices in that lenticular area, in

25   Chappo Basin, the largest of the sub-basins, cannot be said

P11

1   to be the subflow of the Santa Margarita River.  It is perco-

2   lating.  It has left, it has debauched out of the canyon, it

3   has gone underground, it is spread out through two and a half

4   miles of alluvium.

5       THE COURT:  When in the Spring water is running down and

6   comes down as far as Lake O'Neill where you would trap it, do

7   you concede there is any underflow in that area?

8       MR. VEEDER:  There may be some underflow.

9       THE COURT:  Where would it be?

10      MR. VEEDER:  It would be immediately under the stream and

11  very shallow.

12      THE COURT:  And very shallow.

13      MR. VEEDER:  Because once, under the California cases,

14  the water has left the stream so that it is no longer identified

15  with the flow, one of the most important elements here is, is

16  this water part of the flow?  Can it be honestly found that

17  this water is part of the flow?  And it cannot be found, in

18  my view, to be part of the flow.

19      THE COURT:  I think the mistake you make is that you

20  assume that as soon as one of these surface streams dries up

21  that it ceases to be a stream, when as a matter of fact the

22  reason that water used to flow in the Santa Margarita through-

23  out the Santa Margarita Rancho was that the underground flow

24  was sufficient to maintain the flow on the surface.  And I

25  don't think that automatically the minute the underground water

P12

1   is lower than the bed of the stream and no longer in contact

2   with the stream bed and it becomes a dry stream, I don't think

3   you then say that it ceases to flow, because we know that

4   further downstream it again comes to the surface and flows on

5   the surface.  It may sink in again, and then flow on the sur-

6   face again.

7       MR. VEEDER:  Right.  But a mile away from where the

8   surface stream is, it can't be said that that water is part

9   of the surface flow or sub-surface flow.

10      And here is something that is extremely important, and

11  the cases so hold, that the fact that ultimately it goes out

12  as a surface or ground water subterranean stream does not

13  mean that it is part of a subterranean.  It is a basin.  It

14  is a reservoir.  And this is a reservoir and a basin that is

15  involved here, and the waters which have fingered out and

16  spread out through this basin are percolating waters, and they

17  are such that, under California's rules and California's

18  decisions, they would be held to be percolating waters -- they

19  have so far departed from the stream.  And your Honor, I

20  believe, will find that the waters over in the southern part

21  a mile and a half away from a dry stream bed are not part of

22  a subterranean stream, but rather they are percolating waters

23  in a basin or a ground water reservoir.

24      And that is why California has, in my view, adopted the

25  rule, which I have repeated in this brief and have stated

P13

1   previously; California has declared that where waters are

2   percolating, where waters are percolating in a stream in a

3   basin, you need not file an application to appropriate. The

4   waters which percolate through the ground water basins at

5   Camp Pendleton do not follow any pattern. They are governed

6   by the lenticular elements which they encounter, they are

7   governed by gravity, they are governed by numerous factors.

8        THE COURT: That would be true of all water underground,

9   whether it was part of the stream or not.

10       MR. VEEDER: Your Honor, that is exactly what happened

11  in the Raymond Basin and in San Fernando Valley. San Fernando

12  Valley has been relied upon by counsel in all of their argu-

13  ments. I checked this out with the State Water Rights Board

14  and I checked this out with counsel in the San Fernando cases,

15  and they said there has never been a filing required by these

16  people who are using water. Admittedly these rights in the

17  San Fernando Valley are subject to the pueblo right of Los

18  Angeles, but among themselves they do have interests in

19  that basin. That matter is now being adjudicated. In the

20  San Fernando Valley there has never been a filing of an

21  application to appropriate the percolating waters of the San

22  Fernando Valley. And I think we are being charged here with

23  the responsibility, we are being required to do something --

24  the Marines, the Navy, the United States is being required to

25  do something in regard to the acquisition of a right that no

P14

1   one else is required to do.  And we believe that it is

2   discriminatory.  We believe that it is error to require

3   something of the United States of America that would not be

4   required of anyone else under the circumstances.

5       Your Honor has alluded on several occasions to the case

6   of <u>Rancho Santa Margarita</u> (11 Cal. 2d).  You will observe, your

7   Honor, the language is clear;  they refer to the surface flow,

8   they refer to the sub-surface flow, and they refer to the

9   waters in the underground basin.  So even in that case,

10  although the issue was not presented there, they did recognize

11  that there was a difference in the flow of the waters of the

12  stream.  And it is the law of California, your Honor, that

13  even if the percolating waters ultimately come together and

14  form the surface stream or the sub-surface stream, they are

15  nevertheless percolating when they are impounded in the basin.

16  And that is the whole crux of the matter.

17      I have reviewed the geology that we entered.  I have

18  reviewed the factors which are important here.  Does your

19  Honor have Exhibit 45 before him?

20      THE COURT:  I have Exhibit 40, which shows the basin.

21      MR. SACHSE:  Exhibit 45, your Honor.

22      MR. STAHLMAN:  Exhibit 45.

23      MR. VEEDER:  Your Honor, in regard to Exhibit 45 -- can

24  your Honor see it?

25      (The Court steps down from the Bench.)

1    MR. VEEDER:  Your Honor will observe that the waters in

2   Chappo Basin, for example, while they progress toward the

3   ocean as in the San Fernando Valley, they nevertheless have no

4   single course to pursue.  They are percolating.  They may go

5   one way, they may go another.  It is true that ultimately they

6   come down through the Narrows, just as in the San Fernando

7   Valley.  But in the area upstream the waters are percolating.

8   They are controlled by the interstices as shown on Exhibit 38.

9       THE COURT:  Of course, the only one on which there would

10   be any question is not the Upper or the Ysidaro, but the so-

11   called Chappo Basin.  You can't claim that the Chappo Basin,

12   of probably --

13       MR. VEEDER:  Two and a half miles wide, your Honor.

14       THE COURT:  -- of probably not over four square miles at

15   the outside, can be compared with the San Fernando Valley or

16   the Raymond Basin.

17       MR. VEEDER:  I think it can be, and I think the only

18   significant difference, your Honor -- there is only one issue:

19   Is the water percolating at the point where it is pumped?  Is

20   it percolating through these interstices?  And I submit that

21   they are.  I submit that the California rule in regard to the

22   appropriation of percolating waters is squarely in point.  I

23   think it was written in contemplation of just the situation

24   that prevails here.

25       Now your Honor has made one statement that worries me.

P16

1   You have stated that in a state of nature the Santa Margarita

2   River was a continuously flowing stream.

3       THE COURT:  Not at all times of the year.

4       MR. VEEDER:  That is right.

5       THE COURT:  But it was a stream that flowed, according

6   to the reports in the Vail case, which talk about the twenties.

7   I have been interested to know what the report of the water

8   engineers in 1880 said about it.  I think that is in evidence

9   somewhere.  But it flowed awhile and would come to the surface

10   in a pool, sink down, flow again, come up in a pool.  It did

11   this maybe not in the extremely dry season, but it was a lot

12   different than it is now.

13       MR. VEEDER:  But your Honor, the fact remains and the

14   cases bear out this proposition that it is true that the

15   percolating waters immediately under the bed of the stream

16   may be in contact with the surface stream and may progress

17   along with it.  That may be.  You can apply that rule here.

18   I don't recommend it because I don't think it is applicable.

19   But I do say this, that the waters a mile and a half away

20   have so far departed from the surface stream that you cannot

21   identify them with the flow of the stream.

22       THE COURT:  Your own exhibit shows a water gradient and

23   a water level, and the waters that are a mile away that you

24   speak of are necessary to support a stream.  In other words,

25   if there were no waters in this area a mile away, the stream

18,047

P17

1    waters coming down or the surface stream would fill up this

2    area and it would only be when the level was brought up from

3    bank to bank that the stream could again flow as a surface flow.

4        MR. VEEDER:  That is true of every single basin.

5        THE COURT:  It is not true of every single basin, because

6    in what we would without dispute call a basin such as the San

7    Fernando Valley or the Raymond Basin you don't have a basin

8    supporting a surface stream in the basin itself.  There is no

9    stream.

10       MR. VEEDER:  Ultimately it does.  Ultimately the Los

11   Angeles River is supported.

12       THE COURT:  When it does ultimately, they call it an

13   underground river.

14       MR. VEEDER:  Yes.

15       THE COURT:  You don't have a surface stream flowing across

16   the basin that is supported by water in the basin.  It is not

17   that kind of animal.

18       MR. VEEDER:  That is exactly what San Fernando Valley is.

19       THE COURT:  There is no surface stream that flows on the

20   surface across San Fernando Valley, except down at the Narrows.

21       MR. VEEDER:  Your Honor, the Los Angeles River was a

22   flowing stream well upstream on the surface of the basin.

23       THE COURT:  How far up?

24       MR. VEEDER:  Several miles above the Narrows.

25       THE COURT:  Within the Narrows.

P18

1    MR. VEEDER:   In a state of nature.

2    And that is exactly the Santa Margarita case.

3    THE COURT:   This is the area which they said was the

4    underground stream.   The Los Angeles River, or with the tribu-

5    taries that came to the Los Angeles River in that area, flowed

6    on the surface only at time of flood, and then in the higher

7    areas for a short time in the Spring.   But across the basin

8    of San Fernando Valley there were no surface streams that

9    flowed except right at flood time.

10   MR. VEEDER:   With all respect to your Honor, I have read

11   about the Los Angeles River in a state of nature prior to the

12   pumping, and it was an extended river, just exactly like the

13   Santa Margarita.   The Santa Margarita as it approached the

14   ocean would become a flowing stream because the percolating

15   waters had moved down there and formed the stream.   And that

16   is exactly the situation here.   And that is exactly the

17   situation in the Raymond Basin.

18   THE COURT:   You have said this a hundred times, and I

19   don't think you are adding anything to it.

20   MR. VEEDER:   I have presented our position, your Honor.

21   THE COURT:   I would like to have you discuss another

22   proposition.   I don't think there are any underground waters

23   that can be called surplus.   The only surplus on this stream

24   is flood waters, and I am prepared to so find.   The only

25   surplus waters on this stream are flood waters, and I don't

P19

1    how you could possibly contend that there is a surplus of

2    water underground that you can appropriate.

3        MR. VEEDER:  Your Honor, our position in that regard is

4    that in regard to the appropriation of water by the pumping of

5    it and the diversion outside the watershed, it can still be

6    an appropriation, even though there is no surplus water.  Now

7    that is true.  And that is the case in the Raymond Basin, and

8    that is how those prescriptive rights arose.

9        THE COURT:  You could appropriate water wrongfully that

10   was needed by other riparians and something was not done about

11   it, and if it were not for the fact that prescription will not

12   run upstream you might get a prescriptive right like in a

13   basin situation.  But there is no surplus water that would

14   become a basis for a legal appropriation.

15       MR. VEEDER:  Your Honor, there is nobody competing with

16   us in our basin.  Therefore, the question of prescription in

17   the basin couldn't arise.  But certainly when you pump the

18   water out of the basin and export it from the watershed, there

19   is an appropriation.  That is exactly what Judge Ault held.

20       THE COURT:  Is it the kind of appropriation where you

21   have a right to continue it?

22       MR. VEEDER:  Yes.

23       THE COURT:  And to require riparians upstream to let

24   water down to you?

25       MR. VEEDER:  I am not talking about riparians.  I am

P20

1    talking about subsequent appropriators.

2         THE COURT:  Subsequent appropriators.

3         MR. VEEDER:  And that is exactly the situation.

4         THE COURT:  I can't be convinced.  You are talking about

5    subsequent appropriators and you are not talking about water

6    to which there are riparian rights.  You are then talking about

7    surplus water.

8         MR. VEEDER:  I am talking about water for which there is

9    no immediate overlying or riparian claim.  That is what I am

10   talking about.  I am talking about that water which would come

11   down and recharge our basins if it were not interfered with,

12   by upstream appropriators.  That is what I am talking about.

13   It is the water that would normally flow down and recharge our

14   basins and not needed by riparians and not needed by overlying

15   users.  And that water is what we export from the basin, and

16   that is the water we are claiming here.

17        THE COURT:  But you claim you have a right to have water

18   come down because you are a riparian, and so the water comes

19   down to your basin.  Now you can't at the same time say, "Now

20   the water has got here, therefore it is surplus water,"

21   because you admit there is no surplus -- you claim there is

22   not enough water in your basins to take care of your needs.

23   Therefore, you brought the lawsuit, and therefore you are

24   trying to get an adjudication of rights so that you could get

25   more water to come down.  How can you claim this is surplus

P21

1     water?  The surplus, if there is any on this stream, is flood

2     water, and this is all that Fallbrook will be able to appro-

3     priate.  You are not trying to get your dipper into the flood

4     waters.  You are saying, "We are going to take this water out

5     of our basin, and because we take it out of the basin we

6     therefore say it is surplus and therefore we have an appropria-

7     tive right ahead of the people who are trying to appropriate

8     the flood waters."

9     MR. VEEDER:  Your Honor, let me make this extremely clear.

10    You don't have to have surplus water to effectuate an

11    appropriation of percolating waters from the basin.

12    THE COURT:  Physically to appropriate it.  But to have

13    it adjudicated that you have any kind of right, it has to

14    appear that there is some water over and above what is needed

15    by riparian and overlying owners.

16    MR. VEEDER:  That is not the rule in Pasadena vs.

17    Alhambra.  Pasadena vs. Alhambra says  specifically --

18    THE COURT:  Mr. Veeder, there they said that this

19    appropriation which was wrongful had become prescriptive and

20    therefore there was a right to it.  There is no doubt that

21    you physically can appropriate water.  You have done it.  You

22    have taken it out of the basin.  The question is, what kind

23    of right can I adjudicate?  Can you say it has become a

24    prescriptive right?

25    MR. VEEDER:  I don't have to.

18,052

P22

1    THE COURT:  Can I adjudicate it as being an appropriative

2    right to a surplus?  No, there is no surplus except flood

3    waters.  What kind of right is it, then, that I adjudicate for

4    you?

5    MR. VEEDER:  You adjudicate an appropriative right to

6    the use of waters in addition to our riparian and overlying

7    rights, and that appropriative rights will be prior to the

8    Fallbrook claims and prior to Vail Dam, and that is the waters

9    that we appropriated.  It was percolating waters in a ground

10   water basin.  And we respectfully submit that, in justice,

11   we are entitled to have that adjudged, and ahead of Fallbrook

12   and ahead of Vail Company.

13   MR. GIRARD:  Your Honor, I will comment directly on Mr.

14   Veeder's brief, if I might.

15   THE COURT:  I would like to have one or both of you

16   comment on this business about this appropriative right and

17   what kind of right it could possibly be and what it is that

18   he appropriates et cetera.  But go ahead in whatever order you

19   want to.

20   MR. GIRARD:  All right.  I will comment on that in

21   closing.

22   Concerning myself directly with the matters discussed in

23   Mr. Veeder's brief, I think commencing at approximately page

24   20 with the Pomeroy case, on page 21 at the bottom of the page

25   a quote from the Pomeroy case is underlined with the apparent

P23

1    intent to indicate that the only waters with which the Court

2    were concerned to be in the stream were those in the narrow

3    outlet of the valley between the two mountains, which is

4    certainly correct.  That is what the Court was concerned with.

5         However, if you will just go on where Mr. Veeder stopped

6    quoting with the word "hand" and ad the following, you will

7    find it is almost exactly identical to our factual situation:

8              "It is true this basin on the surface is from one and

9              a half to two and a half miles in width."

10   In other words, it is exactly the factual situation that we

11   have here.

12        I think Mr. Veeder conceded five minutes ago that the

13   wide part of his ground water area is two and a half miles.

14   Actually, the total amount of the basin down there, as he

15   called it, is roughly 288 square miles, whereas ours is at

16   most four square miles at Camp Pendleton Basin.  So there is

17   no comparison between those two.

18        But the point is that in the Pomeroy case the factual

19   situation where these wells were was in younger alluvium in

20   a confined position roughly two and a half miles in extent.

21   The factual situation in the Pomeroy case is outlined also on

22   pages 606 and 617 of the Decision of the California Supreme

23   Court, and it clearly indicates there that the factual situation

24   where the Supreme Court concluded that the waters were in a

25   known and defined channel is almost identical with the situation

P24

Belt 3

1   in the Pendleton Basin.

2       Your Honor did comment, and I will not reiterate, on the

3   question of the hundred feet going through the outlet, because

4   it is perfectly apparent from the exhibit cited in Mr. Veeder's

5   brief -- I believe it was 49, I am not sure -- but anyway that

6   concerns the years 1942, through 1960, when of course you had

7   pumping.  I don't think there is any question that under natural

8   conditions you would have substantially more going out either

9   through the alluvium or rising to the surface.

10      Almost exclusively Mr. Veeder's brief is directed to the

11  decision by Judge Ault.  Of course, I am not going to get

12  into the problem of Judge Ault's factual situation.  It is not

13  a final decision.  No findings have been made.  As I emphasized

14  the other day, and as I think was brought out by your Honor,

15  that in talking to Judge Ault he decided the case without

16  anybody even bringing his attention to the Pomeroy case.  The

17  question there was basically prescriptive claims as distinguished

18  from this situation.  And I feel that even if you concede that

19  his decision is inconsistent, which I don't, but even if you

20  do, I don't think it is particularly pertinent in this case

21  where counsel have relied primarily on Pomeroy and Hunter and

22  related cases which weren't brought to his attention.  Moreover,

23  that decision is not final.

24      Mr. Veeder cites the fact that the State Water Rights

25  Board is holding hearings, et cetera.  The answer to that is

P25

1    that the State Water Rights Board hasn't even ruled on it.  I

2    don't see how you can cite any case that is merely submitted as

3    being authority for anything.

4        Mr. Veeder did quote at length in his argument and cited

5    in his brief the Application 17666, which concerned the

6    appropriation from Cache Creek by the Mojave Public Utility

7    District in Kern County.  That was a case where the State

8    Water Rights Board concluded that the waters were not in a

9    known and defined channel.  It is obvious that it has no

10   similarity at all to our facts.  In the first place, the

11   situation as far as the alluvium is concerned is almost

12   identical with the Diamond and Domenigoni type of situation.

13   There was not any known and defined banks.  As brought out on

14   page 6 of that opinion:

15       "The east bank of Cache Creek is shown as well

16   defined (Mojave Exhibit 1, and Monolith Exhibt 5),

17       but the west bank is not well defined because of breaks

18   in the banks at both the North and Proctor Gap."

19   Reading above:

20       "The right (west) bank of the basin is neither

21   continuous nor well defined due to the breaks at North

22   Gap and Proctor Gap where the water bearing materials

23   are contiguous to and in contact with similar deposits

24   in Tehachapi Valley.  These offer a means for flow of

25   ground water to or from Tehachapi Valley ground water

18,056

P26

1    basin depending on the hydraulic gradient."

2    In other words, you didn't have known and defined banks

3    in that case.  It is squarely in the decision.

4    Moreover, in this case there was no claim made that these

5    ground waters which defendant contended were in a known and

6    defined channel were in contact with any certain stream -- in

7    fact, the opposite contention was made.

8    I don't cite this decision as being any great authority.

9    As your Honor points out, this is an administrative body.  But

10    on page 5 of the Decision they indicate that if the facts were

11    like the facts in our case it might very well be in a known

12    and defined channel.

13        "There is one place about a mile and a half to

14        the south and east of Well S-26 near Tehachapi Pass

15        where the flow of underground water is concentrated

16        and has the definite and visible characteristics of

17        a small underground stream.  At this point, the bedrock

18        walls have constricted the alluvium-filled channel to

19        the extent that surplus water at times has been forced

20        to the surface as rising water."

21    Just exactly the situation we have at Camp Pendleton.

22    In short, this decision, if anything, is directly

23    contrary to Mr. Veeder's position, and even looking at it in

24    the light most favorable to him it has no application whatso-

25    ever.

P27

1    I think that is about the comments I will have on his

2    brief.  I don't find anything in there that affects at all our

3    position so far as the Pomeroy case is concerned, which is our

4    basic position.

5         Directing my attention to another point, I do think your

6    Honor has overlooked one thing on the question of surplus water.

7    Surplus water can be created merely by non-use.  In other

8    words, if the United States is not exercising through use its

9    overlying rights or its riparian rights --

10        THE COURT:  Or if somebody else is not doing it.

11        MR. GIRARD:  -- or if somebody else is not doing it, then

12   there is surplus water.  But of course that surplus water

13   continues only so long as those rights are not being exercised.

14   As soon as someone else, either the United States itself or

15   if they split it up and somebody else down there uses it, then

16   that water is no longer surplus.  But as long as there is not

17   use of the safe yield of that basin by the United States,

18   even though there is plenty of land on which they could use

19   it, there is surplus water which is subject to appropriation.

20   But that appropriative right, if any, whether it be non-

21   statutory or statutory, would be conditioned upon the fact

22   that as soon as these proper riparian uses commence the right

23   would be extinguished.

24        THE COURT:  Except that the Raymond Basin case would

25   indicate that an extensive use of this appropriative right

18,058

P28

1    might ripen into prescription.

2    MR. GIRARD:  There is no question at all, your Honor, if

3    there were some other owners of this United States basin right

4    now, in the basin downstream, over the same basin, Chappo Basin,

5    the United States very well might have a prescriptive right

6    against them right now.  But the point is they can't prescribe

7    themselves.  They are the only owners.

8    THE COURT:  But do you think the evidence shows that this

9    is surplus water now that comes in this category of water to

10   which can attach riparian and overlying rights but which is

11   surplus and not being used?

12   MR. GIRARD:  I think, in all fairness to the United

13   States, right now there is water which is surplus.

14   THE COURT:  In their basin?

15   MR. GIRARD:  In their basin.

16   THE COURT:  They don't dare take that position.  You

17   might take it for them.  But they don't dare take the position

18   that there is surplus water in their basin.  If they do that

19   and change their position on that, then they are certainly

20   not in any position to make any claims upon upstream owners.

21   If today, after a series of dry seasons, they could contend

22   that there is surplus water in that basin, the lawsuit is at

23   an end.  Nobody would have to ever worry about use upstream,

24   if today, with this series of dry years, there is surplus

25   water in that basin.  I don't think the United States intends

P29

1   to take that position.  They have some kind of theory that

2   they are entitled to get their hands on this surplus flood

3   water because the surplus flood water would come in after they

4   had taken water out of the basin, which would recharge the

5   basin.

6       MR. GIRARD:  If they are claiming an appropriative right,

7   which they are, at the very onset they have to also be able

8   to state emphatically that there is surplus water to appropriate;

9   and I think the only way they could show surplus water is that

10  they are not exercising all of their riparian rights -- their

11  riparian land is not being irrigated.

12      THE COURT:  They can't stop there.  If there is water

13  which they, as riparians, would be entitled to use, then they

14  could call this surplus.  What they have been talking about

15  is water to which other riparian overlying owners are entitled.

16      MR. GIRARD:  I don't agree with your Honor.  Take a

17  riparian who has on a surface stream riparian land.  He can

18  get an appropriative right to that.  He can even file on that

19  same water, saying he doesn't irrigate his riparian land, but

20  he wants to take it over the mountain somewhere.  He can file

21  on it with the State Water Rights Board and get a permit to

22  take it out and use it.  That appropriative right that he

23  would get from the State for surface water would be limited,

24  conditioned on the fact that if he or anyone else ever exercised

25  his riparian right on that land the surplus would no longer be

P30

1    there and his appropriative right would be no good.

2    But I don't see any legal objection on behalf of the

3    United States at least where they cannot merely accomplish a

4    surplus of water by not using their riparian right.  I don't

5    agree with Mr. Veeder that he can claim his full riparian

6    rights and also an appropriative right.  He can't do that.

7    But he can claim an appropriative right -- assuming this is

8    percolating water, which is a crucial question, I think --

9    but he can claim an appropriative right which would entitle

10   him to use the amount of water that he has been using.  The

11   surplus would be created by the fact that he had not exercised

12   his riparian rights.  Once he starts to exercise his riparian

13   rights, the surplus would no longer exist and his appropriative

14   right would be extinguished.

15   Of course, in taking that position, it would, as you have

16   pointed out, absolutely preclude any type of regulation of any

17   upstream overlying or riparian owners, because they would

18   obviously be senior to his appropriative right.  But I don't

19   think the United States, in all fairness to them, is trying

20   to regulate any upstream riparian or overlying owners.

21   MR. VEEDER:  No.  The only thing we are claiming is, can

22   we appropriate?

23   MR. GIRARD:  Still the crucial question is the factual

24   situation on known and defined channel, and I don't think Mr.

25   Veeder's brief has supported his contention one iota.

P31

1    MR. SACHSE:  Your Honor, I am going to touch on this same

2 question that you asked Mr. Veeder, as well as the matter of

3 some other comments.  I will try not to duplicate.

4    When I read Mr. Veeder's brief, I was first disappointed

5 because he didn't meet squarely what I think is the critical

6 issue, and that is one of fact.

7    He says percolating waters.  I think your Honor points

8 it up clearly.  Should we call them "percolating"?  What we

9 really should be talking about  is, are these waters percola-

10 ting in a known and defined channel?  When you read Mr. Veeder's

11 brief carefully, particularly when you listen to his argument

12 this morning, I think it is rather obvious why he doesn't do

13 that.

14    This morning he said -- and I took my notes -- your Honor

15 asked him, "When the Santa Margarita River was flowing as a

16 surface stream, what sub-surface waters were part of that

17 stream, Mr. Veeder?"  And his reply was, "The waters immediate-

18 ly under and very shallow."  I took down his words as he said

19 them.

20    Now, if we will stop just a minute and think about that,

21 it becomes very apparent what Mr. Veeder's contention here is.

22 His contention isn't that as a matter of fact the bed and

23 banks are not as we contend.  His contention is that as a

24 matter of law there can't be an underground stream.  That is

25 what he is saying.

P32

1      If we take to the logical conclusion that statement,

2   "The water immediately under and very shallow," there is no

3   such thing as an underground stream. As a matter of law, it

4   is impossible.  Because you know and I know that any extraction

5   from sands isn't very shallow.

6      If your Honor bought this argument of Mr. Veeder's, you

7   would give the Marines the right to use a few acre feet of

8   water outside the watershed, and with the same stroke of the

9   pen your Honor would destroy every single permit and license

10  to extract ground waters that has been issued by the State of

11  California since 1913.

12      MR. VEEDER:  To whom?

13      MR. SACHSE:  To extract ground water since 1913 every

14  single statutory permit, just like these statutory permits

15  Mr. Veeder is talking about in the Ault case, just like these

16  statutory permits that have been granted all up and down this

17  stream.

18      THE COURT:  Why?  I don't know that I follow you on that.

19      MR. SACHSE:  Because Mr. Veeder says that anything except

20  the water immediately under and very shallow is percolating.

21  And if it is percolating, the State hasn't got a right to

22  give a permit.  He has made this point at great length.  The

23  Water Code says that you can't grant permits to percolating

24  water.  You can only grant them to underground streams.

25      THE COURT:  I follow you.

P33

1      MR. SACHSE:  You would at one stroke of the pen destroy

2  every single permit to pump underground water that has been

3  granted by the State of California in 48 years.

4      Now I want to stick to the facts in this case.  This is

5  a question of fact.  Your Honor is compelled on the evidence

6  in the record to make a determination of what are the bed and

7  banks of this stream within the limits of Camp Pendleton.

8      Mr. Veeder pointed out Exhibit 45, and I am going to

9  point to something else about it.  Exhibit 45 shows the ground

10  water contours which are at five foot intervals.  The highest

11  contour shown is 135 feet -- it is 125 plus 5 plus 5; but the

12  highest contour is obviously 135 feet.  The contour at Ysidaro

13  is five feet.  In other words, there is a fall in this under-

14  ground flow of water of 130 feet.  What distance?  Let's count

15  it, in a straight line -- I will not count the meanders --

16  130 fall in nine miles.  In the upper half of it there is 35

17  feet of fall in a mile and a half.  Now nobody in his right

18  mind is going to contend that water doesn't flow when you have

19  a fall of 130 feet in nine miles.  That is between 15 and 16

20  feet to the mile.  On the surface that is a flowing river.

21  That isn't a basin.

22      Mr. Veeder says that the course of the water deviates

23  slightly from the river channel.  Well, it does in a surface

24  stream.  When a surface stream encounters a large boulder it

25  goes around it.  When a  surface stream comes up to a sand

P34

1   bank it ponds behind it and percolates through. And that is

2   exactly what happens here. When a surface stream hits a wide

3   place we will find an eddy and it may instantaneously be

4   flowing in the opposite direction. But the course of the

5   stream is down gradient. It is within its defined banks,

6   whether they be wide or narrow.

7       It is beyond my comprehension how anyone, in the face of

8   this exhibit, the United States' own exhibit, can seriously

9   deny that the ground waters found within the younger alluvium

10  on Camp Pendleton are not a part of the stream. It is beyond

11  my comprehension how it could be seriously so contended. They

12  are the stream. Chappo Basin is a wide place. The Upper Basin

13  isn't quite as wide. The extreme end up near De Luz Creek is

14  a little narrowed. But they are the stream. That is the

15  stream.

16      Now, on this appropriative matter, I have conceded to

17  Mr. Veeder and to the Court that non-statutory appropriations

18  of water that is not part of a stream -- I will phrase this

19  just a little differently -- are possible. I will not argue

20  with you. I will not use this word "percolating" because it

21  is too dangerous. I will say instead of "percolating", I will

22  say non-statutory appropriation of waters which are not part

23  of a stream can be accomplished. If these waters are not part

24  of the stream, he could so appropriate. Let's face that.

25      But if these aren't part of a stream, your Honor, no

P35

1   sub-surface waters anywhere in California can be part of a

2   stream, on the argument Mr. Veeder has advanced. It is im-

3   possible.  If the only water that is part of a stream is very

4   shallow and immediately beneath, there goes our entire

5   appropriative system of ground waters. It's done.  It is

6   eliminated.  And your Honor is not going to find or make an

7   extreme ruling of that kind which would so utterly and complete-

8   ly wreck the whole system of water rights.

9      Your Honor has to ask yourself the question -- you can't

10  buy his reasoning -- you have to say to yourself, what are

11  the bed and banks of the Santa Margarita River at Camp

12  Pendleton?  And if when you answer that question you can find

13  a line to draw somewhere, not quite at the edge of the alluvium,

14  you can do it.  But I don't know what you can call bed and

15  banks except the point of contact.  I don't know where you can

16  hold them to be on the evidence.  Where are they?

17     THE COURT:  You have to go two ways.  You have to say

18  the little narrow channel in which the water flows after flood

19  time when there is a little stream of water flowing down, and

20  without any factual basis, a little bit of water, I think Mr.

21  Veeder one time said ten feet --

22     MR. SACHSE:  Within less than ten feet.

23     THE COURT:  -- less than ten feet below, that that is the

24  bed and banks.  Or you have to go the other way.  No one has

25  suggested any way to make any other determination.

P36

1    MR. SACHSE:   There isn't any.

2         I may be stealing a little of Mr. Stahlman's thunder
3    here -- I don't want to -- when he made his argument the other
4    day and read at such great length from the testimony/Mr. Worts
     of
5    in this case.   That is why we have to go back perhaps and be
6    honest with ourselves and say, how did this thing get here?
7    What is it?  We know what happened.  There was a little valley,
8    the water filled it up with sand, the water filled up the sand,
9    and the water percolated out a little thinner.   What are the
10   banks?  What did Mr. Worts describe this as being similar to?
11   An elongated badly bend bathtub.   Those are Mr. Worts' quotes
12   -- that this basin is similar to an elongated badly bent
13   bathtub.   And what are the banks of the bathtub?   The contact
14   between the older and the younger alluvium.   If it is a bath-
15   tub, those are the banks.   The banks aren't in the middle of
16   the bathtub.   They are the tin that the bathtub if made out
17   of.   And those are the words of Mr. Veeder's own expert.

18        I am going to reiterate.   I will say this sincerely.   Mr.
19   Veeder has simply ignored this factual situation that is put
20   to your Honor.   What are the bed and banks of the stream within
21   the limits of Camp Pendleton.   He has ignored it.   He can't
22   face it because he can't tell you what they are -- unless they
23   are the contact between the older and the younger alluvium.
24   This is a factual question.   It will be decided as a question
25   of fact.

18,067

P37

1      Insofar as any loose threats of appeal are concerned,

2 that one exhibit alone supports the finding that I sincerely

3 and respectfully request your Honor to make:  That the banks

4 of the Santa Margarita River sub-surface are the contact

5 between the older and the younger alluvium, and that all water

6 found within the younger alluvium is within the banks of the

7 Santa Margarita River and is an integral part of it.

8      THE COURT:  We will take our recess.  I would like to have

9 you look up this exhibit from the State engineer back in 1880.

10 I don't know whether he talks about the Santa Margarita River

11 or not.

12      MR. SACHSE:  He talked about Camp Pendleton's irrigation,

13 I know.  But I don't recall.

14      THE COURT:  He talked about Lake O'Neill.  See if you

15 can find it.  Wasn't it a Vail Exhibit?

16      MR. VEEDER:  No, it was one of ours.

17      THE COURT:  Also, you must have some aerials of the so-

18 called basins in Pendleton.

19      MR. VEEDER:  Yes, we have.

20      THE COURT:  Was there ever put in evidence the picture

21 taken of the last flood?  I remember seeing it.  Do you

22 remember a picture showing the flood waters coming down over

23 Pendleton?

24      MR. VEEDER:  I don't know of any.

25      MR. SACHSE:  We had some newspaper pictures.

18,068

P38  1    THE COURT:  A newspaper picture I am referring to.  That

2  was never put in evidence?

3    MR. SACHSE:  I don't think so.

4    MR. VEEDER:  In 1952 and '58 did the water ever leave the

5  channel, the bed and bank?

Belt 4  6    COLONEL BOWEN:  By artificial spreading, yes.

7    MR. VEEDER:  Outside of that, no other way.

8    I think that is right, your Honor.

9    What is it you want?

10    THE COURT:  I wanted to see an aerial.  I wanted also

11  that picture.  I guess it was not in evidence.

12    (Recess.)

13    MR. SACHSE:  Your Honor, if I may add something.  You

14  asked about his old report.  There are two things that help

15  a little.  First, referring to the River -- this is Exhibit

16  125-C:

17    "Above the canyon the lands that may be classed

18  as irrigable are limited to about 3,000 acres, in the

19  Temecula, Pauba and Little Temecula Ranches.  Below

20  the canyon there are no less than 3,000 acres of

21  bottom lands that are easily irrigable, but are

22  naturally moist and require little, if any, irrigation,**"

23  That is Camp Pendleton.

24    "**while on the rolling masses on either side of the

25  valley are forty to fifty thousand acres of irrigable

P39

1    only by conduits * *"

2        The only thing that helps is this reference in Exhibit

3    125-A to the irrigation ditch to Lake O'Neill below the ranch

4    house:

5            "From the reservoir to the ranch house, one and

6        one-half miles, the ditch is about six feet wide on

7        the bottom, two feet deep, with a grade of four feet

8        to the mile.  It is carried one and one-half miles

9        further, and has a number laterals from which water is

10       distributed in checks in the alfalfa field.  This is

11       probably the only old irrigation ditch in the County

12       irrigating any considerable area, which has any pretense

13       of a systematic utilization of water, and in this case

14       its use is rather more required for exterminating gophers

15       than as an absolute necessity for plant growth, because

16       the bottom lands on which it is used are naturally

17       moist and sub-irrigated.* *"

18       MR. VEEDER:  If you would like to take a look at Chappo

19   Basin --

20       MR. STAHLMAN:  Mr. Sachse is concluding his argument,

21   Mr. Veeder.

22       MR. VEEDER:  I didn't know this was part of the argument.

23       MR. SACHSE:  I hope it is argument.

24       As far as the photographs are concerned, with Colonel

25   Bowen's assistance we have put slips of paper in this May 1938

P40

1   as close as we can get.  They are the only photos we have.

2       COLONEL BOWEN:  There is a 1929 that is in evidence.

3       MR. SACHSE:  We will get that one too, then.

4       This is where it empties into the ocean.  This is where

5   the water runs probably.  The barrier is broken, and it is a

6   wet year, as has been pointed out.  This is May and it had

7   been a wet Winter.

8       THE COURT:  Is this water?

9       MR. SACHSE:  There is water here and here.

10      MR. VEEDER:  I don't believe that is water there.  I don't

11  see any water there.

12      MR. SACHSE:  This is water.

13      MR. VEEDER:  That is a lagoon there.

14      MR. SACHSE:  We go to No. 2.  We are moving upstream.

15  They may overlap.  This is Ysidaro Narrows.  My contentions

16  would be that the bed and banks follow as you can clearly see

17  the break in the hills, very narrow at Ysidaro Narrows.  Now

18  we are coming up along the break of the hills and clear out in

19  a large eddy, as I said.  This climbing the hill.  It comes

20  out roughly around the outskirts marked in red.

21      Now our next one would be 3.

22      THE COURT:  Is this water running there?

23      MR. SACHSE:  That is wet ground or water obviously.  Isn't

24  it, Colonel Bowen?

25      COLONEL BOWEN:  Yes, sir, that is water.  That is following

P41

1    very high runoff year the Winter of 1937-38.

2       MR. SACHSE:  We are still overlapping.  In other words,

3    we come around here.  I would contend that the break of the

4    hills is again approximately where the red line is.

5       MR. VEEDER:  What is this exhibit?

6       MR. SACHSE:  Exhibit 75-4.

7       THE COURT:  And following.  We are now looking at 75-13.

8       MR. SACHSE:  Yes.  On the north side of the river the

9    break of the hills is very clearly shown again.  Now the

10    channel again becomes quite narrow, as we go up in the Ysidaro

11    sub-basin.  The roadway is right at the break of the hill here,

12    very narrow.  There is water here, water here, water here.

13       MR. VEEDER:  Is that water?

14       THE COURT:  This is water here.

15       MR. SACHSE:  That is water.

16       THE COURT:  This is a field that has been overrun at some

17    time with water.

18       MR. SACHSE:  This is water.  Then we get to Chappo to the

19    widest place.  Now we come, we leave the Narrows between

20    Ysidaro and Chappo and we come into Chappo and it is quite

21    wide.

22       THE COURT:  Exhibit 75-15.

23       MR. SACHSE:  The break in the hills is -- where is it

24    here, Colonel?

25       COLONEL BOWEN:  It is here.

P42

1  MR. SACHSE:  The older alluvium is here.  On the other

2  side the break of the hills approximates the road.  This is

3  cultivated land below.  This is a hill.  That is up in Thompson

4  Canyon.  That is not down in the stream.  Here we come along

5  here.  This is a hill, this is above the stream, this is

6  another stream, that is a terrace up on the hill.

7  THE COURT:  This would be the south half of Chappo Basin.

8  This side is south, and this is north, isn't it?

9  MR. SACHSE:  Roughly, yes.

10  THE COURT:  The large portion of Chappo Basin is a flood

11  plane where you can see the channel.  Even down here it is

12  cultivated.

13  MR. VEEDER:  You have your hand now on the large cultivated

14  area of the basin.

15  THE COURT:  You can see here where the flood plane is.

16  MR. SACHSE:  We go to 5, the next one.  This one again

17  overlaps.  We are looking at some of the same thing we just

18  looked at.

19  THE COURT:  This is 75-53.

20  MR. SACHSE:  Here is the same area that Colonel Bowen

21  referred to as a terrace.  The break of the hills is immediate-

22  ly south of it.  The river channel, if you want to call it

23  that, is pushed right over against the hills here.  Here is

24  the water coming right down here.

25  Now again we narrow out and we hit wide.  That would be

P43

6. I have to backward. Now you come up toward Lake O'Neill.

THE COURT: 75-52.

MR. SACHSE: Aren't we about at the ranch house, Colonel? Yes, here is the ranch house.

COLONEL BOWEN: The ranch house and Lake O'Neill on the right.

MR. SACHSE: It is getting quite narrow here.

COLONEL BOWEN: That is the Upper Basin.

THE COURT: Where is Lake O'Neill?

MR. SACHSE: Here is Lake O'Neill. Here is the ranch house.

THE COURT: This is 75-20.

MR. SACHSE: There is a substantial overlap. We have seen much of this already. This is the place that is now the Naval Hospital on a bluff above the river. Here the river is very narrow. It is just squeezed into a very small channel here.

THE COURT: This is the Upper Basin now.

MR. SACHSE: Yes.

THE COURT: It is obvious that this is a flood plane.

MR. SACHSE: Yes, you can see the water course.

Finally, we come to the last one. It carries this on up to De Luz Creek and Santa Margarita.

THE COURT: This is 75-25.

MR. SACHSE: If you will just pick that up, Colonel Bowen, so that I can pull this other one out.

Now, if your Honor will again look at Exhibit 45.

P44

1    What is the date on that?

2    COMMANDER REDD:  1929.

3    THE COURT:  Is there a natural structure of some kind

4    that diverts the river to the north?

5    MR. SACHSE:  It shows on Exhibit 45.

6    THE COURT:  Here is a thing that runs out there.

7    COLONEL BOWEN:  That is Moe Hill or terrace formation

8    that the ranch house is built on.  That projects generally

9    northerly into the constriction between the Upper Basin and

10   Chappo Basin.

11   THE COURT:  It has the effect of diverting the river.

12   COLONEL BOWEN:  Yes, sir.

13   THE COURT:  This area of farm land in Chappo was undoubt-

14   edly laid down by eddies.  There is no direct movement of water

15   through that hill.  It must have been laid down -- I am trying

16   to figure out how it got laid down.  It is a very flat piece

17   of ground.

18   COLONEL BOWEN:  I think there is no question, your Honor,

19   but that the river has at times in the geologic past flowed or

20   its channel has been over the surface of that basin.

21   THE COURT:  Yes, but this jutting piece of terrace has

22   been there.  It has never been washed out where the farm land

23   is.

24   COLONEL BOWEN:  Yes.

25   THE COURT:  So the river had to swing almost at right

P45

1   angles to go in a northerly direction; isn't that right?

2       COLONEL BOWEN:  That is right.

3       THE COURT:  And this area of farm land, sort of protected

4   by that jetty or terrace, must have been thrown down by sort

5   of eddy action.  How would silt be deposited immediately to

6   west part of that terrace that jetties out except by --

7       COLONEL BOWEN:  It would have to be an eddy behind that

8   terrace, your Honor.  That is correct.

9       MR. VEEDER:  Is this Chappo Basin right here?

10      COLONEL BOWEN:  The red line on Exhibit 73 generally

11  limits the boundary of Chappo Basin on the south.

12      MR. VEEDER:  What is the width of it across there?  About

13  two and a half miles?  Is that the widest area?

14      COLONEL BOWEN:  That is right.

15      THE COURT:  Do you have something more, Mr. Veeder?

16      MR. VEEDER:  No, your Honor.

17      MR. SACHSE:  I have nothing further, your Honor.

18      MR. VEEDER:  I would like to have a few minutes to wind up.

19      THE COURT:  Mr. Stahlman.

20      MR. STAHLMAN:  Your Honor, I will be very brief.  I am

21  not going to do as Mr. Veeder did and continually repeat a

22  proposition.

23      Your Honor has read the brief which I submitted, and I

24  believe there has been no contradiction whatsoever to the

25  principles as laid down by Kinney.  Mr. Veeder hasn't answered

18,076

P46

1   that at all, particularly after description of what constitutes

2   rivers on the coastal plane and in the area of the southwest.

3   He goes further to say that with expanding knowledge many

4   of these underground basins are now found to be tributary to

5   streams and that the percolating water is tributary to streams.

6   In other words, that this is a progressive thing.  That some

7   of these basins that were thought to be basins in yesteryear

8   are now, by reason of more modern knowledge, found to be

9   tributary to streams.

10   I think that Hutchins sort of epitomized it here on the

11   subject of ground waters in two terse sections consisting of

12   just about three paragraphs under the subject of characteristics:

13   "The underflow or subflow of a surface stream consists

14   of water in the soil, sand, and gravel immediately

15   below the bed of the open stream, which supports the

16   surface stream in its natural state or feeds it directly.

17   "To constitute underflow, it is essential that the

18   surface and sub-surface flows be in contact and that

19   the sub-surface flow shall have a definite direction

20   corresponding to the surface flow."

21   Then he makes a comment on the Pomeroy case.

22   Then under the subject "Lateral Limits Of Underflow" quote:

23   "The underflow may include the water moving not

24   only in the loose, porous material that underlies the

25   bed of the surface stream, but also the lateral extensions

1    of the water bearing material on each side of the

2    surface channel."

And he cites Larsen vs. Apollonio, 5 Cal. 2d 440:

4    "But it must be moving in a course and confined within

5    a space reasonably well defined, so that the existence

6    and general direction of the body of water moving

7    underground may be determined with reasonable accuracy."

8         Your Honor read the Santa Margarita case.  I also read

9    it last evening and I think it is quite apparent, especially

10   in Section 14 and Section 19, when they are discussing this

11   question of the basins of Camp Pendleton, that the Supreme

12   Court was presupposing, the language indicates there, that

13   this underground was part of the river.  In Paragraph 19 they

14   were discussing the admissibility of evidence and comparability

15   of the basin with the San Luis Rey Basin.  The Court finally

16   concluded in determining whether this evidence was admissible

17   which the lower court had excluded to make the determination

18   on that question which came up, which I think has some bearing

19   on the situation here.  And going back to Section 14, the

20   Court found that the evidence was clearly admissible on one

21   of the basic issues involved in the litigation.

22        THE COURT:  Of course, that evidence started out on a

23   comparison with the San Luis Rey.  But actually what the

24   attorneys for Vail were trying to prove was that there was

25   water available in the basin.

18,078

P48

1    MR. STAHLMAN:   Yes.

2    THE COURT:   An objection was sustained to it on the
3    ground that it was immaterial what water was had.   Of course,
4    the error was, in part, due to the Herminghaus case which had
5    come down.

6    MR. STAHLMAN:   Yes.   And they even made reference to the
7    constitutional amendment of 1928 in relation to the question.

8    But as I say, it doesn't clearly say what I would like
9    it to say.   The language of the Court, I think, predisposes
10    the fact that this other ground water is part of the Santa
11    Margarita River.

12    All of the text writers and people who have combined the
13    physical features -- engineering, hydrology and geology --
14    with the legal decisions come to this conclusion, I think, that
15    where this material has been laid down by stream action and
16    there is a definite area into which it has been laid, that that
17    is part of the stream.

18    I had devised a little illustration -- Mr. Sachse kind
19    of jumped the gun on me with it, which I was happy for him to
20    do -- but if I may expand it a little.   Your Honor will recall
21    Mr. Sachse put up several illustrations of what the canyon
22    would be prior to the time there was a fill in it.   And I
23    would say if we would take this situation as a cross section
24    view of any of these areas, call them basins or what you may
25    call them, but where the material has been deposited by stream

P49

1    action, as Mr. Worts testified in this case, you certainly

2    have a ridiculous situation.  Because in the early stages of

3    the flow -- and I think we must go back to the interpretation

4    of nature itself and the manner in which it has constructed

5    the stream, to determine whether or not it is a stream, surface

6    or sub-surface -- we will say at the early stages there is only

7    a small amount detrital material deposited, and that when the

8    water flows in the stream there is a large amount of water

9    compared to the amount of alluvial material.  And then as this

10    progresses and as these lenses and lenticular deposits are

11    laid down over a period of time and it becomes deeper and

12    deeper, then I would ask, at what point in the advancement of

13    nature are we going to conclude, if Mr. Veeder's contention

14    is correct, that this has ceased to be a surface stream or

15    that the water flowing below ceases to be part of the river

16    and that which flows on the top still is part of the river?

17    At what period of time and at what point?  Does man now come

18    in and superimpose his knowledge?  I presume if he has the

19    wisdom that Mr. Veeder has he would do it and contradict nature

20    in the very structure of this phenomenon that we are considering.

21    I think not.  I don't believe there is any inconsistency with

22    the position that has been taken by those of us who are opposed

23    to Mr. Veeder.

24         I am not going to take the time for it, but I can see many

25    complications that would ensue if your Honor would take the

P50

1    position that Mr. Veeder here has indicated.

2         What does he contend he has in the way of riparian rights,

3    if this thing is so?

4         There are other situations that would occur in relation

5    to the application of the principles of law in relation to

6    appropriation.

7         And what is the contention that he would make, under these

8    circumstances, in relation to the fact that he was contending

9    throughout the entire trial here that they were putting  this

10   water on the mesa up there and outside the watershed under

11   the terms of the stipulated judgment?

12        We have been all through this.  I think we are merely

13   rehashing it.  Mr. Veeder has rehashed the situation a

14   multitude of times, and every little opportunity he gets he

15   takes everybody's ball and tries to run to the goal line with it.

16   I think what we have here, considering the intensity with which

17   Mr. Veeder is pushing this thing, is a pique and a feeling

18   rather than a desire to analyze calmly what the factual

19   situation in this case is.  And when it is done I think you

20   can come to no other conclusion than that which your Honor has

21   expressed to Mr. Veeder many times, and that we also have

22   expressed to the Court in our arguments.

23        I will not take further time, and I will submit it.

24        MR. VEEDER:  The crux of the entire question is this,

25   your Honor:  Is the water flowing in a subterranean stream,

P51

1    the water in Chappo Basin?  There is not a scintilla of evidence

2    that it is flowing in a stream.  It is water percolating through

3    the lenticular deposits that are found there.  The water is

4    percolating.  It is not flowing.  And if your Honor will refer

5    to the brief you will find that the State of California has

6    repeatedly referred to Chappo Basin as a "basin," and it has

7    ruled that underground waters not flowing in a subterranean

8    stream, "such as water percolating through a ground water

9    basin" -- and this is a ground water basin -- "is not subject

10   to the Board's jurisdiction and application to appropriate

11   such water, regardless of the place of use, should not be

12   submitted."  That is the crucial point.  No one here has been

13   able to point to a single word that the water that percolates

14   through these interstices is a stream flowing beneath the land.

15   It is water that percolates as distinguished from flowing.

16       I have summarized the matter in my brief.  I respectfully

17   submit that there is a rule being applied against the Marines

18   that is not being applied against other people in the State

19   of California.

20       THE COURT:  From looking at these aerials, I would have

21   a lot of trouble trying to find what the channel is, Mr. Veeder,

22   if I followed your contention.  What is the channel?  Where

23   the water flows, or where it flowed last year, or is it both?

24   You would say that the stream is the channel.  Where is it in

25   some of these areas?  Where is the channel up here in the Upper

18,082

P52

1    Basin?

2        MR. VEEDER:  I would like to have Colonel Bowen here to

3    identify it.  I can identify it.  It comes right straight down

4    along here, your Honor.

5        THE COURT:  You mean the channel is over on this side?

6        MR. VEEDER:  I want the record to show --

7        MR. SACHSE:  Let's get that in there.

8        THE COURT:  The Colonel showed the channel, in his opinion,

9    as being on the north side, and Mr. Veeder showed the channel

10   as being on the south side.

11       MR. VEEDER:  I will concede I was in error on that.

12       THE COURT:  Where would the channel be down in Chappo?  I

13   am not going to take a dotted line that you draw on a map, on

14   Exhibit 45, and say, "This is the channel."  Where is the

15   channel of Chappo Basin, according to your theory?

16       MR. VEEDER:  It is on the north side.  It follows right

17   along --

18       THE COURT:  Here is an aerial.  Could you show me what

19   part of that is the channel?

20       MR. VEEDER:  I will have my expert do it, your Honor.  I

21   don't purport to be an expert on it.

22       COLONEL BOWEN:  On the upper part of Chappo Basin, your

23   Honor, the channel is pretty well defined.  It swings over

24   against the bluff on the northerly side.  Then in the central

25   portion it becomes a braided stream.  It widens out until it

P53

Belt 5

1    reaches the constriction between Ysidaro and --

2        THE COURT:  Does some of this channel come down more to

3    the west or about to the center of the basin?

4        COLONEL BOWEN:  Yes, your Honor.

5        THE COURT:  And some over on the north side?

6        COLONEL BOWEN:  Yes, your Honor.  That on the north side,

7    though, takes principally runoff from the lateral tributaries

8    to the Santa Margarita River, such as Thompson Canyon.

9        THE COURT:  While you are here, let me ask you this.

10   What is the distance in elevation, if you know it, between this

11   flood plane that is shown in the upper part of the Chappo Basin

12   as being the part where we know no attempt has ever been made

13   to cultivate and the area circled with the red line on Exhibit

14   72 which has been the part that has been cultivated?  Is there

15   any substantial difference in elevation?

16       COLONEL BOWEN:  Yes, there is approximately ten feet

17   difference in elevation.  The area in which the stream flows

18   primarily is approximately ten feet lower than the adjacent

19   land that was irrigated and called the alfalfa field by the

20   old ranch.

21       THE COURT:  This would be true of the whole area shown in

22   red in Chappo Basin on Exhibit 73?

23       COLONEL BOWEN:  No, sir.  The southerly portion of the

24   field was, and is, low, except that we have now filled it to

25   build some structures on it; but the southerly portion against

18,084

1    hill was lower than the irrigated alfalfa field in the middle

2    portion of Chappo Basin.

3        THE COURT:   Then this area which is maybe ten feet higher

4    is the area in Chappo Basin lying directly southwesterly of

5    the old alluvium now that sticks out and causes a turn in

6    the river.

7        COLONEL BOWEN:   Where the ranch house is situated.

8        THE COURT:   And then extends southwesterly as sort of a

9    plateau in an area of lower elevation.

10        COLONEL BOWEN: Yes, sir, except that actually there is

11    a slope southerly from the bank of the stream to the contact

12    between the alluvium and the hills.   The same is true in

13    Ysidaro, your Honor.   Against the hills on the easterly side

14    the ground area is lower than it is immediately adjacent

15    to the principal stream channel.

16        THE COURT:   And that is why at some time or other the

17    stream has cut across from that Ysidaro area, I take it?

18        COLONEL BOWEN:   That is right, your Honor.

19        THE COURT:   The only possible area that we could even

20    argue about might be that little plateau in there, but I don't

21    know how you could justify excluding it merely because the

22    past action of the river has laid it down and presently it is

23    a little higher on its north side.   It slopes to the southwest

24    to lower elevations.

25        I have looked over these cases and I tried to find some

P55

1    cases that involved Southern California streams.

2         The Verdugo matter in 152 Cal. 655, on page 659, picking

3    up the description of the river:

4         "* * where, after passing through a rather narrow

5         gorge, it opens or expands into a wide plane forming

6         part of what is usually known as the San Fernando

7         Valley.  The floor of the canyon is comparatively

8         level and varies in width from about 700 feet to

9         something over 1800 feet, with high hills or mountains

10        on each side.  During times of heavy rain, and for a

11        few days afterward, a stream of water flows down the

12        canyon, through all the lands in controversy and into

13        the Los Angeles River, some distance below. * *"

14        Then on page 663 there is a reference to the fact of the

15   land being riparian:

16        "* * This was the case with respect to each of the

17        three surface streams then flowing, and also with

18        respect to all the underground flow which constituted

19        a part of said streams. * *

20             "It is obvious that the continued presence in

21        the soil, sand, and gravel, composing the bed of the

22        canyon, of a sufficient quantity of water to supply

23        and support these surface streams in their natural

24        state, is essential to their existence and preserva-

25        tion, and that the parties have as clear a right to

P56

1    have this quantity remain underground for that purpose

2    as they have to the stream upon the surface.  Neither

3    party should be permitted to decrease this necessary

4    quantity of underground water to the depletion of the

5    surface stream and the injury of those to whom it has

6    been assigned.  This much is clear from the previous

7    decisions of this Court. * *"

8        Now it is true that this case, of course, was decided

9    before the Constitutional Amendment, and like many other cases

10   it talked about the right of people to have the underground

11   flow of the stream kept up in order to maintain a surface

12   stream.  To that extent the case may not be good law.  But its

13   description of this operation of the underground stream and

14   the surface stream is exactly what we have here.

15       The Vail case, of course, I have read and re-read,

16   describing the Temecula-Santa Margarita River.  It states:

17       "* * As the river leaves this canyon it debauches

18       over a porous area referred to as 'the outwash area,'

19       into which, except in times of heavy rains and floods,

20       it disappears from the surface and percolates under-

21       ground.  In the dry season the river customarily reappears

22       and becomes a surface stream on the Pauba Grant about

23       three miles westerly of the mouth of Nigger Canyon, * *"

24   Then they talk about the Santa Margarita below the Gorge.

25       "* * The trial court found that, although through

P57

1   much of its length the Temecula-Santa Margarita River

2   has both a surface and sub-surface flow, all of the

3   water -- surface and sub-surface flow -- is brought

4   to the surface at about the eastern end of Temecula

5   Gorge due to the existence of granite bedrock in the

6   channel along the banks immediately easterly of this

7   point. * *"

8   Then it goes on, on page 511:

9   "* * After crossing the easterly boundary of the

10   ranch the course of the river lies entirely within

11   respondent's property until it empties into the ocean.

12   The trial court found (Finding 8) and the finding is

13   not challenged, that after entering respondent's

14   ranch, the stream does not flow as a continuous surface

15   stream but 'that in the dry and irrigating season of

16   the year the surface stream customarily and ordinarily

17   disappears, when not artificially interfered with, at

18   a point on the plaintiff's lands approximately eight

19   miles from the ocean,' * *"

20   I will interject that that is up in the Upper Basin.

21   MR. SACHSE:  That is, I would say, at the bottom of the

22   Upper Basin.  It shows it on Exhibit 45.

23   THE COURT:  "* * sinking into the sand and gravels of its

24   bed or channel, and again reappearing as a surface

25   stream two to three miles below, * *"

P58

1 Two to three miles below would be below the point -- well, it

2 wouldn't be down that far.  It would be in the Chappo Basin

3 somewhere.

4     MR. VEEDER:  It would be below the Chappo Basin.

5     MR. SACHSE:  I would say it would be right at the bottom

6 of Chappo Basin.

7     THE COURT: "'* * and thence flowing as a surface stream

8     of diminishing volume to its confluence with tide water.'"

9 Now it is true that in other places in the Vail decision

10 they talk about the basins, but even though they talk about

11 the basins there is still the reference to the stream.  Referring

12 to this Temecula Basin:

13     "* * The basin as a whole, and particularly the outwash

14     area, creates a large underground basin into which the

15     water of the river sinks, and in fact, in the dry season,

16     into which it entirely disappears as a surface stream,

17     reappearing again on the surface across the artesian area."

18     Then in the case of Ventura Land and Power Company vs.

19 Meiners, 136 Cal. 284, there is supposedly the approved

20 definition of the bed and banks of the stream.  At page 290:

21     "According to the most approved definitions, the banks

22     of rivers or other water forces are 'those boundaries . .

23     which contain their waters at their highest flow'; or,

24     as otherwise expressed by the same judge, they are

25     'the fast land which confines the water of a river in

P59

1  its channel or bed, in its whole width' — i.e. as

2  determined by its highest flow. * * This definition

3  seems to have been generally accepted. * *"

4  The Ventura case involved the Ventura River, a semi-dry

5  river like ours.

6  In Huffner vs. Sawday (153 Cal. 86), involving the San

7  Pasqual River near Ramona, in connection with the finding

8  (page 90) it says:

9  "* *In connection with the finding of the

10  existence of a water course as alledged, attention

11  is called to evidence that the San Pasqual River does

12  not, at all seasons of the year, carry a flowing body

13  of water through the San Pasqual Valley, in which the

14  plaintiffs' lands are situated, and that the location

15  of the river bed or channel is subject to change.  It

16  appears that in this valley the stream is dry during

17  the summer months, and that its surface flow begins,

18  in years of ordinary rainfall, about the end of

19  November, and ceases in June.  The soil is sandy, and

20  the river bed 'varies greatly and changes ofter,' as

21  stated by a witness for the plaintiffs.  These circum-

22  stances are not inconsistent with the existence of a

23  water course, nor do they deprive those owning land

24  fronting on the bed of the stream of the character of

25  riparian proprietors."

P60

1    On page 92:

2    "* * There are long stretches of sandy bottom between

3    the defendants' proposed works and the lands of the

4    plaintiffs. Water flowing over the rocky bed above

5    sinks into the sand, which must become saturated

6    before there can be a flow over its surface. To so

7    fill this sand requires, as witness testifies, several

8    weeks. The Court was justified in drawing from this

9    testimony the inference that an interruption to the

10   flow of this water would prevent or diminish the

11   saturation of the sandy bed underlying the stream and

12   thereby materially postpone the time when a surface flow

13   would come to plaintiffs' lands. Such postponement

14   would be a clear injury to the plaintiffs, whose

15   interests in the waters of the stream included the

16   right to have the river bed continue to hold sufficient

17   water to supply and support the surface stream in its

18   natural state."

19   This case is also probably subject to the limitation

20   that, as a matter of law, a party is no longer entitled to

21   have the sub-surface flow of the stream kept up so that it

22   maintains a surface flow.

23   But the description of these streams in this southern

24   dry area is identically what we have here.

25   So I propose to find that through the Marine Corps Base

P61

1   the older alluvium constitutes the banks of the Santa Margarita

2   River. Although the surface stream widens out occasionally

3   and is spoken of as a basin, this is a matter of degree. Every

4   time a stream with an underground flow swells out a little bit

5   at one place and there is an underground body of water, there

6   is no reason that it should then be called a basin instead of

7   a stream. Certainly big basins like the San Fernando Valley

8   and the Raymond Basin are one thing. Here, at best, it is

9   about four square miles. The exhibits show the water levels

10  and the gradient toward the ocean. The aerials show the

11  changing course of the stream, the flood plane -- in fact,

12  the Court can practically take judicial notice that at times

13  of high flood the waters would spread over much of the area

14  shown as containing the old channels of the stream.

15      MR. SACHSE:  Your Honor, may I make a suggestion, or a

16  request. It is in connection with his Honor's remarks. You

17  use the word "older alluvium." It is not what they call it at

18  Pendleton.

19      THE COURT:  What is it?  The La Jolla --

20      MR. STAHLMAN:  The La Jolla formation.

21      THE COURT:  The contact between the younger alluvium with

22  the older materials would probably cover it.

23      MR. VEEDER:  That is the bluffs on each side of the

24  Pendleton Basin.

25      THE COURT:  It is also the contact of the younger alluvium

P62

1  laid down by stream action with the older materials below and

2  on either side.

3      Have you done any work at all toward any possibility of

4  a physical solution here that might afford you some relief?

5      MR. VEEDER:  I have talked to Colonel Bowen about, yes.

6      THE COURT:  Do you propose to do anything about it?

7      MR. VEEDER:  The Colonel is going to prepare it, and he

8  tells me that by the middle of November he will be prepared to

9  submit some material on it.

10      Isn't that correct, Colonel?

11      COLONEL BOWEN:  That is correct.

12      MR. VEEDER:  And I talked at great length with him.  I am

13  not suscribing to the idea of a physical solution.  I have asked

14  Colonel Bowen, though, to do as you direct.

15      MR. GIRARD:  If Mr. Veeder isn't going to suscribe to it,

16  what is the sense of doing it?

17      MR. VEEDER:  I think it is necessary that it be done at

18  your Honor's direction.

19      THE COURT:  Is that all you are doing it for -- because

20  I suggested it?  You are not interested in this at all?

21      MR. VEEDER:  I am certainly interested in protecting the

22  interests and rights of the United States, your Honor.  I do

23  not believe that the rights of the United States could properly

24  be protected if Fallbrook ever puts a dam above us.  That is

25  my personal view, and I would be very much in error not to say

18,093

P63

1   so.

2       However, in good faith, we will go ahead with your request.

3   I will ask Colonel Bowen to prepare it.

4       THE COURT:  You are actually better off, in the opinion

5   of the Court, with a dam above you than you are without it.

6       MR. VEEDER:  I disagree with your Honor on that.  I think

7   your Honor is in error.

8       THE COURT:  I would like the record to show that I disagree

9   very firmly with you.  Since Fallbrook can only take flood

10  waters, I think you are better off with a dam above than you

11  are without it.  But you have a right to have any opinion you

12  want.  You can prolong this case forever, if you want to.

13      MR. VEEDER:  Your Honor, I have tried to wind up this case.

14  I want the record to show that had your Honor not reversed

15  yourself and had California not reversed themselves after

16  June 1, the matter would have been far gone.

17      THE COURT:  Reversed themselves?

18      MR. VEEDER:  Correct.

19      THE COURT:  You have a right to call it what you want,

20  Mr. Veeder.  I would say that you raised a new theory that

21  had not been considered, and as a result it was necessary to

22  re-analyze what you were talking about.  You can call that a

23  reversal, if you want to.  But when a lawyer comes in, at the

24  last minute, with a new theory, the judge has to give it some

25  consideration.  He should try to make his decisions uniform

P64

1   and fit various situations.  That is what I tried to do.

2       MR. VEEDER:  Your Honor, in regard to the next hearing,

3   as I understand there will be no proceedings here in this case

4   next week.

5       MR. STAHLMAN:  I would like to find out whether or not

6   Mr. Veeder is going to rest his case now that he has finished

7   this last point that he brought up.  He has never rested,

8   except on the matter of the stipulated judgment.

9       THE COURT:  I think he has rested his case -- you have

10  rested insofar as evidence is concerned have you not?

11      MR. VEEDER:  Yes.

12      MR. STAHLMAN:  Fine.

13      MR. GIRARD:  Fine.

14      MR. VEEDER:  If I comprehended, there is to be no case

15  next week.  I would like to leave this evening, if I could.  I

16  talked to Mr. Girard and, as I understand, he is working on

17  some additional findings and he tells me he will contact me

18  in Washington in regard to this matter.  The question is, when

19  do we convene again?

20      MR. GIRARD:  I will serve the Murrieta findings on Mr.

21  Veeder and the Court and counsel next week.  I will send you

22  a copy here and in Washington.

23      MR. VEEDER:  Please.

24      MR. GIRARD:  But I am sure Judge Carter will want to

25  go over them.

P65

1    THE COURT:  I want to take three weeks off in October.

2    MR. GIRARD:  I have a two months trial commencing November

3    13 also.

4    MR. STAHLMAN:  I have two trials in November.  One is the

5    6th and one on the 16th.  They were put over because of this

6    case.  The one on the 16th is going to take a minimum of a week.

7    THE COURT:  You will probably be able to take care of your

8    trials.

9    I would say Tuesday, October 24th.

10   MR. STAHLMAN:  That is all right.

11   MR. SACHSE:  Mr. Stahlman might lodge Vail's findings and

12   serve us before then, so that when we come back we would all

13   have had an opportunity to look over the findings on Vail.

14   MR. STAHLMAN:  Yes, I'll be glad to.

15   THE COURT:  Can't you do that?

16   MR. STAHLMAN:  Yes, your Honor, surely.

17   MR. GIRARD:  I am hopeful that the United States' findings

18   can be lodged by then -- at least the ones I will submit.

19   THE COURT:  You will lodge the ones you are revising.

20   MR. GIRARD:  Yes, I will have those lodged next week.

21   THE COURT:  You are leaving at 2 o'clock?

22   MR. GIRARD:  Yes, your Honor.

23   THE COURT:  I will have a further chance to study then.

24   Where will you be -- in Sacramento?

25   MR. GIRARD:  Yes, your Honor.

18,096

P66

1           THE COURT:  I can commmicate with you.

2           MR. SACHSE:  Is it at 10:00 on October 24th?

3           THE COURT:  Yes.

4           (Whereupon an adjournment was taken until Tuesday,)
            (                                                   )
5           (October 24, 1961, at 10:00 o'clock A.M.           )

6                            - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P67

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
         vs.                    )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                    Defendants. )
_____ )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: September 22, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within the foregoing sixty-seven (67) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 25th day of September 1961.

John Swader
Official Reporter
JOHN SWADER, OFFICIAL REPORTER