VOLUME NO. 174                                    MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                Plaintiff,

    vs.                                        No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Tuesday, October 24, 1961

Pages:    18,098 to 18,184

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
               DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY ) DISTRICT, et al., ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday,  October 24, 1961

APPEARANCES:

  For the Plaintiff:                     WILLIAM H. VEEDER, ESQ.,
                                         Special Assistant to the
                                         Attorney General

                                         CDR. DONALD W. REDD

    For the Defendants:

      Vail Company:                      GEORGE STAHLMAN, ESQ.

      State of California:               FRED GIRARD, ESQ.

      Fallbrook Public Utility           FRANZ R. SACHSE, ESQ.
      District, et al.:

P2

1  SAN DIEGO, CALIFORNIA, Tuesday, October 24, 1961, 10:00 A.M.

2     (Other matters.)

3     THE COURT:  Call the Fallbrook case.

4     THE CLERK:  10-1247-SD-C United States vs. Fallbrook.

5     THE COURT:  Gentlemen, can we operate down in the new

6  courtroom, or will that be exceedingly inconvenient, with our

7  documents and papers?

8     MR. VEEDER:  I don't think it would be inconvenient, your

9  Honor.  If we need anything we can send for it.

10     THE COURT:  We will be largely going over these findings.

11  Let's go down and try it.

12     (The following proceedings were had in the new courtroom.)

13     THE COURT:  What do we have in the nature of an agenda?

14     MR. GIRARD:  I haven't seen an agenda, your Honor.  We

15  have, I presume, filed for consideration the Murrieta-Temecula

16  findings, the Vail Company findings, the Diamond-Domenigoni

17  findings, the findings regarding the military enclave, and Mr.

18  Veeder's objections and his proposed findings.

19     THE COURT:  Have these been lodged?  Let's take the Vail

20  findings.  Did you lodge a set with the Clerk?  It is not

21  necessary.

22     MR. STAHLMAN:  No I didn't, your Honor.

23     THE COURT:  Let's date them.  Mine is dated October 15th.

24     MR. STAHLMAN:  That is right.  I dated them all.

25     THE COURT:  It is the first draft, so we will know what

P3

1   we are talking about.

2       The Government's proposed findings, which aren't named

3   but apparently it is Murrieta above the gorge and below the dam.

4   Is that right?

5       MR. VEEDER:  That is correct, your Honor.

6       THE COURT:  That was lodged on October 23.

7       The Murrieta-Temecula area Mr. Girard worked on was lodged

8   October 17th.

9       MR. VEEDER:  They have been lodged?

10      THE COURT:  Yes.

11      MR. GIRARD:  Yes, I sent a copy to the Clerk and a copy

12  to the Judge.

13      THE COURT:  And the Government's objections were filed on

14  October 23rd.

15      And then the proposed findings on the military enclave

16  were lodged on October 23rd.

17      Where do you want to start on this matter?

18      MR. STAHLMAN:  Your Honor, I would think that possibly

19  the Murrieta findings would precede the Vail findings for the

20  reason that it affects other people besides Vail only and also

21  affects some of the area that is considered in the Vail findings.

22      MR. SACHSE:  I concur, your Honor.  We have been over the

23  Murrieta findings half a dozen times.  It should be one of the

24  least disagreement as to the facts.

25      THE COURT:  Let's start on Mr. Girard's draft and we will

P4

1    be looking at the Government's objections.

2        What is incorrect, Mr. Veeder, about this statement that

3    the waters "changed their course . . . by accomplishing a

4    break through . . . at the Gorge"?

5        MR. VEEDER:  Well, your Honor, as I understand, what

6    transpired -- this is simply a technical point that I think

7    might be important for future consideration -- is that the

8    Santa Margarita River actually pirated, incised into and through

9    Temecula Gorge, causing the water to drain from the Gorge

10   rather than the water in the Temecula-Murrieta area breaking

11   through.  I think it is more technically correct.  You could

12   say that the water broke out of the Murrieta-Temecula Basin.

13   But as I understand it, the term "pirated" has been used that

14   the Santa Margarita River eroded from its original course

15   into the Basin rather than that the water broke out.  I would

16   just like to see it correct is all.

17       THE COURT:  It is pretty hard for me to see the difference.

18   Looking at page 3, line 7, of Mr Girard's proposed findings,

19   "surface waters changed their course to their present stream

20   condition by accomplishing a break through . . . at the place

21   known as the Gorge . . . "

22       MR. STAHLMAN:  To me it is a distinction without a

23   difference.

24       MR. SACHSE:  I agree.

25       THE COURT:  " . . . surface waters changed their course

P5

1    by accomplishing a break through . . . "  I see nothing in it

2    at all.   To be technically correct, on line 17, after Township

3    8 South, Range 2 West, SBBM.

4         MR. GIRARD:   That would be true on all of them, then, your

5    Honor.   I don't think SBBM is set forth.

6         THE COURT:   The second objection is to the statement that

7    younger alluvial deposits were laid down by stream action

8    following the break through.

9         MR. VEEDER:   The point I am trying to make on that, your

10   Honor, is simply that there is a great deal of the younger

11   alluvium that is not stream transported -- detritus that has

12   been washed down off the hills with sheet water and by wind

13   erosion and in many other ways.

14        MR. SACHSE:   Put "other" in, if you want to.   It is my

15   impression that the principal deposit is by stream action.   But

16   Mr. Veeder is right -- stream and other actions.

17        MR. STAHLMAN:   Not only that; it comes off of the hills.

18   If the stream is flowing, doesn't the stream deposit it further

19   down?

20        THE COURT:   Add "stream action and erosion."   There is no

21   dispute that this occurred after the break through, Mr. Veeder?

22        MR. VEEDER:   I think that is correct.

23        THE COURT:   That is on line 31 -- "stream action," add

24   "and erosion."

25        Somewhere here there was a statement -- maybe we haven't

P6

1    come to it yet -- that the deposits of younger alluvium were

2    deeper at the Elsinore end than at the southern end.

3         MR. SACHSE:  That is further along.

4         THE COURT:  That is further along, is it?

5         MR. VEEDER:  The statement is also made that it is deeper

6    at the mouth of Nigger Canyon.

7         MR. GIRARD:  That is a gross error.  I telephoned Mr.

8    Kunkel and asked him, and I just copied what he told me.  Any-

9    thing that Mr. Kunkel says as to where it is deeper is right.

10   I just misquoted.

11        THE COURT:  As to Finding III, there is an objection that

12   the two well defined faults are approximately parallel.  Mr.

13   Veeder says that the evidence will not support that.  It is

14   true that they are not exactly parallel.  Where is the error

15   there?

16        MR. VEEDER:  The Elsinore phenomenon is a fault zone of

17   criss-crossed faults inferred which go off into the basement

18   complex, and surely the large area of these faults on Elsinore

19   Fault is not in the older or younger alluvium.  The evidence

20   would indicate that there is some kind of series of several

21   faults that constitute the zone.

22        THE COURT:  There are some criss-crossed minor faults

23   shown on these maps, and there was testimony about them, but

24   the two major faults are the Elsinore and the Wildomar Faults.

25   Isn't that true?

18,104

P7

1    MR. VEEDER:  No, your Honor, my understanding of the

2    testimony and the evidence which California itself put in is

3    that the Elsinore is not a continuous fault in any sense of

4    the word.  It is a series of faulted areas.  The Wildomar Fault,

5    on the other hand, is rather a well defined fault area which

6    does run from northwest to southeast quite the length of the

7    valley.  But that is not true in regard to Elsinore.

8        Again, as I said in regard to this incising of the Santa

9    Margarita River, I feel that this degree is going to be read

10   by some technical people, and I would like to have it as nearly

11   right as it can be.

12       MR. STAHLMAN:  I don't recall the testimony as Mr. Veeder

13   says.  However, I do know that Exhibit 15 shows almost a

14   continuous fault line on there.

15       MR. VEEDER:  Completely inferred.  There is no testimony

16   whatever.  If you will look at Exhibit 15-E, which is a key

17   exhibit here, you will find that the Elsinore Fault does not

18   even appear on it.

19       THE COURT:  Did you bring down 15-E?

20       MR. VEEDER:  15-E is here.

21       MR. STAHLMAN:  Exhibit 15 shows it, though, when they were

22   testifying to it.

23       THE COURT:  Did you bring 15 down?

24       MR. VEEDER:  Yes, 15 is here.

25       MR. GIRARD:  I would willing to have Mr. Kunkel draft it,

P8

1    if he wants to.

2        MR. SACHSE:  I don't think this is too critical.

3        MR. STAHLMAN:  That particular fault isn't so important.

4    It is the basement complex.

5        MR. VEEDER:  There is an inferred line.  It goes off into

6    here (indicating).  Exhibit 15 is the most general kind and

7    type of map.  Exhibit 15-E is the one that was introduced to

8    show the exact geology as nearly as we could find it.

9        MR. STAHLMAN:  When he was testifying to the geology he

10   was using Exhibit 15.

11       MR. GIRARD:  That is right.

12       MR. VEEDER:  No, he was using 15-E on the technical geology.

13       MR. SACHSE:  Look at the date of the identification.

14       MR. VEEDER:  Here is the thought I am going to tender.

15   The United States will not agree to California's proposed

16   findings.  We think they are in error.  We believe they are

17   basically contrary to the evidence.  Your Honor, we say that

18   time would be saved if you want to adopt California's findings,

19   by all means do so, and let our objection stand, because I

20   would not be a party to it.

21       THE COURT:  "Fault, dashed where position is inferred,

22   dotted where concealed."  You had some part in drawing these,

23   Mr. Kunkel?

24       MR. KUNKEL:  (Previously sworn.)  Yes, I did, your Honor.

25       THE COURT:  What do you mean by "concealed"?  Do you mean

18,106

P9

1    where it is concealed that you are sure the fault is there, but

2    it is not apparent on the surface?

3        MR. KUNKEL:   That is right.   It is beneath younger alluvium,

4    which lies over the top.

5        THE COURT:   Then what is the difference between "inferred"

6    and "concealed"?

7        MR. KUNKEL:   The evidence for the fault is not as distinct.

8        THE COURT:   Which is not so distinct?

9        MR. KUNKEL:   The inferred.

10       THE COURT:   The "concealed" is more distinct than the

11   "inferred"?

12       MR. KUNKEL:   Actually, by "concealed" I was referring to

13   the Wildomar Fault zone in the stretch below Santa Gertrudis

14   Creek from Long Valley on up the valley toward Elsinore.   The

15   fault in that position was determined by differences in altitude

16   of water levels on opposite sides of the fault.   The position

17   is rather carefully controlled there.   But the fault cannot

18   actually be seen on the surface.   Whereas, with regard to the

19   Elsinore Fault zone, we know there are the Santa Rosa Mountains

20   to the south and it is a thousand or more feet to basement in

21   the Murrieta Valley.   Therefore, there is a strong inference

22   that there is a fault there.   There is limited evidence where

23   the fault can be observed on the surface, but it was not

24   actually mapped with the same degree of precision.

25       THE COURT:   I am trying to distinguish between your

P10

1    "concealed" and "inferred."  Here in the dotted lines running

2    across the area of younger alluvium you say it is concealed.

3        MR. KUNKEL:  That is correct.

4        THE COURT:  But you have proof of water levels plus the

5    lines on either end which indicate that is where it is.

6        MR. KUNKEL:  That is correct.

7        THE COURT:  What about inferred up in here, for instance?

8        MR. KUNKEL:  Well, there is an inferred stretch of the

9    Elsinore Fault right below the word "Murrieta" in Section 12

10   8 South.

11       THE COURT:  What is the difference between "inferred" and

12   "concealed"?

13       MR. KUNKEL:  There is no actual point where a geologist

14   can go on the ground and say the fault is at this point.  We

15   know there are mountains to the south and very great depth to

16   the basement complex in the valley.  Therefore, there is an

17   inference that that fault exists, but the exact position of

18   that fault is not as accurately determined.

19       THE COURT:  This is a roadway here?

20       MR. KUNKEL:  That is a road.

21       THE COURT:  This is a fault here, but this is a road.

22       MR. KUNKEL:  That is a road.

23       THE COURT:  This is an inferred fault?

24       MR. KUNKEL:  That is correct.

25       THE COURT:  Wildomar; is that right?

P11

1    MR. KUNKEL:  That is correct.

2    THE COURT:  And this is Exhibit 15, the exhibit you were

3  using when you were testifying?

4    MR. KUNKEL:  That is correct.

5    MR. VEEDER:  When?

6    THE COURT:  When he testified to the geology of this area.

7  Exhibit 15-E was not even in existence at that time.

8    MR. STAHLMAN:  This went into evidence on October 1, 1958.

9    MR. GIRARD:  Just before I came into the case. .

10    MR. STAHLMAN:  And Exhibit 15-E didn't come in until 1959.

11    MR. SACHSE:  1960.

12    MR. STAHLMAN:  April 5, 1960.  The geology had all been in

13  at that time.

14    MR. VEEDER:  You think the geology was not the same in

15  1960 as it was in 1958.  It doesn't matter.  I have already

16  stated our position in regard to California's findings.

17    MR. GIRARD:  To be quite honest, I drew this finding

18  looking at Exhibit 15 and also California's exhibit in Bulletin

19  No. 57 on geology.

20    MR. VEEDER:  You couldn't say a parallel fault using

21  California's geology map.

22    MR. GIRARD:  I disagree.

23    THE COURT:  Just a minute.  Mr. Kunkel, you think there

24  is a fault there, the Elsinore Fault, do you not?

25    MR. KUNKEL:  There is a fault or a series of echelon faults.

P12

1     THE COURT:  Which follow a general line?

2     MR. KUNKEL:  Follow a general line from northeast to

3 southwest.

4     THE COURT:  And that fault, though partly inferred and

5 partly concealed et cetera, is approximately parallel to the

6 Wildomar Fault, is it not?

7     MR. VEEDER:  The fault zone.

8     MR. SACHSE:  Wouldn't we cover it if we do what Mr. Veeder

9 says?  Let's say there are two well defined fault zones which

10 are approximately parallel.

11     THE COURT:  Is that the better statement of the geology --

12 fault zones?

13     MR. KUNKEL:  The substitution of the word "zones" would be

14 better.  This is in gross a general parallelism.

15     MR. SACHSE:  Fault zones which are approximately parallel.

16 One of said fault zones.

17     THE COURT:  All right, let's put it in.

18     MR. VEEDER:  I never heard of the Wildomar Fault being

19 called a "zone."

20     Mr. Kunkel, you didn't call the Elsinore a zone, did you?

21     MR. KUNKEL:  I don't recall that I used the word "zone."

22     MR. STAHLMAN:  I think the way it was at first is more

23 correct.

24     THE COURT:  What do you say now?  Is Elsinore a fault

25 zone, or are the two of them together a fault zone?  What is

P13

1    your position?

2        MR. KUNKEL:  Well, it is my opinion that the faults, in

3    general, are related.  I would tend to think of the Wildomar

4    and the Elsinore as actually separate fault zones.  They

5    probably occurred at the same time while Murrieta Valley was

6    being down-dropped as a block.  And whether you think of it as

7    one zone or as two zones, in part, is dependent on the scale

8    of the map you are looking at and whether you are looking at

9    the whole regional geology --

10       THE COURT:  We would not be in error, geologically, then

11   to speak of the Wildomar Fault zone and the Elsinore Fault zone,

12   would we?

13       MR. KUNKEL:  I think that would be a correct manner to

14   refer to them.

15       THE COURT:  In line 10, "and the other zone which runs

16   in the identical direction and is generally parallel thereto,

17   . . . known as the Wildomar Fault; . . ."  Mr. Veeder says that

18   the Elsinore Fault does not terminate in Murrieta Valley, but

19   extends along the westerly portion -- he objects to this state-

20   ment -- of the alluvial deposits in Wolf-Pechanga Valley and

21   into the San Luis Rey watershed.

22       MR. GIRARD:  I think that is on a California exhibit, your

23   Honor.

24       MR. SACHSE:  This exhibit does not show the exact extension

25   into the San Luis Rey.

P14

1    MR. GIRARD:  Have you got Bulletin No. 57 here?

2    I will just as Mr. Kunkel if it is correct.

3    MR. SACHSE:  May we ask Mr. Kunkel if that is the correct

4    fact, your Honor.  I don't care.

5    THE COURT:  Is it correct?

6    MR. KUNKEL:  My recollection of the regional geology is

7    that the zone does extend into the San Luis Rey.  Personally,

8    I haven't traced it out.

9    MR. VEEDER:  I don't know of any exhibit that shows it.

10   I don't believe Mr. Kunkel testified to it.

11   MR. SACHSE:  California's exhibit does show it.  We can

12   get Bulletin No. 57.  But this isn't important enough for me

13   to want to fight about it.  If Mr. Kunkel says it is right,

14   all right; or if he says it is wrong, it's all right.  Because

15   this case doesn't involve the San Luis Rey.

16   THE COURT:  I don't think it is too important, either.

17   Mr. Veeder objects to the language "acts as a barrier to

18   the movement of ground waters . . ."

19   MR. GIRARD:  In Mr. Veeder's proposed findings, he says

20   that is what happened.

21   MR. SACHSE:  Mr. Veeder used the same language to which

22   he objects.

23   THE COURT:  Actually, the testimony is, as he states, that

24   the fault is far from impervious and water moves through it.

25   However, it is a much tighter formation, and as he had in his

P15

1  proposed findings the water passes through and over the Wildomar

2  Fault.

3      MR. STAHLMAN:  Hasn't it been testified that it acts as a

4  partial barrier?

5      THE COURT:  It is a partial barrier.

6      MR. VEEDER:  I have no objection to "partial barrier."  I

7  think I said a "semi-barrier" to ground water percolating.

8      MR. GIRARD:  "Semi" is fine.

9      THE COURT:  Partial or semi-barrier.

10      MR. SACHSE:  If Mr. Veeder wants "semi," let's use it.

11      THE COURT:  On line 22 after "over" insert "and through"

12  said fault.

13      How can you state, on page 3 of your objections, "As the

14  younger and older alluvium cannot be distinguished the state-

15  ment is without basis in fact"?  If they can't be distinguished,

16  there was a lot of time wasted showing the older and the younger

17  alluvium.  Now it is true that the point of contact in many

18  cases is difficult, and particularly as you go downward where

19  the younger ends and the older begins.  But certainly on the

20  surface they can be distinguished.  In many places you can see

21  clearly that this is older alluvium and in other places that

22  this is younger alluvium.  The point of contact is not always

23  clear.  But this represents the best judgment of the engineers

24  and the geologists as to the point of contact.

25      MR. VEEDER:  Your Honor, the point that I desire to make

P16

1   on these findings and these preliminary statements that I am

2   directing my objections to is that the detritus is all the same

3   material.  The valleys, I think unfortunately, in retrospect,

4   were delineated with a yellow line.  No one ever dreamed at the

5   time that this material went in that it would be ceased upon

6   as the basis for the bed and banks of streams.  But the truth

7   is that I don't believe that anyone can go out and say, this is

8   the older alluvium and this is the younger alluvium.  I don't

9   believe it.

10          And I will say this.  I would be pleased just to have the

11   United States withdraw from consideration from these and let

12   us proceed to attack them when they are entered.  I am tired

13   of the harassment from --

14          THE COURT:  You are not being harassed.

15          MR. VEEDER:  Oh yes I am.

16          THE COURT:  You are an officer of this Court and to the

17   extent that you can be helpful you will assist.

18          MR. VEEDER:  The real assistance that I could be to this

19   Court now was tendered to you.  I proposed the kind of findings

20   that the United States is correct.  But certainly to go along

21   with things that we know are physically impossible is a waste

22   of time.

Belt 2

23          THE COURT:  Whether you think it is a waste of time or

24   not, we will proceed.

25          Line 30.  I suppose we don't have to incorporate "zones"

P17

1    again.  We have called them by name and then we talked about

2    the faults.

3        MR. GIRARD:  "Fault zones" on line 27, though.

4        MR. SACHSE:  Instead of "lines."

5        MR. GIRARD:  Yes, instead of "lines."

6        THE COURT:  Fault zones.

7        Down to V now.  Actually, all the alluvial materials with-

8    in the Murrieta Valley are sedimentary, but the younger alluvium

9    is of a higher water bearing capacity and permeability than the

10   older.  So technically V, it would seem to me, should say that

11   the younger and older -- insert "older" -- alluvial deposits

12   within the valley consists of sedimentary materials; that said

13   younger alluvial sedimentary -- insert "younger alluvial" --

14   materials are of a higher water bearing capacity and permeabil-

15   ity as contrasted to the older alluvial deposits.  Is that

16   agreeable?

17       MR. SACHSE:  I think that is probably more correct.

18       THE COURT:  It seems to me that in VII and throughout these

19   findings we ought to distinguish between a description of these

20   valleys in a state of nature and a situation that may exist

21   today.  We have examples of that.  One is the reverse gradient

22   in Murrieta, which is not a situation in a state of nature.

23   You have the same problem in the Pauba Valley where you have

24   Pauba Valley in a state of nature before the dam and then you

25   have the situation with the dam.

P18

1      I would try out for size on VII:  After "That" insert

2  "in a state of nature" -- what is the language used there?

3      MR. GIRARD:  I guess under natural conditions.

4      THE COURT:  "That under natural conditions the surface

5  flow of the Murrieta Creek," you say, is between the fault

6  lines.  You don't mean that it extends from fault line to fault

7  line?

8      MR. GIRARD:  No.

9      MR. SACHSE:  That is made clear, I think, in the rest of

10  the sentence.

11      THE COURT:  I would think it would read better that the

12  surface flow of Murrieta Creek is over (dropping down to line

13  12) and upon the younger alluvium lying in the area between the

14  fault zones.

15      MR. VEEDER:  Now your Honor, I hate to keep bringing these

16  things up, but I think if you do have Bulletin 57 here,

17  California's own evidence showed that the Elsinore Fault goes

18  off into the basement complex.  I don't see how we could

19  conceivably, with any degree of accuracy, say that Murrieta

20  Creek -- unless you want to relate it to the Pacific Ocean,

21  you could say something like that -- but I don't believe that

22  it makes sense to say that the surface flow of Murrieta Creek

23  is between said faults.

24      THE COURT:  That is what we are talking about.  I am

25  suggesting that we change that.

P19

1          MR. VEEDER:  Why don't you drop out the reference to the

2     fault?  What difference does it make?

3          THE COURT:  Let me state what I think we ought to say on

4     this paragraph and you can look at the notes later:

5          That under natural conditions or in a state of nature the

6     surface flow of Murrieta Creek has been over and upon the

7     younger alluvium in the Murrieta Valley lying generally between

8     the two fault zones; that in times past there have been high

9     flood waters which covered the entire area of younger alluvium

10    and were, in part, the cause of laying down the areas of younger

11    alluvium.

12         In other words, I think we could find that in times past

13    the flood waters of Murrieta Creek have spread clear across

14    the younger alluvium in that valley.  That is how they got there.

15    It doesn't happen today, with all the pumping.  It might happen

16    again in time of flood.  But these flat areas of younger

17    alluvium are there because of stream action spread clear across

18    the area.

19         And then go ahead after the "but," "that upon said areas

20    of younger alluvium between the faults the location of the

21    surface flow has, and may in the future, vary considerably and

22    it is quite common for the surface stream to shift its surface

23    bed . . ."

24         I think we ought to, if we get my idea, talk about the

25    state of nature and talk about the fact that these flood waters

P20

1    have obviously covered all these younger alluvial fills in times

2    past.

3         Any objection to that?

4         MR. GIRARD:  No.

5         THE COURT:  In VIII, again, that under natural conditions

6    or in a state of nature.

7         Then I think that we ought to add to VIII, or include in

8    VIII, that within the last ten or fifteen years the perennial

9    flow commenced -- I don't know whether Mr. Veeder has designated

10   it correctly or not, but it is at least near that point north-

11   west of Vail boundary and flowed to join Temecula Creek.

12        And then I think we ought to add the fact of this reverse

13   gradient, which I don't think you have in here anywhere.

14        (Defense counsel confer off the record.)

15        THE COURT:  "In recent times" is satisfactory.

16        And then I would add to VIII, while we are at it, that

17   the evidence indicated -- what was that, 1959 or '60, the

18   reverse gradient?

19        MR. GIRARD:  Yes, we should have a finding on that.  I

20   will prepare one on it.

21        THE COURT:  That because of extensive pumping in the

22   Murrieta Valley and adjacent areas -- I wouldn't limit it to

23   the Murrieta Valley -- adjacent areas in the older alluvium,

24   there was actually a reverse gradient.

25        MR. SACHSE:  I don't like your Honor's phrase "because of

P21

1    pumping."  May we add "because of conditions of drouth and

2    excessive pumping" et cetera?

3         THE COURT:  Yes, drouth and pumping would be the reason this

4    reverse gradient has occurred.

5         MR. GIRARD:  Yes.  That was the testimony of Mr. Kunkel.

6         MR. VEEDER:  Any findings to which there is not an objection,

7    your Honor, I want to have the general objections that I have

8    made, applicable.

9         THE COURT:  You may have them.

10        Now is it necessary that we make a finding -- and at one

11   time somewhere I saw one -- as to this water coming down out

12   of the older alluvium and passing over and through the Wildomar

13   Fault and creating the series of points of rising water in that

14   area?  This is a definite phenomenon which distinguished the

15   ground water area easterly of the Murrieta Valley, in the

16   Murrieta Valley itself.  Because in Murrieta Valley I am

17   prepared to find that the water flows in the direction of the

18   flow of the creek.  But maybe this could be worked in later in

19   your findings where you have the language of the water moving

20   southerly and westerly through the older alluvium.  But the

21   points of rising water along the Wildomar Fault are very

22   obvious phenomena which, I think, we ought to have a finding

23   on.

24        MR. GIRARD:  Do I discuss that at all in Finding XXV on

25   page 11?  That is not the same thing.

P22

1    MR. VEEDER:  Government's proposed Finding XXXI has the

2    language that I think your Honor just stated.

3    MR. SACHSE:  On what page is that?

4    MR. VEEDER:  On page 10.

5    MR. SACHSE:  I think you could add Bill's language about

6    the course of the Wildomar Fault zones marked by a series of

7    springs, et cetera.  That could go in there.

8    THE COURT:  "Ground waters in the Basin" -- you use the

9    word "basin," which we would change to the "older alluvium" or

10   "ground water area" --"percolate through, over and across the

11   Fault." I think that is correct.

12   MR. SACHSE:  Where do you think this ought to go, your

13   Honor?  Should this go in back up here?

14   THE COURT:  I think there is a place further on where he

15   talks about water in the older alluvium moving downward.   I

16   think that is where it ought to go in.

17   MR. GIRARD:  All right.

18   THE COURT:  We can find a place later.

19   Now, starting in with X, Mr. Veeder has objected vehemently

20   to the word "enclosed," and I suppose the technical use of the

21   word "enclose" means on all sides -- top, bottom and both sides.

22   "Enclosure" would be that connotation.  Other than that, I

23   can't make much out of this objection "The younger alluvium

24   is not and cannot be enclosed by older alluvium."

25   MR. VEEDER:  It surely cannot, your Honor.  At most it is

P22

1   a thin veneer deposited someplace on the surface of the basin.

2       MR. GIRARD:  I think we could do it the way we did it on

3   the ones on Camp Pendleton, which is better language, that the

4   younger alluvial deposits in Murrieta Valley rest upon and are

5   confined laterally by deposits of older alluvium.

6       THE COURT:  That would be better, I think -- "rest upon"

7   instead of "enclosed."

8       MR. VEEDER:  How can they be confined laterally, your

9   Honor?  The deposition of the younger alluvium is simply spread

10   out by the stream action, by side erosion of the older alluvium

11   and the surrounding mountains, the detritus from them.  I think

12   you could, if you wanted, use the language that the younger

13   alluvium overlies; but certainly not "confines," it is certainly

14   not enclosed, and it is certainly not surrounded.

15       THE COURT:  The older alluvium was laid down first, there

16   is no doubt about that.

17       MR. VEEDER:  I agree on that.

18       THE COURT:  Naturally, when the younger alluvium was laid

19   down in the fills and the gullies, in some places as veneers on

20   top of the older, it was naturally confined by the older

21   alluvium.  It was like pouring concrete into the form.  Here

22   was the form already built.  Here came the detritus in the

23   older alluvium.

24       MR. VEEDER:  I don't think that is a physical possibility,

25   your Honor.  I think you are speaking of the streams doing

P24

1   something that is a physical impossibility.  For example, under

2   no circumstances did either of the streams cut below the level

3   of 957, because that is the outlet of Temecula Gorge, and

4   certainly your younger alluvium couldn't be at any greater

5   depth than that.

6       THE COURT:  Why not?

7       MR. STAHLMAN:  Wait a minute.

8       MR. VEEDER:  Because you can't possibly have a stream

9   cutting a hole out and then depositing the younger alluvium.

10      THE COURT:  The area that was filled in the Murrieta Valley

11  was cut out at a time when the water ran toward Elsinore.  Did

12  you ever see an irrigation ditch fill up with silt clear to the

13  top of the lip and run over the side?

14      MR. VEEDER:  I haven't.

15      THE COURT:  Here you have the hole created, the water comes

16  down, and the detritus and the younger alluvium settles and it

17  gradually is filled up.  It may even have been a lake in there

18  at some time where all this material was washed in.

19      MR. VEEDER:  We have made our objection.

20      THE COURT:  I don't see any merit to that at all.

21      Bedrock lip 970 feet deep preventing younger alluvium

22  from getting into an area at a lower elevation -- if the

23  depression existed from stream action, as it probably did.  On

24  X change that language and use what you used before, laid down

25  by stream action and erosion.

P25

1    MR. GIRARD:  Rest upon or confined laterally on each side

2  by older alluvial deposits.

3    THE COURT:  Yes.

4    MR. GIRARD:  This probably should have a reference to that

5  reverse gradient in there, too, someplace.

6    MR. VEEDER:  As stated, it is now incorrect.  It says, at

7  line 13, "said ground waters contained in said younger alluvial

8  deposits move in a general southeasterly direction . . ." They

9  don't do it now, as my objection X(b) points out.

10    THE COURT:  You say in X, on page 9 at lines 10 and 11,

11  "older alluvial deposits because of their tighter characteristics

12  and limited permeability impede" -- you don't say "prevent" --

13  "impede ground waters contained in the younger alluvial deposits

14  from moving into the older alluvial deposits, . . ."

15    MR. GIRARD:  I guess it is just a word.

16    THE COURT:  Effectively impede.  I don't know whether the

17  adjective means very much.  I think the word "impede" is proper.

18  I don't think it prevents.  I think there is and can be an

19  interchange.

20    MR. GIRARD:  That is what I wanted to leave the idea with.

21  That is why I used it.  There is some water that probably does

22  get in there.

23    THE COURT:  I think probably right in there where you say

24  "but on the contrary," I would think that some statement ought

25  to be made that there could be some interchange of waters from

P26

1  younger to older alluvium, et cetera.

2      MR. VEEDER:  Your Honor, in regard to these matters, the

3  water pumped by Vails in the Murrieta Valley -- if you want to

4  call it, the graben area in there -- the water that is pumped

5  from any material depth necessarily is pumped from the older

6  alluvium and the recharge that goes into that older alluvium

7  goes in through the younger alluvium.  I know of no evidence

8  which would say it is impeded.  I think the recharge comes

9  down and effectively goes through the older alluvium down to

10  the water table, and I don't believe that we can say, with any

11  scientific responsibility in these matters, that in Pauba and

12  in Murrieta the waters are impeded.  When there is a cone of

13  depression the recharge goes in there.

14      MR. SACHSE:  Aren't we talking about lateral movement at

15  this point rather than vertical?

16      MR. VEEDER:  Lateral?

17      MR. SACHSE:  Your Honor was discussing X.  You start out

18  by saying they are confined laterally on each side by older

19  alluvial deposits; "that while it is true that the ground

20  waters within said older alluvial deposits are in hydrologic

21  contact with the ground waters contained in the younger alluvial

22  deposits" -- we are talking about lateral, Mr. Veeder -- "said

23  older alluvial deposits because of their tighter characteristics

24  and limited permeability effectively impede ground waters con-

25  tained in the younger alluvial deposits from moving into the

P27

1   older alluvial deposits." That is what we are saying. That is

2   what we intended by this draft, and I think that is what his

3   Honor understood. His Honor points out that there may be under

4   some conditions lateral movement. We are not talking about

5   up and down at the moment.

6   MR. VEEDER: Of course, I wouldn't agree with it anyway.

7   But at least the error wouldn't be of such magnitude if we

8   said "lateral."

9   THE COURT: I think Mr. Sachse has in mind what I am

10  talking about now. In fact, the very testimony the Government

11  offered that the older alluvium is less permeable than the

12  younger would afford the inference that if it was less permeable

13  there was an impeding of the movement of water into it.

14  I think you can fix X up to satisfy me.

15  There of course would be movement downward as well as

16  laterally. I wouldn't know any stream bed, unless you had a

17  concrete duct, that there was not water that could move down-

18  ward as well as laterally as the stream moved along.

19  This isn't unrealistic. You could take the smallest

20  rivulet you could think of. Take a hole and put an irrigation

21  ditch down. Your water moves down the ditch, but water is

22  moving downward and it is moving out laterally. Take some

23  little stream you might see running. It could be moving down-

24  ward, unless you had bedrock underneath. I don't think you

25  have to have a bedrock bottom to have an underground or a

P28

1    surface stream.  That is not necessary.

2        Now XI.  Here is where Mr. Veeder's remarks are directed --

3    "and around".  Is that the right word on line 29 -- which lie

4    beneath and adjacent to, beside of, on either side of?

5        MR. SACHSE:  Beneath and on either side of.  We are talking

6    about the bed and banks.

7        THE COURT:  "On either side of" would be better than the

8    word "around".

9        I am satisfied with XI.  Anybody have any improvements on

10   it?

11       On page 5 of the Government's objections Mr. Veeder says

12   that it is contrary to the law of nature that "at all times

13   said ground waters within the younger alluvial deposits in the

14   Murrieta Valley move in the identical direction of Murrieta

15   Creek when in fact it physically flows".

16       MR. VEEDER:  I don't believe it is physically possible for

17   that to occur, your Honor.  I don't believe that the evidence

18   would support it.  I truly think it is erroneous.  Because if

19   we review the recovery in wells during wet periods it is obvious

20   that the water had to go down to the water table first, bring

21   about a recovery, ultimately bring the water table up to the

22   bottom of the bed of the stream.  I don't believe that there

23   is any course that the water would take other than vertically

24   downward to the water table.

25       THE COURT:  Then what happens?  Suppose it goes vertically

P29

1   down to the water table.  Then what happens?

2       MR. VEEDER:  It spreads out when it gets to the water table.

3       THE COURT:  And it spreads out to the areas of older

4   alluvium.  Then what happens?  It has to go downstream.

5       MR. VEEDER:  It spreads out.  But your Honor, the younger

6   alluvium is a very thin veneer and the water that is carried

7   to it and down into the interstices goes necessarily down.  It

8   doesn't proceed along.  Gravity is downward.  It is not along

9   the bottom of the stream.

10      I am just putting these in.  I realize you will overrule

11  me.  But in good conscience the United States can't sit by and

12  have the laws of nature violated.  And I want that known.

13      THE COURT:  Let the record show general laughter by counsel.

14      MR. VEEDER:  In company with the general harassment for

15  the last three years of anything that --

16      MR. STAHLMAN:  I don't think Mr. Veeder should make these

17  statements.

18      MR. VEEDER:  -- of anything that didn't go along with the

19  desires of Fallbrook.

20      THE COURT:  Let's not cry about this.  You haven't been

21  harassed.  You have been given lots of rope.

22      MR. STAHLMAN:  When Mr. Veeder presented his findings we

Belt
3

23  analyzed them like we are doing here.  There was no abuse.  I

24  think we proceeded like lawyers in the case.  Now he is guilty

25  of sarcasm and is charging us with harassing him.

P30

1     MR. VEEDER:   I just want the record to show it.   As long

2  as my objections to these findings are part of the record, that

3  is all I want.

4     MR. GIRARD:   We could cross out "at all times" and just

5  state "said ground waters within the younger alluvial deposits,"

6  at line 17 on page 6.

7     MR. SACHSE:   That is Mr. Veeder's exact language that he

8  appears to object to.

9     MR. GIRARD:   That language to which he objects doesn't

10  appear in his comments on proposed Finding XI.

11     THE COURT:   Before you go down that far on XII, on line

12  11, "that except during or immediately after periods of

13  precipitation Murrieta Creek does not flow as a continual

14  surface stream," and then you talk about its flowing for a

15  short distance, disappearing and rising, et cetera.   That is

16  probably in a state of nature there.

17     MR. GIRARD:   Yes.

18     THE COURT:   You would strike out "at all times" on line 19.

19     MR. VEEDER:   And you are leaving in that the "deposits

20  within Murrieta Valley move in the identical direction of

21  Murrieta Creek when in fact it physically flows"?   Is that being

22  left in?

23     THE COURT:   Yes.   This metaphysical concept that you are

24  trying to talk about, if you want to make a finding on it, we

25  can make one.   If you can, imagine the area of younger alluvium

P31

1  completed denuded of water and a rain storm comes.  The first

2  water would flow into this younger alluvium and go down fairly

3  vertically and spread off to the sides, and then you put another

4  bucket of water in and as soon as this area is saturated it

5  moves along a little further.  You have saturated twenty feet

6  of it with water and you put another barrel of water in, it

7  can't move down.  This area has been saturated.  It fills up

8  the next area and it probably progressively would fill up your

9  younger alluvium.  Then what would happen? - You would pour in

10 more water.  You have water in the younger alluvium, water on

11 the surface and water below supporting the surface flow, and

12 the water moving generally down gradient that exists in the

13 valley.

14      I don't know that we have to go into these things of that

15 sort.  The finding is that it moves in the direction of Murrieta

16 Creek.  This is the general movement of the water.  It doesn't

17 mean that water when coming into a dry alluvial fill would not

18 move downward also.  I don't know how we could draw these

19 findings to go into all those matters.  You would have to do

20 something like I suggested.  Take a dry bed, no water at all,

21 and describe how the water would move.

22      Any other matters on XII?

23      MR. GIRARD:  I might add on proposed Finding XIII, I read

24 the record and this probably is the one you mentioned the last

25 time we mentioned these, your Honor.  I checked the record and

18,129

P32

1    this fact came out when Mr. Sachse was cross-examining Mr.

2    Kunkel, I believe.  There was no reference in there, I don't

3    believe, to Palomar Street and west of Orange Street.  But I

4    talked to Mr. Kunkel on the telephone and he indicated that was

5    the area.  Whether the record shows that I don't know.  Maybe

6    we can ask him whether it is correct and refer to the exhibits

7    as to where those streets are presently.

8         MR. SACHSE:  The record does show it.  I cross-examined

9    Mr. Kunkel by direct reference to the map, and there was no

10   mention of the streets.  He indicated the barrier indicated on

11   the map.

12        MR. GIRARD:  I think it should be clear.

13        MR. VEEDER:  He has "Probable barrier" on 15-E.  There is

14   no disagreement on that.

15        THE COURT:  Mr. Kunkel, for the record, does the reference

16   "northeast of Palomar Street and west of Orange Street"

17   sufficiently depict the area of that barrier?

18        MR. KUNKEL:  They are so close that that is a good

19   description.

20        THE COURT:  All right.  Now you say "as said streets are

21   presently depicted on U.S. Exhibit _____."  Are there any on

22   any exhibits?

23        MR. GIRARD:  That is what I was going to find.

24        THE COURT:  Check that and see if they are.

25        MR. GIRARD:  Yes.  I didn't have the exhibits.  I was

P33

1    hoping they would be.

2         THE COURT:  Now we come to XIV where reference is made to

3    the "deepest areas".

4         MR. SACHSE:  Mr. Veeder is plainly wrong.  That is what

5    his own witness testified to.

6         THE COURT:  No, this is a mistake that Mr. Kunkel said

7    he made.

8         MR. GIRARD:  No, if the mistake was made, it was not made

9    by Mr. Kunkel -- it was made by me.

10        THE COURT:  That is what I mean.

11        MR. GIRARD:  But I don't think this is the finding in

12   which the mistake was made.  I think it was made in the Temecula

13   findings.

14        MR. SACHSE:  This finding, I think, is absolutely correct.

15        MR. GIRARD:  I may have quoted this wrong, when I talked

16   to Fred on the phone, and if there is an error it is my fault:

17   "that the deepest areas of younger alluvial deposits in

18   Murrieta Valley are in the most northwesterly portion thereof

19   and decrease gradually in depth toward its shallowest area

20   which is located in the most southeasterly portion of said

21   Valley".

22        THE COURT:  That is what Mr. Veeder attacks.

23        MR. GIRARD:  And I have misquoted it.  I would rely

24   entirely on Mr. Kunkel as to whether that is right or wrong.

25   I don't know.

18,151

P34

1   MR. KUNKEL:  I think our phone call, Fred, was to the

2   effect that in Murrieta the younger alluvium is very thin, and

3   I don't believe I gave you an exact figure; but fifty feet is

4   greater than, in my opinion, it would be.

5   MR. GIRARD:  What would you say it would be -- the deepest

6   part of Murrieta Valley?

7   MR. KUNKEL:  The deepest now, and this isn't an average

8   and it is thinner through most of the area, but I would say the

9   deepest would be on the order perhaps of 30 feet; but much of

10  it would be a matter of five or ten feet.

11  MR. SACHSE:  What about where the alluvium is the deepest?

12  Is it northwest or is it southeast?

13  MR. KUNKEL:  I don't have an opinion on that, because

14  throughout the whole valley it is quite shallow.

15  MR. SACHSE:  Why can't we, then, simply delete -- I don't

16  see any great importance to the language -- start on line 21,

17  "that generally the deepest areas" and end on line 25 "south-

18  easterly portion of said valley"?  I don't see why it is

19  essential.

20  MR. GIRARD:  No objection.

21  THE COURT:  You changed the 50 to correspond with Mr.

22  Kunkel's testimony.

23  MR. SACHSE:  Yes.

24  MR. GIRARD:  Thirty; that is right.

25  MR. VEEDER:  Did he testify to thirty feet?

P35

1    THE COURT:  He said he thought 30 was the deepest.  He

2    said it was very shallow throughout the valley.  Do we have to

3    swear him everytime we ask one of our experts a question, Mr.

4    Veeder?

5    MR. VEEDER:  I would say this, that I don't believe Mr.

6    Kunkel or anyone else knows how deep it is.

7    MR. STAHLMAN:  Why do you have him here for a witness and

8    ask him questions?

9    MR. VEEDER:  We didn't ask him the depth.

10   THE COURT:  We just asked him today.  I am sure there is

11   lots of testimony in the record on this shallow veneer.

12   MR. VEEDER:  But 30 feet or 50 feet, nobody knows.

13   MR. GIRARD:  He says approximately, Mr. Veeder.

14   THE COURT:  I am going to adjourn a little early and we

15   will meet again at two o'clock.  Leave your papers right here,

16   if you want to.

17   (Noon recess.)

18

19

20

21

22

23

24

25

18,133

P36

1   SAN DIEGO, CALIFORNIA, Tuesday, October 24, 1961, 2:00 P.M.

2                                -oOo-

3        MR. VEEDER:   I don't know whether your Honor suggested the

4   finding be entered to the fact that the Murrieta so-called

5   younger alluvium would all be under flood at one time or another

6   and that the stream would run from, I suppose, older alluvium

7   to younger or older alluvium.  But I think if your Honor would

8   look at 29-J and compare it with the maps 15-E you would see

9   that there is a great deal of younger alluvium which is nothing

10  more nor less than the deposit of detritus coming down off the

11  hills around this area here, with the result that if the water

12  was as high as the younger alluvium at flood stage you would

13  have the town of Murrieta about a hundred feet under water.

14       THE COURT:   Well, it certainly isn't true that at any

15  time all of this went under water.  But the very elevation of

16  this valley, the flatness of it, the general slope to the

17  southeast, was caused by water that came down that valley

18  historically.  You might have had detritus come down out of

19  some of these canyons which might have been ten feet high in

20  some places.  Another flood comes along and washes it down.

21       MR. STAHLMAN:   We can establish the fact that in 1937 and

22  '38 there was a foot and a half of water in the stores at

23  Murrieta.

24       MR. VEEDER:   That is a hundred feet over the top of the

25  buildings, though.  If you take a look at these elevations,

18,134

P37

1  your Honor, you will see why we have been trying to make the

2  point that there is confusion between the flood plane and the

3  area which has been designated as recent alluvium, and I don't

4  believe they are synonymous at all.

5  THE COURT:  When you get up to the northwest end of the

6  valley it is true that it is a little different situation.

7  MR. VEEDER:  I am pointing to the town of Murrieta and

8  the immediate vicinity.  Here is the 1200 foot contour.  Your

9  town of Murrieta is a hundred feet lower.  Your younger alluvium,

10  your recent alluvium is all the way through there.  That is a

11  result of a different kind of action than flood deposit.

12  THE COURT:  How was it carried there?  By wind?

13  MR. VEEDER:  A lot of it has been washed off by sheet

14  runoff, by wind erosion.

15  THE COURT:  But look at your contours coming down here.

16  MR. SACHSE:  That is a 20 foot difference from here to

17  here.

18  MR. VEEDER:  Here is your 1200 foot contour, here is

19  1100.

20  MR. SACHSE:  From here to here?

21  MR. VEEDER:  That's right.

22  THE COURT:  Look at your contours.  When you go down

23  further the thing straightens around here.

24  MR. VEEDER:  There is no relationship, your Honor.

25  Here is another example.

P38

1    You are asking for findings showing that the ground water

2 running in Murrieta Creek is in identically the same direction,

3 follows the course of the younger alluvium.  You will find here

4 is a tongue of older alluvium creating a constriction and the

5 ground water obviously, by reason of the well levels, is shown

6 to be passing right straight through the older alluvium.

7    Here is something more that would be of interest to you.

8 Some of the plates that were entered in California's evidence

9 shows that they have created a basin.  They have three basins

10 in here.

11    THE COURT:  Where does the creek run here?

12    MR. VEEDER:  The creek runs through here.

13    THE COURT:  Through the younger alluvium.

14    MR. VEEDER:  And you have your ground water passing right

15 straight through the older alluvial fill.

16    MR. SACHSE:  But with no information as to how fast

17 relatively it may pass through the older alluvium.

18    MR. VEEDER:  But your Honor, it is not backed up here, so

19 you know it is passing through.

20    MR. STAHLMAN:  It is passing around here.

21    MR. VEEDER:  No.

22    MR. STAHLMAN:  Why not?

23    THE COURT:  This is the line of least resistance.  Most

24 of your water is going to make a turn.

25    MR. VEEDER:  It can't do that.

JOHN SWADER, OFFICIAL REPORTER

P39

1    But I just want the record to show that I am doing the

2    best I can to keep it straight.

3    THE COURT:   I suppose you could make a finding on every

4    foot of this ground.   When you talk about the water moving in

5    the younger alluvium in the same direction that the Murrieta

6    Creek flows, that doesn't mean that there might not be places

7    where it swings a little to the north, south, east or west as

8    it goes down.   Generally it goes that way.   I have no doubt

9    that underground waters in the older alluvium are moving in

10   the same general direction.   But they are not moving in the

11   same manner that water in the younger alluvium moves.

12   Do you have any particular suggestion as to that portion

13   of the valley that Mr. Veeder talks about?

14   MR. GIRARD:   No sir, I think we have covered it.   I think

15   with that additional language that you suggested to Finding VII

16   we can take care of it.

17   MR. SACHSE:   That is the finding where your Honor suggested

18   that we rewrite it, pretty substantially, that under natural

19   conditions the surface flow had been, in times of flood, between

20   the faults, et cetera, et cetera -- elaborate on it considerably.

21   MR. GIRARD:   During periods of floods the surface flow has

22   extended over several different areas of younger alluvial

23   deposits.

24   THE COURT:   All right.   We are on XIV now.

25   MR. GIRARD:   That is right.   We had deleted that.

P40

1    MR. SACHSE:  Starting back on line 21 and ending with

2  "Valley" on line 5.

3    THE COURT:  Yes.

4    MR. GIRARD:  Change it to 30 feet from 50 feet.  I had

5  written 50 and Mr. Kunkel said approximately 30.

6    MR. VEEDER:  You orginally said to change it.

7    MR. SACHSE:  On the same line, commencing with the word

8  "that" on line 21, delete commencing with the word "that" and

9  end the deletion on line 25 with the word "Valley".

10   THE COURT:  We might consider in XIV inserting something

11 like this:

12   That although the contact line between the younger alluvium

13 and older alluvium on the surface is not always readily apparent

14 or exact, it was apparent enough for the United States to prepare

15 maps and exhibits showing the contact line, and that this

16 generally has been accepted by the Court as being the contact

17 line; that the contact line between the older and younger

18 alluvium underground, of course, is more difficult to ascertain

19 in that the older alluvium is more solidly packed and more

20 inpenetrable, but that with reasonable certainty we know there

21 is a contact line between them and that the fact that we can't

22 pinpoint that contact underground throughout the length of the

23 Valley does not mean that we cannot say that the older alluvium

24 constitutes the bed and banks of the stream.

25   MR. STAHLMAN:  We treated it in the Vail findings in

P41

1   somewhat that way, your Honor.  It is proposed Finding XXVII on

2   page 10(a).  It reads:

3       "Murrieta Creek traverses the lands of Vail Company

4   as described in Finding _____ herein.

5       "The waters of said creek flow on the surface and

6   subsurface of the detrital fill composed of the younger

7   alluvium that lays generally in the Murrieta Valley with

8   extensions to the northeast and southwest following the

9   various named and unnamed creeks which join Murrieta

10   Creek from both sides of Murrieta Valley, the aerial

11   extent of said alluvium being depicted on U.S. Exhibits

12   15 and 15-E.  The waters of said creek flow in a south-

13   easterly direction confined to the surface and subsurface

14   of the younger alluvium as hereinabove described.  Due

15   to the lesser permeability of the older alluvium,

16   weathered basement complex, and basement complex which

17   surround the younger alluvium of Murrieta Valley and its

18   tributary valleys, said older alluvium, weathered basement

19   complex, and basement complex are considered to be the

20   bed and banks of Murrieta Creek and its tributaries.

21   The bed, upon which is laid the younger alluvium of the

22   Murrieta Valley, is shallow at the northwestern end of

23   said Valley as evidenced by outcrops of basement complex

24   and areas of older alluvium and deepens to an unknown

25   extent in a southeasterly direction towards the juncture

P42

1    of Murrieta and Temecula Creeks."

2    THE COURT:  You haven't said a lot of things which we have

3    already covered.

4    What do you think of the suggestion that I made, Mr. Girard

5    and Mr. Stahlman's contribution?

6    MR. GIRARD:  I had thought of that, whether we wanted a

7    similar finding.  However, I had approached it on the basis of

8    proposed Finding No. XV, which says that attached hereto and

9    marked Exhibit A will describe the pieces which are riparian,

10   and that you would determine the riparian land which touches

11   on the creek by going to 15-E and somebody would have to list

12   the lands which overlie the basin in whole or in part.

13   THE COURT:  I particularly direct my attention to Mr.

14   Veeder's objection that how can you tell older and younger

15   alluvium apart.  The Court has relied on exhibits and testi-

16   mony that he has offered, and I don't know of any reason why

17   we can't say that, although it is difficult to point out with

18   exactitude the line of demarkation on the surface between

19   older and younger alluvium, the United States by expert testi-

20   mony and maps have delineated it and the Court is prepared to

21   accept it.

22   MR. GIRARD:  Even quarter sections.

23   THE COURT:  That takes care of the surface contact.

24   MR. GIRARD:  Yes.

25   THE COURT:  And then put in a paragraph that underground,

P43

1  of course, it is more difficult to establish this contact

2  because the older and younger alluvium being of similar materials,

3  the older being merely more compacted, tighter, less permeable,

4  but that the contact between them does exist and that it does

5  exist even though we cannot demark exactly where this contact

6  occurrs on the ground.

7      MR. VEEDER:  I think it is only proper, however, if your

8  Honor is going to pursue that course, to continue and say that

9  as distinguished from the maps 15-E and 15, which are of very

10  general character, that in the numerous engineering reports

11  which were entered there was no effort made nor was it possible

12  to determine with any degree of accuracy the contact between

13  the two.

14      The prejudice that your Honor is now directing against the

15  United States in these matters, I had no intention and no one

16  ever believed that when Mr. Kunkel testified or when these

17  exhibits were offered that anyone would ever proceed on the

18  basis that the contacts were of sufficient definity that you

19  would attempt to define riparian or non-riparian land on the

20  basis of them.

Belt 4  21      THE COURT:  I am certainly going to have the right to

22  rely upon evidence that you presented, which I heard, and upon

23  maps which I saw; and I am prepared to make that kind of finding.

24  And I don't intend to go into what you did or did not do.

25      MR. STAHLMAN:  Mr. Veeder continually intersperses this

P44

1  record with statements about the Court's prejudice.

2      THE COURT: I don't pay any attention.

3      MR. SACHSE: May I suggest something here that maybe we

4  are overlooking. This really isn't too critical. I would

5  almost offer to bet a dinner for everybody involved in this

6  case that you won't find a single ownership where the actual

7  boundary line is going to be this contact. We could plot the

8  ownerships on 15-E. They would be small, but you are going to

9  find them all over the place. No one's ownership is going to

10  follow that line of contact.

11      To go a step further, what is the significance of that

12  contact line on the surface? The only significance is if the

13  user is making a surface riparian diversion. Because if he is

14  making an underground diversion his rights are the same anyway

15  as those of an overlying landowner.

16      THE COURT: We all agree that this has no significance in

17  the Murrieta Valley. We all understand that this objection is

18  being made by the Government in connection with their position

19  downstream as to the contact between the older and the younger

20  alluvium or between the younger alluvium and the La Jolla

21  formation et cetera downstream. The Government can't success-

22  fully contend that anybody would be hurt by what we do in the

23  Murrieta.

24      MR. STAHLMAN: As previously pointed out, you have the

25  same problem when you are defining the bed and banks of a

P45

1    surface stream.  It is not done with exactness and definiteness,

2    as Mr. Veeder thinks it should be done here with some geometric

3    certainty.  It is done at all times just as we are doing it

4    here, as the proof established.  That I think is the reason for

5    the presumption that occurs that the water that is not in the

6    stream is not part of the stream system.

7       THE COURT:  Mr. Girard, when you get the transcript, see

8    if you can put in something there particularly about the fact

9    that the Government's map was introduced by the Government and

10   that the Court has relied upon it, and that although the

11   contact line is not always easy to find the Government engineers

12   and the Government counsel produced evidence showing the

13   approximate contact line on the surface.

14      MR. GIRARD:  As far as I am concerned, I am sure that is

15   the Government witnesses' best estimate.  I am willing to go

16   along with it.

17      This XV would be primarily a plotting job on the map in

18   connection with 15-E, setting forth the descriptions of the

19   land which do abut or are traversed by.

20      THE COURT:  Mr. Veeder's objection is, where is Murrieta

21   Creek?  Heretofore you have found that Murrieta Creek is the

22   younger alluvium.

23      MR. GIRARD:  Murrieta Creek includes the surface flow of

24   Murrieta Creek and all waters which are within the younger

25   alluvial deposits as those deposits are depicted on 15-E.  So

P46

1   then you would just take your ownership maps and see which of

2   those lands overlie the younger alluvial deposits on 15-E and

3   they would be described in a separate exhibit.

4           THE COURT:  Coming to XVI, again you have the problem of

5   Temecula Creek in a state of nature and Temecula Creek since

6   the operation of Vail Dam and since the pumping by Vail et

7   cetera.

8           MR. GIRARD:  Not XVI.

9           MR. STAHLMAN:  XVII.

10          THE COURT:  "XVI.  That Pauba Valley lies northeasterly

11  of Temecula Gorge and is depicted on U.S. Exhibit 15-E.  That

12  said Valley consists principally of younger alluvial deposits

13  over which the surface waters of Temecula Creek flow."

14          MR. SACHSE:  Over which in a state of nature.

15          THE COURT:  Over which in a state of nature.

16          MR. SACHSE:  And on XVII the same correction should be

17  made on the last line as we did for Murrieta:  "The younger

18  alluvial deposits rest upon and are confined laterally by"

19  instead of "enclosed within".

20          THE COURT:  Also the same thing that the younger alluvial

21  deposits and the older alluvial deposits are of sedimentary

22  materials.

23          MR. SACHSE:  Yes.

24          THE COURT:  And that the younger --

25          MR. GIRARD:  And older alluvial deposits within Pauba

P47

1  Valley --

2      THE COURT:   Yes.   And that the younger alluvial materials

3  are of relatively high water bearing capacity.

4      Change the word "enclosed" on line 18 to make it conform

5  to what we did above.

6      MR. GIRARD:   Yes.

7      THE COURT:   Again, in XVIII you have to go back to a state

8  of nature and then the situation after the development of Vail

9  wells and finally the erection of the dam.   So in XVIII, "That

10  the ground waters which are contained in said younger alluvial

11  deposits are, in a state of nature, recharged . . ."

12      MR. GIRARD:   You could say that under natural conditions

13  or in a state of nature the ground waters contained in said

14  younger and older alluvial deposits --

15      THE COURT:   -- were recharged by the surface flow, et

16  cetera.

17      MR. GIRARD:   Yes.

18      THE COURT:   That Temecula Creek, in a state of nature, is

19  an intermittment stream, et cetera.

20      I would make the first part of it talk about the state of

21  nature.

22      And then in XIX I would point out some of the changes.

23      MR. GIRARD:   You want me to be a little bit more elaborate

24  in XIX?

25      THE COURT:   I haven't got to XIX yet.

P48

1    MR. SACHSE:  The end of XVIII, at the present time, because

2    you are talking about pumping.

3    THE COURT:  You might limit XVIII to the state of nature

4    situation, and then put the balance of XVIII into XIX as to

5    what has happened after pumping.  The floor of Pauba Valley

6    was, in substance, formed at flood times by waters that leveled

7    off the floor of the valley, the same as you have in Murrieta.

8    MR. SACHSE:  I think it would read a lot better if we

9    started with "That" and ended Paragraph XVIII with "Pauba

10   Valley" on lone 26.

11   THE COURT:  Yes.

12   MR. SACHSE:  Rewrite XIX to talk about present conditions.

13   THE COURT:  Right.

14   MR. GIRARD:  All right.  Let's see, you would have your

15   waters  which in a state of nature, would cover the entire area,

16   would be added to XVIII.

17   THE COURT:  Yes.

18   MR. SACHSE:  Yes.

19   THE COURT:  We have to do quite a bit of working over to

20   accomplish this.

21   Mr. Veeder is right that the source of recharge is both

22   the older and the younger alluvium.  The water in a state of

23   nature or waters that are released from the dam flow into that

24   area below Nigger Canyon.  You probably have that covered.

25   MR. GIRARD:  The ground waters are recharged by waters of

P49

1  Temecula Creek and its tributaries, whether it is in a state of

2  nature or whether it is in Vail Dam -- it is the same water.

3      MR. STAHLMAN:  I think probably it should be reflected in

4  the findings that when you have years when there may be heavy

5  precipitation water is held back.  I think water that would have

6  gone into the ocean is held back and the dam, therefore, would

7  benefit from the recharge.

8      THE COURT:  That could be put in some findings in connection

9  with the dam.

10     MR. STAHLMAN:  I think I have that in our findings, your

11 Honor.

12     THE COURT:  The point is that the older and the younger

13 alluvium are recharged not only from water by Temecula Creek

14 but by precipitation and by waters from the small tributaries

15 flowing into the Pauba Valley.

16     MR. GIRARD:  Yes.  That is taken care of in the first

17 paragraph, isn't it, your Honor, in XVIII:  That under natural

18 conditions the ground waters which are contained in said

19 younger and older alluvial deposits are recharged by the surface

20 flow of Temecula Creek and its tributaries?  That would include,

21 I presume, tributaries in Pauba Valley.

22     THE COURT:  Well, I suppose.

23     MR. GIRARD:  I don't have any objection to adding it.

24     THE COURT:  And I suppose direct precipitation also.

25     MR. GIRARD:  Yes, throughout this there would be direct

P50

1   precipitation.

2   THE COURT:  You ought to add that.

3   MR. GIRARD:  To a lesser degree.

4   THE COURT:  Did you find somewhere that the waters in the

5   older alluvium also support the River, although they may not

6   be part of the underground flow?

7   MR. GIRARD:  Yes, there is a finding on that, your Honor.

8   It is Finding XLII on page 18: "That all ground waters within

9   the older alluvial deposits within the ground water area are

10   in hydrologic continuity with the waters of the Santa Margarita

11   River" and I guess it should be "and its tributaries, and do

12   add to and support the Santa Margarita River and tributaries

13   thereto by . . ."

14   Then I have Exhibit H, which describes those lands which

15   overlie the older alluvial deposits in the ground water area.

16   THE COURT:  Going to XX, you have the word "surround".

17   MR. SACHSE:  ". . . older alluvial deposits which lie on

18   either side of the younger alluvial deposits upon which the

19   younger alluvial deposits lie" -- it is a little different

20   language than we had previously -- "which laterally confine . ."

21   I don't think Mr. Veeder likes "confine".

22   MR. STAHLMAN:  Laterally bound.

23   MR. GIRARD:  We had it before to make it consistent that

24   the older alluvial deposits on either side, so that it would

25   read that the older alluvial deposits which lie on either side

1   of and upon which said younger alluvial deposits rest are of

2   considerably tighter material than the younger alluvial deposits.

3       MR. VEEDER:  Do I comprehend that we are finding here, I

4   mean that your Honor is finding that there is a flow of water

5   through the younger alluvium?  Is that what we are finding?

6       MR. SACHSE:  In Pauba Valley, yes.  I think so.  Isn't

7   there?  According to all the Vail evidence, all their present

8   pumping is from the younger alluvium.

9       MR. VEEDER:  From the younger alluvium?

10       MR. STAHLMAN:  Yes.  There is not a well in there that

11   goes into the older alluvium that is used for irrigation, except

12   the Navy well.

13       MR. VEEDER:  I just wanted to be sure.

14       THE COURT:  Mr. Kunkel, does JG?

15       MR. KUNKEL:  I think it is JK, your Honor.

16       MR. VEEDER:  There is no need for argument.  I just wanted

17   to know that we are saying that the water that is being pumped

18   today is being pumped from a subterranean stream.  Is that right?

19       MR. STAHLMAN:  We don't say that in the finding.

20       MR. VEEDER:  I am just asking.  Are we saying that the

21   water progresses down through all the channel of the younger

22   alluvium?

23       THE COURT:  I think so.

24       MR. GIRARD:  We are saying, in essence, that the ground

25   waters in the younger alluvium are part of the stream.  If, in

P52

1  fact, Vail's wells are drilled into and not beneath the younger

2  alluvium, then they are drawing stream water.

3      THE COURT:  How does that hurt the United States?

4      MR. GIRARD:  Not at all.  Either way Vail Company has an

5  overlying riparian right.

6      MR. VEEDER:  I don't believe you know enough about the

7  position of the United States.

8      I am just reaching for a specification of error.  That is

9  all I wanted to get.

10      MR. GIRARD:  I am trying to be constructive.

11      MR. VEEDER:  Yes, I know.

12      THE COURT:  Don't you have some artesian wells further

13  down?

14      MR. STAHLMAN:  The only well is the Navy well.

15      THE COURT:  Don't you have other wells that were artesian

16  wells in the past?

17      MR. VEEDER:  China Garden and the Dairy wells.

18      THE COURT:  They are not artesian now, though.

19      MR. VEEDER:  Sure they are.

20      MR. GIRARD:  Ask Sandy.

21      THE COURT:  Mr. Wilkinson, are they?

22      MR. WILKINSON:  There are four other artesian wells in

23  the Valley.  The source of water for the feed lot and the main

24  camp headquarters at the ranch, and also two others that are

25  not used in the Valley.

P53

1    THE COURT:  You are using none of these four artesian

2    wells for irrigation, then?

3    MR. WILKINSON:  None except the Navy well.

4    THE COURT:  But there are other artesian wells?

5    MR. WILKINSON:  Yes, there are, your Honor.

6    THE COURT:  Refresh my recollection.  You say there are

7    three others besides the Navy well?

8    MR. WILKINSON:  Four, your Honor.

9    THE COURT:  Four besides the Navy?

10   MR. WILKINSON:  Yes, your Honor.

11   THE COURT:  Do these four others have a sodium content

12   similar to that of the Navy well?

13   MR. WILKINSON:  They do, your Honor.

14   THE COURT:  And they differ in some of the content from

15   the shallower wells that you use for irrigation?

16   MR. WILKINSON:  That is right, your Honor.

17   THE COURT:  If we want to take up another page --

18   MR. STAHLMAN:  We have it in our findings, your Honor.

19   THE COURT:  -- for a finding on this Valley, I think, if

20   I recall the evidence, the situation was this:  That these

21   deposits particularly -- well, there are lenticular deposits

22   both in the younger and the older alluvium, and that at the

23   mouth of Nigger Canyon in the alluvial fill at the mouth,

24   which was in the state of nature a spreading ground, that water

25   reaching that area from the canyon fed both into the lower

18,151

P54

1    ground and the upper ground.

2        MR. STAHLMAN:  We cover that in our findings.

3        THE COURT:  And that these are lenticular deposits, and

4    the lack of permeability of the older alluvium resulted in this

5    artesian phenomenon and that there was a different chemical

6    content in the artesian wells from that in the surface wells.

7        MR. STAHLMAN:  Finding XXX in Vail's findings covers that

8    entire situation.

9        THE COURT:  I looked them over hurriedly.  Let me look at

10   it now.

11       MR. STAHLMAN:  It is on page 15.

12       MR. GIRARD:  This would be essentially what you would

13   find (handing document to the Court).  This is your confined

14   zone.  Nigger Valley is here.  Here is your younger alluvium.

15       THE COURT:  Is this in evidence?

16       MR. GIRARD:  I am not sure.

17       Is Plate 16 in evidence?

18       MR. SACHSE:  I don't know.

19       Mr. Veeder, have you got your list of exhibits?

20       THE COURT:  Plate 16 Exhibit L and a series of subdivisions,

21   California's Exhibit L-16, Pauba-Santa Gertrudis.  Is that what

22   it is called?

23       MR. SACHSE:  Yes.

24       THE COURT:  Geologic Sections, Pauba-Santa Gertrudis.  Is

25   that it?

P55

1    MR. SACHSE:  Yes.

2    THE COURT:  That is in evidence.  And I am content to base

3 a finding on that.  Is your Paragraph XXX as to Pauba Valley

4 consistent with that?

5    MR. STAHLMAN: Yes, your Honor.

6    THE COURT:  Let me look at it hurriedly.

7    MR. SACHSE:  Page 9(a), I think, has that.

8    MR. STAHLMAN:  Page 9(a) and XXX together cover the entire

9 situation.

10    MR. GIRARD:  I have that in XXV also, your Honor, of my

11 findings.  It probably should be a little more detailed.

12    MR. STAHLMAN:  On page 9(a) it refers to the sodium content,

13 et cetera.

14    MR. GIRARD:  Mine is on page 11 starting at the bottom of

15 the page.

16    THE COURT:  On what page is yours?

17    MR. GIRARD:  On page 11 commencing at the bottom of the

18 page.  I think it is similar to Vail's.

19    That is the one you read into the record.

20    MR. STAHLMAN:  Yes.

21    THE COURT:  That is very similar.

22    MR. STAHLMAN:  Yes.

23    THE COURT:  Mr. Veeder objects to a grammatical matter

24 in XX:  "Said older alluvial deposits impede the ground water

25 contained in the younger alluvium from moving into the older

P56

1  alluvial deposits." I suppose it is the tightness and lack of

2  permeability or relatively less permeable character of the older

3  alluvial deposits which impede ground waters contained in the

4  younger alluvium from moving into the older deposits. You might

5  give that a little attention from the standpoint of grammar.

6      MR. VEEDER: My objections go much further than that, your

7  Honor. Grammatically, yes. But definitely I have to repeat,

8  your Honor, that the wells, as we comprehend this matter, get

9  their waters from the older alluvium.

10     THE COURT: What wells get their water from the older

11  alluvium?

12     MR. VEEDER: Wells that they are now pumping for their

13  irrigation purposes. That the waters throughout the entire

14  Murrieta-Temecula Basin are largely drawn from the older

15  alluvium. That the whole ground water area basin, the chief

16  source of water bearing materials, is the older alluvium, with

17  the result that the dewatering of those older deposits results

18  in a recharge which comes down from the River -- call it

19  younger alluvium, if you want -- within a few feet from the

20  point that it leaves the River it recharges the older alluvium.

21  I think the record entirely supports that.

22     THE COURT: I think it does support the fact that the

23  older and the younger are both recharged, and that there is

24  some movement of water between them, but that there is a

25  difference in the density of the older material and the

P57

1  lenticular bodies obviously create the artesian belt.   There is

2  no dispute about that.

3      I want a finding that this area at the mouth of Nigger

4  Canyon, the water entering the natural spreading ground there

5  recharges both the younger and the older.

6      MR. STAHLMAN:  Our finding does say that.

7      MR. GIRARD:  I will work out a finding, your Honor.

8      THE COURT:  Where do we go now -- XXI?

9      MR. GIRARD:  Yes, sir.

10     MR. SACHSE:  To make this conform to Murrieta XI, which is

11  parallel to instead of around, we should say on either side of,

12  at line 30.

13     MR. GIRARD:  Yes, beneath and on either side of.

14     THE COURT:  Yes.

15     MR. GIRARD:  I guess verbatim with the one we have already

16  checked over, your Honor, except the direction in which the

17  water flows.

18     THE COURT:  XXII.

19     MR. VEEDER:  In regard to XXII, your Honor, I want all the

20  objections I have directed to the same erroneous concepts to be

21  made applicable to that proposed finding.

22     THE COURT:  You may have the objections.

23     It may be well to check on California's Exhibit L-16, that

24  Plate we looked at, and you may want to make reference to it

25  somewhere in here, Mr. Girard.  Check to see that it is in

P58

1   evidence.  My notes show that it is.

2        XXIII.

3        MR. GIRARD:  There should be a correction right to start

4   where I made an error on line 6, page 11.  It says "southwesterly."

5   I think it should be "northeasterly."

6        MR. STAHLMAN:  It should be westerly.

7        MR. GIRARD:  Yes, it should be westerly.  And line 9

8   should be "easterly" and not "northeasterly."

9        THE COURT:  Where did you get the 130 feet?  Was that

10  shown in L-16?

11       MR. GIRARD:  No.  Maybe this is my error.  This was the

12  result of a phone call.  I believe, to the best of my knowledge,

13  that is transcribed correctly from what Mr. Kunkel told me.  I

14  did not check the transcript.  In just checking the transcript

15  or at least California's exhibits, it would appear that while

16  that is substantially correct --

17       THE COURT:  How deep?

18       MR. GIRARD:  It goes to 200 feet in one place.

19       MR. STAHLMAN:  Around 200 feet.

20       THE COURT:  Your deepest irrigation well, except the

21  artesian wells?

22       MR. WILKINSON:  The deepest is 300 feet, but the majority

23  of them are in the neighborhood of 200 to 250, I should say.

24       THE COURT:  Where is this 300 foot?

25       MR. WILKINSON:  It is the most recently drilled well at

P59

1 the upper end of the Valley.

2 THE COURT:  The substitute for the JK?

3 MR. WILKINSON:  The substitute for the JK well, your Honor.

4 MR. SACHSE:  I don't know what the exhibits show, but there

5 was a United States profile which shows the depth of alluvium.

6 MR. GIRARD:  On this same Plate 16 it shows the maximum

7 depth of approximately, I would guess, in the neighborhood of

8 200 feet.

Belt 5

9 THE COURT:  Does the Government have an exhibit on the

10 depth of younger alluvium in the Pauba Valley, Mr. Veeder?

11 MR. VEEDER:  I believe it has.

12 MR. WILKINSON:  There is one thing that we omitted, your

13 Honor, and that is the Windmill well.  That is a deep well at

14 the upper end of the Valley.  It is a 500 foot well.  It is a

15 measuring well and stock watering well.  That is further east

16 in Pauba Valley.

17 MR. STAHLMAN:  That is the old well.

18 MR. WILKINSON:  And that has been artesian on occasions.

19 THE COURT:  You say, Mr. Wilkinson, that this measuring

20 well, the Windmill well, on occasion in the past flowed as an

21 artesian well?

22 MR. WILKINSON:  That is right.

23 THE COURT:  And it is the most easterly well in your

24 valley?

25 MR. WILKINSON:  The most easterly well now in use, your

P60

1   Honor.   There are a few test wells further up the Valley never

2   having been pumped, used for measuring purposes.

3        THE COURT:   This would indicate that to have that well an

4   artesian well would have to indicate that those lenticular

5   deposits and the permeability of the older alluvium proceeded

6   that far easterly in the Valley.

7        MR. WILKINSON:   At least that far, your Honor.

8        MR. STAHLMAN:   Also, I think it established the fact that

9   it is below 200 feet, because the other wells are not of that

10   character.   This is a 500 foot well.

11       THE COURT:   We can check this.   My understanding, my

12   recollection, for what it is worth, was that the younger

13   alluvium in the Pauba Valley was deeper than 130 feet.

14       MR. STAHLMAN:   I think so.

15       MR. GIRARD:   I was not in the case then, your Honor.

16       THE COURT:   Did you get that 130 feet from Mr. Kunkel?

17       MR. GIRARD:   I don't think Mr. Kunkel when he talked to

18   me intended to be bound by it.   I think it was just general

19   estimate.   Maybe Fred was talking about the average depth.

20       MR. KUNKEL:   I think I testified the maximum depth, in my

21   opinion, was 130 feet at the Windmill well and got progressively

22   thinner toward the slot.

23       THE COURT:   Maybe we can get the Government's profile.

24       MR. GIRARD:   Has the Government got a profile exhibit?

25       MR. KUNKEL:   I think 16 would show the profile.

P61

1      THE COURT:  Government's 16?

2      MR. KUNKEL:  That is correct.

3      MR. STAHLMAN:  It shows it, I think, at least from a

4  hundred to a little more than that.

5      MR. KUNKEL:  It was approximately 130 feet.

6      MR. STAHLMAN:  Yes.

7      THE COURT:  Passing that 130 for a moment, "that generally

8  the deepest areas of younger alluvial deposits in the Pauba

9  Valley are in the westerly portion thereof."  It is your

10  recollection, Mr. Kunkel, that the younger alluvium was

11  shallower in the westerly part of Pauba Valley?

12      MR. KUNKEL:  The closer one got toward the Temecula Gorge,

13  the shallower it got.

14      MR. VEEDER:  "It" being the younger alluvium.

15      MR. KUNKEL:  The younger alluvium.

16      THE COURT:  Let me see Exhibit L-16.

17      MR. SACHSE:  Exhibit 16 shows the same thing.  The deepest

18  point is up in the middle of the valley.  It would be the

19  easterly portion.

20      MR. GIRARD:  Yes, that should be the easterly portion.  On

21  line 9 it should be the westerly portion.

22      THE COURT:  You will have to change it to the most easterly

23  portion thereof.

24      MR. GIRARD:  That is right.  It would be easterly, on line

25  7, instead of westerly, and crisscrossed south, on line 6, and

P62

1  on line 9 it would be westerly instead of northeasterly.

2      THE COURT:  Mr. Kunkel, you say that was the United States

3  exhibit 16?

4      MR. KUNKEL:  16.

5      THE COURT:  Mr. Bailiff, see if you can find Government's

6  Exhibit 16.  If not, get Mr. Luddy to help you find it.

7      XIV corresponds with a similar paragraph for Exhibit A.

8  Is that right?

9      MR. GIRARD:  That is correct.

10      THE COURT:  Going to line 15, you would change the word

11  "surround" in XXIV.

12      MR. GIRARD:  On this XXV I think probably I should be a

13  little more detailed in showing the location where this water

14  actually goes under Nigger Canyon.

15      THE COURT:  Is there any problem about this?  In lines 30

16  and 31, "upon reaching said fault an area of artesian pressure

17  upstream from said fault is produced"?  Actually, it has been

18  called to our attention that the Windmill well has at times

19  been an artesian well.  I would say that wells -- this is the

20  thought -- that wells penetrating into the waters in the older

21  alluvium beneath the confining bed and lenticular bodies have

22  reached the surface as artesian waters in various parts of the

23  valley.  It is not the fact that the waters reached the barrier

24  that caused the artesian effect downstream.  It is the fact

25  that there is water under these semi-confining bodies and

P63

1  pressure of water upstream trying to get in which causes the

2  water to rise.   It is not merely the fact that the water has

3  reached the end.

4      Two thoughts about that line:   (1)   That these artesian

5  wells are throughout that valley.   The Navy well was an artesian

6  well away down.   Your Dairy well is close, but it is further up

7  than the Navy well.

8      MR. STAHLMAN:   There are no artesian wells below the fault,

9  of course.

10      THE COURT:   No, they are all above the fault.

11      MR. STAHLMAN:   Here is the language we used that may be of

12  some help.

13      THE COURT:   Let me finish.   There are two things about

14  this:   (1)   The connotation from the words "upon reaching said

15  fault an area of pressure is produced".   It is not the fact that

16  the water reaches the fault.   It is the fact that there is a

17  fault there and a confining bed and water upstream which creates

18  the pressure.

19      MR. VEEDER:   Your Honor is using the term "confining bed".

20  I don't follow that.

21      THE COURT:   That is contained in California's L-16.

22      MR. VEEDER:   And you are finding there is a confining bed?

23      THE COURT:   There is something in the nature of a confining

24  bed.   There are these lenticular bodies.

25      MR. STAHLMAN:   The language we used was that the waters of

1  said creek flow over or percolate through the younger alluvial

2  fill in a westerly direction and a portion of said waters cease

3  to flow as a part of the stream as they become trapped or con-

4  fined beneath the impervious layers and bodies which create the

5  artesian belt in the Pauba Valley.

6      THE COURT:  That doesn't do the whole business.  Because

7  you start talking about the younger alluvium, don't you?  Read

8  it again.

9      MR. SACHSE:  Let me try one, your Honor.

10     THE COURT:  Let me hear what he has.

11     What is your paragraph from which you are reading?

12     MR. STAHLMAN:  It is on page 9(a), Paragraph XXI(a).

13     THE COURT:  But you say that the waters of the creek flow

14  through the younger alluvium in a westerly direction and a

15  portion of said waters cease to flow as part of the stream as

16  they become trapped beneath the impervious layers or bodies

17  creating an artesian belt.  Actually, that isn't true.  It is

18  not the waters that are in this upper 75 feet or 100 feet of

19  younger alluvium that become trapped.

20     MR. STAHLMAN:  The picture that I had in this was that as

21  the water flows through Nigger Canyon into the outfall area

22  there is the loose material and that these lenses that extend

23  upstream extend up to the point where the water can percolate

24  down into and below these impervious layers.

25     THE COURT:  But these layers are in the older alluvium.

P65

1    MR. STAHLMAN:  Yes.

2    THE COURT:  And your finding makes it look like they are

3    in the younger alluvium.

4    MR. STAHLMAN:  Yes.  I think that can be clarified.

5    MR. SACHSE:  I think it could be very simple.  Simply make

6    line 30, after the word "fault," read "upstream from said area

7    artesian pressure exists.  Said artesian pressure . . ."  He

8    has already told us how it gets there.  Starting at line 30

9    with "Wildomar Fault," that upstream from said fault an area of

10   artesian pressure exists.  That is all you have to say.  We

11   don't need any more.

12   MR. VEEDER:  Where was that change?

13   MR. SACHSE:  On page 11, line 30.

14   MR. VEEDER:  How would you change it?

15   MR. SACHSE:  After the word "fault; that upstream from

16   said fault an area of artesian pressure exists".  You don't

17   have to say what produces it.

18   THE COURT:  But there should be added the fact that the

19   water in this area of artesian pressure comes from the older

20   alluvium.

21   MR. SACHSE:  I think the rest of the paragraph takes care

22   of that on the next page, your Honor.

23   THE COURT:  From what are you reading?

24   MR. SACHSE:  It pretty clearly does.

25   MR. GIRARD:  I don't think it does.

P66

1    MR. SACHSE:  The bottom of page 11 of **Mr. Girard's** draft:

2 "upstream from said fault an area of artesian pressure exists;"

3 and then go on.  And at the very beginning of his same paragraph

4 he says these are trapped in the olderaalluvial deposits.  It

5 is the beginning of Paragraph XXV.  If you read the whole

6 paragraph now I think it makes perfect sense with what the

7 facts are.

8    MR. VEEDER:  You agree, though, that the water is trapped?

9    MR. SACHSE:  If you want another word than "trapped," Mr.

10 Veeder, tell me.

11    MR. VEEDER:  I just don't believe --

12    MR. SACHSE:  I don't think it is trapped forever.  Do you

13 like "confined" better?

14    MR. VEEDER:  I think semi-confinement.

15    MR. SACHSE:  That's all right.

16    MR. VEEDER:  Creating the artesian pressure.

17    THE COURT:  Let's change, on line 27, the word "of" to

18 "in" -- "certain impervious lenticular bodies in older alluvial

19 deposits"--

20    MR. SACHSE:  All right.

21    THE COURT:  -- are, in fact, not trapped, semi-confined.

22    MR. SACHSE:  "Semi-confined" is okay.

23    THE COURT:  All right, Mr. Veeder's word we will accept.

24    On the top of page 12, the reference to the fact that all

25 irrigation wells are below the level of the artesian belt,

P67

1   you might as well insert that the Dairy well and the China

2   Garden well and the Ranch well have been and are at times

3   artesian wells, that they are deep wells penetrating the older

4   alluvium and the semi-confined area, and also that the Windmill

5   well, a deep well, has at times been an artesian well and

6   penetrates this semi-confined area.

7       Does the Windmill well also have the sodium content of

8   the wells further downstream?  Or does it vary somewhat?

9       MR. WILKINSON:  I would have to look, your Honor.  I

10  don't know.

11      THE COURT:  The well might not, because the water has

12  probably picked up this sodium in its course downstream, and

13  the other waters have gone a lot further than the water in the

14  Windmill well.

15      Let's take a break.

16      (Recess.)

17      THE COURT:  Will somebody take the responsibility to

18  check out the wells shown on U.S. Exhibit 16 by numbers and

19  we will write on them what they are.

20      MR. STAHLMAN:  I will have my engineer do that, your

21  Honor.

22      MR. VEEDER:  I think Mr. Kunkel already has a list.

23      THE COURT:  Do you have them, Mr. Kunkel?

24      MR. KUNKEL:  I have a list of 16 and several other wells.

25      THE COURT:  What have you got so far there?  You have

P68

1    8/2/12H1.

2         MR. VEEDER:  We have 8/2/17M1 -- that is the Navy well.

3    We have 17G1.  Do you want the depths of these?

4         THE COURT:  We know the Navy well is what?

5         MR. VEEDER:  2478.  17G1 is 548.

6         THE COURT:  What is 17G1?

7         MR. VEEDER:  Is that the Studley well?

8         MR. WILKINSON:  I believe it is.  17G1 would be the

9    Studley well.

10         THE COURT:  Is that an irrigation well?

11         MR. WILKINSON:  No, your Honor, it is one of the old

12    artesian wells.

13         MR. VEEDER:  It is still artesian, isn't it?

14         16A1 -- isn't that the China Garden or Dairy well?

15         MR. WILKINSON:  The Dairy well.

16         MR. VEEDER:  16A1 is the Dairy well.

17         THE COURT:  How deep?

18         MR. VEEDER:  550.

19         THE COURT:  There is something wrong here that 17Q1 can't

20    be the Studley well.

21         MR. VEEDER:  17G1.

22         THE COURT:  Oh, 17G1.

23         MR. WILKINSON:  Q1 is destroyed, your Honor.

24         THE COURT:  17G1 is not shown here.  17Q1 is shown.  What

25    is it?

P69

1    MR. WILKINSON:  It is nothing, your Honor; it is destroyed.

2    MR. KUNKEL:  It is now destroyed.

3    MR. VEEDER:  Isn't 17G1 on 16?

4    MR. KUNKEL:  17G1 may or may not be.  I don't know.

5    THE COURT:  No, it is not here.

6    MR. KUNKEL:  It may be off of the line of section.

7    THE COURT:  17Q1 that was destroyed, was that an artesian

8  well?

9    MR. WILKINSON:  No, your Honor, not to my knowledge.

10    THE COURT:  The Dairy well, you say, is how deep -- 16A1?

11    MR. VEEDER:  16A1 is 550.

12    THE COURT:  And 15C1 is what?

13    MR. VEEDER:  15C1 would be the China Garden, wouldn't it?

14    MR. WILKINSON:  That is right.

15    MR. VEEDER:  540.

16    THE COURT:  Do you have 11L1?

17    MR. VEEDER:  What is the depth of 11L1?

18    MR. KUNKEL:  I don't know.

19    MR. WILKINSON:  I can get that for you, your Honor.

20    THE COURT:  What well is that?

21    MR. WILKINSON:  That should be the No. 40.

22    MR. VEEDER:  Is that the one that replaced the JK well?

23    MR. WILKINSON:  No, it is not.

24    THE COURT:  It is not an irrigation well?

25    MR. WILKINSON:  Yes, it is, your Honor.

P70

1    THE COURT:  You are using it for irrigation?

2    MR. WILKINSON:  Yes, we are, your Honor.  It is 17L1.  I

3    can check that in the morning.  Excuse me -- 11L1.

4    THE COURT:  11L1.

5    MR. WILKINSON:  We will check that.  There is another

6    artesian that you missed -- 16G1.

7    THE COURT:  It is not shown here.

8    MR. WILKINSON:  That must be off of the line of the

9    profile.  That is the headquarters artesian.

10   THE COURT:  What is 11P1?

11   MR. WILKINSON:  11P1 is, I believe, a destroyed domestic.

12   The location doesn't look just right to me.  It probably is

13   not listed as destroyed.  It is probably poorly located on

14   this map.

15   THE COURT:  What is 11J4?

16   MR. WILKINSON:  11J4 is our diesel or in close location

17   to our diesel.  It is either J4 or J3.

18   MR. VEEDER:  The diesel is a pumping well, I mean an

19   irrigation well, isn't it?

20   MR. WILKINSON:  A very poor one, yes.

21   THE COURT:  What is 12F1?

22   MR. WILKINSON:  12F1 is destroyed, your Honor.

23   THE COURT:  What is 12K1?

24   MR. WILKINSON:  12K1 is the old JK.

25   THE COURT:  How deep was it?

18,168

P71

1     MR. WILKINSON:  It is a shallow well, I think less than

2     200, I believe.

3     THE COURT:  It shows here.  What is 12H1?

4     MR. WILKINSON:  That is a new replacement.

5     THE COURT:  Or is that the Windmill well?

6     MR. WILKINSON:  No, that is not the Windmill well, your

7     Honor.  Excuse me.  It could be H1.  H1 is the Windmill well.

8     They show 12J1 on this map.  That should be our replacement

9     well.

10    THE COURT:  How deep is the Windmill well?

11    MR. WILKINSON:  It is over 500 feet, your Honor.

12    MR. VEEDER:  515.

13    How deep is the Pit well?

14    MR. WILKINSON:  The Pit well is pumped directly out of

15    the River.

16    MR. VEEDER:  How deep are they?

17    MR. WILKINSON:  They are non-existent.

18    MR. VEEDER:  I mean the one that was.

19    MR. WILKINSON:  The Pit wells were old cement cased wells.

20    They did not have even turbine pumps when they first used

21    those.  They had the  big turbine pumps which had to be dropped

22    into the water.  They were not deep well turbines that we have

23    nowadays.

24    MR. VEEDER:  Don't you have a pumping well there now?

25    MR. WILKINSON:  Yes.

P72

1    MR. VEEDER:  What is that?

2    MR. WILKINSON:  Turbine pumps.

3    MR. VEEDER:  How deep?

4    MR. WILKINSON:  I would have to look at that, Mr. Veeder.

5    I suppose it is 180, 200 feet deep.

6    MR. VEEDER:  What is the designation on that?  Is that

7    17B1 to B4?

8    MR. WILKINSON:  It is not B4.

9    MR. VEEDER:  You have four wells in a cluster there don't

10   you?

11   MR. WILKINSON:  We have two wells in use and one we

12   measure on.  So three wells remain.  That is off quite a

13   distance.

14   MR. VEEDER:  Your Cat is another well.

15   MR. WILKINSON:  That is right, right on the River itself,

16   right close to the River itself.

17   THE COURT:  It is probably not true that the wells that

18   you pump are entirely from the younger alluvium, not according

19   to Government's 16.  Government's 16 shows the younger alluvium.

20   This is your diesel well, your No. 40 would be down there.

21   There is about a hundred feet of alluvium here.

22   MR. WILKINSON:  Typically, we drill the wells until we

23   get into that tighter material, your Honor.

24   THE COURT:  But your well is perforated in both, perfora-

25   ted all the way down?

P73

1    MR. WILKINSON:  It is perforated any time we find a good

2    aquifer, good material.

3    MR. VEEDER:  We do have evidence as to where it is

4    perforated, do we not, in the record?

5    MR. WILKINSON:  I am not sure we have that evidence, but

6    I can certainly check it out.

7    MR. STAHLMAN:  Suppose we check that and have it in the

8    morning.

9    THE COURT:  Check those various wells and what information

10   you have as to perforations.  I don't think it makes a lot of

11   difference.  The water is all part of the stream system.  But

12   let us not say they don't penetrate the older alluvium, where

13   the Government's exhibit shows where it is.  I suppose you

14   intended for me to rely upon this, didn't you, Mr. Veeder?

15   MR. VEEDER:  Yes, and I see that you are.

16   THE COURT:  All right.  Do you have a copy of 16?  Of

17   course, there are other wells besides what are shown on 16.

18   MR. VEEDER:  I think all of the pumping wells, all of

19   the irrigation wells used by Vail are in the record and the

20   points where they are perforated.  Isn't that correct?

21   MR. KUNKEL:  All the logs that are available are in

22   evidence, to my best recollection.

23   THE COURT:  So that at the top of page 12, the first

24   line there, below the level of all artesian wells, we have to

25   check on this later.

P74

1     Now this may be correct.  You say the artesian wells all

2   so far have been 500 feet at least.  These irrigation wells

3   are not artesian wells.  They get into the older alluvium,

4   but they don't get down far enough to get beneath this semi-

5   confining material or semi-confined area.

6     MR. STAHLMAN:  They probably penetrate into what is the

7   confinement.

8     THE COURT:  Mr. Veeder points out that there is a con-

9   tradiction in your finding that the artesian wells do not

10  support the River except as they flow, and a further statement

11  that all ground waters within the older alluvium do add to and

12  support the River.

13    What do you propose that we should find, Mr. Veeder?

14    MR. VEEDER:  I think that all the waters in the Murrieta-

15  Temecula Basin are part of the stream system, except when

16  interfered with by the activities of man; contribute, add to

17  and support the stream.

18    MR. GIRARD:  There may be an inconsistency, I see that

19  now.  But is it true that if there were no wells which were

20  drilled into these confined areas that there would be any

21  contribution from the ground waters under those?

22    THE COURT:  There would be in this sense, that if this

23  water in the semi-confined area was not tapped and was not

24  pumped out at all, as water came out of Nigger Canyon there

25  would be no place for it to go in this area.  It would all have

P75

1  come to the surface or support the flow of the younger alluvium.

2  It is only when water can be taken from this deeper area that

3  there becomes room for more water.

4      Is that correct, Mr. Kunkel?

5      MR. KUNKEL:  In essence, that is correct.

6      MR. VEEDER:  But isn't it true that the water moves

Belt 6

7  through the semi-barrier created by the Wildomar Fault and

8  ultimately, having passed through that thicker and denser

9  material, it does rise to the surface ultimately and go down

10  to the Gorge even in the state of nature?

11      THE COURT:  It is probably true, as I recall the expert

12  testimony, that that Wildomar Fault is not an absolute barrier,

13  that water passes through it in cracks and fissures in it and

14  does, therefore, reach the River.  So this water in the deeper

15  area undoubtedly does support the stream.

16      MR. VEEDER:  I don't see how it could be otherwise.

17  There is no conate water.  There is no testimony that the

18  water has been down there prior to the basin.

19      THE COURT:  We know the barrier is pretty impermeable

20  because of the fact that there are artesian wells.  But that

21  wouldn't mean that there would not be some water that could

22  pass through cracks or fissures or even at a very slow rate

23  through the barrier of the Wildomar Fault.  You couldn't have

24  a lot of it go through or you wouldn't have the artesian wells.

25      MR. GIRARD:  Why not say, said artesian waters are

P76

1    part of the waters of the Santa Margarita River stream system?

2         THE COURT:  Any objection to that?

3         MR. STAHLMAN:  I have no objection to it.  I don't think

4    it makes any difference.

5         But there is testimony that these waters are conate waters.

6         MR. VEEDER:  Who testified to that?

7         MR. STAHLMAN:  Mr. Hall.

8         MR. VEEDER:  That there are conate waters?

9         MR. STAHLMAN:  Yes.

10        MR. VEEDER:  I really don't recall.

11        MR. STAHLMAN:  I don't think it makes any difference.

12        THE COURT:  Is there any objection to finding that the

13   waters in the artesian belt are part of the stream system?

14   What do we care about the flow of the wells?  Let's limit it

15   to the waters in the artesian belt.

16        MR. VEEDER:  Of course, I wouldn't distinguish.  I think

17   all the waters in there are part of the stream system.

18        MR. SACHSE:  If you said it, you just said it twice.

19        MR. STAHLMAN:  I don't think there is any evidence to

20   show that those waters confined within that impervious material,

21   meaning the artesian water, ever gets over the barrier.

22        MR. VEEDER:  Mr. Kunkle testified to that at length and

23   drew pictures and arrows where the water would circulate, and

24   if I recall Mr. Illingsworth didn't dispute that.

25        THE COURT:  Why not just leave this in on line 4, that

P77

1   said artesian waters are part of the waters of the Santa

2   Margarita River stream system, and strike out the next two

3   lines?

4        MR. SACHSE:  Strike everything down to line 8.

5        THE COURT:  Yes.   They are part of the stream system

6   and obviously if they overflow they are still part of the

7   stream system.

8        MR. SACHSE:  I am just trying to understand what your

9   Honor means.  You still want to leave in this last four lines

10  about the sodium?

11       THE COURT:  Yes.  Any objection to that?

12       MR. SACHSE:  I can't see how it affects anybody today

13  one way or the other.

14       THE COURT:  I am certainly going to find that the water

15  in the artesian belt is part of the stream system.  I am not

16  going to say that this is some kind of conate water down in

17  there that is not part of the stream system.  And the use of

18  water from that artesian belt would have to be taken just as

19  water from the younger alluvium.  There is no question but

20  that the waters are fed from the spreading ground at the

21  mouth of Nigger Canyon.

22       XXVI.  Is there any evidence that in the past any of

23  these smaller streams like Santa Gertrudis, Warm Springs,

24  Cole Canyon, Slaughterhouse, Wolf, flooded in the past?

25       MR. SACHSE:  As perennial streams?  There has been no

P78

1  evidence that anyone has seen it.  They have always been

2  identified as being intermittent.  There has been evidence

3  that Tucalota when you get up higher and it reaches the Santa

4  Gertrudis, that it flowed.

5      THE COURT:  Any suggestions on XXVI or XXVII?

6      MR. SACHSE:  They look all right to me.

7      THE COURT:  In XXVIII, at line 8, the word "therefrom,"

8  you undoubtedly refer to the creeks.

9      MR. GIRARD:  That is right.

10      THE COURT:  But it is a little awkward.  The ground waters

11  within the younger alluvial deposits recharge surface flows.

12      MR. STAHLMAN:  I think there is one other creek that ought

13  to be added there that is larger than some of these others, I

14  think, and it is not named but it is shown on an exhibit.  They

15  are pumping from it now.

16      MR. WILKINSON:  It lays between Long Valley and Santa

17  Gertrudis.

18      MR. STAHLMAN:  It is the one between Santa Gertrudis and

19  Long Canyon.  It is quite a sizeable creek.

20      MR. SACHSE:  Don't you have a shotgun coverage?

21      MR. GIRARD:  I have a coverage of all unnamed areas of

22  younger alluvium in Finding L, on page 21.

23      THE COURT:  Strike the word "factual" on line 10.  I

24  don't see what that adds, on page 21.  You could say that

25  "as to such unnamed creeks or gullies."  That would be clearer.

P79

1    "And enclosed within" would go out.

2         MR. SACHSE:  Bedded upon and laterally confined.

3         THE COURT:  Yes.

4         XXIX.

5         MR. SACHSE:  We have that "enclosed" phrased differently

6    here at line 21.

7         THE COURT:  We have to make modification at line 21 of

8    that "enclosed."

9         MR. SACHSE:  Which confined the alluvium on either side.

10        THE COURT:  I am on XV now.

11        XXXII, XXXIII, XXXIV, XXXV.

12        XXXVI, the Temecula-Murrieta Ground Water Area.  The

13   older alluvial deposits are surrounded by impervious materials.

14        MR. SACHSE:  I think that is about right in this case.

15   We are talking about the whole ground water area, except for

16   minor gaps in it.

17        THE COURT:  I see, the entire ground water area.

18        MR. SACHSE:  This is inside the Kunkle line.

19        MR. VEEDER:  No.

20        MR. SACHSE:  Yes.

21        MR. VEEDER:  No.

22        MR. SACHSE:  XXXVI, yes.

23        MR. VEEDER:  No.  The Kunkle line didn't go to the

24   exterior.  As I comprehend, this goes to basement complex on

25   both sides, doesn't it?

P80

1    MR. GIRARD:  No, it goes to the ground water area as

2    delineated on Exhibit 277, which was based on the Kunkle line,

3    as I understand it.

4    MR. VEEDER:  I think you are talking about the Bowen line.

5    MR. GIRARD:  The Bowen line, I guess.

6    MR. SACHSE:  You are right.

7    MR. GIRARD:  Mr. Kunkle had it first, and then it was

8    revised by Colonel Bowen.

9    MR. SACHSE:  I think it is okay here.

10    MR. VEEDER:  I am going to disagree on that, then.  I

11    read it as your Honor did.

12    THE COURT:  If you are talking about the ground water

13    area as excluding the younger alluvium in the Murrieta et

14    cetera, the ground water area on 277 takes in the Murrieta and

15    it takes in the areas outside the Murrieta.

16    MR. SACHSE:  But this paragraph specifically refers only

17    to older alluvial deposits in the ground water area.  It says

18    that they are surrounded by impervious materials.

19    THE COURT:  That wouldn't be true.  The older alluvial

20    deposits in some cases would border upon younger alluvium.

21    MR. GIRARD:  I see, within the ground water area.

22    THE COURT:  Yes.

23    MR. GIRARD:  Yes, I get your point now.

24    MR. SACHSE:  I see.

25    THE COURT:  The water upon it where it came down the

P81

1   Murrieta Creek, where it came down to Santa Gertrudis.

2   MR. SACHSE:  Yes.  Of course, that isn't even true, because

3   in a lot of places this line goes right through the older

4   alluvium.  We would be saying that on one side it is impervious

5   and on the other side it is not.

6   THE COURT:  Yes.

7   MR. SACHSE:  That won't work.

8   THE COURT:  Didn't we have some findings before on this?

9   Where did you get this language?

10   MR. GIRARD:  I don't have them with me.

11   MR. VEEDER:  Mr. Girard, do you want your earlier findings?

12   MR. GIRARD:  I don't know where I got this, to be honest

13   with you, Bill.

14   I don't think we even have to have that sentence.  I

15   think you can cross out that sentence.

16   THE COURT:  Are you purporting to describe the Murrieta-

17   Temecula ground water area in here?

18   MR. GIRARD:  I don't have it.

19   It is graphically set forth, I think, in United States

20   Exhibit 277, which is the first finding in the findings.

21   I think in XXXVI you can just cross out the first two

22   lines.

23   MR. STAHLMAN:  Then say that the waters within the older

24   alluvial deposits within the area of the ground water.

25   MR. GIRARD:  In the southeasterly portion of the ground

P82

1   water area.

2   THE COURT:   The Temecula-Murrieta ground water area.

3   MR. GIRARD:   I see in one here that the Murrieta-Temecula

4   ground water area herein called the ground water area.

5   THE COURT:   All right.

6   MR. GIRARD:   So just say that water within said older

7   alluvial deposits in the southeasterly portion of the ground

8   water area.

9   THE COURT: `All right, in the southeasterly portion.

10   MR. GIRARD:   I think that would be primarily the Pauba

11   area.

12   THE COURT:   The southeasterly portion.

13   Did you bring Exhibit 277 down here?   You have Wolf Valley

14   in the southeasterly portion.

15   MR. VEEDER:   You have everything southeast of Pauba.

16   THE COURT:   You are really talking about this southeasterly

17   portion.   What do you mean by "southeasterly portion"?

18   MR. GIRARD:   I think that is the one you dictated, your

19   Honor.   It would be generally here (indicating).

20   MR. VEEDER:   You have ground water here, you have ground

21   water here, you have ground here.   It is all moving.

22   MR. STAHLMAN:   But it is moving in different directions.

23   MR. VEEDER:   I would simply say it is all moving toward

24   the Temecula Gorge, and then you wouldn't have to worry about

25   what direction it is going.   You could say that just southeast

P83

1   of Pauba is going in a southwesterly direction.

2   MR. STAHLMAN:  I don't know, except that you put Mr. Hall

3   on the stand and he put these arrows down here showing that

4   it is moving this way.  Up here it is moving this way.

5   MR. VEEDER:  What I am trying to say is that if you would

6   simply say that all of the water is moving toward the Temecula

7   Gorge, you wouldn't have to attempt to define the direction

8   of all the ground water.

9   MR. STAHLMAN:  I don't want to get into the position

10   where you are going contrary to the factual situation, where

11   the water in the older alluvium is not moving in the same

12   direction as is water in the younger alluvium, in order to

13   create the other qualifications of the bed and bank of the

14   stream to make it an underground stream.

15   THE COURT:  I like generally what you did in these next

16   paragraphs because it distinguishes this ground water area

17   from the situation in the Pauba and the Murrieta Valley.  But

18   we are going to have to work them over.

19   MR. GIRARD:  Maybe we will have to be more detailed in

20   some areas.

21   THE COURT:  And we ought to have Exhibit 277 to look at

22   when we are working on it, because this is what we are talking

23   about.

24   MR. VEEDER:  In regard to this part here where you say

25   the ground waters northwesterly of the divide -- I think that

P84

1    is the next thing coming up -- your direction is not toward

2    Murrieta Creek in many areas.  Here the direction is toward

3    the pumping hole.

4        THE COURT:  Let's do the same thing.  In a state of

5    nature it is a certain situation, and then because et cetera,

6    let's find that pumping holes exist.  Why don't you spend some

7    time on it and knock it out?  I have plenty to do.  I like

8    the general approach you have because when you got through

9    reading these it distinguished the ground water area from the

10   situation in the Murrieta and Pauba Valley.  I think we ought

11   to show in the state of nature what the situation is, and

12   then have a finding that as a result of this pumping these

13   ground water movements changed, et cetera.  And let's start

14   in tomorrow morning on this at about that place and see what

15   you have worked out.

16       MR. GIRARD:  All right, I will write something.

17       MR. STAHLMAN:  Are we going all week on this, your Honor?

18       THE COURT:  We are going as long as we have to go.

19       MR. STAHLMAN:  I am available every day except Friday.

20       THE COURT:  What have you got to do on Friday?

21       MR. STAHLMAN:  There is a golf tournament in Borrego.

22       THE COURT:  We will probably get enough done so that we

23   can take Friday off.  I have things to work on.

24       When do you want to come in next again?

25       MR. STAHLMAN:  That is all right.  I would like to keep

P85

1   going.

2       THE COURT:  Mr. Veeder has to be gone Friday of the

3   following week.

4       MR. VEEDER:  I have to leave Wednesday.  I am due in

5   Denver on the 2nd and 3rd, your Honor.

6       MR. GIRARD:  You mean in the evening on Wednesday or in

7   the morning, Bill?

8       MR. STAHLMAN:  That would give us four days on this.

9       THE COURT:  Monday is the 30th, Tuesday is the 31st,

10  Wednesday is the 1st.  Couldn't you fly out of here, if we

11  have to, Wednesday some time and be there the 2nd and 3rd?

12      MR. VEEDER:  I'll do my best to do that, your Honor.

13      THE COURT:  We have available anyhow the 31st, Tuesday.

14      MR. VEEDER:  Yes, I have Monday and Tuesday, and I will

15  come back.

16      THE COURT:  We may not have to.  We will see how far we

17  get.

18      MR. SACHSE:  We have before us, and are we planning to

19  consider, not only Murrieta, but also the military enclave

20  and Vail?

21      THE COURT:  Yes, I thought we would go right ahead on

22  these.

23      MR. SACHSE:  That is what I hoped we would do.

24      THE COURT:  I am going to be gone the week of Monday the

25  6th.  Mr. Veeder has to be in Denver the 2nd and 3rd and

P86

1   apparently the 1st.  So we would have up to October 31st,

2   which is Tuesday night of next week.

3       MR. GIRARD:  Would we just be here for Tuesday or be

4   here on Monday also?

5       THE COURT:  I might have some time on Monday.  I have

6   don't have the arraignment calendar.

7       MR. STAHLMAN:  I have a trial starting the 6th.  I will

8   be going practically the whole month of November.

9       MR. SACHSE:  Can we plan to work on Monday and get enough

10  done?

11      THE COURT:  We will have some time on Monday and on

12  Tuesday also.  And we will have Wednesday and Thursday, and

13  we might go ahead and work Friday.  Even if you are not here,

14  you can read the transcript and make your suggestions later.

15      MR. STAHLMAN:  I am sure we will be through the Vail

16  findings by then.

17      THE COURT:  Tomorrow morning at 10 o'clock.

18      (Adjournment until Wednesday, October 25, 1961 at)
19      (10:00 A.M.                                        )

20                              - - -

21

22

23

24

25

P87

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
vs.                                 )     No. 1247-SD-C
                                    )
FALLBROOK PUBLIC UTILITY            )
DISTRICT, etaal.,                   )
                                    )
_____Defendants.__   )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: October 24, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within and foregoing eighty-seven (87) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 25th day of October 1961.

_John Swader_
Official Reporter

JOHN SWADER, OFFICIAL REPORTER