# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Wednesday, October 25, 1961

Pages: 18,185 to 18,264

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION
- - -
HONORABLE JAMES M. CARTER, JUDGE PRESIDING
- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) |
| Defendants. | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, October 25, 1961

- - -

APPEARANCES:

For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                            Special Assistant to the
                            Attorney General

                            CDR. DONALD W. REDD

For the Defendants:

    Vail Company:           GEORGE STAHLMAN, ESQ.

    State of California:    FRED GIRARD, ESQ.

    Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
    District, et al.:

1

2

3

## INDEX TO EXHIBITS

| Defendants' Exhibits | Identified | Received |
|---|---|---|
| Vail Company's BL (well records) | 18,190 | 18,190 |

P2

SAN DIEGO, CALIFORNIA, Wednesday, October 25, 1961, 10:00 A.M.

1  SAN DIEGO, CALIFORNIA, Wednesday, October 25, 1961, 10:00 A.M.

2  (Other matters.)

3  THE CLERK: 4-1247-SD-C United States vs. Fallbrook.

4  THE COURT: Did we find out about the other wells?

5  MR. STAHLMAN: Yes, your Honor. Mr. Wilkinson made a

6  check last evening. I think he can explain to the Court what

7  the situation is there.

8  MR. WILKINSON: Your Honor, I made a list of the various

9  wells and the numbers. We have no information on the artesian

10  wells as to their perforations. They were drilled prior to

11  the acquisition of the ranch.

12  MR. STAHLMAN: Will you explain to the Court what you

13  found regarding some of these irrigation wells and some of

14  the irrigation wells the depth of which is shown here as

15  contrasted with the actual situation in regard to the pumping

16  area?

17  MR. WILKINSON: I found that some of the wells were

18  listed at greater depth than they are actually cased to. The

19  holes were drilled, typically, take the No. 10, the hole was

20  drilled to 327 feet.

21  THE COURT: Which is No. 10?

22  MR. WILKINSON: That is 8 South 2 West 12J1, your Honor.

23  THE COURT: It is not shown on the Exhibit U.S. 16.

24  Let's hear about it.

25  MR. WILKINSON: It was drilled to 327 feet. However,

P3

1 it was only cased to 228 feet, the perforations running from

2 48 to 228 feet.  That same situation applies in the case of

3 some other wells.  Typically, the No. 40 well, 8 South 2 West

4 11L1, was drilled to 298 feet.  However, it was only cased to

5 252 feet.

6    MR. VEEDER:  In regard to this, what is the source of

7 Mr. Wilkinson's information?

8    MR. WILKINSON:  The records of the Vail Company.

9    MR. VEEDER:  Are those matters now in the record here in

10 this court?

11    MR. STAHLMAN:  I don't know.

12    MR. WILKINSON:  The drilling depths are probably all in

13 Bulletin 57, with the exception of the well we will refer to

14 as No. 10, which is 8 South 2 West 12J1.

15    MR. STAHLMAN:  I don't want to complicate this.  May I

16 ask this question of you, Mr. Veeder, just for information:

17 Where did you obtain the information from which you determined

18 the depth of these wells?

19    MR. VEEDER:  Mr. Kunkle made the exhibit.

20    THE COURT:  Can't we handle it this way, that this

21 compilation be marked an exhibit and be received in evidence,

22 subject to checking up at the Vail Ranch and the records from

23 which they are obtained.

24    MR. VEEDER:  I have no --

25    MR. WILKINSON:  I dug this information from the records

P4

1    last night and this morning.

2        MR. VEEDER:  I would feel this way.

3        MR. STAHLMAN:  In view of the fact that we have made all

4    our records available to both the State and the Government, it

5    is obvious what has happened here; they merely designated

6    what the drilling depth was, and undoubtedly when they drilled

7    the well they got down into this cap --

8        MR. VEEDER:  Now, George.

9        MR. STAHLMAN:  Just a moment.  When I am talking to the

10   Court, Mr. Veeder --

11       THE COURT:  Go ahead, Mr. Stahlman.

12       MR. STAHLMAN:  That the best judgment was to case the

13   well to the depth at which they felt the aquifers were such

14   that it would produce water.

15       THE COURT:  Mr. Wilkinson, on the Windmill well, which

16   was a depth of 515, I notice you have that it is perforated

17   23 to 73 feet.

18       MR. WILKINSON:  That is right.

19       THE COURT:  And 105 and 130?

20       MR. WILKINSON:  That is right.

21       THE COURT:  It is not perforated any deeper?

22       MR. WILKINSON:  It is not perforated any deeper, your

23   Honor.

24       THE COURT:  And this is the well which, even with those

25   perforations, has on occasion been an artesian well?

P5

1   MR. WILKINSON:  That is right, your Honor.  I would have

2   to look to see if it is a gravel packed well, which could

3   influence its characteristics.

4   THE COURT:  When was the last time that it flowed as an

5   artesian well?

6   MR. WILKINSON:  I would have to look at the exhibit in

7   the case to tell you, your Honor.  It was some time ago.

8   THE COURT:  Was it at any particular time of the year

9   when it flowed, or was it a well which flowed in a particular

10  period in the past?

11  MR. WILKINSON:  In the very wet cycles that we had in

12  the thirties and forties, your Honor.

13  THE COURT:  That far back?

14  MR. WILKINSON:  That far back, your Honor.

15  THE COURT:  What is the Vail Company's exhibit next in

16  order?

17  MR. WILKINSON:  If it would be all right with you, your

18  Honor, I would be glad to make a better copy of this.  We

19  could have copies for our records as well as the Court.

20  THE COURT:  The Clerk can make photostats of it.

21  What is the next Vail Company exhibit?

22  MR. SACHSE:  I don't have my exhibit records, your Honor.

23  THE COURT:  I think it is BL.

24  MR. STAHLMAN:  Yes, BL.

25  THE COURT:  Hearing no objection, it will be received in

18,190

P6

1    evidence as --

2        MR. VEEDER:  Your Honor, I am just looking at this for

3    the first time.

4        THE COURT:  You just finished telling me that it would

5    be satisfactory that it go into evidence and that the Government

6    might check the records of the Vail Company, and of course it

7    would be understood that you would be permitted at that time

8    to cross-examine on it or to make further objection.

9        MR. VEEDER:  Well, let it go that way.

10       THE COURT:  Let's proceed.

11                              (The well records referred to were)
12                              (marked Vail Company's Exhibit BL )
                                (and received in evidence.        )

13       MR. GIRARD:  Your Honor, I think at the close of last

14    night's session we were on Finding XXXVI of Murrieta which

15    is on page 15.  I have made some substantial changes -- in

16    fact, I rewrote Finding XXXVI in its entirety.

17       THE COURT:  Can you read it slowly, or do you have a

18    copy of it?

19       MR. GIRARD:  I wrote it in longhand.  I don't have a

20    copy of it.

21       THE COURT:  Read it slowly.

22       MR. GIRARD:  (Reading)  There exists a divide within

23    said ground water area which under natural conditions would

24    approximately coincide with the surface water divide between

25    Santa Gertrudis Creek and Long Canyon.  That said ground

P7

1  water divide as it existed in the autumn of 1959, as depicted

2  on U.S. Exhibit 15-L incorporated herein, that in a state of

3  nature all ground water in the older alluvial deposits of

4  said ground water area moves down the hydraulic gradient

5  toward Temecula Gorge, but that none of said ground waters

6  move across the ground water divide; that as a primary result

7  of pumping ground waters within the ground water area there

8  have resulted pumping depressions and consequent reverse

9  gradients in certain areas of the older alluvial deposits

10 within said ground water area to the north of the ground water

11 divide.  The location of said pumping depressions and reverse

12 gradients as they existed in the autumn of 1959 is depicted on

13 U.S. Exhibit 15-L.

14 THE COURT:  Mr. Bailiff, ask the Clerk to make seven

15 copies of that document.

16 Mr. Reporter, later today will you run off a few copies

17 of that finding just read by Mr. Girard.

18 MR. GIRARD:  That would be in place of XXXVI.

19 I might add that I realized there are reverse gradients

20 and depressions in the younger alluvium in Murrieta Creek.

21 But that would be taken care of in the Murrieta findings.

22 In XXXVII, on line 18, after the word "extreme," I would

23 cross out the remainder of the finding and add the words

24 "upstream areas of the ground water area," so that it would

25 read "and as shown thereon are progressively lower as they

P8

1   proceed from the extreme upstream areas of the ground water

2   area toward Temecula Gorge".

3       THE COURT:   I thought you were taking out "extreme".

4       MR. GIRARD:   No.  You can take out "extreme," yes.   It

5   is just an adjective.

6       THE COURT:   And do lines 20 and 21 come out?

7       MR. GIRARD:   That is correct, except for the word "Gorge"

8   in line 20.

9       MR. SACHSE:   I might point out one of the reasons for

10  trying to rephrase this is that we run into this problem that

11  the ground water area has water flowing in actually three

12  different directions toward the Gorge -- from Wolf Canyon

13  north and from Murrieta south.   So Mr. Girard and I were

14  trying to figure out directional terminology which would

15  avoid using points of the compass.   Hence, we used "upstream"

16  and "toward the Gorge," because that would apply equally well

17  to the extreme southerly end of the Wolf Canyon or the ex-

18  treme northerly end of Murrieta.

19      THE COURT:   What about the language "and the contours

20  of 1959 show a different pattern"?   Is that out?

21      MR. GIRARD:   Yes, it is out.   I think the words in the

22  previous sentence "are progressively lower" is about the same

23  thing, isn't it?

24      THE COURT:   Let me read it over.

25      Well, it is actually the water levels that are lower.

P9

1    In line 16, the water levels shown in contours, something like

2    that, as depicted and shown thereon, are lower as they proceed

3    from the upstream areas toward Temecula Gorge.

4        MR. GIRARD:  Yes.  That would be on 15-L over here, I

5    think.

6        THE COURT:  This doesn't show the ground water divide,

7    does it?

8        MR. GIRARD:  Yes (indicating the exhibit).  That is as

9    it existed in the autumn of 1959.

10       MR. SACHSE:  Your Honor, I don't like your suggestion

11   that you use the word "water levels," because it is confusing

12   and implies the level of water in the well; whereas a contour

13   is the elevation of water above mean sea level.  You have to

14   be careful.  If you say "water levels," I am quite sure that

15   in the Navy well the water level is a lot higher than it is

16   in some of these other wells because the pressure goes off.

17   Wholly aside from the pressure conditions, I am sure that the

18   water levels in many of these wells are higher relative to

19   ground surface than they are upstream.  What they are is that

20   they are lower relative to mean sea level.

21       THE COURT:  If you took water levels from the surface,

22   you are right.

23       MR. VEEDER:  Mr. Kunkle just suggested a phrase:  The

24   altitude of water surface is progressively lower, something

25   like that.

P10

1      Why don't we find the ultimate fact on these matters
2  rather than go into these elements of contours and this phase
3  that we are discussing now?  The ultimate fact is that the
4  ground waters in a state of nature throughout the entire area
5  move toward Temecula Gorge; that by reason of pumping north
6  and west of a divide in 1959 the waters in that area are not
7  presently moving toward the Gorge.  Wouldn't that be the end
8  of it?  The only reason you put the contours on a map is to
9  demonstrate the fact that these waters are all moving toward
10  the Gorge.  So why don't you find the ultimate fact rather
11  than making this pretty complicated, rather difficult to
12  understand finding?  I think that one sentence would do it.
13      MR. SACHSE:  I may like your idea -- that is, the finding
14  that Mr. Veeder dictated.
15      Then, as I understand, you don't care about XXXVII and
16  XXXVIII, you don't think they are necessary -- about contours?
17      MR. VEEDER:  I truly believe that the ultimate fact can
18  be found without going into this detail.
19      THE COURT:  This isn't much detail.  Actually, the key
20  item of evidence is 15-L.  There about three elements that
21  we ought to have:
22      (1)  That in a state of nature these waters move
23  generally toward the Gorge and probably -- I say probably --
24  in a state of nature there is a ground water divide somewhere
25  in there.  It may shift.

P11

1 MR. VEEDER:  Your Honor, I would doubt that there would

2 be a ground water divide in the state of nature.

3 MR . STAHLMAN:  Your geologist came up with a ground

4 water divide.

5 MR. VEEDER:  I think he came up with a ground water divide

6 on the basis of the activities of man.  Isn't that correct?

7 It wouldn't be a ground water divide in a state of nature.

8 THE COURT:  It could be.

9 Could there not, Mr. Kunkle?

10 MR. KUNKLE:  The ground water divide is shown as separate

11 water tributaries to Temecula Creek and those not tributary

12 to Temecula Creek.  In a state of nature that circumstance

13 did not exist.

14 THE COURT:  Did not?

15 MR. KUNKLE:  Did not.

16 THE COURT:  Why not?

17 MR. KUNKLE:  Because all of the water in the Murrieta and

18 Temecula, both areas, all of the waters move toward Temecula

19 Canyon.

20 THE COURT:  Temecula, or Murrieta?

21 MR. KUNKLE:  Temecula Canyon.

22 THE COURT:  Not toward Murrieta?

23 MR. KUNKLE:  Some of the waters went by way of Murrieta

24 to Temecula.

25 THE COURT:  When you talk about Temecula you are talking

P12

1    about the Gorge.

2        MR. VEEDER:  Yes, the outlet.

3        MR. KUNKLE:  Temecula Canyon.

4        THE COURT:  Yes.  Ultimately they all moved in that

5    direction.  But if there is a ground water divide, then it

6    would mean that some waters were moving more toward the Pauba

7    Valley before they got to the Gorge, other waters were moving

8    more toward Murrieta before they got to the Gorge.  Wouldn't

9    that be true in a state of nature?

10       MR. KUNKLE:  In a state of nature there was a divide

11   between waters that went to Murrieta and ultimately into

12   Temecula, as opposed to waters that went to Temecula in

13   general through the Pauba.  I am speaking of the Pauba in the

14   sense of your drainage divide rather than just limited to

15   the alluvial plain.  But that divide is not of the same nature

16   or should not be confused with the divide that is shown on

17   15-E.

18       THE COURT:  That natural divide, in a state of nature,

19   might be far removed from where the one was in 1959?

20       MR. KUNKLE:  It could be.

21       MR. VEEDER:  But I think the important thing is that the

22   ground water divide as depict on 15-E and L is entirely

23   artificial.  They created the phenomena and I think we are

24   reading something into the record that shouldn't be there if

25   we are going into this divide idea in a state of nature.

1    MR. STAHLMAN:  May I ask Mr. Kunkle a question that has

2    a bearing on this, your Honor?

3        THE COURT:  Yes.

4    MR. STAHLMAN:  Do you feel that as long as there is

5    activity and extractions of water in the areas that we are

6    talking about there will continue to exist henceforth a

7    ground water divide or some ground water divide such as you

8    found in 1959, Mr. Kunkle?

9        MR. KUNKLE:  Not being able to predict future precipita-

10   tion and what is going to occur in the area --

11   MR. STAHLMAN:  Well, let me ask you this, then.  In the

12   event that there is heavy precipitation in the area for a

13   period of time, would it be your opinion that this ground

14   water divide would disappear, in view of the activity of the

15   pumping that is existing and may continue to accelerate?

16       MR. KUNKLE:  I don't know the answer to that.

17       MR. STAHLMAN:  You don't have any opinion on it?

18       MR. GIRARD:  May I ask Mr. Kunkle a question?

19       MR. STAHLMAN:  You have no opinion on that?

20       MR. KUNKLE:  In the absence of further analysis, I have

21   no opinion.

22       THE COURT:  Mr. Girard.

23       MR. GIRARD:  In answer to Judge Carter's comment on

24   this ground water divide in the state of nature which existed

25   where the waters reach the Gorge by going through Murrieta

P14

1    Creek or by going through Pauba Valley through Temecula Canyon

2    -- correct me if I am wrong -- I take it that the approximate

3    location of that ground water divide in a state of nature

4    does not coincide with the artificial ground water divide

5    resulting from acts of man in the autumn of 1959; is that

6    right, Mr. Kunkle?

7        MR. KUNKLE:  I believe that is correct.

8        MR. GIRARD:  My question is just a basic question.  Would

9    the approximate location of that ground water divide in a state

10   of nature approximately coincide with the surface water divide

11   between the Murrieta Creek and Temecula Creek drainage areas?

12       MR. KUNKLE:  Probably did, and there is probably still

13   a divide of that type in existence.

14       MR. GIRARD:  And it wouldn't be destroyed because of

15   the pumping in the Murrieta area.  Your ground water divide

16   has moved further toward Murrieta, as shown on 15-L now, from

17   what it existed in a state of nature?

18       MR. KUNKLE:  No, don't equate the divide shown on 15-E

19   with the natural ground water divide that existed and perhaps

20   still exists.

21       MR. VEEDER:  Is "natural ground water divide" a good

22   term, under the circumstances?

23       MR. GIRARD:  It is fine with me.

24       MR. VEEDER:  I am just inquiring.  A natural ground water

25   divide.  It would seem to me the progression of water.

P15

1    THE COURT:  Now you have me confused.  Let me see if we

2  can straighten this out.

3    In a state of nature there was probably a ground water

4  divide, as I understand your testimony, which was probably

5  pretty close to the surface divide, which ground water divide

6  shunted some water toward Pauba and down into the Gorge and

7  other waters were shunted toward Murrieta and down into the

8  Gorge.

9    Now here is where I am confused.  I understood that this

10  natural ground water divide because of the pumping in the

11  Murrieta had moved to the north.  But from what you have just

12  said, you say that there is still a ground water divide there

13  and there is this new ground water divide.  Now which is

14  correct?  Has the ground water divide moved northerly?  Here

15  is a map over here, Mr. Kunkle.  Or are there two ground water

16  divides in there now?

17    MR. KUNKLE:  There presently is a ground water divide

18  that would start at the juncture of the Murrieta and Temecula

19  Creeks and by following a perpendicular line to the water

20  level contours one could closely draw a ground water divide.

21    THE COURT:  Proceeding north and east at right angles

22  to the water level contours.

23    MR. KUNKLE:  Through Sections 18, 8, 4, Township 8

24  South 2 West, in that general direction.  The line also would

25  closely approximate the surface water divide between Murrieta

P16

1   and Temecula.  That divide still exists that existed in a

2   state of nature and water, say, in the northeast quarter of

3   Section 13 would move in a general southeasterly direction

4   toward Murrieta Creek, whereas waters in the northwest part

5   of Section 19 would be moving in a general southeasterly

6   direction as part of Temecula Creek.  The divide that is

7   shown on 15-E is a divide that separates waters that formerly

8   were tributary to Temecula Canyon and are no longer tributary

9   to Temecula Canyon.  This is an artificial divide created --

10   THE COURT:  Wait a minute.  You say that it separates

11   waters that formerly were tributary to Murrieta.

12   MR. KUNKLE:  To Temecula Canyon.

13   MR. SACHSE:  May I try this for size, your Honor.

14   THE COURT:  Wait just a minute.

15   MR. KUNKLE:  The legend on 15-E indicates the approximate

16   position of the divide in autumn of 1959 between ground waters

17   tributary to Temecula Canyon and those no longer tributary

18   to Temecula Canyon.

19   MR. SACHSE:  What he is saying is -- Mr. Kunkle, am I

20   not right -- that because of the existence of the reverse

21   gradient which you show in Section 35, you are saying that

22   ground water found north of the divide you have delineated

23   as no longer reaching Temecula Gorge because of the reverse

24   gradient.

25   MR. KUNKLE:  That is correct.

P17

THE COURT:  I follow you that they may no longer reach the Gorge or the canyon.  But they of course are still tributary.

MR. KUNKLE:  Not necessarily, in that they may -- they do go into the pumping depression in Section 26 7 South 3 West and waters that would have formerly been tributary to Murrieta Creek are now, one could say, tributary to the Roripaugh well.

THE COURT:  But waters in the older alluvium south of the ground water divide that you put on Exhibit 15-E and north of what you have just told us would be the natural underground water divide would still be tributary and feed Murrieta Creek.

MR. KUNKLE:  That is correct.

THE COURT:  You don't mean that they run across down into the Pauba Valley.

MR. KUNKLE:  No.

THE COURT:  I think I know what you mean by that ground water divide, and I don't think it now has the significance that I thought it had.

MR. KUNKLE:  I thought we had a natural divide that fluctuated up.

THE COURT:  I thought this was fluctuating and that waters now south of that divide moved down in this direction and that there would be a possibility that they would reach

**P18**

1  Pauba Valley before they ever got to the canyon.  But that

2  isn't what you mean at all.

3      MR. KUNKLE:  No, sir.

4      MR. STAHLMAN:  I am glad to have this cleared up, your

5  Honor.

6      MR. SACHSE:  Then another question -- the importance of

7  the ground water divide in the finding at all.

8      MR. GIRARD:  This is important.

9      MR. SACHSE:  That is important, yes.  The real purpose

10  of a ground water divide in these findings, looking to the

11  future, as I understand it, will be if there is ever parti-

12  tion of this area to determine the rights of overlying land-

13  owners.

14      THE COURT:  That is right.

**Belt 2**  15      MR. SACHSE:  Not this, which may be an entirely

16  fluctuating thing; but return water by pumping.  It is very

17  important to Mr. Veeder.  But I mean for the future rights

18  of this area this is the divide.

19      THE COURT:  The ground water divide now shown on 15-E

20  is only of importance as demonstrating the pumping holes.

21      MR. VEEDER:  And the reverse gradient.

22      THE COURT:  That is all.

23      MR. GIRARD:  We are going to have to work this over a

24  little.

25      THE COURT:  Mr. Kunkle, will you put on by red or blue

P19

1  pencil your best calculated judgment as to the natural ground

2  water divide. Do we have a map that shows the surface divide?

3  MR. STAHLMAN: Yes, we do.

4  THE COURT: You might find that map. And we might want

5  to put it also on the one that shows the surface divide.

6  MR. GIRARD: We should put it on 15-L rather than this

7  one. 15-L is a later exhibit.

8  THE COURT: Take a short recess.

9  (Recess.)

10  THE COURT: We will have to work over this divide

11  business.

12  MR. GIRARD: I'll try to do that at lunch time, your

13  Honor.

14  THE COURT: All right. We have to work over this well

15  situation also. There is no use spending any time on that

16  until you have had a chance to look at this chart. And that

17  one that has to be worked over is on pages 11 and 12, No.

18  XXV.

19  MR. GIRARD: The specific Vail wells which go into other

20  than younger alluvium.

21  THE COURT: Yes.

22  MR. GIRARD: I would suggest that we skip these on the

23  ground waters and go to about page 19.

24  THE COURT: All right, we will skip from about XXXVIII

25  now and XXXIX, XL, XLI, XLII, and go to XLIII.

P20

1   MR. GIRARD:  I think we ought to go to XLIV.  XLIII is

2   the finding which would pertain to the overlying land on the

3   older alluvium.

4   THE COURT:  That is similar to all the others.

5   MR. GIRARD:  Yes.

6   MR. SACHSE:  That is just routine -- XLIII.

7   THE COURT:  XLIV.  You don't want "and" in there on line

8   10.

9   MR. SACHSE:  In the first place, we do, your Honor.

10  After you finish reading it you will see the significance.

11  In other words, older alluvium outside the ground water area.

12  THE COURT:  But you say "and outside".  It makes it

13  ambiguous.  It makes it look like all water found in the areas

14  of older alluvium in the basement complex, and it is sus-

15  ceptible of the meaning that all water outside the ground

16  water area.

17  MR. GIRARD:  You mean the first "and".

18  THE COURT:  The first "and" on page 10.

19  This you have not objected to, have you, Mr. Veeder --

20  do not contribute to the Santa Margarita River or its

21  tributaries?

22  MR. SACHSE:  There is no formal objection by Mr. Veeder.

23  MR. VEEDER:  No.

24  THE COURT:  I think on line 13, after "River" add "and

25  its tributaries," because you have "tributary" down on line

P21

1    15, "and not a part of the River or any tributary".

2    All right, XLV.

3    XLVI.

4    I think the next objection by Mr. Veeder was to XLVII.

5    MR. VEEDER:  Has your Honor had an opportunity to review

6    the findings which I tendered for this area, that is, above

7    Temecula Gorge and below Vail Dam?

8    THE COURT:  I specifically noted your finding where you

9    are making calculations as to Vail's uses.  My first reaction

10   was that that was entirely contrary to the assurances you had

11   given me that there was no apportionment involved and we were

12   not involved with that question.

13   MR. VEEDER:  Your Honor, I have repeatedly stated to your

14   Honor that I firmly believed that Vail Company had to be

15   regulated.  I am not talking about an apportionment at all.

16   It is repeated in the record, and I was very careful on it.

17   I believe Vail Company are using far in excess of the quantity

18   of water that they are entitled to, and when I stated to your

19   Honor that I expected that there should be regulation I

20   certainly had in contemplation this very set of figures that

21   I have tendered to you, particularly in view of the ground

22   water divide we have been talking about so extensively.  I

23   think it is obvious.

24   THE COURT:  The ground water divide you are talking

25   about hasn't been caused by Vail's uses.

P22

1   MR. VEEDER:  I simply say from the standpoint of the

2   Vail Company they are the only ones using the water from

3   Temecula, it is obvious, and that the waters they are using --

4   THE COURT:  Let's take one thing at a time.  Vail Company's

5   uses have not created the pumping holes that led to the ground

6   water divide.

7   MR. VEEDER:  Correct.

8   THE COURT:  All right.

9   MR. VEEDER:  So the fact is that the Vail Company at

10   the present time is so situated that it takes the entire

11   drainage area of Temecula Creek and everything south and

12   east of the ground water divide.  There is no competition

13   between Vail Company and those people north and west of that

14   divide.  If you want to take the facts as they exist and

15   review the uses by Vail Company, you will see that Vails

16   have been using twice as much water in the period 1949 through

17   1960 as was available to them in Temecula Creek at Vail Dam.

18   You will note the footnotes I put there.  I would like to have

19   the Vail Company bring it up to date through 1961.

20   THE COURT:  It is hard for me to see what you mean by

21   not apportionment but regulation.  In very broad outline,

22   what you had in the fall of 1959 was that it is true Vail

23   Company was using a lot of water out of the Pauba, and whether

24   it is in the record or not -- I don't know whether it is in

25   the record or not -- you have stated that they were pumping

P23

1    in order to maintain the flow at the Gorge.

2        MR. VEEDER:  During which period, your Honor?

3        THE COURT:  You say somewhere in one of your memoranda

4    or findings.

5        MR. STAHLMAN:  That same memorandum he just filed.

6        THE COURT:  You stated that Vail Company --

7        MR. VEEDER:  In '61.

8        THE COURT:  In '61.

9        MR. VEEDER:  That is right.

10        THE COURT:  -- was pumping in order to maintain the flow

11    at the Gorge.

12        Now, over in another segment of the Murrieta watershed

13    you have the increasing uses of farmers in that area which,

14    there is no dispute, have created pumping holes and a reverse

15    gradient in a very dry year.  And of course you have the

16    United States pumping very extensively from the water bearing

17    grounds below.  How can you talk about regulation without

18    apportionment?  How do you say that you can regulate Vail

19    without a study as to how much water should be permitted to

20    flow down into the enclave?  And how do you regulate Vail

21    without having some yardstick to regulate it?

22        MR. VEEDER:  My view is this, your Honor, as I stated

23    to your Honor in regard to your specific question, you can

24    get an injunction one user against another, and if the party

25    against whom you are proceeding for an injunction desires to

P24

1   bring in and prove that Roripaugh is contributing to it they

2   can bring them in.  When I was talking to your Honor about

3   regulation as distinguished from basin-wide apportionment, I

4   referred at that very time and I repeatedly stated to your

5   Honor that the physical phenomenon that exists would indicate

6   that Vail and Vail alone are acting to the irreparable damage

7   of the United States; that relief against them would be

8   tantamount to receiving probably all the relief that we could

9   get by reason of the fact that Murrieta Creek for a great

10  many years has never contributed a great deal more water than

11  it is contributing at the present moment.

12       Now, if Vail Company has data to the contrary, they can

13  certainly introduce it.  But I assure your Honor -- I want

14  the record express on this point -- that never have I ever

15  indicated at any time under the facts of this case that the

16  United States was not entitled to specific relief against

17  Vail Company.  And I truly believe it.

18       MR. SACHSE:  Your Honor, as a non-interested party in the

19  specific Vail-United States controversy, I want to tell Mr.

20  Veeder and the Court that I will bring the transcripts

21  tomorrow, because I can put my finger right on it, that it

22  is absolutely contrary to my understanding, and which you

23  have told us all.  It has been gone over so many times in

24  this courtroom with Mr. Littleworth and with me.  We have

25  taken the position that his Honor was going to determine our

P25

1  rights; that having so determined them, if any party there-

2  after felt aggrieved he could come in with an order to show

3  cause and try to straighten it out. But there are 6,000

4  litigants in this case who don't give a continental about

5  anything but getting this case over.

6      MR. VEEDER: That is all I care about, Mr. Sachse.

7      MR. SACHSE: Therefore, there has been accepted and

8  written into every finding so far this same language that

9  there will be no apportionment now, but if anybody wants to

10  come in and yell the Court has continuing jurisdiction and

11  will do it. And I think it would be utterly and absolutely

12  improper in these basic findings that are designed to get

13  the big lawsuit over to have you now start the fight with

14  Vail.

15      MR. GIRARD: I recall the record clearly shows that this

16  came up before. You specifically directed Mr. Veeder to file

17  a written statement -- not a verbal statement, a written

18  statement -- naming whom he wanted regulation of.

19      As I recall, just the other day Mr. Veeder rested. He

20  was all through with everything. We are winding up the case.

21      I have never seen a written statement.

22      THE COURT: He did file something on regulation. I have

23  a file upstairs called "Regulation".

24      MR. VEEDER: Yes.

25      THE COURT: I haven't read it for some time. But even

P26

1    though he did file that, he agreed to the finding that we

2    have been making, the conclusion, the judgment that no

3    apportionment had been sought and none had been granted in

4    this proceeding.

5         I understood that that was all under the bridge, Mr.

6    Veeder.

7         Let me go further.  And I understood that it was somewhat

8    on this basis.  That these decrees being interlocutory, the

9    Vail Company would continue to comply with the old stipulated

10   judgment in connection with their obligations at the Gorge.

11   If an appeal was taken, the Court probably would have some

12   authority, after final judgment, to maintain some status quo.

13   If the judgment is affirmed and we get rid of the major

14   part of this case and if some party wants to, he could then

15   go into questions of regulation.

16        But you are going to have to have a lot of material that

17   we don't now have in the record.  You are going to have to

18   have a study of the yields of the tributaries to which the

19   United States has access alone -- everything below the Gorge.

20   No one substantially competes, except the small landowners

21   in the canyons, with the flood flow below the Gorge.  The

22   extent of the water supplied out of there; you would have to

23   have studies of the yield above the dam, the yield between

24   the dam and the Gorge.  You would have to find out what the

25   riparian uses were of people who are entitled to water, what

P27

1   their acreage was, and you would have a real problem which

2   would involve the people in the Murrieta, the Vail Company and

3   the Government.

4       MR. VEEDER:  Your Honor, I realize and I fully expect

5   the abuse that I will receive.

6       THE COURT:  Expect the what?

7       MR. VEEDER:  Expect the abuse I will receive.

8       THE COURT:  From whom are you receiving abuse?

9       MR. VEEDER:  From counsel.

10      THE COURT:  Listen, let's be lawyer-like in this matter.

11   You and I have gotten along, but I don't like that kind of

12   remarks.  I am pretty easy to get along with.  The intimation

13   was that I am abusing you.

14      MR. VEEDER:  No, sir.

15      THE COURT:  You now disclaim that I am abusing you and

16   say that counsel is abusing you.  Let's forget about abusing.

17   You are not being abused.  You have been treated very toler-

18   antly by counsel and the Court.

19      MR. VEEDER:  Your Honor, I have asked for this finding,

20   which is Finding No. XLIII, in the form that I tendered to

21   you.  There is not a word, there is not a sentence, there is

22   nothing to bring forth the outburst that came at me today

23   from Mr. Sachse, Mr. Stahlman and Mr. Girard.  I think that

24   the facts that I set out in that finding are correct.  I think

25   they are facts which properly should be found.

P28

1       I truly believe that in regard to Vail Company it would

2   be improper to find, as in proposed in Finding No. XLVII,

3   because I don't believe it is reflective of the record.

4       I think that the record will support what I have said,

5   and I see no reason why such finding should not be made.   I

6   haven't asked for regulation as of this moment -- no intima-

7   tion of it.   The day will come, I am quite certain, when that

8   will be requested.

9       But I am saying to your Honor now that you cannot

10  possibly make Finding XLVII on the basis of the record which

11  presently exists.

12      THE COURT:  Mr. Veeder, we were all over this and the

13  use of the word "reasonable" was used in the sense of not

14  involving amounts; that the use of this water was reasonable

15  riparian use and beneficial use, and therefore it was agreed

16  long ago in our conferences that the following language went

17  in:  In the present state of this case the issue of appor-

18  tionment has not been presented.  The Court has taken no

19  evidence establishing whether such water uses are reasonable

20  or unreasonable as to amount of water, et cetera.  Now this

21  is just as clear as can be that we are not adjudicating the

22  respective rights of the parties as to amounts.  We are merely

23  saying that the uses made in the watershed have been reasonable

24  in the sense of the type of uses they have been put to and

25  are beneficial, and then by a complete sentence we said we

P29

1   are not passing on amounts or the reasonableness of amounts.

2        MR. STAHLMAN:  May I be heard, your Honor?

3        THE COURT:  Talk to the legal merits and not to personal-

4   ities.

5        MR. STAHLMAN:  Yes, your Honor, I'll do that.  However,

6   I don't think the record should go unchallenged.  Mr. Veeder

7   at some later date will say that he made these statements

8   and there had been no response.  I am just going to leave this

9   in a moment.  I haven't even talked this morning.  He charged

10  me with abuse.

11       THE COURT:  I was here.  I saw what went on.

12       MR. STAHLMAN:  To show you how ridiculous this situation

13  is at this time, when we are nearing the end of a lawsuit

14  involving 6,000 defendants all out there with the anticipation

15  that this would be concluded in the near future and to start

16  some hassle between Vail Company and Camp Pendleton.

17       I just want to point out some of the small features to

18  show how ridiculous it would be to consider this thing at

19  this time and what it would encompass if we went into it.

20  First, here is the Federal Government -- and I don't think it

21  is the Federal Government, I think it is Mr. Veeder who is

22  coming in here at this late stage of the game in an equitable

23  proceeding violating the first fundamental principle of equity

24  that he who seeks equity must do equity and that he who comes

25  into a court of equity must do so with clean hands, when it

P30

1    is admitted that they are transporting more than half of the

2    water outside the watershed.  Then he makes a compilation

3    of figures which is completely fictitious, false and phony.

4    They do not realistically show the operation of the Vail Ranch.

5    It takes into no consideration whatever the fact that this

6    water usage is implemented by waters which are obtained under

7    a permit and are surplus waters.  It takes into no considera-

8    tion the fact that there is return flow to the water and that

9    there has been aid and assistance in moving the water down-

10   stream and that more water has probably moved down to Camp

11   Pendleton than would have been used there if it hadn't been

12   under this operation.  And I can go on and on.  There are

13   many factors here.  According to their own evidence, under-

14   ground in this area over which Vail lands lie there is at

15   present 418,000 acre feet of water.  That is according to

16   their testimony.

17        And then to make an attack at this time upon Vail Company

18   for the usage of water, with these phony figures that they

19   have compiled here.

20        And furthermore, in the water years 1951 and 1957 there

21   was 78,000 acre feet of water that wasted into the ocean.

22        Those are some of the features that he will have to

23   meet on this apportionment matter.

24        He is not -- I don't want to say scaring me.  But your

25   Honor has expressed what we have all understood here, that

P31

1    there is no determination as to whether the quantity used

2    has been proper, but merely that the uses to which the water

3    is put have been reasonable and beneficial.  I can't see how

4    he missed the point.  It is so palpably clear that I think

5    we have another one of these red herrings here that he is

6    trying to prolong and protract this lawsuit for some purpose

7    other than the honest, legitimate purpose of getting this

8    case concluded and over with.

9        THE COURT:  XLVII makes it very clear -- "all uses of

10   water within said ground water area are in their character

11   reasonable and beneficial".  And then it goes on to say that

12   we are not talking about the reasonableness as to amount.  We

13   have been all over this.

14       I do not propose to make your findings that you suggest

15   with reference to Vail's uses.  I can't understand them.  They

16   are incomplete.  When I read them over to start with I

17   immediately noticed that there was no reference to return

18   flow.  And I have trouble even understanding what you are

19   trying to do with them.  Standing by themselves, they don't

20   mean anything.

21       You would have to have a complete hearing on what would

22   amount to apportionment at least between Vail and the United

23   States.  You can call it regulation if you want, but it is

24   in the nature of apportionment.

25       However, I will say this.  I don't intend to finally

P32

1   upset the status quo, if I can maintain it, until there is

2   some final adjudication of this judgment that we propose to

3   enter.   I don't intend to have some hiatus between a system

4   of regulation that has gone on in the past and been lived

5   with and a two or three year period while this judgment is

6   appealed and affirmed or reversed or modified.

7        MR. VEEDER:  The point I am pointing out to your Honor --

8        THE COURT:  I would be hopeful that the United States

9   would not appeal the judgment and would be in a position then

10  to talk about some physical solution.  I am waiting.  I

11  understand Colonel Bowen is going to do some work on that.

12       MR. VEEDER:  I have tendered the findings, your Honor,

13  and you have rejected it.

14       THE COURT:  XLVII looks all right to me.  It has been

15  approved before.

16       MR. VEEDER:  What?

17       THE COURT:  It has been approved before in other judg-

18  ments.

19       MR. GIRARD:  There is no change.

20       MR. VEEDER:  I think when your Honor and California

21  reversed entirely their position in regard to the early

22  findings -- and I am not agreeing that I ever approved this

23  in regard to Vail Company -- I am simply saying I have to

24  proceed in a way to protect the United States' interest that

25  I think is best.

P33

1    May I inquire in regard to a statement that your Honor

2    made.  You said you did not intend to have what you called a

3    "hiatus".  What does your Honor mean by that?  That is im-

4    portant to us.

5        THE COURT:  I don't know, in view of your attitude that

6    you have shown of recent weeks, that I should even be parti-

7    cularly concerned about it.

8        MR. VEEDER:  What is my attitude, your Honor?

Belt 3   9    THE COURT:  Well, the raising of a new issue in the

10   period of the case when we are working on findings, your

11   position today that you want these proposed findings as to

12   Vail's uses, things of that sort.

13       But I will answer your question.  I would contemplate

14   that there would be interlocutory judgments and a final

15   judgment incorporating the various interlocutories entered

16   up, and the case would then be in a position to become final

17   or to be appealed.  Until such time as the final judgment

18   was entered, of course, the Vail Company understands that

19   they are bound by the other prior stipulated judgment which

20   is in effect.  This judgment has been lived with for some

21   time and I would think -- and this is very tentatively my

22   view -- that if there was to be an appeal I might consider

23   making some order that those procedures remain in effect until

24   there was a final decree on the appeal.

25       I immediately forsee one difficulty.  I don't believe

P34

1   the United States should appeal this judgment. I think we

2   should get all of these people out of this case that is going

3   to be accomplished by this final judgment. We would know then

4   who are the people who have rights on the River and I think

5   that the matter should be worked out by some physical solution

6   and not by continued litigation. And of course if I considered

7   the possibility of maintaining the status quo until the

8   appeal was finally determined, then of course this would be

9   added incentive for you to pursue an appeal.

10   I have those two thoughts in my mind. I don't know what

11   I am going to do about it. Have I made myself clear? That

12   is what I am thinking about.

13   MR. VEEDER: I wouldn't go that far, but at least I see

14   that your Honor is thinking about maintaining the stipulated

15   judgment in effect, at least for a while.

16   THE COURT: I am just thinking about it. But I think

17   at the same time that this adds incentive to the prospect of

18   more prolonged litigation, when actually, as I have said many

19   times, when we get through with this phase of the case we are

20   going to accomplish very little except removing from the case

21   several thousand people who were put in the case not by the

22   Government but by the order of the Circuit Court. I concede

23   that Judge Fee's decision brought that about. But when we

24   get through, what is going to be accomplished? Just listing

25   that certain people have some rights on the stream, and here

P35

1    has been ten years of litigation and this is what has been

2    accomplished.  Practically nil.  When as a matter of fact this

3    matter could have been solved by negotiation, with some

4    physical solution, long ago.  The fight started with Fallbrook.

5         MR. VEEDER:  That is right.

6         THE COURT:  All Fallbrook ever asked was the right to

7    use flood waters.

8         MR. VEEDER:  I won't argue with your Honor.

9         MR. STAHLMAN:  Why don't you let the Court talk? There

10   is one thing that irks me, and that is Mr. Veeder's --

11        THE COURT:  Before I started the case, I proposed that

12   you talk about some solution of the matter, some settlement.

13   Mr. Veeder said that the Government can't even talk about

14   settlement until it gets its rights adjudicated.  Everybody

15   knew then , as they know now, that the Government had certain

16   riparian rights on the River.  All this litigation has moved

17   us one step forward, except in a few isolated areas -- the

18   ground water area, getting rid of the basement complex, getting

19   a lot of people out of the case who shouldn't be in it.

20        Now, referring to XLVIII in these findings, have you

21   referred to other exhibits besides 15-L?  Has there been any

22   reference to 15 or 15-E and 277?  In other words, these areas

23   of older alluvium as depicted, limiting it to Exhibit 15-L,

24   or you could say the exhibits in this case.

25        MR. GIRARD:  All right.  And as substantially duplicated

P36

1   in all exhibits in this case pertaining to that, something

2   along that line.  I don't think there is a great deal of

3   difference between 15-L and 15-F.

4       THE COURT:  Well, you may check back and see what other

5   exhibits you have referred to besides 15-L.

6       MR. GIRARD:  All right.  Exhibit 277 does not list the

7   older alluvium as such.

8       THE COURT:  It doesn't have the symbols.

9       MR. GIRARD:  Does it, Colonel Bowen?

10      COLONEL BOWEN:  Yes.

11      MR. GIRARD:  Fine.

12      THE COURT:  It has the symbols on it.

13      MR. VEEDER:  We will, of course, object to XLVIII.  I

14  have made no specific reference to it.  We think that reference

15  to "mesa silt" and the 1930 findings has no relevancy here.

16      THE COURT:  Well, it is true, is it not, that the term

17  "mesa silt" refers to the same material we have referred to

18  as "older alluvium"?

19      MR. STAHLMAN:  Mr. Hall so testified, your Honor.

20      MR. VEEDER:  I don't know the full area that was

21  designated as "mesa silt," and I further believe that the

22  reference is completely irrelevant in this matter.

23      THE COURT:  Overruled.  We will use XLVIII.

24  XLIX.

25      COLONEL BOWEN:  Your Honor, I was in error; there is no

P37

1  geology on Exhibit 277.

2      THE COURT:  All right, thank you.

3      What is this business about Exhibit J?  I don't know

4  whether I understand it.

5      MR. GIRARD:  As you know, your Honor, the United States

6  has -- I think Commander Redd's office has more or less tabu-

7  lations or sheets showing property descriptions, wells, irriga-

8  ble acreages, et cetera, on each parcel.  Since they have done

9  that work, I think it ought to be attached to the judgment--

10  if they want it in there for their military purposes.  However,

11  in treating the basic question of describing the land which is

12  riparian or overlying, as you will note, I have prepared

13  exhibits with property descriptions solely -- no ownerships

14  other than just the name and no well levels, and this is just

15  an opportunity for the findings on Area 4 to incorporate the

16  work that has been done by Commander Redd's office.

17      THE COURT:  Maybe it would be easier, in duplicating the

18  sheets they prepared, to have that material in connection with

19  the legal descriptions.

20      MR. GIRARD:  Either way they want to do it.

21      THE COURT:  In what form is that now?

22      MR. VEEDER:  Legal description, names, wells, general

23  location of wells, reservoirs, structures of that character,

24  gross and irrigable acreage.  And I think those facts should

25  be part of the decree.

18,222

P38

1  MR. SACHSE:  Are they all on one sheet the way you are

2  assembling them?  Would they be in one document?

3  MR. VEEDER:  They could be put on one sheet.  Some of

4  them have several names.

5  MR. SACHSE:  Under one name in a single document?

6  MR. VEEDER:  Yes.

7  THE COURT:  You would use those sheets again, without

8  having to make new ones.  It would be easier here, it would

9  seem to me, to go back and say that in exhibits marked so

10  and so attached hereto, in addition to the --

11  MR. GIRARD:  That in many of the exhibits attached to

12  this complaint there appears --

13  THE COURT:  Refer to the description of the land. There

14  is other pertinent material, et cetera, et cetera.

15  MR. VEEDER:  I don't know whether this is a proper point

16  to bring up the proposition.  You haven't finished L, and I

17  agreed with Mr. Sachse that I wouldn't make reference to the

18  form of the decree until we got through with this.

19  THE COURT:  What are you addressing yourself to now?

20  MR. VEEDER:  To you, your Honor.

21  THE COURT:  About what?

22  MR. VEEDER:  About the kind and type of form of decree.

23  Rather than having a great number of interlocutory judgments,

24  I really believe, your Honor, that you could write a single

25  decree just as rapidly and avoid duplication.  I have talked

P39

1   to Colonel Bowen extensively about the preparation of a single

2   map which would include all the pertinent data reflected in

3   the exhibits which are, in effect, incorporated by reference

4   into this proposal we have been considering.  On page 1 of

5   the proposed findings of the United States I describe that

6   map and point out a course that I would like to see pursued in

7   it.  Because I simply think that at the present time the series

8   of interlocutory decrees, with the numerous exhibits attached

9   to them, it would be totally unwieldy and completely impossible

10  of handling.  And I don't believe it would take any more time

11  to pursue this course.

12  THE COURT:  How could it possibly simplify it, with some

13  of these interlocutory decrees with the attachments of names

14  and legal descriptions?  I have one on my bench about an inch

15  and a half thick, with all this ground out in the area of the

16  basement complex.

17  MR. VEEDER:  Your Honor, in regard to the basement complex,

18  I am convinced that the way to handle that -- I will tell you

19  my thought on that, so that you could very simply refer in the

20  proposed judgment that I would recommend, the findings that

21  I would recommend -- simply say that any lands or owners not

22  referred to in this decree are not subject to it in regard to

23  ground waters, and that those lands in the basement complex

24  and weathered basement complex are not governed by the decree

25  but rather by such and such, and designate the interlocutory

P40

1   judgments and have that separate and apart from the ones where

2   there are actual rights involved.  I am sincere when I say it.

3   You will have a wholly unwieldy document unless it is concen-

4   trated in the manner that I have recommended.

5       THE COURT:  Take your Murrieta Valley, with those thousands

6   of little parcels.  That, in itself, would make a tremendous

7   document.

8       MR. VEEDER:  I think that it could be reduced very greatly

9   in size and I believe that it could be concentrated more than

10  it has been.  But I am just entering a thought here that there

11  is a way of making a wiedly decree out of it.  I don't believe

12  that 50 or 60 interlocutory judgments -- that is what it would

13  run to -- would be wieldy.  I believe that you could avoid

14  duplication in the manner that I have suggested.  I know the

15  decrees can be written covering a vast area and a great number

16  of people -- have it printed, have it so that it would be

17  useful to lawyers and landowners.  As presently contemplated,

18  the decree, with all these interlocutory judgments attached,

19  in my view, could only be utilized in the Clerk's Office.  I

20  don't see how anybody could ever carry it around.

21      MR. STAHLMAN:  Do I understnd that you are suggesting at

22  this time that we now abandon this particular method and go to

23  the other?

24      MR. VEEDER:  Not at all.

25      MR. STAHLMAN:  Isn't it somewhat premature?  Shouldn't

18,225

P41

1    we wait until we get to these interlocutories where we have all

2    the information and then give it consideration?

3        MR. VEEDER:  I don't believe it is premature for one

4    reason, your Honor.  I would like to have your Honor at least

5    giving consideration to the proposal, so that in the end the

6    final decree that you would sign would be a single composite

7    document reflecting all that went into the interlocutory

8    judgments.  I attempted it in regard to this area that I have

9    referred to above Temecula Creek and below Vail Dam.  I took

10   the data that Mr. Sachse was interested in, in the Domenigoni

11   Valley.  I tried to write it out the way I thought it was

12   desired.  I took the data that I thought would be important in

13   Tucalota Creek and I wrote it the way I thought it should be.

14       THE COURT:  As I understand your proposal, it is that

15   there would be a final decree that would involve the waters of

16   the Santa Margarita River.

17       MR. VEEDER:  The entire watershed.

18       THE COURT:  And it would, therefore, involve all the

19   ground water areas, and it would involve the surface water

20   throughout the watershed and the waters in the younger alluvium

21   outside the ground water areas, with some exceptions.  That

22   you would in some way take out of this final decree the people

23   who own land that has local, vagrant, percolating water not

24   part of the stream system.

25       MR. VEEDER:  I think your interlocutory decrees effectively

P42

1   do that.

2       THE COURT:  How would we take them out?  Incorporate those

3   decrees only by reference?

4       MR. VEEDER:  You could refer to them by reference.  I

5   think that would eliminate a tremendous area and a tremendous

6   number of parties.

7       THE COURT:  That might be workable -- that Decrees X, Y

8   and C, which involve the percolating water, are incorporated by

9   reference.  They therefore became part of the final decree.

10   We are not particularly concerned with them because they are

11   out of the picture as part of the stream system.

12       MR. VEEDER:  That is right.  It would result, in my view,

13   in cutting the decree solely to the people who have rights

14   which would not be illusory in character.

15       MR. STAHLMAN:  You are talking about an editing job.

16       MR. VEEDER:  I think that is a good way of saying it.

17       But I am saying I would like to have you consider it now,

18   at least have it in mind as we go along, because I can see a

19   series of documents with numerous exhibits incorporated by

20   reference and attached to them which could be -- for example,

21   in regard to the maps, you could make one single composite

22   map, as I understand it, which would save a great deal fo time.

23       MR. SACHSE:  I don't see anything wrong with Mr. Veeder's

24   suggestion, particularly after it is clarified as Mr. Stahlman

25   just did, with only one modification.  I have more individual

P43

1   clients probably than anybody here, I think more than Mr.

2   Krieger, and I would like to have for my own assistance some

3   signed interlocutory judgment.  I think with this thought in

4   mind we could perhaps quit worrying about attaching the exhibits

5   to the Diamond-Domenigoni Valley decree or attaching the exhibits

6   to the Sandia Creek decree, We ought to get a stipulated

7   judgment as to the spelling out of these different things.  So

8   that I, with the complicated job of editing I am going to have

9   to do, can have a piece of paper where your Honor has said, I

10  have ruled so and so in such and such a place.  And I would not

11  want us to do this until, to the best of our ability, we had

12  an interlocutory judgment done for all the areas in which I

13  am interested.  I think when it is all over he has a very good

14  format and I think probably we could save a lot of time.  I

15  know that language is duplicated many times in the interlocutory

16  judgments and certainly we could save all that.  But beyond

17  the language there are holdings, rights, there are conclusions

18  of law, there are very important things in some of these.  I

19  don't want to abandon the interlocutory judgment technique.

20  I hope we can get a few more signed.

21      MR. VEEDER:  No one is suggesting it.  I simply had the

22  thought at this time that it was well to bring this point up.

23      THE COURT:  Mr. Girard, sometime today or tomorrow give

24  some thought to talking to Commander Redd and see whether or

25  not in XLIX it wouldn't be possible to refer to the other

P44

1   exhibits that you have already attached for this material

2   rather than to have one setup.  I think that could be worked

3   out.

4       MR. GIRARD:  All right.

5       THE COURT:  Adjournment until 2:00 o'clock.

6       (Noon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P45

1   <u>SAN DIEGO, CALIFORNIA, Wednesday, October 25, 1961, 2:00 P.M.</u>

2       (Other matters.)

3       THE CLERK:  4-1247-SD-C United States vs. Fallbrook.

4       THE COURT:  All right, where are we?

5       MR. GIRARD:  I think we are on page 21, L, and I believe

6   we went all over that yesterday.

7       MR. SACHSE:  Yes, we did.

8       THE COURT:  Let me look this over again.  Line 18, "de-

9   picted on U.S. Exhibits 15-E and 15-L;" you would probably

10  have to go further and incorporate it by reference.

11      MR. GIRARD:  I think they have been incorporated by

12  reference previously in other findings, your Honor, both of

13  those.

14      THE COURT:  Line 27, "that the ground water contained

15  within such younger alluvial deposits are, in fact, in a

16  known and definite channel, to wit, the area of younger alluvial

17  deposits, . . "  It doesn't say anything about the bed and banks.

18      MR. GIRARD:  I will add that.

19      THE COURT:  Confined by the bed and banks of the older

20  alluvium and/or basement complex, something like that.

21      LI.  LI only refers to the area within the ground water

22  area.

23      MR. GIRARD:  Yes.  L specifically states in the first

24  line "within said ground water area as depicted on U.S.

25  Exhibit . . "

P46

1    THE COURT:  Refresh my recollection.  These stringers of

2    younger alluvium in the area outside the ground water area

3    were taken care of in the particular findings that concerned

4    them.

5    MR. SACHSE:  They haven't been written yet, your Honor.

6    Some of them are Wilson Creek, Tucalota Creek and others we

7    have had before us and discussed, but nothing in final form

8    has been lodged.

9    MR. GIRARD:  I lodged the final form for Anza and

10   Coahuilla.

11   THE COURT:  In view of the issue that Mr. Veeder has

12   made about the Pomeroy case and the issue on these dry streams

13   in Southern California, and the fact that I called attention

14   at the time I decided this matter to some of the cases involved

15   similar streams in this area, such as the one I refer up at

16   San Pasqual and the Verdugo and two or three more, I am just

17   wondering whether or not somewhere in these findings it wouldn't

18   be a good idea -- just try this out for size -- to call

19   attention to the fact that these dry creek beds in which water

20   runs intermittently within this watershed are similar to the

21   creek beds described in the case involving the San Pasqual,

22   the Verdugo and several other of these creek beds.

23   MR. VEEDER:  Would that be a finding or a conclusion of

24   law, your Honor?

25   MR. GIRARD:  I think it would be a finding.  This Court

P47

1   can judically notice the factual situations set forth by a

2   California Appellate Court.

3       THE COURT:  Don't incorporate it in the draft, but on a

4   separate sheet try to hint at that.  I think that you have in

5   this State all sorts of streams, and I don't think you can

6   take the factual situations of streams in Northern California

7   and compare them with the factual situations of streams in

8   Southern California.  But I think the streams in Southern

9   California are definitely comparable to what we have in this

10  watershed, as I read the cases.

11      I will spend no more time on it.  But try it and I will

12  take a look at it, too.  Maybe it's argument.  Maybe it's

13  something that could be better done in a brief.

14      MR. GIRARD:  The crucial question, even if the case is

15  appealed on the ground waters, as far as Appellate would be

16  concerned, on whether ground waters in the younger alluvium

17  are part of the stream, will have to be raised as to the ground

18  waters in the enclave.  I doubt very much that Mr. Veeder on

19  appeal could question this finding we are making today on the

20  Murrieta-Temecula, because I don't think he could show where

21  it hurt him one way or the other.  But I think the finding

22  might be more appropriate in the military enclave.

23      THE COURT:  Yes, he will claim error in all the findings,

24  even though the Government was not particularly hurt by those

25  upstream from the enclave.  At any rate, for what purpose we

P48

1    might use it or not use it, try your hand at it.

2        MR. VEEDER:  Your Honor, I have one question.  I didn't

3    comprehend what your Honor said -- perhaps I just missed it --

4    on XLIX, on pages 20 and 21.

5        THE COURT:  I suggested that that be revised after

6    consultation with Commander Redd so that we might use the

7    materials they have already prepared and so that it would read

8    that you refer to certain of the exhibits heretofore attached

9    which show the legal descriptions and the riparian character

10   of land, that there is on those exhibits certain additional

11   information, and then run something in merely describing the

12   additional information that appears on those exhibits.

Belt4

13       MR. VEEDER:  I recall that.  But the factor that gave me

14   the greatest concern and to which I directed specific objection

15   is the sentence "that said factual matters are not to be res

16   adjudicata or prima facie evidence in any future proceeding

17   in this cause, but are set forth for informative purposes only

18   and were not received in evidence in this trial for title,

19   apportionment or injunctive restraining purposes".  Is that

20   going to remain in?

21       THE COURT:  What is wrong with it?

22       MR. VEEDER:  I think it is in error.  The evidence was

23   offered for all purposes, your Honor.

24       I will outline to your Honor what I think the situation

25   will be necessarily in the light of the trial that has

P49

1    proceeded to now.  Your Honor entered an order prior to the

2    trial to the effect that the pleadings as they stood would

3    constitute cross pleadings one against the other for the

4    purposes of the trial inter sese, which, in my view, meant

5    that thest titles were being quieted one against the other;

6    and certainly the evidence that was offered related to and was

7    assistance for the numerous small users up there who didn't

8    appear to prove their cases.  If this material is not considered

9    a part of the record, then I believe the status would be very

10   unfortunate in that those people did not appear and prove their

11   claims and prove their allegations in their complaints.

12        For that reason I would be most reluctant -- I want the

13   Court to know our position in regard to this matter -- I would

14   be most reluctant to say that that evidence in regard to

15   irrigable acreage, in regard to ground water status, in regard

16   to all the many other factors concerning which it was offered

17   and relative to which your Honor wrote letters to most of these

18   people, might wind up with them in the position of having failed

19   to prove their claim and judgment could be entered against

20   them on that ground.  And I think that would be a very serious

21   problem.

22        I don't want to hold up your Honor's consideration of

23   these matters.  But I also think that that matter is of most

24   importance and something that certainly before the trial is

25   through would have to be resolved.  My feeling is that the

P50

1   sentence which I read into the record, which is at the top of

2   page 21 of the lodged findings dated October 13, 1961 and

3   lodged on the 17th, I understand, I think that sentence is

4   probably a conclusion of law.

5        THE COURT:  What sentence are you referring to?

6        MR. VEEDER:  The first sentence at the top of page 21.

7        THE COURT:  Of what document?

8        MR. VEEDER:  Of the findings prepared by Mr. Girard on

9   the 13th of October 1961 and lodged with this Court on the

10  17th day.  I think it is a conclusion of law.  It is something

11  we could discuss later.

12       MR. GIRARD:  I might have a modification here that might

13  satisfy Mr. Veeder.  I think maybe this does go a little too

14  far, your Honor.

15       THE COURT:  All right, check into it.

16       But tell me what factual matters would be on these sheets

17  which Commander Redd has prepared.  Have you got one of them

18  handy that I could look at?

19       MR. GIRARD:  They have wells, diversions, permits, all

20  sorts of things.

21       MR. SACHSE:  I think it goes too far.

22       MR. GIRARD:  I would have it say that any factual state-

23  ments contained therein as to irrigable acreages are not to

24  be res adjudicata.

25       MR. SACHSE:  I agree with Mr. Veeder.  I think it is too

18,235

P51

1    broad the way it is.

2         THE COURT:  Does that satisfy you, Mr. Veeder?

3         MR. GIRARD:  Because I am sure the figures on irrigable

4    acreages were not admitted for all purposes.  I recall that

5    Mr. Sachse objected to them and they were admitted on the basis

6    that there would be no apportionment and they would have

7    relevancy for the Marines primarily.

8         MR. VEEDER:  I would want to check that phase of the

9    record.  I will.

10         THE COURT:  All right, that would sound all right:  Said

11    factual matters as to irrigable acreages --

12         MR. SACHSE:  Did you get the correction, Mr. Veeder?

13         MR. VEEDER:  As I say, I want to read your objections.

14    I don't recall the form of the objection that was made.

15         My own view of the law is this in regard to irrigable

16    acreage, your Honor.  I believe that irrigable acreage, like

17    many other things, would be res adjudicata, unless a party

18    were able to demonstrate that there had been a change of

19    conditions.  If there was a change of conditions, there is no

20    doubt in my mind.  I believe that is the law in California.

21    Maybe Mr. Sachse and Mr. Girard disagree.  But I believe that

22    if a man came in and said, "My irrigable acreage was adjudged

23    on such and such a date to be" -- well, Vail Company, 18,000,

24    and they came in ten years from now and said , "We have devices

25    and means to demonstrate that this very steep slope which is

P52

1   declared to be non-irrigable is now irrigable," I think the

2   original finding would not be res adjudicata. But it would be

3   only res adjudicata on a showing that there had been a change

4   of conditions.

5      MR. SACHSE:  You can't have res adjudicata upon a showing

6   of change of conditions.

7      MR. VEEDER:  Yes.

8      MR. STAHLMAN:  Mr. Veeder, you recall that when these

9   objections were raised you then raised the proposition that

10  Pendleton wouldn't be able to determine what her water needs

11  were down there and the water conditions and the other consider-

12  ations, and the Court made comment about it and it was on that

13  basis that it was admitted.

14     MR. VEEDER:  Let me review the objections.

15     MR. SACHSE:  Mr. Veeder, my objection -- I said it many

16  times, again and again in the record, and I am sure his Honor

17  remembers it -- was simply that evidence of irrigable acreage

18  was absolutely immaterial in the absence of apportionment,

19  and that this case did not have any of the other elements

20  involved in it for an apportionment and that it was immaterial

21  at this time. But you made the point that the United States

22  or the Marines did desire a cataloguing of the ultimate burden

23  on the stream. I am almost quoting it, paraphrasing it at

24  least. For that reason we finally withdrew all these objections.

25     I feel that there is a serious problem with this irrigable

P53

1  acreage if an attempt is made to say that it is res adjudicata

2  because of the fact that nobody has questioned anybody   else's

3  figures on these things, with very few exceptions.  They have

4  come in and been put in as a matter of cataloguing.  With the

5  exception of this rather detailed inquiry into Vail's conten-

6  tion as to irrigable acreage, I don't think this record shows

7  the slightest query in regard to it.

8      THE COURT:  My recollection is that we discussed this.

9  Mr. Sachse refused even to put on proof as to irrigable

10  acreage regarding certain clients.

11      MR. SACHSE:  That is right, your Honor.

12      THE COURT:  And I told you that if you wanted to have

13  some of these catalogued for such help as it would be to the

14  Marine Corps to give them some idea of the irrigable acres in

15  this watershed, that I would have no objection to making the

16  findings.  But it was not part of an apportionment.  We

17  discussed the fact that there would be a lot of irrigable

18  acres listed and that somebody in Washington knowing nothing

19  about this watershed, looking it over, could get some idea of

20  the vast amount of irrigable acres and the small amount of

21  water available.

22      MR. VEEDER:  I would like to get your Honor's comments

23  in regard to what is meant here, "were not received in this

24  trial for title, apportionment or injunctive restraint".

25      THE COURT:  Well, Mr. Girard is going to change some of

P54

1    that.

2        MR. VEEDER: All right.

3        MR. GIRARD: I think ownership is clear.

4        THE COURT: These sheets would concern ownership. It

5 would concern ownership of the wells, if that is important --

6 it follows with the land. It would concern findings as to

7 diversions. The only thing that would really be a problem,

8 as I see it, would be the question of irrigable acres. So the

9 latter part of XLIX should be limited that findings on irriga-

10 ble acreage will not be res adjudicata.

11        Whether we should say that it should not be prima facie

12 evidence I don't know. We might save ourselves a lot of time

13 and bother later on by saying that it could be prima facie in

14 some later hearing, unless somebody objected thereto.

15        MR. VEEDER: I recall some phases of our discussions at

16 that time in which the matter of prima facie evidence was

17 tendered and was considered.

18        THE COURT: I don't know whether we came to any conclusion

19 on it.

20        MR. VEEDER: What I would like, as I said before, would

21 be to review the record on this point and get as effective a

22 decree as we can.

23        THE COURT: Let's make a note not to forget about this.

24        MR. VEEDER: I will not forget about it.

25        MR. STAHLMAN: In the light of that, I would like to

P55

1   mention a couple of things that I think have bearing on it.

2   In regard to some of his clients, Mr. Sachse did not put in

3   any irrigable acreage.  And in Vail's proposed findings we

4   have a situation where we have some of our small properties

5   which have been undetermined as to irrigable acreage, and I

6   carried it out in our findings on page 24 where we have taken

7   those small parcels that we knew the acreage of.  Here is one,

8   139.2 acres; we have no determination.  It has never been

9   irrigated.  It has never been studied.  Another 96 acre parcel,

10   another 140 acre parcel.  We have some small ones as to which

11   we have determined the irrigable acreage.

12       MR. VEEDER:  Where are those located?

13       MR. STAHLMAN:  I would have to make reference to the

14   Vail map of lands.  There are several of them here and they

15   are on there and designated as parcels on Vail Company's exhibit.

16   What was that exhibit, Sandy?

17       MR. WILKINSON:  It just refers to the descriptions in the

18   findings.

19       MR. STAHLMAN:  But there is a map that has all of the

20   parcels on it, by which these particular parcels can be

21   immediately picked up, because they are numbered by parcel.

22       MR. VEEDER:  May I inquire also -- I am not arguing this

23   other point, I am going to check it out -- are you going to

24   bring down to 1961 Vail N before the conclusion .  That is

25   the summary of your irrigated acreages, quantities of water

P56

1    used, et cetera.

2         MR. STAHLMAN:  We have all rested in the case.

3         MR. VEEDER:  I have brought all of our statistics down to

4    date.  I would just ask you to bring these down to date.

5         MR. STAHLMAN:  If the Court wants them, I presume we

6    could.  We keep records up to date.

7         THE COURT:  What is this request now?

8         MR. VEEDER:  Vail N was introduced in evidence.  It is

9    the water distribution for Vail Company 1958.

10        THE COURT:  Water distribution -- what do you mean by

11   that?  Where water was used?

12        MR. VEEDER:  I will hand you a copy of Vail's N.  I am

13   simply asking that it be brought up to date.  There are three

14   years since it was offered in evidence.

15        MR. STAHLMAN:  Are you going to do that with everybody

16   in the case, then, Mr. Veeder?  Do you want everybody to come

17   in here now and do the same thing?  There are lot of other big

18   water users up there.

19        THE COURT:  What good would it do?

20        MR. VEEDER:  It would complete the record, your Honor.

21        THE COURT:  Since we are not going into apportionment.

22        MR. VEEDER:  I truly believe that the exhibits should be

23   brought down to date.  I think it should be reflective of

24   the conclusion of the trial.

25        MR. STAHLMAN:  How about the wells in Murrieta Valley?

18,241

P57

1   There are a lot of them.  Why not everybody do it then?  There

2   have been new wells drilled up there since that time.

3       THE COURT:  Since we are cataloguing rights and not making

4   an apportionment, it would serve no useful purpose.  When the

5   matter came up later you would have to bring it all down to

6   date.

7       MR. VEEDER:  In other words, you are overruling my request?

8       THE COURT:  Yes.  Your request is limited to Vail.  You

9   have not made it a general request that all exhibits be brought

10   down to date.  All exhibits have not been brought down to date.

11   Some of your exhibits your brought down through 1959, some

12   through 1960, and now this is the end of 1961.

13       MR. VEEDER:  Your Honor, we try to bring them down each

14   year as we get them.

15       Did you want Mr. Kunkle to put the ground water divide

16   on 15-E?

17       MR. GIRARD:  I presume it would go on 15-L and whatever

18   other exhibit he wanted to put it on.  Exhibit L is the most

19   recent.

20       I drafted two findings, one to take care of the permanent

21   ground water divide, one to take care of the temporary ground

22   water divide.  I will ask Mr. Swader to type them up for me

23   tonight, and I will have them in the morning.

24       THE COURT:  I will ask Mr. Kunkle to put it on 15-L.

25       And I ask you also to check an exhibit which showed the

P58

1   watershed divide.  I don't know what exhibit that is.  You can

2   work on it this evening.

3       MR. STAHLMAN:  Watershed divide?

4       THE COURT:  The surface divide between the Murrieta and

5   the Pauba.

6       MR. KUNKLE:  I will be glad to do that -- although I

7   believe that is in evidence.

8       THE COURT:  I want to look at the exhibit where that

9   surface divide appears.

10      MR. GIRARD:  They have it.  I think George has one here.

11      MR. STAHLMAN:  We made up a map when we considered the

12   Vail findings.  We were going to pull it out here to see

13   whether it was practical to attach to the findings and have

14   it be made a part thereof.  It shows certain fundamental basic

15   patterns.  My idea was that in connection with the reference

16   to the findings it would be helpful.

17      MR. VEEDER:  I have down at our office, your Honor, a

18   map where we have put the surface water divide.

19      THE COURT:  I think we have one in evidence that shows

20   the surface water divide.

21      MR. VEEDER:  If it is in evidence, I don't recall it.

22      MR. STAHLMAN:  I think we took this off of one in evidence.

23   Didn't we, Sandy?

24      MR. WILKINSON:  Yes.

25      MR. STAHLMAN:  This is what we anticipated using, if it

P59

1    were agreeable to the Court and the other counsel, as a matter

2    of convenience to the Court (handing document to the Court).

3    MR. WILKINSON:  It appears on Vail's L.

4    THE COURT:  Look through the list of exhibits and see if

5    there is any.  I am sure there is one that shows the surface

6    divide in the Murrieta and the Pauba Valley.  I am sure it is

7    available.  Put your underground divide in a state of nature

8    on Exhibit 15-L and let me look at the other one and see if

9    we need any correlation between them.

10    (Another matter.)

11    THE COURT:  We are down to the conclusions of law.

12    MR. STAHLMAN:  I would like to make comment on that.  Of

13    course, it is up to Mr. Girard.  But I think possibly, in

14    view of the fact that there are going to be considerable changes

15    in the findings of fact, that the conclusions of law are going

16    to have to be changed.  It might save time if we went over

17    them after they were changed.

18    Don't you think so, Fred?

19    MR. GIRARD:  I don't think the conclusions of law will

20    be changed at all, George.

21    MR. SACHSE:  No, they are very simple.

22    Has your Honor deferred this whole question of prima

23    facie and res adjudicata for us to think about?

24    THE COURT:  Yes.  And Mr. Veeder wanted to review the

25    record on it, et cetera.

P60

1    MR. SACHSE:  Only to get my own thinking on the record,

2    I realize that what I am saying now may not be to the best

3    interests perhaps of some of my own clients, but I wonder if

4    it is possible for your Honor to say that a piece of evidence

5    that is in here isn't at least prima facie.

6    MR. VEEDER:  Did you say "isn't at least"?

7    MR. SACHSE:  Isn't at least prima facie.  I don't know.

8    I am trying to think this out.

9    THE COURT:  I haven't ruled on this yet.  But my present

10   inclination is, after Mr. Veeder reviews the record, I think --

11   I know I am going to hold that it is not res adjudicata because

12   of that understanding.

13   MR. SACHSE:  It can't be res adjudicata.

14   THE COURT:  But there is some value to consider making

15   it prima facie where it could be attacked by anyone.  But if

16   it was not attacked, we have it in the record and it is availa-

17   ble.

18   MR. SACHSE:  My question is, if six months from now I

19   should choose to bring some sort of restraint against the

20   United States or Vail, would I not have a right to rely on

21   anything in this record already in support of my contention?

22   THE COURT:  If it were in a finding.  If it were only in

23   evidence --- I don't have to make findings on matters that are

24   not material.

25   MR. SACHSE:  I don't know.

P61

1  THE COURT:  If I don't make any findings on it, I don't

2 think it could be availed of merely because it was in evidence.

3  MR. VEEDER:  I would at least like to tender the thought

4 to proceed on the basis -- sufficient unto the/is the evil
                day

5 thereof -- that if Mr. Sachse, for example, sought an order

6 to show cause and he was relying upon the record as we now

7 have it, based upon these letters that you sent out to these

8 people saying "This is your acreage, this is your gross acreage,

9 here is your irrigable acreage," and they write in and say

10 "We agree" -- there are literally hundreds of letters like that

11 -- my view is that based upon that situation it at least could

12 be characterized as a stipulation into the record by these

13 people who have so agreed as to the total acreage and irrigable

14 acreage.

15  THE COURT:  They have stipulated or agreed that I might

16 so find.  But I don't think that you can argue that anybody

17 else has stipulated or agreed with them.  No one else has

18 opposed this prima facie showing, as it were.

19  MR. VEEDER:  And I think the word "prima facie" is

20 extremely important.  But wouldn't it be, and isn't it this

21 situation, that those people having agreed as to the correct-

22 ness of it, someone would have to attack it before it would

23 not be evidentiary at least in character in the case.

24  THE COURT:  They, themselves, might be in a position

25 where they couldn't attack, but I think anybody else could

P 62

1   attack it.  And with that in mind, it would seem to me that

2   after you review this we might dispose of this by saying that

3   these are prima facie showings, these findings as to irrigable

4   acreage are prima facie and unless controverted and outweighed

5   by other evidence will be accepted in later proceedings.

6       MR. VEEDER:  Without further proof?

7       THE COURT:  Yes.

Belt 5

8       MR. SACHSE:  I don't know.

9       MR. GIRARD:  I could probably understand the objection

10  to irrigable acreage, but you couldn't do that with areas and

11  ownerships.

12      MR. VEEDER:  That is changing all of the time.  The only

13  thing we want to be sure of is that this quasi in rem in

14  regard to the location of land, whether it is overlying or

15  riparian, and matters like that, I think that it is a decree

16  that will run with the land.

17      MR. STAHLMAN:  I think it is about as broad as it is long.

18  I think if we had any proceedings the documents in this case

19  certainly would be evidence in the next case -- they would

20  have to be rebutted, whether you call it prima facie or whether

21  you don't.

22      MR. VEEDER:  I think it is always subject to challenge.

23  I will review it.

24      THE COURT:  I will back up and say that as far as these

25  people were concerned who agreed they would be bound as of

P63

1    that date; but if there were changed conditions, I don't think

2    even they would be bound.

3        MR. VEEDER:  I will agree with that.  But they would have

4    to come in and demonstrate that there was a change.

5        THE COURT:  Yes.

6        MR. STAHLMAN:  Yes.

7        THE COURT:  I think we could work something out on prima

8    facie that might save a lot of work and time later.

9        MR. GIRARD:  I can probably go along with that without

10   objection, assuming it is limited to irrigable acreage.  I

11   have a little doubt on some of this evidence the Government

12   introduced as to water duty for native vegetation and things

13   like that, if they are in an exhibit.

14       MR. VEEDER:  I hope you go along on gross acreage and

15   irrigable acreage, too.

16       MR. GIRARD:  Yes, I can go along on any irrigable acreage

17   and gross acreage figure that Colonel Bowen made.

18       THE COURT:  Probably it would be better to make the water

19   duty prima facie also in the absence of attack.

20       MR. VEEDER:  I think that is true.

21       THE COURT:  If nobody attacks it, we would have something

22   we could rely on.  If they wanted to attack it, they could

23   have a full-fledged fight on it.

24       MR. STAHLMAN:  There was minor conflict and there have

25   been changes by the Department of Agriculture in relation to

P64

1    different products.

2         THE COURT:  Under Conclusions of Law, on No. I at line

3    23, that "and" should come out.

4         MR. GIRARD:  Yes.

5         THE COURT:  Generally, II looks all right.  We all agree

6    on that.

7         As to III, IV, V, VI, VII, VIII, IX, what bothers me about

8    this is that it is true that all lands on A, which is Murrieta

9    Creek, have a correlative riparian right.  The same is true

10   on Temecula.  The question is, what do you mean by Murrieta

11   Creek?  And its tributaries?  Temecula and its tributaries?

12   Or just minus the tributaries?  It is the same thing we talked

13   about once before.  It is just a mechanical thing.

14        MR. SACHSE:  We discussed that -- I don't know whether

15   it was in court or just Mr. Girard, Mr. Krieger, myself and

16   Mr. Stahlman -- and we felt that the words "correlative

17   riparian rights" are words of art.

18        THE COURT:  That is all you have to say.  But you have

19   to say what this is.  Here is a fellow that, you say, in V,

20   has a correlative right to the use of water of Santa Gertrudis

21   Creek -- all lands in C.  Now that is only the lands that lie

22   on that creek.  Actually, the people downstream from that creek

23   have correlative rights along with those landowners in C.

24        MR. SACHSE:  That is right.

25        THE COURT:  I don't think you say this when you say all

P565   1    that you have said in Paragraph V.

2    MR. GIRARD:   I would think, as a matter of law -- for

3    example, on the military enclave we say the lands described

4    in Exhibit A have a correlative riparian right to the Santa

5    Margarita River.   They also have a correlative riparian right

6    to all waters upstream which are tributary to it, as a matter

7    of law, without saying it.   It follows that when you have a

8    riparian right to a particular stream you also have a right

9    to reach whatever waters are tributary to that stream under

10   that right upstream.   I think when you say here that the lands

11   described in Exhibit A --

12   THE COURT:   What is Exhibit A?

13   MR. GIRARD:   Exhibit A is those lands which abut upon or

14   are traversed by Murrieta Creek as described in the findings.

15   MR. SACHSE:   That includes every one of these other creeks

16   a fortiori, immediately.

17   MR. GIRARD:   That those people whose property is abutted

18   upon or traversed by Murrieta Creek have a correlative riparian

19   right to the waters of Murrieta Creek and as a matter of law,

20   for example, if they lie downstream from Santa Gertrudis they

21   would have a correlative right to the waters of Santa Gertrudis.

22   MR. SACHSE:   And Warm Springs, Cole Canyon and Slaughter-

23   house, et cetera.

24   MR. GIRARD:   I think when you say that a person has a

25   riparian right to a stream, as a matter of law he has a

P66

1    correlative riparian right to the tributary areas to the extent

2    that they share the water.

3       THE COURT:  Although I generally agree with you, there

4    ought to be some simple way to state it.

5       MR. VEEDER:  Your Honor, we defined the term "correlative"

6    and we wrote it into the original Tucalota Findings.

7       Do you have a copy of those with you?

8       MR. SACHSE:  I doubt it.

9       MR. VEEDER:  I didn't bring mine along.  But I know we

10    worked out the meaning of the word "correlative" as you desired

11    it.

12       MR. STAHLMAN:  What would be wrong with saying "and have

13    such rights in the riparian waters thereof as are provided by

14    the laws of the State of California"?  The law takes care of

15    it.

16       THE COURT:  Take a short recess.  I will think about it.

17       MR. SACHSE:  I have some Tucalotas here, if you know

18    where to look, Bill.

19       (Recess.)

20       THE COURT:  I am going to suggest something to the

21    reporter in general language as to correlative rights.  You

22    say that certain things follow as a matter of law, and maybe

23    they do.  I don't think we have to define "correlative right".

24    We have spent some time on that.  I don't know whether we got

25    anywhere.

18,251

P67

1    I think you said it all when you say "correlative."  But

2  I have about four paragraphs here that I think do the trick.

3  There are very rough.  Maybe the reporter can get these out

4  for us tomorrow.

5    Each riparian right found herein is correlative to all

6  other riparian rights found in other findings in this case to

7  the use of the same water subject to the following principles:

8    (1)  Riparian rights pertaining to a particular parcel of

9  land are correlative downstream with all other riparian rights

10  on the particular tributary and with correlative rights on all

11  streams into which the tributary flows downstream.

12    Take the fellow upstream.  His rights are correlative

13  downstream to everybody on that tributary and to everybody on

14  the stream that that tributary flows into.

15    (2)  Riparian rights pertaining to a particular parcel

16  of land are correlative upstream with all riparian rights on

17  a particular stream and all riparian rights or tributaries

18  joining it upstream.

19    This is the Government's situation.  They are correlative

20  to everybody on the watershed.  They are correlative to all

21  other riparian owners of the watershed.

22    (3)  Where riparian rights exist in different parcels of

23  land on different tributaries and where each parcel lies above

24  the junction of the tributaries, the riparian rights are not

25  correlative.

P68

1    MR. GIRARD:  That is not correct, your Honor.

2    THE COURT:  That is correct.

3    MR. GIRARD:  Is it?  Let's take an example.  I think the

4    case of Santa Margarita vs. Vail, in 11 Cal. 2d, said that as

5    between Vail and the United States --

6    THE COURT:  No.

7    MR. GIRARD:  All of Vail's land --

8    THE COURT:  No.

9    MR. GIRARD:  Maybe I am missing the point.

10   THE COURT:  Look at this little diagram here.  You can

11   see it here, if you will come over here.  Here is a watershed.

12   Here is A, B, C and D.  Now A's rights as a riparian are

13   correlative -- I am talking about downstream -- with all

14   persons on that tributary or stream and all persons on every

15   stream that it runs into downstream from it.

16   Now let's take somebody upstream.  His rights are

17   correlative with everybody on that particular stream that he

18   is on and all tributaries that run into it from above.

19   Let's take A and B.  The last situation, where riparian

20   rights in parcels on different tributaries  are involved and

21   where they lie above the junction of the tributaries, those

22   are not correlative one to the other.  A and B are not corre-

23   lative.  A and C are not correlative.

24   If we laid out four or five general rules that way --

25   MR. SACHSE:  Your Honor, I don't like it because I don't

P69

1 think we have to define "riparian" anymore than you have to

2 define a negotiable instrument. You find that it is a nego-

3 tiable instrument. You don't have to cover every single

4 blessed example of what a negotiable instrument is.

5 THE COURT: What was the language in the Vail case?

6 MR. SACHSE: The Vail case made a mistake. The original

7 findings of fact said that certain lands were not riparian,

8 and that was corrected in the Appellate decision.

9 Mr. Stahlman has a very simple thing here. Mr. Veeder

10 and I just talked about it.

11 MR. STAHLMAN: I have just briefly jotted down what some

12 of the conclusions of law would be in connection with my

13 findings of fact. For instance, take De Luz, one of the

14 tributaries. All I said about De Luz was that the Vail Company

15 is the owner and put in the number of acres of land within the

16 watershed of De Luz Creek, a tributary of the Santa Margarita

17 River, which land is riparian to said creek. That is all you

18 need. And I added that there are so many acres that are

19 susceptible of reasonable water use.

20 MR. SACHSE: If we say that the United States Naval

21 Ammunition Depot is riparian to the Santa Margarita River --

22 just that, it seems to me that that embraces everyone of your

23 possibilities. And to go upstream to another case, if we say

24 that Roripaugh is riparian to Santa Gertrudis Creek, I think

25 the mere statement saying that he is riparian puts into

18,254

P70

1  operation these legal principles.

2  MR. STAHLMAN:  That is my thought, your Honor.  I feel

3  the law is already spelled out as to what rights flow from the

4  basic riparian right.

5  What do you think, Bill?

6  THE COURT:  In Vail they said that certain land was

7  riparian, and they reversed it and said it had to be --

8  MR. STAHLMAN:  But there, your Honor, they excluded

9  certain land as being riparian, which, in truth and in fact,

10  under California law was riparian; and they cited cases to

11  show where that had been previously decided what the rights

12  were of land of that type and character situated as it was.

13  It was a novel situation, of course.  But nevertheless, even

14  though it was novel, the rules had been set down in other cases.

15  I think that the rights which stem from the riparian character

16  of land are all well spelled out in the California law.

17  MR. GIRARD:  Just looking at this thing, and I haven't

18  done any analysis, I can think of one factual situation that

19  your four things don't cover.

20  THE COURT:  What?

21  MR. GIRARD:  Vail.  You had the situation where A and B

22  owned the land on the two forks.  Suppose A owns it all.

23  THE COURT:  Suppose A did own it all.  The fact that he

24  owns it all doesn't make any difference.  The land he owns

25  on one tributary is riparian to that.  The land he owns on the

P71

1  other is riparian to that.  And if he owns land downstream of

2  the juncture, then that land has correlative rights with all

3  the upstream lands.  While as between the two pieces above the

4  juncture there are no correlative rights between them.

5      MR. SACHSE:  Not between the two parcels.

6      THE COURT:  No.

7      MR. SACHSE:  But take your A, like this.  This is your

8  watershed divide, this is a single ownership -- and I will call

9  it A and A-1 to show that one is on each of the two tributaries.

10     MR. VEEDER:  May I be excused from the courtroom for a

11  minute.  You may go ahead without me.

12     THE COURT:  Do you have business?

13     MR. VEEDER:  Yes.

14     MR. SACHSE:  Going downstream, treat this as a single

15  parcel.

16     THE COURT: Well, as to downstream only.

17     MR. SACHSE:  But going upstream you have to treat them

18  differently.  So what we would draw, if we follow my theory

19  and George's on the findings of Vail, you would have to have

20  a description, it is true, of parcel A, which would be part

21  of Vail, and we would say parcel A is tributary to Murrieta

22  and we would say parcel A-1 is tributary to Temecula.  That

23  is what he has done.

24     But all you have to say is "riparian to" and you have it

25  done.

P72

1    MR. STAHLMAN:  I have said how many acres were riparian

2    to Santa Gertrudis or Murrieta.  Then on the main stream I

3    would include all these acres and make it clear that this area

4    is riparian only to this stream, whereas the entire area is

5    riparian to that stream.  I think from that flows your riparian

6    right.

7    MR. SACHSE:  The entire area is riparian to the stream

8    below the juncture.

9    MR. STAHLMAN:  Yes.

10   THE COURT:  It is not riparian to the stream below the

11   juncture.  It is riparian to the stream which it abuts.

12   MR. STAHLMAN:  Yes.

13   THE COURT:  But the correlative rights run below the

14   juncture.

15   MR. VEEDER:  In my view, when you said that lands were

16   riparian, all the legal implications contained in that word

17   flow from the word and lands declared to be riparian, I believe

18   that that embraces all the legal features of it.

19   THE COURT:  Somewhere in some findings there will have to

20   be a full description of the stream system and what tributaries

21   run into what.

22   MR. SACHSE:  Yes.  That is contemplated.

23   MR. STAHLMAN:  Yes, I assume that there would be an

24   over-all set of findings that would describe the basic features

25   of the stream system.

P73

MR. VEEDER:  I think that has to be antecedent to any other finding, too.

THE COURT:  Do I understand that you are all in agreement that all we have to say is that certain land is riparian to a certain tributary or stream?

MR. SACHSE:  That is my view.

MR. STAHLMAN:  That is my view, your Honor.

THE COURT:  Is that your view, Mr. Veeder?

MR. VEEDER:  I think that is all.  I think that if you say a man has a riparian right, I think if you say these lands of Roripaugh as described are riparian to Santa Gerturdis Creek, that is the extent required in the adjudication.

THE COURT:  As long as we later describe where Santa Gertrudis runs and into what stream.

MR. VEEDER:  And describe Roripaugh's land.

MR. GIRARD:  And describe which creeks are tributary to Santa Gertrudis.

MR. VEEDER:  That was one reason I brought up that proposition today.  I think it would be res adjudicata that his lands are riparian to Santa Gertrudis Creek.  Do you agree on that?

MR. GIRARD:  Well, yes, it would be res adjudicata, but it still would be subject to modification or change.

MR. VEEDER:  The mere fact that it is res adjudicata doesn't mean that if you come and show that some of the land

P74

1    has been severed -- it doesn't make any difference.

2        Your Honor, I didn't know whether you wanted me to bring

3    to your attention now that we have Exhibit 15-E with these

4    markings on it, with the watershed line, et cetera.

5        THE COURT:  Is this the one that was on already?

6        MR. KUNKLE:  This is Mr. Veeder's copy of 15-E.

7        MR. VEEDER:  This is our copy of 15-E.  I wanted you to

8    see what it was going to appear like.

9        THE COURT:  We were going to put it on 15-L, I thought.

10       MR. KUNKLE:  We will put it on both of them.

11       MR. SACHSE:  You did it on your copy.

12       MR. VEEDER:  That is right, my own working copy.  Here is

13   the surface watershed.

14       (Whereupon the Court and counsel gather around the map.)

15       THE COURT:  This is off the record.

16       (Discussion around the map off the record.)

17       THE COURT:  On your XXXVI I was going to suggest that

18   after the words "there exists" you insert "in a state of nature

19   a ground water divide between the ground water areas" et

20   cetera, and XXXVI would look all right -- subject to your

21   comments.

22       On XXXVII after the word "that" I would insert "within

23   that part of the ground water area draining into Murrieta

24   Creek as a result of" et cetera.

25       MR. GIRARD:  There is a change that was suggested in

P75

1    XXXVI at line 6, "but those which are contained in those

2    deposits lying north of said divide move toward Murrieta Creek"

3    instead of "move toward Temecula Creek," and then you cross

4    out the rest of that line -- cross out "in a general south-

5    westerly manner" and just say they "move toward Murrieta Creek

6    while those contained in the older alluvial deposits south of

7    said divide move toward Temecula Gorge".

8        THE COURT:  I don't like the Temecula Gorge.  They would

9    move toward Murrieta Creek.  Actually, in a state of nature

10   that divide shows that although they both move toward the

11   Gorge, some move in a southwesterly direction toward Murrieta

12   Creek further down and some move toward Temecula Creek further

13   down.  They all move toward the Gorge.

14       MR. SACHSE:  Then you would put the same correction in

15   that one word in XXXVII.

16       THE COURT:  I am not satisfied with XXXVII.  As I under-

17   stand your suggestions here, you would change the word "Gorge"

18   to "Creek," and I would suggest that you change Temecula Gorge

19   on line 11 to Murrieta Creek.

20       MR. GIRARD:  No.

21       MR. SACHSE:  That correction, your Honor, would be

22   appropriate.

23       THE COURT:  I have it mixed up.  Those lying north of

24   the divide move toward Murrieta Creek.

25       MR. GIRARD:  That is my suggestion.  While those contained

P76

1    in the older alluvial deposits south of said divide move toward

2    Temecula Creek or Temecula Gorge.

3    MR. STAHLMAN:  They don't move toward Temecula Creek.

4    THE COURT:  What part of Temecula Creek?  They move toward

5    Temecula Creek in the area of the Gorge.

6    MR. GIRARD:  All right.

7    MR. STAHLMAN:  Of course, Temecula Creek terminates

8    before the Gorge.

9    MR. SACHSE:  But your Honor, you still would have to add

10   the same correction you made in XXXVII that within the portion

11   of the ground water area draining into Murrieta, because other-

12   wise you have Pechanga all wrapped in this thing and Pechanga

13   drains the other way.

14   MR. VEEDER:  The true situation is that in a state of

15   nature all the water in the ground water area moves toward

16   Temecula Gorge.  That is the ultimate finding.  And what

17   difference does it make?  In a state of nature all the waters

18   move toward Temecula Gorge.  What difference does it make?

19   THE COURT:  But you have shown in your evidence a surface

20   divide and a ground water divide.  I don't know what is going

21   to flow from this.  But the ground water divide does move

22   water one way toward Murrieta and the other way toward Temecula.

23   MR. VEEDER:  My first comment was that in a state of

24   nature it all moves toward the Gorge.  Then you have the

25   situation under the present development.

18,261

P77

1      THE COURT:  We will do it over tomorrow.  I am just

2  telling you what my ideas are.  You can work on it tomorrow.

3      XXXVII.  Within that part of the ground water area draining

4  toward or into Murrieta Creek, talking about that part north

5  of the divide in a state of nature.  Is that right?

6      MR. SACHSE:  Yes.

7      MR. GIRARD:  Yes.

8      THE COURT:  Let me point in passing something you haven't

9  covered.  There is a pumping hole, actually, in the alluvium

10  in Murrieta Creek itself.

11      MR. SACHSE:  That is in another one.

Belt 6       12      THE COURT:  " . . pumping of the ground waters within

13  said ground water area, and other factors . . " -- within

14  said part of the ground water area; there isn't any pumping

15  over in the Pauba -- "a temporary ground water divide has

16  resulted; that said temporary ground water divide and pumping

17  depressions do exist as depicted . . ; that all of said

18  temporary ground water depressions " -- strike out "in the

19  older alluvial deposits" and just say, "in the ground water

20  area" -- "are north of the temporary ground water divide; that

21  said pumping depressions have resulted in a temporary reverse

22  gradient of ground water movement and those waters contained

23  in the alluvial deposits north of said temporary ground water

24  divide under such temporary conditions" -- strike "do not"

25  and just say -- "move down the hydraulic gradient toward the

P78

1   pumping depressions." That is where they move. They still

2   can move toward the Gorge. They may never get to the Gorge,

3   but they are moving so that they would eventually. They now

4   move toward these pumping depressions.

5       MR. VEEDER: May I ask your Honor to read the findings

6   I tendered to you from XLIV on. I think I already have a

7   format that covers exactly what your Honor has said.

8       THE COURT: I can't see where you get "A substantial

9   quantity of that pumped water is used upon . . the 'Piece

10  By Jack's.'"

11      Well, of course, there are more detailed facts.

12      You say "Another ground water divide . ." This is a

13  temporary divide which divides, in turn, the part that has

14  already been divided.

15      MR. VEEDER: No, your Honor, they are two divides. You

16  have the divide here between 2734 and -35. Then you have this

17  divide that starts here and that is the situation.

18      THE COURT: Oh, that's what you are talking about. We

19  have taken care of that when we say there is a reverse gradient

20  in Murrieta Creek. That divide doesn't concern you. In other

21  words, this divide with the red line might have some signi-

22  ficance some day. This divide doesn't particularly concern

23  you, except that it is brought about by a pumping area. This

24  divide doesn't have any particular effect on anybody because

25  by reason of the temporary divide all these waters still go

P79

1    to the Murrieta.  This is the one that might someday have some

2    significance -- the one in the state of nature close to the

3    watershed.  We are talking about where waters go in the water-

4    sheds.  Even though you have this dotted divide, the water

5    here and the water here still comes down the Murrieta.  Al-

6    though you have a temporary divide across the Murrieta, the

7    waters run backward into the Murrieta and properly into the

8    Murrieta.  But it is all into the Murrieta.  That is the way

9    I look at it.

10       Well, I am tired.

11       MR. STAHLMAN:  Me too.

12       THE COURT:  Give it some thought.

13       Ten o'clock tomorrow morning.

14       (Whereupon an adjournment was taken until Thursday,)
         (                                                   )
15       (October 26, 1961, at 10:00 o'clock A.M.            )

16                           - - -

17

18

19

20

21

22

23

24

25

18,264

P80

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,     )
                                 )
             Plaintiff,   )
                                 )
   vs.                     )      No. 1247-SD-C
                                 )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,     )
                                 )
            Defendants.   )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and

on the date herein involved, to wit:  October 25, 1961, was

a duly qualified, appointed and acting official reporter of

said Court.

   That as such official reporter I did correctly report

in shorthand the proceedings had upon the trial of the above

entitled case; and that I did thereafter cause my said short-

hand notes to be transcribed, and the within and foregoing

eighty (80) pages of typewritten matter constitute a full,

true and correct transcript of my said notes.

   WITNESS my hand at San Diego, California, this 26th day

of October 1961.

                                    _John Swader_
                                    Official Reporter