VOLUME NO. ___176___                                                MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

               Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      **Thursday, October 26, 1961**

Pages:   18,265 to 18,348

*FILED*

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

P1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
    vs.                        )    No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.    )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, October 26, 1961

- - -

APPEARANCES:

    For the Plaintiff:            WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to the
                                  Attorney General

    For the Defendants:

      Vail Company:               GEORGE STAHLMAN, ESQ.

      State of California:        FRED GIRARD, ESQ.

      Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
      District, et al.,:

18,265(a)

| | | |
|---|---|---|

## INDEX TO EXHIBITS

| For the Defendants | Identified | Received |
|---|---|---|
| Vail Company's BM | 18,335 | 18,335 |

P2    1    SAN DIEGO, CALIFORNIA, Thursday, October 26, 1961, 10:00 A.M.

2    (Other matters.)

3    THE CLERK:  2-1247-SD-C United States vs. Fallbrook.

4    MR. GIRARD:  Possibly, your Honor, I would like to go

5    through these four or five findings here on the ground waters

6    in the Murrieta-Temecula ground water area, and I think that

7    would wind up these findings, as far as any corrections I have

8    to make are concerned.

9    THE COURT:  Let's get one thing straight in the record.

10   I think it was straight yesterday, but let's get it straight

11   again.  With reference to these conclusions on page 23,

12   beginning with No. III, which are all alike, to the effect

13   that the lands have a correlative riparian right to the uses

14   of water of a certain creek, I want this on the record now.

15   I understand that this type of language is satisfactory to

16   Mr. Veeder, Mr. Stahlman and Mr. Girard.

17   MR. GIRARD:  It is satisfactory with me.

18   THE COURT:  Mr. Stahlman?

19   MR. STAHLMAN:  Yes, your Honor, it is satisfactory.  I

20   think the "correlative" is unnecessary.

21   THE COURT:  Mr. Veeder?

22   MR. VEEDER:  Yes, your Honor, I was on the record on that

23   yesterday.  I think if you say it is riparian, with all the

24   incidents attendant upon it --

25   THE COURT:  All right.

AP3

1    MR. VEEDER:  I want it clear, though, that I do disagree

2  on the proposition that lands can be riparian if they do not

3  abut upon or are traversed by the streams -- the actual

4  channels.

5    THE COURT:  You are disagreeing with my findings of fact.

6    MR. VEEDER:  Yes.

7    THE COURT:  These are conclusions of law.

8    MR. VEEDER:  Yes.  I just didn't want any misunderstanding.

9    THE COURT:  I understand.

10    We have then a couple of more paragraphs.  Let's finish

11  them up and then go back.

12    MR. STAHLMAN:  The word "correlative" will remain in.

13    THE COURT:  Yes.

14    MR. GIRARD:  Yes, I gave counsel and the Court copies of

15  the two tentative findings which were to correct Finding

16  XXXVI, essentially.

17    THE COURT:  Are you satisfied with the suggestions I

18  made on them last night?

19    MR. GIRARD:  Yes.  I would like to see if I got all that.

20  On the first one, which is the shorter one, No. XXXVI, it

21  reads, as I have it now:

22    That under natural conditions there exists a ground water

23  divide within said ground water area which approximately

24  coincides with the surface water divide between Murrieta and

25  Temecula drainage areas; that the ground waters in the older

1   alluvial deposits do not move across said ground water divide,

2   but those which are contained in those deposits lying north of

3   said divide move toward Murrieta Creek while those contained

4   in the older alluvial deposits south of said divide move toward

5   Temecula Creek.

6       THE COURT:  That isn't exactly the way I had it.  Drop

7   down to "move toward Murrieta Creek in a general southwesterly

8   manner," which you had in there already.

9       MR. GIRARD:  All right.

10      THE COURT:  "while those contained in the older alluvial

11  deposits south of said divide move toward Temecula Creek near

12  the Gorge".

13      MR. STAHLMAN:  In a general westerly manner.  I think

14  that is better.

15      THE COURT:  "and that said ground water divide is depict

16  on U.S. 15-L."

17      Is that satisfactory, Mr. Veeder, first as to this

18  natural?

19      MR. GIRARD:  There is a question on whether that ground

20  water divide is depicted.

21      MR. VEEDER:  That has not been done yet.  That was the

22  thing I was going to come to.

23      THE COURT:  Mr. Kunkle will be instructed to change it

24  on 15-L

25      MR. KUNKLE:  Is this the ground water divide or the

surface water divide we want?

THE COURT:  We want both of them on 15-L.

MR. GIRARD:  I think Mr. Kunkle -- well, that's all right.

THE COURT:  Is that satisfactory, Mr. Veeder, as far as we have gone on that?

MR. VEEDER:  I think there may be a little confusion in the use of the term "ground water divide," again.  But I believe that, comprehending what your Honor says, reading this, I think it comports with the facts.

THE COURT:  We call this "ground water divide" that would exist in a state of nature.

The next one talks about "temporary ground water divide," No. XXXVII.

MR. VEEDER:  I don't have XXXVII.

MR. GIRARD:  Your Honor, this morning, with no substantial change in meaning, I did change XXXVII where I think it reads better, and the people I have talked to in the courtroom, which does include Mr. Veeder, incidentally, also agree.

THE COURT:  How do you have it?

MR. GIRARD:  I drafted it to read as follows:

Due to a prolonged drouth and increased pumping in the area north of the natural ground water divide there existed in the autumn of 1959 several pumping depressions which resulted in a temporary ground water divide.  Said pumping depressions and temporary ground water divide are depict on

U.S. Exhibit 15-L.   That said pumping depressions have resulted in a temporary reverse gradient of ground water movement and those waters contained in the alluvial deposits north of said temporary ground water divide under such temporary condition move down the hydraulic gradient toward the pumping depression.

THE COURT:  It is substantially what we have.

MR. GIRARD:  Yes.

THE COURT:  I have only two suggestions:   (1)  Where you say that said pumping depressions have resulted in a temporary reverse gradient, I would say have resulted in certain places in a temporary reverse gradient.

MR. STAHLMAN:  In some areas.

MR. GIRARD:  All right.

MR. VEEDER:  Everything north and west of them.

THE COURT:  It is shown on the exhibit which we made a part here.  But it doesn't mean all the gradient had been reversed everywhere.  It is just in certain areas as shown on this map where the reverse gradient has occurred; in certain areas as shown on 15-L, if you want to say that.

And the other suggestion I have is that you start out by saying "in the area north of the ground water divide".  Maybe this is just an abundance of caution, but I think you ought to say "within the ground water area".  You have it too broad. It could be cleared up.  Actually, the map shows one of those ground water divides running clear up into the basement complex

1    and older weathered alluvium.

2        MR. GIRARD:  All right.

3        MR. VEEDER:  Would your Honor be inclined to say that

4    there is no evidence in the record as of this date that that

5    condition has been changed?  I think it is a continuing

6    condition, and I think it would make your finding more --

7        THE COURT:  I don't think it adds a thing.  When a thing

8    is shown to exist, it continues to exist -- if you want to

9    argue it that way.  We would have to go into it again to find

10   out what the situation was at any particular time, if some

11   matter came up.

12       MR. STAHLMAN:  A condition shown to exist, as a matter

13   of law in California, is presumed to exist until the contrary

14   is shown.

15       MR. VEEDER:  I am fully aware of that.  I think continued

16   drouth and no evidence of reduction of pumping could be found

17   and you would have it.

18       THE COURT:  I have no objection.  What do you want to say?

19   That this existed in 1959 and no evidence has been introduced

20   that it has changed, something like that?

21       MR. STAHLMAN:  I think it is pure surplusage.

22       THE COURT:  It doesn't add a thing.  Let's leave it out.

23   It is complicated enough as it is.

24       Now you are satisfied with XXXVII, except for that last

25   suggestion I made, Mr. Veeder?

P8

1    MR. VEEDER:  Yes, your Honor.

2    THE COURT:  All right.

3    MR. GIRARD:  Now going to Finding XXXVII, on page 16,

4   just to make sure I have it -- I think we did discuss this,

5   but I am not sure that I got everything -- it reads the same

6   until you get down to line 18 where the word "extreme" is

7   crossed out and it reads, commencing on line 18, "progressively

8   lower as they proceed from the upstream areas of the ground

9   water area toward Temecula Gorge".  Is that the extent of the

10  correction?

11   THE COURT:  Yes.

12   MR. STAHLMAN:  Yes.

13   MR. GIRARD:  I don't believe we discussed XXXVIII.  I

14  have no suggestions or corrections to offer on that.

15   THE COURT:  Beginning with XXXVIII we skipped three pages.

16   MR. GIRARD:  That is correct.

17   THE COURT:  Let me look at XXXVIII.

18   Mr. Veeder apparently has no objections.

19   MR. STAHLMAN:  We discussed this very thoroughly in your

20  Honor's chambers and we all agreed on it.

21   MR. VEEDER:  What is that, George?

22   MR. STAHLMAN:  We had lengthy discussion on this question

23  of constructing this particular finding.

24   THE COURT:  Let me read it.

25   I am satisfied with XXXVIII.

P9

1      MR. VEEDER:  Did your Honor consider what I had in my

2  objections on page 12 in regard to Findings XXXVI through

3  XXXIX?  I would appreciate it if you would consider that,

4  because I make reservation in there to the effect that the

5  United States could file further objections when these have

6  been finally formulated.

7      MR. GIRARD:  You objected to them on the crucial basis

8  that you don't agree with the bed and banks idea of the stream.

9      MR. VEEDER:  The general over-all approach, yes.

10     THE COURT:  I understand that.

11     MR. GIRARD:  XXXIX on page 17.  Because of the changes

12  which we have made on the two findings on the ground water

13  divide I would cross out entirely the first two paragraphs

14  commencing at line 8 through line 19, because I think they

15  are taken care of in that other finding.

16     MR. VEEDER:  Incidentally, is Mr. Sachse in agreement

17  with this?

18     MR. GIRARD:  I haven't talked it over with him.  But I

19  think these pertain primarily to these movements which we have

20  covered in the other finding.

21     THE COURT:  Yes.

22     MR. GIRARD:  Then I would start at line 20 and say that

23  the movement of ground water in the older alluvial deposits in

24  the ground water area is not a consistent, continuous movement.

25  That would be the only change I would suggest on that.

P10

1    THE COURT:  All right.

2    Line 26.

3    MR. GIRARD:  That was on line 20.

4    THE COURT:  To the end of the page?

5    MR. GIRARD:  Yes, that is correct.

6    THE COURT:  All right.

7    XL.

8    As to XL I would add after "Temecula Creek," on line 5,

9    "or tributaries thereto".

10    You have or's in there.  Do you want or's or and's?  If

11    you put or's in, then it is not certain whether you mean it

12    affects one or the other.

13    MR. GIRARD:  And.

14    The next is XLI.

15    THE COURT:  Any objection to XL?

16    MR. VEEDER:  I have filed my objection on it, your Honor.

17    I stand on it.

18    MR. GIRARD:  I hope this is correct.

19    THE COURT:  Let's see what his objection is.

20    MR. GIRARD:  Pardon me.

21    THE COURT:  What do you mean, "It is completely in error

22    to state that pumping does not adversely affect the flow of

23    the stream"?  We don't say that.  We say it does affect, to

24    a limited but undetermined degree, the flows of the streams.

25    The objection is overruled.

P11

1    XLI.

2    MR. GIRARD:  On line 17 where it says "northwesterly" --

3    now maybe my suggestion is wrong.  Let me check this a moment.

4    THE COURT:  Let me read XLI.  It looks all right.

5    MR. GIRARD:  On line 17 I would just say instead of

6    "northwesterly" I would just say "north".

7    On line 22 instead of "southeasterly" I would just say

8    "south".

9    And I would change on line 18, I would just have it apply

10   to Finding XXXVI rather than XXXIX, too, so that it is clear

11   that we are only talking about the natural ground water divide,

12   not the temporary.

13   XXXVI would be that one we drafted over, your Honor, that

14   there exists under natural conditions a divide.

15   THE COURT:  You are going to have to put XXXVI and XXXVII

16   in together or change your numbering system.

17   MR. GIRARD:  That's right.

18   THE COURT:  Probably you had better put them together as

19   XXXVI A and B or something like that, or whatever you want to

20   do.

21   MR. GIRARD:  It will have to be done almost completely

22   over anyway.

23   THE COURT:  Any objection ot XLI?

24   MR. VEEDER:  Yes, your Honor.  We can't buy that.

25   THE COURT:  What is the source of the ground water except

P12

1    as stated here?

2        MR. VEEDER:  I don't believe that we can say, under the

3    circumstances, "That specifically the source of recharge for

4    the ground waters heretofore found to constitute a part of

5    Murrieta Creek and the ground water within the older alluvial

6    deposits northwesterly of the ground water divide as found in

7    Findings . . . , is the surface drainage area of Murrieta

8    Creek and tributaries thereto" -- in view of your Honor's

9    findings about bed and banks.

10       MR. GIRARD:  It has nothing to do with bed and banks.

11       THE COURT:  In the sense that you object to bed and banks,

12   you have a continuing objection.  So having passed over that,

13   isn't the rest of it correct?   That the source of water that

14   gets in there is as we state here?  The objection is overruled.

15       What is the next one -- XLII?

16       MR. GIRARD:  I think this is the last one that we haven't

17   considered.

18       THE COURT:  After "Santa Margarita River" do we need

19   "and its tributaries" or not?

20       MR. GIRARD:  I think we should have "its tributaries".

21       THE COURT:  And on line 28 change "or" ot "and".

22       MR. GIRARD:  Yes.

23       MR. STAHLMAN:  You have "a" here.  You wouldn't say "a

24   tributary".

25       MR. GIRARD:  No.

P13

1  THE COURT:  And tributaries.

2  MR. VEEDER:  You are changing that to "and tributaries"?

3  MR. GIRARD:  Yes.

4  THE COURT:  Any objection to that, other than your general

5  objection, Mr. Veeder?  Apparently not.

6  MR. VEEDER:  I was just reading it once more.  What,

7  specifically, do you mean by "hydrologic contact," Mr. Girard?

8  MR. GIRARD:  I don't know what I mean by it.  I will ask

9  the witnesses who have said it all the time.  I am willing to

10  cross it out, if you want it out.  All I mean by this finding

11  is that these ground waters in the older alluvium add to and

12  contribute to the Santa Margarita River and you have a right

13  to your correlative share of it.  Ask Colonel Bowen what it

14  means.

15  MR. VEEDER:  I never heard the term 'hydrologic contact."

16  THE COURT:  What term did you use in the presentation of

17  your case?

18  MR. STAHLMAN:  Continuity.

19  THE COURT:  Hydraulic contact?

20  MR. VEEDER:  I think we said "hydraulic continuity."  I

21  don't believe "continuity" and "contact" are entirely synony-

22  mous.

23  MR. GIRARD:  Professionally or engineering-wise, Colonel

24  Bowen which is correct, "hydrologic contact" or "hydrologic

25  continuity" in these findings?

P14

1      COLONEL BOWEN:  I prefer "continuity," Mr. Girard.

2      MR. GIRARD:  All right, I have no objection if the Court

3  doesn't.

4      THE COURT:  We haven't settled on this prima facie matter.

5  Mr. Veeder was going to talk about that.  Do you want to do

6  that tomorrow morning?

7      MR. VEEDER:  I would just as soon do it tomorrow morning.

8  I am doing a great deal of research on it.

9      MR. STAHLMAN:  What question?

10      MR. VEEDER:  On the question whether the evidence which

11  has been introduced on irrigable acreage --

12      MR. STAHLMAN:  I'll not be here tomorrow.  That's the

13  reason I am concerned.

14      MR. VEEDER:  Anything we say will go into the record

15  and you will have a chance to review it.

16      THE COURT:  We didn't go over the last few paragraphs of

17  the conclusions.

18      MR. GIRARD:  No.

19      THE COURT:  Beginning on page 24, Paragraph X.

20      MR. STAHLMAN:  I would say in that instance the word

21  "correlative" should be left out.  "Riparian," I think,

22  accomplishes it.  That is in addition to merely the correlative

23  feature.

24      THE COURT:  Can we leave it out, Mr. Girard?  It doesn't

25  add anything.

P15

1    MR. STAHLMAN:  It doesn't add anything one way or the

2  other.

3    MR. VEEDER:  I think "correlative" is simply gilding the

4  lily.

5    THE COURT:  All right, take it out.

6    You probably should add somewhere in here these unnamed

7  creeks and the unnamed water courses and creeks as found in

8  paragraph so and so.

9    MR. STAHLMAN:  I would think so, because as I pointed out

10  the other day that one unnamed creek there.

11    THE COURT:  Any objection?

12    MR. GIRARD:  That is covered in Conclusion of Law XIII,

13  too, I think, your Honor.

14    MR. VEEDER:  It has been suggested, and I think it is a

15  good idea, that Santa Gertrudis Creek and its tributaries,

16  Warm Springs Creek and tributaries take in all the unnamed,

17  unknown and undescribed.  They cover everything, if you did

18  that.  You could say Murrieta Creek and its tributaries and

19  Temecula Creek and its tributaries.

20    MR. STAHLMAN:  That would do it.

21    THE COURT:  All right.

22    Exhibit H is the list of overlying lands in the ground

23  water area.

24    MR. GIRARD:  Yes.

25    THE COURT:  The Clerk advises that Exhibit BL was properly

P.16

1  numbered.

2       Conclusion XI.

3       MR. STAHLMAN:  Of course, you could cut out the word

4  "correlative" again -- "overlying rights."

5       THE COURT:  It seems to me that we ought to have a

6  conclusion, or should we, that there is correlation between

7  riparian and overlying rights.  We have set up two different

8  categories here.

9       MR. VEEDER:  I think your Honor has touched on one of the

10  most difficult legal problems that we have, in view of your

11  Honor's findings as to the bed and banks.  I would like to

12  see riparian and overlying as separate conclusions.  Didn't

13  you say that you intended to consolidate them?

14       THE COURT:  No, I didn't say that.  I said that it seemed

15  to me, or is it proper, that we should have a conclusion that

16  there was correlation between riparian and overlying rights?

17  We have set them up in two different categories -- riparian

18  and overlying.  As a matter of law, can we assume, as we did

19  before, that they are correlative?  That the man with an over-

20  lying right has, as far as his rights go -- forgetting the

21  area where it exists -- has about the same right that a riparian

22  has.

23       MR. GIRARD:  I think under California law an overlying

24  owner, if you find he is an overlying owner, has a right to

25  the waters which recharge his ground water area, and he also

18,281

P17

1  has under California law a duty to use those waters in light

2  of the demands downstream which may be made by surplus users,

3  riparian users, where those waters add to or contribute to the

4  river.   I think the problem as far as overlying owners are

5  concerned is the same as it is with riparians.   How far do

6  you want to go in spelling it out?

7      THE COURT:   Can't we make a conclusion of law just about

8  as you state:   That the owner of an overlying right has a

9  correlative right to the use of the waters lying under his

10  ground?

11      MR. GIRARD:   A correlative right to the waters which

12  recharge that area.   And that those people who have rights

13  downstream where those waters add to or contribute to their

14  waters have a correlative right to the use of those waters

15  in the overlying land.   Something along that line.

16      THE COURT:   Mr. Veeder is vigorously shaking his head.

17      MR. VEEDER:   I disagree on it, your Honor.

18      THE COURT:   What should we do?   You have argued that there

19  are overlying rights in the ground water area up there.   You

20  have argued that there are riparian rights on the streams.

21  Let's forget what factually we found the stream to be.   So

22  you have argued that there exists riparian and overlying rights.

23  How would you propose to handle it?

24      MR. VEEDER:   My own inclination, in regard to Conclusions

25  X and XI, is that they properly separate the two rights.   I

Belt 2

P.18

1    think that the situation as it presently exists can become

2    important.  When we start talking about the overlying right,

3    can he claim surface water for that land?  What are his

4    obligations to downstream riparians and downstream correlative

5    users?  I don't believe we can define it.  I think when you

6    say you have a correlative right, I think the implication for

7    the individual case as it may arise -- I wouldn't try to

8    anticipate the full import of these overlying rights at this

9    time.

10   THE COURT:  Are you satisfied, are you content if we

11   merely say that overlying rights have correlative rights and

12   that riparian owners have correlative rights, in two separate

13   paragraphs, and we have said all we need to say?

14   MR. VEEDER:  I think that is a proper conclusion.  I

15   wouldn't try to define what it means, because I have been

16   working on this very problem, drawing pictures and trying to

17   see what your findings actually mean, their effect upon us,

18   and I am in doubt as to really the legal implications at this

19   point in the light of the findings.  I would rather have them

20   stay the way they are without further amplification.

21   THE COURT:  You are satisfied, then, I take it.

22   MR. VEEDER:  I wouldn't say I am satisfied, but I am

23   saying that if you say they have correlative rights you are

24   reciting the law in California.

25   MR. STAHLMAN:  Let's assume that the stream system had

RXR

P19

1  been determined as you had and there were riparian and over-

2  lying rights.  Would this have been satisfactory to you?

3       MR. VEEDER:  I believe it would have been, Mr. Stahlman.

4       THE COURT:  We are not directing our attention now to

5  findings of fact as to the beds and banks of streams or the

6  extent of their riparian rights.  We are directing our attention

7  to the limited question when we say that certain people have

8  riparian rights to use water in streams and we say that some

9  people have correlative overlying rights to ground waters.

10      MR. VEEDER:  Do we have to go any further?  I don't think

11  so, and I recommend that you go no further.

12      THE COURT:  Is that agreeable?

13      MR. STAHLMAN:  Agreeable to me.

14      MR. GIRARD:  Yes.

15      THE COURT:  All right.  XII.  Any objection?

16      MR. VEEDER:  I am going to interpose an objection to

17  that, your Honor.  I feel that there is evidence that there

18  has been unreasonable use, and it raises additional questions

19  that I would like to present now in regard to the findings.

20      Does your Honor contemplate in the findings to reflect

21  the historic runoff as measured at Vail Dam, at Temecula Gorge,

22  at Murrieta Creek, and does your Honor contemplate making any

23  determinations as to averages and mean runoff during the period

24  of record since 1923?

25      THE COURT:  What good would it do?  We don't have a

P20

1   complete picture.

2   MR. VEEDER:  In my view, your Honor, I think we do have

3   a very complete picture on Temecula Creek.  I think we have

4   as complete picture as you can get on Murrieta Creek.  They

5   can be separated and segregated, the runoff of those two

6   streams at the Gorge, which is an important factor to us.

7   THE COURT:  You are therefore proposing this as having

8   some relationship to the entitlement of the United States

9   against upstream owners?

10  MR. VEEDER:  That is correct.

11  THE COURT:  Do you have any figures of the runoff of

12  Sandia?

13  MR. VEEDER:  We have figures immediately above and below

14  Sandia and above the enclave line.  And I believe that gauging

15  station is now within the enclave, is it not?  We have a

16  history from 1923 on down to the point below Sandia, yes, your

17  Honor, we do.  And we have a history from 1923 to day at

18  Ysidaro.  We have some short range runoff records for De Luz.

19  We have extensive records at Lake O'Neill.  That is the reason

20  I am raising this point.

21  THE COURT:  Doesn't this go to the issue of apportionment?

22  MR. VEEDER:  I think it goes to the issue of the extent

23  of availability of water in the stream, and I think that is

24  an important matter and I think it is one concerning which

25  there should be findings.

18,285

P21

1      MR. STAHLMAN:  It goes back to the matter of apportionment.

2   We had considerable argument in the past.  We came up with the

3   proposition, Mr. Veeder himself said in the record that he is

4   not asking for apportionment at this time.

5      MR. VEEDER:  It has nothing to do with apportionment, as

6   I see it.  I think you should make findings in regard to

7   average runoff, mean runoff, the history.

8      MR. STAHLMAN:  Average doesn't mean a thing.

9      THE COURT:  Wait a minute.  If it is put in here, it is

10  only of informational value, because it wouldn't be followed

11  up by apportionment.  Would it be of any value to the Marines

12  or to the Navy?

13     MR. VEEDER:  It certainly would.

14     THE COURT:  Having findings as to what these runoffs were?

15     MR. VEEDER:  It certainly would.

16     THE COURT:  In what respect?  In connection with how to

17  build a dam, or --

18     MR. VEEDER:  I want the Court to make findings in regard

19  to the runoff.

20     MR. GIRARD:  What good are the findings?  Suppose the

21  Court makes a finding that the runoff for the last ten years

22  has been such and such.  It doesn't say that you are entitled

23  to any amount of that water.  If you seek an apportionment,

24  you are entitled to that amount that exists at the time of

25  the apportionment.  As far as this judgment is concerned, it

P22

1   is cataloguing rights.  You have the same right without regard

2   to how much water you have.

3        If we are going to get into any flow studies or have

4   findings on that aspect, before I would even agree to them,

5   I would want to talk it over with Mr. Sachse.  Because I just

6   don't know what they have in here.  Mr. Veeder has made certain

7   statements that they have certain records, which I know are

8   not correct.

9        MR. VEEDER:  What do you mean as incorrect?

10       MR. GIRARD:  I think on Sandia you have only had them

11  for about three years.

12       MR. VEEDER:  I didn't say we had any on Sandia.

13       MR. GIRARD:  Your flow figures on Murrieta, for example,

14  are not natural flow figures; they take in all the return flow

15  upstream.

16       MR. VEEDER:  Would you go back and say what you said about

17  Sandia?

18       MR. GIRARD:  How long have you had measuring stations on

19  Sandia?

20       MR. VEEDER:  I didn't say we had any on Sandia or ever

21  did have.

22       MR. GIRARD:  I thought you said you had.  I'll apologize.

23       MR. VEEDER:  That is your error.

24       I want findings, your Honor, and I am requesting them

25  specifically, in regard to all the gauging stations, in regard

P23

1    to impoundments at Vail Dam, evaporational losses at Vail Dam,

2    the measurements at Fallbrook, the measurements at Ysidaro.

3    And I am asking that those findings be made. I don't care

4    whether we embrace them all here or in another set of findings

5    or in individual findings.

6        THE COURT: If you made them, what conclusions of law

7    would you then base upon those findings?

8        MR. VEEDER: I think we would surely make this conclusion

9    of law, that based upon the record before us the demands upon

10   the stream for riparian and overlying uses are far in excess

11   of the available supply. That would be one conclusion of law.

12       THE COURT: Haven't we made that already? What other

13   conclusion would we draw?

14       MR. VEEDER: That would certainly be the first conclusion.

15       THE COURT: What other?

16       MR. VEEDER: I am not certain. We are in this position,

17   of course, that when we come down to tendering our findings

18   on the enclave, the measurements of water, the quantities used,

19   the quantities diverted become extremely important to us in

20   regard to the exercise of our rights. I never dreamed, under

21   any circumstances, that having put in days of trial and

22   enumerable exhibits in regard to runoff, that we would not

23   have findings on that precise point.

24       THE COURT: Didn't you, yourself, agree that apportion-

25   ment would not be involved in this case?

P24

1      MR. VEEDER:  I said at that juncture, and at this juncture

2  I say, apportionment is not involved.  It is not involved.  This

3  is a quiet title feature of it.  I would never dream of a

4  decree in the quiet title feature not having a complete set of

5  findings in connection with the runoff and the historic runoff

6  to the extent it has been measured.  I never dreamed we would

7  ever do anything otherwise.

8      MR. GIRARD:  Runoff is immaterial to title.

9      MR. VEEDER:  It is not immaterial to us.

10      MR. STAHLMAN:  You are going to expand this, if you are

11  going to do that.  You have your basins up the river and the

12  quantities of water you testified in the underground storage.

13  You are getting into matters that affect other features of

14  the case.  It goes right into apportionment.

15      MR. VEEDER:  I have stated my position, your Honor.  I

16  certainly think it is essential that we have findings of the

17  character to which I have alluded.  Your Honor can rule on it

18  as he sees fit.

19      MR. GIRARD:  Before your Honor rules I would like, frankly,

20  to delay it at least until I have talked to Mr. Sachse about

21  the contemplated ruling.

22      MR. VEEDER:  Is he going to be down today?

23      MR. GIRARD:  Yes. He had a Superior Court appearance.  I

24  am sure he would have some comments.

25      THE COURT:  Renew your contention when he gets here.

P25

1      In some of these findings we have already -- and you can

2  put them in again -- provided that the amount of water availa-

3  ble, in view of the riparian and irrigable lands, is insuffi-

4  cient.

5      MR. VEEDER:  I will tender over-all findings on it, your

6  Honor.

7      MR. STAHLMAN:  Your Honor, here is how ridiculous it

8  would be.  You come to some years where you had enough water

9  that would satisfy everybody and went into the ocean, and other

10  years it is dry.  I think when you talk about the character

11  and type of stream it is and the other features already in

12  here, you don't take every bit of evidence in the case and

13  put it into the findings.

14      MR. VEEDER:  I would just as soon have it held over until

15  Mr. Sachse is here, your Honor.

16      THE COURT:  All right.

17      We were on XII.

18      XIII.  You are proposing that we not list the land in

19  some of the younger alluvial stringers.

20      MR. GIRARD:  Within the ground water area, yes.  I have

21  certainly no objection to listing it if the United States wants

22  to do it, but I think it would be a monumental job.

23      THE COURT:  It is nothing different than what they

24  proposed to do.  They had the property ownership maps of the

25  whole area.

P26

1    MR. GIRARD:  If that is what is desired, I can draft the

2    finding very simply.  It will mean correction of these other

3    findings, too, to find that.  I don't know into how much detail

4    you go.  I think you are going to have areas in this ground

5    water area having maybe not even any younger alluvial deposits,

6    just maybe having an unnamed stream over bedrock or older

7    alluvium in the area.  I think you are going to get into

8    trouble if you try to make findings specifically finding

9    everybody's riparian land to all these little creeks, gullies

10   and water courses.  It doesn't mean anything practically --

11   the riparian right, actually, because in most cases there

12   aren't substantial areas of younger alluvial deposits, and

13   surface flow is negligible.

14   THE COURT:  Mr. Veeder.

15   MR. VEEDER:  Your Honor, you had inquired yesterday in

16   regard to the work of Colonel Bowen's office.  They are work-

17   ing with me in connection with the determination of lands

18   irrigable and irrigated, gross, et cetera, and here is the

19   form, if your Honor desires to look at it.

20   MR. STAHLMAN:  I the question here is whether or not you

21   feel that we should list all the lands or whether this finding

22   would take care of it.

23   MR. VEEDER:  (Handing a document to the Court and another

24   document to counsel for defendants.) Did you see these, George?

25   MR. STAHLMAN:  No, I just glanced at them.  I don't know

18,291

P27

1   the significance of them.

2       THE COURT:  Specifically, as to XIII, what is your view

3   on this?

4       MR. VEEDER:  Let me read the first part of it.  Down to

5   the first semi-colon it says:  "That each smallest tract of

6   land held under one chain of title, a part of which abuts

7   upon or is traversed by an area containing younger alluvial

8   deposits within said ground water area has a correlative

9   riparian right to the use of said ground waters and the use

10  of such waters shall be and is subject to the continuing

11  jurisdiction of this Court; . ."  If I comprehend the findings,

12  most of the wells in the Murrieta area, Santa Gertrudis  and

13  on the Vail properties which are used for irrigation go deeper

14  than the recent alluvium.  So you would have the situation,

15  would you not, where this is not --

16      MR. GIRARD:  That would have nothing to do with this.

17      MR. STAHLMAN:  That would have nothing to do with this.

18      MR. VEEDER:  You would have the situation where you would

19  be pumping out of the older alluvium, which would not be a

20  riparian use in the sense that you use it here.  Isn't that

21  right?

22      MR. GIRARD:  That is correct.

23      MR. VEEDER:  You take care of that situation.

24      MR. GIRARD:  Yes.

25      MR. VEEDER:  Where did you take care of it?  Maybe I

P28   1   missed it.

2          MR. GIRARD:   The overlying uses, I would think, we have

3   already passed that one, Bill.

4          MR. VEEDER:   What I am saying is correct.

5          THE COURT:   That is Conclusion XI.

6          MR. GIRARD:   Yes, Conclusion XI would take care of that

7   situation -- that they would be exercising overlying rights

8   where their wells went into the older alluvium.

9          MR. VEEDER:   Your Honor, I would have to analyze X, XI,

10  XII and XIII further.   Don't hold it up on my account.   I am

11  not sure of all the implications of it.

12         MR. GIRARD:   May we have a brief recess.   I would like

13  to talk to Mr. Sachse.

14         THE COURT:   Yes.

15         What about XIV?

16         MR. STAHLMAN:   We straightened that out yesterday.

17         MR. GIRARD:   Yes.

18         MR. VEEDER:   Isn't that just a matter of locations?

19         MR. GIRARD:   Yes.   This is throwing out the ground waters

20  in that area.

21         MR. VEEDER:   Yes.

22         THE COURT:   All right, take a short recess.

23         (Recess.)

24         MR. STAHLMAN:   Your Honor, I think we are finished, ex-

25  cept for what we talked about with Mr. Sachse.

P29

1      THE COURT:  Do you want to renew your statement as to

2  what you want as to findings on flow?  Mr. Sachse is here now.

3      MR. VEEDER:  Yes, your Honor.  That in regard to the

4  findings ultimately entered there should be a complete set of

5  findings in regard to runoff, historical measurements and the

6  related data as in evidence in this case respecting all of the

7  gauging stations, and that appropriate findings should be

8  made relative to each of the hydrologic feature and facets

9  that are disclosed by those runoff records -- in regard, for

10  example, to Vail Lake, the quantities of water impounded by

11  Vail Lake, the evaporation losses, the water uses by Vail;

12  the water uses, the measurements at Murrieta-Temecula; at the

13  Gorge; at the enclave eastern boundary; at Lake O'Neill; and

14  any other measurements that we have that are reflective of

15  the available water resources in the Santa Margarita River

16  watershed.

17      I bring the point up here because the over-all question

18  is relevant to the findings and conclusions we are now consider-

19  ing.  I am not saying that the findings should necessarily be

20  written into this set of findings.  I am saying that findings

21  of that character should be included in all of the findings.

22      THE COURT:  Then I asked you when Mr. Sachse was absent

23  what conclusions you would base upon the findings if they were

24  made.  Will you state?

25      MR. VEEDER:  I pointed out that at least there was

P30

1 certainly one conclusion of law that is manifest -- it is a

2 mixed question of fact and law, but I would recommend it as a

3 conclusion: That it is evident from the record that the

4 quantities of water available in the stream as the records

5 show is far short of the basic claims of the riparian and over-

6 lying rights which are paramount in the system, particularly

7 in view of the large claims of Vail in the stream and also the

8 appropriative right of Vail.

9 MR. SACHSE: I concede some very positive advantages to

10 Fallbrook in doing this. For instance, the runoff figures

11 will show the average annual waste to the ocean even in the

12 dry cycle of something over 20,000 acre feet -- a few things

13 like that.

14 But I really can see no purpose, your Honor. I think it

15 is unnecessary. I would think this type of finding would be

16 pertinent if there were a controversy as to what the runoff

17 was. But no one has quarrelled with the U.S.G.S. figures. They

18 have been accepted by both sides. They are meaningless the

19 day after they are done and until a controversy arises. I

20 don't think my problems or Mr. Veeder's problems or anyone's

21 will be made any simpler by putting them in the findings.

22 If we have to come before your Honor either to seek

23 injunctive relief Mr. Veeder against me or me to resist it at

24 some future date, putting these figures in the findings isn't

25 going to help us. They are the official Government reports,

.P31

1   which everyone has accepted, and can be very readily presented

2   to you.

3       Beyond that, taking Mr. Veeder's last conclusion, I can't

4   buy that because the runoff figures alone are meaningless,

5   since there is, I would say, next to no surface diversions of

6   water in the watershed.  The runoff figures are only meaningful

7   if tied into safe yield or basin figures.  All of the real

8   use here is pumpage use everywhere.  To say how much water

9   runs down the surface of the stream could not possibly be a

10  basis for your Honor limiting pumping by Vail or limiting

11  pumping by the United States or by Roripaugh, unless you also

12  had before you the safe yield calculations of the particular

13  underground sources from which they are pumping.  You are not

14  going to restrain Roripaugh because there is no surface flow

15  in Santa Gertrudis Creek.  He isn't taking surface water.  This

16  same logic would apply everywhere up and down the basin.

17      I think they are largely meaningless and I can't see any

18  purpose for any conclusion or judgment that would be based upon

19  them, except the possible conclusion of law and judgment, which

20  you have expressed, that we can express in general terms that

21  there are or is from time to time on periods of heavy precipi-

22  tation and runoff surplus water in the river.  That is the

23  only conclusion you could possibly draw from it.  That occasion-

24  ally there is heavy enough rain so that there is surplus.

25  That part I would love to have in.

P32  1  MR. STAHLMAN:  If you start on findings of this type,

2  where are you going to stop?

3  MR. VEEDER:  As I say, I am going to tender them.  You

4  may reject them if you desire.  I want it very much in the

5  record, and I will offer them.

6  THE COURT:  They are in the record.

7  MR. VEEDER:  The findings haven't been tendered in a

8  complete form, and I will tender them.

9  THE COURT:  Do you have anything further to offer to Mr.

10  Sachse's statements?  What figures do we have of the safe

11  yield of the ground water areas you have described?  None.  Is

12  that right?  There is no evidence in the record of the safe

13  yield of the ground water areas.

Belt 3  14  MR. VEEDER:  Your Honor, on the enclave, there is certain-

15  ly evidence on that.

16  THE COURT:  I am talking about the ground water areas --

17  Temecula-Murrieta ground water area, the Aguanga ground water

18  area.

19  MR. VEEDER:  I was pointing out to your Honor, I don't

20  care whether you tie them to these particular findings, but

21  I would want those findings in the record, and I simply bring

22  it up to advise your Honor of the amendments.

23  THE COURT:  How would runoff figures, gauging station

24  figures, be meaningful in our findings unless you had also

25  figures on the safe yield of these ground water areas in

P33

1   Temecula-Murrieta and Aguanga ground water areas?  We have no

2   figures on those.  The areas have never been delineated.

3        MR. VEEDER:  I am sure that California put those in.

4        MR. GIRARD:  No.

5        MR. STAHLMAN:  No.

6        MR. SACHSE:  I have checked this with great care, your

7   Honor, in connection with the findings on the enclave.  The

8   only finding of safe yield of anything is a very brief statement,

9   which, frankly, if the Court would want to accept it and make

10  a finding on it, I would be pleased, but I don't think it is

11  a strong enough statement by Mr. Illingsworth on the safe yield

12  of the enclave.  That is the only evidence on any ground water

13  area whatsoever as to safe yield, and his statement was not a

14  detailed one -- it came out in passing that Water Resources

15  felt the safe yield of the enclave was so many acre feet per

16  year.

17       MR. VEEDER:  I disagree with that.  Mr. Worts testified to

18  that.

19       MR. SACHSE:  You show it to me.  I can't find  it.

20       THE COURT:  Let's forget about enclave.  There may be

21  some testimony about safe yield in the enclave.

22       What testimony is there of the safe yield of the two

23  ground water areas we have marked out upstream of the Gorge?

24  They were never in existence as ground water areas until we

25  marked them out.  How could there have been any testimony on

JOHN SWADER, OFFICIAL REPORTER

P34

1  their safe yield?

2      MR. VEEDER:  In the areas as delineated, that is true.

3  But there is certainly evidence in regard to the individual

4  basins.

5      MR. STAHLMAN:  There is not.

6      THE COURT:  There is only evidence that there are supposed-

7  ly so many acre feet of water.  This doesn't tell you anything

8  about safe yield.

9      MR. VEEDER:  All I can do is make the offer in regard to

10  the findings.

11      THE COURT:  Your offer is overruled.  They would serve

12  no useful purpose.

13      MR. VEEDER:  They would most certainly serve a useful

14  purpose when I attack your Honor's ruling in regard to the

15  stipulated judgment.

16      THE COURT:  In what respect?

17      MR. VEEDER:  Because I will demonstrate how much water

18  Vail has been using.

19      As I have said before in regard to the findings that are

20  presented here, the United States will not accept them.  And

21  I would simply bring out the fact that there is another element

22  that I am interested in bringing in.  I am extremely interested

23  in bringing in the runoff figures as demonstrated.

24      THE COURT:  There is no doubt about the facts.  The

25  question is, should there be findings?  They are not going to

P35

1  be made unless they serve some useful purpose, unless they are

2  the basis of some conclusion; and they serve no useful purpose.

3  MR. VEEDER:  I don't see how your Honor could so rule

4  until I offer them.  I simply bring the point up.  I will tender

5  them to you and ask you to rule.

6  THE COURT:  I will look at them later.

7  MR. SACHSE:  Does that finish Murrieta, then, except the

8  corrections in the afternoon?

9  MR. STAHLMAN:  Yes.

10  THE COURT:  Except at the tail end of this thing you have

11  to say something that this is interlocutory.  You haven't got

12  that in there.  You call it "Interlocutory Judgment".

13  MR. GIRARD:  You are right.  I certainly need that clause

14  in there.

15  THE COURT:  We haven't looked at the interlocutory judg-

16  ment phase either.

17  MR. GIRARD:  On line 23 we should strike out that "and".

18  THE COURT:  Do we want "or's" or "and's" on lines 21 and

19  22 -- "that all ground waters found within areas of older

20  alluvial deposits,. . "

21  MR. SACHSE:  I think you want "or's" if you strike the

22  "and" at the start of line 23.

23  THE COURT:  Strike "and" on line 23.

24  Haven't we had a form where we had been saying that we

25  are not adjudicating these rights inter sese?

18,300

P36

1    MR. SACHSE:  Mr. Girard's form in the so-called A Series

2    of judgments has been approved a lot of times.  I think we

3    might look at the same language again.

4    THE COURT:  We don't have that in here.

5    MR. VEEDER:  We have mutual quieting of title also, your

6    Honor, that is not in there.  In other words, a claimant of

7    vagrant, local, percolating water, by reason of his ownership

8    -- you talk about the language on that.  In other words, if

9    a man owns lands the ground waters of which are vagrant, local,

10   percolating, he can't claim any rights in the Santa Margarita

11   River by reason of that ownership.  It is a reciprocal matter

12   that should be written in there.

13   THE COURT:  That is in about line 10, ". . further adjudged

14   that no rights to the use of water of the River or its tribu-

15   taries exists from the ownership of the land containing vagrant,

16   local, percolating water".

17   MR. VEEDER:  Then you should go on to say that any claims

18   by reason of the ownership of those lands are quieted as

19   against the United States.

20   MR. SACHSE:  I think we might well consider in place of

21   this one paragraph, using the language we have approved in

22   half a dozen A Series of judgments.  He has a subparagraph

23   that says the rights of the United States of America and all

24   other parties in the action having rights in the surface and

25   ground waters of the River as herein adjudicated are quieted

P37

1 against the claims of these basement complex people, and vice

2 versa the rights of the basement complex people are quieted

3 against the claims of the United States and those having rights

4 in the River.

5 THE COURT:  Yes, I think we ought to use the form we have

6 approved.

7 The further paragraphs on the correlative riparian rights

8 are all right.

9 The issue of apportionment was not presented and not

10 decided.

11 Then we would have to have the clause that it is inter-

12 locutory.

13 MR. GIRARD:  Yes.

14 THE COURT:  We have to work that over.  But I would

15 suggest that we use the forms we have approved about mutually

16 quieting title.

17 What do we take up next?

18 MR. SACHSE:  We have either Vail or the enclave.

19 MR. STAHLMAN:  Vail, if you wish.

20 THE COURT:  You are not going to be here tomorrow?

21 MR. STAHLMAN:  I'll not be here tomorrow.

22 THE COURT:  Maybe we can get somewhere on it.  Go as far

23 as we can.

24 MR. SACHSE:  You haven't prepared any formal objections

25 to the Vail proposed findings, have you?

P38

1    MR. VEEDER:  No.  However, I will.

2    MR. STAHLMAN:  Why don't we wait until you have done that?

3    Then we will go through them twice.  If you have objections

4    to them and want time to prepare them, why not do that and then

5    take it up?  We can go into the Pendleton findings now.  We

6    would just be doing a double job.

7    MR. VEEDER:  I think if we would go through these and find

8    where the duplications are in connection with Murrieta findings

9    now we would make some time.

10    MR. STAHLMAN:  I will leave it to the Court.  However, he

11    has had these findings for some time now, and he has prepared

12    other objections.  If he wants to prepare written objections,

13    the only question I have in relation to it is that we would be

14    going through this twice.

15    THE COURT:  Well, we may be going through them two or

16    three times working these things over.  Let's go ahead on them.

17    MR. SACHSE:  I think a lot of the early part of it is

18    very routine.

19    MR. STAHLMAN:  Yes.

20    THE COURT:  I am reading along.  I'll tell you where I am.

21    If anybody has any suggestion, I am down to Paragraph III on

22    page 2.

23    MR. SACHSE:  I take Mr. Stahlman's word for it.  Mr. Veeder

24    can undoubtedly check them.  But I suggest that we jump over to

25    about page 9 where we start talking about the stream system in

18,303

P39

1  Temecula Creek, et cetera, and just quit worrying about the

2  title.

3      THE COURT:  Let me ask a question on page 4, Paragraph

4  X.  The Vail Company doesn't own all the Little Temecula, only

5  Lots 8 and --

6      MR. STAHLMAN:  That is right, your Honor, and that is

7  clearly shown on that Exhibit U.  I think possibly if we are

8  going to have any discussion on this we might get those ex-

9  hibits.

10      THE COURT:  Let's find out if Mr. Veeder is satisfied.

11  You apparently are satisfied?

12      MR. VEEDER:  The Office of Ground Water Resources has

13  run these out, as I comprehend, with Mr. Wilkinson, and there

14  is general agreement.

15      MR. STAHLMAN:  I gave Commander Redd a copy even before I

16  brought them down to San Diego.

17      MR. VEEDER:  I think there is no question now on locations

18  and matters of that nature.

19      The first markings I have made is on page 9(a).  Excuse

20  me, your Honor, if you are not that far on it.

21      THE COURT:  All right, 9(a).

22      MR. SACHSE:  That is Finding XXI(a).

23      THE COURT:  XXI(a).

24      MR. VEEDER:  Your Honor as used language in connection

25  with some of the proposals of California such as semi-confined

18,304

P40

1    aquifers and matters like that, that I think could be related

2    into XXI(a).

3        MR. STAHLMAN:  I think there are some findings here, in

4    the light of what we have done on the Murrieta findings, in

5    which there probably should be some small changes so as to

6    conform.

7        THE COURT:  Yes, I think that is true.

8        MR. VEEDER:  It is your desire to duplicate them in the

9    Vail Company finding.  That was one of the problems I wanted

10   to bring up.

11       MR. STAHLMAN:  My object in writing the Vail findings was

12   that we would have a complete set of findings that would refer

13   to the Vail Ranch, describe the streams and various conditions

14   of the geology and other hydologic factors that enter into a

15   finding as I think it would be.

16       MR. VEEDER:  I am not being critical, George.  I am hoping

17   for a composite set of findings that's all.

18       MR. STAHLMAN:  I would be perfectly willing, if you wanted

19   to reach conformity, to go over what we have now corrected on

20   the Murrieta findings and probably revamp these findings.

21       THE COURT:  That is what ought to be done with XXI(a),

22   in view of the work we have done on Murrieta ground water area.

23       I seem to have something missing.  After the end of page

24   9(a) it jumps.

25       MR. STAHLMAN:  Page 9(a) is probably in the wrong place.

1     MR. SACHSE:  You have to jump back to page 9(a).  Page 9,

2  Finding XXI, and that takes it over to page 10.

3     MR. VEEDER:  May I inquire, Mr. Stahlman, have you tendered

4  these to Mr. Krieger and also to Gibbon and Cottle?

5     MR. STAHLMAN:  Yes, I have tendered them to Mr. Krieger

6  because he asked for them.  If Gibbon and Cottle want them, I

7  will make a copy of them.

8     THE COURT:  Will you do that?

9     MR. STAHLMAN:  Send them to Gibbon and Cottle?  Mr. Krieger

10  has them.

11     THE COURT:  Send them to the counsel who have appeared for

12  the ranchers upstream of Vail in the watershed.

13     MR. STAHLMAN:  I'll be glad to do that.  Don't you think

14  it would be better after we get them worked over and corrected

15  to send them?  I don't think they will be here.

16     THE COURT:  If you want to get another draft of them out,

17  that's all right.

18     MR. STAHLMAN:  I could make copies.

19     THE COURT:  I would send them now, and you can later send

20  another copy.

21     MR. STAHLMAN:  All right, if that is what your Honor

22  desires, I will do that.

23     THE COURT:  On page 10(a) we have the same problem we had

24  with Murrieta Creek.

25     MR. STAHLMAN:  That is the same situation.

18,306

THE COURT:  On page 11 a minor matter at line 17.  "The Murrieta-Temecula 'Ground Water Area,'as found in Findings and Interlocutory Judgment No. 30 and made a part hereof, underlies the lands of Vail Company on the Santa Rosa Rancho in the area of Slaughterhouse Canyon . . "  It is a portion of the Murrieta-Temecula ground water area.

MR. SACHSE:  Yes.

MR. STAHLMAN:  On a portion of the Santa Rosa Rancho.  Is that it?

THE COURT:  No, a portion of the ground water area under-lying the lands on the Santa Rosa Rancho.

MR. STAHLMAN:  Yes.

MR. SACHSE:  Solely as a matter of clarity, what are we going to call Tucalota Creek?  Mr. Girard wrote it T-u-c-o, I wrote it the same way, and Mr. Stahlman has T-e-c-o-l-o-t-e. I think we ought to standardize this.

MR. WILKINSON: "Tecelote" means "owl."  But it has been misspelled so long that it has got to be "Tucalota," which means nothing except that it is on the map that way.

MR. SACHSE:  It is on the map T-u-c-a-l-o-t-a, on your 29 and 15 Series.

THE COURT:  Let's make it uniform.  Make it "Tucalota." Goodbye owl.

MR. VEEDER:  It means "owl" in what language?

MR. WILKINSON:  In Spanish.

P43

1    MR. STAHLMAN:  From there on these various creeks that

2    traverse the Vail property that are described as the main creeks.

3    We have added one that is not referred to here and that is on

4    page 13, and unnamed creek.  It is quite a sizeable creek,

5    although there is no name to it.

6    THE COURT:  Page 15, Paragraph XXX, we have also been over

7    this.  There should be some uniformity on this one.  What made

8    me notice it was the last sentence about the artesian waters

9    are not supported by the surface flow.  And this 500 feet, I

10   think the exhibit shows that one of those artesian wells is

11   less than 500 feet.

12   MR. VEEDER:  Are we going to have a specific finding on

13   that point, in view of Mr. Wilkinson's testimony that the

14   Windmill well was in fact, in a state of nature, an artesian

15   well with 130 foot perforations?

Belt 4    16   I am not going to argue it.  I am just wondering if we

17   are going to change it.

18   MR. STAHLMAN:  I also understand that some of these wells

19   were deeper than they are now.  I am thinking about the wells,

20   your Honor, referred to as the 500 foot.

21   THE COURT:  Vail's Exhibit BL shows that the headquarters

22   well is listed as 412 feet deep, but there is a note "By plumb

23   only.  Originally deeper".

24   MR. VEEDER:  But it is presently an artesian well, isn't

25   it?

•P44

1    MR. WILKINSON:  Yes, it is.

2    THE COURT:  It is just as easy to say in excess of 400

3  feet as it is to say 500.

4    MR. VEEDER:  I think 130 is more correct, isn't it?

5    THE COURT:  What?

6    MR. VEEDER:  We are talking about where they pierce the

7  artesian area, and the artesian area fluctuates, depending on

8  the quantity of water in the ground water table.

9    THE COURT:  The Windmill well is not a pumping well.  It

10  is 515 feet deep.  The perforations only go to 130 feet.  But

11  I take it the bottom of the hole is a perforation.

12    MR. VEEDER:  No, the bottom of the hole goes into bedrock,

13  doesn't it?

14    MR. STAHLMAN:  It is gravel-packed.

15    MR. VEEDER:  It is not a gravel-packed well.

16    THE COURT:  The point is that in the Windmill Well the

17  tube is open at the bottom end.  It doesn't have a cap on the

18  bottom.  So you actually have, in substance, a perforation on

19  the bottom.

20    MR. VEEDER:  I don't believe the record will support your

21  Honor's conclusion.

22    THE COURT:  I never heard of a well yet where you put a

23  cap on the end of the pipe at the bottom.

24    MR. VEEDER:  I don't know where the bottom of the pipe is.

25  That is the point.

P45

1    MR. STAHLMAN:  Do you want to treat that well in a separate

2 paragraph?

3    THE COURT:  If we treat it, we will treat it in a separate

4 paragraph.  We will group the irrigation wells together and

5 group the artesian wells together.  If you want to treat the

6 Windmill well, treat it in a separate paragraph.

7    MR. STAHLMAN:  Very well, we will make an exception to it

8 and treat it separately.

9    THE COURT:  What about the Windmill well, Mr. Wilkinson?

10 Do you know anything about whether there is a cap on the bottom

11 of the casing?

12    MR. WILKINSON:  Not to my knowledge, your Honor, but I

13 wouldn't know because it was drilled many years ago.  These

14 old artesian wells were drilled in 1903 and 1904 before the

15 acquisition of the Ranch by the Vail Company.

16    THE COURT:  Did anybody here ever hear of putting a cap

17 on the bottom of the well, even if you have perforations above?

18    COLONEL BOWEN:  I have heard of that, your Honor.

19    THE COURT:  You have?

20    COLONEL BOWEN:  Yes, sir; to seal off a poor quality of

21 water that might be encountered below fresh water.  However,

22 I am sure that is not the case here.

23    MR. VEEDER:  That is speculative and I move to strike it.

24    THE COURT:  Well, I have to go to a Rotary Club meeting.

25 Two o'clock.

    (Noon recess.)

P46

1   SAN DIEGO, CALIFORNIA, Thursday, October 26,1961, 2:00 P.M.

2       THE COURT:  We are down to about XXXII, the Vail Dam.

3       MR. STAHLMAN:  I might suggest that in that first para-

4   graph, if your Honor desires, it might be better if we put it

5   the elevation in relation to sea level.

6       THE COURT:  What is that?

7       MR. STAHLMAN:  Instead of the height of the structure

8   et cetera, we might use the elevation in relation to sea level.

9       THE COURT:  It doesn't make much difference, does it?

10      MR. STAHLMAN:  I don't think it does.

11      THE COURT:  XXXVI on the next page.

12      Mr. Veeder, have you any thoughts as we go along?

13      This one looks to me like it should be modified -- ". .

14  waters appropriated pursuant to said permit may be used on

15  Vail Company lands as described . . "  If I enter judgment

16  with a finding to that effect, without reservation, you can

17  go ahead and use all the water you catch in the dam.

18      MR. STAHLMAN:  If i haven't clarified it, your Honor, that

19  has reference only to the place to which the water may be

20  applied.  The permit does designate not the entire ranch but

21  certain parts of the ranch.

22      THE COURT:  Then say this:  The permit issued by the State

23  of California has a priority date and provides that the waters

24  appropriated.

25      MR. STAHLMAN:  Very well.

P47

1    THE COURT:  That is what you are trying to say.

2    MR. STAHLMAN:  Yes.

3    MR. VEEDER:  Isn't the place of use Pauba Valley?

4    MR. WILKINSON:  If I may say so, your Honor, Vail Company's

5    Exhibit A is improper here because it is Exhibit A of the

6    application.  It is not Exhibit A.

7    MR. STAHLMAN:  No, it is Exhibit A in this case.  I will

8    check it, however.  I am sure the application is Vail's Exhibit

9    A.  It has both of them in there.

10    THE COURT:  Exhibit A, Application to appropriate water

11    for the dam.

12    MR. STAHLMAN:  That's right.

13    MR. VEEDER:  I had proceeded on the basis, in reading that

14    finding, that the lands to which this appropriative right would

15    be applicable are the lands in Pauba Valley under your irriga-

16    tion system; that you were not permitted to use this water

17    elsewhere.

18    MR. STAHLMAN:  That is true, but --

19    MR. VEEDER:  I am not arguing it, George.

20    MR. STAHLMAN:  I am not either.  I am saying, Mr. Veeder,

21    that it designates by legal description the lands to which the

22    water may be applied, which essentially is in the Pauba Valley.

23    MR. VEEDER:  The alluvial plain.

24    MR. STAHLMAN:  Yes.

25    MR. WILKINSON:  Not entirely.

P48

1    THE COURT:  Well, this would be correct, "and the permit

2    provides that waters may be used on Vail lands as described

3    in this Application".

4    MR. STAHLMAN:  That is right.  The legal description is

5    in there, right in Exhibit A in this case.

6    THE COURT:  In other words, a permit was granted for all

7    the lands asked for in the Application.

8    MR. STAHLMAN:  That is right.

9    THE COURT:  So the Application gives the permit.

10   MR. STAHLMAN:  The permit makes reference to the Applica-

11   tion and both of them are an exhibit in this case.

12   THE COURT:  Line 19, XXXVIII, "as such rights"; I would

13   think it would be better to say "are in these proceedings

14   determined to exist".

15   MR. STAHLMAN:  Yes.  Very well.

16   THE COURT:  Line 23, "There have been at times waters in

17   Temecula Creek sufficient to provide appropriative right . ."?

18   MR. SACHSE:  To provide for the appropriative rights.

19   THE COURT:  To provide, in part, for the appropriative

20   rights.

21   MR. STAHLMAN:  No, I think, your Honor, there have in

22   the past been waters flowing that would have supplied the

23   40,000 acre feet.

24   MR. VEEDER:  Are you saying/in any one year?

            that

25   MR. STAHLMAN:  Certainly in any one year.  It has done

18,313

P49

1   it many times.

2       MR. VEEDER:  Since the period of record?

3       MR. STAHLMAN:  Yes.  The basis upon which the permit was

4   issued was all taken before the State Water Rights Board.

5       MR. VEEDER:  The greatest quantity of water that ever

6   went by the Vail Dam was, as I remember, in 1937-38 during

7   the period of record.  I am quite sure of that.

8       MR. STAHLMAN:  In 1916.

9       MR. VEEDER:  I said in the period of record.  There is

10  nothing in the record as to what went by in 1916.

11      MR. STAHLMAN:  The record in this case you mean?  I will

12  check it and see.

13      MR. VEEDER:  I am glad to have the Vail Company opening

14  up all these statistics in regard to runoff and quantities of

15  water, in light of my request.

16      MR. WILKINSON:  In the year 1926 -27 40,500.

17      MR. VEEDER:  Was there 40,000 in 1927?

18      THE COURT:  It doesn't mean a thing, Mr. Veeder.  The

19  fact that we may describe this dam, which is a physical

20  phenomenon, doesn't necessarily mean that we get into the

21  findings all the other things you want.

22      MR. STAHLMAN:  Take it out, if you want to.  I don't care

23  about it.

24      MR. VEEDER:  There is 12,500 acre feet greatest impound-

25  ment.

P50

1    MR. STAHLMAN:   That is in there in the findings.

2    MR. VEEDER:   That is what I am saying.   I am simply

3  bringing up the point that Vail Company thinks these statistics

4  are important.   So do I, and I think they should be complete.

5    MR. STAHLMAN:   Take it out, if you want to.   I don't care.

6    MR. VEEDER:   I don't want to take it out.

7    MR. SACHSE:   Your Honor's suggestion is still pertinent,

8  I think.   The thing is grammatically improper the way it is in

9  line 23.

10    THE COURT:   Yes.

11    MR. SACHSE:   Provide for the appropriative rights.   Re-

12  gardless of the merits, it is grammatically wrong the way it

13  is written.

14    MR. STAHLMAN:   Yes.

15    THE COURT:   What is the purpose of it anyhow?   The permit

16  has been issued.   The dam has been built.

17    MR. GIRARD:   I think the identical type of paragraph went

18  in on Fallbrook's Application.

19    MR. SACHSE:   I don't have it with me, but my recollection

20  is that it is very similar.

21    Your Honor said there have been at times in the past

22  waters sufficient to satisfy Fallbrook's permits, but you make

23  no finding that such condition would continue in the future

24  and you reserved continuing jurisdiction, et cetera.   I think

25  it is almost identical.   I don't think it has any great

P51

1    significance at all.

2         MR. STAHLMAN:  It is in the Fallbrook findings.

3         MR. SACHSE:  I am sure it is almost the same language.

4         THE COURT:  I suggest that we use the same language.

5         MR. STAHLMAN:  We used it in the Fallbrook findings.  That

6    is what I did -- I used Fallbrook's.

7         THE COURT:  If you are going to have it in there, it has

8    to be changed.  There have been, at times prior to the con-

9    struction of the dam --

10        MR. STAHLMAN:  That will make better sense.

11        MR. VEEDER:  Your permit is for 40,000 -- I want to be

12   sure that I am right in what I am saying -- and your capacity

13   is 49,000; isn't that right?

14        MR. STAHLMAN:  Plus something, yes.

15        MR. VEEDER:  49,000 --

16        MR. STAHLMAN:  500 acre feet.

17        THE COURT:  I would wager that if there was no other dam

18   on the River and we had a nice flood that would put in the

19   extra 9,500 acre feet, everybody downstream from the dam would

20   be pleased to have that extra 9,500 acre feet stored there,

21   even though the permit didn't allow for it.

22        MR. STAHLMAN:  Your Honor, the history in relation to the

23   engineering of that dam would show that it is filled on an

24   average of 6,000 acre feet per year.  That is what the runoff

25   figures show.

P52

1    MR. VEEDER:  No.

2    MR. GIRARD:  You would use that much on a firm basis.

3    MR. STAHLMAN:  No, Mr. Bookman has testified to that.

4    MR. VEEDER:  Look who is --

5    MR. STAHLMAN:  That is unimportant.

6    THE COURT:  Why bring it up?

7    MR. VEEDER:  The point I want to bring up on this matter,

8    and I want it clear, there have never been 49,500 acre feet

9    in any one year.  The most in two consecutive big years was

10   about 67,000 in 1937 and 1938.

11   MR. STAHLMAN:  So what?  We just built a bigger dam in

12   which we are going to catch water.  That is all that means.

13   MR. SACHSE:  The important factor is not the size of the

14   dam.  The State Permit doesn't control that.  The permit is

15   how much they can impound in any calendar year or any period

16   of time.  In the case of the Vail Company it is November 1 to

17   April 30th.  Vail can build under this permit a 100,000 acre

18   foot dam.  But the State Permit only permits --

19   MR. VEEDER:  But you have an inchoate right to 40,000

20   acre feet of water in any one year that you claim.

21   MR. STAHLMAN:  That is right.

22   MR. VEEDER:  And the only perfected right that you are

23   claiming is for 12,500.

24   MR. STAHLMAN:  That is right.  That is clearly set out in

25   the findings.

P53

Belt 5

1    MR. SACHSE:  That is the way I read it.

2    MR. GIRARD:  A perfected right is when you go to license,

3  and Vail hasn't gone to license yet.

4    MR. VEEDER:  I am saying that when you apply it to bene-

5  ficial use that is when you have a perfected right.

6    MR. GIRARD:  I don't think you are correct.

7    THE COURT:  We don't have to go into that now.  They have

8  not secured a license.

9    Line 22, "There have been at times prior to the construction

10  of the dam waters in the Temecula Creek sufficient to --

11    MR. VEEDER:  Equal to.

12    THE COURT:  -- to satisfy the appropriative rights.

13    MR. SACHSE:  Yes.

14    MR. VEEDER:  I don't agree on that, not to satisfy the

15  appropriative right.  In one year there was enough water to

16  equal the 40,000 acre feet covered by the permit.

17    MR. SACHSE:  I can't argue the facts.  I don't know

18  whether it was one year or two or three.

19    MR. VEEDER:  There was only one, and that was in 1927.

20  He is right on that.

21    THE COURT:  To satisfy --

22    MR. VEEDER:  To equal the amount covered by the permit.

23    THE COURT:  To equal the amount covered by the permit.

24  That is better.  All right.

25    MR. STAHLMAN:  I want to get this straight.  To satisfy --

P54

1    THE COURT:  To equal -- well, "equal" isn't good.  It is

2  to provide the 40,000 acre foot storage provided for in the

3  permit.

4    MR. VEEDER:  That is the essence of it.

5    MR. SACHSE:  Would you repeat that please, your Honor.

6    THE COURT:  Sufficient to provide the 40,000 acre feet

7  of annual storage -- strike out "appropriative rights of Vail"

8  and go down to the next line "as provided in the permit, as

9  set forth"-- strike out "above" -- "in the permit subject to

10  conditions therein contained".  This is the same thing adjudged

11  as to Fallbrook.

12    This is the same thing adjudged as to Fallbrook:  The

13  Court makes no finding as to the future.

14    ". . . such surplus waters will be available" instead of

15  "exists".

16    MR. VEEDER:  Did you say "There have been at times," your

17  Honor?

18    THE COURT:  Yes.

19    MR. VEEDER:  I think there has been at one time.

20    THE COURT:  Under the records here what is the fact?  Is

21  there more than once?

22    MR. VEEDER:  Only one year.

23    THE COURT:  I think you could almost assume that if at

24  one time in the past a measurement showed 40,000 acre feet,

25  at some time in the past over the centuries that have gone

18,319

P55

1. before there must have been another time when there was at
2. least 40,000 acre feet.
3.     MR. VEEDER:  But your Honor, to me it is extremely im-
4. portant that since 1923 through 1961 there has only been one
5. year when there was 40,000.
6.     MR. GIRARD:  Why is that so extremely important?
7.     MR. VEEDER:  Because the permit has been issued for
8. 40,000.  There has been only one time that it has ever been
9. available.  There has been no repetitious pattern.  And at
10. Vail Dam the average annual runoff since 1923 down through
11. 1960 was 10,500 acre feet.
12.     MR. STAHLMAN:  It is in the Fallbrook findings.  I don't
13. care.  Cut it out, if you want to, as far as Vail is concerned.
14.     MR. GIRARD:  Line 22 should be changed slightly.  You have
15. "There have been times prior to the construction of the dam
16. waters . . "  I think it should be "surplus waters".
17.     MR. STAHLMAN:  That's right.  I don't think there is
18. tremendous importance to it.
19.     THE COURT:  There was during at least one year.
20.     MR. VEEDER:  During the period of record.
21.     THE COURT:  There was at least one year during the period
22. of record keeping beginning in --
23.     MR. VEEDER:  1923.
24.     THE COURT:  -- 1923.
25.     MR. STAHLMAN:  What record are you talking about?

P56xxxx

1    MR. VEEDER:   I am talking about the U.S.G S. records

2    maintained at Vail Dam since 1923.

3    MR. GIRARD:   What year did you say it happened?

4    MR. VEEDER:   1927.

5    MR. GIRARD:   It also happened in 1915-16.

6    MR. VEEDER:   During the period of record.

7    MR. SACHSE:   I don't know where they got it; they show

8    57,000 runoff in 1915-16.

9    MR. VEEDER:   I am talking about measured record.   There

10   was never a measured record prior to 1923.

11   MR. STAHLMAN:   Cut it all out, if you want to.

12   THE COURT:   It doesn't make any difference.   There was

13   at least one year during the period of record keeping beginning

14   in 1923 when, prior to the construction of the dam, there were

15   surplus waters in Temecula Creek sufficient to provide, et

16   cetera.   That will do it.

17   MR. VEEDER:   Sufficient to provide what, your Honor?

18   THE COURT:   The 40,000 acre feet of annual storage as set

19   forth in the permit, subject to the conditions therein contained.

20   Is that right?   I don't know what difference it makes.   The

21   dam is built.   We certainly are not going to order it destroyed.

22   MR. SACHSE:   Mr. Veeder says are none.   Here is a tabula-

23   tion that goes back to 1894-95.

24   MR. VEEDER:   These are not maintained records.

25   MR. SACHSE:   Who says so?   Maybe they are not U.S.G.S.

'P57

1   records, but here is the tabulation from 1894 to date.

2        MR. VEEDER: I want to read how that was prepared before

3   I go any further.

4        THE COURT: What difference does that make? The dam has

5   been built. It is there. It is under a permit. We know that

6   at least one year even during the period of record there was

7   40,000.

8        MR. STAHLMAN: Every year that they don't get 40,000 it

9   is Vail's loss.

10       MR. VEEDER: That is pure speculation. This is what they

11  did when they were contemplating a 204,000 acre foot dam at

12  De Luz.

13       MR. STAHLMAN: The Government did it.

14       MR. VEEDER: I am talking about the period of record. Do

15  you agree with me on the period of record?

16       MR. GIRARD: No.

17       THE COURT: What do you mean by "period of record"?

18       MR. VEEDER: They began measuring water at Vail Dam in

19  1923.

20       THE COURT: That wouldn't necessarily be the only records

21  kept. There could have been records kept based upon calcula-

22  tions of an engineer who saw it at the time. It wouldn't mean

23  there wasn't a record.

24       I see no use to worry about it. There was at least one

25  year during the period of record keeping beginning in 1923 --

1    MR. VEEDER: All right.

2    THE COURT:  -- and prior to the construction of the dam

3  when there were surplus waters in the creek sufficient to

4  provide.

5    MR. STAHLMAN:  I'll bet if ask Colonel Bowen when they

6  are talking about building a dam at Camp Pendleton they are

7  going beyond these records in their determination.

8    MR. VEEDER:  Let's go ahead.

9    THE COURT:  Let's go ahead.  Pass this up.

10    Do you have the language there?  The Court makes no

11  finding that such surplus waters will be available in the future.

12    What is this last business doing in here?  You have your

13  permit already.  The last sentence isn't needed.  That makes

14  it look like the State Water Rights Board has something to say

15  about it.

16    MR. GIRARD:  I think they have.

17    THE COURT:  They had something to say about granting the

18  permit.

19    MR. GIRARD:  I think they would be the ones, for example,

20  to revoke Vail's permit, to limit Vail's permit.

21    MR. STAHLMAN:  They are the people we have to prove up to.

22    MR. GIRARD:  If you don't prove up to it, I think this is

23  the same thing as Fallbrook.

24    MR. STAHLMAN:  I took this particular paragraph right out

25  of Fallbrook's.  This particular paragraph is plagiarism.

P59

1    THE COURT:  All right, any suggestions?

2    What is the purpose of XLI?  That is not necessary.

3    MR. VEEDER:  It is incorrect to begin with.

4    MR. STAHLMAN:  Let's take one thing at a time.

5    THE COURT:  What is the purpose of it?

6    MR. STAHLMAN:  There is evidence in the record regarding

7    the evapotranspiration losses.

8    THE COURT:  But why is it needed now?  This is the same

9    sort of thing that Mr. Veeder was trying to put in.

10   MR. STAHLMAN:  Take it out.

11   MR. SACHSE:  I have a question mark on it myself.  I don't

12   think it adds anything.

13   MR. STAHLMAN:  Take it out.

14   THE COURT:  Out it goes.

15   MR. GIRARD:  It would be considered in an apportionment

16   proceeding is all.

17   MR. STAHLMAN:  Take it out.

18   THE COURT:  You say in XLII "Waters . . . are metered . .

19   and then you say "waters are measured . . "

20   MR. STAHLMAN:  Yes, your Honor.  It is metered at the dam,

21   and it is measured over a weir.

22   MR. VEEDER:  Doesn't a meter measure?

23   MR. STAHLMAN:  It is two places.

24   MR. VEEDER:  I am not being critical.

25   THE COURT:  Why not use the word "measured" each time?  Is

P60

1   there an actual meter at the dam?

2       MR. STAHLMAN:  There is an actual meter there, and there is

3   a weir at the other place.  I made the distinction.

4       THE COURT:  All right, then there is a distinction.

5       MR. SACHSE:  XLIV I don't see much sense to.

6       MR. STAHLMAN:  XLIV is probably in the same category.

7       THE COURT:  Yes.

8       However, on page 19, line 9, ". . not withstanding the

9   efforts of Vail Company . . to conserve waters . .  In the

10  water years 1951 and 1957, 78,000 acre feet of water was wasted

11  . . . "  First of all, does that 78,000 apply to the total of

12  those two years?

13      MR. STAHLMAN:  Yes.

14      THE COURT:  Or was that the waste each year?

15      MR. STAHLMAN:  That is the two years.

16      THE COURT:  Secondly, this was flood waters running into

17  the stream below Vail Dam then?

18      MR. STAHLMAN:  That is right.

19      THE COURT:  Below Vail Dam.

20      MR. STAHLMAN:  Yes.

21      MR. VEEDER:  They tried to get the dam down there to catch

22  it and they didn't move fast enough.

23      THE COURT:  First, I don't know whether we are going to

24  leave it in or not.  But strike out, "However, not withstanding

25  the efforts of Vail Company and others to conserve waters of

18 325

1   the stream system, during periods of heavy precipitation . . "

2   The only material thing, if you use it, would be "In the water

3   years of 1951 and 1957, a total of 78,000 acre feet of water

4   was wasted into the Ocean at Ysidaro."  The only reason I

5   would leave it in at all would be to put a barb into some of

6   these experts in Washington who are looking at this picture

7   and emphasize the need for a dam downstream to catch this

8   water.  Obviously none of the water spilled over Vail Dam that

9   year.

10      MR. STAHLMAN:  That is true.

11      THE COURT:  And this water all entered the stream system

12   below the dam.

13      MR. VEEDER:  1952 and 1958, to begin with, if you want to

14   consider water years.  I don't agree with the findings.

15      MR. STAHLMAN:  Doesn't start in 1951?

16      MR. VEEDER:  No.

17      THE COURT:  You used the water years 1952 and 1958.

18      MR. VEEDER:  I don't like the word "wasted".  Couldn't

19   you say "entered the ocean".

20      MR. GIRARD:  No.

21      MR. STAHLMAN:  I think it is wasted.

22      MR. VEEDER:  I was attempting humor.

23      THE COURT:  Strike out what I have indicated and let line

24   11 read, "In the water years 1952 and 1958 a total of 78,000

25   acre feet of water entering the stream below Vail Dam was

P62

1  wasted into the ocean at Ysidaro."

2  MR. SACHSE:  Is this on line 18 a misprint, this first

3  word -- "borders."

4  MR. STAHLMAN:  Yes, borders.

5  MR. VEEDER:  Where?

6  MR. SACHSE:  Line 18, the first word is misspelled; it is

7  "borders,"

8  MR. STAHLMAN:  That's right.

9  THE COURT:  Any comments?  I am up to LII now.

10  MR. VEEDER:  I don't believe it is correct to say that

11  35 or 40 per cent of the waters which are used is not consumed

12  but reaches the underground waters of the area which add to

13  and support the Santa Margarita River system.  That is on LII.

14  MR. SACHSE:  Is your disagreement with the percentage, or

15  are you disagreeing with the finding at all?

16  MR. STAHLMAN:  That has been the testimony in the case.

17  MR. VEEDER:  The point of it is, as I think and I think

18  the evidence will show it, that when Vail Company irrigate

19  their land, particularly the upper outwash area and other

20  highly porous areas, 35 to 40 per cent probably enters the

21  ground water and is again used, and so your 35 to 40 per cent

22  is extremely high.  And as written the 35 to 40 per cent sounds

23  as if it would enter Temecula Gorge and flow on down to the

24  lower users.  I don't think it is right.

25  MR. STAHLMAN:  If you want to put in some other language.

P63

1   You have no figures as to what the real use is, et cetera.  If

2   you say it gets down to the bottom, it may be that the well

3   lower down will pump it out.

4        THE COURT:  This is an issue that would come up on

5   apportionment.

6        MR. STAHLMAN:  Yes, your Honor.

7        THE COURT:  There would be no objection to a general

8   statement that this water use -- as to amount this would be an

9   issue that would come up on apportionment.  Presently we are

10  not concerned with amount.  If we are going to use it at all,

11  it would seem to me that merely a statement that a portion of

12  the waters used by Vail reaches the underground water and adds

13  and supports the River system.

14       MR. VEEDER:  I certainly don't want it to appear, and I

15  don't believe it is correct to say, that 35 to 40 per cent of

16  the pumped water and released water is return flow that goes

17  through the Gorge.  And that is how it reads to me.

18       MR. STAHLMAN:  It doesn't read that way to me.

19       THE COURT:  What is your view?

20       MR. GIRARD:  I would more or less concur.  If you are

21  going to have anything at all, it is not necessary to have any

22  statement that return flow occurs.  However, if you are going

23  to knock out the percentages, which are basically evidence,

24  and just say that portions of the water applied to the land in

25  effect return, I think you ought to say and all other defendants,

1   too.

2       MR. STAHLMAN:  It doesn't apply to all other defendants.

3   It has only been directed to Murrieta Valley and it was

4   specifically testified.

5       MR. SACHSE:  We generally know that most people irrigate

6   there is some return flow.

7       THE COURT:  Let's take it out.

8       MR. VEEDER:  I will also say this, that Vail's operations

9   dry up the creek most of the year.

10      MR. STAHLMAN:  There is no necessity for that remark.  You

11  have repeated that dozens of times and you are getting it into

12  this record for some future purpose.

13      MR. VEEDER:  You bet I am.

14      THE COURT:  It is just a statement of Mr. Veeder.  It is

15  not evidence in the record.

16      MR. SACHSE:  I would feel as Mr. Girard says; I think the

17  percentages would be an error -- to have a fixed percentage.

18      THE COURT:  Let's take the whole paragraph out.

19      MR. SACHSE:  Either eliminate the whole paragraph, or

20  if it is important to have it in say that we know that there

21  is a portion of return flow.

22      MR. GIRARD:  If you say there is a portion of return flow,

23  I think then Vail is entitled -- if it is relevant for that

24  purpose -- to the percentage that the evidence establishes.

25  The whole thing ought to go out or be based on the evidence.

1    THE COURT:  We are not concerned with the return flow.

2  That is a matter of apportionment.

3    MR. GIRARD:  That is right.

4    THE COURT:  Take out the whole paragraph.  It is obvious

5  that in the cases of users in this watershed, with the exception

6  possibly of some in Domenigoni, some in Anza and the United

7  States, there must be some return flow from all of them.

8    MR. STAHLMAN:  There is, your Honor.  However, I think it

9  reaches its maximum in those riverbed valleys, like up in

10  Murrieta -- we had testimony on it, and we had testimony on

11  Vail.  But I am not quarrelling about it.

12    THE COURT:  Page 21.  What is this reference to, "Such

13  structures are of the character as more fully described in

14  Finding No. ____. . "?

15    MR. SACHSE:  That is the one you signed also on

16  Miscellaneous Impoundments.

17    THE COURT:  It is not a finding; it is a description.

18    MR. SACHSE:  It is an interlocutory judgment.

19    MR. GIRARD:  In the findings attached to Interlocutory

20  Judgment so and so.

21    THE COURT:  In Finding____ of Interlocutory Judgment ____.

22    MR. GIRARD:  Is that 25?

23    MR. SACHSE:  I can't recall.

24    MR. STAHLMAN:  Yes, 25, I am quite sure.  I have a list

25  of them right here.

P66

1    THE COURT:  No, 25 is the stipulated judgment.

2    MR. STAHLMAN:  That is why I thought of that, I guess. 28.

3    THE COURT:  28, Miscellaneous Surface Impoundments.

4    I don't know whether you just refer to 28 alone, or if

5    there are particular sections.  I don't care about that --

6    whatever you do.

7    Page 22, Riparian Status.  When you say, "Lands of the

8    Vail Company in the Pauba, Little Temecula, and Temecula

9    Rancho  . . are riparian to Temecula Creek," do you mean all

10   the lands in those?

11   MR. STAHLMAN:  Yes, your Honor, they are all riparian, and

12   then the description of them is set out in the findings designa-

13   ted above.

14   THE COURT:  Then all lands of the Vail Company in these --

15   it should be "All lands" then.

16   MR. STAHLMAN:  No, because there are other lands down

17   here that have lost their riparian status.

18   THE COURT:  The first line of the paragraph should read,

19   "All lands of the Vail Company in the Pauba, Little Temecula

20   and Temecula . . are riparian . ."

21   MR. STAHLMAN:  Right.

22   THE COURT:  "All lands of the Vail Company in Temecula

23   Rancho --

24   MR. STAHLMAN:  That is correct.  I get it.

25   THE COURT:  That doesn't follow either, because you have

P67   1   Temecula Rancho here riparian both to Temecula --

2   MR. STAHLMAN:  They are.  That is the situation that exists.

3   You see, we are riparian to the main stream.  However, when

4   you go back to your other findings, when you get to your

5   descriptions, it is a different area.  The one area is riparian

6   to the main stream.

7   THE COURT:  The simple thing to do would be to say, "The

8   lands of the Vail Company described in Findings _____ shows

9   that part of the Little Temecula Rancho described in Findings

10   ____ are riparian to Temecula Creek, that part of the lands of

11   Vail Company in Temecula Rancho described in Findings ____ are

12   riparian to Murrieta Creek".

13   MR. VEEDER:  Which riparian rights are illusory.  Aren't

14   you going to say that?

15   MR. STAHLMAN:  That doesn't quite do it, your Honor.

16   THE COURT:  Let me ask you again.  Is all of the Pauba

17   riparian to Temecula?

18   MR. STAHLMAN:  Yes, your Honor.

19   THE COURT:  The Little Temecula?

20   MR. STAHLMAN:  Yes, your Honor.

21   MR. WILKINSON:  No, the Pauba is not all.

22   MR. STAHLMAN:  The corner is out of the watershed.  That

23   is why when you make reference to these maps it clarifies it.

24   THE COURT:  This ought to be a simple matter for you to

25   solve some way.

P68

Belt 6

1    MR. STAHLMAN:  I think so.

2    THE COURT:  To describe what streams your land is riparian

3    to.  If you have to break down your paragraphs of legal

4    descriptions, break them down again some way.

5    MR. STAHLMAN:  We can do that.

6    THE COURT:  So that you can either use reference to those

7    lands described in Finding ___ are rights of such and such a

8    character --

9    MR. STAHLMAN:  Mr. Wilkinson made this suggestion -- I

10   think it will do it:  Say that all land of the Vail Company in

11   the Pauba, Little Temecula and Temecula Ranchos within the

12   watershed area or drainage area of the watershed are riparian

13   to Temecula Creek.

14   THE COURT:  By "within the watershed" you mean of Temecula

15   Creek?

16   MR. STAHLMAN:  Of Temecula Creek, yes.  Then you would

17   have it.

18   THE COURT:  What do you think of that?

19   MR. SACHSE:  Frankly, your Honor, I wasn't paying

20   attention.  I was looking ahead.

21   THE COURT:  The suggestion was that all those lands of

22   the Pauba Grant within the watershed of Temecula Creek are

23   riparian.

24   MR. SACHSE:  I think that is the fact.  That is very clear

25   and simple.

18,333

P69

1   MR. VEEDER:  Are we going to delineate those subwatersheds

2   in some manner?

3   THE COURT:  They have been.

4   MR. SACHSE:  Mr. Stahlman's map does.  That is what I had

5   in mind.  If this map is attached, it is really solved.

6   MR. VEEDER:  Colonel Bowen is presently working on a

7   composite map that would do the whole thing.

8   MR. STAHLMAN:  Then we can maybe refer to that map.

9   MR. GIRARD:  I think it is helpful, with Vail having as

10  much land as they have in separate grants, to have them depicted

11  on a map.

12  MR. VEEDER:  I would like very much to see that depicted

13  on this composite map.

14  MR. STAHLMAN:  I don't care which map you use.  We can use

15  this same language.

16  MR. VEEDER:  You are not in disagreement if Colonel Bowen

17  goes ahead with his map.

18  THE COURT:  We can talk about the map later.

19  Is the watershed line shown on this?

20  MR. STAHLMAN:  Yes, here is the watershed line here between

21  Pauba and Santa Gertrudis.

22  THE COURT:  Is this the watershed line here?

23  MR. WILKINSON:  Yes, your Honor, that is drainage into

24  the main stem of the Santa Margarita.

25  MR. STAHLMAN:  We come to that later on.  We use the same

18,334

P70   1   language.

2         THE COURT:   Is this the watershed line here?

3         MR. WILKINSON:   That is right, your Honor.   Part of it

4   drains to Murrieta, part of it drains to De Luz, and part of

5   it drains to Sandia.

6         THE COURT:   What base was used for these maps?

7         MR. WILKINSON:   This is a shrunken U.S.G.S. base, your

8   Honor.

9         MR. VEEDER:   Is this the 29 Series?

10        MR. STAHLMAN:   The only purpose I had in mind, really, on

11   this was as a convenience for the interpretation of the findings.

12   However, if Colonel Bowen is going to make a map to show these

13   watersheds --

14        MR. VEEDER:   I think it should be done.   We can run out

15   the subwatersheds as we have done on our over-all map.

16        MR. STAHLMAN:   That is good.   We could use this same

17   language.

18        THE COURT:   Maybe the map will be used, maybe it won't.

19   Let's get one thing at a time.   Is there any objection to using

20   this map at this time?

21        MR. VEEDER:   I have no objection at this time.   I think

22   it is a very good map.

23        THE COURT:   All right, mark it Vail's BM.   If there is

24   no objection, Vail's BM will be received in evidence and you

25   may refer to it in these findings.

P7k

(The map above referred to was marked )
(Vail Company's Exhibit BM for identi-)
(fication, and received in evidence.  )

THE COURT:  Then you could say that the lands in the Pauba

Grant within the subwatershed of the Temecula as shown on Vail's

Exhibit BM are riparian to Temecula.

MR. STAHLMAN:  Yes.

THE COURT:  You work this over  again.

MR. STAHLMAN:  Yes, your Honor, I shall do.

THE COURT:  Beginning at line 18, on page 22, "Lands of

the Vail Company in the Nueva portion . . "  Nueva portion of

what?

MR. STAHLMAN:  And in the Nueva portion of the Murrieta

Tract of Santa Rosa Rancho.

THE COURT:  ". . are riparian to . . " And then you list

about six creeks.

MR. STAHLMAN:  They are riparian to these creeks.  They

are riparian to Murrieta, Slaughterhouse, Cole Canyon, Miller

Canyon and De Luz Creek within the watersheds of said creeks.

THE COURT:  This is up in the Santa Rosa?

MR. STAHLMAN:  Yes.

THE COURT:  You could refer to the map.  The map shows

it.

MR. STAHLMAN:  Yes, I will do that on all of these, your

Honor.

MR. WILKINSON:  It does not show the Murrieta portion or

P72

1    Nueva portion.

2        MR. STAHLMAN:  However, our findings that we are making

3    set out the legal descriptions of the Nueva and the Murrieta

4    Tract and the Vieja portion of the Ranch -- at line 23.

5        THE COURT:  Page 23, line 9, "shown on U.S. Exhibit ____

6    and determined in Finding ____ . . "  You are referring to

7    Interlocutory Judgment 30?

8        MR. STAHLMAN:  We made an exhibit here.

9        THE COURT:  I am talking about the riparian status which

10   is shown on Exhibit ____ and determined in Finding ____ here,

11   or a finding in some other interlocutory judgment?

12       MR. STAHLMAN:  No; it is a finding herein.

13       MR. WILKINSON:  We were assuming that there would be

14   something on that area when these were written, your Honor.

15       MR. STAHLMAN:  I don't think there is a finding on it yet,

16   but there will be.

17       MR. VEEDER:  Are you claiming that Santa Rosa is riparian

18   to the Santa Margarita River, the main stem?

19       MR. STAHLMAN:  Certainly portions of it are.

20       MR. VEEDER:  No; to the tributaries, but not on the main

21   stem.

22       MR. STAHLMAN:  It is on the main stem certainly.  Your

23   own exhibits show it.

24       THE COURT:  Some of it.  Look at the map.

25       MR. VEEDER:  Where?

P73

1    MR. STAHLMAN:   There is another map that shows it.

2    MR. WILKINSON:   U. S. Exhibit 70.

3    MR. STAHLMAN:   We can get Exhibit 70, if that concerns

4    you.

5    MR. GIRARD:   I think you ought to get worked up over it

6    one way or the other -- a little bit of water running over

7    some rocks.

8    MR. VEEDER:   I have been watching George for quite a while.

9    MR. SACHSE:   It is about as steep as it can get.

10   MR. STAHLMAN:   And there is a big bluff there.

11   MR. VEEDER:   It really intersects.   I didn't know.

12   THE COURT:   Somewhere up in here it touches the Murrieta.

13   MR. STAHLMAN:   Yes, up at that end.

14   MR. VEEDER:   I am talking about the main stem.

15   THE COURT:   Where did the Grant go?   To the center of

16   the stream?   This is not part of it?

17   MR. STAHLMAN:   No.

18   THE COURT:   It hits in that one place right there.

19   MR. WILKINSON:   I don't know whether it hits or not, your

20   Honor.

21   MR. VEEDER:   I didn't think it did hit it.

22   MR. STAHLMAN:   Get your Exhibit 70.

23   MR. GIRARD:   The aerial photographs showed it exactly.

24   COLONEL BOWEN:   That Grant line is shown as the approxi-

25   mate boundary.

P74

1    MR. VEEDER:  Colonel Bowen just made a statement about the

2  survey data.  There is a survey being conducted by Riverside

3  and San Diego Counties to establish more definitely this line.

4  Whether they come down to this part or not I don't know.  I

5  doubt it.

6    THE COURT:  Well, gentlemen, check up on that and check

7  up on Exhibit 70.

8    MR. VEEDER:  We are going to have to check out whether

9  it is riparian to the Santa Margarita River -- the Santa Rosa

10  Grant.

11    THE COURT:  Are you going to check it now or later?

12    MR. VEEDER:  I would rather check it later, myself.

13    THE COURT:  You have a finding in here that all your land

14  is riparian.  Do you want to have a finding also that some of

15  your land is overlying?

16    MR. STAHLMAN:  I have that further down.  That is in there.

17    MR. VEEDER:  Are you going to put in "illusory"?

18    THE COURT:  You gentlemen will have to check out these

19  various figures on the irrigable acreage.

20    MR. SACHSE:  We were just talking about it.  Mr. Stahlman

21  also agreed that when we arrive at our decision as to how we

22  are going to handle this res adjudicata-prima facie problem on

23  Murrieta Creek the same language should go in here.

24    MR. STAHLMAN:  Yes.

25    MR. SACHSE:  We were discussing page 23.  So this whole

P75

1   section on irrigable acreage is going to be subject to revision

2   based on what we do on Murrieta.

3   THE COURT: Page 24, line 31, I can't understand this:

4   "Lands of the Vail Company on the Santa Rosa Rancho, within

5   the drainage of Sandia Creek and the Main Stem of the Santa

6   Margarita River . ."

7   MR. STAHLMAN: Yes.

8   THE COURT: What do you mean by that?

9   MR. VEEDER: That is just what we were talking about,

10  whether they are riparian to the Santa Margarita River.

11  MR. STAHLMAN: In other words, this land through here,

12  which is this portion which is, we contend, riparian.

13  THE COURT: I am talking more about your language. You

14  say "within the drainage area of Sandia Creek" I understand

15  that. Do you mean "and within the Main Stem"? What is the

16  reference to the "Main Stem"? And adjacent to the main stem?

17  MR. STAHLMAN: Yes, adjacent to the main stem.

18  THE COURT: Within the drainage area of Sandia Creek and

19  adjacent to or bordering on.

20  MR. SACHSE: No, I don't think that is what he means.

21  I think what you mean is within the drainage area of

22  Sandia and the drainage area of the main stem. There is a

23  distinction. It shows very clearly on the larger scale map.

24  Parts of that drain straight into the River, not via Sandia

25  Creek.

P 76

1     MR. VEEDER:  I would like to have Colonel Bowen make the

2  statement into the record that he just made to me in regard to

3  that 13,771, if that is permissible.

4     THE COURT:  What is that, Colonel?

5     COLONEL BOWEN:  This Finding XLIV simply gives the total

6  area within the Santa Rosa Rancho which is within the drainage

7  area of Sandia Creek and the minor tributary drainage directly

8  to the Santa Margarita River which lies easterly of Sandia

9  Creek.  That was the way we made our report to the Vail Company.

10     THE COURT:  In other words, this is correct then?  The

11  major portion of this is the drainage into Sandia Creek?

12     COLONEL BOWEN:  Yes, your Honor.

13     MR. STAHLMAN:  That is correct.

14     MR. VEEDER:  And the rest of the drainage are small arroyos

15  into the main stem, is that what you mean -- or unnamed tribu-

16  taries?

17     MR. STAHLMAN:  If you read it further, "within their

18  respective watersheds to said creek and river.  Contained

19  within said lands there are (and now you get to your irrigable

20  acreage) 2,674 acres . . "  I think it is clear enough.  We

21  are talking about some really illusory rights there anyway.

22     MR. VEEDER:  Did that get into the record?

23     THE COURT:  On page 25, I am trying to understand these --

24  Overlying Status.  "Vail Company lands of the Pauba Rancho . . "

25     MR. STAHLMAN:  ". . within the exterior boundaries of the

P77

1   Murrieta-Temecula and the Temecula Creek subwatershed above

2   Vail Dam ground water areas as shown on U.S. Exhibits _____

3   and ____. .."

4        THE COURT:  What is "above Vail Dam ground water areas"?

5   I don't understand that.  That doesn't make sense.

6        MR. VEEDER:  He is talking about the Aguanga ground water

7   area.

8        Aren't you, George?

9        MR. STAHLMAN:  Yes, the Aguanga.  You could say Aguanga.

10  I think that would clarify it.  It is shown on that exhibit.

11       THE COURT:  We have never talked about a Vail Dam ground

12  water area.  You are talking about the Aguanga area.

13       MR. STAHLMAN:  It divides Vail Dam.  It is all lands of

14  the Vail Company above Vail Dam as differentiated from Vail

15  Company lands below the dam.  You recall that map.  The line

16  goes right through the dam.

17       Is that right?

18       MR. VEEDER:  It extends from each end of the dam.

19       MR. STAHLMAN:  Yes, and it goes right through the dam.

20  The dam is a dividing line.

21       MR. VEEDER:  The surface water divide, isn't it?

22       MR. STAHLMAN:  Yes.

23       THE COURT:  It is only a matter of form and understanding

24  what you have.  I have no objection to the form.

25       MR. STAHLMAN:  I think when we put the exhibit numbers in

18,342

P78

1    that it will clarify it.

2         THE COURT:  LXIX.

3         Well, generally, I think we have a good starter.  What

4    other matters should be covered that aren't covered?  Con-

5    clusions of law?

6         MR. STAHLMAN:  Your Honor, the conclusions of law I would

7    like to go over.  I have merely outlined them.  It won't be

8    much of a job.

9         THE COURT:  Does anybody think of any major subject matter

10   that ought to be covered in the Vail Findings?

11        MR. STAHLMAN:  I don't think there is any necessity in

12   these findings to make reference to the stipulated judgment.

13   That is already in the interlocutory decree.

14        MR. VEEDER:  Are you going to estimate your acreage within

15   the Murrieta-Temecula ground water area?  You are not.  Did

16   you hear what I said?  Are you going to calculate the acreage

17   of the Vail Company holdings within that Murrieta ground water

18   area?

19        MR. STAHLMAN:  What would be the purpose of it?

20        MR. VEEDER:  I don't know.  I see you have all these

21   references to it.  You have quite a number of sections in there.

22        MR. STAHLMAN:  You can look at the map and see where the

23   land is that is overlying upon which you can apply water.

24        MR. SACHSE:  The only virtue I can see to it, again, would

25   be as a cataloguing.  That would possibly assist you, Mr. Veeder.

P79

1    I don't think it is necessary in the findings.

2        THE COURT:  I don't think we can go any further on Vail

3    today.

4        We will take up this enclave matter after a short recess.

5        (Recess.)

6        MR. VEEDER:  Your Honor, we are at the point where I would

7    like to have some more instructions in regard to what you want

8    put on 15-E and 15-L.  We have the exhibits here and we have

9    Mr. Kunkle here.

10        THE COURT:  I want the watershed line and I want the water

11   divide.  You have on E and L the so-called ground water divide

12   -- the temporary water divide, as I recall.

13        MR. VEEDER:  We have a temporary water divide there.

14        MR. GIRARD:  On 15-L.

15        THE COURT:  That is on 15-L also.

16        I would like the natural ground water divide and the

17   watershed line.  That is all we need.  You can do them at your

18   leisure.

19        MR. VEEDER:  You say the "natural ground water divide."

20   Is that the term you used?

21        THE COURT:  What we call in the findings the ground water

22   divide in a state of nature, which is fairly close to the sur-

23   face divide.

24        MR. VEEDER:  Your Honor, I will say this, that from our

25   standpoint, from the standpoint of the United States, when that

P80

1    goes on it will carry the connotation and the implication, and

2    I will ask for a finding to the effect, that that shows the

3    course of the ground water after it enters the alluvium as

4    distinguished from following identically down the stream course.

5    Now you disagree with me on it.  But when Mr. Kunkle puts that

6    on I am sure that that is what he has in mind in drawing the

7    line.

8         If that isn't correct, say so, Mr. Kunkle.

9         MR. KUNKLE:  That is correct.  Also, if I put it on the

10   contours of 15-E it will actually be the divide as of the

11   autumn of 1959.  If I would put it on the one for the contours

12   of 1953, it would be as of that date.

13        MR. STAHLMAN:  That raises this question.  If you are

14   going to put in your natural water contour line, I mean your

15   natural divide, and you are going to use these water contour

16   lines, you can't do it on these; you will have to go back to

17   a map which will show what they were in the original state of

18   nature.

19        MR. KUNKLE:  We have no such map.

20        MR. GIRARD:  Why can't you put it on what you think it

21   would be in a state of nature?

22        MR. VEEDER:  With the implications he has in mind.

23        THE COURT:  Let's forget about implications, what he has

24   in mind.  Many of these wells are in the older alluvium.

25        MR. STAHLMAN:  Wouldn't it be sufficient if you said that

P81

1   the exact determination of the natural water divide cannot

2   be determined but that it approximately follows the natural

3   ground water contour?

4        THE COURT:  Is that correct, Mr. Kunkle?  I think that is

5   what you testified.

6        MR. KUNKLE:  In general they would closely.

7        MR. STAHLMAN:  Why wouldn't that be sufficient for a

8   finding?

9        MR. VEEDER:  If you put the line on, I would like to have

10  that written in as a legend on the exhibit.

11       THE COURT:  What?

12       MR. VEEDER:  What you have just said.

13       MR. STAHLMAN:  You wouldn't have to put it in.  You would

14  just merely say it was there and followed.

15       THE COURT:  I wouldn't mind if you put it on as a legend.

16       MR. SACHSE:  Why put it on if the finding recites that in

17  a state of nature the surface divide and the ground water divide

18  are approximately the same?

19       MR. VEEDER:  I just want it clear, though, from our

20  standpoint, what it would mean.

21       THE COURT:  That is all right.  We are talking about in

22  a state of nature.  Put the watershed line in between the two

23  subwatersheds.  Then in our findings we will say -- we'll have

24  to revise XXXV.

25       MR. GIRARD:  No, we won't have to revise XXXVI at all.

P82

1        THE COURT:  That the ground water divide closely approxi-
2   mates the watershed line.  Then we have the other finding that
3   talks about this temporary water divide that you found on the
4   north.

5        MR. KUNKLE:  At the present time on Mr. Veeder's copies
6   of the old series I have the divide shown -- it has been
7   checked out by Colonel Bowen and Mr. Wilkinson -- the 29 Series,
8   29N, 29K and 29O.  The watershed divide based on the land
9   surface contours have been drawn in.

10       THE COURT:  Just a matter of transposing them.

11       MR. KUNKLE:  Just a matter of transposing them.

12       THE COURT:  From the 29 Series to 15-E and L.

13       MR. KUNKLE:  I might, incidentally, add this has been
14  checked out with Colonel Bowen.

15       THE COURT:  All right, do it that way.

16       MR. VEEDER:  In other words, it is all right with you,
17  George.  You won't be here tomorrow.

18       MR. STAHLMAN:  Yes.

19       THE COURT:  We are taking up what -- the Enclave?

20       MR. GIRARD:  This is the first one that has been submitted.

21       MR. VEEDER:  Your Honor, there is a matter that I desire
22  to bring to your attention.  I received a copy of these --

23       THE COURT:  What are "these"?

24       MR. VEEDER:  Proposed findings regarding the Military
25  Enclave.  I have considered them.  I of course will not agree

P83

1   them.   But there is a more important factor.   I find now that

2   a copy did not go to Colonel Bowen's office and that he has

3   never seen them.

4   THE COURT:   Let's take them up tomorrow morning.   I have

5   other things to do.

6   MR. VEEDER:   I think it would be better for the Colonel.

7   MR. GIRARD:   I have never sent any copies of the drafts

8   that I have sent to the Colonel.   I'll be happy to do so, if

9   requested.

10   MR. VEEDER:   The point I am making, I didn't know they

11   hadn't gone to  Water Resources or that he hadn't received

12   them.   I don't to delay it.

13   MR. SACHSE:   We will probably work faster if the Colonel

14   has a chance to look them over.

15   THE COURT:   Will you have a chance to look them over to-

16   night?

17   MR. GIRARD:   You can take my copy.

18   COLONEL BOWEN:   Yes, your Honor, I will look at them

19   tonight.

20   THE COURT:   I had to read these things at night.   They

21   came in at the end of my vacation.   I read them Sunday night

22   or Monday night, one or the other, before this started.

23   MR. VEEDER:   I think it is important.

24   THE COURT:   Let's adjourn then until ten o'clock tomorrow

25   morning.

(Adjournment until Friday, Oct. 27, 1961, at 10:00 A.M.)

P84

1        IN THE UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF CALIFORNIA

3        SOUTHERN DIVISION

4        - - -

5    UNITED STATES OF AMERICA,        )
                                      )
6                       Plaintiff,    )
                                      )              No. 1247-SD-C
7    vs.                              )
                                      )
8    FALLBROOK PUBLIC UTILITY         )
     DISTRICT, et al.,                )
9                                     )
                                      )
10                      Defendants.   )
     _____

11              CERTIFICATE OF REPORTER

12        I, the undersigned, do hereby certify that I am, and

13   on the date herein involved, to wit:  October 26, 1961, was

14   a duly qualified, appointed and acting official reporter of

15   said Court.

16        That as such official reporter I did correctly report

17   in shorthand the proceedings had upon the trial of the above

18   entitled case; and that I did thereafter cause my said short-

19   hand notes to be transcribed, and the within and foregoing

20   eighty-four (84) pages of typewritten matter constitute a full,

21   true and correct transcript of my said notes.

22        WITNESS my hand at San Diego, California this 27th day of

23   October 1961.

24                                    _John Swader_
                                       Official Reporter
25

JOHN SWADER, OFFICIAL REPORTER