VOLUME NO. 177

MR. VEEDER:

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

            Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:     **Friday, October 27, 1961**

      Pages:  18,349 to 18,384

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                      DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 177

18,349

P1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,              )
                                       )
                      Plaintiff,       )
                                       )
vs.                                    )        No. 1247-SD-C
                                       )
FALLBROOK PUBLIC UTILITY               )
DISTRICT, et al.,                      )
                                       )
                      Defendants.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, October 27, 1961

- - -

APPEARANCES:

    For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney General

                                    CDR. DONALD W. REDD

    For the Defendants:

        State of California:        FRED GIRARD, ESQ.

        Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
        District, et al.,:

P2

1   SAN DIEGO, CALIFORNIA, Friday October 27, 1961, 10:00 A.M.   -

2                              -oOo-

3        (Other matters.)

4        THE CLERK:  7-1247-SD-C United States vs. Fallbrook.

5        THE COURT:  We are ready to talk about the Enclave?  Or

6   do we have something else?

7        MR. VEEDER:  Colonel Bowen has now placed the natural

8   watershed line on U.S. Plaintiff's Exhibit 15-E and 15-L

9   pursuant to your Honor's direction.

10       THE COURT:  Fine.

11       MR. VEEDER:  And I will deliver them to the Clerk.

12       THE COURT:  All right.  Let's give this a number to start

13  with -- I don't think we have assigned the next number -- 34

14  to the Interlocutory Judgment.

15       MR. SACHSE:  Isn't 34 already numbered?

16       THE COURT:  Amended Tucalota is 31-A.

17       MR. SACHSE:  I just didn't recall.

18       THE COURT:  So this will be 34.

19       Military Enclave -- where does the word "Enclave" come

20  from?

21       MR. GIRARD:  I am not sure.  It has been in the case ever

22  since I have.

23       THE COURT:  It has been in the case since Judge Fee wrote

24  his decision, at least, about the Enclave.

25       MR. GIRARD:  Whatever the Court or the United States

P3

1   wants to call them, I have no objection.

2        MR. VEEDER:  You have been calling it the Naval Enclave.

3        MR. GIRARD:  Would you rather?

4        MR. VEEDER:  I don't care.  I think the designation of

5   Military Enclave, from our standpoint, is simply representa-

6   tive of the three military institutions that are contained

7   within the 133,000 plus acres.

8        THE COURT:  What does "enclave" mean?  Everybody kicks

9   it around.

10       MR. SACHSE:  An "enclave" would be an area withdrawn from

11   the jurisdiction of the normal sovereign.

12       MR. VEEDER:  Would you say California is normal?

13       MR. SACHSE:  I mean of the natural sovereign.

14       MR. VEEDER:  I just wanted to get that straight.

15       MR. SACHSE:  There were enclaves in China and enclaves

16   in those leaseholds et cetera under foreign control.

17       MR. VEEDER:  I think you are right, Mr. Sachse.

18       THE COURT:  Then you would say Naval Enclave, not military.

19       MR. GIRARD:  That's all right.

20       MR. SACHSE:  I am surprised Mr. Girard is so ready with

21   agreement, since he argued this jurisdiction question pre-

22   viously.  It's all right with me.

23       THE COURT:  Let's have your suggestions.

24       MR. GIRARD:  I would like to add one comment to I.  On

25   line 29 after the word "time" insert the following language

P4

1   so it will read "at the time the United States acquired

2   sovereignty over said lands in 1948 and when California

3   became a State".

4        THE COURT:  Any objections to I, Mr. Veeder.

5        MR. VEEDER:  It is not complete, your Honor.  Within the

6   Enclave there is, I think, 1600 acres of public domain which

7   was withdrawn and incorporated into --

8        MR. GIRARD:  Was there?

9        MR. VEEDER:  Yes -- a very substantial piece of property.

10        MR. GIRARD:  Is that for the military?

11        MR. VEEDER:  Yes.

12        I would like to tender designation of the years and show

13   the particular acquisitions.  I think Mr. Sachse would agree

14   there may be some legal significance.

15        MR. SACHSE:  I would prefer if Mr. Veeder could prepare

16   the first paragraph here which would specifically identify

17   separate acquisitions.

18        MR. VEEDER:  I will do it.  I will give you the acquisi-

19   tions, the dates and what was involved.

20        THE COURT:  All right, Mr. Veeder is to prepare it.

21        And except for the public domain land, as to the other

22   lands it is true that they were in private ownership at the

23   time California became a State and at the time that sovereign-

24   ity was acquired over the land; is that right?

25        MR. VEEDER:  That is my understanding.

P5

1    MR. GIRARD:  For my own information, where are these

2    1600 acres?

3    MR. VEEDER:  They are up in the northwest corner of the

4    Enclave.  I can show you.  Plaintiff's Exhibit 1 shows the

5    location of those lands -- indeed, it shows all the titles.

6    THE COURT:  Young man, why don't you come up here where

7    you can watch this a little better?  I will let you sit in

8    the witness box by me.

9    Somebody bring a chair up and he can sit on the Bench

10   with me today.  This will be a good experience for him.

11   You might as well get a point of view where you can see

12   what is going on.  What is your first name?

13   MR. REDD:  Ray.

14   THE COURT:  Ray Redd?

15   MR. RAY REDD:  Yes, sir.

16   THE COURT:  Good.

17   Let the record show that Associate Justice Ray Redd is

18   on the Bench with me now.

19   Shall we pass over Paragraph I?

20   MR. VEEDER:  I would like to have it done so that we can

21   tender the full description.  The years are important, the

22   property is important.

23   MR. GIRARD:  And you are to do a separate description

24   for each separate acquisition?

25   MR. VEEDER:  Yes.

P6

1    THE COURT:  He is going to follow the pattern he has here.

2    MR. GIRARD:  Yes.

3    THE COURT:  II.  Have you looked this over, Mr. Veeder?

4    MR. VEEDER:  I have looked it over, your Honor.  I would

5    like to amplify it to some degree in regard to a more complete

6    statement of the functions of Camp Pendleton.

7    MR. GIRARD:  I am agreeable.  I think there is a stipula-

8    tion entered and filed as to the functions of the Hospital,

9    Pendleton and the Naval Ammunition Depot.  I will incorporate

10   that in the finding, if you want.

11   MR. SACHSE:  There is a lengthy stipulation on page 9

12   of the Pre-Trial Order where you spell out those functions in

13   detail.

14   MR. VEEDER:  I would very much to have it more reflective.

15   THE COURT:  All right.

16   Paragraph III.

17   MR. VEEDER:  I am opposed to Paragraph III.  I think it

18   is a conclusion of law and I don't believe it is reflective

19   of what is contained in the stipulation.  I don't think it

20   is proper.

21   THE COURT:  This is exactly what the stipulation was.

22   We went all over this before.  It may be some matter of choice

23   of words.  But I propose to put in here that the Government

24   stipulated that they didn't claim any rights through sovereign-

25   ity; that they claimed only the rights they acquired through

P7

1  condemnation or purchase.

2      MR. VEEDER:  I have interposed an objection.

3      THE COURT:  Overruled.

4      Is there any dressing up that need be done?  I would

5  suggest you check it as to the use of the words "only such

6  rights to the use of the waters of the Santa Margarita River

7  as it acquired <u>through</u> condemnation or purchase" -- I think

8  is the way it read, which is a very minor matter -- "together

9  with such rights which it may have acquired by prescription

10  or use or both . . " we are only talking about water --

11  "together with such rights to the use of water".

12      MR. GIRARD:  That is right.

13      THE COURT:  All right, IV.  This just a description of

14  the River.

15      MR. SACHSE:  I dug up this figure somewhere of 21 miles.

16  I don't know where I got it.  Is that all right?

17      MR. VEEDER:  Twenty-one miles is what we have been using.

18      MR. SACHSE:  I couldn't find it specifically, but that

19  was my note.

20      MR. GIRARD:  The Circuit Court uses it, too.

21      MR. VEEDER:  Yes, I know 21 miles has been used.

22      THE COURT:  Generally, IV is all right, then, Mr. Veeder.

23      MR. VEEDER:  I think it is descriptive.

24      THE COURT:  V.  Now you pick a point here in Section V

25  where water disappears and/or is diverted.

18,356

P8

MR. SACHSE:  I am responsible for this language, I believe, and what I used was the language we used in the O'Neill Judgment.  And further down you will observe what happens; so that except in periods of precipitation and substantial runoff the River either disappears and/or is diverted.  I don't know that you can fix the point exactly.

THE COURT:  I am thinking of something else.  I am thinking of the record we have here as to this River in a state of nature and those pools of water the cattle used to water in, et cetera, all of which, I think, supports the finding that I have made, or propose to make, that the underground flow there is part of the stream; and I would like a finding which talked about this as in a state of nature, or if we can't do that as it existed at this date many years past when the uses were entirely for stock water.

MR. SACHSE:  That is a good idea.

THE COURT:  And then to follow it up with the situation today where the water is diverted to Lake O'Neill or sinks into the ground.

MR. GIRARD:  All right.

MR. VEEDER:  Your Honor, I am going to tender our own view on this in a specific proposed finding.  But I would call your Honor's attention that even during the ownership of the O'Neills it was not a perennial stream; it was intermittent both as to time and place.  It is now intermittent both as to

P9

1   time and place.

2      THE COURT:  That is true.  But the bit of evidence I am

3   talking about goes even further back than that, I think.

4      MR. VEEDER:  Does your Honor see what I -- on line 6,

5   Finding V, "it is a perennial stream and depending upon

6   precipitation and runoff . . "  That is my principal and first

7   objection.

8      THE COURT:  Would you call it an intermittent stream?

9      MR. VEEDER:  I would say it is intermittent both as to

10   time and place.

11      MR. SACHSE:  I think you are in error.  At the point where

12   it enters the lands of the United States it is a perennial

13   stream.  That is where the River flows all of the time.

14      THE COURT:  I am going to take a short recess.  I want

15   to see Mr. Cogan.  We will pick up right away.

16      (Recess.)

17      THE COURT:  Justice Redd, come back and take your seat

18   here.

19      Court is in session.

20      We were on V.  Has it been agreed that this is a perennial

21   stream where it enters the lands?

22      MR. VEEDER:  It has not.  I don't believe the record

23   supports that it is at all times.

24      MR. SACHSE:  If we put in the state of nature clause

25   your Honor asked for, that will take care of it.  I don't care

P10  1  MR. GIRARD:  It certainly was probably in the state of

2 nature a perennial stream from the Gorge down.

3  MR. VEEDER:  I think we originally had findings to the

4 effect that it was intermittent both as to time and place, and

5 I think that is correct.  If you say it is intermittent as

6 time and place, it could conceivably in some reach of the

7 River --

8  MR. SACHSE:  I don't quarrel.  That's all right with me.

9 I think in a state of nature.

10  MR. VEEDER:  I don't believe there is anything in the

11 record to show it.

12  MR. SACHSE:  I don't care.

13  MR. GIRARD:  I think there is something in the record.

14 I think that Waring Report.

15  THE COURT:  What difference does it make?  If you want

16 to go further, we know what the situation is from the Gorge

17 on down; it flows largely over basement complex.

18  MR. GIRARD:  That is right.

19  THE COURT:  And there is very little loss into the under-

20 ground rock.  There is of course loss through phreatophytes

21 and --

22  MR. VEEDER:  And through evaporation.

23  THE COURT:  Yes.  And there is a different situation

24 after it gets out of that basement complex.  There is not much

25 dispute about the facts.

P14  1    basin.

2         THE COURT:  And probably less permeable than the older

3    alluvium.

4         MR. VEEDER:  Colonel Bowen, in regard to those wells,

5    would that be correct, that the marine deposits in the basin --

6    are they less permeable than the other?

7         THE COURT:  Than the older alluvium.

8         COLONEL BOWEN:  The La Jolla and San Onofre brescia are

9    less permeable.

10        MR. VEEDER:  I am not talking about those.  I am talking

11   about some of the other deposits.

12        THE COURT:  He is talking about what he calls "marine

13   deposits".  Is La Jolla formation marine deposits?

14        COLONEL BOWEN:  These that I named are marine deposits,

15   yes, your Honor.  There are three major marine deposits --

16   La Jolla, San Onofre brecia and San Mateo.  Of the three the

17   San Mateo is the best water bearing formation.

18        THE COURT:  Of the three?

19        COLONEL BOWEN:  Yes.

20        THE COURT:  But it is less permeable than the younger

21   alluvium?

22        COLONEL BOWEN:  Yes, by and large.

23        THE COURT:  And how does it stack up, this best one of

24   the three marine deposits, how does it stak up with the older

25   alluvium?

P15

1    COLONEL BOWEN:   I would say it is comparable, your Honor,

2  because outside of this watershed we are extracting water from

3  the San Mateo formation elsewhere on Camp Pendleton.

4    MR. VEEDER:   Let me try my hand at writing this.

5    MR. GIRARD:   I want to look at 38.

6    MR. SACHSE:   I want to see Exhibit 38.   I think Mr.

7  Veeder is misstating the record.

8    MR. VEEDER:   I am extremely anxious to get 38.

9    (At this point Mr. Wilkinson leaves the courtroom.)

10    THE COURT:   At any rate, this is the sort of thing I

11  am going to find:   That the younger alluvium is confined

12  laterally and underneath by various kinds of these deposits.

13  Now the statement here is that it "cannot move laterally

14  or vertically," apparently into the marine deposits.   It may

15  be that the movement is very definitely impeded.

16    MR. VEEDER:   Where are you now, your Honor?   You are

17  looking at what?

18    THE COURT:   VII on page 4.   There is a flat statement

19  here that the "waters which are within the younger alluvial

20  deposits cannot move laterally or vertically . . "   I take

21  it you mean into these marine deposits.

22    MR. GIRARD:   Into the consolidated rock.

23    MR. VEEDER:   Your Honor, the upper reaches of the basin

24  -- that is what we call the "Upper Sub-basin" -- is contained

25  in basement complex.   Then as you move down the valley Chappo

P16

1   Basin is contained in the La Jolla formation.

2   Isn't that correct, Colonel?

3   And then as you move on down there is an area contained

4   in the San Onofre brecia.  But the basement complex is further

5   up toward the Hospital area.

6   COLONEL BOWEN:  As I recollect, it is.  My recollection

7   is that all of the formation containing the younger alluvium

8   was shown in the exhibit as basement complex.

9   MR. VEEDER:  Did somebody go for Exhibit 38?

10   MR. SACHSE:  Yes.

11   THE COURT:  Did I understand that all of the material

12   confining the younger alluvium where is basement complex?

13   COLONEL BOWEN:  Throughout the reach of the Santa

14   Margarita Basin, your Honor.  I believe the exhibit will show

15   that.

16   MR. SACHSE:  That is my recollection, that there is a

17   very small patch or two of La Jolla of a different color.  But

18   the rest of it is all shown as residuum or basement complex.

19   THE COURT:  Where do these marine deposits appear?  As

20   part of the detritus fill?

21   MR. SACHSE:  Let's look at Exhibit 38.  It is here now.

22   This is the wrong one.

23   MR. VEEDER:  Here is basement complex.

24   MR. SACHSE:  This isn't the one we want.

25   MR. VEEDER:  This is 38.

P17

1    MR. SACHSE:  No, I want the one with the geology.

2    MR. GIRARD:  37 is the one with the geology.

3    MR. VEEDER:  Here is basement complex in the upper sub-

4    basin.  Chappo is contained in the La Jolla formation.

5    MR. GIRARD:  You mean underlaid.

6    MR. VEEDER:  Underlaid.  San Onofre brecia is down here.

7    These deposits in here showing the shells, and they are

8    designated as "fossil shells," that is what I have been re-

9    ferring to as deposits in the basin which were laid down by

10   marine action.  This is what I am talking about here -- from

11   here on in.  This area here is underlain with La Jolla forma-

12   tion.  We have evidence in the record that some of our wells

13   pierced the La Jolla formation, that it is low grade water.

14   MR. GIRARD:  I want to dispute that absolutely.  None

15   of your wells now goes below the younger alluvium.

16   MR. VEEDER:  Just be a little bit gentlemanly in the

17   presence of the young man.

18   The fact remains that tests that went into the La Jolla

19   formation show that water came from them, that it was very

20   low grade and that it was a poor producer; that the bulk of

21   the water comesffrom the lower member.  And here is what we

22   are referring to.  You have the shell deposits here.

23   THE COURT:  This is the only place you have shell deposits

24   except from the arrows on down.

25   MR. VEEDER:  You have the wells showing up here.  You

P18

1   don't have them up above.

2   MR. VEEDER:  That is what I am saying.  I am saying to

3   your Honor that those are the deposits, and it is a geologic

4   fact which is true.  And in regard to the La Jolla formation

5   I will give you the citations, Mr. Girard, from Mr. Wort's

6   testimony in regard to the water from those sources.

7   MR. GIRARD:  I asked Mr. Kunkle specifically, and he told

8   me not more than two days ago that every one of your wells

9   was drilled only in the younger alluvium.

10   THE COURT:  This well is only perforated in the younger

11   alluvium.

12   MR. VEEDER:  I think what Mr. Girard is mistaken about

13   is that there were tests that were made afterward.

14   MR. GIRARD:  I may have been.  But none of your operating

15   wells.

16   MR. SACHSE:  The United States' exhibit will be down in

17   a moment.

18   This geologic plate is in evidence.  Clear down at the

19   mouth, your Honor will observe from the legend, are marine

20   deposits.  All of the rest of it, according to the State's

21   geology, is surrounded by residuum or basement complex.

22   MR. VEEDER:  The legend shows what the La Jolla formation

23   includes.

24   MR. SACHSE:  The dark orange is the terrace deposits.

25   MR. VEEDER:  That is simply a designation.

P19

1      MR. SACHSE:  Here is the United States' geology.  Your

2  Honor will observe their own legend "Consolidated rocks,"

3  and all of these three colors fall in the consolidated rock.

4      MR. VEEDER:  No one denies that.

5      MR. SACHSE:  TIJ La Jolla formation is a consolidated

6  rock.

7      MR. VEEDER:  The consolidated rock is simply to distin-

8  guish the rock from the alluvium, that's all, and the basement

9  complex does extend down as I pointed out, your Honor.

10      MR. SACHSE:  The point is that Mr. Girard's proposed

11  finding says, Mr. Veeder, that it is surrounded by consolidated

12  rock, which is what I contend the fact to be.  Purple is

13  consolidated rock, the green is consolidated rock.  That is

14  what surrounds this younger alluvium, and that is exactly what

15  his proposed finding says.

16      THE COURT:  Down past the Narrows.

17      MR. SACHSE:  Down past the Narrows.

18      THE COURT:  Isn't that correct, Mr. Veeder?

19      MR. VEEDER:  What is that?

20      THE COURT:  That the younger alluvium is surrounded

21  and underlain by consolidated rock.

22      MR. VEEDER:  La Jolla formation.

23      MR. SACHSE:  It is consolidated rock under your own

24  legend.  It is one of the consolidated rocks.

25      MR. VEEDER:  Yes, I am not arguing that.

P 20

1    THE COURT:  Down past the Narrows where you encounter the

2    marine formations.  Is that right?

3    MR. VEEDER:  That is right.  What I was shooting for

4    was accuracy.

5    THE COURT:  Well now, what about this "cannot move

6    laterally or vertically into this consolidated rock"?

7    MR. SACHSE:  I think "cannot" is too strong, frankly.

8    THE COURT:  Soften it a little bit.

9    MR. SACHSE:  It should be softened -- do not readily

10    move laterally.

11    THE COURT:  You are going to prepare something on this,

12    Mr. Veeder?

13    MR. VEEDER:  I am, yes.

14    THE COURT:  All right.  And Mr. Girard is going to re-

15    work it.

16    VIII.

17    IX.

18    X.

19    MR. SACHSE:  I believe there should be added at the very

20    beginning of line 5 on X the words "and its tributaries" --

21    "principal sources of surface flow of the Santa Margarita

22    River and its tributaries".  There are some big tributaries

23    we talked about -- De Luz Creek, et cetera.

24    THE COURT:  All right.

25    MR. VEEDER:  Your Honor, I am going to ask, rather than

P21

1   argue about these things, the right to substitute language.

2   We don't agree, for example, in IX after the semi-colon "that

3   said variance in points of surface flow during periods other

4   than periods of precipitation results to a substantial degree

5   from pumping of the waters contained in the younger alluvial

6   deposits . . "  We believe that natural precipitation is the

7   primary and governing factor and that pumping is significant..

8       MR. SACHSE:  This statement says "other than periods of

9   precipitation results".

10       MR. VEEDER:  I would like to re-work it, because I think

11  it is essential to have a correct showing here.

12       I think that in regard to VII I would like to put in data

13  about the upper and lower member, if that is agreeable to you.

14  I think we should be complete on this.

15       THE COURT:  Let's see what you propose.

16       X.

17       MR. SACHSE:  Did you get my addition to X, Mr. Veeder?

18       MR. VEEDER:  What was that?

19       MR. SACHSE:  Right at the beginning of line 5 before the

20  word "and" insert "and its tributaries".

21       MR. VEEDER:  " . . Santa Margarita River and its tribu-

22  taries are in fact . .."

23       MR. SACHSE:  Yes.

24       MR. VEEDER:   Ahead of the semi-colon again "and its

25  tributaries".

P22

1    MR. GIRARD:  Yes.

2    MR. VEEDER:  ". . are in fact recharged primarily by

3  said surface flow of the Santa Margarita River --

4    MR. SACHSE:  And its tributaries".

5    THE COURT:  XI.  That the consolidated rock prevent.

6  Probably soften that.

7    MR. GIRARD:  Yes.

8    MR. VEEDER:  May I just refer to line 10 -- "that during

9  such times as there is no perennial surface flow . . "

10    MR. SACHSE:  The "perennial" should come out.

11    MR. GIRARD:  Yes.

12    MR. VEEDER:  ". . but only surface flow at those points

13  where the waters rise to the surface, . . "

14    THE COURT:  " . . then disappear and rise again, said

15  surface waters are in fact the ground waters which were within

16  the younger alluvial deposits; . . "

17    MR. VEEDER:  If I recall Colonel Bowen's testimony --

18    Is this state of nature now, Mr. Girard?

19    MR. GIRARD:  No; right now.

20    MR. VEEDER:  As I remember Colonel Bowen testified and

21  there was evidence in connection with it, that some of that

22  surface flow as sewage effluent.

23    Isn't that correct? Your aerials show areas of water

24  flowing in the channel, and that water was testified to in

25  certain areas as being sewage effluent.

P23

1    MR. GIRARD:  I doubt that.  That is certainly true at

2    the lower end.

3    THE COURT:  Then we ought to separate this.

4    In a state of nature where these points of rising water

5    occur the water has come from the ground waters in the younger

6    alluvium.

7    What was your response, Colonel?

8    COLONEL BOWEN:  I said it is correct that waters in the

9    stream at the present time may be sewage effluent.

10   THE COURT:  What would you propose to do, list the places

11   where sewage effluent is dumped into the streambed?

12   MR. VEEDER:  I think it is essential.  We have that

13   evidence in the record and we have evidence where it does

14   appear in the channel of the stream.

15   MR. GIRARD:  Is it put into the stream, Colonel?  How

16   far up would be the maximum upstream point?

17   MR. SACHSE:  Several places that sewage is discharged.

18   COLONEL BOWEN:  Lake O'Neill.  That is, excepting now

19   the Naval Ammunition Depot has a small sewage treatment plant

20   which discharges effluent into Fallbrook Creek.  But in the

21   dry months of the year that never reaches the Sant Margarita

22   River.  So the closest point where it would reach the river

23   woudl be Lake O'Neill furthest downstream.

24   MR. SACHSE:  Where would the major amount of it be?

25   COLONEL BOWEN:  I would say Plate No. 1, which discharges

P24

1   water into Lake O'Neill, has the largest annual discharge of

2   effluent of any plant on the base.

3      MR. SACHSE:  Let me ask another question.  When it dis-

4   charges into Lake O'Neill it wouldn't get into the River,

5   would it, unless there are releases from the Lake?

6      COLONEL BOWEN:  There are seepage losses from Lake O'Neill

7   which would return to the ground water body.  We also have

8   now a bypass wherein we may divert the effluent around Lake

9   O'Neill and discharge it directly into the channel.

10      MR. VEEDER:  I think it is quite a complex operation.  I

11   would like to be able to write it out with specificity.

12      THE COURT:  Yes, take a try at it.

13      We are just looking for things of disagreement and agree-

14   ment here as we go along.

15      XI, line 20 "prevent the ground waters from moving out

16   of the younger alluvial deposits . . "  By "moving out of"

17   you mean into the confining sides and bottom?

18      MR. GIRARD:  Yes, and into the consolidated rock.

19      THE COURT:  "prevent" should be softened.

20      MR. GIRARD:  Yes.

21      THE COURT:  And substantially impregnable bed and bank.

22   "substantially impregnable" is pretty close to the description

23      MR. VEEDER:  We of course disagree with that.

24      THE COURT:  All right, XII.

25      MR. VEEDER:  XII, your Honor, is not correct.  We do know

P25

1   the depth.   We have an isopac map.

2      MR. SACHSE:  We have a reference to it.

3      MR. VEEDER:  ". . the vertical depth of the younger

4   alluvial deposits have not been determined with absolute

5   exactness . . "  Unless you say "with absolute exactness down

6   to the last inch," this is not reflective of the evidence.

7      MR. GIRARD:  I would be happy to say, if you like, that

8   the vertical depth of the younger alluvial deposits set forth

9   on Exhibit 39.

10      MR. VEEDER:  I think I can go further than that.  I think

11   I can demonstrate from the record that the depths are up to

12   200 feet in some areas and feathered out.

13      MR. SACHSE:  Let's use the isopac map and refer to it.

14      MR. VEEDER:  I'll be glad to take another crack at this,

15   your Honor.  I have been working on it.

16      THE COURT:  All right.

17      XIII ". . all wells which are presently drilled . . "

18   All wells presently producing.

19      MR. GIRARD:  Yes.

20      THE COURT:  Is that correct?  It is all the producing

21   wells that are now in the younger alluvium.

22      COLONEL BOWEN:  Yes, your Honor.

23      THE COURT:  I am on page 8, this chart of the uses within

24   and without the watershed.

25      MR. SACHSE:  Unless there are typographical errors, that

1    is a verbatim transcription of the United States' Exhibits

2    150 and 151.

3       MR. VEEDER:  I haven't run those back against the tabula-

4    tion.

5       MR. SACHSE:  That certainly should be checked.

6       MR. GIRARD:  Yes.  My secretary didn't check them either.

7       COLONEL BOWEN:  These figures?

8       MR. GIRARD:  Yes.

9       COLONEL BOWEN:  I checked them myself.

10      MR. SACHSE:  Are they okay?

11      COLONEL BOWEN:  I checked them this morning personally,

12   your Honor, and they are the same as my records.

13      THE COURT:  All right.

14      MR. SACHSE:  Thank you, Colonel.

15      THE COURT:  Mr. Veeder is going to object to XVII, but

16   that looks like it is in pretty good shape.

17      MR. VEEDER:  I concur with your Honor's first part of

18   the statement.

19      THE COURT:  And I take it you are satisfied with XVIII?

20      MR. VEEDER:  Yes.

21      MR. SACHSE:  Are the water years wrong again -- 1952 and

22   1953?  What is it?

23      COLONEL BOWEN:  It was both prior to and subsequent to

24   that.

25      MR. SACHSE:  I took this off of that barograph exhibit

P27

1   that Mr. Worts had prepared.  But if the dates are wrong, let's

2   correct them.

3       MR. GIRARD:  Do you know the dates?

4       THE COURT:  Well, this salt water intrusion didn't happen

5   in 1951 and '52.  It had been a progressive thing.

6       COLONEL BOWEN:  Actually, in 1952 was the year of high

7   precipitation and runoff.  We temporarily halted these in-

8   trusions of sea water by reason of filling the basin with fresh

9   water.

10      MR. GIRARD:  When was the last year you experienced salt

11  water intrusion, Ace?

12      COLONEL BOWEN:  I think my testimony indicated in 1956.

13      MR. GIRARD:  Then we could say that during certain years

14  prior to 1956.

15      THE COURT:  Mr. Girard is very charitable there.  He says

16  that this salt water intrusion was not the result of the

17  wrongful unlawful act of any defendant in this case, but was

18  the result of a combination of dry cycles and pumping water

19  outside the watershed.

20      MR. SACHSE:  I don't think there is any question.  That

21  is what Mr. Cannon and others testified to -- that it was a

22  combination of the two.

23      MR. VEEDER:  We have some revision on that and I will

24  tender you our thoughts on it, your Honor.

25      THE COURT:  I am looking at XX now.

P28

1    MR. SACHSE:  Again, I am not sure of this date, Colonel

2   Bowen, as to when you began reducing pumping at Ysidaro Basin.

3    COLONEL BOWEN:  1956 would be a better date than '53.

4    MR. VEEDER:  I think we have some more --

5    THE COURT:  Pardon me.  Of course, this ground water

6   intrusion, you are talking about the halting of the intrusion

7   up at Ysidaro Narrows.  Actually, the basin below Ysidaro

8   Narrows is long past reclamation.

9    MR. SACHSE:  I don't believe the basin below the Narrows

10  has been used in recent time.

11    THE COURT:  Then we ought to make it clear.

12    MR. SACHSE:  Yes.

13    THE COURT:  That this stopping of salt water intrusion

14  and the fact that there is presently no intrusion --

15    MR. SACHSE:  We referred to Ysidaro Narrows.

16    THE COURT:  Above the Ysidaro Narrows.

17    MR. SACHSE:  That is right.

18    THE COURT:  Below the Ysidaro Narrows has been written

19  off, hasn't it?  There is no fresh water below there, is there?

20    COLONEL BOWEN:  No, your Honor.  It is primarily brackish

21  water.

22    THE COURT:  I think somewhere we ought to say that the

23  halting of the intrusion has been at the Ysidaro Narrows.

24    MR. GIRARD:  Yes.

25    MR. SACHSE:  In line 31 "eight years" should be changed

1   to five years.

2       MR. GIRARD:  Yes

3       MR. SACHSE:  I have another question where I am not sure

4   that our facts are correct, Colonel Bowen.  If you will look

5   at lines 4 and 5 on page 10, the last line of that paragraph,

6   is it pumping from Ysidaro for use outside the watershed, or

7   is it only for use inside?

8       COLONEL BOWEN:  The United States of America has not

9   limited pumping.

10      MR. SACHSE:  From Ysidaro pumping, it says.  Is it outside

11  or inside or both?

12      COLONEL BOWEN:  For any agricultural use.

13      MR. VEEDER:  When you say "commenced" you mean reduced to,

14  don't you?

15      MR. SACHSE:  I said you stopped.  It says earlier here

16  that you stopped.  Now it says you have commenced limited

17  pumping.

18      THE COURT:  I understood that originally you were pumping

19  irrigation water from down around Ysidaro Narrows.

20      MR. SACHSE:  That is right.

21      THE COURT:  And that you stopped that and moved your

22  pumping water for irrigation further upstream into other basins?

23      COLONEL BOWEN:  We have done that, your Honor.  We have

24  put those two new wells in, in the constriction between Chappo

25  and Ysidaro Basin, and we allowed the irrigation contractor

1  to pump from those wells to supply the demand on the Stewart

2  Mesa and most of the demand on South Coast Mesa.  However,

3  because of the manner in which the system is hooked up, it is

4  still necessary on occasion to pump a limited amount of water

5  from Well 4C1, which is low down in Ysidaro Basin, to help

6  augment the demand for irrigation water on the South Coast.

7  MR. SACHSE:  That is what I have tried to say -- that as

8  a result of the water conservation policies salt water intru-

9  sion is stopped and the United States has commenced limited

10  pumping from that area.

11  THE COURT:  Commenced limited.

12  MR. SACHSE:  Has again, has resumed.

13  MR. VEEDER:  I wouldn't say "commenced".  I would say

14  "reduced to limited pumping".

15  THE COURT:  Yes.

16  MR. VEEDER:  But we will write that, too.

17  Your Honor, I think the Associate Justice would like to

18  be permitted to leave.

19  THE COURT:  Justice Redd, it has been a real pleasure

20  to have you up here with me today.  Come back again.

21  MR. VEEDER:  Is your Honor on XXI yet?

22  THE COURT:  I am almost to the end.  Do you have a

23  suggestion on XXI?

24  MR. VEEDER:  We take the position that if Fallbrook

25  should build a dam and operate it as it proposes, it certainly

P31

1    will result in salt intrusion and therefore there is a threat.

2         MR. GIRARD:  Let's just put "any present act of the

3    defendants".

4         MR. SACHSE:  You have continuing jurisdiction of that

5    dam.

6         MR. VEEDER:  Until the dam goes out.

7         THE COURT:  I am not going to find that the Fallbrook

8    dam is going to permit salt water intrusion because I am not

9    going to permit it to cause salt water intrusion.  So don't

10   let yourself get stirred up about that.

11        MR. VEEDER:  All I am doing is pointing out our objection

12   to XXI, your Honor.

13        THE COURT:  I am clear over to XXXI.

14        In other words, you are going through and propose some

15   suggestions.

16        MR. VEEDER:  I will tender a complete set of findings,

17   your Honor.

18        MR. GIRARD:  I think that will be very helpful.  But will

19   it be on what you desire, or will it be based on what the

20   Court has ruled?  If your findings are tendered in the light

21   that you are going to comply with the Court's rulings, they

22   will be helpful; but if you are going to tender what you want

23   whether or not the Court has overruled you, we are going to

24   waste our time.

25        MR. VEEDER:  I think we wasted our time this morning.

P32

1   I will tender what I think are proper findings.

2       MR. SACHSE:  Then we will have to redraft these, too.

3       MR. VEEDER:  I have no objection.  I think working with

4   Colonel Bowen I can tender the Court a very substantial set

5   of findings with which he will have agreed.  He may disagree

6   with some of them.  If he does, I will change it as his

7   direction.

8       THE COURT:  All right.

9       I am on XXXV.

10      MR. SACHSE:  I don't think we ever described Fallbrook

11  Creek, because the Master's findings don't describe it.  So

12  we will have to describe it in XXXI.

13      THE COURT:  Generally, I think you have done a commendable

14  job, Mr. Girard.

15      MR. GIRARD:  It is not all mine, your Honor.  Mr. Sachse

16  contributed a lot of it.

17      I might add, to relieve any apprehensions on Finding of

18  Fact No. XXXV, that of course was specifically requested by

19  Mr. Sachse, and I will have a conclusion drafted, despite Mr.

20  Sachse's arguments to the contrary, that these uses may or

21  may not be under the factual condition where the issue might

22  be determined proper riparian uses.  Mr. Sachse contended

23  that ipso facto they were improper and you had ruled against

24  him.

25      MR. VEEDER:  Do you have extra copies of the original

1 Murrieta-Temecula ground water area?  I don't mean the original.

2 I mean the one we were working on here.

3  MR. GIRARD:  I can get you a copy in Sacramento.  But as

4 soon as I get one day up there I will rewrite them to reflect

5 the corrections made yesterday.  Do you want the old ones, too?

6  MR. VEEDER:  I need a working copy.

7  MR. GIRARD:  All right.

8  THE COURT:  I think that you have got something to start

9 with here, and we will see what Mr. Veeder suggests.  And I

10 would suggest, Mr. Veeder, since you are an office of this

11 Court and also very able counsel, that in certain of these

12 instances as you prepare this draft you submit one finding

13 as you want it and submit an alternative finding right in

14 there pursuant to the findings have made.

15  MR. VEEDER:  I think that would probably save time, your

16 Honor.

17  THE COURT:  Then you can point out that the so-called

18 alternative findings are not your view of what the findings

19 would be, but are done at the Court's suggestion.

20  MR. VEEDER:  Yes.

21  THE COURT:  This might make it possible to use more of

22 your material than otherwise.  You can prepare your findings

23 as you think it ought to be, and then submit an alternative

24 finding as the way I think it ought to be.

25  MR. VEEDER:  I have talked to Mr. Sachse already about it

18,381

P34

1   and we have already taken a dry run, so to speak, in regard

2   to what he wanted on Domenigoni Valley.

3       MR. SACHSE:  I don't think you go far enough.

4       MR. VEEDER:  I say, I am undertaking to the end that we

5   can get a composite decree along the line your Honor suggested

6   I certainly want to do it.

7       THE COURT:  What are you going to have on Monday?  I will

8   have some time on Monday morning available.

9       MR. GIRARD:  I would think, your Honor, speaking for

10  myself, I have to rewrite essentially the Murrieta findings.

11  I think I can do that in one day.  If we come down here Monday

12  that means we are not going to be able to spend any time at

13  all in the office to work.  I don't think we have anything

14  to come down for Monday until we get the Murrieta findings.

15      THE COURT:  Would you rather come in Tuesday?

16      MR. GIRARD:  I would, yes.

17      THE COURT:  Mr. Veeder has to leave on Wednesday.

18      MR. GIRARD:  I can come in with the rewritten language

19  on the Murrieta-Temecula findings as we ironed out in the last

20  two days and that one should be ready for final submission to

21  the Court.

22      MR. VEEDER:  Along that line, is Mr. Stahlman working with

23  you in regard to his?

24      MR. GIRARD:  No, Mr. Stahlman wanted to wait until the

25  Murrieta findings were completely approved before he re-worded

P35

1    that, I haven't worked with Mr. Stahlman particularly on that

2    anyway.

3        MR. VEEDER:   I thought it might be something that he and

4    I could work on.

5        MR. SACHSE:   He has personally stated that he doesn't

6    want to try to finish Vail until he has the benefit of the

7    Court's finished finding on Temecula.

8        MR. VEEDER:   I will be available over the weekend and

9    Monday and Tuesday.

10       THE COURT:   We will continue the matter until Tuesday

11   morning.   That will give you a chance to do some of this

12   work.

13       MR. GIRARD:   Yes, I can get some office work done.

14       MR. SACHSE:   Mr. Veeder, is there any chance of our

15   getting a couple of these other interlocutories that are in

16   your hands and, as far as I know, are done, signed?   There

17   is Sandia, there is Diamond-Domenigoni, and I guess you still

18   have a Wilson Creek.   Is that one ready?

19       MR. VEEDER:   Yes.

20       MR. SACHSE:   I feel this way, your Honor.   Even though

21   I concur with Mr. Veeder that we should have a big master

22   finding, and even though I like his form, I just think this

23   is such a mountainous task to try to check a finding of that

24   kind that I want interlocutories on these.

25       THE COURT:   Yes, let's finish up the way we started with

P36

1  our interlocutories and we will talk about the final judgment

2  later.

3       MR. SACHSE:  There is not a thing to change on Sandia.

4  Mr. Girard re-drafted it.  I have a copy of his re-draft.  All

5  we waited for on it was a set of exhibits of the landowners.

6  And the same thing on Diamond and Domenigoni.  I think it is

7  done.  All there was, was the exhibits.  I don't even feel

8  the exhibits are so important now on the interlocutories if

9  we are going to do it in final anyway.  I think we can sign

10  them without the exhibits.

11      THE COURT:  Can you have some of those ready?  What are

12  we waiting for?

13      MR. VEEDER:  I am not waiting for anything, your Honor.

14  Let me call you on Monday.

15      MR. SACHSE:  You wrote the Sandia finding, which is okay

16  with me.  I am ready to submit it.  I have a copy of it.

17      THE COURT:  Will you check on that and see?

18      MR. VEEDER:  Yes.

19      THE COURT:  Tuesday morning at 10:00 o'clock.

20      (Adjournment until Tuesday, October 31, 1961, 10:00 A.M.)

21                        - - -

22

23

24

25

P37

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,  )
                           )
                Plaintiff, )
                           )
       vs.                 )      No. 1247-SD-C
                           )
FALLBROOK PUBLIC UTILITY   )
DISTRICT, et al.,          )
                           )
                Defendants.)
_____)

### CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: October 25, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within and foregoing thirty-eight (38) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 26th day of October 1961.

_John Swader_
Official Reporter
_____

JOHN SWADER, OFFICIAL REPORTER