VOLUME NO.   178

MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY DISTRICT
et al.,

        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Tuesday, October 31, 1961

Pages:   18,385 to 18,498

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 178                                             18,385

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )        No. 1247-SD-C
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                                 )
                Defendants.      )
                                 )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, October 31, 1961

APPEARANCES:

        For the Plaintiff:        WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to the
                                  Attorney General

                                  CDR. DONALD W. REDD

        For the Defendants:

            Vail Company:         GEORGE STAHLMAN, ESQ.,

            State of California:  FRED GIRARD, ESQ.

            Fallbrook Public      FRANZ R. SACHSE, ESQ.
            Utility District,
            et al.:

18,386

SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 31, 1961, 9:00 A.M.

---oOo---

(Other matters.)

THE CLERK:  Six, 1247-SD-C, United States vs. Fallbrook.

THE COURT:  What do you propose to work on this morning, gentlemen?

MR. SACHSE:  Mr. Girard has returned -- I haven't gone over it carefully -- the Murrieta  corrected as in accordance with our last hearings.  I would like to get them done, if we could.  There shouldn't be too much more.

MR. VEEDER:  I think it would be most helpful to go through them, I would recommend it, your Honor, and have Mr. Girard review where his changes have been made.  Don't you think we can do that?

MR. SACHSE:  Yes.

MR. VEEDER:  If your Honor desires comment as we go, I have gone through them very rapidly and I would make comment as we went along -- points I would like to raise in regard to this overall approach.

THE COURT:  I haven't read it yet.  I just got it this morning.  Let's read it paragraph by paragraph.  I will start to read it.

MR. SACHSE:  Would you like us as we go along to call attention to the changes?

MR. VEEDER:  Mr. Girard, have you extra copies of this?

18,387

MR. GIRARD:  No, I don't, Mr. Veeder.  I have given copies to counsel.  I only had the girl type five of them.

MR. VEEDER:  You don't have much faith in it, is that it?

MR. GIRARD:  I have an extra copy that Mr. Wilkinson is using.  If you want to use it, you may share it.

MR. VEEDER:  I would like to have Colonel Bowen follow along on these.

MR. GIRARD:  The only change in I, incidentally, is the adding of  SBBM.

THE COURT:  I will read it.

MR. VEEDER:  My inquiry right there, your Honor, is, in using the term "ground water area" do I comprehend that you will apply the same rules as if we are using the word "basin" -- I mean the same legal connotation attaches as if we were using the word "basin"?

THE COURT:  We have been all through this.  The Murrieta-Temecula ground water area includes the Murrieta River, the Temecula River and areas adjacent thereto.  So it can't be called a basin, because it is, in part, underground river, and, in part, groundwater area.  This is what we have been through for a week around here.

MR. VEEDER:  All I am saying is that the overlying rights and the riparian rights will have the same legal connotations as if they were in a basin; is that correct?

THE COURT:  I think so -- whether it is over the river

18,388

1    or over the ground water area minus the river.

2       MR. STAHLMAN:  Just have different effects under

3    certain circumstances is all.

4       MR. SACHSE:  Does your Honor want to indicate where you

5    are working and we could then call attention to the

6    corrections?

7       THE COURT:  I am trying to read I.

8       Mr. Veeder, do you have any comments?

9       MR. VEEDER:  I think if you would look on lines 23 and

10   24 on page 2, we were using, as I recall, 15-L.  They are

11   the same, but the one was marked up.

12      THE COURT:  The first question I have is the word

13   "comprise" in line 23 -- "is comprised of younger alluvial

14   deposits ; . . ."  I suppose that is all right.

15      Down on line 31 on page 1, "that immediately northwest

16   and adjacent to said basement complex formation there are

17   older alluvial deposits of considerable depth."  There is

18   also younger alluvium there. Would that make any difference?

19   " . . . older alluvial deposits to considerable depth";

20   instead of "older alluvium is overlain in places by younger

21   alluvium ".

22      MR. VEEDER:  I would like to take a look at the map on

23   that, your Honor.  I doubt if immediately northwest and

24   adjacent -- I don't believe that is the case.

25      THE COURT:  You have the Murrieta in there.  You don't

18,389

have Exhibit 277 here, do you?

THE CLERK:  No, your Honor.

THE COURT:  Go up and get it.

MR. GIRARD:  Exhibit 277 won't show the geology.  I think it is 15-L-2.

THE CLERK:  Oh, here it is, your Honor.

MR. SACHSE:  I think Mr. Girard's statement is correct-- immediately adjacent to the basement complex.

MR. VEEDER:  The older alluvium?

THE COURT:  Yes.

MR. SACHSE:  It should be "northeast."

MR. VEEDER:  Yes, it is northeast.

MR. GIRARD:  On line 30 it should be "northeast," not "northwest."

MR. VEEDER:  What I was worried about was the contact.

THE COURT:  Now, do we anywhere tell in here what we did with Exhibit 277?  We get down toward the end of Paragraph I telling how the bedrock begins to appear -- ". . . said alluvial deposits show a gradual lessening in depth to bedrock and said older alluvial deposits terminate at the extreme north and east portion of said ground water area at that point where the basement complex becomes apparent; . . ."  Then we refer to 15-L₂, which shows the areas incorporated by reference.  Anywhere in here do we say that in drawing the lines of this ground water area we have

18,390

1    proceeded by section lines, roads and other matters

2    approximately?

3        MR. GIRARD:   I think Mr. Veeder did draft a finding

4    along that line.

5        THE COURT:   Is there need for that, Mr. Veeder?

6        MR. VEEDER:   I feel there is, your Honor.   I think your

7    Honor was right in the realistic line that you drew.   You

8    realistically said that as the alluvium feathers out

9    approaching the basement complex the quantity of ground water

10   that would be found would be deminimus, taking care of only

11   domestic uses at the outside.   Therefore, you drew the line.

12   I think realistically you should say why you drew the line.

13       THE COURT:   I think so, for the reason that we all

14   agree that we didn't follow exactly even the evidence as to

15   contact as it appeared.

16       MR. SACHSE:   Mr. Veeder's finding in my judgment, is a

17   very good one.

18       THE COURT:   Read it.

19       MR. SACHSE:   "Realistically, the alluvium and the

20   water contained in the fringe areas of the basin referred

21   to the preceding finding  are not of great importance insofar

22   as the overall yield of the basin is concerned.   Accordingly,

23   this Court finds and arbitrarily fixes the exterior

24   boundaries of the basin by following for the most part the

25   lines established by legal subdivisions in areas in which

18,391

1    the water-bearing strata  are of considerable depth and

2    productivity.   In a few instances the boundary has been

3    designated by roads or physical locations easily determined.

4    The description of the boundary is set forth in Exhibit A."

5        We could just as well say, "boundaries indicated on

6    Exhibit 277" instead of Exhibit A.

7        THE COURT:  Except that we probably should refer to

8    Exhibit A also.  Is it A?

9        MR. VEEDER:  Exhibit 277-A is the metes and bounds.

10       THE COURT:  We should refer to both of them, because

11   one of them gives metes and bounds and the other is just a

12   map.  I think we could adopt Mr. Veeder's finding by

13   changing the word "basin" to "ground water area."

14       MR. SACHSE:  And add it to this?

15       THE COURT:  Yes, it seems to me it belongs in here

16   somewhere, probably at the end of II.

17       MR. VEEDER:  What number is that?

18       MR. GIRARD:  I will draft a finding from Mr. Veeder's

19   XXXIV, and also incorporate Exhibit 277-A in I.

20       THE COURT:  Yes, all right.

21       Let's look at II.

22       MR. SACHSE:  In II on line 30 the words "and erosion"

23   were added -- "stream action and erosion".

24       And then that is all of Paragraph II.

25       MR. GIRARD:  Is that in 15-L?

MR. SACHSE:  Yes, 15-L.

THE COURT:  All right.

III.

MR. SACHSE:  In III there are quite a few changes.

MR. VEEDER:  Would you give us the lines where they are?

MR. SACHSE:  Throughout it refers to the "fault zones". The word "zone" is added.

The other principal change appears on line 20 -- well, starting at line 18, "the Wildomar Fault Zone acts as a semi-barrier to the movement of ground waters from Pauba Valley," then this is added which didn't appear before, "except to the extent that ground waters to a limited degree may move through said fault zone . . ."

MR. STAHLMAN:  What is this exhibit left blank  on line 25?

MR. SACHSE:  I have to check that.  I think it is Plate 16.  I am not sure what it is.  What is Plate 16 in evidence?

THE COURT:  It would probably be L-16.

THE CLERK:  It would be L-Plate 16, your Honor.

THE COURT:  It is/geological section of Pauba; Santa Gertrudis.  Is that what you want?

MR. SACHSE:  Yes.

THE COURT:  I don't know that I understand what you are saying.  The Wildomar Fault cuts across the bottom of the

18,393

Temecula Valley, which we call the Pauba Valley, and it is
a semi-barrier.  The Wildomar Fault also up further to the
northeasterly acts as a semi-barrier for ground waters coming
out of the ground water area.  I don't know whether you are
just talking about the end of Pauba Valley or whether you
are talking about the entire area of the Fault.

MR. VEEDER:  I think that is very important, your Honor,
and I would like, based upon conversation with Colonel Bowen
and Mr. Kunkel and Commander Redd in regard to efforts to
define the smallest parcel -- you see, we have the inferred
or concealed fault all the way along here, which is depicted
only by rising water.  We located by reason of rising water.
Now, we are in the position of viewing the younger alluvium
fill along here and along here.  I have asked the Commander
to begin working on the riparian acreage as the basis of
your rulings.  But it is our view, your Honor, that this is
really younger alluvium, the deposition of which comes from
the surrounding hills by reason of sheet water erosion and
not from the Santa Margarita River.  I am not attacking what
your Honor has ruled.  I am simply saying --

THE COURT:  Which younger alluvium are you talking
about?

MR. VEEDER:  We are talking about the area I am pointing
to north and west of the town of Murrieta, in particular.

THE COURT:  You are talking about the stringers that run

18,394

up in the little canyons?

MR. VEEDER:  Yes, your Honor, north and east and north and west both.

In any event, I believe -- and this goes back to Finding II now, but the whole question is related -- we would recommend that in lieu of the word "erosion" in line 30 that you say "deposition of material eroded from surrounding hills" rather than from erosion alone.  That is the Colonel's suggestion.

THE COURT:  What difference does it make?

MR. VEEDER:  I think it is a factor on both sides of the Valley, and it is a factor of importance because sooner or later we are going to have to ask this question your Honor brought up:  Do we view the concealed fault as the bank of Murrieta Creek?  Or, do we look to the deposition of the younger alluvium north of the Wildomar Fault?  I think it is extremely important, and I know it is important in regard to riparian acreage.

Your Honor is completely right that the Wildomar Fault extends the full length of the Valley.

MR. STAHLMAN:  What is the problem, Bill, really?

MR. VEEDER:  The problem is to say whether the Wildomar Fault is going to be the bed and bank, or whether the contact between the older and the younger alluvium.

MR. GIRARD:  I thought we settled that the other day.

18,395

MR. VEEDER:   I felt an obligation to bring it to the Court's attention now.

MR. SACHSE:   Insofar as his Honor's question is concerned, it seems to me that all he would have to do would be to delete.   It reads perfectly if you delete "from Pauba Valley".   Take those three words out and you have it. ". . . that in fact said Wildomar Fault Zone acts as a semi-barrier to the movement of ground waters, except to the extent that ground waters go through or over . . ." take out the words "Pauba Valley" and it is clear as crystal.   This doesn't solve Mr. Veeder's "erosion" problem, but I think it does solve the question your Honor raised.

THE COURT:   Well, let's solve one thing at a time.   I think it does solve the question I raised.   We could say, "The Wildomar Fault throughout its length acts as a ..."

MR. VEEDER:   ". . . semi-barrier to the movement of ground waters . . ."?

THE COURT:   Of course, this leads us into the next question that Mr. Veeder is talking about.   I suppose logically if it is a semi-barrier to the water coming into the ground waters, the Wildomar Fault actually becomes the northeast bank of the stream.

MR. GIRARD:   That is perfectly all right with me.

MR. STAHLMAN:   That is the way we had it.

MR. GIRARD:   I have no objection.

18,396

1     THE COURT:  Let's forget about the stringers, which is

2  a different problem.   It would be areas such as in here that

3  I have my finger on down in Section 27 where there is an area

4  shown as covered by younger alluvium lying northeast of the

5  fault line.

6     MR. VEEDER:  I think also, in that respect, if we look

7  at line 17, you say " ... and terminates approximately one-half

8  mile northeast of Temecula Creek; ..."  I think the record

9  bears that out.

10     MR. GIRARD:  California's exhibit shows it terminating

11  there.  Whether it does or not, I don't know.  Exhibit 15.

12     MR. VEEDER:  We are referring in the findings to 15-L,

13  and 15-L will show it going on out of the watershed.

14     THE COURT:  We are now talking about Wildomar.

15     MR. VEEDER:  Yes.

16     THE COURT:  On 15-L it is shown all the way along.

17     MR. GIRARD:  Let's knock out the reference to

18  California's Exhibit 16 and then I would change that

19  "extends along the easterly portion and terminates into the

20  San Luis Rey watershed".

21     MR. VEEDER:  You are changing 16 now to say "easterly

22  portion of the alluvial deposits and extending into . . ."

23     MR. GIRARD:  ". . . and into the San Luis Rey watershed."

24  Cross out "and terminates approximately one-half mile

25  southeast of Temecula Creek," delete the reference to

1    California's 16.  Do you want to use 15-L, or which should

2    we use, for the geology, Colonel Bowen and Mr. Kunkel, 15-L

3    or 15?

4        MR. VEEDER:  15-L is much better.

5        COLONEL BOWEN:  15-L should be used for the geology of

6    the Murrieta-Temecula.

7        MR. GIRARD:  Okay.

8        THE COURT:  How do you have this worded?

9        MR. GIRARD:  I would start at line 16, because all the

10   changes are below, "... the easterly portion of the alluvial

11   deposits in Wolf-Pechango and into the San Luis Rey watershed".

12       THE COURT:  Are you inserting something?

13       MR. GIRARD:  Yes, inserting after the word "Valley and"

14   the words "into the San Luis Rey watershed," and crossing

15   out " and terminates approximately one-half mile southeast

16   of Temecula Creek."

17       Then on line 18 it will read "...that in fact said

18   Wildomar Fault Zone" and I would add here "throughout its

19   length acts as a semi-barrier to the movement of ground

20   waters," and then delete the words "from Pauba Valley," so

21   it will read "acts as a semi-barrier to the movement of

22   ground waters westerly".

23       Then there would be no changes except going down to

24   line 24 where I would strike "on California's Exhibit L-16,"

25   so it would read " depicted on U. S. Exhibit 15-L, which

18,398

1  exhibit is incorporated herein."

2  MR. VEEDER: At this point here, we are saying, "to a

3  limited degree". Now, it is a semi-barrier, but the water

4  does in fact move across, over and through, and not to a

5  limited degree. It is very substantial.

6  MR. STAHLMAN: No.

7  MR. GIRARD: My draft here is that the ground waters

8  which move through it move through it in a limited degree.

9  But there is no limited degree on those that flow over on

10  the surface.

11  MR. VEEDER: That is what the evidence shows. In fact,

12  there was not much evidence that any quantity moves through

13  it.

14  MR. SACHSE: The word "limited", Mr. Veeder, only limits

15  the clause "moving through." It is my understanding of the

16  evidence that that is why the water rises -- that a

17  limited amount does move through, therefore it has to rise.

18  MR. VEEDER: Just so you comprehend what I am driving

19  at. I think a large quantity of the water that is pumped

20  out of the Murrieta Valley comes through, over and across

21  the barrier? I don't believe it is limited. I think it is

22  quite substantial.

23  MR. GIRARD: I would agree that it is quite substantial

24  that goes over and across, but I wouldn't agree that it

25  is quite substantial that goes through.

18,399

THE COURT:   There is no dispute about this -- "semi-barrier to the movement of ground waters westerly".   Why not put a semicolon and then say -- this "except to the extent" business confuses me, take it out -- say what this does: "That ground waters to a limited degree move through said fault zone, and other ground waters are contained in younger alluvium which lie above said fault and rise to the surface and move westerly over said fault zone" --  I don't like this "downstream as surface water," that is kind of confusing -- " move westerly over said fault zone into the Murrieta Valley".

MR. GIRARD:   All right.   How did we word that now?   Cross out the words "except to the extent" on line 20, "that ground waters to a limited degree may move through said fault zone," then how did you start it, your Honor?

THE COURT:   "May move," they do move.

MR. GIRARD:   Yes.

THE COURT:   Here is how I have it worded.   Let's see how this sounds.   Starting at line 18, "that in fact said Wildomar Fault" insert "throughout its length acts as a semi-barrier to the movement of ground waters westerly; that ground waters to a limited degree move through said fault zone and other ground waters are" -- on line 21 I am striking out "or" and inserting "and other ground waters are" -- " are contained in younger alluvial deposits which lie

18,400

easterly and above said fault zone" -- strike out "or" and put in "and" -- " and rise to the surface".  They don't all rise at the surface.  Some of them move over and some appear as rising water.  Other ground waters are contained in older and younger, or just in alluvial deposits.

MR. STAHLMAN:  If you put in there that the fault acts as a partial barrier causing a portion of the waters to rise and then go over.

MR. VEEDER:  I think George is getting close to it.

MR. GIRARD:  Why don't we say, on line 22, "above said fault and pass over said fault zone into Murrieta Creek or Murrieta Valley"?  Then it could pass over either beneath or on the surface or on the ground.

MR. VEEDER:  I am worried about the word that you are using there -- "younger alluvium".  I think many of the springs that appear along the Elsinore Fault Zone are in the older alluvium.

THE COURT:  Strike "younger;" just "alluvium".

MR. GIRARD:  Yes, alluvial deposits.

THE COURT:  We have it all mixed up now.  But actually what happens there is no dispute about.  Let's say, "semi-barrier to the movement of ground waters westerly; that ground waters to a limited degree move through  said fault zone and other ground waters are contained in alluvial deposits which lie easterly and above said fault zone".  Now,

1    that is on line 22.  And then we should say, "and flow under-

2    ground over said fault zone and some of the waters rise to

3    the surface in various places along said fault zone and flow

4    into the Murrieta Valley".

5        MR. VEEDER:  Should we say, "and other ground waters"?

6    Shouldn't we say "and ground waters"?  You say, "other," and

7    I think it is one.

8        THE COURT:  We have to look at it.  We have this thing

9    chopped up here.  But isn't this what happens, that some

10    waters to a limited degree go through this barrier?

11        MR. VEEDER:  Right.

12        THE COURT:  Some go over the top, some underground, and

13    in some places they are brought to the surface by the barrier?

14        MR. VEEDER:  That I think is precisely what occurs.  It

15    is a semi-barrier -- water backed up on it or seeping

16    through the tighter material.  And as I recall California's

17    testimony on this, no one has said that it is a continuous

18    barrier.  That explains the word "zone".

19        MR. STAHLMAN:  I have one to try out for size.  If

20    this covers it, it would be very simple:  "Said fault zone

21    acts as a partial barrier, causing waters to rise which

22    flow over said fault zone."

23        MR. GIRARD:  I have a little different change, your

24    Honor.  Starting on line 21, "may move through said fault

25    zone and other ground waters contained in alluvial deposits

18,402

1  which lie easterly and above said fault zone flow underground

2  over said fault zone through said alluvial deposits or rise

3  to the surface and move across said fault zone as surface

4  waters".

5      THE COURT:  That is all right.  That is pretty close to

6  what happens, isn't it ?

7      MR. VEEDER:  I didn't follow all of it, your Honor.  I

8  think it would be pretty strained by the time --

9      THE COURT:  I had the same idea.  I was writing in here

10  at line 22:  "either move underground across said fault zone

11  or rise to the surface and move westerly over said fault

12  zone into the Murrieta Valley".

13      How have you got it now?

14      MR. GIRARD:  The way I have it now, starting on line 18,

15  "that in fact said  Wildomar Fault Zone throughout its

16  length acts as a semi-barrier to the movement of ground

17  waters westerly; that ground waters to a limited degree move

18  through said fault zone, and other ground waters contained

19  in alluvial deposits which lie easterly and above said

20  fault zone flow underground over said fault zone through

21  said alluvial deposits or rise to the surface and move

22  across said fault zone as surface waters".

23      THE COURT:  That is all right.

24      MR. STAHLMAN:  Yes.

25      THE COURT:  Doesn't that do it, Mr. Veeder?

18,403

1    MR. VEEDER:  With the exception of the word "other".  I

2  wouldn't leave the word "other" in it.  I would simply say

3  it is all the ground waters moving down that way.

4    MR. GIRARD:  I think you have to distinguish between the

5  two.  I think the "other" is proper.

6    THE COURT: It sounds all right to me.

7    Let's look at IV.

8    MR. SACHSE:  There is no change in IV.  It is the way

9  it was last time.

10    MR. GIRARD:  Fault zones.

11    MR. SACHSE:  "Fault zones" instead of "lines".

12    MR. GIRARD:  We should correct this to comply with the

13  statement of Colonel Bowen.  We should probably just refer

14  to U. S. Exhibit 15-L.  Colonel Bowen seemed to think that

15  15-L is the better geology map.

16    THE COURT:  Instead of 15-E?

17    MR. GIRARD:  Instead of 15 and 15-A, just put 15-L.

18    MR. STAHLMAN:  The faults don't show very well on that

19  15-L.  The Wildomar shows on here about the same.  The

20  Elsinore does not.

21    THE COURT:  15-L is enough.

22    MR. GIRARD:  Mr. Kunkel can put them on there.

23    THE COURT:  On V what changes?

24    MR. SACHSE:  On line 3 the words "and older" to make

25  it read "younger and older alluvium".  On line 5 the word

18,404

"younger" is omitted.

THE COURT:  On line 5 that word "sedimentary" should be "alluvial," shouldn't it?

MR. SACHSE:  I have it erased and changed three times on my first one and back to "sedimentary" finally.

THE COURT:  Did we argue about that?

MR. SACHSE:  Yes.  It doesn't matter to me.

MR. VEEDER:  I believe it is the same.  When you say "alluvial" don't you mean "sedimentary deposits"?

THE COURT:  To keep it consistent it should be  "said alluvial deposits" instead of "sedimentary materials" in V.

MR. SACHSE:  ". . . said younger alluvial materials," then.

THE COURT:  All right.

MR. GIRARD:  Deposits or materials.

MR. SACHSE:  Use the word "deposits".

There is no change at all in VI.

MR. VEEDER:  In line with what we wrote back in III that the younger alluvial deposits in Murrieta Valley contain ground waters the source of which are the surface waters of Murrieta Creek and its tributaries.  I believe that the finding to which I just made reference would indicate that there is ground water from the older alluvium passing over the fault, through the fault, across the fault into the deposits of the Murrieta ground water area.

18,405

THE COURT:   I think that is right -- "the sources of which are the surface waters of the Murrieta Creek and its tributaries, and waters . . ."

MR. GIRARD:   You could say "and the ground waters which pass over said fault zone as found in Finding _____".

THE COURT:   Yes.

MR. SACHSE:   Through and over.

MR. GIRARD:   "Surface waters" would take care of it. We would just have to say "and ground waters".

THE COURT:   Okay, Mr. Veeder?

MR. VEEDER:   I think that is more accurate, your Honor.

THE COURT:   ". . . over and through the Wildomar Fault Zone as found in Finding _____".

VII is new?

MR. SACHSE:   It has all been rehashed.   It is pretty hard to describe the changes because it was redrafted more or less.   The biggest change is the "natural conditions".

THE COURT:   Let me read it.

The only suggestion I would make is on line 18, to be grammatically correct, after "surface flow has" put in the word "varied" -- " has varied and may vary considerably," because "has varied" doesn't make any sense.

Then we there point out  that it is between the fault lines and that takes care of this thought about this younger alluvium lying easterly of that Wildomar Fault.

18,406

1        Mr. Veeder?

2        MR. VEEDER:  I have notes here in keeping with our

3   earlier statement about the deposits from the surrounding

4   hills.  I don't believe the evidence would support the

5   statement, for example, on line 23, "said flood waters

6   on occasion have extended over and upon all of the younger

7   alluvial deposits".

8        THE COURT:  We are talking about all the alluvial deposits

9   between the fault zones.

10       MR. STAHLMAN:  All of said younger alluvial deposits.

11       MR. VEEDER:  I think, your Honor, when we are looking

12  at the areas around the Town of Murrieta is a good example.

13  And then further on down the Santa Gertrudis areas.

14       MR. GIRARD:  How did they get there if they weren't

15  carried there by water?

16       MR. VEEDER:  They weren't carried there by Murrieta

17  Creek.  That is the point I made.  I think they were brought

18  down maybe by wind erosion and some by water action.

19       MR. STAHLMAN:  I thought we ironed this out the other

20  day.

21       MR. VEEDER:  We have never ironed this out.

22       MR. STAHLMAN:  If your Honor will recall the testimony

23  we put in, in regard to that particular area, when we

24  introduced these aerial maps, they show quite plainly how

25  that material in that area is deposited.  Slaughter House

18,407

1    Canyon comes down there.  You can see it on the map.  That

2    erosion in there would bring down sediment into that

3    basement, because there is a great deal more water comes

4    down there than comes out from the watershed line.

5        MR. VEEDER:  I think you are saying it very well.  The

6    point that I am making, George --

7        MR. STAHLMAN:  Maybe we are talking about the same thing.

8        MR. VEEDER:  I think we are.  I think what you are

9    talking about is the alluvial fans that come out from

10   Slaughter House Creek.

11       MR. STAHLMAN:  Yes, Slaughter House is the headwaters

12   of the Murrieta.

13       MR. VEEDER:  On both sides, is it not correct, you have

14   the erosion from the older alluvium that comes down and not

15   from Murrieta Creek, but by these series of arroyos on both

16   sides, including Slaughter House?

17       MR. STAHLMAN:  Of course, Slaughter House is a

18   precipitous creek that undoubtedly, as the aerial photos

19   shows --

20       MR. SACHSE:  As a matter of fact, I don't think it is

21   essential to say that in times past it did this.  I think

22   you could take out that whole "in times past" paragraph or

23   clause and stop it.

24       MR. VEEDER:  I will guarantee it was in times past.

25       MR. SACHSE:  I say, I don't think this is a critical

18,408

1    finding at all.  No rights are going to depend upon what

2    happened in times that far past.

3        MR. VEEDER:  Let the record show that Mr. Sachse and I

4    concur for the first time in three years.

5        MR. GIRARD:  This was your Honor's suggested finding.  I

6    think probably if it did happen there should be a finding on

7    it.

8        THE COURT:  The general plain of Murrieta Valley indicates

9    clearly that the plain was created by flood waters.  The

10   plain of Murrieta Valley is not a series of little hillocks.

11   The plain of Murrieta Valley is a flat plain ascending to the

12   north and east -- a flat plain of detritus.  How did it get

13   flat?

14       MR. STAHLMAN:  By a lot of water coming over it.

15       MR. VEEDER:  Yes, from a variety of sources, though.

16   That is the point.

17       MR. SACHSE:  It is still flood waters, whether they run

18   off the side of the hill or down the creek itself.

19       MR. GIRARD:  This doesn't say from Murrieta Creek; it

20   just says they have been under water.

21       MR. VEEDER:  I have made my point.  I'll just drop it.

22       THE COURT:  What are you looking for, Colonel?

23   Elevations?

24       COLONEL BOWEN:  Yes, sir.

25       THE COURT:  Isn't it true that the plain of Murrieta

18,409

Valley is a plain ascending in elevations to the north and east?

MR. VEEDER: North and west, your Honor.

THE COURT: North and east.

COLONEL BOWEN: That is true, your Honor. But in speaking of the younger alluvium between the fault zones, it was not all necessarily deposited by Murrieta Creek. Some of it was deposited by tributaries to Murrieta Creek. Some of it was deposited --

THE COURT: I agree. But isn't this how this works? Here is the plain of Murrieta Valley. Here is "X" Canyon. You get a cloudburst in "X" Canyon and here comes an alluvial fan built up right in the Valley. In another year you get a flood over here. Here comes another alluvial fan that is built up. Then you get a big flood and the first thing you know the alluvial fans are cut out and your valleys are evened up again. Isn't this the way it happens?

COLONEL BOWEN: Yes, your Honor.

THE COURT: With the exception of some alluvial fans that exist there presently, the plain of Murrieta Valley has been smoothed out by flood waters. Am I wrong in my belief that the plain of Murrieta Valley is relatively level and ascends to the north and east in elevation?

COLONEL BOWEN: Your Honor is correct that the plain of the Valley is as you described it.

18,410

MR. VEEDER:  North and west.

COLONEL BOWEN:  North and west.

THE COURT:  Ascends to the east, north and east.

MR. STAHLMAN:  Here is north right here on this map.

THE COURT:  All right, north and west.

MR. STAHLMAN:  It almost follows the edge here.

THE COURT:  Isn't the Murrieta Valley what you would call typically a flood plain?

COLONEL BOWEN:  Yes, your Honor.

MR. VEEDER:  Is the younger alluvium all flood plain or from Murrieta?  That is the question.

THE COURT:  It doesn't make any difference where it comes from.

MR. SACHSE:  It doesn't say so, Mr. Veeder.

THE COURT:  Certainly it came off the hills and the tributaries.  But, actually, you get a flood plain created. If there hadn't been floods in there and detritus from the little tributaries running down in there, Murrieta Valley would be a series of hillocks as you proceed along.  This is what happens.

MR. STAHLMAN:  A lot of it comes out of washes and that all goes down toward the creeks which eventually deposit down on the stream.

(Discussion off the record around one of the map     )
(                                                     )
(exhibits.                                            )

1          THE COURT:  As it comes in from these canyons into the

2     Murrieta, and if that is all that ever happened in the bottom

3     of the Murrieta, as you went along it would be really like

4     a roller coaster. But periodically there comes a flood that

5     smooths this out.  You often can see the banks where the

6     alluvial fans have been cut off as stream action came down.

7     As I recall, from seeing it and hearing the testimony, the

8     Murrieta Valley is a flat flood plain.  And that hasn't been

9     done by man, it hasn't been done by wind; it has been done

10    by flood waters.

11         MR. VEEDER:  This will be my last statement on that,

12    your Honor.  We have checked the elevations of the channel

13    of the Murrieta Creek where it is presently located on the

14    maps, and it is quite a number of feet, very much lower,

15    in fact, than the alluvial boundary, so to speak, north and

16    east of where the Creek is.  That is the only point I was

17    wanting to make.

18         THE COURT:  You are talking about the Creek down just

19    before the entrance to the Gorge?

20         MR. VEEDER:  No, I am speaking about it throughout its

21    length, your Honor.

22         THE COURT:  It is incised into the younger alluvium.  Is

23    that what you are saying?

24         MR. VEEDER:  I think the channel as it moves on down is

25    discernible.  I am talking about the slant of the Valley down

toward the southwesterly portion from Wildomar Fault.

THE COURT:  Did you ever drive down the Ridge Route from Tujunga Pass to Los Angeles?

MR. VEEDER:  Yes, sir, I have flown down.

THE COURT:  I don't know if you see it if you fly.  You start down there.  There is a phenomenon on the right hand side.  There are some flood plains of valleys that have been laid down by stream action.  And now the water has incised a channel in this flood plain and they have some bad erosion going on and they have channels twenty feet deep and twenty feet wide cutting right through this alluvial plain that was previously laid down by flood waters.

That is typical of this area.

Let me read this over once again.

Take a short recess.

(Recess.)

THE COURT:  I am satisfied with VII.  The only suggestion I would make would be this:  On line 16, after "zones" I would put a semicolon and I would change the "but" to "that" -- "that upon said areas of younger alluvial deposits . . . the location of said surface flow has varied . . ." in line 20 at the semicolon I would insert "that the floor of Murrieta Valley is a flood plain rising in elevation as it proceeds in a northwesterly direction".  Here it is written out for you.  Then a semicolon.  Then the material

18,413

that is in there, except on line 24 strike out the word

"all", leave it "upon the younger alluvial deposits" and

add "between the said fault zones".   I think that is correct.

I don't think there is any escaping it.   We are not talking

about where it comes from.   It comes from various places,

but it has been smoothed out by flood waters.   And we are

talking about natural conditions in that paragraph.

Have you got that all now?

MR. GIRARD:   Yes.   But I think you are wrong, your

Honor, when you limit it between the fault zones.   As I

understand the situation, I think we are going probably to

have to back up from using the fault zone as the easterly

boundary of the stream, mainly because, as I understand the

situation, the Wildomar Fault does not extend into the

younger alluvium, which is very  shallow, and that in fact

the younger alluvium lies on top of the fault zone, being

only at the deepest point 30 feet, and as I understand, from

just talking briefly, the Wildomar Fault does not impede at

all the movement of ground waters in the younger alluvium.

MR. STAHLMAN:   I have observed this phenomenon up

there, your Honor, that the Wildomar Fault Line as it comes

down there are places where there were trees that had grown

in the past.   But water is not rising at the present time

because of the water table.   But young Mr. Roripaugh, in

explaining this to me -- he has seen this up to about eight

18,414

or ten years ago -- that the waters would even rise there through the older alluvium.  So the fault line extends through the younger alluvium and the older alluvium on the surface.

THE COURT:  Mr. Kunkel, is the fault line visible in the younger alluvium?

MR. KUNKEL:  I have not observed it myself because it has been plowed out, but my firsthand information, discussing it with the original settlers there, claimed that in the early days there was a displacement.  In my opinion, the fault existed.  It has been plowed out subsequent to that.  Mr. Hail has also found sand craters along the area.  But the fault is not a barrier to the movement of ground waters in the younger alluvium.  That is the key point.

THE COURT:  That is what I was going to ask.

MR. KUNKEL:  Yes, your Honor.

THE COURT:  That if the fault did occur after the younger alluvium was in place, it doesn't consitute a barrier in the younger alluvium.

MR. KUNKEL:  That is right.  Displacement has been minor and is not a barrier.

MR. SACHSE:  Your Honor's words, "between the fault zones" should go out.

THE COURT:  All right, strike them out.

Do you think we should go back to III and point out --

1      MR. SACHSE:  No, I don't think there is anything wrong

2   with III.  We are going to have to do further things when

3   we get further on, though.

4      THE COURT:  All right.

5      Let's look at VIII.

6      MR. VEEDER:  I don't believe VIII is correct, your Honor.

7   I believe that at present and as far back as we have any

8   evidence the Murrieta Creek is a perennial stream just above

9   the Vail boundary, but that it is an intermittent stream as

10  to time northwest from that point but not as to place.

11     THE COURT:  I am concerned with lines 28 and 29 on page

12  4, starting with "but --"  there is an inconsistency here,

13  "but on the contrary flows throughout its course as a

14  surface stream, then disappears and flows underground and

15  then again rises to the surface; . . ."

16     MR. VEEDER:  That is my objection.

17     THE COURT:  Flows -- it is not throughout its course.

18     MR. SACHSE:  Intermittently in its course it is a

19  surface stream.

20     THE COURT:  Yes; in its course as a surface stream,

21  then disappears, flows underground and rises to the surface.

22     MR. SACHSE:  I have a question in connection with line

23  9 on page 5.

24     MR. VEEDER:  You are ahead of where we should be.

25     MR. SACHSE:  No.

1    THE COURT:  What else?

2    MR. VEEDER:  It would seem to me that the evidence

3  would only support that you have a perennial stream just

4  northwest of the Vail Company boundary, which would permit

5  the deletion.  He says, "that the points where said waters

6  of Murrieta Creek rise to the ground and flow as a surface

7  stream may vary from year to year and within each year; . .."

8  I didn't know that.  Is that correct?

9    MR. STAHLMAN:  That is true.

10    MR. WILKINSON:  There probably isn't evidence, but it

11  is true.

12    MR. STAHLMAN:  Will you say it is true?

13    MR. WILKINSON:  It is true.

14    MR. VEEDER:  There is no evidence of that.

15    THE COURT:  He has been sworn as a witness in this case.

16    MR. VEEDER:  All right.

17    THE COURT:  The finding starts out about a state of

18  nature.  Then it is not until we get down to line 2 that

19  we talk about "in recent times the perennial flow ...

20  commences at a point north -- ..."

21    MR. STAHLMAN:  Should not the word "surface" appear in

22  there -- "in recent times the surface perennial flow" or

23  "the perennial surface flow," I mean?

24    MR. SACHE:  Yes.

25    THE COURT:  Yes.

18,417

MR. GIRARD:  I think this should be, on line 9,

Sections 34 and 35, Township 7 South Range 3 West.

MR. VEEDER:  You are talking about the pumping hole

just north.

MR. GIRARD:  Yes.  I would ask Colonel Bowen to correct

me.

MR. SACHSE:  That was my question.  Do you want to say

a hole, Mr. Kunkel?  Is it a depression or depressions?

MR. KUNKEL:  One.

MR. VEEDER:  You are talking about only this one in

here?

MR. GIRARD:  Yes.

THE COURT:  Talking about the one in Murrieta Valley

now.

MR. VEEDER:  Sections 27, 34 and 35 is where we located

it in our findings.

MR. GIRARD:  So it would be 34, 35 and 27?

MR. VEEDER:  Yes.

MR. GIRARD:  Those are projected sections.

MR. SACHSE:  7 South Range what?

MR. GIRARD:  I have 7 South Range 3 West, but I am not

a map expert.  Is that right?

THE COURT:  Just for the sake of grammar, on line 6 I

would take out the words "there has been caused" and put

them in line 9 after the word "area," so that it would read

18,418

that "in recent times, as a result of . . . in the ground

water area" and then insert, "there has been caused to exist

a pumping depressing located in _____".

MR. GIRARD: "There has been caused to exist"?

THE COURT:  Yes, located et cetera.

Now, this referese gradient of ground water movement--

MR. GIRARD:  I guess instead of the word "toward" on

line 15, it should be "to".

THE COURT:  Let me read it again.

Actually, the referse gradient concerns the waters

south of the depression, not north of it.

MR. GIRARD:  Yes.

THE COURT:  Has resulted in a temporary reverse gradient

of ground water movement in Murrieta Valley, or ground water

movement, and to some extent ground waters which are

contained in the alluvial deposits south of the temporary

pumping depression.

MR. GIRARD:  It would be south of the temporary

pumping depression and north of the temporary ground water

divide ... Is that right?   In other words, Fred, as I under-

stand it, your pumping depression is here and your waters

do move this way into the pumping depression and they do

move this way into the pumping depression.  Where is your

breaking off point?  Where the waters south of the pumping

depression move north instead of west?

18,419

MR. VEEDER:  You have your ground water divide that shows there.

MR. SACHSE:  Why do you have to say it?

MR. STAHLMAN:  I was wondering.  Is it that you have created a hole by reason of the pumping depression and so waters are flowing toward the center of it?  There is now created a pumping depression.  The waters that were flowing through it now flow toward the center of the pumping depression.

MR. SACHSE:  Mr. Stahlman is right.  We are saying this is temporary and we say that to some extent ground waters moving south now move north.  I think it is pointless to point out to what extent today they are moving north.

MR. GIRARD: All right, just add the word "south" for "north" and leave it go?

MR. SACHSE:  Yes.

THE COURT:Actually, Mr. Stahlman is more accurate.  The waters in the areas surrounding the area adjacent to the pumping depression are moving into the pumping depression.

MR. GIRARD:  All right.

THE COURT:  Isn't that what happens?

MR. VEEDER:  From all directions.

THE COURT:  Yes.

MR. GIRARD:  How did you word that now, George?

THE COURT:  "...to some extent ground waters which are

1    contained in the alluvial deposits adjacent on all sides

2    to the temporary pumping depression under such temporary

3    conditions move down the hydraulic gradient toward and into

4    the pumping depression and not downstream toward Temecula

5    Gorge." Isn't that more accurate?

6        MR. STAHLMAN:  That is the thought I had in mind.

7        THE COURT:  Mr. Veeder?

8        MR. VEEDER:  Yes.  I would like to see the word

9    "temporary" taken out.

10       THE COURT:  Well, it will stay in.

11       MR. GIRARD:  Would you read that once more, your Honor?

12       THE COURT:  All right.  Starting on line 11, "...and to

13   some extent ground waters which are contained in the alluvial

14   deposits" -- strike out "north" and insert "adjacent on all

15   sides to said temporary pumping depression . . ."

16       Is that right or wrong, Colonel Bowen?

17       COLONEL BOWEN:  Yes, sir, that is right.  I was just

18   shaking my head over Commander Redd's dilemma.

19       MR. GIRARD:  What is his dilemma?

20       MR. STAHLMAN:  His present dilemma.

21       COLONEL BOWEN:  He is just trying to keep up with the

22   changes.  He is now running out of space, your Honor.

23       THE COURT:  ". . . adjacent on all sides to said pumping

24   depression under such temporary conditions move down the

25   hydraulic gradient toward and into the pumping depression and

18,421

1          not downstream into Temecula Gorge."

2              MR. VEEDER:  Your Honor, are you at IX yet?

3              THE COURT:  Yes.

4              MR. VEEDER:  Isn't it a fact that should be reflected

5          here that it is the lowering of the ground water table in

6          both the younger and older alluvium, and it arises from the

7          fact that there was pumping from the younger and older

8          alluvium?  Isn't that the condition that exists?  I think

9          those wells all tap the older alluvium.

10             THE COURT:  I think something like that is right.

11             MR. SACHSE:  Just delte "within said younger alluvium

12         deposits".  You have what Mr. Veeder wants and no harm done.

13             THE COURT:  We are talking about the areas of rising

14         water --  "rising surface flow in Murrieta Valley".  Insert

15         "Murrieta Valley."  That is what you are talking about.

16         ". . . lowering of ground water levels within the" -- strike

17         out "younger" -- "alluvium".

18             MR. GIRARD:  I don't want it.  I think "younger" should

19         be in.

20             MR. SACHSE:  The first "younger" goes in.

21             THE COURT:  I agree.  In other words, it is true you

22         pump from the older, but when you do that you are helping

23         decrease --

24             MR. SACHSE:  I say just delete 21 and you have it,

25         delte the "younger" in line 21, or delete the whole "within

18,422

said younger". ". . . the wells which tap said ground

waters".

MR. GIRARD:  I think Mr. Sachse is right.

MR. VEEDER:  I think "said ground waters" would be read

back to "younger," the way you have it.

MR. SACHSE:  Then take out "younger."

MR. GIRARD:  I want to be heard before we take out the

word "younger."

THE COURT:  I am going to leave it on line 19.

MR. GIRARD:  Fine.

THE COURT:  ." . . . deposits between said fault zones

resulting from pumping from wells which tap said ground

waters".   How about taking it out on line 21?

MR. VEEDER:  I think it has to come out on 21.

MR. GIRARD:  I am not so sure.  The whole purpose of

these findings is to show a stream in a known and defined

channel.

MR. VEEDER:  That is one of your dilemmas.

MR. GIRARD:  Yes.  And I think basically the surface

waters are affected   primarily by the pumping in the known

and defined channels of the stream.  I certainly agree that

to a minor degree pumping in the older alluvium may have

an effect.

THE COURT:  I think you are right.

MR. GIRARD:  But the major effect on the stream is in the

1    known and defined channel pumping.

2    THE COURT:  I think so.

3    MR. GIRARD:  That is what I wanted to show.

4    MR. VEEDER:  We can't agree with that, your Honor.

5    THE COURT:  I agree with it.  We are talking now about

6    the underground flow of Murrieta.  It is obvious the wells

7    that draw out of the younger alluvium that have the major

8    effect on the underground flow.

9    MR. VEEDER:  With all respect to your Honor, I don't

10   believe there is a scintilla of evidence on that point.  But

11   we will file our objection when this is final.

12   THE COURT:  X.

13   MR. GIRARD:  This is, of course, based on the easterly

14   boundary being the contact with the older alluvium.  As I

15   understand it, as clarified by Mr. Kunkel, we have now

16   abandoned the fault idea.  On line 30, to be consistent, I

17   think either Colonel Bowen or Mr. Kunkel said it should be

18   "hydrologic continuity" and not "contact".  Is that right?

19   MR. VEEDER:  That is right.

20   Where are we at the present moment?

21   THE COURT:  I am reading X, on page 5.

22   MR. GIRARD:  It should be broken up a little somewhere.

23   THE COURT:  On lines 10 and 11, "that throughout the

24   course of Murrieta Valley the ground waters which are

25   contained in the younger alluvial deposits rise to the

1    surface and then disappear . . ." that is actually in a

2    state of nature.

3         MR. GIRARD:  Yes.  I think in line 6 it says "under

4    natural conditions".

5         MR. SACHSE:  This is so long, may I offer a suggestion?

6    On page 5, line 28, take out the word "while;" so it says

7    "that it is true that the ground waters within said alluvial

8    deposits are in hydrologic continuity . . ."

9         THE COURT:  Let's break it up certainly by semicolons

10   or new sentences.

11        MR. SACHSE:  ". . . that said older alluvial deposits

12   because of their . . ."  I think another semicolon on line

13   5 on the next page.

14        THE COURT:  After "moving into the older alluvial

15   deposits"?

16        MR. SACHSE:  Yes.  Then take out "but on the contrary"

17   and say "that" again.

18        THE COURT:  What has the "contrary" got to do with it?

19        MR. SACHSE:  Take that out and just put in the word

20   "that".

21        MR. GIRARD:  Yes.

22        THE COURT:  Yes, that helps.

23        MR. STAHLMAN:  I have one other minor suggestion on that

24   paragraph, your Honor.  The word "tighter," I would say

25   "more compacted" or something of that sort on line 31 --

18,425

1   "more compacted characteristics" or "compacted characteristics".

2      MR. VEEDER:  "Lower permeability" is what he is

3   speaking of.

4      MR. STAHLMAN:  Yes.  You have that all over here.   It

5   explains it all right, but I think the word "compacted"

6   is more descriptive.

7      THE COURT:  "More compacted" instead of "tighter".

8      MR. STAHLMAN:  Yes.

9      THE COURT:  Wouldn't that be more correct, Mr. Kunkel?

10     MR. KUNKEL:  Well, "more compacted" would be all right.

11     THE COURT:  "More compacted characteristics."

12     MR. STAHLMAN:  Colonel Bowen said it would be more

13  correct.

14     MR. VEEDER:  We, of course, can't accept the idea that

15  on page 6,line 1,  "except as to limited amounts of ground

16  waters which do percolate from the younger alluvial deposits

17  into the older alluvial deposits".  We would just like to have

18  a continuing objection, because we think the evidence is

19  contrary to that.  We believe all the older alluvium is

20  recharged in its entirety from the younger alluvium, with

21  the exception of that which falls directly upon the older

22  alluvium.

23     THE COURT:  Anything else on X?

24     XI.

25     MR. VEEDER:  Before you leave that, we have "that

18,426

1  throughout the course of the Murrieta the ground waters which

2  are contained within the younger alluvial deposits rise to

3  the surface and then disappear and flow" again.  We objected

4  to that in the earlier finding.  I don't believe it is

5  correct.

6      THE COURT:  We say in a state of nature.  It all goes

7  back to line 6 -- natural conditions.

8      On XI, line 24, put "more compacted" instead of

9  "tighter".

10     XI looks all right.

11     XII?  On line 24 instead of "hereinafter" say "herein

12  referred to as Murrieta Creek".

13     We are passing up a good piece of testimony here on

14  this underground flow of Murrieta Creek which I think we may

15  have to go back and change.  Mr. Kunkel's data here shows

16  the flow with arrows parallel to the flow of the surface

17  creek.  When we talk about the pumping depression, "that

18  while it is true . . ." his testimony -- and the map, as I

19  recall -- his testimony was that the reverse gradient had

20  occurred in the flow of water in the Murrieta Valley.  The

21  reverse gradient  where the water had been flowing down-

22  stream is now flowing upstream.

23     MR. VEEDER:  I don't think you would use the word

24  "flowing".  I think you would use the word "ground water"

25  movement".  Surely there is no subterranean stream.

18,427

1      But, your Honor, while you are here at the map --

2      MR. GIRARD:  Your Honor, we haven't passed that up.

3      THE COURT:  No, we changed about "flowing in all

4  directions adjacent on all sides".  I am just wondering how

5  we should word that.

6      MR. GIRARD:  In other words, I understood Mr. Kunkel's

7  testimony to be that the only waters that would be moving

8  upstream would be the waters south of the pumping depression--

9  that is, water in here would be moving into the pumping

10 depression, north of the pumping depression.  The waters up

11 here would still be moving toward the pumping depression.

12 So there would only be this limited reverse gradient here.

13     THE COURT: Where does his testimony appear?  Can anybody

14 find it?

15     MR. STAHLMAN:  You find this in all basins where you

16 have pumping depressions that all the streams do like on the

17 San Luis Rey.  There we have pumping depressions all over

18 that stream bed.  Sometimes these depressions don't extend

19 out as far as the edges.  He has them all the way out here.

20 Maybe they do in this case or they don't.  There would still

21 be water coming down here.  This is the line of the pumping

22 depression.  Wherever that static water level would be it

23 goes into the pumping depression.  There happened to be quite

24 a few wells here and it has created quite a large pumping

25 depression.  Every well has a pumping depression, and every

1   well is changing the flow in its vicinity.

2        THE COURT:  Mr. Veeder wanted the pumping hole put in

3   there.

4        MR. GIRARD:  I don't have any objection to considering

5   it.  I thought I did consider it in Finding VIII, and this

6   Finding X is concerned with natural conditions, not existing

7   conditions.

8        THE COURT:  Yes, I am satisfied with that.  I am just

9   thinking about going back.  I would like to find out what

10  Mr. Kunkel did say about that.

11       MR. VEEDER:  I will get the references for you, your

12  Honor.  I am sure there was never a statement that the

13  ground waters flow.  I am sure that it was always "movement".

14  I am sure it was always differentiated between surface flow.

15       THE COURT:  But the key word was a reverse "flow".  If

16  it is flowing downstream and then there is a reversal, then

17  it is flowing upstream.

18       MR. STAHLMAN:  That was the testimony.

19       MR. VEEDER:  It was reverse gradient of water movement.

20       MR. GIRARD:  The reverse gradient of water movement

21  would be that movement of the ground waters south of this

22  ground water depression.

23       THE COURT:  Let's get the testimony over the noon hour.

24       MR. GIRARD:  I don't have my transcripts here.

25       THE COURT:  I have my transcripts upstairs.  Check it

18,429

1    over the noon hour.

2        Don't worry too much about it, Mr. Kunkel.

3        MR. SACHSE:  I don't care whether we use "flowed,"

4    "moves," or "trickles".

5        THE COURT:  The key word is "reversed".  That I know

6    he used -- that it "reversed" itself.  You don't reverse

7    yourself because the water is flowing out in all directions.

8    It reverses itself because the water flowing down the

9    Murrieta at that place is flowing up the Murrieta.  We will

10   look it over at the noon hour.

11       We finished XII.

12       MR. SACHSE:  We finished XI and XII.

13       MR. GIRARD:  That is right.

14       THE COURT:  XIII.

15       MR. GIRARD:  I would like to make sure that Palomar

16   Street and Orange Street are depicted on 15-E or 15-L.

17   Are they (Examining map exhibit)?

18       Change 15-E to 15-L.

19       THE COURT:  You are talking about XIII now.

20       MR. GIRARD:  Yes, your Honor.

21       MR. VEEDER:  Don't say it is "a barrier of bedrock".

22   I think it is probably faulting rather than bedrock.  A

23   barrier which would effectively prevent.

24       MR. SACHSE:   Take out the "bedrock" and just say

25   "barrier".

18,430

1      THE COURT:  All right.

2      MR. GIRARD:  No objection.

3      THE COURT:  Have you got your Townships right?

4      MR. GIRARD: Check me on that, will you, Fred?

5      MR. KUNKLE:  6 South, 4 West.

6      THE COURT:  ". . . northeast of Palomar Street and

7   west of Orange Street . . ."

8
9      (Court and counsel examine map exhibits.)

      MR. GIRARD:  We should add Section 26, too, located

10   northeast of Palomar Street and west of Orange Street.

11      THE COURT:  That is right.

12      Now go to XIV.

13      MR. GIRARD:  I think we should probably add, on line

14   14, "extend to a maximum depth".  As I understood the

15   testimony, it was not that it was 30 feet throughout, but

16   that that was the maximum.

17      MR. VEEDER:  Extends to a depth of a maximum of

18   approximately.

19      MR. SACHSE:  To a maximum depth of approximately 30

20   feet.

21      MR. GIRARD:  To a maximum depth of approximately 30

22   feet; is that correct?

23      MR. SACHSE:  That's right.

24      THE COURT:  To make it read right, extends in various

25   depths to a maximum depth of.

18,431

1        That is a cruel thrust in the last paragraph of XIV.

2        MR. GIRARD:  Just driving the nail a little deeper,

3    your Honor.

4        THE COURT:  But after the Circuit has lived with you as

5    long as I have, they will discover that you are able to

6    fence with the Marine Corps, that you will pick up any

7    weapon anywhere and use it in any way possible.

8        MR. VEEDER:  I think you shouldn't attack my integrity,

9    your Honor.

10       THE COURT:  I am not attacking your integrity.  It is,

11   in a way, a compliment.  I say you very diligently represent

12   your client, but sometimes in this diligence you get into

13   inconsistent positions.

14       MR. VEEDER:  No.  I just want to be sure it is all

15   well defined.

16       THE COURT:  XV is next.

17       MR. VEEDER:  XV is most important to us, your Honor.  I

18   have just administered oxygen to Commander Redd here, because

19   it is going to fall to him to find where that contact is

20   and which was the smallest tract.  It's really a fantastic

21   job.

22       MR. GIRARD:  I realize it is.

23       MR. SACHSE:  I bet Commander Redd a good dinner he will

24   not find a single parcel where the contact line is the

25   property line.

18,432

1      MR. VEEDER:  Let's go on to XVI. You get that dinner,

2  Commander Redd.

3      MR. GIRARD:  I think on XVI it should 15-L, again.

4      THE COURT:  XVII.   "That the younger and older alluvial

5  deposits . . . consit of sedimentary materials; ..."

6      MR. SACHSE:  I think we ought to make the words the

7  same.

8      MR. GIRARD:  Younger alluvium deposits.

9      THE COURT:  Yes, that is what we used before.

10      Depicted on 15-L?

11      MR. GIRARD:  Yes.

12      THE COURT:  It looks all right to me.

13      XVII and XVIII look all right to me.

14      MR. VEEDER:  This all relates back to the natural

15  conditions, in  a state of nature, on XVIII.

16      MR. GIRARD:  Yes.

17      MR. STAHLMAN:  Your Honor, it might be well if the Vail

18  findings be given a number.

19      THE COURT:  35 is the next number.   The Military

20  Enclave was 34.  Vail will be 35.

21      We have a little grammatical thing in XIX, "have and

22  will effect . . ."  It is "affect" and not "effect".

23      MR. GIRARD:  Where are you now?

24      THE COURT:  On line 15, page 10.

25      MR. GIRARD:  On line 19 the word "flood" should be

18,433

deleted.   Their permit is for a period of time, which may or may not be flood water.

THE COURT:   On line 21, "has entered";they  may be entered before or later.  Why not just say that?  Strike out "this Court has entered" and say, "detailed findings of fact in Interlocutory Judgment No. 35 specifically concern Vail Dam; . . ."

MR. SACHSE:   Put the word "are" in front of "specifically" and you will make a sentence with that correction -- "detailed findings in Interlocutory Judgment No. 35 are specifically concerned with Vail Dam;. . ."

THE COURT:   I made it a sentence by striking "concerned with".   I said, "detailed findings in Interlocutory Judgment No. 35 specifically concern Vail Dam; . . ."  You can do it either way.   Either way makes a sentence.

Anything about XIX, Mr. Veeder?

MR. VEEDER:   Just the general objection to it, your Honor.

THE COURT:   All right.

XX.   On line 29 "are of considerably more compacted material".   "More compacted" instead of "tighter".

On page 11, lines 1 and 2, "continuity" instead of "contact".

Now, we have another long sentence here.  Let's see what we can do with it.

1    MR. STAHLMAN:  There is another "tighter" in there on

2  line 3.

3    THE COURT:  Yes.  First of all, on page 10, strike

4  "while".     "... it is true that the ground waters . . . in

5  continuity with . . ."

6    A semicolon on line 3 after "deposits"; "said older

7  alluvial deposits because of their more compacted . . . "

8  then put a semicolon on line 8 after "older alluvial

9  deposits".

10    MR. VEEDER:  Your Honor, if I may go back just a moment,

11  on page 10, line 29 you say "considerably more compacted".

12  Then we go over on line 4 on page 11 and say "more compacted

13  characteristics and limited permeability".  I think we can

14  delete "limited permeability," can we not?

15    THE COURT:  Why?  We say in lines 29 and 30, "more

16  compacted . . . and their permeability .. . less," and then

17  we say that, "because of their more compacted nature and

18  limited permeability the older alluvial deposits do impede".

19    MR. VEEDER:  Isn't "lower" a better word than "limited"?

20  "Limited" smacks to me of concrete.

21    MR. SACHSE:  "Lower permeability" is all right.

22    MR. VEEDER:  I think it is true the permeability is

23  lower, but I don't think it is necessarily limited.

24    MR. GIRARD:  All right, "lower" is all right.

25    I think we should add also on line 29 in XX, "are of

1    considerably more compacted material and lower permeability".

2    Get it in there twice.

3         THE COURT:  You have it.

4         MR. GIRARD:  Yes, that is right.  I overlooked it.

5         THE COURT:  You have it in there.

6         MR. VEEDER:  I think we ought to have it three times.

7         THE COURT:  You can shorten it up on page 11 by saying,

8    starting with the semicolon on line 3, "that said older

9    alluvial because of their characteristics above referred

10   to".

11        MR. VEEDER:  I would like that.

12        MR. SACHSE:  That would be good.

13        THE COURT:  We have just told what they were.

14        MR. GIRARD:  All right.

15        MR. VEEDER:  Except as to limited amounts?

16        THE COURT:  After "to impede" start in, "except as

17   to limited amounts".

18        What about XXI?

19        Well, it's 12:00 o'clock.  This takes a long time to

20   do.

21        MR. GIRARD:  I think we will move faster this afternoon,

22   frankly.

23        MR. SACHSE:  Yes, a great many of these are repetitious.

24        THE COURT:  1:30?

25        MR. VEEDER: W.We have to check this out on this matter

18,436

1     of movement of ground water, your Honor.

2          THE COURT:  I will wait for you if you don't get it

3     done.   That is not going to take long to check out.  1:30.

4          (Noon recess.)

5

6                              ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18,437

SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 31, 1961, 1:30 P.M.

---oOo---

(Another matter.)

THE CLERK:  Six, 1247-SD-C, United States versus Fallbrook.

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  Your Honor asked me about the use by Mr. Kunkel of the word "movement" in connection with the ground waters as depicted on U.S.A. Plaintiff's Exhibit 15-E and 15-L.   At the time the evidence was introduced, those exhibits showing the reverse movement of the ground waters, he was interrogated and his interrogation appears in Volume 120, commencing with Page 13,717 on line 22 through line 10, in which the words "movement" were used, and on Page 13,753, lines 11 through 14, I find that on 13,718 I inadvertently used the word "flowing".  But I believe that Mr. Kunkel has consistently used the word "movement" as to the phenomena by which ground waters get from one place to another, unless, of course, he might have been paraphrasing your Honor, who does at times use the word "flowing".  However, it is our position that the word "movement" is the one that has been used.  If you care to look at the references, I have them marked (Handing document to the Court).

THE COURT:  Let me read these first.

18,438

1  Do you have a reference, Mr. Sachse?

2  MR. SACHSE:  Yes, your Honor, in the next volume,

3 Volume 121 of the transcript at page 13,807, lines 12 to

4 13,808, line 12, your Honor interrogates Mr. Kunkel, and Mr.

5 Veeder may be correct; it may be that your Honor has put

6 words into his mouth, but he uses the term that the water

7 "flowed or moved".

8  MR. STAHLMAN:  I think it flows or moves.

9  MR. VEEDER:  As a matter of fact, we would like to

10 substitute the word "percolate" for all of them.

11  MR. SACHSE:  In the underground stream channels.

12  MR. GIRARD:  Within the defined bed banks.

13  MR. SACHSE:  That is your Honor's copy of the transcript,

14 incidentally.  I brought it down.

15  THE COURT:  Of course, I may have caused this trouble,

16 but his answer says, on -59, "That is correct; it flowed or

17 moved toward the pumping depression".

18  MR. STAHLMAN:  Use both words in the findings just like

19 they are in the transcript, "flows or moves".  Everybody is

20 happy.

21  MR. VEEDER:  No.

22  MR. STAHLMAN:  Except you, under any circumstances.

23  THE COURT:  We are talking now, I take it, of the

24 bottom part of Finding VIII on page 5?

25  MR. GIRARD: Yes.

18,439

THE COURT:  On line 11, in front of the "and" put a semicolon, so that from the semicolon on it could be left the same.  That leaves lines 10 and 11, "that said pumping depression has resulted in a temporary reverse gradient of the ground water movement; . . ."

MR. GIRARD:  I think he used it correctly there -- "ground water movement".

THE COURT:  Then you would insert, I suppose, something like "causing the ground water in the younger alluvium immediately north of the temporary ground water divide shown on Exhibit 13-L to move or flow in a northerly direction or northwesterly direction".

MR. VEEDER:  You are now inserting the word "flow" in there?

THE COURT:  I don't know what the difference is.  Water in an underground stream certainly doesn't flow like water in a surface stream, but it moves among the particles of material.

MR. VEEDER:  I think "percolates" is a good word, isn't it, your Honor?

MR. STAHLMAN:  You could say also "caused the ground water in the younger alluvium to reverse its gradient".

THE COURT:  I'm content to let it be.  It says already, "in a temporary reverse gradient of the ground water movement" and the map which is in evidence and incorporated

18,440

1    in the findings shows it.

2       MR. STAHLMAN:  I don't think you need anything after

3    the word "movement" on line 11.

4       THE COURT: Mr. Girard, do you have any suggestions?

5       MR. GIRARD:  Sandy has a good description, which I think

6    could be worked in, if you wanted something along the line

7    suggested by your Honor, which is to the effect that "said

8    ground water divide is evidenced by and is a result of the

9    pumping depression and a reverse gradient or upstream flow

10   in the area of Santa Gertrudis Creek upstream from the

11   ground water divide in Sections," and then list the sections

12   "has resulted . . .."

13      THE COURT:  What has Santa Gertrudis got to do with it?

14      MR. GIRARD:  It is right at the corner of Santa

15   Gertrudis Creek.

16      I think we ought to leave it alone.

17      THE COURT:  Let's leave it alone.

18      MR. SACHSE:  By "leave it alone," you mean as corrected

19   with Mr. Stahlman's change, "adjacent on all sides to the

20   temporary pumping depression" or the way it was originally?

21      THE COURT:  Put a semicolon in there, so you have two

22   different thoughts, you see.   You have that the pumping

23   depression resulted in a temporary reverse gradient of the

24   ground water movement --

25      MR. VEEDER:  And then continuing.

18,441

THE COURT:  And then to some extent ground water adjacent on all sides of the depression had moved toward, et cetera.

I think it's all right, don't you?

MR. SACHSE:  I am satisfied with it.

MR. STAHLMAN:  I am satisfied.

THE COURT:  What is the next one?

MR. SACHSE:  XXI.

MR. GIRARD:  XXI, your Honor.

THE COURT:  I suppose line 16, "more compact" instead of "tighter".

I would put a semicolon after "stream" on line 18.

Any other suggestions on XXI?

XXII.

MR. VEEDER:  Does this all go back again to the state of nature?

THE COURT:  Which one are you talking about?

MR. VEEDER:  Aren't you on XXII, your Honor?

THE COURT:  Yes.

MR. SACHSE:  No; XXII is present.

MR. GIRARD:  It is present and in the state of nature.

THE COURT:  It talks about "periods of precipitation" et cetera.

Line 10 should be "herein" instead of "hereinafter".

MR. GIRARD:  Line 5 should be 15-L instead of 15-E, also.

18,442

THE COURT:   Any corrections in XXIII?

XXIV?

XXV.

MR. GIRARD:   I have a change -- maybe I missed it -- on XXIII, your Honor.   To make it conform to what we did on Murrieta Creek, line 19, "extend at various depths to a maximum depth," the correction that you made on that one.

MR. VEEDER:   Your Honor, we are desirous to have a continuous objection to all of these findings, but I do believe where there are changes such as these, I have to interpose some statement.   For example, on line 12 of Finding XXIII on page 12, ". . . it is true that the evidence in this case would indicate that younger alluvial deposits extend to a depth of approximately 175 feet . . ."   I thought that was a maximum of 130 feet in the outwash area.

MR. GIRARD:   That is what it was in the first draft, but the discussion yesterday somebody ran the scale and I looked at the record and I believe 175 feet came from his Honor.   I don't care what figure you put in.

MR. STAHLMAN:   You can check the well perforations and they came in around 175 feet.   I don't think it makes much difference.

MR. GIRARD:   I have no preference at all, but looking at the record it looks like the Court felt it was somewhere between 130 and 200.

18,443

1    THE COURT:  I don't remember that.  There is no distance

2  shown on --

3    MR. STAHLMAN:  The well perforations, I think, went down

4  to where the aquifers were in the younger alluvium.

5    MR. VEEDER:  Just so we reserve our right to file

6  specific objections.

7    THE COURT:  Let's decide about the number of feet.  What

8  do you base your statement of 130 feet on, Mr. Veeder?

9    MR. VEEDER:  As I recall, your Honor, Mr. Kunkel

10  testified that the depth of the younger alluvium in the out-

11  wash area immediately below  Nigger Canyon was 130 feet,

12  which was the greatest depth of younger alluvium in the

13  Pauba Valley, and that from there on it thinned out.

14    MR. STAHLMAN:  He might have testified to two different

15  situations:  That that was the greatest depth, but he did

16  at that time testify there was 130 feet.  Then he looked at

17  this map, which is not drawn to scale, and at that time,

18  which was later, just the other day, he says about 130 feet.

19    THE COURT:  Is 130 feet the figure we should use, Mr.

20  Kunkel?

21    MR. KUNKEL:  130 feet is the figure that should be used.

22    THE COURT:  All right, 130.

23    MR. KUNKEL:  That is the maximum.

24    MR. VEEDER:  That is the maximum in the northeast out-

25  wash area.

1    MR. SACHSE:  We have already taken care of the maximum.

2    THE COURT:  It reads now "extend in various depths to

3    a maximum of approximately 130 feet from ground surface; . . ."

4    MR. VEEDER:  In the northeastern portion of Pauba

5    Valley.

6    THE COURT:  That follows.

7    MR. SACHSE:  That follows in the next subparagraph.

8    MR. VEEDER: All right.

9    THE COURT:  Can we go to XXV?

10    MR. GIRARD:  What section is that?

11    MR. VEEDER:  Isn't that all Vail land in XXIV, Mr.

12    Wilkinson:  "That attached hereto, marked Exhibit B and

13    incorporated herein are descriptions of the smallest tract

14    of land held under one chain of title, . . ."  Isn't it

15    all Vail?

16    MR. WILKINSON:  It should be all Vail.

17    MR. VEEDER:  You bought a 40 acre parcel down here

18    near the mouth of the Canyon.

19    MR. STAHLMAN:  I know we have them corrected in our

20    findings.  You could refer to them as to what happened.

21    MR. VEEDER:  That would suit me, because I truly believe

22    there is only one.

23    MR. STAHLMAN:  Yes, there are some lands that are Vail

24    lands that are not riparian.  We left them out.  What would

25    be wrong with making reference to the description in the

1    Vail findings?

2         MR. VEEDER:  Sections 5 and 6 is the outwash area.  It

3    would be Sections 5, 6 and 7 in 8-1.

4         MR. GIRARD:  XXV should be in projected Sections 5, 6

5    and 7, 8 South, 1 West, S.B.B.M.

6         MR. STAHLMAN:  What are you going to do about XXIV?  Are

7    you going to put an exhibit on there?

8         MR. GIRARD:  If all of the lands which are riparian are

9    Vail Company lands, there should be an exhibit.  I presume

10   some of these lands that even are riparian are not in the

11   same chain of title, are they?

12        MR. WILKINSON:  Actually, it touches all three grants,

13   and one parcel within the grant we puchased after a period

14   of time.

15        MR. GIRARD:  I would think if the land which you say

16   in your findings is riparian to Temecula Creek, at least from

17   the Pauba Valley standpoint, these findings then go below

18   the Gorge.

19        MR. STAHLMAN:  There is still some land --

20        MR. GIRARD:  Santa Rosa would not be riparian to

21   Temecula and Pauba Valley.

22        MR. WILKINSON:  No.

23        MR. STAHLMAN:  That is okay.

24        THE COURT:  We are on XXV, then?

25        MR. GIRARD:  Yes.

18,446

THE COURT:  Line 12, "that at said point . . . there

exists  . .. impervious lenticular bodies . . ." They don't

exist only at that point.  Strike out "at said point and".

That within the older alluvial deposits there exists

lenticular bodies.

MR. VEEDER:  The term "impervious" is an error, to begin

with.

MR. STAHLMAN:  No.   Lenticular bodies are impervious

material, it has been testified to.

THE COURT:  These lenticular bodies are certainly the

most impervious.

MR. VEEDER:  The term "impervious," your Honor, I

believe, is an error.  I think you could say "of lower

permeability".  You could say that there are certain lenticular

deposits which are less permeabile.  Isn't that right?  I

don't believe that any of it has ever been said to be

impervious.

MR. STAHLMAN:  It is like clay deposits.  You don't get

any water through them.  You have them on every ranch.  The

geologist testified to the characteristics of those as being

"cementing" was the word.

MR. GIRARD:  Substantially.

THE COURT:  Substantially.

MR. STAHLMAN:  Substantially.

MR. VEEDER:  Substantially impervious?

1    MR. SACHSE:   If you get artesian pressure, you have to

2    have them.

3    THE COURT:   Strike out the word "impervious" on line

4    15, so we don't have to repeat the adjectives -- "said

5    lenticular bodies".

6    MR. GIRARD:   Yes.

7    THE COURT:   ". . . all present irrigation wells,"  I

8    suppose you would say, "in Pauba Valley," at line 20.

9    MR. STAHLMAN:   Yes.

10    THE COURT:   In line 22, after "S.B.B.M.," put a semi-

11    colon and insert "said areas".   Is that what you call them?

12    MR. STAHLMAN:   "Belt" they call it.   That is a technical

13    term I guess.   Isn't that right?   Artesian belt?

14    MR. SACHSE:   In this finding it is referred to as

15    "area of artesian pressure".

16    MR. STAHLMAN:   All the textbooks refer to it as the

17    "artesian belt".

18    THE COURT:   At the end of line 22 insert "and said

19    artesian area is pierced only by wells of . . ."

20    MR. SACHSE:   500 feet or more.   You have to add, "or

21    more" to it.

22    THE COURT:   Actually, it is not 500 feet.

23    MR. VEEDER:   400.

24    THE COURT:   There is one of 412, but it is probably

25    deeper.

MR. STAHLMAN:  Approximately 500 feet.

MR. VEEDER:  Didn't Mr. Wilkinson testify that the Windmill well was artesian?

THE COURT:  It is 515 feet deep.

MR. VEEDER:  But that is not what we have been calling the "artesian belt," is it?

MR. GIRARD:  If it is artesian, it must be.

MR. SACHSE:  If it is artesian, it is.

THE COURT:  I would say, "wells in excess of 400 feet in depth".

MR. SACHSE:  I want to be sure I am right on this point, that Mr. Wilkinson did say that it flowed and that the Windmill well was an artesian well.

MR. STAHLMAN:  It was testified to by Mr. Wilkinson, and it was also testified to by Mr. Hall that in times long past it did flow on the surface, and I think it is very understandable from the geology here.

THE COURT:  Do you want a finding on the Windmill well, too?

MR. VEEDER:  The only point that I am trying to make --

MR. GIRARD:  We have a finding on it on the next page.

THE COURT:  What is your point, Mr. Veeder?

MR. VEEDER:  I'll be frank with you.  In reading these proposed findings by the State, I had understood that they considered an artesian belt to exist not beyond a point

1    about halfway up Pauba Valley.

2        MR. SACHSE:  It doesn't say anything of the kind.

3        MR. VEEDER:  You are treating the whole Pauba Valley as

4    an artesian belt.

5        MR. STAHLMAN:  Not necessarily.  There are a lot of

6    things we don't know about this, but my concept of it is that

7    when you get a head upstream underneath this, as I say,

8    impervious material that underlies the younger alluvium, then

9    you begin to get water rising above the surface.

10       MR. VEEDER:  I don't desire to prolong this.  By

11   "upstream from said fault zone," which is well down the

12   Valley toward the Gorge.  That is where I got the idea that

13   upstream from said fault zone an area of artesian pressure

14   is produced; said area of artesian pressure is below the

15   level of all present irrigation wells . . ."  The important

16   thing is, as I contemplated it, that the artesian belt would

17   be more in the area of the Naval well.

18       MR. STAHLMAN:  Your head is higher when you get down

19   there, naturally.

20       MR. SACHSE:  The next section lists the wells and what

21   sections they are in.  There is no question about it, Mr.

22   Veeder.

23       THE COURT:  Let's finish page 13.

24       MR. VEEDER:  Is your Honor leaving XXV?   Have you

25   finished XXV?

1    THE COURT:  Yes.

2    MR. GIRARD:  Before we leave it, I would add, at the

3   top of page 14, right before the  17 G1 well and then put

4   parenthesis under it so that they will understand it is

5   Well 17 G1.

6    MR. VEEDER:  I would tender this thought, your Honor,

7   that to accord with these findings an important fact is

8   that the pumping of the shallower wells affects the head in

9   the artesian wells.

10    MR. STAHLMAN:  No.  Where do you get that?

11    MR. VEEDER:  I believe that is what the evidence shows,

12   that your pumping during the summertime reduces the head

13   in your deeper wells.

14    MR. STAHLMAN:  No.  Pumping in the artesian wells

15   reduces the head in the artesian wells.

16    MR. VEEDER:  Pumping in the shallower wells does the

17   same thing.

18    MR. STAHLMAN:  No.

19    THE COURT:  Does the pumping of the artesian wells

20   affect the head in the shallower wells?  Outside of the

21   Navy well, you don't pump any of these artesian wells, do

22   you?

23    MR. WILKINSON:  We pump the Dairy artesian well for

24   stock water watering purposes, and the Navy well.  It shows

25   a direct relation to the Studley well.  As soon as you pump

18,451

1    the Navy well there is a reduction of head in the S^Tudley

2    well.  They are both artesian wells, not too far distant.

3        THE COURT:  I am satisfied with XXV.  Mr. Girard?

4        MR. GIRARD:  Yes.

5        THE COURT:  Mr. Sachse?

6        MR. SACHSE:  I am satisfied.

7        THE COURT:  Mr. Veeder?

8        MR. VEEDER:  I will just let it go.  I will file

9    specific objections.

10        THE COURT:  What aren't you satisfied with?

11        MR. VEEDER:  Because I don't believe it is reflective

12    of what actually transpires, your Honor.  I believe that the

13    releases of water from Vail Company Dam has changed the

14    entire regimen of the whole stream; that there is a direct

15    and immediate relationship between any surface water

16    released from the reservoir to the ground water and that the

17    sole source of recovery for the deep wells and for the

18    shallow wells is the surface runoff and now the releases

19    from Vail Company's reservoir.  I don't believe this Finding

20    XXV is reflective of the facts as they presently exist, and

21    I think that it is not going to be clear to anyone reading

22    it that there is a direct and immediate relationship between

23    the shallow wells and the deep wells.  There is no separate

24    or independent aquifers in here -- they are all related.  I

25    just believe that we are making findings that are confusing

18,452

and would contribute nothing to the case; that if we were
to leave out XXV entirely you would probably be just as well
off and just as reflective of the facts as they exist.

THE COURT:  Do you contend that as soon as water is
released from Vail Dam, and if it was spread in the Nigger
Canyon area, that it would immediately affect the shallow
wells that Vail pumped from?

MR. VEEDER:  I would say that the releases which are
presently being made are for the purpose of irrigation and
pumping -- in other words, they put the water in the ground
and pump it out.  But I believe that if the ground water
basin was recharged that that would be the effect.  It is
pumped way down.

THE COURT:  Suppose Vail Dam was not there and water
flowed in the outwash area of Nigger Canyon.  Is it your
contention that that would affect the pumping levels in the
shallower wells that Vail pumps?

MR. VEEDER: I think if it reached down that far it
would.  But I think, first, the water goes straight down
to the water table and builds up the water table sufficiently
high, and if it got high enough certainly there would be
recovery in those wells.

THE COURT:  And if it built high enough it would flow
on the surface, wouldn't it?

MR. VEEDER:  You would have a situation where there would

1  be an increased head in these artesian wells.

2  THE COURT:  Would it flow on the surface if it builds

3  this water level up high enough that you are talking about?

4  MR. VEEDER:  Any time that the percolating underground

5  water table intersects the bottom of the stream, then you

6  do have a flow of water, yes, but that has nothing to do

7  with the subterranean stream.

8  THE COURT:  I am satisfied with XXV.

9  XXVI.

10  MR. VEEDER:  There is one editing factor in XXVI and

11  throughout.  I believe we have been spelling Pechanga

12  with an "a" rather than a "o".

13  MR. GIRARD:  How is it spelled on 15-L?

14  MR. VEEDER:  P-e-c-h-a-n-g-a.

15  MR. GIRARD:  Is that how it is spelled on 15-L?

16  MR. VEEDER:  That is how it is spelled on 15-L and -E and

17  the rest of them, and that is what we have had all along.

18  MR. SACHSE:  Is "Santa Gertrudis" right?

19  MR. VEEDER:  We spelled it with an "i" on 15-E and -L.

20  G-e-r-t-r-u-d-i-s is the way it is on the maps 15-E and -L.

21  THE COURT:  Does XXVI look all right other than that?

22  MR. SACHSE:  Okay with me.

23  THE COURT:  XXVII?

24  I have just finished reading it.  It's all right.

25  XXVIII.   On line 11, "contact" to "continuity".

18,454

XXIX.  "Compact character" instead of "tightness" on Line 21.

MR. SACHSE:  "More compact" on line 27.

MR. GIRARD:  Cross out that line 26 through 28.

MR. SACHSE:  It is a duplication of what goes before, from 15-L.

MR. GIRARD:  "that said older alluvial deposits or basement complex are of considerably tighter material and of less permeability than the younger alluvial deposits;..." I think we just said that above -- "are in each instance physically contained therein and that the contact character and permeability of the older alluvial deposits or basement complex which confine the younger alluvium act as bed and bank".  We might as well leave it in.

MR. VEEDER:  I think we are again making an error in using language which would indicate that you could equate the older alluvium with the basement complex.  Starting on line 20, "are in each instance physically contained therein in that the compact character and limited permeability of the older alluvium or basement complex . . ."  I don't believe that is a correct representation, and when one reads it, it sounds like the virtually impervious basement complex could be compared with the older alluvium.

THE COURT:  All right, change it, on line 21, "in that the compact character and limited permeability of the older

18,455

alluvial deposits and the impervious character of the basement complex . . . "  Then cross out on line 26 the phrase there which is repeated.

MR. SACHSE:  You say we are crossing out now lines 26, 27 and 28?

THE COURT:  Yes, they are repetitious.

MR. SACHSE:  It is just repetition.

THE COURT:  On page 16, we have to get some semicolons in here.  On line 5 after "as a surface stream" a semicolon, I think.  I don't think that "i.e., during periods other than periods of precipitation" adds anything.  We will strike out, "i.e., during periods other than periods of precipitation".

MR. VEEDER:  Could we knock out the "im" in "semi-impermeable" and say "semi-permeable"?  What does "semi-impermeable" mean?

MR. SACHSE:  Not quite impermeable.

MR. VEEDER:  I will guarantee you this Court will never find the older alluvium is impermeable or semi-impermeable.

THE COURT:  It probably would be better to say "semi-permeable".

MR. VEEDER:  Not that I agree that it is, but I think it comes closer than the other word.

THE COURT:  Change the spelling of "Santa Gertrudis" and Pechanga".

MR. GIRARD:  The word "herein" on line 19 instead of "hereinafter," also.

THE COURT:  Put a semicolon after the word "respectively," on line 17.

Are you ready to go to XXX?

MR. SACHSE:  Yes, sir.

THE COURT:  XXXI.  Change the spelling of "Santa Gertrudis".

MR. GIRARD:  Change "Pechanga" on line 30, too.

THE COURT:  XXXVI, on line 25, change "said" to "similar".

MR. GIRARD:  ". . . similar pumping depressions and consequent reverse gradient of ground water movement are referred to in Finding VIII above."

THE COURT:  Yes.

MR. GIRARD:  All right.

THE COURT: XXXVI.  Anything in that you don't like, Mr. Veeder?  We have in there the increased pumping from the ground water area.

MR. VEEDER:  We are in the position, then, of saying that a condition once found to exist will be presumed to continue to exist until there is evidence to the contrary.

THE COURT:  We can argue that later. That is a general rule.

MR. SACHSE:  When you make your first O.S.C., you can

1    argue that.

2         MR. VEEDER:  That won't be long.

3         THE COURT:  XXXVII.    XXXVII look all right?

4         MR. SACHSE:  All right.

5         THE COURT:  XXXVIII.

6    XXXIX.

7         MR. VEEDER:  May I have just a moment, your Honor.   I

8    would like to refer to lines 7 through 9 on XXXVIII.  It has

9    been suggested by Colonel Bowen to make this change:

10   "That except as found in Finding XXXVII above, ground water

11   within said ground water area does not stand at or about

12   the same level".

13        THE COURT:  Yes.

14        MR. GIRARD:  Strike the word "level".

15        THE COURT:  Yes.

16        All right, XXXIX.  On line 27, after the word "the"

17   in front of "permeability" I would insert "degree" of

18   permeability.

19        MR. VEEDER:  Isn't this also true in regard to the

20   younger alluvium?

21        MR. GIRARD:  It may be true to a certain extent, but

22   these findings as we are going on now have nothing to do

23   with the younger alluvium.  These are findings on the older

24   alluvium to support the conclusion.

25        MR. VEEDER:  Yes, I know very well what it is for.  But

18,458

it seems to me that the younger alluvium is lenticular.

MR. GIRARD: No.

MR. VEEDER:  Oh, yes.

MR. STAHLMAN:  We know there is a difference between them.

THE COURT:  As I recall, there was not evidence that there was a great variety in the character of the younger alluvium and the lenticular bodies were, as I recall the testimony, in the older alluvium.

MR. VEEDER:  They were all laid down, younger and older, with lenticular deposits of clays and silts throughout.  You recall we originally had a finding to the effect that good wells and bad wells could be found in both the younger and older alluvium, and that the permeability of the older and younger alluvium varied greatly throughout the ground water area.  It would seem to me like that would be more reflective of the facts.

THE COURT:  If something like that goes in, it goes in somewhere else.  We are talking now about the movement of the ground water in the older alluvium.

In  XL, on line 10, it should be "and Temecula Creek," should it not, instead of "or"?

MR. SACHSE:  Yes.

MR. GIRARD:  Yes.

MR. VEEDER:  I think you are right.  But I think you

1    should say that it does affect; not to a limited degree, but

2    does affect.

3        MR. SACHSE:  Let's take out the word "limited" and say

4    "does affect to a presently undetermined degree".

5        MR. VEEDER:  But it is not undetermined on Temecula

6    Creek.  It dries it up, and it dries it up so that the flow

7    is down in the southeast quarter of Section 18, Township 8

8    South Range 2 West.  That is what is shown and Mr. Wilkinson

9    testified.

10       THE COURT:  But the kind of flow we are talking about

11   are the underground and surface flow.

12       MR. SACHSE:  And what Mr. Wilkinson testified was not

13   the pumping of underground water in the older alluvial

14   deposits, Mr. Veeder.

15       MR. VEEDER:  Yes, it was pumping in the older alluvial

16   deposits.  That is where his wells are pumping from down

17   there.

                                      out
18       MR. SACHSE:  We just found/that they weren't.  We just

19   found out that he has only one irrigation well pumping from

20   anything other than younger alluvium.

21       MR. VEEDER:  That is completely and totally in error.

22       MR. GIRARD:  We haven't found that.

23       THE COURT:  No, we haven't found that.

24       MR. GIRARD:  He said there was only one irrigation well

25   that goes into the artesian waters.

18,460

MR. SACHSE:  You are correct.  I stated it wrong.

THE COURT:  This, again, was not an apportionment case.
We find it does affect pumping in the older alluvium, it
does affect the flow of these two creeks.  What more do you
want?

MR. STAHLMAN:  It looks to me like Mr. Veeder is trying
to cram this record full of statements that he makes for
some purpose.

THE COURT:  You are a good enough lawyer to know that
when a case goes up on appeal that Mr. Veeder's statements
are not evidence.

MR. VEEDER:  I am just trying to help your Honor.

THE COURT:  That is not true of statements made by
Mr. Kunkel, Colonel Bowen and Mr. Wilkinson, who have been
sworn as witnesses.  But certainly your statements, Mr.
Veeder, mine, Mr. Sachse's, Mr. Girard's, are not evidence
in the case.

MR. VEEDER:  I was truly trying to help your Honor in
these matters.

MR. GIRARD:  I would like to suggest a change also --
Mr. Wilkinson pointed it out to me -- that this XXXIX, on
page 20 at line 3, "there is insufficient evidence to show
to what extent said movement and rate of flow . . ."  I
think the words "and rate of flow" ought to go out.  I don't
think rate of flow is the correct term for ground waters in

1  older alluvium.

2       THE COURT:  All right.

3       MR. GIRARD:  I don't have any strong feelings on it.

4       MR. SACHSE:  I still have the question on XL, your Honor.

5  I don't know that I was so stupid as I thought.  Does XL

6  refer, Mr. Girard, to pumps in surface areas of older

7  alluvium, or does it refer to pumps extracting water from

8  below surface/older alluvium?  It is not clear to me.  I

9  want to know which one you are referring to.

10       I think he is referring to surface areas of older

11  alluvium.

12       MR. GIRARD:  No, I am referring to surface areas of

13  older alluvium and older alluvium which is located beneath

14  the younger alluvium.

15       MR. VEEDER:  He says that, "in the older alluvial

16  deposits".

17       MR. GIRARD:  That is what I mean, in the older alluvial

18  deposits.

19       THE COURT:  This really solves it, "the pumping of

20  ground waters from the older alluvial deposits".

21       MR. GIRARD:  Yes.

22       THE COURT:  That is what you mean, isn't it?

23       MR. VEEDER:  I think that is what he means, yes.

24       THE COURT:  All right.

25       Let's go back to XXXIX.  We struck something out.  Now,

18,462

1   does it make sense: "there is insufficient evidence to show

2   to what extent said movement . . ."

3       MR. SACHSE: ". . . is affected by said underground or

4   subterranean conditions".  That is all.

5       THE COURT:  All right.

6       Are you satisfied with XL, now?

7       MR. SACHSE:  I am .

8       THE COURT:  XLI.  It looks all right to me.  Any changes?

9       MR. GIRARD:  Did you pass on XLI, your Honor?

10      THE COURT:  It looked all right.

11      MR. GIRARD:  I think there should be a change or

12   addition of one word.  On line 22 it should be "within older

13   alluvial deposits north of the natural ground water divide"

14   to distinguish it from the temporary.

15      THE COURT:  Then we have something down here to correct,

16   beginning on line 24, "That specifically the source of the

17   ground waters heretofore found to constitute a part of

18   Temecula Creek and tributaries thereof, and the ground water

19   within the older alluvial deposits south of said natural

20   ground water divide . . ."

21      MR. GIRARD:  Yes.

22      THE COURT:  Do you ever use commas?  ". . .comma is

23   the surface drainage area of Temecula Creek and tributaries

24   thereto."   I like to use a lot of semicolons and commas,

25   whether it is grammatically proper or not.  It helps to

1   read this material.

2       MR. VEEDER:  We are glad to make a semicolon available

3   to the State of California.

4       THE COURT:  At Government expense.

5       MR. VEEDER:  Yes, your Honor.

6       THE COURT:  XLII looks all right.

7       XLIII looks all right.  We have the reference to the

8   right -- yes.

9       XLIV.

10      MR. STAHLMAN:  XLIV looks all right.

11      MR. SACHSE:  I think XLV is stated wrong.  I think there

12  is a corner of 15-L that is outside the watershed of the

13  Santa Margarita.

14      MR. VEEDER:  Have you finished XLIV?  I haven't had a

15  chance to catch up.

16      MR. GIRARD:  After 15-L add "within the Santa Margarita

17  River watershed".

18      THE COURT:  On line 20, first, "within said" insert

19  "ground water" again.  You have too many "areas".

20      MR. SACHSE:  That isn't true,though, is it?

21      THE COURT:  What?

22      MR. SACHSE:  Is that what you want to say?

23      THE COURT:  What are you looking at?

24      MR. SACHSE:  Line 20, your Honor.

25      MR. GIRARD:  Yes, that is correct.

1    MR. VEEDER:  There is basement complex.

2    MR. SACHSE:  Okay.

3    THE COURT:  Are you ready to go to XLV?

4    MR. GIRARD:  Yes, sir.

5    MR. SACHSE:  The only error there is that there is one

6    corner on one of those maps not in the watershed.

7    MR. GIRARD:  After 15-L, on line 30, add "within the

8    Santa Margarita River watershed".

9    MR. VEEDER:  Would you point it out?

10   MR. SACHSE:  On line 30 it will read, "... on U. S.

11   Exhibits 277, 15-E and 15-L within the Santa Margarita

12   watershed are a part of the Santa Margarita River."

13   THE COURT:  In other words, the map has some land on it

14   that is not within the watershed.

15   MR. VEEDER:  That's all right.

16   THE COURT:  The first question about XLVI is, what area

17   are you talking about now -- the ground water area?

18   MR. GIRARD:  Yes.  It is a thing that is probably true

19   throughout.  This deals with the Temecula ground water area.

20   MR. VEEDER:  Isn't that true throughout the whole area?

21   MR. SACHSE:  Except we are writing different findings.

22   You are going to repeat it somewhere else.

23   I think it would be better language if we say, "with

24   the exception of extremely limited portions of said ground

25   water area".

18,466

1       THE COURT:  All right.

2       MR. VEEDER:  Why do you have that at all?

3       MR. GIRARD:  This was your finding originally which you

4  drafted, Bill, and I think we followed it.

5       MR. VEEDER:  I think we are leading up to the perennial

6  flow in the Murrieta and Temecula.

7       THE COURT:  I want it in.  "That with the exception of

8  extremely limited portions of said ground water area there

9  is surface water only during periods of heavy precipitation

10  . .. is illusory . . ." that looks all right.

11       XLVII.  Does XLVII look all right?

12       MR. SACHSE:  It is all right with me.

13       MR. VEEDER:  We are objecting to it throughout.

14       THE COURT:  Overruled.

15       XLVIII.

16       MR. GIRARD:  XLVIII, on line 26, I think there is an

17  "and" on line 26 after "15-L" which shouldn't be there.

18       THE COURT:  Does that mean 15-L or 15-E?

19       MR. GIRARD:  It should be 15-L.

20       THE COURT:  All right.

21       MR. VEEDER:  We object to that, too, your Honor.

22       THE COURT:  Overruled.

23       MR. GIRARD:  The next one is this one I drafted on the

24  alternative provisions.

25       MR. SACHSE:  I thought about this res judicata problem,

and I think the first one is wrong.  I think we have to face

the fact that the finding could be prima facie evidence, and

I, personally, would string along with Mr. Girard's second

alternative.

THE COURT:  Have you read them, Mr. Veeder?

MR. VEEDER:  Yes, I have.  I have gone back very

extensively to the record, and it is my view, based upon that

review  and the review of the findings which your Honor has

approved and which were entered by the Special Master, I

believe that the evidence respecting irrigable acreage has

gone in for all purposes and that that has been the course

of conduct in this case.

I believe, moreover, that by reason of that fact these

findings can be made.  Your Honor in the record has stated

that the evidence was prima facie, and I believe there has

been nothing to rebut it.  So I think it would be appropriate

to make the finding predicated on prima facie evidence.

Now, I will agree that the rule of law would be that if

there is a changed condition somebody could come in and raise

the point.  But at this juncture I think the findings should

reflect the irrigable acreage.

THE COURT:  You said something that you didn't mean to

say.

MR. VEEDER:  What was that, your Honor.

THE COURT:  You said certain evidence was prima facie and

1   then we should make a finding that it is prima facie.

2      MR. VEEDER:  No, I don't believe you can have such a

3   think as a prima facie finding.  I think you can have a

4   finding of prima facie evidence.

5      THE COURT:  The Court, based upon evidence that is

6   prima facie, may make a finding.

7      MR. VEEDER:  That is correct.

8      THE COURT:  There is no question about that first point.

9   Now all we are talking about is whether we shall make these

10   findings -- allow these findings to have the effect of res

11   judicata or shall only provide that they shall be prima

12   facie in effect and therefore subject to rebuttal at some

13   later proceeding.  Isn't that what we are talking about?

14      MR. SACHSE:  That is all I am talking about, your Honor.

15      MR. VEEDER:  I will start again, because I want my

16   position to be clear.  I believe the evidence is prima facie

17   in character that has gone in.  I believe that predicated

18   upon that evidence --

19      THE COURT:  Let me stop you right there.  It doesn't

20   make any difference whether the evidence was conflicting

21   where there was one witness on one side and 50 witnesses on

22   the other, or whether it was only a skin case or a prima

23   facie case.  The Court may make findings.  So let's skip

24   that point.

25      MR. VEEDER:  All right.

18,469

1      THE COURT:   There is evidence that the Court may

2  consider.   Now, what do we do?

3      MR. VEEDER:   Then just make the findings as to the

4  irrigable acreage predicated on the evidence in the record.

5      THE COURT:   And shall we say that thereafter or in the

6  event of changed conditions?

7      MR. VEEDER:   Upon a proper showing the irrigable

8  acreage can be questioned.   I think that is the rule.

9      MR. SACHSE:   I don't think it is fair, and for this

10  specific reason, your Honor.   If this is res judicata, if

11  I understand the term properly, the only basis on which I,

12  let us say for Stardust Ranch, at a future date could come

13  in and contest the irrigable acreage claims of the United

14  States or of Vail or of anyone else who has put them in

15  would be that I first have the burden of proving changed

16  conditions and then maybe you will let me put in my evidence.

17  But if this is prima facie, I can come to this Court and say,

18  "Your Honor, I never put in anything for Stardust.   Now I

19  want to have a chance to put some of my stuff in without

20  having the burden first of proving changed conditions."

21  That is what I think the sticker is in this.   Lots of people

22  didn't put in evidence.   They might want to fight with

23  Colonel Bowen.   They might want to, but they didn't.   That

24  is the only distinction I see between your prima facie

25  and your res judicata principle.

18,470

MR. VEEDER:  I want to clear up the record on one important point, Mr. Sachse.  At your request --

MR. SACHSE:  Don't throw Stardust at me.  There is evidence, I know, on Stardust.  I am just pulling a name out of the blue.

MR. VEEDER:  Why did you use Stardust?

I don't know the position he is taking here.  In regard to Stardust we made a finding.

THE COURT:  Let's forget about Stardust.  He represents other clients as to whom he did not put in proof of the irrigable acreage.

MR. VEEDER:  But any time he represented a client I will assure you that irrigable acreage went in.

MR. SACHSE:  Without any rebuttal.

MR. VEEDER:  And no desire to rebut it, because you said it was accepted.

MR. GIRARD:  It was never offered for acceptability as to its relevancy for any other issue except thatyou wanted it to satisfy the Marines' own purpose of  cataloguing.

MR. VEEDER:  What else?

MR. GIRARD:  If you wanted to use it as a finding which will bind other defendants, you should have said so, so they could have rebutted Colonel Bowen.

MR. VEEDER:  Your Honor, we made the offer in regard to this irrigable acreage.

18,471

1      THE COURT:  I have been all through this many times, and

2  if there is going to be argument about it, we will take time

3  to see what the facts are.  That we early decided that this

4  was not an apportionment matter and therefore irrigable

5  acreage didn't mean a hill of beans, but that you wanted it

6  in.  And I said if you wanted it in for the purpose of

7  showing your clients the great extent of irrigable acreage

8  in this area, it could go in.  But since there was  no

9  apportionment involved, we were not concerned with irrigable

10  acreage.  That is the fact, isn't that right?

11      MR. GIRARD:  That is the facts.

12      MR. SACHSE:  Unquestionably.

13      MR. GIRARD:  As far as a practical matter goes, if you

14  want to follow the second alternative or the alternative

15  draft here, in most cases these things would have the

16  effect at least --

17      THE COURT:  Mr. Veeder, do you dispute that that is

18  what happened?

19      MR. VEEDER:  I certainly take the position, I don't

20  recall that you said it didn't mean a hill of beans.

21      THE COURT:  I admit that I probably didn't use the

22  vernacular of the street.  But Mr. Sachse had been on his

23  feet at various times and said he didn't propose to put on

24  any proof of irrigable acres.  We went all over this matter.

25  We agreed --

1    MR. VEEDER:  I never at any time ever agreed that the

2    irrigable acreage that we offered was not evidentiary in

3    character and that you couldn't predicate a finding upon it.

4    I have always agreed that if there were changed conditions--

5        THE COURT:  It comes down to this.  The mere fact that

6    you put in evidence doesn't mean that I have to make a finding

7    on it, unless it is a material issue to this case.

8        MR. VEEDER:  I am requesting a finding on it, and it

9    is material here.

10       THE COURT:  It is not a material issue, unless we get

11   to the issue of apportionment.

12   }    MR. GIRARD:  That is right.

13       MR. SACHSE:  That is right.

14       THE COURT:  I am, however, willing to make some kind of

15   provision that these findings that I make shall have a prima

16   facie effect, unless controverted by someone at some later

17   proceeding.

18       MR. VEEDER:  As far as I am concerned, I think that is

19   the rule of law.  But I have never ever agreed --

20       THE COURT:  Mr. Veeder, the difference is just as Mr.

21   Sachse said.  If we say that they are prima facie in effect,

22   that is one thing.  If everybody stands still in a subsequent

23   proceeding, the same findings then are effective.  But if

24   we take the other position and say that changed conditions

25   must be shown, immediately the burden is put upon somebody

18,473

1   to show changed conditions -- a different burden than if

2   the situation was only prima facie.  If it is only prima

3   facie, he is satisfied.  If he is not satisfied, he puts in

4   proof and then the Court has before it a prima facie showing

5   from the old finding and some new evidence  at the new

6   hearing to be considered.  The Court can make its finding

7   based on one or the other.  There is a real difference in how

8   we treat this.

9      MR. VEEDER:  Your Honor, I have gone back to the

10   records searching this matter on the basis of what Mr. Sachse

11   has said, on the course of our conduct in this, and it has

12   been the position of the Government unwavering throughout

13   this whole case that in the quiet title proceeding aspects

14   of it the irrigable acreage was important; that it was a

15   factor which would show the maximum measure  of these people's

16   rights; and I truly don't believe that to say that this is

17   a prima facie finding is reflective of the record.  That is

18   my position.

19      THE COURT:  Strike out the word "unwavering".

20      MR. VEEDER:  I have never changed my position.

21      THE COURT:  And I might find some merit in what you have

22   said.  But you on several occasions, in substance, have

23   agreed that this was not an apportionment proceeding -- this

24   was a cataloguing of rights.

25      MR. VEEDER:  That is absolutely right.  But there is a

18,474

1 | non sequitur in what is being said here.  This evidence that
2 | was offered by the United States was offered for all purposes,
3 | and I submit, your Honor, and it is my position now and I
4 | will take it throughout, that when this evidence went in, it
5 | went in to show the irrigable acreage.  A proper finding
6 | upon it, should, in my view, be made, and if at some
7 | subsequent time the question arises as to whether there is a
8 | change of irrigable acreage, fine.

9 | THE COURT:  Can't we, without having a big row about it,
10 | do it by saying that these findings shall have prima facie
11 | effect and unless controverted at some subsequent proceeding
12 | will be binding?  It leaves the door open to these people
13 | who were sent letters and did not reply to our letters to
14 | them.  And we are going to find, under what I am proposing,
15 | certain irrigable acreage, but it leaves the door open to
16 | them.  It is prima facie.  If they want to stand on it, all
17 | right.  But if they want to come in and say, "I never had a
18 | real crack at the ball and I would like to be heard," it
19 | leaves the door open.

20 | MR. VEEDER:  May I express my view on that.  The status
21 | of the record in this matter, as I view it, would be this.
22 | If the Government had not taken the course that it did and
23 | introduced this evidence itself -- the rights of these people
24 | are being ti tried inter sese.  It is based upon your Honor's
25 | order.  Many of them didn't even answer, but many others did

answer and they didn't put in any evidence at all.   In the normal course of events, all parties being thus related one to another on pleadings would be in a position to have a decree entered defaulting those who didn't appear and put in their cases.   That would be the status if this irrigable acreage was not put in.

Now, it was put in.   It was put in by the United States in the full belief that it was protected, and I still believe it is, protecting the interests of these people.   So if that evidence were not in, they would be in a real critical position.   Throughout your Honor has stated that you were convinced that the irrigable acreage introduced by Colonel Bowen was always fair, always just, and I think  it was correct.

My great concern, frankly, is that when we get through the respective rights of the parties will not be properly shown on the basis of this present plan of saying it is only prima facie.   I don't know what a prima facie finding would be.   But I do believe that we could make the findings along the line that I would recommend, and then if you wanted to put in a conclusion of law that at some subsequent time if these were challenged a showing of a change of fact would, of course, be reflective of the law of California.

I don't believe Mr. Sachse was discussing the matter of irrigable acreage when he was talking about the question of

18,476

1    whether he put in all the proof he should have or not.   The

2    question came up between Mr. Sache and me in regard to

3    irrigated acreage of Stardust, and I agree with him that

4    criterion is the irrigated acreage.

5        I have stated my position as to this.   Your Honor can

6    go ahead on the basis you choose.   I don't believe anything

7    I have ever said has mislead anybody on this matter.

8        MR. STAHLMAN:   May I ask Mr. Veeder a question.

9        Assume, for instance, that the findings are as you have

10   suggested to the Court on the irrigable acreage.   Assume,

11   then, that someone has had a change, such as Vail has had,

12   as the evidence shows here, that several hundred acres of

13   land that had previously been waste land has now become

14   irrigable.   What would the position be in any future

15   proceedings where there may be an apportionment?

16       MR. VEEDER:   I think, in that regard, that the only

17   thing that the Vail Company would be called upon to do would

18   be simply in a responsive pleading indicate that there has

19   been subjected 700 acres since the date of the decree, and I

20   think the Court is bound to take cognizance of it.

21       I can give you examples where we run into this in other

22   instances.   There will be a decree saying that there are 160

23   acres irrigated and irrigable acreage.   By reason of improper

24   drainage fifteen years after the decree is entered, there are

25   20   acres which are no longer irrigable.

18,477

MR. STAHLMAN:  I realize it would work both ways.

MR. VEEDER:  It would work both ways.

THE COURT:  Take a short recess.

(Recess.)

MR. GIRARD:  I would like to comment very briefly on this, your Honor.  I think if you enter a finding in the nature of this alternative finding, you are giving Mr. Veeder and the United States every bit as much as they are possibly entitled to in this case.  I think you could very well refuse to make any finding at all on this, because I don't see, under any circumstances, how irrigable acreage and irrigated acreage and water duty is relevant in a quiet title suit. It has nothing to do with quiet title.

But I am perfectly willing, as far as the State is concerned, to go along with a finding in the nature of the alternative which makes such evidence prima facie.  But I do feel that if you do that it is very difficult for me to understand how the United States can ask for more.

MR. SACHSE:  That  is exactly my position, your Honor. I think a finding that this is prima facie would be helpful not only to the United States and Vail, who are the two largest parties, but it might be helpful to some of these little owners.  Colonel Bowen has not supplied all adjoining landowners with each other's surveys of irrigable acreage. We don't know whether  some of these people might have wanted

1    to object to the findings as to their neighbors.  If your

2    Honor says that you will regard Colonel Bowen's findings, in

3    which I have complete confidence, as prima facie and leave

4    the door open if someone wants to rebut it -- I can't

5    conceive of anybody doing it, but I don't think you can slam

6    the door on it.

7         THE COURT:  Mr. Veeder, why doesn't that do everything

8    you want done here?

9         I am willing to do this -- first of all, let me say that

10   I think we have to tighten up this reference to exhibits.  I

11   think we have to refer to the particular exhibits that we

12   are talking b about and identify them, because there are lots

13   of exhibits in this case and we don't want a blanket finding.

14   So first we tighten up these exhibits.

15        I take it we are referring here to these summaries that

16   you gave me some copies of, which have been made up from

17   the soil surveys in the testimony of Colonel Bowen and that

18   sort of thing.  That is what you are talking about, isn't it?

19        MR. VEEDER:  That is correct, and I can be specific as

20   to the exhibits.

21        MR. SACHSE:  All you have to say is Exhibits A through

22   _____attached to this finding.

23        MR. VEEDER:  I thought you were referring to the sources

24   of them.

25        THE COURT:  No.

1     Now, suppose I find the facts as appears thereon -- that

2   would mean a change here.  It says that these factual

3   statements shall be prima facie evidence -- I make a finding

4   that the factual material contained thereon, on  exhibits

5   (Indentifying them) as to gross, irrigable, irrigated, et

6   cetera are correct, but that because of the extensive

7   defendants in the case and the impossibility of having all

8   persons present and the fact that the case  had to be tried

9   seriatim -- whatever you want to say.

10     MR. STAHLMAN:  And by reason of the fact that the Court

11   is keeping continuing jurisdiction.

12     THE COURT:  Yes.  That these findings on these

13   particular matters shall be, in any subsequent proceeding,

14   prima facie evidence of the facts contained therein.

15     Now, let's see what that does.  I can't see that that

16   hurts the United States at all.  It puts anybody who comes

17   in on an issue of apportionment in a position of saying,

18   "I don't have to go down and make a record on these cases

19   where there is already a finding of irrigable acres.  I may

20   have to go ahead and put on some evidence on somebody's we

21   don't have or somebody where there is changed conditions.

22   But I have a record I can rely on.  These findings are prima

23   facie evidence."

24     But that means that they could be contested -- that we

25   had made a finding that everybody in this courtroom would

18,480

1    have a right to be heard.

2         I don't see how it hurts the Government at all.   Why

3    don't we do it that way?

4         MR. VEEDER:   Let me consider it, your Honor.   As I say,

5    we would like to go a step further and have it more

6    concise.   But if that is the relief that is adequate, we

7    will undertake either to file specific objection to what your

8    Honor has stated, supported by authorities, or it will go the

9    way that you have suggested.

10        MR. SACHSE:   That is the alternative you are talking

11   about.

12        THE COURT:   You are talking about the alternative.

13        MR. GIRARD:   I will draft up a new alternative along

14   the lines.

15        MR. SACHSE:   I feel this way, frankly -- for example,

16   if you look on line 16, "That on many of the exhibits

17   hereinabove referred to there appears in addition to the

18   property description summation of informative factual

19   matters . . ." well, it goes beyond that.   It is evidentiary

20   in character.

21        THE COURT:   We are actually talking about specific

22   things.   These exhibits that we are talking about are going

23   to be attached as parts of -- they are actually what we call

24   Exhibit A.

25        MR. GIRARD:   Yes, Exhibit A would probably have a couple

18,481

ₜhundred separate exhibits included within it.

THE COURT:  It wouldn't be on many of the exhibits.  It would be on Exhibits A to whatever it is.

MR. SACHSE:  A, B, C, D, E, F.

MR. GIRARD:  A, B, C, D, E, F, G and H.

THE COURT:  A through H.   " ... attached to these findings and hereinabove referred to there appears in addition to the property description " -- let's cut out a lot of this material -- "a list of the (1) apparent ownerships, (2) gross, (3) irrigable and (4) irrigated acreage.

MR. GIRARD:  Well, there is a list of diversions, also.

THE COURT:  Water duty.

MR. VEEDER:  To the extent that that data is available we have put it in.

THE COURT:  Water duty, wells, surface diversions. That is about all.  Then I would say that the Court finds that such facts set forth on such above matters in the Exhibits A to H are correct.   And I would include a few caveats about the nature of this case -- the great number of defendants, just a few things in there of that sort. That the Court concludes that such findings should be only prima facie evidence as to the material so found in the event of   further proceedings in this case.

That is how I am thinking of doing it.

18,482

Let's take the United States and Vail.  You are the most likely to be the two aspirants for the heavyweight title here in this future contest.  And so what has happened? We have a finding as to irrigable acres in the enclave, we have the finding as to the irrigable acres in the Vail estate. If you get into an apportionment row where we have to go into a lot of other things, if both of you are content to sit back, that matter is available as proof as prima facie evidence in a new case.

But suppose the Government says, "We want to show that we have additional acreage," or, as a matter of fact, if you wanted to show that we made a miscalculation, or suppose you wanted to say that Vail has miscalculated and is not entitled to as many, this is open.  And it is not opened with any problem of necessarily changed conditions.  It is open if somebody wants to contest it.

But more important, the small individual who gets caught in some row between the two larger landowners and bigger water users, we have made some finding as to him.  Maybe he has never been before this Court.  Maybe he got a letter and never showed up.  We have gone ahead on testimony of Colonel Bowen and made a finding.  If he comes in, we would say to him, "Well, this is a prima facie finding.  We have evidence here that you have 160 irrigable acres.  If you want to go to the expense of putting on some proof as to how many you ·

1    have, we will hear you."

2    But it seems to me this is the -- this is how we have

3    tried this whole case-- the idea way to do it.

4    MR. VEEDER:  May I have your thought, your Honor, in

5    regard to notice.  For example, is it your view that this

6    prima facie evidence having been introduced it would be

7    necessary for the United States, in the event of seeking

8    injunctive process, to notify everybody again?

9    MR. SACHSE:  I don't think so.

10   MR. GIRARD:  It all depends.  If you sought relief

11   against everyone, yes.

12   MR. VEEDER:  I am asking the Court.

13   THE COURT:  I would think in the event of a further

14   proceeding all the United States would have to do would be

15   to notify those persons against whom they proceeded -- that

16   they wanted further hearing, bring them in on an order to

17   show cause.

18   MR. GIRARD:  Against whom in the future proceedings

19   they thought necessary, and if the opposition thought it

20   requisite to bring the other people in the burden would be

21   on them in third party practice; is that correct?

22   THE COURT:  That is the way I understand it.  Let's

23   see how that would work.  You bring an apportionment
                                                    it
24   proceeding and you notice /against Vail, Roripaugh and two

25   or three of these ranches.   If  they want to come in on that

18,484

1   kind of basis, they can.   Suppose they want to bring some

2   other people in, they can do so.

3        MR. VEEDER:   But the burden resides with them of bringing

4   them in.

5        THE COURT:   You have findings in the record of a bunch

6   of irrigable acres upstream that are a duty on this creek.

7   That record is available to these parties who are now in the

8   new hearing.   But if either of you aren't content with what

9   the evidence shows in this prima facie showing, other

10  evidence could be introduced.   It saves the expense of having

11  to go back on a watershed and say, "Here is a watershed.   We

12  have a record made of the water duty of this watershed up

13  to here.   I can rest on that.   I can use that by reference."

14  Mechanically how we do it is another thing.   We may have

15  them brought back in, or we may incorporate it by reference

16  or merely refer to the findings.   But we have that all done.

17       On the other hand, maybe some individual somewhere along

18  the line we don't have any proof on, to make a showing of

19  the water duty on a creek, somebody might take the

20  responsibility of putting on some proof on this fellow's land

21  -- what his irrigable acres were and what his water duty

22  was.   It is no big burden if there are a few parcels like

23  that.   I think Mr. Sachse has clients as to whom there has

24  been no proof of irrigable acres.

25       MR. VEEDER:   I don't believe so.

18,485

1     MR. SACHSE:  I know there are a couple where there is

2  proof -- withdraw that -- where there are findings in

3  conflict with Colonel Bowen.

4     COLONEL BOWEN:  F.P.U.D.?

5     MR. SACHSE: Well, as a riparian, yes.  There are no

6  findings of irrigable acreage in F.P.U.D. riparian lands.  I

7  haven't bothered with it.

8     MR. VEEDER:  Let's go ahead, your Honor.  Let Mr. Girard

9  come up along the line he has suggested and let me consider

10  it.

11     THE COURT:  All right.  I think upon reflection you will

12  decide that we have done it properly.

13     L.

14     MR. GIRARD:  Strike the reference to 15-E, on page 24.

15     THE COURT:  It looks all right to me.

16     LI.  LI looks all right.

17     What is this reference to Exhibit I in Conclusion I?

18     MR. GIRARD: That is the description of the lands within

19  the ground water area which overlie basement complex.

20     THE COURT:  Then we will have to refer to it as Exhibit

21  I attached to these findings.  It is not an Exhibit I in

22  evidence.

23     MR. STAHLMAN:  It is attached hereto.

24     MR. GIRARD:  Yes.

25     THE COURT:  And so there wouldn't be any confusion, it

18,486

1    might be well in parenthesis to say (Description of the land,

2    et cetera).

3        Are you using E and L both?

4        MR. GIRARD:  No; 15-E should go out.

5        MR. SACHSE:  And there should be added to Conclusion II,

6    after 15-L, again, "within the watershed of the Santa

7    Margarita River."

8        THE COURT:  Yes.

9        MR. GIRARD:  Take out 15-E, too.

10       THE COURT:  Down through IX we have already approved

11   those.

12       Correct Pechanga on line 21, page 26.

13       MR. GIRARD:  Santa Gertrudis on line 5, also.

14       THE COURT:  Yes.

15       MR. VEEDER:  Wolf Canyon.

16       MR. STAHLMAN:  Wolf Valley.

17       THE COURT:  Is it Wolf Valley?

18       MR. STAHLMAN:  Yes, your Honor, it appears throughout.

19       THE COURT:  It appears also on line 26 -- on lines 21

20   and 26.

21       MR. VEEDER:  I think in redoing these findings and

22   conclusions it would be more correct to say Pechanga Creek

23   which flows through Wolf Valley, or something like that.

24   I don't believe Wolf Valley is significant.  I think it is

25   Pechanga  Creek.

18,487

1        Isn't that correct, Mr. Wilkinson?

2        MR. GIRARD:  I don't care.

3        MR. SACHSE:  I think it is more geographically correct.

4    Isn't that right, Colonel?

5        COLONEL BOWEN:  Yes, it is.

6        MR. GIRARD:  In other words, just refer to it as

7    Pechanga Creek.

8        MR. SACHSE:  Pechanga Creek would be better.

9        MR. GIRARD:  All right.

10       MR. WILKINSON:  Pechanga Creek is in Wolf Valley.

11       MR. SACHSE:  Yes.

12       MR. GIRARD:  The ground waters in the younger alluvium

13   would be part of Pechanga    Creek.

14       THE COURT:  If you eliminate it here, what does it do

15   to what you have done already?

16       MR. GIRARD:  Yes, I would have to make some changes

17   back here.

18       THE COURT:  Is XIII clear enough?  You talk about

19   the "ground water area," and then you talk about the "use of

20   such waters".  What are you talking about here?  This is land

21   which "abuts upon or is traversed by any area containing

22   younger alluvial deposits within said ground water area

23   has a correlative riparian right to the use of such ground

24   waters in the younger alluvium"?

25       MR. GIRARD:  That is right.

18,488

MR. SACHSE:  What it covers is the area, if any, where the controversy might arise over unnamed stringers of younger alluvium.   In effect, it finds that each of those unnamed stringers is also the stream.   That is the substance of it.

MR. GIRARD:  That is right.

THE COURT:  Then what you ought to say is "has a correlative right to the use of said ground waters in the younger alluvium".

MR. SACHSE:  Said ground waters within the --

MR. GIRARD:  Within said younger alluvial deposits, that's right.

MR. SACHSE:  Yes.

THE COURT:  Let's correct Santa Gertrudis on XXIX and Pechanga on XXXI.

MR. GIRARD:  Strike 15-E on page 26.

Add 15-L on Conclusion of Law XIV.

THE COURT:  What exhibit is it that lists the streets?

MR. GIRARD:  15-L.

THE COURT:  No, in XIV.

MR. GIRARD:  Yes, 15-L.

I would like to add that the first judgment is not the correct one.   It is the same one we had before.   I didn't have any of these interlocutory judgments under these vagrant percolating lands available, but I will put one in exactly like Mr. Veeder asks.

18,489

1    THE COURT:  Disregard this?

2    MR. GIRARD:  Disregard this first one, because that is

3    identical to the one that I had last time and I will have to

4    write up a quiet title judgment similar to the one Mr. Veeder

5    had in his 30-Series.

6    THE COURT:  Where do we go from here?

7    MR. GIRARD:  On 29 I would cross out 15-E.

8    MR. VEEDER:  May I just inquire a moment here in regard

9    to this Conclusion of Law XIII, on Page 27, and be sure that

10   I comprehend the intention of it.   ". . . each smallest

11   tract of land held under one chain of title, a part of

12   which abuts upon or is traversed by any area containing

13   younger alluvial deposits within said ground water area

14   has a correlative riparian right to the use of said ground

15   waters . . ."

16   THE COURT:  In the younger alluvium.

17   MR. SACHSE:  Insert after "waters" "within said younger

18   alluvial deposits."

19   THE COURT:  And then you will notice the exception

20   later on.  So this section only applies to your unknown

21   stringers of streams.

22   MR. VEEDER:  Assuming that the wells, as we most

23   assuredly would, penetrate the older alluvium, then what would

24   be the status?

25   MR. GIRARD:  They would be pumping water under XI.

18,490

1    MR. SACHSE:  They would be pumping water under

2    Conclusion of Law XI.  If the younger alluvium is saturated ,

3    they can extract water from the younger alluvium under a

4    riparian right.  That is all we have tried to say.

5    MR. VEEDER:  Let's look, if you will join me here, Mr.

6    Sachse, for a moment, and see if I comprehend what  you have

7    said.   I am pointing to Section 17, Township 7 South, Range

8    3 West.

9    MR. SACHSE:  It is applicable because it is within the

10   confining banks of older alluvium and it is in Murrieta

11   Creek.

12   MR. VEEDER: All right.  Again pointing  to Well D-1

13   in Section 17, 7 South, Range 3 West.  Now, is it the view

14   that that well is pumping riparian water?

15   MR. GIRARD:  Does it go into the older alluvium?  If it
16
     is drawing water from the older alluvial deposits, it is not

17   pumping riparian water -- it is pumping overlying water.

18   MR. SACHSE:  If it is drawing water out of the younger

19   alluvial deposits, it is exercising a riparian right.

20   MR. GIRARD:  How would you know that?

21   THE COURT:  In most cases it wouldn't make any difference.

22   MR. GIRARD:  Their rights are exactly the same.

23   MR. VEEDER:  No.

24   THE COURT:  It wouldn't make any difference.  You have

25   already agreed with me that we may conclude that so-and-so

18,491-92

1    had correlative overlying rights and somebody had correlative

2    riparian rights and you don't even want me to put in the

3    findings that they are identical, correlative with each

4    other. So what difference does it make?

5        MR. VEEDER:  I am not trying to be otherwise than to

6    ascertain what this means, your Honor.

7        MR. GIRARD:  How deep is that well, Fred?

8        MR. KUNKEL:  That was reportedly 450 feet deep.

9        MR. GIRARD:  There is no question at all on that one

10   that he would be pumping ground water within the older

11   alluvium and he would come under XI.  Where you run into a

12   problem is where you run into one about 25 feet deep or

13   something along that line and then you have to find out

14   probably from the well location.

15       MR. SACHSE:  What difference does it make?

16       MR. VEEDER:  I am not arguing whether there is a

17   difference or not.  I would draw you a picture here.  Here

18   is a man whose lands are overlying.  I will make that man

19   "A".  He overlies younger alluvium between the contacts of

20   the older and the younger alluvium in Murrieta Valley.  Would

21   he be entitled to pump water a mile away and bring it to his

22   land and apply it under a riparian right?

23       MR. SACHSE:  If he takes it out of the younger alluvium,

24   yes.

25       Now you are assuming that he buys a well site down here

18,493

1    and gets his water.

2          MR. VEEDER:  That is right.

3          MR. SACHSE:  If he takes it out of the younger alluvium,

4    yes.

5          MR. GIRARD:  He would be entitled to do the same thing

6    as overlying land owners.

7          MR. VEEDER:  No, not the same as an overlying landowner.

8    The overlying landowner wouldn't have that right.

9          THE COURT:  I am not so sure about that.

10         MR. VEEDER:  You are pointing to the older alluvium.

11         THE COURT:  Yes.  Why couldn't an overlying owner here

12   take water from a parcel here and put it on a parcel here?

13         MR. GIRARD:  As long as the amount of water he took was

14   not more than what he would take from his own overlying

15   land.

16         MR. VEEDER:  There is some question about title and

17   other matters.

18         MR. GIRARD:  He would have to have a right to go on

19   the other man's land.

20         MR. STAHLMAN:  Don't you think three overlying owners

21   could put in a common well and supply water to the three

22   different parcels?

23         MR. SACHSE:  I think an overlying owner could do this,

24   as long as he doesn't take more and as long as he stays

25   within the surface watershed.

MR. VEEDER:  Assuming this situation where a parcel of land lies on both sides -- the parcel of land is intersected by the contact between the older and younger alluvium. Assuming that he is pumping from the older alluvium, would he be taking riparian water or overlying water?

MR. STAHLMAN:  If he is a riparian owner --

MR. VEEDER:  He is a riparian owner, based upon the finding.

MR. SACHSE:  He would be taking riparian water, yes.

MR. VEEDER:  But if he went down below?

MR. GIRARD:  If he went down to the older alluvium --

MR. VEEDER:  Then could he export it across the contact?

MR. SACHSE:  Sure.

MR. GIRARD:  We had that at one of the Kunkel meetings in Judge Carter's chambers where we considered whether we were going to treat overlying owners the same as riparian owners.

THE COURT:  I asked, "Do you want me to make a conclusion of law here that riparian and overlying rights are correlative?"  And you fellows said for the record, "No, this is all taken care of by California law."

MR. VEEDER:  In regard to the use of the term "correlative," as I comprehend what you are speaking about was whether the overlying owners rights were correlative with other overlying owners.  And I think they are.

1    MR. GIRARD:  Yes, and other riparians.

2    THE COURT:  I asked you specifically, "Do you want me

3   to make a conclusion of law that riparian rights and over-

4   lying rights are correlative one with the other?"  And you

5   expressly said "No.  It is all taken care of by California

6   law."  And I have it in the record very clearly.

7    MR. STAHLMAN:  There are a number of cases.  They have

8   merged those rights before.

9    (Further discussion around the map off the record.)

10   THE COURT:  All right, gentlemen, when do we meet again?

11   MR. GIRARD:  As I mentioned before, I have a two weeks

12   trial commencing the 13th of this month.  It is a condemnation

13   trial.  I think the chances are about nine to one that it

14   will settle.  But if it does go to trial, I will have to be

15   at that trial.

16   THE COURT:  That would be the weeks of the 13th and

17   20th.

18   MR. GIRARD:  Yes.  My offhand suggestion, if we want

19   to meet those weeks is to set Fallbrook, and  I fully

20   anticipate that the case will settle and I will be able to

21   be here, and if it doesn't settle I can h let you know and

22   hope we can get another date.

23   MR. STAHLMAN:  I have a jury trial starting the 6th and

24   it is anticipated to go two weeks, and then on the 16th I

25   start a trial, a non-jury trial, before Judge Toothaker that

1   is supposed to go two weeks.

2   THE COURT:  I expect to be away the last week in

3   November.  What about the first week in December?

4   MR. STAHLMAN:  I think that is all right.

5   MR. VEEDER:  That would suit us very well.

6   MR. GIRARD:  That is all right with me.  If you want to

7   meet earlier, it is all right with me.

8   THE COURT:  Tuesday, December 5th.

9   MR. GIRARD:  Tuesday, November 5th?

10  THE COURT:  Tuesday, December 5th, at 10:00 o'clock.

11  MR. GIRARD:  December 5th, that is what I mean.

12  THE COURT:  Can we get some work done between now and

13  then?

14  MR. STAHLMAN:  We have some work to do to revamp our

15  findings.

16  MR. GIRARD:  I will have to get the Murrieta findings

17  in final shape.

18  I will make the corrections and additions on the

19  Military enclave.  I presume Mr. Veeder is going to draft

20  some up on that, too.

21  MR. VEEDER:  We are doing that now.

22  Will you send a copy to Washington and also a copy to

23  Colonel Bowen's office and also here?

24  MR. GIRARD:  Yes.  I think I delivered 50 or 60 copies

25  of the Diamond - Domengoini findings and conclusions of law,

18,496

1    which have already, I think, been approved pretty much by

2    counsel, which are ready.

3        MR. SACHSE:  Those are even run on the duplicator.

4        MR. GIRARD:  I have submitted the Anza and Terwilliger

5    Valley findings to Mr. Veeder.

6        And as I understand, he is going to prepare findings on

7    Wilson Creek and incorporate those.

8        We do have the minor problem of Gibbon and Cottle, which

9    is still pending.

10       THE COURT:  Will you have time to get some of these

11   findings in order before the next hearing, Mr. Veeder?

12       MR. VEEDER:  We will undertake to do that, yes.

13       THE COURT: December 5th, then.  See if you can get some

14   papers ready for me to sign.  I have laying on my Bench

15   upstairs 34-A.  It has been there for weeks.

16       MR. VEEDER:  I thought you were going to sign that,

17   your Honor.

18       THE COURT:  Is that ready?

19       MR. VEEDER:  Yes, your Honor.

20       MR. GIRARD:  Vagrant, local, percolating; yes.

21       THE COURT:  What is that one laying on my desk there --

22   Wilson- Coahuila?

23       MR. GIRARD:  That is 34-A.

24       MR. VEEDER:  Let me check it.

25       THE COURT:    Tucalota.

18,497

MR. SACHSE:  It is Tucalota basement complex.

THE COURT:  31-A, is it ready to go?

MR. VEEDER:  I thought 31-A had been signed.

THE COURT:  No.

MR. VEEDER:  Let me check those out, your Honor.

MR. GIRARD:  Mr. Veeder has been handling all this A-Series.

THE COURT:  29-A has been signed, 32-A has been signed, 33-A has been signed.

MR. VEEDER:  I would be speaking strictly from memory if I did not check those out.

THE COURT:  All right.

MR. VEEDER:  10:00 a.m. on Tuesday, December 5th.

THE COURT:  31-A as amended, the Clerk says.

THE CLERK:  On July 28th.

THE COURT:  I will have to check it.

December 5th at 10:00 o'clock.  Continued to that date.

(Thereupon an adjournment was taken until Tuesday, )
(                                                    )
(December 5, 1961 at 10:00 o'clock a.m.              )

----000---

18,498

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3                  SOUTHERN DIVISION

4                      - - -

5   UNITED STATES OF AMERICA,      )
                                   )
6                Plaintiff,        )
                                   )
7        vs.                       )   No. 1247-SD-C
                                   )
8   FALLBROOK PUBLIC UTILITY       )
    DISTRICT, et al.,              )
9                                  )
                 Defendants.       )
10  ───────────────────────────────)

11              CERTIFICATE OF REPORTER

12       I, the undersigned, do hereby certify that I am, and

13  on the date herein involved, to wit:  October 31, 1961, was

14  a duly qualified, appointed and acting official reporter of

15  said Court.

16       That as such official reporter I did correctly report

17  in shorthand the proceedings had upon the trial of the above

18  entitled case; and that I did thereafter cause my said short-

19  hand notes to be transcribed, and the within and foregoing

20  114 pages of typewritten matter constitute a full, true and

21  correct transcript of my said notes.

22       WITNESS my hand at San Diego, California this  2nd day

23  of November, 1961.

24

25                          John Swader
                            Official Reporter