# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

               Defendants.

No. 1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**     San Diego, California

**Date:**     Thursday, December 7, 1961
              and
       Friday, December 8, 1961
         **Pages:**  18,517 to 18,576

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

18,517

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,    )
                             )
                Plaintiff,  )
                             )
     vs.                     )    No. 1247-SD-C
                             )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
                             )
                Defendants.  )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, December 7, 1961

- - -

APPEARANCES:

     For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney General

                                 CDR. DONALD W. REDD

     For the Defendants:

        Vail Company:            GEORGE STAHLMAN, ESQ.

        State of California:     FRED GIRARD, ESQ.

        Fallbrook Public Utility  FRANZ R. SACHSE, ESQ.
        District, et al.:

SAN DIEGO, CALIFORNIA, Thursday, December 7, 1961, 2:00 P.M.

THE COURT:  What is 34-A?

MR. VEEDER:  It is Temecula Creek Subwatershed Above Vail Dam.  It has been on your desk.

Are we on the record now?

THE COURT:  Yes.

MR. STAHLMAN:  That is not approved yet, is it?

MR. VEEDER:  That is the reason why I am having this amendment.

THE COURT:  Is that the same as Wilson Creek?

MR. VEEDER:  No, it is not.

MR. STAHLMAN:  It is part of Wilson Creek, isn't it?

MR. VEEDER:  You have been holding it on your desk, your Honor.

THE COURT:  It is not Tucalota.  You say I have it on my desk?

MR. VEEDER:  Maybe the Clerk has it at this time.  I don't know.

THE COURT:  This is what you were talking about before. I have 34 as the Military Enclave.

MR. VEEDER:  That is right, and it should be changed.

MR. GIRARD:  The Military Enclave will probably have to be changed to what -- 37?

MR. VEEDER:  You gave Diamond and Domenigoni No. 36.

MR. GIRARD:  That is right.

THE COURT:  Did you find anything, Mr. Clerk?

THE CLERK:  No, sir, I haven't received 34.

MR. VEEDER:  34-A was on your desk.  Your Honor referred to it at the last hearing -- that it was complete and ready to be signed.  You said, however, you thought it desirable to amend some paragraphs.

MR. GIRARD:  You say here that 34-A was entered December 7, 1961, which is today.

THE COURT:  I have found it.

MR. VEEDER:  I am assuming that the Court will sign it.

THE COURT:  I have found it, and it is dated at the top 9-7-61, and it is Temecula Creek Subwatershed Above Vail Dam.

MR. VEEDER:  That is right.

THE COURT:  It is 34-A.

First of all, let us straighten out some numbers here. What was 34 to have been, then?

MR. GIRARD:  34-A series only pertains to basement complex.  It has never been submitted even for consideration in findings on the Temecula Creek subwatershed above Vail Dam, except for basement complex.

MR. VEEDER:  That is correct.

THE COURT:  All right.  First of all, let's change the number on this Military Enclave to 37.

MR. GIRARD:  Right.

THE COURT:  34-A is Temecula Creek Above Vail Dam.

1        MR. GIRARD:  That is right.

2        MR. VEEDER:  That is right.

3        THE COURT:  And it is basement complex.

4        MR. VEEDER:  No, Mr. Girard, it shouldn't be September,

5    because his Honor hasn't signed it yet.

6        THE COURT:  Has everybody looked this over?

7        MR. VEEDER:  I have just completed the work on this,

8    your Honor.  It has been looked at, but I would like to

9    outline, if I could, the background on this to the end that

10   my office can go ahead with the balance of the basement

11   complex and weathered basement complex where there is no

12   ground water involved in this litigation.

13       We have, as recited in the proposal that I tender to

14   your Honor (handing document to the Court) --

15       THE COURT:  You now tender?

16       MR. VEEDER:  This is to be the amendment that you asked

17   me to draw for all of the interlocutory judgments that have

18   been signed, plus Temecula Creek.  That is 34-A.

19       THE COURT:  Have you got another copy of it?  This you

20   are tendering now for the first time, I take it.

21       MR. VEEDER:  That is right.

22       THE COURT:  An original and copy.

23       MR. VEEDER:  I am tendering it to you for consideration

24   in outline as to what I would propose to do.  If this form

25   is acceptable to you, I would have it run in final and have

1    your Honor sign it.  Then I would redraft entirely the form

2    that had been used for the "A" series and insert these

3    paragraphs D through G in Finding No. IV of 34-A or the "A"

4    series.

5         THE COURT:  I understand that not only would you ask me

6    to sign this amendment to these five interlocutory decrees,

7    but then you would redraft the interlocutory decrees.

8         MR. VEEDER:  No.  The ones that have been entered would

9    be unchanged and the amendment would be applicable to them.

10        THE COURT:  And you would put this language in the future

11   ones.

12        MR. VEEDER:  That is correct; and we would rerun entirely

13   the present.

14        THE COURT:  Let me read over what you have here, first.

15   So many things happen to me around here that I have lost all

16   track of what this is all about.  Yes, I recall now what it

17   is all about and understand.

18        MR. VEEDER:  If the form is acceptable, I want to have

19   it rerun this afternoon and I will have it in your hands for

20   signature.

21        MR. SACHSE:  We have no objection.

22        MR. VEEDER:  Is it suitable to you?

23        MR. SACHSE:  Yes.

24        MR. VEEDER:  Is it all right with your Honor?

25        THE COURT:  Yes.

1    Let me read something else.

2    I think it is all right, and you are all satisfied with

3  34-A?

4    MR. SACHSE:  Yes, your Honor.

5    THE COURT:  So at this time I will sign 34-A and the

6  Clerk will file it.

7    MR. VEEDER:  Then I will have this rerun and have it up

8  for your signature.

9    MR. GIRARD:  Bill, would you get me a copy of 34-A?  I

10  know I had it, but I must have left it somewhere.

11    MR. VEEDER:  Yes, I'll get you one.

12    May I go ahead as to some of these matters to get some

13  direction and clarification respecting the balance of the

14  areas designated that would come within the "A" series of

15  interlocutory judgments?  Is it all right to proceed now, your

16  Honor?

17    THE COURT:  Yes.

18    MR. VEEDER:  The Murrieta-Temecula Interlocutory

19  Judgment No. 30, the one we are now looking at, refers to some

20  basement complex, and there are tracts of basement complex

21  within the general outline of the ground water area.

22    MR. GIRARD:  That is correct.

23    MR. VEEDER:  I see that there are contained in the

24  Murrieta Interlocutory Judgment, on page 30, if your Honor

25  has that before him, it refers to basement complex.  The

language set forth in No. 30 is of the earlier vintage and
does not comport with the language presently used in the "A"
series.

Also, in regard to the Conclusions of Law on page 26 in
regard to basement complex -- vagrant, local, percolating
water -- that does not comport with the language presently
used in the "A" series.  It would occur to me that you would
probably want the same language in both, or else you might
want an "A" series for this Murrieta-Temecula basement
complex.

THE COURT:  One or the other.  But you have put your
hand on something that I noticed also.  Conclusion of Law
No. I, on page 26, starts, "That all ground waters found
within areas of older alluvium or basement complex outside
the ground water area as depicted on 15-L and 277. . "  That
is pretty awkward.  You are trying to get that peripheral
stuff.  But these maps run on forever and it was not the
purpose of this judgment to take care of anything except what
was really within this area.

MR. VEEDER:  That was my understanding.

THE COURT:  Not the material that was outside of it.

With that in mind, it seems to me that we ought to
eliminate basement complex and older alluvium outside of our
ground water area and put it in an "A" series or somewhere
else.

MR. GIRARD:  All right, we can do that more easily.

MR. VEEDER:  We have these letters that you have approved to be submitted, and I would like to get started on those, if I can, and notify these people whose lands are basement complex and advise them that the ground waters in their properties are not part of this lawsuit.

THE COURT:  This is for people within the confines of the ground water area.

MR. VEEDER:  No, this is for all people with basement complex.

THE COURT:  I see.

MR. VEEDER:  You approved that in the past.  I thought you might want to look at it (handing document to the Court).

MR. GIRARD:  Do you want these conclusions and judgment to take care of the basement complex and weathered basement complex within the ground water area?

THE COURT:  Let's decide that right now.  I think this matter of the ground water area in one judgment, we could take care of everything within the limits.

MR. GIRARD:  Good.

THE COURT:  But you see, the real vice is this business about the matter outside as depicted on these exhibits, and how far do you run?  There is too much uncertainty.

Just give me a minute to look over this letter.

I am a little concerned about this.  You give them

1   notice to appear at a certain time, and if they don't appear

2   I propose a final interlocutory judgment respecting the

3   property.  Of course, I wouldn't have to do it on that date.

4   I could do it on some later date.

5       MR. VEEDER:  That was my understanding, your Honor.  I

6   thought we had better give them a date on which they should

7   appear than when you enter the final decree.

8       THE COURT:  If they didn't appear on the date set, they

9   wouldn't have to be notified again.

10      MR. VEEDER:  That is my hope.

11      THE COURT:  You have to have some notice to these other

12  people also.

13      MR. VEEDER:  Yes, I think that is right, your Honor.

14      THE COURT:  All right.

15      MR. VEEDER:  If this letter is acceptable, we will use

16  it.

17      THE COURT:  The other point made, that the findings and

18  judgment don't comply with later versions, I think, should

19  be explored; and in this final paragraph of the judgment on

20  page 33 it seems to me that the form we were using, and we

21  used it in 34-A, provided that notice would be given -- isn't

22  that something we have been putting in all of these judgments?

23      MR. GIRARD:  You mean notice will be given to --

24      MR. SACHSE:  To modify or to vacate?

25      No, we haven't done that, your Honor.

18,526

THE COURT:  It is in 34-A.

MR. VEEDER:  Are you looking at 34-A?

MR. SACHSE:  No, I don't have it here.

THE COURT:  I am going back to 29, for instance, which has been lodged but not signed; it has the same language -- that it is interlocutory and all parties are adverse, all other parties to the proceedings may object to these findings and conclusions of law and will be given full opportunity and due notice to interpose their objections to these findings, conclusions and interlocutory judgment.  What we have got to do is to be consistent in the types of judgments; not have one read one way and one another.  This is a job to go back through and see what we have been using to get some consistency out of it.  For instance, also this concerns Domenigoni Valley; you don't have any inter se se business in there. We have been putting that in the judgments.

MR. GIRARD:  I would agree with that.

MR. VEEDER:  Did you refer to Domenigoni just now?  That was the next note I have, because in my view we should correlate these "A" series in connection with Warm Springs.

THE COURT:  Let us not go to Domenigoni.  I just mentioned that "inter se se."

MR. VEEDER:  All right.

THE COURT:  On 30 it would be a matter of redrafting possibly the conclusions, but certainly the judgment.

18,527

MR. GIRARD:   I have taken care of it on the suggestion
we have just gone over.   I think if you just delete, on page
22 of the Conclusions, the whole first paragraph of that
language down to the phrase "277."

THE COURT:   That takes care of that part.

MR. GIRARD:   And then change the word "and" to "that"
and you have taken care of that.

And in the Judgment, on page 30, delete lines 3, 4 and
5 and the first two words of line 6 and you have taken care
of that problem.

MR. VEEDER:   I would doubt that, for the reason that
his Honor asked us to make changes, if you remember, in the
"A" series to include this phraseology following "heirs,
successors, executors, administrators, and assigns," it says,
"who, by reason of their ownership of the lands described . ."

MR. GIRARD:   If you want to draft them in the specific
language, you do it.   I think your language is lousy.   This
language was drafted by Franz and I think it is ten times
better than yours.

MR. VEEDER:   Judge Carter wrote the language.

MR. GIRARD:   No, he didn't.   If I have to draft these
findings and follow every word you put in your 34-A series,
I don't like 34.   I have never quarreled with it too much
because I think it deals with an insignificant part of this
case.   I think it deals pretty much with land none of us is

1    concerned about.

2        THE COURT:  Well, I want some uniformity.  Let me look

3    over what is involved.

4        The type of language you refer to appears in what

5    judgment?

6        MR. VEEDER:  Let me refer to the Conclusions of Law,

7    first, which appear on 3 of 34-A.

8        Do you have that?

9        THE COURT:  No, I gave it to the Clerk.

10       MR. VEEDER:  Here is a copy.

11       THE COURT:  What page?

12       MR. VEEDER: Page 3.

13       THE COURT:  Which one?

14       MR. VEEDER:  You start in there about the "inter se se"

15   and then you come on down.

16       THE COURT:  Page 4.

17       MR. VEEDER:  That is right, and throughout the whole

18   3  and 4  you have asked that following the words "successors,

19   executors, . . by reason of their ownership of the land,"

20   that, I think, is important, whether Mr. Girard likes it or

21   not, and you thought it was sufficiently important for us to

22   recast all of these to include it.

23       THE COURT:  Let me read through it.

24       What is the corresponding language in 30?

25       MR. GIRARD:  It is on page 30 of Mr. Sachse's.

THE COURT:  What line?

MR. GIRARD:  It starts the whole first paragraph.

THE COURT:  Let me read it.

If you want to be technical, on line 13 you say "and the rights of the owners of said land, the use of said ground waters are forever quieted against the United States and all of the parties".  Actually, in a quiet title suit you operate only against the defendants.  You don't operate against owners. A man might be the owner and he might not be a party.  If a lis pendens is filed, it makes no difference.  In the ordinary case, in a quiet title suit, there are certain instances where it can be in rem.  But I don't know that this is a proceeding in rem.  It is actually against defendants, and this was what motivated me to talk about defendants -- adverse claims of the defendants, in the other wording.

MR. SACHSE:  The real distinction, your Honor, between the two phraseologies, I believe, -- it comes roughly between lines 20 and 22 -- in this draft on the Murrieta Findings we restrained them from asserting rights in and to the waters of the Santa Margarita River except rights to the surface waters. Mr. Veeder's draft restrains them from asserting rights in and to the waters of the Santa Margarita based on the owner- ships of said lands.  With opology, I think my language is clearer.  To say that you restrain them from asserting rights based upon the ownership of said lands doesn't mean anything.

1    THE COURT:   Then it should be "except surface waters".

2    MR. SACHSE:   Yes, I think this "except surface waters"

3    is a more clear exposition of what we tried to accomplish.

4    MR. VEEDER:   We should go back and read the record where

5    this language came from and the circumstances under which it

6    was written in and it becomes clear.

7    MR. SACHSE:   I don't care whether it came from his Honor

8    or not.   He is not necessarily always faultless.   We are

9    trying to help him.

10   THE COURT:   This would be fruitless, because it was your

11   language and I was trying to dress it up.

12   MR. VEEDER:   I am not concerned about the criticism.   I

13   am trying to point out that there were reasons why your Honor

14   wanted this in and it was explained in the record at the time.

15   I couldn't care less about the observations that have been

16   made.   The only thing is that I think you had sound reason

17   for putting it in and it was in and has been utilized.   You

18   have signed now five judgments with it in.   If it is to be

19   changed, we can work out another amendment.   George suggested

20   an amendment to the amendment.

21   MR. SACHSE:   I appreciate also your Honor's feeling that

22   we ought to be as consistent as we can.   But truly, these

23   are interlocutories.   I understand Mr. Veeder's findings.   I

24   have not objected to any of the 34-A.   I think it is okay.

25   I think this says exactly the same thing.   I don't see why

1      we have to have every single one of these identical.

2           THE COURT:   I don't, and as a matter of fact they could

3      vary.  But as we go over these and check them, for easy

4      checking if they follow some pattern or if they follow two

5      patterns that were equally satisfactory, we are all right.

6      Otherwise, if we are using different language each time, then

7      you have to read it with a fine tooth comb.  I know that you

8      probably and I would like to be able to think about it a little

9      bit and go over this a little more carefully.  I don't know

10     whether I want to do it right now.  Will you put it on the

11     list for the first thing tomorrow morning.

12          MR. GIRARD:   Yes.

13          MR. VEEDER:   I had these other inquiries to make.   I

14     will hold them all up until tomorrow morning.

15          THE COURT:   What are the other inquiries?

16          MR. VEEDER:   Well, as I comprehended, you were directing

17     that we go ahead and have a 30-A series to take care of

18     basement complex in the Murrieta-Temecula Judgment.

19          MR. GIRARD:   I didn't hear you.

20          MR. VEEDER:   I had originally thought you were going to

21     have a "A" series.

22          MR. GIRARD:   Yes.  That language I suggested be deleted

23     from that conclusion of that judgment would mean you would

24     make an "A" series.

25          MR. VEEDER:   And you would refer in your interlocutory

18,532

1    and in your conclusions and findings that there is an "A"

2    series to this 30, I assume.  I don't care.

3         MR. GIRARD:   The "A" series will speak for itself.

4         MR. VEEDER:  All right.

5         MR. GIRARD:  I don't care.

6         THE COURT:  How far does this "A" series go?

7         MR. SACHSE:  That is what worries me.

8         THE COURT:  It starts on the eastern line of the ground

9    water area, and we will have to get some kind of check map

10   or something not to slop into watersheds that we have taken

11   care of.

12        MR. VEEDER:  That is a problem I am going to have to

13   talk to the Office of Ground Water Resources about, because

14   we are in the process of getting the "A" series for the lands

15   that are below Vail Dam and above the Gorge.

16        MR. SACHSE:  How far north and south?

17        MR. VEEDER:  That is what I am going to have to check

18   out, Mr. Sachse.  I am going to have to have a "A" series for

19   that area which appears to slop over into this particular area

20   I have just referred to.

21        MR. GIRARD:  Outside the ground water area.

22        MR. VEEDER:  Yes.

23        MR. GIRARD:  I wonder whether it is proper to have an

24   "A" series to 30.

25        THE COURT:  Because we have taken care of everything in

the area.

MR. GIRARD:  Yes.

THE COURT:  He is talking now only about numbers.  Where we have used the "A" series we have indicated that it was a complementary judgment to the number without the "A."

MR. VEEDER:  Right.

THE COURT:  Actually within the ground water area we are taking care of the basement complex and other ground.

MR. VEEDER:  That is right.

Belt 2

THE COURT:  So the ground water area is complete in itself.  I would think we wouldn't talk about 30-A.  We would talk about some other number.

MR. GIRARD:  Give it a separate number.

MR. SACHSE:  The first "A" we entered, or not the first one but one of the 31-A is smack in the middle of this area on your map, and you have a 31-A for that outside the ground water area.  So what are you going to do with the next stream down and the next stream up?

MR. VEEDER:  We have to delineate the parcels that haven't already been covered, because some of them haven't been covered by either one.

THE COURT:  I think you should get at least for our use in the courtroom here and for your use some kind of control map which shows what areas we have covered by various judgments and then try to make our decision.

1    MR. VEEDER:  We have a map that I have been working with

2  since I got into town.

3    THE COURT:  It is a control map?

4    MR. VEEDER:  It is a control map.  I am going to have to

5  have a delineation on the basis of the judgments that have

6  been entered.

7    THE COURT:  That is what I think we should have.

8    MR. VEEDER:  But I do have a control map.

9    THE COURT:  When can we have a copy of that?

10    MR. VEEDER:  I will have to talk to Colonel Bowen about

11  it, but as fast as we can get it.  I, myself, have to have

12  it, because I am running into the duplication of parcels now.

13    THE COURT:  Are you going to continue to work here some

14  time next week?

15    MR. VEEDER:  I hadn't planned on it, your Honor.  I am

16  going to have this thing set up, though, so that the work

17  will go right on.

18    THE COURT:  I don't know.  I know how this work goes

19  along when you are not here.  Maybe some of the work over at

20  the Base goes on, but we don't get further along on judgments.

21    Well, all right, you are going to get that for us as

22  soon as you can.

23    MR. VEEDER:  That is right.

24    THE COURT:  What is the next thing you wanted to talk

25  about?

18,533

1    MR. VEEDER:   I wanted direction from your Honor in regard

2    to Diamond and Domenigoni, because I think that we have a

3    comparable problem with 30.   There are areas of basement

4    complex in there.   So I will follow the same idea and work

5    out something on Diamond and Domenigoni Valley comparable

6    to what is going to be worked out on the 30 series.

7    THE COURT:   Then that raises the question, do we anywhere

8    define in 36, which is Diamond-Domenigoni Valley, what area

9    this covers?

10    MR. VEEDER:   It is defined as being the area on Exhibit

11    274.

12    Isn't that right?

13    MR. SACHSE:   That is right.

14    MR. VEEDER:   On Exhibit 274, which is incorporated by

15    reference.

16    THE COURT:   274 will include on it automatically some

17    area outside the watershed of Warm Springs Creek.

18    MR. VEEDER:   Certainly it includes outside the basin

19    that you have designated in Diamond and Domenigoni, and there

20    are protrusions in there of basement complex.

21    THE COURT:   It seems to me that this would be a good

22    idea for 36-A.   Anybody object to that?

23    MR. SACHSE:   No, not at all.

24    THE COURT:   And it seems to me that 36 and 36-A, then,

25    should be defined to indicate that they are only including

18,536

1   the area within the subwatershed of Warm Springs Creek.  Isn't

2   that it?

3       MR. VEEDER:  No, your Honor, it is not.  Number 36 is

4   more limited than that.  No. 36 is limited to the basin in

5   Diamond and Domenigoni Valley.

6       THE COURT:  Then there has to be some way to tell us in

7   36 and 36-A what area is being covered.

8       MR. VEEDER:  That has to be done.  What I would

9   recommend being done in that connection is that on Exhibit

10  208-C, which is a map of Upper Murrieta and Warm Springs

11  Creek, we have the whole area that is involved.  We will

12  delineate the basement complex area and when that is read

13  back against Diamond and Domenigoni Valley I think you will

14  not have a problem.

15      MR. SACHSE:  I think you are right.  I think we should

16  treat 36 as relating to this alluvial area.

17      MR. VEEDER:  All right.  That is what your 36 is written

18  on.

19      MR. SACHSE:  It has lumps of old basement complex

20  scattered through it.

21      MR. VEEDER:  That is right.

22      THE COURT:  What exhibit did you refer to?

23      MR. VEEDER:  Exhibit 208-C is the map of the ownerships.

24  That will be the guide in determining the areas to which 36

25  and 36-A will relate.

18,537

1      THE COURT:  You could pull that out for me and have it

2  ready for me this afternoon, couldn't you?

3      MR. VEEDER:  I'll try.

4      Are the exhibits down here now?

5      THE COURT:  Find the Clerk.  I have something I have to

6  take care of.  I have to leave in about five minutes and will

7  be back in about 30 minutes.  I'll take a little longer than

8  the usual recess.  You can pull that out and have it ready

9  to work on and talk about what you are going to do with it.

10  We all agree there should be some demarkation in 36.

11      MR. SACHSE:  Except for the bulges of basement complex

12  in the middle of the alluvium in 36, which is comparable to

13  30.

14      THE COURT:  All right.  Wh

15      What is the next matter you have?

16      MR. VEEDER:  It is just a continuation of these problems

17  that I am trying to work out.  I will follow the guide you

18  started here and I may not have any further questions.

19      THE COURT:  Let me interject this.  Have you talked

20  about what I suggested on Tuesday, I guess it was, about

21  riparian and overlying rights being correlative?

22      MR. SACHSE:  Yes, your Honor.  I thought we were in

23  agreement, your Honor, that the language speaks for itself

24  and that your Honor would be treading on extremely dangerous

25  ground that none of us is capable of trying to spell out

1  exactly what this correlative situation means, because it

2  varies so when it is applied to specific statements of fact,

3  and that the phrase "rights are correlative" is a term of

4  art and that we are safe in using it without delineation

5  thereof.

6     Isn't that the substance?

7     MR. GIRARD:  It is my view, your Honor, that when you

8  say that a man has a correlative overlying right or a

9  correlative riparian right --

10    THE COURT:  I am talking now about the relationship

11  between riparian and overlying.

12    MR. GIRARD:  That is right.  And when you say in a

13  judgment that a man has a correlative riparian right to water,

14  you also say in the judgment that a man has a correlative

15  overlying right to waters, and you also say in the judgment

16  that those waters which are overlying rights apply to it and

17  contribute to the stream.  I think their rights, as a matter

18  of law under California law, work together, and how much

19  water each is entitled to or how you regulate it depends on

20  the factual situation.  But you don't have to say anything

21  else.  That is my opinion of it.

22    THE COURT:  If I said anything, remembering the

23  discussion we had, I wouldn't talk about "co-equal" or

24  anything, but I would merely say that there is correlation

25  between overlying and riparian rights.

MR. STAHLMAN:  But in some instances there is not, your Honor.

THE COURT:  Well, you say riparian rights are correlative, and in some instances where one riparian in no way affects the other riparian -- the downstream riparian doesn't affect the upstream riparian.

MR. STAHLMAN:  This situation as I observe -- we had considerable discussion on this -- and that is that a person whose land --

THE COURT:  Wait.  I haven't time now.

MR. STAHLMAN:  All right.

THE COURT:  We will take it up later.  Is there any way you can solve this between yourselves?

MR. STAHLMAN:  We did.

MR. SACHSE:  I thought we did.

MR. STAHLMAN:  Didn't you agree, Mr. Veeder?

MR. VEEDER:  If you say a man whose has an overlying right has a correlative share in the supply of water, that is my comprehension.

MR. GIRARD:  Yes.

MR. VEEDER:  I think it cannot be said that his rights are identical with those of the riparian owner.

MR. STAHLMAN:  No, it cannot.

THE COURT:  Can we make it clear that the riparians have correlative rights to the stream system, that the

18,540

1    overlying owners have correlative rights to the stream system?

2    Doesn't that do it?

3        MR. STAHLMAN:  No, your Honor.

4        THE COURT:  The very word "correlative" indicates a

5    relationship that may or may not exist, depending on the

6    facts.

7        MR. STAHLMAN:  I will be perfectly willing -- I explained

8    the other day my views, and I think Mr. Veeder agreed with

9    me, and so did Mr. Sachse and Mr. Girard.  We had considerable

10    discussion.

11        THE COURT:  Discuss it further and see if you can come

12    up with something.

13        MR. GIRARD:  All of us agree that we don't want anything,

14    your Honor.

15        THE COURT:  Mr. Veeder, too?

16        MR. GIRARD:  I believe so.

17        MR. VEEDER:  I would like to have it put into the record

18    what we were saying in my office.

19        MR. GIRARD:  I'll be happy to.

20        THE COURT:  All right.  Take a short recess.

21        (Recess.)

22        (Other matters.)

23        THE COURT:  Gentlemen, do you want to work some more

24    tonight?  I have things to do.

25        MR. STAHLMAN:  I think we've had it, too.

MR. VEEDER:  We will be here in the morning.

THE COURT:  Be here at nine-thirty, will you?

MR. SACHSE:  It's all right with me.

THE COURT:  Wait a minute.   (Conferring with the Clerk)
Be here at ten.

MR. STAHLMAN:  I will not be albe to be here tomorrow.
However, next week I will be here, or any date before the 8th
of January, when I start another trial.

THE COURT:  All right, 10:00 o'clock tomorrow morning.

(Whereupon and adjournment was taken to Friday, December
8, 1961, at 10:00 o'clock A.M.)

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA, )
                                  )
                Plaintiff, )
                                  )
    vs.                           )    No. 1247-SD-C
                                  )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,              )
                                  )
                Defendants. )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: December 7, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing    26     pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 12th day of December, 1961.

                               John Swader

                               Official Reporter

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                   Plaintiff,  )
                               )
       vs.                     )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                   Defendants. )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, December 8, 1961

- - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Vail Company: | GEORGE STAHLMAN, ESQ. |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE, ESQ. |

1

# INDEX OF EXHIBITS

2

3

| Plaintiff's Exhibits | Identified | Received |
|---|---|---|

4

208-F   ("Upper Murrieta Creek
And Warm Springs Creek
Watershed Geology And Land          18,560
Ownership Map.")

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, Friday, December 8, 1961, 9:30 A.M.

-o0o-

(Other matters.)

THE CLERK:  4-1247-SD-C United States vs. Fallbrook.

THE COURT:  Mr. Veeder, you handed me those amendments?

MR. VEEDER:  Yes, your Honor.

THE COURT:  They are laid on my desk.  I take it these are the ones to be filed.

MR. VEEDER:  That is correct.  Are you going to sign those as of December 7th?  I hope you are.

THE COURT:  Yes.

Mr. Clerk, they were ready yesterday.  They are dated December 7th, so file them as of that date.

The Clerk says they will be entered today.  But they were filed yesterday.  The entry is something else again.

MR. VEEDER:  May I see that, Mr. Clerk.

I am afraid --

THE COURT:  What are you afraid about?

MR. VEEDER:  XXXIV(a) entered December 7, 1961.  That was entered.

THE CLERK:  Yes.

MR. VEEDER:  In other words, that was entered.

THE COURT:  Yes

MR. VEEDER:  That is all right.

THE COURT:  It will be filed as of December 7th and will

1    be entered today.

2        MR. VEEDER:  Your Honor asked me to bring to the court-

3    room some of these maps to indicate the location of properties,

4    indicating the areas that are involved, and I have the maps

5    here, if you desire to look at them

6        THE COURT:  This is the map that shows us what areas

7    we have covered by judgments.

8        MR. VEEDER:  It shows the areas upon which we have

9    been operating, and I am going to have a map prepared to

10   have the exact areas covered by the judgments.

11       But I would like to bring to your attention some of

12   these other factors in regard to Domenigoni Valley and the

13   problems that we are being confronted with from the stand-

14   point of the interlocutory judgments which are more and more

15   piecemealing some of these valleys.  I would like to have

16   the Court be apprised of what is actually transpiring.

17       THE COURT:  Well, what is transpiring?

18       MR. VEEDER:  I will show you the ownership maps, your

19   Honor.

20       (The Court steps down to the counsel table and looks

21   at maps.)

22       MR. VEEDER:  As related to the geology, as related to

23   the stream system, as related to your Temecula-Murrieta

24   ground water area.  I am talking about Domenigoni Valley as

25   a prime example why I am concerned as to the various

1    interlocutories that are being entered.

2         You will observe that the Diamond-Domenigoni map

3    incorporated by reference in the Diamond-Domenigoni

4    interlocutory judgment takes in a rather very extensive area

5    extending down to the northwest quarter of Section 30

6    Township 6 South Range 2 West and extending on across for

7    several miles.  However, it does not complete the area which

8    constitutes the full length of Warm Springs Creek.  This map

9    cuts off in Section 30.  You have an area for about five or

10   six miles which is not included in the interlocutory judgment.

11   You also have another reach of the stream which extends into

12   the Murrieta ground water area.  You have the so-called

13   "A" area -- in other words, the basement complex areas which

14   are not included.

15        The result will be, as I comprehend it, your Honor,

16   probably four, maybe five separate interlocutory judgments

17   to take in this one subwatershed.  In my view, it is becoming

18   extremely complex and extremely difficult to handle, extremely

19   difficult for anyone to locate his property or to determine

20   what his rights are under the circumstances that are

21   prevailing.  I am not being critical.  I am simply outlining

22   the difficulty.

23        THE COURT:  This area where underground water flows out

24   of Domenigoni Valley --

25        MR. VEEDER:  That is Menifee Valley right there.

1    THE COURT:   This is not called Domenigoni Valley, this

2  southwest?

3    MR. SACHSE:   The exhibit delineates the location of the

4  lip at the south line of Section 9.

5    MR. VEEDER:   That is right.  Now you have basement

6  complex throughout there -- you have basement complex there.

7  You have the same situation.

8    THE COURT:   What about doing it this way?  Why not limit

9  our Judgment No. XXXVI on Domenigoni Valley to this basement

10 lip, which you can pretty well describe because it is on that

11 section line, it is very close to that section line, and

12 have the one judgment for Domenigoni Valley on the watershed

13 of the Domenigoni Valley down to there?

14   MR. VEEDER:   Your Honor, the delineation that your Honor

15 has there is the younger alluvium.  That is not the watershed.

16 Here is the subwatershed with the ownerships on it, and here

17 is Diamond-Domenigoni area delineated by the dotted line.  It

18 is entirely possible to do what you directed.  We have a

19 problem, however.

20   THE COURT:   This dark line is the watershed line.

21   MR. VEEDER:   This is the subwatershed line.

22   THE COURT:   Where is that section where the lip is?

23   MR. VEEDER:   Section 9 should be along here, right here.

24 This is the ownerships.  So you have the problem of the

25 exterior boundaries of these parcels of land which are

1  cutting across basement complex, the younger alluvium, some

2  of which are riparian and some of which are not.  I attempted

3  to take care of it in the findings that I presented to your

4  Honor in Part No. 1, in which I described the whole area.

5  However, that was not accepted.  I am satisfied with whatever

6  ruling you make as long as I have the right to present my

7  objections.

8      MR. SACHSE:  May I make a suggestion, your Honor.  There

9  could be presented Finding No. I without  the slightest

10 reference to the specific findings your Honor made.  I don't

11 care whether this Diamond-Domenigoni Valley is in one or

12 forty-one judgments.  My client, the one who tried the case,

13 is concerned with a specific finding about the basement lip

14 and the movement of the water in and out of Menifee Valley.

15 If Mr. Veeder will write that in his finding, he can write

16 the findings.  That is all I want in it.  And he hasn't done

17 that.

18     MR. VEEDER:  You haven't read the findings, Mr. Sachse.

19 It is in there.  Read the findings, Mr. Sachse, and you will

20 find that I put it in there.  This objecting without reading,

21 Mr. Sachse --

22     MR. SACHSE:  I have read it, Mr. Veeder, and you persist

23 in writing findings which seek to avoid and to escape the

24 conclusions the Court has expressed.  I have told you,

25 frankly, a dozen times, you don't want to write the findings

1    the Court has adopted.

2        THE COURT:  Well, let's quit worrying about that.

3        MR. VEEDER:  All I want is your direction, your Honor.

4        THE COURT:  What is the easiest way to do this?  One

5    alternative would be to do it as a watershed down the line

6    of the Murrieta ground water area as a complete watershed.

7    That would be one alternative, a subwatershed.

8        MR. VEEDER:  I believe that would be the simplest way.

9        MR. GIRARD:  We can draft findings from Warm Springs

10   Creek on the ground water area all the way up, if you want

11   to do it that way.

12        Do you still want a separate "A" series for the basement

13   complex outside the younger alluvial deposits?

14        MR. VEEDER:  It is entirely up to the Court.  We can do

15   it that way.  Nor am I objecting to what you are doing.  The

16   only thing I am saying is, I am greatly concerned about a

17   great number of interlocutories in a single watershed.

18        THE COURT:  What alternatives do we have?  One alterna-

19   tive would be to take the entire watershed down to the line

20   of the ground water area and throw everything in it, basement

21   complex and other ground.

22        The second alternative would be to take the entire

23   watershed and have an "A, B" series, as we have done else-

24   where.

25        A third alternative probably would be -- and I am not

1   recommending it, but it is an alternative -- to take Exhibit

2   274, which shows the younger alluvium in the Domenigoni

3   Valley -- I am thinking aloud -- take the younger alluvium

4   and make our findings about this underground water flowing

5   out of the watershed as one of the findings in the valley

6   in this watershed.  You would probably have to put in all

7   the descriptions of the valley land to have it mean anything.

8       MR. VEEDER:  Yes, I think, your Honor, the way this

9   matter has been set up by Exhibit A of the Domenigoni

10  Interlocutory would take all of the overlying land and all

11  the riparian land in that subwatershed.  You could make an

12  interlocutory on that.  Then put in your "A" series, which

13  would be your basement complex, and then you would be through

14  with the whole thing.

15      THE COURT:  This would be the basement complex even

16  within the spotty basement complex within the valley floor

17  itself.

18      MR. GIRARD:  We could treat that like we did in

19  Murrieta.

20      MR. VEEDER:  I don't believe there would be any problem.

21  Just simply say, in regard to the lands, basement complex

22  concerning which there is no ground water.

23      THE COURT:  Specifically, I am talking about the two

24  or three items of basement complex.  Would you run those

25  into the Judgment No. XXXVI, or would you put them in No.

1    XXXVI(a)?

2        MR. VEEDER:  I would prefer them in Judgment No. XXXVI,

3    because then you would have a complete unit.  No. XXXVI(a)

4    are the lands -- you are trying to get the lands where there

5    are no possible claims.

6        COMMANDER REDD:  I don't think there are entire parcels

7    within this valley that would be all basement complex.  There

8    are just small portions of parcels that would come within

9    that.

10       MR. VEEDER:  That is the problem, yes.

11       THE COURT:  So it would be better then to have the

12   islands that exist in the younger alluvium, at least, in

13   Judgment No. XXXVI and not in XXXVI(a).

14       COMMANDER REDD:  Yes.

15       MR. GIRARD:  If you do that, would there be descriptions

16   of those lands, or just reference generally to islands as

17   depicted on Exhibit 274?

18       COMMANDER REDD:  I would suggest as depicted on this

19   map as basement complex, and that the waters in those are

20   local, vagrant, percolating.

21       MR. GIRARD:  By "this map" you mean Exhibit 274.

22       COMMANDER REDD:  This composite map of the ownership

23   and the geology.

24       MR. GIRARD:  What is this number?

25       MR. VEEDER:  This is the composite that the Court directed

1   us to prepare to set forth the exterior boundaries of the

2   parcels and the geology.

3       MR. GIRARD:  This map will be attached to the findings?

4       MR. VEEDER:  I would recommend that.

5       MR. SACHSE:  Instead of Exhibit 274?

6       MR. VEEDER:  I think it is better, because 274 doesn't

7   have the exterior boundaries of the parcels on it.

8       COMMANDER REDD:  This is a composite of 274, the owner-

9   ship map, and 15-E.

10      MR. GIRARD:  If we cut off this map in Section 9 and

11  made a separate XXXVI for this area, this map covers a lot

12  more area than that.

13      MR. VEEDER:  Yes, it does.  As I pointed out, it covers

14  the tributaries which are riparian to Warm Springs Creek.

15      THE COURT:  Wouldn't it be best to treat this as a

16  watershed -- XXXVI, XXXVI(a)?

17      MR. GIRARD:  I have no objection.

18      THE COURT:  And include everything right down to the

19  ground water area?

20      MR. GIRARD:  Is this the ground water area?

21      MR. VEEDER:  That is right.

22      MR. GIRARD:  Do you have a copy of this map?

23      MR. VEEDER:  Yes, I have in the office.

24      MR. GIRARD:  If you get me a copy today, I can do that.

25      THE COURT:  This hasn't been numbered and is not in

evidence, is it?

MR. VEEDER:  No, it has not, your Honor.

MR. GIRARD:  Just attach it as an exhibit.

MR. VEEDER:  We put it in as an exhibit in regard to Tucalota Creek.  I would just as soon have it as an exhibit.

THE COURT:  Do you have your list of ownerships all worked out?

MR. VEEDER:  Yes, it is done, your Honor.  Here it is.

THE COURT:  All done?

MR. VEEDER:  The fact is I put it on.

THE COURT:  The ownerships down to here?

MR. VEEDER:  I would have to run it out.  But you will have your ownerships, you will have all your overlying and all your riparian ownerships within the subwatershed.  I want to check those out again.  But that is how it was originally set up.  And for the sake of convenience, I would recommend that that be done.

THE COURT:  I don't see that it would be very difficult. You would have to start with your finding and show that all surface water in this subwatershed is part of the stream system, and then you would describe this underground water. How would you describe it, though, to indicate this valley toward Domenigoni Valley?

MR. GIRARD:  I don't think we would have any great changes from what it is in here.  The younger alluvial deposits are

1     set forth on this map, as I understand it.

2          THE COURT:  But what I am getting at is this.  You see,

3     you just can't say all the area covered by younger alluvial

4     deposits, that the underground water flows out, because that

5     is not true from here down.

6          MR. SACHSE:  Everything north of Section 9.  I would

7     include it, Mr. Veeder.  And that is why I say this is utterly

8     inadequate.  It talks about a lip and it says the greater

9     part of the water moves out here.  But he doesn't talk about

10    the specific finding that your Honor made that the ground

11    waters which do move down Warm Springs Creek are consumed

12    almost in their entirety by transpiration and evaporation.

13         MR. VEEDER:  I have no objection to putting that in.

14         MR. SACHSE:  All right then, let's do it.  Let's quit

15    arguing about it.

16         THE COURT:  Let's settle that by providing that for that

17    subwatershed there will be a XXXVI(a) and XXXVI(b), and in

18    XXXVI we are going to have to meet this problem of the situa-

19    tion above the line between 9 and 16, and 8 and 17.

20         MR. SACHSE:  I don't think it would be any problem

21    whatsoever.

22         MR. VEEDER:  I see no reason why it should be.  But I

23    do think it would eliminate at least four different inter-

24    locutories.

25         THE COURT:  All right, we will do it that way.

1        MR. GIRARD:  Whom do you want to do it, your Honor?

2        THE COURT:  I have this other matter to work on.  If you

3   and Mr. Sachse would like to work on this.

4        MR. GIRARD:  All right.

5        MR. SACHSE:  Mr. Veeder, I will take your draft that you

6   call "Part 1" and I'll take your findings between XVI and XX,

7   which are all you have on Warm Springs Creek, and rewrite by

8   "a" paragraphs the several additional things I think you have

9   left out, such as the instance you have just mentioned.  And

10  so there is no misunderstanding, as to the other and most

11  important specific finding of the Court, it would be wasteful

12  and unreasonable to require the water level of Diamond and

13  Domenigoni Valley to be maintained on the 1200-foot level.

14  That is what I want in, and you didn't put it in.

15       THE COURT:  It is going to be in.

16       MR. VEEDER:  I don't see anything wrong.  If he wants

17  to write the findings, fine.

18       THE COURT: So much for that point.

19       Now, on this matter of conclusions and judgments, I am

20  going to give you another job, Mr. Girard.  I want you to

21  go through these judgments we have signed and make some kind

22  of check list of these items we have covered and didn't cover

23  and try hereafter to have some uniformity in what we put in

24  our conclusions and judgments.  I think you would have to go

25  back over the judgments on different subject matters -- the

quieting of title, the owners who have land where there is

vagrant water, the quieting of title of the United States and

others to the waters of the stream against these people, the

inter se se or inter se problem, the problem that each of

these judgments should have in it, the fact that they will be

given a chance to object before the final judgment is entered.

I think from the various judgments we have already signed up

you can come up with a pretty good list of what we have to

include in these various judgments to have uniformity.

MR. VEEDER:  May I suggest, in that connection, that

reference also be made to your Honor's conclusions which

relate to that phase of the interlocutory to the end that

there will also be uniformity in your conclusions of law.

THE COURT:  I am talking about conclusions of law in

terms of the interlocutory judgment.  Because as we are going

now we get a new judgment in here and it follows a little

different form.  I am not so much concerned about the actual

wording as the covering of certain allocated subject matters.

MR. GIRARD:  All right.

THE COURT:  What other matter do you want to bring up?

MR. VEEDER:  I have copies in my office of all the

interlocutories.  If you come down I will see that you get

them, Mr. Girard.  You will see the matters to which I am

referring.

MR. GIRARD:  I would like to take a copy up to Sacramento.

1  MR. VEEDER:  I think we have copies of everything and

2  you may take it along.

3  MR. SACHSE:  So I am clear on this, do I understand now

4  we are going to have a No. XXXVI, which will cover the entire

5  Warm Springs Creek subwatershed?

6  MR. VEEDER:  Right.

7  MR. SACHSE:  Upstream from the ground water area?

8  THE COURT:  Right.

9  MR. SACHSE:  And that included within that, not as a

10  separate judgment, will be the language pertaining to the

11  Diamond and Domenigoni basins?

12  THE COURT:  Right.

13  MR. SACHSE:  And then there will be a XXXVI(a) on the

14  basement complex?

15  THE COURT:  Yes.

16  MR. VEEDER:  For the record, it might be of assistance,

17  the ownership map, 208-C, is in evidence.  Exhibit 208-C is

18  the one from which you will find the delineations of owner-

19  ships and the locations of parcels.

20  This composite map here, which sets forth the geology

21  and the exterior boundaries of the parcels, if your Honor

22  wants to have that marked in evidence as one of the 208 Series,

23  which would be your Upper Murrieta and Warm Springs Creek,

24  then they would be ready to go on that.  I don't know what

25  the last number is on the 208 Series, though.  Do you want

1    that in or not?

2        MR. SACHSE:  It's okay.  I will draft XXXVI and send it

3    to you, out of your Part 1 of your other judgment.

4        MR. VEEDER:  On Xmas Eve?

5        MR. SACHSE:  I will get it to you before Xmas Eve, Mr.

6    Veeder.

7        THE COURT:  Mr. Clerk, what is the last exhibit in the

8    208 Series?

9        THE CLERK:  Your Honor, 208-F will be the next one.

10       THE COURT:  You will later on supply us copies, I take it.

11   You have one already to mark?

12       MR. VEEDER:  Yes, I do.

13       THE COURT:  Will you supply me a copy later?

14       MR. VEEDER:  I will, your Honor.

15       THE COURT:  This would be the Warm Springs-Upper Murrieta

16   watershed.

17       MR. VEEDER:  It has a block there; it is "Upper Murrieta

18   Creek And Warm Springs Creek Watershed Geology And Land

19   Ownership Map," Exhibit 208-F.  We offer it.

20       MR. SACHSE:  Those are now available, you say?

21       MR. VEEDER:  Yes.

22       THE COURT:  Received in evidence.

23       MR. GIRARD:  Mr. Veeder, is the geology on that map

24   identical to Exhibit 274 in the same area?

25       COMMANDER REDD:  Yes.

17

1      THE COURT:  You told me before what it was based on.

2  What is it based on, a couple of other exhibits?

3      MR. VEEDER:  That is correct.  It is based on your

4  Exhibit 208-C, which is the ownership map; it is based on

5  Exhibit 274.

6      THE COURT:  It is a combination of those two things?

7      MR. VEEDER:  That is correct.

8      THE COURT:  Geology and ownership?

9      MR. VEEDER:  That is right.

10     THE COURT:  Exhibit 208-F received in evidence.

11
                   ( The document referred to was     )
12                   ( marked Plaintiff's Exhibit 208-F,)
                   ( and received in evidence.      )

13     THE COURT:  Can we pass that for a minute?

14     MR. SACHSE:  Yes.

15     THE COURT:  What was this understanding you had and

16  talked about yesterday before I left, about some statements

17  made in chambers which seemed to satisfy all of you on this

18  overlying-riparian problem?  Do you remember?

19     MR. GIRARD:  As I understand, the general agreement

20  among the attorneys was that once you say that certain land

21  has a correlative riparian right and that certain land has

22  a correlative overlying right there is no necessity for

23  spelling it out in any more detail and saying that these two

24  types of correlative rights are correlative to each other.  I

25  think when you say that land has a correlative riparian right,

18

1    implicit under California law is the conclusion that land

2    has rights to ground waters which add to and support that

3    particular stream.  I, myself, don't think you have to go

4    any further and try to define them.

5         THE COURT:  Are you satisfied with that, Mr. Veeder?

6         MR. VEEDER:  I believe that is reflective of the law,

7    and I think it depends on where your land is located.

8         MR. GIRARD:  The amount of water you are entitled to

9    under the right depends entirely upon where your land is and

10   what water is there, et cetera.

11        MR. VEEDER:  Its location in the valleys.

12        MR. GIRARD:  Its location in the valleys.

13        THE COURT:  Mr. Stahlman was satisfied also, was he?

14        MR. GIRARD:  I am sure he was.

15        THE COURT:  Then we have passed that.  We will find that

16   certain land is overlying and has correlative rights, and that

17   other land is riparian and has correlative rights, and go no

18   further.

19        MR. GIRARD:  I think that is all you have to do.

20        THE COURT:  What is the next matter?

21        MR. GIRARD:  I presume these Murrieta Findings which we

22   have gone over in detail.  Before I submit them finally I

23   will check through these various judgments to make sure there

24   is a clause to make them uniform to all the others.

25        THE COURT:  Yes.

**19**

   1       MR. GIRARD:   I, myself, know we will need some additions.

   2   Just the couple of things you have mentioned here on notice,

   3   et cetera, are not in this one draft, and I will check through

   4   those judgments that have been entered so far and make sure

   5   there is a clause in there for everything to make it uniform

   6   with the others.

   7       THE COURT:   Yes.

   8       MR. GIRARD:   Insofar as the real meat of the findings is

   9   concerned, I think the language has been pretty well ironed

  10   out and given the approval of the Court.   I know that Mr.

  11   Veeder does have objections to some of these, but we have

  12   ironed that out -- I don't know whether he wants to discuss

  13   it more in detail or not -- except as to the language on

  14   pages 24 and 25 where I have treated the prima facie problem

  15   a little bit differently than it was done before.   In my view,

  16   this is the better way to treat it.

  17       Incidentally, the definition of "prima facie," taken

  18   right out of the Code Of Civil Procedure of the State of

  19   California, provides, in essence, that anyone who seeks future

  20   relief, regulation or apportionment before this court can

  21   come in and make a case just by filing, through some appro-

  22   priate motion, the particular findings which concern the

  23   irrigable acreage, the irrigated acreage and water duty which

  24   have been entered, and the burden is then on the person

  25   against whom that relief is sought to prove those particular

20

1   findings are wrong.  In other words, a paper showing can be

2   made just by filing them on a motion.

3          THE COURT:  Why isn't that very workable, Mr. Veeder?

4          MR. SACHSE:  Mr. Veeder has agreed, I think.

5          MR. VEEDER:  No.  The primary difference I have with Mr.

6   Sachse and Mr. Girard is simply this.  I believe the evidence

7   to which he is making reference was offered for all purposes.

8   I believe if you enter the findings that I have requested, the

9   burden would be upon anyone attacking the final decree to come

10  forward and show that there was a change.  I believe there is

11  that primary difference from our standpoint.

12         As I comprehend their position, a man will come in with

13  a motion for an order to show cause why someone shouldn't

14  be restrained from using more water than is specified in the

15  decree.  He would have made out his case by that single act.

16  However, the only way that that finding could be attacked,

17  would be for the man who was opposed to the finding as written

18  in your Honor's decree to show a changed condition.

19         I am not sure whether that is splitting hairs or not.  I

20  think there is a difference, though.

21         THE COURT:  I like the way Mr. Girard has it.  I think

22  this means that these findings on these particular facts of

23  acreage, et cetera, could be relied upon by anyone as a prima

24  facie showing, and then if everybody is content we need to go

25  no further.  Certainly those are only part of the kind of

21

1   showing that would have to be made to get an apportionment.

2       MR. GIRARD:  Yes.

3       THE COURT:  But if nobody is discontented, the job is

4   done.  If somebody is discontented, let him take the burden

5   of trying to show what is changed or what is wrong.

6       MR. VEEDER:  I will advance this thought, your Honor, if

7   I may.  I think if you were to enter findings without any

8   caveats, without any statement of the character that was

9   proposed, then the legal effect of them would follow.  But

10  what you are doing, I believe, when you say that such a

11  finding is prima facie evidence of a fact is, in effect, to

12  give an advisory decree as to what might be raised in subse-

13  quent proceedings.

14      I don't want to hold this matter up.  Let it go in that

15  way.  I will file objections to it.  I don't want to hold

16  these matters up anymore.

17      THE COURT:  I am trying to find out if you can't be

18  content with it.

19      MR. VEEDER:  I feel this way.  If you will just enter

20  the findings and let the legal conclusions flow from them,

21  that will be all right.

22      MR. SACHSE:  I, of course, disagree vigorously.

23      MR. VEEDER:  Mr. Sachse disagrees vigorously.

24      THE COURT:  What do these concern now?

25      MR. SACHSE:  They concern, fundamentally, your Honor,

22

1   irrigable acreage where your Honor, I am sure, recalls that

2   for five years I have been objecting to the admission at all.

3   THE COURT:  I am trying to find out what items we are

4   talking about.

5   MR. GIRARD:  We are talking about gross acreages, irriga-

6   ted acreages, irrigable acreages, and water duty, your Honor.

7   THE COURT:  You are not talking about the facts that are

8   shown on some of these slips as to wells?

9   MR. GIRARD:  No, I made a special statement on that, that

10  the factual statements contained in said exhibits which pertain

11  to wells and surface diversions are, as of the date of this

12  interlocutory judgment, true, because I don't think there is

13  any question on that.

14  THE COURT:  As far as irrigable acreage, irrigated

15  acreage, and water duty are concerned, I am content entirely

16  with Mr. Sachse's and Mr. Girard's positions.  What about

17  gross acreage?

18  MR. GIRARD:  I think if there is ever a situation where

19  this should be the ruling that I have outlined here, it

20  pertains to the gross acreage.  I have tried enough condemna-

21  tion cases to know that most of the time when you take the

22  gross acreages off the recording information or various dis-

23  trict information of so many acres, more or less, I'll bet

24  30 per cent of the time they are not right, and we have pretty

25  much of the time just relied on those.  We haven't surveyed

23

1    each of these little parcels.

2        THE COURT:  We have the further fact that so many of

3    these people did not come in.  If they have answered, they

4    have not appeared.  And we have been trying to give them due

5    process, and it would seem to me that this would be as fair

6    a thing as we could do.

7        MR. GIRARD:  If it turns out that instead of actually

8    120.5 acres, more or less, they had 127 acres, and we made an

9    actual survey, and they think it is important to decide that,

10   they should have an opportunity to do it without showing a

11   change in the conditions.

12       THE COURT:  All right, I am content, and your objections

13   are overruled, Mr. Veeder, and you needn't file any written

14   objections.  You have stated your objections on the record.

15       MR. GIRARD:  That, I think, will take care of the

16   Murrieta Findings.  The main thing is to make sure that every-

17   thing is in here.

18       The big issue that I think Mr. Sachse is most concerned

19   about, and I am, too, is getting approval on the language

20   basically of the findings concerning the Military Reservation,

21   and I think the only way we can do that is just to sit down

22   and listen to Mr. Veeder's objections and weigh them and your

23   Honor rule one way or the other, and I think it will take at

24   least a day to go throught this Military finding, assuming

25   Mr. Veeder has objections.  And I am sure that Colonel Bowen

24

1   and Mr. Sachse, at least, already have found factual errors

2   which I have to correct. But before I redraft this -- it is

3   a rather detailed one -- I would like to have the Court

4   consider the propriety of the factual findings as to their

5   correctness, and I think we are going to have to hammer it

6   out. I don't know of any other way.

7        THE COURT: Let's talk a minute about future plans. You

8   have matters next week, Mr. Veeder, I take it?

9        MR. VEEDER: Your Honor, I haven't heard from Denver yet

10  as to what is going to come up there. I talked to them on

11  the phone yesterday. It may be that there will be a change.

12       MR. GIRARD: I do have a trial in Reno on Wednesday and

13  Thursday.

14       THE COURT: I have a matter next week that I have to

15  hear. I couldn't do it next week.

16       MR. GIRARD: The only other date which would be objection-

17  able, from the standpoint of calendar, I have a trial commencing

18  the 22nd of January. I presume we can meet before then. We

19  can meet, I presume, the week before Christmas -- although

20  I prefer not to, but not for reasons of work. I'll be here

21  if everyone wants to be. I don't have any objection that

22  strong.

23       I think Mr. Stahlman also, as he mentioned yesterday,

24  has a trial commencing January 8 as of this time, although

25  he will know for sure on that today. He is having pre-trial

25

1     on it today.

2         MR. SACHSE:  However, Mr. Stahlman has also made clear

3     to me, and I know to Mr. Girard and Mr. Wilkinson also, that

4     he has no objection to our going ahead with the Enclave in

5     his absence.  He just wants to be sure to be here for Vail

6     and Murrieta.

7         THE COURT:  Next week, starting Tuesday, the 12th, I

8     have matters that can't be put over.  Then we come to the

9     week of Tuesday, the 19th, the week before Christmas.  In

10    addition, I am supposed to be in Los Angeles that week on my

11    arrangement with Judge Kunzel, although it is a question as

12    to how much I will have -- this is an uncertain thing.  Then

13    we come to Christmas.  I would think we can't do anything

14    until, say, January 9th.

15        MR. GIRARD:  All right.  And I think, as pointed out,

16    we will spend a full day and a half going over these word

17    for word.  Don't you think so, Mr. Sachse?

18        MR. SACHSE:  I don't think you will finish it in a day.

19        THE COURT:  Is Tuesday, January 9th, agreeable?

20        MR. GIRARD:  Yes, your Honor.

21        MR. SACHSE:  Can we assume or hope that we will continue

22    for several days?

23        THE COURT:  Yes.  I have a matter on Friday, the 12th,

24    but I would figure we would have three days anyhow, and we

25    probably could get some time the following week.  But a lot

of this work has to be done outside of the courtroom.

MR. GIRARD:  That is right.

THE COURT:  I will list the 9th to the 11th for Fallbrook.

MR. VEEDER:  In other words, at ten o'clock on January 9th, 1962.

THE COURT:  Yes.

MR. GIRARD:  Mr. Sachse is going to re-do Diamond and Domenigoni Valley.

I am going to re-do Murrieta.

Speaking for myself, and I hope for Mr. Sachse, I hope that is not a monumental job either one of us is going to do. I think we have some other areas where there haven't been any findings submitted, I think downstream from Temecula Gorge to the Enclave, possibly other areas.

MR. VEEDER:  I have submitted findings on that.

THE COURT:  What is this document you are talking about, Mr. Veeder?

MR. VEEDER:  I have prepared what I have referred to as "Part 2" of the findings, and if you will turn to page 9 you will find a review of Sandia Creek, Rainbow Creek, the descriptions of the lands within the area of De Luz Creek, Fallbrook Creek.

THE COURT:  Before we get too energetic about other sets of findings, how about cleaning up some of this we have been kicking around here?  We have Anza Valley.

27

1    MR. GIRARD:  That is right, we have Anza Valley,

2    Coahuilla Valley, which I have submitted to Mr. Veeder at

3    least six months ago, which haven't come out of the office.

4    The only problem on there that we had was the Gibbon and

5    Cottle problem, and I will draft them whichever way you rule.

6    But those findings have been submitted.  Maybe I had better

7    look them over again to see if they have everything in there.

8    MR. VEEDER:  You'll find, Mr. Girard, that those findings

9    are as far from acceptable as your Diamond and Domenigoni and

10   Murrieta findings, because of disparity between the inter-

11   locutory judgment and your conclusions of law.

12   MR. GIRARD:  Let's clear it up, Mr. Veeder.  You were

13   going to incorporate those findings into your major findings

14   on that whole watershed, that was eight months ago, and we

15   haven't received one word in here on that finding.

16   I don't care whether Mr. Veeder does them, or whether we

17   do them.  But somebody ought to do them.  My assignment was

18   to do those two areas which I gave to Mr. Veeder and he was

19   going to incorporate them into Wilson Creek findings.  As of

20   now we haven't seen the Wilson Creek findings.

21   THE COURT:  Wasn't that the understanding -- that you

22   didn't want them separate as to Anza Valley, but wanted them

23   part of Wilson Creek?

24   MR. VEEDER:  My proposal has been set out here throughout

25   that we have a complete set of findings above Vail Dam.  I

28

1   would recommend, your Honor, in view of Mr. Girard's outbursts,

2   that the Court go ahead and enter findings.  I think they are

3   totally incomplete, but I can't do slipshod work, nor will I,

4   and the work that is before me now submitted by Mr. Girard is

5   slipshod, it is incomplete, and I absolutely refuse to be a

6   party to it.  As I told you before, I will file objections

7   to them and that will be it.

8   THE COURT:  Wait a minute.  Just answer my question.

9   Wasn't it your understanding that instead of having separate

10  findings on Anza Valley you were going to incorporate those

11  into Wilson Creek?

12  MR. VEEDER:  I think that was true.  And your Honor has

13  also said that in regard to the area above Vail Dam you want

14  to have separate findings in regard to the Aguanga ground

15  water area.

16  THE COURT:  Does Anza drain down through Aguanga?

17  MR. VEEDER:  Anza drains into Wilson Creek, and Wilson

18  Creek comes on through Aguanga.

19  MR. SACHSE:  No.

20  MR. VEEDER:  The ground water area?  Certainly.  Coahuilla

21  Creek drains to Anza Valley, it comes on down and joins Wilson

22  Creek, I believe it is in Section 3, and Wilson Creek comes

23  on across the Aguanga ground water area.  It is very simple

24  to check it.

25  THE COURT:  Wilson Valley runs into this other ground

29

1    water area that we are going to talk about.  But it doesn't

2    drain down through Aguanga Valley.

3        MR. VEEDER:  This is the Aguanga ground water area.

4    Wilson Creek comes into it right down there.

5        THE COURT:  But Mr. Veeder, what we would have, if I

6    understand this matter, would be a set of findings on this

7    second ground water area.

8        MR. VEEDER:  The ground water area, your Honor, extends --

9    may I show you -- the ground water area is right here, comes

10   on up here and across here.  You have drawn it on here, right

11   here.  Wilson Creek, which comes right down here, goes right

12   across it.

13       THE COURT:  What we would have would be this other ground

14   water area.  Then we would have Wilson Creek, Coahuilla Valley,

15   and Anza Valley.

16       MR. VEEDER:  It would be Wilson Creek above the ground

17   water area.

18       THE COURT:  Right.

19       MR. VEEDER:  And that is what you have done with Murrieta.

20   Then you would have Temecula Creek above the ground water area,

21   too.  So you would have that set up.

22       MR. GIRARD:  In other words, you would have a finding

23   for Aguanga ground water area or the ground water area above

24   Vail Dam.

25       MR. VEEDER:  It would be Aguanga ground water area which

30

1    appears on Exhibit 277.

2         MR. GIRARD:  And then a separate finding for Wilson

3    Creek above that ground water area.

4         MR. VEEDER:  That is my understanding.

5         MR. GIRARD:  Fine and dandy, if we can get it.

6         THE COURT:  Wilson Creek, actually, on this map I have

7    in front of me, runs up over here; and this other creek is

8    Coahuilla Creek.

9         MR. VEEDER:  Coahuilla Creek joins Wilson Creek; that is

10   correct.

11        THE COURT:  You would run both of those in.

12        MR. VEEDER:  I think they should be both together just

13   the way you recommended today in regard to Warm Springs Creek.

14        THE COURT:  Can you work on that?  I am fairly well

15   content with the findings that Mr. Girard drew as to the Anza

16   Valley situation.  Can you take those and work out the rest

17   of it down to the ground water area?  Have we fixed the lines

18   of that other ground water area?

19        MR. VEEDER:  Yes, they are fixed, and they appear on

20   Exhibit 277.

21        THE COURT:  Then aren't you in a position to go forward?

22        MR. VEEDER:  We are in a position to go forward.

23        THE COURT:  Will you work on that?

24        MR. VEEDER:  I will.

25        THE COURT:  Because that involves an immense basement

31

1    complex area.

2        MR. VEEDER:  That is correct.

3        MR. GIRARD:  It will be a monumental exhibit-preparing

4    job, but it will not be very hard to draft the findings.

5        THE COURT:  I have to hear this labor board matter.  We

6    are going to go to noon and then go after noon.  Can we

7    adjourn until the 9th?

8        MR. SACHSE:  Very well.

9        Is there any thought that these letters will go out before

10   then?

11       MR. VEEDER:  I would like to have direction on that, your

12   Honor.  I tendered to your Honor the form letter which you

13   had approved.  I have held up sending it out until there was

14   agreement among the parties as to its use.

15       THE COURT:  What is your thought?

16       MR. SACHSE:  My thought is that you are borrowing trouble

17   with a capital "T" if we send this out before we are done,

18   because the biggest thing about the letter is that it purports

19   to summarize the "A" series of judgments.  I feel the better

20   way to handle it would be the way you handled the Master's

21   Findings when you simply sent out a letter saying that the

22   Master's Findings on De Luz Creek et cetera are here and you

23   may go and look at them.  There is one thing that is going to

24   worry these people, I know.  The letter says that accordingly

25   I entered, on such and such date, the interlocutory judgment

32

1    declaring that you have no right, title or interest in or to

2    the waters of the Santa Margarita River or its tributaries.

3    That is true.  But it is only half true, because your inter-

4    locutory judgment does declare that they have a right to the

5    surface waters flowing on their lands.  It doesn't say that

6    anywhere in here.

7         THE COURT:  Let's hold it up.  What is the value in

8    sending it out?

9         MR. VEEDER:  It is just a matter of moving these things

10   along.  I am not making any recommendation on it.

11        THE COURT:  Let's hold it up, because we are eventually

12   going to have to serve and notify everybody in this watershed

13   when we settle the final judgment.

14        MR. SACHSE:  That is my thought.

15        MR. VEEDER:  You are directing us to prepare a map which

16   will show all the interlocutories; is that correct?

17        THE COURT:  What I am talking about is not a map that

18   we use in evidence, but a check map that we can use so we will

19   know what part of this area we have covered by judgments.

20   That is all I am asking you to do.  And get copies to counsel.

21        MR. VEEDER:  We will do that.

22        THE COURT:  Then as we sign a judgment up and get rid

23   of Wilson Creek we can know we have an area of this watershed

24   out of the way.

25        MR. VEEDER:  Very good.

33

1    (Another matter.)

2    (Adjournment until 10:00 o'clock A.M. on January 9th,

3    1961.)

4

5                           - - -

#$ 34

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
      vs.                          )      No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
                    Defendants.    )
_____

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: December 8, 1961, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within and foregoing thirty-four (34) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 12th day of December 1961.

John Swader
Official Reporter

JOHN SWADER, OFFICIAL REPORTER