MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

　　　　　　Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

　　　　　　Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:　　San Diego, California

Date:　　Tuesday, January 30, 1962 and
　　　　Wednesday, January 31, 1962.

　　　Pages:　18,577 to 18,644

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

F 1

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1247-SD-C |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, January 30, 1962
Wednesday, January 31, 1962

- - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al.; | FRANZ R. SACHSE, ESQ. |
| Defendant Oviatt, et al.: | BEST, BEST & KRIEGER by ARTHUR L. LITTLEWORTH, ESQ. * |

*Present on January 30th only.

JOHN SWADER, ...

1    SAN DIEGO, CALIFORNIA, Tuesday, January 30, 1962, 9:30 A.M.

2                              -oOo-

3         (Other matters.)

4         THE CLERK:  9-1247-SD-C United States vs. Fallbrook.

5    Further court trial.

6         THE COURT:  Gentlemen, we are in trouble, as you can

7    guess.  Mr. McNulty and Mr. Bradley are trying a mystery case

8    here about how a tuna boat sank, and I have been hanging on

9    every word of the testimony to discover how this tragedy

10   happened.  I hope we can finish it today.  Mr. McNulty is

11   a little pessimistic about that.

12        Mr. Bradley?

13        MR. BRADLEY:  I am very pessimistic about that.

14        THE COURT:  We are really going to work today.  We may

15   go late.  We'll see if we can finish it up.

16        And I would suggest that you, gentlemen, in the Fallbrook

17   case sit down and work out an agenda for us and go over what

18   papers have been filed -- I have a big pile of them here,

19   and see what are ready for signature, which ones have some

20   work to be done.  I think you can do this and save a good

21   bit of time.

22        MR. VEEDER:  I see that Mr. Littleworth is here, your

23   Honor.

24        MR. LITTLEWORTH:  Yes.

25        MR. VEEDER:  Will you be here tomorrow?  If not, I will

18 479

1    spend some time working with you today.

2        MR. LITTLEWORTH:  I had not planned to be here tomorrow.

3    I thought the Murrieta-Temecula findings were in good shape.

4        THE COURT:  You could come back at 1:30 and if you have

5    something I can do, sign some things up, I am in a signing

6    mood, or findings, if you tell me they are ready.

7        So spend some time this morning out an agenda and tell

8    me what I can sign, and then we will try to get at this as

9    soon as we can.  We will find out at 1:30, if somebody will

10   come back, how rapidly Mr. McNulty and Mr. Bradley proceed

11   here.

12       (Another matter.)

13       (At 1:30 P.M. of said day counsel in the Fallbrook case

14   returned and there was a conference in chambers off the

15   record.)

16   SAN DIEGO, CALIFORNIA, Wednesday, January 31, 1962, 9:30 A.M.

17                           -oOo-

18       THE CLERK:  1-1247-SD-C United States of America vs.

19   Fallbrook.  Further court trial.

20       THE COURT:  First, Mr. Girard prepared a summary of

21   routine provisions in judgments.  It is going to be helpful,

22   but it was not exactly what I had in mind.

23       What I had in mind is the fact that in various of these

24   judgments we have been saying things in different ways, and

25   I hoped that we can pull together the language that we have

used on these different subject matters and then, as it were,
select the one standard and use it uniformily.

In a way, it is a small matter, and maybe I am just
being super-technical about it.  But every time we get a new
judgment in, we have some different language about a similar
subject matter.  We ought to be able finally to agree upon a
certain way to handle the quiet title aspect as to vagrant,
local waters, the quiet title aspect as to surface waters,
et cetera.  I know it is a big job, but I had hoped that Mr.
Girard would go through these findings and pick out the
various ways we have done it.  As it is, he has selected a
proposed form.  It may be -- I haven't had a chance really
to study them over -- it may be that we can agree upon the
provisions in his outline as being the language to use.

MR. GIRARD:  I think, your Honor, with the exception of
the quiet title suit, where it has some minor differences,
most of the other specific quotes are used in all of them
word for word -- the inter se findings, continuing juris-
diction.

THE COURT:  Let's pass that up.

MR. VEEDER:  Your Honor, I would like to make reference
here, as long as this matter is up, on actually the quiet
title language.  I have a question which ties right to the
suggested forms presented by Mr. Girard.

I was of the impression, perhaps incorrectly of the

1    impression, that there would be entered in the conclusions

2    of law and interlocutory judgments in all these cases quiet

3    title language comparable to that which was used in regard

4    to the basement complex lands in the A Series.  In other

5    words, you would have a conclusion of law that each party in

6    Exhibit H, for example, whose rights are therein declared,

7    has those rights quieted one against the other in accordance

8    with your original ruling that there would be no cross plead-

9    ings and that the trial would be inter se se.

10        I have touched on this with Mr. Sachse and Mr. Girard.

11   I think they disagree with me on this proposition.

12        THE COURT:  I disagree with you on that.  If I understand

13   what you are talking about, we are not going to adjudicate

14   waters in the basement complex, vagrant local waters, we are

15   not going to adjudicate that inter se se.

16        MR. VEEDER:  I didn't make myself clear, your Honor.

17   What I am speaking about is now the waters in the Murrieta-

18   Temecula ground water area, waters which are part of the Santa

19   Margarita River system, and I had thought we would adjudicate

20   those inter se se.  In other words, we would say that this

21   man is riparian, he has such and such acreage, and to the

22   extent of his rights we quiet his rights against everyone

23   else in the litigation.  Am I clear now?

24        THE COURT:  It doesn't mean anything unless you have an

25   apportionment.

MR. SACHSE:   That's right.

MR. GIRARD:   That's right.

MR. VEEDER:   I think it does.   I think you can certainly have a quiet title suit without an apportionment.   There is no doubt about it.

THE COURT:   It doesn't add anything to what we have done. What we have done on the ones we are now taking is to say that ten people are riparian and have riparian rights and their rights are quieted against those persons who have no interest in the stream, in the land where the water is vagrant and percolating.

Now, what is the difference between saying that and saying that ten people, Numbers 1 to 10, that each is riparian and each has his rights quieted against everybody else?  You still have to decide eventually the extent of his rights. When we have said that he is a riparian and that he has a correlative right, we have done all the quieting of title that we can.

MR. VEEDER:   Your Honor, I will just take one step at a time, then.   I will say to that point, then, there should be language in the conclusions of law and in the decree quieting their rights one against the other inter se se.   I think that is language that should be included in both the conclusions of law and judgment.   Although I would also say that I think you should have included in there the quiet

18 583

1   title in regard to the extent of their irrigable acreage.

2       In other words, this is a quiet title suit, declared by

3   you to be inter se se one against the other without cross

4   pleadings.  I think it is entirely proper.  I think that is

5   what was intended by the Ninth Circuit, and I would think

6   that you would use substantially the same language in your

7   conclusions of law in regard to riparian and overlying rights

8   as you have in your conclusions of law in your A Series, in

9   which you say all these owners of rights in the basement

10  complex have their rights in that basement complex quieted

11  against everybody who has rights in the system and vice versa.

12  That is what it amounts to.

13      And then I would say that Vail Company's title would be

14  quieted against Mr. Roripaugh to the extent of their riparian

15  acreage and to the extent of their irrigable acreage, as

16  shown in the record.

17      I think you can have a quiet title decree.  I think

18  Katz vs. Walkinshaw is precisely in point on the proposition,

19  and other quiet title suits, without going into the question

20  and saying, "Well, on the basis of X second feet you are

21  entitled to participate on the basis of five per cent of it."

22  I don't believe you have to take that additional step.

23      But I do think that to have a quiet title decree you

24  must have that kind of quiet title language in the conclusio

25  of law in regard to each right and quiet title language in

1    each decree in regard to each right.  That is my view.

2         THE COURT:  I can't follow that.  I don't think it adds

3    a thing to what we are doing.

4         MR. SACHSE:  I concur with what your Honor has said.  I

5    think this is a matter of semantics.  If your Honor decrees

6    that my client A is a riparian, with a correlative right in

7    the stream, "correlative" itself tells his relationship.  My

8    client B is an appropriator.  My client C is so and so.  I

9    don't think you are adding anything to it when you say his

10   title is quieted.  This is really, perhaps, not so much a

11   quiet title suit as it is a declaratory judgment and your

12   Honor's stating what each of these rights is as to character.

13   The quiet title language, as far as I am concerned, will only

14   confuse the person who reads this later on.

15        THE COURT:  Yes.

16        Did you have something more to say, Mr. Veeder?

17        MR. VEEDER:  I will file objections on it.  There is no

18   sense in arguing.

19        THE COURT:  What is the use of filing objections?

20        MR. VEEDER:  Because on appeal I want it very clear that

21   I am saying that the decrees that are being entered are

22   insufficient.

23        MR. SACHSE:  The only thing I would suggest to Mr. Veeder,

24   rather than an objection, I frankly can't see anything serious

25   about this, and if Mr. Veeder might choose to redraft, just

1    informally, in the next few days what he wants --

2        MR. VEEDER:  I'll do that.

3        MR. SACHSE:  Maybe it is going to be harmless surplusage.

4        THE COURT:  This is the first time that you have ever

5    suggested this kind of language, Mr. Veeder.

6        MR. VEEDER:  No, it is not, your Honor.  I have always

7    said throughout the whole case that you had to have quiet

8    title language in your conclusions of law and in your decrees.

9    I wrote them in regard to the A Series, and certainly it was

10   intended to have the same language in the other series.  It

11   never occurred to me that you wouldn't.

12       THE COURT:  We have already signed some judgments in the

13   other series, on the A Series, some that you prepared.

14       MR. VEEDER:  No, your Honor, no.  You haven't.

15       THE COURT:  I'll dig them out and show them to you.  I

16   say to you on this record that this is the first time that

17   you have injected this idea that we quiet title to each

18   individual who had riparian rights against every other

19   individual who had riparian rights.  In fact, the language

20   we used in these decrees was your language.  It was later on

21   that Mr. Girard started to use some language which you didn't

22   like and criticized his language over the language you had

23   used.

24       MR. VEEDER:  The only language that I ever prepared for

25   the purpose of actually an interlocutory judgment is right

1    here, and I am referring to the A Series.

2    I will say that I will do as Mr. Sachse suggests, because

3    I certainly say that in any quiet title suit you have to have

4    that kind of conclusion of law and that kind of judgment.  If

5    you overrule it, that is fine.  But I do want the record to

6    show that I am raising the point now.

7    There are two additional points that I would like to

8    raise now, which are far away from this point here, if I may,

9    because I want to get your observations in regard to them.

10   I have gone through the record in an effort to ascertain

11   the breadth of your rulings in connection with the stipulated

12   judgment and as it relates to whether the waters under the

13   stipulated judgment were open to appropriation.  Now I can't

14   find that you have ever made a ruling on that point.

15   THE COURT:  Let me get your point.

16   MR. VEEDER:  Your Honor, you have repeatedly stated that

17   anybody who isn't subject to the stipulated judgment could

18   not be bound by it, and I have agreed to that.  But I wanted

19   to know whether, in your view, water being delivered to the

20   United States pursuant to the stipulated judgment would be

21   open to appropriation if that water were going to be exported

22   by the United States out of the watershed.  Am I clear on

23   that now?

24   THE COURT:  No, you are going pretty fast for me this

25   morning.

1    MR. VEEDER:  I'll start again, because this is extremely

2    important.

3        THE COURT:  And I think you are going pretty fast for

4    Mr. Girard and Mr. Sachse, if I understand the expressions on

5    their faces.

6        MR. VEEDER:  I think they may be pained somewhat.

7        The point that I am making is that I have read your

8    Honor's rulings and I have not been able to ascertain from

9    your rulings whether you have said that where water was

10   delivered pursuant to the stipulated judgment or released to

11   the United States pursuant to the stipulated judgment, whether

12   that water would be subject to appropriation under State law,

13   particularly the water that the United States desired to

14   export from the watershed.

15       THE COURT:  You are talking about the past practice

16   observed by Vail Company of complying with the stipulated

17   judgment and requiring a certain amount of water to flow

18   through the Gorge?

19       MR. VEEDER:  I will say this.  I am not particularly

20   worried about past practices.  You can just simply say, in

21   my view, whether the water which the United States claimed

22   a right to export was subject to appropriation by Fallbrook

23   Public Utility District.

24       MR. GIRARD:  In the first place, I want to clear up the

25   situation.  As I understand the situation, Vail never released

any water to the United States.  The water that got down to

the United States was water which came down the stream

naturally.  As I understand, this year was the first time that

Vail pumped water out of their basin.

MR. VEEDER:  There was certainly compliance with the

stipulated judgment at the time the United States bought the --

MR. GIRARD:  Whether Vail was there or not, the water was

coming down the stream.

MR. VEEDER:  Let's quit arguing this point for just a

moment and simply say, have the ruling now, or whether you

have ruled on the proposition or not.  I can't find that you

ever did rule that waters which would be subject to the

stipulated judgment were open to appropriation under State

law.

MR. SACHSE:  Of course, they were.

MR. VEEDER:  Just a minute.  I want to know whether the

Court has ruled.  I can't find that you have.

THE COURT:  I can't even begin to grasp exactly what you

are talking about.

MR. VEEDER:  Do you want me to write it out, your Honor?

THE COURT:  Either you have to write it out or enlarge

upon what you are talking about.  Unless I understand what

you are talking about, there is no sense in making a ruling.

MR. SACHSE: Apparently, Mr. Veeder is contending, for

example, that two major water users on the San Joaquin River

1  can enter into a contract saying they have rights to all of

2  the waters of the San Joaquin River and the people of the

3  State of California cannot exercise any appropriative rights

4  on those waters.

5      My position is, essentially, that the waters belong not

6  to the United States, belong not to Vail, but belong to the

7  people of the State of California, and to the extent that

8  those waters are not subject to prior vested rights the State

9  Water Rights Board has clear jurisdiction to grant appropria-

10  tive rights to anyone who applies. But I can't conceive of

11  -- maybe I am misreading your contention, but I don't think

12  you are contending that two people can by contract divest

13  the State Water Rights Board or can by stipulated judgment

14  divest the State Water Rights Board of jurisdiction over

15  waters which are not subjec to present use.

16      THE COURT:  I am beginning to understand what you are

17  talking about. Let's assume, just for argument, that under

18  the stipulated judgment there was a stipulated judgment that

19  Vail should allow a thousand inches of water to run down the

20  river.  Just say that for argument.

21      MR. VEEDER:  All right.

22      THE COURT: And Vail then proceeded to let a thousand

23  inches of water to run down the river at the Gorge pursuant

24  to a stipulated judgment which was entered into by agreement

25  and signed by the Court.

18,590

The question is, is that water that so ran down the
stream so earmarked with some rights of the United States
that no one could use the water or acquire any rights to the
use of that water?  Is that it?

MR. VEEDER:  You have part of it, your Honor.  Now here
is one element of it.  That water that was coming down the
Gorge, the thousand inches to which you made reference, was
to be exported from the watershed by the United States of
America by reason of the provisions of the stipulated judg-
ment.  That is one phase of it.

THE COURT:  Wait just a minute.  There was nothing in
that stipulated judgment that said you had to export it.

MR. VEEDER:  No.

THE COURT:  The judgment said that you might use it any-
where you wanted to, in or outside the watershed.

MR. VEEDER:  Let me make myself clear.  At least we have
gotten to the point where water is coming down the canyon
pursuant to a stipulated judgment.  The next question is
this.  The United States of America, or we will say B, who
is part of the stipulated judgment, wants to export that water
from the watershed pursuant to the stipulated judgment.  In
other words, he is making a claim against the riparian up-
stream to have water come down to him which he could export
which would be not part of his riparian right -- it would not
be surplus water, it is not flood water, it is not like that

1   to which there is not some claim; it is water, though, that

2   would be used in a manner not comprehended by the riparian

3   right, either exportation or storage.  And I haven't been

4   able to find whether you have ruled on that precise point.

5       If this is not clear, I will write it out.

6       MR. GIRARD:  I think you should, Mr. Veeder, because

7   this does concern Mr. Stahlman, too.

8       THE COURT:  Well, what is your contention?  Let's take

9   a riparian downstream who decided to use some of that water.

10      MR. VEEDER:  Outside the watershed.

11      MR. GIRARD:  No.

12      THE COURT:  No.  You have a riparian who is going to

13  use it in the watershed.

14      MR. VEEDER:  I see, a third party riparian.

15      THE COURT:  Could he use it?

16      MR. VEEDER:  Yes, he could.  He would share correlative-

17  ly on it.

18      THE COURT:  Let us assume, then, that an appropriator

19  said, "Here is water coming down this stream," and he went

20  to the State Water Rights Board to get a permit.  And your

21  contention is that the State Water Rights Board would have

22  no right to give him a permit to that water.

23      MR. VEEDER:  I haven't put out any contention on it.

24  But my view would be that it is a perfectly proper contract

25  between riparians to say one riparian against the other can

1   use the water outside the watershed.

2        THE COURT:   To the exclusion of an appropriator?

3        MR. VEEDER:   To the exclusion of an appropriator, because

4   that water would not be open to appropriation.

5        MR. GIRARD:   I think Mr. Veeder overlooks that the

6   stipulated judgment or the contract between Vail and the

7   United States cannot give him a water right.   The most it can

8   get is that Vail cannot object to something that you are doing

9   which you are doing under that contract.

10       MR. VEEDER:   That is exactly what I am saying.

11       MR. GIRARD:   But the mere fact that you and Vail agreed

12  to use water outside the watershed doesn't give you a water

13  right unless you have complied with the State law.

Belt 2   14     MR. VEEDER:   We are getting right down to the point of

15  this thing, then.   Does it mean that this water should be

16  riparian water between these two riparians that they have

17  contracted to either be stored or exported outside the water-

18  shed?   Does that water now, because of the fact that we want

19  to use it outside the watershed, become available for appro-

20  priation?

21       MR. GIRARD:   Of course.

22       MR. SACHSE:   May I take a crack at this.   I think you

23  have ruled on this, your Honor, and Mr. Veeder is overlooking

24  something, and we can go straight back to your pre-trial

25  opinion where you stated in so many words that nobody could

1    acquire a right to appropriate water, that is, a right to

2    export as distinct from what Mr. Girard points out as some

3    waiver of Vail's objection.  Nobody can acquire a right to

4    export without compliance with the State Water Law.  If you

5    want to reverse yourself, maybe Mr. Veeder can start an

6    argument.  But under your Honor's ruling the United States

7    cannot acquire a right to take that water out of the water-

8    shed by virtue of any contract it had with Vail.  It may have

9    a covenant not to sue from Vail, or it may have some kind of

10   committment that Vail will not object.  But it doesn't get a

11   right.  That is the distinction.  And when it has no prior

12   vested right, as Mr. Girard pointed out a moment ago, then

13   under California Law the water is subject is appropriation.

14   We have been through this so many times.

15       The mere fact that there are riparians downstream who

16   could use all of the waters doesn't prevent an appropriator

17   from appropriating.  If they are not using it properly for

18   riparian purposes, he can appropriate.

19       Let's take Mr. Veeder's contention that this is all

20   proper riparian water, it is a proper agreement between these

21   two parties, neither will object if the other takes it out.

22   My answer is that you have already ruled.  You have said

23   that no, the right of the State of California to consider

24   applications for appropriation hasn't been affected one way

25   or the other by this contract between the parties or by this

1    judgment.

2         MR. VEEDER:   What I think I would like to have you do,

3    then, your Honor, and I am not arguing the point, if you

4    would enter such a ruling, because I think it is a matter that

5    is not clear.

6         THE COURT:   You write out your question or questions.

7         MR. VEEDER:   Yes.  Because, you see, it has two factors:

8    The period during which the stipulated judgment was in effect

9    and was not attacked; then the point where you have said it

10   would be inequitable to enforce it.   There are two different

11   periods that are important to me from the standpoint of

12   appropriation.

13        Then I have one more question.   Are we going to go all

14   morning?

15        THE COURT:   Yes.

16        MR. VEEDER:   I will hurry through this because I know

17   you want to get on to this other point.

18        One additional point.   I haven't been able to find in

19   your Honor's rulings a clear issue as to whether you have

20   power in equity to say to Fallbrook that under the circum-

21   stances you would be precluded from initiating an appropria-

22   tive right.   I don't find the exact language there, that you

23   would say in equity I can deny you the right to take water

24   that the Government was using at the time you made your

25   filing.   I can't find that in the rulings, your Honor.   It

1    may be there.

2         But I will formulate these more precisely and present

3    them to you, if that is what you desire.

4         THE COURT:   What is this last question?

5         MR. VEEDER:   Whether you, in the exercise of your power

6    in equity, could say to Fallbrook Public Utility District,

7    "Well, under the circumstances, it would be inequitable and

8    unconscienable to allow you to take the water that the United

9    States is now exporting from the watershed".   I haven't been

10   able to find that ruling in what you have passed upon, although

11   we have argued the breadth of your power in equity.

12        I will specify these questions as I have already present-

13   ed them, if you desire me to do so, and I think because Mr.

14   Stahlman is not here it is probably desirable.

15        THE COURT:   Let me ask another question.   Have there been

16   any further developments on the proposed physical solution?

17   You have told us something about some talk about dams in

18   general terms the last time.

19        MR. VEEDER:   There has been this situation, your Honor.

20   All of the studies that have been made are now being re-

21   studied.

22        THE COURT:   By whom?

23        MR. VEEDER:   By the people who wrote the original report

24   and by the U.S. Geological Survey.   And I will say that at

25   this time there is certainly no physical solution that --

1    MR. GIRARD:   I understand that Colonel Bowen submitted

2  one through channels.  Where is that?

3    MR. VEEDER:   Colonel Bowen did not submit it through

4  channels.  Both these gentlemen say they understand he did.

5  I have not been advised that he has submitted it through

6  channels.

7    MR. GIRARD:   Did Colonel Bowen make some recommendations?

8    MR. VEEDER:   I think he made some.  Yes, he did.  He

9  made some recommendations.

10    MR. GIRARD:   Are those the ones we are talking about

11  that are being studied by the U.S.G.S. and who else?

12    MR. VEEDER:   No.  If I understand correctly, what has

13  taken place within the Navy itself, Colonel Bowen's recommenda-

14  tions have not been accepted.  However, I think I had better

15  talk to Colonel Bowen about it, because I don't know what the

16  result has been.

17    MR. GIRARD:   I think you had better talk to him, too.

18    THE COURT:   Who is studying what?  That is what I want

19  to know.  You say the people who made the reports.  Who are

20  the people who made the reports -- what department?

21    MR. VEEDER:   These are the reports that were involved:

22  Fallbrook's Montgomery Report --

23    MR. SACHSE:   That is our engineering report for a small

24  project loan, your Honor.

25    MR. VEEDER:   Bulletin 57.  There was a report which was

1   prepared for the Navy which is now being re-studied at the

2   present time.

3       THE COURT:   Prepared for the Navy by the Navy?

4       MR. VEEDER:   By the Navy, yes, and for the Navy.   Those

5   matters are presently being reviewed, and to my knowledge

6   there has been certainly no --

7       THE COURT:   Being reviewed by whom?

8       MR. VEEDER:   By the people who made the report, by the

9   Navy, by the U.S. Geological Survey, by me, for sure, and by

10  -- everybody deals himself a hand in this lawsuit for some

11  reason, so it is being reviewed by Colonel Bowen, I assume,

12  and by anyone else who happens to be interested.

13      MR. SACHSE:   I will assure your Honor that the Montgomery

14  Report is not being reviewed by the people who made it.   Mr.

15  Veeder says it is being reviewed by the people who made it.

16  And I don't think Bulletin 57 is being reviewed by the people

17  who made it.   What Mr. Veeder is saying is that somebody, and

18  I am curious to know who, has taken this conglomeration of

19  reports and is seeking a possible physical solution.   That is

20  what I want to know -- who is doing it.

21      THE COURT:   That is what I am asking you.

22      MR. VEEDER:   I have told you who is doing it.

23      THE COURT:   Is the Attorney General also reviewing it?

24      MR. VEEDER:   Yes, sir.

25      THE COURT:   That is, the Assistant Attorney General.

1  MR. VEEDER:  Not Bob Kennedy.

2  THE COURT:  Mr. Clark.

3  MR. VEEDER:  Yes, Mr. Clark.  I am going to call him

4  just as soon as you let me out of here.

5  THE COURT:  Is this Montgomery Report the report that

6  concerns the proposed dam you are about to build?

7  MR. SACHSE:  Yes, your Honor.  The Federal Small Projects

8  Act and the State of California Davis-Brunsky Act, the two

9  possible vehicles we were looking to for financial assistance,

10  require that an engineering and financial study be submitted

11  in support thereof.  The Montgomery Report has been prepared

12  -- I am not sure of my dates, but I think I am about right --

13  within the past year.  It reached final form.

14  MR. VEEDER:  It was submitted one day after your Honor

15  entered the final findings and conclusions of law in regard

16  to Fallbrook.

17  MR. SACHSE:  It has been within the past year, the

18  physical work.  It has nothing to do with any cooperative

19  project of any kind, your Honor.  It deals only with our

20  project, the cost of the project, the ability to repay, the

21  way the water will be used, where the pipelines will be built,

22  et cetera.

23  THE COURT:  Did the report that was prepared by the Navy

24  for the Navy concern the dam that the Navy proposed to build?

25  MR. VEEDER:  Yes it did.

THE COURT:  And that is being reviewed?

MR. VEEDER:  Yes, it is, your Honor.  However, I am making no representation to your Honor as to what the outcome would be of any of this material.  I am simply saying they are being reviewed, and I am keeping you advised.

MR. GIRARD:  Speaking as just one interested party, I am of course interested in this, but I am still basically interested in seeing Colonel Bowen's recommendations.

MR. VEEDER:  I'll say this to you, Mr. Girard, that I don't believe they can be released.

MR. GIRARD:  Not after they have gone through Washington and Captain Powers' office and the Department of Justice back there.  I don't object at all to their going back there, but some time along the line I want to see what Colonel Bowen recommended.

MR. VEEDER:  I agree on that.  I think you had better get Navy clearance.

THE COURT:  Did you see Colonel Bowen's recommendations?

MR. VEEDER:  Yes, your Honor.

THE COURT:  We started on this with the understanding, I understood, that the Colonel would be asked to prepare some kind of proposal that might look toward a physical solution, and I was under the impression that the Court was going to be supplied with a copy of it, as well as counsel.  Of course, the Colonel is a military man and he must follow military

directives, and if this was made through channels then I
suppose we have no right to it unless it is released.  But it
is my understanding that he was doing this at my request to
see what could be done on a physical solution.

Wasn't that the understanding of everybody?

MR. SACHSE:  That is very specifically my understanding,
your Honor.  I was responsible for it.  I told your Honor
that implicit in your duty on that Bench is always, in a case
of this kind, to seek a physical solution.  You have a perfect
right, if you so desire, to hire John Smith, Engineer, to
look at this file.  But because of our universal acceptance
of Colonel Bowen's grasp of this problem, the fact that
everybody accepts his judgment -- nobody has been tangling
with him on his facts or his accuracy -- your Honor requested
Colonel Bowen to present something to you, not to the Navy.

THE COURT:  I thought he was the ideal man to do it.

MR. VEEDER:  Colonel Bowen doesn't have an engineering
background or a background in hydrology, your Honor.

THE COURT:  I was not asking him to draw any plans for
a dam.  I didn't expect that kind of report.  But for the
reasons that Mr. Sachse stated, we had all come to respect
the Colonel.  The public relations job he did was a terrific
one in the Fallbrook area and in Temecula and elsewhere.  His
findings have been uniformly accepted.  He has a wide know-
ledge of both the problems at Pendleton and this watershed.

And he was the ideal man to do something like this, and this
was the reason that I requested that the Colonel give some
thought to it.  And he, here in court, agreed that he would
try to work on it.

Now somewhere along the line, instead of a report to this
court, it has become a secret document sent to the Navy.

MR. VEEDER:  No, there is nothing secret about it.

THE COURT:  Well, it is secret in the sense that it has
gone through channels.  We don't have a copy of it.  I would
like to ask a copy right now.  If I did, you would tell me
I couldn't have it.

MR. VEEDER:  I will certainly call Washington now and
ask them if I can deliver a copy to you, your Honor.  I have
no desire to be secret about it at all.  I will say this, that
the whole matter is under review right now and under considera-
tion right now, and Colonel Bowen participated in a conference
on Monday in regard to the whole matter.

THE COURT:  In Washington?

MR. VEEDER:  No, here, with all the representatives who
are interested in this matter.

THE COURT: Were they out here?

MR. VEEDER:  Yes -- I mean the local people who had been
in charge of it -- yes, your Honor.

THE COURT:  Who was at this conference?

MR. VEEDER:  The Eleventh Naval District, and Camp

1    Pendleton, and I was there, the representatives of the U.S.

2    Geological Survey were there, the people who are responsible

3    for this thing from the whole question of analysis, review

4    and what we can do.  There is no question about it.

5        But I will say this, that I will certainly, because I

6    have no desire to be secretive on this thing, not at all, I

7    will simply ask if it is appropriate for me to give you a copy

8    of it, your Honor.  It is not in my power now, for sure.  But

9    this idea, if there is any idea that I am trying to hold it

10   up --

11       THE COURT:  Did you advise or suggest to Colonel Bowen

12   that instead of submitting this to the Court that he submit

13   it through channels?

14       MR. VEEDER:  Not at all, no, your Honor.  I think this.

15   I think the Colonel verywisely submitted it to his superiors.

16   But certainly it was not on any dictation from me that he

17   did so.

18       THE COURT:  Were you going to find out whether a copy

19   is available for the Court?

20       MR. VEEDER:  I will just call as soon as we are out of

21   here.  I will call Mr. Ramsey Clark and tell him that you

22   desire a copy of this and see if I can get you one.

23       I think that the matter is subject to review and is now

24   being reviewed, the whole background of everything that has

25   been done.

1    THE COURT:  Now the next thing I want to bring up --

2    you know, if I had time enough to work on this thing we could

3    avoid a lot of these problems that keep coming up -- but we

4    went to a lot of trouble to amend some judgments and to put

5    in a translation of our hieroglyphics, and then we agreed that

6    all new judgments would have that in them, and 38-A doesn't

7    have it.

8        MR. VEEDER:  May I see the copy your Honor has?  I don't

9    have my copy here.

10       THE COURT:  Well, it doesn't have it, because it was

11   formulated prior to the time we did this, and then we forgot

12   about trying to run this into all the judgments.  You see,

13   this originally antedated the time that we agreed upon that

14   language.

15       MR. GIRARD:  By that are you talking about how you

16   interpret the various numbers?

17       THE COURT:  Yes.

18       MR. GIRARD:  I think it is in  Paragraph D on page 3,

19   isn't it?  At least on my copy it is.

20       MR. VEEDER:  It should be.

21       MR. GIRARD:  "The parcel numbers referred to throughout

22   this interlocutory judgment are explained as follows: . . "

23       MR. VEEDER:  This has been on your desk for some time,

24   your Honor.  Here is the material that you asked to have

25   included.

THE COURT:  Now the mystery becomes apparent.  This copy that is lodged -- and I haven't seen the original -- does not have page 3.  It has pages 1, 2, 4.

MR. GIRARD:  It is going to have some minor corrections, also.  Maybe we had better file a new one.

THE COURT:  This is the same one, 12-28.

Mr. Clerk, do you have the original there?

Of course, I was not looking at page numbers, but there is the explanation.  In the copy Mr. Veeder just handed me, on page 3 all this matter appears.  We just have a page missing.

While the Clerk is looking for the original, the second question is this:  This is the area below Vail Dam and above the Gorge, but do I understand that it includes the land within the Temecula-Murrieta ground water area?

MR. VEEDER:  Yes, your Honor.

MR. GIRARD:  That was my understanding.

There is one little correction on the draft we will have to make.  On the quiet title provision it does not provide that the people who own land containing vagrant, local, percolating waters have rights to surface waters.

MR. VEEDER:  What is this?

MR. GIRARD:  That is this other problem that we talked about yesterday and you agreed that it would have to be corrected.

Belt 3

1    MR. VEEDER:  No, I didn't agree on it.  I said I wanted

2    to check on it.

3      MR. GIRARD:  To check on it.

4      Let's take Paragraph 3 of Conclusion of Law on page 5.

5    As I read that, it essentially provides that the United

6    States and all other parties to this action who have rights

7    in the Santa Margarita or its tributaries are having those

8    rights quieted in their favor against the defendants who own

9    these basement complex lands, any rights to the river asserted

10   by reason of their ownership of the lands.

11     The judgment provision, which is on page 6, the second

12   paragraph, is the same thing.  It says, in essence, that the

13   people who own basement complex lands have no rights to the

14   Santa Margarita River asserted by reason of the ownership of

15   the lands.

16     My position is simply that some of those people up there

17   may have perennial surface streams flowing which they would

18   have a right to because they own the lands.  It is a very

19   minor point.

20     THE COURT:  Just a moment.  In Paragraph 3 on page 5 --

21   it is a matter of semantics and we haven't done too good a

22   job -- it says that the United States of America and the

23   parties having rights to the use of the waters in the Santa

24   Margarita River are entitled to have quieted their title in

25   and to those rights against any and all adverse claims of

defendants referred to in Finding IV who are listed in Exhibit

B.  So that what is referred to there is the adverse claims

of the defendants, and then the defendants are listed in

Exhibit B.

In Paragraph 4 we haven't done it too well, again.  We

don't really talk about claims.  We merely say that there are

lands which do not overlie any ground water which feeds the

stream.

MR. VEEDER:  May I make an observation in regard to this,

your Honor?

THE COURT:  Yes.

MR. VEEDER:  Your Honor will recall that when we prepared

these A Series we went through the procedure to follow in

designating these lands.  We eliminated by crossing out any

lands that were overlying, we eliminated by crossing out any

lands that could have, in our view, a riparian right.  In

other words, the only thing to which these lands related --

and if you would like to have me check these out for you I

will -- the only matters to which these A Series related were

lands which had nothing but vagrant, percolating water and

which did not have any riparian rights.

MR. GIRARD:  No, that is not correct.  Many of these

lands do have riparian rights, surface-wise.

MR. VEEDER:  In that regard, unless there was an error,

any tract of land -- there may have been a dry arroyo some

place in some of these lands, and we couldn't tell it in every

instance -- but anyplace where it was intersected or traversed

by or abutted upon Wilson Creek, for example, or abutted upon

or was traversed by Coahuilla Creek, for example, that tract

of land was not included.

MR. GIRARD:  That is not what I am talking about.  Like

Vail Company, some of their land which is basement complex

land does have surface water on it -- maybe a stream, maybe

a little part of a stream that flows over rock from a crevice

-- and they do have a right to that surface water.  I am not

talking about anything other than surface water which may flow

over and upon those lands, and merely because there is base-

ment complex formation does not mean that there may not be

some slight surface water.  Some of those people may have

springs up there on which they rely for drinking water.  I

don't know.  Colonel Bowen undoubtedly knows a lot more about

it than I do.  But I am sure there are some areas in the

basement complex where there are surface waters of very minor

amount.

Is there, Colonel?

COLONEL BOWEN:  Yes, sir.

MR. GIRARD:  I don't want to see these people wiped out

of this surface water when no one intends to do it.  It is a

relatively simple drafting job, I think.

THE COURT:  Page 3 was in the original.

1    Have you entered this, Mr. Clerk?

2    THE CLERK:  Yes, sir.

3    THE COURT:  It has been entered?

4    THE CLERK:  Yes, sir.

5    THE COURT:  You have had to do all the copying, or will

6    that be done later?

7    THE CLERK:  It will be done in L.A. by microfilm, your

8    Honor.

9    THE COURT:  We can set aside the order of entry.

10    Don't you think, Mr. Veeder, that Mr. Girard is right?

11    I know that you are right when you say that where land was

12    over one of the known streams --

13    MR. VEEDER:  Yes.

14    THE COURT:  We took that out.

15    MR. VEEDER:  That is right.

16    THE COURT:  But out of an abundance of caution, in these

17    areas where there would be a spring or some water that ran

18    a little bit on the surface, certainly we ought to be careful

19    not to cut off those people.

20    MR. VEEDER:  If there is the slightest doubt on that, I

21    favor revising it.  My own thought was that it was not necessary,

22    but if there is even the prospect of it, let's revise it.

23    THE COURT:  Make a minute order setting aside that entry

24    of judgment so that you will not have to go through all this

25    copying process, Mr. Clerk, on 38-A.

18609

1    THE CLERK:  Yes, sir.

2    THE COURT:  Then that puts us in the position where we

3    can --  they have a terrific job.

4    MR. VEEDER:  I understand that.

5    THE COURT:  Let's not let it get started through.  Better

6    set aside the filing and the entry both.

7    THE CLERK:  May I strike your signature from this, so

8    that we don't get this fouled up, your Honor.

9    THE COURT:  Yes, better strike my signature, too.

10   MR. VEEDER:  Here is a thought on this, if you have a

11   moment.  On your Paragraph 5, on page 6, Conclusion of Law

12   V on page 6, "This Court retains continuing jurisdiction with

13   respect to surface water, if any, found on these lands," and

14   that is also part of your Interlocutory Judgment.  That will

15   not suffice to remove any doubt.  I suppose we had better

16   revise the Conclusions of Law III and IV and the provisos in

17   the Interlocutory Judgment III and IV and II.

18   THE COURT:  Now we have the same situation existant in

19   all our other 38-A problem.

20   MR. VEEDER:  All the A Series will have the same problem.

21   THE COURT:  Pardon me.  All the A Series.

22   MR. SACHSE:  I think it could be most easily corrected

23   the way Mr. Veeder did the previous amendment to the A Series.

24   It should be a simple change, actually, language-wise; and

25   if your Honor will recall, on December 8th you entered this

1    bundle of amendments to the A Series where the description

2    as to how the parcel identifications were to be interpreted,

3    and I didn't do it exactly the same way.

4         Don't you think so, Bill?

5         MR. VEEDER:   I think that is the only way to do it and

6    have it retroactive.  Why not simply put in provisions spelling

7    it out in so many words, saying that this does not in any way

8    relate to surface water upon the lands to which this judgment

9    has application?

10        MR. GIRARD:   Fine.  So long as it is clear.

11        MR. SACHSE:   That is what we wrote in the Murrieta.

12        MR. VEEDER:   Put that in.

13        THE COURT:   All right, you gentlemen this afternoon when

14   we get through here spend a little time seeing what you can

15   work out on that.

16        THE CLERK:   These Exhibits 38-A, since they are to be

17   redrawn, can be withdrawn, if Mr. Veeder wants.

18        THE COURT:   We can just substitute a new page, or we

19   could, if we decide, let this one go through by putting in a

20   new page and make the amendment effective, as well as the

21   other.

22        MR. SACHSE:   I see no objection.  It would be less paper

23   work.  Just make the simple statement that nothing in the

24   Interlocutory Judgment does or was intended to have any effect

25   on the surface water rights.

1     THE COURT:  We have spoiled the set, but you have other

2     sets.  We will put this over to tomorrow and by that time we

3     will know what we are going to do with it.

4          You propose this amendment to the A Series where this

5     appears.

6          MR. VEEDER:  We will simply recite in the caption of the

7     A Series and say that insofar as any of those judgments alluded

8     to above and entered are concerned they do not pertain in any

9     degree to surface water.

10         THE COURT:  We will have to catch it in the new ones.

11         MR. VEEDER:  I will rewrite the new ones, your Honor.

12         THE COURT:  And a new page set up there, a new set of

13    written material to go with the exhibits.  So start all over

14    again on it tomorrow.

15         What is next?

16         MR. GIRARD:  In the Murrieta Findings there are going to

17    have to be some corrections, which we are working on with the

18    United States, with reference to exhibits, because the huge

19    job that Commander Redd has done in setting up the exhibit

20    system, my language doesn't exactly conform to that and it is

21    much easier to change the language in the judgment than for

22    Commander Redd to change his system.

23         I think the first paragraph is --

24         MR. VEEDER:  XV on page 9.

25         MR. GIRARD:  Yes, XV on page 9, where I say that attached

1    to and marked Exhibit B are descriptions of the smallest

2    tract et cetera.  We are going to have to work out language

3    to work it into the system Commander Redd has done.  I don't

4    envisage any difficulty on that situation.  I don't know

5    whether we want to discuss that here now or not.  I think it

6    is purely a mechanical chore, referring the judgment to the

7    right exhibit the way Commander Redd has set it up.  I think

8    we can take care of that in language all of us will agree to

9    probably this morning or this afternoon, without bothering

10   the Court on it, unless you want to go into it with us.

11        THE COURT:  You work on that.

12        MR. GIRARD:  Outside of that problem and the substitution

13   of the letter B instead of A, where U.S. Exhibit 277-A appears

14   -- it should be 277-B throughout it -- I have no further

15   language corrections to make.

16        I talked to Mr. Littleworth, and he is satisfied with

17   them.  I believe Mr. Sachse is satisfied with the language.

18   Most of it has been approved.

19        THE COURT:  Let me read you some language, gentlemen.

20   I hate to be a wet blanket, but let me read you some language.

21   I don't know of any reason why in these long findings we don't

22   use arabic numbers instead of these Roman numbers hereafter.

23        MR. GIRARD:  Fine with me.

24        THE COURT:  This business of Roman numbers is just hard

25   work.  There is no reason why you can't use arabic numbers

for findings.

MR. GIRARD:   Fine.

MR. SACHSE:   Fred can't read them himself.   When we were upstairs hashing it over Fred would have to say X-L-I.   So I think he approves of your Honor's suggestion.

THE COURT:   It is probably in the conclusions, too, but let's turn to the judgment on page 31, let's start down at line 14:

> " . . it is further ordered, adjudged and decreed that this
> Court has no jurisdiction over the use of said ground
> waters, and the rights of the owners of said lands
> and their heirs, successors and assigns to the use
> of said ground waters are forever quieted in them . . "

Now, if this isn't a non sequitur -- in one breath you say we have no jurisdiction over these ground waters, and in the next sentence we quiet title to their rights.   I think this is wrong about no jurisdiction over the ground waters. The Circuit ordered us to name everybody who had any rights in the stream.

MR. SACHSE:   Yes.

THE COURT:   But that certainly has to be changed, because in one breath we say we have no jurisdiction over them and in the next sentence we quiet title.

MR. SACHSE:   I see your point.

THE COURT:   It may be in the conclusions, too.   You will

1    have to check that.

2        MR. SACHSE:  It would be the first Conclusion.

3        THE COURT:  It appears also on page 34 of the Judgment,

4    at lines 16 and 17 -- "that this Court has no jurisdiction

5    over the uses of ground waters".

6        In your form you have on line 28 on the first page that

7    this Court has no jurisdiction.

8        MR. GIRARD:  I think if we just delete the term "that

9    this Court has no jurisdiction".

10       MR. SACHSE:  Yes.

11       MR. GIRARD:  It is ordered, adjudged and decreed that

12   the rights of the owners of said lands, et cetera.

13       MR. VEEDER:  I don't know how important this is to your

14   Honor, but I think your Honor does not have jurisdiction over

15   those rights, because they are not before the Court.  Isn't

16   that right?

17       MR. SACHSE:  That was the reason, I think, for the

18   language.

19       MR. VEEDER:  That is right.

20       MR. GIRARD:  Yes.

21       MR. SACHSE:  That ground waters which were not part of

22   the River were outside your jurisdiction in this case.

23       MR. GIRARD:  I believe your Honor is correct; jurisdic-

24   tionally, they are within his jurisdiction.  They are parties,

25       MR. VEEDER:  They are not before the Court, though.

1    That is a fact that I think is important.

2        THE COURT:  They are before the Court.

3        MR. GIRARD:  They are.

4        THE COURT:  Many of these owners came in and said by

5    answers, "I have got some water here and it belongs to me".

6    They may not have said it arfully, but these issues are raised.

7    In other words, you are asked to quiet title to waters in the

8    stream and you certainly can say that certain things aren't

9    part of the waters of the stream when you make that decree.

10        MR. VEEDER:  The only reason I am raising this point is

11   that we discussed this in regard to the Fallbrook individual

12   decrees.

13        MR. SACHSE:  In the Fallbrook Creek area.

14        MR. VEEDER:  Fallbrook Creek area.  We went into this

15   matter, and at that time the question came up as to what was

16   before the Court.  I am not arguing with your Honor on this

17   at all.  There are quite a number of decrees with, I think,

18   substantially the same language that have been entered -- I

19   think Mr. Sachse and I agreed on it -- that by reason of the

20   fact that the only matter that was before your Honor for

21   adjudication was the waters of the stream system.  I am not

22   urging that you leave the words "no jurisdiction" in, but I

23   think we might say these matters are not before the Court and

24   are not to be adjudicated inter se se.

25        MR. SACHSE:  No, I don't see that, Mr. Veeder.  I think

1  if this is an error I am certainly going to accept my share of

2  the responsibility, because I felt the way you did.  But I

3  think his Honor is quite right.  I repeatedly in the case of

4  hundreds of defendants -- I don't have any of the files here --

5  pleaded as an affirmative allegation that all of the ground

6  waters were vagrant, local, percolating, not part of the Santa

7  Margarita River system.  I used that language constantly.  In

8  fact, I was asking his Honor for a ruling to that effect.

9  Well, he gave it to me.  He must have jurisdiction to give me

10  that ruling that these waters are not part of the stream

11  system.

THE COURT:  I don't think there is any jurisdictional

13  language.

MR. SACHSE:  It is sloppy language, that is all.

THE COURT:  It is true that this suit started out to

16  quiet title to waters in the stream, but then the Court made

17  everybody who owned land in the watershed a party.  Then

18  immediately arose the issue, does X, who owns land, have

19  waters in the stream?  If he doesn't, we are certainly not

20  going to leave him hanging on the cliff and say we have no

21  jurisdiction.  We are going to say that his waters are not

22  part of the stream.  So we may have to go back and correct

23  judgments on this point, too.

MR. VEEDER:  I agree.  I wanted it in the record that

25  we have been concerned about this before.

1      THE COURT:  You are going to do some work on 30.

2      Now what do we turn to?

3      MR. GIRARD:  After I make those corrections on your

4 Honor's problem there, and after the United States and Mr.

5 Sachse and I and everyone agree as to the form to be used to

6 refer to the various exhibits, if there are any other correc-

7 tions to make I will have them stenciled up in final shape

8 for filing.

9      THE COURT:  Don't do any stenciling until we look it over

10 again.  I only had a chance to read it this morning.  That is

11 the only thing I picked up.  I would like to compare some

12 language we have used in some of these other decrees with

13 reference to conclusions and judgments.  If I get time to do

14 that, I'll tell you.  Otherwise, you go ahead with what you

15 have with these changes.

16      I don't like the first paragraph of your judgment.  It is

17 too long.  You can break it down logically into two or more

18 parts.

19      I don't like your long paragraph on page 34, which is

20 a similar matter.

21      MR. GIRARD:  I think it can be broken down.

22      THE COURT:  Maybe it has to be.

23      What do we go to now?

24      MR. GIRARD:  The other item that I think is on the agenda

25 is the findings concerning Pendleton, and I think those

1  are going to have to be pretty much discussed finding by

2  finding, as the United States may have some objections to

3  them.

4 fls.  4          MR. VEEDER:  There is that possibility.

5          I don't quiet recall what you said this morning, your

6  Honor, on the point of quieting title one against the other.

7  Did you reject the idea that we might put in here a clause

8  that these rights in regard to the riparians one against the

9  other are quieted?

10          THE COURT:  Yes, I rejected that.

11          MR. GIRARD:  This the one for 11-17-61, and there should

12  be my name on it.

13          THE COURT:  Mr. Veeder, this continued  story that you

14  keep giving me in installments, are these some findings that

15  you are proposing for the whole watershed up north of the

16  Gorge?

17          MR. VEEDER:  Your Honor directed me to prepare findings

18  in connection with the Aguanga ground water area.  I did

19  that.  Then I prepared another set, and serving them always

20  on counsel, in regard to the Anza area, too.  You directed

21  the Aguanga ground water area.  It didn't make sense to me

22  to leave the Coahuilla Creek and Wilson Creek hanging.  So

23  I prepared findings on those.

24          THE COURT:  This is called Part 3 and Part 3-A?

25          MR. VEEDER:  That is right.

1    THE COURT:   What is the Part 1 and Part 2?

2    MR. VEEDER:   I originally drew the No. 1 area, which is

3    my thoughts of the kind of conclusions and findings we should

4    have on the Murrieta.   Part 2 was the area below the Gorge.

5    My own view is that it would be simpler to write a decree in

6    three parts; that you would have the big area below Vail Dam

7    northwest from the Gorge, you would have the No. 2 area, the

8    area below the Gorge, and the No. 3 area, the area above Vail

9    Dam.

10   THE COURT:   Part 1 was what?

11   MR. VEEDER:   Part 1 was the Murrieta-Temecula ground

12   water area, but it also took in the purple streams.   Part 2

13   area was all the area below the Gorge.

14   THE COURT:   The area below the Gorge?

15   MR. VEEDER:   Yes, your Honor.

16   MR. SACHSE:   Part 2 is not so identified, your Honor.

17   THE COURT:   Part 2 is below the Gorge.   So this would

18   involve the military enclave; is that right?

19   MR. VEEDER:   That is right.

20   THE COURT:   And then Part 3 is above the dam?

21   MR. VEEDER:   Yes, your Honor.

22   MR. GIRARD:   Is Part 3-A and Part 3 the same?

23   MR. VEEDER:   No, because his Honor directed the prepara-

24   tion of the Aguanga ground water area, which would be, in my

25   view, Part 3 of the watershed, I simply took the number 3 and

18,629

1  made that the Aguanga ground water area.  Part 3-A is the

2  Anza Valley of Wilson Creek and Coahuilla Creek above Aguanga

3  ground water area.

4      THE COURT:  It must be that 3-A is a substitution for 3,

5  because I have before me 3 and 3-A.

6      MR. VEEDER:  May I see what you, your Honor?

7      THE COURT:  And they both start out talking about the

8  Aguanga ground water area.  One is called 3-A and one is 3.

9      MR. VEEDER:  This recitation points out that the Aguanga

10  water area has been taken care of.  This is Anza Valley.  I

11  have written it up here.  Here is Aguanga ground water area

12  here, and Anza Valley here.  That is what you asked me to do.

13  I always put the designation up in the righthand corner.  Now

14  is how you can tell.

15      THE COURT:  All right.

16      MR. VEEDER:  On the No. 1 that ir originally filed with

17  your Honor on the 23rd of October I broke down the areas to

18  which I was going to direct my findings.

19      MR. SACHSE:  Mr. Veeder, Part 1 you didn't so designate.

20  I want to be sure I am right.

21      MR. VEEDER:  Yes.

22      MR. SACHSE:  All right, I understand.

23      THE COURT:  Let's take a recess before we start.

24      (Recess.)

25      THE COURT:  Did you get your long distance call through?

1    MR. VEEDER:  No, sir, I didn't, your Honor.

2    THE COURT:  Well, I did, but it was not on the same matter.

3    It took me a little while to get mine through.

4    MR. VEEDER:  I was afraid I didn't have enough time.

5    THE COURT:  What are we starting on, No. 37?

6    MR. GIRARD:  That is correct, your Honor.

7    THE COURT:  And the draft I have in front of me is dated

8    November 17, 1961.

9    MR. GIRARD:  That is correct.

10    MR. SACHSE:  That is correct.

11    MR. VEEDER:  We are now talking about 37.  In other words,

12    Interlocutory Judgment No. 34 should be changed to 37.

13    MR. SACHSE:  That is right.

14    THE COURT:  Yes, we changed the number on that.  We had

15    a mistake there.

16    What changes in the first paragraph?

17    MR. GIRARD:  The first paragraph, I think, on line 29,

18    just end that sentence with "San Diego County".  It is not

19    the City of Fallbrook.  Just end it with San Diego County.

20    THE COURT:  Any objection?

21    MR. SACHSE:  Didn't you ask, Mr. Veeder, also that the

22    135,000 figure on line 23 be stricken and the exact figure be

23    put in?

24    MR. VEEDER:  If you will look on page 18 of Part 2 that

25    I submitted to your Honor, there is the breakdown on the

1   acreage.

2        MR. GIRARD:  Yes, it is 122,202.72.

3        Is that right Colonel?

4        THE COURT:  Do you want the breakdown, Mr. Veeder?

5        MR. VEEDER:  I think it may be of some importance,

6   because of questions that have been raised in regard to the

7   riparian acreages.

8        MR. SACHSE:  I think it should be.  And later on in

9   Paragraph 1 there is space to put it in, in Mr. Girard's draft.

10       THE COURT:  I wonder what I did with your Part 2.  Here

11  it is.

12       MR. VEEDER:  It is the total at Camp Pendleton 122,202.72

13  acres.

14       MR. SACHSE:  On page 19 of Part 2 it is 134,713.57.

15       MR. GIRARD: Does that include the Ammunition Depot?

16       MR. VEEDER:  That is the total for the Enclave.  I will

17  have to figure it out for Camp Pendleton, because the 122 and

18  some other parts have been added to it.

19       THE COURT:  Then it is not correct, because this just

20  talks about it as being a military reservation located upon

21  134,000.  That wouldn't be right.

22       MR. GIRARD:  Your Honor, I would suggest that on this one

23  I do some substantial drafting and incorporate into my draft

24  the findings that Mr. Veeder has drafted on pages 18 and 19

25  of his draft, to set forth the specific acquisitions in detail

18,623

THE COURT:  Is that satisfactory?

MR. VEEDER:  Yes, that is correct, your Honor.

THE COURT:  All right.

MR. GIRARD:  I would like to ask one question, though.
Is there a figure in your draft, Mr. Veeder, as to how much
of the total acreage of Camp Pendleton and the total acreage
of the United States Ammunition Depot is within the Santa
Margarita River watershed?

MR. VEEDER:  Yes, there is.  If you will turn to page
24, there is 38,694 acres.  I am having all these figures
checked out.

MR. GIRARD:  Okay.

MR. VEEDER:  Again I want to say I want to have every
figure that I set out here rechecked.

MR. GIRARD:  Then I will use your figures on this.

MR. VEEDER:  If there is any disparity we will correct
it.

There is a point that I would like to raise right here
before we go any further.  It would seem to me, your Honor,
that from the standpoint of preparation that it would be well
to start at Temecula and bring your stream on down to the
Enclave.

Do you disagree with that, Mr. Sachse?

MR. SACHSE:  I disagree vigorously, Mr. Veeder.

MR. VEEDER:  I think we are piecemealing this to the

1    point where it is just going to be absolutely totally unwieldy.

2    MR. SACHSE: I don't care how this is put together when

3    it is over, but from the standpoint of the defendants involved

4    in this case, who are vitally concerned, you have got to

5    piecemeal it. I am not talking about coping with a 300-page

6    judgment, on one page of which there are some rights of the

7    United States, on another page some more rights. I want to

8    hammer out what the rights of the United States are in the

9    Enclave. When we have done this you can put them into a

10    single one, if you want to. It's all right with me.

11    MR. VEEDER: No --

12    THE COURT: I don't see any harm doing it this way, Mr.

13    Veeder. Actually, it is a better deal, because these inter-

14    locutory judgments that concern certain areas, somebody

15    interested in land doesn't have to get the whole bundle. He

16    can take the part involved. We are going to have Vail

17    Judgment that concerns Vail, you are going to have a judgment

18    concerning the United States, you will have a tag end area,

19    it is true, down in the Santa Margarita from the Gorge picking

20    up a lot of land in there that doesn't belong to Vail and

21    doesn't belong to the United States. There will have to be

22    another area in there. But that is of limited significance

23    in getting rid of this case. There is no real problem up

24    there. I would prefer to have it done this way.

25    MR. GIRARD: Maybe Colonel Bowen can correct me. I am

18565

1   probably wrong here.  In the last part of Paragraph 1 I say,

2   "All of the lands of Camp Joseph H. Pendleton and all of the

3   lands of the U.S. Naval Ammunition Depot were originally in

4   private ownership at the time when said lands were within the

5   sovereign territory of the Republic of Mexico; . . "

6   Is that right, Colonel?

7   COLONEL BOWEN:  That is right.

8   THE COURT:  Do you have a finding on that, Mr. Veeder?

9   MR. VEEDER:  We have a finding as to the sources of all

10  the lands.  In other words, some of the lands belonged to the

11  United States in the original instance.  We bought some of

12  the lands.  On pages 18 and 19 you will find where we con-

13  demned in 1942 additional lands.  I put in the dates of each

14  acquisition or of each transfer and the source from which it

15  was derived, and it was not all in private ownership at the

16  time we went in there.

17  MR. GIRARD:  I do feel in my own mind I want a finding

18  in here somewhere which is correct, that part of the present

19  Camp Pendleton which was in private ownership at the time of

20  the Treaty of Guadalupe was entered.  It is important on this

21  reserve water rights theory that may be argued in the Appellate

22  Courts, particularly in a couple of cases where this finding

23  would prevent, in all seriousness, in my view, the United

24  States from relying on any reserve theory.  Actually, it

25  doesn't mean anything, but as I understand the situation on

1    the reserve theory it would mean that when the United States

2    gave patents to land they intended to reserve all the water

3    necessary for their own lands; and I want to bring out that

4    much of this land was in private ownership at the time the

5    United States acquired any sovereignty over it.

6         MR. VEEDER:  I have brought into court, if you want to

7    see, the descriptions of each one of these, Mr. Girard, and

8    the lands that were acquired from the Rancho and have shown

9    here the lands which were acquired in Orange County and so on.

10   We have all of the material.  To me it is a mechanical task.

11   I think the descriptions should be incorporated by reference.

12   We will incorporate it by reference on the basis of each

13   acquisition, if that is suitable to your Honor.

14        THE COURT:  By reference to what?

15        MR. VEEDER:  To the actual land descriptions.

16        THE COURT:  To what are you going to refer?  You say you

17   are going to incorporate it by reference.  By reference to

18   what?  The deed?

19        MR. VEEDER:  Yes, these were acquisitions by condemnation,

20   and I assume that we would have to refer to the lands which

21   were acquired from the Rancho Santa Margarita.  That would be

22   all you would need to know, wouldn't it, that these lands came

23   through Pio Pico on down as a result of Mexican grants?

24        MR. SACHSE:  Could you do this -- it seems to me it

25   would be quite simple -- take your language on your page 18,

18 627

1    take the first one, the United States Ammunition Depot, and

2    then could you just tell us whether that 9,000 acres was in

3    private ownership at the time of Guadalupe Hildago.   The next

4    acquisition on Camp Pendleton, was that 122 in private owner-

5    ship at the time of Guadalupe Hildago?

6         MR. VEEDER:  All right, I'll do that.

7         MR. SACHSE:  I think both of those two were.

8         MR. GIRARD:  Were there any others in these, Colonel?

9         MR. VEEDER:  I would have to run those out.  I don't know.

10   You will notice, though, that there were acquisitions by

11   condemnation in 1941 and '42, at the bottom of the first page.

12   I think the 1941 is incorrect.

13        MR. GIRARD:  All right.

14        MR. VEEDER:  I want to be sure I have your Honor's

15   instruction on this.  Do you want us to say this was in private

16   ownership at the date of the Treaty of Guadalupe Hildago?

17        THE COURT:  Yes.

18        MR. GIRARD:  I think Paragraph 2 is exploratory, and

19   Paragraph 3 is, I believe, a direct verbatim quote from the

20   stipulation that was entered into the record as to what the

21   United States does.

22        MR. SACHSE:  Paragraph 3 is taken verbatim from your

23   pre-trial stipulation, Mr. Veeder.

24        THE COURT:  You check 2 and 3.  They say they have taken

25   it from your material, and if you have changes will you call

1    our attention to it?

2        MR. VEEDER:  Yes, I will.

3        THE COURT:  All right.

4        I don't see exactly what you are doing in Paragraph 4.

5    ". . Exhibit A through _____ are descriptions of each

6    smallest tract of land held under one chain of title, said

7    land being within the watershed of the Santa Margarita River

8    and a part of Camp Joseph H. Pendleton; . . "

9        MR. SACHSE:  You mean a part of the whole military enclave.

10       MR. VEEDER:  On things like this on Paragraph 4 I would

11   have to confer with Colonel Bowen as to just what all of this

12   means and how it would be done, Mr. Girard.

13       MR. GIRARD:  The reason for that is -- I don't know

14   whether it is important or not -- but as I understand the

15   situation, much of this land --

16       How many separate acquisitions were there of this land

17   within the watershed?

18       MR. VEEDER:  As far as you would be interested, in my

19   view, the big one is 9,147 acres acquired for the Ammunition

20   Depot in 1942.

21       MR. GIRARD:  Was that all from one single source?

22       MR. VEEDER:  That is right.

23       MR. GIRARD:  One purchase?

24       MR. VEEDER:  Yes.  And then you have the Camp Pendleton

25   area of 122,000 acres condemned almost one year later.

1    And at one time Mr. Sachse raised the point, as I remember,

2  as to the effect on the riparian rights of the Ammunition

3  Depot in Camp Pendleton.

4    Isn't that correct?

5    So I thought the breakdown would be important in that

6  regard.

7    MR. GIRARD:  The whole thing of setting these forth

8  separately, maybe it is not factually applicable, but if there

9  were separate acquisitions of separate parcels and your chain

10  of title would be broken -- for example, if a piece was not

11  riparian to a stream, or say one piece was riparian, if you

12  acquired it in two separate acquisitions, the top piece would

13  no longer be riparian.

14    MR. VEEDER:  I can describe to you what transpired.  The

15  Ammunition Depot, which is bounded partly by the thread of

16  the Santa Margarita River, was acquired separately from the

17  remaining 122,000 acres.  It was bought first, but there was

18  not the kind and type of severance where you would cut off a

19  piece of land and thus sever it from being a piece of riparian

20  property.  Do you follow what I am saying?

21    MR. SACHSE:  In other words, the old Rancho Santa

22  Margarita riparian right is now represented in two separate

23  parcels.  There has been no actual severance and loss of right.

24    MR. VEEDER:  There has been no cutoff from the stream.

25    MR. SACHSE:  That is the way I understand it.

MR. VEEDER:  I can't ascribe any legal significance to it.

THE COURT:  I can't either, but it probably should be set forth, showing the various parcels acquired.

Now, what do you want to do about this description?  You were talking about incorporating by reference.  Your condemnation proceeding is a very cumbersome thing to refer to by a file number.  Was there a final decree in the condemnation matter?

MR. VEEDER:  There is, and the lands are there described.

THE COURT:  Was it recorded?

MR. VEEDER:  Yes, your Honor.

THE COURT:  Do you have a recording reference in the County?

MR. VEEDER:  I will want to check that.  I am sure that it was.

THE COURT:  It would seem to me that if you had a recording reference of a final decree in condemnation, or a recording reference to the purchase of this 9,000 acres for the Ammunition Depot, that you could by reference refer to the book and page of the official records.

MR. VEEDER:  Without setting out the metes and bounds description of the property?

THE COURT:  If those deeds did it, we would just save a lot of work by a one line reference to a book and page of the O.R. of the County Recorder.

1   MR. VEEDER:  I would be very happy to do it that way.

2   MR. GIRARD:  It is all right with me.

3   THE COURT:  Do you see anything wrong with that?

4   MR. VEEDER:  No, I don't see anything wrong with that.

5   THE COURT:  That is the place to go to look for the title

6   in the County Recorder's Office, not the files in a condemna-

7   tion suit.

8   MR. VEEDER:  I don't see how anybody could go far wrong

9   on it.

10   MR. SACHSE:  It fine with me, your Honor.

11   THE COURT:  Of course, this would help the title companies,

12   because they are working with book and page of official records.

13   MR. VEEDER:  Of course, the condemnation was from this

14   Court.

15   MR. GIRARD:  It is still recorded in the State.

16   MR. VEEDER:  I think it is recorded.  I will check it

17   out.

18   THE COURT:  You could refer to the number of the case,

19   but if there was recorded a final decree, and I think there

20   would be, you could refer to the case number:  Final Decree

21   in such case being recorded at book and page so and so.

22   MR. VEEDER:  We will do that, your Honor.

23   THE COURT:  That would do it and save pages and pages.

24   MR. SACHSE:  I have a question in Paragraph 5, the

25   language starting at line 6, of Mr. Girard's draft.  I don't

1       know what it means and why it is there.

2           MR. VEEDER:  Isn't that a conclusion of law to begin with?

3       Why do you have 5?

4           MR. GIRARD:  Mr. Veeder suggested that we just delete

5       that clause, at the last session, according to my notes.

6           MR. VEEDER:  I am perfectly happy to have it as a con-

7       clusion of law, but I don't think it is a finding of fact.

8           MR. GIRARD:  As far as that goes, I have no objection to

9       just deleting all of Paragraph 5.  The basic reason for it was

10      to make sure that if one of the defendants felt that the United

11      States was using more water than it should, it wouldn't run

12      into the consent to sue statute in trying to get it enforced;

13      that this Court will keep continuing jurisdiction and no one

14      has to worry about bringing an injunctive suit against the

15      United States to restrain their water use.

16          THE COURT:  Let's put it in the conclusions of law.

17          This absolute privilege to the use of water of the river,

18      let's spell it out as the facts are:  That the United States

19      as the last user on the stream is, therefore, in a position

20      to use such water as reaches it, since no one above can

21      complain when the water has reached the Enclave.

22          Maybe we also should put in a paragraph where we use some

23      shorthand, such as the Military Enclave or something, to

24      describe this whole bundle of property.

25          MR. SACHSE:  I was going to suggest that as an addition

to Paragraph 1.  After you spell all of this out, you get too mixed up, and I would refer to the whole thing as the Military Enclave.

MR. VEEDER:  Let's knock out "Joseph H. Pendleton" on the first page and hereafter refer to the Hospital, the Ammunition Depot and Camp Pendleton, hereafter referred to as the Naval Enclave.

MR. SACHSE:  Yes.

THE COURT:  This material is coming from your draft of the breakdown of the properties, and then put in this clause that you are hereafter talking about the Military Enclave, and then on Paragraph 5 in your conclusion let's spell this out as to what this right is.

MR. VEEDER:  That will go into the conclusions of law.

THE COURT:  Yes.

MR. VEEDER:  We will locate the United States as the last riparian and last owner on the stream.  That is one reason I was somewhat anxious about having a description showing where the water entered the United States in the last 21 miles, et cetera.

THE COURT:  You can do that in a paragraph.  You don't need a description.  You can say the last 21 miles of the stream and that it runs clear down to the Pacific Ocean.

MR. VEEDER:  I agree with that.

MR. GIRARD:  Yes.

18-634

1    THE COURT:  You can do this in a paragraph, and I think

2  it should be in there.

3    MR. VEEDER:  On page 11, I have written it, if you want

4  to look at it.  It describes where it proceeds along the United

5  States Naval Ammunition Depot.

6    MR. GIRARD:  I can take care of it.

7    MR. SACHSE:  You have the same thing on the next page,

8  Mr. Girard, on page 5.

9    MR. GIRARD:  Yes, my Finding No. 7 is that finding on the

10  other side.  Maybe I don't need that at all in 5.

11    THE COURT:  In 7 he has that no other water users or

12  water claimants or land owners on said river downstream from

13  said place where said Santa Margarita River enters the lands

14  of the United States of America.  Doesn't that do it?

15    MR. SACHSE:  I think it takes care of it.

16    THE COURT:  I think it does.  Look it over, Mr. Veeder.

17  I think it takes care of it.

18    Let's look at 6.

19    MR. VEEDER:  I think, also, your Honor, in that regard,

20  I have no objection to having a finding that the stipulation

21  was entered into -- I think it is a proper finding, but I

22  believe that other than that, whatever is agreed to as a

23  result of the stipulation should be in as a conclusion of law

24  rather than of fact.  I would hope, for example, in line 27,

25  it says that its rights are to be determined by California

18635

law.  I don't have the stipulation before me.  As I remember

it, the language was that the rights are being measured by

California law.  But I would rather have that in a conclusion

of law, whatever you ultimate determination is.

MR. GIRARD:  Why not say that the United States entered

into a stipulation in this case, setting forth the stipulation?

MR. VEEDER:  That is right.

MR. GIRARD:  In the exact words, and say that at all times

herein relevant, or something like that, this stipulation has

been in full force and effect.

MR. VEEDER:  I think that is a proper finding, and set

the stipulation out in its entirety.

THE COURT:  Now, before you got into the case, Mr. Girard,

there was a series of motions made to interpret the stipula-

tion.

MR. GIRARD:  That is right.

THE COURT:  And you will have to include in your conclu-

sions of law my interpretations of the stipulation.

MR. VEEDER:  That is right.  But I don't think that should

appear here.

THE COURT:  No, I think the stipulation should be set

forth verbatim as factual matter.

MR. GIRARD:  I probably should refertoto that reported

decision.  I could in the finding refer that the stipulation

has been construed by this Court, and refer to the Federal

1    Supplement citation also.

2        THE COURT:  There were a couple of very vigorous conten-

3    tions made by Mr. Veeder, and I think they should be paraphrased

4    in these conclusions.

5        MR. VEEDER:  In the conclusions?

6        MR. GIRARD:  Yes.

7        MR. VEEDER:  I have no objection.  I think that is the

8    proper place.

9        THE COURT:  You may also refer to the opinion, but I

10   think you should pull together --

11       MR. VEEDER:  Just show the stipulation is set out in its

12   entirety and then you will not have to interpret it here.

13       MR. GIRARD:  The conclusions of law should set forth the

14   conclusions you reached in your decision.

15       THE COURT:  Yes, at least that.

16       Number 7 we have already talked about.  It looks all

17   right.  Mr. Veeder is checking it.

18       Number 8.

19       MR. VEEDER:  May I anticipate a little bit here, because

20   I think it goes to organization.  You incorporate by reference

21   the findings of fact and conclusions of law in the old case,

22   in Paragraph 43 at page 23.  There is only one thing I am

23   raising.  I certainly object to the inclusion of them, but I

24   am not sure that there won't be a disparity between what you

25   say in 8 and some of the things that are recited in those

18,637

1    conclusions of law.

2         MR. SACHSE:  I think you are reading 43 wrong, Mr. Veeder.

3    He doesn't incorporate the State case.  He incorporates Judge

4    Carter's prior interlocutory decree relating to the State case.

5         MR. VEEDER:  Is that it?

6         MR. SACHSE:  "That this Court has previously entered

7         Findings of Fact, Conclusions of Law and Interlocutory

8         Decree No. 25 pertaining to a State Court judgment . ."

9         The State judgment is not incorporated.

10        MR. VEEDER:  I see.

11        THE COURT:  What are we looking at, 8?

12        MR. GIRARD:  Yes, your Honor.  This was redrafted along

13   the lines your Honor suggested, I think, to refer to those

14   two old -- I don't know what they were -- articles or exhibits

15   which described the --

16        MR. SACHSE:  The State Engineer's report.

17        MR. GIRARD:  The State Engineer's report, those old ones.

18        MR. VEEDER:  I don't remember that phase of it, Mr. Girard.

19   Is that United States of America Plaintiff's Exhibit 125?

20        MR. GIRARD:  I don't know.  It is that old engineering

21   report.

22        MR. VEEDER:  That is what it is, then.  I want to look

23   at that, because I don't recall this phase of it.  I don't

24   recall where this came from.  I'll take a look at it.

25        THE COURT:  You have a hazy memory, plus the fact that

there was some evidence that later on when things began to dry
up a little and water was not there they did go out with
scrapers and they did scrape a little hole in the sand and
they did get a pool of water, this was the next stage along
the line, until finally it got to where you could scrape holes
in the sand and not get any water.

You are going to take a look at it, Mr. Veeder?

MR. VEEDER:  Yes, I will, because I don't remember where
this came from, frankly.

MR. GIRARD:  We discussed it the last time.  It was
redrafted.

THE COURT:  Let's look at 9.

MR. VEEDER:  I don't believe 9 is right.

MR. GIRARD:  If it is not, let us correct.

MR. VEEDER:  I don't believe that it rises and goes
underground and rises again at the present time.  I think you
do have a surface flow down there where the sewage effluent
is down toward the lagoon area, but that is about the only
place.  Do you want me to locate that on the map?

MR. GIRARD:  No.  In other words, you could say that
downstream from that point, during periods, sometimes it flows
entirely underground and sometimes it flows as an intermittent
stream for a short while.  Is that right?

MR. VEEDER:  I would like to try my hand at writing that.

THE COURT:  From that point during periods other than

1  during and shortly after periods of precipitation it flows

2  largely underground, and that sewage effluent which enters

3  the stream at such and such a place adds sufficient water to

4  the waters underground that from there on down the stream

5  flows on the surface.  If you are going to put in the sewage

6  effluent, I would refer to the fact that it added to the waters

7  underground.  The sewage effluent would merely go into the

8  sand and wouldn't flow on the surface.  Is that right?

9      MR. VEEDER:  I don't like the innuendo.

10     THE COURT:  You are going to try your hand at this?

11     MR. VEEDER:  I would like to, because I think there is

12 an area where this sewage effluent enters where you do have

13 a perennial flow.

14     THE COURT:  Where anybody tries their hand at some of

15 these, put them on a separate page under the same number.

16     MR. GIRARD:  I think somewhere along the line here there

17 are specific findings as to the sewage, the point where they

18 are discharged, et cetera.

19     MR. VEEDER:  Without bringing down the wrath of the Gods

20 on my head, I think there are areas where they are repetitious

21 throughout these.  I think we could consolidate and save quite

22 a lot of space.

23     THE COURT:  What about 10?

24     MR. VEEDER:  I would like to see reference made to Santa

25 Margarita coastal basin, the sub-units.

1   MR. SACHSE:  We aren't there yet, Mr. Veeder.

2   MR. VEEDER:  This where it starts, though.

3   May I inquire, before saying anything more on this, at

4   line 23 -- and I have seen it used in the other Murrieta-

5   Temecula findings -- what is meant by "a relatively high

6   water bearing capacity"?

7   MR. GIRARD:  That means it bears more water and moves

8   more than the surrounding material.

9   MR. VEEDER:  When it is saturated.

10   MR. GIRARD:  When there is water.

11   MR. VEEDER:  The point I am trying to make is that it is

12   a tremendous amount of area.

13   THE COURT:  What?

14   MR. VEEDER:  In my own view, having a relatively high

15   water bearing capacity --

16   THE COURT:  Isn't that true?

17   MR. VEEDER:  I think some of it is more permeable than

18   others.  I am not quarreling.  I just want to know.

19   MR. GIRARD:  I did put down in the next line particularly

20   dealing with your Marine problem down there that some of that

21   stuff is not identical.

22   MR. VEEDER:  I am going to tender a thought in regard to

23   that.

Belt 7

24   THE COURT:  What about 11?

25   MR. VEEDER:  Your Honor, in regard to all this material,

1   10 and 11 in particular, and then other findings in regard to

2   the basins, I would request your Honor to enter findings as

3   to the depth of the alluvium, the breadth of the surface of

4   the alluvium, the number of acres in the basin area.  I think

5   those are facts that are important and I think they should be

6   reflected in the findings.

7        MR. GIRARD:  I agree.  At the last hearing it was mention-

8   ed and we stipulated that we would use the depth.  Well, it is

9   in Finding No. 17, Mr. Veeder -- I guess I have made the

10  correction already -- that the vertical depth of the younger

11  alluvial deposits is depicted on U. S. Exhibit 39.

12       MR. VEEDER:  Can't we spell them out?  I think we have

13  incorporated everything in here by reference.  I think the

14  language is important.  The surface area of the basin, the

15  depth, upper member and lower member, all the data that went

16  into the record.  If you will turn to page 13 of my proposed

17  findings you will find those references.

18       MR. GIRARD:  In the first place, the words "basin" in

19  connection with the three streams was used for convenience

20  only as a reference, and they are all one continuous deposit

21  of younger alluvium.  It is not, in essence, a basin.

22       MR. VEEDER:  The State of California certainly testified

23  that it is a basin.

24       MR. SACHSE:  The Court has ruled that it is not; that

25  the younger alluvium comprises the stream bed.  Either we

1  accept the Court's ruling as to the stream bed or we don't.

2  MR. VEEDER:  My only point is that the facts as they

3  exist should be set forth, and then your conclusion that it is

4  not a basin, if that is what your conclusion is, your Honor.

5  MR. GIRARD:  It is set forth, Mr. Veeder.  We refer to

6  U.S. Exhibit 37, which specifically depicts the area of

7  younger alluvium.  We refer to another exhibit.  Both these

8  are your own exhibits, which set forth the estimated depth.

9  For the purpose of these findings I don't think it is parti-

10  cularly material to describe in detail what is shown on these

11  exhibits.  It all depends on how detailed you want to go.

12  THE COURT:  I have no objection to pointing out that

13  for convenience these are referred to as the Chappo Unit, the

14  Ysidaro Unit, et cetera, and the extent of the acreage of it

15  and the depth of the younger alluvium.  I am not going to

16  find that they are basins, but I have no objection to making

17  it clear just to identify them how big they are and where they

18  are located.

19  MR. VEEDER:  I think they are important facts, your

20  Honor.  And I think it is important for us to have it in the

21  findings.

22  THE COURT:  Well, it's 12:00 o'clock gentlemen.  I have

23  a luncheon engagement.  I think I'll be through with this

24  tuna case this afternoon, and if I am not I will be through

25  shortly in the morning.  So why don't you come in at 10:00

1   o'clock?   If I have any extra time tomorrow I'll start in at

2   9:30.

3        MR. VEEDER:  We are at 10:00?

4        THE COURT:  Yes.

5        (Noon recess.)

6        (Whereupon an adjournment was taken until Thursday,)
7        (February 1, 1962, at 10:00 o'clock A.M.               )

8                           - - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,      )
                               )
                   Plaintiff,  )
                               )
        vs.                    )        No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                   Defendants.)
_____

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and
on the dates herein involved, to wit:  January 30, 1962 and
January 31, 1962, was a duly qualified, appointed and acting
official reporter of said Court.

That as such official reporter I did correctly report
in shorthand the proceedings had upon the trial of the above
entitled case; and that I did thereafter cause my said short-
hand notes to be transcribed, and the within and foregoing
sixty-eight (68) pages of typewritten matter constitute a
full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 5th day of
February, 1962.

_John Swader_
Official Reporter

JOHN SWADER, OFFICIAL REPORTER