VOLUME NO.  182                                             MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

– – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – –

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Place:     San Diego, California

Date:      Thursday, February 1, 1962

Pages:     18,645 to 18,720

## FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                    DEPUTY


J O H N   S W A D E R
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

|                                                    |     |                 |
|----------------------------------------------------|-----|-----------------|
| UNITED STATES OF AMERICA,                          | )   |                 |
|                                                    | )   |                 |
| Plaintiff,                                         | )   |                 |
|                                                    | )   |                 |
| vs.                                                | )   | No. 1247-SD-C   |
|                                                    | )   |                 |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al.,         | )   |                 |
|                                                    | )   |                 |
| Defendants.                                        | )   |                 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, February 1, 1962

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | COMMANDER DONALD W. REDD |
| For the Defendants: | |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE, ESQ. |

1   SAN DIEGO, CALIFORNIA, Thursday, February 1, 1962, 10:00 A.M.

2                              -oOo-

3        THE CLERK:  1-1247-SD-C United States vs. Fallbrook.

4        THE COURT:  I am in doubt, and so is the Clerk, as to

5   what you plan to do about 38-A.  I was going to make a minute

6   order setting aside that entry and he crossed off my signature.

7   What did we propose?  That we would sign it as is, or was

8   there some other change to be made?

9        MR. GIRARD:  I think we were going to sign it as is, and

10  Mr. Veeder was going to draft up some interlocutory amendment

11  or something of that nature which would apply to 38-A and all

12  the others, which would indicate that nothing in these judg-

13  ments was intended to deprive anyone of any surface water rights.

14       Is that right?

15       MR. VEEDER:  That is in the process of being run.  I

16  propose to make the amendment as to each interlocutory order

17  that has been filed, including 38-A.

18       THE COURT:  Then they will have to be prepared.  Have you

19  got that copy with my signature off?

20       THE CLERK:  Yes, your Honor.

21       THE COURT:  Let me have it.  I can take it as the copy,

22  and you can take this as the original, can't you?  Let me have

23  your pen.

24       MR. VEEDER:  I understand that Mrs. Tooker picked up the

25  copy this morning.

1        THE COURT:  Yes.

2        I'll set aside that order setting it aside and eliminate

3    that.

4        MR. VEEDER:  I have that in the rough, your Honor, at

5    the present time.  We are starting a little early.

6        Your Honor has asked me in regard to this physical solu-

7    tion, and as I understand there has been some --

8        MR. GIRARD:  Don't look at me.  I don't know anything

9    about it.

10       MR. VEEDER:  I was not looking at you, Mr. Girard.  Un-

11   fortunately, sometimes I have to look straight ahead, and there

12   you are.

13       THE COURT:  What are you talking about now?

14       MR. VEEDER:  On the physical solution.  You asked me

15   yesterday about the physical solution and its status, your

16   Honor.

17       THE COURT:  Well, Mr. Ramsey Clark called me yesterday,

18   I had quite a long talk with him on the telephone, and there

19   had been some meetings et cetera, and I told him I would not

20   insist that a copy of Colonel Bowen's report be sent to me at

21   this time.  I get the impression that they are very definitely

22   exploring this whole thing, and nothing we could do would help

23   them.  As a matter of fact, kicking the report around would

24   possibly have the other effect.  Apparently, the report was

25   not an extensive one.  It was a very short suggested

1   disposition.  So we will just have to let that ride along.

2   Apparently there have been conferences, and there are to be

3   more.

4          So we will start in again.  Where were we?  Down to about

5   12 or 11?

6          MR. SACHSE:  I show that we were on 11, in my notes, your

7   Honor.

8          MR. VEEDER:  That was where you said, if I recall correct-

9   ly, that it would be proper to put in a full description of

10  the Santa Margarita coastal basin, with the subdivisions

11  Chappo and Ysidaro.

12         THE COURT:  Yes, I recall.  And reference was made to

13  some of the material on page 13 and Mr. Veeder's suggestions.

14         MR. GIRARD:  We can copy these almost verbatim.  Delete

15  that word "basin".

16         THE COURT:  Then we are down to 12.

17         MR. VEEDER:  I would like to refer to 12 there.  It says:

18         "That the location of the surface flow of the Santa

19  Margarita River is upon the younger alluvial deposits

20  referred to herein above; that the area of surface flow

21  thereon will fluctuate considerably and it is not

22  uncommon for the surface flow to shift its position

23  upon the younger alluvial deposits from year to year or

24  within each year during periods of substantial surface

25  flow."

1    Your Honor, I don't know that the evidence will support

2    any statement that the River has within recent times changed

3    its position.

4        THE COURT:  The best evidence are the photographs of the

5    River where you see where the water has run down various

6    patterns across this younger alluvium.

7        MR. VEEDER:  But never clear across Chappo Basin, for

8    example, or never clear across Ysidaro Basin.  There have been

9    various channels within the beds and banks, as it appears.

10   There has been no fluctuating back and forth across Chappo

11   Basin.  I deny that there has.

12       MR. GIRARD:  I recall looking at the pictures, and it is

13   obvious that the stream had shifted its course many times.  I

14   believe Colonel Bowen testified to some of those things -- that

15   originally the stream came around this way and went around that

16   way, and that was the reason for these cuts in the terrain.

17       MR. SACHSE:  This Finding No. 12 doesn't say anything

18   about covering the whole of Ysidaro Basin or covering the whole

19   of Chappo Flats.  It says that it fluctuates and shifts its

20   position upon the younger alluvium.  I don't know how else you

21   can state it.

22       MR. VEEDER:  The point I am trying to make is that when

23   you say upon the younger alluvium deposits you are implying

24   that it has gone within recent times.  It says from year to

25   year.  There has never been within any recent period that the

*8fls.

1  channel of the stream has changed its course in the manner

2  described.

3      MR. SACHSE:  I don't know what you mean by "recent," but

4  it shows on those photographs, and I consider the photographs

5  recent.

6      MR. VEEDER:  I object to it because there is no evidence

7  to support the kind and type of change that has been made.

8      THE COURT:  The objection is overruled.  No. 12 looks

9  all right to me.

10     Any  comments on No. 13?

11     MR. VEEDER:  I don't recall of any evidence that would

12  support the statement that "said variance in points of rising

13  surface flow result to a substantial degree from pumping of

14  the waters contained in the younger alluvial deposits by the

15  United States of America".

16     MR. SACHSE:  What do you think causes them, Mr. Veeder?

17     MR. VEEDER:  I think probably the most important thing

18  is during the winter time there is substantial flow coming

19  down and then when the River dries up or the flow is reduced

20  the water goes into the alluvium.

21     THE COURT:  Don't you think that if there were no pumping

22  in the military enclave there would be a different physical

23  situation on the River?  Maybe not all throughout the summer,

24  but for long periods of time in the spring and in the summer.

25     MR. VEEDER:  There may be some difference, your Honor,

18,651

but  I don't recall the evidence which says --

THE COURT:  I think it is an inference that can be clearly drawn.

MR. SACHSE:  It has certainly been testified to in Murrieta, for example, that the pumping caused the change of the point of rising water.  If pumping causes it in the Murrieta, I think it is most logical to infer that the pumping also causes it in other basins.

MR. VEEDER:  I don't know of any evidence to support the finding.  I am simply making the record.

THE COURT:  The objection is overruled.

14.

MR. VEEDER:  I am going to make an inquiry here, your Honor, in regard to 14, which relates -- has your Honor read this?  It is the part relating to salvage water and to sewage effluent.  I don't find a proposed conclusion of law.  Maybe I have missed it.  Is there a proposed conclusion of law, Mr. Girard, in connection with this salvage water?

MR. GIRARD:  I don't think so.  What conclusion do you want drawn?  I would be very happy to draw one.

MR. VEEDER:  It occurs to me, your Honor, that in regard to sewage effluence and in regard to any salvage water that is created by the removal of phreatophytes and similar conservation practices, there should be a conclusion of law that the United States is entitled to the benefit of that salvage water

1   and from the recovery of the sewage effluent; and that as to

2   that water, that being so much water which is just really

3   developed water, salvage water, that there would be no question

4   about the right to export that water or to impound that water,

5   and I believe that there is no one upstream who could possibly

6   complain about any injury to them by reason of it; and I think

7   there should be a concomitant conclusion of law to say that

8   in regard to any quantities of sewage effluent which are

9   salvaged and in regard to any recovery by reason of removal

10  of phreatophytes, the United States of America is free to

11  export the water or to impound it.

12      MR. SACHSE:  I would like to be heard briefly on this,

13  your Honor.  First, the effluent.  This creates a very

14  marvelous picture whereby the United States takes water utterly

15  without right by your Honor's ruling outside the watershed,

16  runs it through the sewer systems in the barracks, then it

17  brings it back in, and now it wants a right to use the water

18  which it used improperly in the first place, brought around

19  and brings it back in, and now it wants an appropriative right

20  to it.  No.

21      Number two.  Much more fundamental than this particular

22  problem is the that every single water use by a riparian is

23  predicated in the eyes of the common law as well as the present

24  day law of California upon a return flow.  That is what it is.

25  That is the one fundamental reason why a riparian cannot export

18 653

water out of a watershed; that he is supposed, as part of his use, return everything he doesn't need to the watershed.  That is the purpose of it.

And it would be utterly unreasonable to say that because they used the water wrongly and improperly in the first place, they then acquire a right to water outside the watershed.  It is a complete non sequitur.

MR. VEEDER:  Are you through for a moment?

MR. SACHSE:  I am through.

MR. VEEDER:  I think we should break it down on two scores, your Honor, this point in regard to sewage effluent. There is, of course, sewage effluent returned to the basins from waters which are used within the watershed.

MR. SACHSE:  That is right.

MR. VEEDER:  For example, we are recovering 500 acre feet of sewage effluent and returning it to the basin within a proper riparian use.  I would like to have a ruling whether we could export that water.

MR. GIRARD: Let me have a brief explanation.

MR. VEEDER:  Let me finish.

MR. GIRARD:  Pardon me.

MR. VEEDER:  I would like to see it broken down on that basis to the end that the record would be clear in regard to sewage effluent.

I would also like to have a ruling from your Honor in

1    regard to the salvage of water by reason of the removal of all

2    phreatophytes that can possibly be removed by defendants in

3    the creek bed and down through the various water table.

4         THE COURT:  You are talking about three situations.  You

5    are talking about water used within the watershed.

6         MR. VEEDER:  That is correct, your Honor.

7         THE COURT:  And then collecting the sewage and returning

8    it to the watershed.

9         You are talking about taking water outside the watershed

10   that has been reclaimed and brought back into the watershed.

11        MR. VEEDER:  That is right.

12        THE COURT:  You are talking about water saved by clearing

13   out phreatophytes.

14        MR. VEEDER:  Conservation practices, yes, your Honor.

15        THE COURT:  Number one, I am willing to make a finding

16   that your conservation practices are very admirable and you

17   have done a fine job in that respect.  If you want that in,

18   we will get that.

19        Secondly, as to the phreatophytes, it seems to me that,

20   first of all, the problem doesn't arise until the water is

21   already down there, and if the water is already down there

22   then nobody can complain about what you do with it.  In other

23   words, you are talking about cutting out phreatophytes to

24   conserve water which the phreatophtyes will ordinarily use up.

25   So if the water is already down there, there wouldn't be any

1    use to cut phreatophytes.  If the water is down in the military

2    and Naval Enclave, then of course nobody can prevent you from

3    doing what you want with it.

4        But this isn't what you want.  You couldn't expect me

5    to make a finding that because you had had a fine conservation

6    program on cutting phreatophytes, that you therefore were

7    entitled to appropriate water and use it outside the watershed

8    that you had thereby saved.  Is that what you want me to find?

9        MR. VEEDER:  I would like to have a ruling, I am request-

10   ing such a ruling, your Honor.

11       THE COURT:  I am not going to find that because you saved

12   water by cutting phreatophytes, that water then becomes subject

13   to an appropriative right.

14       I will find that when the water gets in the Enclave you

15   can do as you please with it.  There is no dispute about that.

16       On the sewage matter, the water that you use in the

17   watershed and the return, I think Mr. Sachse is correct.  That

18   is exactly what is done when persons irrigate.  They use the

19   water and there is a return of the water to the water strata

20   again.

21       Can you spell out any legal argument for me?

22       MR. VEEDER:  Certainly, your Honor.  What Mr. Sachse said

23   may be relevant in regard to a downstream riparian, but it is

24   certainly not relevant in regard to an upstream appropriator.

25   There is no question that return flow is essential in sharing

1   the correlative rights among riparians on a stream.  It follows

2   that the return flow is part of what each riparian lives upon.

3   We have a finding that there is no one downstream who would

4   benefit from it, that is, there is no riparian.

5       Now we are confronted with an inchoate appropriator

6   upstream who is claiming that by reason of this salvage water

7   -- I am speaking now only of salvage within the watershed,

8   I am speaking strictly about that -- I believe that the real

9   argument that he might present, if he were a riparian, has no

10  application here at all.

11      We are here using water with a proper riparian use, as

12  you have already found, we are bringing that water back,

13  cleaning it up, putting it into the basin.  Maybe 500 acre

14  feet -- I am not sure how much it is.  I see no reason at all

15  why the rules in regard to salvage of water would not be

16  applicable certainly as to the water within the watershed.  I

17  have filed a brief on that point.

18      THE COURT:  What are these rules about salvage of water?

19      MR. VEEDER: Anyone who by his own efforts reclaims water

20  and salvages the water is entitled to use that as his own.

21      THE COURT:  What kind of right is this?  An appropriative

22  right?  Or --

23      MR. VEEDER:  So far as I know, your Honor, there has been

24  no specific designation of it other than under the headings

25  of "Developed And Salvaged Water".  In other words, the

salvaged water that comes to the man's land which he recovers

by putting in a concrete ditch, eliminating any losses in that

manner, is his, because the water has been developed through

his own personal effort.

That is exactly what we are talking about here.  In other

words, here is a man with a right to one second foot.  His

neighbor is entitled to one second foot.  But his neighbor,

by a series of developments, increases it from one second

foot to three second feet.  He is entitled to the benefit of

that development by reason of his own personal activity, and

as long as the neighbor gets the one second foot to which he

was originally entitled he can't complain as to the taking of

three second feet under the circumstances.

THE COURT:  You say you have filed a brief with some

authorities on this?

MR. VEEDER:  I filed authorities in connection with the

sewage effluent in response to California's twelve questions

some months back, your Honor.

MR. SACHSE:  I think I almost agree with everything he

says, your Honor, but it still doesn't follow that he is going

to ask your Honor for an appropriative right.  Take Mr. Veeder's

own example.  I have had personal knowledge when in a desert

stream of heavy seepage the lower water user did concrete the

entire ditch.  Now he didn't affect in the slightest the use

of the main stream.  His rights as to that main stream didn't

change one iota.  What he did was that he saved water and he
had a right to do it, and what he saved he used.  But his
rights with relation to the man upstream did not change in
the slightest.

If the United States by careful conservation practices
saves water and thereby has more water to use, without reaching
upstream against other claimants, appropriators or riparians,
that is fine.  They have an absolute right to it.  There is
no question.

THE COURT:  You are sort of begging the question.  Let's
take your example.  A man upstream and the man downstream in
the desert are each entitled to, we will say, one inch.  This
is their correlative share.  The man downstream, by putting
in a ditch so that the water goes through a concrete canal,
actually increases the water that he gets to where he is
getting two inches.  Can the man upstream say, "Now you are
getting two inches down there.  Our ratio was fifty-fifty, so
that I am, therefore, entitled to increase my use upstream"?

MR. SACHSE:  No, I don't think he can, your Honor.

THE COURT:  Then, you see, this is the question.  If that
is the situation, then the rights of the United States as a
riparian would be correlatively charged on the basis of their
use, without taking into account their conservation of this
water.

MR. SACHSE:  As a riparian, your Honor.  But your Honor

1    phrased the question to Mr. Veeder, and he said what he wanted

2    was an appropriative right in this.

3        THE COURT:  There are two different things on this.  Let's

4    forget about whether it is subject to appropriation.  If you

5    are content with the law that apportionment between riparians

6    in the exercise of their correlative rights is charged on the

7    basis of their use, without taking into account the conserva-

8    tion that the one downstream does, then in substance the one

9    downstream gets the benefit of what he conserves, because any

10   apportionment between him and the upstream man does not take

11   into account this conservation.  That is one thing.  Apparently

12   you concede that.

13       MR. SACHSE:  Yes, your Honor.

14       THE COURT:  And this, it seems to me, should probably

15   solve Mr. Veeder's problem without pressing the question that

16   you then have an appropriative right to this water that you

17   save.  I don't know how you could get an appropriative right.

18       MR. VEEDER:  I would simply say that it can be used any

19   way we want to.

20       May I go one step further?

21       MR. SACHSE:  It seems to me that we are all overlooking

22   the point the Circuit makes, that there is a real distinction

23   between the power or the ability of the United States to use

24   water without anybody objecting to it and the right to reach

25   upstream to get it.  That is exactly what this is.  The United

1  States, because it reclaims a lot of water, cannot thereby

2  reach upstream and say, "Now I have a right to this 500 acre

3  feet. Let it come down to me." That they cannot do. They

4  don't get an appropriative right. They can't say, "Because I

5  reclaimed this water, I now have an appropriative right to

6  export 500 acre feet out of the watershed." That they cannot

7  do. They have simply increased the amount of water available

8  to them and it is proper and I can't object, and in any actual

9  acre foot allocation they are going to get all the benefits

10  of it. But they can't reach upstream.

11  THE COURT: I kind of agree. But I think the problem is

12  solved for the United States if we find that in any measurement

13  of the correlative rights of the United States as a riparian

14  as against upstream riparians we do not take into account the

15  water that they have reclaimed.

16  MR. SACHSE: I think that is true as to riparians, your

17  Honor.

18  THE COURT: And that since it is then in the watershed

19  they can do as they please with it.

20  MR. SACHSE: As to riparians. But they do not acquire

21  thereby an appropriative right to export.

22  MR. VEEDER: The point of it is that the 500 acre feet

23  should not be charged against us in regard to other riparians

24  when we are talking about reasonable and beneficial use. That

25  is all I wanted to say.

1    MR. GIRARD:  Let me ask Mr. Veeder this.

2    Vail Company is irrigating by sprinklers 300 acres

3    approximately now.  Suppose they abandon that sprinkler

4    irrigation on 300 acres and do it by ditches, which would use

5    probably a lot less water than they are using by sprinklers.

6    What right do they have by that water conservation practice

7    to that water which they save by changing their method of

8    operation?  Let us say they saved -- I don't know -- let's

9    say they saved 400 acre feet of water by switching from

10   sprinklers to ditch irrigation, which doesn't consume that

11   type of water.  They have 400 acre feet of water that is saved

12   by changing their operation.  Could they take it out of the

13   watershed as a matter of right?

14   MR. VEEDER:  It would all depend.

15   MR. GIRARD:  Yes or no.  It doesn't depend on anything.

16   There are the facts.

17   MR. VEEDER:  I would say that the question of reasonable

18   and beneficial use would probably be involved.

19   MR. GIRARD:  I am not going to get an answer.

20   MR. VEEDER:  No, you are not going to get an answer until

21   I get an answer in regard to the appropriative right.  I am

22   not talking about anybody now but the claim of Fallbrook in

23   regard to the 500 acre feet of water and whether we can put

24   this burden on the stream and an appropriator cannot partici-

25   pate in it.  That is the only thing before the Court now.

1          MR. SACHSE:  A minute ago he said he was talking about

2     riparians.  We agreed that as a riparian he had a right to

3     this water.  I do not concede that this conservation in the

4     slightest way affects an appropriator.  An appropriator is

5     taking surplus water, anyway.  That is all he is getting.

6     That is all he is entitled to by law.  So your conservation

7     of the existing water in the stream -- you used it twice --

8     doesn't affect the appropriator.

9          THE COURT:  It doesn't affect him.  Nor do I think it

10    gives the appropriator any additional rights.

11         MR. SACHSE:  No, your Honor.  The only way the man in

12    the Fallbrook case -- and let us not shut our eyes to the facts

13    -- I concede that if river regulation should come with the

14    Fallbrook Dam in existence and the necessity should arise to

15    cut back any uses, let us say, to provide adequate riparian

16    water for the Naval Reserve, your Honor's duty or any court's

17    duty will be, first, to stop all illegal uses, then second

18    junior appropriators.  So what Mr. Veeder is getting at --

19    let's not shut our eyes to it -- he is trying to have your

20    Honor place the stamp of approval on some of this export,

21    because he knows, and let us face the facts, that under your

22    Honor's present rulings --

23         THE COURT:  We have laid aside for a minute the export

24    situation.  You are talking solely about water used in the

25    watershed reclaimed as sewage.

1    MR. SACHSE:  But he wants the right to export that, he

2    wants an appropriation in that, so that he can take it out of

3    the watershed, and that is the sole purpose of this.  It is

4    to avoid the fundamental rule that when a shortage arises you

5    first stop the illegal uses.  He is trying to stamp legality

6    upon some of his exports on the basis that they are an appro-

7    priation of reclaimed water.  And that, I say, this Court

8    cannot do.

9    THE COURT:  Mr. Veeder, in view of the concession made

10   -- talking now about water used in the watershed, if the

11   Government reclaims and secures 500 acre feet of water by that

12   method -- that this would not be taken into account in any

13   computation of the correlative rights of correlative riparian

14   owners, in view of that fact aren't you willing to concede

15   that you would not have an appropriative right to this water?

16   You do have the right when it is there to use it any way you

17   want to outside the watershed.  But if you are insisting on

18   an appropriative right, an appropriative right reaches up-

19   stream.

20   MR. GIRARD:  I am a little puzzled by your Honor's analy-

21   sis here.  I presume that if we made an allocation today you

22   would do it on some basis of irrigable acreage and water duty

23   and determine from that, that each individual would get so

24   much water out of the stream on a ratio basis.  Let us say in

25   the United States' case on irrigable acreage using the same

1   standard as applied to everyone else, and the same water duty,

2   they were held to be entitled as their fair and equitable

3   share to 10,000 acre feet a year and that is the amount of

4   water they are entitled to take out of the stream.

5     MR. VEEDER:  As their correlative share.  —

6     MR. GIRARD:  As their correlative share.  Now if by

7   proper conservation policies they can actually use a greater

8   percentage of that water by return flow et cetera, if they

9   can actually use it --

10    THE COURT:  Re-use it.

11    MR. GIRARD:  -- re-use it, fine and dandy.  They get the

12  benefit of that.  But it doesn't mean that they are in any

13  better situation than anyone else because of that except as

14  to them.  By their own efforts and by Colonel Bowen's skill

15  they are actually able to make better use of their 10,000 acre

16  feet than somebody else.  But that doesn't mean that they get

17  a right to that excess.  It just means they have used the

18  maximum amount allocated to them in the maximum efficient

19  manner.

20    THE COURT:  I think we are in agreement, but the point

21  would be suppose they use skill and they were able to re-use

22  out of the 10,000 acre feet -- let's take a big number just

23  for argument -- say they got another 3,000 acre feet which

24  they used.  In a later argument about what the proportion

25  should be I don't think you should add the 3,000 to the

9 fls.

10,000 to cut down the amount that they originally had, because

they actually they could overnight terminate their sewage

return business.

MR. VEEDER:  That is right.

THE COURT:  And be right back where they were.  And

actually it is the same water.  They have merely re-used it.

MR. GIRARD:  That is right.

MR. VEEDER:  Your Honor is saying it very well.

THE COURT:  Whether you spell it out or call it some kind

of right or not, the fact remains that the water is there,

they have reclaimed it, it is now within the Naval Enclave,

and nobody can complain about what they do with it.

MR. GIRARD:  No question about it.

THE COURT:  I think if we draw some conclusions of law

along that line we can take care of that problem.

MR. GIRARD:  They have no right against upstream people,

your Honor.

MR. VEEDER:  The point I am trying to make, your Honor,

is this.  Your Honor said precisely the argument that I was

going to advance.  Assuming that we ceased this very expensive

process of sewage reclamation because it was of no benefit

to us for practical purposes.  No one could complain about

that.  But here we are in a position where we are using our

riparian water, reclaiming it.  There is no one downstream

that is in any sense injured.  Let us take this 10,000 acre

1  feet, because that is pretty close to what we have to take
2  from within the watershed.  Say we have 500 acre feet and your
3  Honor is then asked to rule:  Well, you saved 500 acre feet,
4  or you saved 3,000 acre feet.  Therefore, your demands up-
5  stream are going to be cut by 3,000 acre feet.  And I think
6  that is error.

7     THE COURT:  We have all agreed on that.  We have agreed
8  on this premise.  Assuming there had been an apportionment
9  and you got 10,000 acre feet, and then by your proper use of
10 it you re-used another 3,000.  The people upstream couldn't
11 come back and say, "Now, you have done so well, now we are
12 going to cut you down to 7 or 8."  We have agreed on that.

13    MR. GIRARD:  That is right.

14    MR. SACHSE:  That is right.

15    THE COURT:  And I think we can draw something up to show
16 -- and whether we call it a right or not, this is kind of a
17 tricky thing, I don't think it is so much -- if we make it
18 clear that you are not later cut down because of your good
19 husbandry of the water.

20    MR. VEEDER:  We will work on language along that line.
21 In other words, it wouldn't be said that it was not reasonable
22 for us to utilize that water and we wouldn't be cut down.  That
23 is the only thing I wanted to be sure about.

24    MR. SACHSE:  Let us not write something that we can't
25 agree on.

1    THE COURT:  Let's go further and say there is no appro-

2    priative right to this water.

3    MR. SACHSE:  Created thereby.  That is what I am concerned

4    about.  There is no appropriative right to take this water out,

5    because we have to face the practical situation.  You used

6    the example of a concrete apportionment, giving 10,000 acre

7    feet to the United States in connection with the upper riparian.

8    If the river gets more use on it some day that 10,000 might

9    have to be cut as other uses increase.  A recalculation might

10   end up with eight.  Forget Fallbrook entirely, just talking

11   about riparians.  The point is that when a cut is necessary

12   they don't have an appropriative right to export.  When a

13   cut is necessary the first thing that must be done is to stop

14   the illegal use.  And the illegal use, whether it is reclaimed

15   water or not, it is illegal.  It is not under an appropriative

16   right.  Your Honor has found it repeatedly, and we cannot in

17   this proceeding give them an appropriative right to this export.

18   THE COURT:  We are agreed that it is not appropriative.

19   But let us see whether or not you have backed up from your

20   position.  Let us assume there is one other riparian on the

21   stream and the United States, and it was agreed that each got

22   10,000 acre feet, and then the United States reclaims 3,000

23   acre feet and re-uses it.  And then water gets scarce and you

24   have to cut down on these riparians, and so you look the matter

25   over and they each had had 10,000 acre feet before and now you

1  cut them down to 8,000 each.  I don't think when you cut them

2  to the eight you add the three that the United States had

3  reclaimed and say, "Now No. 1 is getting ten.  The United

4  States actually was using 13.  Now we are going to cut you

5  on the ratio of ten to 13."

6  MR. SACHSE:  No.

7  THE COURT:  We are not going to do that.

8  MR. SACHSE:  No.

9  THE COURT:  I think we are in agreement.  There is no

10  appropriative right, but in any apportionment made among

11  riparians on the stream the amount of water reclaimed and

12  re-used is not taken into account in the determination.

13  MR. GIRARD:  That is right.  If a person uses economic

14  methods he is not going to be penalized by the allocation

15  method.  That is certainly correct.

16  THE COURT:  All right, I think we are in agreement on

17  that.  Let's try to write something up and it can go into a

18  conclusion of law.

19  What is the next problem?

20  MR. VEEDER:  The next problem is the salvage from the

21  removal of phreatophytes.

22  THE COURT:  Again, you have no appropriative right to it

23  and I think probably the same situation would apply there.

24  If you have done a good job you are not to be penalized for

25  doing the job, and if you wind up with extra water because you

clean out 20 miles of a canyon it is now in your ground and you can use it where you want.  But I don't think you have any appropriative right to it.  I think the same principles would apply to it as to the other.

MR. VEEDER:  All right.  That is all I wanted to be sure of.

THE COURT:  Now, when we get to the third category of the water that you take out of the watershed and then return back, I don't see, again, how you get any appropriative right. There is no doubt that when there is water down there, and assuming that you are not reaching upstream to require other people to make it available, there is water there and you take it out of the watershed, having taken it out and then having brought it back in again it is subject to your use.  But I don't see any theory on which you get an appropriative right to it.  Can you spell out any theory as to how you get an appropriative right to it?

MR. VEEDER:  Just right at this juncture and on this particular phase of it I am simply saying that we should not be penalized in claiming our fair adjustment in regard to riparians upstream.

THE COURT:  I think that would be true.  I think we could make findings that if there was water within the Enclave and you took it out, without reaching upstream to make it available, and then you brought it back in again and reclaimed it,

1 the mere fact that you brought it back in again you shouldn't

2 be penalized for what you have done.

3   In other words, you take the same proposition we talked

4 about before.  Let's say there were two riparians, 10 and 10

5 acre feet.  I have to figure out how you would do it to make

6 the supposition, because you started out with an apportionment,

7 which means there is a shortage of water and it has to be

8 divided.  So it is 10 and 10.  And after you got your 10, we

9 will say, instead of using it on your riparian land for irri-

10 gation, you took 4 of that out of the watershed and then you

11 brought back 2 of it into the watershed.  Now you get down to

12 the question of a readjustment in the apportionment.  What

13 happens then?

14   MR. SACHSE:  The first thing that would happen, if this

15 was Vail fighting and other riparians with the United States

16 over an adjustment in the apportionment, Vail would say, "If

17 the United States is short of water, your Honor, you shall

18 first stop the illegal uses and then you shall stick Fallbrook

19 because Fallbrook's Dam happens to be junior to my dam, and

20 after that you will stick my Vail Dam if there still has to be

21 more water provided."  I conceive that to be the law.  Your

22 Honor will then say to the United States, "The mere fact that

23 you bring back 2,000 acre feet of this doesn't relieve you

24 from the burden of first stopping the illegal use of the 2,000

25 that doesn't come back.  Put that properly to use within the

watershed."

If you are still short, then the next one we clamp down on is Fallbrook. You say, "Fallbrook, you are the junior appropriator in right. You have got to let some water go."

But that is where Mr. Veeder has the sticker in this, and that is where this appropriative right is so critical, because when the shortage comes it is the duty of the Court first to provide that all the water is properly used by the riparians or, for that matter, by the appropriators. I would stop an illegal appropriation, first. I would stop exportation by riparians, second. I would then go after the junior appropriator on the stream, et cetera. That is the way the Court digs up the extra water.

THE COURT: All this would make sense if you were talking about an upstream situation.

MR. SACHSE: It makes perfect sense.

THE COURT: It is where you get down to the last user on the stream, and the Circuit has said and I think it is clear that once the water gets there --

MR. SACHSE: The last user of the water on the stream says, "Judge Carter, we do not have sufficient water for our proper riparian uses."

MR. VEEDER: I wish you gentlemen would let the Court finish his statement.

All morning they have been interrupting your Honor.

1      MR. SACHSE:   If the Court thinks I am interrupting him,

2   I am sure he will tell me.

3      THE COURT:   Go ahead.

4      MR. SACHSE: Camp Pendleton says to your Honor, "Your Honor,

5   we don't have enough water.   There is not enough coming down

6   the river to keep our basins recharged and to enable us to

7   carry out our proper function in the watershed."   That is their

8   statement to you.   It is not a question of how they use it

9   down there.   They say, "We don't have enough."   If they have

10  enough, they have no complaint.   But the day comes when they

11  say, "We don't have enough."   What does your Honor do to get

12  them more?   That is the crux of this thing.   How do you get

13  them more?

14      THE COURT:   I think the first thing the Court would have

15  to say would be, "Well, let's see what water you have been

16  using," and I am in agreement that you would have to say, "Well,

17  you have been using so much in the watershed and you have been

18  using so much out, and in determining whether you got enough

19  water we just have to add this water you took out to the water

20  that you didn't take out, and now do you have enough?"   I think

21  you have to do that.

22      MR. VEEDER:   Then you credit us with what we salvaged,

23  with what we did take out.

24      THE COURT:   Yes, you would be credited with that.

25      I think in fairness you would say, "Well, you say, 'We

1   don't have enough water.' What has happened?"

2   "Well, we are using 6,000 acre feet in the watershed,

3   we are using 4,000 outside, and we are bringing back 2."

4   I think a Court would have to say, "You had 10,000 acre

5   feet of water.  I don't think the bringing back enters into

6   it.  You had 10,000 acre feet of water.  If you had used this

7   all in the watershed, are you still short?"  And if you are

8   still short, then of course you can't get away from the fact

9   the Court can't say to people upstream to cut down the use of

10   water so you can export water out of the watershed.  There is

11   just no argument about that.

12   MR. VEEDER:  We have 10,000 acre feet of water, 4,000 of

13   which is being exported, but we are bringing back 2,000, and

14   we say, "We need to have released to us from up above 4,000

15   acre feet of water."  You say, "Well, you are exporting 4,000."

16   I say, "Yes, but we are bringing back 2,000."  So as a matter

17   of fact we shouldn't be penalized more than 2,000 acre feet.

18   Isn't that right?

19   THE COURT:  In other words, you have 2,000 acre feet net

20   that you are improperly using.

21   MR. GIRARD:  The thing that bothers me on this whole

22   thing, the example that Mr. Sachse gave and that Mr. Veeder

23   discussed, I don't think you could require Fallbrook or any

24   riparian upstream to release one drop of water to the United

25   States to secure riparian needs until they abandon their

1    exportation outside the watershed.  It is not a question of

2    credit.  If they are using it illegally and Fallbrook is using

3    it illegally, you can't by a set of credits charge Fallbrook

4    and at the same time the United States continues to use it

5    unlawfully.  I think you have to say to the United States,

6    "Stop using it illegally," and once they stop using it illegal-

7    ly you say to Fallbrook, "Release the amount of water required

8    to satisfy their uses within the watershed."  But I don't

9    think you can allow the United States to pump 4,000 acre feet

10   out and only charge them with 2,000, because they are bringing

11   2,000 back, and say to Fallbrook, "You release 2,000," because

12   in that situation you would have Fallbrook releasing 2,000 and

13   the United States exporting it.  I don't see how you can do

14   that.

15        MR. SACHSE:  Mr. Girard has stated it far better than I

16   have.  That is the whole point I am trying to make.

17        To state this in another simpler way -- and this is the

18   critical problem that confronts the Navy, I know this, in view

19   of your Honor's rulings -- so long as an illegal use continues,

20   the remedy of injunction against the upstream owner, whether

21   he be a riparian or an appropriator, is gone to the Navy.  That

22   is what is hurting them today.  That is why there is this

23   conference on a physical solution in Washington.  So long as

24   the illegal use continues they can't enjoin anybody.

25        MR. VEEDER:  No.

18,675

1    MR. SACHSE:  That is my understanding of the law.

2    MR. VEEDER:  Don't interpolate as to whether or not these

3    conferences are in regard to injunction.

4    MR. SACHSE:  I may be wrong.  I don't know.  But the

5    point is that so long as the illegal use continues there

6    injunction is gone.

7    THE COURT:  This has been sticking out in this case from

8    the very beginning.  How the Government could ever come in and

9    seek a release of water upstream to them when they were taking

10   water out of the watershed -- this has been sticking out of

11   this case from the very beginning, and I don't know how, in

12   equity, you could tolerate exportation and still require that

13   other people let water come down to satisfy its need.

14   What about their appropriative right at Lake O'Neill?

15   MR. SACHSE:  To that extent.

16   THE COURT:  That water.  And I suppose there could be a

17   substitution, could there not?

18   MR. VEEDER:  You can certainly export that.

19   THE COURT:  You could export the water stored in Lake

20   O'Neill.

21   MR. VEEDER:  To the full extent of their right.

22   THE COURT:  Yes.  But could there be a substitution?

23   MR. SACHSE:  I don't know that they can export it, your

24   Honor.

25   MR. GIRARD:  They can change their place of use from Lake

1   O'Neill, provided that the change does not adversely affect

2   anyone who has obtained a vested right between the time of

3   their original right and the change.

4   MR. VEEDER:  Then how could anybody except a downstream

5   user be adversely affected?

6   MR. SACHSE:  Very simply, Mr. Veeder.  As I understand

7   the situation, from the rate you put it in Lake O'Neill and

8   you recharge your basin -- in other words, the actual drain

9   on the stream by the use of Lake O'Neill would be substantially

10  less under the present situation than if you took it out of

11  the watershed.

12  MR. VEEDER:  To the extent maybe of some recharge from

13  that.  But from the standpoint of the water actually impounded

14  and from the standpoint of evaporation loss there would cer-

15  tainly be no increased burden on the stream by reason of the

16  exportation of all the O'Neill water.

17  MR. GIRARD:  If that is true, then, certainly you could

18  do it.

19  MR. SACHSE:  I don't think that is correct.  The rule

20  that Mr. Girard stated is very clearly set forth in the Water

21  Code of California, and it is to the effect that the change

22  of place of use of an appropriation can be made, provided that

23  it does not adversely affect the junior appropriator.  So

24  Fallbrook is a junior appropriator.  One of the first rules

25  that the Water Rights Board put on our permit was that we must

maintain the level at a safe level in the basin for the riparian needs of the Navy. Now forget the device of Lake O'Neill for a minute. Suppose they ran this into steel tanks and took it out and pumped it and never let it go into O'Neill Ditch. Wouldn't that adversely affect Fallbrook as a junior appropriator? Wouldn't that take away water that recharges the basin? Of course it would.

MR. VEEDER: I just got through saying, Mr. Sachse, to the extent of the seepage.

THE COURT: To the extent that there was seepage out of Lake O'Neill into the basin, to the extent that water was released out of O'Neill to charge the basin, then of course you meet yourself coming back on that. In the appropriative right to O'Neill it was to store, and I don't know that their appropriative right has a tag on it that you must release that water to recharge the basin.

MR. GIRARD: Just beneficially use. I think that is the stipulation.

MR. VEEDER: That is right.

THE COURT: But to the extent that you can't claim that this water had to be released to recharge the basin, and to the extent that there was seepage, you might, as a junior appropriator, complain. But it would seem to me only to that extent. How could you be hurt otherwise?

MR. VEEDER: That is right.

1    MR. SACHSE:  I am not quite sure now, and I don't have

2    before me the Lake O'Neill judgment that we stipulated to, so

3    I am not prepared to trust my memory sufficiently.  But I

4    believe that the O'Neill appropriation of the United States

5    was an appropriation for military, recreational and recharge

6    purposes.  That is my recollection of this thing.  If that is

7    the case, then they can't export it.  In other words, it

8    operates just as Colonel Bowen operated it last year when we

9    ran into trouble.  He explains that he habitually lets the

10   water out, sometimes in a slug, sometimes more gradually if he

11   wants it to go in, and he hopes to recover it the following

12   rainy season.  That is the technique.  As I say, I don't have

13   the judgment and my memory can't be wrong, but I am of the

14   opinion that the appropriative right was for recreational,

15   military and recharge purposes.  Let's look it up and see.

16       MR. VEEDER:  What we obtained and what was declared to

17   us was an appropriative right to which we succeeded from the

18   Rancho Santa Margarita, and I will have say that I want to

19   check that again because, so far as we are concerned -- and I

20   am certainly going to check what Mr. Sachse said -- we ac-

21   quired from Rancho Santa Margarita an appropriative right,

22   and that appropriative right, so far as we are concerned, so

23   long as it doesn't increase the burden upstream against vested

24   rights can be used anyplace.

25       MR. SACHSE:  If the only right you had is exactly the

1    type of appropriation use that Rancho Santa Margarita had,

2    then any export clearly would injure Fallbrook, because the

3    whole Santa Margarita use, as the testimony clearly explains,

4    was for downstream irrigation and for use within the watershed.

5        MR. VEEDER:  An appropriative right can be used anyplace

6    so long as it doesn't increase the burden on the stream.

7        THE COURT:  But the point they make is that to the extent

8    that 1200 acre feet of water is released and goes into your

9    basins, into your alluvium, to that extent 1200 acre feet

10    would not be required from above to fill the alluvium.

11        MR. SACHSE:  That is my point.

12        MR. VEEDER:  But we have the provision, in addition, that

13    for all evaporation losses and for all seepage losses, in

14    addition to the 1200, there is certainly a net.  The right of

15    Lake O'Neill runs around 1800 acre feet, upward of 2,000 as

16    a matter of fact, on the basis of the record, and I am certain --

17        MR. GIRARD:  1100.

18        MR. VEEDER:  Plus the agreement that we would have a right

19    for evaporation and seepage loss during the summer.  The

20    evaporation losses run around 500, and the seepage about 300.

21        MR. GIRARD:  Anyway, on this point whether they can take

22    that out or not, Mr. Veeder and Mr. Sachse both agree that

23    they can do it, provided they would not adversely affect the

24    upstream people.  So I think that issue would have to be

25    decided when the issue is apparent.  I don't know whether they

1   would or not, although my present recollection is that the

2   present stipulation was as Mr. Sachse said; and if that is

3   correct, I think the United States, for example, recreational

4   use or military use, might not require any releases into the

5   basin.   I would have to look at it, Franz, but I think the

6   stipulation provided that they could use it for essentially

7   beneficial purposes, including military and recreational.

8       MR. SACHSE:  Let's read it.

9       THE COURT:  Let's draft some language on these problems

10   we have been talking about and see what it looks like.  Who is

11   going to try their hand at this?

12       MR. GIRARD:  I will, if you want me to, your Honor, or

13   if Mr. Veeder feels like I shouldn't even do it.

14       MR. VEEDER:  As far as I am concerned, I would like this

15   broken down so that we can have it allocated between within

16   and out of the watershed.   I am interested in this Lake

17   O'Neill water.  I'll be glad to take a crack at it, your Honor.

18       MR. SACHSE:  Mr. Girard just made a remark that is very

19   pertinent, your Honor.  I don't think Lake O'Neill ought to be

20   in this at all.   If this requires a change, we have a separate

21   judgment.  Let's fix up the O'Neill judgment, not conflict

22   with it.

23       THE COURT:  We injected that in here, and as to O'Neill

24   we might as well let it lay.   I think you are both agreed on

25   the law that the point of use can be changed as long as it

13,681

1   does not affect an upstream user.  Let's cross that bridge

2   when we get to it.  We may never get to it.

3   ‐     Do you think that would be a fair way to look at the

4   O'Neill problem?

5        MR. VEEDER:  I think certainly with the present judgment

6   entered the best thing to do is to --

7        MR. GIRARD:  You have a statute in the Water Code that

8   expressly provides it, so you don't need a finding on it since

9   the law is clear.

10       MR. VEEDER:  Yes.

11       THE COURT:  Mr. Veeder and Mr. Girard, work on it.

12       MR. VEEDER:  Talking about conclusions of law which would

13   be a companion with Finding No. 14, I think Finding 14 should

14   be revised to reflect sewage use within and without the water-

15   shed and water uses within and without the watershed, also

16   the question of salvage through removal of phreatophytes.

17       MR. GIRARD:  You don't think the detailed findings as to

18   conservation and the points of discharge and the percentage

19   figures are sufficient?  You want more detailed findings on

20   this problem of water conservation practices?

21       MR. VEEDER:  I'll undertake to write it.

22       THE COURT:  He wants it broken down on in and out.

23       MR. GIRARD:  Isn't it?

24       MR. SACHSE:  We have them except they are blank, because

25   we didn't know how much.

18,682

1    THE COURT:  You may want something more, Mr. Veeder.

2    MR..VEEDER:  Yes, I will.

3    THE COURT:  I see you have O'Neill tossed in here.

4    MR. SACHSE:  We mentioned O'Neill repeatedly in the

5    judgment.  We also referred to it in No. 24, whatever it is,

6    that it is the O'Neill judgment.

7    MR. GIRARD:  This is the finding I redrafted after Mr.

8    Veeder wanted something more on the water conservation policies.

9    I would be happy to leave it out entirely.  I thought it was

10   a water conservation policy and that is why I stuck it in here.

11   Do you want it out?

12   MR. VEEDER:  I would like to take it out.  Go to line 29,

13   "that in addition to the return of waste effluence . . " --

14   take out that reference.

15   THE COURT:  All right, let's look at 15.

16   MR. VEEDER:  No. 15 is not correct from the standpoint of

17   releases of sewage effluent into the stream.  It says, on lines

18   8 and 9, "that during such times when there is no surface flow

19   but only surface flow at those points where the waters rise to

20   the surface, then disappear and rise again, said surface waters

21   are in fact the ground waters . . "  To a marked degree that

22   is sewage effluent we have flowing in the stream.

23   MR. SACHSE:  Isn't it also in contact with the ground

24   waters?  Is it flowing along the top with a vacuum inbetween?

25   MR. VEEDER:  You are injecting something in there, again,

18,683

1    that I am not talking about at this point.  ". . that during

2    such times when there is no surface flow but only surface

3    flow at those points where the waters rise to the surface,

4    then disappear and rise again, said surface waters are in

5    fact the ground waters . . "  In fact, where they rise it is

6    sewage effluent at the present time.

7         MR. SACHSE:  What was the sewage effluent except ground

8    waters?  That is all it was.  It came out of the ground, it

9    is going through a sewage process, and it is back in again.

10        MR. VEEDER:  If we are going to say the sewage effluent

11   is ground waters, you have injected something new.

12        THE COURT:  For one thing, on line 9, "such times when

13   there is no surface flow," you mean no surface flow throughout

14   the course?

15        MR. GIRARD:  Yes; no perennial surface flow.

16        THE COURT:  You say "no surface flow but only surface

17   flow at those points . ."

18        MR. GIRARD:  It should be "no perennial".

19        THE COURT:  I don't know whether it is perennial.  There

20   is no surface flow throughout the course of the river.

21        MR. GIRARD:  All right.

22        THE COURT:  But only surface flow at points where the

23   water rises to the surface.

24        As far as this sewage effluent is concerned, it would be

25   a simple way to solve it merely to add that the situation is

1   further affected by the fact that at such and such a point

2   sewage effluent is returned to the stream and mingles with the

3   other water.  Is there a continual stream of water from the

4   time the sewage effluent is dumped back in, and for how long,

5   and how long a distance?  How long does it take for this to

6   get back into the ground?

7   COLONEL BOWEN:  A very short distance, your Honor.  For

8   example, Sewage Treatment Plant No. 3 at the lower end of the

9   industrial area discharges the effluent through a channel,

10  where it is retained behind one of our pond channel spreading

11  dams and that is as far as it goes -- a very few hundred yards,

12  the pond behind the spreading structure.

13  THE COURT:  There is no surface water in the stream below?

14  COLONEL BOWEN:  None, sir.

15  Another example, our sewage discharge from our biggest

16  plant, No. 1, which is in the 14 area outside the watershed,

17  effluent is pumped back into the watershed and discharged

18  either into Lake O'Neill or bypasses Lake O'Neill, and if it

19  bypasses Lake O'Neill it seeps into the gravels in a very

20  short distance in the upper basin.

21  Similarly, Plant No. 2, which discharges sewage effluent

22  over into the channel in the Ysidaro Valley, the effluent

23  disappears into the sands in the stream channel in a very short

24  distance.

25  THE COURT:  Couldn't we say something like this and just

1  add it to this matter?

2      MR. GIRARD:  All right.

3      THE COURT:  Would that satisfy you, Mr. Veeder?

4      MR. VEEDER:  My own thought on the matter is, your Honor,

5  that if we could take out starting out with "that" on line 8,

6  down through "deposits" in line 13.  I don't believe it adds

7  anything, does it?

8      MR. GIRARD:  I think it adds a great deal.

9      THE COURT:  I want it in there.  It shows the nature of

10  these dry streams, that you only get surface water when you

11  have water in the alluvium beneath to support the surface flow.

12      MR. VEEDER:  Then my thought is that we should enter the

13  substance of Colonel Bowen's statement in regard to sewage

14  effluent and where it enters and what it does.

15      THE COURT:  All right, add it on.

16      MR. GIRARD:  I'll be glad to do that.

17      THE COURT:  16.

18      MR. VEEDER:  Mr. Girard, may I inquire as to what difference

19  -- I'll start again.  Isn't there repetition between Finding

20  No. 11 and No. 16?

21      THE COURT:  Let's start using arabic numbers, too.  We

22  will have a lot better luck.

23      MR. VEEDER:  I am not being critical of it.  I don't know

24  that there is a reason for --

25      MR. GIRARD:  It is certainly repetitious, Mr. Veeder.

1   MR. SACHSE:  The fundamental difference is that 16 is

2   the first time where it expressly states "bed and banks," Mr.

3   Veeder.  No. 11 does not.

4   MR. VEEDER:  If that is all that it is.  Because I read

5   them back the other night.  I don't know what it is offered

6   for.

7   MR. GIRARD:  I followed the same form that I followed in

8   Murrieta, except for the use of "consolidated rocks" as con-

9   trasted with "older alluvial deposits;" and I think in there

10  they were set forth twice, too, and the one was, as Mr. Sachse

11  pointed out, the finding where I tied in the bed and banks,

12  where the other was just more general geology.

13  There is a good deal of repetition.

14  MR. VEEDER:  I was just inquiring if there was some reason

15  for it.  I didn't know.

16  THE COURT:  The repetition would be the least of our

17  problems.

18  17.

19  MR. VEEDER:  If I understand, your Honor has asked that

20  we prepare or set out in detail the description of the basins

21  based upon some of our recommendations, at least, on page 13.

22  Wouldn't that be repetitious there, too, Mr. Girard?

23  MR. GIRARD:  As I understood your page 13, that more or

24  less is a description of the three general subunits within

25  the whole younger alluvial deposits.  I have no objection at

1    all to trying to depict in language that U.S. Exhibit 39

2    shows the depth of the younger alluvial deposits, if you want

3    to do it that way.

4         MR. VEEDER:  I am just raising a point that in regard to

5    the revisions that have been approved by the Court, the fac-

6    tors that are included in 17 have already been covered.

7         MR. GIRARD:  I was not planning on 13, in discussing

8    the general area of the Chappo Basin et cetera, and the general

9    physical factors on the ground, on going into the depth of

10   the younger alluvial deposits in that particular finding.

11   Frankly, I think referring to U. S. Exhibit 39 on the depth

12   of this younger alluvium is sufficient.  I don't know.  What

13   do you do?  Will you just interpret it in language and say

14   that at the upper end it appears to be 120 feet and in another

15   section it is down 125 feet?  I think the exhibit speaks for

16   itself.

17        MR. VEEDER:  I will have to say that this is the first

18   time I have ever written findings where you incorporate by

19   reference the exhibits.  I thought you summarize in the find-

20   ings the content of the exhibits and the testimony.

21        MR. GIRARD:  We have incorporated exhibits and maps in

22   everything we have done.

23        THE COURT:  If you want to put in a little general

24   language, but you should then still say "as more particularly

25   described," because you couldn't in three pages put everything

18,688

that is on one of those exhibits.

MR. VEEDER:  I think you can summarize a great deal more than just incorporating exhibits, your Honor.

THE COURT:  If you want to summarize briefly as to some of the depths, but then say "and as more particularly described on Exhibit 39".

Well, we have been going quite a while.  Let's take the morning recess.

MR. VEEDER:  May I inquire about this afternoon, your Honor and tomorrow?  What are your Honor's plans?

THE COURT:  I couldn't get through/those fellows last night.  I worked here until 5:15.  They just don't want to quit.  So they are coming back at 2:00 o'clock.  I wouldn't think we would get much done this afternoon, if I get them out of here.  I will get them out of here this afternoon, I'll guarantee you that.  So we will start tomorrow morning.

MR. GIRARD:  I would like not to be here, your Honor.  I have to argue a case in the Supreme Court of California on this sovereign immunity statute on Monday and Tuesday and I would like to do a little work on it Friday at Sacramento, if I could.

MR. SACHSE:  I would prefer, not that I don't want Mr. Girard's help, but we are very obviously at the stage in the work where it is not at all final and another draft is going to have to be made, and if Fred will trust me for whatever

18,689

1     we do tomorrow to pick up those portions of the redraft, I

2     think we can keep on going.

3         THE COURT:  All right.

4         MR. GIRARD:  I understand that the following week Mr.

5     Veeder has to be in San Franciso on Monday and Tuesday, and I

6     do, too.  I can be here on Wednesday and Thursday.

7         THE COURT:  We will go to Wednesday, then.

8         MR. VEEDER:  Then the next week you will be busy, you

9     said.

10        THE COURT:  I will be busy.

11        (Recess.)

12        MR. VEEDER:  Your Honor, you asked me to prepare some

13     language in regard to the A Series respecting surface waters

14     (handing document to the Court).

15        THE COURT:  The final clause, by that you mean the final

16     paragraph.

17        MR. VEEDER:  Yes, your Honor.  Do you want that changed

18     to "paragraph"?

19        THE COURT:  I suppose that is better.

20        Then you renumber the last paragraph.  The last one is

21     the fact that it is not final and may be objected to, et

22     cetera.

23        MR. VEEDER:  That is right.  Here is the form (handing

24     document to the Court).

25        THE COURT:  Do all of them have the same number series?

18,690

Do they all run six findings?

MR. VEEDER:  I'll go through each one of them.  I was just concerned about the language.

THE COURT:  This one does, but I don't know -- this one has five conclusions.

MR. VEEDER:  If there is any variance in any of the forms, we will of course correct them from the standpoint of numbers. But my own view was that we should have the tendered paragraph in the decree ahead of the final paragraph as written, what-ever the number is.

THE COURT:  It looks all right to me.  What do you think?

MR. GIRARD:  I think it's all right.

MR. SACHSE:  I think it's all right, your Honor.

THE COURT:  Let's check and see if our numbers run the same, so that we can do it all in one amendment.

MR. VEEDER:  All right.  There is no objection to them.

THE COURT:  Where are we, down to 18?

MR. GIRARD:  I think we are on 18, yes, your Honor.

THE COURT:  Any objection to 18?  It looks all right.

MR. GIRARD:  I would like to ask, your Honor, on some of these I drafted these findings in the light of the evidence as I understood it.  If they are factually wrong, I would like the Colonel or Mr. Veeder to point it out.  It was my under-standing that all these wells were in the younger alluvium.

MR. VEEDER:  I have checked back, and the presently

11 fls.

1   producing wells -- Finding No. 18, line 20, Colonel -- as I

2   understand it, the presently producing wells, although there

3   were some wells that went into the La Jolla formation, the

4   presently producing wells, as you use the term, are in the

5   younger alluvium, as I understand.  That is correct.

6       THE COURT:  Let's look at 19.

7       MR. VEEDER:  We are going to ask for a finding, your

8   Honor, in regard to the need to maintain a hydrostatic head

9   to repell salt water intrusion.  There is a reference to salt

10  water intrusion later on, but we are at the point in 19 when

11  we are discussing water elevations, and I would like to tender

12  the thought that we want a finding that it is a beneficial use

13  to maintain a hydrostatic head at least five feet above mean

14  sea level for the purpose of preventing intrusion of salt

15  water.  Isn't that correct?

16      MR. GIRARD:  I think it is true.

17      MR. SACHSE:  I have no objection to that.  I have a

18  question about 19, though, I wanted to ask Mr. Veeder or

19  Colonel Bowen.  I don't like the language in the first line

20  on page 11 "do in fact stand at or about".  This is going to

21  be a date, I guess, in February 1962.  The figure 135 feet,

22  Colonel Bowen, we took from your isopac maps, whatever the

23  date was.  It is about three years ago.  I think it would be

24  more accurate to state, since I don't think the Colonel is

25  prepared -- if he is prepared to tell us what they do stand

at, I think we should reflect the date on these measurements, that in May 19 -- whatever it was the level stood at or about, because I don't know what it is today.

MR. VEEDER:  It is a fluctuating figure.  That is what I am leading up to.

MR. SACHSE:  Saying on or about such or such in May whatever year it was you drew those exhibits.

MR. VEEDER:  Which ties to the whole proposition that we have put in evidence that the storage capacity of the Coastal basins was 48,000 acre feet, that 25,000 acre feet of that was usuable storage, and that we had to maintain at least 8,000 acre feet minimum to keep a hydrostatic head.

MR. GIRARD:  I want to ask you on this hydrostatic, Mr. Veeder -- maybe I don't quite understand it -- it is important, is it not, in maintaining the hydrostatic head at the bottom, not at the top?  In other words, you don't have to keep the water up there going in at the top of the basin.  You can put it in at the bottom like you are doing now with your sewage.

MR. VEEDER:  Well, hydraulic barrier is what we have been talking about.

MR. GIRARD:  But the barrier is at the seaward side of these younger alluvial deposits where it should be a figure of 5 feet down there.  It doesn't matter whether you run it all the way through the younger alluvium or whether you take it out by the sewage treatment the way you work it now and put

1   it back in, as long as the head is maintained.  But the head

2   can be maintained by a diversion right into the bottom and not

3   necessarily has to be maintained by putting it in up, say,

4   at the head area of the younger alluvial deposits.  Maybe I

5   am wrong, but is that true?

6       MR. VEEDER:  I would rather have Colonel Bowen answer

7   that question.

8       Is that correct?

9       COLONEL BOWEN:  If I understand Mr. Girard correctly,

10  your Honor, he used the word "diversion;" it would be by

11  discharging water in the Ysidaro Narrows we can maintain the

12  hydraulic barrier which will prevent intrusion of sea water.

13      MR. GIRARD:  It is not necessary to put the water dis-

14  charged in up at De Luz Creek.

15      THE COURT:  The situation is like this.  There is a

16  hydraulic gradient coming down through these basins and you

17  have the head down at Ysidaro.  As long as you pump any of

18  the basins above below this level so that there was a reverse

19  flow, you would still have your head, wouldn't you?

20      COLONEL BOWEN:  Yes, your Honor.

21      MR. VEEDER:  But the thing I am shooting for and the point

22  that I have raised is that I would like to have a conclusion

23  of law that as a matter of fact it is a burden on the Santa

24  Margarita River upstream from the standpoint of fresh water

25  being down there to create that hydrostatic head.

1     MR. SACHSE:  I wouldn't quarrel in the least.  The Water

2  Rights Board could insist, no doubt about it, that maintainance

3  of an adequate fresh water barrier is the first essential on

4  the upstream users.

5     THE COURT:  What did you say was your total capacity?

6     MR. VEEDER:  48,000 acre feet, your Honor.

7     THE COURT:  25,000 usuable?

8     MR. VEEDER:  Yes, your Honor.

9     THE COURT:  And what is this 8,000 acre feet?

10    MR. VEEDER:  You would have to have 8,000 acre feet, as

11  I recall.  I will have to check the record.

12    THE COURT:  Down at the Ysidaro Basin?

13    MR. VEEDER:  Down in the Ysidaro Basin.

14    THE COURT:  To make the barrier?

15    MR. VEEDER:  To make the barrier, that is right.

16    MR. SACHSE:  Before we leave this, because I am not sure

17  I have made myself clear to Mr. Veeder and he is going to be

18  rewriting, my suggestion is, Mr. Veeder, that on line 1 on

19  page 11 we say that in May 1958 or whatever the date was it

20  in fact stood at or about 135 feet.  The exhibit to which I

21  refer is not your exhibit of ground water capacity.  It is

22  the exhibit showing ground water contours.  I don't know

23  whether they are the same year.

24    MR. VEEDER:  The point I was going to raise on that as

25  to the appropriateness of such a finding, in view of the fact

that the levels do fluctuate, and when you say 135 feet -- I

will read the sentence to which I am directing my attention:

"that said exhibit shows in essence that the ground water

levels within said area of the younger alluvial deposits do

not stand at or about the same levels but do in fact stand at

or about 135 feet above mean sea level on the date that the

exhibit was prepared."

MR. SACHSE:  The important thing I am interested in is

the rest of it "and thence follow an approximately even down-

ward gradient for the entire length of said younger alluvial

deposits to an elevation of approximately five feet above

mean sea level" where it enters the ocean.

MR. VEEDER:  Which would not be correct if you pumped

down Chappo and Upper Basin, putting the burden on Chappo and

the Upper Basin.  The ground water contours would go down as

you dewatered and would rise again as you recharged.

THE COURT:  You could say that in just so many words,

if you want to -- there is no question about it -- that Chappo

and the areas which have been spoken of, as Chappo Basin et

cetera are excessively pumped they decrease.  I don't think

we should have any trouble on this one.

MR. VEEDER:  If you want to see some tendered thoughts

in regard to my proposed findings on page 17, I will write

language as to storage capacity.

THE COURT:  Which finding?

1    MR. VEEDER:  Page 17, Part 2.

2    THE COURT:  What line?

3    MR. VEEDER:  Start on 9, page 17.  You may not like the

4  way I start out, but if you drop down to line 15 you will find

5  the capacities as to each.

6    MR. GIRARD:  I have no objection to using the capacity

7  figures that were introduced in the evidence of the United

8  States in this case.  But do you want to say based on present

9  knowledge, Mr. Veeder, or do you want to tie yourself down

10  forever by these findings?

11    MR. VEEDER:  I think if there was a change in circumstances

12  what you would do is introduce evidence to show changed condi-

13  tions.

14    MR. GIRARD:  Yes, but I think then you would have -- there

15  is a different type of finding.  This is a finding of a physical

16  fact.  If you find a physical fact, as you have found, which

17  is apparently based on the record in this case and probably

18  is correct, that the total storage capacity et cetera -- that

19  is a finding of fact.  I am not sure you can show that by

20  showing a change in condition, because what change in condition

21  would occur?  There might be some change in knowledge.

22    MR. VEEDER:  The only way I would know how it would be

23  changed -- and this is a fact they talked about at one time --

24  they talked about putting a concrete barrier at Ysidaro Basin

25  to cut off sea water intrusion, which would increase your

1  usuable storage capacity.

2      Would it not, Colonel?

3      COLONEL BOWEN:  Yes, sir.

4      MR. VEEDER:  So we might put in there "under existing

5  conditions and based on the evidence in the case".

6      MR. GIRARD:  I don't care whether you want to be bound

7  forever on it.  I would be a little touchy on it.

8      THE COURT:  That would be better.  And you can somewhere

9  put in the general introductory clause that although the Court

10  has found that this is a streambed running down between the

11  consolidated rock, that for purposes of convenience the areas

12  in the streambed have been referred to in these findings as

13  the Upper Chappo and Ysidaro Basins and the Court does not

14  find that they are basins as such but that they are units in

15  this stream system, et cetera.  Then you can go ahead and use

16  the names and put in the figures.

17      Tell me -- I have forgotten -- how does it happen that

18  if you have 48,000 acre feet on your calculation there, that

19  only 26,000 would be usuable?  Of course, I understand the

20  situation at Ysidaro.  But in the other two basins -- you don't

21  have the figures on the capacity there of Upper and Chappo.

22      MR. VEEDER:  What they did on that, your Honor, the

23  evidence that wen t in showed a usuable capacity of the water,

24  the saturated alluvium -- in other words, the Marine Corps has

25  made a determination that it would be unprofitable to pump

1   below a certain depth, and that was the reason that that

2   conclusion was arrived at.  There is greater depth and there

3   is considerably more yardage of alluvium in there, but you

4   couldn't operate nearly efficiently.

5       MR. SACHSE:  What did he take, Colonel?  The top 50 feet?

6       MR. VEEDER:  No, Mr. Worts, I think, took the top 100 feet.

7       COLONEL BOWEN:  From minus 5 feet below ground surface to

8   sea level.

9       MR. SACHSE:  Is that the depth he used in calculating

10  the 25,000?

11      COLONEL BOWEN:  Yes.

12      THE COURT:  Oh, he went clear to sea level.

13      COLONEL BOWEN:  In the Upper and Chappo Basins, only,

14  your Honor.

15      THE COURT:  Is there alluvium in those upper basins below

16  sea level?

17      COLONEL BOWEN:  Yes, your Honor.

18      THE COURT:  I didn't remember that.

19      COLONEL BOWEN:  Yes, sir.

20      MR. VEEDER:  Would you want to take a look at Exhibit 38,

21  your Honor?  I'll show you.

22      THE COURT:  All right.  I have it.  Certainly in Chappo

23  Basin there is a terrific area there.  He has it in the Upper

24  Basin, too.  Were there ever any figures on what it would

25  cost to put that so-called dam across as a barrier?

1   MR. VEEDER:  I have heard it discussed.  I don't recall

2   the figures.

3   COLONEL BOWEN:  You say the cost, your Honor?  The State

4   of California made some estimates and figured it could be done

5   for around a million dollars.  But actually nothing of that

6   nature, of that depth I should say, has been put in.  Some

7   similar membranes have been constructed elsewhere to a depth

8   of about 60 feet.

9   THE COURT:  Here you would have to go 200 feet?

10  COLONEL BOWEN:  220 feet, sir.

11  THE COURT:  Yes.  All right, I understand.

12  There is no problem about No. 20.

13  MR. VEEDER:  May I inquire as to the course that we are

14  going to pursue in regard to 19?  You want that rewritten

15  and you want the gist of this exchange written into it.

16  THE COURT:  Yes.

17  MR. SACHSE:  The only question on No. 20, your Honor, is

18  whether Mr. Veeder still wants to work with exhibits delineat-

19  ing riparian lands or whether in that description he is going

20  to give us he is going to try to describe them some way and

21  refer back to a legal.

22  MR. VEEDER:  I thought it was decided that we make our

23  references to the record.

24  MR. SACHSE:  And then you don't have to have the exact

25  legal.

MR. VEEDER:  I would like to avoid putting in the description.

MR. GIRARD:  Fine.

THE COURT:  21.

MR. SACHSE:  We had some brief discussion yesterday with Mr. Veeder, your Honor, about the necessity or desirability of including these actual use figures.  As far as I am concerned, and I think Mr. Girard agrees, I do not feel that the finding needs to be this lengthy by having the tabulation that appears on page 12, unless we want it for some reason.  But we have put it in simply so it is here for our discussion.

THE COURT:  Well, it is a pretty important problem.  It sticks out of this case from the beginning, this use outside the watershed and what we are going to do about it.

MR. SACHSE:  The question I think Mr. Veeder raised, and I would like to hear his comment on it, is whether or not this necessarily sets a pattern -- I forget how you put it, Mr. Veeder -- that it is required from now on that in all these judgments we put in use figures.  The problem is that we don't have use figures on a lot of people.

MR. VEEDER:  I will start again on that proposition, because I would like to make myself clear on it.  The question of water uses came up in regard to the Vail Findings and I asked that they be brought to date to the end that we know the quantities used by Vail in 1959, '60 and '61.  As I recall

1    your Honor's answer, you said that you would not require the

2    production of those figures, to which ruling I objected, and

3    I repeat the objection now.  In other words, in regard to

4    quantities of water, if they are relevant in regard to the

5    United States, I think they are relevant in regard to Vail,

6    I don't agree with Mr. Sachse on the proposition that the fact

7    that other people didn't put in their quantities would elimi-

8    nate the introduction of quantities by us.  Mr. Sachse put in

9    his quantities.

10        MR. SACHSE:  I am glad to have them in.

11        MR. VEEDER:  Let me go ahead.  We are confronted with a

12   difficult problem, and it relates to a great number of people.

13   They didn't come in and show the quantity of water they were

14   using, the extent of their demands, or anything else.  I don't

15   believe the United States should be prejudiced by reason of

16   the failure of proof of other parties.  But if your Honor is

17   going to put in findings in regard to uses -- and I truly think

18   they are requisite -- I think they should be put in to the

19   extent that the evidence will support them.

20        MR. SACHSE:  That is okay.  That is perfectly all right

21   with me.

22        THE COURT:  We don't have evidence as to uses throughout

23   the watershed.

24        MR. VEEDER:  We have, for example, indications as to

25   acreages that were irrigated.  We have some evidence along

18,702

those lines.  But the fact remains that a lot of people didn't

undertake to prove those facts.  The United States shouldn't

be prejudiced by that fact.

MR. GIRARD:  How do you feel you are being prejudiced?

MR. VEEDER:  I'll be frank with you.  I think that in

the ultimate disposition of this case the matters of water

demands is important.  I think historic uses become important,

because for example, the uses by the United States are very

short of its demands because of the supply of water.

THE COURT:  The only thing that I am interested in here

-- and if we are going to put in one we might as well put in

both -- is the use outside the watershed.  I think these

findings should show -- no use hiding our heads in the sand --

that one of the problems you have had in this case ever since

you took it over was the fact that this water was used outside

the watershed, and it is something apparently you are going to

have to live with.  You might as well have it in here and let

your superiors know that this amount of water was used outside

the watershed and this amount within the watershed.  It is in

for a different purpose than putting the amount of the uses

by all the other owners.  That might come in on some apportion-

ment matter.  But it really wasn't an issue in the case.

MR. GIRARD:  These figures on the use without the water-

shed is important in conjunction with the testimony of water

taken out, also to show the effect that the pumping outside

1   the watershed has had on the basins.  I presume that somewhere

2   along the line if some engineer wanted to find out if  the

3   exports outside the watershed had resulted in less water today

4   being in the younger alluvial deposits than there would be if

5   the exports had not occurred, would these figures be relevant

6   on that issue?  I don't know what the determination would show.

7   But if the question came up as to how much water was in the

8   younger alluvium today to show that the water in the younger

9   alluvium today would have been more if the pumping outside the

10  watershed had not occurred, these figures would be relevant.

11  Whether these figures and the other return flow figures would

12  support the finding that they were more I don't know.

13      THE COURT:  Let's leave them in.  Except you have to

14  identify that they are acre feet.  You say the following

15  amounts and nothing is said about acre feet.

16      MR. VEEDER:  Then your Honor, I think it becomes signifi-

17  cant as to the quantity of water Vail Company has used, and

18  we would ask your Honor to change his ruling on it.

19      THE COURT:  They are in for a different purpose.

20      MR. VEEDER:  No, your Honor.

21      THE COURT:  Vail Company is not using water outside the

22  watershed.

23      MR. VEEDER:  Vail Company, however, is using water which

24  we, of course, insist upon is subject to the stipulated

25  judgment, and I think when you made your ruling on the

1    proposition you eliminated very important elements from the

2    standpoint of our case as I comprehend.  The reason you are

3    talking about our exportation of water outside the watershed

4    is that the United States is confronted with the most serious

5    problem in regard to its rights and in regard to the maintain-

6    ance of the Camp and I think the whole picture should be dis-

7    closed, if we are going to disclose any of it.

8        THE COURT:  This is for a different purpose.  One of the

9    things -- I will repeat again -- one of the things about this

10   case from the very time you started on it was the use of water

11   outside the watershed and the building of these installations

12   outside the watershed.  This has been a problem.  Suppose we

13   had Vail put down their figures on use.  We don't have all the

14   figures from Roripaugh and the other parties up there in the

15   Santa Gertrudis that use water.

16       MR. VEEDER:  But it is significant from the issues to

17   which I make reference, mainly, your ruling about the stipula-

18   ted judgment and --

19       THE COURT:  What figures do we have from Vail?

20       MR. VEEDER:  We have from Vail that their water uses down

21   through 1958, the waters they have used from 1958 are set forth

22   on their Exhibit N.

23       THE COURT:  To refersh my recollection, what objection

24   did Vail make to bringing it down to date?

25       MR. VEEDER:  As I remember, they simply said that it was

1   irrelevant, and you sustained their objection on that.  I

2   wouldn't want to be held to that.  Objection was made by Mr.

3   Stahlman that he didn't want to bring it up to date, and your

4   Honor said he would not be required to.

12 fls.   5       THE COURT:  I will not pass on it now.  I will take it

6   up with Mr. Stahlman and see if there is any objection to bring-

7   ing it down to date.  Mr. Veeder's point is that in connection

8   with the stipulated ruling and whatever rights the Government

9   claimed it had under the stipulated judgment, it was therefore

10   concerned with Vail's uses and its uses, and in that sense he

11   may have a point.

12       MR. VEEDER:  And our uses outside the watershed.

13       THE COURT:  He may have a point that to have a complete

14   record maybe it should be brought down to date.

15       Raise the question again.  Put it on some agenda and take

16   it up with Mr. Stahlman and let me know about it.

17       MR. VEEDER:  When will Mr. Stahlman be in court?

18       MR. GIRARD:  I don't know.  I saw him day before yester-

19   day and he told me this trial that he is on now will be at

20   least another two weeks.  I don't know when he will be back.

21       MR. VEEDER:  May I go back to page 11, line 24, "that

22   commencing with the water year 1944 the United States of

23   America has annually used waters of the Santa Margarita . . "

24   I would like to put in there that at the time the United States

25   acquired the Rancho  Santa Margarita water was being utilized

1     outside the watershed by the Rancho and what is the problem.

2         MR. SACHSE:  I can't find where you are.

3         MR. VEEDER:  I am on 21.

4         THE COURT:  No, 24.

5         MR. VEEDER:  No.

6         THE COURT:  Page 11, line 24.

7         MR. VEEDER:  Finding 21, line 24.  I think there should

8     be inserted in there that they commenced using water outside

9     the watershed in 1937, that they continued to bring their

10     system down to date and they had full utilization in 1939,

11     and that they were in fact using and pumping the water out at

12     that time.

13         MR. WILKINSON:  Are there any figures for that?

14         MR. VEEDER:  I believe there are and I will check them

15     out.

16         MR. WILKINSON:  I have never seen them.  We should have

17     them, as well as you.  I have not seen them.

18         THE COURT:  All right, if you want it.  Dig up the

19     figures and the record where it appears in the transcript and

20     let counsel see it.  I have no objection to putting it in.

21         MR. GIRARD:  I don't either, as long as we see it.

22         MR. SACHSE:  As long as we clearly spell out the date.

23     You said 1937.  That is my recollection.

24         MR. VEEDER:  They started to build the system in 1937

25     and it was fully completed in 1939.

1    MR. GIRARD:  Is there any evidence as to amounts?

2    MR. VEEDER:  I believe there is, and I will check on it.

3    THE COURT:  All right, let's go to 22.

4    MR. GIRARD:  Line 17, "nor has such use of water  of

5    Santa Margarita River" -- it should be "waters".

6    MR. VEEDER:  Before we proceed any further, I want to

7    interpose this question.  Is your Honor stating that the

8    question of water needs and water demands as distinguished

9    from water uses is unimportant at this juncture?

10   THE COURT:  Are you going back to something?  What are

11   you referring to?

12   MR. VEEDER:  I am looking at 21 and 22 of the findings

13   that we are now reviewing and the breakdown as to use within

14   and without the watershed.  That shows only the pumping outside.

15   Now there is evidence in the record that we have made beneficial

16   use of as high as 5300 acre feet of water in connection with

17   the vegetative cover on the basin.

18   MR. GIRARD:  I am going to object to any vegetative

19   cover being held to be a beneficial use in this case.  That

20   will have to come up on whether it is a reasonable and proper

21   beneficial use on an apportionment proceeding.  Because I

22   doubt very much that anybody could insist upon it being held

23   that vegetative cover was reasonable and beneficial use if

24   there was not enough water to irrigate.  This isn't an appor-

25   tionment proceeding.

1      MR. VEEDER:   I am raising the point because --

2      THE COURT:   What point are you raising?

3      MR. VEEDER:   I am raising the point as to whether we

4   should limit in these findings -- I am just asking for your

5   Honor's ruling on this.  Not as to quantities.  The proposition

6   which I bring up is that we introduced evidence to the effect

7   that the vegetative cover, grasses et cetera, consumed 52-5300

8   acre feet of water.  We take the position that it is a bene-

9   ficial use, that we have grazed livestock on that land, that

10  of course it is a benefit from the standpoint of coverage in

11  the Military Enclave to avoid the basin surface becoming a

12  desert.  To me that is a factor of importance.  It is an

13  element, in my view, that has to be taken into consideration

14  from the standpoint of water demands, water uses and needs.

15  It is an element that I think is important and becomes im-

16  portant in regard to salvage of water.

17      Now, from the standpoint of the United States I would

18  like to have a ruling on that point.

19      I would also like to have a ruling in regard to our

20  agricultural uses which we have very sharply reduced by reason

21  of drouth.  That is an element that becomes important when we

22  consider Fallbrook's demands and uses, assuming that it should

23  build a dam -- which I don't think it ever will.

24      Those are factors I am just asking your Honor to rule

25  on.  I am not asking you to make an adjudication as to

1   quantities, but I will produce quantities, depending somewhat

2   on your ruling.

3       MR. SACHSE:   I think the first and simplest answer is

4   that, to the best of my knowledge, need or demand, to use Mr.

5   Veeder's two words, has never been a criterion in the determi-

6   nation of the existence of a right or what the right is.   The

7   right has nothing to do whatsoever with the need or the demand.

8   As Mr. Girard points out, it might become pertinent between

9   riparians or trying to divide the water on an apportionment.

10  But I think it is utterly immaterial in this proceeding, where

11  your Honor is simply spelling out these rights, to say that

12  under this right the United States made a demand of X acre

13  feet.   That has nothing to do with it.

14      THE COURT:   How would your proposed finding read about

15  this cover?   What is it you would want me to find?

16      MR. VEEDER:   That there are 4600 acre feet, roughly, of

17  basin surface and that the vegetative cover can beneficially

18  use 1.3 acre feet per acre, and that when the basins are full

19  it actually beneficially uses that quantity of water.   I am

20  still talking about the problem that we have of water inside

21  and outside the watershed as it relates to Fallbrook's claims.

22      MR. GIRARD:   When you made your soil surveys on these

23  thousands of defendants, is that listed on that?   When you

24  made your soil surveys of all these defendants, do you list

25  on there the amount of land which is beneficially using water

1  naturally?

2      MR. VEEDER:   I don't think we ever did.

3      MR. GIRARD:   I don't think you ever did either.

4      MR. VEEDER:   The point that I am making is that we did

5  put in extensive evidence on this proposition in regard to our

6  claims, and I think it is a factor of importance for your

7  Honor to rule upon now, because it will show the scope of the

8  case.

9      THE COURT:   The only reason I would consider putting it

10  in at all -- and I want to see how you word it -- would be

11  to let the military and Mr. Ramsey Clark and all know in

12  summary form as much as they can know about this setup. But

13  if you did insert it I would want it coupled with a caveate

14  that this was based upon proof as of that date, and that there

15  is no adjudication of any right and all that sort of thing.

16      MR. GIRARD:   I don't have any objection, your Honor, if

17  you just say that these acreages have consumed so much water

18  from the evidence introduced.  But don't say it is a beneficial

19  use, because it may not be a beneficial use, even under present

20  conditions on the stream today.  In an apportionment proceeding

21  I rather doubt if the United States or Vail Company could

22  demand that someone limit their irrigation or their other

23  uses to allow water to come down to the Navy's vegetation.  I

24  don't know what the Court would rule on that, but I have a

25  little question in my own mind on this stream.

1    THE COURT:  Draw something up and let me look at it.

2    MR. VEEDER:  If Mr. Girard is not going to be here, I

3 would like to put this point in.  It is our view that sub-

4 irrigation of the character to which I have made reference,

5 which is so-called capillary action, certainly is a beneficial

6 use, and vegetative cover -- grass, forage -- grown on a basin

7 surface as against an appropriator, in our view, would be a

8 beneficial use.  And I believe your Honor has seen sub-irriga-

9 tion where native vegetation was raised and livestock raised

10 on it and did very well.

11    MR. SACHSE:  I might agree with Mr. Veeder that sub-

12 irrigation can be a beneficial use.  But I wouldn't agree with

13 Mr. Veeder that he can have his cake and eat it.  If he is

14 using a basin for the purpose of pumping therefrom to supply

15 domestic and military needs, he is necessarily taking the

16 water down below the level where he can sub-irrigate his crops,

17 and he isn't then going to turn around and say, "I needed in

18 1960 a total of 6,050 or 6,150 acre feet.  I also need on top

19 of that another 5300 acre feet to keep my vegetation alive",

20 which he isn't keeping alive.

21    MR. VEEDER:  As against an appropriator, your Honor, the

22 management of the basin becomes important.

23    THE COURT:  I don't mind finding these facts -- I think

24 Mr. Sachse has put his finger right on it -- I don't mind

25 finding the fact that so much water would be consumed to keep

1    these grasses alive, et cetera.  But if you want to be honest

2    with your clients, the military and the Attorney General, you

3    might as well also spell out the inconsistency that is involved,

4    that to keep the water up within, I think the testimony was

5    it had to be, three or four or five feet of the surface --

6         MR. VEEDER:  Five or six.

7         THE COURT:  -- then of course you have to limit pumping,

8    and when you pump and use for military purposes and export out

9    of the watershed you bring the water down below the depth

10   where it will adequately support this cover.

11        I would just as soon have these facts put in.  People

12   aren't going to be able to read this whole record.  People

13   are going to be able to read these findings.  They are going

14   to be able to read some of the minor parts of our work.

15        Work out something on it and we will see.  And I think

16   it also should have the caveat that it is not now determined,

17   in comparison with other uses, what priority, whether this use

18   is beneficial or what priority it has.  But I think there was

19   evidence, and I think this fact should be in.  But you are on

20   the horns of a dilemma on the thing.

21        MR. VEEDER:  Suppose you would rule that we could not

22   export from the watershed and enjoined us, then I would want

23   to be in the position to demand that those basins be maintained

24   to the full extent as against Fallbrook, and I think we are

25   entitled to it.  Moreover, from the standpoint of water uses

1   I believe it would be perfectly proper for your Honor to rule

2   that even if the United States pulled the basins down it could

3   still irrigate that vegetative cover to the extent of 5200 acre

4   feet.

5       MR. GIRARD:  One other problem I have here.  One of the

6   pats on the back we have given the United States for conserving

7   water is removing the phreatophytes.

8       MR. VEEDER:  Don't confuse the phreatophyte with the

9   grass cover.  There is a difference.

10      THE COURT:  All right, see what you can work out and

11  submit it to Mr. Girard and Mr. Sachse.

12      MR. SACHSE:  Then I think we had better put a great big

13  question mark on our next paragraph, because the way it is at

14  the moment I am perfectly willing to concede that all the

15  United States' uses either within or without the watershed are

16  reasonable and beneficial; but if we start putting in the other

17  one, then I am not going to go for Paragraph 23.

18      MR. GIRARD:  I have no doubt that in an apportionment

19  proceeding it would be difficult for the Court to hold that

20  that type of use is a beneficial use, even against an appro-

21  priator.

22      THE COURT:  It would be a simple matter to add to 23

23  "except that the Court does not now pass upon the question as

24  to the cover."

25      MR. SACHSE:  I just want to warn Mr. Veeder that I would

1   expect 23 also to be modified.

2        MR. VEEDER:  What is the most recent warning?

3        MR. SACHSE:  Simply that if we are going to set forth in

4   22 the use for native vegetation et cetera, then I would expect

5   the Court to modify Paragraph 23 immediately below by saying

6   that all uses except use for native vegetation et cetera, are

7   reasonable and beneficial.  But I am not prepared to concede

8   that they are reasonable and beneficial.

9        THE COURT:  All right, let's look at 24.

10       MR. VEEDER:  I think we have an "o" and an "a" transposed

11  in line 31 in "Ysidaro".

12       THE COURT:  Any objection to 24?

13       MR. VEEDER:  When you say "ground waters contained in the

14  younger alluvial deposits below the Ysidaro Narrows -- "

15       MR. SACHSE:  Downstream from.

16       MR. VEEDER:  "are presently and have for many years been,

17  as a result of salt water intrusion, brackish and unfit for

18  ungricultural or domestic use; . . "

19       MR. GIRARD:  The last time these findings were drafter,

20  Mr. Veeder, I didn't have a special finding downstream of

21  Ysidaro.  I believe it was Colonel Bowen or somebody set forth

22  the facts in the record as to below Ysidaro Narrows.

23       THE COURT:  It should be downstream?

24       MR. GIRARD:  Yes, it should be downstream.  I don't know

25  whether it is correct or not.

1    THE COURT:  It appears also on line 8 -- downstream.  I

2 think it is a correct statement of facts.

3    What point do you have, Mr. Veeder?

4    MR. VEEDER:  I was just raising that "downstream" and

5 "below" was of primary concern.  I am not quite sure of the

6 present situation in our salt water intrusion.

7    It has been corrected, has it not, Colonel Bowen?

8    MR. SACHSE:  Not downstream from Ysidaro Narrows.

9    THE COURT:  In fact, the testimony shows that the intrusion

10 has come up even within the Narrows.

11    MR. VEEDER:  We have been trying to reverse that.  This

12 is stated in presenti.  I was wondering.  Is this entirely

13 correct the way it is set down?

14    COLONEL BOWEN:  Yes, it is correct.  Water at the Ysidaro

15 Narrows is presently brackish and unfit for agricultural or

16 domestic use.

17    THE COURT:  Also military use, I suppose.

18    MR. GIRARD:  Those Marines can drink most anything.

19    MR. VEEDER:  They do.

20    THE COURT:  All right, 25.

21    MR. SACHSE:  I think we really should read 25 and 26

22 together, your Honor.

23    THE COURT:  All right, 26.  Spreading effluent, I suppose

24 that is sewer effluent.

25    MR. VEEDER:  That is to bring up the point that I have

1  previously alluded to, the need of maintainance of a fresh

2  water barrier.

3      THE COURT:  Wait just a minute.  I haven't reading it.

4      At line 12 on page 14, "was effluent from waters . .

5  which had been diverted outside of the watershed . . "  All

6  this effluent was not from outside the watershed, was it?

7      MR. VEEDER:  No.

8      MR. SACHSE:  Not at this plant, no.

9      THE COURT:  You will have to correct that "outside".

10      MR. SACHSE:  Pardon?

11      THE COURT:  This effluent that was dumped back in to stop

12  further intrusion was both effluent from water used outside

13  the watershed and inside the watershed.

14      MR. SACHSE:  That is what is says.  It says that sub-

15  stantial amounts had been diverted.

16      MR. GIRARD:  It just says that substantial amounts of

17  the sewage effluent used to recharge had been diverted.  I

18  don't know the percentage at all.

19      THE COURT:  All right.

20      It says that there had been no salt water intrusion above

21  Ysidaro Narrows.  As I recall the testimony, it was already

22  above Ysidaro Narrows.  Have you got it back down to the neck

23  of the Narrows?

24      MR. VEEDER:  If you look at Exhibit 38-A, I think you

25  are right on that.

1     MR. GIRARD:  The Colonel can give us a quick answer.

2     MR. VEEDER:  38-A shows that, I believe.

3     MR. GIRARD:  There was some testimony that came into this
4     record, I think, after 38-A.

5     THE COURT:  38-A, at least some notes I made on it, shows
6     a salt water front in there, just slightly inside the Narrows.
7     But I am thinking of a map that showed some wells and it showed
8     certain wells were brackish that were in and around or off to
9     one side of Ysidaro Basin.

10    MR. GIRARD:  Whatever the Colonel says will be fine.  I
11    will redraft it with whatever he says the facts are.

12    THE COURT:  What do you think?

13    COLONEL BOWEN:  That modified sea water is still in the
14    lower part of Ysidaro Basin.  It has not been flushed out.
15    But I think this is a correct statement that appears on line
16    16, page 14.  It says "for approximately five years there has
17    been no salt intrusion," which to me means that no more has
18    come in.  But that which was there is still largely there.

19    THE COURT:  All right, no further intrusion, and if you
20    want it to be factually correct you could point out that there
21    had been heretofore a small amount within the lower elements
22    of the Ysidaro Basin.

23    MR. SACHSE:  Is the remainder of the sentence, then, to
24    the end of the paragraph accurate, Colonel, that limited pump-
25    ing has been resumed?

18,718

1    COLONEL BOWEN:  Yes, that is correct.  We are pumping in

2    a limited amount of water from the Ysidaro Basin above the

3    Narrows.

4        THE COURT:  Somewhere here I think we should have a

5    paragraph, a pat on the back for the Marine practices both on

6    this pumping and on conservation.  You say they have resumed

7    pumping, but it is only to the limited extent so that there

8    will be no further intrusions within the basin.

9        Well, I have to go.  Mr. Sachse, do you have to make up

10   this week?

11       MR. SACHSE:  No, I don't, your Honor.  Thank you.

12       THE COURT:  Tomorrow morning at 9:30.  There is nothing

13   to keep you gentlemen from working over some of this between

14   yourselves and presenting to me some of your problems.  And if

15   I see some, I will call your attention to them.  You could

16   meet awhile, if you want to, this afternoon.

17       MR. GIRARD:  My plane doesn't leave until 5:30.

18       THE COURT:  If you want to take a chance, I can of course

19   say come back at 3:00 or 3:30.

20       MR. SACHSE:  I am going to be working with Fred and we

21   will be handy and we can always get Mr. Veeder.

22       THE COURT:  All right, if we can get this tuna boat

23   mystery solved.

24       MR. GIRARD:  I can be excused tomorrow?

25       THE COURT:  Yes, sir.

1   MR. VEEDER:  We are figuring, then, on Wednesday of next

2 week?

3   THE COURT:  Yes.

4   (Whereupon an adjournment was taken until Friday,)
    (                      )
5   (February 2, 1962, at 9:30 A.M. o'clock.   )

6           -  -  -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

-m- -

UNITED STATES OF AMERICA, )
                               )
                    Plaintiff, )
                               )
          vs.                  )       No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                    Defendants. )
————————————————————————

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: February 1, 1962, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did htereafter cause my said shorthand notes to be transcribed, and the within and foregoing seventy-five (75) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 8th day of February, 1962.

*John Swader*
Official Reporter