# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Friday, February 2, 1962

Pages:    18,721 to 18,786

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
          vs.                   )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                    Defendants. )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, February 2, 1962

- - -


APPEARANCES:

     For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney General

                                 CDR. DONALD W. REDD

     For the Defendants:

          Fallbrook Public Utility  FRANZ R. SACHSE, ESQ.
          District, et al.:

1    SAN DIEGO, CALIFORNIA, Friday, February 2, 1962, 9:30 A.M.

2                              -oOo-

3         THE CLERK:  1-1247-SD-C United States vs. Fallbrook.

4    Further court trial.

5         MR. VEEDER:  Mr. Girard is not here, the record should

6    show, your Honor.

7         THE COURT:  Yes, he stated yesterday that Mr. Sachse

8    could substitute for him.

9         We are down to about 27, are we not?

10        MR. SACHSE:  Yes, your Honor.

11        THE COURT:  It looks satisfactory to me.  But "this is

12   not true" business, it seems to me it would read better that

13   no past or present act of any defendant.

14        MR. VEEDER:  I would like to have "or now" taken out of

15   there.  There was no proof that any act created this situation.

16   We do now have Vail Dam, Vail's operations above us, we do

17   have Fallbrook's proposed dam above us, and I think the word

18   "threatens" I would like to see come out.

19        THE COURT:  I am going to leave it in.  As a matter of

20   fact, I think this is the only finding you can make here.  The

21   Government contended that the defendants had caused the salt

22   water intrusion, and as a matter of fact I think the findings

23   heretofore reflect what has happened -- that the cyclic decrease

24   in the amount of water in pumping upstream and the pumping

25   downstream, there is no doubt about that, all had a hand in

1    what happened.  After the matter was studied and taken into

2    hand, I think it has been terminated.  You can't argue that

3    the Fallbrook Dam threatens this, because the Fallbrook Dam,

4    if they build it, we will have a gate in it, and as I stated

5    time and again, that the amount of water that would come down-

6    stream would be the same as if the dam was not there -- they

7    are going to have to release water that would ordinarily flow

8    down underground or on the surface.  And Mr. Sachse from the

9    beginning has stated that Fallbrook realized that the only

10   surplus waters they could claim were flood waters.  No other

11   surplus waters in this stream.

12        28.

13        MR. SACHSE:  28, your Honor, I believe, is verbatim.  It

14   is the same finding that we drew, with my corrections, on the

15   Murrieta, except on the next page, line 11, a correction must

16   be made; we changed the number of this judgment from 34 to 37.

17        MR. VEEDER:  Your Honor, I would like to have you bear

18   with me for a moment, if I could state into the record --

19        THE COURT:  Let me read No. 28.

20        MR. VEEDER:  Yes, your Honor.

21        MR. SACHSE:  You got that 37?

22        MR. VEEDER:  Yes.

23        THE COURT:  All right, Mr. Veeder.

24        MR. VEEDER:  Your Honor, I have protested this language

25   as we went along in regard to the character of the evidence

that was offered.  I would like to reiterate the objections
that I have made in connection with this Finding No. 28 on
page 14 and page 15.

The factual data that was offered in this case, as I
said before, was offered for all purposes and I believe that
it is prima facie evidence of the fact, and being prima facie
evidence has not been rebutted and therefore I think it is the
basis for your Honor's finding.  I read this statement in
particular as seeming justification for the statements that
this is only prima facie evidence -- starting at line 1 on
page 15:

> ". . the factual statements contained in said exhibits
> which pertain to gross acreages, irrigated acreages,
> irrigable acreages and water duty are based on evidence
> introduced in this case by the United States of America
> with an express assurance by its counsel that appor-
> tionment was not being sought at this stage of the
> litigation; . . "

Now, it is a total non sequitur to declare that this
evidence is not proper evidence and that it is not conclusive
evidence, in fact, where it is not rebutted.  My statement
that we were not asking for an apportionment had absolutely
nothing to do with the admissibility of the evidence or the
probative character of it.  But I said at that time, and I
repeat, that there was no reason why we should ask for an

1    apportionment in regard to Diamond and Domenigoni Valley in-

2    sofar as the United States was concerned.  There was no reason,

3    from our standpoint, to ask for apportionment in regard to

4    the people in the Wildomar area and down through the valley.

5    But there was certainly no reason for ascribing to my state-

6    ment the fact that this evidence was not offered for all

7    purposes.

8         THE COURT:  What other purpose could it have except to

9    be used to base an apportionment upon?

10        MR. VEEDER:  Your Honor, you can certainly have a quiet

11   title action in a water suit, and when you have a quiet title

12   action in a water suit at that time you find, determine and

13   declare the ownership of the land, the irrigable acreage,

14   water use, if it is offered, all this other material that is

15   absolutely essential to determine and declare the breadth

16   of the rights of all the parties.  If you seek to enjoin them,

17   in fact, to have the waters apportioned, you have the basis

18   for the apportionment in the record.  We are entitled to have

19   a decree quieting title as against every single claim in this

20   water shed so that we will know the measure of the irrigable

21   acreage above us.  If, at some future time -- if next summer

22   it is decided that we must restrict pumping, we would then be

23   in a position to proceed.

24        I am very much disturbed that my statement that we were

25   not at that moment asking for an apportionment would be used

1   as justification by California in writing this paragraph to

2   undercut, in effect, all of the evidence that was offered.

3       I want further to make it clear --

4       THE COURT:  We have been all over this before.  The only

5   purpose, in this posture of the case, in listing the irrigable

6   and irrigated acreages throughout the watershed would be to

7   allow somebody to sit down with an adding machine or let us

8   add up and show how many acres of land there was, how much

9   water duty there was on this stream, and that served no purpose

10  except maybe to assist somebody in determining whether they

11  should build a dam or know something about the shortage of

12  water in this watershed.  So it is not necessary to go that

13  far.  There is a shortage of water --  there is no question

14  about it.

15      Also, you recall the fact that certain of these defendants,

16  in view of the fact that there was to be no apportionment,

17  did not put in evidence of their irrigable acreage.

18      MR. VEEDER:  They didn't do it on my representation, your

19  Honor, nor do I assume any responsibility in that regard.

20      THE COURT:  They did it because the posture of the case

21  was one to determine the rights on the stream and not to

22  determine the extent of the correlative rights.

23      MR. VEEDER:  The point being that you can't determine

24  the rights on the stream without having a determination in

25  regard to irrigable acreage.

1    And this point I want to emphasize.  I would think, that

2    in fairness to the United States of America, there should be

3    removed the statement "by reason of the assurances by counsel".

4    If that is your conclusion, your Honor, as you have just

5    expressed it, so be it.  But let us not say, "Well, we will

6    blame the Federal Government and we will blame counsel for it."

7    I assume full responsibility for how this case has been tried,

8    but I certainly say it is totally without basis, it is totally

9    without reason to say, "Well, Mr. Veeder said he was not ask-

10    ing for an apportionment at this time and therefore all of

11    the evidence that went in in regard to irrigable acreage is

12    aborted".  I think that is wrong.

13    THE COURT:  It is not aborted.  We have been all over

14    this and we have tried to work out a practical problem on it.

15    There is no use repeating all of the arguments.  You have heard

16    them before.  Here were people, many of whom did not appear.

17    They did not have a chance at any contested issue on this

18    matter.  Many of these people, of course, were going out of

19    the case because they haven't got water that is part of the

20    stream.  So we said wherever we have taken this evidence we

21    have put the stamp of approval on it, we have said that it

22    should be prima facie evidence -- mainly, it is good evidence

23    and it will be sufficient in a subsequent proceedings unless

24    somebody comes in and contradicts it.

25    So here is X, who has 50 acres up there.  We have some

18,728

figures on his acreage and his water duty and all that.  If he

is content and nobody else contests it, we have done the job.

On the other hand, if he is not content, he will have a right

to come in and be heard.

MR. VEEDER:  He will have the right to come in anyway,

your Honor, if there has been a change of a factual situation.

THE COURT:  Yes, if there has been a change.

MR. VEEDER:  If there has been a change.

THE COURT:  He would have to show that there was a change.

MR. VEEDER:  May I go on one step further?

THE COURT:  Yes.

MR. VEEDER:  This prima facie evidence matter takes us

over to the conclusion which I think we must view in the light

of --

MR. SACHSE:  What page?

MR. VEEDER:  It would be 23 on through and then you

follow on down to --

MR. SACHSE:  The bottom of 24?

MR. VEEDER:  Yes, you follow on through from the stand-

point of making determinations as to actually what transpired

and the kind and character of rights which the United States

has, with which we are concerned and I am greatly concerned

that when we get through we will say there is no title of

the United States quieted against anyone.  We have a recita-

tion that we have put in a great deal of evidence, but there

is no determination as to the maximum irrigable acreage above

the United States, there is no relationship whatever as to

how the United States' rights will relate to the overlying

rights, to the riparian rights, to the --

THE COURT: How can you do that, Mr. Veeder, unless we

had proceeded -- whether you want to call it an apportionment

or not -- unless we had proceeded to list all the irrigable

acreages, all the irrigated acres, all the water duty, and

then wound up by saying that the rights of the United States

are quieted to its correlative share, which is so and so?

MR. VEEDER: That is precisely what I would ask your

Honor to do. I would say use just exactly the same language

as has been used in the A Series, say, that to the extent that

the ownerships have been found, that the irrigable acreages

have been found, that the riparian rights have been found,

the rights of the United States are quieted against each

individual, their rights are quieted against the United States

to the extent of this riparian and irrigable acreages, and

each right  as found and as concluded here is quieted one

against the other.

Now, as it stands, there is absolutely no declaration

or determination of the respective rights. It says they are

correlative. Well --

THE COURT: There is no way we could apportion and fix

these rights without an apportionment.

1    MR. VEEDER:  But your Honor, you can certainly say, "This

2    parcel of land belonging to Mr. Roripaugh contains 1500 acres

3    of land, of which 900 acres of land are irrigable."  That

4    would be a proper finding.  And you conclude, as a matter of

5    law, that Mr. Roripaugh is the owner in fee simple of that

6    land, and that of his land there are 600 or whatever figure

7    I said of irrigable acreage, and, if you want to put it in

8    further, that this Court continues its jurisdiction so that

9    if in the future there is a change in conditions showing

10   greater irrigable acreage by a motion to show cause he can

11   have this amended.  But that goes beyond the point of prima

12   facie evidence.

13       THE COURT:  Now, to do that, Mr. Veeder, Mr. Roripaugh's

14   right is correlative not only with your right downstream but

15   with hundreds of other people up in that valley.

16       MR. VEEDER:  Right.

17       THE COURT:  And to do what you are suggestion we would

18   have to have had the irrigable and irrigated acres of every

19   other person to whom his rights are not correlative.

20       MR. VEEDER:  We do, and that is in evidence.

21       THE COURT:  We do not have --

22       MR. VEEDER:  Your Honor, with all respect to your Honor,

23   I don't believe that irrigated acreage in regard to rights of

24   the overlying or riparian rights is important.  I think the

25   criteria always will be irrigable acres.  The day of the

1   apportionment, then it becomes important as to how much water

2   he is using.  But your Honor, we have introduced in evidence

3   in this case the irrigable acreage for every piece of land

4   and for every ownership in the Santa Margarita River watershed.

5       THE COURT:  And we have said in these findings that since

6   the issue of apportionment was expressly not in the case, we

7   therefore, are not apportioning water and we therefore say

8   this evidence that has been received has the stamp on it of

9   "prima facie" -- that is, good unless somebody comes in and later

10  wants to contest it at a time of apportionment.

11      MR. VEEDER:  Therefore, your decree is not a decree

12  quieting title.

13      THE COURT:  Mr. Veeder, certainly it is a decree quieting

14  title.  We are right back to where I told you we would be

15  time and time again.  We labor on this case and come back up

16  with a big zero.  The net result is going to be that the decree

17  is going to say that a number of people have riparian rights

18  on the stream, and this we knew to start with.

19      MR. VEEDER:  With all respect to your Honor, I have worked

20  very hard on this part.

21      THE COURT:  What is that?

22      MR. VEEDER:  With all respect to your Honor, I think the

23  course  your Honor is taking guarantees an appeal, because I

24  am not going when I get through here to say, "We have worked

25  for three years and there is nothing."

1        THE COURT:  I told you beforehand, I told you when we

2    started, "Where are we going on this thing?"  When I started

3    on this case, the earliest part of the case, I called you

4    gentlemen together and I said, "This is a matter where there

5    ought to be some physical solution to this case.  There ought

6    to be some settlement or some agreement.  You can't make water

7    by litigation."  And what did you tell me?  You said, "No,

8    we can't do anything like this until the rights of the United

9    States are adjudicated."

10       MR. VEEDER:  That is right.

11       THE COURT:  I said, "What do you mean -- adjudicated?"

12       "Well, we have to find out what the nature and the extent

13   of the rights of the United States are."

14       MR. VEEDER:  As they relate to everyone else in the water-

15   shed.

16       THE COURT:  You then proceeded to advance a lot of fancy

17   theories about these rights of the United States, which went

18   well over into the field of claims by virtue of sovereignty,

19   which you had previously disclaimed.  You asserted rights of

20   prescription as a downstream user, which I held weren't good.

21   And we have adjudicated and are adjudicating some of the

22   rights.

23       But I told you when we got all done what we were going

24   to wind up with was a decree, in view of the fact that no

25   apportionment was being sought, there was going to be a decree

saying that certain people had correlative rights and over-
lying rights in the river.  And that is what we have.  Except
that we have gone a step further and having done some of this
work, having made soil surveys and having found the facts on
many of these properties, we have said that since we were not
hitting the issue of apportionment we would make a finding of
fact and a conclusion that these findings as to acreages,
irrigated and irrigable, and water duty would be prima facie
evidence and that this didn't have to be done again.  If X
wants to come and contest it, we have the prima facie evidence
in the record.  And if he comes in and contests it, the trier
of fact will say you have overcome it or you haven't.  But
the work doesn't have to be done again.  We have done that
work.

But you have got to face the issue that you either have
an apportionment or you don't have an apportionment.

MR. VEEDER:  Your Honor, I think we have guaranteed an
appeal on this.  I think you are wrong.  I do think, though --

THE COURT:  How you could ever get anywhere on appeal,
in view of your expressed statements that you were not seeking
an apportionment, I don't know.  Maybe you will be able to
convince the Circuit Court that you didn't mean what you said
when you said it.

MR. VEEDER:  Your Honor, I realize that I have to be
beaten on the head quite often.  But I think this "with an

1    express assurance by its counsel that apportionment was not

2    being sought," therefore everything is just prima facie

3    evidence, I think -- it can stand, but it is an unfair and

4    it is an untrue statement.  And as I said to your Honor, if

5    there was ever a guarantee for an appeal this is it, because

6    this renders and your Honor's proposed conclusions and decree

7    render the lawsuit aborted -- there is nothing.

8        THE COURT:  I didn't render it aborted.  We have had all

9    this up beforehand.  I can still remember Mr. Sachse's state-

10   ments that in view of your position that no apportionment

11   was sought he was not going to put on evidence as to some of

12   these things.

13       MR. VEEDER:  All right.

14       MR. SACHSE:  I think I should point out for the record,

15   your Honor, that Mr. Girard and Mr. Littleworth, in particular,

16   feel that we have gone too far in this finding.  They feel

17   that when evidence is immaterial it can't even be prima facie.

18   They think your Honor is giving the United States in this

19   case more than it is entitled to with this prima facie state-

20   ment.  I have been willing to go along with it, and they have

21   been willing to go along, too; but they both will state in

22   so many words, "When evidence is immaterial to the issue being

23   tried, then you shall not make a finding on it at all."  And

24   I think they are basically right.

25       THE COURT:  Except that a lot of work was done and we

1    ought to preserve, as far as we can, the work that was done.

2        MR. SACHSE:  Except that a lot of work was done.

3        THE COURT:  I can remember also in past conversations

4    and discussions in this court where Mr. Veeder was talking

5    about listing the amounts of irrigable and irrigated acres,

6    and I said, "Well, I don't care if you want to list the

7    surplusage.  Somebody might be able to have some idea of the

8    watershed by looking at it.  But it is not going to have any

9    bearing on what we do."

10       I remember also calling his attention to the fact that

11   there is a lot of irrigable acreage up there that is illusory

12   in character, "and if you are going to do any listing," I

13   said, "make some categories.  Here is irrigable acreage up

14   on a dry water course where water runs in the winter, and if

15   you want to list it as irrigable acreage, it is irrigable.

16   But there is nobody in the world who would ever irrigate it

17   in the winter."

18       MR. VEEDER:  And I proposed findings like that and

19   tendered findings like that and your Honor has ignored them.

20   I have put in findings precisely along that line, that in the

21   upper watershed there may be riparian acreage, that the only

22   time there is water in those streams is during the winter time,

23   the period of virtually total lack of use, therefore those

24   rights would be illusory.  I have tendered that to your Honor.

25   And I agree with your Honor completely that there are many of

1   these riparian rights that are totally illusory.

2          But at the same time there are many rights which are not

3   illusory, and I think the only way a proper decree could be

4   written, and I would have no objection to your Honor's saying

5   that from the standpoint of the rights, for example, in Burnt

6   Valley, up in some of the Coahuilla area perhaps, some of

7   those highlands, the rights are totally illusory; but I would

8   say, for example, down on the Indian Reservation or the land

9   that overlies  good ground water they are very real and very

10  important rights.

         But my own view, and I petition your Honor for the last

11  time, I am going to file formal objections.

12
         THE COURT:  What do you mean, you are going to file

13  formal objections?

14
         MR. VEEDER:  I will.

15
         THE COURT:  What am I supposed to?  Read and rule on

16
17  your objections?

13 fls.   18   MR. VEEDER:  Yes, because when this goes to the Ninth

19  Circuit I want it very clear that I repeatedly brought it to

20  your Honor's attention.

21
         THE COURT:  If it goes to the Ninth Circuit, I may not

22  live long enough to see the case completed.  That doesn't

23  bother me.  The Ninth Circuit has reversed me before.  I have

24  not seen the last reversal from the Ninth Circuit.  I am just

25  concerned about the people in this watershed and the

1    Government and all the problems,  I would like to get the

2    thing disposed of.

3        MR. VEEDER:  So would I, your Honor.

4        THE COURT:  But you just can't have your cake and eat it

5    too.

6        MR. VEEDER:  This is not a matter of cake, your Honor.

7    This is a matter of survival for a large --

8        THE COURT:  You can't say that you are not going to have

9    apportionment and then try to write a decree which is the

10   equivalent of one.

11       MR. SACHSE:  Did your Honor want to take a recess?

12       THE COURT:  Do we have something else on the calendar?

13       THE CLERK:  A setting for trial, your Honor.

14       THE COURT:  Are counsel here?

15       THE CLERK:  They just stepped out.

16       (Another matter.)

17       THE CLERK:  1247-SD-C United States vs. Fallbrook.

18       THE COURT:  Your objection is overruled, Mr. Veeder, and

19   it has been overruled in the past and I see no need for you

20   to file any formal document called "Objections," which I would

21   then have to rule upon again.

22       MR. VEEDER:  I will file them, your Honor, and you may

23   make whatever disposition you want to of them.

24       THE COURT:  And if you are going to encumber the record

25   with a lot of written objections, don't make them to some

1   proposed findings.  You will have to wait until you get a

2   final set that is about to be signed or is signed.  All these

3   preliminary findings -- filing any formal objections to a

4   preliminary matter doesn't mean anything.  You have already

5   stated your position.

6       Well, do we go to 30?

7       MR. SACHSE:  This is the so-called A Series of findings

8   for the basement complex and residuum within the Enclave.

9   Again, it is almost identical with the ones previously approved.

10      MR. VEEDER:  Are we on 31 now, your Honor?

11      THE COURT:  30.

12      MR. VEEDER:  I think that is the same thing that was

13  previously used.

14      THE COURT:  31.

15      MR. VEEDER:  On this point, on De Luz Creek, other than

16  to declare that the confluence of De Luz Creek is within the

17  Naval Enclave, would be unnecessary, in view of the fact that

18  I believe your Honor adopted the findings of the Master in

19  regard to Du Luz Creek.  This would, in my view, constitute

20  a duplication.

21      MR. SACHSE:  As far as a pure description of De Luz Creek,

22  yes, Mr. Veeder.  But the significant thing is contained

23  starting with line 6 following the semicolon.  This is not

24  found in the Master's findings, that "immediately upstream

25  from its confluence with the Santa Margarita River, and for

1   distance of approximately one mile," there are younger alluvial

2   deposits of considerable depth.  Exhibit 37 was not before the

3   Master.  The Master stopped at the Enclave line and he concerned

4   himself only with De Luz.

5        THE COURT:  That is all it is in there for.

6        MR. SACHSE:  That's all it's in there for.

7        MR. VEEDER:  As long as it is not just a total duplication.

8        THE COURT:  32.

9        MR. VEEDER:  I don't believe you should properly say that

10   basement complex is "extremely compacted material".  I think

11   that is a term that has been used in regard to older alluvium.

12   I think it is compacted material, but I don't believe the use

13   of the term "extremely" is accurate.

14        MR. SACHSE:  If the Colonel wants to give us a better

15   word, it's all right.  I'll be happy to use it.

16        MR. VEEDER:  "Relatively impervious" has been used in

17   the past.

18        MR. SACHSE:  "Relatively impervious" is all right with

19   me.

20        MR. VEEDER:  Isn't that right, Colonel?

21        COLONEL BOWEN:  That is right.

22        THE COURT:  Insert "relatively impervious".

23        MR. VEEDER:  "Relatively impervious material" I would

24   like, your Honor.

25        MR. SACHSE:  That is what I have.  "Relatively" is all

1    right with me.

2         THE COURT:  33.

3         MR. VEEDER:  May I have just a second on this, your Honor.

4         In connection with the language which appears on page 16,

5    the statement is made, starting on line 22 "that as a result

6    thereof the waters within said younger alluvial deposits do

7    not move laterally or vertically into the deposits of basement

8    complex but do in fact move through the younger alluvial

9    deposits in the identical direction of the surface flow of

10   De Luz Creek when in fact it exists; that during such times . ."

11   And continues on "by reason of the nature of the very thin

12   mantle of younger alluvium."

13        We are not making an objection to that language.  It is

14   not, however, in our view, and should not be a precedent in

15   regard to alluvium at greater depth where it is lenticular in

16   character and where the course of the ground water is actually

17   percolating water encountering a variety of deposits.

18        THE COURT:  All right.

19        33.  This is the same language that we worked out.

20        MR. SACHSE:  Right down the line, this is the same thing

21   we have used in the others, your Honor.  When you get through

22   with 33, I have a question on 34.

23        THE COURT:  I have finished 33.

24        MR. SACHSE:  This is as to 34, your Honor please.

25        Colonel Bowen, I don't know, neither did Mr. Girard,

18,741

1  whether the statements in 34 are really necessary at all.

2  What we had in mind was that our recollection of the map of

3  Federal acquisitions was that there were certain parcels of

4  land acquired in small units by surrender of public domain or

5  something else on De Luz Creek which may or may not be covered

6  in the Master's findings and which may or may not be included

7  in the other broad finding as to what the Government's riparian

8  lands are.  Maybe there is a better way of doing this.  In

9  other words, that this would not be included in the broad

10  acquisition.

11      MR. VEEDER:  Does your Honor want to see this?  This is

12  Exhibit No. 1.

13      MR. SACHSE:  Our feeling was that that paragraph was

14  necessary to cover the lands shown on Government's Exhibit 1

15  as acquired by decree filed December 22 and acquired by decree

16  filed, the Public Land Order of August 8th.  I don't know.  It

17  is up to Mr. Veeder and Colonel Bowen whether a separate find-

18  ing covering these lands is necessary or whether we can wrap

19  them up in Mr. Veeder's basic description of all these ac-

20  quisitions.

21      MR. VEEDER:  It is going to be in the basic acquisition.

22  I don't think it really hurts anything.  I don't really know

23  the source of the title of this land here.

24      THE COURT:  Where is the Camp Pendleton line?

25      COLONEL BOWEN:  An irregular line through Township 8-9

South, your Honor.

MR. SACHSE:  The point whether or not this paragraph is necessary is going to depend partly on the first paragraph that Mr. Veeder drew.  If it is not necessary, we can tear it out.

THE COURT:  We know what we are talking about on this paragraph.  You decide what you want to do about it.  These apparently were acquired by deed.

MR. SACHSE:  No, that is away up here.  That is not it. We are concerned with a condemnation and a Public Land Order.

(Discussion off the record around Plaintiff's Exhibit 1.)

THE COURT:  Well, we know what the problem is.

Are you ready in the criminal matter?

(Another matter.)

THE COURT:  Let's go ahead with Fallbrook.  What is that exhibit number you just showed me, Mr. Veeder?

MR. VEEDER:  United States of America Plaintiff's Exhibit 1.

THE COURT:  35.  Change these Roman numerals to arabic also in the body of these, like on 922.

MR. SACHSE:  Yes, your Honor.

This, again, is basically taken from the same finding that we approved on the Murrieta.

THE COURT:  All right.

36.

1    MR. SACHSE:  I would appreciate it if Colonel Bowen would

2    check out our description.  There is no description of Fallbrook

3    Creek in any other finding, to the best of my knowledge.  To

4    be sure we have it correct as to sections, et cetera.  Outside

5    of that, it is just formal.

6        It should be "head waters" and not "headquarters."

7        THE COURT:  Subject to checking it out, any objection to

8    36?

9        MR. SACHSE:  In lines 27 and 28 -- we agreed to this last

10   time -- "comprising a portion of Camp Joseph H. Pendleton" is

11   to go out.  That is not accurate.

12       THE COURT:  Stop after "watershed"?

13       MR. SACHSE:  Yes, your Honor.

14       THE COURT:  37.  If we adopt this "Naval Enclave" business,

15   when we get down to 7 you can say "upon the lands of the United

16   States in the Naval Enclave" or you can use the exhibits.

17       MR. SACHSE:  Change to "Naval".

18       THE COURT:  Naval Enclave or whatever the Marines prefer.

19   Do you like to be called a "military enclave"?

20       MR. VEEDER:  We have designated it "Naval Enclave" in the

21   past, your Honor.

22       COLONEL BOWEN:  The Marine Corps is a branch of the Naval

23   service, your Honor, so we will go along with "Naval Enclave."

24       MR. VEEDER:  I don't believe it is correct to say that

25   Lake O'Neill is an off-channel storage reservoir, going back

to 36.  You say, "that under present conditions the flow of
said Fallbrook Creek is diverted into Lake O'Neill, an artifi-
cial off-channel. . "  Fallbrook flows into, and Lake O'Neill,
the dam, is across Fallbrook Creek, just for the purposes of
exactness.

THE COURT:  What they were talking about is that it was
off-channel as far as the Santa Margarita is concerned.

MR. SACHSE:  That is right.

MR. VEEDER:  That is right.  But not as to Fallbrook Creek.

MR. SACHSE:  Let's take out the word "off-channel."

MR. VEEDER:  Artificial reservoir.  Take out "off-channel."
That is an important contribution.

THE COURT:  All right, strike it.  It doesn't add anything.
38.

COLONEL BOWEN:  May I point out something in 37, your
Honor.

THE COURT:  Yes.

COLONEL BOWEN:  At line 7, "that all of said streams are
intermittent and flow only during and after periods of preci-
pitation and runoff . . "  That is not true with those streams
in which sewage effluent is introduced and which conveys that
effluent into the valley floor.

MR. SACHSE:  That is a good point, and I think we ought
to make an appropriate modification.

THE COURT:  We can put the modification right in there.

1   MR. SACHSE:   Put it right in.   I think maybe we ought to

2   do that.

3   MR. VEEDER:   I would like to designate at least the loca-

4   tion of the courses through which the sewage effluent is

5   delivered into the valley.

6   MR. SACHSE:   Do those streams have names, Colonel?

7   COLONEL BOWEN:   Urine Creek and Infiltration Canyon.

8   MR. SACHSE:   They don't show on the U.S.G.S. maps.

9   COLONEL BOWEN:   No, they don't.

10   MR. VEEDER:   I think it may be important to designate

11   the general course of those artificial streams.

12   MR. SACHSE:   I would suggest, then, if Colonel Bowen could

13   draft or if Mr. Veeder could draft an addition to go in here,

14   which would say, in substance, all such streams are inter-

15   mittent in flow et cetera, except the stream located at so

16   and so and the stream located at so and so, et cetera, which

17   are supplied by sewage effluent.

18   THE COURT:   All right, work it out.

19   38.

20   39.

21   Let's change this all to "Naval Enclave."

22   MR. SACHSE:   Yes, your Honor.

23   MR. VEEDER:   Your Honor, in regard to this 39, I have

24   been  checking through the evidence.   I don't know where this

25   61,600 came from.

1    MR. SACHSE:   It comes from Colonel Robertson's testimony.

2    MR. VEEDER:   As I recall, there was evidence submitted to

3    me and reviewed by me where they said the total would be

4    105,000.   I would like to check out these figures once more.

5    MR. SACHSE:   Mr. Veeder, I don't know if you are reading

6    it correctly.   I don't mind your checking them out, but that

7    last statement is that for the fiscal year 1959 the total

8    population was 61,600.   That is what Colonel Robertson testi-

9    fied, that for that year the total population was so much.

10    MR. VEEDER:   That is what you mean?

11    MR. SACHSE:   Yes.

12    MR. VEEDER:   You don't mean that during mobilization you

13    have --

14    MR. SACHSE:   No.   That is why I said that for the fiscal

15    year 1959 it was projected.

16    THE COURT:   The other way around, that the projected total

17    population for the year 1959 was so much.

18    MR. VEEDER:   I want to bring it down to the 105,000, which

19    would be total mobilization.

20    I would like also to refer to line 12, your Honor, "other

21    than for irrigation our use is essentially municipal in

22    character," I don't think that adds anything, and in view of

23    your Honor's ruling that military use is a use that is recog-

24    nized under riparian law I would like to have that "essentially

25    municipal in character" removed.

1    MR. SACHSE:  Your Honor, I would object vigorously.  This

2  is the next paragraph.  Mr. Veeder talks a great deal about

3  appeals.  I assure you that Fallbrook is never going to appeal

4  this case no matter what happens.  But if the United States

5  appeals, I submit to your Honor that I could write a pretty

6  good brief which I wouldn't be ashamed to submit to any court

7  of the United States on the proper riparian use.  Therefore,

8  I would like findings for my protection in this case on the

9  propriety of your Honor's ruling.  I think I could write a

10  pretty good brief.  There would be a cross-appeal and I would

11  want to show them that one case.  That is why I asked Mr.

12  Girard specifically to spell out these facts, so that a

13  foundation would be laid in case the United States should

14  appeal.

15    THE COURT:  I think it is a proper finding.  You have

16  thrown your weight around here about an appeal, and Mr. Sachse

17  says, "We are not going to appeal, but if you do we want to

18  raise this point."  I have bent over backward -- given you the

19  benefit of the doubt and held that military uses were proper

20  riparian uses.  Under all the circumstances, they were.  But

21  nobody is going to gainsay that Mr. Sachse hasn't got a good

22  legal argument on this, in view of some of these cases we have

23  kicked around.

24    MR. VEEDER:  I just interpose an objection.

25    THE COURT:  Overruled.  But you want to add to this

1   finding the substance of Colonel Robertson's testimony that

2   the projected population in time of mobilization would be

3   one hundred and some thousand.

4       MR. VEEDER:  I do, your Honor.

5       THE COURT:  All right.

6       MR. VEEDER:  I would like to talk about uses a little

7   further when we finish this, because I think we will have some

8   further suggestions.

9       THE COURT:  40.

10      MR. SACHSE:  I will say, frankly, your Honor, I am not

11  sure that every one of the statements in 40 is correct.  I hope

12  Colonel Bowen will check it.

13      MR. VEEDER:  If you missed anything, it is seriously

14  minutiae.

15      MR. SACHSE:  I tried not to miss one, your Honor.

16      MR. VEEDER:  This newspaper, now there is something that

17  I wanted to ask about.

18      MR. SACHSE:  You have a newspaper.

19      MR. VEEDER:  Did they use water in publishing that paper?

20  That is g.g. on line 22.

21      THE COURT:  Do you have something about water for washing

22  cars in there?

23      MR. SACHSE:  Garages and vehicle repair facilities.

24      THE COURT:  Beauty parlors?

25      COLONEL BOWEN:  I thought Mr. Sachse left out recreational

1    facilities, which is very dear to my heart.

2         We also have a very fine stable program.

3         THE COURT:  I thought that was in the --

4         MR. SACHSE:  San Luis Rey.

5         COLONEL BOWEN:  So is the golf course.

6         MR. SACHSE:  Is the golf course in its entirety in San

7    Luis Rey?

8         COLONEL BOWEN:  The golf course is in Windmill Canyon.

9         THE COURT:  Do you use water from the Santa Margarita to

10   water the golf course?

11        COLONEL BOWEN:  We use sewage effluent to irrigate the

12   golf course, and some of that of course originates in the

13   Santa Margarita.

14        We also provide the sewer water and water for drinking

15   purposes from our Santa Margarita distribution system.

16        MR. SACHSE:  Maybe we ought to add the stables.

17        MR. VEEDER:  I think we have done that.

18        COLONEL BOWEN:  The horses drink Santa Margarita water.

19        MR. VEEDER:  And they drink it inside the watershed and

20   go out and back in.  I mean, you got to watch all these things.

21        COLONEL BOWEN:  Your Honor, could I go back to 38 and

22   make a suggestion?

23        THE COURT:  Yes, sir.

24        COLONEL BOWEN:  On page 20, line 5, the reference to

25   Exhibit 37, I think it would be better if Exhibit 29 were

substituted for Exhibit 37, that being the U.S.G.S. 7½ minute quadrangle, and specifically it would be 29-A, B, C, F, G and H.

THE COURT:  All right.

About the only thing I don't see in here that doesn't correspond to strictly municipal uses are those types of buildings and facilities used by the oldest profession in the world.  I don't find one those listed here.

MR. WILKINSON:  That is under "clubs and social facilities," your Honor.

THE COURT:  I see.

MR. VEEDER:  Just so that if you missed one it will not be excluded.

MR. SACHSE:  I am very carefully including but not limiting it to the following.

MR. VEEDER:  Just so we are not dealt out of something.

THE COURT:  All right, 41.

MR. SACHSE:  No. 41 is almost verbatim from our prior interlocutory judgment on miscellaneous surface impoundments. It is designed to say the same thing.

THE COURT:  42.

MR. SACHSE:  This again follows right along the line of the surface impoundments interlocutory previously entered.

THE COURT:  43.

MR. SACHSE:  This is the one Mr. Girard raised the question

1    about the language the other day as to whether we made it

2    clear.  What we are talking about is the interlocutory judg-

3    ment No. 25.  I don't know if he wants to change the language.

4         MR. VEEDER:  I think one of the things that has arisen

5    in my mind is the procedure that will be followed.  Will all

6    these interlocutory judgments be incorporated one into the

7    other?

8         THE COURT:  Not necessarily.  I am still of the view that

9    all we are going to do for a final judgment is just incorporate

10    the interlocutory judgments heretofore entered and make them

11    final.  You have some idea about trying to dress up a final

12    judgment for this whole thing.  I think it would be a waste

13    of time very difficult and complicated.  But we don't incor-

14    porate all the judgments.  The only time we incorporate one

15    is where it has some pertinence to the matter.  In a way, it

16    doesn't make a lot of difference whether this judgment in

17    25 is incorporated or not.

18         MR. VEEDER:  That is the reason why I raised the point.

19    Truly I don't see the objective of it.  We are not going to

20    incorporate, for example, the Murrieta-Temecula.

21         THE COURT:  Now 25 did concern the United States in that

22    it involved the stipulated judgment between Vail and Santa

23    Margarita.

24         MR. SACHSE:  My feeling, your Honor, was, and this has

25    been my fthinking in every case in which I have used this

language incorporating by reference a previous decree, the judgment in this case necessarily is going to include everything.  It has got to.  You can't enter a partial judgment.  The Circuit said we can't.  But for help to a person reading this I have tried, when there was some specific judgment that was of very great importance, to invite their attention to it.

THE COURT:  So it doesn't really make any difference whether you say incorporated or not.

MR. SACHSE:  It doesn't make any difference whether you say incorporated or not has been my thought.  This was just to help the reader by referring him to it.

THE COURT:  Do you object to incorporation, Mr. Veeder?

MR. VEEDER:  I do object to it, your Honor, and I want the record to show that I object to it that it is impossible to correlate the two rulings, under the circumstances.

THE COURT:  What?

MR. VEEDER:  It is impossible for me to correlate, in my own mind, the nature of the rulings that you made there with these rulings here.  If I comprehend what your Honor is saying in regard to the present findings of fact and conclusions of law, namely in Interlocutory Judgment No. 37, you are not making any determination in regard to rights to the use of water at all -- if I comprehend what you are doing.  Whereas I feel that in Finding No. 43, which incorporates this ruling on the stipulated judgment, you do in fact affect, and

1    drastically affect, rights to the use of water.  I don't

2    believe that is proper, and that is why I would like to have

3    them kept separate.  But whatever your Honor wants to do, of

4    course, it is up to you.

5        Do you have before you the findings of fact, conclusions

6    of law and Interlocutory Decree No. 30 for Murrieta and

7    Temecula area?  On page 23 it again relates to the case of

8    Rancho Santa Margarita vs. Vail.  It is Finding 48 of the

9    Murrieta-Temecula interlocutory judgment.

10       THE COURT:  Yes.

11       MR. VEEDER:  I am inquiring as to whether those findings

12   referring to mesa silt as set forth in there are incorporated

13   by reference or how those are to be used.  I have    objected

14   to these separate interlocutory judgments.

15       THE COURT:  You have objected to separate interlocutory

16   judgments?

17       MR. VEEDER:  In the ultimate, yes.  I think it is

18   impossible to determine --

19       THE COURT:  Today for the first time I hear you object

20   to the use of separate interlocutory judgments.

21       MR. VEEDER:  No, your Honor, let me point out what I am

22   saying.  Your Honor decided to go along on the basis of

23   interlocutory judgments.  I always thought there would be a

24   single integrated decree and I repeatedly brought to your

25   Honor's attention that I thought there had to be.  But now if

1  we are going to proceed with just one decree incorporating

2  all these interlocutories by reference, or maybe not incorpora-

3  ting them -- I don't know just what your plan is.  I want to

4  know whether the findings in the Rancho Santa Margarita vs.

5  Vail referred to in Finding 48 makes those findings part of

6  the Murrieta-Temecula finding.

7      MR. SACHSE:  Mr. Veeder, it doesn't make it any part.  It

8  simply says that the term "mesa silt" as used in Santa Margarita

9  vs. Vail is the same as what we call older alluvial deposits.

10  That is all it says.  It doesn't incorporate the finding.

11      MR. VEEDER:  In other words, we will look on these find-

12  ings and into the --

13      THE COURT:  I don't know that this is necessary in 30,

14  in this ground water area.

15      MR. SACHSE:  Your Honor, that is extremely necessary.

16  The purpose is, again, in the light of Mr. Veeder's constant

17  concern over appeals, the case of Bank of America vs. Bernard

18  and the so-called estoppel by judgment theory, with which your

19  Honor is generally familiar and which we touched upon previous-

20  ly in the course of the arguments on the interlocutory

21  judgment -- your Honor never had to rule on it because you

22  set aside the interlocutory judgment, but it is our position

23  that if we should be so unfortunate that we should convince

24  someone in the Circuit that your Honor was in error, then the

25  estoppel by judgment principle arises and Mr. Veeder

1    representing the United States cannot now change the tune that

2    they raised in this one.

3         THE COURT:  Let's wind it up.  It is obvious that we are

4    not incorporating.  We are merely saying that in that judgment

5    they use the term "mesa silt" in the same way we use "younger

6    alluvium" here.  In No. 25, the decree on the stipulated

7    judgment, it is very important in there to point out the

8    identity between younger alluvium and mesa silt.  It was done

9    in that judgment, too.  But that isn't an incorporation by

10   reference.

11        MR. VEEDER:  I wanted to know, and your Honor has explained

12   and Mr. Sachse has stated why, this proposed finding was put

13   in there.  I have been trying to correlate each of these as I

14   went along.  I didn't comprehend them.

15        MR. SACHSE:  I see you had good reason.

16        MR. VEEDER:  I see the object and I think you are in error.

17        THE COURT:  If you want to strike "incorporated by

18   reference," we can say --

19        MR. VEEDER:  If we are going to go this way, if you want

20   to incorporate it by reference, I have objected to the whole

21   concept of bringing them in.

22        MR. SACHSE:  I am mixed up.  The one for Murrieta is not

23   incorporated by reference.

24        MR. VEEDER:  We are talking about 43.

25        THE COURT:  What is your point, Mr. Veeder?

18,756

MR. VEEDER:  If the objective is to incorporate that in its entirety into the findings of fact and conclusions of law which we are now viewing, No. 37, I think it is introducing the question of rights to the use of water, the right to use water, where it can be used, and all that.

MR. SACHSE:  43 incorporates by reference the previous interlocutory judgment of this Court.

MR. VEEDER:  Relating to the stipulated judgment.

MR. SACHSE:  Relating to the stipulated judgment.

MR. VEEDER:  Yes.

MR. SACHSE:  Now perhaps my language "incorporated by reference" is excessively formal.  All it is intended to do -- because I believe every  interlocutory judgment in this case is going to have to be read together, if there is not a single final one -- all this is intended to do is to say to the poor gentleman who is trying to read the facts to find out what the Naval Enclave rights are is to say, "Brother, you better look at Judgment No. 25."  That is all it is trying to tell him.

THE COURT:  Let's try "incorporated by reference" and add on line 12 after County of San Diego "which is referred to for information purposes only" or some similar idea.  Do you follow me?  So we just don't incorporate it by reference.  I don't think it needs to be incorporated by reference.  It is referred to for information purposes only.  That will do it.

1      MR. SACHSE:  I think you don't even have to say that.

2  Just end with "County of San Diego."  You are just stating a

3  fact that you have previously entered findings of fact.  That

4  is all he needs to know.

5      THE COURT:  That is true, except that the stranger wouldn't

6  know what that was about.  It all pertained to the State Court

7  judgment, yes.

8      Let's take a recess and then start on the conclusions of

9  law.

10     MR. VEEDER:  Do you intend to run all afternoon, your

11  Honor?

12     THE COURT:  Not necessarily.  I have been hitting the

13  ball.

14     MR. SACHSE:  Whatever your Honor says.

15     THE COURT:  I went to a quarter of 5:00 last night on

16  the tuna boat case.

17     MR. SACHSE:  I think we'll be through with this shortly.

18  We can't redraft it before next week.

19     THE COURT:  Would you like to have the afternoon off?

20     MR. VEEDER:  No, I was going to arrange for other work,

21  if we were not going to run all day.

22     THE COURT:  If we do work this afternoon, let's come back

23  early and quit early.

24     MR. VEEDER:  If we might be through by 3:00 o'clock I

25  would meet with some people in connection with this lawsuit.

THE COURT:  We will figure that we will go at least by 3:00, maybe a little sooner.  Maybe we have another hour here.

MR. SACHSE:  I think this is going to go very fast, the rest of this, your Honor.

MR. VEEDER:  I am not objecting.

THE COURT:  You may be thinking about this.  I made a group of pre-trial rulings.  Have you incorporated those rulings in this matter?

MR. SACHSE:  As they go along and are pertinent, yes, your Honor.  For instance, you will find a ruling that the United States has no prescriptive rights, and you will find another ruling -- I can't name another one offhand.

THE COURT:  Don't you think we ought to have a conclusion on the metaphysical theory and the bucket at the end of the stream theory?  The mere fact that I put them in the opinion doesn't take care of them in the decree.  I don't want to rub salt in the wounds of my good friend Mr. Veeder, but the mere fact that they are in an opinion doesn't mean anything.

MR. SACHSE:  You have raised a question that I didn't discuss with Mr. Girard.  I think probably it might be wise to put in a conclusion of law that the United States does not have any riparian rights based upon, and try to summarize, your Honor, your pre-trial opinion merely by statements.  But to try to reanalyze them with fact findings is pretty tough.  They are pure conclusions of law.

1    MR. VEEDER:   They had better relate to something.   That

2    is my view.

3        MR. SACHSE:   Don't forget they were made on motion.

4        MR. VEEDER:   They had better be related to some facts.

5        MR. SACHSE:   They were made in the pleadings.

6        THE COURT:   The bucket of water theory is related to the

7    fact that the Government owns some National Forest up on the

8    top of some mountain somewhere.

9        MR. SACHSE:   I am a little confused now.   Maybe I am

10   lost on Federal procedure.   But wasn't that entire pre-trial

11   opinion intended for two things -- intended to rule on a number

12   of motions, which you did at the conclusion of it, and second-

13   ly to give us guidance for the rest of the trial of the cause?

14       THE COURT:   To the extent that it disposed of some legal

15   issues I think they ought to be incorporated in the decree.

16       MR. SACHSE:   I will very carefully check it, then,

17   against the conclusions.

18       MR. VEEDER:   And of course I think the same matter would

19   be essential, at least I think it would be a good idea to have

20   it perfected in regard to the counts     we have put in in

21   regard to Fallbrook's claims.   I am not sure what the result

22   of your Honor's striking three or four of the counts in the

23   original complaint would be.   Wouldn't it be necessary that

24   those be reflected in something?

25       THE COURT:   I don't think as a matter of procedure the

1    striking of counts would have to go into the final decree.  If

2    there is error there, you can take it up on final judgment.

3        MR. VEEDER:  You are not going to have it reflected in

4    the final judgment?

5        THE COURT:  I don't think the striking of counts has to

6    be.  I am only thinking about legal principles which were

7    decided at pre-trial which disposed of certain issues of the

8    case.  I think they ought to be in the legal conclusions

9    somehow.

10       MR. SACHSE:  That will not be too hard to do, your Honor.

11       You raise another question, though.  If we are discussing

12   informally, we might ask it now.

13       Your Honor has made several rulings.  I don't know if

14   they are in the minute order or not.  Maybe that is what Mr.

15   Veeder is getting at.  Maybe that ought to be in some way

16   covered.  The outstanding example I can think of your objection

17   or your motion, Mr. Veeder, predicated on Fallbrook's what

18   you call "ultra vires acts."  What the status of that is in

19   this record you had better look up.  Whether there is a minute

20   order on it I don't know.  I know your Honor overruled him.

21   But what we do with it in this judgment I don't know.

22       MR. VEEDER:  The point that occurs to me on that is that

23   in your Fallbrook Interlocutory Judgment there is reference

24   to the legal capacity of Fallbrook to perform.

25       MR. SACHSE:  The Court said these are valid permits.

1      I am just saying that if you want something in, you will

2  have to write it.

3      (Recess.)

4      MR. VEEDER:  May I inquire for the record, your Honor,

5  in connection with the preparation of conclusions of law, your

6  Honor half facetiously referred to the bucket at the end of

7  the stream theory, and I would like to know whether a con-

8  clusion of law, or indeed perhaps a finding that the United

9  States of America has not claimed and does not now claim that

10  water rights on its public lands under the Bureau of Land

11  Management Administration, the Forest Service land or the

12  Indian land -- let me start that again.  That no rights to

13  the use of water are claimed in connection with Camp Pendleton

14  by reason of the ownership by the United States of America of

15  public domain lands, Indian lands or Forest Service lands.

16      THE COURT:  That is something like I had in mind.

17      MR. SACHSE:  I would like to see it.

18      THE COURT:  But I don't think that you could honestly say

19  that the United States of America has not claimed and does

20  not now claim.

21      MR. VEEDER:  Of course, I never asserted that, your Honor.

22  The fact is I signed a stipulation that we were not claiming

23  a right to move these rights down to Camp Pendleton.  I am

24  not being defensive on this.  I want it clear that such a

25  claim has never been asserted here.

1    THE COURT:  Has never been asserted?

2    MR. VEEDER:  No.

3    MR. SACHSE:  It was asserted.

4    MR. VEEDER:  No, it is not true.  I never made such

5    assertion.

6    THE COURT:  You mean I thought this up, I had a bad dream

7    one night and thought this up?

8    MR. VEEDER:  Here was one thing that could be laid to

9    rest today.

10   THE COURT:  I think we can draw a conclusion that the

11   United States, as of the date of this judgment, does not claim,

12   and the Court finds it does not have any rights in Camp

13   Pendleton by reason of the fact that it owns these other public

14   lands upstream, and I am willing/to go further and say that
                                  not

15   you at one time did claim; that it will have to be limited to

16   the fact that you presently do not claim any rights.

17   I didn't think this up after a bad dream or something.

18   You argued this in my Court.  Why do you think I spent the

19   time putting it into an opinion?

20   MR. VEEDER:  I often wondered, because I originally

21   stipulated that it had no application.

22   THE COURT:  Possibly you or I should have a psychiatric

23   examination occasionally.

24   MR. VEEDER:  I'll tell you, I'll go fifty-fifty with

25   your Honor with regard to this particular point.

1          THE COURT:  Because either you or I had a bad mental

2    lapse, one or the other.

3          MR. VEEDER:  Your Honor being in the position he is in --

4          THE COURT:  No, we're both --

5          MR. VEEDER:  I would simply say this language would take

6    care of it.

7          THE COURT:  We'll work out some language.  I am going to

8    look through this opinion and see what else there is.  That

9    is the type of thing I had in mind.

10          MR. VEEDER:  That would be one way of eliminating it.

11          THE COURT:  I think so.  I think what you have stated

12    and what I have stated, something like that would work pretty

13    well.

14          MR. VEEDER:  Before we leave the findings, may I go back

15    once more to be sure I comprehend what your Honor's directions

16    are, because I have been working on the point.  Back in

17    Finding No. 21 there set out the water diverted outside the

18    watershed and the water used inside the watershed.  As I

19    comprehend it, we were to prepare our thought in regard to

20    the waters or factors in regard to water use, water demand

21    and water needs within Camp Pendleton.  Is that right?  It

22    was not clear to me what your Honor said in regard to 21, and

23    it is not clear to me now.

24          THE COURT:  I don't recall saying anything like that.  I

25    said I wanted this matter put in, because I said that the use

1    of water outside the watershed had been sticking out like a

2    sore thumb in this case from the time it started and I wanted

3    it put in.  I don't know that there was anything said about

4    adding to it about the needs -- or what is your point?  What

5    else do you want in there?

6        MR. VEEDER:  For example, we have put in a great deal of

7    evidence in regard to the land classifications, water duty,

8    material like that.

9        THE COURT:  I have no objection to a prima facie finding

10   on things of that sort.

11       MR. VEEDER:  We will go ahead on it, then.

12       THE COURT:  There is no question about No. 1, is there?

13   2.

14       MR. SACHSE:  On 2 I would suggest, your Honor, it might

15   be better from the second line of the paragraph to strike

16   describing the exhibits blank through blank.  Just use the

17   broad term that Mr. Veeder did and say "within the Naval

18   Enclave as herein defined".

19       THE COURT:  Well, you see, they are not part of the

20   Santa Margarita River.

21       MR. SACHSE:  Well, within the Naval Enclave and the

22   watershed, yes.

23       THE COURT:  You have to get that word "watershed."  That

24   would do it.  Insert "and within the watershed."

25       Have we got a finding in here as to where this watershed

is?

MR. SACHSE:  That is the very beginning one we were supposed to rewrite, your Honor.

THE COURT:  I think all we can do is adopt that map.

MR. SACHSE:  I asked Colonel Bowen, I think at lunch the other day, something about that, and I wonder if this watershed question isn't similar to the word "correlative." We had in this very case evidence how a watershed has changed, and I question the necessity of attempting specifically to delineate the watershed. If the United States wants to, I have no objection.

MR. VEEDER:  There must be a finding on that, your Honor.

MR. SACHSE:  But to try specifically to indicate its boundaries, I don't know that it is necessary.

THE COURT:  Couldn't you say that there is a watershed line et cetera of such and such a date, that as of that date it was depicted on exhibit so and so incorporated by reference, and leave the matter open, if you got a situation where further information or something like that changed the watershed? I don't think it is too important one way or the other, but I think it should be in there.

MR. SACHSE:  I will then request Mr. Veeder -- that is so closely tied to this engineering material -- that you in-corporate that.

MR. VEEDER:  All right, we have an exhibit that will show

it.

THE COURT:  3.  Lines described et cetera, which are within the watershed, because these exhibits are going to have a lot land that isn't in the watershed.

In 4 you don't have the same problem, do you?

MR. SACHSE:  No, your Honor.

THE COURT:  Are those all within the watershed?

MR. SACHSE:  Anything that would be in that exhibit would be in the watershed of De Luz Creek, wouldn't it, Colonel?

THE COURT:  It would be easy to check.

MR. SACHSE:  We will check it.

THE COURT:  Of course in 6 you probably say it all.  But these are conclusions of law.  You could say that the last use of the last user on the stream cannot be adverse to up-stream owners.  I suppose you say it all.

MR. SACHSE:  It seems surplusage to me.

THE COURT:  All right.

MR. SACHSE:  On 7, I don't know whether you have it before you, your Honor, but I submitted -- Mr. Veeder has copies -- two requested additions, 7-A and 7-B , by letter to your Honor.

THE COURT:  Yes, I have them right here.

MR. SACHSE:  Also on 7.  Now this I felt, and I will review your Honor's opinion carefully, but I had felt that 7 does it practically, that when your Honor finds that they have no appropriative right that slams the door on any contention.

1   Some of these rights, I guess, are technically not appropria-

2   tive.  So we had better go through the thing.

3       THE COURT:  Some of the asserted rights smack of

4   sovereignty.

5       MR. SACHSE:  All right, I'll check it very carefully.

6       THE COURT:  Let's see what your additions 7-A and 7-B

7   are.

8       MR. SACHSE:  They don't relate to that problem directly.

9       THE COURT:  Any objection to 7-A, Mr. Veeder?

10      MR. VEEDER:  Yes, definitely.

11      THE COURT:  What is the objection?

12      MR. VEEDER:  It is in error.  But your Honor, I assume,

13  had ruled that that is the situation.

14      THE COURT:  7-B.

15      MR. VEEDER:  Should we drop out "Joseph H. Pendleton"?

16      MR. SACHSE:  Yes, I will make it "Naval Enclave."

17      MR. VEEDER:  I would object.  It seems to me, that that is

18  strictly an  opinion rendered without any basis.  How can you

19  say that in the future it would never give rise to any rights?

20      THE COURT:  This is part of the theory that we discussed

21  some time back that a certain right will not be adverse and

22  thereafter no rights accrue.  You are even further away from

23  a right than the situation where that was applied.  Here the

24  last user never can have an adverse user against people up-

25  stream.  But I think it just makes it clear what the situation

1     is.

2         MR. SACHSE:   If Mr. Veeder and your Honor would read the

3     next clause, which happens to be in the proposed addition to

4     the judgment, I think it makes clear what I am trying to get

5     at.

6         THE COURT:   It would seem to me that you would say "and

7     except further that once the water reaches the Naval Enclave".

8         MR. SACHSE:   No person upstream can object to the use

9     made by the United States.

10        THE COURT:   As long as you have in there that they can't

11    reach upstream to assert this right.   Then I think you ought

12    to have that other exception in there that once the water gets

13    down there they can use it as they please.

14        Would you agree with that, Mr. Veeder?

15        MR. VEEDER:   Your Honor, I have advised against -- you

16    have stated that we would not have quiet title language in

17    regard to any of the rights.

18        THE COURT:   I have not said that, Mr. Veeder.

19        MR. VEEDER:   Now your Honor, the only point I wish to

20    bring to your attention --

21        THE COURT:   I have said, and we have put in the decrees,

22    that the rights of the United States were quieted against et

23    cetera, and the rights of other people were quieted against

24    the United States.   What I said was that I was not going to

25    take individual parcels and owners and say that their rights

1   were quieted against some other correlative owner when we are

2   not in an apportionment situation.  You are talking now about

3   a further exception to this proposed provision in the judgment.

4   Don't you agree that should be in?

5       MR. VEEDER:  Well, I certainly do, that any water reaching

6   the Enclave is not subject -- can be utilized by the United

7   States both within and without the watershed.

8       MR. SACHSE:  No question.  I will add it.

9       THE COURT:  All right.

10      8.

11       MR. SACHSE:  This is, I believe, almost identical to

12   Murrieta.

13       THE COURT:  Yes, it is the same language.

14      9.

15       MR. SACHSE:  Mr. Wilkinson asks me -- let's make sure we

16   are not wrong -- you don't want to substitute the 29 Series

17   for 37 in this reference, do you?

18       COLONEL BOWEN:  No.

19       THE COURT:  No, it was for the small gullies that you

20   wanted to do it, wasn't it?

21       COLONEL BOWEN:  Yes, your Honor.

22       THE COURT:  10.

23       MR. SACHSE:  "Naval Enclave" instead of "Camp Pendleton"

24   again.

25       THE COURT:  Of course, you have kind of a non sequitur.

18,770

You say that the use of water outside the watershed is reason-
able and beneficial.

MR. SACHSE:  This is Mr. Girard's language.  I balked a
little at that.  But he insists -- I want to state it fairly --
Mr. Girard's position is that they are reasonable, that the use
outside the watershed is reasonable.  I say I don't think it
is.  But he says it is reasonable, but it is illegal.  I don't
quite get the distinction.  But we fought this one out.

MR. VEEDER:  Let's get back to this question of illegal,
because we have already said that if the water reaches the
Enclave it is perfectly proper to be used outside the watershed.

MR. SACHSE:  Let's strike "illegal."  That was a very
poor choice of words on my part.

THE COURT:  It is not illegal.  I would rather do it this
way, if we are going to revise it, that the uses within the
watershed are, as to their character, reasonable and beneficial;
that as to the uses without the watershed they are proper as
being the last user on the stream, and that except for their
non-watershed character are otherwise reasonable and beneficial.
Something like that.  It is pretty hard for me to make a flat
finding that a use out of a watershed is reasonable.

MR. VEEDER:  But your Honor, in regard to the water we
have used up to now that has flowed down to the United States
and which will continue to flow down, it is a reasonable use.

MR. SACHSE:  I find myself in a very particular position.

MR. VEEDER:  You have already ruled on that point.

THE COURT:  Did you hear what I just said?

MR. VEEDER:  Yes, I did.

THE COURT:  I said that the use by the United States of water outside the watershed was a proper use or, if you want to call it, a legal use in that the United States was the last user on the stream, and that except as to its non-watershed or as to its out-of-the-watershed character it was otherwise a reasonable and beneficial use. I just kind of can't stomach saying that a use out of the watershed is reasonable.

MR. VEEDER:  Let me follow through on this.

THE COURT:  In the sense that the word "reasonable" is used in water law.

MR. VEEDER:  But here is the proposition, as I comprehend it, and I think it is extremely important to the United States. Any water entering the Enclave can be reasonably used by the United States both inside and outside the watershed, in my view, under your present rulings which presently exist. It is a perfectly legal use to use water outside the watershed once that it enters the Enclave. You have said we cannot reach upstream and demand releases of water to come down for use outside the watershed. But certainly, your Honor, why would we disparage this very important right that we have once that the water is physically in the Enclave?

THE COURT:  The last user on the stream can take water

out of a watershed once it gets there. Actually, he could also make unreasonable uses. He can waste it. If he can take it out of the watershed, he can do anything with it. So when you say it is a reasonable and beneficial use, I think the language I propose does it as well as anything.

MR. SACHSE: The real reason I suggested 7-A and 7-B was after Mr. Girard and I had a lengthy fight over this. I spoke much as your Honor. I will try to paraphrase Mr. Girard's position. He took the position that the use of the term "reasonable" -- I think we would all concede it is beneficial -- that "reasonable" meant non-wastable or non-impractical, and he finally came around and conceded my 7-B to me, in which I have said that all uses outside the watershed are without right but that no person has been or will be injured. In other words, Mr. Girard seems to feel that it is possible to have a use without right which is nonetheless a reasonable use.

THE COURT: That is what I am trying to say. I said "and as to the uses outside the watershed, other than their non-watershed character, they are reasonable and beneficial."

MR. SACHSE: I will try to write it. I will welcome Mr. Veeder's suggestions, too. I have suggested to him already on some of these things that we do them on single pages so that if an alternative is presented it might be easier to work with. But I don't think we will have any great trouble getting an agreement on it.

1    THE COURT:   I think you can work something out.

2    I think it should go further and say "the use outside the
3    watershed as a last user on the stream is a lawful and proper
4    use".   I am just having trouble stomaching the word "reasonable".
5    I don't have any trouble with the word "beneficial".   But of
6    course if it is a proper use, then I suppose it is a reasonable
7    use.

8    MR. VEEDER:   That is what I was going to say.   Are we to
9    have this water come down to us on the Camp, take it out to
10   provide Marines with water, and then have any question as to
11   the reasonableness of it?

12   THE COURT:   The trouble is, Mr. Veeder, the words
13   "reasonable and beneficial" have been used almost exclusively
14   in connection with the uses of riparian water, or maybe I had
15   better say in connection with uses within a watershed.   They
16   are language that is used as to water within a watershed.

17   MR. VEEDER:   I had been hopeful that when you go back to
18   7-A, that no person has been or will be injured by any of the
19   uses for the reasons that the United States is the last user
20   on the stream, to me it necessarily follows, if you are going
21   to have that conclusion, that it is reasonable and beneficial.

22   MR. SACHSE:   His Honor is being tougher than I was.

23   THE COURT:   Let's forget about the word "reasonable" and
24   say that the uses outside the watershed, therefore, are proper
25   and beneficial, and leave out this word "reasonable."

1    MR. SACHSE:  That might be a very handsome solution.  You

2  are not finding that they are unreasonable.

3    THE COURT:  They are proper and beneficial.  There is no

4  doubt they are beneficial.  I just have trouble stomaching

5  the word "reasonable" when it is a use outside a watershed.

6  But maybe we can do it that way -- proper and beneficial.

7  Let's go ahead.  You can work something out on that.

8    MR. SACHSE:  The second clause is a little different,

9  and for the record, as Mr. Girard objected to the finding on

10  line 29 --

11    MR. VEEDER:  Where are you now?

12    MR. SACHSE:  Line 29, the same paragraph on page 25.  It

13  starts at line 25.

14    THE COURT:  Your objection is overruled.  That is one

15  for Mr. Veeder now.  I am trying to be even-handed here --

16  one for Mr. Veeder, one for you.

17    MR. VEEDER:  Give him a rabbit and give me a horse.

18    THE COURT:  You will change "Pendleton" to"Naval Enclave".

19    MR. SACHSE:  Yes.

20    MR. VEEDER:  I would like to have a conclusion that

21  exclusive jurisdiction has been ceded by the State of California.

22    MR. SACHSE:  Mr. Veeder, please save the argument for

23  next week, if you will. I am not capable on that.  As I

24  understand it, the Supreme Court has agreed to hear two cases

25  on this which don't directly affect Pendleton but which involve

1    the same question, and Mr. Girard is very much afraid, although

2    he hasn't anything to do with those cases -- a couple of milk

3    cases in the United States Supreme Court and there is a serious

4    question on that.

5        MR. VEEDER:  A serious question about Pendleton?

6        MR. SACHSE:  About whether this constituted a cession and

7    how exclusive a cession.  That is what concerns him.  Mr. Girard

8    tells me that the cession of Castle Air Force Base was exactly

9    the same and the problem at Castle Air Force Base is going up.

10   I would ask you to hold everything on that and let Mr. Girard

11   argue that.

12       THE COURT:  What is the need for a finding on that here?

13       MR. VEEDER:  Very clearly that the police powers of the

14   State of California have no application within the Enclave,

15   and that the waters that do reach the Enclave and use of waters

16   within the Enclave are not subject to police control of the

17   State of California.

18       THE COURT:  That the waters that do reach the Enclave --

19       MR. VEEDER:  Are beyond the police power of the State of

20   California.

21       THE COURT:  We have already found that waters that reach

22   the Enclave may be properly used.

23       MR. VEEDER:  Only by reason of its being the lower user.

24   I think the matter of exclusive jurisdiction is important.

25       THE COURT:  There is no issue on this.  Nobody is going

18,776

1   to contest this. Why stir up some problem on it? Nobody is

2   going to contest your right of use as the last user. If you

3   contend also that because of exclusive jurisdiction of the

4   United States the State Water Rights Board is exercising police

5   power and has no right to determine who should get a permit to

6   appropriate water --

7       MR. VEEDER:  Certainly within the Enclave the State Water

8   Rights Board has no jurisdiction.

9       THE COURT:  I know. But what they do is outside the

10  Enclave. They give Fallbrook a permit to build a dam. It is

11  outside the Enclave. The police argument doesn't apply there,

12  does it?

13      MR. VEEDER:  All I am saying is that the State of

14  California ceded exclusive jurisdiction of all these lands

15  within Camp Pendleton, and I propose that a finding be made

16  that those acts were taken and that you conclude as a matter

17  of fact that the United States has exclusive jurisdiction over

18  the land and waters within the Enclave.

19      MR. SACHSE:  The request I would make is -- this is a

20  simple finding, apparently, regardless of how your Honor might

21  rule -- let's ask Mr. Veeder to write it and leave it to Mr.

22  Girard. I am not capable, and I know it is something very

23  critical in the Attorney General's office.

24      MR. VEEDER:  Did you say that is now before the Ninth

25  Circuit?

1    MR. SACHSE: · No, the United States Supreme Court agreed

2   to hear the two milk cases at Castle Air Force Base and San

3   Francisco.  And what is more, the Solicitor General <u>Coxen</u>

4   has already filed a brief and in his opening brief he said

5   that a number of the claims of counsel for the United States

6   in the Circuit were in error.

7       MR. VEEDER:  He didn't consult me.

8       THE COURT:  Draw your proposed finding and your proposed

9   conclusion.

10       MR. VEEDER:  I will.

11       THE COURT:  And submit them to Mr. Girard and we will

12   have them on the calendar.  What date did he say he will be

13   back?

14       MR. SACHSE:  Next week he will be here Wednesday when we

15   are in session again.  We were not going to operate on Monday

16   or Tuesday, as I understand, because Mr. Veeder and Mr. Girard

17   both were to be in San Francisco.

18       THE COURT:  All right.

19       Probably we should number the paragraphs in the interlocu-

20   tory judgment.

21       MR. SACHSE:  If we number them, does your Honor wish the

22   language "It is further ordered, adjudged and decreed" repeated

23   each time?

24       THE COURT:  I think repeat it and just number them.

25       On line 18 "no jurisdiction in this case over the use of

1    said ground waters" is to go out.

2         MR. SACHSE:  That is the same thing we discussed on the

3    Murrieta.

4         THE COURT:  Yes.

5         MR. SACHSE:  We will rewrite it in accordance with the

6    language that is approved for the Murrieta?

7         THE COURT:  Yes.

8         I have numbered 9 the paragraph that begins on page 27,

9    about lines 28 and 29, ". . that all uses of the waters of

10   the Santa Margarita River and its tributaries by the United

11   States of America on the lands described in the exhibits

12   blank except as to the uses of water described in Interlocutory

13   Judgment No. 24. . "

14        MR. SACHSE:  The last words are "reasonable and beneficial

15   riparian uses," and Interlocutory Judgment No. 24 and Finding

16   No. 41 relate solely to Lake O'Neill.  So we excepted that

17   Lake O'Neill is not a reasonable and beneficial riparian use.

18   It is an appropriative use.

19        THE COURT:  It would read a lot better if you said "are

20   reasonable and beneficial uses except that the uses of water

21   described in Interlocutory Judgment No. 24 are not riparian

22   uses and the uses of water found in Finding No. 41 . ."

23        MR. SACHSE:  That is Lake O'Neill also.

24        THE COURT:  41 is stock ponds, isn't it?

25        MR. SACHSE:  No, your Honor.

1    THE COURT:  41?  It is stock ponds.

2    MR. SACHSE:  Yes, that is right.  They are not reasonable

3  and beneficial riparian uses, but they are reasonable and

4  beneficial.

5    THE COURT:  Yes.  I think it would a lot better.  You

6  would have to drop down to the last line there and see what

7  you can do to dress that up.  And depending on what we do with

8  this use out of the watershed, except that the uses out of

9  the watershed as described are proper and beneficial but not

10  riparian uses, something like that.

11    MR. SACHSE:  All right.

12    THE COURT:  You have about three exceptions there.

13    MR. SACHSE:  I may end up with about three paragraphs

14  then.  It might be easier to work it out.

15    THE COURT:  No. 10 that begins on line 5 is pretty hard

16  to read.  It ought to have a comma after the word "waters" on

17  line 10 -- "waters, shall be . ."

18    MR. SACHSE:  I think Mr. Girard meant "those," not

19  "thoses," on line 6.

20    THE COURT:  Yes.

21    We have done the same thing again.  We haven't put in the

22  paragraph about persons going to have a chance to object to

23  this judgment.

24    MR. SACHSE:  No, your Honor, and Mr. Girard has that

25  covered in his routine provisions that we contemplated adding.

1    THE COURT:  There is the question whether there will be

2    further conclusions on some of these other problems and further

3    provisions in the judgment.

4        Well, it's after 12:00 o'clock.  Do you want to take a

5    short lunch hour and come back and discuss some other matters?

6        MR. VEEDER:  Whatever your Honor desires.  I'll be here

7    all day.  The only reason I was inquiring about whether you

8    were going to run all afternoon is whether I should proceed

9    to set up some other work.

10       THE COURT:  I would just as soon knock off.

11       MR. SACHSE:  It is all right with me.  I think we can

12   probably have most of almost everything at least in a redraft

13   by next Wednesday.

14       THE COURT:  Did you have a chance to look over any of

15   this material?

16       MR. SACHSE:  I have glanced at it just hastily.

17       THE COURT:  I have no pride of authorship in this at all.

18   I am just trying see if we can get something down that we can

19   get our teeth into.  We will talk about them on Wednesday.

20       MR. VEEDER:  If we are going on over to Wednesday, I have

21   filed those findings on Aguanga and Anza.  Do you propose to

22   look at those Wednesday, Thursday or Friday?  Because I am

23   anxious, if we are going to have separate findings set for

24   the Indian areas, to follow through in a general form.

25       THE COURT:  This is Part 1?

MR. VEEDER:  No, in our discussions the other day the question of the Pechanga Indian rights came up and it was suggested that all the Indian rights or the Forest Service rights and all the other rights be in separate interlocutory judgments.  Is that going to be your Honor's thought in that regard?  It will make a difference, because I will have to consult with other people on it.

THE COURT:  I have no thought about the matter.  One way to do would be to throw the Indian land  and the Forest land in the subwatershed where they appear.

MR. SACHSE:  We discussed this, I believe, the first day this week with Mr. Girard.  I think my recollection is right.  Mr. Girard, Mr. Veeder and I felt it would be wise, simply for convenience, to have a separate interlocutory judgment decree which would spell out the rights of the Indians insofar as they differ from anything that might be contained in the decree, let us say, for the ground water area, one for the Pechanga Indian Reservation in the ground water area.

THE COURT:  That is satisfactory to me.  In other words, you would put all the Indian Reservations in one decree.

MR. SACHSE:  I had thought that would probably be the way to handle it, in view of the way the matter was handled in Murrieta-Temecula.

THE COURT:  That is satisfactory.

To go back to your first question, you asked about Anza.

1   Mr. Girard prepared findings on Anza.

2       MR. VEEDER:   Yes, and I have made a complete rewrite and

3   have tendered those to you.   And you also have your Aguanga

4   matter before you.

5       MR. SACHSE:   Those are not, are they, Mr. Veeder, one of

6   your 1, 2, 3 series?

7       MR. VEEDER:   That land was in the 3 series, and I have

8   just put a 3 and 3-A.   You will find in the upper righthand

9   corner of Exhibit 29 "Aguanga Ground Water Area."

10      MR. SACHSE:   The thing that concerns me about those as

11  submitted by Mr. Veeder, your Honor, is, very frankly, that

12  they don't make any sense at all, unless you use them  all.

13      MR. VEEDER:   What do you mean?

14      MR. SACHSE:   3 as compared to 3 ties into 2 ties into 1.

15      MR. VEEDER:   No, Mr. Sachse, the Aguanga ground water area

16  is separate, apart and distinct.   I don't tie it to anything.

17  Maybe we will not get to it on Wednesday.   I am trying to

18  anticipate as much as I can, because I have a lot of work to

19  do between now and then.

20      MR. SACHSE:   I really haven't gone through it.

21      THE COURT:   Aguanga ground water area, this is the other

22  ground water matter that is comparable to Temecula-Murrieta.

23      MR. VEEDER:   That is right.

24      THE COURT:   Why wouldn't it be better to go over what you

25  have and use the same language we have worked out in 30?   Why

1    have one set of language in one ground water area and another

2    set in another?

3          MR. SACHSE:   That was my thought.

4          MR. VEEDER:   There is a different physical situation

5    there.

6          MR. SACHSE:   You carry this thing right on.   Your first

7    finding is No. 110 and the very beginning of the ground water

8    area starts out by telling about these prior findings, which

9    I think is impossible.

10         MR. VEEDER:   Mr. Sachse, forget everything except the

11   particular finding whee the water rises and follow on down

12   through.

13         All I want to know, frankly, at this time is whether these

14   will be considered on Wednesday, Thursday or Friday.

15         THE COURT:   We will try to consider them.

16         Has anyone else drawn any findings?

17         MR. SACHSE:   Yes, the Warm Springs Creek findings are

18   before your Honor and Mr. Veeder.

19         THE COURT:   On the other ground water area?

20         MR. VEEDER:   I don't believe anyone else has.

21         MR. SACHSE:   I don't believe so, your Honor.

22         THE COURT:   We might be able to take a look at what

23   material you have in here and use the general language we have

24   used in 30.   I would like to have them uniform on the general

25   language.

1    Also you have here Anza Valley.

2    MR. VEEDER:  That is correct.

3    THE COURT:  And Mr. Girard submitted one.

4    Of course, you have gone down further.  You have taken

5    Coahuilla and Wilson Creek.

6    MR. VEEDER:  Yes, in view of the fact that you directed

7    me to prepare the Aguanga ground water area, I thought it would

8    be the logical sequitur to go ahead and proceed up Coahuilla

9    Creek and Wilson Creek and tie them onto the Aguanga ground

10   water area.  If the general form is acceptable to you, I would

11   go ahead and do the same thing on Temecula Creek and that would

12   take care of everything above Vail Dam, that is, in these

13   findings.  I think your conclusions, whatever your conclusions

14   are, your Honor, will probably -- I am not sure whether they

15   would be applicable to the Aguanga ground water area, because

16   I think there are differences.

17   THE COURT:  Up in the corner of this Anza matter you say

18   "Anza Valley, Coahuilla Creek, Wilson Creek And Ground Water

19   Basins In That Drainage Area Above Aguanga Ground Water Area."

20   MR. VEEDER:  That is correct.

21   THE COURT:  This is everything above the ground water --

22   MR. VEEDER:  On Coahuilla Creek and Wilson Creek, that

23   is correct.  The conclusions will be substantially the same

24   as these that are worked out now.

25   MR. SACHSE:  Your Honor, I hate to pick on somebody else's

1    draftsmanship, but it seems to me that we should stick to the

2    general pattern that we have followed.  These things are full

3    of references to climate, references to crop patterns, references

4    to all sorts of things that don't appear in these major findings

5    that we have heretofore made, and to draw a distinction I think

6    it is a mistake.  They don't read well together.

7        THE COURT:  I agree on that.  But he has a lot of findings

8    on the streams and the area descriptions.  It would be a

9    question as to how much of that we could pick out and then use

10   the general language you have used in 30.

11       MR. SACHSE:  I am sure that a great deal of the material

12   here is absolutely correct, but I think the pattern we should

13   try to follow is the pattern we have heretofore used in the

14   other ones.

15       THE COURT:  All right, Wednesday at 10:00 o'clock.

16       (Whereupon and adjournment was taken until Wednesday,)
     (                                                        )
17       (February 7, 1962, 10:00 o'clock A.M.                )

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,       )
                                )
                  Plaintiff,    )
                                )
          vs.                   )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                  Defendants.   )
_____

### CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit:  February 2, 1962, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and fore-going sixty-six (66) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 9th day of February, 1962.

_____
Official Reporter