# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

#### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

        Plaintiff,

  VS.                              No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

        Defendants.

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      **Wednesday, February 7, 1962**

            Pages:   18,787 to 18,879

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street,
San Diego 1, California
BElmont 4-6211 — Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
       vs.                           )          No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY             )
DISTRICT, et al.,                    )
                                     )
                    Defendants.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, February 7, 1962

- - -

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
|  | CDR. DONALD W. REDD |
| For the Defendants: |  |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al.,: | FRANZ R. SACHSE, ESQ. |

SAN DIEGO, CALIFORNIA, Wednesday, February 7, 1962, 10:00 A.M.

-oOo-

(Another matter.)

THE CLERK:  2-1247-SD-C United States vs. Fallbrook. Further court trial.

MR. VEEDER:  Your Honor has seen this map in regard to the areas that are under the A Series of the interlocutory judgments?

THE COURT:  Yes.  It is not to be an exhibit.  It is a reference matter and I suggest that the map have my name put on it and be kept here and from time to time we can add to it.

MR. VEEDER:  We will keep it current then.

THE COURT:  Yes, keep it current.

MR. VEEDER:  I will deliver it to the Clerk.  He may put your name on it and it will be available in his custody.

MR. SACHSE:  I would like, if you can supply them, and I think it would be very handy thing for me to use as sort of an index, if you will give me a blank one that I can work on.

MR. VEEDER:  Very well.

THE COURT: Write on the outside of it "Parts Of Watershed By Decrees By Interlocutory Judgments" and keep it around here and know where it is.

MR. SACHSE:  Your Honor and Mr. Veeder, before we start the routine business today I would like to make a statement in the record which I think you should be fully advised about

1    and the Court also, as to some developments that are taking

2    place on the De Luz Creek watershed.

3        During the past two or two and a half months I have been

4    approached on several occasions by land owners who have asked

5    me if I would form a public district with two purposes: (1)

6    To attempt to bring in imported water either through the

7    Metropolitan Water District or the San Diego Water Authority

8    and (2) to file on flood waters of De Luz Creek.

9        In each case I have told them that as long as this trial

10   was pending it would be impossible and I would not consider

11   doing anything of the kind.

12       However, I am sorry I can't give you the exact dates of

13   these developments and some of my information may not be

14   entirely accurate because what I am telling you is hearsay

15   largely.

16       I believe that Friday or Saturday of last week a mass

17   meeting was held in De Luz by Mr. Dennis, who appeared as

18   attorney, Mr. Yackey, as engineer.  The preliminary steps were

19   taken toward the formation of a community service district

20   which, under the California law, has the power to serve

21   irrigation and domestic water.  I am advised that three

22   prominent land owners agreed to form a "corporation" -- that

23   is the word I heard, and I presume they mean a mutual water

24   company -- but with the express understanding that their

25   filing would be held in trust for this public district to be

18-790

formed.

MR. VEEDER:   They are filing with the State Water Rights Board?

MR. SACHSE:   They will file with the State Water Rights Board.

I was advised that the filing they are discussing is a approximately 12,000 acre feet.  This is all hearsay.

Now we get down to a few facts that I know.  I was tele-phoned last night by a large De Luz land owner, speaking for himself and another one, who wanted me to make a filing for them for 500 acre feet.

I was consulted on Monday by one of my clients, Mr. Matthews, and I gave him the proper forms for the Water Rights Board, and he went up Monday and initiated a filing for 50 acre feet.  I am told by him that at least three other land owners have grouped together and are making still another filing on De Luz Creek.  The amount I don't know.

Now the significance of this to me is simply this.  At this posture of the case the Court has ruled that the United States can only acquire appropriative rights by compliance with the laws of the State of California.  Since the abandon-ment or dismissal of the United States' original filing with the State Water Rights Board there have already intervened in excess of 2,000 acre feet of permits.

THE COURT:   What do they consist of?

MR. SACHSE:   1800 for Mr. Yackey on Sandia Creek, 200 for Garnsey on De Luz, and a number of smaller De Luz ones which I can't recite for you because there are a lot of very small ones.

Now, if the rulings of this Court stick, if it is held that the United States of America can only acquire rights to export, let us say, by appropriation from the State of California, that is, rights enforceable upstream, and a new right for 12,000 acre feet should intervene, I think any informed person, engineer or hydrologist, would state that, for all practical purposes, there would be no more surplus available for appropriation to protect or to secure the exports of the United States.   Now this is the reason I bring this to the Court's attention and to Mr. Veeder's attention, that we have had discussions here of a physical solution.   I have no idea, of course, what the report in Washington contemplates. But I think it would be nothing short of tragic to have a report come out of Washington recommending that the Navy do something, build some sort of dam, and then find out that history has repeated itself and the same thing that happened in 1957 and 1958 happens again and that because of dilatoriness in filing new rights have intervened and we find now that there is no surplus whatsoever available for appropriation.

I think Mr. Veeder should be advised of this.   I don't know what kind of steps he wants to take.   I have no personal

18-792

1    part in this whatsoever.  I am sure the Court and Mr. Veeder

2    understand that filings on De Luz Creek affect Fallbrook not

3    in the slightest.  They will all be junior to our filing.

4    They would be subject to the first charge for whatever waters

5    the Navy might need, if they did exist.  So they don't hurt

6    Fallbrook.  I haven't any concern whatsoever for Fallbrook

7    from this group -- my concern is entirely for the Navy --

8    because of the possibility of my hope of working out a physical

9    solution of some kind which would stop the lawsuit.  I think

10   what is happening on De Luz Creek is going to ruin the chances

11   of it, unless the Navy gets off the dime and at least slaps

12   in some sort of protective filing.

13        MR. VEEDER:  Mr. Sachse, may I  inquire, we have notice

14   of a filing by Garnsey on De Luz Creek.

15        MR. SACHSE:  Right.  Fallbrook got notice also.

16        MR. VEEDER:  Are you handling that for Garnsey?

17        MR. SACHSE:  No, sir.

18        MR. VEEDER:  Garnsey is your client?

19        MR. SACHSE:  Mr. Garnsey is my client in this proceeding,

20   but I have refused to handle the matter.  I didn't even prepare

21   it.  He went up to Sacramento himself and filed application

22   with the assistance of the Water Rights people.  I had nothing

23   whatsoever to do with it.

24        MR. VEEDER:  You are not handling it?

25        MR. SACHSE:  No, sir.

1    THE COURT:  Obviously this doesn't concern Mr. Sachse or
2  Fallbrook, as he points out, in that if these rights accrue
3  they are going to be junior to Fallbrook's.
4    MR. SACHSE:  They are also downstream, your Honor.  They
5  don't even affect the dam.
6    THE COURT:  But it seems to me that it is a matter that
7  should be given some consideration.  I am not telling you your
8  business, but certainly the mere fact that this lawsuit is
9  pending does not mean that the Navy may not make application,
10  if they are so advised.  It certainly wouldn't prejudice any
11  rights you have here.  I think Mr. Sachse is acting in pro
12  bono publico in calling this to our attention.
13    MR. VEEDER:  I appreciate it.  I really do.  And I had
14  understood Bill Dennis, who is the same Mr. Dennis --
15    THE COURT:  He was in this case at one time.
16    MR. SACHSE:  Yes.
17    THE COURT:  Yes.
18    MR. VEEDER:  -- is handling the matter.  This question
19  of the 12,000 acre foot filing is entirely new to me.
20    MR. SACHSE:  I am hopeful that there might be a recent
21  factual story in tomorrow's Enterprise.  I got hold of Mr.
22  Mackey yesterday when I heard this and asked him to try to
23  run it down and see what he could do, because most of what I
24  told you is hearsay, except where I spoke from specific
25  knowledge.

18,794

1    MR. VEEDER:  Your Honor, I think the record should show

2    that Mr. Stahlman is not here, because I am going to inquire

3    whether Vail Company is participating in that development.

4    MR. WILKINSON:  They are not.

5    MR. VEEDER:  They are not?

6    Thank you, Mr. Sachse.  We appreciate what you have

7    brought to our attention.  I am going to have conferences with

8    the Navy on Monday in regard to -- at least I have been advised

9    they are going to be early this next week, and I will certain-

10   ly convey to the appropriate officials the factual information

11   that has been here presented.

12   THE COURT:  I don't see that there is any possibility

13   that any action taken by the Navy or by the Government would

14   in any way prejudice its position in this lawsuit.  Do you

15   conceive of any way that it could?  If there is any thought

16   on that --

17   MR. VEEDER:  I haven't given the matter any thought,

18   your Honor.

19   THE COURT:  If there is any thought on that, I will make

20   it clear that as far as I am concerned there is no prejudice

21   to the Government's position in this lawsuit by whatever action

22   you may decide to take.

23   MR. GIRARD:  I would stipulate to that on behalf of the

24   State of California, that anything you do in regard to protect-

25   ing your rights by filing or any other method would have nothing

1    to do with this lawsuit.

2        MR. VEEDER:  I would like to inquire from Mr. Sachse, do

3    you know whether all those people -- they are all parties to

4    this litigation, are they not, those parties to whom you made

5    reference?

6        MR. SACHSE:  No. On the contrary, it is my definite

7    understanding that one of the three men whom I referred to as

8    acting as trustees and whatnot is a new land owner.  He is a

9    party to the extent that a lis pendens was filed, but he had

10   never been served.   There is no personal jurisdiction over

11   him.   It is a gentleman named Daley.

12       MR. VEEDER:  Do you have his first name?

13       MR. SACHSE:  No.

14       MR. VEEDER:  Maybe we should bring him in.

15       MR. SACHSE:  He may be a party, he may not.

16       THE COURT:  If you are thinking of any restraining order,

17   I wouldn't see any basis.

18       MR. VEEDER:  I was not thinking of a restraining order,

19   your Honor.  I am simply thinking of the impact of 12,000 acre

20   foot filing on De Luz Creek, which takes on the aspects of

21   fantasy to some degree.

22       MR. SACHSE:  I am inclined to agree that it is sort of

23   fantastic, Mr. Veeder.  I don't know exactly where they could

24   put it, without flooding out half of the small farms.

25       MR. VEEDER:  Yes.

1    . MR. SACHSE:  On the other hand, without rubbing salt in

2    the wounds, there were comments made about        fantastic

3    filings a long while ago, which have matured to permits now,

4    and I only want to call it to your attention.  That's all.

5        MR. VEEDER:  Thank you very much.

6        Your Honor, we had orginally offered in evidence Exhibit

7    209-C for Temecula watershed below Vail Dam and above Temecula

8    Gorge.  At that time I utilized my office copy.  I now have a

9    copy that I would like to substitute.  The copy I filed was

10   the only one I had at the time.  I would like to substitute

11   Exhibit 209-C, a copy without any markings on it but neverthe-

12   less identical in regard to the data contained in it.

13       THE COURT:  All right, that will be done.

14       MR. VEEDER:  You people all have copies of 209-C.

15       MR. GIRARD:  I presume so.

16       THE COURT:  What do you plan to work on today, and do

17   you plan to work tomorrow, et cetera?  For the reason that I

18   continued a criminal case until tomorrow morning and some time

19   today I will have to find out whether I am going to try it.

20       MR. SACHSE:  I am under the impression that the Murrieta

21   Creek Findings are done, your Honor.

22       THE COURT:  You mean Murrieta --

23       MR. SACHSE:  Murrieta ground water area.  They are

24   practically ready for signature and entry.

25       In connection with the work we did on the Enclave, I

1   would like to give your Honor -- I have already given Mr.

2   Veeder and Mr. Girard, and I will give one to Mr. Wilkinson --

3   I worked over the weekend on paragraphs of the Enclave find-

4   ings which had to be done substantially more than just a few

5   interlinings, including a number of paragraphs which your

6   Honor requested which are entirely new.  I am not lodging

7   these.  Each one is on a separate sheet so that when the time

8   comes we could discuss those.  I will give them to your Honor

9   now, if you want, but I don't think it would be in order to

10  take this up until we dispose of Murrieta.

THE COURT:  This is a copy for me then?

MR. SACHSE:  Yes, your Honor, and I am having a few more

made.  Maybe I will have them ready by tomorrow, certainly by

Thursday.  My secretary is doing them now.

MR. VEEDER:  Tomorrow is Thursday.

MR. SACHSE:  Certainly by Friday.  I don't know how fast

she is working.

THE COURT:  Mr. Girard handed me this morning No. 30 on

the Murrieta ground water area, with the various changes and

additions, and it is my understanding that it is suitable for

reppoduction, attachment of exhibits, et cetera, if I and the

rest of you are satisfied with it.   But I only received it.

MR. GIRARD:  Yes, your Honor.  As far as the substantive

nature of the findings is concerned, I think those have all

been pretty well hashed out and argued.  The only changes in

1   this draft dated 2-7-62 are those which concern the method

2   whereby we referred to the exhibits prepared by Commander Redd

3   and Colonel Bowen.  When I had drafted up the originals I

4   just merely referred to one exhibit which would, for example,

5   list all the land riparian to Murrieta.  That was not the way

6   Commander Redd and his staff had prepared their exhibits.  So

7   I changed my findings to make them correspond with the exhibits

8   which the United States had prepared.

9       THE COURT:  Then we can't do anything really on No. 30

10  until you have had a chance to read this over and look it over.

11      MR. VEEDER:  I just received it, your Honor.

12      THE COURT:  Yes.

13      MR. GIRARD:  I would like to emphasize, though, your

14  Honor, that as far as the substantive nature of the/findings
                                                      major

15  is concerned themselves, the geology, those have all been

16  discussed and seen and rehashed and there are no changes in

17  those from those approved by the Court.  The only changes in

18  this draft concern these technical matters, with the exception

19  of one finding, which is the last finding on page 27, which

20  states, in essence, that although the lands of the Pechanga

21  Indian Reservation are set forth on some of the exhibits this

22  particular interlocutory judgment does not intend to determine

23  the rights of the Indians and that the Indian rights will be

24  determined in separate findings of fact dealing with that

25  general problem, because there are different and other major

things we have to consider with the Indians.  I think it is
agreed that we should consider those separately and all lands
dealing with the Indians in this watershed.

MR. VEEDER:  You said "findings of fact," Mr.Girard.  You
meant, in addition, conclusions of law and interlocutory
judgment.

MR. GIRARD:  Yes.  The finding says, in essence, that all
water rights which pertain to said lands -- and this means on
the Indian Reservation -- or to the Indians thereon will be
covered in separate findings of fact, conclusions of law and
interlocutory judgment.

MR. VEEDER:  Is it your desire, also, your Honor and
counsel, that we include the Forest Service lands and the
Bureau land, the Taylor grazing land, with the Indian claims?
Or do you want those set up separately?

THE COURT:  I have no preference.

MR. GIRARD:  Is there any of it in the ground water area,
Colonel?

MR. VEEDER:  No.

MR. GIRARD:  There is none insofar as the particular
judgment is concerned.

MR. VEEDER:  That is right.

MR. GIRARD:  I have no preference, Mr. Veeder.  I will
leave it up to you entirely.

MR. VEEDER:  You are referring to 30?

1    MR. GIRARD:  Yes, 30.  If you want to treat those lands

2    in separate findings, I have no feeling one way or the other.

3    I leave it up to you how you want to do it.  I think maybe

4    for real small particular parcels it will probably be more

5    convenient to bring them into the regular findings.  But if

6    there are any extensive holdings, I have no objection.

7       MR. VEEDER:  Your Honor asked how we desired to proceed.

8    The Enclave findings I considered on many points that were

9    raised, and we have obtained the recording data as to each

10   parcel of land which has been acquired.  As I comprehend it,

11   we would simply refer to the Naval Ammunition Depot, Camp

12   Pendleton, the various tracts and parcels of land which go

13   to comprise the entire 135,000 acres and refer to each parcel

14   of land and then say recorded in such and such book, on such

15   and such page and on a particular date.  Is that satisfactory,

16   your Honor?

17      THE COURT:  The thing that was recorded was either a

18   deed or a final decree in condemnation.

19      MR. VEEDER:  That is right; amended judgments in condemna-

20   tion.  The judgments were recorded.

21      THE COURT:  As long as they are identified that way by

22   book and page in the official record, I think that is satis-

23   factory.

24      MR. VEEDER:  I will go ahead then and set them up that

25   way.

1      Do you have Finding No. 4, your Honor, of proposed Inter-

2  locutory Judgment No. 37?

3      MR. GIRARD:  It is on page 3.

4      MR. VEEDER:  Isn't that where it was intended to make

5  reference, Mr. Girard, to the properties in question?

6      MR. GIRARD:  It could be done either in Finding No. 1 or

7  in No. 4.

8      MR. VEEDER:  If you look on my suggested findings on page

9  18, I would amend those to reflect the dates of acquisition,

10  the means of acquisition, and the book and page in the County

11  Records in which those acquisitions would appear.  You would

12  set those up as Finding No. 1 or Finding No. 4 of the present

13  37 which is before the Court.

14      MR. GIRARD:  I think it would also be helpful, even

15  though we are going to refer to the deed and not to the

16  description -- do the deeds have the usual terminating clause

17  "containing more or less so many acres"?

18      MR. VEEDER:  Yes.

19      MR. GIRARD:  That probably should be in the findings

20  generally.

21      MR. VEEDER:  What we would do is go ahead and set that up.

22  For example, it would be the amended judgment on 9,147.55 acres

23  of the Naval Ammunition Depot.

24      THE COURT:  I have found my copy now.  What page?

25      MR. SACHSE:  Page 3, your Honor.

1    MR. VEEDER:  Do you have 37, your Honor?

2    THE COURT:  Yes.

3    MR. SACHSE:  Mr. Veeder, the question I have about Finding

4    No. 4 now, I think everything you have said so far is fine as

5    to the correction of Paragraph 1 in Mr. Girard's draft.

6    MR. VEEDER:  In the draft of Mr. Girard I think No. 1

7    should be revised to refer to Camp Pendleton.

8    MR. SACHSE:  That is correct.

9    MR. VEEDER:  Ammunition Depot, U. S. Naval Hospital

10   hereafter referred to as the Naval Enclave.

11   THE COURT:  Yes.

12   MR. SACHSE:  All that I agree with.  But there is an

13   additional problem in connection with No. 4 on page 3.  The

14   way Mr. Girard has drafted it, it states "that attached hereto

15   are descriptions of each smallest tract of land . . , said

16   land being within the watershed . . " We brought this up

17   the other day.  I don't think Colonel Bowen is going to be

18   able to give you metes and bounds descriptions without very

19   expensive surveys.

20   MR. VEEDER:  Mr. Sachse, I think that has been taken care

21   of by an agreement, I thought, reached by us that there will

22   be reference to the watershed lines as depicted on such and

23   such exhibit.

24   MR. SACHSE:  That is right.  In other words, I think you

25   are going to have to correct both Finding No. 1 and No. 4.

1    Mr. Girard said he thought you could do it all in one, but I

2    don't think so.

3          THE COURT:  Let me interrupt.  This is the kind of job,

4    while you are here, where you could sit down with a stenographer

5    and try to work some of these paragraphs out without my parti-

6    cipation.

7          MR. VEEDER:  Right, your Honor.

8          THE COURT:  My question is, what was your program as far

9    as my time is concerned.  And what did you have in mind for

10    today, and do you want to meet tomorrow and Friday, et cetera?

11          MR. VEEDER:  I would like to work certainly all day today,

12    tomorrow and Friday.  I don't know how the other people feel

13    about that.

14          MR. SACHSE:  I agree.  I would like to have your Honor's

15    consideration of some of these redrafts that are supposed to

16    reflect the very rough draft you gave us of certain findings

17    and other things you have raised.

18          MR. GIRARD:  I think you can go without me.  I would like

19    to be in Sacrament on Friday, if I could.  I have no objection

20    to Mr. Sachse's going ahead with you.

21          MR. VEEDER:  I think there are certainly things that I

22    would like to bring to your Honor's attention and get your

23    direction on, because the matter breaks down at a particular

24    point.

25          THE COURT:  In other words, if you are answering my

1    inquiry, there are certain matters you would like to take up

2    to get my position on it.   Then we would adjourn and you would

3    start to do some of this work.   I would read No. 30, I would

4    some of Mr. Sachse's proposals for No. 37, and we would meet

5    again.

6       MR. GIRARD:   I would hope that we could read 30 today

7    sometime, if we are not meeting and coming in tomorrow, and

8    either approve or disapprove it so that I could have it

9    stencilled for the next session, your Honor.

10      THE COURT:   Yes.   So now you have certain matters you

11    want to take up right now?

12      MR. VEEDER:   If your Honor and Mr. Sachse would look at

13    the first reference designated 5 on page 4, Naval Enclave.

14      MR. SACHSE:   The page references, your Honor, are to the

15    Girard finding.

16      THE COURT:   Of 11-17-61?

17      MR.SACHSE:   Yes, your Honor.

18      MR. VEEDER:   The point that I want to raise in regard to

19    that matter is of importance to us from the standpoint of the

20    cession of exclusive jurisdiction, the point that I raised the

21    other day.   I now have before me the statement by the Solicitor

22    General in connection with the cases of Paul and Mosk vs. U.S.

23      Do you have those, Mr. Girard?

24      MR. GIRARD:   I don't have the statements of the Solicitor

25    General.   I do have the order of the Supreme Court which I will

1    lodge with the Court, if you like.

2           MR. VEEDER:  Go ahead, if you want to.

3           MR. GIRARD:  I don't have my correspondence file with me.

4           Briefly, the facts are this, your Honor.  As you recall,

5    I filed a rather lengthy brief on whether or not the United

6    States had exclusive jurisdiction of Camp Pendleton.  The

7    brief was prepared by a Deputy in our office named John Ford,

8    who was handling the milk control suits for the State against

9    the United States.  And I don't believe Mr. Veeder is handling

10   those cases for the United States.

11          Are you, Bill?

12          MR. VEEDER:  No, I am not.

13          MR. GIRARD:  The three judge District Court had ruled

14   that the United States had exclusive jurisdiction of the

15   Marine installation involving that milk control suit, and I

16   stipulated that if that became final it would apply to this

17   case as well.  However, despite the opinion of the three judge

18   court on exclusive jurisdiction we went to the Supreme Court.

19   The Supreme Court has agreed to hear the case, has accepted

20   it and requested counsel to brief on its merits so that the

21   whole case is not by any stretch final yet.  But I am in the

22   unusual position where in this lawsuit I don't care whether

23   the United States has exclusive jurisdiction or not as far as

24   this case is concerned, but they do have some milk control

25   suits involving Camp Pendleton and I am not in a position where

1     I can sit still for a finding saying that the United States

2 has exclusive jurisdiction on the military installation because

3 it would be used in the milk control suit, which I of course

4 have nothing to do with.

5         I hope we can draft some language.

6         THE COURT:  Why don't we eliminate it?

7         Now, what the Government is concerned with in asking for

8 a finding that they have exclusive jurisdiction is their right

9 to use water after it gets down on the Base.  That is all you

10 are really concerned with.

11         MR. VEEDER:  That is right.

12         MR. GIRARD:  I have no objection to that.

13         THE COURT:  We are going to find that in so many words.

14 We have already talked that over.  So why don't we just elimi-

15 nate the broader term and let the chips fall as they may in

16 this matter and not be involved?

17         MR. VEEDER:  Why not use alternate language, then, to

18 the effect that the record shows that the acts pursuant to

19 which exclusive jurisdiction would be ceded have been accom-

20 plished.  I have the references by which they were accomplished.

21 Depending upon the ruling of the Supreme Court as ultimately

22 determined, this Court will be governed by that decision.

23         MR. SACHSE:  I would see no objection to that.  In fact,

24 your Honor, that is stipulated to.  If you go back to our

25 original pre-trial stipulation, Mr. Veeder, you will find that

1  we stipulated to all of the documents by which jurisdiction

2  was ceded.

3      MR. VEEDER:  That is correct.

4      MR. SACHSE:  But left open the question of what the effect

5  of those documents was.

6      MR. GIRARD:  I would be very happy to have a finding

7  drafted just saying that by the term "exclusive jurisdiction,"

8  as used in these findings, is meant that the United States can

9  use the water that reaches its land in any way they see fit

10  without objection from anyone.

11      THE COURT:  Isn't that the only sense in which exclusive

12  jurisdiction would concern you in this case, Mr. Veeder?

13      MR. VEEDER:  Yes, I think that is probably true.  But I

14  simply think it would be a good idea to say that the State of

15  California had gone through the acts that we consider requisite

16  for the cession.

17      THE COURT:  You could make the findings as to what was

18  done -- the documents, the findings, the letters, all that

19  sort of thing, that were done, if you want that.  But when you

20  get down to drawing regular conclusions, can't we limit it,

21  for instance, to Mr. Girard's suggestion (1) that there is

22  exclusive jurisdiction and to the extent that, and by that we

23  mean this et cetera -- that would be one alternative.

24      Or secondly, not even use the words "exclusive jurisdiction."

25  Merely draw the conclusion that no one can interfere with what

1    the Government does with the water when it gets down there.

2        MR. GIRARD:  I want to make one brief statement, your

3    Honor.  Introducing these exhibits and these things that were

4    done does not cover entirely, I believe, the State's argument

5    in the Paul case on whether there was or was not a cession of

6    exclusive jurisdiction.  Some of the arguments advanced by

7    our attorney in the Paul case and his contention that the

8    United States does not have exclusive jurisdiction is that

9    the United States failed to do certain things which were

10   required of them by statute.  I don't believe there is any

11   evidence in this case on these various points.  There is

12   evidence, I believe, of certain things they did.  But as I

13   recall -- and I am not an expert on this by any stretch --

14   our law provided, for example, that after they did this they

15   had to accept and they had to record, and they didn't record

16   it, as I understand the situation.

17       MR. VEEDER:  On Pendleton?

18       MR. GIRARD:  Yes.  There is some technical argument.

19   They didn't technically comply with the law.  I am not saying

20   whether we are right or whether you are right.  But I don't

21   want to get into litigating that issue in this case if we can

22   possibly avoid it.  Because frankly if we are going to in-

23   troduce these exhibits on this point, I would have to probably

24   have Mr. Ford, who is handling that, handle it himself.  I

25   don't know enough about it.

1     THE COURT:  Can't we do it this way?  Can't we let Mr.

2 Veeder put in evidence, if he has it, any documents he wants

3 to that would bear on this question?

4     MR. VEEDER:  They are in evidence.

5     MR. GIRARD:  They are in evidence, your Honor.

6     MR. VEEDER:  7, 8 and 9.

7     THE COURT:  And a finding and conclusion that there is

8 exclusive jurisdiction -- let's not use the words.  Let's

9 just make the finding that no one can interfere with the United

10 States in the use of the water when it gets down there.

11     MR. GIRARD:  That is a satisfactory idea.

12     MR. VEEDER:  I have to say this.  I can't anticipate,

13 nor can anyone, the true significance of all these matters.

14 I never thought I would read from Judge Fee when he says this

15 in regard to exclusive jurisdiction:

16     ". . By Federal law, thereafter, United States held

17     paramount and exclusive control and jurisdiction over

18     the land and water which at any time is upon the land

19     within the limits of this Enclave.  The process of the

20     State Courts could not run therein unless by consent.

21     The executive and administrative bodies and regulations

22     had no control therein. . "

23     MR. GIRARD:  Of course, that is correct, Mr. Veeder.  But

24 you were handling that case, and you know that that issue was

25 never  litigated in this case.

MR. VEEDER:  That was 235 Fed. 2nd 647, at page 655.

MR. GIRARD:  And I think Mr. Grover stipulated that they had exclusive jurisdiction.

MR. VEEDER:  The only point is that I think "exclusive jurisdiction" is a word of art.  I think there are things run from it which I think would be important.  I tendered what I thought was the reference, that exclusive jurisdiction was ceded to the United States, subject nevertheless to be controlled by the ultimate decision in the case of Paul and Mosk vs. United States (239, October 1961 term).

THE COURT:  Can you do it that way?

MR. GIRARD:  Not necessarily, your Honor, because there is a possibility, as I understand it, in the Paul case that the Supreme Court can review without actually reaching this question of exclusive jurisdiction.

In other words, the Paul case we could either win totally or the United States could win it totally, or neither of us could win it, as I understand.  It might have to be litigated in some other case.  I don't know what particular suit they are going to bring.

THE COURT:  This leaves me utterly uninterested.

MR. GIRARD:  It leaves me utterly uninterested, but it doesn't leave Mr. Ford utterly uninterested.

MR. VEEDER:  It doesn't leave me utterly uninterested.

THE COURT:  What value can you get from a judgment which

says that you have exclusive jurisdiction, which is general
language, when are proposing to say -- not use that language,
but say "except that no one can interfere with your right to
use water when it gets down to the Enclave"?

MR. VEEDER:  Including the State of California.

THE COURT:  Including the State of California.

MR. GIRARD:  I don't quarrel with it.

MR. VEEDER:  I will think about the matter, your Honor.
I will talk to Washington as soon as Mr. Girard brought up
the point.

MR. SACHSE:  Why don't you add to Paragraph 5, 5-A, and
maybe we can agree on it this afternoon.

MR. GIRARD:  Let's try to work out the language.

THE COURT:  What is the next thing, Mr. Veeder?

MR. VEEDER:  Your Honor had prepared some language for
our review in regard to the salvage of water, et cetera.

THE COURT:  But this was very rough.  I just sat down and
dictated it off the cuff.

MR. SACHSE:  I tried to redraft them in these findings
I have submitted, your Honor.

MR. VEEDER:  I thought your Honor would want to discuss
those.  I would just as soon sit down, go to my office right
now and sit down and start working out some of these things
to the end that we would get as far along as we can on this
Naval Enclave matter and reserve the right to bring certain

matters up as we go along.

For example, offering your Honor a thought --

Mr. Sachse; do you want to ride along with me on this thing or not?

THE COURT:   What is your thought?

MR. VEEDER:   Well, assume that your Honor should rule specifically on the point of exportation of water in these findings, conclusions of law and judgment, I would like to have an alternative ruling then to the effect that if the United States of America is thus enjoined from fire protection, taking care of the Marines, any other uses outside of the watershed, nevertheless it does have rights of this character within the watershed in regard to agricultural uses, military uses and similar uses.

For example, the question has arisen, and your Honor has pointed this out, that if we were pumping water out of the watershed and reduced the levels of the basin to the point where capillarity would no longer support the vegetative cover, we couldn't complain about it if we would export that water. However, by reason of the failure to export pursuant to your restraints on that, we nevertheless are still entitled to have that vegetative cover and we are still entitled to use the water within the watershed for all agricultural purposes.

THE COURT:   You have me lost completely.   I have to see this written out.   I don't know really what you have said.

18,813

1    MR. VEEDER:  You have said this.  If you are going to

2    export water you can't claim a right still to maintain your

3    water levels in your basins at a point which would keep grass

4    growing on the surface of the Enclave -- in effect, sub-

5    irrigation.

6         MR. SACHSE:  I think you are misquoting his Honor.  At

7    least the draft I wrote in 8-A --

8         MR. VEEDER:  I am talking about oral statements his Honor

9    made.

10        MR. SACHSE:  Then I misunderstood him, because I didn't

11   write that.

12        MR. VEEDER:  That is why I am raising this point, because

13   it is not clear to me from what I have read of your statements

14   whether there are alternative rights in the United States.

15        MR. SACHSE:  Have you read 8-A the way I drafted it?

16        MR. VEEDER:  Yes.

17        MR. GIRARD:  I don't think his Honor could make a finding

18   on the United States or Vail or anyone else that they have a

19   right to have water in their basins to maintain native vegeta-

20   tion.

21        MR. VEEDER:  I think that he could.  That is the point

22   I am bring up.

23        MR. GIRARD:  In an apportionment proceeding the very issue

24   would be whether or not they would have that right or whether

25   or not Vail had a right.  If Vail has a right, for example,

18,814

to have water in their basins to maintain the native vegetation, it would probably be impossible to get water down to the United States to maintain theirs.

MR. VEEDER:  No, the water that would drain out of the alluvium in Pauba Valley would be most helpful to us.

MR. GIRARD:  But if we are going to maintain the native vegetation throughout the watershed, you would have to concede that if you have that right Vail and everybody else has that right.  So about all you are going to say is that everybody has a right to have the basins maintained full so that they won't result in depletion of their native vegetation, which would mean that no one could pump.

MR. VEEDER:  I don't think so.

MR. SACHSE:  I don't know what we are arguing about. Your Honor wrote a tenative draft of it.  I tried to rephrase it in 8-A.  I would like to see if I am away off base.

THE COURT:  Where did you rephrase it?

MR. SACHSE:  It is in 8-A.  They are in order, the fifth page.  I tried to rewrite what your Honor had given us a very rough draft of.

MR. VEEDER:  That is what precipitated this, Mr. Sachse.

THE COURT:  Let's read it.

Then I proposed a conclusion of law.

MR. SACHSE:  I am doing these strictly in order, findings first and then conclusions.

1    THE COURT:  My thought on the conclusion of law was that

2    I would not now pass upon whether this was reasonable until

3    a question came up concerning other uses and a determination

4    as to what uses could properly be made of the water.

5    MR. SACHSE:  That was how I contemplated handling it.  I

6    have finished, I think, all of the findings that required

7    substantial rewriting, more than just a word deleted or change

8    I could do by interlineation.  I have barely started on the

9    conclusions of law.

10    THE COURT:  What is your objection to 8-A as Mr. Sachse

11    revised my suggestion?

12    MR. VEEDER:  I think that it is much too broad and much

13    too general from the standpoint of our relationship with the

14    Fallbrook Public Utility District, which is a junior appropria-

15    tor.  I think that from the standpoint of the United States,

16    and going back to 11 Cal. 2nd, the Rancho Santa Margarita vs.

17    Vail, in which it was said that it was undoubtedly true that

18    the Rancho Santa Margarita had the right to have water availa-

19    ble in the stream for stock watering purposes, for example,

20    and to maintain the basin at that level for those purposes,

21    the question then arose as between Vail Company and the United

22    States whether a physical solution should not be worked out

23    to see if they couldn't take care of the circumstance before

24    the Supreme Court of California at that time.  I think we have

25    exactly the same proposition here.  We have a question, is this

1    a beneficial use?  Obviously it is.  I think subirrigation and

2    the raising of grass or basin cover is certainly a beneficial

3    use.  The question then becomes whether, as against Fallbrook --

4         MR. SACHSE: -- it is reasonable.

5         MR. VEEDER:  The question then becomes important as to

6    how we can still have this right and enjoy this right.

7         THE COURT:  That is what I would reserve by this conclu-

8    sion that I proposed very roughly.  I didn't say that it was

9    a beneficial use.  I probably should have.  Grass cover is

10   beneficial.  But I said that the Court does not pass upon the

11   question whether the maintaining of grass and vegetative cover

12   is a reasonable and beneficial use of water, in view of other

13   purposes for which water has been and will be used.

14        MR. VEEDER:  Maybe I didn't make myself clear.  You have

15   stated and the rulings have indicated that by reason of pumping

16   the ground water table has been reduced.  If we are prohibited,

17   as your Honor indicates that he will prohibit us, from exporting

18   water for the uses of the Marines outside the watershed --

19        MR. GIRARD:  No.

20        MR. SACHSE:  No such suggestion.

21        THE COURT:  I have never said that.  I have said repeatedly

22   that once the water gets down there you can take it out.  The

23   only problem you have is not taking water outside the watershed

24   -- and you are a water lawyer -- the only problem you have is,

25   can you reach upstream and make other people let water come

1   down to you so that you can take it out of the watershed.

2   That is all that is involved.

3       MR. SACHSE:  If Mr. Veeder is worried about injunction --

4       MR. VEEDER:  I am generally concerned about injunction.

5       MR. SACHSE:  I will state now, Mr. Veeder --

6       THE COURT:  I don't intend to enjoin the Marines from

7   using water outside the watershed.

8       MR. SACHSE:  I will state now for the record and as a

9   stipulation that Fallbrook has at no time ever requested nor

10  intends to request nor will request any kind of injunction

11  against the United States' doing anything it wants with the

12  water in the reservation.   The only interest is in your

13  reaching upstream from the reservation boundaries.

14      MR. VEEDER:  And really my only interest is reaching

15  upstream from the boundary.  If it is declared that we can't

16  export water, just declare it.

17      MR. GIRARD:  It is not going to be restrained.

18      MR. VEEDER:  I am saying that we have a legal right to

19  reach upstream, surely, to maintain basins at a level as

20  against Fallbrook.  I think before I leave here, I know I am

21  going to ask specifically to have this Court rule this way.

22  If the United States of America does not have a legal right

23  to export water at this time, then I am going to ask for a

24  declaration in regard to the extent of its rights within the

25  basin, namely, do we have a subirrigation right, grass coverage

1  within basin?  I want a ruling on that.

2      MR. SACHSE:  I will answer Mr. Veeder this way, your

3  Honor.  I have stated this -- maybe that is what panicked him.

4      MR. VEEDER:  I am not panicked in the slightest, Mr. Sachse.

5      MR. SACHSE:  I stated last week that if the United States

6  comes before this court at a later date and asks Fallbrook,

7  assuming the dam is in existence, or asks Vail or any other

8  upstream appropriator to release water for a proper riparian

9  purpose, my answer -- I don't know what Vail's attorney is

10  going to say -- but my answer is going to be, your Honor, it

11  is your duty first to stop all the improper uses by appropria-

12  tors or riparians.  Then if that does not supply sufficient

13  water for the riparian needs, then stop the junior appropriator

14  -- then stop Fallbrook.  I will so concede the minute your

15  motion comes in.  But I will insist that the Court's first

16  duty is to stop the utterly improper uses, and until they do

17  that they can't stop a proper junior use.  Mr. Veeder, let's

18  have no misunderstanding.  That is my position.

19      THE COURT:  It is just so clear to me that if the United

20  States were insisting that water come down sufficient to

21  maintain the grass cover on the floor of this basin, that they

22  could not be heard on that as long they were taking water out

23  of the watershed.  They could take water out of the watershed,

24  if they wanted, but they couldn't, on the one hand, take water

25  out of the watershed and at the same time say, "We want to keep

1    our basins full sufficient to support the grass cover."  I am

2    going to say somewhere in a judgment.

3        MR. GIRARD:  Even if they stopped taking water out of

4    the watershed, I don't think we can say right now that they

5    are entitled right now to get enough water down there to keep

6    their grass cover.  To get enough water down to Pendleton to

7    maintain their grass cover, physically 30,000 acre feet -- I

8    am just throwing out a figure roughly -- 5,000 would go into

9    the ground and 25,000 would go into the ocean.  I don't think

10   that would be a reasonable and beneficial use in California

11   in a water short area.  But that is a question for allocation.

12       THE COURT:  That is for a future decision on allocation.

13       MR. GIRARD:  That is for a future decision.

14       THE COURT:  I am not intimating that it would be proper

15   to maintain the grass cover.  As I suggested, the question

16   whether the grass cover could be maintained would have to be

17   considered on the basis of all other uses.

18       MR. GIRARD:  Right.

19       THE COURT:  And also on the basis of that use compared

20   with other uses.

21       MR. VEEDER:  Including appropriative uses.  Is that what

22   you are saying?

23       THE COURT:  By that you mean can we maintain a grass cover

24   at Pendleton and consider this as a riparian use and therefore

25   limit the appropriator so that there would be enough water to

18,820

maintain the grass cover?  That is what you are talking about?

MR. VEEDER:  That is right.

THE COURT:  You could never even reach that question as long as you pumped water out of the watershed.

MR. VEEDER:  That is what I said alternatively, your Honor.

THE COURT:  You never even get to that question.

MR. VEEDER:  When I get through with this -- I am pressing on this Enclave matter very hard -- I want to have in my mind when I leave here Friday what I can report to both the Navy and the Department of Justice as to where I think they stand (1) in regard to the exportation of water, water desperately needed to maintain, for example, fire fighting equipment for the Marines,water for bathing and everything else, because the impact of your Honor's rulings is extremely important.

MR. GIRARD:  Mr. Veeder, when you go back to Washington also tell the people back there that it is your position in this lawsuit that when an appropriator builds a storage reservoir he can only do so if he releases enough water to maintain the native vegetation in the watershed.  You want to think a little about the Sacramento River and Shasta Dam and some of these other dams.  Because I don't think the Bureau of Reclamation and the other major projects of the United States of America in California are really going to be consistent with your argument here.  You might win a little here,

1   but you are going to cost the United States an awful lot in

2   the western United States with that argument.

3       MR. VEEDER:  In view of the fact that I have spent most

4   of my time on these things, I am quite aware of the problem.

5       MR. GIRARD:  You had better think about it then.

6       THE COURT:  Let's wind this up.  I have expressed myself

7   as to what my view is.  I don't intend to pass now at this

8   stage, in the absence of proceedings on apportionment, whether

9   your grass cover is a proper use until we can consider all

10  other uses on apportionment.  It is a beneficial use -- no

11  doubt about it.  You certainly can't maintain it and pump

12  water out of the watershed.

13      MR. VEEDER:  I said alternatively, your Honor.

14      THE COURT:  I am satisfied with what Mr. Sachse wrote.

15  If you want to propose something else or confer --

16      MR. VEEDER:  I will confer with Mr. Sachse on the language.

17      THE COURT:  What other matter do you want to take up?

18      MR. VEEDER:  I would think we could do some good if Mr.

19  Sachse and I were conferring for the next hour and maybe come

20  back at 2:00 o'clock and see if we can't begin running off

21  the language on your first finding in 30, so that we can talk

22  specifically on these matters for the next two days.

23      THE COURT:  All right, 2:00 o'clock.

24      (Noon recess.)

25

1  SAN DIEGO, CALIFORNIA, Wednesday, February 7, 1962, 2:00 P.M.

2                              -oOo-

3       (Other matters.)

4       THE CLERK:  No. 1247-SD-C United States vs. Fallbrook.

5       THE COURT:  I hate to be an old woman and be finicky

6  about this thing, but there are a lot of errors in proposed

7  Interlocutory Judgment No. 30.  I was delayed trying to give

8  it a careful reading.

9       First of all, we are going to change -- and you may use

10  my copy later, Mr. Girard, in checking it.

11      MR. GIRARD:  All right.

12      THE COURT:  We are going to change all these numbers to

13  arabic numbers.

14      MR. GIRARD:  Yes, your Honor, those will be changed.

15      THE COURT:  On page 2, line 23, "that the older alluvial

16  deposits within said ground water area feather out, i.e.,

17  show a gradual lessening in depth to bedrock as they approach

18  the exterior boundaries . ." ". . as they approach the north-

19  easterly boundary . ."  Is that right?  They don't feather

20  out in any direction except to the northeast.  Any objection

21  to that?

22      MR. GIRARD:  No, not from me, your Honor.

23      THE COURT:  Page 4.  You have four situations.  You have

24  the Murrieta, the Temecula, the series of named creeks, and

25  the unnamed gullies.  Now there ought to be some uniformity.

1  So in Paragraph 6, on page 4, this refers to the Murrieta,

2  the source of the surface waters and ground waters, and some-

3  where in these others we had "and to a limited extent the

4  rainfall or precipitation".  Certainly it is not one source.

5  "and to a limited extent through rainfall," I suppose, would

6  do it.

7      MR. VEEDER:  The language we have proposed -- I don't know

8  whether you would accept it or not -- is that there was incre-

9  ment to the ground water body from precipitation on the surface

10  of the basin or the ground water area in times of heavy preci-

11  pitation, but in the absence of heavy precipitation it was

12  consumed by the vegetative cover.  That is what I proposed in

13  our finding.

14      MR. GIRARD:  You could add "and to a limited extent rain-

15  fall upon said area".

16      THE COURT:  That is enough.  It is probably true that if

17  you get a heavy mist up there you are not going to get any

18  water in the ground.  But this doesn't tell us anything.

19      MR. VEEDER:  The only reason I was proposing it is that

20  there is evidence in the record to that effect.

21      THE COURT:  And there are some areas where there is no

22  vegetative cover.  Suppose the fellow plows his field prior

23  to the rains, as they often do.  There is no vegetative cover

24  involved.

25      MR. VEEDER:  I am perfectly willing to adopt what you have

1    said.

2          THE COURT:   All right.

3          On page 6, the top line, "there has been caused to exist

4    a pumping depression," the finding says.   It seems to me that

5    after the word "exist" we should insert "as of" -- we ought

6    to pinpoint the time of this pumping depression.

7          MR. VEEDER:   In the fall of 1959?

8          THE COURT:   I think it was in the fall of 1959.

9          MR. SACHSE:   October 1959 is the date in the exhibit.

10          MR. VEEDER:   That is right.

11          THE COURT:   As of October 1959.

12          Down at the bottom of page 6, picking up the language at

13    line 27, "except as to limited amounts of ground water which

14    do percolate from the younger alluvial deposits into the older

15    alluvial deposits, impede ground waters contained in the young-

16    er alluvial deposits from moving into the older alluvial

17    deposits; . . . "  Actually, I think the evidence shows that

18    this can be vice versa; that if you bleed the younger deposits

19    you get a movement of water out of the older, to a limited

20    extent.   This appears all through the four different situations.

21          MR. GIRARD:   I do subsequently, your Honor, have a finding

22    that the ground waters in the older alluvium contribute to the

23    younger alluvium.

24          MR. VEEDER:   Isn't that really the source of all of your

25    stream flow except during periods of heavy precipitation and

1   immediately after?  Isn't it the water draining out of the

2   older alluvium that gives you your flow?

3   THE COURT:  We had some statements by the experts that

4   this could happen either way, that there could be an interchange

5   there of water.  But I don't think you can say it is the source

6   of the water.  You find it is in hydrologic contact.  Maybe

7   we can go back to your finding where you mention this and

8   put something in, in general terms, that would include all

9   these situations.  What finding do you refer to?

10  MR. GIRARD:  It is on page 23, starting at line 28:

11  "That all ground waters within the older alluvial deposits

12  within said ground water area . . "

13  THE COURT:  Paragraph 44?

14  MR. GIRARD:  Yes, Finding 44.

15  THE COURT:  You say on page 6 "impede," which means they

16  don't completely block.  "Impede" would be to slow down.

17  I would suggest that in 44 you add another subparagraph

18  in there at the beginning as part of 44.  Then break it down

19  for a further paragraph, as you now have it set up, and see

20  if you can put something in there.

21  MR. SACHSE:  Leave 10 the way it is?

22  THE COURT:  Leave 10 the way it is.

23  MR. SACHSE:  I would prefer that myself, because I think

24  10 read together with 11 and the ones that follow very clearly

25  refers to the stream.

5 fls.

THE COURT:  Yes.

MR. GIRARD:  In other words, in 44 have some language that shows some of the ground waters within the younger alluvial deposits move the other way into the interchange.

THE COURT:  Depending upon various situations, there could be an interchange back and forth.  It is not an absolutely impenetrable barrier.

MR. GIRARD:  Yes.

THE COURT:  While we are on page 6, just for style, on line 22 I would strike "that it is true".  We have cut that out all along.

MR. GIRARD:  Yes.  I will also break these down into a few more sentences when I type it up in final form, without changing the wording at all.

THE COURT:  On page 7, line 11, what would your reference there be, to Finding 7 or Finding 8 -- "ground waters do rise to the surface"?  It should be 8 instead of 7, shouldn't it?  It is 8 now.  Is it 8 or 7?  You can change those numbers, too, to arabic numbers.

MR. GIRARD:  Yes, that is in 8.

THE COURT:  All right.

On page 8, a very important finding there on lines 6, 7 and 8.  On page 8 it reads "that during such periods the ground waters within the younger alluvial deposits are in fact the source of those waters which rise and flow on the surface

1  for short distances and then disappear; . ."  This is repeated

2  on page 13 in much the same language, "are the source of those

3  waters".  When you get to page 18, on line 7, you say "said

4  ground waters within said areas of younger alluvial deposits

5  do in fact constitute the waters which rise to the surface,

6  flow thereon and then disappear underground; . . "

7       MR. GIRARD:  I like the language on page 18 best, and it

8  should be the same for all of them.

9       THE COURT:  That is what I am thinking about.  " . . are

10  in fact" -- "the source of" would be stricken out -- "are in

11  fact those waters".  Do you follow me?

12       MR. GIRARD:  Yes.

13       THE COURT:  Then on page 13, if you will turn to that

14  right now, on line 27, "are in fact" -- strike out "the source

15  of" -- say "those waters".

16       On page 10, the insert page, I have several questions.

17  First, on line 19 it refers to Riverside County Assessor's

18  Maps page 20-4-1.  Is that right?  Is it page 20?

19       MR. GIRARD:  I would like to have Commander Redd tell you

20  whether it is or not.  I may have copied it wrong.

21       THE COURT:  Is it Map 20 page 4, or is it page 20-4-1?

22       COMMANDER REDD:  This County Assessor's Maps Book 20

23  page 4-1.

24       THE COURT:  Then it should refer to County Assessor's

25  Maps Book 20 instead of page 20.  Then on line 19 in front of

1   the figure 4 you would insert page 4-1.  Is that right?

2       COMMANDER REDD:    4-1, your Honor.  There is a page 4 and

3   then there is a page 4-1.  There is a supplementary page in

4   there in this particular instance, your Honor.

5       THE COURT:  In other words, it might read Book 20 page 5,

6   Book 20 page 6, Bood 20 page 4.

7       COMMANDER REDD:  That is right, sir.

8       THE COURT:  And here it is Book 20 page 4-1.

9       COMMANDER REDD:  Yes, sir.

10      THE COURT:  You changed the word "Book" and insert "Page"

11  between the 20 and the 4; is that right?

12      COMMANDER REDD:  Yes, sir.

13      THE COURT:  The second question on page 10 -- and this

14  appears all the way through these findings -- refers to an

15  alphabetical list of apparent owners.  Didn't we agree that we

16  should say as of the date of the recording of the lis pendens?

17      MR. VEEDER:  Your Honor, on that score there have been

18  some minor changes based upon known transfers in which the

19  names of the parties do differ from the names at the time of

20  the lis pendens.  There are some changes that have been made.

21      MR. SACHSE:  Yes, your Honor, that is very true.  Many of

22  my own clients are people whose names have changed since the

23  date of the lis pendens.

24      MR. VEEDER:  When that fact was known they have been added

25  to the list of defendants.

1    THE COURT:  Then why don't we do this?  We can either

2  renumber all the paragraphs, or a very simple thing to do would

3  be to insert --

4    MR. GIRARD:  I can add another paragraph without any

5  problems, your Honor.

6    THE COURT:  We would call it 14-A.  It would come in just

7  ahead there:  That hereafter where apparent owners are listed

8  they are the apparent owners as of the date of the lis pendens

9  on such and such a date, except in those instances where known

10  transfers have been called to the attention of the Court and

11  named subsequently.  Something like that.

12    MR. VEEDER:  We have in the past agreed to that language,

13  your Honor.

14    THE COURT:  All right, Mr. Sachse?

15    MR. SACHSE:  Yes, your Honor.

16    MR. GIRARD:  Fine.

17    THE COURT:  If you put it in there as 14-A that will take

18  care of all these other places where it appears.

19    MR. GIRARD:  Yes.

20    THE COURT:  And you could get the date of the lis pendens,

21  and it is the recording of it -- it is not the filing of it.

22  You record a lis pendens.

23    MR. GIRARD:  Yes.

24    Do you have the record there on yours?

25    MR. VEEDER:  It is April 4th.  I'll check it.  I have it.

1       THE COURT:  My next question is, why have we got a list

2  of apparent owners as Exhibit 1 and down at the bottom Exhibit

3  A, apparent owners?  Are they different?

4       MR. GIRARD:  That is Exhibit I, your Honor.

5       THE COURT:  What is the difference between I and A?

6       MR. VEEDER:  Exhibit I contains all of the owners, both

7  riparian and overlying.  Exhibit A list only those who are

8  riparian to the streams.

9       MR. GIRARD:  That is right.  Exhibit I includes all the

10  owners of all the lands in the ground water area.

11       MR. VEEDER:  Which are set forth in Exhibit H as in Harry.

12       MR. GIRARD:  In other words, Exhibit I was a separate

13  index the United States prepared which would make it convenient

14  for all persons to find.

15       THE COURT:  Let's underline the word "all".

16       MR. GIRARD:  Where?

17       THE COURT:  In line 3 -- all parcels within the area.

18       And then we come down to A.

19       MR. VEEDER:  In fact, you could say "all riparian and

20  overlying lands;" maybe it would be more clear, because that

21  is the language we have set out in the caption of H.

22       THE COURT:  If it is all lands in the area, it is also

23  the basement complex in the area, too, isn't it?

24       MR. GIRARD:  I think it is, isn't it?

25       MR. VEEDER:  My own view was that it is  simpler and we

1    made that changeover to refer to all riparian and overlying.

2         MR. GIRARD:  But it does include lands within the basement

3    complex.

4         MR. VEEDER:  There is no individual parcel, there is no

5    individual basement complex parcel owned independently of

6    either riparian or overlying rights.  That is the reason why

7    I said that.

8         THE COURT:  Well, underline all -- all parcels of land.

9         And then these other breakdowns are sufficient breakdowns,

10   arent' they?

11        MR. GIRARD:  Yes, the Exhibits A through G are alphabetic

12   lists of apparent owners and parcel numbers dealing with

13   specific streams.

14        THE COURT:  I was confused in reading it.  It might help

15   somebody else if you said somewhere in 15 here that Exhibit I

16   is a list of all the owners, that Exhibits A et cetera are

17   partial lists referring to particular streams or creeks.

18        MR. VEEDER:  Well, they are riparian, your Honor.  That

19   is the difference.

20        We could say that Exhibit I is a master index of all lands

21   within the ground water area, while Exhibits A through G deal

22   specifically with riparian lands for specified streams.

23        THE COURT:  All right, on line 3 insert "a master"

24   alphabetic index and underline "all".  This would do it.

25        MR. GIRARD:  Yes.

1    THE COURT:  Then you catch the rest of it.  All right.

2    Now on page 11, line 3, you have to change the Roman 15

3    to arabic 15.

4    MR. GIRARD:  Yes.

5    THE COURT:  On what would be page 11-A, you are talking

6    now about the flood plain of the Pauba Valley, and when we

7    went over the flood plain of the Murrieta we said it was laid

8    down by flood waters and by erosion from the surrounding hills,

9    I think.

10    MR. GIRARD:  Yes, Colonel Bowen, I think, pointed that

11    out.

12    MR. VEEDER:  That is true in regard to all the flood

13    plains.

14    MR. GIRARD:  I have no objection to it.

15    THE COURT:  Add it on to 11-A.

16    MR. GIRARD:  Where is that?

17    THE COURT:  The second page of the insert at the very end.

18    MR. GIRARD:  I was looking for the section on the Murrieta

19    plain.

20    THE COURT:  I was looking for it, too.

21    COLONEL BOWEN:  Page 6, line 18.

22    THE COURT:  ". . and deposition of material eroded from

23    the adjacent hills . . "  Did you get that all right?

24    MR. GIRARD:  " . . and deposition of material eroded from

25    the adjacent hills . . "

18,833

THE COURT: Page 12. This raises the question we talked about the other day. Do you want to incorporate by reference the Vail Dam findings or only refer to them? Vail Dam is not in this area. I think you probably only need to refer to them.

MR. GIRARD: All right.

THE COURT: So you would strike out on line 18 "that said findings concerning said Vail Dam and said Interlocutory Judgment No. 35 are incorporated herein and made a part hereof by reference."

MR. GIRARD: Period after 35, strike out the rest.

THE COURT: No. ". . 35 specifically concerned Vail Dam."

MR. VEEDER: You are going to take care of the Pechanga Indians in the same manner, I assume, as you are taking care of the Vail findings.

MR. GIRARD: The Pechanga Indians, Mr. Veeder, are taken care of over on page 27.

MR. VEEDER: I say you have exactly the same situation.

MR. GIRARD: We have a little difference, except we haven't got a number for them yet.

THE COURT: That will be covered in separate findings of fact, conclusions et cetera.

MR. GIRARD: Yes.

MR. VEEDER: Yes.

THE COURT: It is solved now. That vice versa business of older and younger comes up again here. But if we are going

18,834

to take care of it in a later paragraph we don't need to do anything here.

MR. GIRARD:  Yes.

THE COURT:  We already corrected line 27.

MR. GIRARD:  Page 13?

THE COURT:  Yes.

MR. GIRARD:  Yes.

THE COURT:  Strike out "the source of".

On your insert paragraph 26 change that Roman 15 to arabic 15.

On page 16, line 24, you refer to Finding 26.  I think it should be 28.

MR. GIRARD:  It probably should be, because these were changed yesterday by the additional findings.

THE COURT:  I notice that several of them are two off all the way along.

MR. GIRARD:  Yes, there have been two added findings from the way this draft was.  So it should be 28.

THE COURT:  28 is what it refers to.

MR. GIRARD:  Yes.

THE COURT:  Strike out 26 and put in 28.

On page 17 we have this same business about direct rainfall, on line 11 -- "surface flows therefrom and to a small extent by direct rainfall".  Do you find where it goes?

MR. GIRARD:  Yes.  ". . and to a limited extent by direct

18,835

1   rainfall upon said area."

2       THE COURT:  All right.

3       On page 18, line 25, your reference to 29 is wrong.

4       MR. GIRARD:  It should be 31.

5       THE COURT:  Well, is it?  I think it is 28 ". . there

6   are areas of younger alluvial deposits" and you name the creeks.

7   Is that right?

8       MR. GIRARD:  That is correct.

9       THE COURT:  It should be 28 then.

10      Some of these notes I have may have been taken care of

11  by other things we have already done.

12      On page 19, line 11, Roman 15 becomes 15.  And this runs

13  all the way down.

14      MR. GIRARD:  Yes.

15      THE COURT:  Page 19, line 22, page 20 line 1, page 20

16  line 11 and line 21.

17      Page 21 line 24 arabic 8.

18      Page 22 line 4 your reference is to 37.  I think it

19  should be 39.  39 talks about the ground water contours.  And

20  this may be where you are two off all along.  39 talks about

21  the ground water contours.

22      MR. GIRARD:  It should be 39.

23      THE COURT:  It should be 39, should it not?

24      MR. GIRARD:  Yes.

25      THE COURT:  Rather than 37.

1    Likewise on page 23, line 19, you have a reference to 36.

2   I think it should be 38.  Check it and see.  38 talks about

3   the ground water divide.  It should be 38 instead of 36.

4    On page 23 you are going to insert something in Paragraph

5   44, is that right?

6    MR. GIRARD:  Yes, I will add the language on the inter-

7   change of the waters.

8    THE COURT:  All right.

9    Just in passing, I notice on page 26 at line 27 you are

10   talking about this prima facie situation, and we have been

11   talking about that in the Military Enclave also.  You use the

12   language "are supported by the evidence . . shall be prima

13   facie evidence . . "  We ought to bear in mind that language,

14   use the same language.

15    MR. GIRARD:  I think it is identical.

16    THE COURT:  All right.

17    MR. GIRARD:  Or was intended to be, wasn't it?

18    MR. SACHSE:  I don't recall, actually.

19    MR. GIRARD:  We will check it.

20    THE COURT:  Page 28, line 3, you refer to 50.  It should

21   be 52.  52 talks about the small creeks and gullies.  Is

22   that right?

23    MR. GIRARD:  Yes, that is right.

24    THE COURT:  Now, your conclusions ought to be numbered

25   with arabic numbers also.  Let's get rid of these Roman numeral

1    things.

2         MR. GIRARD:  Yes.

3         THE COURT:  Then you find some more of that on page 31,

4    line 10.

5         On page 31, just as a matter of inquiry, Exhibit H is

6    only going to concern older alluvium?

7         MR. GIRARD:  Exhibit H describes all land within the

8    ground water area.  It would necessarily include -- maybe this

9    isn't quite correct -- it would have to be a little additional

10   language here "that all lands described in Exhibit H attached

11   and incorporated herein. ."

12        THE COURT:  ". . which overlie older and younger alluvium".

13        MR. GIRARD:  ". . which overlie older and younger

14   alluvium".

15        MR. VEEDER:  We have worked out language on that.

16        MR. GIRARD:  No, "which overlie older alluvium," your

17   Honor.

18        MR. SACHSE:  Not younger.

19        THE COURT:  This raises the question.  Are you going to

20   limit a fellow who is in the ground water area and has land

21   lying over older alluvium and say, "You have correlative rights

22   with other people in the older alluvium, but you don't have

23   correlative rights with the people in the younger alluvium"?

24        MR. SACHSE:  No, all this says is "That all lands described

25   in Exhibit H attached hereto and incorporated herein have a

1   correlative overlying right to the use of the ground waters

2   contained within the older alluvial deposits; that all of said

3   ground waters within said older alluvial deposits within the

4   ground water area add to, contribute to and support the Santa

5   Margarita River . . " But we are only talking here about over-

6   lying rights. We are not talking about riparian rights which

7   are within the younger alluvium.

8       THE COURT: That probably does it, particularly your last

9   phrase, which says that the water in the older alluvium adds

10  to, contributes and supports the stream.

11      Does it look all right, then, as is, without a change?

12      What is Exhibit H? A list of people overlying older

13  alluvium?

14      MR. VEEDER: It is the names of all land owners, parcel

15  numbers, land descriptions, irrigable acreage, gross acreage,

16  irrigated acreage, description of wells, and any diversions

17  or impoundments. It is a composite of all the data we put in.

18      THE COURT: I know, but does it only concern older

19  alluvium?

20      MR. VEEDER: No, it does not, your Honor. Your Exhibit

6 fls.

21  A, to which we make reference, is a list of the names and of

22  the parcel numbers which are riparian to Murrieta, Temecula,

23  Santa Gertrudis, Warm Springs, Cole Canyon and any other creeks

24  that are there within the ground water area. Now those are

25  listed and the properties which are younger alluvium are

1    referred to by parcel number.  You can take those parcel

2    numbers and you can take the names and go to Exhibit H and find

3    them.

4         THE COURT:  Does 11 read all right?

5         MR. GIRARD:  It reads all right as it was.  It doesn't

6    need any change at all.

7         THE COURT:  Does it read all right to you?

8         MR. VEEDER:  It is all right, but I don't agree with the

9    process.

10        THE COURT:  Page 32.  "That each smallest tract of land

11   . . traversed by any area containing younger alluvial deposits

12   within said ground water area, has a correlative riparian

13   right to the use of said ground waters within"  and technically

14   "and upon," I would say -- "ground waters within and surface

15   waters upon".

16        MR. GIRARD:  All right.

17        THE COURT:  It doesn't mean a thing.

18        MR. VEEDER:  That is right.

19        THE COURT:  In most cases.  I don't know whether this

20   occurs elsewhere or not.  I picked it up here.

21        Page 33.  You have reference on line 1 to Finding of Fact

22   No. 50.  It is 55.  I think that is correct -- Roman numerals

23   LV.  I think it is 55, where the State rights are based on

24   applications.

25        MR. GIRARD:  Yes.

18,840

THE COURT:   I think these paragraphs of this judgment should be numbered.

MR. SACHSE:   Mr. Girard was not here when you asked us to do it at the last session and I didn't get the word to him.

THE COURT:   Because we talk about said lands.  So re-number these paragraphs.  I wind up with about 23 of them.

In the second paragraph on page 33, line 15 ". . owners of said lands described in Paragraph 1 of this judgment". That is what you are talking about.

MR. GIRARD:   Yes, that is what we are talking about.  But if I just make this 1 and then go down and put a 2 at line 30 --

THE COURT:   Why mess it all up that way?  Each of these is a separate subject matter:

MR. GIRARD:   All right.

THE COURT:   (1) That the ground waters are vagrant.

(2) That their rights are quieted, the rights of the owners of lands referred to in Paragraph 1 of this judgment.

And then down on line 22 you do the same thing, "owners of said lands" -- that also is Paragraph 1.

It occurs only a couple of times, but I think that makes it clearer.

MR. GIRARD:   I take it there would be a new number for each paragraph.

THE COURT:   Yes, right on through.

MR. GIRARD:   Okay.

1    You would add that same "referred to in Paragraph 1" at
2    line 27, too, wouldn't you?
3        THE COURT:  What page?
4        MR. GIRARD:  33.
5        THE COURT:  Yes.
6        Now go over to page 36, line 5.  You used the word "creek".
7    Don't you think it should be "stream or creek"?  You talk
8    about these unnamed creeks.  Maybe it should be "river, stream
9    or creek".  This is your broad paragraph for the Murrieta-
10   Temecula, the named tributaries and the unnamed tributaries,
11   is it not?
12       MR. GIRARD:  But the only streams to which land was
13   specifically determined to be riparian were the specified
14   creeks Temecula, Murrieta, Santa Gertrudis.  They were all
15   creeks where there was a finding that land was specifically
16   riparian to water.  I think each one of them was  creeks.
17       THE COURT:  You have used the word "creek."
18       MR. GIRARD:  Yes.
19       THE COURT:  All right.
20       Now on line 22, "the owners of lands," and I think the
21   paragraph is the one preceding, which, according to my memory,
22   would be 17 of the Judgment.
23       MR. GIRARD:  Yes.
24       THE COURT:  On line 29 "lands referred to in Paragraph
25   17 of the Judgment".

18,842

1    I think you are set to run it, with those changes.

2    MR. GIRARD:  I will have this stencilled.

3    Mr. Veeder, do you have any idea how many copies you

4 would like?  I would be happy to run off as many as you want.

5    MR. VEEDER:  I am going to have to distribute those to

6 all the interested agencies.  Would it be too much trouble to

7 run a dozen?

8    MR. GIRARD:  I'll you 50 or a hundred, if you want them.

9    MR. VEEDER:  You have plates once you run them, don't

10 you?

11    MR. GIRARD:  We run them on stencils.

12    MR. VEEDER:  That is what I mean.  In other words, if we

13 could have a dozen to start with, I would like to have them.

14    THE COURT:  Do you keep the stencil?

15    MR. GIRARD:  We can keep the stencil, certainly.

16    MR. VEEDER:  I think you should, to save rerunning them.

17    THE COURT:  We may have some requests from people in this

18 area, too, for these judgments.

19    MR. VEEDER:  That was the matter I was going to bring up

20 later, as to whether you want letters sent out over your

21 signature that this interlocutory matter was available for

22 review.

23    Before we break up, you are not going to be here on

24 Friday, Mr. Girard?

25    MR. GIRARD:  Not if I can help it,

1          MR. VEEDER:   There is a question that has come up.   Are

2     you ready to talk about procedures now?

3          THE COURT:   Yes.

4          MR. VEEDER:   Do we notify all people first that you have

5     now signed the Murrieta-Temecula ground water area to the end

6     at least that if there are going to be objections to the land

7     descriptions in A through I, for example, so that we would

8     know the revisions that would have to be made?   Because these

9     people are entitled to be notified of the location of their

10    lands.   There may be something they would like to look at and

11    correct.   We are setting out gross acreage, irrigable acreage

12    and land descriptions.   If you don't think a notice is requisite,

13    we will just let it go.   But we have undertaken, the United

14    States at your Honor's direction and certainly willingly we

15    have gone ahead and put in a vast amount of data, engineering

16    reports and material affecting the rights of these individuals.

17         THE COURT:   Well, it is one thing to notify them that they

18    are down here and can be inspected.   It is another thing to

19    give them the kind of notice we talked about in the judgment.

20    Because we give them that notice we talk about in the judgment,

21    a right to be heard before this becomes final -- fix a time

22    and place for them to come in.

23         MR. VEEDER:   That is right.

24         THE COURT:   You are still contemplating doing that later

25    when we enter the final judgment.   You are talking now about a

1    preliminary notice to them that we have signed up interlocutory

2    judgments.

3        MR. VEEDER:  That is what I was thinking of.

4        THE COURT:  Well, you have the addresses and the form

5    letter.

6        MR. VEEDER:  We do have the addresses.  We have a great

7    deal of material.  But you will recall, your Honor, that there

8    have been objections that came in.

9        MR. SACHSE:  There was a letter that you drafted, Mr.

10   Veeder.  I remember objecting vigorously to some language in

11   it.  I can't find it here.  Do you have a copy?

12       MR. VEEDER:  I have the letter upstairs.

13       MR. SACHSE:  That was what bothered me, the way it was

14   worded.

15       MR. VEEDER:  Let's get over one thing at a time.  Should

16   we send out notices similar to that that were sent out on the

17   Master's hearings, or should we send out more complete notices?

18       MR. GIRARD:  I think it is more than sufficient if you

19   sent out a notice like you had on the Master's hearings, say-

20   ing that these are available for examination at the Courthouse

21   and any objections will be heard in writing or can be presented

22   orally on a specified date.

23       THE COURT:  I think that would be best for this purpose

24   here.  This is not the final notice we are talking about.

25       You ought to make a list of whom you mailed them to and

18,845

1    have Mrs. Tooker make affidavits of service.

2         MR. VEEDER:  I'll do that.

3         THE COURT:  Is she using certificates of service?

4         MR. VEEDER:  She is.

5         THE COURT:  There is no provision for it, is there, in

6    the Federal Rules?

7         MR. VEEDER:  Affidavits of service you mean?

8         THE COURT:  Certificates of service.

9         MR. VEEDER:  All I am doing, I just hand her a certificate

10   in which she files an affidavit of service.

11        THE COURT:  There is a State procedure that a lot of

12   lawyers are using now where in lieu of an affidavit you can

13   make a certificate.

14        MR. VEEDER:  I am unacquainted with that.

15        THE COURT:  Let's not do it anyhow.  Make affidavits of

16   service.

17        MR. VEEDER:  She is filing affidavits.

18        THE COURT:  And show that the notice went out.

19        Let's get a draft of this and then let Mr. Sachse and

20   Mr. Girard see it.

21        MR. SACHSE:  Where do we stand now, Mr. Veeder, for my

22   information, as to those notices?  I know you sent a lot of

23   them out on Fallbrook Creek on the earlier interlocutory

24   judgments to the effect that an interlocutory had been entered.

25        MR. VEEDER:  We haven't sent out notices in regard to the

1   A Series at all.  That is one of the letters we were showing

2   you that you objected to.

3       MR. SACHSE:  That is why I am asking.  I still question

4   the necessity and wisdom of this.  In the Master's case, if

5   your Honor recalls, the Federal Rules require notice.  Now I

6   don't think the Federal Rules require you to send anybody a

7   notice of these interlocutory judgments.  I realize Mr. Veeder

8   is concerned about due process.  If he wants to go the cost

9   of mailing a lot of letters it's all right.  But I don't think

10  it is necessary.  These people are supposed to be here.  Some

11  of them have counsel, others don't.  But I think the thing to

12  do when this job is buttoned up is to send everybody a notice

13  just as you contemplate doing, and not statements, along with

14  half a dozen sessions of people wandering in here who don't

15  know what they are talking about and asking stupid questions.

16      MR. VEEDER:  Their questions may be stupid.  A tremendous

17  number of people come in the office and ask questions that may

18  sound a little bizarre, in view of what has happened, but I

19  think they are entitled to know, Franz.

20      MR. SACHSE:  It's all right with me.

21      MR. VEEDER:  I am not looking for any more work.  We have

22  plenty.

23      THE COURT:  I know it is a lot of work.  It is up to you

24  if you want to send them out.

25      MR. VEEDER:  I think there should be some notices.

1    The next question is in regard to counsel.  There are

2    about 101 counsel who have appeared.  Do we send copies of

3    your findings, conclusions of law and judgments to them,

4    together with exhibits?  Now that is a big parcel.  You don't

5    think so, Mr. Sachse?

6        MR. GIRARD:  No, I don't think you are required to do it.

7        MR. SACHSE:  I don't think you are required to do it at

8    all.  They are in this case.  They are supposed to be paying

9    attention whether his Honor has entered findings.  Ultimately

10   I think you ought to notify them that a final judgment is in

11   and they can come in and look at it.

12       MR. VEEDER:  All I want is direction from the Court.

13   That's all I care about.

14       THE COURT:  I would just send them the same kind of

15   letter we drafted that could go to the attorney or the land

16   owner or both.

17       MR. VEEDER:  And you would not send copies of the decree?

18       THE COURT:  No.  This wouldn't be done until we sign it,

19   saying it is on file and may be inspected, et cetera.  The

20   Clerk's Office  and your office is available to assist them.

21       MR. VEEDER:  That is right.  I will work up some  kind

22   of letter.

23       THE COURT:  What next?

24       MR. VEEDER:  While Mr. Girard is here --

25       MR. GIRARD:  I'll be here tomorrow, too.

1    THE COURT:  Let me ask you this.  In view of the fact

2  that you are going to be here and I will be working with you

3  off and on, I think I had better continue that case for

4  tomorrow.  Don't you think so?   When I start trying a criminal

5  case that's kind of rough.

6    MR. SACHSE:  I think it would be a great convenience to

7  us, if you could, your Honor.

8    THE COURT:  All right.

9    Mr. Clerk, tell counsel to be down here, but that we will

10  continue the case.

11    MR. VEEDER:  The Clerk is not here.

12    THE COURT:  I'll tell him later.

13    What next?

14    MR. VEEDER:  We were discussing the question in regard

15  to the exportation of water/from the watershed and the use of water

16  entering the Enclave.  Mr. Sachse proposed language.

17    What is the number of your proposal, Mr. Sachse?

18    MR. SACHSE:  Which one is this you are talking about now,

19  Bill?

20    MR. VEEDER:  I am talking about the proposal where you

21  said you had taken out all references --

22    Do you have Mr. Sachse's material there, your Honor?

23    THE COURT:  Yes.

24    MR. VEEDER:  It is the language where you said that any

25  water reaching the United States --

1      MR. SACHSE:  The "absolute privilege" language?

2      MR. VEEDER:  Yes.

3      MR. SACHSE:  That is the first one.  That is No. 5 on

4  page 4.

5      MR. VEEDER:  Let me see your copy.

6      MR. SACHSE:  The very first one.

7      MR. VEEDER:  I see.

8      Do you have that, 5 on page 4, your Honor?

9      THE COURT:  Yes. That doesn't talk about water going out

10  of the watershed.

11      MR. SACHSE:  The only change, your Honor, to refresh your

12  recollection, working from my notes taken of your comments on

13  the original discussion, was to start out with "Naval Enclave,"

14  to delete the language in the original draft which said that

15  the United States had an absolute privilege to use the waters

16  of the Santa Margarita which reached said lands without

17  objection from any defendant.  Your Honor will recall that you

18  decided that that "absolute privilege" language should go out

19  and later on in the finding there would be language to the

20  effect that because it is the last user on the stream et

21  cetera there could be no objection.  But the phraseology

22  "absolute privilege," to use the words, has been deleted.

23  Other than that it is as originally submitted.

24      MR. VEEDER:  As I comprehend, the language that was on

25  your 37 original page 4, lines 5 and 6, you said "absolute

1   privilege to use the waters of the Santa Margarita River which

2   reach said lands . . "  I construed that to embrace the idea

3   of exclusive jurisdiction and the idea that no one could object

4   to the water, once it had reached the land.

5       THE COURT:  I think it is a matter of semantics.  There

6   is the use of this "absolute privilege" et cetera, and in some

7   other finding there is to be a finding that when the water

8   reaches the land you can do as you please with it.

9       MR. VEEDER:  Then I will read what Mr. Sachse has here:

10  "That . . at all times since acquiring said lands described

11  in Paragraph 1 . . has had the right of possession and control

12  thereof . . "

13      THE COURT:  Referring to the lands.

14      MR. SACHSE:  That is the lands.

15      MR. VEEDER:  Then your next is a non sequitur -- ". . by

16  bringing this action the United States of America submitted

17  to the jurisdiction of the Court and the continuing jurisdiction

18  thereof as to the use of all waters of the Santa Margarita

19  River."  As far as I am concerned, I don't believe the question

20  of land is involved.  I want it to read that the United States

21  of America acquired these rights to the use of water and has

22  had title to them at all times since said acquisition.

23      MR. SACHSE:  Mr. Veeder, maybe I am not writing it in the

24  order in which you would like it, but all that this paragraph

25  -- perhaps speaking for Fred, we originated it together -- all

1    this paragraph is supposed to say, in the simplest language,

2    is that the United States of America, by bringing this action,

3    submitted itself to the jurisdiction of the Court.  That is

4    an essential finding, as I understand it.

5        MR. VEEDER:  Yes, but one of the points I am raising

6    right here, it seems to me that your sentence and the sentence

7    as originally written, the paragraph as originally written

8    simply said that the United States of America has at all times

9    been the owner of the property involved.  In another finding,

10   then, Mr. Sachse, if you want to, in regard to the jurisdiction

11   of this Court --

12       MR. SACHSE:  Do you want a separate finding on it?

13       MR. VEEDER:  Break it up.

14       THE COURT:  In this one paragraph it looks like you are

15   talking about land and jurisdiction.

16       MR. VEEDER:  That is right.

17       THE COURT:  And there is not too much connection, in

18   view of what we took out.

19       MR. GIRARD:  Yes.

20       THE COURT:  This is a small matter.  Do you want to work

21   on these individually?

22       MR. SACHSE:  We have done a bundle of them this morning

23   already.  Maybe we can go over some of them.  This is one of

24   them.

25       MR. VEEDER:  I would just as soon work for another hour

1   while you are here, because Mrs. Tooker is beginning to run

2   some of this.

3       MR. SACHSE:  Maybe we can tell his Honor, so that he can

4   be looking at a few of them.  The only one that is in clean

5   shape in our file is No. 6.  That is the stipulation one that

6   we agreed was all right.

7       THE COURT:  Then let's take a recess and let me fit these

8   into 37.

9       MR. SACHSE:  They have to be cross-referenced.

10      THE COURT:  The reporter has been using my 37.  Let me

11  fit them in and look them over and we will meet again this

12  afternoon.  Will you have some of this typed up by 4:00?

13      MR. VEEDER:  Yes, she is typing it now.

14      (Recess.)

15      THE COURT:  I have cut this all up and put this in and

16  we can start through and see where you have reached some

17  agreements and what further work should be done.   Where do

18  we start?

19      MR. GIRARD:  Mr. Veeder has drafted language for Finding

20  1, which we are not ready to submit.  I think it is fair to

21  state that by tomorrow we will have the language to the Court

22  for the Paragraph 1 which describes the lands, and as far as

23  I am concerned the language and the way he has treated it is

24  excellent.  There will be two more paragraphs there.

25      MR. SACHSE:  There will be two more paragraphs which we

1   designating now as 1-A, 1-B, 1-C, solely so that the record

2   will be clear.  But when ultimately written they will be

3   numbered consecutively.

4       THE COURT:  All right.

5       MR. GIRARD:  Those I am sure will be ready and they are

6   fine, but they are not quite ready to hand to the Court yet.

7       THE COURT:  All right.

8       MR. GIRARD:  On 2 Mr. Veeder suggested that on line 19

9   we strike the word "many" and add "approximately 200."

10      MR. VEEDER:  Two hundred million.

11      MR. GIRARD:  You add "200" and "million" is in already,

12  which is fine.

13      MR. VEEDER:  Then I would add "approximately six per cent

14  of the Military Enclave receiving water from the Santa Margarita

15  are situated outside the watershed on that stream".

16      THE COURT:  Six per cent of what area?

17      MR. GIRARD:  Sixty per cent.

18      MR. VEEDER:  Sixty per cent of the Military Enclave

19  receiving water from the Santa Margarita River.

20      THE COURT:  I thought you were going to call it "Naval

21  Enclave".

22      MR. VEEDER:  Okay, Naval Enclave.

23      THE COURT:  That sixty per cent of the Naval Enclave

24  receiving water from the River -- I will just shorthand it --

25  is outside the Naval Enclave.

1    MR. SACHSE:  Is outside the watershed.

2    MR. VEEDER:  Situated outside the watershed on that River.

3    THE COURT:  Then you would change on line 17 "Military"

4 to "Naval".

5    MR. VEEDER:  That is right.

6    THE COURT:  And change it on line 19.  That can be dressed

7 up.  Are you going to have a draft of that, too?

8    MR. VEEDER:  I will try to have it, your Honor.

9    THE COURT:  I will mark you down to have a draft of No. 2.

10    MR. VEEDER:  By 10:00 o'clock.

11    THE COURT:  What about 3?

12    MR. SACHSE:  We have agreed that 3 is correct.  It is

13 taken verbatim from Mr. Veeder's.

14    THE COURT:  You are going to strike out "Joseph H.

15 Pendleton".

16    MR. SACHSE:  Yes, except for the correction of Joseph H.

17 Pendleton.

18    MR. VEEDER:  I think there you have to break it down as

19 to references of Pendleton, et cetera.

20    MR. GIRARD:  I think if we add "Naval Enclave" --

21    THE COURT:  If it is basically correct, why not break

22 it down?

23    MR. GIRARD:  I have no objection to it.

24    MR. SACHSE:  Will you do that, Mr. Veeder?

25    MR. VEEDER:  Yes.

7 fls.

18,855

THE COURT:  What are we going to do with 4, if anything?

MR. VEEDER:  That is going out entirely.

THE COURT:  I have a note here "refer to OR," meaning official records.

MR. VEEDER:  That, your Honor, is going to be No. 1.

THE COURT:  Then 4 will go out.

MR. VEEDER:  That is right.

MR. SACHSE:  Except weren't you going to write a substitute there referring to an exhibit to clarify which of them were riparian, Bill?

MR. VEEDER:  If you turn over to 1-C --

MR. SACHSE:  I beg your pardon.  Yes, it is done.  4 goes out entirely, that is right.

THE COURT:  5.

MR. SACHSE:  That has been resubmitted by me as --

MR. VEEDER:  And I am objecting to that, and you have it before you.

THE COURT:  You are objecting on the ground of semantics that it is talking about two different things.

MR. VEEDER:  Are you looking at that now?

THE COURT:  Yes.

MR. VEEDER:  The first sentence, "At all times since acquiring the land described in Paragraph 1 of these findings the United States has had the right of possession . . "

THE COURT:  That can be pulled over into 1.

18,856

1      MR. VEEDER:  I would think so.

2      MR. SACHSE:  It is deleted entirely.

3      MR. VEEDER:  Anything but where it is.

4      MR. GIRARD:  I would like just to point out the purpose

5  of this finding when I originally drafted it was two-fold:

6  (1)  To show that the United States could use the water which

7  was on the Enclave in any way it wanted and (2) to cover the

8  jurisdictional point.  I think the jurisdictional point, start-

9  ing with the word "that" on line 9, should be a separate

10  paragraph.

11      THE COURT:  All right, let that be 5.

12      MR. GIRARD:  All right.

13      THE COURT:  And if Mr. Veeder wants to use this language

14  in the first sentence, put it over into 1.

15      MR. VEEDER:  I think it would make sense there rather than

16  where it is, and I would say "That at all times since the

17  acquisition, title to the property has resided in the United

18  States of America and it is used for the purpose specified in

19  Finding No. 3".

20      MR. SACHSE:  All right.

21      MR. VEEDER:  That is how you would do it.

22      MR. GIRARD:  The main problem I envisioned in the first

23  sentence of 5 was this question of what we may call exclusive

24  jurisdiction.

25      THE COURT:  We don't say "exclusive" here.  We have omitted

1   the word "exclusive".

2       MR. GIRARD:  If that satisfies Mr. Veeder on that score,

3   I am very happy to use that language.

4       THE COURT:  Put the first sentence into 1 somewhere.  Let

5   the 5 be the balance of the present redraft.  All right?

6       MR. GIRARD:  If that takes care of Mr. Veeder's problem.

7       MR. VEEDER:  Wait a minute.  On this 5, before we go into

8   that question of jurisdiction, (1) I think it is not proper

9   to have it there as a finding.  I think it is a conclusion of

10  law.  (2)  I think if we are going to say that the United States,

11  by bringing this action and by the parties appearing and

12  answering in setting up their cross-complaint, has submitted

13  to the jurisdiction of this Court and has continuing juris-

14  diction of the United States of America and all parties --

15      THE COURT:  All right.

16      MR. SACHSE:  Say that.

17      THE COURT:  It is more properly a conclusion, and so it

18  will be put in the conclusions and it will add "all parties".

19      MR. VEEDER:  That is what I think you have to say.

20      MR. SACHSE:  I think it is there already, Mr. Veeder.

21      THE COURT:  Now we know what we are going to do on 5.

22      6.

23      MR. SACHSE:  6 has been completely redrafted to incor-

24  porate verbatim the stipulation, and Mr. Veeder has checked it.

25      MR. VEEDER:  I have no objection as written.  That appears

1    before your Honor on Mr. Sachse's 6 on page 4.

2          THE COURT:   I have two thoughts here.  You have the loose

3    end in Paragraph 1 of the stipulation that referred to the

4    complaint.   Now we have an amended complaint.   The Government

5    has an amended complaint in here, or has a second amended

6    complaint -- what is it?

7          MR. SACHSE:   The Government has a supplementary and

8    amendatory complaint, as Mr. Veeder termed it.   But it seems

9    to me that the only proper way to cover that was by the

10   reference which you find at the very end of the proposed

11   paragraph which refers to your decision.   In your decision it

12   is very clear that there is an amended and supplemental

13   complaint.

14         THE COURT:   That was the second point I was going to raise.

15   I don't know how much space it would take, but I don't like

16   this business of reference to a decision et cetera.

17         MR. VEEDER:   I didn't hear your Honor.

18         THE COURT:   I don't like this matter of putting a decision

19   in by incorporation by reference.

20         MR. SACHSE:   I started to put it in in full and the reason

21   I ran into serious trouble was, if your Honor recalls how you

22   wrote it, you wrote a decision and then you added what I might

23   say is a  great deal of evidence as part of your opinion --

24   extracts of evidence from Congressional hearings, extracts of

25   testimony of others -- and it gets to be quite long, with a

1  lot of material which, unless you know exactly how your Honor

2  wants to chop it off, doesn't properly belong in findings.  It

3  is perfectly proper in the opinion because you cited all the

4  evidence.

5      THE COURT:  I will look at that.  And we might put in

6  this last paragraph that by February 11th there was this

7  amended and supplemental complaint on file and that the

8  Government has at no time during this case asserted that their

9  stipulation as to Paragraph 1 of the complaint did not apply

10  thereafter to the corresponding paragraphs of the amended and

11  supplemental complaint.

12      MR. VEEDER:  Why don't we make it even more affirmative

13  than that?  That the case proceeded on the basis of the stipu-

14  lation.  That is what occurred.

15      THE COURT:  Yes, but you have come in and moved to

16  interpret the stipulation to put meanings into it that I

17  couldn't read into it.

18      MR. VEEDER:  The mere fact, your Honor, that you disagreed

19  with me in his conclusions of law, with which I am still in

20  disagreement with your Honor, I would think that you could

21  simply say that the case was tried on the basis of that stipu-

22  lation, which is most certainly true, and then put in your

23  conclusions of law as to what you interpreted it to be.

24      THE COURT:  Let me look it over and we will pass 6 now.

25      MR. GIRARD:  7 will be taken care of in a new finding

1    which we will submit.

2         MR. VEEDER:  That will be Finding 1-B.

3         MR. GIRARD:  1-B.

4         THE COURT:  7 will go out and will be replaced by 1-B.

5         MR. GIRARD:  Yes, that is right.

6         MR. VEEDER:  If you want to look at these as we go along --

7         THE COURT:  No, I don't need to look at them now.

8         8.

9         MR. SACHSE:  I submitted 8-A, which was intended to

10   replace 8, and Colonel Bowen has filled in the blank that you

11   see on 8-A with the figure 1.2 acre feet.

12        MR. GIRARD:  He was also going, I believe, to take a hand

13   and see --

14        Maybe this is wrong, Colonel.  Is this the one you were

15   going to take a  hand and see if you could draft it a little

16   better factually?

17        COLONEL BOWEN:  Yes.

18        MR. GIRARD:  Which is certainly agreeable with me.

19        THE COURT:  When are you going to do that, Colonel?

20        MR. VEEDER:  I don't believe you are referring to the

21   same thing, are you?

22        MR. GIRARD:  Am I, Colonel, or am I not?

23        THE COURT:  Grass cover.

24        MR. GIRARD:  There was two of them that he was going to

25   do this.

1    MR. VEEDER:  That is right.  I want to be sure it clear,

2    though, what he to do.

3        You have 9 and 10.  Do you have that, Franz?

4    MR. GIRARD:  14 has some work to do on it.

5    MR. VEEDER:  9 and 14.

6    MR. SACHSE:  I thought 9 and 14 were the ones he was going

7    to do.

8    MR. VEEDER:  I thought 9 and 14 were the ones he was going

9    to do, and also this 8 in regard to vegetative cover.

10   MR. GIRARD:  No, it was 8-A and 14.  I think 9 is finished.

11   THE COURT:  If you are going to put this finding in of

12   1.2 acre feet per year, we should have a finding somewhere as

13   to what the acreage of this --

14   MR. VEEDER:  We have that.

15   MR. GIRARD:  Yes.

16   MR. VEEDER:  You have asked me to prepare that language

17   and I have the language as to the number of acres on the sur-

18   face of the three sub-basins.

19   THE COURT:  Then we could refer back to whatever that

20   finding is.

21   MR. VEEDER:  I think we will have to cross-reference,

22   because we can't get them all at once.

23   THE COURT:  Is somebody going to propose new language as

24   to 8-A?

25   MR. GIRARD:  I think Colonel Bowen, as I understood it,

1    was going to try his hand along the same lines and set it up

2    with these figures.

3         THE COURT:   I will mark it "Colonel Bowen."

4         MR. VEEDER:   Is that right, Ace?

5         COLONEL BOWEN:   Yes.

6         THE COURT:   9.

7         MR. SACHSE:   There are some changes on 9.   I can give them

8    to you as you go along.

9         THE COURT:   All right.

10        MR. SACHSE:   In the second sentence, it is a perennial

11   stream to a point on the East half of Section 15.   We got these

12   figures from Colonel Bowen -- the East half of Section 15

13   Township 9 South Range 4 West.   Then we suggested that a

14   period come after the words "younger alluvial deposits" in the

15   next line, and we delete the next four lines to the end of the

16   sentence completely, so that there is no reference herein to

17   Lake O'Neill.   And then start  with the word "downstream" and

18   go on as it now is.

19        THE COURT:   All right.   So this replaces old 9.

20        MR. SACHSE:   Yes, your Honor.

21        MR. VEEDER:   May I raise one query -- I have some cross-

22   references here -- whether you want to take the time on it or

23   not, I don't know.   If you will look on page 7-12 you will see

24   where I am on the original.

25        MR. SACHSE:   Which?

MR. VEEDER:  7, Finding 12.  Will that not be included in your revised 14?

MR. SACHSE:  I don't think so.  12 refers to the last three words.  It deals with the way the River fluctuates during periods of substantial surface flow.  The sewage effluent I don't believe causes any fluctuation in the River.  It is not large enough.  14 is going to spell out where the sewage effluent comes in, but it doesn't cause its course to fluctuate.

MR. VEEDER:  Frankly, it is either repetitious or I don't know what it says.

MR. SACHSE:  12?

MR. VEEDER:  Be sure and look at 14 first.

MR. SACHSE:  Look at 14 first.  Then you have to look at the new 14, Mr. Veeder.

MR. VEEDER:  I am looking at the new 14.  Let's you and I, rather than taking the Court's time, work it out.

THE COURT:  All right.

10.  I have the note "Mr. Veeder to submit some tender thoughts" -- no, "tender some thoughts on 10."

MR. SACHSE:  I have that also.

MR. GIRARD:  I have "full discussion by Mr. Veeder."

THE COURT:  Have you done anything on 10, Mr. Veeder?  Have you any of these tender thoughts ready?

MR. VEEDER:  I'll be glad to have some tender thoughts on that, your Honor.

THE COURT:  Will you have them in writing?

MR. VEEDER:  Yes, your Honor.

THE COURT:  11.

MR. SACHSE:  I have no corrections are required on 11. At least, I made no notes of any during our last session.

THE COURT:  I would suggest "see page 13.  Put in description of basins."

MR. VEEDER:  We have that.  You are going to have Upper Chappo and Ysidaro sub-basins.

THE COURT:  Does that go in 11 or does it go in earlier?

MR. VEEDER:  My notes indicate that you want it to go in there.  I thought we were to describe it earlier.

THE COURT:  I don't care where it goes.  It may go in earlier.

MR. GIRARD:  Descriptions of the physical area of the younger alluvium.

THE COURT:  All right.

12 we have just talked about.

14 I have marked as okay.

MR. VEEDER:  I want to talk to Mr. Sachse about 12.

MR. SACHSE:  13 I have marked as okay.

14 is completely rewritten.  It is incomplete.  Colonel Bowen has to work it over.

THE COURT:  I'll just mark that for Colonel Bowen.

MR. SACHSE:  Would you take a moment, your Honor.  You

have raised this question and I would like to know if the

general idea on 14 as I drafted it meets with your approval,

before Colonel Bowen reworks it, because we didn't have any

of this sewage business in the old one.

MR. VEEDER:  I was going to raise the fact that the Court

has now tendered some thinking.

MR. SACHSE:  I used them in drafting.

MR. VEEDER:  All right.  I thought it would be a pious

idea to kick this around a little bit more.

THE COURT:  Let's wait until we see what Colonel Bowen

comes up with.

MR. VEEDER:  All right.

THE COURT:  And I will look it over.  I have some notes

here:  Salvage of sewage effluent, need a conclusion of law,

right to export or impound, phreatophytes, sewage in watershed,

sewage out of watershed.

Then 14-A is a new one.

MR. SACHSE:  14-A is to be added, yes.

THE COURT:  Does it look all right?

MR. VEEDER:  It should say "resulted in conservation of

a substantial but indeterminate amount of water".

MR. GIRARD:  I have no objection.

MR. SACHSE:  "In a substantial but undetermined," is that

right?

MR. VEEDER:  Yes.

1    THE COURT:  Now 15 is supposed to replace 15.

2    MR. SACHSE:  Yes, it is just a redraft of the existing 15.

3    THE COURT:  Is this the place where we want that language

4    that in areas above where the sewage effluent enters the ground

5    water is in fact the water of the stream that flows on the

6    surface, or similar language?

7    MR. GIRARD:  The language that we had in the Murrieta.

8    THE COURT:  Yes.

9    MR. SACHSE:  I'm lost.

10   MR. GIRARD:  In the Murrieta Findings we added this

11   language --

12   MR. VEEDER:  Give us the citation on that Murrieta.

13   MR. GIRARD:  Page 8 of the Murrieta Findings.  I think

14   it is agreed, essentially, that in areas above those where the

15   sewage effluent is deposited, when surface flow exists the

16   ground waters within the younger alluvial deposits -- this is

17   other than storms -- are in fact those waters which rise and

18   flow on the surface.

19   THE COURT:  You had that in the old 15 and by redraft it

20   has been eliminated.

21   MR. GIRARD:  Yes.

22   MR. SACHSE:  Yes.

23   THE COURT:  You had that language that said surface waters

24   are in fact the ground waters in the younger alluvial deposits.

25   We will have to revise 15 again.

1      MR. SACHSE:  According to my notes, we had no changes

2  or only very minor changes for the next three or four paragraphs.

3      THE COURT:  On 16 I have "compare with 11," whatever that

4  means.

5      Let's go ahead and tonight we will see what else we can

6  do down here, too.

7      We have a proposal for 22, a substitute.

8      MR. SACHSE:  That is the next one I did, your Honor.

9      MR. VEEDER:  19 has to be rehashed, too.

10     MR. SACHSE:  What is wrong with 19?

11     MR. GIRARD:  Weren't you going to summarize 17 rather

12  than just refer to the exhibit?  You were going to summarize

13  the high notes, Bill.  Has that been done?

14     MR. VEEDER:  That has been done.  I have written that in

15  to the orginal findings that I submitted to you.

16     MR. GIRARD:  All right.

17     MR. SACHSE:  On 19 there is a very minor change, but it

18  was so small that I didn't redraft it.  On the top of page 11

19  of the original draft there are some interlineations, "but in

20  fact stood at about 135 feet above sea level" et cetera, and

21  insert the date.

22     MR. VEEDER:  You have a great many variations, though,

23  on that, Franz.  ". . but do in fact stand at about 135 feet

24  above mean sea level at the point of confluence with De Luz

25  Creek".

MR. SACHSE:  That is your own exhibit.

MR. VEEDER:  Well, at the time the exhibit was prepared --

MR. SACHSE:  That is what I say, you want to give us the date.  The interlineation is there, but on blank date in fact stood at or about 135 feet.

MR. VEEDER:  It is a fluctuation, though.  I truly don't see the relevancy of it.

MR. SACHSE:  Mr. Veeder, I might as well answer you that back where you say, "However, the Santa Margarita River flows on the surface" -- and we readily accept Colonel Bowen's statement that it is Section 15, and he will be the first to tell you that it fluctuates every year, but we are pointing out when and what year.

MR. VEEDER:  All right.

20 should come out, because we are taking care of that.

MR. SACHSE:  Yes, I think 20 should come out because it is going to be done in another one of Mr. Girard's.

MR. GIRARD:  Yes.

THE COURT:  Then we come to 22.  Have you had a chance to look it over, Mr. Veeder?

MR. VEEDER:  Yes, sir.  I have notes on it.  I see where Mr. Sachse has taken a crack at it, too.

Haven't you?

MR. SACHSE:  Yes.

MR. VEEDER:  Page 22, "that commencing with the irrigation

1    season of 1927 and continuing thereafter . . outside the

2    watershed," I am going to work that over myself and I will

3    give you some language on that.

4              MR. GIRARD:  I have no objection to Mr. Sachse's finding.

5              MR. VEEDER:  There is direct evidence in regard to the

6    farming and we do have evidence in the record in regard to

7    exportation.

8              MR. SACHSE:  I said there is no direct evidence as to the

9    amount of diversions by the predecessor in interest.  Your

10   exports are in the preceding paragraph and are set forth in

11   detail, but there is no direct evidence as to the Rancho's

12   exports.

13             MR. VEEDER:  I think that Mr. Whitman testified.  It

14   depends on what you mean by direct testimony.  Measured?

15             MR. SACHSE:  That is what I mean.  Yours is measured.

16             MR. VEEDER:  There is no evidence of the measured amounts.

17   He testified to the acreage, and he testified to crops, and

18   we have evidence as to water duty.

19             MR. GIRARD:  But you don't know whether those crops got

20   that much water.

21             MR. SACHSE:  Or from what source the water came.  My whole

22   point is that there is nothing from which this Court could make

23   a finding that water from the basin was applied outside the

24   watershed in a specified amount.

25             MR. VEEDER:  I think we do have pumping records on that.

18,870

1    MR. SACHSE:  From the Rancho?

2    MR. GIRARD:  No.

3    MR. VEEDER:  Yes.  I'll check it out.

4    MR. SACHSE:  Other than that, have you any other objections

5    to it?

6    THE COURT:  Let's pass it.  He wants to look at it.

7    MR. SACHSE:  23 is the one where your Honor asked me to

8    rewrite it because you said you balked at the use of the word

9    "reasonable."

10   THE COURT:  Yes.

11   MR. SACHSE:  This is my best effort.

12   THE COURT:  Reasonable as to the character of their use,

13   or beneficial.

14   MR. SACHSE:  I redrafted it.

15   MR. GIRARD:  Reasonable and beneficial as to character of

16   use within the watershed.  Just beneficial as to character of

17   use out of the watershed, but not reasonable.

18   THE COURT:  Yes.

19   MR. VEEDER:  Your Honor, I would like to have you hear

20   me on that for a moment.  I believe that they have been

21   reasonable.  There is not a sign that we have -- the fact is

22   the evidence in the record discloses that there is really no

23   difference.

24   THE COURT:  You know what I am thinking about.  I just

25   don't like the word "reasonable," because it is a word that

18 871

1  pertains to a riparian use. And I am willing to put in any

2  kind of language here -- in fact I had suggested "reasonable,

3  except that there have been uses outside the watershed." But

4  the finding that has been proposed looks pretty good, "have

5  been beneficial as to character of use and none of the uses

6  is improper or has injured . . " I think you have it all said

7  there.

8 fls.  8  MR. VEEDER: Your Honor has stated that he doesn't want

9  "reasonable" in there, but I would like to have language in

10  there that the quantities of water -- if you don't like

11  "reasonable." We haven't used unreasonable quantities of

12  water in this beneficial use.

13  MR. GIRARD: You would put in quantities of water used

14  without the watershed.

15  THE COURT: Compared to what?

16  MR. VEEDER: I'll be glad to compare it with quantities

17  used within the watershed. In other words, we don't use any

18  more water to take care of a Marine outside the watershed

19  than we do inside the watershed.

20  THE COURT: Something like that is all right.

21  MR. GIRARD: Why don't you say, Mr. Veeder, that the

22  quantities of water used out of the watershed have not been

23  excessive for the beneficial purposes to which the water has

24  been devoted.

25  MR. VEEDER: That would protect me, if your Honor would

1   buy that.

2       THE COURT:  That is all right.

3       MR. SACHSE:  Your Honor, now I have to balk.  It has been

4   my understanding -- back to my old military use argument --

5   that your Honor's ruling was that it is a perfectly proper

6   riparian use, but that whether or not the use of River waters

7   in the quantities that are necessary for a semi-municipal

8   establishment such as this are reasonable depends on the facts

9   -- how much water is in the stream, whether it is logical to

10  use the water of the stream to operate a city, et cetera.  I

11  don't think we dare say that the quantities are reasonable.

12  That is one thing I don't think you can possibly say, because

13  a quantity used by anyone depends on the burden on the stream.

14      THE COURT:  Say that the uses outside the watershed were

15  reasonably comparable to the uses within the watershed, taking

16  into account area and the personnel served, et cetera.  That

17  is what I think Mr. Veeder is getting at.

18      MR. VEEDER:  That is right.  I don't want to have a single

19  implication --

20      THE COURT:  That they are more extravagant outside than

21  they are inside.

22      MR. VEEDER:  That is right.  And if they are reasonable

23  within, they are reasonable without.  You don't like

24  "reasonable."  Mr. Girard's statement that they were not

25  excessive in the beneficial use of the waters.

THE COURT:  What Mr. Sachse has wanted to do, and this is proper, is to reserve the point eventually on any apportion-ment as to what is a reasonable use as to amount compared with other uses on the stream.  That we have not passed on.  We can do both things.  We can point out that your use of water out-side the watershed has been as conservative and as well managed as inside the watershed.

MR. VEEDER:  Excellent.  If we have that, I have no complaint on that.  Your Honor's language I would like to have you repeat.

THE COURT:  As conservative and as well managed.

MR. VEEDER:  That is very good.

THE COURT:  But what Mr. Sachse wants to preserve is any intimitation that I have passed upon reasonableness as to amount compared with other users on the stream.

MR. VEEDER:  In other words, what you are saying is that in the event of apportionment the question would be subject to reexamination.

THE COURT:  Yes.

MR. VEEDER:  All right.

THE COURT:  See what you can do with 23.  Time is getting late.  Let's hurry on.  We can do a lot of work on this.

MR. SACHSE:  I don't have any more changes except very small interlineation changes for a good many paragraphs.

THE COURT:  On 17 I say "see Exhibit 1 in this case U.S.

vs. Land." That is Paragraph 34.

MR. SACHSE: There are a few little changes there. The word "below" has been changed to "downstream from".

THE COURT: 34. The smallest tract of land under one chain of title, on page 17, that presents some kind of problem, particularly on these acquisitions.

MR. VEEDER: Are you on page 17?

THE COURT: Paragraph 34.

MR. SACHSE: The problem I raised there -- and Mr. Veeder was going to ask Colonel Bowen to check -- was whether all of the several parcels on De Luz and Roblar Creeks which had been transferred from the public domain had all been riparian. I don't know and I will take his word for it. It may be that some of them weren't.

MR. VEEDER: I have each condemnation unit and it is clear, in my view at this juncture, I believe, that some may not be riparian.

MR. SACHSE: What I am talking about is the land transfers, whether they were all riparian to De Luz and Roblar Creeks.

MR. VEEDER: You are talking about the public domain.

MR. SACHSE: Yes. I don't know, but you tell us. That was my question.

MR. VEEDER: I thought you were talking about the individual parcels which were condemned.

THE COURT: He was.

MR. SACHSE:   I am talking about both, yes, the individual parcels of condemnation on De Luz Creek as well as the public domain land.

THE COURT:   There is a substitute for 37.   Pass it and look it over later.   I want to read this over.

There are some conclusions of law.

MR. SACHSE:   We are definitely going to have to work those over.   These were a fast attempt to answer your Honor's suggestion that some of the points raised in your pre-trial opinion be included.

THE COURT:   And you listed 6-A, B, D.

MR. SACHSE:   Those all relate to your pre-trial opinion.

THE COURT:   And then 7-A and 7-B you had proposed before.

MR. SACHSE:   That is in the letter I sent you, Fred.

THE COURT:   Then the only other thing, in putting this together I didn't know where your proposed interlocutory paragraph on your judgment went in.   Did you have any thought on that?   There have been a number of these paragraphs in the judgment.

MR. SACHSE:   I submitted this simply as a suggestion, as you will recall, to Mr. Girard when he was drafting it.   I didn't give any particular thought to where it should go in.

THE COURT:   I want to look the thing over.   Let's just let it go at that.

MR. VEEDER:   But some of the findings on which I have notes,

1   I would like to reserve the right to comment on those.

2       MR. SACHSE:   I would like to get together with you

3   tomorrow, Bill.

4       MR. VEEDER:   What time do we meet in the morning, your

5   Honor?

6       THE COURT:   Let's not meet until, say, 11:00 and give

7   you some chance to work.  Have some of this done and ready.

8       MR. VEEDER:   That is right.

9       THE COURT:   To substitute and talk over.

10      MR. SACHSE:   Is this court going to be occupied?

11      THE COURT:   No.  I have a matter at 10:00 that I have to

12  take care of.

13      MR. SACHSE:   If we/wanted to leave things in the courtroom

14  et cetera, we may do so.

15      THE COURT:   You may leave it here.  That'll be perfectly

16  all right.

17      MR. VEEDER:   I was asked, your Honor, what your plans are

18  after this week in regard to time.

19      THE COURT:   We will fix some other date.  I don't have

20  anything definite.  I'll be gone all next week.

21      MR. VEEDER:   I have a matter that comes up the 27th and

22  28th of February.

23      THE COURT:   Somewhere else?

24      MR. VEEDER:   Yes.  I just thought I would bring that to

25  your attention now so that we could do some planning.

1     MR. GIRARD:  I have nothing, so I can be here any day.

2     You are going to be gone the 27th, Bill?

3     MR. VEEDER:  As long as his Honor will not be available

4     on the 12th, I was leaving on Friday afternoon or as soon as

5     we are out of court.  I had planned on being gone certainly

6     the balance of that week and then I have this other matter

7     coming up on the 27th and 28th.

8     MR. GIRARD:  I have no objection.  I think it would be

9     helpful, though, when we meet next time, if we all have our

10    suggested language as to all these matters.

11    MR. SACHSE:  In writing you mean.

12    MR. GIRARD:  In writing.  As far as that goes, I can have

13    mine the week after next.  We are not going to meet next week

14    anyway.  I have no preference as to dates.

15    THE COURT:  The best we can hope to do would be to hammer

16    out some kind of another rough draft.  That is the best we

17    could hope to do.

18    MR. GIRARD:  I would be very happy, and I am sure Franz

19    will, to hammer out our ideas of a rough draft.  But Mr. Veeder

20    has indicated that he has some ideas.  I would like to have

21    his ideas of a rough draft hammered out, too.

22    MR. VEEDER:  I will rerun, to the extent that I can, in

23    the morning the things that we have talked about.  I have

24    cross-references to the findings that I have proposed.  I think

25    you can adopt some of it at least.  The further we go the

18,878

1    better.

2       THE COURT:  I was looking over your findings that you

3    proposed down here, and of course a lot of those we cannot

4    even talk about.  You have findings that in certain years

5    there were so many acre feet of water came down, and after

6    Vail Dam was built so many acre feet came down.  From those

7    findings it looks as if Vail Dam got all this water.  As a

8    matter of fact, actually, the main thing is that you hit this

9    dry spell.

10      MR. VEEDER:  There are three principal elements in regard

11   to that:  You have Vail Dam, Vail pumping, and the drouth.

12      THE COURT:  What is the use of making findings that,

13   when you start to read them, it looks as if you make the find-

14   ing how much water came down the year before Vail Dam, then

15   you say after Vail Dam was closed only so much came down.

16      MR. VEEDER:  You will find that before and after each one

17   of those findings I point out, without assigning the value to

18   what has caused this sharp diminution in runoff.

19      THE COURT:  I can't follow you on that at all.  I don't

20   know why we would put stuff like that in a finding.

21      MR. VEEDER:  I think they are very important, your Honor.

22      THE COURT:  Let's take a look at these before 11:00

23   o'clock tomorrow.

24      MR. SACHSE:  I'll get down here promptly tomorrow, Mr.

25   Veeder.

1        (Whereupon an adjournment was taken until Thursday,)

2        (                                               )
(February 8, 1962, at 11:00 o'clock A.M.        )

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,     )
                              )
                  Plaintiff,  )
                              )
     vs.                      )     No. 1247-SD-C
                              )
FALLBROOK PUBLIC UTILITY      )
DISTRICT, et al.,             )
                              )
                  Defendants. )
_____)

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit:  February 7, 1962, was a duly qualified, appointed and acting official reporter of said Court.

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within and foregoing ninety-three (93) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 9th day of February, 1962.

John Swader
Official Reporter