# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                    Plaintiff,

VS.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                    Defendants.

No. 1247-SD-C

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         **Thursday, February 8, 1962**

              Pages:    18,880   to   18,971

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**J O H N   S W A D E R**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, February 8, 1962

- - -

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| State of California: | FRED GIRARD, ESQ. |
| Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE, ESQ. |

18,881

SAN DIEGO, CALIFORNIA, Thursday, February 8, 1962, 9:45 A.M.

-oOo-

(Other matters.)

MR. VEEDER: Are you ready to proceed, your Honor?

THE COURT: Yes.

MR. VEEDER: We have run off in the extreme rough, of the material we discussed yesterday and I have given counsel copies of it (handing document to the Court).

Do you have it before you, Franz?

MR. SACHSE: Yes, sir.

THE COURT: Let's look at it first.

(A pause.)

MR. VEEDER: Have you got to Finding 3?

MR. SACHSE: Whose is that?

MR. VEEDER: That is Fred's, on page 2.

MR. SACHSE: Yes.  That is a description of functions, et cetera.

MR. VEEDER: Yes.

MR. SACHSE: That is a good idea.

39 or 40 are the same ones from Fred's.

MR. VEEDER: Yes.

MR. GIRARD: I have no objection to 5, either.

MR. SACHSE: The Court indicated he may want to add something to 6 yesterday.

MR. VEEDER: I thought that was what he said.

18,882

1    MR. SACHSE:  I think this is swell.  I think your sug-
2  gestions, from reading 39 and 40, are good.

3    THE COURT:  Two inquiries.  I am just down through page
4  4.  I like your setup and it looks good to me.  I notice you
5  have used descriptions in the declarations of taking which
6  would be just as good as a deed if it properly describes the
7  property.

8    MR. VEEDER:  I think that is correct, your Honor, but out
9  of an abundance of caution I think I will want to reserve the
10  right to check those references out further.

11    THE COURT:  When the Government files a declaration of
12  taking that would be the description.

13    MR. SACHSE:  Mr. Veeder pointed out that to us yesterday
14  and said he wouldn't be sure, there might be some slight
15  variance between the taking and the judgment and he will check
16  it.

17    THE COURT:  On page 3, I don't know whether you have the
18  sections right where the River enters the Enclave.

19    MR. VEEDER:  I think those are right.  I have been running
20  them through and have asked Colonel Bowen to check them.

21    THE COURT:  On the bottom of page 4.  This is the old
22  one horse one rabbit business.  Sixty per cent of the buildings
23  and installations.  Is the 60 per cent area-wise or numerically?
24  Sixty per cent functionally or what?

25    MR. VEEDER:  I will say that that language refers --

1   perhaps better language would be the quantities of water used

2   by personnel.

3   THE COURT:  To supply facilities, et cetera.

4   MR. VEEDER:  That is right.  Colonel Bowen said yesterday

5   that on the basis of water uses you could calculate that 60

6   per cent of the people using water are provided outside the

7   watershed and 40 per cent inside.

8   THE COURT:  I don't know whether we have this in the

9   record.

10   Is that correct, Colonel Bowen?

11   COLONEL BOWEN:  Yes, your Honor.

12   THE COURT:  It is now on the record.  I think you should

13   change that.

14   MR. VEEDER:  We will improve on that, yes.

15   MR. GIRARD:  How do you want it changed, Bill?

16   MR. VEEDER:  I would really like to work that language

17   over more and I'll talk to the Colonel on it.

18   THE COURT:  Now, this new one would be in lieu of 1 and

19   2.

20   MR. SACHSE:  1 and 1-A and 2 and 2-A, et cetera, would

21   take care of 1 and 2.

22   THE COURT:  Yes.

23   MR. SACHSE:  And a lot that is to come later would be

24   eliminated then.

25   THE COURT:  Yes.

1      That would bring us down to 3, wouldn't it?  You say here

2  in his suggested Finding 3.

3      MR. SACHSE:  That is the Girard finding.

4      MR. VEEDER:  That is part of the pre-trial stipulation.

5      MR. SACHSE:  Yes.

6      THE COURT:  3 looks okay then presently.  Is that right?

7      MR. VEEDER:  That is correct.

8      THE COURT:  Next.

9      MR. SACHSE:  39 and 40 are on page 20 of the Girard draft,

10  and I think Mr. Veeder's suggestion is very good.

11      MR. GIRARD:  Are those the ones that deal with the use?

12      MR. SACHSE:  Use on the Base, military and municipal use.

13      MR. GIRARD:  All right.

14      THE COURT:  On what page are they?

15      MR. SACHSE:  Pages 20 and 21.

16      MR. VEEDER:  Pages 20, 21 and 22.

17      MR. SACHSE:  According to my notes, Mr. Veeder, I still

18  have a blank for the full mobilization.

19      MR. VEEDER:  In that regard, I want to say we are going

20  to amplify 39 based on Colonel Robertson's testimony, but we

21  would move it up there and make those amplifications, if it

22  is satisfactory.

23      MR. SACHSE:  I suggest this language to add at the end,

24  "In time of war the maximum population is projected at blank."

25      MR. VEEDER:  105,000 would be the demand against the

1    Santa Margarita River, 21,000 acre feet annually.

2         You will notice on Mr. Sachse's 6 that we eliminated the

3    words "at the previous trial of this cause".

4         THE COURT:   I understand you are taking 39 over, too, 39

5    and 40.

6         MR. VEEDER:   39 and 40, and I am going to tender some

7    suggested changes on that.

8         THE COURT:   On what?

9         MR. VEEDER:   On 39.  We have evidence in the record which

10   amplifies that to some degree.

11        THE COURT:   You are going to do this later.

12        MR. VEEDER:   Yes.  I thought this was just a tentative

13   run.  I would go back this afternoon, if you permit us to do

14   so, and I would start.

15        MR. GIRARD:   I don't think there will be any objections.

16        MR. SACHSE:   I am sure there will not be.  I know what

17   Mr. Veeder has in mind and ought to go in.  It is a question

18   of finding it and being sure the finding is correct.

19        MR. VEEDER:   Colonel Robertson testified to it orally

20   and I can just check it out and put it in.

21        THE COURT:   Are we leaving 3 in as is?

22        MR. VEEDER:   Yes, your Honor.

23        THE COURT:   And 4 goes out, does it?

24        MR. SACHSE:   Yes, your Honor.

25        I am not quite sure I understand, Mr. Veeder, where you

say change 5.  You don't feel that belongs in the findings at all?

MR. VEEDER:  No, I would put that 5 as a conclusion of law, but we had discussed it and I thought we might as well handle it.

MR. SACHSE:  That's all right with me.

MR. GIRARD:  All right with me.

MR. SACHSE:  Isn't it truly a finding that the United States by bringing the action has submitted to the jurisdiction of the Court?  I don't know.

MR. VEEDER:  I think that is a conclusion of law.

THE COURT:  What are you talking about?

MR. GIRARD:  5 on page 5 of Mr. Veeder's draft.  It is also the same as the last paragraph -- not the same, but it is supposed to reach the same result as the last paragraph of my Finding 5.

MR. VEEDER:  And Mr. Sachse's Finding 5.

MR. GIRARD:  Yes.

THE COURT:  Now is proposed 5 to become a conclusion of law and it would go out of the findings and come into the conclusions?  Let me read it.  5 has eliminated this matter of submitting to the jurisdiction of the Court and it says that the rights to the use of water, title to which is in the United States -- I suppose you mean, and title to which is in all parties defendant.

1          MR. VEEDER:  Title to which is in the United States and

2     all parties defendant and their heirs, successors and assigns.

3          THE COURT:  You have made it all parties defendant and

4     all users of water subject to the jurisdiction of the Court.

5     But in the first part you say "all rights to the use of water

6     title to which is in the United States".  It is a little

7     awkward.

8          MR. VEEDER:  May I go to 20 there?  All uses.  We wrote

9     in there "users."  All uses of those waters are subject --

10          MR. GIRARD:  Would there be any particular objection,

11     Mr. Veeder -- I don't think your 5 is any different from the

12     last paragraph of my Finding 5 -- take the last paragraph of

13     my Finding 5 and make it a conclusion instead of a finding.

14          THE COURT:  I like your 5 better than I like Mr. Veeder's.

15          MR. GIRARD:  I think we accomplished the same thing and

16     make it a conclusion of law instead of a finding, if you want

17     to do it that way.  Put it in a finding and conclusion of law.

18          THE COURT:  What is your objection to the last sentence

19     of Mr. Girard's proposal?  It starts with some very vigorous

20     language, "By bringing this action the United States has

21     submitted to the jurisdiction of the this Court and the con-

22     tinuing jurisdiction of the Court in this cause".

23          MR. VEEDER:  The only point that I desire to emphasize

24     there, and the reason why I made the changes that I suggested,

25     are these:  (1)  I think the res or subject matter of this

1   cause is the rights to the use of water in the Santa Margarita

2   River, and I think it is the rights which are subject to the

3   jurisdiction of this Court.

4         THE COURT:  And the parties, too.

5         MR. VEEDER:  Your Honor, now let's read it -- I am not

6   being critical of Mr. Girard's as written: "The United States

7   by bringing this action has submitted to the jurisdiction of

8   this Court and to the continuing jurisdiction of this Court

9   in this cause and/or uses of waters of the Santa Margarita

10   River and its tributaries. . . support".  My thought is, and

11   the only real change that I have made in it, is that he refers

12   to uses.  I refer to both rights and to uses.

13         MR. GIRARD:  The real change, Mr. Veeder, is the fact

14   that the United States brought the suit, because if the United

15   States hadn't brought the suit this Court wouldn't have had

16   jurisdiction of this case.

17         MR. VEEDER:  Let's go back and start once again.  The

18   real reason why I suggested the language is that I think the

19   rights are the subject matter of the case to begin with.

20   Secondly, I think if you want to put in there the fact that

21   the United States brought the litigation, it certainly suits

22   me.  You can put in there something along that line, that the

23   United States of America instituted this action and invoked

24   the jurisdiction of the Court.

25         THE COURT:  Let's solve it by using Mr. Girard's paragraph

1   with any change you want to make as to rights.

2      MR. GIRARD:  All uses of and rights to.  Let's just add

3   that.

4      MR. VEEDER:  Use "rights" first.

5      MR. SACHSE:  Rights to and uses of the waters of the

6   Santa Margarita.

7      MR. VEEDER:  That is right.

8      MR. GIRARD:  Fine.  That is in line 12.

9      MR. SACHSE:  12 and 13.

10     THE COURT:  Does that satisfy you, Mr. Veeder?

11     MR. VEEDER:  Let's read it aloud as your Honor has it.

12     THE COURT:  Just insert on the third line --

13     MR. SACHSE:  Insert it on line 12 and line 13 again --

14   "rights to and uses of".

15     MR. VEEDER:  And you are starting on line, is that correct?

16     MR. SACHSE:  That is correct.

17     MR. GIRARD:  That is correct.

18     MR. VEEDER:  "The United States of America by bringing

19   this action has submitted to the jurisdiction of this Court

20   and to the continuing jurisdiction of this Court . . "

21     THE COURT:  In this cause.

22     MR. GIRARD:  ". . in this cause, and all rights to and

23   all uses of the waters of the Santa Margarita River and its

24   tributaries and all rights to and all uses of waters which add

25   to and support the Santa Margarita River. . by the United

1   States of America and all defendants in this case and by their

2   successors and assigns shall be and are subject to the con-

3   tinuing jurisdiction of this Court."

4       THE COURT:  You have put some other language in there.

5   As I have it, it reads "by any party to this action".

6       MR. SACHSE:  We are reading from Mr. Girard's 5 on page

7   4 of the big draft, your Honor.

8       THE COURT:  Oh, I was reading from your's.

9       MR. GIRARD:  No, we have thrown that out now.

10      MR. VEEDER:  Mr. Sachse's is out entirely, as I understand.

11      MR. SACHSE:  Yes.

12      Our suggestion, your Honor, would be this -- have you got

13   Mr.Girard's 5?

14      THE COURT:  Yes.

15      MR. SACHSE:  We would start with the word "that" on line

16   9 and it would read as follows:  "That the United State of

17   America by bringing this action has submitted to the jurisdic-

18   tion of this Court and to the continuing jurisdiction of this

19   Court and all" -- and here we insert -- "rights to and all uses

20   of the waters of the Santa Margarita River and its tributaries

21   and all rights to and all uses of waters which add to and

22   support the Santa Margarita River and its tributaries" and

23   then continue on.

24      MR. VEEDER:  I want to be sure that the language is clear.

25   Going to 13 where you are reading, Mr. Sachse, "and all rights

to and all uses of waters which add to and support the Santa

Margarita River and its tributaries by the United States of

America"?

MR. SACHSE:  And all defendants in this case.

MR. VEEDER:  You've got to have something about your title

in there, Mr. Sachse.

THE COURT:  You have a little problem now, you see.  Now

you see the word "by" on line 14 presents a problem.  It was

a proper word when you used "uses".  You don't say "rights by

the United States;" you say "uses".

MR. SACHSE:  Asserted.

THE COURT:  Asserted uses, uses asserted, rights asserted.

MR. VEEDER:  It is rights asserted.

MR. SACHSE:  Or uses.

THE COURT:  "asserted" would do it.

MR. VEEDER:  You have to have "rights" in there.

MR. SACHSE:  "Rights" is in there.

THE COURT:  "Asserted" would be all right.

MR. GIRARD:  "Asserted by the United States of America

and all defendants."

MR. VEEDER:  "All uses asserted by ".

MR. SACHSE:  No, Mr. Veeder.  Line 14.

MR. VEEDER:  I am looking at it.

MR. SACHSE:  "Tributaries asserted by".

THE COURT:  He is going back to what we were talking

1    about.  We have two subjects there, rights and uses.

2         MR. VEEDER:  Yes.

3         THE COURT:  Now "rights are asserted" goes all right with

4    "rights," asserted by the United States.

5         MR. VEEDER:  And uses by the United States and all

6    defendants.

7         MR. SACHSE:  It is a matter of grammar.

8         MR. VEEDER:  It is a matter of grammar.  You have two

9    subjects.

10        MR. SACHSE:  Sandy has what might do it, your Honor:

11   "and all asserted rights to and uses of waters in the Santa

12   Margarita River by the United States of America".  Then I

13   think it makes sense.

14        MR. VEEDER:  Why do we have "asserted" in there?

15        MR. SACHSE:  To take care of the two-predicate problem.

16        MR. VEEDER:  My own view is that we are to the point

17   where we are writing about rights which would be adjudicated

18   and decreed, so asserted rights are immaterial at this point.

19        MR. GIRARD:  Bosh.

20        MR. SACHSE:  You write it.

21        THE COURT:  This is a simple matter.  Let's look at this

22   a minute.  Out of an abundance of caution, what about this

23   kind of insert on line 12, "and all rights asserted to the

24   use of water and uses of the waters. . ," then you drop

25   down, "by the United States and defendants. . "?  Wouldn't

1    that do it?

2         MR. VEEDER:  I think that is getting close.

3         THE COURT:  All rights asserted to the use of water by

4    and all uses by, so the word "by" is in properly.  So the

5    insert would read "all rights asserted to the use of waters"

6    -- is "claimed" a better word than "asserted"?  All rights

7    "claimed" to the use of water instead of "asserted".

8         MR. SACHSE:  I think it is immaterial.

9         THE COURT:  All right.  It looks all right to me then.

10        MR. VEEDER:  If I comprehend what you are doing now,

11   "all rights and uses by the United States and all rights and

12   uses by all parties defendant," is that correct?

13        THE COURT:  That is in substance what we are doing.

14        MR. VEEDER:  That is all I care about.

15        THE COURT:  Now what do we do with what was left of

16   Finding 5?

17        MR. SACHSE:  You mean my 5?

18        MR. VEEDER:  The first part is added to 1,your Honor,

19   the first three lines.

20        THE COURT:  Mr. Girard's and Mr. Sachse's is out.

21        MR. SACHSE:  Yes, your Honor.

22        THE COURT:  6.  I went through this opinion last night

23   and there were certain questions I reserved ruling on and,

24   as is often the case, there are certain things where you could

25   have said less or said more.  For instance, in talking about

18,894

1    the Government's use of water outside the watershed I didn't

2    make it clear that this was in the context demanding water

3    to come down to be used outside.  And I am not so sure that it

4    is the proper way to do this to incorporate the opinion by

5    reference.

6        And gentlemen, there ought to be some express findings

7    here on this matter.  Sovereignty is not out of this case.

8    You can take my word for it that if there is an appeal in this

9    case, notwithstanding the assertions made by Mr. Veeder and

10   the Attorney General and the Congress of the United States,

11   and notwithstanding everything that has happened, it is going

12   to be asserted again.

13       And I had almost forgotten what had gone here.  When you

14   read what happened you have the anomalous situation of Mr.

15   Veeder on behalf of the Government moving that the parties be

16   bound by the stipulation and moving that the stipulation be

17   interpreted according to its ordinary language.  Mr. Girard,

18   you were not here in those days.  And I was very happy to grant

19   that motion and I said that it bound everybody who signed it

20   and it should be given its ordinary meaning.

21       Then Mr. Veeder moved for an interpretation of the matter,

22   and then we had a further discussion and a ruling on that.

23       Then he moved that the Court look into all the facts of

24   how it was issued, et cetera, and we took some proof and heard

25   Mr. Goldberg and had transcripts of records and all here, and

1   again I ruled on the matter.

2       And while this was going on Mr. Veeder asserted these

3   rights of sovereignty as to the use of the water on various

4   theories.

5       Now, you have to keep in mind two or three things.  First,

6   this stipulation bound only the State of California, the United

7   States and Santa Margarita.  It was expressly made for the

8   benefit of all the parties.  I think later on some other

9   defendant joined in the  stipulation.  But there has to be a

10  conclusion of law as to other parties to this stipulation that

11  California law controls this controversy.

12      MR. SACHSE:  All of us of record in the courtroom at that

13  time, for Fallbrook we are clearly of record as accepting the

14  stipulation your Honor, you recall that.

15      THE COURT:  There were lots of defendants who didn't.

16      MR. SACHSE:  There were lots of defendants who didn't.

17      THE COURT:  So there has to be a finding that California

18  law controls this matter.

19      MR. SACHSE:  Would that be a finding or a conclusion of

20  law?

21      THE COURT:  Well, conclusion of law.  And I think there

22  has to be a finding that Mr. Veeder had authority to enter

23  the stipulation and that it was ratified by the Attorney

24  General and the Department of Justice.

25      MR. VEEDER:  I didn't hear what your Honor said.

THE COURT:  I think there has to be a finding that you had authority to enter the stipulation and that it was ratified by the Attorney General and the Department of Justice.

MR. VEEDER:  I think that is a conclusion of law, but I think it is proper.

THE COURT:  I think it should be in the findings and in the conclusions.

MR. GIRARD:  Can we stipulate to that in the record, Mr. Veeder, that you had authority and that it was approved by the Attorney General to sign that stipulation?

MR. VEEDER:  Well, yes.  There is no question that I signed it, there is no question that I had authority, and no question that we have proceeded in accordance with it.

MR. GIRARD:  And no question that the Attorney General has done other than accepted it?

MR. VEEDER:  I have never talked to Mr. Bob Kennedy about this matter.

MR. GIRARD:  I don't mean Bob Kennedy.

MR. VEEDER:  But I am sure that the man who was Attorney General certainly approved what transpired, although I can't say that I can find that in writing.

MR. GIRARD:  I don't ask you to write it.

MR. VEEDER:  I assure you that every act that has been taken has been ratified.

2 fls.

1      THE COURT:  I am still willing to wager, as I told this

2   Mexican the other day, a peso, a small coin, that if this

3   goes up on appeal the rights of sovereignty will be asserted.

4   The United States will assert that it had a right to take and

5   to use water as it wanted to and to appropriate water without

6   complying with State procedures.

7      MR. VEEDER:  I think you were wrong in your position --

8   I am certainly going to have that phase of it reviewed, because

9   your Honor has taken the word "measured," that is where you

10   seize upon it, you look at 4, "That the rights of the United

11   States of America to the use of waters herein are to be

12   measured in accordance with the laws of the State of California,"

13   you have in my view erroneously construed that to mean that I
                                                                of
14   had agreed to make a filing and to comply with the laws/the

15   State of California in regard to the State Water Rights Board,

16   which I surely never did, and I certainly reserve  the right

17   to have your Honor's interpretation reviewed.

18      THE COURT:  I say this will come up notwithstanding the

19   express statements.  I read them last night and was amazed at

20   some of the things I read -- I had almost forgotten about it

21   -- the express statements of Mr. Veeder, a member of the

22   Attorney General's staff, a Deputy Attorney General, that the

23   United States of America claimed no rights by reason of the

24   fact that they were the United States, and that all that they

25   claimed was just what they got when they bought the Santa

1   Margarita Rancho just like any private citizen.  This is what

2   they told the Congress.

3         MR. VEEDER:  Your Honor, I am pleased to have your Honor

4   go back over these things, I am delighted that you have re-

5   freshed your memory on it, because I want the issue clear that

6   I fully expect that there should be interpreted each of the

7   paragraphs on review, what was meant, what was undertaken.

8         THE COURT:  I anticipate this.  And therefore I have

9   prepared some rough material.  There is no use taking our time

10  now.  You can look it over during the noon hour and we will

11  talk about 6 when we come back.

12        Let's go to something besides 6.

13        MR. GIRARD:  I am not through discussing this, if you

14  want to.

15        MR. VEEDER:  On 6, Mr. Girard?

16        MR. GIRARD:  No, on 1-A on page 3.

17        I am not sure that this is acceptable.  It may well be,

18  but what I would like to do, I want to reserve the right --

19  do I have copies of these exhibits?

20        MR. VEEDER:  Mr. Girard, those are United States of

21  America Plaintiff's Exhibits 7, 8 and 9.  I have copies for

22  you, if you want them.

23        MR. GIRARD:  I would like to take them up when I go to

24  Sacramento and have Mr. Port look at them.

25        MR. VEEDER:  Why don't you refer to what is in 1-A, so

1    it will be in the record.

2        MR. GIRARD:  1-A is the notice of acceptance by the

3    United States and apparently the acknowledgment by the

4    Governor of the State of California.

5        MR. VEEDER:  Governor Warren.

6        MR. GIRARD:  7, 8 and 9?

7        MR. VEEDER:  I will verify that right now.

8        MR. GIRARD:  And I am also wondering, assuming these

9    findings are satisfactory, what conclusion of law do you intend

10   to have drafted from that?

11       THE COURT:  We have agreed we are not going to say

12   "exclusive possession."  We are going to say "possession and

13   control," and we are going to say also that the Government

14   has the right to use this water that gets down to the Enclave

15   any way they want to use it.

16       MR. GIRARD:  I have no objection to that at all, just so

17   long as we don't litigate the legal question whether or not

18   they have exclusive jurisdiction in the sovereignty sense as

19   distinguished from the physical right to use the water.

20       MR. VEEDER:  Mr. Girard and I are in exactly the same

21   position.  He has the Attorney General of the State of

22   California taking one position.  I have the Solicitor General

23   of the United States taking identically the opposite position.

24   And I think we must maintain --

25       MR. GIRARD:  All I want to do is to let them decide that

18,900

1   issue up there in their case and not here.

2   THE COURT:   7 is now out.   It is replaced by 1-B, I

3   understand.

4   MR. VEEDER:   That is correct.

5   THE COURT:   Have there been any further suggestions on 8?

6   MR. VEEDER:   Mr. Sachse has.

7   MR. GIRARD:   Yes.

8   MR. SACHSE:   Yes.

9   MR. GIRARD:   Colonel Bowen is going to work over, as I

10   understand it, Mr. Sachse's draft of 8.

11   THE COURT:   Mr. Sachse's draft of 8-A is not necessarily

12   a substitute for 8, is it?

13   MR. SACHSE:   No, 8-A is new.

14   Fred, you are in the wrong place.

15   THE COURT:   What about 8?

16   MR. SACHSE:   My notes were that it was okay, but Mr.

17   Veeder wanted to check the language.

18   THE COURT:   Mr. Veeder wanted to look at some old exhibits,

19   is the note I have.

20   MR. SACHSE:   That's right.

21   THE COURT:   We will pass that.

22   Now we come to 8-A.

23   MR. VEEDER:   I would like to make an observation in regard

24   to 8-A.

25   MR. GIRARD:   This is the one that Colonel Bowen is going

1    to rewrite.

2         MR. VEEDER:  That if you would look at the top line, it

3    says "that in a state of nature the flood plain of the Santa

4    Margarita River within the Enclave throughout most of the

5    area covered . . "  We have never used, as I recall, the term

6    "flood plain," Mr. Sachse, and that is one reason why I was

7    going to ask for direction before I wrote anything further

8    today, from your Honor.  The question came up about the use

9    of the term "basin."  You said that you are going to find that

10   these were not basins, but for the purpose of convenience the

11   term would be used.

12        THE COURT:  It would be used in defining areas and

13   capacities, et cetera.

14        MR. VEEDER:  Yes.

15        THE COURT:  This is a simple matter.  Why don't we just

16   say -- I think in my draft I had the "valley floor".

17        MR. SACHSE:  That is what I was checking.  In your draft

18   you said "the canyon and flood plain".

19        MR. VEEDER:  This is the first time I have had an

20   opportunity to comment on the "flood plain" and I think that --

21        THE COURT:  Valley floor.

22        MR. SACHSE:  I don't care what word you use.  Let Colonel

23   Bowen use any word he wants that fits.

24        MR. VEEDER:  If it is all right with you, Mr. Sachse, I

25   am worried about the word from a legal standpoint.

1    MR. SACHSE:  I am, too, and I don't want the word "basin"

2  for that reason.

3    THE COURT:  Use some other word besides "basin" here.

4  We are going to talk about basins only where you want to define

5  the areas and the capacities of the younger alluvium.

6    MR. VEEDER:  I really believe that the way these findings

7  are set up it is not too clear.  If your Honor has the draft

8  that I proposed for this area, page 13, I undertook to write

9  some language.  I realize that you will not adopt the word

10  "basin" as used there, but I do describe the areas, the length

11  or whatever you want to call it, where they are located.

12    THE COURT:  Which finding are you talking about on 13?

13    MR. VEEDER:  Start on 78 and follow on through.

14    THE COURT:  78?

15    MR. SACHSE:  That is Mr. Veeder's 13.

16    THE COURT:  All right, 78, and your first finding "narrow

17  and well defined channel" is out.

18    MR. VEEDER:  I object to the ruling, but I do think it

19  is important to say that the plain, if you want to call it

20  that or whatever it is, starts eleven miles from the ocean

21  located et cetera and on down.

22    THE COURT:  Don't you have that really in this 1-B?

23    MR. GIRARD:  The description of the stream should be in

24  1-B.

25    MR. VEEDER:  No.  No, I give you the course of the stream

1    there.  But this is a broadening.  You call it a "flood plain",

2    I call it the "surface of the basin".

3        MR. GIRARD:  Mr. Veeder, as I understand, the finding

4    where we will discuss the three-storied units is not 8-A.  It

5    will be in Finding 10.  The full discussion of the area and

6    the fact that these have been designated by the terms that we

7    use here and the full discussion -- I have in my notes "full

8    discussion of the physical features of these units are going

9    to be in 10."

10       THE COURT:  We might as well make it clear what we are

11   talking about.  We are talking about the valley floor of the

12   Santa Margarita, and that in the course of the trial there

13   have been references to these basins, identifying them, that

14   the Court finds they are not basins but that for the purpose

15   of identification the areas of younger alluvium and the capaci-

16   ties, the term "basin" may be used to key into the record.  It

17   is a simple thing to state what we are going to do.

18       MR. VEEDER:  That is all right.  That is what I am hoping

19   for, because if you will go on to page 14 we talk about the

20   depth et cetera and the composition of the alluvial material.

21   As I say, if we could get started on that this afternoon I

22   could write it so that at least you have a look at it tomorrow.

23       THE COURT:  You know what I am thinking about.

24       MR. VEEDER:  Yes.

25       THE COURT:  Do you want to try to rewrite it?

1    MR. VEEDER:  Yes, I would.  All I wanted was your direction

2  as to the language you wanted to use.

3    THE COURT:  You have the Townships already.  I would start

4  and talk about the floor of the Santa Margarita Valley to the

5  Naval Enclave, and that it is relatively flat and proceeds

6  down gradient to the ocean, and that within this valley floor

7  there are three areas in the record where we refer to them

8  occasionally as basins and make a finding that they are not

9  basins but that the term will be used for identification of

10  the area of younger alluvium and the water capacities in that

11  area, et cetera.  You can work it out.

12    MR. VEEDER:  That is all I wanted to know, because then

13  we will have something -- I will try very hard to have some-

14  thing before the end of the afternoon for Mr. Girard and Mr.

15  Sachse to look at.

16    MR. GIRARD:  The point I want to make is that the storage

17  capacities and the fact that these are referred to as basins

18  has primarily in this case, as I understand it, been concerned

19  with the ground waters in the younger alluvial deposits, which

20  is more appropriate in Finding 10, where Finding 8-A does not

21  deal primarily with that.  It is a state of nature in the

22  physical sense, more or less, on the surface, the growing of

23  grasses, et cetera.  I don't believe this Finding 8-A is the

24  proper place for that general physical designation.

25    THE COURT:  I think it belongs better in connection with

10.

MR. GIRARD:  Yes.  As I understand the situation on 8-A, there were a few figures and a few checking that was going to be done on Mr. Sachse's draft of 8-A by Colonel Bowen and he had agreed to do it at the meeting yesterday.

THE COURT:  You haven't had time, have you?

COLONEL BOWEN:  No, sir.

MR. GIRARD:  I don't presume he has done it yet, but I presume he will do it.  And that doesn't involve that other problem, which is better in 10.

THE COURT:  There was really also the question of acreage.

MR. GIRARD:  That is right, your Honor.  That was one of the things he was going to consider.

THE COURT:  I am not too concerned about this flood plain. You can call it valley floor or flood plain or river within the Enclave, and I think that is descriptive enough of it.

MR. VEEDER:  All right.  Now it is in addition to Mr. Girard's No. 8.

MR. GIRARD:  Yes.

MR. VEEDER:  I am now alluding to Franz's.

THE COURT:  Yes.

MR. SACHSE:  Yes, it is to be added.  It is indicated as new.  It is a new paragraph.

MR. VEEDER:  All right.

THE COURT:  9.

MR. SACHSE:  On 9, before we go any further, Mr. Veeder and Colonel Bowen, I want to suggest a change.  I thought we were all together on 9 yesterday.

MR. GIRARD:  That is Mr. Sachse's 9.

MR. SACHSE:  My 9 I am talking about.

MR. GIRARD:  Yes, mine is out.

MR. SACHSE:  The language is "at the present time".  I don't want to say "at the present time".  At the present time when his Honor signs this I hope there is going to be water running in Ysidaro, the way our rains are coming.  I want to say in the summer of 1961.

Is that correct, Colonel Bowen?

COLONEL BOWEN:  Yes, sir, that is correct.

MR. VEEDER:  Also, however, I want to tender this thought, that the stream in the East half of 15 at times has dried up entirely, and so you wouldn't have a perennial stream all the while.

THE COURT:  He has limited it now to the summer of 1961. " . . Santa Margarita River existed" -- instead of "exists" --"as a perennial stream".

MR. VEEDER:  I wouldn't say "a perennial stream".  A perennial stream contemplates a continuous run.

MR. SACHSE:  I will accept Colonel Bowen's judgment on this.  He changed my Section 5 to 15 for the perennial stream, and his answer, as I recall, to us in your office yesterday,

1   was that taking last summer, which was even after Fallbrook

2   stopped its pumping, stopped its diversions, that it just

3   barely got to or beyond the Naval Ammunition Depot diversion

4   and he felt that that was probably the limit of it as a

5   perennial stream.   I hope I am not misquoting the Colonel, but

6   that was the general tenor of it.   We said, "All right, tell

7   us where."   He said first Section 15, and then you asked him,

8   he limited it to the East half of 15.

9        THE COURT:   Is that right, Colonel?

10        COLONEL BOWEN:   Yes, sir, that is right.

11        MR. VEEDER:   I am worried about the word "perennial."

12        THE COURT:   The Colonel has just said that he thinks it

13   is a perennial stream down that far.

14        MR. VEEDER:   Let me finish, then.   I have seen the Santa

15   Margarita River dry throughout that reach of the River when

16   Fallbrook was taking water.

17        MR. SACHSE:   No, you haven't, because if we were taking

18   water and it was dry we couldn't be taking water.

19        MR. VEEDER:   No, you were taking water out above it.   That

20   is the point.   It might be that the Santa Margarita River,

21   unless artificially interfered with, is a perennial stream.

22        MR. SACHSE:   Mr. Veeder, I am not going to accept your

23   testimony as to the condition of that River.   I will accept

24   Colonel Bowen's, and I will accept the careful readings.

25        MR. VEEDER:   Isn't it true, Colonel, that the River was

dry, for example, right at that point?

COLONEL BOWEN:  We are talking about the summer of 1961, Mr. Veeder.  Mr. Sachse's proposed Finding 9 limiting the finding to that period of time is correct.  I have been up and down that stream many times during the last summer, Mr. Veeder.  I don't recall that you were there once.

MR. VEEDER:  The point that I am trying to make is that I object to the word "perennial".

THE COURT:  The objection is overruled.

Should it be proper also to add, however, that the distance downstream that the River exists as a perennial stream varies from time to time, depending upon the precipitation and depending upon pumping and utilization made of the waters in the watershed?

MR. GIRARD:  We have that.

MR. SACHSE:  We have something like that.

MR. VEEDER:  I am going back once more and ask your Honor to define for the record what you mean by "perennial stream".

THE COURT:  A perennial stream is a stream that runs the year round.

MR. VEEDER:  That runs the year round and year in and year out?

THE COURT:  Yes.

MR. VEEDER:  Then the "perennial stream" term is in error here.

1    THE COURT:  Where is this Section 15?

2    COLONEL BOWEN:  Just below the Naval Ammunition Depot

3    diversion, your Honor, in the canyon reach of the stream.  And

4    my observations from time to time last summer were that the

5    surface stream existed varying from a quarter mile to a half

6    mile downstream from the Ammunition Depot diversion point.

7    THE COURT:  Last year was one of the driest years we have

8    had.

9    COLONEL BOWEN:  Yes, your Honor.

10   THE COURT:  Would it be your judgment that the stream

11   would be a perennial stream in the vast majority of years

12   down that far?

13   COLONEL BOWEN:  Yes, your Honor, if Fallbrook did as they

14   last year and refrained from pumping water upstream.

15   MR. SACHSE:  Let's look at some exhibits and let the

16   Colonel look at them.  The United States' Exhibit 23, Santa

17   Margarita River near Fallbrook, the Federal guage: --

18   THE COURT:  This is really at about the boundary of the

19   Enclave?

20   COLONEL BOWEN:  That is right.

21   MR. SACHSE:  In 1957 it ran all year -- the water year of

22   1958, pardon me.

23   In 1957 there was no measured flow -- none at that guage

24   in July, August, September or October.

25   In 1956 no measured flow July, August and September.

18,910

1          Then for every year prior to that there was measured

2     flow every month of the year.

3          I don't know what you would call a perennial stream.  If

4     it happens to be dry at the absolutely driest cycle for two

5     or three months and you can't call it  perennial, let's just

6     take the word "perennial" out.

7          MR. VEEDER:  That is what I say.

8          MR. SACHSE:  I think it is a perennial stream.

9          MR. GIRARD:  I don't think the fact that Fallbrook diverts

10    it and prevents water going down there changes the fact that

11    it is a perennial stream.  It just means that it is not a

12    perennial stream because somebody is taking water out.

13         MR. VEEDER:  That is what I said.  I said except when

14    artificially interfered with it is a perennial stream.

15         MR. GIRARD:  Why do you need a finding?  Obviously when

16    you build a dam and stop water there isn't any water there.

17         MR. VEEDER:  I am old-fashioned enough to want the facts

18    set out.

19         MR. GIRARD:  I think it is correct the way it is.

20         MR. VEEDER:  I have objected to it.

21         THE COURT:  I am going to solve this in a bit hurry.  In

22    the summer of 1961 the Santa Margarita River flowed on the

23    surface to a point et cetera; that the Santa Margarita, unless

24    artifically interfered with, has generally flowed as a perennial

25    stream to at least a point in the stream -- and what is it?

18,911

1        MR. GIRARD:  It is at least this point.

2        MR. SACHSE:  Much below that.  If we are going to say

3    that, we will get clear down to Section 5, won't we, Colonel?

4        COLONEL BOWEN:  Yes, sir.

5        THE COURT:  Whatever that section is.

6        MR. SACHSE:  That is the one I had previously, Section 5

7    Township 10 South.

8        THE COURT:  And it is now time for lunch and I now hand

9    you some of these very rough conclusions of law and my

10   secretary also is working on some findings.

11       MR. VEEDER:  What time do you want us back?

12       THE COURT:  Two o'clock.

13       Incidentally, when I just off of the cuff draw a con-

14   clusion or finding, don't think it has any correctness or

15   merit in it.  I am just trying my hand at some of these things

16   that I think ought to be in here.

17       (Noon recess.)

18

19

20

21

22

23

24

25

SAN-DIEGO,-CALIFORNIA, Thursday, February 8, 1962, 2:00 P.M.

-o0o-

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes, sir.

MR. VEEDER:  I hand your Honor the amendments to the presently entered interlocutory judgment relating to the vagrant, local, percolating waters, which set forth specifically the statements that they do not relate to the surface waters.

THE COURT:  This concerns six judgments.

MR. VEEDER:  That is correct, your Honor.

THE COURT:  Could you get me five other copies?

MR. VEEDER:  Yes, your Honor, I will.

THE COURT:  So that I can put one in each of my files.

I have signed it and the Clerk will file it and enter it.

MR. VEEDER:  Your Honor, I have undertaken to write some language for your Honor's consideration in regard to the matter of the subterranean stream below the Northwest Quarter of Section 32 Township 9 South Range 4 West.

THE COURT:  What area is this now?

MR. VEEDER:  It is the point where the Santa Margarita River emerges from the deep canyon into the valley floor that you were talking about just before noon.

Did I give you one of these Mr. Sachse?

MR. SACHSE:  Yes.

JOHN SWADER, OFFICIAL REPORTER.

THE COURT:  In the first one you say "has its course almost due south across Section 32 and then after emerging in" -- you mean from -- "the Northwest Quarter of Section 32".

MR. VEEDER:  If your Honor would just look at that De Luz confluence, just the second paragraph that is there.

THE COURT:  The second paragraph I am talking about. After emerging from, isn't it, instead of in?

MR. VEEDER:  All right.  It is after emerging from the deeply incised canyon through which it flows.

MR. GIRARD:  Is it intended that this second paragraph is supposed to connect with this first paragraph on De Luz Creek?

MR. VEEDER:  No, it is not.

MR. GIRARD:  These are entirely separate?

MR. VEEDER:  These are entirely separate.

MR. GIRARD:  Yes.

MR. VEEDER:  I am just trying to get the language, because I think we should/not be using this language "throughout the entire course of the stream".  It is the language that starts on lines 16 and 17 that I am particularly interested in now.

MR. SACHSE:  Where is the area you are referring to as the deeply incised canyon?

MR. VEEDER:  Right where De Luz emerges, I mean the confluence of De Luz Creek.

MR. SACHSE:  Where is 32-9 South- 4 West?  Is that the

18,914

Gorge?

MR. VEEDER:  Just a moment.  I'll get you the map.

COLONEL BOWEN:  No, it is on the reservation.

MR. SACHSE:  In other words, after emerging from the Northwest Quarter from the deeply incised canyon, you are referring to emerging from the canyon where the diversion is; is that right?

COLONEL BOWEN:  Yes.

(Counsel consulting a map.)

MR. VEEDER:  If you want this language in, it suits me. I want to be sure we have an understanding as to where I am starting.  It is about 12 miles in from the Pacific Ocean.

THE COURT:  It looks all right to me, except I would change the "which is" to "as" on line 25.

MR. VEEDER:  Colonel Bowen has suggested at 24 "basement complex, La Jolla formation" should be "basement complex or marine sediments," knocking out "La Jolla formation".

THE COURT:  It would be basement complex and marine sediments.

MR. VEEDER:  It would be or, your Honor.  There is basement complex half-way down the upper sub-area.

MR. SACHSE:  Basement complex or marine sediments.

MR. VEEDER:  That is correct.

THE COURT:  Where would this fit in now?

MR. VEEDER:  I was going to ask for some direction on

that, your Honor.  Without being critical of Mr. Girard's

finding, if your Honor would turn to Findings 31, 36, 37 and

38, we have reference to the confluence with De Luz Creek in

31, the description of De Luz Creek in 32, and we come on down

and you find in 36, 37, and 38 references to Fallbrook Creek.

THE COURT:  This first paragraph, De  Luz Creek, would

fit in apparently with 31, would it not?

MR. GIRARD:  Yes.

MR. VEEDER:  Yes, it would.  What I would hope to do

would be to move it all up to where we are in our consideration

now of 8, 9 and 10, so that you would have your full descrip-

tion of the watershed.

MR. SACHSE:  I certainly have no pride of authorship in

it.  My thinking, and I told Mr. Girard, we tried to do the

River proper first and then jumped off to De Luz, Fallbrook

and the unnamed tributaries.  I don't care how you do it.

MR. VEEDER:  It just seems to me that we are at a point

where we can consolidate some of those findings that are wide-

ly separated.

MR. GIRARD:  I still personally feel that this language

you have drafted -- perhaps it should be enlarged somewhat --

should go in at 10.  The top one should go in 31 on De Luz

Creek but the bottom one, which is the general discussion of

the three-storied units as they are referred to, should go

in 10.

1      MR. SACHSE:  Or in place of 10.  Isn't that what you had

2  in mind?

3      MR. VEEDER:  All I want now is direction as to where the

4  Court wants it to go.

5      THE COURT:  You are also suggesting to move 31 up into

6  this area, aren't you?

7      MR. VEEDER:  I would like to, unless there is objection

8  to it.

9      THE COURT:  I don't see any objection to it, do you?

10      MR. GIRARD:  In the first place, 31 and 32, and 33 and

11  34 are all concerned with De Luz Creek specifically, and 35

12  also.  There are five or six findings dealing solely with De

13  Luz Creek.  Then there are a couple dealing solely with

14  Fallbrook Creek.  Those findings commencing with about Finding

15  10 and 11, 12, 13, 14, 15 are solely concerned with the Santa

16  Margarita River, and I tried to keep them separate.  Personally,

17  I think it is better to treat the River separately in one set

18  of findings, De Luz Creek separately in another more or less

19  inter-related set.  I don't think there is any advantage by

20  consolidating them.

21      THE COURT:  It is a matter of form.  It doesn't make a

22  lot of difference.

23      MR. GIRARD:  It doesn't make a lot of difference.

24      THE COURT:  If you are talking about the River first and

25  then the various --

MR. GIRARD:  That is what we did on Murrieta.  We talked
about Murrieta first, then we talked about Temecula, then we
talked about Santa Gertrudis and those others, and then we
talked about the unnamed streams.  In this one  I am following
the same pattern.

THE COURT:  Let's put the first paragraph Mr. Veeder's
has proposed, work it in with what is now 31.

MR. GIRARD:  Yes.

THE COURT:  And probably follow what you now have as 31,
would it not?

MR. GIRARD:  I think probably some of the material I have
in 31.

THE COURT:  That is all about De Luz.

MR. GIRARD:  Yes, it is all about De Luz.  I think mostly
I would more or less substitute Mr. Veeder's for mine.

THE COURT:  It is not a substitute.  In De Luz you tell
about younger alluvial in De Luz.  Now the thing that we add
is where De Luz has its confluence with the Santa Margarita.

MR. GIRARD:  That is in 31.  About the only thing that
Mr. Veeder's 31 has in it that my 31 doesn't have is the
drainage area of De Luz Creek and maybe one description, one
section where it says "almost due South".  I could very easily
incorporate everything Mr. Veeder has into my 31, in his first
paragraph.  And then his second paragraph, as I understand it,
is concerned with the alluvial deposits of the River.

1      MR. VEEDER:  That is away up.

2      MR. GIRARD:  Yes.

3      MR. VEEDER:  And your 8, 9, 10 group.

4      MR. GIRARD:  I would think Mr. Veeder's De Luz confluence

5  should go in my 31, and the language that he suggests in the

6  second paragraph dealing with the River should go into my  10.

7      THE COURT:  All right, let me look at this a minute.

8  First of all, one of you says the Southwest Quarter and the

9  other says the South half.  Which is it?

10      MR. GIRARD:  I presume Mr. Veeder got his from the

11  Colonel.  I will take Colonel Bowen's statement.  We are both

12  right.

13      MR. VEEDER:  If you want to be more exact, you can say

14  the Southwest of the Southwest.

15      COLONEL BOWEN:  The Southeast of the Southwest.

16      THE COURT:  Let's take the language in 31 -- do you want

17  to change that to the Southwest half?

18      MR. VEEDER:  Southwest Quarter suits me.

19      THE COURT:  As is then.

20      MR. GIRARD:  Yes.

21      THE COURT:  Southwest Quarter as is and Mr. Veeder didn't

22  have the range.

23      MR. VEEDER:  Your Honor, if you drop down you see the

24  range follows Section 32.

25      MR. SACHSE:  All in Township 9 South.

1      THE COURT:  The only thing new in yours, Mr. Veeder, is

2   "from which point the River has its course" and you would make

3   a new sentence "From the confluence the Santa Margarita has

4   its course . . "  This is part of yours we have used.

5      MR. VEEDER:  My concern is not authorship nearly as much

6   as I had hoped we would also get a land description in 10,

7   too, your Honor.

8      THE COURT:  In 10?

9      MR. VEEDER:  Don't me let interrupt you until you get 31

10  finished.

11     THE COURT:  As I said, we would just eliminate the first

12  three lines of yours, Mr. Veeder, down to the words "of that

13  stream," we would pick up your language from there on "From

14  the confluence the Santa Margarita River has its course due

15  south across Section 32," strike out "all," and that would

16  complete 31.

17     Is that agreeable?

18     MR. SACHSE:  Yes, except I would suggest, it seems to

19  me, Mr. Veeder would want some reference to what Mr. Girard

20  has in 31.

21     THE COURT:  I am using all of what Mr. Girard has, and I

22  am taking that part of Mr. Veeder's that says on line 5,

23  starting a sentence there, strike out "from which point" and

24  insert "From the confluence the Santa Margarita has its course

25  due south . . "  Does that do it?

1    MR. GIRARD:  Fine.

2    THE COURT:  And for the time being we will leave it as

3    31.  If later on we have to rearrange these, we will do it.

4    MR. VEEDER:  Your Honor, I wanted to read my notes in

5    regard to Mr. Sachse's No. 9, if you are ready to consider

6    that, because I think these all tie in together.  Do you agree

7    on that?  This is the language I have based on your statements

8    this morning:  "That in the summer of 1961 the Santa Margarita

9    River flowed as a surface stream to a point in the East half

10   of Section 15 Township 9 South Range 4 West, at which point

11   it disappeared into the younger alluvial deposits.  Downstream

12   from that point the Santa Margarita River disappeared under-

13   ground and only existed as a surface stream during and immedi-

14   ately after periods of precipitation and runoff or at such

15   times and locations as surface flow existed by reason of the

16   discharge of sewage effluent into the bed of said stream, as

17   is more particularly set forth in Paragraph" -- is that 14?

18   MR. SACHSE:  That is right.

19   MR. VEEDER:  ". . 14 of these findings of fact."  Isn't

20   it set forth in Finding 14?

21   MR. GIRARD:  Finding No. 14.

22   MR. VEEDER:  It is not Paragraph.  It is the Finding.

23   MR. GIRARD:  Yes, Finding 14.

24   MR. VEEDER:  Then following that, "The Santa Margarita

25   River, when not          artificially interfered with upstream,

1   has generally flowed as a perennial stream to a point in

2   Section 5 Township 9 South --"

3       MR. SACHSE:   10 South.

4       MR. VEEDER:   " -- 10 South 4 West."  Is that what you

5   have, your Honor?

6       THE COURT:  That was sort of the language I suggested.

7   Is that all right?

8       MR. VEEDER:  It is all right with me.  Where do you

9   propose to have that as it relates --

10      MR. SACHSE:  I would say right where it is.

11      MR. GIRARD:  I would say right where it is, because the

12   first 7, 8 and 9 are more --

13      THE COURT:  He means where in 9.  It is part of 9.

14      MR. GIRARD:  That is 9.

15      MR. SACHSE:  The whole thing.  Everything else in 9 goes

16   out.

17      THE COURT:  This insertion in 9 he is talking about, the

18   question is where in 9, that last statement as to where it

19   generally flows?  It comes at the end?

20      MR. SACHSE:  At the end.

21      MR. GIRARD:  At the end is fine.

22      MR. VEEDER:  This is a substitution for 9 on page 5.

23      MR. SACHSE:  That's right.

24      MR. GIRARD:  That's right.

25      THE COURT:  All right, we have that settled.  Is that

1    right?

2         What about the second part of your suggestion here?   This

3    is to come in some part here?

4         MR. GIRARD:   I think we ought to work it into Section 10,

5    your Honor, but I want to add a little bit to it.  There was,

6    for example, testimony by all the witnesses that there is no

7    lack of continuity, or I don't know what you would call it,

8    between the younger alluvial deposits in these various units.

9         MR. VEEDER:   We have said that they are hydrologically

10   interconnected.

11        MR. GIRARD:   Hydrologically interconnected.

12        MR. VEEDER:   Hydrologically and geologically inter-

13   connected.

14        MR. GIRARD:   I want to throw in a little language along

15   that line.  But I think Mr. Veeder's approach is good.  I think

16   it can be worked into Finding 10 very easily.

17        THE COURT:   Of course, this is just the preliminary where

18   we start to talk about the valley floor and we talk about the

19   alluvial filled valley.

20        MR. GIRARD:   Yes.

21        THE COURT:   It is not a basin.  You don't have to have

22   everything in this preliminary paragraph.

23        MR. VEEDER:   No.  Then I would take my suggestions on

24   page 13 --

25        THE COURT:   Of your findings?

18,923

1      MR. VEEDER:  Yes, and I would change it however you want

2  the language as to basement and refer to the unit, which would

3  be in Finding 80, and then take 81 and 82, changing it all so

4  that it will not conflict with what you said in regard to

5  subterranean stream, 83 and 84.

6      MR. GIRARD:  What page are those on?

7      MR. VEEDER:  Those are 13, 14 and 15.  They are going to

8  have to be radically revised, but the general form  I would

9  follow from the standpoint of what I think the record is.

10     THE COURT:  Where would these go in?

11     MR. VEEDER:  They would follow 11, your Honor.  You see,

12  as a matter of fact, we would in effect supersede 11 by the

13  first language that was looked at, that is, the language

14  "after emerging . . ".

15     THE COURT:  That wouldn't supersede 11, because 11 says

16  that they are laterally confined by deposits of consolidated

17  rock and alluvial deposits, and 11 is not going to be super-

18  seded.

19     MR. VEEDER:  All right.

20     MR. GIRARD:  Your Honor, I think I kind of agree with Mr.

21  Veeder that these ought to go in somewhere right around here,

22  but there is some repetition between what is said in Mr.

23  Veeder's and what is said in some of our findings.  I think

24  it is pretty much impossible now to work it out specifically.

25  I think we are going to have to draft it in.

MR. VEEDER:  I am perfectly willing to do that, but this is a typing job that I don't want to have to repeat.  I thought Mrs. Tooker could get it so that we would have something to look at tomorrow.

MR. GIRARD:  For example, I think you referred to the lower Ysidaro area, to marine deposits of fossil shells in one sentence on lines 29 and 30 on page 14.  At your request I drafted about a full paragraph or six lines on these marine deposits.  Do you want to say they are marine deposits, or do you want to detail it somewhere?

MR. VEEDER:  Where are your details?

MR. GIRARD:  On page 7.  I am sure, and I am sure Mr. Sachse will agree, that we want some language in there that these shell deposits do not act as an absolute barrier.

MR. SACHSE:  That is right.

MR. GIRARD:  We are going to have to work these in.

THE COURT:  Let me make this suggestion in order to get a draft.  Go back to 10.  What Mr. Veeder suggested can for the time being be the first part of 10, and what you have suggested will be the second part of 10, Mr. Girard, except that to make it read properly in your 10 on page 6 lines 13-16 there, you are going to have to say we are talking about the Santa Margarita River.  We have talked about De Luz.  So we would say "At a point upstream from the confluence of the Santa Margarita and continuing downstream to the confluence of

18,925

said Santa Margarita River with the Pacific Ocean" -- well,
I think that tells it. What I was thinking about was saying
there are in the Santa Margarita Valley, on 16, substantial
deposits of younger alluvium. Stick it in anyhow for the time
being, Mr. Veeder. Do you see where I mean?

MR. VEEDER: Yes.

THE COURT: That pretty well makes sense for 10.

MR. GIRARD: Yes.

THE COURT: Then Mr. Veeder, you would insert as a start
to what we talked about from 80 to 85 in there before 11.

MR. GIRARD: Yes. That is on line 22 page 13.

THE COURT: Yes. In there prior to 11, and for the time
being, to keep our numbering system straight, call them 10-A,
B, C et cetera, so that we don't upset the other numbers. We
will later have to renumber them. Will that do for a starter
on that?

MR. GIRARD: I think that is where it should go in, yes.

MR. VEEDER: That will be 10-A, B, C.

THE COURT: Whatever you need. That will fit them in
right there at 11.

What is the next thing to talk about?

MR. VEEDER: Your Honor has given us some of your ideas
to consider.

MR. GIRARD: Before we go to his Honor's suggestions, I
would like to suggest -- and I presume Mr. Sachse and I, we

18,926

1   have discussed this briefly -- we are going to work up a

2   draft along those lines; isn't that right?

3        MR. SACHSE:  Yes.

4        MR. GIRARD:  We are going to leave entirely to Mr. Veeder

5   drafting the findings for No. 20 and 34, which are the pro-

6   cedural findings whereby to set forth what lands are riparian

7   to specific creeks or rivers.

8        MR. VEEDER:  I thought that 20 would be out entirely.

9        MR. GIRARD:  Maybe 20 should be out, but somewhere along

10  the line we have to say that certain land is riparian to the

11  Santa Margarita River.  We can either do it by reference or

12  you can do it by incorporation.  Your Finding 1 doesn't do it.

13       MR. VEEDER:  If you will look there at 1-B, the boundary

14  of the watershed of the Santa Margarita River.

15       MR. SACHSE:  I don't have any 1-B.

16       MR. VEEDER:  Within the Naval Enclave of 38,031 acres.

17       MR. SACHSE:  Oh, 1-D.

18       MR. VEEDER:  1-D.

19       MR. SACHSE:  I guess that will do it, yes, 1-D.

20       THE COURT:  That refers to the map which shows it.  Now

21  does that take care of the smallest unit, et cetera, in view

22  of these later acquisitions?

23       MR. GIRARD:  Maybe I am wrong, but are all lands within

24  the watershed riparian, are all lands within the Naval Enclave

25  within the watershed riparian to the Santa Margarita River?

1    MR. GIRARD:  I think you should care.

2    THE COURT:  Amend your    1-D to point out that the lands

3  within Camp Pendleton -- this is the line of Pendleton, is it?

4  Amend your 1-D to say that all lands acquired from the Santa

5  Margarita are within the watershed, and then separately set

6  up a paragraph that will take care of this material.

7    MR. SACHSE:  That will do it.

8    MR. VEEDER:  Your Honor, Colonel Bowen advises me that

9  he will run a crestline description showing verbally the

10  watershed line of the Santa Margarita River, using quarter

11  sections, and I would prefer that to incorporating the map by

12  reference, and I will submit that to you for review.

13    MR. GIRARD:  I am sure we have no quarrel with it at all.

14    MR. VEEDER:  I am not sure it is Colonel Bowen's map.

15    THE COURT:  In 1-D you are going to say 38,000 acres of

16  land, and this you are going to take care of in a separate

17  finding.

18    MR. VEEDER:  This will be a separate finding on Roblar

19  Creek and on De Luz Creek.

20    MR. GIRARD:  You are going to do that, Bill?

21    MR. VEEDER:  That is going to be done, and it is going to

22  be a written description in lieu of incorporation.

23    MR. GIRARD:  That takes care of 34.

24    We did have one other problem.  I'm not sure whether it

25  was resolved by Mr. Sachse and Mr. Veeder in their discussions

and I don't know how we are going to handle it.  And that is
on 28 -- this  is this prima facie case -- where I referred to
an exhibit which set forth the wells and all of the surface
diversions, gross acreage, irrigated acreage et cetera on the
lands of the United States within the watershed.  As we all
know, there is no such exhibit for these facts on the military
land.  They came in through numerous types of testimony.  As
far as the State of California is concerned, I would be very
happy, if Colonel Bowen drafted one, to stipulate that it go
in evidence and to attach it to the judgment and you can call
it any exhibit you want.  I think it would be much easier than
trying to pick out every little finding in the record.

THE COURT:  Is that agreeable?

MR. VEEDER:  We are speaking only of our agricultural
land now; is that correct?

MR. SACHSE:  Everything.

MR. GIRARD:  One exhibit setting forth where your wells
are, where your surface diversions are, except for possibly
Lake O'Neill, which is covered in another one, gross acreage,
irrigable acreage, irrigated acreage, water duty, whatever you
want to put in on that issue, put it on one, two, three, four
sheets of paper.  I will stipulate that it go into evidence
and attach it to the judgment.

MR. VEEDER:  Our Exhibits 93 and 94 relate strictly to
agricultural land, and Colonel Bowen by oral testimony -- I

1   have that all worked up.  I can show you land class, water

2   duty and all that other material.  You see, we have an addition-

3   al problem I wanted to bring to your attention.  We have the

4   problem of showing the places of water use for military

5   personnel and that, and we are going to have an exhibit on

6   that.  We will have a finding on that either in the form of

7   an exhibit or set out in narrative.

8       MR. GIRARD:  As far as the State of California goes, if

9   you wanted to have Colonel Bowen prepare one exhibit setting

10  forth all these things, like he did/the soil survey, I have

11  no quarrel.

12      THE COURT:  He is substance has said that this is agreea-

13  ble, but Mr. Veeder is pointing out that there is another

14  exhibit or some addition to it that will also be prepared.

15  But I think this would be a good idea to pull together a lot

16  of this testimony about which there is no dispute.

17      MR. VEEDER:  It is all together.  We have it together.

18      THE COURT:  All right.

19      Let's go to the very front page of your document and while

20  we are at it let's knock out the word "proposed" on the findings

21  and let's put in --

22      MR. VEEDER:  We are now looking at those that were lodged

23  on November 21st by Mr. Girard.

24      THE COURT:  11-17.

25      MR. GIRARD:  Naval Enclave.

18,931

1    THE COURT:  I am just looking at your box on the front

2  page.  It might be easier just to put "Naval Enclave" at the

3  top in parentheses, Judgment No. 37, and then below that

4  Findings of Fact, Conclusions of Law pertaining to Camp

5  Pendleton, strike out "Joseph H. Pendleton, Naval Hospital

6  and U.S. Ammunition Depot".  Give it some thought.  I don't

7  care how you set it out.   They are a little easier to spot

8  in a hurry if you put the number at the top.  And we are

9  calling this all the Naval Enclave.

10    What do you want to talk about now?

11    MR. VEEDER:  We have some material here that Colonel

12  Bowen has drafted up, if you want to go to Mr. Sachse's 14.

13    MR. GIRARD:  I think we will probably use it right  away.

14    MR. VEEDER:  Better see what it is (handing document to

15  counsel).

16    MR. SACHSE:  The beginning of mine stays?

17    COLONEL BOWEN:  Yes, sir.

18    THE COURT:  Are you talking about 44 or 14-A?

19    MR. SACHSE:  14, your Honor.  As I understand it, Colonel

20  Bowen's language would begin down half-way down the page with

21  the words "such return" that appear also on mine.  The top of

22  mine stays.

23    MR. GIRARD:  That is right.

24    THE COURT:  Let me look at it.

25    MR. SACHSE:  Colonel, don't you think we ought to indicate

1   which of these plants is in which quarter?

2       COLONEL BOWEN:  Maybe it would be helpful.

3       MR. SACHSE:  Instead of "at locations," "has been made

4   at Plant No. 1 in such and such quarter."

5       MR. VEEDER:  You mean the location northeast northeast?

6       MR. SACHSE:  I don't know whether these are in proper

7   order, but it would read like this:  Is made at Plant No. 1

8   located in the northeast of so and so, Plant No. 2 located

9   in the southeast of the so and so, whatever proper delineation

10  there would be.

11      COLONEL BOWEN:  The plants themselves are not located at

12  those locations.  The discharge is made at these points.

13      For example, Plant No. 1 discharges sewage effluent at

14  the locations described as the northeast of the northeast of

15  8 Section 8 10 South 4 West.

16      THE COURT:  You would have to insert the locations?

17      COLONEL BOWEN:  Yes, sir.

18      THE COURT:  Plant No. 1 is at location so and so.

19      Now this next one is from what plant?  Plant No. 2?

20      COLONEL BOWEN:  No, your Honor, Plant No. 1 discharges

21  effluent to both the first two quarter quarter-sections.  The

22  reason for those two different locations is our bypass system

23  at Lake O'Neill.

24      THE COURT:  All right, from Plant No. 1 at the location

25  northwest one quarter of the northwest one quarter of Section

1    8 et cetera, strike out the semicolon, and --

2    COLONEL BOWEN:  And the southeast quarter of the northwest

3    quarter of Section 8 10 South 4 West.

4    THE COURT:  Yes.

5    Now then what is the next one?

6    COLONEL BOWEN:  The next quarter quarter-section, your

7    Honor, which reads the southwest quarter of the southwest

8    quarter of Section 13 10 South  9 West is Plant No. 8, the

9    point where the sewage effluent from Plant No. 8 is discharged

10    to the channel.

11    THE COURT:  All right, then put a period before we start

12    that and insert -- well, a period isn't going to do it --

13    semicolon from Plant No. 8 at a location in.

14    MR. GIRARD:  What is the next one?

15    COLONEL BOWEN:  The next location described as the north-

16    west quarter of the northeast quarter of 26-10-5 is Plant No.

17    3, the point where the sewage effluent from Plant No. 3 reaches

18    the basin.

19    THE COURT:  All right, from Plant No. 3, insert "at a

20    location in".

21    The next one.

22    COLONEL BOWEN:  The next one is Plant No. 2, your Honor,

23    discharges to the river channel at the southeast quarter of

24    the northwest quarter of 35-10-5.

25    THE COURT:  All right, on Plant No. 2 at a location in

1    et cetera.

2         COLONEL BOWEN:  The final one, your Honor, is Plant No.

3    13.

4         THE COURT:  All right.

5         MR. SACHSE:  I am satisfied with that.

6         MR. GIRARD:  It is fine with me.

7         MR. SACHSE:  I understand, Mr. Veeder, that the rest of

8    the language preceding Colonel Bowen's is to be retained as

9    set forth in my 14.  Is that right?

10        MR. VEEDER:  That is right.

11        MR. SACHSE:  How about the last language, "The practices

12   herein described are" should stay in also, should they not?

13        MR. VEEDER:  I am awarding the Colonel with the Navy Cross.

14        THE COURT:  He would rather have pay raise.

15        That eliminates Mr. Girard's 14, then, does it?

16        MR. SACHSE:  Mr. Girard's 14 goes out and the one I

17   submitted goes in.

18        MR. VEEDER:  Commander Redd is going to have to be

19   excused, your Honor.

20        THE COURT:  All right.

21        MR. VEEDER:  When will we convene in the morning?

22        THE COURT:  9:30.

23        MR. GIRARD:  I probably won't be here.

24        MR. SACHSE:  I would like to be excused, if possible,

25   for not over half an hour tomorrow morning.  I may be a little

1   late.   I have a critical probate matter that will take a few

2   minutes.

3       MR. VEEDER:   There is no sense in our starting without

4   you.

5       THE COURT:   What time will you be here?

6       MR. SACHSE:   I have a probate matter and I am No. 2 on

7   the calendar, but I might be a little lengthy.   I will certain-

8   ly be here by 10:30, I know.   It will not last an hour.

9       THE COURT:   Let's say 10:15 then.

10      MR. SACHSE:   I'll try to make it.   I will rush right over.

11      THE COURT:   15 is Mr. Sachse's substitute for Mr. Girard's?

12      MR. SACHSE:   No, your Honor, my 14-A is supposed to be,

13   at least in our thinking, inserted before we come to 15.

14   Actually, 14-A incorporates some of what was in Mr. Girard's

15   14 and some of the ideas your Honor proposed.

16      THE COURT:   I understand your 14-A is new and so far

17   there is no objection to it.

18      MR. SACHSE:   Yes.   It goes between 14 and 15.

19      THE COURT:   That is right.

20      MR. SACHSE:   And 15 we work on Mr. Girard's.

21      MR. GIRARD:   No, on yours.   I think it is good the way

22   it is.   I did have a problem, and I think your Honor did, but

23   I think Mr. Sachse's language takes care of it.

24      THE COURT:   I want this language out of yours that said

25   that surface waters are in fact ground waters.

MR. GIRARD:  Yes, I agree with your Honor.  But doesn't it say that?  It says "but only occasional surface waters at points where ground waters have  risen".

THE COURT:  Let me read the two of them.

MR. VEEDER:  I have knocked out 15 entirely.

MR. GIRARD:  It should be knocked out.  We are using Mr. Sachse's.

THE COURT:  15 looks all right to you, then?

MR. GIRARD:  Yes.  I think Mr. Sachse's language does take care of the problem we were concerned with on Murrieta.

THE COURT:  All right.

MR. SACHSE:  Now we go back to 16 in Mr. Girard's draft.

MR. VEEDER:  Isn't that just repetitious?

MR. GIRARD:  I might point out also that the problem with which we were concerned on Murrieta is taken care of in 16 directly by the same language.

THE COURT:  Yes.

Now 17.

MR. VEEDER:  You mean with that one has been taken care of before we get there?

THE COURT:  It is going to/taken be care by your 80.

MR. VEEDER:  That is right, by the 10-A, B, C, D Series.

MR. GIRARD:  Mr. Veeder, I don't recall, in looking at your 10-A, B, C.  Do you specifically refer to that exhibit?

MR. VEEDER:  I don't recall that I do.

18,937

MR. GIRARD:   Because I want some reference to the specific exhibit, even though we are describing it.

MR. VEEDER:   37 and 38 you mean?

MR. GIRARD:   U. S. Exhibit 39.

MR. VEEDER:   You refer to 37 and 38.   I will refer to it, if you want me to.

MR. GIRARD:   Exhibit 39 is the one with which I am crucially concerned, which is the vertical depth of the younger alluvium.

MR. VEEDER:   All right, we will put in 39 some place in the 10-A, B, C, Series.

MR. SACHSE:   You mean you will make reference to 39 therein?

MR. VEEDER:   "Reference in that connection is made to U.S. Exhibit 39, which is an isopac showing the depth of the alluvium."

MR. GIRARD:   Also, I don't believe any of your findings, as I have read, take into account the last part of my Finding 17, which begins on line 8.   I am sure you would want that in there, Mr. Veeder.

MR. VEEDER:   I think I will use that.

MR. SACHSE:   That is identical language from the Murrieta. You had better use it.

THE COURT:   What do we do now?

MR. SACHSE:   Some of the next of these -- if you want to

1  take the time, it's entirely up to you -- are in pretty good

2  shape to be approved if we keep on going, your Honor.

3        THE COURT:  Just keep on going through the findings?

4        MR. SACHSE:  Mr. Girard and I went over them this morning.

5        MR. GIRARD:  We can either do that -- that is fine with

6  me.  Whatever you want to do.  It is obvious that we are going

7  to have to redraft them.  We can go through these and Mr. Sachse

8  and I can point out to you our suggested changes, if you like.

9        MR. VEEDER:  If you are not going to be here tomorrow,

10  let's do that.

11        THE COURT:  Is somebody going to try to run a draft of

12  this tonight?

13        MR. GIRARD:  I will run a draft and have it on file here

14  next week, your Honor, when we meet again.  I presume we are

15  not going to meet next week, but I will have it by the follow-

16  ing Monday.

17        MR. VEEDER:  What I would like to do, and I will get

18  started as soon as time will permit, I would like to get as

19  much of this alluvial material for you to look at tomorrow,

20  because I want your direction on it because I am going to

21  leave work here and I am going to be working in Washington at

22  the same time.

23        THE COURT:  All right.

24        MR. SACHSE:  If we could clear everything that Mr. Veeder

25  is most critically concerned with by tomorrow night and have

1   some kind of draft to send up to Fred, then I think it is Mr.

2   Girard's understanding that he is going to do everything,

3   incorporate it as far as he can, and then the rest of it would

4   be drafted without your comments.  But we will have something

5   to work from at the next meeting.

6   THE COURT:  All right.  Then Mr. Veeder is probably going

7   to eliminate 17 by his 10-A, B, C, D.

8   MR. GIRARD:  Provided he adds the last part of that 17,

9   starting on line 8, which is not in his findings, which I

10  think was your Honor's direction.

11  THE COURT:  Yes, put that in.

12  MR. GIRARD:  18.  Mr. Sachse and I did not have any

13  corrective comments.

14  On 19 we did -- turning over to page 11 -- so it will

15  read "do not stand at or about the same level but"  and insert

16  here "on or about October 1957 in fact stood at or about 135

17  feet," which is the date of the exhibit, referring specifically

18  to the date of the exhibit on which these are based.

19  MR. SACHSE:  I looked it up.  That is what your isopac

20  stated -- October 1957.  Look at Exhibit 45.

21  MR. GIRARD:  There may be a question there on the date.

22  MR. SACHSE:  I hope I am right.

23  MR. GIRARD:  I relied on the engineer (checking exhibit).

24  MR. SACHSE:  The word on line 4 has to be in the past

25  tense "followed" instead of "follow".

MR. GIRARD:   20 would be a finding, I presume, that will be taken care of either in 1 or in some finding by Mr. Veeder.

MR. VEEDER:   It will be 1 or 1-D.

MR. GIRARD:   Some finding wherein you tie in the specific lands which are riparian.

21.   On line 16 it will read, "Since the acquisition by the United States of America of the lands comprising the Naval Enclave the waters supplied for said Enclave" deleting the other words.

MR. SACHSE:   Scratch the rest of that line and substitute "comprising the Naval Enclave," and then on the next line scratch the word "military installations" and add the word "Enclave".

MR. VEEDER:   ". . has been obtained from the flow of that River"?

MR. SACHSE:   Yes.

MR. VEEDER:   Well, it has been pumped from the alluvium. I think there is a difference.

MR. GIRARD:   Then we may have a little factual incorrectness here, too.   Mr. Wilkinson advises me that their water supply for the Naval Enclave is not gotten entirely from the Santa Margarita River.

MR. VEEDER:   The Military Enclave is served by the Santa Margarita River.   Is that because you have the San Clemente area?

1    MR. GIRARD:  Yes.

2    MR. SACHSE:  Then we had better rephrase that.

3    MR. GIRARD:  Yes.

4    MR. VEEDER:  Moreover, I think we ought to put in there

5    that the water is pumped from the alluvium rather than from

6    the flow of the River.

7    MR. GIRARD:  It's all right.

8    MR. SACHSE:  All right with me.  I think we had better

9    rewrite this first sentence, then.

10   MR. GIRARD:  Yes.

11   THE COURT:  Then you ought to say "Santa Margarita River".

12   You can't say "said River".

13   MR. GIRARD:  Yes.

14   THE COURT:  We had a correction on line 24, at the end

15   of line 24 -- I can't read my own writing.

16   MR. VEEDER:  We pointed out, your Honor, that the water

17   was used prior to that time for agricultural purposes.

18   MR. GIRARD:  Mr. Sachse has a new finding on that.

19   THE COURT:  Where?

20   MR. VEEDER:  You are rewriting No. 1, though, are you not?

21   MR. GIRARD:  We will rewrite the first sentence of 21,

22   and then I think the rest of 21 is correct, and then Mr. Sachse

23   has a 22.

24   MR. SACHSE:  Which is completely different, which adds

25   to yours "prior to 1937".  Number 22 is to replace Mr. Girard's.

18,942

1    MR. GIRARD:  Mr. Sachse's 22 will replace mine, and in

2  there, if you will note, there are references to irrigation

3  prior to 1944.  Finding 21 is only concerned with the exporta-

4  tion by the United States.

5    THE COURT:  That would eliminate your 22.

6    MR. GIRARD:  That is correct.  Mr. Sachse's takes care of

7  my 22.

8    MR. SACHSE:  Yes.

9    MR. GIRARD:  He also takes care of my 23.

10   MR. SACHSE:  I have a new one for it, yes.

11   MR. VEEDER:  Mr. Sachse, right after your first sentence

12  on 22 I would like to have inserted there that by the time

13  that the lands were transferred to the United States there

14  were approximately 1800 acres of land under the irrigation

15  system constructed by the Rancho Santa Margarita.

16   MR. SACHSE:  What irrigation system?  In and out of both?

17   MR. VEEDER:  Yes.  I think that is important.

18   MR. SACHSE:  Frankly, I don't know why it is important,

19  Mr. Veeder.

20   MR. VEEDER:  It is important to us.

21   MR. SACHSE:  If it is within, it is under a riparian right.

22   THE COURT:  This 22 is limited entirely to water outside

23  the watershed.

24   MR. GIRARD:  Yes.

25   MR. VEEDER:  I will be perfectly willing to break them

down on the basis of water outside the watershed.  The Rancho Santa Margarita had a very complex and extensive irrigation system when we bought the place and they were exporting water outside the watershed to take care of it.

MR. SACHSE:  I still insist, Mr. Veeder, that the record is very clear that there is no direct evidence on it.  If you don't like the word, give me another word.  But there is no specific evidence.

MR. VEEDER:  As to the metered water exported from the watershed.

MR. SACHSE:  That is right; there is not.

MR. VEEDER:  Put it down that way.

MR. SACHSE:  As to the amount.

MR. VEEDER:  All right, as to the amount.

MR. SACHSE:  That is what I have.

THE COURT:  Is there any evidence as to the amount?  I will let you talk about it during the recess.

Also, going back to 21, you are going to have to do something in the very first part of 21 about the fact that there are other parts of this Enclave that get water.

MR. GIRARD:  We are going to rewrite the first sentence, your Honor.

MR. VEEDER:  I suggest "that part of the Military Enclave receiving water from the Santa Margarita River" is the simplest way to say it.

18,944

1    THE COURT:  But who knows what that is?

2    .  MR. VEEDER:  That will be defined, your Honor.

3    THE COURT:  These installations all lie south.  There

4    are no military installations lying north of the watershed

5    that are getting water from the River.  The installations that

6    are getting water out of the River that are outside the water-

7    shed lie south of the watershed line.  Isn't that correct?

8    COLONEL BOWEN:  That is correct regarding the military

9    installations, your Honor.

10   THE COURT:  Outside of agriculture, is there anything

11   north of the watershed line that gets water out of the River?

12   COLONEL BOWEN:  No, your Honor.

13   THE COURT:  Then it ought to be pretty simple to define.

14   In fact, those installations to the south get water nowhere

15   but from the River.

16   COLONEL BOWEN:  That is correct, your Honor.

17   MR. SACHSE:  That would simplify it.

18   THE COURT:  That would help describe it.  And the only

19   part of the Enclave that gets water on the north side of the

20   watershed line is the agricultural lands.

21   MR. SACHSE:  That is right, isn't it, Colonel?

22   COLONEL BOWEN:  From the Santa Margarita River, yes, that

23   is correct.

24   THE COURT:  And do you want in the number of acres that

25   have been irrigated there?

1    MR. VEEDER:  Yes, we will have that.  This is this exhibit

2    we have been talking about.

3    THE COURT:  All right, take a short recess.

4    (Recess.)

5    MR. SACHSE:  I will read the whole last sentence of 22:

6    "None of the uses of the waters of the Santa Margarita River

7    outside the watershed as it is found to have existed in Finding

8    21 herein or as were carried on by the predecessor in interest

9    to the United States of America have been made under any

10   appropriative right recognized by the laws of the State of

11   California.  All of the water uses outside the watershed of

12   the Santa Margarita River referred to in this finding and in

13   Finding 21 above have been made and are being made without

14   benefit of any water right recognized or provided by the

15   statutes and laws of the State of California."

16   MR. VEEDER:  We are not going to buy any of that.

17   MR. SACHSE:  Instead of the words "under a    " or "under

18   no" -- we had "under no" and we thought it was cumbersome

19   language, so we substituted "without benefit".

20   THE COURT:  "Benefit" is the right word?

21   MR. SACHSE:  We were stumbling here.  We thought the

22   language I have, "under no water right," is awkward.

23   THE COURT:  Without sanction.

24   MR. SACHSE:  All right, without sanction.

25   THE COURT:  Without sanction of any water right.

MR. SACHSE:  Yes, and then continues with the sentence as it is.

MR. VEEDER:  Those are conclusions of law, to begin with. That is a conclusion of law and I don't believe it is correct.

MR. SACHSE:  I think it is a finding, Mr. Veeder, whether or not an appropriative right has been granted.

THE COURT:  We will put it in the findings and put it in the conclusions, too, and then you don't have any problem.

MR. VEEDER:  I think, in fairness to the United States, it should be reflected, though, that the exportations which were made after 1940 were pursuant to the stipulated judgment.

MR. GIRARD:  That may well be, but the stipulated judgment is not a water right.

MR. VEEDER:  I think it is essential, though, that irrespective of your Honor's rulings, I think it is entirely fair that we have these factors reflected in these findings respecting the stipulated judgment and uses by the United States pursuant to it.

MR. GIRARD:  I don't think there has been any evidence at all that that was done since I've been in the case.

THE COURT:  What proof is there that you used the water outside the watershed just because the stipulated judgment went in between Vail and Santa Margarita?

MR. VEEDER:  Certainly the stipulated judgment said that they could do it, and they proceeded to do it.  However, I will

propose a finding on it and I will propose a conclusion of law on it. At least, I want in the record your Honor's rejection of it.

THE COURT: I am not willing to go all the way on it, but I would go along with "providing that while the stipulated judgment was in effect it provided that the two parties use water outside the watershed and that the United States did --"

MR. SACHSE: And that Vail didn't object.

THE COURT: " . . . use water outside the watershed and that Vail did not object."

MR. VEEDER: I will work out language. I want to go further on that than what you have said. But I will tender it to you.

MR. SACHSE: I would like to see that as soon as possible, because we will undoubtedly have controversy over it and it is one of those things that we ought to see in black and white.

MR. VEEDER: Mr. Sachse has raised a point that we discussed on the opening day, whether your Honor had ruled, and I have been unable to find whether your Honor has ruled or not, in regard to the appropriability of the waters under the stipulated judgment, whether those waters would be subject to appropriation. I haven't found a ruling on that, and I have stated that I would put specific questions to you on it.

THE COURT: You were going to write something up and we were going to look into it. I had trouble following you.

1    There seems to be some theory that water that Vail was supposed

2    to release down the River was subject to appropriation.

3        MR. VEEDER:  I will write this up for you.  And also on

4    the question whether under your powers of equity you could

5    sustain our right.

6        MR.GIRARD:  My 23 is out.  The draft of Mr. Sachse's

7    23, Mr. Sachse and I have added another paragraph which will

8    go in immediately at the end after the word "stream," which

9    reads as follows:  "All uses of water by the United States of

10   America outside the watershed of the Santa Margarita River

11   have been as conservative and well-managed as the uses of

12   water by the United States of America within the watershed."

13       MR. SACHSE:  That was your Honor's suggestion yesterday,

14   conceding that there was no necessarily wasteful practices.

15       THE COURT:  No objection, Mr. Veeder, I take it?

16       MR. VEEDER:  Delighted.

17       THE COURT:  Now what do we go to?

18       MR. GIRARD:  24, line 23, the word "below" is out,

19   "downstream from" is substituted, "Ysidaro" should be spelled

20   correctly.  On line 8, page 13, the word "below" is out, and

21   "downstream from" should be substituted.

22       THE COURT:  On line 31 the word "below" is out.

23       MR. GIRARD:  Yes, line 31 on page 12, also the same

24   change on line 8, page 13.

25       THE COURT:  All right.

1    MR. GIRARD:   25.  Mr. Sachse and I have no suggestions on

2  that, except for the spelling of "Ysidaro."

3    THE COURT:  26.

4    MR. SACHSE:  26, on line 6, after the word "spreading"

5  add the word "sewage" -- "spreading sewage effluent," so it

6  will be clear what it is.

7    And on line 7 cross out the words "by means of and by,"

8  so it will read "that said ground water recharge program

9  consisted of spreading sewage effluent over said deposits and

10  by the construction and operation of spreading works''.

11    THE COURT:  "Spreading works" sounds like the sewage.

12  " . . spreading works for waters in the stream".

13    MR. GIRARD:  All right.

14    MR. SACHSE:  Actually, I think it is both, isn't it, in

15  some places?  Your stream channel spreading works are also

16  sewage spreading works?

17    COLONEL BOWEN:  Yes, sir.

18    MR. SACHSE:  So I think the one word is adequate.

19    THE COURT:  Okay.

20    MR. SACHSE:  We also thought we would put a period at the

21  end of "native vegetation," because it is a long sentence, and

22  start off with a fresh "That" on line 10.

23    On line 16, between the words "no" and "salt," "no further

24  salt water intrusion".  That was to take care of Colonel Bowen's

25  remark that there was probably still tainted water there, but

1   that there had been no new intrusion.

2       COLONEL BOWEN:  You ought to add on line 10, where you

3   say "water native vegetation," "native or introduced vegetation".

4   Some of it is not native.

5       MR. SACHSE:  Just take "native" out, then; other water

6   consuming vegetation.

7       COLONEL BOWEN:  That would be better.

8       MR. SACHSE:  All right.

9       MR. GIRARD:  And we have added another sentence after

10  the term "Ysidaro Narrows" on line 19.

11      THE COURT:  And spell "Ysidaro" correctly.

12      MR. GIRARD:  Yes, that is spelled wrong throughout this

13  draft, which will have to be corrected.

14      THE COURT:  All right.

15      MR. GIRARD:  Which reads as follows:  "That these practices

16  are commendable and have contributed to the most efficient use

17  of the waters of the Santa Margarita River and its tributaries".

18      THE COURT:  27.

19      MR. GIRARD:  27, on line 21, cross out the phrase "it is

20  not true that any," so that it would read, and then add the

21  word "below," "that no past or present act," substituting the

22  word "no" for "it is not true that any".

23      THE COURT:  The sentence doesn't seem to go anywhere --

24  "now threatens to cause salt water intrusion".

25      MR. GIRARD:  No, it reads now as follows, "that no past

1  or present act of any defendant in this case caused or now

2  threatens to cause salt water intrusion".

3      THE COURT:  That is what I mean.

4      MR. SACHSE:  Into.

5      THE COURT:  Intrusion into the waters of the -- into the

6  what?

7      MR. SACHSE:  Into the lower segment of the younger

8  alluvial deposits above Ysidaro Narrows.

9      MR. GIRARD:  Right.

10      MR. SACHSE:  I am using the same language, in other words,

11  that appears in the paragraph above, "salt water intrusion

12  into the lower segment of the younger alluvial deposits above

13  Ysidaro Narrows".  It probably should say "upstream from

14  Ysidaro Narrows".

15      MR. VEEDER:  How have you changed that, Mr. Sachse, so

16  I can follow along.

17      MR. SACHSE:  Line 28, I will start with the word "in-

18  trusion" --

19      MR. VEEDER:  Line 28?

20      MR. SACHSE:  Start with 21.  "That no past or present

21  act of any defendant in this case caused or now threatens to

22  cause salt water intrusion into any waters of the Santa

23  Margarita River in the lower segment of the younger alluvial

24  deposits upstream from Ysidaro Narrows".

25      THE COURT:  What is your point, Mr. Veeder?

1   MR. VEEDER:  The Colonel and I were just commiserating.

2   The point that I make is that it would be so much easier

3   to say "salt water intrusion into the alluvial fill" or some-

4   thing like that, rather than what we have.

5   MR. SACHSE:  All right, let's say it.  I have used the

6   same thing here.  The point is this is identical language to

7   what was used in the paragraph above.

8   MR. VEEDER:  I was just making the observation.  I am

9   going to object to it very strenuously before we are through.

10   MR. SACHSE:  Do you object to this as a statement of fact?

11   MR. VEEDER:  I object to this language that we don't use

12   the word "basin".  Your Honor has already written the statement,

13   and the only thing I say, let's face up to the fact, there

14   has been salt water intrusion into the basin.  Why don't we

15   just say that?  "Waters of the Santa Margarita River" sounds

16   extremely hypocritical to me.

17   THE COURT:  28.

18   MR. GIRARD:  There is going to have to be a change.

19   MR. VEEDER:  I will rewrite the whole thing.

20   MR. GIRARD:  28?

21   MR. SACHSE:  I think maybe he ought to.
                                          all
22   MR. GIRARD:  You can either rewrite it/or you can prepare

23   an exhibit which will set forth those things.

24   MR. VEEDER:  I am going to break it down to agricultural

25   and military use and show where the water is used and the

18,953

1    quantities.

2        THE COURT:  All right, Mr. Veeder is to rewrite 28,

3    except that you are going to put in --

4        MR. GIRARD:  Prima facie.

5        THE COURT  -- at the last part of it, page 15 on line 14.

6        MR. VEEDER:  We will cut that in at the end of what I say.

7        THE COURT:  All right.

8        MR. GIRARD:  30.  On line 30 it will read "that all

9    surface waters that flow on the lands comprising the Naval

10   Enclave and within the Santa Margarita River watershed".

11       MR. SACHSE:  Take out "described in Exhibits A through

12   blank".

13       MR. GIRARD:  Just saying "comprising the Naval Enclave

14   and within the Santa Margarita River watershed".

15       31 is the one we are going to work on Bill's language.

16   We have already discussed that.

17       THE COURT:  Yes.

18       MR. GIRARD:  I understand on 32, line 21, instead of

19   "extremely compacted material" this term "relatively impervious"

20   will be substituted.

21       THE COURT:  Yes.

22       MR. GIRARD:  33.  We have no comments.

23       THE COURT:  34 is like another one.  This appears a time

24   or two about the smallest tract of land.

25       MR. SACHSE:  Mr. Veeder is going to check that one, too.

1    MR. GIRARD:  In other words, Mr. Veeder is going to show

2    which of his lands are riparian and to what.

3    THE COURT:  I didn't hear what you said.

4    MR. SACHSE:  Which of his lands are riparian and to what

5    stream they are riparian.

6    MR. GIRARD:  No comments on 35.

7    THE COURT:  Change those Roman numerals.

8    MR. GIRARD:  Yes, those will all be changed.

9    36.  Line 20, the words "off channel" are stricken out.

10   MR. SACHSE:  And line 10 "head waters" instead of

11   "headquarters".

12   MR. GIRARD:  Line 27, the period after the word "water-

13   shed" and cross out the rest of it.

14   THE COURT:  This, again, is too long a sentence.

15   MR. GIRARD:  Yes.  I will, your Honor, on all of these

16   I will try to break down the paragraphs much more than I have

17   done.

18   THE COURT:  Break down the sentences within the paragraphs,

19   too.

20   MR. GIRARD:  Yes.

21   MR. SACHSE:  I also wanted on this one to request Colonel

22   Bowen to please check my delineation of the course of the

23   stream.

24   COLONEL BOWEN:  Will do.

25   MR. GIRARD:  37.  Strike this out and use Mr. Sachse's

18,955

37.

THE COURT:   Okay.

Any suggestions on 37?

38.

COLONEL BOWEN:   May I make a suggestion, your Honor?

THE COURT:   Yes, sir.

COLONEL BOWEN:   As Mr. Sachse wrote 37, it refers to Finding 14.   I didn't actually supply the description of the stream, but the points where those streams discharge to the alluvial fill.

MR. GIRARD:   Don't you think that is enough, or do you think it should be clearer?

COLONEL BOWEN:   Thinking specifically now of the Ysidaro Valley where Plant No. 2 discharges sewage effluent to the River sands, they are carried across the valley by a pipeline, so the point of discharge might not be tied in with the actual natural stream through which the effluent flows.

I think with the other one -- there is only one other, really, Urine Creek, that could be located very easily from reference to its point of discharge.

MR. SACHSE:   Is it important enough, Colonel Bowen, to have the words as set forth in Finding 14, or is it sufficient to say "excepting for those streams which are supplied with sewage"?

COLONEL BOWEN:   I think that would be sufficient.   But I

18,956

1    think the reference to Finding 14 should be deleted.

2        MR. SACHSE:  All right, let's do it that way.

3        THE COURT:  38.

4        MR. GIRARD:  38, line 5, page 20, cross out the number

5    "37," substitute "29-A, B, C, F, G and H, incorporated herein

6    by reference, . . "

7        THE COURT:  What happened to 39 and 40?

8        MR. VEEDER:  We moved those up, your Honor.

9        THE COURT:  41.

10       MR. VEEDER:  I have a note up here as to where we are

11   going to have them.

12       MR. SACHSE:  They are listed on your thing, Mr. Veeder.

13       MR. VEEDER:  I have listed them.

14       THE COURT:  I have them moved up.  I will tell you where

15   they were to go.

16       MR. SACHSE:  Suggest that the following three, 39 and 40,

17   be entered.

18       THE COURT:  I think when you draw this draft you ought to

19   put a whole new numbering series and then in parentheses the

20   old number where the paragraph came from.

21       MR. VEEDER:  I have been trying to do that.  If it comes

22   from Mr. Sachse, I put "FRS".

23       THE COURT:  It will have to be redrawn.  So why don't you

24   take a whole new numbering series, like Mr. Veeder's A-1, B-2,

25   whatever looks logical, and put in a new number like

39 and 40 and then in parentheses put the old number.  We will

know that the old number refers to the first set we are working

on.  This will be helpful to our record and our notes et cetera.

MR. SACHSE:  Fine.

MR. VEEDER:  That is the only way we can do it.

THE COURT:  41.  Why do we have to incorporate by reference?

MR. GIRARD:  " . . which is incorporated herein by

reference" is stricken and "Camp Joseph H. Pendleton" is

stricken and "the Naval Enclave" is substituted.

MR. VEEDER:  How does that 41 read now, your Honor?

MR. GIRARD:  "That in addition to Lake O'Neill, which is

the subject of Interlocutory Judgment No. 24, there are within

the Naval Enclave" and continue right on.

MR. SACHSE:  32, no changes.

MR. VEEDER:  You said in 43 you didn't want that incor-

porated by reference, as I recall.

MR. GIRARD:  That is right.  The sentence ends with a

period after "San Diego".

THE COURT:  Mr. Sachse's 2.

MR. SACHSE:  My 2 and 3 conclusions of law are supposed

to replace these.  Practically no change.

MR. VEEDER:  Where does your Honor propose to enter his?

THE COURT:  Let's finish up with what we have here then

we will talk about that.

What about 3?  What is this blank?

1   MR. SACHSE:  My 3 goes in, in place of 3.  They are

2   practically identical.  I just retyped it.

3   MR. GIRARD:  We will have to work out the language on 3,

4   depending on how Mr.Veeder wants to treat his.

5   THE COURT:  It may be paragraphs or it may be --

6   MR. GIRARD:  We will have to wait for that.

7   4 is the same thing.  We don't know how it is going to be

8   treated yet.

9   MR. VEEDER:  Where is your 4?  We didn't write a 4.

10   MR. GIRARD:  We are waiting for your draft of 4.

11   MR. SACHSE:  We are going to wait, because we are not sure

12   how you are going to handle these riparian determinations,

13   whether you are going to refer back to the findings or refer

14   to an exhibit.  It is a very simple thing to write once we

15   know how you are stating them in the findings.

16   MR. GIRARD:  When you tell us by a finding or an exhibit

17   which land is riparian to a specific creek, then we can draft

18   it.

19   MR. SACHSE:  I feel that the language of 4, for instance,

20   will be either as it reads now or that all lands described in

21   Finding blank have a correlative riparian right.

22   THE COURT:  Yes.

23   MR. GIRARD:  Change the Roman numerals to the other ones.

24   THE COURT:  In 6, line 15, "nor does it possess," should

25   you say "own or possess"?

MR. GIRARD:  All right.

MR. SACHSE:  I started, your Honor, and didn't finish, to go through your pre-trial opinion for conclusions of law, all of which I delineated as far as I went 6-A, 6-B, 6-C, 6-D, thinking this would be the logical place to put them in as to these various rights that the United States did not have, and I have prepared A, B, C, D, which are different from yours. I think, in some respects, yours are better.

THE COURT:  Let's leave those for a minute.  Let's go to 7.  7, "nor does it own or possess".

MR. GIRARD:  Yes.

THE COURT:  Then we go to Mr. Sachse's 7-A and 7-B.

MR. SACHSE:  That were transmitted by letter.

THE COURT:  Yes.  ". . within the boundaries of the . . "

MR. SACHSE:  Naval Enclave.

Have you got those?

MR. VEEDER:  No.

MR. SACHSE:  You had them, I know.  I mailed them to you November 22nd.  You had them the other day.

THE COURT:  You say "are without right".  They are without right as far as requiring an upstream owner to make water available.

MR. GIRARD:  But they are not wrongful.

THE COURT:  I think we should enlarge upon "without right".

MR. VEEDER:  I think that is, of course, in error, because

1   the water, even under your Honor's rulings, the waters that

2   enter the Enclave may be exported, and that will be done

3   pursuant to a right even if you want to call the water personal

4   property.

5        MR. SACHSE:  I am not married to the one.  I tried to

6   say it at the end of the sentence, that no one has been injured.

7        THE COURT:  Maybe you should recast it something like

8   this:  Instead of "that all uses of the United States are not

9   wrongful," "that no person has been injured by reason of the

10  fact that the United States is the last user on the stream,"

11  and then "that the United States is not entitled to reach

12  upstream in order to secure water for such purposes".

13       MR. SACHSE:  I will take a try at redrafting it and send

14  it up to Mr. Girard.

15       MR. VEEDER:  I would like to have your Honor's thoughts

16  on this matter whether there is or is not a right once the

17  water has entered our Enclave or once the water has gone into

18  the basin.  Is that exportation with or without a right?  The

19  waters come down the creek within our basin and we export them.

20  Is that with a right, or is it not?

21       MR. GIRARD:  No, it is not technically a right, if you

22  are talking about a corresponding duty.

23       MR. VEEDER:  I would just as soon hear from his Honor,

24  Mr. Girard.

25       THE COURT:  In the sense of being a water right, I don't

1    think it is a water right.  But it is lawful, and it is not

2    wrongful.  We could pick out some language that will cover

3    this.  I just suggested some here.  You wouldn't call it a

4    "water right," would you?

5         MR. VEEDER:  I think that it is surely a right, and I

6    am going to ask for definition of it from this Court.  My view

7    is that the water, once it enters the Enclave, can be utilized

8    as a matter of right by the United States and without limita-

9    tion in the exercise of that right.

10        THE COURT:  The legal answer is a very simple one.  It is

11   an out-of-watershed use, but there is no one who can complain

12   because there is no one downstream, and therefore in that

13   sense you have a right to do as you please with it.  It is just

14   that simple.  It is a right only because there is nobody below

15   you who can complain.  If there was one man downstream, then

16   you couldn't talk about it being a right at all.  It is only

17   a right because there is no one -- if it is a right, because

18   no one can complain about it.  If it is a right, it is a right

19   by default, or, better, by physical location of the Government's

20   Base.

21        See what you can do with this, Mr. Sachse.

22        MR. SACHSE:  7-B is very important to me.

23        THE COURT:  I think it is a proper finding, except change

24   "Camp Pendleton" to "Naval Enclave".

25        MR. SACHSE:  Yes, I have changed that, your Honor.

THE COURT:  8.

MR. GIRARD:  That is a standard conclusion.  I don't think we have any comments on that.

THE COURT:  9.

MR. GIRARD:  We have no comments on that.

THE COURT:  This conclusion should be redrafted, if necessary, in line with the finding that Mr. Sachse made.

MR. SACHSE:  Are you speaking of 9 now, your Honor?

THE COURT:  I am speaking of 10.

MR. GIRARD:  Yes, 10 has to be substantially changed.

MR. SACHSE:  Yes.

MR. GIRARD:  10 is based upon findings of Mr. Sachse.

MR. VEEDER:  23, isn't it, on page 12?

MR. SACHSE:  That is right, 22 and 23 are the ones.

THE COURT:  Yes, that is what it has to be based on.  So redraft it with that in mind.

MR. GIRARD:  Yes, Mr. Sachse's 22 and 23 were substituted for mine.

THE COURT:  11.

MR. GIRARD:  We have no comments.

MR. SACHSE:  Again, we have to straighten that up.

MR. VEEDER:  Is it necessary to have that?  That is a conclusion of law.

MR. SACHSE:  That is a statement of fact.

MR. VEEDER:  I say, you have it set out as a finding.

18,963

1    MR. SACHSE:  I think you may have a good point.  This

2  isn't a conclusion of law, is it?

3    MR. GIRARD:  I am perfectly willing to forget it as long

4  as the finding is in and unless somebody wants it.

5    MR. SACHSE:  Let's take it out.

6    THE COURT:  At Mr. Veeder's request we take it out of

7  the conclusions.

8    MR. VEEDER:  Thank you, your Honor.

9    MR. SACHSE:  Your Honor, before we go into the judgment,

10  could we take a look at some of these other conclusions, yours

11  and mine both?

12    THE COURT:  This obviously had to be done very hurriedly.

13  The question is whether merely to say we incorporate by reference

14  reference a lot of matters here or whether some findings and

15  conclusions are necessary.  This that I dictated would start

16  with 6, if you will go back to 6.

17    MR. SACHSE:  Yes, and all the ones I had I also start at

18  6-A, B, et cetera.

19    THE COURT:  So that if you do it like I am thinking about,

20  the thing that would be changed would be the elimination of

21  the last paragraph in Mr. Veeder's proposal and the last para-

22  graph in Mr. Sachse's proposal.

23    MR. SACHSE:  Which one is this?

24    THE COURT:  In 6.  We would start out with 6, and Mr.

25  Veeder has made a redraft here of what you had.  It is much

1   the same, except that if we do set forth the stipulation, 5

2   and 6 are not particularly material.

3       MR. SACHSE:  Your Honor, I am going to state to your

4   Honor --

5       THE COURT:  Be frank.

6       MR. SACHSE:  With apologies, I think some of this doesn't

7   belong in a finding.  I truly don't.  I think some of this is

8   too narrative, your Honor.  I don't think you should say that

9   "Not content, the United States moved to reconsider," and I

10  don't think we should state "The story is a sorry one" et

11  cetera.  I don't think that belongs in a finding of fact --

12  although, with all due apology, I do agree with your sentiments.

13  But I don't believe it belongs in the findings of fact.

14      THE COURT:  You agree it is a sorry story.

15      MR. SACHSE:  I agree it is a sorry story.

16      MR. GIRARD:  What Mr. Veeder wants to do is to state the

17  facts.

18      THE COURT:  You have a copy of it.

19      MR. VEEDER:  No, I haven't.  If I would see anything about

20  "sorry story," I would be mad.  I am not mad now.  But I

21  probably will be shortly.

22      THE COURT:  Better not read it then.

23      What bothers me, for instance, this motion that Mr. Veeder

24  made.  He made a motion that the stipulation --

25      MR. VEEDER:  Your Honor, if I am going to be insulted, I

18,965

1   want to have it before me.  I don't have the page.

2       MR. SACHSE:  If you haven't seen this, you ought to take

3   a minute and read the whole thing.

4       MR. VEEDER:  By all means I want to read it.

5       MR. SACHSE:  It is not very long.

6       THE COURT:  Didn't he have a copy of it?

7       MR. VEEDER:  No, I didn't have a copy of it.

8       MR. SACHSE:  Colonel Bowen had it.

9       MR. GIRARD:  The copies got mixed up.

10      (A pause.)

11      THE COURT:  Now, the problem is this.  First of all, an

12  incorporation by reference of the pre-trial opinion has, as I

13  mentioned before, some limitations.  There are matters in

14  there that I didn't pass on, there are matters in there where

15  I didn't say enough or didn't say what I think I should have

16  said, particularly on the matter of using the water outside

17  the watershed that came down.  Now of course, we could incor-

18  porate the opinion and say "all matters not consistent with

19  these findings . . " but that is kind of sloppy.

20      More than that, people are not inclined to pay a lot of

21  attention to things that are incorporated by reference.  There

22  is a lot of good juicy material in that pre-trial opinion.

23      Now, you have the second problem that the stipulation,

24  that there has been so much talk about, bound originally only

25  California and Santa Margarita, and later various parties have

1   participated, including Fallbrook and, I think, Vail and

2   possibly a few others who joined in the stipulation.  So there

3   would have to be a finding, in any event, that California law

4   controls this matter, et cetera.

5        Then I think, although there was a pre-trial ruling made,

6   unless we incorporate by reference, we have to draw conclusions

7   of law rejecting some of the legal contentions which Mr. Veeder

8   attempted to pursuade the Court of but of which the Court was

9   not pursuaded and which, in the final judgment, should be

10  disposed of.

11       I think if we don't incorporate by reference we have to

12  have a finding that Mr. Veeder had authority to make the

13  stipulation and that it was ratified by the Department of

14  Justice and the Attorney General.

15       MR. SACHSE:  You have that in another set.

16       THE COURT:  That is in the conclusions.

17       MR. SACHSE:  That is what I mean.

18       THE COURT:  In other words, this one set we are looking

19  at now would be findings.  It would start off with what you

20  have.

21       Let's do some numbering so we can talk about it.  What

22  Mr. Veeder and Mr. Sachse had we will call Mr. Sachse's setup

23  6.  We will call Mr. -- well, they will both be 6-A.  They

24  are alternate 6-A.  Then 6-B would be the paragraph starting

25  "On January 6th," the motion/was   made and that order of
                                that

18,967

1    interpretation.

2        MR. VEEDER:   You are going to make that 6-B?

3        THE COURT:   So we will have a number to talk about, the

4    page starting "On January 6, 1958," that is the Finding 6-B.

5        Turn to the next page.  The beginning of the second para-

6    graph, the first full paragraph, would be 6-C, starting

7    "Thereafter, the United States raised further questions . ."

8        And down where it starts "Not content . ." would be 6-D.

9    And we will strike the words "Not content" right now.

10        I am just numbering them so we will have something to

11    talk about.

12        Then on the next page, on the paragraph that begins "On

13    August 8, 1958 --

14        MR. GIRARD:   6-E is where, your Honor?

15        THE COURT:   I would suggest just before "August 8" 6-E.

16    And then we propose to copy that part.  That word "since"

17    should not have a capital.  It should follow on.

18        Then on the last page, "Mr. William Veeder had authority,"

19    would be 6-F.

20        "The Court adopts the findings" would be 6-G.

21        "Such findings apply to other lands" would be 6-H.

22        And the last one is 6-I, and actually it is the same as

23    6-F -- it goes a little further.

24        Now the next set that you have are certain conclusions.

25        MR. SACHSE:   I am still not    quite clear, your Honor,

1    how far you feel we should go.

2         THE COURT:  I am not passing on it now.

3         MR. SACHSE:  When you say  copy, that is the problem

4    that worries me.  We will end up writing pages, if we tell you

5    the whole story.  And if we don't tell you the whole story,

6    then any copying, to me, is dangerous.  I, personally, would

7    rather try to protect myself by paraphrasing, if you don't

8    feel we can incorporate by reference.  The idea of copying a

9    few sentences is too dangerous, unless we tell the whole story.

10        THE COURT:  We are not going to have time to go further

11   tonight.  I thought we would just number these things and then

12   we will be able to talk about them tomorrow.

13        MR. SACHSE:  Mr. Girard will not be here, but I will bring

14   the pre-trial opinion down and look at some of this.  I don't

15   have my own copy here now.

16        THE COURT:  Here it is.

17        MR. SACHSE:  I have it at the office at home.

18        THE COURT:  Then on these conclusions, the first page is

19   A, B, C, D -- that is properly numbered.

20        These others have another number series.

21        I don't know whether a lot of this material is necessary

22   or not.

23        MR. SACHSE:  Some of those are covered, you will find, in

24   the 4 that I drafted also, your Honor.

25        THE COURT:  Why don't we look them over and talk about it

1   tomorrow?

2       However, in the conclusions of law, we have laid aside

3   one that goes in somewhere, and it was orginally Finding 5.

4       MR. GIRARD:  Yes.

5       MR. SACHSE:  Yes.

6       THE COURT:  That belongs in there some time.  For the time

7   being I am going to put it at the end of the conclusions and

8   later on it can be moved in where we need it.

9       Have we agreed on 10:15 tomorrow morning?

10      MR. SACHSE:  Yes, your Honor.  If I should be a few

11  minutes late I hope you will excuse me in advance.

12      THE COURT:  Yes, sir.  We will adjourn until that time.

13      MR. GIRARD:  Do you have any idea yet when you will meet

14  next time, your Honor?

15      THE COURT:  You are not going to be here tomorrow?

16      MR. GIRARD:  I will not be here tomorrow.  I can't be

17  here Monday of next week.  You are not going to be here anyway.

18  Any other time I think is all right with me.

19      THE COURT:  There is a lot of work to do.  You are going

20  to redraft 30.  Of course, that is largely a clerical job.

21      MR. GIRARD:  30 will take no time of mine at all.  That

22  is the secretary's.

23      THE COURT:  There will be the job on/part of Colonel

    the

24  Bowen and Mr. Veeder of assembling the exhibits and getting

25  it into shape.  This redraft of this job is a considerable job.

1      MR. GIRARD:  Yes.

2      THE COURT:  What is your program, Mr. Veeder?

3      MR. VEEDER:  Well, I intend to leave tomorrow afternoon

4  whenever I can.

5      THE COURT:  Your program for the future weeks, what other

6  engagements do you have?

7      MR. VEEDER:  The 27th and 28th of February.  Those are

8  the only firm dates that I am committed to now.  I never know.

9  That is how it is set up now.

10      MR. GIRARD:  I am going to try to get some of this done

11  next week while this is fresh in my memory.

12      MR. SACHSE:  The faster we can work, making allowances

13  for the time it takes to get the typing done, the better off

14  I think we are.

15      Do you think you would be ready to go two weeks from the

16  19th?

17      I feel confident that we are not going to have this ready

18  for your Honor's signature.  We are going to have another

19  draft.  I hope we will then be able to do enough to get it

20  ready for your signature.  That would be my thinking.

21      (Further discussion about future sessions off the record.)

22      THE COURT:  Adjourn until tomorrow at 10:15.  I will let

23  you know tomorrow about the future sessions.

24      (Adjournment until Friday, February 9, 1962, at)
25      (10:15 A.M. o'clock.                          .)

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )          No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
                    Defendants.    )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit:  February 8, 1962, was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and foregoing ninety-two (92) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 9th day of February, 1962.

_John Swader_
Official Reporter