# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                 Plaintiff,

   vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                 Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:       **Friday, February 9, 1962**

Pages: 18,972 to 19,025

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                  DEPUTY

J O H N  S W A D E R
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 186

18,972

1    IN THE UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3    SOUTHERN DIVISION

4    - - -

5    HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6    - - -

7  | UNITED STATES OF AMERICA,        )
8  |                    PLAINTIFF,    )
9  |        VS.                       )        No. 1247-SD-C
10 | FALLBROOK PUBLIC UTILITY         )
   | DISTRICT, ET AL.,               )
11 |                                  )
12 |                    DEFENDANTS.   )

13    REPORTER'S TRANSCRIPT OF PROCEEDINGS

14    San Diego, California

15    Friday, February 9, 1962

16    - - -

17  APPEARANCES:

18      For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
19                                      Special Assistant to
                                        the Attorney General

20                                      CDR. DONALD W. REDD

21

22      For the Defendants:

        Fallbrook Public Utility        FRANZ R. SACHSE, ESQ.
23      District, et al.,:

24

25

SAN DIEGO, CALIFORNIA, Friday, February 9, 1962, 9:30 A.M.

-o0o-

(Other matters.)

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes, sir.

MR. VEEDER:  I started checking back some of the data
for the purpose of making runs of the data, of the findings
that I have proposed, and I find that on page 12, Finding 21,
no reference is made to the diversions and uses of water by
the United States for the years 1942 and 1943.  Now that
material appears in Exhibit 151-A.

MR. SACHSE:  I thought we took it straight off the exhibit,
Mr. Veeder, but if I didn't --

MR. VEEDER:  You may have just looked at one of the
exhibits.  I think that is the reason.

MR. SACHSE:  Let's add it by all means.

MR. VEEDER:  I will rerun it.

MR. SACHSE:  I took this from some exhibit, but I forget
from which one I took it.

MR. VEEDER:  Here is the exhibit from which you took it.
You used this exhibit here, which is the military uses.  This
is the agricultural uses.

MR. SACHSE:  That is correct.  Now I recall.  I didn't
use 1942 because they didn't give the total usage.

MR. VEEDER:  Nevertheless, there are two years.

1      MR. WILKINSON:   There was no estimate of the military

2  use for those two years.

3      MR. VEEDER:   That is right.  But there was for 1942 and

4  1943 for agricultural uses.

5      THE COURT:   Make that addition.

6      MR. VEEDER:   Yes.

7      THE COURT:   And if it is necessary to explain it or

8  something, you can footnote it.  Will it speak for itself?

9      MR. VEEDER:   I think it will speak for itself.

10      MR. SACHSE:   It will speak for itself.

11      THE COURT:   It shows only agricultural uses.

12      MR. VEEDER:   It will speak for itself on the basis of the

13  finding as written.

14      THE COURT:   And then put in "no figures on military" --

15  I don't care what you do, just so it is understandable.

16      What is the next thing?

17      MR. VEEDER:   In those findings where we have reference

18  to salt water intrusion -- and I don't care where this

19  recommendation is adopted -- I would like to add the statement

20  "That the United States of America by reason of drouth and

21  upstream uses has drastically reduced its water uses for

22  purposes of agriculture," which is of course the fact.

23      MR. SACHSE:   Where is this now, Mr. Veeder?

24      MR. VEEDER:   Go to page 12.  It is really the key.  It

25  would be Finding 21.  Did you find it?

1    MR. SACHSE: 21 ends with a tabulation in mine.

2    MR. VEEDER: Yes. I say, I don't know where this factor

3   is entered, but I would like to have findings to reflect the

4   fact that the United States has greatly reduced, by reason of

5   factors to which I made reference, its use of water and its

6   exportation of water for purposes of agriculture.

7    MR. SACHSE: I thought we said it.

8    MR. VEEDER: If it is said, I have missed it, Mr. Sachse.

9    MR. SACHSE: Yes, on 26, page 14, where we are discussing

10  salt water intrusion, reduced your pumping in the lower segment

11  and simultaneously.

12    MR. VEEDER: That doesn't cover the point that I make.

13  It is that we have drastically reduced our water uses by

14  reason of the limitation of the available supply.

15    THE COURT: At the bottom of the tabulation you can add

16  a statement that the United States has substantially reduced

17  -- I think "substantially" is better than "drastically" --

18  its uses for agricultural purposes, but has increased its uses

19  for military purposes, as shown by the above table.

20    MR. SACHSE: Your Honor, I don't think it is true. I am

21  looking at Mr. Veeder's own exhibit here.

22    I don't know when you are going to start, Mr. Veeder, but

23  1956 is when we started to correct salt water intrusion, as I

24  understand it. In 1956 your total agricultural uses was

25  1750, in 1957 it was 1540, it 1958 it was 1190, in 1959 it was

1730.  I don't call these drastic reductions.

MR. VEEDER:  Go on to 1960.

MR. SACHSE:  All right, 1110.  I think that would be a misstatement of the facts.

MR. VEEDER:  I'll write something up that I think is acceptable.

MR. SACHSE:  The fact of what you used is clearly set forth in the tabulation, and I don't think a descriptive term like "drastically" is necessary.  The reductions in pumping, if any, your Honor, are shown on page 12 in this tabulation. You can plainly see whether there has been a reduction or not.

MR. VEEDER:  There certainly has been.

THE COURT:  Mr. Veeder is right if you go back, say, to 1947 where there was 2100 acre feet, 1948 2700 acre feet, 1949 2200 acre feet, 1950 2100 acre feet, and then you start in 1951 and you have 15, 13, 16, 18, 18, 16, 15, 11, 16, 11. In other words, there was a period in there where there was over 2,000 acre feet and that was dropped down to where it is under 2,000.

MR. SACHSE:  I don't know what you are reading, your Honor, but the total use within the watershed is bigger in 1960 than it was in 1944, and the total use out of the watershed is lower in 1960 than it was in 1944.

THE COURT:  That is counting the military.

MR. SACHSE:  Yes, the total.

18,977

1    MR. VEEDER:  Take Exhibit 151-A and you will see the

2    reduction.

3    THE COURT:  The chart speaks for itself.  We don't have

4    to characterize the chart.  We can merely say that the changes

5    or variations in use by the United States are shown in the

6    above chart.  Why do you have to say it?

7    MR. VEEDER:  I will tender some language for consideration

8    on it.

9    THE COURT:  All right.  What is the next thing?

10   MR. VEEDER:  Also the question arose in regard to pumping

11   by the Rancho Santa Margarita in connection with its agricul-

12   tural uses under the system that had been installed.  In 1937,

13   1938 and 1939.

14   MR. SACHSE:  This would have particular reference, as I

15   understand it, to 22 as in this finding redrafted by me, which

16   is the one where I talk about agricultural uses.

17   MR. VEEDER:  That is right.  I have been talking with

18   the Vail Company representative in regard to whether he has

19   these records.  We do have records of pumpage, and Mr.

20   Wilkinson, if you find any disparity in these figures I have

21   shown you, could you let us know, because I am going to either

22   check them out or --

23   MR. WILKINSON:  I'll be glad to do that.  I need a copy

24   of those figures.

25   MR. VEEDER:  I'll see that you get them.

18,978

1    THE COURT:  Are these figures in the record or will be

2  put into the record?

3    MR. VEEDER:  I am checking them out.  I thought they

4  were in the record.  I still think they are.  But Mr. Wilkinson

5  says he does not have them.  I will let him check them out.

6    THE COURT:  All right.  If you agree on the figures,

7  supply them to Mr. Girard.

8    MR. SACHSE:  I don't know whether it is appropriate to

9  argue the point now or not.  The figures that Mr. Veeder has

10  are some figures accumulated by Mr. Green, which I have no

11  doubt are accurate, for the total pumping by the Rancho.

12  There is no breakdown whatsoever as to how much of it went to

13  irrigate particular fields of alfalfa at the bottom and how

14  much went to irrigate the lands of the United States, which

15  is the pertinent issue.

16    MR. VEEDER:  If you will go back and read Mr. Whitman's

17  testimony, correlate it with this, I think you will find it is

18  significant.  Why don't you let me tender it instead of arguing

19  it now?

20    MR. SACHSE:  As I say, this may not be the appropriate

21  time.  But I have serious doubt whether the findings you request

22  can be made.

23    THE COURT:  What is the next matter?

24    MR. VEEDER:  When we left off we were reading your pro-

25  posed findings and conclusions in regard to Finding No. 6.

1   THE COURT:  Yes.  I have given this some thought, and as

2   far as 6 is concerned I think I will eliminate some of the

3   things I was thinking about, and I am content to go along with

4   the proposal that was made by Mr. Veeder where the pre-trial

5   stipulation was set up and the trial of this case was conducted

6   in accordance with that interpretation.

7   MR. SACHSE:  That is the one attached to your note of

8   yesterday, Mr. Veeder, as I understand it.

9   THE COURT:  This is Mr. Veeder's.

10  MR. SACHSE:  Yes.

11  THE COURT:  So that what I listed yesterday as 6-B, 6-C,

12  6-D, 6-E, that part would be eliminated.  We wouldn't have to

13  worry about that.

14  Then I think that there should be probably a conclusion

15  of law that the opinion is adopted as part of these findings,

16  except where the specific findings herein are contrary thereto.

17  Some general adoption of it.

18  And then I think that I want factual findings such as 6-F

19  that Mr. Veeder had authority to enter into the stipulation,

20  or better than 6-F, 6-I which is the whole business, "The act

21  of Mr. William Veeder in signing the stipulation of" -- and

22  it would not be February 11, but it would be November 29, 1959

23  -- "was authorized, ratified and approved by the Attorney

24  General and the Department of Justice."  That one bit out of

25  that first group would take care of it.

1    MR. SACHSE:  Then we will disregard, if I understand your

2    Honor correctly, your proposed 6-B, C, D and E.

3    THE COURT:  Yes.  That all concerned that interpretation

4    of the stipulation.

5    MR. SACHSE:  But we will use 6-F and I.

6    THE COURT:  6-F and -I are duplicated.  In other words,

7    -F is that he had authority, and -I is that he was authorized

8    and that it was ratified and approved.  So -I is the more

9    comprehensive, and eliminate -F.

10   MR. SACHSE:  What about the first three lines of that

11   same page where 6-F, -G and -H appear?  I didn't understand

12   that.

13   THE COURT:  That word "since" was not a new sentence.

14   That was part of the interpretation.  The Court struck from

15   the order certain language and this was the reason.

16   MR. SACHSE:  All right, so we can disregard that, also.

17   THE COURT:  Yes, that is disregarded, too.

18   Now, I think we might as well -- I don't like 6-G and 6-H

19   -- I think we might as well forget about them.

20   That leaves us with 6-I of the findings.

21   However, on conclusions there are a lot of things that

22   ought to be in on conclusions.  Turning to the conclusions of

23   law, A and B, in a way, duplicate.  So A could be stricken

24   out, and B, which we put in as a finding, should also be as a

25   conclusion.

1    MR. SACHSE:  We are looking at A, B, C and D under the
2  heading of Conclusions.

3    THE COURT:  Yes.  So B as in Baker would be the act of
4  William Veeder in signing stipulation was authorized, ratified
5  and approved by the Attorney General and the Department of
6  Justice.

7    MR. VEEDER:  Wouldn't it be all right to refer to just
8  Government counsel, your Honor?

9    THE COURT:  You mean you don't like your name spread in
10  this?

11    MR. VEEDER:  It is entirely up to your Honor.  I have
12  never seen counsel's name in findings of fact and conclusions
13  of law before.

14    THE COURT:  I don't want to do anything to embarrass you
15  for no good reason.

16    MR. VEEDER:  I am not embarrassed about what I have done.

17    THE COURT:  If you want to refer to Government counsel,
18  we can substitute that for William Veeder.  Except that the
19  stipulation was signed by various Government counsel.

20    MR. VEEDER:  Was it, your Honor?

21    MR. SACHSE:  It was signed by Mr. Veeder for the typed
22  name.

23    THE COURT:  It is typed "Tolin, Graydon and Veeder, By
24  William H. Veeder."

25    MR. VEEDER:  I really don't recall how that was signed.

1    I unquestionably signed it.  I was certainly authorized.  It

2    has certainly been ratified.  The only thing, when I see a

3    name hanging out --

4        THE COURT:  Make it Government counsel.  And you may go

5    back and make it Government counsel in that finding of fact,

6    too.

7        Now C is what I was talking about previously, namely,

8    that the Court adopts as conclusions of law the rulings in

9    the opinion.

10       MR. VEEDER:  That is 58 rather than 51.

11       THE COURT:  Yes.

12       MR. SACHSE:  Yes.

13       THE COURT:  And instead of those dates, strike that out,

14   "The rulings in the opinion in Fallbrook . . except in those

15   instances where they are modified by conclusions of law herein"

16   -- would that do it?

17       MR. SACHSE:  I have a question here.  Perhaps I ought

18   to know the answer, too, but I don't.  In a case of this kind,

19   your Honor has made a lot of minute orders and rulings of one

20   kind and another right down the line.  You have denied in-

21   junctions, you have ruled that Fallbrook's uses were not ultra

22   vires -- there are countless cases where you have ruled.  Now

23   is it necessary or do we state that all these rulings are

24   affirmed, or is the minute order and the notes here sufficient

25   in the record in this case?

18,983

1      THE COURT:  Mr. Veeder.

2      MR. VEEDER:  It is certainly the record, your Honor.  My

3  own view is that you don't have to have findings and conclusions

4  of law.  It was a final act.

5      MR. SACHSE:  That is my view.  I agree with you, Mr.

6  Veeder.  So I wonder if it is necessary in all these cases.

7  I would agree with his Honor that we don't have to say that

8  the Court adopts the rulings of February 11,  April 8, August

9  8.  I think it would be wise to say that you incorporate or

10  that you adopt the pre-trial opinion except where specific

11  findings are made to the contrary.  But I don't think you have

12  specifically to find that you re-adopt any ruling.  I would

13  rather see you not do so,because if there is a finding saying

14  that you adopt the ruling of February 11th and there is no

15  finding on the ruling on some other day --

16      THE COURT:  I struck out February 11th.  Adopts its

17  rulings in the pre-trial opinion.

18      MR. SACHSE:  Then I misunderstood.

19      THE COURT:  Except as modified or changed in this.

20      MR. SACHSE:  That is what I would prefer.

21      THE COURT:  That still leaves open the question about

22  some of these other orders.

23      MR. VEEDER:  None of them was appealable at the time they

24  came down, that is for sure, but I don't think any of them

25  becomes appealable until a final decree has been entered.  I

18,984

1    think the matters are at issue.  I think that the motions

2    place them in issue, and I think they are matters ruled upon

3    by your Honor which became final.

4         THE COURT:  I have no problem about the motions to strike

5    and things of that sort.  Those obviously don't have to be

6    included into the findings and conclusions and final judgment.

7    They may become appealable from the final judgment.

8         MR. VEEDER:  That is right.

9         THE COURT:  That we agree on; is that right?

10        MR. SACHSE:  Yes, that is right.

11        THE COURT:  There are, however, other rulings that were

12   made from time to time which weren't in the nature of motions,

13   and I am not so sure that that same rule applies.  Take this

14   matter of ultra vires and Fallbrook.

15        MR. VEEDER:  Wasn't that a motion for judgment?

16        MR. SACHSE:  It was a motion for summary judgment, but

17   his Honor expressly didn't act on it.  He deferred it until

18   after the facts.  And then we had a hearing in the courtroom

19   and the ruling to the effect that the acts were within Fallbrook's

20   powers.

21        THE COURT:  Did we sign a judgment on Fallbrook?

22        MR. SACHSE:  We have a judgment on Fallbrook which finds

23   that all our permits are valid and that we presently own them,

24   which I would certainly assume by implication says that they

25   are not ultra vires.  You couldn't very well say they are valid

1   if we didn't have the power to have them.  But this is just

2   a matter of making a clean judgment, and I have to defer to

3   the  Federal expert here.

4        MR. VEEDER:  I am letting it go on this basis, that I am

5   ordering a docket entry for the whole case now.  I have to do

6   that.

7        THE COURT:  You are ordering what?

8        MR. VEEDER:  To have Mr. Luddy reproduce the entire docket,

9   so that I will get all the minute orders that you have entered.

10   That is the only way I know how to handle it.  Because you

11   handled those on minute orders, as I remember.  That is the

12   only way to do it.  You may desire to have them all put down

13   together in one place as part of your over-all ruling.  When

14   you come down to enter what you have said would be your final

15   decree, you may want to have that reflected.

16        THE COURT:  The motions fit in one category.  When the

17   motion is ruled on it may be ruled on by only a minute order

18   or there may be an order drawn.  But as far as the motions

19   are concerned, if you go up on appeal, they don't have to be

20   recited in any final judgment.

21        MR. SACHSE:  Then I am satisfied, your Honor.

22        THE COURT:  If they undercut the judgment in some way,

23   they are available.  We agree on that.

24        MR. VEEDER:  Yes, we do.  That is why I say I am going to

25   get a docket entry tabulation on that.

THE COURT:   But we are talking now about matters other than motions.   Mr. Sachse points out that the summary judgment was not ruled on and later on it was sort of handled in the trial as a ruling made.   I am inclined to think we have to pull together conclusions of law to support our final judgment in that matter.   The Circuit has been expressed that their must be findings on factual issues and conclusions on the legal issues and they must be ordinarily separately stated, and when in doubt I follow the practice of running them in both places.

MR. VEEDER:   That brings up the question as to where they would be entered.   We had a series of questions, for example, presented in connection with Fallbrook.   Whether Fallbrook should have additional or amendatory findings and conclusions is presented by what Mr. Sachse has raised.

THE COURT:   As far as Fallbrook is concerned, if necessary, it would be a matter of amending the Fallbrook Interlocutory Judgment.

MR. SACHSE:   I will reread the Fallbrook Interlocutory Judgment and perhaps tender an amendment to it.

MR. VEEDER: I went back for this very reason, Mr. Sachse, and reread your findings and conclusions and interlocutory judgment.   I came to the conclusion that the matter of the power of Fallbrook to make the filings is necessarily a fortiori.   You say that those filings are in good standing.

So I have never brought the point up here.  There are several points that I am extremely interested in bringing together, namely, your Honor's rulings in regard to the complaint.  You have said that it is unnecessary to take care of those separately.  I agree with you.  But I do think that from the standpoint of the record in this case, whether an appeal is taken or not, we should know the disposition made of each of those issues, and I think we have to go through the record and get every minute order and every disposition.

MR. SACHSE:  The only time I can specifically recall a minute order during the pendency of the trial was, I am positive, when Mr. Veeder brought his first motion for injunction.  We were both asked by your Honor if we wanted an order, and we both said a minute order was sufficient.  I am sure Mr. Luddy will find a minute order on that.

THE COURT:  On the injunction, later on I asked Mr. Veeder if he wanted findings, and he did not.  So that was disposed of.  There would be no way to appeal that injunctive order, because of the fact that you waived findings expressly in the record.  Is that right?

MR. VEEDER:  The reason why I asked for no findings and why it was not necessary, Mr. Sachse came in the next morning and agreed that they would quit pumping.

MR. SACHSE:  That is right.

MR. VEEDER:  That is in the record.

1    THE COURT:  So that injunction thing is aside.  But you

2    talk about minute orders.  True, some of these rulings might

3    be shown by minute orders, but many times the Court has ruled

4    on certain legal theories without any minute order being made.

5    The Court merely stated his view.

6        MR. SACHSE:  From an excess of caution, then, I will pro-

7    pose an amendment to the Fallbrook Findings.  I guess that is

8    the logical place to put it, isn't it?

9        MR. VEEDER:  I think so.

10       MR. SACHSE:  Covering a specific finding of fact, or it

11   will be a conclusion of law, that the acts of the Fallbrook

12   Public Utility District in making these filings and proceeding

13   under these filings are not ultra vires.  That is the substance

14   of your Honor's rulings.

15       MR. VEEDER:  Excuse me for telling you how to live.

16       MR. SACHSE:  I'll say they are within our powers; not

17   negative.

18       MR. VEEDER:  I have gone back through these matters in

19   regard to many other of these farmers who appeared here and

20   your Honor said that these are the findings I am going to make

21   and this will be my interlocutory judgment.  I think those

22   matters are going to have to be reviewed, too, don't you?

23       THE COURT:  Yes, but most of those are taken care of

24   when we draw these judgments.

25       MR. VEEDER:  Yes.

18,989

1          THE COURT:  In other words, that is not a real problem.

2          We told a certain fellow that we were going to find that

3     his ground was riparian et cetera.  But we are doing that in

4     these judgments.  If the judgment I finally enter varies in

5     some respect from the minute order, of course the findings

6     and judgment control.  I am not worried about that.

7          I am concerned more about the rulings on legal issues,

8     like ultra vires, and the pre-trial rulings that were made on

9     some of the Government's contentions, not the rulings on their

10    motions.  Let's leave those out.  They are in good shape.

11         MR. SACHSE:  Another example of this which I think we

12    have to take care of in the findings, we are discussing right

13    now the military use issue.  In the military use your Honor

14    deferred it in the pre-trial opinion and in these findings

15    we are making express findings.  So that is taken care of.

16         THE COURT:  That is taken care of.

17         MR. SACHSE:  We will try to do the same thing.

18         THE COURT:  Let's work on some of these other matters.

19    There would have to be a conclusion of law -- I haven't drafted

20    it -- that California law applies to this case as to all

21    defendants in addition to those who were parties to the stipu-

22    lation.

23         MR. SACHSE:  Mr. Veeder and I were discussing that briefly.

24    He is going to help me double check, and we thought it might

25    be appropriate to put in a conclusion that certain named counsel

1   and we are not sure how many there were, did agree and stipu-

2   late to be bound by the stipulation of November 1951, and then

3   to follow that with another conclusion that in any event

4   California law applies to all parties to this case regardless

5   of the stipulation.  Is that what you had in mind?

6        THE COURT:  Yes, that is what I have in mind.  That would

7   be good.

8        MR. VEEDER:  I don't want to leave that go too far.  In

9   regard to the measure of rights, in regard to riparian and

10  correlative rights, that is what I was speaking about, Mr.

11  Sachse.  I have to reserve necessarily the question of exclu-

12  sive jurisdiction in matters like the question of power of

13  the National Government under Article 6 or under Article 4,

14  Clause 2, Section 3.  When you say California law applies,

15  there is no National water law that I know of.

16       THE COURT:  You what I want Mr. Sachse.

17       MR. SACHSE:  I think I understand it, yes, your Honor.

18       THE COURT:  Now go to these other conclusions that follow

19  that first page.  Are some of these covered by your series,

20  Mr. Sachse?

21       MR. SACHSE:  I have just barely started this and the only

22  ones that I covered -- well, there are four of them at the

23  very end of my conclusions -- 6-A, -B, -C and -D.  I cover,

24  I think, sovereignty, inverse condemnation, reservation, and

25  the bucket-at-the-end-of-the-stream, so to speak.

18,991

MR. VEEDER:  On this self-help theory, which is your
Honor's No. 1, there are two aspects of that that I would like
to raise.  Your Honor made a ruling to the effect that the
diversion of percolating water, of water from the Santa Margarita
River basin, was not an appropriation.  Does that come within
the purview of what you call the "self-help theory"?

THE COURT:  That comes in here, and that is probably
properly raised in connection with this No. 1.

MR. VEEDER:  I think there we should have a specific
ruling on that.  Don't you, Mr. Sachse?

MR. SACHSE:  Yes, I think you have it.  I mean, in the
original draft there is a specific finding, No. 7 on page 27,
"except as provided in Interlocutory Judgment No. 24, the
United States of America --

MR. VEEDER:  Page 27?

MR. SACHSE:  Page 27 of the Girard draft.  ". . does
not possess an appropriative right."  That is the broad shot-
gun.  Beyond that his Honor wants the specific one on some of
these other things.

MR. VEEDER:  I think that it becomes important, and that
is why I have been digging back, in regard to pumping and
using water by the United States.  I had assumed that that
self-help was directed primarily to that kind of issue.  So I
think there should    be a finding specifically declaring that
the United States has exported water from the watershed and

18,992

1    was doing so at such and such a time, and then in the con-
2    clusion that that exportation did not constitute appropriation
3    under California law.

4         THE COURT:  We have the finding that you are exporting
5    water from the watershed.

6         MR. VEEDER:  Yes.  I think you should relate it more
7    clearly than has been related, assuming that the self-help
8    theory related to that.

9         MR. SACHSE:  That none of the exportations of water of
10   the United States outside the watershed constitute an appro-
11   priation --

12        MR. VEEDER:  Constitute appropriation under California
13   law.  If that is what the self-help theory --

14        THE COURT:  We might as well state exactly what we are
15   talking about, and we might as well say that the Court having
16   concluded that this is a stream, that water from the stream
17   requires compliance with State law, and that there is not
18   available to the United States the right to appropriate waters
19   from the alluvium in the Santa Margarita Valley and that it
20   has not acquired, does not own or possess any appropriative
21   right.  And this self-help thing could be worked in there.
22   This might all go in as part of 7.

23        Is that what you have in mind, Mr. Veeder?

24        MR. VEEDER:  That is correct, your Honor, because I am
25   not facetious, surely not captious, when I say the self-help

theory has always worried me as to just what your Honor meant
by that.   I think you pointed out what you meant.

THE COURT:   You don't know what I meant?

MR. VEEDER:   I just want to be very sure, your Honor.

MR. SACHSE:   I don't think this finding or conclusion
that Mr. Veeder requests technically belongs under the self-help
theory.

Because, Mr. Veeder, your contention, as I have always
understood it, was that under California law these were percola-
ting waters, and under California law percolating waters could
be appropriated without a filing.

MR. VEEDER:   That is absolutely right.

MR. SACHSE:   So it doesn't belong here.   I agree that
you are entitled to a conclusion, but not under this, because
this says the United States must comply with State law.   Your
contention has always been that you did.

MR. VEEDER:   And that our predecessor in interest had.

THE COURT:   On page 828 is what Mr. Veeder was contending
in that dim distant day in 1958: "That merely by diverting
water and putting it to beneficial use outside the watershed
the United States has acquired valid appropriative rights under
California law on the theory that diversion and application of
water to a beneficial use, coupled with intent to appropriate,
are sufficient under California law to claim an appropriative
right in any water user even if he has failed to comply with

1    the application permit procedures required by the State

2    statutes." That was your original position. And I ruled

3    against you.

4         There ought to be a conclusion there that by diverting

5    the water and applying --

6         MR. VEEDER: What page is that?

7         THE COURT: That is page 828, under the so-called self-

8    help theory.

9         This was no ficticious term. This was the actual theory

10   you argued, that by taking the water and putting it to bene-

11   ficial use you got an appropriative right regardless of the

12   laws of the State of California. That is why I called it the

13   "self-help theory."

14        MR. VEEDER: All right.

15        THE COURT: My No. 1 is not broad enough. I think it

16   should be more in the language of the contention there at

17   page 828, and that is at Volume 165 Fed. Supp. We will have

18   to see what we can work out on this.

19        2. The sovereignty theories.

20        MR. SACHSE: I think my phraseology on your 2-A is better.

21        THE COURT: Where is that?

22        MR. SACHSE: 6-B on the last of my proposals, the last

23   page of the ones I submitted.

24        THE COURT: Yes, I think it is better. Strike mine out

25   and your -B is better. Let's read it again.

1    MR. VEEDER:  You are going to add 6-B in lieu of your 2;

2    is that right?

3        THE COURT:  In lieu of 2-A.

4        MR. SACHSE:  In lieu of 2-A.

5        MR. VEEDER:  FRS 6-B.  That should mean something to

6    somebody.

7        THE COURT:  I agree, Mr. Sachse, to take your 6-B.

8        Mr. Veeder spent a lot of time on this metaphysical

9    theory, and my 2-B is not sufficient.  But the theory was that

10   by these acts there was a severance of land and water and that

11   in some metaphysical way the title to all the water then

12   remained in the United States and the land was available for

13   patent.

14       MR. VEEDER:  295 US 725, your Honor.

15       THE COURT:  At any rate, we are going to have to have a

16   conclusion of law on this.  Of course, it is contrary to his

17   sovereignty stipulation.  But it didn't mean anything then,

18   and it will not mean anything on the appeal, so we have to

19   have this finding.

20       MR. SACHSE:  That is why we asked Mr. Veeder to do his

21   1-B, which we have approved, which is very short, your Honor.

22   I will read it:  "The lands referred to above constituting

23   the United States Naval Ammunition Depot, Camp Pendleton,

24   United States Naval Hospital, acquired from the Rancho Santa

25   Margarita by the United States of America, were in private

1   ownership at the time of the Treaty of Guadalupe Hildago."

2   I wanted this finding directly, because -- in other words,

3   to pull this Naval Enclave out from under the Desert Land Acts.

4        MR. VEEDER:  I thought that myself.

5        MR. SACHSE:  I know you did.  That is why I say we asked

6   Mr. Veeder.

7        THE COURT:  That is one answer to it right there.  Maybe

8   that is the complete answer to it.

9        MR. VEEDER:  There is no dispute on that.

10       MR. SACHSE:  No, we agreed to this finding.  There is

11  no question about it.  Whether we need any more is my inquiry.

12       THE COURT:  In other words, all this land being in private

13  ownership, the Desert Land Acts had no application to it.

14       MR. SACHSE:  Except to very limited parcels that were

15  transferred from the public domain and perhaps as far as they

16  are concerned we should have something such as your 2-B.

17       THE COURT:  Yes, I think we should.

18       MR. VEEDER:  Could we change the metaphysical theory,

19  your Honor?

20       THE COURT:  I just put these on as handles.

21       MR. VEEDER:  I know.  Nor am I greatly concerned.  But

22  when you say "metaphysical theory" --

23       "What does that mean?"

24       I say, "That means the ownership of the unappropriated

25  waters."

18,997

1     "Who ever dreamed up 'metaphysical theory'?"

2     And I would say, "The Honorable James M. Carter, the

3  Judge presiding."

4     Because I didn't advance the term "metaphysical."

5     THE COURT:  I applied the handle to it, like I applied

6  "self-help" and the "bucket at the end of the stream."  This

7  was that fancy argument that in some mysterious way all rights

8  to the water became separated from the land, and you cited

9  authority that this was an incorporeal hereditament and in

10  some mysterious way this incorporeal hereditament now belonged

11  to the Federal Government and didn't pertain to the land and

12  all that.

13     MR. VEEDER:  We should all read <u>Pelton</u>, your Honor.  I

14  didn't mean to interrupt.  Is somebody going to undertake to

15  write this?

16     MR. SACHSE:  Yes.  And I will state right now, I have

17  not contemplated -- unless you direct, I would like to find

18  out -- Mr. Girard and I are opposed to the theory of captions

19  or titles.  We discussed this with Mr. Veeder.  I wouldn't

20  use this language.

21     THE COURT:  All right.

22     MR. SACHSE:  I wouldn't use "self-help," I wouldn't use

23  "sovereignty," I wouldn't put a title on any of these unless

24  you direct me.

25     THE COURT:  What is your reason for being against titles?

18,998

MR. SACHSE:  It is not that I am against titles.  I said to Mr. Veeder, "We ought to get together and decide whether every one of these things from the start to finish is going to have a title.  I think we ought to be consistent.  In all findings to date, Murrieta and everywhere else, we left off titles.  So I didn't see much point in switching to them now.

MR. VEEDER:  I am a firm believer that when you have complex matters like this, with numerous references, that if you had a subject index on each of your interlocutories it would save us all a great of time.  That is why I have always set up captions on the work I did and tried to bring all the factors together.  That is the point I tried to bring up on De Luz Creek yesterday.  From the standpoint of reviewing De Luz Creek as it relates to the military enclave, at least for the people I am representing, I would like very much to have the indexes.

THE COURT:  You can prepare an informal index which we could use.  It wouldn't necessarily have to be part of the judgment.

MR. VEEDER:  It is just easier when you have a heading.

THE COURT:  Prepare headings.

MR. VEEDER:  That is what I have been doing as I have sent my material along.  But we have to have uniformity.  There is no question.

THE COURT:  Mr. Sachse, will you try to draft a conclusion

1    of law which would apply only to these lands that the Govern-

2    ment acquired other than by purchase or condemnation from the

3    Rancho?

4          MR. SACHSE:  I will, your Honor.

5          THE COURT:  So that I will mark my 2-B that you are going

6    to limit it to certain lands and you are going to draw it.

7          MR. VEEDER:  Are you ready to talk on C, your Honor.

8          THE COURT:  Yes.

9          MR. VEEDER:  The matter of exclusive jurisdiction is

10   important there.

11         I don't ever recall that I advanced the "police regulation

12   theory" from the standpoint of claiming upstream.  But I have

13   stated that by reason of exclusive jurisdiction, by reason of

14   Article 6 of the Constitution and Article 4, Clause 3, Section

15   2 and the decisions emanating from them, that the police

16   regulations of the State would not be applicable.

17         THE COURT:  You went further and you characterized the

18   procedures of the State Water Rights Board as part of the

19   police regulations of the State, in substance.

20         MR. VEEDER:  Only in regard, your Honor, for example, to

21   making filings for wells that we have drilled, the filing of

22   logs, the pumpage, the change of point of diversion and place

23   of use.

24         THE COURT:  If that is your position today, all right.

25   But that was not your position then because your position then

19,000

1   was that you did not have to comply with State law to appropri-

2   ate water, and that one of the reasons you didn't have to

3   apply was that this was, in substance, part of the State police

4   power and they had no power over the Enclave.  Therefore, you

5   don't have to comply with the State law to appropriate.

6        MR. VEEDER:  I will not argue with your Honor on that.

7   This police regulation, from our standpoint, becomes important

8   in regard to exclusive jurisdiction.  As I comprehend it, the

9   matter of exclusive jurisdiction is somewhat open at the

10   present time.  I have written language in Finding 1-A, if

11   you recall, which I think is a recitation.

12        THE COURT:  We are not going to use the words "police

13   regulation," and we are making the finding that you can do

14   with the water as you please when it gets down there.  That

15   solves this problem.

16        MR. VEEDER:  I will tender some language for that con-

17   clusion of law, your Honor.  I am in much the same position

18   of Mr. Girard. Here we have the Solicitor General before the

19   Supreme Court insisting that in regard to these lands we do

20   have exclusive jurisdiction, and I couldn't abandon that,

21   myself, without specific authority.

22        MR. SACHSE:  I would be very happy to see what Mr. Veeder

23   wants to tender on it, because I agree that this is perhaps

24   not necessary at all if we make it very clear that they can

25   do as they please with the waters that reach the Enclave.

19,001

1    THE COURT:  Unless he is going to abandon this contention

2    he made.

3    MR. SACHSE:  Yes.

4    THE COURT:  That the requirement to comply with the

5    State Water Rights Board and the California statute was part

6    of the police power and the police power couldn't affect them.

7    That is the contention you made at that time.

8    See what you can do with it, Mr. Veeder.

9    MR. VEEDER:  All right.

10   THE COURT:  D.

11   MR. VEEDER:  May I just tender a thought, that your Honor's

12   B, your "metaphysical theory" and your "reserve land theory"

13   have much in common.

14   THE COURT:  No, they were two different theories.  On

15   the reserve land theory, where it says "constitute it a reserve

16   and that," strike out "therefore," "and that said land became

17   reserve land of the Government."  This was another theory that

18   you spent a lot of time on.  This is, of course, where the

19   power cases into play -- you talked about Pelton, et cetera.

20   This was a question of reserve lands.  I want a conclusion

21   on that.

22   MR. SACHSE:  I want that conclusion very strongly.  I

23   started to write one, which is utterly inadequate, and I would

24   prefer your Honor's.

25   THE COURT:  2-D is not too bad as it is worded.

19,002

1      MR. SACHSE:  No, I think yours is far superior to what

2    I had.

3      THE COURT:  " . . constitute a reserve and that said land

4    became reserve land of the Government" -- maybe put "reserve

5    land" in quotes -- "and that the Government could do as it

6    pleases with unappropriated water in the stream on the reserve."

7    If the Government seeks to reach upstream and acquire addi-

8    tional amounts of water, under its theory the Government may

9    do as it pleases with it and make use of the water in and out

10    of the watershed after it reaches the Naval Enclave.

11      Leave it as it is and let Mr. Girard have a crack at it.

12    But I think it pretty well tells the story on that one.

13      Mr. Veeder also argued that by the exercise of the power

14    of condemnation in taking the Rancho the Government got some

15    extra rights, and then he argued inverse condemnation also.

16      MR. SACHSE:  The second paragraph of that, I think, is

17    wrong, isn't it?  You meant to say "United States acquired no

18    rights by inverse condemnation".

19      THE COURT:  That is right.  It should be "by".  I changed

20    it here.

21      MR. SACHSE:  I think that is very superior to mine and I
                                    that
22    would like to submit/to Mr. Girard.

23      THE COURT:  All right.  But I think the first paragraph

24    should be in there, too.

25      MR. SACHSE:  Yes, both, your Honor.

19,003

1      THE COURT:  Now, the bucket at the end of the stream.

2  Well, actually, your 6-C is much the same as my 2-D, isn't it?

3      MR. SACHSE:  Yes, and I have eliminated my 6-C.  I think

4  yours is much superior.

5      My 6-A, I think, your Honor, is almost verbatim what Mr.

6  Veeder dictated.  I tried to take it down real fast last time

7  we were here.  And that ties in to your -F, bucket at the end

8  of the stream.

9      THE COURT:  Yes, I think your 6-A is better.  I know Mr.

10  Veeder wouldn't like to have me put this last sentence in.

11      MR. VEEDER:  Which last sentence?

12      THE COURT:  Of 6-F.  The United States may not place a

13  bucket at the end of the stream and claim title to the rights

14  to the use of water thereby collected which previously fell

15  on public lands upstream.

16      MR. SACHSE:  Do I understand, then, that you want to dress

17  6-A and use that, basically?

18      THE COURT:  Yes, I think your 6-A.

19      MR. VEEDER:  Are you going to add anything in there, in

20  these conclusions, respecting the stipulated judgment and your

21  ruling in connection with it?

22      THE COURT: We have a judgment.

23      MR. VEEDER:  I say in here, though.  You are not going to

24  put it in here?  I see no mention.

25      THE COURT:  Not unless it comes in in connection with

19,004

1   several tender thoughts you have proposed, or several thoughts

2   you have tendered, whatever the situation is.  You raised

3   the question about whether the United States could appropriate

4   this water which Vail Company was supposed to --

5       MR. VEEDER:  No, whether Fallbrook could.

6       MR. SACHSE:  Yes, whether Fallbrook could.

7       THE COURT:  Also, I understood you to raise the question

8   that this water that Vail released was subject to appropriation

9   by the United States.

10      MR. VEEDER:  No.

11      MR. SACHSE:  I understood it your way, Mr. Veeder.

12      MR. VEEDER:  Yes.

13      I am going through and trying to bring together all the

14  points that we have discussed to the end that we can summarize

15  your Honor's position on each one of the major issues.

16      The question that I can't find that has been ruled upon

17  is whether the Fallbrook Public Utility District, by the filing

18  of its application and its permit, could appropriate the waters

19  which we have asserted were subject to the stipulated judgment.

20  That is one question.

21      The second question that I have been unable to find

22  precise language from your Honor on -- but again I believe it

23  is implicit in all your rulings -- is that in the exercise of

24  your power of equity you could still recognize the rights of

25  the United States which were being exercised by the United States

at the time Fallbrook made its filings.

I don't find those two points covered, and as I said I am going to be specific, whether I file a motion on it or how.

MR. SACHSE:  The transcript says you were going to submit something on both of these, were you not?

MR. VEEDER:  That is right.  I am going to do that, and whether that should be included in these conclusions of law or not I don't know.  But I think they are extremely important questions to us at this time.

THE COURT:  I am not going to pass on it until after I see what you have written out.

MR. VEEDER:  That is right, your Honor.

THE COURT:  But it seems to me to be a very simple problem.  Fallbrook's right to appropriate water is a right to appropriate surplus water, and I don't think any water that came down the stream under the Vail Judgment was surplus water.

MR. VEEDER:  That is the point.  But you see, when you say we can't export water from the watershed, you are leaving really a vast empire without water.

THE COURT:  I merely say you can't reach upstream to make other people let water come down so you may export it.  You may take water out of the watershed.

MR. VEEDER:  I will formulate these and have them for the next hearing.

THE COURT:  All right.

1   We have tentatively okayed several.

2   Now the last one I had in there, and that probably isn't

3   necessary, the effect of the decision of the Court of Appeals.

4   MR. SACHSE:  If we are going to make the conclusion you

5   recommended, that the Court herein adopts the pre-trial opinion

6   except as found to the contrary, you have this clearly set

7   forth in the pre-trial opinion.

8   THE COURT:  All right.

9   MR. VEEDER:  I think you also have made previous rulings

10   to the effect that it is related only to the question of

11   jurisdiction, but that you would be guided and give weight

12   to what Judge Fee said.

13   THE COURT:  We will let that go, along with the incorpor-

14   ation by reference.

15   Now, on conclusions also, we have to have some conclusions

16   on this grass cover.  Did you see what I proposed on that?

17   MR. VEEDER:  Yes, sir.  But may I raise one point?  I

18   think we ought to have a conclusion of law that these findings

19   of fact and conclusions of law are limited strictly to the

20   Naval Enclave.  I have Indians and other National interests

21   that are involved.  Can we do that?  I would like to have that

22   clear.

23   THE COURT:  I see no objection to that, do you?

24   MR. SACHSE:  I am not sure I got it.  I was listening

25   half-way to Sandy and saying something myself.

THE COURT:  Go ahead and finish with Mr. Wilkinson.

MR. VEEDER:  The point that I would like to have set forth in a specific conclusion is that these findings of fact, conclusions of law and judgment relate solely to the Naval Enclave.

MR. SACHSE:  I don't see any objection to it, if I know what you mean.  When a judgment says that you can't get an appropriative right without complying with the State law, that certainly applies to everybody in the watershed.

MR. VEEDER:  I don't want it to be applicable to the Forest Service or Indian lands.

MR. SACHSE:  I think the way to handle that is not to say that this judgment applies only to the Marines -- that's silly, but to say that a separate judgment will be entered.

THE COURT:  We have already done that.

MR. SACHSE:  Yes.

THE COURT:  In a finding.  Maybe it should go into a conclusion.  And this is where at least an index for our own use would be helpful.  We have already provided that a separate judgment will be provided.

MR. VEEDER:  Yes, we have that statement in the findings.

THE COURT:  Why don't you run that in also as a conclusion?

MR. VEEDER:  I want that in as a conclusion.

THE COURT:  All right, similar language.

Now, what about grass cover?  Do you have the conclusion

1  I proposed on that?

2      MR. VEEDER:  I have it.

3      MR. SACHSE:  I have it, your Honor.

4      THE COURT:  It probably should be limited.  We found

5  that it was beneficial, did we not?

6      MR. SACHSE:  Yes, the finding admits that it is a bene-

7  ficial use.

8      THE COURT:  Where is that finding?

9      MR. SACHSE:  I don't think we have it.

10      THE COURT:  We have one.

11      MR. VEEDER:  You had one.  It was 8-A.

12      MR. SACHSE:  8-A.  But that doesn't make the specific

13  finding that it is beneficial.  It simply recites the facts.

14      MR. VEEDER:  That is right.

15      MR. SACHSE:  My 8-A does not specifically find that it

16  is beneficial.  It recites that this was done.

17      MR. VEEDER:  That the use of water to support vegetative

18  cover is a beneficial use.  Isn't that agreeable?

19      MR. SACHSE:  You can't just add it.  8-A would have to

20  be rewritten, and my note is that Colonel Bowen is to redraft

21  it.

22      MR. VEEDER:  8-A has to be completely rewritten.

23      THE COURT:  We have to have a conclusion of law here,

24  and to start with take out the words in my conclusion "bene-

25  ficial," because I don't think there is any question that use

on grass cover would be beneficial.  The real question is whether it is a reasonable use of water.

MR. VEEDER:  Why not say it is a beneficial use and the question of reasonableness is not determined here?

MR. SACHSE:  With his Honor's suggestion, this proposal would now read that the Court does not now pass on the question whether the maintaining of grass and vegetative cover on the valley floor is a reasonable use of water.

MR. VEEDER:  Where are you reading from?

MR. SACHSE:  Reading from his Honor's proposed conclusion of law on grass cover, page 2 on grass cover.  In other words, I have simply stricken the words "and beneficial".

THE COURT:  Yes.  We might refer to the finding, presently 8-A.

MR. SACHSE:  You would have to strike the word "beneficial" in the third line from the bottom, also.

THE COURT:  Yes.

MR. VEEDER:  You are going to say affirmatively that it is a beneficial use, although the matter is not determined as to reasonableness.

MR. SACHSE:  We are going to make a finding that it is a beneficial use.

THE COURT:  Which will be included in 8-A.

MR. SACHSE:  Yes.

MR. VEEDER:  I think that is also a conclusion of law.

1    I think the question whether a use is a beneficial use is a

2    conclusion of law.

3         MR. SACHSE:  We can find that the grass cover is beneficial,

4    but the Court does not now conclude whether or not it is reason-

5    able.

6         MR. VEEDER:  You are going to put that in the conclusions

7    of law.

8         MR. SACHSE:  I will put in language, yes.

9         MR. VEEDER:  Okay.

10        THE COURT:  All right, we know what we are going to do

11   with that now.  It will take some modification on that, Mr.

12   Sachse.

13        MR. SACHSE:  Yes, your Honor.

14        THE COURT:  Now, there is no conclusion of law on the

15   sewage return.  I struggled along on several of them there.

16   What is our finding number on sewage return?

17        MR. SACHSE:  That is another one that Colonel Bowen

18   drafted.  No, that is not it.

19        THE COURT:  It is 14.

20        MR. SACHSE:  Yes, 14-A and 14, 14-A of mine.  No, that

21   is phreatophytes.  It is 14.

22        THE COURT:  14.

23        MR. VEEDER:  Are you speaking of salvage water now?

24        MR. SACHSE:  Yes, sewage.  15.

25        MR. VEEDER:  Franz, you have the sewage effluent.

THE COURT:  I am just trying to find now the finding we have referred to.  We are talking about Finding 14, which was the return of the sewage, and the question is what conclusion of law do we draw, and I had made a proposal: "That the United States" -- that should be modified -- "does not own or possess and cannot assert any appropriative right to the water reclaimed from sewage."

MR. SACHSE:  I agree with that and I think your Honor's language in the second is --

MR. VEEDER:  We have to be together on this now.  What is the top one, sewage return from water used in the watershed?

MR. SACHSE:  We are on Conclusion of Law 1.

THE COURT:  Two conclusions of law I have proposed.  That finding at the bottom was a finding and it is out and has been taken care.  The next issue is Finding 2.  I just put my hand to it.  I take no pride of authorship.  But we agreed on this, Mr. Veeder -- I think you were in agreement -- that if there was later an apportionment that you would not be able to come in and say that because we saved so much water we are now entitled to an additional apportionment.

MR. VEEDER:  Your Honor, I will state what I recall on that proposition.  We have a situation where we have salvaged water, say a thousand acre feet annually.  It is our position that in the even there is an apportionment that salvaged water would not be included in the apportionment, because we have and

19,012

1   we would be entitled to it and it would not be charged against

2   us in determining reasonable use.  That is the position that

3   I have taken.

4        THE COURT:  I think we are agreed on that.

5        MR. SACHSE:  I think we are all in agreement.

6        THE COURT:  I think probably if we are going to do this

7   right we ought to have a third conclusion -- and I don't know

8   in what order -- that this salvaged sewer water can be used

9   wherever the Government wants to use it.

10       MR. VEEDER:  I want that, and also the additional state-

11  ment I just made, because I don't believe it is in your con-

12  clusions.

13       MR. SACHSE:  It is supposed to be.

14       THE COURT:  That is what I tried to say.

15       MR. SACHSE:  I think it is here.  That in any future

16  apportionment the  amount of water reclaimed from sewage may

17  not be used to increase the appropriative share, et cetera.

18       THE COURT:  Well, we could say "may not be used to increase

19  or decrease the appropriative correlative share to which the

20  Naval Enclave may be entitled".  Certainly "or decrease"

21  should be in there.

22       MR. VEEDER:  I would like to have it just stated that in

23  any future apportionment the waters salvaged by the United

24  States, by either salvage of sewage or by the removal of

25  phreatophytes --

1      MR. SACHSE:  Let's stick to sewage for just a minute.

2   I think I will agree with you on that.

3      MR. VEEDER:  Let me finish what I want to say.

4      THE COURT:  Let's stick to the sewage.

5      MR. VEEDER:  All right, I'll stick to the sewer.

6      That in any future apportionment the quantity of water

7   salvaged by the United States of America would not be included

8   in fixing the quantity of water or the percentage of water to

9   which the United States would be entitled and that the sewage

10  effluent thus salvaged could be used by the United States

11  within or out of the watershed.

12      MR. SACHSE:  If I understand you correctly, I think I

13  agree.

14      MR. VEEDER:  Let's get this straight, because I want it

15  understood.  With all respect to your Honor, I don't believe

16  it covers that.

17      THE COURT:  That is what I have tried to say.  Maybe

18  you have said it better.  If I understand you, I agree with

    you also.  And I certainly/that if we use mine there be added
19                        would suggest

20  that this sewage salvage may be used anywhere the United States

21  wants to use it.

22      MR. SACHSE:  May I try to rephrase this, to be sure I

23  understand, Mr. Veeder?

24      MR. VEEDER:  All right.

25      MR. SACHSE:  As I understand, the future apportionment of

1    the waters of the River would require a certain amount of

2    water come to the Navy -- X thousand acre feet per year or

3    X second feet per year or whatever the yardstick might be.

4            MR. VEEDER:  Or X percentage.

5            MR. SACHSE:  Or X percentage.  And you are saying that

6    the fact that you salvage water in the Naval Enclave shall

7    not be used to reduce the amount required on the Enclave.

8            MR. VEEDER:  I agree with you on that.

9            MR. SACHSE:  Then it is all right.

10           MR. VEEDER:  And that that salvage water can be used

11   within or out of the watershed, depending on the determination

12   of those who administer it.

13           MR. SACHSE:  I certainly would have no objection to that

14   in this case.  But again, Mr. Veeder, because this case --

15           MR. VEEDER:  Let's try one case at a time.

16           MR. SACHSE:  Because this may be a milestone in California

17   water law, I don't want to state it quite that simply.  Your

18   statement is correct, because you are the last user on the

19   stream.  But if Vail developed a Camp Pendleton and started

20   to salvage sewage water, Vail could not export that sewage

21   water.  So I don't want his Honor to put a blanket statement

22   in here that these people --

23           THE COURT:  I think it is proper, Mr. Veeder, to put that

24   caveat or limit it to the fact that it exists because are the

25   last user on the stream.

Well, what did the three wise men decide upon?

MR. VEEDER:  We are happy with this sewage deal, your Honor.

THE COURT:  So that it is understood that in any future apportionment, if there is a row between Vail and the United States, the United States will show what uses it has in the watershed, its needs, et cetera, and Vail would show that. Vail would not be able to come in and say, "Wait a minute, you have been able to use that water for various purposes. You have been able to reclaim a lot of that water.  We now want to take into account the fact that if you get a certain amount of water you are going to be able to re-use 70 per cent of it.  Therefore, we have to take this figure into account in what is apportioned to the United States."  We are talking about the same thing, are we?

MR. VEEDER:  That is right.

MR. WILKINSON:  But your Honor, I don't want the idea to go along that they have the salt water intrusion problem and they come up and say to us, "We want some more water.  We have salt water intrusion."  In turn, we should be able to say to them, "Use your sewage effluent, and use it in the basin."  Is that proper?

MR. SACHSE:  In other words, Mr. Wilkinson, your Honor, has pointed out that the caveat I put in applies even if they aren't the last user on the stream.  It is the duty of every

1  water user to use his water within the watershed if it is

2  possible and at least so that it doesn't injure anybody else.

3  If we can imagine the exports so serious that again salt water

4  intrusion resulted from the Navy's failure to let the natural

5  return keep the ocean back, I think your Honor could require

6  them to do it.

7      MR. VEEDER:  Your Honor has continuing jurisdiction, if

8  this academic question should arise, and I would like to leave

9  it on that basis.

10     MR. SACHSE:  I am satisfied with it.  I think we can

11 word this.  I believe it is your right to use it wherever you

12 want because you are the last user, but I also think the

13 Court has continuing jurisdiction of it.

14     THE COURT:  Of course, the reason we should leave it

15 where it lies is that if it came up on a demand by the United

16 States that more water be allowed to come down, then of course

17 the Court has a right to say, "Well, taking into acoount all

18 the factors, in deciding whether more water comes down, I

19 think it is proper that once it gets there you use it where

20 you please and you re-use where you please."

21     Mr. Veeder, you had some suggested language.  Do you

22 want to write it up?

23     MR. VEEDER:  I will write it up, yes.  And just for the

24 record -- because I am using John's report here constantly --

25 to be sure I am talking about the right one, this is sewage

return of the water used from the watershed, as tendered by the Court.

THE COURT:  Yes.

MR. VEEDER:  Findings and conclusions of law.

THE COURT:  Mine is only in principle, but you are going to try to do something else about it.

What about phreatophytes?  That is 14-A in the findings.

MR. SACHSE:  Yes.

THE COURT:  Strike out my finding.  There was no proof as to how much water was conserved by control of phreatophytes, was there?

MR. VEEDER:  Colonel Bowen is working on that point, and we have taken the position that there is salvage of 1.2 acre feet per acre when you remove -- correct me on this if I am wrong, Colonel --

THE COURT:  That is another figure.  That is the figure on your grass cover.

MR. VEEDER:  I thought we had taken that as the basis on phreatophytes.  I would just as soon use that figure, your Honor.

MR. SACHSE:  I would object most vigorously to a finding in the language of your Honor's words that the control and removal of phreatophytes have conserved approximately so much, because I simply don't think there is any proof at all.  Colonel Bowen has said that the phreatophytes use 1.2 acre feet per

acre per year on the average, but he will also tell you that
the average is made up of high figures, low figures.  You don't
know which ones have been effectively removed, you don't know
what acreage there was, we don't know many of those things.

Furthermore, to carry this to a logical conclusion, if
we are going to apply this same rule to whatever amount of
water was conserved that we have just agreed to on sewage,
it is immaterial.  We don't have to have an acre figure.  This
is the last user on the stream.  They can do anything they
want with the water.  And if they remove all phreatophytes
they have that much more water to use.

I think this language your Honor suggested originally
and which is in my 14-A is more nearly correct:  "That said
conservation practices have in fact resulted in conservation
of water in a substantial but undetermined amount," and let
it go in at that as it is in my 14-A.

MR. VEEDER:  Then add to that "and in any future appor-
tionment --"

MR. SACHSE:  We then come to the conclusion of law, yes,
and I will concede that the same rule applies to this water
that applies to sewage water.

MR. VEEDER:  On your Honor's phreatophyte findings and
conclusions of law I am marking "use same language as for
sewage".

MR. SACHSE:  Except for the fact that you can't use

1   exactly that language, because on sewage you are going to have

2   a metered amount.  But you can talk about export, because you

3   are the last user on the stream.

4       THE COURT:  Again, in principle I think mine is all right,

5   but it could be improved upon certainly: "That in any future

6   apportionment the amount of water conserved in controlling

7   the phreatophytes will not be used to increase or decrease

8   the correlative share to which the Naval Enclave would be

9   entitled".   But we have agreed that it is the same principle

10  as is involved in the sewage.

11      MR. SACHSE:  You see, your Honor, the reason this is so

12  tricky, as Colonel Bowen will confirm I am sure, that when

13  a reservoir is built, for example, under normal conditions,

14  such as the Vail or the proposed Fallbrook Dam, the water

15  conserved by the destruction of the phreatophytes is greater

16  than the water lost by evaporation.  Now you are getting into

17  a terribly tricky thing if you start to give rights based upon

18  it.  Because Vail can perhaps now propose that its judgment

19  be amended by saying that they wiped out so many acres of

20  phreatophytes using 1.2 acre feet per acre per year, whatever

21  the figure is, and now are entitled to claim that they have

22  conserved that and use it outside their watershed.  Fallbrook

23  can throw even additional conservation gimmicks in.  We not

24  only will get rid of phreatophytes, but our reservoir will

25  wipe out a whole bundle of riparians who had a legal right to

take water from the River.  Can we claim that little extra water because we eliminated a lot of riparians for the Navy?

MR. VEEDER:  Your Honor, I hate to take issue with Mr. Sachse right now.  Using Vail Company's exhibits to show the grave error that he just stated, Vail Company's AU shows, for example, that when the reservoir is full at contour 1470 there is a total evaporation of 5,390 acre feet annually.  In a state of nature the loss would have been 1486 acre feet.  So there has been an actual increase of evaporation loss by Vail Company's dam of 3,903.38 acre feet.

MR. SACHSE:  Mr. Veeder, may I ask --

MR. VEEDER:  There you are.

MR. SACHSE:  Just a minute.  I am no engineer, I don't know.  I was quoting and I will give Colonel Bowen an opportunity to correct his statement or tell me I misunderstood him.

I believe, Colonel, you answered me the other day -- perhaps privately, perhaps on the record, I don't remember -- that basically the phreatophytic loss was greater than the evaporation loss.  I don't know.  If I am mistaken, tell me. But you are the man I was quoting.

COLONEL BOWEN:  We discussed the subject very briefly and hastily.  Actually, there is water salvaged, but the salvage depends on the site conditions.  It will vary a great deal from site to site, and within a site it varies a great deal.

1          .    I have reviewed the Sonderegger Report that the Vail

2     Company made available to me, and Mr. Sonderegger with a plane

3     table went over the reservoir site and plotted out the area

4     of certain kinds of vegetation and made estimates of their

5     density and made calculations of the evapo-transpiration from

6     each of these sub-sites that he broke out of the whole reservoir

7     site.   In some of those areas, the swamp areas, for example,

8     the evapo-transpiration losses in a state of nature were higher

9     than the evapo-transpiration losses alone from a free body

10    of water on the same area.   But that situation will only occur

11    where you do have a swamp area pretty well covered with

12    arundinacious plants -- reeds, tullies, et cetera -- where

13    the transpiration may well exceed evaporation from a free

14    water surface.

15         You take the converse, if you go to a desert area and

16    build a dam and impound water, the losses from the natural

17    site prior to the impoundment of the water may have been very

18    low and consequently there is little or no salvage of water.

19         So when we speak of the salvage of water from a reservoir

20    area there is a salvage in the respect that you prevent the

21    transpiration of plants that are covered by water in the

22    reservoir area .   That seldom ever offsets the evaporation

23    loss from the free water surface at any reservoir site.

24         MR. VEEDER:   For 9 acre feet of water impounded in Vail

25    Company's reservoir the surface area is 9.4, the evaporational

19,022

loss from that surface would be 47 acre feet.  In a state of nature the losses would have been 38.26.  So there was an actual increase at the minimum impoundment, as shown on Sonderegger, of 8.38 acre feet.

THE COURT:  What has this got to do?  I am very much elucidated by hearing the Colonel and hearing your figures. What has this got to do with this particular finding?

MR. VEEDER:  I haven't the slightest idea.

Why did you bring it up?

MR. SACHSE:  I brought it up for the reason that Mr. Veeder is apparently interested in getting a figure in here --

MR. VEEDER:  Yes, he is.

MR. SACHSE:   -- of acre feet saved by the United States by reason of a program of removal of phreatophytes, a figure rather than the general statement that conservation is accomplished.  I don't think it should be done.  I think this is an extremely dangerous thing that applies to every landowner in this watershed -- every single one.  The removal of phreatophytes is a normal intelligent conservation practice, and I think you are just opening the door to having Roripaugh or Ceas say that he tore out all the tullies someplace.

Sandy was telling me in connection with a completely unrelated problem yesterday that last year they bulldozed to increase percolation into the ground 7, 8 or 900 acres of brush instead of trying to burn it.  Does he get more water

1  now because he bulldozed off the brush that would use a little

2  of it? I don't think so. I think this is a necessary act of

3  any water user.

4  　　　MR. VEEDER:  I am going to write some language on it

5  and I will submit to counsel and to your Honor so that you may

6  see it.

7  　　　THE COURT:  All right.

8  　　　Are we about through with what we have set ourselves to

9  do?

10  　　　MR. SACHSE:  I think we are practically done with all we

11  can do until we have some written material. We have not

12  settled the question of our return. I think Mr. Veeder wants

13  to get away early this afternoon.

14  　　　THE COURT:  Can you come back thw 20 and 21st?

15  　　　MR. SACHSE:  I can, and I would recommend the suggestion.

16  I think we could do a great deal on the 20th and 21st.

17  　　　THE COURT:  Mr. Girard said he could have a draft ready

18  by that time.

19  　　　MR. SACHSE:  He said he will have the Murrieta in our

20  hands next week. He would have the whole thing by then.

21  　　　MR. VEEDER:  He is not going to have a draft of this by

22  then.

23  　　　THE COURT:  February 20th. Then I would skip the next

24  week, the 27th, and ask you to be back in here the 6th of

25  March.

1    MR. VEEDER:  If, for any reason, your Honor, Mr. Clark

2   should tell me I would have to be there, I will call your

3   attention and I will call counsel.  Please understand that I

4   am willing to be here and I will try.

5    THE COURT:  Well, it is slow work, but I think we have

6   accomplished some things.

7    MR. SACHSE:  Mr. Veeder, as far as it affects your own

8   work, frankly, I think you could do more if you arranged to

9   be here the 20th and 21st and had to postpone the March meeting.

10  Because I really hate to let this get cold in our minds.

11   MR. VEEDER:  Mr. Sachse, I am doing everything I can.

12  That's for sure.  Sometimes I am doing more than I can.

13   ( Whereupon an adjournment was taken until Tuesday, )
14   (                                                   )
     (February 20, 1962, at 10:00 o'clock A.M.          )

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, et al., )<br>)<br>Defendants. ) | No. 1247-SD-C |

CERTIFICATE OF REPORTER

    I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: February 9, 1962, was a duly qualified, appointed and acting official reporter of said Court;

    That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within and foregoing fifty-four (54) pages of typewritten matter constitute a full, true and correct transcript of my said notes.

    WITNESS my hand at San Diego, California this 10th day of February, 1962.

                      *John Swader*
                      Official Reporter