# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, February 20, 1962
            &
            Wednesday, February 21, 1962

Pages:      19,026 to 19,165

FILED

SEP 24 1963
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
        DEP'TY

JOHN SWADER
Official Reporter
United States District Court
325 West "F" Street
San Diego, California
BElmont 4-6211    Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, et al., )<br>)<br>Defendants. ) | No. 1247-SD-C |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, February 20, 1962

- - -

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ.,<br>Special Assistant to the<br>Attorney General |
|  | CDR. DONALD W. REDD |
| For the Defendants: |  |
| Fallbrook Public Utility<br>District, et al.,: | FRANZ R. SACHSE, ESQ. |
| State of California: | FRED GIRARD, ESQ. |

1

2

# I N D E X

3

| Defendants' Exhibits | For Identification | In Evidence |
|---|---|---|
| California's BA (letter from Supreme Court re Paul case) | 19,038 | 19,038 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, FEBRUARY 20, 1962, 9:30 A.M.

-o0o-

(Other matters.)

THE CLERK:  12-1247-SD-C United States of America vs. Fallbrook.  Further court trial.

THE COURT:  What do we start on, gentlemen?

MR. GIRARD:  Your Honor, I mailed down last week -- I don't know the date it was lodged with the Court -- the findings on the Murrieta-Temecula ground water area No. 30. I think that all of the corrections in the final language as discussed in the court at the last session are incorporated into these.

THE COURT:  It was lodged February 15th.  Have counsel had a chance to read it over?

MR. SACHSE:  I have reviewed it and it is entirely satisfactory with Fallbrook, your Honor.

THE COURT:  Mr. Veeder.

MR. VEEDER:  I think it conforms with what your Honor directed at the last hearing.

I have in my office the exhibits which I think will be necessary.

MR. GIRARD:  That is absolutely correct.

MR. VEEDER:  There is one point I would like to bring out.  If you will look at page 26, Finding 51, there is a reference to "water duty."  I have examined Exhibit H and

water duty is not set forth on that.  What we would do is to run off a page and make it part of Exhibit H, setting forth the water duty as testified to.  Is that all right?

MR. GIRARD:  That is all right with me.

MR. VEEDER:  Is that agreeable, your Honor?

THE COURT:  Would you prefer to do that?

MR. VEEDER:  Might as well make it part of Exhibit H.

MR. GIRARD:  Yes.

MR. VEEDER:  And then in general the duty of water and the requirements of water would be the same throughout the whole area.

MR. GIRARD:  One other point also on Exhibit H, which may have to be done -- I haven't looked at the exhibits -- but you will notice in Finding 55 where I referred to these minor appropriative rights or applications, I don't know whether those are reflected as far as the application numbers et cetera or not on Exhibit H, Colonel.  Perhaps a similar type of page for those minor ones could be prepared also using whatever information you have plus California's Exhibit, which shows the latest filings within the watershed, and check out which of those are/within the ground water area.

MR. VEEDER:  That can be done.

THE COURT:  This is 55?

MR. GIRARD:  Yes, your Honor.  I just checked on my California Exhibit -- I think it is AS, but I am not sure of

19,029

the number -- where we just filed a statement showing the current status of all applications on the Santa Margarita River watershed. I just glanced at it and I think there are one or two which are within the ground water area. The facts set forth on that exhibit could just be made a separate page to Exhibit H, those that are in the ground water area, and take care of that problem.

Maybe there are none. I thought there were when I looked at it.

MR. VEEDER: I think we ought to go through the whole thing. If we can meet in my office some time today we will do that, in regard to each exhibit.

MR. GIRARD: All right.

MR. VEEDER: And set forth the kind and type of language that should be used for water duty and in regard to the matter of applications now pending with the State of California.

MR. GIRARD: All right.

THE COURT: All right. Other than that, it seems to be all right, and we will assemble the exhibits and if other changes are needed we will make them.

MR. VEEDER: I would like to lodge with your Honor at this time -- the Clerk isn't here. May I go ahead?

THE COURT: Yes.

MR. VEEDER: We have put together language in regard to the properties within the Naval Enclave -- the description

of the stream, the description of the basin.  We have general-
ly outlined the physical features of the area.  I have served
copies of this on counsel and I thought you might desire to
review the form that we are pursuing in that connection.

THE COURT:  All right.

MR. VEEDER:  And I have designated that "February 20,
1962 Naval Enclave WHV."

MR. SACHSE:  I have reviewed it very hastily, your Honor,
and I think that everything he has is included in the larger
Girard draft, not in verbatim language necessarily, although
Mr. Girard and I both think some of Mr. Veeder's language is
better than what is in Mr. Girard's.  Maybe we could work off
a more complete one.

THE COURT:  Why don't you gentlemen sit around a table
and do this?

MR. VEEDER:  That is right.  I have just seen what Mr.
Girard has done and he has just seen what I have done.  Mr.
Girard just handed me a copy of a letter dated January 15,
1962, signed by E. C. Schade, Assistant, which sets forth
the reference to an order entered by the Supreme Court in the
case of Paul, et al., vs. United States, No. 239, October term
1961.  I would hand it to your Honor.  It relates to the
matter of exclusive jurisdiction.  Whether you desire to have
that simply set out in the record or made an exhibit is
entirely up to your Honor.

MR. GIRARD:   Yes, that would concern the draft I handed you this morning, the last paragraph on page 4 going into page 5 of the Findings, which, in essence, is a recitation of the Paul case, and although Mr. Veeder and I have both formally stated, I think, in the record that this case is before the Supreme Court I thought there should be some official exhibit or something.

THE COURT:   I saw your part of it.  Do you think we need anything more than we have here?  I started to read this and got that far.

MR. GIRARD:   I think Mr. Veeder wants to check out the records a little bit further.

On page 4, lines 14 to 25 are supported by the affidavits in evidence in this case.

THE COURT:   Do you both agree that this Paul case is a similar issue?

MR. GIRARD:   I have been informed, and I am certainly willing to state, that yes, I understand the facts which are presented in that case are identical to these.

THE COURT:   You can have an exhibit, if you want, in here, or you can change it.  But it seems to me that you have done a pretty good job.

MR. GIRARD:   I didn't want the exhibit.  I just wanted to lodge that with the Court or stipulate that it go into evidence so that you would have official knowledge that that

1   Paul case is in the Supreme Court.

2       THE COURT:  When the Clerk gets back we will give it a

3   number and make it an exhibit.  I don't think this makes a

4   lot of difference.

5       MR. GIRARD:  I don't think so either, your Honor.

6       THE COURT:  We can probably put in a conclusion that

7   regardless of this question of exclusive jurisdiction, which

8   concerns police power, the Government has a right to use the

9   water that gets to the Enclave.

10      MR. GIRARD:  Yes, there is no question on that at all.

11      THE COURT:  That is the real meat of the coconut.

12      MR. GIRARD:  In this case I don't think the question

13  means anything at all, and there are conclusions which state

14  that the United States can use the water as it sees fit.

15      THE COURT:  What do you want to do, sit around and go

16  over this between yourselves?

17      MR. GIRARD:  I think maybe this morning, if your Honor

18  is so inclined, we might sit down and see where we could agree

19  to insert some of the language Mr. Veeder submitted, or vice

20  versa, into the more complete ones I have.  We might be able

21  to accomplish something this morning on that, and then come

22  back this afternoon and --

23      THE COURT:  Give me a chance to finish reading it.  As

24  far as I have gone, I have just these notes, if you will just

25  look:

On page 6, Paragraph 7, you still have that 60 per cent of the buildings.  Is it 60 per cent of the area, or the number, or the cost, or 60 per cent of what?

MR. GIRARD:  That is Mr. Veeder's finding.

What is it, Mr. Veeder?

MR. VEEDER:  The basis upon which we proceeded is 60 per cent of the water has been used outside the watershed of the Santa Margarita River within the Enclave, and we have proceeded on the basis that 60 per cent of the buildings and installations and water uses are outside the watershed.

THE COURT:  You state 60 per cent of the buildings.  Does this mean that you have counted the buildings, or does it mean 60 per cent of the area of the buildings, or 60 per cent of the cost of the buildings, or do you mean 60 per cent of the water use in the buildings?

MR. VEEDER:  I think we can say 60 per cent of the water use, 60 per cent of the buildings and installations are outside.

THE COURT:  Will you do something about that?

MR. VEEDER:  Yes.

THE COURT:  It is not right as it stands.

The next one I have listed is on page 9 and 10.  I thought you were going to do something about including the golf course.

MR. SACHSE:  It is not in the watershed.

1    MR. GIRARD:   That doesn't make any difference.

2    THE COURT:   You have a golf course.

3    MR. GIRARD:   Maybe we should add a golf course.

4    THE COURT:   No, you have it.  I looked for it before and

5    couldn't find it.  You have it under D on page 9.

6    MR. GIRARD:   Yes.

7    THE COURT:   All right.

8    MR. VEEDER:   I am looking up along the line of the water

9    uses, I don't see any reference here to using water for the

10    cleaning of vehicles, et cetera, et cetera, which is an

11    important water use.

12    MR. SACHSE:   Anything you want, add to it.

13    THE COURT:   On page 14 where you incorporate my pre-trial

14    opinion, the language sort of indicates that we are incorpora-

15    ting that part that concerns the meaning of the stipulation.

16    On page 14 you state "which in part concern the meaning,

17    application and scope of the stipulation referred to in

18    Finding of Fact 12 hereinabove."  And then you add the last

19    sentence.  I think probably there would have to be inserted

20    "and also contains various pre-trial rulings".

21    MR. SACHSE:   Just delete the "which in part".  Wouldn't

22    that do it?  The next sentence would be, "That to the extent

23    that said opinion is not inconsistent with any finding

24    entered herein, said rulings as are set forth in said opinion

25    are adopted herewith."

THE COURT:  My criticism is that it looks all we are interested in, in the opinion, is the interpretation of the stipulation, but there were also in the opinion various pre-trial rulings.  You could strike out "in part" and say "which concern the meaning, application and scope of the stipulation . . . and contain various pre-trial rulings".

MR. VEEDER:  After "hereinabove"?

THE COURT:  After "hereinabove".

That is about as far as I got in reading it.  So why don't you work on this and I'll be available.

(Recess.)

1   <u>SAN DIEGO, CALIFORNIA, TUESDAY, FEBRUARY 20, 1962, 1:30 P.M.</u>

2                          -oOo-

3     (Other matters.)

4     THE CLERK:  12-1247-SD-C United States vs. Fallbrook.

5     THE COURT:  Gentlemen, do you have any flow in the River

6 as a result of these rains?

7     MR. GIRARD:  The Colonel would know more about it than

8 all of us, I am sure.

9     COLONEL BOWEN:  The River, your Honor, has not been

10 remarkably great to date.  We have had no water past the

11 Basilone Ford at the ranch house.  We have been able to contain

12 it all in Lake O'Neill or an off-channel spreading basin with

13 very little being spread in the channel.

14     THE COURT:  Have you got Lake O'Neill full yet?

15     COLONEL BOWEN:  For all practical purposes, your Honor,

16 it is about six-tenths of a foot below the spillway level.

17     THE COURT:  What has happened at Vail Dam?  Any runoff

18 into the Dam?

19     MR. WILKINSON:  Yes, your Honor.  Nothing of consequence.

20 I would assume somewhere in the neighborhood of four or five

21 hundred acre feet.  There is a good stream coming into it.  I

22 was up there this morning.

23     THE COURT:  Apparently all these alluvial basins have

24 been filling up.  If we get another good rain in a week or

25 so, you ought to have a good runoff.

1    All right, we are ready to go, Mr. Veeder.

2    MR. VEEDER:  Your Honor, I would like to refer to page

3    3 and page 4 of Mr. Girard's.

4    THE COURT:  Mr. Clerk, Mr. Veeder filed some proposed

5    findings, and you should lodge the original and let me have

6    a copy.

7    While we are on that, I have in my files some other

8    matters that have been lodged, and I have copies.  I think

9    these lodged matters ought to stay in the Clerk's files.  It

10   doesn't make a lot of difference.  One is an old No. 30 that

11   has been lodged.  One is a No. 36, Warm Springs and Domenigoni

12   Valley.  And one is Part III of your continuation matter.  All

13   of those were lodged.  So I will hand them to the Clerk now.

14   MR. VEEDER:  Did you decide to mark the letter from the

15   Supreme Court?

16   THE COURT:  Yes, as an exhibit.

17   Mr. Clerk, we have a photostatic copy of a letter from

18   the Supreme Court, which it is agreed may be marked as

19   California's next exhibit in order.

20   THE CLERK:  California's Exhibit BA.

21   MR. VEEDER:  There is no objection.  It should be in

22   evidence.

23   THE COURT:  California's BA, copy of a letter from the

24   Supreme Court, received in evidence.

25

1 (The letter referred to was marked)
2 (California's Exhibit BA, and  )
  (received in evidence.    )

3  MR. VEEDER:  Your Honor, if you will turn to page 3,

4 Finding 3, under the heading of sovereignty, of Mr. Girard's

5 draft, you will find on that page and on the succeeding page

6 4 and on down through the top of page 5, reference to the

7 matter of the cession of exclusive jurisdiction.  Mr. Girard

8 has recited certain facts in there concerning which it is

9 necessary that I have the Navy Department personnel review,

10 check out and make the determination as to the real status

11 of this matter from the position of the Department of the Navy.

12 It is really not a matter that is under my control or juris-

13 diction.  I have discussed this with Mr. Girard and it is

14 amenable with him, and as I understand it is amenable with

15 Mr. Sachse, to hold this matter in abeyance until an

16 opportunity to review it in Washington.  Is that correct?

17  MR. GIRARD:  Yes, I have no objection.  I don't press

18 for the acceptance of this.  I think Mr. Veeder is entitled

19 to have this finding examined by the people who are really

20 concerned with this issue in Washington or wherever it has to

21 be.

22  THE COURT:  Subject to a check as to the facts shown

23 here, et cetera, don't you think Mr. Girard has handled it

24 fairly well, Mr. Veeder -- assuming these are all correct?

25  MR. VEEDER:  I would say that, assuming the facts recited

are correct -- I have no way of knowing -- I think he has
done well.  I would like, though, to raise the question whether
your Honor at this time feels that he would not enter a con-
clusion of law in regard to exclusive jurisdiction.

THE COURT:  Because of the pendency of the Paul case,
I think the way he handled it of retaining jurisdiction until
later at the request of anyone here or on my own motion enter
a supplemental finding and judgment, I think all we can do is
keep it open.

MR. VEEDER:  I think you are right.

THE COURT:  And I don't think if the Supreme Court finds
in the Paul case that there is not exclusive jurisdiction and
by the same facts here there would not be exclusive jurisdiction,
I don't think it changes your rights one iota.

MR. GIRARD:  I agree a hundred per cent with that.

MR. VEEDER:  Your Honor will understand, of course, that
both Mr. Girard and I have people looking over our shoulders
in this lawsuit and we simply have to keep the record straight.

THE COURT:  But this matter of keeping it open and when
the Supreme Court decides, if our set of facts is identical
with the Paul case, and it becomes the law of the land, we do
whatever is proper.  Maybe some further steps are taken and
we may reach a different result.

MR. GIRARD:  I'll wager that when that happens neither
one of us will move to have anything done on that.

1    THE COURT:   What is the next matter?

2    MR. GIRARD:   We can do it in either one of two ways,

3 your Honor.   We are coming back on the 6th.   I would like to

4 go through these findings insofar as possible and iron out

5 any objections which anyone may have to them, so that we can

6 proceed along and see if we can get this Military Enclave

7 'indings ready for final approval right after the March 6th

8 week of hearings.   My experience has been, in all sincerity,

9 that we get further along if we just go through each one

10 individually and discuss them.   I don't know whether anyone

11 else agrees with me.

12    THE COURT:   Do you want now to go through them line by

13 line?  Or do you want you and Mr. Veeder and Mr. Sachse to

14 go over some of them?

15    MR. VEEDER:   We had  just started to go through these,

16 the three of us, when the man started in from outer space,

17 so we might do that the rest of this afternoon.

18    THE COURT:   How would we make better time?

19    MR. GIRARD:   As we go along here, your Honor, I know that

20 we are going to run into things that your Honor is going to

21 have to decide one way or the other.   There is no question.

22 There are some additions that we can just point out as we go

23 through them and add them on to the particular finding in the

24 one I drafted.   I don't visualize a great deal of difficulty

25 in any of the provisions that I have examined of Mr. Veeder's,

1    but there are some in mind which may very well, based on

2    experience, have to be settled over the table.  I don't care

3    one way or the other.

4         MR. VEEDER:  Your Honor, I tried to set up on the first

5    16 pages that I tendered to your Honor what I thought would be

6    the physical situation generally in regard to the location

7    of the lands, the course of the stream, the alluvial fill,

8    the alluvial deposits in the De Luz Creek and in Fallbrook

9    Creek.

10        THE COURT:  To read these intelligently, I have to

11   relate them to the findings that Mr. Girard has proposed.

12   Now can you tell me what ones they relate to?

13        MR. VEEDER:  Yes, you will find that we have marked them

14   on, for example -- skipping over the first three pages, your

15   Honor, which is a description of the lands concerning which

16   we are obtaining additional information for further clarifica-

17   tion -- the first three pages are a simple recitation of

18   acquisitions, the date of acquisition, where those documents

19   are recorded and the matters concerning which there is no

20   conflict.  I think that is true on page 3, because Mr. Sachse

21   pointed out on page 3, lines 16, 17 and 18, that we allude

22   to the 1574.61 acres which were transferred from the public

23   domain.  I have asked for a precise -- it will be a metes

24   and bounds description -- from Colonel Bowen's office, which

25   will be substituted there.  That kind of thing I don't believe

1    your Honor desires to take time on.  I don't believe there is

2    any conflict on any of that.

3        I can point out some changes that may be of interest to

4    everyone as we go along.  You will find that you have taken

5    the original Finding No. 1-C and have taken several pages in

6    which to describe the Santa Margarita River within the Naval

7    Enclave.

8        THE COURT:  Let's go back.  Your Finding 1-A is the same

9    as Mr. Girard's 2.

10        MR. GIRARD:  That is correct, your Honor.

11        THE COURT:  And your Finding 1-B, exclusive jurisdiction,

12    what does that correspond to?

13        MR. GIRARD:  That corresponds to my No. 3, your Honor,

14    although it doesn't correspond -- I treated it a little bit

15    differently.

16        MR. VEEDER:  It is the same subject matter.

17        MR. GIRARD:  It is the same subject matter.

18        MR. VEEDER:  I think "exclusive jurisdiction" is more

19    indicative than "sovereignty."

20        MR. GIRARD:  Any time you want to change the titles, it

21    doesn't bother me, Bill.

22        THE COURT:  Then your 1-C, the description of the River,

23    is Mr. Girard's No. 4.

24        MR. GIRARD:  That is right.

25        MR. VEEDER:  That is right.  And here is what we have

done in that regard.  What was originally set forth in what is Mr. Girard's Finding No. 4 was the stream down to or immediately below De Luz Creek.  It occurred to me that by consolidating all the descriptions of the stream we could probably do a better job.  You will observe that on page 5 I have consolidated California's Finding No. 10 into the descriptions, also part of California's No. 3.

THE COURT:  You are talking about yours?

MR. VEEDER:  My page 5.

THE COURT:  And this is your 1-C?

MR. VEEDER:  That is correct.

THE COURT:  So this is part of Mr. Girard's 4.

MR. VEEDER:  If you will go to line 11, on page 5, you will see reference "Part of California's Finding 3".

THE COURT:  Is that present 3?

MR. VEEDER:  No, there was a form from which I was working originally, your Honor.

THE COURT:  To what finding does it refer now?

MR. GIRARD:  It refers to No. 4, your Honor, but I think Mr. Veeder has actually treated it better than I have.  I would be very agreeable -- some of my 4 is repetitious of what he has set forth, but just take all of his 1-C and substitute it for my 4.

MR. SACHSE:  I think it is a good idea, your Honor.  If we are going to do that, though, there are a  couple of

1   specific questions on 1-C.

2       MR. VEEDER:  I may be able to be of some assistance on

3   some of that.  For example, we entered, on page 4 lines 27 and

4   28, reference to the diversion works for the United States

5   Naval Ammunition Depot.

6       MR. SACHSE:  That is right.

7       THE COURT:  Yes.

8       MR. VEEDER:  If you will turn to page 5 you will observe

9   that on line 24 we refer to Fallbrook Creek.  We start at the

10  bottom with Lake O'Neill and then say "Fallbrook Creek flows

11  northwesterly . . "  I am going to have to check out that

12  Section 18 and the point where the stream rises, because it

13  is not entirely clear to me which of the tributaries give rise

14  to Fallbrook Creek.

15      MR. SACHSE:  Also I have a question mark on your direction.

16  It flows northwesterly and then southwesterly and meanders

17  all around.  But these are minor things.

18      MR. VEEDER:  That is what I said, Mr. Sachse.  I want to

19  check out the whole question where Fallbrook Creek arises.

20  Colonel Bowen will supply me with that and that will be re-

21  vised to take care of it, your Honor.

22      MR. SACHSE:  I have another question.  Is this appropri-

23  ate at this time in connection with 1-C?

24      THE COURT:  Yes.

25      MR. SACHSE:  I don't know whether "gallery" means

19,045

1    anything to me.  I am speaking now of this diversion works

2    on page 4.  Or whether you want more detailed explanation of

3    what it is.

4         MR. VEEDER:  We can describe that.  It is in the record

5    with a great deal specificity.  We have a picture of it.

6         MR. SACHSE:  I am aware of it.  I am just calling this

7    to his Honor's attention.  It doesn't bother me.  Is it worth-

8    while?  I don't ask for this.  I just point this out, your

9    Honor, that this may or may not be clear.

10        THE COURT:  You say "across the bed of the Santa

11   Margarita River".  As I recall the evidence, this gallery is

12   a structure down in the alluvial fill.

13        MR. SACHSE:  Yes, your Honor.

14        THE COURT:  It does not go to bedrock.

15        MR. SACHSE:  It is an underground horizontal well is

16   what I used to call it.

17        MR. VEEDER:  There is a well at the south end of it.

18   However, I have a complete description of it and I will write

19   it in.

20        MR. GIRARD:  Perhaps Colonel Bowen can describe it for

21   us.

22        COLONEL BOWEN:  It is an infiltration gallery that

23   consists of a pipeline laid normal to the stream bed

24   approximately on bedrock which discharges into a well at the

25   southerly end, from which water is pumped.

1   THE COURT:  Is there a little dam across there that goes

2   to bedrock?

3   COLONEL BOWEN:  No, sir.  The dam just downstream from

4   the point of diversion merely impounds surface flow, so that

5   during the dry period of the year there is certain water

6   there that seeps down through the alluvial fill into this

7   gallery.

8   THE COURT:  So this is a buried pipe?

9   COLONEL BOWEN:  Yes, your Honor.

10  THE COURT:  This gallery is just a buried pipe.

11  COLONEL BOWEN:  Yes, sir.

12  MR. VEEDER:  We intend subsequently to describe with

13  some particularity the kind and type of structure used to

14  supply water to the Naval Ammunition Depot, because I think

15  there are legal questions that are going to stem from it.

16  MR. GIRARD:  The main thing I want, in asking the question,

17  is to get enough facts to actually write the thing, because I

18  would like to get this in final shape on the 6th, if at all

19  possible.

20  MR. VEEDER:  The facts are in the record.

21  THE COURT:  Can you supply a short description to Mr.

22  Girard in place of the word "gallery"?

23  MR. VEEDER:  Yes -- in addition to the word "gallery".

24  THE COURT:  Yes.

25  Do I understand that you also want to talk about your

works that lead from this gallery to the Ammunition Depot?

MR. VEEDER:  I would like to, because I think they are important.  We have a reservoir containing a million gallons that has to be maintained full for the purpose of fighting fire, and I think that is a use that has to be described.

From these findings I have set up here I have simply undertaken to run through the physical location and locate the particular structures which relate to the Santa Margarita River.  That is the extent of it.

THE COURT:  When are you going to submit this description of the tank?

MR. VEEDER:  I will have the whole thing.

THE COURT:  When?

MR. GIRARD:  When?  Do you know?

MR. VEEDER:  I will have it by March 6th for sure.

THE COURT:  That doesn't do a lot of good, if we can get it sooner.

MR. VEEDER:  I'll try to get it for him tomorrow, your Honor.

THE COURT:  All right.

MR. SACHSE:  The only other suggestion is that somewhere else -- I can't put my hand on it -- in Mr. Girard's that we have referred to the O'Neill Interlocutory Judgment.  I think it would be wise in this Lake O'Neill diversion works section to likewise refer to the separate interlocutory judgment.

That is all in connection with 1-C.

MR. VEEDER:  You will observe that there is a total consolidation of the entire --

THE COURT:  Has anybody checked out these section numbers?

MR. VEEDER:  I have had my office check them out.  I assume they are right.  But I am referring them to Colonel Bowen for final check.

THE COURT:  I think you are going to make better time if you sit down and try to work out some of these things.  But let's go through with other suggestions that you have.

MR. SACHSE:  It gets hard to try to compare now because here Mr. Girard's physical structure differs from Mr. Veeder's. It is hard to compare them item for item.

MR. VEEDER:  I have undertaken to cover every point that Mr. Girard had previously undertaken, wherever they were situated in his original draft, and I have sought to bring together all data in regard to the alluvial fill, the movement of water --

THE COURT:  Let's see if we can identify some of them.

MR. SACHSE:  No. 2 of Mr. Veeder's on page 7 is the last sentence of Mr. Girard's No. 4.  In other words, they are practically identical word for word.

MR. GIRARD:  That is right.

MR. SACHSE:  Then Mr. Girard goes off to riparian lands, and Mr. Veeder doesn't come to that until later, I guess.

MR. VEEDER:  That is right.  Colonel Bowen has written the full description, which I have just received this morning, describing with particularity, metes and bounds, the watershed line within the Enclave.

MR. GIRARD:  Will that be a separate exhibit?

MR. VEEDER:  No, I will set that out as a finding together with language in regard to the riparian acreage.

MR. GIRARD:  Is this particular metes and bounds description of Colonel Bowen's the metes and bounds description of the land within the watershed, including everything within the watershed?

MR. VEEDER:  Within the watershed of the Enclave, yes.

MR. GIRARD:  Let me ask you another question.  Maybe Colonel Bowen will want to answer it.  Is everything within the watershed riparian to the Santa Margarita?

COLONEL BOWEN:  No.

MR. GIRARD:  It is not.

MR. VEEDER:  Roblar and De Luz Creek, which are going to be separately described in the proposed findings, are not treated within the 38,000 plus acres of riparian land to the Santa Margarita River.

MR. GIRARD:  Well, let me ask you this, then.  Is the 38,031 acres all of the land within the Military Enclave within the watershed of the Santa Margarita River?  Or is there more land within the watershed of the Santa Margarita

19,050

1    River than the 38,031 acres?

2        MR. VEEDER:   I will supply you with the total later this

3    afternoon.

4        MR. GIRARD:   I don't care.   Somewhere along the line,

5    though, Colonel Bowen or you will supply me with those lands,

6    some reference either by specific description or reference,

7    to show which lands are riparian to the Santa Margarita River.

8        MR. VEEDER:   We will do that.

9        MR. GIRARD:   I will certainly accept anything you say.

10   That can be worked out, I think.

11       THE COURT:   This metes and bounds description the Colonel

12   is going to work out.

13       MR. VEEDER:   It has been worked up, your Honor.

14       THE COURT:   It takes a number of pages?

15       MR. VEEDER:   That is correct.

16       MR. GIRARD:   Yes.

17       THE COURT:   Do you want it as an exhibit to this, or do

18   you want it in the body of this?

19       MR. VEEDER:   I don't know how you feel about it.   I

20   think the fewer exhibits attached to the findings the better.

21   If we set out this description as a finding, it will be better.

22       THE COURT:   It is all right with me.

23       MR. VEEDER:   It will eliminate the incorporation by

24   reference of a map.   We will refer to a map, but we will have

25   the precise description contained in the finding itself.

MR. GIRARD:  I have no objection.

MR. VEEDER:  We will do the same with Roblar Creek, and we will do the same thing with regard to De Luz Creek.

THE COURT:  That is all right.

MR. VEEDER:  Roblar is a tributary of De Luz Creek.  It will flow largely within the Enclave.

THE COURT:  I think you will make better time if you sit down and start to work out some of these problems.  I want to read these.  I haven't gone all the way through them yet.  If you have certain things that you would like to talk about I'll be available.

MR. SACHSE:  I would like to do that, but I would like to offer this suggestion.  I think it would make our work easier.  The only set purporting to be complete is Mr. Girard's.  Mr. Veeder's doesn't follow from here on.  I would like, if we can, to work off the Girard set.

THE COURT:  Let's work off of Mr. Girard's set.

MR. SACHSE:  And incorporate into this.

THE COURT:  Let Mr. Veeder point out to you where these various findings would come and check whether they are covered and use the Girard set.  I understand that we have already agreed, however, that we are going to use Mr. Veeder's 1-C.

MR. GIRARD:  Yes, I will just substitute that in the new draft for my No. 4.

19,052

THE COURT:  Why don't you go through and do that?  You can do it a lot easier, and give me time to read this.

MR. GIRARD:  We can do that this afternoon.

THE COURT:  Go to work.  I want to read your conclusions of law.

MR. GIRARD:  I have no objections to the conclusions.

THE COURT:  Is that all right?

MR. VEEDER:  That is all right with me.

THE COURT:  Take the Girard draft and work with it.  Take out of it or add to it from material that you have, and then list your matters of dispute, and I'll see you any time this afternoon that you want to see me.

MR. GIRARD:  It may take us pretty much the rest of the afternoon.

THE COURT:  All right.  If not, we will meet tomorrow morning at 10:00 o'clock.

(Adjournment until Wednesday, February 22, 1962)
(                                                      )
(at 10:00 o'clock A.M.                                 )

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                Defendants.     )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, February 21, 1962

- - -

APPEARANCES:

    For the Plaintiff:        WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney General

                                    CDR. DONALD W. REDD

    For the Defendants:

      Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
      District, et al.,:

      State of California:      FRED GIRARD, ESQ.

SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 21, 1962, 10:00 A.M.

-oOo-

THE COURT:  Did you all get copies of this index, for whatever it is worth?

MR. GIRARD:  I did, your Honor.

MR. VEEDER:  Yes, your Honor.

Are you ready to proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  The matter of water duty in the Murrieta-Temecula ground water area  came up yesterday, as you will recall.  I have undertaken to prepare language which would be attached as the first page of Exhibit H.  Copies have been submitted to counsel and to Mr. Wilkinson for the Vail Company.

THE COURT:  I don't know where you got the language "There are occasional rain showers during the irrigation season roughly from April through October".  If it ever rains between April and October in California --

MR. VEEDER:  I believe that is Colonel Bowen's testimony in regard to that area, your Honor.

THE COURT:  I'll stand corrected.  You might in April and May get a shower.  What about it, Mr. Wilkinson?

MR. WILKINSON:  We occasionally get some little local thunder showers in the summertime.  I would say once every five years we will have a thunder shower right in the middle of the summer.

1    MR. VEEDER:  Well, I say "there are occasional showers".

2    THE COURT:  All right.

3    MR. VEEDER:  I'll be glad to take it out.

4    THE COURT:  No, I don't care.

5    Any objection to attaching it as a part of Exhibit H?

6    MR. GIRARD:  Not on my part, your Honor.

7    MR. SACHSE:  Not on my part.

8    THE COURT:  Do you have an extra copy of it?

9    MR. VEEDER:  Yes, your Honor.

10    THE COURT:  This matter on the bottom, I suppose, should

11   come off of it, shouldn't it?

12    MR. GIRARD:  What is that?

13    THE COURT:  Just identification, Interlocutory Judgment

14   No. 30.  It doesn't make any difference.

15    MR. VEEDER:  That is how Exhibit H is prepared, your

16   Honor.

17    THE COURT:  Exhibit H is in evidence already.

18    MR. VEEDER:  Exhibit H-2 Interlocutory Judgment No. 30

19   is what we are talking about your Honor.

20    THE COURT:  Exhibit H is one of our exhibits in the case,

21   isn't it?

22    MR. VEEDER:  No; it is an exhibit to the Interlocutory

23   Judgment.

24    THE COURT:  Oh, it is.

25    MR. VEEDER:  Yes.

THE COURT:  I see.  Then you take care of it.

MR. VEEDER:  Yes, your Honor.  It is not an exhibit in the case.

THE COURT:  Did you see the Fallbrook Enterprise?

MR. VEEDER:  No.

MR. GIRARD:  No.

MR. SACHSE:  I haven't seen it this morning.

THE COURT:  "De Luz group organizes mutual water district." I'll give you the clipping.

MR. VEEDER:  Thank you.

MR. SACHSE:  I am aware of it, but I haven't seen it.

THE COURT:  What day does that come out?

MR. SACHSE:  It is usually Thursday, but because tomorrow is a holiday he undoubtedly brought it out a day early.  I imagine it was mailed last night.  It would be on the newsstand in Fallbrook this morning.

THE COURT:  Here it is, Mr. Veeder.

MR. VEEDER:  Thank you.

I talked to counsel for the State Water Rights Board yesterday, and this morning received a letter from him, giving the name of this group and stating the application had been filed for 12,000 acre feet.

MR. GIRARD:  How many were there, other than that 12,000, do you know?

MR. VEEDER:  There is one for 12,000 which was filed on

the 19th.  Previous to that there had been a filing by several

people for 1250.

MR. SACHSE:  That is Garnsey, Bleeker and others.

MR. VEEDER:  Bleeker, that is correct.  Then there had

been one that had been previously filed by Garnsey.

MR. SACHSE:  That is a smaller one, about 45 acre feet.

MR. VEEDER:  I believe it is 45 acre feet.

MR. SACHSE:  Then there is a Matthews filing on 50.

MR. VEEDER:  No reference was made to that.

MR. SACHSE:  It is filed, I know that.

MR. VEEDER:  Mr. Craig, the counsel, submitted it to me

and said these are all that are involved.  I have his letter

in my office.

MR. SACHSE:  It was filed in Los Angeles two weeks ago.

MR. GIRARD:  I will check on it.

MR. VEEDER:  Would you check on that, Mr. Girard, because

I talked to Mr. Hill this morning on this matter and he has

agreed for a time so that we can investigate these filings

that are being made.

THE COURT:  I understand you are going to rearrange this.

MR. GIRARD:  We have some almost total rearranging in

order, and some substantive changes, and quite a few incor-

porations of Mr. Veeder's language into specific ones.

THE COURT:  I am just going to cut up my copies.

MR. GIRARD:  I think you might as well, your Honor.

THE COURT:  So how do we start?  Is this where we want to start this morning?

MR. GIRARD:  As far as I am concerned, I think it would be advantageous to just start right at 1 and go through and we can all point out changes we have agreed to and the incorporations that are okay and proceed accordingly.

THE COURT:  All right.

MR. GIRARD:  No. 1 -- by the number I will refer to my draft -- is satisfactory, except on page 3, lines 9 through 11, Mr. Veeder is going to supply a new description.

MR. VEEDER:  That is correct.

MR. GIRARD:  No. 2.  There are some changes.  It will read as follows:   "The lands referred to above, constituting 9,147.55 and 123,620 acres were acquired"; so you would scratch out "U.S. Naval Ammunition Depot, Camp Pendleton and U.S. Naval Hospital," and substitute instead the 9,147.55 and the 123,620 acres.

MR. VEEDER:  Would it not be simpler to say 9147.55 constituting the Ammunition Depot and 123,620 acres constituting Camp Pendleton?

MR. GIRARD:  It would for the Ammunition Depot, Mr. Veeder, but the 123,620 does not constitute Camp Pendleton in its entirety.

MR. VEEDER:  But that 123,620 acquired from the Rancho Santa Margarita would do it.

1    MR. GIRARD:  I'll see if I can redraft it along the lines

2  suggested by Mr. Veeder.

3    THE COURT:  Other than that it is okay.

4    MR. GIRARD:  Those are the only two acquisitions which

5  were in this category.

6    THE COURT:  Okay.

7    MR. GIRARD:  No. 3 is okay, at least no one has any

8  changes to make, except Mr. Veeder is given the privilege,

9  as far as the State is concerned, to take this finding back

10  to Washington and check it out and see if it satisfies the

11  people back there.

12    THE COURT:  All right.

13    MR. VEEDER:  You are going to change "sovereignty" to

14  "exclusive jurisdiction".

15    MR. GIRARD:  Yes, if you want to do that, change the

16  term "sovereignty" to "exclusive jurisdiction" on the heading.

17    I might add that I have no pride of authorship on these

18  headings.

19    THE COURT:  I think they are very helpful.

20    MR. GIRARD:  My draft shows that after 3 we will insert

21  5, 6, 7, 8, 9, 10 and 11 of mine.

22    THE COURT:  Your 4 comes out then.

23    MR. SACHSE:  No. 4 is subsequently to be replaced by

24  Mr. Veeder's 1-C, but it goes in after Mr. Girard's 5, 6, 7

25  and 8.

19,060

MR. GIRARD:  5, 6, 7, 8, 9, 10 and 11 of my draft would go in after my 3, your Honor.

THE COURT:  For the time being we are leaving the numbers as they are.

MR. GIRARD:  As soon as I can get back I will draft up another draft, so it will be this way, and send it down.

THE COURT:  Now we are starting with your 5.

MR. GIRARD:  That is right.  The only problem with 5 is on line 10, after the word "watershed" put a period and strike the rest.  And Colonel Bowen is going to check the figure 38,031 and let me know.

THE COURT:  6.

MR. GIRARD:  On 6 there are no changes submitted.

7 is changed so it will read as follows:  "Sixty per cent of the water use of the Santa Margarita River waters within the Naval Enclave is used in or at or upon facilities, buildings and installations . . "

THE COURT:  And the rest reads the same.

MR. GIRARD:  Yes.  I am just reading it -- ". . which were planned, constructed and located . . "

MR. VEEDER:  By the United States of America.

MR. GIRARD:  All right "by the United States of America outside of the watershed of that River".

THE COURT:  So that line 27 practically comes out entirely.

MR. GIRARD:  Line 27 comes out entirely.

19,061

THE COURT:  I have it.

Is that agreeable Mr. Veeder?

MR. VEEDER:  I think that is correct, yes.

THE COURT:  8.

MR. GIRARD:  On 8 there are no changes submitted.  Mr. Veeder did want to look it over and decide whether he wanted to add anything to it or not.  I might add that 8 is taken word for word from the stipulation as to the uses.

9.  Colonel Bowen is going to check out these figures for their accuracy, and also on line 22 the figure 106,000 should be inserted in the blank space.

THE COURT:  106,000?

MR. GIRARD:  I believe that is correct.

MR. VEEDER:  That is correct.  I have made the point, your Honor, that averages are not the thing that concerns the United States in operating a military base like Camp Pendleton.  Maximums are the important things, from the standpoint of water use.

THE COURT:  All right.  So 9 looks okay except for checking.

MR. VEEDER:  We are going to run it through.

MR. GIRARD:  Yes.

10.

THE COURT:  Where does your 4 come in?

MR. GIRARD:  4 comes after 11.

19,062

THE COURT:  10.

MR. GIRARD:  10 has no changes that I know of.

MR. VEEDER:  I am going to add "washing motor vehicles".

MR. GIRARD:  What would that be, hh?

MR. VEEDER:  I don't care where it comes in.  But it is a matter of importance.

MR. GIRARD:  Vehicle washing facilities?

MR. VEEDER:  Yes.

THE COURT:  hh.

MR. VEEDER:  That would be on 10, line 5.

THE COURT:  All right, vehicle washing facilities.

MR. GIRARD:  11 has no changes.

Now we drop back to 4.

THE COURT:  We cut off at 12.

MR. GIRARD:  That is right.  Just drop out my entire 4 and use Mr. Veeder's 1-C, which commences in the middle of page 4 of his February 20, 1962 draft.

THE COURT:  Where does it begin?

MR. GIRARD:  In the middle of the page.  This is referring to his draft.  It begins actually on line 18, page 4, of his draft.

MR. VEEDER:  You have asked for a more complete description of the gallery.

MR. GIRARD:  That is right.

MR. VEEDER:  That will be prepared.

1    Mr. Sachse desires to have a reference to the interlocu-

2  tory judgment in regard to Lake O'Neill.  That would appear

3  on page 5.

4    MR. GIRARD:  Yes.

5    On line 31, page 4, there is a reference to the term

6  "gallery," which Mr. Veeder or Colonel Bowen will supply some

7  language to describe specifically.

8    THE COURT:  They will send that up to you so you can get

9  it in this draft.

10    MR. GIRARD:  I hope they can, your Honor.

11    MR. VEEDER:  Yes.

12    MR. GIRARD:  Somewhere around line 23 and line 24, some-

13  where in that general area on page 5, there will be just a

14  general statement that Lake O'Neill has been considered in

15  detailed findings, conclusions and Interlocutory Judgment No.

16  24 and just a reference to that without incorporating it.

17    THE COURT:  How far down do we go, page 5 or 6?

18    MR. GIRARD:  We will go all through 5, 6, down through

19  the end of page 6.

20    MR. VEEDER:  May I go back once more?  We are going to

21  submit an additional description of Fallbrook Creek, which

22  would appear on page 5, line 24.

23    MR. GIRARD:  There is one thing there that I probably

24  should have caught.  What page?

25    MR. VEEDER:  Line 24 on page 5, "Fallbrook Creek flowing

northwesterly . . " We will give you a more complete description.

MR. GIRARD:  I think in this finding we ought to refer to De Luz Creek and Fallbrook Creek just at their point of confluence with the Santa Margarita River to show the point of confluence, and then in the detailed findings concerning De Luz and Fallbrook Creek we can give an adequate description of it.

MR. VEEDER:  If you want to do that.  Why don't you say, on line 24, "Fallbrook Creek flowing northwesterly has its terminus in Lake O'Neill, an artificial body of water"?

MR. GIRARD:  Fine.

MR. VEEDER:  Then your page 5 is taken care of.

THE COURT:  All right.  Strike out a lot of this material so that it will read "Fallbrook Creek flowing northwesterly has it terminus in Lake O'Neill, and artificial body of water," and then you could add right there your language --

MR. VEEDER:  I think the stream goes southwesterly just before it comes into the Lake, but that Fallbrook Creek flowing southwesterly at its terminus.

MR. GIRARD:  All right.

THE COURT:  Then right after Lake O'Neill make reference to the fact that Lake O'Neill is covered by Interlocutory Judgment No. so and so.

MR. VEEDER:  Yes, we will do that.

MR. GIRARD:  I might also point out on page 6, lines 3 through 6, there is a general reference here to "the alluvial filled valley is not a basin".  That is going to be probably stricken from this finding and it will be in Finding 20, which will be discussed later, where I can incorporate my language and a good deal of Mr. Veeder's specifically concerned with this alluvial deposit.

MR. VEEDER:  That is all right with me.

MR. GIRARD:  Because this Finding 4 is in the nature of a surface stream description.

THE COURT:  And we, of course, strike the asterisk in the Government's reservation.

MR. GIRARD:  Yes.

THE COURT:  Then we go to 7.  Take all of page 7?

MR. GIRARD:  No.  Before 4 we took 5, 6, 7, 8, 9, 10 and 11, which have already been inserted after 4.

THE COURT:  Which 4?

MR. GIRARD:  My 4, which is Mr. Veeder's 1-C.

MR. VEEDER:  The Court inquired, though, do we wind up at the bottom of page 6 with your statement "surface stream of the Santa Margarita River"?

MR. GIRARD:  Yes.

MR. VEEDER:  I would like to see you add on there 2 and 3 on page 7.

MR. GIRARD:  Yes, you are right, Finding No. 2 will be

1   included at the end of 1-C of Mr. Veeder's.

2   THE COURT:  In other words, we take Mr. Veeder's material

3   on pages 5 and 6 and down to line 14 on page 7.

4   MR. GIRARD:  No, down to line 7, the language in Finding

5   No. 3 which says that they can use their water any way they

6   want, which is taken care of in other specific findings detailed

7   with the pumping.

8   THE COURT:  Then we just take down to line 7.

9   MR. GIRARD:  Down to line 7.

10   THE COURT:  All right.

11   MR. GIRARD:  After Finding 4 of mine, which is really

12   Mr. Veeder's 1-C, and Finding No. 2 --

13   THE COURT:  So your 4 is eliminated.

14   MR. GIRARD:  My 4 is out and Mr. Veeder's 1-C plus

15   Finding No. 2, with some minor changes which I have already

16   mentioned, would be substituted for my 4.

17   THE COURT:  All right.

18   MR. GIRARD:  After that we would insert as the new No.

19   5 my 17.

20   MR. VEEDER:  Let me get back on the sled.

21   THE COURT:  Wait a minute.  New No. 5 -- we don't know

22   what the new numbers will be.  You have a lot of them in there.

23   MR. VEEDER:  My notes show that after your 4 we have 17,

24   18, 19, 20, 21, 22, 23.

25   MR. GIRARD:  That is right.  I was going to go through

1      specifically, though.

2           THE COURT:  We are going to go now to 17.

3           MR. GIRARD:  Yes, we are skipping to 17.

4           THE COURT:  I am now to Mr. Girard's 17, surface flow

5      of the Santa Margarita River.  All right.

6           MR. GIRARD:  My 17 is okay.

7           THE COURT:  Is that right, Mr. Veeder?

8           MR. GIRARD:  At least there are no suggested changes.

9           MR. VEEDER:  Yes.

10          MR. GIRARD:  My 18 follows, and there were no suggested

11     changes in that.

12          My 19 follows.  Mr. Sachse suggests a change, which would

13     occur on line 26.  There would be a period after the word

14     "Enclave," and strike the rest of the sentence.

15          THE COURT:  All right.

16          MR. VEEDER:  On this 17, 18 and 19, I want to review it

17     carefully again.  I may have suggestions on this, your Honor,

18     particularly on that part that Mr. Sachse just made reference

19     to.

20          MR. GIRARD:  20 has some substantial changes.

21          THE COURT:  Girard's 20 you are talking about?

22          MR. GIRARD:  Yes, my 20 follows my 19.

23          THE COURT:  What are the changes?

24          MR. GIRARD:  Line 30, page 16, it will read "That

25     commencing at a point" and then insert "on the Santa Margarita

River just upstream," cross out the word "the" and substitute
"its," and then after the word "confluence" strike "of" and
insert the word "with," and after "De Luz Creek" strike out
"with the Santa Margarita River".

THE COURT:  All right.

MR. GIRARD:  On page 17, line 12, strike "are not uniform
in area" and substitute "vary in width".  Then on line 17
after the period following "units" strike the rest of my
paragraph down through line 21 and insert instead of that
paragraph Mr. Veeder's Findings No. 6, 7 and 8, which are on
page 8 of his February 20, 1962 draft.

THE COURT:  Actually, going over to yesterday, I had
marked these three as being proper, except that you notice
you have acreage and area in miles.  But I guess it doesn't
make any difference.

MR. GIRARD:  Does 4600 acres roughly compare with 7 square
miles, Colonel?

COLONEL BOWEN:  Roughly.

MR. GIRARD:  Just so long as we are consistent.

THE COURT:  Now what?  Start on your page 17, Mr. Girard?

MR. GIRARD:  We can go over to page 18, and my lines 8
through 14 would be deleted and we would substitute Mr. Veeder's
Finding 15.

MR. SACHSE:  With one slight correction.

MR. GIRARD:  Yes.

1       THE COURT:  This is very interesting.  I have a note here

2   "Strike your paragraph beginning line 8.  Use Mr. Veeder's

3   No. 7 and 8 and Veeder's No. 15".

4       MR. GIRARD:  Well, we are thinking alike.

5       THE COURT:  You have already used Mr. Veeder's 7 and 8.

6       MR. GIRARD:  We just used Mr. Veeder's 6, 7 and 8.  Now

7   we are using his 15 in this.

8       THE COURT:  All right.

9       MR. GIRARD:  Now there is a change on Mr. Veeder's on

10  page 12, Finding No. 15 of Mr. Veeder, where it says "usable

11  storage capacity for each sub-basin" add the word

12  "approximately as follows," and then on line 15 after the

13  words "Ysidaro Basin" where it says "without salt water

14  intrusion" that language "without salt water intrusion" should

15  be stricken.

16      THE COURT:  I also thought that his 16 was usable.  Are

17  you going to use it somewhere else?

18      MR. GIRARD:  There is a Finding No. 20.

19      THE COURT:  Your finding?

20      MR. GIRARD:  No, it is Mr. Veeder's finding.  When we

21  come to that I think we are going to have some discussion on

22  that.

23      THE COURT:  I have a note here that your 20 had some of

24  this same material that Mr. Veeder's 15 had.

25      MR. GIRARD:  That is right.  We are taking Mr. Veeder's

15 and adding it to mine.

THE COURT:  I see.  All right.

MR. GIRARD:  In other words, my 20 is the one we have just been talking about, where we have added Mr. Veeder's 15 instead of my lines 8 through 14 on page 18.

THE COURT:  All right, we have taken Mr. Veeder's 15.

MR. GIRARD:  With those two minor changes, yes.

THE COURT:  And hooked it onto your --

MR. GIRARD:  To the bottom of my 20.

THE COURT:  To the bottom of your 20.

MR. GIRARD:  So my 20 will actually include Mr. Veeder's 6, 7, 8 and 15.

THE COURT:  Where does your 21 start?

MR. GIRARD:  We are going to skip 21.

THE COURT:  All right.

MR. GIRARD:  I think I made a mistake, your Honor.

MR. SACHSE:  I think you did too.

MR. GIRARD:  I did make a mistake.  After my 19 we skip 20, the one I am talking about here -- we have already been all over the corrections and I can show you where to add it -- we skipped 20.

THE COURT:  We took your 18, 19 and 20.

MR. GIRARD:  Yes, we did, but I did it wrong.  It is in the wrong order.  All of the corrections I think we have made on 20 I think are proper, but we should insert after 19 my

22 and my 23, on which there are no changes, and then my 20.

THE COURT:  All right.  So after your 19 --

MR. GIRARD:  Yes, it goes to my 22.

THE COURT:  We follow your 19, Mr. Girard, with your 22 and 23.

MR. GIRARD:  Yes.  And then No. 20 as corrected with Mr. Veeder's additions, the one we have been talking about.

Then my 21.

THE COURT:  Your 20 follows --

MR. GIRARD:  Yes, my 20 follows 23.

THE COURT:  All right.

MR. GIRARD:  With Mr. Veeder's additions.

THE COURT:  Mr. Veeder's 6, 7 and 8 added.

MR. GIRARD:  Plus 15, which will be inserted into the body of my 20 at the spots indicated.

THE COURT:  Plus his 15.

MR. GIRARD:  Yes.

THE COURT:  His 15 goes at the end of what was your 20.

MR. GIRARD:  That is correct, instead of the last paragraph of my 20 we substitute Mr. Veeder's 15.

THE COURT:  I have that.

MR. GIRARD:  Then comes my 21.  No changes on that.

THE COURT:  I have a question on that one.

MR. SACHSE:  I am trying to keep a double running check as Mr. Girard is talking, checking off the paragraph numbers

1  in his present one and making a new list of the exact order

2  in which they appear.

3       THE COURT:  I am cutting them up and making a set right

4  here.

5       MR. SACHSE:  Between us we ought to work it out.

6       THE COURT:  We will have a double check on it.

7       I am looking at your 21; at lines 30 and 31, "that in

8  the most westerly or downstream portion of the younger

9  alluvial deposits and below the Ysidaro Narrows, which is

10 located in Section 10, there are within said younger alluvial

11 deposits, deposits of fossil shells . . "  Does the evidence

12 show that those fossil shells appear below Ysidaro Narrows,

13 or do some of them appear --

14      MR. VEEDER:  Some of them appear above.

15      THE COURT:  -- slightly above?

16      MR. GIRARD:  Slightly above?

17      MR. VEEDER:  I would like to verify it, but I am sure

18 that that is the situation.

19      MR. GIRARD:  I'll check that out.  Below and slightly

20 above.

21      MR. VEEDER:  Why not say in Ysidaro Sub-basin?

22      MR. GIRARD:  Whatever it is.

23      THE COURT:  It is the very bottom end of it.

24      MR. GIRARD:  Yes.

25      Look at it, Colonel, and tell me what it is.

1    MR. VEEDER:   I would like to have you look at page 18,

2    line 21 of Mr. Girard's, "That these deposits of consolidated

3    rock" and then add "and basement complex".

4    THE COURT:   Which one are you talking about now?

5    MR. VEEDER:   Girard's 18, line 21.

6    THE COURT:   You are going back then?

7    MR. GIRARD:   It is in the lower part of Ysidaro Sub-basin.

8    MR. VEEDER:   Those marine deposits would be in the lower

9    part of the Ysidaro Sub-basin.   That is what you are referring

10   to now, your Honor.

11   THE COURT:   How do you want to word it?   Slighly above

12   and below the --

13   MR. VEEDER:   That in the most westerly part or downstream

14   portion of Ysidaro Sub-basin -- that is where they are located.

15   What happened to 38?

16   MR. GIRARD:   You can add it this way, your Honor: "That

17   in the most westerly or downstream portion of the younger

18   alluvial deposits and downstream from Section 2 Township 11

19   South Range 5 West there are within said younger alluvial

20   deposits . . ."

21   THE COURT:   Take out the word "below" then.

22   MR. GIRARD:   All right.   ". . downstream from and within

23   Section 2 Township 11 South Range 5 West.

24   MR. VEEDER:   It extends a mile into the Ysidaro Sub-basin.

25   MR. GIRARD:   That ties it down exactly, I understand,

1   doesn't it Colonel Bowen, by referring to this specific

2   section?

3        COLONEL BOWEN:  Yes, sir.

4        MR. VEEDER:  Here is the cross section 38, which shows

5   you your deposits right there.

6        MR. SACHSE:  What section is it?

7        MR. VEEDER:  11-5.

8        MR. GIRARD:  I took the Colonel's section.  I am not

9   going to argue.  Whatever Colonel Bowen says is all right.

10        MR. VEEDER:  I don't know why we couldn't refer to the

11   geological cross section.

12        THE COURT:  Section 2, Colonel Bowen says, is correct,

13   looking at both maps, so we will take Section 2, Township 11

14   South Range 5 West.

15        MR. GIRARD:  Yes.  And instead of just downstream we

16   would add "downstream from and within Section 2."

17        THE COURT:  What about this language on 4:  "That while

18   said fossil shell deposits are generally less permeable than

19   the younger alluvial deposits, they do not act as a barrier

20   to the movement of ground waters; that said ground waters move

21   through and around fossil shells toward the Pacific"?  Two

22   points:  (1) The use of the word "while" -- "while the fossil

23   shells are less permeable, they do not act as a barrier".

24   This isn't logical.  Strike out "while".  "Fossil shells are

25   generally less permeable and they do not act as a barrier."

1    But more important is this:  How can you say that the
2  ground waters move through these fossil shells when we know
3  that actually it is the salt water intrusion moving the other
4  way?

5    MR. GIRARD:  In order for the salt water intrusion to
6  get up to the Ysidaro Narrows, didn't it have to go through
7  these fossil shells or under them or around?

8    THE COURT:  May be.  But the findings give us the
9  impression that the waters of the Santa Margarita River --
10  although it doesn't say that, it talks about ground waters --
11  are moving through this marine deposit toward the ocean.

12    MR. GIRARD:  I see.

13    THE COURT:  Actually, this isn't exactly what is happening.

14    MR. GIRARD:  Why don't we just put a period after the
15  word "deposits" on line 7 and strike the rest?  Would that do
16  it?

17    MR. SACHSE:  I have a whole separate section on this salt
18  water intrusion problem.

19    MR. VEEDER:  Why don't you put a period after "marine
20  action" on line 4 where your semicolon is?

21    THE COURT:  That is what they are talking about now.
22  And take care of all this business when you get to salt water
23  intrusion.

24    MR. GIRARD:  All right.  A period after the word "action"
25  on line 4 and strike the rest.

THE COURT: I have a note also on Mr. Veeder's 9 and Mr. Veeder's 10. Maybe they don't belong in here.

MR. VEEDER: There is a separate section we are going to use. Those are under the geological section.

THE COURT: All right. So that we end that, then, at line 4 with the semicolon after the words "marine action" and that finishes your 21, Mr. Girard, is that right?

MR. GIRARD: That is correct.

THE COURT: Now Mr. Veeder wanted to come back to 18, for a minute.

MR. VEEDER: Page 18.

THE COURT: No.

MR. VEEDER: Page 18, under Finding 21, you say "these deposits of consolidated rocks". To be exact you should say "that these deposits of consolidated rock and basement complex" -- in other words, basement complex is not a deposit. When he said "consolidated rocks" I assume he was talking about the La Jolla formation.

THE COURT: All right.

MR. SACHSE: Consolidated rock and basement complex are essentially non-water bearing.

MR. GIRARD: Add it also on line 21.

THE COURT: On line 21 also, yes.

MR. SACHSE: And on line 26 also.

THE COURT: All right.

13,077

MR. GIRARD:  After 21 of mine skip over to my 26.

THE COURT:  Take just it, or several more?

MR. GIRARD:  Take my 26, 27, 28, 29, 30.

MR. VEEDER:  You don't take your 30.

MR. GIRARD:  You're right.

MR. VEEDER:  I thought 30 was going to be substituted.

MR. GIRARD:  There are some changes in it.  When I get to that I'll discuss that.

THE COURT:  Do we go now to Mr. Girard's 26, 27, 28, 29?

MR. GIRARD:  That is right.

THE COURT:  And there are going to be some changes in 30.

MR. GIRARD:  Yes.

THE COURT:  Are there any changes in 26 and 27?

MR. GIRARD:  There are no changes that I show in 26, 27, 28 or 29.

30 has some substantial changes.  First, we strike all of my 30 from line 14 through line 21 to the word "thence". You use Mr. Veeder's No. 17, which is on page 12 of his draft, with some slight changes in it.  Exhibit 45 instead of 145, which was a typographical error.

THE COURT:  As I have it in front of me, it only has on lines 15 to 22.

MR. GIRARD:  That is correct.

THE COURT:  Wait a minute, 17.

MR. GIRARD:  17, lines 15 through --

MR. SACHSE:   Ground water contours and basin designation.

MR. GIRARD:   Yes.   There are some slight changes.

THE COURT:   What is the correction on the exhibit number?

MR. GIRARD:   It is 45 instead of 145.

Then on line 21 of Mr. Veeder's it is changed to read as follows:   "The elevations of the ground water table, as evidenced by said exhibit, conform generally with the ground water surface," and then you jump back to my 30 and pick it up on line 22, instead of the word "follow" it will be "and follow an approximately even downward gradient for the entire length of said younger alluvial deposits to an elevation of approximately five feet above mean sea level at that point with the Santa Margarita River," strike "discharges into the Pacific Ocean" and add "enters the Ysidaro Narrows".   That will be Finding 30.

THE COURT:   Then do we go to 31?

MR. GIRARD:   No, after 30 we go to 24 and 25 of my draft. There are no changes on my 24 and 25.

THE COURT:   Your 25 winds up on line 6 of the next page, "in a substantial but undetermined amount"?

MR. GIRARD:   Yes.

MR. SACHSE:   Yes.

MR. GIRARD:   Then we skip over to my 35.   It will include my 35 the same as it is, but there are going to be some changes on my 36.

THE COURT:   35 is okay.

MR. GIRARD:   35 is, as far as I know, all right.

MR. SACHSE:   In my notes it is all right.

MR. GIRARD:   36.  There is a change.  Instead of starting 36 as I did, "That during certain years . . "  We would start it by inserting into the top of 36 Mr. Veeder's Finding 13 on page 11 on his draft, with some minor changes.

THE COURT:   Yes, I had it marked as proper.  This is very interesting.  Sitting around there yesterday afternoon trying to read these things.  This alluvial fill below sea level.

MR. GIRARD:   That is right.

THE COURT:   And that is the way 36 will start.

MR. GIRARD:   That is right.  And then it will just continue on with my language.  There are a couple of changes in Mr. Veeder's which I will read to you.

MR. VEEDER:   Before we go too far too fast, I would like to have incorporated into this area or certainly in some place my proposed Findings 9, 10 and 11.  Those probably can be worked in, in 24, 25 --

MR. GIRARD:   No.

MR. VEEDER:   Wait a minute -- 26, 27, 28 and 29.  These depths are important.

MR. GIRARD:   I don't think those would go in here with your salt water.  Maybe we will have to backtrack and put those somewhere in the geology.

MR. VEEDER:  That is what I am making reference to, that you have a statement as to depth of alluvium, vertical depth of the younger alluvial deposits, in 28.

THE COURT:  Let's pass it for a minute now, because I had them marked as being generally proper, with some exceptions. But we have your 35.  We have 36, which will start with Mr. Veeder's No. 13.

MR. GIRARD:  That is right.

THE COURT:  Then pick up your 36.

MR. GIRARD:  That is right.

THE COURT:  And go to the end of your 36?

MR. GIRARD:  That is right.  Mr. Veeder's No. 13 has a few minor changes.

THE COURT:  All right.

MR. GIRARD:  Line 5, "Approximately two-thirds of the alluvial deposits are below sea level," strike "fill in the basin," just say "alluvial deposits are below sea level".

THE COURT:  All right.

MR. GIRARD:  Line 8, "water levels in the Ysidaro segment of the basin at a minumum elevation of five feet".

THE COURT:  Yes.

MR. GIRARD:  On line 10 strike the word "basin" and put in the word "deposits".

On line 11 in front of the word "beneficial" add the words "reasonable and".

THE COURT:  This is a great victory for the Marines to get this paragraph in here.  Don't you think?

MR. VEEDER:  It is essential.  Justice is going to be done, your Honor.

MR. GIRARD:  They happen to catch us on a day when Colonel Glenn flew around the earth, so we were charitable, as requested.

THE COURT:  I think that is a proper finding.

MR. GIRARD:  After 36 I go to my 37.

THE COURT:  Let me see if I anticipate you.  I say "Plus Mr. Veeder's 13 and the last part of his No. 18".  Is that what you are talking about?

MR. GIRARD:  No, your Honor.

THE COURT:  All right.

MR. GIRARD:  No, we just go to my 37 next.  We are going to come to some of these problems you are anticipating in a new finding which has been drafted by Mr. Veeder, which is going to have to be enlarged a little.

THE COURT:  This one that I have marked from Mr. Veeder's 18 is already taken care of.

MR. GIRARD:  Yes.

THE COURT:  "To prevent salt water intrusion it is essential to maintain a fresh water head of approximately five feet".  That has already been taken care of now.

MR. GIRARD:  That is taken care of in his 13, I think,

1   by saying that the maintenance of a fresh water barrier is

2   a reasonable and beneficial use.  We will say the same thing.

3       THE COURT:  That is right.

4       MR. VEEDER:  I would like to have that the depth of 300

5   feet of alluvial deposits -- I would like to have that found

6   in there, because it is proper, if you will look at my 18,

7   your Honor.

8       MR. GIRARD:  I think your 18 is correct, but there are

9   going to have to be some additions made to it.  You can

10  maintain your basin not only by maintaining a fresh water head

11  of five feet above sea level.  There are lots of other ways

12  to do it.

13      My 37 and my 38 have no changes.

14      MR. SACHSE:  38 has.

15      MR. GIRARD:  We are going to add.

16      THE COURT:  Your 37 and 38?

17      MR. GIRARD:  That is correct.

18      After my 38 --

19      Have you given the Judge a copy of 20?

20      MR. VEEDER:  Yes.

21      THE COURT:  After Girard's 38.

22      MR. GIRARD:  There will be Mr. Veeder's new 20, which is

23  in his draft but he has drafted a little more in detail,

24  entitled U. S. Finding 20.  But I hope that today we can get

25  a little time to incorporate in his Finding 20 that he has

drafted some of the language in his Finding 18 and also some
of the points that I know Mr. Sachse and I have on this main-
taining the head problem.  But I think we can complete that
by just sitting down with Colonel Bowen and Mr. Veeder and
writing it out.

THE COURT:  Let's pass it.

MR. GIRARD:  That is where this problem of the facts set
forth in Finding 20 submitted by the United States and some
of the other problems on preventing salt water intrusion,
where there should be a finding on that.

THE COURT:  You will take it up later then.

MR. GIRARD:  I hope we can get together today during
the recess or some time and try to work something up with
the Colonel that is factually correct.

THE COURT:  Will proposed U.S. 20 be a new number or
part of 38?

MR. GIRARD:  No, I would add it as a new number.  What
do you think?

MR. VEEDER:  I think it should be a new number.

THE COURT:  What are you going to call it?

MR. GIRARD:  I will just renumber the entire sequence.

THE COURT:  What title are you going to give it?

MR. SACHSE:  Mr. Veeder called it --

THE COURT:  Leaving Ysidaro Narrows?

MR. VEEDER:  I had it "Ground Water Contours Of Basin".

1      MR. SACHSE:  Ground water outflow from basin.

2      COLONEL BOWEN:  Ground water discharge.

3      MR. GIRARD:  Ground water discharge.

4      THE COURT:  At Ysidaro Narrows.

5      MR. GIRARD:  Yes.

6      THE COURT:  That is a good one.

7      MR. GIRARD:  Movement.

8      MR. VEEDER:  I think "discharge" is the technically

9  correct term.

10     THE COURT:  Then where do we go?

11     MR. GIRARD:  After that -- and this is the point where

12  we ended up in our discussions, but Mr. Sachse and I have

13  gone over it and I don't think there is going to be any major

14  argument on form left -- after that Finding 20 of Mr. Veeder's

15  we would insert my 31.  Up to now all these findings that we

16  have set forth in sequence have concerned solely the Santa

17  Margarita River or the alluvial deposits underlying the River.

18  Now we would insert my 31, which would describe which lands

19  on the Naval Enclave are riparian to the Santa Margarita River.

20  We will just incorporate the descriptions, the metes and

21  bounds descriptions that Colonel Bowen has submitted, into

22  the finding itself, to show which lands of the United States

23  within the Naval Enclave are riparian to the Santa Margarita

24  River.

25     MR. VEEDER:  That has been prepared.

MR. GIRARD:  And I will have my secretary insert it right in the finding.

THE COURT:  Then we go next to your 32?

MR. GIRARD:  No.  I think I made a mistake up here on my form.  Let me check a minute.  I think, frankly, your Honor-- if you remember, away back in this case before my discussion, after Paragraph 3 we inserted 5, 6, 7, 8, 9, 10 and 11 -- I think right after 11 we should have added 32, 33 and 34, which are concerned specifically with the types of uses of the United States.

MR. VEEDER:  That is what we talked about yesterday.

MR. GIRARD:  Yes.  The only comment I have on any of those, Mr. Veeder wants to submit a little more detailed language on agricultural uses, as I understand it.

MR. VEEDER:  That is correct.

THE COURT:  After 11.  11 was entitled "Future Jurisdiction".

MR. GIRARD:  Yes.

THE COURT:  Then after 11 followed Mr. Veeder's material.

MR. GIRARD:  My 32.

MR. VEEDER:  On the notes that I made from yesterday, "Following 10".

MR. SACHSE:  I had it after 10, too, Mr. Veeder.

MR. VEEDER:  "Following 10 put agricultural uses, 32, 33 and 34".

1    MR. SACHSE:  That is my note too.

2    THE COURT:  Before 11.

3    MR. GIRARD:  All right, after 10, 32, 33 and 34.

4    THE COURT:  All right, after 10, 32, 33 and 34.

5    On page 26 of your findings just before that tabulation

6 on line 2, it should be "for military and agricultural

7 purposes".  You have left out the word "agricultural".

8    MR. VEEDER:  And there should be inserted the year 1942

9 and '43 at lines 7 and 8.

10    MR. GIRARD:  Have you got them?

11    MR. VEEDER:  Yes.

12    MR. GIRARD:  If you will supply the figures.

13    MR. VEEDER:  That would be your Exhibit 150, 150-A.

14    THE COURT:  Will you get the figures out and give them

15 to him, so he can insert them?

16    MR. VEEDER:  Yes.

17    THE COURT:  Concerning the years 1942 and '43.

18    MR. VEEDER:  That is correct.

19    MR. GIRARD:  Mr. Sachse says they are not quite on the

20 same tabular form.

21    MR. SACHSE:  One of them does not break it down for

22 military or inside or outside or something.

23    MR. VEEDER:  I showed you the exhibits, Franz, and they

24 can be consolidated.

25    MR. GIRARD:  Only agricultural, Mr. Sachse says, is on

1    those two.

2         MR. VEEDER:  That is right.

3         THE COURT:  Well, let's take a short recess.

4         (Recess)

5         THE COURT:  Where do we go next?

6         MR. GIRARD:  We just finished 31.

7         MR. SACHSE:  Let's take out 11.

8         MR. GIRARD:  I had put in 11 back there immediately

9    following 10.  Pull out 11 from there.  It will go in at the

10   end.

11        MR. SACHSE:  11 is one of those jurisdictional ones and

12   we were going to put them all in at the end.

13        MR. GIRARD:  My 11.  It should be in that group that

14   follows 3, your Honor.

15        MR. SACHSE:  It should be 32, 33, 34 and then 11.  Take

16   11 out.

17        THE COURT:  Pull 11 out.

18        MR. GIRARD:  Yes.

19        MR. SACHSE:  That will go in away at the end.

20        MR. GIRARD:  Yes.

21        THE COURT:  We had last your 31, Mr. Girard.

22        MR. GIRARD:  Yes, which will be changed to incorporate

23   specific descriptions.

24        Now after my 31 we will include my 41 through 51, and

25   there are some changes.  On Finding 41, right at the end of

line 6, add so it will read "with the Santa Margarita in the southeast quarter of the southwest quarter".

THE COURT:  I picked that up, too.

MR. GIRARD:  On line 30 change "one mile" to "four miles".

THE COURT:  I said "See Veeder's 14".

MR. GIRARD:  Turning over to the next page, on line 2 --

THE COURT:  I have some other matter here.  I say "Veeder's 23 page 13 alluvial deposits".  That is just a cross reference.

MR. SACHSE:  Yes.

MR. GIRARD:  Yes.

THE COURT:  All right.

MR. SACHSE:  The exhibit number is wrong.

MR. GIRARD:  Yes.

THE COURT:  67 and 68.

MR. GIRARD:  It would be Exhibits 67 and 68 incorporated herein by reference instead of 37.

THE COURT:  When you say "incorporated by reference" you don't attach them?

MR. GIRARD:  That is correct, when we say incorporated by reference we don't attach them.  I have no objection to it, but I don't think we need to, do you Mr. Veeder?

MR. VEEDER:  I prefer not to.

MR. GIRARD:  Fine.

42 has no changes.

1    44.  We will use the same thing we did in --

2    THE COURT:  What 43?

3    MR. GIRARD:  43 has no changes.

4    THE COURT:  Here is one where Mr. Veeder made a good

5 suggestion.  On lines 5 and 6 on page 33 of your 43, "that

6 the ground waters within said younger alluvial deposits are

7 in a know and definite channel," you say "to wit, the younger

8 alluvial deposits," and he says "to wit, the basement complex

9 containing the younger alluvial deposits".

10    MR. GIRARD:  Fine.

11    MR. VEEDER:  Strike the "to wit," please, will you?

12    THE COURT:  "To wit" makes sense.

13    44.

14    MR. GIRARD:  44.  We will do this the same way we did

15 31, which will include specific descriptions of land in the

16 body of the findings which are riparian to De Luz Creek.

17    THE COURT:  Those will be supplied to you.

18    MR. GIRARD:  I understand the United States will supply

19 those.

20    THE COURT:  45.

21    MR. GIRARD:  45 has no changes.

22    THE COURT:  Except that you are going to use 67 and 68

23 instead of 37.

24    MR. GIRARD:  No.  Your Honor, we can use Exhibit 37, but

25 37 is actually the exhibit that shows the surface area of the

1    younger alluvial deposits.  Although as I read 37 -- maybe

2    Colonel Bowen can correct me -- it does not show the younger

3    alluvial deposits to the extent that it does on 67 and 68.

4    In other words, on 67 and 68 it shows younger alluvial deposits

5    of about four miles.  On this exhibit it shows younger alluvial

6    deposits of about a mile.

7        MR. VEEDER:  67 and 68 are the specific geological

8    exhibits offered in connection with De Luz Creek as

9    distinguished from our 37, which related strictly to the basin

10   within the Enclave.

11       MR. SACHSE:  I have no objection to listing 37, 67 and 68.

12       THE COURT:  Use 67 and 68?

13       MR. GIRARD:  But 67 and 68 do not show the areal extent

14   with which we are concerned in this finding.

15       MR. VEEDER:  All right.

16       MR. GIRARD:  This finding we are talking about is that

17   finding where your direct contact line is on the surface.

18   Maybe this one does, Bill.

19       MR. VEEDER:  This is 67.

20       MR. GIRARD:  Then you should use 67 instead of 37.

21       MR. SACHSE:  You are talking not only about De Luz Creek.

22   You are talking about the whole thing in a paragraph, Fred.

23       THE COURT:  67 and 68.

24       MR. GIRARD:  I am only talking about De Luz Creek in

25   this paragraph.

1   MR. SACHSE:  I say Findings 41 through 43.

2   MR. GIRARD:  67 instead of 37.

3   THE COURT:  Is that agreeable to use 67 instead of 37,

4   Mr. Veeder?

5   MR. VEEDER:  67 and 68 is what I want to use.

6   THE COURT:  Do we need 68 in this paragraph?

7   MR. GIRARD:  Not in this paragraph.  67 shows the contact

8   line on the surface.

9   THE COURT:  You say 41 to 43.

10  MR. GIRARD:  This is all De Luz Creek.  That 41 to 43

11  only includes the De Luz Creek Findings.

12  THE COURT:  So it would be just 67.

13  MR. GIRARD:  Just 67.

14  THE COURT:  46.

15  MR. SACHSE:  Mr. Veeder wants to check the description

16  of the course of Fallbrook Creek, et cetera.

17  MR. VEEDER:  That is right, and I don't care whether I

18  do it there or on 1-C.

19  MR. GIRARD:  I would prefer to check the description of

20  both De Luz Creek and Fallbrook Creek in the specific findings

21  concerning those creeks.

22  THE COURT:  Will you do that, Mr. Veeder?

23  MR. VEEDER:  Yes, we will.

24  MR. GIRARD:  47.  The United States will, I presume,

25  supply the same thing -- descriptions of their lands which are

1    riparian to Fallbrook Creek?  Are you going to do that or

2    not?  I don't care whether you do or not.

3         MR. SACHSE:  The same as is riparian to Fallbrook Creek

4    is riparian to Santa Margarita River in the Depot.

5         MR. VEEDER:  Yes.

6         MR. SACHSE:  So the same description will do.

7         MR. VEEDER:  Whatever is within the watershed of the

8    Snata Margarita River is also within the watershed of Fallbrook

9    Creek.

10         MR. SACHSE:  Within the Enclave.

11         MR. VEEDER:  Within the Enclave.

12         MR. SACHSE:  Yes, that is correct.

13         THE COURT:  It is just surrounded by Government land.

14         MR. VEEDER:   It crosses the southern boundary, comes

15    up across and enters Lake O'Neill.  How could it be otherwise?

16         THE COURT:  If you got a description you would have to

17    get a description of the subwatershed of Fallbrook Creek,

18    wouldn't you?

19         MR. VEEDER:  Which I think would be a waste of time. We

20    can work out some general language.

21         MR. GIRARD:  The same land that is riparian to the Santa

22    Margarita River in Finding 31 will be riparian to Fallbrook

23    Creek?

24         THE COURT:  Can't you do it this way ?  You have a map

25    somewhere that shows the Fallbrook Creek subwatershed.

19,093

MR. VEEDER:  That is correct.

THE COURT:  A watershed line.  Make some reference to it and that from the time that Fallbrook Creek enters the Enclave it is thereafter entirely within the Naval Enclave downstream from, and just make some reference to the watershed line, to some map that shows it.  Wouldn't that do it?

MR. VEEDER:  I think we can work it out.

THE COURT:  That would be the land that is riparian to it.

MR. VEEDER:  That is right.

THE COURT:  The only problem that could ever come up would be people up on Fallbrook Creek and the Government downstream on Fallbrook Creek, and there is nothing to appor- tion except in winter.

MR. VEEDER:  That is right.

THE COURT:  So it seems to me that a cross reference to a map which shows the watershed line of Fallbrook Creek would do it.

MR. VEEDER:  We have to prepare findings and conclusions for riparian rights on Fallbrook Creek outside the Enclave, too.  That has not been done.

THE COURT:  Is 47 talking about these lands outside the Enclave as well as the lands within the Enclave?

MR. GIRARD:  No.

MR. VEEDER:  No.

1    MR. GIRARD:  No, he is only talking about lands within

2    the Enclave.

3    MR. SACHSE:  It is completely immaterial, your Honor,

4    except to this point.  It can be most easily demonstrated on

5    the map.  Could you step down for a moment?

6    THE COURT:  Yes.  Why wouldn't you include in that

7    paragraph the Government lands outside the watershed of the

8    Enclave as well?

9    MR. SACHSE:  Here is your Fallbrook Creek problem, your

10   Honor.  This is the Naval Ammunition Depot line.  This is

11   the watershed line.  Some of the Naval Ammunition Depot is

12   outside the watershed.  The Naval Ammunition Depot is riparian

13   by reason of this contact only.  Fallbrook Creek leaves the

14   Enclave but it joins the River.  So theoretically if this

15   were more than one ownership, some of this land would be

16   riparian only to Fallbrook Creek and not to the River.

17   MR. VEEDER:  Will you repeat that?

18   MR. SACHSE:  I said if there were more than one ownership.

19   MR. VEEDER:  You said before it leaves the Enclave.

20   MR. SACHSE:  Before it enters the Enclave.

21   MR. VEEDER:  Before it crosses from the Ammunition Depot

22   into Camp Pendleton.

23   MR. SACHSE:  Yes.

24   MR. VEEDER:  They are all in the Enclave.  That is what

25   I wanted to be sure of.

1        MR. SACHSE:  So it would be perfectly possible, if these

2   were two ownerships, because this down here would not be

3   riparian to the Santa Margarita, it would be riparian only

4   to Fallbrook Creek.  Do I make myself clear?  But why we have

5   to have a separate description is beyond me.  I don't see the

6   point.

7        THE COURT:  This doesn't show the subwatershed.

8        MR. SACHSE:  This doesn't show the subwatershed between

9   Fallbrook Creek and the River, but it shows the River water-

10  shed.

11       THE COURT:  Is this Fallbrook Creek up here, too?

12       MR. SACHSE:  Yes.

13       THE COURT:  You have a few private owners up above, and

14  they only have an interest if there is some flow.  There is

15  no flow except in winter.

16       MR. SACHSE:  My thought would be that we would simply

17  say that those Ammunition Depot lands which are within the

18  watershed of Fallbrook Creek are riparian to Fallbrook Creek;

19  those Ammunition Depot lands which are within the watershed

20  of the subwatershed are riparian to this, without the legal

21  description.  The only time it is ever going to be important

22  is if some day the United States sells off half of this.

23       What is your calculation of the riparian acreage?  Did

24  it include everything in this watershed or just within the

25  subwatershed?

1    COLONEL BOWEN:  6800 some odd acres of the Naval

2   Ammunition Depot is that portion from the thread of the Santa

3   Margarita River to the crest of the watershed.

4    MR. SACHSE:  It is not riparian ot the River proper.

5   That is the point.

6    MR. VEEDER:  Yes it is.

7    MR. SACHSE:  It is not within the watershed.

8    THE COURT:  Some of this land, for instance, in here,

9   that is not riparian to the River but is riparian to Fallbrook

10   Creek.  But if part of the land is in one string of ownership,

11   part of the land is riparian.

12    MR. VEEDER:  Yes, then it is all riparian.

13    MR. SACHSE:  No, let's look at Santa Margarita vs. Vail.

14   Let's assume --you're a water rights lawyer -- that Section 34

15   was in my private ownership.  To what is it riparian?

16    MR. VEEDER:  The question is academic, because it is not.

17   It is in the ownership of the United States.  But it would be

18   severed from the Santa Margarita River, under those

19   circumstances.

20    MR. SACHSE:  That is why I am saying the only significance

21   to this -- it is not significant today, but Section 34 is not

22   riparian to the Santa Margarita River, it is riparian to

23   Fallbrook Creek, and the junction of Fallbrook Creek with

24   the River is below and in separate owners and the owners of

25   Camp Pendleton which was acquired at a separate time.

MR. VEEDER:   I am going to have to read this record, because you are making some terrible mistakes, Mr. Sachse. The whole Ammunition Depot, including Section 34, to which you alluded, is clearly riparian to the main stream of the Santa Margarita.

MR. SACHSE:   Absolutely not.  That was settled in Santa Margarita vs. Vail where the confluence is below their land.

MR. GIRARD:   Suppose Section 32 is in private ownership. If Section 32 is in private ownership, the only land which is riparian to the River as against them would be the land which actually was in the watershed upstream from their land.  As against any upstream owner, all of this is riparian.  That is the Vail case.  If this was in private ownership, this land over here, as against them, would not be riparian to the Santa Margarita River.

MR. SACHSE:   Except that you have the wrong section.  It is not the confluence of the Santa Margarita and Fallbrook Creek.

MR. VEEDER:   There is no confluence now.

MR. GIRARD:   This person would be sitting downstream from the point of confluence.  You couldn't take in against him all these lands.  As against him the only lands which would be riparian to the River on the Ammunition Depot would be the lands within the River watershed upstream.  But you don't have that situation.

5 fls.

1    MR. VEEDER:   That is correct.   The thing/concerns me that

2    very much is Mr. Sachse's statement that these sections would

3    not be riparian.   That is incorrect.   They are riparian.

4        MR. GIRARD:   As against all people upstream.

5        MR. VEEDER:   That is right.

6        MR. GIRARD:   These lands are all riparian to the Santa

7    Margarita.   As against people downstream -- and there aren't

8    any -- you would have an entirely different situation.

9        MR. VEEDER:   That is right.

10       MR. GIRARD:   Which is the Vail case, which said the

11   point of confluence of the Murrieta and Temecula, all of the

12   lands as against the downstream person, the Rancho, were

13   riparian.

14       MR. VEEDER:   That is right.   You said it correctly.   The

15   point I make is that there is no question that the entire

16   Ammunition Depot is riparian to the main stem.

17       MR. GIRARD:   I think we can work out 47.

18       MR. SACHSE:   My point is that there has been a severance,

19   although the United States of America owns both lands.   They

20   were acquired differently.

21       MR. VEEDER:   A severance from what?

22       MR. SACHSE:   The Naval Ammunition Depot from Camp

23   Pendleton.   Those are two separate sets of riparian rights.

24       MR. VEEDER:   That is true, they were separately acquired,

25   Mr. Sachse, but all parcels are riparian to the Santa Margarita

1     River.

2          MR. GIRARD:  As against Fallbrook and as against Vail

3     Company.

4          MR. VEEDER:  That is right, and as against everybody

5     upstream.

6          MR. GIRARD:  Yes.

7          MR. VEEDER:  So it doesn't make any difference.

8          MR. SACHSE:  No, Fred.

9          THE COURT:  Let's kick it around over the noon hour.

10    Let's go on and see what we have.  We are on 47.

11         MR. GIRARD:  Yes.

12         THE COURT:  And this is a problem as to what we are going

13    to do.  I understand now that you are only talking about lands

14    within the Enclave and lands of the Government elsewhere are

15    to be described somewhere else.

16         MR. GIRARD:  That is correct.  I think it is in a

17    conclusion of law somewhere that all lands owned by the United

18    States other than the lands within the Naval Enclave will be

19    considered in separate findings.  We wanted another finding

20    dealing solely with the Naval Enclave.

21         MR. VEEDER:  That is correct.

22         MR. GIRARD:  48 and 49.

23         MR. VEEDER:  Mr. Girard, I want the record to show that

24    this is the first time I have been exposed to 46, 47, 48, 49

25    and 50.  I didn't get them until late yesterday.

MR. GIRARD:  It is not the first time you have been exposed to 46, 47, 48, 49 and 50.  These findings are the same that were in the original drafts.

MR. VEEDER:  I want the record clear on that.

MR. GIRARD:  I don't think there is any change in the language.

MR. VEEDER:  Have you looked at my 23, 24, 25, and 26 and compared them?

THE COURT:  Mr. Veeder's 27 is practically the same as 46.

MR. GIRARD:  Yes, I looked at these, Mr. Veeder, both as to De Luz and Fallbrook and I didn't see any substantial changes.

THE COURT:  Mr. Veeder, 28 is the same as 48, except that Mr. Girard has in his 48 the exception beginning at line 6, "excepting for those streams which are supplied with sewage effluent . . "  That is not in Mr. Veeder's.  In his 28, however, Mr. Veeder does have some language which would fit in on line 13 of 48, "shallow alluvial deposits rest upon and are laterally contained," say "laterally contained on the sides".  His says "rest upon and are laterally contained".

MR. GIRARD:  On line 13.

THE COURT:  On line 13, yes.  Do you have any objection to that addition Mr. Girard has, that exception?

MR. VEEDER:  No.

1        THE COURT:  Otherwise it is the same as yours.

2        MR. GIRARD:  Yes.

3        THE COURT:  All right, 49.

4        MR. GIRARD:  49.  There are no changes.

5        THE COURT:  We modified that the last time.

6        MR. SACHSE:  Changed the exhibits at Colonel Bowen's

7  suggestion to use the U.S.G.S.

8        THE COURT:  Yes.

9        MR. GIRARD:  50 and 51.  There are no changes either.

10  After 51 we go back and pick up my 40.

11        THE COURT:  That is only about 10 lines.

12        MR. GIRARD:  Yes, it deals solely with the basement

13  complex.

14        THE COURT:  Do you have any changes?

15        MR. GIRARD:  No.

16        MR. SACHSE:  No.

17        THE COURT:  To start out with, first you talk about the

18  local, vagrant waters and on line 18 "that all surface waters

19  are part of the River".  I think we ought to put in "and

20  underground flow".  If you are going to say anything about

21  what is part of the River and what is not part of the River --

22  this is what we are doing, we say certain things are not part

23  of the River -- then we say that all surface waters which flow

24  on lands are part of the River and all underground flow of

25  the Santa Margarita and its tributaries are part of the River.

MR. SACHSE:  If we do that we are changing the entire pattern.  This deals solely with basement complex, this whole paragraph.  "The ground waters contained in the deposits of consolidated rock . . are not part . . but surface waters within them are . . "

MR. GIRARD:  Maybe we can correct that, that all surface waters which flow upon the deposits of consolidated rock, weathered basement complex, et cetera.

MR. SACHSE:  No, we have elsewhere taken care of the ground waters.

THE COURT:  All right, if we have.  This would be limited to basement complex, that all surface waters which flow on areas of consolidated rock, weathered basement complex, et cetera, on lands within the Enclave are part of the River, something like that?

MR. GIRARD:  Fine.

MR. SACHSE:  Yes, that's all right.

MR. GIRARD:  That is what it is intended to mean.

THE COURT:  What comes after 40?

MR. GIRARD:  After 40 comes 11 through 16.

MR. SACHSE:  These are all jurisdictional now.

MR. GIRARD:  11 is the jurisdictional one.

12 through 16 concern the stipulation.

THE COURT:  I find 12.  I don't find 13.

MR. SACHSE:  13 and 14 are right at the bottom of the

1    page right after 12.

2         MR. GIRARD:  Line 22 starts 13 at the end of 12.

3         THE COURT:  12 just sets forth the stipulation.

4         MR. GIRARD:  Yes.

5         THE COURT:  And 13 is the authorization.

6         MR. GIRARD:  13 is the authorization of counsel for the

7    United States and ratification.

8         14 deals with the acceptance in the record by Vail

9    Company and Fallbrook and possibly others.  We are going to

10   check it to make sure.

11        MR. VEEDER:  I haven't located that, Mr. Sachse, but I

12   am quite sure I recall where it is.

13        MR. GIRARD:  If we can't locate it, I, and I am sure

14   Mr. Sachse, will agree.

15        On 15 we are going to have a ruling from the Court.  Mr.

16   Veeder has some objections to it, I think, from a legal and

17   factual standpoint, and I think he will have to be heard on

18   it.

19        Isn't this the one you wanted to argue, Mr. Veeder?

20        MR. VEEDER:  That is right.

21        THE COURT:  What do you want to say, Mr. Veeder?

22        MR. GIRARD:  Maybe we can go on, your Honor, and when

23   we come back this afternoon we can get the argument.  We can

24   finish the form now.

25        THE COURT:  All right.

1    MR. GIRARD:  16 comes next, with some minor changes,

2   which you already did, I think, yesterday:  After "hereinabove"

3   on line 5 insert "and also certain pre-trial rulings".

4    THE COURT:  Yes.  And strike out "in part".

5    MR. GIRARD:  Yes, strike "in part" and on line 7 change

6   the word "said" to the word "all".

7    THE COURT:  Yes.

8    MR. GIRARD:  Then we go from 16 to pick up 39, which is

9   the prima facie one.  I don't think there are any changes on

10  that.

11   THE COURT:  On 39, just as a matter of form, I had water

12  duty checked, but that has been taken care of.  It refers

13  specifically to this judgment on line 27, "are not material

14  to any issue decided".  Why do we have to mention this

15  judgment?  This might be a little confusing.  It doesn't make

16  any difference.  That's all right.

17   MR. GIRARD:  Do you want to strike it?

18   THE COURT:  No, it's all right.

19   MR. GIRARD:  The reason I did it, it is the same as

20  Murrieta and I didn't want to change the form.

21   Then we pick up 52, which I think takes care of all

22  these findings.  We will end up, actually, with 53 findings

23  in the new draft, because we had Mr. Veeder's new 20, and that,

24  I believe, takes care of all the order and the corrections we

25  have agreed to.  Mr. Veeder still wants to be heard, I am

1    sure, on Finding No. 15, and I am sure on the conclusions of

2    law.

3        MR. SACHSE:  Your Honor, may I offer a suggestion?  I

4    have kept here in tabular order all these references to Mr.

5    Girard's and it gives us the number.  I hope I am right.  If

6    it would be of any help I might ask Mr. Veeder to verifax it,

7    so that everybody could have a copy of this -- in other words,

8    the exact order in which these paragraphs were run off here.

9        THE COURT:  All right, run them off.  And I have them

10   cut together here, so you could check over what I have.

11       MR. GIRARD:  I will have this all stencilled again as

12   soon as I get the descriptions et cetera from Mr. Veeder down

13   here for further consideration on the 6th.  But this afternoon

14   I think we should further devote some time to the conclusions

15   of law.

16       THE COURT:  And hear Mr. Veeder on some of these matters

17   that he thinks should be included.

18       MR. GIRARD:  Fine.

19       MR. VEEDER:  Particularly references to depth of alluvium

20   and matters like that.  I think it makes a more complete set

21   of findings.

22       MR. GIRARD:  I think if we meet at 2:00, if we could be

23   here a half hour early, Bill, I think we could agree on this

24   depth material.

25       MR. VEEDER:  All right.

1    THE COURT:  I was just checking.  Of your material my

2  file shows that we took out your 4 and discarded it.

3    MR. GIRARD:  That is correct, and substituted Mr. Veeder's

4  1-C and 2.

5    I think the descriptions of the younger alluvium would

6  go somewhere in addition to my Finding 28.

7    MR. VEEDER:  That is what I thought.

8    MR. GIRARD:  I think we can work that in pretty much by

9  consent, if you are just talking about the depth.

10    THE COURT:  I have mine all clipped together, if you

11  want to take a hurried check on it.

12    MR. GIRARD:  We might check, your Honor, to see we are

13  right.

14    THE COURT:  We will adjourn to 2:00 o'clock then.

15    (Noon recess.)

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 21, 1962, 2:00 P.M.

-oOo-

THE COURT:   In the Vail case (11 Cal. 2nd 501, at 532)
appears this statement:

"Where two streams unite we think the correct rule to

be applied in regard to riparian rights therein is

that each is to be considered as a separate stream in

regard to lands abutting thereon above the junction;

that land lying within the watershed of one stream

above that point is not to be considered as riparian

to the other stream . . "

MR. SACHSE:   The next sentence makes it even clearer,
your Honor.

I am sorry, in a way, that I brought this up.   I don't
think it is critical at all.   It certainly isn't to Fallbrook,
because while we are today riparian already we are making no
riparian uses.   But it is very critical, let us say, to Vail
or the riparian user upstream, and I don't think we should
draw findings that are going to be contrary to this.

THE COURT:   Actually, you are confusing two rules.   One
rule is what land is riparian to the stream, and the portions
that I read and Mr. Sachse referred to settle that.   In other
words, the land is riparian where two streams join to the
stream to which it is riparian.

The second rule, which is a little different sort of

thing, is who can complain about improper uses, and then you get into this situation that the fellow downstream can complain about all uses on all tributaries upstream.  But if you have two branches of the stream upstream and here is a man on Branch A.. He can't complain on Branch B, because Branch B water never gets to him.

So you have two different problems in this discussion this morning.  You were mixing them up.  The question as to what stream the land is riparian to, it is riparian to the branch that the land lies on.

MR. GIRARD:  Of course, it is important certainly to the United States.  I want to look at this a little carefully and I am talking not so much about Fallbrook, but whether all the lands of the Naval Ammunition Depot are riparian to the Santa Margarita River.

THE COURT:  They are riparian to the River, they are riparian to Fallbrook Creek, and since they are all one piece of ground, all within the watershed, then as far as any upstream owner is concerned the United States could use water anywhere in there.

MR. GIRARD:  There is no question about that.  But that doesn't face up to the crucial question, which is when you have an allocation.

MR. SACHSE:  That is it.

MR. GIRARD:  When you have an allocation, are they going

1    to be prohibited from taking into account, say, their irriga-

2    ble acreages within the United States Naval Ammunition Depot

3    which are located on lands which are tributary to the Santa

4    Margarita River downstream from the point where the Naval

5    Ammunition Depot lands touch the Santa Margarita River?  That

6    could make a substantial difference in the amount of water

7    as a riparian in an allocation proceeding that the United

8    States could or could not be allocated.

9         I would agree certainly, if there is no allocation

10   proceeding, that they can use the water anywhere they want it.

11   But if you get an allocation proceeding, you are, in a sense,

12   reaching upstream and allowing the United States so much water

13   for all lands which are riparian, and then you have the very

14   important question as to which of these lands within the

15   United States Naval Ammunition Depot are actually riparian

16   to the Santa Margarita River.

17        The question doesn't bother me or Fallbrook particularly.

18   I think Mr. Sachse is right.  I want to look at it a little

19   more.  But if you say that only those lands within the drainage

20   area of the watershed of the United States Naval Depot within

21   the area which drains upstream from the point where this

22   particular acquisition touches the River, you are wiping out

23   a substantial portion of those lands of the United States

24   which are in the same original grant, in the same deed of

25   title, which are within the watershed of the Santa Margarita

1  River downstream from that little point where it touches.

2  You do have a very practical problem there, your Honor.

3      I would like to look at it a little more.

4  MR. VEEDER:  Your Honor, I would suggest that this thing

5  that popped out so unexpectedly -- I had not heard it.  It has

6  never been formulated as an issue in this case.

7      MR. SACHSE:  It has been an issue.

8  MR. VEEDER:  Not the way it is being presented.  It was

9  never raised as an issue.

10      My own thinking about it is that I would like to consider

11  what has been said.  This matter is important to us and it

12  will be considered.

13      THE COURT:  We all want to do that.

14  MR. GIRARD:  Yes.

15      THE COURT:  And in that connection I just make this

16  observation.  When you make the next draft of this document,

17  paper is cheap, put each paragraph on a separate page.

18      MR. GIRARD:  All right.

19      THE COURT:  Then if we have to do any shuffling all you

20  have to do is shuffle pages and add pages.

21      MR. SACHSE:  May I offer another thought in connection

22  with what Mr. Veeder says, and I agree with him.  This is a

23  dangerous question of writing, not for what it does today

24  but for what it could do tomorrow, and I would like to see

25  all of us write a Paragraph 47.

1     MR. VEEDER:   Respecting riparian lands.

2     MR. SACHSE:   On the specific question, because Paragraph

3     47 is on Fallbrook Creek, and the reason it hurts, your Honor,

4     is that the Depot was acquired two years before the rest of

5     Pendleton.

6     MR. VEEDER:   Everybody knows that, Mr. Sachse.

7     MR. SACHSE:   Please, Mr. Veeder, I am trying to think

8     out my own thoughts here.

9     If we look, for instance, at the physical situation that

10    existed at the moment of the acquisition of the Depot, you

11    had a riparian downstream, Rancho Santa Margarita, on whose

12    land the confluence was -- Fallbrook Creek and the River.

13    Then you had the Depot of the United States, and you had

14    upstream riparians -- Wilkinson, Vail, lots of them.   That is

15    what causes this trouble.   So that there has been a physical

16    severance of the Depot riparian right from the Rancho riparian

17    right, and hence we have this problem.   It is very real on

18    Fallbrook Creek, and it is not real anywhere else that I can

19    see.

20    MR. GIRARD:   I think it is much more important on the

21    Santa Margarita River than it is on Fallbrook Creek.

22    MR. VEEDER:   I would tender the thought that we can labor

23    this poor dead animal, but let's get the issue together on

24    this thing and when we meet again bring it up.

25    THE COURT:   Let's all try our hand at a 47, and if you

19,112

1    put these on separate sheets we can shuffle one in without

2    much trouble.

3        MR. VEEDER:  I was wondering if it would be possible for

4    the reporter here to run off what you have done, where you

5    have cut and pieced together, to the end -- we have an index

6    here, I see.

7        MR. GIRARD:  I'll do that before the 6th.  Some of that

8    we have incorporated, but you are going to have to tie in

9    language with other language.

10       THE COURT:  I understand.  But I know what Mr. Veeder is

11   talking about.  He can immediately get a picture of it and

12   look at it long before the 6th.  If he wants the reporter to

13   run this off --

14       MR. GIRARD:  Is there any need then for us to prepare

15   another draft?  Or can we work from what the reporter does?

16       THE COURT:  You can prepare another draft page by page.

17   I don't have all the detailed language.  A few places I have

18   a little insert.  You will have to prepare your draft.  I

19   know what Mr. Veeder wants -- something to work from.

20       MR. VEEDER:  I want a guide so that I can get at it.

21   Mr. Girard and I have gone over some of the language in regard

22   to the alluvial fill, which I believe can be incorporated.

23   Now your Honor, if you want to undertake it --

24       THE COURT:  All right.  Where would that be?

25       MR. GIRARD:  This is my Finding No. 28, your Honor.  I

1   will work into my finding language which appears in Mr.

2   Veeder's Findings No. 9, 10 and 11 on page 9 and 10 of his

3   draft.  It is a little too long to say where it will go in

4   there, but I will work it in so that the descriptions of these

5   alluvial deposits within the younger alluvium --

6       THE COURT:  I am going to fit that in right now after 28.

7       MR. GIRARD:  That is right, your Honor.  I don't know

8   how it will be worked in, but it will be worked into the body

9   of my 28.

10      THE COURT:  Let's see if I have the right material.  Does

11  Finding 11 only have the four lines to it?

12      MR. VEEDER:  No, it runs on over to line 7 on page 10.

13      MR. GIRARD:  Yes, it is also page 9 of Mr. Veeder's and

14  the first seven lines on page 10.

15      THE COURT:  Yes.

16      MR. GIRARD:  And that will go in my 28.

17      THE COURT:  Now in that connection, while we are looking

18  at Mr. Veeder's 9, 10 and 11, you get down to page 9, lines

19  26 and 27.

20      MR. GIRARD:  That is crossed out.

21      MR. VEEDER:  Take out the last sentence.

22      THE COURT:  The last sentence has been taken care of

23  elsewhere.

24      MR. VEEDER:  That is right.

25      MR. GIRARD:  Mr. Veeder and I have a couple of minor

changes in there, your Honor.  On page 10 you cross out the word "rapidly".

MR. VEEDER:  At line 10, page 9, we agreed to that.

MR. GIRARD:  Cross out "rapidly" preceding "downstream" on line 10, page 9, of Mr. Veeder's.

MR. VEEDER:  Change 39 Isopac Map to 38 and 38-B.

MR. GIRARD:  That is right.

THE COURT:  Are they isopac maps?

MR. VEEDER:  No, those are the cross sections, your Honor.

MR. SACHSE:  In other words, you are deleting "isopac map of alluvial deposits".

MR. VEEDER:  That is right, and put in this -- this is what we are talking about (indicating document).

THE COURT:  All right, that has been taken care of.

MR. GIRARD:  That is correct.

THE COURT:  What do we do next?  What else of Mr. Veeder's material has not been pretty well covered?  I have been checking it off as I went through.

MR. GIRARD:  I think most of it, with the exception of his Finding No. 18, I think, in a sense, that is included.

MR. VEEDER:  I thought that would be included.  If it is not included, I think I'll be very bitter about it.  The substance of it is in.

MR. SACHSE:  Yes.

MR. GIRARD:  But some of this, for example, I don't

10.115

think it is absolute.  It has been estimated probably on
Exhibit 38-B to be 300 feet.

Also, if we are going to go into preventing salt water
intrusion, it is not necessarily essential that there be
maintained a fresh water head approximately five feet above
sea level.  You could prevent salt water intrusion by other
methods, too, such as even putting a cement block in there
or something, and if we are going to set forth one of them
we ought to set forth a little bit more detail.

THE COURT:  In that connection, you have made a finding,
which you all seem to be satisfied with, that there is no
practical method of stopping salt water intrusion except to
maintain this fresh water block.  That is in there presently.
I wondered at the time if by putting it in you rejected the
practicality of a submerged dam.

MR. GIRARD:  No, your Honor, as I recall, you said that
the use of the water to prevent salt water intrusion is a
reasonable and beneficial use.

THE COURT:  No, you have said something else.

MR. GIRARD:  I think we said that downstream from the
Ysidaro Narrows it is impossible to prevent salt water
intrusion.

MR. SACHSE:  No, you said maintaining a head of five feet
was necessary.

THE COURT:  It appears in your 35.  It is true that is

1    "Downstream From Ysidaro Narrows".  Of course, somewhere in

2    here we have talked about salt water intrusion that came in-

3    side the Narrows somewhere.  So when you said that salt water

4    intrusion -- maybe it should be limited to below the Narrows

5    -- has not been caused and there is no practical method by

6    which said salt water intrusion in said area, maybe you should

7    insert "below the Narrows".

8         MR. SACHSE:  The exact language is on Mr.Girard's 36,

9    to which we were to add Mr. Veeder's 13 at the beginning.  Mr.

10   Veeder's 13 says "Approximately two-thirds of the alluvial

11   deposits are below sea level.  As a consequence, to prevent

12   salt water intrusion it has been found necessary by the United

13   States of America to maintain the water levels . . at a

14   minimum elevation".

15        MR. GIRARD:  I have no objection to that at all, but I

16   do have --

17        THE COURT:  Then on 35 we had better make it clear, on

18   line 11, after the word "area below the Narrows" and on line

19   9 "that said salt water intrusion below the Narrows".  Then

20   we will make it clear what we are talking about.

21        MR. GIRARD:  All right.

22        THE COURT:  And below the Narrows we are all agreed that

23   there is nothing that could be done.  Is that right, Colonel

24   Bowen?

25        COLONEL BOWEN:  Yes, your Honor.

THE COURT:  Below the Narrows.

COLONEL BOWEN:  Yes, your Honor.

THE COURT:  That still leaves open in 36 -- what is your thought on that?  That you want to talk about other methods that might be used?

MR. GIRARD:  I don't care whether we do or not.  As Mr. Veeder's Finding 13 says, it just says that the United States has found it necessary to maintain the water levels at this point.  That would not mean, for example, that in the future the United States could not find it necessary to maintain it in some other method.

MR. VEEDER:  I don't believe the evidence would support anything other than what we have said.

THE COURT:  I don't believe it would.

MR. GIRARD:  No.

THE COURT:  We don't want to close the door.

MR. GIRARD:  I don't want to close the door.  If they want to spend some money and develop some more storage in that basin by some other method, by closing off salt water entirely, I think they should be permitted to do so.

THE COURT:  Mr. Veeder, is there any other of your material --

MR. VEEDER:  I will read it all back.  That is why I want to get your Honor's copy to see that we have covered everything.

1    THE COURT:  All right.

2    MR. SACHSE:  Mr. Veeder, you had this question on 15.

3    MR. VEEDER:  I raised the point on 15, your Honor.

4    THE COURT:  Your 15?

5    MR. VEEDER:  Girard's 15.

6    MR. GIRARD:  It is on page 15 of his Honor's.  Finding

7    15, your Honor, which is just about the fourth from the last

8    finding in your cut up version.

9    THE COURT:  What about 15?

10   MR. VEEDER:  I will read part of it into the record so

11   that you will see the nature of my objection:  "That all

12   parties to this case have tried this matter before this Court

13   on the theory that the rights to the use of water of the Santa

14   Margarita River and its tributaries and the rights to the use

15   of waters which add to and support said River and its tribu-

16   taries shall be determined by the California law as to

17   plaintiff and all defendants in this cause."

18   Now the substance of the finding, in my view, if I were

19   to agree to it, might preclude my raising in this case the

20   matters which were previously advanced to you and which we

21   orally argued and to which you made reference in your opinion

22   published in 165 Fed. Supp.  In other words, I don't want to

23   have language in the finding which would preclude my preserving

24   those legal points, and I think this language would do just

25   that.

19119

THE COURT:  You raised those points before the trial, but during the trial you have been as shy as a bride whenever I mentioned any of these theories about incorporeal hereditaments, or the bucket at the end of the stream, or sovereignty, and you have gone, as have the rest of us, to Hutchins and the other text on California water law and California cases when we discussed it.  This case has been tried, actually, on that theory.

MR. VEEDER:  Your Honor, I preserve all of the objections that I made to the original rulings, and I preserve all of the elements that were presented in the oral arguments.

THE COURT:  What other law would there be to try it by except California law?

MR. VEEDER:  I'll point out what I am very concerned about in this matter, because of the language of the stipulation signed on November 29, 1951.  That will appear, your Honor, at pages --

MR. GIRARD:  It is Finding 12.

MR. VEEDER:  -- 10, 11 and 12.

THE COURT:  I have it in front of me.

MR. VEEDER:  I have pointed out to your Honor that from our standpoint when we said that the rights of the United States would be those which we purchased from the Rancho Santa Margarita, which would include the Vail stipulated judgment, together with rights to the use of any water which

1    may have been gained by prescription or use or both since the

2    acquisition by Santa Margarita, that language was written, at

3    least from my standpoint, for the purpose of preserving any

4    future questions that might arise from the standpoint of

5    actual diversion and uses by the United States of water.

6         Then you drop down to Paragraph 4 -- this is out of the

7    stipulation, "That the rights of the United States of America

8    to use the water therein are to be measured" -- I want that

9    "measured" underscored --"in accordance with the law of the

10   State of California." I don't believe the words "measured"

11   and "determined" are synonymous. Certainly they are not in

12   the law.

13        I want to preserve those points, and I believe as written

14   Finding 15 might be construed as an abandonment by me of those

15   legal propositions which have in the past been advanced. If

16   you would rather have me make written objection to it, I will.

17        THE COURT: No.

18        It is true the word "measured" is used, but Paragraph 3

19   says expressly, "The United States claims by reason of its

20   sovereignty status no right greater than stated in Paragraph

21   2." Paragraph 2 would make it clear that all you got was

22   rights under California law, and there is no doubt that the

23   word "measured" doesn't mean to measure out so many gallons

24   of water but measure, determine, decide, adjudicate under

25   California law. There is no doubt about that.

1    MR. VEEDER:  All I desire to do is to preserve the

2    propositions that I have advanced, your Honor.

3        MR. GIRARD:  Maybe we can take care of Mr. Veeder's real

4    problem or concern by just crossing out "all parties to this"

5    and just substitute "that this case -- "

6        MR. SACHSE:  ". . has been tried on the theory" et

7    cetera.  That doesn't bind him to any admission.  But it

8    amounts to a statement by your Honor, whose findings these

9    are --

10       THE COURT:  Yes, and then the second paragraph takes care

11   of itself, "That therefore all parties not parties to the

12   stipulation . . "

13       MR. GIRARD:  Yes.

14       THE COURT:  " . . have by their conduct . . "  In other

15   words, we are content to bind the United States by the stipu-

16   lation.  We are talking now about other parties.

17       MR. SACHSE:  That is correct.

18       THE COURT:  Strike out "all parties" and say "that this

19   case has been tried," and then the next sentence starting on

20   13 refers to people who are not parties to the stipulation.

21       MR. GIRARD:  That is right.

22       THE COURT:  Then the rest of it.  Does that take care of

23   it?  I think it does.

24       MR. SACHSE:  I think it does.

25       MR. VEEDER:  I will review it, your Honor.  I think that

1     may take care of it.

2         THE COURT:  All right, anything more now on these

3     findings?

4         MR. GIRARD:  No.

5         On the conclusions of law I suggest that we not particu-

6     larly discuss the Conclusions of Law 3, 4 and 5 until we

7     actually find out how we are going to treat what land is

8     riparian one way or the other, because whatever land we find

9     in the findings is going to have identical conclusions.  It

10    just says that the lands that are riparian have a riparian

11    right.

12        In the first conclusion there is no change.

13        THE COURT:  There again you have used 37.  Do you want

14    to go to 67 and 68?

15        MR. GIRARD:  No, I don't.  I want to use 37.

16        MR. SACHSE:  37 on this one.

17        MR. GIRARD:  37 shows all of the consolidated rock

18    basement complex or weathered basement complex within the

19    Naval Enclave.

20        MR. VEEDER:  I think you better take a look at that,

21    because you will find that where map Exhibit 37 was prepared

22    our witness testified only from the point where the alluvial

23    fill commences the subterranean basin.

24        MR. SACHSE:  37 and 68 then.

25        MR. VEEDER:  You will also have additional exhibits.

1    MR. SACHSE:  37 and 67 would do it all, wouldn't it?

2    MR. VEEDER:  I don't believe it covers the Ammunition

3    Depot.

4    MR. SACHSE:  Your Ammunition Depot, I don't believe, has

5    any alluvium in it.  I am positive it doesn't.

6    THE COURT:  67 and 68 go side by side, don't they?

7    MR. VEEDER:  No, 68 is a cross section of this alluvial

8    fill.  This is 37 here.  Mr. Worts didn't testify above the

9    De Luz dam site.

10   THE COURT:  Where does 67 come in?

11   MR. VEEDER:  It comes in like this.  It doesn't take

12   care of this area or this area.

13   MR. GIRARD:  Can you tell us what exhibits you used,

14   Colonel Bowen?

15   MR. VEEDER:  May this be off the record for a moment.

16   (Discussion around the exhibits off the record.)

17   THE COURT:  That would be 37, 67 and 70.

18   MR. GIRARD:  We should correct Finding 4, then, too, to

19   put the same thing on there.  That is the ninth one from the

20   end on your Honor's copy.

21   MR. VEEDER:  My personal view is that I would like to

22   see that conclusion of law be the last one.

23   MR. GIRARD:  I will work the conclusion of law around

24   to conform to the new forms we have used.

25   MR. VEEDER:  What did you say about 2, 3 and 6, Mr.

19,124

1   Sachse?  Did you say you didn't want to consider those?

2        MR. SACHSE:  Mr. Girard suggested.  Not 2.

3        MR. GIRARD:  2 is all right, I am sure.

4        MR. SACHSE:  I don't think there will be a change in the

5   language in 3, 4 and 5, but the point is the conclusion

6   doesn't mean much until we decide how we are going to write

7   this finding on what is riparian.

8        MR. VEEDER:  I am perfectly willing to have that consider-

9   ed.  Shall we go over 3, 4, 5 and 6?

10       THE COURT:  Let's take 1.

11       1 was vagrant waters.

12       2 talks about surface waters.

13       Again, what about the underground flow of the streams?

14       MR. GIRARD:  They would be covered in 3, 4 and 5.

15       THE COURT:  3 doesn't say anything about underground

16   flow.

17       4 doesn't say anything about underground flow.

18       MR. GIRARD:  No, but when you refer back to the finding--

19       THE COURT:  I want a conclusion that the flow --

20       MR. GIRARD:  All right.  All flow within the younger

21   alluvial deposits within the Naval Enclave are part of the

22   stream which underlies it, or something along that line.  I'll

23   draft that.

24       THE COURT:  What do you want to do?  Make 2-A in there

25   for the time  being?

1          MR. GIRARD:  All right, fine.

2          THE COURT:  There may be a change in the numbering series

3     afterward.  But the underground flow is part of the water of

4     the Santa Margarita River.

5          MR. GIRARD:  It will be in the ground waters contained

6     in the younger alluvium.

7          THE COURT:  Yes.  I am content with that, but I like the

8     language "underground flow," in view of the contentions that

9     have been made.  You can put both of them in.

10          Now we go to 6.

11          MR. GIRARD:  6.  Again, we should include these other

12     two exhibits.

13          THE COURT:  67 and 70.

14          MR. GIRARD:  Yes.  These are the younger alluvial deposits

15     and the surface flow over and upon areas not specifically

16     considered.

17          THE COURT:  Have you any objection to 6, Mr. Veeder?

18          MR. VEEDER:  I will consider it, your Honor.

19          THE COURT:  Go to 7.

20          MR. SACHSE:  Line 12, you have to get the exhibits

21     corrected also.

22          MR. VEEDER:  Just add 67 and 70.

23          MR. SACHSE:  In two places.

24          THE COURT:  Yes.

25          MR. SACHSE:  And Mr. Girard better make special note all

1   the way through to check the finding of fact numbers.

2        MR. GIRARD:  Yes.

3        THE COURT:  Do we go to 7?

4        MR. SACHSE:  7 is all right, as far as I can see.

5        MR. VEEDER:  You're not going to make any mention of

6   overlying rights from the standpoint of the United States;

7   is that correct, your Honor?

8        MR. GIRARD:  You don't have any, do you?

9        MR. VEEDER:  I say, you are going to say that all of the

10  ground waters of the United States within the Enclave are

11  riparian in character and there are no overlying rights.

12       MR. GIRARD:  No.  In the first place, in the first

13  conclusion of law it takes care of all the land of the United

14  States, doesn't it, except that within the younger alluvial

15  deposits?

16       THE COURT:  Mr. Veeder's point is what do you want to

17  do?  Do you want a conclusion that there are no overlying

18  rights and that there are only riparian rights?

19       MR. VEEDER:  I think there would be clarification if

20  you did that.

21       MR. GIRARD:  The point is, Mr. Veeder, really you don't

22  have overlying rights in the sense that you have an overlying

23  right to use your vagrant, local, percolating waters.

24       THE COURT:  He is not talking about that.  He is talking

25  about down in the valley.

1    MR. VEEDER:  I am talking about where we have a well a

2  mile and a half away from the stream and we are pumping water.

3  I think we are exercising overlying rights.

4    THE COURT:  I want to be consistent in my findings, but

5  I wish there were some way you could have told me how I could

6  have defined a stream other than as I did which would have

7  given you some right to take water out of some of these areas

8  down there.  But you talked about a little narrow surface

9  channel and a few feet beneath thereof being the stream

10  system, which just didn't make sense to me.  So there was just

11  nothing I could do about it.

12    MR. VEEDER:  Your Honor, I feel this way.  I would like

13  to have this matter clarified because the issue was extremely

14  important to us and I hope we will put in language that the

15  United States is pumping from these ground waters, something

16  like that.  I will tender some thoughts along that line.

17    THE COURT:  You know, you left me no alternative.  You

18  tendered me a little ten foot wide channel of gravel and I

19  think your language was a few feet underneath thereof as being

20  the stream.  You left me no alternative except to find that,

21  which was supported by no evidence, or to make the finding I

22  did.  There was no middle ground.  You put it right up to me

23  then I was going to find a little dry arroyo and, I think

24  your language was, a few feet beneath was the bed and bank

25  of the stream, or the finding I made.  As between the two I

1  had no choice.  I would be glad to say that the United States

2  urged -- make a finding that I find the bed and banks of this

3  stream to be a small dry arroyo ten or twelve feet wide and

4  "a few feet beneath" and that the rest of the valley floor

5  was a basin and not part of the underground flow of the River.

6      MR. GIRARD:  I would have no objection.

7      MR. VEEDER:  I would be glad to tender you language along

8  that line, your Honor, for a proposed finding.  May I do that?

9      THE COURT:  If you do, then I want you to limit yourself

10  to the contention you made, which I turned down.

11      MR. VEEDER:  I will write what I think is supported by

12  the evidence, your Honor.

13      THE COURT:  I will consider what you submit.

14      MR. VEEDER:  All right.

15      THE COURT:  But I want you to be consistent.  You made

16  certain contentions and I passed on them, and of course if

17  you want to make a new contention, you may make it.  But I

18  would prefer to have the contention you made and my rejection

19  of it.

20      MR. VEEDER:  The affidavit signed by Colonel Bowen as

21  to the physical nature of it is as good a contention as I can

22  advance.  But I will review it again and I will also make a

23  tendered to you.

24      THE COURT:  All right.

25      MR. GIRARD:  8 is the prescriptive rights.  I don't think

1    there are any changes.

2         THE COURT:  Any objection to 9?  Do you still press that

3    contention, Mr. Veeder?

4         MR. VEEDER:  No, your Honor, I think this has been spelled

5    out.

6         MR. SACHSE:  You and I wrote 9 together, actually.

7         MR. VEEDER:  Yes.

8         THE COURT:  10.  You will have to check line 6 to get

9    the right paragraph.  You have 12 in there.  It will be a new

10   paragraph.

11        MR. GIRARD:  Yes.

12        THE COURT:  10.  No objections.

13        MR. VEEDER:  In my statement in regard to Finding 15,

14   your Honor, I would like to have those comments and observa-

15   tions related to your Conclusion of Law No. 10.

16        THE COURT:  Finding 15?

17        MR. VEEDER:  Yes.

18        THE COURT:  What was that about?

19        MR. VEEDER:  We just spoke about that this case was tried

20   on the theory et cetera, on page 13.  I made a statement there.

21   I think my observations are applicable.

22        THE COURT:  I am satisfied with 10.  Any objections

23   thereto are overruled.

24        11.

25        MR. VEEDER:  I have reserved all the way through here my

1  objections, so there is no need to comment any further on 10

2  and 11.

3      MR. GIRARD:  Are you objecting to them, or reserving a

4  right to?

5      MR. VEEDER:  I am reserving a right to object.

6      THE COURT:  11 looks all right to me.

7      MR. VEEDER:  In 12 you mean assuming that you have

8  exclusive jurisdiction.  Isn't that what that means?

9      MR. GIRARD:  I don't think, whether you have exclusive

10  jurisdiction or not, merely because you designate something

11  a Naval Enclave doesn't give you a water right.

12      MR. SACHSE:  That is all that is supposed to say.  You

13  can make it more clear, if you want, "did not of itself confer

14  any".

15      THE COURT:  " . . did not by such designation . ." This

16  addressed to the point that this was a military reservation

17  and therefore reserved lands of the United States.  " . . did

18  not by such designation confer upon the United States . . "

19      13.  I suppose the term "inverse condemnation" is clear

20  enough as the legal term.

21      MR. GIRARD:  As far as California law is concerned, it

22  is, yes.  There has been no actual taking other than in the

23  Naval Enclave.

24      MR. VEEDER:  That gave rise to the "metaphysical"

25  observation, as I recall.

MR. SACHSE:  No.

THE COURT:  No, that is a different theory.  You ought to go back and read your theories and keep up on them as we go along.

MR. VEEDER:  If you don't have a schedule, you can't tell the names and numbers on some of that.  I have a difficult time knowing which one is applicable here.

MR. GIRARD:  See how difficult it is for us to understand, if you don't.

MR. VEEDER:  When his Honor branded one of those that went by sometimes he put his own touch to it.  Sometimes.  He always did.

THE COURT:  14.

MR. SACHSE:  Do you want to leave them in this order?

MR. GIRARD:  No, they are going to have to be changed in order.

MR. SACHSE:  You have another conclusion of law dealing with conservation practices.

THE COURT:  You can sort these out.  There are so many of them.

MR. GIRARD:  Yes.

MR. VEEDER:  I am worried about this "appropriative or otherwise".

MR. SACHSE:  That is why I say when you get to 19 you will see a discussion of what this actually means.

THE COURT:   15.

MR. SACHSE:   I don't mind passing it for a minute until we get to 19.

THE COURT:   This was your metaphysical theory, Mr. Veeder, to keep you posted on the tags, that the Desert Land Act and these other statutes, by some mysterious manner, separated the land from the water and the water was an incorporeal hereiditament.

MR. VEEDER:   I made a grave mistake when I asked your Honor to take the designations off of his conclusions of law.

THE COURT:   Any contention on 15?

MR. VEEDER:   I reserve objection, your Honor.

THE COURT:   On 16, Finding of Fact No. 2 you have to check.

MR. SACHSE:   That is correct.   It is still the same number, your Honor.

MR. GIRARD:   17 is going to have to have some slight modification.

THE COURT:   Do you think in 16, for the benefit of persons reading, including some of our generals, Marine Corps, admirals, et cetera, we should go further and say "the lands referred to in Finding No. 2 which were in private ownership before the Treaty of Guadalupe Hildago"?

MR. SACHSE:   That is all Finding No. 2 deals with.

THE COURT:   People are lazy sometimes.

MR. SACHSE:  All right, I would see no harm in adding it.

THE COURT:  I would like to have such a persuasive set of findings and judgment that when this was reviewed by the Attorney General and the officials of the Marine Corps and the Navy that they would see immediately the strength of some of these conclusions of law and how inescapable they were.

MR. VEEDER:  Your Honor, I will help you all I can on that.

MR. GIRARD:  I think 17 is a little stronger than it should have been, your Honor.

MR. VEEDER:  I think so too.

MR. SACHSE:  The second paragraph is.

MR. GIRARD:  The second paragraph.

THE COURT:  Are you going to want to soften that a little bit?

MR. GIRARD:  The reason I have to soften it is this.  I think theoretically the United States could require water to come down and reach them in areas where they have riparian rights upstream from the areas where they are actually diverting the water from.  In other words, those wrongful diversions downstream would not affect the riparian rights that they have upstream.

THE COURT:  That is right.

MR. SACHSE:  Furthermore, if I have just insisted to your Honor that we have to treat the Naval Ammunition Depot

1   with a separate riparian entity, obviously the Naval

2   Ammunition Depot may have a right.  You can't say that there

3   isn't any right.  It may have one.

4        MR. VEEDER:  Lake O'Neill has a right, too.

5        MR. GIRARD:  That is right.

6        MR. SACHSE:  That is right, Lake O'Neill has a right too.

7        MR. GIRARD:  I have to work this out a little bit.

8        MR. SACHSE:  You have no objection to the form of the

9   first subparagraph of 17.  You are directing yourself, as

10   we are now, to the second subparagraph, are you?

11        MR. VEEDER:  No.  "That the United States of America has

12   no right to compel any Santa Margarita River water user

13   upstream from the Naval Enclave to release water or curtail

14   upstream water use so as to allow such water to reach the

15   Naval Enclave for the purpose of exportation without the

16   Santa Margarita River watershed."

17        MR. SACHSE:  You are objecting to that?

18        MR. VEEDER:  Yes, certainly, on the basis of our Lake

19   O'Neill right and the law of California, we have a right of

20   exportation.

21        THE COURT:  Except as to such rights -- how would you

22   word that?

23        MR. VEEDER:  You see, you have your Lake O'Neill

24   Interlocutory Judgment.

25        THE COURT:  Yes.

1    MR. VEEDER:   I want to rework this language so that it

2  would be this way, that there would be alternatives expressed.

3  In other words, if we are not permitted to export water from

4  the watershed, we nevertheless have other rights within the

5  Enclave which probably would call for just as much water as

6  our exportation right does.   So I want to have this alterna-

7  tively.   If we are going to dry up 60 per cent of the Camp,

8  we still have tremendous agricultural uses within the water-

9  shed as to which we are entitled to call for water from

10  upstream users.

11    MR. GIRARD:   After the word "watershed" I think we could

12  add "excepting as to such rights, if any, which may be

13  permitted under the appropriative right considered in

14  Interlocutory Judgment No. 24".

15    MR. VEEDER:   I am going to write alternative language on

16  this anyway.

17    THE COURT:   And put in parentheses (Lake O'Neill), so we

18  will know what we are talking about.

19    MR. GIRARD:   Yes.

20    THE COURT:   I think that would do it.

21    As to the second paragraph there have been two or three

22  things pointed out.   Do we need it?   We have already found

23  that.   How about phrasing it in the language of our finding --

24  the finding and the conclusion are almost identical -- that

25  there is no right to export water, but that being the last

1    user on the stream no one could complain?

2         Well, you are going to work it over.

3         MR. GIRARD:  Yes, I will work that over.  I do have a

4    conclusion of law somewhere in here that specifically says --

5    yes, I think it is Conclusion of Law No. 28 when we get to it

6    -- that they can use the water as they see fit.  But this has

7    to be worked over.

8         THE COURT:  18.

9         MR. VEEDER:  Before we go too far, as I comprehend, your

10   Honor's conclusions of law will also be made part of your

11   writeup by the reporter.

12        THE COURT:  Yes.

13        MR. VEEDER:  This is crucial to us.

14        THE COURT:  18.  I would suggest that after "Interlocutory

15   Judgment No. 24" you put in parentheses "Lake O'Neill" just

16   for identification.

17        MR. GIRARD:  All right, I'll do that throughout these.

18        THE COURT:  Any objection to 18?

19        19.  There is no objection to that, is there, Mr. Veeder?

20   Can we agree on that?

21        MR. VEEDER:  I have been reading 19 with 17 and am going

22   to try to make an analysis of what actually that means --

23   "That the United States of America has no right . . "

24        THE COURT:  19 is something different.

25        MR. GIRARD:  Yes.

THE COURT:  19 is devoted entirely to your spreading works, control of phreatophytes, and sewage reclamation.  We fought this all out and I thought we all agreed that this was a fair statement.

MR. VEEDER:  But read in the light of 17 it becomes important.

THE COURT:  20.  The only suggestion I have on 20 is --

MR. VEEDER:  It doesn't say what you said.

THE COURT:  There is something wrong about it.  On the finding --

MR. GIRARD:  I don't think there is a finding.

THE COURT:  Yes, we have a finding about the grass cover.

MR. GIRARD:  That is right, 1.2 or something.

THE COURT:  The index would tell us in a minute.

MR. SACHSE:  I just looked and didn't see it.

COLONEL BOWEN:  Finding 18 on page 15, your Honor.

MR. GIRARD:  Yes.

MR. SACHSE:  Yes.

THE COURT:  What I said, as I recall, was that a grass cover was, standing alone, a reasonable and beneficial use, but whether it was reasonable in connection with other uses would have to await a determination.  Isn't that what he said here?

MR. GIRARD:  As I recall, the draft that Mr. Sachse sent up to me was essentially identical to this, except that he did

1   not add the words "and beneficial".

2       MR. VEEDER:  And your Honor specifically stated it was

3   a beneficial use, and Mr. Sachse agreed to it.

4       MR. GIRARD:  Mr. Sachse may have.  I thought this out,

5   I read a couple of cases, and the Court said that under certain

6   circumstances the maintenance of a native vegetative cover --

7   in other words, requiring water to maintain native vegetation

8   cover may, in a sense, be a wasteful use of water.

9       THE COURT:  It goes to the reasonableness of it.

10      MR. GIRARD:  Maybe we are only quarreling about words.

11  I really don't have any strong objection, if no one else has,

12  to just dropping out the words "and beneficial" and leave the

13  term "will in the future be reasonable use of water in view

14  of the other purposes for which water has been required" et

15  cetera.

16      MR. VEEDER:  Dropping out "beneficial".

17      MR. GIRARD:  Because I don't think you have proved it is

18  beneficial.  It may well be under certain circumstances

19  wasteful, and wasteful cannot be beneficial.

20      MR. VEEDER:  Mr. Girard, I believe if you would take a

21  look at the case of Rancho Santa Margarita vs. Vail (11 Cal.

22  2nd), the question is presented in this manner:  Whether it

23  can be denied that maintaining water at a high level for the

24  purpose of watering livestock is a beneficial use.  It may

25  not be proper under California law where the physical solution

1  can be worked out.  I think the principles are much the same

2  here.

3      MR. GIRARD:  And it may be wasteful.

4      MR. VEEDER:  Yes.

5      THE COURT:  What I was thinking of was that probably

6  "beneficial" should go out.

7      MR. GIRARD:  Yes.

8      MR. VEEDER:  You are changing your position then, is that

9  right?

10      MR. SACHSE:  Mr. Veeder, they are giving you exactly what

11  you are asking.

12      MR. VEEDER:  Where are you?

13      THE COURT:  Page 5, line 30.

14      MR. VEEDER:  Would you read what your Honor said?

15      MR. GIRARD:  Just cross out "and beneficial".

16      THE COURT:  Say that the Court does not pass upon the

17  question whether maintaining cover are -- it should be "is"

18  on line 30 --or will be in the future a reasonable use of

19  water in view of other purposes for which water has been or

20  will be used.

21      MR. GIRARD:  This will undoubtedly apply, incidentally --

22  I don't think we have them in other findings -- actually to

23  any water user within the whole watershed, including Vail.

24      MR. VEEDER:  Can't you make a declaration that maintaining

25  water at a level is a beneficial use for the purpose of

1    maintaining vegetative cover?

2         MR. SACHSE:  Not in the light of his Honor's Finding 18.

3         THE COURT:  I proposed a finding and I said, in substance,

4    you couldn't have your cake and eat it, too.

5         MR. SACHSE:  Right.

6         THE COURT:  You couldn't keep a grass cover by having

7    water five feet from the surface and at the same time pump

8    large amounts of water out of your alluvium.

9         MR. VEEDER:  Buy your Honor, there are areas on our

10   basin in which grass cover is maintained.  We pump our Upper

11   Basin down as much as we can.  But there is a grass cover

12   raised on the surfaces of the basin, and there has been each

13   year and cattle have been grazed on that, and I submit that

14   that is a beneficial use, and until somebody says it is an

15   unreasonable use I think it is incorrect.

16        THE COURT:  Let me read 18.  Actually, we are talking

17   about the floor of the valley, aren't we?

18        MR. VEEDER:  That is correct.

19        MR. GIRARD:  Ysidaro, primarily.

20        THE COURT:  We are talking about the floor of the valley,

21   and I don't think we have said anything in 18 about the floor

22   of the valley.  It says like you are talking about somewhere

23   in the mountains.  A water level at least five feet below

24   the surface of the ground on the valley floor.

25        MR. SACHSE:  Before you make the change, your Honor,

1   remember that 18 refers directly back to 17, which talks about

2   the flood plain of the Santa Margarita and the practices of

3   the predecessor in interest in maintaining needed grasses and

4   vegetative cover for stock grazing on the flood plain.

5   THE COURT:  Then let's tie this in.  The mere fact that

6   17 precedes it doesn't automatically tie it in.  "The surface

7   of the ground" you want to say "in the area referred to in

8   Finding 17 . . "  Now you have "was".  It should be "is,"

9   shouldn't it?

10   MR. GIRARD:  Yes.

11   THE COURT:  On 19, the ground water level, maybe we

12   should limit this without specifying to certain areas, certain

13   parts of the valley floor.

14   MR. SACHSE: You are speaking of line 19 now.

15   THE COURT:  Line 19 in Finding 18.  I think it is correct

16   that there are areas still in the valley floor where there is

17   still a grass cover.

18   MR. VEEDER:  That is correct, and that is in Ysidaro.

19   MR. SACHSE:  We say that later.

20   MR. VEEDER:  Certainly where the water is maintained at

21   five feet it is a beneficial use of that water.

22   THE COURT:  Where do you see this?

23   MR. SACHSE:  At line 30 we talk about Ysidaro, " . . it

24   is impossible to maintain the ground water level at an

25   elevation sufficient to support native vegetation upstream

1   from the Ysidaro ground water" area.

2       THE COURT:  While we are on it, on the end of Finding

3   18, the upper and middle areas of the alluvial deposits --

4   Upper Chappo, is it?   Line 3 on the top of page 16.

5       MR. SACHSE:  Upper and Chappo Subbasins.

6       THE COURT:  What is the Upper called?

7       MR. VEEDER:  Upper Chappo and Ysidaro.

8       THE COURT:  It would be Upper and Chappo.

9       MR. SACHSE:  Sub-basins.

10      THE COURT:  Areas.  Maybe we should go ahead and add to

11  it that the use in Ysidaro Basin, the maintaining of a ground

12  water level of five feet from the surface described later in

13  the findings on salt water intrusion, also has the beneficial

14  purpose of maintaining ground cover on Chappo Basin.

15      MR. VEEDER:  Let's put that in.

16      MR. GIRARD:  No.

17      MR. SACHSE:  My thinking is this.  You have found clearly

18  and specifically that the maintaining of ground water level

19  at five feet above sea level at Ysidaro is a beneficial use.

20  We have also found that it is reasonable to do that.  But it

21  is not because it maintains grass cover.  It is because it

22  stops salt water intrusion that it is beneficial and reasonable.

23      THE COURT:  Can't we say it just that way, at the end of

24  18, that as found hereafter in paragraph so and so we have

25  found that the maintenance of a five foot water level in

1    Ysidaro Basin, whatever the language is, in connection with

2    salt water intrusion, that as an incident thereto the main-

3    taining of that water level will maintain a grass cover, and

4    that a grass cover is a beneficial use.  The Court does not

5    pass upon whether it is reasonable.  And then go to our

6    conclusions to the same effect where we talk about grass cover

7    generally, and say that a grass cover is a beneficial use.

8    I think it would be a beneficial use almost anywhere in the

9    watershed.  Whether it is a reasonable use in connection with

10   other demands for water is another question.

11        MR. SACHSE:  I think that is right.

12        THE COURT:  Can't we do something like that?  Mr. Girard,

13   does that bother you?

14        MR. GIRARD:  It bothers me in the sense that I have a

15   hard time in my own mind with the statement that something is

16   beneficial which, under certain circumstances, may be wasteful.

17   I have no doubt at all if you didn't have salt water intrusion

18   on the United States Naval Enclave they wouldn't think at all

19   about maintaining the vegetation.

20        THE COURT:  Beneficial without regard to its comparison

21   with other uses.

22        MR. GIRARD:  Beneficial in the sense --

23        THE COURT:  Without regard to whether or not it is

24   wasteful.

25        MR. GIRARD:  That grass grows which can be used.

1      MR. VEEDER:  Which is used.

2      MR. GIRARD:  Which can be and is used.

3      MR. VEEDER:  I can't imagine anything more beneficial

4  than producing forage for livestock.

5      MR. GIRARD:  How about producing forage on all of the

6  basement complex to prevent flood erosion?

7      MR. VEEDER:  I don't know what we are arguing about.

8      THE COURT:  Mr. Girard's problem is that when he talks

9  about what is a reasonable and beneficial use he gets both

10  words tied in as having a bearing on whether this should be

11  allowed where there are demands for other uses.  I have been

12  trying to separate in my own thinking the term "beneficial"

13  from the term "reasonable in amount," and I think you could

14  throw in behind "beneficial" in parentheses this reservation

15  that you have, without regard to whether it is wasteful, for

16  instance.  This is what you are talking about.  And I would

17  be willing to find that the grass cover in Ysidaro and else-

18  where in the valley floor is a beneficial use -- beneficial

19  without regard to whether or not it was wasteful in comparison

20  to other uses, and leave open the question whether it is a

21  reasonable use in connection with other uses and demands on

22  the watershed.

23      MR. SACHSE:  In other words, your Honor would suggest

24  that you make the finding on 18, or perhaps subsequently

25  where we talk about the five foot level to prevent intrusion,

1    that this water level incidentally has the effect of maintain-

2    ing grass cover, which the Court finds to be a beneficial use

3    of water.  But then your conclusion of law will say that you

4    do not now pass on the question whether this is or will be in

5    the future reasonable in view of other uses.

6        THE COURT:  Right.

7        MR. GIRARD:  We are saying flatly -- and I think this is

8    absolutely correct -- that the maintenance of the salt water

9    barrier is a reasonable and beneficial use, and then we are

10   going to say that that has an incidental beneficial result

11   in that it maintains a grass cover which is effectively used

12   by the United States.

13       THE COURT:  Yes.

14       MR. GIRARD:  All right, we can put it in that way.

15       THE COURT:  Then where are we on that conclusion?

16       MR. SACHSE:  Conclusion 20.

17       MR. GIRARD:  I could say that this Court does not pass

18   upon the question whether the use of water solely to maintain

19   natural vegetative cover would be a reasonable and beneficial

20   use.

21       THE COURT:  That would be one way to do it.  Another way

22   would be that the Court does not pass on the question whether

23   the maintaining of natural grass and vegetative cover other

24   than in the Ysidaro Basin, et cetera.

25       MR. GIRARD:  Yes.

1     MR. VEEDER:  And that would relate to the fact that we

2 have pumped the upper basins down; isn't that right?

3     THE COURT:  That is said in 18.

4     MR. VEEDER:  That is right.  That is in 18.  And you

5 would qualify it in regard to that.

6     MR. GIRARD:  I would stick the finding on the grass over

7 there on the other finding where you are concerned with the

8 maintenance of the salt water barrier, that you had to keep

9 your water levels up to maintain the salt water barrier within

10 five feet.

11     THE COURT:  Does the whole Ysidaro Basin benefit -- the

12 valley floor of the whole Ysidaro unit benefit by this five

13 foot deal, or just the bottom end of it?

14     COLONEL BOWEN:  Your Honor, there is grass cover over the

15 entire face of the Ysidaro Valley, except for that area which

16 I farm down there, about 250 acres, and livestock does graze,

17 both cattle and sheep, clear on up into the lower part of

18 Chappo.

19     THE COURT:  Do you think you get a water level within

20 five feet of the surface in the upper part of the Ysidaro

21 Basin?  Probably not.

22     COLONEL BOWEN:  No, I don't believe it is that close up

23 there.

24     MR. VEEDER:  It depends on the time of the year and a

25 great many other things doesn't it?  Right now I'll bet it is

1   getting close to the five foot level all the way through.

2       MR. GIRARD:  It is flowing out of there.

3       THE COURT:  Right now you have water coming from the

4   skies to maintain your grass cover.  We are not concerned

5   about the winter.  We are concerned when it gets hot and dry.

8 fls.   6       MR. VEEDER:  The water level will maintain the grass

7   cover and it makes feed for livestock and we run livestock on

8   it.  I think it is a beneficial use.

9       MR. GIRARD:  I think actually, your Honor, I could work

10  out the conclusions of law and the findings to cover that

11  point that you discussed on the grass.

12      THE COURT:  Going back to Finding 18, "With the develop-

13  ment of pumping and irrigation within the Naval Enclave and

14  upstream therefrom, the ground water levels, except in the

15  lower half or the lower portion of the Ysidaro unit or Ysidaro

16  Basin --"

17      MR. GIRARD:  Whatever Colonel Bowen says it is.

18      THE COURT:  What would say, lower half or lower two-thirds,

19  the water has declined to a depth greater than five feet?

20      COLONEL BOWEN:  It is at a greater depth, your Honor,

21  but I repeat that there is vegetative cover and was last

22  summer.

23      THE COURT:  Over most of Ysidaro?

24      COLONEL BOWEN:  Over most of the Ysidaro and into the

25  lower Chappo.  Of course, that constriction between Chappo

1    and Ysidaro forces the water to come closer to the surface.

2        THE COURT:  As it flows underground.

3        COLONEL BOWEN:  Yes, sir, as it flows.

4        THE COURT:  This will have to be worked over.

5        MR. GIRARD:  Yes.

6        THE COURT:  You have my ideas on this.  I think a grass

7    cover is beneficial, aside from whether it would be wasteful.

8    Whether it is reasonable or not depends on other demands and

9    uses.  But we have to tie this in with the fact of our finding

10   on salt water intrusion, and that by the maintenance of the

11   five foot barrier at the Narrows the result is incidental

12   thereto that there is cover over the major part of Ysidaro

13   and, if the Colonel says so, even up into the lower portions

14   of Chappo, and    that this incidental result is a beneficial

15   use, et cetera.

16       And then on our findings, down here on 20 we are going

17   to have to find -- we have found somewhere in there that the

18   fresh water barrier is a reasonable and beneficial use, and

19   that the resulting maintenance of a grass cover et cetera is

20   a beneficial use et cetera, but that as to the other parts of

21   the area the question whether grass cover throughout the valley

22   floor upstream is reasonable is going to have to hinge on other

23   uses and demands for water when the time ever comes.

24       Those are my ideas on it.  I think we are all pretty

25   much in accord, aren't we?

1    MR. GIRARD:   I think so.

2    THE COURT:   On 19, when you type these up, I am going

3    to say "see transcript".

4    MR. VEEDER:   I would like to have the reporter to put in

5    this line of discussion we have had on 18, because I am not

6    quite sure where we stand on that.

7    THE COURT:   When he types this up have him put on the

8    side "see Finding 18 and Conclusion 20.   See transcript of

9    2-21-62".

10    Do you want to take a short recess?

11    MR. GIRARD:   Fine.

12    (Recess.)

13    THE COURT:   21.   There is this situation about this

14    stipulation.   You see, that stipulation was on the original

15    complaint, if you go back and read Finding 12, that in the

16    complaint where they used the word "sovereignty" et cetera.

17    Later on Mr. Veeder filed an amended complaint.

18    MR. VEEDER:   Amendatory and supplementary, yes.

19    THE COURT:   But I think in the first part of it you

20    carried over your same language.

21    MR. VEEDER:   It was identical.

22    THE COURT:   I have been thinking about that.   It might

23    be that we have to check 12, because actually the stipulation

24    just talked about the complaint.   But I am going to find that

25    it applied also to the amendatory and supplementary complaint.

12 will be toward the end here.

MR. GIRARD:  I'll check that.  I think Mr. Veeder is right

that the amendatory and supplementary complaint incorporated

by reference those paragraphs.

MR. VEEDER:  In fact, we set them out.

MR. SACHSE:  Set them out in full and incorporated them

in the 3, 4, 5 et cetera.

MR. VEEDER:  Yes.

THE COURT:  I would suggest at the end of 12 and before

13 there might be some finding of fact inserted re amendatory

and supplementary complaint.  And then in 21, whether we would

have to mention it again in the conclusion, has been in force

and effect and binding on the United States.

MR. GIRARD:  I could say that said stipulation as set

forth in Findings of Fact 12 and 13, only they would be

different numbers.

THE COURT:  This insert I suggest would be between 12 and

13.  I don't know whether that is the right place or not.

MR. GIRARD: Just add it at the end of 12, so it would be

part of 12.

THE COURT:  Part of 12, yes.

MR. GIRARD:  Fine.

THE COURT:  22 is okay.

23.  You are going to amend, as we did heretofore, by

striking "in part" and adding at line 22 after "hereinabove,"

1    "and contained various pre-trial rulings" or something like

2    that.

3        MR. GIRARD:  Yes.

4        THE COURT:  Did you ever find out in 24 who joined in

5    this stipulation?

6        MR. GIRARD:  I don't think it has been determined yet.

7    I don't think any of us has searched the record to get that

8    exactly yet.

9        MR. SACHSE:  I know I searched.

10       THE COURT:  I have in the file here a summary, the early

11   part is up to date, if you want to thumb through that at any

12   time.

13       MR. GIRARD:  I'll try to check it in mine and see whether

14   I can get that.  I don't think it is really absolutely

15   necessary that we refer to the date.  If we can't have it,

16   I am sure that Mr. Stahlman and Mr. Sachse will agree that we

17   can say that during the course of this case the Fallbrook

18   Public Utility District and the Vail Company in open court

19   in this cause, something like that -- if we can't tie it down

20   to the exact date.

21       THE COURT:  25.  We will make the change we made in the

22   findings.

23       MR. GIRARD:  Yes.

24       THE COURT:  "This case has been tried on theory . . "

25   Strike out "all parties to".  And on line 8 "and all parties"

1    insert after the word "parties" "not parties to" or "not

2    joining in the stipulation".   That complies with what we did

3    in the finding.

4        We will have to do the same thing with 26:  "Notwith-

5    standing said stipulation and notwithstanding the fact" --

6    strike out "all parties" -- "that this case was tried" --

7    strike out "this case" again.   So that line 13 would read:

8    "being the fact that this case was tried on the theory that

9    California law" et cetera.

10       MR. GIRARD:  All right.

11       THE COURT:  I think that would do it.

12       27 is our form conclusion we have been using.

13       MR. GIRARD:  Yes.

14       MR. SACHSE:  Yes, your Honor, that is the same one we

15   used in the Murrieta.

16       THE COURT:  28.

17       MR. SACHSE:  Mr. Girard here has this exception of

18   Conclusion 20.  This is the same row.  I don't see any reason

19   to have the exception in there.  I don't think it is necessary

20   to go as far as Mr. Girard goes.

21       MR. GIRARD:  I think the exception should say in.

22   Conclusion of Law 20 as redrafted will say, in essence, that

23   vegetative cover maintenance is a beneficial use, but the

24   question of reasonableness is determined subsequently.  This

25   28 says that all uses by the United States are reasonable and

1   beneficial riparian uses -- in other words, the reasonable

2   being added to it.  So I think you still should maintain your

3   exception.

4       THE COURT:  I think so, too.  It looks generally okay,

5   depending on how you dress up 20.

6       MR. GIRARD:  Yes, 20 will have to be dressed up.

7       MR. SACHSE:  Your Honor suggested earlier on the question

8   of these surplus waters away back on Conclusion of Law No. 2.

9   I think this 29 takes care of it.

10      MR. GIRARD:  I think after the word "of" on line 25 we

11   should add "underground flow".

12      MR. VEEDER:  On line 25.

13      MR. SACHSE:  Of page 8.

14      THE COURT:  Part of the underground flow of a stream.

15      MR. GIRARD:  Yes.

16      MR. VEEDER:  In that connection, when Colonel Bowen said

17   that water flowed through those Narrows, he was speaking of

18   course of percolation.  I just confirmed that with him a

19   moment ago and I wanted to have it very clear.

20      MR. GIRARD:  We are not holding him to that comment, Mr.

21   Veeder.

22      THE COURT:  Let the record show that we are being

23   facetious about the problem.

24      Is 30 all right?

25      MR. SACHSE:  It is with me.

THE COURT:   31.

MR. SACHSE:   We have to correct "Camp Joseph H. Pendleton" to "Naval Enclave".

THE COURT:   "Naval Enclave" instead of "Pendleton".

MR. SACHSE:   Yes.

THE COURT:   32 looks okay.

MR. GIRARD:   I guess in order to be consistent, on line 22, "within a known and definite channel part of the underground flow of a particular stream".

THE COURT:   All right.

Before we get to the judgment, I have some conclusions of law that I made some notes on, that I don't think we have made.

MR. GIRARD:   It is quite possible.

THE COURT:   (1)  A conclusion of law that the exclusive jurisdiction awaits the outcome of the Supreme Court decision. We haven't any conclusion on that.

MR. GIRARD:   No, we don't.

THE COURT:   (2)  Do you have a conclusion that the use of water to prevent salt water intrusion is a reasonable and beneficial use?

MR. GIRARD:   Yes, in a sense I do, your Honor.

THE COURT:   Where you say all uses --

MR. GIRARD:   All uses other than those considered in Conclusion of Law 20.  I have no objection to putting it in

specifically.

THE COURT:  I think it should be in specifically.

MR. VEEDER:  We are going to tender one on that.

THE COURT:  Do we have a conclusion of law that the use

made of the waters on the Naval Enclave is similar to a

municipal use?

MR. GIRARD:  No.

THE COURT:  We have made a finding.  That ought to be

a conclusion.

MR. VEEDER:  Your Honor, aren't you reversing yourself

on it?

MR. SACHSE:  No.  You have a finding that says that.

THE COURT:  I found against Mr. Sachse's contention,

in favor of your position, that this was a proper use.  But

I also found that it was similar to a municipal use -- not

all your uses, but the use for the things listed in that

finding, beauty shops, houses and all, and this is Mr. Sachse's

point on appeal.  If the Government wants to appeal, if the

Government decides to appeal this case, Mr. Sachse, as I

understand, intends very vigorously to contend that this

municipal use is not a proper riparian use.  But I also

understand that if the Government does not appeal, Fallbrook

does not intend to appeal.

MR. SACHSE:  That is quite correct.

THE COURT:  You can't have your cake and eat it, too.

I don't think I have reversed myself.  What do you mean?  In what respect?

MR. VEEDER:  The issue, as I recall it, was whether a military use was a municipal use.

THE COURT:  No, the issue was whether the military use was a riparian use.

MR. GIRARD:  There was never any doubt it was not synonymous with municipal use.

MR. VEEDER:  The way it moved over in the arguments was just the way I described it.  Now was the military use a proper riparian use was decided by you in favor of the United States.

MR. GIRARD:  You are jumping a step.  First, military use has no meaning at all in the sense of what type of use it is.  Until you define it, military use is essentially the same thing as a municipal use, and the question is whether a use by the United States on its own lands which is essentially municipal in character can be a proper riparian use, and his Honor held that yes, it could be, and Mr. Sachse contends that his Honor made an erroneous ruling on that.

MR. SACHSE:  Mr. Veeder, to refresh your recollection --

MR. VEEDER:  I am not worried about it, Mr. Sachse?  I am perfectly satisfied with the way the record is.

THE COURT:  Anyhow, I think we need a conclusion.

MR. GIRARD:  Yes.

THE COURT: Most of these I got just by kind of thumbing through the findings and seeing if we had a conclusion. I was not sure.

The fourth one I have listed is with reference to our "prima facie" findings. I think we need a conclusion on that. We make a finding of fact that they are prima facie in a new proceeding. I think we need a conclusion of law to carry that through.

MR. GIRARD: All right.

THE COURT: (5) We have treated surface impoundments here separately, although we have an interlocutory judgment on surface impoundments. I think we need a conclusion of law like we had in the interlocutory judgment that the continued of surface impoundments will not result in any prescriptive or appropriative right. We had some language like that in our other judgment. Do you remember?

MR. GIRARD: Yes.

MR. SACHSE: Yes. That is an oversight. Why don't we have that?

MR. GIRARD: We have it in 31, but only outside the watershed.

THE COURT: I am talking about the little surface ponds. We had language we agreed upon and we had some law to the effect that if the Court made a finding in the future, sort of a declaratory judgment, that no matter what happens

1    hereafter you are never going to get a right on this.  I think
2    we need that.

3         MR. VEEDER:  I think that was in regard to riparians.

4         MR. SACHSE:  In regard to everybody in the watershed.

5         MR. VEEDER:  I'll check on it.

6         THE COURT:  Of course in the Government's case it couldn't
7    be a prescriptive right.  But it can't be an appropriative
8    right either.  We might as well put in here and let the Naval
9    authorities know that you can't blow these up into any
10   permanent rights -- that we are permitting them to remain.

11        (6) concerns the fact that Mr. Veeder claimed he was
12   going to present to me in writing some theories about some
13   matters I hadn't ruled upon.

14        MR. VEEDER:  That is correct, your Honor.

15        THE COURT:  And he hasn't done it.

16        MR. VEEDER:  That is correct.

17        THE COURT:  I can't rule on them until I know in detail
18   what your positions are.

19        MR. VEEDER:  The two points that I have touched upon are
20   whether the waters covered by the stipulated judgment were
21   subject to appropriation under California law, and (2) whether
22   in
     /the exercise of your equitable jurisdiction you could deny
23   the right of Fallbrook to appropriate water under the
24   circumstances.  Those will be filed with your Honor.

25        MR. GIRARD:  When?

1    THE COURT:  When?

2    MR. VEEDER:  Prior to the 6th of March.

3    THE COURT:  Put your suggestions on separate sheets.

4    I think it is pretty clear that you have no appropriative

5    right to water that was released and came down the stream.  I

6    can't see how under any theory you could get an appropriative

7    right.  And I think that is going to be an easy one, and I

8    had listed here a conclusion of law -- I suggest that Mr.

9    Girard draw it -- that there is no right on the part of the

10   United States to appropriate waters which came down the Santa

11   Margarita River, however it came, by release under the Vail

12   Judgment or otherwise.  Water flowing in the stream can't be

13   appropriated without resorting to State procedures, and not

14   by self help.  Do you follow me?

15   MR. GIRARD:  Yes.

16   MR. SACHSE:  Definitely.

17   MR. VEEDER:  I will formulate it.

18   THE COURT:  I don't list any more, but I do think we

19   have to go through the findings and see whether we have

20   carried out an appropriate conclusion of law to cover the

21   findings we have made.

22   MR. VEEDER:  I know I have to make a line by line review.

23   THE COURT:  All right.

24   Now let's go to the judgment.  In Paragraph 1 of the

25   Judgment we are going to use 67 and 70 as well as 37, aren't

we?

MR. GIRARD:  That's right.

MR. SACHSE:  Yes.

MR. VEEDER:  And you are going to move that way from the No. 1.

MR. GIRARD:  I will change the order of these to try to correspond with the findings and conclusions.

THE COURT:  Paragraph 2 is surface waters throughout the Enclave, and standing by itself it is proper.  I have a note "Underground flow." We will find out whether we have adjudged that later on.

3, 4 and 5, again, have to await exactly what we do, don't they?

MR. GIRARD:  I think they will be essentially that.  They will be correct as far as the judgment provision, but we will have to wait.  The finding will change and all we do is refer to the finding in here.  So the judgment language will not have to be changed.

THE COURT:  6.

MR. GIRARD:  That should be 67 and 70 also.

THE COURT:  Don't forget that somebody -- and I think Colonel Bowen was assigned the task -- has to take 37 and take about four sections in there and fill them in with blue, so that we have a complete map -- just a few little sections in there.  You will do that, will you?

19,161

COLONEL BOWEN:  I'll do that, your Honor.

MR. SACHSE:  The same insertion has to be made on the next page.

MR. GIRARD:  At line 10.

THE COURT:  I have little comment on 7 or 8.

On 9 I suggest just for clarity in reading, by other persons than ourselves, that you insert "Lake O'Neill" after "Judgment No. 24".

Paragraph 11, line 13 on page 12, I think your 18 is the wrong conclusion there.  I think you are referring to your present 20.  Conclusion of Law 18 is not applicable at all.

MR. GIRARD:  I see.

THE COURT:  It is 20 you are talking about.

MR. GIRARD:  Actually, I am also talking about 18, because 18 is a use of water by the United States from the Santa Margarita River, but it is not riparian.

THE COURT:  But that is an exception.  In 18 you say "except as provided in Interlocutory Judgment No. 24 (O'Neill)"

MR. GIRARD:  Yes.

THE COURT:  So you are talking about 20 probably.

MR. SACHSE:  No, your Honor, I think you are reading it wrong.  The conclusion says that all uses by the United States of America, except Lake O'Neill, are reasonable and beneficial riparian uses.

MR. GIRARD:  Yes, 18 should be in there, but also

1    Conclusion of Law No. 20 should be in there, too.

2    THE COURT:  That doesn't do it, because 18 Lake O'Neill

3    is an exception.  If you want to say in 11 that all uses

4    except Lake O'Neill et cetera are reasonable and beneficial,

5    and if you want to put in something about your 20 where we

6    talk about the vegetative cover, then you are going to have

7    to say that as to that it is beneficial, but other than in

8    Chappo Basin its reasonableness is not now passed upon.  Do

9    you agree?

10    MR. SACHSE:  I see, yes.

11    THE COURT:  But I think your reference to 18 in the

12    sense you use it is confusing.  I think if you want to say

13    other than the appropriative rights to use contained in

14    Judgment No. 24 (Lake O'Neill).

15    12 looks all right.

16    MR. SACHSE:  I don't think he needs that word "such" at

17    the end of the first line of 13, your Honor.

18    THE COURT:  Strike it.

19    MR. VEEDER:  We will have to qualify 15, your Honor, on

20    the basis of your rulings.

21    MR. GIRARD:  Yes.  Strike the word "are" and substitute

22    "is" on line 18, and strike "and beneficial".

23    MR. VEEDER:  I think there will have to be further

24    revision than that, won't there?  I think there will have to

25    be reflected what has been said today.

MR. GIRARD:  All right.

On the younger alluvial deposits, part of the flow, similar to Conclusion of Law No. 29.

THE COURT:  Shouldn't there also be the form judgment provision that all rights on the part of the United States as a riparian are quieted against the owner of land overlying local, vagrant, percolating water, and the reverse of it?

MR. GIRARD:  I have no objection within the watershed.

THE COURT:  Within the watershed.

MR. SACHSE:  Yes, we have said in the one.  I think we ought to state it in the other, too.

THE COURT:  Throughout the watershed, the whole Santa Margarita.

MR. GIRARD:  Yes.

MR. SACHSE:  Yes.

THE COURT:  The reverse of the thing we plant the rights in this particular area of persons who have this water which is not part of the stream against the claims of the United States.  We ought to quiet the rights of the United States against the owners of land whose ground water is solely local, vagrant, percolating.

MR. VEEDER:  That is included in your "A" Series, your Honor.

MR. SACHSE:  It is.

MR. VEEDER:  I certainly have no objection to incorporating

1  that language -- the fact is I think it is essential that it

2  be done.

3      THE COURT:  I think we have accomplished a good bit.

4      MR. SACHSE:  Mr. Veeder, are you ready to have Murrieta

5  signed?  The exhibits are done, I know.

6      MR. VEEDER:  It is just a matter of assembly.

7      MR. SACHSE:  You have done the additional page for

8  the exhibit?

9      MR. VEEDER:  Yes, I will have that page rerun and put an

10  original copy on your Honor's desk, if that is all right.

11      MR. SACHSE:  It is ready to go, as far as I am concerned.

12  I have checked the page out this morning.

13      THE COURT:  Have you checked the exhibits, too?

14      MR. SACHSE:  It is a page that goes on the exhibits.

15      MR. GIRARD:  I haven't checked Exhibit H.

16      MR. VEEDER:  We will have all the exhibits checked out,

17  run through and put on your desk.

18      MR. GIRARD:  You will have to prepare another sheet like

19  you did today for the water duty one, using our exhibits to

20  list the appropriative right which may be in the ground water

21  area -- if there are any.

22      MR. VEEDER:  If there are any, I couldn't find them.  I

23  don't believe there are any.

24      THE COURT:  As I recall, in that particular ground water

25  area I don't think there were any.

1    MR. VEEDER:  No.

2    THE COURT:  In the other ground water area we may have

3    a few.  But I don't think we have one in there.

4    MR. VEEDER:  I am sure there is not.

5    MR. GIRARD:  I looked at them and I notice in my form,

6    at least, there was a couple in the Warm Springs Creek area

7    -- whether they were outside the ground water area or not.

8    MR. WILKINSON:  Borrell and Nichols are outside the ground

9    water area.

10    MR. SACHSE:  Mr. Girard can't do this final until -- I

11    don't know how fast Colonel Bowen and Commander Redd could do

12    it.  If they could get Mr. Girard the exceptions from the

13    Sections 5 to 8 inclusive and Sections 1 and 2 and 11, 12 and

14    13, we will have that much ready.

15    MR. VEEDER:  Yes.

16    Anything else?

17    THE COURT:  No.  Be back here then at 10:00 o'clock on

18    the 6th.

19    MR. VEEDER:  Thank you, your Honor.  Are we adjourned?

20    THE COURT:  We are adjourned.

21    (Adjournment until Tuesday, March 6, 1962, at 10:00)
       (                                                   )
22    (o'clock A.M.                                         )

23                          - - -

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,        )
                                 )
                    Plaintiff,   )
                                 )
         vs.                     )        No. 1247-SD-C
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                                 )
                    Defendants   )

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the dates herein involved, to wit:  February 20, 1962 and February 21, 1962, was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said short-hand notes to be transcribed, and the within the foregoing 140 pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 22nd day of February 1962.

_John Swader_
Official Reporter