# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, March 6, 1962

Pages:      19,166 to 19,242

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    vs.<br><br>FALLBROOK PUBLIC UTILITY<br>DISTRICT, et al.,<br><br>              Defendants. | No. 1247-SD-C |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, March 6, 1962

- - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ.,<br>Special Assistant to the<br>Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
|    Fallbrook Public Utility<br>   District, et al.,: | FRANZ R. SACHSE, ESQ. |
|    State of California: | FRED GIRARD, ESQ. |

SAN DIEGO, CALIFORNIA, TUESDAY, MARCH 6, 1962, 10:00 A.M.

-oOo-

(Other matters.)

THE CLERK:   6-1247-SD-C United States vs. Fallbrook.

THE COURT:   Gentlemen, I suggest that we read over this new draft before we start our discussion this morning.   I just got a copy.

MR. GIRARD:   Everybody just got it, your Honor.

MR. SACHSE:   We all just got it.

THE COURT:   Why don't you adjourn into the petty jury room or wherever it is confortable and let's all read this over before we start to talk about it.

MR. SACHSE:   I think it would be most helpful.

THE COURT:   Is that satisfactory Mr. Veeder?

MR. VEEDER:   Very good, your Honor.   Would I be called in my office?   I can work there better, I think.

THE COURT:   Yes, we will call you.

(Other matters.)

SAN DIEGO, CALIFORNIA, TUESDAY, MARCH 6, 1962, 2:00 P. M.

-oOo-

THE CLERK:  6-1247-SD-C United States vs. Fallbrook.

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes, sir.

MR. VEEDER:  Has your Honor had an opportunity to review the memorandum that I filed designated "STATEMENT OF UNITED STATES OF AMERICA RESPECTING GROUND WATER WITHIN NAVAL ENCLAVE"?

THE COURT:  Yes, I just found it in my papers and that is what I was doing the last few minutes, reading it over.

MR. VEEDER:  I was particularly concerned, your Honor, when I reviewed the transcript, with the colloquy that took place in the courtroom at the last hearing.  It is the position of the United States that we have never asserted that the Santa Margarita was simply a dry arroyo across the surface of a basin, as your Honor commented.  That is why I went into some detail and reviewed at some length and quoted rather extensively from the affidavit, for example, of Colonel Bowen, which I filed in support of our claim that this Santa Margarita Coastal basin was in fact and in truth the basin, and that we would like to have your Honor so find.  I don't know whether your Honor has read what I have set forth, but I think it would correct what I believe was a misconception on your Honor's part as to the position of the United States in regard to that Coastal basin.

THE COURT:  Well, we have been all over this, and I
don't think I have any misconception of your position.  Here
is water running down in a little channel over this flood
plane, and then it sinks into the ground.  Two hundred yards
further down it comes to the surface and water runs again.
How does this jibe with the basin?  Isn't this the underground
water coming to the surface and flowing on the surface again?

MR. VEEDER:  Your Honor, I believe in that regard the
situation is this, that it is a ground water table, a ground
water plane extending clear across the basin, and at the
point where that ground water plane intersects the incised
channel there it becomes a flowing stream.  But it is not,
your Honor, the ground water flowing as such.  The water
simply comes out of the alluvium and proceeds on down the
channel.

Now the thing that concerned me more than anything else
in your Honor's statement in the record was the statement
that this water in some manner is flowing as a stream.  Well,
it is not, your Honor.  It is the position of the United
States, as I have stated before and as evidenced by Colonel
Bowen's affidavit, that this is a lake, a reservoir in which
are impounded literally thousands of acre feet of water.  Now
those thousands of acre feet of water which are impounded are
not flowing in the sense that a river flows.

THE COURT:  Well, no underground flow flows like a river,

19,170

MR. VEEDER:  And it is not a subterranean stream, in our view, you see.

THE COURT:  First, replying to your statement, what you have said about a water plane and the fact that the water comes to the surface when the level of the flood plane intersects the water table is not inconsistent with the findings that I am proposing to make.  I think there is merit to that, except that it seems to me that all this water is moving gradually downward.

MR. VEEDER:  It is, your Honor, but not in a stream.

THE COURT:  How fast would it have to move to be a stream?  It is moving gradually downward.

MR. VEEDER:  That is right.

THE COURT:  And where the stream flows and then dries up and flows again, the flow that again occurs at the surface is part of this water underneath, and the only reason it flows on the surface is that it is being supported by water from underneath.

MR. VEEDER:  But your Honor, it is not a matter of water being supported.  It is the fact that all basins are on a gradient -- the Raymond Basin, all of them.  You will find that there the elevation near the mountains is much higher than the elevation at the outlet of the basins.  And all of that water is flowing, it is a laminar flowing, it is not a flow as a stream surface flows, and where the particles

1   and molecules of water intersect the bed of the stream -- it

2   is not a matter of water rising, it is a matter of water

3   continuing down gradient, and because it is getting into a

4   surface stream it flows more preciptiously and more rapidly.

5   But it is a plane clear across the two and half miles of

6   Chappo Basin, for example.  Now the water that happens to be

7   in the bed of the Santa Margarita River, the waters are

8   simply the molecules of water which are percolating through

9   these lenticular deposits, and it is not a matter of an

10   over-all stream flowing down.  It is a lake, in effect.

11         Here is the thing that seems so important to me, your

12   Honor, and I will not argue the case again.  I will simply

13   say that we do have findings in here and your Honor has

14   agreed to them that there is impounded 48,000 acre feet of

15   water, that 25,000 acre feet of that stored water is available

16   for use, that 100 acre feet a year is all that moves out of

17   that 48,000 acre feet through the alluvium.

18         THE COURT:  Moves out into the ocean.

19         MR. GIRARD:  Through the alluvium.

20         MR. VEEDER:  Moves through the Narrows, that is right.

21   It moves through the Narrows.  But there is the plug right

22   there in the tub, in the reservoir, in the lake, and the water

23   is backed up in that.  True, it moves down gradient.  That is

24   true in the Raymond Basin and the San Fernando Valley -- it

25   is true in every single basin extant.  The fact that the

1    water in the upper end of the basin is at a higher level than

2    where it has an outlet doesn't change it from being a basin,

3    nor does it change the fact that waters are in truth impounded

4    in this Santa Margarita Coastal Basin, as the State of

5    California has so designated.

6        That is the point that concerns me very much, your Honor,

7    and I feel this way, that we are now down to the point in

8    this litigation where recognition of a State appropriation

9    to export water from this basin would just about terminate

10   the litigation.  But I don't believe that the United States

11   could ever be in the position of accepting findings where we

12   think your Honor, with all respect to your Honor, where we

13   truly believe that what was set forth in Colonel Bowen's

14   affidavit and what we have set forth in our statements and

15   what we think we have proved, namely, that this is a ground

16   water lake in the contemplation of the law which would not

17   require a filing for the exportation right of approximately

18   3500 acre feet.  I think that the real problem I have in

19   these findings turns right there.  Much of these findings we

20   can accept, but we get down to the crux of this matter and

21   that is why I separated and segregated this particular point.

22   We are down to the point now where, as a matter of fact, I

23   don't believe the United States of America can do otherwise

24   than file strenuous objections to these findings on that

25   particular part.

1          THE COURT:   I had somewhere in one of these files, and
2     I am trying to put my hand on it -- we were all over this
3     before.
4          MR. VEEDER:   Yes, your Honor.
5          THE COURT:   -- The Southern California water cases, the
6     cases involving dry streams of Southern California as
7     contrasted with the streams in the North, which is a different
8     kind of stream entirely, and if I had a minute or two I could
9     find them.   In fact, I at one time suggested that we make
10    reference to these decisions and point out that this area in
11    the Santa Margarita was more comparable to some of these other
12    dry streams than it was to other situations.
13         There is only one thing that in a way bothers me about
14    this.   First, Mr. Sachse or Mr. Girard, do you want to reply
15    to this?
16         MR. SACHSE:   Truly, your Honor, I don't think a reply
17    is called for, unless we are going to reverse a great deal
18    that we have done in the last six months.   Mr. Veeder is in
19    substance saying that he doesn't like your Honor's finding.
20    Of course, you have the privilege at any time to change these.
21    These are interlocutory judgments.   But may I remind all of
22    us present that the Murrieta is finished and I assume ready
23    for lodging, as soon as the exhibits are attached.   Mr. Veeder
24    is making the same factual argument, without facing the issues
25    raised by the Pomeroy case, by the Verdugo Canyon case.

1   Incidentally, you have cited all of those cases in the

2   transcript the day when you gave your from-the-Bench ruling

3   on this issue.  You went through them at length.  They are

4   in the transcript.  I don't know where else you are referring

5   to.

6        THE COURT:  Those are the cases.

7        MR. SACHSE:  You went through the Southern California

8   cases and you pointed out the distinction.  I do not have my

9   file on this question with me, so I can't cite you the

10  paragraph and the case numbers.  But it is the Pomeroy case,

11  it is the Verdugo case, et cetera.

12       I don't think we have anything new here.  I think Mr.

13  Veeder is saying that he is unhappy with the finding and he

14  wants you to change it.  I tell you I am more than pleased

15  with the finding and I would prefer your Honor does not change

16  it.  It is that simple.

17       MR. GIRARD:  I did prepare a proposed finding which I

18  lodged with the Court setting forth those cases specifically.

19  It was that one, Mr. Veeder, if you recall, where my secretary

20  typed in "Proposed Feuding."

21       MR. VEEDER:  Yes, and I didn't think we needed a proposal

22  on that.

23       MR. GIRARD:  It was a mistake.

24       THE COURT:  (Stepping down and drawing on the easel.)

25  The only thing that -- I don't know whether it bothers me or

not, but on this business of underground streams there is no

problem.  Mr. Veeder would have to concede that where the

water from one basin is connected with another the water has

to pass through a narrow area and the water moves underground

from one basin to another.  But in drawing these findings we

found, I think it was 125 feet, up at the top of the alluvium,

is that right?

MR. SACHSE:  We said 135, your Honor, down to 5.

MR. GIRARD:  It is 125 at the confluence of the De Luz

Creek with the Santa Margarita.

THE COURT:  135 feet of alluvium there.  When you get

down to the bottom you have about 300 feet of alluvium.

MR. GIRARD:  That is in the Narrows.  He corrected it

to 200 at the Ysidaro.

MR. SACHSE:  It is 200.

THE COURT:  It doesn't make any difference what figure

-- 200.  And of course by the time you get down to the

Narrows you are only a few feet above sea level.  So that your

movement of water is here, and then there is this 100 acre

feet that goes through here.  Now whether this changes the

situation in that bottom basin or not I don't know.

MR. GIRARD:  Of course, you are overlooking one point

when you say only 100 acre feet go through here, which was

correct, but in a state of nature substantially more than

100 acre feet went up and out on the surface.

1      MR. VEEDER:  It wouldn't go up, Mr. Girard.

2      I assume this is your Honor's ground water table right

3  here.  Is that it?

4      THE COURT:  Yes.

5      MR. VEEDER:  Well, wherever that intersects the bed of

6  the stream -- you don't mind if I draw on this?

7      THE COURT:  No.

8      MR. VEEDER:  Where it intersects the bed of the stream

9  you do have a flowing stream.

10      MR. GIRARD:  Yes.

11      MR. VEEDER:  You have a flowing stream, sure.  But here

12  this is ground water here.  That is actually and in truth

13  impounded.  It is backed up.  And the only reason that it

14  flows here is that where you have an intersection of that

15  ground water table you do have surface flow.  And that is the

16  point that I make to your Honor.  Here is 48,000 acre feet of

17  usuable water.

18      THE COURT:  You are talking about three basins.  I am

19  talking about the bottom one.

20      MR. VEEDER:  I will just talk about the bottom one then.

21  Here we have a ground water basin, a segment of the basin

22  which is smaller.  But you have identically the same situation

23  and circumstance.  The fact that the water passing from Chappo

24  Sub-basin into Ysidaro Sub-basin goes through a more

25  constricted area where the basement complex closes in somewhat

1   in my view, doesn't change the fact that the water is in fact

2   impounded in Chappo Basin and some flowing is a subterranean

3   stream.  It doesn't flow itself as a subterranean stream,

4   with all respect to your Honor.  Sure, it moves, but it

5   doesn't -- it percolates, it doesn't flow.

6       MR. SACHSE:  May I make an observation on your Honor's

7   question?

8       THE COURT:  Yes.

9       MR. SACHSE:  This doesn't upset me, your Honor.  There

10  is not a surface stream that we will consider a surface stream

11  as such where we would find this identical condition existing

12  up and down its course -- where you don't find not only

13  constrictions in wide places but where you find deep holes

14  and eddies where the river doesn't flow.  This in no way

15  makes it impossible.

16      THE COURT:  I was just going to talk about the same

17  thing, that in some of these other streams above we found

18  places of basement lip at the surface where we find shallow

19  alluvium.  It is just a matter of size.

20      MR. SACHSE:  It is a matter of relevant size, the depth

21  and holding capacity.  Mr. Veeder uses the word "impounded,"

22  but in the findings it says "the capacity of the alluvium."

23  The holding capacity of the alluvium is bigger where a stream

24  is bigger, it is smaller where the stream is small.  But there

25  is no fundamental distinction between one of these little

1    slivers up at the upper end of the valley where it comes over

2    the basement complex lip and this picture that your Honor has

3    just drawn.  It is identical except as to the size.

4        MR. VEEDER:  I think there is this difference, your

5    Honor.  You have a situation where your alluvium is at great

6    depth, where it goes to the ocean.  Two-thirds of your basin

7    is below sea level.  I think that in itself is a very strong

8    argument against this subterranean stream.  The only way you

9    could possibly have such a circumstance where the sea water

10   wouldn't come in is the fact that you have a reservoir full,

11   a reservoir completely and entirely full, and when you reduce

12   it to any degree the Pacific Ocean moves in.  No one has ever

13   seen a surface stream, a subterranean stream like that, your

14   Honor, at the ocean.

15       THE COURT:  Reverse movement?

16       MR. VEEDER:  No, I am not talking about reverse movement,

17   your Honor.  I am talking about a situation where you have

18   the water impounded in an alluvial fill which actually for a

19   depth of 200 feet below the ocean surface extends out to

20   where it meets the ocean.  That is a difference, your Honor.

21       I want to have the record that I am trying to bring to

22   your Honor's attention the position here.  I was concerned

23   about what your Honor had said in the record when this matter

24   came up in the first instance, and I have tried to bring

25   together for your Honor these statements that were made by

1  Colonel Bowen and the statements that were made in our earlier

2  arguments.

3      THE COURT:  All right, I have considered your statement

4  filed March 5, 1962.  I am not going to change my position

5  on it.  I do want to look at my notes on these cases again.

6      MR. SACHSE:  Your Honor, Mr. Veeder worked independently,

7  but Mr. Girard, Mr. Wilkinson, Colonel Bowen, Commander Redd

8  and I worked together and have been through the whole thing.

9  There are some fairly frequent changes of words and things

10 here and there, although nothing basic to the text.

11     Isn't that about the size of it?

12     MR. GIRARD:  Yes.

13     MR. SACHSE:  How would you like to proceed, your Honor --

14 go through these one at a time?  Or we have one where we have

15 a large question mark.

16     MR. VEEDER:  Which one is that?

17     MR. SACHSE:  On page 50, Finding 40, and on page 43,

18 Finding 33.  That finding cannot be written until we dispose

19 of this legal question that we argued very briefly at our

20 last hearing -- I see that Mr. Veeder has 11 Cal. 2nd in front

21 of him, so I guess he has been thinking about it himself --

22 and that is this business of the riparians in regard to the

23 tributaries, et cetera.  That finding cannot be approved or

24 rewritten until your Honor rules on the question.

25     THE COURT:  Aren't you fellows making this a complicated

problem?

MR. SACHSE: I don't think it is.

THE COURT: For instance, looking at it from the Santa Margarita, all the Ammunition Depot is riparian from the standpoint of the Santa Margarita.

MR. SACHSE: No, your Honor, That is the whole problem. The problem really arises on Fallbrook Creek, not on the River proper. (Mr. Sachse drawing on the easel.) The problem is this. This is the Santa Margarita River, this is the Fallbrook Creek, and for simple draftsmanship let's say that the Naval Ammunition Depot boundary runs like so. The confluence of the Santa Margarita and Fallbrook Creek is downstream from the southernmost boundary of the Depot, and we have a physical fact here beyond controversy that the Depot was acquired separately and in advance of the rest of the Rancho. So there has been a separation -- I will not use the word "severance" -- a separation of the riparian right of the Naval Ammunition Depot from the riparian rights of the rest of the Rancho. They were separated.

Now the physical fact -- and it is a problem from the standpoint of the Navy -- is that all of their structures, I would say perhaps, Colonel Bowen, 95 per cent of the Depot use is within the subwatershed of Fallbrook, not within the subwatershed of the River proper. Now this is of tremendous importance, since water is being taken from here to here, as

to the rights of, let's use the biggest riparian, Vail Company

upstream.  This the issue that was raised in Santa Margarita

vs. Vail as to how we calculate the riparian rights of this

parcel.  And it is my understanding of the law that when the

confluence is downstream from the boundary, as it is indicated

on my sketch, as to upstream claimants the two drainages are

considered separately, the land within the subwatershed of

Fallbrook Creek is permitted rights and can assert rights

against upstream owners in Fallbrook Creek, and the land with-

in the subdrainage of the River proper can assert rights

upstream and share correlatively upstream with those in the

drainage of the River proper.

Now that is my understanding of the law.  I don't know

whether Mr. Veeder agrees or disagrees.  But it poses a

rather serious problem.

Now if I can continue for just a minute perhaps the

problem isn't quite as serious as we might make it sound, for

this reason.  There are no riparians exercising any riparian

use on Fallbrook Creek.  I think we can disregard that.  I

don't think as a practical matter a finding would be necessary

as to what lands are riparian to Fallbrook Creek.  But I

think unquestionably for the protection of Vail and every

other upstream riparian your Honor must make a finding as to

which lands of the Naval Ammunition Depot are riparian to

the River, and that excludes, in my judgment, the lands

riparian to Fallbrook Creek -- it excludes the lands within

the Fallbrook Creek subwatershed.

THE COURT:  What is your view, Mr. Girard -- the same?

MR. GIRARD:  Yes, I think the law is clear on it, as

far as I am concerned.  I don't think under the classical

riparian approach the Vail Company, all lands that reach the

Santa Margarita River downstream, the waters of which flow

thereon and reach it downstream from the point of confluence

are not riparian as against upstream people.  And there are

nothing but upstream people in this case.  I don't see any

other answer to it, unless Mr. Veeder can come up with some

cases.  Clearly there is no contest as to the factual situa-

tion.  The Ammunition Depot hits the River here and that is

the last point it hits it, and the waters which are used on

the Ammunition Depot are now used from here.

MR. SACHSE:  The waters are used from the subwatershed

of the River proper in the subwatershed of Fallbrook Creek,

which, if my understanding of the law is correct and you

came to an apportionment, let us say, cold bloodedly between

Vail and the Naval Ammunition Depot, your Honor would be

forced in such an apportionment to ignore the irrigable

acreage in this watershed and the uses in this watershed

because they are not a proper riparian use and they are not

as against Vail riparian to the lands in the subwatershed

of the River.

1    Now that is not true, of course, below. Everything in

2    Camp Pendleton, yes, that is riparian to the whole system.

3         THE COURT:  Mr. Veeder.

4         MR. VEEDER:  Your Honor, I have, of course, considered

5    this matter, considered the reason for the rule.  I have

6    searched for a case comparable to this situation.  I haven't

7    pulled together sufficiently all of the facts so that I would

8    be willing to agree or to disagree with what Mr. Sachse has

9    said.  But if we look to the reason for the rule that water

10   must be used within the watershed, we see how inapplicable

11   the principles that he has been urging are under the

12   circumstances.  In the case he has referred to in 11 Cal. 2d.

13   -- which I borrowed from your Honor -- it is repeatedly

14   stated that a downstream riparian can complain if the water

15   is taken out of the watershed because he would not receive

16   the return flow.  Now certainly that is not the situation

17   that prevails here.  We are the last user on the stream, we

18   are the last party who can use water.  There is no one below

19   us who could use it, and for that reason I don't see how

20   anybody can complain about this situation.

21        MR. SACHSE:  I agree.

22        THE COURT:  This was true.  After the water gets down

23   there you can take it out of the Santa Margarita and you can

24   throw it over in Fallbrook Creek, because there is nobody

25   that can complain.  But the real question is, and we are

1   anticipating, in case of an apportionment could you insist

2   to upstream owners on the Santa Margarita that your use of

3   water of Fallbrook Creek was a proper riparian use?

4      MR. SACHSE:  That is the question.  Plus, your Honor,

5   the fact that we are very carefully here, and I don't think

6   there has ever been any disagreement with Mr. Veeder, that

7   one of the things we are trying to do is to define and to

8   limit the rights, and one of the things we have found con-

9   sistently in every other finding is what is riparian to what.

10   That will be a res adjudicata finding, unless we make some

11   sort of caveat.  Therefore I think your Honor is going to be

12   compelled to rule on this question and say, in effect, if my

13   law is correct, that the lands on the Depot in the subwatershed

14   other than the River proper are not riparian to the River as

15   against upstream owners.  That is the size of it, I think.

16      THE COURT:  I think that is what this Vail case said,

17   in this extract from 11 Cal. 2d 501, at 532: " . . Where

18   two streams unite, we think the correct rule to be applied

19   in regard to the riparian rights therein, is that each is to

20   be considered as a separate stream, with regard to lands

21   abutting thereon above the junction" -- here two streams

22   unite, and each is to be considered a separate stream with

23   regard to the lands abutting thereon above the junction --

24   "and that land lying withing the watershed of one stream

25   above that point is not to be considered as riparian to the

1   other stream . . "  That is right on the nose.

2        MR. GIRARD:  I will read this quote from the Anaheim

3   case, which is cited in 11 Cal 2nd:

4        "The evidence also supports the finding that the land

5        irrigated by the defendant does not abut upon or extend

6        to the river.  If the owners of a tract abutting on a

7        stream conveys to another a part of the land not

8        contiguous to the stream, he thereby cuts off the part

9        so conveyed . . "  As against upstream people.  I think

10   they are the two cases on it, your Honor.

11        MR. VEEDER:  I have found no case precisely in point on

12   this, your Honor.

13        THE COURT:  That is what I said to start with.  I think

14   it is a relatively simple problem if you start out and treat

15   each stream as a separate stream down to where it joins.  Now

16   here is a little branch off a stream.  Everybody on that

17   stream are correlative one to the other and everybody down-

18   stream from them where they join another stream can be heard.

19   But you can't hear the complaints of the fellow on the right

20   fork about the users on the left fork, because they are in

21   different subwatersheds.

22        Have you drawn the finding on this?

23        MR. SACHSE:  No, your Honor, we want to obtain your

24   Honor's ruling.  A finding is drawn which, in effect, says

25   this, but I don't think we are entirely satisfied with the

1    language. We think we can do it a little better. But we

2    drew it on the basis of the law as I have stated it, as your

3    Honor seems to agree. And we also had the thought that for

4    the reason I expressed, unless Mr. Veeder had an objection to

5    this, we could utterly ignore the finding as to the riparian

6    acreage on Fallbrook Creek proper. As far as I am concerned,

7    I can't think of anyone upstream who could ever argue about

8    riparian rights in Fallbrook Creek. And most of them are my

9    clients. But if Mr. Veeder wants a finding as to riparian

10    lands on Fallbrook Creek drainage we can draw it. But I

11    think we can safely ignore it. There is no flow there except

12    when it is wet and nobody can use the water anyway.

13       MR. GIRARD:  The ground water is all vagrant and local.

14       MR. SACHSE:  Yes. With that one exception, we would be

15    ready to go through this almost line by line, and we can

16    redraft this by tomorrow.

17       THE COURT:  All right, let's start through and see what

18    you have.

19       MR. SACHSE:  You take it over, Fred.

20       MR. GIRARD:  Finding No. 1.  The only thing to be added

21    to this is the description of the lands which were transferred

22    from the public domain.  Colonel Bowen has that and will give

23    it to me, as I understand it.

24       MR. VEEDER:  I think we should do this.  At the top of

25    page 2, line 1, you set out the amended judgment.  However, I

believe the decree on declaration of taking should be

substituted for the amended judgment, and it would then read

"particularly described in the decree on declaration of

taking recorded January 28, 1942" -- there were amendments,

your Honor, as we went through -- "January 28, 1942 in Book

1311 page 1".

THE COURT:  Was your final judgment the same as your

declaration of taking?

MR. VEEDER:  There was some change in regard to the

payment of money, your Honor, but I believe that as far as

the lands which were taken were concerned this is it.

MR. GIRARD:  Does the declaration of taking transfer

title?

MR. VEEDER:  The declaration of taking transfers title.

MR. SACHSE:  I have no objection.

MR. VEEDER:  If you drop down to line 11, "which lands

are more particularly described in decree on declaration of

taking . . "

THE COURT:  Now wait.  What language are you using up

in the first line, "Declaration of taking"?

MR. VEEDER:  "Decree on declaration of taking."  What

did I say?

MR. GIRARD:  I thought you said "of".

MR. VEEDER:  That is what I said.

THE COURT:  "Decree on declaration of taking"?

1    MR. VEEDER:  Yes.

2    THE COURT: I don't think you are talking right about

3    this.  When land is taken in a condemnation matter the

4    Secretary of Navy in this case files a Declaration of taking.

5    There is no decree.  It is just a declaration that the land

6    is taken.  If you want to look at one of them I'll show you.

7    MR. VEEDER:  I have them in my office.  I asked your

8    Honor about this before.

9    THE COURT:  It is not a decree on declaration of taking.

10   No judge makes any order.

11   MR. VEEDER:  May I say when you and I first talked about

12   this this is what it was in the record.  That is why I went

13   back and changed it.

14   THE COURT:  It is not a decree.  The judge may make an

15   order letting you have possession.

16   MR. VEEDER:  That is right.

17   THE COURT:  I am talking about this language "Decree on

18   Declaration of taking".

19   MR. VEEDER:  That is the language in the record.

20   THE COURT:  If it is in the record, then somebody

21   misspoke, because there is no decree.  The declaration of

22   taking is filed and title passes.  There is no judge's

23   signature on it at all.  It is not a decree.  It is a

24   declaration of taking.

25   MR. VEEDER:  Let me check it out.  This is the language

1       I have on my cards and on my record up there.  This is the

2       date when we have assumed title to the land and that is the

3       date when we wanted reflected.

4              THE COURT:  That is the Declaration of taking.

5              MR. VEEDER:  That is right.

6              THE COURT:  And no judge signs a sheet of paper and

7       there is therefore no decree.  It is a declaration of taking.

8       So the language should be -- and we can check it further --

9       strike "Decree," "Declaration of taking".

10             MR. VEEDER:  I am quite sure the instrument to which I

11      am referring is designated "Decree on Declaration of taking".

12      It's all right.  I'll check it out.

13             THE COURT:  All right.

14             MR. SACHSE:  I notice on line 22 you used just the

15      expression "Declaration of taking".  On line 11 you used the

16      term "Decree on Declaration of taking".  Whether that means

17      anything I don't know.

18             THE COURT:  I think on line 11 "Decree on" should be

19      stricken.  I think you are going to find that these are just

20      declarations of taking that are recorded.  I think on line

21      22 it would be the same.

22             MR. VEEDER:  In regard to Finding No. 3 we will provide

23      the description on that.

24             THE COURT:  When will that be ready?

25             MR. VEEDER:  It is ready now.  I want to refer to page 5.

MR. GIRARD:  Just a moment.  We have no changes on Finding No. 2.  Mr. Veeder, I believe, had comment.

THE COURT:  I have a question.  You mentioned in Finding No. 2 the 9,000 acres and the 123,000 acres.  What about this 1600 acres?

MR. VEEDER:  That was not in private ownership as far as the record shows.

THE COURT:  Where did that come from?

MR. GIRARD:  They acquired it by condemnation.

MR. VEEDER:  We want to be careful about that, because there are different acreages that are involved.

MR. GIRARD:  I don't know who they acquired that from.

Did you acquire that from the Rancho, Colonel Bowen?  Do you know whether this was in the Mexican Grant?

COLONEL BOWEN:  It was not within the Grant line of the Rancho Santa Margarita.

MR. GIRARD:  Was it within any other grant line that you know of?

COLONEL BOWEN:  No, it was not within any other grant line that I know of.

MR. VEEDER:  There were a great many parcels that were acquired.

THE COURT:  Where does this land lie?

COLONEL BOWEN:  It lies on De Luz and Roblar Creek, all within De Luz Creek watershed northerly of the Grant line.

1    THE COURT:  You are talking about the 1676 acres?

2    COLONEL BOWEN:  Yes, your Honor.

3    THE COURT:  And you are not talking about the public

4 domain land?

5    MR. VEEDER:  That is right.

6    THE COURT:  Then your Finding No. 2 is correct.

7    MR. GIRARD:  As far as I know.

8    On my Finding No. 3, which is on page 5, I think Mr.

9 Veeder had a comment.

10    MR. VEEDER:  You will find on line 8 "September 8, 1943,

11 acceptance of the 122,202 . . "  It should be 123,620 rather

12 than 122,202.

13    MR. GIRARD:  What does your letter say?

14    MR. VEEDER:  The letter says that -- 123,620.

15    Now on line 17 through line 28 there are several questions

16 presented.  My own feeling is that we would be better off to

17 take that language out.  I have talked to Mr. Girard about it.

18 He would agree to this language:  That the evidence in this

19 case does not indicate whether the plats were filed.  I think

20 that is the fact.

21    Then in regard to the language on line 22, page 5, I

22 don't believe that has anything whatever to do with the matter

23 which is here involved.  Obviously the United States of

24 America could not be forced to ask the State of California to

25 acquire land.  Secondly, I believe the lands are all acquired

prior to the enactment of this law.  Does the Attorney General

of the State of California say it is a retroactive law?

MR. GIRARD:  I am not going to argue this.  We have

introduced evidence of the facts set forth in lines 17 through

28.  I was mistaken when I talked to you about that.  We did

file the affidavits with the County Clerk or the County

Recorder, I forget which, and the representative of the

California Land Commission, and they were introduced in

evidence.  So these facts are in evidence.

As I understand the situation, the case before the

Supreme Court, the Paul case, it is admitted by the State of

California that they filed letters of acceptance, and it is

our position that the filing of the letters of acceptance is

not enough; that in order to get exclusive jurisdiction you

have to comply with the State law, and the State law says

that at one time you had to file a plat with the metes and

bounds description pursuant to Section 114 of the Government

Code.  That was changed.  Now I understand the law is that

you have to go before the California State Lands Commission

with your procedures.  And you have done neither.

MR. VEEDER:  I don't believe you see what I am talking

about.

MR. GIRARD:  I don't see why they can't make this law

retroactive.

MR. VEEDER:  What I am inquiring is this, is the State

of California asserting in this case that the law is

retroactive?  That is what I have asked.

MR. GIRARD:  I don't think it makes any difference.  If

you didn't file your plat on metes and bounds description

under the old law and they changed the law, I presume you

would have to comply with the new law, if we are correct.

Maybe you are correct and you don't have to do either one.

MR. VEEDER:  I simply say I believe the issue should be

avoided here.  If you will let me read once more what I am

talking about, at line 22:  "nor has the United States of

America perfected its application to the California State

Lands Commission for consent to acquire the land comprising

the Naval Enclave, . . "  Are you asserting that we should

or that we should not, or that we are required to?

MR. GIRARD:  I am just saying that you haven't done it.

MR. VEEDER:  I imagine that there are a lot of things

we haven't done.

MR. GIRARD:  That is all the facts are, that you haven't

done it.

MR. VEEDER:  I am talking about the relevancy of the

matter, and I do want to know whether the State of California

is saying this is applicable to the Naval Enclave.

MR. GIRARD:  I don't know.  I don't think anyone knows

until the Supreme Court rules.

THE COURT:  Are these types of facts present in the

1    Supreme Court case that is pending?

2        MR. GIRARD:  That is my understanding, yes.

3        MR. VEEDER:  I have been reading what I can on this

4    matter, Mr. Girard, and I find nothing whatever with reference

5    to this last "nor has the United States of America perfected

6    its application to the California State Lands Commission for

7    consent to acquire the land comprising the Naval Enclave, . ."

8    I don't know that that is applicable here at all.

9        MR. GIRARD:  My people tell me this factual situation is

10    identical to the cases which I think involved -- I am not

11    sure -- I believe one involves the Castle Air Force Base, the

12    other involves the Oakland Naval Base, I think it is -- I am

13    not sure.  But they tell me these facts are almost identical

14    to the Camp Pendleton facts.

15        THE COURT:  What flows from a holding of the Supreme

16    Court, if such is made, that the Government does not have

17    exclusive jurisdiction?

18        MR. GIRARD:  As far as this case is concerned, your

19    Honor, absolutely nothing.

20        THE COURT:  What are they fighting about?  Service of

21    process or something?

22        MR. GIRARD:  No, they are fighting about whether the

23    milk control laws which we have can be made applicable to, I

24    believe it is, wholesalers who sell milk to the Navy at Camp

25    Pendleton.

1    MR. SACHSE:  Exclusively.

2    MR. GIRARD:  Exclusively to Camp Pendleton.  In other

3  words, whether our minimum rates which the State establishes

4  for those milk producers can apply to sales of milk which

5  these producers make to Camp Pendleton or similar military

6  installations.  That is the only issue.  As I understand it,

7  if the United States does not have exclusive jurisdiction,

8  they can't.  If they haven't got it, then our laws can apply.

9  As far as this case goes, nothing.

10    THE COURT:  Most of these acquisitions of title reserved

11  to the State the right to serve criminal process, didn't they?

12    MR. GIRARD:  Yes, I think all of them, as far as going

13  in and serving process.

14    MR. VEEDER:  That is right.

15    MR. GIRARD:  Also in the Paul case -- I am not sure of

16  this -- the District Court at least stated that these laws

17  were inconsistent with the Federal Procurement Act.  I believe

18  -- maybe I am wrong on this -- that argument was advanced to

19  the District Court.  That was abandoned by the Solicitor

20  as being erroneous.

21    MR. VEEDER:  By reason of the change of position.

22    MR. GIRARD:  Yes.

23    MR. VEEDER:  Your Honor might be interested in the brief

24  filed by the Solicitor General.

25    THE COURT:  I don't want to read it.  It just comes down

to this.  You wanted a finding, Mr. Veeder, that the
Government had exclusive jurisdiction.

MR. VEEDER:  Yes I did.

THE COURT:  We can't make the finding while the matter
is open.  There is where we stand on it.

MR. VEEDER:  My objection is to this recitation of facts
in here which I believe are irrelevant.

THE COURT:  All right.  On line 23 "perfected," this
sort of implies that the United States made an application.

MR. GIRARD:  All right.

THE COURT:  " . . nor has the United States made
application" is what you are talking about isn't it?

MR. VEEDER:  That is right.

MR. GIRARD:  I believe so.  That is fine.

THE COURT:  Because your word "perfected" its application
sounds as if they had already made one.

MR. GIRARD:  All right.

THE COURT:  The objection is overruled, Mr. Veeder.  We
are holding the matter open.

I want to go back to line 13.  There you refer to
1574.61 acre tract.

MR. GIRARD:  That is right.

THE COURT:  What tract is that?

MR. GIRARD:  That is the land which is on page 3, which
property description Mr. Veeder is going to submit.  That is

the Governmental transfer of public domain land.  It is correct as indicated in the former description Mr. Veeder gave us.  I am not sure whether that is the correct total acreage now or not.

MR. VEEDER:  The total acreage is correct.

MR. GIRARD:  I know the description was wrong, but that was the total acreage given in the first description you gave us.

MR. VEEDER:  That is right, 4500 acres described.

MR. GIRARD:  I'll take whatever you say on that.

THE COURT:  What is the next one?

MR. GIRARD:  Finding No. 4.  The heading should be changed from "Riparian Lands" to "Watershed Boundary".

Finding No. 5, no change.

MR. VEEDER:  Change that to "Watershed Line"?

MR. GIRARD:  "Watershed Boundary."  I don't care.

THE COURT:  "Watershed Boundary" is good enough.

MR. GIRARD:  I hope that acreage figure is correct.

MR. VEEDER:  That is what we put in evidence.

MR. GIRARD:  I don't recall where I got the figure.  It was different than what was on yours slightly.

MR. VEEDER:  When we changed the watershed line and brought in additional land it brought it to 38,694.

MR. GIRARD:  Fine.  Finding No. 5 on page 8, we had no suggested changes.

Finding No. 6 on page 9 we had no suggested changes.

Finding 7 on pages 10 and 11 we had no suggested changes.

Finding 8 on page 12.  The group that met this morning had no suggested changes, but I understand Mr. Veeder wants to check the figures and see if they are correct.

MR. VEEDER:  I have asked that the finding include a statement that the military demands for each person for water from the Santa Margarita River average 200 gallons a day all year.  I think it is proper for this Court to find that even though we haven't been getting that quantity of water, the average quantity of water required for each person is 200 gallons a day.

And then I would also suggest that we put in there, "The greatest number of personnel requiring water at the Naval Enclave at any time" -- I have it written up.

MR. GIRARD:  I haven't seen this.  I want to make it clear, Mr. Veeder, though, in the first place, when you base your water demand on 200 gallons per day, I think you are cheating yourself from what the State Water Rights Board allows.  I think they give you 250 gallon per day.

In the second place, I want to make it clear that merely because you have seventy or sixty thousand people on a military reservation does not mean that their water requirements have to be satisfied out of the Santa Margarita River.

MR. VEEDER:  The point I make in regard to the 200

19,199

gallon a day is that that was the evidence the Marines wanted introduced, and we introduced it.  That is in the record.

MR. GIRARD:  How much water you are going to use in a day for a particular person, I think you are tying yourself down the same way you are on irrigable acreage.  I don't think it adds anything at all.  In an apportionment proceeding you might be concerned with it.  I don't think you are here.

MR. VEEDER:  We also are desirous of having that increased to 56,000.  The record shows that the maximum number on the Enclave was 56,000.

MR. GIRARD:  Is that the projected total population?

MR. VEEDER:  No, that was the maximum at any time.  That was 56,000.

MR. GIRARD:  These are Mr. Sachse's findings.  My finding said the population has averaged 42,000 per year.  You want a maximum figure, is that right?

MR. VEEDER:  The maximum is the only thing that makes sense.

MR. GIRARD:  Do you want to put the maximum and the minimum, Franz?

MR. SACHSE:  I don't care.

THE COURT:  You have presently a projected population for the fiscal year 1959.  The projected population in 1959 is long past.  Now the maximum figure could well go in rather than this projected figure for 1959.

MR. SACHSE:  All right.

MR. GIRARD:  All right.  That the maximum total population for any given year has been -- is that all right?

MR. VEEDER:  I say the maximum number of personnel requiring water within the Naval Enclave at any time is 56,000.

THE COURT:  When did that occur?

MR. VEEDER:  That occurred in 1944, your Honor.

THE COURT:  Have you got a copy of this for me?

MR. VEEDER:  Yes.  I am going to make some changes in this.

THE COURT:  Let's put it over.  If you are going to work it over, let's talk about it.   Let me see what you have.

MR. SACHSE:  Before you work it over, Mr. Veeder, maybe we ought to raise a couple of questions.  Is 56,000 the maximum population that has ever been on the whole Pendleton so far?

MR. VEEDER:  That is my understanding.

MR. SACHSE:  That doesn't all get its water from the Santa Margarita River.

MR. VEEDER:  The record shows that is the situation.

MR. SACHSE:  The record doesn't show that.  The record shows that they have water supplies in Pulgas and other places.

MR. VEEDER:  They all come originally into the Santa Margarita, and there are 56,000, according to Colonel

1   Robertson's testimony.  If you want to check it out, Mr.

2   Sachse, by all means check it out.  I can give you the page

3   number.

4          THE COURT:  But you say the greatest number of personnel

5   requiring water within the Naval Enclave  --

6          MR. VEEDER:  From the Santa Margarita is 56,000.

7          MR. SACHSE:  That is not true.  It may be for one day.

8          MR. VEEDER:  For one day you have to have water, Mr.

9   Sachse.

10          MR. SACHSE:  But you can't multiply your maximum by a

11   per day figure of 30 acre feet a day for a total of 13,910

12   acre feet for a year, because it is not true.

13          MR. GIRARD:  Why do they have to have it from the Santa

14   Margarita?

15          MR. SACHSE:  They can get it from anyplace -- the

16   Colorado.

17          MR. VEEDER:  Yes, we might get it from the Columbia.

18   But as a matter of fact what is involved is the Santa

19   Margarita, and we are claiming water in that amount and for

20   that purpose.  We are doing exactly like Fallbrook Public

21   Utility District did.  Your Honor made a finding for 35,000

22   acre feet of storage, something like that, with an average

23   of -- what was it, 5,000?

24          THE COURT:  I never made any.

25          MR. VEEDER:  I think you said --

1    THE COURT:  I merely said that they had a right to go

2    to the State Water Rights Board and get a permit, and they

3    got one.

4    MR. VEEDER:  For 35,000 acre feet.

5    THE COURT:  I didn't pass on it.  I even said I was not

6    going to pass on whether they should build their dam or not.

7    MR. VEEDER:  I feel this way about these findings, that

8    the quicker they are entered the better off we are.  I will

9    tender what I think is proper.  I will file formal objections

10   to what I disagree with and let it go that way.

11   MR. GIRARD:  I was not in this case, but is there any

12   evidence at all in this record -- I read the transcript once

13   -- that had it not been for this litigation these plans would

14   have been accomplished?

15   MR. VEEDER:  That is right.

16   MR. GIRARD:  Has the military curtailed its military

17   uses at Camp Pendleton because of this litigation?  Have they

18   quit training Marines down there, quit using it as a national

19   defense establishment?

20   THE COURT:  What happened is this -- I don't think it

21   belongs in the findings -- that Congress refused to appro-

22   priate money until last year, I think, for Pendleton as long

23   as this litigation pended, and I think they broke through

24   last year and you got some new appropriations, didn't you,

25   Colonel?

1    COLONEL BOWEN:  Yes, your Honor.  Actually, the break

2   through occurred a year before last and we had around six

3   million dollars to spend on construction at Camp Del Mar.

4    MR. SACHSE:  Mr. Veeder, may I offer one suggestion in

5   the interest of saving time.  I would suggest if you would

6   help us that you take our Finding 8 and insert the figures

7   that you think are correct therein, and that you also then

8   submit an alternative finding No. 8 that some of us can argue

9   about, including these other things -- this water use.

10    MR. VEEDER:  Fine.  At page 8096, Volume 71:  "Camp

11   Pendleton has been told how many people they should plan and

12   design for, and in turn we have devised construction plans

13   and would have gone ahead with them except for this litigation."

14   That is what Colonel Robertson testified to, and that is the

15   source of this language I have used.  I am perfectly willing

16   to sit down and talk with you gentlemen further about the

17   kind of finding.  The language is in there, Mr. Girard.

18    MR. GIRARD:  I don't think Colonel Robertson or any other

19   military person can testify as to the intent of Congress.

20    MR. VEEDER:  It was in there without objection.

21    MR. GIRARD:  Maybe it is in there.

22    MR. VEEDER:  Well, it is in there.  I just read it to

23   you.

24    MR. GIRARD:  I don't think a Colonel in the Marines can

25   testify why somebody voted for something in Congress.

1    MR. VEEDER:  As I say, let's get these things entered,

2  gentlemen.  That is the only way we will get to the Ninth

3  Circuit.

4    MR. GIRARD:  I don't worry about the Ninth Circuit.  We

5  have won every case you have won up there anyway.

6    MR. VEEDER:  We?

7    MR. GIRARD:  Not me.

8    Finding No. 9.  We have no changes.

9    THE COURT:  What do you want to do about 8?  Do you

10  want to talk to them about this, or do you want me to rule on

11  it?

12    MR. SACHSE:  I want to be perfectly proper and correct

13  with the amounts.  Mr. Girard does too.  If our figures are

14  wrong here, Mr. Veeder, I would sincerely suggest that you

15  just by interlineation on Finding No. 8 put in the figures

16  you want.  Then you propose, which I will resist, your

17  additional finding on this gallons per day et cetera.

18    MR. VEEDER:  All right.

19    MR. SACHSE:  So we will have something we can settle

20  tomorrow and have it done.

21    MR. GIRARD:  Finding No. 9.  We had no suggested changes.

22    MR. VEEDER:  I would like to have added on line 11 the

23  washing of military vehicles.

24    MR. GIRARD:  I have that on hh, on line 15, vehicle

25  washing facilities.

THE COURT:  It is the very last item hh on page 14.

MR. VEEDER:  I guess "vehicles" includes everything.

MR. GIRARD:  I think it does.  It includes a tank, under our Vehicle Code, if it is on the highway, Mr. Veeder.

Finding No. 10.  We are going to have to insert on lines, I guess it is, 22 and 23 the figures for the agricultural uses, which I didn't have in Sacramento when I drafted it and I understand those are on an exhibit.  We will have those tomorrow.

MR. VEEDER:  Do you want them now?

MR. GIRARD:  Yes, any time we can get them.

MR. VEEDER:  Here they are.  I have put them in my copy.

MR. GIRARD:  Read them off.

MR. VEEDER:  In the second column of figures:  Agriculture 700 for 1942, 920 for 1943, total 700 for 1942 and total is 920 for 1943.

THE COURT:  That is within the watershed.

MR. VEEDER:  That is correct, that is within the watershed.  Outside the watershed it is 1090 for 1942, 1440 for 1943.

MR. GIRARD:  The same totals?

MR. VEEDER:  Totals, yes.

MR. SACHSE:  Would that not be incorrect to give totals, because the fact is you have no figures for those years as to military use within or military use without?

1    MR. VEEDER:   I think we should make a separate finding

2    then.   I am perfectly willing to have a separate finding

3    complete and entire for the year 1942 and 1943.

4    MR. SACHSE:   I would suggest just putting in asterisks

5    under "military" and under "total" and add at the bottom

6    "No figures available for either military or total for the

7    years 1942-43".

8    MR. VEEDER:   I have no objection.

9    MR. SACHSE:   That tells your story.

10    THE COURT:   That is better.   Take out these totals you

11    have put in here and put asterisks for the totals and

12    asterisks for military use and say "No figures available".

13    That is correct, isn't it?   All right.

14    MR. GIRARD:   Finding No. 11.   We have no suggested

15    changes.

16    MR. SACHSE:   Except "watershed," I see, is misspelled

17    there on the first line.

18    MR. GIRARD:   Finding No. 12.   We had no suggested changes.

19    THE COURT:   In 12 you have one of these ambiguous

20    statements at the tail end of it, "All uses of water by the

21    United States outside the watershed have been as conservative

22    and well managed as the uses of water by the United States

23    within the watershed".   Maybe it is all right as is.

24    MR. VEEDER:   Your Honor is still objecting to the use

25    of the words "beneficial and reasonable" outside the watershed.

You originally raised the objection.

THE COURT:  Can we get one thing at a time?

MR. GIRARD:  On lines 16 and 17, "All uses of water by the United States of America outside the watershed have been and are conservative and well managed."

THE COURT:  This section talks about both in and out, doesn't it?

MR. SACHSE:  Yes.

MR. GIRARD:  Yes.

THE COURT:  Why not say, "All uses of water by the United States inside . . "

MR. GIRARD:  "All uses of water by the United States within the Naval Enclave . . "

MR. SACHSE:  Within the Naval Enclave, yes.

THE COURT:  I don't care.

MR. GIRARD:  " . . have been and are conservative and well managed."

THE COURT:  Either within or without the watershed, or within the Enclave.

Now, Mr. Veeder, what is your point?

MR. VEEDER:  I would like again to ask you to enter the ruling that they are reasonable and beneficial even if they are used outside the watershed.

THE COURT:  Is this the finding?

MR. VEEDER:  Well, you will observe it starts out, "All

1    uses by the United States of America of the waters of the

2    Santa Margarita River within its watershed have been and are

3    reasonable and beneficial. . ."

4        THE COURT: " . . as to the character of use."

5        MR. VEEDER: I truly believe that that all could be

6    said similarly about the uses outside the watershed.

7        MR. SACHSE: We had it so written and you, yourself,

8    objected.

9        MR. VEEDER: I said I would like to have them reconsidered.

10       MR. SACHSE: You said you didn't want him to find the

11   uses outside the watershed were reasonable.

12       THE COURT: I remember that.

13       Doesn't it read all right the way it is?

14       MR. SACHSE: It reads according to your instructions the

15   way it is.

16       MR. VEEDER: I submit simply, would you not reconsider

17   and simply say that the uses are reasonable and are beneficial

18   outside the watershed, because I think the facts show that.

19       THE COURT: What is the advice of counsel on the matter?

20       MR. GIRARD: I don't feel too strongly on it one way or

21   the other, your Honor, except that the word "beneficial"

22   before "purposes" means essentially that the water is put for

23   beneficial uses. Now whether or not it is reasonable --

24   well, I don't know. I have no objection to adding "reasonable."

25   I think we are quibbling on words, really. As long as we have

1    it qualified  "as to character of use."

2         MR. VEEDER:  I think the evidence would support such a

3    finding.

4         MR. GIRARD:  It is just a question what legal effect

5    does the term "reasonable" have -- for a reasonable purpose?

6    I have some doubt whether use of water outside the watershed

7    without right is a reasonable purpose, in the light of a

8    right.  It certainly is a reasonable purpose in the light of

9    a water use.

10        THE COURT:  Do you want to put "reasonable" in?

11        MR. VEEDER:  I would like to have it read, "All uses of

12   the United States of America of the waters of the Santa

13   Margarita River both within and without the watershed have

14   been and are reasonable and beneficial as to character of

15   use."

16        MR. GIRARD:  All right.

17        MR. SACHSE:  I would have no objection as long as we

18   leave the "character of use" clause in.  I think that is the

19   critical thing.  So you would make it read, "All uses by the

20   United States of America of the waters of the Santa

21   Margarita River both within and without . . " Is that right?

22        MR. VEEDER:  Without the watershed.

23        MR. GIRARD:  No, I don't think you have to do that.

24   Your first sentence refers to just the watershed.

25        MR. SACHSE:  You can do it in two sentences and you would

1   have to change it somewhat.  Add the word "reasonable" after

2   the word " --

3      MR. VEEDER:  Drop down to the second sentence and say

4   "outside the watershed have been reasonable and are for

5   beneficial uses".

6      MR. GIRARD:  " . . have been and are for reasonable and

7   beneficial purposes . . "

8      MR. VEEDER:  That suits me fine.

9      MR. SACHSE:  Okay.

10     THE COURT:  Then let's go down to the bottom where we

11  talk about the uses and instead of saying " within the Enclave"

12  say "within and without the watershed".

13     MR. GIRARD:  All right.

14     THE COURT:  Keep this matter in focus, that a lot of

15  this water is being used outside.

16     MR. VEEDER:  How would that read, your Honor?

17     THE COURT:  At line 16, "All uses of water by the United

18  States of America within and without the watershed of the

19  Santa Margarita River have been conservative and well managed."

20     MR. VEEDER:  Period and strike out the balance?

21     THE COURT:  Yes.

22     MR. GIRARD:  Finding No. 13.  There were no changes.

23  However, I have asked Colonel Bowen to check my property

24  sections to make sure they are correct.

25     The definition of "infiltration gallery," on lines 11

1   through 15 on page 18, was approved by Colonel Bowen today

2   and it is in fact a word for word quote of his testimony.

3   That has been added.  In the original finding we had last

4   time, if you recall, we just referred to "infiltration

5   gallery" and I believe Mr. Sachse felt that should be defined,

6   and this is the definition of an infiltration gallery which

7   is correct.

8        The sections, however, I would like to have checked.

9        Finding No. 14 on page 20 has no changes.

10       Finding 15 on page 21 has no changes.

11       Finding 16 on page 22.  I think we should, in order to

12   make it without any doubt acceptable, delete the last

13   paragraph entirely -- lines 14 through 21.

14       MR. VEEDER:  May I inquire.  We have gone into this

15   before, but I have been trying to figure out why we put in

16   that "in the summer of 1961".

17       MR. GIRARD:  That is the last evidence I think we had.

18       MR. VEEDER:  Really, what is the significance of the

19   proposal?  I think Mr. Sachse proposed it, and I would like

20   to have it in the record.

21       MR. SACHSE:  The proposal is simply this, that this is,

22   to the best of our knowledge, the driest or furthest

23   upstream that the River has ever flowed as a surface stream.

24       MR. VEEDER:  When you say the furthest upstream --

25       MR. SACHSE:  The River has flowed.  There has been less

19,212

water in the River in the summer of 1961 than at any other time to our knowledge.

MR. VEEDER:   In what reach of the River?

MR. SACHSE:   Within the Enclave.   There has been less surface flow within the Enclave in the summer of 1961 than at any other time within our knowledge of this case.   That is the reason for picking that.   Perhaps not the summer, the fall of 1961.

MR. VEEDER:   I would have to check that out, Mr. Sachse, because I really don't believe it.

MR. SACHSE:   Isn't that correct?   No?   Then correct it, Colonel Bowen.

COLONEL BOWEN:   I would say in the summer of 1961, your Honor, we had water as a surface stream further down the Santa Margarita River than we had for a number of summers prior to that.   As a matter of fact, it was in 1952 that we laid the pipe from the De Luz well following the meander of the Santa Margarita River about five miles to the NAD diversion because there was no surface water then at their diversion point to supply their needs.   So we allowed them to pump the De Luz well and every summer since then up until 1961 they did pump water from that well back up the River to their point of  diversion.

MR. SACHSE:   Accepting that correction but still answering your question, Mr. Veeder, the history of this

1    paragraph is that it started out, if you will remember, and

2    I wrote first using the point in Section 5 Township 10 South

3    Range 4 West, the way I first drafted it, that the Santa

4    Margarita under ordinary conditions flowed as a surface stream

5    to so and so.  That was objected to by you or Colonel Bowen

6    because it did not reflect the true facts.  So then we are

7    hunting for a way to describe the present surface flow of the

8    Santa Margarita River.

9         MR. VEEDER:  Couldn't we just strike the whole thing?  I

10   don't see what it contributes really at this juncture.

11        MR. GIRARD:  The summer of 1961 is the last evidence we

12   have as to where the surface flow is.  If you say where it

13   flowed the last time we knew, it sets forth the facts as it

14   existed.

15        MR. VEEDER:  I have no objection to striking the whole

16   thing.  My own view is that it contributes nothing but

17   confusion.

18        MR. GIRARD:  How can it contribute confusion if you say

19   just what the facts were in 1961?

20        MR. VEEDER:  I think this, that what we could do very

21   well is make a finding that Fallbrook Public Utility District

22   and immediately above the Enclave pumped the water out of the

23   stream and reduced the quantity of the surface flow in the

24   Enclave.

25        MR. GIRARD:  I have no objection to dropping it out.

THE COURT:  All you numbers will have to be changed.

MR. VEEDER:  I'll be glad to write a finding for No. 16.

MR. SACHSE:  We have habitually in our findings, Mr. Veeder, described the surface flow of every stream.  Maybe it has been unnecessary in all of them.  I just see no reason for not making such a finding here.  I think it will present the story.  If you can describe it better as to where it flowed --

THE COURT:  What is wrong with Finding 16 as it is?  Is it in error?

COLONEL BOWEN:  No, sir, it is a correct statement of fact as it is written, with the exception of the second paragraph.

MR. GIRARD:  Just knock out the second paragraph.

THE COURT:  What is wrong with the second paragraph?

MR. VEEDER:  I think it is not quite correct.

MR. SACHSE:  " . . immediately preceding the summer of '61" doesn't mean anything.

COLONEL BOWEN:  It did not flow as a perennial stream to the point designated in Paragraph 2 on page 22.

THE COURT:  Where is it usually flowing as a perennial stream?

MR. VEEDER:  I am going to object to Finding 16 unless we make complete findings.  The reason the water was in the stream unquestionably in 1961 is that Vail Company pumped

1    water into the Gorge and Fallbrook Public Utility District

2    did not pump out as it had.  If you want to write it down

3    that way, it suits me.  But let's put in all the facts.  I

4    see no reason for it.  But I will get some language for the

5    morning.

6         THE COURT:  Take a recess.

7         (Recess.)

8         MR. GIRARD:  Your Honor, on Finding 16, the second

9    paragraph, I think I have some language here which might say

10   the same thing, which I don't think can be objectionable, and

11   it would read as follows:  That the Santa Margarita River

12   surface flow within the Naval Enclave varies from year to

13   year, depending upon precipitation and runoff and diversions

14   within and upstream from the Naval Enclave.

15        MR. VEEDER:  And you are going to leave the first

16   paragraph as it is?

17        MR. GIRARD:  I think the first paragraph is just dealing

18   with the summer of 1961.

19        MR. VEEDER:  I think your second paragraph is probably

20   all right.  I see no reason whatever for selecting 1961,

21   unless we amplify it.

22        MR. SACHSE:  Take it out, if you want to.

23        MR. GIRARD:  It is just the last evidence we have.

24        MR. VEEDER:  Just take it out then.

25        MR. GIRARD:  And just say that the surface flow --

1    MR. VEEDER:  That is right, the way you read the second

2  paragraph.

3    MR. GIRARD:  That is fine.

4    THE COURT:  Are you going to take out the first paragraph

5  then?

6    MR. GIRARD:  I don't care -- if Mr. Veeder wants it.

7    MR. VEEDER:  I don't want the first paragraph.  You can

8  change the second one the way you did and let's go.

9    MR. GIRARD:  What reason do you have -- I don't particu-

10 larly care, but just for deleting what the River is right

11 now, which is as close to it as we can get, which is what

12 the first paragraph does.

13    MR. VEEDER:  Not right now.

14    MR. GIRARD:  All right, in the summer of 1961.

15    MR. VEEDER:  It doesn't show the whole picture, your

16 Honor, as I said before, if you want to write that the Vail

17 Company pumped   three second feet of water in  at the Gorge

18 and that Fallbrook Public Utility District quit pumping --

19 start again.  In the summer of 1961 Vail Company in compliance

20 with the stipulated judgment pumped three second feet of

21 water into the canyon and Fallbrook Public Utility District

22 did not pump water in that summer, the Santa Margarita River

23 flowed within the Naval Enclave onto the end of the program.

24 That is what happened.

25    MR. GIRARD:  Well, they didn't pump three second feet in

1    there.

2        MR. VEEDER:  Oh, yes.

3        MR. GIRARD:  They pumped less than one.

4        MR. VEEDER:  They pumped whatever was required to make

5    three second feet.

6        THE COURT:  It doesn't make a lot of difference.  Can

7    you use the first paragraph, put in this new language, and

8    let's go on.

9        MR. GIRARD:  All right.

10       THE COURT:  Finding 17.

11       MR. GIRARD:  Finding 17, we had no changes.

12       THE COURT:  18.

13       MR. GIRARD:  Finding 18, on line 6, change the word

14   "perennial" to "surface."

15       MR. VEEDER:  That's right.

16       MR. GIRARD:  There may have to be some slight modifica-

17   tion in this because this finding referred back to 16, which

18   was the one we just changed slightly.

19       THE COURT:  19.

20       MR. GIRARD:  On line 11 cross off the word "material"

21   at the end of the line.  Two "materials" were typed in there.

22   That is the only one on that.

23       On Finding 20 we had no changes.

24       THE COURT:  On page 27 I don't understand the last

25   paragraph.  I don't know what it means.

1    MR. GIRARD:  Mr. Sachse raised the same question.

2  Essentially, the usable storage of the three basins totals

3  26,200 acre feet of water, and that is storage which is

4  available for use in addition to that which is used by the

5  United States to maintain the fresh water barrier -- in other

6  words, spreading it, which we found later on is a reasonable

7  and beneficial riparian use.  In other words, the usuable

8  storage is 26,200 acre feet above that required to maintain

9  the fresh water barrier.

10   THE COURT:  You don't say that.

11   MR. SACHSE:  That was my question, whether it says that.

12   MR. GIRARD:  All right.

13   THE COURT:  "The usuable storage capacity as set forth

14  above is available for use without tapping the -- "

15   MR. SACHSE:  Without jeopardizing.

16   MR. GIRARD:  " . . is available for use in addition to

17  that required . . "?

18   THE COURT:  No.  The water you maintain in the barrier

19  is not available for use.  " . . . is available for use without

20  affecting the water used to maintain the fresh water barrier,"

21  something like that.  That is what you mean, isn't it?

22   MR. SACHSE:  That is what it is supposed to mean, yes.

23  That is the same question I would ask.

24   THE COURT:  Work it over.  I felt like Mr. Sachse.  I

25  couldn't understand it.

1      MR. GIRARD:   All right.

2      THE COURT:   Finding 20.

3      MR. GIRARD:   Finding 20, we had no changes.

4      THE COURT:   21.

5      MR. GIRARD:   Finding 21, no changes.

6      Finding 22, no changes.

7      THE COURT:   Finding 23.

8      MR. GIRARD:   On line 23 change "300 feet" to "200 feet."

9      Now there are a few changes on page 32, the second page

10     of that finding.  Line 3 the Upper Sub-Basin should be

11     capitalized.

12     MR. VEEDER:   Just a moment.  Give me the page number

13     again.

14     MR. GIRARD:   On page 32, line 3, where the term

15     "upper sub-basin" is used it should be capital U and capital

16     S.

17     On line 10 change the word "portions" to "member."  So

18     it would read "the lower member of the younger alluvial

19     deposits," which is the way it is referred to on the exhibit.

20     It would read "the lower member of the younger alluvial

21     deposits as contrasted to those" and then strike out "near

22     ground surface" and add "in the upper member" on line 11.  On

23     line 13 cross out the words "portions" and substitute the

24     word "member" in each of two cases.  It is "the lower member

25     than exists in the upper member, . . ."

MR. VEEDER:  Are you going to capitalize those?

MR. GIRARD:  Not the word "member," no.

On lines 14 and 15 cross out the words "near ground surface" and substitute "in the upper member".  Then on line 15 cross out the words "lower or deeper areas" and substitute the words "lower member".

That is the extent of the changes on that.

THE COURT:  Finding 24.

MR. GIRARD:  On 24 I have a change which I am sure Mr. Veeder and everyone else will agree to.  Strike out "That it is true that" and start the sentence with "All . . "

MR. VEEDER:  Thank you, Mr. Girard.  I appreciate that more than you know.

MR. GIRARD:  Finding 25, lines 4 and 5, just cross out "which underlie the surface flow of the Santa Margarita River".

THE COURT:  You say "The ground water contours within the younger alluvium within the Naval Enclave. . "

MR. GIRARD:  Yes.

THE COURT:  All right.

MR. GIRARD:  On line 12 change the word "follow" to "followed."

THE COURT:  I would suggest also on line 12 after the words "ground surface" insert "downstream to the ocean," so it would read "The elevation of the ground water table within said deposits as evidenced by said exhibit conform generally

with ground surface downstream to the ocean and followed in

approximately in even downward gradient . . "

MR. GIRARD:  All right.

We have some changes on Finding No. 26, at lines 4 and

5.  Cross out the words "which underlie the surface flow of

the Santa Margarita River of the" and substitute the word

"within".  So it would read "That in a state of nature the

ground waters which are contained within the younger alluvial

deposits within the Naval Enclave . . "

At line 11 cross out the word "on" and substitute the

word "within".

At line 13 where it reads "That the sewage effluent"

add the words "waters of the," so you would insert "the

waters of the".

Going to the next page on line 24 cross out "Naval

Enclave" and substitute "United States of America".

Finding 27 on page 37, lines 8 and 9, cross out the

words "underground alluvium" and substitute "younger alluvial

deposits".  That is just for consistency.

At line 11 the word "practices" is misspelled.

Finding 28 on page 38, line 10, before the word "act"

add the word "wrongful" -- "has not been caused by any

wrongful act".

Finding 29.  There will be a few on this.  At line 13

on page 39 after the word "beneficial" insert the word

"riparian". On line 17 change the word "segments" to

"member." In other words, we are specifically saying

maintenance of the salt water barrier is a reasonable and

beneficial riparian use. And the same thing on line 28.

On line 30 after the "the" where it says "the water table,"

after the word "the" add "elevation of the water table".

And cross out "lower segment of the" on line 31. Cross out

the word "dropped" on line 31 and substitute the word "lower-

ed," so it would read "the younger alluvial deposits lowered

to a point . ." Cross out the rest of the sentence and add

the words "level which permitted salt water intrusion".

Commencing on line 30, then, it would read as follows: "That

as a result of that reduced runoff and pumping, the elevation

of the water table in said younger alluvial deposits lowered

to a level which permitted salt water intrusion." That is

the end of that.

  Finding 30.

  THE COURT: Insert the word "further" in the title, "No

further salt water intrusion . . "

  MR. GIRARD: All right. On line 5 cross out the words

"said lower segment of". So it would read, "That subsequent

to 1956 the United States of America reduced its pumping from

the younger alluvial deposits" and then cross out "above the

Ysidaro Narrows" and add "within the Ysidaro Sub-basin". So

it would read "That subsequent to 1956 the United States of

1   America reduced its pumping from the younger alluvial deposits

2   within the Ysidaro Sub-basin.  Simultaneously" and then

3   insert "United States of America commenced a program of ground

4   water recharge of" and cross out the words "said deposits"

5   and add the words "the younger alluvial deposits within the

6   Naval Enclave; . . "  So that that sentence would now read,

7   "Simultaneously the United States of America commenced a

8   program of ground water recharge of the younger alluvial

9   deposits within the Naval Enclave. . "

10       Going down to line 9 cross out the words "by the" and

11   substitute the word "of," change the words "construction

12   and operation" to "constructing and operating".

13       On line 10 cross out the word "of".

14       MR. VEEDER:  Let's hear that again.

15       MR. GIRARD:  On line 10 the first word "of" cross out,

16   and on line 11 change the word "eradication" to "eradicating,"

17   and cross out the word "of" immediately there following.  So

18   that sentence would read, "that said ground water recharge

19   program consists of spreading sewage effluent over said

20   deposits and of constructing and operating spreading works in

21   combination with an extended program of eradicating

22   phreatophytes and other water consuming vegetation."

23       On line 13 cross out the words "said area" and substitute

24   the words "the younger alluvial deposits".  "Effluent" is also

25   misspelled on that line.

1  THE COURT:  So it would read --

2  MR. GIRARD:  "That substantial amounts of the sewage

3  effluent used to recharge the younger alluvial deposits was

4  effluent . . "

5  Going down to line 16, cross out the words "lower segment

6  of the" and that would be all the changes on Finding 30.

7  On Finding 31 there are no changes.

8  Finding 32, line 7, cross out the words "As found herein

9  above" and start the sentence with just "Subsequent", And

10  on line 8 after the word "of" and the last word in that line

11  add the word "ground".

12  MR. VEEDER:  " . . quantity of ground . . "

13  MR. GIRARD:  Yes, "the quantity of ground water passing

14  from the Ysidaro Sub-basin has been restored . . "

15  Finding 33 is the one which Mr. Sachse and I will have

16  to work out tomorrow morning.

17  MR. SACHSE:  That is right.

18  THE COURT:  All right.

19  MR. GIRARD:  Finding 34, line 15, change the word "in"

20  to "at".  And also on line 5 change the word "at" to "in".

21  On line 15 it would read "That De Luz Creek enters the Naval

22  Enclave at" and then insert "the north boundary of the north-

23  west one quarter of the northeast one quarter of Section 8 . "

24  On Finding 35 we have a few changes which I am sure will

25  please the Court -- made a few paragraphs.  In the title we

1  should add after the words "De Luz Creek Within The Naval

2  Enclave," so it will read "which underlie Surface Stream of

3  De Luz Creek within Naval Enclave".

4       On line 6 put a period after "basement complex," strike

5  the word "that" and put a capital "There".  On line 7 cross

6  out the word "that" and put a comma after "deposits" instead

7  of a semicolon.

8       MR. VEEDER:  I think you are improving, Mr. Girard.

9       MR. GIRARD:  And also cross out the word "said" and

10  substitute the word "which," which is the last word on line 7.

11       MR. VEEDER:  If you begin dropping your "saids" I would

12  say we make some progress.

13       MR. GIRARD:  Cross out on line 2 "said ground waters"

14  and substitute "which" and then change the word "is" to "are,"

15  so it would read "There are ground waters within said younger

16  alluvial deposits, the source and recharge of which are

17  primarily the surface flow of De Luz Creek."

18       MR. VEEDER:  I really think you are demonstrating

19  tremendous progress.

20       MR. GIRARD:  Colonel Bowen, I think, is the one who is

21  responsible for this grammatical change.

22       On line 9 cross out the word "that" and start the

23  sentence with "The".  Go down to line 11, after the word

24  "permeability" change that to a comma, cross out the word

25  "that" immediately following that and substitute the words

1   "and the". So it would read " . . of a relatively high water

2   bearing capacity and permeability, and the deposits of base-

3   ment complex are essentially not water bearing and relatively

4   impervious." Cross out the word "that" on line 12 after the

5   word "impervious" and start the sentence with a capital "As".

6       MR. VEEDER:  How about dropping "thereof" out?

7       MR. GIRARD:  I don't care.  Do you want the word "thereof"

8   out?

9       THE COURT:  Strike it at Mr. Veeder's request.  I have

10  to make a ruling now and then in favor of the Government.  And

11  this is one he is obviously right on.  So it will read "As a

12  result the waters" instead of saying "As a result thereof".

13      MR. GIRARD:  Go down to line 17 and put a period after

14  the word "exists," cross out the word "that" immediately

15  thereafter and start the sentence with a capital "During".

16  On line 9 after the first word, which is "during," add the

17  words "and after," so it will read "that is, during and after

18  periods of precipitation, . . "

19      Go down to line 21 and put a period --

20      MR. VEEDER:  Don't you want "immediately after"?

21      MR. GIRARD:  All right.  Is that all right, Colonel?

22      MR. VEEDER:  Well, it is not forever after, for goodness

23  sake.

24      COLONEL BOWEN:  It all depends on how long is "immediately."

25      MR. VEEDER:  We know it is not as long as after.

1      MR. SACHSE:  Mr. Veeder is laughing, too.

2      MR. GIRARD:  Tomorrow is Lent.  We are being quite

3  generous.

4      On line 21 put a period after "flow," cross out the

5  word "that" and start out with the "During".  On line 22

6  cross out the word "perennial" and then on line 22 after the

7  word "stream" add the words "within the Naval Enclave," and

8  then on the same line 22 leave the word "but" in and cross out

9  "rises to the surface," and then on line 23 cross out the

10  words "and rises again" and substitute the word "underground".

11  So that sentence would read, so far down to there, "During

12  all other times De Luz Creek does not flow as a surface

13  stream within the Naval Enclave but disappears underground, . ."

14  And then go down to line 25 and cross out the words "which

15  rise and disappear as aforesaid" and add the words "of De

16  Luz Creek."  So it would read "and during such periods the

17  ground waters within the younger alluvial deposits do in

18  fact constitute the waters of De Luz Creek."

19      MR. SACHSE:  Before all these changes were made, Mr.

20  Veeder, I hope you appreciate that we had a 26 line sentence.

21      MR. VEEDER:  I am fully aware of it.  I didn't want to

22  say anything because I knew how tender your feelings are about

23  bad grammar.

24      MR. GIRARD:  On Finding 36, page 46, lines 9 through 11,

25  cross out the words "do constitute the waters which rise to

the surface and then disappear during periods other than

periods of precipitation," so the phrase would read " . . are

in direct contact with said surface flow and said ground

waters and said surface flow constitute one creek herein

referred to as De Luz Creek."

THE COURT:  Why did you take that out?

MR. GIRARD:  Because as I understand the situation it

was necessitated as a result of the change on the last finding,

because except during periods immediately precipitation there

is no flow in De Luz Creek within the Enclave.  It doesn't

rise and then disappear.

THE COURT:  All right.

MR. GIRARD:  Is that the right explanation, Colonel?

COLONEL BOWEN:  Very good, Mr. Girard.

MR. GIRARD:  Finding 37.  I believe Colonel Bowen has

the descriptions and they will be given.  Anyway, that would

be just a description of the lands within this watershed of

De Luz Creek.

Finding 38, line 9 on page 48, after the word "area"

put a period, cross out the word "that" and start the sentence

with a capital "As".  Go down to line 12 and put a period

after the word "future," cross out the "that" and start the

line with a capital "The".

MR. VEEDER:  You wouldn't knock off the "that" up there

on line 4?

MR. GIRARD: Certainly will, Mr. Veeder.

MR. VEEDER: Thank you, Mr. Girard. It is bad enough to have bad facts, but when the grammar is bad I really wince.

MR. GIRARD: Let's make the same correction on line 39, the first word.

MR. VEEDER: I think we can probably save a hundred thousand words by going back and taking out all the "that's".

MR. GIRARD: On line 12, Finding 39, page 49, cross out the word "said," and then on line 13 cross out the words "is diverted into" and substitute the word "enters," and then on line 16 after the figure "24" cross out the rest of the sentence and put a period after "24".

Findign 40 is the one on Fallbrook Creek. I would like maybe to throw out the suggestion that maybe we don't need such finding describing the lands which are within the watershed of Fallbrook Creek. But I guess Colonel Bowen can prepare one, if we have to. That is up to Mr. Veeder.

THE COURT: Can you prepare it?

COLONEL BOWEN: Yes, your Honor, I can prepare it.

THE COURT: All right.

MR. SACHSE: Can you get us the date of that order?

MR. GIRARD: Permitting you to file this supplemental and amendatory complaint.

MR. VEEDER: Yes.

MR. SACHSE: Frankly, I don't think we need it.

1  MR. VEEDER:  I think you will find it is attached to

2 the complaint.

3  MR. SACHSE:  It could be.

4  MR. GIRARD:  On Finding 48, line 4, cross out the word

5 "was" and substitute the word "had," so it would read "this

6 case had authorization . . "

7  Finding 49, cross out the words "on or about _____"

8 and substitute the words "during the trial of this cause,"

9 so it would read "That during the trial of this cause said

10 stipulation referred to . . "  And then on line 6 strike the

11 comma, add the word "and" after "district" and after "Vail

12 Company" put a period and strike out the rest of it.  "That

13 during the trial of this cause said stipulation referred to

14 above in Finding No. 47 was joined in and consented to by

15 counsel for the defendants Fallbrook Public Utility District

16 and Vail Company."

17  THE COURT:  Did you check this?  There were no others?

18 You couldn't find them?

19  MR. GIRARD:  I just have not made a check.

20  MR. SACHSE:  I have made no check, but we decided, your

21 Honor, in view of the next paragraph, it doesn't matter.  Two

22 of us did it, we know we did it, and we don't want to put in

23 someone else who didn't.

24  MR. GIRARD:  We don't want to list all of Mr. Krieger's

25 clients, and he is probably the only one who would have.

On Finding 50, where I have inserted on line 5 "of the waters of Santa Margarita River and its tributaries," after the word "tributaries" add the words "and the rights to the use of" or "and the rights to the use". So it would read "That this case has been tried before this Court on the theory that the rights to the use of the waters of the Santa Margarita River and its tributaries and the rights to the use of waters which add to and support said River . . "

MR. VEEDER:  This is one to which I originally made objection, if I remember correctly.

MR. GIRARD:  That is right.  This is the old Finding 15 where the Judge overruled your objection.

MR. VEEDER:  No.

MR. GIRARD:  Yes.

MR. VEEDER:  Didn't we revise in the transcript this very language?  I am sure we did.

MR. GIRARD:  You had objections, but he pointed out that this finding only pertains to everyone in the suit except the United States, California, Fallbrook and Vail.

THE COURT:  This is what we agreed on.

MR. GIRARD:  Yes.

THE COURT:  And then the second sentence starts "By so proceeding upon this theory, all parties to this action not parties to the Stipulation and not defendants who expressly joined in . . . have impliedly, . . "

19,232

1    MR. SACHSE:  That is the exception you requestion, Mr.

2    Veeder.

3    THE COURT:  This is what took you off the finding of

4    consent there.

5    MR. SACHSE:  In other words, it limits your consent now

6    to the stipulation.

7    MR. GIRARD:  On line 22 after the words "State of

8    California" put a period and cross the rest out.

9    Finding 51, there are no changes.

10   Finding 52, no changes.

11   Finding 53, no changes.

12   THE COURT:  What is the exhibit number?

13   MR. SACHSE:  That is an exhibit to be prepared.

14   MR. GIRARD:  Yes.  We have an Exhibit A, which is the

15   map of the watershed.  I don't think we have any other

16   exhibits in these findings.  The descriptions will be inserted

17   right into the body of the findings.  So this probably should

18   be Exhibit B.

19   MR. SACHSE:  Unless Colonel Bowen in his problem of

20   delineating riparian lands somewhere chooses to use an exhibit,

21   that is the only question, rather than a description, and to

22   keep them in chronological order we should say this is the

23   last exhibit.

24   THE COURT:  Well, it is apparently B, unless some other

25   exhibit comes in.

1    MR. GIRARD:  Yes.

2    THE COURT:  What are the changes in Finding 52?

3    MR. SACHSE:  Nothing else.

4    MR. GIRARD:  None in the finding.

5    There are a few in the conclusions of law.  Conclusion

6 of Law No. 3, page 66, line 19, after the word "are" add the

7 words "as to their characteristics".

8    THE COURT:  Are you talking about Conclusion of Law 3?

9    MR. GIRARD:  Yes.  So it would read "intrusion are as to

10 their characteristics municipal uses."

11    THE COURT:  While we are on this, you haven't got a

12 conclusion or a finding that these military uses in the nature

13 of municipal uses are proper riparian uses.

14    MR. SACHSE:  We have a finding that all uses except --

15    MR. VEEDER:  We ought to have what the Court suggests,

16 though.

17    MR. SACHSE:  It is not a finding, Mr. Veeder.  It is a

18 conclusion of law.

19    MR. VEEDER:  I say a conclusion of law.

20    MR. SACHSE:  Well, we have got it.  I think your Honor

21 is mistaken.

22    THE COURT:  You have the findings that all uses are

23 proper riparian uses except et cetera.  Now we are on the

24 conclusions and here is where you probably say that it is a

25 proper riparian use.

MR. GIRARD:  Look at Conclusion of Law No. 8, your Honor. There will be a slight addition to that.

MR. VEEDER:  Let's go back and I would like to read this into the record:  "All uses of water of the Santa Margarita by the United States of America within the Naval Enclave and both within and without the watershed of the Santa Margarita River, other than uses for stock watering and irrigation and subirrigation and the maintenance of a fresh water barrier to prevent salt water intrusion, are municipal uses."

MR. GIRARD:  ". . are as to their characteristics municipal uses."

MR. VEEDER:  " . . are as to their characteristics . . " Well now, you wouldn't say that the maintenance of the fresh water barrier.

MR. SACHSE:  No, we say except that -- all uses, except stock watering, irrigation, fresh water barrier, are municipal uses.

MR. VEEDER:  Are not characterized as municipal uses.

MR. SACHSE:  No.

MR. GIRARD:  Are as to their characteristics municipal uses.  In other words, all other other uses other than stock watering, irrigation and fresh water barrier, are as to their characteristics municipal uses.

MR. SACHSE:  That is right.

MR. GIRARD:  Going over to Conclusion of Law No. 8,

your Honor, I say "That except as to the uses of the waters

of the Santa Margarita River to maintain native vegetation

and grasses" and right there I want to add "and as provided

in Interlocutory Judgment No. 24 (Lake O'Neill)," then we say

"all uses of the waters of the Santa Margarita River by the

United States of America within the Naval Enclave and within

the watershed of the Santa Margarita River, are reasonable

and beneficial riparian uses."  I don't have any objection

to being specific.

THE COURT:  That covers it.

MR. GIRARD:  But the only ones I have excepted from that

are the native vegetation and the appropriative right.

MR. SACHSE:  We have made a blanket finding that every-

thing within the watershed except Lake O'Neill and the grasses

are riparian.

THE COURT:  All right.

MR. GIRARD:  Going down to Conclusion of Law No. 5, put

a comma on line 28 after the word "thereto" and add the words

"on any lands of the Naval Enclave".

MR. VEEDER:  Now Mr. Girard, in regard to your first

sentence there, would you not -- I strongly urge, your Honor,

that there be added, if you are going to adopt that language,

I am going to object to it, but nevertheless I think it is

only proper to state "but there is no declaration one way or

the other whether this maintenance of vegetative cover is

1    reasonable".

2        THE COURT:   You are talking about something else.

3        MR. GIRARD:   Yes, that is taken care of.   There is a

4    special finding on that.   I skipped over there just to point

5    that out.

6        THE COURT:   He is talking about something else now.   He

7    is talking about Conclusion 5.

8        MR. VEEDER:   I know, but I am very anxious about that.

9        MR. GIRARD:   There is a special finding and a special

10   judgment provision on that.

11       THE COURT:   All right.

12       MR. GIRARD:   The only change on page 67 would be in

13   Conclusion of Law No. 8 where I mentioned before after the

14   word "grasses" insert the word on line 24 "and as provided

15   in Interlocutory Judgment No. 24 (Lake O'Neill)".

16       Conclusion of Law No. 9 can go out, because it is

17   identical to Conclusion of Law 36.   It is practically repeated.

18       If you will note, Conclusion of Law No. 10, Mr. Veeder

19   does reserve this natural grass and vegetation problem.

20       Conclusion of Law No. 12 is the next which we have.

21   Start the Conclusion with the word "The" instead of "That,"

22   and then go down to line 5 and after the word "been" add the

23   words "and are," and then on line 6 cross out the words

24   "maximum use" and substitute the word "conservation," so it

25   would read starting with 5 "reclamation of sewage have been

1    and are commendable practices and have resulted in the

2    conservation . . "

3          THE COURT:  All right.

4          MR. GIRARD:  Conclusion of Law 17, after the words

5    "Fallbrook Public Utility District" add the word "and" and

6    then on line 19 after the word "Company" cross out "and the

7    _____," so it would read "Fallbrook Public Utility

8    District and the Vail Company in open court . . "

9          Conclusion of Law 19, on lines 5 through 8, cross out

10   the words "which determine the rights to the use of water of

11   the Santa Margarita River and its tributaries and the rights

12   to the use of the waters which add to and support the River

13   and its tributaries".  Cross out commencing with the word

14   "which" on line 5 through the word "tributaries" on line 8.

15         THE COURT:  So it reads "the laws of the State of

16   California would apply . . "

17         MR. GIRARD:  Yes.

18         Conclusion of Law 27 on page 74, line 2, after the

19   reference to the "S.B.M." insert "and the rights as provided

20   in Interlocutory Judgment No. 24 (Lake O'Neill)," so it would

21   read "confluence of the Santa Margarita River with De Luz

22   Creek in Section 29 . . and the rights as provided in

23   Interlocutory Judgement 24 (Lake O'Neill), no upstream riparian,

24   . . "

25         On Conclusion of Law 29, line 22, cross out the word

1   "a," so it would read "Naval Enclave are in known and definite

2   channels," and then on line 24 cross out the words " a

3   particular stream" and substitute the words "the stream

4   system."  So it would read "are in known and definite channels,

5   are not percolating waters, but are in fact part of the

6   underground flow of the stream system."

7        I think that is the extent of the real examination which

8   was done by Commander Redd, Mr. Wilkinson, Colonel Bowen,

9   Mr. Sachse and I.  However, Mr. Sachse and I alone have looked

10   at the judgment provisions.

11        THE COURT:  On page 76 a minor matter, line 18 -- "shall

12   be litigated in this Court," not "by this Court".

13        MR. GIRARD:  Okay.

14        THE COURT:  And on page 77 the Interlocutory Judgment

15   number is 37 instead of 30.

16        MR. GIRARD:  Yes.

17        (At this point Mr. Stahlman comes into the court.)

18        MR. GIRARD:  We do have an addition to a judgment

19   provision on page 82, Paragraph 18, line 28, after "S.B.M."

20   insert "and such rights as provided in Interlocutory Judgment

21   No. 24 (Lake O'Neill)".  So it would read "Range 4 West . .

22   no upstream riparian, overlying owner, . . "

23        Those are the suggestions we have.  By "we" I mean Mr.

24   Sachse and I.

25        THE COURT:  You have the judgment provision in 15 that

1    all these uses are municipal except the ones you mention.

2    Do you have a judgment that the other uses are proper riparian

3    uses?

4         MR. GIRARD:  Yes, I do, your Honor.  "12.  It is further

5    ordered, adjudged and decreed that as except as to the use

6    of waters as considered in Interlocutory Judgment No. 24

7    (Lake O'Neill) and the use of the waters to maintain native

8    grasses and vegetation cover and the uses of water in minor

9    surface impoundments which may not be proper riparian uses,

10   all uses of the waters of the Santa Margarita River and its

11   tributaries within the Naval Enclave and within the Santa

12   Margarita River watershed by the United States of America

13   are, as to their character, reasonable and beneficial riparian

14   uses."

15        THE COURT:  On Paragraph 11 you are quieting title to

16   the owners of the land containing older basement complex, et

17   cetera.  Is there any other owner involved in this case

18   besides the United States?

19        MR. GIRARD:  I don't think on the Naval Enclave.

20        THE COURT:  This only concerns the Naval Enclave.

21        MR. GIRARD:  Yes.

22        THE COURT:  And Paragraph 10 of your proposed judgment

23   says that ground waters in the basement complex are vagrant

24   and percolating.

25        MR. GIRARD:  Within the Santa Margarita River watershed

1 and the Naval Enclave.  I don't think there are any other

2 owners other than the United States.

3     THE COURT:  Then should Paragraph 11 read "It is further

4 ordered, adjudted and decreed  that the rights of the United

5 States . . "?

6     MR. GIRARD:  That is all right with me, your Honor,

7 except that we did have the first judgment provision, or the

8 first conclusion of law, I guess it was, that just said the

9 United States of America is the apparent owner of the lands.

10     THE COURT:  Why do you put in "apparent"?

11     MR. GIRARD:  We didn't try anybody's title in this suit.

12 But as far as I am concerned it is pretty clear that they own

13 it.

14     THE COURT:  Let's take "apparent" out and let's dress 11

15 up.

16     MR. GIRARD:  Just say the United States of America is

17 the owner.  Yes, I can dress that up.

18     THE COURT:  As the owners of the lands referred to in

19 Paragraph 10.

20     MR. GIRARD:  Yes.

21     THE COURT:  Are forever quieted against all other parties

22 having rights to the use of water.

23     MR. GIRARD:  Right.  This would be "and it heirs,

24 successors and assigns."

25     THE COURT:  Heirs?

MR. GIRARD:  Cross out "heirs".

THE COURT:  Is the United States "its" or "their"?

MR. VEEDER:  "Its," your Honor.  That was settled at Gettysburg, too.

THE COURT:  Are forever quieted in the United States.

Well, I think with a few minor matters we are getting in pretty shape to wind this thing up, aren't we?

MR. GIRARD:  I think we are.  Mr. Sachse and I will get together in the morning and try to draft some finding as to how we are going to treat these riparian lands of the Ammunition Depot.  I think that is the only major drafting job left.

THE COURT:  You have this problem on No. 8.

MR. GIRARD:  I presume Mr. Veeder will have that material to us tomorrow.

THE COURT:  Shall we meet at 10:00 o'clock?

MR. GIRARD:  Fine with me.

THE COURT:  All right.

(Whereupon an adjournment was taken until Wednesday)
(                                                    )
(March 7, 1962, at 10:00 o'clock A.M.               )

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>                                  )<br>                         Plaintiff, )<br>                                  )<br>          vs.                     )<br>                                  )<br>FALLBROOK PUBLIC UTILITY          )<br>DISTRICT, et al.,                 )<br>                                  )<br>                    Defendants. ) | No. 1247-SD-C |

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on
the date herein involved, to wit:  March 6, 1962, was a duly
qualified, appointed and acting official reporter of said
Court;

That as such official reporter I did correctly report
in shorthand the proceedings had upon the trial of the above
entitled case; and that I did thereafter cause my said short-
hand notes to be transcribed, and the within and the foregoing
77      pages of typewritten matter constitute a full, true
and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 6th day
of March 1962.

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER