# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Wednesday, March 7, 1962

Pages:    19,243 to 19,339

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

- - -

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

- - -

7 UNITED STATES OF AMERICA,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
8 ⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
9 ⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀No. 1247-SD-C
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
10 FALLBROOK PUBLIC UTILITY⠀⠀⠀)
DISTRICT, et al.,⠀⠀⠀⠀⠀⠀⠀⠀)
11 ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendants.⠀)
12

13

REPORTER'S TRANSCRIPT OF PROCEEDINGS

14

San Diego, California

15

Wednesday, March 7, 1962

16

- - -

17 APPEARANCES:

18 ⠀⠀For the Plaintiff:⠀⠀⠀⠀⠀⠀⠀⠀⠀WILLIAM H. VEEDER, ESQ.,
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Special Assistant to the
19 ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Attorney General

20 ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀CDR. DONALD W. REDD

21 ⠀⠀For the Defendants:

22 ⠀⠀⠀⠀Fallbrook Public Utility⠀⠀FRANZ R. SACHSE, ESQ.
⠀⠀⠀⠀District, et al.,:
23

24 ⠀⠀⠀⠀State of California:⠀⠀⠀⠀⠀FRED GIRARD, ESQ.

25 ⠀⠀⠀⠀Vail Company:⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀GEORGE STAHLMAN, ESQ.

1  SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 7, 1962, 10:00 A.M.

2  -o0o-

3  MR. VEEDER:  Are you ready to proceed, your Honor?

4  THE COURT:  Yes, sir.

5  MR. VEEDER:  Your Honor, I brought to your Honor's

6  attention yesterday the documents which have been relied

7  upon by the United States in regard to the date of acquisition,

8  and I have requested that page 2 line 1 be changed to read

9  "Decree on Declaration of Taking". That document is the one

10  we have relied upon as to the date when title passed to the

11  United States.

12  THE COURT:  Let me see this document.  You say "Decree

13  on Declaration of Taking".

14  (Mr. Veeder hands documents to the Court.)

15  MR. GIRARD:  The Judge didn't sign it, did he?

16  THE COURT:  It is signed "Jeremiah Neterer."  Let me

17  read this.

18  MR. VEEDER:  Here is another.  These are the three

19  documents to which I referred your Honor and each is signed

20  by the Court.

21  THE COURT:  Of course, the document talks about

22  possession also, and this is probably why they were submitted.

23  I have never seen one of these before.  You are right and I

24  am wrong.

25  MR. VEEDER:  I didn't intend it that way, your Honor.

19,245

1    THE COURT:  Ordinarily the judge makes a decree or an

2  order of possession.

3    MR. VEEDER:  The Declaration of Taking is signed, of

4  course, by the Secretary of the Navy.  But they entered in

5  this instance the decree.

6    THE COURT:  All right.  You have convinced me.

7    MR. GIRARD:  So it is Decree now, Bill?

8    MR. VEEDER:  Decree on Declaration of Taking.

9    MR. GIRARD:  And the dates are the same, January 28,

10  1942?

11    MR. VEEDER:  I will run through the dates with you.

12    THE COURT:  I have seen a lot of condemnation cases.

13  This is the first time I have seen one of those.  I have seen

14  orders on possession.

15    So it will now be, on line 1, "Decree on Declaration of

16  Taking".

17    MR. SACHSE:  The same on line 26.

18    MR. GIRARD:  Recorded on January 26, 1942 in Book 1311

19  at Page 133?

20    MR. VEEDER:  Yes.  Drop down to lines 1 and 4 and set

21  forth that Amended Decree on Declaration of Taking.

22    THE COURT:  On line 4 you are changing "judgment" to

23  "decree"?

24    MR. VEEDER:  That is right.

25    THE COURT:  What is this word "Amended"?

1    MR. VEEDER:  Take that out and put in "Decree".

2    THE COURT:  All you need is "Decree".

3    MR. VEEDER:  On this go to line 7. Apparently the

4    original Declaration of Taking was December 31. However, the

5    date on the Decree on Declaration of Taking should be January

6    5, 1943.

7    THE COURT:  That is the date of recording. Is that the

8    date of recording?

9    MR. VEEDER:  No, sir, that is the date of the Decree.

10    THE COURT:  You say recorded January 9th.

11    MR. VEEDER:  Go to line 7, "January 5, 1943 the United

12    States acquired by condemnation," then drop down to line 11

13    and you find Decree on Declaration of Taking recorded.  That

14    is all right.

15    THE COURT:  It was recorded the 9th then?

16    MR. VEEDER:  That is right.

17    MR. GIRARD:  As I understand it, though, you get your

18    title merely by your Declaration of Taking.  In this case

19    was there a Declaration of Taking filed by the Secretary of

20    the Navy before the Decree signed by the Court.

21    MR. VEEDER:  There was.

22    MR. GIRARD:  So actually you acquired title on December

23    31, 1942, which is the date of your Declaration of Taking,

24    didn't you?

25    MR. VEEDER:  If you will look back even on our Exhibit 1,

1    we have used the Decree on Declaration of Taking, because that

2    is signed by the Court, and that is the date upon which the

3    Navy is asserting title passed to them.  This is their work.

4         THE COURT:  The second paragraph beginning with line 11

5    is all right, "The United States on December 31st acquired

6    fee simple . . which lands are described in . . recorded. . "

7         MR. GIRARD:  In other words, you acquired the title on

8    December 31.  That doesn't change.  Is that right?

9         MR. VEEDER:  Right.

10        THE COURT:  The same is true of the next lines --

11   acquired the title December 31, which are described in a

12   Declaration of Taking.  This on line 21, then, should be a

13   "Decree on Declaration of Taking".

14        MR. VEEDER:  That is right.

15        THE COURT:  Did you get that, Mr. Girard?

16        MR. GIRARD:  Yes, sir.

17        THE COURT:  Then that takes care of page 2.

18        Do you have a date on this intergovernmental transfer,

19   or do you want a date?  That is page 3, line 4.

20        MR. VEEDER:  We have a date on that, too, your Honor.

21   It would be dated August 8, 1945.  That should be entered

22   in there.

23        Do you have a description of that land, Colonel Bowen?

24        THE COURT:  What is the date again?

25        MR. VEEDER:  August 8, 1945.

1    THE COURT:  That should go in right after "the United

2   States of America" -- "the United States of America on August

3   8, 1945".

4    MR. VEEDER:  That is right.  We will have the description

5   of those lands.

6    THE COURT:  All right.  What is the next thing?

7    MR. VEEDER:  That is all I have to start with, your

8   Honor.  I assume there are other things that are going to

9   come up on this.

10    MR. GIRARD:  Your Honor, last night I did a little

11   thinking.  I talked to Mr. Sachse this morning.  This concerns

12   this problem whether or not the United States has a riparian

13   right to use water from the Santa Margarita River on the

14   Ammunition Depot in areas which are in the Fallbrook

15   Subwatershed, and both Mr. Sachse and I took the position

16   that under the express factual situation that exists they

17   did not have such a riparian right -- their conveyances didn't

18   give it to them.  However, in thinking it over, I think an

19   argument can be advanced, supported by findings, that when

20   the original conveyances by the United States Navy with the

21   Rancho were entered into there was more or less an implied

22   reservation right of the United States to use that water

23   necessary for the contemplated project at the Ammunition

24   Depot site, and I think maybe if we got together we might

25   be able to draft up some findings on that which might satisfy

1    the United States and counsel and the Court.

2         THE COURT:  In other words, prior to the time they

3    carved out the Naval Ammunition Depot it was one large rancho;

4    there would have existed at the Rancho a right to use water

5    in the area of the Ammunition Depot.

6         MR. GIRARD:  That is right.

7         THE COURT:  But now they carved out an area for the

8    Naval Ammunition Depot at a different time than the

9    acquisition of the rest of the Rancho, and the area was

10   purchased or was acquired for the purpose of an ammunition

11   depot, and they undoubtedly knew where they were going to put

12   it at the time they got it.  Therefore, you would argue that

13   it could be implied that there was a reservation, or whatever

14   you call it, of a right to use water from the River on the

15   Depot side but not elsewhere.

16        MR. GIRARD:  That is right, for the purposes for which

17   the United States acquired the property, to wit, the building

18   of ammunition depot facilities in certain areas of the

19   Fallbrook Creek subwatershed.

20        THE COURT:  I take it you have no objection, Mr. Veeder.

2 fls.

21        MR. VEEDER:  No.

22        THE COURT:  Mr. Stahlman might be the one who might

23   object.  It doesn't involve a lot of water.

24        MR. VEEDER:  About a hundred acre feet a year, your

25   Honor.  100 is the maximum that has ever been used.

MR. STAHLMAN:  Would that be summer flow?

MR. SACHSE:  Any time.

MR. GIRARD:  It is pretty much a domestic use up there, isn't it?  The requirements don't differ day to day substantially, do they?

COLONEL BOWEN:  Pretty well uniform throughout the year, your Honor.

MR. VEEDER:  You have fire protection as one of the principal uses.

MR. SACHSE:  I have no objection to it for Fallbrook.  I think it is a handy solution, and the amount involved is so minor that even on a future apportionment it would be insignificant.

THE COURT:  Well, it is an ingenious suggestion and I know Mr. Veeder welcomes your cooperation, Mr. Girard.

MR. VEEDER:  He truly does, your Honor, it being Ash Wednesday and all.

MR. GIRARD:  I told you we were going to give you something for Lent, Bill.

MR. VEEDER:  Well, it is water, we can drink that.

THE COURT:  I wonder if his attitude is caused in some way by the atmosphere.  The fact that we have had rains and that water is running down the creeks and all, the outlook is much more optomistic than it was late last fall.

MR. VEEDER:  You be surprised how it changes attitude,

1   your Honor.

2        THE COURT:  Mr. Stahlman.

3        MR. STAHLMAN:  We would like an opportunity to give a

4   little thought to this matter, your Honor.  Do we have to

5   decide it now, do you think?

6        MR. GIRARD:  I think we ought to work on the language

7   of the findings before we decide.

8        THE COURT:  I would suggest that you work on it.  You

9   are the only party here present, you and Fallbrook, that

10  would be adversely affected.  And it is a relatively minor

11  amount of water.  And of course, here was the situation that

12  the Marine Corps had vision enough to build a little

13  watershed.  I think this sort of perspicacity should be

14  rewarded.  The Marine generals decided to place installations

15  within the watershed.  I think we ought to really bend over

16  backward to try to do something for them.

17       MR. GIRARD:  I don't think we are ever going to see that.

18       MR. VEEDER:  See what?

19       MR. STAHLMAN:  May we have an opportunity to express

20  ourselves later on?

21       THE COURT:  Confer with them on it.  I would be inclined

22  to go along with the suggestion.

23       Did you do anything more on this No. 8?

24       MR. GIRARD:  I might add if we could draft this language

25  on this suggestion I just made, I think it will pretty well

take care of our problems on Finding of Fact No. 33 and the one dealing with Fallbrook Creek. Don't you, Mr. Sachse?

MR. SACHSE: Yes, I think you will eliminate the Fallbrook Creek finding entirely and rewrite No. 33.

MR. GIRARD: And then as soon as we get this Finding 8 cleared up, I am hopeful that these are ready for final stencilling and signature as soon as the descriptions are available -- the descriptions of which lands are riparian.

Finding No. 8 is the only one, I think, that yesterday we had any suggestions on.

MR. VEEDER: I handed to your Honor a copy of the language that I have taken out of the record in regard to military demands and uses, the maximum personnel that had ever demanded water, and then put in the additional factors of the total of 62,068 persons if the Camp had been developed as had been hoped for. I have tendered that suggested language for consideration. Do you have that?

MR. GIRARD: You gave it to me yesterday, Bill. I can't blame you for not having it.

MR. SACHSE: I had it, too.

MR. VEEDER: Here is another copy.

Our position, your Honor, in regard to military demands is such that we would like to have findings as to the aggregate requirement in the event of full mobilization -- aggregate requirement as to the demands of Camp Pendleton if

1    and when money is available to bring the personnel to the

2    maximum.

3        THE COURT:  I'll tell you what my view is on it generally,

4    without talking about the language.  I would have no objection

5    to a finding that comported with the proof you put on of what

6    your plans were for this Base and how many people might be

7    there and some estimate as to how much water would be required,

8    because it is going to demonstrate that a dam will be needed.

9    You are not going to be able to satisfy all the needs of the

10   riparian owners downstream, in the event of an apportionment,

11   and it is going to stick out like a sore thumb that the

12   Government has spent a lot of money building an installation

13   and that there are needs in connection with it or demands or

14   whatever you want to call it and that certainly in bad years

15   it is not going to be satisfied by any riparian share based

16   on the other uses in the watershed.  That is as plain as the

17   nose on your face, in my opinion, and for that reason I would

18   think that this might be additional material to convince some

19   of the authorities that the solution to this case is not

20   litigation or appeal but the building of a dam.

21       MR. VEEDER:  Your Honor, I have tendered the language

22   predicated upon Colonel Robertson's testimony, and while I

23   can't comment in regard to the construction of a dam I do

24   think that the Marine Corps planning is important, I do think

25   the history of water use by military personnel is important,

1    I think it is important that we anticipate the 62,000 plus

2    personnel when the Camp is in full peace time development

3    and 106,000 in mobilization.  However, whatever disposition

4    is made of it, I would just like to have the record show that

5    that is what I requested.

6        THE COURT:  What is the position of Mr. Sachse, Mr.

7    Girard and Mr. Stahlman on my suggestion?

8        MR. GIRARD:  I don't have any objection to working in

9    the language submitted by Mr. Veeder, which is primarily

10   figures, but I do have objection to that language that says,

11   on line 19,"that of that total solely for military purposes

12   the Enclave would have used from the Santa Margarita River

13   10,000 acre feet.  Had it not been for this litigation these

14   plans would have been accomplished."   I don't know whether

15   there is any evidence at all -- maybe there is -- whether or

16   not the safe yield of their basins and whether or not there

17   was 10,850 acre feet of water available to satisfy it.   That

18   is assuming that no one else used it upstream and that the

19   basins were used as they are now.  I don't know what the

20   safe yield is of those basins.  I am sure that 10,850 acre

21   feet is the safe yield of the basins.  And if they can't

22   physically get that out of the basin because there is not that

23   much water on a safe yield basis, it is wrong to say that they

24   are going to use it from the Santa Margarita River.

25       THE COURT:  The word "used" is wrong -- "would have been

required or needed;" but the word "used" has other

connotations.   Try it with "needed".

And also why can't we strike out "had it not been for

this litigation these plans would have been accomplished"?

We have not had any evidence of that.   We know from what we

read in the papers that Congress has held up appropriations

because of this litigation, but we do not have it in the

record.

MR. VEEDER:   Colonel Robertson testified to that.

MR. GIRARD:   I have no doubt at all that if there had

been an emergency where Camp Pendleton had been built up

there would have been this many people on it despite the

water rights or anything else.

MR. VEEDER:   Let me say this, your Honor.   There have

been so many items brought up.   I would like to answer them

one at a time, if I can, to the end that this record is as

straight as we can possibly get it.

We have taken the position, and I think the evidence

fully supports, that the safe annual yield as testified to

by Mr. Worts of the basins is 10,000 acre feet a year.   I

think that evidence is in there.   Now in addition, the evidence

went in without objection by Colonel Robertson that these

developments would have been accomplished had it not been for

the litigation.   Whether your Honor wants to accept that or

not.

1      MR. GIRARD:  There is plenty of other evidence in this

2  case opposed to that.

3      THE COURT:  This is a conclusion.  If he said that in

4  the record, all right.  But what he meant to say, if he had

5  not shorthanded it, was that appropriations for the expansion

6  of Pendleton and its facilities et cetera had been held up

7  in Congress because of this litigation and that Congress had

8  not voted monies.  You can't expand this Base until Congress

9  votes monies.  So when you say this would have been

10  accomplished, this is his conclusion that Congress wouldihave

11  voted the money.  Probably it would have.  The fact is that

12  it did not vote the money.  There is no fact that it would

13  have voted the money.  So of what use if that sentence?

14      MR. VEEDER:  It has been our position in this litigation,

15  your Honor, that future developments of a military enclave

16  such as this are important and that it was an issue in this

17  case from the standpoint of what we would ultimately use.

18  Now if your Honor wants to eliminate that language your Honor,

19  of course, has power to do so.

20      THE COURT:  I am talking about the one sentence "But

21  for this litigation these plans would have been accomplished".

22      MR. VEEDER:  That is what I was talking about, too, your

23  Honor.  We put in that evidence thinking it was important.

24  We wanted it to appear very clear what our ultimate demands

25  were and why we haven't proceeded to full development, and I

1  think it is true that this litigation, the conflict over the

2  rights, is an important factor.

3        MR. SACHSE:  I would suggest a further amendment, your

4  Honor, with the same sentence starting on line 19, I would

5  suggest that it be written to read as follows:  "Of that total

6  solely for military purposes the Enclave would have required

7  10,850 acre feet of water a year".  Because you can't say

8  "would have used" for the reason your Honor pointed out,

9  because it probably was not there; and you cannot say "from

10  the Santa Margarita River" because your Honor has already

11  ruled that in the absence of an appropriation they had no

12  right to require water from the River for facilities outside

13  the watershed.  If Mr. Veeder wants to put in their total

14  requirement, I have no objection to it.

15        MR. GIRARD:  I don't either.

16        MR. SACHSE:  But I definitely want deleted that they

17  would have required from the River so many acre feet of water

18  a year, because that finding would fly directly contrary to

19  your previous findings that they don't require that water from

20  the River.

21        THE COURT:  That is the position I will take on it until

3 fls.

22  it is redrafted.

23        MR. STAHLMAN:  One thing puzzles me, your Honor.  First,

24  I think your Honor's observation as to the -- and this is

25  just a question that comes up in my mind.  What is the

1    situation in relation to this finding if Mr. Kennedy and

2    Mr. Kruschev get together, as they are talking about doing,

3    and we do away with military installations and this goes back

4    to an entirely different operation?  Is there any indication

5    from this finding of the effect it may have on that situation?

6    I don't know the answer.  But the question has come up in my

7    mind.

8         We can carry this a little further.  We can say that

9    Vail has so many acres, we would require for our acreage so

10   much, if we can get it.

11        THE COURT:  The only reason I am even suggesting that

12   it go in is for its reading value in Washington, and I don't

13   think it means a lot.  I think you are dead right.  If you

14   want to talk about what might happen in the Military Enclave

15   I think by the same token you might talk about what would

16   happen if you subdivided the Vail Ranch and made Vail Ranch

17   a city.

18        MR. VEEDER:  There is an additional factor on this point,

19   if I may interpose, that it is entirely possible, it is indeed

20   quite probable, human nature being what it is, that Camp

21   Pendleton will always be required for national defense and

22   certainly it has been anticipated that you would have to have

23   106,000 people out there.  To my knowledge Vail City isn't

24   even in the mind of anyone.  Nor is there evidence on the

25   point.  I think there is that distinction.

THE COURT:   We might as well look the horse right in the face.   If the time ever comes that you have 106,000 people on Camp Pendleton and you need water for them, you are going to have to run a line in from the aqueduct or you are going to have to condemn some water rights or you are going to have to build a dam to try to catch some of the flow that would ordinarily be lost to the ocean.   You are not trying to apportion them, with the other riparian lands upstream.   You haven't got that kind of water.

MR. VEEDER:   I think we can go ahead and work something out along the line you have said.   At least we will move on that point.

THE COURT:   All right.   I want to make a further comment. Yesterday I said I was not going to upset my ruling about the bed and banks of these dry streams being the older basement complex and the type of material which contains younger alluvium, the underground flow which is part of the Santa Margarita throughout the younger alluvium.   The Government's position, of course, was that if they could limit the underground flow of the Santa Margarita to some very small area, then the Government would claim that they had by self help made an appropriation of unappropriated waters in what they would call the basement area.   Right?

MR. VEEDER:   Basin area, yes.

THE COURT:   Basin area.   I merely want the record to

1   show that although we never reached it there is a further

2   obstacle that is again to my mind obvious, and that is that

3   there is no unappropriated water available for appropriation

4   except flood flow that might go into the ocean.  I have given

5   my view on that a dozen times.  And Mr. Sachse has stated

6   very frankly that all they ever hoped to catch with the

7   Fallbrook Dam was water which would ordinarily flow and be

8   wasted into the ocean.  In this watershed, in my opinion,

9   there is no water unappropriated that you could appropriate,

10   and even if your contention was right that this was an area

11   where you might try to secure rights to appropriate water,

12   before you can appropriate water you have got to be able to

13   show that there is water subject to appropriation.  And there

14   is not that kind of water in this watershed.

15        MR. VEEDER:  Your Honor, on that point I would like to

16   submit an analysis of runoff based on the materials that are

17   in the record, and I think I can demonstrate, I think Colonel

18   Bowen at this moment is demonstrating, that there is water,

19   that we did appropriate rights to the use of water, that

20   there are times in the winter when your base flow so called,

21   the flow that is draining out of the alluvium and coming on

22   down to us, is such that we could appropriate that water and

23   put it underground and then during the remainder of the year

24   pump it out of the watershed.  I think that constitutes an

25   appropriation.  I think that under our present developments

1    the way we are handling things now we do demonstrate that we

2    do appropriate water, that we have appropriated rights, and

3    that those rights antedate the Fallbrook claim for sure.  I

4    would like just to give you an analysis of that runoff because

5    I think it is essential.

6         THE COURT:  I don't know why I should go into that.

7         MR. VEEDER:  Because your Honor raised an important

8    point as to one of the reasons why you were denying what I

9    think --

10        THE COURT:  This isn't the reason why.  I am just going

11   a step further.  Suppose I had held with your contention.

12   Then you run up smack against the problem I just mentioned.

13   Thirdly, if you have an appropriative right, what is it?  It

14   is subject to all prior vested riparian and other vested rights

15   on the River.

16        MR. VEEDER:  But it did antedate the Fallbrook claim,

17   your Honor, and that is crucial to us.  Here is an exportation

18   right that would figure about 3500 acre feet and let us say

19   that is the last issue in this litigation and I think it is,

20   the right to take water out to take care of 60 per cent of

21   the people, and we believe that the record will support us

22   that this was a basin, that we began exporting water, that

23   water came down and recharged the basin and that we have a

24   right to continue to export.

25        THE COURT:  You are right in the fact that if you had an

1    appropriative right dating from the date you have claimed,

2    it would probably antedate the Fallbrook claim.

3        MR. VEEDER:  That is right, it would, your Honor.

4        THE COURT:  Nevertheless, I go back to what I said.  This

5    appropriative right that you would get would still be subject

6    to all vested riparian and other rights on the River.

7        MR. VEEDER:  We concede that.

8        THE COURT:  And you have achieved, therefore, nothing

9    at all, because with the amount of irrigable land that is

10   subject to irrigation in this watershed, I can't have sat

11   here for two or three years off and on and tried this case

12   without realizing that there just isn't enough water to take

13   care of all these things.  The only additional source of

14   water is flood water which might flow into the ocean, and

15   this is what Mr. Sachse very frankly has stated that they

16   were going to try to catch with their dam, and this is what

17   could be caught with a dam whether built by Fallbrook or the

18   Government or anybody else.  That's all.

19       MR. VEEDER:  Are you telling me not to say anything

20   more?

21       THE COURT:  No, I say that's all I have.

22       MR. VEEDER:  The point that I wanted to make -- I really

23   thought you were shutting me off, your Honor, and that hurt

24   -- the point I wanted to make is that I will tender to your

25   Honor some figures in regard to runoff and I think you will

find that there are periods, your Honor, during the wintertime
when under a state of nature water might go into the ocean.
By reason of our management of the basins that water goes
underground.  It is now and it was then in 1945 and 1946, it
was appropriated, and it was winter runoff and it was not
flood water.

THE COURT:  Mr. Veeder, again the inconsistencies that
confront you are so outstanding.  Why is it available for
you, as you say, to appropriate or to use?  Because you have
pumped a lot of water out of the basin and made room for this
water to come down and collect in there.

MR. VEEDER:  Your Honor said it very well.  That is
exactly what we have done.

THE COURT:  So you therefore say because in a certain
year when there was some runoff that you filled this void
that you made in these alluvial basins before, therefore there
is water that you have a right to appropriate.

MR. VEEDER:  That is right.  And we were doing it before
Fallbrook made a claim.

THE COURT:  There might be once in a while, I could
conceive of a situation like that, but ordinarily there is
not this water available.

MR. VEEDER:  But when it is available it recharges our
dewatered basins.  And that took place prior to Fallbrook's
filing.

1    THE COURT:  And you dewatered them by pumping water out

2    of the watershed.

3    MR. VEEDER:  Right.

4    THE COURT:  There is no evidence that I know of that

5    these basins wouldn't have held all this minor flow that came

6    down had you not pumped water out of the watershed.  You would

7    have had full basins to use in the exercise of your riparian

8    right and there would be no water subject to appropriation.

9    MR. VEEDER:  I truly would like to demonstrate these

10    figures to your Honor.  But you have touched on a point right

11    here that is extremely important.  And in regard to the stream,

12    if your Honor will look at the figures, from November to

13    April you will find that there is water which is being called

14    "base flow," water that is draining out of the alluvium and

15    coming down to the Gorge and goes down and recharges our

16    basin.  That water during the wintertime is certainly in

17    excess of the normal riparian demands.  Now that water that

18    we can call "base flow," if you will, because it is the water

19    that comes down when there are no storms, when that water

20    comes down -- and in my view it is in excess of all riparian

21    needs or it wouldn't be coming down.  It is during the

22    wintertime, as you have many times said and I have fully

23    agreed with your Honor, that during the wintertime there is

24    water in excess of riparian demands because that is the time

25    when the riparians are using virtually no water.  Now that

1   water is not water that actually charges our basins, and that

2   water, in my view, being in excess of the normal riparian

3   demands, was in 1944 and 1945 available for exportation out

4   of the watershed by the process that you have described,

5   namely the pumping of the water itself from the watershed

6   without a filing with the State of California.

7       That, in my view, your Honor, is the response to the

8   point that your Honor just brought up, namely, you have

9   recognized it yourself, that there is water coming down the

10  Gorge over and above riparian demands and that water, in my

11  view, is subject to appropriation pursuant to what you have

12  called the self help method of simply pumping and exportation.

13  And that is the water we are making the claim to here for

14  exportation purposes -- that is recharge water, that is the

15  flood water, that is the day to day runoff.  And I have gone

16  through these exhibits very carefully on this proposition --

17  I think it is the 16, 17, 18, 19 Series.  In any event, it is

18  the runoff records for the whole watershed, and I have been

19  breaking those down, I have working in Washington with people

20  who are talking about a dam and what water would be available

21  for appropriation, and when we find what has transpired we

22  find that there will be a steady flow of, say, 13 or 14 second

23  feet, maybe seven or eight second feet, it will continue for

24  several days, maybe two or three weeks, you will have a storm,

25  there will be a jump in the hydrograph for two or three days,

1    then the water comes back down.  That is not flood water --

2    that six, seven, eight or ten or twelve feet; that is

3    continuous flow through the Gorge.  That water is what we

4    call "base flow," that is water that is draining out of the

5    alluvium, that is water that is coming down to us.  It is in

6    excess of any riparian demand or it wouldn't be there.

7        MR. GIRARD:  Surface water.

8        MR. VEEDER:  Sure, it is surface water, and it is

9    recharging our basin.

10       THE COURT:  First of all, this water would have to be

11   permitted to go into your basin to constitute a ground water

12   barrier, which we have all agreed is needed to keep salt water

13   out.  Secondly, it is water that would be used to supply your

14   riparian needs.  I would be surprised even in this state of

15   facts that there would be anything left over subject to

16   appropriation.

17       MR. SACHSE:  The thing that facinates me with the last

18   presentation of Mr. Veeder is that it seems to me it was a

19   very clear exposition of something that we have all been

20   contending.  Let's go back for a minute to what your Honor's

21   ruling is on the burden of complying with State law on

22   appropriation.  Your Honor has clearly ruled that the United

23   States can acquire no right to surplus waters of the stream

24   without complying with State law.  Now Mr. Veeder has said

25   -- and I have taken his words down -- something he calls the

1  "base flow" is the day to day runoff. Of what? Of the Santa

2  Margarita River.  I am inserting those words.  And that it is

3  surplus to the needs of any riparian, in excess of the needs

4  of any riparian.  He has demonstrated to your Honor that there

5  is a day to day runoff in the winter of the River surplus to

6  the needs of any riparian.  Unless your Honor is going to

7  reverse your pre-trial opinion and everything since, that

8  water, the day to day runoff of the River, using his own

9  words, surplus to the needs of any riparian, can only be

10  appropriated by compliance with State law.  The water he is

11  talking about isn't basin water.

      MR. VEEDER:  It goes down to recharge the basin.  That

13  is what I said.

      THE COURT:  Have you finished?

      MR. SACHSE:  No, your Honor.  The point I wanted to make

16  really -- other than to throw at Mr. Veeder that I think he

17  is demonstrating that there is water which Fallbrook can

18  appropriate -- the real point I want to make is this.  To give

19  Mr. Veeder what he seeks, your Honor has to find several

20  different things.  First of all, your Honor must find that

21  the water exported by the United States from the Pendleton

22  basins, as we termed them, was percolating water.  If your

23  Honor doesn't find that, then any other fact is absolutely

24  immaterial and all the rest of these arguments are pointless.

25  Why brief something, why present arguments which can have no

bearing whatsoever?  If the water in Pendleton is a stream,
Mr. Veeder is dead.  He knows it.  He admits it.  If it is a
stream, he's dead.  If it is percolating water he has a claim.
We have found that it is percolating water -- we have found
that it is a stream.  It is not percolating water.

MR. VEEDER:  That is a Freudian slip.

MR. SACHSE:  Let's not concern ourselves with how much
surplus there is.  That is for an apportionment.  Let's not
go on into these remote and hypothetical situations, if the
water can only be appropriated by compliance with State law.
It is beyond dispute that the State law has not been complied
with.  The argument is over.  I don't think we need any more
briefing of this or any more documents submitted.

THE COURT:  Mr. Girard.

MR. GIRARD:  I would agree with Mr. Sachse on the last
point.  Your Honor has ruled that it is a stream.

And then, of course, whether or not there is unappropri-
ated water available is immaterial, because the United States
hasn't complied with State law.

However, I do agree with Mr. Veeder, and always have,
that there could be and probably is water physically available
for appropriation.  The reason the water is available on the
Naval Enclave for physical appropriation is that on the
military enclave they are not using all of the water of the
safe yield of their basin on their riparian land.  In other

1   words, if they were using all of the safe yield of the basin

2   on their riparian land, then of course there wouldn't be any

3   water to appropriate. But the United States has chosen to use

4   40 per cent of their uses within the watershed, 60 per cent

5   out of the watershed, and certainly by merely doing that

6   they have shown that there is water to appropriate. I think

7   there is water physically available for appropriation because

8   of the fact that they are not exercising all of their riparian

9   uses.

10   MR. VEEDER:  Your Honor, there is just one point that I

11   want to clear up. The surface flow to which I made reference,

12   which comes down day to day, flows on down through the canyon

13   and is absorbed into the basin, and that is the reason why I

14   say that you have this day to day situation -- water draining

15   out of the Pauba, water draining out of Murrieta, which goes

16   down and enters our basin. It is percolating water, in our

17   view, and subject to appropriation.

18   THE COURT:  You keep running into stone walls.

19   MR. VEEDER:  No.

20   THE COURT:  I understand your theory is that you are

21   not going to try to catch it while it is running down the

22   stream. You are going to wait until it gets into the basin

23   and then you are going to say it is subject to appropriation.

24   Meanwhile Fallbrook has complied with the State law and has

25   got a permit. They are going to catch it in their dam and

1   you will never get it in your basin.

2   MR. VEEDER:  No, we made this appropriation before

3   Fallbrook ever made a claim.  We made the exportation.

4   I will not press it any further.  But I just want it

5   clear.  And of course I do think that the point has been made

6   that I think you have to look at this thing as a usufructory

7   right that has been acquired through the actual compliance

8   with State law, namely, the pumping of the water which gave

9   rise to that right.  And it was percolating water.  I think

10   your Honor realizes that it is percolating water.

11   THE COURT:  I haven't so found.  It is true it is

12   percolating, but it is part of an underground stream system.

13   MR. STAHLMAN:  One question, and this probably concerns

14   Vail.  You are not contending this right you are filing on

15   the Vail appropriation.

16   MR. VEEDER:  Your date of priority, as I remember, is

17   1946, isn't that right?

18   MR. STAHLMAN:  I think it is, yes, and I think the Dam

19   went into operation in 1949.

20   MR. GIRARD:  Their exportations would have preceded.

21   MR. VEEDER:  Our exportations preceded.

22   MR. STAHLMAN:  But not for the whole five years.

23   MR. VEEDER:  No, I think, George -- (1) I am still

24   asserting that we were  exporting pursuant to the stipulated

25   judgment as against you, but if the stipulated judgment is

4 fls (at line 13)

1   not in effect we would have been exporting around 3,000 acre

2   feet prior to the time you made your filing, which would to

3   that extent make it antecedent and prior to your appropriative

4   right.

5       THE COURT:  All right.  You are going to work on Finding

6   No. 8 and submit something this afternoon.

7       Is there some other part that we are going to work over?

8       MR. GIRARD:  The only other part that I know of to work

9   over, your Honor, is this brief finding I discussed on the

10  Ammunition Depot implied reservation.

11      THE COURT:  Yes.

12      MR. GIRARD:  That is all I know that is left, other than

13  the descriptions in these findings.

14      MR. SACHSE:  I agree, your Honor, and I would like to

15  be sure that if there are other points of friction or sore

16  spots that we smoke them out now.

17      Do you have any other specific ones, Mr. Veeder?

18      MR. VEEDER:  I have marked out several points here I

19  want to bring to your attention.

20      THE COURT:  Before you do that, there is one other matter

21  on page 27, this paragraph which Mr. Sachse and I couldn't

22  understand.  You are going to work that over.

23      MR. SACHSE:  Yes, we have a couple of things added, so

24  that it reads now, "The usuable storage capacity as set forth

25  above is available for use without affecting the maintenance

1  of a fresh water barrier as set forth in Finding 29 herein-

2  after."

3    THE COURT: All right, that satisfies me.

4    Does that satisfy you, Mr. Veeder?

5    MR. VEEDER: I think it is reflective of the fact.

6    THE COURT: If it is reflective of the fact, --

7    MR. SACHSE: That has never satisfied Mr. Veeder.

8    THE COURT: -- then it satisfies you.

9    MR. VEEDER: Let me hasten to add, your Honor, that I

10  can state a fact and see it slanted to the point where I

11  don't agree with what is done.

12    THE COURT: There is no slanting on this, is there?

13  This is a fact, isn't it?

14    Well, I am satisfied with your change on 27.

15    I interrupted you, Mr. Veeder. You had some matters?

16    MR. VEEDER: I had presented suggested findings, your

17  Honor, in regard to historical uses, starting on page 20 of

18  Part II lodged on December 5th. Now I set out there the

19  historical uses of the Rancho, the lands that were irrigated,

20  the grazing lands and related material.

21    MR. SACHSE: Give us the starting page on this.

22    MR. VEEDER: Starting on page 20, it starts "RANCHO SANTA

23  MARGARITA y LAS FLORES, PREDECESSOR OF THE UNITED STATES OF

24  AMERICA," dated December 5.

25    MR. SACHSE: "In 1883 the Rancho Santa Margarita . . "

MR. VEEDER:  Yes, it goes on there.  To some degree these points have been found in a general way.

THE COURT:  I have found page 20.  Where do you start, line 16?

MR. VEEDER:  It starts at the top of the page, your Honor.  You will find that there are a great number of facts that I have set forth about the historical use of the Rancho, the waters that were being used at the time we purchased the Rancho, the kind and type of uses that were made of the waters, the riparian acreages, the ultimate demand for water, the description of Lake O'Neill, on down through to the description of the system on the Mesas.  I feel that those matters are very important from the standpoint of the United States.  I don't know whether your Honor has considered them or not.

THE COURT:  How far did you go, from page 20 to where?

MR. VEEDER:  We go on down through to page 30.  But I would just like to bring to your Honor's attention the points that I feel would be essential to be included in these findings, and then I am going to make a proposal to your Honor.

On page 28 we refer to the fact that when we bought the land the stipulated judgment was in effect.

Following through several findings, then, on page 29 we refer to the fact that when the United States bought the property the revocable license with the Fallbrook Public Utility District was in force and effect.

1    Now I believe that those findings are important to us

2 for the purpose of the record.  Now it would perhaps suffice

3 to make the record clear, and that is all I am striving for

4 at this juncture, if your Honor were to incorporate into

5 these findings the findings and conclusions that you enter

6 in regard to the stipulated judgment.  That would be

7 Interlocutory Judgment No. 25.

8    THE COURT:  What is 25 about?

9    MR. GIRARD:  Stipulated judgment, findings of fact,

10 conclusions of law.  It is covered in my Finding No. 53.

11 However, I did not incorporate it into these findings because

12 most of them, as I recall, you just suggested I refer to these

13 findings, such as Lake O'Neill.  For example, much of Mr.

14 Veeder's material deals with Lake O'Neill, which of course

15 is covered in Interlocutory Judgment No. 24.

16    MR. VEEDER:  That is right.  What I am trying to say,

17 speaking from the standpoint of organization of the data

18 respecting the Enclave, is that we have your Honor's

19 Interlocutory Judgment No. 25 regarding the stipulated

20 judgment, we have your Honor's Interlocutory Judgment No. 23

21 respecting Fallbrook, we have the interlocutory judgment

22 respecting Lake O'Neill.  Now to me these are factors of

23 great importance and I would like to see them set out in toto

24 in the findings of fact, conclusions of law and judgment

25 respecting the Enclave, because I do think there should be a

single document relating to that.  At least we would see what your Honor has done.  If there is objection to that, I am sure I will hear about it.

MR. GIRARD:  I don't have any objection to incorporating or setting Interlocutory Judgment No. 24 and Interlocutory Judgment No. 25 into this document, except that it is an awful lot of paper work when you have those interlocutory judgments all signed.  Maybe when we enter the final decree you could do this, if you want.  But the main thing I would like to do is to get this interlocutory judgment out of the way.  We have already got Lake O'Neill out of the way.

Incidentally, that is another problem.  On some of the facts Mr. Veeder sets forth here regarding uses by Lake O'Neill, as you recall the United States got an appropriative right to the waters in Lake O'Neill through a special agreement with Mr. Sachse, Vail the State et cetera, which he was happy to accept, and that agreement was not based entirely on facts -- it was based on what everybody thought the United States could use and recognized it as an appropriative right. There was a substantial question whether they had an appropriative right.

If we are going to make all kinds of detailed findings on how the Rancho operated in Lake O'Neill, that may well be inconsistent with what formed the basis of Mr. Sachse's, Mr. Stahlman's and my agreement to give them the appropriative

1  right to Lake O'Neill.  When we stipulated that appropriative

2  right to Lake O'Neill we did it essentially that we were

3  willing to give them what they were using now, and I think

4  that is about what they got.  I have no objection, whatever

5  your Honor wants to do, if you want the Lake O'Neill judgment

6  incorporated in here word for word.

7        THE COURT:  He didn't suggest that.

8        MR. GIRARD:  That is what he suggested, your Honor.

9        THE COURT:  No, he suggested that it be incorporated by

10  reference.

11        MR. GIRARD:  Is that right, Mr. Veeder?

12        MR. VEEDER:  Well, I would just as soon have it set out

13  physically, the whole thing.

14        MR. GIRARD:  That bothers me.

15        THE COURT:  You are not going to do that.  If you want

16  to do anything, incorporate it by reference.  But that is as

17  far as we will go.  We have incorporated the stipulated

18  judgment findings by reference.  But we are not going to

19  reincorporate them in here.

20        MR. SACHSE:  That is my point.  I have no objection to

21  an incorporation by reference.  It is perfectly logical.

22        THE COURT:  Let's look over some of this material.

23        I believe in finding facts as I think they are, and if

24  Mr. Veeder feels that there is some value from his standpoint

25  in some of this historical evidence about the Ranch, we could

start at page 20 and pull some of this material together and
I have no objection to putting some of that in.

MR. GIRARD:  I haven't either.  As far as any use of
water by the Rancho on their land within the watershed, that
doesn't have one iota to do with their United States water
right.  They have a riparian right regardless of how the
Rancho used it -- I mean, whether the Rancho used it for
cattle and the United States uses it for a different use
doesn't affect the water right at all.

MR. VEEDER:  I have brought this down to date showing
the historical use by the Rancho as owners of the lands.
Then I have brought it down and showed the number of acres
that were subjected on the Stewart Mesa and South Mesa before
and showed the acreage that was irrigated at the time that
the property was purchased.  I think there is a reference
by Mr. Girard to that fact.  Now I don't believe that it is
reflective of the extent of the operation at that time.  We
put in extensive evidence on that point.  The reason why I
think it is important to us, again, in regard to the question
whether this Court in its power in equity could deny Fallbrook's
right to invade any right that we have, in view of the fact
that it was well known that these uses were being made --
that is a point that I think is important.  That would be the
reason why it occurs to me that we should have more definity
in these Enclave findings.

5 fls.

1    THE COURT:  Let's take a recess and I'll look them over.

2    MR. SACHSE:  May I make one suggestion before we take

3  the recess.  I think this would be helpful.  We went over

4  this at some length with Mr. Veeder, and if you look at Mr.

5  Girard's most recent Finding No. 11 -- it is the one where

6  we tried to cover this -- I think your Honor will recall that

7  in our February sessions Mr. Veeder asked that there be some

8  express findings as to water use, and solely to refresh your

9  recollection you will remember that there were no meters on

10  the pumps or anything and it was Mr. Veeder's desire that we

11  infer from acres under irrigation and crops what the use was,

12  and after some lengthy discussion it was my impression that

13  your Honor said no.  So the language we used, we say they

14  did it in gradually increasing amounts, but there is no direct

15  evidence -- we put in this word "direct" -- as to the amount

16  of such diversions.  I think that reflects the facts.  If he

17  wants the additional evidence in, I see no objection to it

18  but again I don't think it proves anything.

19    MR. GIRARD:  We could say in this finding, for example,

20  how many acres were under cultivation outside the watershed,

21  if you want to.

22    MR. SACHSE:  You could say that.

23    MR. VEEDER:  And under irrigation.

24    MR. GIRARD:  Whatever you want.

25    MR. VEEDER:  Under irrigation.

1      THE COURT:  Let me look it over in connection with

2  Paragraph 11.

3      MR. SACHSE:  I think Mr. Veeder's proposal should be

4  read in the light of Mr. Girard's No. 11.

5      THE COURT:  All right.

6      (Recess.)

7      THE COURT:  Did you come to any conclusions on this, or

8  is this something that you will probably have to sit down and

9  work over?

10      MR. SACHSE:  We have come, I think, to this much of a

11  conclusion, that we have no objection to Mr. Veeder's putting

12  in evidence.  We might argue about what the evidence is.

13      MR. VEEDER:  You mean findings.

14      MR. SACHSE:  Some of the evidence in Finding 11 on the

15  water uses, on acreage, et cetera.  We have no objection to

16  that being included in it.  But we want to see specifically

17  what he wants to put in.  That is the problem.

18      MR. VEEDER:  Of course, I would want to put in the history

19  in regard to the uses of water inside and outside the water-

20  shed by Rancho Santa Margarita under the irrigation system

21  that was established and concerning which Mr. Whitman testi-

22  fied.

23      MR. SACHSE:  I would answer that this way.  Again, I

24  don't object, but I think Mr. Girard is 100 per cent correct.

25  The uses within the watershed by the Santa Margarita Rancho

1    are utterly and absolutely immaterial.  The uses out of the

2    watershed can be material, according to Mr. Veeder's theory.

3    Now what he contends those uses are, how he chooses to phrase

4    it -- if he tries to convert it to acre feet, I would vigorous-

5    ly object, because I think there is no direct evidence in the

6    record as to the amount.  But if he wants to say that there

7    were so many acres cultivated and so many acres irrigated --

8    if he has that evidence.

9        MR. VEEDER:  That evidence is in the record.

10       MR. SACHSE:  I question it.

11       THE COURT:  Don't you agree there would be no sense to

12   talk about your uses within the watershed?

13       MR. VEEDER:  I think there were certainly riparian uses.

14       THE COURT:  Can't we cover that with just a sentence,

15   that the predecessors of the United States made uses of the

16   waters for riparian purposes within the watershed, but that

17   no findings are made as to the nature or extent of these

18   uses for the reason that it is immaterial, that they possessed

19   their riparian right whether they used it or not?  Wouldn't

20   that do it?  Then take up your uses outside the watershed.

21       MR. VEEDER:  There were historical uses, in my view,

22   from Lake O'Neill which were important.

23       MR. SACHSE:  That I will object to.  We have a finding

24   on Lake O'Neill.

25       THE COURT:  We have taken care of Lake O'Neill.  And

1  when you were proving your case on Lake O'Neill it is true

2  there was this understanding finally not to contest your

3  right.  But if you recall specifically, the defendants were

4  contesting your absence of proof as to just exactly where and

5  how this water had been used, and I said that I was confident

6  that if we took the time and searched far enough we could

7  find that it had been placed to a beneficial use, and it was

8  about that time that this attitude on the part of the

9  defendants was manifest and found you had an appropriative

10  right.

11      MR. VEEDER:  All right, your Honor, I will designate

12  specifically what I would like to have.

13      MR. SACHSE:  Try to tie it in with 11.

14      MR. VEEDER:  Yes.

15      MR. GIRARD:  We will sit down and try to talk about it.

16      THE COURT:  Sit down and try to dictate something on it.

17      MR. VEEDER:  I do feel, your Honor, that there is no

18  finding, no finding has been offered as yet in regard to the

19  fact that the Fallbrook Public Utility District was --

20      MR. SACHSE:  I have no objection at all.  If Mr. Veeder

21  wants to dictate a finding that we were operating under a

22  revocable license granted on such and such a date and that

23  thereafter it was taken from us,  write it up.

24      MR. VEEDER:  Look at page 29.  You will find language

25  I set out there.  It might save time.

1          THE COURT:  Why don't you save the time here in trying

2     to get some kind of draft to work on, sit down and work

3     together on it.

4          MR. SACHSE:  That's all right with us.

5          THE COURT:  Rather than talking about it in a vacuum

6     here.

7          MR. SACHSE:  All right.

8          THE COURT:  Will you do that?

9          MR. SACHSE:   Yes, your Honor.

10         THE COURT:  We will adjourn now until 2:00 o'clock.  See

11    what you can do.

12         (Noon Recess.)

19,283

1      SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 7, 1962, 2:00 P.M.

2                              -oOo-

3          MR. SACHSE:  Mr. Girard has run upstairs with some

4      pencil drafts.  Mr. Veeder's secretary is going to retype

5      them.  He is going to be right back.

6          MR. VEEDER:  Did you send up what you have written?

7          MR. SACHSE:  He has taken them both up.  However, what

8      I have written can be done by interlineation simply, if you

9      want to take it up.

10         THE COURT:  Give one to Mr. Veeder and one to Mr. Sachse

11     and they can all look at it.

12         MR. VEEDER:  Has my secretary started on that, Fred?

13         MR. GIRARD:  Yes, she will have those down as soon as

14     she can type them.

15         THE COURT:  Doesn't a paragraph like that do it all as

16     far as riparian rights are concerned, Mr. Veeder?

17         MR. VEEDER:  Yes, I think that is reflective.

18         THE COURT:  In other words, any findings on the extent

19     of these uses within the watershed would not increase or

20     decrease your riparian right.  But if you want it in there,

21     it is all right to say they irrigated cultivated crops and

22     ran cattle.  But you are not limited in your riparian right

23     by the use or the non-use theretofore made of those rights.

24         You want some findings outside the watershed.  I went

25     through a lot of your proposed findings, which are tied in

1  with Lake O'Neill.

2      MR. VEEDER:  That's right.

3      THE COURT:  And that has been taken care of.

4      MR. VEEDER:  I will say this, in regard to the Lake

5  O'Neill findings, the historical use sets out much of the

6  data that I have here.

7      THE COURT:  Your Lake O'Neill findings do.

8      MR. VEEDER:  That's right.

9      MR. SACHSE:  Have you got a set of the Lake O'Neill

10  findings with you?

11      MR. VEEDER:  No, I don't have one.

12      MR. SACHSE:  I don't think they set forth historical

13  uses.

14      MR. VEEDER:  Oh, yes.

15      MR. SACHSE:  I don't want to argue it, because I don't

16  know.  But my very strong recollection is --

17      MR. VEEDER:  Mr. Sachse, the way to handle it is to find

18  out.

19      THE COURT:  What is the number?  I'll get it right out

20  of my drawer.

21      MR. GIRARD:  No. 24, your Honor.

22      THE COURT:  I see, just starting to look through, that

23  you say, "At present the lands and water resources within the

24  Enclave are used for military and agricultural purposes."

25      II:  "The lands comprising Rancho Santa Margarita are

now utilized by the United States of America as a Naval

Enclave over which the State of California has ceded

exclusive jurisdiction."

MR. GIRARD:  Did we say that?  We have that last

paragraph that these are not final, don't we, your Honor?

MR. SACHSE:  Yes.

THE COURT:  We can hurry through these.

$\overline{V}$ describes  Lake O'Neill.

$\overline{VI}$, "Santa Margarita River water was first stored in

Lake O'Neill in the year 1883.  Since that year, water from

the Santa Margarita River has been diverted into that Lake

at the times and in the amounts which are found in subsequent

findings."

A dam was constructed, et cetera.

Storage capacity historically, et cetera.

Continuously, for the periods and in the amounts

subsequently found, since 1883 water has been diverted from

the Santa Margarita River and conducted into Lake O'Neill.

Head works.

The ditch.

$\overline{XII}$.  Water from the River was historically diverted by

the Rancho into the O'Neill Ditch.

$\overline{XIII}$.  Continuously from 1883 to 1914 and from the date

last mentioned to the time of the transfer, whenever the

quantity of water was available in the River water was diverted

into a ditch, et cetera.

MR. VEEDER:  Acreages.

THE COURT:  <u>XIV</u>.  The United States and Fallbrook Public Utility District have agreed that the term, et cetera.

<u>XVIII</u>.  Rancho practiced seasonal storage.

<u>XIX</u>.  In 1883 the Rancho diverted from the River and stored water for the purpose of irrigating 300 acres of alfalfa, 12 acres of orchard and vineyard.

<u>XX</u>.  Several thousand head of livestock were annually raised on the Rancho.  Water was diverted from domestic purposes.

<u>XXII</u>.  Alfalfa, raised to feed livestock, et cetera.

<u>XXVI</u>.  Row crops, lima beans, sugar beets.

MR. VEEDER:  How many acres of those does that show, your Honor?

THE COURT:  It shows in Finding <u>XXVI</u>, in the years 1911 through 1914 the following acreages were irrigated with the waters impounded in Lake O'Neill:  Alfalfa 150 acres, sugar beets 200 acres, lima beans 200 acres.

<u>XXVII</u>.  Historically there was irrigated on the Rancho with water diverted from the River and stored in Lake O'Neill between  550 and 600 acres.  Chappo Flats, et cetera.

MR. VEEDER:  That is right.

MR. SACHSE:  May I see that for a moment, your Honor?

THE COURT:  Yes.

1   MR. VEEDER:  I think those are the same figures as I

2   had here, Mr. Sachse.

3       MR. SACHSE:  Do you want any more than that?

4       MR. VEEDER:  No, that's all.

5       MR. GIRARD:  Fine.

6       MR. SACHSE:  Great.

7       MR. VEEDER:  Just so it is clear that those findings

8   are in regard to Lake O'Neill and that they have been found

9   by the Court.  That is all I want to be sure of.

10      THE COURT:  Are we waiting for something to be typed up?

11      MR. GIRARD:  Yes, we have two findings:  One which will

12  incorporate the material Mr. Veeder has on this draft, which

13  will go in Finding 8 right after the language I have drafted,

14  which should be down in a moment.  The other, which is a

15  draft of a finding concerning the Fallbrook Public Utility

16  District's revocable permit.  We are, I think, presently

17  going to be able to come up with a figure on the amount of

18  irrigated land outside the watershed.  As I understand it,

19  there is a -- we will have to wait for the figure -- there is

20  an aerial photograph in 1938 made of the area, and I assume

21  that Colonel Bowen and Mr. Wilkinson can make a pretty good

22  estimate as to how much was actually under irrigation outside

23  the watershed of the Santa Margarita River, and as far as I

24  am concerned we can insert that right in my finding and I

25  have no objection to whatever figure they come up with.

MR. VEEDER:   I would want to have entered that there was
an irrigation system which embraced 1100 acres on Stewart
Mesa and 600 acres on South Mesa, that all of that land was
irrigated.   That I have put 900 acres of the land outside
the watershed, and Colonel Bowen has told me he will check
back.

Now, in regard to the quantities of water, Rancho Santa
Margarita was not measuring water at that time.   However, the
evidence shows that of the approximately 1700 acres of land
that Mr. Whitman testified were being irrigated, he said that
100 acres of the land was in lemons at the time we bought
the land and that the rest was in vegetables.

THE COURT:   Where was the 100 acres, in or outside the
watershed?

MR. VEEDER:   The hundred acres was inside the watershed,
your Honor.   I just want to make a correction.   65 of the
105 acres were in the watershed, and 40 acres outside the
watershed.

Now the evidence that is in the record shows that for
vegetables a reasonable water duty is 4 acre feet per acre,
and Mr. Whitman testified that in regard to that produce,
raising vegetables on the Stewart Mesa, he said, "Of course,
the main irrigation season was from May through November, but
it was land that was subject to winter crops and years like
this where we had no rain we irrigated clear up until the

1    rains came in December and January."

2        I think there is adequate evidence in the record to

3    support that at the time the United States acquired this land

4    the predecessor in interest was irrigating, I have approxi-

5    mately 900 acres of land outside the watershed, and that a

6    reasonable water duty would be 4 acre feet per acre.  And

7    that is the basis upon which I would advance my findings.

8        MR. SACHSE:  Mr. Veeder, does this then propose any

9    change in the conclusions of law as to what appropriative

10   rights you do or do not have?

11       MR. VEEDER:  The position that we take in this regard,

12   if your Honor doesn't reverse himself and say we do not have

13   an appropriative right, of course we will disagree with your

14   Honor on that point.  But I would like to have the findings

15   to be reflective of the status of the water use in and outside

16   the watershed at the time the National Government bought this

17   land.

18       MR. SACHSE:  That is the very reason I asked that

19   question.  There is only one purpose for this, your Honor.  It

20   is to give Mr. Veeder a finding on which he can try to create

21   an appropriative right.  Now an appropriative right depends

22   on the water put to use.  I don't think he can get one anyway.

23   But I am not about to voluntarily consent to a finding which

24   says, in substance -- this is your Honor's finding now -- in

25   1937 1100 acres of land were under irrigation pipe, they were

1    in vegetables -- we don't know what kind of vegetables, the

2    normal irrigation season is May through November, the normal

3    water duty is four acre feet per year.  Therefore, I find

4    4 times 1100, I find 4400 acre feet per year use.  That is

5    what Mr. Veeder wants you to do.  That I will not buy.  There

6    is no such evidence in this record.

7         THE COURT:  The Court can draw a reasonable inference

8    from the evidence in the record.

9         MR. VEEDER:  And that evidence is surely in the record,

10   your Honor.

11        THE COURT:  However, a more serious difficulty -- I don't

12   believe in cutting a litigant off on findings that are

13   properly supported by evidence, even though my conclusions

14   of law from the findings may be contrary to a litigant's

15   position -- but a more serious difficulty is this.  Is this

16   record clear as to where this water came from?

17        MR. VEEDER:  Yes.

18        MR. SACHSE:  Yes, it is clear that --

19        THE COURT:  Pumped out of Lake O'Neill?

20        MR. SACHSE:  No, pumped out of Ysidaro.

21        MR. VEEDER:  Pumped out of the basin, your Honor.

22        MR. SACHSE:  That is what he is after.

23        MR. VEEDER:  Of course it is.

24        MR. SACHSE:  Basin appropriation.

25        MR. VEEDER:  There are no subtleties about me.  I am

1    simply saying they appropriated 1937 through 1941 and we

2    acquired the land in 1941-42; that when we acquired the land

3    they were exercising an appropriative right under California

4    law.  The whole objective that I am desirous of having here

5    is the facts clearly stated.  Your disagreement that this

6    may constitute an appropriation is an element entirely apart.

7    I think the evidence offered will support the position that

8    I have advanced in regard to the facts.  Your conclusion of

9    law may be contrary, but I would like to have this reflective

10   -- the status of the water use when we bought the land.

11        MR. GIRARD:  Would you agree that the aerial photograph

12   showing the amount of land under irrigation would probably

13   be more accurate than Mr. Whitman's testimony?

14        MR. VEEDER:  The only photograph that would be of

15   assistance would be a 1938 photograph, which would not be

16   reflective of the period 1940 and 1941 when the whole system

17   was brought to its maximum development.  That is what the

18   evidence shows.  I do have Exhibit 76.

19        Should I wait for California to hear it?

20        MR. GIRARD:  I don't recall.  I was just checking with

21   Mr. Sachse and he says that Mr. Whitman testified that full

22   development occurred in 1939.

23        MR. SACHSE:  That is my recollection.

24        MR. VEEDER:  I know what he said.  He said this.

25        THE COURT:  What page?

6 fls 1      MR. VEEDER:  It would commence at about 6,994 and it

2   follows on through with your Honor interrogating in part, it

3   shifts back and forth all the way down through page 7,003,

4   where Mr. Sachse gave me a fine help on his cross-examination.

5   I think that is generally where you would find it.

6      But basically it says the development was completed, he

7   says, "Probably 1940 or 1941." So I would say that the full

8   1700 was subjected to irrigation at that time, and a good

9   share of that land is of course outside the watershed.  He

10   identified the sections and the watershed line is established

11   on Exhibit 76 and the irrigation system is described in

12   detail.

13      MR. GIRARD:  I am not an expert on this.  Was this in

14   vegetables?

15      MR. VEEDER:  Yes.

16      MR. GIRARD:  Does it automatically follow that vegetables

17   use water -- are irrigated?  Are there vegetable crops such

18   as beans which aren't irrigated?

19      MR. VEEDER:  All I know is that he testified in regard

20   to these vegetables that they were irrigated and when the

21   irrigation season for them took place.  I don't believe there

22   is any inference that they were dry land farmed under the

23   circumstances.

24      MR. STAHLMAN:  Isn't it also true that that line shifted?

25   We have some evidence where the watershed line was.

1       MR. VEEDER:  It was moved southward in the South Mesa,

2   but not in regard to Stewart Mesa.  Indeed Exhibit 76 is

3   reflective of the amended --

4       MR. STAHLMAN:  My recollection is that it was Stewart

5   Mesa where it was moved.

6       MR. VEEDER:  I don't think so.  This map prepared by

7   Colonel Bowen, if you care to look at it, George, is reflec-

8   tive of the watershed line as finally determined upon.

9       MR. SACHSE:  I am not going to quarrel with your Honor's

10  finding, and I certainly subscribe to the principle that

11  simply because it may conflict with your conclusion of law,

12  if it is a proper finding you should give it to Mr. Veeder,

13  I agree.

14      THE COURT:  I don't mean it conflicts.

15      MR. SACHSE:  The point that concerns me is -- I might

16  refer back to your Honor's consideration a month ago of the

17  tuna boat case -- how far is your Honor willing to infer and

18  assume in making a finding which is then going to become res

19  adjudicata?  You were asked in the tuna boat case to infer

20  that the reason the boat sank was that a man did or did not

21  do something in its manufacture.  I think I can honestly

22  agree with Mr. Veeder that he has evidence in the record that

23  there were 1100 acres on the South Mesa that reached about

24  maximum development in 1940 or 1941, and that it was mostly

25  in vegetables.  And then he has additional evidence by another

witness that four acre feet per year is appropriate for row
crops. Those are things that are in the record. That is
what is exactly in the record. How much are we going to infer
from that? That is my whole question. And I don't think we
should indulge in that kind of inference.

THE COURT:  I don't find any trouble in making some
reasonable inferences from those facts. There was water
available in the lower part of the Santa Margarita underground.
The Court can almost take judicial notice of the summer weather
in this community -- the fact that we don't have rain. If
you grow row crops you are going to have to irrigate them.
This witness testified they were irrigated.

MR. SACHSE:  Let me throw another inference at your
Honor. We have very specific evidence in this record, we have
made a finding already which Mr. Veeder has approved and
drafted, that the usuable storage capacity in Ysidaro Sub-basin
is 1260 acre feet a year. I think that is is. If they take
more than that out, salt water intrusion occurs. So now he
wants an inference drawn that from Ysidaro Sub-basin he pumped
four acre feet of water a year on 1100 acres. How can you
draw that inference unless you are at the same time going to
find the Rancho immediately itself caused salt water intrusion
-- which we know it didn't? It did not pump that kind of water
out. We can't conceivably make that kind of inference. He
wants us to find 4400 acre feet of water pumped out of Ysidaro

1    outside the watershed, and if he did it he wouldn't have any

2    Ysidaro Basin and the Rancho would have salted the whole thing

3    up.  And we know it didn't happen.

4        MR. VEEDER:  Your Honor, you are being asked not only to

5    make a finding as I requested.  You are asked to find something

6    about a disaster that obviously didn't occur.  I think they

7    were pumping water, I know they were pumping water from these

8    wells that are described by Mr. Whitman, and those wells were

9    the irrigation wells situated in a series of wells, your Honor,

10   which are connected with the irrigation system.

11       MR. SACHSE:  In Ysidaro Basin, is that right, Mr. Veeder?

12       MR. VEEDER:  In Ysidaro Basin is correct.

13       Now your Honor, what we have asked you to do is to find

14   in regard to the lands which were irrigated, which were in

15   vegetables and which obviously were, indeed the testimony

16   shows were irrigated from May through November, Colonel Bowen

17   has testified and no one has ever challenged him and Colonel

18   Bowen advises me that four acre feet is a reasonable duty of

19   water.

20       Now this additional factor of salt water intrusion,

21   when it came about, what caused it or the circumstances that

22   brought it on --

23       THE COURT:  Well, is it true that the storage capacity

24   of Ysidaro Basin is 1200 acre feet?

25       MR. GIRARD:  It is in the findings which Mr. Veeder

JOHN SWADER, OFFICIAL REPORTER

1    submitted.  I will give it to you in a minute.  It is on page

2    27 of my findings.  It is 1200 acre feet.

3         MR. VEEDER:  The usuable storage capacity, which is

4    based upon the recommendations of the Marine Corps, from the

5    standpoint of efficient pumping for their operation --

6         MR. GIRARD:  What?

7         MR. SACHSE:  Mr. Veeder, read your own finding.  The

8    finding says there is a relative degree of unanimity between

9    the evidence introduced by the United States of America and

10   the State of California respecting the natural characteristics,

11   storage capacity and usuable storage capacity of said alluvial

12   deposit.  Based upon that evidence it is found as follows --

13   now here is your Honor's finding:  The usuable storage

14   capacity of the younger alluvial deposits in each of the

15   designated sub-basins is approximately as follows:  Ysidaro

16   1200.  The usuable storage capacity as set forth above is

17   available in addition to the 500 needed to maintain a salt

18   water barrier.

19        Now how Mr. Veeder can ask your Honor to sign this

20   finding which says all he could possibly take out of Ysidaro

21   is 1200 and then ask your Honor to find the Rancho Santa

22   Margarita potentially took out 4400 every year, I don't know.

23   It is a hopeless inference.

24        THE COURT:  I would like you to address yourself to this

25   point.

MR. VEEDER:   I will address myself to this point, and I am sure I will be interrupted before I finish.

The point that I bring to your Honor's attention is that Mr. Worts calculated the usuable storage capacity in connection with the Marine Corps operation.  His calculation in regard to storage capacity was based upon the kind and type of operation that could be efficiently conducted there.  He testified that he was advised as to the depth of the wells and how far he could pull the water down.  You will find in the study prepared by the State of California that they calculated 61,000, they say 61,000 acre feet.

THE COURT:  Where?

MR. VEEDER:   In there.

THE COURT:  What area?

MR. VEEDER:  For the basin.

THE COURT:  For Ysidaro?

MR. VEEDER:  For the Santa Margarita Coastal Basin.

THE COURT:  We are talking now about Ysidaro.

MR. VEEDER:  That is correct, and I will have to check and see what they say.  I think they say 9,000 for Ysidaro, but I will look.  And I realize that I am being tortured into looking at Bulletin No. 57.

THE COURT:  You are kind of up against the old problem about the irresistible force meeting the immovable object.

MR. VEEDER:  What's that?

THE COURT:  What you are doing now.

MR. STAHLMAN:  Has this Bulletin all been introduced in evidence?

MR. GIRARD:  Do you want to introduce it, Mr. Veeder?

MR. VEEDER:  No.

The material that is involved -- well, there it is; the gross storage capacity is 12,000.

THE COURT:  Of what?

MR. VEEDER:  Of Ysidaro.

THE COURT:  12,000?

MR. VEEDER:  However, they go on and say that 1200 acre feet is usuable.

MR. SACHSE:  And that is not just for the Marines, Mr. Veeder; that is usuable.

MR. VEEDER:  This is one of those where they calculated their storage 25 feet above ground level, I think.

In any event, the evidence that I have offered, the evidence that went in, your Honor, by Mr. Whitman to the effect that they pumped water from the Ysidaro Basin, irrigated 1700 acres of land.  We have figured 900 outside the watershed.  Colonel Bowen says four acre feet per acre.

THE COURT:  That is 3600 acre feet.

MR. VEEDER:  That is right.

THE COURT:  Do you want me to make that finding, in view of the other finding that this particular --

MR. GIRARD:   6800 acre feet he is asking for now --
1700 acres.

MR. VEEDER:   No.

THE COURT: Wait a minute.  That is right.  Because it
was pumped out of the basin in and out of the watershed.

MR. SACHSE:   It is all the same no matter where they
put it.

MR. VEEDER:   I would like to have you take a look at
Exhibit 76 and see where the wells are located, your Honor.

THE COURT:  They are located in Ysidaro Basin.

MR. SACHSE:  They are located in Ysidaro Basin.

MR. GIRARD:  Unfortunately.

MR. VEEDER:   No.  They certainly were in contemplation
of irrigating all this land.  This land is all outside the
watershed.  Here is the South Mesa, here are the wells, you
have a series of wells up as high as Section 35 10 South 5
West.  This is the system that was created, this is the
system that was in operation.

THE COURT:  There is no dispute about that and I am
willing to say that Colonel Bowen's figure for row crops is
four acre feet, and I am willing to infer that some irrigation
went on even in view of the sketchy evidence.  But you are
going to get into a situation where you are going to have
me finding that your predecessor, the Santa Margarita, brought
about this salt water intrusion.  If I make a finding -- what

1    is this four times 1700?

2         MR. SACHSE:   6800.

3         THE COURT:   If I find you pumped 6800 acre feet out of

4    Ysidaro Basin.

5         MR. SACHSE:   Without salt water intrusion, then the rest

6    of our findings collapse.

7         MR. VEEDER:   I don't think it is necessary to put in any

8    finding at all on salt water intrusion on this particular

9    point.

10        THE COURT:   There are other findings about salt water

11   intrusion.   We are all agreed that you have to maintain a

12   fresh water barrier to keep it from coming in.   You have

13   findings that you, yourself, have submitted that there are

14   1200 usuable acre feet in Ysidaro.   Here you are asking me

15   to make a finding that 6800 acre feet was in the successive

16   three or four year period -- 1938, '39, '40, 41.

17        MR. VEEDER:   I am not asking that.

18        THE COURT:   Pumped out of Ysidaro Basin.

19        MR. VEEDER:   I am asking that in 1940 and 1941 there was

20   1700 acres under irrigation, that approximately 900 of that

21   was outside the watershed, that they raised vegetables out

22   there.

23        THE COURT:   I know what you are asking.

24        MR. VEEDER:   If it created salt water intrusion, I

25   truly don't know what that means in regard to this particular

19,301

1    finding.  It may have been a bad practice, it may have resulted

2    in salt water intrusion, it may have done all those things;

3    but the fact does remain that there is evidence in the record

4    of vegetables being irrigated, there is evidence in the

5    record that they were in fact raised, there was a period of

6    irrigation and there was a quantity of water used.  Now the

7    fact that it might have created salt water intrusion could

8    not in any way dissipate those facts.

9         MR. SACHSE:  Mr. Veeder, I will buy everything single

10    one of those facts and I will consent to your amendment if

11    you then will jump over to Finding 29 and I will then ask

12    his Honor to scratch all this that says, "As a consequence

13    to prevent salt water intrusion the United States of America

14    has found it necessary to maintain the water levels in the

15    Ysidaro segment at a minumum elevation of five feet above sea

16    level . ."  If you want to take that out, that you don't any

17    longer have to have this five feet above sea level, if you

18    want to take out the reference earlier in Paragraph 11 to the

19    fact that there is only 1200 acre feet of storage capacity

20    in Ysidaro, if you will take those out you can have your

21    6400 pumped out of Ysidaro.  I'll be the happiest man in the

22    world.

23         MR. VEEDER:  I don't believe it is necessary to make a

24    bargain, your Honor.  I think the evidence that is in the

25    record would support findings of the character I have asked.

THE COURT:   I am going to try to be consistent -- I may not be -- I am going to try to be consistent.   If I find the United States and its predecessors were not responsible for salt water intrusion, I am not going to turn around and make another finding from which you draw a clear inference that the 6800 acre feet out of Ysidaro undoubtedly brought it about.

MR. VEEDER:   May I ask the reporter to read your Honor's last statement.

THE COURT:   Read it.

(The reporter read the Court's last statement.)

THE COURT:   Brought about the salt water intrusion.

MR. VEEDER:   As I say, I see no relationship between the two.

THE COURT:   Let me ask the expert.

Colonel Bowen, from what you know today about Ysidaro Basin, what do you think would happen if you pumped 6800 acre feet out of Ysidaro Basin in one water year?

COLONEL BOWEN:   Well, we would salt up the basin very badly, your Honor, probably ruin it as far as a producing well field is concerned.

THE COURT:   Let me ask you this question.   We don't know from the record when this salt water intrusion came up into the Narrows and even to some of the wells past the Narrows. Do you have an opinion whether pumping 6800 acre feet of water

in one year out of Ysidaro Basin might have permitted the salt water to intrude up through the Narrows and into the bottom part of Ysidaro?

MR. VEEDER: I don't believe there is any evidence on that in the record, your Honor.

THE COURT: Evidence of what?

MR. VEEDER: As to when it started.

THE COURT: I said there was no evidence. I am asking the Colonel if pumping 6800 acre feet in one year could have caused that.

COLONEL BOWEN: Yes, your Honor, it could have very definitely.

THE COURT: A final question. We have evidence that there was some irrigation going on up there. We know that they had a system. Do you have any explanation to reconcile the conflict we have here between first a finding that this salt water intrusion was not caused by the defendants or the Government's predecessors or the Government and this proposed finding that all this water was pumped out year after year in a three or four year period?

MR. VEEDER: Your Honor, may I see the finding before the Colonel responds which is to the effect that the predecessor in interest didn't create the salt water intrusion. I do not know there was such a finding.

MR. SACHSE: There is a finding, Mr. Veeder.

1        MR. VEEDER:  Just let me finish, Mr. Sachse.

2        That is why I asked that the record be read back, because

3   I was unaware that there was any such finding.

4        The general proposition that I am advancing, your Honor,

5   I don't believe has anything to do with salt water intrusion.

6   It does have to do with water uses.  Now you may say based

7   upon the evidence that I find here they didn't use 6800, but

8   they did use X quantity of water.  I don't know.  But I do

9   think the record will support the finding that water was

10  diverted, was applied to beneficial use by the Rancho Santa

11  Margarita and was applied on these lands, and I can find

12  generally that there were so many acre feet used within and

13  without the watershed.  That is all I am asking.  If it

14  created salt water intrusion, I don't know that.

15       THE COURT:  Let me ask you this -- I am not going to

16  forget that the Colonel has a question pending and that you

17  have made quite a little speech here and I want his view on

18  this -- but suppose that the Rancho had pumped 6800 acre feet,

19  and suppose it was excessive pumping and had caused salt

20  water intrusion.  Do you think by any theory of law you could

21  get an appropriative right to continue to pump 6800 acre feet

22  and continue to damage and destroy the basin?  Does that make

23  any sense?

24       MR. VEEDER:  Your Honor, I will say this, that I believe

25  that a man could acquire an appropriative right even if it did

create salt water intrusion.  Yes, I see no relation whatever between that.  I could see a situation where a man could very well -- in fact, it is done; a man will appropriate water far in excess of the available supply in the basin and he will pump it straight down, and I say he would have an appropriative right to the extent even of destroying the basin.  There is no question about that.

MR. SACHSE:  The California Constitution provides that all water uses of an appropriator or riparian shall be reasonable and beneficial, and I don't think this Court is going to find that an appropriation which by its very terms destroyed completely a water basin by salt water intrusion is a reasonable and beneficial use of water.  I don't think the Court is going to so find, Mr. Veeder.

MR. VEEDER:  I think what you have said is a total non sequitur.  I think a man has a right, if he owns a basin, to pump it.

THE COURT:  I agree with Mr. Sachse.  I am not going to make any kind of finding like that.

Colonel Bowen, do you have any explanation of this apparent conflict here between some testimony on Santa Margarita's uses and the findings on the safe yield of Ysidaro Basin?

COLONEL BOWEN:  Well, I believe, your Honor, that the Ranch never pumped the  quantity of 6800 acre feet out of the

Ysidaro.   Their Ranch wells, which we have since abandoned, specifically 582 and 585, were very low down in the Ysidaro Basin, and then we acquired the property and even into the time when I assumed my present duties with the Camp the irrigation water for the Coastal mesas was largely produced from those two wells that I named, and I think those two primarily are responsible for the lowering of the water levels in Ysidaro and the reversal of the hydraulic gradient in the Ysidaro Narrows.   It is very possible that the intrusion of sea water commenced --

THE COURT:   How much would those two wells produce?

COLONEL BOWEN:   They are very good wells, your Honor. They will each produce in the neighborhood of 1500 gallons per minute.

THE COURT:   You say you don't think they ever pumped 6800 acre feet from the Basin?

COLONEL BOWEN:   No, your Honor, I don't.

THE COURT:   Do you have any idea how many acre feet these two wells would produce?

COLONEL BOWEN:   Well, on the basis of -- let's assume that each would produce about four second feet.   That would be a total of eight second feet.   If pumped continuously, that would be 16 acre feet a day, 24 hours, which, in three days, would be 48 acre feet continuous pumping.   No wells could be operated under those circumstances.

7 fls.

1    THE COURT:  This would be assuming that for 300 days,

2    24 hours a day, you were pumping those wells.  And we know

3    that didn't happen.

4    COLONEL BOWEN:  Yes, sir.

5    THE COURT:  Thank you.

6    MR. GIRARD:  I wonder if I could ask Colonel Bowen a

7    question.

8    MR. VEEDER:  I believe this situation has progressed to

9    the point where, if we are going to reopen the case, it suits

10   me, but I am standing on the record as written.  I think this

11   matter of salt water is just a red herring that is largely

12   meaningless.

13   But I have asked that those findings be made.  I am not

14   asking a finding of 6800 acre feet.  I am asking that you

15   make a finding that these lands were irrigated.  I have in

16   the past asked for four acre feet per acre.  If Colonel Bowen

17   says that is an impossibility, all right.  But I do think

18   there is sufficient evidence here that you can make a finding

19   in regard to some quantity of water that was pumped at the

20   time we bought the land.

21   THE COURT:  I don't know how I could fix any quantity.

22   MR. SACHSE:  I can't see what makes Mr. Veeder unhappy

23   about waht Mr. Girard has written:  "Commencing with the

24   irrigation season of 1927 and continuing thereafter to the

25   acquisition of the Naval Enclave by the United States of

America, gradually increasing amounts of water of the Santa
Margarita River were diverted to agricultural uses outside
the watershed by the predecessor in interest to the United
States of America.   There is no direct evidence as to the
amount of such diversions."

MR. VEEDER:   I think there is direct evidence.

MR. SACHSE:   He has everything he wants without creating
this utterly impossible dilemma for your Honor.

THE COURT:   Mr. Girard, you were going to ask a question
of the Colonel.

MR. GIRARD:   I was just wondering if in 1940 you diverted
6800 acre feet of water out of those two lower wells in the
Ysidaro, would the water you pumped out of those same wells
in 1941 be of a quality that you could expect to use for
irrigation?

MR. VEEDER:   Your Honor, this is going far, far beyond
-- this is purely speculation now.

THE COURT:   You know what the answer is going to be and
that is why you are objecting.

MR. VEEDER:   Go ahead.   He can answer the question.   I
think it is pure speculation.   I think there is evidence in
the record, the best evidence that we could introduce.

THE COURT:   Now you have backed up a little bit.   What
do you want me to find?   You say now you are going to ask me
to find 6800 acre feet.

1        MR. VEEDER:  That 6800 feet was never in my mind,

2   frankly.

3        THE COURT:  Four times 1700 acres.  If we are going to

4   talk about irrigating in and out, I take it we would assume

5   that they would irrigate within the watershed as much they

6   would irrigate out of the watershed, and therefore you would

7   take four times 1700 acres of cultivated crops.

8        MR. VEEDER:  I can't depart from the record, that is

9   what the man testified to and I will ask for those findings,

10  four acre feet per acre for 1700 acres.

11       MR. STAHLMAN:  Is it your contention that the findings

12  should follow illogical evidence where there is a conflict

13  as there is in this case?

14       MR. VEEDER:  I have to take the position as to evidence

15  in the record.  It is very important for us to have an

16  appropriative right prior to the time we bought the land.

17  That is all I have to say, your Honor.

18       MR. GIRARD:  I am not sure of Mr. Whitman's testimony,

19  but my understanding was that his testimony paralleled some-

20  what in accuracy and remembrance the testimony that was given

21  in regard to Gibbon and Cottle lands.

22       MR. VEEDER:  No, you were not here, Mr. Girard.

23       THE COURT:  How many pages of Whitman's testimony is

24  there?  Give me those sections.

25       MR. VEEDER:  Pages 6980 to 7018.

1      THE COURT:  That isn't much to read.  Let me read it.

2  Take a short recess.

3      Did you have another witness also on this?

4      MR. VEEDER:  Nichols testified on that, too, your Honor.

5      THE COURT:  Find out where that is.

6      (Recess.)

7      THE COURT:  I have just about got through reading the

8  testimony.  What is the answer?

9      MR. VEEDER:  We have taken the position on the 1942

10  pumpage, if you look at Finding 10 on page 15, the actual

11  measured pumpings shown there is 1090 for use outside the

12  watershed.

13      MR. SACHSE:  It is a figure Mr. Veeder gave us yesterday.

14  We inserted it in pencil.

15      THE COURT:  Yes.

16      MR. GIRARD:  Which was before the United States acquired

17  that particular area.

18      MR. VEEDER:  That is correct.

19      MR. GIRARD:  That was under the Rancho's last year of

20  use, because the Rancho was not acquired on that Base until

21  December 1942.  So I would suggest on page 16 in my findings,

22  on 11, at line 10, after the words "United States of America"

23  put a comma and add "reaching a maximum of 1090 acre feet in

24  the water year 1941-1942".

25      MR. VEEDER:  Would you read that?  What about your

1    sentence on lines 10 and 11?

2         MR. GIRARD:  The only addition in this finding on this

3    point would be on line 10 where you would put a comma after

4    "United States of America" and add "reaching a maximum of

5    1090 acre feet in the water year 1941-1942".

6         MR. SACHSE:  And then delete the next part of it.

7         MR. GIRARD:  Yes, and then you delete the next line.

8         MR. VEEDER:  That is right, you delete that sentence.

9         THE COURT:  Are you satisfied, Mr. Veeder?

10        MR. VEEDER:  I think that is what the evidence will

11   support.

12        THE COURT:  I think you have reached a good conclusion.

13        MR. VEEDER:  I think it is better than saying there is

14   no direct evidence as to the amount of diversions.

15        MR. STAHLMAN:  The purpose of that is to establish an

16   appropriative right.  But now you can only pump 1200 out of

17   the basin without destroying the basin.  Shouldn't that be

18   brought in here?

19        MR. GIRARD:  In connection with this, I would like to go

20   over to Finding No. 29, which is on page 39 of my findings,

21   commencing on line 26, after the "United States of America"

22   insert "and its predecessor in interest".

23        MR. VEEDER:  That suits me.

24        THE COURT:  Let me see how it reads.

25        Well, we solved that problem, did we?

1          MR. GIRARD:  Yes.

2          MR. VEEDER:  Just a moment in regard to that point.  You

3   say "but on the contrary such salt water intrusion resulted

4   from the existence of a dry cycle and subsequent reduced

5   runoff in the Santa Margarita River during the period the

6   United States and its predecessor . . "  As a matter of fact,

7   from 1937-1938 through about 1946 there was a wet cycle.

8          MR. GIRARD:  That's right.

9          MR. SACHSE:  Let's delete "dry cycle" and say it resulted

10  from excess pumping by the United States of America and its

11  predecessor in interest.

12         MR. VEEDER:  No.

13         MR. GIRARD:  What caused it?

14         MR. VEEDER:  Why don't we just leave out --

15         THE COURT:  Why don't we say there is no doubt but that

16  there was increased pumping upstream -- just try this for

17  size -- resulted in increased pumping upstream and consequent

18  reduced runoff and the fact that during the period the United

19  States and its predecessor pumped substantial quantities of

20  water?

21         MR. SACHSE:  In other words, on line 24 we would strike

22  "dry cycle" and insert "resulted in increased . . "

23         THE COURT:  Yes, I think that is supported by the evidence.

24         MR. VEEDER:  I think, your Honor, I would like to bring

25  this point up, that there was a period of salt water intrusion

occurred when measurements first reflected it.  It occurred
about the beginning of the dry cycle, that is true.  I don't
know that you can tie in the predecessors in interest in
regard to the real salt water intrusion which first became
apparent.

THE COURT:  When was it first apparent?

MR. VEEDER:  In 1948.

Why not leave it the way it was and don't put in "its
predecessor in interest" after "United States of America"
at line 26 of Finding No. 29?

MR. SACHSE:  Yes.

MR. VEEDER:  The point being that the first time that
the evidence of salt water intrusion occurred coincided
pretty closely with the beginning of this last dry spell,
and I would simply say not add "and its predecessor in
interest" in line 26.

MR. GIRARD:  When was it first observed, Ace?

MR. VEEDER:  1948.

MR. GIRARD:  In 1948, which was six years after.

THE COURT:  Salt water intrusion had been known to
exist in the area below the Narrows for many years.  Is that
right?  There hadn't been any useful wells below the Narrows
for many years.

COLONEL BOWEN:  That is correct, your Honor.

THE COURT:  Why don't we say this, that for many years

1    salt water intrusion had existed below the Ysidaro Narrows,

2    that the first notice of salt water intrusion within and

3    upstream from the Narrows was in 1948, and that there is no

4    evidence as to exactly when this intrusion occurred?

5        MR. STAHLMAN:  There is this situation, your Honor, that

6    may have some bearing upon it.  If you take the pumping, for

7    instance, in 1942 of both within and out of the watershed for

8    agricultural purposes, you have a total of 1790 acre feet --

9    that is on page 15 -- and then if you would consider with

10   that the fact that the safe capacity of the basin would be

11   1200 acre feet, you could see there was a condition existed

12   at that time that would contribute to salt water intrusion.

13   It must have.

14       MR. VEEDER:  In that regard, Mr. Sachse, and I have

15   discussed this matter and we agreed that we couldn't use the

16   700 acre feet to which Mr. Stahlman made reference, because

17   of the fact that there were other wells that were being used.

18   So it doesn't show that that was pumpage in the lower basin.

19   The fact is there was pumpage above that which contributed

20   to that.

21       MR. STAHLMAN:  During that period of time, you mean that

22   some of the agricultural uses were above?

23       MR. VEEDER:  That is correct, some of it was in the

24   Ysidaro Basin.  Is that not correct, Colonel Bowen?

25       Some of it was in the Ysidaro Basin itself, and some was

1   in Chappo Basin.  So the 700 acre feet within the watershed

2   is not reflective of a condition that would be contibutory

3   to salt water intrusion.

4       MR. STAHLMAN:  It would be.  Some of it certainly is,

5   because you are pumping out of those wells down in that area

6   there for agricultural purposes within the watershed.

7       MR. SACHSE:  It seems to me the most significant thing,

8   if you look at page 15 again, total use, as Mr. Stahlman

9   just pointed out, total use in the last year of the Rancho's

10  operation within and without is 1790.  This is from all basins,

11  I realize.  The total use in 1948 when they started to get

12  salt water intrusion was 6620.  In other words, the total use,

13  the total burden increased four times.

14      Maybe Mr. Veeder is right.  Maybe we shouldn't say that

15  its predecessor in interest had anything to do with it; that

16  the whole thing was caused by the uses of the United States.

17  That is what the exhibits show.

18      MR. VEEDER:  Plus the dry spell.

19      MR. GIRARD:  I think the language your Honor suggested

20  could go in at line 18.

21      THE COURT:  Why don't you put it in at 15?  You say

22  certain years prior to 1956.  We will go back to 1948.  And

23  right where that paragraph starts take another paragraph in

24  there and point out that the area below the Narrows had been --

25      MR. GIRARD:  I have that in Finding No. 28, your Honor.

1   The one immediately before it says exactly what you suggest.

2       THE COURT:  Where is this?

3       MR. GIRARD:  " . . have for many years been, as a result

4   of salt water intrusion, brackish and unfit . . "  That is

5   below the Narrows.  Finding No. 28 covers that, I think.

6       THE COURT:  All right.  Then at line 15 on page 39 say

7   "that the first notice of salt water intrusion within and

8   above the Narrows, as shown by the record, was in 1948; that

9   there is no evidence when it actually started;" and then you

10  would follow with during certain years prior to 1956 there

11  existed this condition and go ahead; and then find at line

12  21 that it is not true that it was caused by any unlawful or

13  wrongful act of any defendant in this case but resulted from

14  increased pumping upstream, reduced runoff, during which

15  period the United States pumped substantial quantities of

16  water.  So we will have it much the same except we take out

17  the dry cycle business, because 1948 was about the beginning

18  of that.

19      MR. VEEDER:  It was about the beginning of it.  I think

20  the dry cycle did contribute, your Honor.

21      THE COURT:  1948, the beginning of a dry cycle.

22      MR. VEEDER:  Just about the time it started.

23      MR. STAHLMAN:  I don't like the use of that word "cycle"

24  because I don't think there is any such thing as a "cycle".

25  We had a dry period.

1    MR. VEEDER: "Drier period" is what you are saying.

2    MR. STAHLMAN: Dry period.

3    THE COURT: You say "dry". Years of relatively small

4    rainfall.

5    MR. STAHLMAN: Yes.

6    THE COURT: Put in "the increased pumping upstream, the

7    years of relatively low rainfall and consequent reduced

8    runoff, during which period the United States pumped . . "

9    Strike out "predecessor in interest".

10   MR. SACHSE: Yes, that does it. That is fine.

11   MR. GIRARD: Yes.

12   THE COURT: All right. Now what do we go to next?

8 fls. 13   MR. SACHSE: I think we could go right now, then, your

14   Honor, to my Finding No. 8, and I have handed your Honor a

15   draft of language which would go on the end of this Finding

16   8, which is taken essentially from the figures supplied by

17   Mr. Veeder in his one page. We have changed nothing in

18   Finding 8, but just added.

19   THE COURT: I have lost my copy of your proposal.

20   MR. GIRARD: I just laid it on your desk here, your

21   Honor. This is one of them.

22   THE COURT: I must have taken it in on my desk.

23   MR. GIRARD: Here is my copy. I can read Mr. Sachse's.

24   THE COURT: Where would this go?

25   MR. GIRARD: Right at the end of Finding 8, your Honor,

which pertains to the population of the Naval Enclave, et cetera.

In looking this over, I guess it is not quite sufficient for the purposes you indicated it should be in here. We probably add some language to the effect that it is obvious that the amount of water required to satisfy the maximum needs of the military at the Naval Enclave is substantially above that in the safe yield of their basins and if they are going to get that kind of water for their uses they are going to have to do it by importation, condemnation or building a dam.

MR. VEEDER: Now is that necessary? I don't believe it is.

MR. GIRARD: I think it is certainly true. I don't think anyone contends that the safe yield of those basins down there is 23,850 acre feet.

MR. VEEDER: We do contend and the evidence supports and I think we should write in that the safe annual yield of the basin here is calculated to be 10,000 acre feet a year.

MR. GIRARD: All right.

THE COURT: You have it already in the findings on the basins.

MR. GIRARD: That is right.

MR. VEEDER: No, it is not.

MR. GIRARD: No, that is the usuable storage capacity.

1    MR. VEEDER:   That is the usuable storage capacity.

2    MR. GIRARD:   Which is a good deal more than the safe

3  yield.

4    MR. VEEDER:   That is right.   The 10,000 acre feet I

5  would like to have written in there, under the circumstances.

6    MR. GIRARD:   Fine.

7    THE COURT:   This was the testimony, was it, 10,000 acre

8  feet?

9    MR. GIRARD:   I am not sure.   I will take Colonel Bowen's

10  figures.

11    THE COURT:   Then we will say that 10,000 acre feet is

12  the safe yield.

13    MR. SACHSE:   I don't think there is any testimony in this

14  record of safe annual yield.

15    MR. VEEDER:   We will check out on Mr. Worts' testimony.

16  I am sure it shows 10,000.

17    MR. SACHSE:   I can be very wrong, but --

18    THE COURT:   Then I would follow it with the suggestion

19  made that based upon the proposed expansion of the Base and

20  the maximum population in time of full mobilization and the

21  other facts in the record, it is apparent that there would not

22  be sufficient water to support the population and that

23  additional water would have to be secured by importation, by

24  condemnation or by the construction of a dam.

25    Bulletin 57 had something on safe annual yield, but

1    whether it went into the record or not is another question.

2         MR. SACHSE:  I certainly don't quarrel with the figure,

3    your Honor, but I am just worried about the record.

4         MR. GIRARD:  I have drafted some language which I think

5    may take care of the additional paragraph on the end of

6    Finding 8:

7              "Based upon the present estimated safe annual yield of

8         the waters within the younger alluvial deposits, to wit,

9         10,000 acre feet, it is apparent that the United States

10        of America must satisfy its water requirements by

11        importation of waters, increasing the storage capacity

12        of said younger alluvial deposits by a physical barrier

13        to prevent salt water intrusion, by condemning upstream

14        rights, or by the construction of a dam to capture flood

15        waters which would otherwise waste into the ocean."

16        MR. SACHSE:  The United States must satisfy its maximum

17   water requirements, not its requirements today.

18        MR. GIRARD:  You are right, yes.

19        THE COURT:  I had mentioned the use of the words because

20   of the finding talking about proposed expansion and then it

21   talked about the number of people in total mobilization, that

22   to satisfy its needs for further expansion and for total

23   mobilization.

24        MR. GIRARD:  All right.  To satisfy its increased water

25   requirements resulting from full mobilization.

19,321

THE COURT:  The more we say of old Bulletin No. 57, the more we see what a fine job it has done.

MR. VEEDER:  Is that on the record, your Honor?

MR. GIRARD:  I hope so.

THE COURT:  Yes.

MR. VEEDER:  I move to strike it.

THE COURT:  Let the record show that Mr. Veeder's motion is facetious, and my remark probably was, too.  But there is a lot of excellent material in the old Bulletin No. 57 and a tremendous amount of work was done in the preparation of it.

MR. VEEDER:  The only thing I disagreed with was its conclusions, your Honor.

MR. SACHSE:  Are you satisfied with this one now?

MR. VEEDER:  Before we go any further on further revision, I think we ought to re-run what you have done, because I want to see it.

MR. GIRARD:  I have no objection to that.

MR. VEEDER:  But I would suggest the second sentence, your Honor, be changed to read "based on a reasonable average water requirement of 200 gallons a day".

MR. GIRARD:  I don't care whether you put that in, Mr. Veeder, but I think you may be tying your hands today for what you may not want to tie them to ten years from now.

MR. VEEDER:  Let me read what I have:  "based on an estimated average water use of 200 gallons . . "

19 322

MR. GIRARD:  Yes.

MR. VEEDER:  I don't believe that is correct.  And I think the evidence that Colonel Robertson put in was that a reasonable average water use requirement was 200 gallons a day.

MR. GIRARD:  Based on an estimated average water use?

MR. VEEDER:  Based on a reasonable.

THE COURT:  On an estimated.

MR. VEEDER:  No, he said it would be a reasonable water use of 200 gallons a day.

MR. GIRARD:  He is giving himself 50 less than the State Water Rights Board gives him.

THE COURT:  If you want to tie it down to that, Mr. Veeder.  They are pointing out to you --

MR. VEEDER:  You can make it, if you want to do this, "based on a reasonable average water requirement of 250 gallons".

MR. GIRARD:  It could be 300.  It could vary.  It may be 150 in some areas -- in Los Angeles where they have meters. But I think you are wrong to tie yourself down to a figure now.

THE COURT:  Why don't we say "based on an estimated average water use"?  This is what Colonel Robertson did. Insert the word "estimated".

MR. GIRARD:  Yes.

MR. STAHLMAN:  I am wondering, in connection with the 10,000 acre feet safe yield of the basin, whether there is evidence of that here.  I don't think there is.

MR. SACHSE:  We will have to check it.

MR. STAHLMAN:  Is there evidence in the record that supports the finding that there is 10,000 acre feet of safe yield of the basin?

THE COURT:  There is a chart.  You remember the flow chart in Bulletin No. 57.

MR. GIRARD:  I think Mr. Illingsworth introduced some testimony that if we cut off all the water in the Gorge.

MR. VEEDER:  Mr. Illingworth said 10,000, and Mr. Worts said 9,000.

MR. GIRARD:  But then of course if you didn't cut off the Gorge you would have more.  So it is not too far off.

THE COURT:  Let's check on it later.  We know what we are looking for.

Colonel Bowen, does 10,000 sound like an average safe yield from the basin?

COLONEL BOWEN:  10,000 acre feet per year is the estimated safe perennial yield of the Santa Margarita Coastal Basin, your Honor.

THE COURT:  Is this based on studies you have made and literature you have looked up, et cetera?

COLONEL BOWEN:  Yes, your Honor.

THE COURT:  We have it in the record now, if we haven't got it elsewhere.

There is the chart I was thinking about, the flood chart (stepping down from the Bench and examining Bulletin No. 57).

MR. VEEDER:  I don't believe we can rely on that, your Honor.

MR. STAHLMAN:  I don't think it is in evidence anyway.

MR. VEEDER:  No, that is not in evidence, and it is not supported by the facts.

THE COURT:  We have the Colonel's statement, which is good evidence.

I think this exhibit was never offered.

MR. VEEDER:  Which is that?

THE COURT:  I hold it in my hand now.  I just took it out of Bulletin No. 57.  I would like to have the Attorney General and the Marine authorities see it, if they have never looked at it.  It is a picture of the Santa Margarita River at Highway 101 in 1927, showing how the railroad bridge was washed out and how the water was surging across.

MR. GIRARD:  I offer it in evidence.

THE COURT:  It also shows Temecula Creek in 1927 running wide across.  Now this corresponds with my knowledge of these coastal streams.  This is the kind of thing that can happen in Southern California.  I have seen the Pacoima --

MR. VEEDER:  Are we on the record now, your Honor?

1   THE COURT:  Yes.  I have seen the Pacoima and the Little

2   Tujunga wash boulders down twice as big as a garage and go

3   ripping down and tearing out farm land and really going on a

4   rampage.  Look at this picture.  There is a railroad bridge

5   washed out in 1927.  Look at that water flowing.

6   MR. VEEDER:  There is one problem with which we are

7   confronted now, though, your Honor, the question of the firm

8   supply of water, the yield in the streams.  I have offered

9   findings in regard to that and you have rejected it.  Now

10   we tendered them as to the actual production of the stream.

11   COLONEL BOWEN:  Your Honor, may I speak for the Marine

12   Corps in regard to this photograph you have just discussed?

13   THE COURT:  Yes, sir.

14   COLONEL BOWEN:  I have framed in a picture frame on my

15   wall six photographs taken of the 1916 flood, which exceeded

16   the 1927 flood by quite a bit.  They serve as a constant

17   reminder to me, your Honor, of the amount of water that has

18   flowed and can flow again through that valley.  They show the

19   water from hill to hill.

20   THE COURT:  The Marines have seen these pictures?

21   COLONEL BOWEN:  Yes, your Honor.

22   MR. VEEDER:  The point that I make is that I am going

10 fls

23   to have to renew my request for findings as to the fact that

24   you have a very erratic stream and what the production really

25   is on this stream, because I don't believe De Luz Dam or any

1    dam is at issue in this lawsuit.

2        MR. GIRARD:  I agree with you.

3        MR. VEEDER:  But I will tender those runoff records

4    and show what they mean.

5        MR. SACHSE:  If you want some figures here, they are

6    on one sheet -- California's AH, AI and AJ.  These are Mr.

7    Illingsworth's safe yield calculations. They are all in

8    evidence.  The first one is the safe yield under actual

9    conditions of water supply assuming full development or use

10   of ground water storage capacity; it comes out 8600 acre feet

11   from the three basins.

12       MR. GIRARD:  Is that cutting the flow off at the Gorge?

13       MR. SACHSE:  No.  And then he made one assuming no flow

14   from Murrieta or Temecula and he shows no flow from Murrieta

15   or Temecula Creeks, the safe seasonal yield is 4200 acre feet

16   from the basins.

17       And then he has one, full development of underground

18   water supply under present conditions of water supply; it

19   comes out 8,000, instead of the historical conditions of water

20   supply.

21       So he has given us two for the River as it flows, 8,000

22   and 8600, and one assuming there is no flow at all at the

23   Gorge, 4,000.

24       MR. VEEDER:  We will have one for the record.

25       THE COURT:  Let's just modify that finding to say that

1 the safe yield cannot exceed 10,000.

2  MR. SACHSE:  All right.

3  MR. VEEDER:  If you are going to make a finding as to

4 safe yield, why not say the 10,000 that the Colonel testified

5 to?

6  THE COURT:  Because we had in the record, it has been

7 called to my attention, testimony that maybe it is 8,000 or

8 8600.  So I stretch a point and I say the safe yield cannot

9 exceed 10,000.

10  MR. SACHSE:  If he wants to make it 10,000, I am happy.

11 Let it be 10,000.

12  MR. VEEDER:  I would like to go back to this language

13 we were talking about.  Whether we say 200 gallons or 250

14 gallons makes no difference.

15  THE COURT:  We are going to get on with this.  Based on

16 an estimated average water use of 200 gallons.  This protects

17 you because it is an estimated average water use and it still

18 accomplishes what you want to accomplish.  Any objection to

19 that?

20  MR. VEEDER:  Well, just so the finding is reflective of

21 what is a reasonable demand for a Marine at Camp Pendleton.

22 I want that finding.

23  MR. GIRARD:  Do you think  you have it here?

24  MR. VEEDER:  Well, if an estimated -- I will accept that,

25 your Honor.

THE COURT:  And then on about seven lines from the
bottom the word "estimate" should be "estimated" -- "based
on estimated average water use of 200 gallons . . 13,000 acre
feet would be required to satisfy 61,000 people".

MR. GIRARD:  Probably on the last paragraph "based on
an estimated" also.  Insert the word.

THE COURT:  Yes.  That is what I suggested.

Now you have this further language.  Have you worked
something out?

MR. GIRARD:  I have it now " based upon the most liberal
estimate of the safe annual yield of the waters within the
younger alluvial deposits, to wit, 10,000 acre feet, it is
apparent that the United States of America must satisfy its
increased water requirements which will result from full
mobilization by importation of waters, increasing the storage
capacity of said younger alluvial deposits by a physical
barrier to prevent salt water intrusion, by condemning up-
stream water rights, or by the construction of a dam to
capture flood waters which would otherwise waste to the ocean".

THE COURT:  I don't like it only in the sense that it
refers solely to full mobilization.

MR. GIRARD:  All right.

THE COURT:  Actually, when you read  Finding 8 --

MR. GIRARD:  It would be "resulting from the planning
estimates".

19,329

THE COURT:  You see, this is a peace time business, it is increased need from the peace time future estimates; you have 61,700 in one place, and in Finding 8 you have 61,600.

MR. VEEDER:  I would like to have that typed up so we can review it your Honor.

THE COURT:  Yes, let's get it typed up.  I want some reference to this future peace time projection and full mobilization.  They are two different things.  One is a full time peace operation, and the other is a war operation. Maybe we can do that and come back in later this afternoon.

What else have we got?  Any other drafts here?

MR. SACHSE:  I think it is very simple and we might do it very rapidly.  Has your Honor got the one on the revocable permit to Fallbrook that Mr. Veeder wants?

THE COURT:  Yes.

MR. VEEDER:  Your Honor put it in "Vail Estate".  As a matter of fact, it is signed by Vail Company.  I don't know how that happened, but there you are.

THE COURT:  All right, change "Estate" to "Company".

Other than that, how does it look, Mr. Veeder?

MR. VEEDER:  I would like to have in there that in 1948 the United States cancelled Fallbrook's revocable license by reason of the fact of Fallbrook's violation of that license.

MR. SACHSE:  You can't show me any evidence for it.  The only evidence of Fallbrook's uses starts in 1948 and is less

than 10 miner's inches of Fallbrook's diversions from the
River.  If you can show me, I will accept it.

. May I point out, your Honor, that even the revocation
doesn't state because of excessive uses.  The letter just says
it is revoked in accordance with Paragraph A.

THE COURT:  What difference would it make?

MR. VEEDER:  It's all right, your Honor.

THE COURT:  The proposed finding is all right?

MR. VEEDER:  It is all right, your Honor.

THE COURT:  All right.  Where will this be worked in?

MR. SACHSE:  That is something to which we ought to give
a little thought.  We were pretty careful as to how we put
this all together.

THE COURT:  We haven't yet worked over this matter of
the Ammunition Depot, which may eliminate a section.  Of
course, that might be put in out of order.  You would want
it, I suppose, in some logical order.

MR. GIRARD:  I think we can insert it anywhere.

MR. VEEDER:  As a place to put it in, what does your
Honor think of either 10 or 11, where we talk about the
acquisition and water uses?

THE COURT:  It doesn't fit under 10 or 11 at all.

MR. SACHSE:  It might go in after 18 where you are
talking about the causes of fluctuation in the surface flow
of the Santa Margarita River, as a possibility.

1        MR. VEEDER:   I think that is a pious idea.

2        MR. SACHSE:   Finding No. 18 is on page 24.   The title

3    is "Fluctuations In Rising Water, et cetera".   You talk about

4    the fluctuations resulting from upstream diversions.

5        MR. VEEDER:   I am looking for the reference to Fallbrook's

6    findings.

7        MR. SACHSE:   There isn't any.   It is in this.

8        MR. VEEDER:   I mean the reference to Fallbrook's

9    Interlocutory Judgment.

10       MR. SACHSE:   The only reference, I believe, is in this

11   proposed paragraph, Mr. Veeder.

12       MR. GIRARD:   My findings don't refer to Fallbrook at all.

13       MR. SACHSE:   It is in this paragraph that you requested

14   that I refer to them.

15       MR. VEEDER:   I had asked that there be reference to them.

16   I first asked that they be incorporated.

17       MR. GIRARD:   Fallbrook's?

18       MR. VEEDER:   Yes.

19       MR. SACHSE:   You asked that they be incorporated in

20   full, and then we discussed this and decided that it should

21   be by reference.   Now they aren't in.   But if you are going

22   to incorporate Fallbrook by reference, I would suggest that

23   the smart place to do it is right at the end where you have

24   incorporated Interlocutory Decree No. 25 by reference, if you

25   want.   I don't think we need it, Mr. Girard, but I have no

1    objection if Mr. Veeder wants to refer to the Fallbrook Decree

2    within this Finding No. 54.

3         MR. VEEDER:  I certainly do.

4         MR. GIRARD:  Do you want to incorporate the Murrieta

5    Decree and every other one in here?

6         MR. VEEDER:  Yes.

7         MR. GIRARD:  Why?

8         MR. VEEDER:  Because I am convinced that you have to have

9    some way to relate all of our properties, so that you have an

10   over-all decree.

11        MR. GIRARD:  But this decree deals solely with the Naval

12   Enclave.

13        MR. VEEDER:  But Mr. Girard, you can't have an interlocu-

14   tory decree that deals solely with anything.  Our water uses

15   necessarily relate to Vail's, they necessarily relate to

16   Fallbrook's.

17        MR. GIRARD:  Are you going to incorporate into your

18   decree the Vail, the Murrieta, the Fallbrook?

19        MR. VEEDER:  It has to be done some time.

20        MR. GIRARD:  All 40 decrees are going to be incorporated?

21        MR. VEEDER:  It has to be done.  You can't look at a

22   single interlocutory judgment.

23        MR. GIRARD:  You are not supposed to.

24        MR. STAHLMAN:  Your final decree is going to set out the

25   whole River system.

1    MR. VEEDER:  I am interested in knowing how this is

2    going to be put together mechanically.  I have a real job.

3    We are the last party on the stream.  We have to have a

4    single document, in my view, that will be reflective of it.

5        THE COURT:  I would propose that we just have a final

6    judgment wherein we incorporate by reference all the

7    interlocutory judgments.

8        MR. STAHLMAN:  That is right.

9        THE COURT:  And that they must be read together as the

10   final judgment in the case.

11       MR. VEEDER:  Let's go to the end of this then.  I would

12   just as soon have it put on page 65, revocable permit to

13   Fallbrook Public Utility District, and that would not foul

14   up the numbers.

15       THE COURT:  It wouldn't foul them up if we don't elimi-

16   nate some numbers.

17       MR. SACHSE:  Mr. Girard is going to re-do the whole

18   thing anyway.

19       MR. GIRARD:  It will have to be re-done anyway, so don't

20   worry about changing the numbers.

21       MR. VEEDER:  Let's put it in 54 then.

22       MR. SACHSE:  And the only change is "Vail Company" to

23   "Vail Estate".

24       MR. VEEDER:  That is right.

25       THE COURT:  Going back to page 12 again where we are

19,334

1  going to add something on Finding 8, we have to strike part

2  of 8 presently to take care of this additional matter, and

3  I think you go down to line 16.  You talk about the projected

4  population for 1959.  That is covered down below.  So you

5  would strike, I think, everything after "Naval Enclave" on

6  line 16 and put a period.  Then you go to the greatest number

7  -- the addition.  It was not 54, it was 56.  Then the fourth

8  line should be "estimated" again instead of "estimate".

9      What is the significance of this business that in 1944

10  there were 56,000 people, and estimated 12,000 acre feet,

11  and it appears that not more than 3600 acre feet was diverted

12  for this purpose?

13      MR. SACHSE:  We have pointed that out to Mr. Veeder

14  already, your Honor.

15      MR. VEEDER:  That happens to be the fact.  The demands

16  that we have are 12,500, but at the time we were actually

17  using only 3600.

18      MR. GIRARD:  They were getting water for some of  that

19  from other areas of the Naval Enclave besides the Santa

20  Margarita River.

21      MR. SACHSE:  Also, the 56,000 weren't there for 365 days

22  of the year.  That is perhaps a one day maximum.

23      MR. VEEDER:  I think we should run this whole thing off

24  again right now, because I want to be sure I see what you

25  have.  Can we do that, your Honor?

1    THE COURT:  All right.  Can you get back here before
2  4:30?
3    MR. GIRARD:  Yes, your Honor.
4    MR. VEEDER:  Yes.
5    MR. GIRARD:  I would like to have the Colonel look this
6  over.
7    THE COURT:  All right, take a short recess.
8    (Recess.)
9    (During the recess the reporter typed up for the Court
10  and made copies of the following proposed finding:
                                8
12  NAVAL ENCLAVE POPULATION, etc.
13    That the use of the waters of the Santa Margarita River
14  by the United States of America on its Naval Enclave both
15  within and without the watershed other than for irrigation
16  are uses essentially municipal in character; that said water
17  is used to satisfy the needs of the population of the Naval
18  Enclave, both military and civilian; that said population has
19  averaged approximately 42,000 people per year.  Testimony in
20  behalf of the United States which the Court credits shows
21  that based upon and estimated average water use of 200 gallons
22  a day _____ acre feet of water would have been required
23  to satisfy the needs of 42,000 persons per year.  That in
24  addition to housing of Naval personnel, said Naval Enclave of
25  the United States of America provides housing facilities for

1   dependents of the Naval personnel, and since 1958 the number

2   of such dependents residing thereon has averaged approximately

3   5500 individuals annually; that in addition to the dependents

4   of said Naval personnel, limited numbers of civilians, not

5   dependents, are residing on said Naval Enclave.

6       The greatest number of persons requiring water within

7   the Naval Enclave during any past year was in 1944 when on a

8   peak day the military and civilian population on the Naval

9   Enclave was 56,000 persons.  Based on the same testimony in

10  behalf of the United States referred to above of an estimated

11  average water use of 200 gallons a day 12,540 acre feet of

12  water would have been required to satisfy the needs of

13  56,000 persons for one year.

14      From the records in this case it appears that not more

15  than 3620 acre feet of water was diverted from the Santa

16  Margarita River for military and civilian use in the Naval

17  Enclave in 1944.  The above apparent discrepancy is explained

18  in part by (1) the fact that 56,000 was a peak figure only,

19  (2) certain of the water requirements were supplied by water

20  produced in the Naval Enclave outside the Santa Margarita

21  River watershed, and (3) in 1944 the Naval Enclave had just

22  started development and only minimal facilities existed.

23      In 1959 the Headquarters Marine Corps planning estimates

24  envisioned a total civilian and military annual population on

25  the Naval Enclave of 61,700 persons.  Based on estimated

average water use of 200 gallons per day, 13,800 acre feet of water annually would be required to satisfy the water needs of these 61,700 persons.

Based on an estimated average water use of 200 gallons per day there would be required 23,850 acre feet of water annually to satisfy the water needs of the 106,000 persons who would be on the Naval Enclave in the event of war and full mobilization.

Based upon the most liberal estimate of the safe annual yield of the waters within the younger alluvial deposits within the Naval Enclave, to-wit: 10,000 acre feet, it is apparent that the United States of America must satisfy the increased water requirements resulting from:

(A)   the contemplated increased annual Naval Enclave population to 61,700 persons and

(B)   the 106,000 population of the Naval Enclave in the event of full mobilization

by

(1)   the construction of a dam to capture flood waters which would otherwise waste to the ocean,

(2)   increasing the usable storage capacity of said younger alluvial deposits by a physical barrier to prevent salt water intrusion,

(3)   importation of waters,

(4)   condemnation or purchase of upstream water rights.)

1        THE COURT:   Adjourn until tomorrow morning at 10:00

2   o'clock.

3        (Adjournment until Thursday, March 8, 1962 at 10:00 A.M.)

4                    - - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,      )
                               )
                  Plaintiff,   )
                               )
        vs.                    )        No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                  Defendants.  )
_____

### CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit: March 7, 1962, was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing  97  pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 7th day of March 1962.

_____
                    Official Reporter

JOHN SWACKER, OFFICIAL REPORTER