Case 3:51-cv-01247-JO-SBC   Document 4693   Filed 09/24/63   PageID.40346   Page 1 of 39

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Thursday, March 8, 1962

Pages:  19,340 to 19,377

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, March 8, 1962

- - -

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Fallbrook Public Utility District, et al.,: | FRANZ R. SACHSE, ESQ. |
| State of California: | FRED GIRARD, ESQ. |
| Vail Company: | GEORGE STAHLMAN, ESQ. |

SAN DIEGO, CALIFORNIA, THURSDAY, MARCH 8, 1962, 10:00 A.M.

-oOo-

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes, sir.

MR. VEEDER:  I have here the findings of fact, conclusions of law and judgment assembled in connection with the Murrieta-Temecula ground water area.  I will tender to your Honor for observation and ask for directions as to whether this form should be submitted to Mr. Krieger and others in advance of signature by you.  I am sure that this is the first time through on such a matter as this.

MR. SACHSE:  I can, I believe, tell you what Mr. Krieger would like, if it meets with his Honor's approval.  He is completely satisfied with the findings as such.  He would have no objection to the signature, provided it is understood by all of us that if he can produce an error in the exhibits. I am sure we would want to correct the error.

MR. VEEDER:  I'll check these out.

THE COURT:  He has seen the findings?

MR. SACHSE:  He has seen the findings, your Honor.  He has not seen the complete exhibits.  But he has no objection to the signing of the findings, with the idea that if we find an error in these descriptions or something we will of course correct it.

THE COURT:  Since it is subject to change and

19,342

1    modification, I think we can sign it and get it over with.

2        MR. SACHSE:  Yes.

3        MR. VEEDER:  I don't know whether Mr. Girard or Mr.

4    Stahlman or anybody else wants to check the exhibits.

5        MR. GIRARD:  I know that Mr. Stahlman does.

6        MR. STAHLMAN:  Yes, we do, because we want these to be

7    reconciled as closely as possible with the Vail Company's

8    exhibits where we set out a description of our properties,

9    and I think from what we have already examined here there are

10   some descriptions that have to be reconciled.

11       MR. VEEDER:  All I want to do is to have everybody

12   happy.

13       THE COURT:  What is your desire?

14       MR. STAHLMAN:  Merely that we have copies of the exhibits.

15   We are satisfied with the findings.  We are in the same

16   situation as Mr. Sachse.  We want an opportunity to correct

17   any errors in the exhibits.

18       MR. VEEDER:  Are you content that he sign the Murrieta

19   Findings?

20       MR. STAHLMAN:  Yes, with the exception of the correction

21   of the exhibits.

22       THE COURT:  In other words, it is subject to correction

23   if error exists, that's all.

24       MR. STAHLMAN:  Yes, that's all.

25       THE COURT:  Do you have two copies, Mr. Veeder?

1     MR. VEEDER:  Yes, your Honor.  We will go ahead then
2   and have copies made up.  I have had my secretary check.
3       THE COURT:  There are no maps attached to this?
4       MR. SACHSE:  There are maps referred to, your Honor.
5       MR. VEEDER:  Yes, there are maps referred to and
6   incorporated by reference.
7       MR. SACHSE:  But there are no attached maps.
8       MR. VEEDER:  They will be assembled.  I want the Court
9   to take a look at them.
10      MR. GIRARD:  If you are going to assemble a copy, then
11  make me a copy, too.
12      MR. VEEDER:  All right.
13      MR. SACHSE:  The record should be made clear.  I saw
14  Mr. Veeder picking up those two objects in front of them.
15  Those are not grenades.  Those are avocados, compliments of
16  Mr. Stahlman.
17      MR. VEEDER:  I think the record should show that Mr.
18  Stahlman gave me two avocados.
19      MR. STAHLMAN:  I didn't want to include you out.
20      MR. GIRARD:  Set them over behind that steel plate in
21  the jury box, will you, Bill?
22      THE COURT:  What's the next thing?
23      MR. GIRARD: I think we could take up this new Finding
24  8 which was drafted by the reporter after dictation by your
25  Honor last night.

1      On line 12, Colonel, what was that figure for 42,000

2   people?

3      COLONEL BOWEN:  9400 acre feet.

4      MR. GIRARD:  It should be inserted in line 12.

5      MR. VEEDER:  9,400?

6      COLONEL BOWEN:  Yes, sir.

7      THE COURT:  On page 2, line 1, there should be a comma

8   after the word "day". And on page 3, the first couple of

9   lines where we talk about the yield in the younger alluvial

10  deposits, we should add -- and I only suggest this language,

11  and before I suggest it I don't think we should tie it

12  entirely to the fact of the estimated yield of the younger

13  alluvium. I think the reason that the United States has to

14  get more water for this contemplated increase in population

15  is not only the limited yield of the younger alluvium but the

16  limited water resources in the watershed.  Because actually

17  as a riparian they are entitled to have their correlative

18  share of the water coming down from above. I don't know how

19  we want to state it.  But you have it tied down now as if

20  their only source of water was that water which would be the

21  safe yield of the younger alluvium. I suggested, after the

22  words "10,000 acre feet" the words "and the limited water

23  resources in the watershed". Maybe you can think of better

24  language. Or "the limited water resources in the watershed

25  and the upstream riparian uses".

1    MR. VEEDER:  Where did you propose that to be entered,

2  your Honor?

3    THE COURT:  On page 3, line 2, right after the words

4  "10,000 acre feet".  Or you could say "the limited water

5  resources in the watershed and the riparian rights of

6  upstream owners".

7    MR. GIRARD:  I just had here "and the limited water

8  resources in the watershed and the rights of others thereto".

9    THE COURT:  Yes.

10  With those changes, what do you think of it?

11    MR. GIRARD:  I think it would be a little clearer, on

12  line 9, page 3, where you have the word "by" if we said "by

13  one or a combination of the following".

14    MR. SACHSE:  One or more.

15    THE COURT:  By use of one or more of the following

16  alternatives.

17    MR. GIRARD:  Yes.

18    MR. STAHLMAN:  One other source, and that would be sea

19  water conversion.

20    MR. SACHSE:  That is importation of water, George.

21    THE COURT:  Yes, I guess it is importation.

22    MR. VEEDER:  I would like to inquire, your Honor, you

23  recommended the use of this language on page 2, lines 4

24  through 12.  The thing that concerns me about that is that

25  the peak figures are important to us, the demands which we

1   have for 42,000 people are important to us.  The mere fact

2   that we use only 3,620 acre feet simply indicates, as I see

3   it, that the system was not adequate to take care of the

4   demands.

5     THE COURT:  The point is this, Mr. Veeder.  You wanted

6   to estimate 200 gallons a day and you wanted to show how many

7   acre feet that amounted to.

8     MR. VEEDER:  That's right.

9     THE COURT:  So that when you took your 56,000, which was

10   the peak period in 1944, your figure came out 12,000 acre

11   feet.

12     MR. VEEDER:  That is right.

13     THE COURT:  Actually, the total use was 3,600 acre feet.

14   And this is a big discrepancy.  This is what, a third?

15     MR. VEEDER:  Yes, it is.  The use of the word "discrepancy"

16   was the only thing that worried me.

17     MR. SACHSE:  Doesn't this take care of it where it says

18   "In 1944 the Naval Enclave just started development and had

19   only minimal facilities"?

20     MR. VEEDER:  Yes, I think if we just took three, because

21   I don't know whether water in Los Pulgas and San Clemente

22   were being used at that time, and if so how much.  I don't

23   know that.

24     MR. GIRARD:  Colonel Bowen said so.

25     MR. SACHSE:  There was.

1    MR. VEEDER:   There was?

2    MR. SACHSE:   Yes.

3    MR. VEEDER:   Do you know how much, Colonel?

4    MR. SACHSE:   It doesn't matter how much.

5    MR. VEEDER:   It does matter to me, Mr. Sachse.

6    MR. GIRARD:   Out of this peak year of 1944?

7    MR. VEEDER:   Out of the 3,620, that is what is worrying

8  me.

9    MR. SACHSE:   None of the 3,620 was from Los Pulgas.

10    MR. VEEDER:   How much was used from Los Pulgas, Colonel?

11    COLONEL BOWEN:   In 1944?

12    MR. VEEDER:   Yes.

13    COLONEL BOWEN:   It approximated 3,000 acre feet from

14  each of the other basins of the Camp.

15    MR. SACHSE:   Los Flores.

16    COLONEL BOWEN:   Los Flores, San Onofre and San Mateo.

17    THE COURT:   So you got about 9,000 other acre feet of

18  water in 1944 in addition to the 3,600 you got out of the

19  Santa Margarita River.

20    COLONEL BOWEN:   No, your Honor, that 3,000 acre feet was

21  the total pumped from all three of those basins, not from

22  each.

23    THE COURT:   3,600?

24    COLONEL BOWEN:   No, your Honor, the 3,000.

25    THE COURT:   So you had 3,000 plus 3,600.

1    COLONEL BOWEN:  Yes, your Honor.

2    THE COURT:  Now are you certain enough of that figure?

3  We could change line 9 and say "approximately 3,000 acre feet

4  were supplied by water produced out of the Santa Margarita

5  River watershed".  Are you certain of that figure for 1944?

6    COLONEL BOWEN:  That is an estimate, your Honor.  I am

7  not sure that we even have any records of the amount pumped,

8  but I would like to have the opportunity to search my records

9  and see if we did maintain records of pumpage from those

10  three smaller basins.

11    THE COURT:  But this, in your judgment, is a fairly

12  accurate estimate for 1944?

13    COLONEL BOWEN:  Yes, your Honor.  That is based on the

14  fact that the safe perennial yield of Los Flores Basin is

15  500 feet, the safe perennial yield of San Onofre Basin is

16  a thousand acre feet, and the safe perennial yield of the

17  San Mateo Basin is 2,700 acre feet, which would give a total

18  of about 4,200 acre feet that could be pumped from those

19  basins without danger of salt water intrusion; and my opinion

20  of 3,000 is further tempered by the fact that I don't believe

21  they pumped San Mateo up to the capacity of its safe perennial

22  yield.

23    MR. VEEDER:  What I would like, then, I think, your

24  Honor, is to have an opportunity to work this out and show

25  where Los Pulgas, San Onofre and the other basins are

situated.  They are a far distance from the Santa Margarita

Basin and the rights there involved are in no way --

MR. GIRARD:  I have no objection to adding to line 9

"approximately 3,000 acre feet" and then cross out and just

go on "of the water requirements were produced by . . "  I

don't think we have to go into any detailed explanation of

where these creeks or basins are.

MR. VEEDER:  I am going to tender some language before

these go in final on that point.

THE COURT:  What difference does it make, Mr. Veeder?

We are trying to get this in final form.

MR. VEEDER:  All right,

THE COURT:  It is outside the watershed.

Are we finished with Finding 8 now?

MR. VEEDER:  No, I would like to make reference to

Colonel Robertson's testimony on the point we are talking

about.  It says that for 62,000 people the demand was 13,910

acre feet and was estimated by the Marines at 10,850 that

would have to come from Santa Margarita River.  That is on

pages 8,096 and 8,097 in Volume 71,

THE COURT:  Haven't we covered all that?

MR. VEEDER:  All right, I would just as soon go ahead on

it.

THE COURT:  All right, Finding No. 8 is okay then.

MR. GIRARD:  I did prepare this language that goes in

1    Finding No. 33, your Honor.  Mr. Sachse and Mr. Stahlman

2    have looked at it and have suggested certain changes which I

3    am agreeable to.

4        The first two paragraphs would read the same.  The third

5    paragraph would be changed so that you wouldn't have to

6    describe a particular property description.  It would read as

7    follows -- I'll say this rather slowly first:

8            "This Court finds that there was an implied reservation

9            and/or an implied acquisition of the former riparian

10           right to use the water of the Santa Margarita River on

11           certain lands within the sub-watershed of Fallbrook

12           Creek for the limited . . "

13   add the word "limited".

14           " . . purpose of use by the United States Ammunition

15           Depot, which is located in the easterly three quarters

16           of Section 26 and that portion of Sections 24 and 25

17           lying westerly of the Grant line, Township 9 South,

18           Range 4 West, SBBM, and for fire protection purposes

19           elsewhere within the Naval Ammunition Depot."

20       MR. STAHLMAN:  I think you should say instead of "which

21   is located," "which lands are located".

22       MR. SACHSE:  Yes.  You make it sound like the whole Depot.

23       MR. GIRARD:  Yes.

24       MR. STAHLMAN:  Which said lands are located.

25       MR. SACHSE:  It is just part of the Depot.

1    THE COURT:  You would put a comma when you finally got

2    through the description of the land and then you would wind

3    up "and for the purpose of fire protection elsewhere within

4    the Naval Ammunition Depot".  What you are talking about is

5    that the Naval Ammunition Depot itself, the facility --

6    MR. GIRARD:  Yes.

7    THE COURT:  -- is located on these lands that you describe.

8    Of course, this whole piece of ground is called the Naval

9    Ammunition Depot.

10   MR. GIRARD:  Yes.

11   MR. SACHSE:  Yes, I think you should say something to

12   the effect, Fred, "for the limited purpose of use by the

13   United States Naval Ammunition Depot on its lands located".

14   THE COURT:  That still doesn't do it.  They call this

15   whole piece the Naval Ammunition Depot.  What you really

16   mean is that it is located on certain lands within the

17   watershed.  " . . for the limited purpose of use by the United

18   States on the physical facilities of the Ammunition Depot".

19   MR. SACHSE:  That would do it.

20   THE COURT:  ". . which is located on certain lands, and

21   for fire protection purposes throughout" -- I take it,

22   throughout the entire area of ground.

23   MR. GIRARD:  I have no objection to just saying "else-

24   where within the Naval Ammunition Depot".  No one is going

25   to quarrel with their fire protection.

19,332

MR. STAHLMAN:  Exhibit 92 shows where the construction is of the facilities of the operation, and then the water which goes out to these different bunkers et cetera, which would be used only for fire protection.

MR. SACHSE:  I would suggest this, your Honor, starting where it says for the limited purpose:  "for the limited purpose of use by the United States upon the physical facilities of the United States Naval Ammunition Depot located upon lands within" and then go on with the legal that he just gave.

THE COURT:  Do your words "implied reservation and/or acquisition" go far enough?  In other words, Rancho Santa Margarita owned this.  There was an implied -- it was really a transfer.

MR. SACHSE:  Implied grant, probably.

THE COURT:  Implied grant.  Or if you say "acquisition" you mean acquisition by the United States.  There was an implied transfer of the riparian rights along with the land. I am a little concerned about the "reservation".

MR. GIRARD:  Let's use the word "transfer" instead of "acquisition".  Or "conveyance" may be a better word.

MR. STAHLMAN:  Conveyance.

THE COURT:  All right.

MR. GIRARD:  It is an extremely nebulous theory anyway.

THE COURT:  Of the riparian right of the Rancho to the

1    United States.

2         MR. GIRARD:  All right.

3         MR. STAHLMAN:  The limited right.

4         THE COURT:  You say "for the limited purpose".   Now

5    this reservation -- in other words, the Rancho Santa Margarita

6    transferred.  It was not a reservation.

7         MR. SACHSE:  The thing could work two ways, your Honor.

8    The reservation, of course, goes back to the grantor.  If the

9    Rancho Santa Margarita really reserved it, then the Navy

10   subsequently acquired the rest.  That is the reason we put

11   the "and/or" in.  Because if they acquired something a year

12   later, which they did, they acquired the rest of the Rancho,

13   then they acquired back with it the reservation, is the theory.

14   So it could possibly protect the United States by the implied

15   grant.

16        THE COURT:  Let's spell that implied reservation out a

17   little more.  If there was an implied reservation to the

18   Rancho which upon the subsequent transfer of the Rancho lands

19   passed to the United States and/or a conveyance of the riparian

20   right -- let's spell it out a little more.

21        MR. VEEDER:  We will work on that, your Honor.

22        MR. SACHSE:  Frankly, I think it is kind of a nebulous

23   theory.

24        THE COURT:  I don't think anybody is going to appeal it

25   for the defendants' side of the case.

1   MR. SACHSE:  I don't think so either.

2   THE COURT:  And you gentlemen present who participated

3   in drawing this finding, of course, wouldn't bring it up.

4   But if it was appealed, I suppose some of the other defendants

5   could raise the point and put us to our mettle to sustain

6   this finding.

7   MR. GIRARD:  I will just sit back and let the United

8   States do that.  I think it would be a tough one to sustain

9   on appeal.

10   THE COURT:  Mr. Veeder looks at the Court very intently.

11   MR. VEEDER:  With a smile.

12   THE COURT:  With a smile.

13   I think you had better work on that a little further.

14   MR. GIRARD:  All right.

15   THE COURT:  That would go in where on Finding 33?

16   MR. GIRARD:  I suggest on that that it would go in on

17   line 25 on page 43, and the rest of that line and all of the

18   language I presently have on lines 25 through 32 would be

19   stricken.  It would just go in, in that place.

20   THE COURT:  Then you are going to leave    in this

21   language about the lands that are within the watershed of

22   Fallbrook Creek.  You are going to leave in lines 13 to 18.

23   MR. GIRARD:  Yes, because those lands are riparian to

24   the Santa Margarita.

25   Now I should point out I would like to have somebody

19,355

check this section I used.  I think that is the point of
confluence of the lands with the River, but I am not sure.
I tried to figure it out from Bulletin No. 57 and I didn't
have it exactly.

THE COURT:  You will have to work with this further.

MR. GIRARD:  All right.  I think as soon as this is
cleared up, that is the last problem I think we have left in
these findings -- now that we have Finding 8 completed.

MR. VEEDER:  I am going to have this run off, your
Honor, so that I can see how it is set up.

MR. SACHSE:  I think we should rewrite it.

MR. GIRARD:  We will have to rewrite it and then we will
have it run.

MR. VEEDER:  I would like to have the reporter give us
that language that your Honor used.

THE COURT:  If he is going to do it, let me try it again
with a little more finesse:

This Court finds that upon the transfer of the title to
the lands of the Ammunition Depot by the Santa Margarita
Rancho to the United States there was an implied reservation
of the riparian rights to the Rancho and that upon the
subsequent transfer by the Rancho to the United States of
Camp Pendleton the rights so reserved in connection with the
Ammunition Depot were transferred and conveyed to the United
States for the limited purposes as hereafter stated; and/or

1    that upon the transfer of the Ammunition Depot by the Rancho

2    to the United States there was an implied transfer and

3    conveyance of the riparian rights of the Rancho for the use

4    of the water of the Santa Margarita River on certain lands

5    within the watershed of Fallbrook Creek for the limited

6    purpose of the use by the United States on the physical

7    facilities of the Ammunition Depot which are located on the

8    following described lands: _____

9    and for the further limited purpose of fire protection

10   throughout the area of the lands constituting the United

11   States Ammunition Depot.

12      MR. STAHLMAN:  May I make a suggestion in connection

13   with that.  I think it could be simplified if we sort of did

14   it in reverse -- in other words, the conveyance was, then

15   put in the limited purpose, and then you can say reserving

16   unto itself all other water rights.

17      THE COURT:  Well, somebody has to get something written

18   out.  Write something out.

19      MR. VEEDER:  If we could have that, Mr. Swader.

20      (Recess.  During the recess the reporter typed up and

21   duplicated the proposed finding that the Court just dictated

22   into the record.)

23

24

25

SAN DIEGO, CALIFORNIA, THURSDAY, MARCH 8, 1962, 2:30 P.M.

-oOo-

MR. VEEDER:  Your Honor, to the end that we all know which ones we are looking at, what are the numbers you have here?

MR. GIRARD:  Starting at the lowest number, the first one is a new 8, which has already been approved.

The second one is the addition to 11.

The third one is the new 16.

The fourth one is the addition to Finding 33.

And the last one is the new Finding 54.

All of the other changes on these findings have been incorporated by interlineation into the findings which I submitted on March 6th.

MR. VEEDER:  Let me see your 54.

MR. GIRARD:  That is the revocable permit.

MR. VEEDER:  That was approved.

MR. GIRARD:  Finding No. 11.  The first paragraph of the finding is the one that was suggested by the Court.  The only change we have, insofar as suggestions are concerned, is on line 10 just after the word "findings" add the word "herein".  The reason for that is that it was requested by Mr. Veeder because there is some discussion in the Lake O'Neill findings as to past uses.

THE COURT:  All right, any objection to that insertion

1    on 11?

2         MR. VEEDER:  No, your Honor.

3         THE COURT:  And we have previously made another change

4    on 10.

5         MR. SACHSE:  That is right.

6         THE COURT:  Do you have that, Mr. Veeder?

7         MR. VEEDER:  That is right.

8         MR. GIRARD:  I see, in the body of the finding, yes.

9         THE COURT:  Yes.

10         MR. GIRARD:  Incidentally, the heading for Finding No.

11    11 should have a change, too.  The title of it would now

12    read "RIPARIAN USES BY RANCHO SANTA MARGARITA AND USE OF

13    WATER OUTSIDE OF THE WATERSHED BY RANCHO SANTA MARGARITA,

14    AND LEGAL STATUS OF SUCH USES BY THE RANCHO AND THE UNITED

15    STATES".  I can change the title.

16         THE COURT:  Can't you shorten it and say "USE OF WATER

17    BY THE SANTA MARGARITA RANCHO WITHIN AND WITHOUT THE WATERSHED,

18    AND LEGAL STATUS OF SUCH USES"?

19         MR. GIRARD:  The only problem is this finding also refers

20    back to Finding No. 10, which is the uses by the United States

21    outside the watershed.  In other words, starting at line 11,

22    none of such use of water outside the watershed as are found

23    to have existed in Finding 10.

24         THE COURT:  These are only titles for identification.

25         MR. GIRARD:  Yes.

THE COURT:  Why don't you just say "USES OF WATER BY RANCHO SANTA MARGARITA WITHIN AND WITHOUT THE WATERSHED"?

MR. GIRARD:  All right.

The next one is 16, which would be a substitute 16 for my 16.  All of 16 I drafted out and just substituted this short paragraph.

THE COURT:  Is that satisfactory?

MR. GIRARD:  Yes.  The heading would be changed. Cross out the word "present" and just say "SURFACE FLOW OF THE SANTA MARGARITA RIVER".

THE COURT:  All right.

MR. GIRARD:  In connection with that change on 16, there would have to be a slight change on Finding No. 18, because Finding 18 referred back to Finding 16 under the old factual statements, and I would suggest that Finding 18 be changed and amended to read as follows:  Cross out "except as found in Finding 16 above" and state "that in most years the Santa Margarita River does not flow within the Naval Enclave as a surface stream" and then insert there "downstream from a point in Section 5 Township 10 South Range 4 West SBBM".  That is the most downstream point in the old 16.

THE COURT:  Any objection?  All right.

MR. GIRARD:  The next one is 33.  I don't know whether your Honor has read that yet.

THE COURT:  33 has two pages?

MR. GIRARD:  No, only one.

MR. SACHSE:  It was drafted and redrafted.  This is the latest one.

MR. GIRARD:  That is the latest one, your Honor.

THE COURT:  This other one is to be thrown away?

MR. GIRARD:  That is thrown away, yes.

Mr. Sachse and Mr. Veeder and I are in accord with it.

Are you in accord with it, George?

I know George has some reservation about it.

THE COURT:  Where does it go?

MR. GIRARD:  This would be inserted, if it is acceptable, on line 25 of Finding 33, and all the rest of my Finding 33, lines 25 through 32, would be stricken and this would be substituted for that.

THE COURT:  Let me read it.

Well, I would say that on lines 14 and 15 "for use by the United States Ammunition Depot for the facilities".  When you use the word "Depot" you are talking about the whole piece of ground.  " . . for the purpose of the use by the United States . . "

MR. GIRARD:  We can use the same language, your Honor.

MR. SACHSE:  I don't think it is necessary, your Honor, because the sentence to which you are referring starts out by saying " . . to certain areas . . for the purpose of use . . by the . . Depot."  We spell out the areas below.

1    THE COURT:  All right, I didn't see that.  I am satisfied.

2    Now, you have something wrong down here on line 21,

3    "which are located upon lands with".

4    MR. SACHSE:  Within.

5    THE COURT:  Any objection to it as now stated?  What do

6    you think of it, Mr. Veeder?

7    MR. VEEDER:  I think it what we have agreed to.

8    MR. SACHSE:  That satisfies me.

9    THE COURT:  All right, then that is 33.

10   Then we go to 54.

11   MR. GIRARD:  We have to have a slight correction in the

12   first paragraph of Finding 33, your Honor.  Colonel Bowen

13   just advises me that all of this 9,147.55 acres were not

14   riparian, because some of them are not in the watershed.

15   MR. SACHSE:  All you have to do is to say all the

16   9,147.55 acres within the watershed.

17   MR. GIRARD:  All of that part.

18   MR. SACHSE:  All of that part of the 9,147.55 acres

19   located within the watershed.

20   MR. GIRARD:  Within the Santa Margarita River watershed.

21   THE COURT:  Line 13?

22   MR. GIRARD:  Line 3.  I will read it in just a minute,

23   your Honor.

24   Line 3 would have a change so it would read:  "all of"

25   and then insert "that part of the 9,147.55 acres more or less"

1   and the insert "within the Santa Margarita River watershed"

2   and then continue on.

3       THE COURT:  Does that mean we have to go back on the

4   original 33 and on lines 13 -- how does this read?

5       MR. GIRARD:  That doesn't change the original 33, your

6   Honor.

7       THE COURT:  "That the following described lands are that

8   portion of the 9,147.55 acres more or less, which are within

9   the watershed . . "

10      MR. GIRARD:  That is right.

11      MR. SACHSE:  Yes.

12      MR. GIRARD:  " . . and which have water which flows into

13  the River within or upstream from the lower most point . . "

14      Has that been checked, Colonel?  That is the one I wanted

15  to make sure of.  You know where that point of confluence of

16  the Ammunition Depot lands is.  I think I have it in the

17  northwest quarter of Section 28.

18      COLONEL BOWEN:  That is correct,  I believe on line 25,

19  page 43.

20      MR. GIRARD:  That is all stricken out.  Lines 25 through

21  32 is out.

22      The last one is Finding 54, which is the finding that

23  I believe is agreed to by Mr. Veeder and Mr. Sachse, which

24  concerns the revocable permit to Fallbrook which the United

25  States cancelled.

1    THE COURT:  All right, that is 54.

2    Does that just about do it?

3    MR. GIRARD:  I think, your Honor, as soon as the property

4    descriptions are in my hands, which the Colonel assures me

5    will be either today or tomorrow, I can have these run off

6    and they will be ready for signature.

7    MR. VEEDER:  I think you had better send them around

8    for one more view.

9    MR. GIRARD:  I don't have any objection.  I will certain-

10   ly send them to everyone.

11   MR. VEEDER:  Okay.  In any event, your Honor, as I

12   comprehend it, the idea is we are free to make objections to

13   any of these things.

14   THE COURT:  Yes, but I would suggest that you send them

15   around to the counsel who have been participating here, send

16   me a copy on the date you send them out, and if the attach-

17   ments are fastened to them and I don't hear from somebody

18   in about ten days I will probably sign them.

19   MR. GIRARD:  Finding 4 refers to a map which the Colonel

20   is presently preparing.  He is going to supply me either

21   today or tomorrow with the name of the map, the title he is

22   going to put on it.  I will not have that map to attach to

23   the copies I am going to mail out.  I don't know when that

24   will be prepared, your Honor.  I haven't asked Colonel Bowen.

25   There was one other exhibit which will have to be

prepared by the United States, Mr. Veeder.  That is Exhibit
B, which is set forth on the prima facie evidence.

MR. VEEDER:  That is right.

MR. GIRARD:  And Exhibits A and B will be prepared by
the United States, and I don't know when those will be
prepared.

MR. VEEDER:  Those are set forth in the testimony of
Colonel Bowen in the record and I have marked them.

THE COURT:  Now did you make a check through these
findings and do we have conclusions that take care of them?
As a matter of fact, we are going to need a new conclusion
because of what we did 33.

MR. GIRARD:  I don't think so.

MR. SACHSE:  I don't think so either, the way it is
worded.  We have discussed that.

MR. GIRARD:  The conclusion of law that would apply to
Finding 33 would be 30.  Yes, there might have to be some
limitations on that.  There probably should be a little
different language in that conclusion of law to indicate that
the riparian right for the lands which we just discussed is
a limited type use.

THE COURT:  Couldn't we say that all lands described
et cetera have correlative right to use water of the Santa
Margarita, except that the lands occupied by the facilities
of the Ammunition Depot?

MR. VEEDER:  As described in Finding 33.

THE COURT:  As described in Finding 33, have a limited right as to purpose as found therein.

MR. VEEDER:  As to uses.

THE COURT:  As to uses, as found therein.  Do you think that would do it?

MR. GIRARD:  As provided in Finding 33.

THE COURT:  How do you have it?

MR. GIRARD:  I have it "except that the right to the use of water shall be limited as provided in Finding 33".

THE COURT:  Does 33 apply entirely to the Ammunition Depot?

MR. GIRARD:  No.  Finding 33 applies to the lands of the Rancho.

THE COURT:  Yes.

MR. GIRARD:  It applies to the lands of the Ammunition Depot which have a legitimate riparian right, and then the third part of it applies to the lands which are within the sub-watershed of Fallbrook Creek.  But the only limitation which is provided in Finding 33 is to those lands in the specific sections in the Fallbrook Creek sub-watershed.

THE COURT:  I don't like it.  It's too shorthand.

MR. GIRARD:  All right.

THE COURT:  Take what you have in 30 and say "except that as to the lands . . "

MR. GIRARD:   Suppose we say, your Honor, "except that the right to the use of water in Sections" and then spell out those sections "and for fire protection purposes in the Naval Ammunition Depot shall be limited as provided in Finding 33".

THE COURT:   That would satisfy me.  Or if you didn't want to spell out the sections, you would say "except as to the lands in the Naval Ammunition Depot occupied by Depot facilities and as described in Finding 33".  One or the other would satisfy me.

How about you, Mr. Veeder?

MR. VEEDER:   I thought what Mr. Girard said was about -- I am worried about the fire protection angle in there because that is through the whole area, not only on the place where the buildings are.

THE COURT:   How did you word it?  Try it again, Mr. Girard.

MR. GIRARD:   I have tentative notes:  "except that the right to the use of water in Sections" and then list all those sections we listed in the findings "and for fire protection . . "

THE COURT:   " . . through the entire . . "

MR. GIRARD:   I thought I would use the same language I used in Finding 33, "and except for fire protection elsewhere within the limits of the Naval Ammunition Depot shall be limited as provided in Finding 33".

19,367

THE COURT:  Does it sound all right?  Except that the fire protection should be so worded that it is not only elsewhere, but also in the sections above described -- "fire protection within the area above described and elsewhere," because as you had it worded it looked like fire protection was only in places other than where the facilities are located.

MR. STAHLMAN:  I think fire protection would be included with the use of the facilities.

THE COURT:  I suppose it would.

MR. VEEDER:  Let's hear it again.

THE COURT:  What have we got now?

MR. GIRARD:  " . . except that the right to the use of water in Sections" and then list the sections "and for fire protection elsewhere within the limits of the Naval Ammunition Depot shall be limited as provided in Finding 33".

THE COURT:  That satisfies me.

How about you, Mr. Veeder?

MR. VEEDER:  I think that is all right, your Honor.

THE COURT:  All right.

MR. VEEDER:  Subject to all my mental reservations.

THE COURT:  Do we need a conclusion on the new 54?

MR. SACHSE:  I don't think you need a conclusion of law, because in itself it is a conclusion.  If Mr. Veeder wants it, I have no objection to it.  You find it was

1     cancelled as a matter of fact.  I think that is enough.

2         MR. VEEDER:  I think that carries it.

3         THE COURT:  If it satisfies you, it satisfies me, Mr.

4     Veeder.  I am very agreeable today also.

5         Now if you are going to amend any judgments they ought

6     to be looked over pretty carefully and make all our amendments

7     at one time.

8         MR. SACHSE:  (Handing a document to the Court)  This was

9     at your suggestion, your Honor, to refresh your recollection,

10    made at our last meeting, and you said you wanted to be quite

11    sure that all of your rulings were covered somewhere.  I

12    really don't think it is necessary.  I think when you found

13    that we have valid permits it is implied therein that it is

14    within our powers to do it.  I really don't care whether this

15    goes in or not.

16        MR. VEEDER:  Why don't we consider this as the Court

17    said?  There are going to be objections.  There are going to

18    be changes.  We know what this is generally.

19        THE COURT:  Let's look it over and see that it satisfies

20    us.

21        MR. SACHSE:  It's perfectly all right with me.

22        THE COURT:  Then we will have to look it over again to

23    see what else we might have to do.

24        MR. VEEDER:  That is right.

25        MR. GIRARD:  We are going to have to amend the O'Neill

Judgment.

THE COURT:  We are going to have to knock out that business about exclusive jurisdiction.  Somebody make a note of that.

MR. GIRARD:  I have made a note of it, your Honor.

THE COURT:  Let's look it over and see what Mr. Sachse has here.

MR. SACHSE:  Frankly, I don't think it is necessary, your Honor.

MR. VEEDER:  I have already told Franz I was going to object to some of this language here.

THE COURT:  To what do you object?

MR. VEEDER:  The word "appropriations," your Honor.  He hasn't got an appropriation, except for a little dribble of water that he pumps.  He has just got some paper.

THE COURT:  Where does the word appear?

MR. GIRARD:  At line 32.

MR. VEEDER:  That it is within the power of the Public Utility District under the laws of California to appropriate waters for irrigation, domestic and municipal purposes, and that each of the appropriations of Fallbrook -- I point out that he doesn't have appropriations.  The most he has is permits.

MR. SACHSE:  If he wants to change "rights" to "permit," I don't care.  In the judgment that has been entered you have

1    already found.

2         THE COURT:  What should we call them, "permits"?

3         MR. VEEDER:  "Permits and license" would cover it "of

4    Fallbrook described in these findings".

5         THE COURT:  " . . permits and license to appropriate

6    water"?

7         MR. VEEDER:  The permits and license to appropriate

8    water of Fallbrook Creek in these findings.

9         THE COURT:  All right, the permits and license (singular)?

10        MR. VEEDER:  That is right.

11        THE COURT:  To appropriate water.

12        MR. SACHSE:  I don't think you even have to say it, your

13   Honor.  Just say that each of the permits and license of

14   Fallbrook described in these findings, take out the word

15   "appropriations" because the findings have spelled them out

16   by date, number and everything else.

17        THE COURT:  All right, it is satisfactory.  So it is now

18   okay, subject to something else we might want.

19        MR. SACHSE:  I will not rewrite this.  I will just hold

20   it because there might be other things, and why do it again?

21        MR. VEEDER:  That is right.

22        THE COURT:  In the light of some of the work we have

23   done, I wonder whether you have gone back over some of these

24   early findings we made on Fallbrook.

25        MR. SACHSE:  I attempted, as a small contribution to Mr.

Girard's work on those, to check all of the other conclusions

of law and judgments to see that everything that appeared

anywhere was embraced in this somehow.  The only one that was

not, and we have corrected it, was the Miscellaneous Surface

Impoundments, according to my check, and we incorporated

them by reference to them rather than -- I think your Honor

observed that -- rather than setting them forth in full,

because there are a couple of pages of them.

Conclusion of Law 39 in this Naval Enclave Judgment

incorporates by reference Conclusions of Law 1, 2, 3 and 4

of the Miscellaneous Surface Impoundments.

THE COURT:  Yes.

MR. SACHSE:  That is the only one I could find.  I would

welcome somebody else's check, though.

MR. VEEDER:  They all have to be read line by line

against each other.

MR. GIRARD:  I did read Conclusions of Law 1, 2, 3 and 4

in Interlocutory Judgment No. 28, and in my opinion they are

applicable to the Naval Enclave.  However, I didn't treat it

that way in the Judgment.  I specifically provided a judgment

provision in this particular Naval Enclave Finding which is

identical to the judgment provision in the Surface Impoundment

Judgment provision of Mr. Sachse's general judgment dealing

with that subject matter.

THE COURT:  What I am thinking about, and I haven't

1    checked back on it to look, some of these early judgments,

2    the first bunch that you ran through, were on some basis of

3    some stipulation between the United States and --

4        MR. SACHSE:  Every one of those was the so-called "A"

5    Series of lands, and I don't think we need to concern ourselves

6    with those at all.  You will find no judgment or anything

7    except "A" Series, basement complex et cetera, that had that

8    stipulation in it, your Honor.

9        THE COURT:  But we do have it on the "A" Series, though.

10    I made some little mental reservation in the past, and I

11    don't know exactly now what it is, and that is that you can't

12    have a stipulation just between you and the Government.  We

13    have to have findings and conclusions that support it against

14    everybody else in the watershed, technically speaking.

15        MR. SACHSE:  What I am trying to say is-- Mr. Veeder

16    should correct me if I am wrong -- I think in every case

17    where you have one of these so-called stipulations or

18    disclaimers, didn't you also cover that same land in an "A"

19    Series?  In other words, your "A" Series of Judgments covers

20    all of the basement complex.

21        MR. VEEDER:  I will tell you again, those are being

22    checked, every one of them, because we have to know that we

23    don't duplicate and that we don't have conflicts in regard

24    to the language that has been used.

25        MR. SACHSE:  I was very much concerned about the same

1    thing, your Honor, because some of those are my clients and

2    I have assumed that every one of them, even those who disclaim,

3    was covered.

4         MR. VEEDER:  And every one has to be checked for that

5    very thing, Mr. Sachse.

6         THE COURT:  Mr. Veeder, here is a book of yours.

7         We will, then, I take it, adjourn until April 3rd.  Is

8    that a Tuesday?

9         MR. SACHSE:  Yes, it is a Tuesday.

10        I will be calling Mr. Krieger, I guess.  So that I

11   clearly understand it now, what is the status of the Murrieta?

12   It will be entered today, your Honor?

13        THE COURT:  It has been signed.

14        MR. SACHSE:  It has been signed and entered.

15        May I tell him you will mail one to him promptly?

16        MR. VEEDER:  We will.

17        MR. SACHSE:  And I can go up and pick up my own now,

18   you say?

19        MR. VEEDER:  Yes, you may come with me right now.

20        THE COURT:  And then when we come back on the 3rd we

21   are going to start to work on Vail.

22        MR. SACHSE:  We have Vail, Warm Springs, Anza, Coahuilla

23   and Aguanga.

24        THE COURT:  I will not push it further, but I have

25   finally found, moving down here, the thing I looked for, the

1    possible finding, and I am going to have it read into the

2    record, about these dry Southern California streams, because

3    I don't know that it appears in the record anywhere else.  I

4    don't think we need a finding.  It is a matter of law.  But

5    here was the proposed finding:

6         "That the California Supreme Court has on several

7         occasions set forth in its reported opinions factual

8         statements in cases concerning ground waters of

9         southern California streams.  That such factual state-

10        ments appear in such cases as City of Los Angeles v.

11        Pomeroy, 124 Cal. 597; Los Angeles v. Hunter, 156 Cal.

12        603; San Bernardino v. Riverside, 186 Cal 7; Verdugo

13        Canyon Water Co. v. Verdugo,  152 Cal. 655; Ventura Land

14        & Power Company v. Meiners, 136 Cal. 284; Hufner v.

15        Sawday, 153 Cal. 86, and Rancho Santa Margarita v. Vail,

16        11 Cal. 2d 501; that insofar as such factual statements

17        were concerned with ground waters in deposits which

18        directly underlie an intermittent stream, there is

19        little, if any material factual distinction between

20        the facts as recited by the California Supreme Court

21        in the above-cited cases and those which have been shown

22        by the evidence in this case to exist on the Santa

23        Margarita River."

24   And I would probably make the further conclusion that

25   the ground waters in this younger alluvium in these southern

1   California mountain streams is part of the underground flow

2   and part of the stream.

3        But I couldn't find it until just now, believe it or

4   not.

5        MR. STAHLMAN:  Your Honor read that some time before,

6   probably not into the record.

7        MR. SACHSE:  It is in the transcript on your ruling on

8   Mr. Veeder's motion.

9        THE COURT:  Is that in the transcript?

10       MR. SACHSE:  Perhaps not in those identical words, but

11   you cited all the cases.

12       THE COURT:  I am going to have to put it in here again

13   as a basis for my decision on the underground flow.

14       What are we going to do on the 3rd of April?

15       MR. SACHSE:  George is going to be ready with Vail, and

16   maybe Aguanga.

17       THE COURT:  Who is working on Aguanga?

18       MR. VEEDER:  I have already lodged Aguanga, your Honor.

19       THE COURT:  What did you call it?

20       MR. VEEDER:  Aguanga Ground Water Area.

21       THE COURT:  You have lodged one?

22       MR. VEEDER:  Yes, your Honor.  It has "Aguanga" at the

23   top corner.

24       MR. SACHSE:  It has "Aguanga" at the top, but it says

25   3-A.

1    MR. VEEDER:  I am going to have conclusions of law for
2  it now that you have decided what you want for the Murrieta-
3  Temecula.

4    THE COURT:  I have found it and I have marked the top.

5    MR. STAHLMAN:  I am quite sure we will be ready, your
6  Honor.  We will do everything we can to be ready.

7    THE COURT:  All right, thank you, gentlemen.

8    (Adjournment until Tuesday, April 3, 1962 at 10:00 A.M.)

9                             - - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
        vs.                          )      No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY             )
DISTRICT, et al.,                    )
                                     )
                    Defendants.      )
_____

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to wit:  March 8, 1962, was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing 38 pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS MY HAND, at San Diego, California this 8th day of March 1962.

_____
                                Official Reporter

JOHN SWADER, OFFICIAL REPORTER