Case 3:51-cv-01247-JO-SBC   Document 4694   Filed 09/24/63   PageID.40387   Page 1 of 123

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:   San Diego, California

Date:    April 3, 4, 1962

Pages:   19,378 to

FILED

SEP 24

CLERK, U.S. D Smith
SOUTHERN DISTRICT

By

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 191

19,378

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, April 3, 1962
Wednesday, April 4, 1962

APPEARANCES:

For the Plaintiff:

RAMSAY CLARK, ESQ.,
Assistant Attorney General,

WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney General

CDR. DONALD W. REDD

For the Defendants:

Fallbrook Public Utility
District, et al.,

FRANZ R. SACHSE, ESQ.

State of California:

FRED GIRARD, ESQ.

Vail Company:

GEORGE STAHLMAN, ESQ.

19,379

SAN DIEGO, CALIFORNIA, TUESDAY, APRIL 3, 1962, 10:00 A. M.

---oOo---

(Other matters)

THE CLERK:   Six, 1247-SD-C, United States versus Fallbrook.

(Discussion off the record, following which there )
(                                                 )
(was an informal conference with Mr. Ramsay Clark, )
(                                                 )
(off the record.  After the conference at 4:30 p.m.,)
(                                                 )
(the case was adjourned until Wednesday, April 4,  )
(                                                 )
(1962 at 10:00 a.m.                               )

---oOo---

19,380

SAN DIEGO, CALIFORNIA, WEDNESDAY, APRIL 4, 1962, 10:00 A.M.

---o0o---

(Another matter)

THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook.

THE COURT:  Mr. Veeder prepared a short agenda.  Did you get copies of it?

MR. SACHSE:  No, I didn't, your Honor.

(Mr. Veeder hands documents to counsel for the  )
(                                                )
(defendants.                                     )

THE COURT:  The first item is Interlocutory Judgment No. 39-A, Basement Complex Below Temecula Gorge and DeLuz Creek Confluence.

How did you handle the Vail land in this area?

MR. VEEDER:  Such lands as are basement complex are reflected in there, your Honor.

THE COURT:  You don't show Vail in the alphabetical index.

MR. VEEDER:  I think there are some small portions of Vail property that were included in that.

THE COURT:  You don't list Vail Company on your Exhibit B, which is the list of names.

MR. VEEDER:  Your Honor, Vail Company has a few minor parcels that are basement complex in that.

MR. STAHLMAN:  There is also that riparian land.  We treat it in our finding, your Honor.

1    THE COURT:  I don't know whether it is worthwhile

2  bothering about, but it would seem to me that there should be

3  some statement in there, except the Vail property which is

4  handled elsewhere.  Isn't that what is going to be done with

5  Vail?  Aren't you going to handle the Santa Rosa?

6    MR. STAHLMAN:  Yes, we have that in our findings, your

7  Honor.

8    You have read our findings, Mr. Veeder?

9    MR. VEEDER:  Yes, I have.

10    MR. STAHLMAN:  You see how we have treated it there.

11    MR. VEEDER:  But there are reflected in here a few

12  minor parcels.

13    THE COURT:  I don't think there are, Mr. Veeder.  I

14  have looked in your alphabetical list of names and Vail

15  Company is not listed.

16    MR. VEEDER:  It should have been listed on those small

17  parcels.

18    THE COURT:  I handed you the other copy.  What did you

19  do with it?

20    MR. VEEDER:  I have it there, your Honor.

21    THE COURT:  Let me see this copy, if we are going to

22  revise it.  Has everybody had a chance to look at it?

23    MR. STAHLMAN:  No, we haven't even had a copy of it.

24    MR. GIRARD:  I haven't seen it, your Honor.

25    THE COURT:  Let's just check hurriedly here.  Your

1   map attached here as Exhibit A shows the Gorge.   What have

2   you done with the Government land shown in there?

3       MR. VEEDER:  The Government land is included, your

4   Honor.

5       THE COURT:  Is that listed?  The State of California

6   is listed.

7       MR. GIRARD:  We don't own Murray Schloss yet.

8       THE COURT:  What is the property marked with the

9   hatch marks on the map?

10      MR. VEEDER:  The United States.  You will find

11  descriptions of it there, your Honor.

12      THE COURT:  You don't list the United States of

13  America.

14      MR. VEEDER:  You will find it, your Honor, if you

15  thumb on through.  There are several parcels of land of the

16  United States of America.

17      THE COURT:  Your index of names doesn't list the

18  United States.  Shouldn't the index of names be keyed to --

19      MR. VEEDER:  It should be, your Honor.

20      THE COURT:  The United States of America is crossed

21  off in here.

22      MR. VEEDER:  I will go back and check each of these

23  myself.  I have been relying on people who apparently can't

24  do things right.

25      THE COURT:  Well, let's not go overboard.

MR. VEEDER: Well, I am overboard. For about the tenth time this has been wrong.

THE COURT: Let's be calm. This land marked with the hatched marks is United States land, is that right?   And California has some small parcel here somewhere?

MR. VEEDER: That is right.

THE COURT: Is that hatched also?

MR. VEEDER: No.

THE COURT: Where on this map is this confluence of DeLuz and Santa Margarita?

MR. VEEDER: It comes down to the watershed there. Here is the Santa Margarita River here. Here is the watershed. Here is Sandia Creek coming down here. This is the subwatershed.

THE COURT: Where is DeLuz?

MR. VEEDER: It is here. DeLuz Creek comes down through here.

THE COURT: It comes in over here?

MR. VEEDER: Yes. This is just down to the watershed line of DeLuz Creek.

THE COURT: You say "and above the DeLuz Creek confluence".

MR. VEEDER: That is right. And the watershed is right here. We already have in for DeLuz Creek the Findings of Fact and Conclusions of Law in regard to this

19,384

1   watershed.

2       THE COURT:  Actually, that is a descriptive title,

3   sort of a handle?

4       MR. VEEDER:  That is right.

5       THE COURT:  It is not exactly accurate, because you

6   have cut off, as I understand here, at the boundary of Camp

7   Pendleton.

8       MR. VEEDER:  That is correct, your Honor.

9       THE COURT:  You cut off at the boundary of Pendleton

10  and so there's a stretch of the river from the boundary of

11  Pendleton down to the confluence with DeLuz?

12      MR. VEEDER:  That is right.

13      THE COURT:  Wouldn't it be more accurate to say the

14  watershed below Temecula Gord and above the north boundary

15  of Pendleton?

16      MR. VEEDER:  The east boundary it would be.

17      THE COURT:  Is it east?

18      MR. VEEDER:  Yes, your Honor.  If you want it set up

19  that way, we will do it that way, your Honor.

20      THE COURT:  Would it be more accurate?

21      MR. VEEDER:  I think it would be.

22      THE COURT:  Will you do that?

23      MR. VEEDER:  I will do that.

24      THE COURT:  Will the rest of you check this over?

25      MR. STAHLMAN:  Yes.

1      MR. SACHSE:  Yes, your Honor.

2      MR. GIRARD:  As soon as we get a copy of it, your Honor.

3      THE COURT:  Item No. 2 is the Amendment to Interlocutory

4   Judgment No. 23.

5      MR. SACHSE:  I don't have a copy of that for everybody,

6   but what I want to do is certainly very important.  Your

7   Honor will recall that you suggested that I add to the

8   conclusions of law on the Fallbrook Public Utility District

9   Judgment, a conclusion covering the determination that our

10  acts were not ultra vires, that they were within our powers.

11  I submitted and lodged an amendment early in March on the

12  last sentence on the first page of which I use the words

13  "the appropriations of Fallbrook" and your Honor and Mr.

14  Veeder thought it would be more appropriate to use the

15  words, "the permits and licenses of Fallbrook".  That is

16  the only change in it.

17     MR. VEEDER:  And those are the changes that were

18  agreed upon.

19     MR. SACHSE:  Those are the changes, the substitution

20  of the words "permits and licenses" for "appropriations".

21     THE COURT:  I haven't got the prior judgment before me,

22  but I take it that in Judgment No. 23 you have a finding

23  that Fallbrook is a public utility district?

24     MR. SACHSE:  Yes, we have a finding that Fallbrook is

25  a public utility district and that it holds these certain

1    appropriative rights, permits and licenses, and the conditions

2    and restrictions.   But there was no conclusion on the express

3    motion of Mr. Veeder.   That was one of these matters that

4    your Honor brought up later, that we should cover these loose

5    ends.   But there is a conclusion now that it is within the

6    power of the Fallbrook Public Utility District to

7    appropriate water for these purposes.

8            THE COURT:  All right, any objection?   Mr. Veeder,

9    of course you have made objection to Fallbrook's power.

10           MR. VEEDER:  Yes.

11           THE COURT:  And you still have that objection.   But

12   other than that, is there any objection?

13           MR. VEEDER:  No, this conforms --

14           MR. SACHSE:  With the understanding we arrived at.

15           MR. VEEDER:  -- as agreed upon.

16           THE COURT:  All right.   April 4 -- I will sign it.

17   Will you get me a copy for my files, Mr. Sachse?

18           MR. SACHSE:  I cannot give your Honor a clean copy.

19   Yes, I can -- pardon me -- here's one.   No, I am sorry.

20           MR. VEEDER:  You can have this.

21           MR. SACHSE:  All right.   I will supply counsel then

22   tomorrow.

23           THE COURT:  The next item is the Revised Naval

24   Enclave, Interlocutory Judgment No. 37.

25           MR. SACHSE:  That is the one that was delivered to you

1    yesterday by Mr. Girard, your Honor.

2        MR. GIRARD:  There are two exhibits which will be

3    attached to this, your Honor.  One is the Exhibit A, the map

4    showing the various lands.  I checked over the map yesterday

5    and it is quite good and quite accurate.  There had to be one

6    slight additional change put on there, and I understand it is

7    being put on today and the map will be here tomorrow.

8        The other exhibit which will have to be attached is

9    the Exhibit B, which is the irrigable acreages et cetera, on

10   the Naval Enclave under that finding on prima facie.

11       THE COURT:  Is that being prepared?

12       MR. GIRARD:  I am not sure, your Honor.  I presume it

13   is.

14       But Exhibit A, the crucial exhibit, will be ready

15   tomorrow.  I would have no objection to having those findings

16   signed with Exhibit A, subject to the right to attach

17   Exhibit B when they get it.

18       THE COURT:  We don't want to do it that way.  How long

19   will it be before you have Exhibit B,  Colonel Bowen?

20       COLONEL BOWEN:  I believe I may have Exhibit B by

21   tomorrow, too, your Honor.

22       THE COURT:  Do you know what the figures are going to

23   show as to irrigable acreage in the Enclave?

24       COLONEL BOWEN:  We put down the total, your Honor --

25   that is already in the record -- within the Naval Enclave, but

1    I don't have it fresh in my mind at the moment what the

2    relation of acreage in DeLuz Creek in the small private lands

3    acquired by condemnation or in the public land withdrawn from

4    entry.

5        THE COURT:   What is the figure in the Enclave itself?

6    I am just curious.

7        COLONEL BOWEN:   In the Enclave itself it is just under

8    19,000, as I recall, your Honor, irrigable acreage.   It will

9    not be affected very greatly by deletion of anything in the

10   DeLuz or Roblar Canyon watershed because very little of that

11   is irrigable.

12       MR. VEEDER:   May I just ask one question before we

13   go further, your Honor?

14       THE COURT:   Yes.

15       MR. VEEDER:   On Page 42, Finding 52, the statement

16   is made -- and this is really just for the record, but I

17   would like to have your Honor's explanation in the record on

18   this -- at Line 30 it says:   "The factual statements

19   contained in said Exhibit B which pertain to gross acreages,

20   irrigated acreages, irrigable acreages and water duty are

21   based on evidence introduced in this case by the United

22   States of America with an express assurance by its counsel

23   that apportionment was not being sought at this stage of

24   the litigation.   Because of this fact and the fact  that

25   this Court is not at this time making any order apportioning

or regulating the use of the waters involved herein, said facts pertaining to gross acreages, irrigated acreages, irrigable acreages and water duty are not material to any issue decided by Interlocutory Judgment No. 37 entered herewith. . ."

The thing that concerns me very greatly, your Honor -- and I realize this is language that has been previously used -- is that I truly don't follow your Honor's conclusions that because we said that there was no apportionment the evidence that was introduced as to our irrigable and irrigated acreages and other material in support of our claims would be treated as prima facie. I don't follow that, your Honor. I really don't. I have gone back and looked at the record and I would like to have a clarification here in the light of the statements that were made yesterday in our informal conference, because I am sure that I am going to be interrogated in regard to this matter by Mr. Clark and I am sure that my views are going to be called for in regard to them, and I just want to be sure that the record is straight as to the reason for your Honor's disposition of this matter.

THE COURT: Counsel may supplement what I have to say.

As far as the Government's showing of irrigable acreages, irrigated acreages, gross acreages, et cetera, I don't recall that there was really any contest. We were well satisfied with the showing made.

1      But there were other parts of the watershed where

2  proof was not put on as to the number of irrigable acres,

3  particularly some of Mr. Sachse's clients.  Mr. Sachse stated

4  he was not going to offer any proof on that matter.  There may

5  have in certain instances come in some proof in connection

6  with some surveys of Mr. Sachse's clients , but I am not

7  sure.

8      At any rate, there was also a number of people, small

9  individuals who did not appear by counsel who, however,

10  consented that a survey be made by the Government, and a

11  survey was made and a report was filed showing the number of

12  irrigated and irrigable acres, and in many cases, but maybe

13  not all, those people consented and agreed that this was

14  proper.  I know in certain cases they were here in court

15  and said they were satisfied.

16      There were other instances where they were not in

17  court.  There were other instances where we had no expression

18  from them whether they were satisfied.

19      And so to have a uniformity overall in the watershed,

20  we came to this understanding that the findings would be

21  made as prima facie evidence.  So that in a later proceeding

22  if the particular litigant was satisfied and willing to

23  rest on what was in the record, that was all we needed.  It

24  left the door open for the matter to be contested,

25  particularly by those persons who had not had a full day in

1     court.

2          This Judgment, of course, concerns the Government

3     downstream. I don't know that any of the counsel have

4     contested the showing you made as to irrigable acres. But

5     this business of a day in court works both ways. X up the

6     stream who didn't appear, has a right to contest how many

7     irrigable acres you claimed. So that there would be no

8     particular reason to make an exception of the Government in

9     this case.

10         The matter would stand on this basis, that here was

11    a prima facie showing. You could rest on it without further

12    proof. If somebody decided to come in and contest your

13    acres, that could be done.

14         Now, do I understand that you are raising the

15    question here as to whether certain major parties actually

16    contest this acreage that you have proved?

17         MR. VEEDER: Well, I look at it this way, your Honor.

18    Frankly, I believe, from my own standpoint, that I made no

19    representation that the data that I was offering would not

20    be proof or that anyone was misled by any of the offers of

21    proof that I made, any evidence that we tendered into the

22    record.

23         My concern is that the statement that I had said we

24    were not at that time seeking an apportionment could not, in

25    my view, have misled anyone in regard tothe evidence that, in

1    my view, they should have offered.

2         I tender to Mr. Sachse this thought, that if any of

3    his clients -- if he can name me any of his clients for whom

4    he didn't introduce irrigable acreage, I think he and I might

5    review it and straighten the matter out.   I don't believe Mr.

6    Sachse acted on my representation at all.

7         MR. SACHSE:   Mr. Veeder, I didn't introduce irrigable

8    acreage for any of my clients.   There are reports by

9    Colonel Bowen for many of them.

10        Your Honor, I would add only one thing to your

11   exposition on this.   The practical significance of this

12   paragraph, as I understand it, is simply this, that if

13   following the discussion of yesterday an apportionment or

14   allocation of water were sought, any party to this proceeding

15   could present evidence as to irrigable acreage et cetera,

16   without first having to meet the burden of showing a changed

17   condition.   That is all.   Mr. Veeder has always agreed that

18   in any apportionment, a change in circumstances might

19   justify changes in these findings.   But the sole significance

20   of this is that any litigant -- Vail, Fallbrook, not

21   Fallbrook because we are not concerned with irrigable

22   acreage -- but any private litigant could come in to your

23   Honor and say, "Your Honor, I would like now to be heard,"

24   without first proving that the conditions have changed.

25        That is all I think it is.   If he doesn't come in, you

1    have a case that will support any allocation that this Court

2    or a State Water Master might make on the basis of irrigable

3    acreages.

4           THE COURT:  Let me ask you this question, again going

5    back to our informal discussion of yesterday where there was

6    general discussed the possibility of some physical solution,

7    the Government has made this showing of irrigable acreage  on

8    the Enclave, and as I understand it corresponds pretty

9    generally with the findings previously made in the old Vail

10   case, does it not?

11          MR. STAHLMAN:  There is quite a substantial increase

12   in this one.

13          THE COURT:  There is?

14          MR. VEEDER:  Yes.

15          THE COURT:  Mr. Wilkinson says no.

16          MR. WILKINSON:  For the Enclave, your Honor.

17          THE COURT:  The Enclave is much the same as it was

18   in the old case?

19          MR. STAHLMAN:  I don't think so.

20          THE COURT:  My question is this:  If there should be

21   some talk of apportionment and physical solution, it might

22   be very important that as between the major parties who

23   appeared in this court and participated in this trial we

24   could pretty well say this issue is at rest, and my inquiry

25   is, does Fallbrook, does the State of California, does Vail

1    seriously contest the prima facie showing made by the

2    Government as to acreage?

3         MR. SACHSE:  No, your Honor.

4         THE COURT:  If the parties here are content with it,

5    we might get to that in the record.  Still, Mr. Veeder, it

6    doesn't mean we can change this, because if we are going to

7    be consistent in our policy, somebody upstream would have a

8    right, if they wanted to come in, and say, "The Government

9    has ten thousand too many irrigable acres there."  I don't

10   anticipate this as a possibility.  I don't anticipate, in view

11   of the fact that you have had major users represented here,

12   there is going to be anybody that is going to do that.  But

13   if we are going to be consistent we don't clothe the

14   Government with one kind of cloak and say the Government has

15   proved now once and for all its irrigable acres, but as to

16   everybody else it is only a prima facie showing.

17        I do think we accomplish the same result if we get

18   into the record an agreement, a stipulation, by Fallbrook,

19   by California, by Vail, who are here present, that they are

20   content and satisfied with this showing of irrigable acres.

21   And then we have got that issue at an end, subject only to

22   changed conditions.

23        Is this what you are thinking about?

24        MR. VEEDER:  Yes, your Honor.

25        I have disagreed, as I told your Honor, with the

1    statement that the proof that we put in was subject to

2    challenge at this time.  But I appreciate your Honor's

3    clarification in the record.

4         In the light of what transpired yesterday, we do

5    necessarily, and your Honor, you have agreed it was proper for

6    us to file objections to this, because I think we do have to

7    preserve our objections.  But I will go ahead on that basis

8    and it will be the basis upon which we will consider it.

9         THE COURT:  Let me inquire further.  I don't have

10   these exact figures before me.  The exhibit will be drawn up

11   on the basis of the evidence in the record.  Mr. Sachse,

12   does Fallbrook contest, absent some change in conditions,

13   the showing made by the Government on irrigable acres?

14        MR. SACHSE:  No, your Honor.  But let me make something

15   very clear that perhaps you are overlooking.  Fallbrook

16   can't do it, anyway.  Fallbrook is a pure appropriator.  If

17   we had the best evidence in the word, we can't argue with it.

18   Only Vail can.  For my other clients -- let's keep our hats

19   straight -- I have not consented.  I can't say I accept these

20   figures.  I can't.  The one I am most concerned with isn't

21   irrigable acres.  It is water duty.  I can't say that on a

22   future apportionment for one of my individual clients I might

23   not desire to introduce evidence showing that some figures

24   of Colonel Bowen on water duty are wrong.

25        But Fallbrook  has no concern in it at all.

THE COURT:   So you can't on behalf of your other clients you represent say you are content with Colonel Bowen's figures?

MR. SACHSE:   I can say at this moment we have no desire to question them, but I can't bind my other clients to the necessity of showing changed conditions before they could put on evidence because I have at all times, your Honor knows, refused to put on evidence on the basis that it is immaterial now and when the times comes up I want to put it in.

THE COURT:   As a practical matter these other clients you represent are so relatively small --

MR. SACHSE:   Not all of them, your Honor.

THE COURT:   Downstream.   Upstream you have a couple of big ones.

MR. SACHSE:   Yes.

MR. VEEDER:   You are still representing Stardust?

MR. SACHSE:   I am still representing Stardust.   I think I am still representing   Searl   Brothers.   I think I have quite a bundle of them that are good sized.

MR. VEEDER:   I am not arguing with you on the point, Mr. Sachse.   I have checked back and I believe there is evidence on each one of your clients as to irrigable acreage and water duty.

THE COURT:   There may have been some Government

1    surveys.  But Mr. Sachse himself didn't put on any.  The

2    record should be clear on this, as I tried to say in summary,

3    I think in many of these cases  the surveys made by the

4    Government made a showing and there is a prima facie showing ,

5    and if Mr. Sachse is content with that showing that was made,

6    regardless who  made it, he can so state and rest.  But if he

7    is not content, the door is open to come in and put his

8    proof on.  Isn't that the posture of the case?

9        MR. SACHSE:  That is exactly it, your Honor.

10        MR. GIRARD:  That is exactly it.

11        MR. STAHLMAN:  I can't see where it is very important.

12        MR. VEEDER:  The point I am trying to make is that

13    a great deal was taken yesterday based upon a possible

14    working out of some kind, what Mr. Clark referred to as an

15    apportionment.  My own view is that I want a clarification

16    in the record as to the position of your Honor as to the

17    parties, and my position, which is contrary to it, because I

18    do believe that what we have offered was proper and that it

19    went in without objection.

20        However, that is the status of the case as your

21    Honor sees it, it is the status in the record, and that is

22    all I want this morning.

23        THE COURT:  Let me ask Mr. Stahlman first.  Are you

24    content with the evidence the Government has put on as to

25    irrigable acreage for the Vail Company?

1    MR. STAHLMAN: Your Honor, as far as we are concerned,

2    I don't see where there is going to be any quarrel about the

3    irrigable acres.  There is a slight difference between those

4    and the other case.  We are not quarreling with it.  Of

5    course, it would work both ways.  If you want it firmed up

6    here instead of having it prima facie, as an established

7    fact, subject to the changed conditions, it would work both

8    ways.

9        THE COURT: I propose to leave it as it is.  But I

10   would like to have your present position.  Your present

11   position is that as things stand now it would not be your

12   intention subsequently to contest this prima facie showing?

13       MR. STAHLMAN: That is correct, your Honor.  We have

14   no thought at the present moment and no intention, having

15   listened to all this evidence.  The fact of the matter is,

16   there is one little thing that sort of hinges upon this

17   thing also, as far as Vail is concerned.  When we set out

18   our irrigable acres, there are some later acquired

19   properties of Vail in which we made the determination of

20   acreage.

21       THE COURT: To make this record available to persons

22   who might be interested, if, for instance, we would swing

23   within a month or so into some question of trying to find

24   out who the substantial users were and what their acreage

25   was, Vail's position at this time is that they would be

1  content with the Government's figures?

2      MR. STAHLMAN:  Yes, your Honor.

3      THE COURT:  California?

4      MR. GIRARD:  No, we have absolutely no quarrel with

5  the figures Colonel Bowen has presented.  If we went into

6  some type of discussion as outlined by Mr. Clark yesterday,

7  we would be quite happy to accept them as the basis for the

8  determination of irrigable acreage of the major parties.

9      THE COURT:  I think the record should also show this.

10  As to the many small owners who were brought in, and there

11  were many who came in after the service that had been made,

12  uniformly Colonel Bowen's figures were accepted.

13      MR. GIRARD:  That is right.  In fact, the several

14  times they were not accepted I think I was the counsel who

15  urged the acceptance of Colonel Bowen's figures.

16      THE COURT:  Occasionally there was something in the

17  nature of an error, either the owner thought he had more

18  land than he actually had, matters of that sort, but those

19  were ironed out.  But as far as the overall acceptance of

20  Colonel Bowen's figures in this watershed is concerned, I

21  think we should say for the record now that they were generally

22  and uniformly accepted by the litigants who were concerned.

23      MR. STAHLMAN:  I will go a little further.  I will

24  say that by reason of the testimony of Colonel Bowen in

25  such a large number of cases in which he has consistently

1    applied the same standards and yet having had so slight a

2    divergence of opinion, even with a diversity of persons

3    with lands in different places in the watershed, that there

4    was such a great consistency there that we certainly have no

5    thought of attacking it at all, either in the Navy or any of

6    the others that might affect our land.

7    　　　MR. VEEDER:　I am sorry that Mr. Krieger is not here.

8    But we did make surveys for virtually all of Mr. Krieger's

9    clients.

10    　　　THE COURT:　And he accepted them.

11    　　　MR. VEEDER:　And they were all accepted, were they

12    not, Colonel Bowen?

13    　　　COLONEL BOWEN:　Yes, sir.

14    　　　MR. VEEDER:　And I think that is true in regard to

15    Gibbon and Cottle, is it not, and the other major users?

16    　　　COLONEL BOWEN:　Yes, sir, it was.　We never had any

17    dissent from any of the major users.

18    　　　MR. VEEDER:　In other words, it would look to me like

19    we are in the position, from the irrigable acreage standpoint,

20    for this Court to be able to rule, if we progress to the

21    point where it becomes more important -- I am speaking now

22    of this apportionment idea -- that we would not be

23    confronted with  extensive challenges to the evidence we

24    offered.

25    　　　MR. SACHSE:　There will be no challenge as far as

1    Stardust is concerned.

2    As to Diamond and Domenigoni Valley, I am not going

3    to express an opinion.  We haven't got a judgment signed yet.

4    The judgment his Honor has drafted and which has been

5    floating around here for six months or so, I mean the

6    judgment in accordance with his Honor's pronouncement, namely,

7    that those waters they are using are not part of the stream

8    system -- then I will sweep them out.  But I will not tell

9    you this minute that I will buy all that  for Searl Brothers,

10   because we haven't got the judgment signed yet.

11   THE COURT:  Wait a minute.  For the benefit of other

12   persons who might read this transcript, it is my present

13   intention to sign up the judgment when it is finally prepared

14   on Domenigoni Valley to the effect that the underground water

15   runs out of this watershed, and this comes right down to the

16   alternative either that this Court issue a decree that the

17   water will cease running out of the watershed or that we

18   cross off Domenigoni Valley from the standpoint of groundwater

19   apportionment.

20   MR. SACHSE:  Certainly.

21   THE COURT:  You couldn't ever consider them in an

22   apportionment.

23   MR. VEEDER:  There is no contest on that.  There is

24   only one thing I was inquiring about, from the standpoint of

25   irrigable acres, for Searl Brothers.  Colonel Bowen, you did

1    make a survey on that?

2            COLONEL BOWEN:  Yes, sir.

3            MR. VEEDER:  And there was no objection by the Searl

4    Brothers.  I think they were on the stand, is that not right?

5            MR. SACHSE:  That is my best recollection.

6            THE COURT:  But, Mr. Veeder, the irrigable of Searl

7    Brothers and Domenigoni Valley would have nothing whatsoever

8    to do with an apportionment.

9            MR. VEEDER:  I am not arguing that point, your Honor,

10   because I am fully aware of the geological situation.  Mr.

11   Sachse seemed to be the one concerned about irrigable acreage.

12   In regard to Searl Brothers and the Domenigoni Valley in

13   general I would say there is probably no real issue there at

14   all.

15            You are not representing Occidental any more, are you?

16            MR. SACHSE:  No.

17            MR. VEEDER:  I don't know of any other clients that

18   you have, Mr. Sachse.

19            MR. SACHSE:  I have a lot of them, but they aren't

20   very large.

21            THE COURT:  Little clients?

22            MR. SACHSE:  Little clients.  But their forty acres

23   is important.

24            MR. STAHLMAN:  Let's put this shoe on the other foot

25   for a moment.  Do you have any ideas at this time in regard

19,403

to contesting the acreage established by Vail Company?

MR. VEEDER:  I have no idea, no.

THE COURT:  But to finish this up.  I would anticipate if at some time in the future the Court should swing into some apportionment problem and a notice went out pursuant to this judgment that the Court is going to treat this evidence as being prima facie -- people were content, no other showing need be made -- I would imagine we would have a very short hearing on those issues.  That would not really be the problem.  There would be a lot of problems, you can guess. But I don't think that would be a problem, Mr. Veeder.

Let me ask you specifically, what figure does the record show as the irrigable acreage for Vail, Mr. Stahlman?

MR. GIRARD:  On Page 24 of his findings, your Honor.

MR. STAHLMAN:  Finding No. 55, your Honor.  It is broken down into different watersheds.  It starts on 24.  Of course, in those figures there the sum total of them would not be realistic because there are some irrigable acres that overlap into other watersheds.

This brings up a question that it might be that in these findings we should figure out and put in the total acres from any of the main creeks or tributaries.  We could do that.  It is merely a mathematical matter, your Honor. You will notice we have broken it down into different water-sheds.

1          MR. VEEDER:   You are referring to Page 23, Finding

2    No. 28 et seq?

3          MR. STAHLMAN:   Page 24, Finding 55.

4          MR. VEEDER:   I want to be sure I am looking at the

5    same thing.

6          THE COURT:   You may have the wrong copy.   This is a

7    new set lodged today.

8          MR. VEEDER:   I want to be sure I am looking at the

9    right one.   Page 24, Finding 55.   I want to be sure I have

10   the right one, Mr. Stahlman.

11         MR. GIRARD:   I would say it is somewhere in the

12   neighborhood of 35,000 irrigable acres.

13         THE COURT:   Have you had a chance to go over these

14   figures, Mr. Veeder?

15         MR. VEEDER:   No, I haven't, your Honor.   These are

16   figures I haven't totaled.   But I am assuming that this

17   comes from -- this is your soil survey, is it not?

18         MR. STAHLMAN:   Yes.

19         THE COURT:   Are you prepared to say whether the United

20   States would contest the prima facie showing made by Vail?

21         MR. VEEDER:   On irrigable acreage?   Colonel Bowen and

22   I talked about this, it must have been in October, as I

23   recall it was the 15th of October, and at that time I believe

24   there was an agreement on the total irrigable acreage in all

25   subwatersheds.

1          Isn't that right?

2          MR. STAHLMAN:  I don't recall that.  I don't believe

3     we did that because it was done piecemeal.

4          MR. VEEDER:  The Colonel checked these, however.

5          MR. STAHLMAN:  Colonel Bowen checked these.  In fact,

6     some of these are his own surveys, particularly on the Santa

7     Rosa.

8          THE COURT:  In the Vail figures is there some of this

9     illusory acreage?

10         MR. VEEDER:  All of it up on Santa Gertrudis, I would

11    assume.

12         MR. STAHLMAN:  Up in the Santa Rosa you will find there

13    are some, yes.

14         THE COURT:  It could be irrigated, but you would never

15    get any water up there.

16         MR. WILKINSON:  We have rights in Murrieta Creek.  You

17    could take water up Murrieta Creek.  We have rights in the

18    Santa Margarita River.  It could be done, but it would be

19    costly.

20         THE COURT:  It is a possibility, but very remote

21    because of distance.

22         MR. STAHLMAN:  Yes, it is, your Honor.

23         THE COURT:  The amount of rise in the elevation of the

24    water and the pumping charges and all that sort of thing.

25         MR. STAHLMAN:  Where you have a large volume of

1    usable land near the source of the supply of water, that is

2    the land of course, that is going to be economically

3    developed and water used on it.

4    THE COURT:  At any rate, to finish this up, then,

5    as to the Vail irrigable acres, without specifying the

6    figures now, the figures that the Vail Company used generally

7    for their findings were those arrived at and substantially

8    agreed to between Colonel Bowen and Mr. Wilkinson.

9    MR. VEEDER:  That is my understanding.

10    THE COURT:  Then again I don't think in some future

11    problem on apportionment we have any real problem.

12    MR. VEEDER:  I am just seeking an appraisal of the

13    status of this matter, your Honor.

14    THE COURT:  Now, we were on Interlocutory Judgment

15    No. 37.  Are there any other matters in 37?

16    MR. GIRARD:  I think all of the language is reflective

17    of the final corrections made at the last session, your

18    Honor.  Mr. Sachse has checked them.  I don't know whether

19    anyone else has.

20    MR. SACHSE:  I have gone through it with the most

21    scrupulous care, your Honor.  I know I can make mistakes,

22    but it seems to be exactly in accord with our penciled

23    changes on March 6th.

24    THE COURT:  Then we may have the exhibits tomorrow,

25    and we will pass Interlocutory Judgment No. 37.

1        We will go to Interlocutory Judgment No. 35, the

2   Vail Company findings.

3        Let's take a short recess and start in on Vail.

4        Then your agenda lists the Aguanga groundwater area.

5        MR. VEEDER:  Your Honor will note on No. 5 I put a

6   note:  Should there be included Interlocutory Judgment No.

7   26 for Oviatt, No. 27 for Knox, Stardust, Gibbon and Cottle?

8   That is just something to think about when we move off Vail,

9   because we do have in the Aguanga groundwater area some

10  independent interlocutories.  I didn't know how you wanted

11  to handle it.

12       MR. GIRARD:  A final interlocutory judgment has

13  already been entered as to Oviatt and Knox.

14       MR. VEEDER:  That is right.  And Gibbon and Cottle was

15  lodged four months ago.

16       MR. GIRARD:  Longer than that.

17       THE COURT:  What about Stardust?

18       MR. VEEDER:  Stardust has not been lodged.

19       MR. SACHSE:  Stardust was included in your first draft

20  of Wilson Creek.  It is all right if it stays there.  I don't

21  want one specially.

22       MR. VEEDER:  All right.

23       THE COURT:  Take a short recess.

24       (Recess.)

25       MR. STAHLMAN:  On these Vail findings, your Honor, as

1   I recall, this is the second time around. We went through

2   them completely. There were very few changes. There were

3   some corrections and deletions that your Honor suggested.

4   The deletions we took out. And there are no major changes

5   in it.

6       MR. VEEDER: I am looking at the document of April

7   3, 1962. Is that the one we are talking about now?

8       MR. STAHLMAN: Yes.

9       THE COURT: Mine says April 4th. All right, the

10   initials you are supposed to put up on them are as of April

11   3rd, and the Clerk has them marked April 4th. We are looking

12   at the same one.

13       As a matter of form, why have any of these say "The

14   Court finds . . ."?

15       How did we start out on the other findings?

16       MR. STAHLMAN: That is not consistent throughout.

17   That merely starts that way, your Honor.

18       THE COURT: I would suggest that you start right out

19   and say "The Defendant Vail Company . . ." strike out

20   "The Court finds . . .".

21       MR. STAHLMAN: Very well. I think it is only in two

22   places, in Findings 1 and 2. We can take that out.

23       MR. VEEDER: Is it correct to say that there are no

24   changes in 1 through 20?

25       MR. STAHLMAN: Right. There is no change at all, you

19,409

1 say, in 1 through 20, yes.

2 THE COURT: On Page 2, Line 12 you list a lot of

3 people, and then you say "and that herein in these findings

4 Vail Company shall mean Vail Company, a Nevada corporation,

5 and such findings shall apply . . ." You mean ,"and the

6 term 'Vail Company' shall apply to and include any and all

7 persons claiming an interest in lands or property hereinafter

8 described as Land of Vail Company or Vail Company Lands."

9 This term "such findings" doesn't actually make much sense.

10 MR. STAHLMAN: Are you talking about Line 9, your

11 Honor?

12 THE COURT: You start out ". . . a Nevada corporation

13 . . ."

14 MR. VEEDER: We could say this, your Honor, "and the

15 name Vail Company as used in such findings shall apply to

16 and include any . . ."

17 THE COURT: All right -- "and the term 'Vail Company'

18 . . ."

19 MR. VEEDER: What is the significance of that

20 statement?

21 MR. STAHLMAN: Twice we came in and there were

22 different names in the Complaint and in the supplemental

23 complaint, and I picked out all the names that I thought

24 you applied to Vail Company, because they were not attached

25 in any way. We picked the names we figured were names we

1  knew would be identified with Vail Company.    I figured that

2  "any and all persons claiming an interest in lands or

3  property hereinafter described as Lands of the Vail Company"

4  would settle it for all time that the Vail Company included

5  all persons that you sued in the action, by first naming all

6  that we knew and then putting the catch-all in there.

7      THE COURT:  So on Line 12 insert "the term 'Vail

8  Company' used in such findings shall apply to . . ."

9      MR. STAHLMAN:  Yes.

10     THE COURT:  On Line 18 strike "The Court finds that".

11     MR. STAHLMAN:  Yes.

12     THE COURT:  On the bottom of Page 2, is it correct

13 that the Temecula Rancho is coextensive and identical with

14 Pauba Land and Water Company, or is only part of it?

15     MR. WILKINSON:  Pauba Land and Water Company is the

16 portion of the Temecula Rancho that the Vail Company owns.

17     THE COURT:  It is only a portion of the Temecula

18 Rancho?

19     MR. WILKINSON:  That is right, your Honor.

20     THE COURT:  Then on Page 2 at Line 31 it would be

21 "Certain lands" instead of "The lands" -- "Certain lands of

22 the Vail Company in the Temecula Rancho have also been

23 referred to in maps, title descriptions and recorded

24 documents as Pauba Land and Water Company."

25     Is the Pauba Land and Water Company a corporation?

1   Is it just a designation?

2       MR. STAHLMAN:  There was a subdivision map filed under

3   that name at one time, and the transfer title records refer

4   to those maps with that designation and that name.

5       THE COURT:  It is as Pauba Land and Water Company

6   tract or subdivision; isn't that what it is?

7       MR. STHALMAN:  We will check the map here.

8       Vail Company owns only a part of what was originally

9   the grant.  I think we can find a map and see just how they

10  designate it.

11      MR. VEEDER:  Wouldn't that appear on Exhibit 206-C?

12      MR. STAHLMAN:  It appears on this map, your Honor,

13  Vail Exhibit U, Pauba Land and Water Company.

14      MR. WILKINSON:  The Temecula grant was broken into two

15  pieces:  Temecula Land and Water Company and Pauba Land and

16  Water Company.

17      THE COURT:  Did the two subdivisions take all of the

18  Temecula grant?

19      MR. WILKINSON:  There might be an exception to that

20  right up -- yes, they include it all.

21      MR. VEEDER:  Exhibit 207-C (Showing exhibit to the

22  Court).

23      THE COURT:  Title passes through the title companies

24  by reference to Lot 10 in Pauba Land and Water Company.

25      MR. STAHLMAN:  That is right.

THE COURT:  Then let's say it.  Let's make a little change here.  On Page 2 start out, "Certain lands of the Vail Company in the Temecula Rancho have been referred to in maps, title descriptions and recorded documents with legal descriptions referring to Pauba Land and Water Company tract or subdivision."  Will that do it?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  On Page 3, Line 23, you have this same problem.

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  The Temecula Rancho is bigger than the subdivision of the Pauba Land and Water Company.  The Rancho was first created by grant, the grant was confirmed, the patent was issued and record in 1869, then you could put a semicolon there and say, "Portions of the Temecula Rancho were later described on the map . . ." wouldn't that be more accurate?

MR. STAHLMAN:  I think it would, your Honor.  Or you could say that portion now in Vail ownership.

THE COURT:  Well, you own more of the Temecula than this, don't you?  Don't you own more parts of the Temecula Rancho than merely the subdivision of the Pauba Land and Water Company?

M R. STAHLMAN:  No.

THE COURT:  Well, you own some town lots in Temecula,

don't you, that were originally part of the Temecula Rancho?

MR. STAHLMAN:  Yes.

THE COURT:  My question is, out of the original Temecula Rancho don't you own more than just what is now shown in the subdivision?

MR. STAHLMAN:  Yes, in the Township of Temecula we do.

THE COURT:  Then say, "Portions of the Temecula Rancho are described on map of subdivision of Pauba Land and Water Company recorded  . . ."  Now, do you own all of that subdivision?

MR. STAHLMAN:  Yes.

THE COURT:  Mr. Wilkinson says no.

MR. WILKINSON:  No, we don't own all of it.

MR. STAHLMAN:  You mean in the townsite?

THE COURT:  We are talking about the Pauba Land and Water Company.

MR. WILKINSON:  We do not own all of it.

MR. GIRARD:  You will after we get through these findings.

MR. STAHLMAN:  The Gonzales piece is not part of it.

MR. WILKINSON:  Yes, it is.

MR. STAHLMAN:  It doesn't show it on this map.

MR. VEEDER:  I would like to get back on the sled, your Honor.

THE COURT:  I am on Page 3, Line 23.

1        MR. STAHLMAN:   The Gonzales piece -- what lot is it?

2    It is not marked as a lot on there -- these lots go right

3    around it.

4        MR. VEEDER:   You are looking at 207-C-1, are you?

5    Or are you looking at Vail's Exhibit U?

6        MR. STAHLMAN:   Yes, Vail's U.   This is the subdivision

7    map where they show 8, 9, 10, 11.

8    ----

6 Fls

9

10              ----

11

12

13         ------

14

15

16

17                      -----

18

19

20                              ---

21

22

23                                  ---

24

25

19,415

Tape 6 Pl

1    THE COURT:  What about this one here?  Do you own that?

2    MR. STAHLMAN:  Yes.

3    MR. WILKINSON:  Yes.

4    THE COURT:  What about this?

5    MR. STAHLMAN:  We own that.

6    MR. WILKINSON:  We own that, your Honor, except that red

7    portion of it.

8    THE COURT:  You don't own this?

9    MR. WILKINSON:  We do not, your Honor.

10   THE COURT:  Then you don't own all of Pauba Land and Water

11   Company?

12   MR. WILKINSON:  No, your Honor.

13   THE COURT:  That is all we have to find out.  So on line

14   23 we say "portions of Temecula Rancho are described on map . ."

15   So we don't really have to face that question there about

16   whether you own it all or not.

17   No. 8.  "With the exception of the Town site of Temecula

18   and certain parcels and portions as designated on Vail Company

19   Exhibit U . . "

20   MR. STAHLMAN:  We have it correct there, your Honor.

21   THE COURT:  Which is Exhibit U?

22   MR. STAHLMAN:  That is the subdivision map I have just

23   shown your Honor.  And these findings I do think conform to

24   this map, because we have designated in here with the yellow

25   line the Vail Company ownership.

MR. WILKINSON:  Here it says "Orange indicates the boundary.  Portions outlined in blue and/or in gray indicates acquisition since March 22.  Transfers are indicated in red. The holdings, acquisitions and transfers in the Town of Temecula as well as portions excepted for roads and right-of-ways are not shown.  The true location of the Temecula River in Sections 23 and 24 Township 8 South Range 3 West is shown approximately by the dotted line."

MR. SACHSE:  What bothers me about this, George, I don't think the "certain" makes it clear at all.  You say "With the exception of the Town site of Temecula and certain parcels and portions as designated on Vail Company Exhibit U, . . . "  But how do we know certain parcels on Exhibit U?

MR. STAHLMAN:  Here is your legend on your map.

MR. GIRARD:  Is all that we are concerned with these sections here?

MR. STAHLMAN:  Yes.

MR. VEEDER:  With the exception of the Gonzales lots, Lots 25, 26, 27 and 28.

MR. STAHLMAN:  We can do that.

THE COURT:  They own part of Lot 25.

MR. VEEDER:  Yes.  Does that appear in your chain of title where this boundary line is situated in 26 and 25, for example?

MR. WILKINSON:  Yes.

P3

MR. VEEDER:  Couldn't we just copy that in the finding, then?

THE COURT:  If this was acquired later you must have got a deed for this.

MR. WILKINSON:  Yes, your Honor.

THE COURT:  First of all, I see there is a break in 26. How did this get away from you?

MR. WILKINSON:  We never did own it, your Honor.  It was deeded out prior to our acquisition.

THE COURT:  Is there a reference to that holding?

MR. WILKINSON:  Our description, I believe, covers that, your Honor.

THE COURT:  You have part of 26 there.  If it was not for that, we could just say 25, 26, 27 and 28, except the portion of 25.

MR. SACHSE:  Could you say all areas on Exhibit U shown within the orange line excepting?  I am just thinking of the easiest way of writing this.

MR. STAHLMAN:  Are you talking about the separate parcels?

THE COURT:  Where is the Town site of Temecula?

MR. WILKINSON:  On page 6 of the findings we start a description of these lands that are not within the orange line on Vail Company's U.

THE COURT:  This is other lands you own?

MR. WILKINSON:  That is right, your Honor.

P4   1        MR. GIRARD:  You don't own these now?

2        THE COURT:  We are talking about the Temecula Rancho and

the Temecula Rancho started here, is that right?

4        MR. WILKINSON:  That is right.

5        THE COURT:  And went up here?

6        MR. WILKINSON:  That is right.

7        MR. STAHLMAN:  On page 6 we referred to the other lands.

8        MR. GIRARD:  That is the lands you own now?

9        MR. STAHLMAN:  Yes.  We have taken these other lands that

were acquired since.  In other words, the unbroken chain of

title refers to this, but these having been acquired later we

treat them as other lands.

13        MR. GIRARD:  But you never say in your findings, do you,

that these lands here are excluded from the lands you own?

15        MR. STAHLMAN:  No, we relied on this legend.  We are

saying it is within this orange line.

17        THE COURT:  Let's try this for size.  We could say that

with the exception of the Town site of Temecula -- how do we

know where the Town site of Temecula is?

20        MR. STAHLMAN:  We have an exhibit on that attached to

this as referred to here later on.

22        THE COURT:  Try this for size.  I would start out "Vail

Company has owned the original grant in a continuous . . .

except for the Town site of Temecula and except for Lots 25,

26, 27 and 28, and except for Lots 6 and 7".  And then the rest

P5

1    you owned all in the chain of title.  I would try to get that

2    in there.

3        MR. STAHLMAN:  Your Honor's question on the Temecula,

4    going back to page 9 where we treat Temecula, we have lands

5    in the Township of Temecula.  Vail Company is the owner of

6    numerous parcels of land in the rural unincorporated Township

7    of Temecula, as shown on the map attached hereto, and we have

8    a description.  The previous copy we gave you had a description

9    of all the lands we owned in the Township of Temecula.  And of

10   course I think we conform also to the title description of

11   the ground water areas.

12       THE COURT:  If you had the old deed references we could

13   do it in a minute.

14       MR. STAHLMAN:  We have an abstract, but we don't have it

15   here.

16       MR. VEEDER:  This is your exterior boundary here?

17       THE COURT:  Of the old Rancho.

18       MR. STAHLMAN:  That is the Temecula.  Then of course it

19   is on the Santa Rosa.  This is the exterior boundary.

20       MR. GIRARD:  This is Lot 25.  Is this also Lot 25?

21       MR. WILKINSON:  These are blocks in here.

22       MR. STAHLMAN:  This is a different.  This Block 22.

23       MR. VEEDER:  Block 22, Lots 25, 26, 27 and 28 are the

24   ones that are excluded, is that right?

25       What does "PCL" mean?

P6

1    THE COURT:  Parcel.

2    MR. VEEDER:  Parcel 2?

3    MR. WILKINSON:  Those are added on for description

4    purposes, your Honor.

5    MR. STAHLMAN:  Here is the way that is handled there --

6    "other lands".

7    THE COURT:  I don't know whether we can do this exactly.

8    MR. GIRARD:  I think we can do it.  The only problem is

9    this portion of Lot 26, and I don't think it makes enough

10   difference where you can't just say portion of Lot 26 in your

11   findings.

12   THE COURT:  That is enough.

13   MR. VEEDER:  Your deed would reflect it, isn't that right?

14   MR. WILKINSON:  Yes.

15   THE COURT:  Is somebody going to try to write something

16   out on this?

17   MR. GIRARD:  I am trying it now, your Honor.  I think if

18   you started it out -- this is just for size -- that except for

19   the Township of Temecula and Lots 25, a portion of Lot 26, Lot

20   27, Lot 28, in Block 22, and Lots 6 and 7 in Block 3, as

21   designated on Exhibit U, and then comes Vail Company has owned.

22   THE COURT:  That should do it.  That is the original

23   chain of title.

24   MR. GIRARD:  Yes.

25   THE COURT:  Next we have the Little Temecula Rancho here,

P7

1   and you list A, B, C, D.  But you apparently also owned E and

2   F, or you sold E and F.

3        MR. STAHLMAN:  No, we never owned it.

4        THE COURT:  What is this red line doing around it?

5   "Transfers are indicated in red."  Here is E and F, the Little

6   Temecula.  It is outside of your yellow line.

7        MR. WILKINSON:  This red line has been added on here to

8   designate the Little Temecula Rancho.  The orange line was

9   our ownership.  We have never owned E and F, your Honor.

10        THE COURT:  The symbols say "Transfers are indicated in

11   red."

12        MR. VEEDER:  It is out of the chain of title, is that

13   what you mean?  This was transferred prior to your acquisition

14   of E and F?

15        MR. STAHLMAN:  Yes, that was the Wolf portion of Temecula.

16   In other words, this was the Little Temecula, wasn't it, and

17   this is what we acquired?

18        MR. VEEDER:  You acquired A, B, C and D.

19        MR. WILKINSON:  The difficulty is this line should be a

20   different shade.  It is a violet or something.  It is supposed

21   to show the Little Temecula and not supposed to show a

22   transfer.

23        THE COURT:  You own all of that now?

24        MR. WILKINSON:  No, we don't, your Honor.  We don't own

25   that portion.

19,422

P8

1    THE COURT:  Just a portion of 15 and 16?

2    MR. WILKINSON:  That is right, your Honor.

3    MR. STAHLMAN:  How did that get away from us?

4    MR. WILKINSON:  That is a funny story.

5    THE COURT:  You own the rest of this then?

6    MR. WILKINSON:  Yes, we do, your Honor.

7    THE COURT:  Then, Mr. Girard, we have to go back and make

8    another exception.

9    MR. STAHLMAN:  How wide are those lots?

10   MR. WILKINSON:  It is one-half of 15 and all of 16.

11   THE COURT:  But it is only the tail-end of it.

12   MR. WILKINSON:  They have never been a continuous chain

13   of title, so we might as well take the whole lots out.

14   MR. VEEDER:  Then your legend is not correct, is it?

15   THE COURT:  Vail Company have acquired everything except

16   this little piece in red down here.  But these lots have not

17   been in continuous chain of title and so you might as well

18   take them out of this paragraph we are talking about and then

19   put it back in later on.

20   MR. GIRARD:  What lots are they?

21   MR. WILKINSON:  Half of 15 and 16.

22   THE COURT:  It would be the south half of 15 and all of

23   16.

24   MR. WILKINSON:  That is right, your Honor.

25   MR. GIRARD:  In what block?

19,423

P9   1     MR. WILKINSON:  Block 1.

2     MR. VEEDER:  Are those town lots?

3     MR. WILKINSON:  They are not town lots.

4     MR. VEEDER:  They are not?  They are not developed?  They

5  are agricultural?

6     MR. WILKINSON:  There is a house on them.

7     THE COURT:  We have to get another color here.

8     MR. WILKINSON:  I will fix it up, your Honor, to show

9  Temecula Rancho.  I show the Little Temecula Grant.

10     THE COURT:  Then you have red here for transfers.

11     MR. WILKINSON:  This was a later addition on the map.

12     MR. GIRARD:  You can correct your map.

13     MR. WILKINSON:  I'll change the color key on the map.

14  Would that be satisfactory?  I mean the color of the outline.

15     THE COURT:  Of course, this is already recorded.

16     MR. VEEDER:  Not the exhibit.

17     THE COURT:  The colors don't show up in the County

18  Recorder's Office.  They do it by a black and white process.

19  It doesn't make a lot of difference, because so far we have

20  said you own all of Pauba Land and Water Company except.

21     MR. GIRARD:  With the Little Temecula it is all right

22  because you refer to the specific lots.

23     MR. VEEDER:  That is right.

24     MR. STAHLMAN:  This requires some explanation.

25     THE COURT:  The Rancho was partitioned in 1887.

P10

1    MR. STAHLMAN:  That is right.

2    THE COURT:  You have the book and page.  It was

3    partitioned into the Santa Rosa Nueva --

4    MR. STAHLMAN:  The Nueva is here, and the Wildomar -- we

5    have shown that.

6    THE COURT:  " . . . Vail Company owns the Santa Rosa

7    Nueva, . . the Wildomar Tract having been deeded to separate

8    ownership on November 12, 1887."  You have left out the Nueva.

9    MR. STAHLMAN:  It's all right.  You go ahead and read the

10    next one.  But there was a severance there.

11    THE COURT:  No. 13 takes care of the Nueva and the

12    Murrieta.

13    No. 14 takes up the Vieja -- " . . . separated by deed . .

14    with the exception of certain parcels . . reconveyed . . "

15    MR. STAHLMAN:  Here is the factual situation.  When they

16    created the subdivision many years ago in 1880-something they

17    sold off these parcels through here, but they have subsequently

18    been acquired by Vail Company, and it is explained here.

19    THE COURT:  Where was the Vieja line?  Was this the

20    Vieja line on here?

21    MR. WILKINSON:  That is right, your Honor.

22    THE COURT:  That ought to do it, if you are going to

23    describe these later.  Subsequently the Vieja was acquired

24    by the Vail Company.  Was the whole Vieja sold at one time?

25    MR. STAHLMAN:  Yes, they were severed.

P11   1       THE COURT:   The whole Vieja?

2       MR. STAHLMAN:   Yes.

3       THE COURT:   Then you get down to No. 15.   You are wrong,

4   aren't you?

5       MR. GIRARD:   Line 4 on page 6 is wrong, your Honor.

6       THE COURT:   "The lands of the Vail Company in the Santa

7   Rosa Rancho as shown on said map and on Vail Company's Exhibit

8   U as Rancho Vieja, excepting those parcels acquired by Vail

9   Company as hereinafter described, have been held in continuous

10   and unbroken chain of title . . "

11       MR. GIRARD:   I think it says "Said lands of Vail Company

12   on the Rancho Vieja portion of the Santa Rosa Rancho . . "

13   When you say "Said" I presume you are referring to  except

14   these little lots.

Belt6-2   15       MR. STAHLMAN:   Excepting those parcels.   That paragraph,

16   I think, takes care of the exception.   And then "such lands"

17   refers to those lands excepting land of the Vail Company.   Of

18   course, you can bring it in there again, if you want to.

19       MR. GIRARD:   Apparently they conveyed this originally

20   and then conveyed it back.

21       MR. STAHLMAN:   What they did, they subdivided it and

22   sold off some of these parcels.

23       MR. VEEDER:   When you say "sold off," it was not sold

24   off by Vail Company?

25       MR. STAHLMAN:   No, this was long before.

P12

1    MR. VEEDER:   The severance took place before you acquired

2    it.

3    MR. WILKINSON:   It was broken into two pieces.

4    MR. STAHLMAN:   And when Vail acquired it, it acquired

5    both pieces.   It then went back to a single ownership again.

6    But it had a severance there.

7    MR. GIRARD:   This is a single separate ownership except

8    for these little blocks, and these are in separate ownerships.

9    MR. STAHLMAN:   Yes.

10   MR. VEEDER:   It is only significant as to what areas you

11   are claiming to be riparian.

12   MR. STAHLMAN:   That is right, and we treat it when we

13   get to our riparian status later on, we treat that as a

14   separate parcel.

15   THE COURT:   This is incorrect, though, in No. 15, "The

16   lands of the Vail Company . . as shown on said map . . "

17   MR. STAHLMAN:   As Rancho Vieja.

18   THE COURT:   " . . on said map and on Vail Company's

19   Exhibit U . . "   What map are you talking about?

20   MR. STAHLMAN:   Referring to Exhibit AA.

21   MR. WILKINSON:   No, AA is not a map, George.

22   MR. SACHSE:   Then there is an error there.

23   MR. GIRARD:   He is referring to the map, he is going back

24   to Finding No. 12, which is a map of the Santa Rosa Rancho

25   recorded November 12, 1887.

P13 1  MR. WILKINSON:  That is right.

2  MR. GIRARD:  That is what he is referring to by "said

3 map."

4  MR. WILKINSON:  Mentioned in Finding No. 12.

5  THE COURT:  " . . and on Vail Company Exhibit U as Rancho

6 Vieja, excepting those parcels acquired by Vail Company as

7 hereinafter described, have been held in continuous and

8 unbroken chain of title . . "  It is not in unbroken chain

9 of title with the rest of it.

10  MR. STAHLMAN:  No, your Honor.

11  MR. GIRARD:  It is severed from the rest of it, but it

12 has been in an unbroken chain of title except for these lots.

13  THE COURT:  Then insert lot and map, in line 29, referring

14 to Paragraph 12.  Will that do it?

15  In No. 16 all these parcels that were severed were later

16 obtained back?

17  MR. WILKINSON:  That is right.

18  MR. STAHLMAN:  Yes.

19  THE COURT:  There were severed by conveyance several

20 parcels shown on Vail Company Exhibit U and Vail Company

21 Exhibit X.  These parcels were subsequently reconveyed to

22 Vail Company and are described.

23  MR. STAHLMAN:  That will do it, I think.

24  THE COURT:  No. 17.  "Vail Company is the present owner

25 of the following described lands . . :  Lots 6 and 7 . . The

Northwest 40 acres . . "

MR. GIRARD:  That is this piece here, your Honor.

THE COURT:  Lots 1, 2, 3 and 4, Section 23 . .

Is Riverside County here?

MR. WILKINSON:  Yes, your Honor.

THE COURT:  And this is San Diego County.

MR. STAHLMAN:  No, it is all Riverside, your Honor.

MR. WILKINSON:  It is all Riverside.

THE COURT:  You have San Diego County here.

MR. STAHLMAN:  They recorded, in the early days, in San Diego County.

THE COURT:  I see.  What is this official record on page 7, No. 3?  Is it a tract?  This is a section.  Was it subdivided?

MR. WILKINSON:  Those are Government lots, your Honor. That is a term -- when they get up to a grant sometimes they get into Government lots.

THE COURT:  Lots 1, 2, 3 and 4, Section 23 and Lots 6, Section 24.  Are you sure you are not using an assessor's map of some kind?

MR. WILKINSON:  The description is Government lots.

THE COURT:  What is this recording?  Is this the recording where you got the conveyance to you?

MR. WILKINSON:  Yes, the conveyance to us, your Honor.

MR. VEEDER:  Let me orient myself just a minute, because

P15

1   I am going to ask you a question along the line of what his

2   Honor is saying.   This is Santa Margarita River that comes

3   down here.

4       MR. WILKINSON:   It is not even the right location.

5       MR. VEEDER:   What is not even right?

6       MR. WILKINSON:   The river as depicted here.

7       MR. VEEDER:   Because when we get to page 23 of the

8   Findings the question as to the riparian nature of the land

9   does become important.

10      MR. GIRARD:   You are not relying on this exhibit for

11  your riparian land?

12      MR. WILKINSON:   No.

13      MR. SACHSE:   I think his Honor has his finger on something

14  critical here that applies to each one of these.   These are

15  the deeds of acquisition by you, not referring to a book and

16  page -- each one of these, as I understand it.   That is the

17  case, isn't it?

18      MR. WILKINSON:   Yes.

19      MR. STAHLMAN:   Yes.

20      MR. SACHSE:   Take 1.   Lots 6 and 7, Block 3 of Pauba

21  Land and Water Company, Book 836, Page 364, of Official

22  Records, Riverside County.   That is what he means.

23      MR. STAHLMAN:   Yes.

24      THE COURT:   These are the book and page of your

25  conveyances?

P16

1    MR. STAHLMAN:  To Vail, yes.

2    THE COURT:  What were you going to say?

3    MR. GIRARD:  Said conveyance being recorded in.

4    MR. SACHSE:  I think that would do it.

5    MR. GIRARD:  And then go all the way through and make

6 that change.

7    MR. SACHSE:  Do that in every one of them.

8    MR. STAHLMAN:  Yes.

9    THE COURT:  Now we come down to 3.  We have that same

10 problem, but I am still wondering what your legal is in that.

11 Because you don't ordinarily in section land get the legal of

12 lots 1, 2 and 3.

13    MR. SACHSE:  You do.  When you come to the irregular line,

14 they will say Government lots 1, 2, 3 and 4.

15    COLONEL BOWEN:  These are fractional sections, Sections

16 23 and 24 8 South 3 West are fractional sections, and it is

17 customary in those instances for the Government survey to

18 show it divided into lots, your Honor.

19    MR. VEEDER:  Mr. Wilkinson, isn't that the land you

20 acquired subsequent to the old Vail case?

21    MR. WILKINSON:  Time-wise I don't know, Mr. Veeder.

22    MR. VEEDER:  From the standpoint of the riparian nature,

23 I think it may be important.

24    MR. WILKINSON:  I believe you are right.

25    MR. STAHLMAN:  It is not included in any of the land.

P17

1    THE COURT:   Lots 4 and 5 and the Northwest Quarter of

2    Section 24.   That is the same sort of thing.   And again that

3    is the conveyance.

4    MR. STAHLMAN:   That is right.   We are going to put that

5    in all of them.

6    THE COURT:   5.   Northwest Quarter of the Northwest

7    Quarter of Section 33.   Where is that?

8    Well, we will adjourn until 2:00 o'clock.

9    (Noon recess.)

SAN DIEGO, CALIFORNIA, WEDNESDAY, APRIL 4, 1962, 2:00 P. M.

---oOo---

THE COURT: Let's go on the record and let's put a couple of these things on that we have been talking about.

First, on this matter of irrigable land we discussed this morning, the surveys made by Colonel Bowen -- check me if I am not right about this -- were the overall calculations of ground that was irrigable without taking into account economic feasibility, availability of water and matters of that sort.  Right?

COLONEL BOWEN:  That is right, your Honor.

MR. VEEDER:  Susceptible of practical and profitable irrigation.  That was the term  you used.

THE COURT:  In other words, it did not take into account the factor of its being susceptible to practical and profitable irrigation.

MR. VEEDER:  We made no effort on that.

THE COURT:  Of course, we know that much of the basement complex was irrigable, and of course we have made findings that this is illusory -- no practical use of the water would be made there.  But within the area that is embraced by the Enclave and the Vail Ranch and some of these big ranches, this factor is one that would have to be gone into further.  Right?

MR. VEEDER:  Let me give you my thinking as we went

19,433

through and put in this evidence, your Honor.   In the Domenigoni area, in the Diamond Valley area, Warm Springs area, Tucalota area, Upper Wilson Creek area, Coahuilla area, Temecula area, as we went through there, your Honor invariably asked this question:   Is it not correct that though you have found these lands to be irrigable, the claim and the right is largely illusory because of the lack of water?   And an affirmative answer was given.

THE COURT:   You are talking now largely of the basement complex?

MR. VEEDER:   I am talking of peripheral streams, not only basement complex but the peripheral streams in many areas.      When we got down below the peripheral streams and down the line drawn on Exhibit 277 and described in Exhibit 277-A, the groundwater areas, there was some reference to illusory rights, for example, in Stardust and Oviatt.   But my recollection is that you did not use the term "illusory" in regard to the areas which were overlying and which had pumping within the large Murrieta-Temecula groundwater area.

THE COURT:   So that taking up the Naval Enclave, with approximately 19,000 acres, there has to be a scaling down on that.

MR. VEEDER:   There would have to be if an apportionment were undertaken.   This was my thinking on it, your Honor.   We would have the maximum acreage which is already in the record.

19,434

1    Then the question in an apportionment turns on the proposition

2    whether in the light of the available supply of water those

3    lands can be practically and profitably irrigated.

4         THE COURT:  Right.

5         MR. VEEDER:  That is the only element, in my view,

6    that was requisite for the apportionment.  My view has been

7    that the data that went in is evidence, and as such it would

8    be scaled down based on the yield of the stream as related

9    to the demand.

10        THE COURT:  The evidence that went in lacked that one

11   element.

12        MR. VEEDER:  That was the one element that would be

13   requisite for an apportionment, your Honor.

14        THE COURT:  Likewise, the Vail area would be scaled

15   down terrifically.

16        MR. STAHLMAN:  No, I don't think so.  I think all that

17   land within the Murrieta-Temecula groundwater area would be

18   susceptible to practical and profitable irrigation, because

19   we say that is underlain with water, and we are not concerned

20   now with whether it is riparian or underground.

21        THE COURT:  You are talking about the valleys?

22        MR. STAHLMAN:  I am talking about the valleys.  But

23   when you get outside the groundwater area, that is true of

24   Vail the same as it would be of  Pendleton.

25        THE COURT:  Let's take this area that lies sort of in

19,435

1    the triangle between Pauba Valley and Murrieta Valley.

2        MR. VEEDER:  The Buck Mesa.

3        THE COURT:  The Buck Mesa.

4        MR. VEEDER:  That is illusory, is it not?

5        MR. STAHLMAN:  No, I don't think so.

6        THE COURT:  First of all, we know that you couldn't

7    grow citrus in it, and you couldn't grow avocados.

8        MR. STAHLMAN:  Yes, it has already been determined.

9        THE COURT:  Well, some of it.  A lot of it would be

10   too cold for that.

11       MR. WILKINSON:  There are many acres that would be.  I

12   checked the weather stations  myself and I have done it for

13   years.

14       THE COURT:  Some of the high spots.  But some of the

15   low spots would be pretty cold, wouldn't they?

16       MR. WILKINSON:  Some of the   low spots would be

17   pretty cold.

18       THE COURT:  You could grow orchards, take apricots and

19   peaches, but actually these crops are a dry farming crop.  I

20   don't know what success has been had with irrigating

21   deciduous fruits.

22       MR. WILKINSON:  We have raised them on the ranch, your

23   Honor.

24       THE COURT:  By irrigation?

25       MR. WILKINSON:  By irrigation.

19,436

THE COURT: Did they do all right?

MR. WILKINSON: Very well.

THE COURT: Of course, they would take that colder area. They don't take a large water duty, though, do they?

MR. WILKINSON: It depends on the type of soil you put them on, your Honor.

MR. VEEDER: I believe, your Honor, this illusory matter becomes important. I believe that the irrigable land within the Enclave is just as susceptible to irrigation as anything.

MR. GIRARD: That isn't decided yet.

MR. VEEDER: But the point I am trying to make is, we are discussing things here in regard to Buck Mesa, for example. I think Buck Mesa is just as illusory a right as any we have on Pendleton.

MR. STAHLMAN: No.

THE COURT: We are not going to decide it today. Let's pass it.

MR. VEEDER: I want the record to show that Colonel Bowen agrees on the proposition.

MR. STAHLMAN: There is no record to show that, that I can see here.

MR. VEEDER: I am sorry it came up the way it did, really.

MR. STAHLMAN: Because that land up there, in the first

1    place, is within the groundwater area.  If the testimony holds

2    up, you should be able to put wells up there and put a supply

3    of water near the point of usage.  Buck Mesa is very fine

4    soil.  It will grow a lot of different things.  And even the

5    valleys up there will grow row crops.  So as to whether or not

6    the land is susceptible of practical and profitable irriga-

7    tion, it is.  When you get outside that area where you have

8    maybe up on Santa Gertrudis some of these other creeks where

9    you are outside the groundwater area, you might have a little

10   different situation.  You have plenty of it in the Santa Rosa.

11   There is no question about that.

12        THE COURT:  We can't decide that.  We know there would

13   be scaling down.

14        Also, in the Aguanga groundwater area you have a big

15   area of so-called bad lands that I doubt could be used for

16   much of anything.  Does the Vail Company own any of those bad

17   lands?

18        MR. WILKINSON:  Yes, we have some classified as waste,

19   your Honor.

20        MR. STAHLMAN:  Yes, they are classified as waste.  They

21   are not in this thing.

22        THE COURT:  Of course, if we had this hearing some day

23   on this matter, my first reaction would be that Colonel Bowen

24   would be the man to make the initial survey on these things,

25   and then the parties could either accept his figures or shoot

1    at them and put on their own proof, and the Court would

2    decide what was profitable and practical.

3        MR. VEEDER:  "Practical and profitable irrigation",

4    are the words of art on it, your Honor.

5        THE COURT:  So now we know we have that loose end if

6    we go into any apportionment among substantial and insubstan-

7    tial users.

8        The second thing I want to put on the record is a

9    little enlargement of Mr. Sachse's matter of terminal

10   facilities and why, for instance, use of Vail Dam for renting

11   storage space would not be the equivalent of a terminal

12   facility.

13       MR. SACHSE:  I would like to have prepared my speech,

14   but I will try.

15       Terminal storage, in the sense of use by a public

16   agency such as Fallbrook Public Utility District, means that

17   water must be available at a place where it can be made

18   available to consumers in the quantities necessary and in the

19   times when the peaks occur.  That is what "terminal storage"

20   means.  It means that when, for example, the long, hot, dry

21   winds hit the Fallbrook area and every avocado or lemon grove

22   in the place starts to irrigate at once, there must be a source

23   of supply which can be called upon to fill all the pipes to

24   maximum capacity all at once right then.  That is what

25   terminal storage is.  It is not just enough to hold water in

19,439

1    case your pipeline breaks down for a day. But it must be so

2    designed that tied into the rest of your system you can meet

3    your peak needs.

4          THE COURT: How much of a capacity is a minimum

5    terminal facility for the Fallbrook setup?

6          MR. SACHSE: I won't attempt to answer that, your

7    Honor. I don't know. I would have to ask my engineer.

8          THE COURT: What is the difficulty with DeLuz?

9          MR. SACHSE: The difficulty with DeLuz -- and I know

10   Colonel Bowen will agree with me -- is that you can't provide

11   these peak loads with a pipe unless you overpipe yourself to

12   a point that is ridiculous. The Colonel would be the first

13   to agree that if Fallbrook had to supply its peak needs with

14   pumps and pipes, that this would kick the peak up nine miles

15   from DeLuz, we would have ap a piping system, a pumping system

16   that would be ridiculous. It is much easier to serve these

17   peak needs by having a tank, to use a figure of speech, or

18   a bucket from which you can shove it out into the various

19   parts of your system when these peaks arrive. You can't do

20   it by just trying to run everything in a pipe. I am sure the

21   Colonel will agree with me. There is no question about that.

22

23

24

25

19,440

P18
Belt 8

1    THE COURT:  Then one of the things you ought to check on,

2  Mr. Sachse, as well as the relative cost of water from the

3  two dams, would be what would be the cost of the minimal

4  terminal facility.

5    MR. SACHSE:  Your Honor, I have.  The only chance I have

6  had to discuss this with anyone from my Board was with the

7  present chairman, General Myers, on the phone briefly last

8  night, and I told the Colonel already this morning that we

9  are immediately going to start certain studies to be designed

10  to tell us everything about the cost of taking care of our

11  district from a De Luz source, except the one factor which

12  he will have to give us and that is this carrying charge or

13  whatever it is.  We will run our own estimates on what we

14  think it would cost to pipe and to pump it.  We will assume

15  a free right-of-way because it is Federal land et cetera.

16    There are a few little factors I want to mention that I

17  didn't emphasize yesterday.  Again, Colonel Bowen is familiar

18  with them.  I discussed it briefly with him this morning.

19    The Fallbrook Public Utility District, through nobody's

20  fault, is oriented completely for its distribution system to

21  take its water from east to west and from the center north

22  and south.  If you have a mental picture of Fallbrook, our

23  main street is only about a quarter of a mile or less from

24  the Ammunition Depot and all our present supply comes either

25  by big pipes from the east, which progressively naturally get

P19

1    smaller as you come out to the ends of the service area, or

2    by distribution from our River source north and south.   There

3    would unquestionably be some cost -- I don't think it would be

4    too great because, fortunately, it is only a short distance

5    from our main line to the Depot -- but there would undoubtedly,

6    if our sources were reoriented so that the water came from the

7    west instead of the east, there would undoubtedly be imperative

8    certain reconstruction of our internal distribution system to

9    make it more practical.

10       THE COURT:  You would have to run the main lines to where

11   the water presently comes in.

12       MR. SACHSE:  Right.  We would have to bring the mains

13   from, let us say, the Depot boundary far enough in to tie in

14   to the present distribution mains.

15       There is one thing I really regret I didn't mention.  If

16   this is going to Mr. Clark, I want to say this particularly.

17   I regret that I didn't think fast enough.  They used a figure

18   of some seven million dollars in referring to our project,

19   which I presume he got from the Montgomery Report.  Well, it

20   must not be overlooked that about a million and a half or so

21   of that figure is involved in the De Luz project also.  In

22   other words, it is in distribution systems which are included

23   as part of our own project.  In other words, it is deleted

24   either from our cost or it is added to the De Luz cost, to

25   treat the two costs fairly.  Do I make myself clear?

P20

THE COURT:   I don't know whether I understand.

MR. SACHSE:   Our total cost, the seven million figure that he used, includes not only the dam but the distribution lines are included in that seven million.   If that seven million works out, that would be $42.00 an acre foot, whatever it is.   We have to either include those same distribution systems in, we figure, with the De Luz water costs, or we have to delete that money when we figure our costs.   In other words, you need a distribution system regardless of which system you use, regardless of the way the water comes.

THE COURT:   This is an enlarged new distribution system you are talking about.

MR. SACHSE:   Yes.

THE COURT:   So it would have to go in regardless whether you got the water from De Luz or from the Fallbrook site.

MR. SACHSE:   Yes, your Honor.   But the point is that this $42.00 per acre foot includes the cost of the distribution system.   So we would have to include the cost of the distribution system in working on our De Luz cost, if we are going to make an honest comparison.   This all has to be done with engineering work.

MR. GIRARD:   Is your engineer going to make recommendation or a study as to the minimal terminal facilities you might be able to develop at your dam site?

MR. SACHSE:   I am going to ask him to.   And I asked Ace

P21

1   this morning what he thought his chances were, from his

2   knowledge of that River, in putting in, I am sure it would

3   have to be, a concrete down to bedrock to spill over the top.

4   Because I have enough of a picture of those gorges to know

5   you couldn't get a spillway in there very well.  But I am

6   going to ask Mr. Smith to try to make some studies on what

7   it would cost to provide a very low level concrete structure

8   down there somewhere in the bottom that the water would run

9   right over the top and go on down the stream.  I can't even

10  guess what the cost might be.  Maybe Ace has an idea, but I

11  don't.

12          COLONEL BOWEN:  May I raise an inquiry in regard to this

13  terminal storage, your Honor?

14          THE COURT:  Yes, sir.

15          COLONEL BOWEN:  Mr.  Sachse is absolutely correct if,

16  say, the De Luz Reservoir were the only source of water they

17  had available to them.   Then the main line from the De Luz

18  Reservoir and the pumps would have to be constructed of

19  sufficient size to take care of their peak demand.  However,

20  I envision that they would continue to take water from the

21  acqueduct as it flows through there and storage in the De

22  Luz Reservoir or even in the Fallbrook Reservoir is an

23  additional supply which can be drawn on to meet the peak

24  demand.

25          MR. SACHSE:  That is absolutely right.  The trouble with

P22    1    the acqueduct supply, as far as meeting peaks is concerned,

2    is that you are prohibited from changing your draft order on

3    the acqueduct without a 48-hour notice.

4        MR. VEEDER:  Don't you anticipate further ahead than that

5    on terminal storage?

6        MR. SACHSE:  I am talking about these peak demands when

7    you run orchards.

8        MR. VEEDER:  The point I make is that you haven't had

9    terminal storage historically, have you?

10        MR. SACHSE:  No.

11        MR. VEEDER:  So you have gotten along pretty well without

12    it.

13        MR. SACHSE:  I will take exception to the pretty well.

14        MR. VEEDER:  I am not to gather from what you are saying

15    that you are rejecting the concept of the De Luz Dam by reason

16    of this terminal storage aspect?

17        MR. SACHSE:  If you are saying only by reason.  First,

18    I am not rejecting the concept of De Luz at all.  Let's get

19    that clear.

20        MR. VEEDER:  Because I was afraid that is where you were

21    going.

22        MR. SACHSE:  Let's get that extremely clear.  I am not

23    rejecting it at all.  But after we broke up my last words to

24    Mr. Clark yesterday afternoon, I said ~~to Clyde~~ as Goodbye that there are

25    three factors which are going to weigh with the Board of

19,445

P23

1   of Directors and me:   (1)   Priorities and legal rights, (2)

2   cost and (3) incidentals, which are very important.

3   THE COURT:  What is 3?

4   MR. SACHSE:  Certain incidentals that I will lump in one.

5   Those incidentals include terminal storage, improvements in

6   distribution facilities, ease in taking care of the needs of

7   the District, recreational values -- there is a whole hodge-

8   podge that falls into 3.

9   Those are the three things that are going to be considered.

10   THE COURT:  Let me ask this.  The Colonel just stated

11   that your pipelines from the De Luz site would have to be big

12   enough to carry your peak load out.

13   MR. SACHSE:  No I don't think he said that.  I don't think

14   they would.

15   THE COURT:  Because if you had a terminal facility where

16   you could overnight run in water your pipeline wouldn't have

17   to be as big.

18   MR. SACHSE:  That is correct.

19   THE COURT:  Because you could run it at night and use it

20   the next day.

21   MR. SACHSE:  And also accumulate a quantity.

22   I don't think Mr. Veeder appreciates what a peak is in an

23   agricultural area like Fallbrook.  Three days of hot, dry

24   winds and every person turns on his water, and if you happen

25   to be on a piece of high ground the trickle is like that out

1       of the sprinklers and nothing gets done.

2           MR. VEEDER:  I am quite aware of your problem, Franz.

3       But the thing that takes some of the steam out of it, as far

4       as I am concerned, is what I said -- you haven't had that

5       terminal storage.

6           MR. SACHSE:  And we have had a never ending problem,

7       and we feel that part of our duty as directors of this

8       district is to try to solve that problem.  With whatever

9       solution we work out, whether it is our own dam or DeLuz, I

10      expect to see it worked out.  That is one of the things we

11      are trying to do with the dam.

12          MR. GIRARD:  Let's see if I understand Ace's comments.

13      The reason you would not need as big a pipe for the DeLuz

14      site is, essentially, that you really have two pipes

15      servicing the entire area.

16          MR. VEEDER:  Two sources.

17          COLONEL BOWEN:  Yes, one from the continuing flow of

18      the acqueduct, and one from the terminal storage reservoir,

19      wherever it might be.

20          MR. GIRARD:  And you would presume that each of these

21      major pipes would serve specific areas in the district.

22          COLONEL BOWEN:  They would serve the entire district.

23          THE COURT:  They would probably both have to go to the

24      same terminal facility, wouldn't they?

25          MR. STAHLMAN:  You have another situation, too.

1      MR. VEEDER:  Has Mr. Girard had his answer yet?

2      MR. GIRARD:  As the Judge was commenting, they would both

3  have to go to the same terminal facility.  By that do you mean

4  a storage facility?

5      COLONEL BOWEN:  The balancing reservoir of the district

6  presently as it operates is well interconnected and the

7  water from either source, either the pipeline, the acqueduct

8  or the terminal storage reservoir, would go into these

9  balancing reservoirs on the high ground and from there out

10  into the distribution system.  The district problem that Mr.

11  Sachse points out is the need to have adequate water,

12  adequate pressure, adequate head in these balancing

13  reservoirs to supply the demand in periods of greatest need.

14      MR. SACHSE:  Here are the two acqueducts, the first

15  acqueduct and the second (Drawing on the easel).

16      THE COURT:  They parallel your district?

17      MR. SACHSE:  Yes.  This is way off scale.  The

18  distances are substantial.

19      The first acqueduct serves every agency in the San

20  Diego Water Authority.  Every single agency in San Diego

21  County can take water out of the first acqueduct.  Therefore,

22  every year when dry weather comes Acqueduct Number 1 is on

23  entitlement.  Our Acqueduct Number 1 service comes  way up in

24  the northeastern corner of the district and basically flows

25  into a little balancing reservoir of about one or two hundred

1    acre feet and from there it goes throughout the system.

2         Acqueduct No. 2 presently serves only a small number

3    of the agencies.   Acqueduct No. 2 is loaded with water, if

4    anybody wants it.   The problem is getting it out of it today.

5    San Diego County today has more than enough, but lots of

6    agencies can't take it.   Acqueduct No. 2 serves this.

7    Fallbrook comes in down here and feeds under our present

8    system into no balancing reservoir at all except perhaps

9    ultimately the Rattlesnake tanks on the hill, which is just

10   a million gallon tank.   This feeds right into the lines,

11   pushes the water in.

12        Our third source is down here in the River where we

13   can pump it out.   Not very much water.

14        When these peak problems arise the only fixed terminal

15   storage, any amount of balancing storage we have, is this

16   little red mound up in the district.   There is no place to

17   put it there.   Thence off into our laterals and down and up

18   and back and forth.   Number 1 gets restricted immediately.

19   This, we can have all the water we want, but we haven't got

20   any place to put it, except through the pipe.   Your valves

21   have to be opened to let us make full use of it.

22        THE COURT:  Can't you get a connection off No. 2?

23        MR. SACHSE:  We do.  All our lines are tied together

24   and you can open valves and you   run into frightful losses

25   and inefficiency in the amount of water you deliver when you

1   reverse the direction of flow suddenly, as Ace can tell you .

2   It just doesn't work too well.

3       Now, the theory on which this district is being

4   developed was that there would be a reservoir here on the

5   River.  Our main distribution lines rigged to flow basically

6   down this way and up this way.

7       THE COURT: South and north.

8       MR. SACHSE:  And out here and up here and down like

9   so.  This one to the San Luis Rey, which which is dead --

10  we can't use it any more.

11      That is the way the system is worked out.

12      To the west these lines get progressively smaller.

13  There is nothing up here but a couple of little houses.

14      If we bring water in from DeLuz, there is going to

15  have to be  a readjustment required to convince this system

16  to let it work with the source of supply from here.

17      But the critical thing is going to be to leave up here

18  in the district with a source that can be rapidly called on

19  to meet the needs of the area north of the River which is

20  the very area where your peaks are going to progressively

21  become greater because it is underdeveloped, it will have

22  the smaller lines, it is where the groves are coming in,

23  there is where the cheapest land is.  Our peaks here are going

24  to get greater and greater.  And our peak demands all can be

25  served from only one direction.  I don't care whether we have

19,450

1    DeLuz or what we have.  They can only be served from the

2    south, either from a pump here or, if our source is DeLuz,

3    by coming in here, going down and up the other way.  They

4    don't tie in and they can't tie in to these other things

5    because of the geographic situation on the River.

6         To our way of thinking, the efficient operation of

7    the district absolutely makes it imperative that there be

8    some sort of facility.  I don't say it has to be a 35,000

9    acre foot reservoir, but there has to be some sort of

10   storage at that place on the River.

11        M R. VEEDER:  What you are describing, though, is an

12   intricate part of the distribution system.  When you are

13   talking terminal storage to me, I envision 35,000 acre feet.

14        MR. SACHSE:  No, maybe balancing storage is better.

15   I don't mean terminal for season.

16        MR. VEEDER:  I am greatly concerned about my under-

17   standing.

18        MR. SACHSE:  I don't mean  terminal for season.  I

19   mean terminal for a week or for the problems that arise day

20   by day.

21        And I think maybe with that sketch you have a picture

22   of the problem, your Honor.

23        MR. VEEDER:  Putting water into a series of reservoirs

24   at night and then drawing it out, is that what you are

25   calling terminal storage?

19,451

1          MR. SACHSE:  Not if you are going to try to pin me

2    down to filling a dam at night.

3          MR. VEEDER:  I am not trying to pin you down.  I am

4    trying to get what you are talking about.

5          MR. SACHSE:  I would say a minimum of three or four

6    thousand acre feet.  I may be a way off.  I don't know.  That

7    is up to the engineer.  And I am definitely putting a  dozen

8    caveats on it.

9          MR. VEEDER:  You introduce something new that I

10   hadn't heard at yesterday's discussion.  That is my only

11   concern here.

12         THE COURT:  Of course, the Vail Company's operation is

13   by gravity.  It is a gravity flow in their lines, isn't it?

14         MR. WILKINSON:  Right, your Honor.

15         THE COURT:  You don't have gravity flow in this

16   whole Fallbrook area.

17         MR. SACHSE:  We have gravity flow throughout the

18   entire district, your Honor.  We put in boosters when the

19   critical shortages come, because without boosters the flow

20   from our good source, Number 2 Acqueduct, is just a trickle

21   up to these upper reservoirs.  So we connect the boosters,

22   even the gasoline boosters, when we have to.

23         But aside from that, under normal operation in other

24   words, we run by gravity, except for pumping out of the

25   River.

MR. GIRARD:  Of course, your new service area would not be served by gravity, regardless of where you get your water.

MR. SACHSE:  No.  For the new area we contemplate a couple of regulatory things way up in the upper corner, up on Gavilan Mountain somewhere, and another in here some-where.

MR. STAHLMAN:  You have how many in the area?

MR. SACHSE:  We have Rattlesnake, Martin Reservoir, and Lang Reservoir.    Martin and Lang really don't do much any more, with the new system.  Lang is the place we ran our boosters from.  That is all we have.

MR. STAHLMAN:  What will you do when you run into periods of years, three or four in a row, when you don't have any of this water available in the River?

MR. SACHSE:  That is why we want it up there so that we can pump water into it right in the middle of our district where we need it, the one place where it has got to be.

To answer your question, George, if there is none in the River and we don't have it stored here, then what kind of problem do we have when our only source of supply has to come in this way and still go down to the bottom and up the other way?

THE COURT:  Is your circle on the   River with the X your Fallbrook Dam site?

MR. SACHSE:  That is supposed schematic, yes.

19,453

1      THE COURT:  If you had terminal facilities there,

2   either a dam or some smaller terminal facility, would you have

3   gravity flow then to the south and to the east?

4      MR. SACHSE:  No, you would still have to pump up.

5      MR. VEEDER:  You would have to raise it about five or

6   six hundred feet.

7      MR. SACHSE:  No, you would raise it four hundred feet.

8   Our lift from DeLuz would be six hundred.  Our present lift

9   from the River is four hundred.  Our lift from the Fallbrook

10  Dam would be less because we figure on a high water level.

11  But the present lifts are, from our pumps about four hundred,

12  from the proposed DeLuz about six hundred, and nine miles

13  from DeLuz and one mile here, which makes a difference in

14  losses.

P24

1      MR. VEEDER:   I think your amplification was essential.

2  I thank you.

3      MR. SACHSE:   Thank you.

4      MR. GIRARD:   One other question.   This is for Mr. Clark's

5  consideration, too.   If you just had a terminal reservoir

6  there of two or three thousand acre foot capacity and you

7  would use that, necessarily to catch Santa Margarita River

8  water.

9      MR. SACHSE:   I don't know.   That would be something you

10  would have to work out in the agreement or the compact with

11  the Navy.

12      MR. GIRARD:   If you had a terminal facility, they would

13  allow you at least to fill it.

14      MR. SACHSE:   If we had 2,000 acre feet there, why not

15  keep it in the middle of the district and save us a few dollars.

16      MR. GIRARD:   And your long term carry over storage would

17  be at De Luz.

18      MR. SACHSE:   This would not be a safe yield reservoir.

19  But I do, of course, think it would be a full reservoir.

20      MR. WILKINSON:   This could be filled from the canyon, too.

21      MR. SACHSE:   I am glad you mentioned that, Sandy.   This

22  doesn't have to be filled through a pipe.   As by the De Luz

23  system or by this system, this can be filled, and has been

24  done by Fallbrook, by just kicking open the blowoff valve

25  which exists now in the acqueduct and we can put a meter on it

P25

1    in 48 hours and the acqueduct has done it for us and let

2    water down the River.

3        THE COURT:  Another thought --

4        MR. SACHSE:  One minute.  It is important, your Honor.

5    That, though, isn't so good today, because the only one of

6    tnose blowoff valves tnat does run over Vail, pretty deep

7    alluvium, is the one on the first acqueduct, which is the

8    overloaded acqueduct.  The second acqueduct is above the lip

9    and inside the Vail property and it is not so easy to open the

10   gate on the second acqueduct and let it run down.

11       THE COURT:  Another point -- it is very minor.  You talk

12   about the recreational value that your directors and your

13   people might put upon this dam.  If you built some minor

14   installation in the way of a terminal facility on the River,

15   wouldn't it be entirely possible at the same time to make it

16   a shallow affair where you would have the recreational

17   facilities that you talk about?

18       MR. VEEDER:  Wouldn't the evaporation kill you on that?

19       MR. SACHSE:  I think his Honor is quite correct.

20       THE COURT:  What do you have, 1200 acre feet in Lake

21   O'Neill?

22       COLONEL BOWEN:  Yes, your Honor.

23       THE COURT:  And you have a pretty good sized Lake.

24       MR. SACHSE:  I will answer your Honor unequivocally yes.

25   The real value in the recreational area is not the few dollars

P26

of revenue you might make by controlled fishing.  The real value is esthetic and psychologic and indirect increase in tax revenues that come from higher land values around it.

MR. GIRARD:  Wouldn't a smaller one be better than a big one?

MR. SACHSE:  If you had 5,000 acre feet full all year around, I would say that is better than 35,000 acre feet fluctuating.

MR. GIRARD:  Would you get any more evaporation loss than storing it in De Luz?

MR. SACHSE:  You would get less probably.  That is a good reservoir site because it is deep and narrow and has a small surface area.

THE COURT:  Have we said enough about this?

MR. VEEDER:  I want to thank you.  This issue was worrying me this morning.

MR. SACHSE:  This is addressed directly to Mr. Clark. That I am definitely requesting that these studies be made just as rapidly as possible and I am taking for granted that we have authority to work as closely as possible with Colonel Bowen and to find out everything we can about where the pipeline goes, the best he can tell us, so that we will know distances, so we will know elevations, so we will know all the other things involved, and I will request that just as soon as there is any decision arrived at in Washington as to

P27

1  the carrying charge or service charge or whatever it is, that

2  we be advised because our figures are going to be meaningless

3  without them.

4       THE COURT:  And outside of the various problems you have

5  presented us, you are not turning your back on De Luz?

6       MR. SACHSE:  Absolutely not, your Honor.

7       THE COURT:  All right.

8       Let's get back to the Vail Findings, unless somebody has

9  something else to say.

10       MR. GIRARD:  I think we were on page 7, your Honor.

11       THE COURT:  Yes.  All down the line here these recording

12  references are the deeds?

13       MR. STAHLMAN:  Yes, your Honor.

14       MR. VEEDER:  That is the conveyances to the Vail Company.

15       MR. GIRARD:  Said conveyances recorded in book such and

16  such, each one of them.  It goes down through 9, 10, 11 and 12.

17       MR. STAHLMAN:  Yes, the bottom of page 8.

18       MR. GIRARD:  I have them all written in mine, your Honor.

19       THE COURT:  These are of the conveyances and not of the

20  legal description.

21       MR. SACHSE:  Yes, that same insertion has to go in

22  everywhere.

23       THE COURT:  How about No. 11?

24       MR. GIRARD:  11 would go in right there, right after

25  Range 1.

P28

1    THE COURT:  You are on 10.

2    MR. GIRARD:  Down at the bottom, said conveyance being

3    recorded in Book 202.

4    THE COURT:  Line 27.

5    MR. GIRARD:  Yes.

6    THE COURT:  No. 12.

7    MR. GIRARD:  On 12 it would go in on line 30.

8    THE COURT:  All right.

9    MR. GIRARD:  I think Mr. Veeder checked out these lots

10   at the recess, so that they correspond to this.  I am speaking

11   of the lots referred to on Findings 1 through 12.

12   MR. STAHLMAN:  Finding 17, 1 to 12.

13   THE COURT:  We go to Finding 18 then.  Is this reference

14   here again a map reference or a recording reference, Book 5,

15   on page 9?

16   MR. WILKINSON:  That is a map reference, your Honor.

17   MR. STAHLMAN:  That is a map reference, yes.

18   THE COURT:  In Map Book 5, yes.

19   MR. STAHLMAN:  That Exhibit A, although it is not on

20   here, we haven't changed the copy at all that was attached to

21   the first.

22   THE COURT:  What exhibit?

23   MR. STAHLMAN:  On lines 5 and 6.

24   MR. GIRARD:  That is the description of the lands.

25   MR. STAHLMAN:  We have tabulated all the lots and put them

P29

1     in an exhibit at the end of the Finding.

2          THE COURT:  All right.  That is just the township lots.

3          MR. STAHLMAN:  Yes.

4          THE COURT:  Stream System.

5          MR. STAHLMAN:  That is really a heading and Temecula Creek

6     is one of the sub-heads describing the various creeks that

7     traverse Vail properties.

8          THE COURT:  Have you got a number of them?

9          MR. STAHLMAN:  Yes, there is Temecula, and on page 11

10    there is Murrieta, on page 12 Tucalota, on page 13 Long Valley

11    Creek, and on page 14 Santa Gertrudis.

12         THE COURT:  If they are all part of this stream system

13    heading, should we put (a), (b), (c) in from of Temecula, et

14    cetera?

15         MR. STAHLMAN:  I think that might be a good idea.

16         THE COURT:  (a) Temecula Creek.

17         MR. STAHLMAN:  Yes.

18         THE COURT:  We will do it as we go along.

19         MR. STAHLMAN:  We made one correction on page 9, your

Belt 10

20    Honor.  We were working on this at noon, anticipating some

21    of these things.  Finding No. 20, on line 22, where it says

22    "alluvium in the bed of said River overlays," scratch out the

23    word "overlays" and put in "alluvium in the bed of said River

24    comprise in part the lands of Vail Company in the Vieja

25    portion".  I think we have checked these very carefully.

P30

THE COURT:  I wonder if in 19 -- this is just a suggestion -- we should say something to the effect that the various parts of the stream system are described in other interlocutory findings and judgments and the pertinent parts on the lands of the Vail Company are described hereafter.

MR. STAHLMAN:  That is right.

THE COURT:  Because that is what we are doing.  You are not describing the whole stream system.

MR. STAHLMAN:  No.

THE COURT:  What do you think of that, Mr. Girard?

MR. GIRARD:  Fine, your Honor.

THE COURT:  You are the official scrivener.  How did you word it?

MR. GIRARD:  That in other findings more detailed descriptions of the Santa Margarita River and its tributaries have been made.

THE COURT:  Hereafter are described the parts of the stream system on Vail land.

MR. STAHLMAN:  Which traverse only Vail properties, something to that effect.

THE COURT:  Have you checked out these section numbers?

MR. STAHLMAN:  Yes, I think we went through this, your Honor.  We very carefully traced the stream from the maps that were used in describing it.

MR. SACHSE:  On page 9 we have to take care of Sandy's

P31

1    spelling.   In the last line the spelling is s-i-t-e.

2        THE COURT:  Yes.

3        " . . where said Rancho abuts . . ."  Does the stream run

4    down through the Santa Rosa further instead of over here?

5        MR. WILKINSON:  It touches in here and wanders through

6    here.  This is an approximate line, this dashed line.

7        MR. VEEDER:  We can't agree to that.

8        MR. STAHLMAN:  Let's look at the exhibit.

9        MR. VEEDER:  Looking now at you Exhibit U.

10       MR. STAHLMAN:  It is not our U.  Exhibit U is not the

11   one that shows the River.

12       THE COURT:  United States Exhibit 70.

13       MR. STAHLMAN:  Exhibit U is only used for the purpose

14   of the land.

15       THE COURT:  They refer here to U. S. Exhibit 70.

16       MR. VEEDER:  That same flows across lands of Vail Company

17   in Section 23, including Vail lands in Lot 4.

18       MR. WILKINSON:  Here is the area we speak of right here.

19       THE COURT:  That is that peak.

20       MR. WILKINSON:  Here is the Grant line here.  Here is

21   the portion that shows right in here as Lot 6 in Section 24.

22       MR. SACHSE:  Isn't this the one that no one knows exactly

23   where this jibes with the boundary line?

24       MR. GIRARD:  There is a photograph that shows it, too.

25       MR. STAHLMAN:  Yes.

19,462

P32

1    MR. GIRARD:  We went all over this once before your Honor.

2    MR. STAHLMAN:  Yes, we had the photograph out the first

3    time we went over these findings.

4    THE COURT:  This is Santa Rosa.

5    COLONEL BOWEN:  This is the Santa Rosa boundary, your

6    Honor.

7    THE COURT:  That is the only contact with Santa Rosa, if

8    there is a contact.

9    MR. STAHLMAN:  The photograph shows it.

10   MR. VEEDER:  This is an approximate line.  This is not.

11   MR. STAHLMAN:  This is your exhibit that you are using.

12   MR. VEEDER:  We are using this for geology.  Do we have

13   the quad on this, one of the 29 Series?

14   MR. SACHSE:  Is this a question whether or not the Santa

15   Rosa is riparian to the Santa Margarita River?

16   MR. VEEDER:  Yes.

17   THE COURT:  It seems to me we did go over that before and

18   found it hit the Santa Rose in one spot.

19   MR. STAHLMAN:  That is right.

20   COLONEL BOWEN:  That point is shown on Exhibit 29-K, the

21   point earlier examined on Exhibit 70.

22   MR. VEEDER:  Isn't it just an approximate line?

23   THE COURT:  I never saw this spot before below the gorge

24   where it hit the Santa Rose.  I remember the Murrieta cuts

25   across the Santa Rosa further up.  But I have never been into

P33

1 this before.

2   MR. STAHLMAN:  We discussed it here once before, your

3 Honor.

4   THE COURT:  Wasn't it the Murrieta cutting the other

5 corner?

6   MR. STAHLMAN:  That goes across 1,500 feet up there.

7   MR. VEEDER:  I have to say based on my conversation with

8 Colonel Bowen that we are not in a position to make an agree-

9 ment that that is presently riparian.

10   MR. STAHLMAN:  What are you going to do with it?

11   MR. VEEDER:  Because of the very fact that it says

12 "approximate boundary."

13   MR. GIRARD:  Is there a photograph of that area, Ace?

14   THE COURT:  On that map the stream does not actually

15 hit the Grant.

16   MR. VEEDER:  That is what I mean.

17   MR. SACHSE:  The confluence is downstream.  Santa Rosa

18 is not riparian anywhere except here, is it?  That is for

19 sure.  If it is riparian at all, it has to be riparian at

20 this point.

21   MR. VEEDER:  I am not even agreeing with that.

22   MR. SACHSE:  I am saying if it is, it has to be here.

23 But suppose it did touch it.  I would like to ask Colonel

24 Bowen how much of it is riparian to the Santa Margarita River

25 -- remembering our downstream confluence problems.

P34

1    COLONEL BOWEN:  Only that portion of the watershed.

2    MR. SACHSE:  Only that portion of the watershed.  It

3 would be a little thing right around here is all that would

4 be riparian.  Maybe it is de minimus.

5    MR. STAHLMAN:  But it is riparian.

6    MR. SACHSE:  This downstream confluence, even if it

7 touches, it would probably be a little piece like so.

8    MR. STAHLMAN:  It isn't much.

9    MR. VEEDER:  It becomes less as we talk.

10    THE COURT:  You could build a house up on that hill and

11 have water from the River.

12    MR. GIRARD:  I am not so sure that that is right.  If any

13 portion of it touches, doesn't it, as against the United

14 States, all drain back into the Santa Margarita River?

15    MR. SACHSE:  I got you all the books on it.

16    THE COURT:  What about Sandia Creek?

17    MR. SACHSE:  The confluence is below their land.  They

18 are riparian to Sandia.  But this portion isn't riparian.

19 The portion between here and here would not be riparian.  Right

20 here somewhere is the dividing line and the stuff that drains

21 into this creek would not be riparian to the Santa Margarita

22 River.  That is exactly the same thing you just dashed out on

23 the Depot.

24    MR. STAHLMAN:  Exactly the same thing that exists in the

25 Vail case, too.

P35

1    MR. GIRARD:  Isn't the result exactly the opposite as

2  against downstream people?

3    MR. STAHLMAN:  No, it is riparian to two different creeks.

4    MR. VEEDER:  Colonel Bowen told me he thought he would

5  have to survey to make the decision.  I have no desire to

6  argue the point at this time because --

7    COLONEL BOWEN:  Your Honor, if I may orient you, referring

8  to this aerial photograph and tying it into Exhibit 29-K --

9    THE COURT:  This is it here.

10    COLONEL BOWEN:  Your Honor has his orientation complete,

11  sir.

12    MR. STAHLMAN:  Quite a little stretch of alluvium there,

13  Bill.

14    COLONEL BOWEN:  However, the photograph does not show

15  the boundary, does not refer adequately to the boundary of

16  the Santa Rosa Grant.

17    THE COURT:  Is this part of the Grant line here?

18    MR. VEEDER:  I don't know, your Honor.

19    MR. WILKINSON:  No, your Honor.  That is the old fence

20  line.  That was settled in court some three or four years ago.

21  They moved the ranch corner on us, and they took it to court

22  and got the thing straightened out.  They moved the other

23  ranch corner away down where your elbow would be.  This was

24  the end that was moved.

25    THE COURT:  Looking at this from above, is this the high

P36

1    ground here?

2        MR. WILKINSON:  Yes, your Honor.

3        THE COURT:  Runs off this way and that way?

4        COLONEL BOWEN:  Yes, your Honor.

5        MR. VEEDER:  I think Mr. Wilkinson raised the point.  We

6    have the approximate boundary here now.  Is it changed now?

7    I am now looking at Exhibit 29-K.  Is the corner on 29-K

8    correct, or has it now been changed, Mr. Wilkinson?

9        MR. WILKINSON:  It has been changed, as far as I know,

10   in the lawsuit settled four years ago.

11       MR. VEEDER:  The point being 29-K is reflective of the

12   boundary line in 1948.  There has been a change.

13       MR. STAHLMAN:  Yes, there has been a change.  The pie-

14   shaped piece went down further here and came down here.  That

15   boundary line comes this way from what they thought it was.

16       THE COURT:  First let's see where some of it is riparian,

17   if it does touch.

18       MR. GIRARD:  As I read the case -- and I think there are

19   some other cases -- this is my offhand view, that as against

20   upstream people only this part where it drains within the

21   point where it touches, I think, in my view -- I want to look

22   at it a little more carefully -- against the Navy downstream

23   all the Santa Rosa land, except the small little tracts that

24   were severed, would be riparian.

25       MR. VEEDER:  Not applying the rule that you have

P37  1    tendered in regard to Fallbrook Creek.

2         MR. GIRARD:  Yes, because if took it here and used it

3    here, it would all get back to the River because it all drains

4    this way.

5         MR. VEEDER:  You don't know what I am saying.  You have

6    a crest away back up here.

7         MR. SACHSE:  I think Bill is right, but I am not sure.

8         MR. GIRARD:  I don't think you are, because they make

9    the distinction here as to upstream owners, but they don't say

10   as to downstream.

11        MR. STAHLMAN:  Mr. Wilkinson went up and looked at it

12   and that is what gave us the idea and then we got the maps

13   out and it showed.

14        MR. VEEDER:  Do you have a cornerstone?

15        MR. WILKINSON:  We have a cornerstone.

16        MR. VEEDER:  Do you have the description from the decree

17   quieting title?

18        MR. WILKINSON:  It is a Riverside case.  Frankly, I was

19   not in on it, so I don't know how it went.

20        MR. VEEDER:  In the decree quieting title they would

21   necessarily describe metes and bounds.

22        THE COURT:  Isn't the rule this, that as to what is

23   riparian you take any given owner and everything upstream of

24   him he is concerned with, everything downstream of him he is

25   not concerned with.  So it depends upon the location.  As to

P38

1   the Government, the Government is concerned because it is

2   downstream and this is a diversion upstream.  As to somebody

3   above here, they are not concerned with this.  It depends on

4   the location of the fellow's land.  Read what they say.

5       MR. SACHSE:  I think Mr. Girard is right.

6       MR. GIRARD:  As against the United States all this land

7   in the Santa Rosa, if this little tip touches, is riparian.

19,469

MR. SACHSE:

"The rules governing relationships of the watersheds of a main stream and those of its tributaries, so far as they bear upon riparian rights within the respective watersheds, are as follows:

"Each tributary is considered  a separate stream with regard to lands contiguous thereto above the junction, so that land lying within the watershed of one tributary above that point is not riparian to the other stream.

"As against lower riparian owners located below the confluence of a main stream and a tributary, however, the watersheds of such main stream and of the tributary stream constitute parts of a single watershed."  (Holmes v. Nay)

(Hutchins' "The California Law of Water Rights, pp. 202, 203)

- - -

19,470

MR. VEEDER:  Before the rule is applicable at all, I
think it has to be determined that it actually abuts upon
the stream.

THE COURT:  Shouldn't we do this?  This is largely an
academic question presently.  Shouldn't we say that the
evidence is not sufficient to permit a determination whether
the Santa Margarita River abuts on the Santa Rosa and that
a survey would be necessary to determine it?  The Court
therefore makes no finding until some other time.  It would
be a simple matter.  You get your deed, you have your line,
your have your cornerstone, you run it across and find out.
Or what?

MR. STAHLMAN:  Why couldn't we say that from the
evidence here it appears that it does, but the Court is not
finding certainly at this time, something to that effect?

MR. VEEDER:  The Court said just the contrary.

THE COURT:  If you would put a magnifying glass on
this and enlarge this, this blue line wouldn't hit that red.

MR. WILKINSON:  It would hit the alluvium on the stream.
The high part would hit that line, your Honor.

MR. STAHLMAN:  That is where you make your determina-
tion, as to what the high water mark is.

THE COURT:  You could say that from the evidence it
either abuts or runs very close, but the Court would not make
a finding and should await a survey.  Is that all right?

MR. STAHLMAN:  Okay.

MR. GIRARD:  How hard is it to make a survey?

THE COURT:  As a matter of fact, the chances are that in my lifetime you would never want to find out.  Isn't this hilly as a whole?

COLONEL BOWEN:  Very rough, your Honor.

MR. STAHLMAN:  Yes.

MR. WILKINSON:  2,600 irrigable acres out of 13,000 there.

MR. VEEDER:  Wouldn't you say this is purely an illusory right?

THE COURT:  Wait a minute.  Where are these 2,600 acres?  You mean in the whole Santa Rosa?

MR. WILKINSON:  No, within the main stem and the DeLuz.

MR. STAHLMAN:  And within the Vieja portion of the ranch only.  That is where our line of demarkation comes.

THE COURT:  This thing we are looking at is the Santa Rosa.  It hasn't anything to do with the Vieja.

MR. STAHLMAN:  It is the Vieja portion of the Santa Rosa.

THE COURT:  Pardon me.

MR. VEEDER:  Your line doesn't look the same as it does on 29-K.

MR. WILKINSON:  It is not intended to.

MR. VEEDER:  That is the point I am trying to make. Does your Exhibit U reflect the quiet title decree?

MR. GIRARD:  No, that is a quiet title exhibit.

THE COURT:  It is an older map.  They are not using Exhibit U for title.

MR. VEEDER:  I appreciate that.  They are looking at several different maps and I am just trying to orient myself.

THE COURT:  Let me ask you:  You say in all Santa Rosa the total is 2,600 acres?

MR. WILKINSON:  No, sir.  Just the drainage and the main stem and the Sandia.

MR. STAHLMAN:  That is right.

THE COURT:  Where is Sandia?

MR. STAHLMAN:  In other words, there is a divide in through here.

COLONEL BOWEN:  Your Honor, Sandia is shown on Plaintiff's Exhibit 70, originating on the Santa Rosa grant and going down to its confluence with the Santa Margarita River.

MR. STAHLMAN:  Is this your Santa Margarita watershed line here?

COLONEL BOWEN:  That is the Sandia Creek watershed line.

MR. STAHLMAN:  In other words, it would take from here and go up to where the grant line is.

THE COURT:  And here is your divide up here, isn't it?

COLONEL BOWEN:  Yes, your Honor.

MR. STAHLMAN:  And then it is also demarked up here by the severance line between Vieja and Mueva.

THE COURT:  The severance cuts across DeLuz Creek.

MR. VEEDER:  DeLuz Road.

THE COURT:  DeLuz Road.

COLONEL BOWEN:  The severance seems to follow fairly close to the watershed boundary of Sandia Creek.

MR. VEEDER:  I think, your Honor, what you said is probably all that you can do right now.

THE COURT:  How high is this land above the River?

MR. WILKINSON:  It is no higher than the Fallbrook pump.  I think 354 feet is the lowest part you can use any water on.

MR. STAHLMAN:  Here is another factor, however.  You probably will not have too much water running through there in the summertime.

THE COURT:  Actually, I don't think you are going to make very much hay with these 2,600 acres from this point, because at this point where you could get water you are down in a rocky defile.  You have no younger alluvium, and you have little water running in the summertime.

MR. STAHLMAN:  That is true.

THE COURT:  And this is going to pretty illusory.

1    I think the best thing to do is merely to say that the

2    evidence is uncertain and to await a survey and later on

3    cross the bridge about how much of that 2,600 acres could be

4    irrigated out of what would flow past that Gorge.

5    MR. STAHLMAN:  Could we say that the evidence at this

6    time --

7    THE COURT:  I wouldn't want to have a couple horses

8    and a garden depending upon the water that would go down that

9    gorge in the summer.

10   MR. STAHLMAN:  That may be true.  But Sandy went down

11   there and he got the maps out and saw where it touched, and

12   so we feel --

13   THE COURT:  Certainly we can't make any other finding

14   but that it is uncertain.

15   MR. STAHLMAN:  That it is uncertain, that the Court

16   retains jurisdiction, and if the question arises the Court

17   will determine it.

18   THE COURT:  Yes.

19   MR. STAHLMAN:  Okay.

20   MR. WILKINSON:  Where this came up, we put a new

21   fence in there and I surveyed the fence line.

22   THE COURT:  And you crossed the alluvium, whatever

23   there was, of the stream.  There is not very much alluvium,

24   is there?

25   MR. WILKINSON:  It is pretty rocky down there, your

1    Honor.

2         MR. STAHLMAN:  We fully appreciate that this is a

3    marginal situation.

4         MR. VEEDER:  Very near the margin.  It is a boundary

5    situation.

6         MR. STAHLMAN:  I can see Mr. Veeder with the same

7    question if he were on the other side.

8         THE COURT:  Let the record show laughter after the

9    reference to "marginal situation."

10        I don't think we have a problem.  Mr. Girard, will you

11   draft a finding on this?

12        MR. GIRARD:  Yes, your Honor.

13        MR. STAHLMAN:  It is not as marginal as the Ammunition

14   Depot.  We got a little gracious and gave Mr. Veeder some

15   water down there.

16        MR. VEEDER:  Note big silence.

17        MR. STAHLMAN:  Let the record show silence by Mr.

18   Veeder on that point.

19        MR. VEEDER:  I am still looking into that.

20        MR. GIRARD:  I would think you would drop that like a

21   hot potato.

22        MR. STAHLMAN:  Maybe we can amend your finding to say

23   the Court makes no determination as to the Ammunition Depot

24   at this time.

25        Where were we, your Honor?

THE COURT:  We are down on Number 20, at Line 24, "where said Rancho abuts on Lot 6 . . . Said stream flows across lands of the Vail Company . . ."

MR. STAHLMAN:  We are drawing a finding on that, your Honor.

I might say Mr. Girard is coming out with us tonight.

THE COURT:  The last sentence you have to take out and substitute something for that.    " . . . Rancho abuts on Lot 6 of Section 24. . ." that is correct.

MR. STAHLMAN:  In other words, where it says "Said stream then flows across lands . . ."

MR. GIRARD:  That is not the crucial thing, is it, your Honor?  Isn't what you are concerned with on Line 22 where you say "The Santa Margarita River flows southwesterly through Temecula Gorge over the lands of Vail Company in Section 24, Township 8 South, Range 2 West" -- is this the crucial point -- "and the younger alluvium in the bed of said river comprises in part the lands of the Vail Company"?

MR. SACHSE:  That is the question.

THE COURT:  On the Vieja portion.

MR. GIRARD:  Yes, on the Vieja portion.

THE COURT:  And the last sentence --

MR. STAHLMAN:  No, the last sentence is different.

MR. GIRARD:  I think the last sentence is correct.

MR. STAHLMAN:  That is correct.

10,477

MR. GIRARD:  But the crucial thing is whether this goes over the younger alluvial deposits in Lot 6.

THE COURT:  All right.

MR. GIRARD:  Where is 23, George?  There is no question on that, is there?

MR. STAHLMAN:  No.  It does flow through these other acquired lands.

MR. VEEDER:  You have been saying we are not using Exhibit U for the purpose of identifying the stream course.

MR. GIRARD:  Use this, then.  Is there any question it flows through Section 23?    I don't know.  It is my under-standing that it does not.

THE COURT:  The Vail Company land runs clear down to here and up to there.

MR. WILKINSON:  That is right, your Honor.

THE COURT:  And then about the center it runs up here and then across something like that.  I don't think there is much doubt.

MR. VEEDER:  No.  That is a subsequent acquisition.

THE COURT:  All right.

You are going to work on that, Mr. Girard?

MR. GIRARD:  Yes, your Honor.

THE COURT:  Well, it's 3:30.  Let's take a recess.

(Recess)

P39
Belt 12

1  THE COURT:  Where are we, 21?

2  MR. GIRARD:  21.

3  MR. STAHLMAN:  On page 10.

4  THE COURT:  On page 10, line 6, you say, "Immediately

5 after entering Vail Company lands, Temecula Creek flows into

6 the reservoir area behind Vail Dam.  In this reservoir area

7 Temecula Creek is fed intermittently by Wilson Creek . ."  Is

8 that is the area of the reservoir or upstream from the

9 reservoir?

10  MR. STAHLMAN:  It is in the area of the reservoir, your

11 Honor.

12  MR. VEEDER:  I think we should have amplification on

13 that.  We have been talking about that.  If you look on the

14 quads, you will find that that is the highest water line that

15 could be impounded.

16  MR. STAHLMAN:  The highest water line is the reservoir

17 area, and then it flows into that area to where ever the

18 reservoir happens to be.  But that is within the confines of

19 the reservoir area.

20  MR. VEEDER:  It was a hoped for reservoir area.  It has

21 not come up close enough.

22  MR. STAHLMAN:  It has not, but it still is.

23  THE COURT:  What difference does it make?

24  MR. VEEDER:  I just think it would be simpler to say --

25  THE COURT:  Where does Wilson Creek come in?

P40

1    COLONEL BOWEN:  Referring to Plaintiff's Exhibit 29-R,

2    your Honor, Wilson Creek enters the reservoir area from the

3    east.

4    THE COURT:  You say Wilson Creek enters.  Is this

5    supposed to be the potential reservoir?  Is this the actual

6    reservoir or what?

7    COLONEL BOWEN:  The dashed blue line, your Honor, which

8    is shown in Nigger Valley on Plaintiff's Exhibit 29-R is

9    approximately the high water mark if the Vail Dam were

10   completely full.  However, it is interpolated between contours

11   and probably would differ from the actual survey.

12   THE COURT:  As a matter of fact, if it doesn't hit the

13   area, then it flows down and hits Vail Lake.

14   MR. STAHLMAN:  Yes.  But the spillway crest is what

15   establishes your reservoir area.

16   MR. VEEDER:  Then let us explain what the reservoir area

17   is.

18   MR. STAHLMAN:  Vail Lake is going to shift, depending

19   upon on how much water is in it.  The reservoir areas is

20   established by the high water line, I would think.

21   MR. SACHSE:  Why don't you just say it enters upstream

22   from the Vail Dam.  I don't see what difference it makes.

23   MR. STAHLMAN:  I don't think it makes any difference.

24   THE COURT:  Why don't you just say Wilson Creek flows

25   into Vail Dam?

P41

1    MR. WILKINSON:  Vail Lake.

2    THE COURT:  Vail Lake.  That is the simplest thing.

3    MR. VEEDER:  That suits me very much.

4    THE COURT:  All right, change it.

5    MR. STAHLMAN:  The next sentence says, "In this reservoir

6    area . . "

7    THE COURT:  Where is the Arroyo Seco?

8    MR. WILKINSON:  The Arroyo Seco is right here flowing

9    from the south in Section 22.

10   THE COURT:  Where is Kolb Creek?

11   MR. WILKINSON:  Kolb Creek flows in Section 20 from the

12   south, joining Arroyo Seco.

13   MR. STAHLMAN:  But Kolb Creek does flow over Vail property.

14   MR. VEEDER:  It is a tributary of Arroyo Seco, though,

15   and Arroyo Seco is the one that enters the Lake.

16   MR. STAHLMAN:  But the creek does flow over Vail Company

17   land.  We are trying to name the creeks that flow through

18   Vail Company lands and we are merely telling where they end.

19   THE COURT:  Mr. Girard, it is a simple thing to provide

20   here that Wilson Creek intermittently flows into Vail Dam from

21   the east.  Right?  And that Kolb Creek flows into Arroyo Seco

22   Creek -- where do they join?

23   MR. WILKINSON:  On the Grant, your Honor, just north of

24   the word "Griffin Springs" here.

25   THE COURT:  --  Southwest of the Dam.  Approximately a

P42

1   mile?

2       MR. WILKINSON:  Approximately a mile.

3       MR. VEEDER:  To which are you pointing for Kolb Creek?

4       THE COURT:  Here is Kolb.

5       MR. VEEDER:  That is right.  But that does not come down

6   to the reservoir area.  Isn't this the reservoir area?

7       MR. WILKINSON:  No, that is wrong.

8       THE COURT:  What difference does it make?  Where is

9   Arroyo Seco?  Is this called Arroyo Seco all the way to the

10  Dam?

11      MR. VEEDER:  That is right.

12      COLONEL BOWEN:  That is right, your Honor.

13      THE COURT:  Kolb Creek flows into Arroyo Seco approximate-

14  ly a mile from the Dam itself, and that Arroyo Seco flows into

15  Vail Lake.

16      MR. STAHLMAN:  Okay.

17      MR. VEEDER:  That is all right.  That does it.

18      THE COURT:  During and after periods of high precipitation.

19  Did you get that Mr. Girard?

20      MR. GIRARD:  Yes, your Honor.

21      THE COURT:  Strike out the "and" there.

22      "For the first two and a half miles below Vail Dam on

23  the Pauba Rancho, Temecula Creek follows the confines of

24  Nigger Canyon over and through the highly permeable material

25  within said Canyon. . . flood plain underlain . . "  Well, I

P43

1   guess so.  The canyon upstream is Nigger Canyon?

2       MR. STAHLMAN:  Yes, your Honor.

3       THE COURT:  No. 22, the next paragraph.

4       MR. VEEDER:  Why don't you put in the exact description

5   where the confluence is on that?

6       THE COURT:  The confluence of what?

7       MR. STAHLMAN:  You mean the Murrieta and Temecula?  It

8   says with Murrieta Creek.

9       MR. VEEDER:  You have a legal subdivision on it.

10      MR. STAHLMAN:  Do you want it in there?  I don't see

11  where it adds anything to it.

12      MR. GIRARD:  I think we could just say -- I have it in

13  my Murrieta Findings, I know.

14      THE COURT:  Actually, it is not in Section 24.  It is

15  probably in Lot 24, isn't it, according to this map?

16      MR. WILKINSON:  It is Lot 24, Block 1.

17      THE COURT:  Block 22.

18      MR. WILKINSON:  I believe it is Block 1, your Honor.

19      THE COURT:  Then we are wrong in our other description,

20  because we took 22.

                                        projected
21      COLONEL BOWEN:  Northwest quarter of/Section 24, your

22  Honor.

23      THE COURT:  Those lots, Mr. Girard, that we accepted

24  before, 25, 26, 27 and 28, are not in Block 22 -- they are in

25  Block 1.

P44

1   COLONEL BOWEN:  Township 8 South Range 3 West.

2   MR. GIRARD:  What are those?

3   THE COURT:  Lots 25, 26, 27 and 28.  We had Block 22.

4   They are in Block 1.

5   MR. GIRARD:  Is the South half of Lot 15 and Lot 16 in

6   Block 1 also?

7   THE COURT:  Yes, it is all Block 1.

8   MR. GIRARD:  And Lots 6 and 7 are in Block 3.

9   THE COURT:  Lots 6 and 7 are in Block 2, aren't they?

10   MR. GIRARD:  I have Block 3.  I wanted to check.

11   MR. WILKINSON:  They are in Block 3, your Honor.

12   THE COURT:  Lots 6 and 7 are in Block 3.

13   MR. STAHLMAN:  Will you give us the description where they

14   meet?

15   COLONEL BOWEN:  The confluence of Temecula and Murrieta

16   Creeks is in the Northwest Quarter of Section 24 Township 8

17   South Range 3 West San Bernardino Meridian.

18   THE COURT:  That is a projected section, isn't it?

19   COLONEL BOWEN:  That is a projected section, yes, your

20   Honor.

21   THE COURT:  Actually, don't they converge on Lot 24 at

22   the Pauba Land and Water Company?  What were you looking at?

23   COLONEL BOWEN:  I was looking at Exhibit 15-E, your Honor.

24   THE COURT:  It would look like the northeast section to

25   me.

P45

1    COLONEL BOWEN:   It is shown on Plaintiff's Exhibit 207-C-1.

2    The confluence of Temecula Creek and Murrieta Creek is within

3    Lot 24, Block 1.

4       THE COURT:   Ace, from 29-K you said the northwest.  It

5    is in the northeast quarter.

6       COLONEL BOWEN:   Yes, your Honor, I made an error.  It is

7    the northeast quarter of Section 24.

8       MR. VEEDER:   What would you say would be the distance of

9    the confluence above the gauging station in Temecula Canyon,

10   between the gauging station and the confluence?

11      THE COURT:   On 29-K it is only a couple hundred yards.

12   H re is the confluence right here, and here is the gauging

13   station.

14      MR. VEEDER:   That is the Temecula Canyon Gauging Station

15   -- Railroad Canyon.

16      MR. SACHSE:   Santa Margarita River near Temecula.

17      MR. VEEDER:   That is what it is.

18      THE COURT:   It is not very far.

19      COLONEL BOWEN:   It scales pretty close to 600 feet,

20   between five and six hundred feet distance between the

21   confluence of Temecula Creek, Murrieta Creek and the gauging

22   station described as "Santa Margarita River near Temecula."

23

24

25

MR. VEEDER:  How far is the Murietta Gauging Station from the point of confluence of the Murrieta and Temecula Creeks?

THE COURT:  Do you want that in here?

MR. VEEDER:  Yes, your Honor.

THE COURT:  Why?

MR. VEEDER:  I would like to have a finding as to where they measure the   water for all Murrieta and Temecula Creek.  I think we     ought to have a finding on it.

MR. GIRARD:  We didn't set forth the gauging stations of the Navy as to that.

MR. VEEDER:  Yes, I did.

COLONEL BOWEN:  The gauging station known as the Murrieta Gauging Station is approximately four-tenths of a mile on Murrieta Creek above the confluence of Temecula Creek and Murrieta Creek.

MR. VEEDER:  Is the scrivener going to take that down?

THE COURT:  He wants it.  Put it in.

COLONEL BOWEN:  I believe, your Honor, those are all described fairly precisely in the exhibits that are put in, in connection with the stream flow gauging stations.

THE COURT:  The exhibits aren't findings.

MR. VEEDER:  That is right.

THE COURT:  We could refer to the exhibits.

MR. VEEDER:  It is Exhibit 21 and 22.

THE COURT:  Say approximately four-tenths of a mile. That is all right, isn't it?

MR. WILKINSON:  Are we going to name all the other gauging stations?

MR. VEEDER:  I think it is a good idea, frankly.

MR. STAHLMAN:  I don't see why you need them.

MR. WILKINSON:  You have already missed one -- Vail Dam.

MR. VEEDER:  We haven't got to Vail Dam yet.

MR. WILKINSON:  The stream goes right past it in the description of the stream system.

MR. VEEDER:  Put it in.

MR. STAHLMAN:  Under Vail Dam, we have that it is measured and metered, et cetera.

MR. GIRARD:  Is there only one gauging station on Murrieta Creek?

MR. VEEDER:  That is right -- four-tenths of a mile above the confluence.

MR. STAHLMAN:  If he wants the gauging stations -- Do you want the gauging station?

MR. VEEDER:  Definitely.

THE COURT:  Let's go ahead.  You have all that, have you, Mr. Girard?

MR. GIRARD:  Yes, your Honor.

THE COURT:  On Page 11, Line 1, "There has been at all

19,487

times perennial surface flow of Temecula Creek. . ." is that true after the construction of the dam?

MR. STAHLMAN:  No.  The next is "the location and extent of said surface flow varies depending on rainfall, . ."

THE COURT:  Have there been perennial flows since 1940?

MR. VEEDER:  No, there have not been in the channel of the stream.

MR. STAHLMAN:  There has.  In the lower part there is right now.

MR. VEEDER:  But the channel of the stream is what I am saying.

MR. SACHSE:  The stream is younger alluvium.

MR. VEEDER:  The water in the year 1960-61 was not rising in the channel of the stream.  Rather it was rising -- you have it intermittent here --  the point where it became perennial flow was --

MR. STAHLMAN:  So what?

MR. VEEDER:  Because your finding is not accurate as written.

MR. STAHLMAN:  It is.

MR. SACHSE:  Isn't this a point of rising water, and is it not in the channel of the stream?

MR. VEEDER:  Yes, it is, but you will find it dries up when it gets down to the Canterini pump.

MR. STAHLMAN:  ". . .the location and extent of said

19,488

surface flow varies depending on rainfall, weather

conditions and uses and extractions of water by Vail Company

and all other upstream users. . ."

THE COURT:   " . . .Except during periods of heavy

percipitation and immediately thereafter such surface flow

that may exist is of minor quantity."

MR. VEEDER:  Here is the point I was making.  Line 1,

"There has been at all times perennial surface flow of

Temecula Creek, . . "  Now, it seems to me important to show

that the Vail Company closed their dam, since they started

pumping the point of rising water has moved down to an area

which is north and west of the channel of the stream.

MR. STAHLMAN:  How do you know where it will be if we

get some wet years?

MR. VEEDER:  I don't know.

MR. STAHLMAN:  I know what you are driving at, Bill.

And it is quite unrealistic.  And your whole premise in these

different findings that you have submitted where you attempted

to invade over into the Vail lands in drawing your findings

on Pendleton, you have used the completely fallacious

argument on it.  The Court didn't receive it, so we left them

out.

MR. VEEDER:  But those appear on the exhibits that

are before the Court as to where Temecula Creek rises.

THE COURT:  Now   wait.  It is true that since Vail

19,489

1   Dam is closed the point of rising water is way down stream

2   on Temecula, isn't it?

3        MR. STAHLMAN:   It is true that it has moved down there

4   since.   But there are many other factors that caused it to

5   move down besides the closing of Vail Dam.   I know what he is

6   driving at here.

7        THE COURT:   What is he driving at?

8        MR. STAHLMAN:   He is driving at an attempt to show

9   that the Vail Dam has been the means of drying up the stream.

10        MR. VEEDER:   It has been a factor.

11        MR. GIRARD:   Of course, since Vail Dam has been closed

12   it has gone down.   But it has also gone up.

13        MR. VEEDER:   No.

14        MR. GIRARD:   Yes, it has.

15        MR. SACHSE:   It seems to me, trying to solve this as

16   a neutral, I don't believe Mr. Veeder's point belongs in here

17   at all.   I think the statement in Mr. Stahlman's findings is

18   absolutely correct.   Later on if in some other place there

19   is going to be comment about whether the effect of Vail Dam --

20   but this is true.

21        MR. VEEDER:   Just so it comes in some place.

22        THE COURT:   It will not be limited solely by Vail Dam.

23        MR. VEEDER:   There are three factors --

24        THE COURT:   Dry season.

25        MR. VEEDER:   Pumping.

19,490

THE COURT:  Uses and the dam.

MR. VEEDER:  That is right -- pumping, dry season.

THE COURT:  I am not going to apportion between them. Let's leave it as it is then.

MR. VEEDER:  I want to reiterate my point just once more, so it is clear to your Honor what I am saying.  But there was a time in 1961 and in 1959 where the point of rising water of Temecula was not in the bed of the stream, but rather it was, if you remember, north and west of the channel stemming from tail water coming off from fields.

MR. STAHLMAN:  And there was a time prior to that when there was surface water before the dam was built.

MR. VEEDER:  I agree with you.  But the point I am making is that the rising water in Temecula Creek that went through the Gorge did not come from the channel of the stream, but rather came from tail water off Vail's fields.

MR. WILKINSON:  That is not necessarily true.

MR. VEEDER:  I want to show you on 15-E where it was.

MR. SACHSE:  There are two of them on 15-E.

MR. VEEDER:  The stream rose in Upper Camp some place along there, it went down to the Pit well and your wells dried the creek up entirely right there.  Then the water rose north and west of the channel near a big cottonwood tree over where there was tail water from your agricultural operations, your irrigation.  Now, I say that there is a variance in that

19,491

1    sentence on the basis of those facts that I just stated.

2         MR. SACHSE:  All the sentence says is that there has

3    been perennial surface flow of Temecula Creek.  You have not

4    denied that in the least in what you have just said.

5         THE COURT:  And we are also going to find that

6    Temecula encompasses all this younger alluvium.  So it doesn't

7    make any difference it arose.  We have that finding, haven't

8    we?

9         MR. GIRARD:  When was this observed?

10        MR. VEEDER:  In 1959 and 1960.

11        THE COURT:  Let me ask this question:  On that roadway

12   leading up to the Vail Ranch and on to Anza, you have a

13   little reservoir.  Does that catch irrigation water?

14        MR. WILKINSON:  That is tail water, irrigation from

15   that field.

16        THE COURT:  Is that dumped into Temecula Creek?

17        MR. WILKINSON:  That is dumped into Temecula Creek,

18   your Honor.  It is practically the confluence with the

19   Murrieta.

20        THE COURT:  Is there an outlet from that little

21   reservoir into Temecula Creek?

22        MR. WILKINSON:  There is.

23        THE COURT:  And that is one source of water, then,

24   down the Gorge?

25        MR. WILKINSON:  That is probably where it joins the

19,492

1    Temecula Creek isn't over 300, 200 yards from the confluence

2    of the Murrieta.

3        THE COURT:  It is right nearby there, I know.

4        MR. VEEDER:  You had some rising water here.

5        THE COURT:  What year was this?

6        MR. VEEDER:  This is 1959.  You had rising water and

7    it came down a ways right down to where you have the words

8    "Pauba Ranch."  It dried up there during pumping.  And I am

9    pointing now to where it arose.  It was down in the

10   southeast of the southeast of Section 18.

11       MR. WILKINSON:  That is a spring.

12       MR. VEEDER:  You had a field there and the water came

13   down from there, and it was not in the bed of the stream

14   where it arose.  It was tail water.  We discussed it at one

15   time.  It is in the evidence.

16       MR. STAHLMAN:  If it was not for the Vail D m, this

17   thing might be further downstream.

18       MR. VEEDER:  I am not arguing the point.

19       MR. GIRARD:  Sandy says it was a spring, not tail

20   water.

21       MR. VEEDER:  It was tail water.

22       THE COURT:  Sandy, where is that little reservoir on

23   this map?

24       MR. WILKINSON:  The reservoir you refer to, your Honor,

25   is along the highway here.  Here is the highway comes right

19,493

1   through here.   The reservoir that used to be was right in

2   here.

3           THE COURT:   Is this the highway here?

4           MR. WILKINSON:   This is the highway here, this dashed

5   line, and then it gets into a solid line -- why, I don't know.

6           THE COURT:   Here is the little Y right here.

7           MR. WILKINSON:   Yes, sir.

8           THE COURT:   Then it is after the little Y, it is up

9   in here?

10          MR. WILKINSON:   No, it is before the little Y; it is

11  closer to Temecula.

12          THE COURT:   Where does this highway come in?

13          MR. WILKINSON:   Here is Highway 395.   Here is the old

14  395; it crosses the bridge where it says "River" there. There

15  is the little Y you speak of.

16          THE COURT:   As you come up on the new 395 the turnoff

17  is not shown.

18          MR. WILKINSON:   It is shown here.

19          THE COURT:   Turn back.

20          MR. WILKINSON:   Turnback before you come to the Y.

21          THE COURT:   That is the old Y.

22          MR. WILKINSON:   Yes.

23          THE COURT:   So it is right in here.

24          MR. WILKINSON:   That is right.

25          THE COURT:   It is in the area then of the older

19,494

1   alluvium.

2       MR. WILKINSON:  It appears to be, your Honor.

3       THE COURT:  What do you have, a little pipe or

4   something from that reservoir down here?

5       MR. WILKINSON:  No, sir, it just overflows and runs

6   under the highway through a culvert and runs right down the

7   stream.

8       THE COURT:  Let's resolve this.  What do you want in

9   there?

10      MR. VEEDER:  I want the statement in there that during

11  the seasons 1959 and 1960 there was no perennial flow from

12  Temecula Creek running into the canyon, but rather Temecula

13  Creek arose --

14      THE COURT:  That isn't a fair statement.  There was

15  a perennial flow.

16      MR. VEEDER:  Not into the Gorge, your Honor.

17      THE COURT:  All right, perennial flow that ran down

18  as far as the Pauba Ranch, there was intermittent flow, and

19  there was a perennial flow supplied in part by a spring --

20      MR. VEEDER:  By irrigation return water.

21      THE COURT:  -- in part by a spring, in part by

22  irrigation return, and in part undoubtedly by rising water

23  in the alluvium.

24      MR. VEEDER:  You can put all that in, if you want to.

25  But I think that is the situation.

19,495

MR. SACHSE:  The point is, I don't think it proves a thing.

MR. STAHLMAN:  It doesn't add a thing to these findings.  The only purpose of it in this finding is to base the --

THE COURT:  What do you want it in for?

MR. VEEDER:  Because I think it has to reflect the water conditions in Pauba Valley at the time of this trial.

THE COURT:  Why do you want it in?

MR. VEEDER:  That is what I want it in for, because I think it is extremely important.

MR. STAHLMAN:  He wants to use it on appeal.

MR. SACHSE:  How about trying this, George, to satisfy Mr. Veeder:  If you take out the words in the first sentence " at all times," so it reads, "There has been surface flow of Temecula Creek, the location and extent ..."

MR. VEEDER:  All right, take out "at all times".  That helps.

MR. STAHLMAN:  All right, take it out.

MR. GIRARD:  The thing is there has been perennial flow at all times.  Why take it out, if it is true?

MR. SACHSE:  I think they are right.

THE COURT:  If Mr. Veeder wants a finding, I would rather say that based upon Exhibit 15-E -- whatever that date is.

1      MR. VEEDER:  Fall of 1959.

2          THE COURT:  That there was perennial flow in the

3      surface stream bed of the Temecula from the Northwest

4      Quarter Section 14 Township 8 South Range 2 West, approximately

5      two miles down to the southwest quarter of Section 16

6      (the same Township and Range) -- these are projected sections.

7          MR. STAHLMAN:  Your Honor please, the purpose for

8      which these findings are written, as far as I am concerned,

9      rather than start to pin this thing down to something that

10     may have existed at one particular time, they could take the

11     whole paragraph out.

12         THE COURT:  What is the harm in the finding, if he

13     wants it?  There is no harm at all in the finding.

14         Thereafter, intermittent flow to the Northeast Quarter

15     Section 19 (the same range and township), and thereafter

16     perennial flow to the Gorge for a distance of about one mile.

17     Said perennial flow from the northeast quarter of Section 19

18     Township 8 South Range 2 West to the Gorge was caused in part

19     by a point of rising water in the Southeast Quarter Section 18,

20     by tail water from irrigation from the reservoir in the

21     Southwest Quarter Section 18, released into the stream, and

22     by the water rising because of the gradient -- how would you

23     state it?

24         COLONEL BOWEN:  Water rising within the channel of

25     the creek.

19,497

1    THE COURT:  -- water rising within the channel of the

2  creek.

3    MR. STAHLMAN:  Why not be consistent with the findings

4  they put on Camp Pendleton in connection with their

5  situation?  Somebody went up here on a certain date and made

6  a map and found it there at that time.  Here is the finding

7  on Camp Pendleton: "That in most years the Santa Margarita

8  River does flow within the Naval Enclave as a surface stream

9  downstream from a point in Section 5, Township 10 South,

10  Range 4 West, SBM , except during periods of substantial

11  precipitation and runoff.  It may, in certain areas, flow

12  intermittently in its course as a surface stream, then

13  disappear and flow underground, and then again rise to the

14  surface.  That the points where the water rises to the

15  surface and flows as a stream, over the younger alluvial

16  deposits may vary considerably.  That said variance in points

17  of rising surface flow is the result of pumping of the waters

18  contained in the younger alluvial deposits by the United

19  States of America, of pumping and diversions of the waters

20  of the Santa Margarita River and tributaries thereto upstream

21  from the Naval Enclave, and of fluctuations in precipitation

22  and consequent runoff."

23    Why can't we be consistent insofar as the rising water

24  is concerned and follow this type of finding that they have

25  in Finding No. 18?  Instead of pinpointing something down to

1 where somebody went out there at some particular date in the

2 year and found a point of rising water.  We know as a matter

3 of fact that you can go out there at different times of the

4 year and find this in different spots.  So, to pin it down as

5 Mr. Veeder wants it here, to make it a different type and

6 kind of finding than he has in the Pendleton findings --

7 I think the findings should be consistent.

8        MR. VEEDER:  I'll take a look at it, your Honor.

9        THE COURT:  Do you have the finding in here somewhere

10 like the other findings you made about the beds and banks of

11 the stream rose and fell and rose to the surface again and

12 the water that came to the surface was a part of the stream

13 flow?

14        MR. STAHLMAN:  Mr. Girard in his findings on the whole

15 area covered a lot of these things which we didn't go into

16 in detail, because we adopted those findings in that area.

17        THE COURT:  Well, we are getting tired.  Let's knock

18 off and see what we have written up.  10:00 o'clock.

19        (Adjournment until Thursday, April 5, 1962 at      )
                                                             )
20        (                                                  )
          (10:00 A.M.                                        )

21

22                        ---o0o---

23

24

25

19,499

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the dates herein involved, to wit:  April 3 and 4, 1962, was a duly qualified, appointed and acting official reporter of said Court;

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing    123    pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS MY HAND, at San Diego, California this 4th day of April, 1962.

_____
Official Reporter

JOHN SWADER. OFFICIAL REPORTER