# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      April 5, 1962

Pages:    19,500 to   19,618

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 192                                              19,500

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

\- -- -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

\- -- -

UNITED STATES OF AMERICA,            )
                                     )
                  Plaintiff,         )
                                     )
        vs.                          )    No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY             )
DISTRICT, et al.,                    )
                                     )
                  Defendants.        )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, April 5, 1962

APPEARANCES:

   For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to the
                                   Attorney General.

                                   CDR. DONALD W. REDD

   For the Defendants:

      Fallbrook Public Utility    FRANZ R. SACHSE, ESQ.
      District, et al.,

      State of California:         FRED GIRARD, ESQ.,

      Vail Company:               GEORGE STAHLMAN, ESQ.

19,500-A

1

2                           I   N   D   E   X

3

4    PLAINTIFF'S EXHIBIT            FOR IDENTIFICATION        IN EVIDENCE

5                 277-A                                          19,533

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19,501

1    SAN DIEGO, CALIFORNIA, THURSDAY, APRIL 5, 1962, 10:00 A. M.

2                               ---oOo---

3         (Another matter.)

4         THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook.

5         MR. SACHSE:  Your Honor, I think Mr. Girard and I need

6    a big eraser.  How you can do these things, after you read a

7    judgment, read a judgment, read a judgment, read a judgment,

8    and still find a complete bonehead in it, which Fred and I

9    have done.

10        THE COURT:  Pass him the sponge.

11        MR. GIRARD:  I have it now, your Honor.

12        MR. SACHSE:  There are two places in the Naval Enclave

13   Judgment where grammatically it makes no sense.  It can be

14   cured by the deletion of one single word, if your Honor would

15   approve it.  If your Honor will look at Page 52 -- it appears

16   on Pages 52 and 62 -- on Page 52 in the conclusions of law

17   on Line 6 the phrase is "unless and until water exportation

18   from without the said Margarita River watershed".  If you

19   delete the word "without" it makes perfectly good sense.  If

20   you leave them both in, it means nothing.  And the identical

21   language is on the judgment on Page 62.

22        MR. GIRARD:  We would like permission to strike that,

23   your Honor.

24        MR. SACHSE:  Strike the word "without" instead of re-

25   writing this page.

1    THE COURT: Strike the word "from"?

2    MR. SACHSE: It reads better if you leave in "from".

3 But it reads better if you strike the "without".

4    THE COURT: Strike the word "without". What pages?

5    MR. SACHSE: Page 62 exactly the same language appears

6 on Line 12. Strike the word "without" again, we request.

7    THE COURT: Mr. Veeder, did you see these? They are

8 the key part of the judgment.

9    MR. VEEDER: I am easily bemused, your Honor.

10    MR. SACHSE: It is a lesson. How you can read and

11 read and read and read and then suddenly the twelfth time you

12 see it.

13    THE COURT: Do we have our exhibits ready on

14 Interlocutory Judgment No. 37?

15    COLONEL BOWEN: Your Honor, we have Exhibit A we

16 brought down this morning. We added the DeLuz Creek

17 watershed line, but I fail to see what it adds to the exhibit.

18    Exhibit B, your Honor, was complete in my office this

19 morning, but on reviewing it I had some minor changes I

20 wanted made on it. My people are working on it now and they

21 have assured me it will be down here by noon.

22    THE COURT: All right.

23    Go back to the Vail judgment.

24    MR. STAHLMAN: I think we were on Paragraph 22, Page

25 11, your Honor.

THE COURT:  Did we resolve last night the matter we had been talking about?

MR. STAHLMAN:  Mr. Girard has rewritten that matter that we disc ussed, and I think he wrote it -- did you not, Fred -- in conformance with the kind of finding that was made in connection with the rising water at Pendleton?

MR. GIRARD:  Honestly, I haven't done it yet.  You can do it one of two ways, and I think that is what we have to resolve.  There is one in the general language in my Finding No. 18 on the Naval Enclave, which I think is probably the proper way to do it.  The other way to do it is by citing the specific area, that at certain times of the year the water flowed.  I think in all of the judgments up to now at least, the Murrieta and the Navy findings et cetera, there have been just general findings to the effect that the perennial flow varies, depending on  precipitation, extractions, et cetera.  Whether you want specifically to say what an exhibit shows at one period of time, I don't think adds anything one way or the other.

MR. STAHLMAN:  If I may add this, your Honor.  We have adopted in our findings the findings on the Murrieta Basin, and Finding No. 21 in the Murrieta Basin treats this same subject in this language:

"That at the present time the areas of surface flow of Temecula Creek as it flows over Pauba Valley

19,504

vary from year to year and within each year, and to
a substantial degree  said intermittent characteristics
of surface flow and area fluctuations are the result
of pumping of wells which have been drilled into the
younger alluvial deposits; that under natural
conditions the surface channel or area of surface flow
of Temecula Creek over Pauba Valley is not stable, but
is often changed during periods of considerable
surface flow.

"That the construction of Vail Dam by the Vail
Company and the impoundment of the waters of Temecula
Creek upstream from that dam have affected and will
affect the surface flow of Temecula Creek from that
which existed under natural conditions in that said
dam will capture and store for subsequent relief and
beneficial use waters which under natural conditions
would flow over and upon the younger alluvial deposits
in Pauba Valley;  . . ."

I would think that has covered the situation and is
done in such manner as is practical, and if we pin it
definitely to where it was on some particular date, I don't
think that conports with the logical finding.  I don't think
it adds anything to it, because we all know that it varies.
And here we have the various factors that enter into it.

MR. GIRARD:  Before Bill starts, one point I would like

1    to make incidentally.   That in the language dictated by the

2    Court yesterday it is to the effect that based on U. S.

3    Exhibit 15-E in the fall of 1959 there was perennial flow, and

4    then you list where it was.   As I understand, Mr. Wilkinson

5    checked, for example, this morning, and it is roughly two

6    miles upstream.   So if you use the fall of 1959 as being

7    reflective of what the last situation is, it is not correct --

8    even though there is no evidence of what Mr. Wilkinson found

9    this morning.

10        MR. VEEDER:   Bear in mind that on these matters --

11   for example, we have established the point of the groundwater

12   divide as of the fall of 1959.   I think there has to be a

13   cutoff date.   I don't know whether the stream flows all the

14   way from the point of rising water today or not.   I am not

15   greatly concerned about it.   But I will say this, your Honor,

16   that I don't believe that the findings as written on Page 10

17   are reflective of fact.

18        If you will go to Line 22 on Page 10 it says:

19            " Temecula Creek, after leaving Nigger Canyon,

20        flows for approximately five miles on the Pauba

21        Rancho, and upon leaving said Rancho, Temecula Creek

22        continues in a westerly direction . . ."

23   Now, that was true in the state of nature.

24        MR. STAHLMAN:   We are not talking about surface flow

25   in this finding at all.   This says, "the flow".

THE COURT:   The word "flow" could be changed.
"Temecula Creek, after leaving . . . extends . . ."

MR. VEEDER:   That is right.

THE COURT:   Change "flow" to "extends".

MR. VEEDER:   The point being that I think the findings
should reflect the facts as they exist, namely, Temecula
Creek now is a stream totally and entirely controlled by Vail
Dam, that there is no natural flow in Temecula Creek below
Vail Dam, that the only waters that reach Temecula Creek are
those which are released from Vail Dam by the Vail Company
for the uses in Pauba Valley.   Now, I think that is the
situation.

MR. GIRARD:   How is there flow now in Temecula Creek
if no releases from Vail Dam have been made?

MR. VEEDER:   The point being that the waters that are
coming out of the alluvium into the bed of the stream are
groundwaters that are draining from the alluvium.   It is not
water that has this year passed Vail Dam.   They are impounding
every drop, and they have been.   The only water that is in
the bed of Temecula Creek is water that is released from Vail
Dam, which may or may not enter the alluvium before it is
used.   And I think that it is essential to show that the
stream is no longer a natural stream, that the only water
that enters   Temecula Creek, natural flow water as such, is
that which falls in Pauba Valley or Pechanga Valley in the

19,507

1    53 square miles of watershed below Vail Dam.

2         MR. SACHSE:  I wouldn't buy that at all, your Honor.

3    I would like to remind your Honor and Mr. Veeder that there

4    is a brief on file in this case by Mr. O'Malley, who presented

5    this exact argument as a basis for taking out of this case

6    entirely any regulation of the people above Vail Dam, his

7    theory which he presented to the Court being that the Vail

8    Dam had stopped everything anyway, and therefore the Court

9    was in no way concerned with any future regulation of anything

10   upstream.

11        To state this matter as broadly as you have stated it

12   would pull right out from under any future control for your

13   benefit or mine, anybody upsteam from the Vail Dam.

14        I will respectfully ask again, what is the matter with

15   the exact language covering the exact stream we are talking

16   about which was already approved by you and --

17        MR. VEEDER:  Already approved by me?

18        MR. SACHSE:  Yes, in the Murrieta findings.

19        MR. VEEDER:  I did not approve anything.  I reserved a

20   right to object to everything, and I intend to object to all

21   of it.

22        MR. SACHSE:  I had hoped --

23        MR. VEEDER:  As to the form -- it is what the Court has

24   ruled upon -- I said, "Let it go."

25        MR. SACHSE:  It seems to me that Finding No. 21 --

1    instead of reading it to you again, take a minute, please,

2    and look at it yourself, your Honor -- if this isn't the

3    perfect description of what Mr. Veeder wants, I don't know

4    how it can be done any better.

5         MR. VEEDER:  Certainly it is not the way it is written

6    on Page 10.

7         MR. SACHSE:  I would suggest that we delete everything

8    from Line 30 on Page 10 --

9         MR. VEEDER:  On Page 10?

10        MR. SACHSE:  Line 30 on Page 10, start with Line 30

11   on Page 10 and delete through Line 7 on Page 11, and

12   substitute Paragraph 21.  That would be my suggestion.

13        MR. STAHLMAN:  I will go along with that.  I think

14   that is okay.

15        MR. SACHSE:  That is the Murrieta.

16        MR. VEEDER:  I know.

17        Do you mind if I read over your shoulder, your Honor?

18        THE COURT:  No.

19        I'll tell you what we are going to do.  Mr. Wilkinson,

20   you have been sworn in this case.

21        MR. WILKINSON:  Yes, your Honor.

22        THE COURT:  What did you observe this morning in

23   Pauba Valley?

24        MR. WILKINSON:  I observed water in the bed of

25   Temecula Creek in projected Section 15, 8 South, 2 West, as

1    shown on U. S. Exhibit 15-E.

2         MR. VEEDER:  Where was that in the Section?  About the

3    center of the Section?

4         MR. WILKINSON:  East of the center of the Section.

5         THE COURT:  And flowing downstream from there?

6         MR. WILKINSON:  And flowing downstream from there, your

7    Honor.  That is the only point I observed it.  I didn't

8    have more time to go through the course of the stream.

9         THE COURT:  Well, I am not going to make findings as

10   to what happened on a particular date, because one date is

11   only a segment in time and what you saw this morning or what

12   existed in the autumn of 1961 would vary entirely with what

13   existed in 1960 or 1959 or 1948, and I see no point in doing

14   that.   So I think the suggestion of striking out the material

15   beginning on Page 10 at Line 30 --

16        How far down do you go?

17        MR. SACHSE:  I would say go to Line 7 on Page 11, your

18   Honor.

19        THE COURT:  -- down to Line 7 on Page 11.  And then use

20   the same language that we used in the groundwater areas.

21        MR. GIRARD:  Yes.  I think it is the Murrieta-Temecula.

22        THE COURT:  The only reason for using it again is to

23   have continuity in your set of findings.  It could be

24   incorporated by reference, but I think it would be better to

25   put it in for continuity .

1    MR. VEEDER:  You have eliminated the word "flow" --

2  looking at Line 22 on Page 10?

3    THE COURT:  Right.

4    MR. VEEDER:  You have changed that.

5    THE COURT:  To "extent".

6    MR. VEEDER:  "Temecula Creek extends . . ."

7    THE COURT:  Yes, that is really what that meant.

8  There was no intention to have a finding there of flowing

9  water for five miles.  If "extends" is not a proper word,

10  use some word of like meaning.

11    Any other suggestions on Paragraph 21?

12    MR. VEEDER:  Mr. Wilkinson raised the point that there

13  is a gauging station at Vail Dam.

14    MR. STAHLMAN:  We didn't raise the point.  You wanted

15  it there, and I don't believe it belongs there.

16    MR. VEEDER:  I said the point came up yesterday.  Mr.

17  Wilkinson, when I was discussing the Murrieta-Temecula

18  gauging station, said there was a gauging station at Vail

19  Dam.

20    MR. GIRARD:  That is covered later on in the section

21  on Vail Dam.

22    MR. VEEDER:  Oh, that is covered later?  All right.

23    THE COURT:  Put a small "b" on Murrieta, because these

24  are the various streams we are talking about and we have put

25  a small "a" in front of Temecula.

MR. GIRARD:  Probably on Line 23, to make it consistent with what I think George intended, instead of saying Murrieta Creek flows, you can say "The course of Murrieta Creek extends" or something like that.

THE COURT:  Murrieta Creek extends in a southerly direction.

MR. GIRARD:  Yes.

THE COURT:  Well, if you can get better language, all right.

Now, on Page 12, Lines 4 to 7, there is a finding that Slaughter House Canyon contributes a larger increment of flow than does the drainage area of Murrieta Creek upstream from this location.  Is there evidence in the record?

MR. STAHLMAN:  Yes, there is, your Honor.  That was testified to off Exhibit aerial photographs.  I think Mr. Wilkinson is getting it now.

Aren't you, Sandy?

MR. WILKINSON:  That's right.

MR. STAHLMAN:  It shows it very clearly on this aerial. There is testimony in the record and it shows that from the line here the small -- and it would only be natural that there is not much catchment in this area -- Slaughter House comes out here and has deposited a great deal of alluvium through here.

THE COURT:  In other words, there is not much in the

19,512

1    back area.

2           MR. STAHLMAN:  There is not much in the back area.  That

3    is that flat land as it gets to the watershed.

4           THE COURT:  How far from the watershed?

5           MR. STAHLMAN:  We are not very far from the watershed

6    here, are we?

7           MR. WILKINSON:  It is pointed out on --

8           MR. STAHLMAN:  Here is Slaughter House Canyon.  So it

9    is only a short distance.

10          MR. WILKINSON:  It enters here.  Probably wouldn't be

11   over three miles.

12          MR. STAHLMAN:  That is rather flat.  This is rather

13   mountainous area.

14          THE COURT:  And there was testimony?

15          MR. WILKINSON:  Yes, Mr. Wilkinson testified to that.

16          THE COURT:  You have observed the flow up there, have

17   you?

18          MR. WILKINSON:  Yes, I have, your Honor.

19          THE COURT:  And the finding is correct?

20          MR. WILKINSON:  The finding is correct, your Honor.

21          THE COURT:  All right.  I don't know what difference

22   it makes.

23          Now, the next paragraph where we have this abutment on

24   Murrieta Creek.

25          MR. VEEDER:  Line 12.

1    MR. STAHLMAN:  Yes, we had the maps out yesterday.  I

2  think everybody looked at that.

3         THE COURT:  We were all over that once before.

4         MR. STAHLMAN:  Yes, your Honor.

5         MR. VEEDER:  I want to reserve, based on conversation

6  with the Colonel, the objection (1)  I don't think you can

7  properly say that Murrieta Creek abuts on Vail Company land.

8  I don't think that the evidence would support the finding that

9  the Santa Rosa Rancho abuts upon the bed and bank of Murrieta

10  Creek as opposed to Vail.

11         MR. WILKINSON:  The true creek course has washed out

12  the corner post in that section of the ranch.  It is right

13  in the course of the creek.

14         MR. GIRARD:  You mean the grant line corner post?

15         MR. WILKINSON:  The grant line corner post.

16         THE COURT:  What side of that well is the creek

17  flowing?

18         MR. WILKINSON:  To the north and east, your Honor.

19         THE COURT:  This is the only place where it can go

20  through, this gap?

21         MR. STAHLMAN:  Yes, your Honor.

22         MR. VEEDER:  Your Honor, I would like to bring to your

23  attention the portion of the stream as shown as U. S.

24  Plaintiff's Exhibit No. 29-J.  The thread of the stream is

25  shown to be east of the corner of the Santa Rosa Ranch, if you

1  will observe.

2      MR. SACHSE:  You are referring to the blue broken line

3  as the thread?

4      MR. VEEDER:  That is right.  And that is the thread

5  of the stream as shown on these exhibits.  You have been

6  looking at 15-E, and Mr. Wilkinson's comments were on 15-E.

7      MR. STAHLMAN:  You are confusing the record when you

8  make statements like that, Bill.  Because using your own

9  Exhibit 29-J, the stream has been defined, and if we interpret

10  15-E in relation to this 29-J, certainly the stream would be

11  in this area here where we have the well and quite some

12  distance to the west of that well.  It overlaps the stream

13  as defined in the Murrieta-Temecula groundwater findings.

14      THE COURT:  What you are saying is that we haven't

15  taken the surface thread of the stream as being the stream.

16      MR. STAHLMAN:  That is right, your Honor.

17      MR. VEEDER:  You are taking the contacts between the

18  older and the younger alluvium to make the bed and banks; is

19  that right?

20      THE COURT:  Yes.  And the map 15-E shows where the

21  stream flows through a narrow area between the two areas of

22  older alluvium .  It comes through a very narrow place.  It

23  would be south, I guess, of the Vail corner.

24      MR. VEEDER:  In other words, what your Honor is

25  stating is that though the thread of the stream is shown on

19,515

1    29-J to be east of the corner of the Santa Rosa Rancho, you

2    are saying that the contact between the older and younger

3    alluvium is such that it would make Santa Rosa riparian to

4    the stream?

5        MR. STAHLMAN:   Right .

6        Now using Vail's BB, the aerial, it shows the narrow

7    part the Judge has just referred to, and here is where the

8    line comes up through here, here is the corner post in the

9    younger alluvium, the younger alluvium comes down through

10   here, and here is the corner post.  So it almost completely

11   crosses the alluvial fill at that point.

12       MR. VEEDER:   That map that you are now looking at is

13   an aerial photograph subject to distortion.

14       MR. STAHLMAN:   How about all of yours that you put in?

15       MR. VEEDER:   Whenever Colonel Bowen put in an exhibit,

16   he took care of the distortions by having the precise

17   location.

18       THE COURT:   I have extended by pencil the grant line

19   to show --

20       What is this, Slaughterhouse here?

21       COLONEL BOWEN:   That is Murrieta Creek, your Honor.

22       THE COURT:   This is Santa Rosa?

23       COLONEL BOWEN:   That is right, your Honor.

24       THE COURT:   If in these aerial photographs you extend

25   these grant lines, it shows that this wide wash --

2 fls

MR. STAHLMAN:  This is downstream, your Honor.

COLONEL BOWEN:  This direction is north, your Honor.

THE COURT:  It shows the wide alluvial plain of the Murrieta, and it shows a very narrow area where it flows between higher ground, and then it shows the wide plain of the Murrieta after it leaves.  It is obvious that that little narrow area is the stream.

MR. GIRARD:  The surface stream.

THE COURT:  And if there ever was an instance where the bed and banks of the stream are the tighter material on either side, it is obviously that area.

MR. VEEDER:  And it is younger and older alluvium, that is right.

MR. STAHLMAN:  I don't agree that it is younger and older alluvium.  I think that is younger alluvium.

MR. VEEDER:  The contact is what I am talking about. You have established the bed and banks of the stream that way. I want to refer to 29-J, which shows the thread of the stream, your Honor.  If you will observe this, the thread of the stream as shown on 29-J is definitely east of the corner of the Rancho as depicted there.

THE COURT:  I observe that.  But that is taken as some surface flow that was observed or evidence of surface flow at a time when this map was made.  But these surface flows change.  Mr. Wilkinson has testified that the corner post of

19,517

1      the Vail Ranch is washed out in that area.

2            MR. STAHLMAN:  Do you contend that the corner post

3      is not in the younger alluvium in that area?

4            MR. VEEDER:  I think it is in the younger alluvium in

5      that area, but it is not on the bed and banks of the stream.

6            MR. STAHLMAN:  I would like to ask Mr. Wilkinson a

7      question.

8            MR. VEEDER:  Your Honor, in regard to opening up this

9      record again --

10           MR. STAHLMAN:  It is because you raise these questions.

11           MR. VEEDER:  I am raising this question, and it is an

12     extremely important question, that the Santa Rosa is

13     riparian by reason of the younger and older alluvium contacts.

14           MR. GIRARD:  I don't think it is solely that.  I think

15     that aerial shows the surface flow itself is over the --

16           MR. VEEDER:  The aerial does not show surface flow.

17           MR. GIRARD:  I think it does.

18           MR. STAHLMAN:  The corner post is on the bed of the

19     stream.  It was cut there.  And the photographs show it

20     clearly.

21           THE COURT:  Let's hear Mr. Veeder.  He has something

22     he wants to say.

23           MR. VEEDER:  I have said, your Honor, that it is

24     extremely important to us that if the basis upon which these

25     findings are made is that the contact of the older and younger

19,518

1    alluvium makes Santa Rosa Rancho riparian to Murrieta Creek,

2    then the findings should reflect that fact -- if that is the

3    basis upon which you are concluding.

4        THE COURT:  We have already found what constitutes

5    the Murrieta.

6        MR. VEEDER:  That is right.

7        THE COURT:  That it is a surface and an underground

8    stream.  And if you want to refer back to our findings on

9    what constitutes the stream of the Murrieta, I don't mind.

10   However, I think the findings should show that the corner

11   post is in the younger alluvium.

12       MR. VEEDER:  All right.

13       MR. STAHLMAN:  Very well.

14       THE COURT:  I might point out this, Mr. Veeder, that

15   at that point in the Murrieta the amount of water available

16   on which claims would be made by overlying owners upstream

17   is not going to support the irrigation of a lot of Santa Rosa

18   land.  So although it may look pretty good on paper, and

19   although it is a right of some kind, it is not such a right

20   as to get all excited about.

21       MR. VEEDER:  I necessarily become excited, and I would

22   think Mr. Sachse would be.  The more riparian acreage that

23   is placed upon Murrieta Creek, the more concerned we naturally

24   are.

25       MR. SACHSE:  I have no great concern, Mr. Veeder.  The

19,519

1    only thing that bothered me -- and it is not too important --

2    is this 1,500 foot claim.  If they touch at all, they are

3    riparian.  So I have not worried about the 1,500 feet.  And

4    I certainly agree with his Honor that the riparian rights of

5    the Santa Rosa in Murrieta Creek attach only to the waters

6    in Murrieta Creek at the point where they abut.  They don't

7    attach to the water of Murrieta Creek downstream from the

8    point where they abut.  I don't think there is a great deal

9    of water in Murrieta above the point where the lands abut.

10   So I am not worried about it.

11          THE COURT:  And what water there is, there are valid

12   claims of overlying owners who can use it.

13          MR. SACHSE:  That is right.

14          THE COURT:  So although there may be some use to the

15   Santa Rosa, it is not going to be any great shakes in this

16   case.

17          MR. SACHSE:  Right.  I cannot visualize Vail being

18   able to put in a pump at the corner there and taking enough

19   water under a valid riparian right to irrigate any substantial

20   part of their Santa Rosa acreage.

21          MR. VEEDER:  What would be a substantial part, in your

22   view?

23          MR. SACHSE:  Any three or four hundred acres probably,

24   with the water supply demand made on the Murrieta upstream.

25          MR. VEEDER:  Certainly they haven't done it historically,

1     have they?

2          MR. SACHSE:  I am not sworn as a witness, but I will

3     be glad to say I don't think they have.  I don't know.

4          THE COURT:  Even with a small area of ground it would

5     be subject to irrigation, that particular area would become

6     a very valuable piece of ground.  But there can't be a lot,

7     there can't be a great use made there by Vail in relation to

8     other people who have rights in the Murrieta upstream from

9     that point.

10          MR. VEEDER:  And on the basis of available water.

11          THE COURT:  Yes.

12          MR. STAHLMAN:  We are mindful of the fact that if we

13     took all the water we could get at that point, we are not

14     going to be able to irrigate any large amount of acreage.

15     There is some good land in that area.

16          MR. VEEDER:  What would you say would be a large

17     amount of acreage?

18          MR. STAHLMAN:  You have riparian to this probably a

19     tremendous amount of acreage, but --

20          THE COURT:  The land without water is probably worth

21     three or four hundred dollars an acre.  You would be pretty

22     optimistic at that.  But with water a ten acre piece could,

23     for a homesite and gardens and all, could be a very valuable

24     piece of ground.

25          MR. VEEDER:  But in regard to the overall Santa Rosa

19,521

1   Rancho you would say it is certainly an illusory right.

2       THE COURT:  Overall it certainly smacks of being

3   illusory.  They realize this.  They don't anticipate -- they

4   couldn't get the water.  If they took all the water to the

5   exclusion of everybody else upstream, the amount they could

6   irrigate would be very small.

7       How did you calculate the 1,500 feet?  From 15-E?

8       MR. WILKINSON:  From the younger alluvium, your Honor.

9       MR. SACHSE:  From the Exhibit 15-E?

10      MR. WILKINSON:  15-E.

11      MR. VEEDER:  Was it 15-E?

12      MR. WILKINSON:  One of the 15-Series.

13      THE COURT:  Here would be about 1,500 feet from the

14  corner to here.

15      MR. STAHLMAN:  That has to be more than 1,500.  I

16  think he said approximately 1,500.

17      MR. SACHSE:  I certainly didn't intend to raise an

18  objection about it, because our rights are going to be the

19  same whether it is 1,500 or 15.

20      THE COURT:  It is practically 1,500 feet right here at

21  the Narrows.

22      MR. VEEDER:  15-E is a composite of the USGS

23  quadrangles, which is the same as 29-J.

24      MR. SACHSE:  Except that 29-J does not delineate the

25  younger alluvium, Mr. Veeder.

19,522

1    MR. VEEDER:  That is the point I am trying to make,

2    that the areas in question as shown in 15-E are taken from

3    the 29-J.

4    MR. STAHLMAN:  Do you think 15-E is in error, Mr.

5    Veeder?

6    MR. VEEDER:  No.  It shows the bed and banks of the

7    stream.

8    THE COURT:  It is the same scale.

9    MR. VEEDER:  Well, it is the same map, your Honor.

10   THE COURT:  The same scale.

11   MR. VEEDER:  It is a composite.  15-E is made out of

12   29-J and another quadrangle.

13   THE COURT:  On 29-J you don't quite get 1,500 feet.

14   But you have an additional area of younger alluvium below.

15   MR. VEEDER:  Yes, there is no question there is younger

16   alluvium there.

17   THE COURT:  It doesn't make any difference whether it

18   was 1,200 or 800, or whether it was 30 feet, it would still

19   abut.

20   MR. VEEDER:  Upon the alluvium.

21   THE COURT:  Yes -- upon the stream.

22   MR. VEEDER:  Where do we go from here?

23   THE COURT:  Do you want to say that Murrieta Creek

24   abuts on Vail land, or --

25   MR. VEEDER:  I want to say the converse of that, your

3 fls

19,523

1  Honor.  I disagree that it does.  But it should be that Vail

2  land abuts on Murrieta Creek rather than that Murrieta Creek

3  abuts on Vail land.

4  THE COURT:  But Murrieta Creek crosses Vail lands.

5  MR. SACHSE:  Traverses.

6  THE COURT:  Traverses.  Strike out "abuts on".

7  Traverses Vail land in the Santa Rosa.

8  MR. GIRARD:  Where was that?

9  THE COURT:  At Line 12.  So that we will not have any

10  doubt, let us add another sentence and say:  The description

11  of Murrieta Creek in finding so-and-so  and judgment so-and-

12  so is incorporated by reference.

13  MR. VEEDER:  The so-and-so would be the Murrieta-

14  Temecula groundwater area.

15  THE COURT:  Yes.  The description of what constitutes

16  Murrieta Creek, or the description of Murrieta Creek, or the

17  definition of Murrieta Creek -- how would you word that?

18  MR. SACHSE:  Description.

19  MR. GIRARD:  As set forth in findings and interlocutory

20  judgment No. 30.

21  MR. VEEDER:  Have you looked at Line 14, your Honor?

22  You make a reference immediately thereafter.

23  THE COURT:  That is something else again.

24  MR. STAHLMAN:  They are made a part thereof right

25  there.

1          MR. VEEDER:  That is what I am saying.

2          THE COURT:  But the specific thing we are talking

3    about, we say Murrieta Creek traverses Vail land, and you were

4    talking about the little surface thread of the stream, and I

5    want a sentence in there that we are talking about Murrieta

6    Creek as described in Finding and Interlocutory Judgment No.

7    30.

8          MR. VEEDER:  What would be the paragraph on that?

9          MR. GIRARD:  It would go in right after the 1,500 acre

10   feet.

11         THE COURT:  He wants the particular finding.

12         MR. VEEDER:  What is the finding you want to rely on?

13         MR. GIRARD:  You want to rely on a particular finding?

14         THE COURT:  Yes.

15         MR. VEEDER:  I thought that was what you wanted.

16         THE COURT:  Yes.

17         MR. GIRARD:  It is Findings 10 and 11.

18         I want to get the judgment provision, too.

19         We have agreed that the description of Murrieta Creek

20   is set forth in Findings of Fact 10 and 11, and in Interlocutory

21   Judgment No. 30 as incorporated herein by reference.

22         THE COURT:  What about this next paragraph about the

23   portion of the groundwater area?  The word "underlying" gives

24   me some trouble.  "Underlies" -- is that all right -- the

25   groundwater underlies?

1          MR. STAHLMAN:  I don't think that is quite a good word,

2   no.  "Extends over", probably.

3          MR. SACHSE:  The lands of the Vail Company contain a

4   portion of the Murrieta -Temecula groundwater area, or some-

5   thing.  That is what you are saying.

6          MR. GIRARD:  You could just start at 16:  The lands of

7   the Vail Company on the Santa Rosa Ranch in the area of

8   Slaughterhouse Canyon, as shown on Exhibit 277, are within

9   the Murrieta-Temecula groundwater area as found in Findings

10  and Interlocutory Judgment No. 30.

11         THE COURT:  That would do it.

12         MR. VEEDER:  You say a portion of it?

13         MR. GIRARD:  Yes.

14         MR. VEEDER:  A portion of what?

15         THE COURT:  No, they say the lands of the Vail Company

16  on the Santa Rosa in the area of Slaughterhouse Canyon are

17  within the Murrieta groundwater area.

18         MR. VEEDER:  The reason why I had a problem is that

19  Slaughterhouse extends considerably, doesn't it?

20         Mr. Wilkinson, how far does Slaughterhouse extend?

21  I thought it went back into the upper hills of the Santa

22  Rosa.

23         MR. WILKINSON:  All this says is that within the

24  groundwater area in the area of Slaughterhouse   Canyon.  It

25  is a description of the location.

1    MR. GIRARD:  As to where it overlies the older

2    alluvium.

3    MR. SACHSE:  I think Mr. Veeder has a point.  I think

4    "a portion" should go in before "the lands of the Vail

5    Company".

6    MR. VEEDER:  That is right.

7    MR. GIRARD:  A portion of the lands of the Vail

8    Company on the Santa Rosa Rancho are within  . . .

9    THE COURT:  That is right.

10   MR. SACHSE:  That is what he is trying to say.

11   THE COURT:  Right.

12   MR. STAHLMAN:  Yes.

13   MR. SACHSE:  A portion of the lands of the Vail

14   Company on the Santa Rosa Rancho in the area of Slaughterhouse

15   Canyon, as shown on Exhibit 277, are within the Murrieta

16   groundwater area.

17   MR. VEEDER:  That is an accurate statement.

18   This  Miller Canyon is a new one on me.  Where is

19   Miller Canyon?

20   MR. GIRARD:  I think you should add also the "the

21   principle named (instead of names) tributaries to Murrieta

22   Creek" and I would insert "which have their headwaters"

23   rather than just "headwaters".

24   MR. VEEDER:  Miller Canyon is not a creek.  It is just

25   an arroyo; is that what it is?  What is it?  It is not a

19,527

1   creek.   That is the only thing.

2          MR. WILKINSON:   It is a creek as much as any of the

3   others are.

4          THE COURT:   It flows in the winter.

5          MR. VEEDER:   Do you call this Miller Canyon a creek?

6          MR. WILKINSON:   That is what I refer to it.   It is the

7   creek that is in Miller Canyon.

8          THE COURT:   All right, let's put a (c) in front of

9   Tucalota Creek.

10         Have you checked these descriptions?

11         MR. STAHLMAN:   I didn't check them carefully.   However,

12   they are looking at them now.

13         THE COURT:   What about this Tucalota groundwater basin?

14         MR. SACHSE:   Your Honor, before you get over there,

15   purely a technical thing, but the findings on Tucalota

16   Creed have not been entered, and the language here would

17   imply they have.   I don't know whether you want to change it

18   or not.

19         MR. GIRARD:   I would cross out that.

20         MR. SACHSE:   At the very beginning you say "on which

21   findings have been heretofore made".   They haven't been.

22         MR. STAHLMAN:   We thought they would be at the time we

23   drew this up.

24         MR. SACHSE:   Why don't you just scratch the reference.

25         MR. VEEDER:   Can't you say "Tucalota Creek is an

1    intermittent stream tributary of Santa Gertrudis Creek that

2    enters upon Vail Company property  . . ."?

3         MR. SACHSE:  That is what I mean; scratch the clause

4    "on which Findings and Interlocutory Judgment No. 31 were

5    heretofore made".

6         MR. GIRARD:  Why don't we just say "which is the

7    subject of Findings and Interlocutory Judgment No. 31"?

8         THE COURT:  Yes.

9         MR. SACHSE:  Because you give it a number.   Yes.

10   That is all right.

11        THE COURT:  All right, you have checked those

12   descriptions.   They are all right.

13        MR. STAHLMAN:  They are checking them again.

14        THE COURT:  What about this Tucalota groundwater basin?

15        MR. GIRARD:  I would just say "is underlain by a body

16   of younger alluvial deposits in Tucalota Valley as shown on

17   U. S. Exhibits 15 and 206-C".

18        MR. STAHLMAN:  Do you want to take out the "groundwater

19   basin"?   Is that what you mean?

20        MR. GIRARD:  Yes.

21        MR. STAHLMAN:  That's all right.

22        THE COURT:  All right, Long Valley becomes (d).

23      -  MR. GIRARD:  On Line 11 at "as it" after the word

24   "which".

25        On Line 25, also, to be consistent with the Murrieta,

19,529

1  change the word "fill" to "deposit".

2          MR. VEEDER:  The younger alluvial deposits.

3          MR. GIRARD:  Yes, instead of "fill".

4          THE COURT:  Have these descriptions been checked out?

5          MR. GIRARD:  Not by me.  Sandy has, I guess.

6          MR. STAHLMAN:  We both went over them very carefully

7  when we drew them and I think they are accurate.

8          MR. VEEDER:  "Tucalota" isn't spelled right --

9  T-u-c-a-l-o-t-a.

10         THE COURT:  Are these projected sections?

11         COLONEL BOWEN:  The sections that appear on 29-Q are

12  not projected, your Honor.

13         (The Court and counsel, Colonel Bowen and Mr.

14         (Wilkinson checked the descriptions referred to against)

15         (the map exhibits, off the record.

16

17         (A recess.)

18         THE COURT:  On Page 14, at Line 28, after the word

19  "creek" insert "hereinafter called Veeder Creek".

20         MR. VEEDER:  Ride on.

21         MR. GIRARD:  At Line 1 strike out "unnamed".

22         THE COURT:  On the next page strike out "unnamed"--

23  it is now named.

24         Have you checked the description?

25

1    (Whereupon, the Court and counsel, Colonel Bowen and    )
     (                                                        )
2    (Mr. Wilkinson checked the descriptions referred to     )
     (                                                        )
3    (against map exhibits.                                   )

4    MR. GIRARD:  I have it written this way, your Honor:

5        "Veeder Creek flows westerly for approximately

6    five and a half miles, originating on lands of Vail

7    Company on Pauba Rancho, then crossing lands of Vail

8    Company in Section 28 Township 7 South Range Q West,

9    and then re-enters Vail Company lands at the

10   Temecula Rancho grant line, proceeds across the

11   Temecula Rancho to its confluence with Murrieta

12   Creek."

13   Is that right, Ace?

14   COLONEL BOWEN:  That is right.

15   MR. SACHSE:  Then you are deleting the "on said

16   rancho"?

17   MR. GIRARD:  Yes.

18   THE COURT:  All right, Long Canyon Creek becomes

19   (g).

20   At Line 13 strike out "flowing" and insert "proceed-

21   ing".

22   At Line 16 "younger alluvial deposits".

23   Anything else on Long Canyon?

24   Santa Rosa is (h).

25   MR. VEEDER:  May I inquire, George, why did you use

1    Exhibit 15-L ?  That is the one that was cleaned up.  Is that

2    the reason?

3         MR. GIRARD:  15-L is the last one.

4         MR. VEEDER:  15-L is the one without markings on it.

5    Is that the reason  you used that?

6         MR. STAHLMAN:  That was a choice.  We could use either

7    one of them.

8         MR. VEEDER:  I have no objection.  I was just

9    wondering.

10        THE COURT:  On Line 25 your exhibit number is right --

11   BL and BJ?  Is it BL or BI?

12        MR. VEEDER:  What about the heading "Santa Rosa

13   Creeks"?

14        MR. STAHLMAN:  Well, there are several of them there,

15   Bill.  It might be well under this Santa Rosa Creeks to

16   incorporate those findings that were made on DeLuz and

17   Sandia.

18        MR. VEEDER:  The reason why I raise the point is that

19   Slaughterhouse Canyon, Cole Canyon Creek,Miller Canyon, are

20   also part of the Santa Rosa, too; isn't that right?

21        MR. STAHLMAN:  Well, they are in a different area.

22        MR. VEEDER:  I would think you would simply use DeLuz

23   and Sandia Creek.

24        THE COURT:  Why don't you change (h) to "DeLuz and

25   Sandia Creeks"?

1      MR. SACHSE:  Isn't there something wrong on the next

2  page, Sandy?

3      MR. WILKINSON:  It should have a heading.

4      MR. STAHLMAN:  Yes.  Paragraph 28 should be called

5  "DeLuz and Sandia Creeks".

6      MR. SACHSE:  What you are saying, if I understand

7  correctly, is that certain portions of the lands in all of

8  these different subcreeks you have just mentioned are within

9  the groundwater area.  Isn't that it?

10      THE COURT:  No, it doesn't have anything to do with

11  creeks.  This should have a new heading.  This should be

12  "Vail Lands in Groundwater Area".

13      MR. STAHLMAN:  You are leaving that last paragraph

14  on Page 15 as it is, because there are other unnamed creeks.

15      THE COURT:  That is all right.  That is just minor.

16      We go to a new subject, Vail lands in groundwater area.

17  This is just an incorporation by reference.  Actually, it

18  should be the Murrieta -- what did we call that?

19      MR. GIRARD:  Murrieta-Temecula groundw ater area.

20      THE COURT:  Yes.

21      MR. VEEDER:  Does Bill have his list of exhibits here?

22      MR. SACHSE:  Fred has one.

23      MR. VEEDER:  My list shows 277-A as not being admitted

24  in evidence.

25      MR. GIRARD:  I think it should be.  I think I refer to

1    it in my Murrieta findings.

2        MR. VEEDER:  I know it is referred to.  I know in

3    checking out our exhibits there was some doubt as to whether

4    that was ever admitted.

5        MR. GIRARD:  Let's offer it now, if it is not.

6        MR. VEEDER:  That is what I want to do.

7        MR. STAHLMAN:  No, it is not in evidence.  Exhibit

8    277-A refers to legal descriptions of the exterior boundaries

9    of Murrieta-Temecula groundwater area, et cetera.

10        THE COURT:  I don't show it in evidence either.

11        MR. VEEDER:  We ought to offer it then, your Honor.

12        THE COURT:  277-A received in evidence.

                          (Plaintiff's Exhibit No.     )
13                        (277-A, for identification,   )
14                        (received in evidence.        )

15        MR. GIRARD:  277-A is merely a description of the

16    boundary line, isn't it?

17        MR. STAHLMAN:  Yes.

18        MR. GIRARD:  So I think it should read, after the

19    word "and" on Line 4, "and described in 277-A depicted

20    therein on U. S. Exhibit 277" -- which it is, isn't it?

21        COLONEL BOWEN:  Depicted thereon.

22        MR. GIRARD:  Depicted on U. S. Exhibit 277 and

23    described in U. S. Exhibit 277-A.

24        THE COURT:  You start a new sentence after 277-A.

25    "Said Exhibits, Findings and Judgment are incorporated

4 fls

1    herein by reference."

2          Thirty.

3          MR. VEEDER:  Is Nigger Canyon a part of Pauba Valley?

4          MR. STAHLMAN:  Yes, it goes up and narrows as it goes

5    up.

6          THE COURT:  Where is the break line between Nigger

7    Canyon and Pauba Valley?

8          MR. WILKINSON:  How wide is a valley, and how narrow

9    is a canyon?

10          MR. STAHLMAN:  It starts narrowing and finally comes

11    down to where it is 700 feet there at the end.

12          MR. VEEDER:  I thought the outwash area is part of

13    the Pauba.

14          MR. GIRARD:  I define the outwash area in my findings

15    on the Murrieta as "immediately downstream from Nigger

16    Canyon and primarily in projected Sections 5, 6 and 7,

17    Township 8 South, Range 5 West".

18          MR. STAHLMAN:  I think the outwash area extends right

19    up into the canyon.  The further up you go the coarser the

20    material, and I think that is true and is demonstrated by

21    the rather large porportion of loss of water when it flows

22    over that material from the dam.

23          MR. GIRARD:  "Permeable" is spelled wrong on Line 13.

24          MR. WILKINSON:  It is spelled wrong throughout the

25    finding.

19,535

MR. STAHLMAN:  We will correct it.

MR. SACHSE:  I am waiting for Bill to make his objection here, considering the fact that we cross-examined and recross-examined and re-recross-examined for the better part of a week over whether the waters are confined or partially confined.  I expected you were going to ask us to put in "partially" on Line 18.  Or have you given up?

MR. VEEDER:  Oh, no, I haven't even thought of giving up.

THE COURT:  It should be "partially," shouldn't it?

MR. STAHLMAN:  I don't think there has been demonstrated to be any vertical movement at all.

MR. SACHSE:  I don't care.

MR. VEEDER:  When you say "vertical movement" --

MR. STAHLMAN:  That is clay.

MR. GIRARD:  I refer to it in mine as "semi-confined".

THE COURT:  Yes, it should be "semi-confined," since you have layers like this.  It might not be exactly vertical, but the water undoubtedly can work around these layers.

MR. STAHLMAN:  This is off the record.

(Mr. Stahlman's remarks off the record.)

MR. VEEDER:  We are at a point, though, "A portion of the subsurface waters flowing from the mouth of Nigger Canyon, at the easterly end of the Pauba Valley  . . ."  I hate to keep riding this horse, but we have got down to where you do

1   distinguish between Nigger Canyon and Pauba Valley, don't

2   you, locationwise?

3        MR. STAHLMAN:   Nigger Canyon is a part of Pauba Valley.

4        THE COURT:   If you have a problem, stick in a

5   projected section.

6        MR. STAHLMAN:   I don't think it is a problem.

7        THE COURT:   I don't think it makes any difference,

8   does it?

9        MR. WILKINSON:   I think it is covered by the fact that

10  it stays "A portion of the subsurface waters flowing from the

11  mouth of Nigger Canyon."

12       MR. STAHLMAN:   Instead of "from the mouth" just say

13  "flowing in Nigger Canyon".

14       MR. VEEDER:   Of course, I go back to the point that I

15  made long ago, your Honor, that the waters that go into there

16  now are stored waters.   They are waters released out of Vail

17  Dam.

18       MR. GIRARD:   It says whatever waters are in the sub-

19  surface area of Nigger Canyon, some of them are trapped

20  beneath this older alluvium.

21       MR. VEEDER:   Is your Honor willing to find that the

22  waters are trapped?

23       THE COURT:   I am going to find that they are semi-

24  confined.

25       MR. VEEDER:   But not trapped.

MR. STAHLMAN:  Your artesian wells demonstrate that. They are trapped.  That is what gives this head.

MR. VEEDER:  Semi-confinement will cause artesian flow.  Isn't that right, Alan?  Water isn't trapped.

MR. STAHLMAN:  Well, that is a word.  I don't think it is going to make a lot of difference.  This is the situation that exists.  You are not going to change it by the words you use.

MR. VEEDER:  But I have said "semi-confined" up to this point.

THE COURT:  Are partially trapped beneath or semi-confined.

On Line 20 "semi-confined".

MR. VEEDER:  You don't mean "impervious" either, there? It is not impervious.

MR. STAHLMAN:  More pervious.

MR. VEEDER:  You mean less pervious.

MR. STAHLMAN:  Which line are you talking about?

MR. VEEDER:  I am on Line 14.  It is not impervious.

MR. SACHSE:  Less pervious.

MR. STAHLMAN:  Less pervious.

THE COURT:  Above on Line 14 you said "substantially impervious".

MR. SACHSE:  Yes, you can say that.

THE COURT:  Relatively impervious.

1      MR. VEEDER:  It is really just low.

2      MR. STAHLMAN:  I think it is substantial.  It doesn't

3  make much difference.

4      MR. GIRARD:  In the Murrieta findings we refer to them

5  as "certain substantially impervious lenticular bodies".

6      THE COURT:  Substantially impervious, all right.

7      MR. VEEDER:  Isn't there a war between "impervious"

8  and "lenticular"?  I mean, if it is lenticular, as I

9  comprehend the  lenticular situation, you have beds of gravel,

10  sand, clay and silt.

11      MR. WILKINSON:  You have lenses.

12      MR. VEEDER:   That is what I say.  You have lenses,

13  which would indicate when you say "impervious lenticular

14  bodies" some of the lenses are not impervious.

15      MR. GIRARD:  We are talking about indurated older

16  alluvial deposits.  We are not talking about cobbles, gravel.

17  These substantially impervious lenticular bodies are older

18  alluvial deposits.

19      MR. VEEDER:  I don't believe the record will support

20  it.

21      MR. STAHLMAN:  Yes, it does.  Do you want me to give

22  you my geological interpretation of what happens there?

23      MR. VEEDER:  Why don't you do it this evening some

24  time?

25      MR. STAHLMAN:  Well, there is a difference between

what was laid down in the older alluvium and the aquifers

beneath there and the acquifers in the younger alluvium --

a substantial difference.. There has to be.  In the later

period, the Pelistocene period, when the older alluvium was

being laid down, that was a lake and that was very fine

material there for a short period of time, and that was what

compacted and made the difference between the aquifers below

and those above.

MR. VEEDER:  My silence doesn't mean I am convinced.

THE COURT:  Gentlemen, on Lines 24 and 25 "below the

level of all irrigation wells but the Navy well . . ."  Is

the Navy well an irrigation well?

MR. GIRARD:  Yes, your Honor.

MR. STAHLMAN:  We have blended it, your Honor.  The

evidence showed we use other waters.  We blended it and do

some irrigating with it.

THE COURT:  Change "but" to "except".

Semi-confined aquifer.

On Line 30 "semi-confined lenticular bodies".

Anything else on Paragraph 30?

COLONEL BOWEN:  May I make a remark on the sodium

content, your Honor?

THE COURT:  Yes, sir.

COLONEL BOWEN:  Actually, it is the percentage of

total dissolved solids.  The percentage of sodium in the total

19,540

1   dissolved solids is high, but it is not necessarily a high

2   sodium content.

3        MR. STAHLMAN:  That probably should be corrected.

4        MR. GIRARD:  How would you correct it, Ace?

5        COLONEL BOWEN:  "Water from said semi-confined

6   aquifer or aquifers are identified by the characteristic of

7   a high percentage of sodium content in the total dissolved

8   solids".

9        MR. VEEDER:  Take out the word "characteristic" and

10  put in what you said, wouldn't you?

11       COLONEL BOWEN:  That is right -- identified by the

12  high percentage of sodium in the total dissolved solids.

13       MR. VEEDER:  I wish you would read the sentence again.

14       MR. SACHSE:  How about trying this:  Water from said

15  semi-confined aquifer is identified by the high percentage

16  of sodium in the total dissolved solids as compared to the

17  lower percentage --

18       MR. VEEDER:  Of sodium content.

19       MR. SACHSE:  You don't have to repeat it again.

20       -- as compared to the lower percentage in the water

21  from the shallower aquifers.

22       MR. GIRARD:  Or the lower percentage found.

23       MR. SACHSE:  Yes.

24       MR. VEEDER:  Well, from the shallow aquifers, period.

25  Isn't that right?

19,541

MR. WILKINSON:  No, lower percentage found in the water.

MR. SACHSE:  -- from the shallower aquifers in the younger alluvium above the semi-confined.

MR. VEEDER:  But not the semi-confined.

MR. SACHSE:  His Honor did that already.

THE COURT:  Well, it's 12:00 o'clock.  Adjourn until 2:00 p.m.

(Noon recess.)


---oOo---

19,542

1    SAN DIEGO, CALIFORNIA, THURSDAY, APRIL 5, 1962, 2:00 P. M.

2                            ---oOo---

3        THE COURT:  Well, where are we?

4        MR. GIRARD:  We do have the exhibits for the Navy,

5    your Honor.

6        THE COURT:  Have you checked them over?

7        MR. GIRARD:  I did.

8        MR. SACHSE:  I am very happy with both Exhibit B and

9    with the map, your Honor.

10        MR. VEEDER:  I hadn't seen it until just now.  I call

11    your attention to "United States Naval Ammunition Depot."

12    "Fallbrook Naval Reservation", I think you make the

13    description in here.

14        THE COURT:  We could do it either way, by just inter-

15    lining in the judgment "referred to on the map as Fallbrook

16    Naval Reservation".

17        MR. GIRARD:  You could just put in parenthesis here

18    (U. S. Ammunition Depot).

19        THE COURT:  It appears twice, here and here.

20        COLONEL BOWEN:  That appears on the published maps,

21    your Honor.  We used the seven and a half minute quadrangles

22    of the U. S. Geological Survey on the Base, published and

23    printed, and they are in evidence in the 29-Series.

24        MR. VEEDER:  The record should show that we have used

25    "U. S. Ammunition Depot" from the outset, however.

19,543

1    THE COURT:  Put in here "U. S. Naval Ammunition

2  Depot".

3    COLONEL BOWEN:  If I may point out, your Honor, this

4  heavy line that appears encloses not only the Naval Ammunition

5  Depot but also Camp Pendleton.

6    Mr. SACHSE:  I don't see it is any problem.  We

7  described the U. S. Naval Ammunition Depot, as to what it is

8  and where it is.

9    MR. VEEDER:  I think when you have an exhibit it

10  should correspond with your findings.

11    THE COURT:  You can put a legend down here that this

12  map was based on the U. S. Geological Survey maps.  Where the

13  term "Fallbrook Naval Reservation" is used, it is referred to

14  in the case and in the judgment as "U. S. Naval Ammunition

15  Depot".  Why make the map over?  Wouldn't that do it?

16    MR. GIRARD:  Yes, fine.

17    MR. SACHSE:  All you have to do is to say "Fallbrook

18  Reservation as  delineated on this exhibit is  U. S. Naval

19  Ammunition Depot" referred to in the rest.

20    THE COURT:  All right, is that agreed?

21    MR. VEEDER:  It suits me, your Honor.

22    THE COURT:  All right, do you want to assemble them

23  and bring them in for me to sign?

24    MR. VEEDER:  It suits me, your Honor.

25    MR. SACHSE:  Yes, I would hope that we can this week

1  say that this has been entered.

2       THE COURT:  All right.  Here is the lodged original .

3  And I hope we made those corrections here.

4       MR. GIRARD:  Yes, they were made -- I checked them,

5  your Honor -- 52 and 62.

6       THE COURT:  So you can take the original and set it up.

7  And my copy must be here.

8       MR. VEEDER:  Have you signed it, your Honor?

9       THE COURT:  No.

10      MR. GIRARD:  One other point Colonel Bowen just

11 brought out to me, your Honor.  Going over to Page 42 in

12 these Naval findings, I used the standard language on the

13 things that were in Exhibit B.  Colonel Bowen advises me that

14 he didn't put any figures in on presently irrigated acreages,

15 and I guess the correct irrigated acreages should be

16 crossed out of Finding 52.  There is no irrigated acreage

17 figure in Exhibit B.

18      THE COURT:  Agreed?

19      MR. SACHSE:  What page?

20      THE COURT:  The last word on Page 42 and the first

21 word on 43.

22      MR. GIRARD:  Irrigated acreages appear on Page 42,

23 Line 27, Line 31, and on Line 8 on Page 43, and on Lines 15,

24 17 and 18.

25      THE COURT:  Now you should have a title for Paragraph

19,545

1    31.  Or is that part of the Pauba Valley?  It is part of

2    Pauba Valley.

3         All right, Vail Dam.

4         MR. VEEDER:  In regard to that Paragraph 31, your

5    Honor, you say that is part?

6         MR. STAHLMAN:  When you make reference to it you mean

7    Finding 38 and 43, the last line?  What do you mean, Bill?

8         MR. VEEDER:  I have Pauba Valley on Page 17, Finding

9    31.

10        THE COURT:  That is that groundwater divide.

11        MR. SACHSE:  Yes.

12        MR. VEEDER:  If that is the objective.

13        THE COURT:  That is what they have incorporated.

14        32.  Have you got your description right?

15        MR. STAHLMAN:  I am quite sure.

16        "Gauge" is spelled backward at Line 15.

17        THE COURT:  How is it spelled?

18        MR. SACHSE:  G-a-u-g-e.

19        MR. STAHLMAN:  We went over these carefully.  We

20   added, as your Honor suggested last time, the sea level

21   figures.

22        THE COURT:  What does gauge height mean?

23        MR. STAHLMAN:  That is the spillway height.

24        MR. SACHSE:  No.

25        THE COURT:  Yes, spillway crest at gauge height.

19,546

COLONEL BOWEN:  There is a staff gauge on the dam calibrated in hundredths of a foot.

THE COURT:  On the spillway?

COLONEL BOWEN:  Actually on the dam, your Honor.  It simply measures the elevation of the water.

MR. STAHLMAN:  The gauge is the extreme height of the spillway.

THE COURT:  33 and 34.  Anybody see anything in there?

MR. STAHLMAN:  There may be some correction here on Lines 22 and 23.

MR. VEEDER:  The gates were closed in November of 1948, isn't that right?

MR. STAHLMAN:  November 13, 1948 the gates were closed.

MR. VEEDER:  You began to impound water then?

MR. GIRARD:  No, they began impounding water before they closed their gates, according to Sandy.

MR. WILKINSON:  That is true.

THE COURT:  How much before?

MR. WILKINSON:  They impounded water for construction purposes all during the construction of the dam, your Honor.

MR. VEEDER:  That has not anything to do with it.  This is where you impound water with the dam.

THE COURT:  What difference would it make?  Is November 13, 1948 sufficient?

MR. WILKINSON:  I don't think it makes any difference.

1    The only difference would be probably the year prior to that.

2            THE COURT:  Your priority date is something else.

3            MR. SACHSE:  Your priority date has no relationship

4    with when it was closed.  That is just a historical fact of

5    interest as to what happened to the stream flow.

6            MR. VEEDER:  Yes, and it is extremely interesting to

7    us.

8            MR. SACHSE:  It is an extremely interesting fact.  But

9    what I mean is that I don't think it has any influence on

10   the stream flow.

11           MR. VEEDER:  All I am hopeful is that we have a date

12   that is accurate and that this is the date that I comprehend

13   when the dam really began operation.

14           MR. STAHLMAN:  I think when you close your gates.

15           MR. SACHSE:  That is what I would say.

16           THE COURT:  That is the date?

17           MR. WILKINSON:  That is the date, your Honor.

18           Mr. SACHSE:  Mr. Girard raised the question, but I

19   think this language is right.  He says permit issued by the

20   State of California.  In our case we said by the State Water

21   Rights Board.  But this was not issued by the State Water

22   Rights Board.  This was before the State Water Rights Board

23   existed.  So I think this is correct language.

24           THE COURT:  All right.

25           Paragraph 36.  You are going to attach an exhibit,

your application, is that right?

1        MR. STAHLMAN:  No, that is the Exhibit A in this case,

2   your Honor.  We should make that clear.  That is the Exhibit

3   A in this case, the first exhibit we put in.

4        THE COURT:  You can just say Vail Company Exhibit A in

5   this action.

6        MR. STAHLMAN:  Very well.

7        THE COURT:  Nobody will be turning the pages to try to

8   find it.

9        MR. VEEDER:  I am going to object to the word

10   "surplus" on Line 13 of Paragraph 37.

11        MR. SACHSE:  I object to your objection.  I think it

12   is a proper word.

13        MR. VEEDER:  When you   use all the waters in the

14   stream you can be very sure --

15        MR. STAHLMAN:  If you read on further, you will find

16   there are certain releases.  We had that amplified in our

17   first go-round and had to strike it out because it was a

18   matter for apportionment.

19        MR. VEEDER:  Why don't you say "put to reasonable

20   beneficial use the waters of Temecula Creek  "?   You can't

21   say they are "surplus waters."

22        MR. SACHSE:  They are under the terms of   their permit.

23        MR. VEEDER:  All right.  I am not going to agree that

24   they are surplus waters when they impound every drop of water

25   in the stream.

1    MR. STAHLMAN:    We don't impound every drop of water

2    in the stream.

3        MR. VEEDER:  You do.

4        MR. STAHLMAN:  When the releases are made there are

5    waters that go underground and they are equivalent to what

6    the stream would be, and that is in accordance with the permit.

7    The figures are filed each year with the State on that.

8        MR. VEEDER:  I know what your figures are, George, I

9    know what you impound, I know what you release, I know when

10   you impound, I know when you release.  The point is "stored

11   and put to reasonable and beneficial use waters of Temecula

12   Creek".  If you say "surplus waters" I object to it.  It is

13   not surplus water.

14       MR. GIRARD:  It is not being used by anyone at the time

15   it is being stored.

16       MR. VEEDER:  They are impounding many times water that

17   is the only water in the stream, all the water in the stream.

18       MR. GIRARD:  I would venture to say the only time Vail

19   has ever impounded water, or 99 per cent of the time they

20   have impounded water there is water in the stream.

21       MR. STAHLMAN:  Also, waters run into the ocean.

22       MR. GIRARD:  Certainly this year the only time they

23   caught their 1,000 acre feet or whatever they caught, there

24   was water flowing downstream.

25       MR. VEEDER:  I would say this to you, if you go back

19,550

1   and read the records, which would be a pious idea, you will

2   find that they impounded water throughout the year, that there

3   was no water released in many, many months.  So when you say

4   it is surplus water you are saying it is above and beyond all

5   demands.  And that is not right.

6       THE COURT:  You have taken all the water of the stream

7   that came down.  Then you have thereafter released water.

8       MR. STAHLMAN:  Yes.

9       THE COURT:  You have released water for other than

10  your irrigation purposes?

11      MR. STAHLMAN:  Yes.

12      MR. VEEDER:  Very small amounts.

13      MR. STAHLMAN:  In accordance with our permit.

14      THE COURT:  The very fact that you released water

15  indicated that these waters that you released were not

16  surplus waters.

17      MR. STAHLMAN:  I think that is right.

18      MR. VEEDER:  They put them into their distribution

19  system, the vast majority.

20      THE COURT:  What does the word "surplus" add?  It is

21  sort of an adjudication that all the waters caught up to the

22  date of this decree were surplus.  I don't think that is true

23  if you release water into the stream from the dam for use

24  below.

25

1    THE COURT:  What do you do now in the summertime?

2  Suppose you had a flow coming into the dam in the summertime.

3  Do you release as much?

4    MR. STAHLMAN:  More.

5    THE COURT:  How do you gauge what comes in above?

6    MR. STAHLMAN:  It has been calculated as to what the

7  release is between Vail Dam and the catchment where it goes

8  into the stream a mile or so downstream, that that quantity

9  of water goes underground.  That has been calculated and

10  those figures are supplied to the State each year.

11    MR. VEEDER:  George, you release  water directly into

12  your distribution system all of the time and you use your

13  water.

14    MR. STAHLMAN:  My goodness, Bill, I just got through

15  saying you don't release it directly into the distribution

16  system.  It flows through an open channel of very highly

17  porous material which it has been calculated that when so

18  much water is released so much goes underground and goes

19  into the basin.

20    THE COURT:  Where does that channel lead to?

21    MR. STAHLMAN:  The channel leads down, your Honor, to

22  a weir where the water then is backed up in a sump and flows

23  over the weir and is measured and goes into the concrete

24  distribution system.

25    THE COURT:  So that you have a measurement of how much

1    you release from the dam and you have a measurement of how

2    much goes over your weir?

3         MR. STAHLMAN:  Yes, your Honor.

4         THE COURT:  And the difference between the two is the

5    amount that went into the alluvium?

6         MR. STAHLMAN:  Subject to a slight evaporation loss.

7         MR. VEEDER:  But they have their pumps in the alluvium

8    and they are pumping it out.  Also, some of the water goes

9    directly into their distribution system.

10        MR. STAHLMAN:  If we didn't have a dam we would have

11   pumps into the alluvium.

12        MR. VEEDER:  The statement is not right.  You can take

13   a look at the USGS records in this case and you will find it

14   is not borne out.  You can also take a look at your own

15   Exhibit N and find it is not borne out.

16        MR. SACHSE:  I still don't quite understand your

17   complaint, Mr. Veeder.  Is it that you feel that Vail has

18   impounded waters at times that they are not permitted to?

19        MR. VEEDER:  Many times.

20        MR. SACHSE:  Outside the terms of their permit?

21        MR. VEEDER:  Yes.

22        MR. SACHSE:  After April 30th?

23        MR. VEEDER:  Yes.

24        MR. SACHSE:  If that is in the record, then I am not

25   aware of it.

19,553

1      THE COURT:  It has to be, Franz, that every drop of

2  water that comes down is impounded.

3      MR. VEEDER:  That is right.

4      THE COURT:  Regardless of the day of the month or the

5  year it comes down.  It is impounded.

6      MR. SACHSE:  That is right -- whether it is stored or

7  goes out or how.

8      THE COURT:  Right.

9      MR. SACHSE:  In other words, your Honor, the way I

10  visualize the Vail permit operating, the way I have always

11  visualized it is that the State Water Rights Board determined

12  that for the period of about November 1 to about April 30th

13  of each year they could stop the river and hold it.

14      MR. VEEDER:  And they do.

15      MR. SACHSE:  And they do.  And that is within the terms

16  of the permit, and that is the surplus water we are talking

17  about.  Physically, of course, the dam stops what summer flow

18  there is.

19      MR. VEEDER:  That is right.

20      MR. SACHSE:  But if Vail were just to stop and let

21  that accumulate behind the dam, that would be a violation of

22  their permit.

23      MR. VEEDER:  They do.

24      MR. SACHSE:  As I understand, they do not, Mr. Veeder.

25  That the calculations have been that the discharge through

1   an open ditch below the dam is supposed to be, if they do it

2   properly, in an amount to represent what comes in at the

3   upper end.

4        Isn't that the way it is supposed to be?

5        MR. STAHLMAN:  Yes.

6        THE COURT:  And then some of that goes into the

7   alluvium and some of it goes into the irrigation system and

8   is put upon the ground and is added to the water put into the

9   basin.

10       MR. STAHLMAN:  That is how I have conceived it.

11       THE COURT:  Which is what you would do anyhow if the

12   dam was not there.

13       MR. STAHLMAN:  Exactly.

14       MR. VEEDER:  I will file objections and tabulate the

15   things.  I have it all tabulated anyway, and I will show this

16   is not correct, your Honor.

17       MR. STAHLMAN:  Running that water downstream from the

18   dam down to that point, we accelerate the flow; we put it

19   further into the basin than it would have gone in the state

20   of nature.

21       MR. VEEDER:  Now George.

22       MR. SACHSE:  I would be very much interested, really,

23   if I thought the Vail permit had been violated.  That is one

24   thing.  But this language you are talking about here refers

25   entirely to winter storage.  It says:  Pursuant to said

1    permit and in compliance therewith, that is, between

2    November and April of each year, Vail has impounded, stored

3    and put to reasonable and beneficial use surplus waters.

4    Waters from November to April are surplus waters.

5        MR. VEEDER:  Not necessarily.  Not so far as we are

6    concerned.  So far as we are concerned, we are using water

7    the year round and we are pumping it out of the basin the

8    year round.  So you have to take a look at a military use as

9    being different than the ordinary agricultural use.  So you

10   have what you have.  We have a twelve-month use .

11       I am not going to buy the idea that it is surplus.  I

12   am not going to buy the idea that Vail makes the same releases

13   as if the water were in a state of nature, because that is

14   incorrect.  They impounded 45,000 acre feet since 1948.  They

15   have lost through evaporation 15,000 acre feet of water.

16       Now, the point I want to make on it is that when we

17   began discussing a very crucial point here, we can't use the

18   language that has been used.  Go ahead and use it, if you

19   desire.  I will simply object to it.

20       MR. GIRARD:  Is it your position, Mr. Veeder, that

21   water stored by Vail in the winter is water which you would

22   have a riparian right to?

23       MR. VEEDER:  I say some of the water most certainly is.

24       MR. GIRARD:  Would you say the same thing about your

25   storage in Lake O'Neill?

1    MR. VEEDER:  During some of the months our storage, our

2    1883 priority there entitles us to impound after April.  We

3    have agreed, and I think it was a very proper agreement, to

4    try to catch some of the winter water.  So you have a different

5    situation than is reflected by these findings.  You have a

6    very important factor, from our standpoint, of getting

7    recharge down to our basin.  I think these findings can be

8    written so that they will be acceptable to us.

9        THE COURT:   Let me give you an example.  Suppose, for

10   example, that the United States were not exporting water from

11   the lower basins and you got into a series of dry years,

12   worse than what we have had now, and the United States pumped

13   their basins down and they were down toward the bottom.  And

14   then you have a poor winter runoff, which we have had, and a

15   very little bit of water comes in.  The mere fact that the

16   State Water Rights Board or the State of California has issued

17   a permit to Vail and said, "You may impound water during

18   November to April" doesn't mean, as I understand the permit,

19   that they may impound that water if it is water that should go

20   to a proper riparian use.

21       MR. GIRARD:  That is right.

22       MR. SACHSE:  That is right.

23       MR. STAHLMAN:  I agree with you.

24       THE COURT:  So the dates that are taken are taken on

25   a general basis.  Ordinarily in that period you have flood

19,557

waters.  But you could well have situations, and you may have had situations in these dry years where there was water impounded there which, strictly, was not surplus water.

MR. GIRARD:  Let me point out one thing to you.  Is it conceivable, your Honor, that you could have had that situation at Vail in any situation where the coastal basins were so low and it was not a flood year?  Certainly there is no doubt at all if Vail Dam had been there that that water would never have got out of Pauba Valley.

MR. VEEDER:  Not necessarily.

THE COURT:  You can't necessarily say that for the reason that the rainfall may vary and you may get more in one area than in another, and you may have had a situation where Pauba Valley still had water and a lot would not have gone into the alluvium in Pauba Valley and some would have gone down the lower basin.

The effect of putting in the word "surplus" there, as I see it, in substance is an adjudication by me that heretofore every single drop of water that was impounded was properly impounded.  I don't think this is a decision I have to make.  I don't think there has been any gross violation of this permit, from what I have seen about it.  But I don't know that I have to go so far as to say that everything you did was exactly right and let it be some precedent in the future.  Because just as I told Mr. Sachse as to the Fallbrook

1    Dam, you can build a dam but this Court is going to decide

2    how much of that water he catches ought to go downstream.

3         MR. SACHSE:  I have to agree.  I will back up.  I

4    hadn't seen Vail's permit.  I thought they had conditions in

5    it, but they don't.

6         THE COURT:  What is it you see in the permit that

7    changes your mind, Mr. Sachse?

8         MR. SACHSE:  I was under the assumption that their

9    permit contained a clause, such as is found in ours, where it

10   states specifically as a condition that the permitee shall

11   release water of the Santa Margarita River downstream from the

12   point of diversion in such amount and in such rates as will

13   be sufficient, together with downstream tributary systems, to

14   supply downstream diversions under vested prior rights to the

15   extent water would have been available for such diversions

16   from flow unregulated by permitee's works.  But that condition

17   does not appear in the Vail permit.

18        THE COURT:  It is implied when they say that it is

19   subject to all prior vested rights.

20        MR. SACHSE:  I was assuming that Mr. Veeder was

21   necessarily saying they had acted in violation of the permit.

22   I don't think they have.  Their permit doesn't say this.

23        MR. STAHLMAN:  In the first place, I think there are

24   a few things that need clarification, your Honor.  Mr. Veeder

25   makes these gross assumptions.  It may be that the word should

1    come out, however I think there are some other factors that

2    affect it.   When you get down a little further where we talk

3    about the Court having control over the releases, et cetera,

4    the language is as follows -- this is Paragraph 39:

5        ". . .The Court makes no finding that such surplus

6    waters will be available in the future and reserves continuing

7    jurisdiction of this cause and the parties thereto to prohibit,

8    restrict or control, upon proper showing, any extraction,

9    diversion, or use of water under said rights to appropriate.

10   The right to appropriate surplus waters of said Creek is

11   subject to the jurisdiction of the Water Rights Board of the

12   State of California and the laws of said State."

13       We have two other findings that were kicked out the

14   first time upon the basis that they were proper for an

15   apportionment.

16       Just to show you the exaggerated statement that Mr.

17   Veeder makes as to the facts of the case, one of them is that

18   the surplus water, this water that we stop, when it is applied

19   to irrigation, this large volume of it that returns to the

20   basin is a benefit to them.   And those are all things that

21   will be considered, I presume, if we came to the situation

22   where your Honor gave the example of the dry year when they

23   were out of water down there.   Certainly your Honor could step

24   in and regulate it.

25       So the statements Mr. Veeder makes in support of his

1    objections to the findings are completely fallacious.   They

2    don't comport with the facts of the case.   They are unrealistic,

3    and they endeavor to punch home in this record continuously

4    something he has contended right along, that Vail Company

5    stopped the whole river and has ruined the river.

6              MR. VEEDER:   That is about what happened.

7              MR. STAHLMAN:   That is not what happened, and I think

8    it is completely ridiculous for an officer of the Department

9    of Justice to make statements of that kind, and I think it

10   characterizes the method, means and manner in which Mr. Veeder

11   has been trying the case all the way through, and the

12   conditions that have preceded the tumult and the discord.

13             THE COURT:   Well, let's cool down.

14             MR. STAHLMAN:   I am not hot.   I am just --

15             THE COURT:   You may not be hot, but somebody else will

16   get hot in real short order.

17             MR. VEEDER:   That's for sure.

18             The point I make to your Honor -- I don't intend to

19   take up any more time this afternoon -- I will demonstrate

20   that Vail Company has impounded water in excess of what could

21   be reasonably called surplus water.   I will demonstrate in

22   regard to the waters that are released into their lake,

23   irrigation in acre feet.   I am referring now to Vail Company"s

24   N, Lake to Basin Acre Feet.   So you have their own evidence

25   here, and just correlate it back against the annual crop of

19,561

Temecula Creek, which I have done and I have done it with
experts, and I will guarantee you that you will find that
they have used huge quantities of water as related to the
runoff of the stream.

Now, set them up any way you want. I am not going to
take any more time on it.

THE COURT: Now wait. What finding do you want me to
make? Are you going to urge upon me a finding that Vail
Company has used more water than they should have or has used
riparian water under the guise of appropriation?

MR. VEEDER: I want to formulate that in an objection.

THE COURT: Is this what you would want me to find?

MR. VEEDER: Yes, I will recommend that finding.

THE COURT: What would be the effect of that finding?
Suppose Vail Company in the past had used more water than it
should have used. It is not my job here to undo what has
been done.

MR. VEEDER: That is right.

THE COURT: It is my job to look to the future. What
use would it be in this case?

MR. VEEDER: May I tender this thought: Finding No.
37, "Pursuant to said permit issued by the State of California
and in compliance therewith, . . . Vail Company has, . . .
impounded, stored and put to reasonable and beneficial use
surplus waters  . . ."  I simply say that is incorrect.

19,562

THE COURT:  Answer my question.  Suppose I made a finding that Vail Company had used, under the guise of its permit, the riparian waters which should have gone downstream and instead had impounded them allegedly as surplus or appropriative water.  Suppose I found that.  What effect would it have?  This is an equity decree.  It speaks prospectively. It doesn't speak retroactively.  I can't give you back a bucket full of water you should have got in the past.  What good does it do?

MR. VEEDER:  I think it would show a history of use and I think it is extremely important.

THE COURT:  Tell me logically what effect could it have in the future or anywhere else?

MR. VEEDER: Because it shows a course of practice. You see, you have also your findings and conclusions of law in regard to the stipulated judgment.  And this worries me very much when I begin to read these findings in connection with the findings you have.  I don't want to be dealing myself out of some future recourse by the kind and type of findings that are being written.

I would say that it would be perfectly proper to say that Vail Company have closed the dam, they have impounded water, they released the water, they have used the water beneficially.  No doubt about it.  But I do object when you say --

1    THE COURT:  Let's get back to what I am asking you.

2  Regardless of how I draw this finding up on the past, what

3  difference is it going to have in the future?  In the future

4  a situation comes up and the Court or the Water Master, with

5  the approval of the Court, has to decide how much water should

6  be released.  What has past history got to do with it?

7    MR. VEEDER:  I think it would show a history of use.

8    THE COURT:  Under some "bad boy" statute?  That they

9  were bad boys in the past and therefore a fortiori they are

10  bad boys in the present?

11    MR. VEEDER:  I think it is extremely important, the

12  history of their use.

13    THE COURT:  Now be logical.  What difference would it

14  make?  I am not going to spend a lot of time reading past

15  records and seeing whether in 1953 Vail Company had a

16  thousand acre feet that they improperly stored.  How is that

17  going to help me decide the future?  Not a bit.  If you have

18  an apportionment, or if you have a question as to what Vail

19  Dam released, I am going to look at the figures as they then

20  stand -- what water comes in, what water has been used, what

21  water is needed below, and as I think the law is their right

22  to appropriate, even though it says between certain dates,

23  is subject to prior vested uses downstream.

24    MR. VEEDER:  Your Honor, you asked me a question in

25  futuro.  May I go back to in presenti, as the man says, and

5 fls

19,564

look at what we are writing here.  We are talking in regard
to historical compliance.  As I say, I don't want to have you
find and say they were bad boys in the past.  But let us
not, for goodness sake, say they were good boys in the past
either.  Let's simply reflect the facts as they exist.  A
permit was issued, a dam was built, the dam was closed, water
has been released, water has been beneficially used.

THE COURT:  I am inclined to take out the word
"surplus" and maybe some of this "compliance" in the sense
that I am not called upon now to put a stamp of approval or
disapproval.

MR. GIRARD:  Maybe I would like to take you and Mr.
Veeder on, on this point.  I think the evidence is conclusive
that they have taken surplus water out.  I don't think there
is any doubt about it.  I would like to say this.  There is
no question at all that right now today the basins at
Pendleton are almost as full or as full as they practically
could be.  The groundwaters are five or six feet.  They are
pretty full right now -- the upper and middle basins.   There
is not doubt that in the past, since Vail Dam has been built,
the United States of America has been able to get all the
water they needed for those years.

MR. VEEDER: That is incorrect.

MR. GIRARD:  From the Santa Margarita River.

MR. STAHLMAN:  And enough to put outside the watershed.

1      MR. GIRARD:  They have satisfied their uses of the

2  Santa Margarita River water by pumping out, and they have never

3  had -- outside of the salt water intrusion, which is not

4  related to Vail Dam, I don't think -- but outside of that,

5  they have been able to pump the water they needed for the

6  military enclave, and even if their basins did drop down

7  with Vail's use, even despite that, these basins have filled

8  up.

9      THE COURT:  Now, wait.  It is true that they have

10  satisfied their needs.  But how have they done it?  They

11  have done it, in part, by reclaiming sewage water, which they

12  would not have been required to do.  If they hadn't reclaimed

13  sewage water they would have been in bad shape.  I don't

14  know of any law that requires a water user to reclaim his

15  sewage water.  The water law hasn't gone that far yet.

16      MR. GIRARD:  No.  But also outside the watershed,

17  you balance the water they wrongfully used with the amount

18  they have returned -- I don't think it is equivalent.

19      THE COURT:  Let me ask you another question.  I will

20  ask you the same thing I asked Mr. Veeder.  What difference

21  does it make whether I say they were bad boys in the past

22  or they were good boys in the past?

23      MR. GIRARD:  Absolutely none.

24      THE COURT:  All right.

25      MR. GIRARD:  But I wanted to bring out clearly that

1    there is certainly no evidence that they have been bad boys

2    in the past, and in my view I don't think it is necessary to

3    consider it now at all -- it doesn't make any difference.

4    The evidence, in my view, is that they have been good boys.

5         MR. VEEDER:  I want to respond to Mr. Girard, your

6    Honor.

7         THE COURT:  Mr. Stahlman.

8         MR. STAHLMAN:  That is the point I want to clear up,

9    your Honor, that Mr. Veeder doesn't make a record here that

10   he will go back and say that the Vails have been doing this

11   and that.   In other words, he is presupposing and presuming

12   in his argument that we have done these things, and there is

13   no evidence whatsoever.   If you would balance out the abuses

14   to this stream system by Pendleton and those that you contend

15   by Vail, there is just no comparison between the two.

16        THE COURT:  Mr. Veeder.

17        MR. VEEDER:  I want it clear that this Court has ruled,

18   and ruled clearly, that waters coming down to Camp Pendleton

19   can properly be used outside the watershed and any place else,

20   and that is what has been used.   They didn't go upstream to

21   get this water.   The water came down and they used it, and

22   you said that is perfectly proper use.   So let's knock off

23   this "bad boy" stuff about shipping outside the watershed.

24   That was water which came down to Pendleton and Colonel Bowen

25   had a right to export it and by your own findings you yourself

1    ruled that they have that right.

2         What I want to do -- I am not trying to ask you to

3    unring the bell -- I am saying let's simply recite the facts

4    without saying "compliance", without saying "surplus."   Say

5    this transpired.   That is all I ask.

6         MR. GIRARD:   I have no objection to striking the word

7    "surplus".

8         MR. VEEDER:   And "compliance", too?

9         MR. STAHLMAN:   I don't go for the "compliance."

10        MR. VEEDER:   I will agree you were appropriating under

11   a permit.

12        MR. STAHLMAN:   We caught the water that was running

13   down to the ocean.   We have conserved and preserved water.

14        MR. SACHSE:   I don't think "compliance" belongs there

15   at all.   "Compliance" implies you are doing something they

16   told you to do.   I think the word "compliance" could go out.

17        THE COURT:   Can't we solve it all by saying exactly

18   what we mean?   Can't we say that the Vail Company has

19   impounded, stored and put to beneficial use waters of

20   Temecula Creek, period?

21        MR. VEEDER:   That is right.

22        THE COURT:   That the Court makes no finding as to

23   whether or not the actions of Vail Company under the permit

24   were proper or improper.

25        MR. VEEDER:   Yes, I will go along on it.

19,568

1    MR. STAHLMAN:  If you will wait just a minute, Bill, I
2    think we can do it.

3    Scratch out the words "and in compliance therewith"
4    on Line 11 and scratch out the word "surplus".

5    MR. SACHSE:  Doesn't that do it?

6    MR. VEEDER:  That is what I have been asking.

7    MR. STAHLMAN:  Let it go out.

8    THE COURT:  Then you don't want me to say just
9    exactly what I have said?

10    MR. VEEDER:  I would be very happy to have you say
11    what you said.

12    THE COURT:  Because I don't think it has any possible
13    bearing on any later issue in this case what happened in the
14    past.  We are going to decide these issues on the basis of
15    what water there is and the need for it, and why should I go
16    back through a bunch of figures?  You might find that Vail
17    Company had actually released more water than they were
18    supposed to have released.

19    MR. VEEDER: That will never occur.  But, so far as
20    I am concerned, I think if we would just recite the facts
21    as they are, it suits me.

22    MR. STAHLMAN:  Here is what concerns me, your Honor.
23    Mr. Veeder has previously submitted in writing some proposed
24    findings in relation to these matters.  I don't know whether
25    it was brought to your Honor's attention.  But there were

some figures compiled and Mr. Veeder took them to
Washington and they came back the most unrealistic and the
most "fakey" figures.  Colonel Bowen didn't work them up.
When they were worked up by Colonel Bowen later, they were
entirely different figures.  And they are different figures
from what we have, and we have realistic figures as to what
the situation was.

THE COURT:  Well, is the agreement, gentlemen, that
whether or not Vail Company did or did not impound some
riparian water under the guise of impounding surplus water
is utterly immaterial to this case at this time?

MR. STAHLMAN:  I believe it is, your Honor.

MR. GIRARD:  I think it is.

THE COURT:  Is it agreed, Mr. Veeder?

MR. VEEDER:  I want to withhold on that, your Honor.

THE COURT:  No, I am about ready to go along with
what you want here.  But let's be honest.  Can you think of
any way in which it is material?

MR. VEEDER:  I think this.  In view of your ruling
on the stipulated judgment, it may be important.  In regard
to the findings as now being written, I think you have
tendered the precise language that should be used.  I think
it is all right.  Because, in these findings if you recite
what transpired, I think you do reflect the situation where
Vail has acquired an appropriative, is not exercising an

19,570

appropriative , and is using the water benficially.

MR. STAHLMAN:   I think if you put in a finding like that, in the light of your statements into this record here, that the implication is that the Vail Company has violated its permit.  You say you are not making a finding on it.  A minute ago, before I scratched this out, he said exactly what he would be satisfied with, and it is exactly what is in this finding.

THE COURT:  He just said he is entirely satisfied with your finding, with those words out.

MR. VEEDER:  Take out the word "surplus" and the word "compliance".  I think then it is reflective.

THE COURT:  And you are not urging upon me, then, any other  finding in lieu of this?

MR. VEEDER:  I am not going to assure you on that.  I have to take a look at the whole record.

THE COURT:  That is what we are here for.

MR. VEEDER:  Your Honor, here is my problem.  It may be necessary for me to file some objections to these and I don't want that foreclosed on me.  It is only a reservation. We are going through these as to form.  We are hammering these out as carefully as we can.  I am confronted with Mr. Stahlman shouting about my flimsy record and my flimsy figures and who worked them up.  I don't know what he is talking about, frankly.  But I do know that we are looking at

19,571

a certain set of findings. You have made a proposal that I think is fine. I would be willing to buy it for this set of findings.

MR. STAHLMAN: We are also entitled to riparian water in the summertime, too.

THE COURT: I am trying to interpret what Mr. Veeder means when he says "I am willing to buy it."

MR. VEEDER: I simply say we have a finding, No. 37, before us, in which you say, " Pursuant to said permit issued by the State of California . . . Vail Company has since November 13, 1948, impounded, stored and put to reasonable and beneficial use waters of Temecula Creek when said waters were available. Impoundments have been made in varying amounts and the maximum amount in any one year since the operation of Vail Dam was 12,500 acre feet. Due to lack of rainfall..." those are the facts that are supported by the record. I don't know exactly what the word "reasonable" means, but it certainly has been for a beneficial use, and it has certainly been impounding the water and therefore certainly there have been releases. I don't see why we have to take the additional step. You said you didn't want to condemn them for being "bad boys", I simply say, recite the facts.

THE COURT: I want to get some of these issues settled as we go along. If you are going to come to me with some compilation of figures and urge an objection or a finding

19,572

1    that Vail took more than their appropriative share, when I

2    get through going over the figures I may put in a finding,

3    if I disagree with you, that Vail's use of their dam has

4    been entirely proper and in full compliance with the permit.

5         MR. VEEDER:  I can give you an example, your Honor.

6         THE COURT:  So it is going to work one way or the other.

7    If you want to keep kicking this around about these figures

8    you say you have and make some objection, we may have to

9    amend it, and if I agree with you that is one thing.  Id I

10   disagree, I may go the other way and put in a finding here

11   that everything they have done has been proper.

12        I don't think it is material, though, and I wanted you

13   to agree that it was not material and didn't have any

14   bearing on this case at this time.

15        MR. SACHSE:  May I remind your Honor and Mr. Veeder,

16   of course, the identical problem arose in the language you

17   asked for in the last paragraph of the findings on the Naval

18   Enclave where you stated that the Fallbrook Public Utility

19   District in violation of its irrevocable license took certain

20   water.  We kicked this around and we finally all agreed that

21   all his Honor should state was that the irrevocable license

22   was cancelled.  That is the only thing that matters now.  If

23   in '46 we took   more or less than we were entitled to, it

24   was utterly immaterial, and you accepted that and that is

25   the way it is written.

1    MR. VEEDER:  Is that what I said?

2    MR. SACHSE:  You said it is perfectly all right;let's

3  just say we cancelled the permit.  And that is what the

4  findings now recite?

5    MR. VEEDER:  That is right.

6    MR. SACHSE:  Why is it at all material,to use your

7  words, to say whether they are good or bad boys?  I don't

8  think it makes any difference.  The word "surplus" and the

9  word "compliance" are deleted. What are we bickering about?

10    MR. VEEDER:  I am not bickering.

11    MR. STAHLMAN:  Let's go to the next one, then.

12    THE COURT:  All right.

13    MR. VEEDER:  "The rights granted by the foregoing

14  permit . . ." I don't think it granted any rights.  I think

15  you acquired some rights when you applied the water to

16  beneficial use.

17    MR. STAHLMAN:  Make it "The rights acquired by the

18  foregoing permit".

19    MR. VEEDER:  I think that is right.

20    THE COURT:  Or exercised under.

21    MR. VEEDER:  Or pursuant to; I don't think the permit

22  grants you rights, that's all.

23    MR. STAHLMAN:  We also acquired some rights, too.

24    MR. VEEDER:  You have acquired rights by diversion and

25  applying the water to beneficial use pursuant to the permit.

1    MR. STAHLMAN:  Yes.

2    MR. VEEDER:  That is what transpired.

3    MR. SACHSE:  Is it okay, then, to have "The rights

4  exercised under the foregoing permit"?

5    MR. VEEDER: All right.

6    MR. GIRARD:  Pursuant to.

7    MR. VEEDER:  Do you have them both in there,

8  exercised pursuant to?

9    MR. GIRARD:  Of course, I don't agree.  I believe the

10  permit itself gives you rights.  I don't go along with Mr.

11  Veeder that you only acquire a right in the sense      when

12  you put water to use.

13    MR. VEEDER:  That is correct.  The Vail Company, for

14  example, has a vested appropriative right to the full extent

15  of whatever right they divert and put to beneficial use.

16    THE COURT:  I would suggest this:  The rights heretofore

17  exercised and hereafter to be exercised -- that is really what

18  it is.

19    MR. VEEDER:  That is right.

20    THE COURT:  The rights heretofore exercised and to be

21  hereafter exercised pursuant to the foregoing permit.  Isn't

22  that better?

23    MR. VEEDER:  I think that is reflective of what they

24  have, yes.

25    MR. GIRARD:  Okay.

19,575

MR. VEEDER: Are you on 39 now?

MR. SACHSE: Yes.

MR. VEEDER: "There have been at times prior to the construction of Vail Dam surplus waters sufficient to provide the .40,000 acre feet of annual storage . . ." As a matter of fact, there has only been on year, hasn't there?

MR. STAHLMAN: No.

MR. VEEDER: In the period of record. I think 1927 is the only time.

MR. STAHLMAN: 1916.

MR. VEEDER: I say in the period of record. You don't have records prior to 1923.

MR. STAHLMAN: We do.

MR. VEEDER: Certainly they are not in evidence in this case.

MR. SACHSE: Mr. Veeder, I don't know whether George sees the nigger in the woodpile here, but I think I do. You wouldn't ask the Court now to make a finding that the Water Rights Board was talking through its hat when it gave him a permit and that there never was any surplus water even before they built the dam? Is that what you are getting at?

MR. STAHLMAN: The whole construction of the dam must be approved by the Water Rights Board and the size of the structure is predicated upon historical figures they have.

MR. VEEDER: Again I will say to you that on the basis

1   of the record in this case I would say that there have been

2   times --

3        THE COURT:   Go ahead.

4        MR. VEEDER:   Well, to begin with, I would simply change

5   the whole tone and temper of Finding 39 and say that there

6   has been at times in the past surplus water.  I wouldn't put

7   it on the basis of 40,000 acre feet.

8        THE COURT:   Let me ask you, what difference does it

9   make?  The dam is built.  It is a fait  accompli.

10       MR. VEEDER:   I agree.

11       THE COURT:   What difference does it make?

12       MR. VEEDER:   It does make a difference when you say,

13  as you say here, or at least it carries the idea that this

14  stream yielded surplus waters in quantities sufficient to

15  provide Vail with 40,000 acre feet.  I don't know.  The record

16  will not support it.  The evidence is not in that would

17  support it.  I would say that at times there have been surplus

18  waters, if it is important.  Again, I don't see why it is

19  important at all.  I don't know what this finding contributes.

20       MR. GIRARD:   It is very important here.

21       MR. VEEDER:   Your Honor, what is the importance of it?

22       MR. STAHLMAN:   They gave a permit for 40,000 acre feet.

23       MR. VEEDER:   Recite it.  I'll buy that.

24       MR. GIRARD:   When they do that, they have to make a

25  finding that based on past records 40,000 acre feet has been

1    in existence.

2         MR. VEEDER:  I don't think the State Water Rights Board

3    is res judicata here.

4         MR. GIRARD:  I am sure we have plenty of evidence on

5    that, and I am sure that Mr. Veeder and Colonel Bowen can tell

6    you it has happened in the past.

7         MR. VEEDER:  They can't tell me from the record in this

8    case that it has happened in the past.

9         MR. GIRARD:  I think they can.

10        MR. SACHSE:  Here are the records in  this case.  In

11   hydrologic units 2 and 3 of Bulletin No. 57, which drain into

12   the Vail Dam, they show there was 57,000 acre feet of runoff.

13        MR. VEEDER:  Wait a minute.  That is not in the record.

14   That part of the Bulletin No. 57 is not in the record.

15        MR. STAHLMAN:  It does support the figure in the permit,

16   however, which is in the record.

17        MR. VEEDER:  Those are not in the record.  I certainly

18   object to the use of them.

19        MR. STAHLMAN:  1915 and 1916.

20        MR. VEEDER:  1915 and 1916 are not in the record.

21        MR. STAHLMAN:  Why don't you keep still once and give

22   somebody else a chance?

23        MR. VEEDER:  I just don't want any mistakes made.

24        MR. GIRARD:  Is the United States interested in the

25   truth or just what is in the record?

19,578

MR. VEEDER:  I am extremely interested in the record.

MR. GIRARD:  Not interested in the truth?

MR. VEEDER:  Outside the record there is no truth, young man.

MR. STAHLMAN:  I think you are outside the record you are outside the record right now, Bill.

THE COURT:  What figures do we have?  How far back do they go?

MR. VEEDER:  1923.

MR. GIRARD:  As I recall, you introduced in evidence at the last session two pictures which were of 1916, weren't they, your Honor.

THE COURT:  I have one.

MR. GIRARD:  And we introduced them  in evidence, didn't we?

COLONEL BOWEN:  The rainfall records in this case begin with February, 1923, your Honor, as shown here by months and by years in the final column.

THE COURT:  Are these totals?

COLONEL BOWEN:  The totals for each year, your Honor, are shown on the right hand column.  In 1927, 40,457 acre feet.

MR. VEEDER:  That is the only year.

COLONEL BOWEN:  At the head of Nigger Canyon.

MR. STAHLMAN:  Well, that is the past.  In 1960,

1    75,800 acre feet.

2         MR. VEEDER:  Where?

3         MR. STAHLMAN:  Vail Dam.

4         MR. SACHSE:  This is the appendix to Bulletin No. 57.

5         MR. STAHLMAN:  The appendices are in, aren't they?

6         MR. VEEDER:  This is not in, no.

7         MR. SACHSE:  Let's get the information.

8         MR. STAHLMAN:  We will offer it at this time.

9         MR. VEEDER:  I am going to object to it at this time.

10   We have gone through this once.  We have put in the records

11   for one year, 1927, and there was no showing that that was

12   at all surplus.

13        MR. STAHLMAN:  1929, 38,400.

14        THE COURT:  Bulletin No. 57 was Exhibit L and there

15   were several subdivisions under it.

16        MR. VEEDER:  That is California's Exhibit L.

17        MR. SACHSE:  Fallbrook's AA for identification only.

18        THE COURT:  Appendix E, Stream and Spring Discharge,

19   went into evidence.

20        What is Appendix E?

21        MR. SACHSE:  That is previously unpublished stream

22   records for the little substreams, your Honor, for just very

23   short periods of time.

24        THE COURT:  Not for the big ones?

25        MR. SACHSE:  No, your Honor.

19,580

1    COLONEL BOWEN:  Those were the records made during the
2    course of the investigation, your Honor.
3    MR. STAHLMAN:  The I-series is in.
4    MR. VEEDER:  The I-series was never offered.  We
5    objected to it because it goes to the question of the building
6    of Fallbrook Dam.
7    THE COURT:  Gentlemen, you can argue about matters
8    that seem so immaterial.  I ruled that the business of
9    granting a permit was the business of the State Water Rights
10   Board.  In this case they have granted a permit.
11   MR. VEEDER:  I agree with your Honor.  The thing I am
12   trying to state here is that the language that is used is
13   objectionable because it is not supported by the record.
14   MR. STAHLMAN:  I think your Honor could make a natural
15   logical deduction from the fact that a permit was issued
16   that there is evidence in the record of one year.  And also I
17   think this question can be completely settled by offering in
18   evidence Bulletin I, which is a State compilation of runoffs
19   on the river.
20   MR. VEEDER:  I necessarily have to object to it
21   straight down the line, as I objected to it before, because
22   it is interpolations -- it is not measured stream flow at all.
23   They simply looked at various valleys and made their
24   calculations as to what the stream flow might have been
25   prior to 1923.  It is purely expert evidence and a man would

1   have to have the right of cross-examination of the man who

2   made these calculations.

3       MR. STAHLMAN:  I don't think so.  Under California law

4   I think it is a State record that is admissible in evidence.

5       MR. SACHSE:  Looking at the index, I am sorry to say

6   that I think Mr. Veeder is right.

7       MR. VEEDER:  That is right.  We objected to it

8   strenuously.

9       THE COURT:  I don't know what difference it makes.

10  Why don't we change 39 with this suggestion -- take a recess

11  and think about it:  Find that the State Water Rights Board

12  found, prior to the construction of the dam, that there were

13  surplus waters sufficient to provide 40,000 acre feet as set

14  forth in the permit; that in the recorded runoff figures in

15  the year 1927 there was _____ acre feet of runoff; and then

16  swing into the fact that the Court makes no finding that such

17  surplus water would be available in the future.

18      MR. STAHLMAN:  That's all right.

19      THE COURT:  See what you can write up, Mr. Girard.

20      MR. GIRARD:  Yes, your Honor.

21      (Recess)

22      MR. GIRARD:  I have some language on 39, your Honor,

23  which is supported by the record.

24      That the State of California found that there were in

25  the past sufficient surplus waters to satisfy the 40,000 acre

19,582

feet of annual storage in Vail Dam; that the records
introduced in this case, which commence in the year 1923,
show that in 1927, 40,457 acre feet of water passed the
Vail Dam reservoir site, and that during the same year, 91,179
acre feet of water wasted to the ocean; in the years 1937 and
1938 a total of 68,566 acre feet passed the Vail Dam
reservoir site, and that during those same years 239,242 acre
feet wasted into the ocean.  This Court makes no finding that
such surplus water will be available in the future and
reserves continuing jurisdiction of this cause and the parties
thereto to prohibit, restrict or control upon proper showing,
et cetera.

THE COURT:  Where did we miss those 1937 figures?

MR. GIRARD:  Those are combined figures for the two
years.  There was about 30,000 acre feet each year.  They are
from Colonel Bowen's flow records.

THE COURT:  When you read that hurriedly it sounded
like a water year 1937-'38.

MR. GIRARD:  No, during the two years.

THE COURT:  Are you satisfied, Mr. Veeder?

MR. GIRARD:  It is two successive water years, 1937-'38.

MR. VEEDER:  I don't believe that the record shows that
the State found that there was that surplus available.  Where
do you find that, Mr. Girard?

MR. GIRARD:  As a matter of law, they would have had

19,583

1    to to grant the permit, Mr. Veeder.

2         MR. VEEDER:   You were saying, "I have this conclusion

3    of law that this is what they did" -- your first statement.

4         MR. GIRARD:   Where is the permit?

5         MR. VEEDER:   Here is the permit.

6         May I have that first statement of Mr. Girard's read?

7         (Whereupon, the reporter read as follows:

8              "That the State of California found that there

9         were in the past sufficient surplus waters to satisfy

10        the 40,000 acre feet of annual storage in Vail Dam".)

11        MR. VEEDER:   I don't believe that is in the record.

12        MR. STAHLMAN:   Say the State granted a permit and then

13   go on with the other factual matter that is in the record.

14        MR. GIRARD:   I think we have already said they granted

15   a permit.  We can start in with the records introduced in

16   this case.

17        MR. VEEDER:   Go on and read the rest of it.

18        MR. GIRARD:   The records introduced in this case,

19   which commence with the year 1923, show that in 1927, 40457

20   acre feet could have been stored at the Vail Dam reservoir

21   site, and during the same year 91,979 acre feet of water

22   wasted into the ocean, and the two successive   water years,

23   1937 and 1938 atotal of 68,566 acre feet passed the Vail Dam

24   reservoir site and that during those same years, 239,242 acre

25   feet wasted into the ocean.

1       MR. VEEDER:  Which were those years?

2       MR. GIRARD:  1937 and 1938.

3       THE COURT:  Well, we don't have the hearing before the

4  State Water Rights Board.

5       MR. GIRARD:  No.

6       THE COURT:  I think it would be safe to say they must

7  have made that finding.  But why is it necessary?

8       MR. GIRARD:  It is not necessary, your Honor.  We can

9  just say that the records in this case --

10      THE COURT:  All right.  Is it agreeable?

11      MR. SACHSE:  It is all right with me, your Honor.

12      THE COURT:  As you read it once you said 40,000 acre

13  feet passed the Vail Dam reservoir site.  As you read it the

14  second time, you said 40,000 acre feet could have been stored

15  at the dam site.

16      MR. GIRARD:  That is right.  As I understand Colonel

17  Bowen's comments, that 68,566 -- is it possible to say that

18  it could have been stored?

19      THE COURT:  Why don't you use the same language in

20  each instance?

21      MR. GIRARD:  All right, I will use "passed" in both

22  of them.

23      THE COURT:  Passed the dam site.

24      MR. GIRARD: Right.

25      THE COURT:  All right.  Paragraph 39 winds up:

1    "The right to appropriate surplus waters of said Creek is

2    subject to the jurisdiction of the Water Rights Board of the

3    State of California and the laws of said State, and the

4    continuing jurisdiction of this Court."

5         MR. GIRARD:  That is in there, your Honor -- it is in

6    last part of 39:  This Court reserves continuing jurisdiction

7    of this cause and the parties thereto to prohibit, restrict

8    or control, upon proper showing, . . ."

9         THE COURT:  All right.

10        MR. STAHLMAN:  That remains in.

11        THE COURT:  All right.

12        40.

13        MR. VEEDER:  Isn't that repetitious?  Isn't 40

14   repetitious?

15        MR. STAHLMAN:  They are in good standing.  That is

16   the point.  That the Vail Company is the owner.

17        THE COURT:  Yes.

18        MR. STAHLMAN:  Nothing wrong with that.

19        MR. GIRARD:  It may be a little repetitious.

20        MR. VEEDER: That the Vail Company is the owner of all

21   rights granted under the permit --

22        THE COURT:  I see what you are objecting to.

23        MR. VEEDER:  And those rights are valid and in good

24   standing.  Why don't we just say that?

25        THE COURT:  All right.

MR. STAHLMAN:  How about "heretofore complied with all terms and conditions"?

MR. VEEDER:  We got the compliance fight over with once.

THE COURT:  The rights are valid and in good standing. That is enough.

MR. SACHSE:  Are you deleting "insofar as physically possible"?

THE COURT:  Yes.  It goes down to "and such rights are valid and in good standing."

41.  That should be changed:  Flow within the streambed of Temecula for a distance of 6,000 feet; at that point the remaining waters, less evaporation and percolation.

MR. SACHSE:  Isn't it enough to say "transportation losses"?

MR. STAHLMAN:  They are not losses.  They percolate into the ground.

THE COURT:  Put a period after "feet," strike "where". "At that point the remaining waters, after percolation into the alluvium and --"  What kind of loss?

COLONEL BOWEN:  Evapotranspiration losses.

THE COURT:  What is transpiration?

COLONEL BOWEN:  Transpiration, your Honor, is the water that is taken out by plants, riparian vegetation used in building of plant tissues, and lost into the atmosphere.

1    MR. STAHLMAN:  Of course, we keep that cleaned out

2  pretty well.

3    THE COURT:  "The remaining waters, after percolation

4  into the alluvium and evapo-transpiration losses, are measured

5  and diverted into the system".  Right?

6    MR. SACHSE:  Yes.

7    MR. GIRARD:  Right.

8    THE COURT:  42.

9    I take it, Mr. Veeder, that is agreeable?

10    MR. VEEDER:  I think that is the fact.  I didn't know

11  there would be any transpiration loss there.  I thought that

12  was carried in a ditch.

13    MR. STAHLMAN:  It is a ditch, yes.

14    MR. SACHSE:  There is grass and  water cress.

15    MR. VEEDER:  As I remember the system, you let the

16  water out through this -- what kind of meter do you have there

17  to measure?

18    MR. WILKINSON:  Farming meter.  It goes through the

19  natural channel.

20    MR. VEEDER:  It is a natural channel that goes down?

21    MR. STAHLMAN:  There is some stuff that grows up there.

22    MR. VEEDER:  Then it goes into a box, does it not?

23    MR. STAHLMAN:  Yes.

24    MR. VEEDER; Where there is a meter?

25    THE COURT:  What is left is again measured.

19,588

1  MR. STAHLMAN:  Then it is metered.  Of course, this

2  next paragraph would take care of what your Honor put in

3  there.

4  THE COURT:  That is all right.  What I put in was to

5  bring out that you metered the remaining  water.

6  MR. STAHLMAN:  Very well.

7  MR. VEEDER:  I wouldn't say that it recharges.  I

8  would say it goes into the underground.

9  THE COURT:  What is the matter with "recharge"?

10  MR. VEEDER:  The "recharge" smacks of -- it has

11  certainly been insufficient to recharge.  It is part of

12  recharge.

13  MR. SACHSE:  Recharging doesn't mean it does it fully.

14  MR. VEEDER:  All right, let it go.

15  THE COURT:  Do you have any finding in here any place

16  that after this water goes into your downstream system it is

17  used on Vail lands and that an unknown portion thereof is

18  again available for downstream use?

19  MR. SACHSE:  In 44, without any amounts.

20  MR. STAHLMAN:  We had that in ours the last time.

21  MR. WILKINSON:  Line 14.  Water can be and is supplied

22  to this system by Vail Dam or by pumping from irrigation wells

23  in the Pauba Valley.

24  THE COURT:  43 is all right.

25  44.  These are figures for 1952 and 1958?

19,589

MR. STAHLMAN:  Yes.

THE COURT:  Diversion and distribution.

MR. VEEDER:  Your Honor, I will tell you what I will do on this.  I don't want to hold it up.  If we are going to put in this kind of language, I am going to tender, before these are put in final, some additional figures in regard to runoff, evaporation losses from Vail Dam and other things, which are strictly factual and which I think should be in here.

MR. STAHLMAN:  We had those in and he objected, then your Honor struck them out last time.

MR. VEEDER:  You didn't hear what I said.

MR. GIRARD:  Yes, I did.  That is exactly what happened. George had some figures to show evaporation loss, how much water had actually been saved.  There was an objection by you and they were stricken.

MR. VEEDER:  Then I say let's take out this finding, too.

MR. GIRARD:  Why?

MR. VEEDER:  Because I simply say if you are going to put in anything here let's have it reflective of all the facts.

THE COURT:  This is a proper finding.  This is true.

MR. VEEDER:  As I say, I will offer some supplemental language.

1    THE COURT:  Now, this Diversion is a main topic, so

2  Main Irrigation System becomes (a) and Other Irrigation

3  Systems becomes (b), I suppose.

4    On Line 7 put a period where the comma is at the end

5  of "sprinklers" and make a new sentence starting with "Said".

6    Do you anywhere say that the water is not only used

7  for irrigation purposes but that there is -- well, I guess

8  it follows automatically that some portion of that water is

9  again available for downstream use.

10    MR. STAHLMAN:  That is another one we had in last time,

11  your Honor, and knocked it out.  It was based on testimony

12  that Colonel Bowen gave as to return flow, and Mr. Veeder

13  objected on the ground that that was in connection with that

14  apportionment, so we took it out.  We had it in the previous

15  finding.

16    MR. SACHSE:  I think, George, you might go over to

17  59 and add at the very end --

18    THE COURT:  There may have been specific findings,

19  but we could have a general finding that this happens.

20    MR. STAHLMAN:  Yes.

21    MR. SACHSE:  If you go clear over to 53, when you say

22  "All means and methods of diversion and abstraction of

23  surface and ground waters .. . are reasonable . . ." and say,

24  "and the return flows therefrom are available for downstream

25  use."

19,591

THE COURT:  All right, put it in there.

MR. GIRARD:  To be completely honest, I presume some of these return flows don't get downstream immediately but go into Rauba Basin.

MR. STAHLMAN:  It eventually gets down.

THE COURT:  We are not making any specific finding of amount, but there has to be a return flow in some amount.

MR. VEEDER:  Again, I am going to tender some figures along that line.  I am going to show what has happened.

THE COURT: Apparently they had these in before and you objected.

Was it Mr. Veeder objected?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  Let's be consistent.

MR. VEEDER:  I think I am being consistent the way this thing is going, Your Honor.  I would like to have entered in there the place of use, if we are going to put in this distribution thing, as shown in the permit -- the 3,797 acres upon which the water can be used.  Have you got that?

MR. STAHLMAN:  Yes.  I will tell you how you get that, Bill, so you will understand.  We state in the first paragraph that in accordance with the permit, and the permit gives the legal description.

THE COURT:  That is in here before.

19,592

1    MR. GIRARD:  It is in 36.  It specifically provides

2    that water appropriated pursuant to said permit may be used

3    on Vail Company lands as described in Application No. 11,518,

4    Vail Company Exhibit A.

5        THE COURT:  Do you want to put the figure 3,797 acres

6    in there?

7        MR. VEEDER:    Why don't we put that in?

8        MR. SACHSE:    In 36?

9        MR. VEEDER:  Yes.

10        MR. STAHLMAN:  What does he want in?

11        THE COURT:  What figure?

12        MR. VEEDER:  3,797 acres of land of Pauba Ranch, more

13    particularly described in Vail Company's Exhibit A in this

14    action.

15        MR. STAHLMAN:  That is something that is subject to

16    change.

17        MR. VEEDER:  I think it is limited to this, isn't it,

18    George?

19        THE COURT:  You couldn't use it on more than that,

20    could you?

21        MR. GIRARD:  Yes, they could seek a change in place

22    of use as long as they have not increased their storage.

23        THE COURT: I know.  But presently this is it.

24        MR. STAHLMAN:  Yes.

25        THE COURT:  This again, is an informative figure that

19,593

1    might be of value.

2              MR. STAHLMAN:  Where did you get those figures from?

3              MR. VEEDER:  They are from your application.

4              MR. GIRARD:  Is the permit the same as the application?

5              MR. VEEDER:  The application is approved by the permit.

6              MR. WILKINSON:  The Pauba Ranch description is not too

7    good.

8              THE COURT:  Are they all within the Pauba Rancho?

9              MR. WILKINSON:  No, your Honor, they are not, and the

10   description of the lands is not.

11             THE COURT:  Then strike "Pauba Ranch."  Vail Company

12   lands as described in permit Exhibit A in this action.

13             MR. VEEDER:  Some of it is Pechanga Valley, isn't

14   that right?

15             MR. GIRARD:  It is described here by sections.

16             THE COURT:  All right, it is described.

17             Go back to 45.  It looks all right.  Any other

18   suggestion on 45?

19             46.

20             COLONEL BOWEN:  At Line 32 on Page 20, Your Honor,

21   "Townsite" is incorrectly spelled.

22             MR. VEEDER:  What was the language we used on

23   Murrieta-Temecula about reasonable uses?

24             MR. GIRARD:  In your findings and in the Murrieta

25   findings we said that they are reasonable and beneficial

1    riparian uses but not as to amounts.  There will be a finding

2    in here.

3         MR. STAHLMAN:  We have adopted 30 in here.

4         MR. GIRARD: There should be a finding here -- it

5    probably is not in here, but I am sure George will put one

6    in here -- that will say, in essence, that this Court is not

7    determining whether any uses of water are reasonable in amount.

8         MR. STAHLMAN:  I think I will lift it right out of

9    yours.

10        MR. VEEDER:  That would seem to me to be proper.

11        MR. GIRARD:  For example, on the Enclave we said that

12   all your uses other than O'Neill and maintenance of natural

13   ground cover within the watershed were reasonable and

14   proper riparian uses and beneficial.

15        MR. VEEDER:  All I am reaching for is an identity of

16   language.

17        THE COURT:  We are looking at 47, 48 and 49.

18        MR. STAHLMAN:  I might explain that.  Those are some

19   properties that were severed from the main irrigation

20   system.  They are small plots that have their own irrigation

21   system.  One of them is that Hutch.

22        MR. GIRARD:  On Line 4, Page 21, before the word

23   "supplied" I think you want to put there -- and George agrees

24   -- "permissably".  So that there is no question that Vi

25   Vail Company didn't prescript out Jack Roropaugh, being as

1    they paid him for it.

2         MR. VEEDER:  Which one is your Honor working on now?

3         THE COURT:  I am looking at 46, 47, 48 and 49.

4         MR. VEEDER:  May I inquire about this other irrigation

5    system in addition to the main system.  You have the Hutch

6    down there?

7         MR. STAHLMAN:  The Hutch is there, the Piece By Jacks

8    is there, the Castarini is there.

9         What is the other one, Sandy?

10        MR. WILKINSON:  That's all.

11        MR. STAHLMAN:  That's it.

12        THE COURT:  47 is where you take the water.

13        MR. STAHLMAN:  That is the Piece By Jacks.

14        MR. SACHSE:  Permissably.

15        THE COURT:  Well, I think we ought to say -- it looks

16   like it might be Vail land that they were taking it from --

17   "belonging to Jack Roropaugh. "

18        MR. SACHSE:  Yes, we can put that in there.  Exhibit

19   J, of course, I think, shows that.

20        MR. VEEDER:  Well, there is no operative system or a

21   system for the Hutch field.

22        MR. STAHLMAN:  It is not operating, and so the finding

23   says.

24        THE COURT:  The Hutch is 48.

25        MR. STAHLMAN:  But the system is installed there.

19,596

1      THE COURT:    ". . . has not been in operation for the

2  past ten years."

3      MR. STAHLMAN:  The last sentence there, "The herein-

4  above described system has not been in operation for the

5  past ten years."

6      MR. WILKINSON:  J. E. Roropaugh.

7      THE COURT:  We ought to get the old man's name in

8  these findings.

9      MR. STAHLMAN:  Yes, we Veeder's in here.

10     THE COURT:  Yes, we can't play favorites.

11     MR. VEEDER:  Of course, I realize you men have been

12  facetious about that, so I haven't made any comment.

13     THE COURT:  We are writing the findings.

14     They look all right, do they, Bill -- 47, 48, and 49?

15     MR. VEEDER:  Isn't it true that the Hutch system is

16  in disrepair?  You would have to build a new one, wouldn't

17  you, Sandy?

18     MR. WILKINSON:  No, not in its entirety.

19     MR.STAHLMAN:  We would have to refurbish it.  You would

20  have to check out your pipes.

21     MR. VEEDER:  You would have to put in new pipes?

22     MR. STAHLMAN:  We might have to put some in.  But

23  this reflects what the testimony shows.

24     MR. VEEDER:  I am trying to acquaint myself with that

25  fact.  Let's go.

19,597

1        THE COURT:   50.

2        MR. SACHSE:   May I ask on 50, are you going to have an

3   exhibit such as we have Exhibit E attached to the Government's

4   findings where we make this prima facie and all that on the

5   whole ranch?

6        MR. STAHLMAN:   No, this exhibit here shows everything

7   except the Santa Rosa, and on the Santa Rosa there are just

8   scattered stock wells.   They are also listed in L and M.

9        MR. WILKINSON:   Except as to Santa Rosa.

10        MR. STAHLMAN:   That is right.

11        MR. VEEDER:   You have a comparable finding -- I

12   couldn't find it -- one that is comparable to the statement

13   about our impoundments?

14        MR. STAHLMAN:   Yes.

15        THE COURT:   That is in 52.

16        MR. VEEDER:   Is there comparable language?

17        MR. GIRARD:   It is comparable, but the language will

18   have to be the conclusion of law and the judgment which is

19   in your findings.   In your findings we incorporated the

20   conclusions of law and we set forth specifically the judgment

21   provision.

22        MR. STAHLMAN:   And in 52 we also adopted as more

23   fully described in Interlocutory Judgment No. 28.

24        THE COURT:   Put in "which is a made a part hereof".

25        MR. GIRARD:   In the Enclave findings you just put a

19,598

period after "Interlocutory Judgment No. 28 (Miscellaneous Surface Impoundments)."

THE COURT:  All right, do it the same.

MR. GIRARD:  And didn't incorporate these judgments.

THE COURT:  All right, Miscellaneous Surface Impoundments .

52.  As it reads, the new phrase is "and return flows therefrom" -- it talks about means and methods -- instead of "therefrom," "and return flows from the use of water on Vail land".

MR. SACHSE:  You don't have to say that.  Say, "return flows are available".

THE COURT: All right, "are available for downstream use".

54.   When you say "Lands of the Vail Company" you mean certain lands of Vail Company?

MR. STAHLMAN:  Yes, in the Pauba.

THE COURT:  You mean certain lands.

MR. SACHSE:  What he means , your Honor -- I think it is a hanging participle or something -- he means lands of the Vail Company within the watershed of the Pauba, Little Temecula, et cetera.  "Within the watershed of the " is the modifying phrase.  ". . .within the watershed of the Temecula Creek are riparian."

MR. STAHLMAN:  When you go back to Findings 5, 6, 7,

8 and 9, you have those lands described within the watershed.

MR. SACHSE:  All lands within the Pauba, Temecula and Little Temecula are riparian.

MR. STAHLMAN:  That is right.

THE COURT:  You are going to insert "within the watershed"?

MR. STAHLMAN:  It is in there.

THE COURT:  Where?

MR. GIRARD:  Line 31.

THE COURT:  Well, it is out of place.

MR. GIRARD:  Yes.

MR. STAHLMAN:  Yes.

THE COURT:  It belongs up after "herein," doesn't it?

MR. SACHSE:  Yes, it should be ". . . herein" "within the watershed of Temecula Creek are riparian thereto."

THE COURT:  Change "said" to "Temecula" and move the phrase up after the word "herein".

On the next paragraph move the phrase up after the word "herein" and change "said" to "Murrieta Creek". "Lands of the Vail Company in the Temecula Rancho (Findings 7 and 8 herein) within the watershed of Murrieta Creek and River are riparian."  What do you mean by "river"?  Santa Margarita River?

MR. STAHLMAN:  Yes.

19,600

THE COURT:  Better say it.  "Lands of the Vail Company in the Temecula Rancho . . . are riparian to the Murrieta Creek and Santa Margarita River."

MR. VEEDER:  I would like to inquire of Mr. Wilkinson in regard to what you call Government land.  That is Pechanga Valley, is it not, and that is not riparian?

You have a separate finding?

MR. STAHLMAN:  That is treated separately, yes.

MR. VEEDER:  I was not sure.

MR. STAHLMAN:  It comes in at the proper place.

THE COURT:  "Lands of the Vail Company in the Pauba Rancho (Findings 5, 6, herein) within the watershed of . . . creeks, are riparian thereto."

MR. GIRARD:  We have to list them.

THE COURT:  Is that good?

MR. GIRARD:  Yes.

THE COURT:  "Lands of the Vail Company in the Temecula Rancho within the watershed of Santa Gertrudis, Long Valley . . . are riparian to said creeks."

MR. SACHE: Make the same change.

THE COURT: The same thing.

MR. GIRARD:  The next paragraph is the one that will have to be worked over, because that is the one on the Vieja portion, on which we were going to draft a finding that this Court makes no finding and there is a close question,

19,601

1        et cetera, down there on the Temecula.

2              THE COURT:  All right, redraft it.  That isn't the--

3              MR. GIRARD:  Only as to the Santa Margarita River.

4   As to DeLuz Creek and Sandia Creek it is correct.  But this

5   Vieja portion was the portion where it was questionable

6   whether it was riparian to the Santa Margarita just down-

7   stream from the Gorge.

8              MR. STAHLMAN:  The others, your Honor, are the small

9   portions that are on the River.

10             MR. GIRARD:  This is that big portion of the Santa

11  Rosa Rancho about which there was a question.

12             MR. VEEDER: May I ask we mark those under 54 (a),

13  (b), (c), (d).

14             MR. STAHLMAN:  Yes.

15             MR. VEEDER: Because I have had difficulty following

16  you now.

17             MR. STAHLMAN:  Good idea.

18             THE COURT: All right, mark them.

19             MR. VEEDER:  That is not to DeLuz Creek, is it?

20             MR. GIRARD:  I don't know whether it is return to

21  DeLuz Creek.

22             MR. VEEDER:  I am at (f) on Page 23, which is that

23  Vieja.  I don't believe that it is riparian to DeLuz Creek.

24             MR. GIRARD:  I don't know.

25             MR. STAHLMAN:  We are talking about that now, Bill.

1    MR. VEEDER:  It couldn't be, because Sandia Creek is

2  in between, isn't it?

3    MR. GIRARD:  It doesn't make any difference.

4    MR. VEEDER:  Yes.

5    MR. WILKINSON:  I would like to look carefully.  There

6  may be a point there.

7    THE COURT:  That one has to be worked over.

8    MR. GIRARD:  Yes, that one has to be worked over.

9    THE COURT:  (g).  Where is this portion, Sections 23

10  and 24?

11    MR. STAHLMAN:  Those are the acquired properties that

12  are right down the Santa Margarita River bottom at the Gorge.

13    THE COURT:  Are they in Santa Margarita or Murrieta?

14    MR. STAHLMAN:  Santa Margarita.

15    MR. WILKINSON:  Santa Margarita.

16    MR. STAHLMAN:  We had that map out yesterday.  What

17  map was that?

18    MR. VEEDER:  Vail's Exhibit U is what we were looking

19  at.

20    MR. GIRARD:  I think they were in blue.

21    MR. STAHLMAN:  Exhibit U is out.

22    MR. WILKINSON:  Below the Gorge it is.

23    MR. GIRARD:  Here it is.

24    MR. STAHLMAN:  These here (Indicating).  Here is the

25  Santa Rosa.  Here is where we had the argument about the

19,603

1   river up in this area.

2   THE COURT:  Yes, we looked at the topographical maps.

3   Okay.

4   MR. VEEDER:  Is the Neueva part of the Santa Rosa?

5   MR. STAHLMAN:  Yes.

6   THE COURT:  It is this portion here.

7   MR. WILKINSON:  This if Vieja here.  This over here

8   is Neueva.

9   MR. STAHLMAN:  Here is your line, Bill.

10  MR. VEEDER:  I see.

11  MR. GIRARD:  On Line 12, Page 23, where it says

12  (Finding 18-3-4, herein), it should be (Finding 17).

13  THE COURT:  3 and 4 are also findings?

14  MR. WILKINSON:  They are subportions of Finding 17,

15  your Honor.

16  THE COURT:  Maybe we had better put them in

17  parenthesis.

18  MR. GIRARD:  All right.

19  THE COURT:  40 acres in Lot 25, Block 1.

20  MR. VEEDER:  Is that that acquisition down at the

21  confluence?

22  MR. STAHLMAN:  That's right.

23  THE COURT:  Right on the river.

24  Lots 6 and 7, Block 3, are riparian to Long Canyon

25  and Murrieta Creeks.  Any question about that?

19,604

MR. GIRARD:  I don't know.

MR. VEEDER:  I am going to ask Colonel Bowen to check all these descriptions out, because I don't know where some of these particular lots and blocks are.

THE COURT:  In (i), Line 17, is that Finding 17 Sub 1 and 12?

MR. WILKINSON:  Sub 1 and 12, your Honor.

THE COURT:  Better put the "sub" in there, too.  Put it above, too, Sub 3 and 4.  That 17 is correct?

MR. WILKINSON:  17 is correct, your Honor.

MR. VEEDER:  When we are cross-referencing back to other findings I think it would be better.

THE COURT:  (k).  You refer to "riparian status". Is that riparian or overlying?  Those Township lots?

MR. STAHLMAN:  They are both.  However, the way we have treated it, this exhibit the Court has attached, we talked about that before.  I don't think "riparian" means much, but it is there.

MR. GIRARD:  You have it covered in Finding 65, George, some of these things.  You have a finding starting on Page 26 with overlying status.

MR. STAHLMAN:  Yes.

THE COURT:  All right, let's go ahead.  Beginning with Line 27 will be (l).  (k) is Line 22.

There are numerous unnamed streams, tributaries, water

1   courses that abut on Vail lands.

2          MR. STAHLMAN:  These are all kinds of little creeks

3   and streams up there.  I don't think they mean much.

4          THE COURT:  I guess that is about all you could do.

5          Irrigable acres.

6          MR. STAHLMAN:  I think these figures have been gone

7   over between Mr. Wilkinson and Colonel Bowen.

8          Is that right, Colonel Bowen, on these irrigable

9   acres?

10          MR. VEEDER:  We would suggest -- you say lands of the

11   Rancho, whatever they are, are irrigable -- we haven't gone

12   to the point of saying "practical and profitable irrigation"

13   in regard to any.  Isn't that correct, your Honor?  I am

14   looking at Line 4.

15          THE COURT:  Well, that is true.

16          MR. VEEDER:  We have only had irrigable acreage.

17          THE COURT:  Strike "susceptible of practical and

18   profitable irrigation" and say "are irrigable".   What about

19   "upon which water may be beneficially used"?

20          MR. VEEDER:  I regard that as being surplusage, your

21   Honor.

22          MR. SACHSE:  Yes.

23          THE COURT: Yes, it goes out.

24          MR. STAHLMAN:  It ought to go out on all these others,

25   too.

19,606

THE COURT:  Strike the last part and just say "are irrigable".

MR. VEEDER: That is on 57, too.

MR. GIRARD:  Yes, all the way through.

MR. STAHLMAN:  Yes.

MR. GIRARD:  May I inquire, on 58, then, you say "undetermined".  Don't you have an estimate on any of those?

MR. STAHLMAN:  No.

THE COURT:  On Line 19 put in "(Sub 1 to 12, inclusive)".

MR. VEEDER:  Would you point those out in general where those lands would be that we have "undetermined" on?  Would those be within the Murrieta groundwater area?

THE COURT:  Where does it say "undetermined"?

MR. VEEDER:  Maybe I am getting ahead.  I am on 58.

THE COURT:  I see.

MR. GIRARD:  Under "irrigable acreage" it is on the right.

THE COURT:  ". . . the amount of land in said parcels which . . . " strike "susceptible to irrigation".

MR. GIRARD:  Are irrigable.

THE COURT:  You have several parcels "undetermined".  How did that happen?

MR. WILKINSON:  They never have been surveyed, your Honor.

MR. STAHLMAN:  There has never been a study made on

1   them.

2          THE COURT:  Where are they located?

3          MR. WILKINSON:  They are located as to the column on

4   the left, Finding 17, and then the sub-items below 1, 2, 3,

5   4, 5, 6 through 12.

6          THE COURT:  Where are they located in the watershed?

7          MR. STAHLMAN:  Let's take Finding 17, No. 3.  No. 1

8   is 112 acres.  No. 3 is the first one that is undetermined;

9   139.2 total acres.

10         THE COURT:  Those are the lots right down in the

11  Gorge, are they?

12         MR. GIRARD:  Township 8 South Range 3 West.

13         MR. STAHLMAN:  Yes.

14         THE COURT:  Those are the lots right down in the

15  Gorge, aren't they?

16         MR. WILKINSON:  This one right here.

17         MR. GIRARD:  Lots 4 and 5, Section 24, Township 8

18  South Range 2 West; 7, Section 22, Township 8 South Range 2

19  West; 8 is Section 13 and the northwest quarter Section 23,

20  Township 8 South Range 2 West; 9 is in Lot 16 and Lot 15,

21  Block 1, in the Pauba Land and Water Company.

22         MR. VEEDER:  Will you sort of orient me on this?

23         MR. GIRARD:  And 10 is in Section 23 and 24, Township

24  8 South Range 2 West.  Also Section 5.

25         THE COURT:  What is this other big one, Number 11?

19,608

1      MR. STAHLMAN:  That is still undetermined.

2      THE COURT:  10 is not undetermined.

3      MR. GIRARD:  10 is in Section 24 and the northwest

4  quarter Section 5, Township 8 South Range 2 West.

5      MR. VEEDER:  You are not asserting that they are

6  either riparian or overlying.  You are just listing them.

7      MR. WILKINSON:  Just listing them.

8      MR. STAHLMAN:  Just listing them.

9      MR. GIRARD:  According to 10 it is in Section 24

10  Township 8 South and Section 23 Township 8 South Range 2 West.

11      THE COURT:  In Pechanga.

12      MR. SACHSE:  No, it is between Pauba and Pechanga.

13      MR. STAHLMAN:  Mr. Veeder suggested that Colonel

14  Bowen make a run on that and make a determination of the

15  acreage.  That would be fine with us.

16      MR. GIRARD:  Without those undetermined ones, you

17  have 38,000 irrigable acres.  I don't know what good it would

18  do to get a little more.

19      MR. VEEDER:  All I am saying is that you have findings

20  where something is undetermined.  I don't care.  I think

21  Vail Company can take care of themselves.

22      MR. STAHLMAN:  There is no water being used on them.

23      MR. VEEDER:  All right.

24      MR. STAHLMAN:  It is all right with us, if you want it

25  done.

19,609

1    THE COURT:  59.  What does all of this mean?

2    MR. GIRARD:  These are all of those lots in Temecula.

3    MR. STAHLMAN:  Your Honor suggested the language on

4    that the last time around.

5    MR. SACHSE:  That determines irrigable acreage.

6    THE COURT:  How do they contain undetermined acreage?

7    MR. GIRARD:  I would say "undetermined irrigable

8    acreage".

9    THE COURT:  Yes.

10    MR. GIRARD:  And it is probable that any future

11    beneficial use of water on said lands would be for purposes

12    other than agriculture.

13    THE COURT:  Yes.  You call it "township".  What is it?

14    Town site, isn't it?  Mr. Veeder didn't want to raise the

15    point.

16    MR. VEEDER:  I'm shy and retiring.

17    THE COURT:  Town site, isn't it, on Line 1?

18    MR. GIRARD:  Yes.

19    COLONEL BOWEN:  There are other places where it has

20    been used interchangeably, your Honor.  It should be uniform,

21    I believe.

22    THE COURT:  Yes, Town site.

23    MR. STAHLMAN:  Very well, town site.

24    THE COURT:  60.  Strike the last part; "are irrigable".

25    The   same in 61.

1    MR. VEEDER:  You have that problem in 61.  Isn't this

2  the land, Alan, that is in dubious battle?

3    COLONEL BOWEN:  This is the Vieja portion.

4    MR. VEEDER:  That is right.  The drainage area of

5  Sandia and the main stem of Santa Margarita (Line 15).

6    MR. GIRARD:  Is this the Vieja portion?

7    COLONEL BOWEN:  That is right.

8    MR. VEEDER:  I would just drop out "Santa Margarita

9  River".

10    MR. GIRARD: Yes.

11    THE COURT:  Is this the portion where there is a

12  dispute?

13    MR. VEEDER:  You said there is no evidence to support

14  it.

15    MR. GIRARD:  Is 61 this Vieja portion where it may or

16  may not be riparian to the Santa Margarita River?

17    MR. WILKINSON:  That is right.

18    MR. GIRARD:  So say it is riparian to A Sandia Creek,

19  and our other finding will take care of the Santa Margarita

20  River, because we are going to leave that open.  So you

21  would drop out "and the main stem of the Santa Margarita

22  River".

23    MR. VEEDER:  What about that thirteen and seven?

24    MR. GIRARD:  You would have to get the change in the

25  acreage figure.

19,611

MR. WILKINSON:  We could change those acreage figures, unless Ace wants to redo his reports.

MR. GIRARD:  We could do here as we did in the case of the United States; we could say that all lands of the Vieja, all lands on the Santa Rosa Rancho are riparian thereto.  Do you have any estimate of irrigable acreages in that area?

COLONEL BOWEN:  Just within the drainage of Sandia Creek.

MR. GIRARD:  Yes.

COLONEL BOWEN:  Yes, we could probably extract that. I believe we may have that already.

THE COURT:  Better put in the gross figures.

MR. GIRARD:  Yes.

THE COURT:  On the possibility that it might or might not be riparian to the Santa Margarita.

MR. GIRARD:  You are right.

THE COURT:  And then break out the portion thereof which are riparian to Sandia and which are irrigable.

MR. VEEDER:  How would that read?

THE COURT: That will have to be  redrawn.

MR. GIRARD:  This is Finding 61, so I can look back in the notes and get the comments.

THE COURT:  In other words, this is a case where the Court cannot determine and a separate survey will be

19,612

1    required where this land is riparian to the Santa Margarita

2    River.  So we can put the figures in, if we have them.  That

3    there are thirteen thousand acres, of which twenty-six

4    hundred are irrigable, where the lay of the land closely

5    approximates the Santa Margarita River, but that the Court

6    does not have sufficient evidence to find.

7         MR. GIRARD:  We could do that by just saying "Lands

8    of Vail Company within the Santa Rosa Rancho within the

9    drainage area of Sandia Creek and the main stem of the Santa

10   Margarita River contain 13,771.6 acres, of which 2,674.1

11   acres are irrigable."  We have our other statement back

12   there anyway, and that finding wouldn't have anything to do

13   with whether the land is riparian.  It is just what land is

14   irrigable.

15        MR. SACHSE:  Yes.  Whether the land is riparian or

16   not hasn't anything to do with whether it is irrigable.

17        THE COURT:  You ought to refer back to the other

18   finding.

19        MR. GIRARD:  All right.

20        THE COURT:  And then you are going to have to break

21   out the amount of the Sandia.

22        MR. VEEDER:  Yes.

23        THE COURT:  Right?

24        MR. GIRARD:  Yes, we should break out Sandia.

25        THE COURT:  Well, it's 4:30.

19,613

1      MR. VEEDER:  What about continuing operations

2  tomorrow?

3      THE COURT:  Yes.

4      MR. GIRARD:  I ask to be excused.  I would like to be

5  in Sacramento tomorrow, if I could.  If not, I will stay.

6      Other than Vail, where are we going tomorrow?

7      THE COURT:  You may be excused.  You will get a copy

8  of the transcript.

9      MR. GIRARD:  All right.

10      THE COURT:  We will finish these up.  Do you want to

11  work all day or just the morning?

12      MR. VEEDER:  I would prefer to work in the morning and

13  get out of town in the afternoon.  But I will do whatever

14  your Honor wants.

15      THE COURT:  What do we have next?

16      MR. VEEDER: Aguanga is next.

17      MR. SACHSE:  Mr. Veeder has his Aguanga form.  We can

18  take a minute on it now.  I think it is hard to work with

19  because it does not conform to the general pattern we have

20  here.  But a lot of it is fact and is applicable, if we put

21  it into the same format.  I think we could profitably go

22  through Mr.  Veeder's Aguanga draft with the understanding

23  that it will be rewritten.  But a lot of the detail in it

24  is in shape to be worked over, even though we are going to

25  change the setup.

19,614

MR. VEEDER:  We have this problem.  I have been in correspondence with Mr. O'Malley.  I have notified the other lawyers interested in Aguanga.  I would suggest that there is no need of calling them in until you have made your directions of how you want the findings written and then submit the copies of it.  Because, they are right in the middle of Ramona Ranch -- the Knox properties, some of Annie Bergman's lands.  I would think we should notify those people as to what you want done on it, because I have heard from Mr. O'Malley in connection with it.  I have talked to Mr. Stark, who represents Gibbon and Cottle.

MR. GIRARD: The chanches are if you are only going to work tomorrow you will not get very far into Aguanga.

MR. VEEDER:  At least we can get directions on Aguanga.

MR. SACHSE:  Get started on it.  It will have to be redrafted.

MR. GIRARD:  Maybe we could take Bill's and try to write it up in the light of your Honor's rulings and see what we can come up with.

MR. VEEDER:  That is what I think should be done.

THE COURT:  If I have a calendar tomorrow, you can meet here and start work on it and pick out things that you want me to talk about.  It's going to be very rough anyhow. I will get to you as soon as I can.

MR. STAHLMAN:  Do you have some extra copies of that?

19,615

1          MR. VEEDER:   I think so.

2          MR. STAHLMAN:   Send me one.

3          MR. GIRARD:   Send me one, too.

4          THE COURT:   Mr. Girard, you will be excused and you

5     will get the transcript.

6          MR. GIRARD:   The only time I can't be in is the first

7     two weeks in May.

8          MR. SACHSE:   When is your Honor going to be away?

9          THE COURT:   I am leaving the 29th of April or the 28th,

10    which is a Saturday, to be in Norfolk the 29th, and then the

11    first week in May, and then I was going to take three or four

12    days off on vacation.   I would get back here about the 12th

13    of May.

14         MR. GIRARD:   That is fine, because the first two

15    weeks I will be in trial.

16         MR. STAHLMAN:   You don't intend to get back to this

17    case before that at any time?

18         MR. VEEDER:   After this week I am going to be pressed

19    for a while.

20         MR. SACHSE:   I am pressed for the week of the 23rd

21    of April.   We haven't much to work on until your Honor is

22    back.

23         THE COURT:   There is a lot of work could be done on

24    more of this basement complex and getting ready this draft

25    on Aguanga.

1  It will be about the 15th of May.

2  MR. VEEDER: I have a date in the first of June. You

3 wouldn't run beyond that.

4  MR. SACHSE: We ought to have Vail ready and buttoned

5 up certainly by the 15th of May, and also with some directions

6 tomorrow we ought to have Aguanga ready to button up. There

7 is still that draft of Warm Springs Creek that has been

8 lodged and distributed.

9  MR. VEEDER: I have been wondering why we haven't

10 acted on that.

11  MR. SACHSE: That is another one we can take up.

12  MR. VEEDER: Then we will meet on the 15th?

13  THE COURT: What is the matter with Domenigoni Valley?

14  MR. VEEDER: I don't think there is anything wrong.

15 I think it is drafted in compliance with your directions.

16  THE COURT: The last I recall we had an agreement

17 whereby Domenigoni Valley was going to be thrown into the

18 set of findings with the area downstream.

19  MR. SACHSE: That is right. That is what we have

20 done. The only question in my mind about Domenigoni Valley,

21 as it is presently lodged, is that the description may or

22 may not overlap, and I don't know whether it is critical,

23 because Warm Springs Creek runs into the groundwater area.

24 That should be checked by someone.

25  MR. VEEDER: We will check that.

1          THE COURT:  Get down a little early and check that,

2     if you will.

3          10:00 o'clock tomorrow.

4          (Adjournment until Friday, April 6, 1962, at          )
                                                                 )
5          (10:00 o'clock a.m.                                   )

6

7                        ---oOo---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19,618

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
          vs.                            )        No. 1247-SD-C
                                         )
FALLBROOK PUBLIC UTILITY                 )
DISTRICT, et al.,                        )
                                         )
                    Defendants.          )
_____)

## CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the dates herein involved, to wit:  April 5, 1962, was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing    119    pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS MY HAND, at San Diego, California, this 5th day of April, 1962.

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER