Case 3:51-cv-01247-JO-SBC   Document 4698   Filed 09/24/63   PageID:40716   Page 1 of 166

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, :JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

Defendants

No.  1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Wednesday, May 16, 1962

Pages:    19,702 - 19,865

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 195                                                    19,702

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )      No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY DISTRICT,   )
et al.,                              )
                                     )
                    Defendants.      )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, May 16, 1962

APPEARANCES:

    For the Plaintiff:            WILLIAM H. VEEDER, ESQ.,
                                       Special Assistant to the
                                       Attorney General.

                                       CDR. DONALD W. REDD

    For the Defendants:

    Vail Company:                 GEORGE STAHLMAN, ESQ.,

    FAllbrook Public Utility
    District, et al:              FRANZ R. SACHSE, ESQ.,

19,702(a)

1    APPEARANCES:   (Continued)

2            State of California:          FRED GIRARD, ESQ.

3            Roripaugh, et al,:            BEST, BEST & KRIEGER
                                           BY: ARTHUR L. LITTLEWORTH, ESQ.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, WEDNESDAY, MAY 16, 1962, 10:00 A. M.

---o0o---

THE CLERK:  One, 1247-SD-C, United States of America vs. Fallbrook Public Utility District and others.

MR. GIRARD:  Your Honor, I would like to apologize for not being here.  I was winding up the last day yesterday of a nine day trial, which we finished at 2:00 o'clock.

THE COURT:  Did you win it?

MR. GIRARD:  No, it is a long stage of a long litigation.

THE COURT:  All right.

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  I would like to refer to the amendment to Interlocutory Judgment No. 30, Murrieta-Temecula groundwater area, filed by Mr. Sachse.  On Page 1 he makes a statement, which I understand your Honor has proposed amendments to and it was not clear to me exactly what those amendments were. But I would recommend that we proceed along that line.  On the last page it says, "though," and on the second page it says, ". . . . there are groundwater storage units containing 418,000 acre feet of water . . ."

I would like to see a period put after "water" and drop out "available for use".

MR. STAHLMAN:  The testimony was that it was.

MR. VEEDER:   I don't believe the testimony was that the fully saturated 100 feet of alluvium throughout the area which has been delineated as the Kunkel line went as as far as to say "available for use," because when you say, "available for use" you are taking into consideration economic factors concerning which there was no evidence at all.

MR. STAHLMAN:   Mr. Veeder, Mr. Kunkel testified that it was within those storage units, and in the calculation of 418,000 acre feet we have not included all of the waters that were in storage units.

MR. SACHSE:   George, I would have to agree that Mr. Veeder is right probably, because Mr. Veeder's statement, as he reads it, makes the proposed amendment to Murrieta conform to the finding for Vail.   We don't have the words "available for use" in the Vail findings, so we shouldn't have them in the Murrieta, I don't think.

THE COURT:   Let's pass it up until we have written up or I dictate the amendment I proposed.

MR. SACHSE:   It's in the transcript, your Honor.

MR. GIRARD:   That amendment is similar to Finding of Fact No. 80 in the Vail Judgment.

THE COURT:   Do you want to pass it until you look it over further?

MR. SACHSE:   Yes.

THE COURT:   I'm agreeable to taking out "available for

1     use."

2              Let's pass it over until you look it over.

3              MR. VEEDER:  There is no objection then to taking out

4     "available for use"?

5              MR. SACHSE:  Not from me, there is not.

6              THE COURT:  I will take out "available for use."  But

7     I want to look at that other language.

8              Are you ready to start consideration of this motion

9     for a physical solution?

10             MR. SACHSE:  I am, your Honor.

11             MR. VEEDER:  Does the record show that Mr. Littleworth

12    is here?

13             THE COURT:  Yes, let the record show that Mr.

14    Littleworth and Mr. Girard are here.

15             Thanks, Mr. Littleworth, for being able to come down,

16    because these things have been moving quite fast and you

17    should have been sent a copy.

18             MR. LITTLEWORTH:   I appreciate your calling me, your

19    Honor.  I am glad I was able to work it out.

20             THE COURT:  Before we start, let me say that I dropped

21    through Washington on my trip and had a short talk with Mr.

22    Ramsey Clark, in which he told me that this motion was going

23    to be filed.

24             He also told me that the Government was preparing a

25    brief on another or a   repetition of some of their theories

1   concerning the appropriation of water and that it would be

2   filed.

3        I want to tell you this, so that you will not let this

4   upset you.  This is not to interfere with the progress made

5   on this physical solution, as I understand.  In other words,

6   it is to demonstrate that the Government has some contentions

7   that they propose to make if this matter is not settled, and

8   if it would have to go up on appeal they want to urge some

9   of the matters in this brief in that event.  But, I got the

10  impression that we could lay the brief aside and work on this

11  problem.

12       Is that the way you understand it?  It is sort of some

13  extra artillery which the Government would propose to use if

14  we don't effect some solution.

15       MR. VEEDER:  The point was discussed with Mr. Clark

16  the other day.  I left Washington and the brief has been

17  prepared.  The position we are taking in regard to filing

18  with the State has been determined.  We hope to have all those

19  matters accomplished and finished by the first of June.  Of

20  course, everything to a marked degree is related to this

21  proposal that is here.  So that your Honor is correct in what

22  he states.

23       THE COURT:  Well, there is no secret about this

24  position.  I didn't go into it in any detail.  I had asked

25  Mr. Clark to read    my pre-trial opinion, and he did it --

1    this shows the interest this man has taken in this litigation

2    -- and I think, at least, he got my views as to what I

3    thought about these matters.  And I think at least one of these

4    propositions is that there was an implied appropriation of

5    water by the setting up of the Camp and appropriating the

6    money for it.  This was not argued extensively, as I recall,

7    in the past.  There may have been a passing touch or two made

8    at it.  But this is one of the matters we may see in this

9    brief, Mr. Veeder?

10   MR. VEEDER:  Yes, the position in the brief is

11   correlative with the other arguments that have been made in

12   the past, namely, that under Article VI of the Constitution

13   of the United States, the supreme law of the land, when the

14   United States went in and began diverting and applying water

15   to beneficial use outside the watershed it was exercising a

16   usufruct in the River that it is entitled to be protected in

17   as against subsequent appropriators; that the police power

18   of the State of California could not regulate the rights of

19   the United States, nor is there a need for the United States

20   to comply with the police powers of the State in acquiring

21   rights to the use of water.

22   THE COURT:  That may all be in the brief.  But I think

23   I got the impression that I had made some dent on Mr. Clark

24   when he read my opinion on this question, who exercises a

25   right to appropriate, if there is one?  Is it done by Mr.

Rankin?  Who does it?  There is no doubt the Government has
a right to take anything, but it is done by Congressional
action.  And I think at least the new material may concern
the contention that the Congress by voting money to buy this
Camp exercised or demonstrated a Congressional intent.

Anyhow, let's not cross bridges until we get to them.
But, as I understand it, it is not going to be an impediment
to our discussion on this motion.

MR. VEEDER:  That is correct, your Honor.

MR. GIRARD:  One other question along the line that
Mr. Veeder suggested.

You said that a decision had been reached as to
whether you are going to file with the State in the future.
Is that correct?

MR. VEEDER:  Yes, a decision has been reached.

MR. GIRARD:  Can we know what that is?

MR. VEEDER:  I will say that the intention is not to
file in the normal course of procedure.  There will probably
be, out of comity, an expression of intention addressed to
the State of California on the proposition.

But may I add, again, none of these matters should
relate to this motion which is here for consideration.

MR. STAHLMAN:  Just a minute.

MR. SACHSE:  Wait a minute.

THE COURT:  Well,    let's take up one thing at a time.

1    When I talked to Mr. Clark I again urged him that

2  there should be a filing -- well, let me go back.  He was

3  very much interested in a solution and repeated that you

4  can't make water by litigation, and he said, "Of course, we

5  have a problem of some sort of firm supply of water, if we

6  effect a solution, from the time of the solution on until a

7  dam can be built."  And I then urged him again to consider

8  the filing on DeLuz and to make the filing on a basis of

9  storage in the underground basins of the Government

10  immediately  and thereafter to be stored in a dam to be

11  built, so that the appropriative rights could become

12  effective upon the placing the water in the storage units,

13  the underground basins.

14    And I also suggested to him something that we hadn't

15  talked about around here -- discussed informally -- and that

16  is, if there was a supply of water needed so that the

17  Government might export until such time as the dam was built,

18  that I saw no reason why they could not also file on the

19  same waters that Fallbrook filed on, on a interim basis,

20  since Fallbrook's right to these waters do not become

21  effective until they build the dam, and that therefore, there

22  are surplus flood waters that are presently subject to

23  provision in the sense that the Government may appropriate

24  them and place them in their underground basins.

25    And Mr. Sachse was very pleased yesterday -- indicated

1    this would not startle him; he thought this was proper and

2    there would be no objection to it.

3        MR. SACHSE:  I didn't say there was no objection to it,

4    your Honor.  I said this doesn't startle me.

5        MR. VEEDER:  You just have steady nerves, is that

6    what you are saying?

7        MR. SACHSE:  If we want to get into this subject, I

8    am quite ready to discuss this one, too.

9        THE COURT:  Let's not get into it right now.  But

10   anyway, this matter of this firm supply of water, I don't

11   know and I didn't discuss what this type of filing, quoting

12   Mr. Veeder, "not in the usual manner," I don't know what kind

13   of filing that would be.  But I think whatever the United

14   States does should take into account this problem that

15   exists -- a right to appropriate water between any time a

16   physical solution might be arrived at and the time they get

17   a dam built and you have an available underground reservoir

18   in which DeLuz water, and I think the waters which Fallbrook

19   filed on can be subject to appropriation and therefore subject

20   to exportation.  I would just like to get that into the

21   record before we start on this matter.

22       MR. VEEDER:  May I clear up the one point, your Honor,

23   while your Honor was quoting my statement.  As I stated,

24   the view is that a declaration will be filed with the State

25   Water Rights Board out of comity simply saying that it is

1   the intention of the United States to build DeLuz Dam without

2   the normal request for a grant from the State, subject to

3   whatever conditions the State desires to impose.  And that

4   would be generally the proposition.

5        THE COURT:  Relying on the DeLuz Congressional Act.

6        MR. VEEDER:  I wouldn't go so far as to say that.  I

7   would simply say we would simply, out of comity, notify the

8   State of our intention to build this dam.

9        But may I tender this thought.  Your Honor has

10  outlined generally what I think is the correct situation as

11  eminating from your discussion with Mr. Clark.  I don't believe

12  that it would be helpful at this juncture, your Honor, to go

13  into the discussion of the Federal-State relationship.  Rather

14  I think it would be productive, if I could strongly

15  recommend it to your Honor, that we consider each item in

16  this motion before we get to the point of no return, which

17  could quite possibly come out of some of the reactions I have

18  noted.

19       THE COURT:  I agree on that.  But I want the record to

20  show that if there is concern about some supply of water to

21  be available for exportation, that there is water available

22  right now, and will be, until such time as the Fallbrook Dam

23  is constructed, because Fallbrook has no appropriative right

24  to that water until they build a dam, and this would bridge

25  the gap.  And this is one of the concerns that Mr. Clark had.

1   He said, "What about an interim supply?  It will take some

2   time to build a dam, if we build a dam."

3        MR. VEEDER:  That is, DeLuz Dam.

4        THE COURT: DeLuz Dam.   "It can't be done overnight.

5   What are we going to do meanwhile?"  And here are two answers:

6   DeLuz, and the water which Fallbrook filed on.

7        But I agree with you that we shouldn't get into this

8   State-Federal problem unless we have to.  And actually, we

9   can't tell the United States Government how to run its

10  business, and I think we should go ahead and work on this

11  motion.

12       MR. VEEDER:  I think it would be most productive,

13  your Honor, and I think as long as Mr. Littleworth and Mr.

14  Girard are here that is the better approach.  I don't know

15  how long Mr. Littleworth can be with us.

16       Will you be here tomorrow, for example?

17       MR. LITTLEWORTH:  I can be, if it is necessary.

18       MR. SACHSE:  I have no objection to going ahead, your

19  Honor.  But I want to make one thing crystal clear at this

20  point.  A part of this motion discusses a physical solution.

21  None of us is kidding ourselves that this physical solution

22  involves Fallbrook.  Your Honor directed us to work with

23  Colonel Bowen and his staff.  I don't believe any Court would

24  order, as a physical solution, that Fallbrook give up legal

25  appropriative rights, which this Court has found to exist, to

1    take water from a source that has no rights.

2         In other words, I don't think a physical solution can

3    put us in worse shape.  I don't think we should shut our eyes

4    to problems.  If Mr. Veeder and Mr. Clark are taking the

5    position that there would be no filing, there would be some

6    sort of comity notification that they are going to build a

7    dam, I, representing Fallbrook, am concerned with California

8    Water Law.  I am concerned with my right to reach upstream to

9    others above who may take water improperly or who might

10   come in with intervening appropriations.  I can't recommend

11   to Fallbrook a physical solution that gives them no rights

12   when at the present time they have some.  And I don't think

13   we can shut our eyes to that problem as we read this motion.

14        THE COURT:  Let's understand preliminarily that if

15   this proceeding on this motion  succeeds, it will only succeed

16   by agreement and cooperation.  This Court may not order a dam

17   to be built.  This Court may not order somebody not to build

18   a dam.  This Court may not negate rights which it has found

19   in certain parties.  But the whole approach was to be on a

20   cooperative basis, if cooperation can be obtained, and I

21   think generally speaking most of these problems are soluble.

22        Then this would be done largely by agreement and

23   stipulation, and would mean agreement, first, by the major

24   parties who are here -- the State, Fallbrook, Vail Company

25   and the clients represented by Mr. Krieger -- and then it

19,714

would mean also securing the cooperation and consent of
other major users.  I doubt very much if we would have to
have the consent of the minimal users in this agreement,
until possibly such time as they got to a place where they
came within the major category.

But, this whole thing is based on cooperation,
consent, agreement, and upon a judicial finding.

I will say finally, also, that, as I see this problem,
if we are going to talk cooperation, you are trading eggs
and peaches -- you have to have something to trade.  Fallbrook
has secured some rights and has something to talk about.
Again, I think ultimately the United States is going to have
to be in a position to say, "We have some rights," if we are
going to talk about trading -- "We have something to trade
with."

But I don't think we have to get into that right now.

MR. STAHLMAN:  Your Honor, may I just make some
observations to the Court.  We had this informal conversation
with Mr. Clark and as a result thereof I think both the
State, Fallbrook and myself wrote letters to Mr. Clark in
connection with it, and I think we all expressed a desire to
approach this matter with the objective in mind of making the
most efficient use of the productivity of the River and in
relation to the rights possessed by the parties.

Then before we received an answer, we have this motion

1    filed.  I don't object to the motion being filed if it can

2    attain the objective that will be beneficial to all the users

3    of the water on the River.  It doesn't matter a great deal

4    the manner in which it is approached.

5         However, there is one consideration with which I think

6    everybody is concerned, and that is, what would be the result

7    of this?  Would this be one benefit where you are trading

8    back and forth, which will have to be in connection with the

9    proposals that are made here, and those which were made

10   verbally by Mr. Clark?  One of the big considerations is

11   whether or not, after this is done, there would be an appeal

12   in connection with certain other matters in the case.  That

13   is a very serious consideration.

14        THE COURT:  I think on that, Mr. Stahlman, we are

15   all going into this with the idea that if we effect a

16   physical solution there is not going to be an appeal.  That

17   is axiomatic, I think.

18        MR. VEEDER:  If the elements that are embraced in the

19   motion are accomplished, your Honor, we would have what we

20   want.

21        THE COURT:  Secondly, I think the work we have done

22   has to be proceed to interlocutory judgments and some final

23   judgment healing up what work we have done.

24        MR. STAHLMAN:  Very well.

25        Now there is one other thing, and that is it doesn't

appear in the record in this case, but I think there are some physical features that it might be well to have in mind when we consider these propositions which we are going to take up one by one, and that is that this year we find we have had more than normal rainfall, we find the basins at Pendleton substantially filled, we find that the appropriation in Lake O'Neil was completely complied with -- that is, there was sufficient water to fill the lake and more, it ran out -- and that Vail Dam has captured less than a thousand acre feet of water.  I think that as we consider some of these matters that are not in the record in the case, the facts that we might apply to this matter should get some consideration.  I think it does affect some of the proposals made in relation to the Murrieta-Temecula Basin.

THE COURT:  You notice that the motion itself says,

"It is the purpose of the United States by this Motion to invite the Court and the parties to explore the possibilities for a resolution of this litigation which will afford all owners of legal rights to use these waters of the Santa Margarita River system the fullest opportunity to exercise, and to be protected in the future exercise of, those rights, . . ."

MR. STAHLMAN:  We agree completely with the preamble. There is no quarrel with the preamble whatsoever, your Honor.

1    THE COURT:  All right, let's get down to A-1.

2    MR. SACHSE:  How does your Honor wish to proceed on

3  this as a matter of format?  Do you want us to make our

4  observations separately?

5    THE COURT:  First, read it into the record, so that

6  we will know what we are talking about.

7    MR. VEEDER:  Would you want to have a copy transcribed

8  in its entirety into the record, your Honor?

9    THE COURT:  I think we should have the paragraphs as

10  we talk about them and then we could have a copy also.

11    MR. VEEDER:  I think it would be all right at this

12  point, if I could give it to Mr. Swader and he could enter

13  the entire Motion as drafted into the record.

14    THE COURT:  All right.

15    MR. VEEDER:  And then you would have the document

16  before you when you were considering it.

17    THE COURT:  All right, do it that way.

18                         (The Motion referred to is        )
19                         (transcribed herewith as follows:)

20        OUTLINE OF PROPOSED PROVISIONS FOR INCLUSION
                      IN FINAL DECREE
21

22    A.    Apportionment between holders of riparian and
              overlying rights.
23

24        1. A determination of rights to the use of

25            water of the Santa Margarita system based on

             substantial riparian and overlying ownerships

and judicial decree.

2   An apportionment of available waters between
holders of such rights on the basis of
reasonable demands for beneficial use for all
potentially permissible uses under such rights,
using as the general criterion for determina-
tion of such demands acreage reasonably
susceptible of profitable irrigation.

3.  Translation of the right of each substantial
user within the category delineated in A.1.
above into percentages of the total rights of
such substantial users based on riparian and
overlying ownerships and judicial decree.

4.  Provision that "available waters" would be that
total quantity which the River Master
determines, as provided under subdivision
C.1.(b), may be safely used, and that the share
of each owner would be determined by applying
to such quantity his percentage entitlement;
that owners be permitted to withdraw waters
apportioned to them from any source to which
their rights attach or to such other sources
as the River Master may specify for
conservation purposes, subject to payment of
reasonable service charges and proportionate

amortization of facility costs if withdrawal
is permitted from or through a facility, or
involves the use of a facility, in a different
ownership; that withdrawals be made generally
from points permitting maximum yield and
most efficient use of facilities.

5. Provision that the United States be permitted
to withdraw its apportionment from the
Temecula-Murrieta basin to the extent this is
necessary to permit the soundest conjunctive
operation of surface reservoirs and ground-
water basins.

6. Provision that waters so apportioned to the
United States not be restricted to use within
the Santa Margarita watershed, except as
against owners of riparian and overlying
rights who have not waived their right to
benefit from such a restriction.

7. Provision that waters not used within such
apportionments be available for use by the
holders of apportioned rights proportionately
to their percentage entitlements in the total
apportionment, to the extent such owners can
make reasonable beneficial use thereof within
the limits of their rights.

**B.**   Surplus Water.

1. A determination of all appropriative rights

and the priority dates therefor.

2. Provision that apportioned waters not used

within the limits of the rights thereto

determined as provided in A.1. shall be deemed

surplus waters; that such waters, together

with other available surplus, shall be

available to the owners of appropriative rights

for the use of such waters on the basis of

priority at the locations at which such

rights attach or on the basis of such agree-

ment as interested parties may make in

consideration of contributions to the cost

of storage structures and other relevant

matters; that "other surplus" shall be waters

captured by impoundment structures or

otherwise captured, which would not have been

put to beneficial riparian use had they not

Been so impounded or otherwise captured and

would not have recharged ground-water basins,

and shall be deemed "available" when so

determined by the River Master as provided

under C.1.(b).

C.  **Appointment of a River Master**.

1.  Provision for the appointment of a River

Master, with powers as limited by the order

of appointment but including appropriate

authority to accomplish these purposes:

(a)  To administer rights to the use of water

as determined by the decree and to make

recommendations for modifications and

changes in rights so determined.

(b)  To study, with the best professional

advice and assistance available, as

determined by the Court, hydrological,

geological and related facts to determine

the amount of water available at all

times within the watershed; to find, from

time to time, the amounts which may be

safely used within given periods of time

as apportioned waters under A. and the

amounts which may be used as surplus

waters under B., having due regard for the

various sources from which surplus waters may

be withdrawn, to the end that there may be

provided a sound conservation program for

use of the water resources of the Santa

Margarita River system without waste, undue

evaporation and transpiration losses, harmful depletion, or damage to the ground-water basins or other natural as well as man-made facilities; and to advise owners of rights of the quantities of water to which their rights entitle them within given periods of time, as early as feasible to permit fullest opportunity to such owners to play for future use of w water.

2.  Provision that all such determinations by the Master be reviewable by the Court.

3.  Provision that annual costs and expenses of the River Master be contributed by the parties in the proportions that the water each uses bears to the total quantity used in each year.

4.  Provision that the River Master shall study, advise and encourage the continued operation, abandonment, and construction, including construction by single parties and bytwo or more parties jointly, of water control facilities to secure maximum yield, conservation and economic utilization; that the River Master shall encourage and cause

economic phreatophyte control and related

conservation practices.

5. Provision that the River Master average the

annual gross withdrawal to involve Temecula-

Murrieta Basin depletion over a 20 to 50-year

period, depending on recharge to the basin;

demand for water, and availability of water

from alternate sources such as desalinized

sea water or available Colorado River or

Feather River water.

D.    Physical Solution and Operating Principles

1.    A finding that the so-called DeLuz Site,

immediately below the confluence of the Santa

Margarita River and DeLuz Creek, provides the

best location for a major surface reservoir

to permit fullest development and use of

the water resources of the Santa Margarita

River system.

2.    Provision that such a structure, if

authorized and built and if permissible under

the authorization, be placed in conjunctive

operation, under supervision of the River

Master, with the Vail Dam, the Temecula-

Murrieta Ground Basin, the Coastal Basin, and

existent and future wells, ditches,

impoundment dams and other facilities, so as
to permit maximum yields consistent with the
economical utilization and conservation of
total water resources.

3.    In conjunction with the provisions respect-
ing construction of a DeLuz dam, provision
might be made that, if determined by the
United States to be practical and engineeringly
feasible, and if properly authorized, the
United States may constuct a physical barrier
across Ysidora Narrows to prevent salt water
intrusion and to make available greater
usable storage capacity in the Coastal Basin;
that nevertheless, the Coastal Basin, insofar
as feasible, be maintained essentially full
to minimize evaporation losses.

E.    Provision for a survey, from time to time, of
insubstantial use of water within the watershed
not involved in apportioned uses to determine
quantity and significance of such use; that
lawful insubstantial uses which increase to the
level determined to be substantial be included
within the apportioned uses from that time on.
This Motion is made without prejudice to the

1    right of the United States to take any action or

2    assert any claim or position whether consistent or

3    inconsistent with the proposals contained therein,

4    which its interests may require.

5         Respectfully submitted,

6         UNITED STATES OF AMERICA.

7              (End of copied material.)

8    THE COURT:  "A. Apportionment between holders of

9  riparian and overlying rights.

10        "1. A determination of rights to the use of water of

11             the Santa Margarita system based on substantial

12             riparian and overlying ownerships and judicial

13             decree."

14    That is actually what we are doing in this case so

15  far.  I don't see any objection to that.

16    MR. GIRARD:  Just a cataloguing of rights.

17    THE COURT:  Rights to the use of water in the system.

18  I don't see the value of the word "substantial".

19    MR. GIRARD:  No.

20    THE COURT:  But based on riparian and overlying

21  ownerships and a judicial decree.

22    Does anybody have any comments about that subdivision?

23    I guess we are all agreed.  That is what we are doing

24  now.  No problem there.

25    Two.

19,726

MR. VEEDER:  Your Honor, I would just as soon go back and explain the position of the United States in regard to the words "judicial decree" after we go on through the whole thing.

THE COURT:  I understand, Mr. Veeder, that the judicial decree, if we have a physical solution, will be a different kind of judicial decree than we would have if we did not have a physical solution.  Is that what you mean?

MR. VEEDER:  Really, the term "judicial decree" means a stipulated judgment, as used in Paragraph 1.

MR. SACHSE:  Paragraph 1 of what?

MR. VEEDER:  A.1.

MR. GIRARD:  In other words, you mean that the stipulated judgment would still be in effect in the final decree in this case.

MR. VEEDER:  To the extent that it could be melted into the physical solution.

THE COURT:  Is that what you mean by the words "judicial decree"?

MR. SACHSE:  "Judicial decree" means, then, the Vail-O'Neil stipulated judgment.  Is that what you are referring to?

MR. VEEDER:  That is correct.

MR. GIRARD:  I would think, your Honor, if there is one thing that would completely botch up the physical solution

it would be that stipulated judgment.

THE COURT:  I would think so, too.  I told Mr. Clark I had never been able to convince Mr. Veeder, but (1) that it would have been almost a physical impossibility to use that judgment and work out a decree.  Secondly, if the decree stuck, then there were -- and I forget the count -- 27 or 37 sections of land owned by Vail which overlie the groundwater area and which, if this old decree stuck, Vail's right to this water was absolute; as far as the United States was concerned, it was vagrant, local, percolating water not part of the stream system.

What was it, 35 sections of land?

MR. STAHLMAN:  It overlies those storage units, too.

THE COURT:  I am talking about the groundwater basin, the storage unit.  There would be no limit to the amount of water Vail Company could get.  And I tried to sketch for him actually what was the quid pro quo in the effect of knocking out the stipulated judgment; that by knocking it out all this Vail land was then thrown in and became part of the stream system as to the United States; that prior thereto it was not part of the stream system.

MR. STAHLMAN:  Also, as I read this proposal, it provides that the principal uses of water will be made out of the Murrieta-Temecula basins by everyone, and how you would maintain surface flow and use the water of Murrieta-Temecula

basis is beyond me.

MR. VEEDER:  Could we go on to Point No. 2?  I didn't want anyone going on beyond that point without comprehending the intendment of the words "judicial decree."

THE COURT:  I misunderstood it.  "Judicial decree" means the stipulated judgment.

MR. STAHLMAN:  You wouldn't get it from this language.

THE COURT:  "2. An apportionment of available waters between holders of such rights on the basis of reasonable demands for beneficial use for all potentially permissible uses under such rights, using as the general criterion for determination of such demands acreage reasonably susceptible of profitable irrigation."

Is there any unseen thing in this that we don't see, Mr. Veeder?  I would say, to start with, that this looks entirely all right, except that the stipulated judgment, referring to "judicial decree," is, I take it, carried down into No. 2 and the proposal would be that this apportionment would be based upon not only riparian and overlying ownerships but based on the old stipulated judgment.  Right?

MR. STAHLMAN:  If this means what we have been doing here, then it would comport with California law.

THE COURT:  This is California law.  The only thing I see in the matter is that the stipulated judgment is carried

down automatically into A.2.   Is that right, Mr. Veeder?

MR. VEEDER:   Yes, it would be, your Honor.   In regard to A.2, your Honor, and Mr. Stahlman are both correct in your view that it is in contemplation of California law.   I believe the facts are such that substantial areas would not necessarily be brought within the decree that is proposed. For example, I think that the Anza area, the Diamond Domenigoni area, except for surface runoff, contribute minimal quantities of water to the Murrieta groundwater area, and as a consequence I would think there would be no reason for bringing them in.   Similarly I would assume that the small users, for example, in the town of Murrieta, or any other small users, domestic users, would be eliminated; whereas users of the magnitude of Roripaugh, Ceas, Yoder, to name a few, would come in.

THE COURT:   That comes later.

MR. VEEDER:   You asked me what it meant.

MR. LITTLEWORTH: Your Honor, I would like to explore the meaning of this word "apportionment" before we go any further.   "Apportionment," to me, generally means a rationing. We have been over what this word means, I guess, at earlier points in the transcript, and perhaps there has not always been agreement on it.

If, by "apportionment," you are simply using another word for talking about the kind of right a person has, then I

don't think this moves us very far along.

THE COURT:  That isn't what it meant.

MR. LITTLEWORTH:  But if this means a limitation on a person's use, so that there is going to be some water left over for somebody else, and that is what I think it means, then, of course, I have some severe objections to this paragraph.

MR. SACHSE:  So have I.

MR. LITTLEWORTH:  Let me perhaps ask Mr. Veeder if this is what he means by the word.  Does he mean, taking as an example, Roripaugh, who has 3,000-odd acres and irrigates two or three hundred -- I don't remember exactly, but a small fraction of his riparian land -- does this mean that Mr. Veeder, who is also a large user, is going to say you can use only so much water, maybe to irrigate only 50 acres, because we are going to regulate the water use in this area in order to provide additional supplies of water for some other area presumably downstream?

MR. VEEDER:  I think under the terminology that has been used, and your Honor having discussed these matters with Mr. Clark, if you find there is disagreement on this --

THE COURT:  I didn't discuss it much further than I have talked about, except that we discussed them with him when he was here and talked with us in the courtroom without the reporter.

MR. VEEDER:  That is correct.  But this terminology and language which is used here is in contemplation of a long range protection of the Murrieta groundwater area as a source of supply to the United States of America and all other people participating in it.  In this view and in connection with the historical uses that have been made, there has been as recently as last year a real threat to the supply of water to the United States.  We take the position that it is not for us to sit by and let a catastrophe catch up with us by over-pumping the Murrieta-Temecula basin; that there would be regulation in effect, that there would be apportionment in effect, based upon the availability of water during each year as would be determined by the Water Master.

MR. LITTLEWORTH:  The problem with Mr. Veeder's statement is that any apportionment has to be based on more than just availability.  It has to be based upon rights.

MR. VEEDER:  Correct.

THE COURT:  Mr. Littleworth, let me see if I can tell you what we are thinking about, because you were not here at this original conference.  Mr. Clark comes from the State of Texas where they don't have water problems, but they have oil problems, and there has been a lot of work in the State of Texas in connection with oil, and by analogy he is utilizing some of the techniques used in the oil fields, with which he is familiar.

19,732

1    So, this apportionment, actually, to start out, first

2    of all, was sort of an entitlement.  Your client has 3,000

3    acres of riparian land.  Maybe he is irrigating only 500 of

4    it.  He has an entitlement.  This would be noted and eventually

5    there would be an effort made to figure out on the basis of

6    these various entitlements what proportionate amounts of water

7    these persons would have.  It is not contemplated that all

8    these people would be using the full amount of water to which

9    they were entitled.  There would be provision also for

10   dividing up again on the second go-round among the users that

11   water to which there were entitlements but which was unused.

12   And this is in accord with California law; if water is not

13   being used, somebody else can use it.

14   I don't agree with Mr. Veeder's view that, as a

15   practical matter, the situation was as bad as he painted it.

16   If it happens that the basins downstream even during this dry

17   period were not depleted, it is, in part, by reason of the

18   good husbandry by the Colonel -- return of sewage affluent

19   et cetera.

20   But this is a long range program that looks to the

21   future when this situation might well become critical with

22   future development in that valley.  There is just so much

23   water, certain people are entitled to it, and as I understand

24   it, it would be a question of spelling out entitlements.

25   MR. STAHLMAN:  Then I think the language should clarify

1    it.   Put it just as your Honor expressed it.

2         MR. SACHSE:   Your Honor, I think it would be helpful

3    if all of us make our comments, even though we may agree,

4    because I am sure Mr. Veeder is going to want to show this

5    to Mr. Clark and Mr. Clark will want to know our views.

6         MR. VEEDER:   That is an understatement.

7         MR. SACHSE:   I agree implicitly with what Mr.

8    Littleworth said on the definition of the word "apportionment."

9         I go a step further, that it seems to me, taking now

10   your Honor's preliminary statements, that the only way this

11   can be accomplished is, in effect, by a stipulation.   If

12   that is what Mr. Veeder means, we are going to be doing

13   nothing but creating a new stipulated judgment which, instead

14   of dividing the water between two people, Vail and O'Neil,

15   divides the waters between 30, and flying possibly contrary

16   to the direct mandate of the Circuit as to how this case was

17   to be tried.

18        MR. VEEDER:   Oh, no.

19        MR. SACHSE:   I offer this only as a thought, Mr.

20   Veeder.   I am trying to get everybody's opinion in here.

21        If I may just add my other thought, the second thought

22   I have is this:   That an apportionment is a judicial act --

23   it is an act of your Honor.   I am not sure, I guess we can

24   stipulate to it.   But a decree setting forth percentages or

25   acre feet, or whatever yardstick you   use would have to be

entered, and I have some very serious doubts that the record

will support one.  As your Honor pointed out, there is no

shortage today at Pendleton.  There has been no deficiency

of water for their reasonable needs.  The basin is full.

THE COURT:  Let me interrupt.  I said it has to be

done by stipulation.  I don't know that there has to be a

stipulation as to entitlements.  We have found out so far what

the irrigable acreage is.  It is true that the record will

not support presently the number of acres that are reasonable

susceptible of profitable irrigation throughout the watershed.

There would have to be further hearings on that.  And it may

be true that the record today would not be in such shape that

if an outright apportionment was asked there might not be

sufficient ground to go into apportionment.  But if this is

a long range program, I see no objection to a judicial

finding on entitlements throughout the part of this watershed

on the River.

MR. STAHLMAN:  Wouldn't the law itself take care of

that?

THE COURT:  Mr. Sachse, what is your objection to

that?

MR. SACHSE:  We have to jump ahead a little in this.

The very next question, for instance, says that these rights

be delineated into percentages of the total.  How are we

going to do it?  I don't think there is any evidence or any

possible basis on which you could say that Roripaugh has

X-percent of the rights of the total of the Murrieta.  Maybe

lots of irrigable acreage isn't used.  Secondly, we don't

know what quantity is in the Murrieta, how much is taken out,

what the recharge is.

Then you can take the example Mr. Girard pointed out

to us this morning, using the Vail example;  the irrigable

acres on the Santa Rosa are enormous, but the water supply

available for Santa Rosa is, I think Vail would agree,

relatively  infinitesimal.  Now you are not going to give

Vail a percentage based on irrigable acreage of the whole

system.  You are going to only give it a percentage of the

water available to it.

If apportionment implies all of these things is what

I am getting at, I would say we can't do it, and I think we

should face the fact.  We should tell Mr. Clark that all we

could do would be set up a River Master or set up a program

of accumulating data for a substantial period of time and

ultimately probably make a proper apportionment, if such is

necessary.  But I don't think we are doing anybody a kindness

if we imply that in this procedure we can come up with an

apportionment, because I don't think we can.

MR. VEEDER:  Would you go back to A.2, Mr. Sachse,

which says, in the final line, "reasonably susceptible of

profitable irrigation".  I think there can be an agreement

among the parties on that.

MR. SACHSE:  My last point, Mr. Veeder -- all that I said was preliminary to the last statement that I don't think we are doing Mr. Clark a kindness if we imply that we feel that a percentage statement of rights is possible at this posture of the case, because I don't think it is.  I don't think there is any way of doing it without a great deal more factual data, and we ought to face up to that fact.

MR. VEEDER:  I will not agree with what you have just said.  But I will say this, that there is certainly sufficient data in the record pursuant to which there could be an agreement as to a criterion or criteria for a percentage allocation.

MR. SACHSE:  Then, your Honor, I come back to my initial objection.  Then we are doing nothing but writing a new stipulated judgment signed only by 30 people, and it is not going to be worth more than the old one if there is not something in here to enable your Honor to make an order or a finding.  The stipulation of Mr. Krieger, Mr. Stahlman, myself, California, isn't worth the powder to blow it up.  We have another stipulated judgment that binds nobody.

MR. VEEDER:  Mr. Sachse, in regard to all the other parties who do not join in these stipulations, which I would recommend, we certainly will chronicle their acreages  at about the time we will chronicle their rights from the quiet

title standpoint -- we will indicate all these rights.  But

in regard to the substantial users referred to in A.1, there

is no reason I can see why there cannot be agreement.

MR. STAHLMAN:  Who are the substantial users?

MR. VEEDER:  I think we would make a list of who we

think are the substantial users when we have finished this

analysis.

MR. STAHLMAN:  This matter of the relationship of the

acreage and the quantity of water that riparian or overlying

owners would be privileged to take, isn't that a matter

already determined by law?  Are we going to conform to that?

Why stipulate to it?  Isn't that the manner in which it is

done?  There is not necessity for an apportionment.  The law

has already spelled out the manner in which it would be

distributed.

MR. VEEDER:  It doesn't preclude agreement.

THE COURT:  There is a way to do it legally and all

that.  But let me say, first of all, that I think Mr. Clark,

and I am only assuming, started from this oil pool situation,

and he probably doesn't realize how the location of lands of

certain tributaries affects and makes difficult some final

percentage figure.  If all the landowners in this district

owned land over one pool of water, like the Murrieta-Temecula

basin, then it would be a simple matter to take their

irrigable acreage and figure out the supply and arrive at the

1   percentages.

2        But that isn't the way it works.  You have people on

3   the Temecula who have correlative rights to other people on

4   the Temecula.  They are not really concerned with other people

5   on the Murrieta because they are on different branches of the

6   stream.  Of course, it is true the groundwater area enters

7   into this big basin we have marked out.  Nor is a person on

8   Santa Gertrudis concerned particularly with somebody up on

9   Domenigoni, because they are not in the same subwatershed

10   and their correlative rights are correlative with other

11   persons in the same position that they are in, plus people

12   downstream from them.

13        However, I don't think this is insurmountable.  We

14   have all agreed that although we may not have it in the

15   record we can find "acreage reasonably susceptible  of

16   profitable irrigation," and we know that there is a lot of

17   illusory riparian land still in these judgments, we know that

18   regardless of how much riparian land Vail has in Santa Rosa,

19   the amount of access they have to water -- this is a matter

20   which is susceptible of some practical determination

21   certainly.  You don't take the whole acreage.

22        MR. STAHLMAN:  Of course, there are other factors that

23   enter into it, such as the groundwater divide -- Vail land

24   overlying both, where it extracts it from, et cetera.  This

25        goes into a number of other projected questions.

1    MR. GIRARD:  I didn't have any major comments on this,

2    your Honor, until Mr. Veeder's remarks this morning.  I agree

3    with him.  I think one of the criteria we would use for

4    indicating any allocation would be the acreage reasonably

5    susceptible of profitable irrigation.  Of course, you would

6    have to consider the source and the facts.

7        But the thing that does bother me, now that he made

8    his comments, as I gather it, you would make an apportionment

9    of the water between the owners of the rights on the basis

10   of reasonable demands for beneficial use, and I take it that

11   relates back to No. 1 when you are referring to rights.

12   Now, will you tell me how that would work, if you mean in

13   -1-the stipulated judgment ?   The stipulated judgment

14   allocation is not based on any reasonable demands for

15   beneficial use.  It is a flat one-third two-thirds allocation

16   of everything.  If you have to recognize that, how could you

17   possibly make any apportionment even between Vail and the

18   United States and everyone else?  And I take it by the term

19   "reasonable demands for beneficial use" you mean reasonable

20   demands for beneficial riparian and overlying uses.  Now,

21   you run into some problems here under the stipulated judgment.

22   Certainly by no stretch of the imagination could a 1930

23   judgment between Vail and the United States make waters

24   exported outside of the watershed by any party reasonable

25   and beneficial riparian as against anyone else.

19,740

THE COURT: Well, in that connection, let me just interrupt just a minute.   We know Mr. Clark is going to keep himself posted on this matter.   It should be pointed out clearly that under that stipulated judgment dividing waters between Santa Margarita and Vail these people who were not parties to that judgment could certainly object to any claim by the Government that water come down so that it might be exported out of the watershed.

MR. GIRARD: Yes.

THE COURT: They are not bound by the stipulated judgment.

MR. GIRARD: As I say, when I looked at this originally I didn't interpret that "judicial decree" to mean that stipulated judgment.   So this stipulated judgment does raise all kinds of problems as to how this could even physically be worked.   I don't think it could.

MR. VEEDER: Let's not go to the point of saying it can't be worked.   I don't know whether we should anticipate here or not, your Honor, but if you will look at Paragraph 6.

MR. GIRARD: I have just a couple more comments and I will sit down, Mr. Veeder.

Am I correct in assuming that the term "beneficial use" would mean a beneficial use permitted under the right, either an overlying or a riparian right?

1          MR. VEEDER:   Certainly, Mr. Girard, in regard to the

2    parties who have not either agreed specifically to exporta-

3    tion or -- stop right there.

4          May I go on to explain the factor on that point,

5    because you have gone back to it twice.

6          It has been my view throughout this litigation, and

7    I reiterate it now and Mr. Clark is in agreement with it,

8    that the United States of America, absent agreement with Mr.

9    Girard, for example, could not make a call against Roripaugh

10   for water  for purposes of exportation on the basis of its

11   ownership of overlying or riparian rights.   In other words,

12   I specifically stipulated with the State of California that

13   the United States of America would not claim, by reason of

14   its sovereignty, the right as an owner of a riparian tract

15   of land to export water based on that riparian right.   That

16   is my position.   I think it is the law.   I don't believe

17   that short of condemnation the United States of America, as

18   owner of a correlative right, could say, "We want to export

19   water under that correlative right," because the right of

20   exportation is not embraced in that proposition.

21         THE COURT:   A demand that upstream owners release

22   water to satisfy the demand.

23         MR. VEEDER:   Precisely, your Honor.   There is complete

24   agreement.   The only basis I have ever said we could export

25   against an upstream user is that under the stipulated judgment

1   it does envision the use of water as between Vail and the

2   United States on an exportation basis.

3       MR. GIRARD:  As I understand, the purpose of this

4   whole thing is to get the best manageable use of all the

5   resources by everyone.

6       MR. VEEDER:  That is correct.

7       MR. GIRARD:  One other point.  I presume if this

8   could be done by arrangement or stipulation or agreement by

9   the parties, you would ask Mr. Sachse to give up his

10  contention that military use was not a proper riparian use.

11      MR. VEEDER:  Well, yes, I think that is envisioned

12  in the whole feature of the question of appeal, as the Court

13  pointed out.

14      MR. SACHSE:  I assumed that.

15      THE COURT:  That was a proper riparian use, and if

16  there was no appeal that would be disposed of.

17      MR. LITTLEWORTH:  I would like to clarify my thinking

18  a little onthis.  All of our clients are riparian or over-

19  lying users.  Under California law, this is the highest

20  priority of a right.  It entitles a person to use as much

21  water as he needs, providing it is put to reasonable and

22  beneficial use on his land and providing the water is

23  available on his riparian land.

24      When you talk about any kind of limitation, you are

25  presupposing there is a shortage.  This is the first thing

1  that concerns me about this -- that there is no evidence in

2  the case, as I view the record now, that there is a shortage

   uses
3  of water for those/which are now being made and, indeed, there

4  are apparently findings that there are surplus waters.

5      What we are really talking about, then, is trying to

6  devise a formula by which limitation would occur at some time

7  in the future when such shortage might occur or be shown, and

8  presumably under this No. 4 we delegate that authority to

9  determine when the shortage did occur to a  Water Master.

10     Now, between my clients and the United States, insofar

11 as its riparian lands are concerned, we each have correlative

12 rights and there is not anybody in our area who is taking

13 anywhere near what his "entitlement" would be.  If you figure

14 a person has so much acreage and he can't legally irrigate

15 all of that, we estimate what that entitlement would be by

16 taking the water duty and putting that against the irrigable

17 acreage and we know that entitlement far exceeds what people

18 are using up there.

19     THE COURT:  Now wait.

20     MR. LITTLEWORTH:  All right.

21     THE COURT:  Presently probably, yes.

22     MR. LITTLEWORTH:  Right.

23     THE COURT:  But if similar people in that entire area

24 pumped as extensively as some of your clients do, then your

25 entitlement, which you are talking about, is going to drop

because there just isn't that amount of water.  So you are

facing a problem -- you might as well look at it now -- of

the future.  I don't think you have too many immediate

problems, but you are facing the problems of the future.

MR. LITTLEWORTH:  To be sure, if the Murrieta-Temecula

area develops and more wells go in there, certainly we can't

reach the stage where there would be enough water to satisfy

the present riparian uses, including the United States.  At

that point there would have to be some limitation based on

the people who were then using the water, taking into account

what their rights were.

What we are trying to do, it seems to me here, is really

to set up machinery and adopt formulas for determining how

that apportionment would be at some time in the future.

Neither does the record support the need for it now, nor is

there enough data in the record to tell how such an appor-

tionment would be made or should be made at some future time.

I really doubt the wisdom of trying to set up

machinery in advance for determining this problem, which is

highly complex and I think would have to be determined by

the Court.  I don't think you are going to be able to do

what Paragraph 4 does, which is simply delegate the entire

responsibility to a Water Master who will determine what may

be safely used.  This is the critical factor.

THE COURT:  Since we are short of records on the

1    amount of water going into the groundwater area, the amount

2    extracted from it, and various other matters that we don't

3    have the factual information on, wouldn't the logical thing

4    be for the Court to require that studies be now started and

5    that when the time comes when it was necessary to make some

6    of these decisions we would have the information?  You can't

7    go back and create it and pull it out of nothing.

8        MR. GIRARD:  You don't have to wait until the horse

9    is out of the barn before you act.

10       MR. LITTLEWORTH:  I have no objection to collecting

11   all of the data that can be collected.

12       THE COURT:  That is also part of this program.

13       It is also part of this program that if today or

14   tomorrow is not a critical time, we have not too much to

15   worry about.  When the critical time comes we will have the

16   record and can make some of these determinations.

17       MR. STAHLMAN:  Is that all of it?

18       THE COURT:  No, that is not all of it.  That is part

19   of it.

20       MR. VEEDER:  I am sure it is not a matter entirely in

21   futuro.  I don't believe that at all.  I think we are

22   confronted with some problems immediately and we have some

23   long range problems.

24       But I think there is a very important finding that his

25   Honor has entered in regard to the Naval Enclave, and that is

19,746

1    Finding No. 8, in which it is clearly recognized that the

2    United States of America has sharply limited what it considers

3    to be its appropriative demands on the basin.

4        In other words, if the Marine Corps were to use the

5    quantities of water that they feel are required, there would

6    be certainly a crises in the Santa Margarita River system

7    and there would have been for some long time.

8        THE COURT:  What is the finding you refer to?

9        MR. VEEDER:  In which we say on the basis of 200

10   gallons a day of demands for the average of 42,000 people, it

11   would have been 9400 acre feet.  Plus (you want to add into

12   that) the rights for Lake O'Neil, plus some of the

13   agricultural rights.  Had we used that quantity of water,

14   Mr. Littleworth, that we feel is absolutely essential, then

15   there would have been truly a crises in the River on the basis

16   of the Court's finding.  Now that to me is a matter of great

17   importance.

18       Moreover, had it not been for the careful husbanding

19   of water by Colonel Bowen's office and by Colonel Bowen, we

20   would be in this situation of even a more critical circumstance.

21   But the use of sewage affluent, the reduction of agricultural

22   uses, the very carefully conducting and inducing water to go

23   underground rather than on down to the ocean -- all of those

24   factors have relieved to a marked degree the claims that we

25   could legitimately have asserted upstream.

1          So I don't believe that we should say there has been

2     no crises, that there has been no real problem, because had

3     we used the quantity of water that we think requisite there

4     would have been.

5          Here is an important factor.

6          MR. GIRARD:  Your basins are full.

7          MR. VEEDER:  The basins have been managed to the

8     point where they haven't been pulled down, that is true.  But

9     that is a matter of management, that is a matter of limitation

10    on uses.  Bear in mind that the State of California has

11    recommended into the record that rather than 200 gallons a

12    day we should be asking for 250 gallons a day.  So had we

13    gone ahead and asked for 250, Mr. Littleworth, there would

14    have been a very serious problem.

15         MR. STAHLMAN:  I think an argument of that kind gets

16    completely away from what we are trying to do here.  I can

17    give him the same argument as to Vail.  Suppose we go up on

18    Buck Mesa and put four or five thousand acres under irrigation.

19    We haven't done it either.  I don't think the halo belongs

20    around the United States.  Roripaugh himself up there is

21    irrigating only a portion of his acreage.  If you get into

22    this kind of argument -- and it has happened in other water-

23    sheds -- everybody comes in and uses everything they can

24    because they think that the use of water gives them some

25    additional advantage or additional right, and you might be

1   creating a Frankenstein here where you are going to get

2   everybody developing all their land to the fullest and have

3   a draft on all these basins that far exceeds the natural

4   development of the area.

5       MR. VEEDER:  There was another point that I didn't

6   bring up, and I think Mr. Girard touched on it and I think

7   he used the term very well.  He said you don't have to wait

8   for a disaster before you act.  You can act and you should act.

9   I think the exhibits that we introduced in evidence show a

10  reverse gradient in the Murrieta Valley -- pumping holes up

11  in the area where the Roripaughs are today.

12      Now, the fact remains, Mr. Littleworth, that all of

13  those phenomena that have been introduced into the record are

14  symptoms of a disaster that is going to occur, unless you

15  get it taken care of.

16      We have statements by Mr. Stahlman today in which he

17  pointed out that the rainfall precipitation has been above

18  average, but due to the fact that these basins above Vail Dam

19  have been depleted those basins have been the first to be

20  recharged, with the result that there has been small runoff

21  into the Vail structure.

22      MR. LITTLEWORTH:  Your Honor, the truth of the matter

23  is, I think, that this case was simply not tried in a way

24  which leads to an apportionment or quantative determinations.

25  It was tried, as Mr. Veeder has told us many times, to

catalogue rights.   There is no evidence -- I don't know whether there is any data available, but there is certainly no evidence which discusses the total quantity of water which comes into the Murrieta-Temecula area, the quantities of extractions.   These are the basic facts which one needs when he starts deciding whether or not there is enough water to go around and what you are going to do about apportioning any shortage.

THE COURT:   I agree.   How are we going to get this? You are going to get it in the final decree.   In this physical solution where you start to have some records kept, over a period of time we will find out what goes in and what goes out.

MR. LITTLEWORTH:   If this Paragraph says we are going to keep records, I have no objection.   But the word "apportionment," I think, means a limitation on use.   This presupposes shortage.   This presupposes facts which we haven't reached.   There are no findings.   The case was not tried on that basis and I don't think we do have the evidence to indicate that that is necessary.

MR. SACHSE:   I would agree, your Honor,   If this sentence is written to say -- it would take more than one sentence, it would take this whole first section -- that the data necessary to accomplish a future apportionment be accumulated, I am not arguing -- I think it is a wonderful

proposal. But this is an outline of proposed provisions for inclusion in this decree, first an apportionment, and when you get down to -3- a translation of this into a percentage.

As I said before, I don't think we help Mr. Clark if we don't make it crystal clear to him that we think that physical translation into percentage in this decree is impossible, that it is perfectly logical to appoint a River Master to take data to start work toward that goal; but let's not mislead him into thinking we can do it in our final decree, because I don't think we can.

MR. VEEDER:  Mr. Sachse, I think we have to start on this proposition with some guiding criteria, and we have already referred to the fact that Mr. Krieger represents a large number of landowners, the Vail Company, the United States, whoever is considered essential for a workable arrangement; we do have the data in the record that could set up the basis for a percentage allocation.

MR. SACHSE:  I don't agree.

MR. VEEDER:  We do have that data in the record and I can point to it, Mr. Sachse.

The fact is, if we were to take the data we have, make this formulation we have been discussing here, and proceed on that basis, it would be a long step toward terminating this litigation and it would be a long, long step toward the conservation and highest utilization of the water resources of

1    the Santa Margarita River.

2         I would guess, Mr. Littleworth, that your own clients,

3    Mr. Roripaugh and the rest of them, would agree that they

4    have probably reached the maximum irrigated acreage that they

5    could utilize at this time with the available water resources.

6    Isn't that about right?  I don't believe, for example,

7    Roripaugh, who is a very efficient operator, wouldn't have

8    pulled a lot more water out of the basin if he had thought he

9    could do so economically.

10        So I think we are at the point where we can do something

11   about it.  We have excellent engineering results.  We have

12   Colonel Bowen's very thorough study, we have the U.S.G.S.

13   thorough studies.  I think we have a place to start.

14        MR. STAHLMAN:  Just to show the fallacy of that, your

15   Honor, -- I would like first to state that we are in agreement

16   with the general principles of the preamble here, that anything

17   that can be done to get maximum efficiency out of these

18   basins or to prevent waste of water in the utilization of it,

19   the highest efficiency of all those things, we agree should

20   be done.

21        We are also agreed, and I think Mr. Sachse and Mr.

22   Girard and Mr. Littleworth expressed themselves along this

23   line, or at least intimated that to have a study made so that

24   determinations in the future can be made, we are all in

25   agreement.  I think at the present time a Water Master should

1    be appointed who should make these studies so that we would

2    have a progressive, continued knowledge of what the

3    characteristics of the water situations are in the basins.

4              Now, here is where Mr. Veeder, I think, is completely

5    wrong -- that there is not sufficient evidence in the record.

6    For instance, let's take the evidence in relation to the

7    water contours in the Murrieta Basin as such, along the

8    Murrieta stream and in that area.  We don't know what the

9    condition is there as of today.  That was taken as of a

10   certain time.  As to physical phenomena, we know that pumping

11   depressions do create holes.  What happens to those holes?

12   It is different in different basins.  The physical

13   characteristics, the hydrologic factor, those are matters

14   that determine whether some of these basins will fill up

15   rapidly.  On the San Luis Rey River sometimes in the course

16   of the winter season when there is no irrigation they will

17   reach the level in the surrounding area.  We don't know what

18   that is.  A continued study by the Master of those wells, so

19   that we know in the future, would be very beneficial.  Then

20   you could make a determination.

21             We also have other factors, as your Honor's findings

22   clearly show, and the evidence establishes that some wells

23   have an effect upon other wells in a short distance, other

24   wells have an effect upon other wells at a longer distance.

25             So that the record here has a dearth of physical facts

19,753

1    from which a determination of a logical, reasonable, sound

2    apportionment could be made.

3        MR. GIRARD:  I am maybe a little somewhere between

4    the ground of Mr. Littleworth and Mr. Veeder.  I think it is

5    certainly proper by this Court in this decree to make

6    provisions so that everyone can be properly assured that the

7    groundwater basins are managed correctly and in the event they

8    are in danger this Court would be in a position immediately

9    to act by restrictions.  I think that is the genesis of an

10   article in the recent California Law Review by Mr. Krieger

11   himself that that should be done.

12       I think what you are going to have to do in order to

13   accomplish this study -- you are not going to be able to

14   accomplish it by putting restrictions on now; I think you are

15   going to have to have a Water Master, he is going to have

16   to determine what the safe yield of the Murrieta Basin in.

17   As soon as that is determined and you know what the safe

18   yield is, he can go into or simultaneously he can prepare

19   figures which show the acreage reasonably susceptible of

20   profitable irrigation of all the people who use that water.

21   Then when that is reached, when the safe yield has approached

22   a point where there is no water there and if there are

23   further withdrawals it will be harmful, you can immediately

24   put in your orders of apportionment.  And it certainly would

25   be different.  For example, today there would be no question

1   that Murrieta Basin is going to be endangered long before

2   Pauba Basin.  But he should be working now gathering informa-

3   tion for a judicial decree determining facts so that the

4   basins can be managed properly by judicial order in the future

5   should that occur.

6        I agree with all of the comments that you couldn't

7   make such an order of apportionment now.  But I do agree that

8   you should set criteria possibly for the Water Master to

9   follow and determine facts, so that when the danger comes he

10   can act.

11        MR. VEEDER:  I think you might skip ahead just one

12   thought on this to be borne in mind, that if the DeLuz Dam

13   is built and water is impounded in DeLuz Dam, the immediate

14   effect would be to reduce the demands of the United States

15   against upstream owners.  Therefore, your possibilities would

16   be materially reduced and the possibility of limiting Roripaugh's

17   operation would be greatly reduced for the plain and simple

18   reason that if the National Government has impounded in the

19   DeLuz Reservoir a substantial quantity of water sufficient to

20   meet its demands immediately and to some degree in the future,

21   then the need for the apportionment or the enforcement of the

22   apportionment would no longer exist.  But if you hit a period

23   in which we were short of water that was impounded, if we were

24   short of water that we needed, then the apportionment would

25   go into effect.  It would not, certainly, be in effect during

1     the wet periods when there is no need for the National

2     Government to make calls for water from upstream.  I think

3     these are also elements.

4        Look at this as an overall matter with four corners.

5     Look at it with the idea that if the DeLuz Dam is built,

6     that there is the very material benefit to your clients, Mr.

7     Littleworth.  I think that is important.

8        MR. LITTLEWORTH:  I think the dam is a separate

9     proposition from what we are talking about in limiting the

10    production by riparian use.

11       MR. VEEDER:  I wouldn't separate it, though, Mr.

12    Littleworth.

13       MR. LITTLEWORTH:  Yes, we would have some benefit from

14    that.

15       But this is a separate question from whether or not

16    riparian users should be limited.  What you are really

17    asking us to do, Mr. Veeder, is to try to set the formula

18    by which a limitation would occur in the future.  I think

19    that is a complicated thing to do in advance.

20       Furthermore, I don't think it is the kind of thing

21    a Water Master has the power to do, really.  An apportionment,

22    finally, has to be done by the Court.  Your Water Master's

23    major function is to collect data and come into court and

24    make certain recommendations.

25       THE COURT:  That is what was anticipated.

1      MR. VEEDER:  A Water Master is only an arm of the

2  Court.

3      MR. LITTLEWORTH:  But as I understand, Mr. Veeder is

4  really asking us now to set the criteria formula and by

5  stipulation by which some time in the future when the Water

6  Master reaches certain levels, I mean, there would be

7  something that would trigger this.  He would then say, "All

8  right, here is  the order.  You cut down your production by

9  10 per cent," or you do this or you do that.  I think that

10  is so vastly more complicated than we can accomplish here

11  that it is not funny, really.

12      MR. VEEDER:  I agree it is not funny, but I don't

13  agree that it can't be done.

14      MR. LITTLEWORTH:  When and if the time for an

15  apportionment comes, then I think you look at the situation

16  at that time and see what needs to be done, and the Court

17  then has that power to impose physical solutions.  I don't

18  think you can sit here now and devise a formula which will

19  take into account people's rights and do equity in the

20  situation at some time in the future under changed conditions.

21      THE COURT:  Assuming there is merit in what you say,

22  we certainly should start out as a minimum by appointing a

23  Water Master to collect data so that when this time comes

24  in the future we are going to have some information.

25      MR. LITTLEWORTH:  I would agree.

1          THE COURT:  Otherwise, if we were today five years

2     ahead and a critical problem had arisen, what information

3     would we have?  And you would be telling me, "Judge, you

4     can't order an apportionment here -- you don't have enough

5     information about it."

6          MR. LITTLEWORTH:  I would agree, your Honor.

7          MR. STAHLMAN:  We agree.

8          MR. LITTLEWORTH:  We don't know the basic simple fact

9     how much water is pumped in the Temecula-Murrieta area.

10          THE COURT:  We would start to find out.

11          MR. LITTLEWORTH:  We asked some of our clients during

12     this litigation to start keeping some records so that we

13     would have some data available.  I don't think they were too

14     faithful at it.  But this is something that any management

15     program is going to require.  I have no objection to

16     starting a collection of data of that kind.

17          (Morning recess.)

18          THE COURT:  One of our purposes here is to understand

19     this proposal, and I think our discussion is bringing out

20     matters in connection therewith.

21          Let me say as to A.2, apportionment, or a matter of

22     figuring out entitlements, if that is to be done, we have

23     two problems:  (1)  We do not have in the record the complete

24     data as to acreage reasonably susceptible of profitable

25     irrigation.  That would mean that additional evidence would

have to be taken.   The second problem in that connection is the problem whether or not there is, the record shows, such a shortage of water that the Court should go into that matter.

However, on that second problem, it would seem to me if this is to be a long range program with the Master starting to gather data and all that, we well could pass up the objection that today at this moment there was not a shortage, realizing that we are working on a long range plan and that the time would come when the data we collected would be necessary and we would have to start some time.

It seems to me those two problems are involved on this question of talking about entitlement.

We are down to No. 3?

MR. GIRARD:  Yes, your Honor.

THE COURT:  We have commented on this.  Let's read it into the record:

"3.  Translation of the right of each substantial user within the category delineated in A.1. above into percentages of the total rights of such substantial users based on riparian and overlying ownerships and judicial decree."

And there "judicial decree" again means stipulated judgment, Mr. Veeder?

MR. VEEDER:  That is correct.

THE COURT:  Before I hear from you, the first matter I

1    merely want to mention, again, is the fact that total

2    percentages of water certainly as a whole is an impossibility.

3    Conceivably you could work out percentages on certain of the

4    tributaries.   But again that doesn't answer the whole story.

5    A man might have a right to a certain percentage on the

6    Santa Gertrudis tributary, but when looked at from the stand-

7    point of the watershed as a whole, with downstream users,

8    he might have a different figure.   So this is a very

9    difficult problem of trying to come out to any percentages.

10           What is your thought on that?

11           MR. VEEDER:   I agree with your Honor on the basic

12   proposition of the overall apportionment.   I view the area

13   in Anza and Domenigoni as out of any consideration in regard

14   to the propositions here being advanced.   So I would consider

15   from the standpoint of the recommendations that were set

16   forth here that we take into consideration Exhibits 277 and

17   277A, which delineat the exterior boundaries of the ground-

18   water basin, the principal groundwater basin, the Murrieta

19   groundwater basin, and consider what would be an apportionment

20   within that area, limited, however, to the substantial

21   riparian and overlying owners.

22           It is quite true that a man situated on Santa

23   Gertrudis Creek might be viewed as having a different

24   percentage with people upstream from him.   But certainly as

25   long as his lands are within the exterior boundaries as

defined on Exhibit 277, defined by your Honor on the basis

of the evidence that is in the record, I think it is entirely

possible to establish the criteria which are referred to here,

namely, a percentage criteria to formulate the basis upon which

limitations and apportionments could be accomplished.

MR. GIRARD:  Percentage of what?

MR. VEEDER:  Based on the percentage, going back again

to the acreage reasonably susceptible of profitable

irrigation.

MR. SACHSE:  What water source do you use?

MR. GIRARD:  Do you take the total amount of water

in the groundwater area and then divide his percentage of

the lands reasonably susceptible to profitable irrigation

into that total, or do you divide it just into the total to

which he is riparian?

MR. VEEDER:  No, I would say that the man on Santa

Gertrudis is entitled to participate in the available ground-

water and the groundwaters available to him and to his

acreage, which would be basin wide.

MR. SACHSE:  May I try the same question.  I don't

understand your answer.  Let's use Vail -- I am talking

about the Pauba Valley.  When you say the percentage, do you

say we would take the percentage of the total irrigable

acreage of Vail within the groundwater area and apply that

to the total supply of the groundwater area, or do we take

19,761

two different percentages of Vail and apply one to the

Murrieta side of the divide and one to the Pauba Valley side

of the divide?

MR. VEEDER:  It is entirely possible, Mr. Sachse, we

would have to use a later formula based on the physical

phenomena in the record.  But I would still go back to the

acreage reasonably susceptible of profitable irrigation in

regard to Vail Company, and I think the history is extremely

important there because Vail Company does have an extensive

history of use and, if my memory serves me right, the areas

which have been irrigated by Vail Company have been largely

restricted to the valley floor in Pauba Valley, and I think

the reason why that was done was that it was not practical

and profitable --

MR. STAHLMAN:  That is not your legal criteria as to

reasonable and profitable.

MR. VEEDER:  A question has been asked, Mr. Stahlman.

MR. STAHLMAN:  You have got me in the habit of

interrupting.  Sorry.

THE COURT:  Let Mr. Veeder finish.

MR. SACHSE:  May I pursue this a moment.  I am not

sure I understand, your Honor.

I think the statement the Court made, Mr. Veeder, and

we were discussing, too, is that we would all agree that the

probability is that there will be an overdraft in the Murrieta

1   much earlier, assuming the present rates of growth, et cetera,

2   than there will be in the Pauba.  Now, do we take all of

3   Vail's acreage and apply it to the whole groundwater area and

4   say Vail has a right to use that percentage then of what

5   water?  Maybe his water is all right.  Maybe Vail has enough.

6   Maybe there isn't any shortage in the Pauba, whereas the

7   Murrieta is already short.  I am asking.  I am not arguing.

8   I want to know your thinking.

9       MR. STAHLMAN:  I would also want to give thought on

10   the proposition of Mr. Veeder -- he injects various things

11   and then goes to something else -- he says that Vail has a

12   long history of use.  So we will take that acreage that has

13   been irrigated as a criterion of what the irrigable acreage

14   is.

15       THE COURT:  This is a matter that would have to be

16   decided later as to what acreage Vail has that is susceptible

17   of profitable irrigation.

18       MR. VEEDER:  Right.

19       THE COURT:  It is not a matter that we decide now.

20   It is a judicial decision based on the facts.

21       MR. STAHLMAN:  Yes, your Honor, but we don't want to

22   get off the track and say it is based on historical use, in

23   view of the law of California as to riparian rights.  Take

24   just a common illustration.  Somebody has a 40 acre or 60

25   acre piece and irrigates their whole acreage and simply

19,763

1    because Vail hasn't, wouldn't limit him to the acreage he has

2    irrigated.

3        THE COURT:  This is a matter we have to decide on

4    facts at a later time.

5        MR. VEEDER:  A question was asked me and I am attempting

6    to respond.  You asked me what would be the criterion.  I

7    think it becomes important.  We have Exhibit 15-E and we

8    have a groundwater divide.  We have a situation where the

9    Pauba Valley has a well defined history and a long history.

10        THE COURT:  Let's not talk about history.  You are

11    not going to be bound by history.  History might be one factor.

12        MR. VEEDER:  But it will be a factor to look at.

13        THE COURT:  But it is not the controlling factor.

14        MR. VEEDER:  Right.

15        THE COURT:  I might own 40 acres on the river bottom

16    and never use it.  History would say I was not entitled to

17    any water.

18        MR. GIRARD:  Let me ask a question of Mr. Veeder.  In

19    determining how much water Vail could use on their lands

20    below the groundwater divide, downstream from the groundwater

21    divide, would you take into account any lands of Vail anywhere

22    else, or would you just take into account the lands in here?

23        MR. VEEDER:  My own view is that based on the operation

24    of Vail Company at the present time, they have no irrigation

25    except for your Cantarini operation here in Long Valley, as I

1      remember, north and west of the groundwater divide.

2          MR. SACHSE:  They have irrigable acreage, Mr. Veeder.

3          MR. VEEDER:  But they are not using water up there.

4          MR. GIRARD:  Whether they are or not.

5          MR. VEEDER:  Just a moment.  If you will take another

6      look at some of the language that is in this Motion, you will

7      find that if an owner, although he is entitled to participate,

8      is not participating and using any water, then the others in

9      the area are entitled to use it.

10         MR. SACHSE:  You are not answering my question, Mr.

11     Veeder.  You statement says very clearly that there shall be

12     an apportionment based on lands reasonably susceptible of

13     profitable irrigation.  All I want to know is, are you breaking

14     those lands down below, downstream from the divide, or are you

15     using the total?  And then the same question as to which water

16     source are you going to apply to those two?  That is all I

17     want to know.

18         MR. VEEDER:  I think under the circumstances of Vail

19     now you would necessarily have to divide along the groundwater

20     divide area in your apportioning the surface water.

21         MR. GIRARD:  Groundwater, too.

22         MR. VEEDER:  All right.

23         MR. GIRARD:  Is that right?

24         MR. VEEDER:  I think we would treat, I think we would

25     have to look at the present time, because we don't know where

1        the groundwater divide is at the surface water divide.

2            MR. SACHSE:  So Vail would have "A" percentage.  You

3        would then apply "X" percentage of the water available

4        downstream from the groundwater divide.  Right?

5            MR. VEEDER:  That is right.

6            MR. SACHSE:  And similarly X-percent of the water

7        upstream from the groundwater divide.

8            MR. VEEDER:  That would be my view.

9            MR. SACHSE:  So finally --

10           MR. VEEDER:  LEt me interrupt just a moment, please.

11       My view of this matter is that we are only -- this is only

12       for purposes of discussion -- searching for criteria that

13       the Court would ultimately determine upon as a means of this

14       apportionment, because there are innumerable factors that must

15       be taken into consideration.  But I would certainly say that

16       the physical phenomena concerning which we have information

17       would be one of the primary guides that we would utilize.

18           MR. GIRARD:  Would you say, Mr. Veeder, that no one

19       would have any  right to a percentage of the water which

20       physically is unavailable to him?

21           MR. VEEDER:  I think that necessarily follows.

22           MR. GIRARD:  Which would mean nobody on Murrieta would

23       have any right to Pauba Valley water?

24           MR. VEEDER:  I think that would have to be a factor

25       taken into    consideration, yes.  Certainly it is this

1    situation as things now exist.

2        MR. LITTLEWORTH:  Aside from the difficulties of

3    turning one's entitlements into percentages, I am not really

4    so sure  that it would really be useful.  Let's take the

5    Murrieta area, for example, and suppose there are 10,000 acres

6    that profitably can be irrigated.  Suppose Roripaugh has,

7    as an example, a thousand acres of them.  He has,then, a

8    ten per cent right presumably to the supply of whatever water

9    is considered to correspond to that irrigable acreage.  If

10   you are really talking overall management and preservation of

11   the basin, you get into engineering problems, and I don't

12   think the proper management would result then in saying, "Well,

13   the way we have got to preserve these basins, we will cut, we

14   will say, everyone in half as an example."  You might very

15   well cut an area because this area had developed far more

16   than some other area.  You might cut another area not at all.

17   You have to take into account where the tributary supply is and

18   how much is coming in at particular times.  If your percentage

19   is to be what then translates into some kind of management,

20   I dont' think that is what a Water Master who is really going

21   to try to manage this basin would really need.  He wouldn't

22   really want to say "I have to save so much water -- I have

23   to cut everybody 10 per cent or 20 percent and chop them off."

24   He might then cut areas where it wouldn't help his problem at

25   all.  Really to solve the problem he might have to take more

1   drastic action in certain areas.   I am not sure that a

2   percentage is ever really going to help in overall management.

3          MR. VEEDER:   You might have some other criterion.   I

4   have no objection to coming up with a different formula.

5          MR. LITTLEWORTH:   This just raises the problem I

6   stated earlier.   I don't think you can really reach a formula

7   right now which is going to say how you are going manage it.

8   I think you have simply to gather your data and look at the

9   problem when it comes, and then make a decision.

10          THE COURT:   You have to read this all together.   You

11   get down to -4-:

12                "Provision that 'available waters' would be that

13          total quantity which the River Master determines, as

14          provided under subdivision C.1.(b) , may be safely

15          used, . . ."

16   Certainly if the Water Master is appointed tomorrow, he can't

17   make a determination on what may be safely used.   It is going

18   to depend on the accumulation of figures and statistics of

19   what water comes in and what water goes out, and we get down

20   to a matter of safe use as one factor.

21          But there are other provisions in here for drawing,

22   as it were, on the bank in times of crises over a 20 year

23   haul, figuring that in that period of time water would be

24   replaced.

25          But I don't visualize that this could be put into

1    operation like this (snapping fingers) and the Water Master

2    come up with some answers.  He may make studies, probably

3    would, in the particular areas that are most critical.

4         MR. LITTLEWORTH:  My point is this, your Honor, if I

5    can say it succinctly.  I don't think the translation of

6    one's riparian right into some kind of percentage entitlement

7    is really going to help the Water Master eventually regulate

8    the system.  I think he will regulate it finally, if it is

9    necessary, on some other basis than a percentage where he

10   would just make mathematical cuts across the board.

11        MR. VEEDER:  It is entirely possible, Mr. Littleworth,

12   that his Honor would find that an across-the-board percentage

13   allocation, in the light of the watershed and in the light

14   of the groundwater divide and the surface area divide, he

15   might say under the circumstances, "Surely we are not going

16   to impose as big a burden on Vail Company as we are going to

17   impose on someone who is utilizing a hundred per cent of his

18   land."  I think those are factors that would be taken into

19   consideration.  I really do.

20        There is one point I didn't touch upon.  The real

21   thing we are concerned about, of course, is that when you

22   pull the vast groundwater lake down to the point where there

23   is no more water at Elevation 957, which is the bottom of

24   the granitic lip in the Temecula Canyon, we are going to be

25   out of business to a very marked degree, and we are very

19,769

concerned.   That is why we are asking for a long range
approach on this, Mr. Littleworth.

THE COURT:   All right, before we go any further --
it's 12:00 o'clock.

MR. VEEDER:   I see it is noon.

THE COURT:   Colonel Bowen, you have been sitting here,
you don't have to comment, but I know we would all appreciate
any thoughts you have on this matter.

COLONEL BOWEN:   Your Honor, I am certainly in agreement
that the management, or a manager, or Water Master or a
River Master should be appointed very soon in order to
commence gathering these data, which will include, not
necessarily limited to, measurement of stream flow of these
small tributaries and even of some of the major tributaries
hitherto unmeasured, the measurement of the wells, at least
among the substantial users, which would mean placing meters
on them and seeing those meters are properly operated and
maintained, as the Vail Company and the United States presently
do.   We have that exchange of information already in
existence.

Also that a River Master should be given ample
opportunity to winnow out the acreages which are reasonably
susceptible of profitable irrigation.   There is a vast
amount of evidence in the record, as Mr. Veeder has said,
on this subject, but the wheat has to be separated from the

19,770

1    chaff in that regard, and that will be a major task which

2    should be gotten into fairly soon.

3        These bothersome features which the gentlemen at the

4    defense table over here mentioned, I agree with in part at

5    least, that I see personally no need for an apportionment

6    at this time, as I have told Mr. Clark when he was here, and

7    I have continually told Mr. Veeder.  We are in pretty good

8    shape at Camp Pendleton waterwise.  We intend to continue the

9    management of our water resources in the best interests of

10   conserving water and using it to the maximum beneficial use

11   possible and until such time as there is a shortage and

12   someone is really in trouble for water, I can see no need for

13   an apportionment, and when that time comes, that person should

14   be the one asking for it.

15       But I am certainly convinced that there is a lot of

16   work that needs to be done, and this Master route seems to me

17   the proper one to take to get these data assembled.

18       MR. GIRARD:  Do we have the safe yield figures on

19   these basins?

20       COLONEL BOWEN:  Not of the upper basins, no.

21       MR. VEEDER:  We do have findings of safe yield on the

22   Santa Margarita Coastal Basin underlying Camp Pendleton.

23       MR. GIRARD:  Yes.  We don't have that in the Murrieta

24   Basin.

25       MR. SACHSE:  No.

1        COLONEL BOWEN:   No.

2        THE COURT:   Certainly you have to make a start to get

3    these figures.  You just can't appoint a River Master and

4    tomorrow expect him to have all this data.  This is a matter

5    of year by year accumulation of information, building up the

6    necessary data required.

7        And according to the Colonel, we are not now facing

8    an apportionment.  I did not really feel that we were either.

9    And I think that by the time we got into a critical position

10   we would have the data available.

11       Meanwhile, if the dam is to be built and the Government

12   exercises rights to appropriate water, it has a legal right

13   to export and you have your interim supply until the dam is

14   built.

15       MR. VEEDER:   Will we continue these conversations,

16   your Honor?

17       THE COURT:   Yes, let's adjourn until 2:00 and we will

18   try to go on and find out what this means.  It was a great

19   shock to me to learn this morning that "judicial decree"

20   meant stipulated judgment.  That jolted me very badly.  But

21   let's find out what it means and then I want you gentlemen

22   not only to be critical in your comments, but be constructive.

23   If you have some ideas of what can be done here, I would like

24   to hear from you.

25       MR. STAHLMAN:   That makes me wonder about some of the

1    other language in this.   This is typical Veeder dictation.

2    I'll bet Mr. Clark never dictated this Motion.

3         THE COURT:  Well, you have no way of winning your

4    bet, so don't put your money out.

5         MR. VEEDER:  George, if you want to put some of that

6    money out on the table I think it would be a pious idea.   It

7    would pay my way home.

8         MR. GIRARD:  This "irreparable injury to all of the

9    parties" sounds familiar, though.

10         THE COURT:  Mr. Veeder told us frankly early in the

11    discussion that "judicial decree" meant stipulated judgment.

12         MR. STAHLMAN:  I have read a lot of dictation from

13    Texas, and I am sure --

14         MR. VEEDER:  This is all going into the record, I

15    hope, because I am going to call him right now.

16         (Noon recess.)

17

18                    --oOo--

19

20

21

22

23

24

25

1      SAN DIEGO,CALIFORNIA, WEDNESDAY, MAY 16, 1962, 2:00 P. M.

2                          ---oOo---

3          THE COURT:  Shall we go on to -4- and see if we

4      understand the rest of what is in here?

5              "4.  Provision that 'available waters' would

6          be that total quantity which the River Master

7          determines, asprovided under subdivision C.1.(b)

8          may be safely used, and that the share of each owner

9          would be determined by applying to such quantity his

10         percentage entitlement; that owners be permitted to

11         withdraw waters apportioned to them from any source

12         to which their rights attach or to such other sources

13         as the River Master may specify for conservation

14         purposes, subject to payment of reasonable service

15         charges and proportionate amortization of facility

16         costs if withdrawal is permitted from or through a

17         facility, or involves the use of a facility, in a

18         different ownership; that withdrawals be made

19         generally from points permitting maximum yield and

20         most efficient use of facilities."

21     MR. SACHSE:  Your Honor, my principal question on

22     this one -- I will ignore the first clause because we have

23     kicked around this question of percentages, et cetera in

24     discussing the various three points -- my principal question

25     in connection with -4- would be the second clause starting

with the fourth line from the bottom, "that owners be permitted to withdraw waters apportioned to them from any source to which their rights attach or to such other sources as the River Master may specify . . ." I seriously question the legality of such provision, if it means what it says. I can best express my objection by stating a hypothetical case.

Let us assume that a decree such as is proposed here were in effect and that Vail properly impounded 10,000 acre feet in a given year of surplus water and the River Master said, "Yes, everybody w as well taken care of this year.  You can have your 10,000."

As I understand California Appropriative Law, that water is now Vail's.  It is subject to no further draft for the benefit of any riparian in the future.

THE COURT:  Well, it is Vail's after there has been a determination that it is surplus water.

MR. SACHSE:  Yes.

THE COURT:  This Court has authority to determine that.

MR. SACHSE:  Yes, that is the point I am making.

We will imagine a soaking year when everybody gets all they need and Vail traps 10,000 acre feet.  Then imagine the next year everything is going dry -- we get zero rain.

As I read this proviso -- maybe it doesn't mean this, but this is my question of Mr. Veeder -- on this second year a riparian would be permitted to withdraw waters from any

source to which their rights attach or to such other sources as the River Master may specify, subject to payment of a price.

Does this mean that in this second dry year the River Master could say to the United States, "You may have 10,000 acre feet of Vail's impoundment subject to the payment of a reasonable service charges and proportionate amortization of facility costs if withdrawal is permitted from or through a facility, or involves the use of a facility, in a different ownership?

MR. VEEDER: I had never thought of your hypothesis, frankly. I will say this, the basis upon which this language was written, and then I will go into your hypothesis. The situation envisioned here would be where the draft upon all available supplies is such that the water level in the Murrieta-Temecula Basin had been reduced below the 957 level where it would no longer pass over the granitic lip. Under those circumstances the United States would assert that it has the right to participate in the water impounded in the subterranean basin upon arrangements being made for pumping from that basin and for the purpose of delivering water down to the Enclave. That is primarily the language that Mr. Clark intended, the concept that Mr. Clark intended with that language.

MR. SACHSE: So when you say "from a facility" you

19,776

don't mean from a surface impoundment, then?

MR. VEEDER:  Truly, I had never thought of the situation you depict, for this reason:  You would need this language to implement your right only if the Murrieta-Temecula basin had been severly drawn down under circumstances which necessarily evince a drought.

THE COURT:  Let me ask this.  You said something about the language suggested by Parker.

MR. VEEDER:  Mr. Clark.

THE COURT:  Oh, Clark.

MR. VEEDER:  I didn't mean to divert from this.  I am in agreement with what he is doing.

THE COURT:  Isn't it true that this could only be done by agreement?  There would be no attempt here to do this by judicial fiat.

MR. VEEDER:  That is correct, your Honor.  We are hopeful that the people will agree to this in the beginning, and if there is agreement, of course, there would be no problem.  However, if the circumstance arose where, as I envision this would occur someday, that pumping north and west of the Vail Company line and pumping on the Vail Company line is such that the water levels had dropped below the area where we would receive water from that basin, then if the United States decided to go in and exercise its power of eminent domain and condemn an area for pumping it could do

1    that, it could pump and it could deliver water from that

2    basin up to its proportionate share.

3        MR. STAHLMAN:   Eminent domain?

4        MR. VEEDER:   I say if there was not agreement on the

5    point we could go in and put down a well and pump from that

6    well to get our adequate share.

7        THE COURT:   We all know you can condemn.   But I under-

8    stand that this was a matter of agreement and not a matter

9    where the Court could order this.   This would be contrary

10   to California water law if it was part of the judgment.   But if

11   it was part of an agreement of the parties it could be worked

12   out.

13       MR. VEEDER:   That is what I say.   If I didn't do so,

14   I intended to preface my comment with the statement that this

15   would be agreed to.

16       MR. STAHLMAN:   There is another element, though, that

17   affects directly the situation that you say this Section is

18   intended to cover, and that is this.   Let's presume, as the

19   picture happens to be at this time, that the drawing down of

20   the basin is up in the Murrieta area but Pauba has not.   What

21   do we do then?   We have two situations there.

22       THE COURT:   Get the broad picture, George.   Whether it

23   could be worked out or not, I don't know, but when you read

24   this document as a whole, it talks about surveys being made

25   over 20-year period and it would be, I take it, a continuing

19,778

1    20-year cycle.  In other words, you would get five years into

2    it, then you are projecting it 20 years, and in a 20-year

3    period you are going to get some wet years.

4         The thought was that by cooperative action, in periods

5    of extreme dry years, on a long range program, resources that

6    are available, such as water in the Pauba Valley, could be

7    tapped for other people that needed it.  In other words,

8    suppose the Murrieta were in bad shape on their end.  Here

9    is water.  We know there is an immense amount of water in the

10   Pauba Valley.  On some intelligent approach water would be

11   made available to the Murrieta.  This would be contrary of

12   the water law, but it would be done by agreement.

13        But by the same token, in this long range program

14   estimates would be made of what water had been taken out of

15   this Pauba Basin and attempts would be made to right this

16   balance and to restore this water to the place it came from.

17        Isn't this the general thought?

18        MR. VEEDER:  That is correct.

19        THE COURT:  By the same token, suppose Vail Dam had

20   water there, and a sizeable amount of water, and a situation

21   develops where there was need in other parts of the area for

22   water.  On a projected 20, maybe 20-year program, some

23   estimates could be made as sparing some water which wouldn't

24   cripple Vail at the time but might save somebody else.

25        It can't all be that Vail Company says we are the one

1    that gives.  It has to work both ways on this thing.

2         MR. GIRARD:  I was just thinking along the lines here

3    of Mr. Veeder's comment.  I was trying to tie it in with

4    another section.  As I understood him to say, if we couldn't

5    get our percentage allocation, we could avail ourselves of,

6    say, waters in Pauba or Murrieta Basins.  And this goes into

7    another provision.  Would you feel that whatever entitlements

8    the United States got, whether in acre feet or in any other

9    way, that your prime source would be your coastal basin first

10   before you went anywhere?

11        MR. VEEDER:  Surely.  The idea is this, that there would

12   be conjunctive operation of all the water resources in the

13   valley.  We naturally would turn to our subterranean basins

14   underlying Pendleton.  But in the event that we found that

15   by pumping water we were threatening them with salt water

16   intrusion or we didn't have enough water, we still feel we

17   have a right to participate in the waters stored in the

18   Murrieta-Temecula Basin, in our relationship with all other

19   owners in that area.

20        MR. LITTLEWORTH:  You would be entitled to this

21   additional water you want, and more entitled than the people

22   you want to cut back to make it available to you?

23        MR. VEEDER:  All within our percentage, Mr. Littleworth.

24   That would have to be an established criterion pursuant to

25   which we would make our call.

1        MR. LITTLEWORTH:  Your Honor, I am concerned about when

2  an agreement of this kind would appear in this long range

3  timetable.  This point we are discussing ties in directly with

4  -5-, which is a clear statement of the right to take water

5  out of the Murrieta Valley.  If we are agreed here that this

6  kind of thing is beyond the water law of California and that

7  in recognizing an agreement, it seems to me that that kind of

8  agreement can't be made in general terms or made in a

9  vacuum, really.  You someday come to the point of a shortage

10  perhaps.  It is a shortage in a certain amount.  There are

11  other areas that may or may not also be short.  You have to

12  consider what the development is in that area and then you

13  may want to put in a well, and if you put in a well, how much

14  water do you want to take out of it?  Are you going to pay it

15  back?  What are you going to do if you lower the watertable

16  and increase the pumping costs of everyone else?  What

17  happens if you pump that watertable down further and somebody

18  has to deepen his well and put in additional pumping

19  equipment?  These are basic mechanical things you would want

20  to reach concrete agreement upon.  I don't think you can,

21  except to say this might be a way that this stream system

22  might be managed in the future.  I don't think you can make

23  an agreement on a lot of concrete problems that are going

24  to rise in the future.

25        THE COURT:  Let me follow Mr. Littleworth's suggestion

1   by saying that if some such agreement were entered into,

2   which of necessity would have to be in broad general terms,

3   if a dispute arose about the only way I think you could

4   solve it would be by an agreement that would also provide

5   that the Judge be the arbitrator and hear the facts and

6   eventually make a determination.  In other words, nobody is

7   going to bind himself to an agreement without some right in

8   the pinch of being hurt.  I wouldn't be around here 20 years

9   from now when this happened.  But if the Judge was made the

10   arbitrator of the dispute, the Water Master makes his

11   recommendations and he has an agreement to abide by this

12   arbitration, you might get some order out of it.

13        MR. SACHSE:  I still don't believe that would be quite

14   enough.  As I read this, and this Paragraph 4 must be read

15   together with -5-, as Mr. Littleworth pointed out, and also

16   together with 2.D.1., it provides in general terms that its

17   ultimate River Master operation shall call for the coordinated

18   operation of all facilities, riparian, appropriative and

19   everything else.  Well, one of the biggest sources of water,

20   one of the most important supplies -- not the most important,

21   isn't considered in this at all and would have to be an

22   integral part of this, and that is imported water.  It is not

23   available today, but if this is a long term proposition by

24   1972 it will be available in larger quantities.  Now,

25   arbitrarily to say that we today will agree that all

19,782

1    appropriative facilities and rights and all riparian and

2    overlying facilities and rights shall be pooled and operated

3    as a unit for the benefit of all, without throwing into it

4    both the right and the obligation to take advantage of other

5    sources of supply, is leaving out one of the most important

6    things on the whole River.

7        THE COURT:  I agree.  But this general plan would

8    envisage things of that sort.  For instance, if Vail Dam were

9    fairly empty and/wanted to store water in Vail Dam, if this

   [you]

10   were a feasible thing to do, some arrangement could be made

11   for an extra charge for the use of the Vail facility and

12   store water for the benefit of other people, or by the same

13   token these other dams that might be built downstream.

14       MR. SACHSE:  It is much simpler than that.  Using Mr.

15   Littleworth's concrete example, if basins at Camp Pendleton

16   were seriously depleted today and the Navy found it necessary

17   to reach upstream to seek water from Temecula-Murrieta, we

18   have on the one hand the series of propositions that Mr.

19   Littleworth presented.  It will cause serious disruptions

20   to individual owners.  Water levels will go down, pumps will

21   have to be dropped, additional pipe lines will have to be

22   purchased, pumping charges will be heavier.  On the other

23   hand, by turning a blowoff valve on the San Diego Aqueduct

24   and using the Santa Margarita River as a conduit and paying

25   a minimum charge, you can run water down the river to Camp

19,783

1   Pendleton even if they don't build a pipeline and make an

2   adjustment for transportation loss on the way down the

3   stream.   I can't believe you should limit your River Master

4   to a consideration of these sources of supply with the

5   serious disruption in economy you would make when it is much

6   easier to say, "Navy, turn on a pipe and buy a little water."

7       THE COURT:  I agree.  I say very definitely the ability

8   to purchase water should be weighed against other methods

9   that might be used.  And I think it would be the River Master's

10  job to say, "Well, is it now the cheapest and most efficient

11  way to buy water, store it here, run it into the basin, run

12  it down the stream," whatever might be done with it, "Or,

13  should some other source be tapped?"  And these all would

14  have to be weighed together.  I am in complete agreement.

15  You can't exclude, to my mind, the availability of other

16  water, if it is available.  But again, in the use of this

17  other water the general pooling system of the entire unit

18  could be used and considered.

19      MR. STAHLMAN:  What does this language mean, Mr. Veeder,

20  the last paragraph of -4-:  "...that withdrawals be made

21  generally from points permitting maximum yield and most

22  efficient use of facilities."?

23      MR. VEEDER:  Very simply, from the standpoint of Vail

24  Company, I would assume the best place for them to get water

25  is out of their own reservoir.

1      MR. STAHLMAN:  How about this situation about your

2  having theprivilege under this arrangement to come up and dip

3  into the basin?  And then let us assume we would have a

4  progression of what seems to be the physical characteristics

5  at the present time -- in other words, heavy pumping in the

6  Murrieta Basin lowering the table up there, there still being

7  a large quantity of water in the Pauba Basin.  In other

8  words, if Vail has husbanded and conserved the water and now

9  you have pumped it down up there so now it becomes necessary

10  for Pendleton to get some water, you would get it out of the

11  Pauba Basin.

12      MR. VEEDER:  Always within the percentage to which

13  you are entitled under the arrangement, and always with the

14  idea if there is going to be a cutback there would be a

15  cutback on the basis of the percentage.

16      MR. STAHLMAN:  What would the benefit, then, of thrift

17  on one person's part be to carefully watch the basin when

18  somebody else is depleting it and being extravagant in its

19  use and then when we reach this situation we would know where

20  you would want to go to get water -- it would be from the

21  person who saved it and was thrifty with it.

22      MR. VEEDER:  I will say we can envision ten thousand

23  reasons why this arrangement can be worked out.  We can

24  envision all the things that Mr. Littleworth has raised.  Mr.

25  Stahlman is correct that if somebody is wasteful it would

1    certainly put an unwarranted burden on somebody else.

2         MR. STAHLMAN:  I am not against the general principle

3    of the thing.

4         MR. VEEDER:  Let me finish.  But my own view on this

5    matter is that we have sought here what might be called, to

6    a degree, a pooling arrangement of all the water resources

7    in the entire area, and it may be that there would be

8    momentary dislocations for the individual; but I believe

9    over and above and for the long period of time it would work

10   out best.

11        When we talk about the effect of heavy pumping in an

12   area increasing the lift, I think the Court which has

13   declared repeatedly continuing jurisdiction, would have the

14   power to make proper adjustments under those circumstances,

15   and I think that proper payment could be made.

16        I touched on these various points.  I just gave an

17   example of what I construe these facts to mean, namely, that

18   if the sensible conservation of the water of the Murrieta-

19   Temecula Basin would envision a pumping down of  that basin

20   considerably below the point that it has ever been, the

21   United States of America would have the right to get its

22   share of the water out of the basin.  If water was in Vail

23   Company's reservoir, the hypothesis raised by Mr. Sachse,

24   and it was carryover water and we had a right to participate

25   on a percentage basis, I think under those circumstances by

1   a proper order of the Court we would be permitted to

2   participate in it.

3       On the other hand, if we had captured substantial

4   quantities of water in our subterranean basin or had

5   substantial quantities of water in DeLuz Dam at the same time,

6   we certainly would not be in a position to make a call on

7   anyone and, indeed, if we attempted to, the Court in its

8   jurisdiction would say, "You have all the water you need.

9   Therefore, you can make no upstream calls."

10      MR. STAHLMAN:   I think this thing is probably leading

11  us into a lot of blind alleys.  As I say, the things we

12  fundamentally agreed upon, there should be made studies and

13  there should be a Water Master.  We all recognize the fact

14  that there may come a time when there may be necessity for

15  some form of apportionment, conservation, et cetera.  However,

16  I think all of the things that are designated so far outside

17  of those fundamental basic things we agreed on so far, are

18  things the Court could do whether we had agreement or not

19  with anybody on the River who may be affected thereby.     I

20  think California law gives the Court that broad power to do

21  the very things and to be able to do it at a time when the

22  problem is intimate, and the factors are all known.  I think

23  it is a little dangerous to attempt to project ourselves into

24  the future and try to make a determination of what may occur

25  at that time.  Some of these things such as Mr. Veeder just

1    mentioned here don't chill me at all.  I think whenever there

2    is a lot of water that Vail captured in the dam, there is

3    going to be a lot of water downstream.  However, to get into

4    these situations and make a determination and balance out

5    certain proportions here when we don't know what the factors

6    are on which those proportions can be made, I think we get

7    into difficulty.  I don't think we have the wisdom to see

8    that far into the future.

9         Basically, I think the thing is okay.

10        MR. VEEDER:  You are much too modest, Mr. Stahlman.

11        THE COURT:  Let me ask, on this theory of putting this

12   all sort of in a pot and everybody having the right to draw--

13   Mr. Stahlman hasn't raised this point, but what is your

14   answer to  the proposition -- probably Vail of all of the

15   groups involved would be the one that would always have to

16   give and never receive.

17        MR. VEEDER:  I don't believe that.  History would

18   belie that.

19        THE COURT:  Where would Vail get water, from what

20   source, if there came a series of long dry years?  I can

21   visualize if Fallbrook built a separate dam and the United

22   States built one, I can visualize some trading back and forth.

23   There might be problems of pumping and all that.  I can see

24   how the United States could get water from these various

25   sources.  I can see the Murrieta farmers being able to draw

on the Pauba Basin in an emergency, with some way to

replenish that basin.   But what is the quid pro  quo?  Let's

be realistic.

MR. VEEDER:   I will be realistic on it, your Honor.

I think the primary factor that would be involved, in

response to your question, would be the long range planning

as to the availability of water in this groundwater basin

and the prospect of the very thing you have described which

precipitated this tender of this motion.   In other words,

certainly we would never ; in my view, under this arrangement,

permit the use of water under circumstances that would create

and imperil the Vail Company operation.   What would occur

would be adequate husbanding of the water year in and year

out to the end that you would make a determination that there

would be sufficient water to meet the reasonable demands

through conservation practices.   I think that is the real

answer, and I think that underlies everything that we have

suggested here.

We talk about who can be aided and who can be injured.

I believe that you have to start with the idea that here is

a natural resource that we have to husband very carefully

for the years that you have described.   I don't see how

Vail Company could possibly pump water ten miles to take

care of their needs.   I realize that.   So, the thing to do

is to be very sure that there is a quantity of water in the

1  Murrieta-Temecula basin which will always guarantee Vail

2  Company the quantities of water that its operation will

3  demand.  I think that is the answer to your Honor.

4      My own view is that probably there will be imported

5  water, and while that element can be taken into consideration,

6  as indeed reference is made to it in the motion, I still

7  think that the key to the whole matter is to look to the

8  water resources of the watershed of the Santa Margarita and

9  then husband them and then administer them and see that in

10  the long run there is not overdraft of the nature you have

11  described.

12      MR. STAHLMAN:  Your Honor, with all that he has said,

13  he has not answered your question.

14      THE COURT:  No, he hasn't.  I don't know whether there

15  has to be any quid pro quo.  But what is the quid pro quo to

16  Vail?

17      MR. VEEDER:  The quid pro quo to Vail, as you have

18  just said, is to see that everyone limits their demands and

19  that limits the quantities of water to the end that Vail

20  Company and the restof them will have sufficient water during

21  these years of drought.  I will not buy, your Honor, the

22  whole concept that Vail Company is the only one that would

23  give here.  I really don't.  My own view on it --

24      THE COURT:  I will give you one answer -- I don't

25  think you have given me any -- but I will give you one, and

1    that is if a program of husbanding water and checking

2    resources were carried on over a 20, 25, 30 year period and

3    there were drafts made on the basin in Pauba Valley, then

4    one of the first rights Vail would have would be when the

5    wet seasons come along to take water impounded in the dam,

6    gradually fill up that groundwater basin as fast as it would

7    take it.   In other words, it may be something that you

8    wouldn't have a right to do otherwise.

9        There is a quid pro quo in the sense that if you are

10   going to get an impartial fellow to run this watershed and

11   you have had three bad years and there has been a big drain

12   on that basin, you might have no surplus water that you

13   could really claim that year but you would be entitled to

14   take water and put it back in that basin as part of the long

15   range plan to balance up.  So I think there is in that sense

16   a quid pro quo.

17       But I don't know where else Vail could seek to get

18   water except from the outside, if Vail were short.

19       MR. STAHLMAN:  Here is another thing that I think is

20   a matter of concern, and this is something that I think only

21   a study can maybe determine, and that is take the situation

22   that we have this year and we are going to limit this as I

23   say to major users.  It may be that accumulation of a lot of

24   small users  on the stringers of alluvium in the creeks and

25   tributaries thereto to the east of Vail in that watershed

1   there, when we consider that the amount of water that was

2   captured by Pendleton in the underground basin and Lake O'Neil

3   and the small amount up there, and if we do not include people

4   in the upper areas there, probably through nature and through

5   man's operations there has been a depletion and drying out

6   of those stringers and an accumulation of all of them must

7   be filled when you have a series of dry years before Vail

8   gets any water in the dam, as we are experiencing this year,

9   how are we going to be able to reach those people?  I merely

10   am exploring.  I am merely asking these questions.  We may

11   have an accumulation of people up there -- they may be small,

12   some of them may be large -- that affect this situation.

13   And here if we get into this arrangement we are concentrating

14   all our energy to trading water back and forth between

15   people a party to it and forget about some of these people.

16          THE COURT:  I think one answer to that suggestion is

17   this.  I think we would probably all agree that why you

18   didn't get a better runoff in the reservoir this year was

19   because the younger alluvial deposits were pumped down and

20   it had to go there first.  You didn't get the runoff.  But

21   I think the answer to your point is that probably these

22   people, none of them above, could ever be said to be getting

23   more than their correlative share of water in the stream.

24   There is not a lot of water in these younger alluvial valleys

25   above, and it is pretty hard for me to imagine a situation

1    where, on the basis of their irrigable acreage and their

2    riparian and overlying characteristics, where it could be

3    said they were getting more than their fair share of water.

4         MR. SACHSE:   What upsets me a little more -- you have

5    raised the question of quid pro quo -- it seems to me that

6    this approach steals from the Bible and it makes the last

7    the first.   Water rights don't work that way.

8         MR. VEEDER:   For Fallbrook that's good.

9         M R. SACHSE:   Water rights work the other way -- from

10   top down.   As we read this whole thing, the United States

11   wants to use it outside the watershed, the United States

12   wants permission to withdraw its apportionment from Temecula-

13   Murrieta, the United States formally requests that the Basin

14   in Pendleton be kept full while at the same time  Murrieta

15   Basin be operated on a 20 to 50 year basis.   What is the

16   quid pro quo for all this?   In other words, it makes the

17   controlling factor in water uses to the topmost reaches of

18   the watershed the needs, the demands of the United States,

19   not the uses -- perfectly proper uses, mind you -- which

20   upstream people may make.   Those aren't the controlling

21   factors.   The controlling factor is what the last man on the

22   stream does.   If he puts more land under irrigation, if he

23   moves in more Marines, then his right to reach upstream

24   increases, under this picture, which absolutely backwards

25   of the way a stream adjudication and stream apportionment

should work.  That is the real quid pro quo question here.

And then the final quid pro quo, which is going to have to be discussed later -- your Honor mentioned it in the very preliminary remarks, but I think it should be thrown in hastily again --  Paragraph 18 of the Judgment governing the Naval Enclave says that as of this minute, presumably as of the end of this case, the United States hasn't got any rights to reach upstream.  None.

THE COURT:  Until it stops --

MR. SACHSE:  Until it stops its improper diversion or gets a State permit.  Therefore, the first prerequisite to any of these things is going to have to be to get a right to pool.  There isn't even a right to pool today in the Navy.  And yet this is completely ignored in this whole proposal.

MR. VEEDER:  I am being very restrained, your Honor.

THE COURT:  All right, continue to be.

MR. GIRARD:  I was going to comment along the same line. I have a long list of things where this agreement works solely to the benefit of the United States.  But the only benefit to the other people is the appointment of the Water Master to gather facts.

THE COURT:  To refer to the overall picture, it would seem to me that there are other things that have to be said, besides what is contained in the pages here.  I think the

first and most important is the action on the part of the
United States to acquire rights to surplus waters available
at DeLuz and thereby implement their right to export.    If
they get enough that way to take care of their exportation,
then the Provision 18, which you refer to, is in a different
position.   They then say, "We are using only our appropriative
right to export out of the watershed.   We now stand on the
basis of any other riparian.   We have a right to reach
upstream," et cetera.   And it seems to me that DeLuz and even
the water that Fallbrook seeks to capture would, pending the
construction of the dam, satisfy this need to export,
s atisy this interim period.

      MR. VEEDER:   Of course, your Honor, we don't feel
that the quid pro quos that have been referred to are all
on one side.   We take the position that in this lawsuit we
have immense equities and that when we seek to make a
settlement, to a degree we are dispensing with those
equities.   We believe that when the National Government
built a two hundred million dollar military establishment,
60 per cent outside of the watershed, with full and complete
knowledge of Fallbrook and Vail Company, and we use that
water for 20 years on an exportation right, we believe we
have some valid rights.

      We are suggesting that there be a conjunctive use of
all of the facilities in the whole area in the watershed; that

1    if we built DeLuz Dam we would be in the position of relieving,

2    to a very marked degree, our demands on the stream.

3        However, the crucial point, as I see it, in this

4    litigation and at this moment, is that during periods of

5    shortage, assuming that the DeLuz were dry and we were hard

6    pressed, we must necessarily be in the position of having

7    a right to demand as against upstream owners the release of

8    water down to us.  We are not going to abandon that claim.

9    We think we have that claim.  We think it is a valid claim.

10   We think we have  valid rights under the stipulated judgment,

11   which gives us the right to export.

12       We are here tendering a motion, offering your Honor

13   an affirmative method of approach.  We don't believe that we

14   are making any unjust demands.  We are just sitting down here

15   at the end of the stream.  I think we are in the best

16   position, really, from the standpoint of water resources.  I

17   think we have a better entitlement.  I think the mere fact

18   that we are insisting there be some kind of arrangement to

19   assure us in the future shouldn't cause the opposition to

20   say, "We will not consider what is being offered."  We want

21   them to consider it.  We want them to make counter offers.

22   If you don't agree entirely with one of the paragraphs here,

23   I would like to have a counter offer.  I talked to Mr. Clark

24   quite extensively during the noon hour.

25       MR. GIRARD:  When you talked to Mr. Clark, did you

1  tell him, Mr. Veeder, that you knew in your own mind that the

2  defendants in this case would arbitrarily absolutely reject

3  the finalization of the stipulated judgment?  Did you infer

4  to Mr. Clark that you thought any defendant in this case

5  would go along with that?  Or is this just an offer which you

6  submitted to Mr. Clark which you knew we would reject and

7  you wanted it rejected?

8      MR. VEEDER:  This psychoanalysis, your Honor, every

9  time we get into this you know what happens -- the blood

10  pressure goes up.

11      THE COURT:  Let's ignore the second question, but let's

12  have an answer to the first question.  Did you tell Mr. Clark

13  at noon today the attitude of the defendants about the

14  meaning you attached to the words "judicial decree" -- namely,

15  stipulated judgment?

16      MR. VEEDER:  Oh, yes.  Yes, I told him that there was

17  some surprise even by your Honor on this point.

18      MR. SACHSE:  The understatement of the week, Mr. Veeder--

19  some surprise.

20      MR. VEEDER:  I also discussed with him the question of

21  apportionment.

22      MR. STAHLMAN:  Your Honor, Mr. Veeder was asked a

23  question, and I think he is making a very good speech for

24  Mr. Clark to read on the record.  But he has brought up

25  something that I think we should have answered, in relation

1    to this last speech he made here about what the rights are

2    on the end of the stream and the installations outside, et

3    cetera.   I wonder if Mr. Clark is aware of the fact that there

4    is a stipulation in this case that the Government would

5    contend it had no greater right than what the predecessor

6    in interest had and that they would be bound by the laws of

7    the State of California and if, under those circumstances, he

8    feels or you feel or believe that you have a right to obtain

9    an appropriative right to take water outside the watershed,

10    considering the stipulation in the case and being bound by

11    California law and all the other things which you stated to

12    the United States Committee -- what was it?

13          MR. SACHSE:   House Interior Insular Affairs.

14          MR. STAHLMAN:   Yes.

15          MR. VEEDER:   I think there are sixteen questions.   I

16    will answer them one at a time or all at once.

17          THE COURT:   Wait.   Let's try to stay on a friendly

18    basis here.

19          I told you that I wrote to Mr. Clark and asked him

20    to read the pretrial opinion in Fed.Supp., and he assured

21    me that he read it and read parts of it a time or two.   He

22    read it all, so he knows about the stipulation.   And, of

23    course, the stipulation said that the United States would

24    claim no greater right than it acquired from Santa Margarita--

25    there is some language about "by use or prescription".

19,798

1    MR. SACHSE:  By prescription or use or both.

2    THE COURT:  Yes.

3    Now, of course, the word "use" is broad enough to

4    cover appropriation, and I so held in the pre-trial memorandum.

5    So that Mr. Clark's thinking has been centering around, I

6    gather from the short conversation, the word "use" by the

7    United States.

8    He also apparently gave consideration to this matter

9    that I raised, since the Government had a right to take or

10   make an appropriation, who did this?  And apparently

11   ordinarily the Congress of the United States did it.  I haven't

12   seen this brief, but I anticipate this brief is going to

13   spell out the theory that there was implied in the

14   appropriations of moneys for the construction of the buildings,

15   et cetera, an  authorization to appropriate waters.  This is

16   an appropriation theory under their word "use," as I get it.

17   Do you want to comment further on that -- on the

18   question that Mr. Stahlman asked?

19   MR. VEEDER:  Yes.  In regard to the question of the

20   appropriation by the United States, I have argued to your

21   Honor, and I repeat here, that when the water was diverted

22   and applied beneficially by the National Government outside

23   the watershed, it then exercised  usufructuary right in the

24   stream which had to be recognized by everyone, including the

25   State of California.

19,799

THE COURT:  I was not asking for arguments.  I was attempting by what I said to head off some arguments.

MR. VEEDER:  Let's go back and save a little time. Let us have the questions specifically and I will be glad to respond to them, because I think it is essential that I make answer to them.

MR. GIRARD:  Let's put it this way.  When Mr. Kennedy and Mr. Khrushchev were negotiating this disarmament conference, Mr. Khrushchev always said, "We will start with no inspection," --

MR. VEEDER:  I will not answer for Mr. Khrushchev.

MR. GIRARD:  -- which is totally unacceptable to the United States, that we don't have any agreement.  When you drafted up this particular proposal was it made clear to Mr. Clark that trying to revitalize the stipulated judgment would be treated by the defendants in this case exactly in the same manner as Mr. Kennedy treats Mr. Khrushchev's statement that there will be no inspection?  In other words, we are on a situation where you are making an offer where you know no one is going to accept it.

MR. VEEDER:  You say, Mr. Girard --

MR. GIRARD:  Yes or no.

MR. STAHLMAN:  Then explain.

MR. VEEDER:  In view of the fact that I did not write one word, not one word into this instrument, I am a little bit

19,800

amused at the approach that is being taken, because I did not write one word.

MR. SACHSE:  Maybe you are misinterpreting.

MR. STAHLMAN:  Who did write it?

MR. VEEDER:  Mr. Clark.

MR. GIRARD:  Maybe Mr. Clark didn't mean the stipulated judgment.

MR. VEEDER:  But Mr. Clark did mean the stipulated judgment.  And I assure you, and I am speaking to the record, and I am speaking to Mr. Clark at the moment, when I say to you that when he used the words "judicial decree" -- and I repeat, Mr. Clark, in the record now -- he meant stipulated judgment and he meant the stipulated judgment of December, 1940, and there is no question about it.  You would like to be able to get rid of it, but you won't.  It's there.

That's the answer to the first question.

MR. SACHSE:  We are wasting our time, then.

MR. VEEDER:  I answered the first question.

I would like to answer this one to George.

THE COURT:  All right.

MR. VEEDER:  He asks the question about compliance with State law.  I am not going to argue it.  I know what the stipulation said.  I know what I stipulated, and I stipulated this way, that the National Government would claim no more rights to the use of water than those it acquired by purchase

1    of Rancho Santa Margarita, which would include the

2    stipulated judgment or such additional rights as it may have

3    acquired by prescription or use or both.   I was very careful

4    when I wrote that, extremely careful, because I fully

5    envisioned a demand above and beyond the exportation right

6    of the stipulated judgment.   So when I put in the word "use"

7    I certainly intended that when the National Government

8    proceeds to perform an authorized function it has the right

9    to continue that authorized function as it has done through

10   20 years.

11        Now, in regard to --

12        THE COURT:  Well, go ahead.  You are re-arguing the

13   case.

14        MR. VEEDER:  I am not re-arguing.  George asked me a

15   question and I was explaining to him what was meant by the

16   stipulation.

17        It was not meant by the stipulation that the Marines

18   or anybody else would go hat-in-hand and say, "Please, Mr.

19   State Water Rights Board, please may I have some water?"

20   Water that we have been using for 20 years.

21        MR. STAHLMAN:  You didn't file on them with the

22   State Water Rights Board.

23        MR. VEEDER:  No.

24        THE COURT:  Let's quit arguing the case and talk

25   realities.

MR. LITTLEWORTH:  Let me express my view of some of these things, your Honor.

I think what is happening, the United States to some extent is not making a distinction between its needs and its rights.  Secondly, management may frequently vary from what one's rights on the stream are.  As I understand the power of a  Court to impose a physical solution, it in effect tends to set aside one's rights to some extent, because it says the strict enforcement of rights results simply in the waste of water or other things which it doesn't feel are equitable and within certain discretionary limits the Court can impose solutions which may in fact temper rights to some extent.

Now what we are involved with here is trying to decide what should be done in the event of a shortage.  If there is enough water to go around, there is no problem.  The way I envision this would work is that if you had a Water Master on the stream, with some data, and if you had a shortage in a particular area in a particular amount, the thing is going to be raised with a particular solution directed to that problem, and the Court would then consider and might impose conditions -- it might impose some compensation conditions, it might very well say that rather than restrict pumping in an area the economical    thing to do would be to turn on the valve and take metropolitan water.

I don't see how we can agree to anything which is

meaningful at this time.  We are simply -- well, we are flying in the face of the ancient tradition in the law that you don't try controversies until they have really arisen. You can't give answers to problems in an academic atmosphere. And I don't think you can solve the problem of shortage until it arises and you know where it is and the amount and what the conditions are in the rest of the watershed at that time, and then you have to come up with a practical physical solution, if possible, and if that doesn't give the United States the water it needs, then it has to condemn.

THE COURT:  We are going to take a recess in a minute. Let's be calm about this.

I think the Government is willing to do some bargaining in order to get a physical solution.  I think the Government wants to end this litigation, and I think we want to end it, and I would be willing to hazard a wild guess -- and this is the wildest kind of guess -- that that "judicial decree" in there (Stipulated Judgment) is the first thing that would be thrown overboard if we got down to where we were making some progress.  You have got to have a little bargaining power in talking about these problems, and the very fact that the Government is going to file a brief and assert in more detail this theory is some more, we will say, of the leverage on the Government's side of the problem.

But let's see what we have here.  Somebody has been

19,804

1   in this case -- I haven't -- for 12 years?

2        MR. STAHLMAN:  January, 1951 it was filed.

3        THE COURT:  For 11 years.  You are not going to make

4   water by litigation.  You are not going to have a bit more

5   water if this case is retried, appealed or anything else.

6   Mr. Veeder has time and time again said, "Get me 3000 acre

7   feet of water."

8        MR. VEEDER:  I have always said more than that.

9        THE COURT:  4,000.

10        MR. VEEDER:  Make it four.

11        THE COURT:  "Get me 4,000 acre feet of water.  This

12   lawsuit is over with."  Water to take out of the watershed

13   to satisfy this desire of the Government, the need of the

14   Government to export water for these facilities outside the

15   watershed.

16        Now, we are down to a place where here is water in

17   DeLuz Creek.  I think the figures given me showed that over

18   the last 10 years the average was 3,000 acre feet a year.  Is

19   that right?

20        COLONEL BOWEN:  About 3,700, your Honor.

21        MR. STAHLMAN:  Dry years.

22        THE COURT:  These were dry years.

23        MR. VEEDER:  Let's get this straight about DeLuz Creek.

24   In 1952 there was a substantial quantity of water.  In 1958,

25   six years later, there was a substantial quantity of water.

But the average is certainly not reflective of any ability on the United States of America to provide its exportation right on the basis of DeLuz Creek runoff.

MR. GIRARD:  It sure is, Mr. Veeder, if you want to appropriate your groundwater.

THE COURT:  At any rate, it is a 10 year average in a dry period.  This hasn't been a wet cycle.  If the United States builds a dam they have an interim right to take care of their exports by appropriating the water stored in their basins, which gives them a right to export this water even before the dam is built.  Finally, the Government in this interim period would probably have a right to appropriate the waters in the Santa Margarita that Fallbrook has the eventual right to on their dam, the surplus waters.  What is the ten year average on that?

MR. SACHSE:  I am not prepared to say, your Honor.

MR. VEEDER:  You mean the last 10 years?

THE COURT:  Yes.

MR. VEEDER:  What is it?

MR. SACHSE:  I don't know.

MR. VEEDER:  45?

MR. SACHSE:  Are you familiar with that, Colonel Bowen?

MR. VEEDER:  I have written briefs on it, some of the very choice briefs around here.

THE COURT:  It is a substantial quantity.

19,806

MR. SACHSE:  It is a substantial amount of water.

THE COURT:  Acre feet per year.

MR. VEEDER:  Let's say that it is probably under 7,000 in the last 10 years.

THE COURT:  Total?

MR. VEEDER:  Yes, on the average.

MR. LITTLEWORTH:  Per year, that is.

MR. VEEDER:  Yes.

MR. GIRARD:  I don't know.

MR. STAHLMAN:  7,000?

THE COURT:  7,000 acre feet a year.

MR. VEEDER:  Something like that.

MR. SACHSE:  Plus 3,000 from DeLuz.   That is 10.

THE COURT:  Until the dam is built there is ample water to take care of your needs.

Actually, I think we are going at the thing backwards. Instead of starting to get some agreement on what we can eventually do, I think the first thing we ought to do is to complete the Interlocutory Judgments and get ready for a final judgment.  In our final judgment we ought to appoint a Water Master and he ought to be put to work gathering data, he ought to be instructed to meter these wells in these critical areas at least, make estimates on the amount of water into the groundwater basins in the Pauba, the Murrieta, and the extractions, so that over a period of time we would have some

information.  He should be put to work immediately on the two

areas which, if there is anything critical in the case, have

developed some of the situations in the Murrieta with the

pumping holes, make complete investigations as to the amount

of pumpage and utilization of that water, and the situation

upstream from the Vail Dam in the areas of some of these

ranches.

MR. VEEDER:  Gibbon and Cottle, you mean?

THE COURT:  Where we had situations of one fellow

using all of the water and the man downstream had none, the

equivalent of that -- two areas there.

And as we progress in this matter and more and more

information is available the Master could be instructed to

make surveys on the acreage reasonably susceptible of

profitable irrigation, starting with these two critical areas,

and they are the areas where I would most likely think there

would be some application to this Court anywhere in the

watershed, and then working out to where he eventually was

able to come in and testify or present in written form his

proof as to   acreage reasonably susceptible of profitable

irrigation.  And I would imagine, from the experience with

Colonel Bowen in the past, if he should be the Water Master,

that many of the landowners would accept his figures -- he

would be using the same yardstick in judging everyone, and we

could eventually get findings as to what is this acreage that

19,808

is susceptible of profitable irrigation.  And then as we go along see what elese could be worked out in the way of cooperation.

I am saying that I think we should certainly make an effort to start on this.  It can't be done overnight.  And the right way to start is to start getting some of these figures immediately, put somebody to work to begin collecting and gathering this information.  Only then will we be able to know what is the safe yield out of the groundwater area.  We have the safe yield figure on the Government basins.  We have no safe yield figure out of the Pauba or the Murrieta groundwater area.  And I don't anticipate that there would be any immediate critical problem, with the exception of the two I mentioned, in the near future.  The Government isn't in bad shape.  Their basins are full and salt water intrusion has been stopped.  And see what we could do.  If we agreed on the principle that we were going to try to estimate percentages, all it amounts to is an agreement.  When we get all this information, that somewhere along the line the Court would then have to find what land could be reasonably and profitably irrigated.  That is what it would mean.

MR. SACHSE:  There is one little hole your Honor left in your own position.  I agree the first order of business is to get our interlocutory judgments finished.  But before we can take the next  step your Honor proposes, getting a Water

19,809

Master operating, we have to decide there is no appeal.  We

have to have somebody say, "We will accept these rights as

they are delineated by the Court, and we will protect or

revitalize (Speaking now of the United States) our riparian

right against the provisions of your Honor's judgment by

proceeding to appropriate in the way you suggested."  That

is the second step your Honor left out.  If we write a

judgment and your Honor says we will appoint a Water Master

and the United States appeals, I don't think I am going to

buy it; I think I am going to be cross-appealing -- I think

I am going to be cross-appealing on military use, on a lot of

these things.  I haven't said a word to Mr. Stahlman or Mr.

Littleworth about it, but I'll bet a good hat if the United

States files an appeal and your Honor had made a Water Master

declaration, you would find a bundle of cross-appeals and

we are farther back than we were ever before.

So the first thing is to get our interlocutories done.

The second thing is to have the United States say, "All right,

we will take it.  We will get the 3,000 or 4,000 acre feet

that we need by appropriation with the State of California."

What your Honor suggested can be done, there is no doubt

about it.  That will revitalize the riparian rights, so to

speak.

Now, let's sit down.  Now we have some rights to put

on this table and bargain.  Now we have some rights that can

19810

be pooled.  Now we have a few things instead of a nebulous thing that will drag on for the next 10 years.

That is the point that your Honor left out.

THE COURT:  I am glad you mentioned it, because it was implied in part of what I had to say.

MR. VEEDER:  I want to be sure -- you see, these gentlemen all ask me questions, and I am too shy to ask them questions -- but if I understand what they are saying, (1) We are to go to the State of California and make application to appropriate water.  Is that the idea?

MR. SACHSE:  That is my thought.

MR. VEEDER:  (2)  Having gone to the State and asked to appropriate water, water we have been using for a good many years, we will also agree we will not take an appeal from anything that has transpired.  Is that right?

MR. SSACHSE:  The word "anything" is perhaps too broad.  But you will accept the water rights as they were delineated, because unless you accept the water rights, we have nothing to appoint a Master to administer.

MR. VEEDER:  I think you are right there, Mr. Sachse, I truly do.  But as I understand, what has emanated from this motion --

Are we through talking about the Motion?

THE COURT:  No.

MR. GIRARD:  No.

19,811

1    MR. VEEDER:  I just wanted to know.  That at least at

2    this juncture we are advised that the position of Mr. Sachse

3    is (1) We will make a filing with the State and,(2) We will

4    agree not to appeal.

5    MR. SACHSE:  You are misstating, Mr. Veeder.  I have

6    stated to his Honor that no physical solution can be

7    discussed unless we know exactly the rights of all of the

8    parties.  That is the first thing.  You can't instruct a

9    Water Master how to administer until he knows what rights he

10   is administering.

11   MR. VEEDER:  That's for sure.

12   MR. SACHSE:  So why waste time talking about a Water

13   Master if we know we are going through six years of appeal.

14   We have to come to a point sooner or later where I say,

15   "Okay, I'll buy his Honor's military use."  You say, "Okay,

16   I'll buy Fallbrook's appropriative rights."  You and I and

17   everyone else say, "Okay, we buy the setting aside of the

18   Vail stipulated judgment."  Where all these things are done.

19   Now we will sweat out this set of rights.  Now we can use a

20   Water Master.  But you not going to do it with an appeal

21   pending.

22   MR. VEEDER:  Is that a question?

23   MR. SACHSE:  That is an answer to your question, Mr.

24   Veeder.

25   THE COURT:  Mr. Veeder, let me point out also that when

1    a suggestion is made to appropriate water in DeLuz Creek, you

2    say appropriate water we have always been using.  I suppose

3    technically you have been storing some of that water out of

4    DeLuz that has been going into your basin.  But you have had

5    no appropriative right to DeLuz -- you never claimed an

6    appropriative right in DeLuz.  This is a new legal animal.

7         MR. VEEDER:  Your Honor, I think that I am in full

8    accord.  We are claiming the right to the use of the water

9    for the purpose of exportation throughout the entire watershed.

10   To me, DeLuz Creek with its 47 square miles of runoff is

11   certainly not a bargaining position for the National Government.

12   We are looking upstream for an appropriative right for whatever

13   water we need to export.

14        I want it clear, further --

15        THE COURT:  We know your position.

16        MR. VEEDER:  That your Honor has made findings that

17   basically we have a demand for approximately 13,000 acre feet

18   of water -- a little more.  The mere fact that we haven't used

19   all that water is beside the point.  We are claiming rights

20   to that extent, we are asserting rights to that extent , and

21   I want it very clear that certainly for us to be talking about

22   an appropriation on DeLuz Creek to make up our exportation

23   right is    error.

24        I will make one more point clear.  I don't believe

25   that under the Constitution anyone can make a filing with the

19,813

1    State of California to acquire a right to the use of water.

2    I just don't believe it can be done.

3        I would like to continue to talk about the Motion,

4    though.

5        MR. GIRARD:  What Constitution are you talking about?

6        THE COURT:  What is that statement, again?

7        MR. VEEDER:  I don't believe that any official of the

8    United States of America could be empowered to go and seek

9    a right from the State of California and request the State of

10   California to decide on the question whether or not it would

11   give us an appropriative right, and, in addition, the way

12   the law is presently written, I am very sure, I am very sure

13   that the Constitution would constitute a barrier to that.

14       THE COURT:  Well, don't be so sure, because I don't

15   know that your boss is so sure about this.  The Congress

16   passed the DeLuz Dam Act, and this is Congressional action

17   indicating a desire to appropriate water in DeLuz.  This dam

18   site at DeLuz would catch not only DeLuz Creek, but it would

19   catch also the water which Fallbrook has appropriated.

20       MR. VEEDER:  That is, filed for.

21       THE COURT:  Filed for and will appropriate when it

22   builds its dam.  So you have Congressional action authorizing

23   the Secretary of Navy to take steps to build a dam.  It would

24   seem to me it would naturally follow --

25       MR. GIRARD:  There is language in there that the

19,814

1    Secretary of the Navy, if possible, or if he can get the

2    right to do so, should ask the State Water Rights Board for

3    a permit, in the Authorization Act.

4         MR. VEEDER:   Just a moment, your Honor.  With all

5    respect to your Honor, I think that the language to which

6    reference is now being made in the DeLuz Dam Act had better

7    be read into the record so that everyone knows what is

8    stated in that clause, because I think each person is putting

9    an interpretation on it without having quite clearly in mind

10   what is said in that Act.

11        MR. SACHSE:  It gives Justice veto power.

12        MR. GIRARD:  The Congressional requirement of the

13   Bureau of Reclamation to proceed under State law is not in

14   violation of the Constitution.

15        MR. VEEDER:  I will not get into that.  I will guarantee

16   no one can go to the State of California, in my view, and

17   say, "Please can we have some water".  That matter was

18   settled at Gettysburg, man.  There is no question that the

19   National Government cannot be controlled by the State police

20   power.

21        THE COURT:  I don't know.  In the judicial field we

22   operate a little differently.  We operate on a basis very

23   often of comity between a State Court and a Federal Court, and

24   we don't try to see who can throw his weight around and be

25   the most important.  We recognize that you get along better

1   with comity.  I don't see anything so terrible about the

2   United States saying that Congress has considered this matter,

3   has authorized a dam, with whatever ifs-and-ands you want,

4   that we have litigated this matter for many, many years,

5   that the Government needs about four or five thousand acre

6   feet of water to take care of its exportation needs, and the

7   water is available and we seek to appropriate it.

8        MR. VEEDER:  Your  Honor, I would like to say this.

9   The word "comity" is certainly written into the paragraph

10  to which you allude in the DeLuz Dam Act.  I think it would

11  be a pious idea to have an interpretation and construction

12  of that Act at this juncture.

13       THE COURT:  We will take a short recess.

14       (Recess)

15       THE COURT:  I just happen to have the statute before

16  me here, and it is a very interesting statute.  DeLuz Dam

17  Act -- that is the name of it -- Act of July 28, 1954.

18       MR. VEEDER:  Mr. Girard is not here, your Honor.

19       MR. SACHSE:  He is on long distance, but I suggest

20  we go ahead.

21       THE COURT:  Section 2(a):

22            "In the interest of comity between the United

23       States of America and the State of California and

24       consistent with the historic policy of the United

25       States of America of Federal noninterference with

State water law, the Secretary of the Navy shall

promptly comply with the procedures for the

acquisition of appropriative water rights required

under the laws of the State of California as soon

as he is satisfied, with the advice of the Attorney

General of the United States, that such action will

not adversely affect the rights of the United States

of America under the laws of the State of California."

Now, I note that it would be very difficult for me to

see how an appropriation on DeLuz Creek or an appropriation

on Santa Margarita, subject to Fallbrook's right, would

adversely affect the rights of the United States under the

laws of the State of California.

MR. VEEDER:  Your Honor, are you through?

THE COURT:  Yes.

MR. VEEDER:  I am very worried about your Honor's

repeated reference to an appropriation on DeLuz Creek by the

United States.  Has somebody suggested that we limit our

appropriation to DeLuz Creek?

MR. SACHSE:  No; everything.

MR. VEEDER:  You see, I am sensitive about these

things, and if your Honor would say an appropriation from

the Santa Margarita, fine.  But when you start talking about

one tiny little 47 square miles of subwatershed --

THE COURT:  Well, except that whatever rights you get

1    there are prior to anyone's rights, and you therefore have

2    got something in your market basket to trade with.

3        MR. SACHSE:  That is the point, your Honor.  If he

4    doesn't do it, they are going to be junior to another 12,000

5    and history is going to repeat itself.

6        MR. VEEDER:  The point I make is, let the poor little

7    National Government suffer its way through alone, you see.

8    I mean, when all is said and done, when I find Mr. Stahlman

9    or Mr. Sachse saying, "Bill Veeder, let me help you in regard

10   to saving the rights of the National Government," then I

11   become extremely worried.

12       The next time we talk about appropriation, let's talk

13   about appropriation on the whole stream.

14       MR. STAHLMAN:  That part is all right, but --

15       THE COURT:  Let's talk about appropriation for

16   immediate use to be placed in the underground basins of the

17   State of California.

18       MR. STAHLMAN:  If Mr. Veeder is right that they have

19   a right to appropriate and that the time of appropriation

20   controls the priorities, there are a lot of people filing up

21   there now.  The conflict will be between people who filed

22   under California law and you when you do not get your

23   appropriative right until after you have made your diversons.

24   You are losing all of the time on that by not doing it.

25       MR. VEEDER:  I fell off the sled on that -- I didn't

19,818

1   follow, because we have made our diversions, we have used

2   water for a long while.

3       THE COURT:   Section 3(c) also has some interesting

4   language:

5           "For the purposes of this Act the basis,

6       measure, and limit of all rights of the United States

7       of America pertaining to the use of water shall be

8       the laws of the State of California:   Provided, That

9       nothing in this Act shall be construed as a grant or

10       a relinquishment by the United States of America of

11       any of its rights to the use of water which it

12       acquired according to the laws of the State of

13       California either as a result of its acquisition of

14       the lands comprising Camp Joseph H. Pendleton

15       and adjoining naval installations, and rights to the

16       use of water as a part of said acquisition, or through

17       actual use or prescription or both since the date of

18       said  acquisition . . ."

19   This is the important part:

20           "Nothing shall be construed . . ." (Paraphrasing)

21       to create any legal obligation to store any water

22       in DeLuz Reservoir, to the use of which it has such

23       rights, or to require the division under this Act of

24       water to which it has such rights.

25   So it even provides by Congressional action that you

1    don't have to store the water in DeLuz Reservoir.

2        Let's go through this document and see what other

3    comments you have.

4        MR. LITTLEWORTH:  We discussed -5-.

5        THE COURT:  We were down to -6-:

6            "Provision that waters so apportioned to the

7        United States not be restricted to use within the

8        Santa Margarita watershed, except as against owners

9        of riparian and overlying rights who have not waived

10       their right to benefit from such a restriction."

11       MR. GIRARD:  I presume that means the Vail Company and

12   the intervenors.  By the term "waived" are you referring to

13   the stipulated judgment there, Mr. Veeder?

14       MR. VEEDER:  Yes.

15       MR. GIRARD:  Again, I am just wondering how this would

16   work.  The Vail Company could not object, under this term, to

17   your exporting your allocated water outside the watershed, but

18   every one of Mr. Krieger's clients or Mr. Littleworth's

19   clients, for example, would be able to say, "No exportation,"

20   wouldn't they, under this term?

21       MR. VEEDER:  I would view it this way, Mr. Girard, that

22   in regard to Mr. Littleworth's clients, who are not a part of

23   the stipulated judgment --

24       MR. LITTLEWORTH:  None of them is.

25       MR. VEEDER:  Right.  I say none of them is.

19,820

MR. LITTLEWORTH:  Yes.

MR. VEEDER:  The United States would not be in a position to make a call upon them for water for purposes of exportation.  It would be beyond our overlying and riparian rights.  We could call on you to the extent of our correlative share, but we would not have the right, under California law or any other law, to broaden the riparian rights that we acquired.  Our whole interest is correlative and we do not have a right of exportation or impoundment against your clients.

MR. GIRARD:  Do you think you could call on them for your correlative share or in any apportionment proceeding prevent them from using all of the water they wanted for reasonable and beneficial riparian uses at any time that you were exporting under this?

MR. VEEDER:  Yes, indeed.  If we were exporting water to the extent of our allocate share under the stipulated judgment we could make a call against Vail Company for water to that extent.  But as against anyone else we would not have that right.

Fortunately for us, Mr. Girard, it is a simple task to separate and segregate the runoff of Temecula Creek, so we can determine with great specificity the extent of the water that we would claim a right to export.

MR. GIRARD:  Also, would you feel that under this

19,821

provision you could limit, for example, upstream appropriators such as Vail and still continue to export? Are you treating your exports as senior to Vail?

MR. VEEDER:  No, Mr. Girard.  The right of Vail Company and the United States, as we view it, is governed by the stipulated judgment, and under that stipulated judgment Vail Company has a right to impound water as against the National Government, and we, of course, agreed to it and we withdrew our protest with California against their filing. In regard to impoundment by Vail Company, we say, "Go ahead. You have the right as long as you stay within the four corners of the stipulated judgment."

MR. GIRARD:  How about Fallbrook?

MR. VEEDER:  We don't think Fallbrook has anything but paper rights, but if there was a surplus of water over and above the demands of all the vested rights, Fallbrook would naturally have a right to participate in that surplus. We have never denied that if a surplus is available, a subsequent appropriator can appropriate rights to the use of water.  I mean, it's just axiomatic.

MR. GIRARD:  Let me ask you specifically:  As to your exportations outside the watershed, under this agreement here, would you place a priority on those exports, or would you treat them as having the same priority as an overlying or riparian use?

19,822

1    MR. VEEDER:  Are you speaking in regard to Mr.

2   Littleworth's client?

3    MR. GIRARD:  In regard to anyone except Vail -- throw

4   out Vail.

5    MR. VEEDER:  All right.  We would say this, that

6   absent a specific agreement with a riparian or overlying

7   owner, for example, where the Roripaughs agree that we could

8   export our allocate share under our correlative right, we

9   would say we did not and could not have a right against

10   them.  It would take a specific agreement for the very reasons

11   that I expressed.  When we bought and paid for the riparian

12   right there was no right embraced for exportation.

13    MR. SACHSE:  That doesn't quite answer the problem in

14   which I am interested, Mr. Veeder.

15    MR. VEEDER:  Did I answer Mr. Girard's question?

16    MR. GIRARD:  I don't see -- well, you answered it.

17    MR. LITTLEWORTH:  You didn't answer it as to riparian

18   and overlying users.

19    MR. SACHSE:  Let me put it to you as an appropriator,

20   Mr. Veeder.  We have today permits which, as his Honor has

21   pointed out, are not yet perfected, but if and when perfected

22   they will hold priority as of the date of the filing.  That

23   is where they will fit in this appropriative scheme on this

24   River.

25    Now, I observe that the language of Section 6 very

1    carefully reserves to the owners of nonconsenting riparian and

2    overlying rights, the rightto object to export.  But what

3    about nonconsenting owners of appropriative rights?

4         MR. VEEDER:  That would be Fallbrook.

5         MR. SACHSE:  Or Vail.  You say you have Vail under the

6    stipulated judgment.

7         MR. VEEDER:  Yes.

8         MR. SACHSE:  Maybe you don't win that, as his Honor

9    suggested.  Maybe that gets thrown out.  So let's say

10   Fallbrook or Vail, with the Fallbrook Dam in existence --

11   to draw you the exact picture, leave Vail out.  Where do we

12   stand in this right to export water?

13        MR. VEEDER:  It is my view, Mr. Sachse, in that

14   regard that two riparians can contract as between themselves

15   for nonriparian uses and that that water is not subject to

16   appropriation under the laws of the State of California,

17   because the law is very clear.

18        MR. SACHSE:  I don't want any argument.  Just tell me

19   if I understand.

20        MR. VEEDER:  Mr. Sachse, I have already told you that.

21   We are saying this, that Mr. Roripaugh and the United States

22   of America could contract to rotate the water, to impound

23   the water, to export the water, and we would say that that

24   water was not open to appropriation by Fallbrook.  We would

25   say that the only thing that is available for appropriation

1  by Fallbrook is water surplus over and above the vested

2  rights of the parties.

3      MR. SACHSE:  Over and above the contract of the two.

4      MR. VEEDER:  Over and above the vested rights of the

5  parties.

6      MR. SACHSE:  Over and above the contract made between

7  the two riparians.

8      MR. VEEDER:  Right.

9      MR. GIRARD:  In other words, you feel you can by

10  contract create a right which you didn't either of you have

11  if you exercised without any contract?

12      MR. VEEDER:  Right.  I think that is true.  I think,

13  Mr. Girard, in that regard, that the agreement among the

14  parties to rotate uses of water between riparians, for

15  example, is a perfectly valid exercise of the contracting

16  powers of two owners.

17      MR. GIRARD:  I would agree with you there, but --

18      MR. VEEDER:  Similarly, I would say this, that two

19  riparians can contract to say you can impound water, your

20  riparian water, during the months of November to October

21  better to utilize our riparian rights.  I think that is a

22  perfectly valid contract.

23      MR. GIRARD:  But it doesn't create a right to impound

24  against anyone else.

25      MR. VEEDER:  It creates, so far as we are concerned, we

would say this, and we will certainly fight for it, that that

water is not thrown open to appropriation by the mere fact

1     that the parties agree better to utilize their riparian rights.

2          MR. SACHSE:  Then, your Honor, again to help Mr. Clark,

3     I would like it clearly shown on the record that Fallbrook

4     does not subscribe to this theory of California law; that we

5     could not and would not accept any proposed physical solution

6     which sought to put an executed valid -- I am presupposing

7     construction of the reservoir, Mr. Veeder -- appropriative

8     right with the priority date granted by the law of California,

9     to put in a junior position to an export right created by

10    contract between two third parties.  I couldn't buy it as

11    part of the law of California.  Mr. Clark might as well

12    realize it.

13          I might ask Mr. Girard what the law of California is.

14          MR. GIRARD:  I think it is perfectly clear.  The

15    argument is ridiculous.  In 1930 the State law provided that

16    you could not gain an appropriative right without filing with

17    the State Water Rights Board.  I don't see how that law

18    could be thwarted between two individuals contracting.

19          MR. VEEDER:  1940.

20          MR. GIRARD:  1940, which is certainly subsequent to

21    1914.

22          THE COURT:  I have trouble following you.

23          MR. VEEDER:  It is nothing new, your Honor.

24          MR. STAHLMAN:  It is back to the same old argument he

25    made on the stipulated judgment.

19,826

MR. SACHSE:  We know what he means on this.  Let's go to -7-.

MR. VEEDER:  Is your Honor going to read these in?

THE COURT:  Read them in, Mr. Veeder.

MR. VEEDER:  "7.  Provision that waters not used within such apportionments be available for use by the holders of apportioned rights proportionately to their percentage entitlements in the total apportionment, to the extent such owners can make reasonable beneficial use thereof within the limits of their rights."

That has already been discussed to some degree.  In other words, if a man has a thousand acres of land and he is not using any water, although he would have a percentage, a right to participate on a percentage basis but he was not going to use any water at all, then the water that he did not use would be available percentagewise for all of the parties.

MR. STAHLMAN:  That is California law, anyway.

MR. VEEDER:  Indeed it is.

MR. SACHSE:  No, it is not California law, not at all, George.

MR. LITTLEWORTH:  It depends on where your land is located.

MR. VEEDER:  Yes.

MR. LITTLEWORTH:  The man upstream has much more

19,827

advantage, presuming that the large supply comes upstream,

to the man downstream as to surplus water, because if there

is surplus available, he can take it and use it, and if it

doesn't get downstream, the man who has downstream land can't

say, "I would like an allocate share of that surplus," unless

he has some kind of appropriative right.

MR. VEEDER:  I quite agree with you.  George pulled me

off base.

MR. LITTLEWORTH:  All right.

MR. SACHSE:  That is still not sufficient, Mr. Veeder.

California law specifically provides that water not used by

riparians is subject to appropriation.  Sure, it is subject

to recapture by the riparian.

I have a specific question here, because it seems to

me -- your draftsmanship or Mr. Clark's draftsmanship --

Paragraph 7, which you just read, gives the right to the

quotas of the apportioned rights, and then Paragraph B.2

says that apportioned waters not used shall be deemed

surplus.  I can't read the two together, and it seems to me

that B.2 is in accordance with California law, whereas , 7 is

not.

MR. VEEDER:  Let me give you an example on this.

You have the situation where Ceas, Lincoln, Roripaugh, Jack

Roripaugh, all have a percentage upon which they could

participate.  That would be the measure.  Three of those

1    parties didn't use the water at all that season.  The others

2    to the extent they could make beneficial use of it, Mr.

3    Sachse, would be entitled to participate in the water.  I

4    think you will agree with me, Mr. Sachse, that the water

5    becomes available for appropriation only when no other

6    riparian -- are you shaking your head, Mr. Sachse?

7            MR. SACHSE:  I agree with you.

8            MR. VEEDER:  All right.  That is the point.

9            MR. GIRARD: And, of course, you have to make it clear

10   that it would have to be a riparian use.

11           MR. VEEDER:  Oh, indeed.  The point I am trying to make

12   is that I disagreed with Mr. Sachse's proposition that if

13   there was a riparian available who could use all the

14   percentage -- just one, no one else was using water, but this

15   riparian could use the water, for example, the United States

16   of America using the water for the Marines would be in a

17   position --

18           MR. SACHSE:  For a riparian purpose.

19           MR. VEEDER:  We have our exportation rights against

20   George for the riparian right, you see, and we could use it

21   all -- yes, we could -- and there wouldn't be anything

22   available for you for you to appropriate, you see.

23           MR. SACHSE:  That latter I understand perfectly.  But

24   this pattern is designed to create a condition where all the

25   water in the stream is 100 per cent under the thumb of the

1  United States.   That is what this whole deal is.

2  MR. STAHLMAN:   I feel that when Mr. Clark reads these

3  speeches Mr. Veeder has made in connection with the stipulated

4  judgment, in order fully to understand it I hope he will go

5  back and read the record that occurred at the time this was

6  under consideration.   I don't want to stop and object to all

7  these arguments which we have gone into at quite some length

8  on other occasions and take up time like Mr. Veeder is taking

9  re-arguing the stipulated judgment.   I hope Mr. Clark gets

10  himself fully informed as to the circumstances and conditions

11  that entered into the setting aside of the stipulated

12  judgment.

13  MR. SACHSE:   I understand 7.

14  MR. STAHLMAN:   I also think, your Honor, this is a

15  regrettable thing that Mr. Clark, who is the author of this

16  document, didn't come out and argue it himself.

17  THE COURT:   This was not to be an argument.   This was

18  to be an exploration.

19  MR. VEEDER:   It is.

20  THE COURT:   To try to understand this proposal.

21  MR. STAHLMAN:   I am just wondering, from Mr. Veeder's

22  interpretation, if some of his language that is not expressed

23  with great clarity is what Mr. Clark had in mind.   That is

24  the difficulty you run into when one man presents and another

25  man interprets something.

19,830

MR. VEEDER:   I assure you, Mr. Stahlman, the transcript will be on its way as soon as my friend John gets it written up and I will get it right back.

MR. STAHLMAN:   I am a little leery of Mr. Veeder's interpretations.   There have been so many of them on different things in this case.

MR. GIRARD:   I want you to know that I agree with B.1.

MR. SACHSE:   So do I.   No argument whatsoever.

THE COURT:   B.1 says:

"A determination of all appropriative rights and the priority dates therefor."

MR. STAHLMAN:   I think we have really done that in the record.

THE COURT:   Read B.2, Mr. Veeder.

MR. VEEDER:   "B.2 Provision that apportioned waters not used within the limits of the rights tereto determined as provided in A.1. shall be deemed surplus waters; that such waters together with other available surplus, shall be available to the owners of appropriative rights for the use of such waters on the basis of priority at the locations at which such rights attach or on the basis of such agreement as interested parties may make in consideration of contributions to the cost of storage structures and other relevant matters; that ' other surplus' shall

19,831

be waters captured by impoundment structures or

otherwise captured, which would not have been put to

beneficial riparian use had they not been so impounded

or otherwise captured and would not have recharged

groundwater basins, and shall be deemed 'available'

when so determined by the River Master as provided

under C.1.(b)."

MR. GIRARD:  I have a couple of comments, particularly

on Page 4.   ". . . shall be available to the owners of

appropriative rights for the use of such waters  on the basis

of priority at the locations at which such rights attach..."

You would also have to take into account, would you not,

the time of the appropriative right?

MR. VEEDER:  Oh, yes, indeed.

MR. GIRARD:  You have a couple of appropriative

rights.

MR. VEEDER:  That is embraced within the idea of the

appropriative right, yes.

MR. GIRARD:  All right.

Then I am wondering what you mean here by "or on the

basis of such agreement as interested parties may make in

consideration of contributions to the cost of storage

structures and other relevant matters; . . ."

MR. VEEDER:  I believe certainly in regard to waters

that are reduced to possession by an appropriation there can

1  be an agreement to participate in those waters.  For

2  example, if Fallbrook's paper rights become of some value

3  we might consider letting them participate in the water

4  impounded in DeLuz Dam.

5      MR. GIRARD:   In other words, by agreements you would

6  mean agreements between parties who have valid appropriative

7  rights.

8      MR. VEEDER:   Indeed.

9      MR. GIRARD:   And you are not talking about an agreement

10  between two people, the United States or otherwise, to create

11  an appropriative right by agreement, such as was attempted

12  to be done in the stipulated judgment.

13      MR. VEEDER:   As was done, Mr. Girard.  I believe that

14  language would be related to individuals who had complied

15  with the State law and who desired to participate in the

16  waters, as I said, in DeLuz Dam.  I don't know that George

17  would agree to any participation in the waters in Vail Dam.

18  But in any event, I think there could be an agreement among

19  parties as to the use of this stored water.

20      MR. GIRARD:   And as I gather the last point in there,
                                              which
21  it is to the effect that waters/have not been used by

22  riparians and waters which have not been captured by

23  appropriators shall be deemed available, the Master can

24  determine those waters to be available.

25      MR. VEEDER:   I would assume that if by some odd

19,833

circumstance you had 143,000 acre feet of water backed up behind DeLuz Dam, some kind of arrangement could be worked out in regard to the use, as I see it.

MR. GIRARD:   I would have no real quarrel with regard to the use of those waters.   But I think we will have to be perfectly clear that insofar as the Master or this Court are concerned, I doubt very much if they could create a right to the use of those waters.

MR. VEEDER:   I think this -- and this is something that I have not discussed with Mr. Clark, but it would appear to me this way -- that if the National Government reduced to possession a large quantity of water for which there had been no appropriative rights attach, that that water would be viewed as personalty and could be sold and disposed of under some kind of arrangement.

MR. GIRARD:   I would agree if no one is using the water, a person can certainly capture it and do what he wants with it.   But he doesn't have a water right to it.

MR. VEEDER:   I think you are probably correct, Mr. Girard.

MR. GIRARD:   As I read this term, this doesn't apply only to the National Government; it applies to anyone.

MR. VEEDER:   I am primarily interested in the National Government.   You may be right.

MR. SACHSE:   May I inquire for a moment.   I think I

followed everything, and Mr. Girard answered a couple of my questions.  I am still not quite clear on this latter, the very last one.  What does the phrase "would not have recharged groundwater basins" mean, Mr. Veeder?  There is no limitation on that at all.  Does that mean recharged fully?  Does that mean recharged to a reasonable level?  What?

MR. VEEDER:  I would assume that the United States would operate this way, that as soon as it impounded water behind DeLuz Dam and there was a need to recharge the groundwater basin, water would be immediately released into those basins for the purpose of recharge, I think that would be true, and when those basins would be filled that is what that means -- that when those basins have been fully recharged and there is still surplus water just sitting there, I think that is what this point relates to.  If somebody came along and wanted to buy some, Fallbrook for example --

MR. SACHSE:  That is the next question I have.  You speak of buying.  I can conceive of conditions -- let's say the United States doesn't build DeLuz Dam and the only structures on the River would be Vail and Fallbrook.  We know from our runoff figures that sooner or later there is going to be a flood, if history repeats itself, that the runoff at Fallbrook couldn't be handled at Fallbrook.  It has been clearly presented that that is one of the reasons why DeLuz Dam is urged.  If that condition exists, could somebody

19,835

1   with a dam site, let us say, above Fallbrook, Vail with another

2   dam somewhere in the Gorge, appropriate that water under this

3   clause?

4        MR. VEEDER:   I don't believe that was ever contemplated.

5   I am sure it was never contemplated there would be another

6   structure.   I think primarily this relates to what I described;

7   it relates primarily to the circumstance where there is

8   surplus water.

9        MR. SACHSE:   Then I would make only this observation,

10   your Honor.   The thing that would worry me most right here

11   would be this "would not recharged groundwater basins"

12   clause, because again I think that phrase, without some

13   restriction upon it, is contrary to the laws of the State of

14   California for the same reason that we pointed out in our

15   discussions on Diamond and Domenigoni.   In other words, it

16   is not a reasonable use of water to insist that a basin be

17   kept full.   On the contrary, the most reasonable and beneficial

18   use is made by using water from basins and, just as we agreed,

19   that you would have had no authority to order the people in

20   Diamond-Domenigoni Valley to maintain the water level at such

21   point that it flows over the lip because that would have been

22   a wasteful use.   So I do not feel that we can consider a

23   situation in which you have to say that there is only surplus

24   water when you have a basin in the watershed which is fully

25   recharged.

19,836

That is all I want to say on it.

THE COURT:  All right, let's take up C.  Mr. Girard, are you in good voice?

MR. GIRARD:  I think so.  I will read it.

"C.1.  Provision for the appointment of a River Master, with powers as limited by the order of appointment but including appropriate authority to accomplish these purposes:

"(a)  To administer rights to the use of water as determined by the decree and to make recommendations for modifications and changes in rights so determined."

I can see that there would be a need for this.  For example, you will have undoubtedly in this decree declarations of land, for example, which is now riparian and would have a riparian right, and in the future quite probably much of this riparian land will be severed and that should be kept up to date.  I would have no objection to Paragraph (a).  I think the Master should do that.

I would presume, Mr. Veeder, by "changes in rights so determined" is not meant that he would make a recommendation, for example, that a hundred acres found to be riparian today and x-hundred acres is riparian ten years from now, that the Master could make a recommendation that x-hundred acres is not riparian.

1    MR. VEEDER:   He could probably make it, but he would

2  not be successful.

3    MR. GIRARD:   I envision your idea that he would make

4  recommendations and modifications only concerned with where

5  factual situations have resulted in the possibility that

6  the right had changed.

7    MR. VEEDER:  A changed condition.  A piece of land

8  becomes sour and no longer is irrigable.  It was irrigable

9  at one time, but through  improvident use of water it is no

10  longer irrigable.  I think he would be authorized to appear

11  before the Court and say, "I desire to have the decree

12  modified in regard to the southwest quarter  of the southwest

13  quarter of  Section _____".

14    MR. GIRARD:  "(B)  To study, with the best professional

15    advice and assistance available, as determined by the

16    Court, hydological, geological and related facts to

17    determine the amount of water available at all times

18    within the watershed; to find, from time to time, the

19    amounts which may be safely used within given periods

20    of time as apportioned waters under A. and the amounts

21    which may be used as surplus waters bunder B., having

22    due regard for the various sources from which surplus

23    waters may be withdrawn, to the end that there may be

24    provided a sound conservation program for use of the

25    water resources of the Santa Margarita River system

without waste, undue evaporation and transpiration

losses, harmful depletion, or damage to the ground-

water basins or other natural as well as man-made

facilities; and to advise owners of rights of the

quantities of water to which their rights entitle

them within given periods of time, as early as feasible

to permit fullest  opportunity to such owners to plan

for future use of water."

I would certainly think the Master, regardless of how

we determine this particular motion, should be prepared

as soon as possible to start gathering all these factual

matters.  We have already commented on the problems involved

in (a) and (b).  But I, myself, believe that it certainly

wouldn't do any harm to have our Master, as soon as we do

get these interlocutory judgments signed, start gathering

information .   Whether we can go into actual apportionment

or not at this stage, I have already expressed some doubts

as to the propriety of it at this time.  But I certainly

encourage the gathering of the factual information.   I don't

know of any other way it could be done except by a Master.

MR. SACHSE:  I have an inquiry about the last sub-

paragraph.  I am not now discussing the difficulty of doing

this, that is, advising the owners of the quantities.  But I

am wondering to what this refers.  Does this refer, Mr.

Veeder, using my example that I used this morning on the Vail

1    Dam, if it gets 20,000 acre feet behind it, thanks to a

2    fortunate wet season, would this purport to give the Master

3    authority to tell Vail how much they can take out of Vail

4    Dam?

5        MR. VEEDER:  I would look at it this way, Mr. Sachse,

6    and generally how Water Masters operate is that they

7    calculate as closely as they can on the basis of the

8    available water supply and as early as possible advise that

9    it appears that it is 75 per cent of normal season and you

10   should govern yourself accordingly as to the amount of crops

11   you plant and the kind of operation you engage in.

12       MR. SACHSE:  That is right as to riparians.  I agree

13   completely that that is how Water Masters operate as to over-

14   lying and riparian owners.  The point I am making is, using

15   this hypothetical case of the Vail Dam, thanks to a wet year

16   he has 20,000 acre feet.

17       MR. VEEDER:  It would be my recommendation certainly,

18   if I were Vail Company, I would say, " We have reduced this

19   water to possession.  All the riparians are taken care of.

20   As a holder of a priority ahead of all of the other

21   appropriators, I desire to use this 10,000 acre feet."

22       MR. SACHSE:  And he would have a perfect right, as you

23   understand it, to use it all in one year if he so chose?

24       MR. VEEDER:  I believe that would be encompassed in

25   the appropriative right, Mr. Sachse.

1    MR. SACHSE:  That is all I want to know.

2    MR. STAHLMAN:  On the other hand, he could spread it

3    out.

4    MR. VEEDER: I would think that would be the way he

5    could do it.  Or I think if he desired to put it in the

6    bottom basin, he could do it.  Because I don't know of any

7    other way of administering the water once it is reduced to

8    possession.

9    MR. GIRARD:  "2.  Provision that all such determinations

10   by the Master be reviewable by the Court."

11   I certainly agree with that.

12   MR. VEEDER:  I think that is a real concession, Mr.

13   Girard.

14   MR. LITTLEWORTH:  I think we need to go even a little

15   further.  Actually, the Water Master in most situations is

16   only going to make recommendations.  In many of these

17   instances only the Court can make the order.

18   MR. VEEDER:  I think that is right, and I think it

19   should be all on order to show cause.  If somebody doesn't

20   like what is being done, he has a right to come into court

21   and have it reviewed.

22   Isn't that right, your Honor?  If a man experiences

23   irrevocable damage his remedy would be to come into court and

24   say, "I am being arbitrarily treated by the Water Master."

25   MR. GIRARD: "(3)   Provision that annual costs and

expenses of the River Master be contributed by the

JOHN SWADER, OFFICIAL REPORTER

parties in the proportions that the water each uses

bears to the total quantity used in each year."

I would agree that the water users should pay the cost of the Water Master. I am not sure whether this is the right formula or not.

MR. STAHLMAN:  I am not either, for this reason -- if you will pardon me for taking the ball, Fred.

MR. GIRARD:  Go ahead.

MR. STAHLMAN:  The Water Master's studies and all this data and accumulation would be to the benefit of people who own land and don't even use water.  In other words, the accumulation of data as a result of these studies will be a benefit to somebody who hasn't used water when they do start using water.

MR. LITTLEWORTH:  It raises this other problem also, your Honor, where we have advanced the cause of the riparian and overlying owners by and large by our participation in this case.  I don't suppose we represent, in terms of actual number, a third of the people in Murrieta Valley in terms of land acreage or some other percentage.  There are lots of people who use water who have never really taken any active part in this case.  I don't know exactly how you are going to go about collecting, if you really try to do it on the basis of the amount of water each person is using, although that might be the fair way.

1    MR. STAHLMAN:  I think you would have to make a study

2    and see what the water uses are there.  You can determine.

3    It may not make much difference at all.  You might use two

4    systems and make two different situations:  Based on water

5    use and based on acreage, even though it is not in use.

6    MR. LITTLEWORTH:  You have the problem of Fallbrook,

7    a major participant in this case, that doesn't use any water

8    right now.

9    MR. STAHLMAN:  You get into the question you have in

10    all mutual water companies in determining the expenses of

11    different stockholders -- some who are not using water, some

12    who are -- and it sort of breaks itself down into what is

13    operating expenses and what is capital investments.

14    MR. VEEDER:  I am in complete accord.  I think that

15    everyone is going to benefit by the collection of data toward

16    the end of determining the firm supply as closely as possible.

17    I think there should be a basis for assessment against land

18    owners who would benefit even though they are not using

19    water.

20    MR. STAHLMAN:  That is the point I have in mind.

21    MR. VEEDER:  I am in complete agreement.  I think we

22    can work that out.

23    MR. STAHLMAN:  If the language merely said there would

24    be a basin charge that the Court would determine would

25    equitable in the case.

MR. VEEDER:  I think that would be good language.  I
would suggest we use something like this.

MR. LITTLEWORTH:  Let me ask this, on both the State
and maybe Mr. Kunkel for the U.S.G.S., whether it is possible
to have appropriations out of those two agences.  Studies of
the kind we are talking about don't come cheaply.  This
hearing I was attending yesterday, the State was talking
about a groundwater study to determine safe yield of the
Chino Basin and were figuring it was going to cost on the
order of a hundred thousand dollars.  To what extent do you
think the resources of either the U.S.G.S. or the State would
be available for some of the gathering of the initial basic
data?

MR. GIRARD:  I rather doubt the State resources would
be available for that, unless a State Water Master was
appointed, and there, of course, are provisions that the
State will pay it.  My own view is, just speaking frankly, I
don't think a State Water Master would be what we want here.
I don't think you get the kind of detailed service and
examination you are going to have to get.

MR. SACHSE:  I don't know.  I have not enough
knowledge.

MR. GIRARD:  I don't know of any funds available.
That doesn't say there are not any.  You must remember, as
far as funds go, we have put quite a bit of money into this

19,844

area already.   I think this is as far as our general planning

goes.   We have about as much information as we ordinarily

obtain in most places.

MR. STAHLMAN:   It would appear to me that a Water

Master should probably be appointed by the Court here,

responsible to the Court and not to any other agency.   This

case has enough factors that create conflicts without having

other agencies inject themselves into it that are tied to

other forms of government.

MR. GIRARD:   We have the statutes that authorize, in

the State courts at least -- I don't know whether they

extend to the Federal Court -- that provide the Department

of Water Resources is directly responsible to the Court as

a Water Master.   But I don't think we have any employees

in the Department of Water Resources in this area.   Los

Angeles are the closest ones.   I don't really think that is

the type of service you need out here.

MR. VEEDER:   Can we talk about it further?

MR. GIRARD:   Yes.

MR. VEEDER:   I think we have two basic factors here

that should be taken into consideration:   The kind and type,

who should be required to pay, how you would spread the

assessment and to whom it would be paid.   I think that is

something we can talk about later.

MR. SACHSE:   In other words, there is no agreement,

19845

on the method of assessment, except that an assessment must
be made.

MR. STAHLMAN:   The people who might benefit should pay
for it.

MR. VEEDER:   And I think there are benefits over and
above the diversion and use of water.

MR. GIRARD:   "(4)  Provision that the River Master
shall study, advise and encourage the continued
operation, abandonment, and construction, including
construction by single parties and by two or more
parties jointly, of water control facilities to
secure maximum yield, conversation and economic
utilization; that the River Master shall encourage
and cause economic phreatophyte control and related
conservation practices."

It should be remembered, though, if you are talking
about construction of storage facilities, your studies have
to be filed with the State Water Rights Board, if it is an
individual at least.   We are not getting into your problem of
the United States.   Other than that I have no quarrel with it.

MR. SACHSE:   I am curious.   Whom is he going to ask to
abandon something?

MR. VEEDER:   It is entirely possible where you have
two or three stockwater ponds where it would be more
economical to consolidate them.

19,846

MR. GIRARD:  Maybe you have drainage ditches which are actually wasting water.

MR. STAHLMAN:  All you can do is advise and encourage.

MR. VEEDER:  That is right.

MR. STAHLMAN:  I presume it has reference to some that may come out of the DeLuz Dam.

MR. VEEDER:  Yes.

MR. GIRARD:  Or anything else.

"(5)  Provision that the River Master average the annual gross withdrawal to involve Temecula-Murrieta Basin depletion over a 20 to 50-year period, depending on recharge to the basin, demand for water, and availability of water from alternate sources such as desalinized sea water or available Colorado River or Feather River water."

I understand, I think, what it means, but I am wondering what the reason was that the same conditions were not put on the downstream basins.

MR. SACHSE:  Why 20 to 50 for Murrieta, and Coastal Basin full?

MR. VEEDER:  The idea -- and his Honor has already referred to Mr. Clark's references to management of oil properties and gas properties -- calculate what would occur if you put this burden on the stream using the fullest in effect mined water to really get the fullest benefit out of

19,847

1    this natural resource.  How long could you calculate it would

2    be available?  What would it mean if you really undertook to

3    dewater, pump out of the alluvium, utilize to the fullest

4    possible extent the water that is there, and, of course, take

5    into consideration some of the recharge from other sources?

6         MR. SACHSE:  Why do that on only one basin?  Why not

7    do it on all?

8         MR. VEEDER:  Salt water intrusion.

9         MR. GIRARD:  Even with salt water intrusion, you would

10   probably have as much water for use on a safe yield basis

11   down there as in some of the upstream basins.

12        MR. VEEDER:  I would have no objection.  I would suggest

13   there be a revision to include Santa Margarita Coastal Basin

14   to make such a study.  Does that take care of it?

15        MR. GIRARD:  I certainly think a safe yield study

16   should be taken into account on all basins, if you are ever

17   going to make an apportionment.

18        MR. VEEDER:  That is right.

19        MR. LITTLEWORTH:  But that is not necessarily related

20   to the 20 or 50-year period.

21        MR. VEEDER:  No.

22        MR. LITTLEWORTH:  I think lawyers are now trying to

23   write a definition of hydrologic answers and equations here.

24   I don't know that we can tell engineers how to determine

25   safe yield and what period to use.

19,848

MR. VEEDER: Nevertheless, if you will observe, he has made calculations taking into considerations all the scientific data that is available to the end, you see, of what would be the result if you made a long term calculation as to what you could really squeeze out of that basin.

MR. SACHSE: Does not the exception, which is the last phrase, "alternate sources," equally apply to all basins -- "desalinized sea water or available . . . River water"?

MR. VEEDER: In that regard, I would be glad to tender the thought that the Santa Margarita Coastal Basin should probably be considered, too. I am not recommending the changes, because I would have to talk to Mr. Clark about that. But I am saying, as to your point, I think it is sound.

MR. SACHSE: "D.1 A finding that the so-called DeLuz Site, immediately below the confluence of the Santa Margarita River and DeLuz Creek, provides the best location for a major surface reservoir to permit fullest development and use of the water resources of the Santa Margarita River system."

Do you want me to comment as I go along, your Honor?

THE COURT: Yes.

MR. SACHSE: I would have to state that that is a correct statement as far as it goes, but I think it needs modification in that it does not discuss the costs to users. That statement as it is there written is literally correct.

19,849

1   There is no doubt that at least every agency whose report

2   I have ever read agrees that if this entire basin is treated

3   as a unit and if this were a totalitarian system where we

4   could do these things regardless of ownership, the most

5   efficient water supply on a maximum conservation basis could

6   be derived from DeLuz.  However, it is not true that the

7   cost to the users are necessarily the cheapest, and I would

8   request that in any physical solution and operating principles

9   this matter be discussed, as it was very frankly discussed

10   before Mr. Clark previously.

11        In other words, I don't think this is intended, is it,

12   Mr. Veeder, to eliminate now the proposition that Mr. Clark

13   himself, I believe, advanced when he said he thought I was

14   in error when I stated that the cost of water to Fallbrook,

15   for instance, would be greater supplied from DeLuz than it is

16   from Fallbrook?

17        MR. VEEDER:  I believe the language is self-explanatory.

18   I believe that here is the statement that from the standpoint

19   of the highest and best use of all the water resources would

20   be a structure at DeLuz Dam.  It does not envision the point

21   that you discussed, namely the pumping of water up to

22   Fallbrook, and I think that that phase is not included that

23   we just made reference to.

24        MR. SACHSE:  If that phase is not covered by 1., then

25   I haven't any more comment on 1.

19,850

"2.   Provision that such a structure, if authorized and built and if permissible under the authorization, be placed in conjunctive operation, under supervision of the River Master, with the Vail Dam, the Temecula-Murrieta Ground Basin, the Coastal Basin, and existent and future wells, ditches, impoundment dams and other facilities, so as to permit maximum yields consistent with the economical utilization and conservation of total water resources."

I think, first of all, that this paragraph is, for all practical purposes, unworkable and I don't think we should kid ourselves.   I think it is outside any jurisdiction of the Court to order, and I think we have got to assume that you are not going to get agreement that all future wells, an enforceable agreement that all existing and future wells, all future ditches, future dams and other facilities are going to stipulate to something.   This is the kind of thing that can only be accomplished by a combination of legislation, probably in both Congress and California, by an agreement between every single person in the whole watershed, and probably extend into additional litigation.

MR. LITTLEWORTH:   One of the problems here is that when you include the groundwater basin you are talking about integrating riparian and overlying rights with appropriative

19,851

1  rights, and by their nature riparian rights and overlying

2  rights can be satisfied first.  You leave out what you really

3  have to say on the end of this thing, that you will also take

4  into account rights.  You may by this scheme develop a

5  maximum utilization of water, but it has got to be done with

6  a realization that there are different kinds of rights and

7  some have priority over others.

8      MR. VEEDER:  I believe that the concept expressed in

9  2. is valid when you take into consideration the fact that

10  the United States does impound large quantities of water in

11  DeLuz Dam.  There is a real benefit accrues to your clients,

12  Mr. Littleworth, there is no question about that, in reducing

13  the amount of our claims for release downstream.

14      MR. LITTLEWORTH:  I am not arguing that.

15      MR. VEEDER:  So to that point the conjunctive operation

16  does modify, and in your favor, the riparian and overlying

17  right, isn't that correct?  And you will agree on that, will

18  you not?

19      MR. LITTLEWORTH:  I don't think it modifies the rights.

20      MR. VEEDER:  It enhances the value of them.

21      MR. LITTLEWORTH:  It simply means that, as you put it,

22  you would be less likely in times of shortage to make a

23  demand on us under your riparian right, because you would have

24  water    in your dam.

25      MR. VEEDER:  Right.  So to that extent I think you do

19,852

1    agree conjunctive operations could be accomplished to the

2    benefit of your client.  Is that right?

3         MR. STAHLMAN:  Is that the limit of your interpreta-

4    tion of the "conjunctive operation"?

5         MR. VEEDER:  This is just one step.

6         You do agree on that, don't you, that if there is

7    impounded water it is to your benefit?

8         MR. LITTLEWORTH:  The situation you have just expressed

9    would be beneficial to our people, yes.

10        MR. VEEDER:  Then I would also say there would be a

11   real benefit to everyone upstream.  That under the

12   circumstances that I outlined the United States of America

13   pump the water from its basin and make as much space

14   available for storage in its basin to the end there would be

15   not only surface storage but groundwater storage.  Again,

16   there is accruing benefit to you.

17        Now, I am not sure just how far we go in regard to

18   pumping down the Vail-Pauba Basin so that it can be used

19   conjunctively with the storage in Vail Dam.  That is a real

20   difficult problem.  Because I can envision the circumstance

21   where Vail Company pumps down Pauba Basin to the point that

22   surface flow would not get down through to us because it

23   would be consumed in the dewatered alluvium.  But I think

24   those are matters which have to be considered when you talk

25   about conjunctive use, and I don't believe that it is

19,853

1   contrary to the California law in any sense of the word.

2   There can't be any invasion of a vested right.   I agree on

3   that.

4         MR. SACHSE:   I don't know how we can agree was my first

5   point.

6         I have another one I haven't come to yet.

7         But I don't know how we can agree among ourselves,

8   assuming we wanted to, that all existent and future wells,

9   ditches, impoundment dams, are going to be operated

10  conjunctively.   We can't agree to that.

11        MR. VEEDER:   To the extent that it is feasible, of

12  course.

13        MR. SACHSE:   We can't agree.   I don't know who is

14  going to build a dam, whether he is going to agree to it or

15  not.   This is another Vail-O'Neil stipulated judgment.   My

16  agreement doesn't bind him.   That was my technical objection.

17        Then I have one practical question.   The thing that

18  intrigues me about this, the sort of the little man who

19  wasn't there.   Everybody in this courtroom knows that the

20  discussion of physical solution that took place here was

21  geared at the possibility of a conjunctive operation of a

22  dam at the DeLuz Site for the mutual benefit of Fallbrook

23  and the Navy.   That is what our meeting was about.   That is

24  what we talked about.   That is what Mr. Clark asked me to

25  work closely with Colonel Bowen, to have my engineer work with

1    him and determine if it was possible for Fallbrook to take

2    its water at DeLuz at a comparable price to that which it

3    would cost at Fallbrook, all factors considered.  We spent a

4    day discussing this matter.  And yet here is the proposed

5    physical solution that comes out of Washington.  There is not

6    one word about this.  Is this abandoned?  Are you now

7    conceding that we go ahead and build our own dam?

8         MR. VEEDER:  No, nothing like that.

9         MR. SACHSE:  Then I think we ought to face the facts

10   and, I mean, what we are talking about, and not indulge in

11   a great many generalities.  I think we ought to say very

12   honestly that one of the principles to be considered in this

13   physical solution is, can a structure at DeLuz -- and I will

14   take the words "if authorized by Congress and if built and

15   if permissible under the authorization"--  placed in a

16   conjunctive operation that will provide Fallbrook with water

17   at least as cheaply and under at least as secure a right as

18   presently exists?

19        MR. VEEDER:  Mr. Sachse, I will tender a thought right

20   here on this point.  I would strongly urge that you write

21   out that language that you just expressed into the record.

22        MR. SACHSE:  It is in the record.

23        MR. VEEDER:  I assume that you want --

24        MR. SACHSE:  I will review what I said.

25        MR. VEEDER:  To review and amplify perhaps, because

19,855

1   here is my thought about it.   You are raising a point that

2   we could talk about indefinitely without ever resolving it.

3   I think the best thing for you to do is to tender a

4   Paragraph 2(a) or a completely new paragraph to be read

5   conjunctively, so to speak, with this No. 2.

6        MR. SACHSE:  Mr. Veeder, I don't want to, for this

7   reason.

8        First, your Honor, we have done a great deal of work.

9   I want to give your Honor a summary of the work prepared by

10  my engineering staff.   Colonel Bowen has this.   There have

11  been many, many hours.   This isn't an exhibit.   This is just

12  something for the Court's examination at its leisure.   The

13  job is not yet done.   But if the Court please, I think that

14  the statement that I am about to make is going to be

15  concurred/by  Colonel Bowen, I think it is, and that is this,
           in

16  that if the cost of water to Fallbrook from the two proposals

17  is determined on the basis of a naked apportionment, the

18  physical costs of construction of one as against two dams, plus

19  the capital carrying costs, plus operating costs, that it is

20  not true that Fallbrook can get its water as cheaply from

21  DeLuz -- I think Colonel Bowen will agree with me -- if this

22  is done on a simple honest analysis of costs.

23       But, if the United States of America makes  a

24  proposition that says, "We will sell you water at x-dollars

25  per acre foot," or if a proposition is made which says,

1    "We will foot the capital cost of the dam and charge you

2    nothing in interest," if any one of these other possibilities

3    exist, then it is quite possible that a formula can be

4    devised which will provide water to Fallbrook at least as

5    cheaply -- forgetting all the incidental benefits I talked

6    about for a moment, just talking cost.  But if some

7    proposition comes from the United States of America, then

8    this can be done.

9        I can't propose to the Department of Justice what kind

10   of a bill I think they ought introduce in Congress or what

11   kind of contract they should write with us.  They can.  And

12   I am not going to suggest to Mr. Veeder that my consent to

13   a physical solution is predicated upon the United States

14   paying all the costs to DeLuz Dam, all the costs to the piping

15   and charging us $10 an acre foot for water.  That is

16   ridiculous.  I think the United States has to say what kind

17   of proposition it is going to present.

18       And I think we are just like ostrichs with our heads

19   in the sand if we ignore the fact that the thing we are

20   talking about here in a physical solution is a way to get

21   Fallbrook off the River.  That is what this physical

22   solution is -- get us off of the River, have us waive our

23   right or pool our rights with you.  And we had better talk

24   about it and what it is going to cost.  This is a big

25   subject.  It's close to quitting time.

1      I am going to repeat, I believe Colonel Bowen will

2  agree that on a naked cost basis, without subsidy you can't

3  do it.  It is too expensive to Fallbrook.  With subsidy, it

4  might be done.  Subsidy is for somebody to offer us.

5      THE COURT:  Well, let's briefly finish this last

6  Provision 3.  Read that into the record.

7      MR. GIRARD:  "3.  In conjunction with the provisions

8      respecting construction of a DeLuz Dam, provision

9      might be made that, if determined by the United States

10     to be practical and engineeringly feasible, and if

11     properly authorized, the United States may construct

12     a physical barrier across Ysidora Narrows to prevent

13     salt water intrusion and to make available greater

14     usable storage capacity in the Coastal Basin; that

15     nevertheless, the Coastal Basin, insofar as feasible,

16     be maintained essentially full to minimize

17     evaporation losses."

18  I don't think they mean --

19      THE COURT:  Evaporative losses.

20      MR. GIRARD:  Yes.  I presume they mean plants, et

21  cetera.

22      MR. SACHSE:  They are increasing transporation losses.

23      MR. GIRARD:  Yes.  I mean storage losses on the

24  surface.

25      But I think it will have to be recognized that in

19,858

order to get any water into the basin to store, they would have to pump some out.  In other words, you can't put surface water into the ground unless you pump it out.  So I presume you would contemplate that it not be maintained essentially full.  To minimize evaporation losses you would also take into account that in order to get the water in there to maintain it full, you would also pump it out every year.

MR. VEEDER:  Naturally, we would draw on that basin as our source of supply and pull it down as much as possible to the end it would have more.

MR. SACHSE:  Would you agree to modify this the same way you did today on No. 5?  What you are really talking about here is operation.

MR. VEEDER:  Along that line, yes.

MR. STAHLMAN:  You have two subjects in there.  You have your salt water barrier.  I think everybody agrees it would be a good thing if you put in there, provided engineers say it is.

THE COURT:  I thought the Coastal Basin was to be kept full to keep out salt water.

MR. VEEDER:  The point being, your Honor, unquestionably true that if you had the membrane across the Ysidora Narrows you would be able to pump down to a much greater depth the groundwater levels in the basin.  In other words, the reason we have to maintain a five foot head above sea  level is

1   because of salt water.  If you had the kind of protection

2   that some people think a membrane might afford, then you

3   could pump that down and you would have a very much larger

4   storage capacity.  You would have your full 48,000 acre

5   feet of storage capacity, whereas now you have only 25,000

6   acre feet of storage capacity because you have to maintain

7   a fresh water barrier.  That is the explanation of this

8   proviso.

9       MR. GIRARD:  You would get to the extent you could

10  get your water from your present basin without getting salt

11  water intrusion.  You would certainly intend to do so.

12      MR. VEEDER:  We intend to dewater those basins just

13  as much as possible because they constitute storage area when

14  the water is available, yes.

15      THE COURT:  Next.

16      MR. GIRARD:  "E.  Provision for a survey, from time

17  to time, of insubstantial use of water within the

18  watershed not involved in apportioned uses to

19  determine quantity and significance of such use; that

20  lawful insubstantial uses which increase to the level

21  determined to be substantial   be included within the

22  apportioned uses from that time on."

23      Of course, as indicated previously, most of us feel,

24  and I think Colonel Bowen indicated the reason for it, there

25  is no real need for an apportionment now.  So I don't know

19,860

how much discussion we need.  But assuming that an apportionment is made and assuming also that there are inconsequential uses which you don't make apportionment to, I think this would be a good idea.

MR. VEEDER:  I think it is essential, because the only way one can keep a decree current is to have it reviewed, and if a man has been apportioned a percentage of water and quits operating or reduces the quantity.

THE COURT:  Well, it's time to quit.  I hope you will think about this tonight and come back tomorrow with some suggestions.

Mr. Littleworth, can you come back again?

MR. LITTLEWORTH:  I can if you think it would be helpful, your Honor.

THE COURT:  I think it is important.

MR. VEEDER:  I think it is desirable from our standpoint, your Honor.

THE COURT:  Let me ask you one question, Mr. Veeder. How do you visualize all these percentages could be worked out?  Mr. Clark is talking about an oil basin -- everybody taking out of one bucket.  How do you visualize we could work out any percentages of a whole, when the rights are correlative -- this fellow on this creek, this one on that one, interrelationships will vary?  Have you discussed with him how you could work out percentages?

19,861

MR. VEEDER:  As a matter of fact, your Honor, it is usual to work out percentages for users to participate, the basis upon which they would participate, establish these percentages on the basis of the physical factors entailed.

THE COURT:  How can you have a percentage unless you have a different set of percentages for people on this tributary and another set of percentages on their relationship with the people downstream?

MR. VEEDER:  I think it is entirely possible that you would have to have different criteria for establishing the percentages in different areas.

MR. STAHLMAN:  You can't do that until after the study is made.

THE COURT:  Right.

MR. VEEDER:  The Court has asked me a question as to how this can be done.

THE COURT:  You say different criteria.  I still don't see how you can get percentages.  I can draw you a simple diagram on three branches of a stream, three people on each of the three branches, and one downstream, and I challenge you to show me any   kind of percentage arrangement where over the whole watershed you could fix percentages.

MR. VEEDER:  I think it is entirely possible.  If a man is situated, for example, up high on the Santa Gertrudis where he is so situated that the groundwater basin below him

19,862

is quite shallow so that the quantity of water that he is
physically situated to obtain would be less than, for example,
Roripaugh, who is down in an area where he is tapping water
at great depth, I think you could work out a percentage which
would say A, who is sitting less favorably situated than
Roripaugh, gets 15 per cent, and you could say that Roripaugh
would probably get 30 per cent.

MR. SACHSE:  Percentage of what?

MR. VEEDER:  Percentage of the available supply as
calculated for that given season.

MR. SACHSE:  This upward fellow that you say has very
shallow water, he gets 15 per cent of what?

MR. VEEDER:  You would have to take the full quantity
lying north and west of the surface area divide and calculate
the quantity of water that would be available upon which they
could participate.

MR. SACHSE:  But you can't get it.  That is the first
thing.

MR. GIRARD:  You have to recognize that not only he
would have a right to it, not only the downstream user would
have a right to it, but the Navy would have a right to it.

MR. VEEDER:  To some degree, that is correct.

Let me answer the first question.  In regard to this
man in the relatively shallow alluvial area, Mr. Sachse, one
of the factors that would have to be taken into consideration

1   in arriving at his 15 per cent or 5 per cent or whatever it

2   is, is the fact that he simply is not physically situated

3   where he could dewater any appreciable area of the alluvium.

4   THE COURT:   I understand how you take into account

5   other factors.   But I could draw you a simple diagram where,

6   if you would take a percentage of the total water available

7   in a watershed, your percentages are going to be different.

8   You can't get a percentage that involves X and Y on one

9   tributary and Z at the bottom, with A, B, and C on another

10   tributary.   The percentages to which A, B and C might be

11   entitled would vary, depending upon their situation, would

12   have no relation to X and Y.   And yet Z at the bottom is

13   concerned with both of them.

14   MR. VEEDER:   It would be necessary for your Honor to

15   divide up the basin and establish the criterion for

16   particular areas.   I think that could be done.

17   MR. STAHLMAN:   You mean like you cut a pie?

18   MR. VEEDER:   To some degree.

19   MR. LITTLEWORTH:   The reason I said earlier that I

20   think we are struggling with a problem that isn't going to

21   be helpful on this percentage matter is that we don't have

22   any information on the flow of the tributaries.   Take Ceas

23   on Santa Gertrudis, Gunther on Warm Springs, our client Mr.

24   Brown on Wildamar.   Ceas shares water out of Santa Gertrudis,

25   but his percentage is not going to have any relationship to

1   Gunther on Murrieta Hot Springs or Warm Springs Creek.

2   Brown near Wildamar doesn't have any relationship to the

3   supply of those two.  Roripaugh further down shares to some

4   extent in the supply which all of those enjoy.  And the United

5   States shares in the supply which all those people enjoy, plus

6   DeLuz and some others.

7       MR. VEEDER:  I think you are going to find this, Mr.

8   Littleworth, and I am sure the Court will find that seasons

    be

9   of the year are going to/an important factor in an

10  apportionment, because you will find, for example, Murrieta

11  Creek yields very little water and has yielded very little

12  water to the United States or to Vail Company from perhaps

13  the first of May on.  I think these are all elements that

14  should be taken into consideration in this matter.

15      I would like to talk more about it tomorrow, though,

16  your Honor.

17      THE COURT:  All right, 10:00 o'clock.

18      (Adjournment until Thursday, May 17, 1962 at )
        (                                            )
19      (10:00 a.m.                                  )

20

21

22                      ---oOo---

23

24

25

19,865

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )       No. 1247-SD-C
                                    )
FALLBROOK PUBLIC UTILITY            )
DISTRICT, et al.,                   )
                                    )
                    Defendants.     )
                                    )

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and on the date herein involved, to-wit:  May 16, 1962, was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing 164 pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS MY HAND, at San Diego, California, this 16th day of May, 1962.

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER