VOLUME NO. 196                                    MR. VEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                                    Plaintiff,

vs.

                                                No.   1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                    Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         Thursday, May 17, 1962

            Pages:   19,866 - 19,927

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 196                                                    19,866

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,              )
                                       )
                  Plaintiff,           )
                                       )
        vs.                            )        No. 1247-SD-C
                                       )
FALLBROOK PUBLIC UTILITY DISTRICT,     )
et al.,                                )
                                       )
                  Defendants.          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, May 17, 1962

APPEARANCES:

        For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                        Special Assistant to the
                                        Attorney General,

                                        CDR. DONALD W. REDD

        For the Defendants:

        Vail Company:                   GEORGE STAHLMAN, ESQ.,

        Fallbrook Public Utility
        District, et al:                FRANZ R. SACHSE, ESQ.

19,866(a)

1    APPEARANCES:   (Continued)

2          State of California:          FRED GIRARD, ESQ.

3          Roripuagh, et al:            BEST, BEST & KRIEGER
                                        BY: ARTHUR L. LITTLEWORTH, ESQ

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, THURSDAY, MAY 17, 1962, 10:00 A. M.

2                           ---oOo---

3         THE CLERK:  One, 1247-SD-C, United States v. Fallbrook

4    Public Utility District and others.

5         THE COURT:  Did you see my picture?

6         MR. SACHSE:  We have seen it, your Honor.  I am not

7    sure we understand all of it.

8         THE COURT:  This is addressed to this question of

9    fixing entitlements and percentages.  As I understood the

10   Attorney General's proposal, it was eventually to fix a

11   percentage on entitlement of Vail water for riparian or

12   overlying.  Then the percentage would be applied to the

13   available water.  Then those people who didn't use water,

14   throw that in again and divide it up again.  So we talk

15   about percentages.

16        Now percentages are going to be very difficult but not

17   impossible to fix.  So, I took a simple illustration and

18   this illustration can be off the record.

19        (Discussion off the record.)

20        THE COURT:  Back on the record.

21        Just to explain this Exhibit A diagram here, I point

22   out that a watershed is not exactly like an oil pool in that

23   everybody isn't pulling out of the straw, out of the same

24   pool.  And if I said anything yesterday that it was

25   impossible to fix percentages of entitlement, I don't want

1    to say that, but I say it is a big problem, a long range

2    problem which will take a lot of information, and the

3    percentages of entitlement will vary depending upon the

4    particular problem that arises.

5         So that if, for instance, the problem arises on the

6    Exhibit Stream J and we will say the bottom owner below the

7    junction is not involved, you have one problem.  But if the

8    bottom owner is involved, you have a second problem.  If it

9    arises and concerns both streams, you have a third problem

10   and the percentages of entitlement then will vary.

11        This is further complicated by the situation of the

12   groundwater basins, the groundwater areas, which are a little

13   different than the stream.  In one sense, they are more

14   susceptible of a control because over a period of years of

15   gauging rainfall, runoff into them, pumping and runoff out of

16   them, you can arrive at some figure on safe yield.  While

17   the intermittent streams above flowing into these groundwater

18   area present a little different problem.  You don't have a

19   firm supply.  You would have water running for a while and

20   then it is gone.

21        The only purpose of my diagram was to show that today

22   we would not be able to work out any entitlements.  We have

23   in the record irrigable ground and in the findings it is

24   prima facie, but it has not been found to be irrigable in the

25   sense that it is susceptible of profitable irrigation.

1          Now, many of those findings may not ever have to be

2     reanalyzed.  If, for instance, a man owns 80 acres of flat

3     ground overlying the groundwater area, there wouldn't be any

4     argument about that if we found that he had 80 acres of

5     irrigable ground that it probably was susceptible of profitable

6     irrigation.

7          On the other hand, there certainly would be a problem

8     in connection with the Vail Estate and with Government land

9     and with other of these people who have ground that just

10    doesn't flatly overlie basins.  I think Mr. Stahlman

11    recognizes that.

12         So we don't have the evidence in the record now to make

13    entitlements.  It is something we could, if we put a Water

14    Master to work over a period of time, we will eventually have

15    that information.  And if we put the Water Master to work

16    and put him to work immediately in two areas, the Murrieta

17    groundwater area and particularly the area where the pumping

18    holes and the reverse flow have occurred -- those can well

19    be the first places that will pop up as being critical; and

20    secondly, on the stream east of Vail Dam, where we mentioned

21    yesterday some owners had all the water they could use and

22    the fellow downstream had nothing.  There should be some

23    immediate remedial action there.

24         MR. SACHSE:  There is one other thing, your Honor, that

25    I don't think the diagram demonstrates, but in this

19,870

1   particular watershed is very critical.  If your "acre feet

2   of water available" figure is meaningful, in this watershed

3   it must include also the safe yield of the basins that you

4   can take without depleting, in which event your 2 body at

5   the bottom of the stream has a supply.  There is a safe yield,

6   whatever it is, which is available to the upstream owners

7   on either fork.  So you get still further complications.  But

8   he has a private source from which he can obtain some water.

        MR. STAHLMAN:  There is also another complication which

10  I think has to be considered in relation to when these

11  problems arise, and that is the rate of transmissibility of

12  some of this water.

        I will give your Honor an example.  Let us assume

14  there was no Vail Dam this year and that the acre feet that

15  had been accumulated  behind Vail Dam went downstream.  It

16  would take years for it to get down to where it would be

17  available for use in the basin.  As to the rate of

18  transmissibility there we haven't had any specific test$$$

19  but from my knowledge of other basins it probably wouldn't

20  be over a thousand acre feet a year.

        MR. VEEDER:  Even if you released all the water behind

22  Vail Dam today, you would have the same problem; isn't

23  that right?

        MR. STAHLMAN:  That is right.

        THE COURT:  We have merely pointed out that there are

19,871

1    many problems, and problems on which only a River Master

2    or Water Master, a person empowered to make studies and

3    collect data could readily and profitably do the job.  It

4    can't be done tomorrow or by the 1st of June, nor can it

5    be done within the next three or four months.  It is a matter

6    where we would start to collect data and as the hot spots

7    arose we would hope that the Water Master had started in

8    those areas and was able to give us the data we needed and we

9    would proceed on.

10        MR. VEEDER:  I am most anxious, though, in view of the

11   fact that we made reference to your Honor's diagram, that

12   that diagram be put into the record or else the comments

13   of Mr. Sachse and others will not be meaningful.

14        THE COURT:  I think I can have it transferred to a

15   piece of this paper that the reporter processes and the thing

16   can be run off as Court's Exhibit A.

17        MR. VEEDER:  Run off into the record the way it is.

18        MR. SACHSE:  In other words, reproduce it in smaller

19   size.

20        THE COURT:  Yes.

21        MR. STAHLMAN:  It might be well if the explanation

22   your Honor made off the record might be included to clarify

23   it.

24        THE COURT:  What explanation off the record?

25        MR. STAHLMAN:  As your Honor explained it to us off

1  the record.

2          MR. SACHSE:  It will speak for itself, I think, with

3  the notes that have been taken on it.

4          THE COURT:  We can put that in the record, if we want,

5  right now.

6                                    (The Diagram by the Court referred
                                      to above is included as a part
7                                     of this transcript and is
                                      numbered Page 19,873.)

8

9          THE COURT:  In other words, assuming we are going to

10  reproduce this, we can put in the record roughly the

11  situation.

12          MR. VEEDER:  I am very much in favor of that, your

13  Honor.

14          THE COURT:  All right.

15          MR. VEEDER:  Because I think the personnel in

16  Washington, Mr. Clark and the men with whom he works, the

17  Judge Advocate General in the Marine Headquarters, should

18  see what you are thinking of on the basis of the tender of

19  the motion we considered yesterday.

20          THE COURT:  Exhibit A, which will appear in this

21  record, is a very simple diagram, with a simple factual

22  situation that illustrates how percentages of entitlement

23  to water vary with the relationship of the parties and

24  their relationship on the stream.

25          The diagram shows a Stream J and a Stream K uniting.



19,874

1    It shows Landowner A and Landowner B on Stream J, and

2    Landowner M and Landowner N on Stream K, and Landowner Z on

3    the stream after the branches unite.   And arbitrarily it

4    has been stated that the supply of water available on Stream

5    J is 1,000 acre feet per year, and on Stream K, 2,000 acre

6    feet per year.

7       Each of these landowners has been assigned arbitrarily

8    certain irrigable acres, and assume tht this is acreage which

9    is reasonably susceptible of profitable irrigation, and

10    there has been assumed, to make it simple, a water duty of

11    three acre feet per year.   So that Landowner A, with a

12    thousand irrigable acres, has a need for 3,000 acre feet,

13    and Landowner B, with a hundred irrigable acres needs

14    300 acre feet.

15       In a dispute between A and B only, the percentages of

16    entitlement would be A, 91 per cent and B, 9 per cent.   But

17    suppose the dispute also concerns Z at the end of the stream

18    (leaving out the Stream K), concerns A, B and Z -- and I

19    might point out right here that this is a very simple

20    diagram, and Mr. Sachse called attention to the fact that,

21    for example, Z was an overlying owner over a basin such as

22    the Government over the Coastal Basin and there would be a

23    safe yield of some sort available to Z which would have to

24    be taken into account as well as the thousand acre feet

25    coming down the stream, and to make it simple we left that

out -- in a dispute between A, B and Z the percentages of entitlement would be A, 43.5 per cent, B, 13 per cent, and Z, 43.5 per cent.

Going to Stream K, if we have Landowner M with a hundred irrigable acres needing 300 acre feet, and Landowner N with 500 acres needing 1,500 acre feet, we have 1,800 acre feet available.  If the dispute is between M and N, there is ample water in the stream to satisfy both their needs and the percentage of entitlement would be a hundred per cent. But if there is a dispute between M, N and Z at the bottom (leaving out Stream J), then the percentages of entitlement are M, 7 per cent, N, 31 per cent, and Z, 62 per cent.

We finally come to a dispute involving Z at the bottom, and we will assume he has no basin under his ground and safe yield, so he is dependent entirely on the water coming downstream.  You would think immediately that all you would do would be to add up the resources of the two streams 3,000 acre feet, and the needs on the stream, namely, 1,000 acre feet, and work out the percentages which are shown:  A, 37 per cent, B, 3.7 per cent, M, 3.7 per cent, N, 18.5 per cent, and Z, 37 per cent.

But that is not the whole story.  As to Z, on that kind of deal, he would get 1,100 acre feet and actually he would be better off than if we do what I am now going to suggest.  But what would happen would be that these landowners

19,876

on Stream J, where there is only 1,000 acre feet, would say, "Wait a minute, we have a smaller amount of water in our stream and we should therefore not have to supply the same amount of water to Z as the landowners on Stream K have to supply, because they have twice as much water. So we would have to see what would happen. If we make Z look for his supply of one-third to Stream J which has 3,000 acre feet and two-thirds to Stream K which has 2,000 acre feet, we then find the percentages of entitlement of water on 1,000 acre feet that comes down Stream J: A, 69 per cent, B, 6.9 per cent, and Z, 23 per cent; and the entitlement on the 2,000 acre feet that comes down Stream K: M, 7.8 per cent, N, 39 per cent, and Z, 52 per cent; and in acre feet Z is better off on this deal because he gets a total of 1,270 acre feet on that kind of apportionment, whereas he would have gotten only 1,111 acre feet in the first method. But this more equitably treats the users on Stream J, which has the smaller supply of water.

The chart is solely to illustrate the fact that percentages of entitlement vary with the relationship, with the area that is involved in the problem, and with a vast number of problems that aren't even shown on the chart, such as have been mentioned here -- the effect of safe yields of underlying basins, transportation losses, and various others.

MR. GIRARD: It is a graph which really depicts a very

19,877

complicated situation probably in the least most complicated way it could be depicted, because factually if you take the United States as being Z you would have to consider the underground basins, you would have to consider all of the tributaries available to the United States other than Stream J and Stream K, which would be DeLuz Creek, Sandia Creek, Fallbrook Creek, et cetera.

THE COURT:  It is the simplest problem you could get.

MR. STAHLMAN:  It is probably over-simplified.

THE COURT:  It depicts five landowners on two branches of a little stream.

MR. VEEDER:  I would like very much, though, to point out that the diagram could certainly envision not only the surface but groundwaters.  I don't agree with Mr. Sachse on that.  It seems to me that when you are talking about quantities as depicted on your diagram, you would say this relates both to surface and groundwaters, and treat it on that it on that basis --

MR. STAHLMAN:  That is what is intended.

MR. VEEDER:  That is what I am saying.  Mr. Sachse said you should show the basins.  It does show the basins.

MR. GIRARD:  It does not show any basins underlying Z's land.

THE COURT:  That is right.

MR. SACHSE:  It does not show any water available to Z

1      other than comes down the stream.

2           MR. VEEDER:  I would treat it in any discussion as

3      reflecting both surface and groundwater and problems that

4      come out of it.  Isn't that right?

5           THE COURT:  You could, because you say 1,000 acre feet

6      available, except that you do have the further complication;

7      if, of that 1,000 acre feet -- well, what you have is water

8      coming down the stream which concerns A and B.  They are not

9      concerned and cannot draw on the safe yield of the basin

10     below.  But Z below can draw on the safe yield of the basin

11     below, and he can also talk about his rights to the stream

12     as it comes down.  So you can get these problems very

13     complicated.

14          MR. GIRARD:  Certainly in a factual case you would

15     have many other tributaries to Streams K and J.

16          THE COURT:  Yes.

17          MR. GIRARD:  Such as Warm Springs Creek.  You would

18     really have a much more complicated problem than that one.

19          THE COURT:  That is my contribution for this morning.

20     We went all over this thing yesterday.  I would like to hear

21     critical comment, but I would like to hear constructive

22     comment as well on this matter.

23          MR. VEEDER:  Of course, I desire to have reflected

24     in the record the comments by each individual who is

25     interested, as closely as they can, on a paragraph by

19,879

paragraph review, because I am greatly concerned to find an area of agreement among all parties.

THE COURT:  Well, let me lead off on this matter.

Now, on the matter of the pooling of the facilities and taking water from sources on other people's lands to fill an entitlement, can't we all agree, first of all, that this is contrary to California law, and, secondly, that it cannot be accomplished by a judicial decree ipso facto?

MR. SACHSE:  That is my view, your Honor.

THE COURT:  And thirdly, that it can only be accomplished by consent and agreement of the parties involved?

MR. SACHSE:  That is the way I understand the California law.

MR. VEEDER:  Your Honor, I believe, in that regard, that certainly Mr. Clark envisioned agreement among the parties, and I think, moreover, that in his presentation here it contemplated a give-and-take feature which would result.

THE COURT:  It seems to me that a final judgment could direct the River Master to study this problem of pooling the facilities, drawing entitlements from other persons' property or in other areas, paying a proportion of the reasonable cost, et cetera; he could collect data, he could make recommendations, and the final judgment could provide "upon the recommendation of the Master, and with the consent of the parties affected, the Court may make orders necessary" to

19,880

effect such matters as could be agreed upon.  I don't think

legally we can go a step further than that.

MR. LITTLEWORTH:  I would agree, your Honor.

THE COURT:  And I don't think that within any reasonable

time from today -- and by that I mean 30, 60, 90 days --

we could get any agreement without there being a study,

without there being proposals, without a full understanding

of how it is going to work.  I don't think anybody is going

to want to make agreements without knowing exactly what the

outcome is going to be.

MR. LITTLEWORTH:  I would add this, your Honor, that

it seems to me that a long term stream management depends,

in the first instance, on whether or not you have dams.

Certainly a competent water master is going to have one set

of recommendations if there is a dam at DeLuz or some other

place downstream, and other recommendations if there is no

dam.  So I think this kind of thing would be a continuing

thing where the Water Master might come up with plans that

would seem to be in accord with good management principles

and you would try to work out agreements as you went along

on these matters.

MR. GIRARD:  I don't think anyone could object to

what your Honor outlined, as I understood it.  This Water

Master would make recommendations to the Court and the Court

would only put them into effect if the parties involved

1    consented.

2        MR. VEEDER:  But your Honor, in that connection, we

3    could go through all of this work and come up with absolutely

4    nothing then, if it were contingent upon full agreement.  I

5    think the Court does have broad power in equity that if we

6    go through and make additional determinations, if they are

7    required, that your Honor would have the power and the

8    authority not to cut across rights particularly, but

9    certainly I think in your power in equity you could control

10   the utilization of the water in these various basins.

11       THE COURT:  Mr. Veeder, I don't think I would have

12   any power to provide that by judgment, aside from the consent

13   of the parties, that a person not entitled to certain

14   riparian water might take it out of Vail Dam, for instance.

15       MR. VEEDER:  I would say that that would be impounded

16   water.  I think you would be cutting across.  But at the same

17   time I can envision a situation where it would be desirable

18   for them to establish their rights and then utilize their

19   rights in a manner that would certainly conserve the

20   available supply of water.  You have competition up there in

21   the Murrieta Valley now where they are pumping against each

22   other in a manner that sooner or later is going to cause

23   disaster in the whole area.  I think you have power to control

24   that.

25       MR. GIRARD:  I would agree that you have power to

1    control that insofar as the pumping was affecting the vested

2    rights of people who had rights to that water. But this

3    doesn't necessarily mean that you would have power to control

4    it to the extent of protecting vested rights by going into

5    Pauba Valley, for example, and providing that Pauba Basin

6    shall make up the difference caused by the acts of the people

7    in Murrieta.

8         MR. VEEDER:   I don't believe that was ever envisioned

9    in this motion. Certainly I didn't say so.

10        MR. GIRARD:   Then there is no disagreement.   I think

11   certainly the Court has a right in the future to control the

12   rights of any water user to the extent the uses aren't

13   affecting other people's rights to that water.

14        MR. VEEDER:   I want it very clear that no statement was

15   made by me yesterday which would envision Roripaugh, for

16   example, going out of the Vail Company-Pauba area and pumping

17   water.   Somebody had a hypothesis on that.   Certainly I

18   didn't.

19        MR. GIRARD:   Inherent in the question as I look at the

20   factual situation that exists, you stated in there that the

21   Temecula groundwater basins could be used by diversions to

22   satisfy the water needs downstream.   I presume in order to

23   do that you would have to have a couple of factual situations

24   existing:   (1)  No water available in the Coastal Basins to

25   satisfy your needs.

1    MR. VEEDER:   Yes.   You wouldn't be in the position,

2    and you are never in the position, when you have water

3    available to have recourse by demanding from an upstream

4    owner that he desist or limit his use to provide you water

5    you don't need.   That is for sure.   The point I was making is

6    that if you got to the position where your Murrieta-Temecula

7    groundwater basin was pumped down so that we were not

8    receiving our water, that we would be in a position to go

9    into the Murrieta Valley and get our allocate share.

10    MR. GIRARD:   The thing I am pointing out, Mr. Veeder,

11    probably factually what is going to happen if there is a

12    pumping down in the Murrieta-Temecula Basin so that you

13    don't get your water, it is going to be a pumping down of

14    the Murrieta part of the Basin by the large number of people

15    pumping from it and therefore, if you are going to get your

16    water out of the basin by pumping, the only place you are

17    going to have to go is Pauba Valley because that is the only

18    place the water is, which would be placing a burden on Pauba

19    Valley way out of proportion to what the actual burden there

20    would be, and I think that could only be done by agreement

21    with the people on Pauba Valley who had rights to the water.

22    MR. VEEDER:   Of course, I disagree with you in regard

23    to the point as to where pumping down is occurring.   I think

24    Pauba Valley probably is pumped down lower than the Murrieta

25    Valley.

19,884

1    But there was this concept advanced by Mr. Clark in

2   the opening statement here that you would look at this

3   Murrieta-Temecula groundwater area as a source of supply for

4   all parties and that there would be a percentage division on

5   the basis of irrigable acres.

6        MR. STAHLMAN:  Your Honor, I don't want that statement

7   of Mr. Veeder's made in the record to go unchallenged that

8   Pauba Valley is pumped down further than Murrieta Valley.

9   That is not true and there are exhibits here that demonstrate

10  that quite clearly.  There are exhibits here that show there

11  is far more pumping of water in the Murrieta Valley than

12  there is in the Pauba Valley by far; that one or two wells up

13  there pump as much water as all of the Vail wells pump.

14       MR. VEEDER:  Mr. Stahlman, that is not in the record.

15  Let's let it stand that way.

16       MR. STAHLMAN:  It is in the record.  It is in the

17  exhibits.

18       MR. LITTLEWORTH:  It seems to me, your Honor, that

19  what we are talking about right now is simply in terms of

20  overall water management, at what point does any recommenda-

21  tion invade private property rights and therefore go beyond

22  the power of the Court?  I think you have to consider that

23  in terms of specific proposals.  It doesn't do us much good

24  to argue here about how far the Water Master's recommendations

25  could go without invading private rights.  You have to see

1  specifically what is involved.

2  THE COURT:  Another thought in this matter is this.

3  If we appointed a River Master, in addition to his general

4  duties of a River Master engaging in measuring, collecting

5  data, et cetera, he could also be made a Master of this

6  Court under the Rules of Civil Procedure, in which event he

7  could either be called in from time to time as an expert in

8  the field to testify, or in certain cases he could make

9  reports and findings, subject to approval by the Court.

10  And if we put him to work on estimating by one yard-

11  stick throughout the watershed the acreage reasonable

12  susceptible of profitable irrigation, he could from time to

13  time in an area or a subwatershed bring in his reports from

14  these areas and certainly the hearings could be relatively

15  simple.  In other words, he could have the report prepared,

16  he could be sworn to testify and say that these were

17  accurate and then be subject to cross-examination or any

18  adverse evidence that other parties wanted.

19  So that he could be utilized both in the real sense of

20  a River Master and also in the sense of a Master of this

21  court in connection with problems that arise.  I think we can

22  keep that in mind.

23  Do you have any comment on that, Mr. Veeder?

24  MR. VEEDER:  I had not thought of such a thing, your

25  Honor.  It is very interesting.

19,886

MR. GIRARD:   I can certainly envision that.

THE COURT:   Why couldn't it be done?

MR. SACHSE:   I would say it would be a very fine idea, your Honor.  He would be a court appointed expert.

THE COURT:   He would be in three or four capacities. He would be a River Master and do the work which a River Master could do -- collect data, have gauging stations put up, supervise them, all that sort of thing.  He would be a court appointed expert who could always be qualified from his experience to testify.  He could also, in substance, be a Master in limited questions of fact to collect, data and even to present reports which would be subject to approval by the Court, just as other Masters reports might be.  Some Masters, of course, take testimony.  I am thinking not so much of taking oral testimony as where he would gather data from his various measuring devices, for instance, and would submit a report.  It would be a Masters report in the strict sense of the word and would be subject to approval by the Court.  And he could also, particularly in this matter of the ground that could be reasonably susceptible of profitable irrigation, he could do a lot of work there, and those matters could be expedited at the hearings.

MR. LITTLEWORTH:   Your Honor, do you think there is any problem in this test of ground which may be profitably irrigated in the sense that the United States'   demands are

19,887

1  primarily for domestic use and aren't for irrigable acres?

2  Are you going to have any problem in the fact that you use

3  two different criteria for needs for water?

4      MR. VEEDER:  I think those are factors that have to

5  be considered.  We are in this position where we have put in

6  evidence -- I am glad you brought that up -- showing that our

7  actual demands at the moment are 12,000, 13,000 acre feet.

8  The fact that we haven't been using it is another element to

9  be considered, and the criterion that has been set up in the

10  motion here is to make the apportionment on the basis of

11  irrigable acreage.  If there is objection to that criterion,

12  I think we ought to hear about it.

13      MR. GIRARD:  I think the motion by the United States, as

14  far as I am concerned at least, which apparently treats the

15  basic allocation as irrigable acreage reasonably susceptible

16  to profitable irrigation throughout the watershed, is the only

17  fair one.  That doesn't necessarily mean that the United

18  States has to use the water allocated to it for that purpose.

19  They can use it for any other beneficial purpose, including

20  what the Court has held to be a military use.

21      MR. VEEDER:  I think it is an element, Mr. Girard, that

22  has to be considered, because of our present demands and uses

23  the agricultural demands are certainly the minor aspects of

24  it.  However, I see no insurmountable difficulty if our

25  domestic or military use is within a fair apportionment on an

1    irrigable basis.  Why anybody should complain, I don't know.

2         MR. GIRARD:  If your military use is within the

3    apportionment on an agricultural basis, I can't conceive of

4    anybody complaining.

5         MR. STAHLMAN:  Unless you pursue what you stated

6    yesterday, that you would determine somebody else's irrigable

7    acreage by what they have done in the past.  You made that

8    statement yesterday.

9         MR. VEEDER:  Mr. Stahlman, the reason I made that

10   statement was that I said I thought there were criteria in

11   the record which would certainly be a guide to what you would

12   think would be practical, profitable irrigation.

13        THE COURT:  Why do you want to talk about the subject?

14   It is as wide as all outdoors.  For instance, proof could be

15   offered that X at one time had tried for years in a row to

16   grow potatoes on a piece of ground and had a crop failure

17   every year and that the ground was not good for potatoes or

18   anything else; therefore, historical evidence might be of

19   some value.  But, on the other hand, we know the fact that

20   a man has never irrigated land does not mean he does not have

21   his riparian and overlying rights.  So there is a matter that

22   is decided on the facts of each case.

23        MR. SACHSE:  Your Honor, what interests me most about

24   this is that the thing we are talking about now, namely, the

25   Water Master, I really don't think there is any disagreement on.

1    I know in my letter to Mr. Clark I told him I thought it

2    was a good idea.  I had no question but that the details as

3    to how he would operate could be worked out.  I know Mr.

4    Girard said the same thing.  So did Mr. Stahlman.

5        What we are talking about, then, is what will happen

6    if there is a termination of this litigation by agreement

7    or by judgment or by physical solution or whatever you choose

8    to call it.  But the big thing that we should explore, I

9    think, is whether this termination is going to be possible.

10   That is where Mr. Veeder's motion ran into trouble yesterday.

11       I don't feel that any of us would, beyond these

12   technical gimmics as to how we approach the problem of the

13   Water Master, quarrel with the principle of the River Master.

14   But we have many things to object to in that portion of the

15   motion which purports to set forth the provisions that

16   should be included in the decree as far as rights are

17   concerned.  Now there is where we are a long way apart, and

18   there is where I think some discussion in the matter might

19   help to clear the air for Mr. Clark.

20       THE COURT:  Well, let me say this.  I think I know

21   most of you pretty well and know what your thoughts are, and

22   I think that in certain situations I am confident the State

23   of California would appeal, in other situations Fallbrook

24   would appeal, Vail would appeal, the Government would appeal.

25   But we are all trying to explore the possibilities of some

1  way to terminate this litigation and get through with it.

2  Actually, I think it is time to sit down informally and talk

3  about swapping horses.

4      MR. STAHLMAN:  I agree.

5      THE COURT:  Just cold turkey without a reporter.  In

6  other words, there is much to be gained from the standpoint

7  of the defendants if the Government doesn't appeal.  On the

8  other hand, the Government says, "We want a solution, if we

9  can get one."  But in the proposal they have made they have

10  said the stipulated judgment must be reinstated.  I think

11  every defense lawyer in this case and everybody in the case,

12  except Mr. Veeder, knows how impossible it would be ever to

13  work a decree around that stipulated judgment.  Secondly,

14  the Government's proposal in substance seems to contain a

15  demand or a right on the part of the United States to reach

16  upstream and satisfy an exportation right from, for instance,

17  the Pauba Basin.

18      Isn't that contained in your proposal?

19      MR. VEEDER:  The satisfaction, your Honor, of the

20  exportation right out of -- well, you said Pauba Valley, and

21  I will say Pauba Valley -- would be basically upon the

22  stipulated judgment, which does provide for exportation.  I

23  have never said, and I reiterated it yesterday emphatically,

24  that there could be no right of  eminent domain, which would

25  permit us to call upon        Roripaugh to reduce his pumping

1     to give us water.

2          THE COURT:  But the point is the proposal that you

3     have tendered us having within it the stipulated judgment

4     then goes a step further and says that by virtue of that

5     stipulated judgment the United States should have a right

6     to call upon the Pauba Basin for your water to export.

7          MR. VEEDER:  On the stipulated judgment, that is all.

8          THE COURT:  Based on the stipulated judgment.

9          MR. VEEDER:  But let me clarify another point here,

10    and I think it is extremely important, your Honor.  The

11    United States has never, and I would not ever, espouse the

12    idea that the United States could assert against any overlying

13    or riparian owner an exportation right by reason of the

14    diversion of that water.

15          Just let me take the additional step here, your Honor.

16    It has been my position throughout the inception of this

17    case, assuming that there is unappropriated water in the

18    stream, when the military men who established the Camp began

19    diverting that water we acquired a right to condemn the

20    diversion of that then unappropriated water.  It has never

21    been asserted ever that that diversion and appropriation

22    could invade then vested rights in the Santa Margarita River.

23    I hope that is clear.

24          THE COURT:  That is clear.  I understand your position.

25          Let's take a recess and then we will reconvene.

19,892

1          Maybe we can close up here by noon, or shortly

2     after noon.

3              (Recess taken)

4              (Counsel and the Court held informal discussions   )
               (                                                   )
5              (off the record.                                   )

6              (Noon recess.)

7                          ---o0o---

19,893

SAN DIEGO, CALIFORNIA, THURSDAY, MAY 17, 1962, 2:00 P. M.

---o0o---

(The Court and counsel hold informal discussion )
(                                                )
(off the record.                                 )

(3:00 o'clock P.M.)

THE COURT:  There is handed to the reporter for incorporation in the record a document entitled "A Physical Solution".   It is, in many respects, much the type of thing which Mr. Clark talked about in his motion.   It is not a ruling by the Court in any sense.   It is suggestions from the Court after listening to discussion, and if it does anything it sort of reverses the order in which Mr. Clark proposed the matter.

It starts out with the fact that we would have to start with a River Master and start to gather data, and it is going to take time to solve entitlement problems, and that this eventually can be accomplished.

And  it adds the proposal that the River Master not only be a River Master but also a Master under the Rules of Civil Procedure in some of the things that could be accomplished.

Secondly, the Court now repeats the proposal that it made that it thinks would terminate this litigation.   Mr. Veeder has numerous times in this courtroom said, "Give the Government the right to export 4,000 acre feet of water and

1   this lawsuit is over with."   I propose to Mr. Stahlman,

2   representing Vail, Mr. Littleworth, representing a number of

3   the upstream in Murrieta Valley, that they make a conditional

4   proposal to the Government that if the Government would make

5   the filing with the State on DeLuz Creek and on all other

6   waters in the Santa Margarita not now appropriated, including

7   a stopgap appropriation of waters which might eventually be

8   impounded by Fallbrook Creek, that they should be willing to

9   agree that an order be made for permitting the exportation

10   of 4,000 acre feet of water, and that if this was done it

11   would not require the Court to make any findings or judgment

12   that the Court couldn't sincerely believe; and that this

13   would, both as a stopgap before a dam was built and as a long

14   range matter, would permit the Government to take waters

15   from DeLuz and Santa Margarita and have available waters for

16   exportation.   This would immediately, as it were, remove the

17   sting of Section 18 on the Enclave to the effect that the

18   Government may not reach upstream to other owners until they

19   cease exportation.

20         MR. VEEDER:   Isn't that Section 18 a Conclusion of

21   Law, your Honor?

22         MR. SACHSE:   It is in the judgment.

23         THE COURT:   It is in the conclusions and the judgment.

24         MR. SACHSE:   Section 18 is the section of the

25   judgment.

1      THE COURT:  All right, Section 18 of the judgment.

2   And that they would then be in the position of having an

3   appropriative right so that the sting of that section, the

4   major effect of it, would be removed.

```
                        (The document referred to above )
                        (under the title "A Physical     )
                        (Solution" is  herein set forth:)
```

## "A PHYSICAL SOLUTION

### (Judge Carter)

The following is submitted to accomplish a
physical solution and terminate the litigation in the
Fallbrook case.

A. IMMEDIATE ACTION

1.  The remaining interlocutory judgments
should be prepared and signed.

2.  A final judgment should be prepared, signed
and entered since the court will retain continuing
jurisdiction - it may or may not continue some of the
matters herein set forth.

3.  A River Master  should be provided for in
the final judgment. His duties would include:

(a) Set up guaging stations or method to calculate-

(1) the runoff into the ground water areas;

(2) the rainfall in the area;

(3) the runoff out of the area;

19,896

(4) The amount of water pumped from the area (by metering);

(5)  the checking of well levels of major or key wells;

(6)  Calculate the _safe yield_ of the ground water areas.

4.   Immediate steps should be taken to institute the program for constructing the dam at DeLuz.

5.  Fallbrook _should decide_ whether it can take water from the government dam at DeLuz or whether it must build its own facility.  In any event, some _small_  reservoir or dam will have to be constructed by Fallbrook to provide a head and efficient means for handling their irrigation problems.

6.  _The United States should make application_ (a) _for appropriative rights from DeLuz Creek_.  The application can seek permission to store (until the dam is built) in the coastal basins on the government Enclave.

This application would -

(1)  Cut off individuals and groups planning to appropriate this water?

(2)  Give the United States appropriative rights to 3000 AF per year (figured on last 10 years - a dry season);

(3)  Give the government the right to lawfully
export this water for their installations underline{outside}^
the water shed and thus substantially negative #18 of the
findings re the Enclave (that the United States may
not reach upstream until it ceases it's exportations);

(4)  This DeLuz right would be superior to
(or better, independent of) the other appropriative
rights and would give the United States trading stock
(eggs in the market basket in dealings with other
dependents with rights on the River) make application
(b) for appropriative rights of the Santa Margarita
River at DeLuz - until such time as Fallbrook's rights
are perfected - and to store this water prior to the
construction of the United States dam (in the Coastal
Basins on the Enclave) and after the United States
dam is constructed, store all <u>DeLuz water</u> amd <u>excess</u>
over Fallbrook's right in the United lStates dam.

This appropriation would have three effects: -

(1) Provide stopgap water (7000 AF per year
from Santa Margarita) which could be exported until
the Fallbrook dam was completed;

(2) Allow use of <u>DeLuz water</u> (3000 AF per
year) until the United States dam was completed and
thereafter store it, (solely the property of the
United States) in the dam;

(3) Appropriate and catch any surplus over Fallbrook's commitment in the United States dam.  In real wet years this could be a substantial amount.

7.  The <u>final judgment</u> adjudicating rights to water, <u>should become</u> final, without an appeal.

------

B. LONG RANGE ACTION

1.  <u>Work of the River Master</u>.

(1)  He should immediately start collecting data for use in problems which will arise in the <u>future</u>, re apportionment, injunctions, etc.

(2)  He should give immediate attention to -

(a)  The Murrieta, where pumping depressions and reverse flow of the underground River has occurred;

(b)  The area east and upstream of Vail Dam where the evidence shows excessive use by some owners and no water available to owners downstream;

(3) His duties should include -

(a)  well measurements,

(b)  data re safe yield of the 2 upstream groundwater areas.  (The evidence now shows the <u>safe yield</u> of the Coastal Basins

19,899

on the Enclave),

(c) measure flow of various creeks and streams,
particularly those flowing into the two ground
water areas,

(d)   rainfall in groundwater areas,

(e)   amount of out flow and pumping,

(f)   losses due to freatafites, transporta-
tion, etc.

(4)   An important duty would be to start surveys
as to acreage susceptible to reasonable and profitable
irrigation.

(a)   first in the critical areas above
mentioned,

(b)   then in other areas.

(NOTE:

The record presently shows in many areas the
amount of irrigable areas.  However, (1) much of this
acreage is illusory since no water is available
although the land is riparian; (2) although the amount
of irrigable areas are in the case of many owners,
set forth, no evidence or findings exist as to the
amount that is capable of reasonable and profitable
irrigation.)

(5)   The River Master could also be made a
Master  under the Rules of Civil Procedure.  We would

19,900

contemplate that he would be available to _testify_
as a Master or expert; in other instances _make findings_
subject to review by the court, etc.

He would compile figures on acreage capable of
reasonable and profitable irrigation.  These he could
submit in writing, at a court hearing, testify to
their correctness and then be subjected to cross-
examination on particular items if desired.

(NOTE:

The present findings provide that the findings
as to irrigable acres will be _prima facie_ evidence
in subsequent proceedings.  Many of these findings
may be also acceptable as acreage capable of reasonable
and profitable irrigation).

C.   SUBSEQUENT LONG RANGE PROBLEMS

No major problem of water shortage presently
exists.  _Time_ will be needed to secure data to solve
these future problems.  The work of the Water Master,
will make this data available by the time the problem
arises.

D.   FIXING OF PERCENTAGES OF ENTITLEMENT.

A watershed is not an oil pool.  It is not a case
of various persons sucking through straws out of the
same glass.  The attached chart shows why fixing
overall percentages in the watershed becomes difficult

in view of different relationships, (See Ex. A).

Percentage entitlements can be eventually worked out by subwatershed and/or area bases.   Ultimately the relationships of the United States could be established.

But a great amount of work, hearings and court time would still be required.

E.   POOLING USE OF FACILITIES

DRAWING ENTITLEMENT FROM OTHER'S LAND.

The proposal for pooling or joint use of facilities and for the taking of an entitlement or share from property of another is of course contrary to California Water law.

It can only be worked out by agreement and consent.   The court may not accomplish it by judicial fiat.

The final judgment could direct the River Master to -

    (1)   study the problem

    (2)   collect data, and

    (3)   make recommendations.

The final judgment could provide "upon recommendations of the Master and with the consent of the parties affected, the court may make orders necessary" to effect such pooling of facilities and

1    taking entitlement from another's land.

2         Over a period of time much could be

3    accomplished."

4                        (END OF COPIED MATERIAL)

5

6    (Section 18 of Interlocutory Judgment No. 37, Naval )
                                                          )
7    (Enclave, is hereafter set forth:                    )

8

9                        18.

10        "IT IS FURTHER ORDERED, ADJUDGED AND DECREED

11   that except as to reasonable and proper riparian uses

12   on lands within the Naval Enclave upstream from the

13   point of confluence of the Santa Margarita River,

14   with DeLuz Creek in Section 29, Township 9 South,

15   Range 4West, S.B.M.,  and such rights to the use of

16   water as provided in Interlocutory Judgment No. 24

17   (Lake O'Neil), no upstream riparian, overlying owner,

18   prescriptor or appropriator dhall be required to

19   release water or curtail reasonable and beneficial water

20   uses so as to allow water to reach the Naval Enclave

21   for any purpose unless and until water exportation by

22   the United States of America from the Santa Margarita

23   River watershed is abandoned and the ground water

24   levels within the younger alluvial deposits downstream

25   from said point of confluence of said DeLuz Creek with

19,903

1  the Santa Margarita River have been restored to that

2  level at which they would have been if such exportation

3  had not taken place."

4  THE COURT:  Mr. Stahlman, you have commented, and Mr.

5  Littleworth, you have commented.  Will you state briefly

6  what you said.

7  MR. STAHLMAN:  You mean in relation to this proposal?

8  THE COURT:  This proposal I made.

9  MR. STAHLMAN:  We are in agreement with this proposal,

10  your Honor, and in agreement with the suggestion your Honor

11  made and the remarks you have just put on the record.

12  THE COURT:  Mr. Littleworth.

13  MR. LITTLEWORTH:  Your Honor, my comments made

14  previously, perhaps amplified a little bit, indicate that I

15  think our people have a lot to gain by settlement of the

16  whole litigation and seeing the United States has water.  We

17  want to do what we can.

18  I previously raised the question with Mr. Veeder as

19  to priority of this appropriative right in the event of

20  any eventual allocation among riparians, with any kind of

21  agreement that might be made, and I think this question was

22  left open.

23  THE COURT:  Mr. Veeder replied to that.

24  MR. VEEDER:  Your Honor, the question tendered by

25  Mr. Littleworth did not relate to your proposal.  It related

19,904

to the statement that I have made that I had hoped that we would be able to work agreement with Mr. Stahlman, representing Vail, and with Mr. Littleworth, representing many large landowners in Murrieta-Temecula.  It did not relate to your Honor's proposal.

THE COURT:  Right.

MR. LITTLEWORTH:  That clarifies that.

THE COURT:  You commented that you thought agreement could be worked out so that in times of shortage in Murrieta -- pick up from there.

MR. VEEDER:  In regard to the agreement that I had proposed betweenVail Company and Mr. Littleworth, the question had arisen as to what would be the effect of such an agreement in regard to their overlying and appropriative rights in time of shortage.

I said basically it was my view that we had diverted water from the watershed during the periods in which there was excess water, and that would be to some degree a limitation on our rights, but that I was willing to confer with Mr. Stahlman and Mr. Littleworth to the end that we would work out the kind and type of safeguards which would be mutually agreeable to the parties.

THE COURT:  Then there was a discussion as to the different things that might happen should some arrangement

19,905

1   be worked out by agreement between the Government and the

2   Vail Company and the Government and Mr. Littleworth's and

3   Mr. Krieger's clients, as contrasted with what might be done

4   if it was worked by decree of this Court confirming the

5   appropriative right the Government would secure on DeLuz and

6   Santa Margarita.   Mr. Sachse and Mr. Girard both had some

7   observations.

8          MR. GIRARD:   Your Honor, I made the comment that

9   regardless of the Vail-United States of America-Littleworth

10  agreement, that that would mean nothing as against anyone

11  else.   For example, Mr. Dennis' clients have filed for 12,500

12  acre feet of water on DeLuz Creek, and if there was a surplus

13  of water on DeLuz Creek -- and by surplus water I mean that

14  water needed to satisfy the proper riparian uses of the

15  United States -- I am sure that Mr. Dennis will take the

16  position that despite the agreement of you three you could

17  not limit him in his use until you quit your exportation.

18  And I am sure the same position would be taken by any other

19  people, not only in DeLuz Creek but on any other tributary

20  of the Santa Margarita upstream, who was not a party to the

21  agreement.

22          So, from a practical standpoint, in the future if there

23  ever is a shortage, a three-party agreement would be pretty

24  much meaningless, because in the absence of a judgment

25  provision giving you some kind of a right to export, it could

not be enforceable against anyone else who didn't agree.

THE COURT:  Mr. Sachse, you made some comment.

MR. SACHSE:  Your Honor, I added only to what Mr. Girard has already said, I pointed out the fact that the mere agreement would never relieve the United States of the burden of Section 18; that in any future allocation any other water user could come in and rely on Section 18 and the Court would presumably be bound by it.

THE COURT:  And you pointed out two other things: that as a water lawyer you were available to represent other people in the district and if you were called upon by one of these people who was not a party to the agreement, this would be one of the first things you would do.

MR. SACHSE:  Yes.

THE COURT:  And secondly, you pointed out with reference to the application for an appropriative right that you would cooperate.

MR. SACHSE:  I pointed out that if the United States chose to follow the appropriative route I undertook to have the Fallbrook Public Utility District appear -- I feel confident my Board would back me up -- in resisting the application of our neighbors in DeLuz and in supporting the application of the Navy.

MR. GIRARD:  And we also did that.

THE COURT:  The State of California made the same

1     offer.

2          MR. GIRARD:   Yes.

3          THE COURT:   Then we got down to the question of what

4     reasons there were why the United States should not make

5     this filing, and it was pointed out that many Government

6     agencies make filings every year with the State of California

7     for appropriative rights, and the question whether this would

8     constitute some precedent came up.   Mr. Girard, maybe you

9     can summarize what was said about that.

10         MR. GIRARD:   If that is what is concerning the

11    Department of Justice, I think we can certainly draft

12    language in the decree itself that would amply make it clear

13    that this was not to be a precedent.   It was done in an act

14    of settlement, and as far as any of the parties are

15    concerned, it will never be used in any other litigation or

16    anything else.

17         MR. STAHLMAN:   Also at that point we ought to have

18    Mr. Veeder's remarks in there as to why they don't want to

19    file.

20         THE COURT:   In summary, what were your remarks, Mr.

21    Veeder?

22         MR. VEEDER:   Our position, your Honor, has always been

23    that when the United States of America diverted the water

24    from the watershed and began utilizing it antecedent to the

25    filing by Vail Company and Fallbrook, that we had in effect

1    acquired, if we needed to acquire, an adequate right to

2    continue the exportation of that water up to -- we have been

3    talking 4,000 acre feet -- I'll say 4,000 acre feet; that it

4    has been my view, and I think it is the view of the Department

5    of Justice, that the United States of America when it acts

6    in the manner that it has acted has already effectuated the

7    appropriation and need not take the additional step.

8    　　　　We also take the view that the United States of

9    America, being the entity that it is, does not have to request

10   the State of California -- indeed, there is grave doubt

11   whether it can legally request the State of California for

12   rights to the use of water; that it is our view from the legal

13   standpoint that we have already acquired and there is presently

14   vested in us this right.   The idea has been advanced here by

15   me -- I think it is in keeping with the law -- that under

16   Article VI of the Constitution no official of the United

17   States would have the power to request the State of California

18   for the kind and type of rights to the use of water that would

19   be granted to it by the State.

20   　　　　I would like to point out here -- I didn't bring this

21   up before -- that the State of  California does not grant

22   rights to the use of water under its established procedure.

23   It grants licenses to use water, and those licenses are

24   necessarily conditioned by the provisions of the California

25   law.   The only type of license that we could get would have

19,909

contained in it, according to Section 1630 (I believe it is)
of the Water Code, a provision to the effect that within
20 years an irrigation district could come along, or any
other entity, including  the State of California itself, and
condemn the rights under the license.  Under those circumstances,
I have stated and I strongly believe that the United States
cannot, and I believe should not, proceed in accordance
with the laws of the State of California in connection with
DeLuz Dam.  I also added, however, that I would be guided
by my Department in regard to the conversation.

THE COURT:  Do you have some comment on that?

MR. GIRARD:  I would say regardless of the California
law, I would say they have no authority to put anything in
a permit involving the United States that would authorize the
condemnation of a property right of the United States,
regardless of what California law says.

MR. VEEDER:  That may be true.  But the law of
California says (1) anyone asking to receive a license under
the circumstances accepts that license subject to the
conditions of this Act.

MR. GIRARD:  I have no doubt at all, Mr. Veeder, that
the license, say, of the Bureau of Reclamation for Shasta
Dam, the license of the Bureau of Reclamation for Folsom Dam,
does not provide that a reclamation district can condemn them
out.  I haven't looked at them, but I doubt it.

1     MR. VEEDER:  You haven't looked at the law.  I have.

2  I have looked at the licenses, I have looked at the law, I am

3  very familiar with the procedure, and I do strongly believe

4  that there are limitations in the California law which must

5  be given greatest consideration by the National Government

6  when it considers an application of the kind recommended here.

7     THE COURT:  Let me say that I regret that your position

8  on the matter is so fixed.

9     MR. VEEDER:  It is not so fixed, your Honor.

10     THE COURT:  The record will show what you said.  You

11  said you would be guided by your Department, but you took a

12  very definite position on the matter.  In our informal

13  discussion, I think it was agreed by all parties present,

14  except you, that if this proposal made by the Court was

15  carried it would terminate this litigation.

16     We also discussed the fact that this litigation has

17  continued since 1951, that the Marine Corps has been up

18  against the gun with its Congressional appropriations because

19  the litigation was pending.

20     We discussed the great expense to many small landowners,

21  the Fallbrook Public Utility District, and to the Vail

22  Company by this litigation.

23     We discussed the fact that although there were things

24  in the judgment that certain defendants who were not presently

25  satisfied with, particularly Fallbrook, that Fallbrook would

19,911

1 stand still and not appeal, and that if an appeal were taken

2 it would probably be two years, with this immense record,

3 before the Circuit got a decision down, and then there would

4 be cert to the Supreme Court and at least another year or

5 two, and then we would be back again either where we are now

6 with the judgment affirmed or we would be back again with a

7 long retrial of at least portions of this case.  And that in

8 any settlement there has to be some give on both sides, and

9 that it seemed this was one way to dispose of this case.

10 MR. STAHLMAN:  There is another thing that I think is

11 very important in connection with the desire to terminate the

12 litigation in this case, aside from any of the matters

13 mentioned and any of the inferences that can be taken from

14 matters in the record in the case, and that is that this

15 case has been a case that has had large repercussions in

16 areas other than the area in which the Santa Margarita River

17 is located.  It has been the subject of certain Congressional

18 Hearings.  It has inflamed feelings in various areas in a

19 way that is inimical too the best interests of the United

20 States and of the people in various areas.  It has been

21 written up in national magazines on several occasions.  There

22 have been other people getting into the act and taking part

23 and expressing themselves on it, many of whom did not know

24 what they were talking about.  And there have been many

25 debates and public hearings and      political attitudes

19,912

taken in relation to it by people who upset the normal political feeling in various areas of the State and the County and even in the United States.   Matters of this kind are like a fire; they catch here and they take on and they become part of other litigation.   It creates feelings among large sections of citizens in various other aspects.   It causes arguments and comments upon what the effect of the actions of the United States is and their domination and all the things of that sort.

It has been a very unhealthy atmosphere that this case has created around many things.   If it were over and disposed of and forgotten it would be a lot better for the entire country, the United States of America included.

MR. GIRARD:   There is also, your Honor, the question of the acqueduct Mr. Sachse mentioned.

THE COURT:   Yes.   Mr. Sachse.

MR. SACHSE:   I can state it, I think, very briefly, your Honor.

This is simply factual.   That/is in existence today owned by the San Diego County Water Authority what is known as the Fallbrook-Oceanside Branch Acqueduct extending from the first barrel of the first San Diego acqueduct through Fallbrook at approximately the Rainbow District to the City of Oceanside.   The City of Oceanside is presently constructing a new service connection to the second barrel of the first

1    acqueduct, from which it will take all of its imported water,

2    which will empty or release for use the entire capacity of

3    the Fallbrook-Oceanside branch below the Fallbrook takeoff,

4    which capacity, I believe, is seven and a half to eight

5    cubic feet per second, or about 4,500 acre feet a year --

6    let's say about 5,000 acre feet a year.   The City of Oceanside

7    has had pending for some six months before the San Diego

8    County Water Authority a request that it give to them those

9    portions of this branch line within the city limits, with the

10    intention of cutting off the branch line entirely from the

11    acqueduct and using it only as a part of Oceanside's internal

12    distribution system.   There is opposition to this.

13        THE COURT:   There remains, therefore, the portion of

14    the line from the city limits of Oceanside --

15        MR. SACHSE:   There remains the portion of the line from

16    the city limits of Oceanside to a point within a quarter mile

17    or so of Camp Pendleton, with a carrying capacity of about

18    seven and a half cubic feet per second, which is going to be

19    abandoned as far as the Authority is concerned.

20        While I am only one Director, I feel confident that

21    a request by the United States Navy to the Authority that

22    this line be kept active, if for no other reason than to

23    provide supplemental or emergency water to the Navy, it would

24    be received in a favorable fashion by the Water Authority.

25    And I believe that the Navy, incidentally, should make that

1  request entirely regardless of any settlement that is worked

2  out in this case, simply as a matter of sensible self-

3  protection without expense to the Navy.

4        THE COURT:  You pointed out also that that first

5  barrel of the acqueduct was built by the Navy.

6        MR. SACHSE:  Mr. Stahlman pointed out that the first

7  barrel of the acqueduct was built by the Navy, and there are

8  contractual rights in the Navy which (I don't know, but I

9  feel quite sure) would give them rights to a certain amount

10  of water out of it.

11        THE COURT:  Mr. Littleworth, you called attention to

12  just this one little practical problem that in the event of

13  a shortage in the Murrieta Valley and a claim downstream by

14  the United States that it needed more water upstream -- I

15  would like to have you repeat it.

16        MR. LITTLEWORTH:  It was pointed out, I think actually

17  by Mr. Girard, that one possible physical solution and the

18  kind of thing that has been done in other cases throughout

19  the country might be that in the event of a real shortage

20  where you would have to curtail riparian uses that it might

21  be cheaper for the riparians upstream to in fact buy

22  metropolitan water and provide that to the Navy through the

23  pipeline which Mr. Sachse just outlined rather than curtail

24  their useage or deepen their wells et cetera, that might

25  otherwise be required.  This kind of physical solution might

19,915

1    be available.

2        THE COURT:   I think it was also pointed out by someone

3    that on this first barrel of the acqueduct Oceanside had this

4    commitment for 4500 acre feet which it is abandoning and

5    which demand will now be made upon the second barrel of the

6    acqueduct.

7        MR. SACHSE:   Oceanside will take its water out of the

8    second barrel.

9        THE COURT:   So there was this 4,500 acre feet on the

10   first barrel allocated to Oceanside.

11       MR. SACHSE:   That is not technically correct, your

12   Honor.   It means that Oceanside's demand in the future will

13   be from the second acqueduct and Oceanside will not make

14   demand on the first.   But it's entitlement is to all barrels.

15       MR. STAHLMAN:   You also pointed out, I think, Mr.

16   Sachse, that the capacity of the second barrel is far in

17   excess of the present use.

18       MR. SACHSE:   That is right.

19       THE COURT:   Colonel Bowen, do you think of anything

20   that should be mentioned here that is pertinent to our

21   discussions?

22       COLONEL BOWEN:   This thought occurred to me, your

23   Honor.   Reference has been made to the second barrel of the

24   acqueduct.   It is not technically correct.   The first

25   acqueduct is comprised of two barrels.   The second acqueduct

19,916

1   is composed of one barrel which exceeds the capacity of the

2   two barrels.

3      MR. SACHSE:   Colonel Bowen is correct.   Oceanside's

4   connection will be made to the second acqueduct, not to the

5   second barrel of the first acqueduct.   And the second

6   acqueduct is an over-supply -- we can't run it even half full

7   now.

8      MR. VEEDER:   We discussed also at noon, Colonel Bowen

9   and I, that the matter of getting water from the Colorado

10   River was investigated thoroughly by the Marine Corps and

11   was found to be unsatisfactory.

12      MR. SACHSE:   Mr. Veeder, I add only the one thought

13   on these remarks that I did not state for the record.   I will

14   repeat it.   I think it would be nothing short of criminal,

15   not just for the Marine Corps but for San Diego County;   I

16   think we ought to keep that acqueduct alive for the needs of

17   the Marines or anyone else.

18      THE COURT:   Whether unsatisfactory or not, it is an

19   emergency supply or source.

20      MR. GIRARD:   Would it be unsatisfactory, Colonel, if

21   the cost were paid by other people?

22      MR. VEEDER:   I was not talking about that at all.   I

23   was pointing out the fact that the question of Colorado River

24   water was explored very extensively.

25      THE COURT:   To be used to satisfy all the needs of the

1    Marine Corps?

2    　　MR. VEEDER:  I don't know about all.  Certainly it

3    was found not to be satisfactory.

4    　　THE COURT:  We are talking about this line as an

5    emergency thing.  I agree with Mr. Sachse that it would be

6    almost inexcusable neglect to have that line torn up that

7    exists there.

8    　　MR. STAHLMAN:  It is not going to be torn up, I don't

9    think.  I feel that if the Navy didn't jump in there and

10   take that line at this time, that some other municipality

11   would take that line over.

12   　　MR. SACHSE:  Rainbow sort of asked for it.  They haven't

13   asked for it officially, but they are thinking about it.

14   　　THE COURT:  Colonel Bowen, any other suggestion?

15   　　COLONEL BOWEN:  No, sir.  Except I think there is much

16   merit in your Honor's proposal here about the physical

17   solution.

18   　　MR. VEEDER:  I think whether the conversations with

19   the Vail Company continue or not, they were initiated, we

20   have talked with Vail Company in the hopes of working out

21   some kind of settlement with Vail Company, and whether they

22   progress or not is entirely up to Vail now.  I am ready,

23   willing and anxious and able to continue the conversations

24   that I had started.

25   　　MR. STAHLMAN:  Bill, I think like a lot of other things,

1  you did propose it, and as I told you, I am perfectly willing

2  to sit down and talk with you about any of these matters that

3  would have for their objective the conservation and the

4  preservation of the source of supply and if we can make some

5  determination as to how there may be some distribution with

6  relation to the rights we have set forth, I am perfectly

7  willing to sit down and explore it.

8      THE COURT: I want you to continue. But I again

9  throw out the caveat that if agreements are made -- and I

10  don't know what they are -- you may find that other people

11  aren't bound by them; other people could upset them, because

12  this business of two riparians agreeing is what we had in the

13  old Santa Margarita case.

14      MR. STAHLMAN: Exactly, your Honor.

15      THE COURT: I think you should fully explore these

16  proposals, whatever they are.

17      MR. STAHLMAN: I told Mr. Veeder that whatever we

18  discussed, Mr. Littleworth and his clients up there should be

19  fully aware and familiar with the discussions, and he said

20  yes, we would take this matter up with Mr. Littleworth.

21      MR. VEEDER: I considered it entirely desirable. Nor

22  am I being slightly critical. In fact, I am endorsing what

23  we have been attempting to do, your Honor.

24      I would point out, and I think it is important, that

25  sometimes the broad panorama of litigation can be handled in

1    segments better than when we get into the overall question

2    of State and Federal relationships -- Fallbrook-Federal

3    relationships.   I do believe sometimes it is easier for people

4    who have a greater community of interest to discuss

5    settlement than for people who have sharply divergent

6    positions.

7        THE COURT:   All right.

8        Now, I think if the United States wants seriously to

9    consider the proposal that has been made, I think this lawsuit

10   could be terminated.   I hope the adamant position you express,

11   Mr. Veeder, will be softened upon reflection.

12       MR. VEEDER:   Please, your Honor, I truly don't believe

13   I have been adamant, nor did I intend to be.   I outlined to

14   you a position which certainly isn't reflective of advocacy.

15   I think it is reflective of very careful thought in regard to

16   the relationship of the National and the State Government.

17       MR. STAHLMAN:   Bill, it seems that when there is

18   something about to be accomplished you always come up with

19   something that seems to upset the entire apple cart.   I would

20   like to go a little further and implore you and say, "Listen,

21   talk this over with Mr. Ramsey Clark, and when you do let

22   him know what we have done out here, that we are trying

23   sincerely to accomplish something."

24       MR. VEEDER:   I am fully in accord.

25       MR. STAHLMAN:   We have given along the line -- like

1    this Naval Ammunition Depot.  We have gone out in various

2    ways -- on your Lake O'Neil.  So we haven't taken this

3    attitude of fighting this thing all the way through to the

4    last ditch and wanting every drop of water.  We realize there

5    are a lot of people in here, that all have interests.  To some

6    of these small people it means just as much as it does to

7    Vail and the Navy.  It might mean a lot more to somebody with

8    a small piece of property and a small amount of water.

9         In connection with this matter of filing with the

10   State, unless it has some great implications as far as it may

11   affect the Government's rights, I can't see why you can't

12   file with the State.  I have no other object except that it

13   accomplish something.

14        THE COURT:  As an example of what you said, Mr.

15   Stahlman, was the suggestion today by Mr. Veeder that the

16   State would reserve some right to condemn, and Mr. Girard's

17   remarks about the Shasta Dams and other dams where the Bureau

18   of Reclamation had gotten permits.  It looks like you are

19   searching for some way to defeat a settlement in this matter

20   rather than to find some way to avoid the pitfalls.

21        MR. VEEDER:  Your Honor, I sincerely hope this record

22   isn't reflective that I haven't cooperated in the last

23   several days all the way down the line to bring about a

24   settlement of this.  I think I would be very derelict not

25   to bring to your Honor's attention the factors that have been

1    thoroughly explored.

2         THE COURT:  I merely express the hope that you will

3    proceed in a cooperative spirit in discussing it with your

4    superiors.

5         In making settlements of litigation -- and this is

6    true also in labor disputes, which I had considerable

7    experience -- you start generally with your main principles

8    of what you want to accomplish, and many of the little

9    details that seem to be obstacles can be worked out.  If you

10   start on the little ones and not on the main premise, you are

11   in trouble.  Many labor agreements could have been dynamited

12   by merely some insistence upon talking about some minor

13   matters which later fell into place when the settlement was

14   accomplished.

15        MR. VEEDER:  I am quite in accord with what your Honor

16   says.  I believe there has to be a spirit of cooperation in

17   this matter.  I truly believe it.

18        THE COURT:  I wonder if we should have something

19   brief on the record as to this study on the Fallbrook Dam.

20   This is a disturbing situation, the figures cited by Mr.

21   Sachse in the informal discussion.

22        MR. SACHSE:  I am perfectly willing to put it on the

23   record, your Honor.  It seems to me that Mr. Clark's

24   directions were to Colonel Bowen and me to try to get together;

25   how much Colonel Bowen has felt he has been able to pass on

19,922

1  to Mr. Clark of the work that has been done, I don't know.

2  But I would prefer, frankly, that Mr. Clark get the private

3  advice of Colonel Bowen as to what he thinks these things

4  are -- I am sure the Colonel isn't going to come up with

5  anything we haven't talked about -- and let the Colonel

6  advise him.

7  THE COURT:  Is that satisfactory?

8  COLONEL BOWEN:  Yes, your Honor.

9  THE COURT:  It is an engineering cost problem.

10  When should we meet again?

11  MR. SACHSE:  May we take one second on what we will

12  do before we will meet again?  We still have this before us,

13  but we have a few other things.

14  MR. STAHLMAN:  I would like to settle the Vail

15  Findings.  The Vail Findings are ready to be signed as soon

16  as we correct a few pages, obtain the three exhibits.

17  THE COURT:  The Clerk corrected the original as we

18  went along with the insertion of the exhibit numbers, and

19  I corrected my copy.

20  MR. STAHLMAN:  Colonel Bowen will have that exhibit.

21  We have ours ready for the sufficient number of copies, and

22  if we can get those from Colonel Bowen --

23  Whenwill Exhibit C be ready, Colonel?

24  COLONEL BOWEN:  I expect to have reproductions

25  available tomorrow.

19,923

1        MR. STAHLMAN:  Very well.

2        Is there any coloring necessary on them, do you think?

3        COLONEL BOWEN:  I think they should be colored in, and

4  I would defer on that to Sandy -- he seems to enjoy it.

5        MR. STAHLMAN:  Sandy says he will let his wife do it.

6  As soon as that is done it is not necessary to wait until the

7  next time.  That is ready for signing.

8        THE COURT:  All right, that is understood.

9        When we meet again somebody is supposed to work on the

10  Aguanga groundwater.

11        MR. VEEDER:  That is right.  I have finished, your

12  Honor, findings on all the Indian claims.  The conclusions of

13  law are being written.

14        THE COURT:  Those were handed to me.

15        MR. VEEDER:  I handed you the findings, your Honor.

16        THE COURT:  Yes.

17        I go back to April 6, 1962 and I see that Mr. Sachse

18  was assigned some task in connection with 39.

19        MR. SACHSE:  A draft of mine was sent to Mr. Veeder

20  and Colonel Bowen and a decision, I think, has been arrived

21  at by them that they prefer to redo the whole 39-Series, they

22  prefer to redo 39, but at the same time eliminate Sandia

23  because the two are in conflict.

24        MR. VEEDER:  That is correct.

25        MR. SACHSE:  You have that under control, now, do you

19,924

1    not?

2        MR. VEEDER:  That is right.

3        THE COURT:  And the Government was to work on 39-A.

4    So that part is the same.

5        MR. SACHSE:  The same.

6        MR. VEEDER:  All work together .

7        THE COURT:  We have not acted on Mr. Sachse's amendment

8    to Interlocutory Judgment No. 30.  That should be on the

9    agenda.

10       The Government was to submit Domengoni and Warm

11   Springs.

12       MR. VEEDER:  On that, I think Mr. Sachse and I had

13   better talk again.

14       I think it is completed, Mr. Sachse.  I have six

15   copies on Diamond and Domengoni Valley in my office.  If you

16   will come up there now, we can look at it.

17       MR. STAHLMAN:  We have agreed there will be a 35-A

18   Series to take care of the Vail lands up on the Santa Rosa.

19       THE COURT:  All Vail land that isn't in the ground-

20   water area.

21       And then there should be on the agenda further talk

22   about a physical solution.

23       MR. SACHSE:  What would you  like us to do?  I have

24   almost no comments about this Indian draft you have sent us.

25       MR. VEEDER:  The conclusions of law are being written

19,926

1    MR. VEEDER:  All right.  Would you go upstairs, Mr.

2  Girard, and I will show you what you should have.

3    MR. SACHSE:  May I come up and take another look at

4  Warm Springs Creek?

5    MR. VEEDER:  Yes.

6    THE COURT:  June 12th at 10:00 o'clock.

7    May I say for the record that notwithstanding my

8  remarks about Mr. Veeder's adamant position, I would like the

9  record to show that he has cooperated thoroughly in these

10  discussions and that we have had a minimum of acrimony --

11  in fact, I can't recall any serious exchanges between counsel

12  in these discussions.

13          (Whereupon, an adjournment was taken until  )
                                                        (
14          (Tuesday, June 12, 1962, at 10:00 A.M.       )

15

16

17

18                    ---o0o---

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )       No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                Defendants.     )
_____)

## CERTIFICATE OF REPORTER

I, the undersigned do hereby certify that I am, and on the date herein involved, to-wit, May 17, 1962, was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing 60 pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego California, this 17th day of May, 1962.

_John Swader_
Official Reporter

JOHN SWADER, OFFICIAL REPORTER