# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al, | |
| Defendants. | |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, June 13, 1962

**Pages:** 19,928 - 19,976

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
        vs.                          )        No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY DISTRICT,   )
et al.,                              )
                                     )
                    Defendants.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, June 13, 1962

APPEARANCES:

| | | |
|---|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General, | |
| | CDR. DONALD W. REDD | |
| For the Defendants: | | |
| Vail Company: | GEORGE STAHLMAN, ESQ., | |
| Fallbrook Public Utility District, et al: | FRANZ R. SACHSE, ESQ. | |
| State of California: | FRED GIRARD, ESQ. | |

19,929

1    <u>SAN DIEGO, CALIFORNIA, WEDNESDAY, JUNE 13, 1962, 10:00 A.M.</u>

2    ---o0o---

3    THE COURT:  Call the case.

4    THE CLERK:  Two - 1247-SD-C, United States vs.

5    Fallbrook.

6    THE COURT:  I will be tied up here until noon.  Mr.

7    Veeder, have you served these documents that you showed

8    me yesterday?

9    MR. VEEDER:  We have, your Honor, and they have been

10   read and they are now in the process of discussion.

11   THE COURT:  Will you keep your tempers?

12   MR. VEEDER:  I always keep mine, your Honor.

13   MR. SACHSE:  We are doing fine, your Honor.

14   THE COURT:  If you will look at Volume 196, we said

15   at about Page 19,924, there is some sort of little agenda

16   here of the matters we should talk about.

17   And there has also been passed around -- I don't

18   know whether they have been lodged -- these findings on

19   Coahuila.

20   MR. VEEDER:  Yes.  Mr. Girard has read them.  I

21   don't believe the others have.  However, each one has a copy

22   of that.

23   THE COURT: Then will you do the best you can,

24   gentlemen, until 2:00 o'clock.  I hope we can get through

25   here sometime today.

   (Recess until 2:00 p.m.)

SAN DIEGO, CALIFORNIA, WEDNESDAY, JUNE 13, 1962, 2:00 P. M.

---o0o---

(At 2:00 o'clock p.m., the Fallbrook case was   )
(                                                )
(continued until later in the afternoon.         )

(At  3:15 o'clock p.m., the proceedings in the)
(                                                )
(Fallbrook case were had as follows:             )

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  I have handed your Honor a revised draft.  You will note that it is referred to as Draft No. 2, June 13, 1962, STATEMENT OF THE UNITED STATES OF AMERICA RESPECTING INTENTION TO CONSTRUCT A DAM WITHIN THE NAVAL ENCLAVE ON THE SANTA MARGARITA RIVER.

I don't know what your Honor would desire.  I would recommend that this form as written be made part of the record and then that comment be directed to the form in the course of the afternoon, if that is acceptable to you.

THE COURT:  It is acceptable.  Do you have a copy to give the reporter?

MR. VEEDER:  I will give it to him at the end of the session.  Then he can enter it at the outset of this phase of the hearing.

THE COURT:  This is Draft No. 2?

MR. VEEDER:  Yes, your Honor.

THE COURT: All right.

P-3

THE RESOURCES AGENCY OF CALIFORNIA
STATE WATER RIGHTS BOARD
P. O. Box 1592
SACRAMENTO, CALIFORNIA

TO:         )
           )   STATEMNT
STATE OF CALIFORNIA    ) OF THE UNITED STATES OF
STATE WATER RIGHTS BOARD   ) AMERICA RESPECTING INTENTION
           ) TO CONSTRUCT A DAM WITHIN
           ) THE NAVAL ENCLAVE ON
           ) THE SANTA MARGARITA RIVER

The United States of America, in the interests of comity between the United States and the State of California and in the furtherance of coöperation between the United States and the State for the fullest development, conservation, and utilization of the water resources of the Santa Margarita River system, shows:

I

During 1942 and 1943 the United States acquired the Rancho Santa Margarita in San Diego County, California, consisting of approximately 133,000 acres of land, acquired certain other smaller tracts, withdrew some of its public lands, and established on those properties three military installations:  Camp Pendleton, United States Naval Ammunition Depot, and United States Naval Hospital, hereinafter referred to as the Naval Enclave.

II

The Santa Margarita River traverses the Naval Enclave for the last 21 miles of its course to the Pacific Ocean.

P 4

1    This river system is the principal source of water supply for

2    the Enclave.  For approximately 20 years the United States

3    has, under a claim of right, pumped waters from the Santa

4    Margarita Coastal Basin, the waters of which are a part of

5    and are recharged by the Santa Margarita River, has made

6    surface impoundments, and has otherwise beneficially used

7    the waters of the stream for military and agricultural

8    purposes.

9                          III

10       The rights to the use of water in the Santa Margarita

11   River and its tributaries are the <u>res</u> or subject matter of

12   the case entitled <u>United States of America</u> v. <u>Fallbrook Public</u>

13   <u>Utility District, et al.</u>, in the United States District Court

14   for the Southern District of California, Southern Division,

15   No. 1247-SD-C, which case is now being tried.

16                          IV

17       The State of California has intervened in that case,

18   is now represented by its Attorney General, the Honorable

19   Stanley Mosk, and is actively participating in the trial.

20                          V

21       The record in the pending litigation shows, and all

22   parties agree, that the runoff of the Santa Margarita River is

23   erratic and fluctuates between periods of severe drought and

24   infrequent floods of short duration when the surface waters

25   of the stream far exceed the demands on the stream.  In order

to conserve flood waters for beneficial use in times of

shortage, both the United States and the State of California

have made extensive and comprehensive investigations as to

the best location of a structure to impound surplus surface

water.  On the basis of these investigations the United

States and the State are agreed that the best location for

such a structure, in order to achieve the greatest storage

potential from the standpoint of both conservation of water

resources and economic feasibility, is within the Naval Enclave

shortly below the confluence of DeLuz Creek with the Santa

Margarita River.

VI

The Department of the Navy is going forward with plans

pursuant to which Congress will be requested to authorize and

provide funds for the construction of a dam at the DeLuz site.

The size of the structure for which it will be recommended

that funds be appropriated has not been finally determined

upon, but studies on which such recommendation will be based

are now in progress and a reservoir with a storage capacity

of approximately 150,000 acre-feet is indicated.  However, the

size and design of the structure to be recommended will be

such as to provide for maximum flood control and conservation

benefits consistent with sound principles of economic feasibility.

It is expected that when the dam is constructed, it will be

operated to provide water for use by the United States on the

Naval Enclave, in addition to the yield of its riparian,

P-6

1  overlying and other vested rights as determined in the above

2  mentioned case of the United States of America v. Fallbrook

3  Public Utility District, et al.   The surplus waters stored in

4  the reservoir will be available for use by other water users

5  as may be authorized.   Further, the reservoir will also

6  reduce demands on upstream sources to satisfy the vested

7  water rights of the United States on the Naval Enclave.

VII

8

9  The major litigants in the case of the United States

10  of America v. Fallbrook Public Utility District, et al.,

11  referred to above, are presently attempting to arrive at an

12  agreement that will terminate by an effective decree such

13  litigation and will provide a physical solution that will

14  yield the greatest benefit to the watershed and owners of

15  water rights thereon.   As a consequence, the construction of a

16  dam by the United States of America at the DeLuz site is

17  of major importance in the accomplishment of such settlement,

18  physical solution, and effective decree.

VIII

19

20  In the interest of comity and for the benefit of the

21  Board, the United States of America will, as soon as possible,

22  submit to the Board its engineering plans and specifications

23  concerned with the DeLuz Dam and will, if desired by the Board,

24  make available an engineer or other qualified person to

25  explain or amplify such engineering plans and studies.

P-7

## IX

It is agreed that in the event a physical solution cannot be accomplished, nothing herein shall be construed to limit in any manner whatsoever the Fallbrook Public Utility District from exercising its rights to store water as adjudicated in the United States of America v. Fallbrook Public Utility District, et al.

IT IS RESPECTFULLY RECOMMENDED to the State Water Rights Board, that excepting for such appropriative water rights in or to the waters of the Santa Margarita River system as are adjudicated in United States of America v. Fallbrook Public Utility District, et al., the Board take the following action:

1. Defer for a reasonable period of time the issuance of permits which would conflict with the demand for and use of DeLuz dam.

2. Refrain from issuing permits which would conflict with water rights adjudicated in United States of America v. Fallbrook Public Utility District, et al.

3. Advise the undersigned of its willingness to defer for a reasonable time action on pending applications to appropriate waters of the Santa Margarita River system.

4. Advise the undersigned that in the event Congress authorizes construction of the DeLuz dam, all permits hereinafter issued will specifically be made subordinate to

P-8

1  the use of water at the DeLuz dam to the extent of the

2  reservoir capacity as it may ultimately be constructed

3  pursuant to such Congressional authorization.

4

5  (End of copied material.)

MR. VEEDER:  I would like to have the record show, in that regard, that while I have brought to the attention of Mr. Clark some of the changes, I have not brought all of them to his attention because revised Page 4 was just completed a few moments ago.  I will bring it further to his attention this evening.

MR. STAHLMAN:  It has not really changed the substance.

MR. VEEDER:  I really don't believe that the substance has been changed materially, with the exception of No. IX, which was put in as a caveat at the request of Mr. Sachse.

I don't know how your Honor desires to proceed. Shall we go paragraph by paragraph and discuss it, or how would you like to have it?

MR. SACHSE:  May I suggest, your Honor, we have been over this pretty carefully and I hope we are pretty much in agreement, and if your Honor would care to take it paragraph by paragraph and then suggest comments, or maybe some of us  might see something new.  I think we are practically agreed, aren't we?

MR. GIRARD:  I think generally.  I think Mr. Veeder should comment that in the title of it will be a reference to a number of the DeLuz filings by the Mutual Water Company up there, and refer to all other proceedings

19,938

concerning the Santa Margarita River.

MR. VEEDER:  My thought was that we would put:
In re:  All Pending and Future Applications to appropriate
rights to the use of water in the Santa Margarita River,
including but not limited to the pending filing on DeLuz
Creek by this entity to which Mr. Girard just made
reference.

THE COURT:  You mean in the title?

MR. SACHSE:  Yes, your Honor.

MR. VEEDER:  Yes, your Honor, to the end that there
would be some kind of identification on the form as filed.

THE COURT:  All right.

I will hear your comments paragraph by paragraph.

MR. STAHLMAN:  I have a comment on III.

THE COURT:  Anybody have any comment on I?

MR. SACHSE:  I have no objection to I.  It is
satisfactory.

MR. VEEDER: Why not start with the preamble?  As
I understand it, the first unnumbered paragraph is
acceptable to everyone.  Is that correct?

MR. SACHSE: Yes.

MR. GIRARD:  Yes.

MR. VEEDER:  That is likewise true in regard to
No. I.

Mr. Stahlman has objected to the phrase "under a

claim of right" in Line 28.

MR. STAHLMAN:  Let me explain it, Mr. Veeder.

THE COURT:  You are talking about what?

MR. VEEDER:  II.

MR. STAHLMAN:  Starting at Line 27, the last word where it says, from there on, "For approximately 20 years the United States has, under a claim of right, pumped waters from the Santa Margarita Coastal Basin, . . ." I think it is a little misleading in relation to the facts in the record of the case.  I think they have claimed a right, it is true, and they have pumped water for 20 years, and they have claimed a right in this trial; but I don't think there has been a claim of rights for 20 years, and I think the construction of the language would give that implication -- that they have been claiming this right for some 20 years.

THE COURT:  I don't see that that is particularly--

MR. STAHLMAN:  Well, it could be.

MR. GIRARD:  The only point I think Mr. Stahlman has, and I am inclined to agree with him, is that all the parties are going to be asked to sign this.

MR. STAHLMAN: That is the point.

MR. GIRARD:  The United States has, of course, asserted in their complaint at least prescriptive rights. One of the arguments advanced by the defendants, at least,

4

1    and I think considered in court, was that there was no

2    possibility of this use downstream being adverse or under

3    a claim of right during the period until the lawsuit

4    commenced.   I don't know that there was any evidence at all

5    before the filing of this lawsuit that anyone, on behalf of

6    the United States, ever noticed or claimed to anyone else

7    that their use of water was under any claim of right other

8    than just the right to use the water on the basis that they

9    were the lowest user on the stream.

10       MR. VEEDER:   That is why I pointed out to both Mr.

11   Girard and Mr. Stahlman that I felt it was rather important

12   There are a great many elements in there.   I don't believe

13   that anybody is going to be bound by any legal connotation.

14   Certainly the men who constructed Camp Pendleton and

15   diverted water out of the watershed were doing so under a

16   claim of rights.

17       MR. GIRARD:   If anything, I think the record shows

18   they didn't know what they were doing.

19       MR. VEEDER:   The stipulated judgment was in effect

20   at that time.

21       THE COURT:   It could be changed so as not to

22   prejudice the United States and at the same time make it

23   acceptable by saying that for approximately 20 years the

24   United States has pumped water from the basins et cetera,

25   and then down at the   bottom throw in "and claims rights to

5

1    continue to do so."

2        MR. GIRARD:  I would have no objection.

3        MR. STAHLMAN:  That's all right.

4        THE COURT:  That is factually correct and we don't

5    cross this bridge.  Do you follow me?   Take your phrase,

6    "under a claim of right" and throw it in at the end of

7    the paragraph.

8        MR. VEEDER:  And claims a continuing right to do

9    so.

10        THE COURT:  Yes.

11        MR. VEEDER:  I am not going to hold up further

12    discussion on that point.  That sounds acceptable to me,

13    because I think we have progressed a long way on this, your

14    Honor.

15        THE COURT:  Let's try that for size anyhow in a

16    revision.  It is true that you have pumped water for 20

17    years from the Basin.

18        MR. VEEDER:  Well, I would like to move it back

19    then a ways.   "For approximately 20 years the United

20    States has p umped water from the Santa Margarita Coastal

21    Basin and is claiming the right to continue to pump . . ."

22        THE COURT:  Put your right to continue to do all

23    these things at the bottom.

24        MR. STAHLMAN:  Yes.

25        MR. VEEDER:  All right.

THE COURT:  You don't mention it in there -- and I hope this doesn't precipitate a big argument -- you haven't mentioned in there the use of the water outside the watershed.

MR. GIRARD:  No.  I think the joint purpose of this whole thing is to cover the DeLuz Dam and not get involved with past history.

Is that right, Mr. Veeder?

MR. VEEDER:  That is correct.  All that we are trying to do here is to show that for 20 years we have been operating a camp down there.  I have tried to avoid many of the issues that are before your Honor.

THE COURT: Then take out your words "under claim of right" and at the end of Paragraph II, after you list all of the things you have done, insert something to the effect "and claims the right to continue to do so."

Paragraph III.

MR. SACHSE:  No objection.

MR. GIRARD:  No objection.

THE COURT:  IV.

MR. SACHSE:  No objection.

MR. GIRARD:  No objection.

MR. STAHLMAN:  No objection.

THE COURT:  V.

MR. GIRARD:  No objection on behalf of the State.

19,943

MR. SACHSE:  There is no objection on behalf of Fallbrook, if the rest of it goes as drafted.  There are some changes later on.  We might have some objections here. But it is taken care of by a caveat .

THE COURT:  VI.

MR. STAHLMAN:  That word "upon" doesn't belong there.

MR. VEEDER:  That is on the first line.  Take that out and move your comma back to "determined".

MR. STAHLMAN:  Line 1 on Page 3.

MR. VEEDER:  ". . . appropriated has not been finally determined upon,. . ." strike "upon".

Should your Honor compare that original form that I filed with the other, you will see that there are changes commencing in VI in the last two sentences.  However, the substance is unchanged.

MR. STAHLMAN:  Which one is this?

MR. VEEDER:  Still on VI, George, starting with Line 7.  His Honor has the original copy.

THE COURT:  I don't care what the changes are.

MR. VEEDER:  I thought you might be comparing them.

2 fls

P-1
Take 2

1    MR. STAHLMAN:  Bill, I have no objection to this, but

2  I'm just wondering about the language starting on line 12

3  where it says, "The surplus waters stored in the reservoir

4  will be available for use by other water users as may be

5  authorized.."  Do you think from that the Water Rights

6  Board might get the impression that they would be the ones

7  to authorize something?

8    MR. GIRARD:  By "authorize" you mean by agreement between

9  the United States and the user.

10   MR. VEEDER:  There are a lot of elements there.  To

11  begin with, to me the controlling factor would be the kind

12  and type of legislation enacted by the Congress -- the

13  modus operandi as to how others could participate in the

14  surplus water.  We have tried to be as broad as we could in

15  that, George.

16   MR. STAHLMAN:  No criticism.  I'm just wondering if

17  it might not be confusing to the Board.

18   THE COURT:  You could say "as may be authorized by the

19  act of Congress or by the agreement of the United States

20  and the other parties thereto."

21   MR. STAHLMAN:  Yes,

22   MR. VEEDER:  Once we start chronicaling methods of

23  authorization, though, you enter upon a pretty broad field

24  where you probably can't anticipate.  That was the problem

25  when we wrote that sentence.

P-2

1     MR. GIRARD:  You could say "by the act of Congress or

2 the Department of the Navy."

3     MR. VEEDER:  I have no objection to something like that.

4 I just thought "authorized" would be the simpler method

5 to handle it.

6     THE COURT:  George's point is -- it might be a good point --

7 I think it would complicate things if the Board started to

8 decide whether it was going to authorize.

9     MR. VEEDER:  "The surplus waters stored in the reservoir

10 will be available for use by other water users as may be

11 authorized in accordance with .."

12     THE COURT:  "..by the act of Congress or by the Department

13 of the Navy."

14     MR. VEEDER:  "..by the act of Congress or by the

15 Department of the Navy."  That suits me.

16     THE COURT:  Seven.

17     MR. VEEDER:  You will notice that we use, Mr. Stahlman

18 in particular, we use "terminate" in line 20, and we use

19 "settlement" in line 25, and I assume you wanted "terminate"

20 in both places.  Am I right?

21     MR. SACHSE:  Yes, change "settlement" to "terminate."

22     THE COURT:  Where are you changing "settlement"?  On

23 line 24 and a half, to "termination"?

24     MR. VEEDER:  Termination.

25     MR. SACHSE:  Termination.

P-9

1    THE COURT: All right, anything else on VII?

2    VIII?

3    MR. STAHLMAN: No objection.

4    MR. SACHSE: No objection to VIII.

5    MR. VEEDER: Our view, in that regard, is that we

6    must have comparable data available to present to Congress,

7    and certainly a public record and certainly use of comity,

8    we would be glad to supply that to the State of California.

9    MR. GIRARD: Also make it clear, Mr. Veeder, that

10   somebody might file an application and it might require

11   some evidence on behalf of the United States that their

12   storage would be adverse.

13   MR. VEEDER: I have no objection to it as written.

14   MR. GIRARD: I presume you would want to show them.

15   THE COURT: All right, IX.

16   MR. VEEDER: I still have a string on No. IX.  I read

17   it to Mr. Clark during the noon hour.  He is considering it,

18   and I intend to speak to him later this evening on it.

19   MR. SACHSE: Just so the record is clear, IX is my

20   caveat, and if IX is not acceptable I want to withdraw

21   approval of everything that has gone before.  I want it

22   understood that I reserve the right then to raise objections

23   to this.

24   MR. VEEDER: Yes.

25   THE COURT: All right.

P-10

1      Then we come to the recommendations.

2      MR. GIRARD:  We should, I think, have one more paragraph,

3  your Honor.  I previously mentioned this. Unfortunately,

4  we didn't go into it.  I think both Mr. Veeder and I agree

5  that this statement should not be any precedent type of

6  thing; it is limited to this River.

7      MR. VEEDER:  I would just as soon have it a precedent,

8  but I'm not going to fight about the point.

9      THE COURT:  What would you propose?  This would be

10  Paragraph X?

11     MR. GIRARD:  Paragraph X.  That the United States, in

12  submitting said statement --

13     MR. SACHSE:  The parties are doing it.

14     MR. GIRARD:  Yes, that in submitting said statement,

15  it is agreed by all parties thereto that this statement shall

16  not be considered to be a precedent in any other proceedings.

17     MR. VEEDER:  Precedent period.

18     MR. STAHLMAN:  It applies only to this particular

19  case and should not be considered as a precedent.

20     THE COURT:  And that the parties have joined in the

21  statement in an attempt to secure a termination and physical

22  solution.

23     MR. GIRARD:  Somewhat along that line.

24     MR. STAHLMAN:  In this particular case, yes, somewhat

25  along that line.

P-11

1   THE COURT:  What do you think, Mr. Veeder?

2   MR. VEEDER:  If it will assist in getting agreement

3   on this thing, that suits me.  As I say, I would just as

4   soon have a precedent statewide and nationwide.

5   MR. STAHLMAN:  There is something else along the same

6   line that we have discussed -- I don't know whether we finally

7   agreed on it -- and that was that the application itself as

8   to whether it would be made with the State or would be made

9   by all the parties.  We would all sign it, but would we sign

10   it as principals?

11   Did you discuss that with Mr. Clark?

12   MR. VEEDER:  I outlined that to him, yes.  But I refer

13   back now to the caption, which says "Statement of the United

14   States of America.." It is our statement to the Board, and

15   we are delighted to have anybody come along and say, "We approve

16   this procedure as set forth in the statement."

17   MR. STAHLMAN:  How then are we going to conclude it

18   when we get through?  The United States would be the -- what

19   would you call yourself?

20   MR. VEEDER:  Just the United States.

21   THE COURT:  The draft had a provision where the United

22   States signed it and where the other parties came in with

23   another paragraph.

24   MR. VEEDER:  I don't think it makes an awful lot of

25   difference.  I think if they are evincing their approval

P-12

1 of the course we are pursuing, I think it would be of

2 assistance to us before the State Water Rights Board. I

3 don't believe the form is too important, your Honor.

4 THE COURT: What about the recommendations? Any

5 suggestions on those? Apparently not.

6 MR. GIRARD: What I am thinking about -- I just got

7 it here now:

8 "Advise the undersigned that in the event Congress

9 authorizes construction of the DeLuz Dam, all permits

10 hereinafter issued will specifically be made subordinate

11 to the use of water at the DeLuz Dam to the extent

12 of the reservoir capacity as it may ultimately be

13 constructed pursuant to such Congressional authorization."

14 Suppose, however -- and this is pure speculation -- that

15 the Congressional action were to have other conditions

16 placed upon the Navy in order to build their dam. Suppose,

17 your Honor -- and this is not going to be advocated by me --

18 but suppose Congress puts in a condition that they do certain

19 things. For example, what I am specifically speaking about,

20 suppose Congress directs that they secure a permit from the

21 State of California, which is not a novel suggestion in

22 that they have considered those before. Certainly the

23 Navy would have to comply with the Congressional act in order

24 to get a right.

25 MR. VEEDER: My failure to respond does not mean that

P-13

1  I agree with you, Mr. Girard.  I'm simply saying that I

2  wouldn't endeavor to anticipate all the conditions that

3  might be imposed.  I simply say that at this juncture I

4  would leave it as it is, substantially.

5      MR. SACHSE:  I have no objection to the language as it

6  is.  I would be willing to sign it, I think subject to most

7  of my Board's approval.  But I do have a question as to

8  whether the Water Rights Board could do this, really. I have

9  a serious question.  I have expressed it to Mr. Veeder.  We

10  have inserted a time limit at the beginning, "Defer for a

11  reasonable period of time." Well, that's all right.  No. 2

12  is "Refrain from issuing permits which would conflict."  The

13  Board can do that, I'm satisfied.  But whether the Board

14  could say that a DeLuz Dam which might be constructed 10 or

15  12 or 15 years from now would have rights superior to any

16  permits issued hereafter, after the date of this thing, I

17  seriously question.

18      MR. VEEDER:  Then why don't you put in "Advise the

19  undersigned that in the event Congress, within a reasonable

20  time, authorizes the construction of the dam."?

21      MR. SACHSE:  That would improve it.  As I say, it

22  doesn't matter to me.  This is to iron it out so you are

23  in more foolproof shape before the Water Rights Board, that's

24  all.

25      MR. VEEDER:  I see the point that is made.  My own view

P-14

1    is, that I would like to make it as acceptable as possible

2    to the State Water Rights Board.  Mr. Girard is probably

3    the best qualified to anticipate what they might desire.

4        MR. GIRARD:  I think what we might want to do, Bill,

5    we are going to meet with Mr. Gray this week or next week

6    and go over this with him and see what he thinks we might

7    be able to draft.  I see Franz's point.  What you are doing,

8    in essence, by this is asking the State Water Rights Board

9    to make all applications junior to something that may never

10   occur.

11       MR. VEEDER:  That is why the reasonable time.

12       MR. SACHSE:  It has another significance.  I don't

13   know whether it would bother you, but it is conceivable to

14   me that the Water Rights Board might say, "This is an

15   application to appropriate water, which we will treat as such,

16   even though it is not in the form of our application, and

17   we will give it a stamp for its filing date." Then they

18   could conceivably hold DeLuz hearings, deny all existing

19   applications.  Then you would come in with a situation where

20   somebody files after you.  Would this be an application, or

21   wouldn't it?  The Water Rights Board would decide how to

22   treat this.

23       MR. VEEDER:  Just a moment.  This is not an application.

24   Nor should it be considered as an application or construed

25   as an application.  We are advising the State of California,

P-15

1          THE COURT:  Don't be too broad on this.

2          MR. VEEDER:  -- out of comity, that we intend to build

3    DeLuz Dam, and we sincerely hope that, in the exercise of

4    their broad discretion, they would defer any action for a

5    reasonable time which would conflict with this proposed

6    dam.

7          THE COURT:  I don't think you should say, however, that

8    you do not want the Water Rights Board to consider it as

9    an application.  Let them treat it as they see fit.  You

10   are making it as a statement of the position of the United

11   States, to be joined in by other parties to this litigation.

12   But I don't think you should go any further.

13         MR. GIRARD:  What difference does it make?  Suppose

14   they treat it as an application, and you treat it as a statement.

15   Everybody is happy, aren't they?

16         MR. SACHSE:  The other point is, I still think the

17   language, by adding a reasonable time, is going to tie the

18   hands of the Water Rights Board to the degree that they

19   could not accept.  Because look at your existing DeLuz Dam

20   Act -- when was that act passed?

21         MR. VEEDER:  1954.

22         MR. SACHSE:  That is eight years old.  Just because

23   Congress authorizes a dam doesn't mean the dam will be

24   constructed within a reasonable time.  If the funds are

25   appropriated within a reasonable time, or something like that.

P-16

1    I think you will have to put in, to satisfy Mr. Craig and

2    the Water Rights Board.  They can't tie up forever that

3    subsequent permits will be junior.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19,954

3-1

1       MR. VEEDER:   I think this, though, and what I would

2 really desire at this moment, I would like to have assurances

3 from California that during this period in which we are

4 endeavoring to work out a broad basis upon which this

5 litigation may be terminated, they will abstain from

6 taking any action in regard to applications now pending;

7 that when we get this matter finally formalized -- I am

8 referring to this statement now -- that we would present it

9 to them, having outlined previously our positions and why

10 we are taking this course, with the understanding that

11 perhaps six months or a year would elapse, during which

12 time they would hold in abeyance everything that is now

13 pending before them and everything -- I am speaking now of

14 applications -- that would come subsequent to the lodging

15 or the filing of this statement with the State.

16       In other words, there is an immediate factor with

17 which I am concerned.   No action to be taken now.   A

18 period in which you gentlemen can get your boards and

19 your superiors to agree.   And I can get Mr. Clark's

20 signature on this.   Then when it is presented there would

21 be a reasonable time, six months or a year, in which they

22 would take no action.   That is how I understood it.

23       I understood there was a possibility of a hearing

24 starting the 21st of June regarding some of the DeLuz.

25       MR. SACHSE:   Yes.   That might be a very good point to

19,955

3-2

1   put in the record, because I don't think his Honor knows

2   yet.

3       I told Mr. Veeder this morning.  There had been

4   originally set for the 21st of June the election for the

5   DeLuz Municipal Water District, which would have created a

6   public entity.  The only applicant now is a mutual water

7   company, a paper corporation.  Apparently objection to the

8   formation of a public district developed in the DeLuz area

9   and the proponents themselves have asked the Board of

10  Supervisors to cancel the election, and it is canceled.

11  Therefore, it seems to me that this move of Mr. Veeder's

12  or Mr. Clark's is coming at a very ideal time from the

13  standpoint of the Water Rights Board, because there is no

14  public California entity at this moment involved.  There

15  is only a paper corporation of a mutual water company.  If

16  another election is held, it might put some pressure on the

17  Water Rights Board again.  But today I think they are in

18  pretty good shape to listen to something like this.

19      MR. VEEDER:  I gathered that the State Water Rights

20  Board was considering action.

21      MR. SACHSE:  Not to my knowledge.

22      MR. GIRARD:  I have been advised exactly to the

23  contrary.  They told me they would give me at least three

24  months notice before any hearings would be set.

25      THE COURT:  Going to IV, don't you think all we

3-3

1    should do in IV is  in very general terms advise the

2    undersigned parties, including the United States and the

3    other persons who join in this, that if the program

4    outlined for the application to Congress for the dam

5    et cetera, proceeds with reasonable dispatch, that the

6    Board will consider providing that any permit meanwhile

7    issued be made subordinate et cetera.  That is about all

8    you would need to do, because the Board, if they proceed

9    on this at all, are certainly going to do this.  You don't

10   want to put them in a tight jacket where they are guaranteeing

11   that 10 years from now a dam might not be built and they

12   would do this.  But all you want is a caveat to them that

13   this matter is progressing and that the permits should be

14   so limited, and I don't think you would have any problem.

15           MR. STAHLMAN: There is another good reason for it.

16           MR. VEEDER:  I didn't get your Honor's language.

17           MR. STAHLMAN:  There is another good reason for

18   putting that in, and that is that it might help Congress

19   to speed up and get this thing going.

20           MR. VEEDER:  May I have the reporter read back your

21   suggestion.

22           THE COURT:  Before he reads it back, the thought

23   was merely to have something very general in there pointing

24   out the problem, but which would not be something which

25   the Board would buck at.

19,957

3-4

1    Mr. Reporter, see if you can find it.

2    (The reporter read the Court's remarks as )
3    (requested by Mr. Veeder.                  )

4    MR. GIRARD:  I have some language suggestions, I

5    think, your Honor, along the line of IV.

6    THE COURT:  Let's hear them.

7    MR. GIRARD:   Advise the undersigned that in the

8    event Congress, within a reasonable time, authorized

9    construction of the DeLuz dam, and appropriates funds

10   therefor, this Board consider making all permits hereinafter

11   issued  subordinate to the use of water at the DeLuz dam

12   to the extent of the reservoir capacity as it may

13   ultimately be constructed pursuant to such Congressional

14   authorization.

15   THE COURT:  It sounds all right to me, except you

16   say "all permits thereafter issued."  I think it should be

17   made clear that what you are talking about is all permits

18   meanwhile issued or issued after the act of Congress.  It

19   is a little ambiguous.

20   MR. GIRARD:  I don't think the Board could make a

21   permit that has been issued today junior to this.

22   THE COURT: Well, they could postpone acting on a

23   permit.

24   MR. GIRARD:  They could postpone acting on permits,

25   but it says here "this Board consider making all permits

3-5

1   hereinafter issued".  Now that would include every permit

2   that has not been issued up to date.  The only permit that

3   it wouldn't include would be a few very minor ones -- it

4   would be Fallbrook and Vail.

5       MR. VEEDER:  Those are very minor.

6       THE COURT:  Why don't you try it again?  Use the

7   first part of the language:  That all applications for

8   permits will be deferred while this program progresses

9   and that after the authorization et cetera, permits be made

10  subordinate, et cetera.

11      MR. VEEDER:  Your Honor, we would like to have a

12  little more substance in that No. IV than that.  If we go

13  ahead, I would like very much to have California refrain

14  from issuing any permits which would be prior to DeLuz

15  dam, and I don't believe that is unreasonable under the

16  circumstances.

17      THE COURT:  That is what I had in there.

18      MR. VEEDER:  You said "to consider".

19      THE COURT:  No, this second suggestion didn't use

20  the word "consider".  To defer permits until the

21  authorization comes through, and after it came through to

22  make them subordinate.

23      MR. VEEDER:  Okay, that's fine.  I just want to be

24  sure that it is a firm commitment once this money is

25  appropriated and the dam is under construction.

3-6

1    MR. SACHSE:   I don't think they can do it for you,

2   Bill.

3    MR. VEEDER:   I want to ask them to do it.

4    MR. SACHSE:   I don't think they can.

5    MR. VEEDER:   Why not?

6    MR. SACHSE:   What you are saying is that any permit

7   issued --

8    MR. VEEDER:   Based upon applications now pending.

9    MR. SACHSE:   Right.

10    MR. VEEDER:   Not your application.

11    MR. SACHSE:   No, I understand.  Let's take Garnsay's--

12    MR. VEEDER:   DeLuz 12000.   Take Matthew's 100.   He

13   has an application for 100 pending.   You are saying that if

14   it takes you even 20 years --

15    MR. VEEDER:   The reasonable time is in there.

16    Mr. SACHSE:   Within a reasonable time authorizes

17   construction and appropriates funds.   You still have 20

18   years to build a dam, and I don't think the Water Rights

19   Board has a right to hold up Matthew's 100 acre feet.

20    MR. VEEDER:   The money has to be spent each   year.

21   You might have three years at the outside.

22    MR. SACHSE:   I am not going to object to this.   This

23   language is all right with me.   But if we present this --

24   and I say "we" because I am very hopeful I will have my

25   Board's approval to sign it -- I want something that will go

19,960

3-7

1    through, that's all.

2        MR. VEEDER:  Under the circumstances and the

3    interruptions, I would like to have this run off so that

4    we could see what it is this evening, if I could.

5        MR. SACHSE:  It would be helpful to me, although I

6    do not think this paragraph will bother my Board.

7        MR. VEEDER:  Let's pull the language around.  Your

8    Honor originally started with language to which I interposed

9    objection.  Now we have it down to where it would be firm

10   language, and I would like that.

11       MR. SACHSE:  The other reason, if I could add one

12   thing more to it, Mr. Veeder, if you ask the Water Rights

13   Board to consider making all permits hereinafter issued

14   subordinate, that they can unquestionably do -- that is

15   within their power.  But I can well conceive that the

16   Board's attorney might say to them, "Gentlemen, this is

17   not an appropriation.  You cannot treat this as an

18   appropriation and you have no right to make it superior

19   to another appropriation."  So I don't think they can

20   positively agree.  I think it has got to be a comity affair

21   tagged to this particular case, and I think there has got

22   to be a little mutual trust in this thing that if the

23   State of California, Fallbrook, Vail and the United States

24   all ask for this, knowing the physical conditions that exist

25   on the River, that we could put it across.   But I

19,961

3-8

don't think we should go to the Water Rights Board and ask them to treat something which you, yourself, say is not an application as something prior to something that is an application.  You are asking them to break their own statute.

MR. VEEDER:  Let's go back to IV as written and see how we can move it to the point where there would be some agreement among us here.

MR. SACHSE:  I would like some language about the consideration.  We have a hope that they will do it if we all go to them.

MR. VEEDER:  What are your changes, then, Fred? I would like to have them this evening, if I could.

MR. GIRARD:  I just had "Advise the undersigned that in the event Congress, within a reasonable time, authorizes construction of the DeLuz dam, and appropriates funds therefor, this Board consider making all permits hereinafter issued subordinate to the use of water at the DeLuz Dam. . ."

MR. VEEDER:  I think that when we go to the Board we should go to the Board with the strongest statement, and then if they say "We can't do it," that is something else.

MR. GIRARD:  The thing is now, your theory, with which I may or may not agree -- personally, I am inclined to agree with you -- this is not taking into account the

3-9

1    stipulations signed in this case, which wouldn't

2    apply to the DeLuz dam application which you are talking

3    about now -- if the United States Congress authorized a

4    project for the use of water and does not provide for

5    compliance with the State law, there is certainly a

6    substantial basis for arguing that they don't have to

7    comply to get a water right.  But what you are asking the

8    Board here to do, in essence, is to give the United States

9    a priority for DeLuz dam to a date that you filed your

10   statement of intention, which is, just for all practical

11   purposes a statement by an employee of the Department of

12   Justice or the Navy, either one of the two.  You don't

13   have any act of the United States Government authorizing

14   the construction of the dam.  For all we know -- and this

15   is pure speculation -- Congress may tell you no.

16        MR. VEEDER:   I think we all comprehend that.

17        MR. GIRARD:   And the whole idea of the United

18   States having a right to acquire a water right without

19   filing an application with the State Water Rights Board

20   is on the idea that Congress would authorize it.

21        MR. VEEDER: And having done so, we would not have

22   to comply with the police regulations of the State.

23        MR. GIRARD:   But right now Congress hasn't done so.

24        THE COURT:   Why isn't Mr. Girard's suggestion proper?

25   Because in III you request, "Advise the undersigned of its

willingness to defer for a reasonable time action on

pending applications to appropriate waters of the Santa

Margarita River system."

Well, this is very broad.  They can say, "Yes, we

would defer action on pending applications," and I think

we have to have a certain amount of give-and-take and

trust and confidence.

Then IV comes along and under Mr. Girard's language

it would provide that in the event Congress within a

reasonable time authorizes construction and appropriates

the money the Board consider making all permits thereafter

issued or hereafter issued subordinate to the dam.

So you take care of both phases of it, and again

the best that you could hope would be to get some general

statement by the Board that they would generally go along

with this program.

What do you think, Mr. Veeder?

3 fls

P-17

1    MR. VEEDER:  Your Honor, I have expressed myself that

2    I would like to have a more substantial declaration.  We

3    had talked about using the word "deny."  Originally, we

4    said that if and when the Congress authorized the construction

5    of the dam, appropriated funds, and the project proceeded,

6    thereafter the State of California would deny the issuance

7    of any permits.  It was during the give and take conversation

8    that we had, so no one certainly is bound by it.  I like

9    that language because it is language in perpetuity.  It means

10   that they think they have the power, and I would like to go

11   to them on the basis of saying, "Well, you do have the power.

12   You have the power, if Congress authorizes this structure,

13   to recognize that an entity with the power has acted, and

14   that you could not act in derogation of Congressional

15   authority," something along that line.  The precise language

16   would depend upon the circumstances.  But to leave it

17   entirely open to the discretion of a Board that may or may

18   not be in existence -- in other words, the Board that probably

19   approves this --

20       The term of office, I think, is three years, isn't it?

21   One member changes every year, doesn't it?

22       MR. SACHSE:  No, it is a four-year term.

23       MR. VEEDER:  Whatever it is, it is entirely possible

24   that a Board that was wholly agreeable to this process, having

25   full knowledge, would say, "Yes, we will consider this."

19,965

Then you have a new Board and they say, "No, we will not

consider this."

MR. GIRARD: That could happen regardless of what

they do.  Under California law, the Water Rights Board would

be a legislative body, and one legislature cannot bind the

next.

MR. VEEDER:  I am not going to argue that point.  I

am simply saying that if we do have a commitment they could

not change their position on this matter.  And they could

deny these pending applications if we go ahead -- which is

for the mutual benefit of all of us.  I think we have a

very sound and very reasonable approach to the existing

Board to ask them to say, "Well, we will deny present

and future applications which would conflict with DeLuz

dam."  I don't believe that is unreasonable to ask.  They

may say, "We can't do it," that is something else.  I hate

to go there and simply say, "The United States is willing

to proceed on the basis that if you will just sit on these

things we will go ahead."  In the meantime we might

get our brains beaten out by an entity up on DeLuz dam

which could come into existence.

MR. SACHSE:  It's all right with me.  As I say,

with my Board's approval I am willing to sign it, and I

will recommend that they sign it along the lines you have.

But I would rather see it in such a way that you do not

19,966

leave the Board in this position, Mr. Veeder.  They are

absolutely nothing more nor less than a creature of the

statute, and the statutes of California provide that

applications to appropriate surplus water can be filed,

that the Board shall hear them, that other things being

equal first in time shall be first in right, and I don't

think you should ask the Board to say, "We are going to

disregard the statutes of the State of California in this

one case."

You have to say, "Please consider the elements," and

I think we can put that across.  But don't ask them to

promise to disregard the California law.

MR. VEEDER:  I thought the language we had in there

was pretty good:  " Advise the undersigned that in the

event Congress authorizes construction of the DeLuz dam,

all permits hereinafter issued will specifically be made

subordinate to the use of water at the DeLuz dam . . ."

MR. STAHLMAN:  If you build that dam, there will

never be any further permits.

MR. VEEDER:  But you are asking us to make a filing

and get no assurance of protection.  That is what it amounts

to. / That language.  That is my interpretation.
    with

MR. STAHLMAN:  I am not going to argue about it.

MR. GIRARD:  In the first place, if you and Fallbrook

reach an agreement here shortly, we can certainly draft

a Congressional Act to take care of your problem.

MR. VEEDER:  I was hopeful that we would be able to--

MR. SACHSE:  Bill, I am not objecting.  I will take

your language and go with it.  Everything that I have

suggested is only with the thought that we would have a

better case to the Water Rights Board.  But I am not going

to raise the question to them.

MR. VEEDER:  This would be almost meaningless unless

we do get some assurance, as firm an assurance as they can

give us.  I am not being adamant.

MR. GIRARD:  I don't have any objection, Mr. Veeder,

to your procedure, but let us not tie it down completely

until we talk to Mr. Craig, because I have a hunch he will

say, as Franz has, that the Board can't go that far.

MR. VEEDER:  That is why I say let's go to him with

a request for the firmest assurance we can get.  If he

says no, that is a horse of another merry-go-round -- we

have another problem.  But with all respect to your

gentlemen, I feel it would be much better to ask for what

we really think we need than to go and say, "Well, you

consider it after we spend our money."

MR. SACHSE:  Okay, I'll buy it.

MR. VEEDER:  I am not arguing with your Honor on it.

I am just outlining what I think I would like to attain

there.

THE COURT:  I am at a loss what to say.

MR. VEEDER:  What was that, your Honor?

THE COURT:  I am at a loss as to what to advise you.
Mr. Girard knows more about this than I do.

MR. GIRARD: Well, we could leave it like this, your
Honor:  "Advise the undersigned that in the event Congress,
within a reasonable time --"

I presume Mr. Veeder doesn't object to that?

MR. VEEDER:  No.

MR. GIRARD:  ". . .authorizes construction of the
DeLuz dam and appropriates funds therefor," insert that, and
then carry it on the way he has it exactly, "all permits
hereinafter issued will specifically be made subordinate
. . ."

And I think we should accept that language at this
stage with an understanding that we might have to modify
it if Mr. Craig advises us that that is beyond his Board's
power to do so.

MR. VEEDER:  I think that is the only reason.  If
his lawyer says they can't do it, certainly that is the end
of the language as written.

MR. SACHSE:  Let's try that.  That sounds good to
me.  Let's try it.  May I read it to be sure I have it
right, Fred:  "Advise the undersigned that in the event

Congress within a reasonable time authorizes construction

of the DeLuz dam and appropriates funds therefor. . ." all

the rest of it just leave it.

THE COURT:  All right, I understand now you are

going to talk to Mr. Clark, Mr. Veeder?

MR. VEEDER:  I am going to speak to him this

evening.  I am looking at the clock now.  It's getting late

back there.

THE COURT:  Mr. Girard, you are going to talk to

Mr. Craig?

MR. GIRARD:  Mr. Veeder and I are going to make

arrangements to talk to Mr. Gavin Craig, lawyer for the

Water Rights Board, either Friday of this week or Monday.

Mr. Veeder is coming to Sacramento.

THE COURT: Anything else that we can do about this?

How about this signatory part of the other parties on the

original draft?  Is that all right?

MR. SACHSE:  It's all right with me.

MR. GIRARD:  I would not sign for the State of

California.  This should be the Attorney General of the

State of California, and I want to talk to Mr. Mosk before

I sign it.

THE COURT: What about the language, though?

MR. VEEDER:  We had thought that would be no longer

necessary.

1  MR. SACHSE:   I said as long as I sign this at all, I

2 am perfectly willing to sign it right underneath the United

3 States' name on the face sheet of it.

4  MR. GIRARD:   I can go along with either one.

5 Personally, I think it is better for the United States to

6 sign their statement.   It's really their statement.

7  MR. VEEDER:   That'sright.

8  MR. GIRARD:   And for us to concur in it this way.

9  MR. VEEDER:   I am inclined to agree on that.  After

10 all, it is our statement.  You simply  evince approval of

11 the course we have adopted.

12  THE COURT:   Can we leave that for a moment?  You

13 are going to talk to Mr. Clark and you are going to plan

14 to see Mr. Craig Friday or Monday?

15  MR. VEEDER:   I would like to see him Friday.

16  MR. GIRARD: We will call him by phone and see if

17 we can make an appointment for Friday.

18  MR. VEEDER:   Again, my seeing him is somewhat

19 contingent upon talking with Mr. Clark.

20  THE COURT:   Have you made  progress in any other

21 respect?

22  MR. SACHSE:  We thought this was a pretty big job.

23  MR. GIRARD:   The defendants are pretty much in

24 harmony that Mr. Veeder's motion should be denied.

25  THE COURT:   The motion can be laid aside.  It doesn't

1   have to be acted upon.  Has it been filed?

2        MR. GIRARD:  I don't know.

3        MR. VEEDER:  When I tendered it to your Honor I

4   considered it was filed.

5        THE COURT:  What?

6        MR. VEEDER:  I want it filed, yes, your Honor.  You

7   have the original and a copy.

8        MR. SACHSE:  The point is, if the motion is granted

9   this is a needless act -- all this work we have been doing.

10       THE COURT:  Here is the motion.  It may be filed.

11  But the Court will not act on it.

12       MR. VEEDER:  Did you want an additional copy for

13  yourself, your Honor?

14       THE COURT:  Yes.  It may be called up again at some

15  later date in the far distant future.

16       MR. VEEDER:  We are now referring to the motion of

17  the United States for the termination of the rights to

18  export water from the Santa Margarita River watershed.

19       THE COURT:  Yes.  One significance of the motion,

20  or rather the memorandum that accompanies it is, that it

21  lends a little support to the Government's so-called

22  statement, and in that sense could be called to the attention

23  of the Board, if it were thought proper to do so.

24       Now, what is your plan for tomorrow?

25       MR. VEEDER:  Your Honor had asked, in that

connection, you will remember, you had written a memorandum to the attorneys in the Fallbrook case, the memorandum being dated May 25, 1962, in which you proposed two inquiries.. I have gone into the matter quite thoroughly and if you want me to make some comment at this time I will do so.

THE COURT: Can you do that tomorrow?

MR. VEEDER: All right, tomorrow.

MR. SACHSE: Just so I bring the right file with me, Mr. Veeder.

MR. VEEDER: I will call the files to you.

MR. SACHSE: Just tell me this. Are you planning on doing both the Master and the Interlocutory Judgments?

MR. VEEDER: They are inextricable. Yes, indeed.

MR. SACHSE: Then I will bring Rainbow Creek and DeLuz Creek, which I don't have here today.

MR. VEEDER: I will read what I have here: DeLuz Creek, Fallbrook Creek, Rainbow Creek, and the area south.

MR. SACHSE: All the Master's, yes.

MR. VEEDER: And those are referred to in the notice dated August 21, 1961.

MR. SACHSE: What about the interlocutory judgments, though? The Fallbrook interlocutory judgments Nos. 2 through 22, whatever it is.

MR. VEEDER: Those are here. I think you should have

1    them here, because you are going to find, I believe, that

2    they are directly related to Mr. Cranston's findings.   In

3    addition, I would think you would want to be prepared to

4    discuss the offers which have been made for settlement.   I

5    have prepared a list of those.   There are probably 250 offers

6    of settlements.

7        These were "B.G", "Before Girard", so you may not

8    know what I am talking about.   They are offers of settlement

9    that were made that were approved at one time on the basis

10   that they would limit their rights to domestic uses.

11       MR. SACHSE:   Without going into it, but just so you

12   will know my thinking, Mr. Veeder, so far as I am concerned,

13   I think the proper way to handle that judgment on the

14   offers of settlement is that every single one should be

15   vacated and every single one should be covered by

16   interlocutory judgments.   They are all involved in basement

17   complex, or at least they all should be.

18       MR. VEEDER:   But they are not, Mr. Sachse.

19       MR. SACHSE:   Then they should be thrown out by the

20   Court, because anybody who isn't basement complex who

21   wrote that kind of thing, it was very foolish.

22       MR. VEEDER:   I think it was some of your clients,

23   Mr. Sachse.

24       MR. SACHSE:   Not mine.

25       MR. GIRARD:   I went over your findings on your

1   Indians.   On the whole I think they are pretty acceptable.

2   I have some comments on them, some objections.

3        MR. VEEDER:   I think we should go into those

4   tomorrow.   I will be glad to go into those tomorrow.

5        MR. GIRARD:   How are we coming on Wilson Creek

6   interlocutory judgment, and also on Diamond-Domenigoni

7   Valley?

8        MR. SACHSE:   Also 39 or 39-A, from the Gorge to

9   the Enclave.

10        MR. VEEDER:   I will be glad to talk to you gentlemen

11   about that now.

12        We delivered to you, Mr. Girard, on January 17, 1962

13   the proposed findings in regard to Anza Valley.

14        On January 5th there was proposed an Aguanga

15   groundwater area, and I will be glad to talk about those

16   now or later.

17        MR. GIRARD:   I had better come up and get those

18   copies, Bill.

19        MR. VEEDER:   I wish you would.   They are there.

20   They were lodged on the dates I mentioned sometime ago.

21   I am always anxious to get these things done, Mr. Girard.

22        MR. GIRARD:   Okay.

23        THE COURT:   All right, let's adjourn until tomorrow

24   morning.

25        MR. STAHLMAN:   Another thing, if you file any more

1      motions, which I presume you are going to do, Bill, let's

2      have them a few days ahead of time.

3          MR. SACHSE:  I suggest that no more motions will be

4      filed by anybody except there are two interlocutory

5      judgments filed with them, so that we at least get going

6      toward the end of the case.

7          MR. VEEDER:  I am in perfect accord.  I wish you

8      gentlemen would look at this work we gave you in January,

9      so we can get going.  This worries me no end.

10         THE COURT: Everybody has been working.  Don't build

11     a record here that you have been doing a lot of work and

12     everybody has been sitting on their hands.

13         MR. VEEDER:  No, your Honor, I find that these young

14     fellows cooperate very well.

15         THE COURT:  What time do you want to come in?

16         MR. VEEDER:  Your Honor, I would like to deliver

17     back to your Honor the transcript sent to Mr. Clark.

18         THE COURT:  All right.

19     10:00 o'clock.

20         (Adjournment tuntil 10:00 o'clock a.m., Thursday )

21         (                                                )
       (June 14, 1962.                                   )

22                       ---oOo---

23

24

25

19,976

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. )   No. 1247-SD-C
)
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al., )
)
Defendants. )
)

## CERTIFICATE OF REPORTER

I, the undersigned do hereby certify that I am, and on the date herein involved, to-wit, June 13, 1962, was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing  49  pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 13th day of June, 1962.

_____
Official Reporter