# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                         Plaintiff,

             vs                                    No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

                         Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**      San Diego, California

**Date:**       Thursday, June 14, 1962

            **Pages:**      19,976 - 20,079

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                              Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211   Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
          vs.                            )        No. 1247-SD-C
                                         )
FALLBROOK PUBLIC UTILITY DISTRICT,       )
et al.,                                  )
                                         )
                    Defendants.          )
_____     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, June 14, 1962

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General, |
| | CDR. DONALD W. REDD |
| For the Defendants: | |
| Vail Company: | GEORGE STAHLMAN, ESQ., |
| FALLBROOK PUBLIC UTILITY District, et al: | FRANZ R. SACHSE, ESQ. |
| State of California: | FRED GIRARD, ESQ. |

SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 14, 1962, 10:00 A. M.

---o0o---

THE CLERK:  1247-SD-C, United States of America vs. Fallbrook, etc. et al.

MR. GIRARD:  Mr. Veeder and I have contacted Mr. Craig's office, your Honor.  He is not going to be in Friday. We are going to meet with him on Monday sometime, depending on Mr. Veeder's schedule.  We are going  to talk this statement over with Mr. Craig and see if he has any sugges-tions as to this statement which the United States is going to file with the Water Rights Board.

Also, while we are on the record, and probably for Mr. Clark's benefit, while they are filing a statement, not an application, before the Board, I am wondering if they have any views at all in the event Fallbrook and the United States agree as to proceeding before the State Water Rights Board to accomplish your assignments of Fallbrook's rights.

In other words, I presume if you agreed to a joint dam, certainly it would be advantageous to everyone to transfer Fallbrook's filing to you, and in order to do that you are going to go to the Board and not just file a statement of intention; because Fallbrook's rights are under a Board permit and those will have to be assigned with the Board's approval.  So somewhere along the line, if the United States are going to build their DeLuz Dam, at least

for that portion of the dam which is going to be covered by Fallbrook's applications, you are going to have to go to the Board.

MR. VEEDER:  We are going to have to go to the Board and request the Board's approval?

MR. GIRARD:  Yes.

MR. VEEDER:  The United States?

MR. GIRARD:  Yes, to get the advantage of Fallbrook's priority you are going to have to, and I would think you would be crazy not to.

THE COURT:  Couldn't Fallbrook make the request?

MR. VEEDER:  That is what I would think.

MR. GIRARD:  I don't know whether Fallbrook could make the request for a change in point of diversion or point of a dam site on United States land.

MR. VEEDER:  My thinking on that was the simplest way to handle it -- and this is strictly my own thoughts on it -- is that we would handle our relationship with Fallbrook by a contract.  It hadn't occurred to me that we would accept, in substance, an assignment or a transfer from Fallbrook of its applications or permits.

MR. GIRARD:  I would think you would be crazy not to. In the first place, Fallbrook's permits are senior to Yackey.

MR. VEEDER: This is new to me.

19,980

MR. GIRARD:  If you build your dam and you agree with Fallbrook, you certainly want to take advantage of Fallbrook's priorities.

MR. STAHLMAN:  In all probability, Fallbrook would have to make the application.  You would have to consent to it, at least.

MR. VEEDER:  I think you would have to have a contract with Fallbrook evincing an intention.

MR. GIRARD:  I am sure this could be worked out. But I wanted it in the record so that Mr. Clark would be aware of the fact that Fallbrook does operate under a State application and a State permit, and if the United States wants to take advantage of the rights of Fallbrook, in the event of reaching agreement -- and I am sure you must want to -- I am sure you will have to get an order of the State Water Rights Board approving it.

MR. VEEDER: Franz, have you any thoughts on that? The more we get into the record as of this moment, the better I like it, from the standpoint of working out this arrangement we  are starting on here.

MR. SACHSE:  I believe I raised this either when Mr. Clark was here or at our last session, and that is that I am  certain no one would ask Fallbrook to accept an inferior right in a joint project to a right they would have under their own.  That will require, as I understand

19,981

California law two things:  It would require that we

obtain Water Rights Board approval to change our point of

diversion to the DeLuz site.  That is a must.  Our rights

are no good there today.  They have to be transferred

there.  And secondly, I am still of the opinion that, by

one device or another -- maybe this request would be ample

to do it -- but by one device or another --

        MR. VEEDER:  You are referring to the statement now?

        MR. SACHSE:  Yes. -- we have got to get a right in

the United States before the contract is feasible.

        I am not going to argue any further about the wisdom

or the lack of wisdom of the United States' filing.  Mr.

Veeder knows how I feel.  I think they ought to file. But

if, for their own reasons, they don't want to, this

statement he has worked up is the next best thing.  Sooner

or later, if Fallbrook is going into the DeLuz project,

there is going to have to be action before the Water

Rights Board.

        MR. VEEDER:  Well, I have no further comment.  As I

say, I hadn't given the matter thought.  I thought whatever

action transferring rights—involving participation between

Fallbrook and California to effectuate that transfer ~~with~~ would

be some kind of arrangement and agreement with the United

States.

        MR. SACHSE:  I think you might discuss this with Mr.

19,982

Craig, too, when you go up there.   Certainly it is a very practical question.

THE COURT:   It seems obvious to me that there would have to be some action by the Water Rights Board on somebody's application, if the United States wants to avail itself of the priorities and rights that Fallbrook has, plus the matter of the change of point of impoundment.   So this ought to be discussed with Mr. Craig.

MR. VEEDER:   That will certainly be our intention, your Honor.   I discussed the matter of an interview with Mr. Clark, and he, of course, is anxious to have this.   He is particularly pleased that California is going along as Mr. Girard has outlined.   I explained to him that Mr. Girard is going to contact the Attorney General Mosk on this matter and we will try and firm up the position of all parties.

Isn't that correct, Mr. Girard?

MR. GIRARD:   Yes, I will talk to the Attorney General probably tomorrow.   I anticipate that there will not be any problem as far as our office signing this.

MR. SACHSE:   Solely for my information, Mr. Veeder, I shall go ahead then with my Board on the assumption that Draft No. 2 as changed --

THE COURT:   Has there been a revision of Draft No. 2?

MR. GIRARD:   I think Mrs. Tooker is typing it now.   It

1    would be the same with the corrections made in court

2    yesterday.

3         MR. SACHSE: And with the new Paragraph X on the

4    subject of precedent.

5         MR. GIRARD:  Yes.

6         MR. SACHSE:  Then, Bill, am I right, is that draft,

7    as far as you know, basically acceptable to Mr. Clark?  I

8    want to be able to say to my Board that I think we have a

9    deal.

10        MR. VEEDER:  I will have to say this to you, Mr.

11   Sachse -- no equivocation in regard to it -- it is a matter

12   in regard to which I am in the same position as is Mr.

13   Girard.  I have to talk to Mr. Clark.  He is delighted that

14   there is agreement on it.  He has to see the form in its

15   final form, and I am quite in accord that he should.

16   Certainly this is the initial step.  It is a step that has

17   to be taken.  And I would suggest to you that you find out

18   from your Board its reaction to it in the present form.

19   If there are changes, you will certainly be advised.

20        MR. SACHSE:  I will expect to try to do it tomorrow.

21   The point is that I can perhaps tell you before you go to

22   Sacramento.

23        MR. VEEDER: All right, I think that will be all

24   right.

25        Has your Honor had any further reaction to this

course we are pursuing?

THE COURT:  No, I have nothing further to add.

MR. VEEDER:  Your letter of May 25th brought up some points, your Honor.  Do you want to proceed on that?

THE COURT:  We can.

MR. VEEDER:  I have tabulated a list of the parties who have signed.  Your Honor will see that there are a very substantial number of people who have signed agreements dating back to 1958 (Handing document to the Court).  That was a stipulation  limiting and settling rights to the use of water.  At the time this was entered into the procedure now being adhered to had not been thought of and had not been devised.  It occurred to us at that time that with the approval of the Court, by agreements in regard to using domestic water and limiting the use of that water to a half acre land, in accordance with California statute as to the meaning of domestic uses, we could work out settlements.  We did.  We worked out a great many of them.  However, the procedure changed, partly as a result of the taking of evidence by Mr. Cranston, who entered his findings, conclusions of law and recommended  decree.

I don't know what your Honor has in mind on this.  At one time we discussed whether we should simply ignore these arrangements that were entered into and embrace them all in interlocutory judgments -- in fact, a great many of

P-1

1     them are presently in interlocutory judgment.

2         MR. GIRARD:  That is what I want to know.  Are the

3     lands of some of those people who signed the agreement

4     described in the exhibits attached to some of the interlocutory

5     judgments?

6         MR. VEEDER:  Indeed they are.  You perhaps may not

7     recall, but I'm sure Mr. Sachse will, that on Interlocutory

8     Judgments Nos. 2 through 21 --

9         MR. SACHSE:  Yes.

10        MR. VEEDER:  -- we did include those, a great many of

11    them.  I don't know whether they are Mr. Sachse's clients

12    or not -- I have forgotten.  But anyhow we decided that it

13    would be better to have uniformity in the disposition of

14    these matters rather than have him write no decree in regard

15    to them.  And that is what it amounted to in the original

16    instance.

17        You have asked whether there should be some judgment

18    to pick up all of these loose ends.  I think it is essential

19    that some kind of over-all judgment relating particularly

20    to these Interlocutory Judgments No. 2 through 21, to the

21    end that any doubt as to the status of these offers of

22    settlement would be resolved and would also reflect the

23    fact that they are no different category, I would assume,

24    than any other person who did not sign the offer.

25        I would like to hear from Mr. Sachse, whatever his views

P-2

1    are.

2        MR. SACHSE:  I agree with Mr. Veeder that the practice

3    should be uniform.  To the best of my knowledge, no client

4    of mine signed the stipulation.  I advised against it.  And

5    I think we ought to, in substance, set aside any stipulation,

6    of course not until we are clear and certain that we have

7    included them in a judgment.  But I think ultimately, any

8    of these commitments should be thrown out.  I don't think it

9    is proper.  I think they should be taken care of under

10   the basic findings of the Court.  Most of these people will

11   be, I think, practically all of them, Bill, will be found

12   to be basement complex and vagrant local percolating, won't

13   they?  I don't know.

14       MR. VEEDER:  There are enough of them in the Murrieta

15   Temecula groundwater area so that I think we have --

16       MR. SACHSE:  That is another problem.  I was not thinking

17   of Murrieta.  I was thinking of Fallbrook Creek.

18       MR. VEEDER:  There are some up there.  We have a complete

19   inventory of them.

20       MR. SACHSE:  I think we ought to set these things

21   aside.

22       THE COURT:  On the Murrieta area, they have all been

23   picked up, I take it, within the groundwater area.

24       MR. VEEDER:  Yes, they are within the groundwater area.

25   Nevertheless, they do exist and there is a hiatus.

P-3

1    MR. SACHSE:  And they are covered in the findings

2    dealing with the Murrieta groundwater area.

3        MR. VEEDER:  Yes, they are.  Nevertheless, in Exhibits

4    A,B and C, the lands to be described are incorporated by

5    reference.

6        MR. STAHLMAN:  Then some of these would have a different

7    character of water right than they would have under the

8    stipulation, is that right?

9        MR. VEEDER: Yes, they would, and much to their prejudice.

10.      MR. STAHLMAN:  It wouldn't,however, be restricted or

11   diminish the right to which they stipulated, but it would

12   expand it.

13       MR. SACHSE:  I think so.

14       MR. VEEDER:  Yes.  Individual circumstances might vary.

15       MR. STAHLMAN:  I understand that.  But any of those

16   that were in areas that were not in basement complex, where

17   there may be some water, they would have an advantage under

18   the judgment, then, over what they had under the stipulation.

19       THE COURT:  Under the judgment they have their rights

20   under California law as domestic users, and they have such

21   other rights as might pertain to them.  I am talking about

22   the Murrieta.So the judgment gives them broader rights than

23   they have under the proposal.

24       I would suggest, first, as to the Murrieta situation --

25   I am assuming that you included all the parcels of land in

P-4

1     the judgment on the groundwater area.

2          MR. VEEDER:  Yes, indeed.

3          THE COURT:  That we draft a form letter and either

4     mail these things back to these people or advise them that

5     they will not be used and will be disregarded, and see what

6     suggestions you have on that, pointing out to them that

7     their rights under the judgment are more extensive than

8     their rights would be under this stipulation.

9          MR. STAHLMAN:  That is the thing.  Otherwise, you might

10    get an unwarranted reaction from them and cause confusion.

11         MR. VEEDER:  I think, in fairness to them -- here's

12    a man, some of them are as large as four acres -- I think

13    it would be totally unfair to that man.

14         THE COURT:  We are agreed on that.  What do we do?

15    Mail these back to them?  Stamp them "void"?  Destroy them?

16    Write them a letter?  How do we do this?  Let's talk about

17    the Murrieta.

18         MR. VEEDER:  I would like to express how I think we

19    could treat their status so that there will be no conflict

20    in regard to the law on this matter.  I think we would have

21    to treat them in sort of an interlocutory status even though

22    they signed the agreement -- in other words, I don't want

23    to be in the position of having somebody object to the

24    United States relinquishing any rights against those people.

25    My own view is that we should  relinquish.  Some  semicolon.

P-5

1   man might say, "You don't have power, under the circumstances,

2   to do so." I think we do, and I think we should.

3   I am going to recommend to my Department and I'm

4   going to proceed on the basis that they will agree to it,

5   that we will notify these people that these offers which

6   were made were not finally entered by the Court and that

7   their status has now been changed by reason of this

8   interlocutory and that unless we hear from them we will

9   agree to it.

10   MR. STAHLMAN:  This brings some people back into the

11   lawsuit when they thought they were out of the lawsuit.

12   MR. SACHSE:  That is right.

13   MR. GIRARD: Of course, that agreement doesn't get them

14   out of this lawsuit. As I understand it, everybody's

15   rights are against everybody else's. It is not just the

16   United States being a party and just because the United

17   States and they agree that their rights would be treated

18   a certain way doesn't affect their rights as far as, for

19   example, Vail Company is concerned. So that stipulation

20   doesn't get them out of this lawsuit legally. You have

21   about 300 small stipulated judgment problems where you have

22   an agreement with one water user on the stream which doesn't

23   bind anybody else.

24   MR. STAHLMAN:  But some of those people think they

25   are, by reason of the stipulation, out of the lawsuit, and

P-6  1  you are going to get a reaction up there.

2      MR. SACHSE:  I think George is right.

3      MR. GIRARD:  They may think they are out of it.

4      THE COURT:  Do you have one of those forms here?

5      MR. VEEDER:  Yes, your Honor.

6      THE COURT:  Let me see how they read.

7      MR. VEEDER:  I think California should write the letter.

8      THE COURT: Well, of course, it has a caveat in the

9  offer, "..The United States of America in making this offer

10  neither acts for nor purports to bind any cross-claimants

11  in this case."  So I think it is a matter of the kind of

12  letter we write them.

13      Let's pass that up.  Somebody put his hand to drafting

14  a letter, after you get authority to proceed.

15      MR. VEEDER:  I will, your Honor, and I will move on it.

16      THE COURT:  Now, the situation in the Fallbrook area

17  is different, however.  There are a lot of these people who

18  have not been included in any judgment at all, aren't there?

19      MR. SACHSE:  It is only different if that latter statement

20  is correct.  But I know, it is, Mr. Veeder, in this as it

21  has been in mine.  If we haven't succeeded, we do intend

22  to cover every landowner in the Fallbrook area sooner or later.

23  So then the situation will not be any different.  It will

24  be just the same.

25      MR. VEEDER:  Which brings us to the Master's Findings

P-7

1   and conclusions of law approved by the Court, in which the

2   Master made his recommendations in regard to all riparian

3   land.

4        MR. SACHSE:  Let's take one thing at a time.  In the

5   Fallbrook area he found everything to be vagrant, local,

6   percolating.  He found no riparian status, except at the

7   moment when the stream ran, and he said Fallbrook runs so

8   little that it could be disregarded.  That is the substance

9   of his findings.  He found all ground water to be vagrant,

10  local, percolating, even immediately under the surface of

11  Fallbrook Creek.

12       MR. VEEDER:  I am in full agreement.  But Mr. Sachse,

13  you will also note that he found that those in Exhibit A

14  attached which are identified with the letter R, are riparian

15  to Fallbrook Creek.

16       MR. SACHSE:  That is right.

17       MR. VEEDER:  It is true that he says it is local, vagrant,

18  percolating groundwater underlying.  Now, those parcels which

19  were marked R have not been included in this 2 through 21

20  series of interlocutories.  They have to be disposed of.

21       MR. SACHSE:  I was not aware of that.

22       MR. VEEDER:  That is the situation.

23       MR. SACHSE:  Then they must be disposed of.

24       MR. VEEDER:  That is right.  Because they are in a

25  different status.

P-8

1          THE COURT:  Were the parcels that overlay water that

2   was local, vagrant, percolating, included in judgments?

3          MR. VEEDER:  They are all in the 20 through 21 series,

4   your Honor.

5          MR. SACHSE:  Well, Bill, in other words, if the

6   Master found that all land on Fallbrook Creek was local,

7   vagrant, percolating, aren't they all in them now, even if

8   they abut on Fallbrook Creek?

9          MR. VEEDER:  I am not speaking of groundwater at all.

10  I'm speaking of those people on Fallbrook Creek, some of

11  whom have developments on Fallbrook Creek, even to the point

12  of having dams and reservoirs, which wouldn't be riparian,

13  of course.  I don't care what happens.

14         MR. SACHSE:  I certainly agree with you.  We had better

15  straighten it out.  I was not aware that problem existed.

16         MR. VEEDER:  It certainly exists, and it exists compounded

17  by reason of these numerous offers of settlement, which we

18  thought was a very pious idea at one time.

19         I have worked on this thing in an attempt to find

20  out how we would handle it.

21         MR. SACHSE:  I did a little work on it, too.  Let

22  me express my thought to you and the Court before we go

23  any further then.

24         This is as good a place as any, right on Fallbrook Creek.

25         It is my recollection -- I checked this, but I don't

P-9

1  have a copy of it -- in which you approved the Master's

2  findings.  It has the caveat in it that they are approved

3  in all respects in which they are not at variance with other

4  specific findings of the Court.

5      Now, I throw this out as a question, because this

6  problem arises with all of the Master's findings.  Mr. Cranston

7  took a somewhat different approach, as far as language is

8  concerned, than your Honor has done in the A series of

9  interlocutories.  Mr. Cranston pretty generally phrased it,

10  if I can paraphrase, to say that these people overly vagrant,

11  local, percolating waters not part of the stream's system

12  and therefore aren't here or don't belong here.  Isn't that

13  about the substance of it?

14      MR. VEEDER:  Yes.

15      MR. SACHSE:  And therefore no judgment was necessary,

16  because they are not part of the subject matter of the

17  litigation.

18      Now, your Honor, of course we have done it just the

19  opposite.  We have made very specific findings on them

20  and have quieted titles back and forth.

21      The point I'm getting at is the question, is that

22  minor variance taken care of?

23      MR. VEEDER:  We have argued that.  You have forgotten

24  it, I believe, Mr. Sachse.  We argued the effect of these

25  people being named defendants and Mr. Cranston coming along

P-10

1   and saying they don't seem to have any interest.  The

2   Court ruled on the basis of our suggestion, and I think

3   correctly, that even if a man doesn't have any right

4   presently, if he has filed an answer a decree should be

5   entered quieting title one against the other.

6       MR. SACHSE:  My only question is directed to his Honor's

7   inquiry of us, do we have to do anything?  It seems to

8   me it is not critical.

9       THE COURT:  The Master didn't draw any judgments.

10      MR. SACHSE:  That is right.

11      THE COURT:  He just drew findings and conclusions.

#2 fls
12

13

14

15

16

17

18

19

20

21

22

23

24

25

P-11
#2

1      THE COURT:  He just drew findings and conclusions.

2      MR. SACHSE:  So I think we could ignore trying to

3  correct all those things.

4      THE COURT:  All we have to do is to draw findings

5  and judgment where necessary to wind the thing up.

6      MR. SACHSE:  That is just what my conclusion is, in

7  response to your inquiry.  I think that all that has to

8  be done to tie us together here-- we can forget the Master's

9  findings and conclusions, but I think we should see that

10  a judgment is entered,covering all the people on whom the

11  Master made findings.  That is all it is going to take,

12  in my opinion.

13      MR. VEEDER:  If his Honor's judgment says that any

14  variance between this judgment and other interlocutory

15  judgments with the Master findings --

16      THE COURT:  Now, I have lost you.  Start over again.

17      MR. VEEDER:  I would think if you just put in a line

18  that as to any variances between the Master's findings

19  and conclusions and the interlocutory judgments that have

20  been entered the interlocutory judgments would be controlling,

21  then I think that does away with the problem, doesn't it?

22  Because you have the ultimate power to dispose of his findings.

23      THE COURT:  That doesn't do away with the problem

24  of getting the judgment entered.

25      MR. VEEDER:  I would put that in your judgment.

P-12

1      MR. GIRARD:  How much of a job is it to prepare a

2   judgment for those things?

3      MR. SACHSE:  I don't know about Murrieta's.  I think

4   they are all taken care of.  But as far as Fallbrook Creek

5   goes, it is not going to be anything of a job.

6      MR. VEEDER:  It is not going to be anything of a job.

7   All it would have to be is a decision as to what is to be

8   done.

9      THE COURT:  Let me look one of these over now.

10      I have just read over Judgment No. 2.  It does a pretty

11   good job, even to the extent of providing that we don't

12   adjudicate rights inter se between these people.  The

13   only thing that would disturb me a little bit -- and I

14   don't think it is pertinent or ever will be material --

15   is that in the preliminary part of it Judgment No. 2

16   provides:

17           "..defendants hereinafter named having disclaimed

18       any right, title or interest in and to rights to the

19       use of water of the Santa Margarita River..; this

20       Court having heard arguments of counsel and based

21       upon the record of the case, including the admissions

22       of the United States of America.."

23   I suppose there is a factual basis even apart from all that

24   matter for these findings and judgments.

25      MR. SACHSE:  Yes, your Honor.  But the reason for that

P-13

1    language, it is directly, definitely chargeable to my

2    tactic in the case -- every one of these in that first form

3    were based on requests for admissions which I have served

4    on the United States where I said, "Admit that my people

5    are not riparian and admit that they have no right in

6    the watershed and that their waters are only vagrant, local,

7    percolating," and the United States did so admit.  So, it

8    is a correct statement that there is a disclaimer by my

9    people in this particular case.

10         MR. STAHLMAN:  If my memory serves me correctly, I

11    think sometime early in the proceedings here, in the record,

12    when some of these people were here, there were statements

13    made to them to indicate that they were out of the lawsuit.

14         MR. SACHSE:  I'm not too worried about that, except

15    as a matter of public relations.

16         MR. VEEDER:  That is the big worry, and I think when

17    we start throwing a bomb at this point, --

18         THE COURT:  What people are you talking about now?

19         MR. SACHSE:  Frankly, your Honor, I don't think

20    we ought to write any letters to people who have signed

21    the offer of settlement or anything until this thing is

22    ready to be closed.  I don't see any point in rocking the

23    boat.  I don't think there is any need for it.  They

24    are not being hurt.  As a practical matter, this document

25    in the file doesn't injure them today.  I think it would be

P-14

1   a serious public relations error to start writing letters

2   and start more furor up there.  They will come storming

3   in with complaints and we will gain nothing by it.

4        MR. STAHLMAN:  I agree with that, knowing the temper

5   up there, that at the time the judgment is formalized they

6   be notified that their judgment is in, and let them go

7   from there.  It will work itself out then.

8        THE COURT:  We have lots of evidence in the record

9   about this Fallbrook area from the stream courses and the

10  basement complex and stringers of alluvium there are -- we

11  have all of that in the record, plus the Master's findings,

12  and I think it would be just a matter of pulling together

13  in the judgment these loose ends of these people.

14       MR. SACHSE:  That would be my thought, and say nothing

15  about it until it is done.

16       THE COURT:  Will you start work on that?

17       MR. VEEDER:  Yes, we will do it.  It is a matter

18  of checking a lot of descriptions, and that will be done,

19  your Honor, and we will make a simple form.  Do you think

20  we ought to have findings of fact and conclusions of law,

21  or just an all-embracing judgment referring to these

22  interlocutories that have been entered and the Master's

23  findings and conclusions?  Whatever you direct on that.

24  Let's try it for form and you look at it then.

25       THE COURT:  All right.

P-15

1     MR. SACHSE:  May I raise a question here.  Now, we

2  are fooling around with a lot of these loose fringes, and

3  this was one that has bothered me as a practical matter for

4  a long time.  What happens, Mr. Veeder -- just a practical

5  question -- where there have been these repeated property

6  ownership changes?  For example, you have an answer on file

7  from me as an individual covering land I haven't owned for

8  six years.  It may have gone through half a dozen hands.

9  Is your interlocutory judgment going to cover Sachse as

10  a defendant with a description of land that he no longer

11  owns.  I am not trying to make trouble.  I'm just curious.

12     MR. VEEDER:  This is quasi in rem and relates to the

13  land, Mr. Sachse.

14     MR. SACHSE:  So that it would appear in that fashion?

15     MR. VEEDER:  I think there is no other way.

16     MR. SACHSE:  I don't think there is.

17     Now, do you have any idea, based on your talks with

18  the title companies, how they are doing this?  Are they

19  indexing this as against the land all the way through?

20     MR. VEEDER:  That is correct.

21     MR. STAHLMAN:  You have recited that they are apparent

22  ownerships, anyway.

23     MR. VEEDER:  Yes.  However, as I said, quiet title is

24  quasi in rem.  It is charged against the land and it is

25  reflected by the title companies as against the land.

20,000

P-16

1    MR. SACHSE:  Then there is no need for us to make

2    any attempt to try to correct any ownership records.

3        MR. STAHLMAN:  The lis pendens was filed.

4        MR. VEEDER:  Yes.  We certainly could not keep up

5    with the myriad of transfers that have taken place since

6    April of 1958.

7        THE COURT:  Have you followed through with the

8    procedures you have worked out with the title companies?

9        MR. VEEDER:  The procedures we have worked out with

10   the title companies are very simple.  They simply say they

11   are taking cognizance of this litigation.

12       MR. SACHSE:  They are writing an exception on every

13   policy in the Fallbrook area.  It says at the bottom,

14   in substance, that this policy does not express any opinion

15   on whatever rights and duties are involved in United States

16   versus Fallbrook, No. 1247-SD-C, et cetera.

17       MR. VEEDER:  Anybody who is buying a tract of land

18   is notified by the title company.  That is all they are

19   doing.  They say they couldn't assume any further responsibility

20   on it.

21       MR. SACHSE:  Almost every week somebody comes in, some

22   newcomer, and asks me what this means.  So it is still

23   appearing.

24       MR. VEEDER:  And I think it will appear in perpetuity.

25       MR. SACHSE:  If your Honor wants to assign some work --

P-17

1   I don't want to volunteer to try to take on the Fallbrook

2   job, although it sounds like I should, but I'll be glad

3   to undertake any of the others where it is not necessary

4   to have such good maps and ownership records, et cetera.

5   For instance, if you want a judgment written on DeLuz Creek,

6   let's say, I will try my hand at it.  It shouldn't be

7   too difficult.

8      MR. VEEDER: I would recommend that we proceed along

9   that line, Mr. Sachse.  But I also think we should work

10   with you in regard to Fallbrook Creek, because you are

11   probably more acquainted with the situation than anybody.

12      MR. SACHSE:  Unless we start with an ownership plan,

13   and we don't have one.

14      MR. VEEDER:  We have it right in the office.  I would

15   like to see you go through it.

16      However, we will do it, your Honor, and we will come

17   up with a form for you.

18      THE COURT:  What progress have we made?  I am going

19   down the list of this agenda.  Judgments Nos. 39 and 39a

20   (Sandia).

21      MR. VEEDER:  That hasn't been finished yet.  We are

22   working on it, and that is all I can say, your Honor.  We

23   aren't through yet.  You see, there are areas affected by

24   the Master's judgment in which no judgment has been entered.

25      The answer to your question is yes.

P-18

1      MR. STAHLMAN: I would like at this point to say that I

2   think this Judgment No. 35a that he talked about for Vail,

3   which is the basement complex area, should be held up until

4   these out.

5      MR. VEEDER: There would be no sense in doing otherwise,

6   Mr. Stahlman, because at this juncture I will assure that

7   we are trying to bring together a whole series of interlocutory

8   judgments wherein the lands have been actually chopped up

9   by reason of the course which was pursued -- namely, subwater-

10  sheds.  It may be that when we get through we would be a

11  whole lot better off to have a single A series below the

12  gorge down to the Enclave, because I will assure that the

13  Office of Groundwater Resources in my office are in a

14  terrific dilemma in regard to land locations now.  It is

15  easy to say, "Well, why don't you get it done?"  I will

16  also say that I am more anxious probably than you are to

17  get it done.  But from the standpoint of checking out land

18  descriptions, it is a difficult job.

19     MR. SACHSE:  Before your Honor goes to this agenda,

20  and while we are still talking about the Master's findings,

21  I would like to point out to the Court -- I know Mr. Veeder

22  is well aware of this -- I think the most critical problem

23  confronting us -- it is going to take some real work, and

24  I don't know how to do it -- is in the Master's findings

25  that are entered on Rainbow Creek, plus the fact that we

P-19

1   have a number of Rainbow Creek people included in Judgments

2   Nos. 2 through 21.

3        MR. VEEDER: That is right.

4        MR. SACHSE:  Plus the fact that we have got a physical

5   situation on Rainbow Creek that may take a specific or

6   a separate kind of finding from what we have heretofore

7   entered.

8        Rainbow Creek, if your Honor recalls -- you have to

9   look at the map itself, but there is a big chunk of alluvium

10  that Rainbow Creek winds down through.  But the watershed

11  line is across here.  It is as flat as a billiard table.

12  It is very similar to Diamond and Domengoni Valley.

13       Now, we have some direct conflict in Rainbow Creek.

14  For example, I filed disclaimers, as Mr. Veeder calls them,

15  requests for admissions on a couple of my clients.  I can

16  name one right now offhand, Costello, where I asked in the

17  early days of this trial that the United States admit

18  that his lands were not riparian to any stream and that

19  the waters underlying them were vagrant, local, percolating.

20  The United States did.

21       Now, the Master has come in and said that Costello's

22  land, or we have the fact, let us say, that Costello's

23  land is over alluvium, and the Master has a finding determining

24  that Costello is riparian to Rainbow Creek.

25       We have some real foul-ups in that area.  I don't

P-20

1   know of any way to take care of that but to write a whole

2   new judgment for the Rainbow Creek area.

3       Am I not right, Bill?

4       MR. VEEDER:  That is right.

5       MR. SACHSE:  That is the real foul-up.  The rest of

6   them are going to be easy.  But that one isn't.

7       MR. VEEDER:  We have a situation where we are going

8   to have to go through and see if you and I can agree on the

9   facts, Mr. Sachse.

10      MR. SACHSE:  Yes.  We actually have Master's findings

11  that directly conflict with an interlocutory judgment

12  entered by this Court.

13      MR. VEEDER:  Do you have your Rainbow Creek?

14      MR. SACHSE:  I don't have the whole list.

15      MR. VEEDER:  I think the thing for you and me to do

16  in regard to your clients is to sit down and see if we

17  can work out a stipulation of fact and tender it to the

18  Court for the purpose of resolving this conflict.

19      MR. SACHSE:  But while we are here I think we ought to

20  go a step further.  We have been consistently following,

21  except for Diamond and Domengoni Valley, which isn't written

22  yet, we have been consistently following this alluvial riparian

23  relationship.  What are we going to do on Rainbow Creek?

24      MR. VEEDER:  That is not my idea, Mr. Sachse.

25      MR. SACHSE:  It is nobody's idea.  But this is a problem

P-21

1  we are going to have to face up to and try to take care

2  of it.

3      MR. VEEDER:  Are you going to change your Diamond

4  Domegoni to be that way?

5      MR. SACHSE:  No, because the Court has made a specific

6  finding in Diamond Domegoni also in regard to this basement

7  lip problem, which makes that difference.

8      MR. GIRARD:  It eliminates all the groundwaters down

9  below the lip.

10     MR. SACHSE:  As far as Diamond Domegoni Valley are

11 concerned, it eliminates all the groundwaters down below

12 the lip. But that situation doesn't exist in Rainbow.

13     MR. VEEDER:  Consistency may be the mark of a small

14 mind, but I assure we ought to have some consistency on

15 this particular point.

16     MR. SACHSE:  Then it is going to take a pretty carefully

17 drawn exhibit, it seems to me, a map of some kind, because

18 his Honor obviously isn't going to say that the bed and

19 banks of the Santa Margarita go into the San Luis Rey River

20 watershed.  He isn't going to say that.  So your bed and

21 bank is going to have to be the watershed line, which is

22 going to have to be some kind of carefully delineated line

23 on a map or someplace.

24     MR. VEEDER:  We can kick this around all day and we will

25

20,006

P-22

1    get noplace.  I would think if we adjourn sometime this

2    afternoon, you and I should work out something toward

3    this stipulation.  I don't believe we can handle it otherwise.

4        MR. GIRARD:  I don't agree.  I think the only way we

5    ever made progress in these findings is for somebody to

6    draft up a complete set of findings and iron them out word

7    by word.

8        MR. VEEDER:  All right.

9        THE COURT:  More than that, you can't get a stipulation

10   from Mr. Sachse except as to the people he represents, and

11   there are a lot of people he doesn't represent.

12       MR. VEEDER:  It suits me, your Honor.  Let's get

13   a complete set of findings for Rainbow and be done with

14   it then.

15       MR. SACHSE:  If I'm going to go to work, what am

16   I going to do?  What is the desire of the Court and counsel

17   as to how we handle the watershed line?

18       THE COURT:  I think it is very simple.  We are just

19   going to have to find that it is an alluvial basin across

20   the edges of both watersheds and that these people have

21   overlying rights over it and their rights are correlative,

22   and we don't cross the bridge as to what would happen in

23   a dispute.

24       MR. SACHSE:  We make no finding at this time, as to

25   whether the direction of groundwater movement today is from

P-23

1    San Luis Rey to Santa Margarita or vice versa.  We don't

2    know.

3       THE COURT:  Nor do we attempt to adjudicate rights

4    of the people that lie outside our watershed line in future

5    litigation in that basin that would involve people in both

6    watersheds regardless of your watershed line.  I would

7    think that those people have correlative rights there.  I

8    don't think the fellow on the San Luis Rey side has a right

9    to pull all the water from the Santa Margarita side, and

10   vice versa.

11      MR. SACHSE:  It is just a question of draftsmanship,

12   because I don't think there is the most remote possibility

13   of there ever being litigation in Rainbow Basin.  Water

14   is probably coming up instead of going down.  It is getting

15   into such small holdings that people don't pump anymore.

16      THE COURT:  Do you want to start work on that?

17      MR. SACHSE:  I'll try it.

18      MR. VEEDER:  And you are going to follow along generally

19   at least on what the Master has done, is that correct?

20      MR. SACHSE:  Yes. And I think, Bill, on some of these

21   people's mind, we are going to have to just set aside and

22   stipulate aside the previous judgment that says they had

23   no rights on the stream.

24      MR. VEEDER:  I am perfectly willing to consider it,

25   Mr. Sachse.

P-24

THE COURT:  What about the amendment to Judgment No. 30? We have never acted on that.  That is Mr. Sachse's proposed amendment.

MR. VEEDER:  I thought that hand been tendered.

MR. SACHSE:  I didn't bring my copy.  I thought it had been okayed.

THE COURT:  We suggested some change in it.  I don't know whether it was revised.

MR. VEEDER:  That was in regard to the 480,000 acre feet capacity?

MR. SACHSE:  That is right.

MR. GIRARD:  It was covered in the Vail findings.

MR. VEEDER:  We simply reserved our right to make general objections to everything.

MR. SACHSE:  I haven't my copy.

MR. GIRARD:  It is Finding No. 80 in the Vail findings.

THE COURT: It has never been redrafted along the line of the suggestions I made.  I will get mine after the recess. Maybe we can have it drawn up.  One of the objections I had was that this finding as made, stated that I find that certain exhibits state.  I want to find the facts.

MR. SACHSE:  I recall now, your Honor.

THE COURT:  I will get my copy at the recess and we will see if we can revise this.

MR. STAHLMAN:  Does your Honor have Finding No. 80?

P-25

1   It is the same thing.  In other words, we had discussed

2   what to do with the Murrieta finding regarding these groundwater

3   areas within the Murrieta, and we took the language and

4   put it in the Vail finding, which we assumed would be the

5   same language.

3 fls    6           THE COURT:  How does it read in the Vail findings?

7           MR. STAHLMAN:  It reads:

8               "That Vail Company lands overly a portion of the

9       Murrieta-Temecula Groundwater Area described in Findings

10      of Fact and Interlocutory Judgment No. 30.  That U.S.

11      Exhibits 17 and 18 to which the Court gives credence

12      show that in a lesser area included entirely within

13      the groundwater area there are 418,000 acre feet of

14      groundwater contained in those alluvial deposits."

15          THE COURT:  The language that the Court gives credence

16  is along the line of finding so and so, but I have some

17  language very similar to that and I will get it at the

18  recess.

19          What about Warm Springs and Domengoni Valley?  Where

20  are we on that?

21          MR. SACHSE:  I don't want to pick on Mr. Veeder.

22          MR. VEEDER:  You don't need to pick on Mr. Veeder.  I

23  wrote you last and told you it was not in conformity with

24  other findings and if you want to change it let me know,

25  and you didn't do it.

P-RMX 26

1     MR. SACHSE:  It didn't have an exhibit.  I can't write

2     the exhibit, Mr. Veeder.  You have to write it.  That's

3     all it takes.

4     MR. VEEDER:  You realize what it says, Mr. Sachse.

5     It says that attached hereto is an exhibit -- this is your

6     langauge-- showing the smallest parcel of land in a chain

7     of title.  I brought that to your attention.  I thought you

8     would like to drop it out.  You can leave it in if you want

9     to.  But I really didn't know it had such a bomb in it.

10     MR. SACHSE:  That same language has been written in

11     every judgment.  If you want to take it out of Warm Springs

12     Creek, its your language.

13     MR. VEEDER:  We can follow through on it.

14     MR. SACHSE:  I can't write the exhibit.

15     MR. VEEDER:  We will do it for you.

16     MR. SACHSE:  The judgment is written, the findings

17     of fact and conclusions of law are written.

18     THE COURT:  What is the problem?  Isn't this the

19     language you have used in other judgments?

20     MR. VEEDER:  We don't have this one exhibit referred

21     to in your Diamond Domengoni.  We will revise it, we will

22     refer to it, we will incorporate it, and that will be done,

23     Mr. Sachse.  Commander Redd just told me he will undertake

24     it himself.

25     THE COURT:  Answer my question, please.  Hasn't this

P-27

1    same language been used?

2        MR. VEEDER:   It has been used, your Honor, but there

3    was one exhibit that was not incorporated in the Diamond

4    Domengoni findings.

5        THE COURT:   But that same exhibit has been made for

6    other sets of findings.

7        MR. VEEDER:   That is correct, your Honor, and that

8    is the situation.   We will straighten that out and that

9    will be done.

10       THE COURT:   We have been talking about postponing

11   35a.

12       MR. VEEDER:   Yes.

13       MR. SACHSE:   Yes.

14       THE COURT:   What about the Aguanga?

15       MR. VEEDER:   That was tendered sometime ago.  Mr. Girard

16   apparently can't find his copy.   I am having a copy

17   reproduced for him.

18       MR. GIRARD:   Is that the one where you tendered, in

19   those findings that you tendered, did you treat the groundwater

20   as held by the Court or as contended by you?

21       MR. VEEDER:   I treated those as contended by me, and

22   we are going to have to, I assume, we will change them so

23   that we will have the contact between the younger and the

24   older alluvium.   There are about 60 pages there, Mr. Sachse,

25   and Mr. Girard.

P-28

1    I have given you the Indian findings.

2    MR. GIRARD:  I have the Indian findings.

3    MR. SACHSE:  I took time out to do a little work

4    on those.  I would just as soon do a little work on those.

5    MR. VEEDER:  I would just as soon have some comment

6    on those.  We can go ahead on those.

7    THE COURT:  Are they going to be a separate set of

8    findings?

9    MR. VEEDER:  Yes, your Honor, the Ramona-Coahuila-Pechanga

10   Indian findings for the whole watershed.  I thought that

11   was what you desired.

12   THE COURT:  We can do that after the recess.

13   Isn't there also an area -- well, the Anza Valley

14   on down.  What is that -- Wilson Creek?

15   MR. VEEDER:  There has been lodged a set of findings

16   captioned --

17   MR. GIRARD:  In June, 1961, I lodged some findings,

18   conclusions of law et cetera pertaining to Anza and Coahuila.

19   These are going to be incorporated into Mr. Veeder's

20   over-all findings on Wilson Creek.

21   Is that right, Bill?

22   MR. VEEDER:  This is the caption that was set up on

23   Anza Valley-Coahuila Valley-Wilson Creek Groundwater Basins

24   in that drainage area above Aguanga Groundwater area.

25   THE COURT:  What is the date of that set?

P-29

1     MR. VEEDER:  January 17th.

2     THE COURT:  And you have served those?

3     MR. VEEDER:  Yes, that is correct.

4     I will have another rerun on these, if you want me

5 to do that.  Do you have a copy of these, Mr. Sachse?

6     MR. SACHSE:  Which one?

7     MR. STAHLMAN:  Anza-Coahuila.

8     MR. GIRARD:  I must have lost it.

9     MR. SACHSE: I don't have them here.

10    THE COURT: Did we assign a number to it?

11    MR. GIRARD:  You didn't refer to a number in your

12 Indian findings where you referred to that.  So I presume

13 no number has been assigned to it.

14    MR. VEEDER:  No, there has been no number as yet on

15 those.

16    MR. WILKINSON:  What is No. 33, Wilson-Coahuila?

17    MR. VEEDER:  Probably it would be 33, Mr. Girard.

18    THE COURT:  Isn't it the Wilson Creek-Coahuila?  That

19 33a is the vagrant.  Wouldn't it be 33 then?

20    MR. VEEDER:  That is what I say.

21    THE COURT:  That would be Anza Valley down to the

22 groundwater.

23    MR. VEEDER:  Anza Valley, Wilson Creek and groundwater

24 basins in that area.

25    MR. GIRARD:  Down to the cutoff with Interlocutory

P-30

1   Judgment No. 30.

2       MR. VEEDER:  No, it would be down to the cutoff of the

3   Aguanga groundwater area.

4       THE COURT:  34 is the groundwater area of Aguanga.

5       MR. VEEDER: No, I don't believe that has been assigned

6   a number, your Honor.

7       THE COURT:  What has not been assigned a number?

8       MR. VEEDER:  The Aguanga groundwater area has not

9   been assigned a number.

10      THE COURT:  34.

11      MR. VEEDER:  Has it?

12      MR. SACHSE:  Yes.

13      THE COURT: And 34a is Temecula above Vail Dam basement

14   complex.

15      MR. VEEDER:  You have Temecula Creek subwatershed

16   above Vail Dam.  Are you going to have that combined for

17   the Aguanga groundwater area?  It makes no difference to

18   me.

19      THE COURT:  Take a recess.

20      (Recess taken)

21      THE COURT:  Did I hear you say that you have to get

22   a new number for Aguanga?

23      MR. VEEDER:  I think it is desirable, your Honor.

24      THE COURT:  Why?

25      MR. VEEDER: Because if we are going to treat the

P-31

1   groundwater area separately, as we treated Murrieta groundwater

2   area separately from the stream system, and that, I think,

3   would call for another number for the Aguanga groundwater

4   area, and then give Temecula Creek above Vail Dam a number,

5   and Coahuila and Wilson Creek and Anza Valley a number.

6       MR. STAHLMAN:  Why take it above Vail Dam?

7       MR. VEEDER:  Or above Aguanga groundwater area then.

8       MR. STAHLMAN:  Yes.

9       MR. VEEDER:  All right, let's do it that way.

10      THE COURT:  Let's see if we are all agreed.  No. 33

11   is Anza Valley-Wilson Creek-Coahuila down to the groundwater

12   area.

13      MR. VEEDER: No, down to the Aguanga groundwater area.

14      THE COURT: Yes.

15   Then 33a will be the same area, basement complex.

16      MR. VEEDER:  That is correct.

17      THE COURT:  That has already been filed.

18      MR. VEEDER:  That has been entered.

19      THE COURT:  Yes.

20   Then 34 will be Temecula Creek down to the Aguanga

21   groundwater area.

22      MR. VEEDER:  Above Aguanga groundwater area rather

23   than above Vail Dam.

24      THE COURT: All right.  Temecula Creek above the

25   Aguanga groundwater area.

P-32

1    MR. SACHSE:  That is 34 now, you say?

2    THE COURT: That is 34.

3    Then 34a, which is already filed, is the basement

4    complex.

5    MR. VEEDER:  That creates no problems.

6    THE COURT:  All right.

7    MR. SACHSE:  Give me a number again for your Aguanga

8    groundwater area.

9    THE COURT:  We haven't got a number.  So this would

10   be, I take it, the next number -- we haven't assigned it --

11   this 40 would be the Aguanga groundwater area.

12   MR. VEEDER:  That is right.

13   And while we are at it, there has been some discussion

14   in regard to whether the Indians should be treated separately.

15   If the Indians are not treated separately, I assume their

16   interlocutory judgment would be No. 41 then, wouldn't it?

17   THE COURT:  Temporarily, give the Indians this No. 41.

18   We will have a handle.  The Indian findings will temporarily

19   be No. 41.

20   I have a 38a, Temecula Creek subwatershed below Vail

21   Dam above the gorge.  That has already been entered.

22   MR. VEEDER:  That is right.

23   THE COURT: Excluding the groundwater area.

24   What is 38?  Is there any 38?

25   MR. SACHSE:  That is Temecula Creek below Vail Dam

P-33

1  not in the groundwater area.

2      MR. VEEDER: That should be taken care of on 35.

3      THE COURT: There is no Temecula Creek below Vail

4  Dam.

5      MR. SACHSE:  Santa Margarita River, I mean, below

6  Vail Dam.

7      MR. VEEDER: No.

8      MR. STAHLMAN: No.

9      MR. VEEDER:  No, I think, Franz, that 38a should be

10  38, I assume.  Temecula Creek below Vail Dam and down to

11  the gorge is in 35, is it not?

12      MR. STAHLMAN:  Yes.

13      MR. SACHSE:  So 35 and 35a will take care of it then?

14      MR. VEEDER:  That is right.

15      THE COURT:  So we just won't have anything for 38.

16  It will be a blank.

17      MR. STAHLMAN: What is the number of that one for

18  Vail property down to the gorge?

19      MR. VEEDER:  That would be 39.

20      MR. STAHLMAN:  Yes.

21      THE COURT:  We may never have a 38.

22      MR. VEEDER:  Because it is unique, your Honor.

23      THE COURT:  Yes, because the groundwater area took

24  part of this.

25      MR. VEEDER:  That is right, and Temecula Creek below

P-34

1    Vail Dam runs on Vail property throughout.

2         THE COURT:  Now, let's see if we can get this amendment

3    to Judgment No. 30 out of the way.

4         MR. GIRARD:  I made a couple of corrections on my copy.

5         THE COURT:  Struck the "r" after 18.

6         MR. GIRARD:  Yes, after 18, you could either cross

7    out the "r" or say "is located."  I think cross out the

8    "r" is just as good.

9         THE COURT:  And it should be "comprising" instead of

10   "comprise".

11        MR. SACHSE:  I think it needs a verb somehow.  I don't

12   find one.  You want to say that it contains groundwater

13   storage units, don't you?  "..comprising only a portion

14   thereof are groundwater storage units.."

15        THE COURT:  "The Court finds that the land area" --

16   this is the subject -- "shown on Exhibit 17 and 18 lying

17   wholly within the groundwater area are groundwater storage

18   units."

19        MR. GIRARD:  I had a suggestion, your Honor, so it

20   would read this way:

21             "Evidence offered by the United States of

22        America contained in U.S. Exhibits 17 and 18 of these

23        proceedings shows and the Court finds, that the land

24        area shown on Exhibits 17 and 18 is located wholly

25        within the Murrieta-Temecula groundwater area but

P-35

1    comprises only a portion thereof and the alluvial deposits

2    within this land area contain approximately 418 thousand

3    acre feet of water."

4    THE COURT:  All right.

5    MR. VEEDER:  Would someone please read for me down

6    to the first comma of that -- "However, evidence offered.."

7    Have you made any changes on that yet?

8    THE COURT:  What do you want read to you?

9    MR. VEEDER:  I was wondering.  Your Honor says, "However,

10   evidence offered by the United States of America and contained

11   in U.S. Exhibits 17 and 18 of these proceedings.."  Now

12   there is a lot of oral testimony that went into that in

13   regard to the depth of the alluvium, et cetera.

14   THE COURT:  Let's say, "Evidence offered by the United

15   States of America and United States Exhibits 17 and 18.."

16   MR. GIRARD:  All right.

17   MR. VEEDER:  I think that is unfair, because I know

18   there is a great deal more.

19   MR. STAHLMAN:  I think it would clarify it better,

20   in the third from the last line:

21          "..but comprise only a small portion thereof."

22   And then strike out "are" and insert "shown as Groundwater

23   storage units."

24   THE COURT:  Mr. Girard's proposal takes care of that.

25   Go back and read what you have and follow along.

P-36

1    MR. GIRARD:  "However, evidence offered by the United

2    States of America and United States' Exhibits 17 and

3    18 of these proceedings show, and the Court finds,

4    that the land area shown on Exhibits 17 and 18 is

5    located wholly within the Murrieta-Temecula groundwater

6    area but comprises only a portion thereof" and then

7    strike the rest of that language and say,

8    "and the alluvial deposits within this land area

9    contain approximately 418 thousand acre feet of water."

10    MR. STAHLMAN:  That is not quite clear.

11    "..and the alluvial deposits within the areas

12    designated as storage units.."

13    MR. GIRARD:  Well, it is alluvial deposits within this

14    land area, which is Exhibits 17 and 18.

15    MR. STAHLMAN:  No, 17 and 18 is other lands, and the

16    storage units are demarked within there.  We are only talking

17    about the area demarked within the storage units as shown

18    on the map.

19    MR. GIRARD:  "..the designated groundwater storage units.."

20    MR. SACHSE:  Instead of "this land area."

21    MR. STAHLMAN:  There was only these areas here shown

22    as storage units, and then this ties in with 18.

23    THE COURT:  What does 18 show -- much the same?

24    MR. STAHLMAN:  No, 18 shows the amount of water.

25    MR. SACHSE:  18 is the tabulation.

P-37

1     MR. VEEDER:  This is 17 here.

2     MR. STAHLMAN:  As a matter of fact, you could further

3 than that clarify it, and say "as shown in Storage Units

4 1, 2, 3, 4 and 5."

5     THE COURT:  Well, leave out 5; 5 concerns Aguanga.

6     MR. STAHLMAN:  1,2,3 and 4.  And then you could come

7 to 18 -- 1,2,3 and 4.

8     THE COURT:  You are going to have to insert there, about

9 the third line, Mr. Girard, that "Storage Units 1,2, 3 and

10 4 within the or shown on." Strike "land area."

11     MR. STAHLMAN: And here is the legend which applies

12 there, the legend shown on Exhibit 17:  "Boundary of ground-

13 water storage unit.  The number refers to storage unit and

14 tabulation of groundwater storage capacity."

15     THE COURT:  Have you got something worked out now?

16     MR. GIRARD: Yes, I think it would read this way:

17       "However, evidence offered by the United States

18     of America and U.S. Exhibits 17 and 18 of these

19     proceedings shows, and the Court finds, that Storage

20     Units 1,2,3 and 4, as shown on Exhibit 17 and 18,

21     located wholly within the Murrieta-Temecula groundwater

22     area but comprising only a portion thereof, contain

23     approximately 418 thousand acre feet of water."

24     THE COURT: That is all right as far as it goes.  Maybe

25 that is as far as we should go.  We took out "usable."

P-38

1   But, looking at this exhibit and these calculations, groundwater

2   in storage, they gave the thickness of the uppermost

3   water zone.   Then this is groundwater storage.   That's all

4   right with me.

5        Does that suit everybody?

6   MR. GIRARD:  Yes, sir.

7   MR. STAHLMAN:  Agreeable with me.

8   MR. GIRARD:  Where are we going to put these in these

9   Murrieta findings, by the way?

10   THE COURT:  Here's your original.

11   MR. SACHSE:  Where did I have it in there.  Finding of

12   Fact No. 49 is unended by adding an additional sentence.  I

13   will redraft it, your Honor.

14   MR. VEEDER:  You are going to submit copies.

15   MR. SACHSE:  Yes.

16   MR. VEEDER:  I want to be sure what language is used.

17   THE COURT:  We have taken care of that.

18   Now, what do you want to do?  Start on these Indian

19   findings?  Have you had a chance to look them over?

20   MR. VEEDER:  Yes, we have looked at them.  I have

21   talked with Mr. Girard in regard to them.  I find that there

22   have been some duplications in land descriptions on page 6.

23   There have been some references to Township 7 rather than

24   Township 6 and vice versa.  Those corrections will be made

25   in the land descriptions.

P-39

1      MR. GIRARD:  Do you want to go through these one by one,

2  your Honor?

3      MR. VEEDER:  The question has been raised as to whether

4  these should be separate or not.

5      I think, Mr. Sachse, if we were to make these separate

6  now, it would be necessary to incorporate at least part of

7  them into the Murrieta groundwater area.

8      MR. SACHSE:  It doesn't matter to me.

9      MR. VEEDER:  While those land descriptions are in the

10  exhibits, there is no specific finding in regard to the

11  Indians.

12      MR. GIRARD:  There is a specific finding that says,

13  the rights of the Pechanga Indians will be covered in other

14  judgments.

15      MR. VEEDER:  That is right, because part of the land

16  description is in Exhibits 77 and 77a.

17      MR. GIRARD:  The only comment I have on the first page,

18  just more or less one to avoid confusion, where the reference

19  is to Temecula Canyon, so that no one will get that confused

20  with Temecula Gorge, I think you ought to refer to the

21  section number.

22      MR. VEEDER:  When you say Temecula Gorge, what do

23  you refer to, Mr. Girard?  I think Temecula Canyon is the

24  official designation of where Santa Margarita River flows.

25      MR. GIRARD:  When you say here "at a point immediately

P-40

1   east of Temecula Canyon," what are you talking about?

2        THE COURT:  He is talking about Temecula Gorge.

3        MR. VEEDER:  It is designated Temecula Canyon.

4        THE COURT:  That is what he is talking about, the

5   gorge.

6        MR. VEEDER:  It is the same thing.  I believe the

7   official designation is "canyon".

8        MR. WILKINSON:  Temecula Gorge, Railroad Canyon, Temecula

9   Canyon are all the same place.

10       MR. SACHSE:  Where are they?

11       MR. WILKINSON:  Just below the confluence of the

12   Murrieta and Temecula.

13       MR. SACHSE:  Then this is certainly not right, in

14   Temecula Canyon.

15       MR. VEEDER:  Immediately east of Temecula Canyon.

16       THE COURT:  This may not be necessary.  Coahuila Creek

17   is a tributary of Wilson Creek, which, in turn, is a tributary

18   of Murrieta Creek.

19       MR. VEEDER:  That is right.

20       MR. SACHSE:  That is all we have to say.  Why say anything

21   about the canyon?

22       MR. VEEDER:  All right, it makes no difference to me.

23   Take it out.

24       THE COURT:  You say "all as fully found."  What judgment

25   are you going to refer to?

P-41

1   MR. VEEDER:  I think it would probably be in 30.

2   MR. GIRARD:  I don't think 30 has any reference to

3   Coahuila Creek.

4   MR. VEEDER:  No, I am talking about where --

5   THE COURT: He is talking about the stuff we took out.

6   What we struck out is what you are referring to, in

7   another judgment, isn't that right?

8   MR. VEEDER:  That is right.  Take it out, then.

9   MR. SACHSE:  What are you taking out?

10  THE COURT:  Everything after Murrieta Creek on line 27.

11  MR. SACHSE:  All right.

12  THE COURT:  Do you have another finding somewhere of

13  the section number where it joins Murrieta Creek?

14  MR. GIRARD:  I can tell you where it did, yes, your

15  Honor.

16  MR. VEEDER:  Isn't it Projected Section 18?

17  MR. SACHSE:  I think all you have to say is that

18  Coahuila Creek is a tributary of Wilson Creek, tributary

19  of Temecula Creek and part of the Santa Margarita River.

20  MR. VEEDER:  Do that and you can strike out the last

21  three lines.

22  THE COURT:  All right.

23  MR. VEEDER:  In regard to the legal descriptions, I

24  am simply going to have to refer this to the Indian Service

25  in Sacramento to have all of the descriptions taken out.

P-42

#4

1    There will be no other changes.

2         THE COURT:   On Finding No. 2 you have the Anza

3    Groundwater Basin.

4         MR. GIRARD:   I had comment on line 3, page 2, your

5    Honor.  After the word "flows" I would add "except for

6    extremely limited areas."  As I understand it, there is

7    some yearly flow in some parts of Coahuila Creek.

8         MR. SACHSE:   You mean subterranean flow in some places.

9         MR. GIRARD:   Yes -- according to Sandy, at least.

10        MR. STAHLMAN:   Colonel Bowen testified to some of it.

11        THE COURT:   We haven't any findings yet on Anza

12   Groundwater Basin, have we?

13        MR. VEEDER:   That is right.  But, there is certainly

14   a basin up there, your Honor.  You remember Dr. Mann

15   testified very extensively on it.  I think the basin will

16   be governed by the alluvial deposits that are shown on there

17   and concerning which Dr. Mann testified and concerning

18   which the State testified and concerning which we had

19   testimony.

20        MR. SACHSE:   That is the same problem we have at

21   Rainbow.  It slops over into the watershed again.  It is

22   a question of which way it drains.

23        MR. VEEDER:   It goes out Terwilliger Valley.

24        MR. SACHSE:   The question I had in connection with this

25   is that it is really impossible to comment on 2 until we

P-43

1  know what the more fully described description of Anza Groundwater

2  Basin is going to be...

3      MR. VEEDER : Why don't you just hold it in abeyance

4  and let us get the Court to make the finding on Anza Basin.

5      MR. GIRARD: What we are talking about on Finding No. 2

6  is the surface flow of Coahuila Creek.

7      MR. VEEDER: That is right.

8      MR. GIRARD: So, instead of saying "Anza Groundwater

9  Basin" why don't you just say "Anza Valley"?

10     MR. VEEDER: To avoid any conflict, why don't we just

11 drop out where it enters Ramona Indian Reservation, after

12 the word "section" in line 10?  That will probably save

13 time.

14     THE COURT: All right.

15     MR. SACHSE: Stop with "section"?

16     MR. VEEDER: That is right.

17     MR. SACHSE: That will do it.

18     THE COURT: All right.

19     MR. SACHSE: Then you would make the change on line 25.

20     MR. VEEDER: Well, are you satisfied with 3?

21     MR. SACHSE: I have no comment on 3.

22     MR. VEEDER: Those descriptions have to check out.

23     MR. GIRARD: I have no comment.

24     MR. SACHSE: On line 25, Finding No. 4 again refers

25 to the basin.

P-44

1    MR. GIRARD:  Anza Valley, I think, is the easiest way.

2    MR. VEEDER:  It suits me as long as that other finding

3    has been made.  It continues on across Anza Valley.

4    MR. GIRARD:  Yes.

5    THE COURT: And then strike out "as fully described..".

6    MR. VEEDER:  Down to "and proceeds"?

7    THE COURT: Yes.

8    MR. GIRARD:  On Finding No. 5, again, I don't see

9    any point to the reference, I would say just stop with

10   "place".

11   MR. VEEDER:  The fact is, there is probably not a

12   need for Finding No. 5, in view of the fact that we have

13   already said it was intermittent.

14   MR. GIRARD:  Yes.

15   MR. VEEDER:  Finding No. 1.  I think you can delete

16   Finding No. 5.

17   THE COURT:  The next one will become 5, then.

18   MR. VEEDER:  That is right.

19   In regard to that unnamed creek, your Honor, as I

20   pointed out to Mr. Girard, I put it in there because it

21   makes sense in connection with Dr. Mann's testimony, which

22   was introduced in regard to the Hamilton property.  He said

23   that that lower aquifer was recharged by an unnamed creek.

24   MR. STAHLMAN:  Do you think we ought to give it a name?

25   MR. VEEDER:  I think we ought to call it Stahlman Creek.

P-45

1   MR. STAHLMAN:  Is it larger than the other one, or

2 smaller?

3   MR. VEEDER:  No, the unnamed creek on Vail's is a

4 torrent, man.

5   MR. SACHSE:  My only thought was, -- you have partly

6 answered it, Mr. Veeder -- we just pick this one unnamed

7 creek, and I don't find anything about this creek later on.

8   MR. VEEDER:  You will when you get down to the source

9 or recharge for this subterranean deal, Mr. Sachse.

10   MR. SACHSE:  Okay.

11   MR. VEEDER:  You can take it out, if you want to.

12   MR. SACHSE:  No.

13   MR. VEEDER:  I don't believe it lends anything to

14 the Indians.  It lends some sense to the geology introduced

15 by Dr. Mann.

16   MR. SACHSE:  But in the next sentence you say it

17 constitutes a source of recharge.  Why pick just this one?

18   MR. VEEDER:  Because Coahuila Creek itself is part

19 of the source of recharge, Mr. Sachse.

20   MR. SACHSE:  And is the word "from" correct in 7?

21   THE COURT:  It should be 6, anyhow.

22   MR. SACHSE:  Yes, 6.  Is the word "from" correct, in

23 line 21?  "..a source of recharge from the Anza Groundwater

24 Basin.."

25   MR. VEEDER:  That should be "to".

P-46

1    MR. GIRARD :  Is this unnamed creek one of the Thomas

2    mountain area?

3    MR. VEEDER:  Yes, it is. It drains off the Thomas

4    mountain area right across Ramona Indian reservation, as

5    nearly as our maps show.  Bear in mind, those maps up

6    there are very poor.

7    THE COURT:  You have Anza Groundwater Basin again.

8    MR. VEEDER:  Just change that to Valley.

9    MR. SACHSE:  If you are talking about recharge, you

10   have to talk about basin.

11   MR. VEEDER:  Your basin is certainly there, because

12   Dr. Mann depicted it in there.

13   I am going to take an adjournment.  You gentlemen

14   can work on it for a while.  I will let you go until about

15   12:15 or 12:30, and come on back and do some work here.

16   MR. SACHSE:  Has your Honor definitely determined

17   not to continue tomorrow?  I have to phone relative to

18   another appointment.

19   THE COURT:  All right, it will be agreeable.

20   MR. SACHSE:  We will not work, or we will?

21   THE COURT:  We will not.

22   MR. VEEDER: We will not.  Have you any thought about

23   this afternoon's adjournment?

24   THE COURT:  Suit yourselves.

25   MR. SACHSE:  I would like to get this thing done, if

P-47

1    we can.  Let's go as far as we can with this, Bill.

2        MR. VEEDER:  I was simply making an inquiry.  I want

3    to get this Indian thing done so that I can get it in shape.

4        THE COURT:  Be back at 2:00.  If you want to come

5    back earlier and go to work, it's all right with me.  I

6    am going to a rotary meeting.

7            (Whereupon, at 12:00 p.m., a recess was taken until)
8            (                                                    )
             (2:00 p.m. of the same date.                        )

9

10                              o0Oo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P-48

SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 14, 1962, 2:00 P.M.

----

THE COURT:  Mr. Girard, you might check up on this, but I understand through one of my official friends that the Forestry Service, Department of Agriculture, just made filings with the State of California.

MR. GIRARD:  They make a hundred of them a month, your Honor.  I can supply you a hundred of them, if you want to know that.

THE COURT:  Or a number of them with the State Water Rights Board.

MR. VEEDER:  Of what significance is that?

THE COURT:  Some Governmental agencies, apparently, don't gag as much as others do on this matter of merely pro forma complying with the state requirement in asking permits.

MR. GIRARD:  The Forest Service has always, in every instance, got what they asked for.

MR. VEEDER:  May I say this, that the Forest Service, if they were to follow through sensibly, would lose a great deal of water, because if they were to follow through on the basis of California law, they would be in the position of losing water for the United States of America.  Fortunately, they don't make too many filings in relation to the quantity of water that is available.  So they make these mistakes

P-49

1    quite frequently and many times we have to correct them.

2         Are we on the record on all of this?

3         THE COURT:  I suppose we were.  I noticed the use

4    of the word "mistake."

5         MR. VEEDER:  It is an error for them to file.

6         THE COURT:  What is Mr. Wilkinson doing?

7         MR. VEEDER: He is drawing a picture, your Honor.

8         MR. SACHSE:  We have got a head-on conflict on what

9    the facts are.

10        MR. VEEDER:  I dont believe it is a head-on conflict,

11   Mr. Sachse.  I think we were talking about this confined

12   aquifer, if you recall, your Honor, that Dr. Mann testified

13   to, in the state of nature.  I think we are all in agreement

14   that the water flowed out through Terwilliger Valley.

15        THE COURT:  Up in Anza.

16        MR. VEEDER:  In Anza Valley.

17        THE COURT:  Yes.

18        MR. VEEDER:  There was a semi-confined aquifer or

19   a confined aquifer which in ancient times would flow out

20   of the area.

21        THE COURT:  Mr. Girard at one time, prepared some

22   findings.

23        MR. GIRARD:  You approved them, your Honor.

24        THE COURT:  Which I thought were entirely proper,

25        MR. GIRARD:  Here they are.  I don't know whether your

1   Honor has a copy or not.  They are dated 6-16-61 on my copy.

2   And I think they are supported by these two exhibits and also

3   by Dr. Mann's testimony.

4          THE COURT:  What problem did we run onto now?

5          MR. GIRARD:  I think the first time we hit it is on

6   Page 5 of Mr. Veeder's findings, on the line starting around

7   Line 11.

8          MR. VEEDER:  Page 5, Finding No. 11, Line 7.

9          THE COURT:  You are changing these numbers as you go

10  along?

11         MR. VEEDER:  Yes.  This would be 10 now.

12         THE COURT:  Have you made other changes as you went

13  along?

14         MR. VEEDER:  We haven't changed any finding numbers,

15  have we?

16         MR. SACHSE:  I have.

17         MR. GIRARD:  You deleted one finding.

18         MR. VEEDER:  Other than that one that we dropped out.

19         MR. GIRARD:  Yes.

20         MR. SACHSE:  We also agreed on Page 4, your Honor, the

21  last three lines Mr. Veeder took out -- "The exterior

22  boundary  . . .."

23         MR. VEEDER:  That designation has not been made.

24         MR. SACHSE:  Yes.  The last sentence goes out.

25         Now we are on Page 5.

20,035

1    THE COURT:  And that becomes Finding No. 10.  What is

2    the problem?

3        MR . SACHSE:  The language is this, if you start on

4    line seven and a half:  "All of the lands of the Ramona

5    Indian Reservation" and then drop down to Line eleven and a

6    half, "overlying the Anza groundwater basin and the waters

7    contained in the alluvium are part of the Santa Margarita

8    River System. . .."

9        I feel that this is not correct, in the light of

10   Dr. Mann's testimony.

11       MR. VEEDER:  It might be helpful to your Honor if you

12   were to look in the area of the semi-confined aquifer as it

13   relates to the Ramona Indian Reservation.  Here is the

14   Indian Reservation up here.  Part of it is alluvium.  This

15   down here is alluvium.  I have said that the waters in that

16   alluvium would be part of the Santa Margarita River System.

17   Mr. Sachse suggests that those waters are a part of the

18   confined aquifer.Where Dr. Mann delineated this increased

19   aquifer is several miles south and west of the Ramona

20   Indian Reservation, and therefore I would say that the

21   groundwaters in there would not be part of the semi-confined

22   aquifer.

23       MR. SACHSE:  Where did Dr. Mann testify these waters

24   were recharged?

25       MR. VEEDER:  He testified that they were recharged in

1    part also from Coahuila Creek.  You see, Coahuila Creek

2    comes down here.  This water coming down from these looped

3    areas -- I am referring now, your Honor, to Hamilton's A --

4    these are surface waters.  They recharge the whole younger

5    alluvial area, and they are also the source of recharge for

6    this  semi-confined aquifer which is delineated on Hamilton's

7    A.

8         My point is that Mr. Sachse says the groundwaters in

9    this area would be part of the semi-confined aquifer, and

10   I say the evidence doesn't support it.  Some of it might go

11   into the semi-confined aquifer.  I don't know.

12        THE COURT:  If that is the issue, I agree with Mr.

13   Veeder.

14        MR. GIRARD:  You have to remember one other thing

15   also, your Honor.

16        MR. VEEDER:  That is one of the issues, your Honor.

17        MR. GIRARD:  Dr. Mann drew this line on this exhibit

18   here.

19        THE COURT:  Yes, I have that somewhere.

20        MR. GIRARD:  Exhibit 278 and Hamilton's A.  What he

21   said, in essence, was that this is a basement lip here and

22   that the basement lip here, and there is also the fault here

23   -- the fault here which is not depicted on there, but it is

24   depicted on this exhibit, this is the fault here --

25        What he said, in essence, was that the basement lip

1  here between these two watersheds was lower in elevation than

2  the basement lip here and the fault here, and therefore,

3  except for those waters which are contained in the alluvium

4  above this elevation here the waters would move out this way.

5      MR. SACHSE:  That is my understanding.

6      MR. VEEDER:  Your Honor, my understanding of this

7  semi-confined aquifer is that the semi-confined aquifer was

8  part of an ancient stream bed, that it went out through

9  Terwilliger Valley, but I don't recall that there was ever

10  any testimony which would say that the groundwaters which

11  were not within the semi-confined aquifer flowed out of the

12  valley.

13      MR. SACHSE:  Mr. Veeder, can I read some language

14  that I think answers clearly --

15      MR. VEEDER:  Unless you read the whole thing, you will

16  just confuse this.

17      THE COURT:  Let me hear it.

18      MR. VEEDER:  Go ahead.

19      MR. SACHSE:  "Q  BY MR. MITCHELL:  Dr. Mann, as I

20      understand the testimony that you have just given,

21      if the water level of the groundwaters was high

22      enough to run out of Anza Valley, it would flow

23      southeasterly through Terwilliger Pass; is that

24      correct?

25          "A  That is correct, through the old gravel

channel."

In other words, he says if it was high enough to run anywhere, it will run east.

MR. VEEDER:  The old gravel channel is the semi-confined aquifer.

MR. SACHSE:  No.

MR. VEEDER:  Oh, yes.

MR. SACHSE:  He said the old gravel channel is that there used to be years ago a stream ran out here.

MR. VEEDER:  Read the whole record.

THE COURT:  My recollection of the matter was this -- and I approve Mr. Girard's finding -- that there was an old streambed down through there, which is shown on Hamilton's A with the cross lines by the fault; that this is rather deep gravel, et cetera, and of course, it has been covered over now with the valley floor; that the good wells that were obtained were obtained down in that particular area and that this -- I don't remember about semi-confined. It was just the fact that it was an old stream bed which took off into Terwilliger Valley and had an open end on it out there where it ran out.  That these people in that area, of course, got good wells.  The other people got much poorer wells and shallower wells in the younger alluvium outside that particular area.  But this area with the good wells, the old streambed was charged from waters coming down in the

1   three streams that are shown with the circles around them

2   off of Thomas Mountain.   That this water off Thomas Mountain,

3   of course, also charged this younger alluvium in the valley

4   as well as charging these waters down deep in this old stream

5   bed.

6         Now, also I seem to recall that there was testimony

7   that this basement lip which would prevent any great amount

8   of water flowing out of the Anza Valley, although, as I

9   recall, there was still some overburden on the lip --

10         MR. GIRARD:   I have a finding on it, your Honor.   He

11   testified that it was consumed almost entirely by phreato-

12   phytes and wire grass as soon as it got over there.

13         THE COURT:   Now I don't know what all the shooting is

14   about.   There is no doubt but that the location of this

15   Indian Reservation is such that the younger alluvium shown

16   there gets the first charge out of the waters coming off of

17   Thomas Mountain before water goes further on down into this

18   old canyon.

19         MR. SACHSE:   Are those waters part of the stream, or

20   are they not?

21         MR. GIRARD:   I would agree with Mr. Veeder to the

22   extent that they probably support waters which go over the

23   lip in a limited amount they are.

24         MR. VEEDER:   But also they support the surface water,

25   too, Mr. Girard.

MR. GIRARD:  Yes, surface water.

THE COURT:  Yes, I think they support surface water.
They support flood flow.  In other words, you wouldn't get
a flood flow over this basement lip down in the canyon unless
these shallower bodies of alluvium were pretty well saturated.

But where is the problem?  The Indian Reservation lies
upstream from this deep hidden valley.

MR. VEEDER:  The reason why the problem originally
arose is that we were talking about all of the waters in the
entire Anza Basin.  I had confined the waters going out of
the Anza Basin to that water in the confined aquifer, and
that is what I thought Dr. Mann testified to.  At the present
time -- this is another finding that I put in there -- at
the present time there  is a reverse gradient from
Terwilliger Valley into Anza Valley, so there is no water
moving out at the present time.

MR. SACHSE:  There is no dispute about that.  I don't
quarrel with Mr. Veeder's finding on that point.

MR. VEEDER:  If your Honor would turn to Finding
No. 21 on Page 8, I see there:

"As found above, the drainage from the semi-

confined aquifer was southeasterly through

Terwilliger Valley.  However, water levels in Well

27-M, within the Cahuilla Indian Reservation, located

. . . disclose that there is now a reverse gradient

20,041

away from Terwilliger Valley, running north of the

Cahuilla Indian Reservation boundary, with the result

that water no longer passes into Terwilliger

Valley through the ancient subterranean channel above

described."

I think that is the case.

THE COURT:  Since we have approved the findings that

Mr. Girard has written on the Anaz Valley, why don't we

incorporate some of those by reference?

MR. VEEDER:  We can re-write them.  I think Mr. Girard

and I come relatively to being in agreement.  I disagree on

the proposition --

What's the matter, Mr. Sachse?

MR. GIRARD:  Mr. Sachse has the crucial finding.

MR. SACHSE:  The critical finding is, if your Honor

will turn over to Page 10, Finding No. 24 -- this is Mr.

Veeder's, this is the whole thing -- starting on Line 9, the

last sentence:  "Under existing conditions, the groundwaters

in the ancient streambed draining into Terwilliger Valley

are, by reason of the reverse gradient, all as found above,

part of the Santa Margarita River stream system."  I think

that is wrong.  Just because there exists a temporary

pumping reverse gradient doesn't make them part of the Santa

Margarita River steam system.

MR. GIRARD:  They are just sitting there in a hole and

1    they haven't reached the elevation to flow out.

2         MR. VEEDER:  But they are not sitting there in a hole.

3    They are now being pumped out by Hamilton and others and

4    using that water within the Anza Valley.

5         THE COURT:  What is the significance of all this,

6    since your Indian Reservation is upstream?

7         MR. VEEDER:  Your Honor,  I will say this, that the

8    confined aquifer -- Ramona Indian Reservation is upstream,

9    but the Cahuilla Indian Reservation is --

10        MR. SACHSE:  Right there.

11        MR. GIRARD:  Right there.

12        MR. VEEDER:  Actually the confined aquifer does run

13   right into that area.  All I am trying to do is get the facts.

14        MR. SACHSE:  My fundamental question is, I am sure

15   your Honor didn't intend to make a finding that because

16   somebody pumped enough to create a reverse gradient that they

17   are no longer a part of their natural system.  You have

18   that remaining part of their natural system.

19        THE COURT:  I don't see that we should have any

20   problem stating the facts here.  I agree with Mr. Veeder

21   that waters flowing down from Thomas Mountain and through

22   the younger alluvium are part of the stream system in the

23   sense that they support surface flow and in the sense that

24   some of it may pass over the basement lip, but that there is

25   this old valley where, in a state of nature, water coming

1      from Thomas Mountain down through these streams gets into

2      this old valley and runs out into Terwilliger Valley.

3          MR. VEEDER:  Some of the water, your Honor.

4          MR. GIRARD:  If it runs anywhere, it runs into

5      Terwilliger Valley.

6          THE COURT:  It doesn't run anywhere else.  Meanwhile,

7      there have been extensive wells put into this valley and

8      presently there probably is very little water running out --

9      by reverse gradient or whatever you want to call it.

10         MR. VEEDER:  And that it is being used within the

11     Santa Margarita River watershed.

12         MR. GIRARD:  Surface watershed, Bill.  But the waters

13     contained in that gravel, even though there is a reverse

14     gradient, are not part of the Santa Margarita River because

15     they don't contribute to it.

16         MR. VEEDER:  I think we can probably work out some

17     kind of language.  I don't agree with these things that Mr.

18     Girard just said that the water in the younger alluvium

19     outside the confined aquifer flows out of the valley.

20         THE COURT:  Where did you get this language about a

21     confined aquifer?

22         MR. VEEDER:  That is what he uses.

23         MR. SACHSE:  Who?

24         MR. VEEDER: Dr. Mann uses the term that this is a clay

25     bed and that the waters --

1      MR. SACHSE:  He has language in his testimony which

2  states that these aquifers are restricted by clay beds between

3  it and the shallower --

4      MR. GIRARD:  Well, he says you have a fault.  Behind

5  this fault is where the stream bed is, and that there is

6  vertical confinement because of some clay aquifers between

7  the younger alluvium and the deeper deposits.

8      MR. SACHSE:  That is right.

9      MR. GIRARD:  I have a finding based on his testimony

10  that they are recharged primarily from the Thomas Mountain

11  area waters.

12      THE COURT: All right.

13      MR. VEEDER:  Just let me read you a little here when

14  he talks about this confinement.  I was cross-examining

15  on Page 16,466, Volume 144:

16          "Q  And there is no separation between the deep

17      and the shallow?

18          "A  There are indicated separations at places

19      where we have the well control.

20          "Q  But nothing continuous?  In other words, this

21      is one single groundwater body , isn't it?

22          "A  No, I would not consider it that way.  I

23      would consider it separated.  The fact that artesian

24      pressures are able to built up indicate that the heads

25      from the higher aquifers . . .

20,045

1   I am interpolating that that is the aquifer above this

2   confined area.

3           "A   . . . cannot be dissipated into the shallow

4       ones.   I think there is a good deal of separation

5       between these two zones."

6   That is the deeper aquifer and the higher aquifer.

7       MR. GIRARD:   That is right.

8       MR. SACHSE:   I agree.

9       MR. VEEDER:   That interrogation was conducted along

10  the line that there was this separation.   But it was limited

11  to those two areas.

12      I think Mr. Girard and I can probably work out some

13  language.   At least I'll try.   But I, myself, can't buy

14  what he has said.

15      THE COURT: What he has said where?

16      MR. VEEDER: All that he has said in his findings in

17  regard to the groundwaters.

18      MR. GIRARD:   I don't think I made a mistake.

19      THE COURT:   I went over these.   I think we all went

20  over them.   Mr. Girard's Finding No. 11 in his proposals of

21  June 16, 1961:

22          "That due to the fault referred to in Finding X

23      above and the layers of clay and silt referred to in

24      Finding VI, the groundwaters within the deep aquifer

25      are contained and cannot move westerly to the Santa

20,046

Margarita River; that any groundwater movement of the
waters contained within said deep aquifer can only be
in an easterly direction out of the Santa Margarita
River watershed and into another watershed (desert
drainage watershed) in that the elevation of the bed-
rock lip between the Santa Margarita River watershed
and the desert drainage watershed is slightly lower
than the elevation of the fault referred to herein-
above in Finding X and lower than the bedrock bench
or lip marking the downstream boundary of the ground-
water body (Anza Valley) described in Finding VII
above."

MR. VEEDER:  You see, he has an inconsistency there,
because he uses the term "deeper aquifer".  Now, the deeper
aquifer is the confined aquifer.  That is, only the water in
the deeper aquifer is that which moves out of Terwilliger
Valley.

MR. SACHSE: But you say it is part of the Santa
Margarita River system.

MR. VEEDER:  You don't follow what I am saying.  There
is a separation down there through this clay bed so that the
confined gravels in the ancient streambed are covered over
and, in effect, capped and the water in that is that which
moves out.

MR. SACHSE: But you say it is part of the river system.

Is it, or isn't it?

MR. VEEDER:  I am talking about the finding that he is referring to here, to the one that the Court just read.

MR. GIRARD:  I said exactly that -- that the waters behind the fault, which is the deeper aquifer --

MR. VEEDER:  Oh, no.  The fault is through the alluvium, which is not part of the deeper aquifer.

MR. GIRARD:  I don't believe the fault extends up into the younger alluvium.  Check it.

MR. VEEDER:  You will find that the fault does not run through the clay bed.

MR. WILKINSON:  I thought it went up and cut the clay bed off.

MR. GIRARD:  I think my findings are factually correct. The fault does not extend up into the shallow aquifer.

MR. VEEDER:  Where is Exhibit 278?

(Discussion off the record.)

THE COURT:  In my file, Mr. Girard, I have your findings of June 19th -- oh, they are a revision of some you made in May.

MR. GIRARD:  Yes.

THE COURT:  All right.

How are you going to handle it?

MR. GIRARD:  Frankly, your Honor, I think we can take Mr. Veeder's and mine and draft up a set which will probably

20,048

1   be pretty much acceptable to both of us along the lines that

2   Mr. Veeder agreed that the groundwaters in the deep

3   aquifer are not part of the River.

4       There is one crucial finding that I think we ought

5   to discuss.

6       MR. STAHLMAN:  Do you want my language, before you get

7   into that?

8       MR. VEEDER:  Mr. STahlman's language is acceptable to

9   me.

10      MR. SACHSE:  Before you get into that, was there any

11  distinction made in your Honor's finding in this area between

12  the water found in the older and in the younger alluvium, or

13  are we treating them the same, surface areas of older and

14  younger?

15      MR. VEEDER:  We have not yet had a designation of the

16  groundwater basin up there, so I would recommend that we

17  refrain from going into that at this time.

18      MR. SACHSE:  Okay.

19      MR. GIRARD:  I think we should say groundwaters in the

20  older alluvium and younger alluvium are part of and add to

21  and support the Santa Margarita River.

22      MR. VEEDER:  I will buy that, with the exception of

23  the areas within the confined aquifer.  Is that all right?

24      MR. GIRARD:  Good.

25      MR. STAHLMAN:  Take Finding 10 on Page 5 and at Line

1   13, "and the waters contained in the alluvium above the more

2   impervious material which confine the deep aquifer are part

3   of the Santa Margarita River".

4   THE COURT:  You are saying the same thing.

5   MR. VEEDER:  I think we are in agreement.

6   THE COURT: All right.

7   MR. GIRARD:  One finding that I think we are going to

8   have to get into and iron out one way or the other is

9   Finding No. 56 on the last page.  I have a couple questions

10   on it.

11          "The United States of America, when it withdrew

12          the Indian lands above described in the preceding

13          finding, intended to reserve rights to the use of the

14          waters of the Santa Margarita River stream system,

15          including rights to the use of groundwaters, the yield

16          of which would be sufficient to irrigate the

17          irrigable acreage which has been found above at the

18          maximum annual water duty of 4.4 acre feet an acre."

19   I took Mr. Veeder's total irrigable acreage for the

20   three Indian reservations.  It came out 14,387 irrigable

21   acres.  I multiplied that by 4.4.  I came up with a figure

22   of 65,194.8 acre feet of water.  And I don't think there is

23   that kind of yield in that area or anywhere near that kind

24   of yield in that area.

25          MR. VEEDER:  I think, though, that it becomes

important in that regard, exactly like Vail's situation,
where they have 30,000 acres of riparian land and they are
claiming 4.4 water duty for it.

MR. GIRARD:  They are not claiming 4.4.

MR. VEEDER:  Whatever they are claiming.

MR. GIRARD:  They are just claiming they are entitled
to their correlative share, whatever that would be in an
apportionment proceeding.

MR. VEEDER:  I would tender this thought.  If you
would go to Line 14 of your Finding No. 56, "the yield of
which would be sufficient . . ."

". . . the yield available would be sufficient
for all the irrigable acres. . ."

MR. GIRARD:  Then you haven't said anything.

MR. VEEDER:  The point I am trying to make to you is
that there was reserved to the extent that water is available
water sufficient to irrigate the Indian lands.

MR. STAHLMAN:  What is the evidence by which it is
indicated that there was an intent to reserve?  I know there
are laws in relation to water on Indian reservations.  What
is the evidence by which we make a finding that there was
an intent to reserve for these purposes?

MR. VEEDER:  Mr. Stahlman, the case of United States
vs. Winters ( or Winters vs. United States), 207 U.S. 570-
something, as I remember, says that when semi-arid lands are

20,051

1    withdrawn for habitation by the Indians there is an implied

2    reservation of water to irrigate the lands.   When the

3    Executive Orders were entered, there was the implied

4    reservation, as a matter of law, pursuant to which there was

5    water reserved for the Indians.

6           THE COURT:   Do you have the findings when these lands

7    were withdrawn?

8           MR. VEEDER:   Yes.

9           MR. SACHSE:   Yes.

10          MR. VEEDER:   There is a variety of years, I might add.

11   For example, your Honor, turn to Page 6.

12          MR. GIRARD:   I can give you the exact figures:

13   Cahuilla 1875, 1887 and 1891; Ramona 1891; Pechanga  1882.

14          MR. VEEDER:   In fact, this is set forth, if you will

15   got to Finding No. 14:

16              "The Cahuilla Indian Reservation was established

17          pursuant to an Executive Order dated December 27,

18          1875, . . ."

19          THE COURT:   I remember reading these Indian water cases

20   and I came to the conclusion then -- and somebody would have

21   to shake me on it now -- that if anybody has a good right

22   to water, it is the Indians.   The gist of the case was that

23   the Indians are entitled to just about all the water they

24   could possibly use for any purpose on their lands, if it is

25   available.

1      MR. GIRARD:  I would qualify that -- water in a state

2  of nature.  The Indians have no right, for example, to

3  storage water or to flood waters which would not be available

4  in a state of nature to them.

5      MR. VEEDER:  That is an academic question here.

6      MR. SACHSE:  It is very academic here.

7      THE COURT:  Well, we are talking about a state of

8  nature.

9      MR. VEEDER:  Nor are we talking about a state of

10  nature.  We are talking about a situation where lands were

11  withdrawn and there was reserved for those lands, pursuant

12  to the doctrine of implied reservation in the Winter case.

13      THE COURT: The only trouble with your Finding No. 56

14  is the last three lines.

15      MR. SACHSE:  Yes.

16      THE COURT:  ". . . intended to reserve rights to the

17  use of the waters of the Santa Margarita River stream system,

18  including rights to use of groundwaters, sufficient to

19  satisfy the needs for irrigation of the irrigable acres on

20  the reservation."

21      MR. GIRARD:  I would like to point out, your Honor,

22  that the cases which go with the intent to reserve water

23  are that it is for the Indians; it is not for the irrigable

24  lands use.

25      MR. VEEDER:  No.

20,053

MR. GIRARD:  For example, there may be reservations--
and I am sure there are, Mr. Veeder -- in Arizona where you
would have a million irrigable acres and no one in their
right mind would have ever contended that Congress intended
to reserve enough water to irrigate a million acres, because
you might only have a hundred Indians or no Indians.

MR. VEEDER:  Mr. Girard, the reservation was for the
land.  The reservation of the right to the use of water is
for the irrigation of the land, not the irrigation of the
Indians.

MR. GIRARD:  The cases hold that the reservation is
for the Indians' use, not the land.

MR. VEEDER: The water is reserved for the land and on
the land, and if you sell the land --

MR. STAHLMAN:  You say you have a case that says that?

MR. VEEDER:  Yes.

MR. STAHLMAN:  Give me that citation.

MR. VEEDER:  We have a whole series of them.

MR. STAHLMAN:  The Winters case you were talking about?

MR. VEEDER:  207 U.S.  The page slips me at the moment
-- I think it is five hundred-something.

We have the Powers case, which is 307 U. S.

The matter is presently before the Supreme Court in
Arizona vs. California.

MR. GIRARD:  You are going to have an awful hard time

20,054

1    convincing me that Congress intended to reserve enough water

2    to irrigate 15,000 acres of land in that area.

3        MR. VEEDER:  If the water is available.

4        MR. GIRARD: That is just like saying if I had a brother

5    he would have blue eyes.

6        THE COURT:  For the land as used by Indians.

7        MR. GIRARD:  Yes.

8        MR. VEEDER:  No, it was reserved for the Indian land.

9        THE COURT:  Let's get the case.

10       MR. GIRARD:  I think you will find that those cases

11   discuss the pattern of living of the Indians.  Some of them

12   in Pyramid Lake, for example, discussed the fact that these

13   Indians were fishermen and that was taken into account.

14   They discussed what the Indians did on the land.  Then they

15   say it would be ridiculous for Congress to make a fish-living

16   tribe have no water to fish, and therefore we give them so

17   much water, whatever they need, for fish.

18       MR. VEEDER:  Mr. Girard, I think if you will review

19   the cases -- I can give you the citations for them now.  The

20   Walker River case is 104 --

21       MR. GIRARD:  I am not talking about the Walker River.

22   Pyramid Lake is on the Truckee River.

23       MR. VEEDER:  If you would quit interrupting for just

24   a moment I will give you some of these cases that might

25   enlighten you.

1        104 Fed. 2d is the Walker River case.

2        101 Fed. 2d you will find the McIntyre case.

3        You will find in 305 or 307 the Powers case.

4        You will find any number of cases in which it says

5    the reservation of rights to the use of water is implied

6    to the extent that the Indians can beneficially use the water

7    in the future.

8        MR. GIRARD: Wouldn't you agree, in the Colorado case,

9    Mr. Veeder, in the case that Mr. Riskind pointed out that

10   the Indian Reservation lands are so large, if Mr. Riskind

11   had given water for the total acres of those lands there

12   wouldn't have been any water for any state.

13       MR. VEEDER: You will find that he specified the

14   acre feet for the Colorado River Indian Reservation.  You

15   will find the very principles I am talking about here.

16       MR. GIRARD: Are you going to tell the Court that in

17   the Colorado River case Mr. Riskind made allocation for the

18   total irrigable acres?

19       MR. VEEDER: For which proof was put in, yes.

20       MR. GIRARD:  Of Indian land?

21       MR. VEEDER:  For which proof was put in.

22       MR. STAHLMAN:  Where is the proof here that the

23   Indians can use this or have used it?     My point is that

24   I think the common sense of the law would be that there would

25   be sufficient water for the use to which the Indians would

20,056

1    put it -- reasonable and beneficial use.  But to reserve it

2    to the land, an Indian reservation may terminate at some time.

3    Then that land has an advantage over all of the other lands.

4        MR. GIRARD:  Actually, this Indian reservation here,

5    Mr. Veeder, has not gone quite far enough.  The priority

6    would be the date that it was made an Indian reservation.

7        MR. VEEDER:  I will be glad to argue that point.

8        MR. GIRARD:  That is exactly what Mr. Riskind did.

9        MR. VEEDER:  Do you want me to argue further on what

10   I think about the kind and type of reservation that was made?

11       THE COURT:  Let's look at some of the language of

12   this decision.

13       This case doesn't come right out and say anything that

14   particularly helps us, (Winters vs. United States, 207 U.S.

15   564).

16       But it seems to me that you are advancing the extreme

17   position.  o  If you took the position that these water

18   rights attach to the land absent Indians, then it would be

19   entirely possible for the Government later to sell so-called

20   Indian lands to people other than Indians and have water rights

21   on these lands that were far different and superior to what

22   other people would have in an arid country.

23       As I understand the rule, it was that the rights

24   reserved for the Indians were all that the Indians presently

25   needed and all that they might need in the future.  It was

entirely a flexible reservation, depending upon the needs of the Indians.

MR. VEEDER:  That is right.

THE COURT:  And it is tied in with the needs of the Indians, and therefore is not attached to the land alone.  It is in relation to the needs of the Indians.  If a time came that the Indians had no need for it, then you have a different problem entirely.

MR. VEEDER:  No, your Honor, and I want the record to show right here when I said that I was agreeing with your statement that the reservation related to the land -- in other words, the situation is that runs with the land the implied reservation of a quantity of water sufficient to irrigate the irrigable lands set aside for the Indians. In other words, as occurred in the Colorado area, it was anticipated that different tribes of Indians might be moved onto the Colorado Indian Reservation.  There was no relationship between the reservation and the particular band or the particular number of Indians who happened to be there, and it was in anticipation of an increased growth of the Indian numbers and an increased growth of water use by the Indians.

THE COURT:  No argument about that.  And there was also in mind that the habits of the Indians might change.

MR. VEEDER: They had to change.

1    THE COURT:  They were nomadic.  They might settle down

2  and become farmers.

3    MR. VEEDER: That is right.

4    THE COURT:  But the point is, this right reserved is

5  a right that is reserved not to the lands alone; it is a

6  right reserved for the use of the Indians on the lands, and

7  it is tied in with the use of the Indians.  I don't see that

8  you can advance a theory that it was given to the lands

9  regardless of whether Indians lived there or not.

10    MR. VEEDER:  It certainly was set aside for the

11  Indians and for a home and an abiding place for them.  If

12  they should sell the land, though, the reserved water would

13  adhere to the land and the purchaser would succeed to the

14  rights the Indians had.

15    MR. GIRARD:  You are tying this reservation to the

16  irrigable acreages.

17    MR. VEEDER:  That is correct.

18    MR. GIRARD:  That is ridiculous in this case.  For

19  example, you have the Ramona Indian Reservation where you

20  have absolutely no water.

21    MR. SACHSE:  I don't think you have any Indians up

22  there.

23    MR. GIRARD:  You have reserved 400 acres, whatever

24  it is.

25    MR. VEEDER:  It is 104 acres of irrigable land.

MR. GIRARD:   In a state of nature you don't have a drop of water.

MR. VEEDER:   It is overlying.   You have some springs up there.

MR. GIRARD:   You may have little.   But to say that Congress intended to reserve water which never even existed is ridiculous.

MR. VEEDER:   As I pointed out, to the extent that water is available for use on that Indian reservation, they did reserve it.

MR. GIRARD:   That isn't what you said.   If you say that Congress intended to reserve water, just such water as is available on the Indians' lands for the Indians' use, then that is one thing.   But to say that Congress intended to reserve 4.4 acre feet of water for each irrigable acre is another thing.

MR. SACHSE:   To go a step further, you say Congress intended to reserve rights to the use of water to the Santa Margarita River stream system , not just the waters on the Indian lands.   If you read this paragraph literally, this is some kind of goofy idea where they could reach somewhere else and get water.

MR. VEEDER:   Mr. Sachse, I will assure you that there was a reservation, and there are groundwaters, and under the Indian reservation they had a right to participate in that

1   groundwater and pump it out, in that circumstance, and pumping

2   that water to the extent of their needs was certainly part

3   of the implied reservation.

4       MR. SACHSE:  They certainly didn't intend to reserve

5   any water in Murrieta Creek, let us say, for the Indians

6   on Ramona Reservation.

7       THE COURT:  He is complaining that your language is

8   too broad.

9       MR. VEEDER:  It may be too broad, your Honor.  I am

10  perfectly willing to adjust it to the facts as they should

11  be.  There is no sense in Mr. Sachse getting all fuzzy about

12  this matter.  I am certainly willing to adjust the language

13  so that everybody will be happy, so long as I get water

14  for my Indians.

15      MR. GIRARD:  The point is, your Indians are not going

16  to get water that isn't there.

17      THE COURT:  On 56, first of all, it is obvious that

18  there was no intention to make any reservation of downstream

19  waters.  We can agree on that.

20      MR. VEEDER:  Yes, that is correct.  In other words,

21  there would be no idea of going down and pumping from

22  Temecula Gorge.

23      THE COURT:  So you would have to modify Line 13,

24  "the waters of the Santa Margarita River stream system".

25  This would be surface waters that flowed upon the reservation,

20,061

it would be groundwaters within the grounds of the

reservation, and there probably would be also the riparian

right of the Indians to get a fair share of water as

compared with persons above.

MR. VEEDER:  On that, your Honor, I would suggest this,

and to a degree I am anticipating the conclusion of law that

I would recommend to you.  As I see it, there was a withdrawal

in 1875 for a reservation.  There was an implied

reservation at that time for water, I will put it assuming

that it is available, because we have that real problem here,

in quantities sufficient to irrigate the land.  As of that

cutoff date the Indian right would be prior and superior

to any subsequently vested right.  I think we are all in

agreement on that.

I take the additional step, however, and say that,

in my view, that acreage which, had it gone into the hands

of a non-Indian, would have been entitled to participate

correlatively with overlying and riparian owners, when it

went into the title of the Indians, went in for the use

of the Indians, would simarily be entitled to participate

correlatively with riparian rights that had vested antecedent

to the establishment of the reservation.  In other words,

you have a situation where we would be ahead of everything

subsequent to that time and would participate correlatively

with riparian and overlying rights that had vested prior to

1    that time.

2         THE COURT: We have cut out everything downstream now

3    from the reservation.  Let's take upstream.  Do you contend

4    that the creation of the reservation put a charge upon  un-

5    homesteaded Government ground above so that a homesteader who

6    came in later had somewhat less of a right than he would have

7    gotten otherwise?

8         MR. VEEDER:  I think that would be the result; yes, I

9    do.  In other words, I think that a man who came in after

10   1875 and acquired a riparian right, that he would not be

11   in a position to share correlatively with the Indians.

12   That would be the circumstance.  I believe that would be the

13   situation.  In other words, there would not be a diminution

14   of the Indian rights because the reservation was fixed at

15   that time.

16        MR. SACHSE:  This is Fred's language on this same

17   question, and isn't this correct:

18        That the United States in providing for the

19   said Cahuilla Indian Reservation intended to reserve rights

20   to the use of such water as is physically available on said

21   lands as may be necessary to satisfy the water use of the

22   Indians;

23        Isn't that exactly what they did?  Why not say it?

24        THE COURT:  Why can't we let it go at that?  It is

25   not going to be any problem.  This is subject to modification

later.

MR. VEEDER:  I want it clear, and I will write up conclusions on this matter.  I want to look at the language that Mr. Girard tendered.

MR. GIRARD:  One other question, Bill.  Did Colonel Bowen prepare these surveys, soil studies, for the three reservations?

MR. VEEDER:  Yes, that is right.

THE COURT:  Don't you think we could use some rather general language in this matter, without having to be specific about these problems?  They may never come up.

MR. VEEDER:  Your Honor, I think that the reservation is very real.  I think it is a legal question.  We put in evidence on irrigable acreages of these various areas.  You will note that that statement is in keeping with your Honor's pre-trial rulings, namely, that you would defer to the Winters doctrine and the others, and I didn't know there was going to be a dispute on it.

THE COURT:  I think Mr. Girard's statement is in accord with my pre-trial ruling.

MR. VEEDER:  Let me study over what he said.  I am anxious to work out proper language.  I just want to be sure the Indian rights are protected.

MR. GIRARD:  I agree with the Judge.  As far as the Ramona Indian Reservation is concerned, we can write anything

20,064

we want.  They are not going to get any water because there isn't any there.

MR. VEEDER:  I wouldn't go that far.

MR. STAHLMAN:  You have the number of acres determined by Colonel Bowen to be irrigable.  You have also in there, in Finding No. 28, the requirements of the irrigation.  Why wouldn't the general language do it?

MR. VEEDER:  As I say, I hadn't heard his language and I am interested in reading it.

MR. STAHLMAN:  You have the amount of acreage that is irrigable and water duty for the various types of crops.

THE COURT:  Well, we are running around in circles. We will take a recess.

(Recess taken.)

THE COURT:  Obviously, this is going to have to be worked over.

MR. GIRARD:  Yes.

THE COURT:  Can it be worked over having in mind the work Mr. Girard heretofore did on this Anza Basin?

MR. VEEDER:  Yes, I am meeting with Mr. Girard on Monday and we may be able to get in some licks then.

THE COURT:  Do you want to talk any more about 41, the Indian matter, or not?

MR. SACHSE:  No.

MR. GIRARD:  The only other comments I have are pretty

1    much housekeeping.   Mr. Veeder and I can resolve them.

2         THE COURT:   No conclusions and no judgments.

3         MR. VEEDER:   No.

4         THE COURT:   But may I suggest that in drawing this on

5    these Indian lands that we use some broad language, refer

6    to the continuing jurisdiction of the Court, and let us not

7    decide matters that aren't before us.   Let's draw it in such

8    a way that the door is open later on if you got into an

9    argument as to whether or not the Indians had a prior right

10   over homesteaders who came in after that date.   The thing

11   is left open to decide.

12        MR. GIRARD:   It really isn't a major issue.

13        THE COURT:   No.   As a matter of fact, the Indian

14   population on these reservations is so small.   Let's draw

15   it so that it can't hurt anybody as a precedent and leave

16   the thing open.   We probably will never have this issue come

17   up.

18        MR. SACHSE:   I certainly agree.

19        THE COURT:   I was thinking about the matter from the

20   standpoint that in most of these Indian cases the matters

21   involved a flowing stream of water, and I am not so sure that

22   Congress didn't intend tht there would be flowing water to these

23   Indian reservations that might be needed for present and

24   future uses, and if you follow out that analogy you may be

25   correct that there is some prior right to curtail later

20,066

1  homesteaders to satisfy present or future needs of the Indians.

2  But I don't think that we will ever reach this problem.   So

3  let's just put in general language and reserve jurisdiction

4  and do it in such a way that we don't tie our hands, and

5  will not have any problem on this.

6       MR. STAHLMAN:   If we pursue this with particularity

7  we may have a few problems of white Indians or half-white

8  Indians, paternity suits, in this case.

9       MR. VEEDER:   I agree completely with your Honor.

10      THE COURT: All right.

11      MR. VEEDER:  May I make one more run through this

12 statement?

13      THE COURT:   Yes.

14      MR. VEEDER:   So that there will be complete agreement.

15      THE COURT:  We will go back now to the statement.   Do

16 you have another run of it now?

17      MR. VEEDER:   I haven't made another run of it -- but

18 I want to be sure.   If we could just run through these once

19 more, so that everybody will have an understanding of it, and

20 then I will have Draft No. 3 prepared and distributed.

21      On Page 1, Line 28, we knock out "under a claim of

22 right".   We put a comma at the bottom of the page on Line

23 32 and add "claims a continuing . . ."

24      MR. GIRARD:   ". . . claims the right to continue to

25 do so."

20,067

MR. VEEDER:" . . . claims the right to continue to do so". You see, there is some disagreement on the exact language that was being used. I will read that again, the final line on the bottom of Page 1, "and claims the right to continue to do so"; is that what your Honor has?

THE COURT: That is what I have.

MR. GIRARD: No changes on 2.

MR. VEEDER: 2 is unchanged.

On 3, at Line 13, after the word "authorized," on thirteen and a half, "by the Act of Congress or by the Department of the Navy".

THE COURT: Also on Line 1 strike the word "upon".

MR. GIRARD: Yes.

THE COURT: At Line 24 change "settlement" to "termination".

MR. VEEDER: That is right.

MR. SACHSE: There will be a new 10 -- no precedent as far as the Water Rights Board is concerned.

MR. VEEDER: That was one I wanted to be sure what your Honor wanted on the language. I didn't write it down.

THE COURT: I didn't write it down either. I think you and Mr. Girard can draft something. We have talked about it so many times. It is not so much, it seems to me, that this is a precedent for the Water Rights Board. It should be directed to the fact that none of the parties

hereto, by making this statement or joining in, bind them-
selves to a precedent.  That is really what we are talking
about, isn't it?

MR. VEEDER:  All right.  I think we had better say
"by approving this statement, do not agree that it will
constitute a precedent in any other case."

MR. STAHLMAN:  It is broader than that.  In other
words, what we are doing here is signing this thing to
effectuate some purposes in this particular case, to
accomplish something in this case.

THE COURT:  That could be a preamble.

MR. STAHLMAN:  Yes.

THE COURT:  That this has been executed and approved
for the purpose of furthering an amicable termination of
this long litigation.  But the precedent angle is not so
much of assuring the Board about it, because the Board
tend to their own business; it is a situation that the United
States or the State of California or Fallbrook or Vail not
having this be a precedent and binding.

MR. STAHLMAN:  Not intended as a precedent.

THE COURT:  I don't think you will have any trouble
doing that.

What do you have on the recommendations?  On  4 there
is a change.

MR. SACHSE:  After the word "dam" a comma .

1     MR. VEEDER:  After "DeLuz dam" comma.

2     MR. SACHSE:  No, after the word "Congress".

3     THE COURT:  Within a reasonable time.

4     MR. SACHSE:  In the event Congress, within a reasonable

5  time.

6     THE COURT:  And then after the word "dam  and

7  appropriates funds therefor".

8     And then there will be the approval.

9     MR. SACHSE:  Yes, and on that Mr. Girard wanted that

10  changed so that it doesn't change "State of California".

11     THE COURT:  Attorney General of the State of California

12  by.

13     MR. SACHSE:  Should we all do the same thing?

14  Just sign as attorney?  I am not the Fallbrook Public Utility

15  District.  I guess I could get a resolution, if it is

16  important enough.

17     MR. GIRARD:  No, I don't think so.

18     MR. VEEDER:  What was Mr. Girard's statement on that?

19  You wanted it changed to what?

20     MR. GIRARD:  Attorney General of the State of California;

21  not the "State of California".

22     THE COURT:  All right, does that take care of that?

23     MR. VEEDER:  That concludes it.  Just so that all of

24  us have an understanding of the basis upon which we are

25  leaving it at the moment.

20,070

MR. GIRARD:  I would suggest, Bill, that you have at least a couple of copies of this complete thing up there for Mr. Craig on Monday.

MR. VEEDER:  We will re-run it and it will be there available.

MR. GIRARD:  You can say Vail Company by its attorney.

MR. VEEDER:  However you want to sign it.  I don't care.

THE COURT:  What else should we talk about?

MR. GIRARD:  I think at the next session we should plan it with the idea that we will have some completed drafts of findings to work on.

MR. STAHLMAN:  Are you going to have any more motions, I wonder?

THE COURT: What is that?

MR. GIRARD:  I think our next session we should plan and assure that everybody that has a responsibility for drafting up some findings have them prepared and submitted so that we can discuss them word for word.

Mr. Veeder and I will, I am sure, by the next session have Anza Valley and Coahuilla Valley drafted up in a complete set of findings, conclusions and judgments.  We may disagree, and in that case we will try to write alternative ones.

1        MR. VEEDER: That is the only thing to do.

2        MR. SACHSE:   I will make a pass at Rainbow Creek,

3   although I don't think it will be in shape to be agreed to.

4   It will take some talking.

5        MR. GIRARD:   If we come up with the Wilson Creek ones,

6   which includes Anza and Coahuilla.

7        I understand now the findings on Warm Springs and

8   Diamond and Domenigoni Valley are all ready to sign, except

9   for an exhibit.   Is that right?

10       MR. VEEDER: That is correct.

11       MR. GIRARD: So maybe we ought to have those in final

12  form.

13       Then we have the Aguanga groundwater area and the area

14  below Temecula Gorge.

15       MR. VEEDER:   39-A.   I frankly say to you that I think

16  the most sensible approach would be to have a single

17  vagrant, local, percolating groundwater area judgment which

18  would take in all of that area, because the conflicts there

19  are terrific, and I am going to work along that line and I

20  will tender it to you on that basis.   Do you know what I

21  am saying?   The area where Vail Company lands are situated

22  on down all the way to the Enclave.

23       MR. WILKINSON:   There is still another portion below

24  the dam above the Gorge that is not in Vail Company ownership

25  that is vagrant, local, percolating.

1    MR. VEEDER:   There is 38-A, isn't there, on that?

2    MR. WILKINSON:   His Honor spoke this morning of there

3    being no 38.   Perhaps I misunderstood him.

4    MR. STAHLMAN:   There is one other thing, too, before

5    we pass that.

6    THE COURT: We haven't passed it yet.   I don't under-

7    stand it.   38-A has been signed, and 38-A is Temecula Gorge

8    subwatershed below Vail Dam and above the Gorge, excluding

9    the groundwater area.

10    39 was to involve the main stream of the Santa

11    Margarita from the Gorge to the Enclave.   This was to be the

12    riparian land.   We were to leave open the question whether

13    Santa Rosa Rancho was riparian to the main stream.

14    39-A was the basement complex below the Gorge and

15    above the Enclave.

16    MR. VEEDER:   In which we have encountered innumerable

17    difficulties because parcels are split on a watershed basis.

18    I would strongly recommend that we have only one A-Series

19    from the Gorge on down to the Enclave.

20    MR. SACHSE:   Including DeLuz Creek.

21    MR. VEEDER:   Down to -- well, I will check that out.

22    I am not sure whether we shouldn't do it all the way down

23    to DeLuz Creek.   We will tender a 39-A at the next meeting.

24    We can discuss it and look it over.   Our problems are very

25    great in that area.

MR. SACHSE:  What about 39 itself?  Is anybody working on that?  It is not a complicated area.

MR. VEEDER:  There is very little area in that.

MR. SACHSE:  It is nothing but the riparian lands and there are very few landowners.

MR. VEEDER:  We will go on that.  Mr. Lincoln's clients will be in there -- the Schloss estate.

MR. STAHLMAN:  One other thing that we don't want to forget next time.  We have some small amount of evidence -- I think Colonel Bowen should be here at the time -- that we were going to put in nunc pro tunc on the acreages in Sandia.

THE COURT:  I have a note on that, that although the Vail judgment was signed, there is a little gap in the evidence and some evidence should be taken on it.

MR. VEEDER:  I have no opinion.  I wouldn't be surprised that some place along the line you would have to wedge in a little evidence.  I am not sure.

MR. STAHLMAN:  Do you have the exhibits on the Vail judgment, Bill?

MR. VEEDER:  Yes, we have.

Now, there is another factor that is beginning  to haunt us a little.  Not very many attorneys are getting all of these copies.  I haven't given them broad distribution on these matters.  Our feeling was that when they have jelled more everybody should be served with all these forms.

1    But I don't think it desirable to undertake to send them out

2    to a hundred lawyers at this time.   Is that agreeable to

3    your Honor?

4           THE COURT:  I think so.  More than that, the lawyers

5    don't want all of them; they just want parts of them.

6           You still have the problem of some notice to everybody

7    on the final judgment.

8           Now, the most important thing, I think, is to push

9    forward with this Water Rights Board situation.  Mr. Clark

10   mentioned something about July 1st as the target date.  That

11   isn't very long .  I think every effort should be bent on

12   that matter.  It is the first thing of importance.

13          When do you suggest you come back again?

14          MR. VEEDER:  I have matters the last week of June,

15   I have matters the first week of July, and then I have

16   some more in August.

17          MR. GIRARD:  I think I can have the findings drafted

18   with which I am concerned, the Wilson Creek ones, within

19   two weeks, and any time after that will be all right with

20   me, except the date July 21st, that week.  That week right

21   in there, July 22-23, I'll be in court.

22          MR. VEEDER:  I am going to be tied up starting the

23   19th, as a matter of fact.

24          THE COURT:  That would mean the week of the 17th of

25   July to come back.

1    MR. STAHLMAN:  I have a trial on the 17th, a two day

2    trial.

3    MR. SACHSE:  I have two days on the 19th and 20th.

4    I would rather get here earlier, if I could.  I would rather

5    be back here July 9th and 10th.

6    THE COURT:  What about the week of the 24th?

7    MR. GIRARD:  I have a trial that week, a Public

8    Utilities Commission trial, your Honor.

9    How long is your trial of July 9th?

10   MR. VEEDER:  It depends on how long it is going to

11   last.  I haven't any idea now.

12   MR. SACHSE:  You are tied up on the 17th?

13   MR. STAHLMAN:  Yes.  I estimate about a two day trial.

14   It has to go to trial.

15   MR. VEEDER:  Any reason why we couldn't come on

16   Wednesday then?

17   MR. SACHSE:  I am tied up on the 19th and 20th, that

18   week.

19   THE COURT:  How long is your trial, Mr. Girard?

20   MR. GIRARD:  Probably in the neighborhood of two weeks.

21   It is a major trial.

22   MR. STAHLMAN:  How about earlier in July?

23   MR. SACHSE:  The first week is shot by the 4th.  We

24   could have Tuesday, Thursday and Friday of that week.

25   THE COURT:  What about      the week of July 2nd?

1    MR. GIRARD:  All right with me.

2    MR. SACHSE:  All right with me.

3    MR. STAHLMAN:  Okay.

4    MR. VEEDER:  Your Honor, I think we would accomplish

5    more on this matter that you said is of utmost importance

6    if we put it off further, frankly.

7    MR. STAHLMAN:  I think we ought to get here shortly

8    after the deadline of your State thing.  When are we going

9    to sign that?  When are you going to have it ready for

10   signature?

11   THE COURT:  Mr. Veeder, you talk about the deadline

12   or target date of July 1st.  This is a month later.  I would

13   prefer to set it for July even if something came up where

14   we had to, for some reason, postpone it.  But take the target

15   date of July 2nd to meet again.   You can't meet on the

16   9th.  The two men can't meet on the 17th.  Mr. Girard can't

17   meet on the 24th.  The 31st runs into the Judicial

18   Conference, and we would be clear over to the 7th of August.

19   MR. VEEDER:  Put it down that way then, your Honor.

20   THE COURT:  July 2nd.

21   MR. SACHSE:  Tuesday the 2nd or Monday the 3rd?   You

22   are always tied up on Mondays, aren't you?

23   THE COURT:  I am tied up on Mondays, although not on

24   that particular Monday.

25   MR. SACHSE:  That suits me fine.

20,077

1          MR. GIRARD:  I would rather have a Monday, because

2     Wednesday is the 4th, isn't it?

3          THE COURT:  Yes.  Let's say Monday, July 2nd.

4          MR. GIRARD:  And we will all try to have our drafts

5     of our interlocutory judgments in, I understand.

6          THE COURT:  Let's get them in so we can have a chance

7     to look them over beforehand and make some notes.

8          MR. SACHSE:  Mr. Stahlman just asked, what are we

9     going to do about this piece of paper?  You are going to

10    meet, I understand, informally with Mr. Craig.

11         MR. VEEDER:  That is the objective.

12         MR. SACHSE:  Then let us assume that there are no

13    changes in it, what are you going to do -- mail it around

14    to us for signature?

15         MR. VEEDER:  I think the thing to do is to find out

16    the acceptability of it by Mr. Craig first.  We will

17    certainly contact you at once.  My own idea is to work out

18    the form in final and send it to each counsel.

19         MR. GIRARD:  Your target date for mailing is July

20    1st, Bill?

21         MR. VEEDER:  No, the target date, as I comprehend it,

22    is to try to get the statement filed by the 1st of July.

23         THE COURT:  Why not just change it to the 2nd of

24    July and we will all be here and sign, rather than mailing

25    it all around.

20,078

1          MR. SACHSE:  We can come down here if you have it

2   at your secretary's office.  I will see that it gets signed.

3          THE COURT:  If you have it prepared to be signed, you

4   can just send it to Fred for filing in Sacramento and he can

5   sign it.

6          MR. VEEDER: All right, we will go ahead on that basis.

7          THE COURT:  July 2nd at 10:00 o'clock.

8          (Whereupon, an adjournment was taken until Monday,)
            (                                                 )
9          (July 2nd, 1962 at 10:00 o'clock a.m.             )

---oOo---

20,079

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

UNITED STATES OF AMERICA,            )
                                     )
5                    Plaintiff,      )
                                     )
6            vs.                     )            No. 1247-SD-C
                                     )
7    FALLBROOK PUBLIC UTILITY        )
     DISTRICT, et al.,               )
8                                    )
                     Defendants.     )
9    _____ )

10

CERTIFICATE OF REPORTER

11          I, the undersigned do hereby certify that I am, and

12    on the date herein involved, to-wit- June 14, 1962, was a

13    duly qualified, appointed and acting official reporter of

14    said Court:

15          That as such official reporter I did correctly report

16    in shorthand the proceedings had upon the trial of the above

17    entitled case; and that I did thereafer cause my said

18    shorthand notes to be transcribed, and the within and the

19    foregoing   101   pages of typewritten matter constitute a

20    full, true and correct transcript of my said notes.

21          WITNESS my hand at San Diego, California, this 14th

22    day of June, 1962.

23

24

25                                        _____
                                              Official Reporter

JOHN SWADER, OFFICIAL REPORTER