Case 3.51-cv-01247-JO-SBC   Document 4705   Filed 09/24/63   PageID.41146   MR. VEEDER 107

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

                  Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     August 8, 1962

Pages:    20,168 - 20,273

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
               DEPUTY

J O H N   S W A D E R
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 202                                                        20,168

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>      v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT,<br>et al.,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)   No. 1247-SD-C<br>)<br>)<br>)<br>)<br>)<br>) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, August 8, 1962

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ.,<br>Special Assistant to the<br>Attorney General |
|  | CDR. DONALD W. REDD |
| For the Defendants: |  |
| Vail Company | GEORGE STAHLMAN, ESQ. |
| Fallbrook Public Utility<br>District, et al: | FRANZ R. SACHSE, ESQ. |
| State of California | FRED GIRARD, ESQ. |

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, AUGUST 8, 1962, 10:00 A.M.

2                          ---o0o---

3         (Other cases called.)

4         THE CLERK:  Two, 1247-SD-C, United States v. Fallbrook.

5         THE COURT:  Are you ready to proceed?

6         MR. VEEDER:  We are ready, your Honor.

7         MR. GIRARD:  Yes, your Honor.

8         MR. SACHSE:  Yes, your Honor.

9         MR. VEEDER:  Mr. Girard, have you reviewed the findings

10   on the Indians?

11        MR. GIRARD:  Yes, I have, Mr. Veeder.

12        MR. VEEDER:  I think everyone has copies of the

13   tentative drafts.

14        THE COURT:  I have your draft that you submitted on

15   August 7th, and there is some earlier material, isn't there?

16        MR. VEEDER:  Yes.

17        MR. GIRARD:  There was one submitted on May 15.

18        MR. VEEDER:  That is right.

19        THE COURT:  I will have to get that.

20        MR. VEEDER:  I think this supersedes the entire set.

21        THE COURT:  This one you handed me on August 7th

22   starts with Finding No. 54.

23        MR. VEEDER:  There are two sets on August 7th.

24        MR. GIRARD:  There are two sets of August 7.

25        MR. VEEDER:  If you don't have it with you here is

1    another copy, your Honor.

2         THE COURT:  Have you all been over it?

3         MR. SACHSE:  Yes.  I have, your Honor.

4         THE COURT:  What suggestions do you have?

5         MR. GIRARD:  While it is lengthy, it is not nearly as

6    long as it appears, because a great deal of it is pure

7    repetition, one Indian Reservation after another.  There are

8    a few places where I think there is actual controversy as to

9    the language in the findings.  I don't know.  It is up to

10   Mr. Veeder.  Do you think it is better to go through them

11   and say certain ones are okay, starting at the beginning?

12        THE COURT:  All right, let's start with No. 1.

13        MR. SACHSE:  The only thought I had was to add

14   "system" at the end of the sentence -- "Santa Margarita

15   System."

16        THE COURT:  All right.

17        MR. VEEDER:  In regard to descriptions, your Honor,

18   I am working with Colonel Bowen and Mr. Kunkel to be sure

19   that the descriptions are correct, that the courses of the

20   streams are right, and any change like that would be

21   minute.

22        THE COURT:  All right.  Add "System" on Line 27

23   of Finding No. 1.

24        MR. SACHSE:  I have no suggested changes on Findings

25   Nos. 2, 3, 4, 5, 6, 7, 8 and 9.

MR. GIRARD:  I have one for Finding No. 2.  On Line 30, after the word "flows," add "except for extremely limited areas," because here is another finding later on concerning  Cahuilla which says there are at least two spots where it flows as a perennial stream.

MR. VEEDER:  "Except for extremely limited areas"?

MR. GIRARD:  Yes.

THE COURT:  All right.

MR. GIRARD:  I have no comments on Findings Nos. 3, 4, 5 or 6.

THE COURT:  What about Finding No. 7?

MR. STAHLMAN:  Is this No. 6 right?  What I have reference to is Line 7 -- in other words, "Anza Groundwater Basin and the semi-confined aquifer situated in the bed of an ancient stream which at one time drained some of the Anza Valley water into Terwilliger Valley."  It still drains subsurface water, doesn't it?

MR. VEEDER:  No, not now.  There is a reverse gradient.

MR. STAHLMAN:  Is that due to pumping?

MR. VEEDER:  Yes, pumping in Anza Valley has resulted in a reverse gradient and it no longer goes into Terwilliger.

MR. GIRARD:  Is this the deeper aquifer in Anza Valley we are talking about?

MR. VEEDER:  That is correct.

MR. GIRARD:  Did that ever in a state of nature go into Terwilliger Valley?  As I understood Dr. Mann's testimony, it was confined by a fault and the movement, if any, was into the desert drainage area.

MR. VEEDER:  That is Terwilliger Valley.

MR. SACHSE:  That is Terwilliger Valley.

MR. GIRARD:  Okay.  Isn't it true now that if it drains at all it would drain into Terwilliger Valley?  It is not going into the Santa Margarita River now.

MR. VEEDER:  There is a reverse gradient back into the Anza Valley, yes.

MR. GIRARD:  Well, is it a reverse gradient, or is it just that the pumping has reduced the groundwaters in the deeper aquifer to a level below the lip into Terwilliger Valley?

MR. VEEDER: Well, here is what the Doctor says.

MR. SACHSE:  I think this is all right. This just describes the surface stream.

MR. KUNKEL:  It is pretty much in conformance with Dr. Mann's testimony, too.

MR. STAHLMAN:  Okay.

MR. SACHSE:  I think there is a controversy on this question later, but not at this point.

MR. VEEDER:  If you want Finding No. 6 revised --

MR. SACHSE:  I think Finding No. 6 is correct.

MR. GIRARD:  Finding 6 is all right, then, your Honor.

MR. SACHSE:  The question we are discussing, your Honor, really is not pertinent at this point.  It comes up later.  Finding No. 6 is merely a description of this unnamed creek and where it drains.  There are other findings on Terwilliger Valley later.

THE COURT:  All right.

MR. GIRARD:  Finding No. 7 is all right, as far as I am concerned.

THE COURT:  8.

MR. SACHSE:  Finding No. 8 is okay with me.  And so is No. 9.

MR. GIRARD:  Findings Nos. 8 and 9 are all right.  I presume the figures are correct.

MR. VEEDER:  You observe on Page 4, at Lines 19 and 20, reference to Interlocutory Judgment No. 33, which is still in the process of preparation.  It relates to Anza-Wilson Creek.

I would just as soon take out the reference to the other interlocutory, if you work out different language.  I don't care.

THE COURT:  We are talking about Ramona clear up in the mountains there.

MR. VEEDER:  That is right.

MR. GIRARD:  As I read it, this says, in essence, that

1   the groundwaters contained in the alluvium above the deeper

2   aquifer are part of the river.

3       MR. VEEDER:  Yes, and this Ramona is far removed from

4   the deeper aquifer.

5       MR. SACHSE:  It is all right with me.

6       MR. STAHLMAN:  You are talking about the first

7   paragraph.  We had some discussion yesterday in relation to

8   the language on Line 24, as to whether it should be called

9   a groundwater basin.

10      MR. SACHSE:  That is the thing I was talking about to

11  you that comes along later, Bill, where there will be an

12  area between Anza and Cahuilla which would not be a basin

13  but will be a stream.  I don't think it applies to the

14  Ramona Indian Reservation.  That is way upstream.  That

15  discussion doesn't apply to this one, George.  Ramona

16  Indian Reservation is way at the upper end.

17      MR. VEEDER:  That is right.  But part of it is in

18  the older alluvium.

19      MR. SACHSE:  That is right.

20      MR. VEEDER:  And part of the older alluvium is on the

21  Reservation.

22      MR. SACHSE:  That is right.  But there is no younger

23  alluvium in the Reservation which is not part of the Anza

24  Basin.  Isn't that correct?

25      MR. VEEDER:  That is right.

1     THE COURT:   Say that again.

2     MR. SACHSE:   There is no younger alluvium in the Ramona

3  Reservation which is not also within the external limits of

4  the Anza groundwater area.

5     THE COURT:   There is no younger alluvium at all on the

6  Ramona Indian Reservation.

7     MR. VEEDER:   That is right.

8     THE COURT:   The only alluvium is the older alluvium ,

9  and it is at the very bottom end of the Reservation.   So

10  this is all right, then.

11     MR. SACHSE:   Yes; I have no objection.

12     MR. GIRARD:   Yes.

13     THE COURT:   Finding No. 11.

14     MR. GIRARD:   I have no objection to Finding No. 11.

15     THE COURT:   Finding No. 11 says:

16          "Virtually all of the lands of the Ramona

17     Indian Reservation within the Santa Margarita River

18     watershed are comprised of older continental

19     alluvium and are part of the Anza groundwater basin."

20     Oh, I see, this watershed line cuts across this

21  Reservation.

22     MR. VEEDER:   It angles northeasterly across, cutting

23  the bottom half.

24     THE COURT:   I see.   All right.

25     MR. GIRARD:   Yes.

20,176

THE COURT: Any suggestions on Finding No. 12?

MR. SACHSE: No. 12 is all right.

THE COURT: No. 13?

MR. SACHSE: No. 13 is okay with me.

THE COURT: Did you find how many acres are involved in this Cahuilla Reservation?

MR. VEEDER: Yes, your Honor, there is a finding on that. I think there are 18,000, something like that.

MR. STAHLMAN: Are we on No. 14 now?

THE COURT: No. 14.

MR. STAHLMAN: There is a question in my mind. "By the Executive Order dated March 14, 1887" -- would that require evidence, or is there evidence in the record of that situation?

MR. VEEDER: The Executive Orders, of course, the Court will take judicial notice of. I do have them, if you want them in the record. I have certified copies of them, if you want them.

MR. STAHLMAN: I don't know. I am just thinking about the basis on which the finding would be made.

MR. VEEDER: They are available, George. They are also referred to in the statute books.

MR. STAHLMAN: You have checked the dates?

MR. VEEDER: Oh, yes. The fact is they are in my office.

20,177

MR. STAHLMAN:  Is it an Order which applies just to this one particular Reservation?

MR. VEEDER:  This particular Executive Order relates solely to the Cahuilla Indian Reservation.

THE COURT:  Is there any problem about that?

MR. STAHLMAN:  No.

THE COURT:  Are you suggesting that the Court take judicial notice of them?

MR. STAHLMAN:  I just want to know if the basis of the finding was correct.

THE COURT:  On Line 9:  "was acquired by deed. . ." Who acquired it?

MR. VEEDER:  The Secretary of the Interior acquired that piece of property.  I truly don't know how that transpired.  It says, "The North half of Lot 3 in Section 8 . . ."

MR. STAHLMAN:  A deed from whom?

MR. VEEDER:  Some individual.

THE COURT:  Don't you think we should say, "acquired by the Secretary of the Interior"?

MR. VEEDER:  Yes, all right.

THE COURT:  Then it ends with a "by".  It needs another "by" --  "by deed dated . . ."

No. 15.

MR. GIRARD:  I have some questions about No. 15.

1      MR. SACHSE:  So have I.

2      MR. GIRARD:  When you talk in here about the "deeper

3  deposits of the older continental sedimentary deposits," are

4  you talking about the deeper aquifer?

5      MR. VEEDER:  No, indeed not.  If you want to take a

6  look at the exhibit -- have you got Exhibit 278?

7      MR. GIRARD:  Yes.

8      MR. VEEDER:  This area in here is what I am speaking

9  about, through this whole area.  But this does not relate

10  to the deeper aquifer which extends, as I remember, from

11  Section 21 on down to the southwest corner of Section 27

12  within the Reservation.

13      MR. GIRARD:  I am not sure in my own mind.  The younger

14  alluvial deposits, do they rest upon older continental

15  deposits or upon basement complex in the Anza Valley,

16  except for the deeper aquifer?

17      MR. VEEDER:  I had thought that all of the younger

18  alluvium in the area rested upon older continental alluvium.

19  I may be wrong.

20      MR. STAHLMAN:  I don't think so.  I don't know.

21      MR. GIRARD:  I don't know either.

22      MR. VEEDER:  There is the man who made the map -- Mr.

23  Kunkel.  Maybe Mr. Kunkel can tell us.  I thought there was

24  just a mantle.

25      THE COURT:  Another point on No. 15.  This doesn't

1   mean anything when you say, "A thin mantle of younger

2   alluvium," unless you refer to Exhibit 278, because that

3   mantle is not over the Indian Reservation, only certain areas

4   of the Indian Reservation.

5       MR. GIRARD:  I think you could drop out No. 15.  It

6   doesn't mean anything.

7       MR. SACHSE:  I don't think it contributes a thing to

8   your substantive finding.

9       MR. VEEDER:  As far as I was concerned, I was simply

10  describing the situation where we have alluvial deposits

11  within the reservation.

12      THE COURT:  Why not say, so as not to have to change

13  all of the numbers --

14      MR. VEEDER:  We are going to have to change the

15  numbers anyway.

16      THE COURT:  You could refer to the map Exhibit 278

17  as showing the areas of younger and older alluvium.

18      MR. GIRARD:  Yes, just say the areas of younger and

19  older alluvium and basement complex are depicted on

20  Exhibit 278.

21      MR. VEEDER:  All right, we will do that.  We will

22  take out the first sentence, as I understand it, then, take

23  it out entirely, and simply refer to the alluvial deposits

24  within the Cahuilla Indian Reservation as depict on

25  Plaintiff's Exhibit 278.  Is that all right?

20,180

THE COURT:  The areas of younger and older alluvium and basement complex.

MR. SACHSE:  And weathered basement complex.

THE COURT:  Is it weathered?

MR. SACHSE:  There is some near the gray.

THE COURT:  The areas of younger and older alluvium and basement complex and weathered basement complex in the Cahuilla Indian Reservation are shown on Exhibit 278.  I don't think you need this where it comes from.

MR. VEEDER:  All right.

THE COURT:  U. S. Exhibit 278.

16.

MR. SACHSE:  On No. 16 I have a question.  Perhaps it will be cleared up when Judgment No. 33 is finished.  The very last sentence, Bill, on Page 7 -- it starts on Page 6-- you are speaking of the boundary of the Anza groundwater basin:

"That boundary continues west along the South

line of the North Half of Section Twenty-Nine . . ."

and then on Line 3:

". . . leaving the Cahuilla Indian Reservation

at the northwest corner of the last mentioned section."

MR. VEEDER:  Isn't that correct?

MR. SACHSE:  Well, I don't know.  That is the thing we have to clear up, as to whether we will treat the younger

20,181

alluvium downstream from that point as part of the stream. We are going to have a bed and banks problem there.    We are going to have to draw a different finding for this portion.   It is a question.   I want to be sure we are right.

MR. GIRARD:   I would draw your basin where you have the line across the younger alluvium in Section 29.

MR. VEEDER:   Then why not run your line along the south line of the north half of the northeast quarter, thence north along the east line?

MR. SACHSE:   Yes.   It would be a lot easier to just say -- this is so academic -- just draw your basin line along the middle of the section.

THE COURT:   Actually, that limit of Anza Valley is practically on a diagonal bisecting Section 29.

MR. SACHSE:   Yes, that would do it.

MR. GIRARD:   And as depicted on U. S. Exhibit 278.

MR. VEEDER:   All right.   That suits me.

THE COURT:   It is not depicted there, unless the witness wrote it in.

MR. GIRARD:   I think the witness did write it in.

THE COURT:   I have it on my copy.

MR. VEEDER:   I think Dr. Mann did.

MR. GIRARD:   Dr. Mann wrote it in.

MR. SACHSE:   Can we say it would be the diagonal bisecting Section 29 from northwest to southeast?

1          THE COURT:  Where the diagonal bisects the younger

2  alluvium.

3          MR. SACHSE:  Yes.

4          MR. VEEDER:  You have got to leave Section 29 some

5  place.

6          MR. SACHSE:  Yes, northwest to the southeast corner

7  of Section 29.

8          MR. VEEDER:  All right.

9          THE COURT:  "The exterior boundary of the Anza Ground

10  Water Basin within the Cahuilla Indian  Reservation commences

11  at the center line of Section 27. . ."

12          MR. VEEDER:  Your Honor, /the question of the exterior
                                              on

13  boundary of the Anza groundwater basin, we simply have to

14  wait until Interlocutory Judgment No. 33 is entered to find

15  that specifically.  However, Colonel Bowen has delineated

16  what he considers to be the exterior boundary of the basin

17  and we have run it through and I think there can be agreement

18  on it.  I set out a description of the Anza groundwater area

19  in my suggested findings of January 17, 1962, and generally

20  I have followed that.

21          THE COURT:  Now you are just describing that part of

22  the groundwater area that is in the Cahuilla Reservation.

23          MR. VEEDER:  That is correct, your Honor.

24          THE COURT:  I just couldn't make any sense out of it,

25  looking at the map.

1       MR. VEEDER:  That explains it.

2       MR. STAHLMAN:  Another question.  We are calling it

3   a basin, and it is really just a groundwater area.  Is there

4   any water in it?

5       MR. VEEDER:  Yes, there is water in it.

6       MR. STAHLMAN:  That has been a question.

7       MR. VEEDER:  No.  It is certainly a basin.  We have

8   always called it a basin.  The State has called it a basin.

9       THE COURT:  You clip off part of the younger alluvium

10  as not part of the basin, by this description.

11      MR. VEEDER:  That is right.

12      MR. GIRARD:  That is right.

13      MR. VEEDER:  Because it seems better to delineate it

14  to the exterior boundaries of the legal subdivisions than to

15  attempt any other kind of description.

16      THE COURT:  All right.  What changes are you going to

17  make?

18      MR. VEEDER:  The only changes I thought we would make

19  is the reference to the diagonal across the north half of

20  Section 29 as depicted on U. S. Plaintiff Exhibit 278.

21      MR. SACHSE:  Also, Bill, I leave the language to you

22  but you say it is leaving the Cahuilla Indian Reservation at

23  the northwest corner.  That is not correct.  That is the edge

24  of the basin.  The basin doesn't extend beyond that point,

25  does it?

1    MR. VEEDER:  But the basin also continues then into

2  private ownership, Mr. Sachse, up along there.

3    MR. SACHSE:  Yes.  But it is the downstream edge of

4  the Anza basin.

5    MR. VEEDER:  Put that in, if you want it:  It is the

6  downstream edge of the basin, which is absolutely right.

7    THE COURT:  How are you going to word it?  Let's not

8  have to draw this again.

9    MR. VEEDER:  You would start on Line 31 and you would

10  change it, as I see it now -- may I use this map for a

11  moment?

12    MR. SACHSE:  Yes.

13    MR. VEEDER:  As I see it, that boundary continues west

14  along the south line of the northeast quarter of Section 29,

15  thence diagonally across the northwest quarter of Section 29

16  to the northwest corner of that section.

17    MR. SACHSE:  Southwest corner.

18    MR. VEEDER:  To the northwest corner of that section.

19    THE COURT:  Are you looking at the same thing I am?

20    MR. VEEDER:  Yes, your Honor.

21    THE COURT:  I can't read that description that starts

22  in Section 27 as outlining this basin.

23    MR. VEEDER:  The exterior boundary of the Anza ground-

24  water area within the Cahuilla Indian Reservation commences

25  at the center line of Section 27 right there.

1  THE COURT:  Well, the center line doesn't mean anything.

2 At the center line of the north edge.  The center line of

3 Section 27 is where?

4  MR. VEEDER:  The center line of Section 27 is right

5 there.  You can call it the northwest corner, if you want to

6 do that.

7  THE COURT:  You can't, unless you know it is the bottom

8 or the top or where.

9  MR. VEEDER:  All right, we can do what we said, then:

10 The northwest quarter corner, thence south --

11  THE COURT:  Is that right, the northwest quarter corner?

12  COLONEL BOWEN:  No, the north quarter corner.

13  MR. VEEDER:  All right, the north quarter corner.

14  THE COURT:  Put it in.

15  MR. VEEDER:  The north quarter corner of Section 27,

16 and continues to the south line of that section.  In other

17 words, it runs down to the south line of Section 27, thence

18 west along the southern boundary of the southwest quarter

19 of that section, continuing along the southern boundary of

20 the southeast quarter of Section 28, thence north along the

21 western boundary of the southeast quarter of Section 28,

22 thence west along the southern boundary of the northwest

23 quarter of Section 28.  That takes in some of  the basement

24 complex.  That boundary continues west along the south line--

25 here is where we make the change -- that boundary continues

west along the south line of the northeast quarter of

Section 29 --

    THE COURT:  29?

    MR. VEEDER:  Yes, 29.

    THE COURT:  We are in 28.

    MR. VEEDER:  We are leaving 28.  We go straight across.

    THE COURT:  Look at what it says.

    MR. VEEDER:  Thence west along the southern boundary

of the northwest quarter of Section 28.

    THE COURT:  To where?

    MR. VEEDER:  To the common boundary between 28 and 29.

That boundary continues west along the south line of the

northeast quarter of Section 29 -- now here is where you

put in your diagonal -- and from the southwest corner of

the northeast quarter diagonally across the northwest

quarter of Section 29 to the northwest corner of that

section.

    MR. STAHLMAN:  Then you are going to say, "as

depicted".

    MR. VEEDER:  As depicted.

P-1
#2

MR. STAHLMAN:  Why wouldn't it be simpler if you would just mark the entire area you describe there on this map and make reference to it for the description?

MR. VEEDER:  One reason why I wanted to have these delineated is that we are relating it to another set of findings of fact.

MR. STAHLMAN:  But my point is, why not just draw a line here and then when you look at this thing in relation to other findings, if you have occasion to, you would have it all pictured here.  You wouldn't have to do what we are doing here.  It would simplify it.

MR. VEEDER:  I would rather have the description.

MR. STAHLMAN:  Put both in.  Put the description in and then the diagonal line.

THE COURT:  Another thing, you know where this describes the limits here.  It is quite obvious.  Then you say, "The exterior boundary of the Anza Basin commences .."

MR. VEEDER:  That is right.

MR. STAHLMAN:  My point is, why not leave your description in there and mark the whole thing out, so that if you want to make reference you have it all on there?  You have your diagonal line there.  Why not put a line following your description?

MR. VEEDER: And demark it on Exhibit 278?

CMDR. REDD:  Rather than coloring up Exhibit 278, I

20,188

P-2

1   would suggest that we make it on a copy of 278 and make it

2   Exhibit B to these findings.  We have made exhibits to the

3   findings in all of these others.

4        MR. STAHLMAN:  Why make two when you have one map you

5   can do it on?

6        MR. VEEDER:  What does your Honor desire on it?

7        THE COURT:  It is not very important.  You could almost

8   say that Exhibit 278 depicts that portion of the groundwater

9   area that lies within the Cahuilla Reservation, or you could

10  put it on the map.

11       What do you think, Colonel Bowen?

12       COLONEL BOWEN:  If we attempted, your Honor, to draw

13  a line that would show the legal subdivisions in the manner

14  your Honor directed us to do in the Murrieta groundwater area --

15       THE COURT:  The question is, should we put it on this

16  map Exhibit 278?

17       MR. KUNKEL:  Why don't we rough draft it on the topo

18  sheet and when everybody agrees to it, transcribe it on to

19  Exhibit 278?

20       MR. STAHLMAN:  Any way you can get it on there and

21  get it correctly.  I would think instead of just having this

22  line here, you might as well put the whole thing in.

23       MR. VEEDER:  If your Honor will authorize it, we will

24  have it put on Exhibit 278.

25       THE COURT:  All right, put it on the topo sheet and

20,189

p-3

1   be sure everybody agrees to it and then just transcribe it

2   over.

3       MR. VEEDER:  All right.

4       THE COURT:  Then we go to No. 17.

5       MR. GIRARD:  In No. 17 I have some changes.  At line 12-13,

6   where it says, "In a state of nature, some of the groundwaters

7   from the Anza Ground Water Basin drained down that channel .."

8   I think all of the groundwaters drain down that channel.

9       MR. VEEDER:  I don't believe the record will support

10  that.

11      MR. GIRARD:  Where do they go?

12      MR. STAHLMAN:  When it gets up to a certain level, some

13  of them will go.

14      MR. GIRARD:  They either stay in the groundwater there

15  or they move down the channel.

16      THE COURT:  But not all of the Anza groundwaters drain

17  down that channel.  Isn't that true?

18      MR. VEEDER:  Very little drain.

19      THE COURT:  There are some groundwaters from the Anza

20  Basin in the upper layers, a small amount that could get

21  over the lip.  But all the deeper groundwaters --

22      MR. GIRARD:  Isn't this concerned solely with the

23  deeper aquifer?  This isn't concerned with anything above

24  the deeper aquifer, is it, Bill?

25      MR. VEEDER:  As Dr. Mann testified, if I recall it, there

p-4

1   was a surface stream flowing into Terwilliger Valley in

2   ancient times. The alluvium filled in and the drainage

3   from, I think it is, Section Two was all into Anza Valley,

4   the surface drainage.  He said that there was this confined

5   or semi-confined aquifer which did drain into Terwilliger

6   Valley, and that is what we are attempting to say here.

7   If that is not worded the way you desire it, I will be glad

8   to make changes.

9       THE COURT:  I would suggest that you start then on line

10  9:  "..there is(insert) underground an ancient stream bed .."

11  There is no ancient stream bed apparent on the surface there.

12      MR. VEEDER:  That is right.

13      THE COURT:  "..there is underground an ancient stream

14  bed which proceeds from the northwest to the southeast across

15  the Anza Ground Water Basin into Terwilliger Valley, which is

16  a part of the Salton Basin.  In a state of nature, all but

17  the shallow groundwaters" or you could say "the deeper ground

18  waters drained down that channel."

19      MR. VEEDER:  All right.

20      THE COURT:  What do you suggest?

21      MR. STAHLMAN:  Would it be possible to say that the

22  groundwaters would reach a certain height?  As I understand,

23  it would reach a certain level, above which some of it would

24  drain in the other direction.  Would that be the picture?

25      MR. GIRARD:  Not in the deeper aquifer.

p-5

1      THE COURT:  Don't you think that does it?

2      MR. STAHLMAN:  That would do it, I think.

3      MR. SACHSE:  I was trying to paraphrase what your

4  Honor said:  That in a state of nature the deeper groundwaters

5  drained down that channel.

6      MR. VEEDER:  That is all right with me.

7      MR. GIRARD:  I have some changes commencing on line 13,

8  too.

9      COLONEL BOWEN:  May I make an observation, your Honor?

10     THE COURT:  Yes.

11     COLONEL BOWEN:  On line ten and a half and eleven, it

12  says "across the Anza Ground Water Basin into Terwilliger

13  Valley, which is a part of the Salton Basin."  Terwilliger

14  Valley extends across the divide.  It is partly in the

15  Santa Margarita River watershed and partly in the Coyote

16  Creek watershed.

17     MR. GIRARD:  Where is that?

18     THE COURT:  Terwilliger Valley, which lies, in part,

19  in the Salton Basin.  Does that do it?

20     COLONEL BOWEN:  Into Terwilliger Valley, a part of which

21  is within the Salton Basin drainage area.

22     THE COURT:  That is all right.

23     MR. VEEDER:  That is all right with me.

24     MR. STAHLMAN:  May we have just a moment here?

25     (Conferring).

p-6

1    Mr. Girard has a thought about it here, I think.

2    MR. GIRARD:  Starting at line eleven, where it says,

3    "In a state of nature," and I think your Honor had added

4    "the deeper groundwaters," we would suggest "deeper vertically

5    confined groundwaters."

6    MR. STAHLMAN:  The following sentence on line thirteen

7    and a half says, "In the ancient stream bed are deep gravels

8    overlain with a thick bed of clay."  So they would be confined

9    groundwaters.

10   MR. VEEDER:  I have no objection.

11   THE COURT:  All right, deeper vertically confined

12   groundwaters.

13   MR. GIRARD:  Drain down that channel.

14   THE COURT:  Drain down that channel and out of the

15   watershed.

16   MR. GIRARD:  All right, out of the Santa Margarita

17   River watershed.

18   THE COURT:  All right, Mr. Veeder?

19   MR. VEEDER:  That is all right with me, your Honor.

20   MR. GIRARD:  Then I would change, on line 13, where

21   it says, "In the ancient stream bed, "  I would say "under

22   present conditions the ancient stream bed consists of gravels

23   and other pervious materials overlain with a thick bed of

24   impervious clay."

25   MR. VEEDER:  I doubt it is impervious, Mr. Girard.

P-7

1    MR. GIRARD:  Dr. Mann's testimony was that it was.

2    MR. VEEDER:  No, he didn't say it was impervious.  He

3  said that there is some separation.  But I don't believe you

4  could say it is impervious.

5    MR. GIRARD:  All right, just say clay.

6    MR. VEEDER:  Yes.

7    MR. GIRARD:  Under present conditions, the ancient

8  stream bed consists of gravels and other pervious materials

9  overlain with a thick bed of clay.

10    MR. VEEDER:  All right, I think that is correct.

11    THE COURT:  Impervious, you said?

12    MR. GIRARD:  Other pervious materials.

13    MR. VEEDER:  In other words, the deeper aquifer is

14  comprised of gravels and other pervious materials --

15    MR. GIRARD:  Overlain with a thick bed of clay.

16    Then the next to the last sentence, starting on line 15,

17  where Mr. Veeder said, "The ground waters in those gravels

18  does not appear to be in free hydraulic continuity with the

19  surface waters,"  I would just say, "The ground waters in

20  those gravels do not add to, support or contribute to the

21  Santa Margarita River."

22    MR. VEEDER:  I'll not buy that, because the language

23  that I used there is exactly what Dr. Mann said.  He said

24  it does not appear to be in free hydraulic continuity with the

25  near surface waters.

p-8

1    MR. GIRARD:  What  is hydraulic free continuity?

2    MR. VEEDER:  I don't know.  Dr. Mann uses some very

3    odd language.

4    MR. GIRARD:  Why put it in the findings?

5    MR. VEEDER:  I am not going to buy the idea.  As I

6    comprehend, what Dr. Mann stated, and what I am trying to

7    reflect in this finding, is the fact that there is some

8    relation between the surface waters in the Terwilliger area

9    and this deeper aquifer.

10    MR. GIRARD:  Yes, and then he said waters in the deeper

11    aquifer move into the desert drainage area and they don't

12    contribute to the Santa Margarita River.

13    MR. VEEDER:  He doesn't say that now.

14    MR. GIRARD:  He said it in his testimony.

15    MR. VEEDER:  It was in a state of nature.  Now there

16    is a reverse gradient, so that the water goes back to

17    Anza Valley.

18    MR. GIRARD:  In the deeper aquifer.  But it doesn't

19    contribute to the Santa Margarita River.  It stays in there,

20    but it doesn't go out.

21    MR. SACHSE:  That is right.

22    MR. VEEDER:  No, the water is presently pumped out of

23    the deeper aquifer.

24    MR. SACHSE:  Yes, it is pumped out.

25    MR. VEEDER:  And the result of the pumping out in the

p-9

1    deeper aquifer is to cause waters which normally would be

2    Santa Margarita River waters to come in and recharge the

3    deeper aquifer.

4         So I insist, with all respect to your Honor, that

5    we do now have a situation in which the deeper aquifers

6    are tapping waters in the shallower aquifers and those waters

7    are part of the Santa Margarita River.

8         MR. GIRARD:  I would agree, Mr. Veeder, that to the

9    extent that the deeper aquifer waters are depleted, they

10   are recharged by waters which fall within the Santa Margarita

11   River watershed, just exactly as happened in a state of nature.

12   And the same thing applies all throughout the watershed.  But

13   still, once those waters are in the deeper aquifer they don't

14   contribute to the Santa Margarita River.

15        THE COURT:  It is a very simple thing to state.  All

16   you have to do is to go down about as far as you are now and

17   say that these waters in the deeper aquifers, absent pumping,

18   would flow out of the watershed; that now they are being

19   pumped and that some of the best wells are found in those

20   areas.  As they are pumped out of the deeper aquifers, the

21   Santa Margarita waters falling in the Santa Margarita River

22   watershed recharge that deeper aquifer.  And then it is also

23   true that as the water is pumped out of those deeper aquifers

24   and is used for irrigation on the surface, I suppose a certain

25   amount of that water gets into the upper layers of groundwater,

p-10

1   which, in turn, would possibly support stream flow in the

2   case of rain.

3       It is a pretty complex picture, but the essential

4   thing is that absent pumping those waters are lost to this

5   watershed.

6       MR. VEEDER:  But I wouldn't say that they don't physically

7   support the waters in the shallower aquifer.  In other words,

8   the best proof of what I have said is that when you pump

9   that water out, water which was normally part of the Santa

10   Margarita River watershed goes in to recharge it.  So I do

11   think to that extent the waters in the deeper aquifers do

12   support the waters in the shallower aquifers.

13       MR. GIRARD:  I think we have to redraft the findings

14   of fact.  But in the conclusions and judgment, are you going

15   to ever contend that anyone downstream could regulate the

16   people in Anza Valley who pump the deep aquifer?

17       MR. VEEDER:  You say would I ever?

18       MR. GIRARD:  Could it ever be?  Wouldn't you have to

19   make a conclusion that you couldn't?

20       MR. VEEDER:  I would say on that point that as long

21   as the pumping out of the deeper aquifer does reduce the

22   quantity of water in the Santa Margarita River watershed,

23   I would think the answer would be yes.

24       THE COURT:  I don't agree.  I don't think it is the

25   pumping of the deeper aquifer that reduces the water.  The

p-11

1   situation you have is this.  If that water is not pumped,

2   it is lost to the watershed.  When it is pumped, and we will

3   say pumped excessively, then you get a reverse gradient,

4   and you also get the benefit of this irrigation in the

5   upper layers of the valley, which is beneficial to the

6   stream's system below.

7      MR. GIRARD:  Just like importing water, if you want

8   to look at it that way.

9      THE COURT:  Yes.

10     MR. VEEDER:  Let's actually see what Dr. Mann testified

11  to on this point of water leaving the watershed.  He said

12  that that water in the deeper aquifer --

13     MR. STAHLMAN:  Are you reading now?

14     MR. VEEDER:  No.

15     MR. STAHLMAN:  I thought you had your transcript.

16     MR. VEEDER:  He said that the water in the deeper

17  aquifer moved 500 feet a year.  Well now, your Honor, 500

18  feet a year wouldn't take very much water out of the water-

19  shed.

20     MR. STAHLMAN:  How do you know?

21     MR. GIRARD:  How wide a spot?  500 feet a year for

22  six inches isn't very much.  But 500 feet a year for a mile

23  is.

24     MR. VEEDER:  It is a very limited area.  All you have

25  to do is look at the map.  And when the water is only moving

20,198

p-12

1    500 feet a year -- this is not the Columbia River.  It

2    is not anything like that.

3        MR. SACHSE:  He says in the next section, it is half

4    a mile wide and a mile long.

5        MR. VEEDER:  But the combined aquifer is not even

6    depicted.  He couldn't even describe it going out of the

7    Terwilliger watershed.  So you don't know.  And I am not

8    going to buy the idea that there is a very large leakage

9    out of the Santa Margarita River.

10        MR. GIRARD:  I would agree with you, Bill.  But the

11    point is that in a state of nature, regardless of how much

12    was down there, not one drop of it got into the Santa

13    Margarita River.

14        MR. VEEDER:  I will say this, that all of the recharge

15    into it comes from the Santa Margarita River; so that to the

16    point that the lower aquifer was entirely filled it did

17    support the Santa Margarita River water and any diminution

18    of that would reduce the quantity of water going down through

19    the creek.

20        THE COURT:  You have a serious question whether you

21    could ever restrain pumping there because certainly the

22    pumping out of that deep aquifer causes a reverse gradient;

23    and secondly, the pumping takes the water from the deep

24    aquifer and puts it up on the surface of the ground where

25    a portion of it goes back into the upper layers and gets

p-13

1    downstream and would also tend to support the surface

2    flow that would flow down the channels.

3        MR. STAHLMAN:  I think Mr. Veeder has a reverse gradient

4    in his thinking on this question.

5        MR. VEEDER:  We certainly have a reverse gradient at

6    the present time.

7        THE COURT:  Didn't Dr. Mann testify that in a state

8    of nature that water flowed out of the watershed?

9        MR. STAHLMAN:  Yes.

10       MR. GIRARD:  Yes.  And now you have stopped it.

11       THE COURT:  Isn't that what he testified to?

12       MR. GIRARD:  Yes; that it moved into the desert drainage.

13       THE COURT:  And by deep pumping you stop that and you

14   bring the water from below to the surface, so that the deep

15   pumping is beneficial.  It would seem to me it would be

16   very difficult to restrain that deep pumping.

17       MR. VEEDER:  I will say this, your Honor, I think at

18   this juncture it is an academic question.  The only thing

19   I do want is that it appear that at the present time the

20   pumping from the deeper aquifer does have an effect on the

21   Santa Margarita River one way or the other.  I don't want

22   all this pumping in the area of the deep aquifer to be

23   outside the jurisdiction of this Court.  I want it subject

24   to determination here, and I want the controls over those

25   pumps in the deeper aquifer to continue.  If we have that,

1    I have all that I can ask for.

2         I think the really important aspect here is the relation-

3    ship between the Indians and the people who are pumping in

4    the deeper aquifer.  So, if we could have language along

5    the line I have described here of the continued jurisdiction

6    over those pumps in the deeper aquifer and the relationship

7    between the rights of the Indians and those rights of those

8    pumping, I think that is all I desire.

9         THE COURT:  I don't really see how the Indians are

10   affected.  The Indians are upstream on higher ground.  The

11   pumping is down below.  Oh, you are talking about Cahuilla.

12        MR. VEEDER:  Yes.

13        MR. GIRARD:  Some of the Cahuilla Indian land overlies

14   this deeper aquifer.

15        MR. VEEDER:  That is right.  The fact is, the deeper

16   aquifer starts in Section Twenty-one and angles clear across

17   Section Twenty-seven.

18        MR. GIRARD:  But the Indians certainly would have the

19   same rights to that water as anyone else in that area would

20   have, regardless of downstream rights.

21        MR. VEEDER:  That is correct, and I want that to be

22   very clear, that in this litigation here, the matter is

23   before the Court and their rights are to be adjudged  here.

24   That is all I want.

25        MR. GIRARD:  I have no objection to that as far as inter se

p-15

1    among the people in Anza Valley, because the Indians alone

2    would give this court jurisdiction.

3         MR. VEEDER:  That is right.

4         MR. GIRARD:  But still, don't you concede, that when

5    the groundwaters are in that deeper aquifer, once they get

6    down there, the only way they can add to, contribute to or

7    support the Santa Margarita River is if somebody pulls them

8    out and pumps?

9         MR. VEEDER:  No.  This matter was gone into by Dr. Mann

10   and he points out that in the area of recharge, that is,

11   where those three streams come down, it is a highly porous

12   area in there.  Actually, there is continuity between the

13   waters in the deeper aquifer and the shallower aquifer in

14   the area of recharge.  So I say that the waters in the

15   deeper aquifer do, in fact, support the water in the

16   shallower aquifer.

17        THE COURT:  I am not going to find that.  Mr. Girard,

18   you can take a hand at drawing this.  Because it is patent

19   that if you didn't pump the deeper aquifer and then the

20   waters in these three areas of charge came down in there,

21   you would be losing water out of the Santa Margarita River,

22   because it would be flowing underground out of the watershed.

23   There is not any question about that.  So that your pumping

24   of the deeper aquifers is beneficial in moving the water

25   from the ground to the surface.  This cuts both ways with the

p-16

1 Indians and the farmers up there.  I think, as a matter of

2 fact, the Indians in that one section in there, parts of

3 two sections, over that ancient stream bed, have a terrific

4 water right in view of the fact that apparently the Indians

5 have a right to all that they can or will use in the future.

6 They have a pumping right over the bottom of that stream

7 bed.  It would cut both ways.  But I can't ever imagine

8 restraining people from pumping out of that stream bed

9 to protect waters of the stream.  Suppose there is no

10 pumping at all.  Then this deeper aquifer is, to a certain

11 extent, recharged by the Santa Margarita River.  But what

12 is happening?  You are losing water out of the watershed.

13 There is no economy there.

14 　　I don't know how you are going to word this.

15 　　MR. VEEDER:  Well, let me try some language during

16 the recess.

17 　　THE COURT:  Mr. Girard, will you try your hand, too?

18 　　MR. GIRARD:  Yes, your Honor.

19 　　THE COURT:  All right, take a recess.

20 　　MR. GIRARD:  I have no objection to No. 18, incidentally.

21 　　(Recess  -- Another Matter)

22

23

24

25

20,203

#3-1

1    THE CLERK:  Two, 1247-SD-C, United States v. Fallbrook.

2    THE COURT:  We are down to No. 18.

3    MR. GIRARD:  I have no objection to 18.

4    MR. SACHSE:  I have no objection.

5    THE COURT:  19.

6    MR. SACHSE:  I have no objections to 19.

7    THE COURT:  20.

8    MR. SACHSE:  On 20, at Line 15½, I think the statement

9    is not quite correct.  It says, "...with the result that

10   water no longer passes into Terwilliger Valley. . ."   I

11   think you mean to say, water  no longer passes out of the

12   watershed.

13   MR. VEEDER:  Yes, you are right.

14   THE COURT:  Strike out "into Terwilliger Valley" and

15   say, "out of the watershed".

16   21.

17   MR. STAHLMAN:  In 21 should there be some reference to

18   what the finding was on Anza, the number of the finding?

19   THE COURT:  You are talking about Cahuilla Ground Water

20   Basin.  Are you going to mark out a groundwater area there,

21   too?

22   MR. VEEDER:  I think it will be necessary, your Honor.

23   THE COURT:  I notice the map spells some of this

24   "C-o-a-h" and some of it " C-a".

25   MR. VEEDER:  I have used "C-a-h" because that is the

3-2

1    language used in the Executive Orders and in the statutes.

2        MR. GIRARD:  He makes it clear also in Finding No. 1

3    by referring to another spelling of it.

4        MR. VEEDER:  On Line 25 we say " Cahuilla Creek

5    (sometimes spelled Coahuilla Creek)".

6        THE COURT:  All right, any suggestions on 21?

7        MR. SACHSE:  Yes, at least a question, or else I am

8    not reading these sections right.  I think this is incorrect,

9    with the line you have worked out earlier, because it says

10   Section 33, Township Seven South, overlies the basin.  Well,

11   it doesn't, according to the lines Colonel Bowen has drawn.

12   Section 33 is down in --

13       MR. VEEDER:  Here is Section 33.  Are you in the right

14   place now?

15       THE COURT:  Range Two.  We are starting a new subject

16   here.

17       MR. SACHSE:  I beg your pardon.  I am all wrong.  Pardon

18   me.

19       THE COURT:  All right.  22.

20       MR. STAHLMAN:  In 21 do you think we should make

21   reference to the specific finding in Anza instead of merely

22   these findings in connection with the Anza groundwater basin?

23       MR. VEEDER:  I really think on this whole matter,

24   George, that Mr. Girard and I should work together on

25   Interlocutory Judgment No. 33 and correlate it back and forth.

3-3

1    I think that is the only way we can do it.

2         THE COURT:  All right, 22.

3         MR. GIRARD:  I have no objection to 22.

4         THE COURT:   "Ground waters draining from the alluvial

5    fill of the Basin in Section Fourteen (14) and Twenty-three (3

6    (23). . ."  Where are they?

7         MR. VEEDER:  Here, your Honor, (Indicating on a map).

8         THE COURT:  All right, 23.

9         MR. GIRARD:  I have no objection, except that

10   commencing on Lines 17 through 21 I think that sentence

11   should be deleted.

12        MR. STAHLMAN:  It doesn't make sense.

13        MR. GIRARD:  It should be worked out with that language

14   I am going to try to do over on Finding No. 17.

15        MR. VEEDER:  That is correct.

16        THE COURT:  Should the language come out of here, then?

17        MR. GIRARD:  Yes.

18        MR. VEEDER:  It will have to coincide with whatever is

19   agreed upon, on Finding No. 17, your Honor.  Starting with

20   "Under" and ending up with "system".

21        THE COURT:  All right, 24.  We are talking about the

22   Anza Basin this time.

23        MR. SACHSE:  Yes.

24        THE COURT:  25.

25

3-4

1    MR. GIRARD:  25, 26, 27.  I have a slight question

2    on 29.  I have no objection to these findings, but I think

3    we ought to have that general finding on prima facie

4    evidence on these things, which is not in there -- you know,

5    the one that was used throughout the other findings, that

6    these statements as to irrigable acreage only prima facie

7    evidence.

8         MR. VEEDER:  I will, of course, object to that, as I

9    always have. .

10        THE COURT:  Let's put it in.  Make them consistent.

11        MR. VEEDER:  Where will that go in, then, your Honor?

12        MR. SACHSE:  Bill, since you have a great many of

13   this type of findings for each Indian Reservation, I would

14   suggest that it go practically at the end of the finding of

15   fact and just refer back and say that findings of fact as

16   contained in 25, 26, 27, 28, 38, whatever they are, are

17   prima facie.

18        MR. VEEDER:  We will put it in, reserving my right to

19   object to it.

20        MR. STAHLMAN:  There is one other question I have

21   in connection with No. 25.  At Line 14 it says, "Freezing

22   temperatures or below freezing termapure may be expected

23   during the period from November to April each year."  I

24   think probably that is correct in that area.  But where is

25   the evidence in the record?

3-5

1    MR. VEEDER:  Colonel Bowen testified.

2    MR. STAHLMAN:  Is that in his reports, too?

3    MR. VEEDER:  Yes, Colonel Bowen testified that that is

4    the situation, and his reports went in on that basis.

5    MR. GIRARD:  On No. 29 I have a question just for my

6    own clarification.  You say, "There are twelve thousand,

7    nine hundred and ninety-eight (12,998) acres of land,

8    Class I - IV, which are susceptible of irrigation within the

9    Cahuilla Indian Reservation."  Is that the same thing as

10   saying "which are irrigable"?

11   MR. VEEDER:  That is right.  If you want to use the

12   word "irrigable" it suits me.

13   MR. GIRARD:  It doesn't make any difference.

14   THE COURT:  Do we anywhere in this record say what

15   Class I to IV is?

16   MR. VEEDER:  Yes.

17   MR. GIRARD:  It is in the soil surveys, but I didn't

18   know that meant necessarily irrigable.  I assumed it did.

19   MR. VEEDER:  Yes.

20   THE COURT:  At least put it in parenthesis.

21   MR. VEEDER:  I would just as soon.  This is the only

22   place I have used it.  Why not say that twelve thousand

23   acres are irrigable?

24   MR. SACHSE:  Acres of irrigable land.

25   MR. VEEDER:  Drop out the Class I and IV.

^36

1    THE COURT:  All right.

2    30.  Do we have this in the record?

3    MR. VEEDER:  Yes, your Honor.  Mr. Warnock testified

4    to this.

5    MR. SACHSE:  What I am curious about this one is what

6    the particular significance of this is.  Does this create

7    some sort of prescriptive or appropriative right?

8    MR. VEEDER:  No, it simply evinces the use of water,

9    Mr. Sachse.

10   THE COURT:  Who does this spring belong to?

11   MR. VEEDER:  It is on part of the Indian Reservation.

12   THE COURT:  Why don't we tell what you are saying

13   here:  "There are situated. . ."  the Indian Reservation is

14   Cahuilla?

15   MR. VEEDER: Cahuilla, yes.

16   THE COURT:  Insert "in Cahuilla Indian Reservation".

17   All right, 31.

18   MR. GIRARD:  I would just add there, if this is

19   correct, "situatued within the Cahuilla Indian Reservation

20   in the north half of the Northwest Quarter . . ."

21   MR. VEEDER:  Yes.

22   THE COURT:  Do the same thing there.  This is also

23   the Cahuilla?

24   MR. VEEDER:  That is right.

25   THE COURT:  The same as to 32?

3-7

1    MR. VEEDER:  Yes, that is right.

2    MR. STAHLMAN:  Is that right,"have been irrigated"?

3  Being irrigated now?

4    MR. VEEDER:  I couldn't say, George, whether it is

5  being irrigated now or not.  But there is evidence that they

6  had an irrigation system up there.

7    THE COURT:  So that the extent of the irrigation that

8  has taken place has been 35, 55, 65, 71 acres?

9    MR. VEEDER:  Something like that, your Honor.
   THE COURT:
10    In 32 you would make the insertion, "situated at . . ."

11    MR. VEEDER:  Cahuilla.

12    MR. GIRARD:  Is there anything in the evidence to

13  indicate how many Indians reside on this Reservation?

14    MR. VEEDER:  I would have to look, Mr. Girard.

15    MR. GIRARD:  Do you have an estimate, Colonel Bowen?

16    COLONEL BOWEN:  I think Mr. Warnock testified in that

17  regard.

18    MR. VEEDER:  I can check it out, if you want.

19    MR. GIRARD:  I would like to have added on here, in

20  No. 33, "water rights used to meet the domestic needs of the

21  approximate _____(blank) number of Indians residing on the

22  Reservation," if it is in the record.

23    MR. VEEDER:  I will have to check it.  I don't know.

24  I have forgotten.

25    MR. STAHLMAN:  Is there testimony that there is livestock

20,210

3-8

1    up there?

2        MR. VEEDER:  Yes, Mr. Warnock testified on that.

3        MR. STAHLMAN:  I don't recall that testimony.

4        THE COURT:  You put that in as to Cahuilla.

5        And we do the same thing as to Ramona, is that right?

6        MR. VEEDER:  Yes, we will put that irrigable.  Is

7    that all right?

8        MR. STAHLMAN:  Yes.

9        THE COURT:  On 34 you would strike the Classes?

10       MR. VEEDER:  And put in "irrigable."

11       MR. SACHSE:  Acres of irrigable land.

12       THE COURT:  Which are irrigable.

13       Are you going to put in No. 35 the number of Indians?

14       MR. VEEDER:  If it is in the record, your Honor.  I

15   will have to check it.

16       THE COURT:  36, Pechanga.

17       MR. STAHLMAN:  Does 35 mean anything here?

18       MR. VEEDER:  It means something to me, George.

19       MR. STAHLMAN:  What does it mean, Bill?  "The cropping

20   pattern, water duty and related matters found in regard to

21   the Cahuilla Indian Reservation are equally applicable to

22   the Ramona Indian Reservation."

23       MR. VEEDER:  When you go back to 25, 26 and 27 -- I

24   can repeat them, if you want me to.

25       MR. STAHLMAN:  You don't need to repeat them, but I

20,211

3-9

1    think you ought to make reference to what you mean there.

2        MR. VEEDER:  It suits me.  I will say, "The cropping

3    patter, water duty and related matters found in Findings

4    No. 25, 26 and 27 in regard to the Cahuilla Indian

5    Reservation are equally applicable here."

6        MR. STAHLMAN:  Okay.

7        MR. SACHSE:  On No. 36 I think you ought to put in the

8    number of Indians.  There are very few there.

9        MR. STAHLMAN:  There are four of them, I think, aren't

10   there?

11       MR. VEEDER:  Four?

12       MR. SACHSE:  About that.

13       MR. STAHLMAN:  Four, but they are part-time residents.

14       THE COURT:  Is that all there is in Pechanga?

15       MR. SACHSE:  I am not being facetious.  I recall at

16   the Congressional Hearing that all of us attended in

17   Washington some Congressman asked about this particular

18   Reservation and asked the Solicitor for Agriculture what they

19   did -- what is the name of the Solicitor for Agriculture --

20   who said he thought that they all left the Reservation and

21   were working in the aircraft factories.  It was Pechanga he

22   was talking about.

23       MR. GIRARD:  Mr. Wilkinson says he doesn't think there

24   are six up there.

25       THE COURT:  Do you have any proof on this?

20,212

3-10

1    MR. VEEDER:  I will have to check it, your Honor.  I

2    don't recall.

3    THE COURT:  Mr. Wilkinson has been sworn heretofore.

4    You live in that area, do you not?

5    MR. WILKINSON:  I do, your Honor.

6    THE COURT:  How many Indians currently are living on

7    Pechanga?

8    MR. WILKINSON:  I do not exactly know, but I would be

9    surprised if there are more than six Indians living on

10    Pechanga.

11    THE COURT:  How many houses in there?

12    MR. WILKINSON:  There are various houses in there in

13    states of disrepair.

14    THE COURT:  Unoccupied?

15    MR. WILKINSON:  I wouldn't say how many houses are

16    occupied, your Honor.  I would doubt if there are more than

17    two.

18    THE COURT:  And how many Indians lived there at any

19    time in the past, do you recall?

20    MR. WILKINSON:  That I don't know, your Honor.  In my

21    experience, there have been very few.

22    THE COURT:  All of the time you have been up there?

23    MR. WILKINSON:  All of the time I have been up there.

24    MR. VEEDER:  I am going to move to strike that evidence

25    on the ground that it is incompetent, irrelevant and

3-11   1   immaterial, and the man says he doesn't know.

2   THE COURT:  This is your best estimate?

3   MR. WILKINSON:  My best estimate, your Honor.

4   MR. VEEDER:  He is no expert on Indians.

5   MR. STAHLMAN:  Do you visit the Reservation on

6   occasion?

7   MR. WILKINSON:  I have been there on frequent occasions.

4 fl   8   THE COURT:  37.

9   38.

10   MR. SACHSE:  37, 38 and 39 are okay.

11   THE COURT:  At the bottom of Page 13, "added to the

12   Pechanga Indian Reservation," I suppose when you say

13   the Reservation that means the deed ran to the Secretary?

14   MR. VEEDER:  That is correct, your Honor.

15   THE COURT:  40.

16   MR. SACHSE:  Okay.

17   THE COURT:  41.

18   MR. SACHSE:  Okay.

19   THE COURT:  42.

20   43.

21   44.

22   45.  Do we refer to any map that shows the weathered

23   basement complex or basement complex?

24   MR. VEEDER:  I haven't, your Honor, but it would

25   appear on 15-E.

MR. SACHSE:  15-E Series.

MR. VEEDER:  15-E.  May I check that just a moment.

I am quite sure it embraces the whole thing, but I want to be sure.

That is correct, your Honor, 15-E takes it all in.

THE COURT:  Let's put it in here after "... within the Pechanga Indian Reservation, as shown on Government's Exhibit 15-E".  That shows the Reservation, too, doesn't it?

MR. VEEDER:  Yes, it does, your Honor, the boundary is outlined on it.

THE COURT:  All right.

46.

MR. GIRARD:  I have a question on that, and also on No. 25 may be another one.  On Line 7 it says, "Agriculture can not be successfully practiced without irrigation."  It is my understanding that a lot of this land around here has dry farming on it.

THE COURT:  A lot of it has been dry farmed for years.

MR. VEEDER:  Let's take it out, then.

MR. GIRARD:  It should come out on 25, too, because it is the same situation.

MR. VEEDER:  I think the word "successfully" is important there.

MR. GIRARD:  47 and 48 I have no comments on.

On 49 Mr. Sachse and I have comment.

13

1      MR. SACHSE:  I think either we had better change

2   everything we have in the record or you take that Class VI

3   land out of irrigable lands, because every one of your

4   exhibits in there says "land not suitable for cultivation,

5   Class VI."

6      MR. VEEDER:  I want to talk to Colonel Bowen about this.

7   If you want to be on the record, it's all right.  As I

8   remember, the question came up whether there was some

9   avocado land on the Pechanga Indian Reservation which was

10   Class VI.  I believe there is something in the record that

11   that land could be used for avocados.

12      Do you recall that, Colonel?

13      COLONEL BOWEN:  Avocados or citrus.

14      MR. SACHSE:  My point is, your Honor, that every single

15   one of these reports (Handing document to the Court)

16   indicate land not suited for cultivation Class VI, and we

17   have hundreds of them in the file.

18      MR. GIRARD:  We have to be consistent one way or the

19   other.

20      COLONEL BOWEN:  There is ample evidence in the record,

21   your Honor, in explanation of this.  But to refresh Mr.

22   Sachse's memory, I will remind him that at the lower

23   elevations of the Santa Margarita River watershed on sites

24   which are suited to the production of avocados and citrus,

25   crops which may be  grown with little or no cultivation, a

14

1  Class VI site was considered irrigable throughout the DeLuz

2  area, the Fallbrook area, the Santa Margarita below the

3  Temecula Gorge, and in this portion of the property, as well

4  as on the Vail Ranch, Class VI land which can produce a

5  crop without cultivation but with irrigation is listed as

6  "irrigable".

7       MR. SACHSE:  Do we have any evidence in the Pechanga

8  as to the number of acres of this stuff?  Is it so broken

9  down?

10      COLONEL BOWEN:  Yes, sir, we do.

11      MR. SACHSE:  All right.  I recollect fully that DeLuz

12  problem, since it is my client.

13      THE COURT:  Isn't it too cold for citrus or avocados?

14      COLONEL BOWEN:  That is the border line, your Honor,

15  and it would not be in the valleys, but on the slopes, the

16  higher ground similar to the Pauma Valley development over

17  the hill, just as in the Fallbrook area or the San Luis Rey

18  Heights area, there is much of that lower lying land which

19  is cold and not suited to subtropical plant production.  The

20  same is true up in this area.  And, as I say, it borders on

21  it.

22      MR. STAHLMAN:  I don't think we, in our interpretation

23  of "irrigable acres," considered a lot of that land, for

24  instance, on Santa Rosa, classified as Class VI being

25  susceptible of irrigation.  We are out of step with the

Indians.

COLONEL BOWEN:  I believe, your Honor, if Mr. Stahlman would check the report we made for him, that Class VI sites, where considered suitable for irrigation without cultivation, have been included in the irrigable acreage on the Santa Rosa.

THE COURT:  All right, I think if you are going to put Class VI in here you had better put some more language in to define what it is.

MR. VEEDER:  All right.

THE COURT:  It is irrigable but not cultivatable, and it is a border line proposition.

MR. VEEDER:  All right.

MR. SACHSE:  What is Exhibit C?

MR. VEEDER:  Take that out, Mr. Sachse.

MR. SACHSE:  Take the whole sentence out?

MR. VEEDER:  Yes.

MR. SACHSE:  The whole sentence on Line 19 goes out, according to Mr. Veeder.

MR. VEEDER:  Yes.

MR. GIRARD:  One question I wanted to ask also.

MR. VEEDER:  Excuse me just a moment.  We would delete Class I through IV and Class VI, putting in the explanation the Court requested in regard to the land for avocados.

THE COURT:  You might as well leave the IV and VI in and

1      then just put in a paragraph as to what it means.

2             MR. VEEDER:  All right.

3             MR. STAHLMAN:  It is one of those prima facie situations

4      anyway.

5             MR. SACHSE:  Yes.

6             MR. GIRARD:  One question I wanted to ask, Bill.  On

7      your Area A lands, that includes these lands which were added

8      to the Pechanga Indian Reservation by a patent; is that right?

9             MR. VEEDER:  That is right.

10            MR. GIRARD:  What was the history of these patents?

11     Were they acts of Congress, or were there any reservations

12     or Executive Orders concerning Indian Reservations?

13            MR. VEEDER:  Yes, there was an order.

14            MR. GIRARD:  On Page 13 it says "were added to that

15     Reservation by an unnumbered patent".

16            MR. VEEDER:  That is correct.  There was a patent

17     actually issued to the Mission Indians or the Temecula

18     Indians, as they were referred to at that time.

19            MR. GIRARD:  Was it issued to them as part of the

20     Reservation?

21            MR. VEEDER:  That is right.

22            MR. GIRARD:  Or just an ordinary patent?

23            MR. VEEDER:  No, it was part of the Reservation.

24            THE COURT:  What about No. 50?  This would imply that

25     there are waters  running down Pechanga Creek and that the

20,219

Indians there are making use of them.   That is probably not true.

MR. VEEDER:  No, your Honor, I think there is evidence in the record to that effect, that is largely a livestock operation and that all of these Indian Reservations --

MR. SACHSE:  I was going to raise the same question your Honor did.  Your Finding No. 50 says, "At the present time the waters of Pechanga Creek and the Murrieta-Temecula groundwater area within the Pechanga Indian Reservation are largely used for stock raising and domestic purposes."  I don't think that is true.  The waters of the creek aren't largely used for stock raising and domestic purposes.  There is nobody there to use them.

MR. VEEDER:  It suits me.  We will change that then.

THE COURT:  Actually, if you are going to find the facts, it should be that there is very small use there, and what use there is is for stock raising and domestic purposes.

MR. STAHLMAN:  I don't think there is any stock raising there.  There might be a cow or so there.  There is no operation of raising stock.

MR. VEEDER:  What was the language you wanted, your Honor?

THE COURT:  Say that at present or currently there is very little use made by the Indians of the waters out of the

groundwater area, but that such use as is made is for stock raising and domestic purposes.

MR. VEEDER:  All right, sir.

THE COURT:  What is this next one about the trust allotment?

Who was Pedro Justapiz?

MR. VEEDER:  He was an Indian and a patent issued to him on August 29, 1893.

MR. STAHLMAN:  That is not in the evidence.

MR. VEEDER:  Yes, it is.

MR. STAHLMAN:  Where?  I don't recall that.

MR. VEEDER:  There is an exhibit showing it.

THE COURT:  Is this land a part of the Reservation?

MR. VEEDER:  It is not a part of the Reservation, and I have put it down separately from the Reservation, if you will observe, your Honor.

THE COURT:  Just because he was an Indian and got a patent, that doesn't give him Indian rights, does it?

MR. SACHSE:  I think we ought to clarify it.  I thought this was down around Pechanga somewhere.  Evidently it is up in the other end of the watershed.

MR. VEEDER:  Yes.

THE COURT:  What difference does it make?  The mere fact that he is an Indian and got a patent doesn't give him Indian rights, does it?

1       MR. VEEDER:  I think it does.

2       THE COURT:  What was the patent?  Just a homestead?

3       MR. VEEDER:  No, it was a patent that was issued to

4  this Indian by the Department of the Interior.

5       MR. GIRARD:  Let's see the patent you have there.

6       MR. STAHLMAN:  I don't remember any evidence in

7  connection with it.

8       MR. VEEDER:  Exhibit 126-C was put in evidence. Colonel

9  Bowen made a soil survey of it.  You have the exhibit in your

10  hands.

11       MR. STAHLMAN:  Where is there evidence there was a

12  patent issued to this particular person?

13       MR. GIRARD:  The whole doctrine of Indian rights is a

14  doctrine based on treaties with nations, not with

15  individuals.  I'm certainly not going to quibble with Pedro.

16       MR. STAHLMAN:  I am not going to quibble about it but

17  I don't think we ought to put in a finding of fact and

18  affirmatively establish matters that have not been factually

19  proved.

20       MR. VEEDER:  This has been factually proved.  What

21  more do you want?

22       THE COURT:  Either let's look at the patent and see,

23  or put a caveat in that although the Court has entered this

24  parcel in Interlocutory Judgment No. 41 on the Indians, the

25  Court makes no finding as to whether this individual possesses

1   any Indian rights or whether he possesses merely the rights

2   of a patentee of land.

3       MR. VEEDER:  You will observe that I have left out any

4   reference to this particular piece of land from the

5   conclusions of law and decree, because I wanted to bring it

6   to your attention, the nature of it.  It is not part of one

7   of the Reservations.

8       MR. GIRARD:  What is a trust allotment, Bill?

9       MR. VEEDER:  A trust allotment is the means of

10  conveying title by the United States to Indians.  In other

11  words, for a period of 25 years the land would be occupied

12  under what they call a trust allotment.  The land would not

13  be subject to alienation or sale.  After a period of 25 years

14  then the property could be sold.

15      THE COURT:  Trust allotments have other meanings.  The

16  Palm Springs Indian case involved trust allotment.

17      MR. VEEDER:  That is right.

18      THE COURT:  I think the ordinary case of a trust

19  allotment is where instead of the tribe being specified, the

20  individuals are allotted certain parcels of ground.  But this

21  is ordinarily within an Indian Reservation.

22      MR. VEEDER:  This is unique in that regard.  I have

23  never encountered one like this before.  Normally, as your

24  Honor said, in the old days it all went to the tribal group.

25  Then as a decision was made as to whether the Indians were

1    sufficiently advanced to get title themselves, trust patents

2    would be issued to them as individuals as separate from the

3    tribal group.

4         THE COURT:  Do the heirs of this alleged Indian live

5    up there on that ground?

6         MR. VEEDER:  I have been unable to get any information

7    on that.

8         THE COURT:  You must somewhere have the patent.

9         MR. VEEDER:  It is of record, and I will obtain it.

10        THE COURT:  Let us either find out about the patent, or

11   let us put a caveat  in that although we make these

12   findings, we make no finding as to whether this is Indian

13   land or whether there are Indian rights.

14        MR. GIRARD:  Do the Indians still own it?

15        MR. VEEDER:  Mr. Girard, I don't know that.  I will

16   check it out with the Indian Service.

17        THE COURT:  That brings us to the end of the first

18   installment.

19        MR. SACHSE:  There are three more findings on the

20   next page, and then the conclusions of law.

5 fls

21

22

23

24

25

MR. GIRARD:  I have no comment on Nos. 54 and 55.
We might start with 56, on which I may have some comments.

MR. SACHSE:  No. 53 is out.  We will have to renumber it.

MR. VEEDER:  That arises from the original draft.
These have to be all rerun.

MR. GIRARD:  I would say generally, Bill, that your prima facie findings should come in where No. 56 is now.

MR. VEEDER:  You mean your prima facie findings.

MR. GIRARD:  Yes, the Court's.

THE COURT:  You are going to do something as to No. 55.
You are going to say, "The cropping pattern, water duty and related physical phenomena found in Findings No. 25, 26 and 27 .." I think they were.

You haven't made any finding about Pechanga.  Oh, pardon me.

MR. GIRARD:  Yes, he did.

THE COURT:  Now 56.  Why do you fasten it down to 4.4 when actually the duty varies, depending upon the type of crop, and the findings I have made show this.

MR. VEEDER:  The maximum demand, as I recall the record, the maximum diversion duty for crops in the watershed and for irrigated pasture, as I remember, we put it down to 4.4.
That would be the most that could ever be claimed for a single acre.

p-18

1    THE COURT:  No, on page 10 you have row crops four

2    acre feet, and then you say "to the requirement above should

3    be added 10 percent," so that would be 4.4.

4    MR. VEEDER:  Yes, row crops is the lowest water,duty,

5    and that is 4.4.  That is the reason why we use that figure.

6    THE COURT:  Why do you say lowest water duty?

7    MR. VEEDER:  No, the less water you use the higher

8    the duty, the more water you use, the lower the duty.

9    MR. GIRARD:  The point I am making on this Indian

10    matter, certainly the 18,000 acres of irrigable land in

11    the Cahuilla Indian Reservation, you certainly couldn't

12    conceivably argue that anyone intended to reserve 4.4

13    acre feet of water for that many acres.  It is ludicrous,

14    because in the state of nature if they were the only person

15    using the water it is not there.

16    MR. VEEDER:  I think that is true.  I will not agree

17    as to its being ludicrous.  I will say that at any time in

18    the desert areas you talk about the claims, demands and

19    desires of the people, you are talking about far more water

20    than there is probably available.  Nevertheless, when they

21    did set aside these reservations they certainly intended

22    to reserve water to the extent that it was available for

23    those reservations, and my view is that I'm not talking about,

24    and I don't believe anybody is talking about, sayingthe

25    exact quantity of water that was reserved.  So I give you a

P-19

1    criterion upon which you can work.

2        MR. GIRARD:  I would just say rights to the use of

3    groundwaters for the Indians' use, but not any specific

4    quantities.

5        MR. VEEDER:  We have already made findings as to

6    specific quantities, Mr. Girard.

7        MR. GIRARD:  Certainly you make findings on Pechanga,

8    for example, but you have no Indians living there, to speak

9    of.

10       MR. VEEDER: That is beside the point.  Whether there

11   are Indians there or not, the water is reserved and the

12   land is for the Indians.

13       MR. GIRARD:  But if it ever came down to an apportionment

14   proceeding, if the Indians themselves or someone else was

15   not using that water, you wouldn't just tie it up as Indian

16   water.

17       MR. VEEDER:  Certainly unless there was someone there

18   to use the water you wouldn't say that that water would

19   be set aside for that land.  That is true.  But this is

20   a proceeding in which we are making a declaration as to their

21   rights, and this is not the injunctive process at this point.

22       THE COURT:  Has anybody given any attention to this

23   matter in view of these Indian cases which we looked at?

24       MR. GIRARD:  We are going to get into rather lengthy

25   argument this afternoon on conclusions of law for this matter,

p-20

1    your Honor.

2        THE COURT:  Have you done some work on it?  Have you

3    got some suggestions to make?

4        MR. GIRARD:  We have some suggestions.  I am sure

5    Mr. Veeder has.  I think you are going to have to resolve

6    them.

7        Essentially, as I read these findings and conclusions

8    of law, Mr. Veeder takes the position that the Indians have

9    a right to water as against prior vested rights correlatively.

10   By prior vested rights I mean prior to the date of the

11   Indian reservation being established.  He says that as

12   to prior vested riparian rights he shares correlatively

13   with those.  As to subsequent riparian rights, where the

14   patent existed after the date of the Indian Reservation's

15   creation, he says that they take junior to the Indian rights.

16       I think Mr. Sachse's and my position will be, essentially,

17   that the Indians have either got to take it under the regular

18   Indian right, which is set forth in Mr. Riskind's report as

19   a right to use water that Congress intended to reserve to

20   the Indians, the right to use sufficient water to satisfy

21   their needs, but that right has a priority date as of the

22   date of the creation of the Indian Reservation and the

23   Indian Reservation takes subsequent to all prior vested

24   rights.

25       THE COURT:  Is there going to be any contention by the

p-21

1   government that since the government is a trustee for these

2   Indians, the government has some right to this Indian

3   water downstream at Pendleton?  You're not going to resurrect

4   that bogie, are you?

5        MR. VEEDER:  No.

6        THE COURT:  We have buried that one sufficiently deep,

7   haven't we?

8        MR. VEEDER:  I have never proposed it, certainly.  You

9   have given me some ideas, though.

10        THE COURT:  Much time has gone by.  You remember your

11   bucket at the end of the stream.

12        MR. VEEDER:  Your Honor, I went back and read all that.

13        THE COURT:  And fell on the National Forests, and fell

14   on the Indian lands.

15        MR. VEEDER:  I will not press it, unless you urge me

16   to, your Honor.

17        THE COURT:  Let's adjourn until 1:30.

18        (Thereupon, a recess was taken until 1:30 o'clock)
                                                           )
19        (p.m. of this same date.                         )

20

21

22

23

24

25

p-22

SAN DIEGO, CALIFORNIA, THURSDAY, AUGUST 8, 1962, 1:30 P.M.

- - - -

1  THE COURT:  Let's go ahead with the Fallbrook matter.

We are talking about No. 56 and the Indians?

MR. VEEDER: That is correct, your Honor.

THE COURT:  What do you want to do, proceed with these

other sections until we come to the conclusions and then

go back to No. 56?

MR. GIRARD:  I don't know that that is necessary.

The thing I object to in No. 56, if you assume --which

I will assume -- that they intended to reserve rights to

the use of water for the Indians, they only intended to

reserve whatever water was needed by the Indians, not 4.4

acre feet or anything else.  It would depend on how much

the Indians used at any given time.  And this reference that

they "intended to reserve rights to the use of the waters

of the Santa Margarita stream system, including rights to

the use of ground waters, the yield of which, if the water

is available, would be sufficient to irrigate the irrigable

acreage which has been found above at the maximum annual

water duty of 4.4  acre feet an acre," there is no evidence

whatsoever that Congress or anyone else was even aware of

4.4 acre feet or anything else.  You have six Indians in

the Pechanga Indian Reservation.  I don't know how many

irrigable acres you have.  But certainly there is no evidence

p-23

1  that Congress ever intended to reserve enough water to

2  irrigate all of those lands, unless it was needed by the

3  Indians.

4      MR. VEEDER:  I put a ceiling on the quantity of water,

5  thinking you would like that.  I'll be glad to do this, that

6  there were reserved sufficient waters to irrigate the irrigable

7  acreage.

8      MR. GIRARD:  I don't think that is correct.

9      THE COURT:  No.  The record shows how many irrigable

10  acres there are.  The record also shows what is the general

11  water duty.  But I would find that the intent in reserving

12  the lands was to reserve water sufficient for the present

13  or future needs of the Indians.

14      MR. GIRARD:  Yes, whatever that might be. It might

15  be one acre, it might be a lot.

16      MR. VEEDER:  I can't complain about that, I don't think.

17      THE COURT:  That is what the law says, isn't it?

18      MR. VEEDER:  I said sufficient to irrigate the irrigable

19  acreage.  You said sufficient to take care of their present

20  or future needs.

21      THE COURT:  Yes.

22      MR. VEEDER: All right, that suits me.

23      THE COURT: Do we have any problem about the use of

24  the waters of the stream system?  Obviously, the Reservation

25  rights only concern the waters of the stream system flowing

through the Indian Reservation.

6 fls

6-1

1      MR. GIRARD:  Yes.

2      THE COURT:  And groundwaters in the Indian Reservation.

3  There should be no finding that the Indians are entitled

4  to this water out of the stream, unless they can get it on

5  the Reservation.

6      MR. VEEDER:  I have written this in all of the findings,

7  your Honor, limiting it to those streams that border upon or

8  traverse the Indian Reservation.

9      THE COURT:  Where did you put that in?

10     MR. VEEDER:  That is in all of the findings.

11     MR. SACHSE:  You mean in the Judgment?

12     MR. VEEDER:  I know I put it in.

13     THE COURT:  The thing to do in this one is to reserve

14  the rights to the use of water of the Santa Margarita stream

15  system when upon said Indian Reservation.  Or maybe that

16  should go after groundwaters.

17     MR. VEEDER:  May I refer, your Honor, to Page 19,

18  Conclusion Ib:

19          "When the United States of America withdrew the

20      lands constituting the Ramona Indian Reservation it

21      reserved rights to the use of water in  Cahuilla Creek

22      and all other streams which traverse or border upon

23      the Ramona Indian Reservation, and in the Anza Ground

24      Water Basin within that Indian Reservation, . . ."

25     MR. STAHLMAN:  You would have to change the balance of

20,232

that, though.

MR. VEEDER:  I am just tendering the sources of water to which this would pertain.

MR. GIRARD:  I have a suggestion, your Honor.  "The United States when it withdrew the Indian lands just described in the preceding finding intended to reserve rights to the use of water of the Santa Margarita River stream system which, under natural conditions, would be physically available at the Indian Reservation, including rights to the use of groundwaters sufficient for the Indians' present or future needs."

THE COURT:  Isn't that right, Mr. Veeder?

MR. VEEDER:  How did you say that?  Available, did you say?

MR. GIRARD:  I go down to your first three lines to the word "system".

THE COURT:  And then you insert, "which, under natural conditions, would be available".

MR. GIRARD:  "Which, under natural conditions, would be physically available at the Indian Reservation, including rights to the use of groundwaters sufficient for the Indians' present or future needs."

MR. VEEDER:  I think that comes pretty close, your Honor.  I am not going to quibble about it.

THE COURT:  All right.  Then we would strike out

"the yield of which" and instead insert -- what did we say?

MR. GIRARD:  Sufficient for the Indians' present or future needs.

MR. VEEDER:  Let me explore this a moment, Mr. Girard and your Honor.

THE COURT:  Let's try this first and then you may explore it:  "sufficient for the present or future needs of the Indians residing on the Reservation."

MR. GIRARD:  All right.

MR. VEEDER:  Well, residing when, your Honor?  At the time they are demanding the water, or at the time of the withdrawal?

THE COURT:  Obviously.

MR. VEEDER:  All right, good.

I think that a point has been made here that probably is important as anything can be.  It should be so that if they lease the land, I mean use by a tenant of the Indians is just as important as the Indians using it themselves.  So we should have that sufficiently broad.

THE COURT:  Sufficient for the present or future use of Indians residing on the Reservation.  Well, why cross those bridges until we get to them?  The Court does not rule on the question of the rights of an assignee of the Indians. This is a big subject matter.

MR. VEEDER:  I am going to ask your Honor to.  Because

1    I think this, that this right to the use of waters reserved

2    for the Indians is an extremely valuable property right, and

3    if they chose to lease the land they are certainly entitled

4    to do that, and the right that we are claiming here runs to

5    the land and not to the Indians.

6        THE COURT:  Why cross that bridge?  There is no

7    evidence in the record that any of these lands are leased.

8        MR. GIRARD:  Therefore, the reservation you base your

9    right on runs to the Indians, not to the land.

10       MR. VEEDER:  It runs to the land.  It could not run to

11   the Indians.

12       MR. GIRARD:  It runs to the land, but the amount is

13   dependent upon the Indians' needs.

14       MR. VEEDER:  No.

15       MR. STAHLMAN:  The Indians, need and use.

16       THE COURT:  I assume that this is a fairly intricate

17   problem.

18       MR. VEEDER:  It is.

19       THE COURT:  Can't we solve it by saying we don't

20   adjudicate this problem; that there is no evidence in the

21   record that any of the Indian lands are presently leased?

22       MR. STAHLMAN:  Can they be leased?

23       MR. VEEDER:  Of course.

24       MR. STAHLMAN:  I don't know.  I am asking a question.

25       MR. VEEDER:  They are leased all the time.

THE COURT: And the Court does not now rule on rights of lessees of Indians or how to measure such rights. Isn't that the way to do it? We could fancy a thousand things that might come up. Why cross bridges that aren't in the case?

MR. VEEDER: I am going to point out, with all respect to your Honor, that what is involved here is a piece of land with rights to the use of water which are part and parcel of it, and the thing we must obtain is an adjudication to those lands of rights. The fact that those Indians would one day sell that land --

THE COURT: Let's talk about some authorities. Have some of these matters been decided?

MR. VEEDER: Yes, your Honor.  Certainly it has been decided that the rights to the use of water are part and parcel of the land and run to the land and the Indians have the right to the use of the water.

MR. GIRARD: I'll go along with that.

THE COURT: You are talking about when the water is used by someone other than the Indians.

MR. VEEDER: Yes, sir.

The necessity of such a determination right here, in my view, is of paramount importance to us, that we have a ruling that this is a reservation for the land irrespective of who subsequently owns it or who leases it.

MR. STAHLMAN: By what authority?

1     THE COURT:  If you have some cases I would like to look

2  at them.  Apparently, so far you are citing Veeder on water

3  law.  Do you have other authorities besides Veeder on water

4  law?

5     MR. VEEDER:  Yes, the United States v. Ahtanum

6  Irrigation District, 236 F. 2d,342.

7     THE COURT:  I will take up the alien matter.  Meanwhile,

8  pull a few of your authorities down.

9     MR. VEEDER:  May I go to your library?

10    THE COURT:  Yes.

11    MR. GIRARD:  I think Mr. Riskind's decision was pretty

12 much along the line suggested by Mr. Veeder, but it said

13 that the Indian allocation runs to the assignees and

14 successors of Indian lands; but Arizona is contesting that

15 vigorously before the Supreme Court.

16    MR. VEEDER:  But unsuccessfully.

17    MR. GIRARD:  How can you say that?  The Supreme Court

18 hasn't ruled yet.

19    THE COURT:  Then why should we try to prejudge the

20 Supreme Court here?    Why not leave this open?

21    MR. GIRARD:  I don't think it is decided.

22    (Another case called.)

23    THE CLERK:  Two, 1247-SD-C, United States v. Fallbrook.

24    MR. VEEDER:  Are you ready to proceed?

25    THE COURT:  Yes.

1    MR. VEEDER:  Your Honor inquired as to whether there

2  is any authority on the proposition that transferees or

3  asignees of Indian lands for which rights to the use of water

4  are claimed -- whether I had any authority on the

5  proposition.

6    I think the leading case on the matter is United States

7  v. Powers, 305 U.S. 527.  Involved there was a situation

8  arising on the Crow Indian Reservation in Montana where

9  transferees of the Indian allotments, that is, White

10  transferees of Indian allotments, asserted rights under the

11  Winters doctrine, and the Court sustained their right as

12  successors in interest to the Indians and so held against

13  the claim by the Indians that the Indians were entitled to

14  the waters for the original trust allotment.  I think that

15  case is squarely in point on the proposition and I think it

16  sustains entirely the position that we take here that the

17  successor of rights to the use of water on Indian Reservations

18  are entitled to protection.

19    THE COURT:  I have no doubts that some rights would

20  pass.  But the question is, what rights and how extensive?

21  Would the successor then be riparian along with all other

22  riparians, or would he have all the right the Indian had as

23  if he were an Indian?  Does this case involve also taking

24  water off the land onto some other area?  In other words,

25  would this water be severed from the land?  Why cross these

bridges when apparently the Supreme Court will have to pass on this, in part, in the Arizona-California case?

What did you find there, Mr. Girard?

MR. GIRARD:  We have a number of Indians.  Apparently, there is none in the Ramona Reservation.  There was 35 on the Cahuilla Reservation.

MR. VEEDER:  How many on the Pechanga?

MR. GIRARD:  There was a slight conflict.  The Indian Agent testified to about 25 on Pechanga.  Apparently this is way before my time.  Mr. Veeder in the interrogatories stated -- I was just checking this.

MR. VEEDER:  It is our position that it is not even remotely relevant, your Honor, as to how many Indians there are now.  The Reservation is to the land and the rights are for the land.

MR. GIRARD:  This is an examination of Mr. Warnock by Mr. Sachse.  I presume Mr. Warnock was an Indian Agent.

"Q  Now, on the Pechanga, you state there are presently a population of 25.  Where did you obtain that figure?

"A  We obtained that from an Indian on the Reservation.

"Q  I am very much intrigued, Mr. Warnock, by the fact that in May, 1958, Mr. Veeder in a sworn answer stated that there were 212 Indians living on

Pechanga.  Do you know whether or not 187 Indians

have died or moved away since May of last year from

that Reservation?

"A  I am certain that there has not.  But let

me say this:  That there are other people who belong

to the Pechanga group and who do not live on the

Reservation."

I read from Mr. Warnock's testimony in Volume 66.

So Mr. Warnock stated that there were 25 Indians on the

Pechanga Reservation, there were none on the Ramona, and 35

on the Cahuilla.

THE COURT:  As of 1958?

MR. GIRARD:  As of the date of his testimony, which

was January 20th, 1959.

MR. VEEDER:  I also say that the information supplied

me in regard to the response to the interrogatories came

from the same source.  So I make no apology.

THE COURT:  Let's get back to what we are talking about.

MR. SACHSE:  This is pertinent to what you are talking

about, your Honor.  If my notes are correct, your last

Finding No. 56 now says, "The United States of America, . . .

intended to reserve rights to the use of the waters of the

Santa Margarita River stream system, which under natural

conditions would be available, including rights to the use

of groundwaters, sufficient for the present or future needs

1    of Indians residing on the Reservation."   If we are not going

2    to do this, we had better change that finding.

3         MR. VEEDER:   That finding has been objected to by me

4    legally.

5         MR. SACHSE:   I thought you had agreed that this was

6    approximately correct.

7         MR. VEEDER:   I did not agree.

8         MR. SACHSE:   However, let me pursue it a moment, Mr.

9    Veeder.   This whole assignability thing, to me, revolves

10   around what can be assigned.   If this is a water right which

11   is fixed in amount at four acre feet per year per acre, then

12   that is one thing.   If this is a water right that depends on

13   the uses of Indians, then the assignability situation is

14   something entirely different.   And I think we have got to

15   resolve this preliminary before we can talk about the

16   assignability.

17        THE COURT:   I go back to what I said.   Why can't we

18   leave the language in No. 56 as I have proposed:  Present

19   and future needs of the Indians, and then provide that there

20   has been no problem raised so far in this case as to

21   assignment?

22        MR. SACHSE:   I think that is the way to do it.

23        THE COURT:   That the Court retains continuing

24   jurisdiction of the case.   We understand that the issue may

25   be presented in Arizona v. California, or leave that out, and

1    the Court does not, therefore, pass on what rights are

2    assignable or how to measure the assignment of those rights.

3            MR. SACHSE:  I think we are compelled to do that.

4            MR. VEEDER:  No, I will object to that.  I would rather

5    have your Honor rule and rule squarely on it.

6            MR. STAHLMAN:  How can you?

7            THE COURT:  You can conceive of all kinds of situations.

8    Suppose, for instance, the Ramona tribe dies out completely--

9    there are no Indians there at all.  The purpose of the

10   trust allotment has ended and this land then is conveyed by

11   the Federal Government to somebody else.  What kind of water

12   rights is he going to have?

13           MR. VEEDER:  I would say there inheres in that land

14   the right originally reserved, and that is exactly what is

15   involved here.

16           MR. GIRARD:  What rights were originally reserved, Bill?

17           MR. VEEDER:  The Government intended to reserve, when

18   it set aside this land, water sufficient to irrigate the

19   property to the extent of the Indians' needs.  I have

20   proposed a ceiling by putting 4.4, which, multiplied out

21   against the irrigable acreage in Ramona, would run around

22   1,500 acre feet a year.  I think that is reasonable.

23           MR. GIRARD:  How can it be reasonable when there

24   aren't any Indians?

25           MR. VEEDER:  I am trying to explain to you.  The

1    reservation is to the land and not to the Indians.

2        THE COURT:  Let me see some of your cases.  Let me

3    see the Powers case.

4        MR. GIRARD:  I would agree it is to the land, but the

5    amount that goes to the land is dependent upon the Indians'

6    needs.

7        MR. VEEDER:  You can figure the maximum needs, and the

8    only way you can possibly handle a matter like this is to

9    fix a ceiling as to the maximum quantity that would be

10   claimed.

11       MR. GIRARD:  Why fix a ceiling?

12       THE COURT:  Why cross the bridge now?  This hasn't been

13   extensively briefed except in the past there was some

14   briefing on it, and then I don't believe it concerned

15   assignability.  Why cross the bridge when we don't have the

16   problem?

17       MR. VEEDER:  With all respect to your Honor, I am going

18   to ask you to rule on it.  It is certainly an issue in this

19   case.

20       THE COURT:  How is it an issue?

21       MR. VEEDER:  Because we want to have fixed for the

22   Indian Reservation a maximum quantity to which they can look.

23       THE COURT:  You could compute that without my

24   computing it.  But the Indians could, by no stretch of the

25   imagination, be entitled to more than the right to irrigate

1   all their irrigable land.  There would be no other use they

2   could make of it.

3       MR. VEEDER:  And I would like a finding on that, and I

4   want conclusions along that line.

5       THE COURT:  I would be willing to say that the maximum

6   use that ever could be made would be a certain amount, but

7   that the Court does not pass upon this question of

8   assignability.

9       Let me see what the Supreme Court said in this case.

10  Are there any more recent cases than this?

11      MR. VEEDER:  The most recent interpretation by the

12  Ninth Circuit that I have found of the Powers case is the

13  Ahtanum decision.  I think it appears your Honor has read

14  this phase of it because I see it marked.

15      (Pause)

16      THE COURT:  What page is this other one?

17      MR. VEEDER:  At 236 F.2d, Page 342.  The question

18  involved in that case was of this character, that the Yakima

19  Indians had sold several hundred acres of land to White owners

20  and they had been named in that case as third party

21  defendants.  They were represented in the case, we making

22  a claim on their behalf in effect, but they were also

23  represented by their own counsel.  The question presented was

24  whether they were entitled to participate in the waters

25  reserved by the Yakima Indians, and the Court said that in the

1   light of the theory in the Powers case, which you have just

2   read, they were entitled, as successors in interest, to

3   participate on the basis of their acquisitions.

4        THE COURT:   The Powers case, among other things,

5   involved the interpretation of the particular treaty by which

6   the Reservation was set up.   It involved whether acts of

7   Congress were involved.   It was a situation where there had

8   actually been allotments to individual Indians and all that

9   sort of thing.   And even with all of that the Court wound up

10   by saying, "We do not consider the extent or precise nature

11   of respondents' rights in the waters."   The respondents had

12   some rights.

13        MR. VEEDER:   Of course, that was an injunction suit,

14   your Honor, that's all.

7 fls

#7

P-24

1  THE COURT: I am not going to rule on it in the dark.

2 You would have to research each patent and look at the

3 language of it. You would have to see whether there are any

4 other acts that might affect it. You would have to determine

5 whether there have been allotments. Many problems would

6 be involved in the matter. This can be saved for another

7 day.

8  MR. STAHLMAN: I think we have skimmed this thing

9 over rather lightly because of the character of the Reservation

10 involved and the few people involved. We have assumed what

11 Mr. Veeder has said in a lot of respects is so, when there

12 is no clear evidence as to the particular origin of these

13 executive orders, and there may have been some restrictions

14 or confinements in relation to waters, or extensions.

15  THE COURT: There may be some treaties involved, too,

16 that we haven't seen.

17  MR. STAHLMAN: Yes. When we were taking evidence

18 on the matter, Mr. Veeder was rather expressive in some

19 of the matters here in a way that was a little contrary to

20 what he is saying.

21  MR. VEEDER: In what regard, Mr. Stahlman? Where is

22 it? Come on. Let's knock that off.

23  MR. STAHLMAN: We will give it to you. You even filed

24 affidavits that there were so many Indians on there, when

25 the testimony didn't nearly come up to that. You didn't

P-25

1   have a full grasp of the situation at that time.

2   THE COURT:  This isn't getting us anywhere.  I don't

3   know why Mr. Veeder wants this maximum figure.  But if he

4   has any interest in the maximum figure --

5   MR. GIRARD:  I would like to read a quote, if I may,

6   your Honor.

7   THE COURT:  All right.

8   MR. GIRARD:  "Mr. Stahlman:  What happens to a

9   Reservation assuming that the Indians die out?

10   "THE WITNESS:  I assume --

11   "MR. VEEDER:  Now, just a minute.

12   "THE COURT:  It is a legal question, probably.  Can

13   you tell us, Mr. Veeder?

14   "MR. VEEDER:  It truly is.  Well, I have had some

15   experience in regard to these matters and I think it is

16   a matter of executive and administrative determination

17   as to what is done with the land.  It is entirely within

18   the power of Congress.  If it decides to revoke these

19   withdrawals, it may do so.  But I don't believe that

20   any executive branch of the government can do it

21   arbitrarily.

22   "I have no further questions."

23   MR. VEEDER:  What better statement do you want than that?

24   MR. GIRARD:  Where is there anything in here about their

25   assignability?

p-26

1    That was at page 7,532 of the record, your Honor.

2  I agree with the judge.  I don't think we ought to decide

3  it now.

4    THE COURT:  If you can frame a finding that you want

5  in No. 56 -- what value this would be to you, I don't know,

6  but if you could frame a finding that the extent of this

7  water right, without passing on the question of its present

8  extent, in view of the number of indians, or without passing

9  upon the question of what would be the effect in the event

10  of allotments and assignments to third parties, et cetera,

11  that the Court nevertheless finds that in no event could

12  the maximum use of water on the Reservation exceed 4.4

13  acre feet on so many irrigable acres, I could find that.

14  Because I don't see how they could possibly use, no matter

15  how the Indians might multiply or what they might do, or

16  if they pass the land on to somebody else, they couldn't

17  use more than that kind of water.

18    MR. GIRARD:  That wouldn't be a correct finding, though,

19  because throughout all these findings we have had a finding

20  that the irrigable acreage and water duty are only prima

21  facie, and certainly if they are only prima facie, they

22  could go down but they might also go up.

23    MR. STAHLMAN:  I don't see where it adds anything to

24  the case.

25    THE COURT:  I think you are right on that.  We have

20,248

p-27

1    taken that position, that it is prima facie, and we might

2    have a situation where somebody would prove a higher water

3    duty.

4          MR. GIRARD:  It might conceivable in certain areas.

5          THE COURT:  Or lower.

6          So what I prefer to do on this matter is to provide

7    in No. 56 "sufficient for the present or future use of

8    Indians residing on the Reservation," and then point out

9    that the Court has continuing jurisdiction and it does not

10   pass upon but leaves open the question of problems concerning

11   allotments and assignment of allotments and rights of

12   third parties on Indian ground to be decided if, as and

13   when that arises.  If you can work out some suitable language

14   on that.

15         MR. STAHLMAN:  It is quite obvious, also that this

16   acreage figure in relation to irrigable acres contained on

17   these Reservations falls in that category that your Honor

18   has often referred to as some of these remote lands and

19   illusory.

20         THE COURT:  It certainly is illusory up in Ramona.

21   There might be some land that is irrigable in Cahuilla and

22   Pechanga.

23         Will you try to frame something on that, Mr. Girard?

24         MR. GIRARD:  All right.

25         I think Colonel Bowen had some additional language he

p-28

1    wanted to suggest.

2        THE COURT:  Do you have some suggestions, Colonel

3    Bowen?  We have practically made you co-counsel in this

4    case.

5        COLONEL BOWEN:  I thought your Honor said to restrict

6    it to the present or future needs of the Indians.  Write it

7    in general and say "for the present or future beneficial

8    uses of water on the Reservation."

9        MR. STAHLMAN:  Doesn't that leave the question open

10   as to whether or not --

11       THE COURT:  I want to leave the question open, but

12   I don't see any harm in stating that it is clear that

13   Congress intended that there be sufficient water for the

14   present and future use of the Indians.  That part, I think,

15   is clear.  Then leave the problem open as to what happens

16   thereafter.  I am not so sure that the wording you suggest,

17   Colonel, "beneficial uses" is the equivalent of what the

18   Supreme Court talked about in the words "present and future

19   uses of the Indians."  That might be hard to conceive of.

20   It might be a bigger right than the other language.

21       Mr. Girard, will you try to prepare some language on

22   that?

23       MR. GIRARD:  Yes, your Honor.

24       THE COURT:  No. 1 of the Conclusions.

25       MR. GIRARD:  I have no objection to No. 1, your Honor.

P-29

1    MR. STAHLMAN: The testimony that was given at the

2    time may be in conflict with No. 1.

3    MR. SACHSE: I had forgotten this entirely. Mr. Reporter,

4    I am reading from page 7523. This is my cross-examination

5    of Mr. Warnock:

6        "Q    Now, the Ramona Indian Reservation has no

7    people living on it today, as I understand it?

8        "A    That is correct.

9        "Q    Do you know how long since anybody has lived

10   there?

11       "A    No, sir.

12       "Q    Your old records don't tell you that?

13       "A    No, sir.

14       "Q    How old are your records that no one has lived

15   there?

16       "A    Well, our records don't, haven't -- records

17   I reviewed hadn't even said that there were nobody living

18   there. The Ramona Tract was bought for a family or

19   obtained for a family -- I am not sure that it was

20   purchased as -- but it was set up as a reservation,

21   oh, let's see -- I don't have a date that that reservation

22   was established -- but when it was established, it was

23   for a family living there at that time.

24       "MR. STAHLMAN: Ramona?

25       "THE WITNESS: That is the Ramona.

p-30

1    "MR. STAHLMAN:   That is probably Ramona and

2    Allesandro."

3    And then more on this.

4    I don't know whether this is an Indian Reservation now.

5    MR. VEEDER:   I assure you that an executive order

6    dated December 29, 1891 withdrew it.  I will put it in

7    evidence.  I have it in my office.

8    MR. GIRARD:   Assuming that that executive order is

9    correct, as Mr. Veeder states, I have no objection.

10    MR. SACHSE:   I have no objection to it.

11    THE COURT:   Let's have a look.  Bring those down

12    tomorrow.

13    MR. VEEDER:   All right.

14    THE COURT:   No. 1b.

15    MR. GIRARD:   I think that would have to be worked out

16    a little more to conform with No. 56.

17    THE COURT:   Yes, will you work on that, too, Mr. Girard.

18    MR. GIRARD:   Yes, your Honor.

19    MR. SACHSE:   Now we come to the big fundamental disagreement

20    on c(i).

21    MR. GIRARD:   May we have the blackboard, your Honor.

22    In essence, I think the problem I have in trying to

23    work out these conclusions of Mr. Veeder is that he treats

24    this simply that the Indian Reservation is created in 1891.

25    Then he says that the Indians have a correlative riparian

p-31

1   right with all other riparians whose patent preceded the

2   date 1891.  Then he says that they are senior to all

3   riparians whose patent antedated 1891.

4       MR. VEEDER:  I think that is correct.  That came

5   subsequent to --

6       MR. GIRARD:  Yes, that came subsequent to 1891.  And

7   then he recognizes that their Indian rights are junior

8   to all appropriate rights which occurred prior to 1891.

9       The problem I see is not so much a paper problem, but

10  I don't see how you could ever get an allocation on a stream

11  or in an area with this type of right situation, and I would

12  like to just have the blackboard to point out what I'm talking

13  about.  May I take a recess for a minute and I'll write it

14  out on the blackboard with the various types of rights

15  with which we are concerned.  Because you would have a situation

16  where you couldn't conceivably give water to anyone other

17  than -- you don't know who you would give it to.  Probably

18  the riparian with a patent right, the Indian Reservation would

19  get some water.

20      THE COURT:  Your position, Mr. Veeder, is that you

21  look, first, to the date of priority established by the

22  withdrawals or the patents to the Indians, is that right,

23  and that as of that date you inventory, as it were, what

24  appropriative rights existed, what riparian rights existed?

25  So the Indians' rights go back to the date of the withdrawal

p-32

1  of the land.

2  MR. VEEDER:  The Indian right would be fixed as it

3  relates to all other rights on the date of the withdrawal.

4  The basis for the Indian right, and these cases would

5  go back to the Treaty of Guadalupe Hidalgo, when title

6  passed to the National Government from Mexico, but the rights

7  that are outlined here would be in this nature: (1)  In regard

8  to the Ramona, which is as of the date 1891, it would be

9  subject, in my view, to any existing appropriative rights.

10  THE COURT:  Well, there aren't any, are there?

11  MR. GIRARD:  There may be one, your Honor.  Is that around

12  there, the Stark 1, the Gibbon and Cottle claim for appropriative

13  right?

14  MR. STAHLMAN:  That is downstream, I think, on Cahuilla.

15  MR. VEEDER:  That is on Temecula.

16  MR. GIRARD:  As far as I know, there are none.

17  THE COURT:  Appropriative rights.  What else?

18  MR. VEEDER:  In regard to vested overlying and riparian

19  rights, it is my view that they would participate correlatively

20  with the vested right.

21  THE COURT:  There is no argument about that.

22  MR. SACHSE:  Yes, that is the big argument.

23  THE COURT:  Don't you gentlemen concede that when this

24  land was withdrawn and a Reservation created that the Indian

25  didn't get any more than a riparian or a correlative right?

P-33

Just because a reservation was created, the Indians
did not then secure for the Indian land rights greater
than what would amount to the correlative riparian overlying
right?

MR. GIRARD: I would concede that if you would apply
it to subsequent riparians.

MR. SACHSE: But Mr. Veeder wants to apply correlative
back but superior to riparians. That is impossible. That
is what creates this hopeless situation that Mr. Girard is
going to diagram.

THE COURT: Take it a part at a time. What other
position could you take? You could, I suppose, take the
position that in view of the Supreme Court's language "for
all present and future needs," that the Indians got a right
which was superior to then existing riparian and correlative
rights.

MR. VEEDER: And we don't assert that claim.

MR. GIRARD: You couldn't assert that, in the light
of the Desert Land Act, I don't think.

THE COURT: What other position could you take on the
matter as of 1891?

MR. SACHSE: They had the same status as of 1891 where
other riparians were concerned that the prior patentee had
as of that date, subject to the fact that as against their
riparians they could take all they needed of the waters that

20,255

p-34

1    crossed their land.  They were superior to that extent.

2    But when they are not taking it, they run correlatively

3    both forward and backward.

4        MR. STAHLMAN:  Oh, no.

5        MR. SACHSE:  Yes.

6        MR. VEEDER:  Mr. Girard, Mr. Sachse, Mr. Stahlman

7    and your Honor, if I may tender a thought, the problem

8    becomes more complex in regard to the Cahuilla Indian

9    Reservation than in regard to the Ramona by reason of the

10   fact that the withdrawal was in 1875 prior to the act of

11   1877.  It is an extremely complex legal question.

12       THE COURT:  1877 was the Desert Land Act.

13       MR. VEEDER: That is correct, and these withdrawals were

14   made for the Cahuillas antecedent to that date, and I think --

15       MR. SACHSE:  Your Honor --

16       MR. VEEDER:  Why don't you let me finish, please.

17       So I think it is essential, if we are going to go

18   into any diagrams by Mr. Girard, that he use 1875.

19       MR. GIRARD:  I am using the Ramona Indian one because

20   that is the one I have up here.  I would be happy to use

21   the other one.

22       THE COURT:  Gentlemen, I don't foresee any problem

23   about these Indian rights.  You have six Indians on Pechanga,

24   none on Ramona, and 35 on Cahuilla.  Why can't we put this

25   problem over and cross the bridge when we get to it?

p-35

MR. GIRARD:  I would be very happy to.

MR. SACHSE:  I'd be happy to.

MR. VEEDER:  The point is, I want a ruling.

THE COURT:  Why should we argue out the intricate problem involving all these statutes, dates of withdrawal, when there has not been presented to the Court any problem concerning these Indian lands, and when the Court is going to keep continuing jurisdiction of the case, and some day if some Indian comes along and he is not getting his share of water then is time enough to go in and find out what all this means?

MR. SACHSE:  I think that is the only possible solution.

THE COURT:  Why isn't that the answer, Mr. Veeder?

MR. VEEDER:  Because I think this matter has to be concluded.

THE COURT: Why?

MR. VEEDER:  Because I'm asking for a quiet title.  I am asking that these rights be adjudicated.  I simply say, let's take the facts as they are, let's take the law as it exists, and let's apply it.

THE COURT:  We can make the finding that if there are rights in connection with these Indian Reservations to water, the Court does not now pass upon the full nature or extent of them.  No problem has arisen.  There are relatively few Indians living on the Reservation, none on one of them,

1   and when the problem is presented is time enough to go

2   into the matter.  If you can give me some other reason than

3   because, I want to listen to you.  Does this affect the

4   Marine Corps if we don't go ahead and try to spell out in

5   detail what kind of rights these six Indians have up in

6   Pechanga?

7       MR. VEEDER:  I say right now, your Honor, that the

8   confusion between the number of Indians on the Reservation

9   and the rights to the use of water which adhere to and are

10  part of the reservation. -- I'll start again.  There is no

11  relation whether there is an Indian or 500 Indians on the

12  land.  There is a Reservation to that land, presently and

13  in the future, for the quantities of water required to meet

14  their demands.  Now I have tried to figure out a ceiling

15  so that the valley would know the maximum quantity that

16  could ever be called for by these Indians.

17      THE COURT:  Mr. Veeder, these so-called ceilings are

18  all illusory.

19      MR. VEEDER:  They may be illusory.

20      THE COURT: They don't have any reality.  You talk about

21  somebody the same as this riparian ground up in the desert

22  country; it is riparian, but there is no water to use.  So

23  what is the use of even computing the acreages or the water

24  duty?

25      MR. VEEDER:  I have made my point, your Honor, and I

p37

1  have tendered what I thought was the correct statement of

2  fact and the correct law.

3      THE COURT:  Mr. Girard, how would you propose that

4  we would word something like this to indicate there was a

5  right?

6      MR. GIRARD:  You could do it like Mr. Riskind did in

7  his report; just state, in essence, what you set forth in

8  your Finding No. 56 as redrafted and state that the dates

9  that the various lands were actually withdrawn or by executive

10  order, and just state in there that this Court makes no

11  conclusion of law or judgement as to allocation or priority

12  of rights as contrasted to others until the situation arises

13  in the future.

14      MR. VEEDER:  May I respond to that, your Honor, about

15  the Riskind matter, because he is in error.

16      THE COURT:  All right.

17      MR. VEEDER:  Here is what was done by Judge Riskind

18  in Arizona versus California.

19      MR. GIRARD:  That is what I'm talking about.

20      MR. VEEDER:  In regard to the Indian rights.

21      MR. GIRARD:  Yes.

22      MR. VEEDER:  He said there are 19,000 acres in the

23  reservation.

24      MR. GIRARD:  That is right.

25      MR. VEEDER:  He said to assure that everyone in the

p-38

1   valley will know the extent of the demands, I am awarding to

2   that land, whatever it was, 28,000 acre feet annually from

3   the stream.

4   MR. GIRARD:  That is correct.  You left out one little

5   factor, Mr. Veeder.  As usual, you didn't say:  With a

6   priority of such a date.

7   MR. VEEDER:  Then he said the priority of that right

8   will be on the date of the withdrawal, he put a maximum quantity

9   of water.  And that is precisely what I have asked here.

10   MR. GIRARD:  You have not.  You have asked for not a

11   priority as of the date of the withdrawal.  You have asked

12   for rights.  You have asked for correlative rights for

13   lands that have vested rights before the withdrawal, and that

14   is certainly something that Mr. Riskind did not give the

15   Indians in Arizona.

16   MR. STAHLMAN: That suit was an apportionment.  That has

17   not been reached in this case.

18   MR. GIRARD:  Yes, that was an apportionment proceeding.

19   MR. VEEDER:  He did exactly what I said.  He said there

20   was withdrawn for so many irrigable acres this quantity of

21   water with a priority of the date of the withdrawal.

22   MR. SACHSE:  But he didn't say anything about correlative

23   for the years prior to the withdrawal, Mr. Veeder.

24   MR. GIRARD:  Those people in Arizona that had vested

25   rights prior to the Indian date of withdrawal didn't share with

p-39

1    the Indians; they took ahead of them.

2         MR. VEEDER:  If you had any background in water law

3    you would know there were no riparian rights in Arizona.

4    There are probably some appropriative rights in Arizona,

5    but there are no riparian rights.

6         MR. GIRARD:  There are prior vested rights, and that

7    is all a riparian right is.

8         MR. VEEDER:  I have stated specifically in here in

9    regard to appropriative rights that we would recognize the

10   prior appropriative rights.

11        MR. GIRARD:  Sure, you have, because there aren't any.

12        THE COURT:  I still can't see why we have to get this

13   in this judgement.  We have found the acreage on these

14   three reservations.  We have found the irrigable acreage.

15   We know how much could be irrigated.  We have evidence in

16   the record as to how many Indians were on them in 1959.  And

17   we could make a further finding that there has been no

18   evidence presented that any Indian is in need of water or

19   has suffered from any problem up to this date.  There have

20   been no allotments on these reservations.  There are no

21   questions of assignment to third persons.  And these matters

22   will all be held for a future day, and when the problem

23   arises we will find out.  The only thing we have to do is

24   to make some general finding that there are these inchoate

25   unprecisely defined Indian rights upstream.

p-40

8 fls

1          MR. STAHLMAN:   Most of them are drinking imported water

2     anyway -- fire water.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

#8

1    MR. VEEDER:  You can make a finding as to what George

2  just said.  I don't care.  If they are drinking it up there,

3  we should know about it, and you should make a determination

4  on that, your Honor.

5         THE COURT:  Mr. Girard, will you lend your hand to that?

6         MR. GIRARD:  Yes, sir.

7         MR. VEEDER:  The fire water?

8         MR. GIRARD:  Yes, also.

9         THE COURT:  What about the date of priority?

10        MR. SACHSE:  If we are going to skip entirely this

11  question -- I would like to invite your Honor's attention to

12  Mr. Veeder's express language in (i) on Page 20, that the

13  Ramona Indian Reservation participates correlatively in

14  the available supply of waer from all of the sources

15  mentioned in I (b) above with the owners of riparian or

16  overlying rights to lands patented prior to 1891.

17        Then in (ii), at Line 20, he says:

18            "The rights to the use of water reserved for

19        the Ramona Indian Reservation are prior, superior and

20        paramount to all riparian or overlying rights which are

21        part and parcel of lands patented subsequent to

22        December 29, 1891, . . ."

23  If we are not going to go into this, I think then we

24  can drop this diagram.  But if we are going to make either

25  of these conclusions of law as to the effect of the withdrawal

8-2

1   date, then we have to go into it.  If we are just going to

2   say that the reservation was withdrawn on such and such a

3   date and that there are existing rights in the Indians as

4   of that date and no controversy has arisen yet, no request

5   for an apportionment, no apportionment is being made by the

6   Court at this time, we can drop the thing right there and we

7   can take somewhat the position we did, your Honor will recall,

8   on overlying rights.  We decided we were not going to spell

9   out exactly how the overlying rights went together, but put

10  it aside for the future.

11       THE COURT:  If we proceed with this matter of a final

12  judgment and some of the suggestions of Assistant Attorney

13  General Clark on spelling out rights, it seems to me that

14  we still have no problem, because he has a category of

15  rights in there that lands have certain rights and where

16  waters are not being used, whatever these rights are, are

17  tossed into the pot for division among the people who are

18  using rights, and in this subsequent phase of the case we

19  could do almost the same thing.  Again, we could say no

20  problem has arisen, there is apparently water available for

21  such few Indians as live on this ground, there is no need

22  therefore to make any allotments to Indians.  They would be

23  minor users anyhow, under the categories Mr. Clark suggested:

24  Major users and minor users.  Doesn't that follow, Mr.

25  Veeder?

8-3

1     MR. VEEDER:  I think, in that regard, I would recommend

2 that -- you are speaking now of the motion for a decree that

3 I have mentioned -- I believe that the way we would like to

4 proceed there would be to eliminate the lands on Warm Springs

5 Creek, Diamond and Dominegoni, and proably Cahuilla and

6 Ramona, anyway, but I think the Pechanga would be involved

7 in the Murrieta-Temecula groundwater area.

8     THE COURT:  In other words, you would have no problem,

9 then, as to either Ramona or Cahuilla, and a very minor

10 problem as to Pechanga.

11     MR. VEEDER:  That is my tentative thought, your Honor.

12     THE COURT:  I don't think there is any of those

13 Pechanga Indians who are growing anything on the Pechanga

14 Reservation.

15     Mr. Wilkinson, are they doing any farming at all there?

16

17     MR. WILKINSON:  Not this year, your Honor.  They have,
spasmodically.

18

19     THE COURT:  There is a piece of ground on the west

20 side of the highway that runs down to Pala that is Indian

21 ground.

22     MR. WILKINSON:  I have never seen it farmed.  Perhaps

23 I have, but it has not been farmed in the last 10 years.

24     MR. VEEDER:  You are now speaking of the Little

25 Temecula grant land?

     MR. WILKINSON:  It is called the Kelsey tract.

8-4

1      MR. VEEDER:  Yes.

2      MR. STAHLMAN:  They are all working down at Convair

3  now.

4      THE COURT:  Do you want to go into this diagram?

5      MR. GIRARD:  Not if that is acceptable to your Honor.

6  I think Mr. Sachse's suggestion was a very good one.  Then

7  we don't have to go into that diagram.  The diagram was just

8  put on there to show the impossibility of the priority

9  right or a right as set forth by Mr. Veeder.  But if we are

10  not going to decide that now, let somebody put the diagram

11  up 50 years hence.

12      THE COURT:  Maybe Mr. Veeder would feel better if you

13  convinced him that his proposal was not sound.

14      MR. VEEDER:  My dear Judge, your Honor, nothing but

15  static ever emanates from the other side.

16      MR. SACHSE:  Your Honor, there is one very good aspect

17  to this suggestion.  If it is followed, we are going to tear

18  up the last 16 pages, practically, of the findings.  I think

19  Mr. Veeder will agree we will not need dozens of things.

20      MR. VEEDER:  I will not agree with anything that

21  happened this afternoon.

22      MR. STAHLMAN:  Or any other afternoon.

23      MR. VEEDER:  Not always.

24      THE COURT:  I don't know whether we have sufficiently

25  worked it out so that if there are any bugs in this suggestion

8-5

1    we have made -- presently I can't, as a practical matter, see

2    any problem arising from the Indian Reservations, even on an

3    apportionment.

4        MR. SACHSE:  I think that is absolutely right.  And in

5    the light of the fact that there is not any apportionment

6    anyway, why waste our time?

7        MR. GIRARD:  I think we can redraft theseconclusions

8    of law pretty much along the line Mr. Veeder has, except we

9    will cut down a lot of these repetitious findings on

10   priorities, and I really don't know that there is any need

11   to go through them.  Or do you?

12       MR. SACHSE:  No.

13       THE COURT:  Suppose we follow this, Mr. Veeder, to which

14   you apparently strenuously object, how are we hurt?  How is

15   our final decision affected?

16       MR. VEEDER:  Because I truly think such a decree will

17   be totally abortive.  I don't think it will mean a thing.

18       THE COURT:  It doesn't mean a thing, because we post-

19   pone the problem until it arises.  It may never arise.

20       MR. VEEDER:  I am paid to get a quiet title decree here,

21   and that is what I desire, and I want the Indian rights

22   quieted as they relate to other rights.  My view is that what

23   is being proposed now may put it off for a hundred years, and

24   I don't believe I will be bothered at that time.  But I don't

25   think we are going to accomplish a thing    without proceeding

8-6

1   through.   I would be delighted to argue with Mr. Girard

2   either here or in my office on his picture there.   I hate

3   to see us abandon the idea of an ultimate and effective

4   decree, and I think that is what we are going to do if we

5   follow this procedure.   However, if that is your Honor's

6   ruling, there is no sense taking any more of your Honor's

7   time.   Mr. Girard and I can attempt to work out language that

8   will conform with your rulings.

9       THE COURT:   For the life of me, it is hard to imagine

10  a situation within probably the rest of the time I am on

11  this Bench where a problem would come up on these Indian

12  Reservations.

13      MR. VEEDER:   I would be gravely in error to try to

14  anticipate that.   But it is our position in this litigation

15  thatwhat we are seeking here is to have a final decree and

16  determination of the extent, nature and character of the

17  Indian rights in regard to these three Reservations.   I think

18  there is confusion gotten into this matter by reason of the

19  fact that the question of the number of Indians that are on

20  the land was brought up.   I don't believe that has a thing

21  to do with it.   I think it is entirely possible that ultimately

22  they might sell some of the land.   I think it is entirely

23  possible that they might increase the number of Indians on the

24  land.   It is their land.   It was set aside for them.   And my

25  own view is that we should have a determination of the extent

8-7

1    of the rights which were reserved for those Indians.

2        MR. STAHLMAN:  Could it be that the reason you are

3    so intent that the quantity of water should be expressed is

4    your belief, not here expressed however, that these rights

5    may be transferred to some other Governmental agency?

6        MR. VEEDER:  I haven't any idea of that, Mr. Stahlman.

7        MR. GIRARD:  Certainly you would concede that you

8    would not ask that the Indian rights be catalogued in amount,

9    as was done by Mr. Riskind in Arizona.

10        MR. VEEDER:  I would say the maximum quantity should be

11    indicated.

12        MR. GIRARD:  You would recognize that the maximum

13    quantity would be a ridiculous figure.

14        THE COURT: And then you ignore it completely on any

15    apportionment, because it is not being used.

16        Well, I haven't any fear that we will have any problem

17    about the Indians doing any extensive farming.  I think if

18    problems arise it will be as a result of allotments or someone

19    else acquiring an allotment from an Indian and then trying

20    to assert some superior water right to it.

21        I think we might all be better off -- when I speak

22    of "we" I mean the landowners in the valley -- not to have

23    these Indian rights spelled out too precisely.  If somebody

24    tries to buy some of this land, let him know that he is going

25    to have a lawsuit on his hands.

8

1 MR. VEEDER:  Your Honor has said so well  that when

2 we get through there will be no adjudication of the rights

3 to the use of water for the Indians.

4 THE COURT:  But the Court will have jurisdiction when

5 the matter comes up.  You give this Indian some superior

6 right, and some promoter goes up to Cahuilla and gets a

7 bunch of allotments made to the Indians and then buys the

8 Indian land and pumps the valley dry.  I would rather have

9 him faced with the problem of having the right adjudicated

10 when he got ready to do this.

11 Take a recess.

12 (Recess taken.)

13 (Another case called.)

14 THE COURT:  I am just wondering, in view of the

15 position we are going to take on these Indians, whether it

16 would be more expeditious to do some revision on the rest of

17 these findings and judgments before we spend time going over

18 them all.  Maybe you could work this afternoon and I can get

19 some work done.

20 MR. VEEDER:  That suits me, Judge.

21 MR. SACHSE:  May I give his Honor a copy of this

22 proposed Rainbow.

23 Bill, you have been over it many times.

24 MR. VEEDER:  Yes.

25 MR. SACHSE:  I would hope you would go over it tonight.

9

1    MR. VEEDER:  I will go over it tonight.

2    MR. SACHSE:  And those we could probably clear up and

3    retype and attach the exhibits.

4    THE COURT:  All right.  Is there further work that has

5    to be done on it?

6    MR. SACHSE:  Except the first page. It says "proposed".

7    We can always pull one page out.

8    I didn't give your Honor that additional  five.

9    Colonel Bowen drafted No. 5.  I put it in the wrong place.

10    THE COURT:  All right.  Then suppose you gentlemen

11    work on some proposed language on some of these sections

12    we passed up, like No. 56 and the rest of these findings.

13    MR. GIRARD:  I will do that tonight.

14    THE COURT:  And have something to submit tomorrow on

15    the Indian matter, and start tomorrow on Rainbow, and start

16    on this proposed final judgment.  It seems maybe there would

17    be certain sections of that we could draft up.  There would

18    be certain alternatives, depending upon how things eventuate.

19    MR. VEEDER:  Has your Honor any idea as to time on this

20    matter?  I want to schedule the rest of my time that I am

21    out here.

22    THE COURT:  We could wind up tomorrow, I would think.

23    MR. SACHSE:  Fine.

24    THE COURT:  Don't you think so?

25    MR. SACHSE:  I would think so.

20,271

MR. STAHLMAN:  When would we go over to, then?

THE COURT:  We would have to go over to sometime in September.

MR. STAHLMAN:  That is all right.

THE COURT:  I would say the middle of September would be about the first available date.

MR. STAHLMAN:  That would be all right.

MR. VEEDER:  Then I can figure that we will wind up tomorrow evening, is that right?

THE COURT:  That is right.  I don't think we can spend more than a day presently.  We can get some ideas probably about drafting up some proposals on a final judgment, and by the next time you might have some drafts on some of the different parts.

MR. VEEDER:  That would be very fine.  I have some things that are important.

MR. SACHSE:  Could we then not also have ready for this September meeting, because the last one here is Aguanga, and we  ought to notify Mr. Stark.

MR. VEEDER:  Did I say I had heard from Mr. Stark?

MR. GIRARD:  You said he didn't want it on this session.

MR. VEEDER:  That is right.  That is in the agenda.

MR. SACHSE:  It would be wise to look that far ahead because that is the next difficult one we have.

1        MR. VEEDER:  Mr. Stark asked that we refrain from

2  considering it now.  I have some language on it, and so have

3  you, haven't you?

4        MR. GIRARD:  No.

5        THE COURT:  Then do some work this afternoon before you

6  leave, on this Indian matter, and let's meet tomorrow

7  morning at 10:00 and try to wind up tomorrow night.

8        MR. VEEDER:  All right, thank you, sir.

9        THE COURT:  By the way, those dates would be either

10  September 11th or 18th.

11        MR. VEEDER:  How about the 18th?

12        MR. STAHLMAN:  The 18th would be better for me.

13        THE COURT:  All right, September 18th.

14  We will continue tomorrow.

15  (Whereupon, an adjournment was taken until Thursday, )

16  (                                        )

(August 9, 1962, at 10:00 a.m.          )

17

18                     ---o0o---

19

20

21

22

23

24

25

20,273

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,         )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )     No. 1247-SD-C
                                  )
FALLBROOK PUBLIC UTILITY DISTRICT, )
et al.,                           )
                                  )
            Defendants.           )
                                  )

## CERTIFICATE OF REPORTER

I, the undersigned do hereby certify that I am, and on the date herein involved, to-wit, August 8, 1962, was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing __106__ pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS MY HAND AT SAN DIEGO, CALIFORNIA, this 8th day of August, 1962.

_____
Official Reporter

JOHN SWADER, OFFICIAL REPORTER