# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.                                No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

                    Defendants.


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         Thursday, August 9, 1962

        Pages:      20,274 - 20,375        **FILED**

                                    SEP 24 1963

                                    CLERK, U.S. DISTRICT COURT
                                    SOUTHERN DISTRICT OF CALIFORNIA

                                    By _____ DEPUTY


                                    JOHN SWADER
                                    Official Reporter
                                United States District Court
                                    325 West F. Street
                                 San Diego 1, California
                                BElmont 4-6211 - Ext. 370

**VOLUME** 203                                                          20,274

1

2          IN THE UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF CALIFORNIA

4                   SOUTHERN DIVISION
                       - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING
                       - - -

6   UNITED STATES OF AMERICA,           )

7                   Plaintiff,          )
                                        )
8          vs.                          )     No. 1247-SD-C
                                        )
9   FALLBROOK PUBLIC UTILITY DISTRICT,  )
    et al.,                             )
10                                      )
                                        )
11                 Defendants.          )
    _____)

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 San Diego, California

15            Thursday, August 9, 1962

16   APPEARANCES:

17       For the Plaintiff:        WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to the
18                                 Attorney General

19                                 CDR. DONALD W. REDD

20       For the Defendants:

21       Vail Company:            GEORGE STAHLMAN, ESQ.

22       Fallbrook Public Utility
         District, et al          FRANZ R. SACHSE, ESQ.

23       State of California       FRED GIRARD, ESQ.

24

25

1    SAN DIEGO, CALIFORNIA, THURSDAY, AUGUST 9, 1962, 9:45 A. M.

2    ---ooo---

3    (Other matters.)

4    THE CLERK:  Three, 1247-SD-C, United States v.

5    Fallbrook.

6    MR. STAHLMAN:  Your Honor, I want to make a motion to

7    introduce further testimony regarding the population of the

8    Indian Reservation at Pechanga.   There was an error of

9    about 33-1/3 per cent.  Mr. Wilkinson checked up on it last

10   evening and I think the figures are different.  I would like

11   to have him tell the Court.

12   THE COURT:  You have been sworn, Mr. Wilkinson.

13   MR. WILKINSON:  Your Honor, I made inquiry last night,

14   and apparently there are four on there.

15   MR. VEEDER:  This is hearsay, your Honor; I object to

16   it.

17   THE COURT:  What kind of inquiry did you make?

18   MR. WILKINSON:  I made inquiry of one of the Indians

19   in the area, and apparently there are four Indians living

20   on the Pechanga rather than six.

21   MR. VEEDER:  I move to strike it on the grounds that

22   it is the purest type of hearsay.

23   THE COURT:  That is probably the only type of evidence

24   we could get.  The objection is overruled.  It doesn't make

25   a lot of difference whether there are four or six.  There

1        are not very many.

2            MR. STAHLMAN:  We will probably have to rewrite the

3        findings in connection with that.

4            THE COURT:  No, we will adopt the figure of six,

5        approximately six as of 1959.

6            What do we do next?

7            MR. GIRARD:  I drafted up a few copies yesterday.  I

8        think your Honor was given a copy of them last night.

9            THE COURT:  Yes.

10           MR. GIRARD:  I think to one of them Mr. Stahlman has an

11       addition.

12           MR. STAHLMAN:  If we are ready to proceed on this, I

13       suggested to Mr. Girard, and I think he agreed with me, that

14       on Line 4 of Finding No. 17, after the word "deposit" there

15       should be an insertion of another sentence to read as

16       follows:  "Between the lower aquifer and the upper shallow

17       aquifer there exists layers of material composed of clay and

18       other indurated less permeable material which impede the

19       free transmissability of water."

20           THE COURT:  Read it again.

21           MR. STAHLMAN:  It would then read like this, the entire

22       thing:   "Across the Anza groundwater basin there is a deep

23       aquifer which lies in an ancient stream channel which is

24       composed of gravel deposits and underlies a shallow aquifer

25       of younger alluvial deposits."  And thereafter I would add:

"Between the lower aquifer and the upper shallow aquifer there exists layers of material composed of clay and other indurated less permeable material which impede the free transmissability of water vertically."

THE COURT:  Did you check Dr. Mann's testimony?

MR. STAHLMAN:  That is the testimony on it -- that there is this cap over the older deeper aquifer.  I think he said "clay".

THE COURT:  Any objection?  If not, we will have it inserted.

MR. VEEDER:  Your Honor, I think on that first sentence (1) it is not at all clear -- "Across the Anza groundwater basin. . . ."  Well, it is not across the Anza groundwater basin.

THE COURT: All right, change "across" to "In the Anza groundwater basin," and later on in the next sentence state where it is.

MR. VEEDER:  All right.  It is certainly not across.

THE COURT:  Do we have any finding here of the size of it?

MR. VEEDER:  In Finding No. 18 that I propose.

MR. SACHSE:  Mr. Veeder has it in No. 18.

MR. VEEDER:  That is right.

THE COURT:  Then we probably should add to this after the word "east" on Line 2.

MR. GIRARD:  Your Honor, it should be pointed out that in the Wilson Creek findings, which will be concerned with Anza and Cahuilla, there will be more detailed descriptions of this deep aquifer.  However, in this Finding 17 it merely describes the sections, and then in No. 18, which we have approved, drafted by Mr. Veeder, it defines the area within the reservation with which these findings are concerned.

THE COURT:  Then I will merely insert for reference purposes on Line 12, after the word "east," that the aquifer is more fully described in Interlocutory Judgment No. 33:  "Said deep aquifer is more fully described in Finding and Judgment No. 33."

What about the word "contained" down there on Line 17: "That as a result of pumping from the deep aquifer a reverse gradient has been created and the waters no longer move into the desert drainage watershed but are contained..."  I suppose that's all right.  Those that are not pumped out are contained.

MR. GIRARD:  Yes.  They don't move out of the deep aquifer.

THE COURT:  No.

Any objection to No. 17 now, Mr. Veeder?

MR. VEEDER:  Yes.  I think it is essential, if we are going to put in the language that is being used that a finding be made to the effect that where the water is pumped

1    out of the deep aquifer the water from the shallow aquifer

2    enters it, with the result that there is a reduction in the

3    quantity of water that would go down the river.

4          MR. GIRARD:  I think you can say the recharge, if any,

5    is from water which fall within the Santa Margarita River

6    watershed.

7          MR. VEEDER:  The recharge, if any?  It is recharged

8    entirely.

9          MR. GIRARD:  From water within the watershed.

10        MR. VEEDER:  From water within the watershed.  And it

11    is recharged from the recharge area, to repeat the term,

12    depicted on Hamilton's Exhibit A.

13        MR. GIRARD:  Which is the Thomas Mountain area, which I

14    don't think is the younger alluvial deposits.

15        MR. VEEDER:  No, it is not the Thomas Mountain area

16    where the recharge enters.  The water runs off Thomas

17    Mountain in the area, but the recharge is well down in the

18    Anza Basin area.  I wish you would look at these things and

19    see what you are writing about.

20        MR. GIRARD:  I think we could refer to Dr. Mann's

21    testimony.

22        MR. VEEDER:  I have Dr. Mann's testimony.

23        MR. GIRARD:  Read it and save time.

24        THE COURT:  I am satisfied with that point.  I have

25    the map I made at the time of his testimony, and it shows

1   the three areas in the older alluvium lying above and

2   adjacent to the younger alluvium, and these three are the

3   recharge areas.

4         MR. VEEDER:  Yes, and they come down -- this is the

5   way Dr. Mann drew them, and they are right here, and they are

6   well down below the Ramona Indian Reservation.

7         THE COURT:  Yes, but I don't go further, then, and

8   draw the conclusion that it is not drawn; that if this water

9   that charges this deep aquifer didn't recharge it, it would

10  run out and down the Santa Margarita River.  I think that if

11  the water was not pumped the water would run out in the

12  desert and the new water would come in and replace the water

13  that ran out into the desert watershed and you would be in

14  the same situation you are now and maybe worse off.  Because

15  presently the deep wells are bringing water up and applying

16  it to the surface.

17        MR. VEEDER:  There is nothing along that line whatever.

18  He says the water movement is very slow out of the area.

19  That is one thing he does say.  But he emphasizes, if you

20  will look at it, on Page 16,475 of the transcript, he goes

21  on and testifies that there is --

22        THE COURT:  Read what he says.

23        MR. VEEDER:  I am reading now on Page 16,475:

24              "Q  Will you point out to me on 278 where you

25        think the deeper aquifer on the Hamilton property is

1    recharged?  Where would you say generally that would

2    be located?

3         "A   I would say generally along the stream

4    courses in Section 5 and the northern part of Section

5    8 and in Section 4 and the westerly part of Section 9."

6    I think your Honor had those marked.

7         "Q   You would say that was where the water

8    generally came from to recharge the Hamilton --

9         "A   To recharge the deep aquifers, yes.

10        "Q   And have you observed any general decline in

11   the water tables for the deeper aquifers in this Anza

12   Valley?

13        "A   Well, no, no general decline.  There is, of

14   course, a decline during the pumping season.  But in

15   general the levels have responded year by year fairly

16   well."

17   Then he goes on and testifies on Page 16,483.  Your

18   Honor did the interrogation there.  He was again talking

19   about the recharge area.  The question on Line 4, Page 16,483:

20        "Q   So as a matter of fact, when the groundwater

21   level is reduced in the area depicted on Hamilton A --

22        "THE COURT:  In what area?

23        "Q   BY MR. VEEDER:  -- in the crosshatched area,

24   that permeable portion of the Valley would be

25   receptive to recharge from the areas around it; isn't

1    that right?

2         "A   The area of recharge is beyond the indicated

3    crosshatched area, because at this position in the

4    crosshatched area the deep aquifer is a confined

5    aquifer, and there would be no dewatering within this

6    indicated area. "

7    In other words, immediately above --

8    THE COURT:   And to the sides.

9    MR. VEEDER:   -- and to the sides, he says there was

10   not.

11        "THE COURT:   By dewatering within the area, you

12   mean in the semi-perched area above?

13        "THE WITNESS:   Yes.

14        "THE COURT:   There would be no dewatering of that?

15        "THE WITNESS:   There would be no dewatering

16   within the area which is crosshatched.

17        "Now somewhere, where this is recharged, there

18   would obviously have to be a lowering of the water

19   level because as the water is flowing into this area,

20   it would have to replaced from somewhere, but that

21   would be in the area I spoke of before, which would be

22   the recharge area."

23   The point I make, your Honor, is that the witness has

24   declared that when you dewater a deeper aquifer it dewaters

25   the area in the recharging area above it, with the result

1    that there is a reduction.

2         MR. STAHLMAN:  Don't we have this situation?  Let's

3    fully understand the physical phenomenon that exists there.

4    As I understand it -- and I think this comports with the

5    testimony of other geologists who testified earlier in the

6    case, and a comparison can be made -- I think you have a

7    similar situation in the recharge areas of Nigger Canyon;

8    the only difference being -- I should first point out there

9    are three creeks that come down here instead of one as down

10   the Vail Ranch -- the water that drains off of the drainage

11   area within the watershed, when it reaches this coarse

12   material which is in the upper end of the stream, which we

13   have referred to as the recharge area, whether it be Nigger

14   Canyon or the recharge area, the phenomenon is the same.

15   The only difference between the two, as I see it, is that

16   the ancient underground stream, the aquifers of that stream

17   take a course/of the watershed in this area, whereas in the

18   Pauba area the deeper aquifers stay within the watershed.

19   Isn't that the sum total of the testimony?

20        THE COURT:  Where is the first part of his testimony

21   where he told about this underground valley filled with

22   gravel?  There is no doubt as to how the deeper aquifers are

23   recharged.

24        MR. VEEDER:  That is the point.  I don't believe there

25   is.

THE COURT:   Recharge comes from the areas that he indicates.   I am not going to insist on this other finding, but I think if you didn't pump these wells in the deep aquifer the water would go out into the desert and the recharge would go on just the same.

Where is the first part of his testimony where he talks about this deep valley?

MR. VEEDER:   The Volume is No. 144.   He goes on at quite some length, your Honor.   He had a statement -- I am trying to find it -- in which he described the clay cap that surrounded these ancient gravels.

THE COURT:   Let me see the Volume.   I am talking about where the testimony starts.

MR. STAHLMAN:   Both the shallow aquifer and the deep aquifer are charged in the same area.

THE COURT:   He first tells about the fault that lies to the west of this area of the deep aquifer and outlines the fault as running from the south quarter corner of 21 to the northwest corner of 21, and that the alluvium is very shallow to the west of it and as much as 200 feet deep to the east of it.   That is on Page 16,444.

MR. SACHSE:   Your Honor, have you got 16,453?   I think that is where he discusses the question.

MR. VEEDER:   I don't believe there is any doubt about the physical features at all.   I do think the question of

recharge --

MR. STAHLMAN:  But is the recharge of any benefit to the Santa Margarita River?   We wish it did.

MR. VEEDER:   I think at any time you pump it out, George --

MR. SACHSE:  Dr. Mann says exactly no, on Page 16,454 at the top of the page.  It starts on Page 16,452:

"Q  Dr. Mann, what happens to this shallow groundwater that is present in the Valley?

"A  I might point out here that any water, if it is to get out of Anza Valley and move into the Santa Margarita system, must cross this shallow bedrock bench which occurs in the southwestern portion of the Valley.  The water then must flow through shallow zones because the bedrock in this bench area is at a shallow depth."

At Line 17:

"Q  What about the deep ground waters?

"A  The irrigation wells lying to the northeast of the fault that I have indicated on Hamilton A, they tap gravel aquifers which are not present southeast of the fault.  The deep groundwaters cannot flow southwesterly because in order to do so they would have to flow the fault and into the uplifted barrier of basement rock.  These deep groundwaters would have

difficulty in moving vertically upward also because

of the capping layers of clay which are indicated in

the well lines.  It is my opinion that irrigation

pumping causes little, if any, depletion of ground-

water spill into the Santa Margarita system."

I think that is about as flat as you can make it.

MR. VEEDER:  Your Honor, the point I am still making

is that at any time you are taking water out of here you are

reducing the quantity of water that goes down the Valley.

THE COURT:  You have to raise the level of the water

through the deep aquifers into the shallow ones in order to

get anything to flow across that little dike there in 29,

and meanwhile, while you are trying to raise the water, the

water is running out into the desert water course.  That is

what I am going to find.  So now let's be on our way and

work it out some way.

MR. SACHSE:  Are you through with No, 17, Bill?

MR. VEEDER:  Except for the objections.

THE COURT:  Have we said enough here to indicate what

my finding is going to be?

COLONEL BOWEN:  The description is not entirely

correct, your Honor.

MR. GIRARD:  We can straighten that out, Colonel.

COLONEL BOWEN:  At Line 4½-5 where it says "deep

aquifer proceeds from the northwest to the southwest," it

has to be changed to the southeast.  And then on Line 9 it

says "of section 27;" insert a comma and delte the "and,"

so it would read "of Section 27, Section 21, and Section 34;"

and then delete "diagonally from the northwest quarter of

the southwest quarter through Section 34".

MR. VEEDER:  How would that read now, Ace, from start

to finish?

COLONEL BOWEN:  Again reading, beginning on Line 4:

"Said deep aquifer proceeds from the northwest to the

southeast and is located primarily  in the southwest

quarter section 16, southeast quarter of Section 17,

northeast quarter of Section 28, northwest quarter of

Section 27, Section 21, and Section 34, Township

7 South, Range 3 East."

THE COURT:  All right.

Well now, the matter of this fault that we are talking

about, it lies in the Indian Reservation -- the diagonal

fault in Section 29.

MR. VEEDER:  Is that a fault or is that just where --

THE COURT:  Well, I don't know.  My map shows that

as a limit of the Anza Valley.

MR. VEEDER:  I think that is what it is, your Honor.

THE COURT:  The fault must be along the west side of

that deep aquifer.

MR. VEEDER: That is correct.  That is the way it appears

1    on 278.   I thought that the diagonal line was simply the limit

2    of the basin and not a fault.

3         THE COURT:   I think if we are going to do it, then we

4    ought to provide that there is this fault on the west side

5    of the deep aquifer, and also find that the irrigation from

6    the deep aquifer causes little, if any, depletion of water

7    spilled into the Santa Margarita River.

8         Do you have some language, Mr. Girard?

9         MR. GIRARD:   I will try this for size:   Just add to

10   it:   "That because of the fault on the westerly portion of

11   the deep aquifer which prevents the movement of water in the

12   deep aquifer westerly, and the impervious clays which prevent

13   the movement of said waters vertically, the pumping of said

14   waters contained within the deep aquifer has not depleted

15   the waters which would have, in a state of nature, contributed

16   to the Santa Margarita River stream system but said pumping

17   has in fact impeded said waters from moving into the desert

18   drainage watershed. "

19        MR. SACHSE:   I don't think you ought to say "prevented."

20   I think you should say "impeded."   That is Dr. Mann's

21   statement.

22        THE COURT:   That sounds all right to me.

23        Does that sound all right to you, Mr. Veeder?

24        MR. VEEDER:   No, I don't agree with it.   I think if

25   you read Dr. Mann's testimony as a whole -- conceding that

1    he was sort of a mouse-in-the-weeds and hard to catch up with,

2    but the fact remains that when he said that this water has

3    to come from the recharge area he was talking about

4    depletion of the quantity of water moving down and out of

5    the Valley.

6         THE COURT:  I don't disagree with you where the

7    recharge comes from, but it is patent that the basement lip

8    he talks about on that fault line the deep water can't get

9    across.

10        MR. VEEDER:  I don't say the deep waters.  I say when

11   you pump out of the deep aquifer it has to be recharged

12   from the area above, and when that occurs it reduces the

13   quantity of water moving down and out of the Valley.

14        THE COURT: And if you don't pump and it flows out

15   underground of the watershed, then it is replaced by water

16   from the areas of recharge, and in that sense depletes the

17   water.

18        MR. VEEDER:  But there is not a word in the record that

19   says that.

20        THE COURT:  Yes, there is.  I just got through --

21        MR. VEEDER:  Your Honor, there is not anything in the

22   record that says that in a state of nature the water from the

23   higher aquifer went into the deeper aquifer and moved on out.

24        THE COURT:  Page 16,457:

25

1       "A  . . . However, as late as 1950, and that is

2   about as far back as the information is available,

3   water levels in the southeasterly portion of Anza

4   Valley did have a southeasterly slope, so the picture

5   generally, as I see it, is if the water levels were

6   to rise again in Anza Valley --

7       "Q  That is the deep groundwaters?

8       "A  -- the water levels in the deep aquifers,

9   the spill would tend to be through these old gravels

10  southeasterly towards Terwilliger Valley.

11      "THE COURT:  And then out of the watershed?

12      "THE WITNESS:  They are already out of the

13  watershed when they pass through Section 34, your

14  Honor, . . ."

15  MR. VEEDER:  I will not argue with your Honor.  I think

16  the pumping does affect it, and I will make objection to

17  it.

18  THE COURT:  Overruled.

19  MR. SACHSE:  Your Honor, before we go to the next of

20  these insertions, I have a rather serious question here

21  about maybe a new finding.  If you look at any of these

22  exhibits there is a stretch of stream running downstream

23  from the westerly boundary of the basin, as indicated on

24  278, before you get to the Cahuilla Basin.  In other words

25  it is the stretch of alluvium that you find in Sections 29,

1  30.

2      MR. VEEDER:  From the diagonal line, isn't it?

3      MR. SACHSE:  Yes, downstream from the diagonal line.

4  We have no finding covering that, and I think we should be

5  consistent on this bed and banks proposition and what the

6  status of ownerships there is.

7      THE COURT:  That is all in the Indian Reservation.

8      MR. VEEDER:  That is all in the Indian Reservation.

9      MR. SACHSE:  Yes, but it is not within the basin, and

10  we have no finding anywhere on Cahuilla, Mr. Veeder, which

11  does what we have previously done and said the bed and banks

12  shall be regarded as the contact point between the younger

13  alluvium and the older continental deposits or the basement

14  complex.  I don't know that it is critical, for it is all

15  Indian Reservation.  But if any part of it ever was not, it

16  might be very important as to what the status of that land

17  is.

18      MR. VEEDER:  Again, Mr. Sachse, on the Anza Valley

19  findings, which I filed on January 17, we did undertake a

20  description of that part.  I think we have to look at

21  Interlocutory No. 33.

22      MR. SACHSE:  If it doesn't have to go in the Indian

23  one, that's all right.  I am just calling attention to it.

24      MR. VEEDER:  You are going to have a set of findings

25  where Cahuilla Creek is described with a great deal more

1    particularity, as you are going to describe Anza Basin.

2         MR. SACHSE:  All right.

3         MR. VEEDER:  I don't care, if you want to.

4         MR. SACHSE:  Let's leave it for the Wilson Creek

5    findings.

6         THE COURT:  What is the next one, 49?

7         MR. SACHSE:  That is a very brief one, your Honor.

8    You requested us to add at the end of it something explaining

9    why Class VI lands were irrigable.

10        MR. VEEDER:  Did Colonel Bowen say that?

11        MR. SACHSE:  Yes.

12        MR. VEEDER:  Is that all right with you, Ace?

13        COLONEL BOWEN:  Yes.

14        THE COURT:  All right.  The next is No. 50.

15        MR. SACHSE:  The next would be No. 50, which is a new

16    finding.

17        MR. GIRARD:  It should be 51 instead of 50; it should

18    be a new one for 51.

19        THE COURT:  Why?

20        MR. SACHSE:  No.

21        THE COURT:  It should be 50.  Present 50 says the

22    waters of Pechanga are used for stock raising and domestic

23    purposes.

24        MR. GIRARD:  You are right, your Honor.  I have the

25    old one here.  Yes, it should be 50.

1    THE COURT:  Any objection to 50?

2    COLONEL BOWEN:  Yes, your Honor.

3    THE COURT:  What is the objection?

4    COLONEL BOWEN:  I think it should be for approximately

5    six persons alleged to be Indians there, your Honor.

6    MR. GIRARD:  I'll go along with that change.

7    THE COURT:  Six persons alleged to be Indians.

8    MR. VEEDER:  Are you going to put in "alleged"?

9    THE COURT:  It doesn't make any difference to me.

10   MR. VEEDER:  I am opposed to it.

11   THE COURT:  All right, let it read six Indians.

12   MR. VEEDER:  And I am going to find out if there aren't

13   more than six Indians.

14   MR. STAHLMAN:  How are you going to find out?

15   MR. VEEDER:  I will get a Marshal to go out there.

16   His Honor sent them out one time before.

17   THE COURT:  You are just going to add this to 52?

18   MR. GIRARD:  Yes, your Honor.

19   THE COURT:  This only takes care of Pechanga.

20   MR. GIRARD:  This takes care only of this little trust

21   allotment.

22   MR. VEEDER:  It is only to the 40 acres.

23   MR. GIRARD:  There is a longer one on the Indian rights

24   in general.  This is just for that 40 acres which were by

25   trust allotment  to Pedro Justapiz.

THE COURT:  Then we come to No. 56.

MR. GIRARD:  That is right.

MR. VEEDER:  In regard to this No. 52, your Honor, I would like to reserve the right to have the Indian Service, if they have more information -- that is the only information that they gave me, and if they have some data I will get it before the next hearing.

THE COURT:  They may have lists of rolls of some of the tribes.  Sometimes they would not have even that.  I don't know if they have any information as to how many there are living on the reservation.

MR. VEEDER:  I am anxious to get it as correctly as I can.

THE COURT:  What about No. 56?  Is that all right?

MR. VEEDER:  I have expressed my objections, your Honor, to the idea that this is geared to the Indians residing on the Reservation.  I argued it yesterday, and I will renew those arguments and my objections and I will not take any more time.

THE COURT:  All right, overruled.

Are you satisfied with this language, Mr. Sachse and Mr. Girard?

MR. SACHSE:  Yes.

MR. GIRARD:  Yes.

THE COURT:  All right.

1    MR. GIRARD:  I haven't drafted up the conclusions of

2    law.  However, I don't think it will be a monumental job to

3    change those to reflect the findings.  Many of Mr. Veeder's

4    conclusions of law can be accepted just as they are.  But

5    I think the only difference in the changes in the conclusions

6    of law would be, for example, on Page 20 where you would just

7    in effect, state as a conclusion of law, the first paragraph

8    of No. 56, and then you would just make another conclusion

9    of law setting forth the dates that these Indian Reservations

10   were reserved.

11       MR. STAHLMAN:  We talked about this exhibit.  Mr.

12   Veeder said that he has all of these copies of these

13   Executive Orders and dates.  There should be something in the

14   record on them.

15       MR. GIRARD:  I can draft up the conclusions of law

16   on the information that Mr. Veeder has set forth in the

17   findings.

18       MR. STAHLMAN:  Don't you think there should be some

19   evidence in the record on it?

20       MR. GIRARD:  I have no objection to it.  I presume

21   Bill's copies are correct.

22       MR. VEEDER:  You gentlemen may have forgotten.  I

23   offered to show them to you in my office.

24       MR. SACHSE:  I am not arguing about it.

25       MR. GIRARD:  I am not arguing about it.

MR. VEEDER:  They are all there and I will bring them in, if you want them.

MR. GIRARD:  But I think with Mr. Veeder's findings, which we have gone over pretty well, may be accepted in toto, except for these few changes.  I can draft up some conclusions of law and judgment provisions certainly for the next session, your Honor.  I don't think it will be a monumental job, do you?  It will be relatively brief.  There are also, as Mr. Sachse pointed out, several of these routine judgment provisions which aren't in there.

MR. SACHSE:  Surface impoundments.

MR. GIRARD:  Which I will put in.

THE COURT:  All right, shall we pass it?

Mr. Veeder, here is your transcript.

What do you want to go to next?

MR. GIRARD:  Rainbow, I think.  Let's get Rainbow out of the way.

MR. SACHSE:  Have you reviewed Rainbow, Mr. Veeder?

MR. VEEDER:  I have gone over it.

MR. SACHSE:  Will you then perhaps call attention to places you think are unsatisfactory and speed it up?

MR. VEEDER:  Well, generally, you and I have talked about it.

MR. SACHSE:  I tried to do exactly what we agreed to in your office, except new Paragraph 5 has been drafted by

1    Colonel Bowen as you requested.

2         MR. VEEDER:   That is all right.

3         MR. SACHSE:   It is satisfactory to me, too.

4         THE COURT:   What is the number on this Rainbow?

5         MR. SACHSE:   There is none, your Honor.   We never gave

6    it one.   It is one of those Master's.

7         THE COURT:   It would be 42, then.

8         MR. SACHSE:   And his Honor has requested that Paragraph

9    15 on the minor surface impoundments be changed and that

10   we make it clear that Interlocutory No. 28 is incorporated.

11        MR. STAHLMAN:   Are you going to change from the

12   Roman numeral also?

13        MR. SACHSE:   Yes, I will change it all the way through.

14        MR. GIRARD:   We will want a general conclusion of law

15   in there incorporating your conclusions of law on

16   Interlocutory No. 28.

17        MR. SACHSE:   Right, I will.

18        MR. VEEDER:   Did we ever agree on the disposition to

19   be made of the question of the admissions of your two clients

20   and the other clients in the Rainbow area?

21        MR. SACHSE:   As I understood it, your understanding and

22   mine, Mr. Veeder, was that this judgment would necessarily

23   have to supersede any individuals who were included in 2

24   through 22, and we  will have to have an order from his Honor

25   after we check them out vacating the prior judgment that says

they are vagrant local, and in fact they aren't under this one.

MR. VEEDER: All right. In other words, on those two where you ask for admissions from us, you will just vacate them and be done with it. That's all right with me.

MR. SACHSE: Do you understand the problem we are discussing?

THE COURT: In other words, you have individual judgments entered up as to some individuals that are included in this judgment.

MR. SACHSE: And they conflict -- two of them conflict. I have agreed with Mr. Veeder that this should supersede the prior one. I don't think that needs to go in here at all, Mr. Veeder. Just have an order vacating. We don't mention it in this at all. They are going to be attached.

MR. VEEDER: We will have them included in the exhibits.

MR. SACHSE: Right.

MR. VEEDER: All right, that suits me. We will just change our records on it.

THE COURT: Then are you going ahead with any other suggestions?

MR. SACHSE: I will go ahead and get this done, if there are no other suggestions.

MR. VEEDER: I think all that has to be done is that we obtain the exhibits for Rainbow. Those are not done yet.

MR. SACHSE:   No.   Colonel Bowen has a copy of this and can go ahead with the preparation of the exhibit while I re-do it.   That is short and sweet.

MR. VEEDER:   I will go ahead on 39-A and that is not ready yet, the exhibits on 39-A.   That would be the vagrant local percolating water between the Canyon and the Naval Enclave.   We are going to have to have another A-Series for Rainbow.

THE COURT:   For Rainbow you say another A-Series?

MR. VEEDER:   We are going to have to have an A-Series for Rainbow, are we not?

MR. SACHSE:   We discussed that.   To me it is a mechanical problem for Commander Redd and Colonel Bowen. Commander Redd pointed out last night that there are a lot of parcels in Rainbow.   It might be easier from the pure standpoint of bulk, as I understood it, to have an A-Series for Rainbow.   I think we should do it that way.   Actually, I have a finding here that all lands on the basement complex are vagrant local waters.   But with a separate A-Judgment it is a cinch to write one.   All it takes is an exhibit.

THE COURT:   That would be 42-A, then.

MR. VEEDER:   Yes.

THE COURT:   Not 39.

MR. VEEDER:   39-A is entirely separate from Rainbow. I was saying that we have to have an A-Series for Rainbow.

1        THE COURT:   All right.   Who is going to work on that?

2        MR. VEEDER:   We are working on it.

3        These agreements of mine are strictly as to form.   I

4  reserve the right always to object.

---o0o---

THE COURT:  All right.  Are we ready to start talking about physical solution, the Government's motion?

MR. GIRARD:  I am, your Honor.

MR. SACHSE:  I am.

MR. VEEDER:  Yes, your Honor, I am prepared.

THE COURT:  All right, we will take our recess and then start in.

(Morning recess.)

THE COURT:  Now, when we start this discussion of the final judgment, I would like to make a few suggestions.

First, I think the final judgment should, in part, be an incorporation of these interlocutories by reference.  I don't see any need to re-do a lot of this work -- this terrific job that the Colonel and his assistants have had in getting together these names and descriptions and all that.  Suppose we have some inconsistencies or we have problems.  They can be straightened out later on.  The pattern of having interlocutory judgments by watersheds or subwatersheds is a very good one, because if some individual wants to know where he stands in this matter he can find the judgment that pertains to the particular watershed and it is an easy way to find it.  I don't see any value in doing anything except an incorporation by reference.  That would be my first

1-2

suggestion on it.

Secondly, if we progress with this final judgment, we have a lot of other procedural things we have to do. We have to give notice to all these people, a chance to be heard on these interlocutory judgments before they are incorporated in the final. That is a tremendously big job. We have to set a hearing date. I don't anticipate that we will have probably any objectors. But this has to be done to carry out our plan of due process.

Thirdly, we can hold up the entry of this final judgment in order that we attempt to solve some of our problems. In other words, we control when we sign the judgment so that we don't run into any problem there and be immediately faced with the question of whether there is going to be an appeal or not an appeal. We should keep that in mind.

What comments do you have on those?

MR. SACHSE:  On No. 1, your Honor, I am in complete agreement. I think they should be incorporated by reference, principally for the last reason your Honor suggested, that I think it would be most convenient in that fashion for the individual landowner. He isn't going to have to get one tremendous thing. He can confine himself to one with which he is concerned.

The second, regarding notice, I leave that up to your

1-3

1  Honor and Mr. Veeder, what is necessary for due process. I

2  would hope we could avoid any more three ring circuses, but

3  if we can't, we can't.

4      On the delay of the entry of the final, delay, yes;

5  but --

6      THE COURT:  If it serves a purpose.

7      MR. SACHSE:  Exactly.  This case already now is 12

8  years old. For 12 years the Navy has been prevented, largely

9  by this litigation, from doing anything on the River, and

10  for 12 years the Fallbrook has been prevented, and I think

11  if we are realists, both the Navy and Fallbrook are going to

12  recognize that we are going to continue to be prevented.  I

13  don't think Congress is going to give the Navy money for

14  De Luz Dam with water rights unsettled.  I am pretty sure

15  we are not going to get any money out of the Department of

16  the Interior, Small Projects, at least without a decree in

17  here.

18      MR. VEEDER:  What about California?

19      MR. SACHSE:  California is another question.  The

20  actual situation on the Davis-Grunsky Act was this, Mr.

21  Veeder.  A basic condition of the Davis-Grunsky Act is that

22  funds not be available from other sources.  California

23  approved our application for Davis-Grunsky funds for the

24  reservoir, subject only to the funds that we were

25  simultaneously applying to the Bureau for Small Project money,

1-4

1    and they said until you demonstrate that Small Project money

2    is not available you cannot get Davis-Grunsky money.

3        MR. VEEDER:  Is that a recent development?

4        MR. SACHSE:  No, that was a year or year and a half

5    ago.  It was before Mr. Carr went -- Mr. Carr was the

6    president of the California Water Commission -- he is now in

7    Washington.

8        MR. VEEDER:  I have heard that your application with the

9    State had been rejected.

10       MR. SACHSE:  It has been rejected, and the express

11   reason was that we have pending this Federal one.

12       MR. VEEDER:  I am sorry to have interrupted.  Go ahead.

13       MR. SACHSE:  No, I think it is part of the story.

14       Now, if the Bureau ever outright rejected us I would

15   hope that we would then be eligible for Davis-Grunsky money.

16   But we have to go ask again.

17       But the point I make, your Honor, is that I don't think

18   we are doing ourselves, either side to this litigation, a

19   kindness by any unnecessary delay in this thing.  We are

20   going to have to face realities, Fallbrook is and so is the

21   Navy and so is the Justice Department.

22       THE COURT:  You are probably right, and if an appeal

23   were taken and it was later decided to abandon it, it could

24   be dismissed.

25       MR. SACHSE:  Exactly.

1-5

1    I don't think we are going to get a bill through

2    Congress.  I don't think we are going to contract between

3    the Navy and Fallbrook for a joint project at De Luz.  I

4    don't think Fallbrook is going to get any money, I don't

5    think the Navy is going to get any money, if we constantly

6    have to say this thing is still in the air.  If we can go

7    to Congress and say, "These are the rights we have

8    adjudicated by the Court today," then I think we can sit

9    down and talk.

10    I would be strongly opposed to any delay except for

11    a really specific purpose.

12    THE COURT:  Mr. Veeder.

13    MR. VEEDER:  If Mr. Girard has anything to say on this--

14    I would like to speak specifically in regard to the items

15    set forth in the motion and get reactions in regard to the

16    various provisions in the motion at this time.  So if there

17    is any other general statement --

18    MR. GIRARD:  The only general statement I would have

19    is in regard to notice.  I think from the due process

20    standpoint, except for the Master's Judgment, and assuming

21    De Luz and the Master's Judgments are rewritten into Court

22    judgments, I don't know that the requirement of due process

23    on notice of entry of judgment is applicable at all.

24    THE COURT:  Well, every judgment we have entered has

25    provided that people may be heard on the matter.

20,306

1-6

1        MR. GIRARD:   I think we ought to provide that they

2   be heard, but I don't know that we ought to have to

3   prepare individual judgments and send out each one.   My

4   suggestion would be more of a notice that the judgments

5   have been prepared and are lodged with the Court, and

6   to lodge enough copies with the Clerk's office for anyone

7   to come down and look at them.

8        MR. STAHLMAN:   I would like to ask Mr. Veeder a

9   question -- if you are through, Mr. Girard -- as to whether

10  you think this would meet the due process provisions:   That

11  if we follow what the Court has suggested here, have

12  interlocutories and then the interlocutories be referred to

13  in the final judgment, and then you would send a notice

14  that there was a final judgment and that the decree insofar

15  as it relates to their particular property is contained

16  in Judgment No. so-and-so?

17       THE COURT:   That is what I contemplate -- on file with

18  the Clerk.

19       MR. VEEDER:   I think the rules require notice of some

20  kind, and we have gone ahead and gotten envelopes ready in

21  anticipation of sending out notices.

22       MR. GIRARD:   Set a date for them all to come in and

23  object, if they have any objection.

24       MR. VEEDER:   Mr. Stahlman suggested identification to

25  the individual.

1     MR. STAHLMAN:  That would also be flexible, because

2 you could put this out in one area and see what response they

3 have, and if two or three come straggling in, then you could

4 send them to a greater number and wind it up.  My believe is

5 that when you send these out you are going to have very few

6 people coming in to court.

7     MR. VEEDER:  Of course, I have expressed my view that

8 it would be simpler to have a single decree.  But whatever

9 your Honor's ultimate ruling is.

10     THE COURT:  Why would it be simpler?

11     MR. VEEDER:  For the reason that if you have one

12 integrated document it would be much easier from the stand-

13 point of running it through on the location of each parcel

14 of land throughout the watershed on a township-range-section

15 basis.  My own view is that it would be a very practical

16 thing to do.  That when all is said and done we have

17 repeated and repeated and repeated, and necessarily repeated

18 the various paragraphs in these interlocutories.  My own

19 thought is that if we were to consolidate those paragraphs

20 all into an individual paragraph applicable to the entire

21 watershed it would be simpler.  I don't believe it would

22 be such a tremendous volume or tremendous document to follow

23 through as I have recommended.  I think that you would have

24 a pretty concise document.  We have written decrees which

25 were very concise and very compact because we would make

1-8

1 broad general provisos.

2  MR. STAHLMAN:   It is going to be a big document.  I

3 am still aching in the back from carrying home the one on

4 Murrieta Basin.

5  MR. VEEDER:   I think it could be a printed document

6 and a very small document, a very concentrated one.

7  THE COURT:  Did you ever write one for 6,500 defendants?

8  MR. VEEDER:   I think the 6,500 people are not the

9 fact that governs the size.  I think it is in the area that

10 would be actually adjudicated.  For example, I think one of

11 the best things we have done is where we have found there is

12 no water we have eliminated a vast part of the watershed

13 where we say it is basement complex.

14  MR. GIRARD:   You still have the A-Series judgments

15 there.

16  MR. VEEDER:   I think those could be handled in

17 simpler form than they have been handled now.

18  However, these are just observations.

19  MR. GIRARD:   We agree that the A-Series could have been

20 simpler.

21  MR. VEEDER:   The point I am trying to make is that I

22 do believe we could have a concentrated and more effective

23 decree, and of course I feel very strongly against these

24 efforts to incorporate by reference maps and things like that.

25 I think we could do it more simply.

1-9

1    But that is all part of an over-all approach I think

2    we are going to have ultimately to take in regard to this

3    matter.

4        MR. STAHLMAN:  Couldn't your final judgment, Bill,

5    contain as an exhibit a map that would show the areas in

6    which all of the previous judgments were contained and marked

7    as such, and then people could find it very readily?

8        MR. VEEDER:  Quite possibly.  I have talked with

9    Colonel Bowen on that and we did try a composite map, and we

10   may try it again.  I think that there can be one worked out

11   which would eliminate a great many of the documents that are

12   incorporated by reference.

13       But those are really mechanical tasks.  I have much

14   greater concern on other points.

15       Are you ready to turn to the motion, your Honor?

16       THE COURT:  Yes.  Now, before we start in again on

17   all the points of this, we went over this and had the

18   expressions of views and let us not have a repetition of

19   that.  It would seem to me that we should take up certain

20   points, and if something can be done about it, put somebody

21   to work drafting the section.

22       MR. VEEDER:  What do you mean by "section"?

23       THE COURT:  A proposed section for this proposed

24   judgment we are talking about.  We have already spent two

25   days or more going over the thing and getting everybody's

1-10

1   views on it.   What did you want to do today, just some

2   more?

3        MR. VEEDER:   I really believe, your Honor, that we are

4   in this position -- and I might add I talked rather

5   extensively this morning already to Mr. Clark on the

6   proposition, because I said that the motion had been moved

7   up for consideration now as distinguished from the next

8   meeting -- and we are hopeful, we would like to have your

9   Honor consider, if you would, the ideas that we have

10  promulgated in Paragraph A-1 and 2 on Page 2 of the motion.

11  We think that there is a real need to have a decree that

12  would actually control the quantities of water that would

13  come down to us through Temecula Canyon.   We think that

14  absent some kind of over-all decree entered by this Court,

15  in its power in equity, we would be forced to stand on

16  strictly our legal rights -- a thing we would like to avoid.

17  We think the areas of control would be the Murrieta-Temecula

18  groundwater area, and that there is sufficient data -- this

19  is my view, your Honor may not agree -- we think there is

20  enough data in the record now to support the kind and type

21  of apportionment that is referred to in A-1 and 2.

22       THE COURT:   How do you get over the question of

23  profitable irrigation?   We haven't that in the record.

24       MR. VEEDER:   My own view on that, your Honor, is that

25  we have a great deal of data in there, based upon the

1-11

information that is in the record, that we could work up,
by stipulation or otherwise, if we need more data, how to
handle that.   I think we have the irrigable acreage.  We put
in all the data that was available -- the United States put
it in.   I think the matter of the irrigated acreage is
academic at this point.  We do know there are these areas
to which I am making reference of irrigable land.  They are
limited by the quantity of water available, they are
limited by certain economic aspects and features.  We could
sit down and work out the criteria which you would think
essential to Paragraphs A-1 and 2.

MR. STAHLMAN:  Your Honor, let's take 2, for instance.
This rather amazes me.  I think we are right, on the question
of apportionment, not to attempt to make any finding in
connection with that matter or place those matters in the
decree.  Here is how it reads:

"2  An apportionment of available waters
between holders of such rights on the basis of
reasonable demands for beneficial use for all
potentially permissible uses under such rights,
using as the general criterion for determination of
such demands acreage reasonably susceptible of
profitable irrigation."

Now he says he is asking an apportionment of
available water, and this is something that varies from year

1-12

1   to year.  You have to have a formula first upon which this

2   matter can be based, and that requires the very thing we

3   have talked about here -- a River Master to make studies and

4   to make a determination.  How can you divide up something

5   when you don't know what you are dividing?  How much of

6   the melon are you going to get when you don't know how big

7   the melon is?

8      MR. VEEDER:  In response to that proposition, Mr.

9   Stahlman, I think it would be a proper matter for you and me,

10   because your client and mine certainly are the primary

11   clients in this business, with all due respect to Mr. Sachse

12   we might sit down and endeavor to work out some kind of

13   language.

14      MR. STAHLMAN:  This would be very fine.  But if we

15   attempt to sit down and work that out, we are going to have

16   just a "Fallbrook" situation all over again.  Because I know

17   what those people up there are going to say -- I know their

18   temperaments and their feelings.  They are going to say,

19   "Here is the big Vail Company and the United States getting

20   together and whacking up this water again."  This was their

21   cry when this first started.  We are creating another

22   monster such as we have in the stipulated judgment.  You are

23   going to have all of the Lilliputians up there coming down

24   and trying to tie the monster down.

25      MR. VEEDER:  We have Mr. Girard, who, in parens patriae,

1-13

1    represents everyone.

2         MR. STAHLMAN:  I would like to hear from Mr. Sachse

3    and Mr. Girard on it.  I haven't even talked it over with

4    them.

5         MR. GIRARD:  I am not about to go for any apportionment

6    until someone shows that there is a real need for it.  In the

7    first place, I agree with George.  On many of these

8    substantial streams you don't even have any measurement --

9    you don't know how much water there is available.

10        And, secondly, and most importantly, I don't think the

11   United States has shown any evidence to indicate that

12   someone should be cut down to let water come down to them.

13   Their present uses are being satisfied by the waters which

14   are available on their properties.

15        And, thirdly, even if you concede that they are short--

16   which the evidence doesn't support -- even if you concede

17   that they are short, you must remember that the judgment

18   provision which dealt with the Naval Enclave said

19   specifically you are not to cut anybody down until you quit

20   exporting out of the watershed.

21        MR. VEEDER:  May I respond to your one point about the

22   matter of demands on the Enclave.  There is a finding

23   already entered by the Court in regard to the Enclave in

24   which the statement is made that our demands are actually

25   between 12,500 and 13,500, and that we are not getting that

1-14

1    kind of water.

2       MR. GIRARD:  You are not pumping that kind of water.

3    But there is no finding that it is not there.

4       MR. VEEDER:  Well, it is not there, Mr. Girard, and

5    the finding is that we have a firm supply there of a maximum

6    10,000.  So when we are confronted with that situation I

7    necessarily have to take issue with your idea that we are

8    getting all the water we are entitled to.

9       MR. GIRARD:  How do you answer the outside the water-

10   shed problem?

11      MR. SACHSE:  Yes, how do you answer the outside the

12   watershed problem?

13      MR. VEEDER:  In regard to our exportation outside the

14   watershed, as  I said in my preliminary and initial statement,

15   we sincerely hope that the suggested solution which we have

16   tendered to you would be adopted.  We have no desire, I

17   certainly  don't have any desire to stand firmly on our legal

18   rights with  all the implications of such a course.  In

19   other words, we are in this position, where we believe that

20   we have a legal right to export water.  We believe that.

21   But we believe that it is a claim that, if asserted in its

22   full implications, could have really an adverse effect on the

23   conclusion of this lawsuit.  We feel we have that right.  We

24   are not going to abandon that claim.  But we think it is an

25   element to take into consideration in the proposal we here

1-15

1 tender.

2   Similarly, in regard to the stipulated judgment, we

3 can take our legal stand on that and struggle through for

4 a long time on it, and my own view is that we would prevail.

5 But we are trying to tender to you here a thought of working

6 out the kind and type of control that we think  essential.

2 fls

2-1

1    Now these observations are made after a great deal of

2    consideration.

3    So when you say, what are you going to do about the

4    exportation?  I say to you that if we stand on our legal

5    claim, that there will be a prolongation of this matter,

6    whereas if there is some give and take here I think we could

7    avoid that prolongation.

8    MR. GIRARD:  I think all you can do on apportionments

9    only at this time is set up any final judgment for the

10    appointment of a River Master for certain duties for him to

11    do, provide possibly in the judgment for the sharing of the

12    cost et cetera, so that he can gather these facts that

13    are essential to make a determination on how much water

14    anybody would get in the event of an apportionment.  But

15    I can't conceive of making any apportionment now just on

16    a factual basis, even if you assume that all the defendants

17    will drop their legal arguments.

18    MR. VEEDER:  In regard to the points you are raising here,

19    in my view, and I believe certainly my recommendations on the

20    point would be along the line that we are making these studies

21    on DeLuz Dam.  I think that actually the construction of

22    DeLuz Dam is, to a marked degree, conditioned upon the decree

23    that is acceptable to the United States.  I believe that is

24    the situation.

25    MR. GIRARD:  I will  tell you right now, Mr. Veeder,

2-2

1 if you are putting your plans in on DeLuz Dam on the assumption

2 of there being an apportionment, California will oppose it

3 in Congress. I want to know right now. Is your plan on

4 DeLuz Dam conditioned on an apportionment, cutting down

5 the people upstream?

6   MR. VEEDER: My view, Mr. Girard --

7   MR. GIRARD: Yes or no?

8   MR. STAHLMAN: I would like to have a yes or no. We

9 always get these speeches when there is a matter put directly

10 to Mr. Veeder that strikes at the very heart of the situation

11 we have to consider.

12   MR. VEEDER: To the extent I have any authority on the

13 matter, the answer is yes.

14   MR. STAHLMAN: All right, then, your Honor, we have

15 spent a good many days here, and we were certainly sincere

16 in our attempt -- we put our signature on a document to the

17 State Water Rights Board in an attempt to cooperate with

18 the Federal Government in relation to the belief that there

19 is sincerity in the attempt to cooperate to build DeLuz Dam,

20 and I think that this document here flies completely in the

21 face of that, and I think if we are to take this matter up

22 here it cuts completely across.

23   THE COURT: Look, gentlemen, let's not dynamite this

24 out of the water to start with.

25   First of all, Mr. Clark's suggestion, with all respect

2-3

1    to Mr. Clark, had the cart before the horse.  I tried to

2    point that out in the transcript we made before.

3        The first step is to appoint a River Master or some

4    agent who has authority to gather information, find out what

5    water is flowing into what underground basins and all the

6    data that we do not have, and over a period of time get the

7    information we don't have, so that we could talk about

8    some of these things.

9        Now, the second point I think we have to keep in mind

10    is that actually the Government may -- and I don't always

11    agree with the way Mr. Veeder presents his matters -- but

12    the Government may be talking about an interim situation

13    until the dam is built.  After the dam is built and water

14    is stored in the dam, the problem gets to be a different

15    kind of problem.  Then if there is reasonable expectation

16    that you will have water in this dam, and the history of the

17    runoff at DeLuz shows ten thousand acre feet at least a

18    year there -- is that right?

19        MR. VEEDER:  From DeLuz, your Honor.

20        THE COURT:  Yes.

21        MR. VEEDER:  No, not ten thousand.

22        THE COURT:  We went all over this.  I think it was

23    in excess of ten thousand.

24        MR. VEEDER:  I don't want to interrupt on that.  Go

25    ahead, your Honor.  I dont really know what the yield on

2-4.

1    DeLuz is.

2        THE COURT:  What does the past record show?

3        MR. SACHSE:  Mr. Veeder said it perfectly.  We don't

4    know what it is.  How are we going to apportion this banana

5    when we don't know how long it is and how fat it is?  It's

6    ridiculous.  Your Honor is correct -- the cart is before

7    the horse.

8        MR. VEEDER:  I'll tell your Honor this, that DeLuz Creek

9    has yielded water in, I think, two years during the eleven

10   years we have had measurements.  Taking the fact that we

11   had two very large years, 1952 and 1958, I think the average

12   runs around 3500.  That is what it is.

13       MR. STAHLMAN:  They are not two large years, to start

14   with.

15       THE COURT:  What do the figures on DeLuz show, Colonel?

16       MR. VEEDER:  35.

17       MR. STAHLMAN:  The Court asked Colonel Bowen.  Why don't

18   you keep still?

19       COLONEL BOWEN:  The stream flow record at DeLuz Creek

20   near Fallbrook by the U. S. Geological survey shows that

21   from 1952 through 1961 the average flow was 3,732 acre feet

22   per annum.

23       MR. GIRARD:  What was the highest flow, Ace?

24       COLONEL BOWEN:  The minimum was zero.  The maximum was

25   20,809.  That occurred in the water year 1957-1958.

2-5.

1    MR. VEEDER:  I think your Honor was touching on something

2    when you said "interim period."

3    THE COURT:  The point is this.  The program contemplates

4    a dam, and if the dam were built we are eventually going

5    to get some water.  Then the problem of the United States

6    is eased.  They say they have need for more water than they

7    claim they can presently obtain.  The problem is eased.  And

8    I am not so sure but that on an interim arrangement with the

9    matter of assuring the building of the dam and the stopgap

10   measures, things might not be worked out here between some

11   of the major parties which could not consent to it on any

12   long-range proposition.

13   Am I wrong that, in part, your proposal is an interim

14   thing?

15   MR. VEEDER:  I think that is true, your Honor.  When

16   you say interim, I assume that you mean until such time

17   as we have impounded this surplus water behind the dam that

18   is entirely adequate for our needs.

19   THE COURT:  That is what I am talking about.  In other

20   words, you are not hurt this year, but in the two, three

21   or four years it will take to build a dam, there might be

22   years when you would hurt, and the question is, what could

23   we do to bridge the gap during that interim?

24   MR. VEEDER:  To assure us a supply until we have

25   surplus water impounded.

2-6

THE COURT:  The other features of your plan, of course, propose a lot of things which would take study and all before you could ever agree to them, and they are long-range propositions -- the matter of exchange of water and things of that sort.  But there is involved this interim problem of water until the dam is built and water is stored.

MR. SACHSE:  Your Honor, I, Fallbrook, has a water right today which your Honor has confirmed.  We hope to build a dam.  The United States has no storage right which your Honor has confirmed.  I think your Honor is a little unjust if you suggest that we guarantee a supply to somebody who hasn't even got a water right.  I have one which you have confirmed and I want to build a dam and nobody is talking about guaranteeing me any.  We would buy it from the San Diego County Water Authority and we would pay a fat price for it.

And I think we have to treat the United States the same way.  We have to start in this discussion about what the rights are that your Honor has determined.  Then we have got to take the next step and find out how much can be divided in these rights.

Now what Mr. Veeder is trying to do, beyond any question, in this device, is to find a means of avoiding your Honor's holdings on the rights.  Your Honor has expressly ruled that they can't export.  Your Honor in paragraph 18 expressly

2-7

1   ruled that they can't reach upstream until they stop

2   exporting.  He is trying to dream up a gimmick whereby he

3   can avoid the consequences of that.  What is perhaps more

4   significant, he is trying to find a gimmick whereby he

5   can avoid your Honor's pre-trial opinion wherein you stated

6   that if he wants these appropriative rights, he has to file

7   with the state for them.

8        Those are the things that are going to smash this

9   DeLuz project, if anything does.  It is not going to be

10   lack of cooperation.  We are perfectly willing to talk.

11   But I'm not going to discuss trading a water right your

12   Honor has confirmed for nothing.  I am willing to discuss

13   trading a water right which today is for not to exceed

14   30,000 acre feet a year and is prior to anything your Honor

15   has found the United States has appropriatively.  I am not

16   going to trade that for something junior that they may get

17   appropriatively.  We have to be realists and look at the

18   judgment in front of us and then to try to get together, and

19   if, by pooling all our rights, we can help in a major

20   conservation project without hurting us quantitywise, priority-

21   wise or costwise, we are very willing to cooperate.  But

22   we are not, if it means giving up quantity, giving up

23   priority, or giving up on costs.  And those are the subjects

24   Mr. Veeder doesn't want to talk about.

3 fls

25

3-1

1       MR. STAHLMAN:  May I be heard for a moment, your

2  Honor.  I think the attitude which we have headed toward

3  here in relation to matters we have considered on the

4  DeLuz Dam and others was for the purpose of avoiding conflict,

5  and I think we should be very zealous and careful not to

6  do anything that can provoke conflict, and I believe if we

7  attempt without having had studies made on this river to

8  enter into some agreement between some particular parties,

9  whether they be the big parties or any parties in relation

10  to it, and what their rights are, rights which are substantial

11  and definite, or whether they are inchoate  or otherwise,

12  that we are going to project ourselves into conflict greater

13  than we have already had.

14       I would like to point out a few reasons.  First, we

15  find out that by reason of the physical characteristics

16  of this peculiar Santa Margarita River stream system that

17  the last year, bringing the matter right up to date, the

18  basins at Camp Pendleton have received tremendous recharge

19  when there has been by comparison less than a thousand

20  acre feet of water in the upper reaches of the Pauba Basin.

21  Then we start making an agreement.  What are we going to

22  make an agreement to give to them?  Where are we going to

23  start?  What is going to be the measurement?  Let us assume

24  this is directed toward Vail Company.  We can project a lot

25  of conflict in connection with this thing.  I can just see

20,324

3-2

1  what is going to happen. Where is this water coming from?

2  It is going to come out of the Murrieta Basin.  I am going

3  to sit here on the part of the Vail Company and let us

4  assume I go along with Mr. Veeder and we make some such

5  arrangement that if they are in need prior to the time the

6  dam is built -- I hope the dam is built within a reasonable

7  period of time -- but we make such an arrangment.  How is

8  this water going to get down?  Do we let them come up there

9  and pump it down?  We have to interpret this thing.  What

10  is going to be the practical answer?  I can see Mr. Krieger

11  and all those clients, when Vail Company starts giving some

12  of that water downstream, you're going to have a Fallbrook

13  case all over again.  This is a matter that affects everybody.

14     Let's take Vail Company, for instance.  We have to pay

15  taxes on that land up there just like other landowners in

16  that valley.  We have a large acreage, true.  But, we have

17  only sufficient water where we can only water a very small

18  percentage of the land which is available for cultivation.

19  On the other hand, some small property owners, with 60 acres --

20  there are several of them up there with small ranches --

21  water a hundred percent of their lands.  We are completely

22  departing from the entire theory of distribution of water

23  under California Water Law.  To make such an arrangement

24  as this, we are further departing from that.  And the purpose

25  of the lawsuit is to get these rights established so that when

3-3

1    there is to be a deficiency and an apportionment   becomes

2    necessary that it can be done on a legal basis.

3        I believe this is Mr. Veeder's idea.  I think he

4    sold it to Mr. Clark.  I don't think Mr. Clark sitting back

5    there knows all about this river.  It couldn't be expected

6    that any man, I don't care how good a lawyer he is, without

7    having studied the matter and having lived through the

8    factors that enter into this case, would have that kind of

9    knowledge.  Mr. Veeder sold Mr. Clark a bill of goods to

10   come in and make such a motion.  I think the only thing

11   it could possibly do is disrupt and interfere with the

12   accomplishment of a lot of things we have gone through and

13   have accomplished in this case -- and I think we have

14   accomplished things in this case insofar as getting back

15   to some degree of normalcy from having disturbed a lot

16   of people in the area over a small amount of water.

17       That is all I have to say.

18       MR. VEEDER:  May I say one thing.  I truly regret

19   Mr. Stahlman's personal attack upon me.

20       MR. STAHLMAN:  It is not personal.

21       MR. VEEDER:  For this reason.  I assure you that

22   Mr. Clark drew the motion himself.  He drew it independent

23   of me.

24       THE COURT:  I am not going to cross-examine you.  But

25   you supplied data to him and rough drafts of material?

3-4

1     MR. VEEDER:  But to say that I sold him a bill of

2 goods, your Honor, is an attack on Mr. Clark.  He is not

3 here.  I have to defend him.  I certainly did not sell him

4 a bill of goods, nor did I recommend any bill of goods

5 at all.  I told him what I knew about the lawsuit.  I don't

6 think it is right that we go off each time on some idea

7 that Mr. Veeder is back there running the Department of

8 Justice and controlling the thoughts of my superior.  That

9 just can't be.  And the only effect it has is a disrupting

10 effect.  I'm not angry about it.  I simply think it is an

11 impractical approach.

12     THE COURT:  Of course, the first thing we run onto

13 in your a-1 is the fact that you told us the words "judicial

14 decree" meant "stipulated judgment," and you have not

15 changed your position, I take it, that this proposal, in

16 substance, then that the Court be required to back up on

17 its decision on the stipulated judgment.

18     MR. VEEDER:  Your Honor, if there is a device or means,

19 a decree that can be worked out which is more all-inclusive

20 and broader, yes.

21     THE COURT:  Let's not talk in generalities.  Specifically,

22 what do you have in mind?  I can conceive of an interim

23 situation where Vail might, with a large amount of water

24 underground in the Pauba Basin, be willing to say, "We will

25 see that you get some water in a pinch if this dam is going

3-5

1   to be built, because we know when the dam is built, your

2   problem is going to be largely solved." But to say that

3   you're going to ask the Court to set aside its decision on

4   this stipulated judgment just doesn't make sense.

5        MR. VEEDER:  I don't believe it would be entirely

6   necessary to set aside the entire ruling.

7        I think it is essential, your Honor, to take into

8   consideration that these thoughts are tendered with the

9   idea that if someone has a counter proposal in regard to

10   No. 1 we would be glad to listen to it and start from there.

11   Up to this point it has been simply flatly rejected.

12        MR. SACHSE:  You have the proposal that we stick to

13   the judgment we have.

14        THE COURT:  And the counter proposal was that we

15   start with the River Master to gather data so that we can

16   do some of these things.  You can't sit down and do any of

17   these things, even if you reached agreement, without additional

18   data.

19        MR. VEEDER:  Let's start on one key proposition which

20   I think warrants review.  We have been exporting water for

21   20 years.  It is absolutely essential to the maintenance of

22   that camp that we continue to export.  Now it would seem to

23   me that if we would get down and really face up to the facts

24   of the situation, recognizing that a tremendous public

25   interest is attached to that exportation right and see if there

3-6

1    is not some ground of agreement among the parties which

2    would recognize that right of exportation.

3        MR. SACHSE:  I have a theory, very simple.  There is

4    surplus water in the Santa Margarita River today.  Fallbrook

5    hasn't taken it.  I don't care what our permits are.  DeLuz

6    Creek is there.  Even if it is only 3500 acre feet a year,

7    sub-surface storage is perfectly legal in California.  You

8    don't even have to build DeLuz Dam.  You don't have to

9    spend five cents beyond the magnificent spreading works

10   that Colonel Bowen has already.  All you have to do is

11   to say to the State of California, "Give us a permit to

12   store the surplus underground," and you have all the export

13   water you could conceivably use today.  There is a counter

14   proposal, Mr. Veeder.

15       THE COURT:  We went all over this, and I talked with

16   Mr. Clark about this on the phone, and apparently there is

17   no interest at all on the part of the Government on this

18   proposal.

19       MR. STAHLMAN:  Here is what is incongruous about this

20   situation.  We were sitting down here and I thought that

21   is what we were doing.  Anybody who has practiced law for

22   a period of time sits down in good faith and attempts to

23   negotiate to eliminate further litigation or to terminate

24   a lawsuit.  And while we are doing this, in the middle out

25   goes Mr. Veeder and slams us with a motion here to do a lot

3-7

1    of things, and now he says they are in the nature of things

2    that could be negotiated.

3        Why didn't you come to us and negotiate these things --

4    let us see where we are before we have another motion slammed

5    in our face?

6        THE COURT:  Let's not be technical.  The motion suggests

7    a pooling plan and many other things that have some similarity

8    to what is done in the oil fields.  It has many things in it

9    which I think could be worked out.  But I think it starts

10   at the wrong end.  I think it starts out trying to bring

11   into full play a lot of things that can only be worked out

12   when you get all the facts.

13       I have to adjourn at this time.  I'll see you at two

14   and take up from there.

15       (Thereupon, at 12:00 o'clock p.m., a recess was taken)
16       (                                                      )
17       (until 2:00 o'clock p.m. of the same date.            )

18

19

20

21

22

23

24

25

3-8

1    SAN DIEGO, CALIFORNIA, THURSDAY, AUGUST 9, 1962, 2:00 P.M.

2                    - - - - - - - - - -

3        (Another Matter)

4        THE CLERK:  3 -- the case on trial -- 1247-SD-C, United

5    States versus Fallbrook.

6        THE COURT:  Let's take up where we left off.

7        You say the pressing need of the United States is

8    to be able legally to export water.  To how many acre feet?

9    Have you got that in the record?  I have forgotten.

10       MR. VEEDER:  I think the maximum, I think I have always

11   said to your Honor 3500 to 4,000, somewhere in there.

12       THE COURT:  Let's just be practical about this thing.

13       One, you have a right to export water after it gets

14   down there, and you have a good-sized basin below which can

15   be drawn upon for that purpose.

16       Two, we have been over this time and time again.  You

17   have a right to file with the State of California to appropriate

18   immediately and to store in the basins water from DeLuz and

19   water which Fallbrook has filed upon prior to the time they

20   build their dam.  There is a second answer to it.

21       What other practical solutions do you have in connection

22   with this exporting of water?  You are suggesting, are you,

23   that there be an agreement by the principal defendants in

24   this case, that they will make some agreement with you that

25   they will not object to your exporting water and calling upon

3-9

1   water upstream to replace the water you export?

2       MR. VEEDER:  Your Honor, on that score, we feel, of course,

3   that we do have the legal right to do it.  We feel that if

4   DeLuz Dam is built, the possibility of calling for water

5   upstream is materially reduced.  The time when you need water,

6   though, is during the period of shortage, let's face it, and

7   we would want agreements that would protect us in that

8   exportation; and in return we would provide storage which

9   would greatly reduce our demands upstream.  And to me it

10   can't be all one way, in our view.  We feel if we build

11   DeLuz Dam, with the attendant accumulation of surplus water

12   when there is water available, that it is certainly a benefit

13   to everyone, and our exportation right, in my view, could

14   be recognized as part of this over-all physical solution.

15       THE COURT:  What do you mean, recognized by written

16   agreement of the parties?  Is that what you are talking about?

17       MR. VEEDER:  That is right.

18       THE COURT:  The water that would be secured by appropriation

19   in building of the dam could be subject to export, could it

20   not?

21       MR. VEEDER:  That is right.

22       THE COURT:  You have a stopgap problem.

23       MR. VEEDER:  That is correct.  And I would be in error

24   not to say that during periods of severe shortage when the

25   reservoir is dry, we must have a right of exportation.  In

3-10

1    our view, under the stipulated judgment, we have such a right.

2    In my view, also, we have such a right by the mere fact that

3    the United States of America diverted water and exported

4    it. There are two legal propositions, and we think they

5    are sound.

6         THE COURT:  We have already crossed the bridge of

7    those, haven't we?

8         MR. VEEDER:  Indeed we have, your Honor.  But I think

9    there is something that we can certainly assert in any effort

10   to resolve this thing amicably, and I think it is worth

11   some bargaining to have a means of terminating this litigation.

12        So again I say the only way I know how to get started

13   along the line of getting a sensible decree would be to

14   sit down and talk about the tough points, and one of the

15   really tough points would be exportation.  As I say, we

16   would hope that the water impounded in DeLuz Dam would be

17   adequate to always take care of the exportation.

18        MR. SACHSE:  I don't think exportation alone is really

19   the problem, because as Mr. Veeder and your Honor are well

20   aware, he can export and we can't stop him today.  This has

21   always been recognized by the Circuit.  Nobody can try to

22   stop him.

23        The critical point is, what right has he to demand water

24   to come to him for this export purpose?  And that involves,

25   at least his proposal involves, as I read it, a reversal by

3-11

1   your Honor of the findings heretofore made.

2       MR. VEEDER:   You are speaking of the motion now, Mr. Sachse?

3       MR. SACHSE:   Yes.  You speak of the right to take

4   your allotment from the Murrieta Basin to the extent necessary.

5   Well, that, no, because I don't think even if you had an

6   existing appropriative right today, an appropriative right

7   to export, you could ever assert that appropriative right

8   as superior to the rights of riparians in the Murrieta Basin

9   or overlying owners in the Murrieta Basin.  Even if you today

10  had a valid appropriative right, it would be no better than,

11  say, Fallbrook's appropriative right and, as such, junior

12  to all riparians upstream.

13      To me the settlement of this controversy is going to

14  revolve 100 percent on what kind of proposal the United

15  States can make to us, to Fallbrook probably.  I think that

16  is really the nutshell.

17      MR. VEEDER:   Proposal to Fallbrook?

18      MR. SACHSE:   Yes.  If it is possible to pool rights in

19  some way that would give Fallbrook an equally safe right

20  and equal priority, an equal quantity right to what it now

21  has and save us money, obviously we are going to be very

22  much interested in it.  But if it can't do those things, I

23  don't think we are going to be very much interested in it.

24      And I believe the way to do it is to follow the

25  suggestion made by his Honor -- get the interlocutory signed,

3-12

1   get the final decree entered incorporating in it a River

2   Master provision.   Then if the United States is willing to

3   state that they will accept these facts, that there will not

4   be an appeal on the Vail stipulated judgment, for example,

5   or on these other principles, then there is some room -- by

6   that time the engineering studies will be completed that

7   the Navy is now making -- then there is some room to sit

8   down around a table and say, "Well, we are going to build

9   a pipeline to the naval ammunition depot anyway, we are going

10   to have to pump water anyway, it will cost so much additional

11   capital expense to enlarge the capacity for Fallbrook, so

12   much annual energy charges -- all these things are engineering

13   matters -- and we, Fallbrook, if you want to pool your rights

14   with us, we can divide the water in such and such fashion."

15   But I can't discuss those things intelligently until I know

16   what our rights are and what the United States' rights are.

17   I can't.   And I think we are talking in a complete vacuum

18   when Mr. Veeder asks us, in effect, to agree that everything

19   we have won in this case we are going to set aside without

20   knowing what the quid pro quo for it may be.   It's that

21   simple.

22      If there is going to be an appeal, there will be no

23   settlement.   I think all parties are agreed on that.   We

24   will fight it out the hard way.   But if the judgment of the

25   Court is going to be accepted and we are going to try to

3-13

1  work out a physical ways and means, then I think it might

2  be done.

3      MR. VEEDER:  Mr. Sachse, may I inquire, just a yes

4  or no answer:  Are you at this juncture saying that you

5  don't find the proposal made in the motion acceptable?  Are

6  you saying you find nothing in it that is acceptable?

7      MR. SACHSE:  No, I find much in it that is acceptable.

8  I find much that is not acceptable, also.

9      MR. VEEDER:  There would be some advantage to me and

10  to the record if you would say those areas of the motion

11  that you do find acceptable.

12      MR. SACHSE:  I'll be very happy to.

13      I think the Water Master provisions are fine, and I

14  think the final decree should call for it.  I am not

15  discussing, however, any detailed operations of the Water

16  Master.  I think that is fine.

17      MR. VEEDER:  All right.

18      MR. SACHSE:  I do not accept at all the proposal that

19  would require the stipulated judgment, the Vail-O'Neil

20  stipulated judgment to be, in effect reinstated.  That is

21  not acceptable.

22      I do not accept that part of the proposal that calls

23  for an immediate apportionment.  I think it is unreasonable,

24  and I think it would constitute the grossest kind of injustice

25  to thousands of defendants who have written judgments already

3-14

1   saying "No apportionment." I don't think it is possible.

2   THE COURT: Let me interrupt you there on apportionment.

3   You mean on our present state of the record?

4   MR. SACHSE: On our present state of the record.

5   THE COURT: But after a Water Master had gone to work

6   and had gotten data --

7   MR. SACHSE: Then I think there should be an apportion-

8   ment.

9   MR. GIRARD: I will not go that far.

10   MR. SACHSE: I will not say it should be. Then I think

11   it could be, if a need arises. I don't know whether a need

12   would exist.

13   I cannot agree that the final judgment must include

14   a provision that the United States be permitted to withdraw

15   this apportionment from the Temecula Creek Basin. I think

16   that would be absolutely contrary to the State Law of

17   California, and I am just good enough a lawyer so I'm not

18   going to say that is possible.

19   MR. VEEDER: Mr. Sachse, in that connection, do you

20   not feel at all that a court in the broad power of equity

21   could enter a decree which would permit the United States

22   to look to that basin in the event it is drawn down very

23   sharply to the point where there was no water entering

24   the canyon and that we could go in and pump water for the

25   purpose of supplying our needs?

3-15

MR. SACHSE:  No, Mr. Veeder.

MR. VEEDER:  You don't think the court of equity has that power.

MR. SACHSE:  I don't feel the court of equity has that power in the light of the present findings.  If Judge Carter wants to reverse himself, yes, he could have that power.  But so long as your export is without right, the procedure to provide water for a riparian who is deficient is first to stop the totally improper uses, and until those have been stopped you have no right to reach upstream to another riparian or to a senior appropriator such as Vail. You have first to stop the absolutely improper ones. That is why I think that is utterly unworkable in the light of the Court's present rulings.

THE COURT:  You talk about the broad power of equity. I have serious doubt whether the Court has that power absent consent by the landowners in that Murrieta area.

MR. VEEDER:  We are contemplating, I think, consent on that.

THE COURT:  I think it would be a physical impossibility to say you could get all the major landowners in that area to make such an agreement.

MR. GIRARD:  The answer to it would be not to allow the United States to go up there and pump; it would be to stop the people who are pumping more than their share.

1    MR. VEEDER:  Mr. Girard, on that point, the real threat,

2    in our view, is that the water levels in the Murrieta-Temecula

3    Groundwater area would be pulled down to the point in the

4    future where we would not receive water during the dry

5    period adequate to our needs, and we have taken this position

6    that there are water resources up there, rather substantial

7    quantity/available storage there, and that one of the
     of

8    elements in working out this over-all basinwide inter-basin

9    control would be to have the assurance that in a period of

10   shortage when the demands of the Marine Corps were such that

11   we could under an order from this court pump, if necessary,

12   out of that basin to supply our needs.

4-1

1   MR. SACHSE:  I don't think the Court could order --

2   this goes straight to the question of the Court's power

3   as a court of equity -- I don't think the Court would have

4   the power to order any holder of a prior right to make water

5   available downstream for a junior right.

6   MR. VEEDER:  Do you think it would be possible to have

7   an amicable agreement among the larger people for that

8   purpose?

9   MR. SACHSE:  Possibly.  If you ever achieved what you

10   hope to achieve with the Water Master, if you had a

11   comprehensive analysis of all the sources of supply and

12   some sort of broad agreement along the lines suggested by

13   Mr. Ramsey Clark could be arrived at -- I am saying could

14   be.  I don't know.  This gets complicated when you bring in

15   all these parties.  But I guess it could be possible.

16   MR. VEEDER:  On the basis of an amicable agreement.

17   MR. SACHSE:  Yes.  But not until we first have a firm

18   adjudication of rights, and second until we have a great

19   many more facts than we have today.  In other words, I would

20   venture to guess it would probably take the Water Master

21   two, three or four years -- let's be realists -- to arrive

22   at calculations of safe yield from Murrieta-Temedula, of

23   discharge from Santa Gertrudis, of all the other factors

24   that would be necessary.  I don't think you could do it

25   today.

4-2

1     MR. VEEDER: What would/think as a starting point if
2     we came up with what we thought would be the safe yield
3     with the idea that as we obtained experience in the
4     operations of the Valley as a whole under a single unit
5     decree, don't you think it would be possible for us to arrive
6     at at least a tentative feeling or a tentative floor of what
7     would be the safe yield?     I think we could.

8         MR. SACHSE: Not without rights, Mr. Veeder, because
9     no landowner who has the funds to even ask a lawyer for a
10    consultation is going to consent to the release to you of
11    something to which you have no right. He just isn't.   You
12    are going to have to spell out the respective rights of the
13    parties in this, and from there on go into your Water
14    Master adjudication.

15        MR. STAHLMAN: May I point up something?   I think that
16    it is absolutely fundamental and has to be determined
17    before you can ever reach any agreement, or assuming that
18    the Court did have the power to reach up and say the water
19    should come down, there is nothing in this record by which
20    a determination could be made.   And assuming that we do
21    have evidence that there is a large quantity of water, say,
22    in the Murrieta Basin -- we have some evidence as to the
23    physical circumstances as to the reverse gradient and the
24    fact that pumping has affected it, but there is nothing in
25    this record from which a determination can be made that if

20,341

4-3

1    you did pump any quantity of water out of that Basin and

2    sent it downstream that you couldn't probably destroy the

3    entire basin.   Because we don't know what quantity can be

4    withdrawn from that basin before you have reached the point

5    where recharge could establish the basin for practical

6    operation.   We don't know those things.   That is why you have

7    to have, as the first thing, Bill, before we can talk about

8    these things and you can have any logical agreement --

9    assuming that agreement can be reached, and we have

10   indicated we are perfectly willing to discuss it -- but you

11   have to have some basic facts upon which you can have such

12   a discussion, besides the one I have mentioned to your Honor,

13   which probably could be determined by a Water Master.   And

14   as Mr. Sachse said, I think it would take some appreciable

15   time.   You can't do it overnight.   It is going to take some

16   studies and some measurements and consideration of past

17   performance of the operation of the basins.   So I don't think

18   you can reach the point even where we can intelligently sit

19   down and discuss this thing.

20        MR. VEEDER:   It occurs to me, though, George, isn't

21   this possible?

22        MR. STAHLMAN:   You act like Khrushchev.   You want to

23   have a certain thing done and you don't care how it is, and

24   you are advocating or suggesting that we do something here

25   that the very suggestion you make completely blocks any

4-4

1   logical conclusion or some arrangement that might be made.

2       I am perfectly willing to discuss this thing.  I would

3   like to sit back with somebody who would take a new approach

4   into this situation, who would not probably hindered by some

5   of the stings that you might have had in this case, Mr.

6   Veeder, and let's see if we can't work this thing out.  We

7.  are perfectly willing to do it if there is a situation there

8   without detriment to the Vail rights and the preservation

9   of the rights to water, that water could go down, if that

10  can be worked out.  We have no facts upon which you can even

11  explore that situation.  And here we are talking about

12  reaching a conclusion on it.  I don't think we have gone that

13  far.  To me it is like arguing religion with you, Bill.

14      MR. VEEDER:  George, you and I have never argued

15  religion.  We have argued a lot of things.

16      MR. STAHLMAN:  Let's go to something else, because we

17  get no place on this thing.

18      MR. GIRARD:  There is one other point, too, Bill.  You

19  suggest that when there is a shortage, when the water level

20  in the Murrieta-Temecula groundwater area drops below a

21  certain level the United States should have a right, under

22  your proposal, to pump.  But I think what you overlook

23  somewhat is that not all of the people in the Murrieta-

24  Temecula groundwater area are causing those water levels to

25  drop.  As I understand the situation, the water levels are

dropping primarily in the Murrieta area where there a large

number of wells.

MR. VEEDER:  I don't believe that is entirely correct.

But go ahead.

MR. GIRARD:  But there may be many people there who are

not using more than their share and are trying at least to

maintain the basin, and these other people who are pumping

more than their share are drawing it down.  Your remedy is

just to draw it down further, which would hurt those people

in that area who are trying to save the water.  The remedy

is not to keep pumping it out faster, but the remedy is to

stop the people who are pumping more than their share, so

you keep it at a safe yield.

MR. VEEDER:  I think all of those things can be

arranged.

MR. GIRARD:  I agree with you, but not on what we know

now.

MR. VEEDER:  I would think we have certainly enough

in the record today to proceed to make a determination as

to a firm supply.

THE COURT:  Mr. Veeder, don't make statements like

that in a record which the Attorney General is going to read,

because you know it is not true.  We do not have the

information as to the amount of water going into the ground-

water area above.  We do not have these figures.  We do not

4-6

1   have figures, in all cases of the big owners, of the amount

2   of profitably irrigated ground.  They are not here.  You

3   know that as well as I do.

4       MR. VEEDER:  What I tried to say, your Honor, is this,

5   that there is in the record certainly all the evidence

6   available in regard to water supply, and it would seem to

7   me --

8       MR. STAHLMAN:  But there is not.

9       MR. GIRARD:  There is all the evidence that may have

10  been collected, but it has not been collected in a lot of

11  areas.

12      MR. VEEDER:  I don't know of a single record that has

13  been maintained that isn't of extractions or anything else.

14      MR. STAHLMAN:  Tell me what the record of recharge is

15  in the Murrieta Basin.

16      MR. VEEDER:  I wish you would let me finish, George.

17      MR. STAHLMAN:  Whether it be in relation to rainfall

18  or any other factor.

19      MR. VEEDER:  I would like to finish on this, George,

20  if I may.

21      I think we have today in the record sufficient so that

22  we could start on the basis of what we would think would be

23  the firm supply of water out of that area, and as we progressed

24  under such an arrangement we could modify and change as our

25  experience warranted changes.  Certainly there is no record

4-7

1   on the contributions of Warm Springs Creek.  We know that.

2   But we do know that since, I think it is, 1930 we do know

3   the water that is going out of the Murrieta.  We do know the

4   long history of the water going into Nigger Canyon.  We do

5   know from a long history the quantity of water entering

6   Temecula Canyon.  And I believe on the basis of that data

7   we could at least start on the kind and type of regulation

8   that has been suggested in this motion.  We realize that

9   your Honor would have to have continuing jurisdiction and

10  that changes would have to be made as experience evidenced

11  the need for changes.  But I do believe, further, that on the

12  important  pumps we could begin metering water, as water

13  has been metered at Camp Pendleton for a good many years.

14      MR. STAHLMAN:  And the Vail Company has metered water.

15      MR. VEEDER:  That is correct.  And I think that the

16  two large users have a good long history of metering water.

17      MR. STAHLMAN:  But let me just stop you right there.

18  We have in this record, however, that Vail Company's total

19  ability to pump -- and the figures have been recorded and

20  kept -- is a small percentage of the pumping that is going

21  on at the common supply in the Murrieta Basin.  What

22  are we going to do with that until we get the figures of what

23  these other people are pumping?  Where is that _ going to

24  put Vail?

25      MR. VEEDER:  My own thought on that, George, is that we

4-8

1    would certainly have to, as part of this arrangement to

2    conclude this litigation, as I strongly urge, I think we

3    would ask that the pumpers start now metering their water.

4        MR. STAHLMAN:  I am with you.

5        MR. VEEDER:  And continue right along.  But I do think

6    we have a very sound basis to commence now with some

7    sensible over-all regulation and control.

8        MR. STAHLMAN:  I will make a motion right now that a

9    Water Master be appointed on this River just as soon as

10   possible.

11       THE COURT:  We all agree that we can commence to

12   collect data.

13       I ask Colonel Bowen this question -- and you don't

14   have to answer, but you are probably better qualified than

15   any of us here on the matter of computation:  Do you think

16   there is enough evidence in this record presently to come

17   to any conclusions as to safe yields of the Pauba Valley and

18   the Murrieta- groundwater area or basins of that kind?

19       COLONEL BOWEN:  No, your Honor, I don't believe there

20   is sufficient evidence in the record to arrive at a safe

21   yield of the Murrieta groundwater area.

22       THE COURT:  What type of information would we need?

23       COLONEL BOWEN:  Your Honor, we would need to increase

24   our knowledge of the inflow to the basin.  That would be

25   principally Tucalota, Warm Springs Creek Santa Gertrudis,

4-9

1   Slaughter House, some of the other major tributaries that

2   do contribute recharge to the Murrieta groundwater basin.

3   Estimates or calculations from the inflow from those sources

4   would have to be determined.

5       THE COURT:  Then we would have to know, by metering or

6   calculation, the amount of water being taken?

7       COLONEL BOWEN:  Yes, sir.  The discharge would have to

8   be measured also, both artificial and natural discharge.

9       THE COURT:  How many of those landowners up there,

10   outside of Vail, are metering water?

11       COLONEL BOWEN:  None to my knowledge, your Honor.

12       MR. GIRARD:  Just a minute, Colonel.  Our fire house

13   is.  I have volumes of them I am going to bring down.

14       COLONEL BOWEN:  No groundwater is being measured, your

15   Honor, except for that on the Vail Ranch.

16       MR. VEEDER:  It appears to me that we could do much

17   that is being done; start with what we have -- that is what

18   I recommended -- meter this area that you made reference to.

19   Certainly from the standpoint of the operations at Camp

20   Pendleton we start each year with an estimation of what can

21   be expected, and I think that we could start with an

22   estimation of what could be expected out of Pauba Valley.

23

% FL
5 fls   24

25

5-1

1    MR. STAHLMAN:  Yes, you can start with an estimation

2    because you have a meter that meters the inflow into your

3    basin.  Colonel Bowen just got through saying that there are

4    principal tributaries that represent the inflow that have

5    not been determined.  It is an entirely different situation.

6        Mr. Veeder puts up one illogical argument after

7    another to support a contention that he has here that I

8    think is completely ridiculous.

9        THE COURT:  It is just as clear as day to me that you

10   have the cart before the horse.  It seems to me that if we

11   are going to approach this intelligently we would immediately

12   appoint a Water Master, if we could work some way to

13   compensate him.

14       MR. GIRARD:  Let me try my hand at drafting a

15   judgment provision for a Water Master.

16       THE COURT:  All right, I would be glad to have you do

17   it.  We could certainly start and find where the gaps are,

18   where we lack information, and see what arrangements could

19   be made.  Now you have the problem of directing these persons

20   to meter their water.  I think that would be within the

21   power of the Court -- to give them some reasonable time to

22   put in meters.  You have also other tributaries that flow

23   into either the Pechanga or the Pauba or the Murrieta

24   besides those named.  How extensive those are would be a

25   question.  Some of them it might be difficult to meter in

1    times of flood.

2         MR. STAHLMAN:  I think the matter of compensation for

3    the Water Master is something that is very difficult.

4         THE COURT:  That is another thing.  Is the Government

5    prepared to arrange to compensate a Water Master?

6         Let me go further on that.  I think that the cost of
                                          be
7    a Water Master would have to/equitably distributed over the

8    persons -- the major concern, the major benefit.  But I

9    would anticipate that until we had further information to

10   work out some proportional arrangement, that the Government

11   would have sufficient stake in this that it ought to be

12   willing to pay for at least a year and maybe two years for

13   the sole expense of the Water Master until something like

14   that could be done.

15        MR. SACHSE:  There is one other thing about this

16   Water Master I think we tend to overlook.  I haven't any

17   doubt your Honor could appoint a Water Master to collect

18   physical data as we are discussing now and that this

19   process could continue even pending appeal.  There isn't

20   any doubt about that.  But that Water Master couldn't

21   possibly apportion, he couldn't possibly exercise any of

22   the ultimate powers he is to exercise so long as any

23   appeal is pending on the status of these rights.  Until

24   these rights are accepted and adjudicated he is going to

25   be a pure and simple fact finding agency.

5-3

1          Now, if, on the other hand, these rights are

2     determined, if the Court knows who are the riparians and

3     where they are, you could be finding facts and also perhaps

4     doing the very thing Mr. Girard and Mr. Veeder suggested.

5     It might well be that in a year's time or less a Water

6     Master could say Roripaugh is taking too much water or "X"

7     is taking too much water.  We could come in and demand water

8     from your Honor.  But until the rights are determined, what

9     is the Water Master?  He is just another person collecting

10    factual data.  He isn't going to do anything to help the

11    parties to this litigation  until the rights are, once and

12    for all, settled.  That is why I am playing a cracked

13    phonograph record.

14          But as far as I am concerned, the heart and soul of

15    a compromise has got to be a final determination of the

16    rights, followed by a commitment:  No appeal.  Then you can

17    compromise.  But until then I don't think you can.

18          MR. GIRARD:  I don't exactly agree with Mr. Sachse.

19    I think you could have a Water Master right now and perform

20    a valuable function whether there is an appeal or not.

21          THE COURT:  I/not  so sure he wouldn't have authority,
                             am

22    even while the appeal pended, and I would think if there was

23    any question the Circuit Court would permit him to

24    exercise some jurisdiction while an appeal pended and make

25    reports and try to preserve some status or keep things from

5-4

1  getting worse.

2      MR. SACHSE:  May I put it this way.  I don't think he

3  would have a right to make an order that water be released

4  from Murrieta downstream merely because the United States

5  appealed from some order of your Honor that they haven't any

6  right to take water down there.  At least, we would be

7  operating under what your Honor found the rights to be.

8  Then maybe they would let him make a temporary order.

9      THE COURT:  Has the Government given any thought to

10  the matter of compensating this Water Master?

11      MR. VEEDER:  I will say this, your Honor, that I

12  haven't at this point discussed it with Mr. Clark, and this

13  is an item that I will certainly discuss with him on

14  Saturday I assume.  I expect to be back by then.

15      THE COURT:  I would think it is something that should

16  be done.  We ought to start on it.  I think there should be

17  some guarantee of compensation for a year or, preferably,

18  for two years, and within that period of time have sufficient

19  data gathered so that some    equitable apportionment of

20  the expense could be made.  Obviously the    two major

21  parties are going to share a good part of the expense --

22  Vail and the Government.  But there are other substantial

23  water users who would certainly have to contribute some

24  proportionate share.  This could not be determined presently.

25  We would guess at how much water some of these people are

5-5

1  using -- we know their acreage, but we wouldn't even

2  presently have facts on which to say the apportionment of

3  the Water Master is so much.

4      MR. VEEDER:  Let me discuss this phase with Mr. Clark

5  this weekend.  We have a hearing on September 18.  We can

6  come up with something then.

7      MR. STAHLMAN:  There is one other thing there.  I think

8  your Honor could, even at this time, order that meters be

9  put on pumps of at least certain size, on irrigation pumps

10  of a certain size.

11      THE COURT:  We could do that, and we could also direct

12  that records be kept so that even if we didn't get a

13  Water Master started for three or four months we would have

14  the benefits of some records after the installation of the

15  meters.  But we would have to give some reasonable time

16  for their installation.

17      MR. GIRARD:  Yes.

18      MR. VEEDER:  I think that this approach is productive,

19  and as I say, I will talk with him as soon as I can, and

20  I think the record will be reflective of your position.

21      THE COURT:  One thing further --  it has been talked

22  about by Mr. Sachse -- the fact that the judgment has to

23  become final before there could be any settlement.  I agree

24  before a settlement could be consummated.  However, I think

25  there could be negotiations as to what might be done    based

5-6

1   on the predicate that the judgment become final determining

2   the rights.   I don't think that it is sound bargaining to

3   say we will wait until the judgment becomes final.   Then we

4   sit down to bargain as to what can be accomplished.   I

5   think there can be bargaining going on based on the predicate

6   that there be no appeal and the rights be determined.

7       MR. SACHSE:   I am in complete accord.   But I think the

8   predicate that has to be stated -- and I have wondered,

9   myself, whether I have made it clear enough to Mr. Clark that

10  as far as I am concerned I am perfectly willing to try to

11  work this thing out -- but I want it understood that the

12  absolute condition precedent is no appeal.   I am not going

13  to talk settlement and then have the United States at the

14  last minute say we have settled something, but we still want

15  the right to appeal these questions -- that these rulings

16  were not applicable.   I want it clearly understood that if

17  we are going to fight this thing on an appeal that is one

18  thing.   If we are going to try to arrive at a physical

19  solution, that is another.   I will work toward the physical

20  solution.   But the day an appeal is in here, every other

21  commitment is off.   It has just got to be off.

22      THE COURT:   Does that make sense, Mr. Veeder?

23      MR. VEEDER:   Well, I would say this --

24      MR. STAHLMAN:   Why don't you answer it?   Does it

25  make sense?   And then explain it, like a witness has to do.

5-7

1     MR. VEEDER:  I am not a witness.

2     I think this, that if we could find a place to start

3     on conversations which would protect the interests of the

4     United States, the question of the appeal would become, I

5     assume, moot.  If we had agreements with the major parties

6     that would permit us to do what we have to do and what we

7     have been doing for the last 20 years, I think, yes, I

8     think the idea of an appeal would be gone.

9     MR. SACHSE:  You say, then, Mr. Veeder -- and I

10    appreciate, I think, what you say -- you say if we can get

11    everything we need, there is no need for an appeal.  What

12    about us?  Don't we, in a compromise, get anything?  What

13    comes to us in a compromise?

14    MR. VEEDER:  I think you do.

15    MR. SACHSE:  Let's talk about Fallbrook alone.  What

16    comes to Fallbrook?  What is a possible  quid pro quo?

17    MR. VEEDER:  Certainly I would say it would be a

18    tremendous quid pro quo if the National Government were to

19    build a dam at De Luz and you had a right to participate

20    in the available supply.  I couldn't imagine a greater

21    quid pro quo.

22    MR. SACHSE:  You say a right.  What kind of right?

23    As good as we have now?  I say yes.

24    MR. VEEDER:  I don't know how good your right is.

25    MR. SACHSE:  I am speaking of the status of the

5-8

1    judgment as it is today?  As good as that?  What kind of

2    priorities?  This is the kind of thing we have to talk about.

3    And if the United States and Fallbrook can't get together

4    on the kind of division we would make of the water, or how

5    much it would cost Fallbrook, or who gets how much while the

6    dam fills -- all these things were included years ago in

7    the original memorandum.  We even worked out how much water

8    Fallbrook got and how much the United States got, stage by

9    stage, after the reservoir filled.  Those things have to be

10   done.  I am not going to do them in a vacuum and say I will

11   agree to this, I will agree to this, and I will agree to

12   this, and then you appeal.

13        If you will say to me, for purposes of this discussion

14   -- let us assume that our rights are such as Judge Carter

15   has presently arrived at, for purposes of our discussion

16   only -- now then how can we correlate our rights to the

17   best interests of the whole basin?  That I will talk on.  But

18   I will not talk on the assumption that you have rights that

19   Judge Carter hasn't found.

20        MR. VEEDER:  I will convey your thoughts to Mr. Clark.

21        THE COURT:  Let me say this.  If you are going to

22   convey some thoughts to the Assistant Attorney General, you

23   have pointed out what you call a need for the Government to

24   have a right to export water and to do so with a further

25   right to reach upstream, if necessary, to replace the water

20,356

5-9

1   you have exported.  We have all conceded you have a right

2   to export water that gets down there.  I think it is criminal,

3   I think it is criminal that this case in its twelfth year--

4        MR. SACHSE:  That is right.

5        THE COURT:  --that this case in its twelfth year, and

6   with water from De Luz, with water which Fallbrook eventually

7   would impound if it built a dam, available for present

8   appropriation, water from those two sources available for

9   storage in your basins to be exported or, if you want to

10  put it that way, to replace water that you export, and with

11  a right thereby acquired to export this legally out of the

12  watershed, that the Justice Department doesn't take that

·6 fls  13  necessary step.

14

15

16

17

18

19

20

21

22

23

24

25

6-1

1    MR. VEEDER:  Which step is that, your Honor?

2    THE COURT:   Make a filing and ask to appropriate

3  waters and store them in this basin.

4    Now what you have done, an intention to build a dam,

5  only speaks of the future.  If, as and when you build a dam,

6  you acquire some water and some rights.  But meanwhile, we

7  know the dam will take years to build if it were authorized

8  tomorrow, and we don't even have a bill in talking about the

9  dam.  Meanwhile, here is water subject to appropriation

10  sufficient to take care of your present need that you claim

11  the Marine Corps has.  Here you are with basins available

12  to store that water, and you do nothing about it.

13    And I want to go a step further.  I think largely you

14  are responsible for nothing being done about it.  I think

15  with your background in this case and your fixed views on

16  these matters, you are the person that would prevent that

17  kind of step being taken.  And I think it is criminal from

18  the standpoint of the Marine Corps that this hasn't been

19  done in the past and that something isn't done about it now.

20    MR. VEEDER:  Your Honor, do you really think I am the

21  one who stands in the way of these things?

22    MR. STAHLMAN:  He is the one when the Navy had filed

23  for an appropriation on the stream -- there must have been

24  some pretty good heads there.  They had worked out a plan and

25  submitted their application to the Water Rights Board.  It was

a logical, reasonable thing.  It was based upon studies on the River.  They made an application to appropriate the water. And then when they had the hearing on it, Mr. Veeder went in there and practically insulted the hearing officer in the case.  We were there -- we saw it.

THE COURT:  Let's be realistic about it.  What has happened?  You had a filing on this river.  You wouldn't do anything about it.  Fallbrook came in and got a filing and winds up with a right to build a dam and to appropriate water.  It is true your filing was not first in time, but that didn't mean it couldn't have been made.  There was a public interest involved.  The filing would have got priority.

MR. VEEDER:  Your Honor, there was submitted to the State Water Rights Board a statement of our intention.  It has been received by the Board.  They are proceeding to act on it now.  They have said they will issue no permits during this period.  We have done what we think we are legally empowered to do.  And when your Honor says that I am guilty of something, I don't know what it is, other than attempting to represent the United States to the best of my ability. We now have the situation, your Honor, where the Assistant Attorney General and the Secretary of the Navy have filed notice with the state of our intention to build DeLuz Dam.

THE COURT:  Do you concede that this does not presently

6-3

1    give you any appropriative rights to the present flow of

2    DeLuz and the Santa Margarita?

3        MR. VEEDER:  I think that it gives us a full right,

4    your Honor, to proceed with the dam, to construct the dam,

5    and to export water that is impounded.

6        THE COURT:  I didn't ask you that.  Does this filing

7    of an intention, in your opinion, consitute such an act

8    that the Court could make findings that you now have appropriated

9    the waters of DeLuz and the waters of Santa Margarita and

10   therefore have a right to export it out of the watershed?

11       MR. VEEDER:  I think your Honor could very well make

12   the finding that when we began exporting water from the

13   watershed, at that time we had a right.

14       THE COURT:  I didn't ask you based upon what you have

15   done in the past.  We have talked about that.  I have asked

16   you whether, based on the filing of this statement of intention,

17   you could legally contend that rights had arisen in the nature

18   of an appropriation of water prior to the time that you would

19   get this dam built and start to collect the water?

20       MR. VEEDER:  I don't believe that is the case, your Honor,

21   in regard to this filing.

22       THE COURT:  I don't think it is either.

23       MR. VEEDER:  I think the right to export, which we have

24   presently vested, I think that what we did in regard to

25   DeLuz Dam in the filing of that notice bears out the proposition

6-4

1    that I have advanced to you many times, that the United

2    States of America not only doesn't have to file, I don't

3    think it is legally possible to file under the circumstances

4    that exist.

5        MR. STAHLMAN:  A lot of government agencies have been

6    obtaining water after filing.

7        THE COURT:  You say you base this on the contention that

8    there is no statutory authority for you to file.

9        MR. VEEDER:  For the exportation.  I don't believe it

10   is necessary for us to have statutory/to acquire a right
                                    authority

11   or to exercise a right to export.  I think that has been

12   an accomplished fact for 20 years.  I don't believe we have

13   to file a piece of paper with the State of California to

14   get a right to export water to take care of a military

15   installation.

16       Now your Honor, in regard to this settlement, we were

17   hopeful that these rights would be recognized and we would

18   be protected.  We were hopeful that there would be some

19   means worked out whereby we would be protected if there was

20   overpumping in the Murrieta-Temecula Groundwater area.

21       Now these matters I will take back to Mr. Clark.  I

22   will take back the transcript.  I have asked John to supply

23   us with it immediately.

24       MR. GIRARD:  One thing I would like to emphasize.  This

25   whole physical solution doesn't hinge on any factors which

6-5

1    are set forth in your motion.  I think, as all of you

2    people have stated, you can't build DeLuz Dam and have a

3    Fallbrook dam at the same time.

4         MR. VEEDER:  That is correct.

5         MR. GIRARD:  So the main thing that is going to help

6    this physical solution is for the United States to figure

7    out what they can offer Fallbrook insofar as priority of

8    water, amount of water and cost of water are concerned.

9    Those three things are what this settlement is held up on.

10   As far as the State of California is concerned, if Fallbrook

11   and the Navy can agree, we would be tickled pink.

12        MR. VEEDER:  On that score, Mr. Girard, studies are

13   underway right now on this matter.

14        MR. GIRARD:  If you and Fallbrook can agree on that,

15   we will get a practical solution.  And I think that is the

16   pressing thing.

17        MR. VEEDER:  I am fully in accord that we have to have

18   some additional data.

19        MR. STAHLMAN:  Mr. Veeder, one other thing I would like

20   to know.  In your discussions with Mr. Clark --

21        MR. VEEDER:  George, may I answer one thing, and then

22   I will come back.

23        We need some additional data in regard to the quantity

24   of water that could possibly be made available to Fallbrook

25   and meet our demands.

20,362

6-6

1          MR. STAHLMAN:   In your discussions with Mr. Clark,

2    have you made him aware in relation to this filing with

3    the State?  Has he been made aware of the fact that the

4    stipulation and filing in this case is governed by California

5    law?

6          MR. VEEDER:   Yes, indeed, we have gone over it many

7    times.

8          MR. GIRARD:   Along this line, being a government

9    lawyer, I wish that in all of the cases I have lost I had

10   an opportunity to win them as easily as you do here after

11   you have lost them.  Every case I lose I don't have a chance

12   to file a piece of paper and recoup.

.7 fls   13

20,363

7-1

1     MR. SACHSE:  One piece of paper could solve all of

2     this.

3         Mr. Veeder, we arrived at a physical solution with

4     the Navy before you ever got into this act.  But the situation

5     today is very different.  At that time, we were going to

6     pool two sets of applications -- the Navy's and ours.  Now

7     we are prior.  Now you want to go back to 1948.

8         MR. VEEDER:  Not I.

9         MR. SACHSE:  And you want to say, "Fallbrook, now come

10    around with your hat in your hand. "  I am not going to hold

11    my hat in my hand.  I want to hear what you are going to

12    offer, and I am going to listen and try to cooperate, because

13    I do believe, speaking watershed-wide, I do believe that,

14    unquestionably, the interests of everybody concerned, the

15    DeLuz Dam is probably the best.  But we have got something

16    now -- we have a set of rights, and I'm not going to walk

17    in and sit down and talk to you at a conference table and

18    say, "I don't have it.  Forget everything.  We have spent

19    half a million dollars fighting this lawsuit and a few other

20    things and now we are going to junk them all and go back

21    to 1948."  I want you to face some realities of today.

22        I will say in passing -- I hope I am not doing you

23    an injustice, and if I am, believe me it is from my heart --

24    I believe that some day I expect to find the true story of

25    what happened to that memorandum which was directed to the

7-2

1    Navy, on which we have correspondence from Mr. McKinnon

2    saying it will be signed tomorrow.  It will be signed tomorrow,

3    it will be signed tomorrow, and finally disappeared, and it

4    disappeared in the Justice Department and all they ever

5    came out with was a lawsuit, and I believe with all my heart

6    that you were the cook --

7        MR. VEEDER:  The what?

8        MR. SACHSE:  The cook, not crook.

9        MR. VEEDER:  Crook, C-r-o-o-k?

10       MR. SACHSE:  The cook.

11       THE COURT:  C-o-o-k.

12       MR. SACHSE:  You were the cook who got this "slum-gullion"

13   together and said to the Navy, "Boys, you can't sign that,

14   because I have won it already and no sense contracting

15   with Fallbrook."  I am not going back to the old days.

16       MR. VEEDER:  You are back there now, young man.

17       THE COURT:  I think, Mr. Veeder, you should spend some

18   time before the next meeting drafting one or more alternatives

19   on principle as to what your proposal would be in the

20   pooling of rights or this handling of government rights

21   and Fallbrook rights.  You can't put in figures because the

22   studies aren't complete.  You can't put in the cost of water

23   and that sort of thing.  But you can, at least, give us some

24   of your thinking in principle.  What is this to be?  A

25   pooling of government's and Fallbrook rights with a share and

7-3

share alike, or a share according to need, or what, the
government contention that they take the top off and if there
is water enough left they make it available to Fallbrook,
or is the Government going to state that Fallbrook gets
the first slug of water out of the Santa Margarita and the
Government takes what is left and what comes from DeLuz?
I think, without figures, amounts, prices, et cetera, you
could at least give us some idea in principle of how this
agreement would be worked out.

MR. VEEDER:  We will undertake that, your Honor, and
we will have it in form on September 18th at ten o'clock
a.m.

MR. SACHSE:  May I, Mr. Veeder, then, with all sincerity,
say that I certainly agree with what his Honor said.  If
you could give that thing to me a few days before September
18th, we might really accomplish something, if it was nothing
more than to say this is hopeless.  I mean get it to me as
much in advance as you can because we are interested in
trying to work this out, and if you can do it as his Honor
suggested, in formula-fashion, not the fixed amount.

MR. VEEDER:  Very good.

MR. SACHSE:  But in formula-fashion.

MR. VEEDER:  Fine.

THE COURT:  May I suggest that in doing this you give
some thought to the fact that the dam that the government

7-4

1  would erect would catch water to which Fallbrook presently

2  has no rights, and it would also catch water on the Santa

3  Margarita to which presently Fallbrook has superior rights,

4  and that therefore there would have to be some give and

5  take; and it would seem to me the only way you are going

6  to make further progress in working out a deal with Fallbrook

7  in addition to satisfying them on price, would be on some

8  equitable basis where the rights possessed by the two parties,

9  although different in quantity and kind, would be shared

10  in some equitable fashion.

11      MR. SACHSE:  I agree.

12      THE COURT:  I think if you do anything but that you

13  are wasting our time.  If you come in and say, "We will

14  make water available to Fallbrook if, as and when we have

15  satisfied the Government's needs, I think you have stubbed

16  your toe right there.

17      And I think, by the same token, Fallbrook has to

18  be prepared to say, "We will concede that we have pooled

19  rights we have with the rights the Government has because

20  they are different in kind, amount and place and all that,

21  and we equitably share the net result of what we get."

22      I make that as a suggestion in your thinking on this

23  matter.

24      MR. VEEDER:  Thank you, your Honor.

25      MR. GIRARD:  Somewhat like community property, Bill.

7-5

1    THE COURT:  Well, it is sort of a shotgun marriage.

2    MR. SACHSE:  It is definitely shotgun.

3    THE COURT:  Where there is consent, but --

4    MR. VEEDER:  I didn't hear.

5    THE COURT:  Where there is a type of consent.

6    MR. GIRARD:  Suprisingly, they might enjoy it after

7    they got together.

8    THE COURT:  Well, that often happens.

9    Mr. Girard, I would like also to have you be ready

10   to present some suggestions on this Master, with the idea

11   in mind of seeing what things we can start as early as

12   possible, and also this question of compensation.

13   I think, Mr. Veeder, that is a matter that you ought

14   to approach.

15   I think it is within the power of this Court to cause

16   the expense to be shared, but I think the sooner you commence

17   something like that the better, and I think in order to

18   get it off to a good start and be assured it will be carried

19   out -- as a matter of fact, this Water Master thing transcends

20   any talk about settlement, in a way.

21   MR. SACHSE:  It would surely cost less than a lawsuit.

22   That is for certain.

23   THE COURT:  Regardless of what might ever happen to

24   this lawsuit eventually, there will be a Water Master on this

25   river, and the sooner we get some of this data and know what

7-6

1   we have the better off we will be.  Therefore, with all the

2   money the government has spent in this case, the guarantee

3   of a fair start with a Water Master for, say, two years,

4   with an arrangement within that time, as soon as the Court

5   could get sufficient data, that some apportionment

6   should be considered, regardless of what you do -- even

7   if you appeal this case.

8        MR. VEEDER:  As I said before, your Honor, that will

9   be one of the items I will discuss, I hope, by this weekend.

10       THE COURT:  Suppose the Congress should authorize the

11  Navy to file an application with the State to appropriate

12  water.  What would happen then?

13       MR. VEEDER:  You mean for --

14       THE COURT:  For DeLuz Dam, presently, and store it in

15  their basins.  What would be your position?

16       MR. VEEDER:  I haven't given the matter any thought.

17       MR. GIRARD:  Your Honor has a great deal of power

18  insofar as forcing parties to reach an equitable solution

19  that they may not want to reach under California law.

20       MR. VEEDER:  I think your Honor has unlimited power.

21       MR. GIRARD:  He might force the Navy to file.

22       THE COURT:  Yes, what would you think about that?

23  Suppose this Court, in the exercise of its equitable powers,

24  and realizing that there is presently a supply of water

25  subject to appropriation, with storage available, and after

7-7

1  listening to all the long cry that you want water that

2  you can legally appropriate, would direct that the Navy

3  Department or the United States acting for the Navy make

4  a filing on this water and that it be done under Court

5  compulsion and that therefore it be no precedent and be

6  no abandonment as to any theories the Government might

7  have as to State rights.

8      MR. VEEDER:  Again, I would have to consider very

9  carefully what you have said.  I couldn't possibly make

10  any comment at this point.

11      THE COURT:  This would be an immediate answer to a

12  lot of problems.

13      MR. STAHLMAN:  Your Honor has that power by reason of

14  the fact that water has wasted into the ocean and would

15  continue to waste, and could be preserved by the Navy filing

16  and obtaining a permit.

17      MR. VEEDER:  May I inquire on this point now.  I thought

18  there was agreement in regard to the statement that we

19  have filed with the State and that there was cooperation

20  among us in connection with it.

21      MR. GIRARD:  There is agreement, Bill.  But never let

22  it be said that I think you went far enough.  I pointed out

23  in the record that I wished you had gone a good deal further.

24      THE COURT:  So did I.

25      MR. SACHSE:  So did I.

7-8

1        MR. GIRARD:   I am happy you did what you did, and I

2    think it is a step in the right direction.  But only that.

3        THE COURT:   Even under the Government's theories, even

4    under your theories, Mr. Veeder, I don't see what was wrong

5    in saying it is also the intention of the Navy immediately

6    and forthwith to appropriate the flow of DeLuz and the flow

7    of the Santa Margarita until such time as Fallbrook builds

8    a dam, and without prejudice to what our position may be

9    with Fallbrook, and to store that water to use it and to

10   export it.  I don't know why you didn't do that.  It certainly

11   could have been worded in such a way.

12       MR. STAHLMAN:   He's a hard-headed little fellow.

13       MR. VEEDER:   I move to have that expunged.

14       THE COURT:   No, I think it is an understatement.

8 fls

8-1

MR. SACHSE:  Mr. Veeder, believe me, I am sincere about this, and I am going to make a suggestion.  I don't know whether it is out of order.  Since it is too much for me to ask that I be called in for consultation with you and Mr. Clark in presenting the proposition in general terms as his Honor outlined, I will ask that Colonel Bowen be brought in because I think that he has a better and truer understanding of our problems -- of the financial situation that is involved, of the relative cost of the water -- I don't for one moment think he would be my spokesman, but I think Mr. Clark would be a little closer to getting an honest picture of Fallbrook's problems if he got it from Ace than if he gets it from you.  This is your own expert.  I would like to have him in on your deliberations before you come up with a proposition to us.  I mean it with all sincerity.

MR. VEEDER:  Now is there anything else?

MR. STAHLMAN:  I could sit here for a good while and get a lot of pleasure out of it.

THE COURT:  I think we have made some start on this.

I would suggest, Mr. Girard, in this matter you are going to prepare, that you have in mind my general counter suggestion to Mr. Clark and Mr. Veeder's suggestion, namely, that we start this gathering of data looking forward to the time when we would be in a position to say what rights there were in cataloguing rights and amounts of water and

8-2

1    then looking forward to the discussion of some of the other

2    matters in the motion, namely, interchange of source of

3    supply, how you would give back what you had borrowed, the

4    long range planning on a 20 or 25 year basis for the use of

5    water, that would ultimately lead into that sort of thing.

6        MR. GIRARD:  I imagine the Water Master could come up

7    with some very good suggestions on exchanges.

8        MR. STAHLMAN:  I do think that even in this paper

9    which the Government filed, which we were glad to see filed

10   and hope they get their water, I think they ought to file

11   a supplement to that thing and point out this underground

12   water thing.  I don't think that is in there, is it?

13       THE COURT:  It is not in there, and Mr. Veeder concedes

14   that under that statement that they filed it probably has

15   no effect in itself in creating any right or evidencing

16   any intention of appropriating the present supply of De Luz

17   and Santa Margarita prior to the building of these dams, if

18   they are built.

19       MR. VEEDER:  On that let me clarify that position.  I

20   believe that when the dam is constructed we appropriate

21   fully all of the unappropriated water.  I am using that term.

22   I don't believe there will be any more water.

23       THE COURT:  We are talking about prior to the time the

24   dam is constructed.

25       MR. VEEDER:  You are talking about strictly our present

8-3

1    exportation?

2           THE COURT:  Yes.

3           MR. STAHLMAN:  As was pointed out by the State Water

4    Rights Board, that at this time you have capacity in your

5    basin that you could store so much water, that when they

6    consider these permits of these people they would turn them

7    down because that water could be used at Camp Pendleton.

8    They could consider this paper as an application and give

9    you a right to appropriate water.

10          THE COURT:  Then another very practical thing occurs.

11   If you do something to indicate this intention to

12   appropriate and either to comply with the state procedure

13   or to follow this shorthand procedure you have been trying

14   to follow, which is a kind of maybe-yes-maybe-no-but-don't-

15   quote-me, then you have something to bargain with.  You are

16   in a position to say, "All right, we have this right,

17   Fallbrook has this right, Vail has certain rights.  We can

18   talk about how we are going to work in this watershed."  Mr.

19   Sachse's point is a good one that you don't have presently

20   the rights as far as the decision that has been made by

21   this Court.  You have prospectively some rights, but

22   presently you don't have anything to bargain with.

23          Well, I don't know whether we can go any further today.

24   Do you?

25          MR. VEEDER:  September 18th at 10:00 o'clock?

8-4

1      MR. STAHLMAN:  The next step is in orbit.

2      THE COURT:  Incidentally, we set the 18th, but that

3  is State Bar Week.  Does that interfere?

4      MR. STAHLMAN:  I had intended to go.

5      MR. SACHSE:  How about the preceding week?

6      THE COURT:  That is the 11th.

7      MR. STAHLMAN:  I am starting a case on the 28th.  I

8  think it will be finished.  It is a murder trial.  It will

9  go ten days.

10      MR. VEEDER:  I would like to see it the 18th or the

11  next week after that.  But whatever your Honor desires.  What

12  day is today?

13      MR. GIRARD:  Today is the 9th.

14      MR. STAHLMAN:  I would like to go to the Bar, but I

15  add nothing to it.

16      THE COURT:  We had better make it the 18th.  We may

17  not go all week and maybe you can get up there before the

18  week is over.   September 18th at 10:00 o'clock.

19      (Whereupon, an adjournment was taken until      )
          (                                            )
20      (10:00 o'clock a.m., Tuesday, September 18th,   )
          (                                            )
21      (1962.                                         )

22

23                    ---oOo---

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1247-SD-C |
| | ) | |
| FALLBROOK PUBLIC UTILITY DISTRICT et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

CERTIFICATE OF REPORTER

I, the undersigned do hereby certify that I am, and on the date herein involved, to-wit, August 9, 1962 , was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case; and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing  102  Pages of typewritten matter constitute a full true and correct transcript of my said notes.

WITNESS my hand at San Diego, California this 9th day of August, 1962

_____
Official Reporter

JOHN SWADER. OFFICIAL REPORTER