# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

              Defendants.

          No. 1247-SD-C


### REPORTER'S TRANSCRIPT OF PROCEEDINGS


Place:       San Diego, California

Date:       September 24, and 25, 1962

        Pages: 20,376 thru 20,417

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy


**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

             IN THE UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF CALIFORNIA

                  SOUTHERN DIVISION

4

                   - - -

5

        HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

                   - - -

7   UNITED STATES OF AMERICA,      )

                             )

8                  Plaintiff,  )

                             )

9   vs.                       )

                             )   No. 1247-SD-C

10                           )

                             )

11   FALLBROOK PUBLIC UTILITY       )

    DISTRICT, et al,            )

12                             )

                 Defendants. )

13   ————————————————————————————)

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              San Diego, California

17           Monday, September 24, 1962

18           Tuesday, September 25, 1962

19

20

21   APPEARANCES:

22       For the Plaintiff:       RAMSAY CLARK, ESQ.

                                Assistant Attorney General

23                          of the United States

                                WILLIAM H. VEEDER, ESQ.

24                          Special Assistant to the

                                Attorney General

25                          CDR. DONALD W. REDD

APPEARANCES (continued):

    For the Defendants

        Vail Company:               GEORGE STAHLMAN, ESQ.

        Fallbrook Public
        Utility District:        FRANZ R. SACHSE, ESQ.

        State of California:     FRED GIRARD, ESQ.
                             Deputy Attorney General

20378

SAN DIEGO, CALIFORNIA, MONDAY, SEPTEMBER 24, 1962, 10 A. M.

- - -

THE CLERK:  2 - 1247-SD-C UNITED STATES OF AMERICA v. FALLBROOK etc., et al.

THE COURT:  Good morning, Mr. Veeder.

MR. VEEDER:  Good morning, Judge.  How are you?

THE COURT:  Do we want to discuss this matter with the Reporter present or without?

MR. GIRARD:  I hope without, your Honor.  Whatever Mr. Clark wants to do.

THE COURT:  You probably can speak more frankly without a Reporter and we would have no record of what we discussed, but we could later summarize things on the record.

MR. CLARK:  Whatever the Court pleases.  I think we might be better off proceeding off the record, and if we want to put something on the record we can do so.

THE COURT:  Any objection?

MR. GIRARD:  No.

THE COURT:  If not, excuse the reporter.

(Discussion off the record.)

- - -

(At 4:40 p.m. of said day, the following note:)

THE COURT:  Let the record show that the Fallbrook case is continued until tomorrow morning at nine o'clock a.m.)

(ADJOURNMENT TO TUESDAY, SEPTEMBER 25, 1962, at 9 A.m.)

1      SAN DIEGO, CALIFORNIA, TUESDAY, SEPTEMBER 25, 1962, 9:00 A.M.

2                              - - -

3          (No. 1247-SD-C UNITED STATES OF AMERICA v. FALLBROOK PUD,

4      et al, the same appearances as on the previous day, with the

5      exception of Rear Admiral Powers.)

6          THE COURT:  As many of you did, I did some thinking

7      about this last night, and I thought I would outline what my

8      thoughts are and then we would go on from there.

9          1.  This is very much preliminary.  I think we are all

10     agreed that the building of a dam is a very desirable thing

11     to all parties to the litigation -- the Marine Corps,

12     Fallbrook, etc.

13         2.  There is no doubt in my mind but that the attitude

14     of Congress toward this dam is going to be a very important

15     factor -- you just don't make Congress' mind up for them --

16     and it seems to me in thinking about this matter that it is

17     most desirable that we arrive at some understanding as to a

18     program, in effect and under way, when you go to Congress.

19         And of course, this would entail, also, the understanding

20     that there would be no appeal.  If there is going to be an

21     appeal, I would wager right now that you are not going to

22     get action by Congress while this litigation pends.  By the

23     same token, unless we work out some sort of program and

24     embark upon it and have a fairly respectable appearance of

25     cooperation and work toward an ultimate solution, I don't

20,380

1   think you are going to do as well with Congress as you would

2   with ⊐ such program.

3        So it seems to me that Mr. Clark's suggestion of a

4   physical solution or a program under way in that direction --

5   because I don't think you can solve everything immediately --

6   is a pre-requisite to the dam.

7        So much preliminarily.

8        Now going over to the things that we talked about last

9   night, the first item I have down here, under Items to Talk

10   About, is:

11        1.  Can we charge the United States with exportation

12   only as to the difference between the exportation and the

13   sewage return?

14        I looked at the figures in Interlocutory Judgment No. 37,

15   and the sewage return for 1959, 1960, 1961, were running

16   around 2500 acre feet.  In 1959 it was 2561, in 1960 it was

17   2468, in 1961 it was 2535.  There is no export figure for

18   1961 in that judgment.  We probably have it now.  We didn't

19   have it at that time.  But the export figure for 1960 was

20   3280, in 1959 it was 3910.

21        Do you know offhand, Colonel Bowel, what your export

22   figure is for 1961?

23        COLONEL BOWEN:  Offhand I don't know, your Honor.

24        THE COURT:  We can find it.

25        COLONEL BOWEN:  Yes, sir.

1      THE COURT:  At any rate, this difference between export

2  and sewage return for 1959 was 1349 acre feet, for 1960 it

3  was 812 acre feet.  And the sewage return seems to be fairly

4  stable at around 2500 acre feet.

5      So the first question is:  As a legal proposition, do

6  we charge the United States only with the difference between

7  exportation and sewage return?

8      In thinking back over the discussion, we discussed

9  return flow to the River, we discussed the law of return

10  flow as being part of the riparian water and that sort of

11  thing.  I don't think we ever got down to talking about the

12  net difference between the sewage return and exportation.

13      Of course, this water is taken out of the watershed in

14  pipes, and it comes back in pipes, and the only time it is

15  not out of a pipe is the time it is run through a sink, a

16  toilet or a shower.  I think that is true, is it not?

17      COLONEL:  That is true.

18      THE COURT:  The water that is put on the golf course,

19  the water that is used for irrigation, of course, is lost,

20  outside the watershed.

21      So it seems to me that unless there is some legal

22  objection to that position, we ought to see if we can't

23  arrive at that proposition.

24      2.  Can we make findings concerning the spreading works

25  that the Colonel has prepared in the bottom of the River bed,

1   and then make a general finding as to the amount of water

2   that was saved--we would probably have to take evidence --

3   from entering the ocean last year, and on succeeding years

4   make findings as to how much water was saved from entering

5   the ocean, and find and hold that this water saved is legally

6   subject to export without curtailing the riparian rights of

7   the United States?

8   There is a legal problem involved.  Is this water surplus?

9   And Mr. Clark yesterday made a point that may be seriously

10  considered, and that is that unless you hold that this water

11  that would otherwise go into the ocean is surplus and can be

12  exported without prejudicing the riparian rights of the

13  United States, then you are putting a premium on letting

14  water waste.  In other words, why should a person go to the

15  bother of saving this water that would otherwise go to the

16  ocean if, in doing so, he is going to be faced with the con-

17  tention that he, in some way, has prejudiced the exercise of

18  his riparian rights?

19  This would seem to me to be a point that should be

20  talked out and we should determine whether or not we can

21  legally take this position.

22  3.  If these two propositions hold up, then we should

23  amend Judgment No. 37, and it would involve additional

24  findings, it would involve Conclusion 27 and Judgment

25  Section 18.  There may be others.  I went through this

hurriedly.

4.    I think we should immediately embark upon the preparation of an order that meters be installed at least for a selective number of the major users.  In that connection, we would have to get a list of them.  They would be listed particularly in Murrieta and probably some of the users above Vail Dam.  First, we would probably have to notice an order to show cause why this shouldn't be done and give them a chance to be heard.  And we would have to fix a time limit, and I would think at the end of the irrigation season would be the logical time.  The logical time would be the 1st of January 1963.  That is ample time.  We would have to devise a procedure whereby the meters would be read or the landowners themselves would report and probably send copies of the reports to Colonel Bowel and the Court, or possibly to the major parties also.

This, of course, is a start toward gathering information that we all realize we have to have.

5.    The matter of directing the Government or Colonel Bowen or Mr. Wirts, or the three in conjunction with someone -- I am suggesting Colonel Bowen in this connection -- to make a study of what available data we have looking toward this solution.  We have a lot of data.  It is a matter of pulling this together.  I imagine probably the Colonel has done some work on this already.

In that connection, one of the important things of the report would be to point out the areas where information is missing completely:

The pumping by the owners in the Murrieta.

We know there are no figures on runoff of the Santa Gertrudis or Pachanga or various of the tributaries that come into the Murrieta.

There are various other places probably where our information is not as complete as it should be. But it would be a matter of gatering together what we have and pointing up the spots we should work on looking toward complete factual information, and this would be a start on gathering and compiling of data and getting the necessary information.

6. The problem of what could be profitably irrigated. And in order of complexity -- I will put it in the reverse order -- in order of ease, I would think that the Murrieta users would present the smallest problem there. As to those users, most of whom are on flat land and most of whose land is obviously subject to profitable irrigation, it seems to me we could issue an order to show cause, point out that the figures on irrigable acreages are in the record and are prima facie evidence, and that we propose to find in accordance with the soil reports made by Colonel Bowen unless they have some evidence to the contrary. I don't think we would have much of a problem. We might have a problem on whether we

should embark on this project from Mr. Krieger and others.
But as far as the project itself is concerned, I don't see
that that is a big problem.

The second easiest problem would be probably the
U. S. lands, because the U. S. lands lie largely in the
valley floor and on the mesas, with the exception of the
rolling area around the Ammunition Depot.

The next easiest probably would be the lands above Vail
Dam.

And finally, the roughest one would be the Vail lands.
I am not so sure that that as a start, with the understanding
that it was subject to modification on further study, we
wouldn't have enough information in the record for the
Colonel to confer with Vail and give us some calculated
guess and probably by agreement arrive at a starting point,
which would be subject to later scaling up or down, on Vail
lands.  But there is so much of Vail lands and it is so
diverse in character that I can see possibilities of a lot
of work.  Although I think some figures probably can be
arrived at.

7.  Can we appoint Colonel Bowen as Master?  We can't
do that while he is an Officer of the United States.  I think
that is clear.  So for the immediate moment this is
impossible.  However, I think we can get the same result by
using him as an expert witness.  We can send the Colonel out

1    to survey situations and make reports.  The reports can be

2    reduced to writing.  They can be served upon parties that are

3    involved.  At the hearing the Colonel can be called upon as

4    an expert witness, and we would get, as a practical result,

5    a situation very similar to what you would get out of a

6    Master's report -- except that in the case of a Master's

7    report ordinarily, under the law, the findings that he makes

8    are prima facie correct and the other side has to rebut them,

9    while here it would be merely expert testimony in the record

10   which the other side would combat or not as they saw fit.

11       8.  We should be working on -- I say "we," but probably

12   you people know more about it than I do -- formulas for

13   percentages of entitlement.

14       And this is a rather interesting thing.  I remember I

15   prepared a sketch that went into the record, trying to show

16   Mr. Clark how complex this problem of entitlements might be

17   taking just two arms of a stream.  So last night I started

18   to work on this again, very roughly, and I am convinced that

19   I was wrong in the sketch that I made.  I slipped a cog as

20   I went along.

21       Yesterday I showed Mr. Clark after court the sketch I

22   had made.  He said, "It's very interesting.  I spent a lot

23   of time on your sketch."  I think it was probably helpful

24   in stimulating interest in the problem.

25       MR. CLARK:  It surely did.

THE COURT:  Here is where I think I slipped a cog.  On two sub-watersheds where the stream meets and runs through a lower piece of ground, I was treating them -- and I went back over them and I didn't do that until after I had prepared this sketch -- I was treating the people in the sub-watersheds and the landowner below as all being on a parity, when actually this lower landowner has a right to his correlative share out of Watershed A and has a right to his correlative share out of Watershed B and the two are added together, because he is entitled to share correlatively in this whole watershed.  This may be subject to some debate.

Let me give you this example which convinces me that this is correct.  Suppose this lower landowner had a piece of ground down here.  Here is one sub-watershed, here is another sub-watershed, and here is the lower landowner.  If these streams come down through his property in this fashion and don't join, it is true you would have a watershed divide in his property.  But this piece of land A would be entitled to its correlative share in this watershed, B would be entitled to its share over here.

Now why should the situation be any different as to a landowner farther down where these two streams merge?  Because as the lower landowner, with the stream going through his land, this landowner may look upstream to each watershed.  It would be an incongruous result if, in the situation first

1   listed, he got the benefits of both watersheds because both

2   streams went through his property, but where the streams

3   have joined and go through his property he doesn't get the

4   same result.

5      At any rate, on the basis of that I sort of revised my

6   thinking.  And then I discovered that Mr. Clark had been

7   doing some work on the same subject.

8      However, on this matter of formulas, as shown in that

9   original sketch that I made, it would involve formulas as to

10  problems that might arise, for instance, in the Murrieta, in

11  which people downstream are not concerned; probably above

12  Vail Dam, which would involve Vail and people above, and not

13  necessarily people below; or formulas that would involve the

14  United States from the bottom of the stream on up.

15     That is my thinking on some of these problems.  I thought

16  I would sort of spread them out here, and you can go from

17  there.

18     MR. SACHSE:  Not to take over the conversation, but

19  simply to report to you and Mr. Clark at an appropriate

20  time today, I would like to discuss it.  I put in an awful

21  lot of overtime last night with my Board and with my

22  Engineers.  I want to make some comments on Mr. Clark's

23  proposals of yesterday, particularly on cost, quantity and

24  priority.

25     THE COURT:  Do we want this on the record?

MR. SACHSE:  I don't care.

THE COURT:  If the Judge is through, I should much rather hear from you.

MR. SACHSE:  I went through, with my Board and Mr. Smith, our engineer, my notes on what Mr. Clark proposed yesterday.

With this point about no appeal, of course, we are in complete accord.

The second point that Fallbrook must have a right in De Luz which is protected priority-wise just as if it would be from its own dam, we agree.  We are perfectly willing to let it wait to find out how you hope to accomplish it, but we take it for granted that it can be accomplished.

I think the proposal -- and I realize that it is only a proposal and it is subject to discussion -- the proposal on the items of cost, quantity and priority is not as good as it looked and has some pretty good sized holes in it, and I think in fairness we should point them out.

MR. VEEDER:  Are you going to make a tabulation available to us on this?

MR. SACHSE:  The Colonel has this.

Didn't you serve copies?

COLONEL BOWEN:  Yes.

MR. SACHSE:  This was prepared back in May and has been distributed.

MR. SACHSE:  First, on cost, our own studies -- and I am

going to have to ask you to accept them, because they are not

our studies, they are prepared by a responsible independent

firm of engineers and have at least received preliminary

approval as to their financial and engineering soundness

from the California Department of Water Resources and from

the Bureau of Reclamation -- our studies show that we can

build our project to supply water to us at about $35.95 an

acre foot.  That money amortizes our project; it pays for it

in 40 years.  In other words, the advantage pointed out by

Mr. Clark of possibly declining cost of water as the project

is amortized at De Lux applies equally to this.  We can build

our own project for $25.95 and have it paid for in 40 years.

The second thing -- which was something I simply didn't

know until we looked at the contour map last night -- Mr.

Clark proposed that water be delivered to us at the

Ammunition boundary, which of course is reasonable; and that

the cost of distributing it from that point on be borne by

the buyer, with which I don't quarrel.  But this also has an

effect on the so-called market prive or market value of

water, because that point, Mr. Clark, is some 50 to 60 feet

below the delivery point contemplated in our cost studies

for our terminal distribution reservoir at 50 or 60 feet

lower elevation, which means that to whatever figure the

United States might select as a market value of the water

we would have to add a lift factor to our proposed point of
distribution plus the capital cost of works, both the
pumping works themselves and modifications of the distribution
system, which might not be large, since the water would be
coming from a 90-degree removed point of the compass, and
the way our system is laid out it would mean extra cost.

So summarizing on cost, a figure of $35.00 per acre
foot, which was used here -- I realize it was not at all a
commitment -- by Colonel Bowen, would be extremely unattractive
cost-wise to Fallbrook.  It would not be any less than we
could deliver the water to ourselves for, under our own
project.  And our own project would carry with it the
incidental benefits of increased assessed valuation and a
broader tax base for our District's needs, and of course the
recreational facilities, etc.

If it is all right with you, there are only three
points.  I will not be lengthy.  We might as well do all
three of them.

MR. CLARK:  I will say two quick things, if that will
not interrupt you.

MR. SACHSE:  No, go ahead.

MR. CLARK:  Assuming this 35-dollar figure is right,
you pay that whether you get the water or not, at your dam.
You pay it to us only if you get the water.

MR. SACHSE:  We are aware of that.

1     MR. CLARK:  That is pretty significant.  How much is the

2  insurance worth?

3     MR. SACHSE:  We discussed that factor with our Board --

4  the point that if we build our dam and run into dry years,

5  we pay this amortization without any water to pay for it,

6  whereas in this case we pay it only if we get water.  The

7  Board is aware of it.  These are factors that have to be

8  considered.

9     MR. CLARK:  The only other point is -- you don't have to

10  comment on it now -- that it might be there is a more

11  economical system when you contemplate using De Luz water

12  rather than water from your dam.

13     MR. SACHSE:  I question, Mr. Clark, that that offers

14  much help, because this point was selected as the best and

15  highest point at which we can build a small distribution

16  reservoir (dam type) to put water and give us pressure all

17  over the place.

18     MR. CLARK:  I don't know.  I just suggested the

19  possibility.

20     MR. SACHSE:  Now on the quantities, again, on our own

21  project.  Our own project is supposed to give us 5600 acre

22  safe yield of new water.  Pardon me -- 5200.

23     Fifty-two hundred is correct, isn't it?

24     MR. SMITH (Fallbrook's Engineer):  5600 net.  5,000

25  delivered into the meters.

1    MR. SACHSE:  A net of 5,000 into the meters -- I will

2    use that -- of new water.  When I say "new water" that assumes

3    that we keep our 1800 acre feet of stream flow.  I am using

4    the lowest figure Mr. Smith just gave us.

5         Now the United States proposes a 40% allocation to

6    Fallbrook from the De Luz Dam, which, according to my

7    figures, has a net safe yield of new water of 14,000 acre

8    feet.

9         Is that right, Colonel?

10    COLONEL BOWEN:  Yes, sir.

11    MR. SACHSE:  So 40% of 14,000 is 5600 of new water,

12    which looks quite attractive on the face of it.  In other

13    words, comparing 5,000 or 5200, or whatever it might be, of

14    our figure with theirs, it is at least as good or probably

15    better than De Luz.

16         But the figure is meaningless, because, Mr. Clark, you

17    state as your minimums or essential requirements that the

18    export needs of the United States be considered before surplus

19    is calculated.  Now if that export need is 4,000 -- I realize

20    it may be reduced by the matters you were discussing -- if

21    that is 4,000, and if that 4,000 acre feet is taken off

22    before we calculate the water available to the reservoir, I

23    am quite sure that Colonel Bowen will agree that the safe

24    yield figures are knocked into a cocked hat.  In other words,

25    this 14,000 acre feet of safe yield was arrived at without

1   assuming 4,000 acre feet for export.  It was arrived at

2   assuming the demands on Lake O''Neill and riparian demands

3   and saying all the rest is surplus.  But if you are going to

4   skim off another 4,000, the safe yield figure goes blooey.

5       THE COURT: Let me point out right there that if the

6   sewage return is 2500 acre feet, then this export figure,

7   aside from the works and all, is only 1500 acre feet.

8       MR. SACHSE:  No, your Honor, not quite true.  Because

9   what we are talking about, if I understand Mr. Clark correctly,

10  is what water coming down the River each year is first taken

11  out before anything is stored.  That is what he is talking

12  about.  The first water taken out is riparian.  The next is

13  export.  The first water taken out of the River is 4,000

14  acre feet.  It is not available for storage.  Maybe 2500

15  acre feet of that comes back at a point below the dam and

16  into the basin, but it is not available to create the

17  foundation on which you calculated that safe yield.  Do I

18  make myself clear?

19      So I think quantity-wise Mr. Clark's 40%-60% apportion-

20  ment is going to work out -- if you ask your Engineers to

21  figure -- in such a fashion that the allocation to Fallbrook

22  from De Luz Dam would be, quantity-wise, substantially less

23  than it hopes to accomplish from its own dam.

24      And again, on these safe yield figures, I may repeat

25  that these have gone through the Bureau preliminarily and

through the Department of Water Resources.  They are not just off-the-cuff charts.  We think these are accurate figures.

MR. CLARK:  I might say three things on that point.

MR. SACHSE:  Go ahead.

MR. CLARK:  In one sense, your lower safe annual yield might be safer because it has a greater drawing capacity.

The second point, under our theory of the law of this case -- I don't mean law of the case in the technical sense -- we have an exportation right of 4,000 acre feet that is superior to your appropriative right anyway.  If we sustain that, then this --

MR. SACHSE:  I appreciate that.  My theory is that you are wrong.  And if I sustain that, --

MR. CLARK:  The point is we have a lawsuit.

Then the third point is, of course, that you have lost your risk on your bonds -- on your investment, and you have got, at the very least, something that is probably safer and practically as much as you could hope for from your own dam.

These are things that you study.

MR. SACHSE:  These are things that we have to talk about, and I want to be sure that you understand our position, or what we think it is at the moment.

MR. CLARK:  Yes, I appreciate hearing it.

1          MR. SACHSE:   This is perhaps the most critical of all,

2     and that is this priority question.

3          If I understand Mr. Clark correctly -- and what he has

4     just said confirms it -- it is his position that the United

5     States has, legally and properly, and could substantiate on

6     appeal, if Judge Carter would not reverse himself, that the

7     United States has, legally and properly, a prior appropriative

8     -- I will call it that because it is the same word I use

9     for my own right, although I realize you don't claim it as

10    such -- that it has a prior appropriative right to X acre

11    feet (4,000, whatever it may be).   I think it is 4,000

12    regardless of the return flow -- the explanation I gave you

13    a moment ago.

14         The question is, What has it a right to take?   Not

15    what it is net.   So his right, if he has it at all, I think,

16    is 4,000.   It is not 1500.   I see Mr. Clark nodding his head.

17    It is not a question of how much you put back.

18         MR. CLARK:   We would continue sound conservation

19    practices.   Those don't affect our rights.

20         MR. SACHSE:   But your right to take, I feel, is 4,000.

21    That is what I think it would be.   If your legal position is

22    correct, you have a right to take 4,000.   I have to say this

23    is a point of legal disagreement.   I don't think he has a

24    right.   I think in the present status of this case, the

25    probable status of a final judgment, subject only to the

Lake O'Neill rights, Fallbrook has a prior right to take
flood waters of the stream up to a maximum of 30,000 acre-
feet a year.

Now, if the United States is asking us, in effect, by
contract -- which is what it is, and I am sure such a contract
could be entered into; even if Judge Carter entered final
judgment saying we were prior, we could properly contract,
with Water Rights Board approval and with Court approval,
to subordinate ourselves to you, we could do that legally --
if that is what his request is, it does two things.  In
the first place, it takes the cream of the River completely
out from any participation by Fallbrook.  It means that on
the low run years and the dry years the United States has it
all.  But what is of greater importance to me even than
that -- because a big dam at De Luz might solve this cream-
of-the-River problem -- it makes the sole guarantor of the
United States' export rights Fallbrook.  It makes us the
sole guarantor.  When water is short the only person who can
be called upon to cut back -- when water is short for export
-- is the Fallbrook Public Utility District.  I do not think
that is an equitable basin-wide problem.

I think there must be some way either to let the United
States assume all or a substantial part of that risk itself,
or else a way devised -- if this whole project is to the
benefit of the entire watershed, you cannot place the burden

20,398

1    of the risk upon this small public agency.

2         Those are my three fundamental points.

3         The other things I would prefer, frankly, not to row

4    about, because I don't think they present any problems, after

5    talking to my Board.  I think we can work out the questions

6    of water exchanges I mentioned, or the questions of Fallbrook's

7    extractions of part of the water at the Fallbrook site for

8    its own reasons of convenience.  Those things I don't think

9    are large roadblocks.

10        But I think in fairness to Mr. Clark and Colonel Bowen

11   and Mr. Clark's advisors these substantial roadblocks have

12   to be pointed out.  And that is the way I see them now.

13        MR. CLARK:  Let me make this comment on your priority

14   point.  If Fallbrook is better off under this setup, it

15   would be pursuing its rights and there is nothing inequitable

16   to it about the settlement.  The thing that makes it the

17   party with whom we have to negotiate on the exportation is

18   that the exportation right cannot run against a riparian,

19   and the appropriative rights, under California law, are

20   determined on the basis of priority, and the most significant

21   owner of a potentially prior apprpriative right, from the

22   standpoint of appropriation at the De Luz or Lippincott

23   damsite, is Fallbrook.  So it is those factors that make

24   Fallbrook the primary party with whom we can negotiate that

25   point.

1     I will say that any technique of negotiations that
2 doesn't affect riparian rights that you can devise we will
3 be interested and anxious to consider.   Vail has a very
4 substantial appropriative right at its damsite --if you can
5 talk with them and bring them in.  I don't see how we could
6 demand, expect or hope that all of the five or six thousand
7 people with riparian rights in this watershed would share
8 in a detriment to that riparian right for this exportation
9 right, because the United States does not claim this export
10 right against any riparian.

11     MR. SACHSE:  I think you are right.

12     MR. CLARK:  We never have, and don't intend to.  I don't
13 see how we can ask a single riparian, a great big one, to
14 participate in this.  I'm just thinking out aloud.  For one
15 thing, if one of them should agree to, he would defeat his
16 riparian right.  It is not part of his correlative riparian
17 right that he can agree that some of his riparian water
18 would be taken for exportation purposes, not being a riparian
19 use.

20     MR. SACHSE:  I concur, Mr. Clark.  I don't think you
21 can do it that way.  I think the meat of the cocanut --
22 you and I are in absolute disagreement as to what the law is
23 as to your 4,000 acre foot export right -- I say that the
24 burden of providing for those export rights should be on the
25 United States.  The United States has a basin with a 10,000

acre foot safe annual yield.  It has clearly been presented here yesterday that their use is only about 6,000 acre feet. Judge Carter has just pointed out that another 2500 acre feet of that is coming right back in.  You, yourself, have pointed out that the works constructed and operated by Colonel Bowen are saving X amount of water a year  which might otherwise waste into the ocean.  All of those things are matters within your control.  You can run your own basin. You can pump it as hard as you want.  You can build as many spreading works as you want.  It is yours.  You don't need anybody else's help to do that.

I say the burden of meeting this need, which I insist is junior to us, has to be borne by the United States.  It cannot be pushed upstream to the holder of what is, as of today and until either a reversal by his Honor or an appeal, the status of the priorities.

And finally, assuming complete disaster, water-wise, there is always available import water.  And why that burden should be placed upon us to go to import water to the exclusion of the United States I don't understand.  And I am going to have to say that this is a pretty -- I don't like the word "ultimatum" or I don't like the word "must" or "condition precedent".

MR. CLARK:  You don't have to do a thing, except protect your client, as far as that is concerned.

20,401

1    MR. SACHSE:  But this is a pretty strong objection in

2    my mind.   This is the overpowering objection -- this priority

3    question.

4    MR. CLARK:  Let me say this.  That settlement, as I

5    understand it, is a matter of give and take.  And if I could

6    assure my client, first, that he could avoid an eight or

7    nine million dollar expenditure on a dam that might not ever

8    pay out, that on the basis of expectancy -- and that is all

9    we can go on -- on the very basis of the offer made he

10   would get at least 80% from the broader base, including

11   running his right up De Luz Creek, at least 80% of what

12   nature could give him on the basis of his expectancy from

13   this settlement, I would not say that we are not pretty close

14   together.  You are giving very little for what you are

15   giving, at most.  You are getting 20% of what you could

16   expect from nature if you built your own dam.  But to get

17   that 20% you have to bond an eight or nine million dollar

18   dam.  You would have to hope the water would not come down

19   De Luz Creek, because it would look like you made a bad

20   mistake if it kept coming down De Luz Creek for two or three

21   years and your dam was empty.  These are pretty substantial

22   considerations, and I am sure you are giving them due

23   consideration.

24   MR. SACHSE:  They are.  And this is a settlement, and

25   settlement means give and take.  And I sat down last night

1    after the Board meeting and scribbled on a paper at home

2    just a hard-boiled "What have I got to offer? What has the

3    United States got to offer" sort of analysis, and to me the

4    simplest form of analysis is this.  The United States has to

5    offer two things:  no appeal, which gets this thing over and

6    gets the show on the road; and money -- assistance in

7    substantial financial expenditures.  That is what they have

8    at this stage of the case.  Fallbrook has to offer, at this

9    stage of the case, two things:  priority, and quantity.

10   Because that is what we have as of today.

11       If you are talking settlement, Mr. Clark, we have to

12   talk settlement on the basis of rights as we think they are

13   today.  Sure, I can put a percentage factor of what we think

14   -- you can to yourself, I can to myself -- of what we think

15   our chances are of suffering reversal wholly or in part.

16   But when you settle a PI case or something of that kind, you

17   figure your special damages and then you say to yourself,

18   "My chances of winning this case are a hundred percent,"

19   and that is one thing.  If my chances are only fifty per

20   cent, that is another thing.  If we are talking settlement,

21   I think we have to talk about and consider the conditions

22   under which both you and I think as of this minute we are

23   operating.  And you are asking me to give up quantity and

24   priority, as I analyze this, for a financial contribution,

25   which I don't think, as I pointed out in the first step of

my analysis, holds water.  I don't think the financial
contribution will hold water on the rough figure I have
been using of 35.  Maybe if it were another figure it would
hold water.  But I don't think it does at this moment.

MR. CLARK:  Thirty-five.

MR. SACHSE:  Thirty-five dollars an acre foot.  At
$35.00 an acre foot your financial offer, I don't think,
holds water.  I don't think it gies us a nickel, and it takes
away priority and it takes away quantity.

So that is where we stand in the horse-trading.

MR. CLARK:  Let me say this.  I disagree with your
basis of your analysis of the United States' position, because
we are not offering money at all.

The United States has, because of the lay of its land
and the quantity of its land, a number of needs because of
the use to which it puts this land.  A major dam at the
De Luz site, if it never caught any water, would be extremely
valuable to the United States because it would protect
hundreds of acres downstream on the flood plain which could
not otherwise be used for improvement purposes.  Your dam
offers no such protection, either to property upstream or
to Federal property.

Our dam offers the opportunity, if it does rain heavily,
for a much greater water right to Fallbrook than it could
otherwise secure from its own dam.

1    Finally, and most significant to me, if I were in your
2    shoes, I would have to think an awfully long time before I
3    could ever recommend to the people of that utility district
4    that they put their signature on an obligation in the amount
5    of eight or nine million dollars, whatever it is, that has
6    but one possible economic benefit to them, and that is
7    dependent upon ample rainfall in the future.   I am not trying
8    to make that judgment for them.   But whether they could, if
9    there were no lawsuit and no question but that their right
10   was prior to everything, whether they could afford that
11   expenditure is highly problematical.

12       Now take that, and then take the United States' dam,
13   which offers you a potential for more water than you could
14   ever have.   It offers you a potential for water you could
15   never touch otherwise in De Luz Creek.   We know tremendous
16   torrents come down there on occasion.   It offers you water
17   for which you pay if you get it.   You don't pay for anything
18   if you don't get it.   And at a price which probably will be,
19   at least from what these people tell me -- we talk about
20   35, we don't know what the price will be.   But if I had to
21   bet, not knowing much about engineering, I would bet that
22   in final analysis the water from De Luz would cost you less
23   than water from Fallbrook.

24       I really don't see how you can afford to pass it up.
25       MR. SACHSE:   On the one point, you may not understand.

1   You say you would hesitate to recommend to my public, the

2   electorate of the District, this certain expenditure.

3   Whether they are fools or general optomists or what they

4   are I don't know, but they are a democratic institution,

5   and they have been voting this thing now for some good many

6   years, more than we have been in this lawsuit, repeated and

7   repeated and repeated, overwhelming pronouncements of the

8   electorate that we go ahead.  Regardless of the recommenda-

9   tions, and who made them and how they came, from them or

10   from me -- I was in the position of director at one time,

11   but believe me there were many, many men before me and

12   many men since me in the policy making end, who have been

13   riding this same horse.  In fact -- I can't tell you right now,

14   but maybe Bill knows -- there was Fallbrook Public Utility

15   District v. Bradley going in the supreme court back about

16   1890.  I'm afraid I wasn't around then.

17      As far as the public being for spending the money is

18   concerned -- lots of what you say has a lot of merit, but

19   that one I don't think would carry much weight.

20      MR. CLARK:  I am not talking in terms of the public

21   sentiment.  That is what you have to weigh against the

22   desirability of this settlement.  You are their lawyer.  You

23   don't advise them on questions of policy, but you certainly

24   have to bring to their attention the fact that this is an

25   element in this settlement that they should carefully consider.

1    MR. SACHSE:  I am going to say what I said two months

2    or more ago,  I do not intend to slam the door.  There is

3    nothing so intended.  We want to listen.  But I don't think

4    we do the Court or the United States a kindness if we don't

5    put right out on the table what we think are the serious

6    roadblocks.  And then if there are ways to get around them

7    we will talk for a long time.  But if there is no way of

8    getting around them, we are saving time perhaps by knowing

9    it right away.  That is all I am saying.  If you think we

10   can get around some of these things, let's go ahead and talk.

11       THE COURT:  This keeps occurring to me.  If we revise

12   37, and if we charge the United States only with this

13   difference in exportation plus sewage return, then we would

14   be talking about 1500 acre feet instead of the 4,000 acre

15   feet the United States says it has a priority for.

16       MR. SACHSE:  No, we would not be.  They have to have

17   4,000 to take out.

18       THE COURT:  We know they have a basin with a big yield.

19   So they have the water to take out before they get other

20   water to put in.  It is just a question of which water they

21   use.

22       MR. SACHSE:  Are you suggesting, then, the United States

23   prior right be 1300 instead of --

24       THE COURT:  I am suggesting, aren't we realistically

25   talking about a claim now for 1500 acre feet rather than for

1   4,000 acre feet?

2       MR. CLARK:  I don't think so, for this reason.  That

3   would limit the United States to a continuation of conserva-

4   tion practices it might not be able to continue.

5       As far as Franz' point is concerned, I think by an

6   exchange we could resolve his point fairly easily.  In other

7   words, for the return water, say 2500 acre feet, we put in

8   the basin we exchange 2500 acre feet at the damsite.  So

9   that probably can be worked out quite easily, as far as I

10  can see.

11      But if the United States today agreed to cut its

12  exportation to 1500 acre feet and we got no substantial rain

13  for three or four years, and if we had to curtail the con-

14  servation practices -- putting these chemicals in that

15  water -- for fear of destroying the basin with the chemicals,

16  then we would drop below  in exportable water the amount that

17  we would need.

18      This is a purely practical consideration to Fallbrook,

19  but it is quite manifest to me.  The United States is quite a

20  fortunate thing for Fallbrook in terms of happenstance.

21  It has a tremendous piece of property down there.  It has a

22  property that could exercise, in other uses, in other

23  ownerships, tremendous riparian rights that would go a

24  tremendous way in fully defeating Fallbrook's appropriative

25  right.  But I think as a practical matter we can assume that

1   while the United States has that property it is not going to

2   irrigate 25,000 acres of land to grow crops down there.  It

3   is going to run a Marine Base, and I think we can assume, as

4   reasonable men, that it is not going to make any drastic

5   increase in its use.  I think we can assume it is not going

6   to let water waste.  When there is more water there, whether

7   it is part of its 4,000 acre feet exportation right or

8   whether it is exportable water, or whether it is part of its

9   60% water in the dam, I think you can assume -- I am not

10  representing that this is what the United States would do;

11  it doesn't have to do it under these proposals we make -- if

12  the water is there and the United States doesn't need it, I

13  think you can assume it would be sold at the same rate as the

14  other water.  It is entirely conceivable -- I don't make this

15  as a representation on which Fallbrook would in any rely --

16  that they would get not 40% in the particular year, but 90%

17  of surplus water caught by that dam because the United States

18  might not have need for it.  If there were a lot of water,

19  we might want to maintain a reservoir level.  But we are not

20  going to waste water.  We are not going to hold water in

21  excess of reasonable expectancy of use.

22       Ace, what do you think about these comments I have made?

23       COLONEL BOWEN:  I think they are good.  And they are

24  borne out by General Allen's remarks when I was back in

25  Washington -- he is the Quarter-Master General of the Marine

Corps -- that the Marine Corps contemplates no significant increase in water in the foreseeable future. Mr. Clark has pointed out, of course, that we can't guarantee that, but that is the intent of our people who are making the policy for the Marine Corps now.

MR. GIRARD:  Of course, there is one thing that I think the Navy would have to recognize.  Let us even assume that the Fallbrook Public Utility District was not on the stream with a permit and did not even contemplate building a dam and it were just the Marine Corps versus the other riparians upstream, and let us even assume that your argument is correct that you have a valid appropriative right of some nature -- I don't know whether you call it an appropriative right or anything -- to export 4,000 acre feet of water outside the watershed.  You couldn't at the same time, under the physical situation, even without Fallbrook, have an appropriative right to 4,000 acre feet of water plus a right to irrigate the riparian lands.  Because the simple fact is that if you irrigate your riparian lands you don't have any water to export -- there is not any water there.  In other words, if you exercised your riparian right to irrigate your riparian lands, you wouldn't have water physically available to export.

MR. CLARK:  I don't understand that.  What about that water that goes into the ocean every once in a while?

1   MR. GIRARD:  The point is that your present practice is

2   that you don't store surface water for your appropriative

3   right.  You are storing underground.

4   MR. CLARK:  You don't have a riparian right to store

5   surface water, do you?

6   MR. GIRARD:  No.  And your appropriative right, if you

7   have any, is based on the fact that you are putting water

8   underground, which isn't being used to satisfy your riparian

9   needs.  Now if you were exercising your riparian needs, your

10   basins would obviously go down and other water that went in

11   there would fill them up.  The amount of water you would

12   save by your spreading works, if you were exercising your

13   riparian right, would be nil.  What it would be doing is

14   just recharging waters which in a state of nature would go

15   into that ground.

16   MR. CLARK:  Not if it had gone into the ocean, as Ace

17   said yesterday it would have.

18   MR. GIRARD:  I doubt very much what would go into the

19   ocean if your basins are down.

20   MR. CLARK:  That is a question of fact.

21   MR. GIRARD:  Yes.  In other words, if your basins are

22   down, the water is going to soak into the ground.

23   MR. CLARK:  That is the way you use logic.  But our

24   experience shows, for instance -- we were talking about this

25   last night upstairs.  Ace, you were there.

COLONEL BOWEN:  Yes.

MR. CLARK:  The surface runoff from Temecula and Murrieta had remained about the same even during these dry years despite the fact that the basin had been pumped down. The conclusion you have to reach is that the water comes faster than the land can absorb it.

MR. GIRARD:  You have a basin of 10,000 acre feet safe yield.  Assume that.  The most water you can get out of that ground, out of that basin, whether you use it on riparian land or export it, is 10,000 acre feet, without wrecking your basin.

MR. CLARK:  You are talking about capacity.

MR. GIRARD:  The capacity of your basin is 10,000 acre feet.  So that is all you are going to get out of it whether you use it in or outside the watershed, unless you get some surface storage.  Now your riparian rights, if you irrigated all your riparian land, you would certainly use 10,000 acre feet of water.  You have that much irrigable riparian land. If you use 10,000 acre feet of water on your riparian land, physically you don't have the water to export -- unless you built a surface dam.

MR. CLARK:  That gets back to the same point.  If water were going into the ocean, you wouldn't have a recharged basin anyway.

MR. GIRARD:  Sure, it would be lost.

1    THE COURT:  This is arguing the ruling we made that the

2    Government had no appropriative right, and this is one of the

3    things we considered whether this was an appropriation when

4    water was taken out of the ground rather than caught in some

5    surface dam.  I don't know that it gets us anywhere.  I

6    wouldn't have made the ruling if I didn't think I was right.

7    Whether I am right or not, of course, somebody else can pass

8    on.

9         I just want to say to you that I looked into this thing

10   and wrote a memorandum about this so-called appropriative

11   right.  But not only do I think the findings on beds and

12   banks will stick as a factual matter.  But I think, secondly

13   -- and this is a matter into which we didn't go in great

14   detail, but I remember suggesting to Mr. Veeder and I think

15   to Mr. Girard -- that this taking of water out of the basin

16   was not an appropriation of surplus water; that the use of

17   that water would be a riparian use, and you don't appropriate

18   water when you are actually using it for riparian use.

19        But this all goes back to whether the Court was right

20   or wrong on this decision.

21        MR. SACHSE:  May I suggest that we go off the record

22   for a while to give the Reporter a chance to do this part.

23   I would like to have this transcript to take back.  What

24   would you think of having some of this done?

25        MR. CLARK:  That would be fine, if that would help

1    to expedite matters.

2        MR. SACHSE:  Yes.  Maybe I can take it home with me.

3        MR. CLARK:  I don't know that we need the rest of this

4    on the record.

5        MR. SACHSE:  No.

6        THE COURT:  All right.  Mr. Reporter, get busy on it.

7        (Further discussion off the record.)

8                    - - -

9        (At 3:05 p.m. of the same day, back on the record as

10   follows:)

11       THE COURT:  Mr. Veeder is to prepare an order directed

12   to the Department of Water Resources and/or the Regional

13   Pollution Control Boards to make available to Colonel Bowen,

14   who will supply copies, information as to new wells drilled

15   in parts of the watershed.

16       The case is continued to October 9, 1962, at 10:00 a.m.

17       Mr. Veeder is to prepare a form letter this afternoon to

18   go out to Counsel who have participated in the trial, calling

19   their attention to this date, a very important date, urging

20   them to be present -- insisting that they be present.  Lay

21   it on me.

22       Mr. Girard is to prepare some additional findings, an

23   amendment to Conclusion No. 27, and an amendment to

24   judgment provision 18 in Judgment No. 37.  He is also to

25   prepare a short one-page memorandum about meters, submitting

1       statutes and cases.

2           U. S. Study on Safe Yields, with the word "safe"

3       questioned by Mr. Kunkel, is to be ready by the end of

4       October.  Colonel Bowen's study on wells and irrigable acres,

5       his yardstick, etc.  By the way, you ought to have a page

6       in here on what your yardstick is.  We may take oral testimony

7       on it.  I think you ought to have a page as to what this

8       yardstick is that you propose in selecting wells.  Do you

9       understand?

10          COLONEL BOWEN:  Yes, sir.

11          THE COURT:  To have that revision ready by October 8 or

12      9.

13          Mr. Sachse is to go back and talk to the Board and see

14      if he can get an area of maneuverability, about which he can

15      then talk, in person or by telephone preferably, or by mail

16      to Mr. Clark.

17          What else have we agreed on?

18          MR. GIRARD:  I thought Franz was going to submit it in

19      writing and the two of them were going to get locked in a

20      room.

21          MR. SACHSE:  Wait until Colonel Bowen's report comes out

22      and then we will try to put it in writing.

23          MR. CLARK:  How long will that be?

24          MR. SACHSE:  Will it be ready by October 9?

25          COLONEL BOWEN:  It will be a long ways down the road.

MR. SACHSE:  We will be ready to make you at least a tentative proposal, even if it is not in black and white, by October 9.  I don't know why it can't be ready.  Dick says it can be ready.

THE COURT:  Also, what judgments do we consider on the 9th?

MR. GIRARD:  We have Rainbow already to sign, I think.

THE COURT:  Did you read it last night?

MR. VEEDER:  Yes, I did.  I think Franz and I had better talk about it.

THE COURT:  What is the other one?

MR. GIRARD:  I am sure there will be lengthy discussions on the Anza, Cahuilla, Wilson Creek findings.

MR. VEEDER:  And Aguanga.

MR. GIRARD:  I didn't draft Aguanga.

Anza-Cahuilla-Wilson Creek are all one findings.

And the other one I drafted up concerns solely the Indians in the Ramona, Cahuilla and Pachanga Indian Reservations, and I am sure there will be discussion on that.

MR. SACHSE:  And I have a draft form, your Honor, which I have been working on, not with Mr. Veeder but solely with Colonel Bowen and Commander Redd, this rewrite of De Luz Creek to make the Master's findings conform with our own.  I will try to have that in form so that Mr. Veeder can start talking about technicalities.

1    THE COURT:  Did we sign up Domenigoni Valley?

2    MR. SACHSE:  Yes.

3    THE COURT:  That is out of the way.

4    MR. SACHSE:  That is out of the way.

5    THE COURT:  This is about all we have on this, then.

6    MR. GIRARD:  That is all we have now.

7    Actually, we have findings to prepare on the River from

8    the Gorge to the Navy, less De Luz and Rainbow.

9    Then we have upstream on Temecula above Vail Dam.

10   And then we have the Aguanga Groundwater Basin.

11   MR. SACHSE:  The point is you will have Temecula

12   independent of Aguanga, I assume.

13   MR. GIRARD:  Yes.

14   MR. SACHSE:  So that will be above the Aguanga Ground

15   Water Area.

16   MR. GIRARD:  That is all.

17   MR. STAHLMAN:  And the Vail A series.  That is nothing.

18   THE COURT:  Are you working on this Vail A series?

19   You say it's nothing.  Let's get it submitted and out of the

20   way.

21   MR. GIRARD:  We will have it by tonight.

22   THE COURT:  Mr. Clark, if you had been in this case

23   when it started eleven years ago, it wouldn't be here today.

24   MR. CLARK:  You would have given up.

25   THE COURT:  In 1957 when I first took the case over and

20,416

inquired whether there was not some way to dispose of this matter, and with all respect to your good friend Bill Veeder, he told me flatly that this was not possible. I think we have made a lot of progress. I don't mean by that that everything is solved, but I think we have made a lot of progress.

I think I speak for everyone here our sincere thanks. We know how busy you are.

If you attorneys who have never been back to the Justice Department want to see the Assistant Attorney General, you generally get in there about five o'clock and sometimes before eight or eight-thirty to get to see him.

MR. CLARK: I can see anybody in town who comes to Washington. I would like very much to. You would not have to wait.

THE COURT: Here is one little case that you spent two days on out of the many thousand you have in your Department.

MR. SACHSE: I have one suggestion. I certainly don't think this should be on the agenda.

THE COURT: This is off the record.

(Further discussion off the record.)

(ADJOURNMENT TO OCTOBER 9, 1962, at 10:00 A.M.)

- - -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, ET AL,

Defendants.

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and

on September 24 and 25, 1962, the dates herein involved, was

a duly qualified, appointed and acting official reporter of

said Court;

That as such official reporter I did correctly report

in shorthand the proceedings had upon the hearing of this

cause on said dates; and that I did thereafter personally

transcribe my said notes and the within and foregoing forty

(40) pages of typewritten matter constitute a full, true

and correct transcript of my said notes.

WITNESS my hand at San Diego, California, this 25th

day of September, 1962.

*John Swader*

Official Reporter