# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.                                     No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, October 9, 1962

Pages:      20,418 to 20,568

# FILED

SEP 24 1963

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                        DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 : Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | No. 1247-SD-C. |
| FALLBROOK PUBLIC UTILITY ) DISTRICT, ET AL., ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tusday, October 9, 1962

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General. |
| | CDR. DONALD W. REDD. |
| For Defendant Cal Tech | O'MELVENY & MYERS, By Lorin Wright, Esq. |

For defendants County of    BERTRAM McLEES, JR.,
San Diego, et al.,          County Counsel.
                            By JOSEPH KASE, JR.,
                            Deputy County Counsel.

For defendants County      TILDEN BROOKS, ESQ.
of Riverside, et al.

For defendant Schloss       WALTER G. LINCOLN.
Estate

For defendants             BEST, BEST & KRIEGER,
Roripaugh, et al.          By ARTHUR LITTLEWORTH.

For defendant Gibbon       CLAYSON, ROTHROCK & STARK,
and Cottle                 By DONALD STARK.

For defendant
Annabelle Hines, et al.    WILLIAM DENNIS.

For Defendant              GEORGE STAHLMAN, ESQ.
Vail Company

For Defendant
Fallbrook Public           FRANZ R. SACHSE, ESQ.
Utility District

For Defendant State        FRED GIRARD, ESQ.,
of California              Deputy Attorney General.

1    San Diego, California, Tuesday, October 9, 1962.   10 A.M.

2

3        THE CLERK:  Two -- 1247-SD-C, United States vs. Fallbrook

4    Public Utility District, et al.,

5        THE COURT:  Well, we have present this morning Mr.

6    Lincoln, Mr. Dennis.

7        MR. WRIGHT:  I am Lorin Wright, of O'Melveny & Myers,

8    appearing for Cal Tech.

9        MR. McLEES:  I am Joseph Kase, Jr., Deputy County

10   Counsel, actually on behalf of the County of San Diego,

11   Fallbrook Union High School District, Fallbrook Elementary

12   School District De Luz School District, and the Vallecito

13   School District.

14       MR. BROOKS:  I am Tilden Brooks representing the County

15   of Riverside and various school districts up there.

16       THE COURT:  Mr. Lincoln, where do you stand on your

17   representation?  Whom do you represent now?

18       MR. LINCOLN:  In so far as this case is concerned, I

19   stand just where I always did.

20       THE COURT:  What happened to that proceeding between

21   you and Mrs. Bates?

22       MR. LINCOLN:  Unfortunately for the proceeding, Mrs.

23   Bates was murdered and in consequence I presume that your

24   Honor will make an order either dismissing the petition which

25   she raised or denying it.

1        While I am on my feet I might suggest to the Court that

2   in so far as the Schloss matters are concerned, that is, the

3   various proceedings in Riverside County, the Honorable

4   Supreme Court set all of those aside which we had been carry-

5   ing on for two years, your Honor will remember, and after

6   that was done a petition was filed by the Attorney General

7   suggesting that the trust has failed and consequently under

8   the will the property reverted to the State of California.

9   His Honor Judge Gavitt of Riverside County made an order by

10  which he recognized the fact that all of the Schloss property

11  was then vested in the State of California and various proceed-

12  ings were had, which have not yet been terminated, to make

13  that decree absolute in its various details.   All of the

14  personal property has been transferred to the State and I

15  presume that under the Court's order the real property has

16  been vested in the State-- that naturally followed.

17        THE COURT:  Did you represent anybody but the Schloss

18  Estate here?

19        MR. LINCOLN:  No, sir.

20        THE COURT:  Well, then, you are practically through

21  with your representation.  It would divolve upon Mr. Girard

22  to represent the Schloss property.

23        MR. GIRARD:  We are installing our wells now.

24        THE COURT:  Does that follow?  You have no other

25  client that you represent?

1    MR. LINCOLN:  That is all, sir.

2    THE COURT:  All right.

3    MR. LINCOLN:  I didn't know there was any other attorney

4    that was appearing for the Schlosses.

5    THE COURT:  Mrs. Bates was the only other one.

6    MR. LINCOLN:  She was only appearing here to get rid

7    of me, if she could.

8    THE COURT:  But in view of what has happened, you will

9    not have any more to do with the case, will you?

10   MR. LINCOLN:  No, sir.

11   THE COURT:  All right.

12   MR. LINCOLN:  I was ordered to appear here, of course,

13   and so I am here.

14   THE COURT:  Mr. Littleworth is here.

15   Mr. Stark is here.  Mr. Stark, whom do you represent?

16   MR. STARK:  Gibbon and Cottle.

17   THE COURT:  Mr. Dennis, whom are you representing now?

18   MR. DENNIS:  As far as I know, I represented Fred Jones

19   at the Master's hearings, but it was under an understanding

20   I was only representing him for that purpose.  I represent

21   two or three individuals in the Fallbrook area, such as

22   Annabelle Hines and Bill Huess, Magarian who had property,

23   Steinberg who had property in the Fallbrook area, which has

24   more or less been eliminated at the Master's hearings.

25   THE COURT:  You represent nobody in the Murrieta.

1    MR. DENNIS:   I represent nobody in the Murrieta, your

2  Honor.

3       THE COURT:   All right.

4       MR. VEEDER:   He does, your Honor-- if I may interpose--

5  he outlined his position in regard to the De Luz--

6       What is the name of it?

7       MR. DENNIS:   I will be glad to make a statement.

8       MR. VEEDER:   I wish you would.

9       MR. DENNIS:   Several months ago we formed the De Luz

10  Mutual Water Company and they made a filing with the State

11  of California on De Luz Creek.  Subsequent to that time

12  proceedings were instituted for the formation of a municipal

13  water district known as De Luz Heights Municipal Water

14  District.   The week that the election was successful the

15  Board of Directors were elected.   There was a tie between

16  Ralph Gordon and Donald Day.   The Board of Supervisors last

17  Tuesday declared the district had been formed, the election

18  was successful.   They set a week from today as the date to

19  determine who is to occupy position 4.   I assume that a

20  certificate was prepared and sent to that effect, or a

21  certified copy of the resolution, to the Secretary of State.

22  Mr. Veeder informs me that the Secretary of State has issued

23  this certificate and that the County Clerk filed it yesterday.

24  I have had no notification of that fact except through the

25  statement that Mr. Veeder made this morning.

1          It is the intention of the Municipal Water District,

2     if the State Water Rights Board consents, to acquire whatever

3     rights they had by the filing of the mutual water company, and

4     I think it will probably be two weeks before it is in a

5     position to hold the first meeting of the board of directors

6     of the Municipal Water District.  I represent the Mutual Water

7     Company and I have represented the proponents of the Municipal

8     Water District.  Whether or not I will continue to represent

9     the Municipal Water District after the first meeting of the

10    Board of Directors I cannot say.

11         THE COURT:  I will only say to you what I said to the

12    woman who came in and described the big reservoir that she

13    built somewhere up above Vail Dam.  I told her not to spend

14    too much money on it.  I merely say to you, don't spend too

15    much money on this water district.  I pass upon matters as

16    they come before me.  Presently there is nothing before me

17    about it.  But don't spend too much money on the water

18    district.

19         MR. DENNIS:  The water district, of course, has no

20    intention of spending any appreciable amount of money until

21    such time as the State Water Rights Board grants a permit to

22    them.  If they do not grant a permit, of course, no money

23    will be spent whatsoever.

24         THE COURT:  The gentleman next to you, from O'Melveny

25    & Myers-- what is the name again?

1   MR. WRIGHT:  Lorin Wright, your Honor.

2   THE COURT:  Where is this Cal Tech's property?

3   MR. WRIGHT:  Mt. Palomar, your Honor, the Observatory,

4   some 1400 acres, about half of which is in the Santa Margarita

5   River watershed and half in the San Luis Rey.

6   I received your letter and that is why I am here.

7   THE COURT:  We shouldn't have asked you to come in.  You

8   may stay around as long as you want to.  But I don't think

9   this is going to concern you very much.

10   Has this property been included yet in an interlocutory

11   judgment, Mr. Veeder?

12   MR. VEEDER:  Not yet, your Honor.  But I have talked to

13   Mr. Wright in the past and he has always been interested in

14   the litigation.

15   THE COURT:  A lot of basement complex up there, I

16   suppose.

17   MR. VEEDER:  Yes, there is.  But here is the source

18   of come of the water in Temecula Creek, and we thought he

19   should be here.

20   THE COURT:  We are glad to have you, Mr. Wright.  But

21   this judgment in which you will be included will probably

22   provide that you are pretty much cut off from this lawsuit,

23   except as to surface waters.  You still claim some right to

24   surface water.  But it is our intention to say that any water

25   you find under the ground you are just lucky to have.

1    MR. WRIGHT:  I understand that the only surface waters

2  up there are snow and rain when they occur.

3    THE COURT:  And when the surface water runs nobody wants

4  to use it.

5    MR. WRIGHT:  The water supply for the Observatory,

6  fortunately, is on the San Luis Rey side of the hill.

7    With your Honor's permission, I will leave the hearing

8  at the end of the day rather than being down here tomorrow.

9    THE COURT:  Thank you.

10    MR. WRIGHT:  Thank you.

11    THE COURT:  We had a rough agenda laid out here to talk

12  about today.  There is no particular reason that we should

13  proceed in this order, but as I had them in my notes, one

14  was the Unite States's study of the safe yield.  Mr. Kunkel

15  was going to prepare something on that.  That was to be,

16  however, by the end of this month, was it not?

17    MR. KUNKEL:  That is correct.

18    THE COURT:  Nothing today, then, would come up on that.

19    MR. KUNKEL:  We have nothing to offer.

20    MR. STAHLMAN:  Your Honor, in that connection, a matter

21  has come to my attention that gave me a little question. I

22  understand there has been a large number of sizable wells

23  recently installed in that area, and I wonder if Mr. Kunkel

24  has picked up those wells in his studies.  There are quite a

25  few.

1          THE COURT:  You have the current wells in your study,

2   Mr. Kunkel?

3          MR. KUNKEL:  We have picked up one or more.  I amnot

4   certain of the exact number.  But we have been working on that.

5   Although we have not made a systematic effort to pick up all

6   the new wells that have been drilled.

7          MR. STAHLMAN:  Is Colonel Bowen going to be here today?

8          MR. VEEDER:  I would assume so.  I have heard nothing

9   to the contrary.

10          MR. STAHLMAN:  We have apprised him of this, and I

11   think possibly he is making some inquiry.  I left a little

12   early, if your Honor will recall, last time.  You made some

13   orders.

14          THE COURT:  I didn't make the order. Mr. Veeder said it

15   was not necessary.

16          Have you been able to get from the State of California

17   the information on wells?  What is it-- permits for wells,

18   et cetera?

19          MR. KUNKEL:  I have not checked directly with the State

20   of California.  I have called the Regional Water Pollution

21   Control Board in Sacramento and discussed the matter with

22   them.  The law states that every well driller within thirty

23   days must file a written report with the Regional Water Pollu-

24   tion Control Board.  These well logs are identified by the

25   driller's description and filed and a copy is placed also on

1  file then with the California Department of Water Resources.

2      THE COURT:  Do you need any help to get them?  This is

3  the question,  I didn't find the order.  Mr. Veeder, did you

4  check further on this?

5      MR. VEEDER:  Yes, I have checked on it, your Honor.

6  Those are available without any order.  They are available

7  pursuant to statute to any agency that desires them.  I talked

8  to Mr. Kunkel about this as to the best way of getting the

9  data that is required.  He says the law has not been enforced

10  by the State of California.  These logs are not filed in many

11  instances.  I think the only proper procedure to follow is to

12  bring the canvass up to date, which was down to 1959.  A

13  canvass on the ground a physical canvass is the only possible

14  way of getting those.

15      THE COURT:  This is what you are going to do?

16      MR. VEEDER:  That is correct, your Honor.  We have a

17  man in the field.  Mr. Bader has been in the field checking

18  on them.  I haven't seen Colonel Bowen this morning.  I

19  haven't talked to him.

20      THE COURT:  Pass that, then.

21      Then I have on the list the matter of metering wells

22  and the proposal of some yardstick as to what wells should

23  be metered, and this was assigned to Colonel Bowen and he was

24  to report by yesterday.  Has he prepared anything on it?

25      MR. VEEDER:  He hasn't delivered anything to me yet.

1    I know he is investigating at the present time.

2         THE COURT:  Will he be here?

3         MR. VEEDER:  I have assumed so.  I haven't heard from

4    him.

5         THE COURT:  Also, I take it including some yardstick

6    on the matter of a proposal, at least, on what acreages can

7    be called susceptible of profitable irrigation.  That was

8    assigned to him also, was it not?

9         MR. VEEDER:  That work is going ahead.  Your Honor does

10   have the acreage originally submitted, which was 10,800

11   acres in the Murrieta Valley.  I have real hope that that

12   can be reduced.

13        Colonel Bowen is apparently coming in now.

14        THE COURT:  Then we had the matter of the revision of

15   Interlocutory Judgment No. 37.  Mr. Girard made some sug-

16   gestions, I made some countersuggestions.  Mr. Girard was

17   asked to write a memorandum on metering, that went out to

18   certain of counsel- Mr. Clark, Mr. Veeder, Mr. Sachse, Mr.

19   Stahlman.

20        You haven't seen it, Mr. Stark?

21        MR. GIRARD:  I sent one to Mr. Krieger, too.  It doesn't

22   show.

23        THE COURT:  Mr. Stark, would you like to look at this?

24        MR. STARK:  Yes, your Honor.

25        THE COURT: I will get a copy of it for you from the

1      Clerk.

2           Then we had the remaining interlocutories we were going

3      to work on.  How do you want to proceed?

4           MR. SACHSE:  How long will we be here this week, your

5      Honor?

6           THE COURT:  We have today and tomorrow, two or three

7      days, if necessary.

8           MR. SACHSE:  The reason I raise the question now is

9      that it will be impossible for me to be here Thursday morning

10     probably until midafternoon.  It would be my personal wish,

11     if it meets the Court's convenience and that of counsel, that

12     the Indian judgment, which concerns me the least, be put over

13     until then, and maybe Anza and Cahuila, until then, if we are

14     going to work that long, and get to the ones with which I am

15     directly concerned, mainly De Luz, Rainbow and the amendments

16     to No. 37-- get those done, if possible, today and tomorrow.

17          THE COURT:  Don't you think the first thing we ought to

18     take up is this proposal concerning the metering?

19          MR. GIRARD:  I think that is what most of the attorneys

20     who are here generally are most concerned with.

21          THE COURT:  May I state for the benefit of some of our

22     friends who come and go, who honor us with their presence

23     occasionally and do come in when invited by the Court-- I am

24     talking about Mr. Stark and Mr. Krieger, and I am being

25     facetious, because I know you keep up pretty well with what

1   is going on, but we wanted you to be here on this matter

2   particularly-- there have been going on discussions for a

3   physical solution of this case.  Whether or not this can be

4   accomplished is a debatable question.  Mr. Ramsey Clark has

5   taken a real interest in the matter.  He has been out on

6   several occasions and has demonstrated a learning on water

7   law that has amazed all of us.  He has really been the first

8   official above the rank of Mr. Veeder who has taken any real

9   interest in this case that I know of.

10          A rough outline of a physical solution, if worked out,

11   would be:

12          There would be no appeal.  We would proceed to enter

13   the rest of the interlocutory judgments and to enter a final

14   judgment.  There would be no appeal.  The judgment would

15   become final .

16          There would be proposed to Congress the construction

17   of a dam at De Luz (143,000 acre feet).

18          One of the big problems would be whether the United

19   States and Fallbrook could come to some agreement in connec-

20   tion with Fallbrook's use of water out of that dam.

21          And also as part of a physical solution would be the

22   starting out of securing of complete records on the parts of

23   this valley, this watershed that concerns us.  This would be,

24   roughly, the two ground water areas-- the Murrieta ground

25   water area and the Aguaga ground water area.  This would mean

1   that much of the area above, upstream from those ground water

2   areas, would not concern us, except probably the ranches

3   upstream from Vail Dam.

4        And the general proposal was to secure a Water Master,

5   who would start to gather data on what water is being ex-

6   tracted and used, and the inflow into these ground water areas.

7   At the present time all Vail water and all United States

8   water is metered.  We don't anticipate that anything can be

9   done immediately about lots of data that we need.

10       It has been proposed to the Court that Mr. Kunkel in

11  some way come up by rubbing his magic ball, can tell how much

12  water runs out of the Murrieta, and by telling how much water

13  runs out of it give us an opinion as to the safe yield.  This

14  I have to see.  I am skeptical about this type of thing.

15  Although Colonel Bowen apparently thinks also that at least

16  some rough figures can be so obtained.

17       At any rate, the proposal that certain categories of

18  wells be metered we are going to discuss today.  We don't

19  propose to require the metering of domestic wells or small

20  wells, but that the big wells be metered.  And as a rough

21  target date we would probably fix the first of the year--

22  not worry about the rest of this irrigation season.  It would

23  be a matter of establishing a yardstick as to when a well is

24  of such magnitude as to require metering.

25       There has been discussion of what kind of meters.  They

1    would have to pass some kind of standard test.

2        The memorandum that I talked about concerns the power

3    of the Court to order meters.

4        The area we would be particularly interested in would

5    be the Murrieta, where there has been a large amount of pump-

6    ing by various land owners, and the area upstream from Vail

7    Dam, which concern me, Mr. Stark, where there are some large

8    wells and, incidentally, where there are a couple of small

9    users who have really felt the pinch.  I think you are

10   familiar with some of that situation.

11       That is just in a nutshell what we are going to talk

12   about on metering.

13       Connected with this matter of gathering data is the

14   problem of what acreage can be profitably irrigated.  I may

15   be wrong, but I have this view on it.  The figures that were

16   put into the record on Colonel Bowen's surveys of irrigable

17   acreage probably in the Murrieta Valley will be also the

18   acreage that can be profitably irrigated, because much of

19   that ground is flat.  And I would imagine that this may be

20   true with the ranches upstream from the Vail Dam.  It may be

21   that the figure on irrigable acreage in the reports are very

22   close to the figure for profitable irrigation.  However, when

23   you get to the two big users, the Vail Company and the United

24   States-- and this is only the 'Court's view on it-- it will

25   be a considerably more difficult problem in that I think it

1    is conceded, to start with, that the figure for irrigable

2    acreage, for both the United States and Vail, is not necessarily

3    a figure for profitable irrigation. And so we have that

4    problem to talk about.

5         First of all, take meters, is this a fair outline of

6    what we have been talking about in general terms?

7         MR. VEEDER:  That is correct, your Honor, and I think

8    the areas designated by you are the proper areas of reference.

9         THE COURT:  How do you want to proceed on this?

10        MR. VEEDER:  I would like to hear from Mr. Littleworth.

11        THE COURT:  All right.  First, in general, is there

12   going to be any objection to this plan of gathering data and

13   centralizing it, eventually getting a Water Master, and bring-

14   ing some order generally to this watershed?

15        MR. LITTLEWORTH:  I think, as we discussed, your Honor,

16   in May, we all recognize that there was a great shortage of

17   data on which any kind of regulation of the whole stream

18   system could be based.  I think we all agreed that the Court

19   had the power to appoint a Water Master and this was probably

20   a good thing, and he would have to concern himself initially

21   with the gathering of a good deal of data.

22        So far as meters are concerned, my first concern about

23   it, from my client's point of view, is probably as to cost.

24   I haven't made any real investigation, but in asking around

25   among some of the people here who have some knowledge of it,

1    apparently, an irrigation meter would be in the neighborhood

2    of $500. So if a man has water wells you are asking him to

3    assume a fairly substantial cost. Most of the people that I

4    represent have at least one irrigation well, and many of them

5    two or three. So it is not just a trivial amount of money

6    we are talking about.

7        I am also concerned as to where the problem of meter-

8    ing fits into a settlement. My people obviously have a good

9    deal to gain by a settlement which would involve the con-

10   struction of a dam, because I think that might very largely

11   solve the problem physically. If there is to be a settlement,

12   that is one thing. If we are to be ordered to meter and

13   there turns out not to be a settlement, that is quite a

14   different thing.

15       I haven't really researched the question of the Court's

16   power to order meters. I don't offhand know of any case

17   which specifically holds that the Court does have such power,

18   although obviously the Court has pretty broad powers in water

19   cases and the Court may have power absent an agreement.

20       At the last hearing in May, my recollection was that

21   Colonel Bowen then stated that Lake O'Neill was filled and

22   the ground water basins under the Pendleton area were filled

23   and there was at that time no shortage of water.

24       From my point of view, I am looking, then, for the most

25   economical way to gather data, which I recognize ultimately

1  must be gathered.   I wonder whether, for present purposes,

2  you could estimate the water by the amount of crops that are

3  irrigated.   We know pretty much what the water duty is on

4  alfalfa.   I don't think there are too many crops that are grown

5  in that area.

6        There are other possibilities of making some fairly

7  close estimates of water usage without the financial burden

8  on the individual of maybe upwards of a thousand dollars a

9  person.   And of course, if we go to meters, I wonder about

10  the possibility of spreading the cost in some way.   Since

11  this is to be, in some measure, for the protection of every-

12  one in the watershed, if there is not some way to spread the

13  cost.

14        Those are just my offhand thoughts on it, your Honor.

15        THE COURT:   This is like a Quaker meeting now.   If the

16  spirit moves you and you have something to contribute, speak

17  up.

18        MR. VEEDER:   Were you speaking to everyone, your Honor?

19        MR. STAHLMAN:   Quaker number one.

20        MR. VEEDER:   Your Honor, from our standpoint, I would

21  like to point out to Mr. Littleworth that the United States

22  takes the position that it does not need to wait until there

23  is a complete crisis in which we are shut off from water in

24  the Murrieta-Temecula groundwater area, and for that reason

25  we feel that it is appropriate at this time to undertake

1    some kind or type of regulation in that upper area, starting

2    with meters, to find out who is using water and where.

3         We feel that if the United States does proceed with the

4    construction of De Luz Dam, that everyone in the entire water-

5    shed will be greatly benefited by it.  We look at it this way,

6    that if the national government impounds water and is able

7    to use water from the Lake that will be created by De Luz

8    Dam, there will be an attendant reduction of claims upstream

9    by the United States, and that of course will benefit every-

10   one.  At the same time we feel, as I said before, that there

11   must be some kind and type of control in the upper valley,

12   or in the ultimate we are threatened presently, in our view,

13   and could be irreparably damaged by the upstream users,

14   which are of course increasing.  We understand new wells

15   have gone in up there.  Perhaps you have some information

16   on the new wells.  I don't have.

17        MR. LITTLEWORTH:  Only, as I think has been mentioned

18   here, there apparently are new wells being drilled.  I think

19   many of the ranches which were owned by two or three

20   generations of families in that area have changed hands to

21   Los Angeles and other investors and there apparently are new

22   wells being drilled in the Murrieta Valley.

23        I think we need to come to grips with one other ques-

24   tion, and that is whether data which my ultimately lead to

25   some regulation is to be regulation for the benefit of those

1    in the Murrieta Valley or is to be for the benefit of the

2    United States or perhaps both.  If the judgment stands that

3    the United States's rights would be on an equal priority with

4    the riparians and overlying users upstream-- that is, its

5    riparian usage within the watershed down there-- I don't know

6    whether we would ever get to the point where there would have

7    to be regulation of the upstream users to provide that amount

8    of water just to meet Camp Pendleton's needs.  If you are

9    talking about all of Camp Pendleton's needs, the needs of

10   the Government both within and without the watershed, then

11   you have a different question, and then you get into the legal

12   problem of trying to subordinate upstream riparians and

13   overlying users to a far junior appropriator.  This is why I

14   say whether or not there is to be a settlement is of a great

15   deal of importance here.  If we are put to the expense of

16   metering on the assumption that we are going to control

17   pumping upstream to help the Government downstream, and you

18   are really talking about the full Government use of water and

19   not what it may be entitled to as a riparian, that is quite a

20   different question than whether we ar considering this within

21   the framework of an assurance that the dam will be built and

22   that the case will be settled.

23       THE COURT:  Of course, this settlement talk is very

24   difficult, because there are so many unknown quantities.  One

25   of those very important factors is convincing Congress that a

1    dam should be constructed.  There have been all sorts of

2    claims made in this case.  The Government takes the view that

3    there has been excessive use in the Murrieta.  There has been

4    no showing yet, that I recall, that any one owner in the

5    Murrieta has been injured by another owner adjacent thereto.

6    But the unknown quantity is, what is the yield of this ground

7    water basin?  How long can this type of pumping go on without

8    someone being badly hurt?  And until we have data on the safe

9    yield in the Murrieta Basin you can't talk intelligently

10   about the matter.

11        Going back to the first factor, I would think that the

12   Congress would be much more inclined to look favorably upon

13   a bill if there were in progress an orderly program and an

14   assurance that within some reasonable time we would know

15   the yield of these basins and we would know what was a proper

16   use in the Murrieta, for instance, and what was not a proper

17   use.  And if the matter is left up in the air, this could well

18   be a ground for some congressman to say, "This is no time for

19   a dam until we find these facts."

20        That is must my view on that score.

21        Certainly it is not to be done solely for the benefit

se regardless of the situation of the United States.

     Mr. Stark.

1    MR. STARK:  First of all, I am reluctant in the first

2   half hour, after some year of absence, to say anything be-

3   cause of a lack of current orientation as to how we arrived

4   where we are.  But at the same time I feel that it is necessary

5   to indicate at least what appears to me to be the interest of

6   my clients, the Gibbons and Cottles, as water users above

7   Vail Dam.

8        First of all, it has been the position of our office

9   from the outset that this case need not have and should not

10  have proceeded as a plenary water suit including all water

11  users; that neither the Ninth Circuit nor the interests of

12  justice required the inclusion of all the small water users

13  who have been included.  But we have proceeded to this point

14  and are in the eleventh year of the litigation, and it seems

15  to me now in talking about this physical solution that we

16  are not talking about it in the normal sense of continuing

17  jurisdiction where someone establishes a case and there may

18  be problems that require continuing jurisdiction and supervision

19  by the Court.  But I wonder if we aren't more nearly in the

20  situation where, after ten to eleven years, the Government

21  has come up without the necessary factual proof as to safe

22  yield and as to water supply on which to predicate its case

23  and now rather than have the case collapse, as the normal case

24  would, for failure of proof on the part of the plaintiff,

25  isn't the Government saying, "We have a case.  Let's keep it

1    open and let's by the Court's order begin to collect the

2    information that the Government hasn't been able to accumulate

3    during this eleven-year period." And as to the small

4    individual water user who, through the procedures that the

5    court has done its best to keep everyone advised and we have

6    been able to come in and out of the case more or less at

7    will, that has not been entirely satisfactory from a defense

8    standpoint but has been absolutely necessary from an economic

9    standpoint.  But now after eleven years and a considerable

10   expenditure, albeit a spotty type of defense, if we are to

11   assert a continuing jurisdiction and go to a physical solution

12   requiring metering and continuing studies, it seems to me

13   then the Court is placing itself in the position not of

14   determining an adversary proceeding but in the position of

15   legislating and determining what should, in the public good,

16   be done with this watershed.

17        As I say, I am reluctant because I have not attended

18   all of the Government's case and so some of my conclusions

19   may not be entirely correct in this regard.  But it is my

20   impression that as of the present time there is not sufficient

21   proof in the record to lead to any affirmative relief by way

22   of apportionment of waters; that the entire suit, notwith-

23   standing ten years of prosecution, is still premature in a

24   factual sense, and I question whether the suit should be kept

25   open in order for the evidence to be accumulated or whether

1    the suit itself could not well be abandoned and dismissed and

2    the accumulation of evidence undertaken by means available

3    to the Government, available through the Legislature of the

4    State of California.   This type of information has been

5    accumulated in all Southern California counties, I believe,

6    except San Diego County.   There is no particular reason that

7    it should not be accumulated through normal means in San Diego

8    County.

9         But I question whether this action is necessarily the

10   vehicle for making a study of the Santa Margarita River, or

11   whether this isn't and shouldn't properly be considered

12   simply a proceeding in which the plaintiff proceeded ahead

13   of his evidence and has failed in the aggregate to establish

14   the case.

15        And as to the particular clients that I represent, my

16   only feeling is that they have been involved and have had

17   expenditure over an eleven-year period.   I would hate to see

18   them become involved in an open and continuing discussion

19   which might involve the accumulation of data for a ten-year

20   period at some expense and the necessity of reviewing and

21   then a reopening of the proceeding as a continuance of an

22   action started in 1951.

23        As I say, I am reluctant to jump in with both feet at

24   this point because I haven't even had the opportunity of a

25   day or so here.   But at this point this would be my feeling

1    on this matter of continuing jurisdiction and physical solution

2    in this posture of the case, as I understand it.

3        MR. VEEDER:   I am extremely interested in what Mr. Stark

4    has said by reason of the question whether the United States

5    is entitled to any relief on the basis of the record.   I think

6    if Mr. Stark would review the record he would find that there

7    has been a prolonged period in which the United States has

8    not utilized the quantities of water concerning which it

9    offered proof.   We put in showing that we actually need down

10   in the basin 12,500 acre feet of water a year.   The need was

11   put in by the Marine Corps and I am sure that they want to

12   claim the water they think they absolutely should have.   We

13   have reduced our claims in many ways, including bringing back

14   sewage effluent.   We have used every kind and type of con-

15   servation methods possible.   We could have gone ahead, of

16   course, and proceeded beyond the yield and had an injunctive

17   proceeding all up and down the river.

18       We think there is an abundance of evidence, therefore,

19   to show that the United States of America has demonstrated

20   beyond doubt the need for an adjudication and the need for

21   the purpose of demonstrating the respective rights of the

22   parties so that in the future we can be protected.

23       We have, of course, shown that the Fallbrook Public

24   Utility District has made claims of 30,000 acre feet a year,

25   and that the construction of a dam by the Fallbrook Public

20,444

1    Utility District would necessarily invade our rights.

2        To come down to the specific reference to the Aguanga

3    groundwater area, I think Mr. Stahlman is probably in a better

4    position to talk about that than I.   There is no question in

5    my mind, based upon the record in regard to Mr. Stark's client--

6    Knox, Oviatt, Stardust and the rest-- that they have used

7    water far beyond the capacity of the Aguanga ground water

8    area.   I haven't checked these matters out, but I understand

9    from Mr. Wilkinson that only 11,000 acre feet went into the

10    Vail Dam this year.

11        They say that perhaps our contest is not with Gibbon

12    and Cottle; that it is a contest between Vail and Gibbon and

13    Cottle.   I don't subscribe to that.   I think this is a water-

14    shed.   I think it is a total matter.   We are the last people

15    on the stream, and when there is an overdraft in the Aguanga

16    ground water area, I think it becomes extremely important to

17    us to protect, not only at the present time but in the future,

18    against what I think have been overdrafts in the Aguanga, in

19    which Gibbon and Cottle are located.   I think the best

20    evidence of that fact-- I have forgotten the depths of the

21    wells in the area, and Mr. O'Malley is not here-- but your

22    Honor will recall when they were putting in the Oviatt

23    evidence there was a series of wells.   I think they started

24    at a hundred feet.   As they went on down, I think at 200,

25    250 feet, there still was not water.   So we have taken the

1   position, and we will continue to take the position, (1) We

2   are faced with irreparable damage now by overdrafts upstream.

3        We believe the Court of Appeals for the Ninth Circuit,

4   when they referred the matter back here, put a mandate on

5   this Court to join everybody.  There is no question about

6   that.  They said every land owner and everyone using water

7   inside or outside the watershed must be before the Court.

8   Whether that mandate was too broad or not is not for me to

9   say.  That is the way the case had to be tried, and that is

10  the way it was tried.

11      THE COURT:  Well, Mr. Veeder, you know, these generali-

12  ties make a nice speech for someone to read, and if we took

13  at face value everything you have said there would be no

14  problem at all.  But you gloss the thing over.  With some

15  of the things you say I agree.  With other things I don't

16  agree.  But just to take a wide brush-- first of all, just

17  take one thing, I don't think there is any evidence in the

18  record that shows presently an overdraft in the Aguanga ground

19  water area.  Maybe there is.  But the essential thing that we

20  do know from the record is that we don't have any information.

21  We don't know how much is being pumped by various people.

22  We don't know how much water is going into it.  They are

23  going to tell us by how much water runs out what the safe

24  yield is.  Of that I have to be convinced.

25      Secondly, taking at random some of the things you have

1    talked about, when I got this case in 1957 one of the first

2    things I said was, "Well, why can't this be disposed of in

3    some way?" Your answer was, "Well, we have to have the rights

4    of the United States adjudicated-- find out what the rights

5    of the United States are." Well, at various times I have

6    pointed out that when we got all through we were going to

7    find that certain people are riparian and have rights on the

8    stream-- we knew that beforehand-- and that is about all that

9    would happen in the case, unless we got down to the matter

10   of collecting data and finding out what we had here. And then

11   you, yourself, at various times in the record pointed out that

12   you were not going to ask a physical solution.

        MR. VEEDER:  I don't believe I ever said we were not

14   going to ask for a physical solution. I said a basinwide

15   apportionment, your Honor. But I always insisted that we

16   had to have some regulation on the River.

        THE COURT: Well, counsel, I think we are familiar with

18   the representations that you have made. In fact, Mr. Sachse

19   expressly stated that he was not going to offer any proof as

20   to some of his clients as to the irrigable acreage for the

21   reason that this issue was not involved. This doesn't mean

22   that maybe we shouldn't go into these things now. But with a

23   wide brush to paint this as you do bothers me. Maybe the

24   situation changes. We are talking about a physical solution.

25   We are hopeful that a dam will be built. We are trying to do

1   what we can to assist in that respect. Whether we did it in the

2   past, maybe it is something we should do now.

3        I don't mean to be antagonistic to you.  I would like

4   to know what other counsel think about this position you take.

5   What is your view on this matter?

6        MR. GIRARD:  Your Honor, in the first place, I don't

7   think there is the slightest evidence in this record that the

8   United States has been damaged up to date by any upstream

9   user.  I think the evidence conclusively shows that they

10  haven't been damaged by any upstream user.  That doesn't mean,

11  necessarily, that some type of factual gathering procedure

12  should not be initiated now.  I think in a water-short area

13  the Court does not necessarily have to wait until the basins

14  are drawn below their safe yield before it determines what the

15  safe yield is.  I think you can take reasonable methods now

16  to gather facts.

17       However, in my view, the gathering of facts upstream

18  from Temecula Gorge will be primarily for the benefit of

19  the people who are in that area.  I don't feel the physical

20  solution is dependent one way or the other on the upstream

21  overlying or riparian uses of ground water.  I doubt very

22  much if the surface reservoir at De Luz, which is what the

23  physical solution hinges on, will be affected too greatly

24  by the riparian upstream uses of ground water.  I think the

25  factual information which will have to be gathered, which is

1    contemplated to be gathered, will serve the benefit of

2    protecting the people themselves in the upstream areas.

3        What type of factual information you use or your are

4    going to obtain, or how you obtain it-- by meters or by some

5    other method-- I am not qualified to say.  I agree with Mr.

6    Littleworth that the cheapest method of gathering information

7    should be followed.  I defer to Colonel Bowen whether meters

8    are the only way to gather that factual information.

9        I think there is authority for the Court at this stage

10   to install meters.  But I don't think the installation of

11   meters should be made on the basis that if these meters aren't

12   installed the United States is going to be irreparably dam-

13   aged, because I think the evidence is overwhelming, conclusive

14   and uncontradicted that it is not the United States that needs

15   these meters.  It is the people upstream.

16       MR. LITTLEWORTH:  Mr. Veeder said the United States needs

17   approximately 12,000 acre-feet of water a year.  I think

18   sometimes we neglect to distinguish between what the United

19   States needs and what it has a right to have.  At the present

20   time the proposed interlocutory judgment--

21       MR. SACHSE:  It is already signed.

22       MR. LITTLEWORTH:  --states that the United States has

23   certain riparian rights.  Riparian rights are the only rights

24   on which it stands on an equal basis with all of the other

25   riparians and overlying users upstream, and most of its

1   12,000 acre-foot need is water used outside the watershed and

2   not a proper riparian use.  So when we talk about regulating

3   anybody upstream, now or in the future, for the benefit of

4   the United States, what you have got to say is that the

5   United States's riparian need is not going to be met.  All

6   appropriative uses will first be cut off in order to make up

7   water available for proper riparian use, and then there will

8   still have to be some futher regulation.  We are so far

9   from that point that I want to make sure (1) Whether this

10  is really necessary and (2) where it tends to lead, because

11  I think we can lose the focus of the case.  Certainly there

12  can be no regulation of riparians, at least for the benefit

13  of the United States, until all of the appropriative use have

14  ceased and the United States can still then show some water

15  shortage as to its proper riparian uses, and that the other

16  people are exceeding their proper share of the water.

17      MR. GIRARD:  I didn't mean to say and to imply that I

18  don't think meters are necessary.  That may well be.  But I

19  don't think they are necessary for the benefit of the United

20  States.

21      THE COURT:  I understand you had some figures, Mr.

22  Veeder, or some rough computation where you have computed the

23  irrigable acreages in the Murrieta and Vail and the United

24  States.

25      MR. VEEDER:  That is correct, we did have.

1    THE COURT:  They have never been exhibited to counsel.

2  In what form are they-- rough computations?

3    MR. VEEDER:  The computations that were delivered to me

4  and a copy of which were delivered to you--

5    THE COURT:  I never received them.

6    MR. VEEDER:  Didn't you get those?

7    THE COURT:  I know they were kicking around.  I have

8  never seen them.

9    MR. VEEDER:  The basic data that we received showed

10  approximately 10,800 acres in the Murrieta Valley where there

11  were wells which we considered to be making a draft upon the

12  waters of the Santa Margarita River.  That 10,800 acres is

13  in the Murrieta.  The breakdown of the Vail Company ran

14  substantially this way.  There are about 9,500 acres of the

15  Temecula Grant which was riparian, in our thought, to the

16  main stem of the Santa Margarita River and to Temecula and

17  Murrieta.  Then there was in the Pauba Grant 18,500 acres,

18  if I recall.  And I can't recall what the Little Temecula

19  acreage was.

20    MR. GIRARD:  Are we just talking about irrigable acreage,

21  Bill?

22    MR. VEEDER:  Irrigable acreage.

23    There had been no calculation of irrigable acreage above

24  Vail Dam.  However, the findings have not been completed on

25  the Aguanga ground water area.  The areas that we were

interested in above the Vail Dam are as follows:  Gibbon and

1    Cottle-- and the evidence is in on those, your Honor made

2    reference to the reservoir that Mrs. Gibbon had built up there--

3    the Sunny Brook Ranch, which I believe is owned by Mr. Knox,

4    the Allen property (Mr. Sachse represented Mr. Allen), and

5    then the Oviatt Rancho Ramona.   Those are the areas in which

6    we have been specifically interested.

7          THE COURT:   Oviatt also?

8          MR. VEEDER: That is right, Oviatt.   That is the Rancho

9    Ramona.

10         THE COURT:   Who has the Stardust?

11         MR. SACHSE:   I have.   That is Allen.

12         MR. VEEDER: That is Allen.

13         THE COURT:  Are all these ranchos within the Aguanga

14   ground water area?

15         MR. VEEDER:   Yes, they are, your Honor.

16         THE COURT:   All within that area.

17         MR. VEEDER:   That ones I just made reference to, yes,

18   and they are within the area which you have designated.   The

19   confluence of Wilson Creek and Temecula Creek within the

20   high-water area.   Vail Dam is in general the area of the ground

21   water area.   Now those properties in there are the ones that

22   we have stated that, in our view, have an immediate impact

23   upon runoff reaching the United States and which, in our view,

24   do constitute a threat to the downstream runoff in the future.

25         I think Mr. Girard was right when he made the statement

1   that it is not necessary to sit by and wait until disaster

2   occurs; that this Court has jurisdiction to take the whole

3   matter under continuing jurisdiction and at this time to

4   enter a decree for the purpose, in our view, of apportioning

5   among these various areas the quantities of water that can

6   reasonably be expected to be the yield of these areas as they

7   relate to practical and profitable irrigation.   I believe

8   your Honor has that power at this time.

9        We think, from our standpoint, that the construction

10  of De Luz Dam down there is certainly a quid pro quo for

11  everyone on the stream to take into consideration their future

12  development and benefits to them-- not only Fallbrook.   I

13  think Fallbrook stands to benefit from that dam.   I think

14  certainly Vail Company would benefit from it.   I don't know

15  what Mr. Stahlman's feeling is in regard to the uses above

16  Vail Dam-- whether he thinks they are encroaching upon Vail's

17  rights or not.   That is not for us to say.

18       MR. LITTLEWORTH:   Mr. Veeder again says that he thinks

19  this Court has power to make an apportionment at the present

20  time in certain areas.   I will say this once again.   I don't

21  believe the Court has the power to make an apportionment

22  until the United States shows that it is suffering a shortage

23  in the use of water for its proper riparian uses.   It is the

24  only party in this whole lawsuit that is asking for an

25  apportionment.   No one else is doing so.   In order for the

1    United States to ask for an apportionment it has got to show

2    a shortage.

3        MR. VEEDER:  Again I repeat if we haven't demonstrated

4    shortage down on the enclave it is impossible to conceive it.

5        MR. LITTLEWORTH:  Shortage within the area of your

6    rights; not within the area of your needs.

7        MR. VEEDER: We are certainly showing that had we used

8    all the water we actually needed, had we applied the water

9    we think we are entitled to, had Colonel Bowen not gone through

10   a very long process of conservation, I think we would be in

11   the position right now of being short.  The problem of salt

12   water intrusion with which we were confronted we have cor-

13   rected.  We don't think the law is of the nature that we

14   would be required first to pull our basins down to the point

15   of destruction and then ask the Court for a basinwide

16   adjudication.  I don't believe that is the law.

17       I say, moreover, that certainly the United States is

18   entitled to have its rights quieted as against everybody in

19   the watershed.  Certainly that is the ruling of the Ninth

20   Circuit in this very case.

21       THE COURT:  What do you mean by "have our rights

22   quieted against everybody"?

23       MR. VEEDER: To the extent of the claims upstream we are

24   certainly entitled to have them chronicled.

25       THE COURT:  What do you mean by quieted?  What kind of

1   decree?  A decree specifying your right proportionately to

2   other people on the stream?

3        MR. VEEDER:  I think that is right.  I think we can

4   demonstrate our irrigable acreages.  I think you will have a

5   decree showing the irrigable acreage of the other claimants.

6        THE COURT:  That is only part of the story.

7        MR. VEEDER:  Yes.

8        THE COURT:  You don't contend that just on the basis

9   of irrigable acreage the Court can make some decree quieting

10   title to the United States against upstream owners of a

11   certain portion of water.  What water?

12        MR. VEEDER:  I think to the extent that we have demon-

13   strated, as I think we have, an invasion of our rights, you

14   can certainly enter a decree regulating the uses upstream.

15   That is all I have ever asked of your Honor.  I can show,

16   and we have shown, in our view, that from the standpoint of

17   the United States Vail Company is using more water than it is

18   entitled to under the circumstances that prevail.  As I say,

19   had we not gone into these very extensive programs of

20   conservation, of salvage of water, of bringing water back

21   into the watershed, all these acts we have done, we would be

22   in a desperate plight right at this moment.  If the law is

23   such that we are to be penalized by reason of our conservation

24   practices, I think we should have a declaration to that

25   effect, too.  They say, "Oh, you haven't been hurt."  You

1   haven't been hurt because you have been using sewage effluent.

2   I am not going to even concede that we haven't been hurt.   But

3   certainly if we had not brought sewage effluent back into the

4   basin, if we had not salvaged the water that came down to us,

5   we would certainly be in a desperate plight.   If your Honor

6   thinks the rule of law in the State of California is that we

7   have to wait and demonstrate that our basins are ruined by the

8   sea, then perhaps under those circumstances what Mr.

9   Littleworth is saying is correct.

10   MR. GIRARD:   I am going to comment on that very briefly.

11   That is the most ridiculous general statement that looks all

12   right in the record, that Mr. Clark will be thrilled when he

13   reads it.   It's just garbage.

14   THE COURT:   That is what I am talking about.   I took

15   after Mr. Veeder on his first one.   Here is a second one along

16   the same line.

17   How can you make a decree quieting title to any quantum

18   or proportion of water until you have the facts we need?   I

19   am perfectly willing, I have indicated, to proceed on the basis

20   of securing these facts so as eventually to be in a position

21   to have something in the record upon which we could, if neces-

22   sary, act, either on an application of Vail as to people

23   upstream or on an application of somebody in the Murrieta,

24   or on the application of the United States, if they can make

25   a showing.   But we haven't got it now.   I would like to have

1   you tell me how you would word a decree.  Suppose you had a
2   figure for irrigable acreage in the Murrieta and you had a
3   figure for irrigable acreage of Vail Company.  How could you
4   word a decree that would quiet your title to any proportion of
5   water other than to say you have a riparian right correlative
6   with other parties?

7       MR. VEEDER:  Your Honor, I can draw it very readily
8   right on the precedent before your Honor on that point, and
9   to me it is a very fine decree and one that I have always
10  insisted be enforced.  It is the stipulated judgment.  Your
11  Honor said he is not going to enforce it.

12      THE COURT:  Mr. Veeder, Mr. Clark himself practically
13  conceded that he thought you were wrong in your position on
14  your stipulated judgment.

15      MR. VEEDER:  I have never heard Mr. Clark say that.

16      THE COURT:  You may take it up on appeal.  But he
17  concedes, he said right here in the courtroom that you
18  couldn't build a decree in this watershed around that stipulated
19  judgment.

20      MR. VEEDER:  I don't know that he ever said that.

21      THE COURT:  That is the inference I got.

22      MR. VEEDER:  But let me go on, on this proposition.
23  There can be no doubt in the case of Rancho Santa Margarita
24  vs. Vail the Supreme Court of the State of California made
25  the rulings from which emanated the stipulated judgment in

1  which there was apportioned to the Vail Company 33-1/3% of

2  the total yield of the stream and to the United States or its

3  predecessor in interest 66-2/3%.  You ask me, is it possible?

4  It certainly is possible.  And there it is demonstrated

5  beyond doubt.

6  THE COURT:  Well--

7  MR. VEEDER:  Let me proceed, your Honor.  Your Honor

8  said you are not going to enforce the stipulated judgment.

9  I think your Honor is in error.

10  But there is certainly no question, in my view, that

11  if your Honor would proceed on a percentage allocation to the

12  Murrieta based upon its acreage there, based upon the acreage

13  of Vail Company property, and based upon our acreage, you

14  would have what I have called, and will continue to call, a

15  decree quieting our title in and to the rights in the Santa

16  Margarita River.  If there is a use beyond that particular

17  allocation to these various areas, then we would be in the

18  status of being able with a motion to show cause, we could

19  bring our injunctive action.

20  Now quiet title is nothing new, your Honor.  In this

21  State Katz vs. Walkinshaw, I think, is a primary example

22  where a man was able to go in and obtain a quiet-title decree

23  in regard to rights to the use of water which he at that time

24  was not even exercising.  But he was entitled to be protected.

25  He was entitled, under the decree that was there entered,

1   to be protected in regard to the extent and nature of his

2   rights.

3   THE COURT:  I am not going to embarrass you by asking

4   you to do it now, but over the noon hour, in just a couple

5   of paragraph, just tell me how you would word such a decree

6   on this present record.  Percentage of what?

7   MR. VEEDER:  Percentage of total runoff, your Honor.

8   MR. GIRARD:  How could you quiet title to something that

9   is always fluctuating?

10   MR. VEEDER:  Very simply, on the supply.  You take a

11   percentage of the available supply.

12   THE COURT:  Over the noon hour knock out a couple of

13   paragraphs how you would handle this matter.  Assume for

14   argument that there is 11,000 acres of irrigable ground in

15   Murrieta.  Assume these figures you gave me for the Vail

16   Company.  And what figure do you take for irrigable ground

17   in the enclave?

18   MR. VEEDER:  13,800.

19   THE COURT:  Let's assume 13,800 acres for the enclave--

20   to make it easy, just assume 14,000, 11,000 in the Murrieta,

21   and the Vail figures-- what do you have, 9,500?

22   MR. VEEDER:  I will give you the specific numbers we

23   have used.

24   THE COURT:  Just show me how you would enter a decree

25   where you have such factors as the runoff from Sandia, Rainbow,

1 De Luz, that come into the watershed below the Murrieta, where

2 we don't know the yield of the Murrieta Basin, where we don't

3 know whether when there are pumping holes existing in dry

4 weather that is an overdraft that is going to hurt the basin

5 or is not.  Just write up three or four paragraphs as to how

6 you would do that.

7  MR. VEEDER:  I'll do that, your Honor.

8  I want to straighten up some numbers I gave you in the

9 first instance.

10  THE COURT:  All right.

11  MR. VEEDER:  On the Vail-Pauba, we have in the record

12 the irrigable acreage of 18,500.

13  On Vail-Temecula Grant we have 9,600.

14  On the Murrieta irrigable acreage we have 10,600.  I

15 think that is high.

16  THE COURT:  What do you have on the Temecula Grant?

17  MR. VEEDER:  The Temecula Grant is 9,600.

18  THE COURT:  Does that include the Little Temecula, too?

19  MR. VEEDER:  I think it does, your Honor, yes.  I will

20 check that out.

21  In regard to the United States, we have used 13,800 as

22 the irrigable acreage within the enclave.

23  MR. SACHSE:  Within the enclave, or within the watershed?

24  MR. VEEDER:  Within the watershed.  Of course, Franz,

25 the riparian acres would necessarily be within the watershed.

THE COURT:  Let us assume for argument that these are all acres that are susceptible of profitable irrigation.  You draw up, and have copies for Mr. Sachse, Mr. Girard, Mr. Stahlman, Mr. Stark and Mr. Littleworth, how you would draw just a little simple decree.

MR. VEEDER:  Yes, showing the percentages that I think they would be entitled to participate.

THE COURT:  And show me the percentages of what.

MR. GIRARD:  In amounts of water.

THE COURT:  Of what?

MR. VEEDER:  Of the runoff of the stream.

THE COURT:  You are just talking about runoff.  You are not talking about ground water?

MR. VEEDER:  Your Honor, our position is, as we have stated in the past in this matter.  We believe that necessarily there be some assumptions, but basically we can arrive at what we would consider to be the safe annual  yield or the yield, rather, of Murrieta Creek.  We believe that it is a sound hydrologic premise that basically the amount of water that has drained out of Murrieta Basin in the state of nature is indicative of the quantity of water that comes in.  That is an established hydrologic principle.  And we think we can arrive pretty close at what is the state of nature in regard to Murrieta.  That is likewise true, in our view, in regard to Temecula Creek.  There is a situation that has, of course,

1  transpired on Temecula Creek.  The Vail Dam has been constructed.

2  But nevertheless we believe that by taking the runoff even

3  during the period of record, and I think that is a long enough

4  record to be able to make a determination as to what can be

5  reasonably anticipated from Temecula Creek in a state of

6  nature-- that is, a state before Vail Dam was closed.  That

7  will, of course, entail a determination on our part as to what

8  we think the runoff or the firm supply could be reasonably

9  anticipated at Nigger Canyon.  We believe that that figure at

10  Nigger Canyon would be reflective of the yield of the Aguanga

11  ground water area plus the surface runoff coming into the

12  Aguanga ground water area.

13       On the basis of that data there is no doubt in my mind

14  that there can be determined, to the only degree of accuracy

15  that can ever be obtained, the yield that can reasonably be

16  expected to drain out of the various areas of the Santa Margarita

17  Basin.

18       THE COURT:  You concede, do you not, that these things

19  you say you believe and these figures are not now in the

20  record?

21       MR. VEEDER:  Oh, they are in the record, your Honor.

22       MR. STAHLMAN:  Your Honor, may I--

23       MR. VEEDER:  Let me go on.

24       There are in the record today the runoff measurements

25  at Nigger Canyon, there are runoff records near Murrieta, the

1   runoff records near Murrieta, the runoff records at Temecula

2   Canyon, and it is a very simple process, your Honor, to

3   determine the runoff of Temecula Creek by the process of de-

4   ducting the measured runoff of Murrieta Creek.  We have the

5   key stations above the enclave.  Then there are the runoff

6   records at the gaging station presently located immediately

7   within the eastern boundary of the enclave-- that is the

8   Fallbrook Gaging Station.  Next downstream is the De Luz

9   Gaging Station, the Lake O'Neill Gaging Station, and the

10   Ysidora.  There is not a question in my mind, your Honor, that

11   with the data we have in the record these determinations and

12   findings can be made by your Honor in accordance with the

13   suggestions that I have put forth to date.

14        THE COURT:  Is this the material that you are getting

15   ready to submit by the end of October that Mr. Kunkel is

16   working on?

17        MR. VEEDER:  In the first week of November, yes, your

18   Honor.  That is in accordance with your direction at the last

19   hearing.

20        THE COURT:  So that you are going to pull this together,

21   then, out of the record.

22        MR. VEEDER:  It is all in the record, yes, except the

23   1962 runoff records, and I have just brought those down.

24        THE COURT:  This is the compilation that Mr. Kunkel is

25   going to prepare based on matters in the record.

1    MR. VEEDER:  That is correct.

2    MR. GIRARD:  You had better check with Mr. Kunkel.

3    Is that correct, Fred?

4    MR. VEEDER:  Mr. Hoffman was also the surface water man.

5    He is also doing this work.  And the data will be available

6    in accordance with what I told yourHonor.

7    MR. STAHLMAN:  I would like to hear from Mr. Kunkel

8    whether or not, together with Mr. Hoffman, he is going to be

9    able to come up with that.

10   MR. GIRARD:  From the record.

11   MR. STAHLMAN:  Yes.

12   THE COURT:  From the present record.

13   MR. GIRARD:  Maybe he can.

14   MR. KUNKEL:  According to data that are presently in the

15   record, Mr. Hoffman and I are in the process of preparing such

16   an analysis.

17   THE COURT:  All right, let's pass that until we get it,

18   then.

19   I would still like to see the language of this proposed

20   decree-- assuming you get all these figures you are talking

21   about, this proposed decree where you are going to apportion

22   a certain percentage of something or other to the United

23   States.  I would like to see the language of that, if you

24   would.

25   MR. LITTLEWORTH:  I had not heard about this so-called

1    safe yield study, your Honor.   I don't know when this arose.

2         THE COURT:  Very recently.

3         MR. LITTLEWORTH:  Let me just say that if, as the end

4    result of the process, Mr. Veeder produces the safe yield,

5    the U.S.G.S. will not put its stamp of approval on it.  This

6    isn't the way you produce safe yield.  I don't know when we

7    ought to tackle it.

8         THE COURT:  Let's wait until we get it.  It is not ready.

9         Were you through, Mr. Veeder?

10        Let's wait until we get this report at the end of

11   October or the first of November.

12        Meanwhile, I would like to see just the general language,

13   without these supporting figures, on how you would draw a

14   decree apportioning a certain percentage or a certain number

15   of acre feet to the United States.

16        MR. VEEDER:  I will undertake it, your Honor.

17        THE COURT:  It is going to be a percentage of what?

18   That is what I am interested in.  I would like to see something

19   very rough at 2 o'clock.   Mr. Stark.

20        MR. STARK:  I had just one minor question, your Honor.

21   There is apparently an assumption in discussing this language

22   that Mr. Veeder is to draw and the discussion of inventorying

23   riparian lands that the only lands taken into consideration

24   are those susceptible of profitable irrigation.

25        You recall that in the testimony of Mr. Rowe for the

1    Gibbon and Cottle properties there was indicated the additional

2    factor of land not susceptible of irrigation but susceptible

3    of domestic development-- riparian domestic use, and I am

4    curious whether there has been any ruling or disposition of

5    that, particularly in the country above Vail Dam, that hill-

6    side use of water on riparian land could be significant as

7    compared to the agricultural use, and I just wondered whether

8    there has been a ruling at some point that the only measure

9    of riparian right is to be profitable irrigation or whether

10   we don't have to consider the full potential riparian use.

11   Mr. Veeder is going to draw a decree which is going to

12   apportion percentages.

13           MR. STAHLMAN:  Your Honor, this has been rather an

14   unfortunate session we have had here up to this point.  I

15   have listened with a great deal of interest to some of these

16   lawyers who have not been here too often, and I think some

17   of the things they say make common sense.

18           I think Mr. Stark's analysis of coming in at this late

19   date and accumulating this data is a criticism that is justi-

20   fied.  I don't know whether it is justified to the point

21   where we shouldn't proceed from here on and do it.  But we

22   certainly have been making progress.  I had felt that we were

23   making some progress to reach the position where we would have

24   some understanding and common-sense knowledge of this question

25   of apportionment, if we ever reach it.  Now very late in this

1  case Mr. Veeder, not only one time but many, many times,

2  declared that he was not asking for regulation or apportion-

3  ment. It is in the record I think at least a half dozen times,

4  your Honor. And I am distressed somewhat at the manner in

5  which he approaches this matter this morning.

6      I think Mr. Veeder is talking into the record for the

7  benefit of some other purpose. He is undoubtedly the most

8  skillful, artful dodger that I have met, and he jumps from

9  one side to the other and he doesn't stick to one thing. I

10  regret that these other lawyers were not here when Mr. Clark

11  was here, because he started making some sense out of this

12  case. He seemed to have a practical approach to it. He

13  didn't have this adamant position that Mr. Veeder takes in

14  relation to either side that suits him. He was rather

15  logical, I thought, and reasonable in his approach. And the

16  minute he is gone we are right back to the wrangling that we

17  have had in this case prior to his appearance-- the repetitious

18  statement of evidence that is supposed to be in the record.

19  I have reference to these matters telling us where every

20  gauge is on the river. We have gone through that. We know

21  that, and all these other things.

22      But we come to this main question as to how we are

23  going to make a determination. I don't know whether Gibbon

24  and Cottle are affecting Vail or not. It looks like they may

25  be. I don't know what Vail's safe use is. Maybe we are

1   using too much.  Maybe we are not using near enough water.

2        In the case of Pendleton, they had isopac maps and

3   they made determinations, and I believe Mr. Wirts said the

4   only way you could make this determination of safe annual

5   yield of the basin is to know what kind of basin you have,

6   and he went through the process of explaining how isopac maps

7   are made, and he came up with a figure as to what the safe

8   annual yield of that basin is.

9        Now we have a more complex basin in Murrieta-- two

10  streams running in different directions that eventually meet.

11  They are all part of this common thing.

12       Mr. Veeder makes these rash charges that Vail could pump

13  this basin down to the point that it is injurious to the

14  basin.  There is no such evidence of that in the record.  His

15  own evidence shows 480,000 acre feet of water in the first

16  hundred feet on only a portion of the area of the Murrieta

17  Basin.  I don't think some of these lawyers know that.  I

18  don't know how accurate his evidence is or whether it is there

19  or not or whether it can be used.  It is going to require

20  further studies, and I don't think they are going to do it by

21  measuring the stream system.  I have had some limited

22  experience as to other basins on which I have had litigation,

23  and it becomes very important to have knowledge of the fact,

24  what is the capacity of the basin.  However, you can pump the

25  basin to the point where you destroy it.  This large volume

1    of water is up there, as he says, and can be used.  Maybe it

2    can, maybe it can't.  He hasn't gone that far.  He merely says

3    the water is there.  If that water is there, on the one hand,

4    how is he charging Vail with pumping the basin down?  He is so

5    irritated by some of the things that he hates on Vail that

6    he goes over and over these matters that have been settled by

7    decree that your Honor has signed and filed in this court.

8         I think Mr. Veeder is talking for some other purpose.

9    I wish that he had the flexibility to get down like some of

10   these other gentlemen and take a lesson from them and come

11   up, as Mr. Littleworth did-- he explained that there are

12   financial problems on these meters.  We realize that.  Vail

13   has meters, yes.  Maybe it is a benefit to us, maybe it is

14   not a benefit to us.  I don't know.  But I do believe that if

15   it is necessary to acquire knowledge as to this basin it

16   should be practically and sensibly, and I don't think Mr.

17   Kunkel, in all due respect-- I shouldn't criticize a geologist,

18   but we all get to be geologists when we get into these cases--

19   I am sure Mr. Kunkel is not going to stake his reputation on

20   determining the safe annual yield of that basin by measuring

21   the surface flow, because it takes into consideration no

22   matters pertaining to the functional characteristics of this

23   basin.  Certainly if you had it in a state of nature, you

24   know that the basins were undoubtedly full at one time because

25   of the deposits of alluvium there.  But what has the pumping

1    over the period of time done to this basin?  Maybe it is

2    destroyed already.  We don't know.

3        I am not going to make any charges against Gibbon and

4    Cottle upstream.  I think the fact that we only reported

5    1200 acre-feet in that dam last year, when Camp Pendleton was

6    filled to capacity, would indicate to me that maybe upstream

7    we are being hurt.  But I don't think there is sufficient

8    evidence in this record to support it.  I am not going to

9    make such a charge.  If we had the evidence and it showed from

10   a practical point of view that that was the case, then I

11   certainly would make the charge.

12       I don't know whether Vail is in the position of having

13   used more water than they are entitled to, or have not used

14   nearly enough.  If they have 480,000 acre-feet in there, we

15   should be able to go in there and pump and irrigate a lot

16   more of our land.  Until we know what we are going to do to

17   that basin, I don't think we can do it.

18       THE COURT:  We have gotten off what we started to talk

19   about.  We started to talk about whether we should put meters

20   on.  The Court expressed itself that it was willing to go

21   along with the collection of data looking to the future when

22   we would hope to have sufficient information to make appor-

23   tionments or regulations, if necessary.

24       This is a summarization.

25       Mr. Veeder apparently takes the position that there is

1  in the record, as he says, sufficient data now that there can

2  be some approximation made of some apportionment.  And this

3  we will have to wait and see until the first of November.

4  So we might as well pass that.

5      We might as well get back to the long-range problem of a

6  master, the matter of metering, collecting data, et cetera.

7  What would the cost of a meter be for a good-sized well?

8  Does anybody know?

9      MR. VEEDER:  I have inquired about that and I think

10  what Mr. Littleworth says is about right-- $500.

11      MR. STAHLMAN:  Well, there are different sized meters.

12  The price fluctuates greatly.

13      MR. VEEDER:  For the normal meter.

14      MR. STAHLMAN:  There is no normal.  Some people use

15  two-inch, three-inch, four-inch, up to six-inch.  I think we

16  have some twenty-four.  They vary in price.

17      MR. VEEDER:  When Mr. Littleworth said $500, that came

18  to about what Mr. Kunkel had told me a meter would cost.

19      THE COURT:  What is the life of a meter?

20      MR. VEEDER:  I think it depends on the quality of the

21  water.

22      THE COURT:  Five years?

23      MR. GIRARD:  Ask Colonel Bowen or Sandy.

24      THE COURT: Five years?

25      MR. WILKINSON:  No, longer than that.

1    THE COURT:  Ten years?

2    MR. WILKINSON:  Twenty.

3    THE COURT:  If the life of a meter is even ten years,

4    it certainly could be amortized.  a $500 meter would be $50 a

5    year.  If its life is more than that, then it decreased in

6    cost per year.

7    MR. STAHLMAN: There is another thing to think about on

8    these meters, and that is that any water user that is using

9    water from any of these water companies, they have to have

10   meters on them to determine the price.  I am not going to

11   take the position of telling these people that they should

12   spend that money for meters, but I don't think it is going to

13   be as big an item as it appears.

14   THE COURT:  What type of yardstick would you propose,

15   Colonel, to ascertain the type of well we would meter?  Have

16   you given any thought to that?

17   COLONEL BOWEN:  Yes, your Honor, we have.  We have

18   attempted to determine from the record in this case and from

19   information available in the flood control district office

20   in Riverside, California, and from the Regional Water Pollu-

21   tion Control Board records at San Diego, the data on wells

22   that have been drilled subsequent to the submission of most

23   of the evidence on wells in this record.  Based on those three

24   sources, we have decided that wells eight inches in diameter,

25   that is, a minimum of eight inches in diameter drilled to

1   significant depth should be further explored to determine if
2   they produce sufficient water, that is, if their yield is
3   sufficient to bring them into the substantial production group.
4   We at the present time have a paucity of information on this
5   yield data.  But in reconnoitering the Murrieta Basin a week
6   today, in company with Mr. J. B. Wilkinson of the Vail Company
7   and Mr. Paul Campo from my office, we discovered a tremendous
8   activity in the Murrieta Valley.  There appears to be a
9   tremendous activity in trading and developing land.  There
10  are at least five well rigs currently drilling wells.  There
11  is land being levelled, distribution systems being constructed--
12  I mean substantial systems, too, like Transite Pipe for main
13  lines.  From the evidence of the transformers on poles it is
14  indicative that a number of new wells have been put in that
15  consume large quantities of energy.  We confined our reconnais-
16  sance to the roads, so we did not have any information on
17  the pumping data at the present time.  Based on the data I
18  have at present, though, there appear to be somewhere around
19  215 wells in the Murrieta Valley alone that might prove to be
20  in the substantial production class.  Also, if we are going
21  to get to the people that actually own or operate the land,
22  we are going to have to bring up our ownership data so that
23  we know who the people are with whom we are dealing.
24          THE COURT:  As a matter of fact, even your eight-inch
25  casing, for instance, is a pretty arbitrary thing.  You could

1  have a six-inch casing with a well that had an excellent

2  yield and you might pump a lot more water out of it than out

3  of a well with an eight-inch casing.

4      COLONEL BOWEN:  That is true.  You might have an eight-

5  inch casing that is drawing more.  That is the area we don't

6  have complete data on at this time.

7      THE COURT:  Are you going to be able to fix a yardstick

8  that just involves inches in size of casings, or would there

9  be other factors such as the amount of land being irrigated?

10  If a fellow had a two-acre piece up there the chances are, no

11  matter how big a well he had he wouldn't be a substantial

12  user, would he?

13      COLONEL BOWEN:  This is an area, your Honor, if you

14  divide a hundred acres of irrigable land into two-acre parcels,

15  which is not beyond the realm of reason in this area, and

16  each of those persons irrigates two acres, the aggregate is

17  substantial.  But the individual is probably in the in-

18  substantial area.  The trend up there appears to be going both

19  ways.  There are some consolidations of properties to make it

20  a larger ownership, and some subdivision of properties to

21  make smaller ownerships.  It would appear, based on my own

22  observation and consulting with some oldtimers in the area,

23  that the subdivision trend may be in the preponderance.  It is

24  difficult to say where you would chop it off areawise.  For my

25  first go-around I have taken ten acres as the minimum area for

1    consideration as a substantial user.

2        THE COURT:  Ten acres irrigated regardless of how much

3    land the man had?

4        COLONEL BOWEN:  No, sir; a gross of ten acres irrigable,

5    or a gross acreage of ten acres, of which the most part of it

6    is irrigable.  This situation is common in the Murrieta Valley.

7    It is not too common elsewhere.  In the valley itself generally

8    the irrigable acreage approximates the gross acreage.

9        MR. LITTLEWORTH:  I wonder while Colonel Bowen is in

10   this discussion whether we could address ourselves to this

11   question of how necessary meters are.  Looking to the long-

12   range question of overdraft, basically you are trying to weigh

13   water use against water supply.  There are, I guess, two ways

14   to work out that equation and come up with either an overdraft,

15   which is excessive use over the safe yield, or come up with

16   an answer that you are within your safe yield.  You can measure

17   the water which is pumped out of the ground and say this

18   represents our usage, and then you measure on one hand your

19   various sources of supply and in that case you have to add

20   in, on the supply side, the return flow from irrigation.

21   Some water goes back into the ground after it is placed on the

22   ground, and some runs off at the end of the furrows, et

23   cetera.  So you really get into the problem then of what is

24   the net consumptive use.  You don't use and completely consume

25   and withdraw from the watershed all the water that is pumped

1    out of the ground, only some portions of it.   In what experience
2    I have had, this becomes one of the most difficult problems
3    in water law.

4         There is another way in which I think perhaps almost
5    generally engineers attack this problem, and that is not by
6    determining the actual production but by so-called land use
7    survey where they simply look at any particular moment at the
8    uses which are being made.   And it would be rather simple in
9    this area because it is agricultural primarily.   You look at the
10   uses and you say there are so many acres of alfalfa.   Basic-
11   ally alfalfa has a thre-acre-foot or four-acre-foot, whatever
12   it is, water duty.   Multiply this out and you make your
13   determination from a land use survey at the time that you are
14   interested in determining what the actual use is.

15        Now safe yield has got to be a current determination
16   at the time when you are facing a problem of shortage.   It
17   doesn't really do any good to know what it was in a state of
18   nature.   This is an academic question.   You are concerned at
19   some shortage period what can be pumped and still maintain
20   the basin at a so-called safe yield level.   So you have got
21   to have got to have at that time current information on usage.
22   You need long-range data on supply and rainfall because by
23   virtue of the definition safe yield is the amount of water
24   which you can count on over a long period of time.   So your
25   supply figures have got to be long range.   But your usage

1    figures are current.  It doesn't do you any good to know what

2    the use probably was ten years ago.  You have got to weigh it

3    against current usage.

4         I wonder if the accumulation of data on what is being

5    pumped is really going to help us, weighed against the cost

6    that we can anticipate that everyone is going to be put to.

7    Or if you have to have this information, can't you get it

8    from a land use study and get it perhaps more cheaply?

9         Maybe Colonel Bowen can respond to those questions.

10        COLONEL BOWEN:  Before I respond to Mr. Littleworth's

11   query, your Honor, I would like to state that we have discovered

12   that the Riverside Flood Control District made a recent aerial

13   photographic survey of this area, and today we are accepting

14   delivery of aerial photo prints that were taken this summer.

15   So we should be able to make a land use survey rather rapidly

16   down through this summer.

17        It is possible, of course, to make estimates or approxima-

18   tions of the amount of water used by this method that Mr.

19   Littleworth has proposed.  I think the net use figure in this

20   area may be rather close to the gross pumpage, because most

21   of the new developments are using sprinkler irrigation and

22   the return flow from a properly designed sprinkler irrigation

23   system is generally quite small.  But it would be possible to

24   approximate the water use through such land use survey.

25        MR. GIRARD:  How accurate is it, Ace?  Is there a range

1    of error on land use survey?

2        COLONEL BOWEN:  It wouldn't be possible just to go and

3    make an on-site check once a year.  It would be necessary to

4    check periodically the manner of irrigation, making observations

5    of runoff return flow.  The accuracy of it would depend in

6    large measure on the number of observations that were made

7    during the year.  It would be anywhere from maybe 75% to 90%

8    accurate.

9        MR. STAHLMAN:  What about the expense, regardless of

10   who would have to pay the bill, as compared with a meter,

11   which I believe you intimate would be more accurate or

12   would assist in the accuracy, and the land survey, the work

13   that would be necessary periodically to check?  Would that

14   checking cost more eventually than if you had meters?

15       COLONEL BOWEN:  That is a good point.  It certainly

16   is not inexpensive to get competent engineering assistance to

17   make such a survey.  I am unprepared at the moment to say

18   which would cost more.  But certainly they would tend to

19   equalize.

20       MR. STARK:  How much margin of error is there, assuming

21   you use meters, in making the computation from meters to net

22   consumptive use?  Don't you have the same problem of error in

23   that regard?

24       MR. STAHLMAN:  I don't think so-- if I could tell you

25   why.

1       MR. GIRARD:  You would have to compute the return flow.

2       MR. STARK:  That is right.

3       MR. STAHLMAN:  We have service meters on a system and

4  we also have to meter the water that comes into this system,

5  and we figure that the difference between the two is about

6  two or three percent.

7       MR. STARK:  I am talking about the return irrigation

8  flow to get the consumptive use.

9       MR. STAHLMAN:  That is a different question.

10       MR. STARK:  I think the testimony on Temecula Creek at

11  least is that that is a highly variable item, and most of the

12  testimony is related to land use studies and the actual

13  pumpage was rejected there.  I would be, for instance, quite

14  reluctant as a practical matter to see the Gibbons and Cottles

15  measure their series of wells, that is, go to the expense of

16  metering their series of wells, which are fundamentally supple-

17  mental wells.  Their main source of supply in ordinary cir-

18  cumstances is surface diversion, and they have a series of

19  wells which are used to supplement that source.  To put meters

20  on all of those wells, unless there were a direct and necessary

21  benefit to be derived by that method only, I seems to me to

22  be an excessive cost for wells which may or may not be used

23  in the course of one or more years, and being applied to land

24  which has a history of heavy return flow.

25       MR. VEEDER:  They have a weir on their surface diversion.

1   So there is no question about the quantity of water that is

2   taken there.  I think you would have to formulate a decree to

3   fit the situation.  I don't believe you would have to have it

4   clear across the board in every instance.

5       THE COURT:  Do Vail's figures on pumping show the fields

6   on which the water was used?

7       MR. STAHLMAN:  We have, as your Honor recalls, put in

8   the maps as to which fields are being irrigated, and we have

9   evidence as to the kind and type of crops that were grown.

10      THE COURT:  Let me go further with my question and you

11  will see what I am getting at.  If your records showed the

12  amount of water that went into a particular field, it wouldn't

13  be a very big job to run a few studies on the Vail figures of

14  water used on a field as compared with a study made upon a

15  survey of a field and see just exactly how close the calcula-

16  tion of land use and a calculation of water would come to

17  actual metering of water on a field.

18      MR. STAHLMAN:  You can't do it because of the kind and

19  type of distribution that Vail has.

20      THE COURT:  In other words, the water is not metered to

21  a particular field.

22      MR. STAHLMAN:  No.  It runs downhill, of course, and is

23  pumped from different places and releases from the dam, and

24  then we have balancing reservoirs.  We have some few tenants

25  that have leased.  We metered the water that we have sold to

1    them.

2         MR. STARK:  But you still don't meter the return flow,

3    so you haven't got the balance of the computation.  The land

4    use study is a consumptive use figure and you are not going

5    to arrive at a comparable consumptive use figure by finding

6    out what the actual application of water was.

7         THE COURT:  There would have to be an allowance made.

8         MR. GIRARD:  All Mr. Stark is saying is that if you use

9    meters you have one variable which you have to estimate, whereas

10   if you use photographs you would have two variables you would

11   have to estimate.

12        MR. STARK: What are the two?

13        MR. GIRARD:  You would have to estimate the total

14   diversions, and then you would have to estimate the losses.

15        THE COURT:  How many tenants are there and how much

16   acreage is involved where you meter the flow?

17        MR. WILKINSON:  Speaking of only one tenant, that is

18   our potato tenant, the acreage varies from year to year.  It

19   might run as high as 500 acres.  It might be down as low as

20   200 acres per year.

21        THE COURT:  Colonel Bowen, would it be any aid in running

22   a check, for instance, on the current acreage and see how

23   close your figures would be?

24        COLONEL BOWEN:  We could set up a consumptive use study,

25   your Honor.  This is easily done.  Probably there is sufficient

     information available already, though, in Federal and State

JOHN SWADER, OFFICIAL REPORTER

1   Government agencies to give us a reliable consumptive use

2   figure.

3        The fallacy of Mr. Stark's assertion that you can make

4   land use studies determine fairly closely the quantity of

5   water used lies in that different operators use or believe

6   they must use different quantities of water.  Some people

7   might say that you need six acre-feet of water per acre per

8   year for alfalfa, and others might get along very well with

9   three and a half or four.  The irrigation system itself has

10  a lot to do with it.  It is not possible just to look at an

11  aerial photograph and say there is 40 acres of alfalfa; the

12  consumptive use of alfalfa in that area is two and a half

13  acre-feet per year and arrive at a figure of 100 acre feet

14  consumptive use.

15       THE COURT:  Going back to my experience as a boy,

16  wouldn't the type of ground have something to do with it?

17       COLONEL BOWEN:  Very likely.

18       THE COURT: I can remember irrigating sandy land where

19  it was like pouring water down a rat hole.  On a different

20  type of ground you didn't lose as much water.

21       COLONEL BOWEN:  True.  But we do have in the record

22  evidence on the character of the soil.  So we have that

23  variable pinned down.  But that is a factor one must take

24  into consideration.

25       MR. LITTLEWORTH:  If there are 215 wells which might be

1   in the substantial category in Murrieta-- I don't know how

2   many there might be in the rest of the watershed-- for Murrieta

3   alone that is $107,000 if they cost $500 apiece.  We are

4   talking about a lot of money.  I wonder how necessary is it

5   at this point, how necessary is it to be a hundred percent

6   accurate?  You are never accurate even if you have meters.

7   A meter has a ten percent error built right into it.  You are

8   never completely accurate.  And in advance of some more

9   evidence than we have now of even an impending shortage, how

10  necessary is it that we spend a hundred-odd thousand dollars

11  right now?

12      MR. VEEDER:  In this regard, I don't believe the Colonel

13  meant there are 215 operating wells at this time in the area.

14  I think he said there were 215 wells.

15      MR. SACHSE:  Let's find out, then, because I misunder-

16  stood him.

17      MR. LITTLEWORTH:  I put "substantial" in my notes.

18      COLONEL BOWEN:  I believe this time Mr. Veeder interpreted

19  my statement correctly.  I said that there are 215 wells which

20  our research has developed warrant further study and further

21  study includes an on-site examination, and examination of

22  yield test data, if any, of all of this, which is going to

23  take time.  But I am not ready to stand here today and say

24  215 wells in the Murrieta Valley are in the substantial

25  production class.

20,963

THE COURT:  We have a problem then as to whether we can secure some approximate data by land use figures and what that would cost, or whether we should embark immediately on metering, or whether the metering might be postponed for some period or limited to particular wells where we had difficulty in figuring the land use.  That is the problem.  My thinking is that we should get started on these calculations and we may be able to define them as we go ahead.

MR. GIRARD:  If it is necessary to determine this factual information, as far as the State of California goes, our position will be that it will be whatever Colonel Bowen thinks is desirable.

THE COURT:  We have a rancher in the back here.  Is this one of your clients, Mr. Littleworth?

MR. LITTLEWORTH:  Yes.  He has been sworn and speaks eloquently.  I would like to hear what Mr. Roripaugh has to say.

THE COURT:  How many acres are you irrigating this year?

MR. LEO RORIPAUGH:  About 350, I guess.

THE COURT:  How many wells have you been pumping from?

MR. LEO RORIPAUGH: Four.

THE COURT:  All over eight inches?

MR. LEO RORIPAUGH:  No, there is only one six and the others are all eight.  Are you talking about the casing or discharge?

1    THE COURT:  The casing, to start.

2    MR. LEO RORIPAUGH:  No, the casing are all over eight.

3    MR. LITTLEWORTH:  How many acres do you own?

4    MR. LEO RORIPAUGH:  3,000.

5    MR. LITTLEWORTH:  Is there such likelihood that Mr.

6  Roripaugh, who is irrigating a hundred percent of his land,

7  is going to be cut down that he has to spend $2,000?

8    THE COURT:  That 3,000 acres is in the Murrieta?

9    MR. LEO RORIPAUGH:  No, there is about 2,000, and then

10  there is 800 that doesn't join the main ranch to the east.

11  The 800 is riparian, I believe.

12    THE COURT:  Is it all susceptible of irrigation?

13    MR. LEO RORIPAUGH:  An awful lot of it, if you want to

14  sprinkle.  But not all of it.  The thing you have been talking

15  about has an awful lot to do with this thing in the type of

16  soil.  You mentioned a minute ago that if it was sandy it

17  would take so much water and if it is pretty firm it takes a

18  lot less.  That is a real big factor as to how much it is

19  going to use.

20    THE COURT:  Well, we didn't have a recess.  It's 12

21  o'clock.  Do you want to come back at 1:30 and discuss this

22  a little more?

23    (Noon recess.)

24

25

1          San diego, California, Tuesday, October 9, 1962.   1:30 P.M.

2

3          THE COURT:  Mr. Kase.

4          MR. KASE:  Your Honor, I would like to introduce to the

5   Court Tilden L. Brooks, a member in good standing of the Bar

6   of the State of California, and a person of good moral character.

7   I move the court that this gentleman be admitted to practice

8   before the Federal Court in the Southern District of California.

9          THE COURT:  Motion granted.

10          Mr. Clerk, administer the oath.

11          THE CLERK:  Raise your right hand.  You do solemnly

12   swear that you will support the Constitution of the United

13   States, that you will bear true faith and allegiance to the

14   Government of the United States, that you will maintain the

15   respect due the courts and judicial officers, and that you

16   will demean yourself as attorney, proctor, advocate, solicitor

17   and counselor of this Court uprightly.  So help you God.

18          MR. BROOKS:  I do.

19          THE COURT:  I am happy to grant this motion.  I will

20   not make a speech today.  You are around here today with some

21   pretty good lawyers present.  You will get some idea of how

22   things operate in this court.  I am happy to have you.

23          MR. BROOKS: Thank you, yourHonor.

24          THE COURT:  I would like to have Colonel Bowen's ideas

25   on this matter of measuring water.

1    I might say that Mr. Albany is present.  Mr. Albany,

2  seated in the back of the room, has bought the Knox Ranch.  He

3  came in and introduced himself after the morning session.  He

4  has a view that meters operate differently under different

5  pressures and that meter measurement is not accurate.

6    I don't think the Colonel shares that view.  You may

7  either come up to the witness stand or you may sit there.  I

8  would like to ask you some questions.

9    What is your view about the efficiency of a meter in

10  measuring output of a well regardless whether it is pumped

11  out under pressure?  I think Mr. Albany told me he has eight

12  miles of line, or where the water is pumped out in a downhill

13  flow.  What is the efficiency of a meter on a pump?

14    COLONEL BOWEN:  Speaking, I suppose, of a Sparling

15  type of meter, which is the most common type of installation

16  on the well, if properly maintained and regulated, it should

17  operate within 10% efficiency under any circumstances.  We also

18  have meters on wells at Camp Pendleton that measure water that

19  is under considerable pressure.

20    THE COURT:  What are your views on the use of statistics

21  and checks by the electric company on the efficiency of the

22  well?

23    COLONEL BOWEN:  The electric company will make periodic

24  checks on the efficiency of wells in order to allow correlation

25  with the energy metered or the electricity metered to the pump,

1   and if made at fairly short intervals, with continuing records

2   of the static level of the water so that it is known from what

3   depth the water is being pumped, the power information can be

4   very useful in determining the quantity of water pumped and

5   probably under controlled conditions might equal the efficiency

6   of a Sparling type meter.

7        THE COURT:  One factor in this computation is the depth

8   of the water in the well, is it not?

9        COLONEL BOWEN:  Yes, sir.  That of course is subject to

10   change from season to season and during the season.  The deeper

11   the water gets, the more energy is required to lift it to the

12   surface.

13        THE COURT:  If electrical output checkups were used,

14   how often, how many times during the irrigation season would

15   that depth have to be checked to get any kind of accurate

16   report?

17        COLONEL BOWEN:  I would say the water level measurement

18   should be made on a weekly basis, your Honor.

19        THE COURT:  Does the electric company check the water

20   level when they make this report, or does the land owner have

21   to check his own water level?

22        COLONEL BOWEN:  When they make the actual efficiency

23   test, they do measure the depth to water.  But not at other

24   times.

25        MR. VEEDER:  I have obtained, your Honor, a recent

1   publication of various means of determining quantity of water,

2   how to calculate the quantity of water extracted from a well,

3   and if you are interested I will bring it down.   I have it in

4   my office.   It was published by the U. S. Geological Survey

5   last year, I think.   It is in line with what Colonel Bowen has

6   said.

7         THE COURT:   What experience or what knowledge do you

8   have as to the cost of these Sparling meters?   Have you used

9   them at Pendleton?

10        COLONEL BOWEN:   The experience I have is through the

11  installation of meters on wells at Camp Pendleton, your Honor.

12  The cost varies between five hundred and a thousand dollars

13  per installation, depending upon the size of the meter prim-

14  arily.

15        THE COURT:   Any other questions you gentlemen want to

16  ask on this matter?

17        What would your view be as to postponing an installation

18  of meters, say, for a year and seeing what luck we had with

19  calculations made from ground usage plus required information

20  supplied by owners as to electrical output checkup, having in

21  mind something like an order where we would state we are not

22  at this time ordering meters installed, postponement of this

23  decision for at least a year and see what experience we have,

24  one of the conditions being that the owners fully cooperate

25  in supplying us all data we would think necessary in making

1    calculations?

2         COLONEL BOWEN:  Your Honor, I would be in favor of

3    adopting a program like that inasmuch as it will take some time

4    fully to develop our knowledge of the production of wells and

5    determine which wells might fall into the substantial produc-

6    tion group.  We do have immediately at hand a basis for de-

7    termining water usage or land use surveys, as has been recom-

8    mended here.  We have immediately at hand the power consumption

9    data, and if we can pin down the variables that affect that,

10   such as depth to water, head pressure, et cetera, we can, I

11   believe, make some fairly reliable estimates of the amount of

12   water consumed without the necessity of meter installation.

13   And then probably in a year's time the Court might be in a

14   better position to determine which additional wells, if any,

15   should be metered with a flow meter device.

16        THE COURT:  Thank you, Colonel.

17        Does anybody have any further questions along this line

18   to ask the Colonel?

19        Mr. Veeder, what would your view be?  Would that be

20   satisfactory as a start on this, in view of the factors Colonel

21   Bowen has enumerated?

22        MR. VEEDER:  Frankly, I hadn't given the matter any

23   thought at this time, your Honor.

24        As for the number of wells that would be involved,

25   which I think would be the primary factor, I think we will be

1  able to determine that and in the not too distant future.

2  I am sure that the faster we get into the matter of proper

3  controls and regulations the more satisfied Mr. Clark will be,

4  and I think certainly the most desirable way of determining

5  the quantities used is by the meter system.  I believe the

6  Colonel will agree with that.  That is the most effective

7  method.

8      MR. GIRARD:  Does the United States have any objection

9  to proceeding the way that was outlined by the Colonel, which,

10  as I understood, in essence was to use the aerial photographs

11  initially until it is determined what wells you are going to

12  have to measure and then make a determination whether meters

13  are necessary?

14      MR. VEEDER:  I think I agreed with that just this very

15  moment.  When we determine there are thirty wells that have

16  to be regulated, that is one thing.  If he determines it is

17  seventy-five, it is a big job and there is more to be done and

18  different elements are involved.

19      THE COURT:  Mr. Littleworth, what do you think about

20  postponing for a year and insisting upon land-owner cooperation

21  meanwhile?  As a matter of fact, the extent of cooperation we

22  receive might be a yardstick in determining whether we require

23  meters.

24      MR. LITTLEWORTH:  Basically, I think I approve that,

25  your Honor.  My blood pressure went up when Mr. Veeder just

1   said we will determine what wells had to be regulated, and I

2   will not repeat my arguments as to why I think this is not

3   proper.  But it seems to me that metering and the collection

4   of data ought to fit into some other framework of what is

5   going to happen to the whole case.

6       It seems to me that perhaps we first ought to finish the

7   interlocutory judgments and have such hearings as are neces-

8   sary and enter a final judgment.  This, it seems to me, is the

9   number one priority task.  Then a water master presumably

10  would be appointed.  The functions we are talking about now,

11  I think, are largely functions of a water master, about which

12  he ought to have some say, and obviously he should have more

13  data than we have now.  We are talking about metering.  We

14  don't know how much they cost.  We don't know what can be done

15  by way of finding out consumptive records or land-use surveys.

16  These are things that presumably a water master would look at

17  carefully and would render some reports that we could then see

18  and see whether we agree with it or not.

19      I think also that the amount of data which is going to

20  be necessary is, in some ways, dependent on what happens

21  downstream.  My recollection of the outflow from Murrieta

22  Creek, the stream record outflow, has been that it has been

23  essentially the same over the last twenty years.  There has

24  not been a decrease in the outflow from the Murrieta Basin

25  area.  Whether or not you have a dam downstream picking up

1    the DeLuz water I think makes a difference as to how much any

2    water master or any court is going to have to be doing up-

3    stream at the request of the United States.  Maybe there will

4    be problems of development upstream among people themselves,

5    but that is a family affair and somebody feels hurt enough to

6    come into court and state his case and make a claim against

7    someone else.

8         So I think postponing the installation of meters has the

9    additional advantage that we get time to know whether we have

10    a physical solution in the nature of a dam downstream.

11         THE COURT:  Mr. Girard, will you take the responsibility

12    of working with Colonel Bowen in preparing some sort of order

13    where we indicate we are thinking about meters in the future

14    but we are going to postpone the decision for ten months

15    or a year and meanwhile we ask the land owners who are desig-

16    nated to cooperate in certain respects by furnishing such

17    information as the Colonel feels he would need.  See what you

18    can prepare on that.

19         MR. GIRARD:  Yes, your Honor.

20         MR. LITTLEWORTH:  I should have added, your Honor-- I

21    didn't mean to omit this-- I think there is no question but

22    that all of our clients would cooperate in giving whatever

23    information they had or could acquire.  Colonel Bowen made

24    soil surveys on virtually all of our clients, so there is a

25    lot of river data which has already been gathered, and I am

1  sure that our people would continue to cooperate in a voluntary

2  way as they are able.

3      THE COURT:  I think the next thing we ought to discuss

4  would be this question of land subject to profitable irrigation

5  and how big a job we are faced with on that matter and what

6  procedures would be followed in working that out.

7      MR. VEEDER:  Wouldn't that be part of the same work that

8  you are speaking of now?  Isn't that essentially part of it?

9  In other words, establishing the areas, the ownerships that

10  would be involved, and making the determination of practical

11  and profitable irrigation at the same time?

12      THE COURT:  It is connected.  It will be part of the same

13  problem as supplying data.  But it is a separate problem it-

14  self.  As I understand the situation, probably in the Murrieta--

15  I will ask the Colonel to check on this-- your figures of

16  irrigable land are pretty close to figures of profitable

17  irrigation?  Or are they?

18      COLONEL BOWEN:  They are fairly close, your Honor.  In

19  many instances the gross acreage is entirely irrigable, and

20  in many other instances in Murrieta 90 to 95% of the gross

21  area is irrigable.

22      THE COURT:  How does the area, would you think, that is

23  subject to profitable irrigation correspond with irrigable

24  acreage in Murrieta?

25      COLONEL BOWEN:  It would correspond very closely, your

1    Honor.

2         MR. GIRARD:  There is one thing-- maybe this comment is

3    assumed-- but I presume that the order which I will work with

4    Colonel Bowen in drafting and compiling this information on

5    factual matters and also the amount of acreage which can be

6    profitably irrigated will be pretty much a job that the Colonel

7    will be doing factually and will not delay the consideration

8    of the other judgments and winding up the case in so far as the

9    legal findings are concerned.  I think this is separate and

10   apart.  I think the Colonel or whoever does this work can go

11   ahead and do it and we can still wind up the case in so far as

12   getting the interlocutory judgments entered at the same time.

13        THE COURT:  I would tentatively suggest-- we have four

14   categories here:  We have Murrieta, we have the land above

15   Vail Dam, we have the enclave, and we have the Vail property--

16   now as to Murrieta and probably the land above Vail Dam, as

17   a starter, I would suggest that the Colonel-- we load him up

18   with work and I don't know how he does all these things-- go

19   through the soil reports and make up a tentative list of the

20   lands and the irrigable acreages and what in his judgment

21   from the study that he has made would be the area subject to

22   profitable irrigation and then be able to send this out to the

23   land owners involved and advise them that it is understood

24   the Colonel would be prepared to so testify and if they have

25   no objection to the figure he is going to fix that would be

1   the end of it.  We would call the Colonel and go through the

2   list.

3        MR. SACHSE: There will be some objections.  I am going

4   to continue to ride the horse I rode when this case started.

5   I cannot conceive of any materiality today to the question of

6   what land id susceptible of practical and profitable irrigation.

7   The only materiality to that question is if the Court is at

8   that time considering an apportionment.  This is different

9   than Colonel Bowen's investigative material, which is to help

10  accumulate data which might help you to decide in the future

11  whether an apportionment is necessary.  But it is completely

12  irrelevant to discuss how many acres is susceptible of profit-

13  able and practical irrigation unless you do so in the light

14  of conditions at the time you are going to apportion, and if

15  that is ten or twenty years from now everything he collects

16  today will be utterly useless and immaterial.  I don't think

17  we should waste our time at this time and I don't think we

18  should put it in the record at this time.

19       THE COURT:  I know what your position has been, and the

20  mere fact that we secured this data would not necessarily mean

21  that we immediately went into any apportionment.  But if we

22  got these figures, plus Vail and the enclave, it would do a

23  lot to clear the air as to what the situation is presently.

24       MR. STAHLMAN:  Aren't all the Vail figures in now, your

25  Honor?

1    THE COURT:  I was going to inquire.

2    MR. STAHLMAN:  What is your standard of profitable?

3    THE COURT:  That would be something we would have to

4    establish some yardstick by expert testimony.

5    MR. STAHLMAN:  Hasn't the law already established that

6    really?

7    THE COURT:  How far apart is the United States and Vail

8    on their calculations as to how many of Vail's acres are

9    subject to profitable irrigation?

10    MR. VEEDER:  I am not in a position to state that at

11    this time, your Honor.

12    THE COURT:  Do you have a tentative calculation from the

13    standpoint of the United States of how many acres you think

14    Vail could profitably irrigate if water were available?

15    MR. VEEDER:  I don't have an estimate at this time.

16    MR. GIRARD:  One other problem bothers me, and beginning

17    along the lines of the general suggestion I made that we

18    should wind up the case of the interlocutory judgments.  What

19    we have, in essence now, is Colonel Bowen going on the Aguanga

20    area above Temecula and determining what wells we are going

21    to use, how much irrigable acreage, and yet we have no find-

22    ings determining what it is.  Essentially, Colonel Bowen will

23    go out and do this.  He knows generally which area is going to

24    be in there.  But I think we ought to concentrate also in the

25    Court, as far as the lawyers go, in getting these interlocutory

1   judgments finished.  I think we have only about three or four

2   left.  I don't say you have to make them final right now in

3   the sense of appeal, but we ought to at least get them all

4   drafted so that the legal work in this lawsuit is done while

5   Colonel Bowen is doing this work.  It may be a year before

6   he is in a position to know whether he will need meters.  I

7   certainly hope we have these interlocutory judgments all

8   signed up before a year is over.  We have the Aguanga and

9   the area from Temecula down to the naval enclave, and I don't

10  know that we have any other major ones at all.

11      MR. VEEDER:  You have Temecula above the Aguanga ground

12  water area.

13      MR. GIRARD:  That is relatively a minor one.  The

14  Aguanga ground water area is the only one of any real sub-

15  stance.  We are not going to run into any problems from the

16  Gorge down to the Navy.  We are not going to run into any

17  problems on Temecula upstream from Aguanga.  So let's get them

18  done.

19      MR. VEEDER: We have them on Anza.

20      MR. GIRARD: We have Anza here.  Whether they are

21  approved or not is another matter, but we have the drafts.

22      MR. VEEDER:  From our standpoint, we have only Temecula

23  Creek above Aguanga, concerning which there has not been at

24  least a draft of an interlocutory judgment.  I think that is

25  the last one.  We have at least drafts on the others.

1    THE COURT:  I am in accord with that.  I don't propose

2    to postpone the judgments.  I have a longer list than you

3    gentlemen's list.  I have Rainbow.

4        MR. GIRARD:  Yes, there are some others.

5        MR. SACHSE:  Rainbow, I think, is ready for signature.

6        THE COURT:  De Luz, Indians, Aguanga ground water area,

7    Vail A Series.  We have about seven in there.

8        MR. SACHSE:  Rainbow is, I believe, ready for signature.

9    We have De Luz ready.  Mr. Girard has distributed since our

10   last hearing the Indians and Anza.  We are very close to being

11   done.  And my personal wish would be that we push as hard as

12   we can to get this part of the case over with.

13       THE COURT:  Let me ask this, Mr. Veeder, going back to

14   this profitable irrigation, do you have an estimate as to how

15   many acres you contend on the enclave of your irrigable acres

16   are subject to profitable irrigation?  I thought you had some

17   of these figures.

18       MR. VEEDER:  I have.  Colonel Bowen has given me 13,800

19   acres.

20       THE COURT:  Irrigable, or profitable?

21       MR. VEEDER:  Of irrigable land, and I have treated those

22   as subject to practical and profitable irrigation.  That

23   13,800 is a figure--

24       THE COURT:  I understood it was your position that you

25   wanted to ascertain how much of this irrigable ground in the

1   watershed was subject to profitable irrigation.  Isn't that

2   what you and Mr. Clark wanted to ascertain?

3       MR. VEEDER:  I think it is desirable, and I think it is

4   essential, and I think it should be done.

5       MR. SACHSE:  It is his opinion that a hundred percent

6   of the enclave was subject to practical and profitable irriga-

7   tion, but that something less than 50% of Vail and 40% of the

8   private land owners.

9       THE COURT:  Since you wanted to find this figure, how

10   did you propose we proceed?

11       MR. VEEDER:  In regard to the practical and profitable

12   irrigation?  Exactly the way your Honor is proceeding.  I

13   think there is no other way of proceeding than to select the

14   lands you think would come within this decree-- I don't want

15   his blood pressure to go up-- the decree that might regulate

16   these properties, determine on those lands which would be

17   subject to practical and profitable irrigation.  I think much

18   of the land in the Murrieta area that would be selected

19   probably would be considered as such.  I would contest some

20   of the Vail land.  I believe it would be illusory up there

21   in the Buck Mesa area.

22       MR. STAHLMAN:  I am going to contest a little bit of

23   yours, too.

24       MR. VEEDER:  I expect you to, Mr. Stahlman.  But the

25   point I make is the starting place along the line I have

1    outlined here.

2         MR. STAHLMAN:  As long as you are squinting at this

3    thing again from a different angle, what is your contention

4    as to what is profitable irrigation, Mr. Veeder?  How do you

5    determine that?

6         MR. VEEDER:  I would think in regard to the Vail Company

7    land--

8         MR. STAHLMAN:  Let's take a standard that would apply

9    to all lands in the watershed.  I know you will take the Vail

10   Company land, I think you would take it back to Washington

11   with you, if you could.  Let's take a standard that would

12   apply to anybody.  How do you determine what is profitably

13   irrigable?

14        MR. VEEDER:  I would start this way, Mr. Stahlman.  I

15   am convinced, myself, although there is disagreement with my

16   superior on the point, I told him from my standpoint at this

17   juncture the best means of determining practical and profitable

18   irrigation are those lands which have been historically

19   irrigated.  Because I believe that men like Roripaugh and

20   Cease will irrigate the land that they can subject practically

21   and profitably, based upon prices, water supply, all the other

22   factors that go into whether it is a practical way and a

23   profitable means of supplying.  I want it understood that

24   as a point of beginning I suggested this thought to Mr.

25   Clark and he rejected it.  But it seemed to me it was a point

1   or beginning in this lawsuit.

2   THE COURT:  The point of beginning is really just a

3   calculation of the lands which have in the past been irri-

4   gated.

5   MR. STAHLMAN:  How do you get that 13,000 acres in

6   Pendleton, then, under that standard?  Come on, Bill.

7   MR. SACHSE:  I am curious myself.

8   MR. VEEDER:  I would have to say that at this time all

9   that acreage had not been subjected to that.

10   MR. SACHSE: Then you are going to cut out over 10,000

11   acres of Pendleton, are you?

12   MR. VEEDER:  No, I wouldn't cut out that much of it.

13   MR. GIRARD:  Let's take the last ten years on land that

14   has been irrigated.

15   MR. VEEDER:  There is an extremely interesting point,

16   Mr. Girard.  We have been using at the military base--

17   MR. GIRARD:  And that is why Ramsey Clark rejected your

18   theory, I am well sure.

19   MR. VEEDER:  Your Honor asked me to draw some kind of

20   decree.  May I read what I have dictated?

21   MR. STAHLMAN:  I think this is an important thing.

22   THE COURT:  Postpone that a minute.  Let's finish this.

23   What was Mr. Clark's suggestion?

24   MR. VEEDER:  He proceeded on the idea-- and I think

25   basically he is right-- Mr. Clark proceeded on the idea that

1   we would select the irrigable lands and that we would make

2   the apportionment on the basis of irrigable acreage within

3   the area selected for this apportionment that we have been

4   talking about-- in other words, the basis and the criterion

5   that would be adhered to was set forth in the motion of the

6   United States dated May 14th and in that paragraph we started

7   out:   A - 1   A determination of rights to the use of water

8   in the Santa Margarita based on substantial riparian and

9   overlying rights.

10          MR. SACHSE:   And judicial decree.

11          MR. VEEDER:   And judicial decree.

12          MR. SACHSE:   Which means the Vail stipulated judgment.

13          MR. VEEDER:   That is right.

14          2.   An apportionment of available water between holders

15   of such rights on the basis of reasonable demand for bene-

16   ficial use for all potentially permissible uses under such

17   rights, using the general criterion for a determination of

18   such demands acreage reasonably susceptible of profitable

19   irrigation.

20          THE COURT:   That just states the problem.   That doesn't

21   give us any yardstick.   That is what we are going to talk

22   about.   How are we going to decide?

23          MR. STAHLMAN:   Hasn't the law set the yardstick?

24          MR. VEEDER:   I think the law has set the yardstick.

25          THE COURT:   How?

1    MR. VEEDER: Go ahead, George.

2    MR. STAHLMAN:  Any land that can be irrigated.  I don't

3  think it says you have to make a certain profit off of it.  If

4  you are going to make an economic determination as to whether

5  land is subject to profitable irrigation, this is a flexible

6  rule; it changes at the time, it changes as to conditions of

7  use, and it bears a relation to the type and kind of uses that

8  are made of the land in the general area.  If you are going

9  to determine that it is going to cost so much to put in a line,

10  as long as the land is riparian I take the position that the

11  law has indicated that that land, which, according to the

12  normal uses that land of that character can put to in the area,

13  that that land then is subject to profitable irrigation.  I

14  don't think you measure each farmer to see whether he makes a

15  profit on his land.

16    THE COURT:  What does the term mean if it doesn't mean

17  profitable enterprise?  Take land where you might grow cactus

18  and sprinkle it and grow a fine crop of cactus.  What would

19  you do with it?

20    MR. STAHLMAN:  If you had a cactus farm and were growing

21  cactus and land was subject to that, I think you would be

22  entitled to use water on that.

23    THE COURT:  But suppose the cactus didn't even cover the

24  cost of your water, your work on it, your taxes.  Are you

25  going to call that profitable irrigation?

1    MR. STAHLMAN:  I don't think you are going to take each

2    individual piece and go over the man's books like you do his

3    income tax and make a determination.  As the process of

4    economic development in the community and the type and kind

5    of uses of land changes, some people make a profit and some

6    don't.  But they put the water to the same type and kind of

7    use with the expectation that it will make a profit.  I think

8    the natural course of events normally takes care of it.  For

9    instance, in certain areas in the north where they have put in

10   avocados, some of that land is such now that it has reached

11   the point that it is not worth putting the water on the land

12   and they don't put it on the land.

13       THE COURT:  The natural course of events doesn't answer

14   it either, because there is much land in this watershed that

15   could be irrigated if there were water.

16       MR. STAHLMAN:  But the point is this-- I think I know

17   what you are driving at, and I think we missed this point in

18   the case-- the standard the law has set down and the rule of

19   law is that the disuse of land does not destroy its riparian

20   characteristics, nor does the use of water upon that land gain

21   any additinnal advantage or right.  It is true you are going

22   to find little areas where there is not sufficient water to

23   water all the land that may be riparian to any one of these

24   particular streams.  As your Honor pointed out, there are some

25   places where this right is illusory.  But where there is land

1   that is susceptible of irrigation within the watershed, I

2   don't think the rule of law can be that the farmer has to put

3   his water on any particular part of that land or on the land

4   that the Court or that somebody else might think will gain him

5   a bigger return on his money.   I think he has a right to put

6   that water on any part of that land.   Suppose he has to trans-

7   port that water for a considerable distance from the source

8   of supply, but that water can be transported and you can grow

9   an orchard away from the source of supply and you would have

10  to put in a pipe line.   But if that were a custom of the

11  community and if it were a thriving community, like Fallbrook

12  where they transport water for some distance-- in our particular

13  area we have a pipe line for nine miles, and we grow trees

14  and we sell fruit, and some years we make a profit and many

15  years we don't; but it then becomes a determination of the

16  individual land owner as to where he is going to put that

17  water on that land.

18      THE COURT:   That begs the question.   Let's take an

19  example on the Vail property.   We made a finding that Santa

20  Rosa was riparian to the Murrieta.

21      MR. STAHLMAN:   Yes.

22      THE COURT:   You have a little corner that runs across

23  the River.   Let's assume-- and all this argument is predicated

24  on the assumption-- there is enough water for all the

25  irrigable land that can be profitably irrigated.   You wouldn't

20,506

1   contend that it would be profitable to run a pipe line out

2   of the Murrieta up the side of the Santa Rosa Mountain to

3   water something on top of the Santa Rosa?

4       MR. STAHLMAN:  It all depends, your Honor.  Offhand I

5   would say it would appear it is not profitable to do it.  But

6   suppose there was some development on the top of that hill,

7   some religious society that had a lot of money that needed some

8   water up there to keep their buildings going, et cetera, and

9   they did some farming and they could keep that business going

10  up there, then I think you could.

11      THE COURT:  We all agree that what is profitable will

12  vary from year to year.  That is Mr. Sachse's point that

13  any calculation we make today or next year will  not be binding

14  five or ten years from now.  We are all familiar with that.

15  But what I am trying to point out is that you have a question

16  of fact, haven't you?

17      MR. STAHLMAN:  Yes, I think it becomes a question of

18  fact.

19      THE COURT:  In each instance as to what land is subject

20  to reasonable and profitable irrigation.

21      MR. STAHLMAN:  Yes.  There is no question in my mind

22  that it is a question of fact-- the law having set the standard.

23      THE COURT:  Mr. Stark.

24      MR. STARK:  I am curious still as to why we appear to

25  have arbitrarily limited our determination of Riparian land

1    to irrigable lands.  If you take the Gibbon and Cottle land

2    as an example of what I am talking about, you have a small

3    valley, essentially a meadow in the valley surrounded by hill

4    lands where probably in this Southern California area within

5    the next ten years the highest and best riparian use of water

6    is going to be domestic development overlooking the meadow,

7    not the crop you grow in the meadow.

8        I agree with Mr. Sachse that the entire matter of

9    inventorying these lands is a transient thing that is not

10   going to accomplish anything, and I have doubt as to why we

11   are doing it.  But if we are doing it, we are supposedly

12   inventorying the riparian right of the land.  And if this were

13   solely an agricultural area maybe it is reasonable to take

14   the irrigable acreage and say this is the way to measure the

15   riparian right.  But I don't think in Southern California

16   you can ignore the very substantial riparian nonagricultural

17   potential.  In the case of Gibbon and Cottle only a half to

18   two-thirds of their acreage is irrigable land.  Very little

19   of it that is riparian is not usable for domestic development.

20       THE COURT:  I think the answer to your suggestion is

21   this:  That when the time comes that Gibbon and Cottle, we

22   will say, develop that property for small home sites or

23   domestic use, that a new inventory would have to be made.

24   Anything we did now is not going to be res adjudicata.  What

25   determination we would make this year or next year would not

1 bind the land owners as to the future. We would meet those

2 problems when they come. You may have a townsite in the Pauba

3 Valley and you would then have a different problem entirely

4 from what you have now. But we can't say that presently this

5 area is susceptible right now of development into small home

6 sites.

7   MR. STARK: But if this is so, what is the purpose in

8 making this inventory at this time, since it must be conceded

9 there will be no apportionment now? Do you accomplish any-

10 thing by doing it?

11   THE COURT: That is going to depend somewhat on what we

12 find by this inventory. The Government contends, and I think

13 their position is, that when this inventory is made, in some

14 way the Court is going to be able to say there has been ex-

15 cessive use somewhere and this will inure to the Government's

16 benefit. I am not so sure this is going to result and I

17 don't know how, with the limited matter we have in the record,

18 a decree can be drawn. I am going to look at this matter

19 later.

20   But the second thing, Mr. Stark, is that I get the im-

21 pression from Mr. Clark that it is sort a requisite to have

22 the Justice Department propose and push the dam, that we

23 embark upon a study of profitably irrigable lands and a compila-

24 tion of data for several reasons. And I can see one, namely,

25 that if there appears an effort on our part to bring some

1   order and a forward-looking approach to problems that will come

2   up from time to time, this may make it easier to effect the

3   dam; and a dam is presently requisite to any physical solution.

4   That is one thing.

5       MR. STARK:  Is it then feasible to consider ordering

6   some of these steps which involve watershed management con-

7   tingent upon the approval of the dam?  Because it seems to

8   me that we stand a chance of getting into many years of

9   continued litigation because we want the Government to help

10  with the settlement with the dam and we may find ourselves

11  into the lawsuit and then the settlement collapses.

12      Specifically, I find myself representing one of these

13  smaller parties who has had any particular continuity of

14  representation.  They have already spent a substantial amount

15  of money to this point.  They would like at some time to see

16  the expenditure of money terminated, and if the case keeps

17  going on and on, if only annually or semi-annually, we will

18  be back on hearings and reviewing documents and if it is not

19  leading to a settlement it seems to me it is just sort of a

20  long bleeding process.  That if there is to be continuing

21  jurisdiction and a study of the watershed that it could be

22  spelled out as to how that continuing supervision would be

23  done and then ordered contingent upon the approval of the dam

24  and the settlement.

25      THE COURT:  In answer to that, I think Mr. Veeder has

1   convinced Mr. Clark that when this data is gathered it will

2   be just as open and plain as the sheet of paper or the nose

3   on your face that the Court should make some order curtailing

4   upstream users to the benefit of the United States; and if

5   for no other reason than to get these facts laid out and see

6   what we have, I would be willing to go along and have it done.

7   I am not so sure that that is what it is going to show, but I

8   am convinced this is Mr. Veeder's position.

9       Do I misstate your position?

10      MR. VEEDER:  You are right.  I think that is correct.

11      THE COURT:  This is also the reason the Government is

12   embarked upon the Kunkel study which is going to show us the

13   yield of these basins by virtue of what flows out of them.

14   That is to be submitted.

15      I think Mr. Veeder has convinced Mr. Clark that it is

16   just that simple; that when you pull these all together you

17   can say statistically that the Court should make some cutting

18   down of Leo Roripaugh and Ceas and everybody else in the

19   Murrieta so that more water can run down into the basin.  I

20   don't think that is what is going to happen.  But if it is

21   necessary to have it demonstrated, I would like to see what the

22   figures show and I would like to see how a decree could be

23   written with the limited information we have.

24      MR. LITTLEWORTH:  Your Honor, how is this happening

25   mechanically?  The Government has rested its case, we are

1  writing findings and presumably this would almost be through.

2  THE COURT:  Well, don't waste time on that.  In substance,

3  we reopen the case every time we have a hearing and take more

4  testimony.

5  MR. LITTLEWORTH: But it is more serious than that.

6  THE COURT:  It is, in part, because the Government,

7  through one of its high and competent officials, has for the

8  first time shown an interest in trying to terminate this

9  litigation.

10  MR. LITTLEWORTH: Right.  And I appreciate that you can

11  do some things within the framework of trying to settle a case

12  that you might not do if you were engaged in a trial on it.

13  I am not sure that land which is susceptible of profit-

14  able irrigation is the legal test at all if you ever got to an

15  apportionment among riparians.  And this, it seems to me, is

16  sort of a settlement test-- this is something that has arisen

17  out of the settlement negotiations.  But we don't want to get

18  into this business of apportionment.  As Mr. Sachse and all

19  of us know, the record is clear our whole case was predicated

20  on the assumption there was not to be an apportionment, and

21  I don't want to drift in through the back door.

22  THE COURT:  I understand.  We discussed this on several

23  occasions when you were not here.

24  Mr. Girard, what in your opinion is the legal yardstick?

25  What do the cases say?

MR. GIRARD: Mr. Sachse has presented me with a case. I have to give credit where credit is due. I think all of us are familiar with it. This is the Half Moon Bay Land Company case versus Cowell, 173 Cal. 545. I agree also with Mr. Littleworth that it is not necessarily the test that has to be followed by the Court. In that case the court in allocating water used the standard of what riparian land is suitable for profitable irrigation in a water-short area.

> "In apportioning the waters of a stream
> among the riparian owners, where there is not
> sufficient for the needs of all, many different
> facts are to be considered. In Harris v. Harrison,
> . . ., the court, in considering this question,
> said: 'The length of the stream, the volume of
> water in it, the extent of each ownership along
> the banks, the character of the soil owned by each
> contestant, the area sought to be irrigated by
> each -- all these, and many other considerations,
> must enter into the solution of the problem. . . .
> So far as we are aware, no court has ever undertaken
> to lay down a comprehensive rule on the subject.
> We are satisfied that the court may also consider
> the practicability of irrigation of the lands of
> the respective parties, the expense thereof, the
> comparative profit of the different uses which could
> be made of the water on the land, and that when the

1  water is insufficient for all the land or for all

2  of the uses to which it might be applied thereon,

3  and there is enough only for that use which is

4  most valuable and profitable, the shares may

5  properly be limited to and measured by the quantity

6  sufficient for that use, and the proportions fixed

7  accordingly. . . ."

8  Then it gones on with general language.

9  (See next page)

1    MR. STARK:  None of which is the holding in the case.

2    MR. SACHSE:  The holding is that they can use it any-

3    where they want to once the share has been determined.

4    MR. GIRARD:  Mr. Stark's argument, in all seriousness,

5    to the effect that Gibbon and Cottle has some land which can

6    be used for homesites, show me some land that isn't usable

7    for homesites.

8    THE COURT:  Isn't this a problem that you take up when

9    the time comes?

10    MR. GIRARD:  If they stick homes on it they are entitled

11    to water.

12    MR. STAHLMAN:  This is something that has occurred in

13    the San Luis Rey watershed in the last two or three years.  The

14    Utah Construction Company bought a large quantity of land

15    surrounding a golf course in Pauma Valley.  Then they set

16    up a subdivision.  I think they were either a half-acre or

17    one-acre lots that they were going to sell.  They went to the

18    Planning Commission with a map for six or seven hundred of

19    these parcels of land included within subdivision.  It so

20    happened that the engineers for the subdivision had placed

21    the subdivision immediately around the golf course, which was

22    in the flood plane area of the river.  So now they are in the

23    process of being turned down on that.  They are moving the

24    subdivision to the higher land-- you could visualize it on

25    this stream-- and they are put it up on the hillsides.  There

1   is no importation of water in there.   It is all obtained out

2   of the river.   That is what is happening on that particular

3   stream.   And that could happen here.

4          THE COURT:   I think we can pass that problem until we

5   get small home sites.   I think we ought to talk about whether

6   there is some yardstick for practical and profitable irrigation

7   and how we crack the nut as to Vail and Santa Margarita.   I

8   don't anticipate that the Murrieta or the upstream owners--

9   Mr. Stark's clients, Mr. Albany above the dam-- are going to

10   present much of a problem.   I think the real problem comes

11   between Vail and the Santa Margarita.

12          MR. SACHSE:   May I remind you of the very first sentence

13   that Mr. Girard read:   In apportioning the water of the stream

14   among the riparian owners where there is not sufficient for

15   the needs of all, we do this.   And we haven't got it, your

16   Honor hasn't so found, and I believe, with all sincerity, that

17   for us to concede Mr. Veeder's argument by implication, which

18   is what we are doing here-- I don't concede it, but if we start

19   talking about how we are going to apportion this water we are

20   conceding Mr. Veeder's argument, which your Honor has not

21   found.   I don't think we ought to be put to the problem  of

22   meeting this at this time, until the Kunkel studies are

23   complete and until Colonel Bowen's studies are presented,

24   until something is presented to you on the basis of which you

25   are willing to write this finding that says I have found a

1    demonstrable shortage and a division.  Then let's do these

2    things, not now, your Honor.

3         THE COURT:  Just answering one thing.  Insufficient for

4    the needs of all-- that doesn't answer my question.  Let's

5    take Roripaugh irrigating 300 acres, and he has 2,000 acres

6    up there.  I would assume he has another 300 acres that is

7    susceptible of irrigation that is profitable.  If he thought he

8    could get water put on the other 300 acres he would probably

9    irrigate it, too.

10        MR. SACHSE:  Let him do it.  Nobody is objecting to it.

11   He is not asking for it.

12        THE COURT:  He probably knows there is not enough water

13   to irrigate 300 acres and 300 more.

14        MR. SACHSE:  There is only one claim made of insufficient

15   water in this court, and that is by the United States, and

16   the United States's claim has not been supported by your Honor.

17   Your Honor has knocked it right on the head the way the judgment

18   sits today.  They can't assert that claim.  We don't ask any

19   restriction on anyone else.  The only person asking it is the

20   very party this Court has said in the judgment that is now

21   entered, "You can't reach upstream."  That is what the order

22   says today.  Nobody else is asking for this.

23        THE COURT:  Am I right or wrong about this, Mr. Roripaugh?

24        MR. LEO RORIPAUGH:  I think my case is pretty clear

25   about that.  I am strictly a farm.  I am not a dude.  I been

1  there a long time and I am gradually building this ranch.  And

2  as I say, the part that is economically feasible to irrigate

3  I irrigate it.  I could develop more water on the ranch.  But

4  the economy of the thing will determine what I can do with it.

5  If I can't make a dollar with it and that is my only income,

6  I will not do it.  If I can, I will.

7      MR. LITTLEWORTH:  I think probably involved in that

8  question is also the problem of raising capital expenditures--

9  putting in new wells, laying pipe lines, et cetera.  Sometimes

10  the land, if it were under a system of irrigation, could well

11  profitably be irrigated.  But there is the problem of getting

12  capital to do that.

13      MR. STAHLMAN:  Like he says, the dude comes down from

14  the city and brings his capital and puts in his well.  Without

15  that expense he may only pay his taxes.  But that to me would

16  be profitable.

17      THE COURT:  I don't think you would take into account

18  the capital investment as such just ipso facto.  I think you

19  would take into account how far you had to lift the water and

20  that sort of thing.  The fact that a man did or did not have

21  the capital to put it in I don't think would be the criterion

22  for judging what land would be profitably irrigated.

23      MR. LITTLEWORTH:  Following Mr. Sachse's view, isn't

24  there much to be said for the ancient principle that courts

25  don't adjudicate disputes until they really exist?

26,517

1    THE COURT: You were not here when Mr. Clark came down

2    to these meetings and sat around in the courtroom here-- we

3    didn't have a reporter-- and chatted about this thing. And I

4    say again, and I say so advisedly, Mr. Veeder has convinced

5    Mr. Clark that if calculations were made along the lines Mr.

6    Veeder wants to make them, the matter would be very clear that

7    the Court should immediately make some order. And I don't think

8    this follows. But I think the only way to convince Mr. Clark

9    is to get the figures up and show him it doesn't follow.

10    MR. LITTLEWORTH: Suppose Mr. Clark doesn't convince.

11    Then what happens?

12    THE COURT: Our hope for a dam hinges upon what coopera-

13    tion we get out of the Assistant Attorney General and the

14    Justice Department. That dam, to my mind, is an important

15    thing to you people in the Murrieta. I would think if the dam

16    were built and successfully operated it would mean less

17    demand upon the Murrieta in the future than might otherwise

18    be made. We don't know. But I have that feeling. I have

19    the feeling that a dam would benefit everybody in this situa-

20    tion.

21    Mr. Clark has been informed by Mr. Veeder that there was

22    enough data in the record right now where tomorrow I could sit

23    down and make some kind of order here. I tried to point out

24    at various times that we didn't have the figures on what

25    acreage could be profitably irrigated. I pointed out that we

1   might get that over some period of time; that there would be a

2   problem, particularly with the Vail property and the Santa

3   Margarita, but that I was not adverse to working toward that

4   end.  I will be openminded when the figures come in, but I

5   don't think this is going to solve our problem.  But I think

6   the matter is in a position now that we may have to go ahead

7   and find that.

8        MR. LITTLEWORTH:  What happens to the finding we now

9   have made that the Government has no legal right to any regula-

10  tion upstream until it ceases its own appropriations?  This

11  is a legal matter.

12       THE COURT:  Of course, even without amendments-- and

13  we are talking about some amendments of a minor nature to that

14  decree now-- without amendments, of course, the Government

15  tomorrow could quit exporting water, and with their basin now

16  full, if they could prove that they need additional water to

17  satisfy their correlative riparian right, they would immed-

18  iately be in a position to assert it.  There are some "ifs" in

19  that statement, but there it is.  All they would have to be

20  would be to cease exporting, show that their water basin had

21  been restored to where it had been had they not exported, and

22  then demonstrate a right to a larger correlative share than

23  they are getting.

24       MR. STAHLMAN:  Your Honor, on this question we have been

25  discussing here as to the reasonable and beneficial use, I

1  think Hutchins has sort of laced these cases together. It is

2  too long to read here, but I invite your Honor's attention

3  to the language starting on page 220-- "No priority in

4  beginning time" is the subject, and then "Reasonable use for

5  beneficial purposes." He discusses and cites the cases that

6  support his text as to the understanding of it. He cites these

7  cases starting at about page 220 and going to the top of page

8  226. There are about four or five pages there inwhich I think

9  he has explained quite clearly what comes out of these cases.

10    THE COURT: I am not going to spend all afternoon talk-

11  ing about this thing. I want to give you all a chance to be

12  heard. I would like to ask a couple more questions.

13    Thank you for the citation, Mr. Stahlman. I would like

14  to look it over.

15    I would like to ask Mr. Stahlman, have you made any

16  calculation of what figure you would assert of Vail irrigable

17  land that could be practically and profitably irrigated at

18  present?

19    MR. STAHLMAN: Yes, your Honor, in this way. I think

20  the Pauba and the Temecula figures of irrigable acres fall

21  within the category of those which can be reasonably and

22  profitably irrigated. When you get into the acreage on the

23  Santa Rosa, there may be some different situation there.

24  However, I think that is taken care of by the fact that there

25  is not the water thereto irrigate those acres. For instance,

as I recall, the Sandia watershed, we are unable at any time.

1    That is an illustory situation such as your Honor has indi-

2    cated.  You can dispense with that because you can't get the

3    water and it is not riparian to some of the other streams that

4    do have water.  When you get to the Murrieta itself, I think

5    you are limited there by the amount of water you can extract.

6    I think the physical factors there would limit you in extracting

7    any amount that would conflict with the rights.

8        THE COURT:  I submit you are off on the wrong track when

9    you say that the amount of your acreage that could be profit-

10   ably irrigated is affected by the amount of water available.

11       MR. STAHLMAN:  No, I don't mean that, your Honor.

12       THE COURT:  The premise is, assuming there were water

13   available.

14       MR. STAHLMAN:  Assuming there were water available, yes.

15   That has been determined.  I think Colonel Bowen and Mr.

16   Wilkinson got together and got those acreages and they eliminated

17   a tremendous abount of acreage.  The percentage of acreage from

18   the De Luz or Sandia is very small in relation to the total

19   acreage in there.

20       THE COURT:  I know you got together on the figures on

21   irrigable land.  Is your position going to be that all of the

22   irrigable land is subject to profitable irrigation?

23       MR. STAHLMAN:  Yes, I think the irrigable land in there

24   is.  And I think the same thing applies to Pendleton.

25       THE COURT:  Is it your position, Mr. Veeder, that all of

1 the irrigable lane on Pendleton is subect to profitable

2 irrigation?

3     MR. VEEDER:   Certainly at this juncture it is, your

4 Honor.

5     MR. STAHLMAN:   These cases in Hutchins show that this

6 thing can change from time to time.

7     MR. SACHSE:   If all of the irrigable land is subject to

8 practical and profitable irrigation, what do we need another

9 figure for?

10     THE COURT:   We don't.

11     MR. SACHSE:   I don't think we do.

12     MR. GIRARD:   This whole thing of determining an

13 apportionment, you look at the factual situation realistically,

14 while if you start out in this case by making assumption

15 that there is water available  your realistic approach is

16 ridiculous-- there is not water available.   I don't mean to

17 cite Vail, but let's look at the Santa Rosa.   I believe, as I

18 recall, a portion of the Santa Rosa Rancho that touches the

19 Murrieta is away up in the boondocks somewhere?

20     MR. STAHLMAN:   Why don't we take the area where we are

21 using water?

22     MR. GIRARD:   In other words, if you took every drop of

23 water that was physically available, and assuming no one else

24 touched the water-- it was in a state of nature, you wouldn't

25 have enough water available to irrigate a hundred acres.   So

1    why approach it on the basis of making the assumption that

2    there is all kinds of water there?

3        MR. VEEDER:  You refer to Santa Rosa, though, in the

4    Santa Margarita River.

5        MR. GIRARD:  I meant the Santa Rosa Rancho.

6        MR. VEEDER:  And you meant Murrieta Creek, didn't you?

7        MR. GIRARD:  I don't have the map here.

8        THE COURT:  I was talking about the Murrieta.  I was

9    not talking about where it hits the Santa Margarita.  We

10   haven't settled that.

11       MR. GIRARD:  Somewhere up there there is a small portion

12   that may or may not touch on Murrieta Creek.  Isn't that

13   correct.

14       MR. VEEDER:  Yes.

15       MR. GIRARD:  Or it does touch, I think.  But we all

16   know that if no one else used water in the whole watershed,

17   there would not be enough water in there to irrigate any

18   appreciable amount of land.  It just isn't there.  So why

19   approach it on the basis of what is irrigable on the completely

20   ridiculous, unrealistic approach that there is water avail-

21   able?

22       MR. SACHSE:  Mr. Girard is so absolutely right.  In

23   the very case to which he just referred the court did not

24   attempt to apportion the entire quantity of water that might

25   at any time be flowing in the stream.  The apportionment is

1   made for the respective shares of the parties at the time when

2   the stream had flowed only 23 miner's inches.   The year that

3   gave rise to this suit was the driest that had been known for

4   many years.   In other words, if there were all the water you

5   need, then you aren't going to apportion.   There isn't any

6   problem of apportionment if all of the land could be irrigated.

7   The only time this problem arises is when there is not water

8   enough to irrigate everything, and then the court must weigh

9   these factors of practicability, profitability, highest and

10   best use, domestic against agricultural, et cetera.   That is

11   the only time the problem arises.   So therefore we don't pull

12   the figure out of a vacuum, as Mr. Veeder asked us to, and

13   then apply it to this shortage.

14          MR. VEEDER:   I think Mr. Sachse and Mr. Girard are right.

15   I think the problem is in regard to the available supply of

16   water at the present time, and I think  we demonstrated

17   repeatedly that there is not enough water.

18          MR. SACHSE:   I disagree with your demonstration, Mr.

19   Veeder, and the Court has not entered such a finding.

20          MR. VEEDER:   No, but he will before we are through, Franz.

21          MR. GIRARD:   Of course  Bill, today if you cut down

22   every use upstream, you wouldn't have any more water available.

23          MR. STAHLMAN: Whatever standard you use, you are going

24   to have to use it for the entire watershed and apply it to

25   everybody, and I am quite sure we go on the basis that the

1 available water is to be apportioned in relation to the

2 quantity of land that can be reasonably and profitably irri-

3 gated.  In other words, we have the situation of Vail today

4 where we are irrigating only what I think is a very small

5 percentage of our land.  Somebody else has forty acres up the

6 line and they are irrigating 40%.  If the Court were going to

7 apportion water, you may not cut down Vail at all.  You are

8 not going to cut down on the basis of what they used in the

9 past.  Then you have those little people who are irrigating

10 a little ten-acre piece a hundred percent.  They are the ones

11 who are going to have to be cut down.  I don't think when

12 you have a lot of land and you are irrigating only a small

13 part of it, it is going to hurt very much.

14     MR. VEEDER:  In regard to the statementthat this has to be

15 basinwide, I thought it was agreed among all the parties that

16 it was not basinwide.

17     MR. STAHLMAN:  All of the parcels have the right to

18 participate in the water in the particular stream or basin.

19     MR. VEEDER:  Just so.

20     MR. STAHLMAN:  The physical feature of the watershed

21 makes that determination.

22     MR. VEEDER:  We have been attempting to limit the area

23 that would be subject to this decree to the lands in the

24 Murrieta ground water area and indeed a reduced area within

25 that area from the standpoint of regulation or apportionment

1 or whatever you want to say.

2     MR. GIRARD:  Of course, that is looking at it from the

3 approach of the United States.  You are willing to limit it

4 to the Murrieta-Temecula area and portions thereof because

5 they are really the only people who can realistically affect

6 you.

7     MR. VEEDER:  That is right.

8     MR. GIRARD:  But when you regulate those people, the

9 thing is that somebody sitting upstream just beyond that little

10 imaginary line you have drawn there will say, "It affects me."

11 It may not affect you.  If the downstream person is the one

12 who demands regulation, you are probably going to have to

13 regulate the whole system.

14     MR. VEEDER:  In that regard I would say this.  That if a

15 line were drawn by this Court as to the area that would be

16 subject to the decree that we have referred to in our motion

17 of May 14, and the line were drawn in a way, for example, that

18 Ceas was included and his neighbor was not included, and Ceas

19 felt that his neighbor was pumping in direct competition with

20 him, then I would say Ceas would certainly be entitled to

21 bring into the decree anyone else or this other party that he

22 thought was interfering with him.  I think the best way to do

23 is to limit the decree as much as possible, and then on an

24 order to show cause bring in whoever else is demonstrated to

25 be participating.

1    MR. GIRARD:  Let's get one thing straight.  If, in all

2    this discussion about a decree, you are talking about the

3    decree suggested in your motion, I don't think you have

4    anyone here who is going to go for that type of decree, on

5    the evidence we have now.

6    MR. VEEDER:  I am responding to your question, Mr.

7    Girard.

8    MR. GIRARD:  I am just saying that if the United States

9    is the one who is going to seek regulation, you are not going

10   to be able to reach upstream and say, "Vail, you stop pumping,"

11   because as soon as you do that and bring a case against Vail,

12   Vail is going to reach a little further upstream and say,

13   "Gibbon and Cottle, you stop pumping," and then Gibbon and

14   Cottle are going to go one step further.  I would think

15   everyone would agree that Gibbon and Cottle's uses cannot

16   possibly affect the United States.

17   MR. VEEDER:  The Vail dam between Gibbon and the United

18   States.

19   MR. GIRARD:  Even if the Vail dam were not between

20   Gibbon-Cottle and the United States, the amount of water

21   that Gibbon uses would have just gone  into the Pauba basin.

22   It would have never come to the United States.

23   MR. VEEDER:  That is why we look primarily to Vail

24   Company on this matter.

25   MR. GIRARD:  You may look to Vail Company.  But let's

1    assume other existing conditions today.  If you cut down all

2    the uses, you wouldn't get one drop of water more than you get

3    today.

4        MR. STAHLMAN:  You didn't sue Vail Company alone in the

5    case; you sued all six thousand owners.

6        THE COURT:  Let's take a recess.

7        Do you have copies?

8        MR. VEEDER:  Yes, I have.

9        THE COURT:  Will you pass them out.

10       (RECESS)

11       THE COURT:  Who has copies of this draft that Mr. Veeder

12   passed out?

13       MR. GIRARD:  Franz and I have one here.

14       THE COURT:  For the sake of argument, let's take a

15   couple of examples, because I think this is going to point up

16   some very interesting matters.  Let's assume for argument

17   that the figures as set forth are the riparian land as

18   indicated that are susceptible of practical and profitable

19   irrigation.

20       Now before I make my comment, have all of you read it

21   over?

22       MR. GIRARD:  Yes, your Honor.

23       THE COURT:  Who wants to start out?  Mr. Girard?

24       MR. GIRARD:  I will let Franz start out.

25       MR. SACHSE:  First, I think the percentage figures,

1  whether Mr. Veeder did this hurriedly --

2      MR. VEEDER:  You saw me.  I had an hour in which to do

3  it, Mr. Sachse.

4      MR. SACHSE:  On page 2 -- I will use this as an example

5  because this occurs in all of them -- he shows that Murrieta

6  lands, except Vail, represent 31% of the irrigable acres.  Of

7  what irrigable acres?  Of irrigable acres on the whole stream?

8      MR. VEEDER:  No.

9      MR. SACHSE:  Is that not correct?

10     THE COURT:  No, we will assume for argument that it is

11  31% of the lands which would be riparian to Murrieta Creek.

12     MR. SACHSE:  Well, it is'nt.

13     MR. VEEDER:  Which is susceptible of practical and

14  profitable irrigation.

15     MR. SACHSE:  It is 100% of the whole.  Look at it.  When

16  you go over on the next page he says the Murrieta users have

17  31% of Murrieta Creek.

18     MR. VEEDER:  You see, your Honor, if I were permitted

19  to make just a brief introductory statement in regard to what

20  this is --

21     THE COURT:  All right, do that.

22     MR. VEEDER:  -- then it would be clear.

23     THE COURT:  You are permitted right now.

24     MR. VEEDER:  The important thing, as I have set out here,

25  is the fact that your Honor asked me to prepare a very rough

1    draft of what I think would be an overall decree for the

2    Santa Margarita River basin.  I have limited it to the area

3    of the Murriet-Temecula ground water area and the areas

4    downstream.  It naturally breaks down into three primary

5    valleys -- that is what we will call them -- that is, Murrieta

6    Valley, Temecula Valley, and the main stem.

7        Now Vail has, in regard to Murrieta -- We don't have our

8    board here.

9        THE COURT:  We will assume your figures are correct.

10   You mean Vail Company has 9600 acres of land which is riparian

11   to Murrieta Creek.

12       MR. VEEDER:  Here is how I do it, your Honor.  (Mr.

13   Veeder draws on the board.)  Now in regard to Murrieta Creek

14   -- this is the Enclave line here -- in regard to Murrieta

15   Creek I have taken an arbitrary figure of 10,600.

16       THE COURT:  For people other than Vail.

17       MR. VEEDER:  For people other than Vail.  I have simply

18   put in the 10,600.  Whatever the Colonel comes up with will

19   govern.

20       Then I have taken the Pauba Grant on Temecula and I have

21   put 18,500, I think it is.

22       Now the Temecula Grant is so situated that it is

23   entitled to participate in Temecula and in Murrieta both.

24   So what we did was calculate -- take 100% of the whole flow

25   of Murrieta and apportion it between the 10,600 here, the

1    9600 here, and the 13,800 here, which is the Enclave proper,

2    and when we were through the percentages that I have reflected

3    in this drawing came about.

4         In other words, there was a full 52,500 acres that we

5    treated to be within the scope of the decree. When it broke

6    down the 10,600 represents the right of this land here, the

7    Murrieta land, to participate in the entire runoff of Murietta

8    Creek on the basis of 31%. The Vail Company's land, the

9    9600 in the Temecula Grant, would be entitled to participate

10   in the yield of the Murrieta on the basis of 20%. The

11   United States, being riparian to the main stem of the Santa

12   Margarita River, would participate, in our view, correlatively

13   with the owners in the Murrieta Valley at the rate of 41%.

14   Now that accounts for 100% of the yield of the Murrieta

15   Creek. That is how we arrived at that calculation.

16        Now in regard to Temecula Creek you have a situation

17   where Vail Company's Pauba land is the largest riparian. It

18   participates correlatively, in our view, with the Temecula

19   Grant and with the United States of America. There are some

20   acreages in the reach of the stream between Temecula Canyon

21   and the Enclave, and of course those small riparian acreages

22   would be entitled to whatever their share would work out.

23   So on Temecula Creek -- and this, Mr. Stark, is below Vail

24   dam -- we have taken the 18,500 of Pauba and calculated that

25   that would be entitled to participate in the yield of the

1    stream on the basis of 44%.  Now the Temecula Grant is also

2    riparian not only to Murrieta Creek but also to Temecula,

3    and there it gets 23% of the total yield.

4         THE COURT:  Of Temecula.

5         MR. VEEDER:  That is correct.  That is a total for Vail

6    Company of 67% of the yield of that stream.

7         MR. STAHLMAN:  Did you include Little Temecula in there?

8         MR. VEEDER:  It has not been included, no, George.

9         THE COURT:  Let's leave it out.

10        MR. VEEDER:  I wanted to draw these very simply.

11        Now the United States, being riparian owner downstream,

12   in our view, is entitled to share in the yield of Temecula,

13   which runs to 33% of that total.

14        Now there is the total of the correlative participants

15   in the yield of the stream.

16        Now below Temecula Gorge there are no substantial

17   riparian users or claimants at all.  The United States of

18   America is the only one.  You have Sandia Creek, you have

19   Rainbow Creek, De Lus Creek, and the increment, in our view,

20   would be this way.  The United States would not participate

21   with anybody above the Vail line.  We would participate

22   correlatively in Rainbow Creek and in Sandia Creek and in

23   De Lus Creek.  We would be entitled -- and this is just a

24   speculation on that -- I think the increment overall between

25   the Vail boundary and the Enclave is something like 4,000

1   acre feet.  I am not sure of that, your Honor.  But never-

2   theless we would participate in that as a correlative owner

3   and we would have, in our view, with all respect to Mr.

4   Dennis, 100% of De Luz Creek.  And that would be the basis of

5   our correlative share.

6       MR. SACHSE:  May I make a comment, your Honor.  If you

7   will look on page 2, you will find that of the total irrigable

8   acreage in the entire watershed that he is talking about, the

9   United States has what?  It has 26% of 52-5.  Yet under this

10  ingenious system Mr. Veeder has devised he has only 26% of

11  the total irrigable acreage, but he gets 41% of the water in

12  the Murrieta, 33% of the water in Temecula, and 100% of

13  everything else.  He has only 26% of the acreage, but this

14  is what he is getting -- 41% of the water here before these

15  people, and he takes 41% of that.  These people are held

16  back and he takes 33% of this and he takes all of this.  This

17  is the phoniest proportion of any I have seen in my life.

18      MR. VEEDER:  For a man representing only a piece of

19  paper --

20      MR. SACHSE:  An appropriator, that's right.

21      MR. VEEDER:  The point I want to make is that the

22  United States, being so well situated, is certainly going to

23  be in a position to participate at a higher percentage rate

24  than anyone else for a very good reason.  De Luz Creek comes

25  to us -- I don't believe there is anyone of any magnitude,

1    there are some small users upstream -- Rainbow, Sandia, the

2    increment between there and the Enclave.  By reason of our

3    location we are in a better position.

4         THE COURT:  We know that.

5         Let me ask this question.  This is all predicated upon a

6    flow of the Murrieta and the Temecula.

7         MR. VEEDER:  Whatever the flow should be, that is the

8    basis.

9         THE COURT:  What are you talking about?  Flow in a state

10   of nature?

11        MR. VEEDER:  Yes.  And your Honor, in this regard, the

12   reason we haven't put any numbers in that, we are in the

13   process of attempting to reconstruct the flow of Murrieta-

14   Temecula and the main stem in a state of nature.

15        THE COURT:  So this is all predicated on a flow of the

16   Murrieta-Temecula in a state of nature.

17        MR. VEEDER:  Or you could have it the way it is now.  It

18   doesn't make any difference to me.  The percentage of par-

19   ticipation doesn't make any difference in the number of acre

20   feet available.

21        THE COURT:  The percentage of what?  What do you do

22   about overlying owners who have a right to participate in the

23   basin?

24        MR. VEEDER:  That is all part of the stream system.

25        THE COURT:  It is not part of the flow.

1    MR. SACHSE:   I think he intends it to be.

2    MR. VEEDER:   I think you have to take a look at it the

3    way it is.  You have a stream that produces X quantity of

4    water, and a part of it is flow that -- for example, in

5    Murrieta Creek -- well, I will use Temecula Creek -- there is

6    a constant flow out of Murrieta Creek.

7    THE COURT:   You are pointing to Temecula.

8    MR. VEEDER:   Out of Temecula Creek, which comes directly

9    out of the alluvium.  It is draining out of the alluvium.

10   There is a constant supply of water.  Call it ground water,

11   if you want.  You have the same thing over here on Murrieta.

12   You have flow that comes down here from October on through

13   until the beginning of the irrigation season.  Sure, it's

14   ground water.  It is water that is draining out of the

15   alluvium.  There is direct flow, too.  There is storm flow.

16   But basically and fundamentally it is the aggregate of the

17   water that comes out of the alluvium and storm flow that

18   comes down to us.

19   THE COURT:   I want to understand, first, what you are

20   figuring.  You are trying to reconstruct these streams in a

21   state of nature, which would eliminate all pumping out of

22   basins.  Is that what you are trying to do?

23   MR. VEEDER:   I think we can select the period of years

24   that are in the record.  Your Honor can look at them, if you

25   want to make findings on them, and make the determination

1   that this is as close to a state of nature as you are going

2   to get.  And when you have made that determination it makes

3   no difference to us, or to me anyway, what period of time you

4   use or how you view this matter -- whether it is a day-to-day

5   flow -- I submit that the Enclave, by reason of its location,

6   by reason of its irrigable acreage, will participate in that

7   available supply.  Suppose you have determined that the

8   annual yield of Murrieta Creek is 5,000 acre feet a year,

9   and the basis of participation would then be on these per-

10   centages that have been set up.

11   MR. GIRARD:  What you would suggest, then, is that you

12   get 41% of the safe annual yield of Murrieta Creek, and

13   assuming that is 5,000 -- I don't know what it is -- but you

14   would concede, wouldn't you, by the use of the ground waters

15   you are getting a much more of a safer yield than existed in

16   a state of nature?

17   MR. VEEDER:  By the use of the ground waters.  What does

18   that mean?  You mean people are pumping water and it comes

19   down to us?

20   MR. GIRARD:  You would say you would be entitled to 41%

21   -- I would throw out flood waters, you are going to get those

22   anyway, assuming no one builds a dam up -- 41% of the surface

23   flow of Murrieta Creek as it existed in a state of nature.

24   MR. VEEDER:  I would say that, yes.  Take 5,000 annual

25   yield -- let's use that term -- and our view is that these

1   people who are pumping water out of here are actually using

2   part of the --

3       MR. GIRARD:  Where do you measure your flow?  As it

4   reaches Pendleton?  Are you going to reconstruct your figures

5   for what existed in a state of nature down at the military

6   base, or up there?

7       MR. VEEDER:  I would reconstruct it at each point.  In

8   other words, here is the Murrieta gauging station right here.

9   That is just a short distance from the town of Murrieta and

10  above the confluence of Temecula and Murrieta where the

11  stream runs.  Now you have a gauging station in Temecula

12  Canyon right here.  The difference between the measurement at

13  Temecula Canyon and the Murrieta flow is substantially the

14  yield of Temecula Creek.  So you are in a position where you

15  can actually determine which each stream contributes.  You

16  will have to make some assumptions.  I don't believe it is

17  possible to do otherwise.  It is absolutely essential that

18  some assumptions be made.  But nevertheless I believe it is

19  possible to demonstrate the sources of water and to establish

20  a criterion in which to participate from Murrieta Creek.  I

21  think that is entirely possible.  I think it is entirely

22  possible to do exactly the same thing for Temecula.

23      Now we know Vail Company's dam went in -- let me put in

24  one more point here -- and I think this becomes important.

25  You will find a difference in the quantity yielded at Nigger

1   Canyon which would be the measurement of the stream prior to

2   the time that the Vail dam went in there. So you would be able

3   to make a calculation as to the yield of this stream prior to

4   that time. I don't want to be held to this number, but it is

5   something like 10,000 here at Nigger Canyon, something like

6   12,500 at the mouth of the Gorge. There is an increment

7   into Temecula Creek between Vail dam and the mouth of the

8   Canyon. Maybe it is 2,000 acre feet. That would be Pachanga

9   Creek that comes in here. And then there is some participa-

10  tion that goes into Temecula Valley, which does show some

11  increment in a state of nature.

12      Now you have some real problems in regard to arriving at

13  what would be the yield of the stream. If you take the

14  overall yield down/the last fifteen years of drought -- it
              to

15  may be that I think that would be the one I would recommend --

16  you would find down to 1946 or 1947 you had quite a sub-

17  stantial output of the stream. But for the last fifteen years

18  it has just not averaged that. Again, you would have to make,

19  in our view, an arbitrary finding as to what you would think

20  would be a proper period to make the determination as to how

21  you would apply these percentages that I have set out here

22  and which I have just very hurriedly and very roughly set out

23  in the suggested decree or the parts of the decree that I

24  handed to your Honor.

25      That is the predicate upon which we worked. I am not

1    saying that the percentages are arithmetically right.  I am not

2    saying that that is the only way apportionment can be

3    effectuated.  I do believe, though, that our schematic drawing

4    will provide a basis for proceeding in accordance with our

5    motion of May 14.

6        THE COURT:  Let me ask you this.  How do you treat over-

7    lying owners?

8        MR. VEEDER:  Overlying owners -- so far as we are con-

9    cerned, Vails would be entitled to participate in the ground

10   waters that they pump out.

11       THE COURT:  I know.  But they are pumping not from the

12   flow of the stream; they are pumping from ground waters.  You

13   have an immense basin there.  Your figures are astronomical

14   as to the amount of water in that ground water area.  How do

15   you know what is the safe yield of that basin?

16       MR. VEEDER:  Here is how I would say you could ascertain

17   what is the safe yield of that basin.  I think this is in

18   accordance with what Colonel Bowen and Mr. Kunkel have said.

19   That in a state of nature -- and again, you must make

20   assumptions, because you are not going to have all the facts

21   -- you can assume, as I understand it, that the inflow into

22   the basin is substantially the same as the outflow in a state

23   of nature, less losses through evapo-transpiration.  I don't

24   know whether those evapo-transpiration loss figures have been

25   set forth by the  farming, etc. that has taken place.  But

1    nevertheless you can make a calculation as to what water the

2    overlying users can participate in, relating it back to the

3    quantity of water that has historically flowed out of

4    Murrieta Valley.

5        THE COURT:  Well, what do you do about this situation?

6    Here is a large basin and there is water available there for

7    the overlying owners, and by putting the water on their

8    ground they pump down this basin.  Then when the floods come,

9    which would ordinarily flow into the ocean, they fill up this

10   basin again.  That is a proper use of riparian water.

11       MR. VEEDER:  I think it is, your Honor.

12       THE COURT:  Then how do you limit the Murrieta land-

13   owners to a percentage of what would be the natural flow of

14   the stream?

15       MR. VEEDER:  Because I believe the entire yield of the

16   stream embraced what would naturally flow out of there.  Flow

17   out of it I have been using as base flow.  I think you can

18   normally tell what they would be entitled to.

19       THE COURT:  I don't think you follow me.  Suppose that

20   in this big basin, over which these people in Murrieta are

21   overlying owners, they use three times as much as your

22   percentage figure would show and they pull down the basin.

23   Then when the floods come along the flood fills up the

24   Murrieta Creek basin, which would otherwise go to the ocean.

25   Why isn't that a proper riparian use?

1      MR. VEEDER:  I think it would be a proper riparian use

2  -- let me start again.  If there is such an overdraft as you

3  have described, they do make some room for recharge.  But

4  basically I believe, your Honor, the situation in Murrieta

5  is this.  That the permeability of the soil is such that when

6  you have got your storm floods, they are coming down there,

7  that there would/be a complete recharge to it.  I think there
                **not**

8  would be an overdraft, and I think the fact that you have

9  pumping holes in through here indicates that overdraft.

10  I think you would probably have to go back to what I have

11  said is the yield of that basin, which would be the historic

12  outflow from it.  And I think if you got too much of an

13  overdraft you would have the situation you had in the fall

14  of 1959 where you create a ground water divide and many

15  serious pumping holes.

16      MR. LITTLEWORTH:  May I indicate what I think is

17  basically wrong with this, your Honor.  There are lots of

18  things I think you can pick at, but this at least what comes

19  to my mind right now as the basic thing wrong with this

20  analysis.

21      I suppose you can have, fundamentally, two kinds of

22  decrees.  You can have a decree -- which I thought Mr. Veeder

23  wanted throughout this trial -- a decree which categorizes

24  the type of water right that you have, and you can say that

25  a person is riparian to a certain stream and define it, and

1   if it were a simple situation of just two landowners that

2   owned the same amount of land, equally irrigable, you say

3   each had half the rights in the stream.  Trying to go beyond

4   simply saying that these people have correlative rights raises

5   all the problems that you put on the board with your little

6   sketch last May when you try to begin to say you have a

7   correlative share in what.  And obviously the percentage

8   varies all the way up and down the stream system, depending

9   on where you are and what tributaries feed your riparian land.

10  That is, basically, one kind of decree, and I think that is

11  what Mr. Veeder is talking about here.

12        But what bothers me, I think he wants to jump from that

13  type of decree and jump over and say this is the way you would

14  apportion if you had a shortage.  And this is not true.  If

15  you have a shortage, then you are going to look at where the

16  shortage is and who is causing it.  Now I don't care what

17  percentage Mr. Veeder might have next to the United States.

18  If you had a decree which said the United States of America

19  has a riparian right and it has X percentage to various

20  portions, whatever that percentage might be, if in fact it was

21  short of water you would first have to see what supplies it

22  was getting.

23        Let me turn it around a minute.  If, for instance, a

24  hundred per cent of De Luz Creek were giving it all the water

25  it needed, it couldn't do a thing about upstream no matter if

1    the people up there took away their water and nothing flowed

2    over the lip, as long as the United States had all the water

3    it needed.  If there were a shortage, you would then have to

4    figure out whether cutting down in particular areas would

5    really help the person who had a right to be helped.  Maybe

6    cutting down in the Murrieta would get more water to the

7    United States.  Maybe it wouldn't.  There is ten miles of

8    channel there.  Suppose you cut everybody in Murrieta 20%.

9    This might cause more water to flow over the lip.  It might

10   not, really.  If it did, that water might well be consumed

11   by the phreatophytes on the way down.  You have to look at

12   the physical situation, and then the Court has to make a

13   common-sense determination on how this water can best be

14   shared in the face of the shortage as it exists.  And it will

15   not be, I am convinced, on an arbitrary basis of cutting

16   people out on some kind of percentage based on irrigable

17   acreage.

18        MR. SACHSE:  I agree with what Art has said, but I want

19   to point out what I think is another fundamental error in

20   this plot of Mr. Veeder's.  This method of calculating

21   respective shares in a stream will work where you have the

22   typical stream in the wet country, which is bigger at the

23   mouth than it is when it starts.  But when you have streams

24   such as a typical Southern California stream that is bigger

25   when it starts than it is when it ends -- in a state of nature

1   there is more water on the mountain than ever comes down to

2   the sea -- the last man on the stream does not have an

3   arbitrary right to his percentage of the water at the very

4   top.  He has a right to the percentage of water that would

5   have reached him, subject to the reasonable and proper

6   diminutions, exercises of rights, by users above him.

7       So Mr. Veeder can't even go so far as to say, "I have

8   26% of the total acreage and therefore I want 26% of all

9   these streams."  Let alone this fantastically far-fetched

10  thing of adding all this acreage in here to give him 41 not

11  46, and adding this to give him 23 not 26.  He has done this

12  absolutely backwards.  If this were the Hudson River or the

13  Columbia, maybe this kind of adjudication would work.  I

14  have never had anything to do with that kind of river,

15  unfortunately, so I don't know.  It positively will not work

16  on a California stream.

17                  (See next page.)

18

19

20

21

22

23

24

25

Belt 11

1    I will ask Bill Dennis, what is the name of the Ringe

2  case?

3    The Ringe Land case where this very thing was gone into

4  -- the fact that the Malibu Creek, or whatever it was, had

5  a lot of water at the upper end and none when it ran into

6  the ocean.  So they tried to work this kind of division, and

7  the Court said it's bughouse -- it will not work.

8    MR. VEEDER:  I have to respond to some of your totally

9  erroneous statements.  The Santa Margarita river is a gain-

10  ing stream down past DeLuz, there is no question about that,

11  and even in the reach of the stream between Vale Company's

12  boundary and the enclave boundary there is a gain of pro-

13  bably 4000 acre feet.

14    MR. SACHSE:  Mr. Veeder, there is a gain of winter

15  flood water, which no riparian can conceivably use.  That

16  is what you are talking about.  But your state of nature

17  stream flow, no; you haven't got this kind of water.

18    MR. VEEDER:  Just a moment, Mr. Sachse.  From the

19  standpoint of the United States, with its underground basins

20  etc., the recharge for the stream is extremely important to

21  us, even the winter recharge, particularly the winter

22  recharge, and when we start running up this stream we are

23  certainly going to claim our full correlative share against

24  the people in Murietta.  That is definitely the law.  There

25  is no question that the one below the confluence of each of

A2

20,545

1    the streams -- we went into this very theory not too long ago.

2    THE COURT:  When I drew the sketch rather hurriedly to

3    start, I may have skipped a cog on that.  But we talked about

4    this the other day.

5    I am not satisfied with Mr. Veeder's figures.

6    But let's take two situations.  Here is the Governments

7    land as it exists where the Government's land is riparian

8    both to the Murietta and the Temecula.  I suppose in

9    principle the Government then has to share on both streams.

10   To show what I mean, suppose the Government's land were

11   here before the confluence of the Murietta Creek and

12   Temecula.  There would be some watershed in here, of course,

13   between the two.  This portion would share on the Murietta,

14   this portion would share on the Temecula, and the total of

15   the two shares, I suppose in theory, would be the same as

16   in the situation where the Government's land is below the

17   confluence.  In other words, the Government below the con-

18   fluence should be in as good a position as if it lay astride

19   both streams.

20   MR. VEEDER:  The Temecula Gorge is so situated that it

21   participates --

22   THE COURT:  In both streams.  I think that is true.

23   I would like to hear Mr. Girard's view on this.

24   MR. GIRARD:  One thing I would like to know.  Does your

25   average annual yield include ground water?

1    MR. VEEDER: "It includes everything, Mr. Girard.

2    MR. GIRARD: In a state of nature you wouldn't use

3    ground water. You made the statement that -- maybe this

4    is correct, but it sounds illogical to me -- that your

5    safe annual yield would be the amount discharged in a state

6    of nature.

7    MR. VEEDER: I think you are confusing. Maybe I was

8    the one.

9    THE COURT: That is what you said, wasn't it?

10    MR. VEEDER: Yes.

11    MR. GIRARD: That is what I understood you to say,

12    which doesn't ring the bell.

13    MR. VEEDER: The yield of the basin is the discharge

14    from the basin.

15    MR. GIRARD: Where do you get that? Is that a correct

16    hydrologic statement?

17    MR. VEEDER: Yes, I think it is.

18    MR. GIRARD: The yield of the basin is the amount of

19    what?

20    MR. VEEDER: That discharges from it, less evapotrans-

21    poration.

22    MR. GIRARD: In a state of nature?

23    MR. VEEDER: That is true.

24    MR. GIRARD: That is ridiculous.

25    MR. STARK: Is there hydrologic testimony in the record?

1    THE COURT: Not yet.

2    MR. LITTLEWORTH: The outflow is frequently created by

3    return irrigation flow. It is created sometimes by pumpers

4    who put it over the lip in a state of nature.

5    MR. VEEDER: You are talking about state of nature.

6    MR. GIRARD: The yield of a basin assumes pumping.

7    MR. VEEDER: As I said, you would have to have

8    assumptions in this matter. But basically, you can do this.

9    It is entirely possible, with matters in the record, to

10   determine from day to day discharge from the Murietta Basin.

11   MR. GIRARD: In a state of nature?

12   MR. VEEDER: I say, we will assume the period of record

13   down to 1948, if you want to choose it that way, as being

14   the state of nature -- if you want to do that.

15   MR. GIRARD: I am not going to assume anything. I want

16   to know what you include here in your average annual yield

17   of Murietta Creek. Do you include just the surface flow in

18   a state of nature?

19   MR. VEEDER: That term, as we are using it, is the

20   entire yield of Murietta. The yield of the basin, though,

21   I am trying to say to you, is the discharge that can be

22   calculated out of the alluvium. In other words, it is

23   entirely possible to determine -- and this is a hydrologically

24   acceptable process -- you can take your daily run-off a

25   couple of days after a storm and you can determine the

1    quantity water that is draining out of the alluvium, and

2    that is base flow.  That quantity water that comes out of

3    the alluvium can be considered to be discharge from the

4    Murietta Basin itself.

5        MR. GIRARD:  Okay.

6        MR. VEEDER:  Now the flow --

7        MR. GIRARD:  Wait a minute.  Let's not stop.  Now in

8    order to have any water to come out, you would have to have

9    a full basin, wouldn't you?

10       MR. VEEDER:  No.

11       MR. GIRARD:  Or practically full?

12       MR. VEEDER:  No.  You can have a situation like you

13   have here.  I think the windmill well shows the water pumped

14   down to about 70 feet below ground level, and yet you have

15   a discharge of ground water out of Pauba.  So you don't have

16   to have a full basin to yield base flow.

17       MR. GIRARD:  All right.  But you have to have water

18   above the bedrock lip.

19       MR. VEEDER:  Indeed.  And that is why we are here.  We

20   don't want anybody to go below that or we are out of water.

21       MR. GIRARD:  Let's not make any hysterical statements.

22   Do you think you are entitled to any percentage of what is

23   below that bedrock lip?

24       MR. VEEDER:  You are asking me a hypothetical question.

25       MR. SACHSE:  That is very actual.

MR. GIRARD:  Because actually that is where the safe yield of the basin is.  Do you think you are entitled to anything from there?  Because as soon as you say you are, then you are diminishing your surface flow, and you can't have your cake and eat it, too.

MR. LITTLEWORTH:  I don't see where we get with this state of nature business, because all we have in the record are some U.S. G.S. Gaging Station Measurements.

THE COURT:  We are assuming for argument that he can reconstruct the state of nature.  Let's not go into that. We are assuming for argument to try to get his theory. I don't know how he can do it.

But here is where I think is the difficulty with that. Let us assume that he has reconstructed the state of nature flow out of the Murietta, and let us assume it is 5000 acre feet of water.   I take it that under Mr. Veeder's percentages, then, he would claim that the United States was entitled to 31% of that.

MR. VEEDER:  41%.

THE COURT:  I am talking about Murietta.

MR. VEEDER:  41%.

THE COURT:  He wants 2000 acre feet.  41% of that.

Now, doesn't that overlook the fact that these people in the Murietta overlying the basin of water, that as over-lying owners they are in an advantageous position with water

1  beneath them.  They are entitled to pump as long as they

2  don't hurt this basin.  Aren't they, therefore, entitled

3  to pump their basin down and allow the basin to be refilled

4  by flood flow rather than to have all the flood flow come

5  down and recharge basins below?  And if they are entitled

6  to do that, how do you figure any kind of percentage?  They

7  are entitled to draw on this basin.  They are entitled to

8  have the basin refilled, in a state of nature, to the extent

9  of 5000 acre feet.  It is no longer a state of nature

10  because they are utilizing a basin over which they are

11  overlying owners.

12      It is one thing to figure out a theory and say we are

13  going back to a state of nature.  But here are a group of

14  farmers who overlie a basin and are overlying owners.  And

15  I think the water law is clear that they have a right to

16  use water in this basin as long as they do not injure the

17  basin or injure other people.

18      MR. VEEDER:  That is right.

19      THE COURT:  Then why couldn't they conceivably use a

20  larger amount of water because they overlie the basin and

21  rely upon the flood flow, which is not riparian water, to

22  fill that basin?

23      MR. VEEDER:  I quite agree that they have the right to

24  pull the basin down.  I quite agree that they have a right

25  to participate in the available supply of water.  But I

1    also insist that the United States is entitled to participate

2    correlatively in the yield of that valley.  The logical

3    sequitur of what your Honor started saying would result in

4    the total destruction of the riparian right downstream.

5    We say yes, that Mr. Ceas and Mr. Rorapaugh have a right to

6    participate in this basin.  We insist they have a right.  We

7    also insist that we have the right to participate in it,

8    and if they were to use 65% of the water in that basin or

9    the yield of the stream and pull it down to the extent that

10   you would destroy the direct flow or flood flow to us, we

11   would suffer irreparable damage.

12       MR. LITTLEWORTH:  Maybe you would suffer, depending on

13   what DeLuz does.

14       MR. VEEDER:  Wait a minute.  His Honor used a very

15   important phrase -- the advantageous position, and the

16   advantageous position that we have, Mr. Littleworth, is that

17   we are in a position to participate in DeLuz Creek.  But we

18   are not to be penalized in our participation up here because

19   we have that advantageous situation.

20       MR. LITTLEWORTH:  This is the first time I have ever

21   heard that the bottom position on the stream system is the

22   most advantageous.

23       MR. VEEDER:  But it is, because you have all these other

24   streams contributing to it.

25       MR. LITTLEWORTH:  So if you have enough water, you can't

1   touch the man upstream.

2      MR. VEEDER:  Absolutely.  If you have enough water, you

3  can't touch him.

4      MR. LITTLEWORTH:  You have enough water, so you can't

5  touch him.

6      MR. VEEDER:  No, we have had to do everything under the

7  sun to conserve our water.

8      MR. SACHSE:  You still have enough.

9      MR. VEEDER:  The point I'm trying to make in regard to

10  your question, Mr. Littleworth, is the fact that your people

11  are here and that we are riparian to the stream, not only to

12  Murietta but to DeLuz, doesn't result in a diminution or a

13  stripping off of our rights in Murietta.  If we can put that

14  water to a beneficial use.

15      THE COURT:  Well, look at it another way.  The

16  constitutional requirement is that the maximum use be made

17  of water.  The Murietta defendants overlie a basin which we

18  concede they are entitled to pull down and have refilled with

19  flood water.  Why isn't the maximum best use of water,

20  therefore, considering the correlative rights of these

21  people, to require both basins to be pulled down and both

22  basins to be recharged by flood flow?  Why should there be

23  a requirement that they keep the upper basin full so that

24  there would run out the 41% of 5000 acre feet downstream?

25      MR. VEEDER:  I don't say that at all.

MR. GIRARD:  How do you get your 41% unless the basins are full?

MR. VEEDER:  May I respond to this, first?

THE COURT:  Yes.

MR. VEEDER:  I believe this is how it will work.  I think Mr. Ceas and Mr. Rorapaugh are pulling this basin down. I think they are making storage space available and I think it will be recharged, and I think we get a large portion of of our water during the winter as these basins fill up and the water runs downstream.  I think it is working out that way.  I believe if we are in a position to pull our basins way down and catch all the water we can it will be a very advantageous position for us.  Because if we don't need water we will not knock at the door of Mr. Rorapaugh and say, "We want our 41%."  The only time you are talking about percentages and allocations is during a period of extreme drought where a continued pulling down of the Murietta Basin would result, first, in a reduction of the quantity of surface water reaching us, pulling down the Temecula Basin far beyond that percentage, and we would wind up situated as we are without getting any water from upstream at all.

THE COURT:  Why shouldn't you be required to pull the basin of the United States down before you require other people to release water?

MR. VEEDER:  I am perfectly willing to say we should

1   pull our basins down and make them receptive to every drop of

2   water that would come in from DeLuz and from every other place.

3   But during periods like we are in now and have been in I say

4   we have a right to look upstream and we have a right to

5   participate in this water on the basis of our irrigable

6   acreage.

7       MR. GIRARD:  Your 5000 acre feet of annual flow doesn't

8   necessarily mean you are entitled to 41% of the flow of the

9   creek, even if your irrigable acreages are the same.

10      MR. VEEDER:  Why is that?

11      MR. GIRARD:  You take into account the time that it

12  flows.

13      MR. VEEDER:  I think you are arguing against yourself

14  on this point.  We view it this way -- as a matter of fact,

15  you will find this is about the way it is going to work out.

16  Even though we concede up to 31% of the entire yield of the

17  stream, they are going to be in a position probably to use

18  a much smaller percentage for the very reason that you

19  expressed, namely, that you have a large quantity of water

20  coming from November through March.  Now they can't put it

21  to a riparian use at all.  So we are in a position to pull

22  our basins down, and to catch that and probably relieve the

23  summer demands up here.

24      THE COURT:  Are you figuring as the yield of that

25  Murietta stream flood water as well as current flow?

1    MR. VEEDER:  We have combined base and direct flow, yes,

2    your Honor, that is the way it is.

3    THE COURT:  You have rights to flood water, you have

4    rights to have flood water pass over your ground and go in

5    your basin.  But figuring your percentage of the gross flow,

6    including flood water, doesn't make sense to me at all.

7    MR. VEEDER:  We are entitled to participate on the

8    basis of the percentage that I set up.

9    MR. SACHSE:  I am very curious about the question his

10   Honor just asked you, Bill.  Does this mean it is your

11   contention that as a riparian you are entitled to 41% of

12   the water that flows across Murietta Basin at the peak flood

13   of the year -- it is your right to have that come down to

14   you?  Do I so understand you?  Pick any day when the surface

15   flow of the Murietta was at the absolute peak, the first run

16   of the season.  It is your contention that you have a right,

17   as a riparian, to have 41% of that flood water come down to

18   you; is that right?

19   MR. VEEDER:  Are you referring, Mr. Sachse, perhaps to

20   an extraordinary flood, something like that?

21   MR. SACHSE:  Not extraordinary.  Just the peak run-off

22   of any year, the wettest day of any year.  Are you contending

23   your are entitled, as a riparian, to 41% of that run-off?

24   MR. VEEDER:  Yes.

25   MR. GIRARD:  Even though you wouldn't use any of it on

your irrigable acreage?

MR. VEEDER:  No.  The point being that during the period of this winter run-off we, as riparians, are certainly entitled to have our basins recharged by that high run-off.

MR. SACHSE:  But not to the extent of 41%.

MR. VEEDER:  Let's take one thing at a time.  You will admit that as an overlying riparian owner we have a legal right to have water come down to us in the wintertime to recharge our basin.  Will you agree to that?

MR. GIRARD:  Assuming you are using the water for riparian uses.

MR. VEEDER:  You will agree that is a legal right.

THE COURT:  Here is another thing, though, that has this all fouled up.  It says the safe yield of Murietta is 5000 acre feet, and in that he has flood water -- not just the flow in the summer time or in the spring, but he has the flood water.  So then he takes the figure 41%.  Let's make it easy and say 40%.  So he says 40% of 5000 acre feet is 2000 acre feet.  So through this mathematical calculation he is going to insist upon 2000 acre feet.  I am not saying this is right, but if he insisted on 40% of the water each day the water flowed, that would be one thing.  It would be 40% in time of winter flood, it would be 40% in the summer when there is a trickle.

I see what you are leading up to, Mr. Veeder.  You are

Belt 12

1   going to say 5000 acre feet; we are entitled to 40%, therefore

2   2000 acre feet. I don't follow that at all.

3       MR. GIRARD: In other words, you are connoting a riparian

4   right which exists in a state of nature with an average

5   annual yield, which isn't the same thing. In other words,

6   you are taking your percentage of the average annual yield

7   of the stream, which is entirely different from the daily

8   flows.

9       MR. VEEDER: Mr. Girard, on that score I think we have

10   to arrive at what we would consider to be the perennial yield

11   of each one of these streams and participate on that basis.

12   In other words, I look at it this way. That Rorapaugh and

13   Ceas are farmers and are operating up there. They have a

14   percentage of an established yield for each year, and on that

15   basis they can reasonably calculate as to what they dan draw

16   out of that basin. They have to have that.

17       MR. LITTLEWORTH: The rights of an upstream riparian or

18   overlying user like Rorapaugh or Ceas is this. They can use

19   all the water they want for proper overlying or riparian

20   purposes, subject only to two qualifications: (1) That there

21   actually be a shortage of water to some other riparian user

22   or overlying user of equal dignity downstream. This is not

23   to your appropriative rights, but to another person having an

24   equal priority right. (2) That all of the appropriative

25   uses would be discontinued and the water devoted to the

riparian and overlying users.  And then it would still be determined whether those men were using more than their correlative share.  It is not going to be a simple little mathematic figure that you can just grab out of the hat a certain percentage of irrigable acreage.

MR. SACHSE:  May I point out something else.  I am sure Colonel Bowen is agreed -- he has told us many times-- that for all practical purposes we can disregard the alluvium between the Narrows and the enclave boundary --  the rock is just about on the surface, it is agreed.

Now as a riparian, then, and in a state of nature, we know that the only water that is going to come to Pendleton in the summer months is a day to day affair.  We know that in the summer months all the water that he could have a share of is the surface flow of this stream.  Now if that surface flow is diminished by proper and reasonable riparian uses upstream, not dried up but diminished, he has to also accept that diminution.

Now, Mr. Veeder is trying to by-pass completely the problem of his day to day rights as a riparian in what is a very small part of this 5000 acre feet he talks about.  It is a part that will not amount to a couple hundred acre feet. He by-passes that and jumps up and says because he has 40% of a right in this --  and I don't agree that he had 41%, but because he has that, that he can insist on 41% of the

1   water available here.  He can't.  All he can insist on is his

2   share of the water that would be available to him day by day

3   as it flowed down that stream.  And that is a surface stream

4   and a mighty small one.

5       MR. VEEDER:  On the basis, though, of calculating the

6   contribution of that mighty small flow, we can look to

7   Murietta Creek for a contribution and we can look to

8   Temecula Creek for a contribution, and that is how you make

9   up your riparian right, and it is agreed and it has been

10  agreed by all of us that the downstream riparian participates

11  in everyone of the floods all the way up to the top of the

12  watershed.

13      MR. GIRARD:  But not necessarily on the basis of the

14  irrigable acreage.

15      MR. LITTLEWORTH:  Any only if that person upstream by

16  taking the water is going to hurt the downstream person.

17      MR. VEEDER:  You see, Mr. Littleworth, I am quite in

18  accord with what you say on this.  The point I am trying to

19  make to you is that I have been asked to set up a basis for

20  apportionment within the Santa Margarita River system, and

21  I have taken what I think is an established criterion for

22  making that apportionment, realizing in every instance that

23  there are qualifications to every legal right to the use of

24  water.  Now those factors cannot be denied, nor do I intend

25  to deny them.  I am saying, however, that where we sit here,

1   as we do, with a large basin, that we are entitled to call

2   upstream here for the purpose of having that basin recharged.

3   That is part of our riparian right. You have agreed to that.

4       MR. LITTLEWORTH:  Under some circumstances.

5       MR. VEEDER:  Yes.

6       MR. LITTLEWORTH:  Not just carte blanche like that.

7       MR. VEEDER:  Assuming it is a riparian use and assuming

8   it is a riparian right, you will agree that basically and

9   fundamentally we have a right to participate in Murietta

10  Creek.

11      MR. LITTLEWORTH:  Assuming you are short of water,

12  assuming all other appropriations are cut off, assuming the

13  upstream people are taking more than their fair share, you

14  may have a right to call on them.

15      MR. VEEDER:  But, nevertheless, yes.

16      THE COURT:  One thing I have a lot of trouble following

17  on this. You are going to make this calculation on a flow

18  in a state of nature, and in a state of nature you are not

19  worrying about basins; the basins are all full, nobody is

20  using it, and the water is flowing downstream. We know you

21  don't pump out basins and maintain a state of nature. You

22  pump basins down and they are refilled at flood time. The

23  constitutional provision requires that a maximum beneficial

24  use be made of water. Certainly an overlying owner in

25  Murietta and the United States downstream should rely on

1   basins at dry times and have them recharged in flood time.

2   How can you, therefore, go back to the state of nature flow

3   and try to make an apportionment, when you can't have a state

4   of nature if you are pumping out of basins?

5       MR. VEEDER:  I would be perfectly happy to reject the

6   state of nature and go to the historic run-off and take an

7   average on that basis.  I would still say, with all the

8   qualifications that Mr. Littleworth has put in here, I would

9   still say that it doesn't matter to me whether you add up

10  the last ten years and divide it to find what your annual

11  flow is or whether you take any other method.  I still say

12  from the standpoint of our riparian acreage the percentage

13  will always remain the same as against each one of these

14  contributing tributaries.  Now I said a state of nature.  If

15  that is not acceptable, let's find out another period -- for

16  example, the last ten years.  That will be very hurtful,

17  because if you take the last ten years, if we hadn't used

18  all the conservation methods we have been using we would have

19  been in a very perilous state.

20      MR. LITTLEWORTH:  Everybody helps out.  If Mr. Rorapaugh

21  had irrigated 100% of his acreage, he should be worse off.

22      MR. VEEDER:  I think Mr. Rorapaugh gave the best answer

23  I have heard in this whole lawsuit.  He says the reason I

24  haven't brought more acreage into cultivation is that it was

25  not economic to do so.

1    MR. LITTLEWORTH:  Maybe he didn't have a $100,000.00

2    to drill more wells and put in more pipe lines.  Maybe some-

3    body coming from Los Angeles would have.

4        MR. VEEDER:  The point I am trying to make to your Honor,

5    don't let this idea that I introduced here of a state of

6    nature be thrown out.  I am suggesting that here is a

7    criterion for dividing up the waters of the stream.  I don't

8    want that to happen.  I say here is a method.  You may find

9    a different period that suits you better, you may find a

10   lot of other factors that are important, but I truly would

11   like to proceed on this basis of thinking at this time in

12   regard to our motion of May 14th.

13       MR. GIRARD:  If there is any idea at all that we are

14   going to issue an order telling us how to apportion it now,

15   I want to object very strenuously to it.

16       MR. SACHSE:  I kind of resent this a little.  This is

17   a camels nose under the tent.

18       MR. VEEDER:  I have been called everything today.

19       THE COURT:  That is why I wanted this laid out.

20       MR. GIRARD:  If Ramsey Clarks or Mr. Veeder's idea of

21   Mr. Ramsey Clark's coming out here is to suggest all this

22   apportionment in a judgment, let's just appeal it.

23       MR. VEEDER:  Good idea.

24       THE COURT:  I am glad to get these ideas out on the

25   table, because I haven't had a chance to look at them.  I

1   understand the United States has been fooling around with

2   some of these figures.

3       Let me ask another question.  Give me a very tentative

4   answer.  I have been doing some work on this.  What do you

5   say, very roughly, is the safe yield of the Murietta?

6       MR. VEEDER:  The safe yield?

7       THE COURT:  This is what?  You are talking about total

8   annual yield, roughly?  You are not bound by it.  I just

9   want to know what you are thinking about here.  You must

10   have some idea.

11       MR. VEEDER:  Your Honor, I would put it around --  I

12   am talking about the yield of the basin.

13       MR. GIRARD:  Safe yield of the basin.

14       MR. VEEDER:  And don't hook me too hard on this safe

15   yield.

16       THE COURT:  All right.

17       MR. VEEDER:  I would/put it at between maybe 1800 and, oh,

18   3000.

19       MR. SACHSE:  Now, let me ask a question.  You say the

20   safe yield of the Murietta, with the tremendous depth it

21   has and with no salt water intrusion problem, is between

22   1800 and 3000.  And yet Mr. Wirts tells you the safe yield

23   of your much smaller area, of much less depth, with a water

24   intrusion problem, is 10,000.

25       MR. VEEDER:  The point being the advantageous position.

1          MR. SACHSE:  How many is it, 480,000 acre feet of water

2     is impounded in there, and it has a safe yield of 1300 acre

3     feet a year?

4          MR. VEEDER:  Now let me proceed.

5          THE COURT:  Is this the figure you would say in a state

6     of nature would be the safe yield?

7          MR. VEEDER:  I am talking about the water that would

8     drain out of the basin.

9          MR. GIRARD:  No, the safe yield.  I am talking about

10    how much you could get out of the basin.

11         MR. VEEDER:  You mean surface flow, too?

12         MR. GIRARD:  Safe yield.

13         THE COURT:  Just a minute.  In Paragraph 5 you have the

14    sentence:

15         "The court further finds that the average annual

16         yield of Murietta Creek . . ."

17         MR. VEEDER:  The average annual yield of the direct

18    and base flow both, and that would run  --  I will put the

19    figure right now  --  tentatively around 5000, 6000 acre

20    feet.

21         THE COURT:  Then you have a statement in here that the

22    average annual yield of Temecula Creek is --  how many acre

23    feet?

24         MR. VEEDER:  The average annual yield of Temecula Creek

25    --  I can give you what the averages are.

1.  THE COURT:  Very roughly.

2.  MR. VEEDER:  All right.  I would say that the average

3.  annual yield of Temecula Creek will run around  --  it should

4.  be about 48% more than Murietta Creek has been kicking in --

5.  it will run around maybe 8500, 7500, something like that.

6.  Now this is the base flow and the direct flow.  It is water

7.  that comes out of the alluvium and the direct flow, the

8.  storm flow.

9.  THE COURT:  What do you say is going to be the yield

10. of these tributaries downstream?

11.  MR. VEEDER:  DeLuz Creek, for example.

12.  THE COURT:  DeLuz, Rainbow.

13.  MR. VEEDER:  Let me say this, your Honor.  Now I am

14. pointing to the area below Temecula Canyon and above the

15. enclave line.  You can put an arbitrary figure of 4000 acre

16. feet as what you might figure to be the pick up on Sandia

17. and Rainbow and Stone Creek and some of the other smaller

18. affluents.

19.  MR. SACHSE:  I hope this isn't regarded as expert

20. testimony.

21.  THE COURT:  No.

22.  So that on that basis you would be claiming 41% of

23. 5000, which would be approximately 2000 acre feet out of

24. the Murietta; you would be claiming 33% of Temecula, which

25. would be around 2500 or 3000 acre feet; you would be claiming

1    4000 acre feet downstream from the Gorge.  That would be 8500

2    or 9000 acre feet.  Is that right?

3         MR. SACHSE:  The next question, then, would be, what is

4    the estimated total stream discharge after everything is

5    accumulated?

6         MR. VEEDER:  May I go back for just one moment before

7    I answer your question on that point, your Honor.  The reason

8    why there is such a big difference, why I said the yield of

9    Murietta Basin is very much less than one would reasonably

10   anticipate is the fact that the storm flow out of Murietta

11   Creek apparently doesn't go underground the way it does, for

12   example, in Pauba Valley.  In other words, your annual yield

13   out of the basin is less than one would anticipate.  There

14   are several factors.  One of those factors is this:  that

15   the gradient of Murietta Creek is not very much, whereas

16   you have quite a sharp gradiet coming down Temcula.  The

17   point I am trying to make to you is that your storm flow

18   derived out of Murietta Creek is very substantially higher

19   on the percentage than it would be out of Temecula.

20        Now down here -- I will go to your question now --

21   what did you say, 9000?  It would be more than that.  We have

22   these affluents here.  You have DeLuz Creek.

23        MR. STAHLMAN:  You have another big factor to talk about.

24        THE COURT:  You want to make it come out about 12,000,

25   I suppose.

1      MR. VEEDER:  I want a nice substantial sum on it. Let's

2  face it.

3      MR. STAHLMAN:  Is this in a state of nature, or is this

4  at the present time?

5      MR. VEEDER:  I think if we went on the state of nature

6  basis, it would be very substantially higher.

7      THE COURT:  Well, we started at 1:30.  It's 4:00 o'clock.

8  Let's think some of this over.  Do you want to start at 9:30

9  in the morning?

10      MR. GIRARD:  Yes.

11      THE COURT:  9:30 tomorrow morning.

12      (Adjournment until Wednesday, October 10, 1962, 9:30A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
                    Plaintiff,   )
                                 )
        vs.                      )        No. 1247-SD-C
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                                 )
                    Defendants.  )
                                 )
────────────────────────────────)

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certify that I am, and
on the dates herein involved, to wit:  October 9, 1962, was
a duly qualified, appointed and acting official reporter of
said Court:

That as such official reporter I did correctly report
in shorthand the proceedings had upon the trial of the above
entitled case;  and that I did thereafter cause my said
shorthand notes to be transcribed, and the within and the
foregoing 150  pages of typewritten matter constitute a
full, true and correct transcript of my said notes.

WITNESS MY HAND, at San Diego, California, this 11th
day of October, 1962.

John Swader
Official Reporter

JOHN SWADER, OFFICIAL REPORTER