# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:** San Diego, California

**Date:** Wednesday, October 10, 1962

**Pages:** 20,569 to 20,697

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 1247-SD-C |
| vs. | ) | |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, October 10, 1962

APPEARANCES:

For the Plaintiff:  WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney General.

CDR. DONALD W. REDD

For the Defendants:

Vail Company:  GEORGE STAHLMAN, ESQ.

Fallbrook Public Utility
District, et al.,  FRANZ R. SACHSE, ESQ.

A27

20,570

APPEARANCES:   Continued

  For the Defendants:

    State of California           FRED GIRARD, ESQ.

    County of San Diego        JOSEPH KASE, ESQ.
                                 Deputy County Counsel

A28

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 10, 1962, 9:30 A.M.

2                          ---o0o---

3       THE CLERK:  1247-SD-C United States vs Fallbrook.

4       THE COURT:  Which are we going to start on?

5       MR. SACHSE:  Your Honor, I went over very briefly with

6    Mr. Veeder --  and there may be other comments he has  --

7    these Rainbow conclusions, findings and judgment which I

8    had stated, we believed, were ready for signature.  They have

9    not yet been delivered to your Honor.  I have them here.

10      There is one error which, I feel, could be very readily

11   corrected by pen and ink interlineation in that the findings

12   refer to an Exhibit C in the text, whereas actually the

13   Exhibit is broken down into two Exhibits, C-1 and C-2.  If

14   your Honor would have no objection to the pen and ink

15   correction on that, we can do it, Mr. Veeder agrees.

16      There is one other place where there is just a clear

17   typographical error.

18      MR. GIRARD:  On what page?

19      MR. SACHSE:  There are several pages.

20      Then there is a purely typographical error, of course,

21   where an Exhibit A is improperly stated as Exhibit A and it

22   should be B.

23      I think those are the only actual changes in the findings

24   themselves.

25      However, so that the record is clear, there are contained

1   in these findings four defendants, namely, defendants Adkins,

2   Costello, Riggle, and Chapman.  Each of those defendants was

3   covered by requests for admissions that I filed at the very

4   outset of this case, in which I asked the United States to

5   admit the waters were vagrant - local, which was prior to

6   any geologic evidence.  The United States did so admit.  The

7   geologic evidence since has disclosed that they are not

8   vagrant - local water but overlie the Rainbow alluvial area.

9   Now, simply to clear our records and to avoid a conflict

10  between an earlier judgment, which has said that this land

11  is vagrant - local, Mr. Veeder has requested that I prepare

12  a document, which I am willing to do -- my clients have no

13  objection.  I want to know what to do.  It won't set aside

14  the entire A judgment.  It would just take four names out of

15  an earlier A judgment.  What can I give your Honor, or in

16  what form shall I do that?

17      THE COURT:  It would be an amendment to that particular

18  judgment deleting those four names, and probably for

19  identification purposes they will be now covered by judgment

20  number so and so, whatever the number is.

21      MR. VEEDER:  That is certainly agreeable to us.

22      MR. SACHSE:  All right.  I will undertake to do that.

23      And if your Honor will authorize the pen and ink changes,

24  I think Mr. Veeder said he would have the secretary make them

25  on all copies.  There aren't very many.

20,573

1    MR. VEEDER:  That is agreeable.

2    MR. SACHSE:  Perhaps we can have this ready this

3 afternoon to sign.

4    THE COURT:  What is the number?

5    MR. SACHSE:  42.   It is complete with Exhibits attached.

6 The United States was very kind to reproduce for me.

7    THE COURT:  Can you have that done, Mr. Veeder?

8    MR. VEEDER:  Yes.  I can have that done.

9    MR. STAHLMAN:  Here are the rest of the copies, Mr.

10 Veeder.  You might as well take these.

11    MR. VEEDER:  All right.  Then we will make the changes,

12 Mr. Sachse.  And you are acquainted with them.  I have shown

13 you all the changes.

14    MR. SACHSE:  So that the record is clear on them, Mr.

15 Reporter, let me read the exact parcels.  It is Parcel 33,

16 which appears on Page 16 of Exhibit B (Adkins); Parcel 126,

17 which appears on Page 16 of Exhibit B (Costello); Parcel 154,

18 which appears on Page 103 of Exhibit B (Riggle); and Parcel

19 157, which appears on Page 105 of Exhibit B (Chapman).

20    In each of those cases I will draw an amendment to the

21 original interlocutory judgment deleting those parcels

22 from Interlocutory Judgment Number 2 and stating that they

23 are to be included the Interlocutory Judgment for Rainbow.

24    MR. VEEDER:  On e point I would like to bring up now,

25 your Honor.  We were dealing with acreages yesterday.  If

1   you recall, I used 10,600 for Murietta, 18,500 for Pauba, etc.

2   Those figures necessarily were tentative figures, because

3   they haven't been finally determined.  I just want it clear

4   that they were just used for example purposes.

5       THE COURT:  I understood.

6       MR. VEEDER:  Did everyone understand that?

7       MR. SACHSE:  May I have one more minute, Mr. Veeder?

8       I have prepared, which the Court directed, the first

9   draft, which has not been distributed to anyone yet other

10  then Colonel Bowen -- he has worked on the legals with me --

11  for DeLuz Creek.  I don't know whether we can get to it, but

12  I would like to distribute them today so that Counsel will

13  have a chance to look at them.  I want to apologize,

14  gentlemen.  The first four pages, pages 1-A through 1-D,

15  are all legal descriptions, and I had a part-time girl and

16  for some stupid reason, those first four pages are on

17  un-numbered legal.  I don't know why she did it.  But at

18  least they are adequate to work with.

19      THE COURT:  This DeLuz judgment, then, is 32?

20      MR. SACHSE:  Yes, your Honor.  Is there any sense in

21  giving you two copies of this first draft, which we know

22  won't go?

23      THE COURT:  No.

24      MR. VEEDER:  This is 10-1-62.

25      MR. SACHSE:  Yes.

1      Do you have lo-1-62 there, Bill?

2      THE COURT:  What is the number of this draft by Mr.

3 Girard on Anza-Coahuilla-Wilson?

4      MR. GIRARD:  I didn't know, your Honor, so I left it

5 blank.

6      MR. SACHSE:  It is Number 33.

7      THE COURT:  What do you want to go to?

8      MR. VEEDER:  I would prefer, if we could at this time,

9 your Honor, to go to Interlocutory Judgment No. 37, where

10 Mr. Girard originally made proposals to amend Finding No. 27

11 and Conclusion of Law No. 27 and your Honor made some

12 comments respecting that proposal by your Honor's letter of

13 October 4, 1962, if that is convenient.

14      THE COURT:  All right.

15      MR. VEEDER:  Does everyone have it?

16      MR. SACHSE:  I brought it, if I can just put my hand

17 on it.

18      THE COURT:  Well, I started out with a proposal to add

19 a paragraph to Finding No. 26.  Mr. Girard's proposal started

20 with Finding No. 27.  Have you found it?

21      MR. SACHSE:  Yes, your Honor.

22      THE COURT:  What is your thought, Mr. Veeder?  I

23 thought you would be pleased with what I have done.

24      MR. VEEDER:  Let's say it is an improvement over a bad

25 situation.  That is the way I look at it.

20,576

1          Do you have the letter there, George?

2          MR. STAHLMAN:  I don't have 26 here.

3          MR. SACHSE:  It is 37.

4          MR. GIRARD:  Finding No. 26 was a finding that set forth

5     the amounts of return flow.

6          THE COURT:  Didn't you have my letter to you?

7          MR. STAHLMAN:  Yes.

8          THE COURT:  They are attached as sheets behind the letter.

9          MR. GIRARD:  I have one brief question, which probably

10    should go to Colonel Bowen, on your addition to Finding No.

11    26, your Honor.  When these waters are pumped from basins --

12    they are underground, there is no more loss -- when you

13    pump them out of the basin and then you return them into

14    sewage, do you lose any amount of that water that is placed

15    on the ground in return sewage effluent, or does it all go

16    into the basin?

17         THE COURT:  There are evaporative losses.  There is

18    water pumped out of the basin which is used on the golf

19    course, for instance, and used on lawns, outside the watershed,

20    which never comes back.

21         MR. GIRARD:  No, I mean the stuff that comes back.

22         THE COURT:  But the water that comes back is that which

23    is caught, I take it, in toilets, drains, sinks, bathtubs.

24         MR. GIRARD:  No, I mean when you put it on the ground

25    within the watershed, after you bring it back there are

20,577

1    certain losses which would not have occurred if you had

2    never removed it in the first place.

3        MR. SACHSE:  In other words, you don't get a hundred

4    acre feet back.  You get a hundred acre feet minus a minimal

5    amount.

6        THE COURT:  In other words, as it is spread into the

7    alluvium there are evaporative losses.

8        MR. GIRARD:  If it is minimal, fine; but if it is forty

9    or fifty percent, then it is another question.

10       MR. STAHLMAN:  What is the legal effect of this?

11       MR. GIRARD:  I don't know.

12       THE COURT:  One thing at a time.

13       What about it, Colonel. -- What losses, if any?

14       MR. SACHSE:  I felt it was minimal, and I have no

15   objection.

16       MR. GIRARD:  Because your Honor's language treats this

17   as a hundred feet.  If it is just minimal, fine, I have no

18   objection to it.

19       COLONEL BOWEN:  There are losses, of course, your Honor.

20   The sewage effluent, for example, from Plant No. 1 is

21   discharged to a natural drainage channel, passes through an

22   aeration lagoon and from there either on to the Lake O'Neill

23   or by-passing Lake O'Neill to the gravels of the Upper Basin.

24   There are evaporation transpiration losses enroute.  Similarly,

25   in the effluent discharged from Plant No. 2.  Your Honor has

1    already remarked how effluent is consumed for irrigation on

2    the golf course. But once that effluent is returned to the

3    Santa Margarita River Watershed it is discharged through a

4    natural channel down with your flow to a diversion structure,

5    from whence it is conducted by a pipe-line to the gravels

6    of the Ysidora Basin, and there are evapo-transpiration

7    losses there. We have made some calculations from the amount

8    of loss, but at the moment I don't have those figures with

9    me, so I can't give you that calculation.

10        MR. SACHSE:  How big is it, Ace?  Is it big?  It is not

11   very large, is it?

12        THE COURT:  Percentage-wise it is difficult to say.

13        COLONEL BOWEN:  I would like to look at the figures,

14   your Honor, before I make the statement.

15        MR. SACHSE:  Your Honor, if this were a critical issue,

16   maybe by changing that last line of your suggestion to say

17   the excess of the gross exports annually over net annual

18   sewage return and just shut up and leave it there.  This

19   really doesn't mean anything unless some day in the future

20   a critical problem arises.  The United States is going to

21   have to come in and say this is our sewage return and ask

22   you for a ruling at that moment.  In other words, we are

23   not determining an amount here.  We are just creating a

24   formula.

25        THE COURT:  That is right.

1    MR. SACHSE:  So I don't see why we need to say anymore

2  than just net sewage return, if you want.

3    MR. GIRARD:  Not only net sewage return, Franz.  Again,

4  in making these comments, I am assuming that the evaporation

5  losses may be something substantial.  If they are not, maybe

6  we don't have a problem.

7    MR. SACHSE:  Say sewage return to the ground water, if

8  you will.

9    MR. GIRARD:  To the ground waters or something like

10  that, if you want to put that in the formula.

11    THE COURT:  After the word "return" say "to the ground

12  waters."

13    Mr. Veeder, did you have some objection to this

14  language?

15    MR. VEEDER:  No, I will go along with that.  Simply

16  as to form is the reason I brought it up.

17    THE COURT:  For the benefit of these two men -- you

18  don't have copies of this, do you? -- just read into the

19  record this suggestion as to Finding No. 26.

20    MR. VEEDER:  I think I have a copy here, your Honor.

21    MR. STAHLMAN:  I was just trying to explore this in

22  my own mind to get what we are actually accomplishing with

23  this change.  I was thinking of what the possible legal

24  effect may be.  The object, I presume, is to obtain a

25  realistic figure as to what had been exported from the

A37

1    watershed.  Is that it?

2         THE COURT:  The object is, essentially, to see that the

3    United States should be charged only with the excess of

4    exports over what they put back.  Otherwise, you would

5    penalize them for bringing back the water.

6         MR. STAHLMAN:  Of course, I am thinking about the legal

7    effect.  I don't think it probably enters into it then.

8    However, I just throw it out while I am thinking of it that

9    you have a distinction in the, say, ownership of rights in

10   riparian water as distinguished from appropriative water.

11   In other words, these waters are riparian waters that belong

12   to the basin.

13        THE COURT:  They have a right to take them out as the

14   last user.

15        MR. STAHLMAN:  Yes.

16        THE COURT:  The whole thing hinges on the question,

17   may they export water and still call upstream for additional

18   water?  That is the problem.

19        MR. STAHLMAN:  I know there is a distinction, of course.

20   If they are contending that this was taken out of the

21   watershed under a proper right to export, as Mr. Veeder has

22   contended in this case, then the character of the water

23   taken out is on a different legal aspect.  In the case of

24   riparian waters the only right would be the usufructory

25   right, and in connection with the taking, if it was water

1    for export, having a right to do so, they would have a right

2    to the corpus of the water even to the extent of recapturing

3    it again, if it were possible to do so.

4        Do you agree with me there, Franz?

5        MR. SACHSE: Yes.

6        George is raising a problem that didn't occur to me.

7    I haven't assumed that anything in this is construed as giv-

8    ing the United States an appropriative right to any part of

9    the water they export. I have interpreted your Honor's

10    finding here as simply saying that the net export, regardless

11    of how they did it -- whether they do it under an

12    appropriative right or whether they do it under the basic

13    right of the last user on the stream -- shall be calculated

14    at so much. But I do not read anything in here to mean they

15    have a right to export water, and I never have.

16        THE COURT: Except the right as the last user.

17        MR. SACHSE: Except the right as the last user, yes.

18        THE COURT: To export water. No, there is no intention

19    here to do anything like that.

20        MR. GIRARD: I think you had better add one word, then,

21    your Honor, on Line 4, where you have "insofar as exportation

22    affects the right of the United States,"add the" riparian"

23    right, which is what we are talking about.

24        THE COURT: That is right.

25        MR. SACHSE: I have one other question on this same

1    thing.

2        MR. STAHLMAN:  Pardon me a moment, Franz.

3        Shouldn't there also be something to clarify our think-

4    ing on this, that we are all in agreement that this is the

5    water that is taken out under a claim of right to appropriate?

6    I don't know what the language would be, but I think there

7    should be some language to clarify that and confine it more

8    by just using the word, as Mr. Girard suggested, "riparian".

9    I think there also should be some caveat there.

10       THE COURT:  I don't know how you can say it any more

11   clearly.  "Insofar as exportation affects the riparian right

12   of the United States to call upon upstream users . . ."

13       Then the gist of it is that we charge them with the net

14   of water exportation.

15       MR. SACHSE:  That is all right.

16       THE COURT:  In view of what you said about the evaporation

17   losses, I would suggest while we are revising this that on

18   about Line 4, where it reads "Finding No. 26 sets forth the

19   amount of effluent return to the watershed," after "water-

20   shed" I would insert "Evapo-transpiration losses, if

21   material, are subject to calculation".

22       MR. STAHLMAN:  Why not just say all losses?

23       MR. GIRARD:  Where is this?

24       THE COURT:  After "shed".

25       MR. SACHSE:  Losses in transportation are not included

1  in this material.  It is all losses.  There are evaporation

2  losses, transpiration losses, leakage losses, whatever they

3  may be.  They are not included.

4      MR. STAHLMAN:  Say "net return to the basin".

5      THE COURT:  The point is that evapo-transpiration
                                    be
6  losses may or may not/a material factor, and I merely was

7  going to suggest that we insert after "watershed" that

8  evapo-transpiration and other losses are subject to calculation,

9  if material.

10     MR. SACHSE:  That is all right.

11     THE COURT:  Is that right?

12     COLONEL BOWEN:  That is correct, your Honor.

13     THE COURT:  Do you want to change that next to the last

14  line -- "gross transportation annually of actual return

15  sewage"?  Insert the word "actual" return to the watershed.

16     MR. SACHSE:  To the ground waters.  It is not what comes

17  into the watershed.  It is what goes back into the under-

18  ground.

19     THE COURT:  All right, it is what goes back to the

20  ground waters.  Is that all right now?

21     MR. SACHSE:  That suits me fine.

22     MR. VEEDER:  Your Honor, on these particular changes,

23  I have gone over them with Mr. Clark.  I will go over them

24  again and if he has comments he desires to make I will make

25  those in writing, if that is agreeable to your Honor.

Belt 2

1          THE COURT:   It will have to be, I suppose.   Don't you

2     know what your position is going to be now?

3          MR. VEEDER:   Certainly this is, in my view, a more

4     favorable circumstance than the original finding.   As I say,

5     I am putting this out as a caveat.

6          THE COURT:   Let's go to No. 27.   Do you think we should

7     clear up this matter about the water year?

8          MR. SACHSE:   I think you should operate on a water-year

9     basis, because if you don't Ace can't possibly coordinate

10    his figures with the surface discharge figures without

11    setting up, in effect, a new set of gauges.   Isn't that

12    right?   So we should do all these things on a water-year

13    rather than on an annual year.

14          MR. VEEDER:   That is from October 1 through September.

15          MR. SACHSE:   Yes.

16          MR. GIRARD:   I don't have any preference at all.

17          THE COURT:   What were these figures Ace gave us?   Were

18    they calendar year or water-year in 1961?

19          COLONEL BOWEN:   I believe all the figures I have given

20    the Court were on a water-year, your Honor.

21          THE COURT:   Then in Finding No. 27 insert water-year

22    1961.

23          What did you testify to?

24          COLONEL BOWEN:   Is your Honor referring to the

25    tabulation on Page 26?

1    THE COURT:  27.

2       MR. GIRARD:  It is Finding of Fact No. 27.  I redrafted

3    the additional paragraph and left blank the acre feet

4    numbers, Ace.  "In the water-year 1961, by the use of

5    artificial spreading works, the United States of America

6    increased the natural percolation."

7       COLONEL BOWEN:  In water-year 1961, your Honor, which

8    would be the year beginning October 1960 and continuing

9    through September 30, 1961, no water would have run to the

10   ocean at any time even had we not had such channel spreading.

11      THE COURT:  So no water was saved that year.

12      COLONEL BOWEN:  No water was saved that year, your

13   Honor.  But water was saved in the year just past, 1961-1962.

14      THE COURT:  All right, then, we will change 1961 to

15   1962, water-year 1962.  What was your figure for that?

16      COLONEL BOWEN:  For water-year 1961-1962.

17      MR. GIRARD:  What is technically correct, your Honor,

18   1961-62 or just 1962?

19      MR. SACHSE:  When you say water-year you say the dash;

20   it becomes the water-year 1961-62.

21      THE COURT:  All right.

22      COLONEL BOWEN:  1961-62.

23      MR. GIRARD:  And I think you should also insert there,

24   so there is no confusion between water-year fiscal year, in

25   the water-year 1961-62.

1      THE COURT:  I have that in.  I already told you to

2  insert "water-year" in there.

3      What is the figure, Colonel.

4      COLONEL BOWEN:  Our records show, your Honor, that in

5  1961-62 we spread 2708, rounded out to 2700, acre feet of

6  water in our off-channel spreading basins.  The bulk of this

7  came in one month, in the month of February, and in that

8  month the channel of the Santa Margarita was wetted clear

9  down with surface water to a point just above the Ysidora

10 Gauge.

11     THE COURT:  So the whole 2700 acre feet would have

12 wasted.

13     COLONEL BOWEN:  Had we not had the off-channel spreading

14 basin, yes, the whole 2700 acre feet would have flowed past

15 the Ysidora Gauge.

16     THE COURT:  All right, insert 2700 acre feet.

17     What about the addition I made to Finding No. 27?

18 Strike out "calendar" and have it read "water-year of

19 1961-62".

20     MR. GIRARD:  That was October 1, 1961 through when,

21 Ace?

22     MR. SACHSE:  September 30.

23     COLONEL BOWEN:  September 30, 1962.

24     MR. SACHSE:  I don't see anything wrong with it.  I

25 think this is what would have to be done.  At the close of

1    a water-year, if this problem became critical and the United

2    States were seeking to reach upstream, Mr. Veeder would come

3    in with Colonel Bowen and would present to your Honor his

4    evidence as to what he thinks he saved and what the net

5    export loss was, and if you found that the saving exceeded

6    the exportation loss the United States could reach upstream

7    against any riparian.  If it didn't exceed it, he could not.

8    It would take a special finding each time.

9         THE COURT:  That is all right.

10        MR. SACHSE:  That is all right with me.

11        THE COURT:  Mr. Veeder, do you have any objection

12   or additions to No. 27?

13        MR. VEEDER:  I think they are proper, your Honor.

14        MR. STAHLMAN:  May I comment.

15        THE COURT:  Yes.

16        MR. STAHLMAN:  I am just wondering -- and again I am

17   exploring this for the sake of accuracy and safety in knowing

18   that we are doing something that will project itself into

19   the future --  I am wondering whether we are factually stating

20   in this finding what the situation is.  I am referring to

21   this language "and the said conservation practices have in

22   fact resulted in the conservation of waters in a substantial

23   but undetermined amount".  This is the language with which

24   I am concerned:  In the 1961-1962 water-year, I guess, "by

25   the use of these artificial spreading works of the United

1    States of America was able to increase the natural percolation

2    of surface waters into the younger alluvial deposits . . . "

3    Now I am not convinced that that is a true situation for this

4    reason. We are talking about the natural situation. We are

5    talking about the river in its natural state. I think that

6    nature had provided these spreading grounds and that there

7    would have been the quantity of percolation into the under-

8    ground as there would be by the establishment of these

9    artificial works. That is, when water comes down on a flat

10   alluvial plain as nature had created this plain, the rate

11   of percolation is entirely different than when you have

12   channelled out, as has been done in these streams in

13   Southern California, and diverted the waters for these years

14   and made use of the ground in the flood plain area of the

15   river. So I am wondering whether in its natural state it

16   would not be a fact that this water would have percolated

17   into the underground basin without the construction of

18   spreading works.

19        THE COURT: These streams that have flood plains also

20   have little channels within the flood plains, and that

21   channel varies from time to time.

22        MR. STAHLMAN: Right.

23        THE COURT: So whether or not there had been an

24   artificial channel created, there would have been in the

25   flood plain the channel or some channel, one or more, where

1    the water went down.

2        MR. STAHLMAN:   I don't know what are the physical

3    characteristics of this channel.  I know there is some

4    evidence in here that there has been some artificial channeling,

5    I think.  To what extent I don't think the record is clear.

6    However, with my knowledge of other basins in the general

7    area, I know there are conditions where they have channelled

8    out narrow channels and taken the land and used it for

9    agricultural purposes, so that the water at the present time

10   does not percolate with the rapidity which it did in a state

11   of nature.  There are a lot of our basins in Southern

12   California that are not being recharged to the extent which

13   nature would recharge them by reason of the fact that they

14   have been artifically channelled out.

15       THE COURT:   The Colonel's statement was that in this

16   channel, whether it is natural or artificial, there was

17   water clear to the surface, all the way to the Ysidora

18   Narrows.  Obviously, if you got water up to the surface that

19   far down, you are not going to get any more water in the

20   younger alluvium.  The flood is going to go right across

21   the top to the ocean.  So I am content to accept his

22   statement on it.

23       MR. STAHLMAN:   I am not making a point on this.  I am

24   bringing this up to explore it.  What have we to determine

25   here that the water, had it not been for these spreading

1    works, would have gone into the ocean?  What part of it?

2        THE COURT:  This is a question of fact that each time

3    could be gone into.  Certainly the channel doesn't necessarily

4    run the same.  The spreading works doesn't remain the same.

5    Each year a calculation would have to be made, if there were

6    a contest.  There could be testimony taken as to what the

7    channels were and what the situation was as to the level of

8    water.  The mere fact that we make this finding does not

9    become conclusive on the set of facts on which it might be

10   made next year or the year after.

11       MR. SACHSE:  Why don't you just delete the word "natural"?

12   There is no argument on it.  If the word "natural" is a

13   stumbling block, I don't think it helps or hurts the finding.

14       MR. STAHLMAN:  Am I off the beam on this, Colonel?  Or

15   is there something to it?  It is something I thought I had

16   experienced in other cases.

17       COLONEL BOWEN:  I think Mr. Stahlman is on the beam.

18   But in this particular instance, your Honor, I didn't take

19   any credit for the water spread by our own channel spreading

20   works, and each one of these was full of water, which would

21   offset any channelization that might have been made in times

22   past on the Santa Margarita River.  So there was additional

23   water spread by the on-channel spreading system itself, which

24   is not reflected in this 2700 acre feet.

25       MR. GIRARD:  Ace, no water stored in this 2700 acre feet

1   and spread was operated out of O'Neill, was it?

2   COLONEL BOWEN:  No, this was all first run water from

3   the Santa Margarita River diverted through the O'Neill Ditch

4   and not passed through Lake O'Neill.

5   THE COURT:  All right, strike the word "natural".  I

6   don't think it adds anything.

7   What about, for the sake of logic here -- you say in

8   the middle of Finding No. 27 "in a substantial but undetermined

9   amount," and then we make a determination of what happened

10   in one year?

11   MR. GIRARD:  I think we can cross that sentence right

12   out, your Honor.

13   THE COURT:  Let's strike the words "but undetermined".

14   ". . . have in fact resulted in the conservation of water

15   in a substantial amount."  Leave that in.  Strike the "but

16   undetermined".

17   Can we go, then, to Conclusion No. 27?

18   MR. VEEDER:  Your Honor added on to that, you recall,

19   you put "add to Finding No. 27 at the request of the/United

20   States or any of the parties".  Do you have that?

21   THE COURT:  Yes.

22   MR. VEEDER:  No one has any objection to that.

23   THE COURT:  In other words, no need to make these

24   calculations unless somebody wants them made.  So anyone

25   could ask that we have a hearing on that issue.  To me I

1    think that looks all right。

2        MR。 SACHSE:  I have no objection to adding the addition

3    to Finding No。 27 set forth in your letter。

4        THE COURT:  I thought we had passed that addition to

5    No。 27。

6        MR。 SACHSE:  No, you have the addition to 26。

7        THE COURT:  Has anybody any further suggestions on the

8    addition to 27?  We are going to cross out the word "calendar"

9    and it will read "water-year 1961-1962"。

10       MR。 GIRARD:  I added, for continuity, the word "deposits"

11   after "younger alluvium"。

12       THE COURT:  All right。

13       Then let's go to Conclusion No。 27。  My first suggestions

14   there were to change the language so as to use these terms

15   that we had defined.  About eight or nine lines down, where

16   it would read "unless and untill" and then insert "net U.S。

17   water exports" from the Santa Margarita River watershed,

18   strike out the "abandoned" and have it read "has been reduced

19   to zero"。

20       MR。 SACHSE:  I think I know what this means and I think

21   I interpret it correctly,  But may I inquire here.  Let me

22   pose a physical situation。  Assume that seventy-five per

23   cent, or fifty per cent, to make it easy arithmetic, of the

24   export comes back to sewage, all of which, however, is

25   deposited at Ysidora.  Say that as an assumption, although

A50

20,593

1   I know it is not true. Under those conditions the United

2   States would never have its net water reduced to zero. It

3   would be impossible to have its net water reduced to zero,

4   unless we had a year like last year. Isn't that right? I

5   wanted to be sure I understood the factual interpretation

6   of this correctly.

7   THE COURT: As I understand, what it means is this:

8   that the United States has an export figure of, we will say,

9   4000 acre feet, and let us assume that sewage return is

10  2500 acre feet. So now they have a charge against them of

11  1500 acre feet that they have exported. If they catch flood

12  water, that would otherwise waste, they may be able to wipe

13  out that difference.

14  MR. SACHSE: In other words, your Honor, though, or

15  someone is going to have to make a finding in that case that

16  500 acre feet of flood water would have reached the sea.

17  THE COURT: That is right.

18  MR. SACHSE: That is fine.

19  MR. STAHLMAN: Further to expose my ignorance, I will

20  explore another matter -- as to how this would work in actual

21  practice. Let us assume as time goes on we reach this

22  situation where they are in a position where they could reach

23  upstream. What is the basis of the calculation on their

24  exportation? Is it a current year, or is there an accumulation

25  of the waters which were taken out of the basin over a period

1  of time?

2       MR. SACHSE:  I don't think there would be any accumulation.

3  The riparian right works on a current basis.  To me I don't

4  think there is any possibility of accumulating and asking

5  the United States to make good previous net losses.

6       THE COURT:  No.

7       MR. SACHSE:  The only way that would work would be to

8  bring your basin up to par.

9       MR. STAHLMAN:  What is the gauge then?   Is it that the

10  basin has to reach a certain point?

11       MR. SACHSE:  The Court hasn't changed the language,

12  George.  It says "unless and until the net U.S. water

13  exportation . . . has been reduced to zero" and the Court

14  has left it in, as I understand, "and the ground water levels

15  within the younger alluvial deposits . . . have been restored

16  . . ."  That has not been taken out, has it?

17       THE COURT:  No.

18       MR. SACHSE:  So your question is solved.  They have to

19  have two conditions:  first, a net zero, and second, the

20  ground water where it ought to be; but if those two exist,

21  we can't go back and say they still owe us 6000 acre feet

22  from the past.

23       MR. STAHLMAN:  The point is that the water basin would

24  not come down to that level if it had not been extracted

25  over a period of time in the past.

1    MR. SACHSE:  I am not sure I follow Mr. Stahlman's

2    worry.  I want to be sure he is not right, because this is

3    very critical.  Let me state it again as your Honor did,

4    then, as I understand it.

5    In a given year in the future the United States' exports

6    were 4000.  Their returns were 2500.  In that same year

7    Colonel Bowen could satisfy this Court that he conserved

8    1500 that would otherwise have wasted into the sea.  He has

9    met Condition No. 1 to reach upstream.  But to meet

10   Condition No. 2  to reach upstream, he must also establish

11   that the ground water levels are at a point where they would

12   not have been except for the exports.

13   MR. STAHLMAN:  What exports?

14   MR. SACHSE:  Any exports.

15   MR. GIRARD:  For the previous years.

16   MR. STAHLMAN:  Right.  If that is the understanding,

17   that solves my point.

18   MR. VEEDER:  My silence is a very strained silence.  I

19   want you to understand that.

20   MR. SACHSE:  The reason that this is what I think it

21   means is that under the basic logic it seems to me if Colonel

22   Bowen is able to trap very much water in his channel spread-
                              is
23   ing basins he/going to, as a necessity, pretty well have

24   brought his basins up before he can trap very much.  Isn't

25   that going to follow?  Is it conceivable to you that you

1    could trap 1500 acre feet of water and not have your basins

2    fairly full, Colonel?  Is it conceivable that you could

3    trap 1500 acre feet and still have an empty basin?  Remember,

4    1500 in off-channel spreading.

5         COLONEL BOWEN:  I don't believe I follow your question

6    there, Mr. Sachse.  Would you restate it?

7         MR. SACHSE:  Here is the question.  Is it possible  --

8    "probable" is a better word -- it is probable that you could

9    trap water which would otherwise have wasted to the sea --

10   satisfy the Court on that issue -- that would have otherwise

11   wasted to the sea to the amount of 2700 acre feet, as you

12   did last year, without at the same time having your basin

13   pretty well restored to normalcy?

14        COLONEL BOWEN:  I see.  Then you are posing that there

15   is water in the basin to support a surface stream flow.

Belt 3   16        MR. SACHSE:  No, let me ask it this way.  Hypothetically

17   and in the future you export 4000 acre feet.  You return

18   2500.  Under his Honor's interpretation now your net export

19   is 1500.  Under his Honor's proposed finding you can reach

20   upstream if two conditions are met:  (1) the net export is

21   reduced to zero and (2) the ground water levels within the

22   alluvial deposits have been restored to that level at which

23   they would have been if such exports had not taken place.

24   Those are the two conditions.

25        MR. STAHLMAN:  So that I may understand his answer,

A54

20,597

1    when you talk about net exports, what do you mean?

2         MR. SACHSE:  What his Honor has defined here very clearly.

3         MR. STAHLMAN:   I see.

4         MR. SACHSE:  It is exports minus the sewage return to

5    the ground waters.

6         MR. STAHLMAN:  Sewage in one year?

7         MR. SACHSE:  Yes, the net calculation is for one year.

8         MR. STAHLMAN:  I don't think that would give them the

9    right to reach upstream if they had been exporting over a

10   period of time.

11        THE COURT:  That is taken care of, George, by the

12   condition that the basins be reduced.

13        MR. SACHSE:  The basin has to be up, also.  You have

14   to read the whole thing.

15        Let me try this again, Ace, please.

16        As I understand, there are two conditions that must be

17   met before the United States could reach upstream: (1) your

18   net export must be reduced to zero and (2) your basin has

19   to be up.  Now on the facts we will assume that your export

20   is 4000, you put back 2500, so you have 1500 now you have

21   to make up by water spreading.  Is it conceivable to you

22   that you could capture 1500 acre feet in off-channel spread-

23   ing works without pretty well at the same time having your

24   basin up to par, in that picture?  1500 acre feet which

25   would have wasted to the sea, not just captured.

1    THE COURT: George, stay out of this until we get an

2    answer.

3        MR. STAHLMAN: All right.

4        COLONEL BOWEN: Well, in order to have 1500 acre feet

5    induced to go into the ground water basin in the off-channel

6    spreading structures that would otherwise have wasted to the

7    sea, there would have to be surface water that would overtop

8    the diversion weir and continue on down and percolate into

9    the channel. So my response to your question would be in

10   the affirmative.

11       MR. SACHSE: It would be almost impossible, wouldn't

12   it?   The two conditions would have to exist simultaneously.

13       MR. STAHLMAN: Why have it in here then?

14       MR. SACHSE: It is one of the biggest protections I

15   have ever seen, to demand that the basin be up, because it

16   was wet to the ocean and the basins were up.

17       THE COURT: Couldn't you have this situation with your

18   three basins down there?  Couldn't you have a situation

19   where you say your Upper Basin had been pulled down consider-

20   ably, we will say by pumping, and yet your Lower Basin above

21   the Ysidora Narrows is pretty well up?  It has to be up to

22   prevent salt water intrusion.  Might you not have a situation

23   where flood waters that passed over the Upper Basins without

24   being entirely absorbed would come down to the Lower Basin

25   and where you were pumping out and making room for it would

20,599

1   otherwise have gone down to the sea, except for your pumping

2   and your spreading?  Is that possible?

3        COLONEL BOWEN:  Yes, your Honor.  Of course, there is

4   a variable here that we haven't considered, mainly, the

5   intensity of rainfall and the volume of run-off.  The

6   infiltration into the ground water body, percentagewise,

7   or the percentage of infiltration from a flowing stream

8   varies inversely with the volume or quantity of the stream.

9   It is conceivable if a flash flood brought a thousand cubic

10   feet per second down there, that even though the ground water

11   levels were drawn down pretty well that a substantial

12   proportion of that thousand second feet would go on across

13   and go into the ocean.

14        MR. SACHSE:  Then the second condition would not have

15   been met.  I am sort of arguing on Mr. Veeder's side here,

16   it seems to me; not against George, but to clarify this.

17   There are two conditions that have to be met, it seems to

18   me:  the exports for the year must be reduced to zero, and

19   the basins have to be brought up to par, which is not a one

20   year proposition on the basins.  That means that whatever

21   has been taken out of them for many years has to be restored.

22   And until those two conditions are met, as I read this, until

23   two conditions have been met: (1) the annual export reduced

24   to zero and (2) the ground water levels within the younger

25   alluvial deposits have been restored to that level at which

1   they would have been -- when those two conditions have been

2   met they can do it, if exportation has not taken place. That

3   is what I think it means.  If it doesn't, let's say so.

4       MR. STAHLMAN:   It means historic.

5       MR. SACHSE:  It means the ground water basins have to

6   be restored.

7       MR. GIRARD:  You could add:  if no net U.S. water

8   exports had taken place.

9       MR. SACHSE:  I don't think it is necessary. To me this

10  is what it means.

11      THE COURT:  I would propose to have this read at the

12  end of the first paragraph of Conclusion No. 27: "have

13  been restored to that level at which they would have been

14  if such" insert "net U.S. water exports had not taken place."

15  You can't go back and talk about what went on in the past.

16  The basins today are full.  Regardless what the United States

17  may have done in past years in exporting water, it is all

18  cured now.  The basins are full.  You have to treat this, I

19  think, on a year to year basis.

20      MR. GIRARD:  Not in the future.  Right now you would,

21  yes.  But let us assume you got ten dry years and your basins

22  dropped.  Once the basin comes up full, then of course any

23  prior exports which occurred are out the window I would agree.

24  But it might be feasibly possible where in a given year your

25  basins are not full and have been reduced because of net

1   U.S. water exports which had occurred over a three year period.

2   As I read this, and as I intend it, this would prevent the

3   United States from reaching upstream until the ground water

4   levels have returned to the level they would have been if no

5   net U.S. water exports had occurred for that three year

6   period.

7       MR. SACHSE:   That is the way I understand it, your

8   Honor.

9       MR. GIRARD:   Otherwise I don't see how you could protect

10  anyone.

11      MR. SACHSE:   You don't otherwise.   It is perfectly

12  possible that for five, six, or seven years Colonel Bowen

13  has a net export of 1500 acre feet.   No recovery because it

14  is too dry.   At the end of five years he has dropped the

15  basin by 7500.   Now, if in the next wet year that comes along

16  he reduces his net to zero and captures 1500, he hasn't made

17  good the 7500 -- he has just made good 1500 of the 7500.   I

18  don't think it means this.   And if that is what it means,

19  we had better rewrite it.

20      MR. GIRARD:   Of course, once your basin gets full, then

21  you have wiped out all prior deficiencies and there is no

22  question on that.

23      MR. SACHSE:   Right.

24      MR. STAHLMAN:   The way it is written here, the only

25  thing to do is that you have to have a full basin.

A59                                                                          20,602

1        MR. SACHSE:  I would like to ask his Honor what he

2   meant. (Mr. Sachse drawing on the board)  Here is your full

3   basin.  And as a result of five years it goes down this way

4   each year for net U.S. exports.  Each one of these is a

5   different year  --  net U.S. export.  Then comes six, and

6   in the sixth year Colonel Bowen has the same 1500 feet net

7   export.  But he also stops 1500 from going into the ocean.

8   So he has reduced his net export to zero.  But what about

9   the storage in the basin?  Doesn't he have to get it up to

10   Point 1 again?

11        MR. STAHLMAN:  In other words, the only time he could

12   reach upstream is when he had a full basin.

13        MR. SACHSE:  Not necessarily full, no; when he had

14   restored the export.

15        MR. STAHLMAN:  What export?

16        MR. SACHSE:  The net export.

17        MR. STAHLMAN:  For how many years?

18        MR. SACHSE:  To when this exporting started.

19        MR. STAHLMAN:  Does that say that?

20        MR. SACHSE:  I think it says it.  That is what I would

21   like to have it say.

22        MR. VEEDER:  How are you going to determine what it

23   would have been if we hadn't exported?

24        MR. SACHSE:  Because you know how much you have exported.

25        MR. VEEDER:  In other words, our net export is what

20,603

1  you are going to say the basin would have been if we had not

2  exported.

3      MR. SACHSE:  Yes, if you didn't take it out, it would

4  have been there.

5      MR. VEEDER:  In other words, any ground water that

6  appears to be passing through Ysidora Narrows wouldn't be

7  charged against us.  I mean, water is going to flow out, you

8  know that.  You are just going to charge us with the net

9  export.

10      MR. SACHSE:  I am using his Honor's words.  He is

11  creating a formula by which net export is arrived at.

12      MR. VEEDER:  Okay.

13      MR. SACHSE:  And you have two conditions in your

14  judgment that before you can reach upstream your net export

15  must be reduced to zero and the basin must be restored.  It

16  is an "and".

17      THE COURT:  Take a recess.

18      (Recess)

19      MR. VEEDER:  I had understood we were to go the ninth

20  and tenth, and I have made plans that way.  I hadn't planned

21  on going tomorrow, your Honor.

22      THE COURT:  You can't be here tomorrow?

23      MR. VEEDER:  No.

24      MR. SACHSE:  I can't be here tomorrow -- I couldn't

25  be here tomorrow morning.

1      MR. STAHLMAN:  I can't either.

2      THE COURT:  Let's go ahead and see what we can get done

3  today.

4      MR. GIRARD:  I would make this suggestion, to make it

5  clear, on this conclusion of law problem, your Honor.  Going

6  to sub-paragraph 5 of your October 4th letter, on page 24,

7  the line from the top should read as follows:  if prior net

8  U.S. exportations had not taken place.

9      THE COURT:  Change the "such" to "prior".

10     MR. GIRARD:  Yes.  And change "exportation" to

11  "exportations".

12     MR. SACHSE:  I think then we would finally all under-

13  stand what this means, including Colonel Bowen.  We have

14  gone over this.

15     THE COURT:  And that automatically takes care of the

16  situations where the basin has been filled, as it has been

17  this last year.

18     MR. SACHSE:  Yes.

19     MR. GIRARD:  Yes.

20     THE COURT:  All right.  Then I would propose to strike

21  out the next paragraph beginning with the word "Notwith-

22  standing" and substitute a paragraph as shown in my attach-

23  ments to your letter.

24     MR. SACHSE:  I think it is satisfactory.

25     THE COURT:  Mr. Girard?

1      MR. GIRARD:  Yes.

2      THE COURT:  Mr. Veeder?

3      MR. VEEDER:  Yes, your Honor, again with the idea that

4  I am going to write some statements on this.

5      THE COURT:  You are going to what?

6      MR. VEEDER:  I am going to analyse our position in

7  this regard and file a statement in regard to it, if it is

8  all right with your Honor.

9      THE COURT:  Of course, you know, when you say that you

10  just postpone decision on these matters and then you write

11  one of these long briefs with those generalities in it --

12  pinching the right of the United States.

13      MR. SACHSE:  If Mr. Veeder's statement is to be a

14  re-argument on the legality of export, I think we ought to

15  tell him right now we don't want it.  If it is going to be

16  a suggested modification of the judgment your Honor has

17  entered, I would be very happy to look at it.  But I don't

18  want to re-hash this whole question.

19      MR. GIRARD:  If he wants to file something fine.

20      MR. VEEDER:  I just want you to know.

21      MR. STAHLMAN:  When will you do this, Bill?

22      THE COURT:  Then you go to the interlocutory provisions.

23  About ten lines down, after the word "until" insert "net

24  U.S. water exports . . .," and then strike out "abandoned "

25  and make it "reduced to zero".  And we would also then,

1　five lines from the bottom, change the word "such" to "prior"

2　and add an "s" to exportation. So that that corresponds with

3　what we have had up to date. And then I suggested that we

4　stike out this further part and use the same conclusion we

5　used, so it would read: "it is further ordered, adjudged and

6　decreed that notwithstanding the above provisions of this

7　paragraph the United States may deduct . . ."

8　　MR. VEEDER: You have just put the 27 in there.

9　　THE COURT: Yes, in lieu of what Mr. Girard had.

10　　MR. GIRARD: In other words, you add the same thing in

11　the conclusion language.

12　　THE COURT: Yes.

13　　MR. VEEDER: Your Honor, you referred to Interlocutory

14　Judgment No. 24, Lake O'Neill. We would like to have added

15　there, and in accordance with the stipulation between the

16　Fallbrook Utility District and the United States of America,

17　that stipulation being dated April 13, 1961 --

18　　MR. SACHSE: Now Mr. Veeder, I don't have that

19　stipulation in front of me, but I would object to your

20　language and much prefer that we rewrite the judgment. If

21　the Lake O'Neill judgment does not conform with the

22　stipulation, let's rewrite it. Because I dont want, in

23　future years, to be working at a judgment and then going

24　behind the judgment to see what created the judgment. If

25　that judgment is not right, make your motion to change it.

1      MR. VEEDER:  The judgment is all right, Mr. Sachse.

2  You signed a stipulation with me in which you provided that

3  the United States is entitled to have evaporation and seepage

4  losses to maintain Lake O'Neill full.

5      MR. SACHSE:  Let me see it and if it is not in the

6  judgment let's rewrite the judgment.

7      MR. STAHLMAN:  Why should it be in there?  Why should

8  you get the evaporation?  He can't stipulate for everybody

9  in the watershed.

10      MR. VEEDER:  I think you heard what I said.  I said

11  Fallbrook and the United States.  That is 800 acre feet of

12  water a year.

13      MR. SACHSE:  800 out of 1100?

14      MR. VEEDER:  The evaporation losses from Lake O'Neill

15  are 500 acre feet a year, Mr. Sachse, and the seepage losses

16  are 300 acre feet a year.

17      MR. SACHSE:  Where do you get this?

18      MR. VEEDER:  From Colonel Bowen's testimony.

19      MR. STAHLMAN:  Better fill the lake up then.  It is

20  not doing much good, except wasting water.

21      MR. GIRARD:  If it is 800 acre feet in 1100 storage,

22  you don't have a very good conservation lake.

23      MR. STAHLMAN:  That is a waste of water, and I think

24  under the Constitution we ought to abandon O'Neill.

25      THE COURT:  I understood that loss you were arguing

1    about was 150 to 200 acre feet.

2        MR. VEEDER:  No, the evaporation loss from O'Neill was,

3    with 125 acres of surface, 500 acre feet annually, and the

4    seepage loss is 300 acre feet, according to Colonel Bowen's

5    testimony.  I can give you the pages in Volume 68.

6        THE COURT:  We discussed this.  I remember the dispute

7    and it involved betwen 150 and 200 acre feet.  Does the

8    stipulation talk about these figures?

9        MR. SACHSE:  No, the language of the stipulation pro-

10   vides, in the second paragraph, the one I asked for, that

11   the United States shall attempt to fill Lake O'Neill for

12   the winter and spring run, provided further that the United

13   States of America shall have the right to divert Santa

14   Margarita River water through the irrigation season

15   sufficient in quantity to off-set seepage and evaporation

16   losses for the purpose of keeping Lake O'Neill filled.  If

17   Mr. Veeder is now trying to slip in an 800 foot gimmick, I

18   will not buy it.

19       THE COURT:  The transcript shows that at about the time

20   this stipulation was entered into there were discussions

21   as to what you were talking about and that was 150 to 200

22   acre feet.

23       MR. VEEDER:  Your Honor, I would have to say to your

24   Honor that I don't recall that at all.  But certainly it

25   is extremely important to us under the circumstances that

are transpiring that Fallbrook abide by the stipulation, and
I think all they need to do is let enough water go by to
maintain the Lake full.

MR. SACHSE:  Your Honor, as far as I am concerned, when
a judgment is written and is signed, the judgment represents
the determination.  That judgment may be based upon evidence
or on a stipulation or upon both.  But the judgment is the
thing that is going to bind the parties in the years ahead.
If Mr. Veeder thinks the O'Neill judgment is not right, I
will be very unhappy in reopening it but let him reopen it
with a motion.  But I don't want any other findings in here
or in any other judgment that say we look not only to the
judgment but we look to a stipulation that preceded the
judgment.

MR. VEEDER:  It didn't precede the judgment.  If you
want to get out of this stipulation, you file a motion to
get out of it and we will fight about it.  I am not going
to agree that you can avoid that stipulation.  I want it
understood.

MR. SACHSE:  I will equally state to you, and I will
ask his Honor to rule on it right now, if the judgment is
not the document upon which future orders to show cause will
be based rather than stipulation which preceded it.  And it
did precede it.  They are both dated the same day, but the
judgment was the result of the stipulation.

1     THE COURT:  We are going to end this right now.  We will

2   not refer in this judgment to any stipulation.  If you want

3   to work the gist of the stipulation into the O'Neill judgment,

4   then do so by an amendment.

5     MR. SACHSE:  It is in now.

6     THE COURT:  And it can be done even though it binds only

7   Fallbrook.  There can be a provision that as to Fallbrook,

8   Fallbrook has conceded so and so and it would be part of the

9   judgment.

10     MR. VEEDER:  All right, we will amend the judgment.

11     MR. GIRARD:  I think the judgment does say exactly

12   what the stipulation says.

13     MR. VEEDER:  No, we will combine them and we will have

14   an Amended Interlocutory No. 24.

15     THE COURT:  Go back and look at your transcripts and

16   you will find the wrangle between you and Mr. Sachse at

17   that time didn't concern 800 acre feet of water.  It concerned,

18   my recollection is, something around 150 or 200 acre feet at

19   the outside.  It may be that the Colonel so testified here,

20   but when you discussed it with Mr. Sachse I will wager you

21   will find in the record there was a discussion about a

22   couple hundred acre feet of water and Mr. Sachse gave on

23   the couple hundred acre feet.

24     MR. STAHLMAN:  This point Mr. Veeder brings up is

25   certainly conducive to working out a physical solution.

1    MR. SACHSE:  Yes, I love this, I really do.  I think

2    Mr. Stahlman's remark is most appropriate.  It makes me most

3    sympathetic to suggestions of the United States that we enter

4    into a contract and try to do something.

5    THE COURT:  There has never been any finding made on

6    Colonel Bowen's testimony.  The Court would have to make a

7    finding.

8    MR. SACHSE:  Exactly.  Now he wants to go beyond the

9    judgment and the findings and run in a new sleeper.  If this

10   is the way he is going to treat contracts  --

11   MR. VEEDER:  Mr. Sachse, we signed the stipulation.

12   If you want to avoid it, file a motion.

13   MR. SACHSE:  The Court ordered the judgment and I am

14   not filing any motion.  I am riding on the judgment.

15   MR. VEEDER:  Okay.

16   THE COURT:  Mr. Veeder, you have no other objection,

17   except that you want to file some document about these

18   amendments to 37?

19   MR. VEEDER:  As I said to your Honor in the first

20   instance, these are matters concerning which I have had

21   discussions with Mr. Clark.  I said I thought I would like

22   to have a clarification into the record based on conversations

23   in the Courtroom and those conversations have now been

24   conducted.  I think it might be a good idea, as we have

25   done in the past, to put your Honor's form of the findings

A69

20,611

1   as revised into the record, so that everyone will have

2   exactly the same findings and conclusions of law and

3   interlocutory to look at.

4       MR. STAHLMAN:   I thought the purpose of these discussions

5   was to have a mutual understanding and exchange of ideas, and

6   if you have some ideas why don't you express them at this

7   time so that we can be thinking about them?   After you have

8   talked to Mr. Clark, what is the situation?   We are now only

9   wasting time.

10      MR. VEEDER:   No, we are not.

11      MR. STAHLMAN:   You undoubtedly are not satisfied with

12  it or you would not request this.   I think you could express

13  your situation to us to the same extent we have tried to

14  iron out these matters and get to some common basis of

15  understanding rather than have to wait until some future

16  date and file documents.

17      MR. VEEDER:   I will save time, George.   So far as I am

18  concerned, based on what I have heard today, I think these

19  findings, conclusions and interlocutory proviso are reflective

20  of what the Court has said he would rule upon and I think

21  in form, they are, as I said, reflective of the thinking

22  in the Courtroom.

23      THE COURT:   Then the Reporter will be instructed to

24  put it into the record.

25      MR. GIRARD:   I can give the Reporter a complete copy

20,612

1    of all the corrections to copy.

2        THE COURT:   Then you will have to show him how that last

3    paragraph comes in.

4        MR. GIRARD:   Yes, on the conclusions of law and the

5    judgment.

6        THE COURT:   Okay.

7        (The document ... referred to is by the Reporter
          incorporated at the end of this transcript.)

8

9        THE COURT:   Let's go to something else then.

10       MR. VEEDER:   How about the Anza Ground Water Basin?

11       MR. SACHSE:   As far as I am concerned, either the

12   Indians or Anza are very close to finished and I would like to

13   see us get rid of them.

14       MR. VEEDER:   That is my thought, that if we start on

15   Anza now, either one of them  --  it doesn't make any

16   difference to me  --  I think Anza covers the physical

17   situation in regard/Coahuilla Indian Reservation to a very
                        to

18   considerable extent.

19       THE COURT:   Start on Anze, No. 33.

20       MR. VEEDER:   The draft I have before me is 9-14-62.

21       MR. SACHSE:   By Mr. Girard.

22       MR. VEEDER:   Yes.

23       MR. STAHLMAN:   What is the number of this going to be.

24       MR. SACHSE:   33.

25       MR. VEEDER:   Do you have an additional copy for these

1    gentlemen here?

2        MR. GIRARD:  I think I have, Bill.

3        MR. SACHSE:  Do you want us to do these paragraph by

4    paragraph, your Honor?   I have next to no objections of

5    any kind, and what they are, are typographical and minor.

6        THE COURT:  Have you been all through them?

7        MR. SACHSE:  Yes.  And I would ask Mr. Girard or

8    someone who is much more concerned than I am to take the

9    lead.  I will interrupt once in awhile for some minor thing.

10       THE COURT:  Have you any suggestions, Mr. Veeder.

11       MR. VEEDER:  I had originally thought we would do with

12   Anza Ground Water Basin that which we did with the Murietta-

13   Temecula and the Aguanga, namely, run it out on the basis

14   of legal descriptions.  The way it is presently described

15   is simply by an incorporation of the United States Exhibit

16   No. 278.

17       THE COURT:  Why should we run it out with a legal

18   description as we did in the Murietta when this basin, we

19   all concede, can have little effect or contribution to

20   the downstream water users?

21       MR. VEEDER:  The only reason it is important to the

22   United States is that we do have a substantial area of the

23   ground water basin in the Indian Reservation, and that is

24   the reason why I originally asked that it be described.

25       MR. GIRARD:  I have no objection, if you want to describe

20,614

1    it.

2         THE COURT:   I don't think it needs to be described.

3         MR. SACHSE:   We didn't describe it in Rainbow, which

4    we treated as the same kind of ground water basin.

5         THE COURT:   We will pass that up.  If there is a dispute

6    later as to the extent of the basin and it becomes material,

7    the Court will make findings on it.

8         THE COURT:   What other point, Mr. Veeder?

9         MR. VEEDER:   The deep aquifer is described on one of

10   the maps that Dr. Mann introduced.  Otherwise I don't believe

11   that it is well defined in here, Mr. Girard.  I would be

12   unable to locate it.

13        MR. GIRARD:   It is defined by specific sections which

14   were taken from plaintiff's Exhibit 278 and also the

15   transcript wherein the Doctor or someone  --  I presume it

16   was the Doctor  --  drew it on it.

17        MR. VEEDER:   That is Hamilton's A, he drew it on.

18        MR. GIRARD:   It was also put on Exhibit 278, at least

19   my copy of 278.  Maybe it is on Hamilton's A, too.  I have

20   no objection to adding other sections, if the record

21   supports it.

22        MR. VEEDER:   The point being, the greatest width of

23   that deep aquifer is about half a mile.

24        MR. GIRARD:   Yes.

25        MR. VEEDER:   And it seems to me we would define it

A73

20,615

1    more specifically than you have done it.

2         MR. SACHSE:  It is described by quarter sections.  It

3    is not over a quarter mile in width, according to this

4    description.  The second half of paragraph three on the

5    second page.

6         MR. VEEDER:  Why don't you put in there, as long as

7    we are incorporating these by reference, and say "as more

8    clearly depict on U.S.A. Plaintiff's Exhibit 278"?  That

9    suits me.

10        MR. GIRARD:  I think that is my copy, Bill. Better

11   make sure the original has that.

12        MR. VEEDER:  I didn't realize that.  I thought it was

13   just put on Hamilton's A.

14        MR. GIRARD:  Maybe I just put it on my copy off of

15   Hamilton's A.  So let's get Hamilton's A and 278.

16        MR. VEEDER:  I don't see it.

17        MR. GIRARD:  Get Hamilton's A, then.  It is taken off

18   one of them.

19        THE COURT:  You have incorporated 278 by reference

20   already in the first paragraph.

21        MR. GIRARD:  Yes, that clearly shows.

22        MR. VEEDER:  It is not on 278.  So I would like to

23   have Hamilton's A referred to, because it does depict it.

24        MR. GIRARD:  Yes, it is depicted on Hamilton's A.

25        THE COURT:  All right, let's insert, then  --  if there

1   are not too many changes we can do it by interlineation or

2   add it by typing  --  on line 19, page 2, "as shown on

3   Hamilton's Exhibit A incorporated by reference".   Is that

4   what you want?

5        MR. VEEDER:   I would like that.

6        MR. SACHSE:   As shown on Hamilton's Exhibit A

7   incorporated herein by reference.

8        MR. VEEDER:   We have already argued on the ground water

9   source of recharge.   There is no purpose in my referring

10   again to those objections that I originally made.

11        MR. SACHSE:   Are you on 4?

12        MR. VEEDER:   Yes.

13        MR. SACHSE:   I would like to suggest a couple of very

14   minor typographical things here, because it is just too hard

15   to read.   I would like to say:

16        "The shallow aquifer is composed of alluvial

17        deposits, and with the exception of the upper

18        slope area of said ground water basin, of layers

19        of clay and silt, . . . "

20   The thing just reads roughly.

21        MR. VEEDER:   You are hurting Mr. Girard's sensitive

22   soul.   If you have extra commas, it suits me.   I have no

23   objection.

24        MR. GIRARD:   I had better check whether that fault is

25   on Exhibit 206-C.

1     MR. VEEDER:  Usually the C series is an ownership map

2     and I would doubt if it is on that.

3     MR. GIRARD:  It is certainly drawn on Hamilton's A.

4     Maybe we ought to substitute Hamilton's A for 206-C.

5     MR. SACHSE:  That is at line 11 on page 3.

6     MR. GIRARD:  Yes.

7     MR. VEEDER:  You take out "United States".  Why do you

8     put in "by a witness"?

9     MR. STAHLMAN:  ". . . by a witness which is located in

10    a general northwest line . . . "

11    MR. VEEDER:  I would like to see him there, but I don't

12    believe it is possible.

13    MR. GIRARD:  I have no objection to striking it.

14    THE COURT:  Does the map show what we are talking about.

15    MR. GIRARD:  It shows it.

16    THE COURT:  All right.

17    MR. SACHSE:  Are we going to delete "by a witness . ."?

18    THE COURT:  Delete "by a witness".

19    Have you checked these sections and townships?

20    MR. GIRARD:  I did, your Honor, but I am not the world's

21    best section checker.  Section 17 is correct, 20 is correct,

22    21 is correct, and 28 is correct.  And I had better make

23    sure of the township.  I will let Ace do it.  It looks like

24    there are two townships there.

25    Your Honor, on page 3, paragraph 5, starting on line 12,

20,618

where "by a witness" is crossed out, it should read "which is located in a general northwest line in Sections 16 and 17, 6 south, 3 east.

THE COURT:  16 and 17?

MR. GIRARD:  Yes.

THE COURT:  No.  Here you are talking about the fault now.

MR. GIRARD:  Yes.

THE COURT:  The fault isn't in 16.  The fault is in 17.

COLONEL BOWEN:  17.

MR. GIRARD:  Section 17, 6 south, 3 east, 21 and 28. Is 27 in there, Ace?

COLONEL BOWEN:  No.

MR. GIRARD:  It would be 21 and 28, Township 7 south, range 3 east.

THE COURT:  My copy of the map that I made when he was testifying -- of course, I was watching where he put that line -- shows the fault line to cut across right at the corner 20.  Is that what the map shows there, Ace?

COLONEL BOWEN:  Yes sir.

MR. GIRARD:  Right at the corner of 20.

THE COURT:  Right at the corner of 20.

COLONEL BOWEN:  That is the northeast corner of 20, your Honor refers to.

THE COURT:  Yes.

1    COLONEL BOWEN:  Yes sir.

2    THE COURT:  And it showed the fault as going into 28

3    in about the middle of the northerly section line.  If you

4    wanted to, you could define it by saying "running from almost

5    the center of 17 across the corner sections of 17 and 21 and

6    down the middle line of 28 and on to about the middle of

7    . . . -- wait a minute.

8    MR. GIRARD:  Your Honor, Colonel Bowen, I think, will

9    be able at noon to draft up the description of what this

10   shows for both paragraphs 3 and 5 insofar as sections are

11   concerned.

12   MR. VEEDER:  In fact, you have the original one that

13   was drafted up right here.  We talked about that.  I think

14   you had better look at it again.

15   MR. GIRARD:  It is off the map, wherever it shows.

16   MR. VEEDER:  These findings as I have written them are

17   simply reflective of pretty largly what we discussed when

18   the original set was presented.  Isn't that right?

19   MR. GIRARD:  Yes, the finding on the geology are

20   essentially what we had in the original filings which were

21   taken from Doctor Mann's testimony and which were submitted

22   to Doctor Mann at that time to see if it generally reflected

23   what he thought.  The fact that I submitted them to Doctor

24   Mann is not in the record.  But it is taken from Doctor

25   Mann's testimony.

1       MR. VEEDER:  We went through these line by line, your

2   Honor, before, if you remember.

3       MR. GIRARD:  These are reflective of the prior findings

4   on Anza and Cahuilla Valley.  I think there is very little

5   change, if any.  It is only grammatical change.

6       MR. VEEDER:  Okay.  When I read these I read them on

7   the basis of our earlier reviews, that's all.

8       THE COURT:  Do you have any other suggestion, Mr.

9   Veeder?

10      MR. VEEDER:  No, I don't.

11      THE COURT:  On page 6 you have a blank.  An Exhibit to

12   be attached.

13      MR. GIRARD:  Yes.  I am not sure whether Commander Redd

14   has or is going to prepare for this area an exhibit similar

15   to that that he prepared for Murietta-Temecula showing the

16   list of irrigated and irrigable acreage and that type of

17   exhibit.  I would insert any number that should be in there,

18   if such an exhibit is going to be prepared.  Is there?

19      MR. VEEDER:  As long as we are not defining with

20   specificity the legal sub-divisions of the Anza ground water

21   basin I see no reason for having the same kind of exhibit

22   as we have in Murietta-Temecula.  I think these are defined.

23      MR. SACHSE:  You have the same one, just for uniformity,

24   again, Bill.  Rainbow is not defined by geological lines.

25   It is defined only by reference to the map, and there is an

20,621

1    exhibit of this character in Rainbow.  I don't care.  I have

2    no interest up there.  If you want to put it in, it is just

3    a question of giving it an exhibit number.

     MR. GIRARD:  You have done the work.  I think it would

5    be a good idea to put it in.

     MR. VEEDER:  We have the wells listed.  We can put them

7    on.

     MR. SACHSE:  Isn't that usually a C?  A is an alphabetic

9    list, B is legal descriptions, and C is wells.  Isn't that

10   right?

11   MR. VEEDER:  No, C is usually the map.

12   MR. SACHSE:  I mean exhibits as attached.

13   MR. VEEDER:  Are you talking about 211-C?

14   MR. SACHSE:  No, I am talking about an exhibit to this.

15   To most of our judgments exhibit A is an alphabetic list of

16   the land, exhibit B is legal descriptions, and sometimes

17   exhibit C is attached which gives this other data on irrigable

18   acreage, etc.  Isn't that right?

19   MR. VEEDER:  Let me check it.

20   MR. GIRARD:  I would Commander Redd to read paragraphs

21   10 and 11, and 12 and 13, and see if those conflict with the

22   way he has set up his exhibits.

23   COMMANDER REDD:  We have prepared no exhibits on this

24   area as yet.

25   MR. GIRARD:  How about 13, where you set forth your

20,622

1  wells and your irrigable acreage, that type of thing --

2  what exhibit would that be?  Is that 211-A?

3     MR. SACHSE:  No, that is the same as C in this other

4  finding.

5     MR. VEEDER:  That has been C.  On Rainbow it is C.

6     MR. SACHSE:  Exhibit C is what it has been almost

7  uniformly.

8     MR. GIRARD:  Do you want to call it exhibit C?

9     MR. VEEDER:  What paragraph are you on now?

10    MR. GIRARD:  13 on page 6.

11    COMMANDER REDD:  It makes no difference.

12    MR. GIRARD:  Might as well call it exhibit A, if you

13  are going to call it A, because it is the first one we are

14  referring to.

15    MR. SACHSE:  All right, call it A.

16    THE COURT:  You have a lot of exhibits to attach,

17  apparently.

18    MR. GIRARD:  Yes, we have three so far, your Honor.

19    MR. VEEDER:  You will have your alphabetic index, you

20  will have your legal descriptions indexed, and you will

21  have your data indexed.

22    THE COURT:  We are not attaching 278.

23    MR. GIRARD:  That is what I was going to say.  I didn't

24  think I attached 278.

25    THE COURT:  We are not attaching Hamilton's A.

1        MR. GIRARD:  No.

2        THE COURT:  We are attaching exhibit A for the blank in

3    line 8 on page 6.

4        MR. SACHSE:  That is a correction I would suggest, your

5    Honor, on page 5, line 20.  Mr. Girard says he is going to

6    attach U.S. Exhibit 211-A.  I don't think that is the logical

7    way to do this.  I think we ought to take the material  --

8    and Colonel Bowen can reproduce it  ---  but it becomes an

9    exhibit A to the judgment, which is what we have done in all

10   of the other cases.

11       MR. VEEDER:  You have to have your alphabetical list,

12   you have to have your land description list, or you will

13   not be able to locate your property.

14       MR. GIRARD:  It would be exhibit B, and on page 6 it

15   would become exhibit C.

16       THE COURT:  On page 5 this 211-B.

17       MR. GIRARD:  Exhibit 211-A is A, and 211-B is B.

18       THE COURT:  Then that is not the way it works.  Your

19   first reference is to 211-B on page 5 line 23.

20       MR. GIRARD:  No, on line 20, your Honor.

21       MR. VEEDER:  Your alphabetical list is 211-A.

22       MR. GIRARD:  "Attached hereto is United States Exhibit

23   A which is a list setting forth the apparent owners . . ."

24       MR. VEEDER:  Your next is your legal descriptions.

25       THE COURT:  All right, that is B.  And then on line 25

1    change 211 to B.

2         MR. GIRARD:  Yes.

3         THE COURT:  Then you go to 6 and this becomes C.

4         MR. SACHSE:  That becomes C, yes.

5         MR. GIRARD:   Also on line 29, "That all lands described

6    in United States Exhibit B," on page 5.

7         THE COURT:  Yes.

8         MR. GIRARD:  And the same thing on line 2, page 6.

9         THE COURT:  Yes.  And the same on line 12, page 6.

10        MR. GIRARD:  Yes.

11        THE COURT:  You are breaking down the land descriptions

12   so that the land descriptions under B are just the Anza Basin;

13   is that right?

14        MR. GIRARD:  Yes.

15        THE COURT:  Then you get over on page 10.  Is this

16   another description of lands?

17        MR. GIRARD:  Yes.  This would be lands which overlie

18   the Coahuilla Ground Water Basin.

19        MR. SACHSE:  Actually, your Honor, as I recollect the

20   exhibits, those are included in the U.S. 211 series, but

21   for the purposes of this they are going to be broken down

22   into separate exhibits.

Belt 5 23        MR. VEEDER:  But you are in effect describing your

24   basin by legal sub-divisions.

25        MR. GIRARD:  By ownerships.

20,625

1    THE COURT:  You gentlemen go through and work out these

2    exhibit numbers.  You don't need me here for that, do you?

3       MR. SACHSE:  No.

4       MR. GIRARD:  No, I am willing to go anyway Colonel

5    Bowen and Commander Redd want to go.

6       THE COURT:  Work this matter out.  You have listed here

7    under A  a list of owners back on page 5.  Do you have a

8    list of owners for Coahuilla?

9       MR. VEEDER:  Yes.

10      THE COURT:  There is no space in the proposed judgment

11   for that.

12      MR. GIRARD:  If they haven't I can make findings 18,

13   19, and 20 to conform to the identical way we now handled

14   findings 10, 11, and 12.

15      THE COURT:  Will you work it out.

16      MR. GIRARD:  Yes.

17      THE COURT:  It is a matter of agreeing on what you are

18   going to do.

19      MR. VEEDER:  Most of it is in the Indian Reservation,

20   to begin with.

21      THE COURT:  Go ahead.  If you need me, call me.

22      MR. STAHLMAN:  If we don't call you, what time will

23   you be back?

24      THE COURT:  1:30.

25      (Recess)

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 10, 1962, 1:30 P.M.

2        MR. SACHSE:  Before we get started on the findings, I

3    want to suggest a correction in the record for September 24th.

4    Your Honor is interrogating Colonel Bowen concerning sewage

5    return figures and the transcript, at page 20,380, line 21,

6    reads, "THE COURT:  Do you know off-hand, Colonel Bowel?"

7        THE COURT:  You want to correct it, is that it?

8        MR. SACHSE:  I want to correct it.  There is one other

9    occasion that it appears.

10       THE COURT:  Going back to 33, did you gentlemen agree

11   on these exhibit numbers?

12       MR. GIRARD:  Yes, your Honor.  Were you given a copy?

13       THE COURT:  Yes, I have some material.

14       MR. GIRARD:  Commencing on Finding No. 18, which is on

15   page 10, there are four findings  --  18, 19, 20, 20-A.

16   These will have to be renumbered in the final draft which

17   concerns the Coahuilla Ground Water Basin and the result

18   of those is to treat the exhibits exactly the  same as we

19   treated the exhibits for the Anza Ground Water Basin.  And

20   then going over to Finding No. 25 on page 12  --

21       THE COURT:  What about 22?  There is a blank there.

22       MR. GIRARD:  Yes, there is a blank space.  This is a

23   question which I don't know.  This concerns the younger

24   alluvial deposits which comprise the Wilson Creek, and I

25   don't know the United States exhibit upon which those are

20,627

1    depicted.  They are not depicted on 278  --  all of them

2    aren't.  I don't know.  I was going to check with someone

3    who is more familiar with the exhibits which exhibit would

4    depict the younger alluvial deposits in Wilson Creek.

5        MR. VEEDER:  Let me look at 206-C.

6        MR. GIRARD:  The same thing for Lancaster Valley in

7    Finding No. 24.  I didn't have the exhibits in Sacramento.

8        MR. VEEDER:  I believe the younger alluvium would

9    appear on exhibit 15.

10       THE COURT:  I don't think exhibit 15 goes up that far.

11       MR. GIRARD:  I don't think it does either.

12       MR. VEEDER:  That is the whole area.  You are looking

13    at 15-E, your Honor.  Exhibit 15 is the original geology

14    map.  I think we can get this for you.

15       THE COURT:  Yes, the big one.  Exhibit 15 is the whole

16    watershed.

17       MR. VEEDER:  Exhibit 15 will show it, your Honor.

18       THE COURT:  All right, let's use exhibit 15.

19       You have something wrong here.  In your supplement F

20    here, you mark exhibit F as a compilation of the plans

21    described in E.  That is right.  Then you go to 20-A, the

22    lands described in E.  That is right.  All right.

23       MR. GIRARD:  Going over to Finding No. 24, there is

24    a reference to the exhibit which would depict the younger

25    alluvial deposits in Lancaster Valley.

20,628

1      MR. SACHSE:  That is the Aguanga Ground Water area.

2      MR. GIRARD:  I don't know the exhibit for that.

3      MR. VEEDER:  That will appear on 277, I think.  Exhibit

4  No. 277-B is the Aguanga Ground Water area.

5      MR. WILKINSON:  275, isn't it?

6      MR. VEEDER:  The Aguanga Ground Water area is delineated

7  on 277-B.

8      MR. GIRARD:  The younger alluvial deposits is all I am

9  interested in.

10     THE COURT:  This shows the ground water area.

11     MR. GIRARD:  I think 275-A is clearer on Wilson Creek,

12 too, your Honor.

13     MR. VEEDER:  Then it is 275 and 275-A, if you are going

14 to get the delineation of it.  I think you ought to use them

15 both.

16     MR. GIRARD:  Commander Redd has just pointed out

17 something to me that I didn't know.  Lancaster Valley is

18 apparently in the Aguanga Ground Water area, Bill.  Is that

19 right?

20     MR. VEEDER:  Yes, it is.

21     MR. GIRARD:  Do you want these findings to consider

22 Lancaster Valley, or should that be considered in the find-

23 ings dealing with the Aguanga Ground Water area?

24     MR. VEEDER:  Lancaster Valley is simply part of the

25 Aguanga Ground Water area.

MR. GIRARD:   It is also part of Wilson Creek.   Where do you want it?

MR. VEEDER:   We have described Wilson Creek down to the Aguanga Ground Water area, which I think is going to appear in another set of findings.   I certainly would bring Wilson Creek all the way down.

MR. GIRARD:   To where.

MR. VEEDER:   Down to the Aguanga Ground Water area where it comes in, I think, Section 3 right here.   Here is Wilson Creek comes down here and has its confluence with Coahuilla right down here.

Let me get a precise check on this, because you have your streams coming together.   Here is Coahuilla, coming down here.

MR. GIRARD:   If you don't want Lancaster Valley in these findings dealing with Wilson Creek   ---

MR. VEEDER:   I wouldn't deal with Lancaster Valley separately at all, because it will be one of the principal areas.

MR. GIRARD:   You want to cut off these findings?

MR. VEEDER:   I would stop where you have the confluence of Coahuilla with Wilson Creek.

MR. GIRARD:   All right, Coahuilla Creek and Wilson Creek.

MR. VEEDER:   And that is here.   It is hard to tell

20,630

1    from this map.

2        MR. GIRARD:   It looks to me to be in the northeast

3    quarter of Section 10.

4        MR. VEEDER:   We ought to use the U.S. G.S. quad on that

5    to get it precisely.

6        MR. GIRARD:   According to my findings, I have it that

7    Wilson Creek joins Coahuilla Creek in the southeast quarter

8    of Section 3 Township 18 South, Range 1 East.

9        MR. VEEDER:   I think that is right.   Coahuilla joins

10   Wilson Creek.

11       MR. GIRARD:   Yes, Coahuilla Creek joins Wilson Creek

12   in Section 3, Township 8 South, Range 1 West, and that forms,

13   roughly, the boundary of Aguanga Ground Water Basin.

14       MR. VEEDER:   That is just about where it starts.

15       MR. GIRARD:   And you would prefer to have these find-

16   ings dealing with Wilson Creek, just go to that point?

17       MR. VEEDER:   I think so.   And I think we should do the

18   same thing with Temecula Creek and stop right there.

19       MR. GIRARD:   That would mean, then, your Honor, deleting

20   from these findings wherein I have described lands which are

21   riparian to Wilson Creek in Lancaster Valley.

22       THE COURT:   Can you work that out before you draw

23   another draft and have it ready to go?

24       MR. GIRARD:   All I would do would be to delete Findings

25   25, 26, 27, and 28.   It would be just a drafting change.   I

20,631

1    would just say that Lancaster Valley will be considered in

2    Findings of Fact dealing with the Aguanga, and that no

3    specific findings dealing with which lands that are riparian

4    to Wilson Creek upstream from the Aguanga Ground Water body

5    are being made at this time.

6        MR. SACHSE:   It is the opposite.   No specific findings

7    downstream.

8        MR. GIRARD:   . . . are being made in this finding.

9    And we are also not making any finding on Wilson Creek as

10   to which lands are riparian upstream, because it is not

11   important enough.   I think I can redraft that, your Honor.

12       MR. VEEDER:   You are going to take out 23?

13       MR. GIRARD:   I would say that upstream from that point

14   where Wilson Creek converges with Coahuilla Creek the amounts

15   of ground waters contained in the younger alluvial deposits

16   are limited and this Court is not at this time (cross out

17   ." except as to Lancaster") making findings of fact

18   specifically delineating which lands have riparian rights

19   to the surface and ground waters of Wilson Creek.

20       MR. VEEDER:   All right.

21       MR. GIRARD:   Then I would make reference to that

22   portion of Wilson Creek which flows over and across Aguanga

23   Ground Water Basin will be considered in other findings of

24   fact.

25       MR. VEEDER:   Dealing specifically with that ground

1    area.

2         MR. GIRARD:   Yes.

3         MR. VEEDER:   Okay.

4         MR. GIRARD:   But that will **require some changes in**

5    **draft**smanship, your Honor.   But on the assumption that these

6    findings will only concern Wilson Creek upstream from its

7    confluence with Coahuilla Creek, I don't think there will be

8    any controversy on it.

9         MR. VEEDER:   There shouldn't be.

10        THE COURT:   All right.   Where do we go from here?

11        MR. GIRARD:   I have worked out with Commander Redd

12   the mechanics of the exhibits.   Mr. Veeder has supplied

13   through Colonel Bowen, the correct descriptions which will

14   be inserted in Finding No. 3 and Finding No. 5.   Finding

15   No. 3 deals with the deep aquifer.   Finding No. 5 deals with

16   the fault and Colonel Bowen has checked these and these are

17   the correct sections it should go in.   Those will be inserted

18   in those findings of fact.   I think the next draft we make

19   should be in final form, your Honor, assuming that no one

20   has any quarrel with the substantive language.

21        MR. VEEDER:   I have one suggestion, when you re-write

22   these.   We have found Coahuilla Creek is spelled two or

23   three different ways, and I would suggest that you put in,

24   in your first reference to it, Coahuilla and then say

25   (spelled C O A H U I L L A Creek).

1      MR. GIRARD:  Otherwise known as that.

2      MR. VEEDER:  All right.  I don't care how you do it.

3   You will find it on the same map spelled differently.

4      THE COURT:  Then there is not much more we can do on

5   this, is there?

6      MR. GIRARD:  Before I stencil it up in final form, your

7   Honor, I would like to have general approval as to the

8   substantive findings and conclusions.

9      MR. SACHSE:  I have found nothing wrong with them

10   substantively.

11      MR. VEEDER:  We have in the past discussed the deep

12   aquifer.  I made my objections originally, the Court heard

13   them, and these are written in accordance with the Court's

14   rulings, as I see it.

15      THE COURT:  On page 13 you refer to the Indian Lands,

16   the Indian Interlocutory Judgment is No. 41.

17      MR. GIRARD:  Yes.

18      THE COURT:  You will have to make these other exhibit

19   numbers correspond in the conclusions.

20      MR. GIRARD:  That is correct, your Honor.

21      THE COURT:  41 goes in again on page 18.

22      MR. GIRARD:  Yes.  Also on page 25.

23      MR. STAHLMAN:  What about page 20, Coahuilla Creek?

24      MR. GIRARD:  No, Coahuilla Creek is all right.

25      MR. VEEDER:  You are going to have to change your

1    interlocutory aspects to conform with your exhibits.

2         MR. GIRARD:  Yes, also the conclusions of law.

3         MR. VEEDER:  Those will all have to be conformed, too,

4    18, 19, and 20.

5         MR. GIRARD:  That is right.

6         MR. VEEDER:  21, 22, 23, 24 and 25.

7         MR. GIRARD:  One other question I wanted to ask.  Maybe

8    whether
     Ace would be the one to ask it.  You asked/exhibit 278 shows

9    the sub-water shed of Anza and Coahuilla Ground Water Basins.

10   It does not show the sub-water shed of Wilson Creek.  Which

11   exhibit shows that?  Would 275 show that?

12        THE COURT:  275 only goes up to about the edge of the

13   ground water area.

14        MR. VEEDER:  I think the best description is on exhibit

15   15, the overall geology map, which is a composite of the

16   U.S.G.S. map.

17        MR. GIRARD:  From exhibit 15 can you depict the sub-

18   water shed of Wilson Creek?

19        MR. VEEDER:  Yes, it is split right down.  Or else we

20   have the ownership map on that, too.

21        MR. GIRARD:  You have to show where it is within the

22   watershed.  I am sure there must be a map which shows it.

23        MR. VEEDER:  211-C will have it.  211-C is the owner-

24   ship map and that will show it.  I will also recommend that

25   we use 211-C as to the point of confluence of Coahuilla Creek

20,635

1    and Wilson Creek, because it shows it up very well.

2       MR. GIRARD:  I spelled that out specifically, Bill.  That

3    is on Finding No. 14 on page 7.  I said ". . . proceeds across

4    the northwest quarter of Section 1, Township 8 South, Range 1

5    East and then across Section 2 and into the southeast quarter

6    of Section 3, Township 8 South, Range 1 East, whereupon it

7    joins Wilson Creek."  Is that right?

8       COLONEL BOWEN:  Make it the southeast quarter of the

9    southeast quarter of Section 3, 8 South, 1 East.

10      MR. GIRARD:  I will have no trouble with the mechanical

11   problems.  It is just the substantive language I am concerned

12   with now.

13      MR. VEEDER:  All right.

14      MR. GIRARD:  I can draft it up finally now, I am sure.

15      THE COURT:  Have you finished that one?

16      MR. SACHSE:  As far as I am concerned, it is ready to

17   go.  It may be redrafted without any objection to the sub-

18   stantive matters, unless someone else has objection.

19      MR. VEEDER:  That is right.  I think we went through

20   this all once before and you have simply reflected what the

21   Court originally ruled upon.

22      MR. SACHSE:  That is my understanding.

23      MR. GIRARD:  To put it another way, what the evidence

24   supports.

25      MR. VEEDER:  I wouldn't go that far.  Certainly the

1   matter has been reviewed.

2       THE COURT:  All right, let's pass this up, then, and

3   hope that the next draft will be the last.

4       MR. STAHLMAN:  Your Honor, there is one matter that has

5   been hanging fire here  --- we commented on it at the time

6   we drew Vail's 35  --  and that is there is no testimony to

7   support the irrigable acreage on Sandia.  Colonel Bowen had

8   made the study and comment that he would put the evidence

9   in, and I think it should go into the record.

10       THE COURT:  Do you have it ready?

11       MR. STAHLMAN:  Do you have those figures, Colonel Bowen?

12       COLONEL BOWEN:  Yes sir, I do.

13       MR. STAHLMAN:  I think if we would have Colonel Bowen

14   testify to what they are, then it will support our findings.

15       THE COURT:  All right, Colonel Bowen, you have been

16   sworn.

17       COLONEL BOWEN:  Yes your Honor.  Within the Vail Santa

18   Rosa Grant riparian to Sandia Creek there is a total area of

19   10,255.7 acres.  Of that quantity the surveys made by me

20   or under my direction and supervision showed a total irrigable

21   acreage of 2206.8 acres.

22       THE COURT:  Any questions?

23       MR. GIRARD:  I would like to call the Colonel for a

24   witness, too.  I think I might as well introduce my Murray

25   Schloss soil surveying evidence, whatever number it is.  I

20,637

1    will stipulate it may go into evidence as far as the State

2    is concerned.  What number is it, do you know, Ace?

3         THE COURT:  Where is it?

4         MR. GIRARD:  I think it is filed, isn't it?

5         COLONEL BOWEN:  I don't believe it is in evidence.

6         THE COURT:  We will have to pass it until it is ready.

7    Which one shall we take up?

8         MR. SACHSE:  Mr. Veeder hasn't got Rainbow done with

9    the corrections.  But the Indian Reservation has, as nearly

10   as I can see, nothing but a very few blanks to be filled in,

11   which I think we can do in a couple of minutes.

12        MR. VEEDER:  Before we pass up the Murray Schloss

13   exhibit, title is vested in the State in regard to all that

14   land; is that correct?

15        MR. GIRARD:  I don't know.  I am just taking Mr.

16   Lincoln's word that it is, and I am saying as far as I am

17   concerned, if we own it, we will put in Colonel Bowen's

18   soil report and that ends it.

19        THE COURT:  Find out later.

20   Let's go on to 41.

21        MR. GIRARD:  I have never gotten involved with Mr.

22   Lincoln and his trust problems.

23        THE COURT:  Who has read over 41?

24        MR. SACHSE:  I have read it, your Honor.

25        THE COURT:  Mr. Veeder, have you read it?

1     MR. VEEDER: I have gone through it, yes, your Honor.

2     MR. SACHSE: There are a couple of blanks that Mr.

3 Veeder is going to have to supply.

4     THE COURT: What changes?

5     MR. SACHSE: On 6, we don't know how many Indians are

6 in the Ramona.

7     THE COURT: We took some testimony here from someone

8 on that.

9     MR. STAHLMAN: There are none in Ramona. Yes, there

10 were six.

11     MR. VEEDER: Your Honor, there has been now a check by

12 the Indian Service. There are presently no Indians living

13 on the Ramona Indian Reservation. The lands, however, are

14 presently leased by Indians on the Coahuilla Indian

15 Reservation for grazing purposes.

16     THE COURT: How many Indians belong to this Ramona

17 Tribe? Whether they lived on the land or not, they would

18 have rights on the Reservation.

19     MR. VEEDER: It is the Coahuilla Indians entirely.

20     THE COURT: There are no Ramona Indians left?

21     MR. VEEDER: That is right.

22     MR. SACHSE: The blank on page 7, line 14, is 33,

23 your Honor, that is the judgment number.

24     THE COURT: What are we going to do about that

25 paragraph 6?

20,639

1    MR. VEEDER:  I would revise it and say  --

2    THE COURT:  At the present time no Indians reside on the

3 Ramona Indian Reservation.

4    MR. VEEDER:  But those lands are being utilized by the

5 Indians on the Coahuilla Indian Reservation.

6    MR. GIRARD:  What are they using it for?

7    MR. SACHSE:  Stock raising.

8    MR. GIRARD:  There is some stock raising?

9    MR. VEEDER:  That is right.  At the present time there

10 are no Indians residing on the Ramona Indian Reservation.

11    MR. GIRARD:  But Indians of the Coahuilla.

12    MR. VEEDER:  Unless you people are willing to agree to

13 it --

14    THE COURT:  We will agree.

15    MR. VEEDER:  --  I can put somebody on the stand to

16 show the present circumstances.

17    THE COURT:  We will have to re-do this page 3 anyhow,

18 then.

19    MR. GIRARD:  Yes.  They are using said lands for limited --

20    MR. VEEDER:  Why don't you just say stock raising?

21    MR. GIRARD:  How many cattle have they got up there?

22    MR. VEEDER:  I haven't counted them since yesterday.

23    THE COURT:  What other suggestions now?

24    MR. SACHSE:  The blank on 7, number 33, has to be

25 filled in, at line 14 on page 3.

20,640

1    MR. GIRARD:   Page 5.   This was taken from Bill's findings.
2    There is a date that will have to go in there at the bottom.

3    MR. VEEDER:   I have that now.

4    THE COURT:   What is it?

5    MR. VEEDER:   I will get it and insert it, your Honor.
6    On page 4 I interposed an objection originally and I would
7    like to refer to that before we go on and renew my objection.

8    THE COURT:   Where?

9    MR. VEEDER:   Finding 12, on page 4.   So far as I am
10   concerned, where you say the question of future rights to
11   assignees and successors, I think that is improper, your
12   Honor.   I think it is an advisory opinion.   I would just
13   like to leave the matter out, if we could.

14   THE COURT:   You made such a fuss about it that I think
15   it should read just as it is.   No need to make findings
16   about the rights of any future assignees or successors and
17   it is left open.   If we ever have to cross that bridge, we
18   will cross it.

19   MR. VEEDER:   I had hoped you would simply drop out that
20   paragraph.

21   THE COURT: Why?

22   MR. VEEDER:   If the matter ever comes up it can be
23   ruled upon.

24   THE COURT:   This makes it clear that we will rule
25   on it if it ever comes up.   Leave it in.

1          What other objection?

2          MR. SACHSE:  There are four places on page 6 where the

3    same blank, Judgment No. 33, needs to be filled in.

4          MR. VEEDER:  Here, again, these matters were all

5    reviewed.  We made some objections.  They were ruled upon

6    in every instance.  There is no sense in my bringing them

7    up again.

8          THE COURT:  We understand that.

9          MR. SACHSE:  On page 7, how many Indians on Coahuilla?

10          MR. VEEDER:  The most recent census shows within the

11   year there are 94 Coahuilla Indians in the Coahuilla Tribe

12   and 32 Indians on the Coahuilla Indian Reservation.

13          MR. SACHSE:  The figure then is 32 for this blank.

14          THE COURT:  However, I think we might as well add to

15   the end of 20  --  how many in the Tribe?

16          MR. VEEDER:  There are 94.

17          MR. GIRARD:  There are approximately 94 in the --

18   what do you call it?

19          MR. VEEDER:  Coahuilla Tribe.

20          MR. GIRARD:  In the Coahuilla Tribe, of which  --

21          MR. VEEDER:   32 are residing on the Coahuilla Indian

22   Reservation.

23          THE COURT:  What is the next thing?

24          On page 8 line 13, that is 33 again.

25          On line 31  --

1    MR. SACHSE:  That is 33.

2    THE COURT:  We didn't say how may Pachanga Indians.

3    MR. STAHLMAN:  The last testimony was that it was 6.

4    THE COURT:  We don't have that in here.

5    MR. VEEDER:  On Pachanga the Tribe is composed of 194

6    and there are 6 residing on the Reservation.

7    MR. SACHSE:  We have the 6, but we don't have the 94.

8    That is on pages 13 and 14.

9    MR. GIRARD:  The Pachanga Indian Tribe?

10    MR. VEEDER:  Yes.

11    THE COURT:  What is that business doing over on 14,

12    if it involves this Indian Reservation, which starts on

13    page 9?

14    MR. GIRARD:  It is still the Pachanga, your Honor.

15    THE COURT:  Where is this paragraph you are talking

16    about?

17    MR. SACHSE:  It starts on page 13 and continues on

18    to 14.

19    MR. GIRARD:  How many Indians in the Tribe?

20    MR. VEEDER:  194.

21    THE COURT:  Anything else?

22    MR. STAHLMAN:  Does that include those that live in

23    Pala, Bill?

24    MR. VEEDER:  The 194?

25    MR. STAHLMAN:  They are the same Indians, aren't they?

1    THE COURT:  It is a different Reservation over there

2    at Pala.

3    MR. STAHLMAN:  Yes.  Some of these others live in Pala.

4    MR. VEEDER:  You are raising some points concerning

5    which I have no knowledge.

6    THE COURT:  We are only concerned with the present.

7    It could change overnight.

8    MR. SACHSE:  There is a question on page 13 at the top.

9    There is a blank, and it is U.S. Exhibit 15  - something,

10   but which one of the series is the best to fill that blank

11   in with is up to Colonel Bowen.

12   MR. GIRARD:  It shows the weathered  basement complex

13   of the Pachanga Indian Reservation.

14   MR. VEEDER:  That is 15-E.  That is the one that shows

15   the whole area.

16   MR. GIRARD:  I left it blank because I didn't know.

17   MR. SACHSE:  And that same thing appears somewhere

18   else.

19   COLONEL BOWEN:  I think, your Honor, we drew up 15-L,

20   which is the same as 15-E without the markings entered on

21   it in the Court, which was used in other interlocutory

22   judgments.

23   THE COURT:  Does that also go in on page 22?

24   MR. SACHSE:  Yes, your Honor, the same one.

25   MR. VEEDER:  Is is the same as 15-E.

1    THE COURT:  It will show it, will it not?

2    MR. VEEDER:  I am looking for the specific exhibt at

3  the moment, your Honor.   Exhibit 15-L is suitable to me.

4  It is the same as 15-E.  So just put it down that way.

5    THE COURT:  I have my copy you can look at to see if

6  it satisfys you.

7    MR. GIRARD:  Is 15-L okay?

8    MR. VEEDER:  That is all right.

9    MR. SACHSE:  The next change that I know of is on 18,

10  and it is just to fill in Judgment No. 33 at the top, the

11  second line.

12    MR. VEEDER:  If I may be excused, I will go up and get

13  the Rainbow Creek for signing, your Honor.

14    MR. GIRARD:  Get also, Bill, if you can, the date.

15    THE COURT:  Wait just a minute.  Anything else on this

16  one?

17    MR. SACHSE:  Just to finish it.  On line 2 Judgment 33

18  goes in; on 20, line 10, Judgment 33 goes in; on 22, line 24,

19  15-L; and that does it.

20    MR. GIRARD:  The date I am interested in is on page 5,

21  Bill.

22    THE COURT:  Take a short recess and get it and come on

23  back.

24    (Recess)

25    THE COURT:  Any objection to putting this on the record?

1      MR. VEEDER:  Putting what on the record?

2      MR. SACHSE:  I don't object but I question the wisdom

3   of it.  It is not going to embarrass me at this stage of

4   the game, but I think it could cause trouble if it got out.

5      THE COURT:  This is off the record.

6      (Discussion off the record)

7      THE COURT:  Is Rainbow ready to be signed?

8      MR. SACHSE:  With the pen corrections.

9      THE COURT:  All right.

10     MR. VEEDER:  Franz, I want you to take a look and see

11  if those are the way you want them?

12     MR. SACHSE:  I just looked at them.  They are all right.

13     (Mr. Veeder distributing copies of a document.)

14     THE COURT:  I will put in the date 10-10.

15     MR. SACHSE:  You are dating it today or tomorrow?

16     THE COURT:  Today is the 10th.  We assigned a number

17  on this already, didn't we?

18     MR. SACHSE:  No. 42.

19     THE COURT:  We will have to get the Clerk down later.
    What next now?

20

21     MR. STAHLMAN:  Your Honor, I have this one little

22  matter here.  Bill, I want you to listen to this.  This is

23  a little departure from what we have been doing.  In

24  connection with the A series of Vail, which is very simple

25  to draw, the problem arises as to how to outline and define

A104

20,646

1    those lands which are outside the overlying lands.  We have

2    gone over this and I think they are all on exhibit C, which

3    is part of Vail's 35.  And I am just wondering if, without

4    having to attach another map to that, this is the quickest

5    way to show the description of the land, merely take map 35

6    and use it and make reference to it in 35-A and say exhibit C

7    of findings heretofore filed as 35.

8         THE COURT:  Is this in evidence?

9         MR. STAHLMAN:  Yes.  Here is the geologic map.  Here

10   is the only alluvium which is on Santa Rosa.  And then when

11   you get up here, it is this area through here which is all

12   basement complex.  We might refer to what is overlying and

13   what is younger alluvium in 35.  So this would merely make

14   reference to the same map, and it is demarked on there and

15   it conforms to the exhibits.

16        MR. SACHSE:  I think it is a good idea.  It will save

17   referring to a lot of exhibits.

18        MR. WILKINSON:  It will be necessary to use these, too.

19        MR. STAHLMAN:  Otherwise you have to make up two

20   exhibits, and this one is already in.

21        MR. VEEDER:  Colonel Bowen, have you compared exhibit

22   69 and exhibit 70 with Vail's exhibit C?

23        THE COURT:  This is not C in evidence, is it?

24        MR. STAHLMAN:  No, this is C.

25        MR. SACHSE:  He wants to attach it to his exhibit.

1    MR. GIRARD:   I think it went in when the Vail Company's

2  findings were filed.

3    MR. VEEDER:  Yes, it was incorporated by reference.

4    MR. STAHLMAN:  And then we attached it to Vail's 35.

5  My point is instead of putting another map in, 35-A, which

6  is going to be a very small document.

7    THE COURT:  Let's use this one.  Any objection?

8    MR. VEEDER:  If Colonel Bowen has compared it and it

9  coincides with 69 and 70.

10    MR. STAHLMAN:  Anybody reading 35-A and wanting to know

11  what it was would have to go to 35 to get the map that would

12  show it.

13    MR. VEEDER:  I am with you on it.  I couldn't guess

14  whether the geology on 69, which is the Sandia Watershed

15  geology, and 70, which is the geology  --

16    COLONEL BOWEN:  Your Honor, may I clarify this by

17  stating that Vail's exhibit C, at which you are looking,

18  was prepared in my office and under my direction and

19  supervision except for the coloring.  The geologic contacts,

20  the exterior boundaries of the Vail Ranch were placed on

21  portions of U.S.G.S. seven and a half minute quadrangle and

22  it was compiled from exhibits 15, 15-L, 67, 69, 70, and 275,

23  which are in evidence in this matter.

24    MR. STAHLMAN:  So the designations as to the geology

25  are correct on the map?

1    COLONEL BOWEN:  Yes sir.

2    MR. STAHLMAN:  We only colored them to conform.

3    THE COURT:  All right, then, let's do it that way.

4    MR. VEEDER:  We have no objection.

5    MR. STAHLMAN:  That will save a lot of time and work.

6    THE COURT:  Do you want to go to DeLuz?

7    MR. SACHSE:  I would like to ask a few questions before

8    we start on DeLuz, if I can, as to where we stand on some

9    of these.  I am sorry, my notes on these judgments are not

10   up to date.  I have a complete blank in here as to what we

11   ever did with number 31 on Tucalota Creek.  I know that there

12   is a 31-A.  I know maybe a year ago I started drafting some-

13   thing.

14   MR. VEEDER:  We have a current list in my room.  I

15   wouldn't want to guess at it now, Mr. Sachse.

16   MR. SACHSE:  The other thing I was going to suggest

17   is that there are a couple of A series judgments which should

18   be fairly simple to prepare that we might delegate out to

19   Commander Redd and Colonel Bowen.  For instance, in the

20   DeLuz A everything has been done, the Master's Report is

21   there.

22   THE COURT:  DeLuz A?

23   MR. SACHSE:  Yes.

24   THE COURT:  That has been filed.

25   MR. SACHSE:  Has it?

1        THE COURT:  I have a note on August 5th.

2        MR. SACHSE:  All right.

3        THE COURT:  Is that right?

4        MR. GIRARD:  I don't know.

5        MR. VEEDER:  I would have to check it out again.  I

6    don't have my list of judgments here.

7        THE CLERK:  August 4th 32-A was entered.

8        MR. SACHSE:  I am sorry.  I just didn't have it.  That

9    is one of the blanks I had.

10       MR. STAHLMAN:  How much trouble would it be to bring

11   an index up to date?

12       MR. VEEDER:  We are trying to keep one up to date in

13   my office, working with Mr. Luddy, and I will provide you

14   with copies of it.

15       MR. GIRARD:  I know we had some original drafts.  Have

16   we got a relatively up to date draft, considering the Court's

17   rulings on the Aguanga Ground Water Basin?

18       MR. VEEDER:  A draft of the findings of fact, conclusions

19   of law and interlocutory judgment?

20       MR. GIRARD:  Yes, findings of fact, conclusions of

21   law and interlocutory judgment.  All we have is what Mr.

22   Veeder started with, I think, but we don't have any draft

23   at all for the Gorge to the Enclave and we don't have a

24   draft at all, that I know of, from Temecula Creek upstream

25   from Vail Dam.

A108

20,650

1    MR. SACHSE:  On No. 39, the Gorge to the Enclave,

2  Commander Redd and Colonel Bowen supplied me this morning

3  with their draft of the exhibits that would have to be

4  attached to that, showing the respective ownerships on the

5  respective sub-creeks.  I'll be glad to undertake making a

6  draft of that, asking Colonel Bowen, as I did for DeLuz, to

7  provide me with the descriptions of the several tributaries

8  that are involved, and I don't think it will be a very big

9  job, your Honor.  They will be short exhibits.

10    THE COURT:  Will that be number 39-A, too, the basement

11  complex?

12    MR. SACHSE:  No, that would be 39 only.  The exhibits

13  that Colonel Bowen has given me are limited to 39.  The

14  A series would have to be a different exhibit.  Isn't that

15  right?  He says he has those ready.  So I can do that for

16  us, too, if you want.

17    I wanted to take that for our next meeting.  Can you

18  give me the A series?

19    MR. VEEDER:  I have all the defendants that are involved.

20    MR. SACHSE:  That is all I have.

21    THE COURT:  Mr. Sachse will take number 39 and 39-A.

22    MR. GIRARD:  The only thing I have to do is to redraft

23  these two that we went over today, and also draft up some

24  type of order for Colonel Bowen's functions as outlined

25  yesterday.

1    MR. VEEDER:  In that regard Mr. Girard, are you going to

2    send copies around or are you going to submit that for

3    signature?

4        MR. GIRARD:  No, I will send copies to everyone.

5        THE COURT:  Which are the two you are going to redraft?

6        MR. GIRARD:  I am going to redraft numbers 33 and 41,

7    which should be final and ready for signature.  Number 41

8    has no exhibits to be attached to it, so it should be final.

9    Number 33 will have some exhibits, which Commander Redd will

10   have to have attached.  And also draft up the order which

11   your Honor outlined yesterday in the record concerning the

12   obtaining of facts.

13       THE COURT:  On wells, yes.

14       MR. Stahlman is working on number 35-A.

15       MR. STAHLMAN:  I will have that ready next time we come

16   to Court.

17       MR. SACHSE:  And I will have an amendment to Judgment

18   No. 2, deleting from it those names I read into the record

19   earlier this morning.

20       THE COURT:  Yes.

21       MR. GIRARD:  On the Temecula Creek upstream from Vail

22   Dam, the only thing Mr. Stark did ask me was to let him know

23   whenever that was going to be drafted and give him a copy,

24   whoever drafts it.

25       MR. VEEDER:  He is in Aguanga.

1     MR. STAHLMAN:   Is he?   Is Gibbon and Cottle within

2  Aguanga?

3     MR. VEEDER:   Gibbon and Cottle are within Aguanga, and

4  I have been in contact with Mr. Stark right along on this.

5     MR. GIRARD:   In Temecula Creek above Vail Dam, where

6  do you draw the line?

7     MR. VEEDER:   At the Aguanga Ground Water Line.

8     MR. GIRARD:   That should be a very simple finding to

9  draft.

10     MR. VEEDER:   There is, of course, Oak Grove.   We have

11  quite a lot of alluvium up there.   But the geology is in.

12     THE COURT:   Have we assigned a number to that ?

13     THE CLERK:   The Aguanga Ground Water area is Number 40.

14     MR. GIRARD:   It is 34-A and 34.   That is what Sandy's

15  records indicate.

16     THE COURT:   Number 34-A has been signed, Temecula above

17  Vail Dam, basement complex.

18     MR. GIRARD:   Yes.

19     THE COURT:   And 34-A is Temecula above Aguanga Ground

20  Water area.

21     MR. GIRARD:   I don't think there has been any draft on

22  that.

23     THE COURT:   Who is going to work on Aguanga?   The only

24  draft is the one Mr. Veeder made.   Have we maps for the

25  legal descriptions and for the boundaries?

1     MR. VEEDER:  For the Aguanga?  Yes, they are in evidence

2  now.

3     THE COURT:  Mr. Girard, are we working you too hard to

4  have you work on Aguanga?

5     MR. GIRARD:  I can do it if I can get a copy of the

6  geologic map which shows it.  I don't know where it is.

7     MR. VEEDER:  I will send you one.

8     THE COURT:  275, isn't it?

9     MR. GIRARD:  Does 275 depict Aguanga?

10     MR. VEEDER:  That is right, 275 has it.

11     THE COURT:  Could I lend you my copy?  Then you will not

12  have  the Clerk's copy.  In fact, I have two copies, and they

13  are not the same.

14     MR. VEEDER:  You want 277-B likewise.  Exhibit 277-B

15  sets out the ownerships and the exterior boundaries of

16  the Aguanga Ground Water area.

17     THE COURT:  And this one is also a copy of 275, but

18  it didn't go quite high up enough.  So why don't you borrow

19  this one here?

20     MR. GIRARD:  Here is Aguanga.

21     THE COURT:  This is the Aguanga Ground Water area.

22     MR. GIRARD:  All of this would be either younger or

23  older alluvial deposits within the Aguanga Ground Water

24  Basin?

25     COLONEL BOWEN: Exhibit 277-B has the line that follows

A112

20,654

1    the legal sub-division, including the Aguanga Basin.  That

2    does not appear on 275.

3        THE COURT:  No, this is just the geology.  What is the

4    other one?

5        COLONEL BOWEN:  Exhibit 277-B, your Honor, shows the

6    land ownerships and the exterior boundaries by legal

7    description of the Aguanga Ground Water Basin.  It is this

8    dash-dot line that appears.

9        MR.GIRARD:  Is this different from the geology on

10   275?

11       THE COURT:  It is the same geology.

12       COLONEL BOWEN:  It is drawn in the same manner as the

13   exterior boundaries on Murietta-Temecula Ground Water Basin.

14       MR. GIRARD:  So it wouldn't conform actually then with

15   275.

16       THE COURT:  The intent was to follow as closely as

17   you could.  You ran it up in here to pick up this, didn't

18   you?

19       COLONEL BOWEN:  Yes, your Honor.

20       THE COURT:  It takes in Vail dam, too, then?

21       COLONEL BOWEN:  Yes sir.  The divide between Murietta-

22   Temecula Ground water area and the Aguanga Ground Water

23   area is the surface divide at Vail Dam.  That is shown as

24   being a solid line on 277-B.

25       THE COURT:  We will lend him 277-B and I will lend him

Belt 7

1    275.  What else do you need?

2       COMMANDER REDD:  We can give him an extra copy of this.

3       MR. GIRARD:  I really don't want to take the one in

4    evidence, I guess.

5       THE COURT:  All right, you will take a shot at that,

6    will you?   Do you have Mr. Veeder's first stab at it?

7       MR. GIRARD:  I am sure Mr. Veeder gave me a copy and

8    I will have to find it.

9       THE COURT:  It is not called the same thing.  It is

10   Part 1, 2, or 3 of a long series.

11      MR. VEEDER:  I have it here.

12      THE COURT:  You want to remember this, Mr. Girard, that

13   within that area we have already entered a judgment as to

14   Oviatt and a judgment as to Knox.

15      MR. GIRARD:  Right.

16      MR. STAHLMAN:  And Vail, of course, covers that portion.

17      MR. GIRARD:  That is right. There have been judgments

18   as to Oviatt, Knox and part of Vail.

19      MR. VEEDER:  And Gibbon and Cottle have Findings of

20   Fact, Conclusions of Law and Judgment in here.

21      MR. SACHSE:  They lodged their own proposal.

22      MR. GIRARD:  I will probably copy word for word Knox

23   and Oviatt into the findings and draft up what I think the

24   findings are as to Gibbon, or incorporate them by reference,

25   either one or the other.

20,655

1    MR. SACHSE:  Your Honor, although it is my masterpiece,

2  I don't think much would be gained at this time by trying to

3  struggle through DeLuz Creek.  The only people who have seen

4  it are the Colonel and Commander Redd.  I do think it is only

5  in the draft form.  You couldn't sign it anyway.  I think

6  it would be a great help if Mr. Veeder could advise me ahead

7  of time if he finds it nearly satisfactory or as to minor

8  errors.  I will try to re-do it in final form for the next

9  time.  It looks almost all right.  I think it is.  I have

10  checked with Colonel Bowen now.

11    THE COURT:  If we have passed DeLuz, we will have some

12  fireworks.  Pass this around dor discussion.  Withold

13  judgment until you have read the whole document.  It is

14  very tentative.  It is a start.  Sit down and read it.

15    MR. SACHSE:  Your Honor, do you want a hasty comment

16  on one thing about this?

17    THE COURT:  Yes.

18    MR. SACHSE:  I seriously question the legality, certainly

19  the due process  --  issuing an order to show cause to these

20  people upstream based on documents that ColonelBowen prepares,

21  while at the same time everything on Vail and everything on

22  the United States is in the camera and they haven't the

23  slightest idea what the evidence on that is going to be.

24    THE COURT:  We could strike out this clause about what

25  we are going to do with it.

1      Here is my thought on the matter.  I would like to

2  put the toes of the United States and Vail right to the fire

3  and see what they say not only as to their land that can be

4  profitably irrigated but what they say as to the other

5  fellows's.

6      MR. SACHSE:  Let's do the whole thing in camera.

7      THE COURT:  The other areas rest on a different situation,

8  I don't think we will have a problem on the others.  I

9  wouldn't be surprised if the Colonel made a compilation, and

10  we strike out this business about what we are going to do

11  with it, and we later can send it out and probably most of

12  it would be accepted.  I am not too concerned about the

13  Murietta and the area above the Dam.

14      MR. STAHLMAN:  Your Honor, one thing that I think is

15  overlooked in this  --  there may be a lot of things  ---

16  but this is one pivotal point, and that is the law which

17  provides that the land is susceptible of profitable and

18  reasonable irrigation, not that it can be or is.

19      Then when you come into the question of profitable,

20  there is a question in my mind as to whether or not reasonable

21  and beneficial use isn't the true test rather than profitable.

22  I don't think the Court's have made that clear distinction.

23  Because when you go into the question of profits and go into

24  an economic question, all of the values to human life are

25  not based on economic matters.  There are uses of water that

20,657

give rise/benefits to people of a spiritual nature even,
etc.

THE COURT:  We are talking now about irrigable land and
farming.  We are not talking about a camp meeting ground or
a church.

MR. STAHLMAN:  Nevertheless let's look at a couple of
factors that enter into it.  I am just kind of thinking
aloud on this thing to try to achieve the same object your
Honor is trying to achieve and do it within the scope of
what I believe the law to have settled on some of these
questions.  Let's take the practical application or aspect.
On the Vail lands, according to the sruvey made by Colonel
Bowen, there are many acres of avocado land.  They are
susceptible of profitable irrigation.  If you put them all
under irrigation at the present time and used all the water
available, you would probably depress the avocado market
to the point where nobody would have profitable avocado
irrigation.  There is just that much avocado land up there.
But that land is susceptible of profitable irrigation and
in time, properly put into production, that land can become
very profitable land.

It would be much more profitable, from an economic
point of view, to utilize the water on that land than it
would be down in the bottom lands where the temperature is
different and you can't raise them.  And yet that land is

20,658

1     somewhat removed from the source of water.  We find out

2     looking over the area up there where the orchards are

3     planted that they find it more profitable to take the water,

4     elevate it, pump it up to the hillsides, where it has a

5     higher productive use economically.

6          And so you have all these features there. And I think

7     to comport with the decisions of the Court that have been

8     adhered to for many years, that if the division of water is

9     what we are talking about this lends itself to an apportion-

10    ment proposition, you have to go back to the fundamental

11    basis whether the lands are susceptible of reasonable and

12    profitable irrigation and correlate that with the law that

13    the disuse of the land is not destroy it's right to the use
                                    does

14    of riparian water, nor does the use gain any advantage over

15    the other riparians on a correlative basis.

16          So I think there are a lot of factors that enter into

17    this thing.  I don't think it can/very well simplified.   That
                                        be

18    is my view.

19          I would like to hear from Mr. Sachse.

20          MR. SACHSE:  I think George is right, your Honor.  And

21    simply as a matter of information  - -  your Honor may have

22    forgotten or perhaps doesn't know  --  when the DeLuz Creek

23    hearings were originally had before the Special Master there

24    was evidence taken and as to each parcel he would make this

25    type of finding:  the parcel contains 190 acres, 50.8 acres

Belt 8

of which are irrigable.  The most productive and profitable

uses to which said land can be devoted at the present time

are 15.1 acres row crops and 35.7 acres permanent pasture.

It is physically possible to raise turkeys, chickens or

poultry upon all lands within the DeLuz Creek watershed.

If such lands were used for such purposes water would be

required.  The evidence is insufficient to establish whether

it is or is not economically feasible to use any land in the

watershed for such purpose, and the evidence is also

insufficient to determine the amount of water which would

be required.

If this study, as George says, were intended to result

in an allocation of water to land, and taking this at its

face value, and I own 50 acres riparian to the Santa

Margarita River, let's say below the Gorge, which is a

hundred percent basement complex, I will come out with a

zero water allocation.  I probably will.  But that doesn't

mean that I couldn't, if I wanted to, pump my riparian water

and put turkeys on that basement complex or put chickens

on it and could have a pretty heavy water use.

The reason this "practical and profitable" phrase has

come into the cases  --  I think George is absolutely right --

is that in cases where you find it the competing stream

owners were all irrigators.  In the Half Moon Bay case they

were all irrigators and there was not enough, so they decided

A119   26,660

1    we have to find a way to apportion water between these

2    irrigators.  But I don't know of any case that says how

3    you are going to apportion between chicken raisers and

4    irrigators.

5         THE COURT:  I am not proposing, on the basis of what

6    Vail and the United States submitted to me, to make any

7    decision.  I would just like to see, if it were put to them,

8    what they claimed was land that could be profitably irrigated,

9    what they would come up with, and that is why I asked them

10   to do it in camera.  It might have a very significant

11   impact on this thing.  If they are both going to take the

12   position that all the irrigable land they have is susceptible

13   of profitable irrigation, it may wind up that the yard stick

14   we are going to take is irrigable ground.  Therefore, I

15   would just like to see them do it in camera and tell me

16   what they think as to what irragable acreage is subject to

17   profitable irrigation.

18        Now the other group rests on a different category.  I

19   may be wrong, but I have a hunch that the figures of

20   irrigable acreage in Murietta, except Vail and above Vail

21   Dam in the Aguange Ground Water area, are going to be preety

22   close to what are suspceptible of profitable irrigation,

23   although there may be a similar problem to what George is

24   talking about up on some of these ranchos.

25        MR. SACHSE:  May I add one more thing.  I think that

1   is true of the Murietta, but it is not true of the Aguanga.

2   There is a basement complex shown all through the middle

3   of the Aguanga area and it is land that is riparian.   You

4   are going to find a lot of these riparians in that ground

5   water area where the whole thing is probably basement complex.

6   THE COURT:   I would like to get an idea of what the

7   Colonel thinks.   He can change his mind later.   We can strike

8   this business about sending it out immediately.   Let's see

9   what we get out of this.

10   MR. STAHLMAN:   We surely appreciate that if we knew

11   what the entitlement would be for everybody, in other words,

12   if we had these figures to show the capacity of that basin

13   and what water could be used.   We realize there are probably

14   a lot of parcels of land that certainly would not have

15   sufficient water to irrigate all of that land.   But the

16   Court has set the standard as to the division as being in

17   relation to the irrigable acreage which you own.   If we

18   pursue this matter we might get ourselves into the type

19   and character of fight they had on the limitation of the

20   hundred and sixty acres that the Government put on the use

21   of their land.   Of course, that doesn't comport with the

22   rules Supreme Court of the State of California has established

23   in relation to deteriming the right to the quantity of water

24   that one would have on a correlative basis.

25   There are several other factors that enter into it.

1    There are certain types of land that can be developed to

2    a high use.   There are sub-tropical crops that are being

3    initiated in Northern San Diego County, and it appears that

4    some of them may be productive and lucrative crops.   But in

5    most of these cases, take avocados, you have to develop the

6    land and utilize the water in order to bring it to fruition

7    for a period of seven or eight years before they become

8    economically productive.

9        You have all these different factors that enter into

10   this.   So to determine on the basis of immediately knowing

11   as to whether a piece of land can be profitably irrigated

12   or not, it takes a lot of factors into consideration.

13       MR. VEEDER:   May I inquire, has the order been signed

14   by your Honor?

15       THE COURT:   No, this is a very rough draft.

16       MR. VEEDER:   I saw the name on there was all.

17       THE COURT:   No, just working it out here at recess,

18   just trying to get some start on this.   I welcome criticism,

19   I welcome suggestions.

20       There are two different approaches to two different

21   things.   As to Vail and the United States, I would just

22   like to see, without the other fellow seeing what position

23   you take, what position you take as to what you are going to

24   contend for.

25       MR. STAHLMAN:   I would venture to say that this would

A122

20,665

1    probably be one of the first things that the Government and

2    Vail would reach agreement on, and I haven't even talked to

3    the Government about it.

4        THE COURT:  It may be.  You see, that is very important.

5    If it turned out that these figures were pretty close, this

6    wouldn't solve the problem.  It might go a long ways toward

7    solving the problem as to Vail and the United States.

8        MR. GIRARD:  Also, the standards established would,

9    of course, have to be compatible with all other lands in

10   the watershed.

11       THE COURT:  I just struck off some guide marks.  There

12   are probably more that you have to use.  And some of those

13   might not be right.  This is a starter.  I would like to

14   have some other expressions on it.  Mr. Veeder, are you

15   ready?

16       MR. VEEDER:  I would to consider it, your Honor,  I

17   think we have to start some place, and this sounds like the

18   place to start.

19       THE COURT:  Do you want to read it further?

20       Mr. Girard, do you want to comment on it?

21       MR. GIRARD:  Briefly  --  I am not going to comment at

22   all on the standards you have imposed as to what would be

23   considered  --  I do think that it would be improper to

24   gather this factual evidence as to Vail and the United

25   States and then at this stage not know what you are going

1    to do with it, which is what I gather your draft as to Vail

2    and the United States is.

3         THE COURT:  What is wrong with that?

4         MR. GIRARD:  And at the same time to gather these

5    factual matters as to everybody else in the watershed, have

6    hearings and make determinations.  I think if you are going

7    to make any determinations they should all be made by the

8    Court.

9         THE COURT:  We strike that paragraph out at the top

10   of the page.

11        MR. GIRARD:  If you strike that and have a gathering

12   of this factual information and leave it to be determined

13   on some future date if you are ever going to use it and for

14   what purpose, if ever.

15        THE COURT:  Strike the paragraph at the top of page 3.

16        MR. GIRARD:  In other words, the Colonel can certainly

17   go ahead and make these determinations.  But I would

18   personally at this stage, if I were representing them, and

19   even in behalf of the State, I would say that determinations

20   on this evidence made at this stage would be immaterial

21   because no one could get an apportionment.

22        THE COURT:  I understand that.

23        MR. GIRARD:  But I have no objection to gathering it.

24        THE COURT:   I am not even sure about these factors

25   that I have listed.

20,665

1    Anybody else have any comments on it?

2    MR. SACHSE:  Well, yes, another one.  Under our Water

3    Code the first use of water is domestic.  The State of

4    California  --  and this is semi-facetious, but it is true  --

5    planned on making some kind of a retreat of Murray Schloss'

6    Ranch for retired school teachers and deputy attorney

7    generals, where they can go and take life easy.  I am serious.

8    This problem hasn't arisen too often in California Law,

9    to my knowledge.  But I can think of a case just like that,

10   which is one that I used in the military use fight.  That

11   is the case from New Jersey where the Big Brother movement

12   created a retreat on a stream in New Jersey where they

13   brought large numbers of city kids out in the summertime

14   and they put a burden on the stream that the New Jersey Court

15   said was an improper riparian use and they couldn't do it.

16   There was unquestionably a point at which this burden was

17   proper, and then there was another point where it ceased to

18   be proper.

19   This, to me, is one of the most dangerous things about

20   this, and one of the reasons why I am so strongly opposed

21   to even suggesting we are fixing a yardstick on irrigable

22   acreage.  If this problem arises, you are going to be con-

23   fronted by every creek in the upper Murietta, every little

24   surface trickle and spring where people make domestic use

25   of it today, and those uses are going to be prior.

THE COURT:  We know that.

MR. SACHSE:  Then down the line you are going to find hickens, you are going to find turkeys, you are going to find all kinds of things.  I don't like the idea.

MR. VEEDER:  Fundamentally, though, Mr. Sachse, what is the difference between this and what Colonel Bowen is undertaking to do right now?  Basically, what is the difference?

MR. SACHSE:  There is no difference.  This is exactly it.  But as I told the Court yesterday, yes, there would be, at least from me, objection to the entry of findings as to practical and profitable irrigable acreage, because I don't think this is the time for it.  I don't think it is material at this stage of the proceeding.  I realize I may be alone.

MR. VEEDER:  I think fundamentally you are just asking to do what Colonel Bowen is undertaking to do now, except for the procedure you have outlined with respect to the relationship between Vail Company and the United States.

THE COURT:  He is presently undertaking a well study and all that.  I don't know what he is doing.  Maybe he is doing this already.  I am asking for a compilation.

Are you doing this already?

COLONEL BOWEN:  Yes sir.  It is my understanding of the Court's instructions that I would proceed to determine

the acreage susceptible to practical and profitable irrigation

on these lands owned by substantial water users.

THE COURT:  You are working on that, then, already?

COLONEL BOWEN:  Yes sir, your Honor

MR. GIRARD:  As I understand it, the test you will use

there will not be the same as just whether they are irrigable

or not.

MR. STAHLMAN:  What is going to be the standard?

MR. GIRARD:  The Judge has set forth certain standards,

which would include some conditions other than the mere

fact or irrigation, as I understand.  I am not sure that

if we were faced with an apportionment, I am not sure that

I would agree with Mr. Sachse that the way you would

apportion is on irrigable acreage.  I think you would  --

irrigable acreage with some limitation.

I don't see any problem with the domestic use, even

under that standard.  A chicken ranch, if one is in fact

being used, you could easily make the allocation and say

people are entitled to domestic water without being worried

about your basic allocation.  I am sure that in any allocation

on any watershed you have always had domestic users in the

area.  Probably the best way to do it is to allocate it, if

you have to, on the basis of irrigable acreage.  But I think

you should have the same standard as to all and it should

be some reasonable standard.  I haven't examined these

1   completely as to whether they are all reasonable or not, or

2   whether some more should be added.

3   MR. VEEDER:  I'll bet Colonel Bowen will be looking

4   through about one through eight in making his determination.

5   THE COURT:  Colonel, what do you think of these items?

6   This is very rough.  What do you think of these items of

7   standards?  Let's take up one.

8   COLONEL BOWEN:  I think No. 1, on the bottom of page 1,

9   whether capital is available immediately or not, is certainly

10   not a consideration.  A man can go out and borrow money.

11   THE COURT:  Two.

12   COLONEL BOWEN:  The amount of water available should

13   be considered.  I think that is intrinsic in the statement

14   I have previously made that we would consider only sub-

15   stantial users.  It is is intrinsic that if they are sub-

16   stantial users, water is available, and we have attempted

17   to winnow out the illusory type of properties.  The amount

18   of water available should be considered, and I think that

19   spells it out very well.

20   THE COURT:  Let me stop you right there.  On two, isn't

21   this the law, that even if you had a thousand acres of

22   irrigable ground but you only had a hundred acre feet of

23   water at the level that was available, as far as that is

24   concerned, we are talking about the land that would be

25   served by a hundred acre feet of water?

MR. STAHLMAN:  Yes.  But when you come to your correlative rights, you have to diminish the use by reason of shortage of water.  It is not done in proportion to the amount of water that is available.  It is done in proportion to the amount of irrigable land you have.  That is my understanding.

THE COURT:  Suppose you had a thousand acres of irrigable ground, but at the point where you could get water for it there would be only a hundred acre feet available, and suppose other people also had a claim on this hundred acre feet.  Do you mean that in some apportionment you could throw in your whole thousand acres?

MR. STAHLMAN:  No, I guess we are talking at cross purposes here.

THE COURT:  At best you have a limited amount of ground that you could irrigate in that area, and that would be taken into account with the amount of ground somebody else could irrigate.

MR. STAHLMAN:  But let's see if we can approach it from another angle and see if we can get a common understanding.  Let us assume I have a hundred acres of land and I am subject to the same source of water your Honor has and you have ten acres of land, and we have sufficient water just to irrigate that amount of land  --  one hundred ten acres. We find out that we have to cut the water in half  -- fifty percent off.  The fifty percent that you are going to cut

20,670

1    is fifty percent of the proportion of water that goes for

2    ten acres.  In other words, I am still going to get ten times

3    as much water as you.  Isn't that right?

4        THE COURT:  I don't think any of this is subject to an

5    exact mathematic computation.  I think that is one of Mr.

6    Veeder's big errors in his talk here yesterday.  Because

7    you have a lot of other factors to take into account.

8        MR. GIRARD:  The problem I see on that, too, your Honor,

9    say you have a stream here and there is enough water physically

10   available to irrigate a hundred acres.  Let's say this man

11   here owns two hundred acres.  This man over on this side of

12   the stream owns fifty acres.  In allocating this water under

13   that standard, would you consider, in determining how much

14   this man's share is, the fact that he owns a hundred acres

15   more than there is water physically available?

16       THE COURT:  I would think so.  You are taking a hard

17   case.

18       MR. GIRARD:  Yes, this is a hard case.

19       THE COURT:  But actually what you have is water available

20   for a hundred acres, and suppose he owned ten thousand acres.

21   Do you think we would say he would throw in his ten thousand

22   acres in comparison with the --

23       MR. GIRARD:  That is the question.  I don't know how

24   you would say it.  I would say you shouldn't ever throw in

25   ten thousand, because you get completely out of the realm

A130

20,671

1    of reasonableness.

2    MR. VEEDER:  I think your Honor has used the term

3    "illusory" throughout this entire ligitation, and I believe

4    that the term "illusory" to a marked degree is applicable

5    to the situation you are speaking of.  I think you can say,

6    "sure, he has a riparian right, it is illusory," and I think

7    when Colonel Bowen takes a look at 1 through 8, if he sees

8    a situation where the right is illusory  --

9    MR. STAHLMAN:  What are the standards for illusory?

10    MR. VEEDER:  His Honor has used the term.

11    MR. STAHLMAN:  I know he has, and I know what he means

12    by "illusory".  He is talking about areas up there where

13    there is practically no water whatever.

14    MR. VEEDER:  It is a matter of degree.

15    MR. STAHLMAN:  Suppose we have this stream here and we

16    have two pieces of land on that stream.  This one has a

17    hundred acres, and this one has fifty acres.  All of it

18    is susceptible of reasonable and profitable irrigation.

19    THE COURT:  How much water is available?

20    MR. STAHLMAN:  Let us assume there is X quantity of

21    water.

22

23    THE COURT:  Not X.  How much?

24    MR. STAHLMAN:  Let us say there is enough to irrigate

25    a hundred acres, to make it simple.  Then the quantity of

1   water, the X now becoming a hundred, this party here with

2   this land, all susceptible of profitable irrigation, is

3   entitled to twice as much water as is this man here, under

4   our law.

5   THE COURT:  But you jump very nimbly and assume a fact;

6   you say all this land is susceptible of profitable irrigation.

7   MR. STAHLMAN:  Yes.

8   THE COURT:  When as a matter of fact, it is not,

9   because your,  maximum conditions you assumed a hundred

10  acres  --

11  MR. STAHLMAN:  Fifty acres and a hundred acres.

12  THE COURT:  There is enough there to irrigate a hundred

13  acres.

14  MR. GIRARD:  If you change this to two hundred acres,

15  then you have a question.

16  THE COURT:  That is the question.

17  MR. STAHLMAN:  There is the point.  He can put that

18  water on any part of that land.

19  THE COURT:  He can only put it on one part.  If he has

20  a hundred acres and has enough water for a hundred, he can

21  put it on a hundred acres somewhere.

22  MR. STAHLMAN:  Yes, somewhere on the ranch.

23  THE COURT:  But he can't put it on a thousand.

24  MR. STAHLMAN:  I know that.  There is not enough water.

25  But I am talking about the division of water when it comes

20,673

1    to a correlative division of water.

2    THE COURT:  Then you don't take the thousand acre

3    figure, do you?

4    MR. STAHLMAN:  Certainly.  If a small fellow has only

5    five acres, he cuts down the same percentage as the fellow

6    with a thousand.

7    THE COURT:  But there would be enough water to irrigate

8    all of his five acres.

9    MR. STAHLMAN:  That is just too bad for him.  That is

10   what the law says.

11   MR. VEEDER:  Now we are getting into the area where

12   the case of Rancho Santa Margarita vs Vail comes in, where

13   they put the ninty six hundred acres on Murietta Creek and

14   said this is irrigable, but is it reasonable to use it on

15   that land?  Isn't that what it says, George?

16   MR. STAHLMAN:  Yes, because you haven't come to the

17   question as to whether it was susceptible of reasonable

18   and profitable irrignation.  That was not considered.  That

19   is all they were hitting at there.

20   THE COURT:  Let's go ahead.  We are not going to decide

21   anything right this minute.  Don't be excited.

22   The Colonel agrees with No. 2.

23   What do you think about 3 and 4?

24   COLONEL BOWEN:  I am not wholly in accord with 3,

25   your Honor, inasmuch as I wouldn't be willing to concede,

1    at this moment, that sprinkler irrigation is more economical

2    than either flood or row irrigation. But I do think it should

3    be considered a proper means of irrigation.

4        MR. STAHLMAN:  It is true that in some areas it is and

5    in some it is not.  Isn't that true, Colonel?  That the

6    return flow being great, you may have just as economical use

7    of water as you would would with sprinklers, in some areas,

8    or about the same?

9        COLONEL BOWEN:  That is the point I make.  That there

10   are many variables that must be considered in making this

11   determination, and I wouldn't be willing just to say that

12   it is more ecomonical.

13       THE COURT:  Go ahead.

14       COLONEL BOWEN:  Four.  Certainly customary and trad-

15   itional crops in the area should be considered.  Along this

16   line, in the arguments being presented, say a low duty crop

17   were to be grown and it was customary and traditional for

18   the area.  There might be only enough water to grow twenty

19   five acres of a low duty crop, whereas that water might grow

20   a hundred acres of ahigh duty crop.  So the acreage is not

21   too important.  You are not going to tell a farmer that he

22   has to grow alfalfa and not barley.  Certainly No. 4 is

23   reasonable.

24       Five.  Your Honor, I am not sure I understand what

25   your Honor means by "there shall be given great weight ."

20,675

1    THE COURT:  It is hard to state, but I mean this.  If

2    you show that a certain area has been irrigated in the past,

3    the presumption is that it is profitable to irrigate it.

4    I don't mean just one crop sometime, but where there has been

5    traditional use of water, it doesn't become much of a problem

6    as to whether that is irrigable.

7        COLONEL BOWEN:  One of the greatest problems in the

8    arid West, your Honor, is the loss of lands owing to the

9    accumulation of minerals in the soil that is brought about

10   by irrigation.  So that there are tens or hundreds of

11   thousands of acres in the West that have been irrigated that are

12   no longer susceptible of practical or profitable irrigation

13   because of the accumulation of salt.

14       THE COURT:  So you would question that one.

15       COLONEL BOWEN:  It is an indication that it has been

16   used and I will consider that in arriving at my evaluation.

17       MR. STAHLMAN:  If I may comment on that one, your Honor.

18   You don't intend, by saying it shall be given great weight,

19   that it would conflict with the established rule that land

20   which has not been irrigated  --

21       THE COURT:  Well, no, I am not talking about that, that

22   you have lost any rights.

23       MR. STAHLMAN:  Right.

24       THE COURT:  But I just mean ordinarily if you found a

25   piece of ground that had been irrigated for the last ten

A135

20,676

years you wouldn't go any further  --  you would probably

assume this was profitable irrigation.  If you found it had

been irrigated once twenty years ago and there was a crop

failure or something happened, you might wipe it out.  It

is hard to state these things.

I see your limitations on 5.  What about 6?

MR. VEEDER:  Whether the wetness factor and the alkaline

factor would be taken into consideration.

COLONEL BOWEN:  I had just stated the areas irrigated

in the past shall be considered and it would be enough

without having to spell/all the variables that might apply.
out

THE COURT:  What is your comment on 6.

COLONEL BOWEN:  I am in accord with 6, although we are

not in a position of speculating.  These are research matters

that would have to be proven before they could be considered

factual.

MR. STAHLMAN:  Take the horse ranch on the way to

Pendleton.  There are acres of those trees in there.

COLONEL BOWEN:  That is the Camelot Ranch in the San

Luis Rey Valley.  It is wholly speculative.  The man never

knows whether he is going to make a dime out of it.

THE COURT:  Seven.

COLONEL BOWEN:  Yes sir; 7 connotes the cost of

delivering water to the field, and that certainly should

be considered in determining practicality and profitability

1    of the venture.

2         THE COURT:  I don't know what my thought was on that

3    last phrase, especially as to areas previously irrigated.

4         MR. STAHLMAN:  That would cut out Fallbrook entirely.

5         MR. SACHSE:  Except we aren't a riparian.

6         MR. VEEDER:  You are out already.

7         MR. STAHLMAN:  You have to raise it six hundred fifty

8    feet.

9         COLONEL BOWEN:  I think that would probably come out,

10   that last phrase in seven, wouldn't it?

11        THE COURT:  Yes.

12        Eight.

13        MR. SACHSE:  What do you mean by "type of crop that

14   could be grown"?

15        THE COURT:  Well, you can't grow avocados on an

16   area where the temperature goes down to twenty degrees.

17   You can't grow alfalfa on a piece of ground that is vertical.

18

19

20

21

22

23

24

25

1    MR. SACHSE:  No.  But if I understand you, these are

2    factors to be determined in whether it is susceptible of

3    practical profitable irrigation.  Are you going to say that

4    because an avocado may or may not be a more profitable crop

5    per acre than alfalfa, that therefore every acre suitable

6    for avocados gets credit and every acre suitable for alfalfa

7    doesn't?  I don't see what difference the crop has, as long

8    as you can grow it profitably.

9        THE COURT:  Colonel?

10    COLONEL BOWEN:  Your Honor, I would agree that the type

11    of crop in this instance would be an unnecessary factor.  We

12    are simply determining the correlative quantity of water

13    available to the farmer and not attempting to dictate the

14    type of crop he could use.  He can grow a tree crop or a

15    small grain crop or a hay crop, each of which would require

16    different quantities of water per acre.  Certainly all of

17    the factors affecting the soil  --  the soil texture, depth,

18    the contour slope of the land, and even micro-climatological

19    features which are inferred in temperature average  -- would

20    be considered in determining practicability and profitability.

21        THE COURT:  Now gentlemen, the possibility of putting

22    this thing out I will illustrate by a story.  It is a legal

23    story, because the Rabbi in Europe had a semi-judicial

24    position  --  he settled disputes that came to him, and

25    very often the decisions of rabbinical courts were taken to

1   courts of a country or state and were affirmed.

2       The story concerns the traveler who was going through

3   this European town, and his friend had said, "If you get to

4   this town, look up my friend Jacobs. He is a great friend

5   of mine. He will take good care of you." So the traveler

6   went to this town and looked up Jacobs. Jacobs said, "Why

7   sure, I know your friend." He put out the red carpet -- gave

8   him the best room in the house, served him fine meals,

9   brought the neighbors in to visit, had minstrels come in

10  and put on a great show. The traveler was only going to

11  stay a day or so, but at the urging of Jacobs he stayed

12  almost a week. When he finally got ready to leave he said,

13  "Jacobs, you have been wonderful to me. I am going to tell

14  my friend in the States how well you took care of me. You

15  don't know how much I appreciate this." Jacobs said, "I am

16  glad you appreciate the hospitality we could offer you. Here

17  is the bill." And here was the bill itemized. The traveler

18  was taken aback a bit. He said, "I don't want to be cheap,

19  but I didn't understand that I was paying for all this. I

20  thought I was your guest. You urged me to stay." There

21  was quite an argument developed about the matter. So Jacobs

22  said, "All right, if you dispute the matter we will go down

23  to the Rabbi and let the Rabbi decide it." The two of them

24  went down to the Rabbi in the small town and each presented

25  his case to the Rabbi. The traveler told what he thought

the situation was.  Jacobs told what he thought the situation
was and that his bill was reasonable.  So the Rabbi decided
the case and said to the traveler, "Pay the man the money
he has on the bill."  They walked out of the Rabbi's residence
and the traveler started to get the money out of his purse.
Jacobs said, "Oh, put your money away.  Forget about it.  You
don't owe me anything."  So the traveler said, "I don't under-
stand this," and he recounted the whole thing.  "I came, I
thought, as a guest.  I had a great time.  You then gave me
a bill.  We argued about it.  You took me down to the Rabbi.
The Rabbi decided in your favor.  And then you say, 'Forget
it.  You owe me nothing.'  Jacobs said, "I just wanted to
show you what kind of a schmo a Rabbi is."

Part of this is to illustrate, not that anybody part-
icularly is a schmo, but to illustrate what kind of problems
we are going to have if we go very deeply into this question
of what kind of ground is subject to reasonable and profitable
irrigation.  You are going to have disputes that even the
Rabbi can't decide.

But this illustrates another thing.  If we do it, I
don't think the task is to lay out standards, because we
would be here all day agreeing upon what were standards.
I think all you could do would be to take a man who was an
expert and say to him, "Tell us what is subject to practical
and profitable irrigation," or whatever phrase you are going

20,681

to use.  Let him give his opinion and then subject him to

cross-examination as to factors he considered.  Did you

consider this, or did you consider that?  He took this into

account, he attached great weight to this and little weight

to that.  And somehow or other, as any expert does, he comes

up with an opinion.

That is part of the purpose of this.

I am not going to make any order that the Colonel do

this.  He is already working at it and I will look forward

to seeing the kind of report that he makes.

Belt 9

The second part of it has a different purpose, and that

is I would like to see what Vail and the United States would

come up with as to each other's properties.  I would just

like to get how they react on this matter.  How big a job

would it be for the United States and Vail to comply with

the latter part of this?

MR. SACHSE:  May I tell you what worries me the most

about the last part.  It is the very last phrase on the last

page:  "The Court will thereafter inspect the materials

submitted to determine what other proceedings there will be

had in connection with acreage susceptible to . . . "  I

think this is the camel's nose under the tent.  After the

head is in the neck, then the shoulders, and finally the

whole damn beast and we are going to have regulation, and

I don't think we should approach it in that fashion.

1       THE COURT:  Well, strike it out.  I am curious to see

2   what they would come up with.  Mr. Stahlman says he thinks

3   this is an area where the United States and Vail could

4   probably get together.  But I would be interested to see

5   what positions they take  --  what position the United States

6   would take as to it's land, and what position it would take

7   as to Vail.  I will even go further, if I make you do it,

8   and that is provide  --  I will think about it at least  --

9   I will tear up your reports.  That might not be a good idea,

10  Of course, they are submitted in camera and if they do that,

11  technically I couldn't use them, unless I found you pretty

12  close together.

13      Is it a waste of time?

14      MR. STAHLMAN:   I don't think you are going to accomplish

15  anything by it, your Honor.

16      THE COURT:  You don't want to do it.

17      MR. VEEDER:  I think we are accomplishing something,

18  on the first eight, that's for sure.

19      THE COURT:  We are talking about the last portion,

20  starting on page 3, the Vail Ranch.

21      MR. GIRARD:  You are not accomplishing anything if you

22  just do it on the small people, unless you do it on Vail and

23  the United States.

24      THE COURT:  But this is a starter.  I would just like

25  to see what position they are going to take.

1   MR. SACHSE:  You may have a point, maybe Mr. Vecder will

2   come out and say he has the camel inside the tent.  Then we

3   will know where he stands.

4   MR. GIRARD:  I want to see if they both come in with

5   irrigable acreage figures.

6   MR. STAHLMAN:  Sure.

7   THE COURT:  And they have their irrigable acreage

8   figures, but they would have to relate those to this business

9   of practical and profitable irrigation.

10  MR. STAHLMAN:  Until you know how much water there is,

11  how can you determine?  At the present time if there were

12  enough water there, I submit that every bit of the land which

13  Colonel Bowen has found to be susceptible of being irrigable

14  would be included.  There is enough water there that you

15  could irrigate it all.

16  MR. GIRARD:  The United States stands in the position

17  of having the ground water basins safe yield determined.  So

18  they are limited.

19  MR. VEEDER:  That is only the ground water.

20  THE COURT:  What do you think about the last part of

21  this?  Do you think this takes us anywhere?

22  MR. SACHSE:  I would like to see what they say.

23  MR. VEEDER:  I certainly say it is a point where sooner

24  or later we had to arrive.

25  MR. STAHLMAN:  I have no objection to exploring this

1   information.

2       THE COURT:  Suppose I make no formal order on it, but

3   just orally direct you to do this, Vail and the United

4   States.

5       MR. STAHLMAN:  Your Honor, I could take exhibits right

6   now and show you where it is all  --  that is, all of Pauba

7   that has been included in the irrigable acreage.

8       THE COURT:  Is there water available for all of it?

9       MR. STAHLMAN:  How much there is water available for

10  we don't know.  I don't think there is water available for

11  all of it.  If that four hundred eighty thousand acre feet

12  is in there and if it replenishs itself readily, there

13  certainly would be.  So we don't know.  That to me is the

14  big hiatus in this whole thing.

15      THE COURT:  Mr. Stahlman's answer now is that he is

16  going to come in and say it is all susceptible of practical

17  and profitable irrigation.

18      What are you going to say about the United States?

19      MR. VEEDER:  I have always been reasonable in all these

20  matters.

21      MR. SACHSE:  He is just going to say ninety-nine percent

22  is susceptible.

23      THE COURT:  What are you going to say about the United

24  States?

25      MR. STAHLMAN:  If they want to put it into  farming

1    and we want to put it into farming, I think we are on an

2    equal basis.  I think our land is going to be judged

3    according to the same standard.

4        MR. VEEDER:  In the memorandum and motion of May 14,

5    1962 that is spelled out.

6        MR. GIRARD:  The United States couldn't, under this

7    theory, claim more acres than ten thousand acre feet of

8    water could be used on.

9        MR. STAHLMAN:  I think it is completely idiotic to

10   try to establish a figure about the amount of water you

11   would use and be entitled to over-water also.  I think you

12   are just barking up the tree and wasting time and spinning

13   your wheels on that.

14       THE COURT:  Let me ask Mr. Veeder.  Is your position

15   going to be that all of your land is subject to profitable

16   irrigation?

17       MR. VEEDER:  I would say this.  I will be guided to very

18   large degree by Colonel Bowen and the Marine Corps on that matter.

19       I will also say that I am delighted to be able to show

20   this to Ramsay Clark as your present thinking on this point.

21   I am in this situation in regard to the whole matter.  I have

22   to review it with him and see what his views are going to be.

23   I think he will probably go along with it.

24       MR. SACHSE:  May I inquire on these conditions that

25   Colonel Bowen reviewed, are we taking the land in its present

1  shape -- that is, a hundred acres are under roof and pavement?

2  Is that land susceptible of practical and profitable irrigation?

3  Or are we taking it the way it would have been if the houses

4  weren't there?

5       MR. VEEDER:  These are things we have to go through.

6       MR. SACHSE:  These are things that are absolutely vital

7  to the Navy.

8       THE COURT:  That is just another illustration.  Of

9  course, pavement could be removed, a house could be torn

10  down.  I am not laying down these rules.  I am not going to

11  make an order on this.  I am interested to see what the

12  Colonel is thinking about.  It illustrates the difficulty

13  in this problem.  The Colonel is proceeding on the first

14  part of this.  The only thing is whether to ask you

15  gentlemen to do something on it.  Maybe, in view of Mr.

16  Stahlman's statement, just a memorandum, maybe a memorandum

17  from the Government on their position, both in camera.

18       MR. STAHLMAN:  Here is another factor that I think

19  has to enter into this situation to which we haven't given

20  consideration.  We are talking about riparian water.  What

21  about the overlying uses and the relationship between the

22  riparian and the overlying?  You have a factor there that

23  comes into this situation also.  Pendleton has a little

24  different situation.  The entire basins within the confines

25  of the enclave and they overlie the whole basin.  So as far

1    as their overlying rights are concerned, they are different.

2    We have correlative overlying rights with other people and

3    you get into another factor there in connection with the

4    relationship of your riparian to your overlying water rights.

5    So this becomes very complicated.

6         THE COURT:  Let's terminate it now by saying that instead

7    of making an order that you do these things, I would just

8    ask you to write me a memorandum in camera  - -  don't serve

9    it  --  as to what you think your total acreage as to

10   profitable and practical irrigation is and what you think

11   the Government's is and ask Mr. Veeder to do the same thing.

12   I would like to lay them down side by side and see what you

13   gentlemen think about.

14        MR. SACHSE:  Can we see these in camera?

15        THE COURT:  We will see.

16        MR. STAHLMAN:  In writing this up, would your Honor

17   consider the Half Moon Bay case?

18        THE COURT:  You can cite me a case on which you base

19   your opinion.  I went back last night and read the parts

20   of Hutchins that you asked me to read, and this, in part,

21   comes out of having read Hutchins.  Incidently, from reading

22   Hutchins, also, I think Mr. Veeder's mechanical percentage-

23   wise figure is not borne out by the authority.  I think it

24   is not a matter that you can put down in exact percentages.

25   There are too many factors involved.

1    but it will take me a month to think about it.

2        THE COURT:  Have it ready by the next meeting.

3        MR. VEEDER:  That is important.  I have been talking

4    to Colonel Bowen about the time.

5        THE COURT:  When do you want to come back?

6        MR. SACHSE:  The sooner the better.

7        MR. VEEDER:  We had mentioned November 1st.  I believe

8    that under the circumstances that prevail we would like to

9    have it nearer the middle of the month than the first of

10   the month.

11       MR. SACHSE:  Can't we come back for at least a day or

12   two and knock off a couple of these judgments?  There are

13   four of them that are going to be ready  --  even if you

14   don't do the rest of these things you are talking about.

15       THE COURT:  I am starting a Wherry case on the 22nd

16   of October and that is going to go probably two weeks.

17   Election day is Tuesday, the 6th, I take it.

18       MR. SACHSE:  What about Wednesday, Thursday and Friday

19   that week, then?

20       THE COURT:  I have a literary property case I am tied

21   up to try in Los Angeles on the 6th.  It should take only

22   a day.  If you want to take a chance that I might not get

23   here on the 7th, and you can do some of the work if I don't

24   get here, I can set the 7th, 8th and 9th of November.

25       MR. STAHLMAN:  That is good, because the next week I

A149

20,690

1    have a trial.

2        MR. GIRARD:  Are we assured of the 8th and 9th?

3        THE COURT:  You are assured of the 8th and 9th.  After

4    all, there is a lot of this work you fellows can do.

5        MR. SACHSE:  We can have some of these judgments ready

6    so that we can just hand those to you and say sign them,

7    your Honor.

8        MR. VEEDER:  In regard to this memorandum, is the 8th

9    and 9th of November all right?

10       THE COURT:  I would suggest you have it on the 7th.

11   Have it on the 8th, if you want.

12       MR. STAHLMAN:  As long as we are going to do it and

13   people want to see it, I have no objection.  Put it in, and

14   I will put it in, and see what it looks like.  I know it is

15   going to be a complicated thing, because I have a few cases

16   running in my mind on this question of law.

17       THE COURT:  The matter is continued to November 7, 1962

18   at 10:00 o'clock A.M.  If I am not here, the Clerk will

19   continue it to November 8, 1962 at 10:00 A.M., and you

20   gentlemen take my Courtroom and proceed to get a lot of

21   these things done.

22       (Adjournment to November 7, 1962 at 10:00 o'clock A.M.)

23

24

25

1        IN THE UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3              SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,      )
                                   )
5                  Plaintiff,      )
                                   )
6   vs.                            )       No. 1247-SD-C
                                   )
7   FALLBROOK PUBLIC UTILITY       )  ORDER AMENDING FINDINGS OF
    DISTRICT, et al,               )  FACT, CONCLUSIONS OF LAW, AND
8                                  )  INTERLOCUTORY JUDGMENT NO. 37
                   Defendants.)
9   _____)       NAVAL ENCLAVE

10

11       This Court on              entered Findings of Fact,

12  Conclusions of Law and Interlocutory Judgment No. 37.

13       Good cause appearing, it is now hereby ordered that

14  Finding of Fact 27, Conclusion of Law 27 and Interlocutory

15  Judgment 18 be amended in said Findings of Fact, Conclusions

16  of Law and Interlocutory Judgment No. 37 to read as set forth

17  in the Exhibit attached hereto and made a part hereof.

18       Dated:

19

20

21                                       _____
                                                JUDGE

22

23

24

25

AMENDMENTS TO FINDINGS OF FACT, CONCLUSIONS OF LAW

AND INTERLOCUTORY JUDGMENT NO. 37,


Add to Finding of Fact No. 26.


Exportation of water from the watershed by the United States are set forth in Finding No. 10.  Finding No. 26, above, sets forth the amount of sewage effluent returned to the watershed.  Evapo-transpiration and other losses, if material, are subject to calculation.  Insofar as exportation affects the riparian right of the United States to call upon upstream users to release water or curtail reasonable and beneficial water uses so as to allow water to reach the Naval Enclave, the annual exportation charged against the United States shall be the excess of gross exportation annually over annual sewage effluent return to the ground waters, which will be hereafter called the "net U. S. water exportation."

### Finding of Fact 27

That the United States of America has diligently attempted to make the maximum and most efficient use of the waters available within the Naval Enclave and in connection therewith has entered into a comprehensive control of phreatophytes and other water-loving vegetation, and has constructed spreading works to increase the natural percolation of surface waters into the younger alluvial deposits. These conservation practices have in fact resulted in the conservation of water in a substantial amount.  In the water year of 1961-1962 (October 1, 1961 through September 30, 1962) by the use of these artificial spreading works the United States of America was able to increase the percolation of surface waters into the younger alluvial deposits within the Naval Enclave by approximately 2,700 acre feet of water, and if in fact said artificial spreading facilities had not been in operation, said 2,700 acre feet of water would have wasted into the Pacific Ocean during  said 1961-1962 water year.

### Add to Finding No. 27.

At the request of the United States or any other party, the Court will from year to year take evidence and make findings as to the amount of water which the United States in years subsequent to the water year of 1961-1962 has been able by artificial spreading to place in the younger alluvial

1   deposits and which water would have otherwise wasted into the

2   ocean.  This annual calculation as to amount shall be

3   hereinafter referred to as "water saved by artificial

4   spreading by the U. S."

6                           Conclusion of Law 27

7        That except as to reasonable and proper riparian uses

8   on lands within the Naval Enclave upstream from the point of

9   confluence of the Santa Margarita River with DeLuz Creek in

10  Section 29, Township 9 South, Range 4 West, S.B.M. and the

11  rights as provided in Interlocutory Judgment No. 24 (Lake

12  O'Neill), no upstream riparian, overlying owner, prescriptor

13  or appropriator shall be required to release water or curtail

14  reasonable and beneficial water uses so as to allow water to

15  reach the Naval Enclave for any purpose, unless and until

16  net U. S. water exportation from the Santa Margarita River

17  watershed by the United States of America has been reduced to

18  zero and the ground water levels within the younger alluvial

19  deposits which underlie the Santa Margarita River downstream

20  from said point of confluence of said DeLuz Creek with the

21  Santa Margarita River have been restored to that level at

22  which they would have been if prior net U. S. water exporta-

23  tions had not taken place.

In lieu of last paragraph of proposed

Conclusion of Law 27

Notwithstanding the above provisions of this paragraph, the United States may each year deduct the amount of the "water saved by artificial spreading by the U. S." from the "Net U. S. water exportations" for the purpose of reducing the "Net U. S. water exportations" to zero or to a minus figure.

Interlocutory Judgment No. 18

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that except as to reasonable and proper riparian uses on lands within the Naval Enclave upstream from the point of confluence of the Santa Margarita River with DeLuz Creek in Section 29, Township 9 South, Range 4 West, S.B.M., and such rights to the use of water as provided in Interlocutory Judgment No. 24 (Lake O'Neill), no upstream riparian, overlying owner, prescriptor or appropriator shall be required to release water or curtail reasonable and beneficial water uses so as to allow water to reach the Naval Enclave for any purpose unless and until net U. S. water exportations by the United States of America from the Santa Margarita River watershed is reduced to zero and the ground water levels within the younger alluvial deposits downstream from said point of confluence of said DeLuz Creek with the Santa Margarita River

1  have been restored to that level at which they would have

2  been if prior net U. S. exportations had not taken place;

3       IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

4  notwithstanding the above provisions of this paragraph, the

5  United States may each year deduct the amount of the "water

6  saved by artificial spreading by the U.S." from the "Net U. S.

7  water exportations" for the purpose of reducing the "Net U.S.

8  water exportations" to zero or to a minus figure.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DIVISION OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )       No. 1247-SD-C
vs.                             )
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                    Defendants. )
_____)

CERTIFICATE OF REPORTER

I, the undersigned, do hereby certidy that I am, and on the dates herein involved, to wit:  October 10, 1962, was a duly qualified, appointed and acting official reporter of said Court:

That as such official reporter I did correctly report in shorthand the proceedings had upon the trial of the above entitled case;  and that I did thereafter cause my said shorthand notes to be transcribed, and the within and the foregoing        pages of typewritten matter constitute a full, true and correct transcript of my said notes.

WITNESS MY HAND, at San Diego, California, this 17th day of October, 1962.

John Swader
Official Reporter