# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

              Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Tuesday, December 11, 1962

Pages:    20,723    - 20,833

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

VOLUME 208                                                20,723

1                      IN THE UNITED STATES DISTRICT COURT

2                         SOUTHERN DISTRICT OF CALIFORNIA

3                               SOUTHERN DIVISION

4                                   - - -

5               HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                                   - - -

7   UNITED STATES OF AMERICA,     )
                                  )
8                      Plaintiff, )
                                  )
9            -vs-                  )        No. 1247-SD-C
                                  )
10  FALLBROOK PUBLIC UTILITY      )
    DISTRICT, et al.,             )
11                                )
                                  )
12                  Defendants.   )
    _____)

13

14                   REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                          San Diego, California

16                       Tuesday, December 11, 1962

17

18  APPEARANCESL

19       For the Plaintiff:            WILLIAM H. VEEDER, ESQ.,
                                       Special Assistant to the
20                                     Attorney General

21                                     COMMANDER DONALD REDD

22       For Defendant Vail:          GEORGE STAHLMAN, ESQ.,

23       For Defendant Fallbrook:     FRANZ R. SACHSE, ESQ.

24       For Defendant State of        FRED GIRARD, ESQ.
         California:
25

20,723-A

1
2
3

## I N D E X

WITNESSES

FRED KUNKEL          EXAMINATION BY THE COURT - Page 20,786

## E X H I B I T S

DEFENDANTS' EXHIBITS          FOR IDENTIFICATION   IN EVIDENCE

AS-1                                                    20,737

1    SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 11, 1962, 10:00 A. M.

2                              ---oOo--

3        THE CLERK:  1247-SD-C, United States of America v.

4    Fallbrook Public Utility District, et al.,

5        MR. VEEDER:  Is your Honor ready to proceed?

6        THE COURT:  Yes, sir.

7        MR. VEEDER:  Your Honor, the matter to which I would like

8    first to refer relates to a letter that has been directed

9    to Mr. Ramsay Clark from the Murrieta Chamber of Commerce.

10            They propose to form a local water district to

11   serve the inhabitants of Murrieta.  I have talked this over

12   very briefly with Mr. Sachse, Mr. Girard and Mr. Stahlman,

13   pointing out to them that a request had been made to Mr.

14   Clark to respond to the Murrieta Chamber of Commerce as to

15   whether, in his opinion, there would be any legal complica-

16   tions.

17            I would like to have your Honor, if you would, look

18   at the letter, because I am going to have a conference

19   some time this week with the Secretary of the Murrieta

20   Chamber of Commerce, and I feel that everyone should be

21   notified of the plans.

22            They intend to have an election the early part of

23   January 1963 for the purpose of organizing this entity to

24   provide water for the community.

25            May I hand this to your Honor?

1          THE COURT:   Yes.   Has counsel seen this?

2          MR. SACHSE:   Yes, your Honor.

3          MR. GIRARD:   I saw it, your Honor.

4          MR. SACHSE:   Your Honor, I would like to make this

5     observation.   That I have received from Mr. Girard, or the

6     State of California, under date of November 29, only 12 days

7     ago, a tabulation of all pending applications as of that

8     date to appropriate anywhere in the Santa Margarita River

9     System; and there is not any application for this outfit.

10    Whether they are laboring under the misapprehension that this

11    county water district can simply pump groundwaters without a

12    permit from somebody, I don't know.   But I think it is A,B,C,

13    that they are not going to have any right to take ground-

14    waters out of that basin simply because they are several

15    people who might, as individuals, have a right to take ground-

16    waters.   That won't work on a public corporation.   It would

17    if they formed a mutual water company, perhaps, but not on

18    a public corporation like this county water district.   I

19    think somebody ought to look into this and tell them they

20    are wasting money.

21         THE COURT:   Your position is that if it is a county

22    water district then they have to get a permit?

23         MR. SACHSE:   Right.   They can't take that water

24    just because they happen to have some small piece of land

25    on which to put a pump.   If they formed a mutual water

1    company -- I think that is the way Mr. Stahlman's mutual

2    works and many others -- if they formed a mutual water

3    company and by proper legal instrument assigned all the water

4    rights to the mutual, then this could be done.  But not by a

5    county water district, I do not believe.

6        MR. STAHLMAN:  That was settled in that San Bernardino-

7    Riverside case, I think.  I think that is the case where

8    Riverside made claim to serve people  who had  formerly been

9    riparians or overlying owners, and it was held that they

10   couldn't do it, even though they had formerly had the right.

11            In this situation here these people are laboring

12   under some delusion up there, because they are having an

13   election.  They must have progressed under some legal

14   advice.  I think we ought to find out who the attorney is and

15   have him come down here.

16       THE COURT:  Why don't we do that?

17       MR. VEEDER:  I have contacted the Secretary and advised

18   him that I thought it was very important that they come down.

19   But I would like to have them meet with counsel.  It is no

20   good to meet with just the United States in this matter.

21       MR. SACHSE:  Absolutely not.

22       THE COURT:  The attorney for this group certainly should

23   be here, as well as the Secretary or the officers.

24       MR. STAHLMAN:  I don't think there is anything

25   inherently wrong in trying to solve the water problem up there.

1        I think that is coming in a lot of communities.

2        MR. SACHSE:   I see no basis on which any of us could

3        logically object to the formation of a district.   They have

4        a right to and hope that someday they can contract with the

5        Metropolitan or something like that -- create a public

6        entity.   But I think we ought to make it very clear that I,

7        for one, would resist any attempt on the part of the district

8        to extract water from Murrieta for municipal purposes without

9        a permit.   If they want to have their district in existence,

10       hoping to get water from the Metropolitan, that is fine and

11       dandy.   But not to start pumping water from the Basin.

12       MR. GIRARD:   I think they ought to be pretty firmly

13       advised that there are no groundwaters available for

14       appropriation in the Murrieta.

15       THE COURT:   No, but these people who overlie this Basin,

16       who would have water and are using water for domestic use,

17       by pooling their wells or forming a mutual water company could

18       do more economically and efficiently what they are doing now

19       without any greater drain on the watershed.

20       MR. GIRARD:   Yes, they could do that, and then their

21       pumping would not be in the nature of an appropriation, but

22       it would be just pooling riparian rights.

23       THE COURT:   Mr. Veeder, can you get your secretary

24       started at the recess to call around and find out who the

25       attorney is and get him down here Wednesday or Thursday?

1      MR. VEEDER:  All right, sir.  If I may have the letter,

2  I will have her start now, because this Secretary is hard

3  to get ahold of.

4      THE COURT:  How long do you contemplate you will be here

5  this week?

6      MR. VEEDER:  I don't know.  I am available throughout the

7  week.

8      THE COURT:  Let's try to get them down tomorrow, if

9  possible.

10      MR. VEEDER:  He should bring his lawyer?

11      THE COURT:  Certainly we want counsel here.

12          Now, do you have any agenda of what we are to take

13  up this week?

14      MR. GIRARD:  I prepared one, your Honor.  I think we can

15  go right into it.

16      THE COURT:  What is it?

17      MR. GIRARD:  One, to present to you  for signature

18  Interlocutory Judgment No. 32.

19      THE COURT: What is 32?

20      MR. GIRARD:  32 is DeLuz Creek.

21          Two, to present to you for signature Interlocutory

22  Judgment No. 39, which is the Santa Margarita River between

23  the Gorge and the Enclave.

24          Three, to present to you for signature Interlocutory

25  Judgment No. 33, which is Anza and Coahuilla.

1          Four, to present to you for signature Interlocutory

2    Judgment No. 35-A, which is Vail Company basement complex

3    lands.

4          Five, to present to you for signature or at least

5    for discussion the order relating to the extraction of

6    groundwaters and the measurement by Colonel Bowen, and what

7    we are going to do about it.

8          Six, Interlocutory Judgment No. 40, Aguanga, will

9    be either available to present to you for signature today

10   or tomorrow.   I had it finally stenciled up yesterday and

11   my secretary mailed it to me by airmail-special delivery last

12   night.   I hope it is here today, but if it is not here

13   today it will be here tomorrow.

14         I think, as far as I know, that takes care of every

15   outstanding assignment that anybody has been given.

16         Is that right, Franz?

17   MR. SACHSE:  That is right.

18   MR. GIRARD:  Colonel Bowen's staff has been extremely

19   diligent.  We have all the exhibits either attached to the

20   judgments or ready to be attached.

21   THE COURT:  Interlocutory Judgment No. 39-A was assigned

22   to Mr. Sachse.

23   MR. SACHSE:  Interlocutory Judgment No. 39-A is finished

24   and is here ready for action today.   No. 39-A we did last

25   time.

1        MR. VEEDER:  I haven't seen a copy of 39.

2        MR. SACHSE:  You have one, Mr. Veeder.

3        THE COURT:  39-A was signed up, that is right.

4            Numbers 33 and 41.  What is 41?

5        MR. GIRARD:  No. 33 is ready for signature.

6        THE COURT:  41 was the Indians.  That is signed, isn't

7    it?

8        MR. SACHSE:  Yes, that is signed.

9        THE COURT:  35-A was Mr. Stahlman's.

10       MR. SACHSE:  Yes.

11       MR. STAHLMAN:  That is ready.

12       THE COURT:  No. 2, delete four names.  I signed that up.

13       MR. GIRARD:  Last time in your absence.

14       THE COURT:  I didn't sign it while you were here, but

15   I signed it later on.

16       MR. VEEDER:  I have an inquiry, your Honor, respecting

17   the Master's Findings.  Those have been signed, as I under-

18   stand it, and they have been filed November 8, 1962.  Is that

19   the situation?  The point I am trying to make on this, your

20   Honor, is that we were discussing at the last hearing the

21   Master's Findings and it was not clear to me when we

22   terminated our discussions what disposition would be made

23   in regard to them.  The record, as I comprehend it,  shows

24   that they were filed November 8, 1962, each one.

25           Isn't that correct, Mr. Luddy?

20,731

THE CLERK:  I don't believe it was 1962, Mr. Veeder.  I believe it was 1961.  It was nunc pro tunc.

May I go up and get those in my office, your Honor?

THE COURT:  Yes.

MR. VEEDER:  Check that out, because I want to be very sure.

THE COURT:  I don't remember what we did on this.

MR. VEEDER:  I don't know myself, your Honor, and I know the exhibits are not part of the Master's Findings.

THE CLERK:  That is correct; they are not.  I have no exhibits at all to the Master's Findings.

MR. VEEDER:  It occurred to me before we went ahead with these DeLuz findings you might/to straighten the matter out or make final disposition of it.

THE COURT:  What did we do about the problem of notice about the filing of the Master's Findings?

MR. SACHSE:  That was all done.

MR. VEEDER:  There was a notice sent out.

THE COURT:  It was sent out?

MR. GIRARD:  I think you drafted up a letter or something.

MR. VEEDER:  Here is a copy of the notice that went out.

THE COURT: And that is why we filed the findings nunc pro tunc.

THE CLERK:  As of the date of that order, your Honor.

1    THE COURT:   August 21, 1961 is the notice.

2    MR. VEEDER:   It was 1961 that it was filed.   That should

3    be 1961, of course.   I was saying 1962.

4    THE COURT:   The notice says "Filed Special Masters

5    Proposed Findings of Fact, Conclusions of Law, transcript

6    and original exhibits."   Were the exhibits filed?

7    THE CLERK:   I don't know, your Honor.   I do have all

8    the Master's exhibits here, however.

9    THE COURT:   Then on the 16th of September we called the

10   matter and nothing happened -- nobody appeared.

11   MR. SACHSE:   I am a little confused as to what the

12   problem is.   Jump ahead to the end.

13   MR. VEEDER:   You are getting ready now to enter your

14   DeLuz findings of fact, conclusions of law and judgment.   You

15   also have Master's Findings, findings of fact, conclusions of

16   law and judgment filed with the Court.

17   MR. SACHSE:   Yes.

18   MR. VEEDER:   These will certainly supersede the Master's

19   findings as I comprehend.

20   MR. SACHSE:   Right.

21   MR. VEEDER:   Then when these are filed we will no longer

22   look to the Master's findings at all.

23   MR. SACHSE:   It is my understanding this is happening for

24   every single finding.

25   MR. VEEDER:   Yes.

1     MR. SACHSE:   But that the Court's findings, conclusions

2    of law and interlocutory judgment supersede the Master's

3    findings.

4     MR. VEEDER:   Very good.

5     MR. SACHSE:   And that the only notice that need be

6    given -- this is according to my check of the Federal Rules--

7    the only notice that needs to be given, as we have all

8    agreed, a notice is going ultimately to have to go out when

9    your Honor proposes to sign the final judgment, and at that

10   time everybody is going to be told that here is the judgment

11   and if you want to look at it come in and look at it and

12   object.

13   THE COURT:   Does this mean that we have accepted some

14   of the Master's findings, the evidence he took, in working up

15   our judgments here?

16   MR. SACHSE:   We have, I would say, in the case of DeLuz

17   Creek accepted 100 per cent the Master's findings.   The form

18   in which we have drafted them to make them conform to our

19   pattern is different, but the findings have been accepted, I

20   think, without deletion.   Haven't they?   We haven't taken

21   anything out or ignored anything, have we?

22   COMMANDER REDD:   There is one minor difference on these.

23   We have found that everything that overlies the younger

24   alluvium along the stream is riparian, whether it actually

25   touched the thread of the stream or not.

20,734

MR. GIRARD:  That is right.

THE COURT:  So that the basis of that order I made on the Master's findings was that the Master's findings are approved except insofar as they might hereafter be modified in the interlocutory judgments?

MR. SACHSE:  That is right.

THE COURT:  The only loose end I see is the fact that the notice says the original exhibits were filed, and the Clerk has some doubt as to whether they were or not.

MR. VEEDER:  I had my secretary check in the Clerk's office on the proposition, and they have not been filed, your Honor.

MR. SACHSE:  You mean none of the exhibits that were introduced in court?

MR. VEEDER:  The exhibits that were supposed to be part of the Master's Findings have been lodged with the Clerk, as I understand.

THE CLERK:  I have never received Exhibits to the findings.  I have all the other exhibits that were introduced in the Master's findings.

THE COURT:  Have they been filed now in this proceeding?

THE CLERK:  No, your Honor.

THE COURT:  Have they been filed with you?

THE CLERK:  I have them all, yes, your Honor.

MR. SACHSE:  As far as the DeLuz Creek findings go, there

20,735

1  was no exhibit attached.  We are just talking about two

2  different things, I think.

3       MR. VEEDER:  That is right.

4       MR. SACHSE:  If we are talking about the exhibits in

5  evidence, they are all here.

6       THE COURT:  They are all with the Clerk.  Although the

7  Clerk has custody of them, he has never put a filing stamp

8  on them.

9            Is that right?

10       THE CLERK:  That is correct, your Honor.

11       THE COURT:  So I think we should make an order nunc pro

12  tunc as of --

13            What is the date of that notice?

14       MR. VEEDER:  August 21, 1961.

15       THE COURT:  And have the Clerk file all of the exhibits

16  before the Master which he now has in his possession as of

17  that date.

18       MR. GIRARD:  Would they be in evidence in the main case

19  now?

20       THE COURT:  And consider them in evidence in this case

21  as of August 21, 1961.

22       MR. GIRARD: Fine.

23       MR. SACHSE:  Good.

24       THE COURT:  Any objection?

25       MR. VEEDER:  That is satisfactory.

1    MR. SACHSE:  They all have M-Series numbers, which will

2    not conflict with our own, I am sure.

3    MR. VEEDER:  I think that, then, winds up all the

4    Masters proceedings and findings and they are now incorporated

5    into the findings your Honor has now.

6    THE COURT:  Mr. Clerk, what would your Minute Order be?

7    THE CLERK:  Your Honor, the order that you just made?

8    THE COURT:  Yes.

9    THE CLERK:  That I file these exhibits nunc pro tunc as

10   of August 21, 1961, and that they be received in evidence

11   in this proceeding as of that date.

12   THE COURT:  That completes the Masters problem.

13         (Mr. Veeder and Mr. Sachse  conferring off the )
             (                                              )
14           (record.                                       )

15   MR. VEEDER:  Are you ready to proceed further, your

16   Honor?

17   MR. SACHSE:  The original exhibit was California's

18   AS.

19   MR. VEEDER:  State in the record what it is, Mr. Sachse.

20   MR. SACHSE:  Here it is.

21   THE COURT:  A list of applications to appropriate water.

22   MR. SACHSE:  May I state in the record, then, your Honor,

23   California's Exhibit AS, a memo concerning applications to

24   appropriate water in the Santa Margarita River Watershed,

25   covers all applications, permits or licenses through October

1   30, 1958, the last one being that of George F. Yacky, and

2   M. Y. Taylor, Application Number 18393.

3          We now have a new tabulation which is to bring this

4   up to date, which overlaps and extends up to and including

5   November 29, 1962, of filings.  I just want to make it clear

6   there is an overlap.

7          THE COURT:  Let's call it AS-1, then.

8          MR. SACHSE:  I would like to offer it as California's

9   AS-1.   I guess Fred should.

10         MR. GIRARD:  That's all right, you are always very

11   efficient when you offer anything in evidence.

12         MR. VEEDER:  I am glad the separation of California and

13   Fallbrook is so apparent.

14         THE COURT:  California's AS-1 offered and received

15   in evidence.

16                          (Defendant California's Exhibit  )
                            (No. AS-1, for identification,   )
17                          (received in evidence.            )

18         MR. GIRARD:  May I state into the record that it is

19   significant to note that the last five of them are

20   applications by the National Forest Service.

21         THE CLERK:  These Masters findings are received in

22   evidence in this proceeding as they were received by the

23   Master; is that correct?  There are some of the exhibits

24   that I have that were never received but were marked for

25   identification only.

1          THE COURT:  Only those that were received in evidence

2     before the Master are received now.

3          MR. VEEDER:  I am talking to Mr. Stahlman now in regard

4     to his 35-A.  May I inquire, is it your intention on your

5     35-A, Mr. Stahlman, to refer to every interlocutory judgment

6     which would have any bearing upon the Vail Company's major

7     interest as reflected in your 35?

8          MR. STAHLMAN:  Well, yes.  I think -- and that is one

9     thing I want to discuss when we take up these Findings 39

10    and 32 -- as to the fact that they do reconcile each with

11    the other and that we have made such provisions in these

12    different judgments that they will be in conformity with

13    the other judgments.

14         MR. VEEDER:  I don't think you referred to 39-A, 34-A

15    and 39, and if you are going to do that you might want to

16    interline it with a pen or something.  I don't know.

17         MR. STAHLMAN:  I would like to go into that.  I think,

18    however, we have it covered here.

19         THE COURT:  We will let you gentlemen talk about that

20    among yourselves here.

21         MR. STAHLMAN:  All right, we can work this out.

22         THE COURT:  Another matter on this agenda should be

23    some reference to a letter of which I saw a copy that you

24    wrote that had something to do with the study that was to be

25    made  for this dam.  Do you have a copy of that letter?

Apparently all the brakes were put on -- nothing was being done.

MR. VEEDER:  What letter was that, your Honor?

THE COURT:  At your direction.

MR. VEEDER:  Your Honor --

THE COURT:  I saw a copy of the letter -- something about the Engineers, or to the Engineers.

MR. VEEDER:  Your Honor, as far as I am concerned, there have been no brakes put on it.

THE COURT:  Has somebody got a copy of this letter?

MR. SACHSE:  I don't know what letter your Honor is referring to.

MR. VEEDER:  I don't know what letter you are referring to.  Certainly I didn't write any letter on it.

May I outline right now the situation in regard to the investigations.  The United States Geological Survey has undertaken studies in regard to runoff records in the Santa Margarita River Watershed and the quantity of water that they would estimate to be available at DeLuz Creek. Colonel Bowen has completed his study as to irrigable acreage of the substantial owners.

There is an inquiry that, in my view, is still pending based upon the hearing the time before last where I tendered the thought that the way to determine the amount of water available to the United States at DeLuz Dam site would

1    be to determine percentagewise the quantity of water it would

2    be entitled to participate in on a riparian basis.

3              You remember there was a chart -- we drew it on

4    the blackboard -- and I do think there is a legal problem

5    there as to whether, in making the determination as to the

6    quantity of water that could be available down there at DeLuz

7    Creek, whether your Honor would agree that it is proper in

8    regard to riparian rights at least to use the percentage of

9    irrigable acreage as are presently in the record.

10             In other words, Vail Company has, as the records

11   show, about 9,500 acres of irrigable land in the Temecula

12   grant, 18,500 in Pauba, 1,600 in the Little Temecula.   On the

13   basis of the record -- and I am reserving the right to

14   object to it -- our acreage is 13,800.

15             We proceeded on the basis -- at least this is our

16   thinking in regard to the availability of water at DeLuz Dam--

17   we proceeded on the basis that the United States being

18   riparian to that extent on the Santa Margarita River would

19   participate percentagewise in all of the water from all the

20   tributaries; that Vail Company's Temecula grant would

21   participate on the basis of 9,500 acres in Santa Margarita;

22   that there would be -- I think Colonel Bowen has estimated

23   there are 8,500 acres of irrigable land in Murrieta, and

24   18,500 of the Pauba grant and 1,600 on Temecula Creek.

25             MR. STAHLMAN:   What is this?   Does this get at the answer

1   to the problem as to the availability of water at DeLuz?

2   In other words, we are right back. We are going to have, I

3   think, on that basis -- I am not an engineer, but it would

4   seem to me that we are back to the same problem as the

5   relationship between surface flow and the amount of water

6   that is in storage units underground. Your dam is to capture

7   surplus waters, and your surplus waters don't bear a direct

8   relationship to the amount of acres that are available for

9   irrigation as riparian acreage, I don't think. There are so

10  many other factors that enter into that -- that is, the

11  source of water, where it is to be used, and whether or not

12  there will be land that is not used, riparian not losing its

13  right by reason of nonuse or being frozen by reason of use.

14  Colonel Bown knows more about this than I do. But I don't

15  know that those acreages up there are going to answer your

16  problem whether you should build a dam at DeLuz and whether

17  that would have the water available. I think such exhibits

18  as we already have in the record -- Mr. Illingsworth put

19  in exhibits some time ago as to what the flow was off those

20  streams and made calculations and showed available surface

21  runoff, which is the thing you would be interested in for

22  your dam. To calculate all these acreages upstream and give

23  some consideration to that as being a factor, I don't think

24  answers the problem. I would like to be shown if it does.

25         MR. GIRARD: I understood the Judge's comment in

referring to your letter was something to the effect that
everything had ground to a halt in connection with designing
the dam.

THE COURT:  Some of the studies that were needed.

MR. VEEDER:  Did your Honor say I had written a letter?

THE COURT:  I don't know whether you wrote it or it was
written to you.

MR. VEEDER:  May I inquire, was it sent to your Honor?

I know that Perliter and Soring have a contract to
design the dam.

COLONEL BOWEN:  No, they do not.

MR. VEEDER:  They are making engineering studies in
regard to the availability of water and to calculate as to
the quantity of water that they think will be available for
the dam.  That contract was entered into.  It had been agreed
that the United States Geological Survey would undertake
studies for the purpose of determining the quantities of
water that they thought would be available on a perennial
yield basis.  Those studies have proceeded.

Colonel Bowen has undertaken these studies and
determination as to what he thinks is the irrigable acreage
of the substantial users in the valley.

What precipitated my inquiry as to whether your
Honor has any thoughts that he would care to express on the
proposition whether our view is acceptable that insofar as the

1    riparian acreage is concerned, if we were to break this down

2    percentagewise among the substantial users -- in other words,

3    here we are with 13,800 acres on the main stem of the Santa

4    Margarita River.   It is our view, as I said the time before

5    last, that on the basis of our irrigable acreage we would be

6    entitled to participate in the Murrieta runoff because we

7    have a correlative share there.   We would similarly be

8    entitled to participate in Temecula.

9        MR. GIRARD:   I don't agree with how you approach your

10   allocation among riparians.   But how does that have anything

11   to do with the dam?

12       THE COURT:   We are getting off of the subject.   First

13   of all, on this matter you are talking about of some

14   percentage allotment, I would have to see something submitted

15   in writing.   We have never come to any agreement on this.

16   We have heard some of your theories.   I would like to see it

17   in writing so we could discuss it.

18       But going back to the other proposition, the

19   Engineers had a contract to make a study for the dam.

20       MR. VEEDER:   That is correct.

21       THE COURT:   Did something happen where you were unable

22   to supply them with the material they needed?

23       MR. VEEDER:   No, your Honor.

24       THE COURT:   Or information they needed to go ahead with

25   this?

1        MR. VEEDER:  No.  It was necessary to make these studies,

2   your Honor, and the studies are, so far as we are concerned,

3   now completed.

4        THE COURT:  By "these studies" you mean a percentage

5   allocation of water?

6        MR. VEEDER:  No.  The U.S. Geological Survey has made

7   its estimates as to the perennial yield of Murrieta Creek,

8   Temecula Creek, Santa Margarita, under full development, and

9   it is our view that the factor of full development is

10  extremely important in calculating the quantity of water that

11  we can reasonably anticipate.

12       MR. GIRARD:  The thing that bothers me, Bill, we are

13  working on a settlement basis, or Fallbrook is supposedly

14  working on a settlment basis, I always understood, under an

15  absolute assumption that the Navy desired and wanted to

16  build DeLuz Dam.  Is what you are saying that your studies

17  have not gone far enough yet where you don't know whether

18  DeLuz Dam is feasible?  If Fallbrook is going to negotiate

19  on the basis of settlment, it seems to me that they are

20  doing that on the assumption that you have already decided

21  that the dam is feasible.

22       MR. VEEDER:  The only people that can make the decision

23  as to whether a dam is feasible or not is the Navy, and I

24  assume based upon their contract with  Perliter and Soring.

25  It is of importance that Mr. Burdman, of the Eleventh Naval

1    District, came down today, and he is the man directly in

2    charge of the Eleventh Naval District in regard to these

3    studies.  And from my standpoint there was no interference

4    surely from me on this thing.  I simply went ahead on the

5    basis of what the Navy contract was; that the U.S.Geological

6    Survey would make the analysis and when it was finished and

7    approved they would turn it over to Perliter and Soring for

8    the purpose of completing their studies.

9         MR. STAHLMAN:  May I ask the 64-dollar question?  You

10   say your studies are completed.  Do they show that a dam is

11   feasible at DeLuz?

12        MR. VEEDER:  That is for Perliter and Soring to say.

13   It is not for me to say.

14        MR. SACHSE:  This fascinates me, because as I told your

15   Honor informally and Mr. Veeder informally, and I will put

16   it on the record right now, I had a telephone call

17   yesterday evening from Mr. Ramsay Clark asking me to meet

18   him in Las Vegas to discuss this negotiation for settlement

19   which has been at a standstill since Fallbrook sent its

20   memorandum to Mr. Clark some few months ago.  To make a long

21   story short, we are not going to meet at Las Vegas, but we

22   are going to meet sometime the week between December 19 and

23   December 26 in Washington.  I am going to be there and I

24   have told him I am available and he is going to let me know

25   the days he wants.  If we are not talking anything, if we

1   haven't got a project which the United States is yet prepared

2   to say they are interested in, I don't know what we can talk

3   about in Washington and I don't know why Mr. Clark called me.

4       THE COURT:  Mr. Burdman, may I ask, you are sort of

5   supervising this study?

6       MR. IRVING BURDMAN:  I am known as the Project Engineer

7   for the Southwest Division of the Navy Bureau of Yards and

8   Docks, which is sort of, you might say, attached to the

9   Eleventh Naval District, and we have a contract with Perliter

10  and Soring, who wrote a scope of the work.  We negotiated

11  a contract and they are working on that and the information

12  is furnished through me.  I, in turn, am prepared to

13  receive it from Mr. Veeder, who will release it to the

14  Department of the Navy.

15      THE COURT:  I don't understand that.  Back up.

16      MR. VEEDER:  I think he means that Mr. Ramsey Clark.

17  He doesn't mean Mr. Veeder, I will say that.

18      MR. BURDMAN:  All right.  I beg your pardon, your Honor.

19  I may not be speaking in correct legal terms.  I am just

20  giving it to you perhaps --

21      THE COURT:  You are sort of watching this study that

22  is being made by these Engineers?

23      MR. BURDMAN:  Yes, I am a contact for the Navy

24  Department between the Navy and the consulting engineer

25  firm of Perliter and Soring.

1    THE COURT:   Are you waiting for any material from any

2  of us here?

3    MR. BURDMAN:   I am w aiting for some material which I

4  understand is being or has been prepared by the U. S.

5  Geological Survey and submitted or will be submitted to Mr.

6  Veeder, who in turn will discuss it with me, and then perhaps

7  it will be furnished officially by the Attorney General's

8  office to the Department of the Navy and in turn to

9  Perliter and Soring.

10    THE COURT:   This information from the Geological Survey

11  is to go through Justice before it goes to you?

12    MR. BURDMAN:   I would like to ask Mr. Veeder if that is

13  correct.

14    MR. VEEDER:   The important thing, as I comprehend it, is

15  that arrangements have been made for clearance of all this

16  material; the data from Colonel Bowen submitted to Mr. Clark,

17  the U. S. Geological Survey's submitted to Mr. Clark,

18  cleared by Mr. Clark for Perliter and Soring.   There are legal

19  questions that are involved as to how the waters can be

20  apportioned, who is entitled to it.   That is the reason why

21  I brought the matter up this morning, your Honor.

22    THE COURT:   The studies that would be made by the

23  Geological Survey, I don't know how anything Justice has to

24  say about the studies would have any effect on what the

25  engineers say about it.   I don't understand this clearing

through Justice on this matter.   It seems to me that if this factual matter is prepared it ought to go on through Mr. Burdman to the engineers.

MR. VEEDER:   I think, your Honor, that is probably correct.

THE COURT:   And if you want to talk about the significance of some of the facts that they develop, we can talk about them.   But why should these studies from an agency of the Government be funneled through you or through Justice?

MR. VEEDER:   Your Honor, believe me, I had nothing to do with the funneling of it through me.

The point I want to be extremely clear is that this data that is prepared by the U.S.Geological Survey is material that they have been preparing at our request and in connection with this development.

THE COURT:   Has it been prepared yet?

MR. VEEDER:   Yes, it is completed.

THE COURT:   Has it been passed on to Mr. Burdman?

MR. VEEDER:   He was looking at it this morning.

MR. BURDMAN:   I haven't officially received it, your Honor.

MR. VEEDER:   But it has not officially been released yet , frankly.

MR. BURDMAN:   May I add, Bill, I was going to tell you later today that we would like to get these figures directly,

1    but we would like to get it officially from the Attorney

2    General's office to the Navy Department by letter.

3         MR. STAHLMAN:  Can you do it on the witness stand here

4    and let us all know what is going on here?

5         MR. GIRARD:  No, I don't care about that.  But it seems

6    to me that all this question on apportionment or legal

7    questions are not really too relevant as to your dam.  Isn't

8    it true that the water you are going to store in your dam is

9    going to be flood water?

10        THE COURT:  Let's get back on this.  I am interested in

11   this matter.

12        MR. GIRARD:  All right.

13        THE COURT:  Apparently the studies to be made by these

14   two engineers that have been hired can't go forward until

15   the matters from the Geological Survey go through Justice.

16        MR. VEEDER:  And Colonel Bowen.

17        THE COURT:  And all this is cleared through Justice and

18   through Mr. Burdman and then to the engineers.  This hasn't

19   been done.  Officially Mr. Burdman says he hasn't seen it.

20   Unofficially he has.  He has requested that he get it

21   officially.

22        MR. VEEDER:  And he will get it officially, your Honor.

23        MR. BURDMAN:  Your Honor, on the basis of saving time,

24   I am prepared to take it unofficially, but as a matter of

25   procedure, I want also to get it officially.

20,750

MR. VEEDER:  I certainly favor that.

THE COURT:  Colonel Bowen, what do you know about this? You are sitting back there smiling.  Let's not have any secrets.  Let's find out what's going on.

COLONEL BOWEN:  Your Honor, Mr. Veeder invited Mr. Burdman to come down and see what is going on, and Mr. Burdman gets involved in the matter.

I do know from a copy of a letter that I received that this study by Perliter and Soring appears to have bogged down.  It was originally set up for completion by 1 April.  It is the same firm, incidentally, that made the study last fall, and a good study it was, too.

Mr. Burdman was Project Engineer for the Southwest Division of the Bureau of Yards and Docks for that initial study.  When it was decided to have them re-evaluate the factual data in the Santa Margarita Stream System, I helped write up the scope for the project and it was hoped that we would have their project through early in the next calendar year.  As a matter of fact, I mentioned it when Mr. Clark was here .  He indicated his desire to submit a Bill to Congress early in the next session.  I had stated that they were working on this report and would not have it completed until the end of March.  Therefore, it was with some alarm that I saw a letter which was written by Mr. Burdman, signed by Commander Peacock by direction of the Southwest Division of the Bureau

1    of Yards and Docks and addressed to the Chief, Bureau of

2    Yards and Docks, indicating that there would be some delays

3    in the preparation of the report because all of this data

4    that the Corps of Engineers required to complete the study

5    was being held up.  Perhaps Mr. Burdman could furnish a copy

6    of that letter.

7        MR. VEEDER:  Is that the letter your Honor has reference

8    to?

9        THE COURT:  I don't know.

10       MR. VEEDER:  You said there was some letter.

11       THE COURT: What is being held up, Mr. Burdman?

12       MR. BURDMAN:  Your Honor, while Perliter and Soring are

13   our consulting engineers, they are not required to assemble

14   the basic data.  I don't have the scope here.  A copy of it

15   is upstairs in Mr. Veeder's office.  But until we furnish

16   Perliter and Soring that basic data, they are just studying,

17   just getting more familiar -- they are already familiar

18   through the same people working on the previous report --

19   they are getting familiar with certain other ramifications

20   of it, but they can't work effectively until they receive

21   this information.

22       THE COURT:  What is this information?  That is what I

23   would like to know.

24       MR. BURDMAN:  The information would be the amount of

25   water that could be expected under certain conditions at

1    DeLuz Dam site.

2          THE COURT:  This is to come from the Geological Survey?

3          MR. BURDMAN:  From the Geological Survey.

4          MR. VEEDER:  And from the Office of Groundwater Resources,

5    your Honor.  This material has been assembled.  Colonel Bowen

6    mailed, pursuant to the request of Mr. Clark, on December 3,

7    1962 we received from the Colonel his estimation of

8    substantial users and substantial claimants upstream, which

9    is an integral part of this entire study.  Now the U. S.

10   Geological Survey has completed their work, but the work

11   has just been completed around the first of December.

12   Certainly everyone has moved as rapidly as they could, as far

13   as I am concerned.

14          THE COURT:  Then what does Justice have to do with

15   this before it goes on to these two engineers?

16          MR. VEEDER:  Simply to review it, your Honor, because

17   I think it is extremely important that we know what is

18   involved and how much water can be expected.  It was not my

19   idea that this be in here.  The question of the scope of this

20   operation, the scope of the investigation was necessarily

21   related to this lawsuit.  It was unavoidable.  The data upon

22   which Perliter and Soring will rely, to a marked degree, is

23   evidence in this record.  That is the reason why I am quite

24   certain that the Navy Department desire to have these factors

25   reviewed by the Department of Justice.

1    Now this material, as I say, arrived December 3rd--

2 December 5th, whenever it got there.  Mr. Clark and I talked

3 about it on Friday.  I feel that he has tentatively approved

4 it.  I think that it has been approved.  But I want to get a

5 formal statement for the release of it.  It is not for me to

6 release.  I don't believe there is anything unusual about it.

7 I think Colonel Bowen has worked rapidly and I think the

8 U.S.G.S. has worked rapidly on this, and certainly it would

9 be impossible for Perliter and Soring to proceed to make

10 their calculations without knowledge of the upstream

11 maximum development.  I think we all agree on that.

12   MR. SACHSE:  May I ask a question, your Honor?  Does

13 this study, or does some part of the study, involve this

14 mechanical question at what price water could be delivered

15 to Fallbrook and how much water could be delivered, et cetera,

16 under DeLuz Dam?  Is this part of the work?

17   MR. VEEDER:  No, not to my knowledge.

18   MR. SACHSE:  In other words, there is nothing in this

19 that is going to directly then relate to the terms of the

20 settlement with Fallbrook.  I am just curious.

21   MR. VEEDER:  I will answer this the best way I know.

22 Maybe the Perliter and Soring calculations will determine

23 the value of the water to Fallbrook.  I don't know that.  It

24 is none of my business.

25   MR. SACHSE:  All right, I don't care what kind of report

20,754

1    you get.

2        THE COURT:  Do I understand that this study -- you talk

3    about maximum development.  You are talking about a study

4    which would show what were the upstream uses which might

5    actually legally or illegally take waters which would other-

6    wise come down to the dam site.  Is that what you are talking

7    about?

8        MR. VEEDER:  Yes.   I will present one of the legal

9    questions that has been handed to me for resolution and I

10   would like to have your Honor hear one of the problems that

11   stems from it.

12       It has been estimated that the perennial yield of

13   the Murrieta Basin would be 3300 acre feet.  Now that would

14   be full development.  There would be approximately 3400 -- I

15   am just reaching now for figures, but I think this is correct

16   -- there would probably be 3400 to 3700 acre feet annually

17   of what they call "uncontrolled runoff" -- in other words,

18   there is no place for storage of water on Murrieta Creek.

19   But it does become important -- Mr. Girard, you raised the

20   question -- as to what would be the impact on the runoff at

21   DeLuz if there was a   full development in Murrieta.  Because

22   the more you pump the more room there is for water to go

23   underground when it is available.

24       Now that is a problem.  In other words, Colonel

25   Bowen has indicated -- and these are numbers, again, that have

1   been handed to me -- that there are 8,500 acres of irrigable

2   land in the Murrieta Valley; that presently there is 1,991

3   acres of irrigated land.

4        Now, assuming that the safe perennial yield of

5   Murrieta is 3,300 acre feet annually, it is manifest that

6   when Murrieta is in full development it can consume that

7   quantity of water.

8        Now our position is this, that of that 3,300 acre

9   feet of water which is the perennial yield of the Basin, we

10   say that Vail Company has a right to participate in that

11   to the extent that it has riparian acreage in Murrieta.   We

12   also say that the Marines are entitled to participate in

13   that 3,300 acres on some basis.   We say on the basis of our

14   riparian acreage.   I think that is fair.

15        But it does become extremely important, Mr. Girard,

16   in response to your question, to determine whether those

17   people have the right to the full quantity of water of 3,300

18   acre feet.

19        MR. GIRARD:   Let me ask you a question.   When you made

20   your prior study -- I understand this outfit has made a

21   study previous to this, which Colonel Bowen referred to as

22   an excellent study -- if this is so necessary, certainly in

23   that study someone must have sat down and figured the amount

24   of water that could be expected at DeLuz.   What was the date

25   of that study?

20,756

MR. VEEDER:  The date of that study was, I think, October.  Maybe it was in the summer.

MR. GIRARD:  What has changed since then?

THE COURT:  That is what I want to know.  You said something about a re-evaluation.

MR. VEEDER:  Your Honor, it is extremely important --

THE COURT:  What is this re-evaluation?

MR. VEEDER:  The thing that has transpired is extremely important.  The basis of Perliter and Soring's investigation in the original instance was Bulletin No. 57 prepared by the State of California, the latest date of which was 1953, the Montgomery report of the Fallbrook Public Utility District, which likewise was predicated on Bulletin No. 57.  Since those studies were made we have had a period of virtually continuous drought so that there is a very marked difference in the quantity of water and the quantity of runoff that should be taken into consideration in the calculations.

THE COURT:  This I understand.  You don't have to argue that.  I understand that Bulletin No. 57 and the Montgomery Report should be brought down to date.

MR. VEEDER:  That is right, and that is what is being done.

THE COURT:  But I am a little confused about this talk of estimated full development in the Murrieta and how much the United States would participate in that, how much Vail

1    would participate in that.  You are going to make these

2    decisions ex parte as a basis for the Navy's determination

3    before they build the dam.  I mean, is Justice going to make

4    it?

5         MR. VEEDER:  I think we are confronted with legal

6    questions in that regard, because the only manner -- and this

7    goes to Bulletin 57, they attempted the same thing -- the

8    only manner in which it is possible of calculating the yield

9    of the DeLuz Dam is to take certain assumptions as to what

10   are the legal rights upstream. That has to be done.  Now,

11   Bulletin No. 57 did that.  Bulletin No. 57 made its

12   calculations on the basis that Pauba Valley would be operated

13   and that the groundwater elevations in Pauba Basin would be

14   the same as they had been historically.  That situation just

15   doesn't prevail.

16        Secondly, they made the calculations on the basis

17   that Vail Dam would spill so many times at certain intervals.

18   Now that hasn't transpired.  George knows that.  I think

19   12,000 was the most you ever impounded in that.  You have

20   49,000 acre feet capacity.

21        So the assumptions which were originally used by

22   Perliter and Soring -- I am not being critical of anybody --

23   simply were not reflective of what has transpired.  The

24   question has been presented to me and  I think the matter has

25   to be resolved, what is full development upsteam?

1     MR. GIRARD:  What difference does it make?

2     MR. VEEDER:  It influences the quantity of water.

3     MR. STAHLMAN:  With continual dry years such as you have

4     had you don't know what the future is going to do.  What

5     are you going to do with those calculations?

6     MR. GIRARD:  If the safe yield of Murrieta Basin is

7     3,300 acre feet, what difference does it make as to what

8     the ultimate development will be in trying to catalogue the

9     individual rights?  You know they can't use more than that.

10    MR. VEEDER:  That certainly is a factor.

11    MR. GIRARD:  You don't have to look around and see what

12    each individual irrigable acre is entitled to, because if

13    the safe yield is 3,300 acre feet there can't be any more

14    used up there.

15    MR. VEEDER:  You are injecting something in here.  I

16    don't know what you are talking about.  As far as we are

17    concerned, we know that there is far more acreage in

18    Murrieta than there is safe perennial yield.

19    MR. GIRARD:  Of course.  What difference/does acreage make?  How

20    does acreage upstream enter into it?

21    MR. VEEDER:  From the simple standpoint of being able

22    to demonstrate that with your 8,500 acres there is a very

23    real threat of overdraft.  It is certainly a quantity of water

24    that will burn up all the 3,300 acre feet.  That is important.

25    MR. GIRARD:  You can set the maximum, but the maximum

1     upstream right for Murrieta could not exceed the safe yield.

2         MR. VEEDER:  We are going -- at least I would go on the

3     basis that very definitely that would be the case, because

4     those people would probably restrain one another from pumping

5     each other to death.  That is what it amounts to.  We are

6     going on the basis that certainly they are not going to take

7     more than the safe perennial yield of the Murrieta Creek.

8         MR. GIRARD:  So what difference does it make as far

9     as the downstream is concerned if you try to figure out what

10    each person's share of that would be?

11        THE COURT:  I don't know.  This all leaves me kind of

12    cold.  If you are going to get any water in a dam, you are

13    going to get it from flood water.

14        MR. GIRARD:  Of course.

15        THE COURT:  And you are going to get flood water regard-

16    less of whether the area is overpumped or not.  In other

17    words, you are only going to get water out of flood waters.

18    They could pump Murrieta Basin clear down and there would be

19    some recharge from flood waters of the Murrieta, but most of

20    them would run off to the ocean.  That is what happens in

21    floods in Southern California.  If you are figuring on filling

22    this dam out of ground flow out of Murrieta or Pauba or

23    something like that, you might as well not build the dam.

24        MR. VEEDER:  May I interpose this, your Honor.  I will

25    assure you that that base flow, the water that would drain

1   out of the Basin is absolutely essential in making any

2   calculation of runoff.  We can't go on the basis that we will

3   live entirely on flood water.  Any dam study has to take into

4   consideration the quantity of water that drains out of Pauba

5   Valley and out of Murrieta Valley day in and day out.  Your

6   study cannot justify a dam strictly on the basis of flood

7   waters.  There isn't that kind of water up there.  The day in

8   and day out runoff is extremely important.  The fact is, I

9   believe, the statistics will show that the day in and day out

10   runoff of the Santa Margarita River constitutes a little more

11   thatn 50 per cent of the entire calculated yield.  In other

12   words, when you say brush off, forget this day in and day out

13   base run from the alluvium, you are, I think, condemning the

14   possibility of building a dam, because you have to have that

15   water.  It is part of the stream.  And any calculation that

16   I have ever seen necessarily took into consideration all of

17   the water.  It took into consideration the measured runoff,

18   not the storm runoff; it took into consideration the measured

19   runoff, approximately 50 per cent of which as I stated, and

20   I will repeat myself, is what they call "base flow," the

21   flow that runs out of the alluvium.

22          Now, on the calculations -- and this is the

23   interesting thing -- out of Murrieta the breakdown is just

24   about 50-50.  In other words, there are 3,300 acre feet of

25   groundwater that can be calculated in which we think we are

1   entitled to participate.  Then there is about 3,700 acre feet

2   of uncontrolled runoff.

3   Now, in regard to Pauba Valley-Temecula, the

4   estimations show that in a state of nature -- and they went

5   back and reconstructed the flow -- there was about 11,500

6   annually.  That is over-all.  In other words, your yield from

7   Temecula runs 48 per cent more than the Murrieta in a state

8   of nature.  We have a situation where Vail Company is

9   running -- again I am not being critical in the slightest --

10   Vail Company is running their dam and basin conjunctively.

11   It is a proper operation.  But again this study shows that

12   there are only two years in which there would be any spill

13   from Vail Dam down through the canyon, only two years, and

14   then for a very brief period -- I think it was two or three

15   days.

16   So, you have a situation where we will not be

17   building a dam exclusively on flood waters.  We will be

18   building a dam based upon our call for water as a riparian

19   user.  That is one reason why I think it is extremely

20   important that a determination be made -- maybe your Honor

21   will not make the determination, but I think the only proper

22   way to do it in regard to this base flow is to use a

23   percentage of irrigable acreage.  I know of no other way.

24   MR. SACHSE:  May I be heard briefly?  To me this is

25   the greatest collection of double talk I have ever heard.  We

1    have the case right here in front of us that is within two

2    interlocutory judgments, just two -- Santa Gertrudis and

3    the extreme upper Temecula -- of being ready for final

4    signature.  It is that close.  When that situation arises

5    and when that signature is placed on a piece of paper there

6    are going to be three possibilities in front of the United

7    States:  They can either give up, they can appeal, or they

8    can try to settle.

9         If they give up or if they appeal and lose the

10   appeal, we are going to build a dam.  It is that simple.  The

11   whole purpose of this discussion with Mr. Ramsey Clark was

12   to try to avoid the necessity of an appeal, to try to arrive

13   at a physical solution that would make this unnecessary.

14   Well, we are going to build one and we can on flood waters.

15        If all of this double talk is simply Mr. Veeder's

16   attempt to reopen this and say, "Now, we don't think

17   Fallbrook can build a dam," this is a dead horse; as far as

18   I am concerned, this issue has been tried and settled.

19        The thing I am interested in talking to Mr. Ramsay

20   Clark or to Colonel Bowen about is whether it is physically

21   and practicably possible to pool our resources and to get

22   this water supply we need on satisfactory terms from a

23   DeLuz project.  If Mr. Veeder is going to dream up reasons

24   why the DeLuz project will not work, or if Mr. Veeder is

25   going to dream up reasons why the top half of all the water

1   in the DeLuz must be the water of the United States, that on

2   an irrigable acreage basis 50 per cent of this underflow is

3   U.S. flow trapped behind the dam, he is wasting my time and

4   the Court's time, because as far as I am concerned, the

5   division of water in which I am interested in is a division

6   of the flood waters, and as far as I am concerned, on the

7   present status of the record, we have them all as far as

8   you are concerned, with the exception of Lake O'Neil.  You

9   haven't got DeLuz either.  We haven't got it.  But everything

10   we can get we have, with the exception of little Lake O'Neil.

11       Now, I am not going to listen to this kind of thing,

12   if that is what you are talking about on a settlement, Mr.

13   Veeder.

14       MR. VEEDER:  Mr. Sachse, may I tender you a thought?  I

15   outlined, at the request of the Court, what these matters

16   are.

17       MR. STAHLMAN:  I think Mr. Veeder answered his question.

18       THE COURT:  Let's hear what you have to say.  Go ahead.

19       MR. VEEDER:  I am extremely anxious for Mr. Sachse to

20   present these matters to Mr. Clark.  I have no desire or

21   intention, nor have I done -- I don't have to say that.

22   Certainly it has nothing to do with your clients, Mr. Sachse,

23   anything that I have said here.  His Honor asked me a

24   question, and Mr. Girard similarly pointed up the question,

25   what difference does it make to us in regard to the water

1   draining out of Murrieta Basin and Pauba Basin.  I say, without

2   it I don't see how you can build a dam.  That has nothing

3   to do with Mr. Sachse.

4        MR. SACHSE:  Let's drop it, then, if it hasn't anything

5   to do with the settlement.  Let's go ahead and get the

6   judgment signed and get it in shape so that we can say to

7   Mr. Clark, "This is it."  Because the first thing he said

8   is that this settlement, if it is going to work at all, must

9   work an end to the lawsuit.   There is not going to be any

10  settlement if there is going to be an appeal.  Let's go

11  ahead and get the judgment buttoned up.

12       MR. VEEDER:  I think you jumped up and were very

13  perturbed unnecessarily, because all I did was answer a

14  question.

15       THE COURT:  My being perturbed was on a different basis.

16  I want to see this study go forward, and I want to find out

17  what delays are involved.  I want to find out whether Mr.

18  Veeder when he has started out to talk about these percentage

19  figures has some thought that we are going to have hearings

20  and make some determinations on those matters before your

21  study goes forward.

22       MR. VEEDER:  I feel this way, your Honor.  I don't know

23  how George and the rest feel about it.  I think it would be

24  most helpful if your Honor would say, I make this ruling,

25  that on the basis of irrigable acreages there will be an

20,765

apportionment throughout the valley.  In other words, we can look to Murrieta Valley to ask for 3,300 acre feet of water in which Vail Company and the United States participate.

MR. STAHLMAN:  This is really something.

THE COURT:  Would you be holding up this material that comes to you from the Geological Survey before you passed it on to these engineers until we argued this out?  This could go on for ever.

MR. VEEDER:  I am going to say this.  I think this, that when you are calculating perennial yield you have to take into consideration legal rights.  I don't believe you can just turn your back on the fact that Vail Company is in a position right now, and has been in the position ever since it closed its dam, to control virtually completely Temecula Creek.

MR. STAHLMAN:  We are getting into things --

MR. VEEDER:  Let's drop the whole thing.

THE COURT:  Let's take a recess and cool off.  Then I will hear you.

(Recess taken.)

(Discussion between Court and counsel off the record,  )
(                                                         )
(after which a recess was taken until 2:00 P.M. of this)
(                                                         )
(same date.                                               )

---o0o--

20,766

SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 11, 1962, 2:00 P.M.

---oOo--

MR. VEEDER:  Would your Honor have any objection to putting that letter in the record to which you made reference?

THE COURT:  No.

MR. VEEDER:  Let's have the reporter just copy it into the transcript.  That will be suitable with me.

THE COURT:  I am still interested in what are the aspects to be cleared before it is turned loose.

MR. STAHLMAN:  I don't think it is put into the record as to who wrote the letter, your Honor.

THE COURT:  The letter will be in the record.  It is from the Southwest Division, Bureau of Yards and Docks, F.B. Peacock, By Direction, From: Director, Southwest Division of Bureau of Yards and Docks, to the Chief of Bureau of Yards and Docks.

"Because of lack of basic data, Perliter and Soring have been unable to do any effective work on the report."

(The letter above referred to is herein set forth )
(                                                   )
(as follows:                                        )

20,767

Ser 13647/D-250

16 November 1962

From:   Director, Southwest Division, Bureau of Yards and Docks

To:   Chief, Bureau of Yards and Docks (R-330)

Subj:   Contract NBy-45699, Engineering Services, 1963
Engineering Study for Construction of a Dam on the
Santa Margarita River, Marine Corps Base, Camp
Pendleton, California; delay in obtaining basic
data from U. S. Geological Survey.

1.   On 25 September 1962, Perliter and Soring were given
notice to proceed on subject contract with completion date
on or before 1 April 1963.

2.   At the request of U. S. Attorney William H. Veeder,
conferences involving Mr. Veeder, the U. S. Geological Survey,
Perliter and Soring and Mr. Irving Burdman of this office,
were held in San Francisco on 27 September, and San Diego
on 8 October.     It was agreed that the U. S. Geological
Survey would furnish stream flow data to Mr. Veeder, who
would, in turn, release it to the Navy for use by Perliter
and Soring.

3.   On 7 November, Mr. Burdman was informed by Messrs Kunkel
and Hofmann of the U. S. Geological Survey that due to
certain aspects to be cleared with the Federal Judge in the
Fallbrook Water Case, stream flow records may not be
furnished at this time.

4.   Because of lack of basic data, Perliter and Soring have
been unable to do any effective work on the report.     It

1   appears that further delay may prevent completion of the

2   reporty by 1 April 1963.

3                                   F. B. Peacock
                                    By direction
4
    Copy to:
5
    Office of Ground Water
6        Resources, CAMPEN
    U. S. Attorney W. H. Veeder
7        Washington, D. C.
    FRED KUNKEL, U.S. Geological
8        Survey, Sacramento
    Walter Hofmann, U. S. Geological
9        Survey, Menlo Park.

10

11                   (END OF COPIED MATERIAL)

12       THE COURT: Well, Mr. Veeder informs me that Mr. Clark

13   will be in Los Angeles tomorrow morning and available to

14   talk to on the telephone.

15       I understand you don't want to make any further

16   comment at this time.  You want me to talk to him.  Is that

17   the idea?

18       MR. VEEDER:  My own view about it, your Honor, is that

19   I am simply carrying out instructions when I take the

20   position I have taken here, and there seems to be some

21   violent disagreement in regard to the position I was taking,

22   which I think is perfectly all right.  But it is a legal

23   position.

24       THE COURT:  I don't know what the position is.  You have

25   talked several times, just talked about trying to figure out

1  some percentages of the Government's entitlement.  Is that

2  what you are talking about?

3       MR. VEEDER:  That is correct, your Honor.

4       THE COURT:  Do you want to submit something like that

5  to the Court?  Is that what you are talking about?

6       MR. VEEDER:  I think originally we did submit something

7  to the Court in an informal way in which we pointed out the

8  acreages that were involved; that we thought, for example,

9  in regard to the Murrieta area, the United States is

10  entitled to participate correlatively with the 8,500 or

11  however many acres there are in the Murrieta Valley.

12       We also figured if the stipulated judgment is not

13  going to be enforced that we would participate with Vail

14  Company in Temecula water and all others.

15       If there is going to be a reservoir study by

16  Perliter and Soring, this matter has to be resolved.  There

17  has to be, and in any study that has ever been written,

18  it has always been a calculation of the estimate for the

19  demands upstream.  In other words, it is impossible to make

20  a calculation as to what you think would be the firm supply

21  of a reservoir without such a computation.  That involved

22  are assumptions.

23       We are of the opinion that one way to start on

24  it is to say that we have 13,800 acres of land and that we

25  will participate on the basis of the irrigable acreage as it

1   relates to all other irrigable acreage.   If there is

2   something legally wrong with that, if your Honor thinks that

3   is a wrong approach, or whether your Honor wants to consider

4   it or not, is something else.   But we are in this position,

5   and I understand the U. S. Geological Survey's position, and

6   I understand Perliter and Soring's position, that they must

7   have some legal guidance as to the amount of water that can

8   be reasonably anticipated will be used by riparian and over-

9   lying and appropriative users upstream.   There is nothing

10   radical about that.   I don't believe anybody could criticize

11   it.   And certainly I couldn't ask -- or I shouldn't I

12   couldn't -- it wouldn't seem quite appropriate to say to

13   Perliter and Soring, "Go ahead and make your calculations

14   without regard to legal rights at all."   I have seen that

15   undertaken and I think it is a very grave mistake.   I think

16   any reservoir that is built on strictly physical calculations

17   is doomed to have trouble.   I am certain that the number of

18   assumptions that would be entailed are not  so very great.

19   The Navy can't go ahead and build a dam, however, without

20   recognizing that there are participants upstream who are

21   going to reduce to some degree the quantity of water that is

22   going to come down to us, and in the future we can expect

23   that there will be some additional reduction because there

24   are very extensive rights up there.

25         So the problem that we have, and I am certain that

1    the problem that is referred to Commander Peacock's letter,

2    is precisely what I have said.  They can't make these

3    estimates without some legal conclusions being expressed.

4         Now, I think your Honor will recognize that we do

5    have correlative rights in the River.  I think your Honor

6    has indicated that.  Your Honor has said that because we

7    are exporting water out of the watershed we can't make calls

8    upstream except under certain circumstances that are

9    contained in the amendment of the Enclave judgment.  But I

10   don't think we can proceed on that kind of assumption,

11   frankly, because this base flow, this flow I have been

12   referring to which I consider to be the riparian flow, is

13   an extremely important flow in any calculation.  It is the

14   day in day out normal flow of summer and winter that comes

15   down the stream.  It is not all flood flow, it is not all

16   storm flow, by a far cry.  The fact is the flood flow, as

17   I said before, is about 50 per cent.  So I didn't feel that

18   it was unreasonable to make that statement.

19        It may be that we are asking you for an advisory

20   opinion, and I don't know whether your Honor could make

21   such a ruling.  But it is certainly true that either you

22   assist us in this matter or we just go ahead.  As I said

23   to Mr. Clark on the telephone, I said, "My own view is this.

24   If Judge Carter could, in substance, give us some assistance

25   as to what he thinks would be a criterion for apportioning

1   the riparian runoff up there, it would be helpful.   But if

2   we don't get such ruling," I said to Mr. Clark, "it is my

3   view the Department of Justice should make a specific ruling

4   based upon what we think the law to be, and on that basis

5   let them proceed."   Now, whether that is proper or not is

6   something else.

7            And I might add that he did not respond to what

8   I said.   The matter was left right there.

9       THE COURT:   You make it all so very nebulous.   If we

10  had something specific that you are talking about.

11      MR. VEEDER:   Well, I can say this -- this is Bill

12  Veeder, this isn't the Department of Justice now -- I can

13  show percentages that I think would be a basis for

14  participation.   I am not recommending these.   I am not being

15  nebulous at all now.

16           Colonel Bowen says there is 8,500 acres of land

17  in Murrieta -- Mr. Krieger's clients, et cetera.   The Vail

18  Company Temecula claims are 9,600 against Murrieta.   We

19  think our claims at present -- and I am always reserving the

20  right to object to the rulings on these acreages -- is

21  13,800 acres.   On such an irrigable acreage basis the

22  Murrieta users would be entitled to 27 per cent of the

23  perennial yield, Vail Company would be entitled to 30 per

24  cent, and the United States would be entitled to 43 per cent.

25  That is the basis of irrigable acreages.   If you have a

1    better criterion, fine, that suits me.

2         MR. GIRARD:  There is only one thing basically wrong

3    with that criterion.

4         MR. VEEDER:  What is that?

5         MR. GIRARD:  In determining what your correlative share

6    is, you don't ignore the water you have available in your

7    basins.  You don't just say, "We have 13,000 acres, which is

8    47 per cent of all of the acres involved in Murrieta," and

9    then take the entire share out of the little basins in

10   Murrieta.  You also take into account what your water supply

11   is on your Base.

12        MR. VEEDER:  I am viewing it this way, Mr. Girard.

13        MR. STAHLMAN:  Furthermore, if this was in relation

14   to the determination as to whether you are building a dam

15   down there or not, it has no relevancy whatsoever.  What

16   has it got to do with the building of the dam?

17        MR. SACHSE:  That is what I don't understand.

18        MR. VEEDER:  The point I make to you is that we have

19   a basis or criterion for saying that of the 3,300 acre feet

20   of water that we think is the perennial yield of Murrieta

21   Basin we are entitled to correlatively share on the basis

22   of our irrigable acreage.

23        MR. GIRARD:  But you are not entitled to store your

24   correlative share.

25        MR. STAHLMAN:  It appears to me that what you are

1    trying to do is that you are trying to take advantage of

2    the physical solution in order to get some predetermined

3    apportionment at this time.   That is what it looks like.

4        MR. VEEDER:  Let me go on and say this.   I am not going

5    to defend myself that I am trying to do anything sinister

6    at all.   I am trying to give you a basis for discussion.

7        THE COURT: Before you go further, you gave the figures

8    on Murrieta.   What figures are you talking about on the

9    Temecula?

10       MR. VEEDER:   On the Temecula the participants as I

11   generally look at them now, the Little Temecula would be

12   1,600 acres, Vail's Pauba would be 18,500, Vail's Temecula

13   Rancho would be 9600.   Now, on the basis --

14       THE COURT: And the Government's?

15       MR. VEEDER:   And the Government's basis was 13,800

16   there.

17       THE COURT:   So on this basis you would take your

18   correlative share on each stream?

19       MR. VEEDER:   I think that is what the law is, your Honor.

20   I think Vail Company's  Temecula grant in regard to both

21   tributaries is in the same status as we are.

22       THE COURT:  That is something we should be certain

23   about if we are going to go into this.   That is the first

24   problem that comes up as to whether that is the way you do it

25   or don't do it.

20,775

MR. STAHLMAN:  But you have basins.

THE COURT:  That is the second point.  Mr. Girard is right.  You can't say that the safe yield of Murrieta is x-feet, let's say 3,000 or 4,000 acre feet, and then say we are entitled to 40 per cent of that without taking into account your basin.

MR. VEEDER:  Your Honor, in that regard, let me point out this fact, that we are in the position certainly if we operate our basins and take out the full 12,500 acre feet a year, that we would pull our basin down to the point where it would certainly be receptive to all of that water.

MR. STAHLMAN:  What has that to do with the dam?

THE COURT:  This is the second point we are going to have to consider, if we go into this.  Because there is proof in the record put on by the Government that the safe yield on the basins on the Enclave is 10,000 acre feet a year.  There is proof in the record on that.  Now if you have 10,000 acre feet a year there, you have to take that into account in talking about your correlative share with people who overlie the groundwater area of the Murrieta.

That would be the second problem we would have to discuss -- without passing on it.

MR. VEEDER: That is right.

In regard to the statement when you are talking about a dam, we view it this way, that certainly -- and I have

talked to Colonel Bowen about this -- certainly the United

States will operate the Santa Margarita Coastal Basin

conjunctively with the groundwater basins.   In other words,

the ideal operation -- and I think Vail Company would agree--

the ideal operation is to get as much water underground as

possible rather than have your surface storage.   So when you

say, what has this got to do with a reservoir, it has this

to do with the reservoir.   The reservoir, to a degree at

least, will be operated conjunctively, and will be a means of

aiding and assisting in getting this water underground.   I

think that is a perfectly proper riparian right.

In other words, we couldn't make a call if we

needed the water against the Murrieta people, that is true,

but this would be a ceiling on the call that we could make.

So there is at least that apportionment.

MR. GIRARD:   You couldn't make a call on the Murrieta

people at all to store water on the surface.

MR. VEEDER:   That is exactly what I said, Mr. Girard.

I said the surface reservoir at DeLuz would be operated

surely conjunctively, so that we would put underground or

we would let water run down to an enter the underground

basin as much as possible, and to that extent certainly we

have a call against Murrieta.

THE COURT:   Has this program you are talking about

got anything to do with what you said you were going to do --

20,777

1   put on some proof by Mr. Kunkel about safe yields of these

2   groundwater areas, et cetera?

3      MR. VEEDER:  This over-all idea, yes, indeed it does.

4      THE COURT:  When are you going to put this on?  Maybe

5   I will understand it better after you put it on.  You were

6   going to put it on some time ago.

7      MR. VEEDER:  It suits me.  Mr. Hofmann's wife has been

8   ill and was not able to be down today.  He will be down

9   tomorrow.  Mr. Hofmann and Mr. Kunkel have worked together

10  in this study and I had intended today, if your Honor desired

11  to, to put Mr. Hofmann and Mr. Kunkel on the stand and to

12  demonstrate what their study is.  As I say, it is most

13  unfortunate that Mr. Hofmann couldn't get here today.

14      But I can outline to you what we have in mind,

15  and if you care for me to proceed, I will.  I am simply

16  trying to demonstrate that whoever makes the study, or how-

17  ever it is made, in regard to the reservoir, they have to

18  take into consideration these factors.  Now certainly if we

19  build a dam I would assume the object would be to catch the

20  water which could be classified as water that would enter

21  the ocean.  There is no problem whatever --

22      MR. STAHLMAN:  Pardon me, Bill, before you leave that,

23  you just made a statement.  Are you going to put an

24  engineer on the stand who is going to say that this has to

25  be done in order to determine whether this dam should be

1    built or not and permit us to cross-examine him on that

2    basis?

3         MR. VEEDER:   Mr. Stahlman, the only thing --

4         MR. STAHLMAN:  You made a statement.  Is an engineer

5    going to back you up on that on the witness stand?  That is

6    what I want to know.

7         MR. VEEDER:  I don't know whether he is going to back

8    me up or not.

9         MR. STAHLMAN:  Is this in the nature of an offer of

10   proof?  This is what you expect to prove, isn't it?

11        MR. VEEDER:  No --

12        MR. STAHLMAN:  It goes right at the vital thing we are

13   concerned about, whether or not the physical solution is

14   going forward or whether this is something --

15        MR. GIRARD:  The thing that bothers me about this --

16   and I feel more strongly about this, really, than I do about

17   getting a practical solution -- I don't think we ought to go

18   into a practical solution at all if we are going to have to

19   get an apportionment first.  I would rather go through an

20   appeal than go through an apportionment, and I want to make

21   it clear to Mr. Ramsey Clark, because I don't think on the

22   basis of this record you have any right to an apportionment,

23   and as far as I am concerned, the State, I am not going to

24   agree to letting you get an apportionment just to get a

25   practical solution.

20,779

MR. SACHSE:   I definitely concur, your Honor.   And I want to state it another way.   As far as Fallbrook is concerned, whether there were a physical solution or not, if we have our own dam or if we are parties to a DeLuz Dam, I will have absolutely nothing to say, I will never expect to spend five cents of my client's money to sit in this courtroom while Mr. Veeder argues about the respective rights of the Navy and the people in the Murrieta, because I have no concern.   I have conceded since the first day I was in this court that our dam was for appropriated water, that we take subject to the increased riparian uses upstream.   I haven't any concern in this at all, not one iota of concern, whether I am party at DeLuz or whether we have our own dam, and I want to see this judgment get wound up so that we, on our appropriative right, can go ahead either by physical solution with the United States or on our own.   That is our need.   If Mr. Veeder wants an apportionment, I don't buy it.

MR. STAHLMAN:   Here is another thing, Mr. Sachse.   You have a right that has already been established and is firmed up and you are going to throw that into the pot with this other thing here, and you have that much water they are participating in on a firm right on some basis that you are going to make a division of the water on, and here we are talking about 3,000 acre feet that they might want in some dry period to call upstream to obtain, and we said before if

1    they ever did it, they are going to have to put it in the

2    basin.   What does it have to do with this building of this

3    dam?

4         THE COURT:   I have much of the same feeling.  That is

5    why I asked whether we could hear from this engineer as to

6    what this study is and what they need this for, because it

7    is hard for me to see how this has too much bearing on the

8    problem of building a dam.

9         MR. GIRARD:   There is another problem.   I drafted,

10   along with Colonel Bowen, this order which will allow him

11   to gather certain factual information, which, as I understood

12   it, was going to be imposed for a certain period of maybe a

13   year or maybe longer to see whether we can get the necessary

14   information he needs in order really to make an apportionment

15   in the future without going into meters.

16        Now, is Mr. Veeder telling us that the engineers,

17   the dam designers, have to have all these facts before they

18   can actually tell us whether a dam is feasible?  Are we

19   going to have to wait a year for that?  It seems to me that

20   all they need for their dam is the safe yield of the basin.

21   They don't need any of the figures on apportionment.

22        MR. VEEDER:   I think, your Honor, that the point that I

23   was trying to get across to these gentlemen and to you is that

24   when this matter is terminated and the decree is entered there

25   must be some basis, there must be some legal claim by the

1   United States for water, and it is not a matter whether you

2   call upstream or not.  There is going to be some basis for

3   dividing, there is going to be some calculations as to what

4   can be reasonably anticipated at DeLuz Dam.  I don't believe

5   that anybody can make a calculation on firm supply for

6   DeLuz Dam without taking into consideration the very matter

7   to which I am making reference.

8       MR. GIRARD:  Mr. Veeder, you name me one dam in

9   California which they built after an apportionment.  At the

10  time they built Shasta Dam I don't think there was any

11  apportionment of riparian rights.  I know there was not any

12  on Folsom.  Nothing on Friant as far as specific amounts.

13      MR. STAHLMAN:  Take your dams right down here.  There

14  never has been --

15      MR. VEEDER:  Let me point this out to you, that this

16  terminology that I am using here is simply for the purpose

17  of assisting the engineers to make the determination as to

18  what can reasonably be expected to flow down to them.

19      THE COURT:  Is there any correspondence of what these

20  engineers said they wanted?  Is there any letter or document

21  where they said what they wanted?  Do we have any of that?

22      MR. VEEDER:  You mean Perliter and Soring?

23      THE COURT:  Yes.

24      MR. VEEDER:  The only thing Perliter and Soring -- Mr.

25  Burdman is here.  They have never written to me, I'll guarantee

1    that.

2        THE COURT:  Are they specifically asking you for

3    certain information, Mr. Burdman?

4        MR. BURDMAN:  Yes, your Honor.

5        THE COURT:  What information did they ask you?

6        MR. BURDMAN:  This was verbal.  They asked for informa-

7    tion on the stream flow that could be expected to reach

8    DeLuz Dam site.  I don't know how to put that in more

9    definite terms.  Could I ask Mr. Veeder from his memory of

10   the conversation?  We had two conferences with Mr. Veeder

11   and Perliter and Soring.  I think one --

12       MR. VEEDER:  I think there was one.

13       MR. BURDMAN:  In September, and one in October, or

14   both in October.

15       MR. VEEDER:  I have forgotten the dates but I will tell

16   you what Mr. -- I think it was Mr. Soring said that he

17   desired.  He didn't say it to me.  He was talking to the

18   group.  He said that what they wanted was prepared by the

19   U.S. Geological Survey hydrographs of runoff that could be

20   anticipated so that they could make their calculations of

21   the firm supply for the DeLuz Dam.

22       MR. SACHSE:  That doesn't say anything about percentages

23   you are entitled to as against percentages somebody else is

24   entitled to.  That is just runoff.

25       MR. VEEDER:  I will go ahead and explain what this means

from our standpoint.

THE COURT:  Before you explain what it means from your standpoint, what did the engineers say they wanted?  We have heard Mr. Burdman.  They wanted to know what the stream flow is that can be reasonably expected at DeLuz Dam site.

MR. BURDMAN:  Your Honor, to the best of my memory, that is it, in general terms.  I may have some notes more specific than that, but I don't have them here.

THE COURT:  That is good enough to start with.

MR. VEEDER:  Now the reason why I have undertaken -- when I say I have undertaken -- proceeded on the basis of the legal rights and interests as I see them, that there are two types of runoff from the stream:  The uncontrolled runoff of Murrieta, which will not go underground by reason of the character of the storms.  Some of that water just runs right on through and never goes into the basins at all.  That is uncontrolled runoff.  You can call it storm runoff, you can call it direct flow, you can call it anything you want.  But the 3,300 acre feet to which I made reference is the water that could be expected to be used up there and that the perennial yield of the basin would be that much.  Now, that perennial yield, as a riparian and overlying owner, we could be in a position to make a call for some of that water. Therefore, it is an important factor.

MR. STAHLMAN:  What is the capacity of this dam going to

1    be?

2        MR. GIRARD:  I think this gentleman when he said he

3    wanted to know, or the engineers wanted to know the amount

4    of the flow at the DeLuz Dam site that could reasonably be

5    anticipated, they wanted to know the amount of flow at the

6    DeLuz Dam site which could be stored.  Is that right?

7        MR. VEEDER:  I don't think so.

8        MR. GIRARD:  You are not interested in water that comes

9    in that stream that could/be stored in your reservoir, are
                                not
10   you?

11       MR. VEEDER:  I didn't hear.

12       MR. GIRARD:  I am asking the engineer.

13       MR. VEEDER:  I don't see how he can make a response --

14       MR.  BURDMAN:  I don't believe I can answer that

15   question.

16       MR. GIRARD:  What do you mean, you can't answer it?

17   When you make up your figures on how much water is available

18   for storage you are only interested in how much water you can

19   store.  If water is in the stream which you don't have a

20   right to impound --

21       MR. BURDMAN:  May I say this, your Honor.  I came down

22   here at Mr. Veeder's request to discuss figures that

23   tentatively were considering to be supplied to Perliter and

24   Soring, and it was not at his request that I came in here.

25   We had to adjourn because it was 10:00 o'clock.  I am not here

1    on official orders from my office to be in this courtroom.

2    I am a spectator.  I understand I have to answer your

3    questions.

4         THE COURT:  No.

5         MR. BURDMAN:  And I have to answer Mr. Veeder's questions.

6         THE COURT:  Wait.  You haven't been sworn as a witness,

7    and although you are an engineer, your function apparently

8    is only liason -- you are not making this study.

9              I think it is unfair to question him.

10             Here is what I would like to do, if Mr. Veeder

11   doesn't object.  I would like to put Mr. Kunkel on the

12   stand right now and start to ask him some questions.

13             You have been working on this study, haven't you,

14   Mr. Kunkel?

15        MR. FRED KUNKEL:  Yes, sir.

16        THE COURT:  Come forward.

17        MR. GIRARD:  George doesn't know whether he can go

18   ahead because Sandy isn't here.

19        MR. STAHLMAN:  I don't have my engineer here.

20        THE COURT:  You have been sworn as a witness before in

21   this case?

22        MR. KUNKEL:  Yes, sir.

FRED KUNKEL,

called as a witness by and on behalf of the plaintiff, having

been previously duly sworn, resumed the stand and testified

further as follows:

EXAMINATION BY THE COURT:

Q    How long have you been working on this study with

reference to flow from these streams in this basin?

A    I can't give you the exact date, but we have been

working on it rather intensively for the last several

months, and it all relates back to all that has gone before.

MR. VEEDER:  All that has gone before in this litigation.

THE WITNESS:  In this litigation.

BY THE COURT:

Q    I meant this last statement.

What has been your ultimate objective?  What are

you trying to find out -- what figures?

A    The ultimate objective that we, Mr. Hofmann and I,

have been trying to work up is the amount of water that the

Navy could expect at the Naval Enclave boundary based on the

historical record from 1925 to 1962.

Q    The amount to store?

MR. STAHLMAN:  I can't hear.

THE WITNESS:  Just the amount that would arrive at the

Naval Enclave boundary.

20,787

BY THE COURT:

    Q    To store at the dam?

    A    Well, we were going then to turn those figures over to Perliter and Soring, and they would then, as I understand it, run through to see how much of these waters could be stored, and the results of their studies may show they can all be stored, they may only show part of it could be stored.  We don't know what the results of their study will show.

    Q    The boundary of the Naval Enclave is how far above the dam site?

    MR. VEEDER:  Indeed, you use DeLuz Creek, too.

    THE WITNESS:  DeLuz Creek would be the same amount at the DeLuz Dam site or at the Naval Enclave boundary.

BY THE COURT:

    Q    Them you are really talking about the amount of water available at the dam site?

    A    At the dam site.

    Q    And then these engineers would make calculations as to what could be stored?

    A    That is correct.

    Q    You have been basing this upon a historical background?

    A    That is right.  We used the historical  record and have calculated, or are prepared to calculate, the amount of

1    water that will arrive at the DeLuz Dam site.

2        Q    And since you are using the historical record, you

3    are not making any calculations on increased uses that may

4    occur in the future?

5        A    Mr. Hofmann and myself -- Mr. Hofmann can answer

6    some of these questions better than I can -- together we

7    have made certain assumptions in which he has reconstructed

8    the stream flow to natural conditions if man had not been

9    present in the watershed, and from those figures --

10       Q         You mean on these reconstructions, then, you

11   have eliminated all irrigable?

12       A    We have eliminated the effects of irrigation, uses

13   by man.

14       Q    To get figures of reconstructed natural flow?

15       A    Natural runoff.

16       Q    Have you made any assumptions as to future

17   increased uses in these basins?  I take it you have not.

18       A    This is where we have stopped.  We need guidance

19   in that regard as to what can reasonably be expected to be

20   the demands upstream.

21       Q    In making these assumptions in order to create the

22   natural stream flow or runoff, you first from the historical

23   records had to get what had been the actual stream flow or

24   runoff, having in mind the uses that occurred, did you not?

25   You had to work back from there?

1     A     That is correct.   And this was largely done by

2   Mr. Hofmann.

3     Q     So you know presently what has been the actual

4   runoff which would take into account the uses that have been

5   made upstream and you have recreated the natural flow

6   unaffected by man's activities?

7     A     That is correct.

8     Q     You have gone that far?

9     A     Yes, sir.

10    Q     Well now, I am totally ignorant on these matters.

11  Let's take the Murrieta.   How do you calculate the stream

12  flow of the Murrieta?

13          Strike that.

14          When you talk about natural runoff, are you trying

15  to get something that might be called -- that isn't the

16  safe yield by any means?

17    A     No, it would not be the safe yield.

18    Q     Because the safe yield would have to take into

19  account the uses being made, would it not?

20    A     The uses or the potential uses, yes, sir.

21    Q     Well now, what did you find on the Murrieta?   Did

22  you recreate natural stream flow unaffected by the uses of

23  man?

24    A     Walter Hofmann supplied me with estimates, his

25  best t estimates, making certain assumptions as to what the

1   stream flow would have been in Murrieta under natural

2   conditions.

3        Q    Do you know what that was?

4        A    I would like to check my notes.  If I recall

5   correctly, that was 6,600 -- no, 6,560 acre feet was the

6   average stream flow at the Murrieta gauge, to the best of my

7   recollection.

8        Q    Over the known historical --

9        A    1925 to 1962.

10        Q    That figure would include, then, what would be

11   ordinarily called flood water and would also include a flow

12   in the springtime after the height of the floods had gone by?

13        A    On the basis of an analysis of the daily hydro-

14   graphs where Mr. Hofmann differentiated the total flow in

15   your base runoff and direct runoff.

16        Q    Base runoff and direct runoff.

17        A    Direct runoff.

18        Q    What do you mean by "direct runoff"?  Flood flow?

19        A    That would be the flow immediately following a

20   storm that actually ran off of the surface of the ground into

21   the streams and through the valley.  And agin, for an exact

22   definition, I would prefer to defer to Walter Hofmann's

23   definition.

24        MR. VEEDER:  He will be here tomorrow, I am certain.

25

BY THE COURT:

Q    What would be your base runoff?

A    The base runoff, for the most part, would be the rising groundwaters or the waters that actually discharged from the alluvial deposits.

Q    Now, on your Murrieta study, after you had gotten your flow in a state of nature, did you also make calculations as to what the situation is there presently within the last four or five years?

A    I am of the opinion that Mr. Hoffmann did that.  I did not use those figures as such.  I used the average figures for the period of base and direct, the long term average figures, which was, if I recall correctly, 1,300 acre feet for base flow and the balance was direct.  Again, these figures may be off.  I will have to check my notes.

MR. GIRARD:  1,300 base?

THE WITNESS:  1,300 acre feet per year base flow.

BY THE COURT:

Q    That would  5,260, then, direct runoff?

A    I believe that is correct.

Q    Presently the base runoff as such from Murrieta is practically nil, is it not?

A    No, on the average --

Q    Is there rising water at the bottom of Murrieta that flows into the Temecula Gorge?

20,792

1   A   Yes, there has been, and the rising water has not,

2   to the best of my recollection, at any time ceased entirely.

3   It has continued at all times.

4   Q   How much does this amount to presently in the last

5   two or three years?

6   A   I would have to check with Mr. Hofmann.

7   Q   Has it been gauged?

8   A   It has been gauged.  I am confident that Mr. Hofmann

9   can supply these figures, your Honor.  I do not recall them.

10   Q   It is not a judgment figure, is it?

11   A   I don't recall.  All I can recall right off is the

12   average figure for theperiod of record.  Presumably it would

13   be less than 1,300, but how much less, I don't know.

14   Q   Have you made any calculations as to the safe yield

15   on the Murrieta?

16   A   Yes, I have.

17   Q   How did you go about that?

18   A   Well, we made certain assumptions -- and again, I

19   would like the opportunity to refer to my notes ultimately

20   to verify the figures, but we made the assumption that pumping

21   in the upstream development in Murrieta ultimately could

22   capture all of the base flow, which would be the 1,300 acre

23   feet.  We also knew that if pumping continued and the area was

24   dewatered and the base flow was captured, the direct runoff

25   that we had calculated, if the area had been dewatered, a

1    certain part of that direct runoff would have gone under-

2    ground and recharged the groundwater body.  That amount that

3    could be salvaged by this manner would be added to the base

4    flow and the two figures together would equal the perennial

5    yield of the basin.  The estimate that we made of the amount

6    of additional water that could be induced underground was

7    about 2,000 acre feet.  The 2,000 acre feet plus the 1,300

8    acre feet is what we estimated to be the perennial yield of

9    Murrieta Creek.

10        Q    Which would be 3,300 acre feet?

11        A    It would be 3,300 acre feet.  Now, we realize full

12    well that the basin has never been completed dewatered.

13    Therefore, we cannot check the exactness of these figures,

14    and it has been my opinion and walter Hofmann's opinion that

15    the Court maintaining continuing jurisdiction would be in

16    a position as additional data ultimately were collected to

17    revise these figures or to provide a method for revising these

18    figures as additional data became available.  However, the

19    3,300 acre feet, in our opinion, was a reasonable figure

20    from which to start management of the groundwater basin.

21        Q    So that on management of the groundwater basin,

22    and assuming optimum conditions of being flood flow under-

23    ground, you would figure that 3,300 acre feet could be

24    utilized there in the Murrieta.  That would leave you about

25    3,260 acre feet of direct flow that would go on down.

20,794

1     A     Those numbers are approximately correct.

2     Q     Therefore, on that basis you figured that there

3 would be about 3,260 acre feet available at the dam site

4 less some loss on the way down, I suppose?

5     A     That is correct -- from Murrieta Creek.

6     Q     Now, on that basis 3,260 acre feet would be

7 available down at the dam site regardless of any of this

8 talk about percentages, wouldn't it?

9     A     That is correct.  But this would assume that the

10 upstream users would use all of the perennial yield.

11     Q     This is assuming that there would probably be even

12 a greater development on the Murrieta than there is now?

13     A     That is correct.

14     Q     And there would be steps taken to put waters under-

15 ground to resupply that groundwater basin as it is pumped

16 out for use.  Those are your assumptions?

17     A     Those are our assumptions; that is correct.

18     Q     And that this would go on to such an extent that

19 you would cut off the base flow entirely down at the canyon?

20     A     That is correct.

21     Q     Then you would have to call upon flood waters each

22 year to fill up the groundwater area again.  You might have

23 to use artificial means to be sure you got it into the

24 ground?

25     A     That is right.  Not only the base flow of 1,300 acre

20,795

1   feet would be captured, but an additional 2,000 acre feet of

2   direct runoff.

3      Q      Did you do a similar thing on Temecula?

4      A      A similar study has been made for Temecula.

5      Q      And did you do a similar thing on the Sandia and

6   DeLuz?

7      A      No.  From below the Gorge just the total amount of

8   water that would be available was estimated by Mr. Hofmann.

9   I do not recall the exact figure.

10      Q      The uses of the Sandia and the DeLuz are relatively

11   small uses from the artificial construction there?

12      A      We considered those uses to be minor and that the

13   historical record would show the amount of water to be

14   available is substantially correct at the dam site.

15      Q      What did you do with Pechanga?

16      A      Pechanga is figured in with the estimate of the

17   amount that would come out of Temecula Creek.  I don't recall

18   the exact amount, but there is an amount estimated for the

19   Pechanga contribution.

20      Q      What did you do then with Temecula?  You first

21   figured it historically without the dam to get a natural

22   flow, I take it?

23      A      It was figured historically without the dam to get

24   a natural flow.

25      Q      Do you know what those figures were?

20,796

A     To the best of my recollection, the amount that came out of Temecula and Pechanga together at the mouth of Temecula Gorge reconstructed to natural conditions was 14,000 -- no, I am sorry -- it was 11,000.  Pardon me.

Q     Do you have your notes here?

A     No, I don't have them with me.  They are not in the courtroom.

MR. SACHSE:  Do you have them upstairs?

THE WITNESS:  I don't remember whether it was 11 or 14. I am rather cold on this.

THE COURT:  Let's call it 14 for the time being.

THE WITNESS:  I believe it was 11.

BY THE COURT:

Q     Acre feet in a state of nature.

A     11,000.  Again, subject to revision after I check my notes.

Q     What did you do next on Temecula and Pechanga? How did you take the dam into consideration?

A     Mr. Hofmann ran through figures on that and came up with a 6,300 acre feet use, and again he had to assume certain operating procedures that he would have to explain to you, not myself.

MR. STAHLMAN:  May I have that figure?

THE WITNESS:  I believe it was 6,300 acre feet.

BY THE COURT:

Q    Of use?

A    Of use.   That could be taken out of Vail Dam every year.   Plus, I believe it was, 2,000 acre feet on the average of evaporation.

MR. VEEDER:   May I interrupt for just a moment.   Wasn't that on the basis of conjunctive use of Vail Dam and Pauba Basin?

THE WITNESS:   That is correct.   The study assumed the conjunctive use of Vail Dam and Pauba Basin for the most efficient operating procedure and there was actually a certain operating procedure assumed that under certain conditions water would be taken from the underground, under certain other conditions it would be taken from the Vail reservoir.   I do not recall the exact operating conditions that Mr. Hofmann assumed in these cases.

BY THE COURT:

Q    So, there would be, we will say, 8,300 acre feet?

A    That is correct.

Q    Then the difference between that and 11,000 or 14,000 would be what might proceed at the mouth of the Gorge downstream?

A    That is correct.   That would be water that would come out of Pachanga or water that would spill out of Vail Reservoir, or an additional increment of water that would just

1   be uncontrolled runoff out of Temecula Canyon.

2       Q    That 8,300 figure, does that refresh your

3   recollection whether it was 11,000 or 14,000?

4       A    I believe it was 11,000, your Honor, but I wouldn't

5   want to be held to it.

6       Q    That would be only 2,300 acre feet -- 3,300 --

7   no, 2,200.

8   MR. GIRARD:  2,700.

9   THE WITNESS:  I would have to check my notes to be

10  certain.

11  BY THE COURT:

12      Q    2,700.  Does that sound about right?

13  MR. VEEDER:  2,700 coming through the canyon?  I am sure

14  it is 11,000.  You have about 17,000 or 16,000 coming through

15  the canyon.

16  THE WITNESS:  By 2,700 the Court is referring to some

17  balance after 6,300 and 2,000 has been taken off for use by

18  Vail Reservoir.  The 2,700 sounds correct.

19  BY THE COURT:

20      Q    And with minor diminutions this would be then

21  available at the dam site?

22      A    That is correct.

23  MR. SACHSE:  And accretions.

24  BY THE COURT:

25      Q    We are not talking now about accretions downstream

1  from the Gorge, are we?

2  A   No.  In addition to the figures the 2,700 and the

3  amount of water that came out of the Murrieta, there would

4  have to be an amount added then from the Gorge to the dam

5  site.  There would be an additional increment of water.

6  Q   Did you make any calculations as to whether the

7  8,300 acre feet for use and evaporation bore some reasonable

8  resemblance to the needs of the Vail Company and the users

9  on Pechanga?  Did that sound like a reasonable figure?

10  A   On the basis of the amount of water that could be

11  used, it was my opinion that the total quantity could be used

12  in Temecula watershed.

13  Q   With about 2,700 acre feet left over to spill out

14  of the Gorge?

15  A   That is correct.

16  Q   So far we have 3,260.

17  MR. GIRARD:  You have 6,000.

18  THE COURT:  Yes, we have 6,000 -- well, 6,960.

19  MR. GIRARD:  6,000.

20  THE COURT:  5,960.

21  Q   What did you figure was the amount from DeLuz

22  Canyon?

23  A   I can't give you an exact figure.  It was on the

24  order, I believe, of 3,000 acre feet per year.  That may be

25  revised up or down by Mr. Hofmann.

20,800

1    Q    Did you make some over-all calculation of the

2    increments below the Gorge?

3    A    The figure that I remember or recall as increments

4    below the Gorge including Sandia and DeLuz and what other

5    tributaries, is 4,600.

6    MR. SACHSE:  How much?

7    THE WITNESS:  4,600.  Again, these are to the best of

8    my recollection and subject to verification by Mr. Hofmann.

9    BY THE COURT:

10   Q    Then we have a total of about 10,550 acre feet;

11   right?

12   A    It would be about that amount; yes, sir.

13   Q    At the dam site.  And you had in mind that the

14   basins downstream had a safe yield of about 10,000 acre

15   feet?

16   A    That has been an estimate that was made by Mr.

17   Worts.  Our studies did not.  We left that part of the

18   study from the proposed DeLuz Dam in conjunctive operation--

19   Q    Then on the average if there was full use made of

20   the basins downstream there is just about enough water to

21   fill up the basins?

22   A    It comes out to just about that amount.

23   Q    So that when all is said and done, the only waters

24   you are ever going to get at the dam are really flood waters,

25   namely, waters which you couldn't put in the underground

1  basin above the Gorge and waters which would flow over the

2  top of the basin  below and otherwise flow to the sea?

3      A    I am not quite certain  what would constitute

4  flood waters under these circumstances, because the 10,000

5  to which you refer includes all of the water that would come

6  to the Naval Enclave.

7      Q    Yes, and I am saying that to apportion that 10,500

8  acre feet, you would have to have the basins in the Naval

9  Enclave pulled down to a maximum and then you would have to

10  have maximum conditions to get the whole 10,000 acre feet,

11  wouldn't you?

12      A    That is correct.

13      Q    So that what you are talking about, aren't you,

14  for a dam is flood waters, waters which aren't going to be

15  able to be reasonably put underground in the Murrieta or the

16  Pauba, in other words, which aren't reasonably going to be

17  put underground in the Government Enclave, waters which

18  otherwise will flow into the sea; isn't that what you are

19  talking about for your dam?

20      MR. VEEDER:  I think it would be better for Mr. Hofmann

21  to testify on that, because he is the one who conducted

22  that part of the study.  I regret that he is not here.

23      THE WITNESS:  I would prefer to defer to Mr. Hofmann

24  because he is the one who studied the intensity and the rate

25  at which these storms come.  I do not have these data ready

1   in my mind to answer your questions.

2   MR. SACHSE:  Your Honor, at the risk of arguing with

3   the Court, to me this is absolutely immaterial to any issue

4   that is here.  The question of whether or not a dam at

5   DeLuz is economically feasible for the amount of water

6   available or whether a dam at Fallbrook is economically

7   feasible is not a question for your Honor to determine.  As

8   pointed out several times in the transcript if we want to

9   go ahead and somebody blow the money on a chance of that

10   filling it up --

11   THE COURT:  Let me interrupt.  My inquiry was not

12   directed to that problem.  My inquiry was directed to see

13   how Mr. Veeder's talk about some apportionment would have

14   anything to do with the calculations.

15   MR. SACHSE:  That is the very point I make.  I am quite

16   certain your Honor was not shooting at that, but I am quite

17   certain, sitting here listening to this, that what Mr.  Veeder

18   has in mind is, in substance, to reopen some of these dead

19   horses that I think we have disposed of four or five years

20   ago.  If the United States wants to talk feasibility and

21   practicability in a joint program, I would be glad to

22   listen.  But I don't want to start refighting the   question

23   about whether there is any water available for appropriation

24   in this River.

25   THE COURT:  Don't you agree with me that the limited

20,803

1    inquiry that we have made of Mr. Kunkel would demonstrate

2    that the things Mr. Veeder talks about aren't necessary?

3        MR. SACHSE:   Absolutely unnecessary to the decision

4    that has to be made by the United States and Fallbrook.

5        THE COURT:   That decision doesn't add one iota.

6        MR. SACHSE:   Not an iota.   I agree absolutely with your

7    Honor.

8        MR. GIRARD:   I think in all fairness --

9        MR. SACHSE:   May I proceed, Fred.

10       I don't quite agree with Fred's figures.   I don't

11   challenge them, but I think he may be somewhat in error,

12   because it is an odd coincidence that he uses the figure

13   14,000 rather than 11,000 for the state of nature flow

14   from Temecula to come right out on the button where Bulletin

15   No. 57 was on a state of nature flow also.

16       I have a hunch you may have 14,000.   But that is

17   beside the point.

18       THE WITNESS:   Again, Mr. Hofmann should present these

19   data.

20       MR. SACHSE:   That is really beside the point.   I don't

21   want to challenge the figures, whatever they are.   The United

22   States is going to have to decide just exactly what

23   Fallbrook decided as far as its own dam was concerned:

24   With the amount of water available in the stream and with

25   the cost of the project, can we build one?   And if we build

1    one, what sort of division can we make of the waters

2    captured with Fallbrook?  Not their riparian rights -- they

3    have them anyway.  And when he states that the decision as

4    to the dam is going to depend on what percentage of water

5    he can reach upstream and get for his riparian purposes, I

6    say that has absolutely nothing to do with this at all.  It

7    is an attempt to run in an apportionment under the guise of

8    an essential element of a settlement, which it is not.

9    Fallbrook has no interest in the apportionment.

10        MR. STAHLMAN:  Proof of what you say are some of the

11   things that crept out when Mr. Veeder talks to the Court

12   about this.  He harps on such things as the stipulated

13   judgment.  I don't see how that could have any effect.

14        THE COURT:  Do you want to ask Mr. Kunkel any questions?

15        MR. GIRARD:  My questions would be just on figures, and

16   I don't think Mr. Kunkel can vouch for the figures he used,

17   and I don't think it would be appropriate to cross-examine

18   him.

19        THE COURT:  Another thing that strikes me about these

20   figures is that here you have an estimate for use and

21   evaporation in the Pauba, which is largely Vail, of 8,300

22   acree feet with the tremendous acreage involved, and you

23   have the figure of 10,560 acre feet of flow into the Enclave

24   or at the dam site, which is almost the same.  How the

25   Government can talk about reaching upstream against Vail with

1    figures like that, I don't know.

2         MR. VEEDER:  What do you mean, your Honor?  You mean

3    that we don't have a right upstream?

4         MR. GIRARD:  He means you have been getting your right.

5         THE COURT:  I mean the figures seem to illustrate  that

6    for your 13,000 acres you have been getting 10,500 acre feet.

7    Vail, with 19,000, if you want to take just irrigable

8    acreage, counting evaporation, has been getting about 8,300.

9    This doesn't indicate any gross misuse of water by somebody

10   upstream if historically you have that much down below.

11        MR. GIRARD:  Vail's is under their appropriative right,

12   too.

13        MR. SACHSE:  That is right; some of it is appropriative.

14        MR. VEEDER:  With all respect to your Honor, before we

15   leave off on these matters --

16        THE COURT:  I am not passing any final judgment.

17        MR. VEEDER:  But, your Honor, let me point out to you,

18   to use the terms of his Honor Pierson Hall in one of his

19   rulings, he said, "Fresno is in a highly advantageous

20   situation," and I think this is one point in which I agree

21   with Pierson Hall.  The United States of America is in a

22   highly advantageous position on the Santa Margarita River,

23   and we are entitled to participate by reason of that highly

24   advantageous position in all of the waters in the stream.  We

25   are entitled to participate in Murrieta and in Temecula, and

1    the fact that we happen to get more water than Vail Company

2    explains why the stipulated judgment was based on 66-2/3

3    per cent and 33-1/3 per cent.  I don't want anyone to believe

4    that we are not entitled to legal rights upstream.  The mere

5    fact that we got 10,000 acre feet, we use a lot more.  We

6    have legal rights.  I am not going to go into any of this

7    Socialism.  I am a firm believer in vested legal rights.  We

8    bought and paid for vested legal rights and I don't want

9    anybody trying to socialize those vested legal rights.

10        THE COURT:  Let's look at something else here.  Here is

11   an estimate of a safe yield, meaning what could be safely

12   used in the Murrieta Valley, where I understand your figure

13   is about 8,000 acres.  Here are people who are also in a very

14   advantageous position.  Most of them are overlying owners

15   over a tremendous body of water, no doubt about that.  You

16   could say that they probably, therefore, have about as good

17   water rights as anybody in this watershed, haven't they?  In

18   fact, they have better water rights than a lot of people along

19   the streams where the streams run only in the winter.  They

20   sit over a basin.  And for the 8,500 acres the maximum use

21   that could be made up in that valley of safe yield was 3,300

22   acre feet.

23        Now, you sit downstairs with 13,000 acres, of

24   which you haven't got 8,000 acres that compare with the

25   8,000 acres that overlie this basin; with a basin that has a

safe yield of 10,000 acre feet, and with the figures here

showing that in excess of that amount is available at the

dam site, and certainly that would mean that most of that

goes down over your ground.

Just very roughly, it looks to me like there has

been no disproportionate use of waters in this watershed.

MR. VEEDER:  Let me again point out these factors that

are extremely important, your Honor.  It may be true that

there is water underlying the Murrieta land.  But it is

also true that basically and fundamentally those overlying

owners in Murrieta are entitled to participate, in my view,

only on the basis of what would be the perennial yield of

the stream.  You can say, "Well, that basis is tremendously

full of water," but when all is said and done, if you permit

them to take more than 3,300 acre feet, forgetting for the

moment we are entitled to participate with them, they are

going to be in the process of destruction, they will pump

themselves to death, they will pump themselves out of water

if they take more than 3,300 acre feet a year.  That is the

situation.

We say this.  That Vail Company, which doesn't fit

in the advantageous position of these 8,500 acres, is

entitled to participate with those people.  We say the

reason Vail Company is entitled to participate is that they

are a riparian owner.  I don't believe Vail is going to

1   abandon its Murrieta rights.

2          We also say that the United States, which has to

3   live on the water that comes down to it --

4          THE COURT:  How many acres do you say Vail has riparian

5   to the Murrieta?

6          MR. VEEDER:  9,600.

7          THE COURT:  And 8,500 among the other farmers in the

8   Murrieta?

9          MR. VEEDER:  That is correct.

                                        3,300
10         THE COURT:  Then if you chop that/roughly in half, you

11   have 1,700 acre feet for Vail for 9,600 acres, you have

12   1,700 acre feet for the farmers for 8,600 acres.  Is this an

13   excessive use compared to your use downstream?

14         MR. VEEDER:  I think that may be something your Honor

15   would rule upon.

16         THE COURT:  Just offhand it seems to me you would have

17   a terrific time claiming this would be an excessive use

18   upstream.

19         MR. GIRARD:  You would get roughly 20 per cent.

20         MR. VEEDER:  I am here presenting these matters to your

21   Honor.  We are seeking some guidance.  We would like some.

22          The point that I am trying to make to you is that

23   there must be a recognition, in my view, that we are entitled

24   to participate in these sources of water upstream and that

25   we are immensely interested in seeing that those water

resources are not overdrawn to the point that we will not get water.

THE COURT:  I don't have any objection to making a series of rulings on theory, if this is going to advance it. This could be done easily.  Certainly in a terrific period of drought when the basins upstream in the Murrieta and the Pauba are drawn down and your basins are drawn down and there is only little water available, certainly you are going to share with people upstream.  They can't take all the water and leave you none.  But this is just on theory.  As long as your basins are full, as long as you can refill your basins, as long as you can make the uses that you have been making, you haven't got much complaint.  The people upstream have a right to use water, too.

MR. VEEDER:  Everyone faces this.  If we have a supply of water adequate to meet our needs, there would be no reason for, nor could we enforce, a call upstream.  But we are here in this long controversy not thinking about the years when there is a lot of water.  The really important thing is when we are in a period of severe drought that we will be in a position to make a call upstream to take care of our needs.  That is the only reason for this lawsuit.  We are in this situation, that if we sit by and let development go ahead without some limitation, it will most certainly occur that our basins will drop down to a precarious point.

1   So we want to have legal rights upstream during these periods

2   of drought.

3           I submit, your Honor, that when Perliter and Soring

4   make calculations it would be totally incorrect not to take

5   into consideration the fact of development upstream.

6           Now, you have criticized the criteria that I have

7   tendered.    I don't mind because all I am seeking is some

8   guidance.

9       THE COURT:  What criteria are you talking about?

10      MR. VEEDER:  That the irrigable acreage would be a

11  sensible way of indicating what our participation would be.

12          Now, there has been confusion throughout this case

13  in many respects, in my view, from the standpoint of what is

14  meant by available water.  I think the idea has been that

15  the summer flow, in effect, is the only riparian water that

16  is important.  That is not correct.  It is the day to day

17  runoff from November to April which is extremely important

18  to us, and we don't want to be put on the basis of saying

19  that the only thing you can look at is flood water because

20  there is no basis for it.  We have basins down there that

21  are primarily dependent upon this day to day runoff that

22  comes down and recharges them.   Only by the most careful

23  conservation practices have we been able to survive -- the

24  use of sewage affluent, Colonel Bowen's induction of water

25  underground.

20,811

I think it is entirely proper for us to say, as I have said to the United States Geological Survey, that when you make these calculations it is essential that you take into consideration that Vail Company has extensive rights, that these 8,500 acres have extensive rights, even some rights up in Agunaga. How important those are, I don't know. But we cannot abandon, we cannot possibly abandon the right to make a call as a riparian and overlying owner. I don't think we should be requested to.

MR. SACHSE: Mr. Veeder, may I make an observation. If you were prepared at this moment to come to the Court with a motion that the Court make a pronouncement as to how you would share or on what basis you would make calls upstream, I will object to the Court considering that at all because the Court has ruled. I don't have the amended decree for the Naval Enclave in front of me, but I have the original, and the Court has ruled that you can't make any demands upstream until either the export is stopped or you get a right under California law, and I am going to say to his Honor, "Don't let Mr. Veeder waste my time, your Honor, with a request for something that you, yourself, have ruled he can't have. Let Mr. Veeder come in with the first essential element of proof, namely, that he has a right, some kind of right enforceable upstream, or that he has abandoned the exportation." Now, until you do that you haven't got a right,

20,812

1  unless his Honor strikes Interlocutory Judgment No. 37.  You

2  haven't got a right to ask for anything upstream from anybody.

3        THE COURT:  Of course, this is the big argument to build

4  a dam.

5        MR. SACHSE:  They is why they want to have a dam.

6        THE COURT:  That is why you ought to get a dam.  That is

7  why you ought to file with the State.

8            But let us say for argument that you have ceased

9  your export or that your conservation methods now exceed your

10 export, however we worded that, so that you no longer are

11 in bad standing, as it were, and you therefore say, "I want

12 the Court to adjudicate our right to call upstream on other

13 owners," leaving out that point, the Court could say on

14 principle, "As a lower riparian you have a right to call

15 upstream on upper riparians for an equitable share of what

16 water is available."  But the Court could not say today,

17 "And that shall be a certain per cent."  It would depend on

18 so many factors that would have to be determined at that

19 time when the time came.  It would depend upon how far down

20 your basins were pulled, it would depend on how far down the

21 water levels were pulled in the Murrieta and the Pauba, it

22 would depend on a lot of other factors which might vary from

23 one place to another.  You might have situations where your

24 basins were down and the Pauba and the Murrieta were up.  Or

25 conversely, they might be up in pretty good shape and yours

20,813

1      might be down.  There would be so many factors involved that

2      it is not a percentage thing.  It is a question of what would

3      be fair when the time came.

4              Assuming that you had ceased your exportation, if

5      you ever got to a place where you were suffering for water --

6      of course, you have your second provision there that you

7      would have to restore the water levels to what they would

8      have been if you had not exported -- but assuming that the

9      Court isn't going to say that you are entitled to blank

10     per cent or a certain amount of water, the Court is going to

11     have to inquire what water is available.  Maybe at that time

12     Vail Dam has a lot of water in it.  Maybe the Pauba as a

13     source of water is in good shape.  Maybe you are in bad

14     shape.  There would be all sorts of situations that might

15     develop.  But each one would have to be decided, it seems

16     to me, when the time came, on the facts as they then existed.

17              Am I wrong on this?

18          MR. GIRARD:  I think you are right, your Honor.

19              I would like to ask Mr. Kunkel a couple of questions,

20     if I could, maybe after the recess, and I will advise him in

21     advance what I am interested in.  It might be easier.  I

22     don't want to spring anything on him.

23          THE COURT:  All right.  Do you want to tell him what

24     they are, or do you want to tell him at the recess?

25          MR. GIRARD:  Yes, I will make sure I have my figures

1      right, if I can.

2              THE COURT: All right.

3              (Recess taken.)

4              MR. VEEDER: Are you ready to proceed, your Honor?

5              THE COURT: Yes.

6              MR. VEEDER:  Your Honor, I have talked to the Secretary

7      of the Chamber of Commerce and he advises me that he has

8      arranged to have Mr. Raymond Thompson, Mr. Paul Thompson,

9      and Mr. Carl Cain down here at 10:00 o'clock tomorrow.  And

10     I suggested to them that they bring a lawyer.  They said they

11     have only had a part-time lawyer and they would have to

12     decide on whether they should have counsel or not.

13             MR. STAHLMAN:  What is a part-time lawyer?

14             MR. VEEDER:  George, you should know.

15             MR. STAHLMAN:  Maybe I will represent them, then.

16             THE COURT:  That will be 10:00 o'clock tomorrow?

17             MR. VEEDER:  That is correct, your Honor.

18             THE COURT:  What do you want to talk about now?

19             MR. SACHSE:  We still have some judgments we can give

20     your Honor for signature.

21             THE COURT:  All right.

22             MR. SACHSE:  I have here two copies of DeLuz Creek,

23     Interlocutory Judgment No. 32, and two copies of Santa

24     Margarita.

25             THE COURT:  You handed me only one.

20,815

1    MR. SACHSE:  I left the other one on Mr. Luddy's desk

2  for stamp.

3    THE COURT:  I will mark it.

4        You have gone over this DeLuz Judgment, and you

5  are satisfied with it?

6    MR. SACHSE:  Yes, your Honor.

7    MR. GIRARD:  I am.

8    THE COURT:  Mr. Veeder?

9    MR. VEEDER:  Well, it is in keeping with your Honor's

10  ruling.

11    THE COURT:  In what ways are you dissatisfied with

12  DeLuz?

13    MR. VEEDER:  Your Honor, I have no objection at this

14  time.  Go ahead without objection.  We are going to object

15  to everything when we are through.

16    THE COURT:  What?

17    MR. VEEDER:  We are going to file objections to all of

18  these when we are through.

19    THE COURT:  That is not a very businesslike way to do

20  things.  A judgment is signed up and then object later.  You

21  have that right, of course.

22    MR. VEEDER:  Your Honor directed me to pursue that

23  course.

24    THE COURT:  No, you asked if you could, from time to

25  time.  I never directed you to pursue it.

MR. VEEDER:  My recollection, your Honor, with all respect to your Honor, is that I said, "Should I file objections at the present time?"  You said, "No, wait until they are all entered."

THE COURT:  32 has the exhibits attached to it, doesn't it?

MR. SACHSE:  Yes, your Honor.  And so has 39.  They are both of them complete.

MR. GIRARD:  We had lodged, your Honor, the original and a copy of Interlocutory Judgment No. 33.

THE COURT:  I think I have it here.

MR. GIRARD:  Which is all ready for signature, except these exhibits will have to be stapled on to it.  That is Anza and Coahuila.  It has not been signed.  We are waiting to attach the exhibits.  The exhibits are right here to be attached.

THE COURT:  I don't find that.

MR. GIRARD:  I think it has a couple of ink corrections.

THE COURT:  Here is the original and a copy.

MR. GIRARD:  Make sure these ink corrections have been made on it, your Honor.  Yes, your Honor has made the corrections.

THE COURT:  One is the original and one is the copy.  The one on top is a copy.

MR. GIRARD:  All right.

1          Your Honor, this is the original with a copy.  Mr.

2    Luddy will have to staple it.

3          THE COURT:  What are you going to do when you can't come

4    out here any more, Mr. Veeder, when you get through with

5    this case?

6          MR. VEEDER:  I am going to celebrate.

7          MR. GIRARD:  I will have Mr. Luddy staple your copy,

8    too.

9          THE COURT:  Which number is that?

10         MR. GIRARD:  No. 33.  This is your copy also, your

11   Honor.  Just mark on it "Signed" or something and I will have

12   Mr. Luddy staple it.

13         I had previously lodged the original and a copy of

14   35-A.

15         MR. VEEDER:  Are you going ahead with 35-A in its

16   present form?

17         MR. STAHLMAN:  Yes, we went over it.

18         MR. VEEDER:  George, the thing I brought to your

19   attention is that you have several interlocutories.  Have

20   you changed that?

21         MR. STAHLMAN:  No.

22         THE COURT:  I have 35-A in front of me.  Let's see what

23   they are talking about.

24         MR. STAHLMAN:  Here is the language, if you will turn

25   to page 5.

THE COURT:  Has 35 been filed?

MR. STAHLMAN:  Yes.

MR. GIRARD:  Yes.  That is the original Vail Judgment.

THE COURT:  I don't have a notation on that.  When was that filed?

MR. GIRARD:  It was signed a long time ago.  It says "Dated Entered 4-4-62" on Mr. Luddy's copy.    "Date Signed 4-4-62."

MR. STAHLMAN:  Is that sufficient, Mr. Veeder?

MR. VEEDER:  It's up to you.

MR. STAHLMAN:  I talked it over with Mr. Sachse and he thinks it's all right.

MR. VEEDER:  If Judge Sachse says it's okay, it's okay, of course.

MR. GIRARD:  This is the original of 35-A, your Honor.

THE COURT:  What was the problem here?

MR. STAHLMAN:  Mr. Veeder has a question as to whether or not we shouldn't make reference to some of the other interlocutory judgments in connection with it, and I indicated on page 5, starting at about line 13, we talk about the rights of vagrant local percolating waters et cetera, and then it states:

     ". . . by reason of their ownership of the lands
     referred to in Findings No. 4 and 5 hereinabove,"
and Findings No. 4 and 5 set all these lands out,

20,819

1      "except such rights to the use of water thereon

2      that said lands may have by reason of their riparian

3      or overlying status as found in other interlocutory

4      judgments in this cause. . ."

5      THE COURT:  We can always amend these.  I think that

6  does it.

7      MR. VEEDER:  Your Honor, will we be running Thursday

8  under present plans?

9      THE COURT:  Just a minute.

10     MR. GIRARD:  This is your copy.

11     THE COURT:  Let the Clerk have both of them.

12       Mr. Clerk, I have signed 35-A which has been handed

13  to you there, and I have signed 39, which I hand you, and

14  32.

15       And there is one other big one.

16     THE CLERK:  33, your Honor.

17     MR. GIRARD:  What did you want done with these letters

18  of transmittal that were attached?

19     THE COURT:  Let me have them.

20       Let me inquire, Mr. Clerk, what record do you show

21  on 29, Sandia Creek?

22     MR. SACHSE:  That was withdrawn, your Honor.  39 now

23  includes Sandia Creek.

24     THE COURT:  So there is no 29, then?

25     MR. SACHSE:  No, your Honor.

THE COURT:  It is included in 39?

MR. SACHSE:  Yes.   The same situation is going to exist on Tucalota.  What was the number of that?

THE COURT:  31.

MR. SACHSE:  That is going to be included.  We may use the No. 31, but it is not going to be Tucalota alone; it is going to be the whole Santa Gertrudis watershed.

THE COURT:  What about 31-A?  That is the vagrant --

THE CLERK:  That was entered, I show, on the 5th of July 1961, your Honor.

MR. SACHSE:  That is right.

THE COURT:  That is as amended?  It was amended.

MR. GIRARD:  It was signed June 30.

THE CLERK:  The amended was entered on the 28th of July, 1961, your Honor.

THE COURT:  Now I show no 38 at all.

THE CLERK:  No 38.

THE COURT:  We have 38-A?

THE CLERK:  Yes.

THE COURT:  We have entered 39 and 39-A, and we have entered 41 and 42.  We have pending 40 and 31, then.

MR. SACHSE:  31 is Santa Gertrudis.

MR. GIRARD:  Yes.  40 will be ready for signature tomorrow.

MR. VEEDER:  40 is Aguanga.

20,821

MR. GIRARD:  Aguanga.  31 will be the Santa Gertrudis, and then we have only one other to do.

THE COURT:  What is that?

MR. VEEDER:  Temecula above Aguanga.

MR. GIRARD:  It is Temecula Creek above the Aguanga groundwater area.

THE COURT:  34?

MR. GIRARD:  Yes.  So we have only two left to do, or three.

MR. STAHLMAN:  Did you say you revised and brought up to date the index?

MR. VEEDER:  I am going to have it brought up to date. I am going to ask to have the index brought up to date before the last hearing -- this index of witnesses, index of exhibits and also the index of all interlocutory judgments that have been entered.  I think we ought to have everything brought up to date on the index.

THE COURT:  Now, Mr. Veeder, you made an inquiry.

MR. VEEDER:  I inquired, your Honor, simply for the purpose of scheduling my time, whether plans contemplate proceedings before you on Thursday.  I think we are just about caught up on everything that we had scheduled now.

THE COURT:  We have the order re groundwater movements.

We have signed 32, 39, 33, 35-A.

Do you anticipate we will be busy here on Thursday?

1    MR. GIRARD:  I don't anticipate it, no, although I have

2    no objection to working Thursday.

3    THE COURT:  I have no objection either if we have

4    something to do.

5    MR. GIRARD:  The Aguanga will be done, I am sure,

6    tomorrow, without much trouble.  We went over it the last

7    time.

8    MR. SACHSE:  Tomorrow will be taken up by these people

9    coming down from Murrieta.  I don't know how long it will

10   take.

11   MR. STAHLMAN:  Your Honor, have we settled this question

12   about notification and how the final judgment will be

13   handled?

14   MR. SACHSE:  Yes, I think before this week is out we

15   are so close now I think it would do us all good to take

16   15 or 20 minutes at the end of our hearings this week and

17   talk about how we will proceed with the final wind-up of

18   this.  We are very close.

19   THE COURT:  I think we can do that tomorrow afternoon?

20   MR. SACHSE:  I wouldn't say we could do it all, unless

21   this Murrieta group ties us up.

22   MR. GIRARD:  I don't think they should.

23   MR. STAHLMAN:  Is somebody going to talk to Mr. Ramsey

24   Clark tomorrow about this thing Mr. Veeder called him about ?

25   THE COURT:  I will talk to him tomorrow.

1   MR. VEEDER:  It is up to your Honor.  He said he would

2   talk to you.  I will contact him any time you want to talk

3   to him.

4   THE COURT:  Do you have anything you want specifically

5   to make, some request for findings of a certain kind?  You

6   have left this all very nebulous.

7   MR. VEEDER:  I didn't try to leave it nebulous.  I tried

8   to point out what I thought was extremely important to us

9   in regard to establishing a criterion on this point.  I think

10  I made it immensely clear that I thought we could proceed

11  on the basis of irrigable acreage to establish the percentage

12  of participation upstream.  I outlined, I have drawn pictures

13  on the board.  I don't believe there is any doubt in your

14  Honor's mind what I have in mind on it.  I have been extremely

15  careful to point out that in making these calculations we

16  felt there should be some guidance.  But as I said to Mr.

17  Clark, if your Honor doesn't feel that what I have said

18  calls for some kind of direction to us, maybe the Department

19  of Justice will have to make such determination to assist

20  Perliter and Soring.  But I don't like to have the record

21  show that your Honor thinks I have been too nebulous on this.

22  THE COURT:  You never submitted anything in writing

23  definitely.  You have talked about this, you have talked

24  about that.  You talk now specifically about percentages

25  based upon the irrigable acreages.

20,824

MR. VEEDER:  Yes, I have.

THE COURT:  In substance, are you asking the Court in principle to make a percentage apportionment without regard to what the conditions might be at any particular time?

MR. VEEDER:  I think that your Honor could make such a ruling, say that this would be the guide until something demonstrated that it was not the proper procedure to follow. In other words, as we have said today and as Mr. Kunkel has testified here on the stand before you --

THE COURT:  Will you write out tonight what you think I could say?  Let's see what you have in mind.  In principle you can say a lot of things.  You can say that the evidence now shows that there are so many irrigable acres here and there; that on principle, of course, all the riparians and overlying owners must equitably share the water.  The Court is not making any apportionment.  These are factors that may be considered.

MR. VEEDER:  I will write out what I would like to have you say.

THE COURT:  I would like to see it.  Make some copies and hand it to counsel tomorrow.

MR. VEEDER:  All right.

MR. GIRARD:  One other thing.  On this order for Colonel Bowen there are several exhibits to be attached.  I think I have forwarded the original and a copy to your Honor.

20,825

THE COURT:  Yes.

MR. GIRARD:  These are the exhibits which Colonel Bowen has prepared to be attached to that order.

THE COURT:  The Clerk took my copy last night.

THE CLERK:  Mr. Veeder's secretary has it, your Honor.

MR. VEEDER:  Yes.

MR. GIRARD:  Here is the original exhibit.

MR. VEEDER:  In regard to this order -- I don't know whether this is the time to start it or not -- I have talked to Mr. Clark about the desirability of your entry of this order.  He has directed me to say to you that the Department of Justice is opposed to the entry of this order.

MR. GIRARD:  I am certainly not advocating it.

MR. SACHSE:  I don't want it.

MR. STAHLMAN:  Okay, take it out.

MR. GIRARD:  I want it, but I am not advocating it.

MR. VEEDER:  Believe me, I have never advocated this order.

THE COURT:  Cyrano de Bergerac, the character, says "Improvise , rhapsodize."  What do you mean, you don't want this order?  Where do you think it came from?

MR. VEEDER:  It didn't come from me, your Honor.

MR. GIRARD:  You didn't draft it, I will agree.

THE COURT:  Well now, Mr. Veeder, tell me what are Mr. Clark's reasons or the Justice Department's reasons?

MR. VEEDER:  They were very simple -- and I have talked to Colonel Bowen about this -- I believe that the data, all of the data that is contained in that order can be obtained without an order.  Moreover, I believe Colonel Bowen has been obtaining data without that order.  We simply feel it is just an additional complication that very well might continue the length of this litigation.  It is a matter that, again, I would suggest if you talk to Mr. Clark, you may ask him his views on it.

THE COURT:  Where do you think this order came from?  Did I spin it full blown out of my weary head?  Did some counsel here dream it up.

MR. VEEDER:  I certainly didn't dream it up.

MR. STAHLMAN:  Oh.

MR. VEEDER:  No, indeed, I did not.

MR. STAHLMAN:  Better wake up.  You are still dreaming.

MR. SACHSE:  Mr. Krieger didn't want it.

THE COURT:  This was part of our program of collecting data looking forward possibly to the day when there would be an apportionment.

MR. VEEDER:  We filed a motion on May 14, 1962 in which we asked the kind and type of decree that we thought proper and I believe should be entered.

THE COURT:  It is pretty hard to remember just exactly all that you had in that.

20,827

1    MR. VEEDER:  One of the things we had in there in

2    particular was that there be full recognition of the rights

3    to the use of water among the parties, and that included an

4    enforcement of the stipulated judgment.  That is one of the

5    first things.

6    MR. GIRARD:  Mr. Veeder filed this motion wherein he

7    asks for many things, including a revitalizing of the

8    stipulated judgment, et cetera.  As I recall, Colonel Bowen

9    was specifically asked the question by the Court as to

10   whether there was enough factual information available

11   today actually to make the determinations that would be

12   necessary for an apportionment, and I think his answer was

13   no, and this was one of the vehicles with which I will go

14   along -- I am not advocating it -- that Colonel Bowen was

15   going to have this power instead of actually accomplishing

16   meters.  Mr. Littleworth opposed meters on the basis of

17   cost.

18   THE COURT:  The Government had requested metering?

19   MR. GIRARD:  Yes.

20   MR. VEEDER:  No.

21   THE COURT: What?

22   MR. VEEDER:  No, I don't recall that there was any

23   specific reference ever to meters by anyone.  The way the

24   matter of meters came up, if I remember correctly, your

25   Honor, was this way --

1    THE COURT:  I will tell you how it came up.  You approved

2    the letter I sent around to a lot of these big users, rather

3    their attorneys, telling them to come in on a hearing and

4    we are going to talk about meters.

5       MR. GIRARD:  Yes.

6       THE COURT:  And Mr. Littleworth came in and opposed

7    meters.

8       MR. VEEDER:  May I point out how this occurred?  The

9    question came up as to how we could determine any methods of

10   regulation.  Colonel Bowen in a letter said the best way to

11   make that determination was by metering.  But we didn't file

12   a motion seeking meters to be put on.

13      MR. SACHSE:  No, you didn't do that, that is correct,

14   in so many words ask for meters.

15      MR. VEEDER:  No, I didn't.

16      MR. GIRARD:  Anyway, it was felt -- and I think Colonel

17   Bowen agreed with this -- that under this order he could

18   proceed to gather the same information as would be gathered

19   from meters; that we were going to use this method as a

20   preliminary approach to determine that factor.  I think the

21   last paragraph in there, as I recall, at the last session

22   your Honor suggested I put it in, to the effect that sanctions

23   would result in an order requiring meters.

24      THE COURT:  Yes.  I think it is a good idea.

25      MR. GIRARD:  I think it is a good idea.  I am not

20,829

1    advocating it.  But if the Government objects to it --

2        MR. VEEDER:  We don't advocate the order at all, your

3    Honor.

4        THE COURT:  Do you oppose it?

5        MR. VEEDER:  I was directed to oppose it, but if your

6    Honor wanted to enter it, it is up to your Honor.

7        MR. GIRARD:  If that is the case, your Honor, then maybe

8    in light of the fact that this isn't an apportionment

9    proceeding it might be premature.  I am agreeable to it.

10       MR. STAHLMAN:  It is directed toward attempting to

11   accomplish Mr. Veeder's insistence that we get some form of

12   apportionment.  He talked about it for days here and that is

13   what came out of this thing.  If he wants to withdraw it --

14       THE COURT:  Frankly, I don't understand the Government's

15   attitude.  It sounds to me like they probably have abandoned

16   the dam, have abandoned the compromise talks, and propose

17   to have a final judgment entered and to take an appeal.  That

18   is the impression I begin to get out of this.

19       MR. VEEDER:  There is no reason for your Honor to get

20   that impression from anything I have said.

21       MR. SACHSE:  If the United States doesn't want this,

22   I think your Honor is well aware that the people in the

23   Murrieta don't want it, Fallbrook doesn't want it, I don't

24   think Mr. Stahlman  wants it.

25       MR. GIRARD:  I think it is necessary, and I think on

behalf of the State I am going to ask for it.

THE COURT:  One of the few concrete things that have come out of this lawsuit -- start to compile records in an orderly manner, where Vail is metering, the United States is metering.  We would now have other big owners metering.  One of the few concrete things to come out of this lawsuit.

MR. STAHLMAN:  I know he wanted to know who the major water users were.  Mr. Veeder talked about that time and time again, and this is one way.  This is what this does.

THE COURT:  All right, Mr. Stahlman doesn't care, Mr. Sachse doesn't care, Mr. Girard would like it, Mr. Veeder opposes it but will not fight if it is entered.  The Colonel here is almost counsel in the case.  What is your view?

COLONEL BOWEN:  Well, your Honor, this matter arose from discussions with Mr. Clark back in Washington last fall when I was back there on official business, in which one of the sources of data, or I should say one of the areas in which our data was absent or limited was the discharge of water by artificial means from these groundwater areas, and I informed him at that time that I thought your Honor would be willing to sign an order requiring people considered to be substantial users to put meters on their wells.  And that led up to this hearing last time in which the matter was examined and your Honor examined me to see whether by means of land use surveys a valuation of electric use charges, et

cetera, we could arrive at the consumptive use of water.

I replied in the affirmative, and from that then stemmed this approach to go for at least a year on this basis.

It is true, as Mr. Veeder said, I can probably go out and get this information from the farmers without an order. I have prepared these exhibits which Mr. Girard attached to the order, showing the well data and the irrigable acreage of substantial users without an order. It is an orderly system of gathering the information. I don't know what difficulties I will encounter when I mail forms out to people without any official order. It may well be that they will respond and give us the information we want. If they will, I can well do without an order. If they will not, then I might be in a position where I would have to come back and ask your Honor for some help.

THE COURT: I am inclined to agree with Mr. Girard. I think I will sign the order. I will see what Mr. Clark has to say tomorrow.

Have we put on the shelf entirely the idea of some ultimate order requiring the Government to make this filing on DeLuz? Have we rejected that entirely, or are we waiting to see?

MR. GIRARD: I think we ought to wait and see what comes out of Mr. Sachse's and Mr. Clark's negotiations.

20,832

1      MR. SACHSE:   I would concur, your Honor.   One of the

2  things I will request, from my standpoint, to discuss is this

3  problem, because I have to tell Mr. Clark that without some

4  sort of State authorization I don't think we can go at all.

5      THE COURT:   You are going to write out some material

6  and have copies of it for counsel in the morning as to what

7  this is I can do that will apparently satisfy you and clarify

8  the matter for the engineers and all this business about

9  percentages, acreages, or something?

10     MR. VEEDER:   Yes, your Honor, I will undertake that.

11     THE COURT:   All right, tomorrow morning at 10:00

12  o'clock.

13      (Whereupon, an adjournment was taken until 10:00   )

14      (                              )

      (o'clock a.m., Wednesday, December 13, 1962.   )

15

16

17                    ---o0o---

18

19

20

21

22

23

24

25

20,833

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date specified therein, and that my said transcript is a true and correct transcription of stenographic notes.

Dated this _13th_ day of _December_, AD, 1962 .


_John Swader_
Official Reporter