# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

      No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

        Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Wednesday, December 12, 1962

Pages:    20,834 - 20,931

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
              DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 209                                              20,834

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>  Plaintiff, )<br>)<br>v. )<br>)<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, et al., )<br>)<br>  Defendants. )<br>_____) | No. 1247-SD-C |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, December 12, 1962

APPEARANCES:

|   |   |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ.,<br>Special Assistant to the<br>Attorney General |
|   | COMMANDER DONALD REDD |
| For Defendant Vail: | GEORGE STAHLMAN, ESQ. |
| For Defendant Fallbrook: | FRANZ R. SACHSE, ESQ. |
| For Defendant State of<br>California: | FRED GIRARD, ESQ.,<br>Deputy Attorney General<br>of State of California |

20,834-A

1

2

3    __WITNESS__

4    WALTER HOFMANN          Examination by the Court
                            and various attorneys:    Page 20,885
5

6

7                          ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20,835

SAN DIEGO, CALIFORNIA, WEDNESDAY, DECEMBER 12, 1962, 10:00 AM

---o0o---

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  Your Honor, we have in the courtroom the

gentlemen from Murrieta I mentioned yesterday.  This is

Mr. Raymond Thompson, Mr. Paul Thompson, and Mr. Carl Cain.

I suggested to them that you were certainly willing

to entertain an informal    statement from them on what their

proposed plan is for the consolidation of a district and the

preparation for the purpose of building a municipal water

supply.

Now I think either Mr. Thompson, or whoever their

spokesman is, could outline better than I can their plan.  I

have shown you the letter of May 3rd to Mr. Ramsey Clark,

and that is what precipitated this particular situation.

MR. SACHSE:  Will you give me a copy?

(Mr. Veeder hands Mr. Sachse a document.)

MR. SACHSE:  Thank you.

MR. VEEDER:  Mr. Thompson, would you explain?

MR. RAYMOND THOMPSON:  I am totally unprepared to present

this thing.  I didn't know this is what was going to happen.

We got a phone call last week that Mr. Veeder was wanting

to see us sometime this week.

THE COURT:  Well, you are not in any trouble.  We just

1  wanted to talk the matter over with you, because from the

2  short conference we had yesterday we think there may be ways

3  in which you may proceed up there to accomplish this

4  objective, and there are other ways that you proceed that

5  you may be in trouble.  We just thought we would ask you

6  down here.  You will actually be getting a little free legal

7  advice from some very competent counsel sitting over here at

8  the counsel table.

9      MR. RAYMOND THOMPSON:  We certainly appreciate the

10  invitation.

11      THE COURT:  What do you want to accomplish?  You have a

12  water district election set?

13      MR. RAYMOND THOMPSON:  That is right, your Honor.  We

14  do not have a water district yet.   Our election is set for

15  the 8th of January.

16          There are quite a few people in our district, or

17  in our proposed district, who are apprehensive about our

18  water rights and don't feel we should have a district unless

19  we have some possible way of developing the water.  And most

20  of us feel that way, and we would like to get some kind of

21  assurance from either your office or some place that we will

22  be able to proceed to develop our system for the distribution

23  of our water.

24          You are well aware of the fact that our water table

25  has dropped and the individuals can't afford to sink deeper

1   and deeper wells to furnish their house with water.  So what

2   we are trying to do, basically and honestly, is just get

3   together and put down a big well so we can distribute the

4   water and continue to live on our land.

5       THE COURT:  Well now, Mr. Girard, here, is the Deputy

6   Attorney General representing the State of California.

7       Suppose you state for the record here what flows

8   from the formation of a water district and what would flow

9   from the setting up of some mutual district to use existing

10   and new wells.

11       MR. GIRARD:  I think, as evidenced by the letter, the

12   intent was to form a County Water District through the

13   County.

14       MR. RAYMOND THOMPSON:  Yes, sir.

15       MR. GIRARD:  And I think it is clear that if that is

16   done the County could not pump water without getting from

17   the State a permit to appropriate water.  Also -- and this

18   is just my opinion -- the chances of getting an appropriative

19   right to pump groundwater out of Murrieta Valley would be

20   nil, because I don't think there are any unappropriated

21   groundwaters in the Murrieta groundwater basin.

22       If you are talking about importing water, such as

23   Feather River or Colorado water, then, of course, your County

24   District would be the right vehicle to use.  If you are

25   talking about using the groundwaters in the basin, I don't

20,838

1   think you can accomplish what you hope to accomplish by

2   the formation of a County Water District.

3            However, there is an alternative basis which you

4   can use, which can be formed, which is a mutual water company,

5   which in essence is a group of landowners who get together

6   and form their own company and transfer their overlying or

7   riparian rights to that company, and they operate it for the

8   landowners who have the individual riparian and overlying

9   rights.  I believe your San Luis Rey is one of those, isn't

10  it?

11           MR. STAHLMAN:  Yes.

12           MR. GIRARD:  That can be done.  That way you would not

13  have to get an appropriative right.  You would in essence be

14  exercising the individual landowner's riparian right or

15  overlying right, which all you gentlemen in Murrieta have.

16           Now the formation of a mutual water company

17  certainly will require you to contact attorneys who can set

18  it up for you.  It is not an absolutely simple thing.  You

19  couldn't do it by yourself.  But I think you ought to explore

20  that avenue if you are interested in a community well for

21  domestic water.  I think that is the only vehicle you have.

22           This is just personal advice and it is just worth

23  what you pay for it.

24           THE COURT:  Which is nothing.

25           MR.  GIRARD:  But I think your chances of getting a

20,839

1   water right which you can use in going through your County

2   Water District are very poor.

3       THE COURT:  Mr. Girard has thrown a lot of things at

4   you in a hurry, and I don't know whether you understand all

5   these terms.  Let's go back.

6           You see, if you set up a County Water District, that

7   becomes a new entity, and for it to have any rights to pump

8   water it would have to, I agree with Mr. Girard, make

9   application to the State to appropriate water.  You can only

10  appropriate water which is, in substance, excess unappropriated

11  water -- water on which there are no claims.  You and I, of

12  course, can agree that there is not that kind of water in

13  Murrieta.  There is a shortage of water.  You say that well

14  levels are going down.  So there is no unappropriated water

15  to get.  So if you go the route of this County Water District

16  you are probably going to end up nowhere, unless you merely

17  use the district as a contracting agency to contract for

18  outside water -- Feather River or Metropolitan.

19          On the other hand, each of you as landowners have

20  good water rights because you overlie a lot of water.  There

21  is not much difference legally between what we call a

22  riparian right and an overlying right.   You actually have

23  overlying rights over a basin.

24          If you pool your rights and attempt to use existing

25  wells or develop some of the wells to greater depth and set

20,840

1    up a distribution system, you then are exercising the rights

2    you already have, your overlying rights, and you are merely

3    setting up a businesslike economical setup to pump from one

4    or two wells and to pipe it around for domestic use and

5    everybody gets water.   That seems to me the route you ought

6    to go.

7        MR. RAYMOND THOMPSON:   We contacted the Messrs. Krieger

8    and they told us that there had been the decision in Colton,

9    I believe, by a Judge Ross, whom you may know, that

10   accumulative water rights, such as you have just mentioned,

11   overlying landowners pooling their water rights and, you

12   might say, giving them to a public entity or a district or

13   mutual water company, was no longer legal to do that.

14       MR. STAHLMAN:   May I take a little shot at this?   I have

15   been through some of this.

16       THE COURT:   Wait.   Is anybody familiar with this Colton

17   case?

18       MR. SACHSE:   Not at all.

19       MR. GIRARD:   There is a decision out of that, but it

20   doesn't involve that point.   This must have been just a trial

21   court decision.

22       THE COURT:   Yes, sir.

23       MR. PAUL THOMPSON:   To go into what Raymond says here,

24   the three of us spent about two hours in Mr. Krieger's office.

25   We did not speak with Mr. Littleworth or Mr. Krieger, but we

1   talked to a Mr. Bramwell -- this was in the latter part of

2   October, and to quote him as near as I can, he says, just

3   two weeks when we were exploring this idea of forming a

4   mutual and assigning all the water rights from the individual

5   landowners into one well, he made that flat statement just

6   two weeks ago that this Judge Ross had ruled that out.   I

7   was just wondering.

8        MR. STAHLMAN:   Your Honor, I am not familiar with that

9   case.   That may have been a trial court case.

10        THE COURT:   This is George Stahlman.

11        MR. STAHLMAN:   May we have that sheet of paper here.   I

12   think I can illustrate something here.

13        The Court in this case has already signed an

14   Interlocutory Judgment and Findings in relation to a ground-

15   water area, it is called, extending all the way from north

16   of Murrieta on down.   Let us assume this would be that ground-

17   water area just as a boundary.   Now, within that groundwater

18   area Murrieta lies.   Also, there is the Murrieta Creek that

19   comes through about in here.

20        Now, the Creek has been defined in this decree as

21   being the younger alluvial fill, the bed and banks, and then

22   outside of that -- the banks would go through here -- all

23   of this land here is overlying and has what is known as

24   overlying rights.   The properties which abut upon the creek

25   here have the riparian rights.

20,842

1    Now, this question that you have here  has already

2  been settled.  This case of San Bernardino vs. Riverside

3  is very plain; in reading the syllabus it is very plain upon

4  this question that, under these circumstances, they cannot

5  do it.

6    THE COURT:  What is the citation?

7    MR. STAHLMAN:  San Bernardino vs. Riverside, 186 Cal. 7,

8  your Honor, and it is Syllabus No. 10, which is very short,

9  and I can just read it here -- it is expanded upon, of course,

10  in the decision:

11    "A city situated in an artesian basin which

12    overlies a part of the subterranean waters of the

13    basin has no right to such waters on the theory

14    that the underlying waters of the basin are by law

15    subject to public use for the common benefit of the

16    overlying lands and of the inhabitants of the basin,

17    and that the city is substituted to the individual

18    rights of landowners for the benefit of all, since

19    the water is private property and the rights of the

20    city as a municipality are not to be measured either

21    by the law regarding riparian rights or by the law

22    concerning the rights of the landowner in water

23    underlying his land."

24    In other words, in that case the city, the

25  municipality, attempted to take within their system and to

1    distribute the water to the people who live within the city,

2    who undoubtedly had overlying rights.

3        THE COURT:  Apparently, they contended that since these

4    people lived in the city and owned land and had overlying

5    rights the city in some way collectively owned all their

6    rights?

7        MR. STAHLMAN:  Yes, your Honor.

8        THE COURT:  So this is an authority which would be

9    contrary to their present line of approach.

10       MR. STAHLMAN:  Yes.  I think I agree with Mr. Girard.

11       THE COURT:  Because a county water district wouldn't

12   be much different than a city.

13       Do you follow me?

14       MR. RAYMOND THOMPSON:  Would it be contrary to the

15   mutual setup?

16       MR. STAHLMAN:  I am not familiar with this decision to

17   which you have referred.  It must have been a Superior Court

18   decision.

19       But there is case  of Carlsbad vs. San Luis Rey

20   Heights.  I don't have the citation.  In that case there was

21   organized the San Luis Rey Heights Mutual Water Company --

22   I have been on the Board of Directors of that company for

23   about 14 years, so I am familiar with this -- and they

24   attacked the riparian rights of the mutual water company.

25       In that case, when a tract was first laid out --

20,844

which tract was divided up into parcels and sold, and since
then of course it has been further diveded and redivided and
has continued to be so -- the entire tract transferred all
of their water rights to the mutual water company.  Then the
mutual water company became the agent for the owners of the
water rights to distribute the waters.  And under those
circumstances they held that the entire tract and each piece
of land would have the right to have riparian rights.  But
they did it upon the basis that there had to be a subdivision
of stock owned by each individual in the water company which
was in proportion to the individual's acreage, and it was
divided into hundredths of acres.  A person up there who
might only have 3.97 acres might have 3.97 shares of stock,
and that is checked each time there is a transfer.  And
under those circumstances the court ruled -- Judge Henderson,
who was supposed to be a pretty good water lawyer from
Ventura County, ruled that they do have the riparian rights,
and that ruling has been sustained.

Now, there is one other thing.  In an overlying
basin -- I don't have the authority for this, but I am quite
sure it has been done and I am sure there is authority for
it -- the individual doesn't have to have his own pump.  I
think five or six or a group of any number of people could
get together and put down a pump if they are pumping water
from a common source and distribute it to their lands.  I am

20,845

1 quite sure that can be done.  I don't know whether some of

2 these other lawyers agree with me, but I am quite sure it

3 could be done.  I don't think you have to put down an

4 individual pump on each individual piece of land, but there

5 again you would have to have the agreement between the

6 parties to do it.

   MR. VEEDER:  When you say "between the parties," do you

8 mean all of the parties?

9   MR. STAHLMAN:  The parties who would actually use the

10 water would have to agree.

11   MR. VEEDER:  I think that should be clear.

12   THE COURT:  Mr. Sachse shakes his head on that.

13   MR. SACHSE:  I don't think they can do it, for two

14 reasons.

15   THE COURT:  What can they do?  And what can't they do?

16   MR. SACHSE:  First, I will say I agree completely with

17 George and Fred that the creation of a county water district,

18 which is just another form of municipal corporation, does not

19 give that district the right to exercise the overlying or

20 riparian rights of its constituent population.

21   THE COURT:   Suppose the population constituents

22 conveyed to them their rights?

23   MR. SACHSE:  They can't do it.

24   MR. GIRARD:  It has to be with the land.

25   MR. SACHSE:  It has to be with the land.  The riparian

or overlying right is an integral part of the land.

THE COURT:   Go ahead.

MR. SACHSE:   And Mr. Stahlman's case is absolutely on the button, and there have been many others like it.   In fact, this whole question is involved in that brief I wrote on the question of military use.   The background of it goes into the same thing.

So I don't think this county water district can do them any good at all, unless it gets a permit from the State.   I am not prepared to say whether they can do that or not, but they would have to apply and have a hearing and get a permit.

Now, if they want to form a county water district for a vehicle possibly to get Colorado water by annexation of Western Municipal, fine, that is perfectly proper.   Or to exercise other powers -- for instance the county water district can run a sewer system.

In other words, there is nothing illegal with your forming a county water district.   But the moment that that district tried to pump from one of these wells and to distribute it in your area, it is my judgment that you would be subject to injunction by anybody with a right in the stream from the Navy at the ocean clear up to anybody right up to the boundaries of his property.

I don't know anything about this Colton case, but

1   my understanding is exactly as Mr. Stahlman stated, that if

2   two conditions are met, individuals can convey their rights

3   to a private corporation, and the two conditions are that they

4   have to convey their rights and they can't keep their own

5   right to drill a well and also pretend to give the right to

6   the mutual.

7            In other words, George hasn't any right any more

8   to have a well in San Luis Rey; he has surrendered the whole

9   thing to the mutual and it is acting for him.  But if they

10  can do that and if they require that that right be pertinent

11  and stick to the property and can't be transferred away from

12  it or transferred to different property, then a mutual water

13  company could do this, as far as I am aware.

14           I have never heard anything about this decision

15  by Judge Ross.

16       THE COURT:  Where is the distinction?  Why couldn't the

17  same type of conveyance be made to a county water district

18  that could be made to a mutual, if there were the same

19  conditions met?

20       MR. SACHSE:  If they surrendered all of their private

21  riparian right or private overlying right to the county,

22  maybe that could be done.  But that would take then a

23  separate act, one different from the manner of the formation

24  of a county water district.

25       THE COURT:  I agree.

1     MR. SACHSE:  The county water district alone gives them

2     no right.  I am not prepared to give an opinion whether in a

3     single little overlying basin like this with everybody

4     involved, where the individual surrendered his right to an

5     individual well and surrendered all his water rights to a

6     business agency, I am not prepared to give an opinion whether

7     they could do that or not.  I don't know.  That gets into a

8     lot of complications about this basic issue of a riparian use

9     and municipal use as not being a proper riparian right.

10         On this question of five or six people just

11    getting together on a contract for use of a single well, I

12    think, with all due respect to you, George, you are wrong.

13    There are two objections:  (1) It has to be a public utility

14    -- if more than two people are involved, it is going to come

15    under the California Public Utility Code and it is going to

16    have its rates approved; and (2) If these people get together,

17    each of their overlying rights is on his land and he hasn't

18    any right to export it to anybody else.  I would question

19    their ability to do it.

20    MR. GIRARD:  The answer to your question is that in a

21    mutual water company the ownership is, in essence, the same.

22    In other words, they transfer their water rights to the

23    mutual water company for distribution purposes, but they

24    get back stock so that they still own their proportionate

25    share equivalent to their water right.  Whereas, in the case

20,849

of a county agency you could transfer it to the agency, but there is no provision where a public agency can give back any ownership.  So you would have to go through a private corporation -- which is all a mutual water company is.

MR. STAHLMAN:  Here is their big problem in this case, I think.  I am not familiar with the Colton situation.  But I assume that the reason for the municipal type of organization, the county water agency, is that probably everybody within the boundaries of their proposed district do not agree with this a hundred per cent, so they want to have an election.  So, under those circumstances, if the majority of the people voted for it, it would carry and the organization would come into existence.

THE COURT:  While the mutual would have to be done by agreement?

MR. STAHLMAN:  Yes, your Honor.

THE COURT: And you might find a situation where, for instance, the fellow who owned a piece of ground where your mutual had to put through a line wouldn't go along?

MR. STAHLMAN:  Then on the other hand, there is probably somebody in that area who might have a well that is doing what he wants it to do at the present time and he doesn't want to come in.  I don't know.

MR. RAYMOND THOMPSON:  That is correct.

THE COURT:  Did anybody talk to Mr. Littleworth or Mr. Krieger?

MR. SACHSE:  I spoke to Mr. Littleworth this morning and yesterday, your Honor.  He didn't mention this mutual case to me, but he stated that his advice, or his firm's advice to these gentlemen had been the same as Mr. Girard, Mr. Stahlman and I have expressed here -- that a county water district could not exercise all or any of the rights of its constituent landowners, that they had to get an independent appropriative right from the State of California.

THE COURT:  Which they probably couldn't get.

MR. SACHSE:  That is a question.  I doubt if they could get it, but maybe they could.

THE COURT:  Mr. Cain.

MR. CARL CAIN:  I certainly want to thank everyone for the wonderful advice that we are getting here.

I would like to differ a little bit with the statement that Best, Best and Krieger had given us similar information, which is only partly true.  In other words, we hadn't been told that our county water district was not the right method of approach.  If we had been, we wouldn't be down here bothering you people in this part of our attempt to get the right organization.

We are here to learn and we are not here to criticize.  But I do want to correct that statement.  We

1    hadn't been advised to this extent.

2         I would like to ask this question.  What does a

3    permit that a county water district gets from the State, what

4    does that allow them to do?  I am not asking this question

5    because I am insisting on a county water district.  I just

6    want to find out what we would get if we had it.

7         MR. STAHLMAN:  One thing we hadn't mentioned here, at

8    least in these terms, and that is that the only permit a

9    State could give would be a permit to use surplus waters, and

10   the very fact that you are a little bit distressed up there

11   about the lack of supply would seem to indicate that there

12   is no surplus water there.  But no one can tell what a State

13   agency is going to do -- I couldn't speak for them, but I

14   would think that under those circumstances there would be

15   some difficulty.

16        I think one other thing might be made clear to

17   this gentleman that was expressed here yesterday -- and I

18   think everybody is in agreement here -- and that is that

19   ourpeople whom we represent -- I am speaking for myself, and

20   I think this is the attitude of the others here -- do not

21   have any objection to these peoples' objective, because they

22   wouldn't be, in essence, taking any more water than probably

23   they are entitled to.

24        It seems to me that with all the different types

25   of organizations -- I think at one time there were a

hundred-some different types of water organizations that can

be organized in the State of California under the various

laws -- it would seem to me that there would certainly be

some adequate way, probably not under those organizations,

but under some form of partnership that this could be

accomplished where it is a reasonable thing.  The law

certainly should be adequate to provide a method.

I expressed myself that I thought people could get

together in a water company that would establish rates,

probably on the basis of a partnership where everybody would

participate in the cost of pumping and distribut the water.

I don't know.  I am not sure of that.  But it seems to me

there should be some avenue.

THE COURT:  Yes.

Let me emphasize that, outside of your practical

difficulties such as having to deepen a well, actually you

are in the best possible position as far as water rights

are concerned, because most of your uses up there are

domestic uses.  I am talking now particularly about the small

householders -- a few trees and chickens and that sort of

thing, where you are not farming, but your use is a domestic

one.  That is, of course, the highest priority of any water

right.   You lie right over water, and so you have rights.

Now, the practical question is, what are you going

to do about it?  I assume that the setting up of a mutual

20,853

company, of course, has to proceed on a voluntary basis and
you may be able to get a program laid out.  You undoubtedly
need the aid of counsel to get various individuals to agree
to come along.  The owners might be strung all over the
valley.  I suppose there would have to be continuity in the
pieces of ground.  If you have a group of people at one end
and a group of people at the other end, and if there were a
group in between who didn't want to come in, you might have
serious problems about installing pipe lines between the
two areas.  But once you got started with contiguous pieces
of ground, it seems to me you could add on additional pieces
of ground as people would come along.

MR. SACHSE:  I would like to make only one thing clear
to Mr. Cain.  Apparently you understood me to say that
because this is a county water district you can't do it.
That isn't what I meant to imply at all.  No public
corporation -- put it that way -- no public corporation,
whether you are a city, public utility district, municipal
water district, county water district, whatever you are, can
do it, in my opinion.

THE COURT:  Put it this way.  Just because this public
entity is created, it does not automatically acquire the
water rights which you people own.  So you create the
district, but it has no water rights.  We have explored
the question whether you could convey your water rights to

1    the public district and get back, we will say, stock.

2        MR. SACHSE:  I don't think you can.

3        THE COURT:  Mr. Girard gives a pretty good answer to

4    that -- that the corporate powers might permit you to convey

5    these to a district, but there would be no way to convey back

6    your proportionate share, and then you would be up against

7    the same proposition.

8             Well, I don't know that there is anything that we

9    can do about it.  I would guess that if the district were

10   formed and attempted to set up pipe lines and to pump water

11   without a State permit, that somebody who is riparian would

12   bring an action here; and that if you apply for a State

13   permit to appropriate surplus excess water, of which I don't

14   think there is any, you would undoubtedly be opposed by a

15   State body.

16       MR. STAHLMAN:  One other very interesting thing in that

17   respect, and that is that even though the State gives a permit

18   and the State should decide that there is surplus water, a

19   court can secondguess them.  We had that situation -- Mr.

20   Sachse and I are aware of it -- that occurred before.

21       MR. SACHSE:  It seems to me that this would be the

22   logical thing.  I am giving practical advice now, not legal.

23   I don't know how close you are to Western's or Eastern's

24   boundary.  I don't know how much additional cost would be

25   involved to put in a pipe line.  I think the practical approach

20,855

1    for you people is to form your district and annex to the

2    Western and get the import supply.

3        MR. VEEDER:  Mr. Paul Thompson would like to respond to

4    Mr. Sachse.  Excuse me  for interrupting, your Honor.

5        THE COURT:  Mr. Thompson.

6        MR. PAUL THOMPSON:  I think that is the ultimate answer

7    to the water problem -- to get outside water.  At the present

8    time we are right adjoining Western Municipal -- in fact a

9    couple of miles.  The distributing agent is the Elsinore

10    Municipal Water Company.  But that would involve long extended

11    pipe lines, again.  We are about 10 or 12 miles from the end

12    of the canal.  I have had the figures.  It figures around

13    $30,000 to $35,000 a mile.  This would take $350,000.

14        It is my understanding, according to the newspaper

15    reports and others that we hear, that Metropolitan now has

16    the policy of requiring  a hundred dollar annexation fee

17    to belong to the district, which is not unreasonable for a

18    domestic use.  But to make it practical we would have to

19    wait until the agriculture interests in what we term French

20    Valley cooperate with us.  And then we are up against the

21    problem that even a joint ownership in a line would cost a

22    small area in the neighborhood of $300,000 or more to

23    transport water into the valley.  I agree that in ten years

24    you might have enough of an assessed valuation that you can

25    do it.  Now it is a question of whether it is practical or

20,856

not.

MR. CAIN:  Well, again, I would like to emphasize that we want to thank you for what you are saying and doing for us here, and we certainly want to express our appreciation to you.

MR. SACHSE:  I suggested to the gentlemen that they might ask John to run a separate extract of this so that they can have it to take back to their constituents.  One of you might leave your name and address.

MR. CAIN:  May I ask this question.  On this mutual water company set up -- which would be, as I understand, a private corporation --- of course, one of the big reasons would be to get a composite group to all go together and surrender their water rights et cetera  through this mutual water company without having some little group here and a little group over here, et cetera.  But under a mutual water company setup, then, aren't we wide open to costs in the form of taxation et cetera that we wouldn't be in the case of a county water district, if it were feasible.

Again, don't take me wrong.

MR. STAHLMAN:  The facilities -- the personal property, your pipe lines and reservoirs, if you have any, and your pumps, are assessed and taxed.

MR. CAIN:  Somebody along the line had been given to understand -- I can't tell you just exactly when -- that they

20,857

felt that in the long run the mutual water company was

somewhat economically unsound because of just that fact,

that it would gradually be taxed, you might say, out of the

picture.   That is not  the way it was said.

MR. STAHLMAN:  They are fairly substantial in San Diego

County, where I am familiar with it.   I don't know how

Riverside would be on that.

MR. CAIN:  Also, I think that we here, and other people

in our area, had it in mind that we feel that 10 or 15 years

from now it could be that we would be ready to accept

imported water, and we felt that instead of going along

unorganized -- nothing has been done et cetera -- until the

time it might be available and there might be some increased

growth and development in the area, we would be ready and

in position to accept the imported water instead of waiting

until we needed it desperately, and then we would have to

go through all the steps to get organized.

And yet at the same time the immediate need right

now is this.   There is always someone in our area that is

hauling water.   I mean, somebody deepens a well.   Fine, they

are good for two or three years.   But right along beside

them here is another party and they are actually running a

hose line from that man's property to theirs to get enough

water to wash the dishes et cetera, or else they are hauling

it from some place.   And this is going on continually in our

little area.

MR. STAHLMAN:  You should have been here yesterday. Mr. Veeder said he wanted half of that water down at Camp Pendleton.

MR. VEEDER:  What's this now?

MR. CAIN:  I want to qualify my statement.  We are looking into the future and we are looking at the present. There is a present need and we feel there will eventually be a future need.

MR. VEEDER:  Your Honor, I think the record should show that all these gentlemen who have spoken here are defendants. Their lands are included in your Interlocutory Judgment No. 30, and from our standpoint, from the standpoint of the United States, we assure them of our cooperation.  While I don't have the final say, I don't believe there will ever be any difficulty from the United States if you gentlemen can accomplish the ends you have outlined.

THE COURT:  What would be the position of the United States if they formed a county water district and went up to the State of California and made application to appropriate unappropriated water in the Murrieta Valley?

MR. VEEDER:  If that should occur, I would meet the problem at that time.

THE COURT:  Yes.

MR. GIRARD:  Your Honor, I would like to lodge the

1    original and a copy --

2        THE COURT:  Are we through?

3            You gentlemen may stay or leave.  You are welcome.

4    But I think we have concluded that end of it.

5        MR. RAYMOND THOMPSON:  Thank you for your time again.

6        MR. PAUL THOMPSON:  Yes, we want to thank you again.

7        THE COURT:  Mr. Girard.

8        MR. GIRARD:  I would like to lodge an original and a

9    copy of the proposed findings of fact, conclusions of law

10   and Interlocutory Judgment No. 40 for the Aguanga groundwater

11   area.  Colonel Bowen and Commander Redd prepared the

12   exhibits, which I haven't stapled on to them yet, but I

13   belive Mr. Luddy can do that at the recess.  This is the

14   original and a copy.  The typed one is the original, your

15   Honor.

16       THE COURT:  Is there a map?

17       MR. GIRARD:  No map, no.  The only real problem, I

18   think, is that Gibbon and Cottle is within the   Aguanga

19   groundwater area, and their rights have not been determined

20   yet in an interlocutory judgment.  I checked with the Clerk

21   today and I got the Number 43 for Gibbon and Cottle's findings

22   of fact, conclusions of law and the interlocutory judgment.

23   You will note in Finding of Fact No. 32 in this interlocutory

24   judgment that I reserved jurisdiction for this Court to

25   incorporate the findings of fact, conclusions of law and

1    Interlocutory Judgment No. 43 when entered.

2        MR. SACHSE:  I don't have Gibbon and Cottle's draft

3    here with me, but my recollection is that there are two

4    specific questions that might conceivably conflict with

5    something in this, aren't there?  There is a question of

6    an appropriative right of Gibbon and Cottle, and there is a

7    question of a prescriptive right.

8        MR. GIRARD:  No, neither one of those would conflict

9    with Gibbon and Cottle.  The Court has already ruled that

10   they don't have a prescriptive right.  If they are

11   determined by the Court to have an appropriative right, it

12   would be consistent with this because I believe this is

13   the standard provision which says, "Except as modified in

14   any another interlocutory judgment".  In other words, if in

15   their Interlocutory Judgment No. 43 they are found to have

16   an appropriative right, they would stand in exactly the

17   same position as you did.

18       MR. SACHSE:  I see.  In other words, you are saying

19   here that some appropriative rights are described in

20   exhibits attached to this?

21       MR. GIRARD:  Yes.

22       MR. SACHSE:  So if Gibbon and Cottle has an appropriative

23   right it should be covered.  It is not a statutory

24   appropriation.

25       MR. GIRARD:     No.

1   MR. SACHSE:  It is non-statutory, so it will have to be

2   covered by an interlocutory judgment of the Court.

3   THE COURT:  That is right.

4   MR. VEEDER:  Are you saying that would be an additional

5   interlocutory judgment, or how would that be accomplished?

6   MR. GIRARD:  Gibbon and Cottle would be taken care of

7   by a separate interlocutory judgment the same as Fallbrook,

8   Vail and other people who have litigated their rights before

9   the Court.

10   MR. VEEDER:  And that would be No. 43, and as soon as

11   his Honor rules on the question of an appropriative right --

12   MR. GIRARD:  It is a very simple matter to write it.

13   I don't think there is any dispute as to the facts.  All of

14   their land is clearly within the Aguanga groundwater area.

15   I think all of it is within the younger alluvium.  I am not

16   sure.  Is that right, Ace?

17   MR. VEEDER:  No.

18   MR. GIRARD:  No what?

19   MR. VEEDER:  There are some of the wells on Gibbon and

20   Cottle that are up in the older continental alluvium.

21   MR. GIRARD:  It will be a simple matter to draft.

22   MR. VEEDER:  I haven't seen this setup, but you go

23   ahead.

24   MR. GIRARD:  I made the corrections which we suggested

25   at the last session.

20,862

THE COURT:  Have you been over this?

MR. VEEDER:  No, your Honor.

MR. GIRARD:  He has been over it, your Honor, except --
we went over this at the last meeting, Bill.

MR. VEEDER:  As I say, I haven't seen this.

MR. GIRARD:  Except for Findings of Fact No. 30, 31 and
32, and that is the procedure I followed to take care of
Knox, Oviatt and Gibbon and Cottle.  The reason I followed
that procedure is that we already have detailed interlocutory
judgments filed for Knox and Oviatt.  Oviatt, for example,
is in an interlocutory judgment that takes into account a
lot of areas which are without the Aguanga groundwater area,
so it would have been impossible to incorporate all of that
judgment into this.  So rather than have to rewrite the
Oviatt judgment to have a separate judgment just for the
lands without the Aguanga groundwater area, I incorporated
provisions of that judgment which deal with the lands within
Aguanga.  I went through the Knox and Oviatt judgments and
I don't think there is any inconsistency between these and
those.

        I have one brief question of the Colonel, which I
will straighten up at lunch time.

THE COURT:  That sounds like a proper way to handle it,
doesn't it, Mr. Veeder?

MR. VEEDER:  I have no objection to it, other than my

20,863

1 standing objection I am going to make.

2     THE COURT: What is your standing objection?  This is a

3 groundwater area where I am following your contention that

4 this groundwater area exists.  What is this standing

5 objection?

6     MR. VEEDER:  I have the standing objection throughout

7 the case, your Honor, as to the procedure that has been

8 followed -- we are using interlocutory judgments.  I have

9 also the objection in regard to beds and banks --

10     THE COURT:  Wait.  One thing at a time.  You have had

11 no standing objection to the use of interlocutory judgments.

12     MR. VEEDER:  Yes, I have, your Honor.  I have said

13 repeatedly, and I say now, it is totally impossible by the

14 use of interlocutory judgments to tell the respective rights

15 of the parties.  I made a little experiment the other day.

16 I looked at a piece of land and tried to find out how many

17 interlocutory judgments I would have to go to, to be sure

18 I would locate this particular piece of land.  I think there

19 were seven.  And I submit, your Honor, and your Honor

20 will recall, I am sure, that I suggested a year ago that the

21 proper procedure to follow would be a single document rather

22 than several or forty.

23     THE COURT:  You suggested that eventually the various

24 interlocutories be combined into one document.  I don't

25 recall -- and I stand on the record -- that you have ever

1   objected to the use of interlocutories as such, or had any

2   so-called standing objection on that score.  You may have had

3   a standing objection on beds and banks -- there is no doubt

4   about that.

5           Let me have your pen, Mr. Clerk.

6       MR. GIRARD:  I think that takes care of every interlocu-

7   tory judgment now, except the Santa Gertrudis one, which Mr.

8   Sachse is working on, and the one above the Aguanga ground-

9   water area on Temecula Creek, which I don't believe anyone

10   is working on, and Gibbon and Cottle, which is mine.

11       MR. VEEDER:  Has Mr. Stark been advised about this

12   particular phase of it?

13       MR. GIRARD:  No. Well, he is certainly advised that

14   there has not been any decision on Gibbon and Cottle.

15       MR. VEEDER:  That it was not being incorporated into the

16   Aguanga groundwater area.

17       MR. GIRARD:  In the first place, it is being

18   incorporated into the Aguanga groundwater area.

19       MR. VEEDER:  You are going to have it independent.

20       MR. GIRARD:  Yes.

21       MR. VEEDER:  It is going to be an independent interlocu-

22   tory, however.

23       MR. GIRARD:  Yes.  I am sure he has no objection,

24   because he submitted one himself.

25          I would try to undertake drafting up the

interlocutory judgment on Temecula Creek above Aguanga groundwater area, unless somebody wants to volunteer for it, and I think that will take care of it.

MR. SACHSE:  I can have Santa Gertrudis ready by our next hearing, whenever it is.  I am sure I can. Colonel Bowen and Commander Redd have said the exhibits are not going to be a problem.

THE COURT:  Here is the original, Mr. Clerk.

MR. SACHSE:  Also, we have remaining the problem of Colonel Bowen's order.  I don't recall whether you signed that night or just indicated an intention to sign it.

THE COURT:  No, I indicated an intention to sign it.

MR. STAHLMAN:  I want to refer again to what occurred last evening.  I was rather floored when Mr. Veeder came out and objected to that.  I expressed our attitude.  His statement to the Court that he didn't ask for it and that he didn't want meters on these pumps, which is a part of this thing, I looked over the record last evening and I very hurriedly found eight statements in the record where Mr. Veeder himself made the request and confirmed it and added to the statements made by other people, and it would make very interesting reading.  It has amazed me to find how Mr. Veeder can ride two horses going in different directions at the same time.  I don't want to encumber the record again -- it is already there, but I assure you the record contains

20,866

unequivocal statements on the part of Mr. Veeder.

THE COURT:  I have signed the order.

MR. VEEDER:  That I requested this particular order?

MR. STAHLMAN:  No, that you requested meters.

THE COURT:  This was in lieu of meterings.

MR. VEEDER:  Gentlemen, you can twist the record any way you want.  It makes no difference to me.  On direction I oppose the order as drafted.  I talked to Marine Corps Headquarters.  They said they would go along with it if your Honor signed it, but they were opposed to it.  After discussion with me Mr. Clark said he was opposed to it.  That is what the record shows.

MR. STAHLMAN:  What is the reason for the opposition?

MR. VEEDER:  We are afraid it will prolong the litigation, Mr. Stahlman.

MR. STAHLMAN:  Let's have another early date and get this thing wound up and get an early judgment, then.

MR. VEEDER:  I am most anxious.

THE COURT:  What luck have you had trying to reach Mr. Clark?

MR. VEEDER:  I haven't been able to reach him, your Honor.  But he was in Los Angeles.

Your Honor, you asked me last evening to run a rapid draft of some kind of proposal for a guide as to the methods that could be pursued in determining upstream demands

1   as they relate to DeLuz Dam and also as they relate to the

2   claims of the United States for the Santa Margarita Coastal

3   Basin.

4        I have very hurriedly put together a tentative

5   suggestion in regard, at least, to a method pursuant to which

6   we could allocate, at least to the several areas, the

7   quantities of water.

8        THE COURT:  Let's take our morning recess and I will

9   look it over.

10       (Recess taken.)

11       MR. VEEDER:  Has your Honor had opportunity to look at

12   that?

13       THE COURT:  Yes, I have looked it over.

14       MR. VEEDER:  It is our position, your Honor, and to

15   some degree I will repeat what I said I think two sessions

16   ago and what I said yesterday --

17       THE COURT:  Let me interrupt just a minute.  Have you

18   got a call in for Mr. Clark?

19       MR. VEEDER:  Yes, I do, your Honor, and I have been

20   assured he is going to call me.

21       THE COURT:  Maybe he doesn't want to take a call from

22   you.  Did you tell him I wanted to talk to him?

23       MR. VEEDER:  Yes, sir, indeed, I put it on the line.

24       THE COURT:  That I was calling him?

25       MR. VEEDER:  No, that you were going to.

THE COURT:   What is Mr. Gray's name?

MR. VEEDER:   I think it is Bill Gray.   But Mr. Whelan is the United States Attorney and I put in the call for both those places.   I know Mr. Clark is in Los Angeles.   I think he is probably in conference some place.

THE COURT:   Mr. Bailiff, have my secretary put in a person-to-person call to Mr. Ramsey Clark, and try Mr. William Gray's office -- try the United States Attorney's office first and see if they know where Mr. Clark is, and if they don't know, try Mr. William Gray's office in Los Angeles.

Let's go back.   You started to say something about this.

MR. VEEDER:   There is one thing that we are searching for in regard to the ultimate ruling on the rights of the United States of America and also in regard to the calculations to be made as to the firm supply of DeLuz Dam, if it is ever built.   We think that it will be built.   We think that there will be a structure there some day.   Perliter and Soring have been hired for the purpose of calculating what that yield would be of the reservoir on Camp Pendleton.

As I pointed out yesterday, we are willing to take any adequate criterion for the purpose of calculating what the maximum upstream demands will be.   Absent knowledge of what those upstream demands are, Perliter and Soring cannot possibly tell us what could reasonably be anticipated

20,869

at the structure.

Now, as I pointed out yesterday, the United States Geological Survey, which is doing the basic data for Perliter and Soring, are likewise confronted with the problem, how much do they calculate the Vail Company is going to use from Temecula.  How much will be used by 8,500 acres in Murrieta Valley?

Now, I have simply, for the purpose of pointing out to your Honor the need of a criterion, taken the irrigable acreage of the United States and had Mr. Kunkel run it back percentagewise against a known irrigable acreage. Now, that may not be the perfect design, I am not even saying that it is, but on the knowledge that we have we feel that it is the best way to proceed.

If your Honor or anyone else has any ideas that would lend us assistance in determining what the firm supply of the reservoir at DeLuz Dam would be, we are anxious to have them.  I think what I have offered is the best way.  But if it is not, may I have some assistance from someone else?

THE BAILIFF:  He is on the line, your Honor.

THE COURT:  Pardon me.

(Recess taken.)

THE COURT:  I just talked to Mr. Clark and he is kind of surprised that the wheels haven't been turning on this

20,870

survey, and he couldn't understand why the survey shouldn't

go forward.  I will try to quote him accurately.

He says, "I think eventually somewhere along the

line we have to talk about percentages of entitlement,

et cetera, but I don't see that that has anything to do

with the reasonable yield at the dam site."

And I said, "Well, that is the view of the rest

of us here in the courtroom, except Mr. Veeder."

And I said, "We talked to Mr. Kunkel yesterday, and

apparently he didn't have much trouble in arriving at the

flow at the dam site, notwithstanding he talks about

entitlement."

I said, "In fairness to Mr. Veeder, if I can state

his position" -- and I went beyond what he said here in

court -- "It would be this:  That to convince Congress that

they should build a dam you were probably going to have to

tell Congress how much of this water the United States would

be entitled to otherwise, how much they could reasonably

expect."

Is that a fair statement?

MR. VEEDER:  I think that is --

THE COURT:  You didn't say that.  But that would seem

to me to be the strongest --

MR. VEEDER:  I certainly said this -- and I repeat it--

that from the standpoint of the yield at the dam, it is

1   absolutely essential that you know what the upstream demands

2   are going to be.

3       THE COURT:  But Mr. Kunkel has already made estimates

4   of the upstream demands.

5       MR. VEEDER:  That is precisely the point I am making

6   to your Honor:  That you have your upstream demands -- there

7   is no question about it, and you have to take those

8   calculations into consideration, and I am sure that Mr.

9   Kunkel, himself, said that yesterday, that you take into

10  consideration what the upstream demands are in determining

11  the ultimate yield at the DeLuz Dam.  I don't care what

12  anyone else says, I am quite sure that that was exactly what

13  I said to your Honor yesterday, and I am sure that that is

14  what Mr. Kunkel said.

15      THE COURT:  Mr. Kunkel made estimates yesterday.

16      MR. GIRARD:  3,300 and 8,000.

17      MR. VEEDER:  That is precisely true, and the point of it

18  was, was that on a perennial yield that was calculated could

19  be extracted by the 8,500 acres upstream -- that is, on full

20  development?

21      MR. GIRARD:  No, the 3,300 as I understood it, Fred, was

22  the safe yield that could be extracted from Murrieta Basin.

23      MR. VEEDER:  That is exactly what I said.

24      MR. GIRARD:  Then the only question remains, which I

25  think Fred was concerned with, was, how much of that 3,300

20,872

1      does the United States have a right to because it is riparian

2      downstream?

3          MR. VEEDER:  Exactly what I am saying.

4          MR. GIRARD:  But that has nothing to do with how much

5      water you can store at DeLuz Dam, because whatever

6      your correlative share of that 3,300 is you cannot store it.

7          MR. VEEDER:  Let me point out --

8          THE COURT:  Let me go on.

9          MR. VEEDER:  Go ahead.

10         THE COURT:  Secondly, I said to Mr. Clark, "These studies

11     that are made are made on a historical basis of what the

12     average might be.  And of course this is the way to approach

13     it.  But," I said, "as a practical matter, the only water you

14     are going to catch in the dam are going to be flood waters. "

15             There are going to be situations when the flow is

16     far above the average.  Right?  That is all you are going to

17     catch.

18             "So," I said, "you can make all the calculations

19     you want to try to arrive at what you might catch at the dam

20     site, but you are only going to catch waters in those

21     instances where you have flood waters far in excess of the

22     average that come down."

23             And Mr. Clark agreed.  He said, "That is my under-

24     standing of the situation."

25             You are not going to fill the dam with any regular

1  flow of water that comes out of this watershed.  It is going

2  to be floodwater.

3          He is going to talk to you again.  When will you

4  be in Washington?

5      MR. VEEDER:  When will I?

6      THE COURT:  Yes.

7      MR. VEEDER:  Friday.

8      THE COURT:  Now, going to your statement here, if you

9  are shooting here at some sort of apportionment, I am not

10 even going to talk about that, because we are not at that

11 stage of the case.

12         If you are talking about some kind of general

13 statement on principle which might cut this knot, this

14 holdup, and let these men proceed with their studies on this

15 dam, then with modifications and other provisions we might

16 talk about this.

17     MR. VEEDER:  That is what I desire.

18     THE COURT: Solely for that purpose.

19     MR. VEEDER:  Yes, your Honor.

20     THE COURT:  First of all, there would have to be the

21 caveat that this whole setup is based upon irrigable acres

22 and not acres that/susceptible of practical and profitable

    are

23 irrigation.

24     MR. VEEDER:  Yes.

25     THE COURT:  Therefore, it would be subject to revision.

20,874

I haven't checked your figures as to these irrigable acres,
but assume for argument that they are reasonably correct.

MR. VEEDER: They are the ones that were supplied by
Colonel Bowen, your Honor.

THE COURT:  There would have to be a statement that the
stream system of the Santa Margarita consists not only of
the water flowing in the surface of them, subsurface of the
streams, but of the groundwater areas and basins on Camp
Pendleton.  They are all a part of the stream system and the
water is part of the stream system.

By the way, there is no reference to upstream
uses above Vail Dam.  But that probably could be supplied.

Now, you would have to also have a statement
that looked at solely from the standpoint of flow, without
reference to available supplies in basins or groundwater
areas, percentagewise it would indicate these would be the
general entitlements, but that in any question of apportion-
ment there would have to be considered the particular facts
of the case as to the availability of water among the
parties involved.

For example -- you may not agree with this, but I
am just thinking aloud -- suppose we got into a real dry
spell, worse than we have had, and let us assume that you
cut your exports out -- which you would probably have to do
if you got into that kind of situation anyhow whether you

20,875

wanted to do it or not -- and there is no water in Vail Dam,

your basins below have been pulled down to where you could

demonstrate that there was a danger of immediate salt water

intrusion that might ruin the whole bottom basin and you

have no/water available in your basin.  I am not so sure but
            more

that this Court could not order that there be pumped out of

Pauba underground water supply or the Murrieta groundwater

area some reasonable amount of water to supply lower

riparian demands.  I think that water is part of the stream

system.  I think that the mere fact that Vail overlies that

body of water -- and they can do that in such an emergency,

call upon this supply -- doesn't put them in any better

position than any other downstream owner, because that is

part of the stream system.  I think this same is true of the

groundwater area in the Murrieta where there is an immense

amount of water at great depths.

      But to say that you are going to take percentage

figures and ignore groundwater basins and areas, and ignore

the particular problem at the particular moment, when an

issue of apportionment might be decided, I don't go for.

      MR. STAHLMAN:  I am just wondering if we are not going

a little far afield here for this purpose.  As I understand,

this matter that we are discussing here was initiated by the

necessity for the engineer in connection with this dam to have

certain data that he requires.   I am just wondering --

yesterday Mr. Veeder, I believe, expressed himself that he

hadn't had a direct request from him -- I am wondering if,

before we go into these calculations, which are going to be

guesses at best at this time because there are a lot of

elements that are not taken into consideration in relation

to these percentages besides the water in the groundwater

basin.   There are certain other rights and things contained

in these judgments that have an effect on it.   I don't want

to expand on that at this time.   I don't think it is

necessary.   But I am wondering, in view of what we have

done here, if it wouldn't be expeditious to have the

engineer tell us what he requires in order that we have

further knowledge of what his request is.

I am no better than Mr. Veeder is, probably, when

it comes to these matters.   We think we are all engineers

and know what they want.   But I think we ought to get it

from the horse's mouth and find out from this engineer.

I know in relation to other dams built in Southern

California there were no calculations made and the dams were

built.   I don't know of any precedent for requiring these

figures.   I have seen the studies made of dams at various

locations by the State that have been constructed in this

State, and I presume the same formula goes for all of them.

None of this material is required.   In the building of Vail

20,877

1   Dam there was not any such thing as this considered.  There

2   were certain standardized adopted engineering factors that

3   were taken into consideration to make this determination as

4   to what may be the expect productivity of the dam.  Some

5   of these things were outlined in some of the studies the

6   States have made which I have seen.

7         I am just wondering if this engineering firm needs

8   this material.  And if they don't, why should we at this

9   time project ourselves into it before studies are made by

10   Colonel Bowen, which I think are sound, and know what they

11   want.

12       THE COURT:  That is a good suggestion.

13       MR. GIRARD:  I agree with Mr. Stahlman.  I cannot see how

14   an engineer has to know how much the United States' riparian

15   share of water is in order to determine how much water can

16   be stored at DeLuz.  If you know upstream what the safe

17   yields of the basin are, to which Fred Kunkel testified

18   yesterday as to his estimates -- and I want to make it clear

19   for Fred's protection that the figures he gave were not given

20   on the basis that these were absolute figures but they were

21   his best recollection -- but assuming those figures of safe

22   yields are available, I don't see how important it is to the

23   United States to determine what their correlative share of

24   those safe yields in the basins are for purposes of building

25   DeLuz Dam.  Because whatever their correlative share is,

20,878

1  whatever they are entitled to, they can't store.  As I

2  understand, the only thing the engineers could be interested

3  in, in building DeLuz Dam, is the amount of water which

4  flows in the Santa Margarita River which is subject to

5  storage.  I don't think they are interested in considering

6  the amount of water that can't be stored.  The fact that you

7  are going to operate your dam in conjunction with your

8  riparian rights is immaterial.  The basic point is that you

9  still can't store that water in your dam.  You have to let

10 it go through.

11         In other words, if you have a right to reach

12 upstream -- which you don't have right now -- but assuming

13 you build your dam and you wipe out the limitations you have

14 in your judgment, still if you reach upstream and say, "We

15 have a certain correlative riparian share of this water from

16 Temecula Creek and we have a correlative share of this

17 water from Murrieta Creek," you are right; but the point is

18 that you can't run it into your dam.  You have to run it down

19 into your basins.  You can't store it.  Just because you

20 are operating conjunctively doesn't mean that you can store

21 that water.

22         MR. STAHLMAN:  There is another point --

23         MR. VEEDER:  I would like to respond.

24         THE COURT:  Wait.  Since they are the last user on the

25 stream, they might physically be able to store it; but they

1    couldn't reach upstream for the purpose of storing.

2        MR. GIRARD:  That is right.  They couldn't say to these

3    people upstream, "That is our correlative share, so we can

4    put it in our reservoir."

5        MR VEEDER:  May I respond to what Mr. Girard has said?

6    It is an extremely important point.

7             We are in the position of a riparian and overlying

8    user in regard to our basins -- no question about that, and

9    we can make calls upstream to recharge our basins.  I don't

10   believe there is any doubt about that.

11       MR. GIRARD:  I concede that.

12       MR. VEEDER:  So it is essential to know, or at least

13   to approximate as closely as we can the quantity of water

14   that will be treated as what we have referred to as base

15   flow as distinguished from the direct flow or the flood

16   flow.

17            In other words -- and I think this is one of the

18   basic errors that have been made -- I have heard it

19   repeatedly stated that the summer flow is what you treat as

20   the riparian water.  Now, that is not correct.  There is

21   what I referred to yesterday as being the day to day flow

22   in the river at this moment.  It is water that is very

23   essential to us.  We can't impound that water, no.  We can't

24   have surface storage for it.  But that quantity of water has

25   to come down to us to recharge our basin.  We are not going

20,880

1    to recharge our basin, I would assume, from flood waters.

2    We will, to the extent possible, recharge our basin from

3    overlying and riparian water.  That is exactly why I have

4    asked these gentlemen from the United States Geological

5    Survey to make their investigations and to advise us, and

6    they are in the process of advising us what they calculate

7    to be this base flow and the direct flow predicated on their

8    analysis of the long time history of the runoff.

9         Now, that is the reason why this becomes important,

10   Mr. Girard.

11        One more point -- the process of dewatering Murrieta

12   Valley and the dewatering of Pauba Valley by these pumpers.

13   These people with 8,500 acres up there, who do pump water,

14   and who, at the moment, are using perhaps 1,300 acre feet,

15   but if they really put the pumps on to the full extent of

16   their potential there will  be 3,300 acre feet of water used,

17   and to the extent that there is this increased demand on the

18   runoff of Murrieta Creek you do reduce what you call the

19   flood water or the direct flow water that is induced into

20   the alluvium by reason of that pumping.

21        So, it is a factor that must be taken into

22   consideration when you calculate the quantity of water that

23   will reach DeLuz Dam when full demand is made upstream.

24        MR. GIRARD:  But once you assume that that is the

25   ultimate safe yield of that basin, how much your share of

20,881

that 3,300 is, is immaterial, or how much you can store at

DeLuz.

MR. VEEDER:  Again, let me say this.  I have never

contended that one would store any of that water.  I have

said that we do have a correlative share in that water to

be induced into our groundwater basin, and to that extent

you subtract that from the quantity of water that is going

to be impounded.

MR. GIRARD:  But in planning your dam, you can make your

flow studies, your estimates on the assumption that Murrieta

for example, will require from their basin the safe yield

of 3,300, and once you have made that assumption and you

figure out your flow studies on the basis of the safe yield

of Murrieta, the maximum amount that would be used is

3,300.  Then you figure out the excess above 3,300 in the

flow to determine how much you can store.

MR. VEEDER:  Correct.

MR. GIRARD:  But it is not necessary for you to figure

out your correlative share of that 3,300 to build your dam,

because whatever the correlative share of that 3,300 is you

can't store anyway.  And, as I understood this question, the

sole reason for this thing was to let the engineer know the

maximum amount of demand that could be made by the upstream

people.  Now what you correlative share of the safe yield of

the basin is, as a riparian, has nothing to do with how much

you can store in your dam.  And I don't want to give the impression, because I don't think you are going to get the engineer to say that it is necessary for you to know your correlative share in order to know how much water you can store --

MR. STAHLMAN:  1 want to get in here some place.

THE COURT:  Mr. Stahlman.

MR. VEEDER:  Let George in.

MR. STAHLMAN:  Your Honor, I think you are getting away again from what I have indicated.  I think the engineers should tell us what they w ant.

Now, let us not be unmindful of the fact that there was planned and undoubtedly engineered a dam at DeLuz which would have been a much larger dam and Congress passed a Bill for it years ago.  The dam was not built, but they didn't have this material at that time.  But yet the engineers had figured on a much larger dam than the dam at this time that would be built.  So I can't see why this detailed information would be necessary at this time -- all they are is wild guesses -- that they know what the stream flows are. They certainly should be able to do it.

However, I am not an engineer and I think we should go right back to what I said instead of prolonging this and let the engineer come in and tell us.

MR. SACHSE:  I want to be heard.

20,883

THE COURT: All right.

MR. SACHSE:   Your Honor, I am absolutely opposed to bringing any engineers down and examining them on this.   If Mr. Veeder wants a finding in which this Court declares and decrees that certain above-named lands are entitled to participate in the yields of the streams, he is going to have to say, if he used the word "or," that the United States is entitled to nothing.   Because that is the fact today, and until either the exportation is discontinued or a dam is built and a permit is acquired, he hasn't got a right to participate in one drop of water in Murrieta or from Vail or from anybody else.   That is this Court's judgment.   And I think for us to waste our time with a lot of talk about what he may be entitled to if he builds a dam is a lot of foolishness.   Let's go into it when he overcomes the one colossal roadblock that is before him today before your Honor makes any order of any kind.    Today he is entitled to nothing upstream.   That is the plain and simple fact. So why should we draw an order on the assumption that he is going to do something which he says he isn't?

THE COURT:   I don't understand that Perliter and Soring have made any such request.

MR. VEEDER:   Let me explain that, too, your Honor.   It is not Mr. Veeder who is making these requests.

THE COURT:   Who is making the request?

1    MR. VEEDER:  The gentlemen here.

2    THE COURT:  I want to hear --

3    MR. VEEDER: Let me go on and explain what I said. **They**

4    have asked me as a lawyer, Perliter and Soring -- we had **a**

5    conference on the whole matter -- the question arose as to

6    the effect of full development upstream on the runoff.  Now

7    the point that I make is that these gentlemen have asked

8    for legal guidance on the proposition.  If Mr. Kunkel and

9    Mr. Hofmann want to express what they have asked me, all

10   right.  But don't blame me.

11   MR. SACHSE:  I would like an answer then.  As of today,

12   I don't care if everybody in Murrieta and in the Temecula

13   pumps the joint dry, takes all of the water, you haven't got

14   any rights, Mr. Veeder, and you have to tell them honestly

15   as of today you don't.  So what are we kicking this academic

16   question around for?

17   THE COURT:  Come forward, Mr. Hofmann.  Have you been

18   sworn?

19   MR. HOFMANN:  Yes, sir.

20

21             WALTER HOFMANN,

22   having  been previously duly sworn, resumed the stand and

23   testified further as follows:

24   THE CLERK:  State your name, please.

25   THE WITNESS:  Walter Hofmann.

20,885

EXAMINATION BY THE COURT:

Q    You are working with Mr. Kunkel on making a survey for the U.S. Geological Survey?

A    Yes, sir, I am.

Q    Have you made a request of Mr. Veeder for certain legal interpretations in connection with this survey?

A    Can I qualify my answer, your Honor?

Q    Yes.

A    As we are working for the Justice Department, we were requested to furnish to Messrs. Perliter and Soring, the consulting firm, figures on runoff that they could use in their design studies for DeLuz Dam.  Now I have listened to the discussion, and if I may, I would like to point out one or two things, your Honor, unless you want --

Q    I want you to point them out, but I want to know specifically whether you need certain more help before you can go ahead?

A    Yes, sir.

Q    Apparently the thing has come to a stop.

A    Yes, sir.  Your Honor, we need some more help.

Q    Go ahead.

A    The thing is that normally in the design of a dam you do not have this complicated legal situation.  You use the records of runoff that have been collected in making your whole study -- in designing the dam, your spillway

20,886

1    design ,et cetera.  In this instance, because of the

2    possibility of a considerable amount of additional develop-

3    ment upstream, the actual historical record of runoff is

4    not meaningful.  So that the record, in order to come up

5    with a record  of inflow to the dam, the dam doesn't

6    recognize whether it is riparian water or flood water.  It is

7    a structure there that will stop all water until it is

8    released.  So that in the design of the dam, Perliter and

9    Soring -- I am not attempting to speak for them, but this

10   is my understanding -- need to know the total inflow at that

11   site.

12         They will probably segregate it into a summer flow

13   and a winter flow.  But they cannot base their design or at

14   least I do not think they can, assuming that certain flood

15   flows will occur at certain intervals, say four days one

16   month and eight days another month.  They cannot design

17   their structure from this type of information.  They need

18   the total flow to the DeLuz Dam site.

19         In order to get this total flow figure, your

20   Honor, we have to know how much water comes out of Murrieta

21   Creek, how much water comes out of Temecula, how much comes

22   out of the intervening area, and by summing those up we

23   come out with the flow at DeLuz Dam.

24   Q    So far you don't need any legal advise on it?

25   A    Yes, we do, your Honor.

Q    Unless you go to take the next step and then say, what is the potential use upstream which would decrease the flow.

A    All right.  So far the record of runoff we have, actually the gauge runoff, is not the natural runoff.  We can adjust it, though, to natural conditions on making certain assumptions concerning the usage -- irrigation, so we can come up with a natural runoff for the entire system. We have done this.

Q    All right.

A    Now, in order to come up with a realistic estimate of what the runoff will be after the structure is installed, we would have to know how much this natural runoff is reduced by upstream uses.

Q    By later developments?

A    Later developments, yes, sir.

MR. VEEDER:  Based on legal rights.

THE COURT:  Well now, wait.  What difference does it make on legal rights?

MR. GIRARD:  The dam doesn't recognize that, does it?

THE WITNESS:  No.  But certainly if the assumption is made that the safe yield of Murrieta Basin is used up there, then the average flow of Murrieta Basin will be depleted by that amount.  So that instead of having -- and these figures are rough -- 6,800 acre feet from Murrieta Basin, you

20,888

1    will have only 3,400.  And the same is true then in Pauba.

2    Instead of having 11,000 acre feet from the Temecula System,

3    you may have only 3,000 that will flow down and into this

4    structure.  So that it makes a lot of difference to the man

5    who is designing this structure whether you get 11,000 acre

6    feet or 3,000 acre feet out of the Temecula system.

7    BY THE COURT:

8        Q     You have already made figures as to what this

9    maxium use would be in Murrieta, haven't you?

10        MR. SACHSE:  I would like to make an observation, your

11    Honor.

12        MR. VEEDER:  Just a moment.

13        THE COURT:  Just a minute.

14        Q     Haven't you already made --

15        A     We have made studies as to the so-called perennial

16    yield of the Murrieta Basin and of the Pauba Basin, yes, sir.

17        Q     And you have also made a study as to what the safe

18    yield would be, how much water could be used?

19        A     This is what I meant by perennial yield.  That

20    could be drawn on some long time basis.

21        Q     And that is the figure where they would add 2,000

22    acre feet to the 1,300 and pick up this 1,300 acre feet

23    from flood water?

24        A     Yes, sir.

25        Q     Wouldn't that give you a resulting figure that you

1    may use?

2        A    If all of that water is retained in the basin, yes,

3    it does, and this is the question that we presented to Mr.

4    Veeder.

5        Q    Your question, then, is, is it lawful that the

6    1,300 plus the 2,000 acre feet be used in the Murrieta?   Is

7    that the question?

8        A    Yes.   Can we assume that in the future historical

9    supply on the average -- supply of the Murrieta will be

10   depleted by 3,300 acre feet on the average, and that the only

11   water coming down into the Santa Margarita System and into

12   DeLuz Reservoir will be the remaining water from Murrieta

13   Creek -- the direct runoff, et cetera.

14       Q    How did you arrive at the figure 2,000 plus 1,300

15   acre feet as being the maximum use on irrigable acres in the

16   Murrieta Valley?

17       A    No, it had nothing to do with irrigable acreage,

18   your Honor.   It was just based on rather broad and general

19   assumptions concerning the basin.

20       Q    What it would yield?

21       A    What it would yield.   And this, I think, is

22   extremely rough and would be subject to change after

23   additional information is obtained.

24       Q    And if you pumped more water than that out, you

25   might damage the basin?

1    A    Yes, that is the concept.

2    Q    Why can't you take that figure -- they are not

3  presently using 3,300 acre fee a year, are they?

4    A    No, sir, they are not.

5    Q    Why can't you take that figure and assume that that

6  is the worst that could happen?  Certainly if that would be

7  the safe yield of the basin the Court is not going to let

8  them pump more water than that.

9    A    This is the precise point we wanted clarification

10  on, your Honor.  If the indication is and the judicial opinion

11  is that we should assume this whole amount would be used

12  in the basin, then there would be a reduced inflow to the

13  DeLuz site and as a result a smaller structure might be

14  suitable or a change in design.  I don't profess to speak

15  for the consulting firm.  But this flow that comes down,

16  then, is the basis for their design.

17    Q    It is not a question, then, of particularly

18  figuring out entitlements?

19    A    No.

20    Q    In other words, what is the Government entitled

21  to or what is somebody else entitled to?

22    MR. VEEDER:  Let me --

23    THE COURT:  Just a minute, now.  If you want to object ,

24  you object.  I am just questioning the witness.  If you want

25  to object -- don't tell him the answer -- just object, if you

1    want to --

2         MR. VEEDER:  I have no objection, but I want to ask him

3    some questions, your Honor.

4         THE WITNESS:  Or do I have to clarify myself?

5         MR. GIRARD:  In the design of the spillway, or in the

6    design of the storage?

7         THE WITNESS:  I really can't answer, but it would

8    probably be in the storage.

9         MR. GIRARD: Assuming you have no right to store, it

10   would only relate to the dam insofar as the spillway

11   facility is concerned, wouldn't it?

12        THE WITNESS:  It would also enter into the calculations.

13        THE COURT:  I can see his point on its entering into

14   the calculations.  Let's take this point.

15             If we assume that the most water that ever should

16   be used in the Murrieta would be 3,300 acre feet, then this

17   would mean that there would be 3,300,3,200 available to

18   come down, and this would be the figure which would be used

19   in trying to determine how big the dam would be.  The dam

20   might be smaller.

21        MR. GIRARD:  I would agree with that.  I see Mr.

22   Sachse objects.

23   Q         But in determing how much water you could actually

24   store in the dam, the safe yield of Murrieta, 3,300 acre

25   feet, would be the maximum amount you would have to deduct,

20,892

1   isn't that correct, assuming your figure is correct?

2       A      Would you mind re-asking it?

3       Q      You have a safe yield and I am only using these

4   figures not on the assumption that  they are correct but

5   just assuming --

6       A      Yes.

7       Q      Assume you have a safe yield of Murrieta Basin of

8   3,300.

9       A      Fine.

10      Q      That would be the maximum amount of water that

11  would not go downstream?

12      A      That is correct.

13      Q      So in determining how much you could store that

14  would be the limit in considering the upstream use?

15      A      Yes.

16      Q      Now, you have that figure?

17      A      We have that 3,300 figure.  I haven't checked it,

18  but it is in that neighborhood.

19      Q      Now, insofar as your dam facilities are concerned,

20  the size of your dam et cetera, it is true, isn't it, that

21  the vast percentage of the water you hope to accomplish

22  is flood water, 95 per cent of it, in any given year?

23      A      I am not prepared to answer that, Mr. Girard.  I

24  don't know because --

25      Q      In your dam structure, you would build it, wouldn't

20,893

you, insofar as strength and size is concerned, to take care of the heavy flood?

A    You build the dam to contain a certain amount of water behind it, and it doesn't make any difference whether it comes in high flood or over a sustained period of runoff. It is the quantity of water impounded behind the dam that controls the design of the dam.

Q    That is right.

A    This is why we are interested in the quantity of water entering into the reservoir.

Q    Wait a minute.  You are interested in the quantity of water that is going to be in the reservoir, and you are interested in the quantity of water that is in the reservoir that you can store; is that right?  You are not interested in water which will just flow over or through   without storing?

A    Unfortunately, any water that flows through has to be stored before it is subsequently released, unless you bypass it.  So you have the problem --

Q    Say you have ten second feet coming in and you are under a duty not to impound it.  What you would do then is on the outlet you would release ten second feet, wouldn't you?

A    Yes, sir.

Q    So you wouldn't have a net effect on the reservoir?

A    There would be some delay.

20,894

Q    Not an engineering effect for that kind of water?

A    No, sir.  All right.

Q    So if you know the maximum amount of water, insofar as your design structure is concerned, but cannot be stored, that will not be able to be stored in the dam from Murrieta Basin; isn't that all you need?

A    May I ask a question of Mr. Girard, your Honor?

THE COURT:  Yes.

THE WITNESS:  Do you mean, then, that all riparian waters should be deducted from all inflow to DeLuz Dam and only those waters that are not accessible to the riparian should be considered in the design of this dam?  Is this your point?

MR. GIRARD:  No, not accessibility; not subject to reasonable beneficial use.  Certainly flood waters are riparian waters in the sense that they would flow on riparian land.

THE WITNESS:  Well, you see what the consulting firm is faced with:  The problem of how much water are they going to store behind that dam.

BY MR. GIRARD:

Q    Right.

A    And in order to find that out, you gentlemen are going to have to give us some answer.  This is the only reason why we are here.

Q    Then if you are interested in how much water you are going to store in the dam, you are not interested in the amount of water that they are going to use as riparian users downstream, I mean on Pendleton.  The water that they use on Camp Pendleton as a riparian is not subject to storage. So you are not interested in that, are you?

A    I don't know what the mechanics of the operation will be, but presumably --

Q    They may have a right to store it -- they may have a right to run it through their reservoir; you wouldn't be interested in that, is that right?

A    I would think not.  Again, I am not attempting to speak --

Q    I would agree with you that the amount of water that was used upstream is important for you to know.  But once you get the safe yield figures, which you have now, that is sufficient, isn't it?

A    I will answer  that by saying that if  on the instructions from the Court and Mr. Veeder and the Department of Justice, they tell us that the total amount of water available from the Temecula system and the Murrieta system is to be reduced by the safe yield of Murrieta and Pauba Basin, we can then route the flow on down and come up with an inflow to DeLuz Dam.  Does that answer the question?

THE COURT:  Here is what he is up against.  Through his

conversation with Mr. Veeder -- I will lay it for you cold
turkey -- they have made a calculation of the natural flow
of Murrieta as 6,600 acre feet.  They have made a calculation
as to how much water could maximumly be used safely in
Murrieta, and that is 3,300 feet.  Now Mr. Veeder has said,
"You can't take that as your deduction because the Government
has some right to that water and you are going to have to
get the Court to rule whether that deduction that you make
of 3,300 acre feet is correct or whether Murrieta is going
to be allowed to pump only 2,000 acre feet, which would mean
that there would flow down the river 4,600 acre feet.
That is where we are.

MR. VEEDER:  And that was the question that was asked
of me, your Honor.

Let me present this question as it was.  The 3,300
acre feet they said was the maximum quantity that could be
withheld up there.  He says, "Do they have the legal right
to claim that full 3,300 acre feet, or does the United
States and Vail Company have a right to share in the 3,300
acre feet correlatively?"  And that is a legal question, and
that is the question.

MR. GIRARD:  It is utterly immaterial to the dam.

MR. SACHSE:  It is immaterial to the dam.

THE COURT:  Wait a minute.

MR. VEEDER:  That is the question they asked me.

20,897

THE COURT:  Wait.

This is the place we are, aren't we?

THE WITNESS:  Exactly, your Honor.

THE COURT:  In other words, if Mr. Veeder had not injected the question --

MR. VEEDER:  I didn't inject it.

THE COURT:  The legal right.

MR. VEEDER:  I didn't inject it, and I want that clear now.  I didn't inject it.  They asked me the question.

THE COURT:  Is this the question you asked Mr. Veeder?

THE WITNESS:  Yes, it is, your Honor.

THE COURT:  And that question was, do the people in Murrieta have a legal right to use 3,300 acre feet?

THE WITNESS:  The question was, if the safe yield of the basin is so much, 3,300 acre feet, how much of that will be used in the basin and how much will be permitted to pass downstream for storage at DeLuz Dam?  Because this is the figure we wanted to get them.

Again, I am not speaking for Perliter and Soring. I have made no yield studies on reservoirs.  I am familiar with it through engineering literature.  So I am not an authority on yield studies or design of dams.

But I say to you that Perliter and Soring have issued a preliminary report where they used the annual runoff as recorded and used those figures and simply split the

1  annual runoff into two periods, summer and winter period, and

2  used this design for the dam.

3         It is my understanding that this is exactly what

4  they are proposing to do -- to review the design of DeLuz

5  Dam.  I realize that you are saying they have no right to

6  store this water.  But it is the procedure that Perliter

7  and Soring have used on one study, and as far as I know they

8  intend to use it again.  That is why we were concerned with

9  the total flow rather than the flood flow, which is rather

10  nebulous anyway because you can't define a clear line where

11  you have flood flow and where you don't have flood flow --

12  at least I can't.

13  BY MR. GIRARD:

14     Q    As I understood, you just said you were interested

15  in determining how much of this 3,300 acre feet of safe

16  yield would be used in the Murrieta and how much of it would

17  go downstream and be subject to storage?

18     A    Subject to the inflow into DeLuz Dam. As I say, the

19  legal question of storage has never entered my mind.  All

20  I am requested to furnish to Perliter and Soring is a figure

21  of inflow to the DeLuz Dam site.

22     Q    Do you have any idea what he wants that inflow

23  figure for?

24     A    To design the reservoir, et cetera.

25     Q    And in designing the reservoir he is interested in

20,899

1  how much it is going to store?

2      A    Yes.

3      Q    So really we all know they are interested in how

4  much is going to come down that can be stored.

5      MR. VEEDER:  And how much is going to be released into

6  the basin as part of our correlative share.

7      MR. GIRARD:  He does not need that to build a dam.

8  That's a foolish statement.

9      MR. VEEDER:  Why you have whipped up this storm.

10     MR. GIRARD:  You are using the DeLuz Dam to have an

11 apportionment, and as far as I am concerned, I would rather

12 not have DeLuz Dam than have an apportionment.

13     MR. SACHSE:  I am trying to contain myself with

14 patience.  But I would like to make an observation.  We are

15 just through designing a dam and are having it redone because

16 the Bureau of Reclamation wanted adjustments.  Perliter and

17 Soring or Montgomery or any other designers are going to

18 want to know two things:  They are going to want to know

19 the maximum because that is the basis on which they are going

20 to have to design spillways, et cetera, from the safety

21 standpoint.

22         To accomplish that, no adjustment is necessary, is

23 it, Mr. Hofmann?

24     A    No.

25     Q    In other words, that is on a historical basis,

1  isn't it?

2      A    Yes, sir.

3      Q    They also, however, for Fallbrook, designing a
4  35,000 acre foot reservoir, which is much smaller, they also
5  want to know what they can project as the inflow, they want
6  to know the safe yield because they want to be able to tell
7  us how much water we can get out of that dam safely over a
8  period of time, and when you apply that to the capital cost
9  of the dam and the amortization and maintenance they want
10  to be able to tell us that this is a financially feasible
11  project; that is what they want to know that figure for,
12  isn't that correct?

13      A    Yes, sir.

14  MR. SACHSE:   What Mr. Veeder is trying to do here in
15  this court is to inject -- have this Court give him a safe
16  yield formula, say to him, "You can forever have so much
17  water."  And you cannot do it, your Honor.  Safe yield
18  figures are always speculative.  They have got to be.  They
19  always take into consideration the possibility of further
20  upstream demands.  They always take into consideration
21  changes in demand.  This is nothing but an absolute gimmick
22  to get this Court now to let the camel's nose get under the
23  tent of an apportionment.  That is what this is.  Because
24  there is no necessity whatsoever for any engineer to have
25  a Court tell him what their rights are going to be on safe

20,901

1    yield studies.   They are made very day, and we know they are

2    not exact.

3          Safe yield studies on DeLuz Dam, in my judgment,

4    ought to be made on the basis of just what Mr. Hofmann has

5    said:   The flood flow, deducting the safe yields of the

6    upstream basins and don't consider one cubic foot of the

7    United States' riparian water in making the safe yield study

8    on the dam.

9          THE COURT:   Another reason for this would be that you

10   have to make the assumption that later on, if Courts ever

11   did make any orders of apportionment, they would have to

12   rely upon the engineer's advice as to what was the safe

13   yield of these various areas.

14         So, I agree with Mr. Sachse in making it on the

15   basis of what is the safe yield of these various streams and

16   basins, and not upon the respective rights of the parties.

17         THE WITNESS:   Your Honor, I would like to make just

18   one or two points.

19         If the design of the dam and the safe yield is

20   computed on the assumption that all of this Pauba Basin

21   safe yield and the Murrieta Basin is deducted from the flow,

22   presumably a  lower value for safe yield would result at

23   the DeLuz Dam site and a smaller reservoir might be feasible.

24   In turn then, if it is realistic or if we can reasonably

25   project that there will not be this total deduction, that

1    instead of 3,300 used in Murrieta they may use only 2,000,

2    then in the interests of the best design at DeLuz Dam site,

3    it would be reasonable to me, at least, that we try to come

4    up with some realistic appraisal of what the water inflow

5    in these various areas will be -- realizing these are dealing

6    in projections and rough figures and there are many other

7    problems involved here.  But in trying to set down/criteria
some

8    for the design of this structure, our intent was to be as

9    close --

10   THE COURT:  So you would want the Court to tell you

11   whether it was going to be legal for landowners in Murrieta

12   to use as much as 3,300 acre feet a year?

13   THE WITNESS:  Yes, sir.

14   THE COURT:  Which would allow 3,260 acre feet a year

15   to flow down?

16   THE WITNESS:  I don't really think we need it in that

17   way.  What I am interested in primarily is in the future

18   will Murrieta Basin use the entire 3,300 safe yield of that

19   basin or will they use only a portion of that?

20   MR. SACHSE:  Who knows?

21   THE COURT:  If you are asking what the development is

22   going to be, that is not a legal question.  You can speculate

23   on what will happen on the Murrieta as well as I can.

24   THE WITNESS:  Yes.

25   THE COURT:  If you are talking about whether it is legal

20,903

1    for them, if the development occurs, to use the 3,300, that

2    is another thing.

3        But it seems to me that Murrieta is out the

4    window.  I don't see where you have any concern here at all.

5    Under Mr. Veeder's figures, he has 8,500 acres of landowners

6    other than Vail, he has 9,600 acres of Vail, he shows

7    18,000 irrigable acres against 13,000 for the Government

8    downstream.  On his theory and figures, it would mean

9    ignoring the basins and all the Government is entitled to

10   is 43 per cent.  On the studies you have made to date,

11   assuming Mr. Kunkel's figures of 3,300 acre feet would be

12   the maximum safe use in the Murrieta, 3,250 would be the

13   flow downstream, which is more than 43 per cent; isn't that

14   right?

15       THE WITNESS:  I believe so, your Honor.  But again,

16   would this entitlement apply to the total flow of the stream,

17   or would it be to the base flow or perennial yield?

18       THE COURT:  I took the most favorable figures, I took

19   Mr. Veeder's figures that the Government is entitled to

20   43 per cent of what would be the yield in  a state of nature

21   of the stream, and 43 per cent of 6,560 acre feet is less

22   than 3,200 acre feet .

23       MR. VEEDER:  I would like to have just one second to

24   outline the problem that was presented to me, and let me

25   say it now because I think we should have it here.  The

1    question was presented, assuming 3,300 acre feet in

2    Murrieta as the maximum perennial yield --

3        THE COURT:  Wait.  When you talk about yield, are you

4    talking about what flows out or what is used?

5        MR. VEEDER:  No, I am talking about the quantity of

6    water, the perennial yield -- we will call it, for simplicity,

7    the "safe yield".  They said, "We are going to take 3,300

8    acre feet as the quantity of water that could safely be

9    used in the Murrieta Valley."

10           Then the question was this:  Are they entitled to

11   all of that 3,300 acre feet which is the safe yield of the

12   basin, or is the United States entitled correlatively to share

13   in that water?  That was the question presented to me.

14       THE COURT:  Were you told that the figures showed

15   3,260 acre feet flowed down at a time when they used 3,300?

16       MR. VEEDER:  Of course I was, your Honor.  But the fact

17   remains that that was the legal question which was presented

18   and is presented here now.

19       THE COURT: What is your contention?

20       MR. VEEDER:  When all the sound and fury is done, that

21   was the legal question presented and is one that should be

22   resolved, in my view.  As I said yesterday, I don't care

23   whether you rule on it or whether the Department of Justice

24   rules on it.  The question is here.

25       THE COURT: What is your contention?

1        MR. VEEDER: My contention is this. That both Vail

2  Company and the United States of America are entitled

3  correlatively to share in the safe yield of Murrieta Valley

4  on whatever criterion is adopted. I have come up with

5  irrigable acreage. I don't say that is the sole way of

6  doing it. But there is certainly --

7        THE COURT: Wait. Your point is that you are entitled

8  to share in the 3,300 acre feet, which is the maximum amount

9  that could be used in the Murrieta Valley?

10       MR. VEEDER: No, it is not. That is the safe annual

11  yield of the basin maximum.

12       THE COURT: The amount that could safely be used?

13       MR. VEEDER: Right.

14       THE COURT: That you are entitled to share in that.

15  And you ignore the 3,260 acre feet that flow down to your

16  basin?

17       MR. VEEDER: I don't ignore it. You have two kinds of

18  water there: The safe yield or the perennial yield of

19  Murrieta Basin of 3,300; then you have the uncontrolled flow

20  -- I hope --

21       THE COURT: Go ahead.

22       MR. VEEDER: The point I am trying to make is that there

23  are two kinds of water: 3,300 acre feet safe yield; then

24  there is the uncontrolled flow of water from Murrieta that

25  comes down in such manner that it will not go into the basin

20,906

at all -- it will go on down the Gorge and on down to us.

THE COURT: What happens when it gets to you?

MR. VEEDER: Part of it goes into our groundwater basin. If we build a dam, part of it will be stored, because it is not all flood water -- that uncontrolled water.

THE COURT: You take part of it. How much? Assume you get half of it, 1,500 acre feet.

MR. VEEDER: Of the uncontrolled flow, I think we are in a position probably to get all of the uncontrolled flow.

THE COURT: You would say you are entitled to take this uncontrolled flow, put it in your groundwater basin, and then demand on Murrieta that you share in the 3,300.

MR. GIRARD: 43 per cent of it.

MR. VEEDER: I say that we have a correlative share in the 3,300. I also say that the uncontrolled flow -- uncontrolled flow because there is no basis of storing it up there -- will probably come on down to us.

I was not asked that question, though. I was asked the question whether we would have a right in the 3,300. And I say we certainly do.

In regard to this other proposition that has been raised here, it is immediately stated that you can't store that water. I agree that you can't store that water. But we are going to operate DeLuz Dam and the Santa Margarita Coastal Basin conjunctively. So there is going to be this

1   quantity of water that is riparian or overlying water that

2   comes down to us.   This will be put into the basin -- our

3   basin.   It will not be surface stored.   But nevertheless

4   Perliter and Soring must take those elements into considera-

5   tion.

6       THE COURT:  Mr. Hofmann, I would merely say this.   If

7   you think that water goes downstream and enters the alluvium

8   and enters the Government basins below, if you think that

9   happens, that is still water of the River, and if Mr. Veeder

10  thinks he can ignore that water in storage and seek 43 per

11  cent of the 3,300 acre feet, the safe amount that might be

12  maximumly used in the Murrieta Valley, he is all wrong.   If

13  that will help you in your study, I will say that much.

14      Now, you certainly can't say that you can take

15  river water and put it in a basin and then ignore it and ask

16  for 43 per cent of the maximum amount that could be used

17  in Murrieta Valley.

18      MR. VEEDER:  Let's get this straight again.   There is

19  only one problem, there is only one matter that is presented

20  here, there is only one thing as to which I ask for

21  guidance, and it was foolish to ask for it.

22      MR. STAHLMAN:  It was asked for foolishly.   There is

23  a difference.

24      MR. VEEDER:  You see, I have been ridden for four years

25  by your people and it doesn't bother me in the slightest.   I

20,908

1  am going to tell you that there was a legal question

2  presented to me, and I tell them we have a right to share in

3  the 3,300.  That is the only problem.  And it does make a

4  difference as to the quantity of water that will come down

5  to DeLuz Dam.

6      MR. SACHSE:  Let me show some arithmetic.  I just did

7  it.  This is interesting.  Take 33 and 32 --

8      THE WITNESS:  3,300 and 3,460, I think, is the average

9  annual yield.

10      MR. SACHSE:  Do it the easy way.  6,500 acre feet of

11  total yield in Murrieta in a state of nature.  On Mr.

12  Veeder's own theory he is entitled to 43 per cent.  Of

13  course, this gives him about 2,795, if you figure 43 per cent

14  of the whole.  He is already getting 3,200; not 2,795, but

15  3,200.  He wants 3,200 plus 43 per cent of 3,300, which

16  works out to be about 1,400, in round figures again.

17      So he wants 4,600 out of a total of 6,500.  So

18  on Mr. Veeder's little formula, it ends up in the United

19  States getting 70 per cent of the total yield of the Murrieta

20  Basin in a state of nature.  And he is going to do that on

21  Pauba, and he is going to do that everywhere else.

22      THE COURT:  Take a recess until 1:30.

23      MR. VEEDER:  That is only an hour.

24      THE COURT:  Is that enough?

25      MR. SACHSE:  That is enough for us.

20,909

1        THE COURT:  We are not going to stay all afternoon

2   on this matter.

3        (Whereupon, an adjournment was taken until 1:30 )
     (                                                   )
4   (o'clock p.m. of this same date.                    )

7                    ---o0o--

20,910

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, DECEMBER 12, 1962, 1:30 P.M.

2                              ---o0o---

3       THE COURT:  Where did we terminate this morning?

4       MR. STAHLMAN:  We didn't.

5       MR. GIRARD:  Mr. Veeder was writhing on the floor

6   over there somewhere.

7       THE COURT:  Was writhing on the floor in pain and the

8   bell was tolling.  Fortunately, we adjourned.

9       MR. VEEDER:  Are we on the record, your Honor?

10      THE COURT:  We adjourned before the count of ten.

11      MR. VEEDER:  I petition your Honor for the taxpayers,

12  let's expunge this.  I don't want them to have to pay for it.

13      THE COURT:  All right.  We will have a mandatory eight

14  count rule in this court.  So if you get a lethal blow, you

15  can take your time in getting up.

16      MR. STAHLMAN:  Of course, that other rule applies,

17  that if you hit a foul blow and you are ahead you win the

18  fight.

19      MR. VEEDER:  Was there anything else your Honor wanted?

20      THE COURT:  No.  I am glad you all feel better after

21  lunch.

22          Are there any further questions anybody wants to

23  ask Mr. Hofmann?

24      MR. GIRARD:  No, except I understand his comments today

25  were merely informative, and if we are going into this --

THE COURT:  I don't know what we can do.  We certainly can't adopt this arbitrary percentage situation.  I wrote out some notes.  I don't like to be in a position of saying that I don't want to help an engineer in a problem that concerns us.

I would say, first of all, that I think you should proceed with your work and not be too concerned about these questions of entitlement.

But here is a little analysis I wrote out.

The prospects of whether there will be further development in these areas is not a legal issue.  It is a practical estimate that, I take it, an engineer would have to make.

The question as to the amounts of water that certain areas may be, in certain instances, legally entitled to use, such as the Murrieta area, might in certain instances and possibly in the future be a legal question.

As I understand the question you posed it is this: If, for instance, you found that in a state of nature there was 6,560 acre feet of flow from Murrieta --

THE WITNESS: (Mr. Hofmann)  6,760 acre feet, your Honor.

THE COURT:  Or 6,760 acre feet.  Mr. Kunkel's figure was only an estimate.

And if you also found that 3,300 --

1          Is that right -- maximum?

2      THE WITNESS:  Yes, sir.

3      THE COURT:  -- is the amount that could be safely used

4   in that area, your question then would be, can the United

5   States curtail the use of that 3,300 acre feet or demand

6   a part of the flow downstream?  That is your question, isn't

7   it?

8      THE WITNESS:  Yes.

9      THE COURT:  Here are the only answers I can give you:

10         One.  The United States presently cannot call

11   upstream against any riparian until they comply with the

12   provisions of Interlocutory Judgment No. 37, which provides

13   that they have to cease exporting and restore the basins

14   to the positions they were in before the exportations.  I

15   assume if the basins were full, that after flood time, they

16   have satisfied that part of it.  They, themselves, don't

17   have to restore the basin.  I would take it, once the basin

18   was full, that part of it would be taken care of.

19         Two.  If an apportionment in the future was

20   necessary in one area on part of this watershed:

21         (a) In my opinion it would have to be based upon

22   acreages that were susceptible of profitable irrigation

23   and not merely irrigable acres.

24         (b) We presently do not have figures on the

25   acreage that is subject of profitable irrigation.

(c) The figures on irrigable acreage which Mr. Veeder has are very rough estimates on which to make any calculations; and

(d) We would have to consider as being integral parts of the stream system the groundwater areas upstream and the basins in the Enclave.

Three.   So long as the basins on the Enclave are not unreasonably drawn down to where they are in danger of being injured or where there is danger of salt water infiltration from the sea, it is pretty difficult to see how any curtailment would be made upstream.   In other words, if there is water in these basins that is subject to use, this is a factor the Court would consider in determining whether there would be curtailment.

Four.   If at some time we approach the problem and were to consider as to whether the 3,300 acre feet on the Murrieta was more than the equitable entitlement of those farmers using that water, we would have to consider

(a)   The amount the United States has received in its basins downstream which is usable.   I understand there is a certain amount of that water that is not usable.   But the amount received that would be usable.

(b)   If there was a comparison on the basis of acreage subject to profitable irrigation, I would very tentatively make the assumption that of the 8,500 acres in

20,914

the Murrieta individually owned and the 9,600 acres owned

by Vail, a large percent of that would be found to be

subject to profitable irrigation and a smaller percentage

of the 13,000 acres of the United States -- that is a very

rough estimate, but having some idea of the type of

country involved -- this is only speculation, but the figure

in ratio might not be 13 to 18, as it presently exists, on

irrigable acres.

     And if a percentage figure were taken, if it were,

we will say, 13,000 acres as compared with 18,000 acres on

the Murrieta, the United States entitlement would not be

the percentage figure times 3,300, which is only part of

the water of the Murrieta; you would have to consider, first,

what the United States had received and w hat was available

in the Enclave basins.

     The contention that the United States might take

the difference between 3300 acre feet and 6,760 acre feet,

or such proportion of it as they could catch, which would

3,460 acre feet or such proportion as they could catch, and

then could seek also the percentage based upon 13 as to 18,

which I think roughly was 43 per cent, isn't tenable.

You can't have this riparian water replaced in the basin and

then move upstream and say, "We want another percentage of

the water that happens to be the maximum amount that could

be safely used in the Murrieta."

20,915

1      Now, I have two examples here and they both rely

2  upon a bunch of suppositions.

3      Suppose that we had figures on profitably irrigable

4  acres, and let us assume for argument that the figures were

5  16,000 acres on the Murrieta-Vail and others versus 8,000

6  in the Enclave, and assume that 3,300 acre feet of water

7  is used in the Murrieta safely.  On these figures the United

8  States' percentage is a third or 33-1/3.  But suppose the

9  United States has received in its basin 2,500 acre feet of

10  water, and let's assume that there was an additional three

11  or four thousand -- it doesn't make any difference what

12  figure we take.  It would be available at some future time

13  in the basin.

14      The United States asks that we then curtail and

15  cut down the 3,300 figure.  If you took the United States'

16  theory of percentages in this case, one-third of the water,

17  the facts show that they receive 2,500 acre feet of usable

18  water, and the farmers in the Murrieta are still using

19  3,300 acre feet of water.  There is nothing equitable about

20  limiting the use in the Murrieta.

21      Take another example.  And still using the 33-1/3

22  per cent figure for what it is worth.  I don't think it is a

23  controlling figure by any means.  Suppose we had a year with

24  no rains and with no flood flow and the United States' basin

25  is exhausted, it is down to a place now where you can't

safely pump water out of it.  Let's assume the United States has cleared itself up as far as Interlocutory Judgment No. 37 is concerned or found some way to get around it or it has been held to be invalid.  And the farmers in the Murrieta are using 3,300 acre feet.  No water has come down at all to the United States.  In that instance, it is conceivable-- this is a very rough guess -- you  might say on those facts the United States is entitled to 1100 acre feet of water.  You might curtail Murrieta to 2,200 and the United States get 1,100.

But in each instance you have so many other factors that you must consider.  What water is available?

Those are only  rough suggestions that I can make.

MR. SACHSE: I think your Honor's analysis is absolutely correct.

THE COURT:  You could multiply these examples in different ways and you come out with different kinds of problems.  When the problem of apportionment comes up we don't know where the particular problem will come.

Ordinarily, we are not going to have to apportion the whole watershed.  You can't do this, ordinarily.

You have the unusual factors here of the two large groundwater areas upstream and the large basins downstream. They have to be considered in any situation.  I suggested the other one.

20,917

If the United States' basins were down in a year with no flood runoff -- no water available, you had to prevent salt water intrusion -- you might have the question of whether you should then equitably restrain Murrieta farmers who still had available water and hadn't been hurt as badly as the United States, or whether you should order water pumped out of the Pauba Basin. We know the Pauba Basin is great in extent. And Vail may not like this. It might be in a situation like that more equitable to order, not permanently but as a stopgap proposition, water from the Pauba to be allowed to go downstream, because the chances of these basins being replenished is obvious to all of us. But before we are going to do any of these things we want to know what safely can be done. We don't want to destroy the United States' basins any more than we do the Pauba or the Murrieta.

But you can't take a figure and just say the United States is entitled to one-third of all the water in a state of nature.

What were the figures on Temecula?

THE WITNESS:  The total runoff in a state of nature, for the period 1925 to 1962, is 11,000 acre feet.

THE COURT:  What is the maximum use figure there?

THE WITNESS:  The maximum yield for the Pauba Basin, assuming conjunctive operation of Vail reservoir and the

20,918

Pauba Basin, is 6,300 acre feet.  In addition to that, based on this operation schedule, we estimated about 2,000 acre feet annually as operation loss from Vail Reservoir.

THE COURT: Which would mean a flow at the dam or at the Gorge of about 2,700 acre feet?

THE WITNESS:  About 2,700.  That would be unrecoverable, rejected water from the Temecula system.  And 1,700 from the Pechanga Creek system.

THE COURT: Whatever these figures mean, it is rather interesting, if you took the Government's figures that they submitted on this document that was handed to me today -- which I will ask the Clerk to file.  It is not signed by Mr. Veeder, but put it in the record.

MR. VEEDER:  You just asked for a tentative run-through, and that was a tentative run-through.

THE COURT:  But on that the United States says, "We are entitled to 32 per cent of the yield of Temecula.  If you took the yield in a state of nature, you would wind up with 3,520 acre feet.  If you took the Government's figure of 43 per cent on the Murrieta in a state of nature, you would wind up with 2,820 acre feet.  Together those figures make 6,340 acre feet.   And then estimating another 3,000 from DeLuz and 1,600 from Sandia, you would have something in excess of 10,000 acre feet.  But this is very close to what your figures show looking at it the other way.

1   You take the maximum use in Murrieta.  You have downstream

2   flow of 3,460 acre feet.  If you take the maximum safe yield

3   in the Temecula, you have a downstream flow of 2,700.  Those

4   together make 6,160.  Then, of course, you have the flow

5   from DeLuz and Sandia, another 4,600 acre feet.  So you come

6   out pretty close on those figures.

7           It doesn't seem to me that this entitlement

8   question enters into this at all.

9       THE WITNESS HOFMANN:  May I correct one thing.  I don't

10  know the true figure of inflow between the Gorge and DeLuz

11  Dam site -- I don't have the figures available.  But 4,600

12  acre feet is not correct.  It is low.  It is more than that.

13      MR. SACHSE: The higher it is, the better their position.

14      THE WITNESS HOFMANN:  I just want to make that point

15  clear.

16      THE COURT:  That is all I can say about it.  This is

17  in the nature of a sort of advisory ruling.  I certainly

18  don't have it before me now.

19      THE WITNESS HOFMANN:  May I say this is more or less

20  what we had in mind in contacting Mr. Veeder, to get this

21  clarified through him, and through him the Justice

22  Department will suggest the figures to use for further study.

23      THE COURT:  All right.  But I would suggest that you

24  look the figures over.  You are being called upon to exercise

25  your own engineering judgment.

THE WITNESS:  If it was a question of engineering judgment, I think we would have gone ahead.  But when you get into these legal ramifications and questions of rights and entitlements, we are in a little bit of too deep water.

THE COURT:  I didn't ask you, Mr. Veeder, what your comments are on what I have had to say.

MR. VEEDER:  I have no comment, your Honor.

THE COURT:  You are speechless?

MR. VEEDER:  Truly.  Nor am I objecting.  I asked for you to do what you have done.

THE COURT:  Can we pass this matter then?

MR. VEEDER:  I have requested you to give us some advice on it.  You have done it.

THE COURT: All right.  Can you proceed promptly with this Justice participation?

MR. VEEDER:  We will proceed.  We are ready to go any time on all of this.

THE COURT:  I mean, apparently Justice has their finger in this somehow.  Will you get your finger out as quickly as you can and turn the matter over to the Geological Survey and let them proceed.

MR. VEEDER:  Indeed, your Honor.

MR. SACHSE:  I discussed this briefly with Commander Redd, Colonel Bowen, Mr. Girard, and previously with Mr. Veeder.

20,921

MR. VEEDER: What is this?

MR. SACHSE:  I think it would pay us to give a few minutes thought to where we go exactly from here.

We have done so many of these judgments now that I can't conceive of any objections to either the Temecula, which Mr. Girard is going to prepare, or to the Santa Gertrudis, which is just a mechanical operation now.  So it seems to me that at our next hearing we will probably be able to present your Honor three more judgments to sign, the third one being Gibbon and Cottle, and then we are done.

I would like to take a few minutes to consider, how do we go from there?  What do we do?

Each of our interlocutories has recited that it is not final and that it will become final after notice is given.  I have tried briefly to look at the Federal Rules and whatnot, and I am not under the impression that there is any mandatory method or mandatory period of notice in a case like this.  I don't find one.

THE COURT:  I don't think there is.

MR. SACHSE:  I would like to get Mr. Veeder's reaction.

I know Mr. Girard has had what I think is a very good idea.  He is gone momentarily, so I will try to put it out for consideration.  He thinks we ought to give notice to all the named parties plus all the attorneys of record, plus any known transferees -- that is, transferees of whom

the United States has actual knowledge; simply a letter notice, telling them that these interlocutories are all on file, giving them x-number of days to examine them, and telling them there will be a date set for hearing to consider their objections, and if there are no objections they will be final.  He feels and I am inclined to agree with him, that all that would be required is simply an order of your Honor.

It was also suggested, as an extra caution, that this notice might be published.  He feels, and I agree with him, that all that would be necessary would be a very short, simple judgment making these final.

But -- and this is Fred's idea -- that it would be helpful, and he indicated that the State of California would pay for it, to have Mr. Swader (The Reporter) reproduce in one or more volumes all the interlocutory judgments except the exhibits -- in other words, each judgment itself.  But we would have in a single volume all the interlocutory judgments in one single place, plus the judgment or order making them final.  This is just tossed out for consideration and reaction.

THE COURT:  Without the exhibits?

MR. SACHSE: Without the exhibits in this bound volume.

Then if any of us -- not us, because we presumably have them -- but a strange attorney can get this bound volume and find out which judgment deals with the area in

20,923

which he is interested and then go into the originals and look them up.

Timewise, I would be of the opinion -- of course, we haven't set a date for hearing -- but assuming that it was not the day after New Years, it should give us a little time.  I would say by mid-January these other three judgments ought to be ready to lay on your lap to sign.  And we ought to consider now not only the date when we hope to do that, but also the date thereafter to which we hope to call everybody in on notice.  That was my suggestion.

THE COURT:  Mr. Veeder.

MR. VEEDER:  I think that the plan as outlined is entirely proper.

In regard to the kind and type of notice, under the circumstances I don't believe there is any -- I know of no requirement.  I think they should all be notified.  I think we have indicated that we would.

I think Mr. Sachse is right that at the next hearing we will have the last of the interlocutories entered.  If your Honor desires then to enter the final decree, or wait--

MR. SACHSE:  I don't think he could do it the same day, because we can't do the notice.  I think we will have to face the fact that these interlocutories next time might be wrong.  So we will have to plan on two weeks later or a month later or whatever it is.

20,924

1    MR. VEEDER:  Whatever your Honor says.  I am fully in

2    accord with the plan outlined.

3    THE COURT: We have the practical problem that once the

4    final judgment is filed, then time for appeal starts to

5    run.

6    MR. SACHSE: That is right.

7    THE COURT:  Of course, the Government often files a

8    protective appeal and takes additional time to decide what

9    they are going to do.  However, if progress were being made

10   on some settlement on a physical solution, I wouldn't hurry

11   anybody by entering a final decree and say you have 60 days

12   now finally to conclude it.

13   MR. SACHSE:  On the matter of the physical solution, of

14   course, I have not the slightest idea of what Mr. Clark is

15   going to say when I see him in Washington.  But I don't

16   know of any reason why, if a physical solution is really in

17   the air, it couldn't be tied in exactly with the time

18   schedule I have outlined here, because I will certainly be

19   able to come back at our January hearing with a pretty good

20   idea whether it is in the air or not.

21   MR. VEEDER:  You mean the settlement in the air?

22   MR. SACHSE:  Yes.  I will certainly have a very good

23   idea after talking to Mr. Clark in Washington.

24   MR. GIRARD:  We could still give the notices and have it

25   all ready to enter.

20,925

THE COURT:  Oh, yes, and make the order that the Court rule on all objections and be ready to enter the final decree.

What date in January would you suggest?  The 22nd?

MR. VEEDER: That sounds good to me, your Honor.

MR. GIRARD:  Is it possible to have it the week before that?  I don't have anything on the 22nd, but I have a three week trial coming up on the 28th for which I might need a few days to prepare.

THE COURT:  I have a trial set in Los Angeles on the 29th.

MR. SACHSE:  I think we can face the fact that this is only going to take a day at the most.  We don't have to ask you to pick a Tuesday with the expectation that it will take the whole week.

MR. GIRARD:  If you are going to have it that week, I would rather have it the 24th and 25th, Thursday and Friday.

THE COURT:  How does that sound?

MR. VEEDER: That sounds all right.

THE COURT:  All right, January 24th and 25th for Fallbrook hearings.

MR. VEEDER: Why don't we set down/the timings for the notices ?

MR. SACHSE:  His Honor's indication I don't have as to how many weeks or days notice he wants.  I expect immediately

20,926

following the 25th we can get the notices out.

THE COURT:  I think there should be at least two or three weeks' notice, don't you?

MR. SACHSE:  Yes, your Honor.  Then, if possible, I think we ought to be prepared to set it for the next hearing. How about the week of February 18th, your Honor?  Assuming the notices went out the Monday of January 28th, that would be a little over three weeks written notice.

MR. VEEDER:  Give us a little more room in which to play timewise in sending out those notices.  We have the envelopes all ready.  The envelopes are in the Clerk's hands at the moment.

THE CLERK:  In fact, I believe I turned over some to your office.

MR. VEEDER: So we are in the spot where it is going to take some time to put them out.

THE COURT:  It would have to be set just for one day, wouldn't it?

MR. SACHSE: That is all, I suspect.

MR. GIRARD:  It shouldn't be more than one day. Although, if Mr. Veeder is going to make his objections, we had better set it for more than one day, I imagine.

MR. VEEDER:  I think you will agree with what I say. You always agree with what I say.

THE COURT:  What about February 21st?  February 22nd,

1   is a holiday.

2       MR. VEEDER:   For the next hearing?

3       THE COURT:   Or would you rather have it the 18th and

4   19th?

5       MR. SACHSE:   I think it might be wise, in case somebody

6   did show up, you wouldn't have a holiday following and the

7   weekend following, to leave it the 18th and 19th, out of an

8   excess of caution.

9       MR. GIRARD:   I will need a little time to draw up my

10  cost bill.

11      MR. VEEDER:   If you are going to serve it on the United

12  States, you are going to have a hard time getting it paid.

13      THE COURT:   Let's say February 20th for the final

14  judgment hearing.

15      MR. SACHSE:   Just so we don't slip on all this, will

16  you prepare what you think is the kind of letter notice

17  that should go out?

18      MR. VEEDER: That is right.   I will have it in your hands

19  before the next hearing in January.

20      THE COURT:   The Clerk wonders whether we should have

21  the copies of these interlocutories available in this area.

22  But I think these people who are interested and know enough

23  about this case, and those who are not interested won't

24  show up anyway -- I don't think we had better complicate

25  it that way.

20,928

MR. VEEDER:  I think your Honor is right about that.  I remember we talked about it one time.

MR. GIRARD: We can say it is available for examination in the Clerk's office.

THE COURT:  Did we ever decide what to do on those consents involving people with a house?

MR. SACHSE: As I understand, all of those have been included now in the A-Series of interlocutories.

MR. VEEDER:  They have been.

MR. SACHSE:  Whether the consent needs to be set aside, I don't know.  But they are in judgments today.

MR. GIRARD:  Let's set them aside.

MR. VEEDER:  I think from the standpoint of procedure, they should be set aside.

MR. SACHSE:  Will you prepare an order and have it at the next hearing on that?

MR. VEEDER:  I don't see why it is not perfectly proper to set them aside.

MR. GIRARD:  I think you should.  If they are kept in the interlocutory, you might as well have them there alone.

MR. VEEDER:  I am in full accord.  I think we should set them aside and the people should be notified that they are being set  aside.  We have a complete list of the people who signed those agreements.  We will notify them that that course will be taken, in my view.

1    MR. GIRARD:  You will have an order setting them aside,

2    and also notice.

3    MR. VEEDER:  Yes.  And also notice that will go with

4    the legal notice in regard to the interlocutories.

5    THE COURT:  These were offers and consents, and they

6    weren't, all of them at least, accepted by the Government.

7    It was framed in the form of an offer.

8    MR. VEEDER:  That is correct.

9    THE COURT: Were any of them signed by the Government so

10   they became, in substance, some kind of contract?

11   MR. VEEDER:  I think Colonel Bowen signed some of them.

12        Didn't you?  You didn't.  I will check on it.

13   THE CLERK:  I can get them, if you want.

14   THE COURT:  You check with Mr. Veeder on that.

15   MR. VEEDER:  Yes.  I will look at them.

16   THE COURT:  In an offer we use one kind of language.

17   If some of them have been accepted by the Government, we will

18   use some other kind of language.

19   MR. VEEDER: That is right.  But we will check each one

20   of them through.  We have those records in the office.

21   MR. STAHLMAN:  Did you say you made an index of the

22   interlocutory judgments that are up to date with the date

23   they were signed?

24   MR. VEEDER:  I am going to ask the Clerk to make up a

25   complete index, not only of the interlocutories that have been

20,930

entered; as I said, I am going to have him bring down todate all exhibits that have been entered and all witnesses, so that we will have one complete key index.

THE COURT:  Is there anything furthere?

MR. SACHSE:  I don't think so.

MR. VEEDER:  We have nothing further.

(Whereupon, an adjournment was taken until Thursday, )
(                                                      )
(January 24, 1963 at 10:00 o'clock a.m.                )

- - - - -

20,931

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date specified therein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this _____day of _____, A.D. 1962.


_____
Official Reporter