# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

    Plaintiff,

    -vs-            No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

    Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Thursday, January 24, 1963

Pages:    20,932 - 20,992

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

**J O H N  S W A D E R**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 210                                                    20,932

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, January 24, 1962

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
| | CDR. DONALD REDD |
| For Defendant Vail: | GEORGE STAHLMAN, ESQ. |
| For Defendant Fallbrook: | FRANZ R. SACHSE, ESQ. |

20,933

For Defendant State of
California:

FRED GIRARD, ESQ.,
Deputy Attorney General
of State of California


ALSO PRESENT:

Colonel Bowen

Mr. Fred Kunkel

Mr. Hoffman

Mr. Will Burnham

Mr. Wilkinson

Mr. Phil Swing

SAN DIEGO, CALIFORNIA, THURSDAY, JANUARY 24, 1962, 10:00 A.M.

---oOo---

THE CLERK:  One, 1247-SD-C, United States of America vs. Fallbrook.

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes.  Did you pass out the agenda to counsel?

MR. VEEDER:  Yes, I handed copies of the agenda to counsel.

THE COURT:  Any other matters that should be placed on here?

MR. GIRARD:  I think we should have the record show, your Honor, that we have a dignitary in the counsel group. Mr. Stahlman has won the Statewide Lawyers Golf Tournament.

MR. STAHLMAN:  I would like to make a motion that we go out to the golf course and try our case today.

THE COURT:  I think we probably should have some discussion about the possibility of the physical solution or settlement.  The agenda doesn't seem to say anything about that.

MR. VEEDER:  Do you want to add that to the agenda, your Honor?

THE COURT:  Yes.  Anything else that later on comes up.

MR. VEEDER:  Those are just the matters that occur to me.

20,935

Your Honor, I believe, has a letter dated January 22, 1963 from Mr. Girard to Mr. Sachse respecting the Paul decision which was handed down on January 14, 1963, (Supreme Court of the United States, No. 19-October Term 1962, Charles Paul, Director of Agriculture of California, et al, Appellants, vs. United States), involving the question of the exclusive jurisdiction of the National Government over the Naval Enclave.  It gives consideration to the course that should be adopted in regard to Finding No. 3 on Page 3, and also the conclusions of law, in Interlocutory Judgment No. 37, which relates to the Naval Enclave.

MR. SACHSE:  The Court deferred a conclusion of law on this subject.

MR. VEEDER:  It is Conclusion of Law No. 2 on Page 44. I am not quite sure whether I understand what Mr. Girard meant in his letter.  Do you have your letter?

MR. GIRARD:  I am aware of what it says.

THE COURT:  Get me the file on Interlocutory Judgment No. 37.

MR. VEEDER:  Do you desire to wait until we get the copy?

THE COURT:  I can get it more quickly myself.

MR. VEEDER:  Do you have the reference on that, your Honor?  It is Finding No. 3 on Pages 3 and 4 -- the principal

1    factors that are involved.

2    THE COURT:  I see what we presently have in Judgment

3    No. 37.

4    MR. VEEDER:  I have talked this over with Mr. Girard

5    slightly and I have read his letter.  It is not entirely

6    clear to me the position of the State of California on the

7    matter.  But I do believe there is no question we have

8    exclusive jurisdiction over both the Naval Enclave and

9    over Camp Pendleton under present circumstances.

10    Do you agree on that, Mr. Girard?

11    MR. GIRARD:  Yes, I agree essentially that the whole

12    case resulted in your obtaining exclusive jurisdiction on

13    the dates of the letters of acceptance.  The only problem I

14    had, there are a couple of minor acquisitions where there

15    has never been a letter of acceptance.

16    MR. VEEDER:  Are you familiar, Mr. Girard, with the

17    Attorney General's opinion (Volume 23, Page 14)?

18    MR. GIRARD:  Is that written by Walter Roundtree?

19    MR. VEEDER:  Yes.

20    MR. GIRARD:  We are familiar with it, and our office

21    doesn't agree with it.

22    MR. VEEDER:  You disagree with it?

23    MR. GIRARD:  Yes.  That was cited by the Supreme Court,

24    incidentally, in the Paul case opinion with approval.

25    MR. VEEDER:  So if you are not going to reverse the

Supreme Court, we can rely on that.

To proceed further, at the bottom of Page 1 of your letter, Mr. Girard, you say, "Thus I will concede to the Court that the United States obtained sovereignty . . ." You mean exclusive jurisdiction?

MR. GIRARD:  The same thing.  I used the term "sovereignty" because the Supreme Court used the term in the Paul case.

MR. VEEDER:  ". . . over those parcels acquired at Camp Pendleton subsequent to February 18, 1944..."

MR. GIRARD:  I filed a brief on this.

MR. VEEDER:  I have a copy of your brief.

MR. GIRARD:  On Pages 5 and 6 I think I listed the dates.

MR. VEEDER:  The dates are correct on Page 4 of the Findings.

MR. GIRARD:  Instead of "subsequent" it should be "prior".

MR. VEEDER:  That makes all the difference in the world.

MR. GIRARD:  The three acquisitions in Camp Pendleton where there have been letters of acceptance filed and the dates of the letters are set forth on Page 6 of our brief.

MR. VEEDER:  They are the same as set forth in Finding No. 3.

MR. GIRARD:  Yes.

THE COURT:  The findings say there was no letter of acceptance filed as to this 1,574 acre tract withdrawn from the public domain.  That is way up in the corner, isn't it, on the top of the mountain?

MR. VEEDER:  That is correct, your Honor.  The 112 acres is over in Orange County, as I remember.

COLONEL BOWEN:  It is part of the former Mission Viejo Ranch in Orange County.

MR. GIRARD:  I am not going to make a quarrel on it. He can make a finding on the whole thing.

MR. VEEDER:  I assume, in view of what you have said, we could revise the findings, conclusions and decree that exclusive jurisdiction resides in the United States.

MR. GIRARD:  I think it would be very easy, your Honor, to make a finding setting forth the fact that exclusive jurisdiction or sovereignty was obtained by the United States on the dates set forth by Mr. Veeder, and it should be; but I also want some findings in there on what the California law was on the appropriation of water prior to the date of the acquisition of sovereignty and after.

THE COURT:  Let's pass that for a minute.

In revising the findings on Page 4, if we had a finding of exclusive jurisdiction that would take care of all of the property in the Naval Enclave on Pendleton,

except the two parcels that we talked about -- one of 112

acres in Orange County and the other of 1,500 acres, which

I understand is up high and isn't involved in any of our

current water problems, and I wonder if we should identify

those two about which there is some question.  Are they

properly identified in here?

MR. VEEDER:  They are identified, your Honor, and

of course the exhibits that are in the record identify them,

too.

THE COURT:  On the bottom of Page 2 we talk about the

112 acre tract in Orange County described in the deed.  We

describe the other one.

MR. GIRARD:  Yes.

THE COURT:  ". . . which lands are more particularly

depicted on Exhibit A attached to and made a part hereof

by reference."  What is Exhibit A?  My copy of the judgment

doesn't contain an Exhibit A.  I take it back.  I have

another copy that does have it.

MR. VEEDER:  That is a description of the properties,

your Honor, and there is your map of the Enclave which

shows the various parcels.  But Exhibit 1 in this lawsuit

covers the whole area and the sources of title.

THE COURT:  I take it this map that I have here is the

Exhibit A that is referred to, is it?

MR. VEEDER:  I don't have Exhibit A before me, your Honor.

THE COURT:  I don't think it makes much difference. The 112 acre tract is described by reference to a deed. But whether the other one is described or not is a question.

MR. VEEDER:  We have exhibits in on all of that, your Honor, and if you would want to have a finding drafted making specific reference --

THE COURT:  I am talking now about your findings on Page 3, Line 6:  The United States on August 5, by inter-governmental transfer, added to Pendleton 1,574 acres, which lands are depicted.  We don't make any reference to any recording in Orange County of the 1,500 acres, and I am not so sure that you can just look at Exhibit A and tell what it is.  So I think maybe, if you are going to amend these findings, there should be some more accurate description of the 1,500 acres.

MR. VEEDER:  We will do that, your Honor.

THE COURT:  There must be a recording document.

MR. VEEDER:  Your Honor, there was an inter-governmental transfer which is in the record, and I will refer specifically to that.

THE COURT:  It must have been recorded.  Wasn't it?

MR. VEEDER:  I don't know whether it was recorded or not.  I will check it.

THE COURT:  So that the revision of the findings would provide exclusive jurisdiction of all the lands except the

112 acres and the 1,574 acres.  Is that right?

MR. VEEDER:  Mr. Girard disagrees with this opinion of the Attorney General. There is some indication that we might have exclusive jurisdiction over those two parcels, under the circumstances that prevail.  However, I will draw the finding that you directed.

THE COURT:  Does it do violence to anybody's rights? Wouldn't it be better to throw the whole bundle in -- exclusive jurisdiction over the whole Enclave?

MR. GIRARD:  I have no objection, your Honor.  I told Mr. Veeder I am not going to quarrel about that.

THE COURT:  Can you support it on the basis of that opinion of the Attorney General?

MR. GIRARD:  I don't think so.

MR. VEEDER:  I am not sure.  I think we would be stretching that opinion quite a ways.

THE COURT:  If we were going to do it, we would just throw it in and say as little about it as possible.

MR. VEEDER:  I think that would be better.  And then have a conclusion of law that exclusive jurisdiction over the entire property resides in the United States.

THE COURT:  Let's take up the second half of the problem.  We are agreed on the first half.  Is that right?

MR. VEEDER:  And a conclusion of law, in addition.

THE COURT:  Now the second part of Mr. Girard's

20,942

1    suggestion.

2        MR. VEEDER:   I am going to say I believe that is

3    entirely irrelevant.  I don't believe it has any relation-

4    ship whatever to the question here involved.  I don't believe

5    that the Paul decision or any other decision could possibly

6    make applicable the State law regarding the appropriation of

7    the rights to the use of water to the United States.   That

8    the only construction that I would place upon the Paul

9    decision at this time would be in keeping with the other

10   decisions that have come down through the years as to what

11   the cession of exclusive jurisdiction relates to.

12       My own view on the matter is that the cession

13   of exclusive jurisdiction has nothing to do with the powers

14   of the National Government or its independence from State

15   control.  I think the independence exists by reason of

16   Article VIof the Constitution and has nothing whatever to

17   do with exclusive jurisdiction.  I believe all that exclusive

18   jursidiction pertains to is the legislative power.   I

19   believe that in regard to the citizens of California or

20   wherever the Enclave happens to be, I think on the cession

21   of exclusive jurisdiction the State has no further power to

22   legislate in regard to them.  I don't belive the cession of

23   exclusive jurisdiction, or the lack of the cession of

24   exclusive jurisdiction, would in any way relate to the

25   necessity of the National Government's complying with the

State police power.

Now, if there is a dispute on it, I think we ought to brief it further.

THE COURT:  You are agreed that after cession of jurisdiction the State has no further authority to legislate. So the  narrow question is, what about the legislation that the State has enacted prior to the cession of jurisdiction?

MR. VEEDER:  I think there may be some question in regard to the citizens of the State of California and to the property of those citizens.  There may be some question in that connection.  But it certainly has no relationship whatever to the independence of the National Government from State control.  In other words, California adopted a comprehensive code in 1943.

MR. GIRARD:  1914.

MR. VEEDER:  No, in 1943 it re-enacted everything.

MR. GIRARD:  Yes, but there was no change in the law.

MR. VEEDER: There was not any great change.  So whatever the law was in 1943 when we obtained cession of exclusive jurisdiction, for this statement, I believe the law is the same.  But I don't believe exclusive jurisdiction could in any way change the responsibilities or the power or the authority of the National Government, and I don't believe the Paul case indicates that it does.  In other words, assuming we didn't have the cession of exclusive

1   jurisdiction at all, the National Government would still be,

2   in my view, free from control by the State.  I don't believe

3   that has one thing to do with this question.  We have the

4   situation in the Central Valley -- well, the Ivanhoe case

5   is a good example.  There is no exclusive jurisdiction

6   there involved at all.  But nevertheless the highest court

7   said that the laws of California could not control under

8   the circumstances in regard to the 160 acre limitation.

9       MR. GIRARD:  But you had a Federal Statute.

10      MR. VEEDER: Whether you have a Federal Statute, or

11  whether you do not have a Federal Statute, it could make

12  no difference.  In other words, I don't believe the Paul

13  decision should be in any way read as meaning that the police

14  powers of the State which was in force at the time that

15  cession took place could in any way affect the powers of the

16  United States.

17          If Mr. Girard disagrees, or if Mr. Sachse

18  disagrees, I would like to hear them.  And I would like to

19  reserve,also, if this question is going to be considered

20  further, I think we ought to file briefs on it.

21      MR. SACHSE:  Let's let the question of briefs wait a

22  minute, your Honor.  Have you read the Paul decision?

23      THE COURT:  Yes.

24      MR. ~~VEEDER~~ *Sachse*:  On Page 22 the Supreme Court says:

25          ". . .Since a State may not legislate with respect

to a Federal Enclave unless it reserved the right to
do so when it gave its consent to the purchase by the
United States, only State law existing at the time of
the acquisition remains enforceable, not subsequent
laws . . ."

Then on Page 23, starting with the word "Yet,"
the first full sentence, this is elaborated upon:

". . .Yet if there were price control of milk
at the time of the acquisition and the same basic
scheme has been in effect since that time, we fail
to see why the current one, albeit in the form of
different regulations would not reach those purchases
and sales of milk on the Federal Enclave made from
nonappropriated funds.  Congress could provide
otherwise and has done so as respects purchases and
sales of milk from appropriated funds.  But since there
is no conflicting Federal policy concerning purchases
and sales from nonappropriated funds, we conclude
that the current price controls over milk are
applicable to these sales, provided the basic State
law authorizing such control has been in effect since
the times of these various acquistions. . . "

If that isn't right on the nose.  If you will
take out the words "price control of milk" and say, "Yet
if there were price control of the appropriation of water at

1    the time of acquisition and the same basic scheme has been

2    in effect since that time . . ."

3            Surely the Water Code was rewritten to give us a

4    Water Rights Board instead of a Department of Water

5    Resources.  But there has been no substantial change in the

6    law.  You file it with a different named department, but you

7    file it exactly in the same way, using exactly the same

8    forms.  So there has been the same basic scheme in effect.

9            The Supreme Court says, " . . . we fail to see

10   why the current scheme, albeit in the form of different

11   regulations, would not reach appropriations of water."

12   This is as clear as crystal.  If Mr. Veeder wants to brief

13   this, I think this is a little silly.  The briefs have been

14   submitted to the Supreme Court.  The brief I would give your

15   Honor would be simply this decision and ask your Honor to

16   interpret it.  I don't want to waste time with a lot more

17   briefs on an issue as remote as this exclusive jurisdiction

18   thing.

19   MR. VEEDER:  May I be heard for just one moment more

20   on this.  I think the Paul decision should be read in the

21   light of the facts that were involved.  I think it should be

22   considered.  And while I don't agree with some of the

23   conclusions that are expressed -- I am not sure of what it

24   means.

25       MR. GIRARD: We don't agree with the conclusions expressed

1   by the Supreme Court as far as our Milk Control Act is

2   concerned.

3       MR. VEEDER: What I would like to say, however, is this.

4   That I believe the Paul decision related to the State law

5   expending itself upon the citizens of California, and it

6   does not relate to State laws expending themselves upon the

7   administration of property or funds of the National

8   Government.

9       THE COURT:  Wait.  It expended itself on Post

10  Exchanges, and Post Exchanges had been held in several cases

11  to be instrumentalities of the Government.

12      As I read the case, the only distinction that the

13  Supreme Court (Justice Douglas) made between the milk

14  purchased from appropriated funds and the milk purchased

15  from unappropriated funds -- unappropriated funds being the

16  Post Exchanges, if we can use that term -- was that in the

17  case of appropriated funds Congress had passed a statute

18  and said you must have competitive bidding, and in

19  substance Mr. Justice Douglas says that whatever the State

20  law says, Congress now has spoken on the subject.  But he

21  said Congress has not spoken as to these unappropriated

22  funds, which are funds of the Federal Government.

23      MR. VEEDER:  But it only relates, your Honor, to a

24  citizen contracting with the United   States.  It doesn't

25  relate to the powers of the United States to acquire rights

20,948

to the use of water.  It doesn't relate to the administration of rights to the use of water.

THE COURT:  Let's put it this way.  The Supreme Court probably was not thinking about water when it talked about milk.

MR. VEEDER:  Nor was it thinking about land or livestock grazing on land.

THE COURT:  I think we would probably have to concede that, or the State would have been in there with a brief concerning the water problem.

But if you want to analyze what the Supreme Court has done, and if they are going to be logical, this may well be the program that will follow:  That as to those State laws that were in effect at the time of cession of exclusive jurisdiction, unless Congress enacts laws to the contrary, they will continue in effect after exclusive jurisdiction is obtained.

MR. VEEDER:  But not so far as they would control the administration of Federal property or the acquisition of rights or anything like that.

THE COURT:  Of course, let me say this.  You talk about police power, and that is very broad language.  You talk about the rights of the Government to control its property.

MR. VEEDER:  Right.

THE COURT:  You have to look at it on the narrow basis

of what the law was, and the particular law we are talking

about is a law that said that to appropriate unappropriated

water you must comply with the State procedure.  That is

entirely different from the question of whether or not the

Sheriff of San Diego County may set up a substation up on

Camp Pendleton and proceed to enforce traffic laws on the

Base or to arrest individuals for committing crimes that he

claims are against the sovereignty of the State of

California.  Certainly there is a lot of the exercise of

police power that has been, in the broad sense, surrendered

with the grant of sovereignty, and the United States is

sovereign in that area.  But that doesn't mean that you

could just apply general terms and talk about police power

and read out the possibility that some of these State laws

may not be effective insofar as they deal with citizens

of the State or rights of the State as compared with the

Federal Government.

MR. VEEDER:  I would view it this way, your Honor --

and if there is going to be any proposal to write any

conclusion of law of the character mentioned by Mr. Sachse

and Mr. Girard, we would, of course, have to object to it --

I don't believe that Article IV, Section 3, Clause 2, the

property clause of the Constitution or the supremacy clause

of the Constitution, could in any way be involved in this

matter.  And that is why I say if there is going to be a

1   conclusion of law to the effect that the 1943 law was in

2   force at the time of the cession of exclusive jurisdiction

3   and those laws relate back to 1914 and those laws are

4   applicable to us, we would necessarily object to that.  We

5   couldn't do otherwise.

6          I don't believe that when the Milk Control laws

7   of California were made applicable to a dealer who is a

8   citizen operating in California under the laws of California

9   that that law could be made applicable to the constitutionally

10  delegated authority of the United States of America.  I don't

11  believe the two are at all comparable.  I don't believe

12  that there would be any basis for a conclusion of law of

13  the character suggested , or that we should in any way change

14  our status.  I don't believe exclusive jurisdiction, in

15  other words, would have any effect upon the delegated powers

16  of the United States at all.  I don't believe that has

17  anything to do with it.  I think even without the cession

18  of exclusive jurisdiction the United States would be immune

19  from this kind and type of control.

20      THE COURT:  The proposal that you made, Mr. Girard, is

21  in line with what I have already held, isn't it?

22      MR. GIRARD:  Yes, your Honor.

23      MR. SACHSE:  Yes, this is right on the nose with your

24  present ruling.

25      MR. GIRARD:  It is not going to change the case ruling.

I pointed out this Paul case primarily in the hope that it might provide the Department of Justice some vehicle whereby they can live with filing with the State Water Rights Board.   I don't think it affects this decision one bit.

MR. VEEDER:   That vehicle wouldn't have any wheels on it, as far as I am concerned.

MR. GIRARD:   If that is your position, that is your position.

But as far as this case is concerned, I have no objection to the finding of exclusive jurisdiction in the United States on the dates set forth, or even going further and more or less treating a couple of little parcels away up there and finding exclusive jurisdiction, so that you have the whole Base covered in this case.

But if we are going to do that, I also at least want findings which say that the appropriation of water has been under the statutory scheme prior to the dates the United States obtained exclusive jurisdiction and has remained in that form ever since.   I at least want those findings.

MR. VEEDER:   All right.   Let me check out the facts -- I started that yesterday -- to see what changes had actually been made.   There are some changes.

MR. GIRARD:  There were minor changes.   But the basic

thing is that ever since 1914 you have had to file with a State agency to get an application for a water right.  Now, in 1955, I think, or somewhere along about that time, they changed the agency with which you had to file and things like that.  But the basic requirement of filing with a State agency with reference to the appropriative right has been in effect since 1914 without any change at all, other than changing the name of the person with whom the application would be filed.

MR. VEEDER:  Has anybody checked out -- and I wasn't able to find it yesterday -- whether it continues for the issuing of licenses, the acquisition of rights by municipalities, et cetera?  I haven't been able to find out whether those were all in force in the original law or not.

MR. SACHSE:  As far as I am aware, there is absolutely no substantive change in the law of appropriation of water from the date the Act was first passed in 1914, Mr. Veeder.

MR. VEEDER: As I say, I haven't been able to check it all the way through.

THE COURT:  I am going to sustain Mr. Girard's position and direct thatyou go to work on this matter of preparing amendments to the findings and the conclusions; and regardless of Mr. Veeder's very cavalier rejection of the fact that this provides the Government with a vehicle for cutting some knots, I think we should also add a conclusion

in there, in so many words, to make it clear that the
Government, based upon this Paul decision, might legally
make application for appropriation of water at the dam site.
I think just put it right in there where everybody can read
it.  Because after all, this stuffy attitude about what the
Government is going to do to protect itself in this matter
of getting some rights to floodwaters that might otherwise
be w asting, is a pretty stuffy position.  This business of
saying we don't want to go down with our hat in our hand
to the State and ask permission to do something -- well,
here the door is open.  Here is something that at least takes
any curse off the action by the Government, and if the end
is worthwhile, this is an open way to do it.

MR. VEEDER:  Your Honor, I didn't intend to be either
cavalier or stuffy.  I was simply stating what I understood
the Department's position to be.  If the Department's
position is changed, naturally I can't keep it from being
changed.

Does the record show that Mr. Swing is here?

THE COURT:  The record should show that Mr. Phil Swing
is here present at one of the last sessions of this case,
as he was at the first sessions, and has kept an interest
in the case all the way along, and we are happy to have
him here today.  Before the morning is over we may get some
words of wisdom from the Dean of the Bar of this community.

1    MR. VEEDER:   I hope he continues to agree with my

2    position.

3    MR. SACHSE:   I am extremely interested in what Mr.

4    Veeder just stated in response to your Honor's reference

5    to cavalier treatment of this.

6         If I understood you correctly, Mr. Veeder, you

7    said you are simply reiterating the position of the

8    Government that there will be no filing with the State. Did

9    I or did I not understand you?

10   MR. VEEDER:   As far as I know, at this time.   I haven't

11   talked with anyone about the Paul decision as to how it

12   would affect this particular point.   But we at this juncture

13   have lodged with the State Water Rights Board notice in

14   regard to DeLuz Dam, and until some position is changed

15   from that, to me that is the position of the Department at

16   this time.   I have no further information on the proposition,

17   Mr. Sachse.   Nor do I know whether anybody has any different

18   thinking on it.   As I say, this matter should proceed on

19   this basis, that I will take the word of the Court back to

20   the Department of Justice and let it stand that way.   Because

21   certainly this is a matter for the Attorney General.   It is

22   not for me to say what construction is going to be put on

23   the Paul decision.   I have expressed myself on the point.

24   MR. SACHSE:   I am not concerned with the Paul decision.

25   I am concerned with your statement that as of now -- and

forgetting the Paul decision -- it is the position of the Department of Justice that there will be no filings to appropriate water with the State.

MR. VEEDER:   I will say this, I know of none, Mr. Sachse.

MR. SACHSE:   Your Honor --

MR. VEEDER:   Mr. Sachse, don't go into a frenzy on this. I don't know of any change of position on the point.  We had quite a hectic record the last time.  I would like to avoid it, if I could.

MR. SACHSE:   There will be no hectic record.  But I am going to make a statement in this record for the benefit of Mr. Ramsey Clark, who was extremely courteous to me at our meeting in Washington on December 21st and who asked me at the last moments of our get-together to advise him if, for any reason, I thought that the possibility of a physical solution was foreclosed, so that there would not be any more exhausting digging around and working on it should that condition arise.

Now, Mr. Clark agreed and Admiral Powers agreed, and Mr. Veeder was present, that there could be no physical solution, that there could be no request made of Fallbrook to join in a joint project unless the United States had permits enforceable under State law.  That we agreed.

1      I will state now that Fallbrook is going to stop

2  talking about settlement of any kind unless this thing gets

3  clarified.  I am not going to sit in Washington, D. C. and

4  hear Mr. Ramsey Clark tell me one thing, and then come out

5  here and have Mr. Veeder, who was present at the same

6  meeting, say something diametrically, oppositely opposed.

7  It is ridiculous to ask us to discuss settlement in this

8  case when the one fundamental we have insisted upon since

9  last March when this first came up won't be faced up to.

10  And I am going to stop talking about settlement, and I so

11  advise the Court and Mr. Veeder, and I am going to put it

12  in writing to Mr. Clark, until this thing is, once and for

13  all, cleared up.

14      MR. VEEDER:  As I said, and I repeat, I was unaware of

15  any agreement to make a filing with the State.  If there

16  was such an agreement, I didn't know it.

17      MR. SACHSE:  There was not an agreement to make a

18  filing with the State, Mr. Veeder.  Don't misquote me.  The

19  agreement of Mr. Clark and Admiral Powers was that Fallbrook

20  could not be reasonably expected to enter into any contract

21  for a joint project unless the United States acquired rights

22  defensible under State law.  That was what the understanding

23  was.

24      THE COURT:  Is that correct, Mr. Veeder?

25      MR. VEEDER:  I think that is what Mr. Sachse said.

THE COURT:  Well, wait.  Let me ask further.  He said that.  And was there agreement by Admiral Powers and Mr. Clark that this was correct?

MR. VEEDER:  I will have to say this on that point.  I would much prefer to have Mr. Sachse write Mr. Clark and present the question.  Because here was my interpretation of this matter, Mr. Sachse.  I recall your making that statement.  I don't know whether there was agreement that there would be filings or whether permits would be obtained or anything like that, and I would strongly suggest , because I don't want to confuse this matter at all --

MR. SACHSE:  I don't want to either.  And I am going to read into the record -- you have a copy in front of you -- a letter I wrote to Mr. Girard when I got back to Fallbrook on the 28th.  I sent a copy of that letter, just as I wrote it, to Mr. Girard, to Mr.Clark.  This letter was intended to set forth my recollection of what happened, and I asked Mr. Clark if I was in error in any of this to please advise me.  And I have not been advised.  And the first point in the letter reads as follows:

"They (referring to the United States) will acknowledge that we must be protected by State permits.  Clark also admits that he couldn't get money from Congress without State permits or this appeal pending.  The exact mechanics of whom to apply

20,958

1    with, et cetera, they did not want to discuss, but

2    they did agree with me that time was of the essence,

3    since the Water Rights Board would probably act on

4    the various DeLuz Dam filings before summer."

5         I sent that three-page letter to Mr. Clark, and

6    at the very end -- in the letter of transmittal to him I

7    expressed my appreciation and that I would wait with interest

8    to hear if he thought I made any misstatements in this. I

9    have not heard from him.

10        THE COURT: What is the date of that letter?

11        MR. SACHSE:  December 28, 1962.  Our conference was

12   on December 21st.

13        There was one misstatement made in that letter

14   by me, which I discovered later, and I sent a covering

15   letter to Mr. Clark pointing out that I had been in error

16   in one thing I said.

17        I sent that to Mr. Clark, and Mr. Veeder and Mr.

18   Girard have a copy.

19        THE COURT:  Let's do this.  I am going to ask Mr.

20   Sachse to frame a letter to the Attorney General in which ,

21   as succinctly as possible, you call attention to this

22   particular understanding confirmed by your letter of

23   December 28th and the position taken by Mr. Veeder today.

24        MR. VEEDER:  Your Honor, on this point I am not trying

25   to avoid responsibility for what I said.  I have to say this

1    to your Honor -- and I say it in all sincerity -- all that

2    I said into the record here was this:  I do not know that the

3    Department of Justice has decided to make a filing or to

4    recommend a filing with the State Engineer.  And that is

5    all I have said, your Honor.  I simply said I didn't know.

6    If there has been a change, I am unadvised in regard to it.

7    As I pointed out to Mr. Sachse in the first instance, I

8    certainly do not want any statement I made to cause any

9    difficulty in regard to this matter.

10       THE COURT:  Mr. Sachse has, as it were, just laid down

11   the gauntlet and said he is not going to talk about

12   settlement until he finds out whether his premise is right.

13   Time is of the essence.  Let's get something started.

14       MR. VEEDER:  I am in favor of it, and as I said to

15   Mr. Sachse, by all means write to Mr. Clark.

16       THE COURT:  Write Mr. Clark, and I would like to see

17   a copy of the letter.

18       MR. SACHSE:  I will.

19       THE COURT:  And Mr. Girard, I would like to have you

20   prepare a letter pointing out, as succinctly as possible,

21   the position on the Paul case.

22       MR. GIRARD:  I did send Mr. Clark a copy of my letter

23   to Franz.

24       THE COURT:  I know that, but it is only a copy of a

25   letter to Mr. Sachse.  But I think another letter directed

to Mr. Clark, suggesting that the Paul case may open the door further to cut this knot in trying to get something started.

MR. VEEDER: For the record, once more I want it clearly understood that I was not taking a position contrary to anything that was said between Mr. Clark and Mr. Sachse.

MR. SACHSE: Nothing was said between us at which you were not present. I will guarantee you that. You were there for the whole meeting.

MR. VEEDER: I said I knew nothing about the filing of an application, and that is all I said. I know nothing about that. If there was agreement on it, that is all I can say.

THE COURT: No representation has been made here that there was agreement that the United States would file.

MR. VEEDER: All right.

THE COURT: The representation Mr. Sachse made was that it was the understanding -- his understanding, and he thought the understanding of Mr. Clark and Admiral Powers -- that Fallbrook could not enter into or conclude negotiations concerning its water rights unless the United States had State protected rights so that they could deal with Fallbrook on that basis.

MR. VEEDER: I don't believe there is conflict in any-thing that I have said into the record yet.

1    THE COURT:  Mr. Sachse pointed out that the matter of

2    implementing this -- how, et cetera -- was left open.

3    MR. VEEDER:  So I don't believer there is any conflict

4    with what I have said.

5    THE COURT:  I know.  But your first very broad statement

6    was that you didn't know of any change in policy on the

7    part of the Department of Justice.

8    MR. VEEDER:  In regard to filing applications.  That

9    is all I said, your Honor.

10    THE COURT:  Let's expressly suggest -- possibly you

11    could prepare this letter, Mr. Girard, for me to write to

12    the Attorney General, on the Paul case -- suggesting that

13    this opens a way to dispose of this problem.

14    And meanwhile start your work.  You will have to

15    talk with Mr. Veeder on these proposed findings and

16    conclusions.

17    MR. GIRARD: All right.

18    THE COURT: And the effect of the Paul case on

19    exclusive jurisdiction.

20    MR. VEEDER:  Are you ready to proceed to the next

21    item on the agenda, your Honor?

22    THE COURT:  Yes.

23    MR. VEEDER:  Your Honor  on December 12th rendered

24    what you referred to as an advisory ruling respecting

25    upstream development in the Murrieta Valley in connection

1   with the finding of feasibility of the DeLuz Dam.  Mr.

2   Hoffman and Mr. Kunkel now advise me they have delivered the

3   data to Perliter and Soring.  The two gentlemen I mention,

4   Mr. Hoffman and Mr. Kunkel, are in the courtroom, and if your

5   Honor desires to talk to them about it or to interrogate

6   or to proceed as you did the last time, whatever your Honor

7   desires is fine with me.  They have delivered the data.

8         THE COURT:  The only question I would ask, one general

9   question:  Whether you have been instructed to hold anything

10   up further, or whether you are proceeding?

11         MR. HOFFMAN:  No, sir.  We have completed the job that

12   we were asked to do and furnished the runoff data to

13   Perliter and Soring and to the Department of Justice and

14   the Navy the data that is to be used in the study for the

15   DeLuz Dam.

16         THE COURT:  When was this delivered?

17         MR. HOFFMAN:  Early this week, your Honor; Monday I

18   think I mailed it down.

19         THE COURT:  Is this classified information?

20         MR. HOFFMAN:  No, sir.

21         THE COURT:  Is it available for us to look at?

22         MR. HOFFMAN:  It has been released to the open file

23   and it is available to any citizen or any agency.

24         MR. GIRARD:  Do you have a copy of that?

25         MR. VEEDER:  He has the tabulations here.

MR. HOFFMAN:  I have a copy of the tabulation of the data, which is the meat of the study we made.

MR. STAHLMAN:  I would like to have a copy.

COLONEL BOWEN:  I would like to have a copy, too.

MR. HOFFMAN:  I may run out.

MR. VEEDER:  I would like the record to show that the data prepared by Mr. Hoffman for Perliter and Soring has been handed to the Court.

The Marine Corps has copies of that.  I submitted them to the Marine Corps Headquarters.

MR. GIRARD:  He submitted them to Marine Corps Headquarters.

MR. VEEDER:  I don't know what's funny.

MR. STAHLMAN:  I don't think it's funny either.  I think its laughable.

THE COURT:  I was doing something else and so I didn't hear what the laughter was about.  What transpired?

MR. GIRARD:  Colonel Bowen asked if he could have a copy.  Mr. Veeder said yes, he has sent it to the Marine Corps Headquarters in Washington.

MR. VEEDER:  Yes, of course, in Washington.  I assume he got it.

THE COURT:  Possibly by next December it will trickle down.

MR. VEEDER:  I think you are being critical of the

1    Marine Corps.   I assume there is rapid liaison.

2        THE COURT:   Not that rapid.   Not rapid enough to have

3    it available for the Colonel here this morning.

4            Do you have any other copies of this?

5        MR. HOFFMAN:   I can make them available.   I have only

6    five copies at present.

7        THE COURT:   Let Mr. Swing see one here.   I know he is

8    interested in this matter.   He will hand it back to you.

9    You can get him another copy, if he wants it.

10       MR. HOFFMAN:   Your Honor, we have put together a brief

11   report summarizing the assumptions that were made in this

12   study.   I have not completed because there are some editorial

13   changes coming back from our Washington office that I would

14   like to incorporate into the report portion.   But then the

15   entire report will be available for distribution from our

16   office when it is released.

17       MR. GIRARD: Then we don't know from this the assumptions

18   you have used in reaching these figures?

19       MR. HOFFMAN:   No.   But I would be glad to discuss them.

20       MR. GIRARD:   You are going to have that in a letter

21   shortly, I take it?

22       MR. HOFFMAN:   This is going to be a part of the total

23   report, yes -- the summary.

24       MR. GIRARD: Will you send copies of that portion of

25   the report, when it is cleared through Washington, to us?

1    MR. HOFFMAN:  I could make them available.

2    MR. GIRARD:  I don't care how you make them available.

3  But I would like to have the assumptions used for these

4  figures to attach to it.

5    MR. HOFFMAN:  Fine.

6    THE COURT:  I have no expertise in this matter.  But

7  I take it the final important figures are the last two on

8  the first page on the right-hand column:

9        "Santa Margarita River at Fallbrook Dam Site,

10    average annual runoff 11,480 acre feet.

11        "Santa Margarita River at DeLuz Dam Site,

12    average annual runoff 19,250 acre feet."

13        How do these figures comport generally with other

14  studies and information that Fallbrook had, for instance?

15    MR. SACHSE:  I don't have our Montgomery report here

16  and rather than rely on my memory I would defer to Ace's

17  memory, which is better.  He can probably tell you how

18  closely these figures comport.

19    MR. VEEDER:  I think we had better understand what

20  these figures reflect.  These figures simply reflect an over-

21  all calculation.  They do not reflect what would be the

22  estimate yield or the safe annual yield at DeLuz Dam.  Isn't

23  that right?

24    MR. HOFFMAN:  The important figures are those in

25  Table 4 where the semi-annual flow under project conditions

is tabulated.

THE COURT:   Table 4?

MR. HOFFMAN:   Table 4, yes, your Honor.

THE COURT:   Table 4 is just historical.

MR. HOFFMAN:   No, your Honor.  This is the flow adjusted for project conditions.  It is not historical flow. It is the historical flow that has been recorded through the Vail Reservoir, through the Pauba Basin, through the Murrieta groundwater basin and through the Pechanga Basin, and assumptions as to depletion and uses within these areas have been made and drawn from the historical flow, and this then represents the amount that we feel would have been left under the assumed conditions as used over the historical period.  These are the data, then, that Perliter and Soring will use in their analysis.

THE COURT: This is the breakdown material from which you arrived at the conclusion of the 11,480 acre feet and the 19,250 acre feet?

MR. HOFFMAN:   Your Honor, though, the most important factor is the sequence or the critical dry period.  The average itself is not too meaningful.  It gives you an indication as to the decrease.  But the flow during, say, the last 15 years is more important, I think, in the design of the dam and in the estimate of yield from the dam, than the average figure.

MR. VEEDER:  That is why it is impossible to compare them with the Montgomery report or with Bulletin No. 57 or with any of those others from the standpoint of calculated anticipated yield.  Isn't that right?  In other words, until Perliter and Soring figure out the feasibility of the structure, you are not in a position to compare them with other studies and calculations.  Isn't that correct?

MR. HOFFMAN:  This is correct.  You could make a comparison as to the runoff data that are to be used for this study and those that were used by Montgomery.  For example, they started with the same tabulation probably of semi-annual inflow to the reservoir sites.  They probably did not use these figures because, as I say, we have depleted the record natural runoff in accordance with the estimate upstream.

THE COURT:  The physical conditions at Vail Dam and uses upstream?

MR. HOFFMAN:  Vail Dam , and withdrawal of 3,300 out of Murrieta Basin, withdrawal of 6,300 out of Pauba Basin, and an estimated 500 out of Pechanga.

MR. SACHSE:  They are not project conditions.  These are worse than project conditions, because the facts today and each year historically were that for the April-September period there has been runoff at Fallbrook.  The last page of this exhibit shows zero, zero, zero.  This is untrue.  What

1    he is saying is that he thinks there will not be runoff

2    at Fallbrook.  He is not reporting the conditions.  There

3    has been runoff every year.

4         MR. HOFFMAN:  Your Honor, if I may respond to that.  The

5    natural runoff has been introduced into the record already

6    and we certainly admit that at many sites that there has been

7    flow continuously.  At some sites there has been no flow in

8    the system.  But this isn't purported to report the natural

9    runoff, the recorded runoff that we have already introduced

10   into evidence.  This is an adjustment of those natural

11   runoff figures based on estimated upstream uses which have

12   not now been made.

13        MR. GIRARD:  Maximum uses.

14        MR. HOFFMAN:  Maximum uses.   Your Honor indicated that

15   we could assume that ultimately you might use 3,300 acre

16   feet in the Murrieta Basin.  So this is the assumption.

17   With 3,300 acre feet use in Murrieta Basin, with 6,300 acre

18   feet net use in Pauba Basin, with 500 acre feet net use in

19   the Pechanga Basin -- these are the upstream uses that we

20   considered.  If these uses had been made - - and they may

21   have -- throughout the entire period of record, these

22   figures then are the resultant runoff under those conditions.

23        THE COURT:  You have even projected those present uses

24   back into 1945.

25        THE WITNESS:  Yes, we assumed those use conditions for

1     the entire period.

2          THE COURT:  The ultimate question I would like to ask

3     is:  Having done that, is the result one that would indicate

4     that either or both these dams are utterly impractical?  Or

5     is the result that either or both of these dams could be

6     built?

7          MR. HOFFMAN:  Your Honor, this is/assignment that the

8     Navy has given to Perliter and Soring, and we have made no

9     attempt to evaluate this aspect of it and I am not prepared

10    to answer.

11         THE COURT:  Have you given Perliter and Soring the

12    figures that you say are already in the record?

13         MR. HOFFMAN:  They have those records available for

14    the natural runoff, yes?

15         MR. VEEDER:  We delivered those exhibits to them, your

16    Honor.

17         THE COURT:  Colonel Bowen, have you had a chance to

18    look this over?

19         COLONEL BOWEN:  No, your Honor.  I just saw Mr. Wilkinson's

20    copy this morning.  I haven't had any made available to me.

21         THE COURT:  You have no comment to make?

22         COLONEL BOWEN:  No, no comment to make, except that I

23    would like to indicate the Marine Corps system.  I am sure

24    that Headquarters Marine Corps felt I would receive a copy

25    here.  I doubt that they have forwarded the one they have

1    received in Washington.

2        THE COURT:  You didn't expect to get it in time for

3    this hearing at all.

4        COLONEL BOWEN:  No, sir.

5        MR. HOFFMAN:  May I indicate, from the point of view

6    of the Survey, that this study was just completed last week.

7    We rushed the copy back and so we got it released as of last

8    Monday and furnished a copy to Perliter and Soring, and I

9    was going to bring the other copies here and furnish copies

10   to those interested at that time.  Apparently I don't have

11   enough but I can make them available.

12       MR. VEEDER: Well, what is next, your Honor?

13       MR. SACHSE:  I have Interlocutory Judgment No. 31

14   completed, thanks to Colonel Bowen and his staff for the

15   reproduction.

16       MR. VEEDER:  I have just received it.

17       MR. SACHSE: Do you have a copy for the Court, Commander

18   Redd?

19       (Mr. Sachse hands the Court copies of the document.)

20       THE COURT:  Do I understand you have the exhibits?

21       MR. SACHSE:  The exhibits are attached.  It is ready

22   to go.

23       THE COURT:  Has it been looked over by counsel?

24       MR. VEEDER:  I haven't seen it yet, your Honor.

25       MR. GIRARD:  Mr. Sachse forwarded me a typed draft of the

same thing, which I looked over.

MR. SACHSE:   I guess it has not reached Mr. Veeder.   I am sorry.

However, Mr. Veeder, I am sure you will not have any difficulty in reviewing it hastily.   It is a very simple judgment.   It is nothing except just a rephrase of what has happened in all the others.

MR. VEEDER:   I think we should look at it during the recess.

THE COURT:   All right.   Look at it during the recess.

What about No. 34?

MR. GIRARD:   That is the Upper Temecula.   I have to state I haven't done it.   I checked and found I had the assignment to do it and I forgot that and didn't do it.   I will try to get it done the day I get back.

I did the Gibbon and Cottle one.

MR. VEEDER:   Mr. Stark is due in the morning.   Is that right?

THE COURT:   Tomorrow, yes.

MR. SACHSE:   I don't think Temecula is going to present any great problems.

MR. GIRARD:   No.

MR. SACHSE:   And I would suggest if Mr. Girard can do it early enough, we might try getting it done and distributed with a five day objection clause of some kind.   These are

1    cut and dry -- unless you run into a peculiar individual

2    case.  I know these are identical paragraphs that have been

3    repeated in each one.  They have been repeated and repeated,

4    except for descriptions and exhibits, and the descriptions

5    and exhibits we can take strictly from the Navy.  I don't

6    attempt to check them.  I just take it for granted that

7    Colonel Bowen's and Commander Redd's staff are doing it.

8    These are really long past the stage of argument.

9        THE COURT:  Take a short recess and look this over

10   and we may be through, then, this morning pretty shortly.

11       MR. SACHSE:  We may be, your Honor.

12       (Recess taken.)

13       THE COURT: Did Mr. Swing leave?

14       MR. SACHSE:  Yes.

15       MR. GIRARD:  He did have one pertinent comment to make

16   which I hadn't thought of, your Honor.  He did say that

17   milk was substantially water.

18       THE COURT:  I was looking for Veeder Creek.  Isn't

19   Veeder Creek in this area of Interlocutory Judgment No. 31?

20       MR. GIRARD:  No, it is in 35.  It is the Murrieta-

21   Temecula Groundwater.

22       THE COURT:  That has been taken care of, has it?

23       MR. GIRARD:  Yes.

24       THE COURT: We have Veeder Creek spread on the record?

25       MR. GIRARD:  I don't know.  Has the U.S.G.S. got that

20,973

map?

MR. HOFFMAN:  I will have to ask.

MR. GIRARD:  I had asked originally that it be incorporated.

THE COURT:  Does the Court have to make an order that you put it on the map?

MR. HOFFMAN:  We are in the wrong outfit, your Honor. The Map Making Unit is the Topographic Division.  We have no jurisdiction.

MR. STAHLMAN:  We just used your name in vain, Mr. Veeder.

MR. VEEDER:  You mean you can't move without me here?

THE COURT:  I was just inquiring if Veeder Creek was in this Interlocutory, and I have been told it has already been taken care of in 34 or 35.

MR. VEEDER:  Yes, I understand Vail Company went into bankruptcy when they found out my name was on their property.

THE COURT: And then I inquired whether the Geologic Survey was going to put this name on, or whether there had to be an order of the Court to make sure this name Veeder Creek appeared on future maps.

MR. STAHLMAN:  I was so put out when I found they put Mr. Veeder's name on that map that I had to go and enter the State Golf Tournament to reach the same eminent position that Mr. Veeder has.

20,974

1      MR. GIRARD:  It is not Veeder Creek, your Honor; it is

2  Veeder Dry Gulch.

3      MR. VEEDER:  It is "Dry Gulch Veeder" is what you

4  are going to do before we are through.

5      THE COURT:  Seriously, in Interlocutory Judgment No. 31--

6  this is a minor matter -- although this is supposed to

7  be "boiler plate", you didn't run in this paragraph about

8  how to translate these hieroglyphics.  I suppose we could

9  forget about it.

10      MR. SACHSE:  You don't have the hieroglyphic problem

11  here, your Honor.

12      MR. VEEDER:  Yes, you do.

13      MR. SACHSE:  I see what you mean.  Do you think it is

14  necessary?

15      THE COURT:  I suppose we can get by without it.  Or

16  we could add one line that the method to translate the

17  hieroglyphics is found in Interlocutory Judgment Number

18  So-and-So.  Actually, it always stumps me when I start to

19  look at this.  Let's take Page 1 here.  Take the first one:

20  72W.

21      MR. VEEDER:  Range, township, section.

22      THE COURT:  Do you start with Range?

23      MR. VEEDER: Range 7, Township 2 West, Section 1.

24      THE COURT:  Then the following are various Sections, and

25  the Parcel Number is 132.

MR. VEEDER:   That is right.   But for the purpose of location you always start with your Range, then your Township, then your Section.

THE COURT:   I will leave it up to you.

MR. GIRARD:   I don't think you need it, your Honor, mainly because in this one on the alphabetic list you have the name which specifically refers to only Exhibit B where the land is specifically described.

MR. SACHSE:   There is a complete legal description of every parcel.

THE COURT: Then, of course, under the name list you do have Section 9, Township 7 South, Range 1 West.

MR. STAHLMAN:   If you read the description, you can pick it up.

THE COURT:   At the bottom of Page 6, land ownership, you could in one line write in there a reference to some other Interlocutory Judgment where we have done this.

MR. SACHSE:   Or it could be, if your Honor feels it is necessary, perhaps with a little more room on the Exhibit A itself, on the last page of Exhibit A.   Add at the very bottom the parcel numbers above are explained as follows.   There is a little more space.

THE COURT:   Yes.

MR. SACHSE:   I could have this page re-done, return it to you for reproduction by Monday.   If that is satisfactory,

1  we could put it on the bottom of the exhibit itself,

2  explaining what the parcel numbers mean.

3      MR. VEEDER: You have a lot of room on Page 17. Why

4  not just put it above his Honor's signature?

5      MR. SACHSE: I think it looks bad to put an addition

6  below the Judge's signature.

7      MR. VEEDER: I say rewrite the page and put that in

8  right now, if you want it done. Then it could be signed.

9  We would have an opportunity to get it signed now.

10      MR. SACHSE: Whatever his Honor prefers.

11      THE COURT: You could put a note below the judgment.

12      MR. SACHSE: On Page 17 put in a note of explanation

13  of parcel numbers on the exhibit.

14      THE COURT: Of the numbering system shown as to parcels.

15      MR. SACHSE: Exhibits A and B.

16      MR. VEEDER: Set forth on Exhibit A.

17      THE COURT: They are used also to a certain extent in

18  other exhibits. In Exhibit A and other exhibits it is set

19  forth in detail, in Interlocutory Judgment Number Blank.

20      MR. VEEDER: Or set forth in detail here. You have

21  plenty of room.

22      MR. SACHSE: Yes, you have plenty of room.

23      THE COURT: How long does it take?

24      MR. VEEDER: Only as long as it takes Mrs. Tooker to

25  run it.

1   THE COURT:  All right, put it in as a note, and I

2   will sign the judgment.

3   MR. VEEDER:  Mr. Girard, you were asking for a copy of

4   a map for Interlocutory Judgment No. 34, above Aguanga.

5   MR. GIRARD:  Yes.  Commander Redd has prepared one.  It

6   is not in evidence yet -- I checked with Mr. Luddy -- and

7   the number for it should be 210-D, and I will refer in the

8   findings to Exhibit 210-D and we will just introduce that

9   exhibit in the case at the time they are submitted.

10   MR. VEEDER:  What I was inquiring, shouldn't there

11   have been the same exhibit attached to Interlocutory

12   Judgment No. 34-A?  If I remember correctly, 34-A has

13   been entered, has it not?  I just want to be sure that we

14   have the same exhibits on both 34 and 34-A.  I don't want

15   to take your Honor's time on this.  I think we can take care

16   of it after court.

17   MR. GIRARD:  I presume there was an exhibit referred

18   to in 34-A, a geology exhibit.

19   MR. VEEDER:  I have asked Mr. Luddy to get that

20   Interlocutory with the exhibit.  I don't think we should have

21   34 and 34-A with different exhibits.  That's all I was

22   saying.

23   MR. GIRARD:  We will check it out.  I don't think it

24   makes a lot of difference.  I presume the geology as far

25   as the younger alluvium is concerned would  be the same.

MR. VEEDER: Of course. But certainly it is the geology that is all important on the 34-A Series, because that is what governs the parcels that were covered, and I just want to besure that they are the same. Now your Exhibit 210-C was the original exhibit that went in, but it didn't have the geology on it. So you will have 210-D.

MR. GIRARD: 210-D is just the same as this, except with geology on it, and the boundaries of the Aguanga Groundwater area will be depicted on 210-D so that it will be clear.

MR. VEEDER: It suits me very well. Let's just change 34-A to correspond with 34 .

THE COURT: You work it out.

MR. VEEDER: Yes, I will.

MR. GIRARD: We will work it out.

MR. VEEDER: I have no objections other than our standing objections to Interlocutory Judgment No. 31, your Honor. As I understand, that note can be put on after you sign it?

MR. SACHSE: I will take it up and if we can ask Mrs. Tooker to prepare it, we can attach it simply typewritten to show you now and ask Colonel Bowen to reproduce it.

MR. VEEDER: All right.

MR. SACHSE: Then his Honor can sign it when it is actually here.

THE COURT:  All right, now, we have completed about as far as we can go on the agenda matters.  Let's talk about this physical solution.  What is the status of it?  What are the prospects on the dam, et cetera?  What has been done?  Anything?

MR. VEEDER:  Perliter and Soring, I am advised, are progressing in their study in connection with DeLuz Dam in accordance with their contract.  Mr. Bergman, of the Navy, was over sand spent the afternoon with me yesterday discussing this proposition.  I am advised that Perliter and Soring are moving along.  As I understand it -- and I think maybe Mr. Kunkel or Mr. Hoffman can correct me -- I don't think they have been in any way delayed in the preparation of their work.  Your Honor showed some anxiety on December 12th on that point.  I don't believe they were in any way delayed by reason of this question that came up as to how to calculate the availability of water at DeLuz Dam.  I asked particularly whether they would meet the deadline  that had been established by the Navy, which is April 1.  I have been advised that they understand that the deadline will be met and that the Perliter and Soring report as to feasibility and availability of water and the calculated safe yield at DeLuz Dam will be concluded.

THE COURT:  It will be in the hands of the Navy by April 1?

MR. VEEDER:  That is what I understand.  Of course, I am speaking on something that is strictly none of my business here, that I know about.  This is just what I have been advised.  That, of course, is crucial in connection with the building of the dam.

THE COURT:  What progress has been made on the matter of the price of water and what arrangements could be made between Fallbrook and the United States?

MR. VEEDER:  On that score, also, the price of water, if I understand it correctly, is going to be calculated by Perliter and Soring based upon the data they are developing.

That is correct, isn't it, Ace?  They are going to calculate the cost of water?

COLONEL BOWEN:  That will be included in their report.

MR. VEEDER: Yes, that will be available on April 1, as I understand.

THE COURT: And Fallbrook can't proceed further until they know what that is.  Is that right?

MR. SACHSE:  We have advised Mr. Clark, and I believe he agreed -- it was agreed among all of us -- that obviously no m commitment could be made by Fallbrook until (1) a water price is arrived at, and second, or I should simultaneously at least, we are protected by a water right of some kind -- the matter I discussed before the recess. Mr. Clark went even a step further in agreeing that obviously

without the water right being jelled or determined it would be ridiculous to submit a bill to the Congress.  Congress wouldn't approve a project without some kind of water right. As far as Fallbrook is concerned, I don't believe we can do a thing except sit tight and wait.

I am directed by my Board, I might say in passing, to expedite the final judgment in this case in the meantime.

THE COURT:  That raises the question of the final judgment which will have to be drafted, and of course if that judgment is signed -- what is the date?

MR. VEEDER: February 20th.

THE COURT:  February 20th.

-- then all parties except the Government, have what -- 30 days?

MR. SACHSE:  60 days.

MR. VEEDER:  Everybody has 60 days, your Honor.

THE COURT:  Everybody has 60 days.

MR. VEEDER:  Yes, to file the notice of appeal.

THE COURT:  That would be April 20th.

MR. VEEDER: Somewhere around that date.

THE COURT:  And you have the time for appeal running. And the report is only in the hands of the Navy by April. Then what are your desires there?  To have final judgment entered and let anybody so advised take what might be called a protective notice of appeal?  That has drastic

20,982

implications.  Once Congress gets into this and they know

an appeal is pending, then you have other problems.  It is

all right to say an appeal can be dismissed.  But the point

is an appeal has been taken.

MR. STAHLMAN:  The public won't understand it and they

will write their Congressman.

THE COURT:  The case is on appeal.  The timing of this

thing seems rather important to me.  Has anybody made any

calculations if the report was in the hands of the Navy by

April 1 how long it would take to make some decision, and

would there be any prospect for a Bill to be introduced

at this Session?

MR. STAHLMAN:  Didn't Mr. Clark indicate when he was

here that he anticipated presenting a Bill in this Session?

MR. VEEDER:  I didn't hear what you said.

MR. STAHLMAN:  I think MR. Clark when he was here

indicated that this Session of Congress was when he would

anticipate presenting a bill.

MR. VEEDER: George, I don't recall that he said that.

MR. SACHSE:  That is my recollection of his earlier

conference.  But to answer your question, George, the matter

was not discussed at our conference in Washington beyond

the very brief mention that if there ever was a settlement

arrived at, obviously some sort of ultimate time limit of

action by Congress would have to be inserted.  But we didn't

1    talk about how much.  It couldn't sit forever awaiting

2    Congressional action.  That is as far as we went.

3           The other thing I think that is fundamental to

4    all of this is that there has never been the slightest

5    disagreement, I am sure, between Mr. Clark and myself that

6    if there is an appeal there is no settlement.  We will not

7    go.  I have made that very clear to him.  And I think he

8    agrees that if an appeal is pending, it is ridiculous to

9    try to get a Bill through Congress.  If we are still

10   fighting about the lawsuit, there will not be any Bill go

11   through.  So I think your Honor's suggested procedure is as

12   practical as one could be.  A settlement is always possible

13   with an appeal pending, I presume, if we could get together

14   and an appeal be dismissed, as you indicate.  But from the

15   practical standpoint, I don't think we are going to want to

16   talk of settlement very much if there is an appeal.

17          MR. STAHLMAN:  There are other people in the act by

18   then.

19          MR. GIRARD: Aside from the question of appeal and
                                                been
20   everything else, I think it has/ten months since Mr. Clark

21   came here for the first meeting regarding this settlement,

22   and the Navy and Mr. Clark, according to Franz' last

23   statement have indicated an agreement at least to get a

24   water right which is defensible under State law.  The

25   Navy has filed that statement and the State Water Rights

1    Board has held up now for a good many months this DeLuz

2    application.   But, frankly, they are not going to hold it

3    up indefinitely waiting for the United States to make up its

4    mind.   This question of getting a water right does not

5    depend at all upon this report they are waiting for.   I

6    think somewhere along the line someone has to sit down and

7    make up his mind -- and it shouldn't take a great deal of

8    effort, it is not complicated -- how you are going to do it

9    and whether you are going to do it and do it and not just

10   sit here and say, "We are working on it and thinking about

11   it and we recognize the problem."   By the time you do that

12   the State Water Rights Board is going to grant these DeLuz

13   permits and then you can be talking all you want.   You are

14   just going to be back in another Fallbrook trial to set those

15   aside if you want to build a dam, or condemn them.

16       THE COURT:   Which, public relationwise, creates

17   problems.

18       MR. GIRARD:   Yes.   But I think this has to be done

19   within a week or two weeks.   It can't sit forever.

20       MR. SACHSE:   I would like to elaborate on this with

21   one fact I haven't had a chance to communicate to Mr. Clark

22   -- I don't even know that it is accurate.   But Mr. Dennis

23   was in my office Monday and asked me if I had any knowledge

24   as to how soon the Water Rights Board intended to take up

25   the DeLuz filings.   There is the big DeLuz filing, and then

20,985

1   there are also Garnsey and Matthews.  I told him I had no

2   knowledge.  And he said that his information -- how he got

3   it, I don't know -- was that they expected to take up the

4   DeLuz filings by May.

5           After they take them up, at least if they are

6   complicated by a Federal filing, you can be quite sure you

7   are not going to get a decision from the Water Rights Board,

8   I don't think, in four to six months.  They don't render

9   judgment from the bench.  And if this is complicated by a

10  junior filing on the part of the United States and there is

11  a conflict between Mr. Dennis' clients and the United States

12  and between Garnsey and Matthews, the small ones, we may be

13  confronted with a situation where the United States is not

14  going to be able to show Fallbrook a water right for a year.

15  So, I want to second, in the strongest possible language,

16  what Mr. Girard has just said; that we have been monkeying

17  around with this thing for a long, long time and the first

18  essential prerequisite we haven't even taken the first

19  step to accomplish.  We are doing all the three, four, five

20  or six things along the line, but not the first one.  The

21  thing I want to emphasize is that if you don't take that

22  first step, it may be too late.

23          MR. VEEDER:  Have you been in communication with the

24  State Water Rights Board, Mr. Sachse?

25          MR. SACHSE:  Mr. Gavin Craig, their counsel, has called

me several times and told me the DeLuz people have, essentially, been trying to push these, that he is holding off, and what is the status of the settlement? I advised him I felt the United States and Fallbrook were negotiating and a decision as to how the water rights of the Navy would be acquired would be reached in the immediate future. He would like to hold off, and I think the Board would, but they can't forever. Somebody has to decide what you are going to do.

THE COURT: This could well fit into this letter you are going to write about the Paul case. Maybe it should be the other way. The letter really ought to concern the necessity of filing, and the Paul case as a crack in the door to justify the action. In fact, the Government filing would not commit them to go ahead. I don't see how they possibly could be hurt in filing. They could abandon, if they wanted to.

MR. GIRARD: If they file right now, they are in pretty good shape to expedite everything. We have their report right up to date. On April 1st you will have a complete Engineering report on your dam, apparently. Either it will be feasible, or it is not. If it turns out the project isn't feasible, then you are going to drop the dam anyway. But if it is feasible, you are ready to present those plans to the Board. You have no problem with finance

particularly.  You should be able to move right along.

MR. SACHSE:  I would go a step further.  Advice is never welcome, I suggest.  But if I were doing this for the Government and there were no constitutional objections, I would two filings.  I would make one on water to be extracted from the underground through their existing pumping facilities to protect them in their export needs. That they could do like a shot.  They could get a license within 24 hours after getting a permit, because the use is established -- the whole thing is done.  If they got that, I think that alone would effectively forestall the Dennis applications, because what it would amount to would be a prior charge on DeLuz water for purpose of basin recharge. It might not stop the whole Dennis application, but it would stop a part of it.

THE COURT:  If one was filed, they both should be filed.

MR. SACHSE: That is what I say.  I would also file an application for all the water on the Santa Margarita that is left, for a dam.  But the suggestion I make is that I think the easiest way -- in fact, I would say it is fool proof for them to protect their export needs, and that is the fundamental thing they need. Whether they ever arrive at a settlement with Fallbrook or not, the thing the United States needs most is some kind of State right to justify their export and thus revitalize their riparian rights which

20,988

1  today they can't enforce.  And the procedure I outline, I

2  think, would get them back in nothing flat regardless of

3  the settlement.

4       THE COURT: What does this mean?  Mr. Veeder smiles,

5  and Mr. Kunkel nods his head.

6       MR. VEEDER:  We were both, I am sure -- at least I was

7  -- reflecting delight at being advised by Mr. Sachse.  It

8  is the first time he has ever helped me this way.

9       MR. SACHSE:  I advised them once before, and they

10  didn't take the advice.  I advised them they would be better

11  off if they had fought Fallbrook in the Water Rights Board.

12  I still say so.

13       THE COURT:  This is a serious matter. Let's not joke

14  about it.

15       MR. VEEDER:  I am not joking, your Honor.  I couldn't

16  imagine anything more serious.

17       THE COURT:  It would seem to me, regardless what the

18  Government wants to do eventually, that it is certainly not

19  going to be hurt by taking some immediate step to make

20  these filings.  We have been talking about this.  Mr. Clark

21  is going to behere --

22       MR. STAHLMAN:  The 4th of February.

23       MR. SACHSE:  I am going up on the 4th of February to

24  this water conference in Los Angeles.  I am going to try to

25

get this letter you suggest off to him by Monday and suggest

if it is humanly possible I will make myself available to

meet with him either before or after the conference in

Los Angeles on the 4th.

MR. STAHLMAN:  Is your Honor aware of thatconference?

THE COURT:  Yes, Mr. Krieger told me about it.  Is

that the date he is to be here -- February 4th?

MR. VEEDER:  That is what I understand, your Honor.

MR. SACHSE:  I have the announcement here, if your

Honor cares to look at it.

THE COURT:  Could you spend some time this afternoon

on the draft of the letter you are going to write for me,

Mr. Girard?

MR. GIRARD:  Yes, your Honor.

MR. VEEDER:  Will you work with me this afternoon in

regard to changing Interlocutory Judgment No. 37?

MR. GIRARD:  Yes, I will be here this afternoon,

ready, willing and able.

MR. VEEDER:  I think we can get those changed.

THE COURT:  I have had no comment from Mr. Veeder.

Do you have any comment at all about this matter

of making some of these filings, at least on a tentative

basis?

MR. VEEDER:  I have no comment to make, your Honor.

That is a matter exclusively and entirely within the control

1    of Mr. Clark.  I would hesitate even to express myself on

2    it.

3        THE COURT:  All right.  Then I suppose the thing to do

4    is to adjourn until tomorrow morning.

5        MR. STAHLMAN:  There is one thing here I mentioned

6    during the recess that I think is really a matter of a

7    factual situation that exists and I think your Honor should

8    be aware of.  We know there is a great deal of activity

9    in the area within the watershed around Murrieta.  The other

10   day driving to Palm Springs I saw a very large new lake

11   spring up right near Aguanga.  It looks like it is several

12   acres.

13       MR. VEEDER:  Not Aguanga.  It is on Wilson Creek,

14   isn't it?

15       MR. STAHLMAN:  Well, you see it from the highway.

16   It is up there by Bergman's , in that area.  Do you have

17   the same one in mind?  I understand it is a Minor property.

18   They have never even been in court.

19       MR. VEEDER:  Is that in Reid Valley?

20       MR. STAHLMAN:  I didn't look at it on the map.

21       MR. VEEDER:  I have been checking out the Wilson

22   Creek Interlocutory and I want to be sure that the land is

23   covered.  I am not entirely sure it is.

24       MR. STAHLMAN:  That is quite a large body of water

25   there.  I thought I would bring it up.

20,991

1.  THE COURT:  An artificial lake, and they are pumping

2.  it out of the ground?

3.  MR. STAHLMAN:  Yes, quite a large dam.  I was passing

4.  there a month or so before I ever noticed it just recently.

5.  MR. SACHSE:  I am not familiar with the dam he speaks

6.  of.  But Bergman I represented at one time, and I have been

7.  all over that area.  There are a lot of big springs in there.

8.  I don't know whether this is one of those spring-fed ones.

9.  MR. STAHLMAN:  I don't think it is.  It is on the flat

10. land.  I don't think there would be  spring out there.

11. THE COURT:  Can you start tomorrow at 9:30?

12. MR. GIRARD:  Fine.

13. MR. VEEDER:  We would like to.

14. THE COURT:  Because I may want to take a recess in

15. the middle of the morning to attend a Board meeting, and

16. then I can come back later before the noon hour would be

17. over.  So let's get started and see wwhat we can do.

18.  Interlocutory Judgment No. 31 will be lodged.

19. MR. VEEDER:  Has 31 been signed?

20. MR. SACHSE:  No, he is going to hold up the signing

21. until we get this correction.

22.  (Whereupon, an adjournment was taken until 9:30 o'clock)

23.  (
 (a.m., Friday, January 25, 1963.                              )

24.

25.

20,992

## C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above-entitled cause on the date specified therein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this _____ day of _____ A.D., 1963.

_____
Official Reporter