# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

      Plaintiff,

    -vs-

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

      Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Wednesday, February 20, 1963

Pages:   21,056 - 21,137

# FILED

SEP 24 1963

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

21,057

APPEARANCES:   (Continued)

| | |
|---|---|
| For Defendants OOviatt,<br>et al., | BEST, BEST & KRIEGER<br>BY: ARTHUR L. LITTLEWORTH, ESQ. |
| For County of San Diego<br>et al: | JOSEPH KASE, ESQ.<br>Deputy County Counsel. |
| For Certain Other<br>Defendants:<br> Ed Fletcher Co., et al. | HIGGS, FLETCHER & MACK<br>BY: WILLIAM H. IREDELL, ESQ. |

ALSO PRESENT:

| | |
|---|---|
| Harry Watson | Harry Horton |
| Mrs. Virginia Bogstie | Mrs. Ruth Pfefferkorn |
| Carl A. Brown | G. G. Pepple |
| M. M. Henderson | W. L. Cameron |
| W. C. Albany | Alex Shane |
| F. R. Stephenson | Abraham Margolis |
| Clyde Christiansen | David Shane |
| Kenneth L. Howell | |

# I N D E X

| WITNESSES | EXAMINATION |
| --- | --- |
| V. L. CAMERON | 21,072 |
| W. C. ALBANY | 21,075 |
| CLYDE CHRISTANSEN | 21,081 |
| KENNETH L. HOWELL | 21,089 |

# E X H I B I T S

| PLAINTIFF'S EXHIBITS | IN EVIDENCE |
| --- | --- |
| 210-D | 21,099 |
| 293 | 21,110 |

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 20, 1963, 10:00 A.M.

2                              ---o0o---

3         THE CLERK:  One, 1247-SD-C, United States vs. Fallbrook.

4         MR. VEEDER:  Are you ready to proceed, your Honor?

5         THE COURT:  Yes.  Let's get the names of the persons who

6   are here and want to be heard.

7         MR. SACHSE:  Your Honor, may I ask now if I may have the

8   Court's permission, I have a very brief pre-trial at 11:00

9   o'clock in the Superior Court.  I am quite sure there will be

10  no necessity for me to be here for that 15 minutes.  May I

11  leave without asking your permission?

12        THE COURT:  Yes.

13        Mr. Littleworth called, and there is a terrific

14  fog in the Riverside area.  He doubts he will be here before

15  11:00 or 12:00.  He wanted me to call it to the attention

16  o f his clients who may be here.  He will be here eventually.

17        May I have the names of the persons here?

18        (The following named persons announced their presence )
        (                                                        )
19      (to the Court:  Harry Watson, Harry Horton, Mrs.         )
        (                                                        )
20      (Virginia Bogstie, Mrs. Ruth Pfefferkorn, Carl A. Brown)
        (                                                        )
21      (G. G. Pepple, M. M. Henderson, V. L. Cameron, W. C.     )
        (                                                        )
22      (Albany, Alex Shane, David Shane, F. R. Stephenson       )
        (                                                        )
23      (Abraham ⁻⁻ Margolis and Clyde Christiansen.             )

24        THE COURT:  This hearing was set today to consider

25  any objections to incorporating together into one final

1    judgment the various Interlocutory Judgments that were

2    heretofore prepared, signed and filed involving the various

3    parts of this watershed.  Instead of trying to draw one large

4    judgment involving all the landowners in the Santa Margarita

5    Watershed, we adopted a method of taking certain bits of

6    watershed, by area or by subwatersheds, and prepared findings

7    and interlocutory judgments concerning those areas.

8         Now, there have been many changes of landownership

9    since this case started, but some years back -- and maybe one

10   of counsel can supply me with the date -- there was recorded

11   a lis pendens or a notice of action in the County Recorders

12   office in San Diego and Riversity Counties, which is the

13   formal method to give formal notice that an action is pending.

14   Therefore, whether you owned the land before or whether you

15   acquired the land afterward, the proceedings affect the land

16   and you have notice of the proceedings.  I mention this to

17   new owners for the reason that we are continually getting

18   letters from people who say they purchased land and they

19   don't know anything about the lawsuit and what is it all

20   about.

21        Now, just a word about what the lawsuit is about.

22   There has been more misinformation put out about the Fallbrook

23   case than about any other piece of litigation that I know

24   of, starting from the time the reporter for the Los Angeles

25   Times began to run the series of articles that the Government

1   was going to steal all the water from the small farmers in

2   Fallbrook.

3            The suit is a quiet title action -- an action in

4   which the United States, owning land at the bottom of the

5   watershed, at the end of the stream at Camp Pendleton, brought

6   an action to determine what were the rights of the various

7   people in the watershed to the waters of the stream.  It was

8   not a suit to appropriate water.  It was not a condemnation

9   action to take your water from you and to pay compensation.

10  It was the same right that any property owner would have to

11  say, "Here, I have some water rights, and other people have

12  water rights.  I want to get a judicial determination as to

13  what my rights are and what their rights are.  Who are the

14  people that have rights on the stream?"

15           Originally, the Government commenced the action

16  against a limited number of people.

17           What did you have -- a couple hundred to start?

18       MR. VEEDER:  That is correct, your Honor.

19       THE COURT:  And one of the Judges of this court then

20  proceeded to try a part of the case as to certain of the

21  defendants.  The case went up on appeal to the Circuit Court

22  of this Circuit, sitting in San Francisco, and the Circuit

23  Court reversed that judgment and said that every person who

24  owned land in the watershed had to be made a party defendant.

25  This was not the desire of the Government.  This was not the

1   doing of any trial judge.  This was the order of the Circuit

2   Court.  And hence, everybody who owned land, all land in the

3   watershed clear up to Anza/Domenigoni Valley was brought into

4   the case.  And this was, to say the least, a very burdensome

5   situation.  We wound up there with over 6,000 defendants in

6   the lawsuit.  But this was the order of the court.  That is

7   why some of you were made defendants who were up on basement

8   complex where you didn't have any water and never will have

9   any water to speak of.  But you had to be brought into the

10   lawsuit.

11          Now, in trying the case, trying to place land in

12   various categories, we had expert testimony from geologists

13   from the State of California, from the United States and from

14   some of the major defendants to give us a picture of that

15   land and what water was present; and the land fell into several

16   general categories.

17          First, there were those people who had land that

18   lay across a stream which ran occasionally or bordered on a

19   stream which ran occasionally, such as some of the landowners

20   down on the Temecula and on the Murrieta; and of course, these

21   people were riparian owners, as the word is used in water

22   law, and had a riparian right to a reasonable use of that

23   water.  The United States, of course, downstream was a

24   riparian owner because the stream ran through Camp Pendleton.

25   The Vail Company, of course, was a riparian owner, being

1  astraddle the Temecula and part of the Murrieta.

2  A second category of land developed, and that was

3  the land that did not border on a stream that ran, but land

4  which lay over on alluvial fill -- rock, sand, gravel, silt --

5  where there was water and where this water was in contact and

6  fed the stream, the Court held that this was a part of the

7  stream system.

8  A third category was land overlying what we spoke

9  of "basement complex". And basement complex is practically

10  the solid rock -- areas of land where you have a foot or 18

11  inches of soil, maybe two or three feet, and down below is

12  not an alluvial fill but almost solid rock. In those areas,

13  of course, very little water was obtained. Where water was

14  obtained it was because the landowner was lucky enough to

15  find a crack or a fissure in this basement rock where water

16  seeped or ran through and occasionally a man got a domestic

17  well, once in a while he got a well that he could do a little

18  irrigating with. But this land that overlay basement complex,

19  the Court decided was/overlying/ If there was any water,
        not        land.

20  it was water that was not part of the stream system.

21  And so one of the things we tried to do was to

22  separate out in the various judgments those people who over-

23  lay this rocky material and provide in the judgment that

24  that water was not part of the stream system; that if they

25  were lucky enough to get water they could use it, and the people

1    who had rights in the stream system had no concern with this

2    water.

3              By the same token, these people who overlay this

4    basement complex had no rights in the water of the stream

5    system.   And the substance of those judgments was to cut

6    these people off and out of this litigation.   And we used

7    what we called an "A-Series".   Most of the property in the

8    basement complex was put together in a judgment that had a

9    letter "A" after it.   So that, with some few exceptions,

10   waters underlying property which appears in the A-Series are

11   not part of the stream system.   If landowners get any water,

12   they are just lucky to have it; and the only problem they

13   would have with that water in the future might be some dis-

14   pute with a neighbor   If you were on the same fissure or

15   crack on which the neighbor was and your well was taking all

16   the water, you and he might have some litigation some day

17   to divide up that little bit of water out of this crack in

18   the rock.   That wouldn't concern the Government.   It wouldn't

19   concern any of the landowners who overlie the stream system.

20             So far I have been talking about water underground.

21   All the water that falls by rain in this watershed is a part

22   of the stream system -- the surface water.   This water flows

23   down through the little gullies into the creeks and from the

24   creeks down into these alluvial deposits and some of it

25   flows on down the stream into the alluvial deposits on Camp

Pendleton and some of it occasionally is wasted into the ocean.   But this water is the water of the stream system.

Now, you say, "Well, suppose I own land up above and there are no alluvial fills underneath it -- no water underneath it.   Can I catch this water that falls on my land?"   The State of California has established a procedure whereby, to build a dam to catch water you have to get a permit from the State.   Technically -- I say technically -- this would be true of a sump, filling a little gully to catch a little water in the winter to water cattle.   Strictly speaking, you would have to have a permit from the State of California.   I am not making this law.   The State has made this law.

On the other hand, these minor basins to catch water -- and there are many of them -- probably will not be interferred with.   We have drawn one judgment here, in which Judgment No. 28, we describe this type of dam or basin, and we provide that we are not going to do anything about it now, but that technically a permit must be obtained from the State to have one of these and that no rights in the way of prescription or appropriation will be obtained by maintaining any of these small dams or reservoirs.   There is a judgment that describes that situation.

Now, there is a further situation, category of land, and that is suppose you are up in the dry part of the Valley

1   and you have land that borders on a little creek bed and no
                                in
2   water ever runs/that creek except after a rain in the winter-

3   time.   You are a riparian owner.   And this sounds very good,

4   because you border on a stream.   But unfortunately your right

5   is a very illusory one because at the time you need water

6   there is no water running in that creek, and at the time when

7   the water does run in it you can't irrigate.   So you have a

8   very fancy right if you happen to be up there and astraddle

9   of the adjoining creek bed.   Under the law you are a riparian

10  owner.   You have a right to the reasonable use of that water

11  with other persons who are riparian owners.   But it should be

12  obvious to you that this riparian right you have isn't worth

13  a red cent, unless you want to go out and irrigate in the

14  wintertime, because  when the summer comes along there is no

15  water in this creek.

16          There are some variations.   In some of those

17  situations in those creekbeds there is some alluvial fill

18  in the bottom of the creek beds and water coming down those

19  creek beds fills up that alluvium and you may have a fairly

20  good well out of that alluvium, and therefore as a riparian

21  owner you have some rights out of the stream.   In those cases

22  we have held that the water under your land is part of the

23  stream system.   If you have two or three acres of gravel or

24  sand in one of these creek beds, where you have a well, that

25  water, in most cases, is a part of the stream system, and the

judgments provide that you have correlative rights with everybody who has rights in the stream system.

Now, this is not a simple problem, but I am trying to tell you in general terms what is going on. We have defaulted no one -- whether you have an attorney and came into court, or whether you didn't get an attorney. We required that some survey be made of your land. We had geological maps of all of the area, and we made findings as to that land -- whether you ever came into this court or not. No one was defaulted. We tried evenhandedly to apply the same rules to everyone whether you owned an acre in the Murrieta Valley or a townsite or whether you owned the thousands of acres that the Vail Company owned or the thousands of acres which the Government owned. The same yardstick was applied to all problems.

Does any counsel want to add a word or two to this general summary about what this case is about and what has happened?

MR. VEEDER: I think you have done very well, your Honor. I couldn't imagine a better statement.

Does the record show that Mr. Swing is in the courtroom?

THE COURT: If it doesn't show, it should show.

Mr. Swing, we are glad to have you here. You probably did more for water in San Diego County than any

1    person in this courtroom ever did or ever will do.   You worked

2    on the Colorado Aqueduct and you were in this case from the

3    beginning, and we are glad you are here toward the end of it.

4    You are welcome.   We would enjoy a few words of advice from

5    you.

6         MR. SWING:   Your Honor, it is a pleasure and a privilege

7    to be here today to witness what I hope and believe will be

8    the termination of this long drawn out battle which began

9    in January 1951 by the United States Government's filing a

10   claim, claiming all the water in the Santa Margarita River

11   and accusing 6,000 inhabitants of that Valley of stealing the

12   water which rightfully belongs to the United States.   I am

13   hopeful that your Honor, when you sign this judgment, you will

14   bring peace to the troubled inhabitants of the Santa Margarita

15   Valley.   As I recall, at the conclusion of the War  between

16   the States the survivors of the victorious side formed an

17   association and thereafter annually met to celebrate the peace

18   which that War finally closed, and I am assuming that the

19   survivors who have formed the victorious side in winning what

20   we hope will be the termination of this long drawn out war

21   may in the future form an association to celebrate the winning

22   of this peace, and if so, I hope to be a member of that

23   association.

24        Thank you, your Honor.

25        THE COURT:   Mr. Swing, you will be a member of the

1  veterans of the War of the Santa Margarita.  You have served

2  honorably and well.

3         Any other counsel want to add anything generally to

4  what I have said?

5      MR. SACHSE:  No, your Honor.

6      THE COURT:  All right, we will start with Mr. Watson

7  here.  Do you have some inquiry?  Do you want to be heard?

8      MR. WATSON:  Yes, your Honor.

9      THE COURT:  Come forward up here where we can hear you.

10  Take the witness stand here.  Be seated.

11     MR. HARRY WATSON:  I would like to describe the property.

12  I am under the impression that it is going to be grouped in

13  with all the rest of the property that is on basement complex.

14  It is the northeast quarter of Section 13 3 South 7 West.

15     THE COURT:  In what area is it?

16     MR. HARRY WATSON:  It is the Anza area.

17     MR. VEEDER:  It is up on the San Jacinto Fault.

18     MR. WATSON:  It is located right in the middle of the

19  San Jacinto Fault System.  There are about six million breaks

20  at that point, and when it starts to rain those faults are

21  in the same position as the river running under the water

22  table, and there is practically no runoff up there.

23     THE COURT:  Let's find out first what judgment.

24     MR. GIRARD:  No. 33, your Honor.

25     MR. VEEDER:  He is on No. 33-A, your Honor, he is on the

1  basement complex, and his parcel is No. 277, if you want to

2  locate it.

3       THE COURT:  What Section is that in?

4       MR. WATSON:  Section 13.

5       MR. GIRARD:  Yes, Section 13, your Honor, Township 7

6  South Range 3 East.

7       MR. WATSON:  The Northeast quarter.

8       MR. VEEDER:  It is delineated right there.

9       THE COURT:  It would be right in here, then?

10      MR. VEEDER:  Yes.

11      THE COURT:  Now the judgment provides that your land

12  is/an area of basement complex.
   ^in

13      MR. WATSON:  Yes.

14      THE COURT:  And it provides that any water under your

15  ground is not part of the stream system.

16      THE WITNESS:  It is the surface water.  I contend it is

17  s eparate and apart from the Santa Margarita.  There is no

18  runoff.  It goes right in.  There is no creek developed there

19  o r anything.

20      THE COURT:  You may be right.  So what?  What do you

21  want to do with the surface water?

22      MR. WATSON:  I am just afraid I was being grouped with

23  some others that are borderline cases and it might affect

24  the final judgment.

25      THE COURT:  I don't see that it would.  Now you are

1    talking about surface water?

2        MR. WATSON:  Yes.

3        THE COURT:  You are not concerned with underground water?

4        MR. WATSON:  Yes.

5        THE COURT:  Let's assume you want to put in a dam to

6    catch surface water.  That is not my business. You have to go

7    to the State of California to get a permit.

8        MR. WATSON:  You can't catch it.

9        THE COURT:  If you can't catch it, don't worry about it.

10        MR. WATSON:  On top of that, there is no back country.

11   I am on the ridge.  There is only about 200 acres.

12        THE COURT:  I would say you have nothing to worry about.

13   Did you get water on your property?

14        MR. WATSON:  You have to go down to get it out of the

15   faults.

16        THE COURT:  Have you been able to get any?

17        MR. WATSON:  No.  It is dry.

18        THE COURT:  You will be pretty lucky.

19        MR. WATSON:  I am pretty sure the water is there.

20        THE COURT:  I don't think you have any problem, Mr.

21   Watson.

22        MR. WATSON:  Thank you.

23        THE COURT:  And being on basement complex, you are out

24   o f this lawsuit.

25        MR. WATSON:  That is what I hope.

1    THE COURT:  We will not have to bother you any more.

2         Who is the next person?  Mr. Horton.

3    MR. HARRY HORTON:  I have no problem.

4    THE COURT:  Virginia Bogstie?

5    MRS. VIRGINIA BOGSTIE:  No problem.

6    THE COURT:  Ruth Pfefferkorn, do you have a problem?

7    MRS. RUTH PFEFFERKORN:  No.  I think our problems are

8    all solved very congenially.

9    THE COURT:  Carl A. Brown?

10   MR. BROWN:  I think it is all settled, the way you

11   explained it, your Honor.

12   THE COURT:  G. G. Pepple.

13   MR. PEPPLE:  I have nothing to say, your Honor, only I

14   would like to mention that this lawsuit has caused the water

15   from the northern part of California to be difficult to be

16   brought down because of the fact that everyone in the watershed

17   on the Oregon border will have to be sued.  I would like to

18   mention that.

19   THE COURT:  I hope I am not around here when they file

20   that one.

21        Mr. Henderson.

22   MR. M. M. HENDERSON:  No problem.

23   THE COURT:  Mr. V. L. Cameron, come forward.

24        Maybe we had better swear each of these men, in

25   case we have some testimony.

V. L. CAMERON,

being first duly sworn on his oath was examined and

testified as follows:

THE COURT:  Where is your property located?

THE WITNESS:  Your Honor, I am a water geologist and

hydrologist 38 years experience in this area.  I have made

a study of most of Southern California and very intimately

of the Elsinore Basin and the Santa Margarita System, and I

think that the Elsinore Basin should be exempted from this

water complex because it has practically no relation to it

at all.

THE COURT:  The Elsinore Basin?

THE WITNESS:  Yes.

MR. VEEDER:  It is not involved.

MR. SACHSE:  It is exempted.

THE WITNESS:  My land has been covered by this suit and

I have been served with papers.

MR. VEEDER:  May I inquire where your land is?

THE COURT:  Let's find out where your land is.

In fact, we clipped off one area from the top part

of the Murrieta and, in substance, gave it away because we

conceded that that land overlay water that ran into the

Elsinore Basin.

MR. VEEDER:  Here is Exhibit 277, your Honor.  The

Court has delineated the exterior boundaries of the Murrieta-

Temecula groundwater area.

You haven't told me where your property is located.

THE WITNESS:  Where is Lake Elsinore?

MR. VEEDER:  It is clear up here over the divide.

MR. SACHSE:  It is not in the watershed.

THE WITNESS:  A great many of us in the Elsinore area on the north side of the mountain range were served with papers, and we are evidently part of the lawsuit, and then I got notice to appear here today if I wanted to make comment. There are many things that pertain to that.

THE COURT:  What is your name again?

THE WITNESS:  V. L. Cameron.

THE COURT:  Is he listed?

THE CLERK:  I have none of the judgments here, your Honor.

THE COURT:  Affidavits of mailing?

THE CLERK: Those are upstairs, too.

MR. SACHSE:  Do you know the Section and Range, Mr. Cameron?

THE WITNESS:  I have two pieces.  I have 105 acres. Part of it lies in 33 and I can't remember which Section the other is in -- a half mile east and a half mile west of Gordon Road.  That doesn't show Grant Avenue, does it?

MR. VEEDER:  I would like to get your Township and Range.

THE WITNESS:    This seems to be on the opposite side of the lake.

MR. SACHSE:   I think it is safe to say that if it drained into the Lake Elsinore watershed it is not involved in this lawsuit, by judgment anyway.

THE WITNESS:   I have some information that is very pertinent to this suit and it may help you anyway even though it may not have any bearing on mine.   I have been served and I have been a part of this all the time from the start.

But one of the things that I learned was that the well that the Navy drilled on the Vail Ranch came out exactly according to my predictions on it when they started it, and that is in an underground river 300 feet wide that flows through Temecula and then between Temecula and Murrieta it goes through the mountain range and into Camp Pendleton.   But nothing west of there has any bearing on this complex at all.

MR. VEEDER:   I didn't know Mr. Cameron was served, frankly, and I have to check it, because I don't believe he is a party.

THE COURT:   I don't find him.

You say you got notice of this hearing?

THE WITNESS:   Yes.   And my wife and I each got a pile of papers.

THE COURT:   Do you own any land in the watershed?

THE WITNESS:   They claimed it was in the watershed.

THE COURT:  Do you have a legal description of your property?

MR. CAMERON:  I didn't bring it with me.

THE COURT:  Mr. Veeder, have somebody check it out.

MR. VEEDER:  I will check it out, your Honor.

THE COURT:  You may step down.

W. C. Albany.


W. C. ALBANY,

being first duly sworn, on his oath was examined and testified as follows:

THE COURT:  Mr. Albany, what is your problem?

THE WITNESS:  I don't know, really.

THE COURT:  You own the Knox Ranch now?

THE WITNESS:  I have the Knox Ranch, the major portion of it.  He retained a little over a hundred acres.

THE COURT:  We drew a separate judgment.

MR. SACHSE:  No. 27, your Honor.

THE WITNESS:  The question that I ask on this is that I received a copy of a judgment filed on April 25, 1961 when I purchased the property, and have there been any changes in that, that you know of?

MR. SACHSE:  No.

MR. GIRARD:  No.

THE COURT:  Well, yes.

1    MR. VEEDER:  The Aguanga groundwater area, Judgment

2 No. 40.

3    THE COURT:  Let's get the map.

4    MR. GIRARD:  The Aguanga groundwater area judgment

5 incorporated specifically the Knox judgment by number.

6    MR. SACHSE:  Yes.

7    THE COURT:  So you will understand, you and some of the

8 other individuals --

9    MR. GIRARD:  Gibbon and Cottle were the others.

10    THE COURT:  -- had some of these big ranches.  There

11 were separate judgments drawn as to your property.  But at

12 the same time we are working on the judgment on what we call

13 the Aguanga groundwater area.  There were two large groundwater

14 areas:  (1) The Murrieta Groundwater Area and (2) the Aguanga

15 Groundwater Area.

16    THE WITNESS:  Yes.

17    THE COURT:  In fact, the attorneys tell me that when your

18 judgment was signed reference was expressly made to the fact

19 that you were within the Aguanga groundwater area.  Now the

20 effect of this judgment in this area is to say that you people

21 in that area have correlative rights.  The situation isn't

22 as clear there as it is in Murrieta, because there is a lot

23 of faulting.  But actually your rights are correlative in that

24 what you do with water underground may affect your neighbors,

25 because there is an inter-relation to the water in that area.

1          THE WITNESS:  I see.

2          THE COURT:  Have we got a map so we can show him?

3          MR. VEEDER:  Here it is, your Honor.

4          MR. GIRARD:  Here is the finding in the Agaunga.  This

5    is No. 30, your Honor.

6          MR. VEEDER:  This is Map 277-B, your Honor.

7          THE COURT:  Don't we have the colored map?  That would

8    show this a lot better.

9          MR. VEEDER:  Yes, we do.

10         THE COURT:  In Interlocutory Judgment No. 40, which is

11   the Aguanga groundwater area, Paragraph 30 states:

12              "This Court has heretofore entered Interlocutory

13         Judgment No. 27 concerning the lands apparently owned

14         by Defendants Garner L. Knox, Flora S. Knox, Walter

15         G. Knox, located in  . . .; that Findings of Fact,

16         Conclusions of Law and Interlocutory Judgment Number 27

17         are incorporated herein by reference . . ."

18   And pull your judgment as part of this.

19         MR. VEEDER:  This is Exhibit 210-D, your Honor.  I think

20   it should be in evidence -- this composite.

21         MR. GIRARD:  Yes, I am going to offer it in evidence.

22   That is 210-D.  It is the exhibit we used by reference in

23   the 34-Series.

24         THE COURT:  Doesn't 275 show it here?

25         MR. VEEDER: Yes, it does, but I have a better

1    delineation on 210-D.

2         THE WITNESS:  This is my property.

3         THE COURT: Where is this groundwater area marked out

4    here?

5         MR. GIRARD:  It is up from these red lines.

6         THE COURT:  To orient yourself, here is the Vail Lake

7    and Vail property.

8         THE WITNESS:  Yes.

9         THE COURT:  This red line was put in here by section

10   numbers to make it easy for description.  We couldn't run a

11   diagonal line.  So the red line marks out this groundwater

12   area that we are talking about.

13        THE WITNESS:  I see.

14        THE COURT: Where does it go from here?

15        COMMANDER REDD:  It goes up into the Wilson Creek

16   watershed, your Honor.

17        THE COURT:  And this we call the groundwater area.  Your

18   judgment is incorporated by reference in the general judgment

19   that covers this area.  So you would be concerned largely

20   with the two judgments, Numbers 27 and 40.

21        THE WITNESS:  I see.  All right.

22        THE COURT:  Do you have any other questions?

23        THE WITNESS:  In Number 40, were there any overlapping

24   or any changes made in the other judgment, other than that

25   situation?

MR. GIRARD:  No, you are still riparian to that same extent, or overlying, that you were in Judgment Number 27.

MR. VEEDER:  We will have mailed to Mr. Albany a copy of Number 40.

THE COURT:  The gist of this is that with you located up here and here is a fellow down here in the same groundwater area, actually the judgment provides that you all have correlative rights, but as a practical matter probably nothing that he did up here would affect you down there.  However, there is an inter-relation in the groundwater in that area.

THE WITNESS:  How about the surface running of the water?

THE COURT: The surface water is part of the stream system.  As a riparian owner, you have a right to reasonable uses of that water.  You can't use it to the exclusion of all your neighbors.

THE WITNESS:  This is happening.

MR. GIRARD:  They can't use it to the exclusion of you.

THE WITNESS:  It is happening now.

THE COURT:  By people upstream from you?

THE WITNESS:  Yes, they cut it off, they fill up their dams.  We don't see it again until next spring.

THE COURT:  This is something we haven't gotten to.

MR. STAHLMAN:  Is that Gibbon and Cottle?  We have had that problem.

MR. GIRARD:  This particular judgment is only to define

21,080

1    rights.   In other words, it didn't adjudicate between people

2    as to how much water they were entitled to.   In the event that

3    you feel in the future one of your neighbors upstream is

4    t aking more than his share of riparian water, you would be

5    p rivileged to seek an injunction or some other relief before

6    the court to get your fair share.   But this judgment is only

7    to define what your rights area in the sense whether you are

8    a riparian, overlying owner, or vagrant local percolating

9    water owner.

10          THE WITNESS:   I see.

11          MR. STAHLMAN:   I am just wondering if it would be

12   advisable to explain to the people that the Court is retaining

13   c ontinuing jurisdiction and that some studies might be made

14   in connection with these matters.

15          THE COURT:   Yes.   Mr. Stahlman calls my attention to the

16   fact that all of these judgments and the final judgment will

17   h ave a provision in them that the United States Court retains

18   continuing jurisdiction of these lands where the waters are

19   p art of the stream system.   We haven't got any more concern

20   with the waters in the basement complex.   But we are concerned

21   with waters that are part of the stream system -- that is,

22   surface waters or underground waters that are part of the

23   stream system, and the Court will continue to take jurisdiction

24   and, if necessary, there may be further proceedings in the

25   matter of equitable and fair use of water.

1        THE WITNESS:  Thank you, sir.

2        THE COURT:  Mr. Alex Shane.

3        MR. ALEX SHANE:  No objection.

4        THE COURT:  Mr. David Shane.

5        MR. DAVID SHANE:  No objection.

6        THE COURT:  Mr. Margolis?

7             Mr. F. R. Stephenson?

8        MR. STEPHENSON:  No objection.

9        THE COURT:  Mr. Clyde Christiansen.

10       MR. CHRISTIANSEN:  A couple of questions.

11       THE COURT:  Yes, sir.  Come forward.

12

13                 CLYDE CHRISTIANSEN,

14   being first duly sworn on his oath was examined and

15   testified as follows:

16       THE WITNESS:  Your Honor, along the general resume that

17   you made, one question that will probably be in a lot of

18   people's minds out in the country.  Will owners that were

19   previously served with the judgment receive any further

20   information at the termination of this relative to the status

21   of their particular lands -- whether they are in the basement

22   complex area or some place else?  Will they learn that?  Will

23   they be issued a mimeographed sheet that says it is over and

24   this is where you are now, or anything of that nature --

25   whether they answered or whether they didn't answer?

1    THE COURT:  We didn't contemplate doing that.  However,

2  those persons who want a copy of a judgment or want a copy of

3  a map, there are ways in which they can be obtained.  These

4  are all public records.

5    THE WITNESS:  But to your knowledge now, there will not

6  be a mailing or a serving, as there was in the beginning, saying

7  that now it is over and this is where you are?

8    THE COURT:  Well, the only thing you could do would be

9  to mail copies of these judgments, and they are so big.  Even

10  broken down as we have broken them down you couldn't, in a

11  few sentences, tell a man exactly what the situation was,

12  except in very general terms.  So that the only thing you

13  could mail him would be copies of the judgments.   You take

14  the judgment in the Murrieta area where you have all those

15  Townsites, that judgment with the descriptions and all is

16  about two and a half or three inches thick.  It is indexed.

17  You can find things in it.  But I don't think it would serve

18  any useful purpose to mail these out.

19    THE WITNESS:  I appreciate the problem involved.

20    Secondly -- along the same line, a little more

21  technical -- will there be any release of the cloud on the

22  title of lands in a certain area in this respect?  In property

23  now that is purchased or sold, et cetera, it shows on the

24  policy of title insurance this Santa Margarita lawsuit, and

25  that always rides on there and that could shake some new

1    purchasers up a little bit.

2         THE COURT:  The title companies will not guarantee

3    water rights.  We did run onto one case where the title

4    company had written a guarantee of a water right for one

5    individual, and the title company had to hire a lawyer to

6    defend the case, and I think we held adversely to the title

7    company.  Did we not?

8         MR. GIRARD:  We held they were riparian, that is all;

9    no appropriative or prescriptive right.

10        THE COURT:  We didn't sustain the prescriptive or

11   appropriative right they guaranteed.

12             The title companies will not write insurance on

13   your water rights.  All they will do in a title policy is to

14   point out that you are in an area in the watershed involved

15   in this action.  I don't think there is much we can do for

16   you on that.  We have tried by some of these maps which are

17   attached to many of the judgments to make it visually clear

18   what area this property was in and whether the land was

19   basement complex where you would largely be unconcerned with

20   the lawsuit or whether you lay in one of the groundwater areas

21   where you might be concerned in the future in the lawsuit.

22        THE WITNESS:  I was thinking more specifically not of

23   the title companies or anyone guaranteeing any rights, but

24   in relation to the area you originally referred to earlier

25   this morning as the basement complex or the A-Series.  That

I am assuming now would no longer be a part of this action and it covers a lot of area that this original judgment that is on record would be erased from there, so that it doesn't continue to appear on policies of title insurance.

MR. GIRARD:  Those lands are still a part of this lawsuit because they are still within the watershed for surface waters.  The title company would still note that they are subject to this lawsuit, at least to the extent of surface waters.  Groundwaters, of course, are vagrant local and not subject  to the jurisdiction.

THE COURT:  I had representatives of all of the title companies down here and I was hopeful that something could be done along the line you suggest, and I got nowhere.  In case you don't know it, the title companies are the "Supreme Court" of the State on the law of titles and there is not much you can do about it.  I was hopeful the title companies would be willing to put in their searches that this area in judgment number so-and-so is in the basement complex, and we were going to supply them copies.  But all they are going to do is merely refer to the fact that the suit is pending.

Are you a real estate man?

THE WITNESS:  No, I am a farmer.

Technically, the area that is in the basement complex, as this gentleman pointed out, is still in the watershed.  So in effect it is not out of the water suit and

1    it will remain on record that this is in the area.

2         THE COURT:  Right.  But practically it is out, because

3    the only concern we have in this basement complex is the

4    surface water and the uninterrupted flow of rainfall down

5    the gullies and creeks, et cetera.

6         THE WITNESS:  I see.

7         THE COURT:  Of course, you have enough problems about

8    your own property.  I wouldn't be worrying about other

9    peoples'.  You can find out exactly where your property is.

10        THE WITNESS:  That is right.  But if you live there and

11   questions are asked it would be interesting to have some kind

12   of answer.

13        MR. STAHLMAN:  I think in view of the question the

14   gentleman asked it should be clear on the record that there is

15   available to him the judgment that involves his property.

16        THE COURT:  Yes.

17        THE WITNESS:  In relation to that, this may be a small

18   detail, but on your Judgment No. 36-A, on a propertythat we

19   own, which consists of 660 acres in one parcel, you Murrieta-

20   Temecula Basin boundary barely skirts the edge of it and

21   includes three lots and leaves one out, and it involves about

22   700 feet and it is right in the very edge and most of the

23   land is out.  For our own practical intent and purposes, we

24   would be much happier if it was all out instead of saw-

25   toothing up the bottom edge of it.  And it happens there is a

1   property line, and I agree there is no way of knowing whether

2   it is going to remain that way, but it has for a long time.

3   That it would also be convenient to run that boundary along

4   the property line separating the two properties rather than

5   in a saw-tooth fashion right on the edge of our border.  That

6   would put all of the land in the basement complex.

7           THE COURT:  We were trying to do that.  What is the

8   description?

9           MR. VEEDER:  I want to be sure of the reference to the

10  judgment.  Did you say 36-A?

11          THE WITNESS: That is my impression.

12          THE COURT:  30-A probably.

13          MR. VEEDER:  I think it is 30-A.

14          THE WITNESS:  It may be.  It is the Murrieta-Temecula.

15          MR. VEEDER:  The Murrieta-Temecula groundwater area?

16          THE WITNESS:  Yes.

17          MR. VEEDER:  I think the record should show he is

18  referring to Judgment No. 30 rather than 36-A.  You have not

19  signed 36-A.

20          THE COURT:  Let's see if we can locate his property.

21          MR. GIRARD:  Colonel Bowen has it located.

22          THE WITNESS:  I have a well-worn aerial here that

23  clearly indicates the two types of soil conditions.

24          COLONEL BOWEN:  The southwesterly boundary of the property

25  bisects Lots 19, 20, 21 and 22 in the area north of Murrieta.

1      THE WITNESS:  Our property consists of this area up here.

2      THE COURT:  Here are the Santa Rosa Mountains.

3      THE WITNESS:  Lot 22 is in.

4      THE COURT:  You own Lot 22?

5      THE WITNESS:  Yes.  Lot 21 is out.  We own that.  We own

6  Lot 20 and 19, both of which are in.

7      COLONEL BOWEN:  May I add, only half of 19, 20 and 21

8  are apparently owned by Mr. Christiansen.

9      THE WITNESS:  This line is the separation of the property

10  line between the larger owner below and the larger owner up

11  here.

12      THE COURT:  Here is our problem.  The geology of the

13  thing showed a diagonal line cutting across these properties,

14  and we tried to take sections or divisions of lots so you

15  could have some proper legal description.  I don't see that

16  this hurts you a bit.  There may be some advantage to it.  Your

17  land above is out of the water area.  We don't anticipate

18  you ever will get any wells up in there that will have any

19  effect on this water system.  That is why you are out of it.

20  Now your fringe land around the boundary is so near the same

21  t ype that there would be serious doubt in my mind if you

22  would ever get wells in 22, 20 or 19, although they are in

23  the water area, that would have any effect.  You are far up

24  toward the basement complex.

25      THE WITNESS:  I realize those right on the boundary, and

for 700 feet it puts us in where we are out.

1    THE COURT:  I don't know that we can do much about that.

2    THE WITNESS:  On this aerial this is the division of

3    these half lots.  In other words, there are 40 acres recorded

4    a long time ago.  And so this one is in, this one is out, and

5    this one is in, and this is in.  And this darker line, these

6    fingers, actually the lower area that would be considered

7    alluvium, that is in the basin, and yet fingers of it come up

8    in here, and this one is out, and this one has lots of

9    mountains.

10    THE COURT:  You can see why this was done.  This alluvial

11    area they attempted to throw into the water area, but obviously

12    you couldn't draw a description that went up on each of these

13    fingers.

14    THE WITNESS:  No.  That is why it would be nice to make

15    it just straight along the property line.

16    THE COURT:  I don't think I will do that.  I don't think

17    you are hurt.  Anything else?

18    THE WITNESS:  I believe that completes my comments.

19    THE COURT:  Mrs. Gheen, did you have some problems?

20    Anyone else who has come in who wants to be heard

21    or has some questions?

22    MR. GIRARD:  The record should show that Mr. Littleworth

23    has arrived through the fog.

24    MR. LITTLEWORTH:  Your Honor, I apologize. Actually we

25    started at 7:30, but we have been coming most of the way at

1   20 or 25 miles an hour.

2       THE COURT:  Anybody else who wants to be heard in this

3   m atter?

4       MR. HOWELL:  I am Kenneth Howell, from Wildomar.  I

5   wrote you three days ago.

6       THE COURT:  I answered your letter this morning.  But

7   y ou have so many suggestions in your letter that I would have

8   to sit down with you for about half a day to talk about a lot

9   of them.  Some of them are very good.  Some of them are just

10  contrary to the water laws of the State of California.  Come

11  forward if you want to be heard, Mr. Howell.

12

13              KENNETH L. HOWELL,

14  being first duly sworn on his oath was examined and

15  t estified as follows:

16      THE CLERK:  State your name, please.

17      THE WITNESS:  Kenneth L. Howell, Wildomar, California.

18      THE COURT:  Are you married to the former Ada Schram?

19      THE WITNESS: No, I am not.  Her last name was Nellie

20  Henderson.

21      THE COURT:  That is another Howell.

22          I read your letter with interest, but a lot of

23  t he matters you suggested you are wrong about, which, if I

24  had time, I could explain to you.  Some of your suggwstions

25  are interesting, but there is not much I can do about them.

1    THE WITNESS:  Is that first point true?  That I have no

2 right to hold the water that falls on my own land?  I can prove

3 that it falls on my own land, but I have no right to hold it

4 there?  Is that correct?

5    THE COURT:  That is technically right.  How many acres

6 do you have up there?

7    THE WITNESS:  Almost 1,200.

8    THE COURT:  Are you in the Murrieta Valley?

9    THE WITNESS:  No; in the Wildomar area just northwest

10 of Murrieta.

11    THE COURT:  You are in Judgment 30.

12    THE WITNESS:  I am not familiar with what Judgment 30 is.

13    MR. VEEDER:  He is partly in and partly out of the

14 Murrieta-Temecula groundwater area.

15    THE COURT: This is the map.

16    THE WITNESS:  I have lands which go down into the

17 Valley floor, but most of it is on this so-called basement

18 complex.

19    THE COURT:  Here is Murrieta.  Where is Wildomar?

20    THE WITNESS:  Here is Wildomar. These are my lands in

21 here.  I am up against the Forest Reserve and most of it is

22 basement complex.

23    THE COURT:  I know generally where.

24    THE WITNESS:  I also own across here on this Section

25 25 and 26 on Baxter Road here, I also own 350 acres here.

21,091

THE COURT:  That is out of the groundwater area.

THE WITNESS:  Then this area, I own Lots 3, 4, 11, 5, 6, 1 and 2 in the Santa Rosa Addition of Wildomar.  That is inside your map.  I have tried to get water there.  I have not been able to do so.  I strike rock at about 90 feet.  That seems to be the end of it.  I own 350 acres of Sections 25 and 26 on Baxter Road, north of Baxter Road.

THE COURT:  That would be this area in here?

THE WITNESS:  Yes, northerly from Wildomar.  My lands, according to this map, are within the district, are some of the lots of the Santa Rosa Addition to Wildomar -- I gave the numbers a moment ago.  The rest of this is basement complex.  And the problem that really hits me hard, if I understand your decision, is that I had planned all these years -- I bought that property in 1933, and I had planned, until this suit cameup, to install means of collecting and saving water from my own area on this southwesterly side of the valley in this basement complex.  I want to know what I can do about it.

MR. GIRARD:  This suit had nothing to do with your right to store that water.  You just didn't have the right period, unless you got a license from the State.

THE WITNESS:  As I said in my letter, a number of years ago when the request was made for a dam here in the lower reaches of the Santa Margarita, I sent in and gave an

1    opportunity to raise any objection, I sent in saying I have

2    no objection to a dam down here but I would like to have the

3    same right to hold my own water on my own land, anything I

4    can prove comes from my land.

5        THE COURT:  Let's go back a minute.

6        THE WITNESS:  And the reply was, your objection is denied,

7    from the State of California.

8        MR. GIRARD:  That is right.

9        THE COURT:  In your town lots, you haven't found water,

10   but you are within the groundwater area.

11       THE WITNESS:  I have a little water, but not much.

12       THE COURT:  On 25 and 26 we have found you are outside

13   the groundwater area.

14       MR. HOWELL:  Yes.

15       THE COURT:  If you get water, you are lucky.

16       MR. HOWELL:  Yes.

17       THE COURT:  We don't think you are going to get much

18   water.

19       MR. HOWELL:  Yes.

20       THE COURT:  Let's take your basement complex.  This suit

21   hasn't changed any law that exists there, except we -- it

22   hasn't changed any law.  Now we have said that if you find

23   groundwater there -- if you dig in and find springs or

24   fissures, this water is yours.

25           As to the water that falls in a state of nature

21,093

over all of this watershed, including your property, this is the water which, in a natural state, runs down to supply lower riparian owners.   If the law were that everybody could catch all the waterthat fell on his particular property, you would destroy the whole natural method by which streams operate.   Because a stream is a collection of water which has fallen on other land and then goes downstream.   I haven't changed any law.

As to building dams, I suppose as to some minor catchment there would be no complaint.   Technically, if you build a dam, you have to get a permit from the State -- not from me.

MR. HOWELL:   Does one have to get a permit from the State for a dam less than 15 feet high?   I understand he does not.

MR. GIRARD:   You are talking about the dam requirements?

MR. HOWELL:   Yes.

MR. GIRARD:   There are two types of approval by the State.   You have to get a permit for impoundment of water for seasonal storage regardless of how big the dam is.   You also have to get a permit from the State for a dam structurally if the dam is over a certain height or holds so much.   In other words, if you have just a ten acre foot dam five feet high, you don't have to get a permit from the State for that particular structure.   You still would have to get a permit from the State to get a right to impound that water.

1    MR. HOWELL:   I do have a reservoir which has been used

2    since the '80's.   It only holds about half an acre foot.   I

3    have another reservoir which has been dug for several years,

4    which holds two and a half acre feet, and I have been hoping

5    to impound quite a bit of water, but according to this suit

6    I was not going to be allowed to do so.   That is what hit me

7    hard.

8         MR. GIRARD: This suit has nothing to do with your right

9    to impound water.   You never had that right before.

10        MR. HOWELL:   According to what the State of California

11   has said, I would not have a right to impound water.

12        THE COURT:  We haven't changed any law.   This has been

13   the situation.   Up in the agricultural and pasturing areas

14   there are many of these little stock reservoirs.   They exist

15   without permits.   Nothing is being done about it and

16   probably will not be as long as they are not too big.   But

17   conceivably if everybody had a little reservoir or dam and

18   you had thousands of these in this watershed, you could

19   collect enough water in them that people in other parts of

20   the area that were entitled to have water run down wouldn't

21   have any run down.

22        MR. HOWELL:   Then do I understand I did the wrong thing

23   by buying that area to get water and hold it?   I bought it in

24   1933.

25        THE COURT:  I can't tell you about that.   But I don't

1    think anybody who owns land in Southern California did the

2    wrong thing.  With a little exploration in your mountain rock

3    you might be lucky and might hit a pretty good bit of water

4    with a little bit of work on it.  They tell me you can get

5    water in the solid rock in the Santa Susana Mountains.

6         MR. HOWELL:  I do have two sets of springs, but together

7    they do not produce much more than an inch of water except

8    in the wintertime.

9         THE COURT: Anything more I can do for you?

10        MR. STAHLMAN:  You might get together with Mr. Cameron.

11   He said he is a water finder.

12        MR. HOWELL:  My Doctorate minor is in geology.

13        MR. STAHLMAN:  Do it yourself.

14        THE COURT:  Anything further I can do for you?

15        MR. HOWELL:  I am afraid not, your Honor. That is my

16   problem.

17        THE COURT:  We have an individual judgment here that

18   involves these surface impoundments, and generally, you might

19   like to look at that.

20             Who will make a copy available?

21        MR. VEEDER:  He can get one in my office.

22        THE COURT:  If you will see Mr. Veeder's office, they

23   will give you a copy of this judgment that involves these

24   surface impoundments.

25        MR. HOWELL:  Thank you, your Honor.

1   THE COURT:  Anyone else want to be heard?

2     What about this fine looking group of lawyers here?

3 Are you just here to add class to this meeting, or do you

4 h ave something to present?

5   MR. KASE:  We have no objection on behalf of the

6 County's properties, your Honor.

7   THE COURT:  Mr. Iredell?

8   MR. IREDELL:  I have nothing, your Honor.

9   MR. STAHLMAN:  I have never known Bill Dennis to walk

10 into a court without having something to say.

11   THE COURT:  How about it?

12   MR. DENNIS:  I will break the chain -- I have nothing

13 to say.

14   THE COURT:  Mr. Littleworth?

15   MR. LITTLEWORTH:  I think you have heard from us from

16 time to time throughout.  There is nothing we have new to

17 add.

18   THE COURT:  This is a very friendly meeting.

19     One other matter maybe I should have mentioned,

20 although no one has raised it here.  Mr. Tarwater apparently

21 has been very active sending out copies of these letters to

22 a lot of people up in the Valley about the Treaty of Guadalupe

23 Hidalgo and the fact that there are supposed to be certain

24 rights guaranteed by the Treaty of which he and other people

25 are beneficiaries.  If any of you are interested in that, we

looked that up and we had a judgment drawn telling about

the Treaty of Guadalupe Hidalgo, and we found it very

interesting that the Mexican water law is about the same as

California law.   So anyway you look at it, there are no

extra rights that anybody has because they claim under the

Treaty of Guadlupe Hidalgo.   I have been getting all sorts of

requests on that.

        Mr. Veeder, what have you to present?   You have

always got something.

        MR. VEEDER:   I think it is time for a recess, your

Honor.

        (An interruption.)

        MR. VEEDER:   I have nothing, your Honor.   I have an

agenda of work we still have to do, but I don't think it has

anything to do with these gentlemen and ladies.

        You have heard from Mr. Trent Anderson, a lawyer

for A. A. Ward.

        I have heard from Mr. O'Malley, who represents

Oviatt.

        I have talked to Mr. McInnis and some other lawyers,
               would
but I thought we/go into that later.

        These are suggestions that have been made by these

gentlemen.

        Mr. Ward wants to put in some evidence in regard

to an appropriative claim he has up on Temecula Creek.   I

21,098

1   told Mr. Anderson I would bring this matter to your attention

2   this morning and that your decision as to whether the Ward

3   claim would be heard would be relayed to him.

4            I told Mr. O'Malley that I would refer to his

5   memorandum, a copy of which is before your Honor.

6            And a gentleman named Buchanan called me in regard

7   to some of his land.   I am advising him where it is located.

8   A lawyer named Hendricks brought to my attention the properties

9   of the Chihuahua Land Company.   They have some reservoirs up

10   there.   I have checked this out with Colonel Bowen.   The

11   Colonel has made a soil survey.   I have tried getting hold of

12   Mr. Hendricks to advise him of the disposition of it and I

13   have not been able to.   I called his office and he hasn't

14   been there.

15            Those are housekeeping matters that I don't believe

16   anybody but we are interested in.

17       THE COURT:   Let's take up matters you have on your

18   agenda here.

19       MR. GIRARD:   Before we start, I would like to clear up

20   the record.   We should introduce in evidence Exhibit 210-D,

21   a geology map for the 34-Series, prepared by Colonel  Bowen.

22   It is the geology exhibit of the Temecula subwatershed above

23   the groundwater area.   It is a composite, your Honor.

24       MR. VEEDER:   It is a composite of 210-C and the geology.

25       THE COURT:   Any objection?   Exhibit 210-D received

in evidence.

MR. GIRARD:  Also, I would like to submit the Interlocutory Judgment No. 34, which has the exhibits attached.

THE COURT:  You have a judgment ready for signature here?

MR. GIRARD:  Yes, Interlocutory Judgment No. 34, which has the exhibits attached.  That is the Temecula subwatershed above the Aguanga groundwater area.

THE COURT:  Have you looked this over, Mr. Veeder?

MR. GIRARD:  I don't know that he has.

MR. VEEDER:  I really haven't.  I haven't received it. I will go over it.

MR. GIRARD:  We can have that signed this afternoon, your Honor.

THE COURT:  All right, look it over.

                    (Plaintiff's Exhibit 210-D, for )
                    (identification received in     )
                    (evidence.                      )

MR. GIRARD:  There is one thing I would like to ask your Honor.  In that Interlocutory Judgment I incorporated by reference California's Exhibit AS, which concerns applications to appropriate water which are on file with the Court and the State Water Rights Board.  I should have also referred to Exhibit AS-1, which is the later one bringing them up to date.  What I would like to do -- and this has Mr. Sachse's and Mr. Stahlman's concurrence, and I hope Mr. Veeder's --

1    is to have Exhibit AS-1 in this record attached to Exhibit AS

2    and it would be just one exhibit.

3       THE COURT:  As I recall, we brought that up to date with

4    a list of late filings, did we not?

5       MR. GIRARD:  Yes, AS-1 is the late filing.

6       THE COURT:  In other words, you don't want to interline

7    on your judgment, but you just want to make one exhibit.

8       MR. GIRARD:  Yes, your Honor.

9       MR. VEEDER:  It is a public record.  I have no objection.

10      MR. GIRARD:  It is in evidence.

11      THE COURT: What is the exhibit?

12      MR. GIRARD:  AS-1 made part of AS.

13      THE COURT:  AS-1 will be made part of AS.

                        (California's Exhibit AS-1, for )
                        (identification received in      )
                        (evidence as part of Exhibit AS.)

16      THE COURT:  Now, on the first matter you have on the

17   agenda, the matter of handling these letters that have been

18   received, I think all letters received ought to be filed

19   and most of them ought to be answered.  You and I talked

20   yesterday about this.

21      MR. VEEDER:  Yes, your Honor.

22      THE COURT:  Work out some general language to take care

23   of different situations.  The hardest letters to answer are

24   these new owners who say, "I have just bought some land.  What

25   is this lawsuit all about?  I don't know a thing about it."

About all we can do is to tell them what judgment their property is in and whether they are an owner overlying the basement complex or whether they are an overlying owner on water bearing gravel or whether they are riparian, a few things like that.

MR. VEEDER: We will advise them when the lis pendens was filed and that their property was subject to the suit.

THE COURT: There are a few more letters this morning. We probably have most of them. I don't think they are going to run over a hundred altogether.

MR. VEEDER: That is about what it will be, your Honor. We will go ahead and handle them.

THE COURT: You may prepare letters for my signature.

MR. VEEDER: That is correct.

THE COURT: Take up this Oviatt matter. Apparently Mr. O'Malley only wants an insertion of three or four words in that judgment. Is that the way you read it?

MR. VEEDER: As I see it, all he wants to do is to say a "continuous flow" in the interlocutory that was signed in regard to his client. I talked to Mr. O'Malley about it. If the record will support it, I have no objection. But I don't know that that is a continuous flow right that he has. I really have no objection to using the term.

THE COURT: I have the same view. I can't recall now what the record shows about this Koehler Canyon Creek.

1     MR. GIRARD:  I will try to check it at the noon recess,

2  and if it is correct, I have no objection to it, either.

3     MR. VEEDER:  It is seldom you have a situation where

4  there is a continuous use of the water.  That is all I say.

5  And if we put in there "as long as it is beneficially used,"

6  I don't know of any reason to object.

7     THE COURT:  Pass it up until you check it out.

8     MR. GIRARD:  I will check it.  I can use your Honor's

9  transcript.

10     THE COURT:  Yes.

11         What about Trent Anderson?

12     MR. GIRARD:  I don't know anything about that, Bill.

13  Would you explain it briefly to me?

14     MR. VEEDER:  What has transpired is this, your Honor.

15  Apparently Mr. Ward has a very substantial ranch up in

16  Dameron Valley, I believe it is.  Isn't it, Colonel?

17     COLONEL BOWEN:  Yes, sir.

18     MR. VEEDER:  And the Colonel has made a soil survey and

19  engineering report in regard to it.  Originally I thought

20  all the Mr. Ward was claiming would be a riparian right, and

21  I talked to Mr. Anderson about it, believing there would be

22  no real dispute.  I find now, though, that Mr. Ward is

23  claiming an appropriative right dating back to 1890 for a

24  substantial quantity of water from Temecula Creek.  If he

25  could prove it, it would seem to me to be an extremely

1     valuable water right.

2       THE COURT:  Did you tell Mr. Anderson that we are taking

3   the water right out of the stream bed and that it was a

4   riparian use and how could it ever be an appropriative use?

5       MR. VEEDER:  As I comprehend it -- and Colonel Bowen,

6   I think, will probably explain the water system into the

7   record, and I think he should -- if there is actually a

8   d iversion of water out of the stream, as I comprehend it,

9   and taken through a pipeline and run up onto some land --

10   that may or may not be a riparian thing, I don't know -- then

11   h e would have an appropriative right and apparently it would

12   be of some value.

13       THE COURT:  The point is this.  I understood Mr.

14   Anderson was going to submit this on the matters that he sent

15   in.  If he wants to do that, that is one thing.  If he wants

16   to be heard, then we will have to fix a date and have him

17   d own here and be heard.  It has to be one way or the other.

18       MR. VEEDER:  He has this problem.  And I would have Mr.

19   Anderson explain the circumstance of the fact that the

20   evidence w as not put in, because that is not for me to say.

21   But what I originally thought was a very simple matter,

22   apparently is not.  It is a matter of an appropriative right.

23   He doesn't want to abandon that right.

24       MR. GIRARD:  Is he here today?

25       MR. VEEDER:  No.

1    MR. GIRARD:  Can he be here today or tomorrow?

2    MR. VEEDER:  I asked him about that.  He said he couldn't

3  get Mr. Ward or his witnesses down there today or tomorrow.

4    MR. GIRARD:  I don't want to wait around until Mr. Ward

5  or Mr. Anderson get around to an opportune time to prove

6  their case.  If he isn't here today or tomorrow, I think he

7  ought to go without his right.

8    MR. VEEDER:  So sayeth the State of California.

9    MR. GIRARD:  So sayeth the State of California.

10   THE COURT:  Gentlemen, I think it is apparent we can't

11  clean up all the loose ends today.  Commander Redd advised

12  me there are enough loose ends on descriptions and tag end

13  pieces and whatnot that they wouldn't even have the work done

14  today.  So we probably will have to fix another date.

15       But I think Mr. Anderson, who has been in this

16  case a long time -- of course, he apologizes for this.  He

17  claims it is his fault.  But he is not a newcomer to this

18  lawsuit.

19   MR. VEEDER:  That is correct; he represented the Knox

20  matter.

21   THE COURT:  I think if he is going to put on any proof,

22  h e ought to put it on promptly.

23   MR. GIRARD:  I haven't seen his letter, your Honor.

24  Maybe he does have a good excuse.

25   MR. VEEDER:  You will see his letter now.  He sent a

1    check for $25, which I would like to have back.

2         THE COURT:  Look the matter over.  I am going to take

3    a recess shortly.  Look the matter over and be ready to

4    recommend this afternoon what we do.   You did ask him whether

5    he could be here tomorrow?

6         MR. VEEDER:  Yes, I did, and he said he couldn't get

7    Mr. Ward or the witnesses here.

8         THE COURT: Did you ask him when he could get them here?

9         MR. VEEDER:  He didn't indicate any time.  I said I would

10   bring it to your attention and advise him what your Honor

11   thought was best.  He said something about a hearing in two

12   weeks.  He did say that the disparity in the irrigable acreage

13   between Colonel Bowen's position and Mr. Ward's position, he

14   thought, could be worked out without any difficulty, he said,

15   as a matter of compromise.  And I said I thought we probably

16   could get something right on it -- although Colonel Bowen has

17   made an investigation and he says he wants some time on it

18   as written.

19        THE COURT: This is unimportant because we find these

20   findings as to irrigable acreage are only presumptatively

21   correct, and if later on some controversy arises the door is

22   not shut in his face -- he can come in and show what acreage

23   is irrigable.

24        Mr. Sachse is not back, and the next matter concerns

25   him.  So I will take an adjournment until 2:00 o'clock.  I

1   have to speak to the Kiwanis Club today.  You might go over

2   some of this other matter and see what you can organize

3   between now and then.

4        MR. VEEDER:  All right, your Honor.

5        (Noon recess.)

7                    ---oOo---

SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 20, 1963, 2:00 P.M.

THE COURT:  Mr. Veeder.

MR. VEEDER:  Your Honor, I mentioned to you in Chambers about Mr. Hendrickson.  I will call him.  You want him here in the morning in regard to this other matter?

THE COURT:  Yes.

MR. VEEDER:  Yes.  Your Honor, there is one matter that I would like to make reference to and relieve Mr. Hoffman. He did as you directed him to do.  He sent out the data upon which he made his calculations for the runoff on the Santa Margarita River.  I told Mr. Hoffman that I would make the statement now and if anyone wants to interrogate him in regard to the basis upon which he proceeded, he would be available.  And then he would like to be excused, if possible.

THE COURT:  I received a copy.  Did you send copies to other counsel?

MR. SACHSE:  Yes, I received one, your Honor.

MR. GIRARD:  I received a copy, your Honor.

As I understand it, this study was prepared by the U. S. Geologic Survey in connection with a report which will be submitted to the engineers who are concerned with the design of your dam.  It is prepared for that purpose.

MR. HOFFMAN:  Yes, sir.

MR. GIRARD:  And as far as the State is concerned, any figures the U. S. Geological Survey submits for the purposes

21,108

of their dam are entirely up to them.  I am not concerned one way or the other.  I want it clear that these were prepared for that purpose, and on that basis I haven't concerned myself with their accuracy or inaccuracy because I feel that it is up to the United States on their problem with their dam to evaluate the feasibility of the dam on their own evidence any way they want to evaluate it.  Just like Fallbrook did.  But if it is to be used in the case in chief, then it is another matter.

THE COURT:  I understand it is solely for that purpose that was indicated by Mr. Girard.  Is that right?

MR. VEEDER:  Yes, your Honor.

THE COURT: All right.

MR. VEEDER:  The reason why he was here is that your Honor had the statistics that were delivered to you.  You said you would like to see the basis upon which they were arrived at.  The assumptions surely are not put in evidence. The numbers are all in evidence.

THE COURT:  Should this be made part of the record for the limited purpose?

MR. STAHLMAN:  I don't think so.

MR. GIRARD:  I don't have any objection, for the limited purpose of showing the United States has prepared these for submission to their own engineers.  Really, whether they are accurate or inaccurate, on that basis I don't have any interest

in them.

THE COURT:  My suggestion of putting them in the record would be the fact that we have in the record all this talk about a physical solution and this is part of that picture. It has no other function in the record.

MR. SACHSE:  I have no objection if it goes in, but I take exactly the position that Mr. Girard takes.  I am not going to cross-examine on it, unless we are told that this is going to be considered in the re-opening of the case in some fashion.

THE COURT:  All right.  Get a copy of the document, Mr. Clerk.  What would be the next exhibit number?

THE CLERK:  293, your Honor.

THE COURT: 293 will be received for the limited purpose of showing what study the U.S. Geological Survey has made at the request of the Government in connection with the proposed dam and the study that the engineers are making concerning the feasibility of the dam.

MR. STAHLMAN:  May it further be understood that it will not be considered as prima facie evidence in any apportionment, if such does occur?

THE COURT:  It will be so considered.

MR. VEEDER:  I would like to put the title of it into the record:  "Annual Runoff In The Santa Margarita River Basin California (1925-'62) United States Department

of the Interior Geological Survey, January 1963."

THE COURT:   All right, Exhibit 293.

(The document referred to was marked   )
(Plaintiff's Exhibit No. 293, for        )
(identification, and received in         )
(evidence for a limited purpose.         )

THE COURT:   I heard some criticism of the report, but maybe nobody wants to cross-examine on it.   When we had the preliminary sheets before it was finally completed I heard indications that it was not an accurate picture.

MR. STAHLMAN:   That is our feeling.   That is why I made the suggestion that it not be considered as prima facie evidence in this proceeding.

THE COURT:   But nobody wants to question about it.

MR. GIRARD:   I am not saying it is accurate or inaccurate-- I haven't checked it with our engineers, but on the basis that it was just prepared solely and exclusively for the use by the Navy in building their dam, which is their concern, I have felt it is not my concern to check the accuracy.   However, if anyone is contending that these figures are accurate for the purpose of this lawsuit, that would be another matter.

THE COURT:   Of course, we are all interested in the prospect of a physical solution and the dam being constructed, and the specific comment that I heard was that the figures shown as to the runoff on the Murrieta, with the development that has already occurred in the Murrieta, which is almost

5

1    100% developed, didn't show the actual water which had run

2    down the Santa Margarita from the Murrieta Valley.

3    MR. VEEDER:  Your Honor, we are getting into a situation

4    that worries me a little bit.  This was brought in for the

5    sole purpose of doing what you directed.  With all respect

6    to your Honor, if your Honor is somewhat attacking these

7    numbers, I don't know whether I have to defend them or not.

8    MR. STAHLMAN:  I don't think his Honor directed you to

9    do this.

10   MR. VEEDER:  Yes.

11   MR. STAHLMAN:  No, there was a study made by Colonel

12   Bowen.

13   MR. VEEDER:  No, George.

14   MR. STAHLMAN:  But, you, yourself, proposed this study

15   would be made.  I think that remark in the record is

16   certainly contrary to my understanding.

17   THE COURT:  I have just this feeling.  The Attorney

18   General of the United States, or rather the Assistant

19   Attorney General and ranking officers of the Marine Corps

20   are going to have something to say about whether a dam is

21   built, and the engineers employed are going to take these

22   figures to determine whether a dam is feasible, and if this

23   is a slanted story on the facts on runoff figures then this

24   is just another torpedo in a possible dam and a possible

25   physical solution to the Fallbrook story.

MR. VEEDER:  Your Honor, I want the record very clear, you directed that these assumptions or the basis upon which the numbers were arrived at be submitted to counsel, and that has been done.  I don't know a thing about engineering along this line.  I am not taking one stand or another.  I have great confidence in Mr. Hoffman.

Are you ready to proceed on to something else, your Honor?

THE COURT:  Yes.

MR. VEEDER:  The next thing I had was an inquiry as to the form of the final judgment.

Are you gentlemen ready to discuss the form of the final decree, or do you want to talk about something else?

MR. GIRARD:  Have you looked at No. 34?

MR. VEEDER:  I have gone through it.  I think it is in conformity with what the Court has ruled.

MR. GIRARD:  If there is any question about it -- I checked it with Colonel Bowen and Commander Redd, and I think the exhibits are in order.  It is ready for signature.

MR. VEEDER:  Of course, I have had the standing objection all the way through.

MR. GIRARD:  I don't know what your standard objection is as to this one.

MR. VEEDER:  As far as I am concerned, I have opposed the general procedure that has been followed in regard to the

1    riparian acreage and in regard to the entry of numerous

2    interlocutory judgments.

3         THE COURT:  You mean upon the ground that you want one

4    judgment?

5         MR. VEEDER: That is right.

6         THE COURT:  And not a series of interlocutories?

7         MR. VEEDER:  That is right.

8         THE COURT: Is that what you talk about as your objection?

9         MR. VEEDER:  Yes, indeed.

10        THE COURT:  It is overruled.

11        MR. SACHSE:  My suggestion would be, your Honor, that

12   as far as possible we get as many of these interlocutories

13   -- there are four or five of them sitting here -- approved,

14   if we can, and then go on to the final.

15        MR. VEEDER:  Perfectly all right with me.  I just brought

16   up what is on the agenda.  What have you got there?

17        MR. SACHSE:  36-A, which you have seen.

18        THE COURT:  Let's take one at a time.  Is 34 ready?

19        MR. GIRARD:  No. 34 is ready.  The exhibits have been

20   attached to it.

21        THE COURT:  Here is the original.  Do you have a copy?

22        THE CLERK:  Yes, your Honor.

23        THE COURT:  I have signed it.

24             What is the next one?

25        MR. VEEDER:  Franz, do you have 36-A there?

1    MR. SACHSE:  I have one copy.

2    MR. VEEDER:  I thought you were going to give one to the

3    Court for signature and get another copy.

4    MR. GIRARD:  Here are some copies.

5    THE COURT:  36-A, Diamond-Domenigoni; is that what it is?

6    MR. SACHSE:  Yes.  That is the A-series for the Warm

7    Springs Creek watershed.  I prepared it since the last session,

8    and Colonel Bowen and Commander Redd have reviewed it and

9    attached the exhibits.

10    THE COURT:  These exhibits that are attached are already

11    in evidence?  They are copies of exhibits?

12    MR. VEEDER:  That is correct; they are consolidated into

13    a single exhibit.

14    THE COURT:  I have signed 36-A.

15    MR. GIRARD:  The other one that I have, your Honor, is

16    the order amending and supplementing Interlocutory Judgment

17    No. 37, which pertains to the sovereignty question.  We

18    went over that the last time.  The only change that I made,

19    other than approved by the Court -- and maybe this should be

20    discussed -- on Page 3 of this where it says:  "It is

21    further ordered adjudged and decreed that the United States

22    of America is the owner in fee simple of the lands described

23    and referred to in Finding of Fact No. 1 and that jurisdiction

24    or sovereignty over the specific lands referred to in

25    Finding No. 3 as amended was transferred to the United States

1   of America on the specific dates of the Letters of Acceptance

2   set forth in Finding No. 3." And I deleted the word

3   "exclusive" jurisdiction on Line 21 -- the word "exclusive"

4   preceding the word "jurisdiction."

5       MR. VEEDER: Why was that?

6       MR. GIRARD:  Because I believe under the Paul case and

7   the finding there probably isn't what you would call

8   exclusive jurisdiction.  I think we are talking about

9   sovereignty, not exclusive jurisdiction.  As I read this

10  finding, it says -- and these findings were approved, the

11  conclusion of law also:  That these provisions of California

12  law were not rendered inapplicable by the transfer of

13  sovereignty; and I think if you throw in the word "exclusive"

14  jurisdiction you might be conflicting with your conclusion

15  of law.

16      THE COURT:  Yes, I agree.

17      MR. VEEDER:  Your Honor, we have already expressed

18  ourselves that the Paul case doesn't mean --

19      MR. GIRARD:  I don't think it affects your basic

20  argument.  Your objections are still the same.

21      MR. VEEDER:  Just so the basic objections are recognized

22  and made a part of the record.

23      MR. GIRARD:  I think as far as I am concerned that

24  concludes all of the ones I had assigned to me, your Honor.

25      MR. VEEDER:  We have finished 42-A.  I will get the

1      exhibits.   That is Rainbow Creek, the basement complex.

2           THE COURT:   Let's take one at a time.   I now have before

3      me the order amending Judgment No. 37 on the sovereignty and

4      jurisdictional question that was reserved pending the decision

5      of the case of Paul v. United States, and I will now sign it.

6           MR. VEEDER: And the objections that we have made are

7      reserved.

8           THE COURT:   Overruled.

9           MR. GIRARD:   I should point out also on 34, your Honor,

10     which is the area of the subwatershed of Temecula Creek above

11     the Aguanga groundw ater area -- Mr. Veeder and I discussed

12     this by phone last week and we agreed it would probably be more

13     desirable to have a separate finding and judgment concerning

14     the National Forest lands and the withdrawn lands.

15          MR. VEEDER:   The land administered under the Taylor

16     Grazing Act.

17          MR. GIRARD:   And Mr. Veeder is preparing that particular

18     judgment.

19          MR. VEEDER: That is correct.

20          MR. GIRARD:   I presume we will treat these Forest

21     Service lands the same as the Indian lands where you had

22     them all drawn into one judgment.

23          MR. VEEDER:   That is right.

24          THE COURT: When will this judgment be ready?

25          MR. VEEDER:   As soon as I can, your Honor.   Colonel Bowen

1   is checking some of the acreages for the Bureau of Land and

2   Management properties.   I just handed that to him.

3         THE COURT:   This is National Forest lands?

4         MR. VEEDER:   This is National Forest lands and the lands

5   administered pursuant to the Taylor Grazing Act.   Those lands

6   are under the jurisdiction of the Secretary of the Interior

7   and they are administered by the Bureau of Land Management.

8         MR. GIRARD:   I, myself, know I will have no objection to

9   the descriptions or whatever system you are doing along that

10  line, and it might speed it up a bit if you have -- I don't

11  know whether you have or not -- the language you are going to

12  use in the findings, conclusions and judgment.

13       MR. VEEDER:   They are in the process of preparation.

14       MR. GIRARD:   I am sure I will have no quarrel with the

15  description  aspect.   We might have some problem on the

16  language.

17       MR. VEEDER:   I will certainly submit them to you.

18       MR. GIRARD:   Don't hold off the language pending the

19  descriptions.

20       THE COURT:   When will you submit them?

21       MR. VEEDER:   Your Honor, I am going to have to talk to

22  Mr. Clark about the language I am going to use in regard to

23  those properties.   I intend to return to Washington Friday.

24  I will have the language and the findings submitted to Mr.

25  Girard and submitted to this Court -- I will try very hard --

1   by Wednesday of next week.

2        THE COURT:  Can we assign a number to this judgment?

3        MR. VEEDER:  Yes, I have put it down tentatively for,

4   I think it is, 43.

5        THE COURT:  No.

6        MR. VEEDER:  I guess it is 44.

7        THE COURT:  44.

8        MR. VEEDER:  I have prepared 42-A and we will, if it is

9   agreeable to you, Mr. Sachse -- it is a regular standard form

10  -- we will attach the exhibits to it that are now being

11  prepared (Handing document to Mr. Sachse).

12       THE COURT:  42-A?

13       MR. VEEDER:  42-A, Rainbow Creek, the basement complex.

14       MR. SACHSE:  Enter it and attach the exhibits when you

15  get them.

16       MR. VEEDER:  You can either sign it and I will have

17  the exhibits put on later, or I can have my secretary bring

18  the completed form down on Monday.

19       THE COURT:  Let's see it.

20       MR. VEEDER:  It is a regular standard form that has been

21  used on all the basement complex, your Honor.

22       THE COURT:  You can't enter it without the exhibits,

23  can you?

24       MR. SACHSE:  I would have no objection to your Honor's

25  holding it and when the exhibits are made available enter it

1    as of that date.   I am satisfied with the form of judgment.

2         THE COURT:   All right.

3         MR. SACHSE:   I would say file it today and when the

4    exhibits are attached to it --

5         MR. VEEDER:   Is your Honor ready to consider something

6    else?

7         THE COURT:   Yes.

8         MR. VEEDER:   I have submitted to Mr. Sachse, Mr.

9    Stahlman and Mr. Girard, and delivered a copy to your Honor,

10   of a proposed amendment to the Interlocutory Judgment No. 39-A.

11   Does your Honor have that?

12        THE COURT:   39, or 39-A?

13        MR. VEEDER:   I am addressing myself first to 39-A, your

14   Honor.

15        THE COURT:   All right.

16        MR. VEEDER:   If your Honor will recall, when we first

17   started entering interlocutory judgments, because of the

18   number of people in the Fallbrook area we decided it would

19   be a simple process to take a given number and then have an

20   interlocutory judgment prepared in connection with them.   It

21   became just as bulky in the long run -- there were 22 separate

22   interlocutory judgments entered, and we find now that it is

23   extremely difficult for us, even with the facilities we have,

24   to pick out a particular tract of land.

25        So what I have proposed, your Honor, is the

1  consolidation of those 2 to 22 Interlocutory Judgments into

2  Interlocutory Judgment No. 39-A.

3         Now 39-A is the area from the Temecula Canyon down

4  to the Enclave boundary, which actually is the general area

5  in which these properties are situated.  So I have proposed,

6  as you will observe, that we amend the caption of 39-A to

7  say, ". . .Including Fallbrook Creek and the area south of

8  the Santa Margarita River between Fallbrook Creek and Rainbow

9  Creek Watersheds," and have attached, and will attach, the

10  names of the apparent owners, the legal descriptions and the

11  related data for the area to which I have made reference.

12  It would greatly simplify the record in this case to do this.

13  Mr. Sachse has said he is in agreement on the general idea.

14  I haven't heard from Mr. Stahman on it.

15      MR. STAHLMAN:  I think it is a good idea.

16      MR. SACHSE:  I think it is excellent.

17      MR. GIRARD:  You will have an exhibit attached to this

18  that will set aside the prior ones?

19      MR. VEEDER:  What we have simply said, you will notice,

20  say that Interlocutory Judgments Number 2 through (it should

21  be) 22 be and they are hereby incorporated into, merged and

22  consolidated with and made part of Interlocutory Judgment

23  No. 39 and the apparent owners referred to in this judgment

24  and the lands to which they relate are subject to the

25  provisions, et cetera.

MR. SACHSE:   Then you will have attached to this the big bulky new exhibit?

MR. VEEDER:   The descriptions and apparent owners. All we do is wipe out those.

MR. GIRARD: So this is ready for signature as soon as y ou have the exhibits attached?

MR. VEEDER:   The exhibits are available.   They are in my office.   I will tender this tomorrow.

MR. GIRARD:   Fine.

MR. SACHSE:   I think this is an excellent solution, because, if you recall those early ones, there was no particular rhyme or reason -- they are not even alphabetical. Judgment No. 2 will have 20, Judgment No. 11 will have another bundle of names.   This will make some logic out of it.

MR. VEEDER:   Let the record show that California, Fallbrook and the United States are in agreement.

THE COURT:   Have you mimeographed this proposed judgment?

MR. SACHSE:   Yes, it is distributed.

THE COURT:   Is it ready to go?

MR. VEEDER:   The amendment?

THE COURT:   Yes.

MR. VEEDER:   I think it is ready to go.

THE COURT:   The last paragraph on Page 3 --

MR. VEEDER:   I have just offered this for tentative review, if you have some corrections.

21,122

THE COURT: The last paragraph starts, "The last provision will be numbered VII . . . ."  What do you mean? Which last provision?  Above?

MR. VEEDER:  Are you looking at 39 or 39-A?

THE COURT: 39-A.

MR. VEEDER:  "The last preceding provision" is what it should be.

THE COURT:  I am just inquiring.  Areyou going to number it VII, and then you are going to renumber the last paragraph in 39-A as VIII?

MR. VEEDER: Whatever you want.  You see, what happened there, your Honor, your Honor asked me to amend the language of the judgment to the end that any of the people who are included in the judgment who have made these stipulations of settlement would be advised that those stipulation wouldn't be enforced by this Court.  I will straighten out that language however you want it written.  The last provision would be VII and then the interlocutory will be numbered VIII.

THE COURT: First of all, I think it is ambiguous as to what you mean by the "last provision."

MR. VEEDER:  The provision immediately preceding that, if you want that.

THE COURT:  There is a lot of material immediately preceding it.

MR. VEEDER:  I will do it any way your Honor wants.

THE COURT:  You are talking about Lines 14 through 22; right?

MR. VEEDER:  Yes, that is right.  This is the language: "Set forth on Exhibit H, incorporated by reference into this Interlocutory Judgment, is a list of defendants who executed 'Stipulation limiting and settling rights to the use of water.'  However, as this judgment is broader in scope and provides for greater rights than set forth in the Stipulation last mentioned, those documents will not be acted upon by this Court, all in accordance with the notice previously sent to those defendants."  That will be Paragraph VII in Judgment No. 39-A.

THE COURT:  May I make this suggestion -- I think it will clear up a lot of ambiguity:  Instead of the renumbering any numbers in that old judgment -- that old judgment runs through VII, why don't you start at about Line 14:  It is ordered and adjudged that in Interlocutory Judgment No. 39 there will be inserted a new Paragraph VIII reading as follows:   And then put in the paragraph.

MR. VEEDER:  That suits me.

THE COURT:  Put it right at the end.

MR. STAHLMAN:  That is too simple.

THE COURT:  It might be a little too simple.  Can you do it that way?

MR. VEEDER:  Yes, your Honor, I will be delighted to.

1    Thank you.

2         THE COURT:   What is next?

3         MR. VEEDER:   Number 39 is another amendment.   Here is

4    what transpired.   Interlocutory Judgment No. 39 was entered

5    referring to Sandia Creek, Stone Creek and some of the small

6    tributaries between the canyon on down to the Naval Enclave.

7    I simply suggest that it would be a pious idea to include

8    Fallbrook Creek in that Judgment No. 39 and thereby simplify

9    it.   It is exactly the same thing you did on 39-A.   But you

10   would eliminate a large number -- you would consolidate into

11   one judgment the entire area.

12        THE COURT:   Talking now about 39.

13        MR. SACHSE:   Again, the only effect of this is to put

14   in one place, in one single judgment all of those property

15   owners whose lands abut upon or are traversed by Fallbrook

16   Creek.

17        MR. VEEDER:   That is right.

18        MR. SACHSE:   I think it is a good deal and will make

19   the judgment easier to read.

20        MR. VEEDER:   You will note one thing, in addition -- and

21   this comes from the proceedings before the Master -- there

22   were two unnamed tributaries that enter the Santa Margarita

23   River in Sections 17 and 18.   I don't know how it occurred

24   that the Master made findings on riparian land.   However, he

25   did.   And I have included those with Fallbrook Creek.   If

21,125

1    that is acceptable, I will prepare the exhibits and tender

2    them to your Honor.

3         THE COURT:  Have you been over it?

4         MR. SACHSE:  I have been over it.  I think it is

5    perfectly satisfactory.  The only waters involved, I might

6    add, are surplus waters in this case.  There is no area of

7    alluvium where we are confronted with underground riparian

8    water.

9         MR. VEEDER:  That is correct.  That is the situation on

10   39 generally.

11        MR. SACHSE:  Yes.

12        THE COURT:  Mr. Girard, are you satisfied?

13        MR. GIRARD:  I am, yes.

14        THE COURT:  Mr. Stahlman?

15        MR. STAHLMAN:  Yes, your Honor.

16        MR. SACHSE:  Just so I can keep my notes straight, you

17   say 39-A you will have ready for tomorrow?

18        MR. VEEDER:  Yes.

19        MR. SACHSE:  How about 39?

20        MR. VEEDER:  I will have to check.

21        MR. GIRARD:  Bring me some copies.  These were apparently

22   mailed to me and arrived in Sacramento after I left.

23        MR. VEEDER:  I have copies of them.

24             Your Honor, we found that in several different

25   interlocutory judgments where defendants who had signed the

1    Stipulation limiting and settling their rights, and it

2    occurred to me it might be simpler to have your Honor sign

3    a separate order for each one rather than make a complete

4    amendment throughout the entire watershed, and so I propose

5    that, for example, amendment to Interlocutory Judgment --

6    if you have that before your Honor.

7         THE COURT:  Yes.

8         MR. VEEDER:  -- Amendment to Interlocutory Judgment

9    Number Blank, I put in 34, and I put in 34 down below, and

10   then I would list the names of the defendants in the space

11   that is left open there.

12        THE COURT:  Why not make this simple?

13        MR. VEEDER:  Perfectly glad to .

14        THE COURT:  This is going to concern many judgments.

15        MR. VEEDER:  No.  It is going to concern six or seven.

16        MR. SACHSE:  It is going to concern 42, 39 and --

17        MR. VEEDER:  It is going to concern 42, 39 and 30.

18        MR. SACHSE:  And 30.

19        THE COURT:  Why not have just the one amendment to all

20   these judgments?

21        MR. VEEDER:  For this reason, your Honor.  I have found

22   t his to be the situation.  We made that kind and type of

23   amendment in connection with the A-Series at one time.  I

24   believe it would be simpler, at least in my view, to do what

25   we did with 37 -- have it a separate amendment so that your

1   entire document will be before you rather than having to check

2   it through.

3        THE COURT:   All right.

4             Do any of the owners who are here know what you are

5   talking about on this?   For their benefit, early in the case

6   the Government prepared a document called a consent of some

7   kind, which provided that people who wanted to use water just

8   for domestic uses and for a small house garden et cetera,

9   could sign these documents and be free of any further worry

10   in the case.   A lot of them were signed up.   The Court has

11   never acted on them as such, and the judgments we have signed

12   up are broader and give more rights than were given under

13   this consent arrangement.   Therefore, the consents don't mean

14   anything.   So that the purpose of these amendments is -- well,

15   the language says the apparent owners of land included in

16   this judgment executed "Stipulation limiting and settling

17   rights to the use of water."   However, as this judgment is

18   broader in scope and provides for greater rights than set

19   forth in the Stipulation last mentioned, those documents will

20   not be acted upon by this Court, all in accoradance with the

21   notice previously sent to those defendants.

22             So you will prepare one of these for each judgment

23   in which any of these consents limiting the rights to the

24   use of water were signed.

25        MR. VEEDER:   Yes, your Honor, set out the name and the

1    parcel number in the space provided.

2            Your Honor, I have one of these letters that was

3    signed in regard to irrigable acres et cetera that I would like

4    to have added to Exhibit 207-E, if I may.

5        THE COURT:  Add it to 207-E.

6            Now, what else?  Are there any other interlocutories

7    that are being worked on?

8        MR. SACHSE:  No, your Honor.

9        MR. VEEDER:  Yes, there is one more.  We have found that

10   we need a 30-A Series.  We originally didn't think so.

11       MR. SACHSE:  You mean for the Murrieta-Temecula area?

12       MR. VEEDER:  For the Murrieta-Temecula area, for this

13   reason.  Where the Court made the delineation of the exterior

14   boundaries of the Temecula-Murrieta groundwater area there

15   are some several parcels which were not included in the

16   Murrieta and Warm Springs land descriptions.  I don't know

17   how many there are.  There may be 20 or 25 separate parcels

18   that are in that category that really aren't basement complex.

19   But they have been excluded from the Murrieta-Temecula

20   groundwater area, and I think they should be included in an

21   A-Series.

22       MR. SACHSE:  Why not just include them in 36-A?

23       MR. VEEDER:  We might do that.  We might amend 36-A to

24   include them.

25       MR. GIRARD:  This is the boundary of the Murrieta-

1   Temecula?

2           MR. VEEDER:   Yes.

3           MR. GIRARD:   There is some land within the boundaries

4   that is basement, too.

5           MR. VEEDER:   That is covered in 30, I am sure.

6           MR. GIRARD:   It is covered in 30, I believe, by reference.

7           MR. VEEDER:   Yes. But those areas I am alluding to

8   simply were not included in the subwatershed.  Maybe we can

9   amend 36-A and include them.

10          MR. SACHSE:   The critical thing is, if they are described

11  in the exhibit attached to 36-A --

12          MR. VEEDER:   They are not.

13          MR. SACHSE:   Then that is where they should be.  Am I

14  not right, Commander Redd?  You prepared the exhibits.

15          MR. VEEDER:   The point being, Mr. Sachse, that the areas

16  were divided up for title purposes.  The reason why we have

17  the A-Series is because it was on a subwatershed basis.  They

18  are not in the subwatershed as it was divided up.  I don't

19  care whether we amend 36-A to include it or not, but there

20  are some parcels not included.

21          THE COURT:   36-A is limited to Warm Springs watershed.

22          MR. VEEDER:   That is correct.

23          THE COURT:   Might as well call this 30-A.

24          MR. VEEDER:   It would be very simple.

25          MR. SACHSE:   It is all right with me.

1    MR. GIRARD:  It would be a monumental job.

2    MR. VEEDER:  It will be a big job to draft up.

3    MR. GIRARD:  Better assign it to someone else.

4    MR. STAHLMAN:  I think the people in the watershed ought

5    to know about this new creek -- Veeder Creek.

6    THE COURT:  Yes.  We found an unnamed creek up there on

7    the Vail Ranch, and because Mr. Veeder has made such a

8    great impression on the populous and the landowners in this

9    community, we thought we should name a creek for him, and so

10   we named this creek Veeder Creek and we have instructed the

11   Geological Survey hereafter to show it on the maps by that

12   name.  There was some thought that we should call it Veeder

13   Dry Gulch.

14   MR. VEEDER:  I pointed out that I had been dry gulched.

15   MR. STAHLMAN:  I might add that since Mr. Vail learned

16   there is a creek on the Vail land called Veeder Creek he has

17   never been able to come to court.

18   THE COURT:  All right, let's go on.

19   MR. SACHSE:  You are going to prepare this 30-A, then,

20   Mr. Veeder?

21   MR. VEEDER:  Yes, I am.

22   Mr. McGinnis called me and asked me to say he might

23   have some objections to the judgment on Sandia Creek or

24   Bryans Creek, wherever his property is.  I told him I would

25   convey the information to you.

1        THE COURT:  When is he going to make the objection?

2        MR. VEEDER:  All I do is run errands for these people,

3   your Honor.

4        THE COURT:  Call him back this afternoon.  If he has

5   an objection, be in here tomorrow morning.

6        MR. VEEDER:  I will.

7        MR. SACHSE:  I don't know what objection he could have.

8        THE COURT:  Will you take care of that?

9        MR. SACHSE:  I will call him during the recess, your

10   Honor.  I am in close touch with his client.

11        THE COURT:  What is next?

12        MR. VEEDER:  I think he said the only objection he might

13   have might be something about the description of the land.

14        THE COURT:  Mr. Sachse, did you get a chance to check

15   out Mr. O'Malley's suggestion?

16        MR. GIRARD:  I am checking it out now, your Honor.  I

17   have found the reference where they refer to this Koehler

18   Creek diversion, and all it says there is that the capacity

19   of the diversion works, which was a pipe, was a net result

20   of three and a half miners inches, and they irrigated twelve

21   acres from it, and I have found no reference at all to any

22   continuous flow testimony yet.  The exhibit which was filed

23   to support it, I believe is Oviatt's AA, which is just one

24   of those standard old intent to appropriate forms, which says

25   they intend to appropriate all the waters of Koehler Creek.  Of

1    course, under California law regardless of that intent, the

2    maximum amount they could appropriate on a nonstatutory

3    appropriation would be the amount they actually diverted

4    through their particular pipe.

5        MR. VEEDER:  And that which they have beneficially used.

6        MR. GIRARD:  And beneficially used.  And the evidence

7    so far -- I haven't gone through the last part of the

8    testimony -- apparently there is some reference here coming

9    up there is going to be a Mr. Green testify.  Did he testify?

10       MR. VEEDER:  I don't recall whether he did or not.

11       MR. GIRARD:  But I have just a little bit more to go

12   and then we get into Mr. Vail's testimony about something

13   else.  I will have an answer for you in half an hour as to

14   what the record shows, your Honor.

15       THE COURT:  Tomorrow will be satisfactory.

16       MR. GIRARD:  Yes, I will have it tomorrow.  The way it

17   looks, the ditch or the pipe took the water as it came into

18   it and it was not backed up or cut off -- it just flowed.

19       THE COURT:  Any chance of having any of these ones you

20   are talking about prepared by tomorrow?

21       MR. VEEDER:  I am trying, your Honor, to get those

22   exhibits assembled for the amendments to 39-A and 39 and

23   42.  And I have to have Colonel Bowen check out these parcels

24   in 30-A, because I don't have the data in my office to take

25   care of that.  Colonel Bowen says, of course, he will take

1   care of it.  I will have the 30-A form available and ready

2   and we can do what you have done in regard to 42-A, if that

3   is acceptable -- we can just get the form of the judgment

4   ready and the exhibits will be prepared.

5       THE COURT:  I am thinking about signing these judgments

6   while this hearing on objections is on.  Of course, I can

7   continue the hearing for objections and point out that these

8   other judgments are pending.  But I want to make the right

9   kind of record here on these objections.

10      MR. VEEDER:  We will move as rapidly as we can, your

11  Honor.

12      THE COURT:  Do you want to go to work, or do you have

13  other matters?

14      MR. VEEDER:  I think we could go to work right now in

15  regard to some of these matters I have before me, such as

16  these amendments.  It would be helpful to me to get at it

17  this afternoon.

18      THE COURT:  Anyone else present who wants to be heard

19  or make any objection to any of these interlocutory judgments

20  and findings?

21      MR. GIRARD:  I should give you this, your Honor.  I

22  prepared a draft of the final judgment, which I have served

23  on counsel but which I haven't given you yet.

24      MR. VEEDER:  Have you served me with that?

25      MR. SACHSE:  Yes, I put it on your table there, Bill.

THE COURT:  We will adjourn until 10:00 o'clock tomorrow morning; right?

MR. SACHSE:  Have we arrived at a decision on the Ward matter?

THE COURT:  I told Mr. Ward that he would probably have to be heard on the 5th of March or the 12th of March.  He said either date was satisfactory.

MR. SACHSE:  I wish we could have some guidance from you on this.  I sympathize with the problems Mr. Veeder is having on this thing, but I think we ought to face up to it that some of these counsel have absolutely no excuse whatsoever for the position they are taking and coming in and asking at this late date to hold up the proceedings affecting about 6,000-odd defendants.  I can see where individual defendants who may not have been represented by counsel might have a legitimate complaint.  But when they have been represented by eminent attorneys who have been pestering some of us pretty thoroughly throughout this case and having us do this work for them and then they haven't taken the time or shown the Court the courtesy to come down in response to the Court's order, I, personally, am not sympathetic.

THE COURT:  I am not sympathetic either.  But one or two weeks is not going to spoil anything.

MR. SACHSE:  I am not thinking so much of Mr. Anderson and the Ward case.  I am thinking of some others that may be

1    popping into Mr. Veeder's lap any moment.  One continuance

2    can become two, it can become three, it can become a dozen,

3    and that is what concerns me, your Honor.

4        MR. VEEDER:  Did your Honor say March 12th?

5        THE COURT:  We put it over to tomorrow and we will

6    decide tomorrow on the 5th or the 12th.  You may want to

7    consult your calendars.

8        MR. VEEDER:  I have to.

9        THE COURT:  You will call Mr. McGinnis this afternoon?

10       MR. VEEDER:  Yes, I will.

11       THE COURT:  What about this man Hendrickson?

12       MR. VEEDER:  I will call Mr. Hendrickson this afternoon,

13   your Honor.

14       THE COURT:  10:00 o'clock tomorrow morning.  All

15   matters concerning the objections to these interlocutories

16   are continued to that date.

17       (Whereupon, an adjournment was taken until Friday, )
     (                                                      )
18   (February 21, 1963 at 10:00 o'clock a.m.               )

19

20                       ---o0o---

21

22

23

24

25

21,136

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above-entitled cause on the date specified therein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this _____ day of _____ A.D., 1963.

_____
**Official Reporter**