# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — — —

UNITED STATES OF AMERICA,

            Plaintiff,

    vs.                                      No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT
et al.,

            Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Thursday, February 21, 1963

Pages:      21,137- 21,208

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

by _____
                    DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| -vs- | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, February 21, 1963

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General. |
| | CDR. DONALD REDD |
| For Defendant Vail: | GEORGE STAHLMAN, ESQ., |
| For Defendant Fallbrook: | FRANZ R. SACHSE, ESQ. |
| For Defendant State of California: | FRED GIRARD, ESQ. |
| For Defendant Chihuahua Land Company: | Leo R. Hendrickson, ESQ. |

21,138

SAN DIEGO, CALIFORNIA, THURSDAY, FEBRUARY 21, 1963, 10:00 A.M.

---o0o---

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes, sir.

MR. VEEDER:  I have a letter here from George G. Buchanan in regard to some property that appears to be in the Murrieta area.  I just want the record to show we are checking this matter out for Mr. Buchanan, that we will advise him of the status of it and the interlocutory judgment that covers it.  That matter is being taken care of now, your Honor.

Mr. Hendrickson, I think, has something to present.

MR. HENDRICKSON:  Good morning, your Honor.

THE COURT:  Good morning.

MR. HENDRICKSON:  I apologize for appearing in this matter at this late date, your Honor.  However, my client, Chihuahua Land Company, received notice that the final judgment was about to be entered.  They own some 360 acres of land that are riparian to the Chihuahua Creek.  On this 360 acres they maintain two lakes and a house, and the land is used primarily for recreational purposes.  It is leased to people who use it for hunting and fishing.  The total value of the land would be $50,000 to $60,000 and has not warranted an appearance in a lawsuit of this magnitude.  However, having received your notice, I have looked into the

1  are springs et cetera.  This here is an orchard here.  This

2  is an area between the two lakes.  That is always wet.  You

3  can see there are substantial trees in there.  This is looking

4  easterly.

5      THE COURT:  In what area is this?

6      MR. GIRARD:  In what section is that?

7      MR. HENDRICKSON:  It is in Sections 3 and 4, Township

8  9 South, Range 3 East.

9      MR. GIRARD:  Here it is, your Honor.

10     MR. SACHSE:  At the extreme upper end of Chihuahua.

11     MR. HENDRICKSON:  This U.S.G.S. topo map will be useful

12  to you.

13     THE COURT:  I just want to know the general area of

14  the watershed.

15     MR. GIRARD:  It is up in the basement complex, as far

16  as the groundwater is concerned.

17     MR. HENDRICKSON:  I would say this right here is probably

18  the beginning of the creek.

19     MR. GIRARD:  Chihuahua Creek has several branches.

20     THE COURT:  Chihuahua runs into Temecula?

21     MR. GIRARD:  Yes, a way downstream.

22     MR. HENDRICKSON:  It is very near the headwaters of that

23  creek.

24          As I say, your Honor, the facet that we object to

25  is the wording of the findings and conclusions and judgment

1    that say, as to our neighbors -- for example, you can see

2    downstream people from us here -- we have maintained these

3    lakes since 1947 and 1949 and we would hope that some rights

4    have ripened as against them.

5        THE COURT:  What rights did you acquire?

6        MR. HENDRICKSON:  The right to make the continued use

7    that we have made in the past -- the right to use this water

8    for the reasonable, beneficial, riparian use of recreational

9    purposes.

10       THE COURT:  Do you want to make a record and then we will

11   discuss the legal aspect of it.

12       MR. GIRARD:  I will stipulate you have that right.

13       MR. STAHLMAN:  What right?

14       MR. GIRARD:  A riparian right.

15       MR. HENDRICKSON:  Will you stipulate that the use that

16   we have made since 1947 and 1949 is a riparian right?

17       MR. GIRARD:  I don't know what it is.

18       MR. HENDRICKSON:  I can put on some testimony, if you

19   like.

20       THE COURT:  Let's put it on shortly.  The aerial

21   photograph will be marked Chihuahua's Exhibit A.

22       MR. VEEDER:  May I tender a thought here, your Honor.  I

23   don't see Colonel Bowen. Colonel Bowen has made an investiga-

24   tion of this property.  He doesn't have an engineering report

25   prepared on it, but he did say there were five acres of

1   irrigable land on the property.  I am not testifying.  I am

2   outlining.  If Colonel Bowen were here, he could put in

3   additional material.  It might be we should prepare a

4   statement.

5       THE COURT:  Has the Colonel made a survey?

6       MR. VEEDER:  Yes, he has, and I have talked to him about

7   it.

8       THE COURT:  But it has not been written up?

9       MR. VEEDER:  It has not been written up.  But I would

10  think he can do that -- as far as the United States is

11  concerned, he can.

12      THE COURT:  Let's do one thing at a time.  The aerial

13  photograph is Chihuahua's Exhibit A.

14      THE CLERK:  Yes, your Honor.

15      THE COURT:  Chihuahua's Exhibit A, aerial photograph.

16                      (The aerial photograph referred to  )
                        (was marked Chihuahua's Exhibit A,   )
17                      (for identification.                 )

18      THE COURT:  As to a soil report, the Colonel and his

19  staff have made these all over the district and uniformly

20  they have met with approval.  He has established a reputation

21  for being very fair.

22          We have also inserted in these judgments a

23  provision which I think takes care of the problem.  In other

24  words, we have found in the judgments that the findings as

25  amount of irrigable ground shall be prima facie evidence in

1   some further proceeding involving apportionment, if one ever

2   comes up.  In other words, the landowner may say, "I am

3   content to rely on this figure that has been found," or he

4   can assume the burden of proof that he has more than is shown

5   by the survey.  Do you follow me?

6        MR. HENDRICKSON:  Yes, your Honor.

7        MR. SACHSE:  At a later date.

8        THE COURT:  At a later date, if a problem on apportion-

9   ment came up.

10        So I would suggest we have the Colonel prepare his

11   land report and file it as an exhibit.

12        And I also suggest -- and you can disagree if you

13   want to -- that you accept this finding, which is only prima

14   facie.  If you are later content with it, in case some

15   further proceeding came up, all right.  If not, you then

16   would have the burden of showing that you had more irrigable

17   acreage than he outlined.

18        The same is true with these other findings as to

19   impoundments.

20        MR. SACHSE:  It is only proof of their area, et cetera.

21        THE COURT:  The thought was that if later on we had

22   problems come up, by making this prima facie evidence the

23   landowner would then be relieved of the burden if he was

24   content with the finding.  If he was not content, he would

25   have the burden that he would ordinarily have of showing what

he had.

MR. HENDRICKSON:  Your Honor, I am concerned that if there is a judgment entered that says that no party to this lawsuit has acquired a prescriptive right --

THE COURT:  This is another problem.  I am talking now about the Colonel's report.

MR. HENDRICKSON:  Oh, yes, this is the Colonel's report.

THE COURT:  So we will assign to the Colonel the engineering report.

MR. VEEDER:  I think Colonel Bowen is arriving now, your Honor.

THE COURT:  We will receive it in evidence and mark it B, and if you have something to object to later on you can come in.  We will have another hearing on March 5th or March 12th and you may be heard on it.  I don't think you will have any problem.

Chihuahua's Exhibit A is received in evidence.

        (Defendant Chihuahua's Exhibit A, for  )
        (identification, received in       )
        (evidence.                     )

THE COURT:  Do you want to call the witness and tell us what you have and how long you have had it?

MR. HENDRICKSON:  Yes, your Honor.

Before doing that, I wonder if I could make one other technical point.  In Finding of Fact No. 3 it states that there are within the watershed many structures used for

1   impoundment of surface runoff for soil conservation,

2   recreation or other beneficial purposes.  And that follows

3   a similar finding on irrigable acreage, et cetera.  When it

4   gets to the conclusion of law it leaves out the recreational

5   and soil conservation purposes.

THE COURT:  How does the conclusion read?

MR. HENDRICKSON:  The conclusion just says:  "The

8   temporary and nonseasonal impoundment by riparian owners

9   of surface runoff  for the purpose of providing a head for

10   irrigation or for the purpose of temporarily accumulating

11   sufficient water to make possible efficient irrigation is a

12   proper riparian use of water."  We would like to insert there

13   "and for soil conservation and recreational use."

MR. SACHSE:  That I object to, your Honor.  When I

15   drafted this my purpose was, and still is, that the temporary

16   impoundment to provide a head for irrigation is a proper

17   riparian use, but that recreational uses are only acquired

18   under a permit from the State of California.

THE COURT:  Of course, I should tell you about water

20   law.  Are you associated with the Jennings firm?

MR. HENDRICKSON:  Yes, sir.

THE COURT:  You are supposed to be great experts in

23   water law, and so I should tell you about this.

But as I understand the law on this matter of

25   impoundments, if you impound water to create a head so you

1   can pump -- at night fill up the reservoir and irrigate during

2   the day -- you are creating a head of water for irrigation

3   purposes.   I suppose you could create a head maybe for other

4   purposes.   But the point is, you are not carrying the water

5   over for some period of time.   This has been held to be a

6   proper riparian use.   But once you impound water on a

7   seasonal basis where you carry the water over for some period

8   of time, then you run up against the State law, which says

9   that for this you have to have a permit.

10              This is your point?

11       MR. SACHSE:   That is my position, your Honor.

12       MR. HENDRICKSON:   Of course, I am familiar with Mr.

13   Gavin's Law Review article.   We do not subscribe to the

14   principle that the only way you can acquire a prescriptive

15   right for irrigation, recreation or domestic use or what

16   have you is by first filing with the State.   And we are

17   involved in litigation now which we hope will result in

18   that being decided.

19       MR. SACHSE:   I would like to try to make something clear

20   to Leo.   I think we are talking in circles.

21              First, as to your question about Conclusion of

22   Law No. 2, that has nothing to do with your prescriptive

23   right.   Conclusion of Law No. 2 says that the temporary

24   impoundment by a riparian owner is a proper riparian use.

25   And if it is a proper riparian use, you are not getting a

1    prescriptive right at all by the exercise of it.   It is a

2    proper use.   It is not adverse.

3    Insofar as the Gavin Craig theory is concerned,

4    I agree with you.   I think you may have acquired a prescrip-

5    tive right, or it is possible to acquire, I will say, a

6    prescriptive right to impound water without filing with the

7    State Water Rights Board.   But you don't have an appropriative

8    right to do it, because you didn't file.   And you don't have

9    a riparian right to impound for recreational purposes

10   because it is not a proper riparian use.   That is the

11   distinction.   I am not arguing with Gavin Craig's philosophy.

12   MR. HENDRICKSON:   You are saying that recreation is not

13   a proper riparian use.   There is California authority that

14   it is proper.

15   MR. SACHSE:   Not seasonal impoundment.

16   THE COURT:   There is ample authority that if you have

17   a running stream or a natural lake, that recreational use

18   is a proper riparian use.   The problem is, can you impound--

19   can you cut off the running of a stream and impound and

20   create a body of water and then say this is a proper riparian

21   use of the water?

22   MR. STAHLMAN:   There is another situation here.   As I

23   understand, counsel said that one of the lakes had been

24   in use since 1947 and the other one since 1949.   A prescriptive

25   right, according to my understanding, requires a five-year

1  period of time, and I don't think a prescriptive right could

2  be obtained during the tenancy involved in this property.

3  This lawsuit was filed in 1951.   They started in 1947 and

4  1949.   They still wouldn't have the period of time required.

5      THE COURT:  Let's go back to what I said.  Let's take

6  some evidence and get a record and then we will talk about

7  the legal problem.

8      MR. HENDRICKSON:  All right, your Honor.

9

10              JOHN GIBSON,

11  called as a witness by and on behalf of the Defendant

12  Chihuahua Land Company, being first duly sworn, was examined

13  and testified as follows:

14      THE CLERK:  State your name, please.

15      THE WITNESS:  John Gibson.

16

17              DIRECT EXAMINATION

18  BY MR. HENDRICKSON:

19      Q     Mr. Gibson, you are the Secretary-Treasurer

20  of Chihuahua Land Company and a member of its Board of

21  Directors and a shareholder in the corporation; is that

22  correct?

23      A     That is right.

24      Q     The land in question here is portions of Sections

25  3 and 4, Township 9 South, Range 3 East.  Do you know of

1    your own knowledge that the Chihuahua Land Company owns

2    approximately 360 acres there?

3        A    This is true.

4        Q    And you have seen this photograph that has been

5    labeled Chihuahua's Exhibit A?

6        A    Yes.

7        Q    Does it generally outline the area involved?

8        A    Yes, it does, with the exception of this area here

9    is not part of the property.  This is the property in the

10   "L-Shape".  But not this area in here.

11       MR. HENDRICKSON:  Shall we use a colored pencil to mark

12   it?

13       THE COURT:  Yes.

14       MR. HENDRICKSON:  Mark the one that is the Chihuahua.

15       We will mark in red the general outlines of the

16   area that is owned by Chihuahua Land Company.

17       Q    Now, on this map -- I am pointing at a spot that

18   I am marking "A" -- What is that?

19       A    That is the lower impounded area, the pond of water.

20       Q    That is a lake?

21       A    A lake.

22       Q    Do you know about when that was built?

23       A    That was built in 1949.

24       Q    And do you know about what its surface area is?

25       A    Oh, approximately 2 acres, I would say.

Q    Now, I am labeling an area as "B" and putting an arrow to it.  And what is that?

A    That is the upper reservoir or dam.

Q    And when was it built?

A    That was built in 1947.

Q    And what is its approximate surface area?

A    Approximately an acre.

Q    Now, I am making another arrow here, Area C.  And what is in that general area?

A    That is where the house and the planting, the fruit trees, are, and there is a swimming pool and the living area.

Q    There is a fruit orchard there?

A    A fruit orchard, yes.

Q    Do you know the general acreage in that area that you have cleared?

A    That would be in excess of two acres, probably three acres that is cleared, and the general area around there would be more like five that is used for recreation.

Q    What use is made of these lakes, Mr. Gibson?

A    Well, the lakes are stocked with fish and they are used for fishing and for boating -- recreational.

Q    Boats have been maintained on them?

A    Oh, yes.

Q    Has there also been hunting?

1    A    Yes, there is hunting in season, both quail and

2    dove and deer.   In fact, we see deer around the lakes quite

3    frequently when we are fishing.

4    Q    The lakes are used in connection with duck hunting,

5    are they?

6    A    Yes.

7    THE COURT: They have been used since the impoundments

8    were constructed in 1947 and 1949, respectively?

9    THE WITNESS:  That is right, continually.

10   THE COURT:  There has been water in them ever since they

11   were built?

12   THE WITNESS:  Yes.

13   THE COURT:  By what are they fed?

14   THE WITNESS:  By springs and some runoff.

15   THE COURT:  You can't tell us the portion that comes

16   from springs and the portion that comes from runoff?

17   THE WITNESS:  I don't believe I would be able to do that.

18   THE COURT:  Is there considerable runoff in winter down

19   t hat creek?

20   THE WITNESS:  In recent years --

21   THE COURT: When you have rain.

22   THE WITNESS:  When we have rain, there is some runoff,

23   yes.

24   THE COURT:  Is there some way that water is released

25   from the upper reservoir to the bottom?

THE WITNESS:  When it overflows it runs down through the stream channel.

THE COURT:  Where do the springs feed -- into the upper or the lower?

THE WITNESS:  Both.

THE COURT:  Does the upper one ever overflow from water coming from the springs?

THE WITNESS:  No.

THE COURT:  When it overflows water comes down after rains?

THE WITNESS:  Yes.

THE COURT:  How many times has the upper one overflowed that you know of since 1947?

THE WITNESS:  I am afraid I couldn't give you that information, either.

THE COURT:  Has it ever overflowed?

THE WITNESS:  Yes.

THE COURT:  It has the spillway to take care of that?

THE WITNESS:  Yes.

THE COURT:  Where are these springs on the map?

THE WITNESS:  Let's see, this is the upper lake.  Now there are springs in the area here, and in this area.  Then down through here nearly all the way there are springs.

THE COURT:  You have pointed out as springs -- if I may use the pencil.  Is this the pencil?

1    MR. HENDRICKSON:  No, your Honor.  This is the colored

2 pencil.

3    THE COURT:  You marked with small arrows where you say

4 there are springs.  Are you marking in the bottom?

5    THE WITNESS:  Near the edge of it.  They come out the

6 side hill.

7    THE COURT:  And where else?

8    THE WITNESS:  And in this area out of the side hill.

9    THE COURT:  Small arrows.  Then you said in the bottom

10 down here?

11    THE WITNESS:  Yes.  I think there is one up in here.

12    MR. HENDRICKSON:  Right in this general area.

13    THE WITNESS:  And one right in here.  I am afraid I

14 couldn't designate exactly, but generally down through here

15 in the side hill there is a number of springs, and depending

16 some on the time of the year.

17    MR. HENDRICKSON:  For the purposes of identification,

18 that is the area between the two lakes, isn't it?

19    THE WITNESS:  Yes, that is true.  Then, of course, above

20 the house area there is a spring here, right in there, from

21 which we get the water for the house.  And there is a spring

22 back in here, and one right in here that feeds this swimming

23 pool right here.

24    THE COURT:  Those three springs in the house area do not

25 feed any water to either pond?

THE WITNESS:  No.

THE COURT:  And the spring further between the house area and the bottom of the creek -- I will draw a circle around the X here -- that doesn't feed directly into the creek?

THE WITNESS:  No.

THE COURT:  So the springs you refer to are these that you say are in the bank?

THE WITNESS:  Yes.

THE COURT:  Are any of them in the bottom?

THE WITNESS:  Well, of course, depending on how much the flow is.  In recent years it dries up to where they don't flow as much as they used to.

THE COURT: Does this bottom have any gravel or is it practically solid rock in the bottom there?

THE WITNESS:  No, there are areas that have quite a lot of rock, but there is sand and little meadows down through there where the deer and cattle graze.

BY MR. HENDRICKSON:

Q    Mr. Gibson, this area between the lakes, if you walk from the upper lake to the lower lake, from B to A on here, it is generally moist in that whole area, isn't it?

A    Yes.

Q    Even in dry seasons do you find water standing in pools there from time to time?

A    Yes, there is always some water there.

1     Government?

2          MR. VEEDER:  Yes, your Honor.

3          THE COURT:  And this was done on their usual basis of

4     the landowner paying a part and the Federal Government paying

5     a part?

6          THE WITNESS:  That is right.

7          THE COURT:  So the record will be straight, you didn't

8     make any application to the State of California Water

9     Resources Board to build a dam for either one?

10          THE WITNESS:  At this time, I am not able to find

11     anything in the records that indicates.

12          MR. VEEDER:  It doesn't appear on California's Exhibit

13     AS.

14          THE COURT:  We have an exhibit on file wherein all the

15     applications that were made have been listed and brought up to

16     date very recently.  It does not so appear?

17          Mr. VEEDER:  That is correct.

18          THE COURT:  Any questions, Mr. Girard?

19          MR. GIRARD:  I have a couple, your Honor.

20

21

22                    CROSS-EXAMINATION

22     BY MR. GIRARD:

23          Q     Are you familiar generally with that area, Mr.

24     Gibson?

25          A     Yes.

1    Q    Do you live up there?

2    A    No.

3    Q    As I understand, the last soil report by Colonel

4  Bowen indicated that these reservoirs were dry on occasion.

5  Is that right?  I think the last time the Marines were up

6  there apparently they were dry.

7    A    The lower never has been dry.  The upper one was

8  dry at one time when we raised the dam.  We emptied it

9  deliberately and then raised the upper dam.  To my knowledge,

10  it has not been dry only on that one occasion.  The lower

11  dam has never been dry since it was built.  We have had

12  fish in it all of the time.

13    Q    You mean you increased the size of the upper one?

14    A    Yes.

15    Q    When was that done?

16    A    That was, I believe, in 1955 or 1956.  What

17  happened, there was a flash flood that tore out the spillway

18  and damaged it, and we cleaned out some of the silt that was

19  washed in and replaced the dam and built a new spillway.

20  And at that time it was drained.

21    Q    On your property here, Mr. Gibson, are there any

22  springs on your property downstream from this second

23  reservoir in this area of the river?

24    A    Below the dam --

25    Q    Yes.

1      A      -- in this area right in here there are springs.

2      Q      Would you circle that?

3      A      May I have the pencil, please, sir.

THE COURT:  Yes, sir.

THE WITNESS:  Right in this area.

BY MR. GIRARD:

7      Q      Are those pretty much of the same nature as the
springs in the above area?

9      A      Yes.

10      Q      Are you familiar at all with the land downstream
on Chihuahua Creek from your property?

12      A      I have been on the road.  Not in the canyon at all.
I have been down to the mine below there.

14      Q      Can you observe or do you have a knowledge at all
as to whether on other land downstream from your property
there are similar types of wet areas or springs or whatever
you want to call them?

18      A      I wouldn't be able to tell you that, I am afraid.

19      Q      You don't know at all?

20      A      No, I am not aware.

21      THE COURT: What is the significance of this, in your
opinion, Mr. Girard?

23      MR. GIRARD:  I am just trying to establish whether these
uses up there have been actual adverse, hostile notice to
anyone downstream, insofar as prescription goes -- assuming that

1    prescription could run.   That is the point.

2         THE COURT:   Any further questions.

3         MR. SACHSE:   No.   I was going to raise the same point

4    Mr. Girard raised.

5    BY MR. STAHLMAN:

6         Q    Are these ponds kept full at all times?

7         A    No.   The evaporation and the use, of course, some-

8    times they vary up and down naturally to some extent.

9         Q    What is the capacity and acre feet of water which

10   each of these dams holds?

11        A    Well, the upper one has a surface area of about an

12   acre, and the lower one about two.   I can't say without being

13   able to measure the depth there.   The upper one possibly in

14   the deepest part would run from five to ten feet deep, and

15   the lower one would run from 10 to 18 feet deep, I think,

16   in the deepest part.   Of course, they go out to nothing on

17   the edges.   So without some way of measuring it, I wouldn't

18   actually know how many acre feet there would be in them.

19   I would know roughly what the surface area would be.

20        Q    This area that is covered by property which you

21   people own, is that near some highway or roadways?  How do

22   you gain access to it?

23        A    There is a roadway to the property from the Hermet

24   Valley road.

25        Q    Which road?

A   I believe they call it the Hermet Valley road.

Q   What is the nearest County road or State highway?

A   Well, the State highway that goes from Warm Springs
to --

MR. HENDRICKSON:  That is 79.

THE WITNESS:  North 79.  It is about nine miles from
that road back to the property, I believe.

BY MR. STAHLMAN:

Q   Are these ponds or lakes in view of these highways?

A   No, they aren't.

MR. STAHLMAN:  That is all I have.

THE COURT:  What kind of road runs off of 79?  Is this
a private road or a public road?

THE WITNESS:  No, it is a public road, a County road
perhaps five or six miles of the way, and it is oiled -- part
of the way it is oiled, and then there is just a country road,
I guess you would say, just two tracks back through the
other properties to our property.

THE COURT:  Is that a private road?

THE WITNESS:  No, it is used by quite a number of
ranchers.

THE COURT:  Just an old road?

THE WITNESS:  Just an old road.

THE COURT:  Are there gates to get into your property?

THE WITNESS:  Yes, locked gates.

1      THE COURT:  Locked gates?

2      THE WITNESS:  Yes.

3      THE COURT:  Kept locked except when visitors are

4  permitted in?

5      THE WITNESS:  That is right.

6      THE COURT:  This has been true since 1947?

7      THE WITNESS:  Yes.

8      MR. SACHSE:  I do have a question, if I may, your Honor.

9  BY MR. SACHSE:

10     Q    Mr. Gibson, were you familiar with this property

11  before you built the lakes?

12     A    No, I am afraid I was not.  The last lake, I was

13  familiar with the construction of that, from that time on in

14  1949.

15     Q    That is the lower lake?

16     A    Yes.

17     Q    Are these just earthen structures?

18     A    Yes.

19     Q    Or concrete?

20     A    Earth.

21     Q    Just earth?

22     A    Yes.

23     Q    Have you observed that there has been any change

24  in the amount of water or the surface evidence of water down-

25  stream from the lower lake since its construction?

A    No, I am afraid I haven't.

Q    In other words, you don't know whether there is any percolation through there?

A    Yes, there is.

Q    And you don't know whether that percolation has encouraged the springs downstream or dried them up?

A    I am afraid I couldn't tell you that.

THE COURT:  Is there percolation through the upper reservoir into this wet area below?

THE WITNESS:  Yes, both of them.

MR. SACHSE:  That is all I have.

MR. GIRARD:  I have nothing further, your Honor.

BY MR. VEEDER:

Q    Were you there when they undertook the construction of these dams?

A    The lower one in 1949, yes; and then when the construction of the upper dam, I was present at that time.

Q    Did you observe whether any of the water from the springs actually reached the bed of Chihuahua Creek?

A    In some cases, yes.

Q    They do contribute then to the surface flow of the stream?

A    Yes.

MR. VEEDER:  I have no further questions.

REDIRECT EXAMINATION

BY MR. HENDRICKSON:

Q    Mr. Gibson, this work that was done on the upper dam, was the area of impounded water increased any at that time?

A    Probably not over the original construction, because there was considerable silting of the upper dam and in order to store usable water area the simplest solution was raising the dam rather than excavating out the washed in material.

Q    This was really then a reconstruction rather than a new construction?

A    That is true.

MR. HENDRICKSON:  Since there has been testimony concerning the access to the property, perhaps we should put in this map.  What would it be?

THE COURT:  C, Geological Section Map.

MR. HENDRICKSON:  This is the Warner Springs, California sheet of the Department of the Interior Geological Survey, dated 1939.

MR. VEEDER:  That is already in evidence.

MR. HENDRICKSON:  Outlined in orange is the area involved here.

Q    Is that the area, Mr. Gibson?

A    That is right.

Q    And one lake would be at this point, and the other

lake at approximately this point?

A    That is close.

Q    Showing them in orange.

A    That is very close.

Q    The locked gates you talked about are located at this point; is that not correct?

A    That is right.

Q    And there is another locked gate at about this point?

A    Yes.

Q    And a fence between them?

THE COURT:  This point doesn't mean anything.  We live by Number 1 as the first reference, and by Number 2 as the second reference.

BY MR. HENDRICKSON:

Q    Now, the road that is shown here as running from the southern boundary to the northern boundary of the property near its westerly boundary, that is open at all times, isn't it?

A    That is open to the public.

Q    And the public does use it and they see the lakes from there?

A    They see the lower lake.  They drive right by it.

Q    Although there is a fence between the road and the lake?

1          A     That is true.

2          THE COURT:  In other words, this public road goes across

3  your property?

4          THE WITNESS:  Yes, it is used by a number of ranchers

5  and people that live in the general area.

6          THE COURT:  Do you consider that a public road, or do

7  you consider you have a right to close that road at any time?

8          THE WITNESS:  No, we haven't any right to close that road.

9  It has been used how long?  That would be a question.  I don't

10  know if I could answer that question whether we could close

11  it or not.  I think that probably takes a court to decide.

12  BY MR. HENDRICKSON:

13          Q     Mr. Gibson, this is used as a fire road, isn't it?

14          A     This is a fire road.

15          Q     As a matter of fact, the Forestry has on frequent

16  occasions taken water out of the lakes and they use water

17  to fill their tankers out of there?

18          A     They have permission to do it at any time.

19          Q     And you have recently granted Forestry an easement

20  across the property?

21          A     Yes.

22          Q     To relocate this road?

23          A     Yes.

24          Q     They wanted to improve the road?

25          A     Either relocate it or if they wanted to put a locked

21,175

1    gate on it, it would be up them.  It would be their authority,

2    if they wanted to do it, I suppose.

3         Q    But that is another use that has been made of this

4    water?

5         A    Yes.

6         Q    It has been used for fire prevention purposes in

7    that area?

8         A    Right.

9         Q    The roads that you described, this one where it

10   says Chihuahua Valley Road, that is the one that is a County

11   road; is that correct?

12        A    That is right.

13   THE COURT:  This is the way you get to your property?

14   THE WITNESS:  Yes.

15   MR. HENDRICKSON:  Yes, sir.

16   MR. VEEDER:  You have no objection to the Marine Corps

17   going on there to finish their investigation out there, have

18   you?

19   THE WITNESS:  No.

20   MR. HENDRICKSON:  No.  We will stipulate there is no

21   objection to your going.  We will give you the combination.

22   I have already given you the combination.

23   MR. VEEDER:  Yes, I have it, and Colonel Bowan should

24   have it, too.

25   MR. GIRARD:  Can he bring his fishing pole?

MR. HENDRICKSON:  Yes, he can bring his fishing pole.

Q    Mr. Gibson, the area that is downstream from the lower dam is quite rough and impenetrable area; isn't that correct?

A    Yes, it is rather rugged.

Q    Have you ever tried to walk down the stream line there?

A    No, I haven't.

Q    Have you ever gone up this road that shows as going to a mine in Section 6?

A    Yes.

Q    Did you notice what the condition of the water was in there when you did that?

A    No, I am afraid I didn't observe.  I can't recall.

Q    But this is definitely more rugged, the stream bottom is more rugged area than it is on your property as shown by the contours of this map?

A    That is true.

MR. HENDRICKSON:  I have nothing further.

MR. STAHLMAN:  I have one other question.


RECROSS-EXAMINATION

BY MR. STAHLMAN:

Q    How far downstream do you have to go before you come to any habitation or cultivation and use?

1    A    Well, it would be several miles is my best guess.

2    MR. VEEDER:   I don't think we should have a guess in the

3  record.

4  BY MR. STAHLMAN:

5    Q    Well, is it your best judgment that it is about

6  several miles downstream?

7    A    Yes.

8    Q    And by "several," what do you mean?

9    A    Three or four.

10   Q    Three or four miles?

11   A    Yes.

12   MR. HENDRICKSON:   It is off this map, isn't it, Mr.

13  Gibson?   None of the area shown downstream on this map is

14  irrigated or inhabitated, is it?

15   THE WITNESS: That is right.

16   MR. HENDRICKSON:   And that is four miles?

17   THE WITNESS: Yes.

18   MR. STAHLMAN:   You have made my point nicely.

19       That is all.

20   MR. HENDRICKSON:   That is all.

21   MR. VEEDER:   Mr. Hendrickson should be advised that the

22  United States has objected and takes the position that the

23  evidence in regard to riparian and irrigable acreage is in

24  for all purposes, and we disagree with the prima facie aspect

25  of the findings that have been made.

MR. GIRARD:  But that is what the judgment says.

MR. VEEDER:  Yes.

MR. SACHSE:  His Honor says it is prima facie.

MR. VEEDER:  That is right, but I want the record to be clear.

THE COURT:  I don't think Mr. Hendrickson is too concerned about what arguments may have preceded some judgment.

MR. VEEDER:  Yes, but he is certainly entitled to know we are unhappy about this.

MR. STAHLMAN:  If you are going to explain all of them that you are unhappy about, we will be here a long time.

MR. VEEDER:  George, we could mark you as an exhibit.

MR. STAHLMAN:  Probably will before we are through.

THE COURT:  What are your views on this matter, gentlemen?

MR. HENDRICKSON:  It was suggested that we could perhaps stipulate that the uses we have been making are riparian uses.  If that can be done, I will go home happy.  Certainly we are not hurting you people.

MR. SACHSE:  I can't stipulate that seasonal storage is a riparian use.  I would be stipulating absolutely contrary to every rule of law in California.

THE COURT:  Your use of the water for recreational purposes is a proper riparian use.  No question about that.

The question is, can you impound the water and have a proper

1  riparian use?  That is the problem.

2      MR. HENDRICKSON:  I understand there is that problem.

3      MR. SACHSE:  Just to kick it open, the way I see it, your

4  Honor, is this.  This is seasonal storage and therefore can't

5  be a riparian use.  It is quite obviously not a statutory

6  appropriation.  Mr. Hendrickson doesn't contend there ever was

7  one.  It can't be a non-statutory appropriation because it is

8  since 1913.

9      So there is only one theory on which a right

10  seasonally to impound the water can be claimed by Mr.

11  Hendrickson, and that is by prescription.  There isn't any

12  evidence that any water has been consumed or used other than

13  the natural transpiration and evaporation.  There isn't any

14  evidence that this has adversely affected the flow downstream

15  in any way.  Presumably if this water ran out of the springs

16  without being impounded it would have soaked in and transpired

17  and been evaporated just the way that it is now.  There is

18  no evidence, in other words, of any hostile or adverse use

19  to any person downstream.

20      I think Mr. Hendrickson may be arguing about how

21  many angels stand on the head of a pin.  Maybe he isn't

22  hurting anybody downstream.  Maybe there is nothing anybody

23  downstream can object about.  But he still doesn't have a

24  prescriptive right.  That is my point.

25      MR. HENDRICKSON:  I would like to make the record clear

as to what I propose.  I have no objection at this time to
this Court retaining jurisdiction to regulate this whole
watershed, and from the point of view of the United States
Government, the Vail Ranch and the Fallbrook Public Utility
District, we recognize that we have to face the fact that
someday there may be regulation in this basin and that is
why you are retaining jurisdiction.  And I don't want to
fight Fallbrook or the Vails or the United States.  My client
doesn't have the money to do it.  However, I don't see why
Fallbrook or the Vails want to insist upon a finding and a
conclusion of law that as to our downstream neighbor or any
of our neighbors we have not acquired a prescriptive right,
if it should turn out that we have.  We haven't been parties
to this lawsuit.

THE COURT:  I will give you several reasons why.  This
lawsuit brought in 6,000 defendants.  A lot of these people
appeared just in pro per without a lawyer, and some didn't
even appear, and I early stated I was not going to default
anybody.  Therefore, we have made a conscientious effort
properly to consider the rights of all the parties, whether
they came in here with a high priced lawyer like Mr.
Stahlman or with almost as high priced a lawyer as Mr. Sachse,
or just an ordinary Government paid lawyer like Mr. Veeder.
And we had, of course, the State of California participating
in a sort of pro patriae function here to see that the law is

properly applied.

I think our findings should be uniform.  I don't think there is any reason that we should treat your client any differently than we have treated these other people. We have uniformly held that none of these people have established any prescriptive right, and we have also provided that their use hereafter will not ripen into a prescriptive right.

Now, as a practical matter, it may well be that it would be very difficult for anybody to show they were hurt by what you are doing.  You are up in an area where there is, of course, a limited amount of water.  Apparently the amount of water that is involved here, if allowed to flow down this canyon, there would be some of it lost through phreatophytes and what not which would use a lot of it up, and in the course of five or six miles before it got down to where anyone could use it, there probably wouldn't be much left.  So as a practical matter I don't know that you are hurting very badly.  We don't propose in this judgment to kick these out. It is more of a caveat -- be careful how much money you spend on building dams and be aware of the fact that some day you may not be able to maintain them.

MR. HENDRICKSON:  I follow your Honor's reasoning up to the point where you say that you are making findings that there has been no adverse use as against Fallbrook and Vail

1  and the people that are fighting this lawsuit.  I didn't

2  get your Honor's point as to why you feel it is necessary

3  for all of these other 5,994 defendants to be foreclosed as

4  between themselves when they haven't been here in the fight.

5    MR. SACHSE:  I might point out that I have a few

6  individual clients and my objections are not made entirely

7  on behalf of Fallbrook.  There are some clients downstream

8  from Chihuahua on Temecula Creek.

9    THE COURT:  Let's forget about the 5,000 other defendants.

10  Let's talk about the four or five downstream immediately

11  below you.  In a suit of this sort, in view of the way we

12  have tried it, why shouldn't I be looking out for their

13  rights?   I don't think you could prove adverse user.

14    MR. HENDRICKSON:  If you are going to look out for their

15  rights, I ask you to look out after ours, too.  And the

16  effect of this finding is to foreclose us.  If we have to

17  h ave a water fight with our downstream neighbors, perhaps

18  w e have to have it, and we feel if we do we ought to each of

19  us start at the same starting point and run toward the

20  same finishing point.  If we have such a lawsuit after this

21  one that starts with a res judicate judgment that even though

22  we haven't been in here fighting each other, that we don't

23  have any rights against each other, that we don't have any

24  rights as against them, and I would just like to have it say

25  that as to the parties who have not appeared you are not

making findings as to whether or not they have prescribed

inter se se.

MR. VEEDER: There would be absolutely no reason for

saying anything in regard to either prescriptive or

appropriative or riparian rights then.

Mr. Hendrickson, I didn't want to deal myself a

hand in this.  It really didn't make any difference.

MR. STAHLMAN:  We have had other situations here that I

think clearly demonstrate that there has been no adverse use

shown here.  Take the situation of Mr. Poore, who didn't see

the effect of the upstream impoundments until some several

dry years, and therefore he would be unaware of the fact that

someone upstream had impounded the water -- it is not brought

to their attention.  And there are undoubtedly many people

downstream from these various impoundments, and yet they would

not be affected by the prescriptive and they would not have

any opportunity to come into court and the water they had a

right to would be taken by prescription without having had any

notice of the fact that away up in the hills some place some-

body impounded water that didn't affect them.

MR. HENDRICKSON:  I would like the record to be clear.  I

am not asking you to find that we have a prescriptive right.

Mr. Stahlman sounds like I am asking you to do something that

forecloses those people.  I don't.  If we are going to have

to have a fight with them, I just want that we both start even.

1   That is all I ask.   The effect of this finding is to say that

2   we lose.

3        MR. SACHSE:   Have you seen Interlocutory Judgment No. 34?

4        MR. HENDRICKSON:   No, the only one I have seen is No. 28.

5        MR. SACHSE:   Interlocutory Judgment No. 34, which was

6   filed and entered yesterday, is the basic judgment for this

7   area and your client will be on there, and the exhibit

8   attached is on there and it covers his riparian right as such.

9   That judgment states as follows:   It is further adjudged

10  and decreed that the rights inter se of the owners of those

11  lands referred to in this interlocutory judgment, to the extent

12  of the groundwaters, are not herein determined.   That is the

13  substance of it.

14       MR. GIRARD:   That provision applies only to groundwaters.

15       MR. VEEDER:  That relates only to vagrant local percolating

16  water.

17       MR. HENDRICKSON:   If we can have that, that is all we

18  want.

19       MR. SACHSE:   You have it.   There is no apportionment

20  made of the surface waters, and there is no inter se

21  determination of the groundwaters between you and your

22  neighbors downstream.

23       MR. HENDRICKSON:   Why can't we have a finding that there

24  is no inter se determination of prescription between us?

25       MR. SACHSE:   Because I can't go for it.

MR. GIRARD:  I am opposed to it.

MR. SACHSE:  In all fairness, the proposed ultimate regulation of this river is going to require that all prescription be stopped.  It is conceivable that these little natural impoundments, these Soil Conservation puddles, many of which are not even used -- they are just a dam and dry half of the time -- it is conceivable that some day in the future those are going to have to be regulated.  From the facts, as I understand your case, I think the chances are extremely doubtful -- I think if I were the next nearest user downstream and sought to enjoin Chihuahua from their diversion or sought a mandatory injunction, the first logical thing you would ask would be, "Does our dam hurt you in any way?"  I would have to say, "No, it has not taken any water from me."  So I can't stop you.

I think this is going to be a kind of fruitless academic discussion.

THE COURT:  More than that, the map and the testimony showed for four miles downstream this land is not cultivated and not being used, and how, therefore, could your user ever be adverse to these people below who are not now seeking to make any use of this water?  If there was left open to you the right to litigate, how could you, on the facts that exist at this date, show any prescriptive to water when there has been no attempt at use by the people immediately downstream

from you?    And in our Interlocutory Judgment No. 28 we

provide that hereafter any further use shall not be a

prescriptive use.   There is authority for the fact that the

Court may, by its judgment and decree, prevent prescription

from running in the future where it has taken jurisdiction of

the rights to the use of water.

MR. HENDRICKSON:  I am taking a lot of valuable time.  I

would like to make just one more statement and then I will

silently fade away.

As I understand the basic theory of California

Water Law and of the 1928 Constitutional amendment, the

person who takes the water and puts it to a beneficial use

is a person who should have some prior consideration.  He is

certainly to have consideration above the person who has just

sat downstream in a rocking chair and liked to watch the water

go by.

It seems to me that the effect of your conclusion

of law here is saying that no matter what the facts may be,

there has been no right obtained by prescription inter se.

You are protecting not the one, such as my client, who has

been making a beneficial use of this water, but you are

protecting the one who has been sitting on his rocking chair

and if he at some time in the future decides to make use of

the water then he can come along and say, "You have no rights

by prescription because Judge Carter says so," even though he

21,187

1    and his predecessors and we and our predecessors weren't here

2    fighting against each other.   The people fighting here are

3    the United States and Vails and a few isolated owners.

4         MR. SACHSE:  There is an order that every party here is

5    adverse to every other party.   It is one of the first orders

6    made in this litigation.

7         MR. GIRARD: The decision of the Circuit Court directs

8    this Court to enter one final judgment determining the rights

9    of all of the parties within the watershed.   I don't think

10   you can ignore one party's right and leave it hanging in the

11   air any more than you could leave the United States' right

12   hanging in the air.

13        MR. VEEDER:  This brings up a point.   I have been looking

14   at the map.   Maybe this is truly academic.   I see for the

15   first mile and a half the title to the property downstream

16   from Mr. Gibson's stands in the United States.

17        MR. GIRARD:  There is no prescription there.

18        MR. VEEDER: There is no prescription against the United

19   States, that is for sure.

20             The first one I find is 148-A.   That is Oviatt.

21   I don't know whether Mr. O'Malley would be unhappy about

22   this situation or not.

23        MR. GIRARD:  We had the identical ruling as to O'Malley.

24   He made the same contention that this gentleman is making.

25   And I think Mr. O'Malley's priorities were way ahead of his.

1    MR. VEEDER:  Again, I didn't want to deal myself a hand

2  in this, because I was not greatly concerned about it.

3    MR. STAHLMAN:  If we are going to establish all the

4  rights, they have to prove them at this time and not let it

5  hang until some future time.

6    THE COURT:  Are both these Oviatt's?

7    COMMANDER REDD:  Yes, sir.

8    THE COURT:  It would seem to me that any row in the

9  future that would come up would be between you and the Oviatts.

10    MR. HENDRICKSON:  If we have any trouble with him, he

11  is going to have to take his cattle out of our pasture.

12    THE COURT:  In view of the use he has made of the water

13  down there, it would be pretty hard to complain about the

14  amount you use.

15    MR. HENDRICKSON:  I have made my point, and if I am

16  unable to prevail, as I said, I will silently steal away.

17    THE COURT:  All right.  The Court finds that you have

18  no appropriative right by either the old method or the new;

19  that there is a proper riparian right to use waters, but you

20  have no right to impound waters other than for a head for

21  irrigation, and that you acquire no prescriptive right.

22    I don't know whether we need any separate findings

23  on this.

24    MR. HENDRICKSON:  While you are at it, would you add

25  that our uses have damaged no one?

1    MR. SACHSE:  That finding, I think, Mr. Hendrickson, is

2    included in every one so far -- not in this language.  The

3    finding has stated that the Court makes no determination of

4    any kind as to reasonableness or unreasonableness of use inso-

5    far as quantity is concerned, and this is part of the

6    continuing jurisdiction.

7        THE COURT:  Don't we have in Interlocutory Judgment

8    No. 28 something to that effect?

9        MR. GIRARD:  We have it in No. 34.  Franz has it.

10   It is the standard finding.  It may be in the judgment, also.

11       THE COURT:  Did we have the reporter make us a file

12   of the judgments?

13       MR. GIRARD:  It is being done, your Honor.

14       THE COURT:  I thought there was some language in

15   Interlocutory Judgment No. 28.

16       MR. GIRARD:  There may be in No. 28.  No. 28 deals

17   specifically with this problem.

18       MR. HENDRICKSON:  I haven't seen anything that there has

19   been a finding that no one has been damaged.

20       MR. SACHSE:  Not in 28.  It just says in 28:

21           "There is no evidence that any of such structures

22       or impoundments presently constitute an unreasonable,

23       wasteful or non-beneficial use of water."

24       THE COURT: That is what I am talking about.  That is in

25   28.

1    MR. SACHSE:  And jurisdiction is retained.

2    THE COURT:  So that covers it.

3    MR. HENDRICKSON:  Does that cover the matter of damage,

4  in your opinion?

5    THE COURT:  Damage?

6    MR. HENDRICKSON:  Yes.

7    MR. VEEDER:  Injury.

8    MR. HENDRICKSON:  That there is no evidence that any of

9  the structures or impoundments presently damage any other

10  person.

11    THE COURT:  Yes, there is no evidence now.

12    MR. HENDRICKSON:  Those words are not in here, and the

13  words that are here do not mean that to me.

14    THE COURT:  Read that section to me again.

15    MR. HENDRICKSON:  It now says:

16        "There is no evidence that any such structures

17    or impoundments presently constitute an unreasonable,

18    wasteful or non-beneficial use of water."

19        Would you consider adding:  Or that they damage

20  anyone?

21    THE COURT:  I don't see that it adds anything.  I prefer

22  to leave the language as it stands.

23    MR. SACHSE:  The next one says that the impact of any

24  such individual impoundments is de minimis.  That is a damage

25  term.  It says, ". . .the cumulative effect of such structures

1   and impoundments may at a future date become substantial. . ."

2   I think Mr. Hendrickson's request is taken care of.   I think

3   it is there already.

4            THE COURT:   I think so.

5                 You don't want any separate findings?

6            MR. HENDRICKSON:   No.

7            THE COURT:   We have covered this all under the general

8   impoundments matter, and you are in 34.

9            MR. SACHSE:   He is in 34-A, I think.

10           THE COURT:   Are the impoundments listed in 34-A?

11           MR. SACHSE:   Yes, your Honor.

12           MR. VEEDER:   He is in 34-A.   However, 34-A does not

13   relate in any way to surface waters.   He will have to be in 34.

14           MR. GIRARD:   He is in 34.

15           MR. SACHSE:   He is in both.

16           MR. VEEDER:   That is right;   he would have to be in both.

17           MR. HENDRICKSON:   May I get a copy of 34 and 34-A?

18           MR. VEEDER:   Yes.   Mrs. Tooker has them upstairs.

19           THE COURT:   It is not required that any separate

20   findings be made further; is that right, Mr. Hendrickson?

21           MR. HENDRICKSON:   No.   Hearing your separate findings,

22   I say, please make none.

23           MR. STAHLMAN:   Your Honor brought up the question of

24   the preparation of these volumes of the findings, conclusions

25   and judgment.   I am wondering, now that we have combined the

1    Fallbrook findings Nos. 2 through 22, whether they will be

2    in this volume.

3         THE COURT:  They are incorporated by reference into

4    39-A.

5         MR. SACHSE:  Yes.

6         MR. VEEDER:  We didn't set them aside.  They are

7    consolidated and merged into 39-A.

8         MR. STAHLMAN:  They don't have to be in.

9         MR. VEEDER:  I think they do, because I sent them to

10   these people.  I don't want to be in the position of having

11   to contact everybody up there.

12        THE COURT:  Take a short recess.  Do you think you will

13   go this afternoon, also, or finish this morning?

14        MR. GIRARD:  Finish this morning.

15        MR. SACHSE:  Mr. Veeder may have a couple of judgments,

16   but I don't think it will take more than a few minutes.

17        MR. VEEDER:  There is onething I would like to refer to

18   here, if I may.

19        THE COURT:  Do it after the recess.

20        MR. VEEDER:  All right.

21        (Recess taken.)

22        THE COURT:  You may proceed.

23        MR. VEEDER:  Your Honor, in regard to the Bureau of

24   Land Management lands, we had marked for identification

25   Exhibit 152.  At the time it appeared to me that there was

1   no problem, no real reason for claiming rights to the use of

2   water in connection with those lands because of their location

3   and most of them are far away from the streams, and Colonel

4   Bowen and I had talked about the possibility of water uses on

5   those. I didn't at that time offer the Colonel's study in

6   evidence.

7           We now find that a substantial acreage is within

8   the Aguanga groundwater area. I also find that out of about

9   8,800 acres of land there are right at 400 acres that are

10  irrigable in character, most of which are located within the

11  Aguanga groundwater area. I have spoken to Mr. Sachse, Mr.

12  Stahlman and Mr. Girard about it and they have no objection

13  to my offering at this time in evidence Exhibit 152, and I

14  have made a tabulation which will be an exhibit on the

15  Government's judgment in connection with the Forest Service

16  lands and Bureau of Land Management lands. They are taken out

17  of that exhibit and Colonel Bowen has checked --

18          Isn't this correct? You have checked this now back

19  against Exhibit 152?

20      COLONEL BOWEN: I would sooner, Mr. Veeder, you would

21  show the one that was prepared by me.

22      MR. VEEDER: I am delighted to show the one that was

23  prepared by you, Colonel, and that will be the one that will

24  be made a part of the judgment.

25          THE COURT: And the part that will be made part of the

1    judgment is taken from Exhibit 152?

2         MR. VEEDER:  That is correct, your Honor.

3              The balance of the lands are just lands within

4    the watershed that are not either riparian or overlying.

5         THE COURT:  And you offer in evidence 152?

6         MR. VEEDER:  Yes, I do.

7         THE COURT:  Received in evidence.

8                                    (Plaintiff's Exhibit No. 152,)
                                     (for identification, received)
9                                    (in evidence.                )

10        MR. VEEDER:  I have also spoken to counsel in regard to

11   the procedure I would like to follow, if I could, in regard

12   to the judgments which are now before you and for which

13   exhibits will be available.  As rapidly as they are prepared

14   by Colonel Bowen's office or by my office, they will be

15   affixed to the judgments that are before you, and the

16   gentlemen have agreed with me that as fast as those assemblies

17   are accomplished they can be delivered to you for signature.

18   I will send to each of counsel the memorandum which  I direct

19   to your Honor transmitting the exhibits and the judgment.

20        MR. SACHSE:  And we pick up the completed copies with

21   the exhibits annexed?

22        MR. VEEDER:  That is correct, or you can come to the

23   office.  Each of you will be notified as rapidly as the

24   judgments are tendered to the Court with the exhibits.

25        THE COURT:  Let's see if we have a list of the judgments.

1    There is Interlocutory Judgment No. 44, the Forest Lands.

2        MR. VEEDER: That is correct.

3        MR. GIRARD:  That one we want to see before it is signed.

4        MR. VEEDER: That will be distributed to counsel.

5        THE COURT:  42-A, Rainbow Creek.

6        MR. VEEDER: That is right.

7        COMMANDER REDD:  The exhibits are ready now, your Honor.

8        MR. SACHSE:  That can be done today, then.

9        MR. VEEDER:  Probably can be done today.

10       THE COURT:  39-A, the amendment.

11       MR. VEEDER:  That has been done and Mrs. Tooker, I think,

12   will have it down this afternoon.

13       THE COURT:  And 39, the amendment.

14       MR. VEEDER:  39 is not finished.

15       THE COURT:  And 30-A, the amendment.

16       MR. VEEDER:  30-A is in the process of preparation now.

17       THE COURT:  And then there is to be this series of

18   amendments to any judgment where there were these consents.

19       MR. VEEDER:  You have approved the form and those will

20   be done this afternoon, I think.

21       THE COURT:  Is that all?

22       MR. SACHSE:  That is it.  That is my list.

23       MR. GIRARD:  39-A, 39, and 30-A.

24       MR. SACHSE:  and 30-A is ready to be signed.

25       MR. VEEDER:  That is right.

1    MR. SACHSE:  And 44 we will handle separately.

2    MR. VEEDER:  That is right.  That is all I have.

3    MR. GIRARD:  I have one thing I should bring to the

4    attention of the Court on this Oviatt's objections to the

5    word "continuous" flow.

6    THE COURT:  Yes.

7    MR. GIRARD:  I checked the record.  I don't think it is

8    too important.  In checking with some of the people who

9    know something about the term "miner's inches," when you use

10   the term "2½ or 3 miner's inches" you are assuming a continuous

11   flow.

12   MR. WILKINSON:  That is a term of measurement.

13   MR. GIRARD:  In other words, in computing miner's inches

14   it is a continuous flow.

15   MR. SACHSE:  It is a quantity-time ratio.

16   MR. VEEDER:  It is no different from second foot.  It

17   is a measurement of the flow.  But the point is, I don't

18   believe there is evidence that he ever continuously used

19   the 3½ miner's inches.  And I think that is important.

20   MR. GIRARD:  But the testimony in the record was,

21   undoubtedly correct, that this pipe had a 2-inch capacity

22   and he estimated that approximately 3½ miner's inches came

23   out of the pipe, with which he irrigated, according to his

24   t estimony, 12 acres from that Koehler Creek operation; and

25   as I understand   it, when you use that term, "3½ miner's

1    inches" you are implying a flow over a period of time.

2        MR. VEEDER:  It is not beneficially used, though.

3        MR. STAHLMAN:  Maybe Sandy can explain it.

4        Colonel Bowen can probably tell us about that.  Or

5    Sandy.

6        They both remain silent.

7        MR. VEEDER:  The point of it is, the mere fact that it is

8    continuous flow, a device for determining the quantity of

9    water, doesn't mean that he has a right to that continuous

10   flow.  That is all I am saying.  I agree with what you say

11   in regard to the characteristics of a miner's inch.

12       MR. GIRARD:  Maybe I misunderstood the engineering

13   aspect.  When you say in the finding that he has an

14   appropriative right to 3½ miner's inch in Koehler Creek, what

15   do you mean?

16       MR. SACHSE:  It means he has a right to continuous flow

17   of three and a half times 9 gallons per minute, roughly

18   28½ gallons per minute continuous flow.  That is what it

19   means.

20       MR. GIRARD:  Is that right, Colonel?  Following the

21   word "continuous flow" do you want to add anything to what

22   you have already said?

23       MR. SACHSE:  You would make it utterly redundant.

24       THE COURT:  Mr. Veeder apparently has an objection.

25       MR. VEEDER:  I will withdraw any objection.  I don't care.

1    THE COURT:  Mr. O'Malley's objection is overruled.

Probably he should be advised.

3    MR. VEEDER:  I told him I would advise him.

4    THE COURT:  Advise him that the Court is of the view

that we have said it all when we have said that he has this

3½ miner's inches on a daily basis.  Also, the words "daily

basis" indicate, I suppose, 24 hours.

8        Will you write him a letter on it, Mr. Veeder?

9    MR. VEEDER:  I will write him a letter, yes, your Honor.

10   THE COURT:  What else?

11   MR. VEEDER: When do we come back, your Honor?  I would

like that 12th date better than the 5th, if we can make it.

13   THE COURT:  What was the number of that Oviatt judgment?

14   MR. GIRARD:  No. 26.

15   THE COURT:  Can we continue this matter until Tuesday,

March 5th?

17   MR. SACHSE:  It is all right with me.   Mr. Veeder

requested the 12th, and since Mr. Veeder has assumed the

burden of getting these other judgments done, I would hope that

when we get here, on whatever date we do, everything will be

ready and we can finally end it up.

22   MR. VEEDER:  We had better get the 12th, I will tell you

that, because this matter is a tremendous task.

24   MR. GIRARD:  You contemplate the judgment on the Forest

Service lands and the other lands will be, as I understand it,

1   mailed out by you next week?

2      MR. VEEDER:  Yes, that is right.

3      MR. STAHLMAN:  One other thing.  I have tried to keep up

4   with these judgments and I have a copy of each judgment with

5   the exhibits attached. I appreciate the fact that the volume

6   the reporter is going to prepare will be a ready reference

7   to the judgments.  However, we will want those judgments with

8   the exhibits attached.  So in the event we don't have them,

9   do you have them?

10     MR. VEEDER:  Yes, we do.  We have them available.  And I

11   think we have to have a complete assembly, and that is going

12   to be it.

13      Are you going to talk in regard to the form of the

14   final decree?

15     MR. SACHSE:  Have we settled the date or not?

16     THE COURT:  To what date did we continue that Guevara

17   case, Mr. Clerk?

18     THE CLERK:  To the 15th, your Honor.

19     THE COURT:  That is right.

20      Tuesday, March 12th, then.  And we will take an

21   extra day, if necessary.

22      You will advise Mr. Trent Anderson to be ready on

23   March 12th.

24     MR. VEEDER:  Yes, I will, your Honor.

25     THE COURT:  Let the record show that this date, March

12th, is a continued hearing from the hearing set for yesterday and today on the matters concerning the final judgment; and that yesterday Judgments 34, 36-A and the Supplement to 37 were signed; and that there is still open for consideration judgments in the course of preparation 44, 42-A, Amendments to 39 and 39-A, Judgment 30-A and Amendments to various judgments where consents of defendants are involved, all of which will be on the calendar for the 12th.

MR. VEEDER:  Your Honor, a question came up in my discussions with Mr. Clark about filing objections by the United States.  He said that he felt until he saw the form of the final decree he didn't know what kind of objections to make or the position to take in regard to them.  There has been no mention here -- I see the time is running out.  Has there been any decision by your Honor or thought as to the kind and form of final judgment you desire to enter?

THE COURT:  Each party was supposed to submit something, and the only one who did was Mr. Girard.

MR. SACHSE:  No; I did, your Honor.

THE COURT:  I didn't see it.

MR. GIRARD:  I have a copy.

MR. VEEDER:  I received a copy of it.

MR. GIRARD:  It is fairly synonymous with the one I sent in.

MR. SACHSE:  Ours is very similar.

THE COURT:  Let's see, maybe I will apologize, Mr. Sachse.

MR. SACHSE:  If you didn't receive it, I certainly have it here.  In fact, the letter was written to you.  The original should have gone to you, and the copies went to Mr. Veeder, Mr. Girard and Mr. Stahlman.

THE COURT:  Yes, sir, I do have your copy.

Did you prepare one, Mr. Veeder?

MR. VEEDER:  No, I didn't, your Honor.  Here is my view on it.  I have objected to the form of the interlocutory judgments.  In my view, I believe that it will suffice if you simply enter a line saying that all the judgments are made final, and that would be the end of it.  I don't see any need of going beyond that, other than also putting in a statement that the status quo would be maintained during the appeal, if any.  And that would be the end of it.

THE COURT:  This last point, though, what about that?

MR. VEEDER:  I would assume that the status quo would be maintained.

THE COURT:  Have you considered this?

MR. GIRARD:  I have.  But I am not in favor of the status quo.  It seems to me that when your Honor enters a judgment that is it.  If Mr. Veeder wants to get a stay on appeal -- of course, the judgment is not an injunctive type of judgment ... anyway.  I don't know what he could get to stay.

1   But it seems to me the judgment should be, as far as the

2   Court is concerned, in effect.

3       MR. SACHSE:  Further than that, your Honor, I think such

4   an order in the broad general terms that Mr. Veeder suggests

5   would be, in effect, negating your judgment itself.  Your

6   judgment itself says that the Water Rights Board has authority,

7   for instance, to consider the DeLuz Creek applications.  It is

8   their business, not your Honor's business.  If he says maintain

9   the status quo, does that mean that the State Water Rights

10  Board shall not consider the DeLuz Creek applications?

11      MR. GIRARD:  Also, does it mean that Colonel Bowen shall

12  not go out and get this information in that order which

13  directed that he be able to get factual information?  I presume

14  even if there is an appeal or even if there is not an appeal,

15  he will still be pursuing that type of actions.

16      THE COURT:  Of course, that is something you have raised

17  now.  That was an order made, but it was not made an

18  interlocutory judgment.  It should probably be part of this

19  final judgment, too.

20      MR. GIRARD:  I think you are right, your Honor.

21      THE COURT:  Of course, maintaining the status quo would

22  encourage an appeal, it would seem to me, wouldn't it?

23      MR. VEEDER:  The important thing, as I see it now, your

24  Honor, and the reason why I bring it up at this moment, you

25  haven't indicated -- I shouldn't say that -- the question of

1    the form of the judgment is important.  I would, of course,

2    ask that there be a proviso to maintain the status quo and

3    that the rights be not affected until the period of appeal

4    had expired or --

5         THE COURT:  I will overrule you on that.  I think that

6    should not be in the judgment.  If the Government appeals

7    and wants a stay on the execution of parts of the judgment,

8    the customary practice is to do it that way.  If you have a

9    money judgment and you want to stay the effect, you put up

10   a supersedeas bond.  If you have an injunctive judgment, of

11   course, there are some provisions that apply.

12         Does an appeal automatically stay an injunction?

13         MR. GIRARD:  I think it does.

14         THE COURT:  At any rate, the Appellate Court could grant

15   relief.  Maybe you wouldn't want to stay the whole thing.

16   Suppose we incorporate in the final judgment the order

17   directing Colonel Bowen to gather material.  You wouldn't

18   want to stay that.  The chances are what you would be trying

19   to stay would be the effect of the judgment involving the

20   stipulated judgment.

21         MR. VEEDER: That is quite possible.

22         THE COURT:  So that instead of trying to stay the whole

23   judgment, you might want to stay just parts of it.

24         MR. VEEDER:  I will convey your thoughts to Mr. Clark,

25   your Honor.  He and I have talked about this.

THE COURT:  It seems to me that would be the better way to handle it.  I disagree with you, Mr. Veeder, that you need just a one-line judgment incorporating the interlocutory judgments.  I think you need some of the material such as Mr. Girard and Mr. Sachse have proposed -- that is, more than just to say that we hereby incorporate all the interlocutories in the final judgment.

MR. VEEDER:  I have expressed my opinion on that.  I have talked to Mr. Sachse about the questions that he put into his proposal.  He puts in there that your Honor's jurisdiction wouldn't control the State Water Rights Board.  I don't believe that is necessary, because the jurisdiction of the State Water Rights Board is related only to unappropriated water. So I don't believe there would be any problem there. I don't believe it is possible to have concurrent jurisdiction with the State Courts.  I think you have ousted any State Court of jurisdiction.

MR. SACHSE:  I will back off from that, your Honor.  I have gone into that further.  The remark I made in my letter, I agree with Mr. Veeder that I am in error.  I don't believe there could be concurrent jurisdiction between you and the State Court.  I don't know whether the draft I made creates concurrent jurisdiction or not, but I agree with Mr. Veeder that it shouldn't.

THE COURT: Before we leave this question, I will ask

1    Mr. Sachse and Mr. Girard to collaborate on the two drafts

2    and see if you can propose another one.

3            MR. GIRARD:  I will have one in by the next hearing.

4            THE COURT:  Have it in form so that if we found it

5    proper we could sign it.

6            MR. SACHSE:  Yes, your Honor.

7                Now, I have another question on this form.  I listed

8    as much for my own help as for anything, every single

9    interlocutory judgment.  I seriously question whether that is

10   necessary in the final.  I would like guidance on that.

11           MR. GIRARD:  I think it is necessary.  I think we should

12   set forth every one of them to make sure we have them all.

13           MR. VEEDER:  I think that is probably right.

14           MR. GIRARD:  I will get Mr. Luddy to make sure we have

15   them all.

16           MR. STAHLMAN:  There is one other matter in relation to

17   State jurisdiction.  There now reposes in the State Court and

18   undisposed of this action involving Barbee-Oviatt  and then

19   the intervention by Vail in that State action.  I think that

20   probably should be disposed of.  Are you interested in that,

21   Bill?

22           MR. VEEDER: As I said, I thought this Court had all the

23   parties before it and that certainly the Superior Court

24   doesn't have jurisdiction.

25           MR. STAHLMAN:  I am just wondering if this wouldn't be

1        MR. STAHLMAN:  You are not concerned then?

2        MR. VEEDER:  I don't say I am not concerned.  I am

3    concerned.  But the United States, of course, is not in that

4    proceeding.

5        THE COURT:  Go ahead and proceed on it and submit the

6    order as a matter of courtesy to Mr. Veeder, Mr. Girard and

7    Mr. Sachse.

8        MR. STAHLMAN:  Yes, your Honor.

9        THE COURT:  Anything else?

10       When the time comes to say goodbye, Mr. Veeder, and

11   we don't see you around here for some time, we are going to

12   miss you, sir.

13       MR. VEEDER:  I will just bet, your Honor.  I will

14   certainly miss you, your Honor.

15       THE COURT:  All right, March 12th.

16       (Whereupon, an adjournment was taken until Tuesday,  )
                                                               )
17       (March 12, 1963, at 10:00 o'clock A.M.                )

18

19                          ---oOo---

20

21

22

23

24

25

21,208

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above entitled cause on the date specified therein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this _____ day of _____, A.D., 1963.

_____
Official Reporter