# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

—   —   —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

—   —   —

UNITED STATES OF AMERICA,

Plaintiff,

-vs-                                              No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

—   —   —

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         **Tuesday, March 12, 1963 and Wednesday, March 13, 1963**

Pages:        21,209 - 21,258, Inclusive

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1
2
3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

7     UNITED STATES OF AMERICA,          )
8                      Plaintiff,         )
9                      -vs-               )          No. 1247-SD-C
10    FALLBROOK PUBLIC UTILITY            )
      DISTRICT, et al.,                   )
11                                        )
12                     Defendants.        )

13

14                    REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                           San Diego, California

16                          Tuesday, March 12, 1963.

17    APPEARANCES:

18       For the Plaintiff:           RAMSEY CLARK, ESQ.,
                                      **Assistant Attorney General and**
19                                    WILLIAM H. VEEDER, ESQ.,
                                      Special Assistant to the
20                                    Attorney General.

21                                    CDR. DONALD REDD.

22       For Defendant Vail:          GEORGE STAHLMAN, ESQ.

24       For Defendant Fallbrook:     FRANZ R. SACHSE, ESQ.

         For Defendant State of
         California:                  FRED GIRARD, ESQ.

25       For Defendant Sawday:        LUCE, FORWARD, HAMILTON &
                                      SCRIPPS,
                                      By ROBERT MC GINNIS.

# I N D E X

WITNESSES

| FOR THE PLAINTIFF: | DIRECT | CROSS |
|---|---|---|
| BOWEN, C. A | 21,220 | 21,224 |
| WARD, Alvis A. | 21,226 | 21,238 |


# E X H I B I T S

| PLAINTIFF'S EXHIBIT | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 294 | 21,221 | 21,222 |
| 295 | | 21,223 |
| 296 | 21,227 | 21,240 |
| 297 | 21,230 | 21,240 |
| 298 | 21,239 | 21,240 |

SAN DIEGO, CALIFORNIA, TUESDAY, MARCH 12, 1963; 10:00 A.M.

---o0o---

(Other matters.)

THE CLERK: 10 - 1247-SD-C, United States vs. Fallbrook, etc., et al.

THE COURT: We will hold the case.

(Other matters.)

THE CLERK: 10 - 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER: Are you ready to proceed, your Honor?

THE COURT: Yes, sir.

MR. VEEDER: Your Honor, Mr. Ward is in the courtroom this morning and he is desirous of putting in some evidence respecting his claim from Temecula Creek. Mr. Ward uses water in Dameron Valley. We have some evidence that we could put in in connection with Mr. Ward's claim.

THE COURT: This is the man who is represented by Mr. Anderson?

MR. VEEDER: Mr. Anderson told me this morning, your Honor, that he would not be here, and he asked me to co-operate with Mr. Ward in this connection, and I assured him that we would.

THE COURT: So, you are going to sort of represent Mr. Ward in an offhand way.

MR. VEEDER: I told Mr. Ward --

1    THE COURT:  Mr. Ward, the Court will try to protect

2  your intests as best he can.

3    MR. VEEDER:  I assure your Honor we have no desire

4  other than to protect his interests.

5    THE COURT:  I understand.  Mr. Anderson has not

6  elected to be here.

7    MR. MC GINNIS:  If the Court please, may I make a

8  preliminary statement regarding one of the judgments in

9  this case.

10    We have, on behalf of the Sawday interests, no

11  objection to the judgments which have been entered hereto-

12  fore.  I wish to state that for the record.  According to

13  the previous discussion, I was to enter any objections there

14  were on behalf of the Sawday interests on this date.  We

15  have reviewed the judgments and have no objection.

16    THE COURT:  That reminds me that the notices went out

17  for the last hearing, which was held on February 20, at

18  which time the notices said we were to consider the various

19  interlocutory judgments that had been signed, and at that

20  session other judgments were also signed, and at the

21  conclusion of that session I continued the hearing to this

22  date.

23    At that last session Interlocutory Judgment No.

24  34, 36A, the Supplement to No. 37 were signed.  Inter-

25  locutory Judgment No. 42A was approved and was signed by

the Court on February 25 and was entered.

Also, there was considered at that hearing the amendment to various judgments that had in them references to consents filed by various defendants, and subsequently, as outlined at the meeting on the 20th and the 21st, I think it was, those judgments were presented and signed. They are Amendments to Interlocutory Judgments No. 30, 31A, 32, 33A, 34, 34A and 36A.

MR. STAHLMAN: None of those affects that Sawday property. That would be in 29A.

THE COURT: Do you understand what I mean about these consents?

MR. MC GINNIS: Yes, your Honor.

THE COURT: People who consented to a limited use. But the judgments entered were broader than the consents. So, we are eliminating the consents.

Also, at these meetings there was proposed that there be prepared Interlocutory Judgment No. 44 on the Forest lands, and Amendment to Judgment No. 39, and Amendment to Judgment No. 39A.

I have a reference here to Judgment No. 30A, Mr. Veeder.

MR. VEEDER: Yes, your Honor. I have No. 30A here, which is the area outside of the Murrieta-Temecula Ground Water Area. It is prepared, your Honor. I have just

1    handed counsel a copy of it.

2        THE COURT:  I want the record to show that these matters

3    were continued over from the last hearing, as to which

4    notices were sent, and are before the Court at this hearing.

5        Is there anyone who has any interests in these

6    judgments?

7        You have no objection?

8    MR. MC GINNIS:  We have no objection, your Honor.

9    THE COURT:  Thank you, sir.

10   MR. MC GINNIS:  Thank you.

11       (Another matter.)

12   THE CLERK:  10 - 1247-SD-C, United States vs.

13   Fallbrook.

14   THE COURT:  Are you ready to proceed, Mr. Ward?

15   MR. VEEDER:  Your Honor, for the purpose of refreshing

16   the memory of the parties here, I have brought together the

17   data that appeared to me that might be important in

18   connection with Mr. Ward's claims.

19       There was testimony, your Honor, which appears

20   in Volume 25, commencing at page 2,346, which your Honor

21   may desire to look at.

22   MR. STAHLMAN:  Pardon me for interrupting.  Where is

23   this property located?

24   MR. VEEDER:  Dameron Valley off Temecula Creek.

25   MR. GIRARD:  Who gave the testimony?

MR. VEEDER:  Mr. Kunkel testified in regard to it, and also Colonel Bowen has testified in regard to it.

I intend to offer the engineering report prepared by Colonel Bowen.

MR. GIRARD:  All right.

MR. VEEDER:  Here is the transcript on the subject, your Honor.  That is Mr. Kunkel's testimony.

THE COURT:  Has Mr. Ward seen this?

MR. WARD:  No, sir.

MR. VEEDER:  He just came into my office a few minutes ago.  I haven't had a chance to show it to him.

THE COURT:  How far does it continue?

MR. VEEDER:  It is only about three pages, your Honor.

It may be of assistance to your Honor.  I brought a copy of Exhibit 281.  If your Honor will observe, here is the area concerning which the evidence is offered.  Here is Dameron Valley.  Here are the points of diversion on that.

THE COURT:  I think Mr. Ward ought to hear this testimony.  You ought to read it into the record.

MR. VEEDER:  I thought perhaps your Honor would want to do that.  I will do it, if you want me to.

THE COURT:  Where does it start?

MR. VEEDER:  It starts up in Section 7, right here.

It would be about line 5 on page 2,346, your Honor -- only about two and a half pages.

1     THE COURT:  This is Mr. Kunkel testifying?

2     MR. VEEDER:  Mr. Kunkel testifying.

3     THE COURT:  The gentleman seated beside you is an

4  employee of the U. S. Geological Service.  You know him,

5  I take it?

6     MR. WARD:  Yes, I do.

7     THE COURT:  He is describing the valley into which

8  Temecula Creek flows.

9          "Q     You may proceed with your description

10    of the next valley into which the Temecula Creek

11    flows.

12          "A     At a point in Section 7, Northwest

13    Quarter of Section 7, Township 9 South, Range 2

14    East, there was an earth dam across the channel

15    of the Temecula River.

16     MR. SACHSE:  May we ask if that is the one

      that is indicated on the map?

      "THE WITNESS:  Yes, diversion to Dameron

   Valley.  That is an earth dam."

   MR. VEEDER:  I would like the record to show that Mr.

Ward is now viewing Exhibit 281.

   THE COURT:

          "Q     And would you describe, if you observed,

   the utilization which is made of that dam?

          "A     The first visit that I made to that dam

1    there was a pump in operation, and the water was

2    being pumped from the impoundment of water behind

3    the dam, purportedly for use in Dameron Valley.

4    I did not trace it out.

5         "Q    You can only testify, Mr. Kunkel, to

6    what you saw. You observed, then, the pumping of

7    water from that point; is that correct?

8         "A    I observed pumping of water from

9    that point.

10         "Q    Now, would you proceed with the

11    description of the valley into which the channel

12    of Temecula Creek proceeds?

13         "A    Below the diversion there was no flow

14    in Temecula River. And in the Northwest Quarter

15    of Section 7, Township 9 South, Range 2 East, the

16    channel of the Temecula River widened out and

17    flowed across an area that was underlain by alluvial

18    deposits. The extent of Dameron Valley is

19    approximately a half mile square, as indicated by

20    the area colored yellow."

21    He is talking about the map you are looking at.

22    What Exhibit is it?

23    MR. VEEDER:  That was Exhibit 15.  This is an enlarge-

24    ment of that particular area that appeared on Exhibit 15,

25    the key map.

Mr. Kunkel, Exhibit 15 you are referring to in the testimony. We are looking at Exhibit 281, which is a larger scale map showing the same features.

THE COURT:

"Q    Have you compared the areas of the continental deposit with the younger alluvium in making your investigation there?

"A    Yes, I did.

"Q    Would you state for the record the comparative areas, if you have them?

"A    They are in area -- they are approximately equal.

"Q    Now, proceeding on down from Dameron Valley, would you describe the channel of the Temecula Creek?

"A    The channel of Temecula Creek in Cameron Valley is incised a matter of five or six feet beneath the alluvial plain of Dameron Valley. In the south half of Section 1, Township Range 1 East -- sorry -- Township 9 South, Range 1 East, I observed a sump, apparently bulldozed into the channel of the Temecula River. There was standing water in the river, in the sump during the period that I observed it. There was no pumping on the date that I observed it. Downstream

1   from that point --

2         "Q    When you were there, did you observe

3   facilities that could be utilized for pumping?

4         "A    I would have to check my notes.

5   I don't recall.

6         THE COURT:  This is at the place marked

7   'Sump' in Section 1 of the township and range

8   you have noted?

9         "THE WITNESS:  Yes, sir.

10         "THE COURT:  O.K.  Go ahead."

11         Do we go further, or is that the end of it?

12   MR. KUNKEL:  A little more, I believe, your Honor.

13   THE COURT:

14         "Q    Now, would you proceed on down the

15   Temecula?

16         "A    Downstream in the same section,

17   Section 1, Township 9 South, Range 1 East, the

18   valley -- or the channel again is confined between

19   banks of basement complex.  There is also an earth

20   dam across the valley in the west half of Section 1

21   that impounds water.  On the date that I visited the

22   installation, I observed no pumping, and there was

23   rising water beneath or below the dam in the west

24   half of Section 1, Township 9 South, Range 1 East.

25         "THE COURT:  Below your symbol where you

1      show the earth dam, it looks as if you might have

2      a circle drawn there, or it might be other lines.

3            THE WITNESS:  That is a circle with a solid

4      line followed out.  On the color map here I have

5      the circle here in Section 1, and the solid line

       follows across the northeast quarter of Section 2

       on into Section 35, Township 8 South, Range 1 East.

8            Q      What is that circle supposed to mean?

9            A      The circle is a point of rising water.

10     Just as we observed the rising ground water in

11     Oak Grove Valley, ground water was observed to

12     rise in the channel of Temecula Creek at the point

13     indicated by that circle, and increased -- and

14     the quantity of water, as indicated by the flow

15     in the channel, increased as one proceeded down

       gradient."

       THE COURT:  Is this all?

18     MR. VEEDER:  That is all.

19           Your Honor, I would like also to refer to Exhibit

20     231A, in which evidence respecting the wells of Mr. Ward was

       introduced in evidence (handing the document to Mr. Ward).

       May I call Colonel Bowen, your Honor.

23           I would like the record to show now, if we may,

24     that Mr. Ramsey Clark, Assistant Attorney General of the

25     United States, is in the courtroom.

1          THE COURT:   The record will so show.

2          Come forward, Colonel Bowen.

3

4                    A. C. BOWEN,

5     a witness for the plaintiff, having been previously duly sworn,

6     on his oath, was examined and testified further as follows:

7          MR. VEEDER:   I have here, your Honor, a copy of Colonel

8     Bowen's engineering report in regard to Mr. Ward's property.

9

10                   DIRECT EXAMINATION

11    BY MR. VEEDER:

12         Q    Colonel Bowen,   has a copy of this engineering

13    report been delivered to Mr. Ward to your personal knowledge?

14         A    Yes, sir.

15         THE COURT:   Have you ascertained what this Exhibit

16    number will be?

17         MR. VEEDER:   I was going to have to ask Mr. Luddy,

18    your Honor.   I don't have my list of exhibits with me.

19         THE COURT:   We didn't have a series of engineering

20    reports, did we?

21         MR. VEEDER:   No, we didn't.   Our last one was

22    Chihuahua engineering report.

23         THE COURT:   I think it is 294.   The last exhibit we

24    received was the runoff exhibit, which was only for

25    information.

1        MR. VEEDER:  That is correct, your Honor.  This will be

2   No. 294.

3        THE COURT:  294 marked for identification.

                                    (Plaintiff's Exhibit 294    )
                                    (marked for identification.)

BY MR. VEEDER:

7        Q     Colonel Bowen, I hand you the exhibit marked for

8   identification 294 and ask you to state into the record the

9   contents of it.

10       A     Plaintiff's Exhibit 294 for identification is a

11  copy of Engineering Report No. 232, which was prepared from

12  investigations and surveys made in September 1956 by

13  personnel from the Office of Ground Water Resources at

14  Camp Pendleton under my supervision and direction.

15       Q     Colonel Bowen, would you state whether a copy of

16  this has been delivered to Mr. Ward?

17       A     Yes, sir, a copy was delivered to Mr. Ward.

18       Q     Would you state into the record the total acreage

19  and the irrigable acreage as reflected by the engineering

20  report?

21       A     The total acreage as shown in Plaintiff's Exhibit

22  294 is approximately 360 -- that is three six o -- acres.

23  Of that amount our surveys indicated that 189.1 are

24  irrigable.  The balance is non-irrigable.

25       Q     Colonel, to your personal knowledge, is the data

set forth in the engineering report for identification

No. 294 accurate?

A    Yes, sir, it is.

MR. VEEDER:  We offer Exhibit 294 in evidence, your

Honor.

THE COURT:  Mr. Ward, have you had a chance to look at

it?

MR. WARD:  Yes.

THE COURT:  Any objection?

MR. WARD:  No, your Honor.'

THE COURT:  294 received in evidence.

(Plaintiff's Exhibit 294)
(received in evidence. )

MR. VEEDER:  While the Colonel is on the stand, your

Honor, I would like to offer in evidence the engineering

report of the Chihuahua Land Company.

MR. SACHSE:  Let's get done with Mr. Ward.  I have a

couple of questions.

THE COURT:  While the Colonel is here.

MR. VEEDER:  I asked if I could get this identified

and we will offer it.

THE COURT:  It will be No. 295.

MR. VEEDER:  We all agreed this could go into evidence

without any further testimony at the last time when Mr.

Anderson was here, your Honor.

1      THE COURT:  He had a copy of the report?

2      MR. VEEDER:  That is correct.

3      THE COURT:  All right.

4  BY MR. VEEDER:

5      Q    Colonel Bowen, would you state into the record

6  whether you made an investigation in connection with the

7  Chihuahua Land Company engineering report?

8      A    I did.

9      Q    And is the data contained in it accurate, to your

10  personal knowledge?

11      A    Yes, sir, it is.

12      MR. VEEDER:  Your Honor, in view of the stipulation by

13  counsel at the last hearing in regard to the Chihuahua Land

14  Company, I offer this engineering report in evidence.

15      THE COURT:  Received in evidence.

                              (Plaintiff's Exhibit 295 )
                              (received in evidence.    )


18      THE COURT:  What total acres and what irrigable acres

are shown, Colonel?

20      THE WITNESS:  Plaintiff's Exhibit 295 for identifi-

cation, your Honor, shows approximately 342.4 acres as the

total area in the property, and of that amount 5.1 are

suitable for irrigation.

25      THE COURT:  Five acres?

1    THE WITNESS:  5.1 acres, your Honor.  The balance is

2  non-irrigable.

3    THE COURT:  All right.

4    You may cross-examine.

5    MR. VEEDER:  We have offered in evidence 295, your

6  Honor.

7    THE COURT:  It will be received.

8    You may cross-examine the Colonel.

9

10    CROSS-EXAMINATION

11  BY MR. GIRARD:

12    Q    Colonel, what was that exhibit pertaining to Mr.

13  Ward's land?

14    A    Plaintiff's Exhibit 294, sir.

15    Q    All of the land which you refer to as total

16  acreage and irrigable acreage depicted on the map attached

17  to that exhibit is riparian?

18    MR. VEEDER: I object to that as calling for a

19  conclusion, your Honor.

20    THE COURT:  Overruled.

21    THE WITNESS:  Yes, Mr. Girard, the land is traversed

22  by Temecula Creek and is apparently riparian thereto.

23  BY MR. GIRARD:

24    Q    It is treated as riparian land in the exhibits of

25  the United States?

A    Yes, sir.

Q    One other point, Colonel.  Are there two dams depicted on this exhibit?

A    There are two dams depicted in the lower right-hand corner of the aerial photograph attached to Plaintiff's Exhibit 294, and they would appear in the Southeast Quarter of the Northeast Quarter of Section 12, Township 9 South, Range 1 East.

Q    Colonel, are those earth-constructed dams?

A    Yes, sir.

Q    Constructed out of what?  The material right there on the spot?

A    The material readily available at the site.

Q    Are they completely pervious or impervious, or do you know?

A    Well, no earth-filled dam is completely pervious.

Q    And water would go through?

A    Water could go past.

THE COURT:  When you say completely pervious, you mean completely impervious?

THE WITNESS:  Yes, your Honor, completely impervious.

MR. GIRARD:  That is all the questions I have, your Honor.

THE COURT:  Mr. Sachse.

MR. SACHSE:  No questions.

THE COURT: Mr. Stahlman.

MR. STAHLMAN: No questions.

THE COURT: Mr. Ward?

MR. WARD: No.

THE COURT: Thank you, Colonel.

MR. VEEDER: I would like to bring to your Honor's attention one fact, and the reason for my objection on this point. In the pleadings Mr. Ward has asserted that he had an appropriative right dating back to 1890, and I have no idea what his evidence will be on that proposition; but I do think it is important that he have an opportunity to explain his position on that.

MR. SACHSE: We haven't had evidence of an appropriative right yet. That is what I am waiting for. I thought that was what Mr. Ward wanted.

THE COURT: Come forward and be sworn and tell us about your property, Mr. Ward.


ALVIS A. WARD,

one of the defendants in this action, being first duly sworn, on his own behalf was examined and testified as follows:

MR. VEEDER: Do you want me to proceed, your Honor?

THE COURT: Do you want to examine him, Mr. Veeder?

DIRECT EXAMINATION

BY MR. VEEDER:

Q    Well, Mr. Ward, how long have you been acquainted with this property?

A    I purchased it from Mr. Barbee in 1954.

Q    Mr. Ward, in your pleadings I observed that you assert an appropriative right in connection with this land. Have you with you a copy of the filing or notice upon which you predicate your claim?

A    Yes, here is a photostat of a copy of the filing in the County of San Diego.

MR. VEEDER:   I would like to have this photostatic copy marked for identification as Exhibit 296.

THE COURT:   296 marked.

                              (Plaintiff's Exhibit 296   )
                              (marked for identification.)

BY MR. VEEDER:

Q    I hand you a copy of 296 and ask you to state whether that is part of the chain of title to your claimed appropriative right?

MR. GIRARD:   I object.

THE COURT:   On what ground?

MR. GIRARD:   On the basis that if he is contending that this is just a -- I think the question stated whether this was a portion of the chain of title to his claim of a

1  water right.  I don't think there is any evidence that he

2  has traced any chain of title on this property.

3      MR. VEEDER:  I want the record to show here now the

4  difficulty with which we are confronted here.

5      THE COURT:  I understand.

6      MR. VEEDER:  That Mr. Ward is here and he has asked me

7  to help him if I can.

8      THE COURT:  This Exhibit 296 which has been marked

9  for identification is one of the documents you rely upon in

10  claiming this appropriative right?

11      THE WITNESS:  Yes, sir.

12      MR. GIRARD:  I have no objection, if that is the basis

13  of it.

14      THE COURT:  That is what we are trying to get at.

15      Let's see it.

16      Have you gentlemen seen this?

17  MR. GIRARD:  No, your Honor.

18  MR. SACHSE:  No, your Honor.

19  MR. STAHLMAN:  No, your Honor.

20      THE COURT:  Let's see if we can read it into the record

21  so that you will know about it:

22

23      Notice is hereby given that I, Peter Escallier,

24  claim the water now or hereafter flowing in the stream of

25  water known as the Oak Grove Creek in the County of

1    San Diego, State of California, in the amount of 200 inches

2    measured under a 4-inch pressure.

3            The purposes for which I claim said water are

4    for the irrigation of agricultural lands belonging to and

5    situated in Section 12, Township 9 South, Range 1 East,

6    SBM, and that I will convey said water from the point of

7    intended diversion to the said agricultural lands by means

8    of a ditch.   The point of intended diversion of said water

9    is at a point on said stream distant a mile and a half

10   from the Oak Grove Road and near the Township line in

11   Section 7, Township 9 South, Range 2 East, SBM.

12           "Dated August 20, 1890.

13               (Signed)  Peter Escallier."

14      And then it says:

15        "Received per record September 1, 1890, 30 minutes

16   past 9 o'clock, at the request of Mr. William H. Holcomb.

17

18                "County Recorder,

19                      by B. F. More Duffy.

20   "Recorded September 3, 1890, at 9 o'clock and 45 minutes

21   a.m.   E. H. Miller, County Recorder, by H. R. Haight, Deputy."

22

23

24

25

BY MR. VEEDER:

Q   Mr. Ward, would you describe the irrigation system that you have on the premises and that you are now operating?

A   Yes.  The irrigation system is quite different from any that has been reported on, because I have been continually improving it.  When I first bought the property in 1954 it consisted of the one diversion dam which was testified to and there was a pump there which pumped water up into a large reservoir.

THE COURT:  Let me interrupt a minute.  You or your attorney had a little sketch.  Do you have it here?

THE WITNESS:  Yes, sir, I have a sketch.

THE COURT:  Let that be marked as Exhibit 297 for identification.

(Plaintiff's Exhibit 297    )
(marked for identification.)

THE COURT:  Showing you the sketch --

I think you gentlemen have had copies of this, haven't you?

MR. SACHSE:  No, your Honor.  Mr. Anderson was supposed to be here.

THE COURT:  You may use my copy, Mr. Sachse.

This sketch, Exhibit 297, shows in the rectangular outlines your property, I take it?

THE WITNESS:  Yes, it does.

1      THE COURT:   And it shows the location of Highway --

2          THE WITNESS:   Highway 79.

3          THE COURT:   -- Highway 79 which crosses part of your

4      property; is that right?

5          THE WITNESS:   Yes.

6          THE COURT:   And it shows Temecula Creek going down

7      through your property?

8          THE WITNESS:   Yes.

9          THE COURT:   You said when you first acquired the

10     property there was what you called a diversion dam?

11         THE WITNESS:   There was a diversion dam at point A on

12     the stream.

13         THE COURT:   And that was on your property?

14         THE WITNESS:   That was on my property, yes, sir.

15         THE COURT:   Would this be easterly of your property

16     line, or westerly?

17         THE WITNESS:   Westerly of the property line.

18         THE COURT:   What is the X shown on Exhibit 297?

19         THE WITNESS:   That is a --

20         THE COURT:   A well?

21         THE WITNESS:   Wait a minute.  No.  No, that X is where

22     the old diversion point was that was mentioned by Mr. Peter

23     Escallier in his filing.  He diverted it up -- that was at

24     that time public land, and he diverted it up there.

25         THE COURT:   How do you know that X is that old point?

1    THE WITNESS:  The old ditch and the place where he

2    diverted is still there -- the remains of it is still there.

3    You can see it.

4    THE COURT:  What you see is an old ditch and an old

5    point of diversion.  But you don't know that that is the

6    point that Peter Escallier established?

7    THE WITNESS:  Other than it would be very impractical

8    to get it at any other point.  He had to get it up there

9    because he was depending upon the water running down.  He had

10    no way of pumping.

11    THE COURT:  Have you ever investigated as to whether

12    there is any evidence on that ground of other points of

13    diversion above point X?

14    THE WITNESS:  Yes, I have been all up and down there and

15    that is about the only point that you could do it.

16    THE COURT:  And point X is about how far  from your

17    property line?

18    THE WITNESS:   It is about 200 yards.

19    THE COURT:  And is it right in the bed of the stream?

20    THE WITNESS:  Yes.  He had just a slight dam there

21    which would make the water then run into the ditch and it

22    would flow by gravity on  down onto the property.

23    THE COURT:  Where was  the ditch located?

24    THE WITNESS:  It was right at the side of the stream

25    on the bank.

1      THE COURT:  Higher than the stream?

2      THE WITNESS:  Higher than the stream, yes.

3      THE COURT:  And by this ditch he was then able to get

4  the water upon land that he couldn't have got it up onto

5  from the stream?

6      THE WITNESS:  That is right.  That is why it was

7  diverted further up the stream, so he could use gravity to

8  get it down.

9      THE COURT:  This old sump was just an earth fill?

10      THE WITNESS:  Yes.

11      THE COURT:  Go ahead and describe it.

12      THE WITNESS:  There is a dam at A and an electric pump

13  there which pumps water up into the reservoir C.

14      THE COURT:  And that dam is an earth dam, also?

15      THE WITNESS:  It is an earth dam.

16      THE COURT:  Was that dam on the property when you bought

17  it from Mr. Barbee?

18      THE WITNESS:  Yes, it was.  And then there was an

19  irrigation line running from C.  The dashed line was a

20  concrete irrigation pipe, which I later replaced with an

21  8-inch metal pipe.  And then in 1956, latter part of 1957,

22  at point E I dug a sump there.  There are dotted lines

23  surrounding a big sump all in that area.  Water is right at

24  the level of the ground.  You can dig down a foot or two

25  and get water.  In some spots it is actually on the level

21,234

of the ground.  So, I had the power company run the power

lines to point E and put a 25-horse-power pump, 500-gallons-

a-minute pump, and ran lines in from point E up into the

old irrigation system and also up into some other irrigable

land around.

THE COURT:  What is F and G?

THE WITNESS:  F is another little dam there, and I have

a gasoline pump there.  And G is the old sump which was

shown on the original methods.  I believe it is on record

here.

THE COURT:  G was the sump on the property when you

acquired it?

THE WITNESS:  It was there when I acquired it.

THE COURT:  You have no knowledge as to how long it had

been there?

THE WITNESS:  No, I don't.

THE COURT:  And F is one you put in, and E you put in?

THE WITNESS:  That is right.

THE COURT:  Since 1956?

THE WITNESS:  Yes.  And then  at the point H here is

another dam and a lake which I have not used for irrigation

purposes, but it is a little dam and a little lake there.

THE COURT:  When  was that put in?

THE WITNESS:  That was around the same time; in 1956 and

the early part of 1957.

THE COURT:   I see reference to an old reservoir as D up in the right-hand corner.  Were there ditches that ever ran to that?

THE WITNESS:   Yes.  Actually, this water which came from point X, there is a ditch that runs across it and would run all the way up there and run water into that old reservoir up there by gravity from point X.  That has not been used since I have owned it.

THE COURT:   And you haven't used X as a diversion point since you have had the property?

THE WITNESS:   No, I haven't.

THE COURT:   Will the water run up there from your point A?

THE WITNESS:   No, it has to be pumped from point A.

BY MR. VEEDER:

Q   During the dry period of the year, Mr. Ward, what is the effect of the dam which you now have located at your point A?

A   Point A, depending upon the year, there have been as much as four months during the summer that it was dry. There have been other years when enough water came down to where I could irrigate all the year around.

Q   How much water in the creek would you say during the dry season of the year does your dam divert?

A   I have a 200-gallon-per-minute pump and I can run

1   it enough to irrigate about ten or twelve acres of alfalfa

2   and keep it alive during the summer months.

3        Q   During the summer months how much water passes the

4   dam at point A, which dam is across the Temecula Creek, as

5   I understand

6        A   None of it actually passes over the dam spillway,

7   but it does seep underneath.  That entire area there is

8   quite sandy and even during the winter months, unless there

9   is a flood, the stream disappears entirely at point B.

10  It goes onto the ground at that point.

11       Q   The surface water is diverted into your ditch,

12  however, at the dam; is that correct?

13       A   Well, I have a pump at the dam.  There is no

14  ditch there.

15       Q   And you take all the water that is available in

16  the stream?

17       A   That is true.

18       Q   And how long have you been doing that?

19       A   Ever since I owned it.

20       Q   How long has that been.

21       A   I bought it in 1954.

22       THE COURT:  You say you take all the water available.

23  You take all the water that is --

24       THE WITNESS:  That is on the surface.

25       THE COURT:  But there is water that goes underneath

1      your dam?

2             THE WITNESS:   Yes, quite a lot.

3             THE COURT:   And disappears underground at B and probably

4      runs down to feed the swampy area?

5             THE WITNESS:   To feed the swampy area.   And from that

6      swamp on down the stream runs year around.   It never seems

7      to change a great deal, even in the summer or winter, other

8      than when there is very heavy rains.   But from that swamp

9      the stream runs constantly.

10     BY MR. VEEDER:

11            Q    Going back to your A, what is the capacity,

12     would you say, of your pipe or whatever structure you

13     divert with?

14            A    It is about a 200-gallon pump a minute there.

15     And this is an 18-inch concrete pipe that runs up to

16     reservoir C.

17            Q    Will that fill your 18-inch pipe when you are

18     irrigating?

19            A    No, I don't try to fill the pipe.   I just use it

20     to take the water up to reservoir C.

21            MR. VEEDER:   I have no further questions.

22            THE COURT:   Any questions?

23            MR. SACHSE:   Yes, your Honor.

24            THE COURT:   All right.

25

CROSS-EXAMINATION

BY MR. SACHSE:

Q    Mr. Ward, inviting your attention to your Exhibit 296, do you note that the purported appropriation is entirely to use water in Section 12?

A    Yes, I noticed that.

Q    What part of your property is in Section 12?

A    Section 12 starts right here.   This part here is Section 12.

Q    In other words, the great bulk of your irrigated land is in Section 12?

A    That is right.   But from the line just drawn straight across there, from that point downward is Section 12.

Q    Do you have any means of calculating what amount of water from that diversion you have used in Section 12 since you have had the property?

A    I have records of the electric bill on that pump, and in looking at the electric bill -- I have not broken it down.   It could be broken down, but I haven't done it.

Q    I have here a letter in the file that was handed me by his Honor, a letter apparently signed by you and addressed to Mr. Trent G. Anderson.   Is he your attorney?

A    Yes.

Q    In which letter you state, "I have no specific

1    evidence covering the amount of water used for irrigation

2    on this ranch prior to the time I bought it late in 1953."

3    Is that right?

4        A    That is right.

5        THE COURT:  Mark it 298 for identification.

6        MR. SACHSE:  298 for identification.

7                                (Plaintiff's Exhibit 298    )
                                (marked for identification.)
8

9    BY MR. SACHSE:

10       Q    You had no way of knowing whether or not Mr. --

11   what is his name?

12       A    Peter Escallier.

13       Q    Peter Escallier used any water, is that right?

14       A    No, I have no concrete evidence other than that

15   there is the remains of an irrigation system there that

16   evidently must have been used at one time.

17       MR. SACHSE:  I have no further questions.

18       THE COURT:  Mr. Girard?

19       MR. GIRARD:  None.

20       MR. VEEDER:  Is the letter from Mr. Ward in evidence?

21       MR. SACHSE:  I now offer it.

22       THE COURT:  298 received in evidence.

23           297, of the sketch, received in evidence.

24           296, the recording, received in evidence.

25

(Plaintiff's Exhibits 296,)
(297 and 298 received in   )
(evidence.                 )

MR. SACHSE:  This was yours, your Honor.  You handed it to me.

THE WITNESS:  I might mention just as a matter of explanation that a large part of my water at the present time does come from point E in the larger pump.

THE COURT:  Do you have anything else you want to present, Mr. Ward?

THE WITNESS:  No, I think not, your Honor.  I made claim as against the survey made by Marine Corps where they said there was 189 acres which could be subject to irrigation.

THE COURT:  How many acres do you think are subject to irrigation?

THE WITNESS:  My claim was 250 acres.  But that is just a matter, I think, of individual interpretation of what is or can be irrigated and what can't be.

THE COURT:  Any other matters in the report that you don't agree with?

THE WITNESS:  No, there is nothing else.  I agree with all of the other report.

THE COURT:  Anything further?

MR. SACHSE:  Nothing, your Honor.

THE COURT:  You may step down, Mr. Ward.

21,241

MR. VEEDER:  It appears he has put in sufficient evidence to give consideration -- I would suggest you might give consideration as to whether he has a right gained by prescription in the operation here since 1954.

MR. SACHSE:  Against whom?  The United States?

MR. VEEDER:  Certainly not against the United States, Mr. Sachse, because prescription will not run against the Government.

MR. SACHSE:  I would like a little specific evidence as to which downstream owner has been adversely affected by the activities of this defendant.

THE COURT:  Mr. Veeder is trying to represent Mr. Ward here and put Mr. Ward's best foot forward.  But isn't this exactly the situation we had with the Oviatt property where the ditch had been up on other property?  Let me have your view on it, Mr. Sachse and Mr. Girard.

MR. GIRARD:  Your Honor, my view is that all he has established is a proper riparian use.  I can't conceive of a prescriptive use because at least for the time he has used he has run into the period of the lawsuit, without any question of adverse effect, and it certainly couldn't run during the period the lawsuit was filed against anyone.

As far as the appropriative right is concerned, I don't think he has shown any use at all prior to 1953 in the sense of any tangible evidence, and as far as any

1    downstream people are concerned there is no evidence **here**

2    that would indicate that his use was anything other **than**

3    really a riparian use.  I think  it is the same **as** the

4    Oviatt and Gibbon and Cottle and all of the others that **have**

5    been adjudicated already.

6        MR. SACHSE:  I think so, your Honor.

7        THE COURT:  Of course, the proof offered is clear

8    that this dam does not divert all of the water out of **the**

9    stream bed; that water flows beneath it.

10       MR.  Mr. Ward, we have had this problem up before **on**

11   other ranches.  Of course, as to rights that you might **have**

12   to go up to point X off your property on what was **formerly**

13   Government land, we will not adjudicate that.  I don't **know**

14   who owns that land there.  Is it still Government land?

15       THE WITNESS:  No; it is privately owned.

16       THE COURT:  We will not adjudicate that now.  You **may**

17   or may not have a right to maintain a ditch up there.

18   But as to your rights in the stream, to be consistent **the**

19   Court is going to find that you have a riparian right, **a**

20   correlative right with other users on the stream; but **you**

21   don't have a prescriptive right, and you don't have an

22   appropriative right.  As a matter of fact, it doesn't **make**

23   a lot of difference.  Your riparian right is about as **good**.

24   If you had an appropriative right off that Government land,

25   all it would do would be to put you prior to people who **had**

1   acquired Government land subsequent to that filing.

2       Isn't that all it would do at the very best on

3  appropriative right?

4     MR. SACHSE:  I agree, your Honor.

5     MR. GIRARD:  It would still be limited to only

6  Section 12.

7     THE COURT:  That would be limited to Section 12 even

8  then.  But your riparian right is your best right.

9     THE WITNESS:  Yes.

10     THE COURT:  And you are situated, of course, right

11  across this stream.

12     Will findings be prepared in this matter?

13     MR. GIRARD:  I don't think it is necessary, your

14  Honor.

15     MR. SACHSE:  It isn't necessary.  The findings to which

16  Mr. Anderson objected were the findings that stated there

17  are no appropriative or prescriptive rights other than

18  those as set forth in the basic judgment that covers the

19  Upper Temecula.

20     MR. VEEDER:  Interlocutory Judgment No. 34.

21     MR. SACHSE:  Interlocutory Judgment No. 34, yes.

22  Mr. Anderson's objection was that there is a finding now in

23  Interlocutory Judgment No. 34 that says there are no

24  appropriative or prescriptive rights except as expressly

25  found.  All we would do is repeat it.

MR. VEEDER:   I don't believe Mr. Ward has been informed of that particular phase of this matter, and I think as long as you are speaking on it why don't you clarify it in the record?

MR. SACHSE:   Speaking as much to Mr. Ward as to the Court, the present judgment signed by the Court affecting your property gives you a correlative riparian right. It also states that you do not have a prescriptive right or an appropriative right.  It doesn't name it specifically, but it says there are no prescriptive or appropriative rights. So, unless there is some specific reason for drafting a judgment, I don't see that we could add anything to it.

THE COURT:   Do you want a special judgment drawn in your case, or are you content to have your property included in this general judgment?

THE WITNESS:   I see no advantage to a special judgment.

THE COURT:   All right.

Gentlemen, do you think you can adjourn and preliminarily discuss some of the other matters and let me pick a jury and get started here?

MR. SACHSE:   Yes.  I would like to do one thing, if I may.  I would like to get lodged, so that counsel can have them and be looking at them, the draft of the final judgment.  I can already call attention to one error in it, in that Interlocutory Judgment No. 30A which you just filed,

1   is not listed in the proposed finding.  So the filing will

2   have to be corrected.  But I would like to lodge it so that

3   counsel and the Court can be looking at it as to format

4   et cetra.

5        THE COURT:  You are lodging a draft of a final

6   decree?

7        MR. SACHSE:  Yes, your Honor.

8        THE COURT:  Let it be lodged and let me have a copy

9   of it.

10       MR. SACHSE:  I have handed the original and one to the

11   clerk, your Honor.

12       THE COURT:  Mr. Veeder, is there anything you would

13   like to take up at this time?  I think possibly you could

14   well use some of this time until 2:00 P.M. or 1:30 to

15   confer.

16       MR. VEEDER:  I think that would be very good, your

17   Honor.  That would be fine, your Honor.

18       THE COURT:  Suppose I see you gentlemen back here at

19   1:00 P.M.  Mr. Clark, I know, wants to talk to some of you.

20            Anything you would like to do at this time?

21       MR. CLARK:  I think all of us could get together and

22   talk could be helpful.

23       THE COURT:  You may use my chambers, or you may use the

24   jury room.  You may close the door.  My chambers are as

25   good as any.

MR. SACHSE:   Thank you, your Honor.

(Other matters.)

(At 3:45 P.M. of said day the following proceedings were had:)

THE CLERK:   10 - 1247-SD-C, United States vs. Fallbrook.

THE COURT:   Gentlemen, in arranging our schedule for further work on this case, you have other things to do, you have this afternoon and tomorrow morning, and if it is satisfactory with you I will put this case over now until 10:30 tomorrow morning, and announce now that I will fix as a further date for hearing in the case Tuesday, April 9, 1963, at 10:00 o'clock A.M.

As counsel well know, there has been pending since May of 1962 a motion by the United States concerned with a physical solution. As I understand this term "physical solution," it means an equitable arrangement which will assure the development of the water resources to the maximum extent possible and to the maximum benefit of all the water users. I think everyone will gain if this can be accomplished.

Over the years I believe I have become reasonably familiar with this River. I am convinced that a single multi-purpose dam at the De Luz site will provide the maximum water conservation and will be to the overall

benefit of all the parties.

While a physical solution based on such a multi-purpose dam at De Luz has not yet been agreed to, I feel that there is a good possiblity of such a successful agreement and termination of our search for a physical solution. Pursuant to my authority as a Judge in this case, and as permitted by both State and Federal law, I am directing all parties to devote their efforts to this goal between now and the next session on April 9 and to render to this Court at that time a complete report of their progress towards such a solution.

There remain a number of small but bothersome loose ends in the case which we have been working on -- a few of the remaining judgments, and I want the work to continue on that ground to the end that we will clean up all the loose ends in the case and certainly hope that we will have them all cleaned up by April 9.

But I think I should frankly state at this time that I don't intend to enter a final judgment in this case as long as there is a reasonable possibility of accomplishing the physical solution that we have been talking about, and if it becomes necessary to postpone final action in the case to have reasonable opportunity to accomplish this physical solution I think I have the power and the authority and I intend to withhold final judgment until

all these possibilities have been exhausted.

MR. VEEDER:  Thank you, your Honor.

THE COURT:  Is that too strong?

MR. CLARK:  That is fine.  Thank you, sir.

THE COURT:  Do you have that material now?

MR. SACHSE:  I have it, your Honor.

THE COURT:  You are authorized to release it.

I'll see you at 10:30 tomorrow morning.

Have a nice trip back, Mr. Clark.

(Adjournment until Wednesday, March 13, 1963,

at 10:00 A.M.)

---oOo---

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 1247-SD-C |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, March 13, 1963.

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General. |
| | CDR. DONALD REDD. |
| For Defendant Vail: | GEORGE STAHLMAN, ESQ. |
| For Defendant Fallbrook: | FRANZ R. SACHSE, ESQ. |
| For Defendant State of California: | FRED GIRARD, ESQ. |

SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 13, 1963; 10:45 A.M.

---oOo---

THE COURT: The clerk had to go upstairs. We can start without him.

MR. VEEDER: Your Honor, may I pick up Interlocutory Judgment No. 39A. It is ready to sign.

THE COURT: Yes.

We have 39A here. Has this been looked over?

MR. SACHSE: Yes, your Honor.

MR. GIRARD: Yes, your Honor.

THE COURT: 39A consolidates all this Fallbrook matter; is that correct?

MR. VEEDER: That is correct.

MR. SACHSE: It is a masterpiece of work which I will be more than happy to have a copy of in my office. It has all those people we had scattered over twenty-two different judgments in one judgment now.

THE COURT: I will sign it.

The reporter inquires whether this replaces the first twenty-two Interlocutory Judgments.

MR. VEEDER: No, your Honor, it only merges them.

MR. SACHSE: It just incorporates them into a single document.

THE COURT: So they are still in effect.

MR. SACHSE: Yes, your Honor.

THE COURT:  All right.

MR. VEEDER:  We did that to avoid having to send notices to everyone, your Honor.

THE COURT:  All right.  I will give them to the clerk for filing.

What else do you have, gentlemen?

MR. VEEDER:  Your Honor, we lodged Interlocutory Judgment No. 30A with your Honor.  Here is 30A, your Honor, which takes care of the areas outside the Murrieta-Temecula Ground Water Area in the Murrieta Valley and in the Temecula Valley below Vail Dam.  Some of the area may be older continental alluvium, but you have made a finding to the effect that the waters are of such character that they do not contribute to the stream.

MR. GIRARD:  There are some deposits of basement complex within the Murrieta Ground Water Area.

MR. VEEDER:  Yes.

THE COURT:  And you have looked this over and you are satisfied?

MR. GIRARD:  Yes.

MR. SACHSE:  Yes.

MR. VEEDER:  We have one other situation along that line.  If you recall, Judge Swing had the Garner property clear up by the extremities of the Wilson Creek Watershed, upon Thomas Mountain.  That was Interlocutory Judgment No. 1.

Now, I haven't talked to Mr. Swing about this, but I have

prepared 33A, which would incorporate the Garners into the

Wilson Creek Interlocutory Judgment, if that is agreeable.

THE COURT:  You mean an amendment to 33?

MR. VEEDER:  Yes, your Honor.  It will eliminate one

more judgment.  I have a copy of it here.  I should contact

Mr. Swing, and then I will have the secretary deliver it to

you tomorrow.  I want to tell him what we plan to do.

THE COURT:  The only effect of it would be to put the

substance of Interlocutory Judgment No. 1 into No. 33A.

MR. VEEDER:  Into the proper watershed.

MR. SACHSE:  Yes, into the proper watershed.  It is all

by itself.

THE COURT:  Talk to him then.

MR. SACHSE:  I am sure he will be satisfied.

THE COURT:  And if he is satisfied, there is no

objection.

I have still remaining two be acted on Inter-

locutory Judgment No. (49) and an amendment to No. 39.

MR. SACHSE:  No. 39A is just what we gave your Honor.

MR. VEEDER:  We are working on No. 39.

THE COURT:  No, an amendment to No. 39.

MR. VEEDER:  No. 39, which would incorporate the

Fallbrook Creek riparian lands, is now being done in

Colonel Boven's office.

On No. 44, I have talked this morning with Mr. Girard, Mr. Sachse and Mr. Stahlman. I would just as soon have Mr. Girard express his views on it. I have explained that this is one judgment that I have to discuss further with Mr. Clark, but I think we are pretty generally in agreement on the form. This relates to the Bureau of Land Management Properties and the Forest Service properties within the Santa Margaritta River Watershed.

MR. GIRARD: That is right. I said yesterday I thought I had some objections to it. In our meeting today, I think, as far as the draft Mr. Veeder has prepared -- Bill is going to make a few additions, et cetra -- I think we are pretty much in agreement on it. However, I think Mr. Veeder has to discuss it further with Mr. Clark in Washington as to whether he wants to claim both riparian rights and reserve rights.

MR. VEEDER: It is a matter that I can't resolve here.

MR. GIRARD: Our position is that you can't have both.

MR. VEEDER: Mr. Girard, as soon as I have the opportunity to resolve this I will be in contact with you.

MR. GIRARD: All right.

MR. STAHLMAN: You have revised your figures on the amount of water contributed by springs.

MR. VEEDER: Yes. We had 50,000 acre feet, and that well just doesn't produce that.

THE COURT: Anything further we can do?

MR. VEEDER: I think that is all I have, your Honor.

MR. STAHLMAN: That is all until the next time.

THE COURT: Then the hearing will be continued to April 9th at 10:00 o'clock, and there will be continued to that time the hearing on objections to the various judgments that have been signed, and in addition to the judgments signed at the time of the notice that was sent out the various judgments that we worked on during these hearings, most of which have been signed. I think the additional judgments in addition to those noted on the hearing notice were Interlocutory Judgments No. 34, 36A, 37, 42A (which has been signed), the amendment to No. 39A (which has been signed), No. 30A (which has been signed), and we still have pending No. 44, an amendment to No. 39, and an amendment to No. 33A to add the substance of Interlocutory Judgment No. 1. Apparently we have three open.

MR. SACHSE: That is my understanding.

THE COURT: All matters concerning the objections to the Interlocutories are continued to the hearing on April 9, 1963.

MR. SACHSE: Is it understood that if Mr. Veeder brings down the amendment to No. 33 you will go ahead and sign it?

THE COURT:   I will sign it.

MR. VEEDER:   What about No. 39?

MR. SACHSE:   I am perfectly willing to do that also,
if you think you will have it ready.   It is a matter of
exhibits there.

MR. VEEDER:   It is a matter of its being checked out,
and if we get it done we will bring it down.

MR. GIRARD:   It is only the exhibits.   It is not the
substance.

MR. SACHSE:   It is a question of what lands are
riparian.

MR. VEEDER:   It is simply riparian to Fallbrook Creek
on No. 39.

MR. SACHSE:   As far as I am concerned, you can sign it
as soon as it is drafted.

MR. VEEDER:   You have already seen the proposed
amendments that have been approved.   It is simply a matter
checking them out.

THE COURT:   Then the amendment to No. 39 will be ready
to be signed, too.

MR. SACHSE:   Yes, your Honor.   The only thing that we
really would have left that might involve controversy is
No. 44.   I don't think there is much controversy on that.

MR. VEEDER:   I don't think there is much controversy
on that.

THE COURT:  Let the record show that the matter was continued from last night until today at 10:30, and I have already announced the continuance also to April 9th.

MR. STAHLMAN:  What time on April 9th, your Honor?

THE COURT:  Ten o'clock A.M.

Anything further?

The photostatic copy of that old filing made by Mr. Ward has disappeared.  I read it into the record.  It is in the record as I read it.  I checked it this morning, but something has happened to it.

MR. GIRARD:  Mr. Ward must have taken it.

MR. STAHLMAN:  He had it last.

MR. VEEDER:  I have a photostatic copy of it on my desk.

THE COURT:  You have?

MR. VEEDER:  Yes.

MR. GIRARD:  I will stipulate that the copy can go in.

MR. SACHSE:  I will stipulate that the copy may go in.

THE COURT:  Mr. Veeder has another copy of it.  We will substitute Mr. Veeder's copy for the one that disappeared.

Anything further?

MR. VEEDER:  Is that in the record, your Honor?

THE COURT:  It is in the record.  Mr. Veeder may substitute his photostatic copy of that old filing by Peter Escaallier.

(Adjournment until April 9, 1963, at 10:00 A.M.)

---o0o---

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above-entitled cause on the date specified herein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this __13__ day of ___March___, A.D., 1963.

_____
Official Reporter