# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

       Plaintiff,

  -vs-                    No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

       Defendants.


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Place:      San Diego, California

Date:     Tuesday, April 9, 1963

       Pages:   21,259 - 21,294, Inclusive


# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )
                              )
        -vs-                  )     No.  1247-SD-C
                              )
FALLBROOK PUBLIC UTILITY      )
DISTRICT, et al.,             )
                              )
            Defendants.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, April 9, 1963.

APPEARANCES:

|   |   |
|---|---|
| For the Plaintiff: | RAMSEY CLARK, ESQ., Assistant Attorney General and WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General. |
|   | CDR. DONALD REDD. |
| For Defendant Vail: | GEORGE STAHLMAN, ESQ. |
| For Defendant Fallbrook: | FRANZ R. SACHSE, ESQ. |
| For Defendant State of California: | FRED GIRARD, ESQ. |
| For Defendants Garner: | PHIL SWING, ESQ. |

1    the earliest possible signing of a final decree and the

2    placing of this case in shape for an appeal by the United

3    States, if it desires to take one.

4         However, they have also instructed their engineer,

5    Mr. Smith, that he is to continue to try to work with the

6    Navy, if the Navy will consent -- in fact, Mr. Smith is here

7    today -- in an effort to at least arrive at a common under-

8    standing of a basis for evaluating the different proposals;

9    and if such continuing consultations should make it appear

10   that this judgment was ill advised, we would like the Court

11   and the Navy to know that we will remain open-minded and will

12   subsequently, even pending appeal, consider fairly any sub-

13   sequent proposal that the United States may care to offer.

14        However, I am specifically directed not to

15   stipulate or to consent to any delays in the final

16   termination of the action by the entry of a final decree.

17        There are other factors involved in addition to the

18   cost and the quantity of water, but there is no sense in

19   reviewing them, because those are the two fundamental

20   issues on which the Board of Directors made the determination.

21        THE COURT:  Do you have anything to add, Mr. Clark?

22        MR. CLARK:  I would say, in view of that, that it would

23   be my opinion that an early entry of a final judgment would

24   be in the best interests of the parties.  I say that without

25   prejudice to a continuing negotiation by the respective

1  engineers for the Navy and Fallbrook Public Utility District,

2  and certainly I will request and believe that the Navy will

3  do everything it can to develop a common understanding of the

4  facts that we have been discussing.

5        The greatest chance, I believe, and still do, to

6  maximize water rights and opportunities is through a physical

7  solution, and we will do what we can through further

8  consideration of that.  I don't think, in view of the report

9  Mr. Sachse has made, though, that further delay in the final

10  adjudication of this matter would be in any party's best

11  interest, and I would again say that I think the probabilities

12  of achieving a physical solution are substantially lessened

13  by continuance of the litigation on appeal.  But that is the

14  status of the case, apparently.

15      THE COURT:  Would there be some possibility that you,

16  Mr. Clark, or your office, could formalize in some way some

17  of the matters that you presented yesterday?

18      MR. CLARK:  Yes, sir.

19      THE COURT:  Maybe by way of a letter.

20      MR. CLARK:  We certain can.  I think that would be

21  desirable, so that everybody understands exactly what was

22  said and can refer back to it, and for that purpose, in

23  view of your suggestion, we will prepare a letter that will

24  incorporate the considerations that were presented yesterday

25  and we will try to get it to the Court next week.

THE COURT:   I am constrained to make a few remarks.
I will try to do so deliberately and advisedly.

Maybe I should start with a story that you all
know.  The story goes that Oliver Twist was locked up in a
cell and the people who had him living at their house called
for Mr. Bumble, the beedle, to come and get Oliver out of
the cell.  And Oliver wouldn't come out.  So Mr. Bumble
comes down and knocks on the door, "Oliver, come out."
Oliver wouldn't come out.  Mr. Bumble said to these people,
"What have you been feeding this boy?"  "Well," they said,
"he gets a little gruel and scraps from the table, and once
in a while we will throw him a piece of meat off the table."
"Oh," said Mr. Bumble, "That's the trouble.  You have been
feeding this boy meat.  You have raised up in him a spirit
far above his station in life."

Well, now, let's review what happened.  To say the
least, I am very much disappointed at Fallbrook's attitude.
Fallbrook comes in here with a showing that they have made
applications under State Law to build a dam.  The Goverment
resisted very vigorously that they had any rights.  The Court
found they had a right to build a dam, that this was a
matter of State Law -- no authority of mine to say they
could or could not build a dam.  However, I said at the time
that the dam would have to have a hole in it; that there
would have to be provisions for water to be released as this

Court saw fit.  I also made it clear that if the dam was
built I didn't want anybody at Fallbrook to think I ever put
any stamp of approval on it that it would be successful or
that it would be economical -- that there would be an
amout of water that is subject to appropriation which would
be sufficient.  I think I made that very clear.

And the case rocks along and Fallbrook has other
contentions.  One of them was the beds and banks of streams.
I suppose if I could have honestly decided that against
Fallbrook's contentions and against the State of California's
contentions, this case might have had a different aspect,
because water subject to appropriation would then be vested
in the Government.  But I couldn't honestly feel that that
is the way it had to be decided, and so again I ruled in
favor of Fallbrook.  And I made various rulings in favor of
Fallbrook.

And what have they got today?  They have a permit
to build a dam and to condemn some land, which they now own
and on which they cannot get hurt.  And they have a permit,
which is subject to condemnation, for, in my opinion, a
relatively small return.

The Government has come forward with a proposition
that, viewed in the light of the background of this litiga-
tion, is a most remarkable proposition, namely, that they
would propose a Government dam, that they would want the

guarantee of 1,800 acre feet of the first water caught, but all
the rest of the water they would share equally with
Fallbrook -- a far better proposal than was, I think,
contemplated by the Utt Bill.  No expense to Fallbrook in
financing or building a dam.  Pay for water as you go.

And the Board of Directors -- I am not criticizing
them, they have a duty to their constituents -- say, "We
don't think this is a good deal, and we prefer to have the
litigiation proceed to the entry of the final judgment and
appeal."  Two years more before a decision comes down,
possibly the case has to be retried, and in the meanwhile the
Fallbrook Dam can't be built while the litigation proceeds.
When the wet years come along, water runs into the ocean.
The dry years come along and nobody gets water -- everybody
is hurt for water.

I go back to Oliver Twist.  "You have been feeding
this boy meat and you have raised up in him a spirit far
above his station in life."  I think, putting it very mildly,
that Fallbook has got a little heady from some of these
victories.  But be that as it may, I am just being very
frank -- I am disappointed.

MR. SACHSE:  I appreciate your frankness, your Honor,
and perhaps I would be less than fair with the Court if I
were not equally frank.  I would remind your Honor that all
these conditions which you say you have found for Fallbrook,

21,266

1    and which are true, every one of them existed in 1951.   The

2    permits were there.   In 1956 the land was condemned.   The

3    rights which you have confirmed were, in fact, in existence

4    when the United States undertook to initiate this litigation.

5            Now, I will not say that we have been fed strong

6    meat.   Mr. Clark may be interested, and the Court may be

7    interested -- I had not intended to make this remark, but I

8    will -- the most significant thing that was said in yesterday's

9    conference, significant to my Board, was when Counsel for the

10   United States -- I am referring to Mr. Veeder, not to Mr.

11   Clark -- stated that we were not talking about 14,000 acre

12   feet, we were talking about 8,000 acre feet.   And the

13   position of my Board is this -- and I must agree with them --

14   if we are talking about 8,000 acre feet at De Luz, taking

15   off 1,200 for Lake O'Neill, taking off 1,800 for the

16   priority requested by the United States leaves 5,000, which

17   divided in half leaves 2,500.   If that is the fact, which

18   Counsel just stated it was, we wouldn't go into a De Luz Dam

19   project on any basis, because we could not afford to

20   surrender any priority.   We would have to keep the 1,800

21   priority, we would have to keep every single priority given

22   us by our prior permits, because otherwise the thing is

23   utterly incomprehensible.   It can't work and it can't do

24   anything for anybody.   This is the nail in the coffin, your

25   Honor.   And that is why I say that we will keep this door

1   open and try to find out or try to arrive at a common

2   determination of what the facts in this case are.  But at the

3   present time I can see no advantage whatsoever in delaying

4   the entry of a final decree,

5       THE COURT:  In fairness to Mr. Veeder -- and I don't

6   want him to make a speech now,

7       MR. VEEDER:  Can't I make just one small speech, your

8   Honor?

9       THE COURT:  Not even a small one.

10          In fairness to Mr. Veeder, what he was trying to

11   do was not to urge that the facts showed that this is all

12   there was going to be in the dam, but he was trying to make

13   an argument as to, "Suppose this happened.  What would this

14   cost be?"  He may not have done it artfully.  But as I

15   understood it, that was the purpose of it.  I don't think

16   the Government would be spending money for the surveys and

17   all if the expectations were that there would be only that

18   amount of water.  But no one knows.

19          At any rate, thank you for your frankness.

20       MR. SACHSE:  Thank you, your Honor.

21       THE COURT:  You will pardon my frankness, Mr. Sachse.

22   And let's hope that the parties will continue to explore the

23   possibilities of some common ground in a solution which, in

24   my opinion, is ultimately going to be the only answer.

25   I don't care how long you litigate it, how many appeals you

1   take.  You can't make water out of litigation, and some day

2   you are gong to have to get down to brass tacks and talk

3   about what you are going to do about the dam up there.

4   And I don't think there are going to be two dams on the

5   Santa Margarita.  I don't think it is economically feasible.

6   I don't think there will be two dams on the Santa

7   Margarita.

8           What else have you outlined, Mr. Veeder?

9       MR. VEEDER:  Your Honor, we have been talking with Mr.

10  Girard and Mr. Sachse in regard to the form of the final

11  decree.

12          We have also talked to Mr. Sachse and Mr. Girard

13  in regard to the Forest Service and Vail Dam rights.

14          They have agreed to work with me as soon as we

15  adjourn.  We hope to have some agreement as to the form

16  sometime this afternoon.  Is your Honor going to be here this

17  afternoon?

18      THE COURT:  Oh, yes.  You don't have this judgment

19  drawn up?

20      MR. VEEDER:  It is not in final form.

21      MR. GIRARD:  It is substantially drawn up, but not in

22  final form.

23      MR. VEEDER:  It is not in final form.  And they have

24  both agreed to meet with me this afternoon, and if it would

25  be all right, to come back in at 2:00 o'clock and check in

1   and show what we have done.

2   MR. SACHSE:  Yes.  We also have in mind, I think, Mr.

3   Veeder, that we are going to at least review the form of

4   the final decree that has been lodged.

5   MR. VEEDER:  Yes.

6   MR. SACHSE:  But which does need some changes.

7   MR. VEEDER:  That is right.  And I think we ought to talk

8   it through, because I would like to send it to Mr. Clark as

9   soon as I can so that the matter will ultimately be

10  terminated.

11  THE COURT:  That is satisfactory.

12  I think the record should show -- I am trying to

13  find the list -- that this is a continued hearing on

14  objections to these various interlocutory judgments.

15  I don't want to lose jurisdiction on that phase of it.

16  MR. VEEDER:  That is correct.

17  THE COURT:  And that in addition to the interlocutory

18  judgments that were listed in the notice there were the

19  additional judgments which have been signed but are still

20  open for consideration:  Judgments 34, 36A, the Supplement

21  to 37, the Amendment to 39 --

22  MR. VEEDER:  I have the Admendment to 39 ready for

23  signature, your Honor.  I can present that this afternoon,

24  if you desire to have me do so.

25  MR. GIRARD:  Has Interlocutory Judgment No. 30A been

1  filed yet?

2     MR. VEEDER:   Interlocutory Judgment No. 30A has not

3  been filed.

4     MR. GIRARD:   Is there a 30A?

5     MR. VEEDER:   Yes, there is.

6     THE COURT:   Number 30A has been signed.

7     MR. VEEDER:   Has it been?

8     MR. GIRARD:   I thought it had been.

9     MR. VEEDER:   I will check on that.   I didn't realize

10  you had signed that.

11     THE COURT:   We have open   No. 34, 42A has been signed,

12  39A has been signed, the Amendment to 39 has not been signed.

13     MR. VEEDER:   That is here.

14     THE COURT:   And 33A, an amendment to add Mr. Swing's

15  Judgments Numbers 1 to 33A.

16     MR. VEEDER:   That is correct.

17     THE COURT:   That has not been signed.

18     At any rate, these hearings today are for the

19  purpose of considering objections to all the Interlocutory

20  Judgments, including those mentioned and those that have

21  not yet been signed.

22     What do you propose to do?

23     MR. VEEDER:   I would like to adjourn now and work on

24  these matters.

25     MR. SACHSE:   Yes.

1          THE COURT:   It is satisfactory with me.   Two o'clock

2    then.

3               (Noon recess.)

1    SAN DIEGO, CALIFORNIA, TUESDAY, APRIL 9, 1963;  2:00 P. M.

2                          ---o0o---

3         MR. VEEDER:  Your Honor, I mentioned earlier that we had

4    Interlocutory Judgment No. 33A, which is ready for signature.

5    That incorporates by reference the first Interlocutory

6    Judgment into the broader general decree involving the lands

7    in Wilson Creek and Coahuila Creek.

8         THE COURT:  All right.

9         MR. VEEDER:  May I tender it to your Honor.

10        THE COURT:  Mr. Swing said that was satisfactory.

11   I heard you talking to him this morning.

12        MR. VEEDER:  That is right.  I think counsel has already

13   received copies.

14        MR. SACHSE:  We have received copies and it is

15   satisfactory, your Honor.

16        THE COURT:  All right.

17        MR. VEEDER:  An order amending Interlocutory Judgment

18   No. 39 -- everyone has copies of this, your Honor -- bringing

19   39 up to date to include Fallbrook Creek and the other areas.

20        MR. SACHSE:  I have reviewed this, your Honor.  I think

21   all of the people in it are either my clients or are in my

22   area.  I think it is satisfactory.  It simply incorporates

23   into a single document all of the riparian areas, including

24   Fallbrook Creek.

25        MR. VEEDER:  Mr. Girard, do you want to report on our

1    activities in regard to the Forest lands, or do you want me

2    to do that?

3         MR. GIRARD:  Your Honor, we met for the last couple of

4    hours.  I think at least counsel have agreed on the findings

5    of fact, conclusions of law and judgment provisions for the

6    Forest Service lands and the Taylor Grazing Act land.  I am

7    sure that at the next session that judgment will be ready for

8    signature.  I presume the exhibits are prepared now and will

9    be attached to it.

10        MR. VEEDER:  They are all available.

11        MR. GIRARD:  Mrs. Tooker is going to send out this week

12   or probably next week, the copies to all counsel as to the

13   draft provisions of the changes which are made on Mr.

14   Veeder's draft, which were relatively minor, and I am pretty

15   confident that that will be ready for signature at the

16   next session.  That is Interlocutory Judgment No. 44.  As I

17   view the list, that is the last one that has to be submitted

18   to the Court for signature.

19        THE COURT:  That is what my list shows.  I show the

20   rest of them all signed.

21        MR. GIRARD;  One other point I wanted to bring out,

22   your Honor.  As your Honor knows, you entered the order

23   concerning the inspection or well test data et cetra for

24   Colonel Bowen and his staff.

25        THE COURT:  Yes.

1    MR. GIRARD:  That was never given a number.  My present

2    information is -- I don't know whether other counsel agree --

3    that we ought to give it Number 45 and also incorporate that

4    into the final judgment.

5    THE COURT:  That is satisfactory.  The order concerning

6    the activities of Colonel Bowen in measuring wells and

7    reporting will be now numbered as Interlocutory Judgment

8    No. 45.

9    MR. GIRARD:  And previously Mr. Sachse and I collaborated

10   and drafted up what we felt would be an appropriate method

11   of handling the final judgment.  That has been lodged --

12   except for changes in the first paragraph to bring it up to

13   date on the numbers of the judgments and the dates et cetra.

14   As far as I am concerned, it is acceptable and I think

15   satisfactory to the State, and this method of incorporation

16   of the final judgment I would suggest be the method of

17   proceeding in this case.  By the next session, whenever it

18   is -- it is just a simple matter of checking out the numbers

19   of the judgments to make sure we have them all -- I can have

20   final copies of this final judgment here in court ready for

21   signature, assuming that this is the method we want to go by.

22   MR. SACHSE:  I have only one suggestion in addition --

23   I think Fred probably meant it -- I think in listing the

24   Interlocutories we should do something I didn't do in this

25   draft; we should include the date of entry of each of the

1     interlocutories, and I think we should also include each

2     instance that appears on this note here where there appears

3     an amendment.

4         MR. GIRARD:  Mrs. Tooker, incidentally, has made up a

5     list of those with that information on it.  I would include

6     all of it just exactly the way the United States has

7     prepared it up to this draft.

8         THE COURT:  Are you talking about the draft of March

9     12th?

10        MR. GIRARD:  I don't think it had a number on it.

11        MR. SACHSE:  It just said "Final Judgment and Decree."

12    I lodged two copies at our last hearing.

13        MR. GIRARD:  Here is my copy of it.

14        MR. VEEDER:  I have here one that was submitted to me

15    on March 6, but I think it was revised subsequent to that.

16        THE COURT:  This one Mr. Girard handed me was lodged

17    March 12.

18        MR. SACHSE:  That is the one.

19        THE COURT:  That would be the copy.

20        MR.  GIRARD:  Starting on page 2 you can see where we

21    have listed the judgments.  We do it like Mrs. Tooker did --

22    list the date that they were entered, with their numbers.

23        THE COURT:  All right.  Why, on page 5 paragraph 2,

24    do you say that the date of entry of each of the Interlocutory

25    Judgments is vacated and will have the same date of entry as

1    the final judgment?  What good does that do?

2         MR. GIRARD:  That is your language, Franz.

3         MR. SACHSE:    My only thinking in this, your Honor,

4    was that if we say simply that -- I am trying to think of

5    an example.  Let's say the Vail, where, as I recall, on

6    Vail's Judgment the applicability of the stipulated judgment

7    was suspended.  Well, I thought we ought to, since there is

8    positive action in many things here where there is

9    injunctive effect, all sorts of things, we ought to have

10   everyone of them on the same day, if we could.  I don't know.

11   I was shooting blind here.  I don't know whether it is

12   important or not.

13        THE COURT:  What have you got in here?

14        MR. SACHSE:  Furthermore, I think it is basic, isn't it,

15   that all equitable relief is supposed to take effect as of the

16   date of the final decree?

17        THE COURT:  Have you got any stay of proceedings in

18   here?

19        MR. SACHSE:  No.

20        MR. GIRARD:  No, your Honor.

21        THE COURT:  I am not so sure but that I will not stay

22   the effect of some of these judgments.

23        MR. SACHSE:  I didn't understand, your Honor.

24        THE COURT:  I am not so sure I will not stay the

25   effect of some of these judgments, if there is going to be

1    an appeal, in view of what has happened here.

2    MR. SACHSE:  Then this would require an indication from

3    you as to your thinking on what is or is not stayed.

4    I presume there is no purpose in staying any of these

5    factual ones.  They don't mean anything.  There is, of course,

6    George's problem.  Really, if the Vail-O'Neill is vacated,

7    I presume there is no right in the United States, as of the

8    date of the vacation, to demand downstream releases, for

9    instance.  Is that the kind of thing you are contemplating

10   staying?

11   THE COURT:  Well, there are two or three provisions.

12   One is the releases under the old status quo by Vail

13   downstream.

14   MR. VEEDER:  That is the stipulated judgment.

15   MR. SACHSE:  That is the stipulated judgment.  That is

16   what I was referring to.

17   MR. STAHLMAN:  Then there is the O'Neill --

18   MR. VEEDER:  We interrupted the Court.

19   THE COURT:  Then there is the O'Neill that works the

20   other way.

21   MR. SACHSE:  In other words, you are going to stay the

22   right of the United States to demand the water to which it

23   is entitled under the judgment on Lake O'Neill.

24   THE COURT:  No, I say, if we stayed everything, then

25   that would be stayed, too, and the question whether some

1    parts should be stayed.

2        MR. STAHLMAN:  What would be the advantage, your Honor,

3    if we look at it from a practical aspect?  For instance, the

4    releases never get down there anyway.  They never have during

5    the entire period of this case for ten years.

6        MR. VEEDER:  Your Honor, I can't let George say that.

7        MR. STAHLMAN:  Wait a minute, Mr. Veeder, please.  We

8    don't interrupt you.  I would like to get my thoughts across

9    to the Court.

10        THE COURT:  Go ahead.

11        MR.  STAHLMAN:  If Mr. Clark were here, you would

12    probably keep still for a little while.

13        THE COURT:  Go ahead.

14        MR. STAHLMAN:  During this period of time that we have

15    been in litigation in this case, what has been the benefit

16    of any of these releases?  There are certain natural flows

17    that come from the stream, anyway.  If this judgment is set

18    aside it should be set aside.  We should take an affirmative

19    position on it.  I don't see any reason to show any weakness

20    of the Government here on this thing.  I think it should have

21    been set aside.  I think your Honor wrote a very stong and

22    very good opinion as to why it should set aside, and I think

23    we ought to stand behind it.  Let them go to the Ninth

24    Circuit, if they feel it should be done.  I don't see where

25    we should do it in this case.

1          As I say, it would involve complications in this

2     case.  Just like was pointed out in relation to some of the

3     reasons when the judgment was set aside.  We could go up

4     there in the Hutch and pump down there and deliver the water.

5     What are we going to do?  We are going to upset the  status

6     quo of this case.  Let us assume the condition becomes

7     practical up there for us to utilize the waters in the

8     Temecula basin and that we go up in the Murrieta and pump.

9     There is nothing in the stipulated judgment that prevents us

10    from doing that.  We are creating complications in this case.

11    If we have a final judgment in this case, let it be final.

12          THE COURT:  You are going to have one more hearing on

13    this, aren't you?

14          MR. SACHSE:  Yes, your Honor.  I can see the possibility

15    -- I sympathize with George on this, very sincerely -- I am

16    thinking fast, here -- I can't think of much of anything that

17    has to be stayed, except possibly George's problem.

18          MR. STAHLMAN:  I don't see why that should be.

19          MR. SACHSE:  What can we stay?

20          THE COURT:  This is something we should give some

21    thought to.  If, for instance, we stay everything, so that it

22    would in any way effect the status quo, then maybe we ought

23    to stay the right to fill Lake O'Neill as well as the

24    Interlocutory Judgment involving the Stipulated Judgment.

25          MR. SACHSE:  I am not going to request that.

1   THE COURT:  There is also the prohibition against the

2   Government reaching up stream until it ceases its appro-

3   priation.  What is the effect of staying that?

4   MR. SACHSE:  The stay means nothing on that, your Honor.

5   They can't do it anyway.  The only way they can do it is to

6   ask you for an order reaching upstream, and unless you

7   reversed yourself you wouldn't grant it.

8   THE COURT:  Probably I wouldn't.  But if you stayed

9   everything, that is probably what you should stay.

10  Is the Government content with a final judgment

11  with no stays?

12  MR. VEEDER:  No, your Honor, definitely not.

13  THE COURT:  I think you had better dress up the judgment

14  that you have worked on here without the stays, and then the

15  Government take that judgment you have agreed on, the parts

16  you have agreed on, and propose such stays, or a complete

17  stay, if any, as they would want to urge, and then file some

18  separate memorandum as to why certain parts of it should be

19  stayed.  Be in a position at the next hearing to go either

20  way on it.

21  MR. STAHLMAN:  That is the position I take, your Honor.

22  THE COURT:  There is merit to your position.  Frankly,

23  I don't think very much of that water released by Vail ever

24  has any appreciable effect downstream.

25  MR. VEEDER:  But, your Honor, when Fallbrook is not

1  pumping that water out it is a real benefit to us, and we

2  would want Fallbrook stayed on that point.

3      MR. SACHSE:  Just a minute.  Mr. Veeder, there isn't any

4  order staying Fallbrook now.  You are asking for a new order.

5      MR. VEEDER:  The judgment says that Fallbrook can take

6  water only when there are not needs for it downstream, and

7  that is the order that has now been entered.

8      MR. GIRARD:  You have Interlocutory Judgment No. 35.

9      MR. SACHSE:  There is another judgment that says you

10  can't reach upstream for anything.  So that, as I understand

11  it, restores this to the status quo your Honor is talking

12  about.  The status quo was that we had and were exercising

13  certain diversionary rights which your Honor recognized and

14  which your Honor refused to enjoin, and I stipulated to a

15  discontinuance of those last summer.  That stipulation ended

16  at the end of the last dry season.

17      I am not asking your Honor to stay the Lake

18  O'Neill order.  I think O'Neill in its present shape is fair

19  to both the United States and Fallbrook.  The United States

20  tries to takes its water in the winter.  They did pretty well

21  this winter, with the one rain they got.  And Fallbrook is

22  willing to see they get the rest of it this summer.  I don't

23  see any reason for staying that.  It wouldn't be a stay.

24  It would be an injunction, a new order from your Honor telling

25  us we have to stop pumping.  No such order exists now.

1    MR. VEEDER:  As far as I am concerned, I think this.

2    If it is proposed that we appear here prepared to argue these

3    various points that have been raised, fine; but I don't

4    believe that a shotgun approach to this thing at this time,

5    this afternoon, should be attempted.

6    THE COURT:  I am not going to decide it this afternoon.

7    I don't think we have given very much consideration to it.

8    I think we have to go over most of these judgments and look at

9    them again and you have to do it in the light of this, and

10   that is, if an appeal is taken and no stays of any kind are

11   granted, then -- there, again, I don't even know what the

12   basic law is.  Does an appeal in an injunctive order stay the

13   matter automatically?

14   MR. VEEDER:  I think it does, your Honor.

15   MR. SACHSE:  In California Courts, your Honor, an appeal

16   from a mandatory injunction stays it automatically.  An

17   appeal on a prohibitory injunction does not.

18   THE COURT:  I am not even sure what the law is on that.

19   Mr. Girard, what is the law on that?  Do you know?

20   MR. GIRARD:  I don't know, your Honor.  I would have to

21   look it up.

22   THE COURT:  But the point is this.  Unless we make some

23   intelligent decision here, there will be an application to

24   the Circuit on a complicated record and, of course, what is

25   liable to happen is that you can't expect the Circuit Judges on

1   one of those applications to know as much about this water-

2   shed as we do and you might get some kind or order you

3   wouldn't want to live with.

4        MR. STAHLMAN:  However, I think if the Court takes

5   affirmative action in relation to the stay, it should be

6   done on some sound, logical basis, not just give a stay as

7   a matter of per se, and I think if we go into this situation

8   the next time -- as your Honor indicates, there are questions

9   of law involved prior to determining the factual situation.

10  A stay is not going to be of any benefit whatsoever.

11       THE COURT:  I don't know what the law is.  On a money

12  judgment an appeal does not stay the judgment unless a super-

13  cedeas bond is put up.  Now, when you get into injunctive

14  orders I think there is the difference between a prohibitory

15  injunction and a mandatory injunction.  I am not sure on that.

16  Secondly, you have always the question whether an injunction

17  is mandatory or prohibitory.

18       MR. SACHSE:  Your Honor, may I make an observation that

19  will certainly help me and I would like you to clarify my

20  thinking, because Mr. Veeder and I are misunderstanding what

21  you are saying.  As far as a stay is concerned, a stay of

22  the present judgments as they exist -- and I am not going to

23  speak  about Vail, that is their problem -- but I don't think

24  I object to a stay of your orders.  Mr. Veeder is apparently

25  assuming that the word "stay" can be interpreted to request

1 you to make some injunctions that don't now exist.  This is a

2 different kettle of fish.  This calls for some kind of

3 motion on notice requesting additional injunctive relief from

4 you.  If he wants simply to stay any executory provisions of

5 these judgments, it doesn't panic me.  I don't think he gains

6 anything, frankly.  But I don't want some new order in here

7 without my knowing it, without notice and hearing.

8  MR. VEEDER:  The thing I am speaking of here is this.

9 We can't anticipate all that is going to transpire.  If this

10 drought continues, we can't have a situation where Vail

11 continues to pump the water it has.

12  MR. STAHLMAN:  He goes into the argument on the very

13 thing that we --

14  MR. VEEDER:  The point I am trying to make to your

15 Honor is that the way your interlocutories read now is that

16 they would not become operative until the final decree was

17 entered.

18  MR. SACHSE:  Correct.

19  MR. VEEDER:  If that is the situation, and we feel we

20 need relief against Vail Company, I think we should sit down

21 and talk with Vail as to how we would operate during this

22 season and during the period of the appeal.  But we certainly

23 can't be in the position of changing the status quo,

24 assuming that this moment would be treated as the status quo,

25 that there would be a change of water level or that there

1   would be a cut-off of water to us or something like that --

2   I don't think that is possible.

3       MR. SACHSE:   I do.

4       MR. STAHLMAN:   The situation in the last ten years of

5   droughth and taking last years' rainfall, we put less than a

6   thousand acre feet through Nigger Canyon, which is the

7   greatest source of contribution.

8       MR. VEEDER:   There you go arguing.

9       MR. STAHLMAN:   Because you did.

10      And that they filled Lake O'Neill, and we should

11  have this requirement of 3-1/2 cubic second feet to go down

12  there for a two-year appeal.   I think it is ridiculous under

13  the factual situation.   That is why I think it should be

14  explored further.

15      THE COURT:   I am saying it should be explored.   You have

16  raised a lot of points.   Mr. Sachse raises a point now.

17  I recall that you ceased the pumping from the stream.   Of

18  course, he points out now that that was only an agreement

19  for that one season.   Is that your position on that?

20      MR. SACHSE:   Yes, your Honor.   That is very clear on

21  the record.   We agreed to stop, and we stopped, and we have

22  pumped since.

23      MR. VEEDER:   Vail has pumped from the Hutch well to get

24  water into the Canyon.   Yes, they did.

25      MR. SACHSE:   I don't know about that.

1        MR. VEEDER:  I know they did.

2        MR. STAHLMAN:  Nothing from Pauba.

3        MR. VEEDER:  Yes, they have pumped from the Hutch well

4    into Murrieta Creek.

5        MR. STAHLMAN:  None of it went into Murrieta Creek.

6        MR. VEEDER:  I had a man up there measuring it.

7        MR. SACHSE:  Your Honor, let's think for a minute about

8    what this judgment does.

9        THE COURT:  I haven't thought about it, because I had

10   assumed we were going to get something worked out and I was

11   assuming we were not going to enter a final decree for  some

12   time.  There are a lot of bridges I haven't crossed.  Now, I

13   am having to do a lot of different type of thinking.  I am

14   not going to decide it today.  I think each party should go

15   through these judgments and see what the effect is going to

16   be if a final judgment is entered and there is an appeal.

17   I think there should also be some conversations between you.

18   Some of these matters may be susceptible of practical

19   solution between you.

20       MR. SACHSE:  I concur.  But I would like only one thing

21   that to me is very critical, and I think we must recognize

22   that your Honor is talking, I believe, about a stay as such

23   in a technical sense -- that is, a stay of an existing

24   judgment, not the granting of new prohibitory relief of some

25   kind.  This is what I would like to have clear, your Honor.

1   THE COURT:  I get your point.  I don't know exactly how

2   it works.

3   MR. STAHLMAN:  One thing Mr. Veeder said that does make

4   some sense to me is that maybe there could be some arrangement

5   that if certain conditions exist during that period of time,

6   in other words, their water level is at a certain place and

7   ours it at another, that maybe there could be some relief

8   given there.  But I think that would have to be worked out.

9   THE COURT:  That would have to be worked out.

10   Why isn't this the orderly way to do it?  We have

11   practically prepared the final judgment.  If the Government

12   is interested in some stay or has some other ideas, make

13   their suggestions and have the thing served before the next

14   hearing, submit a memorandum as to why.

15   MR. SACHSE:  Let's make cross-suggestions, then, in

16   advance of our next hearing as to what should be done on

17   stays.

18   THE COURT:  All right.

19   MR. GIRARD:  I think factually one point everyone should

20   consider.  Mr. Veeder's only real basis for a stay, if you

21   want to call it that, is that he wants to be sure the Navy

22   gets water down to it, and under the present Interlocutory

23   Judgment No. 35 you are prohibited from reaching upstream --

24   it says you can't reach upstream until you have stopped your

25   exports, as I read that judgment.  Now, it is one thing to

1   require releases in the summer which may or may not benefit

2   the Navy under present conditions where they may not need the

3   water today.  I think you can say your basins are sufficient

4   to take care of any uses for the next two years even if it

5   doesn't rain.  But it might be a satisfactory solution to

6   stay the part of the provision in Interlocutory Judgment

7   No. 35 that says you can't reach upstream against riparian

8   users until after the appeal is terminated, and in that event

9   if you can show a need then you would be able to act just like

10  a riparian.

11      THE COURT:  I say we have to rule on this.

12      MR. VEEDER:  Mr. Stahlman and I have -- is that right,

13  George -- he and I can talk about this thing before the next

14  meeting and I think we will have some ideas.

15      THE COURT:  We have Rule 62, which has a good bit of

16  material on injunctions, and this has to be considered.

17  Rule 62(c) provides that when an appeal is taken from an

18  Interlocutory Judgment or a final judgment granting, disolving

19  or denying an injunction, the Court in its discretion may

20  suspend, modify, restore or grant an injunction during the

21  pendency of the appeal upon such terms as to bond or otherwise

22  as it considers proper for the security of the rights of the

23  adverse party.

24      Then there is a further provision as to supercedeas

25  bond in (d).

1        And in (e) a provision that if the stay is at the

2   application of the Government no bond or security shall be

3   required from the appellant, the United States.

4        We have to do some work on Rule 62.

5        MR. VEEDER:  I think your Honor is right on this thing.

6   I think we can square it up so that we can preserve a status

7   quo that would be satisfactory to the parties.

8        THE COURT:  That is all I am thinking about.  If you

9   are going to have a two-year period on appeal, let's talk

10  about what is going to happen between the time the notice of

11  appeal is filed and the judgment comes down.

12       MR. VEEDER:  When does your Honor propose to call the

13  next hearing?

14       THE COURT:  When do you want it?

15       MR. VEEDER:  I would like to come out here sufficiently

16  early so that we could get the kind and type of temporary

17  restraining order or injunction on appeal, or whatever you

18  want to call it, so that we would maintain as nearly as

19  possible an arrangement that is satisfactory to the parties.

20  George and I can sit down and talk about it.  And I think

21  Franz will do the same thing.

22       MR. SACHSE:  I am willing to.  I would be happy to get

23  in on it.  I don't think, offhand, I have any concern about

24  a stay at all -- a stay as distinctive from new injunctive

25  relief.

1    MR. VEEDER:  I propose that we talk this through.

2    This matter of each party arguing the point is just a waste

3    of time.

4    THE COURT:  We really don't know what we are talking

5    about until we go over the judgments, until we look at

6    Rule 62, and look at the law, and until we analyze from a

7    practical standpoint what is going to be our situation between

8    the time the notice of appeal is filed and the appeal is

9    determined.

10           What date do you suggest?

11   MR. SACHSE:  The first or second week in May.

12   THE COURT:  Yes, I would say May 14.

13   MR. VEEDER:  That would be satisfactory, your Honor.

14   MR. SACHSE:  May 14th is out, your Honor.  Unless the

15   case blows up, I have a jury trial starting on the 13th in

16   Riverside which will last three days or so.

17   THE COURT:  How about May 7th?

18   MR. SACHSE:  May 7th will be all right.

19   MR. VEEDER:  That is satisfactory.

20   THE COURT:  I will continue the matter until May 7th,

21   and will hold May 8th open also, and I will continue to that

22   time further hearings on the various interlocutories which

23   have heretofore been signed as shown on the record and

24   Interlocutory No. 44, which will be ready for signature by

25   that time.

1    Why don't you spend some time this afternoon

2 exploring your problems and then agree upon sometime between

3 you whereby your cross-suggestions will be in at least a

4 week before that hearing?

5    MR. SACHSE:  May I inquire one word on that.  If, as I

6 think my only suggestion is going to be -- go ahead and stay,

7 I don't care as long as it is just a stay of the existing

8 judgments -- shall I simply in the form of a memorandum to

9 your Honor and counsel so advise them?  Or do you want

10 formal requests from us on motion on notice, or what?

11    MR. STAHLMAN:  Our position may be different.

12    MR. SACHSE:  Yes, your position may be different.  All

13 of them may be different.  That is why I am asking the Court

14 how he wants us to do it.  I think obviously if Mr. Veeder

15 is going to ask for new injunctive relief, he should do it

16 on motion.

17    THE COURT:  I think the Government should come forward

18 first with whatever they have in mind.  Couldn't you get

19 that out in a couple of weeks?

20    MR. VEEDER:  We will do that, your Honor.  You set the

21 time on that.  I will serve counsel with our position on it.

22    THE COURT:  By Monday, April 22?

23    MR. VEEDER:  All right.

24    THE COURT:  The Government's memorandum and

25 suggestions.

1   And then you can come back that week or the

2 following week with your replies.

3   MR. SACHSE:  That would be wonderful.

4   THE COURT:  Is that agreeable?

5   MR. VEEDER:  I think that is satisfactory, your Honor.

6   And this is a continuation of the objections.

7   THE COURT:  Continuation also of the objections.

8   Anything further?

9   MR. SACHSE:  Nothing further, your Honor.

10   THE COURT:  You say Fallbrook has pumped from the

11 stream since the time you voluntarily ceased to pump?

12   MR. SACHSE:  Yes, during the fall and winter we have

13 pumped intermittently on certain occasions.  Colonel Bowen

14 knows it.  I think we have basically been keeping him

15 advised.

16   THE COURT:  And you propose to do that in the future?

17   MR. SACHSE:  From time to time as the occasion arises,

18 yes, your Honor.

19   We received a phone call -- Colonel Bowen didn't

20 even know this, neither did Mr. Veeder or Mr. Clark -- from a

21 young lady at the Ammunition Depot last week, somebody's

22 secretary, and said to Mr. Smith, "We don't want you to start

23 your pumps without 90-days notice."  And he said, "Well, I

24 am not planning on starting them in 90 days.  But I would

25 rather not take your word for it.  Who says I have to give

1    you 90-days notice?" And he called me up. It was just a

2    confusion. It was a case of somebody not knowing the facts.

3    We are perfectly willing to cooperate on not pumping, and we

4    are going to cooperate, and we would be happy to have an

5    order from your Honor if you want us to give the Navy notice

6    and give them a chance to object or something of that kind.

7         THE COURT: Maybe you can come to some agreement on

8    these matters.

9         MR. VEEDER: I think we can.

10        THE COURT: Spend some time this afternoon on it.

11   Mr. Girard, you are appointed chairman of the conference

12   with full power to keep them in order.

13        MR. SACHSE: I think Ace and I can probably work it out

14   without Fred's help in five minutes.

15        MR. GIRARD: All right, the chairman will be here for

16   ten minutes.

17             (Adjournment until Tuesday, May 7, 1963 at

18   10:00 A.M.)

19                      ---o0o---

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above-entitled cause on the date specified herein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this 9th day of April, A.D., 1963.

_____
Official Reporter