# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN
### CENTRAL DIVISION

– – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

              Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:           Reche School, Fallbrook, California

Date:            May 21, 1958

Pages: 1-67

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT 370

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3                  SOUTHERN DIVISION

4                     - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                     - - -

7   UNITED STATES OF AMERICA,       )
                                    )
8                     Plaintiff,    )
                                    )
9            vs.                    )        No. 1247-SD-C
                                    )
10  FALLBROOK PUBLIC UTILITY        )
    DISTRICT, et al,                )
11                                  )
                                    )
12                    Defendants.   )
    _____)

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15        Reche School, Fallbrook, California

16                  May 21, 1958

17

18                     - - -

19  APPEARANCES:

20      For the Plaintiff:          WILLIAM H. VEEDER, Esq.
                                    WILLIAM E. BURBY, Esq.
21                                  Special Assistants to the
                                    Attorney-General
22                                  Department of Justice
                                    Washington, D. C.

23

24                     - - -

25

APPEARANCES (continued):

| | |
|---|---|
| For U. S. Marine Corps: | COL. ELLIOT ROBERTSON<br>LT. COL. A. C. BOWEN<br>LT. DAVID MILLER |
| For Defendant Vail Company: | GEORGE E. STAHLMAN, Esq. |
| For Defendant Mercy Anderson and Others Herein Listed: | F. R. SACHSE, Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq.<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, Esq.<br>Deputy Attorney-General |
| For Defendant W. C Sievers and Alice Sievers: | DEWITT MANNING, Esq. |
| For Defendants A. S. Richardson and Aileen Richardson: | HARRY ASHTON, Esq. |
| For Defendant De Luz School District: | JAMES DON KELLER, Esq.<br>District Attorney and County Counsel<br>MILTON MILKES, Esq. |
| For Defendant David W. Miller: | GEORGE GROVER, Esq. |
| For Defendant Santa Margarita Mutual Water Co.: | W. B. DENNIS, Esq. |
| For Defendants Samuel Lewis and Mrs. Samuel Lewis: | RAY EBERHARDT, Esq. |
| SPECIAL MASTER: | JOHN M. CRANSTON, Esq. |

1    FALLBROOK, CALIFORNIA, WEDNESDAY, MAY 21, 1958, 10:00 A.M.

2              (At the Reche School in Oak Grove.)

3              THE CLERK:  1 - 1247-SD-C, United States v. Fallbrook

4    Public Utility District, etc., et al.

5              For commencement on the hearing before the Special

6    Master.

7              THE COURT:  I would like to have the appearances

8    made by those people appearing here in pro per without a law-

9    yer from the De Luz Creek area.  If you will start over on this

10   side and state your name for the Reporter.  Is there anyone on

11   the first, second or third row from De Luz who does not have

12   an attorney and who have made an appearance or are here present

13   involving property in the De Luz Creek area?  Is there anyone

14   on this side?

15             MRS. HOLZWORTH:  I guess I am closest.

16             THE COURT:  We are not going to take testimony now.

17   I just want your names.

18             MR. SACHSE:  Mrs. Holzworth is represented by me,

19   your Honor.

20             THE COURT:  I need only those who do not have lawyers.

21   Who else appears without a lawyer from De Luz Creek?

22             MR. BAXTER:  John C. and Flo Baxter.

23             MRS. GILLETTE:  Daun Gillette.

24             THE COURT:  Anyone else from De Luz Creek?

25             MRS. HUNT:  Pearl R. Hunt.

1          MRS. PFEFFERKORN:  Mrs. Frank Pfefferkorn.  We join

2    the Holzworths' property.  If she is filing today, I think we

3    should.

4          THE COURT:  Let's have your name for the record.

5    What are your initials?

6          MRS. PFEFFERKORN:  Frank Pfefferkorn.

7          MR. McDOWELL:  Homer C. McDowell and Marian J.

8          MRS. PFEFFERKORN:  Ruth H. Pfefferkorn.

9          MR. JONES:  Fred M. and Grace R. Jones.

10         THE COURT:  Anyone else from De Luz?

11         MRS. CALDWELL:  Vilate  Caldwell.

12         MRS. GILES:  Mary L. Giles.

13         MR. MOSER:  Benny Moser.

14         MR. STINSON:  Dale L. Stinson.

15         MRS. DRAKE:  Esther C. Drake.

16         MR. CHESTMOLOWITZ:  Frank H. Chestmolowitz.

17         MR. SACHSE:  Mr. Chestmolowitz is represented by

18    Counsel.

19         THE COURT:  Just those people who do not have attorneys.

20         MR. DEAUVILLE:  Paul Deauville.

21         THE COURT:  Anyone else in the De Luz area who does

22    not have an attorney, who has or has not filed an answer?

23         MRS. VINSON:  We are in the De Luz district, but not

24    on De Luz Creek.

25         THE COURT:  Let's have your name anyhow.

1        MRS. VINSON:   Ruth Helen Vinson and A. B. Vinson, my

2   husband.

3        THE COURT:   Anyone else?

4        MR. KOCH:   Paul Koch and E. J. Koch.

5        THE COURT:   Anyone else?

6        If there are any, we can get them later at the end

7   of the hearing.

8        Have we got the appearances of Counsel?   Mr. Sachse?

9        MR. SACHSE:   I'm appearing for the following de-

10   fendants in the De Luz watershed: Mercy Anderson, sued herein

11   as Mercy Pyeatt, and Niler Pyeatt; Robert B. Bleecker; Frank

12   J. Chestmolowitz and Patricia Ann Chestmolowitz; Frank Couch

13   and Anna J. Couch; David R. Foss, Mary Olia Foss, sued herein

14   as Olia Foss; Marion Foss Elledge; Herbert C. Foss; R. E. Foss;

15   Florence Foss Roberts; Harry Seares; Lila Foss Krause and

16   Howard A. Krause; Rudolph C. Foss; Felix R. Garnsey and Theo-

17   dora L. Garnsey; Alfred Holsworth and Helen E. Holsworth;

18   William A. Goodchap and Roberta L. Goodchap; John Kuhnis; Mary

19   J. LeVack and Rosamond E. LeVack; Richard F. Matthews and

20   Rosabel L. Matthews; Cora Myers; W. J. Ross and Eula Ross;

21   Truman C. Rowley and Beatrix Rowley; Herbert E. Shaver and

22   Joan B. Shaver; Gaius Ray Shaver and Stella C. Shaver; Burton

23   Lewis and Michael Taylor; George Webster Towne and Rose Garri-

24   son Towne; Georgia P. Walling.

25        MR. STAHLMAN:   George Stahlman, representing Vail.

THE COURT:  Mr. Moskovitz, representing the State of California.

MR. MOSKOVITZ:  Yes, your Honor.

MR. KELLER:  James Don Keller, District Attorney and County Counsel, representing De Luz School District.

MR. EBERHARDT:  Ray Eberhardt, representing Samuel Lewis and Mrs. Samuel Lewis.

MR. GROVER:  I represent David W. Miller.

THE COURT:  This is a reasonable facsimile of a lectern.

Before we start the hearing, I wanted to talk with you briefly about this case.  I am reminded, as I talked to Mr. Burby this morning, about the fact that in the old English common law they had what they called the pie-poudre Court, the Court of dusty feet, where the Court met on the highway and decided cases.

This is a rather unique situation.  We have a Federal Court, the Master of that Court, coming out, as it were, to the people to bring the case nearer to them where there is difficulty in long distances to come to the Courthouse in San Diego.

First of all, this is a Courtroom.  We are not conducting a town meeting.  We are here to start the trial of a lawsuit.  We are not here to debate its merits.  I have a lot of faith in the American people.  When they understand a problem, they generally can act intelligently.  I have discovered

5

1   that with juries.  I have a lot of faith in the American jury.

2   When the facts are all in and the jury hears those facts, you

3   get a pretty fair decision.  I am confident that you people

4   have come here today to participate honestly and in an orderly

5   manner in this hearing.

6        I know that there are a lot of you who know a lot

7   about this area and about the water problems of the area.  You

8   may know a lot more about it than some of the lawyers or the

9   experts.

10       I know also from things I have read that there are

11  some of you who are laboring under misinformation as to some

12  of the basic matters involved in this lawsuit.  I am going to

13  try to answer what I think will be a good number of your

14  questions.  If you will be patient I think you will get a lot

15  of answers in which you may be interested.

16       First a word about who I am.  I am not Justice Carter

17  of the Supreme Court of the State of California, the gentleman

18  who recently was in the newspapers for using his rifle to keep

19  people out of his swimming pool.  I have a lot of respect for

20  his legal ability, but I heard rumors that people said that

21  they didn't think it was a good idea to have that judge  who

22  was using the rifle down here presiding  in this case.  I am

23  not related to the gentleman, although I have a high regard for

24  some of his opinions.

25       I am a property owner in this County.  I have owned

1  property down here since 1945.  It is in the San Luis Rey water-

2  shed, and not on the Santa Margarita, but it looks about like

3  this kind of territory.

4          I was born here in California and I know something

5  about the problems of the arid area here in the Southwest.  I

6  hold Court in San Diego.  I have been on the Bench since 1949

7  and am now charged, and have been since April, 1956, with the

8  responsibility for this lawsuit.

9          A word or two about the right of the United States

10  to bring this action.  That is not a debatable matter.  The

11  United States has a right to bring an action in the United

12  States Courts just as anyone of you citizens has a right to

13  bring an action.  Their rights in that Court are no greater

14  and no less than those of any other citizen of the United States

15  -- no greater or no less than those of any other person of the

16  United States who might not be a citizen.  The Courts are open

17  to individuals, citizens or non-citizens, and they are open to

18  the Government.

19          This might be called some words about what this case

20  is not.  This case is not a replica of the Owens Valley case.

21  There have been stories around that this was Owens Valley

22  repeated.  I will go into this in more detail, but I want to

23  tell you why it is not.  In the case of Owens Valley the city

24  of Los Angeles went up and condemned land to get the water,

25  and eventually they condemned the whole valley in order to get

the water, and the city owned the water which it had bought

when it condemned the land. Then the city sold the land back,

without water, to whomever wanted to buy it. Of course, that

dried up Owens Valley. But they bought the Owens Valley.

This is a case where the Court has been asked to de-

termine the equitable distribution of the water that is here

available. It is case where no one party wins this lawsuit.

There will have to be a decree which will adjudicate the rights

of all the parties, but that decree will fix their rights as

well as it will fix the rights of the Government, of the Fall-

brook Public Utility District, of various parties who are in

this lawsuit.

We therefore don't debate this problem whether the

United States may bring this suit. What we are trying to do is

to handle the matter reasonably, with the use of such intelli-

gence as we have, and we have tried to do what we could to make

it easier for you, the small people in the community, knowing

what a burden a lawsuit of this sort puts upon you.

Now, a word about these 6000 defendants. I want to

go to Mr. Veeder's defense in that respect. It is not Mr.

Veeder's idea to bring in 6000 defendants. This case went to

the Ninth Circuit Court of Appeals, which reviews the decisions

from the Court in which I sit, and the Government lost that

appeal. The Government didn't win it -- they lost that appeal,

and the Court that rendered the decision on that appeal said

1  that at the trial of this action there should be adjudicated

2  all the rights in the watershed, all the rights on the stream.

3  So the Government had no alternative in view of the decision of

4  the Ninth Circuit, and that decision is binding on me as the

5  Judge of this Court.

6      Now, there has been served on some of you, and there

7  will be served on others of you later, this packet of papers

8  entitled "Notice and Orders, Complaint and Supplementary and

9  Amendatory Complaint."  I want to say a few words about the

10  papers that are in there and their significance.  It is a large

11  volume to serve, but the purpose of compiling that, and it was

12  done with the Court's authority, is to let you know what the

13  status of this case is at the time you are served with these

14  papers, and if you will take time to read some of these things

15  and I hope with the words that I have to say about them they

16  will make some sense.

17      The Complaint itself, which document begins on Page 1,

18  is identical to the original Complaint filed.  There have been

19  no changes made in that.  What has been done is that there

20  have been added additional Counts  or causes of action.  So in

21  studying this, if you have studied it, you will notice that the

22  first part of it is identical to what was on file before.

23      These additional claims were set up.  Now they con-

24  sist of two or three kinds.  First, there are certain  claims

25  that involve the Santa Margarita Water District and

1   the Fallbrook Public Utility District, in which the Government

2   makes certain contentions as to those organizations.  I think

3   the attorneys representing these districts understand the pro-

4   blem.  There are still legal questions to be argued as to

5   whether some of those causes of actions will stand or will go

6   out.  But by and large those causes of action do not affect the

7   small owner in any particular degree.

8            The second group of Counts that have been added are

9   claims upstream to land in which the Government has an interest--

10  and let's not forget now that we all are part of this Govern-

11  ment.  This is land which is National Forest, public domain,

12  Indian reservations, some of that land may have riparian water

13  rights.  If you can imagine a little valley up here with steep

14  mountains on either side, which is the kind of ground we gave

15  the Indians, and here comes a little bit of water down there

16  and there may be a couple of acres of ground at the bottom of

17  that valley that could be irrigated.  Probably the mountain

18  peaks or the steep sides of the mountains couldn't be irrigated.

19  But since the Circuit said that we had to adjudicate the rights

20  on the stream, the Government has a right, therefore, to say

21  that here are two acres or twenty acres up in this valley that

22  are subject to irrigation and we would have to adjudicate the

23  riparian rights that pertain to that land.  The same would be

24  true as to the National Forest; the same would be true  as

25  to the public domain.  Now the settling of the rights as to the

1   National Forest, the public domain and the Indian reservations,

2   by stipulation of the United States and order of this Court,

3   does not increase the amount of water which the Government can

4   claim downstream at Camp Pendleton, and there is an order in

5   this document to that effect.

6   If you will follow me, suppose it is determined that

7   there is a certain amount of water in certain streams up there

8   that pertain to the Indian reservations or the public land and

9   certain land is riparian and could be irrigated. The Govern-

10  ment has conceded and the Court has ordered that the Govern-

11  ment has no right to let that water flow by and then pick it

12  up at Camp Pendleton. If rights are adjudicated as to the

13  water pertaining to Government lands, it will be water that can

14  be used upon those Government lands.

15  So those parts of the Complaint, although they are

16  long actually are not nearly as intricate and do not complicate

17  this case to the extent that some people seem to think it does,

18  and of course this had to be done in view of the decision of

19  the Circuit that any rights on the stream had to be adjudicated

20  in this case. Therefore, the Government either had to file a

21  separate suit involving those lands that it had upstream, which

22  undoubtedly would have been consolidated with this because it

23  had to be decided at one time, or it had to bring them in as

24  causes in this pending action.

25  Now, attached to the set of documents that you have

1    there is what is called a Pre-Trial Stipulation.  This was a

2    stipulation as to facts that was entered into between the major

3    defendants -- the State of California and the Government, the

4    Fallbrook Public Utility District, Santa Margarita, the Vail

5    Estate -- the major defendants who had Counsel and were working

6    on the case.  This pre-trial stipulation binds only the parties

7    that sign it.  But this stipulation is largely a matter of un-

8    disputed facts.  It describes where the streams are, the areas

9    that they run through, it has a bunch of physical facts as to

10   which I doubt very much if there is going to be any dispute.

11   Now what we have done is to provide that you get a copy of that

12   pre-trial stipulation of facts.

13          It is not in this assembly, is it?

14          MR. CRANSTON:  It is sent out.

15          THE COURT:  It was sent out with a notice to people

16   on De Luz.  It will be sent out to people in the other tri-

17   butaries.  When the hearing starts we expect to call a witness

18   who will testify to what we think are these undisputed facts

19   and put it in the record.  If any of you object -- think that

20   those facts aren't correct, you will have a chance to study

21   that stipulation of facts over, you will have a chance to offer

22   evidence to show where it is wrong.  I may be optimistic in

23   thinking that those facts that have been agreed upon probably

24   aren't going to be disputed by anybody.  It is going to save a

lot of time to get that series of facts out of the way, and

1  that is the way we propose to do it.  You are not bound by the

2  stipulation because you didn't sign it.

3  But when a witness testifies to those matters at a

4  hearing before the Master or before the Court, then if you have

5  any evidence contrary to that, you should come forward and rebut

6  it -- offer that evidence.  You have a chance to see that docu-

7  ment and read it over and see if there is anything in there

8  that you don't agree with.

9  Now a word or two about defaults.  I originally issued

10  orders that no defaults were to be taken.  That was to protect

11  the people in this area who didn't have attorneys and who were

12  bothered with this problem.  So when this lawsuit got ready to

13  go to trial I had to get you to come in and file answers and

14  make appearances and I had to set aside, therefore, the order

15  that no defaults would be taken, and that was to put some

16  pressure on you to get some answers in and to get together and

17  collectively hire a lawyer or hire your own -- get in an

18  appearance in the case.

19  I'll tell you frankly, and say it on the record here,

20  I don't intend to take defaults for a long time to come.  I

21  don't intend to take defaults certainly until after the trial

22  starts on the main stream, which will be the middle of June --

23  not earlier than that, and probably even later than that.  But

24  I want to urge all of you to get your appearances in and not

25  wait.  I can't make an order that eventually you won't be

1   defaulted, but I am certainly telling you that the Court has

2   no intention to default anybody in this litigation who wants to

3   appear.  And I also want to say to you  that even if a default

4   should be entered, there are provisions whereby you can move

5   to vacate that default and the Court will listen leniently to

6   applications if situations like that occur.

7       Finally, even if defaults should be entered, a decree

8   cannot be entered just wiping your ground out of the case.

9   The Court is going to have to hear some evidence on the matter

10   and certainly will require the Government to produce evidence as

11   to what facts it knows about your ground before any final

12   decree is entered.

13       Later on I am going to talk -- maybe I had better do

14   it right now -- about this soil survey.  The Government has a

15   team of experts who, if you permit, will go upon your ground

16   and make a survey -- a water and soil survey.  It will not go

17   unless you permit them to enter your land.  If you do permit

18   them to enter your land, you don't bind yourself to accept

19   those findings at all.  You just say, "You can go and survey

20   my land."  But the Government will then make available to you

21   what it found as a result of that survey -- make it available

22   in writing so you can look it over, and that survey will show

23   generally the acreage, whether the ground is riparian, whether

24   you have wells or springs, what the soil conditions are, what

25   crops are suitable, the amount of land you can irrigate and

1   the maximum amount of water, the maximum amount of water you

2   could use if there was water available for everybody to the

3   maximum amount.  After you have seen that, if you are satisfied

4   with it, your battle is over with, because you know what the

5   Government is going to offer against you and you can accept it

6   or not, and if you are not satisfied with it, you are then in

7   position to know what the Government's case is and you are in

8   position then to try to rebut it, if you think that is desirable.

9   Any lawyer will tell you that in the trial of a lawsuit when

10   you know what the other man is going to prove against you, you

11   are in a good way to defend yourself.  So I think I can say

12   without hesitation that none of you is going to hurt yourself

13   by permitting this soil and water survey to be made.  You don't

14   have to accept it.  You can reject it entirely.  It is true

15   that the Government may offer it in evidence at the trial of

16   the action, but you are in the position of getting a peek at

17   what the Government expects to prove.  I understand that in a

18   number of cases these soil and water surveys have been accepted

19   by these people whose ground is involved and who felt that a

20   fair job had been done and were willing to rest their case on

21   what the Government had found from this survey.

22           Now I don't want to be misunderstood.  I'm sitting

23   here in the middle.  I'm not trying to help the Government

24   prove its case any more than I'm trying to help you prove your

25   case.  But I think it is desirable where you have ground to

1   permit that survey to be made and then use your own judgment

2   as to whether you want to accept it or whether you want to

3   offer other evidence to combat it.  Of course, if you don't

4   permit the Government on your ground, the Government may have

5   been on ground next door or here or there.  They have available

6   these various geological maps, the water surveys have been made,

7   and they know a good bit about your ground before they go on

8   your ground.  So the Government is going to offer evidence

9   about the condition of your soil and how much of your ground

10   is irrigable and what kind of water you have, whether you let

11   them on or not.  I would therefore suggest that that be done.

12   If you desire to do that, you contact the Ground

13   Water Resources Unit at Camp Pendleton.  The address can be

14   obtained from the Master or any of the attorneys.  Counsel here

15   know where that is located.

16   Going back then to answers.  If, for instance, you

17   decide to put in a pro per answer for yourself and have no

18   Counsel, and if you are satisfied from this survey that the

19   best showing has been made as far as you are concerned, your

20   battle is practically over, because you have the facts on your

21   lands, you have an appearance on file, and if there were pro-

22   blems that came up where we had to have you present we could

23   ask you to come in.  That will go a long way to solve this pro-

24   blem in many instances.

25   Now in this assembly with the Complaint that has been

1   served or will be served there is an order concerning cross-

2   pleadings, an order that says that everybody shall be considered

3   adverse to everybody else and that you don't have to answer

4   other people's pleadings.  Now that was made to save a lot of

5   trouble.  Because of the decision of the Circuit, it is my in-

6   terpretation of it that all parties who have an interest in this

7   stream are adverse.  If you and your neighbor have land side

8   by side on this stream, you are adverse to each other, just as

9   the Government is adverse to you, and if you had to answer not

10  only the Government's Complaint but then had to answer what

11  your neighbor said and then answer what your neighbor upstream

12  another couple of miles had to say, this case would be in such

13  shape that all you would be doing would be filing pleadings to

14  these other documents.  So the Court has provided by order that

15  all parties are adverse and all you need to do is get in an

16  answer to the Complaint and that as a matter of law it will be

17  considered that your rights are adverse to every other person

18  who claims an interest in this stream.

19          There is also an order in this assembly referring to

20  responsive pleadings, and it provides that if you have filed

21  an answer already to that first Complaint that you needn't file

22  another answer to that part of the Complaint because your

23  answer may stand.

24          If you want to answer the allegations in the addi-

25  tional causes of action, then you should put another answer on

1  file answering them or picking up and answering both the Com-

2  plaint and additional Counts that have been inserted.  But with

3  an answer on file to the old Complaint, even if you never answer

4  again, you can't be defaulted because you have an appearance on

5  file and if that is the only answer you have in the case you

6  couldn't be defaulted out.  That was done for your protection.

7           Now, in addition to trying to work out some way to

8  try this case in as simple a manner as we can, I appointed a

9  Special Master.  This is a part of the purpose to bring the

10  Court to the people.  I think I selected a well qualified

11  Master.  I want to tell you, to start with, that there is nothing

12  political in his appointment.  He belongs to one political

13  party, and I belong to another.  We are both lawyers.  I have

14  a lot of respect for him.  He is a graduate of Stanford Law

15  School and has been a successful practitioner in San Diego.  He

16  belongs to a number of social and civic organizations in that

17  community.  He has represented water districts and water liti-

18  gants in other areas.  I don't think he has done any work in

19  the Santa Margarita Valley.  He was recommended to me by Judge

20  Haines of your Superior Court, who is now retired, who was an

21  expert in the field of water law.  He was recommended to me by

22  Judge Weinberger and almost uniformly by lawyers to whom I

23  talked.

24           In substance, Mr. Cranston is a judge.  He will try

25  the matters on some of these tributaries just as if I were up

1   here trying them.  He will make rulings as we go along.  He will

2   take evidence and then he will make findings on the facts and

3   he will draw what he finds to be his conclusions of law, and

4   he will submit them to me for approval.  If I am satisfied with

5   them, I will approve them.  If I am not satisfied, I will send

6   it back for more evidence, or I will reject them and start all

7   over again.  But that is the way a Master operates.

8          Those of you who haven't met him, I want now to intro-

9   duce him to you for a bow.  Mr. John Cranston, who is a Special

10  Master in this case.

11          (Applause.)

12          THE COURT:  He has been up here before these hearings

13  started and has been trying to assist you and to explain, as I

14  have been explaining, what this lawsuit is about and how it is

15  going to work.

16          Here is about the way he is going to operate.  We have

17  started on De Luz Creek, the tributary nearest the ocean, and

18  there have been notices sent out to all the people on De Luz

19  Creek of these hearings.  They were already served with the

20  Complaint, and attempts have been made to get as many of their

21  answers on file as we can.  We will get more on file if they

22  are not all taken care of.  They were also served with a copy

23  of this pre-trial stipulation, this stipulation of what we

24  think are undisputed facts -- they have had a chance to look

25  that over, and as these hearings progress a witness will be

called who testify under oath, a man who knows this area, to
those undisputed facts: What the streams are, what their names
are, what ground they flow through, things of that sort, and
every person who objects to any of those facts, doesn't think
they are right, may have a chance to be heard and to present
evidence.  We don't think there are any mistakes in them.  You
may find some.  I'll go into more detail in a minute as to what
he will do in a particular tributary.  But after he has held
hearings on De Luz, he may move up to Sandia and various other
tributaries and do the same thing over again on each of these
tributaries.

On about June 16 I am/start trial in San Diego of,
as it were, the main stream with the major defendants, and that
will progress for some time.  Then eventually the Court is
going to have to weave together the various findings of the
Master.  I may go out and try some of these tributaries.  We
are going to try to speed this along as fast as we can.  We are
going to weave together all the findings made on these tri-
butaries and the findings made on this main stream into one
decree covering this stream and fixing the rights of the people
in the stream in an equitable manner.

As far as the hearings on De Luz, the matter will
operate something like this.  The Government will make an open-
ing statement of what it expects to prove.  The Government will
put on what we might call a prima facie case, a skin case.  It

1   will put on its general proof of its claims to water.  There will

2   be a witness called who will testify to these matters contained

3   in that pre-trial stipulation, and then the individual defendants

4   will be permitted and will be asked to come forward and make a

5   showing of their rights on De Luz Creek.  For instance, if one

6   of these soil and water surveys has been made and found satis-

7   factory and it goes into evidence without objection, that con-

8   stitutes your showing.  In other instances, it may be necessary,

9   if you haven't permitted that to be done or if you think it is

10  not correct, to testify yourself or to bring in witnesses.  But

11  particularly we will be interested in the legal description of

12  your land, which you can get from a deed or a tax bill, al-

13  though, with all respect to Mr. Keller, County Counsel here,

14  some of these tax descriptions aren't always the same as the

15  legal description.  You are better off with a description from

16  a deed than from a tax bill.  But if you haven't got a deed,

17  bring in a tax bill.  An attempt will be made to ascertain

18  whether your water consists of spring water or well water,

19  whether your land is riparian -- by "riparian" is meant does it

20  border on a stream or tributary -- how much of your land is

21  irrigable (could be irrigated), what type of soil you have,

22  what uses it could be put to, what will it grow?  I don't think

23  any of you is going to claim that you can grow alfalfa on the

24  sides of some of these steep hills.  But we want to know what

25  uses your land can be put to.  Then an attempt will be made to

1   find the maximum amount of water that you could use on that

2   irrigable land if there was an unlimited supply of water.   So

3   you go down De Luz Creek and get all of the maximum uses.   But

4   we all know that there isn't that much water, and the purpose

5   of this trial is to fix in an equitable manner the amount of

6   water which, in fairness, each would be entitled to.

7           Now this may be a good time for me to tell you some-

8   thing in a general way about the law of riparian rights and how

9   it works.   I will try to make it simple, and it may leave a lot

10  of questions unanswered, but I don't want to go into any more

11  detail, except with a general statement.   Let's assume that there

12  is a little creek up here -- we will call it De Luz, and there

13  are ten people on that creek.   Let's assume that the creek

14  flows right into the ocean, so you don't have any tributary

15  property.   You have one mile of creek flowing into the ocean

16  and subterranean or underground water at the bottom of the

17  creek.   Streams can run underground as well as on top.   If

18  there are ten people who lived on that creek and each of those

19  ten people had the same amount of acreage that could be irri-

20  gated, and each of those people had identical soil, and the

21  property was subject to identical uses, then the ten people

22  would have what we call correlative rights to the use of that

23  water -- that is, the ten people would have to share that water

24  equitably and would have to share it probably on the basis of

25  one-tenth each.   I am taking a very simple case.   That is what

24

1   we mean by "correlative riparian rights."

2          There is no right on the part of the man upstream to

3   put down a well and pump the water out of the watershed into

4   another watershed.   That is one of the things which is involved

5   in this case in some instances.   Under California law when water

6   once leaves a watershed and gets into another watershed, then

7   you have trouble.

8          Nor would there be a right for a man upstream so to

9   use the water as to contaminate it so that the  people down-

10  stream couldn't use it.   In other words, your rights as ri-

11  parian owners are, as we say, correlative.

12         In a larger sense, that is what is involved in this

13  lawsuit.

14         The Government purchased by condemnation the Rancho

15  Santa Margarita.   There is no dispute about that.   The Santa

16  Margarita Rancho had certain water rights -- certain rights.

17  The Government has various claims.   Whether they are good or

18  bad I am going to decide.   One of the claims that the Govern-

19  ment makes is that it is a riparian owner, it has land border-

20  ing on the stream, and that therefore it has correlative rights

21  to the use of water the same as other people upstream have

22  correlative rights as riparian owners.   Eventually there has to

23  be a determination of what these rights are between the rights

24  the Government claims as riparian owner and the rights that

25  people claim upstream as riparian owners.

The Government does not claim that because it is the Government it can take all the water in this stream. That is not its claim. It couldn't make that claim or it would be out on its ear in a minute. But it does claim the same right that you claim. If you bought some ground and your ground is riparian, you have a right to the reasonable use of the water in that stream. The Government says, "We bought the Santa Margarita Rancho. It had certain water rights. We acquired whatever it had, and we want a determination of what our rights are."

The Government has other claims. The Government asserts rights to appropriate -- appropriative rights, it asserts rights by adverse user, matters of that sort. Those all have to be determined as a matter of law. We will not know until the evidence is in or until some further pre-trial rulings are made just exactly what the extent of those rights and claims is.

Now there is another kind of water in California. I am going to coin a phrase for it -- you will probably never hear it again, but to try to describe it for you. I have been asking Counsel in this case merely to agree with me that we could have two terms that could be used and we would all know what they meant. I haven't been able to get them to do this yet, but I have some big sticks in my closet and it is going to be done before we get through with this.

As I told you before, there are streams that run on

1   the ground and streams that run underground.  If you have a

2   piece of ground and under your ground there is a basin or

3   stream of water that feeds some other underground or above-

4   ground stream, that water is in definite contact with other

5   water that feeds the stream and that water is subject to these

6   correlative rights that I talk about.

7       But suppose that you had a stream up on top of a

8   hill -- it got up there somehow or other, and the water was

9   not in contact with other water.  I'm going to call this "local

10  water."  If all you have is "local water" then that isn't going

11  to be affected by this decree, except in the sense that it may

12  confirm in you the ownership of "local water" on your property,

13  which is not affected by any of this row on the River about the

14  riparian rights.  Do you follow me on that?  That is a question

15  of fact, whether your water is part of a basin or part of an

16  underground stream or in direct contact with it, or whether it

17  is, as it were, independent water and is not directly feeding

18  some stream.  That is a question of fact.  No one can decide

19  that until we get the evidence in on a particular piece of

20  ground.  But if it turns out that you have that kind of water

21  and a decree is made that you have that kind of water, this

22  lawsuit is a bonanza to you, because you have proved title  to

23  water and you have a decree that says that this is what you

24  have and that is the end of it.

25      On the other hand, if you have water that is part of

1   or belongs to these streams aboveground or underground, then

2   again you have only correlative rights in comparison with all

3   the other persons who have the same kind of rights.

4           Now, in this document with the Complaint that was

5   served on you, or will be served in districts where they haven't

6   done it yet, there is a stipulation entered into on November 29,

7   1951. We have some legal problems on that, which we are going

8   to hear in San Diego maybe later today and tomorrow. But as

9   the matter now stands the situation is this. That stipulation

10  outlines what the Government claims. By the way, a "stipu-

11  lation" is an agreement. That is a lawyer's word for "agree-

12  ment." This stipulation was signed originally between the

13  United States, California and --

14          MR. VEEDER:  That is all.

15          THE COURT:  Wasn't it Santa Margarita also?

16          MR. MOSKOVITZ:  No, your Honor.  Later on they joined

17  in it.

18          THE COURT:  Later on it has been joined in by Santa

19  Margarita, Fallbrook, the Vail estate.  All the major parties

20  joined in that stipulation or agreement.  In substance, it says

21  that all that the Government claims by this lawsuit -- by the

22  way, remember that this speaks as of 1951; it doesn't affect

23  this Indian land situation, because that was not in the case

24  at the time -- but it says that all the Government claims is

25  what rights they acquired since they bought the Santa Margarita

1    Rancho -- in other words, what water rights Santa Margarita

2    Rancho had and what rights the Government may have thereafter

3    acquired by appropriation, adverse or prescriptive use --

4              MR. VEEDER:   Prescription, or use, or both, your

5    Honor.

6              THE COURT:   All right.

7              The stipulation also states that the case is to be

8    governed by California law.

9              Speaking of the way the matter now stands, we have

10   some further arguments on it, and I have a ruling, which is

11   contained in here, that California water law controls this

12   case -- in other words, our law as to riparian rights, our law

13   as to appropriation, our law as to adverse user.  This does not

14   apply to the Indian lands, because they weren't in the case

15   when the stipulation was entered into.  But I have already ex-

16   plained to you that the Government has conceded, and I have

17   healed it up with an order, that any rights the Government

18   establishes for riparian lands in the public domain, in the

19   National Forest or in the Indian reservations cannot augment

20   or increase the rights that the Government claims downstream

21   at Santa Margarita.

22             Now this stipulation binds only those parties who

23   signed it, and it is not binding on you.  Before this case is

24   over I am going to have to rule on the question of law as to

25   how these same problems are solved as to the other defendants

1   who haven't signed that stipulation.   I wouldn't concern your-

2   self about that for the time being.   The Government is bound by

3   this stipulation as to these major defendants.   As a practical

4   matter, it will probably have to stay put and be bound by the

5   stipulation as to others who didn't sign it.   It is pretty hard

6   for me to conceive that the Government can try the case on one

7   theory with certain major defendants and try to use a different

8   theory with individual defendants.   So don't worry about that.

9          But read the stipulation, read the Court's inter-

10   pretation.   I think from what I have said you will understand

11   what it means.

12          Now there is another matter I want to discuss with

13   you, and that is the Government's offer to settle on these

14   matters involving half an acre for domestic use.   This was done

15   at the Court's suggestion.   I have heard some stories up here

16   that this was a dirty Government trick to weed some of you

17   people out forever of your rights.   This was done at my urging.

18   The Government kept talking about 'these      people using a

19   small amount of water, maybe we can stand still for it."   I

20   said, "Make an offer in writing of what you can do."   We finally

21   got the Solicitor to make the offer and we circulated it, and

22   it provides, in substance, that if you have a piece of ground

23   of a half acre or less and all you are claiming is domestic

24   water -- for domestic livestock, trees, vines, garden, what-

25   ever would be on a half acre -- the Government will consent

1  that your right to that kind of water be adjudicated.  Again,

2  your right, of course, is a correlative right.  If there is not

3  enough water on the stream to take care of, we will say, a

4  bunch of people who had these small areas, the mere fact that

5  the Government conceded that you have that kind of right wouldn't

6  give you water that isn't there.  But the Government says, "We

7  will not fight with you over that kind of maximum use, and as

8  far as we are concerned we will quit fighting with you."  This

9  of course binds you and the Government, but because this case

10  is adverse as to all parties someone else might contest that.

11  If they do, they will get a chance to be heard.  I think it is

12  very unlikely that any other defendant will contest any of

13  these agreements entered into on the half acre pieces.  If they

14  do contest it, you will have a chance to be heard.  So you don't

15  lose anything in the sense of losing your day in Court as to

16  other parties if you sign these agreements.

17        I am not going to discuss presently what this does

18  not apply to.  There is talk about, "Well, it wouldn't apply

19  to building a duplex or an apartment house."  Those are speci-

20  fic cases that will have to be taken up individually.  Present-

21  ly it applies to those properties that will come within the

22  description of the offer and it will take care of a lot of

23  small people.  We already have piles of those documents that

24  have come in and they will be merely filed presently, and

25  eventually when the decree of the Court is entered, if nobody

1  contests those rights, they will be incorporated in the decree

2  that is entered in this action.

3          If you sign one of these, this does not affect your

4  right to take water from some existing agency, if it has water

5  to sell to you.  It has nothing to do with that.  You can still,

6  if you are getting water from Fallbrook and Fallbrook has water

7  to sell, you can still have your water from Fallbrook.  This

8  concerns what your right would be to put down a well on your

9  ground and get water out of it.  It does not affect the Fall-

10  brook Public Utility District.  You are not being a traitor if

11  you are taking water from them and you have a city lot and you

12  say, "All I want  is my right to put down a well if I want to."

13  If you sign that document, you are not hurting Fallbrook.

14          Is that right, Mr. Sachse?

15          MR. SACHSE:  I will not comment.

16          THE COURT:  Well, generally.  Maybe there is something

17  that I don't see about it that Fallbrook might take offense at.

18  But the point is that you are not giving away your right to

19  buy water elsewhere.  You are merely saying that on this half

20  acre the Government is not fighting with me to put a well down

21  or to develop water, as long as I use it on half an acre and

22  have a house and use it for domestic use and for such animals

23  as come within the domestic class.

24          Well, I have told you something about our trial plans.

25  I have mentioned something about these riparian rights, and I

1   have mentioned something about what I call "local water."

2         There are also appropriative rights that exist on this

3   stream, and they are going to have to be recognized, if they

4   are valid rights. There are also alleged appropriative rights

5   on this stream and that has to be settled.

6         There are people pumping water out of this stream

7   into other watersheds. That is going to have to be adjudicated

8   as to whether they can or cannot legally do it, and if they

9   haven't got a valid appropriative right to pump water out of

10   this watershed that has to stop, because under California water

11   law you cannot, without a valid appropriative right or a vested

12   right of some kind, take water out of one watershed and use it

13   in another, and a lot of the difficulty we have been having in-

14   volves these problems. We are going to have to decide those

15   things. We can't decide them all at once.

16         There's also recognized by California law adverse use,

17   prescriptive rights, and under California law a person upstream

18   who could establish a prescriptive right against a downstream

19   user and establish a right to water from adverse use over a

20   long period of time. That is an intricate legal problem, If

21   any of you people have problems that you think involve adverse

22   user, I would certainly recommend that you consult a lawyer.

23   That is a difficult problem, because a man has his riparian right

24   whether he uses it or not. So if you are upstream and you have

25   used a lot of water, and the fellow downstream hasn't been using

1  any, the mere fact that he hasn't used any doesn't make your

2  use adverse to him because he hasn't been using any.  He can't

3  lose his right just by non-use.  If you were trying to use

4  water downstream and you kept cutting his water off and kept

5  him from using it when he was trying to for five years, I guess,

6  under a claim on your part that you had a right to use it, you

7  might have an adverse use.  But you don't get any adverse use

8  upstream just because the fellow below wasn't trying to use his

9  water.  By the same token, if you have land downstream you

10  haven't lost your right merely because the fellow upstream was

11  using water and you were not.  This is an intricate problem.

12  I'm not going to go further into it, except that if you have

13  that kind of problem, I think you certainly should see a lawyer.

14       I have introduced the lawyers to you.  I would like

15  to introduce my staff.  Bill Luddy is my Clerk.  Mr. Luddy,

16  will you stand.  He is stationed at San Diego and he can help

17  you if you are down that way with problems.  He has forms for

18  pro per answers, and if you want to file a general denial to

19  the allegations of the Complaint, Mr. Luddy is prepared to

20  give you a form and help you do it.  There is no filing fee for

21  an answer.

22       John Swader is my Court Reporter.

23       You have met the Master.

24       Where is my Bailiff?  He is missing, I guess.  Mr.

25  Henry is my Bailiff.

1      I would like to ask Mr. Cranston, who has been sitting

2  here listening and noting all the mistakes I made, to sort of

3  pick up and straighten me out and straighten you out in places

4  I have got out of line and add any other remarks that he wants

5  to make at this time.

6      MR. CRANSTON:   I certainly don't think Judge Carter

7  has made any mistakes in what he said to you.  I will merely

8  try to give you a little additional information possibly about

9  myself.

10      I'm not a native son of California.  I was born in

11  Colorado.  However, we moved to Escondido in 1920 and I lived

12  at Escondido from 1920-1932.  I have been in San Diego since

13  then.  I still own some property in Escondido.  I have none in

14  this particular watershed.

15      The hearings, as the Judge has indicated, will pro-

16  ceed on an area-wide basis, that is, first covering the pro-

17  perty in one area and then the property in another area, begin-

18  ning with this De Luz area.  There will be certain days on

19  which the hearings will be held and others on which they will

20  not be -- that is, this will not be a continuous hearing five

21  days a week.  The hearings will probably be two or three days

22  a week.  There will always be occasional days when I will, you

23  might say, put on my other hat and come up for conferences with

24  the defendants.  That is, I am in a rather dual position.  For

25  the last four weeks I have been in this area on certain days

35

1  helping the defendants in the filing of pro per answers and I

2  have seen well over 600 defendants during that time. I don't

3  know the full number.  Tomorrow I will be in the Temecula com-

4  munity hall at 10:00 o'clock in the morning and as long there-

5  after for the morning and the early part of the afternoon as

6  seems necessary to take care of any people in that area or from

7  this area who want to go to Temecula to see about filing answers

8  in the action.

9         The hearings, of course, will continue here on Friday,

10  and then on Monday and Tuesday of next week.  But what the exact

11  schedule will be after that will depend to some extent on the

12  progress which is made at the hearings.  As you can imagine,

13  we can't foresee now just how fast this will go -- that is,

14  something may take half an hour to present or it might take a

15  whole day, depending upon the circumstances.  After we have

16  been going for a few days we will have a better idea just how

17  long it is going to take to cover any particular area.

18         I can assure you, however, that, as Judge Carter has

19  said, each defendant will have an ample opportunity to present

20  any evidence which he wishes to present, which he feels is

21  necessary to rebut any of the evidence which is presented by

22  the other parties in the case.

23         THE COURT:  With the limitation that you may have

24  questions that  I don't choose to answer, because they may in-

25  volve a problem I have to decide, I am willing to permit a few

36

1  reasonable questions here on matters with which you may be con-

2  cerned, and if I do not answer it I will tell you why.

3          Yes, sir -- state your name.

4          MR. BURCH:   I am Bill Burch.   I am one of the small

5  property owners you mentioned that signing of that stipulation

6  would be an adjudication of the rights between the Government

7  and the individual, but I believe that you did say that as in

8  my case I could or there is a possibility of future building of

9  a duplex.   My lot is split and I would be precluded from doing

10  that or developing my property to that extent if I signed that

11  stipulation.

12          THE COURT:   What I said was that the offer that the

13  Government had made presently was limited to the description of

14  the property put in that offer.   Now there may be instances

15  where, because of where your property is located, the Govern-

16  ment may or may not be willing to make concessions.   That is up

17  to them.   I can't speak for them.   I have got this offer from

18  them, which they put in writing, and I understand that this

19  offer pertains to half acres regardless of where they are lo-

20  cated.

21          Correct me if I am wrong.

22          I understand that over at Temecula, for instance;

23  where a lot of these small lots lie directly over what is al-

24  leged to be a basin of water, the Government is willing to enter

25  those agreements at Temecula.

37

1    MR. VEEDER:  If it is limited to --

2    THE COURT:  -- limited to domestic use.

3    MR. VEEDER:  That is correct, your Honor.

4    THE COURT:  In other words, it wouldn't make any dif-

5    ference whether your lot was lying right over a stream or

6    basin or how good a supply of water you had, if you were willing

7    to accept that proposal the Government would go.

8        Now what they will do I don't know if you had a piece

9    of land up in the mountains somewhere and they surveyed it and

10   it looked like all you had was "local water" anyhow.  The

11   chances are that they might let you out of the case in the same

12   manner.

13   MR. VEEDER:  May I suggest that they get in contact

14   with us.

15   THE COURT:  Yes, I think it should be taken up with

16   the Government -- with the Ground Water Resources Unit at Pendle-

17   ton.  Talk it over and find out.  This is a matter of agreement

18   on their part.  If you can come to terms, then all right.  But

19   I can't say any more about that.  Certainly you can't take a

20   half acre of ground and then put down a well and decide that

21   you are going to supply half the town with water that comes off

22   that half acre.

23       Any other questions?

24       State your name please.

25   MRS. GILLETTE:  Dorothy B. Gillette.

1    The Ground Water Resources made a survey of our land.

2 We have no information as far as the results or decision they

3 came to.  How do we get that information?

4    MR. VEEDER:  Contact us.

5    THE COURT:  Don't you have a procedure of automati-

6 cally supplying them after you have concluded the survey, Col.

7 Robertson?

8    COL. ROBERTSON:  Yes, sir.

9    THE COURT:  How long does it take ordinarily after

10 the survey has been completed?

11    LT. MILLER:  I know in regard to the Gillette property

12 there was only recent permission and it will be completed prior

13 to their hearing.

14    THE COURT:  It will take a little time.  Contact their

15 office and they will tell you when it is ready.

16    Any other questions?

17    MR. MYERS:  From the standpoint of evidence at the

18 hearing, will the Court accept a stipulation regarding the sur-

19 vey if the experts testify that that will be their testimony

20 and that we will not have to corroborate that by any further

21 evidence, assuming that we accept the Government's survey?

22    THE COURT:  It is my understanding that if you accept

23 the Government's survey, the Government is going to use this

24 survey, and if you accept it then it automatically goes in.

25    Is that right?

1    MR. VEEDER:  That is right, your Honor.

2    THE COURT:  Does that answer the question?

3    MR. MYERS:  That answers part of the question.

4    Now, any other rights that the defendant may claim,

5    such as prescriptive, which is a big problem in this case as

6    to these independents, we will then put on corroborative

7    evidence, whatever facts you have, from witnesses who can prove

8    these particular uses.

9    THE COURT:  Definitely that would be your burden to

10   prove your prescriptive right.

11   MR. MYERS:  I have one other question.  Will the Court

12   accept a title search in order to go back for the chain of title?

13   Would the Government accept that title search from a reputable

14   concern like Union Title Co. showing the title search?  Will

15   they accept that as the chain of title, or do we have to bring

16   in members from the Union Title Co. who made that search?  If

17   we have to go that far, they would be running down --

18   MR. VEEDER:  Do you want me to answer, your Honor?

19   THE COURT:  Yes.

20   MR. VEEDER:  The question has arisen on several oc-

21   casions in regard to title.  Tentatively at least, in regard to

22   these titles -- I think it will probably be the procedure we

23   will follow throughout -- if a man is called to testify and he

24   testifies that he is the owner of the property, and he is the

25   record owner of the property and our records show that, we

1  would try to avoid requiring any additional proof respecting

2  his title.

3          THE COURT:   But he is talking about something else.

4          MR. MYERS:   I understand.

5          THE COURT:   He is talking about his chain of title.

6  He may want to go back and show in his chain of title something

7  in the past.   He is not merely talking about proving the present

8  record ownership.

9          MR. MYERS:   Predecessors.

10          MR. VEEDER:   I understand.   I am thinking of proving

11  his present title.   I just outlined how I think he should.

12          If he has another question in regard to chain of title,

13  I would suggest that he sit down and talk with me a little bit

14  about it, because I would hate to make a general statement in

15  regard to chain of title here.

16          THE COURT:   The answer is that in regard to proof of

17  record title -- that is, who presently owns it -- title policies

18  will be accepted.   If, on the other hand, you are relying upon

19  something in the past, years before when somebody owned this

20  property and want to use something in your chain of title, then

21  you had better confer with some of the Counsel for the Govern-

22  ment to find out whether they are going to require you to bring

23  in the expert on title or whether they will accept the title

24  policy.

25          MR. VEEDER:   May I add one thing more, your Honor,

1    in conclusion.

2           We desire, in regard to proof of present ownership,

3    the right further to check out the title and rebut, if we find

4    that there is something in regard to the title that we think

5    must be contested.

6           THE COURT:  The Government has a lot of information

7    about these titles and in most cases your information, your

8    proof of record title will probably correpond to theirs.  If

9    there are irregularities, the Government reserves the right to

10   go into it further.

11           MR. VEEDER:  That is right, your Honor.

12           MR. SACHSE:  I have a question.  If I understood Mr.

13   Veeder correctly, his statement is in direct conflict to what

14   I have understood the United States' position to be and I want

15   to clarify it.

16           Will the United States offer its soil surveys when

17   no answer has been filed by a defendant and when no request is

18   made by a defendant?

19           THE COURT:  I could answer that.  I would require

20   them to.

21           Any objection?

22           MR. VEEDER:  I had understood your Honor, in that

23   regard, that certainly if Mr. Sachse is speaking of default,

24   I think the Court rules and you would require that there be

25   some evidence in regard to the rights and interests.  I want to

1   emphasize now, we have no desire for any defaults at all and

2   we will certainly make available all the data that we have.

3           THE COURT:  But if you have a soil survey --

4           MR. VEEDER:  We will make it available.  It is avail-

5   able to your Honor.

6           THE COURT:  You will make it available and you have

7   no objection if I order it to go into evidence, even if no

8   answer has been filed?

9           MR. VEEDER:  Not in the slightest.  I can't conceive

10  of such circumstance.

11          THE COURT:  I can't either.

12          MR. SACHSE:  In other words, any individual here who

13  is not represented by Counsel can make a request of Mr. Veeder

14  and the United States will then see that the soil survey goes

15  into evidence.  That is what I want to pin down.

16          THE COURT:  That has been accepted, yes.

17          MR. SACHSE:  All right.

18          THE COURT:  In addition, there has been publicity out

19  for a long time that your office at Rainbow was open.

20          MR. VEEDER:  That is right.

21          THE COURT:  Where there is information available as

22  to what the Government knows about your property.  That is tied

23  in with this soil survey proposition, I suppose.  They have

24  charts and maps.  You are not bound by anything you see up

25  there, but if you want to find out what the Government has --

1   after all, the Government has a lot of facilities to gather

2   information.  You are welcome to go up there.  The Government

3   has made that offer public a long time ago.

4           MR. BURCH:  You mentioned that you coined the word

5   "local water" to apply to independent streams which have no

6   bearing whatsoever on the watershed.

7           THE COURT:  I didn't say "streams."

8           MR. BURCH:  Or bodies of water.  What term do you

9   apply to the Colorado River Water which we buy and runs into

10  the watershed and which we should have a right to recapture?

11          THE COURT:  You have raised a legal question there

12  to which I don't know the answer -- this recapture of purchased

13  water.  I would hazard an outside guess that if you bought it

14  and put it in the ground, you had no right to recapture it.

15          MR. BURCH:  We have no right?

16          THE COURT:  I don't know of any law on that.  Los

17  Angeles did this for years, of course.  They had a tunnel in

18  the narrows back by Elysian Park.  Those tunnels in the

19  narrows there fed a city with water up to about 400,000, didn't

20  they?  Then they got the Owens Valley water and sold it to the

21  farmers in the San Fernando Valley, and then of course re-

22  captured water again down in those tunnels.  I don't know the

23  answer to that.

24          Any other question?

25          MR. HANEY:  My name is W. B. Haney.  I have a piece

1    of property, fifty-three acres, and it is set out by a Cali-

2    fornia Court that I have riparian water rights to 20 miner's

3    inches and all water that can be developed on the land.   Will

4    the Government acknowledge that?   Here is the document setting

5    it out (showing document to the Court).

6            THE COURT:   This is a matter that would have to be

7    gone into.   Ordinarily this judgment and decree which you have

8    is binding on you and whoever you litigated with.   But suppose

9    that I owned land downstream, I was never served in that suit.

10   Am I to be bound because you and another fellow went into Court

11   and litigated it?

12           MR. HANEY:   Thank you.

13           THE COURT:   I think you have a problem about which

14   you had better talk to an attorney.   You may have something,

15   and you may not.

16           MRS. PEARLSON:   I am Mrs. Pearlson from Murrieta.   I

17   was wondering about this word "paramount" that is used, is it

18   not, in the Complaint by the Government.   How does that stack

19   up with appropriative, prescriptive and riparian?

20           THE COURT:   I don't want to take the hide off my

21   friend, Ed Ainsworth.   I ought to introduce him, by the way --

22   Ed Ainsworth of the Los Angeles Times is sitting at the Counsel

23   table.

24           (Applause)

25           THE COURT:   But this word "paramount" has caused a

1  lot of trouble.  The word "paramount" was used in the sense

2  that it is used in water law, it is a word of art in water law,

3  and this stipulation in 1951 expressly states that the word

4  "paramount" does not mean that it is some sovereign right of

5  the Government but that the word "paramount" is used in the

6  sense that it was used in the Peabody case in California.

7          MRS. PEARLSON:  You mean it says that in the Complaint?

8          THE COURT:  It doesn't say it in the Complaint, but

9  it says it in the stipulation of November, 1951.

10         MR. VEEDER:  The last document, your Honor -- there

11  it is.

12         MR. CRANSTON:  Beginning on the bottom of page 86,

13  your Honor.

14         THE COURT:  On page 86 of this assembly that was

15  served is this stipulation.  When you go to the end of it you

16  find that it was dated November 29, 1951.  Among other things

17  it says, "For clarification of the issues of this litigation

18  and for the benefit of all the parties to this cause, it is

19  hereby stipulated....."

20         By the way, for the first time I have read the words

21  "for the benefit of all the parties to this cause."

22         MR. VEEDER:  That was the contemplation, your Honor.

23         THE COURT:  I just now saw them.

24         "Paragraph 1.  That in paragraphs 8 and 9 of the

25     plaintiff's Complaint herein...."

1          That would still be paragraphs 8 and 9 of the Amended

2   and Supplementary Complaint.

3          "....the word "paramount" is used in the same

4          sense in which that word is used in the second para-

5          graph on page 347 of the opinion of the Supreme Court

6          of California in the case of Peabody v. Vallejo, 2

7          Cal. 2d 351," etc.

8          MRS. PEARLSON:  That means nothing to me.

9          THE COURT:  That is Greek to you, but to lawyers

10   Peabody v. Vallejo is a leading water case and "paramount" is

11   used in the sense that "paramount" is used in water law.

12          MRS. PEARSON:  Is it possible for you to explain how

13   that word is used in water law, briefly?

14          THE COURT:  We will try to do something for you, but

15   I don't think that any of the Counsel, although we have had

16   some arguments about this stipulation in other respects, I

17   think we are all in agreement as to that part of it.

18          Where does this word appear in the Complaint?

19          MR. CRANSTON:  At page 89.

20          A VOICE:  Please define the term.

21          THE COURT:  Did you leave it out?

22          MR. VEEDER:  I think it is in the Prayer, your Honor.

23   You see, the Prayer is moved back.

24          THE COURT:  But your stipulation says that in para-

graphs 8 and 9 of plaintiff's Complaint and in paragraphs 2

1    and 3 of the Prayer.  I don't find it in paragraphs 8 and 9.

2    Maybe it's there.  Let's see the Prayer.

3            MR. VEEDER:  If your Honor will look at page 7 at

4    line 24 you will find the word "paramount" there as used.

5            MR. SACHSE:  At line 26 on page 6, where the United

6    States asserts a paramount right against the defendant for

7    35,000 acre feet.

8            THE COURT:  Well, I'm not going to spend any time on

9    it.  This "paramount" talk is all ancient history, and what

10   the Government is claiming is the rights to waters that it ac-

11   quired when it bought the Santa Margarita Rancho and such

12   rights as it thereafter acquired by appropriation or prescription

13   or both.  This is long under the bridge.  The stipulation pro-

14   vides that if there is any significance to the word, it is in

15   the sense that it is used in water law, and I can't quote the

16   Peabody case and I'm only guessing.  I would guess that it

17   would say that a person who had a riparian right had a right

18   paramount to that of an appropriator.  That is about what it

19   says -- in other words, a better right.  Don't be concerned

20   about that.

21           MR. VEEDER:  In Colorado they use the term "superior."

22   That is all it means.

23           MR. KELLER:  I would like/have one thing clarified.

24   In the matter of what the Court's schedule will permit in the

25   way of determination of the defendant in accepting a survey or

1    ordering a survey, and then a determination of whether or

2    not that is to be the defendant's case -- I understand, of

3    course, that you want to expedite this De Luz phase of the

4    case, but I wonder at what time it would be determined.

5         THE COURT:  It is done informally.  You contact the

6    Ground Water Resources Department down there and I would guess

7    if they were working on a tributary they might say that we can't

8    get on your ground for a month because we are working on

9    Sandia now.  I think you  can work it out.  Have you had any

10   problem so far in being able to fix a time?

11        LT. MILLER:  It is as you have mentioned, that we

12   have taken the De Luz area first.

13        MR. KELLER:  For further clarification, suppose it

14   were a month.  Would the Court's schedule then permit us to

15   enter that survey into evidence at that time, or if we resist

16   it?

17        THE COURT:  We can adjust that.  For instance, we

18   have problems like this that you lawyers will appreciate.  Here

19   are people on De Luz who maybe haven't been served.  They are

20   living away.  Maybe we have to serve them by publication.  There

21   will probably have to be some further hearing or some of these

22   other people will be given notice who were not given notice of

23   this hearing.  We will have all sorts of problems.  We will try

24   to adjust our schedule to take care of your problems, not only

25   the problems of the little people but the problems of the big

12

1    County of San Diego, Mr. Keller.

2            MR. KELLER:  We have just the De Luz School District,

3    your Honor.

4            THE COURT:  Mr. Moskovitz.

5            MR. MOSKOVITZ:  I would like to make known to the

6    people here that the State of California, whom I represent,

7    has made a study of the Santa Margarita River watershed.  A

8    written report was compiled and issued some two and a half or

9    three years ago as a result of the study.  It is not in the

10   same detail as to individual parcels that the surveys the

11   United States is making, but it does have a lot of information

12   about the watershed which is available to anyone who wants it.

13   We have copies of the report and there are also basic data on

14   which the report was based.  Anyone who wants a copy of the

15   report may get it upon request, and if you want to write to

16   me in Sacramento, in the Attorney-General's Office, for a copy,

17   I will arrange to get it to you, or you may write to the Office

18   of the Department of Water Resources at 11th and Grand Avenue

19   in Los Angeles, the Southern California office, and if you de-

20   sire you may examine the data on which the report is based in

21   the office in Los Angeles.  So this is available also as well

22   as what the United States is making available to you.

23           THE COURT:  I will answer a couple more questions

24   and then go ahead.

25           MRS. BOREN:  What was the office he just gave in Los

     Angeles?

1    MR. MOSKOVITZ:   The address in Los Angeles is 11th

2    and Grand Avenue.

3       THE COURT:   What is the name of it?

4       MR. MOSKOVITZ:   The Department of Water Resources

5    of the State of California.

6       THE COURT:   The man back here.

7       A VOICE:   What has been done about saving that water

8    that is now running into the ocean?

9       THE COURT:   You know as much about it as I do.

10      THE VOICE:   Wouldn't it be pertinent that that be

11   attempted to be reclaimed or be dammed up instead of this ex-

12   pensive suit that makes everybody suffer?

13      THE COURT:   The only thing I'm going to say about that

14   is this.   I have heard a lot of information passed out that the

15   Government has spent enough on this lawsuit to have built a

16   dam and all that sort of thing.   I haven't made any accurate

17   compilations, but I think those statements are entirely falla-

18   cious.   The expense of this lawsuit has been nothing like that.

19   It has been an expensive lawsuit and will be, but it is not

20   that kind of money.

21      I don't care to comment on the matter of the water

22   running into the ocean.   I imagine that the lawyers are going

23   to offer evidence on that when we try the case.

24      Any other questions?

25      A VOICE:   In regard to being served with summons,

1   you said those who couldn't be served would be served by ad-

2   vertising.  How would that be advertised?

3            THE COURT:  It would be advertised in a legal news-

4   paper.  Attempts are made to get notice to the individual in

5   every possible way.

6            MR. GROVER:  In connection with the other tributaries,

7   which will be handled later, will there be anything in the

8   Government's case today, which the notice says will be the

9   general case respecting the nature of the watershed, which the

10  other area defendants should attend, this being the first one?

11           THE COURT:  I understand that the Government plans

12  on each tributary to make the same skin case that they are going

13  to make on the De Luz area.  They will put a skin case or prima

14  facie case on here at De Luz.  I understand that they are going

15  to repeat that on each tributary.

16           MR. VEEDER:  That is correct.  I'm always worried

17  when you say "skin," though, your Honor.

18           MR. GROVER:  Will that prima facie case include the

19  Government's requirements at Camp Pendleton outside of the

20  tributary concerned?

21           MR. VEEDER:  Yes, we intend to put in a prima facie

22  case.

23           MR. GROVER:  For the whole case, not just the tri-

24  butary?

25           MR. VEEDER:  I'm not going into the full lawsuit, if

1   that is what you mean, when we start putting in our case. We

2   will put in a prima facie case. But there is a great deal of

3   geology that will not go into this De Luz hearing, if that is

4   what you mean.

5         MR. GROVER:  So that actually the Government's full

6   case on the Camp Pendleton property will be only in the full

7   trial before the Court.

8         MR. HOWELL:  Judge Carter, I am Dean Howell, County

9   Supervisor of this District, and I would like to raise a

10   question.

11        Our Board determined yesterday that we should write

12   our Congressman and the President and the Vice-President and

13   all the rest of them back in Washington about this deal. Do

14   you think it will have any effect at all on the situation?

15   Our Board are very concerned about this whole problem. We think

16   it is completely unnecessary and we have written to Congress

17   before to that effect and we are writing again. I wonder what

18   you might think about that.

19        THE COURT:  I don't think I care to comment, Mr.

20   Howell. I have a lawsuit to try and as long as it is pending

21   I propose to try it. If Congress says that I can't try it, I

22   will obey the will of Congress. I don't want to get into that

23   kind of controversy. I prefer not to answer it.

24        MR. HOWELL:  The water people up here asked our

25   Board some seven years ago to send a representative to

53

1   Washington, and they happened to send me and that is why I

2   personally am a little more conversant with the whole problem,

3   and I'm personally concerned because people all over this

4   country talk to me about it and I have enough problems beside

5   that one, and I was served last week by the U. S. Marshal and

6   that information went over to our District Attorney's Office

7   and they are here defending what rights the County might have,

8   I presume.

9           THE COURT:  I think Mr. Keller will do a pretty good

10  job.

11          MR. HOWELL:  I am sure he will.  He always does.

12          MRS. BOREN:  I would like to know something.  We know

13  that our name is on that list and we haven't been served.

14  Should we go ahead and answer it as if we had been served?

15          THE COURT:  Yes.  Well, you can ask the Government

16  to give you a copy of the Complaint.  They can serve you.  It

17  doesn't have to be done formally.  You can answer even if you

18  haven't been served.

19          Shall we proceed?  You have been very patient and

20  your questions have been intelligent and I hope that I have

21  been of some help in trying to tell you what we are going to

22  try to do in this suit.

23          Mr. Veeder, are you prepared to make your opening

24  statement?

25          MR. SACHSE:  I have one question, your Honor.  In

13

1 connection with the engineering study Mr. Veeder will have wit-

2 nesses available who had anything to do with the preparation

3 of the study, if a property owner disagrees, in other words,

4 whom we can't call as an adverse witness and cross-examine on

5 what he did.

6 MR. VEEDER:  Yes, certainly.  My recommendation,

7 though, Franz, if there is ever an instance where you disagreed

8 with Col. Bowen's investigation, is to bring it to his attention.

9 We are not in competition.  What we want to do is a good

10 thorough job on the matter, and certainly if you disagree you

11 can call him as an adverse witness -- you can cross-examine

12 him, you can do anything you want.

13 MR. SACHSE:  Specifically, then, if I wish to request

14 that the engineering studies on certain properties, that the

15 men who made the engineering studies on certain properties be

16 available, should I make such request of you, say, today, or

17 will that be routinely available?  I have six properties that

18 have engineering studies made, on each of which I want to cross-

19 examine the person who knows what the study is about.  If it is

20 not Col. Bowen, I want to know who it is.

21 MR. VEEDER:  We will certainly make that information

22 available to you.

23 MR. SACHSE:  Could I give you the names informally

24 later?

25 MR. VEEDER:  I think it would be a good idea.  I want

1    to know if there is any disagreement.  We invite you first be-

2    fore the trial to bring it to our attention.  We may be able to

3    straighten it out.

4              THE COURT:  If it is a matter of disagreement or you

5    think there is an error, I would suggest that you take it up

6    beforehand.  If it is a matter of merely wanting to elicit some

7    matters on cross-examination and find out who the man is, ask

8    Mr. Veeder to have him there available with some reasonable

9    notice.

10              MR. VEEDER:  Certainly.

11              THE COURT:  Mr. Veeder, are you prepared to make your

12   opening statement?

13              MR. VEEDER:  If your Honor desires it.

14              THE COURT:  First, we will take a short recess for

15   the Reporter.

16              (Recess)

17              THE COURT:  Mr. Veeder, do you care to make an open-

18   ing statement as to what you expect to prove in this lawsuit?

19              MR. VEEDER:  Thank you, your Honor.

20              We feel that it is fitting and right and proper that

21   the Court in our democracy should come to the people as it has

22   done today, and I, personally, want to thank your Honor and

23   the Special Master, Mr. Cranston, for being here.  We think you

24   have done a great deal for us.  The fact that you virtually

25   made the opening statement relieves me of quite a lot of

1    responsibility in that regard.

2            THE COURT:  I didn't intend it to be    pro-Government.

3    Are you inferring --

4            MR. VEEDER:  No, we are not pro or con, here.  We are

5    simply trying to get the facts, your Honor.

6            Now, I think all of us know that the United States of

7    America came into this area and bought a large acreage of land

8    on the Santa Margarita River for the creation of great military

9    establishments.  One of the primary reasons for the occasion of

10   these establishments was the fact that there was what we con-

11   sidered to be a firm and adequate water supply on Camp Pendleton.

12   That supply is unique for several reasons.  It is an autonomous

13   supply.  It is a ground water basin very largely, and it is a

14   basin which is, from the military standpoint, ideal.  It is not

15   connected by any great tube reaching to the Colorado River,

16   which would naturally be more vulnerable, and we feel that the

17   rights which we acquired must be defended.

18           We are not seeking in this proceeding, as your Honor

19   so ably stated, to acquire any rights to the use of water.  It

20   is our sole and only objective to have declared and determined

21   the rights to the use of water which the United States of

22   America claims and now exercises.  Very largely those rights,

23   I think perhaps all of the rights, that are now being exercised

24   are rights that were exercised by our predecessor in interest --

25   the Rancho Santa Margarita.  When we acquired those rights they

1  were utilizing water outside of the watershed and we have con-

2  tinued to do the same.

3    We are claiming rights that were used by the Rancho

4  within the watershed, which, similarly, are not riparian rights.

5  There are some storage rights.  But, by and large, and we be-

6  lieve that the facts will support it, that the United States of

7  America acquired a complete and firm supply of water adequate

8  to meet its needs.

9    Our problems arose as the area above the enclave be-

10  gan to increase in population and demands were made.  Fallbrook,

11  Santa Margarita Mutual and others initiated claims subsequent

12  to the time that the United States bought these lands and a

13  conflict arose.  We are seeking here to have our rights to the

14  use of water quieted.  We are seeking no more.  We are seeking

15  to have the Court define and declare what we purchased, and

16  when we do that we think we are benefiting the entire community,

17  because in this day and age where water is so scarce and so

18  precious we feel that every landowner, including the United

19  States of America, should know by judicial decree what his rights

20  are and what he can expect.  That is all the United States of

21  America is seeking here.

22    We feel, moreover, that the Marine Corps Base has been

23  prejudiced in the past because this adjudication was not com-

24  pleted sooner.  It has been impossible to make Camp Pendleton

25  the complete entity that it was intended and planned because of

1  this litigation.  Congress has steadfastly refused to provide

2  money until this litigation is concluded.  For that reason we

3  are pressing as hard as we can to get an early adjudication.

4          The lady inquired as to the use of the word "para-

5  mount," and I wish to assure her that we use that, as your

6  Honor said, in compliance with the law of the State of Cali-

7  fornia.  We claim no right here whatever to invade a vested

8  right at the time that we purchased the Rancho Santa Margarita.

9  We have no desire, we make no claim whatever that we could re-

10 duce the riparian rights above us, nor do we claim any more

11 than a correlative share on the basis of those riparian rights.

12 We readily admit that we cannot cyclically store the riparian

13 water, nor can we divert the riparian water out of the water-

14 shed.  We do assert that we have a right to divert the water

15 outside of the watershed as our predecessor in interest has and

16 as we have for fifteen years.  There is a conflict that must be

17 resolved.

18         We feel moreover that interference above the enclave

19 with the water which comes down to us is a serious threat and

20 is becoming more serious.  The reason I state that is that we

21 are dependent upon a ground water basin very largely for our

22 supply of water.  If we do not receive the water that runs down

23 from the watershed -- and we are referring to the entire water-

24 shed -- if there is interference with that, and if there is a

25 reduction of that water which is so greatly needed to recharge

1    our subterranean basin, we stand to suffer irreparable loss.

2    At the present time there has been salt water intrusion from

3    the Pacific Ocean, and that threat continues today.  We have

4    just completed ten years of the greatest drought of recorded

5    history and we have suffered very, very seriously by reason of

6    it.  We will suffer more if the diversions upstream are in-

7    creased or a greater burden placed upon the stream.  Fortunately

8    for us, for the first time in six years there was some water

9    available that ran down to the United States.  Some of that

10   water went into the Pacific, and we feel that the control of

11   that water would virtually have been impossible in any event.

12   Some of it might have been stored, but a great share of it came

13   down De Luz Creek and we do not believe it would have been a-

14   vailable at the Fallbrook site in the first instance.

15          But that is/matter, I believe, that is going to be

16   involved in this present proceeding in regard to De Luz Creek,

17   for it is our feeling in that connection that the competition

18   of the riparian owners on De Luz Creek will be greatly accentu-

19   ated if there are other diversions upstream which create a

20   greater burden on the Santa Margarita River.  For that reason

21   we think that the proceedings which are now starting are of

22   great and grave importance to us.  We must maintain our sub-

23   terranean basin.  We have no desire to intrude upon or en-

24   croach upon the riparian rights.  We do feel that subsequent

25   appropriative claims, such as that of Fallbrook Public Utility

1   District, do conflict with our rights and, if they are exer-

2   cised, may well defeat our rights and interests in the Santa

3   Margarita River.  Again, however, the question is not whether

4   we are taking water from anyone.  We could not, in this liti-

5   gation, invade Fallbrook's rights, if it has any.

6          We are in this position.  We are asking this honorable

7   Court to adjudicate and determine the respective rights of the

8   parties, and we will have those rights chronicled in a decree

9   so that in perpetuity all of us will know what our rights and

10  interests are.

11         We have a map on the wall here which is designated

12  "Santa Margarita River Watershed" and we are going to ask, when

13  the case begins, to have this stipulated into the record.  I

14  think Mr. Sachse has already said that he has no objection to

15  it.

16         But the extent of our interests is basin wide.  It

17  will be noted up here, the Coahuila Indian Reservation is a

18  large area and on that Indian reservation are tributaries of

19  the Santa Margarita River which are sizable and the quantities

20  of water which we believe are reserved for those Indians is of

21  such magnitude that it will have a definite effect upon the

22  runoff of the Santa Margarita in the future.  We find up there

23  that electricity has come in.  They are drilling a lot of wells

24  and each well that goes down reduces to that extent the quantity

25  of water which will ultimately leave the enclave down here.

1    It is not and has never been any assertion of the

2  United States that in some manner we could move the Indian

3  rights down to the enclave where the Ammunition Depot, Camp

4  Pendleton and the Naval Hospital are situated.

5    There is another Indian reservation, the Pechanga

6  Reservation, which is situated further down the watershed very

7  closely to the Vail Estate.  In the green  area here is a

8  source of water for the whole watershed.  That is the Cleveland

9  National Forest.  As Judge Carter pointed out, those rights in

10  the National Forest were brought in, in contemplation of the

11  ruling of the Court of Appeals for the Ninth Circuit.  We feel

12  that it is essential that those rights be adjudicated.

13    Perhaps the most spectacular phenomenon on this map,

14  if I may use that term, is the Vail Reservoir.  It is situated

15  about midway in the basin, and it is capable of impounding

16  40-50,000 acre feet of water.  That came into operation, I believe,

17  in the early '50's and has had a great impact upon the runoff

18  of the stream.  This probably is the primary example of why it

19  is essential that parties have their rights adjudicated in this

20  cause, for it is obvious that there is a growing demand, and

21  we will prove a growing demand, throughout the entire watershed

22  which will in itself have an impact on the De Luz Creek.

23    Now the enclave of Camp Pendleton, the Ammunition

24  Depot and the United States Naval Hospital are within this area

25  where the arrow is pointing.  We have exclusive jurisdiction

62

1   ceded to us by the State of California.  That doesn't have any

2   effect whatever, in our view, as to upstream rights above us.

3   It is simply a matter of jurisdictional relationship between

4   California and the United States.

5        Now these rights, as I said, are all interrelated

6   throughout the whole vast area.  The Vail Estate has an appro-

7   priative right for the Vail Reservoir, but at the same time it

8   has riparian rights of such magnitude that it could use every

9   drop of water in the simple exercise of those rights.  That

10   would be true were it not for a stipulated judgment between the

11   Vail Estate and the United States of America that was originally

12   entered into by the Rancho Santa Margarita prior to the time

13   the United States acquired its property.  As a result there is

14   water in the River which we believe would not be in the River

15   were it not for that judgment.  That is a factor of great im-

16   portance and, again, is an element that we have to view when

17   we are considering our relationship with the owners of property

18   on the De Luz Creek.  For every single diminution of water above

19   our enclave puts us in sharper competition with the riparian

20   claimants, the people who are using water in De Luz Creek.  So

21   when there is a reduction here on the main stem of the Santa

22   Margarita we find ourselves looking more to De Luz Creek.  The

23   yield of that stream is extremely small in comparison with the

24   great demands of the United States.  It must be borne in mind

25   that there are 4600 acres of land within the enclave which

1  overlie this subterranean basin, and that basin constitutes

2  our sole source of supply.

3       In the proof of our case in the De Luz case we will

4  offer evidence as to our title, we will offer evidence as to

5  the cession of exclusive jurisdiction, we will put in what may

6  be called a skeleton case in regard to our demand and in regard

7  to our future needs.

8       I'm assuming that the people on De Luz Creek will

9  prove up in full their riparian rights and their full potential.

10  We desire them to do so, because absent knowledge on our part

11  of the demands on De Luz Creek and all the other streams we

12  will never know for sure how much water we can contemplate and

13  depend upon in the Naval enclave.

14       It is our purpose in the litigation that is going to

15  be and the hearings that will commence on Friday in this school,

16  we will put in evidence from Rainbow Creek on the south, the

17  south affluent of the Santa Margarita River, and from Sandia

18  Creek, which is on the north side.  We believe that it is

19  extremely important in this litigation the fact that Fallbrook

20  Public Utility District contemplates the construction of a dam.

21  We do not know what the effect of that is going to be.  We do

22  know that the State of California has issued to the Fallbrook

23  Public Utility District a permit, which is on April 10, and we

24  feel that it drastically changed the status quo which has been

25  maintained for a great many years on the stream.  That is an

1    element that we must bring into the case and must have it re-

2    viewed.  It may be that it will be declared to be irrelevant

3    as far as this phase of the matter is concerned, and if so we

4    will have to await later adjudication.  We will, however, in-

5    troduce some evidence in regard to the uses of that water or

6    at least the claimed uses for that water.  We don't believe

7    that we will have to go back into anything more than the area

8    above Rainbow and Sandia.

9            We will have, as his Honor has already stated to you,

10   a stipulation in regard to the general phenomena within the

11   Santa Margarita Watershed.  In other words, there are a great

12   many things concerning which there is complete agreement -- the

13   area of the watershed, the tributaries, where they are located,

14   and to some extent the water uses that are now being claimed

15   by the parties upstream.

16           We will show all the applications which have been

17   filed for claims of water throughout the entire watershed.

18           We will have a witness who will give that general

19   statement to which his Honor made reference, and then we will

20   have more specific detail and data in regard to the area which

21   now constitutes the enclave.

22           There will be no evidence at this time in regard to

23   the Indian rights or in regard to the Forest Service rights.

24           That, in general, will be our lawsuit, your Honor,

25   at this stage of the proceedings.

65

1    THE COURT:   Thank you, Mr. Veeder.

2    You are appearing for certain defendants here, Mr.

3    Sachse.   Do you want to make a statement?

4    MR. SACHSE:   I prefer to defer my statement until

5    I present the defendants' case, your Honor。

6    THE COURT:   All right。

7    Now, ladies and gentlemen, the program is as follows:

8    The Government has made some motions which raise matters of

9    law and I have decided to hear them in San Diego。   We will start

10   this afternoon.   I expect to be done with them by Thursday

11   afternoon sometime.   I propose, therefore, to adjourn this

12   hearing and the actual taking of testimony until Friday morning

13   at this schoolhouse.

14   This is the Master's hearing, and you concur with

15   me, do you, Mr. Cranston, in adjourning this hearing until Fri-

16   day morning?

17   MR. CRANSTON:   Yes, your Honor。   That will be at

18   10:00 o'clock on Friday morning?

19   THE COURT:   Well, 10:00 --

20   MR。 CRANSTON:   Or 9:30?

21   THE COURT: Well, let's make it 9:30.

22   I will be here again on Friday.   We will proceed with

23   the taking of testimony at that time。

24   I want to say this.   In getting a big lawsuit started

25   you have all sorts of problems。   It is not like going out and

16

1  putting your foot on the starter of the automobile and the

2  engine turns over and away you go.  We have had pre-trial hear-

3  ings in this matter off and on and the Court has made various

4  rulings, but there are others that have to be made.  There was

5  a motion filed and noticed by the Government for this morning

6  at this school, and it concerns the matters concerning this

7  stipulation of November 29, 1951.  It is a matter of law and

8  it is going to be more convenient to hear it in San Diego, and

9  that is where we propose to hear it.

10      Unless someone has some inquiry or some matter that

11  we should tend to, we will adjourn this Master's hearing until

12  Friday morning at 9:30 A.M.

13      I think there are two motions.  You have a motion,

14  too, Mr. Sachse.

15      MR. SACHSE:  Yes, I have a motion.  It may go over.

16  It is of no moment at all.  I simply filed that to protect my

17  time, under the Federal Rules.

18      THE COURT:  To keep it on the calendar, both motions

19  will be continued until 2:00 o'clock in the Courtroom at San

20  Diego.

21      The Court wants to thank you for your patience and

22  for your intelligent interest in this problem.  Your questions

23  were pertinent.  I hope that we have been of some help to you.

24  As we progress, particularly outside of Court hours, I know that

25  the Master, myself, any of the people here will be glad to

1    answer specific questions, and we will all try to be helpful to

2    you with your problems.  We know that this is a burden on you.

3    We are trying to make it as easy as we can, with your coopera-

4    tion.

5              We will stand adjourned until 2:00 o'clock P.M.

6              MR. SACHSE:  May the record indicate that, as Counsel

7    for forty-two defendants in this case who appeared here on an

8    order of the United States set for hearing, have left their

9    places of business, left their homes and ranches and are here

10   and ready to proceed, I want the record to indicate that I,

11   as Counsel for the forty-two defendants whose names I gave this

12   morning, object to the continuance and desire that the hearing

13   on De Luz Creek proceed.

14             THE COURT:  Your objection is overruled.

15             I'm going to dispose of these motions and then pro-

16   ceed again on Friday morning at 9:30.

17             (Recess until 2:00 P.M.)

18

19

20

21

22

23

24

25