ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JAMES M. CARTER
and
BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**Volume:** II

**Pages** 71 - 234

**Date:** May 23, 1958

**Place:** Fallbrook, California

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

## APPEARANCES

WILLIAM H. VEEDER, ESQ.,
    For United States of America.

Lt. DAVID W. MILLER, (USN),
    For United States of America.

FRANZ R. SACHSE, ESQ.,
    For Fallbrook Public Utility District.

GEORGE STAHLMAN, Esq.,
    For Vail Estate.

ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General,
    For State of California.

INDEX TO WITNESSES

| For the Plaintiff: | | D | X | RD | RX |
|---|---|---|---|---|---|
| Henry Holsinger | | 92 | | | |
| Max Bookman | | 155 | 206 | | |
| | | | 225 | | |

INDEX TO EXHIBITS

| For the Plaintiff: | | | Ident. | Rec'd. |
|---|---|---|---|---|
| M-1 | Judgment and Decree in condemnation | | 81 | |
| M-2 | Judgment and Decree in condemnation | | 81 | |
| M-3 | Judgment and Decree in condemnation | | 81 | |
| M-4 | Judgment and Decree in condemnation | | 82 | |
| M-5 | Public Land Withdrawal | | 82 | |
| M-6 | Letter of 1-12-47 | | 83 | |
| M-7 | Letter of 9-18-43 | | 83 | |
| M-8 | Letter of 2-18-44 | | 83 | |
| M-9 | Stipulated Judgment | | 84 | |
| M-10 | Aerial photograph | | 86 | |
| M-11 | Aerial photograph | | 86 | |
| M-12 | Aerial photograph | | 87 | |
| M-13 | Map | | 89 | |

|  |  |  | Ident. | Rec'd. |
|---|---|---|---|---|
| 1 | M-14 | Map | 90 | |
| 2 | M-15 | Application | 102 | |
| 3 | M-16 | Incorporation File | 105 | |
| 4 | M-17 | Application 11586 | 116 | |
| 5 | M-18 | Application 12178 | 117 | |
| 6 | M-19 | Application 12179 | 117 | |
| 7 | M-20 | Application 12576 | 118 | |
| 8 | M-21 | Amendment to 12576 | 118 | |
| 9 | M-22 | Letter of 7-13-49 | 119 | |
| 10 | M-23 | Amendment to 11587 | 119 | |
| 11 | M-24 | Amendment to 12178 | 119 | |
| 12 | M-25 | Amendment to 12179 | 119 | |
| 13 | M-26 | Letter | 139 | |
| 14 | M-27 | Letter, February 15, 1955 | 152 | |
| 15 | M-28 | Application 3846 | 152 | |
| 16 | M-29 | Permit 3514 | 154 | |
| 17 | M-30 | Letter, October 3, 1934 | 154 | |
| 18 | | | | |
| 19 | For the Defendants: | | | |
| 20 | M-A-1 | Bulletin 57 (Volume I) | 207 | |
| 21 | M-A-2 | Bulletin 57 (Volume II) | 207 | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1      <u>Fallbrook, California, May 23, 1958, 9:30 a.m.</u>

2

3          THE CLERK:  Number 1247-SD-C, United States of America

4      versus Fallbrook Public Utility District, et al, for further

5      hearing before the Master.

6          Would Counsel present state their names for the record,

7      please?

8          MR. VEEDER:  William H. Veeder.

9          LT. MILLER:  David W. Miller.

10         MR. MOSKOVITZ:  Adolphus Moskovitz, Deputy Attorney General

11     for the State of California.

12         MR. SACHSE:  Franz R. Sachse, for the Fallbrook Public

13     Utility District, and the individual defendants named.

14         MR. STAHLMAN:  George Stahlman.

15         THE COURT:  What individuals are here from the DeLuz area

16     who have not appeared by a lawyer, who are appearing pro per,

17     that is without a lawyer, or who have not filed an Answer?

18     What persons are here from the DeLuz area?

19         MR. CRABTREE:  Frank Crabtree and Lilly M. Crabtree.

20         A VOICE:  Didn't you say, Judge Carter, the ones that

21     have not filed an Answer?

22         THE COURT:  No, the ones who have not appeared by a lawyer.

23         Let's start over here, this first row, the lady here with

24     her hand up.  Your name?

25         MRS. GLICK:  Vera B. Glick.

1      MR. McDOWELL:  Homer C. McDowell.

2      MR. JONES:  Fred M. and Grace R. Jones.

3      THE COURT:  Anyone else in the third row?  Fourth row?

4      MRS. DINSON:  A. B. Dinson, Ruth Keller Dinson.

5      MR. GILLETTE:  We filed an Answer, but we are not repre-

6  sented by an attorney.  That is Dorothy G. Gillette and Don I.

7  Gillette.

8      THE COURT:  Anyone else on the right-hand side?  Over on

9  the left here.  The people who do not have a lawyer in the

10  DeLuz area.

11      MR. BAXTER:  John C. and Cloy I. Baxter.

12      MRS. DOERRER:  Anna Doerrer.

13      THE COURT:  Anyone else?

14      Now, this is a Master's hearing which we started Wednesday,

15  and it will continue to be the Master's hearing.  I am going

16  to be here all day, and while I am here I may preside, I may

17  ask Mr. Cranston to take over, but it is still the Master's

18  hearing, and this is a Master's court.

19      Are you ready to proceed, Mr. Veeder?

20      MR. VEEDER:  Yes, your Honor.  There are one or two things

21  to which I would like to make reference.

22      J. D. Rankin, Solicitor General, called me yesterday and

23  said he had received a communication from -- Are we hooked up

24  here?

25      THE COURT:  Yes, I think we are hooked up.  Can everybody

1   hear?  Is his mike hooked up?

2       COL. ROBERTSON:  There are no speakers inside.

3       THE COURT:  Then speak up, Mr. Veeder.

4       MR. VEEDER:  J. D. Rankin, Solicitor General, called me

5   yesterday and said that he had a communication from the people

6   in the Murrieta Creek area, that they had expressed concern in

7   regard to the protection of their rights, and also in regard to

8   the matter of soil surveys, water surveys, and similar questions.

9       He directed me to assure the Court that the United States

10   would make available its soil surveys to these people and would

11   cooperate in every way in assisting them.

12       He desired me to assure them, as we have in the past, and

13   as your Honor has assured them, that there is no intention or

14   possibility of the United States taking anything from anyone

15   in this litigation, that is strictly a matter of adjudicating

16   rights.

17       He also asked me to state into the record that he regretted

18   that Mr. Phil Swing was ill, that Mr. Swing had communicated

19   with him and had asked for some more time in regard to answering

20   the Complaint.

21       THE COURT:  I wrote Mr. Swing and told him to have no

22   concern, there would be no defaults taken as to his clients,

23   and get his Answers in when he could.

24       MR. VEEDER:  We are in full accord with that.

25       The next matter with which we are concerned, in the

1    Superior Court in San Diego County there has been a Petition

2    for a writ  of mandate filed by the Santa Margarita Mutual

3    Water Company in connection with the permits issued by the

4    California State Water Board to the Fallbrook Public Utility

5    District.  We don't know the status of that matter, we don't

6    know whether that case is going to be prosecuted, how it is

7    going to be handled, but we are confronted with the problem,

8    as I see it, your Honor, of two proceedings going at the same

9    time, namely, this lawsuit and the proceeding in the Superior

10   Court of San Diego County.

11       THE COURT:  Do you mean from the standpoint of being

12   physically present at both?

13       MR. VEEDER:  Yes, your Honor, and from the standpoint of

14   there are numerous issues, in my view, at least, that are the

15   same.  And I would like to have an expression from the State

16   as to whether that proceeding will be suspended until such time

17   as this matter is concluded.

18       I talked to Mr. Dennis this morning, he is not going to

19   be here, but Mr. Dennis said that he had some kind of a --

20       MR. STAHLMAN:  He is here.

21       MR. VEEDER:  Well, there he is.  He said he wouldn't be

22   here.  I am glad he is here, because I was touching on a

23   problem that worried me a little bit, and now that he is here

24   it is much simpler.

25       He said that he had an agreement with the State that the

1    State would not respond to his Petition for the writ for some

2    time.

3        Now, if the matter is going to be suspended indefinitely,

4    why, I would personally like to know it, because it will make

5    a great deal of difference in our plans as to the plans to be

6    pursued.  And if Mr. Moskovitz or Mr. Craig is here -- and I

7    don't know who is representing the State in that matter -- we

8    would like to know what the plans are from the standpoint of

9    the State as to whether that case is going ahead.

10        MR. MOSKOVITZ:  Your Honor, the State has not yet been

11    served with any pleading in that case.  We have received inform-

12    ation informally that a Petition for a writ of mandate has

13    been filed.

14        We have not discussed the conduct of the case if we are

15    served, and there is nothing that we can report at this time.

16        THE COURT:  Mr. Dennis, what are your plans in the matter?

17        MR. DENNIS:  Well, I think we filed a Petition a week ago

18    Friday, I believe it was, and it was our intention to file an

19    amended Petition, because there were certain maps and so on we

20    didn't have time to make copies of.

21        I talked to Captain Craig and told him what I had, and we

22    had an agreement that we would forward it to the State in

23    blank, and they could take as much time as they wanted to

24    respond.

25        In the meantime it was the understanding that the State

and ourselves, the respondents, the State, and the Rainbow

Municipal Water District, the Santa Margarita Mutual Water

District, Guy Earl, Jr., and Herbert Hamm, would agree as to

what portion of the files of the State Water Rights Board would

have to be brought before the Superior Court, because their

files are very voluminous, and if they had to make copies of

everything in their file it would take them a long time and

would cost considerable money to do it.  And it was my feeling,

and I think Mr. Craig's feeling on it, that there are only a

limited number of those documents that have any bearing on the

hearing.  And we thought in the interests of holding the record

down as much as possible, and in the interest of conserving

what would constitute the record on appeal, and what would not,

with an open end stipulation, that if during the hearing it

became evident that there were certain documents that neither

party had brought up, they could bring them up before the Court,

or if the Court should want them.

THE COURT:  There are two problems in your suggestion, Mr.

Veeder.  One is a physical problem of a hearing of that sort

starting while the trial was going on in San Diego, or the

Master's hearing was going on.  That is not an immediate problem

until we finally find what the dates are that are ascertained

in the stipulation.

The other problem that is inherent in your suggestion is,

unless I am wrong, some thought as to whether this hearing

1    should proceed, the mandate hearing should proceed while these

2    hearings proceed.

3        MR. VEEDER:  That is certainly inherent in my inquiry,

4    because that gave rise to the question.

5        THE COURT:  I am not going to pass on that now.  Offhand,

6    my tentative view would be that if the physical end of it can

7    be worked out where lawyers who are in both cases can work out

8    a schedule so that one or the other could be tried, I see no

9    reason why it shouldn't proceed.  And if you had any thought

10   that it should not proceed you should make that by motion and

11   support it by authority, and bring it on regularly for hearing

12   in my court.

13       MR. VEEDER:  Yes, your Honor.

14       MR. DENNIS:  If your Honor please, I might call the Court's

15   attention to, and I would like to ask Mr. Veeder, when I had

16   the alternative writ signed by Judge Turrentine he stated that

17   the government had asked for thirty days extension in which to

18   file a writ  of mandate, and that will have some bearing on

19   what we do as to whether or not the government intends to file

20   a writ  of mandate in those proceedings.

21       THE COURT:  Is it your intention to go into Superior Court

22   for a writ  of mandate?

23       MR. VEEDER:  I am trying to form an opinion at the present

24   time.  It is extremely important to us, the course that we

25   take in it.

THE COURT:  Let's pass the matter at this time.  What has been said at this time, plus Mr. Dennis' remarks, when and if this stipulation is entered into I would like to have copies served on Counsel --

MR. SACHSE:  Fallbrook is a real party in interest, and we haven't a copy of anything.  Beg your pardon, he gave us a copy of his motion.

THE COURT:  He is going to amend it.

MR. SACHSE:  I would like to have one now so I can intervene, so I will be of record in the proceedings.  He hasn't given me the courtesy.

THE COURT:  Mr. Dennis, talk to Mr. Sachse and keep him advised.

MR. DENNIS:  I told Mr. Sachse when we got our amended Petition we would furnish him with a copy.

THE COURT:  When you get a stipulation formulated serve copies on all counsel.

Does that take care of that?

MR. VEEDER:  That is fine, your Honor.  Thank you.

I have some documentary evidence --

MR. DENNIS:  Pardon the interruption, Mr. Veeder, but when you say serve it on all counsel for all parties, Mr. Stahlman, Mr. Sachse and the State?

THE COURT:  The major parties, not the two hundred that appear.

1      MR. VEEDER:  The documentary evidence to which I just

2  made reference are those which relate to title of acquisition

3  by the United States of America of the enclave.

4      These documents, by and large, are the same documents that

5  were in the original case, but I want them marked newly.

6      THE COURT:  I understand you are going to use M-1, M-2?

7      THE MASTER:  Yes, the Clerk has the proper exhibit stamp.

8      MR. VEEDER:  I wish to have marked for identification as

9  the first exhibit of the United States of America a certified

10  copy of the judgment and decree in condemnation in which there

11  was taken title to the United States Naval Ammunition Depot.

12      THE COURT:  It will be M-1.

13      Any objection to its receipt in evidence?

14      MR. SACHSE:  No objection.

15      THE COURT:  It will be received in evidence, M-1.

16      MR. VEEDER:  The next document will be the judgment in

17  condemnation in the case where the United States of America

18  took title to what is now Camp Pendleton, 123,000 acres.

19      THE COURT:  It will be received as M-2, and marked in

20  evidence unless there is objection.

21      MR. MOSKOVITZ:  There is no objection.

22      MR. VEEDER:  I would like to have marked for identification

23  as the United States of America's Plaintiff's Exhibit Number 3

24  the judgment and decision in condemnation for 1,676 acres of land,

25      THE COURT:  It will be marked M-3.

1    Any objection?  It will be received in evidence.

2    What particular area was this?

3    MR. VEEDER:  That is part of Camp Pendleton.  But 1,670

4    acres were acquired in addition to the 133,000 acres acquired

5    from Rancho Santa Margarita.

6    The next is a deed for 112 acres in Orange County.  That

7    will be Plaintiff's Exhibit 4.

8    THE COURT:  M-4.

9    Any objection?

10    It will be received in evidence.

11    MR. VEEDER:  This is the Plaintiff's Exhibit Number 5.

12    Now, this is an exhibit that was not introduced in evi-

13    dence in the earlier case.

14    MR. SACHSE:  Is that 112 part of the original Rancho, or

15    not?

16    MR. VEEDER:  No, it is not.

17    The public land withdrawal of the lands which were trans-

18    ferred from the public domain to the enclave will be Plaintiff's

19    Exhibit Number 5.

20    THE COURT:  Any objection?

21    It will be received in evidence.

22    This is not public domain land?

23    MR. VEEDER:  That is public domain land.

24    MR. SACHSE:  How many acres were in that?

25    MR. VEEDER:  I think there were 1,200 on that.

83

1      THE COURT:  It will be received in evidence M-5.

2      MR. VEEDER:  The next are the letters relating to the

3  cession of exclusive jurisdiction, a copy of a letter dated

4  January 12, 1943, from the then Secretary of the Navy James

5  Forrestal, a letter which was received by Earl Warren, then the

6  Governor of the State of California.

7      THE COURT:  This will be M-6.

8      Any objections?

9      MR. MOSKOVITZ:  No objection.  May I just look at that for

10  a moment?

11      THE COURT:  No objection.  M-6 will be received in evidence.

12      MR. VEEDER:  The next is a letter dated September 8, 1943,

13  signed by James Forrestal, directed to Earl Warren, then

14  Governor of California.  And receipt of it was acknowledged by

15  Governor Warren, exclusive jurisdiction covering part of the

16  land which is now in the enclave.

17      THE COURT:  This will be M-7.

18      MR. SACHSE:  All of these are exclusive jurisdiction?

19      MR. VEEDER:  Yes.

20      The next is a letter dated February 18, 1944 --

21      THE COURT:  What was the date again?

22      MR. VEEDER:  February 18, 1944, signed by A. L. Gates,

23  Acting Secretary of the Navy; it was received by the then

24  Governor Earl Warren.  It relates to 1,676 acres of land.

25      THE COURT:  It will be marked M-8.

1        Any objection?

2        It will be marked in evidence.

3        MR. VEEDER:  The next exhibit which we desire to offer is

4   a certified copy of the stipulated judgment between the Rancho

5   Santa Margarita and the Vail Estate.  The Rancho was the pre-

6   decessing interest of the United States of America, and the

7   Vail Estate is now the Vail Company.  Am I right on that?

8        MR. STAHLMAN:  That is right.

9        MR. VEEDER:  This will be M-9.

10       THE COURT:  M-9.  Any objection?

11       MR. SACHSE:  May the record indicate, your Honor, that this

12   is admitted only insofar as the signatories to the stipulation?

13       MR. VEEDER:  I think that is the ruling by the Court,

14   isn't it?

15       THE COURT:  Yes, I think that is obvious.  The Court made

16   a comment that the judgment binds the parties to the judgment

17   and their successors in interest.

18       MR. VEEDER:  We are offering it for what it is worth, and

19   for all purposes, your Honor.

20       THE COURT:  We will cross those bridges when we get to

21   them.

22       MR. STAHLMAN:  May it be admitted subject to its inter-

23   pretation and certain matters which we may want to go into?

24       THE COURT:  It may be.

25       MR. STAHLMAN:  In other words, the proof there is such a

1    judgment as indicated by reason of the document?

2        MR. VEEDER:  Yes.  But I want it understood that we are

3    offering it for all purposes, as I said before.

4        THE COURT:  It will go generally into evidence, and we

5    will subsequently determine what its effect is.

6        Any objection?

7        It will be received in evidence, M-9.

8        MR. VEEDER:  I would like, your Honor, to have these

9    exhibits that we used in the proceeding yesterday marked for

10   this case on its merits.  And they will have to have new

11   numbers.

12       THE COURT:  The first one was this map?

13       MR. VEEDER:  The first one was this aerial.

14       THE COURT:  For the benefit of the parties here without

15   counsel, the first of the series of exhibits, judgments and

16   deeds, and so forth, is for the purpose of showing the govern-

17   ment's title downstream to Pendleton.  The letters, Exhibits

18   M-6, 7 and 8, are in reference to exclusive jurisdiction and

19   concern the following out of the procedure in the law whereby

20   when the government acquires land the government advises the

21   Governor of the state, and the Governor of the state replies or

22   acknowledges receipt of the letter, and jurisdiction is then

23   ceded to the United States, generally reserving to the State of

24   California a right to civil process, and a few things of that

25   sort.

1          MR. VEEDER:  That is right.

2          THE COURT:  M-9, the judgment in the Vail Estate, resulted

3     from litigation between the Vail Estate and Santa Margarita

4     Rancho.  It was tried in San Diego, judgment was entered,

5     reversed and thereafter stipulated judgment was entered into

6     between the Santa Margarita and the Vails fixing their rights

7     on the river.  And M-9 is that certified copy.

8          Now, at a hearing yesterday in San Diego there were certain

9     exhibits received in evidence, and Exhibit 1 of that hearing

10    yesterday will now become M-10, and it was an aerial photograph

11    of a portion of the area here involved, which specifically

12    showed a part of the Marine Corps installations which had been

13    installed outside of the watershed and which were identified

14    as having been in existence on November 29, 1951, at a date

15    when a stipulation you got in your file of historical documents

16    was entered into.

17         The little picture here shows Lake O'Neill, and the stream,

18    and the area over here is the part outside of the watershed of

19    the Santa Margarita.

20         If there is no objection it will be received as M-10.

21         The second document was Exhibit 2 in yesterday's hearing;

22    it will be marked now M-11.

23         The same situation, except that extended a little further

24    to the west and south, and showed on the right-hand side that

25    part of the area that is not in the Santa Margarita watershed

1    but is in the San Luis Rey watershed.

2         It will be marked M-11.

3         Any objection?

4    MR. MOSKOVITZ:  No objection.

5    THE COURT:  It will be received in evidence, 10 and 11 in

6    evidence.

7         That was 4, wasn't it?

8    MR. VEEDER:  Yes.

9    THE COURT:  Exhibit 4 was one page out of an assembly of

10   -- What are these, Geodetic Surveys?

11        MR. VEEDER:  United States Geological Survey maps.

12        THE COURT:  And it involved the Morro Hill Quadrangle, and

13   showed approximately the same situation, although it was a

14   bigger picture and showed the watershed of the Santa Margarita

15   coming down in this fashion, and also outside of the watershed,

16   and also the watershed of the San Luis Rey.

17        Is that what it shows, Mr. Veeder?

18        MR. VEEDER:  That is correct, your Honor.

19        THE COURT:  It will be marked Exhibit M-12.

20        Any objections?

21        It will be received in evidence.

22        MR. VEEDER:  I would like the privilege, your Honor, of

23   substituting -- to withdraw the book.  I think I had better

24   leave the pages marked, and I will get another page for myself.

25        THE COURT:  Why don't you take out eventually the page and

1    insert a new one in your assembly, and use the page with the

2    marks on it?

3        Any objections?

4        MR. SACHSE:  No objection.

5        MR. MOSKOVITZ:  No objection.

6        THE COURT:  Now, the final exhibit was a map marked yes-

7    terday Exhibit 5, for the purpose of a hearing on the motion,

8    which was directed to the same general problem, showing the

9    watershed of the Santa Margarita, showing certain installations

10   connected with Camp Pendleton that lie outside and did lie out-

11   side of the watershed of the Santa Margarita on or about

12   November 29, 1951.

13       MR. VEEDER:  That is correct.

14       MR. SACHSE:  I have no objection, your Honor.  But may I

15   ask a question as to terminology?  What do you call, Colonel

16   Robertson, those things?  Do you call them service areas, those

17   numbers?

18       COL. ROBERTSON:  They are administrative areas.

19       THE COURT:  They are arbitrary areas set up for the pur-

20   pose of administering the base?

21       COL. ROBERTSON:  Yes.

22       THE COURT:  So when you talk about Area 19, everybody on

23   the base knows what it is and what it comprises, is that right?

24       COL. ROBERTSON:  Yes.

25       MR. VEEDER:  There is a distribution system on this exhibit.

THE COURT: Yes. It shows pipeline, a water distribution system that was in existence on November 29, 1951. It may show something else.

MR. VEEDER: It does have marks on it where Colonel Robertson identified certain areas of construction subsequent to that date.

MR. MOSKOVITZ: Your Honor, the State has a question concerning the purported watershed line in the portion right near the coast. We feel that there may be some question as to where it runs, and we would want to --

THE COURT: Receipt of the exhibit will be without prejudice, without proof as to where the exact watershed line runs.

It will be marked M-13, and it will be received in evidence.

MR. VEEDER: I would like to have marked for identification at this time, your Honor, the map which is on the easel here and which is designated Santa Margarita River Watershed, prepared by the Office of Ground Water Resources, Marine Corps Base, On that map are reflected by brief statements the documentary evidence which we have offered.

There are areas further up the valley concerning which no documents have yet been offered, and we are not offering it for that purpose. But we do want to show the areas where exclusive jurisdiction is conceded, areas of acquisition.

Your Honor had previously asked us to designate where the Ammunition Depot, Camp Pendleton, and the Naval Hospital is

1   located.

2   THE COURT:  That will be M-14 for identification.

3   Any objection to this map for the limited purposes it is

4   offered?

5   MR. SACHSE:  May I have just a second, your Honor?

6   May I ask a question before I object?

7   Is this watershed boundary the same as the watershed boundary

8   on M-13?

9   MR. VEEDER:  I will have to ask the Colonel on that.

10  May I say this, we are not attempting at this time to com-

11  pare the two maps at all, I think they are at different scale.

12  THE COURT:  This is for general reference only.  It is not,

13  I take it, for the purpose of fixing any watershed boundary?

14  COL. ROBERTSON:  These are schematics, these are different

15  scale and, of course, the larger scale is more accurate.

16  THE COURT:  The larger scale is M-13, obviously.

17  Any objection to M-14?

18  MR. SACHSE:  No objection.

19  MR. MOSKOVITZ:  I have no objection.

20  THE COURT:  These are all subject to correction.  If you

21  have dispute as to where the watershed lies you can put evidence

22  on.

23  MR. SACHSE:  My only comment is they appear to be different.

24  THE COURT: It will be received in evidence.

25  Mr. Veeder, I would like to have you briefly tell the

people -- Can we hold it around some way so that they can see it?

Just outline how it demonstrates the title which you put in.

MR. VEEDER:  The title, did you say, your Honor?

THE COURT:  You told me it demonstrated the titles you put in here.

MR. VEEDER:  Yes.

January 21, 1942, that is the judgment in condemnation pursuant to which the United States Naval Ammunition Depot was acquired.

THE COURT:  Point out the Depot.

MR. VEEDER:  Now, that runs where I am bringing the pointer, it is shaded in with this design cross-hatching there.

The larger area, the acquisition by decree filed January 5, 1943, was Camp Pendleton.  Now, Camp Pendleton is with this broad border, it goes all the way around.  You will note it goes to the north of the Ammunition Depot, and then goes on around here.

This area here with the longitudinal stripes are the 1,600 acres that we acquired subsequently, which was December 22, 1943.

There was public domain lands which were transferred on August 8, 1945, they are up here.  Those lines there, around 1,600 acres.

1      THE COURT:  Run your pointer around it.

2      MR. VEEDER:  Here it is.  It really is an unusual area.

3      And then we have the Orange County property which was

4  acquired by deed dated February 8, 1949.  That is a small area,

5  about 112 acres.

6      THE COURT:  Then the two heavy lines running through the

7  Ammunition Depot and Camp Pendleton are the watershed lines of

8  the Santa Margarita?

9      MR. VEEDER:  Yes, that is what we are attempting to show.

10      I didn't mention this.  In this box up here, exclusive

11  jurisdiction cession by the State of California, by the letters

12  that we have introduced in here.

13      I will call Mr. Holsinger, please.

14      THE COURT:  M-14 received in evidence.

15      MR. VEEDER:  I think this is the witness chair, is it not?

16      THE COURT:  That is the witness chair.

17

18                      HENRY HOLSINGER,

19  called as a witness, sworn, testified as follows:

20

21                    DIRECT EXAMINATION

22      THE CLERK:  Would you state your name, please?

23      THE WITNESS:  Henry Holsinger.

24  BY MR. VEEDER:

25      Q  What is your age, Mr. Holsinger?

1      A   I will be sixty-nine on the 15th of June next.

2      Q   And where do you reside?

3      A   Sacramento.

4      Q   And would you state your official position, if any?

5      A   Chairman of the State Water Rights Board of the State

6   of California.

7      Q   And what are the functions of the State Water Rights

8   Board as you comprehend them?

9      A   The functions of the Board are to administer the law

10   for the appropriation of water as provided in Division 2,

11   Part 3.

12      MR. VEEDER:   Can you hear Mr. Holsinger?

13      THE COURT:   Yes.

14      THE WITNESS:   And to perform certain functions respecting

15   the recordation of the use of water under surface and ground

16   water rights as provided by Division 2, Part 5 of the Water

17   Code, and certain ancillary functions.

18   BY MR. VEEDER:

19      Q   Now, would you state what was the office antecedent to

20   the establishment of the State Water Rights Board?

21      A   The Division of Water Resources of the Department of

22   Public Works, and the chief of that division, the State Engineer.

23      Q   Now, could you briefly state what transpired when the

24   law was enacted and became operative in establishing the State

25   Water Rights Board?   What did that do from the standpoint of the

1  State Engineer's office?

2       A  It abolished the office of the State Engineer and the

3  Division of Water Resources, but continued the functions in

4  effect, and divided those functions between two newly created

5  agencies of state government, the Department of Water Resources

6  and the State Water Rights Board.

7       All functions of the former Division of Water Resources,

8  State Engineer, that I have not enumerated were vested in the

9  Department of Water Resources.

10      Q  In the contemplation of your law is the Department of

11 Water Resources independent of you, or is there any relationship?

12      A  Both completely independent of each other.  The Depart-

13 ment of Water Resources is not an independent agency of state

14 government, because the Director is subject to removal by the

15 Governor.

16      The members of the State Water Resources Board, comprising

17 three members, are not removable by the Governor; they are

18 appointed by the Governor, but not removable by him.  They can

19 be removed for cause only by majority vote of all members

20 elected to each house of the Legislature.

21      Q  Would you state which of the two departments has in its

22 custody the applications for the filing of permits?  Is that

23 your organization?

24      A  Just as I recited, yes, the administration of the law

25 of appropriation of water.

1    Q  What other functions do you perform?  Now, you have the

2  custody of the applications, and you issue the permits.

3    Are there any other functions that you perform from the

4  standpoint of rendering decisions, or do you pass on the pro-

5  priety of issuing permits?

6    A  Oh, yes.  There are numerous provisions, which are very

7  broadly discretionary within the jurisdiction of the Board, and

8  in which hearings are held and determinations of fact and law

9  are made; and the passing on conflicting applications to ap-

10  propriate water, that is protested applications.  That is the

11  major work, work load of the Board.

12    Q  You are, in other words, the custodian, though, of the

13  documents that are filed, and that is under your direction, too?

14    A  That is correct.

15    Q  Now, you stated that you passed on questions of law

16  and fact.  What questions of law do you pass on when you are

17  considering the issuance of a permit?

18    A  Please don't ask me to detail those.

19  MR. MOSKOVITZ:  I will make an objection here, your Honor.

20  I have not objected heretofore on the understanding that these

21  were preliminary questions to establish Mr. Holsinger's position

22  and his general responsibilities of State government.  But now

23  we are getting into rather detailed questions concerning the law

24  that governs the Water Rights Board.  And it seems to me that

25  those are outside of the scope of this proceeding, and I object

96

1    on that basis.

2        MR. VEEDER:  These are preliminary, your Honor.

3        THE COURT:  What do you expect to prove?

4        MR. VEEDER:  I intend to prove -- May I ask some more

5    questions, and I will show you what I mean.

6        I intend to have him adduce evidence in regard to the

7    Santa Margarita River.  I intend to offer some applications

8    that are in his custody for the appropriation of rights to the

9    use of water, and that of course is documentary material, he

10    is the custodian of those documents.

11        THE COURT:  That is about it then?  You are not going to

12    retry here the hearing held before the State Water Rights Board?

13        MR. VEEDER:  I have made no mention of that, your Honor.

14        THE COURT:  Objection overruled on the ground these are

15    preliminary questions.

16        MR. MOSKOVITZ:  Your Honor, the last question asked about

17    what issues of law are passed on, that doesn't relate to the

18    purpose for which Mr. Veeder said he called Mr. Holsinger.

19        THE COURT:  I assume it is preliminary.  I would like to

20    hear it.

21        MR. MOSKOVITZ:  Of course you have no better exponent than

22    Mr. Holsinger.

23        MR. VEEDER:  We always go right to the mouth of the horse.

24        THE COURT:  Tell us briefly, Mr. Holsinger.

25        THE WITNESS:  Well, I hope that you are not going to hold

me here long enough for me to detail all of the legal questions

that are passed on during the course of a hearing and the deter-

mination of the application, the disputed application and the

protest thereto, at this session of the sitting of the court.

I am sure it would take longer than a day to do it.

    MR. VEEDER:  We have got a lot of days.

    Q  For example, do you consider the question of priorities?
That is a question of law, is it not?

    A  Yes, that is a question of law and fact.

    Q  And you pass on the question of law that is involved
in the establishing of a priority.  Is that right?

    A  That is right.

    Q  When you are reviewing claimed riparian rights you take
the evidence from that, too.  Is that correct?

    A  In general, yes.  Generally, yes.  We don't go into
the subject of riparian rights like the Court would, of course
not.

    Q  You are a lawyer?

    A  Yes.

    Q  From your experience and knowledge now of your functions
on the State Water Rights Board do you consider it a quasi-
judicial or a judicial entity?

    A  The fact is that the function of the board --

    MR. MOSKOVITZ:  Your Honor, I would like to object here.
This is all very interesting.  The same information, I think,

1   can be acquired by Mr. Veeder, if he is interested in this,

2   from Mr. Holsinger privately.

3      There are some publications that have been included in

4   some of the recent law reviews.

5      MR. VEEDER:  You take so much time I will withdraw the

6   question.  I am in a hurry.

7      THE COURT:  There is no doubt but what it is either a

8   judicial or a quasi-judicial body.

9      THE WITNESS:  I would like to make a statement along that

10   line myself voluntarily.

11      MR. VEEDER:  Well, I am anxious to have you, sir.

12      THE WITNESS:  So it will bring out clearly here for the

13   Court, and the Master, and yourself will understand exactly

14   what the function of the Board is.

15      MR. VEEDER:  I want to know.

16      THE WITNESS:  On the conflicting applications to appropriate

17   water.  The major point of determination, absolutely juris-

18   dictional to the exercise of the Board by its function in

19   issuing permits, is the existence of unappropriated water.

20      Now, in doing that the Board has been held by the Supreme

21   Court of California in East Bay Municipal Utility District vs.

22   Department of Public Works, and reported in 1 Cal 2nd, that the

23   functions of the Board are really -- they are not traditional

24   at all, but they are really quasi-legislative in character,

25   because the Board establishes a rule, that is the permit, for

1    the future.  In other words, it arrives at an estimate of

2    whether there exists unappropriated, that is unused, water

3    surplus to the existing rights on the stream available for

4    beneficial use.  Now --

5        MR. VEEDER:  May I ask one question here before we go too

6    far?

7        THE WITNESS:  Permit me to conclude briefly.

8        THE COURT:  Conclude.

9        THE WITNESS:  The waste of water is prohibited by the

10   Constitution of the State, and the Court has imposed the

11   obligation upon the Board in acting on applications to appro-

12   priate water to prevent waste of water, and we take that very

13   seriously.

14       MR. VEEDER:  May I ask a question now?

15       THE COURT:  Yes.

16   BY MR. VEEDER:

17       Q   You cited 1 Cal 2nd?

18       A   Yes.

19       Q   Now, that related to the organization succeeded to by

20   the State Board.  Is that not right?

21       A   That is correct.  Functional.

22       Q   In other words, it is your view that you are now per-

23   forming the functions that were previously performed --

24       A   By the State Engineer and Division of Water Resources.

25   That is one of the functions we are talking about now.

1    Q   And you did succeed to those powers?

2    A   Correct.

3    Q   Now, you said the Court has imposed on you  the responsi-

4    bility?

5    A   I didn't say the Court, I said the Legislature.

6    Q   I think you said the Court.  You meant the Legislature?

7    A   The Court construed that function.

8    Q   I think you said the Court.

9    A   No, you are erroneous, I don't think I said that.

10   Q   Well, as long as we have it straight now.

11   Now, would you, Mr. Holsinger, approach Plaintiff's Exhibit

12   M-14 and orient yourself in regard to it, with particular

13   reference to DeLuz Creek and the main stem of the Santa

14   Margarita River?

15   A   Yes.

16   Q   Can you see that?

17   A   Yes.

18   Q   Would you take this red pencil and go and mark on it

19   where DeLuz Creek flows down to and enters --

20   MR. SACHSE:  I will object.

21   THE WITNESS:  That is not my function.  My function is

22   legal.

23   MR. VEEDER:  But, sir, I called you as a witness --

24   THE WITNESS:  Well, I can't do it.

25   MR. SACHSE:  If your Honor please, I will object.  This is

1    absolutely cross-examination -- pardon me, examination --

2    absolutely improper examination.

3         THE WITNESS:  I am not capable of it.  I am not familiar

4    enough with the area of the map, I can't do it.  There are

5    people here in my organization who are fully capable of that;

6    I am not.

7         THE COURT:  I will sustain the objection.

8         THE WITNESS:  I have been with this function since 1930,

9    but my experience has been throughout legal, not engineering

10   or fact-finding.  And I haven't changed my character, my

11   temperament.  My training hasn't changed, nor my functions

12   since I have been on the Board.

13   BY MR. VEEDER:

14        Q  Do you in performing your responsibilities find facts?

15        A  I take my -- I do, but I take my recommendations from

16   the engineers.

17        Q  In other words, you perform the functions of a fact-

18   finder?

19        A  I am only one member of the Board, which does have fact-

20   finding functions.  But I follow the recommendations of the

21   engineers; one of our members is an engineer.

22        MR. MOSKOVITZ:  Your Honor, I am going to make a motion

23   to strike the last three questions, approximately, which are

24   delving again in the details of the organization and operation

25   of the Water Rights Board.  I think those are wholly extraneous

1  to this hearing.

2  THE COURT:  Overruled.

3  BY MR. VEEDER:

4  Q  Now, I hand to you a copy of -- First I want to have

5  it marked for identification.

6  This will be Plaintiff's M-15.

7  MR. MOSKOVITZ:  Do you mind if we look at it, Mr. Veeder?

8  MR. VEEDER:  Well, gentlemen, I am not very used to having

9  somebody else --

10  MR. SACHSE:  Don't argue with me, make your motion.

11  THE COURT:  You are both lawyers, cut out the horse play.

12  If you have something to say to the Court, say it.

13  MR. SACHSE:  There hasn't been an offer made, your Honor.

14  THE COURT:  What is M-15?

15  MR. VEEDER:  M-15 is an application Number 11587, dated

16  October 11, 1946, filed by the Fallbrook Public Utility District.

17  I requested that the State of California supply me these

18  documents.  This is a copy of one of the documents that I

19  asked for.

20  THE COURT:  Well, do you want to put it in evidence?

21  MR. VEEDER:  Yes.

22  THE COURT:  Any objection?

23  MR. SACHSE:  Yes, your Honor.  It is not a complete copy.

24  It is not, as a matter of fact, and if it is going to go in in

25  this shape I would like leave to go on voir dire and establish

1   it is not a complete copy.

2       MR. VEEDER:  Ask some questions, I don't care.

3       MR. MOSKOVITZ:  I have some comment, your Honor.  I don't

4   believe Mr. Holsinger is the proper one to call as to the

5   authenticity of these documents.  He is just not the correct

6   person.

7       THE COURT:  Who has custody of the files?

8       MR. VEEDER:  I asked that question, your Honor, and he said

9   that these files are in his custody.  I said were all of these

10  documents under his direction.

11      THE COURT:  Who specifically under the Chairman of the

12  Board has custody of these files?

13      THE WITNESS:  Mr. Witmer is one of the staff, he is a

14  member of the hearing section.  Mr. Hill is the executive

15  officer under the Board.  What I was thinking of was the man

16  who has --

17      MR. MOSKOVITZ:  Mr. Spencer?

18      THE WITNESS:  Spencer, that is the man I was trying to

19  think of his name, he would have immediate charge of files of

20  this nature.

21      MR. VEEDER:  Your Honor, I asked on April 23 for these

22  documents, and I asked to be advised by May 10 in connection

23  with them from the State of California.  On May 13 I was told

24  on the telephone that they would not be available unless I paid

25  in excess of $700.  Now, under the rules --

THE COURT:  For certifying copies.  We went into this yesterday, we need no further record on it.

MR. SACHSE:  I have available -- not here, unfortunately, but not but minutes away -- certified copy of the forwarded applications complete, and I will be very, very happy to put them in evidence if he wants them.

THE COURT:  Is that what you want?

MR. VEEDER:  I want to put in my case as I see fit.

THE COURT:  What could you want better than a certified copy of the applications?

MR. VEEDER:  I will be glad to state, your Honor, and I will outline in detail, there is one reason why I wanted to call this gentleman who has passed upon the question of -- some of these questions, at least, and it is extremely important to us, it is extremely important to us the order in which these filings have been made; it is extremely important to us to have the record extremely clear and very early clarified as to the kind and type of rights that are involved.

First, on application 11587 it will be observed --

THE COURT:  This is M-15 for identification?

MR. VEEDER:  This is M-15 for identification.  There was a filing made by the Fallbrook Public Utility District for domestic and municipal uses.  Now, that was made for 10,000 acre feet on the main stem of the Santa Margarita River.

I call particular attention to the purposes for which that

1   filing was made, domestic and municipal purposes.

2        I have here, and I would like to have marked for identi-

3   fication, a certified copy of the Articles of Incorporation of

4   the Fallbrook Public Utility District.  That will be M-16.

5        THE COURT:  M-16.

6        MR. VEEDER:  I think that you had better mark both.

7        MR. SACHSE:  May I look at them?  I never heard of Articles

8   of Incorporation of F.P.U.D.

9        MR. VEEDER:  I am old fashioned, but I would like to have

10  them marked first.

11       THE COURT:  The entire file will be marked M-16.

12       MR. VEEDER:  Are you counsel for the Fallbrook Public

13  Utility District?

14       MR. SACHSE:  I am.

15       MR. VEEDER:  Then you should be acquainted with them.

16       MR. SACHSE:  I am, and they are not Articles of Incorporation,

17  Mr. Veeder.  May I ask that the document be correctly identified

18  for the record, your Honor?

19       THE COURT:  Let me look at them.  I think you spend a lot

20  of time on what you gentlemen want to characterize these docu-

21  ments; that is not important.

22       MR. VEEDER:  Papers of incorporation, whatever you want

23  to call them.

24       THE COURT:  Well, apparently they are in order.  These

25  papers consist of an order of the Board of Supervisors of San

Diego County, declaring the formation of the Fallbrook Public

Utility District, together with a certificate by the Chairman

of the Board of Supervisors, and together with a certificate

from the Secretary of State that they are a true copy of the

documents that appear in his office.

MR. SACHSE:  I have no objection to their admission, I

just want them correctly identified.

THE COURT:  They will be received as Exhibit M-16.

MR. SACHSE:  May I go back to M-15?  I have another

objection.

THE COURT:  Look, I am not going to spend any time about

this matter.  I am going to instruct that some officer of the

State produce a full set of files on these applications.

MR. SACHSE:  Your Honor, it is stipulated in our pre-trial

order, signed by Mr. Veeder and everybody, that a copy is at-

tached and filed with the Clerk.  I don't want an uncertified

-- We have here in our stipulation, it is a part of this record,

a stipulation that application 11587, appropriation of water,

was filed and is filed with the Clerk of this court.  Why is

Mr. Veeder bringing an uncertified copy to impeach something

into the record?  It is page 14 of the order sent out by the

Master, and it is item 4 under the heading Fallbrook Public

Utility District.  This is all in the record already.

MR. VEEDER:  Your Honor, it isn't in the record, it couldn't

be in the record.  And I would like to offer and put in my case

1  in the way I desire.

2      MR. SACHSE:  Signed by your superior J. Lee Rankin, and

3  that a copy of it is attached.

4      THE COURT:  All right, let's quiet down here.

5      There was a pre-trial stipulation entered into which governs

6  the government and Fallbrook --

7      MR. SACHSE:  And the State of California.

8      MR. VEEDER:  I am in full accord with that, your Honor.

9      THE COURT:  And there was assembled, as I understand it,

10  a list of applications for the appropriation of water, they

11  were filed with the Clerk.

12      MR. VEEDER:  They are with the Clerk with the agreed facts,

13  your Honor.

14      THE CLERK:  Filed, I think is the language, Mr. Veeder.

15      MR. VEEDER:  Are they filed?

16      THE COURT:  Filed with the Clerk.  The order on the pre-

17  trial stipulation was filed May the 8th, 1958, and it referred

18  to and incorporated by reference the various applications.  But

19  the applications as such were filed as a separate document.

20      What date do you have on that, Mr. Clerk?  My copy doesn't

21  show.

22      MR. VEEDER:  Your Honor, I have absolutely no dispute what-

23  ever about the fact that those are there.

24      THE COURT:  What else do you want to prove?  Refer to them

25  by reference and offer them in evidence at this hearing.

MR. VEEDER:   I would like to put them in in order by which the filings were made and the basis upon which the original applications were made.

This becomes extremely important in our view and as part of our case in chief in putting in this material, that the sequence of the filing and the purposes for which the filings were made are extremely important.   One reason why I was anxious to have Mr. Holsinger here, the original filings made by the Fallbrook Public Utility District are of extreme importance, for they show that the filings were made for domestic and municipal uses.

Now, it is our view that the Fallbrook Public Utility District is acting ultra vires when it seeks to go beyond the municipal and domestic uses.

THE COURT:   I get your point.   We are talking about how we are going to do it.   Just be quiet, Mr. Moskovitz.

MR. MOSKOVITZ:   I didn't say anything, your Honor.

THE COURT:   It has been stipulated that there is a full file of these available.   The purposes will be stated in the file.   I take it that the dates these were filed appear on each one.   You may go through and make your record right now by picking out the particular ones that you want to put in evidence, and you can call attention to the Court and the Master of the purpose listed in the filing, and the filing date.

MR. VEEDER:   Your Honor, these are exact copies of what

37-L

1  your Honor is holding, and I am simply offering these in

2  evidence.  That is exactly what I am doing.

3      THE COURT:  Now, Mr. Sachse, you contend that one of these --

4      MR. SACHSE:  Is not a correct copy, because it is not

5  complete.

6      THE COURT:  What is lacking in it?

7      MR. SACHSE:  If your Honor will examine any application

8  you will find that the application is a four or six sheet docu-

9  ment, which includes with it a permit all on the same document.

10  Mr. Veeder is tendering two sheets taken off of the total,

11  which is the application without the permit.  I want all of it.

12      MR. VEEDER:  Now, your Honor --

13      THE COURT: Let me understand you.  Mr. Veeder has the

14  application.

15      MR. SACHSE:  But not the permit, which is a part thereof.

16      THE COURT:  And the permit is the permit recently issued?

17      MR. SACHSE:  No, your Honor.  This is an old application.

18  This permit was issued -- again I brought in the wrong thing --

19  but the permit in this case was issued in 1951, April 23, '51,

20  the permit in the case Mr. Veeder is now discussing, and it

21  should be, and no doubt is, in front of your Honor, because I

22  checked those with great care.

23      You will find it is a part of that file, but it is not a

24  part of the document which Mr. Veeder is presenting.

25      MR. VEEDER:  May I ask a question?

THE COURT:  Yes.

MR. VEEDER:  The point that I desire to make is this, the document which I have in my hand, M-15, is the first paper filed for a storage right by the Fallbrook Public Utility District.

True, some years later, sometime later amendments were made.  But this goes to a very, very important aspect of the case for this reason, intent to appropriate is very important, and the intention to appropriate in 1946 by the Fallbrook Public Utility District was for domestic and municipal purposes.

Now, he can say you can get all of these documents together, but their sequence from the standpoint of priority and uses is of extreme importance.  And I submit every document that I have that is marked here we agreed to, they are part of the agreed facts.  But their sequence is the controlling factor in this litigation, and I would like to offer them in the sequence in which the filings were made, and the amendments were made, and the permits were issued.

THE COURT:  Just a minute.

MR. MOSKOVITZ:  Your Honor, may I make a statement now?

THE COURT:  Yes, sir.

MR. MOSKOVITZ:  My observation is this, what has all of this to do with Mr. Henry Holsinger as a witness?

MR. VEEDER:  Is that an objection?

THE COURT:  That is a pertinent question, because if we are going to start and put into evidence a series of these permits

1      and applications, and so forth, which have been stipulated to

2      we are not going to need Mr. Holsinger sitting up here in

3      front.

4          Mr. Sachse.

5          MR. SACHSE:  I have simply one further comment.  When I

6      stipulated on behalf of Fallbrook -- I would like to get this

7      very clear now.  When I stipulated to this pre-trial statement

8      of facts, which we spent, as your Honor knows, nearly a year

9      hammering out, I assumed -- and I don't have any of the originals

10     here with me, I don't have any of the copies -- I assumed this

11     took care of this portion of the case.  Now, if Mr. Veeder

12     intends to reopen every single one of these items, facts which

13     have been stipulated to, I think we might as well tear up the

14     pre-trial order and start this case over again.

15         That file before your Honor discloses the dates of the

16     filings, it has the pencil notations that were made by officials

17     of the State Division of Water Resources at the time; it shows

18     the complete progress of that application through the permit

19     date.

20         Now, while I realize this is -- what I am going to say next

21     is extraneous-- Mr. Veeder has raised the question -- Mr. Veeder

22     says that the use of the water is ultra vires.  Now, Mr. Veeder

23     knows, or he should know, that there hasn't been one drop of

24     use of water under that permit.

25         Mr. Veeder is either attempting to mislead the Court or

1    assemblage, or someone.  That is a permit that has never been

2    exercised because of this very litigation.  That is a storage

3    permit, there has been no use of water under that permit.

4       If these facts we have stipulated to are not going to be

5    accepted I will have to know it, and I will have to secure per-

6    mission to go to my office and bring down a wad of papers,

7    because I am not prepared to double check all of these documents.

8    I thought I checked them a year ago.

9       MR. VEEDER:  Your Honor --

10      THE COURT:  Just a minute.  I think I am prepared to rule

11   on this right now without further argument.  Do you have some-

12   thing further you want to say?

13      MR. VEEDER:  Yes, I do.  So far as I am concerned I would

14   like to point out the reason why this material is very relevant,

15   and frankly --

16      THE COURT:  I will save you some time.  I think you have a

17   right to take any document out of this file and put it in in

18   any order you want to.

19      Do you want to argue any further?

20      MR. VEEDER:  No, sir.

21      THE COURT:  Mr. Sachse.

22      MR. SACHSE:  I have no objection to taking it out of that

23   file.

24      THE COURT:  I will give him my copy.  Wait a minute.  Have

25   you got yours lined up there, Mr. Veeder?

1        I withdraw what I said about my file, I would like to keep
2   it complete.

3        Upon your assurance that the documents which you have come
4   out of the assemblance filed with the Clerk on May 8, 1958, and
5   subject to correction, I am going to let Mr. Veeder put any
6   document in he wants to.

7        MR. SACHSE:  If a document is one single sheet of paper,
8   if he can put it in without tearing it.

9        THE COURT:  We are not going to tear any paper.

10       Mr. Sachse, when the Fallbrook Public Utility District
11  filed an application the permit was not a part of the original
12  application they filed.  Now, apparently Mr. Veeder wants to
13  show the things done.  I think it is a silly objection.

14       If Counsel wants to show the chronological order in which
15  certain applications were filed and have them before the Court
16  in that order that is proper, just as in a pre-trial stipulation
17  if there were a hundred facts stipulated to Counsel would be
18  entitled during the course of the trial to call the Court's
19  attention to paragraph 5, for instance, of that stipulation.

20       MR. SACHSE:  Your Honor, I don't want to argue, but I
21  feel that this is so vital to motions that will be made later
22  in this case.  I want to be quite sure that my position is
23  clearly understood.

24       It is my contention, and your Honor knows it from motions
25  that are pending to be argued next month, that this Court has

1  no jurisdiction whatsoever go to into the actions of the State

2  Water Rights Board, that once the State Water Rights Board has

3  issued a permit that is a fact.  The reasons why the permit was

4  issued, the priority of the application, all those questions

5  are moot, they are all settled by the action of the State Water

6  Rights Board.

7  Now, my motion is now pending having to do with recent

8  applications of the Fallbrook Public Utility District.  I just

9  assumed that a permit granted as long ago as 1951 was not going

10 to be attacked in this court.

11 THE COURT:  I know your position, Mr. Sachse, and I am

12 not going to rule on it today.

13 I think the Master is going to take the same attitude,

14 we are going to let the parties make their contentions.  There

15 is no jury here.  I don't mean we are going to go far afield.

16 If there is any reasonable pertinency we are going to put it

17 into the record.

18 MR. SACHSE:  Then as I understand it this procedure is

19 analogous to a case when a judgment has been rendered seven

20 years before permitting to go back and submit evidence on which

21 the complaint was entered.

22 THE COURT:  Mr. Sachse, I can think immediately of another

23 ground on which all of these would be admissible, admissions

24 in interest.  I don't know whether they are or not, but con-

25 ceivably a document filed by your client could always be argued

1    as an admission against interest if there is some statement

2    in there Counsel want to rely on.

3         The history of the entire litigation would be another one.

4         We have just wasted a lot of time over something that I

5    think you gentlemen should have sat down beforehand and said

6    here is what we are going to do, and have it done.

7         MR. VEEDER:  I am amazed at objections of this character.

8         THE COURT:  Let me be amazed, and you go ahead and saw

9    away.

10        It is now a quarter of eleven, we have been going since

11   9:30.  Since we will all feel better, we will take a ten minute

12   recess.

13        Mr. Holsinger, you can step down out of the witness chair.

14        (Recess.)

15        MR. VEEDER:  I would like to make just one brief reference,

16   your Honor, and to avoid any further argument.

17        Under the Agreed Facts it reads as follows:

18        "Jurisdiction:  This Court has jurisdiction of the above-

19   entitled action by reason of the express declaration by Congress

20   that the United States District Court 'shall have original

21   jurisdiction of all civil actions, suits or proceedings com-

22   menced by the United States.'"

23        So I know we can't stipulate jurisdiction on the Court.

24        Now, I have M-15 here, which has been marked for identi-

25   fication, that is application Number 11587, filed October 11,

1   1946.  It is a claim for domestic and municipal use.  I quite

2   agree with Mr. Sachse that no use has ever been made of any

3   water pursuant to this application.

4       THE COURT:  You offer it as M-15 in evidence?

5       MR. VEEDER:  That is correct, your Honor.

6       THE COURT:  Any objection?

7       MR. SACHSE:  No objection has been stated by Counsel.

8       THE COURT:  Now, these are subject to correction if any

9   errors are found in them, and they are offered upon your repre-

10  sentation that they are true copies out of the assembly filed

11  with the Clerk, assembly of applications, orders and so forth,

12  with the Clerk?

13      MR. VEEDER:  Absolutely, your Honor, and I think they are

14  all made on the same run; as a matter of fact, the ones that

15  you have there.

16      THE COURT:  What is the next one?

17      MR. VEEDER:  That would be M-17.  The number of the appli-

18  cation is 11586.  That was filed October 11, 1946.  It was

19  originally for domestic and municipal use only.  Subsequently --

20  And one reason why I wanted the gentleman from the State here,

21  I observed that after the original filing had been made there

22  has been a change to include irrigation, it was written in in

23  pen.

24      I will have that marked for identification.

25      THE COURT:  M-17.

117

1    MR. VEEDER:  M-17.

2    MR. SACHSE:  That is 11586, Mr. Veeder.  Is that right?

3    MR. VEEDER:  Yes.

4    THE COURT:  M-17.

5    MR. SACHSE:  No objection.

6    THE COURT:  Corrections to any of these may be made.

7    Objections heretofore will be overruled.

8    M-17 will be received in evidence.

9    MR. VEEDER:  Now, I offer to have marked for identification

10   M-19 --

11   THE COURT:  M-18.

12   MR. VEEDER:  18.  It is application Number 12178.

13   THE COURT:  What is the date of it?

14   MR. VEEDER:  The date of this application, November 28,

15   1947.

16   Now, as filed, it is for the appropriation or a claimed

17   appropriation on Rainbow Creek, Rainbow Reservoir.  It is for

18   10,000 acre feet on Rainbow Creek, a tributary upstream from

19   Fallbrook-Lipincott site.

20   THE COURT:  It will be received in evidence, M-18.

21   MR. VEEDER:  The next is M-19, application Number 12179.

22   The date on that is November 28, 1947.  It is for 10,000 acre

23   feet, and it is for a reservoir on Sandia Creek, a tributary of

24   Santa Margarita.

25   THE COURT:  Who is the applicant?

MR. VEEDER:  The applicant is Fallbrook Public Utility District.

THE COURT:  They were the applicant in M-18?

MR. VEEDER:  Yes, they were, your Honor.

THE COURT:  M-19 will be received in evidence.

MR. VEEDER:  M-20, marked for identification, is application Number 12576.  That was filed June 30, 1948, by the United States Navy.  It is for 165,000 acre feet of the Santa Margarita River.

THE COURT:  It will be received into evidence, M-20.

MR. VEEDER:  The next is an amendment to application Number 12576, filed June 30, 1948, mark that --

THE COURT:  12576.

MR. VEEDER:  12576, yes, your Honor, that is the application number.

THE CLERK:  M-21.

THE COURT:  M-21.

MR. VEEDER:  That is filed by the United States Navy Department for water for military purposes from the Santa Margarita River.  The date is June 30, 1948.  I offer it.

THE COURT:  Received in evidence.

Was that amendatory of M-20?

MR. VEEDER:  Yes, it was, your Honor.

Now, the next is a letter dated July 13, 1949, from G. B. Erskine, Major General, United States Marine Corps, addressed

47-L

1      to the State of California Department of Water Resources.   It

2      relates to application Number 12576.

3              THE COURT:  Received in evidence, M-22.

4              MR. VEEDER:  The next document that I have is application

5      Number 11587, it is amendatory.  It is dated December 11, 1950,

6      an amendment to 11587.

7              THE CLERK:  M-23.

8              THE COURT:  M-23 received in evidence.

9              MR. VEEDER:  Now, the next document which I have is appli-

10     cation Number 12178, amended on July 28, 1952, purporting to

11     change the place of storage from the Rainbow Reservoir to the

12     Santa Margarita River.

13             THE COURT:  By Fallbrook?

14             MR. VEEDER:  Fallbrook Public Utility District.

15             THE COURT:  M-24 will be marked and received in evidence.

16             MR. VEEDER:  The next application, Number 12179, purported

17     amendment to the original application 12179 filed by the Fall-

18     brook Public Utility District.  It is dated July 28, 1952.

19             THE COURT:  It will be marked M-25 and received in evidence.

20             MR. VEEDER:  Now, I would like to call Mr. Holsinger to

21     the stand again, if I may.

22             THE COURT:  Come forward, Mr. Holsinger.

23     BY MR. VEEDER:

24         Q  Mr. Holsinger, when you were sitting as Chairman of the

25     State Water Rights Board in considering the applications 12178

1   and 12179, did you take into consideration whether or not the

2   Fallbrook Public Utility District had the corporate power to

3   form the intention to appropriate rights to the use of water

4   for other than domestic and municipal uses?

5       MR. MOSKOVITZ:  I object, your Honor.  This is an attempt

6   to go behind the decision that was rendered, and to go to

7   matters which are within the rights of the State Water Rights

8   Board, and are irrelevant to this proceeding.

9       MR. SACHSE:  I will concur in Mr. Moskovitz' objection.

10      THE COURT:  State briefly why we should go into a matter

11  of that sort.

12      MR. VEEDER:  By reason of the fact, your Honor, that one

13  of the most important phases in this litigation is the deter-

14  mination by the priority, if any, which the Fallbrook Public

15  Utility District could obtain under the laws of the State of

16  California.

17      And this Court certainly has the power to make a deter-

18  mination as to the date of priority, if any, that the Fallbrook

19  Public Utility District would have.

20      It is moreover pleaded by the Fallbrook Public Utility

21  District -- A part of the prayer of the Fallbrook Public Utility

22  District is that your Honor decreed a priority to the Fallbrook

23  Public Utility District, so I see no basis whatever for the

24  objection.  The objection is contrary to the pleadings already

25  on file here by the Fallbrook Public Utility District.

1      Secondly, I think that your Honor and this court has the

2  full jurisdiction to make a determination as to whether the

3  Fallbrook Public Utility District could acquire a right to the

4  use of water for uses other than domestic and municipal purposes.

5      In other words, I think the entire question of Fallbrook's

6  priority is before you for review.  Certainly there is no

7  administrative tribune of the State that could interfere with

8  that determination, nor the objection could not be sustained

9  on any argument of which I am aware that this Court could be

10  deprived of that right to make that determination.

11      As I said, while we cannot confer jurisdiction upon this

12  Court by agreement, it has nevertheless been agreed by all

13  parties that this Court has jurisdiction.

14      The reason why it is important to us in these stipulated

15  facts, Mr. Sachse himself has agreed that you have jurisdiction.

16  Attached to this pre-trial agreement are the very applications

17  to which I made reference.

18      Certainly there is complete agreement among all parties

19  that this very subject would be reviewed, and the corporate

20  powers of the Fallbrook Public Utility District are extremely

21  important.

22      And in addition, the prime element in making appropriation

23  of rights to use of water in this State or in any other State

24  is that there be formulated an intention to appropriate rights

25  to the use of water.  It is indeed the very essence of a priority.

1    The man who is claiming it, or the corporation which is claiming

2    it, has the power to formulate such an intention to appropriate.

3    And it has been observed, and I will point out that each one of

4    the early ones were simply for the domestic and municipal pur-

5    poses.   They were filed completely in conformity to the state

6    laws of California.   Subsequently, and as an afterthought, the

7    question of irrigation came to mind and they attempted to bring

8    that into their applications.

9        As we progress I am going to offer into evidence the

10   filings of the Fallbrook Irrigation District.

11       It will be observed that the Fallbrook Public Utility

12   District was in existence in 1922.   That is why I filed these

13   Articles of Incorporation, to show that during the period from

14   1922 down to 1946 the Fallbrook Public Utility District made

15   no claim for anything but municipal and domestic water, and

16   that was pursuant to rights from the Santa Margarita.   The

17   reason for that is obvious, the Fallbrook Irrigation District

18   was in existence and it had to file an application to appro-

19   priate 35,000 acre feet of water.   In other words, in the area

20   which we are discussing there were two entities, one for the

21   purpose of securing water for irrigation purposes, while the

22   Fallbrook Public Utility District was performing its functions

23   within its corporate structure to obtain water for domestic and

24   municipal use.

25       Therefore, I think it is highly appropriate to ask the man

1   who issued the permit, did he take into consideration these

2   purpose factors in issuing the permits.

3      THE COURT:  I am going to sustain the objections.  The

4   argument you made is very interesting and may present some nice

5   legal questions, it may present some problems as to the powers

6   of the Fallbrook Public Utility District, but we have their

7   corporate structure here in evidence.

8      The question to the witness was did you take into account

9   a certain thing.  Now then, your next question, did you take

10   this into account.

11      If you are going to pursue it you are going to have to

12   ask how much weight did you give this and that.  I am not going

13   to review now what this State body did.

14      Now, there may be ways in which you can attack that

15   decision, but I don't think you are going to attack it by

16   calling in the triers of fact and say what weight did you give

17   this, did you consider that, and so forth.

18      Now, this is without prejudice in consideration by the

19   Court of matters that may be properly considered.  I am not

20   going to do that, any more than you would call a jury and say

21   you have given this plaintiff a hundred thousand dollars, now

22   did you take into account this factor, how much weight did you

23   give that factor.

24      MR. VEEDER:  Well, your Honor, there is an additional

25   factor that I would like to make reference to, then I will make

1   an offer of proof.

2       The fact is that the State of California is an intervenor
3   here and a party to the cause.  And I believe that that element
4   is a factor that is important in this manner:  In other words,
5   California, for some reasons which I have never understood,
6   has intervened and is now a party.  Now, it takes a long and a
7   drastic step in changing the status quo of this proceeding
8   right during the trial will full knowledge we are ready to go
9   to trial.  I wanted that in the record.

10      THE COURT:  Make your offer of proof.

11      MR. VEEDER:  I ask this witness to state, he being the
12  sole party before whom the facts were adduced --

13      THE COURT:  That isn't correct.  I understand it is a
14  Board of three, he didn't sit alone.

15      MR. VEEDER:  Your Honor, he did.  He sat alone, he took
16  the evidence alone.  Mr. McGill was not with him, and the other
17  party to the Board did not participate.

18      Now, I will be glad to state it this way, the evidence
19  that was -- the oral evidence that was introduced at the hearing
20  of August 12 through 14 was before Mr. Holsinger sitting alone.
21  Now, I assume that Mr. McGill reread the testimony and con-
22  sidered it; but what I said is correct, that he sat alone.

23      THE COURT:  Make your offer of proof.

24      MR. VEEDER:  The offer of proof is that what we would
25  elicit from this witness would be to show whether he took

1  individual consideration of the fact that the Fallbrook Public

2  Utility District is an entity organized under the laws of the

3  State of California for the purpose of meeting in a suburban

4  and an unincorporated area the functions which a municipal

5  government usually provides.  For that reason it is our opinion

6  and we think the applications which were filed showed that this

7  entity could not formulate an intention to approriate water for

8  irrigation purposes.

9       THE COURT:  All right.  The same objection made to the

10  offer of proof?

11      MR. MOSKOVITZ:  Yes, your Honor.

12      THE COURT:  Sustained.

13      MR. SACHSE:  It is sustained.  I think there is something

14  I am not clear on.  Which of these applications does this offer

15  of proof relate to?

16      MR. VEEDER:  12178 and 12179.

17      THE COURT:  The objection is sustained to the offer of

18  proof.

19      You may proceed.

20  BY MR. VEEDER:

21      Q  Now, Mr. Holsinger, do you know where the DeLuz Creek

22  enters the Santa Margarita River as that point of confluence

23  relates to the site of the so-called Fallbrook-Lipincott site?

24      A  Frankly, Mr. Veeder, we have heard a multitude of

25  applications since the time that we took the evidence -- when I

126

acted as hearing officer for the Board on these applications, and I remember very little about it now.  I don't attempt to carry all of those details in my head.

Frankly, I couldn't answer your question.

Q  You don't know where the DeLuz enters the Santa Margarita?

A  All I know is they are tributaries, that is all I remember.

Q  And when you were taking this evidence, Mr. Holsinger, did you consider the impact upon the riparian and appropriative rights on DeLuz Creek which would result from the installation at the Lipincott site of a dam to impound 35,000 acre feet of water?

MR. MOSKOVITZ:  I object on the same basis that I objected to the first question, as to whether Mr. Holsinger took into account at the time of the hearing certain information.

THE COURT:  And you repeat now your same argument you made before, I take it, by reference?

MR. VEEDER:  Your Honor, I will have a little different argument.  I will make an offer of proof.

THE COURT:  The objection is sustained to the question.

Offer your proof.

MR. VEEDER:  I would seek to elicit from Mr. Holsinger, whom I would say would be the greatest expert on the Santa Margarita River of anyone, because he granted the permit, that any time that you put a structure of 35,000 acre foot capacity

127

above the confluence of the DeLuz Creek with the Santa Margarita
River there is a direct and immediate invasion of every appro-
priative and every riparian right on DeLuz Creek by reason of
the fact that the United States of America is a riparian owner
downstream before the confluence of the DeLuz Creek.  And there-
fore the competition for the available supply of riparian water
is greatly increased, and the quantities of water that each
individual on DeLuz Creek will receive is very, very materially
reduced if this structure is built.

MR. MOSKOVITZ:  I make the same objection to the offer of
proof.

THE COURT:  Sustained on the offer of proof and on the
further ground that the question and the offer is unintelligible
unless there is an explanation of how the dam would operate.
If the dam permitted a full flow of water without interference,
if the dam dammed up everything on the river and let nothing
come through, then there might be some resemblance to the point
you make.

It means nothing as far as I am concerned.

The objection is sustained.

MR. VEEDER:  The objection is sustained?

THE COURT:  To the offer of proof, for the reasons that
were given in the objection, and for the further reasons that
I stated.

MR. VEEDER:  I want to be very sure that -- Well, I will

128

1    ask another question.   This can be a long process.

2         Q   When you issued the permit to the Fallbrook Public

3    Utility District in connection with applications 12178 and 12179

4    as amended what was the quantity of water that you considered

5    that the United States of America was entitled to receive by

6    reason of its riparian right in the Santa Margarita River?

7         MR. MOSKOVITZ:   I object, your Honor, on the same basis

8    as the previous objections.

9         MR. SACHSE:   I will add to that that the permit, and the

10   decision of the board, and the records of this court speak

11   for themselves.

12        THE COURT:   Was there a prima facie finding in the order

13   concerning that subject matter?

14        MR. VEEDER:   No, there was not.

15        MR. SACHSE:   The order contains detailed provisions as to

16        MR. VEEDER:   The answer is no, your Honor.

17        MR. SACHSE:   May I complete my statement?

18        The opinion of the Board and the order both contain pro-

19   visions designed, as I understand it, to protect downstream

20   users.

21        THE COURT:   Objection sustained to the question.

22        MR. VEEDER:   The United States of America would elicit in

23   this case from Mr. Holsinger proof that a dam of 35,000 acre

24   foot capacity could not be constructed without interfering with

25   the riparian rights, that the United States of America had these

57-L

5

1   prior and paramount rights, and that absent a determination as

2   to the measure and extent of those rights it would be impossible

3   to issue the permit.

4       MR. MOSKOVITZ:  I object to the offer of proof, your Honor.

5       THE COURT:  Same grounds?

6       MR. MOSKOVITZ:  Same objection, same grounds.

7       THE COURT:  Sustained.

8   BY MR. VEEDER:

9       Q  Mr. Holsinger, in considering the evidence adduced at

10   the hearing of August 12 through 14, which was the hearing

11   concerning which all of my questions have been directed, did

12   you take into consideration the quantity of water which the

13   United States of America would require from the Santa Margarita

14   River at a time of full mobilization?

15       MR. MOSKOVITZ:  I object again, your Honor, on the same

16   grounds as the previous objections.

17       MR. SACHSE:  I object on the same grounds.

18       THE COURT:  Sustained.

19       I can't understand you taking this time, Mr. Veeder.  It

20   is obvious that the findings of the State Water Rights Board

21   is without prejudice to the vested riparian and appropriated

22   rights of the stream.  Their finding is only a preliminary

23   finding that there is a surplus.

24       I don't see how the government is prejudiced.  I think we

25   are wasting time.

1          Objection sustained.

2   BY MR. VEEDER:

3          Q   The next question, Mr. Holsinger, is did you take into

4   consideration in rendering your --

5          You are not denying me the right to proceed, are you,

6   your Honor?

7          THE COURT:  No.  If you want to make a record here you

8   have that right.  A lawyer has that right.  Make it as short

9   as you can.

10         MR. VEEDER:  I am doing my best.

11         MR. MOSKOVITZ:  Your Honor, to save time, I would be

12   willing to permit Mr. Veeder to write these questions and

13   submit them, and stipulate he would have asked them as if they

14   had been asked.

15         MR. VEEDER:  Now, Federal Rule 43 says that the testimony

16   will be taken by oral testimony.

17         THE COURT:  Go ahead and ask your questions.

18         MR. VEEDER:  Now, in that regard I want to make an offer

19   of proof, that the determination has been made by the executive

20   branch of the government, that the needs at Camp Pendleton --

21         THE COURT:  You are talking about the federal government

22   now?

23         MR. VEEDER:  Oh, yes, that national government.

24         THE COURT:  You will make an offer of proof by this witness

25   about that matter?

1    MR. VEEDER:  I will say that anyone who would issue a

2    permit on the Santa Margarita River must necessarily consider

3    the fact that there has been a determination, and he should

4    have known it when he issued the permit that there is a maximum

5    demand at full mobilization for 23,000 acre feet of water in

6    the Santa Margarita River.

7        MR. SACHSE:  Same objection, your Honor.

8        MR. MOSKOVITZ:  Same objection.

9        THE COURT:  The objection to the offer of proof is sus-

10   tained.

11   BY MR. VEEDER:

12       Q   Now, in giving consideration to the issuance of the

13   permit did you take into consideration the fact that the

14   United States of America was and is and has been diverting

15   large quantities of water out of the Santa Margarita River?

16       MR. SACHSE:  Same objection.

17       MR. MOSKOVITZ:  Same objection, same grounds, your Honor.

18       THE COURT:  Sustained.

19       MR. VEEDER:  We will make an offer of proof in that con-

20   nection, your Honor, that there could be no determination such

21   as was attempted in this permit without taking into consideration

22   the fact that the United States of America and its predecessor

23   in interest for many years prior to the formation of the Public

24   Utility District and its filing for the appropriation of water

25   was, and is, and I think will continue to divert water outside

1  of the watershed of the Santa Margarita.

2  MR. MOSKOVITZ:  Same objection, same grounds.

3  THE COURT:  Same ruling.

4  So that some of these lay people may understand, if the

5  government has vested rights to appropriate water out of that

6  stream they still have it.  If they haven't got them they still

7  don't have them.

8  What the Water Board did does not attempt to define what

9  the vested rights are on this river, and that is wide open

10  here to be decided in this trial.  That is the right of any

11  litigant, the vested right of the United States.

12  MR. VEEDER:  That, of course, is the objective of my offer

13  of proof, your Honor.

14  THE COURT:  All right.

15  MR. VEEDER:  We would show, as we showed in the record

16  yesterday, by this witness that assuming that he had the facts

17  before him to make such a -- to issue such a permit that the

18  United States of America has constructed outside of the water-

19  shed of the Santa Margarita River and has maintained since 1942

20  large military installations wholly dependent upon the Santa

21  Margarita River as a source of water supply.

22  We would show, moreover, that the present uses are far

23  short of what the maximum claim to the United States are in the

24  event of full mobilization.

25  THE COURT:  Objection to that as an offer of proof?

1        MR. MOSKOVITZ:  Yes.

2        MR. SACHSE:  Yes.

3        THE COURT:  Sustained.

4    BY MR. VEEDER:

5        Q  Mr. Holsinger, would you state the quantity of water

6    which the United States of America is presently using -- I will

7    back up on that.

8        Will you state whether you took into consideration at the

9    hearing of August 12 through 14 the quantities of water that

10    the United States of America was utilizing at that time?

11        MR. MOSKOVITZ:  Same objection, same grounds.

12        THE COURT:  Same ruling, sustained.

13        MR. VEEDER:  I would like to make an offer of proof on

14    that.  We would show that the United States of America at the

15    time of the hearing and at the present time had a minimum

16    demand of 12,500 acre feet of water, and that of course is far

17    short of the maximum demand for mobilization.

18        MR. MOSKOVITZ:  Same objection, same grounds.

19        MR. SACHSE:  Same objection, same grounds.

20        THE COURT:  Sustained.

21    BY MR. VEEDER:

22        Q  Did you take into consideration, Mr. Holsinger, when

23    you issued the permit that the United States of America as of

24    that time was using large quantities of sewage effluent that

25    it diverted back into the watershed of the Santa Margarita for

purposes of reuse?

MR. MOSKOVITZ:  Same objection, same grounds.

MR. SACHSE:  Same objection, same grounds.

THE COURT:  Same ruling.

MR. VEEDER:  The United States of America makes an offer to show that the evidence which was introduced and the facts which were put into the record in the State case did not consider the fact that the basins would have been far short of water had it not been for the husbanding of the sewage effluent and the return of the water to the Santa Margarita watershed, and that it is absolutely essential that the United States of America receive fresh water in lieu of the sewage effluent that it is presently using because of the detriment and danger to the base that it is suffering by using sewage effluent.

MR. MOSKOVITZ:  Same objection, same grounds.

MR. SACHSE:  Same objection, same grounds.

THE COURT:  Same ruling.

BY MR. VEEDER:

Q  In considering the issuance of the permit to the Fallbrook Public Utility District did you take into consideration the financial ability of the Fallbrook Public Utility District to construct the dam?

MR. MOSKOVITZ:  Same objection, same grounds.

THE COURT:  Sustained.

MR. VEEDER:  The United States of America makes an offer

**135**

1    that the Fallbook Public Utility District does not have financial

2    capacity to build the dam, or indeed to undertake the con-

3    struction of it.

4         The maximum bonding capacity of the Fallbrook Public Utility

5    District is approximately -- well, it is twenty percent of its

6    value; that would run around $1,500,000.  Presently there are

7    outstanding debts of $300,000, so that the bonded ability of

8    issuing a bond by the Fallbrook Public Utility District would

9    be $1,200,000.  And the cost of the dam at the very smallest,

10   as I understand it -- although they have no plan -- is

11   $3,500,000.

12        Therefore, they are without financial capacity to under-

13   take the construction of the dam.

14        MR. MOSKOVITZ:  Same objection.

15        MR. SACHSE:  Same objection, and the additional objection

16   it is irrelevant and immaterial.

17        THE COURT:  Objection sustained.

18        Of course you asked the question of the witness did you

19   take into account.  And the objection is sustained to that.

20   And then your offer of proof was not that he did or did not,

21   you brought up a lot of figures which probably couldn't be

22   proved by this witness.

23        MR. VEEDER:  The point that I desire to make is that if I

24   were permitted to examine the witness I would ask a great many

25   more detailed questions.  I am not permitted to examine the

136

1    witness, so I am cutting through and trying to save some time.

2        THE COURT:  Very well, good enough.

3    BY MR. VEEDER:

4        Q  Now, who was the principal witness from the standpoint

5    of the management of the Fallbrook Public Utility District at

6    the hearing of August 12 through 14 in regard to applications

7    12178 and 12179?

8        MR. SACHSE:  Same objection, plus the objection that the

9    record speaks for itself.

10       MR. MOSKOVITZ:  I make the same objection, on the ground

11   that this is again an attempt to go behind the decision and

12   review it at this time.

13       THE COURT:  If there is any secret about it I might let

14   him testify, but it is obviously a matter of record.  The

15   question said who was your principal witness.  If that doesn't

16   call for a conclusion --

17       MR. VEEDER:  Who was the principal witness for the Fall-

18   brook Public Utility District.

19       MR. SACHSE:  There is a complete stenographic record.

20       THE COURT:  Was there only one witness?

21       MR. VEEDER: Yes, in regard to the management of the Fall-

22   brook Public Utility District.

23       THE COURT:  You may answer, if you know his name.

24       THE WITNESS:  I don't remember.

25

BY MR. VEEDER:

Q   You don't remember Mr. Yackey's name?

A   Well, I do recall Mr. Yackey as a witness, but whether he was the principal witness I can't say, I will have to read the transcript.

MR. MOSKOVITZ:   I make a motion to strike the question and the answer on the ground that this is --

THE COURT:   Denied.

What is your next question?

BY MR. VEEDER:

Q   Were you aware of the size -- of the number of acres within the Fallbrook Public Utility District at the time that the evidence was taken on August 12 through 14?

MR. MOSKOVITZ:   I make the same objection, on the same grounds.

THE COURT:   Sustained.

MR. VEEDER:   Well, we will make an offer of proof then, your Honor, that the Fallbrook Public Utility District -- I might add just extraneously that I have tried to get this same information from Fallbrook by interrogatories, very much of it, and they haven't answered.

THE COURT:   That sounds like a proper interrogatory, but we will take that up later.  Go ahead.

MR. VEEDER:   The point that I would show is the fact that the Fallbrook Public Utility District does not have the irrigable

1    acreage which would support and provide funds for the con-

2    struction of the alleged project that the applications 12178

3    and 12179 pertain to.

4        MR. SACHSE:  I will make the same objection, with the

5    additional objection that the offer of proof has no relation

6    to the question, which was did you consider how big the

7    district was.

8        THE COURT:  I will sustain the objection.

9        But it is understood, of course, that the objection is

10   sustained only in connection with the offer of proof as to

11   this witness.  If you bring some witness in who knows these facts

12   independently I may or not at that time let you put the evidence

13   in.

14       MR. SACHSE:  So the record will be clear, as to the inter-

15   rogatories that Mr. Veeder has mentioned --

16       THE COURT:  We will take it up later.

17       What is your next question?

18   BY MR. VEEDER:

19       Q  Did you take into consideration when you were passing

20   on applications 12178 and 12179 acreages outside of the Fallbrook

21   Public Utility District?

22       MR. MOSKOVITZ:  Same objection.

23       MR. SACHSE:  Same objection.

24       THE COURT:  Sustained.

25       MR. VEEDER:  We would show from this witness, and certainly

1    he should know, that the evidence was offered by Mr. Yackey to

2    the effect that he knew that a majority of the land owners in

3    the area composed of some 3,000 acres of land wanted to come in

4    and be part of the Public Utility District and would be part of

5    the service area.   And I would ask this witness -- I would seek

6    to prove by this witness that that area was not incorporated at

7    the present time, and there are no facilities or means pursuant

8    to which the land could be irrigated, that the original claim

9    on Sandia Creek for 10,000 acre feet of water might have had

10   in contemplation the irrigation of that land from Sandia Creek,

11   but certainly at the time the application was made there was

12   no contemplation of irrigating that land from the main stem of

13   the Santa Margarita River.

14       MR. MOSKOVITZ:  I make the same objection, the same grounds.

15       MR. SACHSE:  The same objection, and the additional

16   objection that it would call for a hearsay answer.  It is not

17   admissible, and there is a transcript of what Mr. Yackey said.

18       THE COURT:  Sustained.

19       MR. VEEDER:  I have an exhibit that I want to offer at this

20   time, your Honor.

21       I desire to have a photostatic copy of a letter dated --

22   You don't even date your letters, Franz.

23       Here is an undated letter that I want to have marked for

24   identification, M-26.

25       THE COURT:  M-26.

BY MR. VEEDER:

Q  I hand to you, Mr. Holsinger, Plaintiff's Exhibit marked for identification M-26, and ask you if you are the "Dear Henry" from Franz that is referred to in that letter?

A  The letter is directed to me, if that is what you mean.

Q  And you are the "Dear Henry"?

A  Well, you can call me what you please.

Q  Do you recall receiving a letter from Mr. Franz Sachse in which he states "Actually I" --

MR. SACHSE:  I will object, if the Court please, the letter speaks for itself.  My objection is that it is immaterial to any issue in this case.  And I ask your Honor to read the letter before any offer or ruling is made.

If you have read the letter, your Honor, you can perhaps better understand the objection in that this has no bearing or relation to any of the applications made, or to any of the proceedings before this court.  This is a personal letter for personal information.  It is on my personal letterhead, and not as attorney for the District.

MR. VEEDER:  I would like to ask one question.  Is this not one part of the official files of the State of California and the State Water Board?  In fact, I know it is.

MR. SACHSE:  I don't know.

THE COURT:  You can ask the witness.

BY MR. VEEDER:

Q   Is this letter part of the official files of the --

A   I don't know.  Let me have it.

It has gone through the custodian of the official files, that is obvious from the notes on it.  That is all I can say.

MR. SACHSE:  I will submit, your Honor, that whether it is part of the official files or not is not material.  There are applications from Del Norte County --

MR. VEEDER:  Your Honor, may I --

THE COURT:  We can talk about the exhibit going into evidence later.  Let's finish up with Mr. Holsinger if you can by noon, and get through with him.

If you want to argue about the admission of the letter, he has admitted that he was the person the letter was addressed to.

Just go ahead with Mr. Holsinger on what things you want to get from him.

MR. SACHSE:  And the ruling on the letter?

THE COURT:  It hasn't been offered.  We will talk about it later.

MR. VEEDER:  I will offer it in evidence.

MR. SACHSE:  I thought it was offered.  I had stated my objection.

THE COURT:  We will reserve ruling and talk about that later.  I don't know that there has been any formal objection,

70-L

1       but we will take it up.

2          MR. SACHSE:  I thought I had made one, your Honor.

3          THE COURT:  I will give you an opportunity later.

4   BY MR. VEEDER:

5          Q  Now, Mr. Holsinger, will you state whether you conferred

6   with Mr. Sachse as he asked you to in regard -- in this letter?

7          MR. SACHSE:  I will object, if the Court please.  That is

8   not a correct statement of the letter.  There is no request for

9   a conference.  And it is irrelevant and immaterial.

10         THE COURT:  Sustained.

11         MR. VEEDER:  I will read the letter.

12         THE COURT:  You don't need to read it, it is marked.  Let's

13  go ahead.

14  BY MR. VEEDER:

15         Q  Now, Mr. Holsinger, in the hearing in regard to the

16  applications 12178 and 12179 did you take into consideration,

17  as Mr. Sachse states, that he was interested in making some

18  developments along the Sandia Creek in connection with appli-

19  cation 12179, and that he had made a shotgun guess that there

20  might be 1,500 acre feet?

21         Your manners are not good, Mr. Sachse.

22         THE COURT:  Mr. Veeder and Mr. Sachse both, we are trying

23  a lawsuit, and let's go ahead.

24         MR. MOSKOVITZ:  Is the question concluded?

25         MR. VEEDER:  No.

1          Would the reporter please read the question back?

2          (Record read.)

3     BY MR. VEEDER:

4          Q   -- of water available in Sandia Creek?

5          MR. SACHSE:  If your Honor please, I will object to that

6     question.  That is an incorrect statement of the letter.  I

7     will ask your Honor to reread the letter, and I will ask your

8     Honor's protection from misquotations by Mr. Veeder that are

9     designed for the simple and exclusive purpose of embarrassing

10    me in the community.

11         And I will ask the reporter to read back the question.

12         THE COURT:  Make the objection.

13         MR. SACHSE:  Irrelevant and immaterial.

14         MR. MOSKOVITZ:  I make the objection that it goes behind

15    the issue of the decision.

16         MR. VEEDER:  May I be heard?

17         THE COURT:  No.  Sustained.

18         MR. VEEDER:  I will make an offer of proof.

19         THE COURT:  The letter is already here, it is marked for

20    identification.

21         MR. VEEDER:  But I want to make an offer of proof.

22         THE COURT:  What do you want to prove from this witness?

23         MR. VEEDER:  I will ask him one more question.

24         Q   In approving application 12179 did you take into con-

25    sideration  that as late as -- I wish, Franz, you had dated

1    this letter -- as late as a period immediately prior to February

2    15, 1955, that there had been developed no firm plan for the

3    appropriation of rights of the water pursuant to application

4    Number 12179?

5         MR. MOSKOVITZ:  Object on the same grounds as stated.

6         THE COURT:  Sustained.

7         MR. VEEDER:  I will make an offer of proof, your Honor,

8    that a matter of intention is extremely important in making an

9    application to appropriate rights to the use of water.  And as

10   recent as February, 1955, the Fallbrook Public Utility District

11   had not formulated an intention in regard to the appropriation

12   of water, that Mr. Sachse at that time was stating that he

13   was contemplating development in rough country along the Santa

14   Margarita River, and that he wanted no other water in Sandia

15   Creek to appropriate so that he could make that development,

16   and that he was referring at that time to applications 12178

17   and 12179 which were filed, as the dates will disclose on the

18   exhibit now in the record.

19        MR. SACHSE:  Your Honor, I will make an additional objection

20   that this is an offer of proof, and how Mr. Holsinger can

21   testify as to what my intention was in the letter I don't know.

22   Either the letter speaks for itself or I should be called.

23        THE COURT:  Your general objections?

24        MR. MOSKOVITZ:  Yes.

25        THE COURT:  Sustained.

Now, Mr. Sachse, I have indicated I am going to sustain the objection to the questions about did you take into account, did you consider.  I said Mr. Sachse, I meant Mr. Veeder.

If it is error you have got your record made.

MR. VEEDER:  I think Mr. Holsinger's health is bad, and I would like to release him.

My own feeling on this then, your Honor, can be succinctly stated, believe it or not from me.

There is Mr. McGill who I have called, Mr. Holsinger whom I have called.

Is Mr. Max Bookman here?  Now, he falls in a different category, he is an engineer, or purports to be.  And I would --
That would be a declaration against interests if I said he was.

I would release Mr. Holsinger and Mr. McGill, if I can have your Honor state what you just stated in regard to these two gentlemen, that I have made my record in regard to the two permits.

THE COURT:  You have made your record.  And if you called Mr. McGill and the same questions were asked and the same answers given my rulings would be the same.  I don't intend to let you question these men as to what they took into account or what weight they gave it.  Are you clear now?

MR. VEEDER:  Yes.  I want to be very, very sure that in requesting me to cease these questions, and I am perfectly willing to do so, that I will not be prejudiced in the record,

1  because there are a great many more questions that would be

2  asked.

3      THE COURT:  Yes, I can imagine that you would ask a lot

4  more.  And my ruling is based on the fact that I have let you

5  ask a lot of them, and I have sustained the objections to all

6  of them, and there would be no point in taking up our time or

7  Mr. Holsinger's or Mr. McGill's if the same or similar questions

8  were asked of him.

9      The record will show that Mr. McGill is present and that

10  you could call him and ask him the same questions.

11  BY MR. VEEDER:

12      Q  Would you state what Mr. McGill's status is?

13      A  He is a Board member.

14      Q  And on the California State Water Rights Board?

15      A  That is right.

16      Q  Did he participate in the decision and the issuance of

17  the permit with you?

18      A  He did.

19      MR. VEEDER:  He did.  Now, on that basis, your Honor, I

20  will terminate this phase of the questioning.  But I would

21  like -- This was offered in evidence?

22      THE COURT:  I reserved ruling on it.  We will take it up

23  later.

24      MR. VEEDER:  All right.  Because I am going to have another

25  letter which is the response to it.

1    THE COURT:  Mr. Holsinger, you may step down.

2    MR. MOSKOVITZ: He may be excused?

3    THE COURT:  He may be excused, and Mr. McGill may be

4 excused.

5    The engineer will remain.  By the way, what is the

6 engineer's name?

7    MR. BOOKMAN:  Max Bookman.

8    THE COURT:  This remark that Mr. Veeder made, he later

9 explained that it was on the basis that he didn't want to make

10 any admissions against interest.

11    I merely want to say this, that all of these attorneys

12 have been pretty vigorous in their position.  When you get to

13 know Mr. Veeder, although he says things that seem a little

14 impolite, he is not a bad sort of fellow, so don't take any

15 offense at it.  I chided him that when he went to school he

16 had never taken his course in public relations, he just studied

17 law.

18    I am trying to dig you out of a hole you just dug for

19 yourself in Fallbrook.

20    Your next witness will be Mr. Bookman?

21    MR. VEEDER:  Yes, I will call him.

22    THE COURT:  How long would you be with him?

23    MR. VEEDER:  It could be a long while.  I don't believe

24 any of these objections that were whipped up here could be

25 applied to him.  I would ask him some information about --

1    THE COURT: How long would it take you to get lunch and come back? 1:15, 1:30?

3    MR. VEEDER: I would like 1:30, at least.

4    THE COURT: I would like to finish early today.

5    MR. VEEDER: 1:15 is all right with me.

6    THE COURT: Let's say 1:30. Can you finish up in a couple of hours?

8    MR. VEEDER: I will see, your Honor. I will move right along.

10    MR. SACHSE: The only question, if you are going to follow Mr. Bookman's testimony through, if that is your personal wish, there will be probably very, very extensive cross-examination of Mr. Bookman.

14    THE COURT: I don't have to follow it all the way through. It just happens that the Master and I are both here, and we have conferred already on some of these matters. I have perfect confidence I can leave this hearing at any time.

18    MR. SACHSE: I think Mr. Veeder is right, and I don't think some of the objections will arise in Mr. Bookman's testimony.

20    MR. VEEDER: I will call him as an adverse witness and, depending on your rulings, it may be much faster.

22    THE COURT: I would probably be inclined to let Mr. Veeder examine him as an adverse witness, to save time. He is an officer --

25    MR. SACHSE: He is an employee of a department of the State

1    of California.  It is all right with me, it will set a pre-

2    cedent of my right to call Marine officers as adverse witnesses.

3         MR. VEEDER:  They would be hostile, I think.

4         THE COURT:  Adjourn until 1:30.

5         (Noon recess.)

7                              - - -

Fallbrook, California, May 23, 1958, 1:30 P.M.

1          THE COURT:  Mr. Veeder, for the record, so we will not

2   misunderstand each other, the objections I sustained to the

3   questions you asked of Mr. Holsinger were all predicated upon

4   the fact that your questions said did you take into account

5   this and did you take into account that.  And my rulings are

6   without prejudice to you offering independently proof of certain

7   facts that you think are material, and we will rule on those

8   when the time comes.

9          Do you understand?

10         MR. VEEDER:  Thank you, your Honor.

11         THE COURT:  It is my understanding you will have additional

12   evidence.

13         MR. VEEDER:  That is correct.

14         We were attacking the permit with that offer.

15         THE COURT:  That is right.  And you understand that you

16   will be permitted to offer, and I will rule on it when the

17   time comes, the physical facts contained in some of these

18   questions you put to Mr. Holsinger.

19         MR. VEEDER:  Thank you, your Honor.

20         I have made an offer of Plaintiff's Exhibit M-26, and as

21   I understand it you have that under consideration.

22         THE COURT:  Well, let's dispose of that.  Now, I don't

23   recall if there was a full objection to it.  And before we have

24   an objection for the record I am inclined to receive into evi-

25   dence--

1      MR. SACHSE:  I will withdraw the objection, your Honor,

2  with that qualification, which I think Mr. Veeder is going to

3  answer.  Let him put the answer in, which will clarify the

4  dates, and if any explanatory material is needed I can offer

5  it later.

6      THE COURT:  I was proposing to receive into evidence

7  and let there be read into the record the second sentence of

8  the second paragraph, and the third paragraph.

9      MR. SACHSE:  I would withdraw my objection to the whole

10  letter.  The reply will establish approximately the date, at

11  least, at which the letter was sent.

12      THE COURT:  I was trying to sort out the things which

13  have materiality.  If you have no objection to it entirely--

14      MR. SACHSE:  I have no objection to the entire letter,

15  and if I have any evidence to offer I will offer it.

16      THE COURT:  I will say now if the letter goes in that

17  the material portion of the letter would be the second sen-

18  tence of the second paragraph, and the third paragraph of the

19  letter.

20      MR. SACHSE:  Are you offering it?

21      MR. VEEDER:  Yes, it is offered.

22      MR. STAHLMAN:  What is the letter about?

23      MR. SACHSE:  You have seen it, George, you used it at the

24  Grand Jury.

25      MR. STAHLMAN:  Then I would like to hear it.

1    THE COURT:  You can read it at your leisure.  M-26 re-
2  ceived in evidence.

3    MR. VEEDER:  I would like to have that reply marked for
4  identification M-27.

5    THE COURT:  M-27.

6    MR. VEEDER:  There are no intervening exhibits?

7    THE COURT:  No.

8    MR. VEEDER:  M-27, the letter dated February 15, 1955,
9  in response to the letter from Mr. Sachse, A. D. Edmonson,
10 State Engineer, and is addressed to Mr. Sachse, and I have
11 already made the offer.

12   THE COURT:  Received in evidence.

13   MR. VEEDER:  Mr. Stahlman would like to see that.

14   THE COURT:  All right, proceed.

15   MR. VEEDER:  I would like to have marked for identifica-
16 tion Plaintiff's Exhibit 28.

17   THE COURT:  M-28 marked.

18   MR. VEEDER:  M-28, the notice of application to appropri-
19 ate water, application number 3846, Fallbrook Irrigation Dis-
20 trict; the date on that is February 14, 1924.

21   And in connection with the offer, I am making demand of
22 the State of California to produce the original application
23 filed by the Fallbrook Irrigation District, to which this
24 notice pertains.

25   MR. SACHSE:  May I take a look at that one, please?

1253

1    THE COURT:  Mr. Moskovitz, will you make it available?

2    MR. MOSKOVITZ:  We made arrangements to bring down all of

3    this material next week.

4    MR. SACHSE:  I have an objection to this.  Has it been

5    offered?

6    THE COURT:  Yes.

7    MR. SACHSE:  This is an application by Fallbrook Irriga-

8    tion District, an application dated 1926.  There is no rela-

9    tion between the Fallbrook Public Utility District and the

10   Fallbrook Irrigation District.

11   MR. VEEDER:  1924.

12   MR. SACHSE:  No showing of any relation between the appli-

13   cant and this applicant and the party to this litigation.  The

14   fact is, I believe, as Mr. Veeder knows, the Fallbrook Irri-

15   gation District has not been in existence since about 1933.

16   My objection, as far as legal grounds, it is immaterial and

17   irrelevant.

18   THE COURT:  Overruled.  It will be received in evidence.

19   Where is M-27?

20   Go ahead, Mr. Veeder.

21   MR. VEEDER:  I would like to have marked as Plaintiff's

22   M-29, permit number 3514, dated July 17, 1930, to the Fall-

23   brook Irrigation District.

24   THE COURT:  The same objection, Mr. Sachse?

25   MR. SACHSE:  I haven't seen this one yet, sir.

1       May I see the other one for a minute?  I am lost here.

2       I think I like it, your Honor.  I will withdraw all of

3  my objections to it.

4       THE COURT:  M-29 will be received in evidence.

5       MR. VEEDER:  Your Honor, I think that I will make an

6  objection to the basis upon which you admitted M-26, which

7  you admitted only in regard to the two paragraphs.

8       THE COURT:  I didn't say that.  I admitted it generally

9  in evidence, but I told you as far as I considered it the

10  two paragraphs are material.  It is in evidence for all pur-

11  poses.

12       MR. VEEDER:  Have I made the offer on 29?

13       THE COURT:  Yes, it is in evidence.

14       MR. VEEDER:  I would like to have marked for identifica-

15  tion Plaintiff's Exhibit M-30.  It is a letter dated October

16  3, 1934, to the Department of Public Works from the Fallbrook

17  Irrigation District, signed by Mrs. Agnes K. Walker, secretary

18  of that district; accompanying it a form designated Progress

19  Report.   The Progress Report is dated October 3, 1934.

20       MR. STAHLMAN:  No objection.

21       THE COURT:  It will be received in evidence, M-30.

22       MR. VEEDER:  Call Mr. Bookman, please.

23       I am calling this witness as an adverse witness, your

24  Honor.

25       MR. SACHSE:  If your Honor please--  Go ahead and swear

1  the witness.

2

3                        MAX BOOKMAN

4  called as an adverse witness, sworn, testified as follows:

5

6       MR. SACHSE:  Mr. Veeder states he is calling him as an

7  adverse witness.  And rule 43-B states that a party may be called

8  as an adverse witness, an officer, director or a managing

9  agent.  I do not believe Mr. Bookman is an officer, director

10  or managing agent of the State of California.

11       My objection is not at all to the form of Mr. Veeder's

12  questions, I have no objection to the cross-examination tech-

13  nique if it will save time.  But I am very much concerned with

14  whether or not Mr. Veeder is going to be bound by Mr. Book-

15  man's testimony.  So I object to him being called as an ad-

16  verse witness.

17       THE COURT:  We are trying this lawsuit to get at the

18  facts and not to settle nice academic questions.

19       Now, Mr. Sachse has conceded that you may interrogate

20  this witness as if on cross-examination.  I take it your posi-

21  tion is he is an adverse witness, one who you would desire

22  to have in substance the scope of cross-examination?

23       MR. VEEDER:  And also I desire to reserve the right to

24  impeach him.

25       THE COURT:  Of course, that is the only thing there would

1 be any point about.  If he is your own witness you may con-

2 tradict him.  Technically, if he is your own witness you may

3 impeach him.  Technically it is an academic question.

4     As a practical matter it wouldn't have a lot to do with

5 the difference between contradicting him and impeaching him.

6     MR. VEEDER:  If I am free to introduce contrary evi-

7 dence to what evidence I  elicit.

8     MR. SACHSE:  This will be a part of the Plaintiff's case?

9     MR. STAHLMAN:  We are going to get into this thing later

10 on.  A person who may be called adversely to another, whether

11 you are bound by the testimony.

12     Secondly, although we have a federal code that doesn't

13 include certain witnesses, and under California law applies.

14 And does California law apply under the stipulation?

15     THE COURT:  Well, California law under the stipulation--

16 We are talking about water law.  We haven't adopted the pro-

17 cedural law of California except in so far as the federal rules

18 adopt the rules of evidence, multiple admissibility theory.

19     We will cross those bridges at that time.  But as I under-

20 stand the matter now, Mr. Veeder may examine this witness as

21 if on cross-examination.  And he says he won't worry about

22 impeachment if he may contradict him.  Let's go ahead.

23     THE CLERK:  Will the witness state his name, please?

24     THE WITNESS:  Max Bookman.

25

157

DIRECT EXAMINATION

BY MR. VEEDER:

Q   Would you state your present position, Mr. Bookman?

A   I am employed by the State of California, the Depart-
ment of Water Resources.  And my title is District Engineer
in charge of the Southern California District, which extends
from San Luis Obispo County to down to the Mexican line.

Q   Would you explain what your functions are in that
connection?

A   I am responsible for the administration, the direc-
tion and the organization of the work and responsibilities of
the Department of Water Resources.  Do you wish me to enumerate
those?

Q   Well, I would like to have sufficient detail so that
we know your responsibility.

A   I will give them in general--

Q   --in connection with the hearing held on August 12th
through 14th of 1957, in connection with the applications of
the Fallbrook Public Utility District, 12178 and 12179.

A   When the department was organized in 1955, the Legis-
lature instructed the Department of Water Resources--although
it divided the State Water Rights Board from the Department of
Water Resources--it instructed the Department of Water Re-
sources to participate in water rights hearings in so far as
they may affect the California water plan, the studies being

1  made by the Department of Water Resources for the conserva-

2  tion and development of the water resources of the State, and

3  to assist in presenting such information by making available

4  to them that information.

5      Q  Now, Mr. Holsinger stated this morning when he was

6  on the stand, stated that he didn't make the findings himself

7  from the standpoint of going out and making investigations,

8  but he relied upon the recommendations of others.  I think

9  that is a fair statement of what he said.

10     Are you one of the parties who have recommended--who

11  make recommendations to Mr. Holsinger?

12     MR. MOSKOVITZ:  Your Honor, I object to that question

13  on the ground that it is an attempt to go behind the hearing

14  that was held by the State Water Rights Board.  I think it

15  is somewhat similar to the questions asked of Mr. Holsinger.

16     MR. SACHSE:  Same objection, and it is asking the wit-

17  ness for a conclusion of what was in Mr. Holsinger's mind as

18  to whether he is one of the men upon whom Mr. Holsinger re-

19  lied.

20     MR. VEEDER:  I asked if he made recommendations to Mr.

21  Holsinger in regard to the issuance of the permit in connec-

22  tion with applications 12178 and 12179.

23     THE COURT:  It might have a bearing on his credibility.

24  Overruled.

25     THE WITNESS:  I did not make a recommendation to Mr.

159

1  Holsinger, if you are using the word recommendations properly.

2      I presented technical facts that were available from

3  engineering investigations we made.  I made no recommenda-

4  tions to him, and the testimony which I gave at the hearing

5  was in connection with these engineering studies made on the

6  California Water Plan and the Santa Margarita investigation.

7  BY MR. VEEDER:

8      Q  Did you ever confer with Mr. Holsinger prior to, during,

9  or subsequent to the hearing of August 12th through 14th, 1957,

10 in connection with these applications?

11     MR. SACHSE:  I will object, if the Court please.  That

12 is an inquiry into the proceedings of the State Water Rights

13 Board, whether he conferred with the chairman of the State

14 Water Rights Board.

15     He testified he gave testimony.  Whether he conversed with

16 the chairman goes beyond the realm of the inquiry.

17     MR. MOSKOVITZ:  I join in that objection.

18     THE COURT:  Objection sustained.

19     MR. VEEDER:  I would offer in proof in that connection,

20 your Honor--and I want to make an offer of proof--I wish to

21 elicit a statement from this witness that he rendered engineer-

22 ing services to Mr. Holsinger outside of the hearing room and

23 prior to, during the time, and subsequent to the hearing.

24     MR. SACHSE:  Same objection.

25     THE COURT:  That in substance would be having this Court

1    try how another tribunal arrived at its decision, and I don't

2    think this is the place to do that.

3         The objection is sustained to your offer of proof.

4    BY MR. VEEDER:

5         Q  Mr. Bookman, would you take this pencil and step over

6    to Plaintiff's Exhibit M-14 and mark on that Exhibit where

7    De Luz Creek is situated?

8         A  Well, I can, if you wish me to.

9         Q  I certainly wish you to.

10        A  I am not familiar with the map.  Do you want to lo-

11   cate De Luz Creek?

12        Q  Yes.  I want you to draw a nice wide red line down

13   there where De Luz Creek is situated.

14        Now, would you draw on that map, M-14, Plaintiff's Ex-

15   hibit M-14, where you understand the Fallbrook-Lipincott

16   site is situated?  And would you make it a little bigger so

17   we can see it?

18        THE COURT:  And put an initial up there F-L.

19        MR. VEEDER:  And I would like to have him put his ini-

20   tials on there.

21        Q  Now, I observed from the--

22        THE COURT:  May the witness be seated?

23        MR. VEEDER:  Well, he can be, but he is going to  go back

24   very soon.

25        Q  I observed from the action taken by the Board, and I

1  am referring to the State Water Rights Board, that you testi-

2  fied at the hearing--this statement is from the decision of

3  the Board, or at least part of the report--Mr. Bookman testi-

4  fied at considerable length as to the investigation and find-

5  ings set forth in Bulletin 57.  And it goes on and says that

6  you testified in regard to runoff and to other physical fea-

7  tures and physical aspects of the Santa Margarita River.

8     MR. MOSKOVITZ:  Was that a question, your Honor?  I

9  would like to have it read.

10  BY MR. VEEDER:

11     Q  Is that correct?

12     MR. MOSKOVITZ:  I object to the question, your Honor.

13  It attempts to go behind the decision of the Board, into the

14  proceedings of the Board, and therefore it is not appropriate

15  in this case.

16     MR. SACHSE:  Same objection, with the additional objection--

17  with the understanding that there is a stenographic transcript

18  of the proceedings which is the best evidence.

19     THE COURT:  Is this preliminary?

20     MR. VEEDER:  Yes, your Honor.

21     THE COURT:  What are you going into next, what he testi-

22  fied to?

23     MR. VEEDER:  No.  I am going to make  inquiry as to what

24  in his opinion the effect of the Lipincott Dam would be on

25  the users if that dam impounds 35,000 acre feet.

1    THE COURT:  Objection overruled.  You may answer it.

2    THE WITNESS:  May I have the question again?

3    (Record read.)

4    MR. MOSKOVITZ:  I would like to make another statement.

5    THE COURT:  This is preliminary.  You may answer yes

6  or no.

7    THE WITNESS:  Yes.

8  BY MR. VEEDER:

9    Q  Now, in making your studies from which you testified,

10  did you take into consideration the demands for water by

11  riparian and appropriative claimants on De Luz Creek?

12    MR. MOSKOVITZ:  Your Honor, I object to Mr. Veeder tying

13  this into his prior testimony.

14    Now, if he wants to question Mr. Bookman as to his

15  technical knowledge, that is all right.  But I don't think

16  there is any connection between that and a hearing at which

17  Mr. Bookman testified.

18    THE COURT:  I have the same feeling, Mr. Veeder.  If you

19  want to stipulate this man is a qualified engineer then you

20  may question him as to physical engineering facts.  But to

21  tie into did you take into account this, and this, and that,

22  we are right back where we were this morning.

23    MR. VEEDER:  I believe you are absolutely right.

24    From our standpoint I am going to interrogate this wit-

25  ness pretty largely as to what he testified before the State

163

1    Water Board.

2         THE COURT:  The fact that you are asking here what he

3    was asked there doesn't present any problem, but the question

4    is as you framed this one did you take into account.

5         Can it be stipulated this man made a study of this stream,

6    and is an engineer, and testified as an expert witness before

7    the Water Board?

8         MR. SACHSE:  I will so stipulate.

9         THE COURT:  His general qualifications.  And then--

10        MR. VEEDER:  I will agree that certainly he is an engineer,

11   irrespective of my attempt to be facetious this morning, and

12   that he has done work in the Santa Margarita.  I have a genuine

13   question when I ask him what were his studies on the De Luz

14   Creek, because I think it is essential that we know that.

15        MR. SACHSE:  He didn't ask him what were his studies on

16   De Luz Creek.

17        MR. VEEDER:  I said did you take into consideration--

18        THE COURT:  Why don't you ask him "Did you make a study

19   of De Luz Creek," instead of saying did you take into consider-

20   ation when you testified before the Board?

21        MR. VEEDER:  That is a question I would like to have

22   answered.

23        THE COURT:  Objection sustained.

24        MR. VEEDER:  This is an offer of proof.  I would like to

25   show that this witness testified at the hearing, but did not

b-15

1  indicate any calculations as to the demands on De Luz Creek

2  in connection with the operation of the Fallbrook-Lipincott

3  Dam.

4       MR. MOSKOVITZ:  I make the same objection.

5       MR. SACHSE:  The same objection.

6       THE COURT:  Sustained.

7       Now, you are permitted to inquire of him as an engineer

8  about what he knows about the physical facts that are material

9  here.  But let's forget what he testified to, unless for im-

10  peachment purposes it becomes material--or for contradictory

11  purposes would be a better phrase.

12  BY MR. VEEDER:

13       Q  In the studies that you have made on De Luz Creek did

14  you take into consideration the demands for water by riparian

15  and appropriative claimants on that stream?

16       Now, I am asking you not to look at counsel.

17       MR. MOSKOVITZ:  Let me explain this, your Honor.  I told

18  this witness before that I would like a little pause for

19  opportunity to object if an objection is relevant, and he is

20  waiting to see if I am going to object.  There is nothing

21  irregular about that.

22       MR. VEEDER:  I think it is highly irregular.

23       Did you tell him what to say?

24       MR. MOSKOVITZ:  No, Mr. Veeder, you know that I didn't.

25       MR. VEEDER:  I heard that you did.

1    THE WITNESS:  You are wrong, Mr. Veeder.  Your Honor,

2  may I ask a question?

3    MR. VEEDER:  I object to this, your Honor.

4    THE COURT:  Yes, sir, you may ask  questions.

5    THE WITNESS:  In order to answer Mr. Veeder's question

6  whether I took into account the riparian rights downstream,

7  it would require more than a yes or no answer to give the

8  correct picture to the Court of just exactly what we do,

9  because we did take into account the downstream uses.

10    THE COURT:  You may always ask permission to explain an

11  answer.

12    MR. VEEDER:  I desire him to explain it.

13    THE COURT:  Did you or did you not?

14    THE WITNESS:  We took into account, your Honor, the

15  downstream uses.  We did not in our study, engineering studies

16  of the water resources of the State, try to determine water

17  rights, what the riparian rights might be, or appropriative

18  or overlying, or any other type of rights.

19    We were making a study of conserving water now wasting

20  into the ocean.  And who built the projects was of no concern

21  to us.

22    We made a study of the water being used below--  We made

23  a study as to the water  wasting into the ocean.

24    MR. VEEDER:  I object to the last part of that answer.

25    THE COURT:  Overruled.

BY MR. VEEDER:

Q   You said the downstream?

A   Downstream uses.

Q   Downstream uses.  What were the maximum uses that you calculated to exist on De Luz Creek?

A   What were--  May I have the question again?

THE COURT:  Read it.

(Record read.)

THE WITNESS:  The question is quite vague.  May I suggest-- ask you a question?

MR. VEEDER:  No, no.

MR. MOSKOVITZ:  If you can't answer it just say you can't answer it.

THE WITNESS:  It is improper, I can't answer it.

THE COURT:  In what way would you want the question clarified?

THE WITNESS:  Well, if he is talking about a dam proposal on De Luz Creek and the water uses below it, that is one thing.  But when he says what are the water uses on De Luz Creek I will point out to you that De Luz Creek goes all the way up the watershed.

MR. VEEDER:  Put De Luz Creek on, like I told you.

THE WITNESS:  De Luz Creek branches out into a number of forks there.

MR. VEEDER:  Put on the branches.

b-18

1    MR. MOSKOVITZ:  Your Honor, I think it might clarify

2    the record if Mr. Veeder would ask what studies he is talk-

3    ing about.  I am not sure he is clear whether there was one

4    or a number of studies, and what he is now referring to.

5    MR. SACHSE:  I would like to point out, your Honor,

6    that De Luz Creek is not affected by the Fallbrook Dam.

7    THE COURT:  Let's get rid of argument.  Ask your next

8    question, Mr. Veeder.

9    BY MR. VEEDER:

10   Q  Did you consider, when you were making studies on

11   De Luz Creek, the maximum potential demands that would exist

12   on that stream, assuming that the  Fallbrook-Lipincott Dam

13   was constructed?

14   A  The question is improper.  De Luz Creek, your Honor,

15   doesn't have any connection with Fallbrook-Lipincott site.

16   MR. VEEDER:  I don't know who is the lawyer here, but

17   Bookman seems to think he is.

18   THE COURT:  When you say improper, if you don't under-

19   stand the question that is one thing--

20   THE WITNESS:  I understand the question, but I can't

21   answer it physically.

22   MR. VEEDER:  Mentally?

23   THE WITNESS:  Mentally.

24   THE COURT:  I think I know what Mr. Veeder is getting at,

25   if he wouldn't be so chary of words.

b-19

1    MR. VEEDER:  I will ask him.

2    Q  Did you make a study as to the extent of the riparian

3 rights on De Luz Creek?

4    MR. SACHSE:  In connection with what?

5    MR. VEEDER:  In connection with the Fallbrook-Lipincott,

6 for which permits were issued on applications 12178 and 12179.

7    MR. SACHSE:  I have no objection to that question.

8    MR. MOSKOVITZ:  I have no objection.

9    THE COURT:  You don't have to say you don't have an ob-

10 jection.

11    MR.MOSKOVITZ:  I was about to make one.

12    THE WITNESS:  We took into account the water uses on

13 De Luz Creek in connection with our studies of a possible

14 dam at the Fallbrook-Lipincott site.

15 BY MR. VEEDER:

16    Q  What was the results of that study?  How many acre

17 feet a year did you calculate to be the maximum demand that

18 could reasonably be anticipated on De Luz Creek?

19    A  We did not take the anticipated demand.  I mentioned

20 at the start, I explained we took the existing present water

21 use in the area.  We weren't trying to forecast in our studies

22 what the future demands might be, or determine water rights.

23    Q  Would not the result of such a study be to--assuming

24 the dam was built then--wouldn't the result be that the rights

25 could not--the uses, rather, of the water could not be increased

1  without making incorrect your calculations in regard to the

2  yield at the Fallbrook-Lipincott site?

3      MR. SACHSE:  Object, it is unintelligible.

4      THE COURT:  Well, I had trouble following it.

5      MR. VEEDER:  I will rephrase it.

6      Q  You studied only the present uses.  Is that correct?

7      A  And the waste to the ocean.

8      MR. VEEDER:  I move to strike that last part of that sen-

9  tence as not being responsive.

10      THE COURT:  Overruled; assuming he means yes, and the

11  waste to the ocean.

12  BY MR. VEEDER:

13      Q  And what was the maximum riparian uses as of today

14  based on that study?

15      A  What were?  I can't--  We did not determine riparian

16  uses, as I understand the definition of riparian rights.

17      Q  All right.  Did you determine what the total present

18  acre foot use was on De Luz Creek at the present time in

19  connection with Fallbrook Dam?

20      THE COURT:  When you say "At the present time" you mean

21  as of the time the study was made?

22      MR. VEEDER:  As of the time the study was made, as of

23  August 12th through 14th, 1957.

24      THE WITNESS:  We determined all of the present uses be-

25  low the Fallbrook-Lipincott site, including the De Luz Creek

b-21

1    area.

2    BY MR. VEEDER:

3        Q   All right.   Now, answer the question.   What was the

4    demands on De Luz Creek at the present time?

5        MR. MOSKOVITZ:   Now, you can refer to notes if you don't

6    have the exact figures in your head.

7        THE WITNESS:   Well, I don't have them all in my head.

8    I don't know whether we have broken De Luz Creek--  See, we

9    took De Luz Creek and Santa Margarita River as a unit below

10   the Fallbrook-Lipincott site.  You are referring only to

11   De Luz Creek.   Correct?

12       MR. MOSKOVITZ:   While he is looking this up could I have

13   the last question read?

14       (Record read.)

15       MR. MOSKOVITZ:   Do you have the response there that Mr.

16   Bookman made, before he starts looking?

17       (Record read.)

18       MR. MOSKOVITZ:   Your Honor, I think the question has been

19   answered already, there is no question pending.   He said he

20   doesn't have it separated.

21       THE WITNESS:   I don't have it separated, but we took the

22   unit as a whole.

23   BY MR. VEEDER:

24       Q   All right.   You don't have it now?

25       A   I don't have it here.   We might have it separated in

b-22

1   calculations, I think we did.

2        Q   But you don't know the answer now?

3        A   I don't know the answer now, and I don't believe it

4   is published in this.

5        Q   Now, did you consider the maximum irrigable acreage

6   in the De Luz Creek--on the De Luz Creek?

7        A   Yes, we did.

8        Q   And what did you find that maximum irrigable acreage

9   to be?

10       A   Again those figures are not broken down.  In our method

11  of study we took the unit as a whole and reported it here.

12       Q   Would your calculations as to the Fallbrook-Lipincott

13  site be different if you had considered the maximum water

14  demand for lands which were susceptible of practical and

15  profitable irrigation?

16       A   Which figure are you talking about?  You said would

17  your figures be different on the Fallbrook-Lipincott site.

18  What figure are you talking about?

19       Q   As I remember, you said there would be a firm yield

20  of 5,100 acre feet annually, that is the figure to which I

21  am making reference.

22       A   The 5,100 acre feet of safe yield is based on present

23  use and on present waste to the ocean.

24       Q   In other words--

25       A   If there was water development there would be less

b-23

1  yield, if releases had to be made above the present develop-

2  ment.

3      Q  It would require Fallbrook then to release more

4  water to meet the demands downstream if there is an increased

5  water use on De Luz Creek.  Is that correct?

6      A  If that is required of them to operate that way it

7  would be less--it would be a lesser safe yield.

8      Q  In other words, if the irrigable acreage on Fallbrook-

9  De Luz Creek increased by 100 per cent it would have a

10 very drastic effect upon the net safe yield of the Fallbrook-

11 Lipincott Dam.  Is that not correct?

12     A  I am trying to think.  And the reason I am stopping

13 to think, if you will allow--

14     Q  I have no objection to a man thinking.  Go ahead.

15     A  --is how you are thinking this increased use will

16 take place, because that has a physical tie-in on the effect

17 of the yield of the Fallbrook-Lipincott site.  If another

18 reservoir is built on De Luz Creek to store water on De Luz

19 Creek it is--

20     Q  Now, I am going to ask you to stop, because this has

21 nothing whatsoever to do with my question.

22     THE COURT:  I think your question can be answered.

23     MR. MOSKOVITZ:  Do you remember the question?

24     THE WITNESS:  Will you ask the question again, please?

25     THE COURT:  It may save time by re-asking it, Mr. Veeder.

b-24

1    THE WITNESS:  I think you wanted to know--

2    THE COURT:  The question was, as I understand it, if

3    there was a hundred per cent increase of uses of water on

4    De Luz Creek would not that have a major impact upon the

5    safe available amount at the Fallbrook-Lipincott site.

6    THE WITNESS:  Didn't I answer that, that if they had

7    to release water to meet those needs it would have an effect

8    on the safe yield of that basin--of that reservoir.

9    BY MR. VEEDER:

10   Q  Well, as an experienced engineer and as a man experi-

11   enced in water matters, hasn't it been your experience that

12   when there is increase of demand downstream that water is

13   delivered to a man with the vested right downstream?

14   A  If they have vested rights I believe that is true,

15   vested prior rights.

16   Q  So if we were to find in this litigation that the

17   De Luz area had riparian irrigable land not yet irrigated,

18   but susceptible to practical and profitable irrigation, it

19   would have an effect upon the quantity of water that would

20   be impounded at the Fallbrook-Lipincott site.  Is that not

21   right?

22   A  I am thinking again of how they would get that water,

23   if they pumped it out of the ground for that area, lowering

24   the ground water table--

25   MR. VEEDER:  I object to that response.

THE WITNESS:  I will say yes to your question.

MR. MOSKOVITZ:  Do you care to explain your answer?

THE WITNESS:  No, I don't care to explain it, he wouldn't understand.

BY MR. VEEDER:

Q  Now, have you observed in the De Luz area an increase in irrigated acreage since 1953?

MR. SACHSE:  I will object unless the witness defines the De Luz area.  He is talking--  Just a moment.  He is talking about development in the De Luz area downstream from the Fallbrook Reservoir.

We all have eyes and can all look at the map.  Now, how much of the De Luz area is he talking about?

THE COURT:  I know what he is talking about.  Maybe you can't follow it.

Start again and ask the question.

BY MR. VEEDER:

Q  Now, Mr. Bookman, in regard to the De Luz watershed, have you been in there and observed the development since 1953?

A  No.

Q  So when you testified on August 12th through 14th of 1957, you didn't know the then development in the De Luz area?

MR. MOSKOVITZ:  I object to that question on the ground

b-26

1  that it is a question concerning the testimony at the hear-

2  ing.

3      THE COURT:  It might incidentally be that.  Overruled.

4  BY MR. VEEDER:

5      Q  Would you answer the question?

6      A  I testified on the basis of our studies which were

7  completed in 1954, as of 1954, and I haven't personally been

8  in that area.

9      Q  When were the studies in the De Luz watershed made?

10     A  From 1952 to 1954.

11     Q  In other words, it is possible then that the studies

12  were at least five years old when you testified as to the

13  demands and water uses in the De Luz watershed?

14     A  That is correct.

15     MR. MOSKOVITZ:  Your Honor, you overruled my objection

16  once, but it seems to me that you have opened the opportunity

17  for Mr. Veeder to cross-examine--

18     THE COURT:  Go ahead.

19     MR. MOSKOVITZ:  --as to what he testified to, and the

20  basis upon which he testified at the Water Rights Board Hear-

21  ing.  And I submit that is not relevant.

22     If he wants to ask Mr. Bookman as to the knowledge and

23  when he obtained the knowledge, but not to impeach his testi-

24  mony at the hearing.

25     THE COURT:  It might have some bearing on the  credibility

b-27

1    at this hearing.

2        I have indicated we aren't going into the Water Board

3    hearing.

4        Overruled.

5    BY MR. VEEDER:

6        Q  Now, if there is a reduction in the quantity of water

7    reaching Camp Pendleton by reason of increased water uses on

8    De Luz Creek, will that not have an effect upon the quantity

9    of water which can be impounded at the Fallbrook-Lipincott

10   Dam?

11       A  If they require that  water to meet the increased needs

12   below, yes.

13       Q   Now, when you were making your studies did you

14   take into consideration the demands for water at Camp Pendle-

15   ton?

16       A  We took into account the use of water in Camp Pendle-

17   ton area.

18       Q  Did you consider just the then and present uses at

19   Camp Pendleton?

20       A  Our estimates were based on the present and the ulti-

21   mate water requirements in our water resources development

22   studies.

23       Q  What did you consider the Camp Pendleton ultimate

24   demands to be?

25       A  We didn't separate Camp Pendleton.  We had a hydro-

graphic unit below each of the Dam sites, and we didn't make

the study for Camp Pendleton, or for Fallbrook, or for any

particular unit or any particular entity.

Q  Did you take into consideration the military uses on

Camp Pendleton, the Naval Ammunition Depot, and the Naval

Hospital?

MR. MOSKOVITZ:  I object to that question.  The word

"military" should be explained before he answers the question.

MR. VEEDER:  I believe everybody here knows what I

am talking about.

Q  Do you know what the word "military" means?

A  I think I do.

Q  Tell your counsel then.

THE COURT:  That isn't the question, military uses.  You

explain   what you mean by your question, Mr. Veeder.

MR. VEEDER:  All the demands on Camp Pendleton, the

Naval Ammunition Depot and the United States Naval Hospital.

THE WITNESS:  Our present uses were based on data supplied

to us by Camp Pendleton on their military and non-military

uses.

BY MR. VEEDER:

Q  And that was then the present uses at Camp Pendleton,

and not the uses that would be required for complete mobili-

zation.  Is that right?

A  No, we estimated the ultimate water requirement in that

1   area in the event it all fully developed into an agricultural

2   area.

3       Q  You didn't take into consideration then the military

4   demands on the enclave?

5       A  No, we assumed that the military establishment might

6   not be there ultimately.

7       Q  You think Russia might take over?

8       A  I didn't say that.

9       MR. MOSKOVITZ:  I object to that.

10  BY MR. VEEDER:

11      Q  Now we will ask you, in making your calculations did

12  you consider the fact that a large share of the water in the

13  basin is returned sewage effluent?

14      A  Yes, we did.

15      Q  And did you credit the demands down there for the

16  sewage effluent, or not?

17      A  We credited the demands with the sewage effluent which

18  was being returned.

19      Q  Now, you said that you made your calculations on an

20  agricultural demand.  Is that right?

21      A  Ultimately.  Presently on just what is being used.

22      Q  And did you use your sewage effluent on those ultim-

23  ate demands?

24      A  The ultimate demands has nothing to do with the supply.

25      Q  Well, now, you said that you were talking about an

1   agricultural demand down there.  Did you include in that cal-

2   culation sewage effluent from the military establishment?

3       MR. SACHSE:  Object, the question has been answered.

4   Sewage effluent is a supply, not a demand.

5   BY MR. VEEDER:

6       Q  In making your calculations did you view the sewage

7   effluent returned to the basin as part of the available supply

8   for the development?

9       A  Yes, we did.

10      Q  In other words, even though you made your agricultural

11  calculations you included in those calculations sewage efflu-

12  ent from a military establishment.  Is that right?

13      A  Well, now, I may have been wrong in that.  Just a

14  minute.  We in our--  We computed the ultimate water require-

15  ments in view of the fact that the ultimate water requirements

16  greatly exceeded what you can develop locally on the stream.

17      The balance was to be brought by imported water, or by

18  reclamation of sewage, and therefore we did not designate

19  whether we would have sewage returned to the basin or not in

20  that sort of a plan.

21      Q  So you used either imported water or sewage effluent

22  with water being available for your calculations?

23      A  We didn't use it.  We assumed it would be used.

24      Q  Isn't there an inconsistency in your studies, because

25  you have to use sewage effluent to make your studies sensible,

b-31

1  yet you talk about an agricultural demand where you would

2  not have a sewage effluent?

3  A  No.  We can't predict whether that area will be

4  military or agricultural in ultimate use.

5  Q  What was your own use upon which you made your study?

6  A  It was agricultural.

7  Q  How can you be consistent with the last answer?

8  A  There could still be some urban development in the

9  area, as for instance in the Fallbrook area.

10  Q  Where would your sewage effluent come if it isn't

11  coming from agricultural?

12  A  From downstream it would be returned to the basin,

13  unless there was an outfall sewer.

14  Q  What would that be in this hypothesis that you devel-

15  oped?

16  A  I haven't the breakdown here.

17  Q  Could you make a calculation as to sewage effluent

18  without knowing the source of it?

19  A  No.  We assumed in all of our water resources study

20  that within any particular area there is a certain percentage

21  of urbanization as well as agricultural development.  This is

22  based on experience in California.

23  On that basis we base our study on what urban demands

24  will be.

25  Q  Did you not use in your studies the present quantities

b-32

1   of sewage effluent returned by Camp Pendleton?

2       A   Yes, because that is a fact.

3       Q   And used it in your own study?

4       A   No.

5       Q   How much sewage effluent did you say was used in

6   your study?

7       A   I haven't the figure in mind.

8       Q   Now, if there wasn't sewage effluent returned to the

9   stream would that not make a difference in your calculation

10  as to the net safe yield of the Fallbrook-Lipincott Dam?

11      A   If the operators of the Fallbrook-Lipincott Dam were

12  forced to release water to meet those needs, if somebody had

13  a vested or prior right to that sewage, then it would decrease

14  the yield.

15      Q   Now, we have stipulated in this case that there are

16  riparian lands at Camp Pendleton.  Did you know that?

17      A   That there are riparian lands?

18      Q   Yes.

19      A   I don't know anything about your stipulation.

20      Q   So you are aware, are you not, that there is a maximum

21  potential demand for riparian land, even though the rights

22  may not be exercised?

23      A   There is a potential there, yes, sir.

24      Q   And what was the potential you ascribed to those

25  riparian lands when you made your calculations of 5,100 acre

1   feet at the Fallbrook-Lipincott site?

2       A  We made the calculations on the basis of present use

3   downstream.

4       Q  So as a matter of fact, you didn't take into consider-

5   ation the maximum potential use that could be reasonably

6   expected?

7       A  No.  We didn't know who was going to build this

8   reservoir; it could be the Navy building it for their use

9   down below.

10      Q  For the Fallbrook-Lipincott site?

11      A  We didn't know.  We didn't know who was going to make

12  these water resource developments.

13      Q  You made a study that showed a 5,100 acre feet yield

14  at the Fallbrook-Lipincott site, didn't you?

15      A  Yes.

16      Q  When you made that calculation, the 5,100 acre foot

17  safe yield, you must have taken into consideration the demands

18  downstream for the maximum ultimate military needs, or it

19  wouldn't be reflective of what could normally be expected in

20  that area.  Isn't that right?

21      A  No, that is not right.

22      Q  It would be purely academic, would it not, without

23  taking into consideration the future development?

24      A  The future development can be met by imported water

25  or sewage reclamation.  We were merely interested in conserva-

1 tion of water wasting into the ocean, and it could be done

2 by any agency.

3     Q  And when you made your calculations for the Fall-

4 brook-Lipincott site and ascribed to it a net safe yield of

5 5,100 acre feet what was the period of time that you used

6 in making that study?  What were the years of runoff that

7 you used?

8     A  Well, our critical period of runoff, I believe, is

9 during--at the time of our studies, which were made in 1954,

10 was from 19--let's see if I can find that.  In our Bulletin

11 the mean period of runoff which is shown was used for the

12 runoff for the period 1895-'96, to 1942-'43, that is a 48

13 year period, was the mean.  Then we found the most critical

14 period was in that total length of record.

15     Q  Now, how would you describe the period from 1943 down

16 to 1957 when you testified?  Was that one of the driest periods

17 in history?

18     A  Yes, I believe it is.

19     Q  Now, wouldn't it have been a fair calculation to include

20 that rather extensive period of 15 years?

21     A  The critical drought period which the reservoir had to

22 carry over the water in storage was up to 1951, which I be-

23 lieve was the date of our--wait a minute--1953, which was

24 the end of our study, the water year of 1953.  Wait a minute.

25 We stopped the drought period, because 1951-'52 was an above

1   normal year, we stopped our drought period in 1951.

2       Q  So your calculations as to the net safe yield of

3   the Fallbrook-Lipincott site would necessarily be different

4   if you used the full period down to the time that you testi-

5   fied, rather than the period from 1895 to 1943, wouldn't it?

6       A  That is correct.  This drought is now more severe

7   than any of record along that line, and it would increase the

8   safe yield for that size reservoir.

9       Q  So you wouldn't want this Court to believe that the

10  5,100 acre feet net safe yield, concerning which you testi-

11  fied, as being your conclusion at the present time as to net

12  safe yield, at the time you testified?

13      A  I don't want him to believe that, no.  I testified

14  on our studies, not on what it is at the present date.

15      Q  So actually what you testified to and what the 5,100

16  acre feet net safe yield that you said could be expected was

17  inaccurate at the time that you made it from standpoint of

18  actual wet water in the stream.  Isn't that right?

19      A  That is incorrect, because I qualified my statement;

20  I was testifying to this report which had been established.

21      Q  But you were not testifying as to actuality then?

22      A  That is not the question.

23      Q  Well, would you answer my question?

24      A  I was testifying on this report, and I made it clear

25  in my testimony that I was testifying on studies made for

b-36

1   Bulletin 57, and not to mislead anyone to believe--

2       MR. SACHSE:  We are back in the same situation, your

3   Honor.

4       THE COURT:  Yes, we are getting back to bases of what

5   he testified on.  If you want to examine him here as to what

6   he knows about this area that is one thing.

7   BY MR. VEEDER:

8       Q Now, Mr. Bookman, in making your calculations about

9   the 5,100 acre feet net safe yield at the Fallbrook-Lipin-

10  cott site, what would you calculate that net safe yield to

11  be at the present time by reason of the more extended infor-

12  mation in the history of runoff that you now have?

13      A  May I look at something in my briefcase?

14      THE COURT:  Yes.

15      THE WITNESS:  I may say, Mr. Veeder, that--

16      MR. VEEDER:  Now--

17      THE WITNESS:  Oh, you want a direct answer.  I find here

18  and I am looking at a study which I requested--

19  BY MR. VEEDER:

20      Q  May I look at it?  And what are you going to use

21  those notes for?

22      A  I was going to answer your question.

23      Q  Are you refreshing your memory or what you doing?

24      A  I am looking at some figures that you asked for of

25  what the change would be if it was restudied up to the present

b-37 ✓

1    time.

2         Q  As up to August, 1957.

3         A  My study was as of the end of the water year, Septem-

4    ber, 1957.

5         Q  Did you make that study yourself?

6         A  No, I had one of my staff make the study.

7         Q  Was it made under your direction?

8         A  Yes.

9         Q  And would you state the source of your data upon

10   which the study was made?

11        A  On the basis of USGS records, and also on the basis

12   of De Luz--  Well, we studied all of the safe yield, what

13   they would be at the present time, of USGS records of run-

14   off.

15        Q  Yes.  And did you take into consideration the other

16   elements that you studied when you made your original calcu-

17   lations of your 5,100 acre feet?

18        A  It is made on the same basis of water use below.

19        Q  Below the Lipincott site?

20        A  That is right, but on a more critical drought period.

21        Q  And what were the results of that study?

22        A  The results of that study showed that the Fallbrook-

23   Lipincott site for the critical period which would begin in

24   1952 through September, 1957, for a 35,000 acre foot reser-

25   voir, that the safe yield of such a reservoir would decrease

1   over that shown in the Bulletin 57 by approximately 100 acre

2   feet a year.

3       Q   One hundred acre feet a year less?

4       A  Yes.

5       Q   Now, in making that study, in making the calcula-

6   tions in regard to the net safe yield, what were the methods

7   that you used?

8       A   We determined what the inflow is at the point of

9   reservoir, which includes on the Fallbrook-Lipincott site

10  the calculation of the runoff under present conditions--when

11  I say present I am speaking again of the Bulletin 57, assump-

12  tion of conditions as of that time--into the reservoir, from

13  the USGS records available.

14      We first computed the runoff into the reservoir, and then

15  we started out at the beginning of the drought period, or

16  from the year to year runoff and operated--and when I say

17  operated I mean calculated--year by year what the maximum

18  amount we could get out with a varying supply, starting with

19  a full reservoir at the beginning of the drought period and

20  ending up with an empty reservoir at the end of the drought

21  period.  We weren't sure that September, '57 would be the

22  end of the drought period.

23      Q   Now, could you state the quantities of water that

24  would be released down to Camp Pendleton and the Naval

25  Ammunition Depot and the United States Naval Hospital during

b-39

1  the ten years of most severe drought, still proceeding on the

2  basis of a net safe yield of 5,100 acre feet at the Fall-

3  brook-Lipincott site?

4      A  Yes, I can give you the releases that we made.

5      Q  During the ten worst drought years.

6      A  I mentioned that our critical period isn't over the

7  ten drought years, it is over the period from 1953-'54 up

8  to '56-'57.  We had in our analysis previously for Bulletin

9  57, we have the figures of the releases that we would make

10  in our calculation, and those could be added to these, if

11  you so desire.  I don't have those figures or calculations

12  all here.

13      Q  Was there ever a time in all of your studies when

14  no water whatever would be released down to Camp Pendleton

15  during any given year?

16      A  No.

17      Q  Well, what was the minimum amount that would be re-

18  leased down in any bad year?

19      A  I will try to find it here, if I can.  I don't have

20  the figures here in this column.  I would have to make them

21  available, if the Court so desired.

22      THE COURT:  We have been going over an hour.  We will

23  give the reporter a break here.

24      How much longer will we be with this witness?

25      MR. VEEDER:  Well, I am quite satisfied with what he is

1  doing I will probably run out the afternoon with him, maybe

2  Monday.

3      THE COURT:  He states some of his material isn't here.

4  It seems to me if you want some of them--

5      MR. VEEDER:  When he says he doesn't have it I will

6  buzz right on over it.

7      MR. MOSKOVITZ:  Your Honor, I want to call your atten-

8  tion to the fact that this witness has some other commitments

9  for next week.

10      MR. VEEDER:  Maybe I had better get a subpoena.

11      THE COURT:  What matters do you have next week, Mr.

12  Bookman?

13      THE WITNESS:  I am due to be in Sacramento, leave Sunday

14  night, to meet with the Director of Water Resources in connec-

15  tion with the conduct of our work, and he informed me that it

16  was an important staff meeting.  On Tuesday I am due to pre-

17  sent a talk at the Los Angeles Chamber of Commerce Water

18  Conference.  Wednesday I have an appointment in San Bernardino

19  with the County Board of Supervisors.  And I don't know about

20  Thursday and Friday, I can't recall my calendar at the moment.

21      THE COURT:  Mr. Veeder, you know we haven't got a

22  jury, you are trying this case to me, to the Master and

23  eventually it is to me.

24      Now, I am going to be a lot more easily convinced by

25  statistics, studies made, rather than dissertory cross-examin-

b-41

1    ation of a witness.

2         I think maybe you ought to shorten this matter up and

3    try to get through with this witness this evening.

4         MR. VEEDER:  Well, your Honor, here is a witness who,

5    in my view, is extremely important, and I haven't even started

6    to work on him with regard to the demands in the enclave or

7    above the Fallbrook-Lipincott site.

8         THE COURT:  Well, the premise that he has given you for

9    his study was a premise of present uses.  This case is not

10   going to be tried solely on the basis of present uses, so

11   the whole premise is such that you could almost wipe it out

12   and say so what.

13        MR. VEEDER:  The day hasn't been wasted.

14        THE COURT:  Well, present uses may be of some considera-

15   tion to us, but this case on riparian rights is to be deter-

16   mined on what are the maximum uses that could be made of the

17   various riparian rights that exist on the stream, whether they

18   have been used in the past or not.

19        That is a different matter.  Right, Mr. Witness?

20        THE WITNESS:  Yes.

21        MR. VEEDER:  Did you get that?

22        THE COURT:  I want to take the recess, but I want to

23   point out you are not trying this case to a jury.  If you

24   are trying to convince me, let's talk about things that will

25   be helpful.

1    MR. VEEDER:  I am very glad for your Honor's observa-

2    tion.  You said you didn't want to stay until 4:30?

3    THE COURT:  I will stay until 4:30 if we can get

4    through with this witness, rather than having him come back

5    even longer.

6    MR. VEEDER:  I will accelerate things, in view of your

7    Honor's observations.

8    THE COURT:  We are in recess.

9    (Recess.)

10   MR. VEEDER:  Mr. Reporter, could I bother you for the

11   last question?

12   (Record read.)

13   BY MR. VEEDER:

14   Q  Could you produce for us your calculations for--and

15   I would desire your Honor to mark them, and offer them--for

16   the releases below the Lipincott Dam site, predicated on your

17   studies, during the worst ten consecutive years of record?

18   Would you do that for us?

19   A  Yes, I can do that.  May I explain that we determined

20   first the--

21   Q  Can you do it?

22   A  Yes.

23   THE COURT:  Do you mean now, or at some time in the

24   future?

25   MR. VEEDER:  I am going to release him very shortly,

b-43

1   but I am asking him if he will supply this data that I am

2   asking for.

3           THE COURT:  At some time in the future?

4           MR. VEEDER:  Yes.

5           THE COURT:  What did you want to explain, Mr. Witness?

6           THE WITNESS:  I wanted to explain that we computed what

7   we call the gross safe yield over the reservoir, taking all

8   of the inflows through a critical period, and then after we

9   determine the gross safe yield without any releases at all we

10  take off the present uses necessary downstream, and that

11  gives us the new water that we have in the reservoir, so you

12  have that method of computation and that affects your ques-

13  tion that you have asked about the previous ten years of worst

14  drought period.  Do you see what I mean?

15          MR. VEEDER:  No.

16          THE WITNESS:  We compute--  We have the inflow into a

17  reservoir, we take a certain size reservoir and find what the

18  safe yield would be from that water coming into that for the

19  most critical drought period for an average annual--taking off

20  evaporation, and so forth, that gives us a gross yield; from

21  that we deduct the present uses downstream, and that gives us

22  the net new safe yield.  Have I made myself clear?

23          MR. VEEDER:  Well, yes.

24      Q  And will you give me what I have asked for?

25      A  I will give you what you asked for.

1        Q   Now, in  making your studies did you take into

2   consideration the development on the Vail properties?  Now,

3   you know where those are?

4        A   Yes, I do.

5        Q   Did you?

6        A   Yes, we did.

7        Q   And did you take into consideration the quantity of

8   water that the Vail's could use if they utilized their pre-

9   sent distribution system to its fullest maximum capacity?

10       A   We determined the safe yield of the Vail system as

11   it exists today.  Does that answer your question?

12       Q   No.

13       A   We have a distribution system--

14       Q   I will rephrase the question.

15       A   My answer is no.  I did not go into the distribution

16   system.

17       Q   You did not then calculate the quantity of water that

18   the Vail's could use through--

19       THE COURT:   Riparian  water?

20       MR. VEEDER:   All kinds, your Honor.

21       THE COURT:   Vested water, and all?

22       MR. VEEDER:   Yes, that they could use under their pre-

23   sent distribution system.

24       MR. MOSKOVITZ:   Let me see I understand the question.

25   Does this question also take into account the Judge's quali-

1  fications, taking into account the vested right?

2      MR. VEEDER:  Yes.  The appropriated right, and they

3  have their large dam up there.

4      THE WITNESS:  No.  We merely computed the present use of

5  the Vail Company, and we also have their ultimate water

6  requirements.

7  BY MR. VEEDER:

8      Q  And what did you calculate their ultimate water re-

9  quirements to be?

10     A  May I again state that the Vail Ranch is in two of

11  our hydrographic units.  We didn't make the study for the

12  Vail Company, Camp Pendleton or Fallbrook, we made them by

13  natural geographical basins.

14     Q  Have you observed irrigable lands that belong to the

15  Vail Company for which water is not presently available?

16     A  Yes.

17     Q  And it is a sizeable area, is it not?

18     A  Yes, it is.

19     Q  So as a matter of fact if the Vail's utilized all of

20  the riparian and appropriative water to which they are en-

21  titled there wouldn't be any water at all in the Santa Mar-

22  garita River, would there?

23     A  Did you say all that they are entitled to?

24     Q  Yes.

25     THE COURT:  Do you mean absent correlative rights?

b-46

1      MR. VEEDER:  I will rephrase the question.

2      Q  You have observed large areas of irrigable land on

3  the Vail Company.  Is that right?

4      A  That is right.

5      Q  Assuming that all the water that would be required

6  to irrigate those irrigable lands was actually utilized by

7  the Vail estate, would there be any water left in the Santa

8  Margarita River below that point down to Murrieta?

9      A  Down to Murrieta?

10     Q  Down to Murrieta.

11     A  No, if they could physically divert all of the water

12  they could put to use they could use  all of it, because there

13  is a great requirement for  imported water.

14     Q  In other words, the Santa Margarita water is in such

15  short supply that if the Vail's were to take what you believe

16  would be a reasonable entitlement to them--

17     A  I don't know.  You are putting this another way now.

18  I don't know what a reasonable entitlement to them is.  Our

19  studies are on an engineering basis of what water requirements

20  there are for land.

21     Q  You are saying that the Vail's could use far more

22  water than they are using from the Santa Margarita?

23     A  Yes.  That applies to the entire watershed.

24     Q  Did you take into consideration the stipulated judgment

25  between the Vail estate and the United States?

1       A   This we did.

2       Q   And what did you ascribe to that document from the

3   standpoint--   I will rephrase that question.

4       How much water did you calculate that the Vail estate

5   would deliver to the United States under the stipulated

6   judgment, if you recall?

7       A   I don't recall the figure of how much they would

8   deliver.   On the basis of our studies, we have a figure as

9   to what the water supply would be out of Temecula Creek with

10  the Vail Dam in operation, and with the present use of the

11  water.

12      Q   You figure then that the--   In making your study you

13  figured and considered that the stipulated judgment with the

14  Vail Company and the United States was an enforcible document.

15  Isn't that right?

16      A   Yes, we did.

17      Q   And the reason why the water was in the stream at

18  least during the summertime would be at least the existence

19  of that stipulated judgment.   Is that not right?

20      A   That is right.

21      Q   Now, in making your calculations for the Lipincott

22  Dam and how you arrived at your 5,100 acre feet, did you per-

23  mit the full amount of the water that the Vail Company would

24  deliver to the United States to pass the Lipincott Dam?

25      MR. SACHSE:   I will object.   The full amount of water

b-47

1   that the Vail's were required to deliver to the United States,

2   that is assuming a fact not in evidence.  The stipulation

3   does not say that.  The Circuit Court of Appeals, it is

4   stated--I can find the language for your Honor if you want to

5   give me a minute.  I think you will recall that it was

6   something to this effect, it is to be assumed that the re-

7   leases by Vail were to be for the benefit of everybody down-

8   stream, not the United States.  This is a question that is

9   assuming a fact absolutely not in evidence.

10      MR. VEEDER:   I can certainly ask the witness how he

11   arrived at his conclusions.

12      THE COURT:  Your objection is overruled.  Whether he is

13   right or wrong, he can test the witness's opinion.  He is now

14   asking him if he took into account a certain set of facts.

15   Maybe it will turn out later those facts shouldn't be con-

16   sidered that way.

17      THE WITNESS:  We made our studies on the basis that under

18   the stipulated agreement that the Vail Company was obligated

19   to maintain a minimum flow during the summer down Rose Canyon

20   Gorge of three second feet.  And with that inflow coming into

21   the proposed reservoir we were studying, we thereupon found

22   the safe yield and deducted the water uses below to come up

23   with the new yield that you would obtain.

24   BY MR. VEEDER:

25      Q  Did you calculate that three second foot continuous

b-48

1    flow would be permitted to go through the Fallbrook-Lipin-

2    cott site throughout the period from April 1st to October

3    30th?

4        A   Again, I mentioned the way we did it.  We took the

5    total--

6        Q   Could you answer that question yes or no?

7        MR. MOSKOVITZ:  If you can't, just say you can't.

8        THE WITNESS:  No, I can't.

9    BY MR. VEEDER:

10       Q   You can't answer whether you would permit three second

11   feet continuous flow to pass the Fallbrook-Lipincott site and

12   flow down to Camp Pendleton?

13       A   That isn't the way we did our study.

14       Q   You did not do that?

15       A   No.

16       Q   Did you make any calculation as to releases, daily

17   releases, to Camp Pendleton from the Fallbrook-Lipincott

18   Dam?

19       A   No.

20       Q   In other words, there would be periods in your oper-

21   ation where no water would be permitted to flow down the

22   Santa Margarita River to Camp Pendleton?

23       A   We don't know whether there would or would not be,

24   because we are assuming that the method of operation that

25   would be carried out would have to proceed through whatever

b-49

1   the State Water Rights Board, or permit hearings, or otherwise,

2   and so the details of operation are a thing that are undecided.

3       We merely took care of the present water uses below,

4   a fixed amount annually.  And how they regulated that daily

5   or hourly would be a matter of operation detail.

6       Q  Well, now, would there be in your calculation a time

7   when no water would flow on down?   I want to know that.

8       A  We didn't speculate whether there would or wouldn't

9   be water flowing at any moment.

10       Q  In other words, you wouldn't know, based on your

11   calculation of 5,100 acre feet, whether the Santa Margarita

12   would be dry throughout the whole period?

13       A  No.  We provided for all of the water being used

14   downstream in an annual amount.  I assume that the methods

15   of operation would be taken care of, if such an operation were

16   to be undertaken.

17       Q  Now, would you take this pencil and step up to Sandia

18   Creek and write on there--just a moment, I want to be sure

19   that it is 12178 or 12179.  That is on Sandia.  Put 12179 on

20   Sandia Creek, and make a circle on the creek there for a reser-

21   voir.

22       THE COURT:  Do you mean where Sandia joins--

23       MR. VEEDER:  No, no, above the confluence.

24       THE COURT:  Where is that?  That doesn't mean anything to

25   me, that is just out in space.  Whereabouts on Sandia is it?

b-50

BY MR. VEEDER:

1

2      Q   Would you get the description where the Sandia Dam

3   was to be located?

4      THE COURT:   Where is it with reference to where Sandia

5   joins Margarita?

6      MR. VEEDER:   It is above the confluence of the two

7   streams.

8      THE COURT:   Obviously it was on Sandia.

9      MR. VEEDER:   Well, you see, your Honor, the difficulty

10   with this is that Fallbrook figures are so very, very vague,

11   they refer to Sections 8 and 9, and 9 south, range 3 west.

12   So it would--

13      THE COURT:   Let's mark Sandia on the map so we know

14   where it is.

15      MR. VEEDER:   It is on the map.

16      THE COURT:   Mark it in red so we can see it.

17   BY MR. VEEDER:

18      Q   Now, would you also mark on Rainbow Creek 12178, and

19   put a reservoir above the confluence of that stream with the

20   Santa Margarita?

21      THE COURT:   Where is the river here?

22      MR. VEEDER:   Draw a line so we can see Rainbow Creek, too,

23   will you?

24      Q   Now, Mr. Bookman, calculating the runoff of the Santa

25   Margarita, as you know it, and of Sandia and Rainbow Creek,

b-51

1    would it not be a much greater burden on the stream to im-

2    pound 35,000 acre feet at the Fallbrook-Lipincott site than

3    it would be to impound 10,000 feet on the Sandia, and 10,000

4    feet on Rainbow, assuming that quantity of water was avail-

5    able?

6        A   Would there be a bigger burden on the stream?   In

7    what way?

8        Q   Well, if you had a 35,000 acre foot structure on the

9    Santa Margarita that would impose one burden on the stream,

10    would it not?

11        A   Yes, sir.

12        Q   Now, knowing the runoff of Sandia and Rainbow Creek,

13    assuming that you had two 10,000 acre foot  reservoirs, one

14    on Rainbow and one on Sandia, would there not be a lesser

15    burden on the stream by such an appropriation as that than

16    if you had the 35,000 acre foot structure?

17        A   I haven't made such a study.   We found that the

18    storage possibility at these two sites were very small

19    compared to what you could get on the main stem of the river.

20    I didn't make such a study.

21        Q   In other words, you would conclude that having a

22    10,000 acre foot structure on Sandia Creek and a 10,000

23    acre foot structure on Rainbow Creek would result--would not

24    reduce the quantities of water reaching the military enclave

25    as much as a 35,000 acre foot structure at the Fallbrook-

b-52

1    Lipincott site?

2        A    I can only express an opinion.  I think it would

3    be less yield with reservoirs on the two forks than on this

4    fork, and would be less of a burden.

5        Q    So if you were to change a plan from three 10,000

6    acre structures, one on Sandia Creek, one on Rainbow Creek,

7    and one on the Santa Margarita River to one where they would

8    impound 35,000 acre feet in a single reservoir there would

9    be what you would say a drastic change in the project, would

10   there not?

11       MR. MOSKOVITZ:  I object to that question on the ground

12   that it calls for the conclusion of the witness, drastic

13   change.

14       THE COURT:  Overruled.

15       THE WITNESS:  That is what I was thinking about, what

16   the word "drastic" means, and the significance of your inten-

17   tion and mine.

18   BY MR. VEEDER:

19       Q    What does drastic mean to you, Mr. Bookman?

20       A    Well, I would think if it was a hundred per cent change,

21   or more.

22       Q    You think it would be a hundred per cent change?

23       A    No, I don't think so.

24       Q    How much is the runoff of Sandia Creek?

25       A    I don't know.  I haven't got the figures here.

b-53

1      Q  It is pretty small, is it not?

2      A  It should not be too large.

3      Q  Would you say it would be a thousand acre feet a

4   year?

5      A  I don't know.

6      MR. SACHSE:  The witness has testified he doesn't know.

7   BY MR. VEEDER:

8      Q  You don't know.  But you would say that there would

9   be a greater burden on the stream by building one 35,000

10  acre structure rather than by building three 10,000 foot

11  structures at the points we have located there?

12     A  There probably would be.  It would depend on the

13  method of operation again, on the releases required, because

14  most of the water comes during the wet months, and it is

15  the summer months that it would be required to be released,

16  so that the reservoir would be filled up in the winter months;

17  that is one thing.  The drastic change or the magnitude would

18  depend on the method of operation.  But in general I think

19  there would be somewhat of a larger burden by the 35,000 acre

20  reservoir.

21     Q  What method would you recommend calculating--  I am

22  not asking you how much, but what method would you use in

23  determining the extent of the difference by reason of this

24  project change from three small reservoirs to one large one?

25     A  I would make actual studies on these two creeks,

b-54

1    Sandia and Rainbow, the same as we have on Fallbrook and

2    see what the difference is.

3        Q  So if we were to find, for example, that Sandia

4    Creek yielded a thousand acre feet and Rainbow Creek yielded

5    a thousand acre feet, the reduction, at the maximum amount,

6    would be 1,000 for each of those streams.  That is right,

7    isn't it?

8        A  Yes.

9        Q  So if you put in a 10,000 acre foot storage dam on

10   the Santa Margarita River at the Fallbrook-Lipincott site,

11   as distinguished from a 35,000 acre foot structure, the

12   quantities of water that would flow by that structure would

13   be a great deal more than if you had an impoundment--a dam

14   that would impound 35,000 acre feet?   In other words, a

15   10,000 acre dam would just let a great deal more water go

16   by, wouldn't it?

17       A  Yes, it would.

18       Q  Now, in making your calculations--

19       THE COURT:  Can the witness sit down again?

20       MR. VEEDER:  Oh, yes, by all means.

21       Q  Now, in making your calculations in regard to your

22   calculated net safe yield of 5,100 acre feet, did you take

23   into consideration the quantities of water required to main-

24   tain the subterranean basins which underlie Camp Pendleton?

25       A  They were to maintain them under the present uses.

2 0 5

b-55

1    Q  Now, could you maintain--  Would it be physically

2  possible to maintain the subterranean basins which underlie

3  Camp Pendleton if you impounded 35,000 acre feet of water and

4  add your safe net yield to 5,100, if the full demands and

5  diversions from Camp Pendleton would run to 12,500 acre feet

6  a year?

7         A  Diversions from the Fallbrook-Lipincott site?

8         Q  No.  No, from the dam.  I will rephrase it.

9         A  I am having trouble visualizing your question.

10        Q  Assume that the Marines and the Navy use actually

11  12,500 acre feet of water a year rather than the figure that

12  you used, whatever it was, as the present demand.  Would that

13  make a difference in your calculation as to the net safe

14  yield of 5,100 acre feet?

15        A  Yes, it sure would, because we--if the present uses

16  are such below that there is insufficient water that could

17  be developed in the yield in the reservoir, small enough

18  reservoir upstream, it would mean that it wouldn't be a

19  feasible project.

20        MR. VEEDER:  Your Honor, that would be my last question

21  if I have     the right to recall this witness at some time

22  later in the main trial.

23        THE COURT:  All right.

24        MR. VEEDER:  You may cross-examine.

25        You said I could?

1    THE COURT:  Yes, you may recall him.  He may be excused

2    to take care of his business, and we will work out with him

3    a mutually agreeable date to come back.

4

5                    CROSS-EXAMINATION

6    BY MR. MOSKOVITZ:

7        Q  Mr. Bookman, Mr. Veeder has been asking you many

8    questions concerning studies of the State, calculations of

9    the State, and you have been answering such questions.  What

10   were these studies and calculations of the State that you

11   were referring to in answering the questions?

12       A  These were made in connection with a Legislative

13   appropriation of $150,000 to make a basin-wide study in

14   connection with the possibility of developing water resources

15   in the Santa Margarita watershed in 1952.

16       Q  Now, were the results of these studies compiled in

17   any written form?

18       A  Yes, they were published in Bulletin 57, June, 1956,

19   Volumes 1 and 2.

20       MR. VEEDER:  We are going to have a long afternoon if

21   you are going to offer them.

22       MR. MOSKOVITZ:  May we mark them for identification?

23       THE COURT:  Mark them for identification.

24       What agreement have you reached as to the Defendant's

25   Exhibits?

6-57

1    THE MASTER:  M-A.

2    THE COURT:  M-A.

3    MR. SACHSE:  May it also be Fallbrook M-A?  It doesn't

4 matter.

5    THE COURT:  What difference does it make what they

6 are called as long as they are defense  exhibits?

7    THE MASTER:  M-A-1, and M-A-2.

8    MR. VEEDER:  That boy is not going to get to Fresno or

9 wherever he is starting, because if they are offering 57 I

10 want to go on voir dire.

11    THE COURT:  They are not offering it, they are marking

12 it for identification.  You know the difference between

13 offering an  exhibit into evidence and for identification.

14    MR. VEEDER:  Does he?

15    THE COURT:  I say you do.

16    MR. VEEDER:  Well, all right.

17    THE COURT:  If  we are going to have an argument about

18 that we will have it in Court some day where we can do it

19 leisurely.

20 BY MR. MOSKOVITZ:

21    Q  I hand you California M-A-1 and M-A-2 for Identifica-

22 tion, and ask you whether that is the report that you had

23 reference to?

24    A  Yes, it is.

25    MR. VEEDER:  I want to ask some questions on voir dire,

b-58

1  your Honor.

2  THE COURT:  Mr. Moskovitz, is it satisfactory not to

3  offer them at this time?

4  MR. MOSKOVITZ:  Yes, it certainly is, your Honor.  I

5  just want to have them marked.

6  THE COURT:  We don't need any voir dire.

7  MR. MOSKOVITZ:  It is going to take a long time, accord-

8  ing to Mr. Veeder's statement.

9  THE COURT:  Go ahead, Mr. Moskovitz.

10  BY MR. MOSKOVITZ:

11  Q  Now, in answering  questions concerning your calcu-

12  lations and studies, in preparing Bulletin 57, California

13  M-A-1 and M-A-2, you made reference to calculating  or taking

14  account of existing uses, that is, uses of water which were

15  made as of the time your study was made.  Is that correct?

16  A  That is correct.

17  Q  And you also had reference to ultimate requirements.

18  Is that correct?

19  A  That is correct.

20  Q  Would you explain the distinction between present

21  use and ultimate requirements?

22  A  Well, the present use is based on a cultural survey of

23  the area--by culture I mean a crop survey, if it is in agri-

24  culture--and we then apply unit values of water requirements

25  for different crops and come up with a present requirement.

b-59

1    We also take into account the exportations of the basin;

2    for instance, in the Camp Pendleton area if any water is

3    pumped and taken out we get the pumped quantity, and in this

4    case we used the figures of Camp Pendleton for any water

5    being pumped and put onto agricultural land.

6    We also obtained the military use in Camp Pendleton,

7    their figures.  We obtained the amount of water being used

8    in the other parts of the area, and thereby end up with the

9    present use of water.

10    Under ultimate conditions we envision potential for

11    agricultural and urban use.  We thereupon compute what the

12    ultimate need for water will be, and that need is consumptive

13    use, plus the unavoidable losses that would be required to

14    maintain such a land use pattern for full development.  And

15    our ultimate is unknown time in the future when full develop-

16    ment would take place.

17    Q  Your present use is supposed to be an estimate of water

18    actually used at a certain time?

19    A  That is right.

20    Q  And the ultimate is the amount of water the land is

21    capable of using under full development?

22    A  Providing there was a supply of water available for

23    that land.

24    Q  In determining ultimate needs you do not take into

25    account water availability.  Is that correct?

1   A   No, that is correct.

2   Q   Now, in computing these studies which culminated in

3   Bulletin 57, the safe annual yield from reservoirs, I assume

4   there is more than one reservoir?

5   A   Yes.

6   MR. VEEDER:   I object, your Honor.   There is only one

7   reservoir that could be involved.

8   THE WITNESS:   We studied many reservoirs.

9   BY MR. MOSKOVITZ:

10   Q   And in calculating what would be the safe annual

11   yield from these reservoirs you took into account present

12   uses.   Is that correct?

13   A   That is correct.   As I testified, we determined the

14   gross yield of a proposed reservoir for size, and so on, and

15   location, and then deducted the present uses below to get

16   the new yield of water over and above the present use.

17   Q   And the fact is that ultimate use which you also cal-

18   culated would have no reasonable relation to the yield of

19   a reservoir?

20   A   No, that is right.

21   Q   And can you explain why ultimate use would have no

22   relationship?

23   A   Because in this particular case the ultimate require-

24   ment, it is because of the excessive amount of land available

25   compared to the amount of water has no relationship.   Those

b-61

1   ultimate uses or requirements could be met and usually have

2   to be met in an area such as this by imported water, sewage

3   reclamation, and as much development as can be obtained from

4   the stream.  But the figure itself has no relation because of

5   the fact that there is a great deal more ultimate requirement--

6   I believe it was over 455,000 acre feet was the  water require-

7   ment for the entire basin, which is so much more than the

8   Santa Margarita River can produce there is no relationship.

9       Q  Now, Mr. Veeder asked you questions to what effect

10  would have been had upon the yield of the Fallbrook-Lipincott

11  reservoir, which you had computed at 5,100 acre feet annually,

12  if there had been increased use by virtue of increased devel-

13  opment in the De Luz watershed area?

14      A  Yes.

15      Q  Now, would the type of use have any effect upon the

16  difference which that use would make upon the yield of a

17  reservoir upstream?

18      A  The method of obtaining that water either by direct

19  surface diversion or by ground water would have an effect on

20  the answer to what the final effect would have on the Fall-

21  brook-Lipincott site, because as far as surface water for

22  riparian use it has all practically been put to use many, many

23  years ago.  There is a very minor amount of water that further

24  development can take place by riparian diversions of surface

25  water.

b-62

#4

Q  Let us assume that there was the maximum possible development of all of the lands within the De Luz site by use of surface--De Luz watershed by surface flow of the De Luz Creek.  Would that have any material effect on the yield of the reservoir at Fallbrook-Lipincott site?

A  By direct diversion?

Q  Yes.

A  No, it would have very little, because during the summer months when you need it for irrigation there is no water available.  It is a dry stream in most years, except in abnormal wet years there is some intermittant flow, but it isn't a safe supply, and without storage you cannot increase the yield.

Q  Assume that the increased use, maximum increased use were made in the De Luz watershed by virtue of pumping from the underground--

MR. VEEDER:  I object to the underground, there is absolutely no foundation for the inquiry to show that there is ground water available in the De Luz area.

THE COURT:  Overruled.

Let's assume for argument that there is.

BY MR. MOSKOVITZ:

Q  Assuming that that would be the case, would it affect-- Would there be any effect upon the yield of the reservoir at the Fallbrook-Lipincott site under your studies?

b-63

1      A   If ground water were developed in the De Luz valley

2   and thereby decreasing the flow into the Pendleton basin,

3   Camp Pendleton basin below, and if the Fallbrook-Lipincott

4   Dam--a proposed dam--had to make releases to make up that

5   decrease in supply to the Camp Pendleton basin, then there

6   would be an indirect effect on that.

7      Q   From your studies did you determine whether there

8   was ground water developable in the De Luz watershed?

9      THE COURT:   Are you using ground water in the term that

10   it is used in the Civil Code?

11      MR. MOSKOVITZ:   I am using it as being water which is

12   capable of being pumped from underneath the ground that is

13   not available by surface distribution.

14      THE COURT:   Whether it comes from a stream or basin?

15      MR. MOSKOVITZ:   That is right.

16      THE WITNESS:   We computed all of the storage in the

17   recent alluvium on the coastal plain, and I am looking at our

18   geological map to see how far that goes--

19      MR. VEEDER:   I am objecting, because it has not been

20   offered in evidence.   He cannot refresh his memory from this.

21   There is no foundation for his using these notes, or whatever

22   he is using.

23      THE COURT:   Overruled.

24      You were having him refresh his memory from the same

25   book, or permitted him to.

b-64

1   THE WITNESS:  Yes, we showed that we mapped recently

2   alluvium in a rather narrow strip along the De Luz Creek.

3   BY MR. MOSKOVITZ:

4       Q  So there would be possible ground water that could

5   be developed in De Luz Creek area?

6       A  Yes.  I would venture to say it would be rather

7   limited, because it is a narrow valley.

8       Q  Would you then say whether the effect of the develop-

9   ment of the ground water which is available in the De Luz

10  Creek watershed upon the  yield of a watershed at Fallbrook-

11  Lipincott would be material?

12      A  No, it would be very minor.

13      Q  Now, assume that there were a reservoir site on De

14  Luz Creek which were capable of storing the flood flows of

15  De Luz Creek for use in the De Luz Creek watershed, and to

16  the maximum extent possible the flood flows available were

17  so stored and used in the De Luz Creek watershed, would the

18  effect of that upon the yield of the Fallbrook-Lipincott

19  site be greater or less than if the ground water were devel-

20  oped?

21      MR. VEEDER:  I object, your Honor.  There is absolutely

22  no foundation for this question.  There is no foundation to

23  show that a dam could or would ever be built on De Luz Creek.

24      The question is imcompetent, irrelevant and immaterial,

25  and doesn't tend to prove any issue in this case yet.

b-65

1    THE COURT:  I don't know yet.  Overruled.

2    Maybe it is immaterial, and maybe not.  You may answer

3    it.

4    THE WITNESS:  We did study a reservoir on upper De Luz

5    Creek--it is reported on Bulletin 57--two miles north of

6    the confluence..  We studied a 50,000 acre foot reservoir,

7    and we analyzed and found out that we would be able to secure

8    a 6,000 acre foot yield.

9    MR. VEEDER:  Annually?

10   THE WITNESS:  Wait a minute.  No, this is another reser-

11   voir.  This is the upper De Luz.

12   We did--  Let me say, without referring to the report,

13   that we did study a reservoir on this creek--

14   MR. VEEDER:  Just a moment.  I am going to move that

15   his answer be stricken.

16   THE COURT:  It is confusing.  It may go out.

17   THE WITNESS:  We made a study of a reservoir on De Luz

18   Creek itself, and I can't remember the figures of the yield

19   offhand, it is in the report.

20   In answer to your question of whether it would have by

21   surface storage more effect on the ground water basin and

22   less on the Fallbrook-Lipincott site--

23   MR. MOSKOVITZ:  No.

24   Q  Would it have more effect than ground water develop-

25   ment upon the yield of a reservoir at the Fallbrook-Lipincott

b-66

1     site?

2          A   Would it have more?

3          Q   Would it have more effect upon the yield of Fallbrook-

4     Lipincott than upon ground water?

5          A   Yes.

6          Q   Would you explain that?

7          A   You can secure more regulatory storage than in the

8     ground water basin.

9          Q   And that is because the flows come in the wintertime?

10         A   Yes, that is right.  With the flows coming in the

11    wintertime you can store them and get a larger storage on

12    De Luz Creek than you would from the ground water basin.

13         Q   So would you say that the effect of development in

14    the De Luz watershed area upon the yield of a reservoir at

15    the Fallbrook-Lipincott site would depend upon the kind of

16    development you had, that is, how you got the water, whether

17    you used the natural surface flow, or the ground water, or

18    whether you stored flood waters in a surface state?

19         A   Yes.

20         Q   Now, Mr. Veeder asked you to--asked you some questions

21    concerning the amount of water which in your calculations of

22    safe yield of the Fallbrook-Lipincott site you assumed would

23    be released through the dam below to Camp Pendleton?

24         A   Yes.

25         Q   Now, in your studies did you assume a certain figure

b-67

1   for release to Camp Pendleton?

2       A  Yes, we did.

3       Q  Did you assume a different figure for release to other

4   areas below the Fallbrook-Lipincott site, or was there one

5   figure?

6       A  Well, I testified that the figure we used included

7   the amount for the Ammunition Depot, Camp Pendleton, and for

8   the Fallbrook Public Utility District diversion.

9       Q  So there is not one figure for Camp Pendleton and

10  the associated military areas, it was a combined figure for

11  all of the downstream uses?

12      A  Yes.  We have it broken down, if you so desire.

13      Q  Now, Mr. Veeder asked some questions concerning the

14  burden on the stream from reservoirs in different areas.  Would

15  you explain what you mean when you use or refer to the ex-

16  pression burden on the stream?

17      A  What I had in mind, by building a reservoir upstream

18  the burden would be the amount of water that would be re-

19  quired to maintain the water supply for the area downstream,

20  that is if it was a ground water reservoir and there was a

21  certain use--present use on that ground water reservoir the

22  burden would be what you would have to release from an up-

23  stream reservoir to maintain the water supply for what is

24  being developed or has been developed on the downstream basin.

25  If it is a direct diversion the burden would be whatever the

b-68

1    direct diversion amounts might be.

2         However, when you come to asking--  I think I was

3    asked a question about future burden, in the future, under

4    future development, what the burden might be.  This is another

5    question, because it depends on how that water is provided;

6    it might be imported water, sewage reclamation, or some other

7    manner.

8         Q  Well, speaking of the term or expression burden on

9    the stream, what you have in mind is the needs below the

10   particular reservoir which have to be met.  Is that correct?

11        A  That is correct.  We don't usually use the term

12   burden in engineering work.

13        Q  And when you answered Mr. Veeder's questions you had

14   in mind supplying the uses which had been developed below

15   the reservoir site.  Is that right?

16        A  That is right.

17        Q  Now, does the supplying of the needs below a reser-

18   voir site depend upon the size of the reservoir you plan to

19   build?

20        A  An upstream reservoir?

21        Q  Supposing you were building a reservoir at the Fall-

22   brook-Lipincott site and you had in mind two, one 35,000 and

23   one 165,000 foot reservoirs, would the burden on the stream

24   be any different?

25        A  For present developement, no.

Q   The burden on the stream would be the same?

A   Yes, if the storage was on the main channel.

Q   You would have to release the same amount of water to satisfy those downstream?

A   That is right.

Q   So the size of the reservoir doesn't make any difference?

A   That is right.

Q   Now, you were asked to compare the burden on the stream between two reservoirs, one on Sandia Creek and one on Rainbow Creek on one hand, their combined burden on the stream, and the Fallbrook-Lipincott Dam of 35,000 acre feet on the other hand.  Is that correct?

A   That is right.

Q   And you said the burden on the stream of the Fall-brook-Lipincott Dam would be greater than the combined burden of the other two reservoirs.  Is that correct?

A   It would, yes, that is correct.

Q   Now, would you explain why the burden on the stream from the Fallbrook-Lipincott Dam would be greater than the other two?

A   There would be a greater safe yield developed out of the stream to carry over a drought period.  And during the drought period when the downstream development depends on a supply from the  upstream watershed it would thereby be de-

b-70

1    prived of the water unless releases were made.

2        Q   Well, you defined burden on the stream as the re-

3    leases or the needs of the stream below the dam, didn't you?

4        A   Yes.   I guess I was in error then, because it is

5    only if the releases are the same would it be the same with

6    any size reservoir.

7        Q   So no matter what the size of the reservoir, because

8    the burden on the stream is to satisfy the downstream uses,

9    and they remain the same no matter where you build the reser-

10   voir?

11       A   Yes.   In thinking of burden, and not being used to

12   it, I thought of the full burden keeping up the ground basin

13   during drought period and meeting water needs.   The burden

14   would be during drought smaller unless you made the same

15   amount of releases.

16       Q   If you made the--   If you make releases sufficient

17   to satisfy the downstream needs from any reservoirs you may

18   build, which is the assumption you made in each one of your

19   studies, then the burden on the stream is the same by defini-

20   tion?

21       A   That is right.

22   MR. VEEDER:   By definition.   Is that what you said?

23   THE WITNESS:   Yes, by definition, that the burden was

24   meeting the water uses in the downstream area.

25   MR. VEEDER:   I just wanted to be sure.

b-71

BY MR. MOSKOVITZ:

Q   Now, the yield of the two reservoirs combined, one on Rainbow and one on Sandia Creek--

MR. VEEDER:   I think there were three.

MR. MOSKOVITZ:   I just see two circled.

MR. VEEDER:   I also said there was a 10,000 acre foot structure on the main stem of the Santa Margarita River.

MR. MOSKOVITZ:   Let me ask my question.

Q   The yield from two reservoirs, one on Sandia and one on Rainbow Creek, safe annual yield as you have calculated them, would be less than safe annual yield of the one Fallbrook-Lipincott reservoir on the Santa Margarita River.   Is that correct?

A   We didn't calculate that in connection with this investigation, but I ventured an opinion merely that it would be best.

MR. VEEDER:   I don't believe I asked about net safe yield, but I will let him go ahead, on those two reservoirs.

BY MR. MOSKOVITZ:

Q   Mr. Veeder asked you a question in which he asked you to assume that 12,500 acre feet of water was annually used by the Marines at Camp Pendleton.   You recall that question?

A   Yes.

Q   Now, from your investigation and studies, without additional storage on the surface, would a total of 12,500

b-72

1   acre feet of water be annually     available to the Marines

2   at Camp Pendleton?

3       A   No.

4       Q   And why would there not be that much water available?

5       A   Because the runoff records show that the flows de-

6   crease during the drought periods that are available for sur-

7   face diversion to the point where you could not have an average

8   annual amount, or a minimum amount of 12,000 acre feet.

9       THE COURT:   Are you taking into account the basins under

10  Pendleton?

11      THE WITNESS:   No, your Honor.   I thought he asked me

12  for surface diversion.

13      THE COURT:   He didn't ask you that, as I understand.   He

14  just asked you a broad shotgun question, which means you would

15  have to take into account the natural basins, natural flow.

16      MR. MOSKOVITZ:   My question was the building of additional--

17      THE COURT:   Start over again.

18      MR. MOSKOVITZ:   I will leave it.

19      Q   Would there be 12,500 acre feet annually available

20  to the Marines at Camp Pendleton by utilizing the natural

21  amount available without building additional surface storage?

22      A   If they pumped down their ground water basin, yes.

23      Q   Now, could their ground water basin be pumped down and

24  maintained--   I will rephrase that question.

25      Did you calculate what the safe annual yield of the

b-73

1    ground water basin at Camp Pendleton would be?

2         A   Yes, I did.

3         Q   And what was that ground water basin yield?

4         A   I will have to refresh my memory.  We did it in

5    two ways, one in which one would not go below sea level, in

6    which salt water would intrude, of 24,000 acre feet of stor-

7    age.  We developed some 11,200 acre feet of safe yield.

8         Then if there were some sort of a barrier at Isadore

9    Narrows so that you can lower the basin lower than that you

10   can develope more than that, you can develop your 12,000,

11   if you so desire.

12        Q   Did you calculate the magnitude of effect on the safe

13   yield of the Fallbrook-Lipincott reservoir of 35,000 acre

14   feet, how much effect there would be from the development of

15   the ground water in the Camp Pendleton area?

16        MR. VEEDER:   Object to that question, it is unintelli-

17   gible.

18        THE COURT:   Sustained.

19   BY MR. MOSKOVITZ:

20        Q   You calculated in your studies that there would be

21   5,100 acre feet annually from the Fallbrook-Lipincott from

22   present uses?

23        A   Yes, sir.

24        Q   Now, assuming that the uses at Camp Pendleton were in-

25   creased to the maximum extent which would be possible in

b-74

1    developing the ground water basin at Camp Pendleton, how much

2    would the yield of the Fallbrook-Lipincott site be?

3         MR. VEEDER:  I fell off the slide again.

4         THE COURT:  What does that mean to me, maximum uses at

5    Pendleton?  If you gentlemen think you are going to try this

6    lawsuit--this goes for you and Mr. Veeder--on this type of

7    testimony, the Master and I have different ideas about it.

8    If you want to bring studies and ask definite questions where

9    you have definite cornerstones to lay a question on that is

10   one thing, but these questions aren't helping anybody.

11        MR. MOSKOVITZ:  Your Honor, I thought I was being help-

12   ful.  If I am not, I am very sorry.  My questions were to

13   clarify what I thought were some questions--

14        THE COURT: Your question was wide open, maximum uses of

15   Pendleton.  What do you mean by that?  I don't know.  Are you

16   talking about the 12,000?  What are you talking about, 165,000?

17        MR. MOSKOVITZ:  Well, your Honor, I had in mind the

18   12,500 acre feet that had been assumed in Mr. Veeder's ques-

19   tion.

20        THE COURT:  That was never given as a maximum figure,

21   that was given as a present use figure, if there is any

22   probative value to it.

23        MR. MOSKOVITZ:  Well, the 12,500 acre figure, as I re-

24   call it, was given as the needs of Camp Pendleton?

25        MR. VEEDER:  23,000 is what we used.

1    THE COURT:  If you are taking the government's con-

2    tentions you are not right.

3    MR. MOSKOVITZ:  I must have written it down wrong in

4    my notes, I had 12,500 acre feet.

5    THE COURT:  That was the figure the witness gave as

6    present uses at Camp Pendleton.  Right?

7    THE WITNESS:  No.

8    MR. SACHSE:  12,500 acre feet was what the witness said

9    the yield of a basin with a barrier would be.

10   MR. VEEDER:  I asked him the question, your Honor, I

11   said assuming the present uses at Pendleton are 12,500.  But

12   the maximum I also inquired about was 23,000, which is the

13   maximum.

14   MR. MOSKOVITZ:  Well, the question I wanted to have the

15   witness answer was whether he had calculated the effect on

16   the yield of this Fallbrook-Lipincott reservoir of developing

17   the ground water to the extent of being able to use 12,500

18   acre feet annually at Camp Pendleton.

19   THE WITNESS:  No, I haven't.

20   MR. MOSKOVITZ:  That is all.

21

22                    CROSS-EXAMINATION

23   BY MR. SACHSE:

24   Q  Mr. Bookman, in connection with your studies, Bulle-

25   tin 57, did you calculate precipitation in the watershed?

b-76

1     A   Yes, we did.

2     Q   During what months of the year--  Withdraw that.

3         What percentage of the precipitation on the average

4     occurs in the months of November through April?

5     A   Well, I have to look that up again.  November

6     through April?

7     Q   Or October through May, if you prefer.  The water

8     year.

9     A   Yes, the precipitation.  Again I will have to look

10    it up.  I would say the majority of it occurs, of course,

11    during the winter season, and very little of it occurs

12    during the summer.  I can't say the exact percentage.  From

13    October through--

14    Q   What are you looking at?

15    A   Page 43.  October through what?

16    Q   Let's say October through April.

17    A   October through April.

18    Q   Pardon me.  November through April, inclusive, that

19    is the months on the permit.  November to April, inclusive,

20    what percentage of the rainfall occurs?

21    A   Ninety per cent.  90.1 per cent.

22    Q   Now, can you give me--and to speed this up, if you

23    want, I will suggest that you look at page 49--can you give

24    me the percentage of the runoff of the watershed that occurs

25    during the months of November to April, inclusive?

1     MR. VEEDER:   For what period?

2     MR. SACHSE:   Historical, what the average of the runoff

3 is.

4     MR. VEEDER:   I object to that.   This man said he didn't

5 make his calculations from 1952 on down, so how can he talk

6 historically?

7     MR. SACHSE:   As I understood the preliminary testimony,

8 your Honor, he said he used United States Geological Surveys.

9     THE COURT:   He said he took the period 1895 to 1952.

10    MR. SACHSE:   I think that is good for an average.

11    MR. VEEDER:   That is not meeting my objection, historical.

12    THE COURT:   Overruled.

13    MR. VEEDER:   If he will tell it down to date--

14    MR. SACHSE:   Historically for the period covered in

15 Bulletin 57.

16    Q   What years again are covered?

17    A   1925--   The figure I am going to give and the per

18 cent of the months is for the period 1925-'26 through 1952-

19 '53.

20    MR. VEEDER:   Then that is not the historical period.

21    MR. SACHSE:   I will modify my question.

22    Q   What percentage of the annual runoff occurred in

23 the months of November-April, inclusive?

24    A   At the Santa Margarita River near Fallbrook the

25 recorded average was 81.2 per cent.

b-78

1    Q  Now, it would be possible, would it not, Mr. Bookman, from some of your appendices, that are contained in Volume

2

3    2 of the Bulletin to make similar calculations covering a

4    longer period of time?

5    A  Yes.

6    Q  Well, may I ask then that when you return with the

7    figures that Mr. Veeder requested of you you bring us the

8    longest range you can get for an average annual monthly--for

9    that period of months, November through April.

10    A  Runoff?

11    Q  Runoff, and the rainfall.

12    Now, Mr. Bookman, that runoff that occurs during those

13    months is not equally divided every day during the six months

14    period, is it?

15    A  No.

16    Q  In fact, it is again very much concentrated during

17    and immediately after heavy rains.  Is that not correct?

18    A  That is right.

19    Q  Did your studies include any calculation of the

20    average or main runoff into the Pacific Ocean from the water-

21    shed?

22    A  We assumed that the runoff at the Isadore Gage--

23    Q  And for what periods can you give us the figures at the

24    Isadore Gage?

25    A  I have a note of that.  They are tabulated in Volume 2

b-79

1   under runoff.  The gauged runoff at Isadore starts 1923-'24

2   up to date.  What we used was from 1923-'24 to 1952-'53.

3       MR. VEEDER:  That is not up to date?

4       THE WITNESS:  This table is up to '53, it is not up to

5   date.

6   BY MR. SACHSE:

7       Q  Now, do you also have, or do you also use in your

8   Bulletin 57 calculations, what you have called a calculated

9   runoff?

10       A  Yes.

11       Q  How did you calculate that or estimate that?

12       A  Depending upon the point to which we were calculating,

13   we used the gauged runoff as far back as we could, and corrected

14   it for the consumptive use; that is, putting back whatever

15   consumption or diversions were made either by Fallbrook or

16   by the old Santa Margarita Ranch or by Vail Company.  Prior

17   to the time of the record we developed the natural runoff by

18   comparison with adjacent streams, Cuyamaca and Sweetwater

19   Rivers, which have a long historical record, and thereby

20   developed the runoff, going back to 1894-'95.

21       MR. VEEDER:  There is no showing that these are com-

22   parable areas, there is no basis for this phase of testimony.

23       THE COURT:  Sustained.

24       We are just wasting time here.

25

BY MR. SACHSE:

Q   With reference to your gauged runoffs, do you find gauged runoffs at Isadore, which I believe you testified as waste into the ocean, during the period 1923 through 1953 in excess of a 100,000 acre feet a year?

A   Yes.  I find that the 1937-'38 there was 122,000 acre feet of water passed Isadore Gage.

THE COURT:  Are you asking him for an average?

MR. SACHSE:  I am going to in a moment, your Honor.  But I am attempting to show the erratic character of the runoff.

THE COURT:  Aren't these matters going to be presented in some logical manner, showing participation runoff of tributaries?  Why spend an afternoon?  The man was brought here, we can't finish with him today.

MR. SACHSE:  I will offer in evidence at this time the Santa Margarita River investigation, Bulletin 57, this being an official publication of the State of California, Department of Public Works, Department of Water Resources, published June, 1956, by authorization of the State of California.

THE COURT:  I will reserve to you the right to make objections.

MR. SACHSE:  May we use it?  If these figures are not available, your Honor, I am going to have to introduce it year by year.

THE COURT:  Mr. Veeder said he wanted to be heard at

some length on this.  We are going to adjourn at 4:15.  The

witness can't be here Monday.  We are just not going to waste

time with it now.

MR. VEEDER:  I withhold my redirect, if the witness be-

ing excused is subject to my recall for redirect and subject

to my recall for direct.  I can put on another witness--

MR. SACHSE:  I am not finished.  Is Mr. Veeder asking

for a courtesy?  Does he want to put a witness on?  I am not

through.  If you want a favor.

MR. VEEDER:  I just thought we might get something

helpful done.

BY MR. SACHSE:

Q  Mr. Bookman, as a result of your studies, what has

been the average annual waste into the Pacific Ocean for the

period ending 1953?

MR. VEEDER:  I will object to the question, calling for

a legal conclusion--

MR. SACHSE:  I will withdraw the word waste.

Q  What has been the average annual runoff past the

Isadore Gage for the period ending with the water year 1953?

A  As of 1953 it was on the order of 25,000 acre feet

a year on the average.

Q  Have you had the opportunity of seeing current United

States Geological Survey figures for the months of April--of

January through April of this year?

b-82

1    MR. VEEDER:  I object.

2    MR. SACHSE:  I just asked if he had seen them.

3    Q  Have you seen them?

4    A  No, I haven't.

5    MR. VEEDER:  Sometimes I get up too soon.

6    THE COURT:  Now, one question that I want to ask to

7    clarify this 5,100 acre feet safe yield figure.

8    Is it not correct that in arriving at that figure for

9    the Fallbrook-Lipincott reservoir you have first taken out

10   not only the present Navy uses as you found them, but also

11   the present Fallbrook use as you found it?

12   THE WITNESS:  Yes, we have.

13   THE COURT:  In other words, the 5,100 acre feet safe

14   yield is what we might call new water that would be provided

15   by that reservoir.  Is that correct?

16   THE WITNESS:  That is correct.

17   MR. SACHSE: Have you made any calculations as to what

18   percentage of the present irrigation use of water for the

19   Santa Margarita River occurs during the two periods, Novem-

20   ber-April, and May-October?

21   MR. VEEDER:  I will object to that, there is no founda-

22   tion.  This witness said he made his study in 1952.

23   MR. SACHSE:  I will again state for the period ending--

24   MR. VEEDER:  Ending when?

25   MR. SACHSE:  --1953, the water year 1953--

b-83

1    MR. VEEDER:  I object as incompetent, irrelevant and

2    immaterial, and not tending to prove a single issue in this

3    case.

4    He has said he has made no studies at all about future

5    potentials, and certainly we are not trying the case in 1953.

6    THE COURT:  I am going to stop this right now.  I will

7    stop this without prejudice to you gentlemen to examine

8    this man later.  He will be ordered to come back; it may be

9    during the main trial of the case in my Court.  But when he

10    comes back I am going to expect counsel to make some orderly

11    showing of the matters they want to go into.  That is without

12    prejudice to further cross, direct, and anything else.

13    MR. VEEDER:  Redirect?

14    THE COURT:  Redirect, yes.

15    You have a situation where Mr. Veeder said he wanted

16    to make objections to an exhibit and would take some time to

17    do it.  And most of the time he has no direct memory on it,

18    so most of the time you have had him testify from the exhibit.

19    MR. SACHSE:  May I do this, strictly to the identifica-

20    tion of the exhibit, in case our record is not adequate at

21    the moment--

22    THE COURT:  It can be done later.

23    MR. SACHSE:  I had the impression that you were consider-

24    ing ruling on the exhibit prior to Mr. Bookman's return.

25    THE COURT:  No.

b-84

1       Mr. Bookman, you can take your seat over here.  We

2   will expect you back.  We will give you some notice that

3   meets with your approval and ours.

4       MR. VEEDER:  I would like to call--  I think we have

5   a witness we can get on and off in 10 or 15 minutes, your

6   Honor.

7       I will withhold him.

8       THE COURT:  He will be here first thing Monday morning,

9   won't he?

10      MR. VEEDER:  Yes, sir.

11      THE COURT:  Well, it is 4:09 now.

12      MR. VEEDER:  It suits me very well to wait until Monday.

13      THE COURT:  All right.  The Master's hearing is continued

14  to Monday morning at 9:30 in this courtroom.  I don't expect

15  to be here that morning, I have a calendar in Los Angeles,

16  but the Master is armed with authority to conduct these

17  hearings, and I trust he exercises it.

18

19

20

21

22

23

24

25